UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x

UNITED STATES OF AMERICA                        :

   -v.-                                                      :           20 Cr. 330 (AJN)

GHISLAINE MAXWELL,                              :

                    Defendant.            :

--------------------------------------------------------------x


### THE GOVERNMENT'S REPLY MEMORANDUM
### IN SUPPORT OF DETENTION


AUDREY STRAUSS
Acting United States Attorney
Southern District of New York
Attorney for the United States of America


Alison Moe
Alex Rossmiller
Maurene Comey
Assistant United States Attorneys
- Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

UNITED STATES OF AMERICA                    :

   -v.-                                                      :          20 Cr. 330 (AJN)

GHISLAINE MAXWELL,                          :

                  Defendant.             :

-------------------------------------------------------------x

## THE GOVERNMENT'S REPLY MEMORANDUM
## IN FURTHER SUPPORT OF DETENTION

The Government respectfully submits this reply memorandum in further support of its motion for detention, dated July 2, 2020 (the "Detention Memorandum") (Dkt. 4), and in response to the defendant's memorandum in opposition (the "Opposition Memorandum") (Dkt. 18).

The charges against Ghislaine Maxwell arise from her essential role in sexual exploitation that caused deep and lasting harm to vulnerable victims. At the heart of this case are brave women who are victims of serious crimes that demand justice. The defendant's motion wholly fails to appreciate the driving force behind this case: the defendant's victims were sexually abused as minors as a direct result of Ghislaine Maxwell's actions, and they have carried the trauma from these events for their entire adult lives. They deserve to see her brought to justice at a trial.

There will be no trial for the victims if the defendant is afforded the opportunity to flee the jurisdiction, and there is every reason to think that is exactly what she will do if she is released. For the reasons detailed in the Detention Memorandum, and as further discussed below, the defendant poses a clear risk of flight, and no conditions of bail could reasonably assure her continued appearance in this case. Among other concerns: (1) she is a citizen of a country that does not extradite its own citizens; (2) she appears to have access to considerable wealth

1

domestically and abroad; (3) her finances are completely opaque, as her memorandum pointedly declines to provide the Court with information about her financial resources; and (4) she appears to be skilled at living in hiding.  These are glaring red flags, even before the Court considers the gravity of the charges in this case and the serious penalties the defendant faces if convicted at trial.

Instead of attempting to address the risks of releasing a defendant with apparent access to extraordinary financial resources, who has the ability to live beyond the reach of extradition in France, and who has already demonstrated a willingness and ability to live in hiding, the defendant instead proposes a bail package that amounts to little more than an unsecured bond.  Among other things, the proposed bail package contemplates the defendant pledging as the sole security a property that is beyond the territory and judicial reach of the United States, and which therefore is of no value as collateral.  She proposes six unidentified co-signers, an unknown number of whom even reside in the United States, and *none* of whose assets are identified.  The Court and the Government have no information whatsoever regarding whether these co-signers would be able to able to pay the proposed $5 million bond should the defendant flee – or if, of equal concern, the co-signers are themselves so wealthy that it would be no financial burden whatsoever to do so. The defendant does not identify what residence she proposes to live at in the Southern District of New York, nor does she identify any meaningful ties to the area.  And most importantly, the defendant's memorandum provides the Court with no information whatsoever about her own finances or her access to the wealth of others, declining to provide the Court the very information that would inform any decision about whether a bond is even meaningful to the defendant – and which the Government submits would reveal the defendant's financial means to flee and live comfortably abroad for the rest of her life.

Finally, the Government recognizes that the COVID-19 pandemic is – and should be – a relevant factor for the Court and the parties in this case.  However, the Bureau of Prisons ("BOP") is taking very significant steps to address that concern, and the defendant has offered no reason why she should be treated any differently from the many defendants who are currently detained at the Metropolitan Detention Center ("MDC") pending trial, including defendants who have medical conditions that place them at heightened risk.  Inmates at the MDC are able to assist in their own defense, especially long before trial, through established policies and procedures applicable to every pretrial detainee.  This defendant should not be granted the special treatment she requests.

The defendant faces a presumption of detention, she has significant assets and foreign ties, she has demonstrated her ability to evade detection, and the victims of the defendant's crimes seek her detention.  Because there is no set of conditions short of incarceration that can reasonably assure the defendant's appearance, the Government urges the Court to detain her.

