k7e2MaxC kjc

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,                    New York, N.Y.

4              v.                                20 Cr. 330 (AJN)

5   GHISLAINE MAXWELL,

6              Defendant.

7   ------------------------------x              Teleconference

8                                                Arraignment
                                                 Bail Hearing
9
                                                 July 14, 2020
10                                               3:05 p.m.

11

    Before:
12
                        HON. ALISON J. NATHAN,
13
                                                 District Judge
14

15                      APPEARANCES

16   AUDREY STRAUSS
          United States Attorney for the
17        Southern District of New York
     BY:  ALISON J. MOE
18        MAURENE R. COMEY
          ALEXANDER ROSSMILLER
19        Assistant United States Attorneys

20
     COHEN & GRESSER, LLP
21        Attorneys for Defendant
     BY:  MARK S. COHEN
22        CHRISTIAN R. EVERDELL

23
     HADDON MORGAN & FOREMAN, P.C.
24        Attorneys for Defendant
     BY:  JEFFREY S. PAGLIUCA
25        LAURA A. MENNINGER

k7e2MaxC kjc

```
 1              THE COURT:  Good afternoon, everyone.  This is
 2     Judge Nathan presiding.
 3              This is United States v. Ghislaine Maxwell, 20 Cr.
 4     330.
 5              I will take appearances from counsel, beginning with
 6     counsel for the defendant.
 7              MS. MOE:  Good afternoon, your Honor.  Mark Cohen,
 8     Cohen & Gresser, for Ms. Maxwell.  Also appearing with me today
 9     is my partner Chris Everdell of Cohen & Gresser and Jeff
10     Pagliuca and Laura Menninger of the Haddon Morgan firm.  Good
11     afternoon, your Honor.
12              THE COURT:  Good afternoon, Mr. Cohen.
13              And for the government.
14              MS. MOE:  Good afternoon, your Honor.  Alison Moe for
15     the government.  I'm joined by my colleagues Maurene Comey and
16     Alex Rossmiller.  And also, with the court's permission, we
17     learned that the executive staff for the U.S. Attorney's office
18     were unfortunately not able to Connecticut at the overflow
19     dial-in so, with the court's permission, we would like to dial
20     them in from a phone here if that's acceptable to the court.
21              THE COURT:  The last word, the overflow dial-in was
22     not full.  Just a moment and we will make sure that they can
23     connect in.
24              And let me say good afternoon, Ms. Maxwell, as well.
25              THE DEFENDANT:  Good afternoon, Judge.
```

k7e2MaxC kjc

1          THE COURT:  Ms. Maxwell, are you able to hear me and

2    see me okay?

3          THE DEFENDANT:  Yes, thank you.

4          THE COURT:  And are you able to hear Mr. Cohen and

5    counsel for the United States as well?

6          THE DEFENDANT:  Yes.  Thank you.

7          THE COURT:  All right.  If at any point you have

8    difficulty with any of the technology, you can let someone

9    there know right away, let me know, and we will pause the

10   proceedings before going any further.  Okay?

11         THE DEFENDANT:  Thank you, Judge.

12         THE COURT:  All right.

13         Just a minute while we check on the call-in line.

14         MS. MOE:  Thank you, your Honor.

15         (Pause)

16         MS. MOE:  Your Honor, apologies.  We have also heard

17   from colleagues in the office that the line is full.  We have,

18   however, been able to dial in the executive staff to a phone

19   number here and my understanding is that they can hear and

20   participate that way, if that's acceptable to the court.  But

21   of course we defer to the court's preference.

22         THE COURT:  We are concerned about feedback from being

23   on a speakerphone in that room.  The phone number for

24   nonspeaking co-counsel that was provided, that line is not

25   full, and I would assume the executive leadership of the office

k7e2MaxC kjc

1   falls within that category, so they may call in to that number.

2              MS. MOE:  Yes, your Honor.  Thank you.  We will do

3   that.

4              THE COURT:  All right.

5              MS. MOE:  Thank you, your Honor.

6              THE COURT:  All right.  Thank you.  Then we will go

7   ahead and proceed.

8              I have called the case.  I have taken appearances.

9   Counsel, let me please have oral confirmation that the court

10  reporter is on the line.

11             THE COURT REPORTER:  Good afternoon, your Honor.

12  Kristen Carannante.

13             THE COURT:  Good afternoon, and thank you so much.

14             We also have on the audio line Pretrial Services

15  Officer Leah Harmon and --

16             THE PRETRIAL SERVICES OFFICER:  Hello, your Honor.

17  Good afternoon.

18             THE COURT:  Good afternoon.  Thank you.

19             We are here today for the arraignment, the initial

20  scheduling conference, and bail hearing in this matter.

21             As everyone knows, we are in the middle of the

22  COVID-19 pandemic.  I am conducting this proceeding remotely,

23  pursuant to the authority provided by Section 15002 of the

24  CARES Act and the standing orders issued by our Chief Judge

25  pursuant to that act.

k7e2MaxC kjc

1          I am proceeding by videoconference, which I am

2     accessing remotely.  Defense counsel and counsel for the

3     government are appearing remotely via videoconference and the

4     defendant, Ms. Maxwell, is accessing this videoconference from

5     the MDC in Brooklyn.

6          Ms. Maxwell, I did confirm that you could hear me and

7     see me; and, again, if at any point you have any difficulty

8     with the technology, please let me know right away.  Okay?

9          THE DEFENDANT:  Thank you, your Honor.  I will do

10    that.

11         THE COURT:  Thank you.  And if at any point you would

12    like to speak privately with Mr. Cohen, let me know that right

13    away, and we will move you and your counsel into a private

14    breakout room where nobody else will be able to see or hear

15    your conversation, okay?

16         THE DEFENDANT:  Again, thank you, your Honor.  I

17    appreciate that.  Thank you.

18         THE COURT:  Thank you.

19         Mr. Cohen, likewise, should you request to speak with

20    Ms. Maxwell privately, don't hesitate to say that.

21         MR. COHEN:  Thank you, your Honor.

22         THE COURT:  We will turn now to the waiver of physical

23    presence.  I did receive a signed waiver of physical presence

24    form dated July 10, 2020.

25         Mr. Cohen, could you please is describe the process by

k7e2MaxC kjc

1    which you discussed with Ms. Maxwell her right to be present

2    and the indication of her knowing and voluntary waiver of that

3    right provided on this form.

4            MR. COHEN:  Yes, your Honor.  We, given the press of

5    time, we were not able to physically get the form to our

6    client, but my partner Chris Everdell and I went through it

7    with her, read it to her, and she gave us authorization to sign

8    on her behalf and that's reflected on the form in the boxes

9    where indicated, your Honor.

10           THE COURT:  Okay.  Ms. Maxwell, is that an accurate

11   account of what occurred?

12           THE DEFENDANT:  That is completely accurate, your

13   Honor.  Yes.

14           THE COURT:  And you have had the form read to you or

15   you have it physically now at this point?

16           THE DEFENDANT:  That is correct, your Honor.

17           THE COURT:  Okay.  And you have had time to discuss it

18   with your attorney?

19           THE DEFENDANT:  I have, your Honor.  Thank you.

20           THE COURT:  Okay.  And do you continue to wish to

21   waive your right to be physically present and instead to

22   proceed today by this videoconference proceeding?

23           THE DEFENDANT:  Yes, your Honor.

24           THE COURT:  All right.  I do find a knowing and

25   voluntary waiver of the right to be physically present for this

k7e2MaxC kjc

1    arraignment, scheduling conference, and bail hearing.

2             Counsel, as you know, to proceed remotely today, in

3    addition to the finding I have just made, I must also find that

4    today's proceeding cannot be further delayed without serious

5    harms to the interests of justice.

6             Ms. Moe, does the government wish to be heard on that?

7

8             MS. MOE:  Yes, your Honor.

9             The government submits that proceeding remotely in

10   this fashion would protect the interests of the parties and the

11   safety in view of the pandemic.  We further submit that this

12   proceeding can be conducted remotely with full participation of

13   the parties in view of the preparation and steps everyone has

14   taken to ensure proper participation.

15            THE COURT:  All right.  Thank you.

16            Mr. Cohen?

17            MR. COHEN:  Your Honor, we have agreed to proceed

18   remotely as your Honor just laid out.

19            THE COURT:  Okay.  I do find that today's proceeding

20   cannot be further delayed without serious harms to the

21   interests of justice for, among other reasons, that the

22   defendant, who is currently detained, seeks release on bail.

23            The final preliminary matter I will address is public

24   access to the proceeding, which has garnered significant public

25   interest.  As I have indicated in prior orders, the court has

k7e2MaxC kjc

1    arranged for a live video feed of this proceeding to be set up

2    in the jury assembly room at the courthouse.  This is the

3    largest room available and, with appropriate social distancing,

4    it can safely accommodate 60 people.  The court has further

5    provided a live video feed to the press room at the courthouse

6    where additional members of the credentialed in-house press

7    corps can watch and hear the proceeding.

8            Additionally, the court has provided a live audio feed

9    for members of the public.  My prior order indicated that the

10   line can accommodate 500 callers, but with thanks of the court

11   staff, that capacity has been increased to 1,000 callers.

12           Lastly, the court has provided through counsel a

13   separate call-in line to ensure audio access to nonspeaking

14   co-counsel, any alleged victims identified by the government,

15   including those who wish to be heard on the question of

16   pretrial detention, and any family members of the defendant.

17   That line is operational now as well.

18           Counsel, beginning with Mr. Cohen, any objection to

19   these arrangements regarding public access?

20           MR. COHEN:  No, your Honor.

21           THE COURT:  Ms. Moe?

22           MS. MOE:  No, your Honor.

23           THE COURT:  Then I will make the following findings:

24           First, COVID-19 constitutes a substantial, if not

25   overriding, reason that supports the court's approach to access

k7e2MaxC kjc

1    in this case.  As the chief judge of the district has

2    recognized in order number 20MC176, COVID-19 remains a national

3    emergency that restricts normal operations of the courts.

4    Conducting this proceeding in person is not safely feasible.

5          Second, the measures taken by the court are no broader

6    than necessary to address the challenges posed by the pandemic.

7    Although the number of seats in the jury assembly room is

8    limited to 60, it is necessary to do so for public and

9    courthouse staff safety and is closely equivalent to the number

10   of people who would be able to watch an in-court proceeding in

11   a regular-sized courtroom.  The number of people who will be

12   able to hear the live audio of this proceeding far exceeds

13   access under normal in-person circumstances.

14         Lastly, given the safety and technology limitations,

15   there are no reasonable alternatives to the measures the court

16   has taken.

17         Accordingly, the access provided is fully in accord

18   with the First and Sixth Amendment public trial rights.

19         With those preliminary matters out of the way,

20   counsel, I propose we turn to the arraignment.

21         Ms. Moe, am I correct that this is an arraignment on

22   the S1 superseding indictment?

23         MS. MOE:  That's correct, your Honor.

24         THE COURT:  Can you explain what the difference is

25   between the S1 and the original indictment?

k7e2MaxC kjc

1          MS. MOE:  Yes, your Honor.

2          The difference is a small ministerial correction, a

3     reference to a civil docket number contained in the perjury

4     counts, which are Counts Five and Six of the superseding

5     indictment.  Aside from the alteration of those docket numbers,

6     the reference to them, there are no other changes to the

7     indictment.

8          THE COURT:  All right.  Again, I will conduct the

9     arraignment on the S1 indictment.

10          Ms. Maxwell, have you seen a copy of the S1 indictment

11     in this matter?

12          THE DEFENDANT:  I saw the original indictment, your

13     Honor.  The original --

14          THE COURT:  Okay.

15          All right.  Mr. Cohen, did you have an opportunity to

16     discuss with Ms. Maxwell the ministerial change that was

17     completed by way of the superseding indictment?

18          MR. COHEN:  Yes, yes, Judge.  We have, your Honor.

19          THE COURT:  Any objection to proceeding on the

20     arraignment of the S1 indictment, Mr. Cohen?

21          MR. COHEN:  No, your Honor.

22          THE COURT:  All right.

23          Ms. Maxwell, have you had an opportunity to discuss

24     the indictment in this case with your attorney?

25          THE DEFENDANT:  I have, your Honor.

k7e2MaxC kjc

1            THE COURT:  All right.

2            (Indiscernible crosstalk)

3            THE COURT:  Go ahead.

4            THE DEFENDANT:  No.  I said I have been able to

5    discuss it, your Honor, with my attorney.

6            THE COURT:  Thank you.

7            You are entitled to have the indictment read to you

8    here in this open court proceeding or you can waive the public

9    reading.  Do you waive the public reading?

10            THE DEFENDANT:  I do, your Honor.  I do waive --

11            THE COURT:  How do you wish to --

12            THE DEFENDANT:  -- your Honor.

13            THE COURT:  Thank you.  And how do you wish to plead

14    to the charge?

15            THE DEFENDANT:  Not guilty, your Honor.

16            THE COURT:  All right.  I will enter a plea of not

17    guilty to the indictment in this matter.

18            Counsel, we will turn now to the scheduling

19    conference.

20            I would like to begin with a status update from the

21    government.  Ms. Moe, you should include in your update a

22    description of the status of discovery.  Please describe the

23    categories of evidence that will be produced in discovery.  I

24    will also ask you to indicate how you will ensure that the

25    government will fully and timely meet all of its constitutional

k7e2MaxC kjc

1    and federal law disclosure obligations.

2              Go ahead, Ms. Moe.

3              MS. MOE:  Thank you, your Honor.

4              With respect to the items that the government

5    anticipates will be included in discovery in this case, we

6    expect that those materials will include, among other items,

7    search warrant returns, copies of search warrants, subpoena

8    returns, including business records, photographs,

9    electronically stored information from searches conducted on

10   electronic devices.  In addition, the materials with respect to

11   the core of the case also include prior investigative files

12   from another investigation in the Southern District of Florida

13   among other items.

