UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x
                        :

UNITED STATES OF AMERICA,        :

                   :       20 Cr. 330 (AJN)

       v.             :

                   :

GHISLAINE MAXWELL,         :

                   :

        Defendant.    :

                   :

-------------------------------------------------------x

## MEMORANDUM OF GHISLAINE MAXWELL
## IN SUPPORT OF HER RENEWED MOTION FOR BAIL

Mark S. Cohen
Christian R. Everdell
COHEN & GRESSER LLP
800 Third Avenue
New York, NY 10022
Phone: 212-957-7600

Jeffrey S. Pagliuca
Laura A. Menninger
HADDON, MORGAN & FOREMAN P.C.
150 East 10th Avenue
Denver, CO 80203
Phone: 303-831-7364

Bobbi C. Sternheim
Law Offices of Bobbi C. Sternheim
33 West 19th Street - 4th Floor
New York, NY 10011
Phone: 212-243-1100

*Attorneys for Ghislaine Maxwell*

# <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

ARGUMENT ......................................................................................................... 7

I.    Reconsideration of the Court's Bail Decision is Appropriate Under 18 U.S.C. § 3142(f)................................................................................................................ 7

II.    Ms. Maxwell Should Be Granted Bail Under the Proposed Strict Bail Conditions .......................................................................................................... 10

    A.    Ms. Maxwell Has Deep Family Ties to the United States and Numerous Sureties to Support Her Bond............................................................ 10

        1.    Ms. Maxwell is Devoted to Her Spouse ████████ and Would Never Destroy Her Family By Leaving the Country ............. 11

        2.    A Number of Ms. Maxwell's Family and Friends, and the Security Company Protecting Her, Are Prepared to Sign Significant Bonds ................................................................... 13

    B.    Ms. Maxwell Has Provided a Thorough Review of Her Finances for the Past Five Years ................................................................................... 15

    C.    Ms. Maxwell Was Not Hiding from the Government Before Her Arrest....... 18

        1.    Ms. Maxwell Was Trying to Protect Herself ████████ from a Media Frenzy and from Physical Threats........................................... 18

        2.    Ms. Maxwell's Counsel Was in Regular Contact with the Government Prior to Her Arrest............................................... 22

        3.    Ms. Maxwell Did Not Try to Avoid Arrest, Nor Was She "Good At" Hiding....................................................................... 23

    D.    Ms. Maxwell Has Waived Her Extradition Rights and Could Not Seek Refuge in the United Kingdom or France............................................. 25

    E.    The Discovery Contains No Meaningful Documentary Corroboration of the Government's Allegations Against Ms. Maxwell...................................... 30

    F.    The Proposed Bail Package Is Expansive and Far Exceeds What Is Necessary to Reasonably Assure Ms. Maxwell's Presence in Court ............. 34

G.     The Alternative to Bail Is Confinement Under Oppressive Conditions
        that Impact Ms. Maxwell's Health and Ability to Prepare Her Defense ........ 35

CONCLUSION ................................................................................................................ 38

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*United States v. Boustani*,
  932 F.3d 79 (2d Cir. 2019).................................................................................. 3

*United States v. Bradshaw*,
  No. 00-40033-04-DES, 2000 WL 1371517 (D. Kan. July 20, 2000) ......................... 8

*United States v. Chen*,
  820 F. Supp. 1205 (N.D. Cal. 1992) ...................................................................... 27

*United States v. Cirillo*,
  No. 99-1514, 1999 WL 1456536 (3d Cir. July 13, 1999)........................................ 26

*United States v. Karni*,
  298 F. Supp. 2d 129 (D.D.C. 2004) ....................................................................... 27

*United States v. Khashoggi*,
  717 F. Supp. 1048 (S.D.N.Y. 1989)....................................................................... 27

*United States v. Lee*,
  No. CR-99-1417 JP, 2000 WL 36739632 (D.N.M. 2000).......................................... 8

*United States v. Orta*,
  760 F.2d 887 (8th Cir. 1985) ................................................................................ 35

*United States v. Petrov*,
  No. 15-CR-66-LTS, 2015 WL 11022886 (S.D.N.Y. Mar. 26, 2015)........................... 8

*United States v. Rowe*,
  No. 02 CR. 756 LMM, 2003 WL 21196846 (S.D.N.Y. May 21, 2003)....................... 8

*United States v. Salvagno*,
  314 F. Supp. 2d 115 (N.D.N.Y. 2004) .................................................................... 27

*United States v. Stephens*,
  447 F. Supp. 3d 63 (S.D.N.Y. 2020)................................................................... 7, 38

*United States v. Ward*,
  63 F. Supp. 2d 1203 (C.D. Cal. 1999) ..................................................................... 7

**Statutes**

18 U.S.C. § 3142(c)(1)(B)(i) ................................................................................. 3

18 U.S.C. § 3142(f) ......................................................................................... 7, 8

18 U.S.C. § 3142 ................................................................................................. 3

**Rules**

Rule 5(F) of the Federal Rules of Criminal Procedure ................................................ 5

## **TABLE OF EXHIBITS**

Exhibit A.     Letter of ███████████

Exhibit B.     Letter of ████████

Exhibit C.     Letter of █████████████

Exhibit D.     Letter of ██████████████████

Exhibit E.     Letter of ████████████

Exhibit F.     Letter of ████████████████

Exhibit G.     Letter of █████████

Exhibit H.     Letter of █████████

Exhibit I.     Letter of ████████████

Exhibit J.     Letter of ███████████████

Exhibit K.     Letter of ████████████

Exhibit L.     Letter of ████████████

Exhibit M.     Letter of ████████████

Exhibit N.     Letter of ██████████

Exhibit O.     Financial Condition Report

Exhibit P.     Statement of ██████

Exhibit Q.     Media Analysis

Exhibit R.     Timeline of Discussions with SDNY

Exhibit S.     Statement of █████████████

Exhibit T.     Extradition Waivers

Exhibit U.     UK Extradition Opinion

Exhibit V.     France Extradition Opinion

Exhibit W.     Letter of ██████████

Exhibit X.     Letter of ███████████

## PRELIMINARY STATEMENT

Ghislaine Maxwell respectfully submits this Memorandum in Support of her Renewed Motion for Release on Bail.

As set forth more fully below, Ms. Maxwell is proposing an expansive set of bail conditions that is more than adequate to address any concern regarding risk of flight and reasonably assure Ms. Maxwell's presence in court.  Ms. Maxwell also provides compelling additional information in this submission, not available at the time of the initial bail hearing (which was held 12 days after her arrest), that squarely addresses each of the Court's concerns from the initial hearing and fully supports her release on the proposed bail conditions.  This information includes:  (1) evidence of Ms. Maxwell's significant family ties in the United States; (2) a detailed financial report, which has also been reviewed by a former IRS CID special agent, concerning her financial condition and assets, and those of her spouse, for the last five years; (3) irrevocable waivers of her right to contest extradition from the United Kingdom and France and expert opinions stating that it would be highly unlikely that Ms. Maxwell would be able to resist extradition in the implausible event of her fleeing to either country; (4) evidence rebutting the Government's contention that Ms. Maxwell attempted to evade detection by law enforcement prior to her arrest; and (5) a discussion of the weakness of the government's case against Ms. Maxwell, including the lack of corroborative, contemporaneous documentary evidence in support of the three accusers.

Ms. Maxwell vehemently maintains her innocence and is committed to defending herself. She wants nothing more than to remain in this country to fight the allegations against her, which are based on the uncorroborated testimony of a handful of witnesses about events that took place over 25 years ago.  The Court should grant Ms. Maxwell bail on the restrictive conditions proposed below to ensure her constitutional right to prepare her defense.

**The Proposed Bail Conditions**

Ms. Maxwell now proposes the following $28.5 million bail package, which is exceptional in its scope and puts at risk everything that Ms. Maxwell has—all of her and her spouse's assets, her family's livelihood, and the financial security of her closest friends and family—if she were to flee, which she has no intention of doing.

- A $22.5 million personal recognizance bond co-signed by Ms. Maxwell and her spouse, and secured by approximately $8 million in property and $500,000 in cash. As noted in the financial report, the $22.5 million figure represents the value of <u>all</u> of Ms. Maxwell and her spouse's assets. The three properties securing the bond include <u>all</u> of the real property that Ms. Maxwell and her spouse own in the United States, including their primary family residence.

- Five additional bonds totaling approximately $5 million co-signed by seven of Ms. Maxwell's closest friends and family members. The individual bonds are in amounts that would cause significant financial hardship to these sureties if Ms. Maxwell were to flee. These include:

    o A $1.5 million bond co-signed by ███████████ both U.S. citizens and residents, and fully secured by ███████ primary residence ████████████

    o A $3.5 million bond co-signed by ████████████ who are U.K. citizens and residents. The $3.5 million sum represents virtually all of ████████████ assets. ████████████ is the guarantor of the existing mortgages on these assets.

    o A $25,000 bond co-signed by ████████████, a U.S. citizen and resident, and fully secured by $25,000 in cash.

    o A $25,000 bond signed by ████████, a close family friend, and fully secured by $25,000 in cash. The cash security is money that ████████ planned to set aside for his own daughter's future, but he is prepared to pledge it for Ms. Maxwell.

    o A $2,000 bond signed by ████████, a close family friend, who is a U.S. citizen and resident, and fully secured by $2,000 in cash.

