UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

UNITED STATES OF AMERICA                    :

   -v.-                                                      :           20 Cr. 330 (AJN)

GHISLAINE MAXWELL,                           :

                  Defendant.              :

------------------------------------------------------------x

## THE GOVERNMENT'S MEMORANDUM IN OPPOSITION TO THE DEFENDANT'S RENEWED MOTION FOR RELEASE

AUDREY STRAUSS
Acting United States Attorney
Southern District of New York
Attorney for the United States of America

Maurene Comey
Alison Moe
Lara Pomerantz
Assistant United States Attorneys
- Of Counsel -

## **TABLE OF CONTENTS**

THE GOVERNMENT'S MEMORANDUM IN OPPOSITION TO THE DEFENDANT'S
RENEWED MOTION FOR RELEASE......................................................................................... 1

BACKGROUND .................................................................................................................... 2

APPLICABLE LAW ............................................................................................................... 6

DISCUSSION ....................................................................................................................... 8

A.     The Nature and Circumstances of the Offense ................................................... 8

B.     The Strength of the Evidence ............................................................................. 9

C.     The Characteristics of the Defendant............................................................... 12

D.     Conditions of Confinement............................................................................... 29

CONCLUSION.................................................................................................................... 33

## TABLE OF AUTHORITIES

*Jackson v. Goord*, 664 F. Supp. 2d 307 (S.D.N.Y. 2009)..................................................................27

*United States v. Abdullahu*, 488 F. Supp. 2d 433 (D.N.J. 2007) ....................................................19

*United States v. Banki*, 10 Cr. 008 (JFK), Dkt. 7 (S.D.N.Y. Jan. 21, 2010), *aff'd*, 369 F. App'x 152 (2d Cir. 2010).26

*United States v. Benatar*, No. 02 Cr. 099 (JG), 2002 WL 31410262 (E.D.N.Y. Oct. 10, 2002) ............................26

*United States v. Bodmer*, No. 03 Cr. 947 (SAS), 2004 WL 169790 (S.D.N.Y. June 28, 2004) ................................28

*United States v. Bohn*, 330 F. Supp. 2d 960 (W.D. Tenn. 2004) ....................................................15

*United States v. Botero*, 604 F. Supp. 1028 (S.D. Fla. 1985) ........................................................15

*United States v. Boustani*, 356 F. Supp. 3d 246 (E.D.N.Y.), *aff'd*, No. 19-344, 2019 WL 2070656 (2d Cir. Mar. 7, 2019)....................................................................................................................................28

*United States v. Boustani*, 932 F.3d 79 (2d Cir. 2019) ....................................................6, 25, 26

*United States v. Chen*, 820 F. Supp. 1205, 1209 (N.D. Cal. 1992)..................................................15

*United States v. Cilins*, No. 13 Cr. 315 (WHP), 2013 WL 3802012 (S.D.N.Y. July 19, 2013) ............16, 19

*United States v. Cirillo*, No. 99-1514, 1999 WL 1456536 (3d Cir. July 13, 1999) .............................15

*United States v. Cohen*, No. C 10-00547, 2010 WL 5387757 n.11 (N.D. Cal. Dec. 20, 2010)................................15

*United States v. Dreier*, 596 F. Supp. 2d 831 (S.D.N.Y. 2009).......................................................27

*United States v. English*, 629 F.3d 311 (2d Cir. 2011) ..................................................................7

*United States v. Epstein*, 155 F. Supp. 2d 323 (E.D. Pa. 2001).....................................................28

*United States v. Epstein*, 425 F. Supp. 3d 306 (S.D.N.Y. 2019)...............................................15, 29

*United States v. Esposito*, 309 F. Supp. 3d 24 (S.D.N.Y. 2018)......................................................24

*United States v. Georgiou*, No. 08-1220-M, 2008 WL 4306750 (E.D. Pa. Sept. 22, 2008) ......................15

*United States v. Karni*, 298 F. Supp. 2d 129 (D.D.C. 2004)...........................................................15

*United States v. Kazeem*, No. 15 Cr. 172, 2015 WL 4645357 (D. Or. Aug. 3, 2015) .............................15

*United States v. Khashoggi*, 717 F. Supp. 1048 (S.D.N.Y. 1989) ...............................................15, 28

*United States v. Madoff*, 586 F. Supp. 2d 240 (S.D.N.Y. 2009) ......................................................27

*United States v. Mercedes*, 254 F.3d 433 (2d Cir. 2001).........................................................7, 29

*United States v. Morrison*, No. 16-MR-118, 2016 WL 7421924 (W.D.N.Y. Dec. 23, 2016) ....................15

*United States v. Namer*, 238 F.3d 425, 2000 WL 1872012 (6th Cir. Dec. 12, 2000) ............................19

*United States v. Patrick Ho*, 17 Cr. 779 (KBF), Dkt. 49 (S.D.N.Y. Feb. 4, 2018).................................28

*United States v. Petrov*, 15 Cr. 66 (LTS), 2015 WL 11022886 (S.D.N.Y. Mar. 26, 2015)...................7, 8

*United States v. Rowe*, 02 Cr. 756 (LMM), 2003 WL 21196846 (S.D.N.Y. May 21, 2003).........................7

*United States v. Sabhani*, 493 F.3d 63 (2d Cir. 2007) ....................................................................6

*United States v. Salvagno*, 314 F. Supp. 2d 115 (N.D.N.Y. 2004) ..................................................15

*United States v. Stanton*, No. 91 Cr. 889 (CHS), 1992 WL 27130 & n.1 (S.D.N.Y. Feb. 4, 1992)..........................18

*United States v. Stroh*, No. 396 Cr. 139, 2000 WL 1832956 (D. Conn. Nov. 3, 2000)............................15

*United States v. Young*, Nos. 12 Cr. 502, 12 Cr. 645, 2013 WL 12131300 (D. Utah Aug. 27, 2013)......................15

*United States v. Zarger*, No. 00 Cr. 773 (JG), 2000 WL 1134364 (E.D.N.Y. Aug. 4, 2000)....................26

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

UNITED STATES OF AMERICA                           :

   -v.-                                                         :                20 Cr. 330 (AJN)

GHISLAINE MAXWELL,                                    :

                 Defendant.          :

-----------------------------------------------------------------x

## THE GOVERNMENT'S MEMORANDUM IN OPPOSITION TO THE DEFENDANT'S RENEWED MOTION FOR RELEASE

The Government respectfully submits this memorandum in opposition to the defendant's renewed motion for release on bail, dated December 8, 2020 (the "Renewed Bail Motion"). Five months ago, after thorough briefing and a nearly two-hour hearing, this Court concluded that the defendant posed a serious flight risk and that no condition or combination of conditions could ensure her appearance in court. The defense now asks this Court to reverse that finding by essentially repackaging its prior arguments and presenting a more specific bail package. However, at the July 14, 2020 bail hearing in this case, this Court rejected the defendant's request to keep the record open to allow the defendant to do precisely what she has done here—namely, present more detailed information about her finances and a more concrete package—determining that further information about her financial picture would be irrelevant because no combination of conditions could ensure this defendant's appearance. The Court's conclusion was plainly correct, and the Renewed Bail Motion does nothing to undermine it. The offense conduct outlined in the Indictment remains incredibly serious, the evidence against the defendant remains strong, and the defendant continues to have extensive financial resources and foreign ties, as well as the

1

demonstrated ability to live in hiding for the long term. In short, the defendant poses an extreme flight risk, no condition or combination of conditions can reasonably ensure her appearance in this District, and the Court should not alter its prior finding to that effect.

