UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x
                              :
UNITED STATES OF AMERICA,       :
                              :
        v.                   :     20 Cr. 330 (AJN)
                              :
GHISLAINE MAXWELL,           :
                              :
          Defendant.       :
                              :
------------------------------------------------------- x

**MEMORANDUM OF LAW IN SUPPORT OF MS. MAXWELL'S MOTION TO DISMISS COUNTS ONE THROUGH SIX OF THE SUPERSEDING INDICTMENT FOR PRE-INDICTMENT DELAY**

Jeffrey S. Pagliuca
Laura A. Menninger
HADDON, MORGAN & FOREMAN P.C.
150 East 10th Avenue
Denver, CO 80203
Phone: 303-831-7364

Mark S. Cohen
Christian R. Everdell
COHEN & GRESSER LLP
800 Third Avenue New
York, NY 10022
Phone: 212-957-7600

Bobbi C. Sternheim
Law Offices of Bobbi C. Sternheim
33 West 19th Street - 4th Floor
New York, NY 10011
Phone: 212-243-1100

*Attorneys for Ghislaine Maxwell*

# TABLE OF CONTENTS

TABLE OF CONTENTS..............................................................................................i

TABLE OF AUTHORITIES ......................................................................................ii

TABLE OF EXHIBITS .............................................................................................iv

PRELIMINARY STATEMENT ................................................................................1

INTRODUCTION ....................................................................................................1

APPLICABLE LAW ................................................................................................4

I.   Prejudice to Ms. Maxwell. ..............................................................................7

II.  Dead Witnesses and The Lost Testimony. ......................................................8

   A.   Jeffrey Epstein.........................................................................................8

   B.   Paula Epstein. ..........................................................................................9

   C.   Michael Casey. ........................................................................................9

   D.   Detective Joseph Recarey......................................................................10

III. Lost and Missing Witnesses. ........................................................................11

IV.  Witnesses Whose Memories Have Failed or Corrupted. ..............................12

V.   Lost or Destroyed Records. ...........................................................................12

VI.  Prejudice Resulting from Prejudicial Media Reporting and Inappropriate Pre-Trial Publicity..........................................................................................14

VII. The Reckless, Tactical, or Bad Faith Delay. ................................................15

   A.   Abuse of the Civil Litigation Process to Gain a Tactical Advantage...........................15

   B.   The government's Tactical Delay and the Civil Litigations. ..................16

   C.   The Timeline Relating to the Accuser-2 Civil Litigation. ....................17

   D.   *Jane Doe v. Indyke*, Case No. 20-cv-00484 (JGK). ............................18

CONCLUSION.......................................................................................................19

Certificate of Service ............................................................................................21

# TABLE OF AUTHORITIES

**Cases**

*Farmer v. Indyke*, Case No. 19-cv-10475 (S.D.N.Y.) .................................................... 17

*Hoo v. United States,* 484 U.S. 1035 (1988).................................................................. 6

*Howell v. Barker*, 904 F.2d 889 (4th Cir. 1990) ........................................................... 6

*Jane Doe v. Indyke,* Case No. 20-cv-00484 (S.D.N.Y) ................................................ 18

*Oregon v. Sperou,* 442 P.3d 581 (Or. 2019) ................................................................ 2

*Schurman v. Leonardo*, 768 F. Supp. 993 (S.D.N.Y. 1991) ........................................ 6

*United States v. Brand*, 556 F.2d 1312 (5th Cir. 1977) ............................................... 5

*United States v. Capone*, 683 F.2d 582 (1st Cir. 1982) ............................................... 9

*United States v. Collamore*, 751 F. Supp. 1012 (D. Me. 1990)..................................... 6

*United States v. Crable,* No. 16-40101-01-DDC, 2017 WL 4843295 (D. Kan. Oct. 26, 2017)..... 1

*United States v. Crouch*, 84 F.3d 1497 (5th Cir. 1996) ............................................... 1

*United States v. Drayton*, No. 1:04CR00009, 2006 WL 758742 (W.D. Va. Mar. 23, 2006)......... 1

*United States v. Eight Thousand Eight Hundred and Fifty Dollars ($8,850) in U.S. Currency*, 461 U.S. 555 (1983) ........................................................................................ 5, 6

*United States v. Glenn*, No. CR 15-99-1, 2018 WL 4091786 (E.D. Pa. Aug. 24, 2018)............... 1

*United States v. Glist,* 594 F.2d 1374 (10th Cir. 1979) ................................................ 1

*United States v. Gouveia*, 467 U.S. 180 (1984) .......................................................... 5

*United States v. Lawson,* 683 F.2d 688, 694 (2d Cir. 1982)......................................... 3

*United States v. Lindstrom*, 698 F.2d 1154, 1158 (11th Cir. 1983 ............................... 5

*United States v. Lovasco*, 431 U.S. 783, 790 (1977) .............................................. 5, 6

*United States v. Marion*, 404 U.S. 307, 326 (1971)............................................. 1, 4, 6

*United States v. McNeal*, No. 03 CR 80, 2006 WL 760186 (N.D. Ill. Mar. 20, 2006).................. 6

*United States v. Moran*, 759 F.2d 777 (9th Cir. 1985) ................................................ 6

*United States v. Sabath*, 990 F. Supp. 1007 (N.D. Ill. 1998)......................................... 5

*United States v. Santiago*, 987 F. Supp. 2d 46(S.D.N.Y. 2013) .................................................. 6

