UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x
                              :

UNITED STATES OF AMERICA         :

                              :          20 Cr. 330 (AJN)

          v.                     :

GHISLAINE MAXWELL,         :

                   Defendant.     :

                              :

---------------------------------------------------------X

## MEMORANDUM OF GHISLAINE MAXWELL
## IN SUPPORT OF MOTION TO DISMISS SUPERSEDING INDICTMENT
## FOR BREACH OF NON-PROSECUTION AGREEMENT

Mark S. Cohen
Christian R. Everdell
COHEN & GRESSER LLP
800 Third Avenue
New York, NY 10022
Phone: 212-957-7600

Jeffrey S. Pagliuca
Laura A. Menninger
HADDON, MORGAN & FOREMAN P.C.
150 East 10th Avenue
Denver, Colorado 80203
Phone: 303-831-7364

Bobbi C. Sternheim
Law Offices of Bobbi C. Sternheim
33 West 19th Street - 4th Floor
New York, NY 10011
Phone: 212-243-1100

*Attorneys for Ghislaine Maxwell*

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ............................................................................. 1

STATEMENT OF FACTS ................................................................................... 7

    A.    The Structure of the NPA ................................................................ 8

    B.    The Negotiation of the NPA ........................................................... 11

ARGUMENT ..................................................................................................... 12

I.    The Indictment Should Be Dismissed for Breach of the NPA. ................... 14

    A.    Ms. Maxwell Has Standing to Enforce the NPA. .............................. 15

    B.    The NPA's Prohibition on Prosecution of Potential Co-Conspirators Is Not Limited to the SDFL. ....................................... 18

        1.    The NPA is binding on the USAO in this District. ................... 18

        2.    *United States v. Annabi* does not alter the analysis. ................... 19

            a.    There is an "affirmative appearance" that the co-conspirator immunity provision was intended to apply outside the SDFL...... 20

            b.    The Second Circuit's subsequent application of *Annabi* supports Ms. Maxwell's position. .................................. 22

            c.    To the extent that *Annabi* conflicts with Eleventh Circuit law, Eleventh Circuit law applies and would require enforcement of the NPA here. ....................................... 23

    C.    The NPA's Prohibition on the Prosecution of Potential Co-conspirators Is Not Limited to Prosecution for Conduct Between 2001 and 2007 or for Particular Statutory Offenses. .............................. 26

II.    In the Alternative, the Court Should Permit Discovery and Conduct an Evidentiary Hearing Regarding the Parties' Intent. .............................. 28

CONCLUSION ................................................................................................... 32

i

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Advani Enters., Inc. v. Underwriters at Lloyds,*
140 F.3d 157 (2d Cir. 1998) ............................................................................. 23

*Bochese v. Town of Ponce Inlet,*
405 F.3d 964 (11th Cir. 2005) ........................................................................... 15

*Chen St. v. Street Beat Sportswear, Inc.,*
226 F. Supp. 2d 355 (E.D.N.Y. 2002) .............................................................. 15

*Crutsinger v. Hess,*
408 F. Supp. 548 (D. Kan. 1976) ...................................................................... 24

*Florida Power & Light Co. v. Mid-Valley, Inc.,*
763 F.2d 1316 (11th Cir. 1985) ......................................................................... 15

*Giglio v. United States,*
405 U.S. 150 (1972) ........................................................................................... 13

*In re Wild,*
955 F.3d 1196 (11th Cir.), *reh'g en banc granted, opinion vacated,* 967 F.3d 1285
(11th Cir. 2020) .................................................................................................. 11

*Index Fund, Inc. v. Ins. Co. of N. Am.,*
580 F.2d 1158 (2d Cir. 1978) ............................................................................ 23

*Innes v. Dalsheim,*
864 F.2d 974 (2d Cir. 1988) .............................................................................. 14

*LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.,*
424 F.3d 195 (2d Cir. 2005) ........................................................................ 21, 27

*Perez v. United States,*
Nos. 14 Civ. 846, 04 Cr. 937-1, 2015 WL 3413596  (S.D.N.Y. 2015) ............ 18

*Port Consol., Inc. v. Int'l Ins. Co. of Hannover, PLC,*
826 F. App'x 822 (11th Cir. 2020) ............................................................... 21, 27

*Santobello v. New York,*
404 U.S. 257 (1971) ........................................................................................... 12

*Subaru Distribs. Corp. v. Subaru of Am., Inc.,*
425 F.3d 119 (2d Cir. 2005) .............................................................................. 15

*United States v. Aleman,*
    286 F.3d 86 (2d Cir. 2002)................................................................................... 29

*United States v. Annabi*,
    771 F.2d 670 (2d Cir. 1985)..................................................................... passim

*United States v. Ashraf,*
    320 F. App'x 26 (2d Cir. 2009) ....................................................................... 22

*United States v. Brown*,
    No. 99-1230(L), 2002 WL 34244994 (2d Cir. Apr. 26, 2002)................................. 23

*United States v. CFW Const. Co.*,
    583 F. Supp. 197 (D.S.C.), *aff'd*, 749 F.2d 33 (4th Cir. 1984) .............................. 16

*United States v. Clements,*
    992 F.2d 417 (2d Cir. 1993)............................................................................... 15

*United States v. D'Amico,*
    734 F. Supp. 2d 321 (S.D.N.Y. 2010)............................................................... 21

*United States v. El-Sadig,*
    133 F. Supp. 2d 600 (N.D. Ohio 2001)............................................................. 17

*United States v. Feldman,*
    939 F.3d 182 (2d Cir. 2019)........................................................... 13, 26, 29, 30

*United States v. Florida West Int'l Airways, Inc.*,
    853 F. Supp. 2d 1209 (S.D. Fla. 2012) ...................................................... 16, 17

*United States v. Gebbie,*
    294 F.3d 540 (3d Cir. 2002).......................................................................... 24, 25

*United States v. Gonzalez,*
    93 F. App'x 268 (2d Cir. 2004) ............................................... 14, 22, 27, 29

*United States v. Harvey,*
    791 F.2d 294 (4th Cir. 1986) ......................................................................... 24

*United States v. Laskow*,
    688 F. Supp. 851 (E.D.N.Y.), *aff'd,* 867 F.2d 1425 (2d Cir. 1988) ....................... 21

*United States v. Marquez*,
    909 F.2d 738 (2d Cir. 1990), *cert. denied,* 498 U.S. 1084 (1991)....................... 15

*United States v. Mozer*,
    828 F. Supp. 208 (S.D.N.Y. 1993) ................................................................. 12

*United States v. Papa,*
   533 F.2d 815 (2d Cir. 1975) ................................................................................ 29

*United States v. Persico,*
   620 F. Supp. 836 (S.D.N.Y.), *aff'd,* 774 F.2d 30 (2d Cir. 1985) ............................ 22

*United States v. Prisco,*
   391 F. App'x 920 (2d Cir. 2010) ........................................................................ 22

*United States v. Ready,*
   82 F.3d 551 (2d Cir. 1996) .................................................................................. 12

*United States v. Russo,*
   801 F.2d 624 (2d Cir. 1986) .................................................................. 20, 21, 23

*United States v. Salameh,*
   152 F.3d 88 (2d Cir. 1998) .................................................................................. 22

*United States v. Sattar,*
   No. 02 Cr. 395 (JGK), 2003 WL 22510398 (S.D.N.Y. Nov. 5, 2003) .................... 29

*United States v. Van Thornout,*
   100 F.3d 590 (8th Cir. 1996) ............................................................................... 24

*United States v. Vaval,*
   404 F.3d 144 (2d Cir. 2005) ............................................................................... 13

## Statutes

18 U.S.C. § 2422 ......................................................................................................... 26

18 U.S.C.§ 2423 .......................................................................................................... 26

## Other Authorities

Justice Manual, Comment to § 9-27.630 ............................................................. 19, 21

## PRELIMINARY STATEMENT

Ghislaine Maxwell respectfully submits this Memorandum in Support of her Motion to Dismiss the Superseding Indictment for Breach of the Non-Prosecution Agreement ("Motion").

