

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 9, 2021

**BY ECF & ELECTRONIC MAIL**

The Honorable Alison J. Nathan
United States District Court
Southern District of New York
United States Courthouse
40 Foley Square
New York, New York 10007

>  Re:   *United States v. Ghislaine Maxwell*, 20 Cr. 330 (AJN)

Dear Judge Nathan:

  The Government respectfully submits this letter in opposition to the defendant's third motion for release on bail, dated February 23, 2021 (the "Third Bail Motion" or the "Motion"). (Dkt. No. 160).  On July 14, 2020, after extensive briefing and a lengthy hearing, this Court concluded that the defendant posed a serious flight risk and that no condition or combination of conditions could ensure her appearance in court.  On December 28, 2020, after the defendant renewed her motion for release on bail (the "Second Bail Motion") by essentially restating her prior arguments and presenting a more significant and specific bail package, this Court issued a thorough opinion and again concluded that the defendant "plainly poses a risk of flight" and denied the motion for "substantially the same reasons that the Court denied" her first motion for release. (Dkt. No. 106 at 1-2 ("Dec. Op.")).  The defendant appealed this Court's December 2020 decision to the Second Circuit, and that appeal remains pending.  Now, the defendant asks the Court yet again to reconsider its decision, and proposes two additional bail conditions to supplement the bail package the Court previously considered and rejected.  For the reasons set forth below, the Motion should be denied.  *First*, the Court does not have jurisdiction to grant the Third Bail Motion—in which she asks this Court to reconsider its December opinion—because the defendant has appealed that December opinion to the Second Circuit.  *Second*, even assuming the Court had jurisdiction to grant this latest bail application, the Court should adhere to its prior rulings because the defendant continues to pose an extreme risk of flight, and the additional bail conditions proposed by the defendant do not justify reversal of the Court's prior findings that no combination of conditions could ensure her appearance.  The defendant's Third Bail Motion should be denied.

> **I.    Background**

  The Government's December 16, 2020 opposition to the defendant's Second Bail Motion details the background of the initial bail proceedings in this case and is incorporated by reference herein.  (*See* Dkt. No. 100 at 2-6).  After this Court denied the defendant's initial application for

Page 2

bail in July 2020, the defendant filed a renewed motion for release in December 2020 in which the defendant proposed a "substantially larger bail package" and presented arguments that "either were made at the initial bail hearing or could have been made then." (Dec. Op. at 1). In denying that second application, the Court found that the information provided in the Second Bail Motion "only solidifies the Court's view that the Defendant plainly poses a risk of flight and that no combination of conditions can ensure her appearance." (*Id.* at 1-2).

On January 11, 2021, the defendant filed a notice of appeal to the Second Circuit appealing the Court's December 2020 opinion denying the Second Bail Motion. (Dkt. No. 113). That appeal is pending; the defendant has not yet filed her brief in support of the appeal.

On February 23, 2021, the defendant submitted the Third Bail Motion, in which she proposed two additional bail conditions to "supplement the . . . bail package she has already offered" in the Second Bail Motion (Mot. at 2): (1) renunciation of the defendant's French and British citizenship; and (2) placement of a portion of her and her spouse's assets in a new account to be overseen by an asset monitor.

## II.     The Court Does Not Have Jurisdiction to Grant the Third Bail Motion Because of the Defendant's Pending Bail Appeal

The defendant asks this Court to "reconsider its earlier ruling and grant bail under the proposed conditions." (Mot. at 4). More specifically, the defendant asks the Court to consider the exact same package previously considered and rejected in the December opinion, as now "supplement[ed]" by two additional conditions. (*Id.* at 2, 8). However, the Court lacks jurisdiction to grant the Motion by virtue of the defendant's appeal of the Court's prior ruling to the Second Circuit.

