UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x

UNITED STATES OF AMERICA,

      v.

                                           20 Cr. 330 (AJN)

GHISLAINE MAXWELL,

           Defendant.


-----------------------------------------------------------------------x


## REPLY MEMORANDUM OF GHISLAINE MAXWELL
## IN SUPPORT OF HER THIRD MOTION FOR BAIL


                                           Bobbi C. Sternheim
                                         Law Offices of Bobbi C. Sternheim
                                         33 West 19th Street - 4th Floor
                                         New York, NY 10011
                                         Phone: 212-243-1100


                                         Christian R. Everdell
                                         COHEN & GRESSER LLP
                                         800 Third Avenue
                                         New York, NY 10022
                                         Phone: 212-957-7600


                                         Jeffrey S. Pagliuca
                                         Laura A. Menninger
                                         HADDON, MORGAN & FOREMAN P.C
                                         150 East 10th Avenue
                                         Denver, CO 80203
                                         Phone: 303-831-7364


                                         *Attorneys for Ghislaine Maxwell*

**Preliminary Statement**

The issue before the Court, as it has been since Ms. Maxwell's first bail application, is whether conditions exist that can reasonably assure Ms. Maxwell's appearance at trial. On her third application (the "Third Bail Motion") (Dkt.160), Ms. Maxwell has put before the Court significant enhancements to the already extraordinary bail package previously presented to the Court in her renewed application for bail (the "Second Bail Motion") (Dkt. 97).[1] Together, these two motions present a unique and comprehensive bail package with the strictest of conditions known in any bail application:

- $28.5 million in bonds (including a $1M bond co-signed by a security company);
- $9.5 million in real property;
- $550,000 in cash;
- Asset Monitoring by a retired federal district court judge;
- Renunciation of British and French citizenship;
- Irrevocable written waivers of the right to contest extradition;
- Surrender of all travel documents;
- Home confinement in New York City;
- Electronic GPS monitoring;
- In-residence third-party custodian;[2]

---

[1] Ms. Maxwell's present motion (the "Third Bail Motion") (Dkt.160) incorporates her Memorandum in Support of Her Renewed Motion for Bail and accompanying exhibits (Dkt. 97, including Attachments 1-24) and her Reply Memorandum in Support of Her Renewed Motion for Bail (Dkt. 103, including Attachments 1-2) (collectively, the "Second Bail Motion").

[2] To assist Ms. Maxwell in making up for lost time preparing for her upcoming trial, one of her lawyers (not trial counsel) has agreed to reside with her and serve as an additional residential custodian.

- On-premises 24/7 private security to prevent Ms. Maxwell from leaving the residence without pre-approval by the Court or Pretrial Services and to escort her when authorized to leave the residence;

- Visitors to be pre-approved by Pretrial Services;

- Strict supervision by Pretrial Services;

- Such other terms as the Court deems appropriate.

The government goes to great lengths to oppose bail arguing technicalities and offering unfounded innuendo ripped from the tabloid headlines to avoid addressing the merits of Ms. Maxwell's exceptional bail package, which puts at risk everything she has, including the assets of her spouse and the financial security of her family and closest friends.

**The Court Retains Jurisdiction to Decide Matters Related to Bail**

The government asserts that the Court should not consider the present bail motion because appeal of denial of the Second Bail Motion, not yet briefed, is pending before the Second Circuit. (Dkt. 165 at 2-3). It is ironic that the government takes this position given that it created this problem by opposing Ms. Maxwell's request for an enlargement of time to file a notice of appeal to the Court's denial of her Second Bail Motion. Indeed, Ms. Maxwell sought the extension to avoid this very issue. (Dkt. 109). The government should not now be allowed to turn that procedural sword into a jurisdictional shield to prevent the Court from considering the instant motion.

Divestiture of jurisdiction in the district court while an appeal is pending is not a per se rule. Rather, it is a judicially crafted rule rooted in the interest of judicial economy that is designed to avoid confusion or waste of time resulting from having the same issues before two courts at the same time. Divestiture of jurisdiction, therefore, should not be automatic, but

instead guided by concerns of efficiency. Here, it is unclear whether interlocutory appeal of a district court's decision regarding bail "divests the court of its control over aspects of the case involved in the appeal." *United States v. Rodgers*, 101 F.3d 247, 251 (2d Cir. 1996). Were it so, a district court would have no authority to remand or modify bail conditions of a defendant released while the government appeals the grant of bail.  Such a rule would detract from, rather than promote, judicial economy and would be unworkable in practice.

