UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

UNITED STATES OF AMERICA,

-v-

JOSHUA ADAM SCHULTE,

          *Defendant.*

------------------------------------------------------------X

S3 17 Cr. 548 (PAC)

**OPINION & ORDER**

Defendant Joshua Adam Schulte ("Defendant" or "Schulte") is a former employee of the Central Intelligence Agency ("CIA") who is charged with stealing national defense information from the CIA and transmitting it to Wikileaks. Schulte initially proceeded to trial in February 2020. The jury returned a guilty verdict on two counts, but failed to reach a unanimous verdict on the national security charges. The Defendant moved for a mistrial with respect to those counts, which the Court granted.

Shortly after the first trial ended, New York City emerged as the global epicenter of the COVID-19 pandemic. As a result, the majority of in-person proceedings throughout the Southern District of New York were suspended. Grand juries and jury trials were no exception. Nevertheless, on June 8, 2020, the Government obtained a third superseding indictment (the "Indictment") in anticipation of a second trial.

Schulte now moves to dismiss the Indictment on the grounds that the grand jury venire that returned the Indictment did not reflect a fair cross-section of the community, in violation of the Fifth and Sixth Amendments, and the Jury Selection and Service Act of 1968 ("JSSA"), 28 U.S.C. § 1861 *et seq*. For the reasons set forth below, Schulte's motion is **DENIED**.

1

## BACKGROUND

### I. Procedural History

Following an extensive investigation by law enforcement authorities, Schulte was arrested in August 2017 on suspicion of leaking national defense information that he had obtained while working for the CIA. (Schulte Br. at 2, ECF 435; Gov't Opp. Br. at 1, ECF 444.) Schulte has been in custody since his arrest. (Gov't Opp. Br. at 1.)

On June 18, 2018, an indictment charged Schulte with thirteen counts of espionage and other offenses. (*See id.*) On October 31, 2018, the Government obtained a superseding indictment, which incorporated the same offenses as the initial indictment but added two additional counts of unlawful disclosure and criminal contempt of court. (*See id.* at 1–2.)

On February 2, 2020, Schulte proceeded to trial on the eleven national security related charges. (*Id.* at 2.) On March 9, 2020, the jury returned a guilty verdict on two counts: (1) making false statements to law enforcement, in violation of 18 U.S.C. § 1001, and (2) criminal contempt of court, in violation of 18 U.S.C. § 401(3). (*Id.*; Schulte Br. at 2.) The jury, however, was unable to reach a unanimous verdict with respect to the remaining eight national security charges. (Schulte Br. at 2.) Accordingly, the Court granted the Defendant's motion for a mistrial on those counts. (Gov't Opp. Br. at 2.)

Immediately following the trial, New York City emerged as the global epicenter of the COVID-19 pandemic. *See Hopkins Hawley LLC v. Cuomo*, No. 20-CV-10932 (PAC), 2021 WL 465437, at *1 (S.D.N.Y. Feb. 9, 2021) (describing the COVID-19 pandemic's effects on New York City). As a result, the vast majority of in-person proceedings throughout the Southern District of New York (the "District") were substantially dialed back or suspended altogether. *See, e.g.*, Standing Order, M-10-468 (CM) (S.D.N.Y. April 20, 2020). Grand juries and jury

2

trials were not spared. *See id.* On June 8, 2020, however, the Government sought and obtained a third superseding Indictment from a grand jury sitting in the District's White Plains courthouse. (Schulte Br. at 2; Gov't Opp. Br. at 2.) The Indictment charges Schulte with nine criminal counts relating to his alleged transmission of national defense information to WikiLeaks. (ECF 405.) According to the Government, the White Plains grand jury that returned the superseding Indictment was the sole grand jury empaneled at the time. (Gov't Opp. Br. at 14.)

## II. Motion to Dismiss

Schulte now moves to dismiss the Indictment on the grounds that it was unlawfully obtained in violation of (1) the Fifth Amendment's Due Process clause; (2) the Sixth Amendment's fair cross-section requirement; and (3) the JSSA. (ECF 435.) He primarily contends that the White Plains grand jury venire—from which the Indictment was obtained—did not reflect a fair cross-section of the African American and Hispanic American populations in the community. And he contends that these effects are symptomatic of the exclusionary processes that are inherent in the District's jury selection system. Relatedly, Schulte argues that the Government's decision to seek the Indictment from White Plains was improperly made.