## ARGUMENT

Each of the relevant factors to be considered as to flight risk – the nature and circumstances of the offense, the strength of the evidence, and the history and characteristics of the defendant – weigh strongly in favor of detention, and the defendant's proposed package would do absolutely nothing to mitigate those risks.

### I.    The Defendant's Victims Seek Detention

As the Court is aware, pursuant to the Crime Victims' Rights Act ("CVRA"), a crime victim has the right to be reasonably heard at certain public proceedings in the district court, including proceedings involving release.  18 U.S.C. § 3771(a)(4).  Consistent with that requirement, the Government has been in contact with victims and their counsel in connection with its application for detention.  Counsel for one victim has already conveyed to the Government that

their client opposes bail for the defendant, and has asked the Government to convey that view to the Court.  The Government also expects that one or more victims will exercise their right to be heard at the July 14, 2020 hearing in this matter, and will urge the Court not to grant bail.  More generally, as noted above, the Government is deeply concerned that if the defendant is bailed, the victims will be denied justice in this case.  That outcome is unacceptable to both the victims and the Government.

## II.    The Government's Case Is Strong

The defendant's motion argues, in a conclusory fashion, that the Government's case must be weak because the conduct charged occurred in the 1990s.  That argument, which ignores the many specific allegations in the Indictment, could not be more wrong.  As the superseding indictment (the "Indictment") makes plain, multiple victims have provided detailed, credible evidence of the defendant's criminal conduct.  And while that conduct did take place a number of years ago, it is unsurprising that the victims have been unable to forget the defendant's predatory conduct after all this time, as traumatic childhood experiences often leave indelible marks.  The recollections of the victims bear striking resemblances that corroborate each other and provide compelling proof of the defendant's active participation in a disturbing scheme to groom and sexually abuse minor girls.  In addition to compelling victim accounts, as the Government has explained, the victims' accounts are corroborated by documentary evidence and other witnesses.

In particular, the victims' accounts are supported by contemporaneous documents and records, such as flight records, diary entries, and business records.  The powerful testimony of these victims, who had strikingly similar experiences with Maxwell, together with documentary

evidence and witness testimony, will conclusively establish that the defendant groomed the victims for sexual abuse by Jeffrey Epstein.[1]

The defendant's motion alludes to defenses in this case, all of which are legal or procedural in nature, and none of which pass muster, let alone counsel in favor of bail. To begin with, the notion that the defendant is protected from prosecution by the Non-Prosecution Agreement ("NPA") between Jeffrey Epstein and the U.S. Attorney's Office in the Southern District of Florida ("SDFL") is absurd. That agreement affords her no protection in this District, for at least three reasons. First, the defendant was not a party to that agreement nor named in it as a third-party beneficiary, and the defendant offers no basis to think she would have standing to claim any rights under the NPA. Tellingly, the defendant cites no authority for the proposition that an agreement she was not a party to and that does not even identify her by name could possibly be invoked to bar her prosecution. Second, and equally important, the NPA does not bind the Southern District of New York, which was not a party to the agreement. *See United States v. Annabi,* 771 F.2d 670, 672 (2d Cir. 1985) (per curiam) ("A plea agreement binds only the office of the United States Attorney for the district in which the plea is entered unless it affirmatively appears that the agreement contemplates a broader restriction."); *United States v. Prisco*, 391 F. App'x 920, 921 (2d Cir. 2010). This rule applies even when the text of the agreement refers to the signing party as the "Government." *Annabi*, 771 F.2d at 672.

Third, and perhaps most important, even assuming the NPA could be read to protect this defendant and bind this Office, which are both legally unsound propositions, the Indictment

---

[1] Additionally, and beyond the strong evidence set forth in the Indictment, in just the past week, and in response to the charges against the defendant being made public, the Federal Bureau of Investigation ("FBI") and the U.S. Attorney's Office have been in touch with additional individuals who have expressed a willingness to provide information regarding the defendant. The Government is in the process of receiving and reviewing this additional evidence, which has the potential to make the Government's case even stronger.

charges conduct not covered by the NPA, which was limited by its terms to conduct spanning from 2001 to 2007, a time period that post-dates the conduct charged in the Indictment, and to violations of statutes not charged in this Indictment.  In this respect, the Government further notes that the Indictment brought in this District is entirely independent of the prior SDFL investigation, and two of the victims referenced in the Indictment were never approached or interviewed by the SDFL, and had never spoken to law enforcement until they met with our Office in 2019.