14             With respect to the status of discovery, the

15   government has begun preparing an initial production and are

16   prepared to produce a first batch of discovery as soon as a

17   protective order is entered by the court.

18             With respect to the status of the proposed protective

19   order, the government sent defense counsel a proposed

20   protective order last week.  We have touched base about the

21   status of that with defense counsel, and they conveyed that

22   they would like to continue reviewing and discussing it with

23   the government, which we plan to do shortly after this

24   conference, with an eye towards submitting a proposed

25   protective order to the court as soon as possible.  Following

k7e2MaxC kjc

1    the entry of that protective order, as I noted, your Honor, the

2    government is prepared to make a substantial production of

3    discovery.

4              Your Honor, in advance of the conference, the

5    government and defense counsel proposed a joint schedule for

6    discovery, motion practice, and a proposed trial date, in

7    particular, the date selected in that schedule with an eye

8    towards assuring that there was sufficient time for the

9    government to do a careful and exhaustive and thorough review

10   of all of the materials that I just referenced to make sure

11   that the government is complying with its discovery obligations

12   in this case, which we take very seriously.  We expect that the

13   bulk of the relevant materials will be produced in short order,

14   primarily by the end of this summer, with additional materials

15   to follow primarily in a category I mentioned before, your

16   Honor, of electronically stored information, which is subject

17   to an ongoing privilege review which we discussed and

18   communicated with defense counsel about.  We have proposed a

19   scheduling order again to be very thorough in our review of

20   discovery and in files in various places where they may be

21   located and we are taking an expansive and thoughtful approach

22   to our obligations in this case, your Honor.

23             THE COURT:  Let me just follow up specifically, since

24   you have referenced prior investigative files, to the extent we

25   have seen in other matters issues with complete disclosure of

k7e2MaxC kjc

1    materials, it has been in some instances due to precisely that

2    factor.  So has there been a plan developed to ensure that down

3    the road we are not hearing that there were delays or problems

4    with discovery as a result of the fact that part of the

5    disclosure obligation here includes materials from other

6    investigative files?

7              MS. MOE:  Yes, your Honor.

8              The files in particular that I am referring to are the

9    files in the possession of the F.B.I. in Florida in connection

10   with the previous investigation of Jeffrey Epstein.  The

11   physical files themselves were shipped to New York and are at

12   the New York F.B.I. office.  They have been imaged and scanned

13   and photographed to make sure that a comprehensive review can

14   be conducted, and they are physically in New York so that we

15   can have access to those files.  And again, as we have heard in

16   ongoing information, we are particularly thoughtful about those

17   concerns given the history of this case and the volume of

18   materials and the potential sensitivities, your Honor.

19             THE COURT:  Beyond the paper files which you have just

20   indicated, the physical files, have you charted a path for

21   determining whether there is any other additional information

22   that must be disclosed?

23             MS. MOE:  Your Honor, just to clarify, is your

24   question with respect to the previous investigation or -- I

25   apologize, your Honor.  I wasn't sure what you meant.

k7e2MaxC kjc

1          THE COURT:  Among other things, but, yes, I'm drilling

2     down specifically on that since that has been, in somewhat

3     comparable circumstances in other matters, the source of issues

4     related to timely disclosures.

5          MS. MOE:  Yes, your Honor.  Our team met personally

6     with the F.B.I. in Florida to make sure that we had the

7     materials, and it was represented to us that the materials that

8     the F.B.I. provided in Florida were the comprehensive set of

9     materials.  We will certainly have ongoing conversations to

10    make sure that that is the case and if, in our review of files,

11    we discover other materials, we will handle that with great

12    care, and we are particularly sensitive to that concern.

13         THE COURT:  And I expect here, and in all matters, not

14    just accepting of initial representations made regarding full

15    disclosure, but thoughtful and critical pushing and pressing of

16    questions and issues with respect to actively retrieving any

17    appropriate files.  Are we on the same page, Ms. Moe?

18         MS. MOE:  Yes, your Honor.  Very much so.

19         THE COURT:  All right.  Thank you.

20         With that, why don't you go ahead and lay out the

21    proposed schedule that you have discussed with Mr. Cohen, and

22    then I will hear from Mr. Cohen if he has any concerns with

23    that proposal.

24         MS. MOE:  Yes, your Honor.

25         We would propose the completion of discovery, to

k7e2MaxC kjc

1    include electronic materials, to be due by Monday, November 9

2    of this year, and following that we would propose the following

3    motion schedule: that defense motions be due by Monday,

4    December 21 of this year; that the government's response be due

5    on Friday, January 22, 2021; and that replies be due on Friday,

6    February 5, 2021.

7            THE COURT:  All right.  Mr. Cohen, based on the

8    government's description of both the quantity and quality of

9    discovery, is that schedule that's been laid out sufficient

10   from your perspective to do everything that you need to do?

11           MR. COHEN:  Your Honor, just two points in that

12   regard.  I think counsel for the government did not mention in

13   the e-mail we had sent to your Honor's law clerk that August 21

14   would be the deadline for production of search warrant

15   applications and the subpoena returns.  I think she just failed

16   to mention it for the record.  That would also be part of the

17   schedule.

18           THE COURT:  Thank you.

19           Ms. Moe, do you agree?

20           MS. MOE:  That's correct, your Honor.  I apologize.

21   We did include that in the e-mail to your Honor's chambers, and

22   that is correct.

23           And thank you, counsel, for clarifying that.

24           MR. COHEN:  Two additional points, your Honor.  The

25   trial schedule that we are agreeing to, of course subject to

k7e2MaxC kjc

1   the court's approval, assumes there will be no substantive

2   superseding indictment.  If there is one, which the government

3   has advised us they don't believe is imminent or I assume not

4   at all, we might have to come back to the court to address not

5   just trial schedule but other schedule as well.

6         And I am assuming -- we take your Honor's points about

7   the issues on discovery, and we agree with them, particularly

8   as to electronic discovery; and I am assuming that, as this

9   unfolds, if we spot an issue we think needs further attention,

10  we will be able to bring it to the court's attention.

11        Those are my points.

12        THE COURT:  Thank you, Mr. Cohen.

13        Let me go ahead and ask, Ms. Moe, Mr. Cohen has made a

14  representation but I will ask if you do anticipate at this time

15  filing any further superseding indictments adding either

16  defendants or additional charges?

17        MS. MOE:  Your Honor, our investigation remains

18  ongoing, but at this point we do not currently anticipate

19  seeking a superseding indictment.

20        THE COURT:  All right.  So with that -- and also let

21  me ask, Ms. Moe, just because it is next on my list, what

22  processes the government has put in place to notify alleged

23  victims of events and court dates pursuant to the Crime Victims

24  Rights Act.

25        MS. MOE:  Yes, your Honor.  I am happy to give the

k7e2MaxC kjc

1    courts details about the process we used for notification for

2    this conference and also what we anticipate to use going

3    forward.

4            So to begin with, the government notified relevant

5    victims or their counsel immediately following the arrest of

6    the defendant on July 2 about the fact of the arrest and the

7    initial presentment scheduled for later that day.

8            In advance of the initial presentment, those victims

9    were provided the opportunity to participate through the

10   court's protocol for appearances in New Hampshire.

11           On July 7, the court set a date for arraignment and

12   bail hearing on July 14, today, and by the following day from

13   the court's order, the government had notified relevant victims

14   or their counsel of that scheduling order and advised victims

15   and counsel of their right to be heard in connection with the

16   bail hearing.

17           On that same day, the government posted to its victim

18   services website, including a link to the indictment, as well

19   as scheduling information relating to the hearing.

20           On July 9, the government updated the website to

21   include the dial-in information that the court provided.

22           In addition, on July 8, the government sent letter

23   notifications to individuals who have identified themselves as

24   victims of Ghislaine Maxwell or Jeffrey Epstein that were not

25   specifically referenced in the indictment.

k7e2MaxC kjc

1          Our process going forward, as we noted in that letter

2     to victims, is that we will use an opt-in process so we will

3     not notify individuals who do not wish to receive additional

4     notifications but will continue to provide ongoing information

5     about upcoming conferences and relevant details on the

6     government's victim services website.

7          With respect to this specific hearing, the government

8     has been advised by counsel to three victims of their interest

9     in being heard in connection with today's bail proceeding.  One

10    victim's views are expressed in the government's reply

11    memorandum; one victim has submitted a statement to the

12    government and asked that the government read it during today's

13    proceedings; and one victim has asked to be heard directly, and

14    the government anticipates that she will make a statement at

15    any time during this proceeding as necessitated by the court.

16          THE COURT:  All right.  Thank you.

17          Then, with that, returning to the schedule that you

18    have laid out, and I thank counsel for conferring in advance,

19    as to a proposed schedule, Mr. Cohen, let me just finalize if

20    you agree to the proposed schedule that has been laid out by

21    Ms. Moe and supplemented by you?

22          MR. COHEN:  Yes, your Honor.

23          THE COURT:  All right.  Thank you.

24          And, Ms. Moe, you continue to support the proposed

25    schedule?

k7e2MaxC kjc

1          MS. MOE:  Yes, your Honor.

2          THE COURT:  All right.  Then I will set the schedule

3     as jointly proposed by counsel.  To reiterate, I am setting --

4     let me ask, Ms. Moe, if we are going to proceed to trial, how

5     long of a trial does the government anticipate?

6          MS. MOE:  Your Honor, the government anticipates that

7     its case in chief would take no more than two weeks.  But in

8     terms of the length of time to block out a trial date, in an

9     abundance of caution, in view of the need for jury selection

10    and the defense case, we would propose blocking three weeks for

11    trial.

12         THE COURT:  All right.  Thank you.

13         With that, I will adopt the schedule.  I hereby set

14    trial to commence on July 12, 2021, with the following pretrial

15    schedule:

16         Initial nonelectronic disclosure generally, to include

17    search warrant applications and subpoena returns, to be due by

18    Friday, August 21, 20.

19         Completion of discovery, to include electronic

20    materials, to be due by Monday November 9, 2020.

21         Any initial pretrial defense motions, based on the

22    indictment or disclosure material and the like to be due by

23    Monday, December 21, 2020.

24         If any motions are filed, the government's response

25    due by Friday, January 22, 2021.

k7e2MaxC kjc

1              Any replies due by Friday, February 5, 2021.

2              If any motions seek an evidentiary hearing, I will

3    reach out, chambers will reach out to schedule an evidentiary

4    hearing.

5              And, as indicated, trial to commence on July 12, 2021.

6              In advance of trial, following motion practice, the

7    court will put out a schedule regarding pretrial submissions,

8    including *in limine* motions and the like.

9              With that, counsel, other matters to discuss regarding

10   scheduling?

11             Mr. Cohen?

12             MR. COHEN:  Not at this time, your Honor, not from the

13   defense at this time.

14             THE COURT:  Thank you.

15             Ms. Moe?

16             MS. MOE:  Nothing further from the government

17   regarding scheduling, your Honor.  Thank you.

18             THE COURT:  Okay.  And, Ms. Moe, does the government

19   seek to exclude time under the Speedy Trial Act?

20             MS. MOE:  Yes, your Honor.  In view of the schedule

21   and the interests of producing discovery and permitting time

22   for the defense to review discovery, contemplate any motions

23   and pursue those motions, the government would seek to exclude

24   time from today's date until our trial date as court set forth

25   today.

k7e2MaxC kjc

1          THE COURT:  Mr. Cohen, any objection?

2          MR. COHEN:  No, your Honor.

3          THE COURT:  Okay.  I will exclude time from today's

4    date until July 12, 2021, which I have said is a firm trial

5    date.  I do find that the ends of justice served by excluding

6    this time outweigh the interests of the public and the

7    defendant in a speedy trial.  The time is necessary for the

8    production of discovery and view of that by defense, time for

9    the defense to consider and prepare any available motions and,

10   in the absence of resolution of the case, time for the parties

11   to prepare for trial.

12          To Ms. Moe and Mr. Cohen, although I have not set an

13   interim status conference in the case, we do have our motion

14   schedule, but for both sides, if at any point you wish to be

15   before the court for any reason, simply put in a letter and we

16   will get something on the calendar as soon as we conceivably

17   can.

18          With that, Mr. Cohen, let me ask counsel if there is

19   any reason that we should not turn now to the argument for

20   bail?

21          MR. COHEN:  No, your Honor.

22          THE COURT:  Ms. Moe?

23          MS. MOE:  No, your Honor.  Thank you.

24          THE COURT:  All right.  I will hear on that question.

25   It is the government's motion for detention, so I propose

k7e2MaxC kjc

1    hearing from the government first, and then any alleged victims

2    who have indicated that they wish to be heard pursuant to 18

3    U.S.C. 3771(a)(4), and then I will hear from Mr. Cohen.

4              Any objection to proceeding thusly, Mr. Cohen?

5              MR. COHEN:  No, your Honor.

6              THE COURT:  Ms. Moe.

7              MS. MOE:  Thank you, your Honor.

8              Your Honor, as we set forth in our moving papers, the

9    government strongly believes that this defendant poses an

10   extreme risk of flight.  Pretrial Services has recommended

11   detention, the victims seek detention, and the government

12   respectfully submits that the defendant should be detained

13   pending trial.

14             Your Honor, there are serious red flags here.  The

15   defendant has significant financial means.  It appears that she

16   has been less than candid with Pretrial Services.  She has not

17   come close to thoroughly disclosing her finances to the court.

18   She has strong international ties and appears to have the

19   ability to live beyond the reach of extradition.  She has few,

20   if any, community ties, much less a stable residence that she

21   can propose to the court to be bailed to.  And she has a strong

22   incentive to flee to avoid being held accountable for her

23   crimes.