- A $1 million bond posted by the security company that would provide security services to Ms. Maxwell if she is granted bail and transferred to restrictive home confinement. This bond is significant as we are unaware of a security company ever posting its own bond in support of a bail application. The head of the security

company has confirmed that they have never done this for any client, and that he is willing to do so for Ms. Maxwell because he is confident that she will not try to flee.

- Ms. Maxwell will remain in the custody of ███████████████ a U.S. citizen who has lived in the United States for 40 years. ██████████ will serve as Ms. Maxwell's third-party custodian under 18 U.S.C. § 3142(c)(1)(B)(i) and will live with Ms. Maxwell in a residence in New York City until this case has concluded.  We have identified an appropriate residence in the Eastern District of New York that has been cleared by Ms. Maxwell's security company.

- Travel restricted to the Southern and Eastern Districts of New York, and limited as necessary to appear in court, attend meetings with counsel, and visit with doctors/psychiatrists/dentists, and upon approval by the Court or Pretrial Services.

- Surrender of all travel documents with no new applications.

- Ms. Maxwell will provide the Court irrevocable written waivers of her right to contest extradition in France and the United Kingdom.

- Strict supervision by Pretrial Services.

- Home confinement at her residence with electronic GPS monitoring.

- Visitors to be approved in advance by Pretrial Services, with counsel and family members to be pre-approved.

- Such other terms as the Court may deem appropriate under 18 U.S.C. § 3142.

For her own safety, Ms. Maxwell will also have on-premises security guards 24 hours a day, 7 days a week.  The security guards will prevent Ms. Maxwell from leaving the residence at any time without prior approval by the Court or Pretrial Services and will escort her when she is authorized to leave.  If the Court wishes to make private security a condition of her bond, the guards could report to Pretrial Services.[1]  We believe these conditions are more than sufficient to reasonably assure Ms. Maxwell's presence in court.

---

[1] As we argued in our initial bail application, this case involves the limited circumstance under which the Second Circuit approved granting pretrial release to a defendant on the condition that she pays for private armed security guards. *United States v. Boustani*, 932 F.3d 79, 82 (2d Cir. 2019) (defendant who "is deemed to be a flight risk primarily *because of* [her] wealth . . . may be released on such a condition only where, *but for* [her] wealth, [s]he would not have been detained" (emphasis in original)).  Therefore, Ms. Maxwell may be released on the condition that she pay for private armed security.  (Dkt. 18 at 20 n.16.)

**New Information for the Court's Consideration**

The defense has devoted substantial time and effort to compile information that was not available to Ms. Maxwell at the time of the initial bail hearing that squarely addresses each of the factors the Court considered at that hearing.  Because of these efforts, Ms. Maxwell can now present the following additional information in support of her renewed bail application:

- **Letter from Ms. Maxwell's spouse**. This letter demonstrates that Ms. Maxwell has powerful family ties to the United States that she will not abandon.  It describes the committed relationship between Ms. Maxwell and her spouse, who is a U.S citizen, and how they lived a quiet family life together ████████████████ in the United States for over four years immediately prior to her arrest.  The letter further explains that Ms. Maxwell was forced to leave her family and drop out of the public eye, not because she was trying to evade law enforcement, but because the intense media frenzy and threats following the arrest and death of Jeffrey Epstein threatened the safety and wellbeing of herself and her family, ████████████████  For these same reasons, Ms. Maxwell's spouse did not come forward as a co-signer at the time of the initial hearing.  (Ex. A).

- **Letters from numerous other friends and family members**.  These letters from Ms. Maxwell's other sureties and several family members and friends attest to Ms. Maxwell's strong, forthright character and their confidence that she will not flee.  The sureties also describe the significant financial distress they would suffer if Ms. Maxwell were to violate her bail conditions.  (Exs. B-N, W-X).

- **Financial report**.  The financial report, prepared by the accounting firm Macalvins Limited, provides an accounting of Ms. Maxwell's financial condition from 2015-2020, and discloses (i) all of her own assets, (ii) all assets held in trust, and (iii) all of the assets held by her spouse over that same time period.  The report reflects that the total value of assets in all three categories is approximately $22.5 million, which is the amount of the proposed bond.  (Ex. O).

- **Report from former IRS agent**. ████████████ a former IRS agent with over 40 years of experience in criminal tax and financial fraud investigations, reviewed the Macalvins report and confirmed that it presents a complete and accurate picture of Ms. Maxwell and her spouse's assets from 2015-2020.  (Ex. P).

- **Statement from the person in charge of Ms. Maxwell's security**.  This statement rebuts the government's claim that she attempted to hide from law enforcement at the time of her arrest.  (Ex. S).

- **Extradition waivers and expert affidavits**.  To address the Court's concerns about extradition, Ms. Maxwell will present irrevocable written waivers of her right to

4

contest extradition in both the United Kingdom and France.[2]   We also provide
opinions from experts in the extradition laws of the France and the United Kingdom
stating that it is highly unlikely that Ms. Maxwell would be able to resist extradition
from either country in the event she were granted bail and somehow fled to either
country, which she has no intention of doing.  Their opinions also state that any
extradition proceeding would be resolved promptly.  (Exs. T-V).

- **Lack of corroborating evidence**.  The government represented to the Court that it
  had "contemporaneous documents," including "diary entries" in support of its case.
  (Dkt. 4 at 5).  The defense has now reviewed the discovery produced to date,
  including all of the documents that the government described as the core of its case
  against Ms. Maxwell.  As explained more fully below, the discovery contains no
  meaningful documentary corroboration as to Maxwell and only a small number of
  documents from the time period of the conspiracy charged in the indictment.  As an
  example, the government produced only ███████████████████████████████████████[3]
  The evidence in this case boils down to witness testimony about events that took
  place over 25 years ago.  Far from creating a flight risk, the lack of corroboration
  only reinforces Ms. Maxwell's conviction that she has been falsely accused and
  strengthens her long-standing desire to face the allegations against her and clear
  her name in court.

- **Oppressive conditions of confinement.**  Ms. Maxwell has now been detained
  for over 150 days in the equivalent of solitary confinement since she was
  indicted and arrested on July 2, 2020, despite the fact that she is not a suicide
  risk and has not received a single disciplinary infraction.  The draconian
  conditions to which Ms. Maxwell is subjected are not only unjust and
  punitive, but also impair her ability to review the voluminous discovery
  produced by the government and to participate meaningfully in the
  preparation of her defense.  Furthermore, the recent COVID-19 outbreak
  at the MDC threatens her safety and well-being.

**Ms. Maxwell Should Be Placed on Restrictive Bail Conditions**

During her more than five months in isolation, Ms. Maxwell has had to watch as she has

been relentlessly attacked in a deluge of media articles that spiked over a year ago when Epstein

---

[2] Ms. Maxwell has not yet signed these waivers because  we have not been able to visit her in the MDC to obtain her
signature since she was quarantined over two weeks ago.  She will sign them as soon as legal visits resume.

[3] In a letter dated October 13, 2020, we asked the government to provide additional discovery including, among
other things, ██████████████████████████████████████████████████████████ In light of the serious *Brady*
██████████ infractions in recent cases before this Court, and the recent order filed in this case pursuant to Rule 5(F) of the
Federal Rules of Criminal Procedure (*see* Dkt. 68), the government's failure to obtain ██████████ is curious and
concerning.

was arrested and has shown no signs of abating.  Indeed, in the three months after her arrest, Ms.

Maxwell was the subject of over 6,500 national media articles.  That exceeds the number of

articles that mentioned such high-profile defendants as Harvey Weinstein, Bill Cosby, Joaquín

"El Chapo" Guzmán Loera, and Keith Raniere in the 90-day period following their arrests,

*combined*.  The media coverage has ruthlessly vilified her and prejudged her guilt, and has

exposed her family and friends to harassment, physical threats, and other negative consequences.

But Ms. Maxwell is not the person the media has portrayed her to be; far from it.  And

her response to these unfounded allegations remains unchanged: she resolutely and vehemently

denies them, and she is steadfastly committed to remaining in this country, where she has been

since Epstein's arrest in July 2019, to fight them in court.  For Ms. Maxwell to flee, she would

have to abandon her spouse ███████████████.  She will not risk destroying the lives

and financial well-being of those she holds most dear to live as a fugitive during a worldwide

pandemic.  In fact, every action Ms. Maxwell has taken from the time of Epstein's arrest up to

the time of the first bail hearing was designed to *protect* her spouse ████████████ from

harassment, economic harm, and physical danger.  Ms. Maxwell wants to stay in New York and

have her day in court so that she can clear her name and return to her family.