## BACKGROUND

As detailed in the Indictment, the defendant is charged with facilitating the sexual abuse of multiple minor victims by Jeffrey Epstein between approximately 1994 and 1997. The defendant played a critical role in the scheme by helping to identify, entice, and groom minor girls to engage in sex acts with Epstein. The defendant's presence as an adult woman normalized Epstein's abusive behavior, and she even took part in at least some acts of sexual abuse. Together, the defendant and Epstein conspired to entice and cause minor victims to travel to Epstein's residences in different states, which the defendant knew and intended would result in their grooming for and subjection to sexual abuse. Then, in an effort to cover up her crimes, the defendant lied under oath during a civil deposition, including when asked about her interactions with minor girls.

Based on that conduct, the Indictment charges the defendant in six counts. Count One charges the defendant with conspiring with Epstein and others to entice minors to travel to engage in illegal sex acts, in violation of 18 U.S.C. § 371. Count Two charges the defendant with enticing a minor to travel to engage in illegal sex acts, in violation of 18 U.S.C. §§ 2422 and 2. Count Three charges the defendant with conspiring with Epstein and others to transport minors to participate in illegal sex acts, in violation of 18 U.S.C. § 371. Count Four charges the defendant with transporting minors to participate in illegal sex acts, in violation of 18 U.S.C. §§ 2423 and 2. Counts Five and Six charge the defendant with perjury, in violation of 18 U.S.C. § 1623.

On July 2, 2020, the Federal Bureau of Investigation ("FBI") arrested the defendant. Following extensive briefing, on July 14, 2020, the Court held a lengthy bail hearing. In its written and oral submissions, the defense urged the Court to release the defendant on bail.

Among other things, the defense emphasized the defendant's family ties and residence in the United States (Dkt. 18 at 2, 3, 12), offered to hire a private security company to monitor the defendant (*Id.* at 20), noted that the defendant remained in the country and was in touch with the Government through counsel following Epstein's arrest (Dkt. 18 at 12-13; Tr. 49, 52-55), argued that the defendant went into hiding to avoid a media frenzy (Dkt. 18 at 14-16; Tr. 55-56), and argued that detention would hamper the ability to prepare a defense (Tr. 42, 67-69). Responding to the Government's concerns about the lack of transparency about the defendant's finances and six proposed co-signers, the defense specifically asked the Court to keep the proceedings open if the Court believed additional information or a more fulsome bond would be useful to the bail determination. (Tr. 52 ("And if the court determines that the conditions that we have proffered are insufficient or need further verification, as long as we can have some assurance of safety and confidentiality, we would recommend that the court keep the proceeding open, and we should be able to get whatever the court needs to satisfy it."); Tr. 59 ("Even if the court were to assume for purposes of today's proceeding that she has the means that the government claims she does, it does not affect the analysis. That is to be addressed in conditions, to be addressed if the court requires it, through verifications and further proceedings before the court."); Tr. 66 ("If the court desires to leave the proceeding open for a week and allow us to come back, if the court has concerns about the number of suretors, for example, verification information, information about financial issues, we think that, now that we have some ability to breathe a little bit, that we should be able to pull this together for the court's consideration."); Tr. 70 ("And if the court needs more information

from us, we would respectfully request that the court leave the proceeding open for a week so that we can try to satisfy the court because we want to.")).

The Court declined the defense's request and instead concluded that the defendant posed a serious flight risk and that no combination of conditions could ensure her appearance.  First, the Court found that "the nature and circumstances of the offense here weigh in favor of detention," given the statutory presumption of detention triggered by charges involving minor victims and the potential penalties those charges carry.  (Tr. 82).  Second, the Court determined that "[t]he government's evidence at this early juncture of the case appears strong" based on the "multiple victims who provided detailed accounts of Ms. Maxwell's involvement in serious crimes," as well as corroboration in the form of "significant contemporaneous documentary evidence."  (*Id.*).  Third, the Court found that the defendant's history and characteristics demonstrate that the defendant poses a risk of flight.  (Tr. 83).

In addressing that third factor, the Court emphasized the defendant's "substantial international ties," which "could facilitate living abroad," including "multiple foreign citizenships," "familial and personal connections abroad," and "at least one foreign property of significant value."  (Tr. 83).  The Court also noted that the defendant "is a citizen of France, a nation that does not appear to extradite its citizens."  (*Id.*).  The Court further found that the defendant "possesses extraordinary financial resources" and that "the representations made to Pretrial Services regarding the defendant's finances likely do not provide a complete and candid picture of the resources available."  (Tr. 83-84).

Although the Court recognized that the defendant "does have some family and personal connections to the United States," the Court highlighted "the absence of any dependents, significant family ties or employment in the United States" in support of the conclusion that "flight

would not pose an insurmountable burden for her." (Tr. 84). The Court recognized the defense arguments that the defendant did not leave the United States after Epstein's arrest and was in contact with the Government through counsel, but emphasized that the defendant may have expected that she would not be prosecuted. (Tr. 84-85). The Court also noted that the defendant "did not provide the government with her whereabouts," and that the "[c]ircumstances of her arrest . . . may cast some doubt on the claim that she was not hiding from the government, a claim that she makes throughout the papers and here today, but even if true, the reality that Ms. Maxwell may face such serious charges herself may not have set in until she was actually indicted." (Tr. 85). Based on all of those factors, the Court found that the Government had carried its burden of demonstrating that the defendant "poses a substantial actual risk of flight." (Tr. 86).

The Court then concluded that "even the most restrictive conditions of release would be insufficient" to ensure the defendant's appearance. (*Id.*). Acknowledging that the defense's initial bail package represented only a fraction of the defendant's assets, the Court found that "even a substantially larger package would be insufficient." (*Id.*). Although the defendant "apparently failed to submit a full accounting or even close to full accounting of her financial situation," the Court implicitly rejected the defense's offer to provide additional information by determining that "*[e]ven if* the picture of her financial resources were not opaque, as it is, detention would still be appropriate." (Tr. 86-87 (emphasis added)). That conclusion was informed not only by the defendant's "significant financial resources," but also her "demonstrated sophistication in hiding those resources and herself." (Tr. 87). "Even assuming that Ms. Maxwell only wanted to hide from the press and the public," the Court emphasized that the defendant's "recent conduct underscores her extraordinary capacity to evade detection, even in the face of what the defense has acknowledged to be extreme and unusual efforts to locate her." (*Id.*). Given that sophistication,

the Court concluded that electronic monitoring and home security guards "would be insufficient" because the defendant could remove the monitor and evade security guards. (Tr. 87-88). Finally, the Court rejected the defense's arguments about the risks of COVID-19 and the difficulty of preparing a defense with an incarcerated client. In so doing, the Court noted that the defendant has no underlying conditions that place her at heightened risk of complications from COVID-19 and emphasized that the defendant had many months to prepare for trial. (Tr. 89-90).

Viewing all of these factors together, the Court ordered the defendant detained pending trial. (Tr. 91).

## **APPLICABLE LAW**

Under the Bail Reform Act, 18 U.S.C. §§ 3141 et seq., federal courts are empowered to order a defendant detained pending trial upon a determination that the defendant poses a risk of flight. 18 U.S.C. § 3142(e). When seeking detention on this ground, "[t]he Government bears the burden of proving by a preponderance of the evidence both that the defendant 'presents an actual risk of flight' and that 'no condition or combination of conditions could be imposed on the defendant that would reasonably assure his presence in court.'" *United States v. Boustani*, 932 F.3d 79, 81 (2d Cir. 2019) (quoting *United States v. Sabhani*, 493 F.3d 63, 75 (2d Cir. 2007)). The Bail Reform Act lists three factors to be considered in the detention analysis when the Government seeks detention based on flight risk: (1) the nature and circumstances of the crimes charged; (2) the weight of the evidence against the person; and (3) the history and characteristics of the defendant, including the person's "character . . . [and] financial resources." *See* 18 U.S.C. § 3142(g). If a judicial officer concludes that "no condition or combination of conditions will reasonably assure the appearance of the person as required . . . such judicial officer shall order the detention of the person before trial." 18 U.S.C. § 3142(e)(1).