*United States v. Scott,* 579 F.2d 1013 (6th Cir. 1978) ............................................................. 1

*United States v. Sowa*, 34 F.3d 447 (7th Cir. 1994) ................................................................. 6

*United States v. Valentine,* 783 F.2d 1413 (9th Cir. 1986) ...................................................... 6

**Statutes**

18 U.S.C.§ 371 ..................................................................................................................... 8

18 U.S.C.§ 1591 ................................................................................................................... 8

18 U.S.C. § 3283 .................................................................................................................. 3

18 U.S.C.A. § 3282 ........................................................................................................... 3, 4

**Other Authorities**

BLACK'S LAW DICTIONARY 1270 (6th ed.1990) ........................................................................ 5

Phyllis Goldfarb, "When Judges Abandon Analogy: The Problem of Delay in Commencing
    Criminal Prosecutions," 31 WM. & MARY L. REV. 607 (1990)................................................ 6

Eli DuBosar, "Pre-Accusation Delay: An Issue Ripe for Adjudication by the United States
    Supreme Court," 40 FLA. ST. U. L. REV. 659 (2013) ............................................................ 6

N.Y. C.P.L.R. § 214-g (McKinney 2019).................................................................................. 14

**Rules**

Fed. R. Crim. P. 12(b)(3)(A)(ii) ............................................................................................... 1

## TABLE OF EXHIBITS

EXHIBIT A: ████████████████████████

EXHIBIT B: ██████████████ June 21, 2016 Deposition Transcript Excerpts

EXHIBIT C: ██████████████ June 3, 2016 Deposition Transcript Excerpts

EXHIBIT D: Department of Justice November 2020 Office of Professional Responsibility Executive Summary Report

## PRELIMINARY STATEMENT

Ms. Maxwell brings this motion under Fed. R. Crim. P. 12(b)(3)(A)(ii) which requires that motions to dismiss an indictment for pre-indictment delay be raised by pretrial motion. She respectfully requests, however, leave to supplement this motion ***after*** the government provides her with meaningful discovery.  Depending on the status of the case ***after*** the disclosure of meaningful discovery, Ms. Maxwell may request that the Court defer ruling on this motion until after any trial if the indictment has not been dismissed on other grounds.  *See United States v. Marion*, 404 U.S. 307, 326 (1971) ("Events of trial may demonstrate actual prejudice."); *United States v. Crouch*, 84 F.3d 1497, 1516 (5th Cir. 1996) (except for "compelling cases, the district court, rather than grant such a motion prior to trial, should carry it with the case, and make the determination of whether actual, substantial prejudice resulted from the improper delay in light of what actually transpired at trial"; *affirmed*); *United States v. Glist,* 594 F.2d 1374 (10th Cir. 1979) (motions to dismiss for preindictment delay taken under advisement prior to trial and granted as to one of four counts after five days of trial).[1]

## INTRODUCTION

The claims made in the Superseding Indictment ("Indictment") occurred approximately twenty-seven years ago. The world has changed significantly during the last three decades.

---

[1] *See also*, *United States v. Scott,* 579 F.2d 1013 (6th Cir. 1978) (motion to dismiss two counts of three-count indictment denied without prejudice prior to trial, granted after close of all the evidence, jury acquittal on remaining count; *affirmed*); *United States v. Crable,* No. 16-40101-01-DDC, 2017 WL 4843295, at *1 (D. Kan. Oct. 26, 2017) (defendant permitted to renew his Motion to Dismiss with authority supporting a renewed motion at the close of evidence); *United States v. Glenn*, No. CR 15-99-1, 2018 WL 4091786, at *3 (E.D. Pa. Aug. 24, 2018) (defendant granted the opportunity to supplement his post-trial motions so that he could assert the issue of pre-indictment delay and renew his request for discovery); and *United States v. Drayton*, No. 1:04CR00009, 2006 WL 758742, at *1 (W.D. Va. Mar. 23, 2006), *aff'd*, 267 F. App'x 192 (4th Cir. 2008) (when ruling on a motion to dismiss for pre-indictment delay, the proper course is to reserve decision, in order to make a determination based on the actual evidence presented at trial).

Tragedies have been forgotten, governments replaced, wars fought. Gen Y has grown up, Gen Z has finished high school and college, Gen Alpha is now in elementary school.

In 1994, Facebook, Twitter, Instagram, and Podcasts did not exist. Few people, young or old, communicate today in the same manner, and the record of any communications has largely moved from paper files to smart phone text messages and computer files. The dissemination of information has also changed drastically as social and digital media platforms permit anyone to publish a story, true or false.  Once published, the story remains accessible on the internet with just a few search words.

The Epstein story is not new. As early as 1996 but at least by 2006,[2] the government was aware of allegations that Mr. Epstein solicited females for sex.  FBI records reflect that Accuser-2[3] was interviewed on November 14, 2006 as part of an ongoing investigation by the government into Epstein and others as documented in FBI case file 31-E-MM-108062-49. The  2006 interview contained some of the allegations made in the Indictment. Investigative referrals appear to have been made to various FBI offices located in the same cities as those alleged in the Indictment.

It was no secret that Ms. Maxwell was Mr. Epstein's employee and friend in the 1995-to-2000 timeframe. It also was no secret that Epstein worked out a deal with the government that

---

[2] According to the New York Times, in 1996 Maria Farmer "contacted the New York Police Department, and said she then went to the Federal Bureau of Investigation, offering to share what she knew about Mr. Epstein and the parade of young women being brought to Mr. Epstein's houses." *See*, https://www.nytimes.com/2019/08/26/us/epstein-farmer-sisters-maxwell.html. Of course, no FBI 302 has been produced corroborating this account.