One does not need to engage in complex analysis to understand what has happened here: the government has sought to substitute our client for Jeffrey Epstein, even if it means stretching—and ultimately exceeding—the bounds of the law.  Yet, it is in precisely this setting—involving a defendant who, despite her years of denials, has been publicly attacked, threatened, and vilified like few others in recent memory—that the government's scrupulous adherence to the law in prosecuting a criminal defendant is most critical.  As the motions being filed today demonstrate, the government has repeatedly fallen short of its obligations here.  The indictment must be dismissed.

The government's sudden zeal to prosecute Ms. Maxwell for alleged conduct with Epstein in the 1990s—conduct for which the government never even charged *Epstein*—follows a history that is both highly unusual and deeply troubling.  The government (and state authorities) investigated Epstein thoroughly in *2006* for alleged conduct that is essentially identical to the conduct alleged in the current indictment.  In 2007, the government's investigation was resolved when it entered into a Non-Prosecution Agreement ("NPA") with Epstein, which was negotiated under the supervision of R. Alexander Acosta, then United States Attorney for the Southern District of Florida ("SDFL"), and approved by senior levels of Main Justice, including the Office of the Deputy Attorney General.  In that NPA, the government agreed that any federal prosecution of Epstein in the SDFL would be deferred in exchange for Epstein's agreement to

plead guilty to a single-count Florida state indictment.[1]  Epstein did so in 2008 and went to prison for 13 months.  At that time, the government did not charge Ms. Maxwell.

In 2016, attorneys representing plaintiffs in civil litigation against Ms. Maxwell met with a section chief in the United States Attorney's Office ("USAO") for the Southern District of New York ("SDNY") and pitched the idea of bringing a criminal case against Ms. Maxwell for conduct similar, if not identical, to that alleged in the current indictment.  The section chief appropriately declined.

Then, in 2018, more than a decade after the NPA was executed, an explosive front-page article in the *Miami Herald* reported detailed allegations, including from attorneys representing plaintiffs in civil litigation, about Epstein's conduct, Acosta's handling of the 2006 investigation, the process by which the NPA had been negotiated, and its substantive terms.  In the wake of the article, the government indicted Epstein in this District for conduct allegedly committed between 2002 and 2005.  Again, the government did not charge Ms. Maxwell.

Thus, at *three* separate junctures over more than a decade, the government had occasion to consider whether to charge Ms. Maxwell for the now 25-year-old conduct alleged in the current indictment.  *Every* time, the government—appropriately—did not do so.  Indeed, such charges would have been baseless.

But in August 2019, Epstein was found dead in his jail cell.  His death while in federal custody was not only disturbing, but publicly embarrassing for the government, characterized by the then-Attorney General as the result of "a perfect storm of screw-ups."

Worse still, almost to the day after Epstein died, the barrage of media attention shifted from Epstein to Ms. Maxwell, including in mainstream publications.  She was portrayed as

---

[1] The government had drafted a 60-count federal indictment against Epstein, which did not refer to Ms. Maxwell.

Epstein's equal—if not his superior—and baselessly caricatured as a villain of near-mythical proportions. Only at this time did the government, according to its own account, decide to launch an investigation of Ms. Maxwell and prosecute her on allegations that it had previously, repeatedly (and properly, since any charges would have been baseless) determined did not merit charges. In short, the government's response to the media frenzy was not to adhere to its earlier objective analysis and consideration of the facts, but to feed the frenzy and substitute Ms. Maxwell for Epstein.

Thus, the government announced its arrest and indictment of Ms. Maxwell on July 2, 2020, the exact anniversary of Epstein's indictment. At an extraordinary press conference, the United States Attorney for this District described Ms. Maxwell's prosecution as the "prequel" to the Epstein indictment; thereafter, the then-Attorney General, in rare public comments on bail proceedings in an individual case, expressed his delight that "we were able to *get* Miss Maxwell."

But in trying "to get" Ms. Maxwell, the government compromised its standards, cut corners, and exceeded its authority under the law. This is shown in the present motion and others we are filing today, and includes the following:

- The government has pressed forward with this case even though the NPA expressly provides that "the United States . . . will not institute any criminal charges against any potential co-conspirators of Epstein." Rather than argue, as it has time and again, that such agreements should be construed as drafted, the government does the opposite here, retreating from the very agreement that its own agents negotiated and agreed to with the approval of senior levels of Main Justice.

- The government has concocted a federal Mann Act case against Ms. Maxwell by alleging that, on some unspecified occasion during a four-year period between 1994 and 1997, and in an unspecified manner, she somehow transported and caused a single individual to travel across state lines for purposes of engaging in unlawful sexual activity with Epstein. Those charges, in turn, require the government to allege a violation of New York law relating to sexual activity. Here, the government has relied upon an alleged class B misdemeanor that, if the state statute of limitations had

3

not expired, would be punishable by up to three months in prison – *less time than Ms. Maxwell has already spent in pretrial detention*.  Yet, here, that misdemeanor has been set up as the basis for federal charges for which the government seeks to impose years of imprisonment, if not the equivalent of a life term.  Not only is this troubling in approach, but even the pieced-together Mann Act charges are time-barred under the applicable statute of limitations.

•   In seeking and obtaining confidential materials from pending civil litigation against Ms. Maxwell, including the deposition transcripts that form the basis of the two perjury counts in the indictment, the government █████████████████████████████

•   The government has based the two counts of perjury on poorly worded questions that were immaterial to the defamation case in which the depositions were taken, and has improperly joined those counts to the Mann Act charges, as addressed in today's motions to dismiss and to sever those counts.

•   In an effort to allow other accusers to testify against Ms. Maxwell, the government has added two conspiracy counts and, as alleged "overt acts" in furtherance of a purported conspiracy to cause minors to travel, has tacked on allegations from two other accusers—one of whom is not alleged to have traveled at all (and who was above the legal age of consent in England, where the alleged conduct took place).

•   In its rush to arrest Ms. Maxwell on the anniversary of Epstein's indictment and maximize the announcement's appeal to the media, the government indicted Ms. Maxwell using a White Plains grand jury, thereby violating Ms. Maxwell's right to a grand jury drawn from a fair cross-section of the community.

•   Finally, the government has charged multiplicitous conspiracy counts based on identical conduct, failed to disclose the names of the accusing witnesses or provide specific facts in the indictment that would permit Ms. Maxwell to adequately prepare for trial, and impermissibly delayed bringing this prosecution for 25 years in violation of Ms. Maxwell's due process rights.

The hue and cry against Ms. Maxwell is unprecedented in both scale and severity.  Under our system of justice, the need for the Court's careful scrutiny of the government's conduct, and for the protection of the constitutional rights of a defendant facing the equivalent of a life sentence, is at its highest.  This case is not about "getting" Ms. Maxwell (or any other

defendant); it is about whether the government, in bringing charges, has met the governing legal standards.  It has not done so here, and the indictment must be dismissed.

* * * *

This memorandum focuses on the NPA.  As this memorandum demonstrates, Ms. Maxwell's indictment violates the clear and unqualified terms of the NPA and should therefore be dismissed.  The NPA was heavily negotiated over approximately eight months and involved not only Epstein and the SDFL but also senior levels of Main Justice in Washington, D.C., which approved the NPA before its execution.  Given the blistering public criticism of the NPA and of Acosta's handling of the Epstein investigation, it is understandable that the current regime may wish the government had not entered into the NPA, or that it had negotiated different terms. Indeed, the Department of Justice's Office of Professional Responsibility ("OPR") found that Acosta exercised "poor judgment" and "agreed to several unusual and problematic terms in the NPA," which OPR characterized as a "unique resolution."