"As a general matter, 'the filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal.'" *United States v. Rodgers*, 101 F.3d 247, 251 (2d Cir. 1996) (quoting *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982)). "The divestiture of jurisdiction rule . . . is a judicially crafted rule rooted in the interest of judicial economy, designed 'to avoid confusion or waste of time resulting from having the same issues before two courts at the same time.'" *Rodgers*, 101 F.3d at 251 (quoting *United States v. Salerno*, 868 F.2d 524, 540 (2d Cir. 1989)); *see also United States v. Ransom*, 866 F.2d 574, 576 (2d Cir. 1989) (describing the *Griggs* rule as "promot[ing] the orderly conduct of business in both the trial and appellate courts").

In January 2021, the defendant filed an appeal from the Court's December 28, 2020 Opinion and Order denying her Second Bail Motion. The defendant's Third Bail Motion not only seeks reconsideration of the very issue presently on appeal but does so by proposing two additional bail conditions to "supplement" the bail package proposed in the defendant's Second Bail Motion, (Mot. at 2, 8), a package which this Court considered and concluded could not "reasonably assure her appearance." (Dec. Op. at 16). Accordingly, the defendant's Third Bail Motion also concerns bail and is thus an "aspect[] of the case involved in the appeal." *Rodgers*, 101 F.3d at 251. The

Page 3

defendant cannot simultaneously pursue bail in both the Second Circuit and the district court.  To allow her to seek relief in both venues runs counter to the principles of judicial economy underpinning the divestiture of jurisdiction upon the filing of a notice of appeal.  *See Rodgers*, 101 F.3d at 251.[1]

The Court's lack of jurisdiction to grant the Third Bail Motion does not leave the defendant without a remedy.  The defendant can withdraw her pending bail appeal to restore jurisdiction to this Court.  Alternatively, the Court can follow the procedure set forth in Rule 37(a) of the Federal Rules of Criminal Procedure, which provides that if the defendant makes a timely motion for relief "that the court lacks authority to grant because of an appeal that has been docketed and is pending, the court may: (1) defer considering the motion; (2) deny the motion; or (3) state either that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue."  However, the defendant should not be permitted to simultaneously pursue bail in both this Court and the Second Circuit.

### III.    The Court Should Not Reverse Its Prior Well-Reasoned and Thorough Bail Decisions

Even if this Court had jurisdiction to grant the Third Bail Motion, the motion should be denied.  This Court has already twice made the determination that the defendant poses a risk of flight.  In particular, the Court has found, "the charges, which carry a presumption of detention,

---

[1] While the Government has not identified a case addressing the precise issue with which the Court is confronted, several considerations support the Government's position that the Court does not presently have jurisdiction to grant the Third Bail Motion.  In addition to the rule articulated by the Supreme Court in *Griggs*, in *Ching v. United States*, the Second Circuit found that while an appeal from the denial of a Section 2255 motion was pending, the district court could not rule on a motion to amend the Section 2255 motion.  298 F.3d 174, 180 n.5 (2d Cir. 2002) ("The district court could not rule on any motion affecting an aspect of the case that was before [the Second Circuit], including a motion to amend the motion, while that appeal was pending.").  Here, too, while the defendant's appeal of the denial of the Second Bail Motion is pending, the Court should not grant the defendant's motion to reconsider that very same bail ruling.  Rule 9 of the Federal Rules of Appellate Procedure, which governs release in a criminal case, also supports such a reading.  Rule 9(b), which governs release *after* a judgment of conviction, provides that a "party entitled to do so may obtain review of a district-court order regarding release after a judgment of conviction by filing a notice of appeal from that order in the district court, or by filing a motion in the court of appeals if the party has already filed a notice of appeal from the judgment of conviction."  In *United States v. Hochevar*, 214 F.3d 342 (2d Cir. 2000), the Second Circuit found that Rule 9(b) contemplates going to the district court first for a bail ruling after a notice of appeal from the judgment of conviction is filed.  Rule 9(a), which governs release *before* a judgment of conviction, does not say anything about going back to the district court for a new bail ruling after a notice of appeal from a prior bail ruling is filed.  In addition, Rule 9(a)(2) provides that the court of appeals "must promptly determine" the pre-judgment bail appeal.  Such promptness would not be necessary if defendants could go back to the district court with another bail motion while the bail appeal is pending.