Should the Court believe it does not have jurisdiction to decide the present bail motion, Ms. Maxwell will move the Circuit to withdraw her notice of appeal without prejudice and thereby remove any theoretical bar to this Court's jurisdiction over the present bail motion. Should the Court summarily deny the present motion on the merits, Ms. Maxwell will file a notice of appeal and request consolidation of both appeals.

**Renunciation of Foreign Citizenship is a Valid and Significant Condition of Release**

Relying on a letter from the French Ministry of Justice, the government urges the Court to give no weight to Ms. Maxwell's agreement to renounce her foreign citizenship. But the letter is wrong on the law and should be disregarded. The letter asserts that the loss of French nationality subsequent to the criminal act which the person is alleged to have committed does not affect the rule against the extradition of nationals, as nationality must be assessed at the time of commission of the offense and not at the time of the extradition request.  As discussed in the opinion from William Julié, French legal counsel (attached as Exhibit A), the government's assertion is entirely incorrect for the following reasons:

- The government's argument goes against the letter of the law.
- The government's argument goes against the spirit of the law.
- The government's argument is contradicted by precedent and case law.

(Julié Opinion ¶¶ 6-26).

3

The language of the extradition treaty between the United States and France and the applicable French statues are clear that anyone seeking to contest extradition on the basis of French citizenship must be a French national *at the time of the extradition request*. (*Id*. ¶ 11). The provisions on which the government relies were not intended to apply in cases where the person whose extradition is sought had lost French citizenship. To the contrary, it was designed to apply to individuals who had *acquired* French citizenship subsequent to the commission of the alleged crime "in order to avoid fraudulent nationality applications of offenders seeking to escape extradition." (*Id*. ¶¶ 15-16). If the person is no longer a French national at the time of the request, the provision does not apply. The government cites no case where the relevant statute was applied to protect a formerly French national from extradition, and we have found none ourselves. (*Id*. ¶¶ 19-21). By contrast, there are numerous examples of French courts *deporting* individuals who have lost French nationality following the commission of an offense. (*Id*. ¶ 21). Accordingly, Mr. Julié concludes: "[I]t cannot have been the intention of French lawmakers that Article 696-4 be construed as meaning that a person who has lost French nationality would still be entitled to be protected from extradition." (*Id*. ¶ 26).

Ms. Maxwell's agreement to give up both British and French citizenship and waive any and all right to contest extradition is a formidable challenge to the assertion that Ms. Maxwell would likely flee if released from custody and goes above and beyond the "reasonable assurances" that the Bail Reform Act requires to grant bail. While we maintain that Ms. Maxwell's written waivers of the right to challenge extradition should suffice, her willingness to forfeit citizenship birthrights exceeds what is necessary and profoundly demonstrates her commitment to abide by conditions of release and appear at trial.

**<u>Monitoring of Assets is a Valid and Significant Condition of Release</u>**

To address the Court's concern about Ms. Maxwell's access to assets, the bail motion proposed another extremely significant and restrictive bail condition – the imposition of a monitor to supervise the assets of Ms. Maxwell and her spouse and approve expenditures. Rather than suggest conditions to satisfy its concerns, the government urges the Court to summarily reject the proposed monitorship.

William S. Duffey, Jr., a retired federal district court judge and the former United States Attorney for the Northern District of Georgia, has agreed to undertake appointment by the Court as asset monitor. Judge Duffey has extensive experience evaluating and monitoring funds held in and disbursed from financial accounts. He has agreed to serve by appointment of the Court in a capacity similar to other trustees and receivers who serve as officers of the Court and are entrusted, pursuant to court order, with oversight authority to restrain, monitor, and approve disbursement of assets requiring his signature. Similar to others who have been appointed by courts to oversee financial matters, Judge Duffey will be compensated at the same hourly rate billed for his services as an ADR panelist for Federal Arbitration (FedArb).

The proceeds from the sale of Ms. Maxwell's London home will be restrained and monitored by Judge Duffey. As required by court order, documentation concerning the proceeds of the sale will be provided to Judge Duffey and the funds will be deposited in the financial account approved by Judge Duffey.

The government tries to steer the Court's attention to allegations of Ms. Maxwell's lack of candor to dissuade the Court from considering the proposed monitorship as a meaningful restraint on the assets of Ms. Maxwell and her spouse. As previously stated, despite being questioned by Pretrial Services following a period of solitary confinement, suicide watch, sleep

5

deprivation, and other conditions adverse to her physical health and mental well-being, Ms. Maxwell responded appropriately and accurately to questions posed by Pretrial Services which were restricted to her personal assets. Since then, financial documents - collected and professionally vetted by a highly respected accounting firm – have been submitted to the government and the Court and provide full details and supporting documentation concerning Ms. Maxwell's personal assets and those jointly held with the spouse. Further, no valid challenge has been made to those submissions.