## III. The District's Jury Plan

To understand Schulte's claims, it is necessary to orient ourselves to some background knowledge of the District's jury selection process. Under the JSSA, each federal district court must "devise and place in operation a written plan for random selection of grand and petit jurors." 28 U.S.C. § 1863(a). The District's jury selection plan ("Jury Plan"), which has been in existence since 2009, provides the blueprint for the random selection of grand and petit jurors throughout the District. *See Amended Plan for the Random Selection of Grand and Petit Jurors in the United States District Court for the Southern District of New York* (hereinafter "Jury

3

Plan"), https://www.nysd.uscourts.gov/sites/default/files/pdf/juryplan_feb_2009.pdf.

The Jury Plan operates as follows. Every four years, following the date of the Presidential Election, two master jury wheels are constructed: one for Manhattan and one for White Plains. *See id.* These master wheels, in turn, are filled with names that are randomly drawn from voter registration lists of the various counties that make up the District. *Id.* The Jury Plan provides that "the number of names drawn from each county should be proportionate to the number of registered voters in that county." *Allen*, 2021 WL 431458, *1.

The two master wheels draw from a different array of counties. The Manhattan master wheel randomly draws names from New York, Bronx, Westchester, Putnam, and Rockland, while the White Plains master wheel draws names from Westchester, Putnam, Rockland, Orange, Sullivan and Dutchess. *See Allen*, 2021 WL 431458, *1. Because Westchester, Putnam, and Rockland counties are included in both master wheels, the Jury Plan instructs that the names from these counties be "apportioned among the two master wheels to 'reasonably reflect the relative number of registered voters of each county.'" *See id.*

"Periodically, names are drawn from the master wheels 'in an amount sufficient to meet the anticipated demands for jurors for the next six months.'" *Id.* (quoting Jury Plan). Those who are drawn from the master wheels are sent jury questionnaires,[1] which determine whether a person is qualified to serve on a jury. *Id.* Jurors who meet the qualification requirements are then placed in the respective qualified wheels for Manhattan and White Plains. *Id.* Finally, as

---

[1] The Jury Plan bases its qualification criteria on neutral standards such as the ability to speak English, citizenship and age, mental capacity, and criminal record. (*See* Gov't Opp. Br. at 5.) Moreover, certain individuals are exempted from jury service by virtue of their professional occupations. (*See id.*) Finally, the Jury Plan also provides a carve-out for individuals who can demonstrate "undue hardship or extreme inconvenience" on a case-by-case basis. (*See id.*)

4

"jurors are needed in each courthouse, names are drawn from each qualified wheel and summonses are sent to those individuals." *Id.*

## APPLICABLE LAW

### I. Sixth Amendment

A "representative jury array remains the expression of the community's role in securing" an impartial trial. *Alston v. Manson*, 791 F.2d 255, 256 (2d Cir. 1986). In recognition of that promise, the Sixth Amendment guarantees a defendant the right to a jury venire drawn from a fair cross-section of the community.[2] *Taylor v. Louisiana*, 419 U.S. 522, 530 (1975). To establish a *prima facie* violation of the fair cross-section requirement, a defendant must prove each of the following elements:

(1) That the group alleged to be excluded is a distinctive group in the community;

(2) That the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and

(3) That this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren v. Missouri*, 439 U.S. 357, 364 (1979).

Demonstrating a *prima facie* violation of the fair cross-section requirement, however, is not enough to prevail under the Sixth Amendment. *Id.* at 367. Under Supreme Court teachings, "States remain free to prescribe relevant qualifications for their jurors and to provide reasonable exemptions so long as it may be fairly said that the jury lists or panels are representative of the community." *Id.* (quoting *Taylor*, 419 U.S. at 538). Accordingly, the Government may rebut the

---

[2] The fair cross-section guarantee has been understood to apply in the context of both grand and petit juries. *See United States v. Osorio*, 801 F. Supp. 966, 973 (D. Conn. 1992).

5

defendant's *prima facie* case by showing a "significant state interest" behind the jury selection process at issue.