Nor is there any force to the defendant's assertion – without explanation, much less legal authority – that the charges in the Indictment are untimely.  As the Government explained in its opening brief, the charges in this case are timely, pursuant to 18 U.S.C. § 3283, which permits the prosecution of crimes involving the sexual abuse of minors at any time during the life of the victim. The defendant's claim that the Indictment is barred by the statute of limitations has no basis in law.  For similar reasons, the Court should not give any weight to the defendant's bare assertions that the indictment is somehow "legally flawed" in unspecified ways or that the perjury counts are "subject to dismissal" for unspecified reasons.  Opposition Memorandum at 19.  These conclusory claims are baseless.

### III. The Defendant Poses An Extreme Risk of Flight

As the Government detailed in its opening brief, the defendant's international ties, considerable financial resources, and transient lifestyle all make her a risk of flight.  That risk is further exacerbated by the fact that the defendant is a citizen of France, which does not extradite its citizens to the United States pursuant to French law.  In addition, and as detailed further below, the defendant has not only the motive to flee, but the means to do so swiftly and effectively.  The defendant appears to have access to extensive sources of wealth.  She does not have a job that would tie her to the United States, much less the Southern District of New York, and she does not

appear to depend on any job – or to have depended on any employment in the past 30 years – for the privileged lifestyle she has maintained for the entirety of that period.  The defendant clearly has the means to flee.

More troubling still, the defendant's conduct at the time of her arrest further underscores the risk of flight she poses.  When FBI agents arrived at the defendant's remote property in New Hampshire on the morning of July 2, 2020, they discovered the property was barred by a locked gate.  After breaching the gate, the agents observed an individual who was later determined to be a private security guard.  As the agents approached the front door to the main house, they announced themselves as FBI agents and directed the defendant to open the door.  Through a window, the agents saw the defendant ignore the direction to open the door and, instead, try to flee to another room in the house, quickly shutting a door behind her.  Agents were ultimately forced to breach the door in order to enter the house to arrest the defendant, who was found in an interior room in the house.  Moreover, as the agents conducted a security sweep of the house, they also noticed a cell phone wrapped in tin foil on top of a desk, a seemingly misguided effort to evade detection, not by the press or public, which of course would have no ability to trace her phone or intercept her communications, but by law enforcement.

Following the defendant's arrest, the FBI spoke with the security guard, who informed the agents that the defendant's brother had hired a security company staffed with former members of the British military to guard the defendant at the New Hampshire property, in rotations.  The defendant provided one of the guards with a credit card in the same name as the LLC that had purchased the New Hampshire property in cash.  The guard informed the FBI that the defendant had not left the property during his time working there, and that instead, the guard was sent to

make purchases for the property using the credit card.  As these facts make plain, there should be no question that the defendant is skilled at living in hiding.

The defendant asks the Court to ignore many of the obvious indicators of a flight risk by arguing that she has lived in hiding because of unwanted press attention.  This argument entirely misses the point.  First, the defendant's conduct is clearly relevant to the Court's assessment of her risk of flight, because it evidences her readiness and ability to live in hiding, and to do so indefinitely.  As such, even if her behavior in the last year could be attributed solely to her desire to avoid media attention, that should give the Court serious concerns about what steps she would be willing to take to avoid federal prison.  Second, the fact that the defendant took these measures to conceal herself after Epstein was indicted in this District – and after the Government announced that its investigation into Epstein's co-conspirators was ongoing – cannot be ignored.  To the contrary, these measures are at least equally consistent with the notion that the defendant also sought to evade detection by law enforcement.

In attempting to sidestep the evidence of her ability and willingness to hide, the defendant points to her decision to remain in the United States for the past year while the Government's investigation remained ongoing.  She claims that because she did not flee the country during an ongoing investigation, she will not do so while under indictment.  This argument ignores the world of difference between believing that an investigation is ongoing and being indicted in six counts by a federal grand jury.  The defendant now faces the reality of serious charges, supported by significant evidence, and the real prospect of spending many years in prison.  The return of the indictment fundamentally alters the defendant's incentives and heightens the incentive to flee far beyond the theoretical possibility of a charge during an investigation (one the defendant may have wrongly believed would or could not reach her).  That is especially so when the defendant has

spent the last two decades without facing consequences for her criminal actions. For years before her arrest in this case, the defendant likely believed she had gotten away with her crimes. That illusion has now been shattered, and she has a host of new reasons to use her considerable resources to flee.