24             Because the defendant is charged with serious offenses

25   involving the sexual abuse of minors, your Honor, there is a

k7e2MaxC kjc

1   legal presumption that there are no conditions that could

2   reasonably assure her return to court and, your Honor, the

3   defendant has not come anywhere close to rebutting that

4   presumption.

5           Turning first to the nature and seriousness of the

6   offense and the strength of the evidence, the indictment in

7   this case arises from the defendant's role in transporting

8   minors for unlawful sexual activity and enticing minors to

9   travel to engage in unlawful sexual active and participating in

10  a conspiracy to do the same.  The indictment further charges

11  that the defendant perjured herself, that she lied under oath

12  to conceal her crimes.

13          Your Honor, the charged conduct in this case is

14  disturbing and the nature and circumstances of the offense are

15  very serious.  The defendant is charged with participating in a

16  conspiracy to sexually exploit the vulnerable members of our

17  community.  In order to protect the privacy of the victims, I'm

18  not going to go into details, your Honor, about the particular

19  victims beyond what's contained in the indictment and our

20  briefing; but, as the indictment alleges, the defendant enticed

21  and groomed girls who were as young as 14 years old for sexual

22  abuse by Jeffrey Epstein, a man who she knew was a predator

23  with a preference for underaged girls.  The indictment alleges

24  that the defendant participated in some of these acts of abuse

25  herself, including sexualized massages in which the victims

k7e2MaxC kjc

1    were sometimes partially or fully nude.  She also encouraged

2    these minors to engage in additional acts of abuse with Jeffrey

3    Epstein.  The indictment makes plain, your Honor, this was not

4    a single incident or a single victim or anything isolated but,

5    instead, it was an ongoing scheme to abuse multiple victims for

6    a pattern of years.  This is exceptionally serious conduct.

7           Given the strength of the government's evidence and

8    the serious charges in the indictment, there is an incredibly

9    strong incentive for the defendant to flee, an incentive for

10   her to become at that fugitive to avoid being held accountable

11   and to avoid a lengthy prison sentence.

12          The history and characteristics of the defendant

13   underscores the risk of flight that she poses.  The Pretrial

14   Services report confirms that the defendant has been moving

15   from place to place for some time, your Honor; and most

16   recently it appears that she spent the last year making

17   concerted efforts to conceal her whereabouts whilst moving

18   around New England, most recently to New Hampshire, which I

19   will discuss momentarily with respect to that particular --

20          THE COURT:  Ms. Moe?

21          MS. MOE:  -- property.

22          THE COURT:  Ms. Moe, there is one assertion in the

23   defense papers that I don't think I have seen the government's

24   response to, and that is the contention that Ms. Maxwell,

25   through counsel, kept in touch with the government since the

k7e2MaxC kjc

1    arrest of Mr. Epstein.  Is that accurate and did that include

2    information as to her whereabouts?

3         MS. MOE:  Your Honor, that information did not include

4    information about her whereabouts for starters; and, second,

5    your Honor, the defendant's communications through counsel with

6    the government began when the government served the defendant

7    with a grand jury subpoena following the arrest of Jeffrey

8    Epstein.  So it is unsurprising that her counsel reached out to

9    the government, which is in the ordinary course when an

10   investigation becomes overt.

11        The government's communications with defense counsel

12   have been minimal during the pendency of this investigation.

13   Without getting into the substance, those contacts have not

14   been substantial, your Honor.  And to the court's question,

15   they certainly have not included any information about

16   defendant's whereabouts.

17        THE COURT:  All right.  Go ahead.

18        MS. MOE:  Thank you, your Honor.

19        It appears that the defendant has insufficient ties to

20   motivate her to remain in the United States.  With respect to

21   her family circumstances, she does not have children, she does

22   not appear to reside with any immediate family members, and she

23   doesn't have any employment that would require her to remain in

24   the United States.

25        But, by contrast, she has extensive international

k7e2MaxC kjc

1    ties.  While she is a naturalized citizen of the United States,

2    she is a citizen of France and the United Kingdom.  She grew up

3    in the United Kingdom and has a history of extensive

4    international travel.  She owns a property in the

5    United Kingdom.  Your Honor, there is a real concern here that

6    the defendant could live beyond the reach of extradition

7    indefinitely.

8            The government has spoken with the Department of

9    Justice attachés in the United Kingdom and France.

10           With respect to France, we have been informed that

11   France will not extradite a French citizen to the United States

12   as a matter of law, even if the defendant is a dual citizen of

13   the United States.

14           As well, we have been informed that there is an

15   extradition treaty between the United Kingdom and the United

16   States.  The extradition process would be lengthy, the outcome

17   would be uncertain, and it's very likely that the defendant

18   would not be detained during the pendency of such an

19   extradition proceeding.

20           Those circumstances raise real concerns here.

21   Particularly because the defendant appears to have the

22   financial means to live beyond the reach of extradition

23   indefinitely.  As we detailed in our briefing, your Honor, the

24   defendant appears to have access to significant and

25   undetermined and undisclosed wealth.

k7e2MaxC kjc

1          In addition to the financial information described in

2     the government's memoranda, we note, your Honor, that in the

3     Pretrial Services report it appears that the defendant tried

4     initially to brush off the subject of her finances when the

5     Pretrial Services officer asked her, noting that she didn't

6     have those details.  The defendant ultimately provided limited,

7     unverified, and questionable information that now appears in

8     the Pretrial Services report.  She listed bank accounts

9     totaling less than a million dollars and a monthly income of

10    nothing.  Zero dollars per month of income.

11         In addition to the matter of her finances, the report

12    raises other concerns about whether the defendant has been

13    fully transparent with the court or whether she is being

14    evasive.

15         THE COURT:  Ms. Moe, you have emphasized the

16    indication on the financial report of zero dollars of the

17    income.  Does the government think that there is income?  Is

18    there some uncertainty as to whether that is investment income

19    as opposed to employment income or the like?  What is the

20    reason for the emphasis on that or to the extent it is an

21    indication that the government finds that implausible?

22         MS. MOE:  Yes, your Honor.

23         Separate from the matter of employment, it is very

24    unclear whether the defendant is receiving proceeds from trust

25    accounts or an inheritance or means of other kinds.  It is

k7e2MaxC kjc

simply implausible that the defendant simply has a lump set of
assets and no other stream of income, especially given the
lifestyle that she has been living and as detailed in the
Pretrial Services report.  It just doesn't make sense.  Either
there are other assets or there is other income.  We can't make
sense of this lifestyle and this set of financial disclosures.
This just doesn't make sense.  And as I will detail in a
moment, your Honor, it is inconsistent with the limited
reference we have been able to obtain as we have been making an
effort to trace the defendant's finances.

On that subject, your Honor, the report does raise
concerns about whether the defendant has been fully transparent
about her finances.  As one example, the defendant told
Pretrial Services that the New Hampshire property was owned by
a corporation, that she does not know the name of the
corporation, but that she was just permitted to stay in the
house.  It is difficult to believe that that was a forthcoming
answer because it is implausible on its face and very
confusing, but the government has continued to investigate the
circumstances surrounding the purchase of that New Hampshire
property.

This morning, your Honor, I spoke with an F.B.I. agent
who recently interviewed a real estate agent involved in that
transaction in New Hampshire.  The real estate agent told the
F.B.I. that the buyers to the house introduced themselves to

k7e2MaxC kjc

1    her as Scott and Janet Marshall, who both have British accents.

2    Scott Marshall told her that the -- that he was retired from

3    the British military and he was currently working on writing a

4    book.  Janet Marshall described herself as a journalist who

5    wants privacy.  they told the agent they wanted to purchase the

6    property quickly through a wire and that they were setting up

7    an LLC.  Those conversations took place in November 2019.  Your

8    Honor, following the defendant's arrest, the real estate agent

9    saw a photograph of the defendant in the media and realized

10   that the person who had introduced herself as Janet Marshall,

11   who had toured the house and participated in these

12   conversations about the purchase, was the defendant, Ghislaine

13   Maxwell.

14            That series of facts, which I just learned about this

15   morning, your Honor, are concerning for two reasons.  First,

16   additionally, it appears that the defendant has attempted to

17   conceal an asset from the court, and at the very least she has

18   not been forthcoming in the course of her Pretrial Services

19   interview; and, second, it appears that the defendant has used

20   an alias and that she was willing to lie to hide herself and

21   hide her identity and we discussed the additional indicia in

22   our briefing your Honor.  So that raises real concerns.

23            Moreover, the defendant's claims about her finances to

24   Pretrial Services should be concerning to the court for

25   additional reasons.

k7e2MaxC kjc

1          THE COURT:  I'm sorry, Ms. Moe, if I may pause you

2     before moving on from those points.

3          There is a basic dispute within the papers as to, I

4     think, efforts similar to the ones you have described that are

5     efforts to hide from authorities, which would certainly be an

6     indication of risk of flight or whether, in light of the

7     notoriety and public interest that the case has generated

8     following the indictment of Mr. Epstein, whether it was an

9     effort to protect privacy and hide from press for privacy

10    reasons.

11         How does the government suggest that that factual

12    determination be resolved, if you agree that it should, and

13    what is your general response to the veracity of that

14    assertion?

15         MS. MOE:  Yes, your Honor.

16         As we discussed in our reply brief, your Honor, in our

17    view, there is no question these circumstances are relevant to

18    the court's determination with respect to bail for a number of

19    reasons.

20         The first is, irrespective of the defendant's motive,

21    these facts make clear to the court that the defendant has the

22    ability to live in hiding, that she is good at it, that she is

23    willing to do it even if it compromises her relationship and

24    contacts with other people and, as the information provided by

25    the real estate agent underscores, she is good at it and that

k7e2MaxC kjc

1    she passes.  In other words, even though, as defense claims,

2    that she is widely known, that there is press everywhere, she

3    was able to pass during the purchase of a real estate

4    transaction under a fake name and not be detected.  So there

5    really can be no question that the defendant is willing to lie

6    about who she is, that she can live in hiding, that she has the

7    means to do so.  All of those things should be extremely

8    concerning to the court, your Honor, as the court evaluates

9    whether the defendant has the ability and willingness to live

10   off the grid indefinitely.  A year is an extremely long period

11   of time to live in hiding, undetected by the public.  And so

12   all of those things are concerning.

13           With respect to the question of motive, your Honor,

14   the government submits the court need not reach that ultimate

15   issue, but we noted, your Honor, that there are indicia during

16   the circumstances of the defendant's arrest that suggested that

17   there was a motive to evade detection by law enforcement.  But

18   the bigger picture, your Honor, is the defendant's --

19           THE COURT:  Ms. Moe --

20           MS. MOE:  -- ability --

21           THE COURT:  -- I was surprised that that information

22   wasn't provided until the reply brief.  Was there a reason for

23   that?

24           MS. MOE:  Yes, your Honor.  The government wanted to

25   be very careful to make sure we had full and accurate

k7e2MaxC kjc

1    information.  So we were first notified about the circumstances

2    the morning of the defendant's arrest, but I wanted to

3    personally confer with the agent who was involved in breaching

4    the door and verify that before including that information in a

5    brief before the court.  That's the reason for the delay, your

6    Honor.

7            THE COURT:  Okay.  But the government has done that

8    confirmation process and is confident of the information

9    provided and the basic contention there is -- the basic

10   contention there is that she resisted opening the door in the

11   face of being informed that authorities were seeking entry and

12   there is a suggestion of an effort to conceal location

13   monitoring of some type by placing a cell phone in foil of some

14   kind.

15           Could you explain what the government's understanding

16   factually is and what you think I should derive from that?

17           MS. MOE:  Yes, your Honor.

18           And, with apologies, we were very careful to make sure

19   that the specific language in our briefing was accurate in

20   consultation with the agents, so I don't want to add additional

21   facts or speak extemporaneously about that; but, in short, that

22   is correct that the defendant did not respond to law

23   enforcement announcing their presence and directing her to open

24   the door; that, instead, she left and went into a separate

25   room.

k7e2MaxC kjc

1          And then, separately, the details about the cell

2    phone, as the court noted, are contained in our brief and we

3    submit that there could be no reason for wrapping a cell phone

4    in tinfoil except for potentially to evade law enforcement,

5    albeit foolishly and not well executed.

6          THE COURT:  All right.  Go ahead.

7          MS. MOE:  Thank you, your Honor.

8          I believe I was discussing the defendant's finances,

9    which underscore the concern about the defendant's ability to

10   flee and about her questionable candor to the court.  We submit

11   there are concerns there for two reasons, your Honor.

12         The first is that we learned that records relating --

13   reflecting to client information for a SWIFT bank include

14   self-reported financial information from the defendant.  In

15   other words, when the account was opened, there were

16   disclosures made about the defendant's finances.  In those

17   records, which are dated January 2019, the defendant's annual

18   income is listed as ranging from $200,000 to approximately half

19   a million dollars.  And both her net worth and liquid assets

20   are listed as ranging from $10 million and above.

21         Second, as we noted in our reply, the defendant is the

22   grantor of a trust account in the same SWIFT bank with assets

23   of more than $4 million as of last month.  Bank documents

24   reflect that the trust has three trustees, one of whom has the

25   authority to act independently.  One of those trustees is a

k7e2MaxC kjc

1    relative of the defendant and the other appears to be a close

2    associate.

3            Despite having put millions of dollars into this

4    trust, your Honor, and despite its assets being controlled by a

5    relative and close associate, the defendant mentions it not

6    once in her motion before the court or in her Pretrial Services

7    interview; and, in fact, despite the fact that the government

8    said in its opening brief that the defendant's finances and her

9    uncertain amount of wealth, including issues about whether her

10   wealth was stored abroad, are serious concerns with respect to

11   the defendant's risk of flight, the defendant's opposition does

12   not discuss this at all.  There is no mention of the

13   defendant's finances and no effort to address those concerns

14   whatsoever.