Justice is not reserved solely for the victims of a crime; it is for the accused as well.

Here, justice would be served by granting Ms. Maxwell bail under the comprehensive conditions

we propose.  The alternative is continued detention under oppressive conditions that are

unprecedented for a non-violent pretrial detainee, which significantly impair her ability to

participate in her defense and prepare for trial and which jeopardize her physical health and

psychological wellbeing.

**ARGUMENT**

**I.   Reconsideration of the Court's Bail Decision is Appropriate Under 18 U.S.C. § 3142(f)**

A prior determination that a defendant should not be released on bail does not preclude

the Court from reconsidering its decision in light of new information.  To the contrary, a bail

hearing

> may be reopened . . . at any time before trial if the judicial officer finds that
> information exists that was not known to the movant at the time of the hearing
> and that has a material bearing on the issue whether there are conditions of release
> that will reasonably assure the appearance of such person as required and the
> safety of any other person and the community.

18 U.S.C. § 3142(f).

Courts have relied on § 3142(f) in revisiting bail determinations where the defendant

presents material testimony or documentary evidence that was not available to her at the time of

the initial hearing, even if the underlying facts might have been within the defendant's

knowledge.  For example, in *United States v. Ward,* 63 F. Supp. 2d 1203 (C.D. Cal. 1999), the

court granted the defendant's request to reopen his bail hearing to present evidence of his

immediate family's willingness to act as sureties for his release.  *Id.* at 1207.  The court held that

although "his immediate family and relatives were obviously known to" the defendant at the time

of his arrest, his inability to contact them and secure their appearance at his initial bail hearing

justified reconsideration.  *Id.*

Courts also have found § 3142(f) satisfied where there is new information regarding the

defendant's guilt or innocence or the nature and seriousness of the alleged offense—facts

generally not known to a criminal defendant at the time of the initial hearing—particularly where

the evidence undermines the government's prior representations to the Court regarding the

strength of its case.  *See, e.g., United States v. Stephens,* 447 F. Supp. 3d 63, 65 (S.D.N.Y. 2020)

(Nathan, J.) (reconsidering bail decision based, in part, on evidence suggesting government's case weaker than alleged at initial hearing and concern about possible outbreak of COVID-19 in BOP facilities); *United States v. Lee,* No. CR-99-1417 JP, 2000 WL 36739632, at *3 (D.N.M. 2000) (reopening hearing to consider, *inter alia,* affidavits relating to seriousness of the offense that defendant "could have not have martialed" in the 17 days between his indictment and the original hearing).  Changed circumstances also have been found to satisfy § 3142(f) even when the change was within the defendant's control.  *See United States v. Bradshaw,* No. 00-40033-04-DES, 2000 WL 1371517 (D. Kan. July 20, 2000) (reopening hearing where defendant decided to seek substance abuse treatment following initial hearing).

In addition, the Court may exercise its inherent authority to reconsider its own decision. "[A] release order may be reconsidered even where the evidence proffered on reconsideration was known to the movant at the time of the original hearing."  *United States v. Rowe,* No. 02 CR. 756 LMM, 2003 WL 21196846, at *1 (S.D.N.Y. May 21, 2003); *see also United States v. Petrov,* No. 15-CR-66-LTS, 2015 WL 11022886, at *3 (S.D.N.Y. Mar. 26, 2015) (noting "Court's inherent authority for reconsideration of the Court's previous bail decision").

Here, Ms. Maxwell has obtained substantial information and evidence that was not available to her at the time of her initial detention hearing.  Ms. Maxwell and her counsel have also received and reviewed the voluminous discovery produced by the government (over 2.7 million pages), which was not available at the initial hearing and which raises serious questions about the strength of the government's case.  As a result, Ms. Maxwell can now present for the Court's consideration the additional evidence discussed above in support of her bail application.

It cannot be reasonably disputed that this new evidence meets the other requirement of § 3142(f):  that it have a "material bearing on the issue whether there are conditions of release

that will reasonably assure the appearance of such person as required and the safety of any other person and the community."  The evidence submitted herewith relates directly to factors on which the Court relied in its initial detention order.  Among the bases for the Court's initial order denying bail were its findings that:

- Ms. Maxwell's lack of "significant family ties" in the United States suggested "that flight would not pose an insurmountable burden for her" (Tr. 84);

- the Court lacked "a clear picture of Ms. Maxwell's finances and the resources available to her" that would allow it to set reasonable bail conditions (Tr. 87);

- "[c]ircumstances of her arrest . . . may cast some doubt on the claim that she was not hiding from the government" (Tr. 85);

- Ms. Maxwell "is a citizen of France, a nation that does not appear to extradite its citizens" (Tr. 83); and

- the government had proffered that its "witness testimony will be corroborated by significant contemporaneous documentary evidence" (Tr. 82).

The additional evidence submitted herewith demonstrates that Ms. Maxwell does have significant family ties in the United States; that her assets have been thoroughly disclosed and reasonable bail conditions can be set; that Ms. Maxwell has never attempted to hide from the government; that Ms. Maxwell has waived her extradition rights and it is highly likely she would be extradited from the United Kingdom or France; and that the government's case against her is not supported by the corroborating documentary evidence which the government represented at the initial hearing.

The evidence submitted herewith is significant and substantial, and it could not have reasonably been obtained, assembled, and submitted in the 12 days between Ms. Maxwell's arrest and her initial detention hearing.  This evidence has a material bearing on whether reasonable bail conditions can be set, and it shows that the proposed set of conditions will reasonably assure Ms. Maxwell's appearance in court.

II.     **Ms. Maxwell Should Be Granted Bail Under the Proposed Strict Bail Conditions**

    A.     **Ms. Maxwell Has Deep Family Ties to the United States and Numerous Sureties to Support Her Bond**

Attached to this submission are letters from Ms. Maxwell's spouse and from numerous close family members and friends, many of whom have agreed to serve as sureties to support Ms. Maxwell's renewed bail application.  (*See* Exs. A-N, W-X).  Far from the cruel caricature that the press has so recklessly depicted since the arrest of Jeffrey Epstein, these letters demonstrate that Ms. Maxwell is generous, loving, and devoted to her family and friends, and that her life is firmly rooted in this country with her spouse █████████ ███████████.  The signatories of these letters have known Ms. Maxwell for decades, and some for her entire life.  All know her to be the antithesis of what the government has alleged.  They trust her completely, including with their minor children.

These people have stepped forward to support Ms. Maxwell, despite the considerable risk that, if their names ever become public, they will be subjected to some of the same relentless and harassing media intrusion and personal threats that Ms. Maxwell has experienced for years.  As a sign of their confidence that Ms. Maxwell will remain in this country, the sureties have agreed to sign their own bonds and to post meaningful pledges of cash or property in amounts that would cause them significant financial distress if Ms. Maxwell were to violate her bail conditions.

These letters directly address the concern the Court expressed at the last bail hearing that Ms. Maxwell did not have "any dependents [or] significant family ties" to the United States.  (Tr. 84).  If Ms. Maxwell were to flee, she would be leaving behind the family that has been the center of her life ██████████, she would be abandoning her spouse ██

10

███████████ who are already suffering without her presence, and she would cause financial

ruin to herself and her closest family and friends.

          1.        <u>Ms. Maxwell is Devoted to Her Spouse ████████████ and Would<br>Never Destroy Her Family By Leaving the Country</u>

The letter submitted by Ms. Maxwell's spouse powerfully demonstrates that Ms.

Maxwell has deep roots in the United States and is not a flight risk.  The letter describes Ms.

Maxwell's domestic life with her spouse ████████████████████████ in the

four years prior to her arrest.  Her spouse describes Ms. Maxwell as a "wonderful and loving

person," who ██████████████████████ does not remotely resemble

the person depicted in the indictment.  (Ex. A ¶ 4).  Contrary to the government's assertion

that Ms. Maxwell lived a rootless, "transient" lifestyle (Dkt. 4 at 9), Ms. Maxwell lived a

quiet family life with her spouse ██████████████████████ until

Epstein's arrest in July 2019 ignited a media frenzy that has ripped the family apart.

> The person described in the criminal charges is not the person we know.  I have
> never witnessed anything close to inappropriate with Ghislaine; quite to the
> contrary, the Ghislaine I know is a wonderful and loving person. ████████
> ████████████████████████████████████████
> ████████████████████████████████████████
> ████████████████████
>
> Until the explosion of media interest that followed the arrest and subsequent death
> in custody of Jeffrey Epstein in July thru August 2019, ███████████████
> ████████████████████████████████████████

(*Id*. ¶¶ 4-5).

The letters from Ms. Maxwell's family members similarly describe how Ms.