Additionally, where, as here, a defendant is charged with committing an offense involving a minor victim under 18 U.S.C. §§ 2422 or 2423, it shall be presumed, subject to rebuttal, that no condition or combination of conditions will reasonably assure the appearance of the defendant as required and the safety of the community.   18 U.S.C. § 3142(e)(3)(E).   In such a case, "the defendant 'bears a limited burden of production—not a burden of persuasion—to rebut that presumption by coming forward with evidence that he does not pose . . . a risk of flight.'" *United States v. English*, 629 F.3d 311, 319 (2d Cir. 2011) (quoting *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001)).   The act of producing such evidence, however, "does not eliminate the presumption favoring detention." *Id.*   Rather, the presumption "remains a factor to be considered among those weighed by the district court," while the Government retains the ultimate burden of demonstrating that the defendant presents a risk of flight.   *Mercedes*, 254 F.3d at 436.

When the Court has already issued a detention order, the Bail Reform Act provides that the detention hearing "may be reopened . . . if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue of whether there are conditions of release that will reasonably assure the appearance" of the defendant. 18 U.S.C. § 3142(f).   Accordingly, "[a] court may properly reject an attempt to reopen a detention hearing where the new information presented is immaterial to the issue of flight risk." *United States v. Petrov*, 15 Cr. 66 (LTS), 2015 WL 11022886, at *2 (S.D.N.Y. Mar. 26, 2015).   Although courts in this Circuit have recognized that "a release order may be reconsidered even where the evidence proffered on reconsideration was known to the movant at the time of the original hearing," *United States v. Rowe*, 02 Cr. 756 (LMM), 2003 WL 21196846, at *1 (S.D.N.Y. May 21, 2003), generally the moving party must establish that its arguments "warrant

reconsideration" by, for example, demonstrating "that the court overlooked information or incorrectly applied the law," or that failure to reconsider "would constitute manifest injustice." *Petrov*, 2015 WL 1102286 at *3.

## DISCUSSION

Having already raised numerous arguments in its briefing and oral argument at the initial bail hearing in this case, the defense now asks this Court to reverse itself based on virtually the same arguments it already rejected. The Renewed Bail Application largely reiterates the same claims regarding the defendant's ties to the United States and her behavior after Epstein's arrest that the Court already found unpersuasive. To the extent the Renewed Bail Application presents new information, it consists primarily of financial data that was certainly known to the defendant at the time of her initial bail application and that the Court already assumed could be made available (and thus rejected as immaterial) when ordering detention. Ultimately, nothing in the Renewed Bail Application alters the analysis that led this Court to conclude that the defendant "poses a substantial actual risk of flight," and that no combination of conditions could assure her appearance. (Tr. 86). All three of the relevant Bail Reform Act factors still weigh heavily in favor of detention, and the defense claims to the contrary do not warrant a revisiting of this Court's well-reasoned and thorough prior decision.

A.  The Nature and Circumstances of the Offense

The first Bail Reform Act factor indisputably weighs in favor of detention in this case. The egregious conduct charged in the Indictment gives rise to a statutory presumption of detention, and the Renewed Bail Motion makes no effort to challenge this Court's prior conclusion that the nature and circumstances of the offense support detention. The charges in the Indictment describe horrendous conduct involving the sexual abuse of multiple minor victims. If convicted, the

defendant faces up to 35 years of incarceration, and may very well spend the remainder of her natural life in prison.  The seriousness of the offenses make such a steep penalty a real possibility upon conviction, thereby giving the defendant an overwhelming incentive to flee if given the chance.

In light of that strong incentive to flee, all three of the victims listed in the Indictment have asked the Government to convey to the Court that they continue to seek the defendant's detention. Additionally, pursuant to the Crime Victims' Rights Act, one of the victims has provided a written statement urging the Court to deny bail, which is attached as Exhibit A hereto.  That unanimous view of the victims reflects three related reasons that this factor weighs so heavily in favor of detention.  First, the victims sincerely fear that if the defendant is released, she will be able to evade justice.  Second, the pain that the victims still feel to this day as a result of the defendant's conduct supports the conclusion that this offense is especially serious and may result in a lengthy sentence.  Third, as discussed further below, the victims' attention to this case and willingness to convey their views reflects their commitment to take the stand and testify at the defendant's trial, demonstrating the strength of the Government's case.

In short, this factor offers no reason to reverse the prior detention order.

B.  The Strength of the Evidence

Further incentivizing the defendant to flee, the Government's evidence remains strong.  As the Court recognized when analyzing this factor at the July 14, 2020 hearing, the central evidence in the Government's case will come from the detailed testimony of three different victims, who will each independently describe how the defendant groomed and enticed them to engage in sexual activity with Jeffrey Epstein.  (Tr. 82).  The Indictment itself contains a description of the accounts these victims have provided law enforcement, which corroborate each other in meaningful part.

Further, and as set forth below, those victims' accounts are corroborated by other evidence, including contemporary documents and other witnesses.

In challenging this factor, the defense essentially restates its prior arguments on this score. At the original hearing, the defense argued that the Government's case was weak because it rested heavily on witness testimony regarding events from 25 years ago. (*See* Dkt. 18 at 19; Tr. 64-65). Having received and reviewed the discovery, the defense now contends the Government's corroborating evidence—some of which the Motion itself identifies—is insufficient and reiterates defense complaints that the discovery does not include other types of evidence.[1] (*See* Mot. at 30-33).

None of the defense arguments on this score changes the calculus for this factor. Three different victims are prepared to provide detailed testimony describing the defendant's role in Epstein's criminal scheme to sexually abuse them as minors. As demonstrated by the information outlined in the Indictment, these accounts corroborate each other by independently describing the same techniques used by the defendant and Epstein to groom and entice minor girls to engage in sex acts. Each victim will describe how the defendant befriended her, asked detailed questions about her life, and then normalized sexual activity around Epstein. Each victim will describe the use of massage as a technique to transition into sexual activity. Each victim will describe how the presence of an adult woman manipulated her into entering an abusive situation. In other words, this is a case that involves multiple witnesses describing the same course of conduct, substantially corroborating each other.

---

[1] At the initial bail hearing, the defendant also raised a series of legal challenges she intended to make on the face of the Indictment, all of which she contended weighed in favor of granting bail. After receiving discovery, the defense now appears to have abandoned those arguments, at least insofar as they pertain to the issue of bail.

In addition to corroborating each other, these victims' accounts are further corroborated by other witnesses and by documentary evidence, which has been produced in discovery.  That evidence will make it virtually indisputable that these victims in fact met and interacted with both the defendant and Jeffrey Epstein at the times and locations they describe. ███████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████ ██████████████████████████████████████████

███████████████████████████████ Beyond this documentary evidence, additional witnesses will confirm that both the defendant and Epstein knew and interacted with certain minor victims when those victims were minors.  In other words, the Government's evidence strongly corroborates the victims' testimony that they met and interacted with the defendant and Epstein at particular times and in particular places.