[3] Although the Indictment refers to them as "Minor Victims" One through Three, there has been no finding by any court or jury that these now-adult women are in fact "victims."  Use of those terms thus violates Ms. Maxwell's presumption of innocence, and counsel will refer to them throughout as "Accusers" One through Three or "Accusers."  *See, e.g., Oregon v. Sperou*, 442 P.3d 581 (Or. 2019) (use of word "victim" by prosecutors and state witnesses during trial violated presumption of innocence and constituted improper witness vouching).

resolved the allegations against himself and any potential co-conspirator.  Faced with significant public pressure, the government broke that agreement and brought an indictment against Epstein, and only Epstein, in 2016. The charges were ultimately dismissed because Epstein died while in federal custody. Left with no fish to attempt to fry, the government, belatedly, turned to Ms. Maxwell.

It is inexcusable that decades have passed while the government investigated Epstein, resolved the allegations against him by plea and non-prosecution agreements, and then changed course when these agreements were attacked by plaintiffs' lawyers who fueled the media fenzy. This dithering has allowed memories to be corrupted, conflated, and confabulated. Documents have been destroyed, altered, and lost. Witnesses have died, moved, and become afraid of discussing these matters for fear of media vilification or, as with Ms. Maxwell, tactical indictment by default. Meanwhile, the Epstein story continues to occupy the public's attention with various iterations and conflations including multiple books, podcasts, and television series available to alleged witnesses, posers, attention-seekers, copy-cats, and opportunists for study and exploitation.

The primary guarantees against excessive preindictment delay and the prosecution of overly stale criminal charges are statutes of limitation for criminal offenses. *United States v. Lawson,* 683 F.2d 688, 694 (2d Cir. 1982). Ms. Maxwell has separately moved to dismiss Counts One through Four of the Indictment because those counts were brought after the expiration of the applicable statute of limitation, 18 U.S.C.A. § 3282, which provides, in relevant part, that "no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed."  The government will argue that a much longer statute of limitation applies to the

charges alleged in Counts One through Four, 18 U.S.C. § 3283, which as amended in 2006, authorizes the prosecution of certain specific crimes during "the life of the child, or for ten years after the offense, whichever is longer." As a practical matter, this is tantamount to no statute of limitation and allows for substantial abuse by the government, particularly in a case with no forensic or other evidence to corroborate "she said" allegations.

Ms. Maxwell agrees that Counts Five and Six were brought within five years of her deposition and therefore are within the applicable statute of limitation, 18 U.S.C.A. § 3282. However, as with Counts One through Four, the government's delay in charging Counts Five and Six resulted in substantial prejudice because the questions at issue, along with the resulting answers, are ill defined, ambiguous, and could relate to almost any time. The capricious questioning about 26-year-old claims presents the same practical problems for the defense, evidence that would exculpate Ms. Maxwell has been lost or destroyed.

This Indictment should be dismissed because Counts One through Four are time barred and the 26-year delay in bringing the charges violates Ms. Maxwell's Fifth Amendment right to due process. Counts Five and Six should be dismissed for the variety of reasons as catalogued in other pleadings and the four-year prejudicial preindictment delay also violates due process.

## APPLICABLE LAW

The Due Process Clause of the Fifth Amendment requires dismissal of an indictment for delay which results in a violation of the fundamental concepts of justice or the community's sense of fair play and decency.  To determine whether a due process violation has occurred, the government's reasons for the delay must be weighed against the prejudicial effects of the delay on the defendant. *United States v. Marion*, 404 U.S. 307, 324 (1971). The showing of prejudice, however, does not end a preindictment delay inquiry because "proof of prejudice is generally a necessary but not sufficient element of a due process claim … [T]he due process inquiry must

consider the reasons for the delay as well as the prejudice to the accused." *United States v. Lovasco*, 431 U.S. 783, 790 (1977); *United States v. Lindstrom*, 698 F.2d 1154, 1158 (11th Cir. 1983). A defendant's showing of prejudice triggers a "sensitive balancing of the government's need for an investigative delay … against the prejudice asserted by the defendant." *United States v. Brand*, 556 F.2d 1312, 1317 (5th Cir. 1977). For example, a delay caused by a good-faith ongoing investigation will generally not be considered a due process violation. *Lovasco*, 431 U.S. at 791. Governmental delay caused by "sinister" reasons that prejudice a defendant require dismissal of an indictment. "Sinister" motives include using the delay to gain tactical advantage over the accused or as a weapon to induce a defendant's cooperation. *Marion*, 404 U.S. at 324.