But the government is bound by the agreement it negotiated and executed.  And the NPA is clear, explicit, and unambiguous.  The government cannot now ask this Court to rewrite the agreement in a way more favorable to its current position, nor overlook key distinctions in the agreement, by claiming that they were drafting mistakes or omissions.  Nor may the government ask this Court to construe ambiguities in its favor, in contravention of black-letter law that non-prosecution agreements must be construed strictly *against* the government.

The government, in prior submissions, has raised three arguments why the NPA does not apply here, none of which has merit:

*First,* the government asserts that Ms. Maxwell lacks standing to enforce the NPA because she is not a party to it and is not named in it.  The government ignores that the parties to

5

the NPA clearly intended to confer a benefit on any and all of Epstein's potential co-conspirators in explicitly giving them immunity.  Under well-established principles of general contract law, and particularly under the law relating to non-prosecution agreements, any and all of Epstein's potential co-conspirators are third-party beneficiaries of the NPA.  As federal courts have repeatedly recognized in enforcing third-party immunity provisions, a third-party beneficiary need not be expressly named in an immunity provision as long as she falls within the class of persons on whom the parties intended to confer immunity.  Because the indictment alleges that Ms. Maxwell was a co-conspirator of Epstein, she falls well within the protection provided by the NPA.

*Second,* the government claims that the co-conspirator immunity provision applies only to prosecutions in the SDFL.  But the NPA was a highly negotiated, non-standard agreement.  It is not the standard agreement the government wishes it to be.  The plain language of the NPA squarely refutes the government's position.  The co-conspirator immunity provision does not prohibit merely prosecutions by the USAO for the SDFL ("USAO-SDFL"), but by "the United States."  This broad prohibition was intentional, as demonstrated by the express references elsewhere in the NPA to the United States Attorney and/or the USAO-SDFL.  Indeed, compare the NPA's immunity provision for Epstein himself, which is expressly limited to prosecutions in the SDFL, and the co-conspirator immunity provision, which contains no such limitation.  Even if the language were ambiguous as to its impact on prosecutions on the SDFL, which it is not, any ambiguity must be construed against the government.

In opposition, the government relies on the Second Circuit's statement that "[a] plea agreement binds only the office of the United States Attorney for the district in which the plea is entered unless it affirmatively appears that the agreement contemplates a broader restriction."

*United States v. Annabi*, 771 F.2d 670, 672 (2d Cir. 1985). *Annabi* supports dismissal here by confirming that where, as here, both the text of the NPA and the facts and circumstances of the underlying negotiations demonstrate an intent to bind the United States (other USAOs), they are so bound. Alternatively, any application of *Annabi* that limits the NPA's effect to the SDFL would conflict with the likely interpretation of the NPA by the Eleventh Circuit, which should apply in case of any such conflict.

*Third,* the government argues that the co-conspirator immunity provision prohibits only prosecutions for (i) conduct between 2001 and 2007 and (ii) statutory offenses specifically referenced in the factual recitals to the NPA. Again, the co-conspirator immunity provision contains no such limitations and thus forecloses this argument. The text is clear, but even if it were ambiguous, it must be strictly construed against the government.

In the alternative, to the extent there is any doubt that the NPA bars this prosecution, the facts and circumstances surrounding the NPA at least raise sufficient issues regarding the parties' intent to warrant discovery and an evidentiary hearing on the issue. Accordingly, if the indictment is not dismissed, Ms. Maxwell requests leave to conduct discovery as to the intent of the parties to the NPA with respect to the co-conspirator immunity provision, as well as an evidentiary hearing in aid of this Motion.

## STATEMENT OF FACTS

On or about September 24, 2007, Epstein and his counsel entered into the NPA with Acosta, the United States Attorney for the SDFL.[2] While USAOs in a number of judicial districts, including this District, typically use a standard template for plea agreements and other non-prosecution agreements, this NPA did not follow such a standard format. To the contrary,

---

[2] A copy of the NPA is attached hereto as Exhibit A.

the NPA's language and structure, as well as the manner in which it was negotiated, were highly

atypical.  The result was a one-off agreement that deviated in several material respects from, and

bore little resemblance to, a standard agreement.

The Department of Justice's OPR, after investigating Acosta's handling of the Epstein

case, characterized the NPA as a "unique resolution."  Exh. B (Dep't of Justice, Office of

Professional Responsibility, Executive Summary of Report, Investigation into the U.S.

Attorney's Office for the Southern District of Florida's Resolution of its 2006-2008 Federal

Criminal Investigation of Jeffrey Epstein and Its Interactions with Victims during the

Investigation,  November 2020) at x.  In particular, the OPR concluded that Acosta "agreed to

several unusual and problematic terms in the NPA without the consideration required under the

circumstances."  *Id.*  While the co-conspirator immunity provision appears to be one of the terms

to which the OPR was referring, the government is bound by it.

### A.    The Structure of the NPA

The NPA is a seven-page document consisting of several factual recitals (NPA at 1-2), a

paragraph providing for the non-prosecution of Epstein if he complies with the NPA (*id.* at 2), a

list of enumerated "terms" (*id.* at 5), and, finally, five separate paragraphs containing various

provisions, including the co-conspirator immunity provision at issue here (*id.* at 5).  Although it

contains no defined terms other than "State Attorney's Office" and "Epstein," the NPA clearly

separates "the United States" as a whole from the USAO-SDFL, repeatedly referring explicitly to

the USAO where such a limitation is intended.  *See, e.g., id.* at 3 ("Epstein shall provide to the

U.S. Attorney's Office copies of all proposed agreements . . . ."); *id.* at 5 ("the United States

Attorney has no authority" to bind state prosecutors); *id.* at 6 ("Epstein hereby requests that the

United States Attorney for the Southern District of Florida defer such prosecution").  Thus, the

8

NPA's references to the "United States" demonstrate a definitional intent *not* to limit such provisions to the USAO-SDFL.

The NPA begins with several factual recitals. After noting certain details of the investigation and indictment by the Florida State Attorney's Office, the recitals state, among other things, that (i) the "United States Attorney's Office" and the Federal Bureau of Investigation ("FBI") have "conducted their own investigation into Epstein's background and any offenses that may have been committed by Epstein against the United States from in or around 2001 through in or around September 2007, including" five enumerated federal criminal offenses; (ii) Epstein seeks "to resolve *globally* his state and federal criminal liability" and thus is agreeing to comply with the terms of the NPA "in exchange for the benefits provided by this agreement"; and (iii) "the interests of the United States, the State of Florida, and the Defendant will be served by the following procedure." NPA at 1-2 (emphasis added). Nowhere in the recitals is reference made specifically to the SDFL or to the USAO-SDFL, nor is there any suggestion that the parties in any way intended to limit the "global[]" resolution of Epstein's liability.

The NPA then provides that "prosecution [of Epstein] in this District for these offenses shall be deferred in favor of prosecution by the State of Florida, provided that Epstein abides by" the terms of the NPA. NPA at 2. The NPA also provides that, after its terms are fulfilled,

> no prosecution for the offenses set out on pages 1 and 2 of this Agreement [e.g., the five enumerated federal offenses], nor any other offenses that have been the subject of the joint investigation by the Federal Bureau of Investigation and the United States Attorney's Office, nor any offenses that arose from the Federal Grand Jury investigation[3] will be instituted in this District, and the charges against Epstein if any, will be dismissed.

---

[3] Like the various references to the United States and its agents, the term "Federal Grand Jury investigation" is not defined in the NPA.

*Id.* Thus, the NPA limits the benefit to Epstein to immunity "in this District."

Next, the NPA sets forth 13 provisions labeled "Terms of the Agreement."  These include the details of Epstein's guilty plea and proposed sentence in the Florida state court, as well as Epstein's agreement to waive his right to contest jurisdiction, liability, and damages up to an agreed-upon amount in certain civil actions brought by identified victims.  NPA at 3-5.