Page 4

are serious and carry lengthy terms of imprisonment if convicted; the evidence proffered by the Government, including multiple corroborating and corroborated witnesses, is strong; the Defendant has substantial resources and foreign ties (including citizenship in a country that does not extradite its citizens); and the Defendant, who lived in hiding and apart from the family to whom she now asserts important ties, has not been fully candid about her financial situation." (Dec. Op. at 2). In seeking bail for a third time, the defendant's Motion rests principally on two additional bail conditions. Neither of these conditions will reasonably assure the defendant's appearance in court, and neither outweighs all of the other factors that make this defendant an extreme flight risk. Moreover, the Court should reject as premature the defendant's assertion that her pretrial motions have somehow weakened the Government's case; those motions have not been adjudicated, and, for the reasons set forth in the Government's opposition memorandum, the defendant's motions have no merit.

In short, all three of the relevant Bail Reform Act factors—the nature and circumstances of the offense, the strength of the evidence, and the history and characteristics of the defendant—continue to weigh heavily in favor of detention, and the defendant's Motion does not present any information that warrants revisiting this Court's well-reasoned and detailed prior decisions.

### A. Applicable Law

"After a court has made an initial determination that no conditions of release can reasonably assure the appearance of the Defendant as required, the Court may reopen the bail hearing if 'information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue' of whether pretrial detention is warranted." (Dec. Op. at 4 (quoting 18 U.S.C. § 3142(f)). "A court may also revisit its own decision pursuant to its inherent authority, even where the circumstances do not match § 3142(f)'s statutory text." (*Id.* at 5). Although courts in this Circuit have recognized that "a release order may be reconsidered even where the evidence proffered on reconsideration was known to the movant at the time of the original hearing," *United States v. Rowe*, No. 02 Cr. 756 (LMM), 2003 WL 21196846, at *1 (S.D.N.Y. May 21, 2003), generally the moving party must establish that its arguments "warrant reconsideration" by, for example, demonstrating "that the court overlooked information or incorrectly applied the law," or that failure to reconsider "would constitute manifest injustice." *United States v. Petrov*, No. 15 Cr. 66 (LTS), 2015 WL 11022886, at *3 (S.D.N.Y. Mar. 26, 2015).

### B. Discussion

The defendant's Motion rests on three arguments, none of which is availing. First, the defendant offers to renounce her foreign citizenship, claiming that this eliminates the risk that she will flee from prosecution. Second, the defendant offers to place some of her assets in a monitorship with unspecified terms, and which would still leave her with substantial unrestrained assets. Third, the defendant claims that her voluminous pretrial motions have diminished the strength of the Government's case. None of these arguments is persuasive, and the Motion should be denied.

### 1. The Defendant's Alleged Willingness to Renounce Her Foreign Citizenship Should Not Alter the Court's Prior Bail Determinations

The defendant contends that she has materially strengthened her proposed bail package by offering to renounce her foreign citizenship "if the Court so requires." (Mot. at 2). She claims that such a renunciation will "eliminate any opportunity for her to seek refuge" in France and the United Kingdom or "remove[] any incentive the Court and government believe she may have to seek refuge in those countries." (*Id.* at 2, 5). The defendant is wrong. That she is "willing" to renounce her foreign citizenship would do nothing to prevent the defendant from fleeing and then fighting extradition once abroad, and it does nothing to diminish the risk that the defendant could choose to flee to another jurisdiction altogether, including one with which the United States does not have an extradition treaty and from which extradition is impossible. The Court previously found that the likelihood that the defendant "would be able to *frustrate* any extradition requests . . . weighs strongly in favor of detention" (Dec. Op. at 13); the defendant's Motion provides no basis to disturb this finding. Indeed, just as the defendant's offer to execute anticipatory extradition waivers failed to provide the Court with any assurance that she would not frustrate any potential extradition, so too should her offer to renounce her foreign citizenship.