The government challenges the Court by inanely stating that if "the only way to keep the defendant from using her assets to flee is to take away control of her assets, then she is too great a risk to release." (Dkt.165 at 8.) This statement is fundamentally illogical as it undermines most conditions of release. For example, the same could be said of electronic monitoring – i.e., if the only way to keep a defendant from fleeing the jurisdiction is to place him on home confinement with electronic monitoring, then he is too great a flight risk to release.[3] The Court should readily dismiss this frivolous argument. Under the Bail Reform Act, if there are appropriate conditions for release, bail should be granted. The conditions collectively proposed in the previous and present bail applications provide ample assurance that Ms. Maxwell will be present at trial.

---

[3] Moreover, in an effort to further obfuscate the merits of Ms. Maxwell's bail application, the government desperately argues that funds for legal services, presently held in attorney escrow accounts, would be released and made available to support Ms. Maxwell as a fugitive. To suggest that defense counsel would become accomplices to a violation of a court order shows utter disrespect for Ms. Maxwell's defense team. In particular, New York counsel, who have spent the entirety of their legal careers practicing in this district and establishing well-respected reputations among the bench and bar, take umbrage at the government's callous assertion.

**Conceded Problems Undermine the Strength of the Government's Case**

As Ms. Maxwell's period of detention passes the nine-month mark, the government has continuously upgraded Ms. Maxwell from a "plain [ ] risk of flight" to a "substantial and actual risk of flight" to a "serious flight of risk" and now to an "extreme risk of flight." (Dkt. 165 at 1.) Ironically, her level of flight risk increases as the strength of government's case against her diminishes. Ms. Maxwell has challenged the strength of the government's case in pretrial motions pending before the Court. Among other things, Ms. Maxwell has persuasively argued that the Non-Prosecution Agreement entered into by Jeffrey Epstein in 2007, which immunizes "any potential co-conspirators of Epstein," bars Ms. Maxwell's prosecution in this case, and that the counts charging her with alleged sexual abuse are time-barred.

The government's response to Ms. Maxwell's pretrial motions shines further light of the weaknesses of its case. For example, the government concedes it cannot establish that either Ms. Maxwell or Epstein ever caused, or sought to cause, Accuser-3[4] to travel while she was a minor or that she was underage when she allegedly engaged in sex acts with Epstein. (*See* Opp.162-65 & fn. 57-58.)[5] Hence, her allegations cannot support the conspiracies charged in the Indictment, leaving the government with only two witnesses to prove the charges against Ms. Maxwell. More importantly, in connection with the government's response, it produced documents indicating that government prosecutors misled a federal judge to obtain evidence against Ms. Maxwell (*see, e.g.,*. Opp. Ex. 4-7) - a shocking revelation that undermines the viability of the perjury counts, not to mention the integrity of the entire

---

[4] Accuser-3 is identified in the Indictment as "Minor Victim-3."

[5] "Opp." references are to page numbers of the Government's Omnibus Memorandum in Opposition to Defendant's Pre-Trial Motions, dated February 26, 2021 and not yet publicly filed.

prosecution.

The ongoing review of discovery confirms the lack of evidence in support of the stale allegations in the indictment. Further, the government's concessions reveal that it failed to properly investigate the allegations of at least one of its three core witnesses. The passage of time continues to reveal information and lack of evidence that undermine the purported strength of the government's case.

**Bail Must Be Granted**

The detention of Ms. Maxwell on 25-year-old allegations – based on the lowest grade misdemeanor under New York Penal Law 130.55[6] – presented in a sensationalized indictment containing pictures to inflame the public and entice and feed the media frenzy[7] – is unwarranted in the face of the unique bail package before the Court. Relentless media coverage of Ms. Maxwell, which preceded and impacted the bringing of this prosecution, has increased significantly since her arrest and detention. Ms. Maxwell's continued detention – providing daily fodder for media for the past nine months–continues to severely undermine her presumption of innocence.