## II. Fifth Amendment

The Equal Protection clause of the Fifth Amendment similarly forbids the exclusion of racial minorities from grand and petit juries.[3] *Castaneda v. Partida*, 430 U.S. 482, 492 (1977). To raise a plausible equal protection challenge against a jury selection system, the defendant must show (1) a cognizable group; (2) that is substantially underrepresented; and (3) that the selection procedure is not racially neutral. *Alston*, 791 F.2d at 257. Although this three-part test resembles the Sixth Amendment framework, there is a critical difference: in contradistinction to a fair cross-section challenge brought under the Sixth Amendment, an equal protection claim must allege intentional discrimination by the jury selection system at issue. *See id.* ("The equal protection clause . . . condemns underrepresentation of minorities only if it is the product of intentional discrimination."); *see also United States v. Rioux*, 97 F.3d 648, 659 (2d Cir. 1996).

## III. The JSSA

Finally, the JSSA sets forth the Nation's policy that: "all litigants in Federal court entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes." 28 U.S.C. § 1861. The Second Circuit has held that fair cross-section challenges brought under the JSSA must also be analyzed using the Sixth Amendment's *Duren* test. *See United States v. LaChance*, 788 F.2d 856, 864 (2d Cir. 1986). Thus, if a fair cross-section challenge fails under the Sixth Amendment, it also fails under the JSSA. *See id.* ("[B]ecause the *Duren* test governs fair cross

---

[3] The Supreme Court has incorporated the Fourteenth Amendment's Equal Protection clause into the Fifth Amendment. *See Bolling v. Sharpe*, 347 U.S. 497, 499 (1954)

6

section challenges under both the Act and the sixth amendment, our discussion of the statutory challenge also disposes of his constitutional claim.").

In addition to fair cross-section claims, a defendant may also assert other violations of the JSSA if those violations constitute a "substantial failure to comply with its provisions." *Id.* at 870 (cleaned up); *Allen*, 2021 WL 431458, at *4. "Mere technical violations" of the JSSA, however, are not actionable. *LaChance*, 788 F.2d at 864 (cleaned up). "Whether a violation is substantial or merely technical depends upon the nature and extent of its effects on the wheels and venire from which a defendant's grand jury was derived." *Id.* (cleaned up).

## ANALYSIS

### I. Fair Cross-Section Challenge

Because Schulte's fair cross-section claim arises under both the Sixth Amendment and the JSSA, he must meet the three-part test set forth under *Duren*. *See LaChance*, 788 F.2d at 870.

The parties do not dispute that the first element under *Duren* has been satisfied. That element asks whether "the group alleged to be excluded is a distinctive group in the community." *Duren*, 439 U.S. at 364. Here, Schulte alleges that African American and Hispanic American jurors were unlawfully excluded from the jury venire. (Schulte Br. at 7.) These groups have been recognized as "distinctive" by the Second Circuit. *Rioux*, 97 F.3d at 654 ("Rioux has satisfied the first prong of the *Duren* test: Blacks and Hispanics are unquestionably "distinctive" groups for the purposes of a fair-cross-section analysis."); *United States v. Barnes*, 520 F. Supp.2d 510, 514 (S.D.N.Y. 2007). Schulte has therefore satisfied the first element under *Duren*. The Court holds, however, that Schulte cannot establish the second and third elements of the *Duren* test. Accordingly, his fair cross-section challenge must be rejected.

### A. *Underrepresentation*

The second element under *Duren* examines whether the groups' representation "in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community." 439 U.S. at 364. To answer this question, however, the Court must first define the relevant variables, namely (a) the jury venire and (b) the community.

#### i. **Relevant Jury Venire**

The parties dispute which jury pool ought to be used to analyze the Defendant's fair cross-section challenge. Schulte relies on *United States v. Rioux*, 97 F.3d at 648, and contends that the White Plains qualified wheel is the relevant jury venire. (Schulte Br. at 8.) The Government argues that the White Plains master wheel constitutes the appropriate jury venire. (Gov't Opp. Br. at 15.) The Court agrees with the Government.