Moreover, the defendant's willingness to brazenly lie under oath about her conduct, including some of the conduct charged in the Indictment, strongly suggests her true motive has been and remains to avoid being held accountable for her crimes, rather than to avoid the media. As alleged in the Indictment, in 2016, when the defendant was given the opportunity to address her conduct with minors in the context of a civil suit, she lied repeatedly. Those lies are, of course, the subject of two counts of perjury, and they evidence her willingness to flout the law in order to protect herself. The defendant's lies under oath should give the Court serious pause about trusting this defendant to comply with conditions of bail.

## IV.   The Defendant's Bail Proposal Offers No Security For Her Appearance

In its opening memorandum, the Government highlighted the defendant's extensive means to flee and her opaque finances. In her response, the defendant's brief provides zero information about her assets in the United States or abroad.   The Court should be troubled by this. First, so far as the Government is aware, the defendant has not filled out a financial affidavit, under penalty of perjury, in connection with her application for bail, meaning that the Court has no reliable insight into the magnitude or scope of the defendant's resources.[2] However, what the Court does have are strong indicia that the defendant has access to enormous resources, including the large property she was found on, the private security guard being retained to live with her on that

---

[2] The Government understands from Pretrial Services that the defendant has indicated that she has less than a million dollars in bank accounts. The report has not yet been released. As discussed below, the Court should have serious pause before accepting this unverified information.

property, and the multi-million dollar property in the United Kingdom being offered as collateral. Indeed, it is revealing that the defendant's memorandum declines to discuss her assets or the assets to which she plainly has access.  Without knowing the full scope of the defendant's financial resources, it would be impossible for the Court to even begin to evaluate whether conditions of bail would mitigate her risk of flight.  More importantly, the defendant cannot claim that she has met her significant burden to rebut the presumption of detention in this case when she has failed to provide comprehensive, verified financial information under penalty of perjury.

Although the Government submits that no conditions of bail could reasonably assure the defendant's continued appearance, the defendant's proposed bail package offers almost no security whatsoever.  The defendant appears to have significant assets, she has extensive foreign ties and is a citizen of a country that does not extradite its citizens to the United States, and she is charged with serious crimes involving the sexual exploitation of minors – and yet, she asks the Court to grant her bail secured only by a foreign property, which provides effectively no security at all.

Indeed, it is curious that a defendant who appears to have access to millions of dollars has not offered to post a single dime as collateral for the bond she proposes.  Instead, as noted, she offers as security a foreign property, which is effectively meaningless.  As a practical matter, the Government has no direct way to proceed against foreign property or sureties through bail forfeiture, because the Government cannot seize a foreign citizen's assets abroad or sell property in another nation based on a United States bail forfeiture judgment.  The Government would be required to attempt to litigate a property dispute in another country, with a lengthy process and an uncertain outcome.

Additionally, the defendant proffers no information about her proposed co-signers other than that they are friends and relatives – in particular, she provides no information about the assets

10

of those individuals, including where they are based or whether the Government would be able to collect from them.  Nor does she provide information sufficient to know whether her proposed co-signers are so wealthy that they would be willing to purchase the defendant's freedom for $5 million, an entirely too modest sum for a person of the defendant's means.  In any event, as further described below, the defendant appears to have the financial resources to make her co-signers whole if she were to flee.

The defendant's failure to pledge any liquid assets, or to provide detailed financial information about herself or her proposed co-signers, is particularly jarring because she appears to have access to millions of dollars, principally in foreign accounts.  In recent years, the defendant has been associated with multiple accounts with a Swiss bank (the "Swiss Bank") and multiple accounts with at least one bank headquartered in England (the "English Bank").  In 2018 and 2019, Form 114 ("FBAR") submissions on behalf of the defendant filed with the United States Treasury Department list accounts at the English Bank with maximum values totaling well over $2 million. In connection with the Swiss Bank, the defendant appears to be the grantor of a trust account (the "Trust Account") with a balance in June 2020 of more than $4 million.  Among other transactions, the defendant appears to have transferred approximately $500,000 in March 2019 from one Swiss Bank account in her name to the Trust Account, and records further reflect a transfer between those same accounts in June 2019 of more than $750,000.  The Trustees of the trust account, each of whom may act independently according to relevant Trust Account documents, appear to include both a relative and a close associate of the defendant.  Additionally, the defendant was arrested last week at a property in New Hampshire that was purchased for more than $1 million in cash in December 2019.  It is unknown whether the defendant purchased the property in cash, or whether she has a wealthy patron who did so on her behalf, but either scenario

should raise concerns about the defendant's access to financial resources that would enable her to flee.