15           In sum, your Honor, the court has been given virtually

16   no information about the defendant's possession of and apparent

17   access to extensive wealth.  The court should not take that

18   concealment, your Honor, we respectfully submit, as an

19   invitation to demand further details, but instead to recognize

20   that if the court can't rely on this defendant to be

21   transparent at this basic initial stage, the court cannot rely

22   on her to return to court if released.  In short, she has not

23   earned the court's trust.

24           Finally, your Honor, turning to the defendant's

25   proposed bail package, in light of all of the red flags here --

k7e2MaxC kjc

1    the defendant's demonstrated willingness and ability to live in

2    hiding, her ability to live comfortably beyond the reach of

3    extradition, her strong interactional ties and lack of

4    community ties, significant and unexplained wealth, and the

5    presumption of detention in light of very serious charges -- in

6    light of all that, your Honor, it is extremely surprising that

7    the defendant would propose a bail package with virtually no

8    security whatsoever.

9         In addition to failing to describe in any way the

10   absence of proposed cosigners of a bond, the defendant also

11   makes no mention whatsoever about the financial circumstances

12   or assets of her spouse whose her identity she declined to

13   provide to Pretrial Services.  There is no information about

14   who will be cosigning this bond or their assets and no details

15   whatsoever.

16        The government submits that no conditions of bail

17   would be appropriate here.  But it is revealing, your Honor,

18   that the defendant had both declined to provide a rigorous,

19   verified accounting of her finances and that she does not

20   propose that she pledge any meaningful security for her

21   release.  She identifies no stable residence where she could

22   reside.  Instead, she proposes, among other proposals, that she

23   stay at a luxury hotel in Manhattan, the most transient type of

24   residence.  And it is curious, your Honor, that the defendant

25   offers to pay for a luxury hotel for an indefinite period and

k7e2MaxC kjc

1    yet does not offer to post a single penny in security for the

2    bond she proposes.

3            Your Honor, the defendant is the very definition of a

4    flight risk.  She has three passports, large sums of money,

5    extensive international connections, and absolutely no reason

6    to stay in the United States to face a potential significant

7    term of incarceration.

8            The government respectfully submits that the defendant

9    can't meet her burden of overcoming the statutory presumption

10   in favor of detention in this case.  There are no conditions of

11   bail that would assure the defendant's presence in court

12   proceedings in this case, and we respectfully request that the

13   court detain the defendant pending trial.

14           Thank you, your Honor.

15           THE COURT:  Thank you, Ms. Moe.

16           Just to make explicit what is clear by the

17   government's written presentation and oral presentation, you

18   are not resting your argument for detention on dangerousness to

19   the community at all.  It is resting on risk of flight,

20   correct?

21           MS. MOE:  That's correct, your Honor.

22           THE COURT:  All right.  Thank you.

23           Ms. Moe, you have indicated that you have heard from

24   victims who are entitled, under federal law, to be heard at

25   this proceeding.  Could you indicate -- I think you indicated

k7e2MaxC kjc

1    that you have a written statement and then that there is an

2    alleged victim who wishes to be heard.  Is that correct?

3            MS. MOE:  That is correct, your Honor.

4            THE COURT:  Why don't you begin with the written

5    statement and then after that you can identify, as you like,

6    the alleged victim who wishes to be heard, and my staff will

7    unmute at that time that person so that they can be heard.

8            Go ahead.

9            MS. MOE:  Thank you, your Honor.

10           As I mentioned before, your Honor, the government has

11   received a written statement from a victim who prefers to be

12   referred to as Jane Doe today in order to protect her privacy.

13   The following are the words of Jane Doe which I will read from

14   her written statement.

15           Jane Doe wrote:

16           "I knew Ghislaine Maxwell for over ten years.  It was

17   her calculating and sadistic manipulation that anesthetized me,

18   in order to deliver me, with full knowledge of the heinous and

19   dehumanizing abuse that awaited me, straight to the hands of

20   Jeffrey Epstein.  Without Ghislaine, Jeffrey could not have

21   done what he did.  She was in charge.  She egged him on and

22   encouraged him.  She told me of others she recruited and she

23   thought it was funny.  She pretends to care only to garner

24   sympathy, and enjoys drawing her victims in with perceived

25   caring, only to entrap them and make them feel some sense of

k7e2MaxC kjc

1  obligation to her through emotional manipulation.  She was a

2  predator and a monster.

3       "The sociopathic manner in which she nurtured our

4  relationship, abused my trust, and took advantage of my

5  vulnerability makes it clear to me that she would have done

6  anything to get what she wanted, to satisfy Mr. Epstein.  I

7  have great fear that Ghislaine Maxwell will flee, since she has

8  demonstrated over many years her sole purpose is that of

9  self-preservation.  She blatantly disregards and disrespects

10 the judicial system, as demonstrated by her perjuring herself

11 and bullying anyone who dared accuse her.

12      "I have great fear that she may seek to silence those

13 whose testimony is instrumental in her prosecution.  In fact,

14 when I was listed as a witness in a civil action involving

15 Maxwell, I received a phone call in the middle of the night

16 threatening my then two-year-old's life if I testified.

17      "I have fear speaking here today, even anonymously.

18 However, I have chosen to implore the court not to grant bond

19 for Ms. Maxwell because I know the truth.  I know what she has

20 done.  I know how many lives that she has ruined.  And because

21 I know this, I know she has nothing to lose, has no remorse,

22 and will never admit what she has done.

23      "Please do not let us down by allowing her the

24 opportunity to further hurt her victims or evade the

25 consequences that surely await her if justice is served.  If

k7e2MaxC kjc

1    she believes she risks prison, she will never come back.  If

2    she is out, I need to be protected.  I personally know her

3    international connections that would allow her to go anywhere

4    in the world and disappear at a moment's notice or make others

5    disappear if she needs to."

6              Your Honor, those are the words of Jane Doe.

7              THE COURT:  All right.  Thank you.

8              Ms. Moe, would you indicate how the victim who wishes

9    to be heard should be recognized?

10             MS. MOE:  Yes, your Honor.

11             The government has been informed through the victim's

12   counsel that the victim wishes to speak in her true name, which

13   is Annie Farmer.

14             THE COURT:  All right.  I will ask my staff to please

15   unmute Ms. Farmer.

16             MS. FARMER:  Can you hear me, your Honor?

17             THE COURT:  I can, Ms. Farmer.  You may proceed.

18             MS. FARMER:  Thank you.  I appreciate the opportunity

19   to speak.

20             I met Ghislaine Maxwell when I was 16 years old.  She

21   is a sexual predator who groomed and abused me and countless

22   other children and young women.  She has never shown any

23   remorse for her heinous crimes, for the devastating, lasting

24   effects her actions caused.  Instead, she has lied under oath

25   and tormented her survivors.

k7e2MaxC kjc

1          The danger Maxwell must be taken seriously.  She has

2     associates across the globe, some of great means.

3          She also has demonstrated contempt for our legal

4     system by committing perjury, all of which indicate to me that

5     she is a significant flight risk.

6          We may never know how many people were victimized by

7     Ghislaine Maxwell, but those of us who survived implore this

8     court to detain her until she is forced to stand trial and

9     answer for her crimes.

10          Thank you, your Honor.

11          THE COURT:  Thank you, Ms. Farmer.  All right.

12          And, Ms. Moe, is the government aware of any other

13     victims who are entitled to -- alleged victims who are entitled

14     to and wish to be heard at this proceeding?

15          MS. MOE:  No, your Honor.  Thank you.

16          THE COURT:  And, Ms. Moe, again, just to confirm,

17     because there was allusion in the statements of the victims to

18     fear and danger, the government is not seeking the court to

19     make any findings regarding danger to the community in coming

20     to its ultimate conclusion regarding pretrial detention,

21     correct?

22          MS. MOE:  That's correct, your Honor.

23          THE COURT:  All right.  Ms. Moe, anything further

24     before I hear from Mr. Cohen?

25          MS. MOE:  No, your Honor.  Thank you very much.

k7e2MaxC kjc

1              THE COURT:  Thank you, Ms. Moe.

2              Mr. Cohen, you may proceed.

3              MR. COHEN:  Thank you, your Honor.  Thank you very

4    much for the opportunity to be heard and also for accommodating

5    us with regard to the briefing schedule.  We appreciate that,

6    your Honor.

7              Your Honor, this is a very important proceeding for my

8    client.  It is critical and we submit, as we laid out in our

9    papers, that under the Bail Reform Act and related case law,

10   none of which, by the way, was discussed in the government's

11   presentation, she is -- she ought to be released on a bail

12   package with strict conditions, your Honor.

13             And, frankly, in order to defend a case like this

14   during the COVID crisis, with the extent of discovery which was

15   discussed earlier in the proceeding, that's going to take the

16   government until November to produce to us, the notion of

17   preparing a defense with our client while she is in custody

18   under these conditions is just not realistic.

19             I would also like to take a moment, your Honor, to

20   address a few things.  As we noted in our papers, our client is

21   not Jeffrey Epstein, and she has been the target of essentially

22   endless media spin that apparently the government has picked up

23   in its reply brief and in its presentation today, trying to

24   portray her before the court as a ruthless, aimless, sinister

25   person.

k7e2MaxC kjc

1      I do want to note, before I go further, to pick up on

2   something the court said.  We have a proceeding now where the

3   government is dribbling out facts or what they claim are facts

4   that they could have and should have put in their opening

5   memorandum so we would have had an opportunity to address them

6   in writing before the court.  That's not how this is supposed

7   to proceed, your Honor, and I thank your Honor for pointing

8   that out.  Each --

9      THE COURT:  But, Mr. Cohen, please, by all means, you

10   have had the reply in the time that I have as well.  You

11   shouldn't hesitate to respond to any of those facts now.

12      MR. COHEN:  I appreciate that, your Honor, and I'm

13   going to proceed by proffer.  I would have preferred to be able

14   to submit something in writing, but obviously the way it was

15   done, we were deprived of that chance.

16      I also want to make clear that our client is not

17   Epstein.  She is not the monster that has been portrayed by the

18   media and now the government.  She is part of a very large and

19   close family, with extensive familial relations, extensive

20   friendships, extensive professional relationships.  Many of

21   these folks are on the call today, your Honor, and thank you,

22   your Honor, for making that available, though not identified,

23   which is something one would normally do in a traditional bail

24   hearing, because of the very real concern that they have and

25   our client has about her safety and about her privacy and her

k7e2MaxC kjc

confidentiality, as your Honor pointed out.  And as you will
see in a moment, that explains a lot of the spin the government
is putting on facts in this case.

        Your Honor, people have received physical threats.  My
client has received them.  Most of those close to her have
received them.  They have received death threats.  They have
been injured in their jobs, in their work opportunities, in
their reputations, simply for knowing my client.  It's real.
It's out there.  The facts of all the steps the court had to go
through just to make the public access available to this
proceeding is also a reality.

        There is a real thing out there having a very
significant impact on our client.  There are folks who would
normally come forward as part of a bail package who your Honor
is aware of from the Pretrial Services report who can't now, at
least at this point, because of the safety and confidentiality
concerns.  Since last week our firm alone and my colleagues at
Haddon Morgan have been besieged with e-mails and posts, some
of them threatening.  This is all very real.  The government
attempts to poo-poo it, to give it the back of the hand.  It is
very real, and we submit it is a factor for the court to
consider in its discretion.

        Before I go further, your Honor, I would like to go
through the 3142(g) analysis.  But before I do that, I would
like to make one comment about the CVR -- CVRA proceeding under

k7e2MaxC kjc

377(1), and we understand that the court is following the

statute.  The statute gives alleged victims the right to speak

through counsel, through the government, or directly, and be

heard, and we understand that, your Honor.

          The question today before the court, we submit, is

whether or not our client could be released or should be

released on a condition or combination of conditions to assure

her appearance.  And as to that question, the presentations

today do not speak, they do not speak to risk of flight, and

the courts have -- in this circuit have thought about and

researched what weight should be given to that.  There is an

opinion by Judge Orenstein in the Eastern District, *United*

*States v. Turner*, from April 2005, not cited by the government,

in which the court, after carefully surveying the legislative

history and background of the CVRA and its interplay with the

bail reform statute, concluded, "In considering how to ensure

that the rights are afforded, I am cognizant that the new law

gives crime victims a voice but not a veto.  Of particular

relevance to this case, a court's obligation to protect the

victim's rights and to carefully consider any objections that

victim may have never requires it to deny a defendant release

on conditions that will adequately secure the defendant's

appearance," going on to cite the Senate legislative history

that's being cited with approval of *United States v. Rubin*,

also an Eastern District case.

k7e2MaxC kjc

1              So we understand why the court has to follow this

2      process, but we submit that these presentations just are not

3      relevant to the determination before the court today.  And,

4      again, we don't have spin.  The big fact that the government,

5      Ms. Moe tried to put before you through the victim is that

6      supposedly someone had called in a civil action threatening the

7      two-year-old child.  Notice how carefully that was phrased,

8      your Honor.  It wasn't tied to Ms. Maxwell.  It's more spin,

9      spin, spin.

10             So we are here to consider bail.  We should consider

11     the statute.  We should consider your Honor's guidance under

12     the statute.  So let me just put that to one side.  I determine

13     that that really disposes of the issue of what weight to give.