Maxwell's home is in the United States with her spouse ██████████ and how deeply

committed she is to her family.  *See* Ex. D ██████████████████████████

██████████████████████████████████ It is very obvious that they love her deeply.  They are an incredibly strong and close family unit."); Ex. F ("I ████████ ██████████████████████████████ joined a large family event hosted by Ghislaine and her husband in which she was very hospitable and obviously very much at home and in love."); Ex. C ("[Ghislaine] has called the United States her home for almost 30 years.  She has deep affective family ties here in this country ██████████████████████████ Most of all, her own husband ████████ are here."); Ex. B ("I wish … to attest to the loving relationship she has with her husband ████████████ which I have personally witnessed on many different occasions.") .

Indeed, it was because of Ms. Maxwell's devotion to her family, and her desire to protect her spouse ███████████████ from harassment and threats, that she went forward at the first bail hearing without relying on her spouse as a co-signer, even though she knew his support would greatly strengthen her bail application.  As her spouse writes:

> I did not initially come forward as a co-signer of her first bail application … [because we were] trying to protect ████████ from ferocious media aggression…. ███████████████████████████████████ ██████████████████████████████████████

(Ex. A ¶ 13).  Her spouse is coming forward now because he is deeply concerned about how she is being treated in the MDC and because the terrible consequences that he and Ms. Maxwell were trying to prevent have already occurred.  ██████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████ (*Id*. ¶¶ 10-11).

Ms. Maxwell's spouse fully supports her and is prepared to put up all of his and Ms. Maxwell's assets to ensure that Ms. Maxwell abides by the strict conditions proposed.  He

has agreed to co-sign Ms. Maxwell's $22.5 million bond and to post all three properties he owns—all located in the United States and worth a total of approximately $8 million combined—as security for the bond.  As the financial report discussed later in this submission makes clear, $22.5 million represents all of the current assets of Ms. Maxwell and her spouse.  One of the properties is the family home where Ms. Maxwell, her spouse, ███████████ have lived together ███████████.  If Ms. Maxwell were to violate her bail conditions, which she has no intention of doing, she would be leaving her spouse ████ ███████████ with virtually nothing.  It is unfathomable that Ms. Maxwell would abandon her family, which she has fought so hard to protect, under these circumstances.

2. <u>A Number of Ms. Maxwell's Family and Friends, and the Security Company Protecting Her, Are Prepared to Sign Significant Bonds</u>

In addition to her spouse, a number of Ms. Maxwell's family members and friends, many of whom are U.S. citizens and residents, have volunteered to step forward as co-signers.  These sureties, as well as the others who have written letters on Ms. Maxwell's behalf, know that Ms. Maxwell has never run from a difficult situation and will not do so now.  To show the depth of their support and their confidence that Ms. Maxwell will abide by her bail conditions and remain in this country, the sureties have agreed to sign separate bonds for Ms. Maxwell in amounts that are significant and meaningful to them, and each would cause severe financial hardship if she were to violate her bail conditions.

For example, one surety, who is a U.S. citizen and resident, will post the only property she owns.  This property is worth approximately $1.5 million and is her "only nest-egg for retirement."  (Ex. C).  She writes:

> I do not have any other savings and it would be completely devastating financially and in every way to my own family were the house to be taken over by the Government due to a breach of ███████ bail conditions.

13

(*Id*.).   Nevertheless, she has "no hesitation" posting her home because she knows "in every fibre of [her] being" that Ms. Maxwell "will never try to flee."  (*Id*.).

Similarly, another surety who has agreed to sign a $3.5 million bond writes:

> This amount represents the value of effectively all of my assets, including my home ██████████████████████████████  If I lost these assets because Ghislaine violated the conditions of her release, I would be financially ruined.  I make this pledge without reservation because I know that Ghislaine will remain in the United States to face the charges against her.

(Ex. F).  Two other sureties, one of whom is a U.S. citizen and resident, will post cash bonds in the amount of $25,000, and another will post $2,000 in cash, which are significant pledges for these individuals.

In addition to these bonds, the security company that will provide security services to Ms. Maxwell upon her transfer into home confinement has agreed to post a $1 million bond in support of her bail application.  In our collective experience as defense counsel, we are not aware of a previous example where a security company has posted a bond for a defendant.  The head of the security company has confirmed that they have never done this for a defendant in the past but are willing to do so here because of his company's "long-standing relationship with Ms. Maxwell" and because he is "confident that she will not try to flee."  (Ex. S).

In sum, these bonds reflect the depth of support that Ms. Maxwell has from her family and friends, who are risking their livelihoods, their safety, and their ability to live without constant media harassment to support her.  (*See* Ex. B) ("Absolutely anyone who dares to put their head above the parapet so to speak, to … support Ghislaine personally, gets it shot off immediately amid a hail of social vilification and malignancy and reputational slaughtering.").  Ms. Maxwell would never destroy those closest to her by fleeing, after they have risked so much to support her.

**B.      Ms. Maxwell Has Provided a Thorough Review of Her Finances for the Past Five Years**

The government raised concerns at the initial bail hearing about the accuracy and completeness of the financial disclosures that Ms. Maxwell provided to Pretrial Services. (Dkt. 22 at 11-12; Tr. 28-29, 34-35).  The Court stated that it did not have "a clear picture of Ms. Maxwell's finances and the resources available to her" and therefore had no way "to set financial bail conditions that could reasonably assure her appearance in court."  (Tr. 86-87).

To address the Court's questions about Ms. Maxwell's finances, defense counsel retained Macalvins, a highly reputable accounting firm in the United Kingdom, to conduct an analysis of Ms. Maxwell's assets and finances for the past five years.  The Macalvins accountants reviewed thousands of pages of financial documents, including bank statements, tax returns, FBAR filings, and other materials to create a clear picture of the assets held by Ms. Maxwell and her spouse, as well as any assets held in trust for the benefit of Ms. Maxwell, and the source of those assets from 2015-2020.  This analysis, which is based in substantial part on documents that the government provided in discovery, has involved a significant amount of work and has taken substantial time to complete.  It was not possible to perform this analysis in the brief time between Ms. Maxwell's arrest and the initial bail hearing, especially with Ms. Maxwell detained following her arrest.

The Macalvins report was also reviewed by ▮▮▮▮▮, a Certified Fraud Examiner and a former IRS Special Agent with over 40 years of experience in complex financial fraud investigations.  As a Special Agent, ▮▮▮▮ investigated numerous financial fraud and criminal tax cases, including several in this District.  ▮▮▮▮ reviewed the Macalvins report and the underlying documents and determined that it presents a complete and accurate summary of the assets held by Ms. Maxwell and her spouse, as well as assets that were, or are currently, held in

trust for the benefit of Ms. Maxwell, from 2015-2020.  The Macalvins report and ████████'s

report are attached as Exhibits O and P.[4]

As set forth in the Macalvins report, Ms. Maxwell's net worth at the beginning of

2015 was approximately $20,200,000. (Ex. O ¶ 11).  The 2015 tax return records the sale of

a residential property in New York City for $15,075,000.  The address of this property is

████████████████████████.  The proceeds of the sale were deposited at

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████  (*Id*. ¶ 12).  The sale of Ms.

Maxwell's New York apartment coincided with her intention ████████████████ to

live with her spouse ████████████  (*See* Ex. A ¶ 2).

Ms. Maxwell married her spouse in 2016 and commenced filing joint U.S. tax returns

from the 2016 tax year until today.  (Ex. O ¶ 13).  In 2016, Ms. Maxwell transferred the

majority of her assets into a trust controlled by her spouse and ████████.  (*Id*.).  All assets in

the trust were distributed to Ms. Maxwell's spouse in 2019.  (*Id*. at 9).  Ms. Maxwell and her

spouse's net worth as of October 31, 2020 was approximately $22,500,000. (*Id*. ¶ 15).[5]

There has been no alienation of any assets and no significant sum of cash has been

transferred outside of the control of Ms. Maxwell or her spouse in the period from 2015-

---

[4] We have not provided the Court with the appendices to the Macalvins report because they are voluminous.  If the Court would like copies of the appendices, we are happy to provide them.

[5] At her Pretrial Services interview, Ms. Maxwell reported that she believed she had approximately $3.8 million in assets, which included her London residence worth approximately $3 million, and approximately $800,000 in bank accounts.  Ms. Maxwell was detained at the time and had no access to her financial records and was trying to piece together these numbers from memory.  According to the Macalvins report, these figures are a close approximation of the value of the assets that Ms. Maxwell held in her own name at the time of her arrest.  (*Id*. at 9).  For the reasons already discussed, Ms. Maxwell was reluctant to discuss anything about her husband and expressed that to Pretrial Services.

2020, other than daily living expenditures for her family and for professional services in the defense of Ms. Maxwell from the charges she faces.  (*Id.* ¶ 16).