In the instant motion, the defendant complains that the documentary evidence relevant to the three victims identified in the Indictment and produced to date is not sufficiently voluminous

---

[2] In its Renewed Bail Motion, the defense complains ███████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
██████████████████████████████████████████

and that certain of the corroborating documentary evidence does not specifically name Maxwell.
Leaving aside the fact that volume is not a reliable proxy for quality, by its very nature, abusive
sexual contact is not the type of crime that leaves extensive documentary evidence.  But, as
described above, ████████████████████████████████████████████████████████
████████████████████████████████████████████████.  To the extent other
corroborative documents refer only to Epstein, they still support these victims' testimony, which
will detail their interactions with both the defendant and her co-conspirator, Epstein.  In other
words, documentary evidence does exist, and as the Court has already found, the combination of
multiple victims describing the same scheme, together with documents and other witnesses
confirming that those victims did indeed interact with the defendant and Epstein at the times and
places they say they did, makes this a strong case.  (Tr. 82).

Taken together, this evidence confirms that the Government's case remains as strong as it
was at the time of the defendant's arrest.  Accordingly, this factor continues to weigh heavily in
favor of detention.

C.   The Characteristics of the Defendant

The defendant's history and characteristics include significant foreign ties, millions of
dollars in cash that she largely transferred to her spouse in the last five years, among other assets,
and a demonstrated willingness and sophisticated ability to live in hiding.  The bulk of the
arguments in the Renewed Bail Motion focus on this factor in a manner that largely rehashes claims
that this Court already considered at the July 14, 2020 hearing.  Any new information provided
was either known by the defense at the time of the initial hearing, assumed to be the case when the
Court analyzed this factor at the initial hearing, or, in the case of the defense report regarding

French law, is simply incorrect.  Accordingly, the defendant's foreign ties, wealth, and skill at avoiding detection continue to weigh in favor of detention.

*First*, there can be no serious dispute that the defendant has foreign ties.  She is a citizen of three countries and holds three passports.  As was already noted at the original hearing and is again evidenced in the Renewed Bail Application, the defendant has close relatives and friends who live abroad, as well as a multi-million dollar foreign property and at least one foreign bank account.  (Tr. 83).  In an attempt to minimize the defendant's foreign ties, the defense emphasizes the defendant's relatives and friends in the United States, history of residence in the United States, and United States citizenship.  But the Court was already aware of those factors when making its original detention decision.  (*See* Tr. 84; Dkt. 18 at 2, 12).  The letters and documentation included in the Renewed Bail Motion simply prove points that were not in dispute.   What that documentation does not do, however, is suggest that the defendant has the kind of ties to this country that come with any employment in the United States or any dependents living here. Indeed, as noted in the Pretrial Services Report, the defendant stated in July that she has no children and has no current employment.  (Pretrial Services Report at 3).

The Renewed Bail Motion fails to establish sufficiently strong ties to the United States that would prevent her from fleeing.  Although the defendant now claims her marriage would keep her in the United States, her motion does not address the plainly inconsistent statements she made to Pretrial Services at the time of her arrest, when, as documented in the Pretrial Services Report, the defendant said she was "in the process of divorcing her husband."  (*Id.*).  On this point, it bears noting that the defendant's motion asks that she be permitted to live with ███████ if granted bail, not her spouse.  Moreover, the fact that the defendant's spouse has only now come forward to support the defendant should be afforded little weight given that he refused to come forward at the

time of her arrest.  While a friend's desire to avoid publicity may be understandable, a spouse's desire to distance himself in that manner—particularly when coupled with the defendant's inconsistent statements about the state of their relationship—undermine her assertion that her marriage is a tie that would keep her in the United States.[3]  As for the defendant's asserted relationships with ███████████ and other relatives in the United States, the defendant did not appear to have an issue living alone without these relatives while she was in hiding in New Hampshire, which undercuts any suggestion that these ties would keep her in the United States.  In any event, the defendant could easily receive visits from her family members while living abroad, and, as noted, the defendant has multiple family members and friends who live abroad.

In addition to those foreign connections and ample means to flee discussed further below, the defendant will have the ability, once gone, to frustrate any potential extradition.  Attempting to downplay that concern, the defense relies on two legal opinions to claim that the defendant can irrevocably waive her extradition rights with respect to both the United Kingdom and France. (Mot. at 25; Def. Ex. U; Def. Ex. V).  But the defendant's offer to sign a so-called "irrevocable waiver of her extradition rights" is ultimately meaningless: it provides no additional reassurance whatsoever and, with respect to France, is based on an erroneous assessment of France's position on the extradition of its nationals.  (Mot. at 25).

As an initial matter, the Government would need to seek the arrest of the defendant before such a waiver would even come into play.  Even assuming the defendant could be located and apprehended—which is quite an assumption given the defendant's access to substantial wealth and

---

[3] Adding to this confusion, bank records reflect that when the defendant and her spouse established a trust account in or about 2018, they filled out forms in which they were required to provide personal information, including marital status.  On those forms, both the defendant and her spouse listed their marital status as "single."  It is unclear why the defendant did not disclose her marital status to the bank, but that lack of candor on a bank form mirrors her lack of candor with Pretrial Services in this case, discussed further below.

demonstrated ability to live in hiding—numerous courts have recognized that purported waivers of extradition are unenforceable and effectively meaningless. *See, e.g.*, *United States v. Epstein*, 425 F. Supp. 3d 306, 325 (S.D.N.Y. 2019) ("The Defense proposal to give advance consent to extradition and waiver of extradition rights is, in the Court's view, an empty gesture. And, it comes into [play] only after [the defendant] has fled the Court's jurisdiction."); *United States v. Morrison*, No. 16-MR-118, 2016 WL 7421924, at *4 (W.D.N.Y. Dec. 23, 2016); *United States v. Kazeem*, No. 15 Cr. 172, 2015 WL 4645357, at *3 (D. Or. Aug. 3, 2015); *United States v. Young*, Nos. 12 Cr. 502, 12 Cr. 645, 2013 WL 12131300, at *7 (D. Utah Aug. 27, 2013); *United States v. Cohen*, No. C 10-00547, 2010 WL 5387757, at *9 n.11 (N.D. Cal. Dec. 20, 2010); *United States v. Bohn*, 330 F. Supp. 2d 960, 961 (W.D. Tenn. 2004); *United States v. Stroh*, No. 396 Cr. 139, 2000 WL 1832956, at *5 (D. Conn. Nov. 3, 2000); *United States v. Botero*, 604 F. Supp. 1028, 1035 (S.D. Fla. 1985).[4]   For very good reason: Any defendant who signs such a purported waiver and then flees will assuredly contest the validity and/or voluntariness of the waiver, and will get to do so in

---

[4] The defense argues that several courts "have addressed concerns about a defendant's ties to a foreign state that enforces extradition waiver by requiring the defendant to execute such a waiver as a condition of release." (Mot. at 26). In the cases cited by the defendant, the courts approved the release of the defendants based on the particular facts, but did not address at all the question of whether a waiver of extradition is enforceable. *See United States v. Khashoggi*, 717 F. Supp. 1048, 1050-52 (S.D.N.Y. 1989) (noting, among other things, that the Government's case was "novel," and presented an "untried theory of liability" and that the defendant not only waived his right to appeal extradition in Switzerland but that he traveled immediately to the United States for arraignment, and that his country's government committed to ensuring his appearance at trial); *United States v. Salvagno*, 314 F. Supp. 2d 115, 119 (N.D.N.Y. 2004) (denying Government motion to remand after trial where court found defendant not likely to flee); *United States v. Chen*, 820 F. Supp. 1205, 1209, 1212 (N.D. Cal. 1992) (reconsidering pretrial release where case had "taken a number of surprising turns," including the "suppression of video evidence, the indeterminate stay of proceedings, the overall uncertainty of the government's evidence"); *United States v. Karni*, 298 F. Supp. 2d 129, 133 (D.D.C. 2004); *United States v. Cirillo*, No. 99-1514, 1999 WL 1456536, at *2 (3d Cir. July 13, 1999); *see also United States v. Georgiou*, No. 08-1220-M, 2008 WL 4306750, at *3 (E.D. Pa. Sept. 22, 2008) (distinguishing *Cirillo* on the facts and noting that "defense counsel concedes that a waiver of extradition may not be enforceable in Canada, a fact the court in *Cirillo* did not mention in its opinion").

the jurisdiction of her choosing (*i.e.*, the one to which she chose to flee).  The Department of Justice's Office of International Affairs ("OIA") is unaware of any country anywhere in the world that would consider an anticipatory extradition waiver binding.  Indeed, the defendant's own experts' conclusion—that "because of these waivers and other factors, it is highly unlikely that she would be able to resist extradition successfully," (Mot. at 27)—leaves open the possibility that she could avoid extradition.