"Tactical" delay causing actual prejudice to a defendant violates the Due Process Clause of the Fifth Amendment to the United States Constitution.  *Lovasco*, 431 U.S. at 795 n.17. A tactical delay is one that the government employs as a "deliberate device to gain an advantage over" the accused. *United States v. Gouveia*, 467 U.S. 180, 192 (1984). A due process violation also occurs with prosecutorial delay incurred in reckless disregard of circumstances, known to the prosecution, suggesting that there existed an appreciable risk that delay would impair the ability to mount an effective defense.  *Lovasco*, 431 U.S. at 795 n.17. The Supreme Court, in *United States v. Eight Thousand Eight Hundred and Fifty Dollars ($8,850) in U.S. Currency*, 461 U.S. 555, 563 (1983), interpreted *Lovasco* as holding that claims of prejudicial pre-indictment delay can succeed "upon a showing  that the government delayed seeking an indictment in a deliberate attempt to gain an unfair tactical advantage over the defendant or in reckless disregard of its probable prejudicial impact upon the defendant's ability to defend against the charges." "'Reckless' conduct means acting in a way that is 'indifferent to

consequences.'" *United States v. Sabath*, 990 F. Supp. 1007, 1018 (N.D. Ill. 1998) (*quoting*, BLACK'S LAW DICTIONARY 1270 (6th ed.1990)).

As noted by Chief Judge McMahon in *United States v. Santiago*, 987 F. Supp. 2d 465, 488–91 (S.D.N.Y. 2013), "[t]he Second Circuit has never specifically declined to adopt the *Lovasco* 'Footnote 17' test (as restated in *Eight Thousand Eight Hundred Fifty Dollars*). Nor has it specifically found that pre-indictment delay engendered in reckless disregard of circumstances that would likely impede a defendant's ability to mount a defense can never violate the Due Process Clause."

Courts generally agree that (1) "tactical, reckless, or bad faith preindictment delay that unduly prejudices a defendant is constitutionally dubious," *United States v. McNeal*, No. 03 CR 80, 2006 WL 760186, at \*6 (N.D. Ill. Mar. 20, 2006); and (2) determinations of prejudicial preindictment delay are fact-specific inquiries that will turn on the unique circumstances of a case. *See Marion*, 404 U.S. at 324–25; *Lovasco*, 431 U.S. at 797.[4]

This is that case.

---

[4] Several Circuit Courts of Appeal interpret *Marion/Lovasco* as requiring a balancing test that weighs the prejudice to a defendant against the government's reasons for the delay. *See, e.g.*, *United States v. Valentine,* 783 F.2d 1413, 1416 (9th Cir. 1986); *Howell v. Barker*, 904 F.2d 889, 895 (4th Cir. 1990); *United States v. Sowa*, 34 F.3d 447, 451 (7th Cir. 1994); *United States v. Moran*, 759 F.2d 777, 782 (9th Cir. 1985). *See also United States v. Collamore*, 751 F. Supp. 1012, 1027 (D. Me. 1990), *aff'd*, 940 F.2d 646 (1st Cir. 1991) (quotation omitted) (holding that a defendant may show a due process violation based on excessive preindictment delay incurred in reckless disregard of circumstances, known to the prosecution, suggesting that there existed an appreciable risk that delay would impair the ability to mount an effective defense); and *Schurman v. Leonardo*, 768 F. Supp. 993, 998 (S.D.N.Y. 1991) (recognizing reckless disregard standard). Legal commentators have, for many years, discussed the Circuit split regarding the test to be applied to claims of pre-indictment delay and called for the U.S. Supreme Court to resolve the matter. *See, e.g.*, Phyllis Goldfarb, "When Judges Abandon Analogy: The Problem of Delay in Commencing Criminal Prosecutions," 31 WM. & MARY L. REV. 607 (1990); Eli DuBosar, "Pre-Accusation Delay: An Issue Ripe for Adjudication by the United States Supreme Court," 40 FLA. ST. U. L. REV. 659 (2013); *see also Hoo v. United States*, 484 U.S. 1035, 1036 (1988), where Justice White noted that he would grant certiorari to resolve the conflict among the Circuits on this important question of constitutional law.

## I.  Prejudice to Ms. Maxwell.

As a threshold observation, the government has failed to provide discovery adequate to fully investigate the extent of the prejudice to Ms. Maxwell. We have not been provided with:

- The names of the Accusers;

- The dates of birth of the Accusers;

- The specific location of any overt act;

- The date of any overt act;

- Any witness statements; or

- Any supposed corroboration of any allegation in the Indictment.

Like the preindictment delay, the delay in timely providing discovery is tactical and prejudicial to Ms. Maxwell.  Despite repeated requests, the government refuses to produce any evidence. Without knowing the who, what, when, and why of these allegations, the task of identifying dead and missing witnesses, percipient witness, travel records, phone records, or temporally relevant documents is challenging and limited by the vagueness of the claims. For example, the government produced part of its voluminous 2006 investigative case file concerning these issues.  The names of the alleged witnesses, the agents who conducted the interviews and the agents who conducted the investigation are, however, redacted. Ms. Maxwell has no ability to conclusively identify these individuals much less interview them and therefore cannot represent to the Court whether they are alive, remember anything, or have useful evidence. By withholding this information, the government is purposefully preventing Ms. Maxwell from fully litigating this issue and presenting a defense.

What we know, so far, however, will be sufficient to establish prejudice. Potential defense witnesses are dead, missing, otherwise unavailable, or unable to recall key events clearly. In contrast, the government will profit from the dimmed memories of witnesses with:

(1) any inconsistency or vagary being excused by the passage of time and (2) any specific claim

(to the extent any are forthcoming) being difficult to cross-examine because of the unavailability

of documents or witnesses due to the passage of time.

## II.  Dead Witnesses and The Lost Testimony.

### A.  Jeffrey Epstein.

Mr. Epstein was found dead in his jail cell on August 10, 2019 while awaiting trial for

conspiracy to commit sex trafficking in violation of 18 U.S.C. § 371, and sex trafficking in

violation of 18 U.S.C. § 1591. The alleged range of Mr. Epstein's crimes was from 2002 to 2005.