In the paragraph following the "Terms of the Agreement," the NPA provides that "Epstein understands that the United States Attorney has no authority to require the State Attorney's Office to abide by" the NPA.  NPA at 5.  This section further provides that Epstein retains the obligation to obtain the State Attorney's Office's compliance with the NPA's procedures, "which compliance will be necessary to satisfy the United States' interest," and to convince the Florida state court to accept the proposed sentence.  NPA at 5.  The section contains no similar provision regarding compliance by other USAOs outside the SDFL.

The NPA then lays out the provision at issue in this motion:

> In consideration of Epstein's agreement to plead guilty and to provide compensation in the manner described above, if Epstein successfully fulfills all of the terms and conditions of this agreement, the United States also agrees that it will not institute any criminal charges against *any potential co-conspirators of Epstein*, including *but not limited to* Sarah Kellen, Adriana Ross, Lesley Groff, or Nadia Marcinkova.

NPA at 5 (emphasis added).  Unlike the provision that Epstein will not be prosecuted "in this District" (*id.* at 2), the sentence regarding co-conspirators contains no provision limiting co-conspirators' immunity to the SDFL.  Unlike the agreement that Epstein will not be prosecuted for "offenses that have been the subject of the joint investigation" and "offenses that arose from the Federal Grand Jury investigation" (*id.* at 2), the sentence regarding co-conspirators contains no limitation on the scope of conduct for which "potential co-conspirators of Epstein" cannot be

prosecuted.  Nor does the NPA contain any language limiting its binding effect on other USAOs, as standard agreements typically do.

**B.      The Negotiation of the NPA**

Unlike standard non-prosecution agreements, the NPA here was heavily negotiated. Negotiations began in January 2007, lasted for a period of eight months, and were "extensive." *In re Wild,* 955 F.3d 1196, 1198-99 (11th Cir.), *reh'g en banc granted, opinion vacated,* 967 F.3d 1285 (11th Cir. 2020).  Discovery has revealed that ████████████████████████████ ████████████████████████ *See, e.g.,* Exh. C ███████████████████████████████ ██████████████████; Exh. D █████████████████████████████████████. In addition, ███████████████████████████████████ ████████████████████████████████████. *See, e.g.,* Exh. E ████████████ █████████████████████████████████████; Exh. F ████████████ █████████████████████████████████████████████ ████████████████████████████████████ *Id.*

It is our understanding that the negotiations involved the entire hierarchy of the USAO for the SDFL, all of whom signed off on the NPA.  Discovery indicates that ███████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ███████████████████████. Further, the investigation leading up to the NPA was not limited to the SDFL:  A privilege log produced by the government in civil litigation indicates that the USAO-SDFL involved the USAO for this District in its investigation of Epstein, and that attorneys from the USAO-SDFL traveled to New York and interviewed and/or subpoenaed New York-based witnesses.  Privilege Log, *Doe v. United States,* Case No. 9:08-CV-80736 (S.D. Fla.), Dkt. No. 212-1 (filed July 19, 2013) ("SDFL Privilege Log"), at 4, 5, 7.  Moreover,

discovery demonstrates that ███████████████████████████████████████

███████████████████████████████████. Exh. G ████████████████████████

███████

As the NPA reflects, Epstein's objective in negotiating the NPA was to obtain a global resolution that would, among other things, provide maximum protection for any alleged co-conspirators, in significant part to minimize the likelihood that Epstein could be subpoenaed as a potential witness and have to testify under oath.  NPA at 2 (noting that Epstein "seeks to resolve globally his state and federal criminal liability").  The NPA makes clear that its identification of four "potential co-conspirators" by name—Kellen, Ross, Groff, and Marcinkova—was not intended to limit the immunity provision to those four individuals ("but not limited to"), and we understand that those individuals ██████████████████████████████████████

███████████████████. *See* Exh. H ███████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████.

**ARGUMENT**

The Supreme Court has long recognized the enforceability of plea agreements.  "[W]hen a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." *Santobello v. New York,* 404 U.S. 257, 262 (1971).

While plea agreements are interpreted under basic principles of contract law, the Second Circuit has noted that "plea agreements . . . are unique contracts in which special due process concerns for fairness and the adequacy of procedural safeguards obtain."  *United States v. Ready,* 82 F.3d 551, 558 (2d Cir. 1996) (internal quotation marks omitted); *see also United States v. Mozer*, 828 F. Supp. 208, 215 (S.D.N.Y. 1993) ("[A] prosecutor entering into a plea bargain

agreement is not simply a party to a contract.  The Government is required to observe high standards of integrity and honorable conduct, and the supervisory power of the court is designed to insure that such standards are observed.").  Thus, plea agreements are construed "strictly against the government."  *United States v. Feldman,* 939 F.3d 182, 189 (2d Cir. 2019) (quoting *United States v. Vaval,* 404 F.3d 144, 152 (2d Cir. 2005)).  "Because such agreements involve waivers of fundamental constitutional rights, "prosecutors are held to meticulous standards of performance."  *Feldman,* 939 F.3d at 189 (quoting *Vaval,* 404 F.3d at 153).  Finally, "[t]he prosecutor's office is an entity and as such it is the spokesman for the Government.  A promise made by one attorney must be attributed . . . to the Government."  *Feldman,* 939 F.3d at 190 (quoting *Giglio v. United States,* 405 U.S. 150, 154 (1972)).

The government's attempt to evade the NPA flies in the face of these time-honored, and honorable, principles.  Rather than stand behind the promises it made in the NPA, the government tries to escape them by arguing that Ms. Maxwell has no standing to enforce them— a position that is contradicted by the unambiguous text of the NPA as well as by clear precedent. The government also tries to pretend that the NPA contains geographical and temporal limitations that simply do not exist.  In doing so, the government essentially turns the principles underlying the interpretation and enforcement of such agreements on their head.  Confronted with an NPA that, in hindsight, the government wishes had been negotiated and drafted differently, the government cannot now manufacture ambiguity where none exists and cannot now demand that the court construe such purported ambiguity in the government's favor, when it is a well-established principle that it must be construed in the defendant's favor.

Here, it is wholly unnecessary for the Court to look beyond the four corners of the NPA to determine that it bars Ms. Maxwell's prosecution.  However, the Court can be comfortable

that the facts and circumstances of the negotiation of the NPA are consistent with the parties'

intent to provide potential co-conspirators with the broadest immunity possible.  Even if there

were ambiguity, which there is not, that ambiguity must be construed against the government and

in favor of the defense.  Accordingly, the indictment must be dismissed.  In the alternative, Ms.

Maxwell should be permitted to take discovery regarding the intent of the parties to the NPA

with respect to the co-conspirator immunity provision, and the Court should hold an evidentiary

hearing in aid of this Motion.

## I.      The Indictment Should Be Dismissed for Breach of the NPA.

"Plea agreements have long been interpreted in accordance with contract law principles."

*United States v. Gonzalez,* 93 F. App'x 268, 269 (2d Cir. 2004).  "In interpreting whether a plea

agreement has been breached, this court looks to the reasonable understanding of the parties as to

the terms of the agreement."  *Id.* at 269-70 (internal quotations and citations omitted).  However,

the government "must bear the burden for any lack of clarity in the agreement and ambiguities

should be resolved in favor of the defendant."  *Innes v. Dalsheim,* 864 F.2d 974, 979 (2d Cir.

1988).  Here, the NPA unambiguously precludes prosecution of Epstein's potential co-

conspirators, and the indictment in this case must be dismissed.

In support of its July 2020 motion for Ms. Maxwell's detention, the government raised

three arguments why it contends the NPA does not bar Ms. Maxwell's prosecution:  (i) that Ms.

Maxwell supposedly lacks standing to enforce the NPA; (ii) that the co-conspirator immunity

provision applies only in the SDFL; and (iii) that the provision is limited to conduct occurring

during the 2001-07 time period and to violations of statutes specifically referenced in the NPA.

Government's Reply Memorandum in Support of Detention ("Reply Mem."), Dkt. No. 22 (filed

Jul. 13, 2020), at 5.  None of these arguments has merit.