*First*, the defendant's willingness to renounce her citizenship is an offer of unclear validity. As an initial matter, the defendant's offer is itself of little value, as she would at bare minimum have to follow the legal requirements attendant to each country in order to formally renounce her citizenship. Moreover, she provides no assurances—nor could she—that she will not contest the validity and/or voluntariness of such a renunciation once she is actually in France or the United Kingdom. For example, the Government understands that in order to give up one's British citizenship or status, one must be, among other things, "of sound mind (unless it's decided that it's in your best interest)." *See* www.gov.uk/renounce-british-nationality. The defendant could choose to frustrate any future extradition proceedings by claiming that her decision to give up her citizenship was compelled by some person or circumstance, or that she was not of sound mind. Simply put, while the defendant may believe that it is in her interest to give up her citizenship now, there is no way for the defendant to assure the Court that she will not take the contrary position in the future if she believes it to be in her interest at the time. And even if the defendant could not challenge her renunciation, it is unclear whether, as a separate matter, she could seek to have her citizenship rights restored.

*Second*, and related, the defendant has offered no authority for the proposition that her offer to renounce foreign citizenship would have any impact on an extradition proceeding, nor has she reckoned with the Court's findings regarding her offer to sign a so-called irrevocable waiver of her extradition rights. *See United States v. Cohen*, No. 10 Cr. 547 (SI), 2010 WL 5387757, at *9 n.11 (N.D. Cal. Dec. 20, 2010) ("Defendant's offers to turn in his passports, to 'renounce' his Israeli citizenship, and have someone 'instruct' the Israeli embassy to deny new documents or travel authorizations to defendant, as well as his offer to waive extradition—assuming he flees overseas at some point—do not sufficiently assure the Court that defendant is not still a flight risk. Defendant offers no authority about the real impact of these offers or whether they are enforceable in Israel if defendant were to flee there."). The Court placed "little weight" on the defendant's argument in the Second Bail Motion that waiver of the right to appeal an extradition order indicates

her intent not to flee.  (Dec. Op. at 13 n.2).  The Court recognized that "a defendant could strategically offer to waive the right to extradition while intending to resist any subsequent extradition that might result."  (*Id.*).  So too here.  An offer to renounce her foreign citizenship "[s]hould the Court feel this drastic condition is necessary," (Mot. at 4) is another strategic, but hollow offer given that the defendant would be free to fight extradition once in the United Kingdom or France, or any other jurisdiction of her choosing (*i.e.*, the one to which she chooses to flee).

As such, the defendant's claimed "willing[ness]" to renounce her citizenship in both the United Kingdom and France is little more than window dressing.  After receiving the defendant's Third Bail Motion, the Government, through the Department of Justice's Office of International Affairs ("OIA"), contacted the French Ministry of Justice ("MOJ") to understand the impact of the defendant's offer to renounce her French citizenship on France's categorical unwillingness to deport its own citizens for crimes they have committed.  In response, the MOJ provided the Government with a letter setting forth the relevant law and conclusively indicating that the defendant's offer to waive her French citizenship will not make her eligible to be extradited from France because, for purposes of extradition, nationality is assessed as of the time the charged offense was committed.  That letter in its original French, as well as an English translation of the letter, are attached hereto as Exhibit A.  *See* Ex. A ("[A]ny loss of nationality subsequent to said offense has no bearing upon the removal proceedings and shall not supersede said assessment of nationality."); *see also* Dkt. No. 100, Ex. B at 3 (MOJ letter stating that the French Code of Criminal Procedure "absolutely prohibits the extradition of a person who had French nationality at the time of the commission of the acts for which extradition is requested").  The defendant's renunciation of her French citizenship in 2021 would not change the fact that she was a French citizen at the time she is alleged to have committed the charged crimes in the 1990s and 2016.  As such, the defendant's citizenship at the time of the alleged crimes would bar her extradition from France, making her offer to renounce her French citizenship meaningless.