In the face of this enhanced bail package, the government's claim that Ms. Maxwell poses "an extreme risk of flight" rings hollow. The government urges the Court to apply a standard that defies the law - an absolute guarantee against all risks. *See United States v. Orta*, 760, F.2d 887, 888 n.4 (8th Cir. 1985) ("The legal standard required by the [Bail Reform] Act is one of reasonable assurances, not absolute guarantees."). Under the Bail

---

[6] Counts Two and Four allege violations of New York Penal Law § 130.55 - sexual abuse in the third degree - a class B misdemeanor punishable by maximum penalties of three months in jail or one year probation.

[7] What other purpose could be served by the inclusion of a picture of Ms. Maxwell and Jeffrey Epstein taken over a dozen years after the period of the conspiracy alleged and pictures of three high-value residences?

8

Reform Act, Ms. Maxwell must be released unless there are "no conditions" that would reasonably assure her presence. Here, the proposed bail package - uniquely strengthened by Ms. Maxwell's agreement to renunciate her foreign citizenship and have assets monitored by a retired federal district court judge - satisfies the actual governing standard.

To find there are absolutely no conditions to satisfy flight risk of a 59-year-old woman with no criminal history, who poses no danger to the community, who has made America her home for the past 30 years, and who has established strong roots and forged important connections with family and friends who reside here, is incredulous. The concerns regarding foreign citizenship and restraint of assets have been addressed. To say that renunciation of foreign citizenship and strict monitoring of assets by a retired federal district court judge does not suffice when combined with an eight-figure bond secured by real property and cash and the strictest terms of home confinement and electronic monitoring strains credulity. The government gains a strategic advantage each day Ms. Maxwell remains in custody – her case is tried daily in the court of public opinion based on allegations that are inadmissible in a court of law; the likelihood of seating jurors who are not implicitly biased against her is being severely jeopardized; her physical strength and concentration are becoming increasingly impaired by the conditions of her confinement; and she is being denied a full and fair opportunity to prepare her case for trial.[8]

---

[8] Ms. Maxwell continues to experience difficulty reviewing electronic discovery, including discs that can only be reviewed on the MDC computer but are not readable on that computer, and thousands of pages still not readable on either the MDC computer or the laptop. Her receipt of legal mail – including pretrial motions, responses and replies – are constantly delayed even after tracking information confirms delivery to the MDC. The visiting rooms in the East Building, where Ms. Maxwell is detained, have been reviewed by an HVAC expert retained by the Federal Defenders of New York and have been characterized as a "death trap." The MDC claims it is in the process of installing HEPA filters, a request long overdue in light of concerns regarding ventilation in legal visiting rooms raised early in the pandemic. The alternative – to meet in the open-area where social visiting had been conducted- affords no privacy for confidential attorney-client communication, especially under constant oversight by Ms.

**Conclusion**

The Court should grant bail for Ms. Maxwell on the extraordinary conditions proposed. Should the Court determine that additional conditions are necessary, Ms. Maxwell is willing to satisfy and abide by those terms as well.

Dated: March 16, 2021

                                              Respectfully submitted:

                                              *Bobbi C. Sternheim*

                                              Bobbi C. Sternheim
                                              Law Offices of Bobbi C. Sternheim
                                              33 West 19th Street - 4th Floor
                                              New York, NY 10011
                                              Phone: 212-243-1100

                                              Christian R. Everdell
                                              COHEN & GRESSER LLP
                                              800 Third Avenue
                                              New York, NY 10022
                                              Phone: 212-957-7600

                                              Jeffrey S. Pagliuca
                                              Laura A. Menninger
                                              HADDON, MORGAN & FOREMAN P.C
                                              150 East 10th Avenue
                                              Denver, CO 80203
                                              Phone: 303-831-7364

                                              *Attorneys for Ghislaine Maxwell*

---

Maxwell's guards and a hand-held camera focused on both Ms. Maxwell and counsel. Further, confidential attorney-client communications conducted during video teleconferencing (VTC) are now further compromised by the repositioning of a camera with sensitive audio recording, putting a chill on privileged communication. During VTC conferences, counsel can hear conversation among the guards, so it is likely that the guards, who seem to be writing during those sessions, are able to hear discussions between Ms. Maxwell and counsel. Last night, prior to the filing of defense replies to Ms. Maxwell's pretrial motions, the MDC refused her request to speak with her lawyers to provide information bearing on those filings,. Such denial violates the BOP's Program Statement pertaining to providing legal calls upon request of pretrial inmates. *See* https://www.bop.gov/policy/progstat/7331_004.pdf at par. 24(c). The chronic difficulties related to Ms. Maxwell's review of the millions of documents of electronic discovery are continuing to negatively impact her ability to prepare for a trial that is only a few months away.