"Neither the Supreme Court nor the Second Circuit has defined the 'relevant jury pool' with any specificity." *United States v. Rioux*, 930 F. Supp. 1558, 1565 (D. Conn. 1995) (examining caselaw); *see also Allen*, 2021 WL 431458 (stating that the "Second Circuit has not stated a preference for the use of one wheel over the other"). In *Rioux*, for example, the Second Circuit observed that the "relevant jury pool may be defined by: (1) the master list; (2) the qualified wheel; (3) the venires; or (4) a combination of the three." 97 F.3d at 655–56. Although the *Rioux* court did designate the qualified jury wheel as the relevant venire, *see id.*, that conclusion only followed because the parties *agreed* "that the qualified wheel may serve as the relevant jury pool." *Id.* That is not the case here, so the Court finds *Rioux* to be of little impact.

Instead, the Court concludes that the White Plains master wheel is the relevant jury venire. As noted by the Government (Gov't Opp. Br. at 16–18) several district courts within this

8

circuit have defined the relevant jury pool with reference to "the systematic defect identified by the defendant." *Rioux*, F. Supp. at 1565–66; *see Allen*, 2021 WL 431458, *5 (defining jury pool as both "the White Plains master wheel and the White Plains qualified wheel" because the defendants' allegations impacted both venires). Under that approach, the jury venire that bears the brunt of the defendant's allegations of systematic exclusion is determined to be the relevant jury pool. *See Allen*, 2021 WL 431458, *5; *Rioux*, F. Supp. at 1565–66. Here, Schulte's allegations of systematic exclusion center almost entirely on the juror selection procedures for the White Plains master wheel.[4] *See infra* 15–17. Accordingly, the appropriate venire is the White Plains master wheel.

### ii. Relevant Community

The most significant point of dispute between the parties is which counties constitute the relevant community. According to Schulte, the relevant community must be the counties that feed jurors to Manhattan because that is where his trial will be held. (Schulte Br. at 8; Schulte Reply at 3–5, ECF 454.) But the Government responds that the northern counties from which White Plains draws jurors represent the relevant community. (Gov't Opp. Br. at 9–14, 18.) The Court agrees with the Government.

As a preliminary matter, it should be noted that the Southern District is not statutorily divided into discrete divisions. *See* 28 U.S.C. § 112. Rather, the statutory law prescribes one District that is composed of the following counties: Bronx, Dutchess, New York, Orange, Putnam, Rockland, Sullivan, and Westchester. *See id.* Yet, what the statutory law leaves

---

[4] For example, if Schulte had alleged that the juror questionnaire form displayed systematic exclusion, *see supra* 4 n. 1, then the qualified wheel would be the appropriate jury venire for comparison. Because he does not do that, the master wheel must be the relevant venire.

9

undivided, the District's Jury Plan can divide territorially in the interests of "an impartial trial, of economy and of lessening the burden of attendance." *United States v. Gottfried*, 165 F.2d 360, 364 (2d Cir. 1948); *see* Jury Plan. Accordingly, the rationale justifying this territorial division is based on administrative feasibility. *See Allen*, 2021 WL 431458, at *1.

With this background in mind, the legal issue at hand becomes straightforward. The Second Circuit's decision in *United States v. Bahna*, 68 F.3d 19 (2d Cir. 1995), frames the inquiry and supplies its answer. In *Bahna*, a defendant was indicted, tried, and convicted of various narcotics crimes in the Eastern District of New York's Brooklyn courthouse. *Id.* at 20. But following his initial trial, the defendant was granted a new trial. *Id.* Saliently, the defendant's second trial occurred before a different judge and in a different venue—the Eastern District's Uniondale courthouse.[5] *Id.*

Of concern here, the defendant raised a fair cross-section challenge following his second conviction. *Id.* at 23–24. Under the Eastern District's jury plan, the Brooklyn courthouse drew jurors from *all* of the counties within the Eastern District, while the Uniondale courthouse only drew from Nassau and Suffolk counties. *See id.* at 24. Accordingly, the defendant argued that the Uniondale courthouse's jury wheel underrepresented African American and Hispanic American jurors in comparison to their demographics in the relevant community—which he alleged to be *all of the counties* making up the Eastern District. *Id.*

The Second Circuit, however, rejected that reasoning and held that, "Where a jury venire is drawn from a properly designated division, we look to *that division* to see whether there has

---

[5] The trial court stated that the reason for the transfer "was to accommodate trial congestion in the court's calendar during a period of judicial emergency in the Eastern District." *Soares v. United States*, 66 F. Supp. 2d 391, 397 (E.D.N.Y. 1999).