Moreover, and as set forth in the Detention Memorandum, the defendant has been associated with more than a dozen bank accounts from 2016 to the present, and during that period, the maximum total balances of those accounts have exceeded $20 million.  Those accounts engaged in transfers in amounts of hundreds of thousands of dollars at a time, including as recently as 2019.  To the extent the defendant now refuses to account for her ownership of or access to vast wealth, it is not because it does not exist – it is because she is attempting to hide it.

The defendant's proposal of ankle-bracelet monitoring should also be of no comfort to the Court.  In particular, a GPS monitoring bracelet is of no persuasion because it is does nothing to prevent the defendant's flight *after it has been removed.*  At best, home confinement and electronic monitoring would reduce her head start should she decide to cut the bracelet and flee.  *See United States v. Banki*, 10 Cr. 008 (JFK), Dkt. 7 (S.D.N.Y. Jan. 21, 2010) (denying bail to a naturalized citizen who was native to Iran, who was single and childless and who faced a statutory maximum of 20 years' imprisonment, and noting that electronic monitoring is "hardly foolproof."), *aff'd*, 369 F. App'x 152 (2d Cir. 2010); *United States v. Zarger*, No. 00 Cr. 773, 2000 WL 1134364, at *1 (E.D.N.Y. Aug. 4, 2000) (rejecting defendant's application for bail in part because home detention with electronic monitoring "at best . . . limits a fleeing defendant's head start"); *United States v. Benatar*, No. 02 Cr. 099, 2002 WL 31410262, at *3 (E.D.N.Y. Oct. 10, 2002) (same).

The defendant has no children in the United States, she does not reside with any immediate family members, and while the Government does not dispute that she is close with several of her siblings, as her time in hiding makes clear, she is clearly capable of maintaining those relationships remotely, which of course she could continue to do from abroad.  Moreover, she has citizenship in

a country that does not extradite its citizens, has access to untold financial resources, and has every motivation to escape accountability for her appalling crimes. *See United States v. Boustani*, 356 F. Supp. 3d 246, 255 (E.D.N.Y. 2019) ("[T]he combination of Defendant's alleged deceptive actions, access to substantial financial resources, frequent international travel, complete lack of ties to the United States, and extensive ties to foreign countries without extradition demonstrates Defendant poses a serious risk of flight.") (citing *United States v. Zarrab*, No. 15 Cr. 867 (RMB), 2016 WL 3681423, at *8 (S.D.N.Y. June 16, 2016)). The defendant's proposed bail package is essentially nothing more than an unenforceable promise to return to Court. Given the gravity of the charged crimes, the defendant's substantial resources, her willingness to evade detection, and her lies under oath, the Court should take the proposed bail package for what it is worth: nothing.

## V.    The COVID-19 Pandemic Does Not Warrant The Defendant's Release

Finally, the current pandemic is not a reason to release this defendant. Indeed, courts in this district have regularly rejected applications for release based on assertions about the generalized risks of COVID-19. *See, e.g., United States v. Paulino*, No. 19 Cr. 54 (PGG), 2020 WL 1847914, at *6 (S.D.N.Y. Apr. 13, 2020) (Gardephe, J.) (denying bail application by defendant with hypertension, stating that "[a]s serious as it is, the outbreak of COVID-19 simply does not override the statutory detention provisions [of the Bail Reform Act]" (internal quotation omitted)); *United States v. Ortiz*, 19 Cr. 198 (KPF), 2020 WL 2539124, at *2 (S.D.N.Y. May 19, 2020) (quoting *United States v. Nunez*, No. 20 Cr. 239 (ER) (S.D.N.Y. Apr. 10, 2020) (Ramos, J.) ("[B]ecause there is a pandemic does not mean that the jailhouse doors ought to be thrown open")). Significantly, the defendant has not claimed that she is at a higher risk from COVID-19

than any other inmate at the MDC, and thus she cannot claim any greater need for bail than the many inmates awaiting trial there.[3]