14             In turning to the statute, your Honor, turning to the

15     factors, I don't want to spend a lot of time on the standard,

16     because I know your Honor is very familiar with it, but I do

17     want to point out that, in an opening brief and reply brief and

18     now an oral presentation, the government has not once

19     represented the standard to your Honor nor the burden that it

20     has.  And that is the statute, under 3142(c), says that "even

21     the case where there is not to be release ROR" -- which this is

22     not that case -- "the court shall order pretrial release

23     subject to the least restrictive condition or combination of

24     conditions."  That as you now read, of course, in light of

25     3142(e), (f), and (g), the provisions on detention, that the

k7e2MaxC kjc

1    law of the statute, by its structure, favors release.  The

2    Supreme Court has and the Second Circuit has advised us that a

3    very limited number of people should be detained prior to trial

4    because of the statute's structure, and the government nowhere

5    mentions that.  It basically acts as if all it has to do is

6    invoke the presumption on the client and then we are done, and

7    that's just not the legal standing, your Honor.

8         They also say nothing about the burden, which is

9    discussed on a case written for the Second Circuit by Judge

10   Raggi, and also the *U.S. v. English* case.  Without going into a

11   lot of detail, as the court is aware, the burden of persuasion

12   is the government's.  It never shifts.  The presumption can be

13   rebutted, and we submit it is here, and then it is the burden

14   of the government to show that the defendant is a risk of

15   flight and that there are no conditions or combination of

16   conditions to secure the release, which we submit they haven't

17   done here.

18        So let me turn, your Honor, if I may, to the factors

19   under 3142(g), and before I do that, I also want to address

20   some of the government's comments about the bail package.  We

21   decided that we should come before your Honor with a package

22   that was set out subject, of course, to the ruling provided by

23   the court, subject of course to verification as to suretors by

24   Pretrial Services and the court.  We didn't want to just walk

25   in and say, Judge, we should be entitled to bail, please set

k7e2MaxC kjc

1   conditions.  So what we did is we went through all the high

2   profile cases in this courthouse in the past several years and

3   other cases, cases like *Madoff*, cases like *Dreier*, cases like

4   *Esposito*, where Judge Marrero ruled in 2018 relating to an

5   alleged member of organized crime, and we went through those

6   cases to find the conditions that were listed under 3142(c),

7   and in those cases that would we believe be relevant and

8   applicable here, and we believe we have listed them all.  We

9   understand that of course they would be subject to

10  verification; and as we noted in our papers and I noted today,

11  if we could have a guarantee of safety, if we could have a

12  guarantee of privacy and confidentiality, and if the court

13  required it, we believe there are other suretors who we could

14  provide and perhaps other amounts of property as well.  That is

15  an issue.  It is a real issue in this case.  It is something

16  the government is just avoiding, but it is real.

17          So let me talk now, your Honor, if I might, about the

18  3142(g)(3) factors, which are the factors relating to the

19  history of the defendant.

20          The government said --

21          THE COURT:  Mr. Cohen, just before you move to that,

22  the three cases that you cited -- *Esposito*, *Dreier*, *Madoff* --

23  factually did any of those cases involve defendants with

24  substantial international and foreign connections?

25          MR. COHEN:  No, I don't believe they did.  The cases

k7e2MaxC kjc

1   that are relevant to that, which I was going to get to, your

2   Honor, are *Khashoggi*, *U.S. v. Khashoggi*, *U.S. v. Bodmer, U.S.*

3   *v. Hanson*, and *Sabhnani* itself, all of which involve defendants

4   with substantial connections.

5          And I might follow up on your Honor's question, when

6   you take off the spin and you take off the media –– and I'm

7   going to get to it in a moment, because your Honor is going to

8   allow me to respond –– here is their case:  Defendant is a

9   citizen of more than one country, England and France, not

10  exactly exotic places.  The defendant has three passports.  The

11  defendant has traveled internationally in the past, not in the

12  past year.  There is no refutation from the government on that,

13  and they have been all over her travel records.  The defendant

14  has resided here in the past year.  She has traveled

15  internationally and, according to the government, she has

16  financial means.  I will get to that in a moment, Judge.  But

17  let's assume for the purposes of this discussion that she has

18  financial means and not the lies that the government laid out.

19  What do those cases teach?  They teach that that is something

20  the court can and should address in the bail conditions.  They

21  teach that they may require stricter bail conditions.  They

22  don't teach that that means there should be no bail at all.  In

23  *Sabhnani*, a Second Circuit case, the allegation was that the

24  defendants have held two individuals in slavery for five years,

25  and they had many more international ties or international

k7e2MaxC kjc

1    travel than alleged as to our client, certainly in the past

2    year, and strict release was approved with strict bail

3    conditions.

4        In *Bodmer*, which was before Judge Scheindlin in 2004,

5    the defendant was a Swiss citizen, and Switzerland had taken

6    the position it would not extradite its citizens for

7    proceedings in the United States.  And Judge Scheindlin

8    observed, well, if that becomes the test for bail, then no

9    citizen of Switzerland can ever get bail in the United States.

10   So, too, here.  If that's the test for France, then no French

11   citizen, under the government's reasoning, could ever get bail

12   in the United States.

13       And in *Bodmer* it was even the allegation -- the case

14   was a fraud case -- the allegation was that the defendant who

15   was a Swiss attorney had, according to the government, been

16   opening up Swiss accounts overseas and that that was some form

17   of hiding.  Even with all that, the court said what many courts

18   have said in this courthouse, to be addressed in the

19   conditions.  Doesn't mean the government has carried its burden

20   of showing there is no combination of conditions.

21       In the *Khashoggi* case, written by Judge Keenan in

22   1989, this was a person of extraordinary wealth, way more than

23   anything the government alleges that our client has, he was,

24   according to the government, a fugitive, a Saudi citizen who

25   had not been in the United States for three years prior to his

k7e2MaxC kjc

1    arrest.  That defendant was released on bail conditions, strict

2    bail conditions.

3            And I mention *Esposito*, which is the 2019 case from

4    Judge Marrero, that is a case in which the allegation was that

5    the defendant was a senior ranking member of organized crime

6    and had access to financial means as well.

7            But all of those cases, as well as *Madoff* and *Dreier*,

8    which I'm sure the court is familiar, with involved allegations

9    of defendants with hundreds of millions of dollars, in all of

10   those cases, the courts held that bail should be set subject to

11   strict conditions.  And by the way, Judge, in all of those

12   cases, the defendants appeared for court.  They all made

13   appearances and appeared for trial.

14           There are also cases from the context involving

15   pornography or sex crime allegations, such as the *Deutsch* case

16   coming from the Eastern District several years ago, the *Conway*

17   case in the Northern District of California.  Again,

18   understanding those are the allegations, the decision was made

19   that release could be awarded on conditions.

20           You even had one recently in the Second Circuit that

21   I'm sure everyone is familiar with *United States v. Mattis*,

22   different setting, because that was a dangerousness case and

23   the government is not proceeding on dangerousness grounds, but

24   that is the case where the allegation is that two attorneys

25   threw a Molotov cocktail into a police car; challenge to bail

k7e2MaxC kjc

1    appealed by the government; decision of the court, release on

2    strict conditions.  That is how the law works and comes out in

3    this area, but that's something, your Honor, that the

4    government did not address.  And if the court determines that

5    the conditions that we have proffered are insufficient or need

6    further verification, as long as we can have some assurance of

7    safety and confidentiality, we would recommend that the court

8    keep the proceeding open, and we should be able to get whatever

9    the court needs to satisfy it.  So that's the legal analysis

10   that was absent in the government's presentation today and its

11   papers.

12           Let me now, because I have to, because this has been

13   put out before your Honor in, of course, a public proceeding,

14   let me respond to some of the allegations made for the first

15   time in the reply brief, trying to spin facts to make my client

16   look sinister to your Honor.

17           Here is fact one:  She is a risk of flight because she

18   has been hiding out.  Well, let's think about this.  She has

19   been litigating civil cases in this courthouse and other parts

20   of the country since 2015, denying, as she does here before

21   your Honor, that she did anything improper with regards to

22   Mr. Epstein.  We submit, your Honor, that is the opposite of

23   somebody who is looking to flee.  And in fact, one of the

24   people who spoke before your Honor is a plaintiff in one of

25   those lawsuits seeking millions of dollars from our client and

k7e2MaxC kjc

1    seeking millions of dollars from a fund that's being set up.

2    Something for the court to consider.

3           She has also, as we mentioned, remained in the United

4    States, even though she has known of the investigation.  How

5    could she not?  It's been unbelievably public for the past

6    year.  And we have been in regular contact with her -- with the

7    government.  Your Honor asked that question, very careful

8    question from the court, and we got a shimmy from the

9    government in response.  We have been in contact with them,

10   conservatively -- as we checked last night, because we thought

11   you might ask -- conservatively eight to ten times in the past

12   year, all for the same purpose, to urge them not to bring this

13   case, which shouldn't have been brought.

14          The notion that experienced counsel, and counsel at

15   Haddon Morgan is also experienced, is in regular contact with

16   the government, would surrender their client, and they turn

17   around and deny that to the court and deny that voluntary

18   surrender would and could have and should have been possible

19   here is, we submit, another factor for the court to consider.

20          So let me turn to the reply brief.

21          THE COURT:  Sorry.  If I may, Mr. Cohen, I just want

22   to make sure I understand that last point.  Are you saying that

23   defense counsel indicated to the government that, should there

24   be an indictment returned, you were seeking to arrange a

25   voluntary surrender?  Is that the contention?

k7e2MaxC kjc

1          MR. COHEN:  To be precise, we were urging them not to

2     return an indictment and saying we were always available to

3     speak.  And, frankly, your Honor, I have been doing this kind

4     of work for 33 years, everyone knows what that means.

5          THE COURT:  So you were implying --

6          (Indiscernible crosstalk)

7          THE COURT:  You were implying that, though you were

8     urging --

9          MR. COHEN:  Yes.

10         THE COURT:  -- or seeking to forestall the indictment,

11    should there be an indictment, you were implying that you

12    should be contacted for voluntary surrender.

13         MR. COHEN:  Yes, of course.  And the day after our

14    client was arrested, we got a note from the government sending

15    the application to detention addressed to us and Haddon Morgan

16    saying your client, Ms. Maxwell, was arrested yesterday.  So

17    there was no doubt that we represented her along with Haddon

18    Morgan.  There was no doubt that we were available and could

19    have been contacted and worked this out.  There was no doubt

20    that we are confident we would have.

21         Let me turn to the reply brief and the effort to throw

22    some more dirt on my client that we again submit should not be

23    considered as part of the governing legal standards here and

24    the precise question before the court.  You heard it today and

25    in the brief we hear that at the time of her arrest, the agents

k7e2MaxC kjc

1  breached the gate and they saw her through the window try to

2  flee to another room in the house, quickly shutting the door,

3  and that she -- agents were ultimately forced to breach the

4  door.  So here is the spin.  It's as if the government is just

5  sort of giving it for the media, here is the spin given to your

6  Honor to try to influence your Honor's discretion.  What

7  actually happened?  At least the court has said we can respond

8  by proffer.  We weren't given a chance to respond in writing.

9  My client was at the property in the morning in her pajamas.

10  She was there with one security guard.  Two people in the

11  house.  The front door was unlocked.  All the other doors of

12  the house were open.  The windows were open.  Dozens of agents

13  came storming up the drive, creating a disturbance.  My client

14  had to hire security because of the threats to her that I have

15  already relayed before, and the protocol was that in a

16  disturbance to go into new room.  That's all she did.  Not

17  running out of the house, not, you know, looking for some

18  secret tunnel, went in the other room.  The F.B.I. knocked down

19  the door which, by the way, was open, and my client surrendered

20  herself for arrest.  That's far from the picture painted by the

21  government.

22         Let me turn to another thing that the government

23  mentioned today in an effort to sort of spin the facts, make

24  everything look sinister with respect to my client.  The

25  government said in its opening brief, well, Judge, she is

k7e2MaxC kjc

hiding.  She is a risk of flight because she changed her e-mail

and phone number.  That's what we heard in the opening brief.

Well, what happened?  Something the government, frankly, should

know about, because it was certainly public, last year, in a

civil litigation, in August of 2019, right around the time of

the arrest of Mr. Epstein, the Second Circuit ruled that

certain records in one of the civil cases should be unsealed

and released to the public.  That was done.  There was no stay

at the moment.  The demand was issued, and the documents were

released.  Certain of those documents were supposed to be

redacted and sometimes they were and sometimes they were not,

documents including e-mail addresses, Social Security numbers,

names, phone numbers, the sorts of things your Honor, I am

sure, has to deal with all the time in these kinds of

situations.

          But as it turned out, for whatever reason, some of the

documents were not redacted and her e-mail address was

revealed.  Shortly after that, she starts getting strange

e-mails.  Her phone is hacked, and she had to change e-mails

and change the account.

          Now she has got a phone that has legal materials on

it, correspondence with her counsel in civil litigation that's

been hacked, so she keeps it.  Why does she keep it?  Because

she is in civil litigation.  Her obligation is to keep

evidence, not destroy it, and is advised that a way to keep it

k7e2MaxC kjc

1    from being hacked, again, is to put it in the equivalent of a

2    Faraday bag, whether it be tinfoil or the bags they now make in

3    briefcases, and that's it.  That's all that she does.  And I

4    guarantee to your Honor, given the tenor of the government's

5    presentation, that had she said, well, this phone was hacked,

6    I'm just going to throw it away, the government would be

7    standing before your Honor today say, ah-ha, she destroyed

8    evidence, that adds to risk of flight.  And she had she put it

9    in a safe deposit box, rather than to destroy it, they would be

10   saying we cracked into a safe deposit box, your Honor.  This is

11   evidence of a risk of flight.  It just does not fit the test,

12   we submit.