The Macalvins report confirms that Ms. Maxwell disclosed all of her foreign bank accounts in FBAR filings and properly disclosed her bank accounts, investments and other assets in her U.S. tax filings at all times.  (*Id.* ¶¶ 25, 30).  The report also explains that the transfers of funds between various accounts in the past few years, which the government highlighted in their initial bail submission (Dkt. 22 at 11-12), reflected movements between banks triggered by the closure of one banking relationship and the opening of new relationship, as well movements of cash maturing on deposit and other financial investments.  (*Id.* ¶ 18).

At the last bail hearing, the government suggested that Ms. Maxwell's finances were "opaque" and that she potentially had "significant [] undetermined and undisclosed wealth." (Tr. 27; Dkt. 22 at 11-12).  The Macalvins report lifts this cloud of unjustified intrigue and provides a straightforward answer: Ms. Maxwell and her spouse currently have assets worth approximately $22.5 million.[6]  Accordingly, the proposed bond amount of $22.5 million represents all of the couple's current assets.

The report further shows that Ms. Maxwell has no undisclosed wealth and is not hiding assets overseas.  To the contrary, for the past several years, Ms. Maxwell and her husband have *disclosed* their foreign assets by submitting FBAR filings regarding their

---

[6] We have redacted the name of the bank where ███████████████████████████████████████████████████████████████████████████ Although the balance of the account is fully disclosed in the Macalvins report, we felt it necessary to redact the name of the bank because ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ We will, of course, follow the Court's guidance on how to proceed and provide the name of the bank to the Court and the government, if required.  In that event, we ask that the Court establish guidelines limiting what the government can do with the information.

foreign bank accounts.  Ms. Maxwell is not trying to hide anything from the government.

She has been entirely transparent with her finances and has filed accurate and timely joint

tax returns with her spouse for the last four years, and she has put it all at risk of forfeiture if

she flees under the proposed bail package.  The Macalvins report and the report of ████

████ give the Court a clear picture of Ms. Maxwell's finances.  Accordingly, the Court

should have no pause about granting her on bail on the proposed terms.

### C.    Ms. Maxwell Was Not Hiding from the Government Before Her Arrest

1.    Ms. Maxwell Was Trying to Protect Herself ████████ from a
Media Frenzy and from Physical Threats

The letter from Ms. Maxwell's spouse also forcefully debunks the fiction that Ms.

Maxwell was trying to conceal her whereabouts from the government before her arrest, as

the government argued at the first bail hearing.  (Tr. 25).  Ms. Maxwell made efforts to

remove herself from the public eye solely to prevent the intrusion of the frenzied press into

her personal family life and to protect herself, her spouse, ████████ from third parties

who threatened violence. To suggest that she was a fugitive is patently wrong.

After Epstein's arrest and subsequent death in BOP custody, the media coverage of

Ms. Maxwell spiked dramatically, as the press rushed to substitute Ms. Maxwell for Epstein

as the target of the scandal.  The graph below illustrates the volume of press articles relating

to Ms. Maxwell over the course of the last five years.[7]  The graph shows that Ms. Maxwell

was mentioned in news articles only sporadically between October 2015 and June 2019.  It

was not until Mr. Epstein's arrest in July 2019 that Ms. Maxwell was thrown into the media

spotlight.  For example, Ms. Maxwell was mentioned in only 59 articles in total from

October 2015 to June 2019.  Immediately following Epstein's arrest, however, she was

---

[7] In order to quantify the number of articles published about Ms. Maxwell, we used Nexis NewsDesk, a media
monitoring and analytics service provided by LexisNexis.

named in 97 articles in the month of July 2019 alone.  The level of press coverage spiked

again in November 2019 when the British tabloid *The Sun* ran an advertisement offering a

£10,000 bounty for information about Ms. Maxwell's whereabouts and it continued at a

heightened level over the next several months.



This graph depicts in stark visual terms the sea change in media attention that

upended Ms. Maxwell's life at the time of Epstein's arrest.  But it was not only harassment

from the press that Ms. Maxwell suddenly encountered at this time.  She also faced a deluge

of threatening messages on social media in the days immediately following Epstein's arrest

and death.  (*See* Ex. Q).  The hatred directed towards Ms. Maxwell in these posts is palpable

and unsettling.  Despite the fact that Ms. Maxwell was not charged—indeed, not even

mentioned—in the Epstein indictment, and had not been charged with any crimes, the

authors referred to her as a "crazy, pedophile, pimp, bitch" and a "subhuman c*nt," and

called for her to "rot in jail."  These people also encouraged all manner of violent acts

19

against Ms. Maxwell.  For example, one post stated "they need to get this bitch n string her up by her neck . . . f*ckin monster."  Another stated:

> I hope someone finds her and kills her.  That would be justice.  Obviously her lawyers know's [sic] where she is, someone should stick them up to batteries until we find out where she is.

These posts were particularly chilling because some of them suggested that the authors ████████████████████████████████████████ might ███████ carry out the violent acts they had been threatening.  For example, in response to an August 14, 2019 news report that Ms. Maxwell might be living in Massachusetts, one person wrote:

> SHE'S HERE in #Massachusetts ?! The bitch #GhislaineMaxwell who #SexTrafficked young girls for #Epstein ?!?! Why the hell isn't she being brought in for questioning @ManchesterMAPD ?! WE DO NOT WANT HER HERE! #SleezyLeach She is CLOSE ENOUGH to me, I could grab her myself!

The intense media attention and violent threats made it no longer possible for Ms. Maxwell ████████ to live a quiet life and required Ms. Maxwell to take more drastic steps to protect herself ██████████.  Rather than see █████████ harmed by even more unwanted media attention, Ms. Maxwell made the difficult decision to separate herself ██ ████████ and leave her home.  As her spouse writes:

> The "reporting" of Ghislaine over the past year has exploded exponentially.  From the time of Epstein's arrest and death in custody in the summer of 2019 until Ghislaine's own arrest in July of this year, huge and increasingly frightening levels of media interest meant ████████████████████████ ████████ There are many examples of violence whose seeds were born in conspiracy theories, and the experiences of QAnon, Pizzagate, and the recent Judge Salas attack are terrifying….
>
> It is hard to communicate in words the feeling of being stalked, spied upon and trapped by constant, 24/7 media intrusion ████████████████████████ ████████████████████████████████████ ████████████████████████



(Ex. A ¶¶ 8-10).  Ms. Maxwell had no choice but to separate herself ███████████████ ████████████████████████████████████████████████████ (*Id.* ¶ 11).

Since Ms. Maxwell's own arrest in July 2020, the press attention has exploded.  It significantly dwarfs the media attention given to other recent high-profile defendants such as Harvey Weinstein, Bill Cosby, Joaquín "El Chapo" Guzmán Loera, and Keith Raniere. As reflected in the graph below, in the 90-day period immediately following her arrest, Ms. Maxwell was mentioned in more national media articles than in the analogous 90-day periods for Mr. Weinstein, Mr. Cosby, Mr. Guzmán Loera, and Mr. Raniere combined.



2.      Ms. Maxwell's Counsel Was in Regular Contact with the Government
Prior to Her Arrest

At no time, however, did Ms. Maxwell intend to flee or hide from the government, as the

government argued at the last bail hearing.  In fact, her intent was exactly the opposite.  As her

spouse's letter makes clear, after spending a few months away ███████████, Ms. Maxwell

moved ████████████ so that she could ███████████████ be within

driving distance of the prosecutors in New York in case they wished to speak to her.  (Ex. A ¶

12) ("[Ghislaine] was adamant to not only stay in the United States to fight the smears against

her, but to be within driving distance of New York.").  Contrary to the impression given by the

government, Ms. Maxwell was not "changing locations on multiple occasions" as if she were a

fugitive from justice.  (Tr. 87).  After Ms. Maxwell moved into the house in New Hampshire in

December 2019, she remained there continuously for approximately seven months until her

arrest.  (*See* Ex. B) ("[S]he was finally able to locate a place where she could not be moving

around constantly and collect herself to fight for her life and to clear her name.").

Ms. Maxwell, through her counsel, was also in regular contact with the government

from the moment of Epstein's arrest up the time of her own arrest, as would be customary in

such situations.  Defense counsel corresponded by email, spoke on the phone, or had in-

person meetings with government in July, August, September, and October 2019, and also

in January and March 2020.  The timeline attached to this submission illustrates the extent

of these contacts.  (Ex. R).  Defense counsel also requested an opportunity to be heard in the

event that the government was considering any charging decisions against Ms. Maxwell.

We were never given that opportunity, which is uncharacteristic for the Southern District of

New York, nor were we given any notice of her impending arrest.

The government argued to the Court that defense counsel's contact with the prosecutors in the months leading up to Ms. Maxwell's arrest prove little about her intent to stay in this country simply because she never disclosed her location.  (Tr. 26).  While Ms. Maxwell was understandably not in the habit of volunteering her whereabouts given the intensity of the press attention, her counsel would have provided that information had the government asked for it.  The government never did.