Such an outcome is virtually a certainty as to France, a country of which the defendant is a citizen and which does not extradite its citizens to the United States.  To confirm this fact, after receiving the Renewed Bail Motion, the Government, through OIA, contacted the French Ministry of Justice ("MOJ") to clarify whether there is any circumstance under which France would extradite a French citizen to the United States.  In response, the MOJ provided the Government with a letter setting forth the relevant law and conclusively stating that France does not extradite its citizens to the United States.  That letter in its original French, as well as an English translation of the letter, are attached hereto as Exhibit B.  In that letter, the MOJ makes clear that France does not extradite its nationals outside the European Union (regardless of the existence of dual citizenship), including to the United States, and has never derogated from that principle outside the European Union.  *See* Ex. B; *see also United States v. Cilins*, No. 13 Cr. 315 (WHP), 2013 WL 3802012, at *2 (S.D.N.Y. July 19, 2013) ("Because France refuses to extradite its citizens, Cilins can avoid prosecution on this Indictment if he can reach French soil.").

In other words, even assuming the Government could locate the defendant, if she flees to France, her citizenship in that country will completely bar her extradition.  Any purported waiver of extradition executed in the United States would not be enforceable against the defendant in France because French law embodies an inflexible principle that its citizens will not be extradited

to other countries outside of the European Union, including the United States.  As set forth in Exhibit B, according to the MOJ, the French Code of Criminal Procedure "absolutely prohibits the extradition of a person who had French nationality at the time of the commission of the acts for which extradition is requested."  (Ex. B at 3).  That the defendant is a citizen of multiple countries is of no moment.  (*See id.*).  In applying the Bilateral Extradition Treaty between the United States and France and the "general principle of non-extradition of nationals under French law, France systematically refuses to grant the extradition of French nationals to the American judicial authorities."  (*Id.* at 4).  Thus, contrary to the suggestion of the defense submission, any anticipatory waiver of extradition would not be effective under French law, and would not be recognizable by French courts in any extradition process, or otherwise enforceable.

The defendant's expert writes that "[i]n the recent past," he is "not aware that the French authorities would have had to address the situation in which the United States sought extradition of a French citizen who was also a United States citizen.  Thus, there is no precedent to draw from in that regard."  (Def. Ex. V. at 2).  That is not so.  France has previously rejected such a request. For example, in 2006, Hans Peterson, an American citizen and French national, turned himself in to French authorities in Guadeloupe and confessed to committing a murder in the United States. Despite turning himself in to French authorities, Peterson remained beyond the reach of U.S. law enforcement despite the repeated requests of OIA and U.S. officials.  *See Durbin, Schakowsky, Emanuel Urge French Justice Minister To Ensure Justice Is Done During Hans Peterson Retrial* (Nov. 16, 2012), https://www.durbin.senate.gov/newsroom/press-releases/durbin-schakowsky-emanuel-urge-french-justice-minister-to-ensure-justice-is-done-during-hans-peterson-retrial; *see also Senators' letter to French government* (Mar. 14, 2008), https://www.nbcnews.com/id/wbna23601583 (citing a letter from the MOJ to the Department of

Justice on August 22, 2007 which provides that the "Ministry of Justice considers the American-born, U.S. citizen Peterson to also be a French national and that the extradition request has been denied"). Indeed, the Government is unaware of any instance in which France has ever extradited a French citizen to the United States. (*See* Ex. B at 4 ("[T]he principle of non-extradition of nationals is a principle of extradition law from which France has never deviated outside the framework of the European Union.")). Simply put, the Court was correct when it determined at the initial bail hearing that France does not appear to extradite its own citizens. (Tr. 83).

The defendant's supposed waiver of her extradition rights with respect to the United Kingdom should similarly be afforded no weight. Although an anticipatory waiver of extradition may be admissible in extradition proceedings in the United Kingdom, such a waiver is by no means binding, authoritative, or enforceable. *See United States v. Stanton*, No. 91 Cr. 889 (CHS), 1992 WL 27130, at *2 & n.1 (S.D.N.Y. Feb. 4, 1992) (denying modification of defendant's bail where defendant indicated willingness to waive extradition proceeding by providing extradition waivers, as British authorities advised that extradition waivers were possible only in cases where the fugitive actually appeared before a British magistrate after the filing of an extradition request, and concluding that such a waiver was not an "enforceable undertaking"). Under the United Kingdom's Extradition Act of 2003, consent to extradition is permitted, "if (and only if) [a person] has the assistance of counsel or a solicitor to represent him in the proceedings before the appropriate judge." Extradition Act 2003, § 127(9), https://www.legislation.gov.uk/ukpga/2003/41. As such, a judge in the United Kingdom must independently evaluate any waiver of extradition in real time, thereby necessarily rendering any anticipatory waiver executed before the defendant is found in the United Kingdom meaningless. *Id.* at §127. In other words, consent given

to authorities in the United States would not be binding in the United Kingdom, and the defendant could easily decide not to consent to extradition once found abroad.

Further, a judge in the United Kingdom must make an independent decision on extradition based on the circumstances at the time the defendant is before the court, including the passage of time, forum, and considerations of the individual's mental or physical condition.  *See, e.g.*, *id.* at §§ 82, 83A, & 91.  Even if a final order of extradition has been entered by a court, the Secretary of State still has the discretion to deny extradition.  *See id.* at § 93.  The Government understands from OIA that extradition from the United Kingdom is frequently extensively litigated, uncertain, and subject to multiple levels of appeal.  Moreover, even where the process is ultimately successful, it is lengthy and time-consuming.

Ultimately, although the defendant purports to be willing to waive her right to challenge being extradited to the United States, she simply cannot do so under the laws of France and the United Kingdom, and she would be free to fight extradition once in those countries.  And, of course, the defendant could choose to flee to another jurisdiction altogether, including one with which the United States does not have an extradition treaty.  The defendant's written waivers of extradition from France and the United Kingdom certainly provide no guarantee that the defendant will not flee to a third country from which, even if she can be located, extradition may be impossible.  Courts have recognized that lack of an effective means of extradition can increase a defendant's flight risk, and have cited such facts as a relevant consideration in detaining defendants pending trial. *See, e.g.*, *United States v. Namer*, 238 F.3d 425, 2000 WL 1872012, at *2 (6th Cir. Dec. 12, 2000); *Cilins*, 2013 WL 3802012 at *2; *United States v. Abdullahu*, 488 F. Supp. 2d 433, 443 (D.N.J. 2007) ("The inability to extradite defendant should he flee weighs in favor of detention.").   Beyond being impossible to guarantee, extradition is typically a lengthy,

complicated, and expensive process, which would provide no measure of justice to the victims who would be forced to wait years for the defendant's return.   The strong possibility that the defendant could successfully resist extradition only heightens the defendant's incentive to flee.