Mr. Epstein is the individual with whom Ms. Maxwell is alleged to have conspired and

aided in this case. *See* Indictment, ¶¶ 1, 2, 5, 9, 10, 11, and 16.  Had Mr. Epstein not died, he

would have testified in any trial against Ms. Maxwell that:

- She did not knowingly aid or facilitate any sex trafficking or transportation of minors as alleged in the superseding indictment;

- She was unaware of Mr. Epstein's activities that led to his indictment when the activities allegedly occurred;

- Between 1994-1997, Ms. Maxwell was not involved in any sexual act or massage with any minor including Accusers 1-3 as alleged in the superseding indictment;

- Consistent with written communications with Ms. Maxwell, Mr. Epstein would have testified that she ███████████████, she should ███████ ██████ that the accusers were liars and were lying about any alleged criminal acts attributed to Ms. Maxwell; Ex. A.

- He believed that attorneys for many alleged accusers attempted to extort money from him by fomenting meritless litigation against his former employees, including Ms. Maxwell.

- As to Ms. Maxwell, ████████████████████ And, she ██████ ████████████ Ex. A.

Epstein's testimony would have also authenticated and provided an evidentiary

foundation for numerous documents central to the defense in this case including travel records,

bank records, records of payments to alleged accusers, facsimile transmissions, emails, and phone records.  Presumably the government will argue that any reliance on Epstein testifying is speculative because he may have asserted a Fifth Amendment privilege against self-incrimination. *See United States v. Capone*, 683 F.2d 582, 589 (1st Cir. 1982). Not so.  Epstein was indicted in 2019. Any privilege against self-incrimination would have been lost as a result of his acquittal or final conviction prior to any trial in this matter.

### B.  Paula Epstein.

Paula Epstein was Jeffrey Epstein's mother. She died in April 2004. Had this prosecution been brought in a timely manner, Ms. Epstein would have testified that Ms. Maxwell spent considerable time with her while in the Palm Beach, Florida area. Ms. Epstein would have testified that she did not observe Ms. Maxwell with any Accusers between 1994 and 1997. Ms. Epstein would have provided accurate information about Ms. Maxwell's relationship with Mr. Epstein, dates and times that she was with Ms. Maxwell, and presented a compelling counter to the specious allegations that Ms. Maxwell traveled for purposes of grooming accusers for Mr. Epstein. Ms. Epstein would have been able to portray Ms. Maxwell as a caring and compassionate human being and would have discussed the many days that the two were together. She would have testified that Ms. Maxwell was her caregiver when she was sick and injured.

### C.  Michael Casey.

Mr. Casey died on August 9, 2017. Mr. Casey was the agent of the person believed to be, but not identified by the government, Accuser-1. Mr. Casey had knowledge about Accuser-1's interactions with Jeffrey Epstein and the lack of any interaction with Ms. Maxwell. Mr. Casey, were he available to testify, would establish the whereabouts of Accuser-1 during the relevant time periods and Ms. Maxwell's absence from those locations. Mr. Casey, while working with Accuser-1, did not relate any complaints about Ms. Maxwell to any authority, Ms. Maxwell, or

any other known witness. Mr. Casey would be able to testify about Accuser-1's behavior during the relevant time period, the lack of any "outcry" or "grooming" as alleged in the Indictment.

### D.  Detective Joseph Recarey

Detective Recarey died on May 25, 2018. He joined the Palm Beach Police Department in 1991 as an officer and was promoted to police detective in 1994. During his career, he worked in the police department's Organized Crime Vice and Narcotics Unit, the Department of Justice and Palm Beach County Sheriff's Office Internet Crimes Against Children Unit, and the Palm Beach County State Attorney's Public Integrity Unit. He handled high profile cases and instructed law enforcement personnel and civilian members of the community about criminal and narcotics investigations. Throughout his career, Detective Recarey received more than 150 commendations from the law enforcement community, including the Inaugural "Officer of the Year" Award by the Palm Beach Police Foundation in 2012. He was responsible for the design, implementation and maintenance of the security camera systems throughout the Town of Palm Beach.[5]

Detective Recarey served as the lead detective from the Palm Beach Police Department charged with investigating Jeffrey Epstein. Ex. B at 10. That investigation commenced in 2005. *Id.* Recarey worked only on the Epstein case for an entire year. *Id.* at 274. He reviewed previous officers' reports and interviews, conducted numerous interviews of witnesses and alleged victims himself, reviewed surveillance footage of the Epstein home, participated in and had knowledge of the search warrant executed on the Epstein home, and testified regarding the case before the Florida state grand jury against Mr. Epstein. Ex. B at 212-215. Detective Recarey's investigation revealed that not one of the alleged Epstein victims ever mentioned Ms. Maxwell's name and she

---

[5] *See* https://www.palmbeachpost.com/news/local-obituaries/decorated-detective-remembered-for-work-ethic-making-others-smile/Xn9DqgNZ544V3qx0dSbWpJ/

was never considered a suspect. Ex. B at 10-11, 177, 180-82, 187-96, 241-42, 278. None of Mr.