**A.      Ms. Maxwell Has Standing to Enforce the NPA.**

The Second Circuit has long recognized that plea agreements may include promises of leniency for third parties.  *See, e.g., United States v. Clements,* 992 F.2d 417, 419 (2d Cir. 1993) ("it is now clearly established in the Second Circuit that the government may impose conditions which relate to the conduct or treatment of others"); *United States v. Marquez,* 909 F.2d 738, 742 (2d Cir. 1990) ("Since a defendant's plea is not rendered involuntary because he enters it to save himself many years in prison, it is difficult to see why the law should not permit the defendant to negotiate a plea that confers a similar benefit on others."), *cert. denied,* 498 U.S. 1084 (1991). Yet the government has taken the position that such promises are effectively unenforceable by any third party who is not specifically identified by name.

Fundamental principles of contract law contradict the government's position, regardless of whether the Court applies the law of New York or that of Florida, where the NPA was negotiated and performed.  Both states' laws permit enforcement of a contract by a third-party beneficiary where the parties to the contract intended to confer a benefit on the third party. *Subaru Distribs. Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 124 (2d Cir. 2005) (applying New York law); *Bochese v. Town of Ponce Inlet,* 405 F.3d 964, 982 (11th Cir. 2005) (applying Florida law).  Moreover, "[a]n intention to benefit a third-party may be gleaned from the contract as a whole *and the party need not be named specifically as a beneficiary.*"  *Chen St. v. Street Beat Sportswear, Inc.*, 226 F. Supp. 2d 355, 362 (E.D.N.Y. 2002) (emphasis added) (holding that garment workers had standing as third-party beneficiaries to enforce wage compliance agreement between Department of Labor and clothing manufacturer that contracted with their employer); *Florida Power & Light Co. v. Mid-Valley, Inc.*, 763 F.2d 1316, 1321 (11th Cir. 1985) ("Florida courts have long recognized that a third party beneficiary need not be named in the contract").

Contrary to the government's position here, courts applying these traditional contract principles to non-prosecution agreements have recognized that third parties who claim immunity in such agreements have standing to enforce their rights as third-party beneficiaries, even where they have not been expressly named in the non-prosecution agreement. *See, e.g., United States v. CFW Const. Co.*, 583 F. Supp. 197, 203 (D.S.C.) ("an intended third party beneficiary of a contract may enforce its provisions as against the promisor . . . . if the Government, in negotiating the aforementioned plea agreements, 'promised' that there would be no prosecution against [the third party] for antitrust violations arising in *any* jurisdiction, the promise must be enforced") (emphasis in original), *aff'd*, 749 F.2d 33 (4th Cir. 1984).

Two cases in particular illustrate the infirmity in the government's argument.  In *United States v. Florida West Int'l Airways, Inc.*, 853 F. Supp. 2d 1209 (S.D. Fla. 2012), the government, following a plea agreement with a foreign air cargo provider that immunized certain classes of the provider's employees and related corporations, indicted a U.S. airline and an individual, both of whom asserted that they were within the scope of employees and corporations covered by the plea agreement. *Id.* at 1215-16.  Following a two-day evidentiary hearing, the court concluded that only the individual was covered by the plea agreement, but flatly rejected the proposition that either party lacked standing to invoke the plea agreement if covered by it— even though the parties were not identified in the plea agreement by name. *Id.* at 1228-29. Applying Florida law, the court held that "the signatory parties unmistakably intended to confer immunity on a discrete class of corporations and individuals . . . that could include the Defendants." *Id.* at 1228.  The court added:

> The plea agreement unquestionably conferred a direct benefit on a class of
> individuals:  immunity.  Moreover, the Plea Agreement evinced an intent to
> extend this benefit to a definable class of third parties:  employees of [the cargo

provider], employees of [its] subsidiaries, and subsidiary corporations of [the
cargo provider and a related foreign airline].

*Id.*

An even more loosely defined immunity agreement was enforced in favor of a third party

in *United States v. El-Sadig,* 133 F. Supp. 2d 600 (N.D. Ohio 2001).  In *El-Sadig,* the court held

that the defendant, who was alleged to have purchased firearms unlawfully for two members of

the Saudi royal family who had traveled with a Saudi prince to the United States, had standing to

enforce an oral agreement between the government and the prince not to prosecute any of the

individuals involved in the purchase.  133 F. Supp. 2d at 601.  The court concluded that "even if

the non-prosecution agreement was never directly communicated to [the defendant], he can

enforce the non-prosecution agreement as a third party beneficiary."  *Id.* at 608.  Moreover, the

court reasoned, because the prince himself "was not involved in any of the illegal activity, his

efforts to obtain a commitment not to prosecute were obviously intended by him to benefit third-

parties," and therefore the defendant was a third-party beneficiary with standing to enforce the

agreement.  *Id.* at 609.

Both *Florida West* and *El-Sadig* illustrate how the government's argument that Ms.

Maxwell lacks standing to enforce the NPA is contrary to bedrock principles of contract law, as

applied to immunity agreements.  Like Ms. Maxwell, the defendants in *Florida West* and *El-

Sadig* were not parties to the agreements at issue.  Like Ms. Maxwell, the defendants were not

specifically named in the agreements.  Yet in both cases, the courts held that the defendants were

third-party beneficiaries with standing to enforce the agreements, because the parties to the

agreements obviously intended to confer on them the benefit of immunity.  Ms. Maxwell

similarly has standing to enforce the co-conspirator immunity provision of the NPA, as the

parties to the NPA clearly intended to confer immunity on potential co-conspirators of Epstein, such as Ms. Maxwell.

### B.    The NPA's Prohibition on Prosecution of Potential Co-Conspirators Is Not Limited to the SDFL.

The NPA stands in contrast to the standard non-prosecution agreement used in this District and other jurisdictions, which typically is explicitly limited to prohibit only prosecutions by the USAO for the district in which the plea is entered.  The standard agreement in this District contains the following language:  "It is further understood that this Agreement does not bind any federal, state, or local prosecuting authority other than this Office."  *See, e.g., Perez v. United States,* Nos. 14 Civ. 846, 04 Cr. 937-1, 2015 WL 3413596 , at *8 (S.D.N.Y. 2015).  No such language is included in the NPA.  Moreover, unlike the standard agreement, the NPA refers separately to "the United States" in some places and to the USAO-SDFL in others, in ways that make clear that any reference to "the United States" was intended to refer to the government as a whole, not merely the USAO-SDFL.

### 1.    The NPA is binding on the USAO in this District.

The government's contention that the NPA does not bind the USAO in this District cannot be squared with the clear language of the co-conspirator immunity provision.  On its face, that provision does not limit the preclusive effect of the NPA as to potential co-conspirators to prosecutions in the SDFL.  Indeed, consistent with Epstein's desire to obtain the broadest immunity possible, the NPA expressly provides that, in exchange for Epstein's compliance with the terms and conditions therein, "the *United States* also agrees that it will not institute any criminal charges against any potential co-conspirators of Epstein," with no express geographic limitation.  NPA at 5 (emphasis added).  In contrast, the clauses regarding the non-prosecution of Epstein expressly defer "prosecution *in this District*" and provide that no prosecution for the

offenses at issue will be "instituted *in this District*."  NPA at 2 (emphases added).  In addition,

the use of the term "the United States" in the co-conspirator immunity provision contrasts with

the use elsewhere in the agreement of various terms that refer more specifically to the USAO-

SDFL.  When the government wanted a provision of the NPA to refer only to the USAO-SDFL,

it knew how to do so; where it chose not to do so, a different intent is demonstrated.

Indeed, the omission of express language limiting the co-conspirator immunity provision

to the SDFL was contrary to Justice Department policy.  The Justice Manual (formerly the U.S.