Meanwhile, the defendant's offer to give up her British citizenship does not mean that she will not fight extradition once in the United Kingdom or that an extradition request to the United Kingdom would be successful.  The Government understands from OIA that a defendant's nationality has historically played little to no role in extradition from the United Kingdom.  Indeed, Article 3 of the 2003 Extradition Treaty between the United States and the United Kingdom expressly prohibits using nationality as a basis to deny extradition.  *See* https://www.congress.gov/108/cdoc/tdoc23/CDOC-108tdoc23.pdf at 5 ("Extradition shall not be refused based on the nationality of the person sought."); *see also* Crown Prosecution Service, *Extradition, Legal Guidance, International and organised crime* (May 12, 2020), https://www.cps.gov.uk/legal-guidance/extradition (setting forth the statutory bars to extradition, which do not include nationality).  In any event, assuming the Government could locate and apprehend the defendant if she were to flee, as set forth in the Government's opposition to the Second Bail Motion, a judge in the United Kingdom must make an independent decision on extradition based on the circumstances at the time the defendant is before the court, including the passage of time, forum, and considerations of the individual's mental or physical condition.  The Government understands from OIA that extradition from the United Kingdom is frequently extensively litigated, uncertain, and subject to multiple levels of appeal.  This process is lengthy, complicated, and time-consuming, and would provide no measure of justice to the victims who

would be forced to wait years for the defendant's return.

As the Government has repeatedly emphasized, the strong possibility that the defendant could successfully resist extradition only heightens the defendant's incentive to flee. (Dkt. No. 100 at 19-20). Indeed, in rejecting the defendant's offer in the Second Bail Motion to execute anticipatory extradition waivers, the Court noted, among other things, "the likelihood that any extradition would be a difficult and lengthy process." (Dec. Op. at 13). The Court further noted that the "likelihood that the Defendant would be able to *frustrate* any extradition requests—even if she were correct that she would be unable to stop extradition entirely—weighs strongly in favor of detention." (*Id.*). That statement remains true even if the face of the defendant's newest offer to renounce her foreign citizenship.

As this Court previously found, the defendant has substantial international ties, familial and personal connections abroad, and owns at least one foreign property of significant value. (Dec. Op. at 10-11). The defendant's alleged willingness to renounce her foreign citizenship should not fundamentally alter the Court's conclusions.

## 2.   The Court Should Reject the Defendant's Proposed Monitorship Condition

Next, the defendant has offered to place a portion of her and her spouse's assets into a new account that "will be monitored by a retired federal District Court judge and former United States Attorney who will function as asset monitor and will have co-signing authority over the account." (Mot. at 2). This proposed condition—the details of which are vague—is insufficient to ensure that the defendant appears in Court.

It first bears noting that the defendant's finances—and her candor with the Court about those finances— is not an issue of first impression. Significantly absent from the defendant's Motion is any attempt to address the Court's determination that the defendant's "lack of candor raises significant concerns as to whether the Court has now been provided a full and accurate picture of her finances and as to the Defendant's willingness to abide by any set of conditions of release." (Dec. Op. at 16). That is critical because the value of any proposed monitorship would depend entirely on the monitor having a completely accurate picture of the defendant's finances and access to all of her accounts and sources of wealth. Given the Court's concerns about the defendant's candor, the Court should hesitate before trusting the defendant to be transparent with a monitor under her employ.