EXHIBIT A

**William Julié**
avocat à la cour – attorney at law

March 14th 2021

**Re: Additional opinion on the extradition of nationals by the French government**

1. This memorandum was written pursuant to a request from Olivier Laude, a partner at the French firm Laude Esquier Champey acting on behalf of Cohen & Gresser LLP as counsel for Ms Ghislaine Maxwell. The request was made in the context of ongoing bail proceedings involving Ms Maxwell in the United States of America (hereafter "USA"), where Ms Maxwell is being detained pre-trial on charges relating to her alleged role in sexual activities involving Jeffrey Epstein from 1994 to 1997.

2. In a previous opinion, I have outlined why French authorities could decide to execute an extradition request against a French citizen under the Extradition Treaty between the USA and France, without violating any superior norm of French and international law.

3. As I understand the defendant's French nationality continues to be regarded by the Court as a bar to her release pending trial, I am informed that the defendant is prepared to renounce French nationality under Article 23-4 of the French Civil Code, if the Court so requires.

4. In a letter to the Department of Justice dated 9 March 2021, the Head of the International Criminal Assistance Bureau of the French Ministry of Justice, Mr Philippe Jaeglé, asserts that the loss of French nationality after the criminal act which the person is alleged to have committed does not affect the rule against the extradition of nationals, as nationality must be assessed at the time of commission of the offence and not at the time of the extradition request.

5. This report was written to provide a counter opinion on this issue, in support of the proposition that the French government would be legally entitled to execute an extradition request against an individual who is no longer a French national.

6. The Ministry of Justice's assertion must be regarded as incorrect for three reasons:

    (i) It is not supported by the letter of the law;

(ii) Nor is it supported by the spirit of the law;

(iii) Case law and precedents in fact suggest the opposite.

7. ***First, the Ministry's interpretation goes against the letter of the law.***

8. American extradition requests are principally governed by the Extradition Treaty between the USA and France of 23 April 1996 ("the Treaty") and the French Code of Criminal Procedure for matters not dealt with under the Treaty. [1]

9. Article 3(1) of the Treaty provides:

> "There is no obligation upon the Requested State to grant the extradition of *a person who is a national of the Requested State,* but the executive authority of the United States shall have the power to surrender a national of the United States if, in its discretion, it deems it proper to do so. The nationality of the person sought shall be the nationality of that person at the time the offense was committed".

10. Article 696-4 of the French Code of Criminal Procedure provides for the same rule, under similar wording:

> "Extradition shall not be granted:
> 1° *When the person claimed has French nationality*, the latter being assessed at the time of the offense for which extradition is requested"

11. Under a literal reading of these provisions, the nationality protection only applies where French authorities are faced with an extradition request against a person who is a French national *at the time of the extradition request*. Both the Treaty and the French Code of

---

[1] Other relevant international treaties include: the Agreement on Extradition between the United States of America and the European Union signed in Washington on 25 June 2003, and the Instrument Amending the Treaty of 23 April 1996 between the United States of America and France signed in the Hague on 30 September 2004.

2

51, RUE AMPÈRE - 75017 PARIS - TÉL. 01 88 33 51 80 – FAX. 01 88 33 51 81
wj@wjavocats.com - www.wjavocats.com - PALAIS C1652

Criminal Procedure use the present tense ("a person who *is* a national of the Requested State"/"the person claimed *has* French nationality"), which can only mean that the extradition of a person is denied when that person *is* in fact a French national. If the person is no longer a French national at the time of the request, the provision does not apply.

12. Had these provisions been intended to apply in cases where the person has lost French nationality subsequent to the commission of the alleged crime, the texts would have expressly stated so or would at least have used both the present and the past tense to qualify the national affiliation of the requested person.

13. Furthermore, it is a well-known principle of legal interpretation across all jurisdictions that exceptions to rules must be construed strictly. The nationality ban being an exception to extradition, it must be interpreted in a restrictive manner and its application to a person who is no longer a French national must be rejected.

14. ***Second, the Ministry's interpretation goes against the spirit of the law***

15. The literal reading of Article 3 of the Treaty and Article 696-4 of the French Code of Criminal Procedure is further supported by the fact that these provisions were in fact not intended to apply in cases where the person sought has lost French citizenship, but only in cases where that person has *acquired* French citizenship subsequent to the commission of the alleged crime.

16. In other words, the rule that "nationality shall be assessed at the time of the offence for which extradition is requested" seeks to deny the extension of the benefit of French nationality to persons who have acquired French nationality after committing an offence, in order to avoid fraudulent nationality applications of offenders seeking to escape extradition.