10

been any unlawful or unconstitutional treatment of minorities." *Id.* (emphasis added). And in applying this principle, the *Bahna* court concluded that the correct community was not the entire Eastern District, but the two counties—Nassau and Suffolk—comprising the Uniondale courthouse. *Id.* Thus because there was no underrepresentation shown between the Uniondale jury wheel (e.g. the jury venire) and the Uniondale counties (e.g. the community), the court rejected the defendant's fair cross-section challenge. *Id.*

Just as *Bahna* rejected the proposition that the relevant community was the entire Eastern District, this Court also rejects Schulte's contention that the relevant community is the Manhattan counties or the entire District. *See id.* Because Schulte's grand jury venire was drawn from White Plains, *Bahna* instructs the Court to "look to that division" as the relevant community in assessing his fair cross-section challenge. *See id.* The Court must therefore conclude that the White Plains counties represent the relevant community.

There is one caveat. The precursor to applying *Bahna*, of course, is that it must have been proper for the Government to have sought the Indictment from White Plains. 68 F.3d at 24 ("*Where a jury venire is drawn from a properly designated division*, we look to that division to see whether there has been any unlawful or unconstitutional treatment of minorities.") (emphasis added). And on this issue, Schulte contends that the Government's decision to seek the Indictment from White Plains "deviated from the established, court-tested, and constitutional practice of indicting defendants in the division in which the offenses allegedly occurred and in which the case will be tried." (Schulte Br. at 2.) This argument must be rejected for two reasons.

*First*, the Court finds no persuasive or binding authority that supports the premise that the Government must indict defendants in the same courthouse as where the trial is scheduled to

11

occur. Instead, it is well established in this circuit that the "Sixth Amendment does not entitle a defendant to be tried in a geographic location any more specific than the District where the offense was allegedly committed," *United States v. Plaza-Andrades*, 507 F. App'x 22, 26 (2d Cir. 2013), and that a "jury may be drawn constitutionally from only one division and not the whole district," *Bahna*, 68 F.3d at 25 (citing *Ruthenberg v. United States*, 245 U.S. 480 (1918). It should come as no surprise then that a defendant may be indicted in one courthouse and tried in another, as long as the prosecution stays within the jurisdiction of the relevant district.[6] *See Andrades*, 507 F. App'x at 26; *see also* FED. R. CRIM. P. 18 (stating that "the government must prosecute an offense in a district where the offense was committed"); *cf. United States v. Fernandez*, 480 F.2d 726, 730 (2d Cir. 1973) ("[S]ince the theft of which Fernandez was convicted occurred in Queens, in the Eastern District of New York, trial in Westbury, in Nassau County, a county adjacent to Queens and within the District, rather than in Brooklyn, the headquarters of the Eastern District, does not offend the terms of these venue requirements.").

*Second*, the prevalence of this practice as well as the compelling justification for it in this case add further support for its propriety. As the Government points out, "it is common for cases to be indicted by grand juries sitting in the White Plains courthouse and tried in the Manhattan courthouse." (Gov't Opp. Br. at 4 (collecting cases).) And here, that practice was especially justified in light of the COVID-19 pandemic, which had all but brought grand juries and other in-person proceedings to a grinding halt during the summer of 2020. *See supra* 2–3. Thus, in considering this compelling justification, the Court is unpersuaded by Schulte's allegations that

---

[6] Because this case concerns the grand jury phase of criminal proceedings, the principles espoused in past precedents endorsing a flexible view of *trial venue requirements* ought to apply *a fortiori* in the grand jury context.

the Government had engaged in "prosecutorial gamesmanship" and forum shopping by seeking the Indictment from White Plains. Commonsense compels a contrary conclusion.

Finally, Schulte cites *United States v. Johnson*, 21 F. Supp. 2d 329 (S.D.N.Y. 1998), for the proposition that the relevant community is "widely understood to mean the 'district or division where the trial will be held.'" *Id.* at 334–35. The differing facts in *Johnson*, however, make that case distinguishable from the case at bar.