The virus, of course, presents new and complex challenges for protecting inmates' health, but the BOP generally, and the MDC specifically, are prepared to handle the risks presented by COVID-19 and other health issues. The MDC's response to the pandemic was the subject of extensive evidentiary hearings in the context of a civil lawsuit in the Eastern District of New York. *See Chunn v. Edge*, No. 20 Cr. 1590, 2020 WL 3055669 (E.D.N.Y. June 9, 2020). In *Chunn*, the District Court conducted extensive fact gathering about the conditions at the MDC before concluding that "MDC officials have recognized COVID-19 as a serious threat and responded aggressively." *Id.* at *1; *see also id.* at 25 ("The MDC's response to COVID-19 has been aggressive and has included, among other steps, massively restricting movement within the facility, enhancing sanitation protocols, and creating quarantine and isolation units. And the data—though limited—suggests that these measures have been quite effective in containing COVID-19 thus far.").

Numerous judges in this District have rejected applications for release based on assertions about the hypothetical risks of COVID-19, including multiple cases involving defendants who, unlike this defendant, suffer from underlying health conditions. *See, e.g.*, *United States v. Hanes-Calugaru*, No. 19 Cr. 651, ECF No. 257 (S.D.N.Y. May 4, 2020) (Swain, J.) (denying pre-trial bail application by defendant who was on MDC's initial high-risk list but subsequently removed following new CDC guidance (*see* ECF Nos. 239, 242, 257)); *United States v. Curry*, 19 Cr. 742, ECF No. 37 (S.D.N.Y. Apr. 30, 2020) (Hellerstein, J.) (denying pre-trial bail application by

---

[3] The defendant also argues that the circumstances of the pandemic would pose a "significant hurdle" to the defendant's ability to flee. Opposition Memorandum at 16. The Government submits that the defendant has the means and resources to find her way out of the country, and a short quarantine period abroad would be a small price to pay to avoid years in prison.

defendant with asthma); *United States v. Medina*, 19 Cr. 351, ECF No. 68 (S.D.N.Y. Apr. 14, 2020) (Marrero, J.) (denying pre-trial bail application by defendant with diabetes and hypertension); *United States v. Bradley*, No. 19 Cr. 632, ECF No. 34 (S.D.N.Y. Apr. 14, 2020) (Daniels, J.) (denying pre-trial bail application by defendant with high blood pressure and obesity (*see* ECF Nos. 29, 33, 34)); *United States v. Vizcaino*, No. 20 Cr. 241, 2020 WL 1862631, at *3 (S.D.N.Y. Apr. 14, 2020) (Parker, J.) (denying pre-trial bail application and collecting cases in which bail applications have been denied even where defendants have underlying health conditions); *United States v. Irizzary*, 17 Cr. 283, 2020 WL 1705424 (S.D.N.Y. Apr. 8, 2020) (Preska, J.) (denying pre-trial bail application by defendant with asthma and anxiety); *United States v. Daniels*, 20 Cr. 69, ECF No. 26 (S.D.N.Y. Apr. 3, 2020) (Woods, J.) (denying pre-trial bail application (*see* ECF Nos. 19, 26)); *United States v. Parker*, 14 Cr. 139, ECF No. 51 (S.D.N.Y. Apr. 2, 2020) (Preska, J.) (denying pre-VOSR hearing bail application by inmate on MDC high-risk list with asthma (*see* ECF Nos. 48, 51)); *United States v. Conley*, No. 19 Cr. 131, ECF No. 366 (S.D.N.Y. Mar. 31, 2020) (Engelmayer, J.) (denying pre-trial bail application by defendant on high-risk list with asthma, partial lung removal, diabetes, high blood pressure, and hypertension (*see* ECF Nos. 363, 366)); *United States v. Chambers*, No. 20 Cr. 135, 2020 WL 1530746 (S.D.N.Y. Mar. 31, 2020) (Furman, J.) (denying pre-trial bail application by defendant with asthma); *United States v. Acosta*, No. 19 Cr. 848, ECF No. 14 (S.D.N.Y. Mar. 25, 2020) (Buchwald, J.) (denying bail application by defendant that relied on general reasons to release inmates because of the spread of the COVID-19 virus).  As the foregoing citations make clear, the defendants in many of these cases asserted underlying health conditions that purportedly placed them at heightened risk with respect to COVID-19, but courts nevertheless denied their

applications in view of the applicable factors under the Bail Reform Act.  This Court should reach the same conclusion based on the extraordinary risk of flight described in detail above.