13           And the last point on this, your Honor, which,

14   frankly, in some ways is the most telling point of all, the

15   agents do a security sweep, considering this is a house where

16   there are two people in it -- and I will put that to one side

17   for a moment -- they talk to the security guard, apparently now

18   they are going to do the thing multiple times because the

19   government is dribbling out facts, and they say, well, who

20   lives in the house?  Ms. Maxwell does.  Okay?  She lives in the

21   house.  What do you -- how do you get groceries and so forth?

22   I go out and get them for her.

23           So let's stop and think about this, your Honor.  The

24   government's allegation is that the person who is aware of a

25   criminal investigation in the United States, has her counsel in

k7e2MaxC kjc

1  regular contact with the government, is removed in a property

2  in the United States.  That's the opposite of hiding.  So we

3  think that those kinds of facts, I'm sure, your Honor, if your

4  Honor decides to keep the proceedings open and give us a chance

5  to come on some issues, I'm sure we will have some more facts

6  tomorrow and the next day, all with the disclaimer, we just

7  learned this, your Honor.  They have been investigating this

8  case for ten years, your Honor, okay?

9        So let me turn now to another factor that the

10  government made argument about briefly, two more factors under

11  31(g)(3), the history and characteristics of the defendant.  We

12  heard several times that there was a -- that detention should

13  be warranted because there is a perjury charge.  Very quickly,

14  your Honor, we submit this does not tip the balance in the 3142

15  analysis that the court has to perform.

16        First and foremost, the defendant is, of course,

17  presumed innocent; and, secondly, the allegation and nature of

18  the perjury, if the court has been through the indictment, is

19  someone who denies guilt, who says they are innocent, is asked

20  in a deposition did you do that and says no, the government

21  charges them with perjury.  That is not -- other than the fact

22  that it's an indicted charge, they are still entitled to the

23  weight the court would give a not indicted charge.  That's all

24  the weight it should be given .

25        Let me turn to another factor that the government

k7e2MaxC kjc

mentioned in its presentation, both in its papers and today,

that relates to 3142(g)(3), which is the defendant's financial

situation.

Again, when you look at the case law, which is not

addressed by the government at all, this is a person who has

passports that can be surrendered, who has travel that can be

restricted, who has citizenship that the courts have taking

account of, and does have financial means.  Does she have the

financial means that the government says she has?  We doubt it.

But does she have hundreds of millions of dollars like those in

the *Madoff* and *Dreier* case?  No.

But it doesn't matter.  Even if the court were to

assume for purposes of today's proceeding that she has the

means that the government claims she does, it does not affect

the analysis.  That is to be addressed in conditions, to be

addressed if the court requires it, through verifications and

further proceedings before the court.

And let me just address some of the allegations made

in the government's brief about her financial situation.  The

government goes out and arrests our client even though she

would have voluntarily surrendered, arrests her the day before

a federal holiday, so she spends extra time in the

New Hampshire prison before being transported here, and then

says, how come you don't have a full account of your financial

condition?  How come, when Pretrial Services asked about it,

k7e2MaxC kjc

1    you can't, off the top of your head, explain your financial

2    condition to them?  You must be lying.  That assertion is

3    absurd.

4            We have been working since our client was detained,

5    with our client, trying to access family members to put, as

6    best we could, a financial picture before the court to the

7    extent it is relevant to this application and only this

8    application.  This bail proceeding should not turn into some

9    mini investigation of our client's finances.  The government

10   has had ten years to investigate my client.

11           Let me address some of the specific allegations in the

12   government's brief.  They point to a sale of property in 2016.

13   According to the government, the property was sold for $15

14   million.  There is no secret about that.  Those records are out

15   there.  The government claims our client cleared $14 million

16   from that in 2016 and apparently has it all today, which would

17   probably make it the first New York real estate transaction to

18   that effect.  There has been liabilities.  There has been

19   expenses.  Our client has been through extensive, substantial

20   litigation all over this country denying these claims.  We

21   think the number is far less than what the government asserts.

22   But even taking that number, it's a number far lower than that

23   in *Khashoggi*, far lower than that in *Dreier*, far lower than in

24   many cases, and the impact of that, in the court's discretion,

25   should be addressed by bail conditions.

k7e2MaxC kjc

1          The government also says, well, she has 15 different

2     bank accounts -- and here we get some hedging language -- that

3     are by or associated with her.  No detail, no explanation to

4     the court, just more dirt.  Well, she has three bank accounts

5     that she disclosed.  She believes that there are more, for

6     example, with respect to the not-for-profit that she ran for

7     almost a decade before she was forced to shut it down because

8     of the issues in the media and the attention and the firestorm.

9     So it is some number less.  And if it's important to the court,

10    we will do our best to pull it together.  But under the

11    relevant cases, it doesn't change the analysis.

12          And then we go through the last one, your Honor.  They

13    say in their brief that she did transfers of funds.  One was a

14    transfer of 500,000.  We believe that what that is was a bond

15    maturing.  So when a bond matures, it is transferred out.

16          And then there was another one, and the government

17    sort of changes its mind between its opening brief and its

18    reply brief and I'm sure by tomorrow they will have some new

19    speculation for your Honor, but essentially let's call it a

20    several hundred thousand transfer out of and account in June

21    and July of 2019.  What's that refer to?  It refers to one of

22    the themes we have been talking about in our submission and

23    today your Honor.  When Mr. Epstein was arrested, it had all

24    kinds of effects on our client, one of which was that the bank

25    in question referenced in the government's submission dropped

k7e2MaxC kjc

her.  Well, when the bank drops you, you have to transfer your

funds out.  That's true.  That's what happened.  So there is

nothing in there that's sinister, there is nothing in there

that shows an intent to evade, an intent to evade, and nothing

there that we think warrants detention.

        One last point on the financial stuff, your Honor, if

I might.  In the reply brief, we get a new allegation that an

SDAR, a foreign filing was made in 2018 and 2019, disclosing

that our client had a foreign bank account.  Let's stop there.

Our client makes a legally required filing with the Treasury

Department, obeys the law, and discloses a foreign bank

account, and the government is claiming that's evidence of

hiding.  This is all upside-down, your Honor.  These are not

factors to be considered in exercising your discretion under

3142.

        Let me turn very quickly to the other two factors that

are relevant for today's purposes because, as your Honor has

pointed out, the government is not proceeding on a

dangerousness claim.  That is the (g)(1) and (g)(2) factors,

the nature and circumstances of the case, and the weight of the

evidence.

        Here, I think we -- if you bear with me a moment, your

Honor, here, one thing to keep in mind is an observation

Judge Raggi made in the *Sabhnani* case, at page 77, where she

said, "The more effectively a court can physically restrain the

k7e2MaxC kjc

1    defendant, the less important it becomes to identify and

2    restrain each and every asset over which defendants may

3    exercise some control in order to mitigate risk of flight."  So

4    if the court -- and we have suggested them, but they may be

5    modified by the court -- can put in place stringent bail

6    conditions, we don't need to have a side-long, month-long

7    hearing about my client's assets which is just designed to keep

8    her in detention.  That was an observation by Judge Raggi in

9    *Sabhnani*.

10           Judge, very quickly on the nature and circumstances of

11   the offense and the weight of the evidence, we don't think,

12   your Honor, this is the place to litigate legal motions.  This

13   is a bail hearing.  It is not the place to litigate complex

14   legal questions that we will be presenting to your Honor.  It's

15   very soon on the motion schedule, and we thank the court for

16   agreeing to the schedule.  But there are a few things that are

17   worth pointing out.

18           We believe there are very significant motions here

19   that will affect whether this indictment survives at all or the

20   shape of this indictment and, given the government's

21   representation that it is not planning to supersede, will

22   affect the shape of the entire case, or any case at all that

23   proceeds before the court at trial, if there is a trial.  That

24   is exactly what we submit the court can consider, again, in

25   exercising its discretion as to the weight of the evidence.

k7e2MaxC kjc

1       We believe there are significant motions relating to

2   the reach of the NPA, which we are not going to litigate here

3   before your Honor in a bail proceeding, that are not even

4   foreclosed by the cases the government does cite to you.  They

5   cite to you the -- I'm going to skip this one, the *Annabi* case,

6   A-N-N-A-B-I case, which says, "The plea agreement binds only

7   the office of the U.S. Attorney for the district in which the

8   plea is entered unless it affirmatively appears that the

9   agreement contemplates a broader restriction," and that in part

10  is going to be our argument.  So we will make it to your Honor

11  at the appropriate time.  For today's purposes, it should be in

12  the mix in evaluating the weight of the evidence as should the

13  points I just made about the perjury charge and we think that

14  there are other significant legal challenges to the indictment.

15      We also think there are significant issues with the

16  weight of the evidence.  The government chose to indict conduct

17  that's 25 years old, your Honor.  You will see when you get our

18  motions that this, we think, is an effort to dance around the

19  NPA, to come into an earlier time period, a related time

20  period.  It's all tactics.  That's all this is about.  This

21  case is about tactics.  It's an effort to dance around the NPA.

22  But the fact of the matter is the government --

23      THE COURT:  Mr. Cohen, I'm sorry, by that do you mean

24  that the time period charged is not covered by the NPA.

25      MR. COHEN:  Right.  Exactly.  There is going to be

k7e2MaxC kjc

1    litigation before your Honor about what is in the NPA, and the

2    government, we expect, is going to take the position that

3    unlike '07 is covered and nothing else.  We disagree with that,

4    which we will lay out for your Honor.  What do they do?  They

5    decide we will reach back and indict '94 to '97, totally

6    tactical, your Honor.  So now we have a case where the conduct

7    is 25 years old, no tapes, no video, none of the sort of things

8    you would expect in that age of case, that we are going to have

9    to defend, and we are going to defend.  And I think it goes to

10   the court's consideration of the weight in the context of the

11   only application that's before your Honor, which is how to

12   weigh the 3142 factors with the structure of the statute, with

13   the guidance of the Second Circuit and the Supreme Court, which

14   is in favor of bail, in favor of bail on appropriate

15   conditions.

16           So we submit that the package we laid out for the

17   court is sufficient that we are certainly willing if the court

18   deems it necessary to leave the proceeding open and we think we

19   could be back before the court within a week if that is what

20   the court wants or there is more detail which has been hammered

21   by the fact that our client has been, by design, by design,

22   kept in custody.  And let me just give your Honor a little

23   flavor.

24           THE COURT:  Wait, Mr. Cohen.  I missed that last point

25   could you repeat it, please.

k7e2MaxC kjc

1          MR. COHEN:  I'm sorry.  If the court desires to leave

2     the proceeding open for a week and allow us to come back, if

3     the court has concerns about the number of suretors, for

4     example, verification information, information about financial

5     issues, we think that, now that we have some ability to breathe

6     a little bit, that we should be able to pull this together for

7     the court's consideration.  We came forward with the best

8     package we could put together on a limited notice with a client

9     who was arrested, held in custody, has been since she came to

10    the MDC held in, I will call it, the equivalent of the layman's

11    term of solitary confinement.  There is probably a BOP word,

12    like administrative seg., or some other word they have for it

13    now.

14          We have had a client who has been kept alone in a room

15    with the lights on all the time, is not allowed to speak with

16    us in the jail at all, wasn't allowed to shower for 72 hours,

17    had her legal materials taken away from her, only recently

18    given back.  So working with that, we have been trying to

19    answer questions about financial situation and others, but it

20    is very difficult, your Honor, under circumstances that are of

21    the government's creation, of the government's creation, and

22    we --

23          THE COURT:  So I do want to understand that point.  I

24    think that's the "by design" point that you are making.  Just

25    for clarity, I understand that there was consent to detention

k7e2MaxC kjc

1   originally without prejudice obviously for precisely the

2   proceeding we are having, but it sounded like you were

3   suggesting that her current detention was in some way by design

4   to prevent you from providing a full picture of her financial

5   situation.  Is that the implication you are making?

6           MR. COHEN:  No, I am not saying that, your Honor.  I

7   am not going that far.  What I am saying is, when you have a

8   client who will voluntary surrender, who is staying in the

9   country despite an investigation, and the government instead

10  chooses to arrest her and detain her, that limits in the early

11  instances your access to the client.  It is complicated by the

12  COVID crisis and the other factors your Honor has pointed out

13  in *Stephens* and in *Williams-Bethea*, and so it is very hard for

14  us to pull together this financial information, and we have

15  done it as quickly as we could before the court.  But the

16  notion that my client should have been able to answer off the

17  top of her head the questions from Pretrial Services about a

18  real estate transaction, for example, just doesn't make any

19  sense.  That's the point we are making.

20          THE COURT:  Okay.

21          MR. COHEN:  One last point in that regard, your Honor,

22  in the schedule we set today -- thank you, your Honor, for

23  approving that -- the government is saying that it needs at

24  least until November to complete all discovery, including

25  electronic discovery.  They have told us that there are two

k7e2MaxC kjc

investigations.  There is the investigation of our client and
there is the investigation of Mr. Epstein.  And they are, in
the government's words, in our words together, voluminous
materials.  We haven't seen any of it yet, but voluminous,
including voluminous electronic materials.  The notion that we
would be able to in any meaningful way review these with our
client to prepare the case for motion and for trial under the
current pandemic situation is just not realistic.  It is not
meaningful.  It is not fair.  And I should say, as your Honor
noted, in the *Stephens* case, we are not faulting the Bureau of
Prisons.  We are not faulting the Marshal Service.  We
understand they are doing the best they can under the
circumstances.  But this is just not realistic.  We have
conduct that's alleged to be 25 years old.  You have extensive
discovery that's going to take the government, if they hit the
deadlines your Honor set -- and we all know that sometimes it
doesn't happen -- four and a half months to provide, and the
government wants our client to remain in custody that whole
time, without being able to meet with us in person, with
limited access in some form of administrative seg., apparently
because they are afraid of what happened with Mr. Epstein, I
don't know, and it is just not a realistic way to prepare a
case, particularly, your Honor, when, as we submit, the
conditions and combination of conditions to secure her release
can be satisfied here under your Honor's guidance.

k7e2MaxC kjc

1        And in response to that, the government said, well,

2   too bad, COVID crisis, too bad, Ms. Maxwell, we are not going

3   to let you out.  We are not going to let you out because you

4   might get infected, we are not going to let you out because,

5   you know, because it will be tough preparing your trial.  And

6   they cite to your Honor, in reply, two pages of cases, very

7   limited parentheticals.  If you actually read those cases, they

8   are totally different from our situation, your Honor.  The

9   cases they cite on health risks in the prison environment, they

10   cite 14 cases, 12 of them are dangerousness cases, people who

11   are convicted of multiple felonies, including weapons felonies.