    3.    <u>Ms. Maxwell Did Not Try to Avoid Arrest, Nor Was She "Good At" Hiding</u>

Similarly, had the government reached out to defense counsel before Ms. Maxwell's arrest, we would have willingly arranged for her self-surrender.  We were never given that chance.  Instead, the government arrested her in a totally unnecessary early morning raid with multiple federal agents at her residence in New Hampshire, on the eve of the one-year anniversary of the arrest of Jeffrey Epstein, creating the misimpression that Ms. Maxwell was hiding from them.  That is simply not the case.

The government argued that the events of Ms. Maxwell's arrest—in particular, that she moved herself into an interior room when the officers approached the house and that they found a cell phone wrapped in tin foil—evidence an attempt to evade law enforcement. (Tr. 32-34).  As we previously explained to the Court, Ms. Maxwell was protecting herself from the press, not trying to avoid arrest.  (Tr. 54-57).

Since the hearing, we have obtained the accompanying statement from ███████ ███████ the head of the security company guarding Ms. Maxwell at the time of her arrest, which was not available at the time of the initial hearing.  (Ex. S).  ███████ statement demonstrates that Ms. Maxwell was not avoiding arrest, but was following an agreed-upon procedure to protect herself in the event of a potential threat to her safety or security.

According to ▮▮▮▮▮▮▮, the security guard on duty that day had seen helicopters flying over the house, which he assumed to be the press.  (*Id*.).  When the guard saw the FBI agents walking up the driveway to the house, he again assumed that they were members of the press.  (*Id*.).  Accordingly, he radioed Ms. Maxwell to alert her that the press was on the grounds and approaching the house.  (*Id*.).  In accordance with the procedure that Ms. Maxwell's security personnel had put in place for such an event, Ms. Maxwell moved away from the windows and into a safe room inside the house.  (*Id*.).  Ms. Maxwell was not trying to avoid arrest; she was simply following the established security protocols to protect herself from what had been informed was an ambush by the press.

Regarding the cellphone wrapped in tin foil, we explained to the Court at the initial bail hearing that Ms. Maxwell took this step to prevent the press from accessing her phone after the Second Circuit inadvertently unsealed certain court records with the phone number unredacted.  (Tr. 55-56).  Having now reviewed the discovery produced by the government, it is clear that Ms. Maxwell was not at all the "master spy" the government makes her out to be and was not wrapping the phone in order to evade detection by law enforcement.

First, the cellphone in question was subscribed in the name of "Terramar Project, Inc.," which is easily identifiable through a simple Google search as Ms. Maxwell's charity. Second, Ms. Maxwell used the phone to make calls as late as May 2020, just before her arrest.  She would never have used the phone if she had been concerned that the authorities were using it to track her.  Third, Ms. Maxwell had another phone subscribed in the name of "G Max" that she was using as her primary phone, which was not covered.  It would make no sense for her to try to wrap one phone in tin foil to avoid detection and not the other.

Indeed, the discovery reflects that it was not hard at all for the government to locate Ms.

Maxwell when they wanted to find her by tracking her primary phone.

In sum, the cellphone clearly shows that Ms. Maxwell was not "good at" hiding or

that she was avoiding arrest, as the government claimed.  (Tr. 31-32).  She was trying to

protect herself as best as she could from harassment by the press, not capture by law

enforcement.  Moreover, this should not be a bar to granting bail.  The proposed conditions

ensure her presence at home in plain sight of ████ (and the security guards), GPS-

monitored, and under strict Pretrial supervision.

### D.    Ms. Maxwell Has Waived Her Extradition Rights and Could Not Seek Refuge in the United Kingdom or France

At the initial hearing, the government argued that Ms. Maxwell, a naturalized U.S. citizen

who has lived in the United States for almost 30 years, might flee to the United Kingdom or

France if granted bail, despite the fact that she did not leave the country for nearly a year after

Epstein's arrest.  (Dkt. 22 at 6.)  The government asserted in its reply brief that France "does not

extradite its citizens to the United States pursuant to French law."  (*Id.*)   At the bail hearing, the

government represented that "France will not extradite a French citizen to the United States as a

matter of law, even if the defendant is a dual citizen of the United States," and that extradition by

the United Kingdom would be "lengthy" and "uncertain" with bail "very likely" pending the

extradition proceeding.  (Tr. 27.)  These assertions are incorrect, particularly given Ms.

Maxwell's irrevocable waiver of her extradition rights with respect to both the United Kingdom

and France.

As we noted for the Court at the initial hearing, the concern that Ms. Maxwell would

attempt to flee the United States is entirely unfounded given that Ms. Maxwell had every motive

and opportunity to flee after the arrest and death of Jeffrey Epstein, but chose to remain in this

country.  (Dkt. 18 at 12-14, Tr. 52-53).  It is even more unfounded in light of the daily avalanche

of media coverage of Ms. Maxwell.  She is now one of the most recognizable and infamous

people in the world.  She is being pursued relentlessly by the press, which would no doubt be

camped out by her front door every day if she were granted bail.  The notion that Ms. Maxwell

could somehow flee to a foreign country during a worldwide pandemic (presumably, by plane),

while being supervised and monitored 24 hours a day and with the eyes of the global press corps

on her every minute, without being caught, is absurd.

 To the extent the Court is concerned that her calculus may have changed since her arrest

because the threat of prosecution has now crystallized into concrete charges (Tr. 85-86), Ms.

Maxwell has addressed that concern head-on—she will execute irrevocable waivers of her right

to contest extradition in both the United Kingdom and France.  (Ex. T).  These waivers

demonstrate Ms. Maxwell's firm commitment to remain in this country to face the charges

against her.  Moreover, as discussed more fully in the attached expert reports, because of these

waivers and other factors, it is highly unlikely that Ms. Maxwell would be able to successfully

resist an extradition request from the United States to either country, in the extremely unlikely

event she were to violate her bail conditions.  (Exs. U-V).  Moreover, any extradition

proceedings in either country would be resolved promptly.  (*Id*.).

 Courts have addressed concerns about a defendant's ties to a foreign state that enforces

extradition waivers by requiring the defendant to execute such a waiver as a condition of

release—including in cases where the defendants, unlike Ms. Maxwell, were not U.S. citizens.

*See, e.g., United States v. Cirillo,* No. 99-1514, 1999 WL 1456536, at *2 (3d Cir. July 13, 1999)

(vacating district court's detention order and reinstating magistrate's release order, which

required foreign citizen and resident to sign an "irrevocable waiver of extradition" as a condition

of release); *United States v. Salvagno,* 314 F. Supp. 2d 115, 119 (N.D.N.Y. 2004) (ordering each of two defendants to "execute and file with the Clerk of the Court a waiver of extradition applicable to any nation or foreign territory in which he may be found as a condition of his continued release"); *United States v. Karni,* 298 F. Supp. 2d 129, 132-33 (D.D.C. 2004) (requiring Israeli citizen who lived in South Africa and had "no ties to the United States" to sign waiver of rights not to be extradited under Israeli and South African extradition treaties with United States); *United States v. Chen,* 820 F. Supp. 1205, 1212 (N.D. Cal. 1992) (ordering as a condition of release that defendants "execute waivers of challenges to extradition from any nation where they may be found"). Moreover, a defendant's waiver of the right to appeal an extradition order has been recognized as an indication of the defendant's intent not to flee. *See, e.g., United States v. Khashoggi,* 717 F. Supp. 1048, 1052 (S.D.N.Y. 1989) (Judge Keenan found defendant's extradition appeal waiver "manifests an intention to remain here and face the charges against him").

In response to the government's assertions, Ms. Maxwell has obtained the accompanying reports of experts in United Kingdom and French extradition law, who have analyzed the likelihood that Ms. Maxwell, in the event she were to flee to the United Kingdom or France, would be able to resist extradition to the United States after having executed a waiver of her right to do so. Both have concluded that it is highly unlikely that she would be able to resist extradition successfully.

**United Kingdom.** With respect to the United Kingdom, submitted herewith is a report from David Perry ("Perry Rep."), a U.K. barrister who is widely considered one of the United Kingdom's preeminent extradition practitioners. (Perry Rep. Annex B ¶ 2.1) (attached as Exhibit U). Mr. Perry has acted on behalf of many overseas governments in extradition proceedings; has

appeared in the High Court, House of Lords and Supreme Court in leading extradition cases; and has acted as an expert consultant to the Commonwealth Secretariat on international cooperation. (*Id.*).  In 2011 and 2012, Mr. Perry was part of a select team appointed by the U.K. government to conduct a review of the United Kingdom's extradition arrangements, a review that formed the basis of changes to the 2003 Extradition Act.  (*Id.* Annex B ¶ 3.1).