*Second*, the defendant's behavior in the year leading up to her arrest demonstrates her sophistication in hiding and her ability to avoid detection.   The Court noted as much in denying bail, and the Renewed Bail Application also does nothing to change that conclusion.   (Tr. 87). Indeed, the defendant's time in isolation in the year leading up to her arrest makes clear that, even to the extent she has loved ones and property in this country, she has proven her willingness to cut herself off entirely from them and her ability to live in hiding.   She did so by purchasing a home using a trust in another name and introducing herself to the real estate agent under an alias, placing her assets into accounts held under other names, registering cellphones and at least one credit card under other names, and living in near total isolation away from her loved ones.

The Renewed Bail Application again tries to cast those steps as efforts to avoid the media frenzy that followed Epstein's death.   (Tr. 44, 56-57).   However, as the Court already recognized, regardless of the defendant's reasons for taking these steps, that course of conduct clearly establishes her expertise at remaining hidden and her willingness to cut herself off from her family and friends in order to avoid detection.   (Tr. 87).   Rare is the case when a defendant has already demonstrated an aptitude for assuming another identity and concealing her assets, including when purchasing property, registering cellphones, and managing finances.   Here, the defendant has indisputably taken all of those steps.   She was able to do so because of both her finances and her willingness to take extreme measures and to experience social isolation away from her loved ones. And she was so good at assuming another identity that she was able to avoid notice by locals and

the media even when a bounty was offered for her location and when numerous media outlets were searching for her.

The charts, graphs, and affidavits proffered by the defense do not undercut the defendant's skill at evading detection, and do nothing more than restate the justification for those actions that the defense already made at the prior hearing. (*See* Dkt. 18 at 14-16). That said, there is still reason to believe that the defendant was hiding not just from the press, but also from law enforcement. It is undisputed that defense counsel, even while in contact with the Government, never disclosed the defendant's location or offered her surrender if she were to be charged. (Tr. 53-54). The Court already inquired about defense counsel's interactions with the Government in the year leading up to the defendant's arrest, and the Renewed Bail Application offers nothing new on that score. (*Id.*). Defense counsel contacted the Government when the FBI attempted to serve the defendant with a subpoena, but were unable to locate her, on July 7, 2019. Prior to her arrest, the Government and defense counsel communicated on multiple occasions between July and October of 2019, and communicated briefly on two additional occasions, most recently in March of 2020. At no point did defense counsel disclose the defendant's location, offer to surrender the defendant, or offer to bring the defendant in to be interviewed.

Moreover it is undisputed that when the FBI located the defendant, she ignored their directives and ran away from the arresting agents. Although the defense has submitted an affidavit from the defendant's private security team, nothing in that affidavit should alter the Court's determination that detention is appropriate here. The defense already informed the Court at the July 14, 2020 bail hearing that the defendant's security protocol was to move to an inner room if her security was breached. (Tr. 55). Even still, the new affidavit makes clear that the agents who entered the defendant's property were wearing clothing that clearly identified them as FBI agents.

(Def. Ex. S ¶ 12).  Moreover, the FBI announced themselves as federal agents to the defendant when they first approached her.  Thus, even if the defendant was following her private security's protocol when she fled, she did so knowing that she was disobeying the directives of FBI agents, not members of the media or general public.  Those actions raise the very real concern, particularly in light of the terms of her proposed package, that the defendant would prioritize the directives of her private security guards over the directives of federal law enforcement.  Further, the act of wrapping a cellphone in tin foil has no conceivable relevance to concerns about the press.  The defense argues that the defendant only took those measures because that particular phone number had been released to the public, but that just suggests the defendant believed that was the only number of which law enforcement was aware.  In other words, there is still reason to believe, as the Court previously found, that in the year leading up to her arrest, the defendant sought to evade not only the press, but also law enforcement.  (Tr. 87).

*Third*, the defendant has access to significant wealth.  At the initial bail hearing, the Government expressed doubt that the defendant's assets were limited to the approximately $3.8 million she reported to Pretrial Services, and noted that it appeared the defendant was less than candid with Pretrial Services regarding the assets in her control.  (Tr. 28-30, 72-73).  The finances outlined in the defense submission confirm the Government's suspicion that the defendant has access to far more than $3.8 million, confirm that the defendant was less than candid with Pretrial Services (and, by extension, the Court) during her interview, and confirm that the defendant is a person of substantial means with vast resources.[5]  The defendant's apparent willingness to deceive

---

[5] As noted above, the Court effectively assumed the defendant had considerably more assets than those disclosed to Pretrial Services in rejecting defense counsel's repeated offer to provide a more fulsome picture of the defendant's finances and concluding that even assuming the defense could provide a clearer description of the defendant's assets, detention was still warranted.  (*See* Tr. 87).

this Court already weighed in favor of detention, and confirmation of that deception only reemphasizes that this defendant cannot be trusted to comply with bail conditions.

Now, the defense has submitted a financial report that reflects the defendant has approximately $22 million in assets—far more than the figure she initially reported to Pretrial Services. (Def. Ex. O). Accepting the financial report at face value, it is clear that the defense's proposed bail package would leave the defendant with substantial resources to flee the country. Not only would she have millions of dollars in unrestrained assets at her disposal,[6] but she would also have a $2 million townhouse in London, which she could live in or sell to support herself. In other words, even with the proposed bond—which is only partially secured—the defendant would still have millions of dollars at her disposal. She could absolutely afford to leave her friends and family to lose whatever they may pledge to support her bond, and then repay them much of their losses. In fact, the defendant could transfer money to her proposed co-signers immediately following her release,[7] given the large sums of money that would be left unrestrained by her proposed bail package.

Moreover, the schedule provided by the defense is notably silent regarding any *future* revenue streams to which the defendant may have access. The financial report only addresses the defendant's assets without detailing her income at all. The defendant has similarly provided the Court with no information about what resources her spouse might have access to on a prospective

---

[6] In particular, according to the report, the defendant would have more than $4 million in unrestrained funds in accounts, in addition to hundreds of thousands of dollars of jewelry and other items. Moreover, the Government presumes the defendant has not yet spent all $7 million of the retainer paid to her attorneys, which would still belong to the defendant if she fled.

[7] The Government notes that two of the defendant's proposed co-signers are citizens and residents of the United Kingdom, against whom the Government could not realistically recover a bond amount. These co-signers have not offered to secure this bond with any cash or property, and as a result, such a bond would effectively be worthless if the defendant were to flee.

basis, in addition to their substantial assets.  The financial report submitted by the defense is also careful to note that it does not account for any possible income from inheritances.  (Def. Ex. O at 5).  ███████████████████████████████████████████████████████

████████████████████████████████████████████████████.

The financial report further shows that the defendant apparently spent the last five years moving the majority of her assets out of her name by funneling them through trusts to her spouse. That pattern suggests the defendant has used the process of transferring assets as a means to hide her true wealth.  As the Renewed Bail Application points out, the defendant currently has approximately $3.4 million worth of assets held in her own name, which is close to the amount of wealth she told Pretrial Services she possessed in July 2020.  Importantly, though, that number omits the millions of dollars of assets that she has transferred from her name through trust accounts to her spouse, including funds that were used to purchase the New Hampshire property where the defendant was residing when she was arrested.[8]  This confirms that the Government was right to be concerned that the defendant had refused to identify her spouse or his assets to Pretrial Services. That practice further demonstrates the defendant's sophistication in hiding her assets and maintaining assets that are under her control in other names.