Epstein's alleged victims said they had seen Ms. Maxwell at Mr. Epstein's house, nor said they

had been "recruited by her," nor paid any money by her, nor told what to wear or how to act by

her. *Id.* Indeed, none of Mr. Epstein's alleged victims ever reported to the police they had met or

spoken to Ms. Maxwell. *Id.* Maxwell was not seen coming or going from the house during the

law enforcement surveillance of Mr. Epstein's home. *Id.* at 214-215. The arrest warrant did not

mention Ms. Maxwell and her name was never mentioned before the grand jury. *Id.* at 203, 211.

No property belonging to Ms. Maxwell, including "sex toys" or "child pornography," was seized

from Mr. Epstein's home during execution of the search warrant. *Id.* at 257. Detective Recarey,

when asked to describe "everything that you believe you know about Ghislaine Maxwell's

sexual trafficking conduct," replied, "I don't." *Id.* at 278. He confirmed he has no knowledge

about Ms. Maxwell sexually trafficking anybody. *Id.* at 278-79. Detective Recarey was the

individual from the Palm Beach Police Department who referred the Epstein case to the FBI in

2006.

Detective Recarey entered Mr. Epstein's home in 2002 to install security cameras to

catch a thief and did not observe any "child pornography" within the home, including on Mr.

Epstein's desk in his office. Ex. B at 289-90.

### III.   Lost and Missing Witnesses.

The government alleges a three-year time frame for the allegations in the Indictment for

acts purportedly occurring on Epstein properties in three states and another country. Had these

charges been timely brought, Ms. Maxwell would have interviewed, and subpoenaed as

witnesses, the many Epstein employees that were present at the different locations during that

three-year period. None of the employees would have corroborated any of the allegations made

in the Indictment.

### IV.   Witnesses Whose Memories Have Failed or Corrupted.

Many potential witnesses have been contacted in relation to this matter and other related litigations. Significant numbers of potential witnesses no longer remember when events may have occurred, who was present, and do not have documents to refresh their memories. One example of the pervasive and prejudicial memory loss relates to the identity of passengers on Mr. Epstein's planes. Dave Rodgers was one of Mr. Epstein's pilots beginning in 1991. Mr. Rodgers kept flight logs, produced in civil litigation and subsequently released or leaked to the media. The logs contain the dates, locations of travel, and a rudimentary list of passengers, often identified only by gender, initials, or one name. Mr. Rodgers destroyed records prior to 1994. According to Mr. Rodgers, without his logs he is unable to recall who was on a particular flight. Ex. C at 211-212. And, even with the logs  he cannot identify many of the passengers. "Maria" may or may not be a witness in this matter. *Id*. at 41.  Where the logbook describes "one or two" females, Mr. Rodgers has no memory of who those people were. *Id*. at 44-45. Referring to a flight involving "Nadia," Mr. Rodgers testified "I'm not sure what Nadia that would be." *Id.* 58. The widespread dissemination of the flightlogs combined with the vague passenger descriptions has allowed any female who might have been under the age of 18 between 1994-2013 to claim that they were on the flight and a victim of Epstein.

### V.   Lost or Destroyed Records.

Because of the delay in this prosecution, Ms. Maxwell does not have records including but not limited to the following:

#### 1.   Her own:

- Phone records from 1994-1997;

- Emails from 1994-1997;

12

- Day-Timer records from 1994-1997;

- Tax records from 1994-1997;

- Travel records from 1994-1997;

- Business records from 1994-1997;

- Credit card or ATM records – including, e.g., records of shopping trips, trips to the movies and;

- Checking account records.

### 2. Mr. Epstein's

- Phone records from 1994-1997;

- Emails from 1994-1997;

- Day-Timer records from 1994-1997;

- Tax records from 1994-1997;

- Travel records from 1994-1997;

- Business records from 1994-1997;

- Mr. Epstein internal email "Citrix" communications; and

- Business Records in the Palm Beach, Santa Fe, or New York area reflecting purchases of goods or services.

The documentary evidence would establish that Ms. Maxwell did not travel as alleged in the Indictment; did not conspire with Mr. Epstein, as alleged in the Indictment, and was not present with either Mr. Epstein or any Accuser for significant periods of time between 1994 and 1997. Business records associated with the property identified in the Indictment would detail various employees who worked at the properties during the relevant times. These individuals, were they to be located, would corroborate that they did not observe Ms. Maxwell behaving in any of the behavior alleged in the Indictment. The government has withheld any meaningful discovery relating to when or where any overt acts allegedly occurred. If Ms. Maxwell had this

information, she could articulate the prejudicial loss of these records and witnesses with more specificity.

## VI.  Prejudice Resulting from Prejudicial Media Reporting and Inappropriate Pre-Trial Publicity.

Beginning in 2005 and escalating in 2011 through the present, Ms. Maxwell has been a potential target of a group of personal injury lawyers who made millions of dollars suing Jeffrey Epstein or extorting those associated with him. The playbook was relatively simple: File incendiary pleadings in court to avoid defamation claims; provide the pleadings and background information to various media organizations; obtain alleged victim's names and police reports from law enforcement; share information with potential claimants who hire the lawyers after reading or hearing the reports; file a lawsuit against Mr. Epstein; get money from Mr. Epstein or associates to settle; repeat. Once Mr. Epstein had settled all of these claims against himself and the other individuals alleged to have been involved, a new play was necessary - try to invalidate the NPA; and at the same time drum up litigation against Maxwell with the expectation that either Mr. Epstein would settle any new litigation to avoid being dragged into yet another case that would further tarnish the reputation he was trying to rebuild or result in money directly from Ms. Maxwell.