Attorneys' Manual) expressly provides, and provided at the time the NPA was executed, that "if

practicable, the attorney for the government should explicitly limit the scope of his/her [non-

prosecution] agreement to non-prosecution within his/her district."  Justice Manual, Comment to

§ 9-27.630.  The government's deviation from a policy of which it was obviously aware—for

offenses that, by their nature, involve interstate travel and are susceptible to prosecution in

multiple districts—cannot be regarded as an oversight, particularly where the policy was

followed elsewhere in the NPA with respect to the immunity provision as to Epstein.

### 2. *United States v. Annabi* does not alter the analysis.

In support of its position, the government has cited *United States v. Annabi*, 771 F.2d 670

(2d Cir. 1985).  Reply Mem. at 5.  But *Annabi* does not support the government's position.  In

fact, to the extent it is relevant here, it supports dismissal.

In *Annabi,* the government, following a guilty plea to one count of a three-count

indictment in the Eastern District of New York, agreed to move to dismiss the two open counts.

Unlike here, there was no written agreement; rather, the prosecutor stated on the record at the

time of the plea that "the only agreement that exists between the defendants and the Government

is that at the time of the imposition of sentence on Count Two, the Government would move to

dismiss the two open remaining counts as to each defendant."  771 F.2d at 671.  The defendants

moved to dismiss a subsequent indictment in this District as barred by what they claimed was an earlier "plea agreement" in the Eastern District, and the court denied the motion. *Id.* The Second Circuit, in affirming the denial, stated simply that "[a] plea agreement binds only the office of the United States Attorney for the district in which the plea is entered unless it affirmatively appears that the agreement contemplates a broader restriction." *Id.* at 672.

Thus, not only is *Annabi* readily distinguishable from this case, but it explicitly recognizes that plea agreements can be binding in other jurisdictions, and that a plea agreement that has the "affirmative appearance" of broad applicability—as the NPA does here—will be enforced according to its terms. The Second Circuit's subsequent application of *Annabi* has been entirely consistent with this principle, and with Ms. Maxwell's position here. To the extent that *Annabi* would preclude Ms. Maxwell from enforcing the NPA outside the SDFL, it is in conflict with the likely resolution of the issue under Eleventh Circuit law, which should apply here.

          a.      *There is an "affirmative appearance" that the co-conspirator immunity provision was intended to apply outside the SDFL.*

The "affirmative appearance" contemplated by *Annabi* "need not be an express statement." *United States v. Russo,* 801 F.2d 624, 626 (2d Cir. 1986). Here, the "affirmative appearance" that a broader restriction was intended is evident within the four corners of the NPA, when the NPA is reviewed as a whole. As noted above, the absence of any limiting language in the co-conspirator immunity provision stands in sharp contrast to the NPA's provision regarding the non-prosecution of Epstein, which is expressly limited to prosecution "in this District." NPA at 2. It is difficult to envision a clearer "affirmative appearance" than the express inclusion elsewhere in the agreement of a limitation that is conspicuously absent here.

Basic principles of contract interpretation require an inference that the parties considered the inclusion of the phrase "in this District" necessary to limit the scope of the non-prosecution

provision as to Epstein.  *See, e.g., LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.,* 424 F.3d 195, 206 (2d Cir. 2005) ("In interpreting a contract under New York law, 'words and phrases ... should be given their plain meaning,' and the contract 'should be construed so as to give full meaning and effect to all of its provisions.'") (citations omitted); *Port Consol., Inc. v. Int'l Ins. Co. of Hannover, PLC,* 826 F. App'x 822, 827 (11th Cir. 2020) (same under Florida law).  The Justice Manual supports this view, admonishing prosecutors who do not wish to bind USAOs in other districts to "*explicitly* limit the scope" of the NPA to their districts.  Justice Manual, Comment to § 9-27.630 (emphasis added).  The absence of the phrase "in this District" from the co-conspirator immunity provision therefore compels the opposite inference:  that the parties did *not* intend to limit the co-conspirator immunity provision to the SDFL.

Moreover, "a promise to bind other districts can be inferred from the negotiations between defendant and prosecutor."  *Russo,* 801 F.2d at 626.  One relevant factor in this analysis is the extent to which the USAO negotiating the plea agreement acted on its own, as opposed to involving other USAOs or other offices within the Department of Justice.  *Cf., e.g., United States v. D'Amico,* 734 F. Supp. 2d 321, 349 (S.D.N.Y. 2010) (finding that defendant "offers no meaningful support for his claim that he 'reasonably understood' the Agreement to bar subsequent prosecutions in this District. . . . He does not claim, for example, that the SDNY USAO was in any way consulted or involved in the plea negotiations."); *United States v. Laskow*, 688 F. Supp. 851, 854 (E.D.N.Y.) ("defendants concede [] that the Central District had no knowledge of the investigation that was taking place in the Eastern District at the time the Central District plea was being negotiated. . . . The Central District, unaware of defendants' potential criminal liability in the Eastern District, could not have intended to insulate defendants from prosecution which they had no reason to foresee."), *aff'd,* 867 F.2d 1425 (2d Cir. 1988).

Here, we understand that senior levels of Main Justice were directly involved in the

negotiation and approval of the NPA, and the NPA itself reflects the involvement of the FBI.

NPA at 1.  Moreover, the USAO-SDFL's involvement of the USAO for this District in its

investigation of Epstein, as well its contact with witnesses in New York, reflect a coordinated

effort that transcended the USAO-SDFL.  SDFL Privilege Log at 4, 5, 7.  From these facts, it

affirmatively appears that the government had every reason to foresee a potential prosecution of

Epstein's co-conspirators in this District and, after multiple layers of review within the

Department of Justice, intended to agree to preclude it.

> b. *The Second Circuit's subsequent application of* Annabi *supports*
> *Ms. Maxwell's position.*

In nearly all of the cases in which the Second Circuit has reiterated its statement in

*Annabi* in the context of written plea agreements, those agreements, unlike the NPA here,

contained language expressly limiting the enforceability of the NPA to the district in which it

was made.  *See, e.g., United States v. Prisco,* 391 F. App'x 920, 921 (2d Cir. 2010) ("agreement

is limited to the United States Attorney's Office for the District of New Jersey and cannot bind

other federal, state, or local authorities"); *United States v. Ashraf,* 320 F. App'x 26, 28 (2d Cir.

2009) (plea agreement "by its express terms, bound only the U.S. Attorney's Office for the

Eastern District of Virginia"); *Gonzalez,* 93 F. App'x at 270 ("Paragraph 13 explicitly states that

the agreement binds only the United States Attorney's Office for the District of New Mexico");

*United States v. Salameh,* 152 F.3d 88, 119 (2d Cir. 1998) ("[t]his agreement is limited to the

United States Attorney's Office for the Eastern District of New York and cannot bind other

federal, state or local prosecuting authorities"); *United States v. Persico,* 620 F. Supp. 836, 846

(S.D.N.Y.) (finding agreements "clearly indicate that the bargains are between the defendants

and the Organized Crime Strike Force for the Eastern District of New York" and noting that one

defendant's plea agreement explicitly stated that it "is binding on the United States only in [the Eastern] district"), *aff'd*, 774 F.2d 30 (2d Cir. 1985).  Because there is no such language in the NPA here, Ms. Maxwell's position is entirely consistent with these cases, and they counsel in favor of enforcement of the NPA in this case.

Other Second Circuit cases citing *Annabi* also support Ms. Maxwell's position.  In *United States v. Brown*, No. 99-1230(L), 2002 WL 34244994 (2d Cir. Apr. 26, 2002), the defendants relied solely on their "subjective beliefs" and "implicit understanding" that they would not be prosecuted further in another district, which the court held irrelevant; they cited no "affirmative appearance" in support of their position, as Ms. Maxwell has.  And in *Russo,* the court found it unnecessary to reach *Annabi,* but acknowledged that an "affirmative appearance" of an intent to bind other USAOs can be found even where a plea agreement does not contain an express statement to that effect—an interpretation that supports Ms. Maxwell's position that the NPA binds the government here.  *Russo,* 801 F.2d at 626.