In any event, even if the Court were to accept the defendant's representations about her assets at face value, the defendant's proposal would leave the defendant with significant assets unrestrained. In particular, the defendant's proposal does not in any way restrain her $2 million townhouse in London, which she could live in or sell to support herself. Although the defendant asserts that the monitor would oversee any account into which the proceeds of the sale of the defendant's properties were deposited, the defendant does not explain how the monitor—or this Court—would have the authority to force the defendant to deposit foreign assets in a domestic account. As the Government has previously explained, the Government cannot realistically recover assets abroad. Accordingly, the defendant's proposal would leave her with access to at

least $2 million.  In addition, the defendant proposes that she retain an additional half a million dollars in liquid assets in an unrestrained account, as well as any future income.[2]  That figure appears to be in addition to the approximately $1 million in "chattels" the defendant has disclosed among her various assets.  *See* Dkt. 97, Ex. O at 9.  In short, the defendant's proposal would leave her with ample resources to fund her flight from prosecution.

Further still, the defendant's Motion provides only cursory details of the monitorship program she proposes, and it offers no legal precedent to explain what, if any, authority this Court has to establish and oversee such a monitorship.  Aside from defense counsel's assertions, the Motion offers nothing that would enable the Court to meaningfully consider the details of such a monitorship.  Among other things, it is unclear from the defendant's Motion whether such a program would require the defendant's voluntary compliance with the monitorship, or whether the funds would be placed in a bank account that the defendant could not access.  Given that the defendant's Motion suggests that attorney's fees could be disbursed without approval, it appears that the defendant's proposal would provide her latitude to engage in financial transactions, subject only to a review that would require her voluntary compliance.

Finally, although the defendant does not provide any detail about the amount of money she would pay the monitor, presumably the monitor would not undertake this responsibility for free.  As a result, the tension between the monitor's obligation to review the defendant's finances and the monitor's employment relationship with the defendant creates a conflict of interest.  But at bottom, if the Court determines that the only way to keep the defendant from using her assets to flee is to take away control of her assets, then she is too great a flight risk to release.

In sum, in light of this Court's determination that the defendant "has not been fully candid about her financial situation," the Court should reject the defendant's vague proposal.  (Dec. Op. at 2).  Nothing in the defendant's Motion should alter the Court's determination that the defendant poses a significant risk of flight, and that she has the resources and skills to flee prosecution.  The Court should reject the proposed bail conditions.

### 3.   The Defendant's Pending Pretrial Motions Have Not Diminished the Strength of the Government's Case

Finally, the defendant also argues that the "numerous substantive pretrial motions now before the Court amply challenge the purported strength of the government's case."  (Mot. at 7). But the defendant cannot merely point to the sheer volume of briefing she has filed to suggest that the strength of the Government's case has diminished.  To the contrary, as the Government has set forth in detail in its memorandum in opposition, the defendant's pretrial motions are entirely without merit.  In any event, it is premature for the defendant to claim that her pretrial motions— which have not been adjudicated, much less granted—have altered the Court's original

---

[2] The defendant's proposal also leaves unrestrained several million dollars in escrow for the defendant's legal fees.  *See* Dkt. 97, Ex. O at 9 (listing approximately $7.6 million in retainer fees); *see also* Mot. at 6.  If the defendant fled the country, her counsel would presumably be required to return those funds to the defendant, who would no longer need defense counsel in this case.

Page 9

determination that the Government's case is strong.

### IV.    Conclusion

The defendant continues to represent a "plain[]" risk of flight.  (Dec. Op. at 1).  Even assuming the Court has jurisdiction to grant this third bail motion, the two new bail conditions offer insufficient protection against the "substantial and actual risk of flight" this Court has already found that the defendant poses.  (*Id.* at 21).  The defendant's Third Bail Motion should be denied.

Respectfully submitted,

AUDREY STRAUSS
United States Attorney


By:    s/
Maurene Comey / Alison Moe / Lara Pomerantz
Assistant United States Attorneys
Southern District of New York


Cc: All Counsel of Record (By email)