51, RUE AMPÈRE - 75017 PARIS - TÉL. 01 88 33 51 80 — FAX. 01 88 33 51 81
wj@wjavocats.com - www.wjavocats.com - PALAIS C1652

WILLIAM JULIÉ
AVOCAT À LA COUR – ATTORNEY AT LAW

17. This concern over opportunistic nationality applications is precisely the justification of the rule mentioned in academic literature (see for example *Répertoire de droit pénal et de procédure pénale Extradition Pén. – Conditions de fond de l'extradition – Delphine Brach-Thiel–October 2018, §59*).

18. ***Third, the French Ministry of Justice's interpretation is contradicted by precedents and case law***

19. The French Ministry of Justice's interpretation finds no support in case law, as no case can be found where Article 696-4 of the French Code of Criminal Procedure was applied to protect a formerly French national from extradition.

20. Instead, precedents exist in which Article 696-4,1° of the French Code of Criminal Procedure was relied on by French authorities to execute an extradition request against an individual who had acquired French nationality *after* committing an offence, which is the natural use of this provision (for example, a ruling issued by the Criminal Chamber of the French Cour de cassation on 4 January 2006, n°05-86.258).

21. Although we have found no precedent where French authorities were faced with the *extradition* of a person who had lost French nationality, we have found cases where French authorities were faced with the *deportation* of a person who had lost French nationality. Both extradition and deportation allow for the removal of a person from French territory by the police and its surrender to the authorities of a third State, with the consent and cooperation of the authorities of that State.

22. The European Court of Human Rights (the "ECtHR") treats extradition and deportation analogously. More specifically, the ECtHR considers that the same human rights bars apply to all types of removal of a person from the territory of a State party ("*the Court considers that the question whether there is a real risk of treatment contrary to Article 3 in another State cannot depend on the legal basis for removal to that State. The Court's own case-law has shown that, in practice, there may be little difference between*

4

*extradition and other removals*", ECtHR 12 April 2012, *Babar Ahmad and Others v. the United Kingdom*, no. 24027/07, §168).

23. France has no difficulty with deporting individuals who have lost French nationality by application of Article 25 of the Civil Code, which enumerates the list of crimes that may give rise to a deprivation of citizenship. For example, a dual French-Algerian citizen named Djamel Beghal was recently deported to Algeria after he was convicted of terrorist offences and subsequently deprived of his French nationality[2].

24. While in custody in France, Djamel Beghal was also convicted in absentia to a term of prison in Algeria, but his extradition initially seemed impossible, not because he used to be a French citizen, but because the case law of the ECtHR specifically prohibits State parties from deporting persons deprived of their nationality to the State of which they remain a national, when there is a risk of torture or degrading treatment[3]. Beghal was eventually deported to Algeria where he was arrested upon landing for the purpose of standing trial. In this case, the French government's decision to deprive Djamel Beghal of his French nationality was clearly intended to allow for his removal from France, whether through extradition or deportation, as both means of removal were conceivable at the time. Had there not been a risk of violation of the ECHR at the time of the Algerian extradition request, he may well have been extradited as opposed to deported a few years later, when that risk was eliminated.

25. In any case, the deportation of formerly French citizens shows that the loss of French nationality prevents any retroactive application of domestic provisions which are intended to protect French nationals, be it from deportation or extradition.

---

[2] https://www.lemonde.fr/societe/article/2018/07/16/incertitude-sur-le-sort-de-l-islamiste-djamel-beghal-qui-sort-de-prison-lundi_5332053_3224.html
[3] ECtHR 3 December 2009, *Daoudi* v. France, application no. 19576/08.
or 4 sept. 2014, *Trabelsi c. Belgique*, req. n° 140/10, 17 janv. 2012, *Othman c. Royaume-Uni*, req. n° 8139/09. For more details, http://www.revuedlf.com/cedh/eloignement-des-etrangers-terroristes-et-article-3-de-la-convention-europeenne-des-droits-de-lhomme/

5

**William JULIÉ**
avocat à la cour — attorney at law

26. In these circumstances, it cannot have been the intention of French lawmakers that Article 696-4 of the French Code of Criminal Procedure be construed as meaning that a person who has lost French nationality would still be entitled to be protected from extradition since the French government has on several occasions deported to third countries individuals who had been deprived of their French nationality following the commission of criminal offences.

William JULIÉ
*Avocat à la Cour*



6