In *Johnson*, the defendants moved to dismiss an indictment obtained from White Plains on the ground that the fair cross-section requirement had been violated. *Id.* at 333. In assessing that claim, the *Johnson* court defined the relevant community as White Plains because that was "where the trial [was] to be held." *Id.* at 335. The key fact there, however, was that the defendants' grand and petit juries were *both* drawn from White Plains, *see id.*, which made it only logical to conclude that the White Plains counties represented the relevant community. *See id.* at 334–35. But the circumstances here are quite different; Schulte's grand and petit juries derive from different courthouses in the District. Accordingly, this factual distinction precludes application of *Johnson*'s conclusion that the relevant community is "the district or division where the trial is to be held."[7] *See* 21 F. Supp.2d at 334–35. Schulte's reliance on *Johnson* is misplaced.

### iii. Underrepresentation Analysis

Having determined the relevant jury venire and community, the underrepresentation analysis itself is clear-cut. The "primary approach used in this Circuit" is the absolute disparity method. *Barnes*, 520 F. Supp. 2d at 514 (examining case law); *see Allen*, 2021 WL 431458, at

---

[7] Alternatively, even if *Johnson* is undistinguishable, the Court is bound to apply *Bahna*, which bears directly on this case and is a holding of the Second Circuit.

13

*8 ("The absolute disparity method, on the other hand, appears to be the preferred method for analyzing jury underrepresentation under the Sixth Amendment in the Second Circuit."). The Court will therefore analyze the underrepresentation inquiry using the absolute disparity method.

The absolute disparity method measures the difference between the groups' representation in the relevant community and their representation in the jury venire. *See Rioux*, 97 F.3d at 655–56. For example, if African Americans compose 10% of the community but only 5% of the jury venire, the absolute disparity is 5%. *See id.* Under Second Circuit precedents, absolute disparities nearly as high as 5% have not been found to satisfy the underrepresentation element under *Duren*. *See United States v. Biaggi*, 909 F.2d 662, 677–78 (2d Cir. 1990) (holding absolute disparities of 3.6% and 4.7% were insufficient to satisfy *Duren*'s second element); *see also Rioux*, 97 F.3d at 658 (1.58% and 2.14% were insufficient); *Allen*, 2021 WL 431458, *8 (3.69% and 3.64% were insufficient); *Barnes*, 520 F. Supp. 2d at 515 (2.8% and 2.3% were insufficient).

The Court holds that the absolute disparities here fall comfortably within the outer limits provided by these past decisions. The parties do not dispute that African Americans make up 11.20% and Hispanic Americans make up 12.97% of the White Plains master wheel. (Gov't Opp. Br. at 20.) In the relevant community, African Americans make up 12.45% and Hispanic Americans 14.12% of the jury eligible population. (Schulte Reply at 6–7; Gov't Opp. Br. at 18.) Accordingly, the absolute disparities are 1.25% for African Americans (12.45% - 11.20%) and 1.15% for Hispanic Americans (14.12% - 12.97%). Because those figures fall comfortably within the tolerated disparities in past precedents, the Court concludes that Schulte has not met

the second element under *Duren*.[8] 439 U.S. at 364.

**B.** *Systematic Exclusion*

Apart from the second *Duren* element, Schulte's fair cross-section challenge must also fail because he cannot meet the third element: systematic exclusion, which requires a showing that the "underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Duren*, 439 U.S. at 364.

In *Rioux*, the Second Circuit explained that there is "systematic exclusion when the underrepresentation is due to the system of jury selection itself, rather than external forces." 97 F.3d at 658. Under the external forces principle, outside causes of underrepresentation (such as "demographic changes") do not constitute systematic exclusion. *Id.*; *see, e.g.*, *Schanbarger v. Macy*, 77 F.3d 1424 (2d Cir. 1996) (per curiam) (jury selection process "drawn from voter registration lists" did not constitute systematic exclusion); *United States v. Little Bear*, 583 F.2d 211, 414–15 (8th Cir. 1978) ("inclement weather" in North Dakota that allegedly led to the underrepresentation of rural jurors was not systematic exclusion); *United States v. Jones*, 2006 WL 278248, at *3 (E.D. La. Feb. 3, 2006) (Hurricane Katrina's alleged disparate impact on potential African-American jurors was not systematic exclusion). The lion's share of Schulte's systematic exclusion allegations is foreclosed by this principle.