The defendant's argument that bail is required for her to prepare her defense is equally unpersuasive.  Judges in this district have repeatedly held that the current restrictions on inmate access to counsel do not warrant releasing defendants who should otherwise be detained under the Bail Reform Act.  *See United States v. Tolentino*, 20 Cr. 007 (DLC), 2020 WL 1862670, at *2 (S.D.N.Y. Apr. 14, 2020); *United States v. Adamu*, 18 Cr. 601 (PGG), 2020 WL 1821717, at *6 (Apr. 10, 2020); *United States v. Brito*, 20 Cr. 63 (PGG), 2020 WL 2521458, at *5-6 (S.D.N.Y. May 17, 2020); *United States v. Ellison*, 18 Cr. 834 (PAE), 2020 WL 1989301, at *1-2 (S.D.N.Y. Apr. 27), *United States v. Melamed*, No. 19 Cr. 443 (LAK), 2020 WL 1644205, at *2 (S.D.N.Y. Apr. 2, 2020); *United States v. Pena*, No. 18 Cr. 640 (RA), 2020 WL 1674007, at *1 (S.D.N.Y. Apr. 6, 2020).  Just last week, a district judge in the Eastern District of New York denied bail to a defendant who argued that restricted access to his counsel at the MDC required his release, while noting the volume of decisions reaching the same conclusion.  *United States v. Shipp*, No. 19 Cr. 299 (NGG), 2020 WL 3642856, *3-4 (E.D.N.Y. July 6, 2020) (collecting cases).

This Court's decision in *Stephens* does not compel a different result here.  In that case, this Court concluded that bail was necessary in order to permit the defendant to prepare for a significant hearing, which was scheduled for *six days later*.  *United States v. Stephens*, No. 15 Cr. 95 (AJN), 2020 WL 1295155, at *3 (S.D.N.Y. Mar. 19, 2020) (finding that the limitations on the defendant's access to counsel "impacts the Defendant's ability to prepare his defenses to the alleged violation of supervised release in advance of the merits hearing scheduled for March 25, 2020.").  By contrast, no evidentiary hearings have been requested, much less scheduled, in this case, and a trial date has not yet been set.  *See United States v. Gonzalez*, No. 19 Cr. 906 (JMF), 2020 WL 1911209,

at *1 (S.D.N.Y. Apr. 20, 2020) ("Gonzalez fails to demonstrate that temporary release is 'necessary' for the preparation of his defense because, among other things, his trial is not scheduled for another five months."); *United States v. Eley*, No. 20 Cr. 78 (AT), 2020 WL 1689773, at *1 (S.D.N.Y. Apr. 7, 2020) ("Defendant's request for release is not compelled under the Sixth Amendment; with trial scheduled for nine months from now, this case is distinguishable from other instances in which an imminent evidentiary hearing may support a defendant's temporary release.").

In fact, the defendant's own motion makes clear that the MDC has been responsive to defense counsel's concerns and has ensured that they have access to their client. As their motion notes, the MDC provided defense counsel with access to their client within three hours of a request earlier this week, despite having zero notice and receiving the request after close of business in the evening. *See* Opposition Memorandum at 12. For non-emergencies, defense counsel can avail themselves of the scheduling system that has been instituted at the MDC to request regular calls with their client and will be able to coordinate with MDC legal counsel should an urgent need arise.

## CONCLUSION

As set forth above, the defendant is an extreme risk of flight. The Government respectfully submits that the defendant cannot meet her burden of overcoming the statutory presumption in favor of detention. There are no conditions of bail that would assure the defendant's presence in court proceedings in this case. Accordingly, any application for bail should be denied.

Dated: New York, New York
      July 13, 2020

                      Respectfully submitted,

                      AUDREY STRAUSS
                      Acting United States Attorney

By:                  _____
                      Alison Moe
                      Alex Rossmiller
                      Maurene Comey
                      Assistant United States Attorneys
                      (212) 637-2225