12   The courts in those cases determined the COVID factors do not

13   outweigh that analysis.  They cite nine cases on the

14   preparation and access to counsel.  Several of them are

15   dangerousness cases, and the other ones that have some

16   discussion of flight risk are so extremely different from our

17   case as to not be relevant.

18        Judge, I don't know how we could possibly prepare this

19   case, getting four months of discovery, including electronic

20   discovery, and in over 25 years of conduct, with a client who

21   is in custody, who we can't meet with in person.  And I'm not

22   faulting the BOP.  I understand why they have to do what they

23   have to do, and your Honor has made the same point, but it is

24   just we have to be in the real world here.  We have to --

25        THE COURT:  Whether defendants are detained because of

k7e2MaxC kjc

risk of flight or dangerousness, they are still entitled to the
same Sixth Amendment rights to access defense counsel to
prepare their case.

MR. COHEN:  Of course, your Honor.  My point was a
more narrow point.  My point is that the facts in those cases
are different from our case in a meaningful way and the court
was doing a different evaluation.  That was the point I was
making on this case.

So in conclusion, we believe this is a compelling case
for bail.  We believe that the government, which has the burden
of persuasion that never shifts, has not made a showing as
required, that our client is a risk of flight.  When you
consider the risk, as Judge Raggi put it, in *Sabhnani*, the
actual risk of flight, not fantasy and not speculation, when
you consider that the only factors they really point to are
ones that the cases have already addressed, such as
international travel and passports.

We also submit that the government has not carried its
burden of showing there is no condition or combination of
conditions that secure release.

So we would ask the court to grant bail today.  And if
the court needs more information from us, we would respectfully
request that the court leave the proceeding open for a week so
that we can try to satisfy the court because we want to.

Thank you, your Honor, for your time.

k7e2MaxC kjc

1        THE COURT:  All right.  Thank you, Mr. Cohen.

2        Ms. Moe, would the government like a brief reply?

3        MS. MOE:  Yes, your Honor.  Thank you very much.

4        Your Honor, I want to begin by addressing head on the

5   notion that the government's presentation in this case is

6   somehow about spins or about throwing dirt or about the media.

7   Your Honor, my colleagues and I are appearing today on behalf

8   of the United States Attorney's Office of the Southern District

9   of New York.  Our presentation of the defendant's conduct is

10  detailed in an indictment that was returned by a grand jury in

11  this court.  These are the facts.  It is not dirt.  It is not

12  spin.  That is the evidence and that is what we have proffered

13  to the court.

14        And the notion that anyone could read the indictment

15  that has been returned in this case and now reach the

16  conclusion that an adult woman, cultivating the traffic of

17  underage girls, knowing that they will be sexually abused and

18  exploited by an adult man, and conclude that that is chilling

19  conduct, that is, on the face of the indictment, your Honor.

20        Turning to the facts we have proffered to the court

21  about the defendant's finances, and particularly about the

22  defendant's conduct in hiding, it appears, your Honor, that it

23  is undisputed that the defendant was living in hiding and took

24  those actions.  There cannot be any spin or characterization of

25  this spin.  Those are the facts that appear to be undisputed.

k7e2MaxC kjc

1          Turning to several specific points, your Honor, that I

2    would like to respond to.  I want to address the notion that

3    the defendant would have surrendered if the government had

4    asked her to.  As defense counsel conceded, no offer along

5    those lines was ever made.  And of course the government

6    doesn't have to accept the defense counsel's representation

7    that their client would surrender.

8          In fact, the fact that the government took these

9    measures to arrest the defendant reflects how seriously the

10   government takes the risk of the defendant of flight.  Why on

11   earth would the government notify the defendant through her

12   counsel that she was about to be indicted and arrested if the

13   government had serious concerns that she was a risk of flight?

14   That is exactly what occurred here.

15         In addition, it is interesting that defense counsel

16   notes that it should have been obvious to the government that

17   the defendant would have surrendered when, at the same time, in

18   civil litigation in this district, defense counsel declined to

19   accept service on behalf of plaintiffs who were seeking to sue

20   the defendant in connection with some of these allegations, and

21   they were required to seek leave of the court to serve the

22   defendant through their counsel.

23         Your Honor, turning to the question of the defendant's

24   finances there is still at this point no substantive response

25   regarding defendant's finances or about the lack of candor to

k7e2MaxC kjc

the court, significantly.

And while we recognize that it appears that the defendant's extensive resources may be in complicated banking records, at a basic level, the defense argument is that she cannot remember off the top of her head just how many millions of dollars she has.  That should cause the court serious concern.

A bail hearing, your Honor, is not an opportunity for the defendant to slowly reveal information until the court deems it sufficient.  That is not sufficient process here. That is not appropriate.  This information is coming out in dribs and drabs, and defendant should not be in a position to slowly but surely concede, as the government reveals, that she has been less than candid with the court about her finances. There are serious concerns here.

With respect to the notion that the defendant could just surrender her passports, there are of course no limitations this court could set on a foreign government issuing travel documents to defendant or accepting her if she were to enter into that country.

And finally, your Honor, with respect to the case law that defense has cited, they ignore the obvious comparator case, which is Judge Berman's decision regarding Jeffrey Epstein, who was arrested both on risk of flight grounds and on dangerousness grounds.  And as Judge Berman detailed, the

k7e2MaxC kjc

detention was appropriate in that case on risk of flight alone.
And, again, that conduct was -- at that point significant time
had passed, and Jeffrey Epstein was not a foreign citizen.

I want to respond with respect to the NPA.  At this
point, your Honor, the defense has articulated no legal basis
to suggest that the defendant is shielded by the nonprosecution
agreement, and it simply doesn't make sense that the decision
in this case is somehow tactical to avoid concerns about the
NPA, when the government charged Jeffrey Epstein with conduct
that fell within the scope of the time period within the
nonprosecution agreement and stated before the court in
connection with bail proceedings in that matter that this is
the government's strong view that that agreement does not bind
this office whatsoever with respect to any kind of conduct or
any kind of individual.  That agreement does not bind this
office whatsoever.

Your Honor, in short, it is important for the court to
evaluate the question of bail given the totality of the
circumstances.  The defense's argument, in essence, attempts to
view each of the government's arguments as absolute.  But when
you review the totality of the circumstances -- the defendant's
extensive international ties, her conduct over the past year,
her unknown finances and unwillingness to be more candid with
the court about her resources to flee, her specific bail
proposal which provides absolutely no security to the court --

1    it is clear that defendant has not met her burden to rebut the

2    presumption of detention in this case.  The government urges

3    the court to detain this defendant, consistent with the

4    recommendation of Pretrial Services and the request of the

5    victims.  It is important, your Honor, that there be a trial in

6    this case, and the government has serious concerns that the

7    defendant will flee if afforded the opportunity.

8              Thank you, your Honor.

9              THE COURT:  Briefly, Ms. Moe, just a couple of legal

10   questions.

11             Mr. Cohen argued that you failed to address directly

12   the standards, the burdens under the statutory provision, and

13   that you have avoided the fact of the government continuing to

14   carry the burden by a preponderance of the evidence with

15   respect to risk of flight and whether there are measures that

16   could assure appearance.  Do you dispute anything legally

17   suggested by Mr. Cohen in terms of the standard that applies?

18             MS. MOE:  Your Honor, the government submits that the

19   standard is clear.  It is the defendant's burden of production

20   to rebut the presumption that there are no set of conditions

21   that could reasonably assure her continued appearance in this

22   case.  The government has the ultimate burden of persuasion,

23   but it is the defendant's burden of production.  She has failed

24   to meet that burden for the reasons we set forth in our

25   briefing and arguments today.

k7e2MaxC kjc

1          THE COURT:  Okay.

2          And then the other legal question I had, I think

3    Mr. Cohen began his presentation by noting -- by raising case

4    law suggesting the lack of relevance of the statements of the

5    alleged victims, although fully recognizing their entitlement

6    under the law to be heard.  What is the government's position

7    with respect to the relevance of the alleged victim statements

8    in the 3142 analysis?

9          MS. MOE:  Your Honor, the government has not proffered

10   victim's testimony or information in an effort to support its

11   motion.  To the contrary, the victims have appeared consistent

12   with their rights under the Crime Victims Rights Act.  Of

13   course, as we noted in our reply brief, it is very important to

14   the government that the victims receive justice in this case

15   and that there be a trial so that that could happen.  That is

16   very important to the government, and we respectfully submit

17   that the court should take that into account.  However, again,

18   the victims' participation in this proceeding is pursuant to

19   their rights under the Crime Victims Rights Act.  It is not

20   part of the government's presentation in this case.

21          THE COURT:  Okay.  So I should not consider it --

22   should not consider the substance of the statements in the

23   overall bail analysis.

24          MS. MOE:  Your Honor, with respect to the nature and

25   circumstances of the offense, the offense conduct, the

k7e2MaxC kjc

government submits that the statements of the victims certainly

shed light on the gravity of the offense conduct, the harm it

has caused, and how serious that conduct is.  The court can and

should take that into account.  My point was a procedural one;

that it is not the case that the government is submitting this

as evidence in support of its motion, but it is certainly the

case that the victims' experiences, the harms that they have

been caused can be considered by the court with respect to the

nature and circumstances of the offense conduct, which we

submit is gravely serious.

THE COURT:  All right.  Thank you.

Mr. Cohen, very briefly, any final points?

MR. COHEN:  Yes, your Honor, very briefly.  I won't

get into it, but I don't think she just answered your question

about what they are doing with respect to the CVRA victims, but

I will leave that to the court.

Just very quickly, two points, your Honor.

The government says in its response now that the case

to be relied upon and distinguished is *U.S. v. Epstein*.  They

didn't raise it in their opening memorandum or their reply or

in their oral presentation before your Honor.  To the extent

your Honor considers it, and we have certainly looked at it and

the transcript of the proceeding before Judge Berman, most of

that case is about dangerousness, your Honor, which is

something the government is expressly not proceeding under here

k7e2MaxC kjc

because the conduct is 25 years old, among other reasons.

And as to the risk of flight factors, Mr. Epstein had a prior felony conviction for conduct similar to that alleged in the indictment.  The package before Judge Berman was only two suretors, and any properties that were offered to Judge Berman at the proceeding were already subject to forfeiture and so could not be proposed.  So it is a very, very different situation in that case which was not raised by the government, and that's why we didn't address it.

The last point which I meant to raise earlier, your Honor, and I will end with this, and I should have raised it earlier, what we sometimes see in bail cases, and I'm sure your Honor has seen this, is the government says, well, the defendant was hiding and we have evidence, your Honor, that the defendant was making plans to leave the country.  That is the situation, frankly, in the *U.S. v. Zarger* case, the case by Judge Gleeson in 2000, that the government cites in its brief, but of course doesn't discuss the facts.  There is nothing to that effect here.  To the contrary, the defendant, our client, is sitting in New Hampshire at the time of the arrest.  So there is no evidence that there was some sort of imminence for the court to consider.

So not to repeat all the arguments we made, we thank the court for your time and for reading the submissions and listening, and we just think, Judge, when you step back, the

k7e2MaxC kjc

1    concerns raised by the government can be addressed, they have

2    not carried their burden, and this is really a case that should

3    be subject to strict bail conditions to be set by the court,

4    among other things, to give us any reasonable chance of

5    fighting this -- preparing and fighting this case to trial.

6            Thank you, your Honor.

7            THE COURT:  All right.  Thank you, counsel.

8            I am prepared to make my ruling.

9            Several provisions of federal law govern the court's

10   determination whether to detain the defendant or release her on

11   bail pending trial.  A court must apply that law equally to all

12   defendants no matter how high profile the case or well off the

13   defendant.  It is therefore important to begin here with a

14   clear articulation of the governing law.

15           It is also important to bear in mind that Ms. Maxwell,

16   like all defendants, is entitled to a full presumption of

17   innocence, that is, she is presumed innocent and the only

18   grounds for detention at this stage are, under the law, risk of

19   flight or danger to the community.

20           I may consider the weight of the evidence proffered by

21   the government at this stage in making this determination, but

22   unless this matter is resolved by a plea, it will remain

23   entirely for a jury to decide the question of Ms. Maxwell's

24   guilt as to the charges contained in the indictment.

25           Turning to the government's standard under Title 18 of

k7e2MaxC kjc

1   the United States Code, Section 3142, the court may order

2   detention only if it finds that no conditions or combination of

3   conditions will reasonably assure the appearance of the person

4   as required and the safety of any other person in the

5   community.

6           In making a bail determination the court must consider

7   the defendant's dangerousness, if that's raised, and the

8   defendant's risk of flight.  A finding of dangerousness, if

9   that were an issue, must be supported by clear and convincing

10   evidence.  A finding that a defendant is a flight risk must be

11   supported by a preponderance of the evidence.