In Mr. Perry's opinion, it is "highly unlikely that Ghislaine Maxwell would be able successfully to resist extradition to the United States" in connection with this case.  (Perry Rep. ¶ 2(e)).  After concluding that none of the potentially applicable bars to extradition or human rights objections would prevent Ms. Maxwell's extradition, Mr. Perry explains that Ms. Maxwell's waiver of her extradition rights "would be admissible in any extradition proceedings and, in cases, such as this one, where the requested person consents to their extradition, the extradition process is likely to take between one and three months to complete."  (*Id.* ¶¶ 24-39). Mr. Perry's report also undercuts the government's representation at the initial hearing regarding likelihood of bail (*see* Tr. 27), opining that "a person who absconded from [a] US criminal proceeding in breach of bail . . . is extremely unlikely to be granted bail" in a subsequent U.K. extradition proceeding.  (Perry Rep. ¶ 23).

**France.**  The accompanying report of William Julié ("Julié Rep.") reviews the French extradition process as it would likely be applied to Ms. Maxwell.  Mr. Julié is an expert on French extradition law who has handled extradition cases both within and outside the European Union and regularly appears as an extradition expert in French courts.  (Julié Rep.) (attached as Exhibit V).  Mr. Julié explains that, contrary to the government's representation, "the extradition of a French national to the USA is legally permissible under French law."  (*Id.* at 1).

Mr. Julié opines that the French entity with jurisdiction over the legality of extradition requests would not oppose Ms. Maxwell's extradition on the ground that she is a French citizen, and that it is "highly unlikely that the French government would refuse to issue and execute an extradition decree" against her.  (*Id.* at 2).  Mr. Julié bases his opinion largely on (i) Ms. Maxwell's U.S. citizenship; (ii) her irrevocable waiver of her extradition rights with respect to the United States; (iii) the fact that the issue would arise only if Ms. Maxwell had fled to France in violation of strict bail conditions in the United States; (iv) the fact that a failure to extradite would obligate French authorities to try Ms. Maxwell in French courts for the same 25-year-old conduct alleged in the indictment, which did not take place in France; and (v) France's diplomatic interest in accommodating an extradition request from the United States.  (*Id.*).  Mr. Julié adds that the extradition process would likely be "disposed of expediently"; where the requesting state emphasizes the urgent nature of the extradition request, "the extradition decree is generally issued in only a few weeks."  (*Id.* at 2-3).  And in any event, while the extradition proceedings are pending, "the French judicial authorities would most certainly decide that [Ms. Maxwell] has to remain in custody given her flight from the USA and the violation of her bail terms and conditions in this requesting State."  (*Id.* at 12).

Ms. Maxwell has no intention of fleeing the country and has relinquished her rights to contest extradition.  She has always maintained her innocence and will continue to fight the allegations against her here in the United States, as she has in the past.  Even if she were to flee after being granted bail (which she will not), it is likely that Ms. Maxwell would be extradited expeditiously from France or the United Kingdom.  Accordingly, the Court should give no weight in the bail analysis to the fact that Ms. Maxwell is a dual citizen of these countries.[8]

---

[8] Ms. Maxwell would also have very little incentive to flee to France.  According to recent press reports, French authorities recently broadened their existing criminal investigation into Jeffrey Epstein to include Ms. Maxwell.  *See*

E.     **The Discovery Contains No Meaningful Documentary Corroboration of the Government's Allegations Against Ms. Maxwell**

At the initial bail hearing, the government represented to the Court that "the evidence in this case is strong" and that the allegations of the alleged victims were "backed up [by] contemporaneous documents . . . [including] flight records, diary entries, business records, and other evidence." (Dkt. 4 at 5.) The Court credited those representations and accepted the government's proffer that the witness testimony would be "corroborated by *significant* contemporaneous documentary evidence." (Tr. 82) (emphasis added). The defense, of course, could not rebut the government's representations at the hearing because the government had not yet produced discovery.

Since then, the government has produced, and the defense has reviewed, hundreds of thousands of pages of discovery, including the entire initial tranche of discovery that the government represented was the core of its case against Ms. Maxwell.[9] The discovery contains no meaningful documentary corroboration of the allegations whatsoever, much less "significant" corroboration that the Court was led to believe existed. The vast majority of the discovery that the defense has reviewed relates to the time period in the 2000s and the 2010s, well after the conspiracy charged in the indictment (1994-1997). These documents include ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████ In fact, only

---

*Daily Mail*, "French prosecutors probing Jeffrey Epstein over rape and abuse of children in Paris widen probe to include Ghislaine Maxwell to see if British socialite was involved in his offending," (Oct. 25, 2020), https://www.dailymail.co.uk/news/article-8878825/French-prosecutors-probing-Jeffrey-Epstein-widen-probe-include-Ghislaine-Maxwell html.

[9] The defense has not yet completed its review of the over 1.2 million documents produced on November 9, 2020 and November 18, 2020. This production includes documents and images seized from electronic devices found at Epstein's residences in searches of his residences in 2019. Our initial review, however, shows that the documents are from the 2000s and 2010s, well after the charged conspiracy.

a very small fraction of the discovery pertains in any way to the individuals we believe to be the three complainants named in the indictment, and none of it corroborates any allegations of "grooming" or sexual assault or a conspiracy with Epstein involving Ms. Maxwell.

For example, the government represented to the Court that it had "diary entries" that corroborated the witness testimony, suggesting that more than one of the complainants had kept contemporaneous diaries that implicated Ms. Maxwell.  (Dkt. 4 at 5).  The discovery produced thus far contains only ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████[10]  ████████████████████████

██████████████████████████████████████████████████████

████████████████████████████

In addition, the flight records that the government touted at the bail hearing, which include ████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

─────────────────────
[10] ████████████████████████████████████████████████████

[REDACTED]

[REDACTED]

[REDACTED]

The discovery also does not contain any police reports in which the people we believe to be the complainants reported the alleged crimes to law enforcement.  To the contrary, the only police reports provided are exculpatory.  [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

In sum, the discovery contains not a single contemporaneous email, text message, phone record, diary entry, police report, or recording that implicates Ms. Maxwell in the 1994-1997 conduct underlying the conspiracy charged in the indictment.  The few documents in the discovery that pertain to the people we believe to be the three complainants referenced in the indictment do little, if anything, to support the government's case against Ms. Maxwell:

- [REDACTED]

- [REDACTED]



In addition, the discovery appears to show that, ███████████████████

████████████████████████████████████████████

██████ the government did not issue subpoenas for documents related to Ms. Maxwell until *after* Epstein's death.  Although the discovery does not include the grand jury subpoenas themselves, the subpoena returns appear to indicate that the government began issuing subpoenas for Ms. Maxwell's financial information on August 16, 2019, six days *after* Epstein's death, and issued additional subpoenas in the months that followed.  The facts strongly imply that government only chose to pursue a case against Ms. Maxwell—who was not named in the Epstein indictment—because the main target, Jeffrey Epstein, had died in their custody.  The lack of corroboration in the discovery confirms that the case against Ms. Maxwell was an afterthought and was reverse engineered based on allegations of 25-year-old conduct from a small number of alleged victims.

Thus, notwithstanding the statement in the government's bail submission, we have been provided with no meaningful documentary corroboration in this case.  It appears that the evidence in this case boils down to witness testimony about events that allegedly took place over 25 years ago.  Far from creating a flight risk, the lack of corroboration only reinforces Ms. Maxwell's conviction that she has been falsely accused and strengthens her long-standing desire to face the allegations against her and clear her name in court.  This factor should weigh heavily in favor of granting Ms. Maxwell bail.

**F.      The Proposed Bail Package Is Expansive and Far Exceeds What Is Necessary to Reasonably Assure Ms. Maxwell's Presence in Court**

In light of the additional information that Ms. Maxwell has provided in connection with this submission, which responds to each of the concerns raised by the government at the initial bail hearing, the government cannot meet its burden to establish that no set of bail conditions would reasonably assure Ms. Maxwell's appearance in court. The proposed bail package is exceptional in its scope, addresses all of the factors that the Court considered in evaluating risk of flight, and is more than sufficient to warrant her release from BOP custody and transfer to restricted home detention.