In this vein, the financial report suggests that the defendant originally brought more than $20 million to her marriage, but that her husband brought only $200,000.[9]  (See Def. Ex. O at 10).

---

[8] On this score, it bears noting that that defendant told Pretrial Services that the property was owned by a corporation, and that she was "just able to stay there."  (Pretrial Services Report at 2).  The defendant's lack of candor does not inspire confidence that she can be trusted to comply with bail conditions.

[9] The Government has not been able to verify this financial information—in part because the defense has declined to provide the Government with the spouse's current banking information—but ███████████████████████████████████████████████████ ██████ ███████████████████████████████████████████████████████████████████████████████

Setting aside whether the defendant's spouse has additional assets beyond those included in the financial report, the vast majority of the assets contained in the report itself apparently originated with the defendant.  (*See* Def. Ex. O at 10).  Based on the report, it seems clear that the defendant slowly funneled the majority of her wealth to trusts and into her husband's name over the last five years.  As a result, if the Court were to grant the defendant's proposed bail package and the defendant were to flee, her spouse would primarily lose the money that the defendant gave him rather than his own independent assets.  In other words, were the defendant to flee, she would largely be sacrificing her own money and assets, thereby limiting the moral suasion of her spouse co-signing the bond.  In sum, the defendant's submission does not change the Government's position at the original bail hearing that the defendant has considerable financial resources, and could live a comfortable life as a fugitive.

The combination of all these factors, including the defendant's foreign ties, demonstrated ability to live in hiding, and financial resources, confirm that the defendant's characteristics continue to weigh in favor of detention.  Given the multiplicity of factors supporting detention, this is not one of the rare cases in which a private security company could conceivably be considered as a bail condition. *See United States v. Boustani*, 932 F.3d 79, 82 (2d Cir. 2019).  The Second Circuit has squarely held that "the Bail Reform Act does not permit a two-tiered bail system in which defendants of lesser means are detained pending trial while wealthy defendants are released to self-funded private jails," and that "a defendant may be released on such a condition

---

████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████  The
Court need not resolve this question, however, because regardless of whether the defendant's husband may have additional undisclosed assets, as discussed herein, the key takeaway from the financial report is that the vast majority of the spouse's reported assets, upon which the proposed bond is based, originated with the defendant, meaning he would not be losing his own money if the defendant fled.

only where, *but for* his wealth, he would not have been detained." *Id.* Here, detention is warranted not only because of the defendant's financial means, but also her foreign ties, her skill at and willingness to live in hiding, the nature of the offense resulting in a presumption of detention, and the strength of the evidence, among other factors. The defense suggestion that the defendant's private security guards should post cash in support of a bond does not change this calculus. There is no reason to believe that the defendant would be at all troubled by a security company in which she has no personal stake losing $1 million, especially if that sacrifice meant she could escape conviction and sentencing. Accordingly, release to the equivalent of a "privately funded jail" is not warranted here. *Id.* at 83.

Relatedly, as the Court previously recognized (Tr. 87-88), a GPS monitoring bracelet offers little value for a defendant who poses such a significant flight risk because it is does nothing to prevent the defendant's flight once it has been removed. At best, home confinement and electronic monitoring would reduce a defendant's head start after cutting the bracelet. *See United States v. Banki*, 10 Cr. 008 (JFK), Dkt. 7 (S.D.N.Y. Jan. 21, 2010) (denying bail to a naturalized citizen who was native to Iran, who was single and childless and who faced a statutory maximum of 20 years' imprisonment, and noting that electronic monitoring is "hardly foolproof."), *aff'd*, 369 F. App'x 152 (2d Cir. 2010); *United States v. Zarger*, No. 00 Cr. 773 (JG), 2000 WL 1134364, at *1 (E.D.N.Y. Aug. 4, 2000) (rejecting defendant's application for bail in part because home detention with electronic monitoring "at best . . . limits a fleeing defendant's head start"); *United States v. Benatar*, No. 02 Cr. 099 (JG), 2002 WL 31410262, at *3 (E.D.N.Y. Oct. 10, 2002) (same). Simply put, no bail conditions, including those proposed in the Renewed Bail Motion, would be sufficient to ensure that this defendant appears in court.

In urging a different conclusion, the defense again cites the same cases discussed in its initial briefing and at the July 14, 2020 hearing to argue that the proposed bail conditions are consistent with or exceed those approved by courts in this Circuit for "high-profile defendants with financial means and foreign citizenship." (Mot. at 34; *see* Dkt. 18 at 16, 21; Tr. 48-51). The Court should reject the defense's efforts to raise the same precedent that the Court already took into consideration when denying bail. "A motion for reconsideration may not be used . . . as a vehicle for relitigating issues already decided by the Court." *Jackson v. Goord*, 664 F. Supp. 2d 307, 313 (S.D.N.Y. 2009) (internal quotation marks omitted). The Court already considered and rejected the defendant's efforts to liken her case to other "serious and high-profile prosecutions where the courts, over the government's objection, granted bail to defendants with significant financial resources." (Tr. 88). Noting "crucial factual differences," the Court described those cases, including *United States v. Esposito*, 309 F. Supp. 3d 24 (S.D.N.Y. 2018), *United States v. Dreier*, 596 F. Supp. 2d 831 (S.D.N.Y. 2009), and *United States v. Madoff*, 586 F. Supp. 2d 240 (S.D.N.Y. 2009), as "not on point and not persuasive," and distinguished the defendant for a number of reasons, including the defendant's "significant foreign connections." (Tr. 88; *see id.* (distinguishing *Esposito* where the risk of flight appeared to "have been based on the resources available to defendant, not foreign connections or experience and a record of hiding from being found"); *id.* (distinguishing *Madoff* where "the defendant had already been released on a bail package agreed to by the parties for a considerable period of time before the government sought detention")).

The Court already engaged in a fact-specific analysis in ordering the defendant detained. Among the reasons provided, the Court found that the "the defendant not only has significant financial resources, but has demonstrated sophistication in hiding those resources and herself."

(Tr. 87). Following the analysis the Court has already conducted, several of the cases cited by the defendant are readily distinguishable. *See, e.g.*, *United States v. Khashoggi*, 717 F. Supp. 1048, 1050-52 (S.D.N.Y. 1989) (in ordering defendant released pending trial, noting, among other things, that the defendant not only waived his right to appeal extradition in Switzerland, but that he traveled immediately to the United States for arraignment, and that his country's Government committed to ensuring his appearance at trial); *United States v. Bodmer*, No. 03 Cr. 947 (SAS), 2004 WL 169790, at *1, *3 (S.D.N.Y. June 28, 2004) (setting conditions of bail where defendant arrested abroad had already consented to extradition to the United States and finding that the Government—whose argument was "based, in large part, on speculation" as to the defendant's financial resources—had "failed to meet its burden"). And there is support in the case law for detaining individuals in comparable situations to the defendant. *See, e.g.*, *United States v. Boustani*, 356 F. Supp. 3d 246, 252-55 (E.D.N.Y.), *aff'd*, No. 19-344, 2019 WL 2070656 (2d Cir. Mar. 7, 2019) (ordering defendant detained pending trial and finding that defendant posed a risk of flight based on several factors, including seriousness of the charged offenses, lengthy possible sentence, strength of Government's evidence, access to substantial financial resources, frequent international travel, "minimal" ties to the United States, and "extensive ties to foreign countries without extradition"); *United States v. Patrick Ho*, 17 Cr. 779 (KBF), Dkt. 49 (S.D.N.Y. Feb. 4, 2018) (ordering defendant detained based on defendant's risk of flight and citing the strength of the Government's evidence, lack of meaningful community ties, and "potential ties in foreign jurisdictions"); *United States v. Epstein*, 155 F. Supp. 2d 323, 324-326 (E.D. Pa. 2001) (finding that defendant's dual citizenship in Germany and Brazil, lucrative employment and property interests, and lack of an extradition treaty with Brazil weighed in favor of detention despite the fact that defendant and his wife owned "substantial" property and other significant assets in the

United States).  Further, unlike those cases and the cases cited by the defendant, the crimes charged here involving minor victims trigger a statutory presumption in favor of detention, weighing further in favor of detention.  *See Mercedes*, 254 F.3d at 436.