From 2011 to 2019, Ms. Maxwell was the subject of *millions* of media stories, posts, blogs, podcasts, and comments that simply republished the same allegations that she correctly identified as "obvious lies" in 2015. Once New York passed  L. 2019, ch. 11, known as the Child Victims Act, the door was open to claimants who wanted to take advantage of Mr. Epstein's vulnerability to file new lawsuits on stale allegations. At that point it easy to make copycat

claims about Ms. Maxwell because of the passage of time.[6] A review of the media coverage of the Epstein story reflects an unwarranted transformation of Ms. Maxwell from Epstein friend to Epstein conspirator. This re-casting by the media has no basis in fact but is the cumulative effect of publishing or republishing untrue assertations about Ms. Maxwell.

Had the government brought any charges against Ms. Maxwell in 1996-2011 it (a) would have not prevailed and (b) none of the accusers would have been able to conform their "memories" to the often republished "obvious lies."

## VII.   The Reckless, Tactical, or Bad Faith Delay.

There is no legitimate justification for the extraordinary delay associated with this prosecution. Tactical, reckless, and bad faith motives can reasonably be inferred from the way the government has ignored evidence, delayed any prosecution, enlisted partisan lawyers to do its bidding, circumvented established precedent to illegally obtain evidence, and misleadingly quoting banal testimony so that it could be labeled "perjury." And, after having done so, prejudiced Ms. Maxwell's right to a fair trial by improper extrajudicial statements.

### A.   Abuse of the Civil Litigation Process to Gain a Tactical Advantage.

As detailed in Ms. Maxwell's Memorandum in Support of her Motion to Suppress all Evidence Obtained from the government's Subpoena to ███████ and to Dismiss Counts Five and Six, Ms. Maxwell was involved in lengthy, intrusive, and contentious litigation with

---

[6] A simple Google search for the name "Ghislaine Maxwell" on January 13, 2021 yielded  5,140,000 results in 0.56 seconds.  Stories about Ms. Maxwell abound. Flight logs, complaints, deposition transcripts, and false accounts have been published and republished.



plaintiff, Virginia Giuffre. During the course of that litigation, in 2016, Ms. Giuffre's lawyers made overtures to the government seeking an indictment against Ms. Maxwell. At the same time, these lawyers were engaged in ongoing efforts to void the Epstein Non-Prosecution Agreement in litigation that was initiated in 2008. The government was the defendant and had actual notice of the claims made by Ms. Giuffre, her lawyers, and other Does about the allegations made in this criminal matter.[7]  The Assistant U.S. Attorney's statements to ███████████████ ████████████████████████████████ cannot be reconciled with the facts, many of which are detailed in the Office of Professional Responsibility Report concerning the government's "2006-2008 Federal Criminal Investigation of Jeffrey Epstein" Ex. D and the volumes of pleadings filed in the CVRA litigation. Ms. Maxwell was known to the government for at least 10 years prior to the AUSA's *ex parte* communication with ████████████

### B.   The government's Tactical Delay and the Civil Litigations.

The *Giuffre v. Maxwell* defamation action has been in litigation for over five years. It has been advantageous to the government to have aggressive lawyers collecting information from Ms. Maxwell as part of civil discovery and disseminating that information to the public, as part of an ongoing campaign to vilify Ms. Maxwell.  Using a friendly, *ex-parte*, ████████████, the government obtained ████████████████████ ████████████████████████ The government has not, even after indicting Ms. Maxwell, moved to stay these civil proceedings. Instead, the government has used these lawyers to do their work, both in front of, and behind, the stage. These lawyers have made multiple, inappropriate, and prejudicial extrajudicial comments with no public rebuke from the government. The document unsealing process goes on, most

---

[7] https://www.nydailynews.com/new-york/ny-jeffrey-epstein-maxwell-case-20201013-jmzhl7zdrzdgrbbs7yc6bfnszu-story.html.

recently attracting approximately 1,000 prurient listeners, some of whom illegally broadcast the proceedings on YouTube.[8]  The effect of all of this on a potential juror is not lost on the government and it has been to its tactical advantage to allow as much negative press as possible, fomented by Government shills.

### C.   The Timeline Relating to the Accuser-2 Civil Litigation.

In the civil matter, *Farmer v. Indyke*, Case No. 19-cv-10475 (LGS), plaintiff Annie Farmer (presumed Accuser- 2) discussed in the Indictment, was represented by the same attorneys, David Boies and Sigrid McCawley of Boies, Schiller & Flexner LLP ("BSF") who also represented Ms. Virginia Giuffre in her defamation action.  Shortly after counsel's appearance on behalf of Ms. Maxwell on March 4, 2020, BSF served on Ms. Maxwell a Notice of Deposition for April 29, 2020, without ever having conferred with counsel for available dates. Later, BSF amended their notice of deposition to May 18, or offered dates of May 21, 26, 27 and 28th (and demanded an in-person deposition despite the raging COVID pandemic in New York). Ms. Maxwell filed a Letter Motion on May 13, 2020, requesting a stay of discovery in the case due, in part, to the U.S. Attorney's Southern District of New York's announcements of its "ongoing" criminal investigation into alleged Epstein "co-conspirators," presumed to include Ms. Maxwell. *Id.*, Dkt. 68. In his response opposing the stay of discovery, Mr. Boies represented to the court that "Maxwell has provided no information about the subject matter of the criminal investigation into Mr. Epstein's co-conspirators, the status of the investigation, or even disclosed whether she herself is a target of the Southern District's investigation." *Id.*, Dkt. 72. At the time he wrote that statement, Mr. Boies knew, and Ms. Maxwell and her counsel did not, that his client, plaintiff Annie Farmer, was herself participating in efforts to criminally prosecute Ms.