> c.   *To the extent that* Annabi *conflicts with Eleventh Circuit law, Eleventh Circuit law applies and would require enforcement of the NPA here.*

Under federal choice-of-law rules, which apply in non-diversity cases, factors in determining which jurisdiction's contract law applies include (i) any choice-of-law provision in the contract; (ii) the place where the contract was negotiated, issued, and signed; (iii) the place of performance; (iv) the location of the subject matter of the contract; and (v) the domicile, residence, nationality, place of incorporation, and place of business of the parties.  *Advani Enters., Inc. v. Underwriters at Lloyds*, 140 F.3d 157, 162 (2d Cir. 1998).  New York conflict-of-law rules similarly require that the law of the jurisdiction with the most significant contacts and greatest interest governs the construction of a contract.  *See Index Fund, Inc. v. Ins. Co. of N. Am.,* 580 F.2d 1158, 1161-62 (2d Cir. 1978).  Under either set of rules, because the NPA was

drafted and executed by the government's agents in the SDFL, and because Epstein performed under the contract by entering a plea in a Florida court, any conflict of laws between the Second Circuit and the Eleventh Circuit should be resolved in favor of the application of Eleventh Circuit law to the NPA.

The Eleventh Circuit has not directly addressed whether a plea agreement or non-prosecution agreement signed by one USAO is binding on a USAO in another district. But it may be presumed, as it frequently is when predicting how a state's highest court would rule in a case of first impression, that the Eleventh Circuit would follow the weight of authority. *See, e.g., Crutsinger v. Hess,* 408 F. Supp. 548, 554 (D. Kan. 1976) ("if state law is silent and there is a conflict of authority in other jurisdictions, the federal court construing the law of the state will assume that the state court would follow the weight of authority").

Here, the weight of authority holds that, at least when a plea agreement refers to "the United States" or "the Government," it binds USAOs in all districts absent a provision to the contrary. *See, e.g., United States v. Gebbie,* 294 F.3d 540, 547-49 (3d Cir. 2002) (characterizing the Second Circuit's statement in *Annabi* as an "illogical posture" unsupported by the prior Second Circuit cases on which it relied); *United States v. Van Thornout*, 100 F.3d 590, 594 (8th Cir. 1996) ("Absent an express limitation, any promises made by an Assistant United States Attorney in one district will bind an Assistant United States Attorney in another district."); *United States v. Harvey,* 791 F.2d 294, 303 (4th Cir. 1986) ("It is the Government at large—not just specific United States Attorneys or United States 'Districts'—that is bound by plea agreements negotiated by agents of Government."). In *Gebbie,* the Third Circuit analyzed *Annabi* and its predecessor Second Circuit cases in detail, concluding that the statement

articulated in *Annabi* "really has no analytically sound foundation [in Second Circuit case law]. It just keeps replicating itself each time it is cited." *Gebbie,* 294 F.3d at 547.

It appears that the Second Circuit is the only court of appeals to take the position articulated in *Annabi.* Given that three circuits have held otherwise—and that one of them has addressed the Second Circuit's reasoning in *Annabi* in detail—it is likely that the Eleventh Circuit would follow the weight of authority and hold that absent an express provision to the contrary, a plea agreement or non-prosecution agreement executed in the name of "the United States" binds USAOs in other districts.

As previously demonstrated, there is no conflict between this position and *Annabi* as applied to these facts, because *Annabi* supports dismissal here. But to the extent that *Annabi* could be construed as limiting the NPA's effect to the SDFL, it would be inconsistent with the Eleventh Circuit's likely disposition of the issue and should not be followed here.

We understand that Epstein and his counsel sought to ensure, to the fullest extent possible, that third parties would not face criminal liability in connection with his actions, in part to minimize the likelihood that he would be subpoenaed as a witness. Thus, Epstein and his counsel reasonably understood that, unlike Epstein's own immunity, the immunity for his alleged co-conspirators from federal prosecution would not be limited to the SDFL. To the extent that the government intended to impose such a limitation, it was the obligation of the government, in drafting the agreement, to ensure that such limitations were included. Having failed to do so, the government may not now ask this Court to read limitations into the co-conspirator immunity provision that it did not include at the time the NPA was negotiated.

**C.**     **The NPA's Prohibition on the Prosecution of Potential Co-Conspirators Is Not Limited to Prosecution for Conduct Between 2001 and 2007 or for Particular Statutory Offenses.**

Finally, the government has characterized the NPA's co-conspirator immunity provision as "limited by its terms to conduct spanning from 2001 to 2007 . . . and to violations of statutes not charged in this Indictment."  Reply Mem. at 5-6.  This characterization is grossly inaccurate. The co-conspirator immunity provision contains no limitation as to either the time period or the statutes on which such criminal charges might be based.[4]

Just as the NPA deviates from the standard agreement in failing to include language limiting its scope to the SDFL, it also deviates from the standard agreement by failing to specify the conduct, including the time period, for which the putative defendant—or, in this case, potential co-conspirators—cannot be prosecuted.  As with its failure to limit the co-conspirator immunity provision to the SDFL, the government may not now rewrite the NPA to limit the scope of covered conduct in a manner that it failed to do in drafting the NPA.  At minimum, the absence of any such limitation renders the scope of the provision ambiguous, and any ambiguity must be construed against the government.  *See Feldman,* 939 F.3d at 189.

While the NPA's factual recitals reference the 2001-07 time period and list five potential statutory offenses, the NPA's substantive provisions establish no such limit on the immunity for potential co-conspirators—or, for that matter, for Epstein himself—to either that time period or those offenses.  As to Epstein, the NPA provides immunity for (i) "any offenses that arose" from the undefined "Federal Grand Jury investigation" and (ii) "any other offenses that have been the subject of the joint investigation by the Federal Bureau of Investigation and the United States

---

[4] The government's assertion that the co-conspirator immunity provision is limited to "violations of statutes not charged in this Indictment" (Reply Mem. at 6) is incorrect for the additional reason that both the NPA and the current indictment ("Indictment") reference violations of the Mann Act.  *Compare* NPA at 1 (citing 18 U.S.C. §§ 2422(b), 2423(b), 2423(e)) *with* Indictment ¶¶ 10 (alleging conspiracy to violate § 2422(a)) and 15 (alleging conspiracy to violate § 2423(a)).

Attorney's Office." NPA at 2. The latter investigation, in turn, encompasses not only "offenses" from the 2001-07 time period, but also "Epstein's background." *Id.* at 1. Thus, for example, prosecution of Epstein for a pre-2001 offense that arose out of the FBI/USAO investigation into Epstein's background, or for an unlisted statutory offense that arose from the grand jury investigation, would have been prohibited under the NPA.

The co-conspirator immunity provision does not include even those broad limitations. It provides, simply, that the United States will not "institute *any* criminal charges against any potential co-conspirators of Epstein." *Id.* at 5 (emphasis added). The provision could not be clearer, either on its face or in the context of the NPA as a whole. As with the absence of language limiting the provision to prosecution in the SDFL, the absence of *any* language limiting the offenses for which potential co-conspirators cannot be prosecuted, when such language is included as to Epstein, must be presumed under contract interpretation principles to have been intentional. *See, e.g., LaSalle Bank,* 424 F.3d at 206; *Port Consol.,* 826 F. App'x at 827-28. At minimum, the silence as to time period and covered conduct is an ambiguity and therefore should be resolved against the government. *Gonzalez*, 93 F. App'x at 269.

Even if the NPA were construed as placing *some* limitation on co-conspirator immunity, no rational limitation could exclude the conduct alleged here. The charges against Ms. Maxwell involve her alleged role as a co-conspirator of Epstein, involving alleged conduct almost identical to the alleged conduct that led up to the NPA. Indeed, the United States Attorney for this District, in announcing the current indictment, described it as "the prequel to the earlier case we brought against Jeffrey Epstein." *See, e.g.,* Dienst, J., Valiquette, J., Winter, T., and Fitzpatrick, S. "Jeffrey Epstein Confidante Ghislaine Maxwell Arrested on Sex Abuse Charges." *NBC New York*. July 3, 2020 (https://www.nbcnewyork.com/news/local/crime-and-

courts/ghislaine-maxwell-arrested-jeffrey-epstein-aide/2495762/).  And the government has

acknowledged, by omission, that one of the three alleged victims referenced in the current

indictment was interviewed by the USAO for the SDFL.  *See* Reply Mem. at 6 ("two of the

victims referenced in the Indictment were never approached or interviewed by the SDFL").