*First*, Schulte contends that the Government systematically excluded African American and Hispanic American jurors by seeking the Indictment in White Plains in lieu of the more racially diverse Manhattan community. (Schulte Br. at 2.) But the reason the Government

---

[8] Even if, as Schulte suggests, the White Plains qualified wheel is used as the relevant jury venire, the absolute disparities would be 3.69% and 3.64%. (See Gov't Opp. Br. at 20.) Those statistics do not reflect Constitutional infirmities under Second Circuit teachings.

15

proceeded this way was because of an external force: the COVID-19 pandemic and its substantial curtailment of in-person proceedings throughout the District. *Rioux*, 97 F.3d at 658. This allegation therefore does not establish systematic exclusion.

*Second*, Schulte argues that the Jury Plan's replenishment of the master wheels only once every four years constitutes systematic exclusion. (Schulte Br. at 14.) According to Schulte, the four-year period causes addresses to grow "stale" as people move to new residences, and because African Americans and Hispanic Americans are, on average, younger and thus more likely to move, he argues that these groups are systematically excluded. (*See id.* 14–15.) But even granting the dubious premises that make up this deductive reasoning, the Court remains unpersuaded because, again, the true cause of the exclusion—younger people moving more often—is an external force, not a systematic defect inherent in the Jury Plan. *Rioux*, 97 F.3d at 658 (concluding that a jury system that led to undeliverable questionnaires did not constitute systematic exclusion). At bottom, the Court cannot charge the District's Jury Plan with a Sixth Amendment violation because of how often people move residences throughout the District.

*Third*, Schulte asserts that the Jury Plan's exclusive reliance on voter registration lists constitutes systematic exclusion. This claim, however, is foreclosed by the Second Circuit's decision in *Schanbarger*. *See* 77 F.3d at 1424 ("[A] jury venire drawn from voter registration lists violates neither the Sixth Amendment's fair cross-section requirement nor the Fifth Amendment's guarantee of Equal protection.").

*Finally*, Schulte alleges that the exclusion of "inactive voters" in certain counties within White Plains constitutes systematic exclusion because African Americans and Hispanic Americans are more likely to be inactive voters. (Schulte Br. at 15.) But again, the cause of the

16

alleged exclusion here (e.g. people moving) is an external force.[9] *Rioux*, 97 F.3d at 658. Accordingly, this argument must be rejected under *Rioux*.[10] *See id.*

In sum, Schulte cannot establish the second and third elements under *Duren*. Accordingly, his fair cross-section challenge under the Sixth Amendment and JSSA must be rejected.

## II. Equal Protection Challenge

Schulte next contends that the underrepresentation of African American and Hispanic American jurors violates the Equal Protection clause under the Fifth Amendment. (Schulte Br. at 16–17.) As noted above, the Equal Protection clause forbids the exclusion of racial minorities from grand and petit juries. *Castaneda*, 430 U.S. at 492. But to establish a *prima facie* violation of equal protection, Schulte must furnish "proof of discriminatory intent." *United States v. Biaggi*, 909 F.2d 662, 677 (2d Cir. 1990). Because Schulte cannot make such a showing, his Equal Protection challenge fails. His only contention on this element is that the underrepresentation of African Americans and Hispanic Americans "cannot be the result of

---

[9] Under New York law, voters are designated "inactive" when a "County Board received information indicating that a voter may no longer be living at her address of registration." *Common Cause/New York v. Brehm*, 432 F. Supp.3d 285, 290 (S.D.N.Y. 2020) (examining New York voting law).

[10] The Court is unpersuaded by Schulte's remaining allegations of systematic exclusion, which are that (1) jurors drawn from the overlapping counties were inequitably prorated between the two courthouses, and (2) a technical glitch in the White Plains master wheel excluded jurors who had provided an alternative address when registering to vote. As to the former claim, Schulte has not shown that this alleged error caused the underrepresentation at issue. *See Allen*, 2021 WL 431458, at *11 (finding same error to have had "minimal" effect on venires). And as to the latter claim, the parties concede that this glitch actually augmented, not diminished, African American and Hispanic American representation in the White Plains master wheel. (Gov't Opp. Br. at 17.) Accordingly, these allegations do not satisfy the third prong under *Duren*.