12           In a case such as this one, where the defendant is

13   accused of certain offenses involving a minor victim, federal

14   law requires that it shall be presumed that no condition or

15   combination of conditions will reasonably assure the appearance

16   of the person as required.  That's citing 18 U.S.C. 3142(a)(3).

17           The Second Circuit has explained that, in a

18   presumption case such as this, a defendant bears a limited

19   burden of production, not a burden of persuasion, to rebut the

20   presumption by coming forward with evidence that she does not

21   pose a danger to the community or a risk of flight.

22   Furthermore, once a defendant has met her burden of production

23   relating to these two factors, the presumption favoring

24   detention does not disappear entirely, but remains a factor to

25   be considered among those weighed by the district court.  But

k7e2MaxC kjc

1    even in a presumption case, the government retains the ultimate

2    burden of persuasion by clear and convincing evidence that the

3    defendant presents a danger to the community, if that were an

4    issue, and a showing by the lesser standard of a preponderance

5    of the evidence that the defendant presents a risk of flight.

6          The statute further mandates that the court take into

7    account four factors in making its determination: the nature

8    and circumstances of the offense charged, the weight of the

9    evidence against the person, the history and characteristics of

10   the person, and the nature and circumstances of the danger to

11   any person or the community that would be posed by the person's

12   release.  That is 18 U.S.C. 3142(g).

13         Now that the court has laid out the federal statutory

14   requirements that guide its bail determination, it turns to the

15   government's specific application in this case for detention

16   pending trial.

17         The government does not argue, as has been repeatedly

18   made clear today, for detention based on danger to the

19   community.  Instead, it rests its argument for detention on

20   Ms. Maxwell's alleged risk of flight.  As noted in a

21   flight-risk case, the government bears the burden of proving by

22   a preponderance of the evidence both that the defendant

23   presents an actual risk of flight and that no condition or

24   combination of conditions could be imposed on the defendant

25   that would reasonably assure her presence in court.  And I'm

k7e2MaxC kjc

1   quoting there from *United States v. Boustani*, 932 F.3d 79, (2d

2   Cir. 2019).

3           The court concludes as follows:

4           First, the nature and circumstances of the offense

5   here weigh in favor of detention.  As noted, the crimes

6   involving minor victims that Ms. Maxwell has been accused of

7   are serious enough to trigger a statutory presumption in favor

8   of detention.  And to reiterate, Ms. Maxwell is presumed

9   innocent until proven guilty, but if she were convicted of

10  these crimes, the sentences she faces is substantial enough to

11  incentivize her to flee.  In total, Ms. Maxwell, who is 58

12  years old, faces up to a 35-year maximum term of imprisonment

13  if convicted.  And even if sentences are run concurrently, she

14  would still face up to a decade of incarceration.

15          Second, noting again that Ms. Maxwell is entitled to

16  the full presumption of innocence, it is appropriate to

17  consider the strength of the evidence proffered by the

18  government in assessing risk of flight.  The government's

19  evidence at this early juncture of the case appears strong.

20  Although the charged conduct took place many years ago, the

21  indictment describes multiple victims who provided detailed

22  accounts of Ms. Maxwell's involvement in serious crimes.  The

23  government also proffers that this witness testimony will be

24  corroborated by significant contemporaneous documentary

25  evidence.  While the defense states that it intends to assert

k7e2MaxC kjc

1   legal defenses based on untimeliness and the nonprosecution

2   agreement, those arguments are asserted in a conclusory fashion

3   and have been directly countered by the government with

4   citations to law.  Although the court does not prejudge these

5   matters at this stage, based on what's been asserted thus far,

6   they do not undermine the strength of the government's case at

7   the bail determination stage.  Ms. Maxwell is now aware of the

8   potential strength of the government's case against her and

9   arguments countering these defenses, thus creating a risk of

10   flight.

11          Third, the court considers the defendant's history and

12   characteristics and finds that paramount in a conclusion that

13   Ms. Maxwell poses a risk of flight.  Ms. Maxwell has

14   substantial international ties and could facilitate living

15   abroad if she were to flee the United States.  She holds

16   multiple foreign citizenships, has familial and personal

17   connections abroad, and owns at least one foreign property of

18   significant value.  And, in particular, she is a citizen of

19   France, a nation that does not appear to extradite its

20   citizens.

21          Moreover, as the government has detailed in its

22   written submission and today, Ms. Maxwell possesses

23   extraordinary financial resources which could provide her the

24   means to flee the country despite COVID-19-related travel

25   restriction.  Given the government's evidence, the court

k7e2MaxC kjc

1    believes that the representations made to Pretrial Services

2    regarding the defendant's finances likely do not provide a

3    complete and candid picture of the resources available.

4          Additionally, while Ms. Maxwell does have some family

5    and personal connections to the United States, the absence of

6    any dependents, significant family ties or employment in the

7    United States leads the court to conclude that flight would not

8    pose an insurmountable burden for her, as is often the case in

9    assessments of risk of flight.

10          In sum, the combination of the seriousness of the

11   crime, the potential length of the sentence, the strength of

12   the government's case at this stage, the defendant's foreign

13   connections, and this defendant's substantial financial

14   resources all create both the motive and opportunity to flee.

15          Now, in the face of this evidence, the defendant

16   maintains she is not a flight risk.  She notes that even after

17   the arrest of Jeffrey Epstein and even after the implication by

18   authorities and the press that there was an ongoing

19   investigation into his alleged coconspirators and that she may

20   be implicated, she did not leave the United States.  She hasn't

21   traveled, apparently, outside the United States in over a year

22          To the contrary, through counsel, she has stayed in

23   contact with the government.  The government doesn't contest

24   these factual representations.  The fact that Ms. Maxwell did

25   not flee previously, given these circumstances, is a

k7e2MaxC kjc

significant argument by the defense and it is a relevant

consideration, but the court does not give it controlling

weight here.

         To begin, in spite of the Epstein prosecution,

Ms. Maxwell herself may have expected to avoid prosecution.

After all, she was not named in the original indictment.  The

case was therefore distinguishable from *United States v.*

*Friedman*, 837 F.2d 48 (2d Cir. 1988), a case where release was

ordered in part because the defendant took no steps to flee

after a search warrant was executed against the defendant and

he had been arrested on state charges several weeks earlier.

         Likewise, the mere fact that she stayed in contact

with the government means little if that was an effort to stave

off indictment and she did not provide the government with her

whereabouts.  Circumstances of her arrest, as discussed, may

cast some doubt on the claim that she was not hiding from the

government, a claim that she makes throughout the papers and

here today, but even if true, the reality that Ms. Maxwell may

face such serious charges herself may not have set in until

after she was actually indicted.

         Moreover, Ms. Maxwell's argument rests on a

speculative premise that prior to indictment Ms. Maxwell had as

clear an understanding as she does now of the serious nature of

the charges, the potential sentence she may face, and the

strength of the government's case.  Whatever calculation and

k7e2MaxC kjc

incentive she had before this indictment may very well have

changed after it.  In other words, her federal indictment may

well change her earlier decisions and, given the defendant's

resources, the court concludes that Ms. Maxwell poses a

substantial actual risk of flight.

Having made this determination, the court next turns

to whether the government has met its burden to show by a

preponderance of the evidence that no combination of conditions

could reasonably assure the defendant's presence.  The court is

persuaded that the government has met this burden and concludes

that even the most restrictive conditions of release would be

insufficient.

As an initial matter, the financial component of

Ms. Maxwell's proposed bail package appears to represent a

relatively small component of the access available to her and

is secured only by a foreign property said to be worth about

several million dollars.  But even a substantially larger

package would be insufficient.  The extent of her financial

resources is demonstrated by some of the transactions and bank

accounts discussed in the government's submission and here

today, and Ms. Maxwell has apparently failed to submit a full

accounting or even a close to full accounting of her financial

situation.  She has provided the court with scarce information

about the financial information of her proposed cosigners, for

example.  Without a clear picture of Ms. Maxwell's finances and

k7e2MaxC kjc

the resources available to her, it is practically impossible to
set financial bail conditions that could reasonably assure her
appearance in court.

Even if the picture of her financial resources were
not opaque, as it is, detention would still be appropriate.
Personally, the defendant not only has significant financial
resources, but has demonstrated sophistication in hiding those
resources and herself.  After the arrest of Jeffrey Epstein,
Ms. Maxwell retreated from view.  She moved to New England,
changing locations on multiple occasions, and appears to have
made anonymous transactions both big and small.  The defense
said that she did all of this not to hide from the government
but to maintain her privacy and avoid public and press
scrutiny.  Even assuming that Ms. Maxwell only wanted to hide
from the press and public, an assumption that the court does
not share, but even assuming that's the case, her recent
conduct underscores her extraordinary capacity to evade
detection, even in the face of what the defense has
acknowledged to be extreme and unusual efforts to locate her.

Because of these concerns, even a bail package with
electronic monitoring and home security guards would be
insufficient.  Were she to flee, the defendant could simply
remove the monitoring bracelet and, as other courts have
observed, home detention with electronic monitoring does not
prevent flight.  At best it limits a fleeing defendant's head

k7e2MaxC kjc

1   start.  Likewise, the possibility that Ms. Maxwell could evade

2   security guards or monitoring is a significant one.

3           The court finds by a preponderance of the evidence

4   that no combination of conditions could reasonably assure her

5   presence in court.  The risks are simply too great.

6           Defense cites a number of cases, including *Esposito*,

7   *Dreier*, and *Madoff*, as examples of serious and high-profile

8   prosecutions where the courts, over the government's objection,

9   granted bail to defendants with significant financial

10  resources.  But unlike those defendants, Ms. Maxwell possesses

11  significant foreign connections.

12          This case is distinguishable for other reasons, as

13  well.  For example, the risk of flight in *Esposito* appears to

14  have been based on the resources available to defendant, not

15  foreign connections or experience and a record of hiding from

16  being found.

17          In *Madoff*, the defendant had already been released on

18  a bail package agreed to by the parties for a considerable

19  period of time before the government sought detention.  The

20  court there found there were no circumstances in the

21  intervening period showing that the defendant had become a

22  flight risk.  Because of these crucial factual differences, the

23  court finds the cases not on point and not persuasive.

24          Finally, in arguing for release, the defense raises

25  the challenges and risks posed by the COVID-19 pandemic.  The

k7e2MaxC kjc

1    court is greatly concern by the Bureau of Prisons' ability to

2    keep inmates and detainees safe during the health crisis and

3    has found those considerations to be significant in other

4    cases.  The argument nonetheless fails in this case for several

5    reasons.  Most importantly, unlike almost all of the cases in

6    which this court has granted release as a result of COVID-19,

7    Ms. Maxwell has not argued that her age or underlying health

8    conditions make her particularly susceptible to medical risk

9    from the virus.  In other words, she doesn't argue that she is

10   differently situated than many other federal inmates with

11   respect to the risk posed by COVID-19.  In light of the

12   substantial reasons that I have already identified favoring

13   Ms. Maxwell's detention and her not making any arguments based

14   on her age or health, the COVID-19 pandemic alone does not

15   provide grounds for her release.

16          Second, the defense argues that pretrial release is

17   necessary for Ms. Maxwell to prepare her defense, as

18   COVID-19-related restrictions at the prison at which she is

19   held, the MDC, will hamper her ability to meet counsel and

20   review documents.  The court notes that this case is at the

21   early stages.  There will be no hearings, let alone a trial,

22   for a significant period of time.  The case does stand in stark

23   contrast to *United States v. Stephens*, invoked by the defense,

24   in which this court at the beginning of the pandemic granted

25   temporary release to a defendant who was scheduled to have an

k7e2MaxC kjc

1    evidentiary hearing within one week.  In contrast, the

2    defendant is in the same position as any newly indicted

3    defendant who is incarcerated in terms of the need to access

4    counsel.  Indeed the defense's logic, all pretrial detainees

5    currently incarcerated at MDC and any federal facility would

6    need to be released to prepare their defense.  To the contrary,

7    the MDC has continued to develop procedures to ensure

8    attorney-client access at the facility, and the defendants

9    detained at MDC are able to conduct video and phone conferences

10   with their attorneys.  There is ongoing litigation before

11   Judge Brodie in the Eastern District of New York about the

12   adequacy of attorney-client access at the MDC.  That is case

13   No. 19 Civ. 660.  Public filings from the court-appointed

14   mediator in that case describe the availability of legal phone

15   calls and video calls, video conferences for the purposes of

16   reviewing discovery between detained defendants and their

17   counsel, and that same report indicates that MDC is currently

18   developing a plan to resume in-person attorney-client visits in

19   the near future.

20           At this stage in this case and at this point in the

21   pandemic in New York City, these measures are sufficient to

22   ensure Ms. Maxwell has access to her counsel.  To further

23   assuage these concerns, the court orders the government in this

24   case, and frankly all others before it, to work with the

25   defense to provide adequate communication between counsel and

k7e2MaxC kjc

1    client.  If the defense finds this process inadequate in any

2    way, it may make a specific application to this court for

3    further relief.

4          In sum and for all of the foregoing reasons, the court

5    finds that the government has met its burden of showing by a

6    preponderance of the evidence that the defendant is a risk of

7    flight and that no combination of conditions could reasonably

8    assure the presence of the defendant at court.

9          The defendant is hereby ordered to be detained pending

10   trial.

11         Counsel, is there anything else that I can address at

12   this time?

13         Mr. Cohen?

14         MR. COHEN:  Not from the defense, your Honor.

15         THE COURT:  Thank you.

16         Ms. Moe?

17         MS. MOE:  Not from the government, your Honor.  Thank

18   you.

19         THE COURT:  All right.  My thanks to counsel for your

20   advocacy and my thanks to the staff of the court who worked

21   hard to provide the access to these proceedings in the

22   pandemic.

23         We are hereby adjourned.

24                              oOo

25