Courts in this Circuit have ordered release of high-profile defendants with financial means and foreign citizenship on bonds in lower amounts with less or no security with similar or less restrictive conditions:

| DEFENDANT | BOND | SECURED | HOME DETENTION | ELECTRONIC MONITORING | PRIVATE SECURITY | U.S. CITIZEN | FOREIGN CITIZENSHIP |
|---|---|---|---|---|---|---|---|
| SADR | $32.6M aggregate | ✓ | Nightly Curfew | ✓ | NO | NO | Iran \| St Kitts-Nevis |
| DREIER | $10M | NO | ✓ | ✓ | ✓ | ✓ | NO |
| MADOFF | $10M | ✓ | ✓ | ✓ | NO | ✓ | NO |
| KHASHOGGI Extradited from Switzerland | $10M | ✓ | ✓ | ✓ | NO | ✓ | Saudi Arabia |
| ESPOSITO | $9.8M | ✓ | ✓ | ✓ | Video Only | ✓ | NO |
| SABHNANI Wife | $2.5M | ✓ | ✓ | ✓ | NO | ✓ | Indonesia |
| SABHNANI Husband | $2M | ✓ | ✓ | ✓ | NO | ✓ | India |
| BODMER Arrested -South Korea | $2M | ✓ | ✓ | ✓ | NO | NO | Switzerland |
| KARNI No U.S. Ties | $7.5M | ✓ | ✓ | ✓ | NO | NO | Israel \| South Africa |
| HANSON | NOT REPORTED | ✓ | ✓ | ✓ | NO | ✓ | China |
| HANSEN Travel to Denmark Permitted | $500K | NO | NO | NO | NO | NO | Denmark |
| MAXWELL | $28.5M aggregate | ✓ | ✓ | ✓ | ✓ | ✓ | UK \| France |

The Court should also not give any weight to the government's speculative assertions that others might provide money and other support to Ms. Maxwell if she were to flee. (Dkt. 22 at

11-12).  Ms. Maxwell is not obligated to rebut every theoretical possibility that the government

might raise that may contribute to a potential flight risk in order to be granted bail.  That is not

the standard.  *Cf. United States v. Orta*, 760 F.2d 887, 888 n.4, 892-93 (8th Cir. 1985) ("The

legal standard required by the [Bail Reform] Act is one of reasonable assurances, not absolute

guarantees.").  Ms. Maxwell has no intention of fleeing.  If she did, then under the proposed bail

conditions she would lose everything and destroy the family she has been fighting so hard to

protect since Epstein's arrest.  Ms. Maxwell will not do that, and should be granted bail.

### G.   The Alternative to Bail Is Confinement Under Oppressive Conditions that Impact Ms. Maxwell's Health and Ability to Prepare Her Defense

Granting bail to Ms. Maxwell is all the more appropriate and necessary because the past

few months have shown that Ms. Maxwell cannot adequately participate in her defense and

prepare for trial from the inside the MDC.  The alternative to release is her continued

confinement under extraordinarily onerous conditions that are not only unjust and punitive, but

also meaningfully impair Ms. Maxwell's ability to review the voluminous discovery produced by

the government and to communicate effectively with counsel to prepare her defense.

Ms. Maxwell has spent the entirety of her detention—now over five months—in d*e facto*

solitary confinement, under conditions that rival those used at USP Florence ADMAX to

supervise the most dangerous inmates in the federal system and are tantamount to imprisonment

as a defendant convicted of capital murder and incarcerated on death row.  In fact, multiple

wardens and interim wardens have remarked that in their collective years of experience they

have never seen anything like her current regime.  The restrictive regulations to which Ms.

Maxwell is subjected are not reasonably related to a legitimate goal to ensure the security of Ms.

Maxwell or the MDC.  Instead, it seems clear that the overly restrictive conditions are an

exaggerated response to Epstein's death, effectively punishing Ms. Maxwell for the BOP's own negligence with respect to Epstein.[11]

Counsel has attempted to address the restrictions in numerous letters, emails and calls to the MDC warden, the MDC legal department, and the prosecutors, but to no avail. Rather than repeating these points here at length, we refer the Court to our letter to the MDC warden, dated October 29, 2020, which details the most serious and extraordinarily restrictive conditions of confinement.[12] These include:

- *De Facto* Solitary Confinement
- Excessive Surveillance
- Excessive Scanning and Strip Searching
- Deprivation of Food
- Deprivation of Sleep
- Deprivation of Communication with Family and Friends
- Compromised Communication with Legal Counsel

The conditions of Ms. Maxwell's detention are utterly inappropriate, and totally disproportionate for a non-violent pretrial detainee with no prior criminal history facing non-violent charges a quarter-century old. Moreover, they adversely impact her ability to prepare her defense and compromise her physical health and psychological wellbeing.

In addition to these intolerable conditions, Ms. Maxwell has had to contend with numerous unacceptable delays and technical problems with the discovery that the government has produced to her thus far. We have raised these issues with the prosecutors on numerous occasions. As we advised the Court in our letter of October 23, 2020, defense counsel first

---

[11] These conditions are especially inappropriate because Ms. Maxwell has been an exemplary inmate and has not received any disciplinary infractions since her arrest. In fact, she has been made a suicide watch inmate, which is the highest and most trusted responsibility that an inmate can have. It is the height of irony that Ms. Maxwell is being constantly surveilled as if she were a suicide risk when she, herself, is trusted enough (if she were ever released from isolation) to monitor inmates who are truly at risk of suicide.

[12] The Warden never responded to the letter. In our response to the government's 90-day status report concerning MDC conditions, counsel requested that the Warden provide a first-hand report to the Court and counsel. Following Court directive for a report from the MDC, MDC Legal submitted a letter that recited BOP policy but failed to address a number of concerns.

alerted the government on August 27, 2020 that there were significant portions of the first three discovery productions that Ms. Maxwell could not read.  (Dkt. 66).  Despite numerous attempts to fix these problems over the succeeding weeks, including producing a replacement hard drive containing these productions, the problems were not resolved and the replacement hard drive was broken.  In addition, the fourth and fifth productions, which were produced after the defense alerted the government to these problems, contained some of the same technical problems and included a significant number of unreadable documents.  Most recently, the hard drives for the sixth and seventh productions have stopped functioning properly.  As a result, Ms. Maxwell has not had access to a complete set of readable discovery for *over four* months.[13]  Ms. Maxwell cannot defend herself if she cannot review the discovery.

Most recently, Ms. Maxwell has had to endure the added burdens of quarantine.  On November 18, 2020, Ms. Maxwell was given a COVID test and placed in 14-day quarantine due to contact with a staffer who tested positive.  The revolving team of guards assigned to Ms. Maxwell, some coming from other BOP institutions confronting their own COVID outbreaks, heightens her exposure to the virus.  As reported by the associate warden to the Criminal Justice Advisory Board on December 2, MDC does not mandate testing among its staff.  A temperature check and response to a few questions does little to detect an asymptomic carrier.  The constant strip searching, touch wanding, and in-mouth checking of Ms. Maxwell heightens her risk for exposure to COVID-19.

---

[13] On November 18, 2020, the government, at our request, provided a laptop computer to Ms. Maxwell in the MDC, which it believed would remedy the issues with unreadable documents, and has agreed to provide a new hard drive containing all of the discovery.  It is too early to tell whether the new laptop and hard drive will solve all of the technical problems.  We note, however, that now that Ms. Maxwell has been released from quarantine, she only has access to the laptop from 8am-5pm, five days a week, which will effectively limit her review time to that time slot because of compatibility issues between the recently produced hard drives and the prison computer.

Ms. Maxwell's quarantine period also resulted in cancellation of weekly in-person legal visits.  This is likely to continue in light of the spike in COVID infection within and outside the MDC.  Within a two-day period from December 1 to December 3, 55 inmates tested positive, compared with 25 from March to December 1.  As of the date of this filing, the BOP reports 80 MDC inmates and staff with COVID.[14]  If legal visits are suspended, it will further limit our ability to review the voluminous discovery (well in excess of one million documents) with Ms. Maxwell and will further compromise her ability to prepare her defense.  Moreover, as this Court observed in *United States v. Stephens*, if an outbreak occurs "substantial medical and security challenges would almost certainly arise."  *Stephens*, 447 F. Supp. 3d at 65.  We urge the Court to weigh the threat of COVID as a factor favoring release in this case, as it did in *Stephens*.

## <u>CONCLUSION</u>

Ghislaine Maxwell is committed to defending herself and wants nothing more than to remain in this country, with her family and friends by her side, so that she can fight the allegations against her and clear her name.  She is determined to ensure that her sureties and her family do not suffer because of any breach of the terms of her bond.  We have presented a substantial bail package that satisfies the concerns of the Court and the government, which contains more than ample security and safeguards to reasonably assure that Ms. Maxwell remains in New York and appears in court.  The Court has the obligation to ensure that a defendant's constitutional right to prepare a defense is safeguarded.  The correct—and only legitimate—decision is to grant Ms. Maxwell bail on the proposed strict conditions.

---

[14] *See* https://www.bop.gov/coronavirus/.

For the foregoing reasons, Ms. Maxwell respectfully requests that the Court order her release on bail pursuant to the conditions she has proposed.

Dated:  December 4, 2020

Respectfully submitted,

/s/ Mark S. Cohen

Mark S. Cohen
Christian R. Everdell
COHEN & GRESSER LLP
800 Third Avenue
New York, NY 10022
Phone: 212-957-7600


Jeffrey S. Pagliuca
Laura A. Menninger
HADDON, MORGAN & FOREMAN P.C.
150 East 10th Avenue
Denver, CO 80203
Phone: 303-831-7364


Bobbi C. Sternheim
Law Offices of Bobbi C. Sternheim
33 West 19th Street - 4th Floor
New York, NY 10011
Phone: 212-243-1100


*Attorneys for Ghislaine Maxwell*