"Each bail package in each case is considered and evaluated on its individual merits by the Court."  *Epstein*, 425 F. Supp. 3d at 326.  Unlike the cases cited by the defense, the Government seeks detention not solely on the basis that the defendant is of financial means and has foreign citizenship.  Rather, detention is warranted because the defendant is a citizen of multiple foreign countries, including one that does not extradite its nationals, with "substantial international ties," "familial and personal connections abroad," and "substantial financial resources," (Tr. 83-84), with a demonstrated sophistication in hiding herself and her assets, who, for the myriad reasons discussed herein and identified at the original hearing—including the seriousness of the offense, the strength of the Government's evidence, and the potential length of sentence—presents a substantial flight risk.  (Tr. 82-91).  The defendant continues to pose an extreme risk of flight, and the defense has not offered any new information sufficient to justify reversal of the Court's prior finding that no combination of conditions could ensure her appearance.

D.  <u>Conditions of Confinement</u>

Finally, the Renewed Bail Application reiterates the same argument about the potential harms of detention on the defendant that this Court rejected at the initial bail hearing.  (Tr. 42, 68-69).  As was the case in July, these complaints do not warrant the defendant's release.

The defendant continues to have more time than any other inmate at the MDC to review her discovery and as much, if not more, time to communicate with her attorneys.  Specifically, the defendant currently has thirteen hours per day, seven days per week to review electronic discovery. Also during that time, the defendant has access to email with defense counsel, calls with defense

counsel, and when visiting is available depending on pandemic-related conditions, the defendant has access to legal visits. Due to the recently implemented lockdown at the MDC, visitation is not currently available, but MDC legal counsel is arranging for the defendant to receive a VTC call with legal counsel three hours per day every weekday, starting this Friday. Defense counsel will also be able to schedule legal calls on weekends as needed. Given those facts, the defense argument essentially suggests that no defendant could prepare for trial while housed at the MDC—a patently incorrect claim.

The defendant is able to review her discovery using hard drives provided by the Government, discs that defense counsel can send containing any copies of discovery material defense counsel chooses within the confines of the protective order, or hard copy documents provided by defense counsel. The Government has taken multiple steps to address technical difficulties the defendant has encountered when reviewing her hard drives. These steps included modifying and reproducing productions in new formats, asking MDC IT staff to assist the defendant in viewing her hard drives on the MDC computer, and then purchasing and providing a laptop for the defendant's exclusive use.[10] Even when the defendant was temporarily unable to review some files from some hard drives, she was always able to review other portions of her discovery.

---

[10] The Government understands from MDC legal counsel that the defendant has access to the laptop thirteen hours per day during weekdays and has access to the MDC desktop computer thirteen hours per day seven days per week. The use of the laptop is limited to weekdays because the MDC restricts the number of employees who carry the key to the secure location where the laptop is kept, and the employees with that key do not work regularly on weekends. The MDC previously accommodated an exception to this rule while the defendant was in quarantine and arranged for her to use the laptop in her isolation cell on weekends because otherwise she would not have had access to a computer during weekends while in quarantine. Now that she is out of quarantine, the defendant will have access to the MDC desktop computer on weekends.

As to the defense's most recent complaints, the malfunctioning of the sixth production that the defense complains of resulted from the defendant herself dropping the hard drive onto the ground, and that drive has been replaced.  When the defense informed the Government that the drive containing the seventh production may be malfunctioning, the Government offered to have IT staff review the drive.  In response, the defense indicated the drive was in fact still viewable and declined to have IT staff review it.  Accordingly, it is the Government's understanding that the defendant currently has a full, readable set of discovery at the MDC.  At the defense's request, the Government is preparing yet another copy containing all productions to date on a single drive so that the defendant will have a backup copy of discovery materials at the MDC.[11]  Throughout the defendant's pretrial detention, the Government has been responsive to the defense's concerns regarding access to discovery and counsel.  The Government will continue to work with MDC legal counsel to ensure that the defendant is able to review her discovery and to communicate with defense counsel over the seven months still remaining before trial.

As to the defense complaints regarding the defendant's conditions of confinement, the defense notably does not suggest that the defendant should be housed in general population. Indeed, the defense appears to agree that the best way to ensure the defendant's safety while detained is to be away from general population.  Unlike other inmates in protective custody, however, the defendant is released from her isolation cell for thirteen hours per day, has her own shower, has exclusive use of two different computers, has her own phone to use, and has her own television.  Those conditions set her far apart from general population inmates, not to mention

---

[11] On this score, the Government notes the tension between the defense claim that the discovery produced to date contains little of value or relevant to the charges set forth in the Indictment, and the simultaneous claim that the defendant has been prejudiced by technical difficulties that have temporarily delayed her ability to review portions of those productions, productions which, according to the defense, counsel have already been able to conclude are essentially unimportant.

other inmates in protective custody.  Additionally, psychology and medical staff check on the defendant daily, MDC legal staff are highly attuned to any complaints the defendant has raised, and following initial complaints about the defendant's diet early in her incarceration, the MDC has ensured that the defendant receives three full meals per day and has access to commissary from which she can supplement her diet.

The MDC has taken numerous steps to strike the balance between the security of the institution and providing the defendant with adequate time and resources to prepare her defense. In that vein, many of the searches the defendant complains of—such as searches after every visit, searches of her cell, pat downs when she is moved, and directing her to open her mouth for visual inspection (while the searching staff member is wearing a mask)—are the same searches to which every other inmate is subjected for the security of the institution.  MDC legal counsel has assured the Government that MDC staff does not record or listen to the substance of the defendant's calls and visits with legal counsel.  To the extent MDC staff conducts additional searches or monitoring of the defendant, MDC legal counsel has indicated that those steps are necessary to maintain the security of the institution and the defendant.

With respect to the defense concerns regarding COVID-19, the Government recognizes, as it did in its initial bail briefing, that the virus presents a challenge at any jail facility.  At least for this defendant, the MDC's precautionary measures appear to have worked.  When the defendant was potentially exposed to the virus, she was placed in quarantine, remained asymptomatic, tested negative, and then was released from quarantine.  As the Court found at the initial bail hearing, the defendant has no underlying health conditions that would place her at greater risk of complications from COVID-19.  (Tr. 89).  For that same reason, the Court should again reject the suggestion that the pandemic warrants the defendant's release.

## CONCLUSION

As this Court previously found, the defendant "poses a substantial actual risk of flight." (Tr. 86).  Nothing in the defense submission justifies altering the Court's prior conclusion that there are no conditions of bail that would assure the defendant's presence in court proceedings in this case.  Accordingly, the Renewed Bail Motion should be denied.

Dated:  New York, New York
           December 16, 2020

                                        Respectfully submitted,

                                        AUDREY STRAUSS
                                        Acting United States Attorney

                  By:    _____
                                        Maurene Comey
                                        Alison Moe
                                        Lara Pomerantz
                                        Assistant United States Attorneys
                                        (212) 637-2324