---

[8] *See* https://www.theguardian.com/us-news/2021/jan/19/ghislaine-maxwell-court-proceeding-qanon.

Maxwell. Indeed, BSF attorneys had met with the Southern District of New York's USAO at least once (and likely twice) in 2016, urging that office to prosecute Ms. Maxwell. ████████ ████████████████████████████████████████████████ collected in the *Giuffre* civil litigation. Discovery in this case has not revealed when Ms. Farmer met with the prosecutors, but it is fair to assume that as of April 2020, she had done so.

The Motion to Stay was heard on May 22, 2020 by Magistrate Judge Debra Freeman. *Id.*, Dkt. 80. During that phone conference, Judge Freeman ruled that a temporary stay was justified as to discovery from Ms. Maxwell due to the ongoing criminal investigation. *Id.* She ruled that no deposition nor interrogatories could be sought from her for the foreseeable future, but that other discovery could proceed. *Id.* A short time later, on June 19, BSF reversed its position. Recognizing it could not provide further discovery to the government from Ms. Maxwell through a deposition in the *Farmer* case, BSF then said it did wish to have the case stayed in its entirety while plaintiff participated in the Epstein payment program. *Id.*, Dkt. 84. The Court granted that motion on June 22, 2020. *Id.*, Dkt. 85. The Sealed Indictment in this matter was returned one week later, on June 29 and unsealed on July 2. *Id.*, Dkt. 1.

The government has not provided Ms. Maxwell with discovery regarding its communications with BSF. The timing of the partial stay and the reversal of the previous aggressive posture by BSF cannot be mere coincidence.

### D.  *Jane Doe v. Indyke*, Case No. 20-cv-00484 (JGK).

This action was brought against the Estate of Mr. Epstein and Ms. Maxwell by civil complaint, filed in this district on January 22, 2020. Ms. Maxwell surmises, but does not know, that the Jane Doe in this matter is so called Accuser-1.

When it became clear that Ms. Maxwell (having been indicted) would exercise her Fifth Amendment Privilege against self-incrimination and it was therefore in the government's tactical

interest to stop what would have been a one-way discovery process in favor of Ms. Maxwell, the

government moved to intervene, representing to Magistrate Judge Freeman, among other things,

that:

- "should discovery in civil action go forward, multiple witnesses or potential witnesses at the criminal trial would be subject to deposition"

- "any concern regarding the potential delay of this civil suit is outweighed by the concern that Maxwell would seek to assert her Fifth Amendment rights rather than submit to a deposition in the civil action, and that depositions of other witnesses could potentially interfere with the criminal prosecution"

- "permitting any discovery to proceed in this lawsuit would enable Maxwell to seek a preview of trial testimony in the criminal case, and would afford her with a broader array of discovery than she is entitled to in the criminal case"

- "a complaint concerning sexual abuse of minors by Epstein and Maxwell will inevitably implicate documents, witnesses, and other evidence that overlaps with the criminal matter, whether or not the plaintiff in this action—or the conduct she alleges—has any direct connection to the charges in the Indictment"

Case No. 20-cv-484, Dkt. 80.

These admissions make clear that the government was aware of the substantial overlap

between the allegations it investigated more than a decade before this Indictment. The sharp

contrast between the government's actions in this *Jane Doe* civil matter, and the *Annie Farmer*

civil matter, the *Giuffre* matter, and the *Ransome* matter also establish a strong inference that as

long as the government stood to gain a tactical advantage by delaying the indictment (the sought-

after deposition in the *Farmer* civil litigation), it would not move to intervene. However, where

the government's tactical advantage was lost or threatened (*Jane Doe*) it would shut the case

down.

## CONCLUSION

Ms. Maxwell requests that the Court dismiss the Indictment because of the prejudicial

and tactical delay by the government in prosecuting this case.

Dated: January 25, 2021

Respectfully submitted,


*s/ Jeffrey S. Pagliuca*
Jeffrey S. Pagliuca
Laura A. Menninger
HADDON, MORGAN & FOREMAN P.C.
150 East 10th Avenue
Denver, CO 80203
Phone: 303-831-7364

Mark S. Cohen
Christian R. Everdell
COHEN & GRESSER LLP
800 Third Avenue
New York, NY 10022
Phone: 212-957-7600

Bobbi C. Sternheim
Law Offices of Bobbi C. Sternheim
33 West 19th Street - 4th Floor
New York, NY 10011
Phone: 212-243-1100

*Attorneys for Ghislaine Maxwell*

**Certificate of Service**

I hereby certify that on January 25, 2021, I served by email, pursuant Rule 2(B) of the Court's individual practices in criminal cases, the *Memorandum of Law in Support of Ms. Maxwell's Motion to Dismiss Counts One Through Six of the Superseding Indictment for Pre-Indictment Delay* upon the following:

Alison Moe
Maurene Comey
Andrew Rohrbach
Lara Pomerantz
U.S. Attorney's Office, SDNY
One Saint Andrew's Plaza
New York, NY 10007
Alison.moe@usdoj.gov
Maurene.comey@usdoj.gov
Andrew.Rohrbach@usdoj.gov
Lara.Pomerantz@usdoj.gov


*s/ Christian R. Everdell*