As noted above, Epstein and his counsel sought to prevent prosecution against his

putative co-conspirators to the maximum extent possible.  Had the government intended to limit

that protection to a specific time period or to violations of specific statutes, it could have done so.

It did not.  Thus, by charging Ms. Maxwell with conduct in which she allegedly engaged as part

of a conspiracy with Epstein—conduct that predates the NPA—the government has violated the

NPA.

* * * *

In sum, none of the three arguments proffered by the government regarding the

applicability of the NPA is meritorious.  Ms. Maxwell is a third-party beneficiary of the NPA

with standing to enforce the co-conspirator immunity provision.  The co-conspirator immunity

provision binds all USAOs and is not limited to the SDFL.  It imposes no limitation on the scope

of covered conduct—and even if it did, the conduct alleged here would be covered.  At most, the

co-conspirator immunity provision is ambiguous, and thus must be construed against the

government.  Because the co-conspirator immunity provision bars the government's prosecution

of Ms. Maxwell on charges arising out of her alleged conspiracy with Epstein, the indictment

should be dismissed.

## II.     In the Alternative, the Court Should Permit Discovery and Conduct an Evidentiary Hearing Regarding the Parties' Intent.

The language of the NPA and the facts submitted herewith are more than sufficient for

the Court to find that the NPA bars the prosecution of Ms. Maxwell, particularly when any

ambiguities are construed, as they must be, against the government as drafter. In the alternative, however, the NPA and the circumstances of its execution merit discovery and an evidentiary hearing regarding the parties' intent.

To the extent that extrinsic materials do not make the parties' intent clear, the Court is obligated to make a finding as to the parties' "reasonable understanding," with ambiguities resolved in Ms. Maxwell's favor. *See Gonzalez,* 93 F. App'x at 270 (emphasis and citation omitted). Courts in this circuit have routinely recognized the need for evidentiary hearings where the existence or scope of a plea agreement or non-prosecution agreement is in genuine dispute. *See, e.g., id.* at 270 (noting testimony from defendant's attorney); *United States v. Aleman,* 286 F.3d 86, 91 (2d Cir. 2002) (remanding where "the district court failed to make a record that allows us to determine the existence, scope and effect of an immunity agreement"); *Annabi,* 771 F.2d at 671 (noting that district court heard testimony from two prosecutors, defendant, and defendant's counsel as of the time the plea agreement was reached); *United States v. Papa,* 533 F.2d 815, 820 (2d Cir. 1975) (describing "two evidentiary hearings"); *United States v. Sattar,* No. 02 Cr. 395 (JGK), 2003 WL 22510398, at *1 (S.D.N.Y. Nov. 5, 2003) (noting conclusion that "an evidentiary hearing was warranted . . . to determine whether an agreement existed, what its terms were, and whether there was compliance with those terms").

Ms. Maxwell's request for an evidentiary hearing, and for discovery, is at least as strong as that in *Feldman.* There*,* the district court denied discovery to a defendant who claimed that the government had served a writ of execution in violation of oral representations made in connection with the defendant's plea agreement, holding that the agreement's merger provision barred the consideration of any oral agreements or representations. The Second Circuit reversed, concluding that "while the district court's analysis might have been compelling with respect to a

contract arising out of commercial negotiations among private parties, we believe the court did

not correctly apply the standards that govern the interpretation of plea agreements with the

government.  *We have long recognized that plea agreements are significantly different from*

*commercial contracts.*"  *Feldman,* 939 F.3d at 189 (emphasis added).  The court explained:

> Government conduct in negotiating plea agreements must comport with the
> highest standard of fairness.  Because such agreements involve waivers of
> fundamental constitutional rights, prosecutors are held to meticulous standards of
> performance.

*Id.* (citations and internal quotations omitted).  The court held that given the absence of

discovery and an evidentiary hearing, "the record does not furnish a basis for a complete

understanding of what happened in the course of the plea negotiations," and that the defendant's

evidence was "sufficient in these circumstances" to require the district court to take such action.

*Id.* at 190.

Unlike the agreement in *Feldman,* the NPA here contains no integration clause, and the

co-conspirator immunity provision, on its face, bars prosecution of Epstein's potential co-

conspirators without limitation as to judicial district, time period of the underlying conduct, or

the statutory violations alleged.  Moreover, unlike the defendant in *Feldman,* Ms. Maxwell had

no role in the negotiation of the NPA, and thus *all* of the information relevant to its construction

is in the possession of third parties.  However, we understand that Epstein sought the maximum

protection from prosecution possible for his potential co-conspirators and that Main Justice

participated in the negotiation of the NPA, and there is evidence that the USAO-SDFL consulted

with the USAO for this District in its investigation.  SDFL Privilege Log at 4, 5, 7.  This

information could be confirmed through discovery.

Media reports regarding the November 2020 OPR report further support Ms. Maxwell's

position.  Only the executive summary of the OPR report was released to the public, and the

executive summary does not discuss the co-conspirator immunity provision.  It has been reported in the media, however, that the full OPR report states that the Assistant United States Attorney who negotiated the deal recalled Epstein's counsel telling her that Epstein's intent was "to make sure that he's the only one who takes the blame for what happened."  Hill, J. "Key Takeaways from the Justice Department review of Jeffrey Epstein sweetheart deal." *ABC News.* Nov. 16, 2020 (https://abcnews.go.com/US/key-takeaways-justice-department-review-jeffrey-epstein-sweetheart/story?id=74222922).  If the reporting is accurate, the OPR report suggests that the government understood Epstein's desire to protect his potential co-conspirators to the maximum extent possible, and that the government articulated no objection—*i.e.,* that there was no intent to limit the scope of the co-conspirator immunity provision.  The accuracy of this account, as well as other information about the plea negotiations and the parties' intent, can be confirmed through discovery.

## CONCLUSION

For the foregoing reasons, Ms. Maxwell respectfully requests that the Court dismiss the

indictment.  In the alternative, Ms. Maxwell respectfully requests that the Court conduct an

evidentiary hearing regarding the scope of the NPA, and that Ms. Maxwell be permitted to take

discovery in aid of such a hearing.

Dated: January 25, 2021
      New York, New York

Respectfully submitted,

*/s/ Mark S. Cohen*

Mark S. Cohen
Christian R. Everdell
COHEN & GRESSER LLP
800 Third Avenue
New York, NY 10022
Phone: 212-957-7600

Jeffrey S. Pagliuca
Laura A. Menninger
HADDON, MORGAN & FOREMAN P.C.
150 East 10th Avenue
Denver, Colorado 80203
Phone: 303-831-7364

Bobbi C. Sternheim
Law Offices of Bobbi C. Sternheim
33 West 19th Street – 4th Floor
New York, NY  10011
Phone: 212-243-1100

*Attorneys for Ghislaine Maxwell*

## <u>CERTIFICATE OF SERVICE</u>

   I hereby certify that on January 25, 2021, I served by email, pursuant Rule 2(B) of the Court's individual practices in criminal cases, the within memorandum and any accompanying exhibits upon the following:

Maurene Comey
Alison Moe
Lara Pomerantz
Andrew Rohrbach
U.S. Attorney's Office, SDNY
One Saint Andrew's Plaza
New York, NY 10007
Maurene.comey@usdoj.gov
Alison.moe@usdoj.gov
Lara.Pomerantz@usdoj.gov
Andrew.Rohrbach@usdoj.gov

             */s/ Christian Everdell*