17

chance." (Schulte Br. at 17.) But the Court will not assume or infer that this District has been operating under an *intentionally discriminatory* Jury Plan since 2009. *See Rioux*, 97 F.3d at 659 (rejecting Equal Protection challenge due to lack of evidence showing intentional discrimination). Therefore, the Defendant's Equal Protection claim must be rejected.

### III. JSSA

Schulte's remaining claims arise under the JSSA. To succeed on these claims, he must demonstrate a "substantial failure to comply" with the JSSA's provisions. *LaChance*, 788 F.2d at 870. "Mere technical violations of the procedures prescribed by the Act do not constitute substantial failure to comply with its provisions." *Id.* (cleaned up). The criteria for differentiating between a substantial and technical error turns on the "nature and extent of its effects[.]" *Id.* The Court holds that Schulte cannot demonstrate a substantial failure to comply with the JSSA and that his statutory claims must therefore be rejected.[11]

As an initial matter, Schulte repleads his Sixth Amendment fair cross-section challenge under the JSSA. (Schulte Br. at 19.) But given that the *Duren* test governs fair cross-section challenges brought under both the Sixth Amendment and the JSSA, this claim must be dismissed for the reasons stated above. *See supra* 7–17.

Apart from his fair cross-section challenge, Schulte also contends that the following defects constitute substantial violations of the JSSA: (1) the Government's decision to seek the Indictment from White Plains and not Manhattan; (2) the exclusion of inactive voters from certain counties located in the White Plains array; (3) the allegedly erroneous proration of jurors

---

[11] To be sure, these arguments were already rejected by the Court under the systematic exclusion prong of the Sixth Amendment analysis. *See supra* 15–17. But because Schulte pleads these defects as separate violations of the JSSA, the Court conducts a separate analysis here.

18

from the counties that overlap both courthouses; and (4) the clerical error by which voters who had registered with an alternate mailing address were excluded from jury selection. (Schulte Br. at 19 – 22; Schulte Reply at 11–15.) For the following reasons, the Court concludes that these allegations do not offend the JSSA.

***The Government's Decision.*** The Government's appropriate decision to seek the Indictment in White Plains was entirely proper and in accordance with the Constitution, JSSA, and customary practice. *See supra* 11–13. Accordingly, this prosecutorial decision cannot be said to contravene the JSSA.

***Exclusion of Inactive Voters.*** In *United States v. Allen*, 2021 WL 431458, at *10, Judge Roman addressed the issue of whether the exclusion of inactive voters from certain counties used by White Plains violated the JSSA. *See id.* Judge Roman concluded that the exclusion did not, reasoning that it is "entirely logical for a jury selection process to exclude individuals who have since moved," *see id.*, and even if it did, that the defect was merely a "technical violation" of the JSSA. *Id.* Because the Court agrees with this reasoning on all counts, it concludes that the exclusion of inactive voters here does not violate the JSSA.

***Erroneous Proration & Alternate Mailing Address.*** Lastly, Schulte argues that prospective jurors from the overlapping counties of Westchester, Putnam, and Rockland were incorrectly prorated between the two courthouses, and that a technical glitch inadvertently excluded jurors who had registered to vote with alternate mailing addresses. (Schulte Br. at 21–22; Schulte Reply at 13–14.) The Court is unpersuaded. As to the former contention, Schulte does not explain how the alleged proration error constitutes a "substantial" violation of the JSSA, especially where its "effect" appears to be "minimal." *Allen*, 2021 WL 431458, at *11 (rejecting the same argument on the basis that it was merely a "technical violation of the JSSA"). As to the

19

latter point, it is undisputed that the alternate mailing address defect actually led to an *increase* of representation of the very minority groups that Schulte contends were underrepresented. (Gov't Opp. Br. at 17.) Thus empiricism precludes the notion that the violation was "substantial" in nature. *LaChance*, 788 F.2d at 870 (explaining that the inquiry for whether a violation is substantial is the "extent of its effect on the wheels"); *see also Allen*, 2021 WL 431458, at *11 (rejecting same argument on the ground that it was merely a technical violation). In sum, the Court concludes that Schulte has not demonstrated a plausible violation of the JSSA.

## CONCLUSION

For the forgoing reasons, the motion to dismiss is **DENIED**.

Dated: New York, New York  
March 24, 2021

SO ORDERED

*Paul A. Crotty*  
PAUL A. CROTTY  
United States District Judge