UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

UNITED STATES OF AMERICA          :

   -v.-                         :       S1 20 Cr. 330 (AJN)

GHISLAINE MAXWELL,          :

                  Defendant.     :

-----------------------------------------------------------------x

## THE GOVERNMENT'S OMNIBUS MEMORANDUM IN OPPOSITION TO THE DEFENDANT'S PRE-TRIAL MOTIONS

AUDREY STRAUSS
United States Attorney
Southern District of New York
Attorney for the United States of America

Alison Moe
Maurene Comey
Lara Pomerantz
Andrew Rohrbach
Assistant United States Attorneys
- Of Counsel -

1

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................. 1

BACKGROUND ................................................................................................. 2

ARGUMENT ..................................................................................................... 3

I.   Jeffrey Epstein's Non-Prosecution Agreement Is Irrelevant to This Case ..................... 3
     A.   The NPA Does Not Bind the Southern District of New York ............................................ 4
          1.   The Text of the Agreement Does Not Contain a Promise to Bind Other Districts .......... 5
          2.   The Defendant Has Offered No Evidence That the NPA Binds Other Districts .............. 9
     B.   The NPA Does Not Immunize Maxwell from Prosecution ................................................ 15
          1.   The NPA Is Limited to Particular Crimes Between 2001 and 2007 ............................ 15
          2.   The NPA Does Not Confer Enforceable Rights on Maxwell .................................... 17
     C.   The Defendant Has Offered No Basis for Additional Discovery or a Hearing ................. 21

II.  The Indictment Is Timely ........................................................................... 23
     A.   Statutory Background ............................................................................................. 24
     B.   The 2003 Amendment to Section 3283 Applies Retroactively ......................................... 26
          1.   The 2003 Amendment Satisfies Step One of *Landgraf* ....................................... 28
          2.   The 2003 Amendment Satisfies Step Two of *Landgraf* ....................................... 32
     C.   The Defendant's Crimes Involved the Sexual Abuse of Minors ..................................... 36

III. The Defendant's Motion to Dismiss the Indictment Based on Alleged Improper Pre-
     Trial Delay Should Be Denied ..................................................................... 41
     A.   The Defendant Has Failed to Demonstrate Actual and Substantial Prejudice .................. 42
          1.   Applicable Law .................................................................................................. 42
          2.   Discussion .......................................................................................................... 44
     B.   The Defendant Has Failed to Establish That the Government Delayed the Indictment for
          An Improper Purpose ............................................................................................. 52
          1.   Applicable Law .................................................................................................. 52
          2.   Discussion .......................................................................................................... 54

IV.  The Court Should Deny the Defendant's Motions to Suppress ..................................... 59
     A.   Factual Background ............................................................................................... 61
          1.   The Civil Lawsuit against Maxwell ........................................................................ 61
          2.   February 2016 Meeting ......................................................................................... 62
          3.   The April and July 2016 Depositions of Maxwell ...................................................... 64
          4.   The USAO-SDNY Commences the Instant Investigation in 2018 ................................ 65
          5.   The USAO-SDNY's Subpoenas and *Ex Parte* Applications for Materials .................... 66
          6.   Proceedings before Chief Judge McMahon ............................................................... 68
               a.   March 26, 2019 Hearing ................................................................................. 68
               b.   April 9, 2019 Hearing .................................................................................... 70

i

      c.   Chief Judge McMahon's Memorandum and Order ................................................. 71
   7.   Magistrate Judge Netburn's Order .............................................................................. 74
   8.   Unsealing of Maxwell's Depositions ........................................................................... 74
   9.   The New York Daily News Article ............................................................................... 75
  B.  The Defendant's Suppression Motion Should Be Denied ........................................... 76
   1.   *Martindell* Provides No Basis to Grant the Relief the Defendant Seeks ............... 76
     a.   Applicable Law ...................................................................................................... 76
     b.   Discussion ............................................................................................................... 79
   2.   Maxwell's Fourth Amendment Claim Fails .............................................................. 82
     a.   Maxwell Has Not Established Standing ............................................................ 82
       i.   Applicable Law ................................................................................................. 82
       ii.  Discussion .......................................................................................................... 84
     b.   The Government Acted in Good Faith ............................................................... 86
       i.   Applicable Law ................................................................................................. 86
       ii.  Discussion .......................................................................................................... 88
     c.   Suppression of Certain Materials Would Be Improper Under the Inevitable Discovery
       Doctrine ................................................................................................................... 93
       i.   Applicable Law ................................................................................................. 93
       ii.  Discussion .......................................................................................................... 94
   3.   The Defendant's Motion to Suppress Evidence Obtained Pursuant to the Subpoena
     Under the Fifth Amendment Is Without Merit ......................................................... 96
     a.   Applicable Law ...................................................................................................... 96
       i.   The Fifth Amendment – Generally ............................................................... 96
       ii.  The Fifth Amendment – Act of Production Privilege .................................. 97
       iii. The Fifth Amendment – When Private Action Is Deemed Government Action ...... 98
     b.   Discussion ............................................................................................................... 99
   4.   The Government Did Not Violate Maxwell's Due Process Rights ............................. 103
     a.   Applicable Law ...................................................................................................... 104
     b.   Discussion ............................................................................................................... 107
   5.   The Court Should Not Exercise Its Inherent Authority to Order Suppression ............ 109
     a.   Applicable Law ...................................................................................................... 109
     b.   Discussion ............................................................................................................... 110
   6.   The Defendant Is Not Entitled to a Hearing ............................................................... 111
     a.   Applicable Law ...................................................................................................... 112
     b.   Discussion ............................................................................................................... 115

**V.  The Jury Should Decide Whether the Defendant Committed Perjury ........................ 116**
  A.  Factual Background ........................................................................................................ 117
  B.  Applicable Law .............................................................................................................. 119
  C.  Discussion ...................................................................................................................... 122
   1.   April 2016 Deposition .................................................................................................. 123
   2.   July 2016 Deposition .................................................................................................... 129
   3.   Materiality ..................................................................................................................... 135

VI.   **Counts Five and Six Are Properly Joined and Should Not Be Severed** ..................... **138**
A.  Applicable Law ............................................................................................. 138
B.  Discussion .................................................................................................... 141

VII.  **The Indictment Contains the Elements of Each Offense and Provides the Defendant More Than Adequate Notice of the Charges Against Her** ......................................... **150**
A.  Applicable Law ............................................................................................. 150
B.  Discussion .................................................................................................... 152

VIII. **There Is No Basis to Strike Any Portion of the Indictment** ......................................... **157**
A.  Relevant Facts .............................................................................................. 158
B.  Applicable Law ............................................................................................. 159
C.  Discussion .................................................................................................... 161

IX.   **The Defendant's Motion to Dismiss Count One or Count Three as Multiplicitous Is Premature** ..................................................................................................... **169**
A.  Relevant Facts .............................................................................................. 169
B.  Applicable Law ............................................................................................. 170
C.  Discussion .................................................................................................... 172

X.   **The Defendant's Various Disclosure Motions Should be Denied** ................................... **174**
A.  Bill of Particulars Is Not Warranted ............................................................. 174
    1.  Applicable Law ...................................................................................... 174
    2.  Discussion .............................................................................................. 178
B.  The Defendant's Requests for Early Production of a Witness List and Jencks Act Material Should Be Denied .............................................................................. 182
    1.  Applicable Law ...................................................................................... 182
    2.  Discussion .............................................................................................. 184
C.  The Defendant's Additional Requests for Disclosure Should Be Denied ..................... 185

XI.   **The Use of a Grand Jury Siting in White Plains Was Entirely Proper** ..................... **193**
A.  Background ................................................................................................... 194
    1.  The SDNY and Local Rules for the Division of Business ............................. 194
    2.  The SDNY Jury Plan ............................................................................. 195
B.  Applicable Law ............................................................................................. 197
C.  Discussion .................................................................................................... 198
    1.  The Defendant Was Properly Indicted by a Grand Jury Sitting in White Plains ......... 198
    2.  The Defendant's Fair Cross-Section Claim Is Meritless ................................. 205
        a.  The Defendant Has Not Established that Blacks or Hispanics Are Unfairly Represented ................................................................................... 205
        b.  Any Potential Underrepresentation Is Not Due to Systematic Exclusion ................. 210

**CONCLUSION** ........................................................................................................ **212**

**EXHIBIT LIST**

Exhibit 1:      Notes from the U.S. Attorney's Office for the Southern District of New York

Exhibit 2:      June 14, 2007 Email

Exhibit 3:      November 2020 Report, U.S. Department of Justice, Office of Professional Responsibility

Exhibit 4:      Notes from February 11, 2021 Call

Exhibit 5:      Notes from February 29, 2016 Meeting

Exhibit 6:      November 30, 2018 Email

Exhibit 7:      December 6, 2018 Email

Exhibit 8:      February 28, 2019 Government Letter to Judge Sweet

Exhibit 9:      February 28, 2019 Government Letter to Judge Netburn

Exhibit 10:     Transcript of April 22, 2016 Deposition

Exhibit 11:     Transcript of July 22, 2016 Deposition

Exhibit 12:     Affidavit of Dr. Bernard R. Siskin

# TABLE OF AUTHORITIES

Page(s)

Cases

*Albright v. Oliver*,
  510 U.S. 266 (1993) ........................................................................................... 152

*Andover Data Servs., a Div. of Players Computer, Inc. v. Statistical Tabulating Corp.*,
  876 F.2d 1080 (2d Cir. 1989) .................................................. 106, 119, 149

*Arizona v. Youngblood*,
  488 U.S. 51 (1988) ............................................................................................. 76

*Aronson v. K. Arakelian, Inc.*,
  154 F.2d 231 (7th Cir. 1946) ........................................................................... 19

*Berghuis v. Smith*,
  559 U.S. 314 (2010) ............................................................................... 299, 302

*Blaszczak*,
  17 Cr. 357 (LAK) .............................................................................................. 275

*Blissett v. Lefevre*,
  924 F.2d 434 (2d Cir. 1991) ........................................................................... 158

*Blum v. Yaretsky*,
  457 U.S. 991 (1982) ......................................................................................... 143

*Bochese v. Town of Ponce Inlet*,
  405 F.3d 964 (11th Cir. 2005) .......................................................................... 24

*Botha v. Don King Productions, Inc.*,
  No. 97 Civ. 7587 (JGK), 1998 WL 88745 (S.D.N.Y. Feb. 27, 1998).............. 148

*Boyd v. United States*,
  116 U.S. 616 (1886) ......................................................................................... 145

*Branzburg v. Hayes*,
  408 U.S. 665 (1972) ......................................................................................... 110

*Bridges v. United States*,
  346 U.S. 209 (1953) ........................................................................................... 53

*Bronston v. United States*,
  409 U.S. 352 (1973) ......................................................................................... 181

*Bryson v. United States*,
  396 U.S. 64 (1969) ........................................................................................... 147

*Burgess v. United States*,
  552 U.S. 124 (2008) ........................................................................................... 51

*Caplin & Drysdale, Chartered v. United States*,
  491 U.S. 617 (1989) ......................................................................................... 159

*Carpenter v. United States*,
  138 S. Ct. 2206 ........................................................................................... passim

*Chambers v. Mississippi*,
  410 U.S. 284 (1973) ......................................................................................... 159

*Chemical Bank v. Affiliated FM Ins. Co.*,
  154 F.R.D. 91 (S.D.N.Y. 1994)................................................................... passim

*Christopher v. SmithKline Beecham Corp.*,
  567 U.S. 142 (2012) ........................................................................ 51
*Colorado v. Connelly*,
  479 U.S. 157 (1986) ...................................................... 139, 141, 142
*Colorado v. Spring*,
  479 U.S. 564 (1987) ...................................................................... 138
*County of Sacramento v. Lewis*,
  523 U.S. 833 (1998) ...................................................................... 152
*Cruz v. Maypa*,
  773 F.3d 138 (4th Cir. 2014) .......................................................... 43
*Davis v. United States*,
  564 U.S. 229 (2011) ...................................................................... 122
*Doe 1 v. United States*,
  359 F. Supp. 3d 1201 (S.D. Fla. 2019) ............................................ 14
*Doe No. 1. v. United States*,
  749 F.3d 999 (11th Cir. 2014) ...................................... 173, 174, 176
*Dowling v. United States*,
  493 U.S. 342 (1990) ........................................................................ 76
*Duren v. Missouri*,
  439 U.S. 357 (1979) .............................................................. 289, 296
*Edwards v. Mazzuca*,
  No. 00 Civ. 2290 (RJS), 2007 WL 2994449 (S.D.N.Y. Oct. 15, 2007) ................. 234
*Falter v. United States*,
  23 F.2d 420 (2d Cir. 1928) .............................................................. 45
*Fisher v. United States*,
  425 U.S. 391 (1976) .............................................................. 140, 146
*Flagg v. Yonkers Sav. & Loan Ass'n*,
  396 F.3d 178 (2d Cir. 2005) .......................................................... 143
*Franks v. Delaware*,
  438 U.S. 154 (1978) .................................................. 166, 169, 170, 171
*Gatto*,
  17 Cr. 686 (LAK) .......................................................................... 275
*Golino v. City of New Haven*,
  950 F.2d 864 (2d Cir. 1991) .......................................................... 125
*Graham v. Connor*,
  490 U.S. 386 (1989) ...................................................................... 151
*Grant v. United States*,
  282 F.2d 165 (2d Cir. 1960) .......................................................... 164
*Greer v. Miller*,
  483 U.S. 756 (1987) ...................................................................... 158
*Grunewald v. United States*,
  353 U.S. 391 (1957) ...................................................................... 248
*Hamling v. United States*,
  418 U.S. 87 (1974) ................................................................ 225, 227

*Hemphill v. United States*,
  392 F.2d 45 (8th Cir. 1968) ........................................................ 268

*Herring v. United States*,
  555 U.S. 135 (2009) ................................................................. 123

*Howell v. Superintendent Rockview SCI*,
  939 F.3d 260 (2d Cir. 2019) ...................................................... 302

*Huddleston v. United States*,
  485 U.S. 681 (1988) ................................................................. 254

*In re Enter. Mort. Acceptance Co. Sec. Litig. ("En*terprise",
  ), 391 F.3d 401 (2d Cir. 2004) ......................................... 36, 43, 44

*In re Grand Jury Subpoena Duces Tecum Dated Apr. 19, 1991*,
  945 F.2d 1221 (2d Cir. 1991) ............................................. 108, 113

*In re Grand Jury Subpoena Duces Tecum Dated Oct. 29, 1992*,
  1 F.3d 87 (2d Cir. 1993) ................................................... 140, 145

*In re Grand Jury Subpoena*,
  826 F.2d 1166 (1987) ............................................................... 136

*In re Grand Jury Subpoena*,
  836 F.2d 1468 (4th Cir. 1988) ................................................... 149

*In re Three Grand Jury Subpoenas Duces Tecum Dated Jan. 29,*
  *1999*, 191 F.3d 173 (2d Cir. 1999) ............................................. 139

*In Re Three Grand Jury Subpoenas Jan. 5,*
  *1988*, 847 F.2d 1024 (2d Cir. 1988) ........................................... 136

*In re U.S.*,
  834 F.2d 283 (2d Cir. 1987) ...................................................... 284

*In re Various Grand Jury Subpoenas*,
  924 F. Supp. 2d 549 (S.D.N.Y. 2013), *aff'd,* 579 F. App'x 37 (2d Cir. 2014) ..................... 140

*Int'l Equity Invs., Inc. v. Opportunity Equity Partners Ltd.*,
  No. 05 Civ. 2745 (JGK) (RLE), 2010 WL 779314 (S.D.N.Y. Mar. 2, 2010) ...................... 111

*Johnson v. United States*,
  520 U.S. 461 (1997) ................................................................. 200

*Kungys v. United States*,
  485 U.S. 759 (1988) ................................................................. 222

*Landgraf v. USI Film Products*,
  511 U.S. 244 (1994) ....................................................... 35, 36, 41, 42

*Leocal v. Ashcroft*,
  543 U.S. 1 (2004) ................................................................ 56, 57

*Madanes v. Madanes*,
  186 F.R.D. 279 (S.D.N.Y. 1999) ............................................... 141

*Martindell v. Int'l Tel. and Tel. Corp.*,
  594 F.2d 291 (2d Cir. 1979) ................................................ passim

*Martinez v. McAleenan*,
  385 F. Supp. 3d 349 (S.D.N.Y. 2019) ................................... 150, 151

*Michigan v. Tucker*,
  417 U.S. 433 (1974) ................................................................. 137

vii

*Miller v. Pate,*
    386 U.S. 1 (1967) ........................................................................... 157, 174, 175
*Mills v. Scully,*
    826 F.2d 1192 (2d Cir. 1987) ........................................................................... 158
*Minnesota v. Murphy,*
    465 U.S. 420 (1984) ........................................................................... 144
*Murray v. Met. Life Ins. Co.,*
    583 F.3d 173 (2d Cir. 2009) ........................................................................... 223
*Nijhawan v. Holder,*
    557 U.S. 29 (2009) ........................................................................... 56
*Nix v. Williams,*
    467 U.S. 431 (1984) ........................................................................... 132, 133
*North Carolina v. Pearce,*
    395 U.S. 711 (1969) ........................................................................... 259
*Oregon v. Elstad,*
    470 U.S. 298 (1985) ........................................................................... 139, 141
*Palmieri v. State of N.Y.,*
    779 F.2d 861 (2d Cir. 1985) ........................................................................... 108, 112, 114
*Rakas v. Illinois,*
    439 U.S. 128 (1978) ........................................................................... 115, 116, 118
*Ratzlaf v. United States,*
    510 U.S. 135 (1994) ........................................................................... 165
*Rawlings v. Kentucky,*
    448 U.S. 98 (1980) ........................................................................... 116
*Richardson v. Marsh,*
    481 U.S. 200 (1987) ........................................................................... 212
*Rivera v. United States,*
    928 F.2d 592 (2d Cir. 1991) ........................................................................... 168, 172
*Rochin,*
    342 U.S., 72 S. Ct. 205 ........................................................................... 153
*Rosencrans v. United States,*
    165 U.S. 257 (1897) ........................................................................... 296
*Russell v. United States,*
    369 U.S. 749 (1962) ........................................................................... 229
*Rutenberg v. United States,*
    245 U.S. 480 (1918) ........................................................................... 292
*Salinas v. United States,*
    522 U.S. 52 (1997) ........................................................................... 245
*Santobello v. United States,*
    No. 94 Cr.  (RPP), 1998 WL 113950 (S.D.N.Y. Mar. 13, 1998) ........................................................................... 21
*Sch. Dist. No. 7,*
    167 F.3d 784 (2d Cir. 1999) ........................................................................... 61
*SEC v. TheStreet.com,*
    273 F.3d 222 (2d Cir. 2001) ........................................................................... 109, 113

viii

*Silver*,
   15 Cr. 93 (VEC)................................................................................................275
*Skelos*,
   15 Cr. 317 (KMW) ...........................................................................................275
*Smith v. Maryland*,
   442 U.S. 735 (1979) ...............................................................................117, 118
*Stogner v. California*,
   539 U.S. 607 (2003) ..........................................................................................45
*Swain v. Alabama*,
   380 U.S. 202 (1965) ........................................................................................300
*Taylor v. Louisiana*,
   419 U.S. 522 (1975) ...............................................................................299, 300
*Taylor v. United States*,
   495 U.S. 575 (1990) ..........................................................................................56
*Thom v. Ashcroft*,
   369 F.3d 158 (2d Cir. 2004) .............................................................................47
*Toussie v. United States*,
   397 U.S. 112 (1970) ..........................................................................................48
*United State v. Nader*,
   425 F. Supp. 3d 619 (E.D. Va. 2019) ........................................................passim
*United States v. Ahmad*,
   992 F. Supp. 682 (S.D.N.Y. 1998) .................................................................166
*United States v. Ahmed*,
   No. 10 Cr. 131 (PKC), 2011 WL 5041456 (S.D.N.Y. Oct. 21, 2011) ...........243
*United States v. Al Kassar*,
   660 F.3d 108 (2d Cir. 2011) ...........................................................................154
*United States v. Alameh*,
   341 F.3d 167 (2d Cir. 2003) ...............................................................77, 78, 81
*United States v. Alberti*,
   568 F.2d 617 (2d Cir. 1977) ...........................................................................187
*United States v. Aleman*,
   *286 F.3d 86 (2d Cir. 2002)*.............................................................................27
*United States v. Alfonso*,
   143 F.3d 772 (2d. Cir. 1998) ..........................................................................226
*United States v. Amato*,
   15 F.3d 230 (2d Cir. 1994) .............................................................................209
*United States v. An Antique Platter of Gold*,
   184 F.3d 131 (2d Cir. 1999) ...........................................................................222
*United States v. Anderson*,
   747 F.3d 51 (2d Cir. 2014) .............................................................................212
*United States v. Anderson*,
   772 F.3d 969 (2d Cir. 2014) ...........................................................................162
*United States v. Annabi*,
   10 Cr. 07 (CM) ................................................................................................286

*United States v. Annabi,*
  771 F.2d 670 (2d Cir. 1985) .................................................................. 5, 7, 8
*United States v. Annabi,*
  771 F.2d 670 (2d Cir. 1985), *aff'd,* 867 F.2d 1425 (2d Cir. 1988) ............................. 5
*United States v. Arici,*
  12 Cr. 24 (LAP) ................................................................................ 286
*United States v. Arzberger,*
  592 F. Supp. 2d 590 (S.D.N.Y. 2008) ........................................................... 151
*United States v. Ash,*
  464 F. Supp. 3d 621 (S.D.N.Y. 2020) ........................................................... 145
*United States v. Ashburn,*
  76 F. Supp. 3d 401 (E.D.N.Y. 2014) ............................................................ 126
*United States v. Awadallah,*
  349 F.3d 42 (2d Cir. 2003) ................................................................ 166, 168
*United States v. Bahna,*
  68 F.3d 19 (2d Cir. 1995) ................................................................... passim
*United States v. Balde,*
  20 Cr. 281 (KPF) ............................................................................... 298
*United States v. Barlow,*
  732 F. Supp. 2d 1 (E.D.N.Y. 2010) ............................................................. 300
*United States v. Barlow,*
  732 F. Supp. 2d 1 (E.D.N.Y. 2010), *aff'd,* 479 F. App'x 372 (2d Cir. 2012) ............. 300, 302
*United States v. Barnes,*
  520 F. Supp. 2d 510 (S.D.N.Y. 2007) ........................................................... 300
*United States v. Batchelder,*
  442 U.S. 114 (1979) ........................................................................... 265
*United States v. Bejasa,*
  904 F.2d 137 (2d Cir. 1990) ................................................................... 274
*United States v. Bellomo,*
  263 F. Supp. 2d 561 (E.D.N.Y. 2003) ........................................................... 268
*United States v. Ben Zvi,*
  242 F.3d 89 (2d Cir. 2001) ..................................................................... 41
*United States v. Benussi,*
  216 F. Supp. 2d 299 (S.D.N.Y. 2002) ...................................................... 248, 250
*United States v. Biaggi,*
  675 F. Supp. 790 (S.D.N.Y. 1987) .............................................................. 268
*United States v. Biaggi,*
  909 F.2d 662 (2d Cir. 1990) .............................................................. 298, 300
*United States v. Bin Laden,*
  91 F. Supp. 2d 600 (S.D.N.Y. 2000) ............................................................ 240
*United States v. Birney,*
  686 F.2d 102 (2d Cir. 1982) ................................................................ 61, 65
*United States v. Birrell,*
  470 F.2d 113 (2d Cir. 1972) ................................................................... 183

x

*United States v. Blakney*,
   941 F.2d 114 (2d Cir. 1991) ........................................................................ 205, 219
*United States v. Blaszczak*,
   308 F. Supp. 3d 736 (S.D.N.Y. 2018) ................................................................ 279
*United States v. Block*,
   No. 16 Cr. 595 (JPO), 2017 WL 1608905 (S.D.N.Y. Apr. 28, 2017) ................... 267
*United States v. Bonacorsa*,
   528 F.2d 1218 (2d Cir. 1976) ................................................ 180, 190, 197, 199
*United States v. Bonventre*,
   646 F App'x 73 (2d Cir. 2016) ........................................................................... 271
*United States v. Bortnovsky*,
   820 F.2d 572 (2d Cir. 1987) ................................................... 266, 267, 274
*United States v. Botti*,
   No. 08 Cr. 230 (CSH), 2009 WL 3157582 (D. Conn. Sept. 25, 2009) ................. 218
*United States v. Brand*,
   467 F.3d 179 (2d Cir. 2006) ............................................................................. 236
*United States v. Brand*,
   556 F.2d 1312 (5th Cir. 1977) ............................................................................ 75
*United States v. Brand*,
   No. 04 Cr. 194 (PKL), 2005 WL 77055 (S.D.N.Y. Jan. 12, 2005) ...................... 257
*United States v. Broccolo*,
   797 F. Supp. 1185 (S.D.N.Y. 1992) ...................................... 207, 214, 217
*United States v. Brown*,
   744 F. Supp. 558 (S.D.N.Y. 1990) .................................................................... 170
*United States v. Brown*,
   800 F. App'x 455 (9th Cir. 2020), *cert denied,* No. 20-5064, -- S.Ct. -- , 2021 WL 78235 (Jan.
   11, 2021) ...................................................................................................... 34, 39
*United States v. Brown*,
   No. 07-0296, 2008 WL 161146 (E.D. Pa. Jan. 16, 2008) .................................. 216
*United States v. Brown*,
   No. 99-1230, 2002 WL 34244994, at (2d Cir. Apr. 26, 2002) ............................... 6
*United States v. Bruno*,
   159 F. Supp. 3d 311 (E.D.N.Y. 2016) ................................................................... 7
*United States v. Bunn*,
   154 F. App'x 227 (2d Cir. 2005) ....................................................................... 237
*United States v. Burke*,
   No. 09 Cr. 135 (SJ), 2011 WL 2609837 (E.D.N.Y. July 1, 2011) ........................ 82
*United States v. Butler*,
   351 F. Supp. 121 (S.D.N.Y. 2004) ................................................................... 243
*United States v. Butler*,
   No. 04 Cr. 340, 2004 WL 2274751 (S.D.N.Y. Oct. 7, 2004) ....................... 208, 211
*United States v. Calandra*,
   414 U.S. 338 (1974) ........................................................................................ 110
*United States v. Caming*,
   968 F.2d 232 (2d Cir. 1992) ............................................................................. 165

*United States v. Campo Flores*,
   No. 15 Cr. 765 (PAC), 2016 WL 5946472 (S.D.N.Y. Oct. 12, 2016) ........................... 281, 282
*United States v. Canfield*,
   212 F.3d 713 (2d Cir. 2000) ........................................................................................ 167
*United States v. Canter*,
   338 F. Supp. 2d 460 (S.D.N.Y. 2004) .......................................................................... 283
*United States v. Carbonaro*,
   No. 02 Cr. 743 (RCC), 2004 WL 2222145 (S.D.N.Y. Sept. 30, 2004).................................. 83
*United States v. Carpenter*,
   680 F.3d 1101 (9th Cir. 2012) ...................................................................................... 50
*United States v. Carson*,
   464 F.2d 424 (2d Cir. 1972) ................................................................................ 217, 219
*United States v. CFW Const. Co.*,
   583 F. Supp. 197 (D. S.C. 1984) .................................................................................. 23
*United States v. Chacko*,
   169 F.3d 140 (2d Cir. 1999) ........................................................................................ 259
*United States v. Chalmers*,
   474 F. Supp. 2d 555 (S.D.N.Y. 2007) .................................................................. 225, 226
*United States v. Chambers*,
   800 F. App'x 43 (2d Cir. 2020) .................................................................................... 69
*United States v. Chan Lo*,
   No. 14 Cr. 491 (VSB), 2016 WL 9076234 (S.D.N.Y. Feb. 4, 2016), *aff'd.* 679 F. App'x 79 (2d
   Cir. 2017).................................................................................................................. 183
*United States v. Chen*,
   378 F.3d 151 (2d Cir. 2004) ........................................................................................ 271
*United States v. Cheung Kin Ping*,
   555 F.2d 1069 (2d Cir. 1977) ................................................................................ 68, 81
*United States v. Chuang*,
   897 F.2d 646 (2d Cir. 1990) ................................................................................ 115, 116
*United States v. Coffey*,
   361 F. Supp. 2d 102 (E.D.N.Y. 2005) .......................................................................... 228
*United States v. Coke*,
   No. 07 Cr. 971 (RPP), 2011 WL 3738969 (S.D.N.Y. Aug. 22, 2011).................... 153, 160, 163
*United States v. Collins*,
   409 F. Supp. 3d 228 (S.D.N.Y. 2019) .......................................................................... 278
*United States v. Concepcion*,
   983 F.2d 369 (2d Cir. 1992) ........................................................................................ 252
*United States v. Coppa*,
   267 F.3d 132 (2d Cir. 2001) ........................................................................................ 274
*United States v. Corbett*,
   750 F.3d 245 (2d Cir. 2014) ........................................................................................ 137
*United States v. Cornielle*,
   171 F.3d 748 (2d Cir. 1999) .......................................................................... 60, 77, 78, 85
*United States v. Corr*,
   543 F.2d 1042 (2d Cir. 1976) ...................................................................................... 181

*United States v. Countentos,*
    651 F.3d 809 (8th Cir. 2011) ...................................................................... 57, 58
*United States v. Cromitie,*
    727 F.3d 194 (2d Cir. 2019) ............................................................................ 154
*United States v. Cromitie,* et al.,
    09 Cr. 558 (CM) ............................................................................................... 286
*United States v. Crouch,*
    84 F.3d 1497 (5th Cir. 1996) ............................................................................. 75
*United States v. D'Amico,*
    734 F. Supp. 2d 321 (S.D.N.Y. 2010) ............................................................. 268
*United States v. Davis,*
    702 F.2d 418 (2d Cir. 1983) ....................................................................... passim
*United States v. DeFilippo,*
    No. 17 Cr. 585 (WHP), 2018 WL 740727 (S.D.N.Y. Jan. 31, 2018)................... 169
*United States v. Delacruz,*
    970 F. Supp. 2d 199 (S.D.N.Y. 2013) ............................................................... 77
*United States v. DePalma,*
    461 F. Supp. 778 (S.D.N.Y. 1978) ........................................................... 241, 250
*United States v. Dewar,*
    489 F. Supp. 2d 351 (S.D.N.Y. 2007) ............................................................. 165
*United States v. Diaz,*
    176 F.3d 52 (2d Cir. 1999) ....................................................................... 251, 253
*United States v. DiGregorio,*
    795 F. Supp. 630 (S.D.N.Y. 1992) .................................................................. 155
*United States v. Dodge,*
    597 F.3d 1347 (11th Cir. 2010) (en banc) ........................................................ 54
*United States v. Dornau,*
    356 F. Supp. 1091 (S.D.N.Y. 1973) .................................................................. 73
*United States v. Dorvee,*
    616 F.3d 174 (2d Cir. 2010) ............................................................................ 236
*United States v. Drago,*
    No. 18 Cr. 0394 (SJF) (AYS), 2019 WL 3072288 (E.D.N.Y. July 15, 2019) ...... 86
*United States v. Dumitru,*
    No. 18 Cr. 243 (LAK), 2018 WL 3407703 (S.D.N.Y. June 26, 2018) ................ 261
*United States v. Eldred,*
    933 F.3d 110 (2d Cir. 2019) ............................................................................ 123
*United States v. El-Sadig,*
    133 F. Supp. 2d 600 (N.D. Ohio 2001) ............................................................. 23
*United States v. Elsbery,*
    602 F.2d 1054 (2d Cir. 1979) ..................................................................... 62, 72
*United States v. Estrada,*
    320 F.3d 173 (2d Cir. 2003) ............................................................................ 259
*United States v. Ewell,*
    383 U.S. 116 (1966) ......................................................................................... 80

xiii

*United States v. Falso*,
   544 F.3d 110 (2d Cir. 2008) ........................................................ 166, 169

*United States v. Farmer*,
   137 F.3d 1265 (10th Cir. 1998) ................................................... 179, 180

*United States v. Feldman*,
   939 F.3d 182 (2d Cir. 2019) ......................................................... 8, 20, 27

*United States v. Fennell*,
   496 F. Supp. 2d 279 (S.D.N.Y. 2007) ....................................... 284, 286

*United States v. Figueroa*,
   618 F.2d 934 (2d Cir. 1980) ............................................................... 255

*United States v. Fiumano*,
   No. 14 Cr. 518 (JFK), 2016 WL 1629356 (S.D.N.Y. Apr. 25, 2016) ...................................... 70

*United States v. Florence*,
   456 F.2d 46 (4th Cir. 1972) ................................................................ 293

*United States v. Florida West Int'l Airways, Inc.*,
   853 F. Supp. 2d 1209 (S.D. Fla. 2012) ........................................ 23, 24

*United States v. Forde*,
   740 F. Supp. 2d 406 (S.D.N.Y. 2010) .................................... passim

*United States v. Gallo*,
   No. 98 Cr. (JGK), 1999 WL 9848 (S.D.N.Y. Jan. 11, 1999) ......................................... 275, 281

*United States v. Gambino*,
   838 F. Supp. 744 (S.D.N.Y. 1993) ..................................................... 70

*United States v. Gaudin*,
   515 U.S. 506 (1995) ............................................. 182, 184, 200, 222

*United States v. Geaney*,
   417 F.2d 1116 (2d Cir. 1969) ............................................................ 284

*United States v. Gentile*,
   235 F. Supp. 3d 649 (D.N.J. 2017) ..................................................... 48

*United States v. Ghailani*,
   751 F. Supp. 2d 502 (S.D.N.Y. 2010) .............................................. 155

*United States v. Ghavami*,
   No. 10 Cr. 1217 (KMW), 2012 WL 2878126 (S.D.N.Y. July 13, 2012) .............................. 262

*United States v. Gibson*,
   175 F. Supp. 2d 532 (S.D.N.Y. 2001) .............................................. 268

*United States v. Gilbert*,
   266 F.3d 1180 (9th Cir. 2001) ............................................................. 62

*United States v. Gillette*,
   383 F.2d 843 (2d Cir. 1967) .............................................................. 165

*United States v. Gonzalez*,
   No. 00 Cr. 447, 2000 WL 1721171 ..................................................... 85

*United States v. Gottfried*,
   165 F.2d 360 (2d Cir. 1948) .............................................................. 292

*United States v. Gracesqui*,
   No. 10 Cr. 74 (PKC), 2015 WL 5231168 n.2 (S.D.N.Y. Sept. 8, 2015), *aff'd*, 730 F. App'x 25
   (2d Cir. 2018) ..................................................................................... 209

xiv

*United States v. Green,*
  981 F.3d 945 (11th Cir. 2020) ............................................................... 124

*United States v. Greer,*
  956 F. Supp. 525 (D. Vt. 1997) ............................................................. 72

*United States v. Griffith,*
  No. 99 Cr. (HB), 2000 WL 1253265 (S.D.N.Y. Sept. 5, 2000) ........................................... 264

*United States v. Guerrier,*
  18 Cr. 284 (JSR) ..................................................................................... 286

*United States v. Guzman,*
  337 F. Supp. 140 (S.D.N.Y. 1972) ......................................................... 300

*United States v. Halkbank,*
  No. 15 Cr. 867 (RMB), 2020 WL 5849512 (S.D.N.Y. Oct. 1, 2020) ................................... 261

*United States v. Hallahan,*
  756 F.3d 962 (7th Cir. 2014) ................................................................. 19

*United States v. Halper,*
  590 F.2d 422 (2d Cir. 1978) ................................................................. 216

*United States v. Haqq,*
  278 F.3d 44 (2d Cir. 2002) ................................................................... 115

*United States v. Harrison,*
  764 F. Supp. 29 (S.D.N.Y. 1991) ........................................................... 72

*United States v. Hastings,*
  461 U.S. 499 (1983) ............................................................................ 160

*United States v. Heath,*
  455 F.3d 52 (2d Cir. 2006) ............................................................ 132, 133

*United States v. Henderson,*
  337 F.3d 914 (7th Cir. 2003) ........................................................... 61, 62

*United States v. Henry,*
  861 F. Supp. 1190 (S.D.N.Y. 1994) ...................................................... 269

*United States v. Herbert,*
  698 F.2d 981 (9th Cir. 1983) ............................................................... 293

*United States v. Hernandez,*
  85 F.3d 1023 (2d Cir. 1996) ................................................................. 242

*United States v. Hester,*
  No. 19 Cr. 324 (NSR), 2020 WL 3483702 (S.D.N.Y. June 26, 2020) ................................. 211

*United States v. Heyward,*
  No. 10 Cr. 84 (LTS), 2010 WL 4484642 (S.D.N.Y. Nov. 9, 2010) ..................................... 154

*United States v. Hillegas,*
  578 F.2d 453 (2d Cir. 1978) ................................................................. 79

*United States v. Hoo,*
  825 F.2d 667 (2d Cir. 1987) ................................................................. 78

*United States v. Hsia,*
  24 F. Supp. 2d 14 (D.D.C. 1998) ........................................................... 249

*United States v. Iannelli,*
  461 F.2d 483 (2d Cir. 1972) ................................................................. 64

xv

*United States v. Israel,*
   05 Cr. 1039 (CM) ............................................................................................ 286

*United States v. Jackman,*
   46 F.3d 1240 (2d Cir. 1995) ....................................................................... 300, 301

*United States v. Jeffries,*
   405 F.3d 682 (8th Cir. 2005) ........................................................ 33, 37, 38, 46

*United States v. Jenkins,*
   727 F. App'x 732 (2d Cir. 2018) ................................................................... 194

*United States v. Jennings,*
   960 F.2d 1488 (9th Cir. 1992) ....................................................................... 162

*United States v. Jimenez,*
   824 F. Supp. 351 (S.D.N.Y. 1993) ........................................................ 240, 268

*United States v. Johns,*
   15 F.3d 740 (8th Cir. 1994) ............................................................................ 37

*United States v. Johnson,*
   21 F. Supp. 2d 329 (S.D.N.Y. 1998) ............................................................ 294

*United States v. Jones,*
   482 F.3d 60 (2d Cir. 2006) ............................................................................ 259

*United States v. Josephberg,*
   459 F.3d 350 (2d Cir. 2006) ..................................................................... passim

*United States v. Kaplan,*
   758 F. App'x 34 (2d Cir. 2018) ..................................................................... 182

*United States v. Kenny,*
   883 F. Supp. 869 (E.D.N.Y. 1995) ............................................................... 294

*United States v. Kidd,*
   386 F. Supp.3d 364 (S.D.N.Y. 2019) ..................................................... 231, 232

*United States v. King,*
   560 F.2d 122 (2d Cir. 1977) ............................................................................ 64

*United States v. Kozel,*
   No. 19 Cr. 460 (KMW), 2020 WL 4751498 (S.D.N.Y. Aug. 17, 2020) ............... 236

*United States v. Kross,*
   14 F.3d 751 (2d Cir. 1994) ............................................................ 183, 221, 222

*United States v. LaFlam,*
   369 F.3d 153 (2d Cir. 2004) .......................................................................... 254

*United States v. Lahey,*
   967 F. Supp. 2d 698 (S.D.N.Y. 2013) ........................................................... 168

*United States v. Lambus,*
   897 F.3d 368 (2d Cir. 2018) ..................................................................... passim

*United States v. Laskow,*
   688 F. Supp. 851 (E.D.N.Y. 1988) ................................................................... 8

*United States v. Laskow,*
   688 F. Supp. 851 (E.D.N.Y. 1988) (tbl.) .......................................................... 5

*United States v. Laurenti,*
   581 F.2d 37 (2d Cir. 1978) .............................................................................. 79

xvi

*United States v. Lawson*,
   683 F.2d 688 (2d Cir. 1982) ........................................................................ 60, 78

*United States v. Leo Sure Chief*,
   438 F.3d 920 (9th Cir. 2006) ............................................................. 33, 38, 46

*United States v. Leon*,
   468 U.S. 897 (1984) ........................................................................... 124, 125

*United States v. Leonelli*,
   428 F. Supp. 880 (S.D.N.Y. 1977) .............................................................. 268

*United States v. Levy*,
   No. 11 Cr. 62 (PAC), 2013 WL 664712 (S.D.N.Y. Feb. 25, 2013) ...................... 267

*United States v. Lighte*,
   782 F.2d 367 (2d Cir. 1986) ................................................................ passim

*United States v. Loera*,
   333 F. Supp. 3d 172 (E.D.N.Y. 2018) ........................................................ 152

*United States v. Long*,
   697 F. Supp. 651 (S.D.N.Y. 1988) .............................................................. 65

*United States v. Lopez*,
   944 F.2d 33 (1st Cir. 1991) ................................................................ 21, 26

*United States v. Lovasco*,
   431 U.S. 783 (1977) ............................................................... 76, 79, 80, 82

*United States v. Mahabub*,
   No. 13 Cr. 908 (AJN), 2014 WL 4243657 (S.D.N.Y. Aug. 26, 2014)............... 266, 268, 269

*United States v. Mandell*,
   710 F. Supp. 2d 368 (S.D.N.Y. 2010) ......................................................... 267

*United States v. Marcus*,
   628 F.3d 36 (2d Cir. 2010) ..................................................................... 248

*United States v. Mariamma Vijua*,
   No. 15 Cr. 240, 2016 WL 107841 (N.D. Tex. Jan. 11, 2016) ................................ 22

*United States v. Marion*,
   404 U.S. 307 (1971) ....................................................................... 59, 63, 72

*United States v. Markiewicz*,
   978 F.2d 786 (2d Cir. 1992) ............................................ 178, 180, 187, 198

*United States v. Martin*,
   426 F.3d 68 (2d Cir. 2005) ..................................................................... 167

*United States v. Martinez*,
   No. 92 Cr.  (SWK), 1993 WL 322768 (S.D.N.Y. Aug. 19, 1993) ......................... 216

*United States v. Martinez*,
   No. 94 Cr.  (RPP), 1995 WL 10849 (S.D.N.Y. Jan. 12, 1995) ................................ 77

*United States v. Mason*,
   479 F. App'x 397 (2d Cir. 2012).............................................................. 248

*United States v. Mast*,
   735 F.2d 745 (2d Cir. 1984) ................................................................... 144

*United States v. McCourty*,
   562 F.3d 458 (2d Cir. 2009) ................................................................... 260

xvii

*United States v. McDarrah*,
   351 F. App'x 558 (2d Cir. 2009) ....................................................... 257
*United States v. Medina*,
   No. 13 Cr. 272 (PGG), 2014 WL 3057917 (S.D.N.Y. July 7, 2014) ..................................... 261
*United States v. Miller*,
   116 F.3d 641 (2d Cir. 1997) ....................................................... 252, 292
*United States v. Miller*,
   425 U.S. 435 (1976) ....................................................... 116, 117, 119
*United States v. Miller*,
   911 F.3d 638 (1st Cir. 2018) ....................................................... 44
*United States v. Ming He*,
   94 F.3d 782 (2d Cir. 1996) ....................................................... 161
*United States v. Mitan*,
   No. 08-760, 2009 WL 2328870 (E.D. Pa. July 28, 2009) ....................................... 218
*United States v. Mitchell*,
   966 F.2d 92 (2d Cir. 1992) ....................................................... 144
*United States v. Mitlof*,
   165 F. Supp. 2d 558 (S.D.N.Y. 2001) ....................................................... 268
*United States v. Monserrate*,
   No. 10 Cr. 965 (CM), 2011 WL 3480957 (S.D.N.Y. Aug. 4, 2011) ................................... 267
*United States v. Montoya-Escheverria*,
   892 F. Supp. 104 (S.D.N.Y. 1995) ....................................................... 118
*United States v. Moore*,
   968 F.2d 216 (2d Cir. 1992) ....................................................... 125
*United States v. Morgan*,
   113 F.3d 1230, 1997 WL 268712 (2d Cir. 1997) (unpublished opinion) ................................ 45
*United States v. Mostafa*,
   965 F. Supp. 2d 451 (S.D.N.Y. 2013) ....................................... 242, 243, 247, 262
*United States v. Mulder*,
   273 F.3d 91 (2d Cir. 2001) ....................................................... 241, 242
*United States v. Mullens*,
   536 F.2d 997 (2d Cir. 1976) ....................................................... 139
*United States v. Murgio*,
   209 F. Supp. 3d 698 (S.D.N.Y. 2016) ....................................... 231, 241, 247
*United States v. Muric*,
   No. 10 Cr. 112 (LTS), 2010 WL 2891178 (S.D.N.Y. July 13, 2010) ................................... 86
*United States v. Myers*,
   692 F.2d 823 (2d Cir. 1982) ....................................................... 153, 161
*United States v. Napolitano*,
   552 F. Supp. 465 (S.D.N.Y. 1982) ....................................................... 241
*United States v. Nejad*,
   No. 18 Cr. 224 (AJN), 2019 WL 6702361 (S.D.N.Y. Dec. 9, 2019) ................................... 225
*United States v. Nersesian*,
   824 F.2d 1294 (2d Cir. 1987) ....................................................... 233

xviii

*United States v. Nitsche*,
  843 F. Supp. 2d 4 (D.D.C. 2011) .................................................................. 201, 202
*United States v. Nixon*,
  418 U.S. 683 (1974) ................................................................................................. 282
*United States v. Noble*,
  No. 07 Cr. 284 (RJS), 2008 WL 140966 (S.D.N.Y. Jan. 11, 2008) ....................... 164
*United States v. Okwumabua*,
  828 F.2d 950 (2d Cir. 1987) .................................................................................. 138
*United States v. Olivieri*,
  740 F. Supp. 2d 423 (S.D.N.Y. 2010) ................................................................... 146
*United States v. Oshatz*,
  700 F. Supp. 696 (S.D.N.Y. 1988) ................................................................ 147, 148
*United States v. Page*,
  657 F.3d 126 (2d Cir. 2011) .......................................... 205, 209, 210, 220
*United States v. Pascarella*,
  84 F.3d 61 (2d Cir. 1996) ...................................................................................... 252
*United States v. Paulino*,
  445 F.3d 211 (2d Cir. 2006) .................................................................................. 253
*United States v. Payner*,
  447 U.S. 727 (1980) .................................................................... 115, 161, 162
*United States v. Pena*,
  932 F. Supp. 2d 464 (S.D.N.Y. 2013) ................................................................... 221
*United States v. Perez*,
  940 F. Supp. 540 (S.D.N.Y.1996) .......................................................................... 281
*United States v. Pierre-Louis*,
  No. 16 Cr. 541 (CM), 2018 WL 4043140 (S.D.N.Y. Aug. 9, 2018) ................. passim
*United States v. Pipola*,
  83 F.3d 556 (2d Cir. 1996) .................................................................................... 253
*United States v. Pirro*,
  212 F.3d 86 (2d Cir. 2000) .................................................................................... 229
*United States v. Pizarro*,
  No. 17 Cr. 151 (AJN), 2018 WL 1737236 (S.D.N.Y. Apr. 10, 2018) ............. passim
*United States v. Plaza-Andrades*,
  507 F. App'x 22 (2d Cir. 2013) ............................................................................. 291
*United States v. Polos*,
  723 F. App'x 64 (2d Cir. 2018) ............................................................................. 195
*United States v. Post*,
  950 F. Supp. 2d 519 (S.D.N.Y. 2013) ................................................................... 226
*United States v. Potamitis*,
  739 F.2d 784 (2d Cir. 1984) ............................................................................ passim
*United States v. Prisco*,
  391 F. App'x 920 (2d Cir. 2010) ............................................................................... 4
*United States v. Quinones*,
  511 F.3d 289 (2d Cir. 2007) .................................................................................. 251

*United States v. Rahimi,*
No. 16 Cr. 760 (RMB), 2017 WL 2984169 (S.D.N.Y. June 22, 2017)................................. 225

*United States v. Rahman,*
189 F.3d 88 (2d Cir. 1999) ........................................................................................... 154

*United States v. Rajaratnam,*
No. 09 Cr. 1184 (RJH), 2010 WL 4867402 (S.D.N.Y. Nov. 24, 2010) ................................ 172

*United States v. Ramnath,*
131 F.3d 132 (2d Cir. 1997) ......................................................................................... 300

*United States v. Raymonda,*
780 F.3d 105 (2d Cir. 2015) ......................................................................................... 124

*United States v. Reeves,* et al.,
16 Cr. 372 (VEC) ......................................................................................................... 286

*United States v. Remington,*
208 F.2d 567 (2d Cir. 1953) ......................................................................................... 146

*United States v. Resendiz-Ponce,*
549 U.S. 102 (2007) ............................................................................................. 227, 235

*United States v. Ricco,*
549 F.2d 264 (2d Cir. 1977) ........................................................................................... 61

*United States v. Richardson,*
512 F.2d 105 (3d Cir. 1975) ........................................................................................... 49

*United States v. Richardson,*
537 F.3d 951 (8th Cir. 2008) ........................................................................................ 293

*United States v. Rioux,*
930 F. Supp. 1558 (D. Conn. 1995)......................................................................... 297, 298

*United States v. Rioux,*
97 F.3d 648 (2d Cir. 1996) ..................................................................................... passim

*United States v. Rittweger,*
259 F. Supp. 2d 275 (S.D.N.Y. 2003) ............................................................................. 268

*United States v. Rivera,*
546 F.3d 245 (2d Cir. 2008) .......................................................................... 204, 220, 224

*United States v. Rivera,*
No. 09 Cr. 619 (SJF), 2011 WL 1429125, at (E.D.N.Y. Apr. 13, 2011)............................... 262

*United States v. Rivera,*
No. 16 Cr. 175 (LGS), 2017 WL 1843302 (S.D.N.Y. May 8, 2017) .................................... 274

*United States v. Roberts,*
660 F.3d 149 (2d Cir. 2011) ......................................................................................... 138

*United States v. Roberts,*
852 F.2d 671 (2d Cir. 1988) ......................................................................................... 132

*United States v. Rolan-Zapata,*
916 F.2d 795 (2d Cir. 1990) ......................................................................................... 256

*United States v. Rosa,*
11 F.3d 315 (2d Cir. 1993) ........................................................................................... 253

*United States v. Rosa,*
626 F.3d 56 (2d Cir. 2010) ........................................................................................... 123

*United States v. Rubin*,
  609 F.2d 51 (2d Cir. 1979) ............................................................................. 61

*United States v. Rubinson*,
  543 F.2d 951 (2d Cir. 1976) ............................................................................ 81

*United States v. Ruiz*,
  702 F. Supp. 1066 (S.D.N.Y. 1989) .............................................................. 214

*United States v. Ruiz*,
  894 F.2d 501 (2d Cir. 1990) ............................................ 207, 213, 214, 217

*United States v. Russo*,
  483 F. Supp. 2d 301 (S.D.N.Y. 2007) ................................................... 274, 282

*United States v. Russo*,
  801 F.2d 624 (2d Cir. 1986) ...................................................................... 5, 11

*United States v. Rutkoske*,
  506 F.3d 170 (2d Cir. 2007) ....................................................................... 248

*United States v. Salameh*,
  152 F.3d 88 (2d Cir. 1998) .................................................................. 5, 6, 245

*United States v. Salerno*,
  481 U.S. 739 (1987) .................................................................................. 151

*United States v. Salmonese*,
  352 F.3d 608 (2d Cir. 2003) ............................................................... 247, 249

*United States v. Sampson*,
  385 F.3d 183 (2d Cir. 2004) ....................................................................... 208

*United States v. Sampson*,
  898 F.3d 270 (2d Cir. 2018) ............................................................... 200, 201

*United States v. Sampson*,
  898 F.3d 287 (2d Cir. 2018) ........................................................ 177, 178, 188

*United States v. Samsonov*,
  No. 07 Cr. 1198 (CM), 2009 WL 176721 (S.D.N.Y. Jan. 23, 2009) .................... 269

*United States v. Santiago*,
  987 F. Supp. 2d 465 (S.D.N.Y. 2013) ............................................................ 75

*United States v. Sarwari*,
  669 F.3d 401 (4th Cir. 2012) ............................................................... 179, 180

*United States v. Sattar*,
  272 F. Supp. 2d 348 (S.D.N.Y. 2003) ............................................................ 27

*United States v. Savage*,
  970 F.3d 217 (3d Cir. 2020) ...................................................................... 302

*United States v. Scala*,
  388 F. Supp. 2d 396 (S.D.N.Y. 2005) ................................................ 67, 68, 71

*United States v. Scarpa*,
  897 F.2d 63 (2d Cir. 1990) ......................................................................... 69

*United States v. Scarpa*,
  913 F.2d 993 (2d Cir. 1990) ................................................................. passim

*United States v. Schaefer*,
  No. 17 Cr. 400 (HZ), 2019 WL 267711 (D. Or. Jan. 17, 2019) ........................ 121

*United States v. Schafrick*,
  871 F.2d 300 (2d Cir. 1989) ........................................................................ 182
*United States v. Schmidt*,
  105 F.3d 82 (2d Cir. 1997) ................................................................... 153, 154
*United States v. Schneider*,
  801 F.3d 186 (3d Cir. 2015) ........................................................... 51, 52, 54, 57
*United States v. Seabrook*,
  No. 10 Cr. 87 (DAB), 2010 WL 5174353 (S.D.N.Y. Dec. 14, 2010) ................................... 282
*United States v. Sensi*,
  No. 08 Cr. 253, 2010 WL 2351484 (D. Conn. June 7, 2010) ........................................... 34, 52
*United States v. Sergentakis*,
  No. 05 Cr. 230 (JFK), 2005 WL 1994014 (S.D.N.Y. Aug. 17, 2005) ..................................... 275
*United States v. Serrano,*
   No. 13 Cr. 58 (KBF), 2014 WL 2696569 (S.D.N.Y. June 10, 2014) ..................................... 126
*United States v. Shaw,*
  260 F. Supp. 2d 567 (E.D.N.Y. 2003) ........................................................... 165, 171
*United States v. Sliker*,
  751 F.2d 477 (2d Cir. 1984) ........................................................................ 255
*United States v. Smith*,
  985 F. Supp. 2d 547 (S.D.N.Y. 2014) ................................................... 241, 243, 247
*United States v. Smith*,
  No. 05 Cr. 922 (DLC), 2007 WL 980431 (S.D.N.Y. Apr. 3, 2007), *aff'd,* F. App'x 636 (2d Cir.
  2009) .............................................................................................. 206
*United States v. Snyder*,
  668 F.2d 686 (2d Cir. 1982) .................................................................... 63, 78
*United States v. Soares*,
  66 F. Supp. 2d 391 (E.D.N.Y. 1999) ................................................................ 295
*United States v. Spears*,
  159 F.3d 1081 (7th Cir. 1999) ............................................................ 62, 66, 67
*United States v. Sprouts*,
  282 F.3d 1037 (8th Cir. 2002) ...................................................................... 63
*United States v. Stavroulakis*,
  952 F.2d 686 (2d Cir. 1992) ................................................................... 225, 233
*United States v. Stein*,
  456 F.2d 844 (2d Cir. 1972) ........................................................................ 68
*United States v. Stein*,
  541 F.3d 130 (2d Cir. 2008) ................................................................... 142, 143
*United States v. Stokes*,
  733 F.3d 438 (2d Cir. 2013) ................................................................... 124, 132
*United States v. Stringer,*
  *730 F.3d 120 (2d Cir. 2013)* ........................................................... 228, 229, 231
*United States v. Strohm*,
  671 F.3d 1173 (10th Cir. 2011) ............................................................... 180, 190
*United States v. Swanson*,
  210 F.3d 788 (7th Cir. 2000) ...................................................................... 170

*United States v. Sweig,*
    441 F.2d 114 (2d Cir. 1971) .............................................................. 207, 211, 217

*United States v. Tanu,*
    589 F.2d 82 (2d Cir. 1978) ................................................................................ 79

*United States v. Thai,*
    29 F.3d 785 (2d Cir. 1994) .............................................................................. 252

*United States v. Thompson,*
    13 Cr. 378 (AJN), 2013 WL 6246489 (S.D.N.Y. Dec. 3, 2013) ................................. 281, 284

*United States v. Thompson,*
    896 F.3d 155 (2d Cir. 2018) ............................................................................. 236

*United States v. Thompson,*
    No. 13 Cr. 378 (AJN), 2013 WL 6246489 (S.D.N.Y. Dec. 3, 2013) ..................................... 274

*United States v. Torres,*
    901 F.2d 205 (2d Cir. 1990) ................................................................. 266, 268, 271

*United States v. Towne,*
    870 F.2d 880 (2d Cir. 1989) ............................................................................. 251

*United States v. Tracy,*
    12 F.3d 1186 (2d Cir. 1993) ............................................................................. 283

*United States v. Tramunti,*
    513 F.2d 1087 (2d Cir. 1975) .................................................................. 225, 233

*United States v. Tranquillo,*
    606 F. Supp. 2d 370 (S.D.N.Y. 2009) ..................................................................... 284

*United States v. Trippe,*
    171 F. Supp. 2d 230 (S.D.N.Y. 2001) ..................................................................... 267

*United States v. Triumph Capital Group, Inc.,*
    237 F. App'x 625 (2d Cir. 2007) ................................................................. 184, 187

*United States v. Turoff,*
    853 F.2d 1037 (2d Cir. 1988) ............................................................................ 204

*United States v. Ulbricht,*
    No. 14 Cr. 68 (KBF), 2014 WL 5090039 (S.D.N.Y. Oct. 10, 2014) ........................... 118, 275

*United States v. Urena,*
    989 F. Supp. 2d 253 (S.D.N.Y. 2013) ............................................................... 28, 171

*United States v. Valentine,*
    820 F.2d 565 (2d Cir. 1987) ................................................................. 156, 157, 158

*United States v. Valona,*
    834 F.2d 1334 (7th Cir. 1987) ............................................................................ 66

*United States v. Vickers,*
    708 F. App'x 732 (2d Cir. 2017) ......................................................................... 256

*United States v. Vickers,*
    No. 13 Cr. 128 (RJA) (HKS), 2014 WL 1838255 (W.D.N.Y. May 8, 2014) .................. passim

*United States v. Vilar,*
    No. 05 Cr. 621 (KMK), 2007 WL 1075041 (S.D.N.Y. Apr. 4, 2007) .................................. 169

*United States v. Villegas,*
    899 F.2d 1324 (2d Cir. 1990) ............................................................................ 115

xxiii

*United States v. Walker,*
  191 F.3d 326 (2d Cir. 1999) ............................................................... 70

*United States v. Walsh,*
  194 F.3d. 37 (2d Cir. 1999) ........................................... 228, 266, 271

*United States v. Walters,*
  910 F.3d 11 (2d Cir. 2018) ............................................................ 152

*United States v. Washington,*
  431 U.S. 181 (1977) ..................................................... 136, 137, 138

*United States v. Watson,*
  599 F.2d 1149 (2d Cir. 1979) ........................................................ 78

*United States v. Wedd,*
  *No.* 15 Cr. 616 (KBF), 2016 WL 1055737 (S.D.N.Y. Mar. 10, 2016) .................. 271

*United States v. Weiner,*
  479 F.2d 923 (2d Cir. 1973) ......................................................... 187

*United States v. Werner,*
  620 F.2d 922 (2d Cir. 1980) ....................................... 205, 206, 208, 223

*United States v. Wey,*
  No. 15 Cr. 611 (AJN), 2017 WL 237651 n.8 (S.D.N.Y. Jan. 18, 2017) ......... 85, 227, 229

*United States v. Williams,*
  205 F.3d 23 (2d Cir. 2000) ............................................................ 70

*United States v. Williams,*
  No. 10 Cr. 622 (ADS), 2018 WL 4623017 (E.D.N.Y. Sept. 26, 2018) ................ 123

*United States v. Winter,*
  348 F.2d 204 (2d Cir. 1965) ......................................................... 146

*United States v. Wong,*
  431 U.S. 174 (1977) .................................................................... 146

*United States v. Wright,*
  343 F.3d 849 (6th Cir. 2003) .......................................................... 62

*United States v. Ying Lin,*
  No. 15 Cr. 601 (DLI), 2018 WL 5113139 (E.D.N.Y. Oct. 19, 2018) .................. 206

*United States v. Yonkers Contracting Co., Inc.,*
  682 F. Supp. 757 (S.D.N.Y. 1988) ................................................... 291

*United States v. Young,*
  08 Cr. 285 (KMK), 2008 WL 4178190 (S.D.N.Y. Sept. 4, 2008) .................... 235

*United States v. Young,*
  No. 08 Cr. 285 (KMK), 2008 WL 4178190 (S.D.N.Y. Sept. 4, 2008) ............... 234

*United States v. Zackson,*
  12 F.3d 1178 (2d Cir. 1993) .......................................................... 253

*United States v. Zodhiates,*
  901 F.3d 137 (2d Cir. 2018) .......................................... 122, 126, 131

*Valentine v. Konteh,*
  395 F.3d 626 (6th Cir. 2005) ......................................................... 235

*Vernon v. Cassadaga Valley Cent. School Dist.,*
  49 F.3d 886 (2d Cir. 1995) ......................................................... 42, 43

xxiv

*Washington v. Glucksberg*,
  521 U.S. 702 (1997) ........................................................................... 151
*Weingarten v. United States*,
  865 F.3d 48 (2d Cir. 2017) ............................................................ passim
*Zafiro v. United States*,
  506 U.S. 534 (1993) ........................................................ 209, 210, 220
*Zicarelli v. Dietz*,
  633 F.2d 312 (3d Cir. 1980) ............................................................. 293
*Zietzke v. United States*,
  426 F. Supp. 3d 758 (W.D. Wash. 2019) ......................................... 121

Statutes

18 U.S.C. §1623(a) ............................................................................ 118
18 U.S.C. § 1591 ............................................................................... 152
18 U.S.C. § 1623 ......................................................................... 3, 115
18 U.S.C. § 2 ................................................................................. 2, 3
18 U.S.C. § 2243 ............................................................................... 155
18 U.S.C. § 2422 ......................................................................... passim
18 U.S.C. § 2422(a) ............................................................................ 17
18 U.S.C. § 2422(b) ............................................................................ 17
18 U.S.C. § 2423 ......................................................................... 3, 151
18 U.S.C. § 2423(a) ..................................................................... passim
18 U.S.C. § 2423(b) ..................................................................... 17, 37
18 U.S.C. § 2423(e) ............................................................................ 17
18 U.S.C. § 2703(c)(2) ........................................................................ 87
18 U.S.C. § 2703(d) ............................................................................ 88
18 U.S.C. § 3282 ......................................................................... 24, 35
18 U.S.C. § 3283 ......................................................................... passim
18 U.S.C. § 3299 ............................................................................... 25
18 U.S.C. § 3500 ..................................................................... 181, 184
18 U.S.C. § 3500(a) ........................................................................... 181
18 U.S.C. § 3500(b) ........................................................................... 182
18 U.S.C. § 3509(a) ............................................................................ 37
18 U.S.C. § 3509(a)(8) ........................................................................ 36
18 U.S.C. § 3509(d) ........................................................................... 152
18 U.S.C. § 3509(k) ..................................................................... 24, 36
18 U.S.C. § 371 .................................................. 2, 151, 155, 168
18 U.S.C. § 3771 ............................................................................... 116
28 U.S.C. § 112 ............................................................................... 192
28 U.S.C. § 112(b) ..................................................................... 192, 200
28 U.S.C. § 1861 *et seq.* ......................................................... 193, 194
28 U.S.C. § 1863(a) ........................................................................... 194
28 U.S.C. § 1863(b)(6) ....................................................................... 195
28 U.S.C. § 1865(b) ........................................................................... 194

28 U.S.C. § 1869(e) ............................................................................... 198, 200
28 U.S.C. § 81 ............................................................................................ 192
New York Penal Law § 130.55 .................................................................. 155
Pub. L. No. 101-647 ..................................................................................... 24
Pub. L. No. 103-322 ..................................................................................... 24
Pub. L. No. 108-21 ....................................................................................... 25
Pub. L. No. 109-162 ..................................................................................... 25
Pub. L. No. 109-248 ..................................................................................... 25

Rules

Fed. R. App. P. 4(a)(6) ................................................................................ 99
Fed. R. Civ P 56 ........................................................................................ 153
Fed. R. Crim. P. 14(a) ............................................................................... 157
Fed. R. Crim. P. 16 .................................................................................... 200
Fed. R. Crim. P. 21 .................................................................................... 221
Fed. R. Crim. P. 5(f) ................................................................................. 206
Fed. R. Crim. P. 6(e) ................................................................................... 88
Fed. R. Crim. P. 7 ...................................................................................... 168
Fed. R. Crim. P. 7(c)(1) ............................................................................ 168
Fed. R. Crim. P. 7(d) ................................................................................. 177
Fed. R. Crim. P. 7(f) ................................................................................. 192
Fed. R. Crim. P. 8(a) ................................................................................. 156
Fed. R. Crim. P. 8(a) ................................................................................. 156
Fed. R. Evid. 402 ...................................................................................... 183
Fed. R. Evid. 403 ............................................................................... 183, 185
Fed. R. Evid. 404(b)(2) ............................................................................. 184
Fed. R. Evid. 801 ...................................................................................... 210
N.Y. R.P.C. 3.7(b) ..................................................................................... 166
Rule 14 ...................................................................................................... 157
Rule 404(b) ............................................................................................... 186

Other Authorities

149 Cong. Rec. S 5137 ................................................................................ 30
149 Cong. Rec. S 5147 ................................................................................ 30
H.R. Conf. Rep. No. 108-66 ........................................................................ 29
*Positivism and the Separation of Law and Morals*,
    71 Harv. L. Rev. 593 (1958) ................................................................ 130
*Sexual Abuse Prosecutions*,
    77 J. Crim. L. & Criminology 1 (1986) ................................................ 24

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

UNITED STATES OF AMERICA                          :

   -v.-                                              :          S1 20 Cr. 330 (AJN)

GHISLAINE MAXWELL,                                :

                Defendant.              :

-----------------------------------------------------------------x

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in opposition to the defendant's

twelve pre-trial motions, dated January 25, 2021 (the "Defense Motions").  In her pretrial motions,

the defendant seeks to throw everything but the proverbial kitchen sink at the Indictment, raising

myriad arguments that find little support in fact or law.  For the reasons that follow, the motions

should be denied in their entirety.

*First*, the non-prosecution agreement between Jeffrey Epstein and the U.S. Attorney's

Office for the Southern District of Florida is entirely irrelevant to this case, and the defendant's

motion fails as a matter of law.  *Second*, the indictment is timely under 18 U.S.C. § 3283, which

provides an extended statute of limitations for crimes involving the sexual abuse of minors.  The

defendant's statute of limitations arguments run contrary to the text of the statute, the intent of

Congress, and the weight of authority.  *Third*, the defendant's claim that the Government delayed

in bringing the indictment fails as a matter of law and fact.  *Fourth*, both of the defendant's motions

to suppress evidence obtained through a judicially approved subpoena are meritless, and her

allegations of Government misconduct are baseless.  *Fifth*, Counts Five and Six—which charge

the defendant with committing perjury—are properly pleaded, and the defendant's motion to

dismiss those charges improperly asks the Court to adjudicate her guilt.  It is for the jury to decide whether the defendant committed perjury, and the motion should be denied.  *Sixth*, the crimes in the indictment should be tried together, as all six counts of the indictment are logically connected and provable through overlapping evidence.  The Court should not sever this case, and thereby require victims of child sexual abuse to testify at multiple trials.  *Seventh*, the Indictment indisputably alleges each element of every offense charged and provides the defendant with ample notice of the charges against her.  *Eighth*, the Indictment is properly pled and there is no basis to strike any portion of it as surplusage.  *Ninth*, the defense motion to dismiss one of the conspiracy charges as multiplicitous is premature.  *Tenth*, the defendant is not entitled to a bill of particulars or any of the other early disclosures she seeks.  *Finally*, the use of a grand jury sitting in White Plains to return the Indictment in this case was entirely proper.

## BACKGROUND

On June 29, 2020, a grand jury sitting in this District returned an indictment charging the defendant in six counts.  On July 2, 2020, the Federal Bureau of Investigation ("FBI") arrested the defendant.  On July 8, 2020, a grand jury sitting in this District returned a superseding indictment (the "Indictment") containing the same charges, with ministerial corrections.  (Dkt. No. 17).  Count One of the Indictment charges the defendant with conspiring with Jeffrey Epstein and others to entice minors to travel to engage in illegal sex acts, in violation of 18 U.S.C. § 371.  Count Two charges the defendant with enticing a minor to travel to engage in illegal sex acts, and aiding and abetting the same, in violation 18 U.S.C. §§ 2422 and 2.  Count Three charges the defendant with conspiring with Epstein and others to transport minors to participate in illegal sex acts, in violation of 18 U.S.C. § 371.  Count Four charges the defendant with transporting minors to participate in

illegal sex acts, and aiding and abetting the same, in violation of 18 U.S.C. §§ 2423 and 2.  Counts

Five and Six charge the defendant with perjury, in violation of 18 U.S.C. § 1623.[1]

## ARGUMENT

**I.   Jeffrey Epstein's Non-Prosecution Agreement Is Irrelevant to This Case**

The defendant seeks to dismiss the Indictment based on a 2007 non-prosecution agreement

("NPA") between Jeffrey Epstein and the U.S. Attorney's Office for the Southern District of

Florida (the "USAO-SDFL").  (Def. Mot. 1).  She does so despite the fact that: (1) she did not

negotiate the NPA, was not a party to the NPA, and her name is not contained anywhere in the

document; and (2) her crimes are not identified or named in any way in the NPA.  Essentially, the

defendant claims she is immune from prosecution for *any* federal crime, during *any* time period,

*anywhere*, in the United States, based on the language of a document that does not name her and

which she did not sign.  Moreover, she seeks to enforce the NPA against a U.S. Attorney's Office

that did not negotiate the NPA and is not bound by it.

The defendant's arguments are meritless, and the Court should reject them.  As a threshold

matter, under the well-settled law of this Circuit, the NPA is not enforceable in this District,

because the USAO-SDFL's agreement with Jeffrey Epstein is not binding on the U.S. Attorney's

Office for the Southern District of New York (the "USAO-SDNY").  Moreover, even if the NPA

applied to this District—which it does not—the NPA does not immunize the defendant from

prosecution for the crimes charged in the Indictment.  Finally, because the defendant has failed to

---

[1] As the Government has repeatedly indicated, the investigation into Jeffrey Epstein's co-conspirators remains ongoing.  (*See, e.g.*, Gov't Letter dated Aug. 21, 2020, Dkt. No. 46; Gov't Letter dated Oct. 6, 2020, Dkt. No. 60; Gov't Letter dated Oct. 20, 2020, Dkt. No. 65).  To the extent that investigation results in additional charges against the defendant, the Government intends to seek any superseding indictment at least three months in advance of trial.  The Government does not anticipate that any new charges would require the production of any additional discovery.

offer any evidence to support her claim that the NPA applies to this District, to the defendant, or to the crimes in the Indictment, the Court should deny the defendant's request for discovery and an evidentiary hearing.

### A.    The NPA Does Not Bind the Southern District of New York

As an initial matter, the NPA is not enforceable in this District.  To the contrary, it is black-letter law in this Circuit that a plea agreement in one district does not apply elsewhere, in the absence of express indications not present here.  Indeed, the Second Circuit has considered and rejected the exact arguments the defendant advances in her motion.  The defendant's motion is without any basis in the law and should be denied.

It is well settled in the Second Circuit that "a plea agreement in one U.S. Attorney's office does not, unless otherwise stated, bind another."  *United States v. Prisco*, 391 F. App'x 920, 921 (2d Cir. 2010) (citing *United States v. Annabi,* 771 F.2d 670, 672 (2d Cir. 1985) (per curiam) ("A plea agreement binds only the office of the United States Attorney for the district in which the plea is entered unless it affirmatively appears that the agreement contemplates a broader restriction.")); *United States v. Salameh*, 152 F.3d 88, 120 (2d Cir. 1998).  This Circuit "presumes a narrow reading of the boundaries of a plea agreement unless a defendant can affirmatively establish that a more expansive interpretation was contemplated."  *United States v. Laskow*, 688 F. Supp. 851, 854 (E.D.N.Y. 1988) (citing *Annabi*, 771 F.2d at 672), *aff'd*, 867 F.2d 1425 (2d Cir. 1988)(tbl.).  To meet this burden, a defendant must establish that either the text of the agreement or the "negotiations between defendant and prosecutor" indicate a promise to bind other districts.  *United States v. Russo*, 801 F.2d 624, 626 (2d Cir. 1986).  For the reasons set forth below, the defendant has failed to establish that the USAO-SDFL promised Epstein that the NPA would bind other districts.

1.      **The Text of the Agreement Does Not Contain a Promise to Bind Other Districts**

Turning first to the text of the NPA, the terms of the agreement do not contain an "affirmative appearance" that the parties who signed the NPA intended to bind any other U.S. Attorney's Office.  To begin with, there can be no dispute that only representatives of the USAO-SDFL signed the agreement.  There is no signature block for, nor specific mention of, any other district or component of the Department of Justice.

In her motion, the defendant argues that the words "United States" in the NPA evince an intent to bind the entire United States Government.  (Def. Mot. 1 at 18).  But the Second Circuit has rejected this very argument: "[t]he mere use of the term 'government' in the plea agreement does not create an affirmative appearance that the agreement contemplated barring districts other than the particular district entering into the agreement."  *Salameh*, 152 F.3d at 120 (citations and internal quotation marks omitted).  This rule also extends to plea agreements that use the term "United States."  *See United States v. Brown*, No. 99-1230, 2002 WL 34244994, at *2 (2d Cir. Apr. 26, 2002) (summary order) (plea agreement does not bind other districts "even if the plea agreement purports to bind 'the Government'" or the "United States"); *United States v. Bruno*, 159 F. Supp. 3d 311, 321 (E.D.N.Y. 2016) ("The Court disagrees with Defendant's argument that the phrase 'United States' shows an intent to bind all United States Attorney's Offices.  Rather, the plea agreement covers only Defendant's liability in the SDFL.").

As the Second Circuit first explained in *Annabi*, plea agreements apply only in the district in which they are executed, absent evidence that the parties agreed to broader restrictions:

> As an original proposition, a plea agreement whereby a federal prosecutor agrees that 'the Government' will dismiss counts of an indictment . . . might be thought to bar the United States from reprosecuting the dismissed charges in any judicial district unless the agreement expressly limits the scope of the agreement to the

> district in which the dismissed charges are initially brought. However, the law has evolved to the contrary. A plea agreement binds only the office of the United States Attorney for the district in which the plea is entered unless it affirmatively appears that the agreement contemplates a broader restriction.

*Annabi*, 771 F.2d at 672 (citations omitted). Thus, under *Annabi* and its progeny, a plea agreement only binds the U.S. Attorney's Office that executes the agreement, even if, as here, the agreement references "the Government" or "the United States" and even if the agreement lacks a provision that "expressly limits the scope of the agreement to the district" in which the agreement was entered.[2]

Confronted with this clear and controlling authority, the defendant's motion attempts to limit the rule of *Annabi* by noting that some decisions applying *Annabi* concerned plea agreements that also included express provisions limiting the enforceability of the agreements to the districts in which they were entered. (Def. Mot. 1 at 22). Essentially, the defendant argues that without an express provision limiting the scope of the agreement, every plea agreement should be interpreted to bind the entire federal government. But the law in this Circuit holds the opposite: the presumption is that a plea agreement in one district does not bind another, absent an affirmative appearance that the agreement extends more broadly. *See Laskow*, 688 F. Supp. at 854 ("Defendant's argument, in effect, is that unless there is an explicit statement to the contrary, it is presumed that a non-prosecution agreement binds offices of the United States Attorney that are

---

[2] The defendant's motion emphasizes that the Second Circuit has held, as a general matter, that plea agreements are construed against the Government. (Def. Mot. 1. at 13). That does not carry the day here, as *Annabi* provides a specific mode of analysis for determining whether a plea agreement applies to other districts, and the defendant's motion fails under *Annabi*. More broadly, the authorities the defendant cites for this general principle arise from circumstances in which a defendant has sought to enforce his *own* a plea agreement against the Government. (*See, e.g.*, Def. Mot. 1 at 13 (citing *United States v. Feldman*, 939 F.3d 182, 189 (2d Cir. 2019) (analyzing claim by defendant seeking to enforce promises he claimed prosecutors had made to him)). Notably, the defendant has cited no authority for the proposition that plea agreements are to be construed in favor of a third party who was not involved in plea negotiations.

not parties to the agreement.  This position is at odds with the law in this Circuit, which presumes

a narrow reading of the boundaries of a plea agreement unless a defendant can affirmatively

establish that a more expansive interpretation was contemplated.") (citing *Annabi*, 771 F.2d at

672).  To hold otherwise would turn *Annabi* on its head.

    The defendant next argues that the following provision of the NPA evinces an intent to

bind the entire federal government:

> In consideration of Epstein's agreement to plead guilty and to
> provide compensation in the manner described above, if Epstein
> successfully fulfills all of the terms and conditions of this
> agreement, the United States also agrees that it will not institute any
> criminal charges against any potential co-conspirators of Epstein,
> including but not limited to Sarah Kellen, Adriana Ross, Lesley
> Groff, or Nadia Marcinkova.

NPA at 5; Def. Mot. 1 at 20-21.  Aside from the reference to "United States" which, as noted

above, is insufficient, the defendant does not point to any language in this provision that

purportedly binds other districts.  Instead, she argues that the absence of language specifically

*limiting* this provision to the USAO-SDFL demonstrates an intent to bind the entire federal

government.  This argument fails, for at least three reasons.  First, the defendant's argument inverts

the holding of *Annabi*: in this Circuit, the presumption is that plea agreements bind only the district

in which they are entered, absent affirmative indications otherwise.  Put differently, the *absence*

of express limiting language in this provision is not an affirmative indication of a broader

application.  Accordingly, under Second Circuit law, the absence of limiting language in this

specific provision provides no support for the defendant's motion.

    Second, the defendant's argument acknowledges that the plain terms of the NPA

immunized Epstein from prosecution in "this District," that is, the Southern District of Florida.

*See* NPA at 2 ("After timely fulfilling all the terms and conditions of the Agreement, no

prosecution . . . will be instituted in this District"). In other words, the NPA was expressly limited to the USAO-SDFL.[3] Given this provision, it would be unnatural to read a broader application to other districts—based on no textual indicia—into the provision relating to co-conspirators. Moreover, the defendant's reading of the NPA would require the Court to adopt the view that, where a plea agreement contains limiting terms, they must be repeated in every paragraph in order to have their natural and common-sense effects.

Third, and perhaps most importantly, the defendant's interpretation strains common sense. In order to accept the defendant's arguments, the Court would have to reach the counterintuitive conclusion that Epstein expressly bargained for *broader* immunity for his co-conspirators than he did for himself. That is, under the defendant's reading of the agreement, Epstein bargained to protect co-conspirators nationally for crimes they committed with Epstein, but Epstein only sought protection for himself in the Southern District of Florida. The text of the agreement does not support such a puzzling interpretation. Instead, the more natural reading of the NPA is that its repeated references to the U.S. Attorney's Office and "this District" reflect a universal limitation on the NPA: it applies only to the USAO-SDFL.

Finally, at several points in her motion, the defendant emphasizes that the NPA contains the word "global," but she does not appear to argue that this creates an affirmative appearance that the NPA binds other districts. (Def. Mot. 1 at 9, 12). Nor could she. The phrase "Epstein seeks to resolve globally his state and federal liability," by its terms, refers to Epstein's liability alone. *See* NPA at 2. Moreover, this language appears directly after several paragraphs describing investigations conducted by the Florida State Attorney's Office and the USAO-SDFL. *See id.* at 1-2. Thus, in this context, the terms "global" and "state and federal liability" plainly refer to

---

[3] In fact, the NPA states that it was executed "on the authority of R. Alexander Acosta, United States Attorney for the Southern District of Florida." NPA at 2.

prosecutions by those two offices, and only those two offices.[4]  The defendant therefore cannot argue that the word "global" in this provision means that the NPA binds the entire federal government.

In sum, the defendant points to nothing in the text of the NPA that could possibly be construed to bind other districts.  To the contrary, there are affirmative indications in the text that the NPA applies only to the USAO-SDFL. Accordingly, under *Annabi*, the NPA is only binding on the USAO-SDFL, and the defendant's motion fails as a matter of law.

### 2.  The Defendant Has Offered No Evidence That the NPA Binds Other Districts

Although a defendant may offer evidence that the negotiations between the prosecutor and defendant contained a promise to bind other districts, *Russo*, 801 F.2d at 626, the defendant has failed to do so here.  The defendant's motion is replete with bare assertions and conclusory allegations, but it fails to point to any evidence that the NPA binds the USAO-SDNY.

The lone document the defendant offers in support of her motion is a privilege log filed by the USAO-SDFL in connection with a lawsuit filed by Epstein's victims.  (Def. Mot. 1 at 22).  The log reflects that the FBI agents working with the USAO-SDFL interviewed witnesses in other states—including New York—during their investigation.  That is entirely unremarkable, since federal investigations frequently involve gathering evidence in other states.  This does not in any way establish the substantive involvement of any other districts in the prior investigation, let alone that the USAO-SDFL promised Epstein that the U.S. Attorney's offices in those states would be bound by the NPA.

---

[4] Interpreting the term "federal liability" in this provision could not be read to encompass all U.S. Attorney's offices without also interpreting its neighboring term, "state . . . liability," to refer to every state prosecutor's office in all fifty states.  The USAO-SDFL clearly did not—and could not—make such a broad promise.

The privilege log also does not establish that the USAO-SDFL involved other U.S. Attorney's Offices in plea negotiations with Epstein.  Grasping at straws, the defendant points to a notation in the privilege log, which contains an entry for handwritten notes, reflecting that the prosecutor in the USAO-SDFL spoke with an Assistant U.S. Attorney in New York.  (Def. Mot. 1 at 22).  The notes referenced in the privilege log are attached hereto as Exhibit 1.  As the notes reflect, the prosecutor at the USAO-SDFL reached out to an Assistant U.S. Attorney at the USAO-SDNY to ask about a civil lawsuit relating to Epstein that was handled by the Civil Division of this Office in the 1990s.  The Government is producing to defense counsel today emails that confirm that this was the nature of the contact.[5]  One of those emails is attached hereto as Exhibit 2 for the Court's reference.  Put simply, those communications provide no indication that the USAO-SDNY was involved in plea negotiations with Epstein.  Rather, the USAO-SDFL asked about an old civil case involving Epstein that an AUSA at the USAO-SDNY happened to handle years earlier.  In sum, the privilege log in no way establishes that other districts were involved in negotiating the NPA, much less that Epstein was promised that the NPA would bind other districts.

The defendant proffers no other documentary evidence beyond the privilege log.  Instead, without any citation, she broadly alleges that "senior levels of Main Justice were directly involved in the negotiation and approval of the NPA."  (Def. Mot. 1. at 22).  This vague and unsworn allegation is not evidence.  Moreover, any contacts between the USAO-SDFL and Main Justice

---

[5] In response to the allegations raised by the defense's motion, the Government identified the underlying notes referenced in the privilege log.  The Government is producing those underlying notes, as well as the relevant emails, to defense counsel today.  The Government has also been informed by a human resources representative that payroll records reflect that the Assistant U.S. Attorney referenced in the privilege log left the USAO-SDNY on or about April 29, 2007, months before the NPA was executed.  Although the Government has been informed that Human Resources records do not contain information regarding a division transfer, the Government understands from colleagues that the Assistant U.S. Attorney worked in the Civil Division in the 1990s and worked in the Criminal Division in the 2000s.

would not, without more, establish that the USAO-SDFL intended to bind other districts, much less that the USAO-SDFL communicated a promise to Epstein that the NPA would extend beyond the USAO-SDFL.  The defendant's failure to offer any evidence is fatal to her claim.

Although it is not the Government's burden to address and rebut every innuendo or conclusory statement in the defendant's motion, it is significant here that the circumstances of the NPA have been extensively litigated in a civil lawsuit, and have also been investigated by the Department of Justice's Office of Professional Responsibility ("OPR"), resulting in a report of OPR's findings (the "OPR Report).[6]  The records of both matters provide no support for the defendant's claims.

The OPR Report notes that the USAO-SDFL periodically consulted with the Chief of the Department of Justice Child Exploitation and Obscenity Section ("CEOS"), Andrew Oosterbaan, during the investigation and plea discussions, and that the CEOS Chief attended a meeting with defense counsel, during which defense counsel made a pitch that Epstein should not be prosecuted. November 2020 Report, United States Department of Justice, Office of Professional Responsibility, at 61-62.  However, although the line prosecutor, Maria Villafaña, subsequently sent the CEOS Chief a draft of the NPA, the OPR Report reflects that the CEOS Chief reported to

---

[6] The defendant's motion cites to the executive summary of the OPR Report.  However, the entire report is publicly available, is attached as Exhibit 3 hereto, and has been widely reported on and published by the media.  *See, e.g.*, "Read the report: Investigation into the U.S. Attorney's Office for the Southern District of Florida's Resolution of Its 2006–2008 Federal Criminal Investigation of Jeffrey Epstein and Its Interactions with Victims during the Investigation," *Wash. Post* (Nov. 12, 2020), https://www.washingtonpost.com/context/read-the-report-investigation-into-the-u-s-attorney-s-office-for-the-southern-district-of-florida-s-resolution-of-its-2006-2008-federal-criminal-investigation-of-jeffrey-epstein-and-its-interactions-with-victims-during-the-investigation/db9373e8-22f8-4712-b4a7-be844d162de0/.

OPR that "he did not recall having read the NPA at this juncture and 'had no involvement with it.'" OPR Report at 64 n. 105.[7]

Beyond this, the OPR Report and the record in the civil case note contacts with Main Justice about the NPA, but only *after* the NPA was negotiated, drafted, and signed.  In the civil case, the district court detailed the history of the plea negotiations—and noted that, after the NPA was signed, Epstein's counsel appealed to officials in Washington, D.C., hoping to avoid enforcement of the NPA's requirement that Epstein plead guilty to state offenses, as the agreement required.  *Doe 1 v. United States*, 359 F. Supp. 3d 1201, 1212-13 (S.D. Fla. 2019).  As the district court noted, that appeal was rejected.  *Id.* at 1213.

In particular, and following the execution of the NPA, the report reflects that the USAO-SDFL contacted the CEOS Chief in connection with a letter from Epstein's counsel, Kenneth Starr, protesting about complying with certain parts of the NPA.  OPR Report at 95.  According to the report:

> At the same time, at [USAO-SDFL supervisor] Lourie's request, Villafaña sent the NPA and its addendum to Lourie and Oosterbaan. Oosterbaan responded to Lourie that he was "not thrilled" about the NPA; described Epstein's conduct as unusually "egregious," particularly because of its serial nature; and observed that the NPA was "pretty advantageous for the defendant and not all that helpful to the victims." He opined, however, that the Assistant Attorney General would not and should not consider or address the NPA "other than to say that she agrees with it."  During her OPR interview, [Assistant Attorney General] Fisher did not recall reading Starr's letter or discussing it with Oosterbaan, but believed the comment about her "agree[ing] with it" referred to a federal prosecution of Epstein, which she believed was appropriate. She told OPR, however, that she "played no role in" the NPA and did not review or approve the agreement either before or after it was signed.

---

[7] The OPR Report further reflects that, at the time, a supervisor at the USAO-SDFL noted the CEOS had "no approval authority." OPR Report at 60.

OPR Report at 95. The OPR Report further notes that, thereafter, Epstein sought to avoid complying with the NPA entirely, and his attorneys appealed to Main Justice in the hopes of voiding the agreement. OPR Report at 94-108. That appeal was not successful. *Id.* In any event, the involvement of Main Justice alone would not begin to establish the very different proposition that Main Justice viewed the NPA as binding any district other than USAO-SDFL, let alone specifically considered and approved such an outcome, or communicated such a promise to Epstein.

Further still, the record in the civil case makes clear that the USAO-SDFL's position was that the NPA did not bind other districts. In a July 5, 2013 brief, the USAO-SDFL stated:

> [T]he Non-Prosecution agreement simply obligated the government not to prosecute Epstein ***in the Southern District of Florida*** for the offenses set forth in the Non-Prosecution Agreement. The Non-Prosecution Agreement does not bar the United States from bringing federal criminal charges against Epstein for the offenses set forth in the Non-Prosecution Agreement in any other district in the nation. Neither does the Non-Prosecution Agreement bar prosecution in any district for offenses not identified in the agreement.

Government Brief, 08 Civ. 80736 (KAM), Dkt. No. 205-2, at 10-11 (S.D. Fla.) (emphasis in original); *see also* OPR Report at 81, n.125 (observing that a supervisor at the USAO-SDFL "pointed out that the NPA was not a 'global resolution' and other co-conspirators could have been prosecuted 'by any other [U.S. Attorney's] office in the country.'").

As the USAO-SDFL has explained, the NPA did not bind other districts, and could not. That is because the USAO-SDFL lacked the authority to do so under applicable Department of Justice guidelines:

> Significantly, under the governing provision of the United States Attorney's Manual, the USAO-SDFL did not have the authority to unilaterally bar Epstein's prosecution in any other district in the country: 'No district or division shall make any agreement,

> including any agreement not to prosecute, which purports to bind
> any other district(s) or division without the express written approval
> of the United States Attorney(s) in each affected district and/or the
> Assistant Attorney General of the Criminal Division.'

Government Brief, 08 Civ. 80736 (KAM), Dkt. No. 205-2, at 11 n.11 (S.D. Fla.) (quoting United

States Attorney's Manual, 9-27.641 (Multi-District (Global) Agreement Requests)).  Significantly,

this brief was signed by the same prosecutor who negotiated and signed the NPA.  *Id.*  Although

the defendant makes the sweeping, self-serving, and unsupported allegation that "the government

had every reason to foresee a potential prosecution of Epstein's co-conspirators in this District

and, after multiple layers of review within the Department of Justice, intended to agree to preclude

it," the USAO-SDFL's brief says otherwise.   (Def. Mot. 1 at 22).   Further still, the record

developed in both civil litigation and OPR's investigation does not support this claim.

*** 

        As the foregoing makes clear, the defendant has failed to produce any evidence that the

USAO-SDFL promised Epstein that other districts would be bound by the NPA.  There is no

"affirmative appearance" that the NPA binds other districts, and the motion should be denied.

Under *Annabi* and its progeny, the defendant has failed to establish that the NPA binds other

districts.  For this reason alone, the defendant's motion should be dismissed, in keeping with the

well-established law in this Circuit.[8]

---

[8] In her motion, the defendant asks this Court to apply a bizarre and unprecedented choice-of-
federal-law doctrine, under which the defendant asks the Court to apply non-existent rulings from
the Eleventh Circuit on an issue that Court does not appear to have reached. (Def. Mot. 1 at 23-
25).  This argument has no legal foundation, and the defendant offers no authority for the
proposition that federal plea agreements are governed by the choice of law principles that apply to
conflicting state laws.  *Annabi* is the binding law of this Circuit, and this Court must apply it.

### B.       The NPA Does Not Immunize Maxwell from Prosecution

Even if the NPA bound this District—which it does not—the NPA provides no basis for dismissing the Indictment.  The NPA does not protect the defendant for at least two reasons.  First, the text of the NPA specifically limits the scope of the NPA to certain federal crimes committed between 2001 and 2007, and thus the NPA does not apply to the distinct offenses and time periods charged in the Indictment.  Second, the NPA does not protect the defendant at all, because the mere use of the word "co-conspirator" does not establish that the defendant was among the class of persons contemplated by the agreement, much less that the defendant has standing to enforce it.

### 1.       The NPA Is Limited to Particular Crimes Between 2001 and 2007

Contrary to the defendant's assertions, the NPA did not provide *carte blanche* immunity to Epstein or his "co-conspirators."  In fact, the NPA contains detailed provisions that limit the scope of the crimes immunized in the agreement.

The NPA begins by outlining the scope of the USAO-SDFL investigation, delineating the timeframe of the offense conduct under investigation ("from in or around 2001 through in or around September 2007"), and listing each and every statutory offense under investigation.  NPA at 1.  The NPA does this for a reason, because these terms are later used in the agreement to set the boundaries of immunity.  In particular, the agreement provides:

> [N]o prosecution for the offenses set out on pages 1 and 2 of this agreement, nor any other offenses that have been the subject of the joint investigation by the Federal Bureau of Investigation and the United States Attorney's Office, nor any offenses that arose from the Federal Grand Jury investigation will be instituted in this District, and the charges against Epstein if any, will be dismissed.

NPA at 2.  Thus, the NPA barred the USAO-SDFL from prosecuting Epstein for the specific

offenses enumerated in the NPA.[9]  While these same limitations are not repeated in the provision that purports to immunize "co-conspirators," these limitations apply with equal force across the agreement, because that is the only common-sense way to read the NPA.  Indeed, and as noted above in a related context, it would be exceedingly strange to interpret the "co-conspirator" provision to extend broader immunity than Epstein negotiated for himself.

The defendant may assert that the "co-conspirator" provision has absolutely no limitations, but such an argument would lead to absurd results.  In particular, in arguing that the "co-conspirator" provision lacks any temporal or statutory limitations whatsoever, the defendant seems to claim that the NPA immunized her for *future* crimes including, for example, perjury offenses that she is charged with committing almost a decade after the NPA was executed.  (Def. Mot. 1 at 32 ("For the foregoing reasons, Ms. Maxwell respectfully requests that the Court dismiss the indictment.")).  Although the defendant does not highlight this point in her motion—perhaps recognizing how absurd it would be—that is the natural consequence of her illogical interpretation of the NPA.  Despite advancing an argument that strains common sense, the defendant cites no case in which a court has interpreted a plea agreement to bar prosecution for crimes that pre- or post-dated the period covered by the agreement.  The Government is aware of no such authority. *See United States v. Hallahan*, 756 F.3d 962, 974 (7th Cir. 2014) (rejecting defense argument that plea agreement barred prosecution for subsequent bail jumping, and, in interpreting the

---

[9] By its plain terms, the NPA did not immunize Epstein for his "background," as the defendant suggests.  (Def. Mot. 1 at 27).  This provision refers, instead, to a list of "offenses" under federal law.  Indeed, it is unclear how any plea agreement could immunize a defendant's "background."  Similarly, the fact that the USAO-SDFL interviewed Minor Victim-2 does not mean that this case "arose out of" the USAO-SDFL investigation, an assertion the defendant's motion does not explain or support with evidence.  As the Indictment makes clear, the events underpinning the Indictment involve multiple victims and specific legal charges that were not within the scope of the USAO-SDFL investigation.  As discussed in greater detail below, Minor Victim-1 and Minor Victim-3 were never interviewed by the USAO-SDFL, and they did not agree to speak with law enforcement until 2019.

Government's promises in the plea agreement to only cover past crimes, observing that "not limiting the prohibition to past crimes would make it absurd and probably illegal") (citing *Aronson v. K. Arakelian, Inc.*, 154 F.2d 231, 233 (7th Cir. 1946) ("[A] contract will not be presumed to have imposed an absurd or impossible condition on one of the parties, but will be interpreted as the parties must be supposed to have understood the conditions at the time.")).

Finally, the defendant claims that the NPA covers all violations of the Mann Act.  (Def. Mot. 1 at 26 n.4).  Not so.  The NPA lists specific statutory provisions within the Mann Act, but none of the provisions contained in the Indictment.  In particular, the NPA expressly covers violations of 18 U.S.C. §§ 2422(b), 2423(b), and 2423(e), but it does not include the particular provisions charged in the Indictment against Maxwell, which alleges violations of §§ 2422(a) and 2423(a).  These are plainly not the same crimes, and a plea agreement cannot be read to immunize unnamed crimes in the general ballpark of the specific crimes enumerated in the agreement.  The defendant cites no authority that supports her overbroad reading of this provision.

Accordingly, the NPA immunizes only certain, specific offenses, none of which are contained in the Indictment.  As a result, the defendant cannot invoke the NPA to seek the dismissal of the Indictment.

### 2.      The NPA Does Not Confer Enforceable Rights on Maxwell

Even if this Court were to construe the NPA beyond its plain terms to preclude prosecutions for the crimes contained in the Indictment, the defendant has established neither that those protections extend to Maxwell specifically, nor that she has standing to pursue those protections.

The defendant asks this Court to interpret the NPA according to contract principles, and accord the defendant standing to enforce the NPA as a third party beneficiary.  As a general matter, plea agreements are interpreted using principles from contract law, but that maxim is not without

limitations.  As the defendant's motion recognizes, the Second Circuit has emphasized that plea agreements differ from commercial contracts in meaningful respects.  (Def. Mot. 1 at 30 (citing *United States v. Feldman*, 939 F.3d 182, 189 (2d Cir. 2019) ("[W]hile the district court's analysis might have been compelling with respect to a contract arising out of commercial negotiations among private parties, we believe the court did not correctly apply the standards that govern the interpretation of plea agreements with the government.  We have long recognized that plea agreements are significantly different from commercial contracts.")))  Accordingly, although the third party beneficiary doctrine is a tenet of contract law, its application to plea agreements under federal law is a separate question.

The defendant correctly notes that plea agreements may address leniency for third parties.  (Def. Mot. 1 at 15).  However, it does not necessarily follow that a third party may enforce such a promise.  Indeed, it is far from clear that, under federal law, a third party may enforce a plea agreement.  At least one court in this Circuit has noted the absence of authority that a third party has standing to enforce another individual's plea agreement.  *See Santobello v. United States*, No. 94 Cr. 119 (RPP), 1998 WL 113950, at *3 (S.D.N.Y. Mar. 13, 1998) ("Even if Santobello could establish the existence of plea agreements between the Government and his co-defendants, there is little known authority that would allow him to enforce the agreements as a third party beneficiary.") (citing *United States v. Lopez*, 944 F.2d 33, 36-37 (1st Cir. 1991)).

Following this logic, at least one court has concluded that third parties lack standing to enforce plea agreements.  In *United States v. Mariamma Viju*, the defendant claimed that the Government had entered into a plea agreement with her husband, under which the Government had promised not to prosecute her.  No. 15 Cr. 240, 2016 WL 107841, at *1 (N.D. Tex. Jan. 11, 2016).  Observing that the principles governing interpretation of plea agreements diverge in many

respects from those underlying contract law, the district court concluded that "third-party beneficiaries have no contractual right to enforce plea agreements." *Id*. at \*3-4.   The court reasoned, "[t]he right to enforce a plea deal does not exist for its own sake; rather, it is a means to achieve fairness in plea bargaining." *Id*. at \*4.   That is because a defendant has the right to enforce his plea agreement, and "enforcement by third parties adds nothing to protecting the defendant's right." *Id.*   The same holds true here.

In support of her claim that she has standing to enforce the NPA, the defendant relies upon three district court decisions, none of which analyzed the threshold question of whether third party standing concepts from contract law apply to plea agreements.   In *United States v. Florida West Int'l Airways, Inc.*, 853 F. Supp. 2d 1209, 1228 (S.D. Fla. 2012), the district court applied the third party beneficiary doctrine to a former airline employee based on a prior plea agreement with the airline that immunized, among others, current and former employees of the airline and its subsidiaries.   In its analysis, however, the court applied the doctrine without analyzing the question of whether third party beneficiary standing principles apply to plea agreements.   *Id*.   For similar reasons, the defendant's reliance on *United States v. El-Sadig*, 133 F. Supp. 2d 600, 608-09 (N.D. Ohio 2001) is misplaced.   In that case, the court permitted a third party to invoke a plea agreement, but it did not analyze or address whether third party standing rules apply to plea agreements.   *Id.* Likewise, in *United States v. CFW Const. Co.*, 583 F. Supp. 197, 203 (D.S.C. 1984), the court applied the third party beneficiary doctrine, but relied solely on contracts treatises for support, and did not analyze whether that doctrine should be applied to plea agreements.

In any event, even if third party beneficiaries had standing to enforce federal plea agreements, the defendant has failed to establish that *she* is a third party beneficiary of the NPA. In order to establish that she has enforceable rights under the NPA, the defendant must show that

"a direct and primary object of the contracting parties was to confer a benefit on the third party."

*Fla. W. Int'l Airways, Inc.*, 853 F. Supp. 2d at 1228 (quoting *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 982 (11th Cir. 2005)).  In other words, "the intent of the parties is the key" to evaluating whether an individual is a third party beneficiary.  *Id.*

Here, the defendant has offered no evidence that the parties intended to confer a benefit on her in particular, or that her crimes in the 1990s make her a member of the class of "co-conspirators" the parties had in mind when they negotiated the NPA.  To the contrary, the OPR's investigation of the circumstances surrounding the inclusion of this provision in the NPA strongly undercuts any such argument, and OPR's findings demonstrate that the parties did *not* intend to confer a benefit on the defendant.  With respect to the "co-conspirator" provision, the OPR Report concluded, in relevant part:

> Other than various drafts of the NPA and of a federal plea agreement, OPR found little in the contemporaneous records mentioning the provision and nothing indicating that the subjects discussed or debated it—or even gave it much consideration. Drafts of the NPA and of the federal plea agreement show that the final broad language promising not to prosecute "any potential co-conspirators of Epstein" evolved from a more narrow provision sought by the defense. The provision expanded as [USAO-SDFL prosecutor Maria] Villafaña and defense counsel exchanged drafts of, first, a proposed federal plea agreement and, then, of the NPA, with apparently little analysis and no substantive discussion within the USAO about the Provision.

OPR Report at 166.  With respect to Maxwell in particular, OPR interviewed Maria Villafaña, the lead prosecutor on the case, and noted:

> Villafaña acknowledged that investigators were aware of Epstein's longtime relationship with a close female friend who was a well-known socialite, but, according to Villafaña, in 2007, they "didn't have any specific evidence against her." Accordingly, Villafaña believed that the only "co-conspirators" of Epstein who would benefit from the provision were the four female assistants identified by name.

OPR Report at 167.[10]   After reviewing the facts and circumstances of the negotiation, OPR concluded that "the evidence does not show that [Former USAO-SDFL U.S. Attorney Alex] Acosta, [Former USAO-SDFL supervisor Andrew] Lourie, or Villafaña agreed to the nonprosecution provision to protect any of Epstein's political, celebrity, or other influential associates." OPR Report at 168.[11]

In view of OPR's conclusions—and in the absence of any evidence to the contrary proffered by the defendant—the defendant has failed to establish that that she was an intended third party beneficiary of the NPA.  Accordingly, the defendant lacks standing to enforce the NPA.

### C.      The Defendant Has Offered No Basis for Additional Discovery or a Hearing

The defendant's motion for discovery and a hearing fares no better.  Lacking any evidence—much less any legal authority—that the NPA applies to this District or the crimes in the Indictment, the defendant asks the Court to order discovery and conduct a hearing.  In short,

---

[10] The OPR Report further reflects that in OPR's interview of Villafaña, she reported that she did not have anyone in mind aside from the four individuals named in the "co-conspirator" provision: "Villafaña told OPR that she was willing to include a non-prosecution provision for Epstein's co-conspirators, who at the time she understood to be the four women named in the proposed agreement, because the USAO was not interested in prosecuting those individuals if Epstein entered a plea. Villafaña told OPR, '[W]e considered Epstein to be the top of the food chain, and we wouldn't have been interested in prosecuting anyone else.' She did not consider the possibility that Epstein might be trying to protect other, unnamed individuals, and no one, including the FBI case agents, raised that concern."  OPR Report at 70.  Further, the OPR Report notes that: "Villafaña told OPR that, apart from the women named in the NPA, the investigation had not developed evidence of 'any other potential co-conspirators.'"  *Id.* at 81.  Similarly, the report reflects that a supervisor at USAO-SDFL told OPR "that it never occurred to him that the reference to potential co-conspirators was directed toward any of the high-profile individuals who were at the time or subsequently linked with Epstein."  OPR Report at 80-81.

[11] Although the defendant correctly notes that the OPR Report reflects that the prosecutor remarked that Epstein "wanted to make sure that he's the only one who takes the blame for what happened," OPR Report at 167, that desire explains the existence of the "co-conspirator" provision, but it does not inform its meaning or scope.

the defendant asks this Court to authorize an extensive and burdensome fishing expedition, premised on the defendant's pure conjecture.  The Court should deny the motion.

Although the defendant asserts that the Court is obligated to conduct a hearing, she has failed to establish that any hearing is warranted.  The defendant argues that courts conduct evidentiary hearings "where the existence or scope of a plea agreement or non-prosecution agreement is in genuine dispute."  (Def. Mot. 1 at 29).  But the defendant has not established any genuine factual dispute in this case that a hearing would be required to resolve.  The defendant has offered bare conclusions in support of her motion, which are refuted by governing law, record evidence, and the four corners of the agreement itself.  That is not a basis for a hearing.

As the Second Circuit explained in *United States v. Aleman*, 286 F.3d 86 (2d Cir. 2002), "a district court need not conduct a hearing every time a defendant summarily accuses the government of failing to live up to an alleged bargain."  *Id.* at 91.  In that case, the court held that a hearing was required because the defendant had submitted affidavits from his attorney, as well as corroborating affidavits from other attorneys, and the Government had not submitted any evidence.  *Id.*; *see also United States v. Sattar*, 272 F. Supp. 2d 348, 383 (S.D.N.Y. 2003) (applying *Aleman*, and ordering an evidentiary hearing based upon the defendant's submission of an affidavit from an attorney with knowledge of the alleged oral agreement).  Similarly, in *United States v. Feldman*, 939 F.3d 182 (2d Cir. 2019), the Second Circuit held that a hearing was required based on the defendant's uncontested assertions about specific representations made to him by a prosecutor.  *Id.* at 184, 190.  Here, by contrast, the defendant has offered no evidence in support of her allegations.

The defendant cannot seriously argue that she has made the type of showing that requires a hearing.  For example, she has not offered any affidavits from Epstein's former defense attorneys

claiming that the USAO-SDFL made promises that were not contained in the NPA.  Nor has she pointed to anything in the extensive record of either the OPR investigation or the civil litigation surrounding the NPA that would suggest that the NPA applies to this District, or to the crimes in the Indictment, or to Maxwell.  In the absence of any such evidence—and in the face of substantial contrary evidence gathered in the civil litigation and OPR investigation—the Court has no obligation to conduct a hearing.

For similar reasons, the defendant's motion for discovery should be denied.  To the extent the defendant seeks discovery under Rule 16, she has failed to meet her burden.  A defendant seeking discovery under Rule 16 "must make a *prima facie* showing of materiality and must offer more than the conclusory allegation that the requested evidence is material."  *United States v. Urena*, 989 F. Supp. 2d 253, 261 (S.D.N.Y. 2013) (citations omitted).  Here, the defendant has offered nothing more than her conjecture that some unspecified evidence might exist.  The motion should be denied.

## II.    The Indictment Is Timely

Counts One through Four are timely charged because the applicable limitations period, 18 U.S.C. § 3283 (2003), permits prosecution for offenses "involving the sexual or physical abuse… of a child" at any time "during the life of the child," and each of the victims identified in the Indictment remains alive.  Maxwell contends that Section 3283 should not be applied to conduct that predated its amendment in 2003 (Def. Mot. 2), but that argument is contrary to the text of the statute, Congress's clear intent when extending the statute of limitations, and the decisions of other circuits and district courts in this Circuit.  In effect, the defendant's motion asks this Court to break new ground, and become the first court to hold that Section 3283 applies only prospectively.

In the alternative, Maxwell argues that Section 3283 is inapplicable because the offenses charged in the Indictment do not "involv[e] the sexual or physical abuse . . . of a child."  (Def. Mot. 2 at 12-14).  Yet her argument runs contrary to the weight of authority that has adopted the common-sense view that crimes that necessarily entail the sexual or physical abuse of children "involv[e] the sexual or physical abuse of a child."  This Court should do the same and deny the motion.

### A.        Statutory Background

Between 1990 and 2006, Congress passed a series of laws that expanded the statute of limitations for prosecutions of crimes against minors, ultimately extending the statute of limitations to the lifetime of the minor victim and, for certain offenses, eliminating the statute of limitations entirely.  These laws reflect a virtually unbroken congressional policy that the default five-year statute of limitations for federal crimes, 18 U.S.C. § 3282, is inadequate for such offenses.  An extended statute of limitations is necessary because "child sex abuse offenses . . . may be difficult to detect quickly," in part because children often first report their abuse long after it occurs.  *Weingarten v. United States*, 865 F.3d 48, 54 (2d Cir. 2017) (citing, *e.g.*, David McCord, *Expert Psychological Testimony About Child Complainants in Sexual Abuse Prosecutions*, 77 J. Crim. L. & Criminology 1, 60-61 (1986)).

In 1990, Congress enacted a new statute of limitation for certain crimes against children, which stated: "No statute of limitation that would otherwise preclude prosecution for an offense involving the sexual or physical abuse of a child under the age of 18 years shall preclude such a prosecution before the child reaches the age of 25 years."  Crime Control Act of 1990, Pub. L. No. 101-647, tit. II, § 225(a), 104 Stat. 4789, 4798 (codified at 18 U.S.C. § 3509(k) (1990)).  In 1994, Congress re-codified this provision, moving it to 18 U.S.C. § 3283 with identical language.

Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, tit. XXXIII, § 330018(a), 108 Stat. 1796, 2149 (codified at 18 U.S.C. § 3283 (1994)) ("No statute of limitations that would otherwise preclude prosecution for an offense involving the sexual or physical abuse of a child under the age of 18 years shall preclude such prosecution before the child reaches the age of 25.").

As the Second Circuit has recognized, "after nearly a decade, Congress began to view even the extended statute of limitations period in the 1994 version of § 3283 as 'inadequate in many cases' because it released from criminal liability sex abusers whose crimes were not brought to the attention of federal authorities until after their victims turned twenty-five." *Weingarten*, 865 F.3d at 54 (citing H.R. Conf. Rep. No. 108–66, at 54 (2003)).  Accordingly, in April 2003, Congress amended Section 3283 to permit the prosecution of sex offenses against minors at any time during the lifetime of the minor victim.  Prosecutorial Remedies and Tools Against the Exploitation of Children Today Act ("PROTECT Act") of 2003, Pub. L. No. 108-21, tit. II, § 202, 117 Stat. 650, 660 (codified at 18 U.S.C. § 3283 (2003)) ("No statute of limitations that would otherwise preclude prosecution for an offense involving the sexual or physical abuse, or kidnaping, of a child under the age of 18 years shall preclude such prosecution during the life of the child.").

In January 2006, Congress further amended Section 3283 to its current form to permit the prosecution of such offenses during the lifetime of the victim or ten years after the offense, whichever is longer.  Violence Against Women and Department of Justice Reauthorization Act of 2006, Pub. L. No. 109-162, tit. XI, § 1182(c), 119 Stat. 2960, 3126 (codified at 18 U.S.C. § 3283 (2006)) ("No statute of limitations that would otherwise preclude prosecution for an offense involving the sexual or physical abuse, or kidnaping, of a child under the age of 18 years shall

preclude such prosecution during the life of the child, or for ten years after the offense, whichever is longer.").

Finally, later that same year, Congress enacted a new statute as part of the Adam Walsh Child Protection and Safety Act of 2006, Pub. L. No. 109-248, 120 Stat. 587. That statute eliminated the statute of limitations entirely for certain crimes involving the sexual exploitation of minors. *Id.* tit. II, § 211(1), 120 Stat. at 616 (codified at 18 U.S.C. § 3299).

### B. The 2003 Amendment to Section 3283 Applies Retroactively

Counts One through Four of the Indictment charge crimes that occurred between 1994 and 1997. At the time of the offense conduct, the applicable statute of limitations, 18 U.S.C. § 3283 (1994), ran until "the child reaches the age of 25." However, in 2003, while the statute of limitations had not yet run for the crimes charged in the Indictment,[12] Congress amended the statute, extending the limitations period to permit a prosecution at any time "during the life of the child." 18 U.S.C. § 3283 (2003). Because the victims are all alive, the Indictment is timely under the 2003 amendment.

Put simply, the 2003 amendment applies to any conduct that could have been charged at the time of its enactment. The legislative purpose behind Section 3283 and a plain reading of the statute compel this conclusion, and courts have repeatedly held that the 2003 amendment applies retroactively, provided that the statute of limitations had not run for the offense at the time of the amendment. *See, e.g.*, *United States v. Leo Sure Chief*, 438 F.3d 920, 922-25 (9th Cir. 2006) ("Because Congress evinced a clear intent to extend, rather than shorten, the statute of limitations applicable to sexual abuse crimes, and because there is no *ex post facto* problem here, the prosecution was timely.") (citing *United States v. Jeffries*, 405 F.3d 682, 685 (8th Cir. 2005), *cert.*

---

[12] The timeliness of the charges in the Indictment in 2003 is discussed in greater detail below.

*denied*, 546 U.S. 1007 (2005)); *United States v. Brown*, 800 F. App'x 455, 461 (9th Cir. 2020) ("Because Congress evinced a clear intent to extend the statute of limitations for these types of crimes in its amendments, and because there is no *ex post facto* problem here, the prosecution was timely."), *cert. denied*, No. 20-5064, -- S.Ct. -- , 2021 WL 78235 (Jan. 11, 2021); *United States v. Pierre-Louis*, No. 16 Cr. 541 (CM), 2018 WL 4043140, at *1 (S.D.N.Y. Aug. 9, 2018) (denying motion to dismiss child exploitation charges as time-barred) ("Defendant's argument rests on the erroneous premise that the law requires the defendant to have committed the charged offense after the effective date of the extension of the statute of limitations for the charge to not be time-barred. As long as the original statute of limitations had not lapsed when the extension went into effect, the prosecution is not time-barred."); *United States v. Sensi*, No. 08 Cr. 253, 2010 WL 2351484, at *2 (D. Conn. June 7, 2010) (holding that the 2003 amendment of Section 3283 applies to pre-enactment conduct, and rejecting the argument "that the lack of a savings clause in the 2003 version of section 3283 is fatal to extending the statute of limitations."); *United State v. Nader*, 425 F. Supp. 3d 619, 624-30 (E.D. Va. 2019) (holding that the 2003 amendment of Section 3283 applies to pre-enactment conduct).

In *Landgraf v. USI Film Products*, 511 U.S. 244 (1994), the Supreme Court set forth a two-part framework for determining whether a statute applies retroactively.  At step one of the analysis, "if Congress 'expressly prescribed' that a statute applies retroactively to antecedent conduct, 'the inquiry ends[] and the court enforces the statute as it is written,' save for constitutional concerns."  *Weingarten*, 865 F.3d at 54-55 (quoting *In re Enter. Mort. Acceptance Co. Sec. Litig. ("Enterprise")*, 391 F.3d 401, 405-06 (2d Cir. 2004)).  However, "when a statute 'is ambiguous or contains no express command' regarding retroactivity, a reviewing court must determine whether applying the statute to antecedent conduct would create presumptively

impermissible retroactive effects." *Id.* For the reasons set forth below, the 2003 amendment of 18 U.S.C. § 3283 satisfies both steps of *Landgraf*, and should be applied to pre-enactment conduct.

### 1.    The 2003 Amendment Satisfies Step One of *Landgraf*

At step one of the *Landgraf* analysis, the question is whether Congress has "expressly prescribed the statute's proper reach." *Landgraf*, 511 U.S. at 280. When evaluating Congress's intent at step one of the *Landgraf* inquiry, the Second Circuit has considered both the text of the statute and the legislative history. *Enterprise*, 391 F.3d at 406-08. In this case, the amended versions of Section 3283 evince Congress's express intent to extend the statute of limitations. The text and history of Section 3283 firmly establish that, with each amendment of the statute of limitations, Congress intended to repeal and replace the prior version of the statute and thereby extend the time to bring live charges of child sexual abuse.

The 2003 amendment, like the 1994 version of the statute, specifically states that "[n]o statute of limitations that would otherwise preclude prosecution" of a child sexual offense "shall preclude" prosecution of such offense during the life of the victim. 18 U.S.C. § 3283 (2003). Claims that were live in 2003 were, at the time, subject to the then-existing statute of limitations, which ran until the victims reached the age of 25. Whenever that statute of limitations ran, it would "otherwise preclude prosecution." Instead, that statute of limitations was replaced by the 2003 amendment.

The Eighth and Ninth Circuits have both held that Congress intended to extend the statute of limitations for live claims of sexual abuse. In *United States v. Jeffries*, 405 F.3d 682 (8th Cir. 2005), the Eighth Circuit reasoned that "both the title and wording of § 3509(k) indicate that Congress intended by it to extend the general statute of limitations. . . . § 3509(k) was later recodified at § 3283 and continued to extend the statute of limitations in child abuse cases." *Id.* at 684 (citing *United States v. Johns*, 15 F.3d 740, 743 (8th Cir. 1994) (holding that an earlier version

28

of § 3509(k) applied to conduct predating its enactment in 1990)).   The Eighth Circuit's reasoning—which addressed earlier versions of the statute—applies with equal, if not greater, force to the 2003 amendment, which established an even broader statute of limitations.  Following *Jeffries*, the Ninth Circuit has similarly held that Section 3283 applies retroactively, because "Congress evinced a clear intent to extend" the statute of limitations.  *Leo Sure Chief*, 438 F.3d at 924 (citing *Jeffries*, 405 F.3d at 685).

Not only does the wording of the statute clearly express that Congress intended for the 2003 amendment to be the only governing statute of limitations for live claims of child sexual abuse, but the legislative history also supports this conclusion.  The Joint Report accompanying the 2003 amendment explains that Congress wanted to expand the statute of limitations out of concern that the 1994 amendment did not go far enough to ensure that perpetrators of child sexual abuse were held to account:

> While [the statute of limitations allowing for prosecution until the victim reaches age 25] is better than a flat five-year rule [under Section 3282], it remains inadequate in many cases. For example, a person who abducted and raped a child could not be prosecuted beyond this extended limit — even if DNA matching conclusively identified him as the perpetrator one day after the victim turned 25.

H.R. Conf. Rep. No. 108-66, at 54 (2003).  Congress's express intention was to prevent perpetrators of crimes against children from escaping justice based on a timing technicality.  Moreover, since the 2003 amendment extended the statute of limitations throughout the lifetime of the victim, it is clear that Congress expressly authorized prosecutions to occur decades after crimes had been committed.[13]

---

[13] Although the defendant claims that prosecuting her crimes now presents unique fairness concerns, there is nothing unusual about prosecuting sex crimes long after they have occurred. *See, e.g., United States v. Brown*, 800 F. App'x 455, 461 (9th Cir. 2020) (2014 indictment charging, among other crimes, sex trafficking offenses dating to 2000 and 2001), *cert. denied*, No. 20-5064, -- S. Ct. -- , 2021 WL 78235 (Jan. 11, 2021); *United States v. Pierre-Louis*, No. 16 Cr. 541 (CM),

The defendant argues that Congress did not intend for Section 3283 to apply to pre-enactment conduct, and asserts that the legislative history supports this interpretation.  Specifically, the defendant points to an earlier version of the bill, which contained an express retroactivity provision that was not included in the final version of the statute.  (Def. Mot. 2 at 6-7).  The defendant's argument on this point is both misleading and unpersuasive.  The defendant quotes Senator Patrick Leahy's comments on the 2003 conference committee report to the effect that "the conference agreed to drop language from the original House-passed bill that would have extended the limitations period retroactively."  (Def. Mot. 2 at 7).  This is a selective quotation; the full statement regarding retroactivity is as follows:

> A final point on section 202: I am pleased that the conference agreed to drop language from the original House-passed bill that would have extended the limitations period retroactively. That language, *which would have revived the government's authority to prosecute crimes that were previously time-barred*, is of doubtful constitutionality.  We are already pushing the constitutional envelope with respect to several of the "virtual porn" provisions in this bill.  I am pleased that we are not doing so in section 202 as well.

149 Cong. Rec. S5137, S5147 (Apr. 10, 2003) (statement of Sen. Leahy) (emphasis added).  As the full quotation makes clear, the legislative history does *not* support the conclusion that when Congress amended Section 3283, it declined to adopt the language in the House-passed bill because it wanted the lengthened statute of limitations to apply only prospectively.  Instead, Senator Leahy's comments indicate that Congress declined to add language that would allow for

---

2018 WL 4043140, at *1 (S.D.N.Y. Aug. 9, 2018) (2016 indictment covering conduct going back to 1998); *United State v. Nader*, 425 F. Supp. 3d 619, 622 (E.D. Va. 2019) (2019 indictment for conduct in 2000).  Indeed, that is precisely what Congress authorized when it extended the statute of limitations for such crimes through the lifetime of the victim.

the resurrection of time-barred prosecutions, in violation of the Ex Post Facto Clause.[14]  But that concern is entirely separate from *extending* the statute of limitations for live claims, which is what Congress did here.  Critically—and as discussed in greater detail below—there is no Ex Post Facto Clause issue in this case, because the statute of limitations for Counts One through Four had not yet expired when the limitations period was extended in 2003.[15]

Accepting the defendant's argument would undermine Congress's plain purpose in extending the limitations period.  In 1990, 2003, and 2006, Congress extended—and ultimately abolished—the statute of limitations to ensure that prosecutors could seek justice for child sex abuse victims who come forward or identify their abusers after a delay.  Applying the 2003 statute only prospectively subverts that purpose by exempting all past offenders.  According to the

---

[14] Moreover, the fact that Congress considered, but ultimately omitted, retroactivity language does not end the *Landgraf* inquiry, as the defendant suggests.  Indeed, *Landgraf* itself makes this clear.  In that case, the statute at issue had a predecessor, which contained a retroactivity provision.  That version was vetoed by the President, and the final version of the statute omitted the retroactivity provision.  As the Supreme Court explained, "[t]he omission of the elaborate retroactivity provision of the 1990 bill—which was by no means the only source of political controversy over that legislation—is not dispositive because it does not tell us precisely where the compromise was struck in the 1991 Act."  *Landgraf*, 511 U.S. at 256.  Indeed, "[i]t [was] entirely possible—indeed, highly probable—that, because it was unable to resolve the retroactivity issue with the clarity of the 1990 legislation, Congress viewed the matter as an open issue to be resolved by the courts."  *Id.* at 261.

[15] Minor Victim-1 and Minor Victim-2 were both younger than 25 in 2003, when Congress extended the limitations period.  Minor Victim-3 was not, but this does not alter the inquiry, because the Indictment does not contain any counts that relate to Minor Victim-3 alone.  Instead, she is one of multiple victims of the conspiracies charged in Counts One and Three.  The inclusion of the overt acts relating to Minor Victim-3 in an otherwise timely conspiracy count does not render that count untimely.  To the contrary, for conspiracy counts, the Government is only required to prove that one overt act in furtherance of the conspiracy occurred within the limitations period.  *United States v. Ben Zvi*, 242 F.3d 89, 97 (2d Cir. 2001).  Thus, the defendant is incorrect to assert that the government is "barred" from prosecuting the defendant for any offense against Minor Victim-3.  (Def. Mot. 2 at 10, n.3).  Instead, there is no statute of limitations issue here so long as the jury is properly instructed at trial that it must find at least one overt act within the limitations period—*i.e.*, one overt act that does not relate to Minor Victim-3.

defendant, in 2003, Congress wanted to ensure that every perpetrator who abused a minor in the future was subject to prosecution for the lifetime of the minor, but Congress simultaneously was content to let all previous perpetrators avoid prosecution whenever their victims turned twenty-five.  No such intent is manifest in either the text or in Senator Leahy's statement.

The reach of Section 3283 is clear.  Because Congress has expressly extended the statute of limitations to pre-enactment conduct, the Court should resolve its analysis at *Landgraf* step one and apply the statute as Congress intended.  In the alternative, however, the statute is—at worst— ambiguous.  If the Court takes that view, it should proceed to *Landgraf* step two.

### 2.      The 2003 Amendment Satisfies Step Two of *Landgraf*

If the Court were to determine that the legislative intent behind Section 3283 is ambiguous, the inquiry then extends to the second step of the *Landgraf* analysis, which examines the retroactive effects of the statute.  As the Supreme Court explained in *Landgraf*, "[a] statute does not operate 'retrospectively' merely because it is applied in a case arising from conduct antedating the statute's enactment, or upsets expectations based in prior law."  511 U.S. at 269.  Instead, the question is whether the statute "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed."  *Vernon v. Cassadaga Valley Cent. School Dist.*, 49 F.3d 886, 890 (2d Cir. 1995) (quoting *Landgraf*, 511 U.S. at 280).  Applying Section 3283 here would have none of those effects.  Maxwell's rights, liabilities, and duties were governed by the substantive criminal statutes governing her conduct.  Until the statute of limitations expired, Maxwell had the same legal liability, the same rights, and the same incentives to retain evidence.  A statute extending that period attaches no new legal consequences; rather, it preserves the status quo.  Therefore, the statute does not operate "retrospectively" within the meaning of *Landgraf*.  *See Cruz v. Maypa*,

773 F.3d 138, 145 (4th Cir. 2014) ("[A]pplying [an] extended limitations period to claims that were unexpired at the time of its enactment does not give rise to an impermissible retroactive effect under *Landgraf*.").

The Second Circuit has considered in three cases whether retroactive statutes of limitation are permissible under *Landgraf*.  In *Vernon v. Cassadaga Valley Cent. School Dist.*, the Second Circuit held that a new statute shortening the filing period for a civil claim applied retroactively. In reaching that conclusion, the Court noted that "*Landgraf* and other cases countenance treating statutes of limitations differently from statutory provisions that affect substantive rights," because statutes of limitations regulate secondary, and not primary conduct.  *Vernon*, 49 F.3d. at 890-91. In *In re Enterprise Mortgage Acceptance Co.*, 391 F.3d 401 (2d Cir. 2004), the Second Circuit held that applying an extended statute of limitations retroactively created impermissible retroactive effects.  Yet in that case, it was critical to the Court's analysis that—unlike here—the statute revived claims that were previously time-barred.  *Id.* at 410 ("In our view, the resurrection of previously time-barred claims has an impermissible retroactive effect.").

In *Weingarten*, the Second Circuit considered, but did not ultimately reach, the issue of whether Section 3283 applies retroactively.[16]  In discussing the second step of *Landgraf*, the Court observed: "Courts have routinely recognized a difference between revoking a vested statute of limitations defense and extending a filing period for live claims."  *Id*. at 57 (collecting cases). Moreover, in an opinion by Judge Learned Hand, the Second Circuit explained why extending an active criminal statute of limitations does not offend any concept of fairness:

> Certainly it is one thing to revive a prosecution already dead, and another to give it a longer lease of life.  The question turns upon how

---

[16] The First Circuit has similarly considered this issue in the context of an ineffective assistance of counsel claim and declined to reach the issue of whether Section 3283 applies retroactively. *United States v. Miller*, 911 F.3d 638, 644 (1st Cir. 2018).

> much violence is done to our instinctive feelings of justice and fair play.  For the state to assure a man that he has become safe from its pursuit, and thereafter to withdraw its assurance, seems to most of us unfair and dishonest.  But, while the chase is on, it does not shock us to have it extended beyond the time first set, or, if it does, the stake forgives it.

*Falter v. United States*, 23 F.2d 420, 425-26 (2d Cir. 1928).  The distinction between statutes that revive expired prosecutions and those that extend existing limitations periods has deep roots in established jurisprudence.  It is well-settled that the Ex Post Facto Clause prohibits laws that revive time-barred prosecutions, but permits laws that retroactively extend limitations periods.  *Stogner v. California*, 539 U.S. 607, 632 (2003) (holding that the Ex Post Facto Clause does not "prevent the State from extending time limits for . . . prosecutions not yet time barred."); *United States v. Morgan*, 113 F.3d 1230, 1997 WL 268712, at *7 (2d Cir. 1997) (unpublished opinion) ("The long-standing rule in this circuit is that Congress has the power to extend the period of limitations without running afoul of the *ex post facto* clause, provided the original period has not already run.") (citing *Falter*, 23 F.3d at 425-26).  And other circuits have emphasized this distinction in the context of Section 3283.  *Leo Sure Chief*, 438 F.3d, at 922-25; *Jeffries*, 405 F.3d 685.

Read together, the Second Circuit's decisions in *Weingarten*, *Vernon*, *Enterprise*, and *Falter* establish that Congress may retroactively extend the limitations period for still-viable prosecutions.  That is precisely what has occurred here, because the charges in the Indictment were still timely when the 2003 amendment extended the limitations period.  As a result, applying Section 3283 in this case does not create impermissible retroactive effects.  Therefore, step two of *Landgraf* is satisfied, and Section 3283 applies retroactively.

Resisting this conclusion, the defendant asserts that, in the criminal context, *Landgraf*'s second step provides protections beyond the Ex Post Facto Clause.  But that is not the law.  *See Nader*, 425 F. Supp. 3d at 630 (rejecting the argument that "there is 'daylight' between the Ex Post

Facto Clause and *Landgraf*'s second step.").  Maxwell cites no precedent for the proposition that, in the criminal context, much less in the context of criminal statutes of limitations, *Landgraf* forecloses prosecutions permitted by the Constitution.  Maxwell instead cites dictum by a single judge in a non-criminal case that, "[i]f [he] were judging on a clean slate," he would read *Landgraf* to prohibit some retroactive application of statutes that, "while not the equivalent of criminal *ex post facto*, nevertheless would run afoul of" *Landgraf*'s considerations, and that he "expect[ed] that the Supreme Court's future decisions" would confirm such a reading.  *Thom v. Ashcroft*, 369 F.3d 158, 163 n.6 (2d Cir. 2004) (Calabresi, J., "[s]peaking only for [him]self").  That footnote is too slender a reed to support Maxwell's entire motion to dismiss the Indictment as untimely. Moreover, Maxwell has identified no case in the intervening seventeen years in which the Supreme Court has embraced Judge Calabresi's view.  *See Nader*, 425 F. Supp. 3d at 631 (finding arguments relating to Judge Calabresi's footnote unpersuasive, and concluding that Section 3283 applies retroactively under *Landgraf*).  As *Weingarten* recognized, any court to hold that "retroactively extending a filing period for live charges is a presumptively impermissible retroactive effect under *Landgraf*" will be the first to do so.  865 F.3d at 58.

The defendant also argues that "criminal limitations statutes are to be liberally interpreted in favor of repose," relying on the Supreme Court's decision in *Toussie v. United States*, 397 U.S. 112, 115 (1970).  *Toussie* considered whether a person's failure to register for the draft was a continuing offense subjecting him to prosecution eight years later, notwithstanding the five-year limitations period in Section 3282.  *Id.* at 114.  In that context, the Court invoked a presumption in favor of repose when determining whether the underlying conduct was time-barred.  But that presumption says nothing about whether Congress intended an extension of a statute of limitations to apply purely prospectively, a question governed by *Landgraf*.  Only one case has applied

*Toussie* to the *Landgraf* analysis, *see United States v. Gentile*, 235 F. Supp. 3d 649, 655 (D.N.J. 2017), and that case, which did not concern Section 3283, relied extensively on a pre-*Landgraf* opinion requiring a clear statement of congressional intent in favor of retroactivity. *See id.* at 655 (citing *United States v. Richardson*, 512 F.2d 105 (3d Cir. 1975)). That clear-statement rule is inconsistent with the analysis required by *Landgraf* step two. *See Nader*, 425 F. Supp. 3d at 631 (rejecting an identical argument relying on *Toussie* and *Gentile*).

***

The defendant asks this Court to break new ground and become the first court to hold that Section 3283 applies only prospectively. The Court should reject this invitation. For the reasons set forth above, the weight of authority holds that Section 3283 applies retroactively, in keeping with Congress's express intent to expand prosecutions of individuals who sexually exploit children. The Indictment is timely, and the motion should be denied.

### C.      The Defendant's Crimes Involved the Sexual Abuse of Minors

The defendant next argues that Section 3283 does not apply at all, and she asks the Court to conclude that the crimes of sexual abuse alleged in the Indictment did not involve sexual abuse. Her argument runs contrary to both the case law and common sense. Her motion is meritless and should be denied.

By its terms, Section 3283 applies to any "offense involving the sexual or physical abuse, or kidnaping, of a child under the age of 18 years." 18 U.S.C. § 3283. As discussed above, when the statute was first enacted, it was located at 18 U.S.C. § 3509(k). The definition of the term "sexual abuse" is located in a neighboring provision within that same section:

> For purposes of this section . . . the term 'sexual abuse' includes the employment, use, persuasion, inducement, enticement, or coercion of a child to engage in, or assist another person to engage in, sexually

> explicit conduct or the rape, molestation, prostitution, or other form
> of sexual exploitation of children, or incest with children.

18 U.S.C. § 3509(a)(8).  The term "sexually explicit conduct" is in turn defined to mean, among

other things, "sexual intercourse, including sexual contact"; and the term "sexual contact" means

"the intentional touching, either directly or through clothing, of the genitalia, anus, groin, breast,

inner thigh, or buttocks of any person with an intent to abuse, humiliate, harass, degrade, or arouse

or gratify sexual desire of any person."  *Id.* § 3509(a)(9)(A).  Courts have looked to the definition

of "sexual abuse" set forth in Section 3509(a) to determine whether the statute of limitations of

Section 3283 applies to an offense.  *United States v. Carpenter*, 680 F.3d 1101, 1103-04 (9th Cir.

2012) ("We join our sister circuits in looking to subsection 3509(a) for a definition of 'sexual

abuse' under federal law, and find it the appropriate definition to use in applying section 3283's

extended statute of limitations."); *United States v. Vickers*, No. 13 Cr. 128 (RJA) (HKS), 2014 WL

1838255, at *10 (W.D.N.Y. May 8, 2014) (applying the definition of "sexual abuse" set forth in

Section 3509(a)).

As is evident from its plain text, the definition of "sexual abuse" set forth in Section 3509(a)

includes not only actual "sexual contact," but also the "the employment, use, persuasion,

inducement, enticement, or coercion of a child to engage in, or assist another person to engage in,"

sexual contact.  18 U.S.C. § 3509(a).  The breadth of this definition is underscored by Congress's

use of the word "includes."  The Supreme Court has held that Congress's choice of the word

"includes" is "significant because it "makes clear that the examples enumerated in the text are

intended to be illustrative, not exhaustive."  *Christopher v. SmithKline Beecham Corp.*, 567 U.S.

142, 162 (2012) (citing *Burgess v. United States*, 552 U.S. 124, 131 n.3 (2008)).  Thus, sexual

abuse "as defined here encompasses a wider set of behavior than just rape or other unwanted sexual

touching."  *United States v. Schneider*, 801 F.3d 186, 197 (3d Cir. 2015).  In keeping with that

broad definition, courts have held that Section 3283 "does not require that an offense consist of a sexual act between a defendant and a specific child," *Vickers*, 2014 WL 1838255, at *11, but instead reaches offenses involving the transportation of minors to engage in illegal sexual activity. *See Sensi*, 2010 WL 2351484, at *2-3 (collecting cases interpreting the term "sexual abuse" to encompass "all crimes that would logically relate to the common understanding of sexual abuse even when found in chapters 110 ('Sexual Exploitation and Other Abuse of Children') and 117 ('Transportation of Illegal Sexual Activity and Related Crimes') of title 18"); *Schneider*, 801 F.3d at 196-97 (holding that Section 3283 applied to defendant convicted of traveling with the purpose of engaging in sex with a minor victim, in violation of 18 U.S.C. § 2423(b)); *Vickers*, 2014 WL 1838255, at *11-12 (holding that violations of 18 U.S.C. § 2423(a) were crimes involving sexual abuse under Section 3283).

The defendant's motion does not engage with these authorities at all.  Instead, the defendant asks the Court to apply an "essential ingredients" test, relying heavily upon the Supreme Court's decision in *Bridges v. United States*, 346 U.S. 209 (1953), which concerned the Wartime Suspension of Limitations Act ("WSLA").  (Def. Mot. 2 at 12-14).  But *Bridges* is inapposite, since it concerned a statute "[t]he legislative history of [which] emphasize[d] the propriety of its conservative interpretation" and "indicate[d] a purpose to suspend the general statute of limitations only as to" certain narrowly defined offenses.  *Bridges*, 346 U.S. at 216.  There is no corresponding indication that Congress intended the "essential ingredients" test to apply to Section 3283.  As the Third Circuit has explained in rejecting an identical argument:

> While *Bridges* did adopt an "essential ingredient" test, the limitations-extending statute at issue was a narrowly drafted exception specifically intended to target frauds related to war procurement. Unlike the WSLA, § 3283 has no such restrictive language or legislative history suggesting congressional intent to limit its application to a specific subset of circumstances. Congress,

> rather, has evinced a general intention to "cast a wide net to ensnare
> as many offenses against children as possible."

*Schneider*, 801 F.3d at 197 (quoting *United States v. Dodge*, 597 F.3d 1347, 1355 (11th Cir. 2010) (en banc)); *see Weingarten*, 865 F.3d at 59 n.10 (distinguishing *Bridges* because the "essential ingredient" test there "effectuated Congress's specific intent to limit the WSLA's extended limitations period to only a few offenses," while "Congress had the opposite intention for Section 3283"); *see also Vickers*, 2014 WL 1838255, at *11-12 ("[T]he defendant argues that the charged offense does not "involve" the sexual abuse of a child, as reflected in the elements of the offense. Defendant's argument is illogical and clearly misinterprets the use of the term 'involving' in section 3283.").

Although the Second Circuit has not yet reached this issue, it examined this question in *Weingarten v. United States*, in the context of a claim for ineffective assistance of counsel. *Weingarten*, 865 F.3d at 58-60.  Rejecting the claim, the Second Circuit observed that none of the criteria for applying the categorical approach are met in the context of  Section 3283.  *Id.*  The categorical approach—which focuses on the elements of the offense—is generally only used in settings like sentencing and immigration, where a court is asked to evaluate the conduct from a prior conviction.  *Id.* at 59.  In such a context, a court attempting to examine the facts of the prior conviction to determine the present punishment or immigration consequences would encounter logistical and constitutional obstacles.  *Id.* (noting an *Apprendi* problem and "daunting practical difficulties and potential unfairness").  None of those concerns is present here, where the relevant facts will be proved at trial.

The *Weingarten* court also specifically rejected the argument Maxwell now asserts: that the words "offense involving" require a categorical approach.  "[T]hat Congress used the word 'involving' in § 3283 does not necessarily mean it intended to trigger the categorical approach.

'Involving' . . . is equally consistent with applying a fact-based approach." 865 F.3d at 60 n.11 (citing *Nijhawan v. Holder*, 557 U.S. 29, 38 (2009) (applying the circumstances-specific approach to a statute containing the word "involves")). Moreover, as the *Weingarten* court observed, the Supreme Court has applied the categorical approach to statutes containing the word "involving" where the statutes at issue also referenced "elements" of offenses, or specific prior "convictions," in a manner that referred to specific convictions, as opposed to particular offense conduct. 865 F.3d at 59 (citing *Taylor v. United States*, 495 U.S. 575 (1990); *Leocal v. Ashcroft*, 543 U.S. 1 (2004)). By contrast, the phrase "sexual abuse" in Section 3283 refers to specific conduct, and not the statutory offenses charged in the Indictment.

In *Weingarten*, the Second Circuit further noted that applying the categorical approach to Section 3283 would run contrary to Congress's intention to "cast a wide net to ensnare as many offenses against children as possible." 865 F.3d at 60 (quoting *Schneider*, 801 F.3d at 196). On this point, it bears emphasizing that the interpretation the defendant advances would lead to absurd outcomes, as many federal crimes involving the sexual abuse of minors do not contain, as an element, a requirement that the defendant commit a sex act with a minor. It would run contrary to Congress's intent to interpret Section 3283 in a manner that would exclude many—if not most—sexual offenses against children.

The lone Section 3283 case the defendant cites, *United States v. Countentos*, 651 F.3d 809 (8th Cir. 2011), is easily distinguishable on its facts. In that case, the Eighth Circuit considered, among other issues, whether the crime of possessing child pornography involved sexual abuse within the meaning of Section 3283. *Id.* at 816-18. In analyzing that question, the court discussed, among a variety of factors, the elements of the crime. But it did not consider the categorical approach, or purport to apply an "essential ingredients" test, as the defendant implies. Instead, the

court resolved the issue by answering a common sense question: "Does someone who merely possesses child pornography sexually abuse the child portrayed in the images?" *Id.* at 817.  This inquiry has no relevance here, as this case does not involve the possession of child pornography.

The crimes charged in the Indictment plainly involved the sexual abuse of minors.  First, the Indictment clearly alleges that the minor victims were subjected to actual, physical sexual contact as part of the defendant's crimes.  *See* Indictment at ¶¶ 4 (alleging that conduct toward minor victims involved sexual abuse), 5 (alleging that "Epstein's resulting abuse of minor victims included, among other things, touching a victim's breast, touching a victim's genitals, placing a sex toy such as a vibrator on a victim's genitals, directing a victim to touch Epstein while he masturbated, and directing a victim to touch Epstein's genitals."), 7 (describing patterns of sexual abuse).  Moreover, the Indictment alleges that the defendant persuaded, induced, enticed, and transported minors for purposes of engaging in criminal sexual activity, and that she conspired to do the same.  As discussed above, the offenses charged in the Indictment accordingly involved the sexual abuse of minors as defined in Section 3509(a) and incorporated into Section 3283.

Because the defendant's crimes involved sexual abuse, the expanded statute of limitations set forth in Section 3283 applies to the crimes charged in Counts One through Four of the Indictment and her motion should be denied.

## III.   The Defendant's Motion to Dismiss the Indictment Based on Alleged Improper Pre-Trial Delay Should Be Denied

The defendant contends that the Indictment should be dismissed because the Government's delay in bringing the charges violates the Due Process Clause of the Fifth Amendment.  (Def. Mot. 7).  The defendant has not and cannot successfully establish such a violation.  First, the defendant has not established that any alleged pre-indictment delay caused actual prejudice to the defense.  Her speculative assertions about lost witnesses and records are hardly the sort of evidence that she

can use to carry her heavy burden.  Without proof of actual prejudice, the motion fails.  Second, even if the Court finds actual prejudice to the defense, the defendant has not established that the Government's purpose in any alleged pre-indictment delay was improper or designed to gain any sort of tactical advantage.  The Government obtained an indictment charging the defendant on June 29, 2020, less than two years after opening its investigation and less than a year after victims with information critical to the pending charges came forward.  The defendant thus cannot establish an undue delay, much less a delay caused by the Government for an improper purpose.

Because the defendant cannot establish either element, let alone both, her due process claim is meritless and should be denied.

## A.    The Defendant Has Failed to Demonstrate Actual and Substantial Prejudice

### 1.    Applicable Law

It is well-settled that the statute of limitations is "the primary guarantee against bringing overly stale criminal charges."  *United States v. Marion*, 404 U.S. 307, 322 (1971) (internal quotation marks and citations omitted).  Thus, when a case has been brought within the statute of limitations, it is "only rarely dismissed," and carries a "strong presumption of validity."  *United States v. Cornielle*, 171 F.3d 748, 752 (2d Cir. 1999); *see also United States v. Lawson*, 683 F.2d 688, 694 (2d Cir. 1982).

The Second Circuit standard for pre-indictment delay is clear, and it imposes a heavy burden on the defendant to show that: (i) "he suffered actual prejudice because of the alleged pre-indictment delay," and (ii) "that such delay was a course intentionally pursued by the government for an improper purpose."  *Cornielle*, 171 F.3d at 752 (citations omitted).  The burden for proving both prongs of the standard rests squarely on the defendant.  *United States v. Scarpa*, 913 F.3d 993, 1014 (2d Cir. 1990); *United States v. Rubin*, 609 F.2d 51, 66 (2d Cir. 1979); *United States v.*

*Ricco*, 549 F.2d 264, 272 (2d Cir. 1977).  The burden is so heavy that it is rarely met by a defendant. *See DeMichele v. Greenburgh Centr. Sch. Dist. No. 7*, 167 F.3d 784, 790-91 (2d Cir. 1999) ("[W]hile the [Supreme] Court may not have shut the door firmly on a contention that at some point the Due Process Clause forecloses prosecution of a claim because it is too old, at most the door is barely ajar.").

Substantial prejudice is just that—substantial, actual, non-speculative prejudice.  *See United States v. Birney*, 686 F.2d 102, 105-06 (2d Cir. 1982) (a defendant's "proof of prejudice must be definite and not speculative"); *see also United States v. Henderson*, 337 F.3d 914, 920 (7th Cir. 2003) (prejudice sufficient to warrant dismissal for pre-indictment delay must be "actual and substantial" and "specific, concrete, and supported by evidence").  Prejudice in this context refers to "actual prejudice to the defendant's right to a fair trial." *United States v. Elsbery*, 602 F.2d 1054, 1059 (2d Cir. 1979).  The mere loss of witnesses or evidence, without more, is insufficient.  Claims of loss of memory resulting from the passage of time have been held to be insufficient to warrant dismissal of an indictment on due process grounds.  *See United States v. Wright*, 343 F.3d 849, 860 (6th Cir. 2003); *Henderson*, 337 F.3d at 919-20.  Moreover, even when a claim of prejudice is based upon the complete loss of a witness's testimony or other evidence, a defendant nevertheless must show how that testimony or evidence would have affected the outcome or otherwise have assisted the case.  *See United States v. Gilbert*, 266 F.3d 1180, 1187 (9th Cir. 2001) (defendant's pre-indictment delay claim rejected due to failure to show "how the testimony from [three absent] witnesses would have benefitted his case"); *United States v. Spears*, 159 F.3d 1081, 1085 (7th Cir. 1999) ("[A] defendant must do more than show that a particular witness is unavailable and that the witness' testimony would have helped the defense. He must also show that the witness would have testified, withstood cross-examination, and that the jury

would have found the witness credible" (citations omitted)).  "Courts have held that 'the defendant also has the burden of showing that the lost testimony or information was not available through other means.'"  *Pierre-Louis*, 2018 WL 4043140, at *4 (quoting *United States v. Sprouts*, 282 F.3d 1037, 1041 (8th Cir. 2002)).

The vast majority of pre-indictment delay cases fail on the first prong.  *See, e.g.*, *Marion*, 404 U.S. at 324-25 (fading witness memories insufficient; "no one suggests that every delay-caused detriment to a defendant's case should abort a criminal prosecution"); *United States v. Snyder*, 668 F.2d 686, 689 (2d Cir. 1982) (death of a defense witness three years before indictment insufficient prejudice); *United States v. Iannelli*, 461 F.2d 483, 485 (2d Cir. 1972) (unavailability of witnesses insufficient prejudice); *United States v. King*, 560 F.2d 122, 130-31 (2d Cir. 1977) (death of witness and missing documents insufficient prejudice); *Pierre-Louis*, 2018 WL 4043140, at *4-5 (death of a defense witness and defendant's own memory issues insufficient prejudice).

### 2.    Discussion

The defendant points to at least four ways in which she claims the passage of time prejudiced her defense, but none of her hypothetical claims of prejudice withstand scrutiny.  In particular, she contends that, as a result of the passage of time, four witnesses have died, unnamed Epstein employees have been "lost," unspecified witnesses now have "failed or corrupted" memories, and records have been lost or destroyed.  She further contends that these collectively demonstrate actual prejudice.  (Def. Mot. 7 at 8-14).  None has merit, individually or collectively.

With respect to the first three arguments, the fact that certain witnesses cannot testify because of their deaths or failed memories does not compel a finding of actual prejudice.  "Faded memories or unavailable witnesses are inherent in any delay, even if justifiable.  To merit dismissal a defendant must demonstrate a substantial, actual prejudice to his ability to defend himself."

*United States v. Long*, 697 F. Supp. 651, 657 (S.D.N.Y. 1988).  The defendant has not made such a showing.  Her speculative assertions simply do not rise to that level.

The defendant first claims she has suffered substantial prejudice as a result of pre-indictment delay due to the unavailability of Jeffrey Epstein, Epstein's mother, Michael Casey (the alleged agent of Minor Victim-1), and Palm Beach Police Department Detective Joseph Recarey. She contends that the loss of Epstein demonstrates actual prejudice because Epstein "would have" testified that the defendant did not engage in the criminal activity with which she is charged.  (Def. Mot. 7 at 8).  That assertion is speculative at best, and the law is clear that "proof of prejudice must be definite and not speculative."  *Birney*, 686 F.2d at 105-06; *see also Long*, 697 F. Supp. at 657 (finding that "perceived prejudice is speculative" where there was "no way of knowing what [the unavailable witness's] testimony would have been").  To credit Maxwell's argument is to assume that Epstein, after being indicted with federal sex trafficking charges, would have taken the stand, would not have invoked his Fifth Amendment rights, and would have provided testimony that exculpated Maxwell, which a jury would have credited in the face of contradictory trial evidence. This is an exercise in chain upon chain of conjecture that comes nowhere close to meeting the burden of demonstrating actual prejudice.  *See Spears*, 159 F.3d at 1085 ("[A] defendant must do more than show that a particular witness is unavailable and that the witness' testimony would have helped the defense.  He must also show that the witness would have testified, withstood cross-examination, and that the jury would have found the witness credible." (citations omitted)); *see also United States v. Valona*, 834 F.2d 1334, 1339 (7th Cir. 1987) (noting that prejudice analysis must consider whether the missing witness "would have withstood cross-examination," whether the jury would have found him a "credible witness," and whether the testimony, when compared to other trial evidence "would affect the trial outcome" (internal quotation marks and citations

omitted)).  The defendant has not and cannot establish that Epstein would have been available to testify in the first instance, much less that he would have voluntarily agreed to testify at her trial in a way that would help, rather than hurt, the defendant.

As to Epstein's mother, who died in April 2004, the defendant contends that she "would have testified that she did not observe Ms. Maxwell with any Accusers between 1994 and 1997." (Def. Mot. 7 at 9).  "Counsel's unsworn assertions as to vague generalities" that witnesses, "if alive, would give testimony helpful to [the defendant] do not show that [the defendant's] ability to present a defense has been substantially and actually prejudiced." *United States v. Scala*, 388 F. Supp. 2d 396, 399-400 (S.D.N.Y. 2005).  Here, "there is no evidence before the Court as to what [the deceased witness] would have testified, much less specific evidence of how losing that testimony has caused [the defendant] actual prejudice." *Id.* at 400.  Further, unless Epstein's mother was with the defendant "every moment" between 1994 and 1997, "it would be impossible for [her] to testify that [the] defendant did not commit the charged crimes, so whatever helpful testimony [she] might have offered (the details of which are sparse in the motion) would be easily undermined on cross-examination." *Pierre-Louis*, 2018 WL 4043140, at *4 (citing *Spears*, 159 F.3d at 1081-1085).  Moreover, Epstein's mother died "sufficiently prior to 'any realistic trial date,' to make it improbable that any prejudice it may have caused [the defendant] was the result of government delay." *United States v. Cheung Kin Ping*, 555 F.2d 1069, 1073 (2d Cir. 1977) (quoting *United States v. Stein*, 456 F.2d 844, 848 (2d Cir. 1972)).  Indeed, Epstein's mother passed away before the Palm Beach Police Department even began investigating Epstein in 2005.  (Def. Mot. 7, Ex. D at i).

The defendant's claims relating to Michael Casey and Detective Recarey fare no better. She again speculates that Casey and Detective Recarey, who passed away in August 2017 and May

2018 respectively, would have testified, and that such testimony would have been exculpatory and would have materially helped the defense.  (Def. Mot. 7 at 9-11).  The defendant cannot establish that Casey and Detective Recarey would have testified in a way that would help, rather than hurt, the defendant.

In particular, the defendant contends that Michael Casey, the purported agent of Minor Victim-1, "would be able to testify" about Minor Victim-1's behavior during the "relevant time period" and the "lack of any 'outcry' or 'grooming.'"  (*Id.* at 10).  The defense suggests that Casey not having related any complaints about Maxwell to "any authority, Ms. Maxwell, or any other known witness" means that he knew of no complaints.  (*Id.* at 9-10).  As an initial matter, "there is no evidence before the Court as to what [Casey] would have testified."  *Scala*, 388 F. Supp. 2d at 400.  Even assuming that Casey would have testified as the defendant now contends, such testimony (which would be purely speculative and unsubstantiated) would also have no bearing on whether the abuse, in fact, occurred.

The defendant argues that Detective Recarey would have testified that none of the witnesses with whom he spoke in connection with a prior investigation told him about the defendant participating in sex trafficking activities.  (Def. Mot. 7 at 10-11).  As a threshold matter, the defendant has not established how such testimony, which would consist entirely of hearsay, could even be admissible at the defendant's trial.  Moreover, the fact that Epstein may have abused victims without the defendant's participation is not exculpatory as to charges alleging the defendant assisted in the grooming and abuse of *other* victims.  The well-established law of this Circuit generally precludes a defendant from offering evidence that a defendant did *not* participate in criminal conduct on a particular occasion—or of her law-abiding conduct during uncharged periods or uncharged events—to rebut the Government's evidence with respect to the charged

crimes or events.  *See, e.g.*, *United States v. Scarpa*, 897 F.2d 63, 70 (2d Cir. 1990) ("A defendant may not seek to establish h[er] innocence . . . through proof of the absence of criminal acts on specific occasions."); *United States v. Chambers*, 800 F. App'x 43, 46 (2d Cir. 2020) ("A single occurrence of lawful conduct is 'simply irrelevant' to other occurrences of lawful conduct." (quoting *United States v. Walker*, 191 F.3d 326, 336 (2d Cir. 1999)); *United States v. Williams*, 205 F.3d 23, 34 (2d Cir. 2000) ("We reject Williams's assertion that the evidence of innocent travel was necessary to rebut the government's allegation that Williams had been involved in other cocaine importations from Jamaica. Although the government did argue that Williams had been involved in other importations, it did not allege that Williams had engaged in drug activity during these particular trips."); *United States v. Fiumano*, No. 14 Cr. 518 (JFK), 2016 WL 1629356, at *7 (S.D.N.Y. Apr. 25, 2016) ("The principle is rather elementary. A defendant charged with robbing a bank in Manhattan on April 22 cannot offer as evidence to disprove the charged crime that he did not rob the bank's branches in Brooklyn or the Bronx on April 22 or that he did not rob the Manhattan branch on April 20, 21, 23, and 24, because this evidence is irrelevant to the charge that he robbed the Manhattan bank on April 22."); *United States v. Gambino*, 838 F. Supp. 744, 748 (S.D.N.Y. 1993).

Inadmissibility aside, the Indictment specifically charges conduct between 1994 and 1997. That a different investigative team focused on Epstein's conduct in the early 2000s may not have uncovered evidence about the defendant's conduct in the 1990s has no bearing on the charges in this case, which was brought entirely independent of the prior SDFL investigation.  Moreover, and as detailed further below, two of the victims referenced in the Indictment, Minor Victim-1 and Minor Victim-3, were never interviewed by the USAO-SDFL, and had never spoken to law enforcement until they met with this Office in late August and September 2019, after Epstein's

death.[17]   As such, it is neither surprising nor terribly probative of any issue in dispute in this case

that Detective Recarey might have testified to a lack of knowledge as to what the victims identified

in this Indictment have told the USAO-SDNY.   In sum, the defendant has not put "specific

evidence" before this Court demonstrating that the loss of Detective Recarey's testimony, even if

admissible, has caused her actual prejudice.   *Scala*, 388 F. Supp. 2d at 400.

The defendant next contends that had the Government brought the charges earlier, she

would have interviewed and subpoenaed as witnesses "the many Epstein employees that were

present at the different locations during that three-year period."  (Def. Mot. 7 at 11).  She does not

specify which employees she would have called as witnesses, the grounds for contending they are

"lost" or "missing," whether they would have been willing to testify, or what admissible evidence

they would have provided.  She merely speculates that the evidence could have helped her defense.

This is far from the definite proof of prejudice required to state a due process claim.  *See United

States v. Greer*, 956 F. Supp. 525, 528 (D. Vt. 1997) ("In the context of unavailable witnesses, the

defendant must offer some grounds for his belief that the absent witness would have helped his

case in a material way." (internal quotation marks and citation omitted)).

The defendant also argues that "[m]any potential witnesses have been contacted in relation

to this matter and other related litigations," noting that "[s]ignificant numbers of potential

witnesses no longer remember when events may have occurred" or "who was present."  (Def. Mot.

7 at 12).  Dimming or fading memories over the passage of time are not in themselves sufficient

to "demonstrate that [defendants] cannot receive a fair trial" or "justify the dismissal of the

indictment."  *Marion*, 404 U.S. at 326; *Elsbery*, 602 F.2d at 1059.  Indeed, the fact that the defense

described the witnesses as "*potential* witnesses" suggests that she might still call them.  Further,

---

[17] The third victim, Minor Victim-2, was interviewed previously by the FBI.  The Government is
not aware of Detective Recarey having participated in an interview of Minor Victim-2.

to the extent the passage of time affects the memories of witnesses who testify at trial, the defendant will have an opportunity to cross-examine such witnesses. *See United States v. Harrison*, 764 F. Supp. 29, 32 (S.D.N.Y. 1991) (noting that "the passage of time does affect witnesses' memories and it may be relevant to the credibility of their testimony" and that the Government also faces potential harms from the passage of time).[18]  Accordingly, the defendant's bald assertions regarding diminished memories of potential witnesses are speculative and, thus, fall short of the proof of actual prejudice required by the Supreme Court's standard in *Marion*.

The defendant also claims that because of the delay in the prosecution, she does not have access to certain exculpatory documentary evidence.  (Def. Mot. 7 at 12-14).  Once again, this argument is entirely speculative.  The defendant hypothesizes that if she had access to certain documentary evidence (some of which, such as travel records, has been produced in discovery), or evidence which she herself should have access to (*e.g.*, her own emails from 1994 to 1997, her own phone records from 1994 to 1997, and her own travel records from 1994 to 1997), this evidence would have helped her.  She offers no proof or basis for concluding that the records would be helpful.  Even if such records were helpful, dismissal of the Indictment would be too extreme a measure in light of the relative significance of this form of evidence to other proof in the case.  Thus, the defendant's claim that she no longer has access to certain evidence is not a proper basis to dismiss the Indictment.  *See United States v. Dornau*, 356 F. Supp. 1091, 1094 (S.D.N.Y. 1973) ("A bare allegation that records have been lost or destroyed, which might relate

---

[18] The Government notes that it faces the same potential harms from the passage of time as does any party, including loss of witnesses through death or disappearance, diminishment of memories over the passage of time, and loss of evidence.  The Government, of course, bears the burden of proof at trial, and as such, prosecutors have every incentive to bring cases as promptly as possible, when memories are fresh and when it is possible to identify corroborating witnesses and records.  Any suggestion that the Government delayed bringing the instant case for over two decades for its own benefit or a tactical advantage borders on the absurd.

to the instant prosecution, is insufficient to show actual prejudice. . . . The fact that evidence may be lost or destroyed during the pre-indictment stage is inherent in any delay, no matter what the duration.  Furthermore, there has been no allegation in this case that the destruction of the records was deliberate on the part of either the government or trustee." (internal citations omitted)).

Lastly, the defendant contends that prejudicial media reporting and inappropriate pre-trial publicity from at least 2011 through the present has resulted in prejudice to the defendant.  (Def. Mot. at 14).  She claims that had the Government brought charges against her between 1996 and 2011, the Government "would have not prevailed," noting that the defendant's accusers would not have been "able to conform their 'memories' to the often republished 'obvious lies.'" (*Id.* at 15). This argument, like the others contained in this motion, is steeped in speculation.  The defendant cites not one case in support of her argument that pre-trial publicity can ever establish actual prejudice, nor does she point to any evidence that the Government fomented such publicity dating back to 2011.  To the extent the defendant is concerned about pretrial publicity, she will have the opportunity to propose an appropriate examination of potential jurors during *voir dire* to identify a panel of impartial jurors who have not been prejudiced by any publicity this case may have garnered.

In short, the defendant's complaints are nothing more than the type of self-serving, vague, speculative, and conclusory claims of prejudice that courts have consistently rejected as insufficient to warrant dismissal of charges based upon pre-indictment delay.[19]  The motion should therefore be denied.

_____

[19] The defendant also complains about the Government's failure to "provide discovery adequate to fully investigate the extent of the prejudice to Ms. Maxwell." (Def. Mot. 7 at 7).  Among the items the defense complains about not receiving in discovery are the names and dates of birth of the Minor Victims, the specific location of any overt act, the date of any overt act, any witness statements, or any corroboration of any allegation in the Indictment.  (*Id.*).  As described herein, *see* Section X, *infra*, the Government has made substantial discovery productions pursuant to Rule

**B.      The Defendant Has Failed to Establish That the Government Delayed the Indictment for An Improper Purpose**

**1.      Applicable Law**

If, and only if, a defendant has established significant, actual prejudice does the inquiry turn to the reason for the delay.[20]   *See, e.g.*, *Pierre-Louis*, 2018 WL 4043140, at *5 ("Because Defendant failed to show prejudice, the Court need not even address the second prong.").   The reason for delay violates due process only if it is so extreme that it departs from fundamental notions of "fair play.'"   *United States v. Lovasco*, 431 U.S. 783, 795 (1977).   The Supreme Court has "defined the category of infractions that violate 'fundamental fairness' very narrowly," *Dowling v. United States*, 493 U.S. 342, 352 (1990), and the Supreme Court has "stressed the importance for constitutional purposes of good or bad faith on the part of the Government when the claim is based on loss of evidence attributable to the Government," *Arizona v. Youngblood*, 488 U.S. 51, 57 (1988).

---

16 of the Federal Rules of Criminal Procedure, which provides ample information about the charged crimes and the victims referenced in the Indictment.   Additionally, many of the defendant's requests fall within the scope of the Government's *Giglio* and Jencks Act obligations, which the Government intends to produce at the appropriate stage in the litigation, well in advance of trial.

[20] The defendant invites the Court to engage in a balancing test that weighs the prejudice to the defendant against the Government's reasons for delay. (Def. Mot. 7 at 5, 6 n.4). This Court should reject the defendant's invitation. The defendant cites *United States v. Brand*, 556 F.2d 1312, 1317 n.7 (5th Cir. 1977), for the proposition that a showing of prejudice triggers such balancing. (Def. Mot. 7 at 5). However, the Fifth Circuit subsequently rejected such a balancing test, finding that the "*Brand* footnote is pure dicta" and instead requiring that defendants demonstrate that the prosecution intentionally caused the delay to gain a tactical advantage over the defendant or "for some other bad faith purpose." *United States v. Crouch*, 84 F.3d 1497, 1509, 1512 (5th Cir. 1996). The defendant also cites that several Circuit courts, namely the Fourth, Seventh, and Ninth Circuits, require such a balancing test. (Def. Mot. 7 at 6 n.4). The Second Circuit, however, "has not adopted any balancing test, as the Fourth, Seventh and Ninth Circuits have, and its jurisprudence suggests that it would not do so." *United States v. Santiago*, 987 F. Supp. 2d 465, 490 (S.D.N.Y. 2013). Several other Circuits have also "refused to adopt a balancing test." *Id.* (collecting cases). This Court should follow that example.

The Second Circuit has clearly held that a defendant seeking the dismissal of an indictment filed within the statute of limitations must establish that the Government acted intentionally, deliberately, or with some strategy, and that the Government used that delay to gain a tactical advantage over the defendant. *See, e.g.*, *Cornielle*, 171 F.3d at 752 (delay must be "intentional device to gain [a] tactical advantage over the accused"); *see also United States v. Alameh*, 341 F.3d 167, 176 (2d Cir. 2003) ("To show unjustifiable conduct, a defendant must demonstrate that the government has intentionally used delay to gain unfair tactical advantage."); *see also United States v. Delacruz*, 970 F. Supp. 2d 199, 203 (S.D.N.Y. 2013) ("Delacruz's motion to dismiss would nevertheless fail for the independent reason that he has not made any showing that the preindictment delay was an intentional device designed by the Government to gain a tactical advantage."); *United States v. Martinez*, No. 94 Cr. 219 (RPP), 1995 WL 10849, at *4 (S.D.N.Y. Jan. 12, 1995) ("In order to establish improper delay by the Government in filing an indictment, a defendant must show that the delay was the result of an intentional device of the Government to gain tactical advantage over the accused." (internal quotation marks and alterations omitted) (citing *United States v. Hoo*, 825 F.2d 667, 671 (2d Cir. 1987))). Indeed, some version of the phrase "deliberate device" and "tactical advantage" is found in nearly every Second Circuit decision on the issue. *See, e.g.*, *Alameh*, 341 F.3d at 176 ("intentionally used delay to gain unfair tactical advantage"); *Cornielle*, 171 F.3d at 752 (requiring "intentional device" to gain "tactical advantage"); *Lawson*, 683 F.2d at 694 (delay not "engineered by the government for an improper purpose, such as gaining a tactical advantage"); *Snyder*, 668 F.2d at 689; *United States v. Watson*, 599 F.2d 1149, 1157 n.5 (2d Cir. 1979); *United States v. Tanu*, 589 F.2d 82, 89 (2d Cir. 1978); *United States v. Laurenti*, 581 F.2d 37, 40 n.11 (2d Cir. 1978); *United States v. Hillegas*, 578 F.2d 453, 460 (2d Cir. 1978).

2.      **Discussion**

Even if the defendant could establish any actual prejudice—which she cannot—such prejudice would be "necessary but not sufficient" to establish a due process claim.  *Lovasco*, 431 U.S. at 790.  The defendant's motion fails because she has not demonstrated the other necessary element to prevail: that the claimed delay by the Government was intentional and deliberate to gain a strategic advantage.  Here, as in *Lovasco*, any pre-indictment delay was the result of the Government's continuing investigation of the case.  The *Lovasco* Court held that the investigative delay did not deprive the defendant of his due process rights and noted that imposing a duty upon prosecutors to file charges as soon as probable cause exists "'would have a deleterious effect both upon the rights of the accused and upon the ability of society to protect itself.'"  *Id.* at 791 (quoting *United States v. Ewell*, 383 U.S. 116, 120 (1966)).

The same is true in the present case.  The defendant has not shown—and cannot show— that the Government caused any pre-indictment delay in this case to gain a tactical advantage.  The defendant argues that "[t]actical, reckless, and bad faith motives can reasonably be inferred from the way the government has ignored evidence, delayed any prosecution, enlisted partisan lawyers to do its bidding, circumvented established precedent to illegally obtain evidence, and misleadingly quoting banal testimony so that it could be labeled 'perjury.'"  (Def. Mot. 7 at 15).  But rhetoric aside, the defendant offers nothing beyond baseless speculation in support of her claims.

The defendant claims a twenty-six-year delay on the part of the Government in bringing Counts One through Four and a four-year delay as to Counts Five and Six.  (Def. Mot. 7 at 4).  That is not so.  The USAO-SDNY opened its investigation into Epstein and his co-conspirators in late November 2018.  *See* Section IV, *infra*.  Epstein was charged by indictment on July 2, 2019. Thereafter, the Government continued its investigation, which included interviewing two victims

(Minor Victim-1 and Minor Victim-3) for the first time.  In particular, Minor Victim-1 first agreed to be interviewed in September 2019, and Minor Victim-3 first agreed to be interviewed in August 2019.[21]  The Government conducted multiple additional interviews of both victims, as well as other witnesses, and took additional investigative steps over the next several months before it was prepared to seek an indictment charging the defendant.  Those two victims were critical to the investigation, as they helped form the basis of the charges in the Indictment, which the Government sought on June 29, 2020, less than a year after the victims came forward.  That period of time— and, in particular, less than one year between when key victims came forward and the Indictment was obtained—cannot possibly give rise to a colorable due process violation.[22]  *See Cheung Kin Ping*, 555 F.2d at 1072 (finding that "the government is not responsible for a period of delay during which an important witness is unavailable to it" and describing the delay as the period between the witness's cooperation and the date of indictment); *United States v. Rubinson*, 543 F.2d 951, 961 (2d Cir. 1976) ("If there was any intentional delay in returning the instant indictment, it was due in significant measure to the refusal of critical witnesses until 1973 to reveal what they knew."). *Cf. Lovasco*, 431 U.S. at 796 ("Rather than deviating from elementary standards of fair play and decency, a prosecutor abides by them if he refuses to seek indictments until he is completely

---

[21] While the Government is proffering these facts for purposes of this Motion, the underlying information, which is contained in the FBI 302 reports of interviews with the victims, will be produced to the defense as 3500 material in advance of trial.

[22] In this respect, the Government notes that significant aspects of the defendant's argument rest on a faulty premise: *i.e.*, that the Government *could have* indicted the defendant at any time between 1994 and 2020, but simply chose not to do so for tactical reasons.  As noted above, two key witnesses who helped give rise to the instant charges did not agree to speak law enforcement until 2019, facts that significantly undercut the notion that the Government was intentionally sitting on a criminal case against the defendant for any meaningful period of time.  *Cf.* Ex. 3 (OPR Report) at 81 ("Villafaña told OPR that, apart from the women named in the NPA, the investigation had not developed evidence of 'any other potential co-conspirators.'"); *id.* at 167 (with respect to Maxwell, "according to Villafaña, in 2007, they 'didn't have any specific evidence against her.'").

satisfied that he should prosecute and will be able promptly to establish guilt beyond a reasonable doubt." (internal quotation marks and citations omitted)).

Moreover, even if the Court were to determine that a twenty-six-year period of delay were applicable here, the defendant's motion should be dismissed because she failed to show that the Government acted improperly to obtain a tactical advantage. *See, e.g.*, *Pierre-Louis*, 2018 WL 4043140 (denying motion to dismiss for pre-indictment delay as to conduct charged in 2016 involving sexual abuse of minors from 1998 to 2007 as defendant failed to satisfy both prongs of pre-indictment delay standard); *United States v. Burke*, No. 09 Cr. 135 (SJ), 2011 WL 2609837, at *7 (E.D.N.Y. July 1, 2011) (denying motion to dismiss indictment based on thirty-year pre-indictment delay because even if unavailability of alibi witnesses were prejudicial, defendant failed to show that government delayed for its own benefit); *United States v. Carbonaro*, No. 02 Cr. 743 (RCC), 2004 WL 2222145 (S.D.N.Y. Sept. 30, 2004) (in a racketeering conspiracy case in which a 14-year-old murder was alleged as a predicate act, finding that, even assuming defendant had shown actual prejudice, defendant's motion to dismiss based on pre-indictment delay failed because defendant supplied no evidence that government's conduct was for an improper purpose).

The defendant claims that the Government intentionally delayed the indictment in this case with a prescient view towards capitalizing on civil litigation. For instance, Maxwell asserts that it "has been advantageous to the government to have aggressive lawyers collecting information from Ms. Maxwell as part of civil discovery and disseminating that information to the public, as part of an ongoing campaign to vilify Ms. Maxwell." (Def. Mot. 7 at 16). She again cites the subpoena the Government issued to Boies Schiller & Flexner LLP ("Boies Schiller") to obtain materials from the Giuffre civil litigation. (*Id.*). Leaving aside the fact that, as set forth in Section IV, the Government obtained such materials through a judicially approved and entirely appropriate

process, the inference that the defendant urges this Court to draw—that the Government delayed

seeking an indictment to gain a tactical advantage and did so through strategy in the pending civil

litigation—is both unsupported by the record and illogical.

The defendant makes much of the Government having moved to intervene and stay the

proceedings in *Doe v. Indyke*, No. 20 Civ. 484 (JGK), while the Government has not moved to

stay *Giuffre v. Maxwell*.  (Def. Mot. 7 at 16-19).  She suggests that there is some "sharp contrast"

between the Government's actions in the various civil matters, which "establish a strong inference

that as long as the government stood to gain a tactical advantage by delaying the indictment . . ., it

would not move to intervene." (*Id.* at 19).  Setting the defendant's conspiracy theories aside, the

civil matters were in completely different procedural postures, which implicate different concerns

regarding a pending criminal case.  The *Giuffre v. Maxwell* litigation was settled and complete

well before the Government even opened its investigation in this case.  By contrast, the *Doe v.*

*Indyke* case was initiated after the Government opened its investigation and remained ongoing

after the Indictment in this case was filed.[23]  The defendant quotes the Government's letter to Judge

Freeman requesting permission to intervene and stay *Doe v. Indyke* (*see id.*), but omits the portion

of that letter in which the Government explained that, as far as it was aware, *Doe v. Indyke* was

the "lone case in this District that has not yet been either resolved or stayed at this point. . . .  In

---

[23] In particular, *Giuffre v. Maxwell* was resolved in 2017 and the determination of what material
should remain sealed remains the only open issue.  Accordingly, there is no more discovery to be
conducted in the *Giuffre* case and no possible concern to the Government that, for example, its
trial witnesses in the criminal case might be deposed in that civil case.  In *Doe v. Indyke*, on the
other hand, discovery was just beginning, and if discovery were to have proceeded, multiple
witnesses or potential witnesses at the criminal trial would likely have been subject to deposition.
That concern, among others, raised a significant risk that proceeding with the civil matter would
adversely affect the ongoing criminal prosecution against the defendant.  Moreover, the interests
of judicial economy and the public interest in enforcement of the criminal law were served by a
stay in the *Doe* case because the outcome of the criminal case could resolve disputed issues in the
*Doe* case.  Such concerns are not present in *Giuffre v. Maxwell*.

particular, this matter appears to be the only remaining active civil case in this District in which claims against Ghislaine Maxwell have been asserted." (20 Civ. 484 (DCF) (JGK), Dkt. No. 80 at 2). The defendant's baseless conjecture about the Government's supposedly nefarious reasons for delaying her prosecution are not sufficient to support a dismissal of the Indictment. The defendant ignores the fact that cases such as this one take time to investigate and indict.

The defendant also suggests that the Government engaged in reckless disregard of circumstances that would likely impede her ability to mount an effective defense. (Def. Mot. 7 at 5-6, 15). As an initial matter, this argument falls short of "a standard that requires a showing of intentionality." *United States v. Wey*, No. 15 Cr. 611 (AJN), 2017 WL 237651, at *13 n.8 (S.D.N.Y. Jan. 18, 2017).[24] While this Court in *Wey* did not foreclose the possibility of recklessness sufficing under certain circumstances, much as in *Wey*, "the instant case does not require this Court to pass on the issue," *id.*, because there is no evidence of recklessness in this case. To the contrary, as detailed above, the Government acted promptly in bringing criminal charges shortly after two key victims whose testimony helped give rise to those charges first agreed to speak with law enforcement. Baseless speculation aside, the defendant offers no argument or evidence as to how or why the Government acted recklessly here.

In sum, not only does the defendant fail to demonstrate actual, non-speculative prejudice owing to pre-indictment delay, but she also fails to establish that the Government intentionally

---

[24] This Court has noted "some disagreement among the district courts in this Circuit as to whether *reckless*—as opposed to intentional—disregard of circumstances . . . may support a due process challenge based on pre-indictment delay," but concluded that "the pertinent decisions [], on balance, more plainly comport with a standard that requires a showing of intentionality." *Wey*, 2017 WL 237651, at *13 n.8 (citing *Cornielle*, 171 F.3d at 752 (defendant bears burden of showing that "delay was a course *intentionally* pursued by the government for an improper purpose") (emphasis added)); *see also United States v. Gonzalez*, No. 00 Cr. 447, 2000 WL 1721171, at *1 & n.l (S.D.N.Y. Nov. 17, 2000) ("Neither the Supreme Court nor the Second Circuit . . . has adopted this alternative [recklessness] standard.").

manufactured any alleged delay to gain a tactical advantage over her.  She has "offered no credible evidence to suggest that the Government tarried in bringing charges against [her] solely to gain some prosecutorial advantage."  *Pierre-Louis*, 2018 WL 4043140, at *5.  As such, because the defendant cannot meet her "heavy burden" of showing both actual prejudice and unjustifiable Government conduct, her motion to dismiss the Indictment for pre-indictment delay should be denied.[25]

## IV.    The Court Should Deny the Defendant's Motions to Suppress

The defendant moves to suppress evidence the Government obtained pursuant to a grand jury subpoena issued to Boies Schiller and to dismiss Counts Five and Six under the Due Process Clause, the Fourth Amendment, the Fifth Amendment, and the Second Circuit's decision in *Martindell v. Int'l Tel. and Tel. Corp.*, 594 F.2d 291 (2d Cir. 1979).  (Def. Mots. 3 & 11).  In particular, the defendant contends that the Government violated the Second Circuit's decision in *Martindell* and misled Chief Judge McMahon in obtaining the modification of a protective order. She also contends the subpoena was overly broad and amounted to an unlawful search of materials in which she had a reasonable expectation of privacy, as well as an infringement of her privilege against self-incrimination.  Although the defendant styles her request for relief as two separate

---

[25] The defendant asks the Court for leave to supplement her motion "*after* the government provides her with meaningful discovery" and notes that "*after* the disclosure of meaningful discovery, [she] may request that the Court defer ruling on this motion until after any trial if the indictment has not been dismissed on other grounds."  (Def. Mot. 7 at 1).  As noted above and discussed further in Section X, *infra*, the Government has complied with its Rule 16 obligations and will produce *Giglio* and Jencks Act materials well in advance of trial.  The Court should reject the defendant's invitation to defer ruling on this motion.  *See, e.g.*, *United States v. Muric*, No. 10 Cr. 112 (LTS), 2010 WL 2891178, at *1 (S.D.N.Y. July 13, 2010) ("The motion to dismiss the Indictment as the result of pre-indictment delay is therefore denied, without prejudice to appropriately supported later motion practice."); *United States v. Drago*, No. 18 Cr. 0394 (SJF) (AYS), 2019 WL 3072288, at *2 (E.D.N.Y. July 15, 2019) (denying motion to dismiss on the ground of pre-indictment delay without prejudice to renewal).

motions, the suppression motions overlap in fact and argument, and accordingly, the Government responds to both motions in this section.

As set forth herein, the defendant's suppression motions challenging a judicially approved grand jury subpoena should be denied without a hearing for multiple reasons. As an initial matter, the defendant's claim that the Government "circumvented" *Martindell* fails because the Government issued a valid grand jury subpoena, sought judicial authorization to permit compliance with the subpoena, and obtained materials from Boies Schiller that otherwise would have been covered by the relevant protective order only after receiving such authorization. In any event, even if the Government's motion did not satisfy *Martindell*, *Martindell* provides no basis to suppress evidence, and the defendant cites no authority in support of that request. Second, the defendant's claim that the subpoena was a warrantless search in violation of the Fourth Amendment fails because she has not established standing to challenge a judicially approved grand jury subpoena issued to a third party, and because the subpoena was entirely lawful. Even if she had standing, her claim still fails because suppression would be improper under the good faith exception and the inevitable discovery doctrine. Third, the defendant's claim that the subpoena violated her Fifth Amendment rights fails because, among other things, such a violation requires coercion and state action. Fourth, the defendant's claim that the Government violated the Due Process Clause is meritless, as the Government's conduct was not, by any reasonable definition, outrageous or conscience shocking. And finally, the defendant's request for a hearing should be denied because she has proffered no admissible evidence to support her accusations of Government misconduct; instead, she relies entirely on an anonymously sourced article that, as detailed herein, she cites to describe certain events that simply did not occur.

Accordingly, the defendant's suppression motions should be denied.

### A.      Factual Background

The defendant's motion is, at its core, premised on a false factual narrative.  The defendant alleges, based on a *New York Daily News* article, that Boies Schiller and the Government colluded starting in at least early 2016 with the "precise[] design[]" of having the defendant "charged with perjury."  (Def. Mot. 3 at 10).  In particular, she claims that Boies Schiller met with the Government in February 2016, urged the Government to open an investigation of Epstein and Maxwell, told the Government what was in its files, and met with the Government again in the summer of 2016 to ask if it would consider charging the defendant with perjury after her two depositions.  (*Id.* at 2, 8).

That is not so.  While a now former Assistant United States Attorney ("AUSA-1") met with a lawyer from Boies Schiller and two other attorneys *about Epstein* in February 2016, that meeting was not focused on the defendant, and AUSA-1 did not participate in a second meeting with those attorneys.  Moreover, that February 2016 meeting *pre-dated* the depositions that gave rise to the perjury counts in the Indictment, which itself was obtained more than four years thereafter.[26]  The Indictment was instead the product of an investigation that was not opened until late 2018 and that had nothing to do with a meeting that had taken place nearly three years earlier with an AUSA who played no part in the decision to open the 2018 investigation and similarly played no part in the 2018 investigation itself.

### 1.      The Civil Lawsuit against Maxwell

In or about September 2015, Giuffre, represented by Boies Schiller, filed a civil defamation lawsuit against Maxwell in the Southern District of New York.  (*See* 15 Civ. 7433 (LAP), Dkt.

---

[26] While, as discussed herein, the Government has uncovered evidence of a phone call from one of the attorneys, Stan Pottinger, to AUSA-1 in early May 2016, AUSA-1 has no specific memory of that call, nor did AUSA-1 provide any notes or records of that call to the team working on the instant investigation.

No. 1).  In short, Giuffre alleged that Maxwell had defamed her when Maxwell stated that Giuffre was not the victim of sex crimes perpetrated by Epstein and Maxwell.  Giuffre alleged that Maxwell had made those false statements for the "malicious purpose of further damaging a sexual abuse and sexual trafficking victim; to destroy Giuffre's reputation and credibility; to cause the world to disbelieve Giuffre; and to destroy Giuffre's efforts to use her experience to help others suffering as sex trafficking victims."  (*Id.* at 8).

### 2.       February 2016 Meeting

Attorney Peter Skinner of Boies Schiller contacted AUSA-1, who was at that time the Human Trafficking and Project Safe Childhood Coordinator of the USAO-SDNY, to request an opportunity for him and other attorneys to meet with AUSA-1 to present on a potential case.  (*See* Ex. 4 at 1).[27]  AUSA-1 agreed to the meeting, and on or about February 29, 2016, AUSA-1 met with three attorneys—Peter Skinner of Boies Schiller, Brad Edwards, and Stan Pottinger— regarding Jeffrey Epstein.  (*See* Ex. 4 at 1).  Edwards and Pottinger were also attorneys for Virginia Roberts Giuffre, who had alleged that she is a victim of sex crimes perpetrated by Epstein and Maxwell.[28]  (Ex. 5 at 1).[29]

At the meeting, Edwards provided AUSA-1 with details about, among other things, the USAO-SDFL's prior investigation of Epstein, as well as Giuffre's personal history and experience with Epstein.  (See Ex. 5).  The focus of the meeting was on Epstein, and AUSA-1 understood that the attorneys were advocating that the USAO-SDNY open an investigation into Epstein.  (*See* Ex.

---

[27] On February 11, 2021, to help gather facts relevant to the reporting contained in the *New York Daily News* article, the USAO-SDNY and the FBI conducted a telephonic interview of AUSA-1. Notes of that interview are attached as Exhibit 4.

[28] Peter Skinner of Boies Schiller is not listed on the docket as an attorney representing Giuffre.

[29] AUSA-1's notes from the February 29, 2016 meeting are attached as Exhibit 5.

4 at 1, 4).  During the meeting, the attorneys referenced multiple individuals who worked for and/or helped Epstein, including Maxwell, but the attorneys primarily focused their presentation on Epstein.  (*See id.* at 1-2, 4).  The attorneys did not present particular criminal statutes that might be pursued by the USAO-SDNY or make suggestions about investigative steps, nor did they suggest the use of civil lawsuits as a means to conduct a criminal investigation.  (*Id.* at 2-3).  AUSA-1 did not tell the attorneys whether or not an investigation would be opened, consistent with her standard practice.  (*Id.* at 3).  After the meeting, AUSA-1 received a limited number of emails from the attorneys (*see* Exs. 6 & 7).[30]  AUSA-1 did not participate in a second meeting with those attorneys and has never met David Boies. (*See* Ex. 4 at 4).

AUSA-1 recalls being aware of depositions as a general matter, but she does not recall having knowledge of who had been deposed or the substance of the depositions.  (*Id.* at 5).  AUSA-1 does recall thinking through the challenges of a potential perjury investigation, but she does not recall who specifically would have been he target of such an investigation.  (*Id.*).  AUSA-1 does not recall being asked if the USAO-SDNY would consider charging Maxwell with perjury.  (*Id.*).  Moreover, and critically for present purposes, the meeting described above *pre-dated* the depositions which give rise to the perjury counts in the instant Indictment, making it all but impossible that the attorneys suggested, during that February 2016 meeting, that Maxwell had committed perjury in depositions that, as detailed below, had yet to occur.

The Government has also conducted a review of AUSA-1's emails in an effort to determine whether any further contacts occurred.  One email dated May 3, 2016 from Pottinger to AUSA-1 appears to suggest that AUSA-1 spoke with Pottinger on or about May 2, 2016 by telephone (*see*

---

[30] AUSA-1 left the USAO-SDNY in 2019.  Since receiving the Defense Motions, the Government has searched AUSA-1's archived emails for any email communications with attorneys from Boies Schiller or the other attorneys who participated in the February 2016 meeting.  The Government is producing all identified emails to defense counsel today.

Ex. 7), but AUSA-1 does not recall the details of that conversation (*see* Ex. 4 at 4), nor is the Government aware of any notes or other records documenting the substance of the call.   The Government has not identified any records that suggest AUSA-1 ever communicated via email with Pottinger, Edwards, Skinner, or any other attorney at Boies Schiller regarding this matter after May 3, 2016.

The USAO-SDNY did not open an investigation into Epstein or Maxwell in 2016.  (*Id.* at 4).

### 3.  The April and July 2016 Depositions of Maxwell

On March 2, 2016, Maxwell moved for entry of a protective order for materials produced in discovery and submitted a proposed order for the consideration of the Honorable Robert W. Sweet, the United States District Judge who was then overseeing the *Giuffre v. Maxwell* civil litigation.  (*See* 15 Civ. 7433 (LAP), Dkt. Nos. 38 & 39-1).   On or about March 4, 2016, Boies Schiller represented that Giuffre did not oppose the entry of a protective order, but opposed the form proposed by Maxwell out of concern that it was overly broad and could lead to over-designation of material as confidential.  (*See* 15 Civ. 7433 (LAP), Dkt. No. 40 at 2).  Boies Schiller submitted a redline of Maxwell's proposed protective order, deleting some provisions and adding language that confidential material could be disclosed to law enforcement.  (Def. Mot. 3, Ex. B).  On March 18, 2016, Judge Sweet entered a protective order governing the discovery and dissemination of confidential information after the parties agreed to the form of the order originally proposed by Maxwell.  (*See* 15 Civ. 7433 (LAP), Dkt. No. 62; *see also* Def. Mot. 3, Ex. G at 2-3).

The protective order, among other things, restricted the parties from disclosing discovery materials marked confidential to third parties, absent express permission from the Court.

In connection with the defamation suit, Maxwell was deposed by Boies Schiller, counsel for Giuffre, on April 22, 2016 and July 22, 2016.

On or about May 24, 2017, the parties entered into a settlement agreement and voluntarily dismissed the civil action.  (*See* 15 Civ. 7433 (LAP), Dkt. No. 916).  Boies Schiller has continued to represent Giuffre in post-settlement litigation.  *Giuffre v. Maxwell*, No. 18-2868 (2d Cir.); *Giuffre v. Maxwell*, No. 20-2413 (2d Cir.).

### 4.    The USAO-SDNY Commences the Instant Investigation in 2018

On or about November 29, 2018, the USAO-SDNY initiated its investigation into Epstein and possible co-conspirators, and formally opened the investigation by completing the requisite paperwork to open an investigation on or about November 30, 2018.  The investigation was prompted by a series of articles published by the *Miami Herald* earlier that same week relating to Epstein, his conduct, and the circumstances of his prior conviction.  *See* Julie K. Brown, "Even from Jail, Sex Abuser Manipulated the System. His Victims Were Kept in the Dark," *Miami Herald* (Nov. 28, 2018).[31]  AUSA-1 was not involved in the decision to open the investigation or in the investigation itself.  (*See* Ex. 4 at 6).  Indeed, AUSA-1 stopped serving as the Office's Human Trafficking and Project Safe Childhood Coordinator as of April 2017.

Shortly after initiating the investigation, the prosecutors involved in the investigation learned of the prior February 2016 meeting and requested copies of AUSA-1's notes and records

---

[31] Indeed, on July 8, 2019, at the press conference following the arrest of Epstein, Geoffrey S. Berman, then United States Attorney for the Southern District of New York, stated that while he was not "going to go into any aspects of how our investigation originated[,] I will say that we were assisted from some excellent investigative journalism."

from that meeting.  On or about December 6, 2018, AUSA-1 provided the prosecutors with her notes from the February 2016 meeting (which are attached as Exhibit 5) and documents the attorneys provided.[32]

### 5.    The USAO-SDNY's Subpoenas and *Ex Parte* Applications for Materials

Shortly after opening the investigation in late November 2018, the Government identified possible victims and their counsel through public filings or media reports, which included Boies Schiller.  (Def. Mem. 3, Ex. E at 2-3).  The USAO-SDNY first contacted Boies Schiller about its investigation on or about December 18, 2018.  Shortly thereafter, in or about December or January 2018, the Government indicated to Boies Schiller that it intended to make document requests.  Boies Schiller generally advised the Government that a protective order would govern some of the materials.  (*Id.* at 3).

In or about February 2019, approximately two months after the USAO-SDNY opened its investigation (and almost three years after the February 29, 2016 meeting described above), the USAO-SDNY issued two criminal grand jury subpoenas to Boies Schiller.  One of the subpoenas requested non-privileged documents relating to *Giuffre v. Maxwell*, 15 Civ. 7433 (RWS); the other

---

[32] The Government has reviewed the file that AUSA-1 provided to the prosecution team on or about December 6, 2018 and understands, based on a review of that file, that at the February 2016 meeting, AUSA-1 received copies of Epstein's black book, flight records, and Palm Beach Police Department reports.  Although AUSA-1 does not now recall the attorneys providing her with any documents at the meeting (Ex. 4 at 2), an email she sent to the prosecution team on December 6, 2018 refers to these documents as materials that the attorneys provided at the meeting.

The Government notes that as of March 7, 2016, one week after AUSA-1's February 29, 2016 meeting with the attorneys when she received these documents, Maxwell had only produced two emails in response to Giuffre's discovery requests.  (*See* 15 Civ. 7433 (LAP), Dkt. No. 43 at 1-2).  None of the documents apparently provided to AUSA-1 during the February 2016 meeting was an email.  Accordingly, the Government has no reason to believe that Giuffre's counsel provided AUSA-1 with any discovery materials from the *Giuffre v. Maxwell* civil case.  AUSA-1 also does not believe she ever received any such discovery materials.  (Ex. 4 at 6).

requested the same relating to *Jane Doe 43 v. Epstein, et al.*, 17 Civ. 0616 (JGK) (SN).  Because

of the ongoing and covert nature of the grand jury investigation, and consistent with its standard

practice under such circumstances, the Government did not notify the defendant or her counsel

that it had issued the subpoenas.

In response to receiving the subpoenas, Boies Schiller began producing materials not

covered by the protective orders in the relevant civil cases.  However, Boies Schiller also had

advised the Government that although it would not otherwise contest compliance with the

subpoenas, it believed that the protective orders precluded full compliance.[33]  (Exs. 8 & 9).

Accordingly, the Government applied *ex parte* and under seal to each relevant court (Judge Sweet

and Magistrate Judge Sarah Netburn, respectively) to request that each court modify the respective

protective orders to permit compliance with the subpoenas.  (Def. Mot. 3, Ex. C).

Following a request by Judge Sweet for briefing supporting the Government's initial

application, *see* Def. Mot. 3, Ex. D at 4, 20; Ex. G at 6, the Government submitted *ex parte* and

sealed letters in support of its applications to each court on or about February 28, 2019.  (Exs. 8 &

9).  The Government wrote, "Where, as here, a grand jury subpoena has validly issued, and the

recipient of the subpoena is not contesting compliance—but rather seeking authorization to comply

with the subpoena—a court should grant such permission through limited modification of an

applicable protective order, absent countervailing interests not present in this case." (*Id.* at 2).  The

Government submitted that the court was "best guided" by *Chemical Bank v. Affiliated FM Ins.

Co.*, 154 F.R.D. 91, 93 (S.D.N.Y. 1994), in which the court rejected an application for a party in

civil litigation to be held in contempt for complying with a grand jury subpoena by producing

---

[33] Significantly, and as detailed herein, Boies Schiller did not produce to the Government *any*
materials subject to the protective orders until, as further described below, it received an order
granting it the ability to do so in one of the civil cases.

materials in violation of a protective order, without first obtaining authorization from the court, because the court would have granted such authorization had it been sought. (*Id.*). The court also stated that such formal judicial approval could be obtained *ex parte* if sufficient reason was provided. (*Id.*). In its letters, the Government noted that its "specific knowledge of the subject matter of discovery materials is relatively limited, due to the confidential nature" of the litigation. (*Id.* at 2 n.1). The Government also submitted that the court need not employ the *Martindell* balancing test to evaluate the Government's ability to obtain access to materials covered by a protective order because (1) the *Martindell* balancing test generally relates to "instances where the Government sought protected information *without* [ ] grand jury process" and (2) "any presumption against modification of a protective order is unreasonable where, as here, the protective order is on its face temporary or limited." (*Id.* at 3-4).

### 6.  Proceedings before Chief Judge McMahon

#### a.      March 26, 2019 Hearing

Judge Sweet passed away in March 2019 before ruling on the Government's application. After Judge Sweet's death, but before the civil case was reassigned to a new judge, Chief Judge McMahon took up the Government's application. Chief Judge McMahon subsequently inquired about the Government's application in two transcribed *ex parte* and sealed hearings. (Def. Mot. 3, Exs. D & E). At the first hearing, on March 26, 2019, Chief Judge McMahon inquired as to why Boies Schiller did not make an application for permission to be relieved from the protective order, to which the Government replied that it could not "speak to why Boies Schiller in particular didn't make their own application." (Def. Mot. 3, Ex. D at 3). The Government further noted that Boies Schiller "simply isn't in a position to be able to describe the investigation in the way that we have in our submission." (*Id.* at 11-12). Chief Judge McMahon noted that she believed that

*Martindell* was applicable.  (*Id.* at 3).  She stated that were the Government's application disclosed to the parties, "Maxwell would protest" and argue that the Government lacked standing as it was not a party to the protective order.  (*Id.* at 8).  In response to questions from Chief Judge McMahon, the Government explained that the protective order, on its face, did not implicate the types of confidential business information or trade secrets ordinarily considered by courts in conducting the *Martindell* balancing test.  (*Id.* at 13).

Chief Judge McMahon stated that the protective order did not contain a provision allowing a party to the order to disclose materials requested by law enforcement without permission of the court, noting her understanding that "it may have been negotiated out."  (*Id.* at 14-15).  The court inquired whether the Government's position was that "reliance on the nondisclosure of confidential materials to law enforcement in connection with a grand jury subpoena that has been duly authorized would be unreasonable."  (*Id.* at 14).  The Government responded in the affirmative, stating that the Government believed a provision precluding compliance with a law enforcement request would be void for public policy.  (*Id.* at 15).  The Government further cited *Chemical Bank* in support of the proposition that it would be unreasonable to rely on a protective order provision that barred the disclosure of information to law enforcement.  (*Id.* at 15-16).

In response to questions about the breadth of the subpoena, the Government explained that it was "essentially unable to significantly narrow the request for information . . . . We have either little or no additional information than the Court does in terms of what materials there are [and] who was deposed."  (*Id.* at 17).  In response to Chief Judge McMahon's question about the privacy interests implicated by the protective order, (*id.* at 16-17), the Government also noted that it was dissimilar to an ordinary third-party intervenor in that it would be "extremely restricted" in its use

of the materials in light of the "extraordinary protections" of Federal Rule of Criminal Procedure 6(e).  (*Id.* at 17-18).

Finally, Chief Judge McMahon also inquired whether the materials sought by the Government might be used to commence criminal proceedings against either of the parties to the libel case, *i.e.,* including Maxwell.  (*Id.* at 18).  The Government acknowledged that possibility as a general matter.  (*Id.*).  Chief Judge McMahon noted that the parties to the protective order relied on that order "in order to give whatever in discovery they gave, whether it was deposition testimony they gave or – then again, I can't fathom why anybody who has any criminal exposure would not have taken the Fifth Amendment in response to questions in a civil deposition, but I don't know."  (*Id.* at 18-19).  The Government stated, "I do not know, but I think it is entirely possible that what we are seeking is page after page of people taking the Fifth.  That is entirely possible.  But to the extent that it is not or there are other materials -- and this may be bad for our argument, but in all transparency and candor, I think there may be other individuals who also relied on the protective order."  (*Id.*).  The Government further explained that it "want[ed] to have a formal application" for the relevant materials and took that approach to "avoid the types of problems" created by other less formal government requests in other cited cases.  (*Id*. at 20).

### b.   April 9, 2019 Hearing

Chief Judge McMahon held another conference on April 9, 2019.  She stated that she wanted "to make sure I'm not in a *Chemical Bank* kind of situation, so I would like to know about contacts between [the USAO-SDNY and Boies Schiller] prior to the issuance of the subpoena *on the subject of your investigation*."  (Def. Mot. 3, Ex. E at 2 (emphasis added)).[34]  In *Chemical*

---

[34] Tellingly, Maxwell omits the italicized portion of this question from her motion, thereby stripping important context from the nature of Chief Judge McMahon's question which, as asked, was focused on "your investigation."  (*See* Def. Mot. 3 at 7).

*Bank*, of course, as noted above, the subpoena recipient *produced materials to a prosecutor in direct violation of the relevant protective order*, without seeking a modification of the protective order and without any court authorization to do so.  154 F.R.D. at 93.  Moreover, in that case, the District Attorney seemingly opened its investigation and issued the subpoena in direct response to information provided by the subpoena recipient who was then a party to civil litigation.  *Id.*

The Government responded to Chief Judge McMahon by explaining its contacts with Boies Schiller in connection with the instant (and only) investigation it had opened on Epstein, that is, the investigation prompted by, and opened following, public reporting on Epstein in November 2018.  In particular, the Government explained that the USAO-SDNY opened an investigation first, on either November 30, 2018 or December 3, 2018, and then made contact with Boies Schiller shortly thereafter.  (Def. Mot. 3, Ex. E at 2-3).  In this respect, the Government further explained that the USAO-SDNY, after opening the investigation, had endeavored to identify counsel who represented victims or witnesses in public filings or media reports, which included Boies Schiller, noting that "[w]ith respect to Boies Schiller in particular, we quickly came to learn during the investigation that they had at the time either active or recently completed civil litigation" and indicated that the USAO-SDNY intended to make document requests.  (*Id.*).  The Government also noted that, unlike in *Chemical Bank*, here Boies Schiller had informed the Government that it would be unable to comply with the subpoena in light of the protective order.  (*Id.* (noting that Boies Schiller "generally advised us that they believed there was a protective order that would govern at least some of the materials, and that is why we ultimately made the application to the Court.")).

### c.    Chief Judge McMahon's Memorandum and Order

On or about April 9, 2019, Chief Judge McMahon granted the Government's application and issued a memorandum and order.  (Def. Mot. 3, Exs. F & G).  The Court noted that while the Government's application was procedurally "[i]rregular," there was precedent for granting the Government's request and, therefore, the Court would consider the application.  (Def. Mot. 3, Ex. G at 6, 8-9).  The Court found that, contrary to the Government's arguments, it was appropriate for the Court to analyze the Government's application in light of the *Martindell* factors.  (*Id.* at 9-12).

In so doing, Chief Judge McMahon considered, among other things, "the degree to which . . . the party who could be expected to oppose unsealing[] reasonably relied on the protective order." (*Id.* at 16).  She concluded that such reliance was unreasonable.  (*Id.* at 22).  She evaluated the factors under Second Circuit case law that are relevant to assessing whether a party's reliance on the protective order was reasonable, namely the scope of the protective order, the language of the order itself, the court's level of inquiry before granting the order, and the nature of reliance on the order.  (*Id.* at 17).  She concluded that first three factors favored granting the Government's application for modification.  (*Id.* at 17-20).  Chief Judge McMahon noted that, as the order "plainly gives the court the power to enter an order compelling disclosure to anyone—law enforcement included—Maxwell could not reasonably have relied on the absence of automatic permission for such disclosure to shield anything she said or produced from a grand jury's scrutiny." (*Id.* at 18-19).

As to the last factor, Chief Judge McMahon found that "the nature of the parties' reliance on the order does seem to weigh against modification."  (*Id.* at 20).  She noted that the record indicated that "Giuffre likely could not have secured Maxwell's deposition—at least in the absence of substantial court involvement—without" the protective order.  (*Id.*).  "However, the only thing

on which Maxwell or anyone else might reasonably have relied is that Giuffre or her lawyers would not do what the defendant in *Chemical Bank* did—that is, forward discovery materials in their possession to prosecutors for the purpose of fomenting an investigation.  But I am not faced with that situation." (*Id.* at 21).  Chief Judge McMahon further stated, "Nothing in this record suggests to me that Giuffre or Boies Schiller had anything to do with the Government's decision to convene a grand jury to look into the matters that were the subject of the [civil lawsuit]." (*Id.*).  Instead, she explained that the Government informed the Court that it had "contacted Boies Schiller as part of its search for parties who might have been victims in its investigation; and that Boies Schiller told the Government that it could not consensually produce at least some documents in its files because of the existence of the Protective Order." (*Id.*).  Chief Judge McMahon concluded that it was "quite clear that Boies Schiller did not foment the Government's investigation." (*Id.*).

Among other conclusions, Chief Judge McMahon found that because Maxwell's reliance on the protective order in that case as a "shield [. . .] from the court-ordered disclosure of Confidential Materials pursuant to a grand jury subpoena was unreasonable, the Court may exercise its discretion to grant the Government's application." (*Id.* at 22).  The Court further concluded that "[t]he Government has persuasively demonstrated extraordinary circumstances, which would entitle it to modification in any event." (*Id.*).  She also noted that "while in other circumstances the breadth of the subpoena might be troubling, here the Government is in no position to narrow its request, because [the civil case] was litigated almost entirely under seal." (*Id.* at 25).

Chief Judge McMahon permitted that the Government share the order—and only that order, which itself prohibited further dissemination, and not including any other materials associated with the Government's application—with Boies Schiller.  The relevant order was

provided to Boies Schiller shortly after it was issued.  The materials provided by Boies Schiller included, in addition to deposition transcripts of Maxwell and other individuals, materials produced by Giuffre, Maxwell, and non-parties, and court-related pleadings in the civil case.

### 7.    Magistrate Judge Netburn's Order

On or about April 9, 2019, the Government advised Judge Netburn, who had not yet ruled on the Government's other application in *Jane Doe 43 v. Epstein, et al.*, 17 Civ. 0616 (JGK) (SN), of Chief Judge McMahon's decision via *ex parte* and sealed letter.  (Def. Mot. 3, Ex. I). Subsequently, on April 16, 2019, Judge Netburn denied the Government's application.  (Def. Mot. 3, Ex. H).  Judge Netburn found that she was authorized under the All Writs Act to modify the protective order, but declined to do so as the Government had not established exceptional circumstances or a compelling need.  (*Id.* at 3).  She concluded that on the record before her, the parties' reliance on the protective order was reasonable and the presumption of confidentiality should apply.  (*Id.* at 5-6).  The court rejected the Government's arguments for exceptional circumstances and compelling need as relying on "the general desire for secrecy" and "unpersuasive" under the *Martindell* standard.  (*Id.* at 6).  Judge Netburn concluded that "the Government must demonstrate not that *this investigation* is an extraordinary circumstance, but that *the reason for seeking the* documents is so extraordinary or compelling that there is a need to modify the Protective Order.  The Government has not met that standard."  (*Id.* at 7) (emphasis in original).

### 8.    Unsealing of Maxwell's Depositions

Three months after Chief Judge McMahon issued her Order, *Giuffre v. Maxwell* was reassigned to the Honorable Loretta A. Preska on July 9, 2019.  On or about July 23, 2020, Judge Preska ordered unsealed certain litigation materials, including, and related to, Maxwell's April

2016 deposition transcript.  (*See* 15 Civ. 7433 (LAP), Dkt. No. 1077).  Maxwell appealed Judge

Preska's order, arguing that the court abused its discretion in ordering the unsealing of the

deposition materials and that Maxwell's interests outweighed the public's interests in access to the

materials.  *Giuffre v. Maxwell*, No. 20-2413 (2d Cir.), (Dkt. No. 140-1 at 2).  On October 19, 2020,

the Second Circuit found that Judge Preska "correctly held that the deposition materials are judicial

documents to which the presumption of public access attaches, and did not abuse its discretion in

rejecting Maxwell's meritless arguments that her interests superseded the presumption of access."

(*Id.* at 3).

On October 22, 2020, Maxwell's April 2016 deposition was publicly filed.  (*See* 15 Civ.

7433 (LAP), Dkt. No. 1137-13).

On January 27, 2021, a redacted version of Maxwell's July 2016 deposition was publicly

filed.  (*See* 15 Civ. 7433 (LAP), Dkt. No. 1201-14).  On February 11, 2021, another version of the

July 2016 deposition was publicly filed with fewer redactions.  (*See* 15 Civ. 7433 (LAP), Dkt. No.

1212-1).

### 9.    The New York Daily News Article

On October 13, 2020, the *New York Daily News* published an article describing the

February 29, 2016 meeting (the "*Daily News* Article" or the "Article").[35]  The Article stated,

among other things, that defense attorneys representing victims of Epstein and Maxwell "urged"

the USAO-SDNY to "open an investigation of the duo" during that meeting.  Citing two

anonymous sources, the Article described the defense attorneys' alleged efforts to "pique" the

Government's interest "in a second meeting in the summer of 2016 after Maxwell allegedly

---

[35] *See* Stephen Rex Brown, *Manhattan federal prosecutors declined to pursue Jeffrey Epstein and Ghislaine Maxwell case in 2016: sources*, New York Daily News, Oct. 13, 2020, https://www.nydailynews.com/new-york/ny-jeffrey-epstein-maxwell-case-20201013-jmzhl7zdrzdgrbbs7yc6bfnszu-story.html.

committed perjury."   According to two anonymous sources, "a second meeting occurred." However, the Article cites another anonymous source as "insist[ing] [a second meeting] never happened."

**B.     The Defendant's Suppression Motion Should Be Denied**

Maxwell seeks suppression of the evidence the Government obtained via a judicially authorized subpoena to Boies Schiller under *Martindell*, the Fourth Amendment, Fifth Amendment, the Due Process clause, and the Court's inherent authority.   However, Maxwell's motion turns on erroneous facts, runs afoul of controlling law, and should be denied.

**1.     *Martindell* Provides No Basis to Grant the Relief the Defendant Seeks**

Maxwell argues that the Government "circumvented" the Second Circuit's decision in *Martindell* and "violated Maxwell's rights," which requires suppression of the evidence the Government obtained from the subpoena.   (Def. Mot. 11 at 11-12).   Even assuming that to be true—which, of course, as detailed above and herein, it is not—there is no basis in law to suppress evidence as a result of a *Martindell* violation, and Maxwell cites none in support of her claim. Setting that fatal flaw aside, however, her claim is wrong on both the facts and the law.   The Government issued a valid grand jury subpoena for the materials, applied for judicial authorization to modify the protective order to permit compliance with the subpoena, and a district court judge, who evaluated the Government's application under *Martindell*, properly exercised her discretion in modifying the protective order.   Only after receiving that court order did the Government obtain any protected materials from Boies Schiller.   Maxwell's motion should be denied.

**a.     Applicable Law**

"[T]here is no question that a Rule 26(c) protective order is subject to modification," and a decision to modify such an order is "committed to the sound discretion of the trial court."   *In re*

"*Agent Orange*" *Prod. Liab. Litig.*, 821 F.2d 139, 147 (2d Cir. 1987); *see also Andover Data Servs., a Div. of Players Computer, Inc. v. Statistical Tabulating Corp.*, 876 F.2d 1080, 1083 (2d Cir. 1989) ("It is well-settled here and elsewhere, for instance, that a Rule 26(c) protective order may be overturned or modified based on a finding of improvidence, extraordinary circumstances or compelling need.").

In *Martindell*, the Government informally—and without use of a grand jury subpoena— sought access to discovery materials from a civil litigation that were subject to a protective order. 594 F.2d at 294.  The Second Circuit found that the "deponents [had] testified in reliance upon [a] Rule 26(c) protective order, absent which they may have refused to testify." *Id.* at 296.  In so ruling, the Second Circuit reasoned that the interest in the enforcement of Rule 26(c) protective orders—which included securing just and speedy determination of civil disputes—was sufficient to outweigh the Government's interest in obtaining information by means of an informal document request. *Id.* at 295-96.  The Second Circuit held that "absent a showing of improvidence in the grant of a Rule 26(c) protective order or some extraordinary circumstance or compelling need, . . . a witness should be entitled to rely upon the enforceability of a protective order against any third parties, including the Government." *Id.*; *see also In re Grand Jury Subpoena Duces Tecum Dated Apr. 19, 1991*, 945 F.2d 1221, 1224-25 (2d Cir. 1991) ("The *Martindell* test [ ] does not transform a protective order into a grant of immunity because the test allows a protective order to be overcome by a showing of improvidence in the grant of the order, extraordinary circumstances or compelling need."); *Palmieri v. State of N.Y.*, 779 F.2d 861, 862 (2d Cir. 1985) (holding that "absent an express finding by the district court of improvidence in the magistrate's initial grant of the protective orders or of extraordinary circumstances or compelling need by the State for the

information protected thereunder, it was error for the district court to modify the magistrate's orders").

At the same time, in *Martindell*, the court noted that "[t]he reliance of a private party upon protection of pre-existing documents from disclosure to the Government would normally be more difficult to justify than that of a witness who would, absent the protective order, have invoked his privilege and given no testimony at all." *Id.* at 297 n.8; *see also United States v. Davis*, 702 F.2d 418, 422-23 (2d Cir. 1983) (finding *Martindell* inapplicable and affirming enforcement of a grand jury subpoena where "there [was] no indication that [a witness] agreed to testify only in reliance on [an] 'understanding'" of confidentiality and where many records sought "existed prior to the advent of the litigation"). In subsequent cases, the Second Circuit has clarified that the *Martindell* presumption comes into play only when a party reasonably relies on a protective order in providing deposition testimony. *See, e.g., Davis*, 702 F.2d 418; *SEC v. TheStreet.com*, 273 F.3d 222, 230-31 (2d Cir. 2001) (stating that "some protective orders may not merit a strong presumption against modification," as the nature of some orders "may not justify reliance by the parties").

In *United States v. Davis*, the Second Circuit explained that "[r]anged against these considerations [relating to the policy in favor of enforcing Rule 26(c) protective orders] are the reasons for permitting the grand jury broad subpoena power in a criminal investigation." 702 F.2d at 421. The Second Circuit noted the grand jury's "wide ranging authority to inquire into suspected violations of the criminal law; and to effectuate such investigations it may compel the production of documentary evidence or the testimony of witnesses, as it deems necessary." *Id.* at 421-22 (citing *United States v. Calandra*, 414 U.S. 338, 343 (1974)). "Wide latitude in gathering evidence is vital to the grand jury's investigative function." *Id.* at 422; *see Branzburg v. Hayes*, 408 U.S. 665, 688 (1972) ("Although the powers of the grand jury are not unlimited and are subject to the

supervision of a judge, the longstanding principle that 'the public . . . has a right to every man's evidence,' except for those persons protected by a constitutional, common-law, or statutory privilege is particularly applicable to grand jury proceedings." (internal citations omitted)).

### b.    Discussion

The Government did not, in any way, attempt to circumvent *Martindell*.  To the contrary, the Government presented *Martindell* squarely to the relevant courts, first arguing that its test was not applicable, and then, in the alternative, that the requested relief should be granted even if the courts applied the *Martindell* standard.  It cannot possibly be the case that the Government was attempting to "circumvent" a case that it cited 11 times in its argument to both relevant courts. (*See* (Exs. 8 & 9).  Instead, the Government issued a subpoena to Boies Schiller in connection with its investigation and made an application to two judges to modify Rule 26(c) protective orders that precluded full compliance with those subpoenas.  While the Government argued that the court need not employ the *Martindell* balancing test for several reasons, it also made arguments under *Martindell* in the alternative.  Ultimately, both Chief Judge McMahon and Judge Netburn found that *Martindell* applied and analyzed the Government's application under that framework.

As Chief Judge McMahon found, even under the *Martindell* approach, testimony provided pursuant to a protective order can be divulged to a grand jury if the government establishes "some extraordinary circumstance or compelling need."  *Martindell*, 594 F.2d at 296.  After concluding that reliance on the protective order was unreasonable,[36] Chief Judge McMahon found that the "Government [ ] persuasively demonstrated extraordinary circumstances," citing "significant

---

[36] *See, e.g.*, *Int'l Equity Invs., Inc. v. Opportunity Equity Partners Ltd.*, No. 05 Civ. 2745 (JGK) (RLE), 2010 WL 779314, at *8 (S.D.N.Y. Mar. 2, 2010) (finding that the parties' reliance on a civil protective order "was not unreasonable given the nature of the litigation," but "not so overwhelming as to warrant the indefinite application of *Martindell*'s strong presumption against modification because the order's broad scope and express language, and the minimal level of court inquiry outweigh the Parties' reliance.").

public interest" which resulted in the Government convening a grand jury to investigate a serious crime. (Def. Mot. 3, Ex. G at 22-23). The Court also noted that because the investigation was not publicly known, "the ordinary exercise of grand jury power [*i.e.*, to subpoena witnesses to testify and to produce documents] . . . would implicate and invite the very risk of disclosure—and the possibility of alerting potential criminal targets that they are under investigation, causing them to destroy evidence, flee from prosecution, or otherwise seriously jeopardize the Investigation—that caused the Government to proceed via subpoena [to Boies Schiller] and its related Application." (*Id.* at 23-24). The Court further noted that the "Government's interest is bolstered" as the request was made by a grand jury that had issued a "subpoena for the production of documents as part of an ongoing investigation." (*Id.* at 25). In support of her argument, the defendant cites *Palmieri* where the Second Circuit, applying *Martindell*, reversed the district court's decision granting the state Attorney General's motion to intervene to modify sealing orders. (Def. Mot. 11 at 14). Maxwell's reliance on *Palmieri* is of no avail. There, the Second Circuit held that the district court erred by not expressly finding that the state had shown improvidence, extraordinary circumstances, or compelling need before modifying the sealing orders in a civil case. *Palmieri*, 779 F.2d at 862, 866. By contrast, here Chief Judge McMahon made this explicit finding.

Judge Netburn, on the other hand, rejected the Government's arguments for exceptional circumstances and compelling need as "unpersuasive" under the *Martindell* standard. (Def. Mot. 3, Ex. H at 6). Maxwell argues that Judge Netburn was "exactly right" in her analysis of whether exceptional circumstances existed, but ignores the fact that Chief Judge McMahon made contrary findings on this point. That two neutral judicial officers were presented with the facts, analyzed the law, and reached varying conclusions based on different findings shows that there are guardrails in place to ensure compliance with *Martindell*. In other words, the Government in no

way circumvented *Martindell*; rather, the Government sought court approval to enforce a subpoena and then followed the directives it received.[37]

Most critically, however, even if the Government's motion did not satisfy *Martindell*, Maxwell offers no legal authority for the proposition that suppression is the proper remedy.[38] Indeed, none of the Second Circuit cases applying *Martindell* contemplate suppression as a remedy.  *See, e.g.*, *In re Grand Jury Subpoena Duces Tecum Dated Apr. 19, 1991*, 945 F.2d at 1224 (remanding for findings "on whether the protective order was improvidently granted or whether the government had made a showing of exceptional circumstances or a compelling need"); *Palmieri*, 779 F.2d at 862 (reversing district court's modification of protective orders where district court did not make an "express finding" of improvidence, extraordinary circumstances, or compelling need and "remand[ing] for further proceedings consistent with this opinion").

---

[37] Maxwell asks this Court to review and reverse Chief Judge McMahon's exercise of her discretion in modifying the protective order, because she disagrees with Chief Judge McMahon's analysis of the *Martindell* factors.  Although Chief Judge McMahon's order modifying the civil protective order was not entered on the civil docket, that order, along with the Government's application and related materials, were produced to the defense on or about August 12, 2020.  As a result, Maxwell could have sought review of Chief Judge McMahon's order in the Second Circuit.  *See* Fed. R. App. P. 4(a)(6).  Maxwell asks this Court to second-guess a coequal district court's decision to modify a protective order.  Putting aside the question of whether this Court even has the authority to do so, it should in any event decline Maxwell's invitation to act as a reviewing court to Chief Judge McMahon's decision, which was made in her "sound discretion." *In re "Agent Orange" Prod. Liab. Litig.*, 821 F.2d at 147.

[38] To the extent that Maxwell seeks suppression of documents created prior to the entry of the protective order (or created after its entry but not subject to its protections), that aspect of her motion should be denied.  A significant amount of the materials provided in response to the subpoena included such pre-existing documents not created in reliance on a protective order, which do not trigger the *Martindell* presumption in the Second Circuit, *see TheStreet.com*, 273 F.3d at 234-235; *Davis*, 702 F.2d at 422.  Maxwell's arguments also do not extend to transcripts of other individuals' depositions, who were not parties to the protective order.

### 2.      Maxwell's Fourth Amendment Claim Fails

Maxwell's Fourth Amendment motion is premised on a wholly unsupported expansion of the law.  Because Maxwell lacked a privacy interest in the files of a third party law firm who represented her adversary in civil litigation, and because the subpoena was entirely lawful, she cannot make out a Fourth Amendment violation.  Moreover, even if Maxwell had standing to assert this claim, it would nonetheless fail because the Government relied in good faith on a judicial order permitting compliance with its subpoena.

### a.  Maxwell Has Not Established Standing

### i.      Applicable Law

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend IV.  "The basic purpose of this Amendment . . . is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials."  *Carpenter v. United States*, 138 S. Ct. 2206, 2213 (internal quotation marks and citation omitted).  "It has been clear for a generation that 'Fourth Amendment rights are personal rights . . . [that] may not be vicariously asserted.'"  *United States v. Haqq*, 278 F.3d 44, 47 (2d Cir. 2002) (quoting *Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978)).  Accordingly, a defendant's Fourth Amendment rights "are violated only when the challenged conduct invaded *his* legitimate expectation of privacy rather than that of a third party."  *United States v. Payner*, 447 U.S. 727, 731 (1980) (emphasis in original); *see also United States v. Villegas*, 899 F.2d 1324, 1333 (2d Cir. 1990).  Ultimately, the Fourth Amendment inquiry is "whether [a] defendant has established a legitimate expectation of privacy in the area searched."  *United States v. Chuang*, 897 F.2d 646, 649 (2d Cir. 1990) (citations omitted).  This threshold question involves two separate inquiries: (1) whether a defendant has demonstrated a subjective

expectation of privacy in the places and items that were searched; and (2) whether that expectation was one that society accepts as reasonable. *Id.* It is axiomatic that "[t]he proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." *Rakas*, 439 U.S. at 130, n.1; *see also Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980).

Under the third party doctrine, the Fourth Amendment "does not prohibit the obtaining of information revealed to a third party and conveyed by [the third party] to Government authorities." *United States v. Miller*, 425 U.S. 435, 443 (1976). The Supreme Court has long held that "a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties," *Smith v. Maryland*, 442 U.S. 735, 743-44 (1979), "even if the information is revealed on the assumption that it will be used only for a limited purpose," *Miller*, 425 U.S. 435, at 443. Exceptions to the applicability of the third party doctrine are narrow. For example, in *Carpenter*, 138 S. Ct. at 2220, the Supreme Court declined to extend the third party doctrine to cell site location information, holding that "a warrant is required in the rare case where the suspect has a legitimate privacy interest in records held by a third party." 138 S. Ct. at 2222. However, the Court stressed that its holding was "a narrow one," with specific consideration given to "the unique nature of cell phone location information," *id.* at 2220, which "provides an intimate window into a person's life," *id.* at 2217.

"The law is clear that the burden on the defendant to establish [Fourth Amendment] standing is met only by sworn evidence, in the form of affidavit or testimony, from the defendant or someone with personal knowledge." *United States v. Montoya-Eschevarria*, 892 F. Supp. 104, 106 (S.D.N.Y. 1995) (citations omitted); *see also United States v. Ulbricht*, No. 14 Cr. 68 (KBF), 2014 WL 5090039, at *6 (S.D.N.Y. Oct. 10, 2014); *Rakas*, 439 U.S. at 130 n.1.

### ii.      Discussion

Maxwell cannot assert a Fourth Amendment claim because she had no legitimate expectation of privacy in the deposition transcripts or other materials she designated as confidential under the protective order.  The materials were held by a third party law firm that represented her adversary in the civil suit.  *See Smith*, 442 U.S. at 743-44 ("a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties"); *Miller*, 425 U.S. at 443 (no legitimate expectation of privacy in materials held by a third party "even if the information is revealed on the assumption that it will be used only for a limited purpose"); *Carpenter*, 138 S. Ct. at 2220 ("We do not disturb the application of *Smith* and *Miller* . . .").  Maxwell cites no authority for the proposition that she has standing to challenge a judicially approved grand jury subpoena directed at a third party law firm, because there is none.

Maxwell points to the fact that the materials were designated as confidential under the protective order, but that reliance is misplaced.  (Def. Mot. 11 at 6-8).  *Martindell* by its own terms contemplates the modification of a protective order in a civil action.  *See, e.g.*, *Andover Data Servs.*, 876 F.2d at 1083 ("It is well-settled here and elsewhere . . . that a Rule 26(c) protective order may be overturned or modified based on a finding of improvidence, extraordinary circumstances or compelling need.").  And with respect to the specific protective order at issue, Chief Judge McMahon found that because the order "plainly gives the court the power to enter an order compelling disclosure to anyone—law enforcement included—Maxwell could not reasonably have relied on the absence of automatic permission for such disclosure to shield anything she said or produced from a grand jury's scrutiny."  (Def. Mot. 3, Ex. G at 18-19); *see also* Def. Mot. 3, Ex. A at ¶ 5 ("CONFIDENTIAL INFORMATION[] shall not, without the consent of the party producing it *or further Order of the Court*, be disclosed[.]") (internal quotation

marks omitted) (emphasis added)); *In re "Agent Orange" Prod. Liab. Litig.*, 821 F.2d at 145 ("It is undisputed that a district court retains the power to modify or lift protective orders that it has entered."). It also bears noting that *Martindell* and its progeny do not discuss law enforcement applications in Fourth Amendment terms.

In an effort to avoid the application of the third party doctrine, Maxwell contends that she did not in fact voluntarily share anything in the civil suit, and that "every other circumstance" supported her "expectation that her deposition transcripts would be private." (Def. Mot. 11 at 9). Neither argument withstands scrutiny. As an initial matter, the facts of this case are far removed from the "narrow" circumstances in which the Supreme Court has found an exception to the third party doctrine. For example, the *Carpenter* Court, while stressing that its holding was a "narrow one," 138 S. Ct. at 2220, held that "[g]iven the unique nature of cell phone location records," which provide a "intimate window into a person's life," "the fact that the information is held by a third party does not by itself overcome the user's claim to Fourth Amendment protection." *Id.* at 2217; *see also Zietzke v. United States*, 426 F. Supp. 3d 758, 768 (W.D. Wash. 2019) ("The Court . . . will extend *Carpenter* to new circumstances only if they directly implicate the privacy concerns that animated the majority. [T]he majority was overwhelmingly concerned with 'Carpenter's anticipation of privacy in his physical location.' In other words, *Carpenter* was about surveillance." (internal citation omitted)).

There can be no serious argument that the facts of this case, or the materials obtained pursuant to the subpoena issued here, revealed Maxwell's physical location over a period of time or are otherwise in any way analogous to the narrow category of information contemplated by the majority in *Carpenter*. To the extent the defendant argues that her deposition transcripts implicate such interests because she "did not 'voluntarily convey' her testimony to Giuffre," (Def. Mot. 11

at 10), the Court should reject the defendant's efforts to twist *Carpenter*'s exception to the third party rule beyond recognition.  The defendant was not compelled to participate in the deposition or to answer questions without invoking her Fifth Amendment right against self-incrimination; she voluntarily chose to do so.  Even if she chose to do so in reliance on the protective order, that protective order was subject to modification under well-settled case law and by its own terms.  Contrary to the defendant's claims (Def. Mot. 11 at 10), she assumed the risk that the deposition transcripts would divulged to the Government.  *See, e.g.*, *United States v. Schaefer*, No. 17 Cr. 400 (HZ), 2019 WL 267711, at *5 (D. Or. Jan. 17, 2019) (declining to apply *Carpenter* where government obtained defendant's eBay transactions without a warrant as defendant "assumed the risk that [eBay] would reveal to police the purchases he made" and defendant "did not have a reasonable expectation of privacy in the records of his purchases").

Because Maxwell had no legitimate Fourth Amendment privacy interest in the materials in Boies Schiller's possession, she has no standing to challenge their seizure, and no warrant was required to obtain those materials.  Her motion should be rejected on this ground alone.

### b.      The Government Acted in Good Faith

Even if the defendant had standing to bring this motion, it still fails because the Government only obtained these materials after obtaining a court order authorizing it to do so.  The Government accordingly acted in good faith when it acted pursuant to that judicial order.

### i.      Applicable Law

Under the so-called "good faith" exception, the exclusionary rule and its remedy of suppression do not apply "when the Government 'act[s] with an "objectively reasonable good-faith belief that their conduct is lawful.'"  *United States v. Zodhiates*, 901 F.3d 137, 143 (2d Cir. 2018) (quoting *Davis v. United States*, 564 U.S. 229, 238 (2011) (internal quotation marks

omitted)).   "As the rule seeks to deter future Fourth Amendment violations, the Supreme Court advises district courts to only suppress evidence where it serves such a purpose." *United States v. Williams*, No. 10 Cr. 622 (ADS), 2018 WL 4623017, at *4 (E.D.N.Y. Sept. 26, 2018) (internal quotation marks and citations omitted).   "'[T]he exclusionary rule is not an individual right and applies only where it results in appreciable deterrence." *United States v. Eldred*, 933 F.3d 110, 118 (2d Cir. 2019) (quoting *Herring v. United States*, 555 U.S. 135, 141 (2009)); *see also Herring*, 555 U.S. at 144 (concluding that "[t]o trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system.").   As a result, exclusion should be a "last resort" rather than a "first impulse." *United States v. Rosa*, 626 F.3d 56, 64 (2d Cir. 2010) (internal quotation marks and citation omitted).   The exclusionary rule should be used only where law enforcement "'exhibit[s] deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights.'"   *United States v. Raymonda*, 780 F.3d 105, 117-18 (2d Cir. 2015) (quoting *United States v. Stokes*, 733 F.3d 438, 443 (2d Cir. 2013)); *see also United States v. Green*, 981 F.3d 945, 957 (11th Cir. 2020) ("It follows that when officers act with 'an objectively reasonable good-faith belief that their conduct is lawful'—i.e., by acting in reasonable reliance on a warrant, statute, or court order—the exclusionary rule does not apply because there is little, if any, deterrence benefit in such circumstances." (citations omitted)).

In the context of search warrants, suppression will generally not be warranted where the evidence at issue was "obtained in objectively reasonable reliance on a subsequently invalidated search warrant." *United States v. Leon*, 468 U.S. 897, 922 (1984).   As a result, although the burden is on the Government to establish good faith, "[s]earches pursuant to a warrant will rarely require any deep inquiry into reasonableness, for a warrant issued by a magistrate normally suffices to

establish that a law enforcement officer has acted in good faith in conducting the search." *Id.*

(internal quotation marks and citations omitted); *see also Golino v. City of New Haven*, 950 F.2d

864, 870 (2d Cir. 1991) (noting that the "issuance of a warrant by a neutral magistrate, which

depends on a finding of probable cause, creates a presumption that it was objectively reasonable

for the officers to believe that there was probable cause"). Indeed, the good faith exception does

not apply only in four narrow circumstances:

> (1) where the issuing magistrate has been knowingly misled; (2)
> where the issuing magistrate wholly abandoned his or her judicial
> role; (3) where the application is so lacking in indicia of probable
> cause as to render reliance upon it unreasonable; and (4) where the
> warrant is so facially deficient that reliance upon it is unreasonable.

*United States v. Moore*, 968 F.2d 216, 222 (2d Cir. 1992) (citing *Leon*, 468 U.S. at 923). The good

faith exception analysis applies in the context of court orders. *See, e.g.*, *Zodhiates*, 901 F.3d at

143 (applying good faith analysis in Fourth Amendment challenge to cell phone location

information obtained by subpoena issued pursuant to 18 U.S.C. § 2703(c)(2)); *United States v.

Serrano*, No. 13 Cr. 58 (KBF), 2014 WL 2696569, at *7 (S.D.N.Y. June 10, 2014) (finding good

faith exception would apply to cell site information obtained pursuant to a subpoena authorized by

magistrate judge pursuant to 18 U.S.C. § 2703(d)); *United States v. Ashburn*, 76 F. Supp. 3d 401,

406, 414-18 (E.D.N.Y. 2014) (applying *Leon* to § 2703(d) orders for historical cell-site data

obtained and finding that the good faith exception applied).

### ii.    Discussion

The exclusionary rule and its remedy of suppression should not apply here, as the

Government issued a grand jury subpoena; sought the materials after applying to the district court

for an order to modify the civil protective order; and only obtained the materials after the district

court modified the protective order and issued a 26-page decision.  The Government acted in reasonable reliance on the district court's decision.

The defendant argues that the Government misled the Court when it "claimed not to know what was in Boies Schiller's file and that Boies Schiller had no role in instigating the investigation of Maxwell."  (Def. Mot. 11 at 1).  The defendant's claims are both factually inaccurate and meritless.

*First*, the Government did not mislead Chief Judge McMahon about its contacts with Boies Schiller.  As an initial matter, Maxwell's argument is premised solely on her use of selective snippets from a lone *Daily News* Article that is premised, in meaningful part, on anonymous sources and hearsay.  As the factual background set forth above—which is corroborated by notes and correspondence produced alongside this brief—makes clear, David Boies and Boies Schiller played no role in initiating, let alone "fomenting" the Government's investigation.  That investigation was opened more than two and a half years after the last known contact between any lawyer associated with any civil counsel for Giuffre and, in any event, was initially focused on Epstein, not this defendant.  As detailed above, the USAO-SDNY opened the instant investigation in late November 2018 shortly after the *Miami Herald* published a series of articles about Epstein.  AUSA-1 was not involved in that decision, which in any event had nothing to do with a meeting that had taken place nearly three years prior.[39]  (Ex. 4 at 6).

---

[39] Maxwell repeatedly claims that Boies Schiller urged AUSA-1 to open an investigation of Epstein *and Maxwell*, (Def. Mot. 3 at 8), but that allegation, which is supported by nothing aside from the above-referenced media report, is incorrect.  While AUSA-1 did meet with the three attorneys in February 2016, she understood the attorneys to be focused on Epstein, and not on Epstein and Maxwell as a "duo."  (Ex. 4 at 1, 4).  The presentation to AUSA-1 focused on urging an investigation into Epstein with only passing references to Maxwell.  Simply put, the pitch was to investigate Epstein, not Maxwell.

The defendant repeatedly argues that the Government's failure to mention AUSA-1's prior contact with Boies Schiller in 2016 was a misrepresentation that led to the modification of the protective order.   The argument, which relies principally on hyperbolic rhetoric, is simply incorrect.   As an initial matter, the Government did not insist, contrary to Maxwell's twisted reading of the transcript, that "there had been no contact whatsoever" between Boies Schiller and the Government at any time prior to the Government opening its investigation.   (Def. Mot. 3 at 1). Instead, Chief Judge McMahon's question was more specific: referencing *Chemical Bank* and the desire to avoid "a *Chemical Bank* kind of situation," Chief Judge McMahon asked about contacts between the two parties "prior to the issuance of the subpoena *on the subject of your investigation*." (Def. Mot. 3, Ex. E at 2 (emphasis added); *see also* Def. Mot. 3 at 7 (omitting the italicized portion of the question)).   In response, the Government described accurately its communications with Boies Schiller that had occurred in the time period surrounding the opening of its investigation and the issuance of the subpoena.   Additionally, and in light of the Government's prior arguments to Chief Judge McMahon relating to *Chemical Bank*,[40] the Government attempted to address the misconduct at issue in that case: namely the production of confidential documents without seeking modification of a protective order by confirming that, here, no such production had yet occurred. (Def. Mot. 3, Ex. E at 2) (noting that Boies Schiller "generally advised us that they believed there

---

[40] *See*, *e.g.*, Exs. 8 & 9 at 2-3 (discussing *Chemical Bank* as rejecting a contempt request where a party "compl[ied] with a grand jury subpoena despite the existence of a protective order" and focusing arguments on the nature of the production of documents); (Def. Mot. 3, Ex. D at 15) (the Government describing *Chemical Bank* as "essentially say[ing]: You should have asked, but of course this is fine for you to disclose this information to the government based on the validly issued grand jury subpoena"); *cf.* (*id.* at 4 (Chief Judge McMahon describing *Chemical Bank* as saying "the proper procedure [for the production of documents] is for somebody to make a motion to be relieved from the terms of the protective order"), 20 (Chief Judge McMahon stating that "in the *Chemical Bank* case, it all was ex post facto and it all happened")).

was a protective order that would govern at least some of the materials, and that is why we ultimately made the application to the Court.")).

While the Government appreciates, with the benefit of hindsight, that an answer that had also referenced the February 2016 meeting (and the fact that USAO-SDNY took no action as a result of that meeting) would have provided additional context—and would have further reinforced that this was not a "*Chemical Bank* situation"—as noted above, the Government's response accurately described its contacts with Boies Schiller as relevant to "your investigation" and the issuance of the subpoena at hand.  Indeed, there is no reason to believe that a description of the February 2016 meeting would have been material to Chief Judge McMahon's analysis of whether she was facing a "*Chemical Bank* kind of situation."  (Def. Mot. 3, Ex. E at 2).

In *Chemical Bank*, counsel for a civil party approached the Manhattan District Attorney's Office "suggesting that it had evidence of criminal violations relating to the case."  154 F.R.D. at 93.  In response, a grand jury subpoena was issued and "confidential documents were produced by the defendant without complying with any of the specific procedures or exceptions provided in the [confidentiality] orders."  *Id.*  Here, by contrast, the Government accurately conveyed to Chief Judge McMahon the opening of its investigation in late 2018, the reason it made contact with Boies Schiller shortly thereafter and served a subpoena in February 2019, and that no documents governed by the protective order had yet been produced.  Aside from rank speculation loosely premised on an anonymously sourced news report, the defendant offers nothing to support her assertion that "Boies Schiller was *instrumental* in fomenting the Maxwell prosecution" (Def. Mot. 3 at 2) (emphasis in original), or that AUSA-1's February 2016 meeting with Boies Schiller (as it actually occurred) undercut the accuracy of the Government's representations to Chief Judge McMahon, or played any role in the Government opening its investigation in November 2018.

*Second*, the Government did not misrepresent the extent of its knowledge of the contents of Boies Schiller's files.  As the Government correctly represented to the court, the Government had "either little or no additional information than the Court does in terms of what materials there are [and] who was deposed."  (Def. Mot. 3, Ex. D at 17).  In support of her argument, Maxwell cites again to the *Daily News* Article, which reports that "after Maxwell's two depositions, David Boies himself apparently approached the government in the summer of 2016, asking 'if the Southern District would consider charging Maxwell with perjury'" (Def. Mot. 3 at 8).  But the Government has uncovered no evidence that such a meeting ever occurred.  AUSA-1 does not recall ever speaking with or meeting David Boies in her life.  (Ex. 4 at 4).  Moreover, AUSA-1 does not recall being asked if the USAO-SDNY would consider charging Maxwell with perjury (*id.* at 5), and while notes of the February 2016 meeting refer to the existence of depositions generally, there can be no question Chief Judge McMahon appreciated the Government's general understanding that such transcripts would be part of the civil litigation file.  (Def. Mot. 3, Ex. G at 21).  Simply put, there is no evidence that the Government had any significant knowledge of the contents of Boies Schiller's files, or that the Government's representations to Chief Judge McMahon were incorrect.

In sum, Maxwell has failed to put forth any evidence that the Government misled Chief Judge McMahon, and as such, the good faith exception applies.  To the contrary, the record before the Court demonstrates that the Government directly responded to Chief Judge McMahon's question and accurately described the contacts between Boies Schiller and the USAO-SDNY in connection with the investigation, the Government's lack of knowledge of the contents of that file, and the fact that no protected materials had been produced in violation of the protective order.  Upon receiving a court order issued by a Chief United States District Judge who had carefully

considered the Government's application and then issued a lengthy opinion ruling on that application, the Government was entirely reasonable in its understanding that the order was lawful. It was therefore similarly reasonable for the Government to obtain materials from Boies Schiller in response to the subpoena that had been analyzed and blessed by a court order. The Government acted with an "objectively reasonable good-faith belief" that its conduct was lawful and in reasonable reliance on the district court's order. *Zodhiates*, 901 F.3d at 143 (internal quotation marks and citations omitted).

### c.   Suppression of Certain Materials Would Be Improper Under the Inevitable Discovery Doctrine

To the extent materials the Government obtained from Boies Schiller have now been unsealed and posted on the public docket, there is no basis to suppress such materials because the Government would have inevitably been able to access them upon unsealing.

### i.   Applicable Law

Under the inevitable discovery doctrine, "evidence that was illegally obtained will not be suppressed 'if the government can prove that the evidence would have been obtained inevitably' even if there had been no statutory or constitutional violation." *United States v. Roberts*, 852 F.2d 671, 675-76 (2d Cir. 1988) (quoting *Nix v. Williams*, 467 U.S. 431, 447 (1984)). When a claim of inevitable discovery is raised, the court must "determine, viewing affairs as they existed at the instant before the unlawful search occurred, what *would have happened* had the unlawful search never occurred." *Stokes*, 733 F.3d at 444 (citation omitted) (emphasis in original); *see also United States v. Heath*, 455 F.3d 52, 55 (2d Cir. 2006) (The application of the inevitable discovery doctrine "turns on a central question: Would the disputed evidence inevitably have been found through legal means 'but for' the constitutional violation? If the answer is 'yes,' the evidence seized will not be excluded.").

"The government bears the burden of proving inevitable discovery by a preponderance of the evidence." *Stokes*, 733 F.3d at 444 (citing *Nix*, 467 U.S. at 444). This requires establishing, "'with a high level of confidence, that each of the contingencies necessary to the legal discovery of the contested evidence would be resolved in the government's favor.'" *Id.* (quoting *Heath*, 455 F.3d at 60). As the Supreme Court has explained, if the Government can establish that the evidence inevitably would have been discovered by lawful means, "then the deterrence rationale [for the exclusionary rule] has so little basis that the evidence should be received." *Nix*, 467 U.S. at 444.

### ii.    Discussion

Even if the Court were to find that there had been some constitutional violation in the Government obtaining a modification of the protective order—which it should not—the question in an inevitable discovery analysis is whether the Government would inevitably have found the disputed evidence. The answer is yes, at least as to some of the evidence, including the April 2016 deposition that forms the basis of Count Five and part of the July 2016 deposition that forms the basis of Count Six.[41]

---

[41] In January 2021, the defendant asked Judge Preska to reconsider her order unsealing certain portions of her testimony on the basis that, among other things, public release of the section would make it more difficult for Maxwell to suppress the testimony as evidence against her at her criminal trial. On February 8, 2021, Judge Preska "decline[d] Ms. Maxwell's invitation to reconsider its order" and noted that the defendant had both filed a suppression motion and available tools under the Federal Rules of Evidence and Procedure. (*See* 15 Civ. 7433 (LAP), Dkt. No. 1211 at 3, 5). The portion of the July 2016 deposition transcript that forms the basis of Count Six that has been unsealed relates to the defendant denying that she has given a massage to anyone, including Epstein or Minor Victim-2. (*See* 15 Civ. 7433 (LAP), Dkt. No. 1212-1 at 113). The fact that the defendant argued against unsealing the transcript by pointing to her suppression argument is irrelevant. Judge Preska determined that the public's First Amendment right of access outweighed the defendant's interests. If the Government had not modified the protective order and charged the defendant with perjury based on the deposition transcript, that argument would have been unavailable and the balance would have tipped still more in favor of public access, leading to the transcript's inevitable discovery.

The defendant asks the Court for a drastic remedy, namely suppression of *all* evidence the Government obtained pursuant to the subpoena, as well as the dismissal of Counts Five and Six. In so doing, the defendant seeks a windfall to which she is not entitled based on unprecedented claims that ignore the facts and the law.  Suppression of all materials the Government obtained pursuant to the subpoena is unwarranted here, particularly where certain of the materials have been subsequently unsealed by Judge Preska in the underlying civil litigation, including Maxwell's April 2016 deposition transcript.  (*See* 15 Civ. 7433 (LAP), Dkt. No. 1077).  The Second Circuit affirmed Judge Preska's ruling in October 2020, finding that the Court "correctly held that the deposition materials are judicial documents to which the presumption of public access attaches, and did not abuse its discretion in rejecting Maxwell's meritless arguments that her interests superseded the presumption of access." *Giuffre v. Maxwell*, No. 20-2413 (2d Cir.), (Dkt. No. 140-1 at 3).[42]  On October 22, 2020, the defendant's April 2016 deposition was publicly filed.  (*See* 15 Civ. 7433 (LAP), Dkt. No. 1137-13).  In February 2021, a redacted version of the defendant's July 2016 deposition was publicly filed.  (*See* 15 Civ. 7433 (LAP), Dkt. No. 1212-1).  In other words, had the Government not obtained an order modifying the protective order, the Government inevitably would have discovered and obtained, at a minimum, the defendant's April 2016 deposition transcript and a portion of the July 2016 transcript that form the basis of the charges in Counts Five and Six.

---

[42] Relatedly, the defendant moved to modify the *criminal* protective order in order to use confidential criminal discovery materials in filings she intended to submit in civil litigation.  The defendant raised this precise point—that if the Court ultimately decided that it was inappropriate for the Government to proceed by subpoena, the Government would claim inevitable discovery. (Dkt. No. 54 at 3).  The defendant offered no coherent explanation of how the criminal discovery materials could have any conceivable impact on the issues pending in civil litigation. She cited no case law suggesting that, for example, the possibility of an inevitable discovery argument by the Government should foreclose unsealing in a civil case.  This Court rejected the defendant's motion to modify the criminal protective order.  (Dkt. No. 51).  The Second Circuit also dismissed the defendant's appeal for want of jurisdiction.  (Dkt. No. 71).

### 3.   The Defendant's Motion to Suppress Evidence Obtained Pursuant to the Subpoena Under the Fifth Amendment Is Without Merit

The defendant's motion to suppress all evidence obtained pursuant to the subpoena on Fifth Amendment grounds fails for multiple, independent reasons.  As an initial matter, Boies Schiller is not the Government and was not acting as an agent of the Government when it deposed the defendant or otherwise litigated the civil case against her.  That the defendant may regret her choice to respond to Boies Schiller's questions during two depositions instead of invoking her privilege against self-incrimination does not transform that choice into a Fifth Amendment violation.

#### a.   Applicable Law

#### i.   The Fifth Amendment – Generally

The Fifth Amendment provides in pertinent part: "No person . . . shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  To establish a Fifth Amendment violation, an individual must "demonstrate the existence of three elements: 1) compulsion, 2) a testimonial communication, and 3) the incriminating nature of that communication."  *In re Grand Jury Subpoena*, 826 F.2d 1166, 1168 (1987); *see also, e.g.*, *In Re Three Grand Jury Subpoenas Jan. 5, 1988*, 847 F.2d 1024, 1028 (2d Cir. 1988).

It is "axiomatic that the Amendment does not automatically preclude self-incrimination, whether spontaneous or in response to questions put by government officials."  *United States v. Washington*, 431 U.S. 181, 186 (1977).  "Indeed, far from being prohibited by the Constitution, admissions of guilt by wrongdoers, if not coerced, are inherently desirable."  *Id.* at 187.  "[T]he Fifth Amendment proscribes only self-incrimination obtained by a 'genuine compulsion of testimony.'"  *Id.* (quoting *Michigan v. Tucker*, 417 U.S. 433, 440 (1974)); *see also Washington*, 431 U.S. at 187 ("Absent some officially coerced self-accusation, the Fifth Amendment privilege is not violated by even the most damning admissions.").  Nor does the Constitution "prohibit every

element which influences a criminal suspect to make incriminating admissions." *Id.* The question is not whether a witness was encouraged to speak, but whether his "free will," when he spoke, "was overborne." *Id.* at 188; *see also*, *e.g.*, *United States v. Corbett*, 750 F.3d 245, 253 (2d Cir. 2014).

It follows that the Government need not inform a witness of the nature of its investigation, *see United States v. Okwumabua*, 828 F.2d 950, 953 (2d Cir. 1987), much less his individual status in the investigation, *see Washington*, 431 U.S. at 189 & 190 n.6. The Constitution does not "require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights." *Colorado v. Spring*, 479 U.S. 564, 576-77 (1987) (internal quotation marks omitted); *see also, e.g.*, *id.* at 577 (there is no requirement that law enforcement give information that might affect "the wisdom" of speaking). Nor does the Constitution require that someone be questioned only in the manner most likely to ensure that he gives the decision whether to speak careful thought. *See, e.g.*, *United States v. Roberts*, 660 F.3d 149, 157 (2d Cir. 2011) ("the Fifth Amendment does not protect against hard choices" (internal quotation marks omitted)); *United States v. Mullens*, 536 F.2d 997, 1000 (2d Cir. 1976) (there is a difference between "those choices which are physically or psychologically coerced and those which are merely difficult").

In short, the Fifth Amendment is only violated by "government misconduct" that is "coercive." *Colorado v. Connelly*, 479 U.S. 157, 163 (1986); *see also Oregon v. Elstad*, 470 U.S. 298, 312 (1985) (Fifth Amendment prohibits "coercion" effected "by physical violence or other deliberate means calculated to break the suspect's will").

### ii.     The Fifth Amendment – Act of Production Privilege

The act of production privilege is a form of the Fifth Amendment privilege pertaining to the production of materials. "[A]n individual may claim an act of production privilege to decline

to produce documents, the contents of which are not privileged, where the act of production is, itself, (1) compelled, (2) testimonial, and (3) incriminating." *In re Three Grand Jury Subpoenas Duces Tecum Dated Jan. 29, 1999*, 191 F.3d 173, 178 (2d Cir. 1999).

Consistent with these requirements, the privilege only "prohibits the compelled disclosure of documents when the act of production has independent communicative aspects—such as an admission that the documents exist, that the subject possesses or controls the documents, that the documents are authentic, or that the subject believes the documents are responsive to the subpoena." *In re Various Grand Jury Subpoenas*, 924 F. Supp. 2d 549, 552 (S.D.N.Y. 2013), *aff'd*, 579 F. App'x 37 (2d Cir. 2014); *see also Fisher v. United States*, 425 U.S. 391, 408 (1976). It follows that the privilege does not apply when "[t]he existence and location of the [sought] papers are a foregone conclusion and the [compelled individual] adds little or nothing to the sum total of the Government's information by conceding that he in fact has the papers." *Id.* at 411; *see also In re Grand Jury Subpoena Duces Tecum Dated Oct. 29, 1992*, 1 F.3d 87, 93 (2d Cir. 1993); *Madanes v. Madanes*, 186 F.R.D. 279, 284 (S.D.N.Y. 1999) ("[E]ven if documents contain incriminating information, requiring a person to produce them does not implicate the Fifth Amendment unless the act of production is itself testimonial in nature and incriminating to the person making the disclosure.").

### iii.   The Fifth Amendment – When Private Action Is Deemed Government Action

As discussed above, "[t]he sole concern of the Fifth Amendment . . . is governmental coercion." *Connelly*, 479 U.S. at 170. "[T]he Fifth Amendment privilege is not concerned 'with moral and psychological pressures to confess emanating from sources other than official coercion.'" *Id.* (quoting *Elstad*, 470 U.S. at 305). For this reason, even "[t]he most outrageous

behavior by a private party seeking to secure evidence against a defendant does not make that evidence inadmissible." *Connelly*, 479 U.S. at 166.

This does not mean that only action undertaken directly by the Government may violate the Fifth Amendment (or another right). In certain circumstances, a private entity may be deemed to be acting as a government agent. *See United States v. Stein*, 541 F.3d 130, 146 (2d Cir. 2008) ("Actions of a private entity are attributable to the State if there is a sufficiently close nexus between the State and the challenged action of the entity so that the action of the latter may be fairly treated as that of the State itself." (internal quotation marks and ellipsis omitted)).

However, this standard "is not satisfied when the state merely approves of or acquiesces in the initiatives of the private entity, or when an entity is merely subject to governmental regulation." *Id.* (internal quotations marks and citations omitted; alterations incorporated)). Nor is it sufficient that a non-government entity chooses to cooperate with a government investigation or has its own parallel investigation. *See id.* at 150. Non-government action is attributable to the government "only when it can be said that the State is *responsible* for the specific conduct of which the [defendant] complains." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982) (emphasis in original). "Such responsibility is normally found when the State 'has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State.'" *Stein*, 541 F.3d at 147 (quoting *Blum*, 457 U.S. at 1004); *see also Flagg v. Yonkers Sav. & Loan Ass'n*, 396 F.3d 178, 187 (2d Cir. 2005).

### b.    Discussion

As an initial matter, the defendant's Fifth Amendment claim fails because she has not demonstrated state action. Boies Schiller is not an agent of the Government and has not been at any time during the course of the Government's investigation, including when it initiated the civil

lawsuit against the defendant or took her deposition years before the Government initiated its own investigation.  The defendant offers no evidence to the contrary, and there is no reason to believe, on this record, that the Government in any way controlled Boies Schiller when it litigated a civil case against the defendant.  As such, the Fifth Amendment does not apply.

The defendant's claim further fails because without coercion or compulsion, there is no Fifth Amendment violation.  *See Minnesota v. Murphy*, 465 U.S. 420, 431 (1984) (rejecting claim that a "failure to inform [the defendant] of the Fifth Amendment privilege barred use of his confession at trial"); *United States v. Mitchell*, 966 F.2d 92, 100 (2d Cir. 1992) ("Inculpatory statements are not involuntary when they result from a desire to cooperate, or from a defendant's ignorance of, or inattention to, his right to remain silent."); *United States v. Mast*, 735 F.2d 745, 750 (2d Cir. 1984) (same).  The defendant implicitly argues that she only testified under oath in the civil matter because she thought she would not be held to that oath.  In other words, had she known that she would be subject to the penalties of perjury, she would have invoked her Fifth Amendment right.   But the defendant's misguided expectation that she would face no consequences cannot be said to coerce speech.  The defendant, represented by able counsel, voluntarily chose to waive her Fifth Amendment rights and testify under oath.  And she chose to do so in connection with civil depositions that occurred over two years before the Government opened its investigation.  The circumstances surrounding that decision come nowhere near the type of coercion that rises to the level of a Fifth Amendment violation.  *See, e.g.*, *United States v. Ash*, 464 F. Supp. 3d 621, 627-30 (S.D.N.Y. 2020) (finding suppression of defendant's phone unwarranted where defendant complied with former employer's request to return the phone because defendant was not coerced into doing so, and rejecting defendant's argument that the

employer was required to warn her that it might produce the phone to the government, even assuming arguendo that that employer's actions were attributable to the government).

The defendant's claim that her act of production privilege was somehow violated similarly fails.  Counsel cites *Boyd v. United States*, 116 U.S. 616 (1886) for the proposition that "a compulsory production of the private books and papers . . . [also] is compelling . . . him to be a witness against himself, within the meaning of the fifth amendment."  (Det. Mot. 11 at 15) (quoting *Boyd*, 116 U.S. at 634-35).  In *In re Grand Jury Subpoena Duces Tecum Dated Oct. 29, 1992*, the Second Circuit ruled that the Fifth Amendment does not protect the contents of private papers that are not business documents, and also noted that "[s]everal aspects of the *Boyd* decision did not endure."  1 F.3d at 90 (citing *Fisher v. United States*, 425 U.S. 391 (1976)).

Further, the Fifth Amendment does not protect against being compelled to speak and then speaking falsely.  "[E]ven if an individual's perjured testimony is improperly procured because of government misconduct, that testimony may still be used to prosecute that defendant for perjury." *United States v. Olivieri*, 740 F. Supp. 2d 423, 425 (S.D.N.Y. 2010) (citing *United States v. Remington*, 208 F.2d 567 (2d Cir. 1953); *United States v. Winter*, 348 F.2d 204 (2d Cir. 1965)); *see also United States v. Wong*, 431 U.S. 174, 180 (1977) ("[P]erjury is not a permissible way of objecting to the Government's questions. . . . Indeed, even if the Government could, on pain of criminal sanctions, compel an answer to its incriminating questions, a citizen is not at liberty to answer falsely."); *Bryson v. United States*, 396 U.S. 64, 72, 90 (1969) (rejecting challenge to false statement prosecution; "[I]t cannot be thought that as a general principle of our law a citizen has a privilege to answer fraudulently a question that the Government should not have asked.  . . . A citizen may decline to answer the question, or answer it honestly, but he cannot with impunity knowingly and willfully answer with a falsehood.").

Contrary to the defendant's argument (Def. Mot. 11 at 16), this case is distinguishable from *United States v. Oshatz*, 700 F. Supp. 696 (S.D.N.Y. 1988). There, the defendant had already been indicted at the time of his deposition in a civil case, "was reluctant to be deposed because of the pending indictment, and he agreed only after the parties in the civil case stipulated that the deposition would be sealed." *Id.* at 699-700. The court found that the subpoenas for the deposition transcript were "unenforceable" because the "government has not argued that the protective order was improvidently granted or that there are some extraordinary circumstances or compelling need, in view of the holding in *Martindell*."[43] *Id.* at 701. The court found that the protective order served the "'vital function'" described in *Martindell*, as the defendant had already been indicted at the time of his deposition in a civil case for almost seven months; the defendant "consistently resisted the use of his testimony in the criminal action against him"; and the Government did not seek the deposition "to aid it in a criminal investigation or grand jury proceeding." *Id.* at 700; *see also Botha v. Don King Productions, Inc.*, No. 97 Civ. 7587 (JGK), 1998 WL 88745 (S.D.N.Y. Feb. 27, 1998) (noting importance of policy concerns of *Martindell* where Government obtained an indictment against witness "long before his deposition in the civil action" and where federal criminal case remains pending after civil action is resolved). Here, by contrast, Chief Judge McMahon found that the "Government has persuasively demonstrated extraordinary circumstances, which would entitle it to modification in any event." (Def. Mot. 3, Ex. G at 22). As she noted in her opinion, the situation was distinct from *Oshatz* "where the Government was trolling for evidence to use at a trial, rather than seeking information as part of a criminal investigation or grand jury proceeding." (*Id.* at 24-25). As Chief Judge McMahon already concluded, *Oshatz* does not warrant a different result here.

---

[43] In *Martindell*, the Second Circuit explicitly deemed it "unnecessary for us to decide the Fifth Amendment issues raised by the parties." *Martindell*, 594 F.2d at 297.

The defendant argues that *Martindell* "authorized her to give deposition testimony under the shield of the Protective Order without worrying whether the government could 'insinuate itself' into the case and use her own words against her."  (Def. Mot. 11 at 15-16).  That is not the law, and the defendant cannot use the protective order to cloak her testimony.  The Second Circuit has recognized that because "[i]t is well-settled here and elsewhere . . . that a Rule 26(c) protective order may be overturned or modified based on a finding of improvidence, extraordinary circumstances or compelling need[,]" "as a practical matter it is clear that the protections afforded by a Rule 26(c) order are *not* as extensive as those afforded by the fifth amendment, or by a statutory grant of use immunity, and that a protective order therefore cannot be used to abridge a witness' fifth amendment rights."  *Andover Data Servs.*, 876 F.2d at 1083 (emphasis in original); *see id.* at 1084 ("'Uncertainty about the ultimate outcome of a protective order will mean that no deponent may always effectively rely on a protective order to secure his right against self-incrimination.'") (quoting *In re Grand Jury Subpoena*, 836 F.2d 1468, 1478 (4th Cir. 1988))); *Davis*, 702 F.2d at 421-22 ("Absent applicable grounds for exception, such as a previously asserted Fifth Amendment privilege, no shield protects the civil evidence [ ] from compellable production before the grand jury which subpoenaed it").

### 4.     The Government Did Not Violate Maxwell's Due Process Rights

The defendant also claims that the Government's conduct "cannot be squared with elemental due process."  (Def. Mot. 3 at 14 (citing U.S. Const. amend. V)).  This claim is meritless. Because there was no Government misconduct—let alone the type of outrageous Government

misconduct that would justify the extraordinary remedy the defendant seeks—the motion must be denied.

### a.        Applicable Law

The Due Process Clause of the Fifth Amendment provides that "[n]o person . . . shall be deprived of life, liberty, or property without due process of law . . . ."  The Due Process Clause "protects individuals against two types of government action."  *Martinez v. McAleenan*, 385 F. Supp. 3d 349, 356 (S.D.N.Y. 2019).  Procedural due process "ensures that government cannot unfairly and without meaningful process deprive a person of life, liberty, or property," while substantive due process "prevents the government from engaging in conduct that shocks the conscience, or interferes with rights implicit in the concept of ordered liberty."  *Id.* (internal quotation marks and citations omitted; alteration omitted).

Procedural due process analysis focuses on whether "government action depriving a person of life, liberty, or property. . . [is] implemented in a fair manner," *United States v. Salerno*, 481 U.S. 739, 746 (1987).  "Courts examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the [Government]; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient."  *United States v. Arzberger*, 592 F. Supp. 2d 590, 599 (S.D.N.Y. 2008) (internal quotation marks and citations omitted).

As to substantive due process, the Supreme Court is "always . . . reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended."  *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (internal quotation marks and citation omitted).  Because of this reluctance, the Supreme Court held in *Graham v. Connor*, 490 U.S. 386 (1989), "that where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of

government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *County of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998) (internal quotation marks omitted); *Albright v. Oliver*, 510 U.S. 266, 272 (1993) ("[t]he protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity.").

The defendant bears the "'very heavy' burden of establishing a due process violation." *United States v. Walters*, 910 F.3d 11, 27 (2d Cir. 2018). "To succeed on a claim that the government's conduct in pursuit of evidence violates a defendant's Fifth Amendment due process rights, the government's method of acquiring the evidence must be so egregious that it 'shocks the conscience.'" *United States v. Loera*, 333 F. Supp. 3d 172, 184 (E.D.N.Y. 2018) (internal quotation marks and citations omitted). "The concept of fairness embodied in the Fifth Amendment due process guarantee is violated by government action that is fundamentally unfair or shocking to our traditional sense of justice, or conduct that is 'so outrageous' that common notions of fairness and decency would be offended were judicial processes invoked to obtain a conviction against the accused." *United States v. Schmidt*, 105 F.3d 82, 91 (2d Cir. 1997) (internal quotation marks and citations omitted). "Such outrageous or conscience shocking behavior involves egregious invasions of individual rights, or coercion." *United States v. Coke*, No. 07 Cr. 971 (RPP), 2011 WL 3738969, at *5 (S.D.N.Y. Aug. 22, 2011) (internal quotation marks and citations omitted). The Second Circuit has explained:

> The paradigm examples of conscience-shocking conduct are egregious invasions of individual rights. *See, e.g.*, *Rochin*, 342 U.S. at 172, 72 S. Ct. 205 (breaking into suspect's bedroom, forcibly attempting to pull capsules from his throat, and pumping his stomach without his consent). Especially in view of the courts' well-established deference to the Government's choice of investigatory methods, *see United States v. Myers*, 692 F.2d 823, 843 (2d Cir. 1982), the burden of establishing outrageous

> investigatory conduct is very heavy, *see United States v. Schmidt*,
> 105 F.3d 82, 91 (2d Cir. 1997).

*United States v. Rahman*, 189 F.3d 88, 131 (2d Cir. 1999); *United States v. Al Kassar*, 660 F.3d 108, 121 (2d Cir. 2011) ("Generally, to be 'outrageous,' the government's involvement in a crime must involve either coercion or a violation of the defendant's person.  It does not suffice to show that the government created the opportunity for the offense, even if the government's ploy is elaborate and the engagement with the defendant is extensive." (internal citations omitted)).  The Second Circuit has "yet to identify a particular set of circumstances in which government investigative conduct was so egregious that it shocked the conscience and violated fundamental guarantees of due process." *United States v. Heyward*, No. 10 Cr. 84 (LTS), 2010 WL 4484642, at *3 (S.D.N.Y. Nov. 9, 2010); *see also United States v. Cromitie*, 727 F.3d 194, 218 (2d Cir. 2019).

There also "must be a causal connection between the violation and the deprivation of the defendant's life or liberty threatened by the prosecution." *United States v. Ghailani*, 751 F. Supp. 2d 502, 505 (S.D.N.Y. 2010).  "That is to say, relief against the government in a criminal case is appropriate if, and only if, a conviction otherwise would be a product of the government misconduct that violated the Due Process Clause." *Id.*

Even where Government misconduct meets the outrageousness test, dismissal of an indictment is warranted only where the Government's behavior "resulted in [] prejudice to the [defendant's] defense or legal representation." *United States v. DiGregorio*, 795 F. Supp. 630, 635 (S.D.N.Y. 1992).  Absent a showing of prejudice, the appropriate remedy for conduct violating the test for outrageousness is suppression of the evidence obtained as the result of the Government's outrageous misconduct. *Id.*

### b.      Discussion

The defendant argues that the Due Process Clause requires the suppression of the evidence the Government obtained pursuant to subpoena, including the April and July 2016 depositions, and the dismissal of Counts Five and Six.  The defendant falls far short of carrying the very heavy burden of establishing a due process violation to warrant the extraordinary relief she seeks.  The Government's conduct did not, by any reasonable definition, "shock the conscience."

The defendant has not identified explicitly the component of her due process rights that the Government allegedly violated.  As she does not seem to allege that the Government deprived her of life, liberty, or property in an unfair manner (nor could she), it seems that the defendant is claiming that the Government's supposed misrepresentation of facts to the Court violated her substantive due process rights.  As set forth above, the Government did not mislead Chief Judge McMahon in connection with its *ex parte* application.  The Government did not violate the law, much less participate in any violation that so "shocks the conscience" as to require suppression as a matter of substantive due process.

The defendant has neither specified what "fundamental right" the Government allegedly violated nor provided legal authority supporting her claim.  She cites *United States v. Valentine*, 820 F.2d 565, 570 (2d Cir. 1987), seemingly to argue that her right to a fair trial has been implicated because of the same alleged prosecutorial misconduct in connection with the modification of the protective order described above.  However, the defendant cites no authority for the proposition that such misconduct (assuming, of course, it occurred, which it did not) would warrant the relief she now seeks, and the primary case she relies upon is readily distinguishable.  In *Valentine*, the defendant was convicted of perjury based upon grand jury testimony in which he denied that he was given a loan to make a political contribution.  820 F.2d at 570.  The Second Circuit reversed

and held that it was a due process violation for the prosecutor to suggest that certain witnesses, who had not testified at trial but who had testified before the grand jury, supported the Government's theory of the case, when in fact their testimony before the grand jury did not. *Id.* The Second Circuit stated that this action "violated the due process prohibition against a prosecutor's making 'knowing use of false evidence,' including by misrepresenting the nature of nontestimonial evidence." *Id.* at 570-71 (quoting *Miller v. Pate*, 386 U.S. 1, 6-7 (1967)). The Second Circuit further noted that reversal of a criminal conviction is a "drastic remedy that courts are generally reluctant to implement," and that the court would only do so "when a prosecutor's tactics cause substantial prejudice to the defendant and thereby serve to deprive him of his right to a fair trial." *Id.*

The instant case is easily distinguishable from *Valentine*, as it does not involve any of the same facts, including any alleged mischaracterization of grand jury testimony at trial or any prosecutor making "knowing use of false evidence." *Id.* at 570-71; *see also Mills v. Scully*, 826 F.2d 1192, 1195 (2d Cir. 1987) (citing *Valentine* for the proposition that "[e]ven where defense counsel is aware of the falsity, there may be a deprivation of due process if the prosecutor reinforces the deception by capitalizing on it in closing argument, or by posing misleading questions to the witnesses" (citations omitted)). "Prosecutorial misconduct denies a defendant due process only when it is 'of sufficient significance to result in the denial of the defendant's right to a fair trial.'" *Blissett v. Lefevre*, 924 F.2d 434, 440 (2d Cir. 1991) (quoting *Greer v. Miller*, 483 U.S. 756, 765 (1987)).

The defendant has otherwise failed to identify how she has been deprived of the right to a fair trial. A jury will hear testimony about the defendant's statements during her April and July 2016 depositions, along with other evidence, and determine if her statements were perjurious.

"While the Constitution guarantees a fair trial through the Due Process Clauses . . . it defines the basic elements of a fair trial largely through the several provisions of the Sixth Amendment.'" *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 633 (1989) (citations omitted). "The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations.  The rights to confront and cross-examine witnesses and to call witnesses in one's own behalf have long been recognized as essential to due process." *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973).  And as noted, the defendant cites no legal authority supporting the proposition that the Government's actions during its investigation have somehow deprived her of a fair trial or otherwise violated her due process rights.  In short, none of Maxwell's allegations of misconduct rises to the level of a due process violation.

Dismissal of Counts Five and Six of the Indictment would be all the more unwarranted here, where there was no outrageous Government misconduct and where the defendant cannot show that the Government's behavior prejudiced her defense or legal representation.  Similarly, because there was no misconduct by the Government, there is no basis to suppress the evidence obtained pursuant to the subpoena.  The defendant's motion—unsupported by the law and the facts—must be denied.

### 5. The Court Should Not Exercise Its Inherent Authority to Order Suppression

The defendant urges the Court to exercise its inherent authority to order suppression.  This Court should decline the defendant's invitation to exercise this sparingly used power.

#### a. Applicable Law

"[T]he Supreme Court has recognized three purposes for the supervisory powers, 'to implement a remedy for violation of recognized rights, to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury, and finally, as a remedy

designed to deter illegal conduct.'" *Coke*, 2011 WL 3738969, at *6 (quoting *United States v. Hastings*, 461 U.S. 499, 505 (1983)). "However, while there are times when a district court may properly find it absolutely necessary[, in order] to preserve the integrity of the criminal justice system, to suppress evidence under its inherent or supervisory authority, 'the Supreme Court has explained that a court's inherent power to refuse to receive material evidence is a power that must be *sparingly exercised* [only in cases of] *manifestly improper conduct* by federal officials." *United States v. Lambus*, 897 F.3d 368, 401 (2d Cir. 2018) (alterations and emphasis in original) (internal quotations and citations omitted). The Second Circuit has "'recognized that courts cannot fashion their own sub-constitutional limitations on the conduct of law enforcement agents.'" *Id.* (quoting *United States v. Ming He*, 94 F.3d 782, 792 (2d Cir. 1996)); *see also United States v. Myers*, 692 F.2d 823, 847 (2d Cir. 1982). "Accordingly, the court should not exercise its inherent or supervisory power 'as a substitute for Fourth Amendment jurisprudence, which adequately safeguards against unlawful searches and seizures.'" *Lambus*, 897 F.3d at 401 (quoting *Ming He*, 94 F.3d at 792); *see also United States v. Payner*, 447 U.S. 727, 737 (1980) ("the supervisory power does not extend so far" as to "confer on the judiciary discretionary power to disregard the considered limitations of the law it is charged with enforcing").

### b. Discussion

By asking the Court to exercise its inherent authority, the defendant apparently means to suggest that the Court should grant the relief she seeks, even if she has failed to establish a violation of the Constitution or other governing law. The defendant fails to provide justification for the extraordinary remedy of suppression or to cite persuasive case law in favor of such an extraordinary use of the Court's inherent authority.

The law is clear that a district court's supervisory authority does not extend to suppressing evidence absent some violation of the Constitution or other governing law. *See Payner*, 447 U.S. at 737 (holding that "the supervisory power does not extend" to "disregard[ing] the considered limitations of the law it is charged with enforcing"); *United States v. Anderson*, 772 F.3d 969, 976 (2d Cir. 2014) (same); *United States v. Jennings*, 960 F.2d 1488, 1491 (9th Cir. 1992) ("Absent a violation of a recognized right under the Constitution, a statute, or a procedural rule, a district court is not entitled to exclude evidence as a sanction against government practices disapproved of by the court."). The requirements established by the Supreme Court and the Second Circuit for suppressing evidence would have little effect if district courts were free to disregard them and suppress evidence by invoking their supervisory authority. Consistent with that principle, and given that this power is "*sparingly exercised*," *Lambus*, 897 F.3d at 401, (emphasis in original), this Court should not elect to do so here where the defendant has not established a violation of her Fourth Amendment, Fifth Amendment, or due process rights. *See, e.g.*, *id.* at 401-02 ("We can appreciate the district court's frustration at careless government representations that may impact the integrity of judicial decisions, especially proffers in support of *ex parte* applications that an adversary has no opportunity to dispute[,]" but finding that the district court erred in suppressing evidence by invoking its inherent authority); *Coke*, 2011 WL 3738969, at *6 (declining to exercise its supervisory powers to suppress wiretap evidence and finding defendant "has no Fourth Amendment right, and the novel substantive due process right he asks this Court to create cannot be described as a recognized right." (internal citations omitted)).

### 6. The Defendant Is Not Entitled to a Hearing

The defendant argues that if the Court is "disinclined" to grant the extraordinary relief of suppression she seeks, she is entitled to an evidentiary hearing to probe the Government's

"misstatements" to Chief Judge McMahon and the extent of coordination between the USAO-SDNY and Boies Schiller prior to the issuance of the subpoena. (Def. Mot. 3 at 16). With respect to that alleged "misconduct," the defendant appears to makes two general accusations: first, that in 2016 Boies Schiller encouraged the USAO-SDNY to investigate the defendant for perjury, and second, that the Government's statement to Chief Judge McMahon as to whether she was facing a "*Chemical Bank* kind of situation" was false. Neither is correct, for the reasons described above. Because the defendant has proffered no reliable evidence to support any of the accusations contained in her motion papers, and because the Government has responded to those accusations with AUSA-1's contemporaneous notes of the February 29, 2016 meeting and notes from an interview of AUSA-1 conducted by the USAO-SDNY and the FBI (*see* Exs. 4 & 5), as well as relevant AUSA-1 emails (Exs. 6 & 7), such a hearing is not warranted.

### a.    Applicable Law

"[E]videntiary hearings should not be set as a matter of course, but only when the petition alleges facts which if proved would require the grant of relief." *Grant v. United States*, 282 F.2d 165, 170 (2d Cir. 1960). "In order to make the requisite showing in sufficient detail, the defendant must submit an affidavit by someone with personal knowledge that disputed facts exist." *United States v. Noble*, No. 07 Cr. 284 (RJS), 2008 WL 140966, at *1 (S.D.N.Y. Jan. 11, 2008). "In the absence of such an affidavit, or when the allegations contained in such an affidavit are general and conclusory, an evidentiary hearing is unnecessary." *United States v. Dewar*, 489 F. Supp. 2d 351, 359 (S.D.N.Y. 2007). A district court may decide the motion without a hearing if the moving papers do not create a genuine issue as to any material fact. *United States v. Caming*, 968 F.2d 232, 236 (2d Cir. 1992), *abrogated on other grounds by Ratzlaf v. United States*, 510 U.S. 135 (1994. Moreover, it is well settled that a material issue of fact sufficient to justify an evidentiary

hearing requires "an affidavit of someone with personal knowledge of the underlying facts." *United States v. Shaw*, 260 F. Supp. 2d 567, 570 (E.D.N.Y. 2003); *see also United States v. Gillette*, 383 F.2d 843, 848 (2d Cir. 1967); *United States v. Ahmad*, 992 F. Supp. 682, 685 (S.D.N.Y. 1998) ("ordinarily [a factual issue must be] raised by an affidavit of a person with personal knowledge of the facts;" otherwise "there is no basis for holding an evidentiary hearing or suppressing the evidence").

The defendant's allegations are analogous to those raised when evaluating defendants' claims of Government *Franks* violations.  To obtain a *Franks* hearing, a defendant must make a "substantial preliminary showing," *United States v. Falso*, 544 F.3d 110, 125 (2d Cir. 2008) (quoting *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978)), that (i) there were "inaccuracies or omissions" in the affidavit, (ii) "the alleged falsehoods or omissions were necessary to the issuing judge's probable cause or necessity finding," and (iii) "the claimed inaccuracies or omissions [were] the result of the affiant's deliberate falsehood or reckless disregard for the truth." *Lambus*, 897 F.3d at 397; *see also United States v. Awadallah*, 349 F.3d 42, 64 (2d Cir. 2003).  Even if a defendant clears the first *Franks* hurdle with a substantial preliminary showing of a false statement or omission, the defendant is not entitled to a *Franks* hearing unless a reviewing court makes the legal determination that the false statement or omission was "necessary to the [issuing] judge's probable cause finding."  *United States v. Canfield*, 212 F.3d 713, 718 (2d Cir. 2000).

To determine whether alleged errors and omissions are material, a court should revise the affidavit (adding alleged omissions and correcting alleged errors), and determine whether the revised affidavit supports a finding of probable cause.  *See*, *e.g.*, *Canfield*, 212 F.3d at 719.  If the revised affidavit supports a probable cause finding, then "the inaccuracies were not material to the probable cause determination and suppression is inappropriate." *Id.* at 718.  After adding the

alleged omissions and correcting the alleged errors, the "ultimate inquiry" is whether "there remains a residue of independent and lawful information sufficient to support probable cause." *United States v. Martin*, 426 F.3d 68, 74 (2d Cir. 2005) (internal quotation marks and citations omitted).

"[E]ven if the misrepresented or omitted information was material, a motion to suppress is to be denied unless the misrepresentations or omissions were intentional or deliberate, or were made in reckless disregard for the truth." *Lambus*, 897 F.3d at 399. The standard to demonstrate material false statements and omissions in an agent's affidavit is a "high one." *Rivera v. United States*, 928 F.2d 592, 604 (2d Cir. 1991). The intent prong of *Franks* is particularly demanding with respect to omissions. "*Franks* protects against omissions that are *designed to mislead*, or that are made in *reckless disregard of whether they would mislead*." *Awadallah*, 349 F.3d at 68 (emphasis in original). After all, "'[a]ll storytelling involves an element of selectivity,' and it is therefore not necessarily constitutionally significant that an affidavit 'omit[s] facts which, in retrospect, seem significant.'" *United States v. Lahey*, 967 F. Supp. 2d 698, 708 (S.D.N.Y. 2013) (quoting *United States v. Vilar*, No. 05 Cr. 621 (KMK), 2007 WL 1075041, at *27 (S.D.N.Y. Apr. 4, 2007)); *see also United States v. DeFilippo*, No. 17 Cr. 585 (WHP), 2018 WL 740727, at *2 (S.D.N.Y. Jan. 31, 2018) ("As courts in this Circuit have recognized, it is not shocking that every affidavit will omit facts which, in retrospect, seem significant." (internal quotation marks and citations omitted)).

The "substantial preliminary showing" requirement explained above exists to "avoid fishing expeditions into affidavits that are otherwise presumed truthful." *Falso*, 544 F.3d at 125. "[C]onclusory allegations cannot support a *Franks* challenge as a matter of law." *United States v. Pizarro*, No. 17 Cr. 151 (AJN), 2018 WL 1737236, at *10 (S.D.N.Y. Apr. 10, 2018); *see also*

*Franks*, 438 U.S. at 171 ("To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine.").  Instead, to warrant a *Franks* hearing:

> [t]here must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. . . .  Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant.

*Id*.

The burden to even obtain a *Franks* hearing is a heavy one, and such hearings are thus exceedingly rare.  *See United States v. Brown*, 744 F. Supp. 558, 567 (S.D.N.Y. 1990) ("A defendant seeking to have the Court hold a *Franks* hearing bears a substantial burden."); *United States v. Swanson*, 210 F.3d 788, 790 (7th Cir. 2000) ("These elements are hard to prove, and thus *Franks* hearings are rarely held.").

**b.    Discussion**

In an alternative effort to suppress the materials obtained pursuant to the subpoena, the defendant argues that an evidentiary hearing is warranted to inquire into the Government's "misrepresentations" to Chief Judge McMahon.  (Def. Mot. 3 at 16).  However, as discussed extensively above, Maxwell's motion is little more than speculation and innuendo, itself rooted in a lone news article that, as described above, is not fully accurate.  She otherwise presents no admissible evidence, affidavits, or other materials supporting the breathless accusations contained in her motion papers.  As such, because the defendant does not include "an affidavit of someone with personal knowledge of the underlying facts," *Shaw*, 260 F. Supp. 2d at 570, and because the

Government has responded with reliable information directly rebutting the defendant's allegations, there is no material issue of fact sufficient to justify an evidentiary hearing.[44]

The defendant cites *Franks*, to suggest that a hearing is somehow warranted, but her motion falls far short of the standard required to obtain a hearing.  "While the *Franks* analysis discussed above is typically employed to evaluate misstatements and omissions relating to probable cause, the Second Circuit has extended the Franks analysis to other Title III requirements for obtaining a warrant."  *United States v. Rajaratnam*, No. 09 Cr. 1184 (RJH), 2010 WL 4867402, at *18 (S.D.N.Y. Nov. 24, 2010).  The defendant fails to identify the standard that would govern such a hearing.  In light of the interests implicated by a Title III wiretap, the USAO-SDNY submits that the defendant's depositions in a civil matter, even with a protective order, are no more significant than the interests implicated by a Title III wiretap.  As such, the exacting standard of *Franks* should apply.  On this record, the defendant has not made a threshold showing that the Government acted with the intent to mislead or in reckless disregard for the truth.  The *Franks* standard is rightly a "high one," *Rivera*, 928 F.2d at 604, and one the defendant has failed to meet here.

The defendant's bald assertions alone do not entitle her to a fishing expedition in the form of a hearing.

## V.   The Jury Should Decide Whether the Defendant Committed Perjury

Counts Five and Six of the Indictment allege that, during the course of two depositions, the defendant knowingly made false material declarations, in violation of 18 U.S.C. § 1623.  The defendant moves to dismiss those Counts, arguing that the Court can determine now—on a pre-

---

[44] For similar reasons, the defendant's request for discovery regarding this matter should be denied. The defendant has failed to meet her burden under Rule 16 of making "a *prima facie* showing of materiality and must offer more than the conclusory allegation that the requested evidence is material." *Urena,* 989 F. Supp. 2d at 261 (citations omitted). Because the defendant has offered nothing more than her conjecture, based on an inaccurate and hearsay-ridden article, that some unspecified evidence might exist, her request for discovery should be denied.

trial record—that the questions were fundamentally ambiguous, and the defendant's answers were truthful and immaterial.  (Def. Mot. 5).  To the contrary, the Government expects to prove at trial that the defendant understood the questions and that her answers were both false and materially so.  This case does not present the narrow circumstances in which a court can and should dismiss perjury counts, let alone do so before trial.

### A.    Factual Background

On July 7, 2008, following the USAO-SDFL entering into the non-prosecution agreement with Epstein, two minors filed a petition under the Crime Victims' Rights Act (CVRA), 18 U.S.C. § 3771, alleging that the prosecutors violated their rights under that statute.  *See Doe v. United States*, 08 Civ. 80736 (S.D.F.L).  *See generally Doe No. 1. v. United States*, 749 F.3d 999, 1002 (11th Cir. 2014) (describing the background of the suit).  On December 30, 2014, Virginia Roberts Giuffre moved to join the petition, alleging that the USAO-SDFL had also violated her CVRA rights.  *See Doe*, No. 08 Civ. 80736, Dkt. No. 279.[45]  In her motion for joinder, Giuffre described the defendant as "'one of the main women' Epstein used to 'procure under-aged girls for sexual activities,'" and as a "'primary co-conspirator' with Epstein in his scheme. *See Giuffre v. Maxwell*, No. 18-2868 (2d Cir. 2019), Dkt. No. 287 at 10 (containing the unsealed summary judgment opinion from 15 Civ. 7433 (LAP)).  Among other allegations, Giuffre alleged that the defendant "'persuaded' [her] to go to Epstein's mansion," and, "when Giuffre began giving Epstein a massage, [he] and [the defendant] 'turned it into a sexual encounter.'"  *Id.* at 11.  Giuffre alleged that the defendant also "'participat[ed] in the sexual abuse'" of others.  *Id.*  A few days later, the press reported a statement by a spokesman for the defendant, Ross Gow.  Among other things,

---

[45] Giuffre filed a corrected motion on January 2, 2015.  *See Doe*, No. 08 Civ. 80736, Dkt. No. 280. The court later struck the original motion, sealed the corrected motion, and ordered filing of a redacted version of the corrected motion.  *See id.*, Dkt. No. 325 (Apr. 7, 2015).

Gow stated that Giuffre's claims were "untrue" and "obvious lies."  (15 Civ. 7433 (LAP), Dkt. No. 1 at 6).

As described in the preceding section, in the fall of 2015, Giuffre sued the defendant for defamation.[46]  (*See* 15 Civ. 7433 (LAP), Dkt. No. 1).  Giuffre alleged that Epstein sexually abused her, "with the assistance and participation of Maxwell" at "numerous locations" between 1999 and 2002, and that Epstein abused more than thirty minors between 2001 and 2007 "with the assistance of numerous co-conspirators."  (*Id.* at 3).

During the defendant's first deposition on April 22, 2016, the defendant refused to answer questions that she deemed related to consensual adult sexual interactions.  (*See, e.g.*, Ex. 10 at 92:20-93:6).  Giuffre moved to compel the defendant to answer, explaining that "[a]t the core of [her] allegations is the allegation that [the] Defendant lured her into a sexual situation with the offer of a job making money as a massage therapist; that Epstein always habitually tried to turn massages into sex . . . and that Maxwell recruited other females for an ostensibly proper position, such as therapeutic masseuse, with knowledge that the intent was for that person would be pressured to provide sexual gratification to Epstein."  (15 Civ. 7443 (LAP), Dkt. No. 1137-1 at 5-6).  Giuffre also explained that the defendant's refusal to answer questions about adult consensual sex prevented Giuffre "from seeking legitimate discovery," such as the identity of people the defendant presently deemed adults.  (*Id.* at 6).

The Court granted Giuffre's motion.  "[N]otwithstanding" the intrusiveness of the questions and the fact that the defendant had not put her private affairs at issue, "the questions are directed to reveal relevant answers regarding Defendant's knowledge of Plaintiff's allegations."

---

[46] The below discussion is provided as context for the Court's consideration of the motion.  As discussed further in the Government's opposition to the defendant's motion for severance, the Government expects to provide a more streamlined presentation regarding the *Giuffre* suit at trial.

(Def. Mot. 4, Ex. H at 9). "That knowledge," the Court explained, "goes directly to the truth or falsity of the alleged defamation, a key element of Plaintiff's claim." (*Id.*). The Court therefore ordered the defendant to answer the questions related to her sexual activity with or involving (1) Epstein, (2) Giuffre, (3) underage girls known to Epstein or who she thought might become known to Epstein, or (4) involving massage with individuals the defendant "knew to be, or believed might be, known to Epstein." (*Id.* at 10). The Court further ordered the defendant to answer questions about her knowledge of the sexual activities of others in the same four categories. The Court added that the "scope of Defendant's answers are not bound by time period, though Defendant need not answer questions that relate to none of these subjects or that is clearly not relevant." (*Id.*). The defendant sat for a second deposition on July 22, 2016, before the case settled.

As discussed more fully below, the Indictment charges the defendant with two counts of perjury, one arising from statements made during the April 2016 deposition and one arising from statements made during the July 2016 deposition. Indictment ¶¶ 21, 23. (Ex. 10 at 253:25-254:8, 384:15-20; Ex. 11 at 88:9-89:13, 91:22-92:16, 113:2-12). The defendant now moves to dismiss both counts, arguing that the Court can effectively decide now, as a matter of law, that the questions were fundamentally ambiguous, her answers were true, and her answers were immaterial to the case.

### B.    Applicable Law

Section 1623(a) imposes criminal penalties on anyone who "in any proceeding before or ancillary to any court . . . knowingly makes any false material declaration." 18 U.S.C. § 1623(a). In perjury prosecutions, "whether the witness believes that an answer is true or false generally turns on the declarant's understanding of the question." *United States v. Lighte*, 782 F.2d 367, 372 (2d Cir. 1986). Accordingly, and as is true of virtually all factual issues, "[a] jury is best equipped

119

to determine the meaning that a defendant assigns to a specific question." *Id.*; *see, e.g. United States v. Sampson*, 898 F.3d 287, 307 (2d Cir. 2018).[47]

A narrow exception arises when language in a question is so "fundamentally ambiguous" that a Court can conclude, as a matter of law, that a perjury count cannot stand. *Lighte*, 782 F.2d at 375. A question is "fundamentally ambiguous" when "it is not a phrase with a meaning about which [people] of ordinary intellect could agree, nor one which could be used with mutual understanding by a questioner and answerer unless it were defined at the time it were sought and offered as testimony." *Id.* at 375 (internal quotation marks omitted). In such a case, the "answers associated with the questions posed may be insufficient as a matter of law to support the perjury conviction." *United States v. Markiewicz*, 978 F.2d 786, 808 (2d Cir. 1992) (quoting *Lighte*, 782 F.2d at 375). For instance, in *Lighte*, a case involving post-conviction appellate review, the Court found that a question was fundamentally ambiguous because it used the word "'you' without indication that, unlike the prior two questions, the appellant was now being questioned in his role as trustee." 782 F.2d at 376. "[F]undamental ambiguity," however, "is the exception, not the rule." *United States v. Sarwari*, 669 F.3d 401, 407 (4th Cir. 2012) (quoting *United States v. Farmer*, 137 F.3d 1265, 1269 (10th Cir. 1998)). A defendant cannot demonstrate fundamental ambiguity simply by showing that words used in a question are amenable to multiple meanings, or that an answer "might generate a number of different interpretations." *Lighte*, 782 F.2d at 375; *United States v. Strohm*, 671 F.3d 1173, 1178 (10th Cir. 2011) ("Simply plumbing a question for *post hoc* ambiguity will not defeat a perjury conviction where the evidence demonstrates the defendant understood the question in context and gave a knowingly false answer."). "If, in the

---

[47] The Second Circuit analyzes general principles of perjury similarly under 18 U.S.C. § 1623 and another perjury statute, 18 U.S.C. § 1621, *see Lighte*, 782 F.3d at 372, and it has assumed without deciding that those standards also apply to offenses under 18 U.S.C. § 1001(a)(2), *see United States v. Sampson*, 898 F.3d 287, 307 n.15 (2d Cir. 2018).

natural meaning in the context in which words were used they were materially untrue, perjury was established." *United States v. Bonacorsa*, 528 F.2d 1218, 1221 (2d Cir. 1976).  Critically, and as noted with respect to *Lighte* above, courts generally evaluate whether a challenge to a perjury count on the basis that a question was fundamentally ambiguous *after trial* and following the development of a full factual record.  *See, e.g.*, *Strohm*, 671 at 1175 (appeal following conviction); *Sarwari*, 669 F.3d at 406 (same); *Farmer*, 137 F.3d at 1269 (appeal following conviction and partial Rule 29 dismissal) *Markiewicz*, 978 F.2d at 808 (appeal following conviction); *cf. United States v. Forde*, 740 F. Supp. 2d 406, 413 (S.D.N.Y. 2010) (denying a motion to dismiss a perjury count).  Indeed, the defendant cites no case in which a court has dismissed a perjury count on the basis of "fundamental ambiguity" before trial.

Because perjury requires a knowing false statement, the law does not permit conviction based on answers that are literally true.  *See Lighte*, 782 F.2d at 374.  Nor can a conviction rest on answers that are literally true but unresponsive, and therefore "arguably misleading by negative implication."  *Id.*; *see Bronston v. United States*, 409 U.S. 352, 362 (1973).  But when "the answer is false, the fact that it is unresponsive is immaterial."  *United States v. Corr*, 543 F.2d 1042, 1049 (2d Cir. 1976).  Even statements that "could be literally true in isolation" can support a perjury conviction if they are "materially untrue" in "the context in which the statements were made."  *United States v. Schafrick*, 871 F.2d 300, 304 (2d Cir. 1989).  "[U]nless the questioning is fundamentally ambiguous or imprecise, the truthfulness of [the defendant's] answers is an issue for the jury."  *Id.* at 304; *see United States v. Kaplan*, 758 F. App'x 34, 39 (2d Cir. 2018) (same); *cf. Lighte*, 782 F.2d at 374 (finding the evidence insufficient where some answers "were literally true under any conceivable interpretation of the questions").

Finally, even if a defendant makes a knowing false statement, a perjury conviction requires that the statement be material.  A false statement is material if it has "a natural tendency to influence, or [be] capable of influencing, the decision of the decisionmaking body to which it was addressed."  *United States v. Gaudin*, 515 U.S. 506, 509 (1995) (alteration in original) (quotation marks omitted).  A statement made in a civil deposition is also material if "a truthful answer might reasonably be calculated to lead to the discovery of evidence admissible at the trial of the underlying suit."  *United States v. Kross*, 14 F.3d 751, 754 (2d Cir. 1994)); *see United States v. Birrell*, 470 F.2d 113, 115 n.1 (2d Cir. 1972) (explaining, in the context of a motion to proceed *in forma pauperis* and for appointment of counsel, that "it must be shown that a truthful answer would have been of sufficient probative importance to the inquiry so that, as a minimum, further fruitful investigation would have occurred." (citation and internal quotation marks omitted)).  "The testimony need not have actually influenced, misled, or impeded the proceeding."  *United States v. Chan Lo*, No. 14 Cr. 491 (VSB), 2016 WL 9076234, at *8 (S.D.N.Y. Feb. 4, 2016), *aff'd* 679 F. App'x 79 (2d Cir. 2017); *see Forde*, 740 F. Supp. 2d at 412.  Since materiality is an element of the offense, it is a question for the jury "except in the most extraordinary circumstances."  *Forde*, 740 F. Supp. 2d at 412 (citing *Gaudin*, 515 U.S. at 522–23).

## C.   Discussion

The Government expects to prove at trial that the defendant's deposition statements were knowingly false.  The defendant's strained efforts to inject ambiguity into the questioning and to justify her answers as truthful are in significant part, arguments that are properly put to the jury and not a basis to dismiss the counts pretrial and without the benefit of a complete record.  *See United States v. Triumph Capital Group, Inc.*, 237 F. App'x 625, 627-28 (2d Cir. 2007) ("Generally, the meaning and truthfulness of a defendant's statement is a question of fact for the

jury.").  At this stage, the defendant must identify defects so fundamental that the charged statements cannot, as a matter of law, support a perjury conviction.  She has failed to do so, and her motion should be denied.

### 1.    April 2016 Deposition

At the April 2016 deposition, Giuffre's counsel asked the defendant about how Giuffre came to Epstein's home (Ex. 10 at 14:9-17:4), whether hired massage therapists engaged in sexual activity with Epstein (*id.* at 51:13-55:16), and the defendant's knowledge of Epstein's Florida criminal case (*id.* at 171:25-173:12, 183:25-186:21), among other topics.  The transcript makes clear that when the defendant did not understand a question, she said so.  (*See, e.g.*, *id.* at 9:4-9 ("[C]an you please clarify the question.  I don't understand what you mean by female, I don't understand what you mean by recruit."), 39:23-24 ("I don't understand what your question is asking."), 94:18-95:4 ("You don't ask me questions like that.  First of all, you are trying to trap me, I will not be trapped."), 138:6 ("Define relationship."), 244:22-23 ("You are not asking me a good question, sorry.").

Count Five charges the defendant with perjury arising from two colloquies at this deposition.  First, Giuffre's counsel asked the defendant a series of questions about whether the defendant brought women to Epstein, which the defendant resisted by observing that she hired "people across the board" to "work for Jeffrey."  (*Id.* at 245:7-18).  Giuffre's counsel asked whether any minors worked as exercise instructors or masseuses at Epstein's home, and the defendant testified that they were all adults except for Giuffre, who she acknowledged at least claimed to have been seventeen.  (*Id.* at 246:18-251:12).  Giuffre's counsel then asked questions about whether Epstein had a "sexual preference for underage minors," which drew objections from

defense counsel and which the defendant ultimately answered by saying "I cannot tell you what Jeffrey's story is.  I'm not able to."  (*Id.* at 251:13-253:12).  This colloquy followed:

> Q. Did Jeffrey Epstein have a scheme to recruit underage girls to use them for purposes of sexual massages?
>
> MR. PAGLIUCA: Objection to the form and foundation.
>
> A. Can you ask me again, please?
>
> Q. Did Jeffrey Epstein have a scheme to recruit underage girls to recruit them for sexual massages?
>
> MR. PAGLIUCA: Objection to the form and foundation.
>
> A. Can you ask it a different way?
>
> Q. Did Jeffrey Epstein have a scheme to recruit underage girls for sexual massages?
>
> MR. PAGLIUCA: Objection to the form and foundation.
>
> Q. If you know.
>
> A. <u>I don't know what you are talking about.</u>[48]

(Ex. 10 at 253:13-254:8).

The defendant argues that the question was ambiguous, as shown by her requests for the questioner to rephrase the question.  (Def. Mot. 4 at 9–10, 18).  A properly instructed jury could readily conclude otherwise in light of the evidence the Government expects to introduce at trial. The defamation case involved allegations that Giuffre was a victim of that scheme: Giuffre had alleged that Epstein and the defendant had sexualized a massage that Giuffre gave Epstein.  The preceding questions focused on (1) whether the defendant brought underage masseuses to work for Epstein, and (2) whether Epstein had a sexual preference for underage girls.  Moreover, at trial and as discussed further below, the Government expects to elicit testimony from one or more of

---

[48] Underlined sentences are charged as false statements in the Indictment.

the victims specified in the Indictment about sexualized massages the victims provided to Epstein, conduct that obviously predated the deposition.  *See* Indictment ¶ 7(a), (c). In context, and with an understanding of the Government's other evidence, a rational juror could readily conclude that the question "did Jeffrey Epstein have a scheme to recruit underage girls for sexual massages . . . [i]f you know?" had a clear meaning, and more important for purposes of the instant motion, any ambiguity was not "fundamental."  *Cf. Triumph Capital Grp., Inc.*, 237 F. App'x at 628 (concluding that an answer about "this arrangement" was not fundamentally ambiguous).

Nor is there any basis to dismiss the count now based on the defendant's professed confusion or denial of knowledge of the scheme's existence.  A defendant may commit perjury by falsely denying memory or knowledge of an event.  *See, e.g.*, *United States v. Alberti*, 568 F.2d 617, 625 (2d Cir. 1977); *United States v. Weiner*, 479 F.2d 923, 926, 929 (2d Cir. 1973); *Forde*, 740 F. Supp. 2d at 410-11.  Viewing the question and answer "in the context of the line of questioning as a whole," the defendant "consistently denied" knowledge of Epstein's scheme, *Markiewicz*, 978 F.2d at 810, and a jury could conclude that the "question was not fundamentally ambiguous—and thus that [the defendant], understanding the question, lied."  *See Sampson*, 898 F.3d at 307; *cf.* Indictment ¶¶ 4(e) 11(c)-(d), 17(c)-(d) (discussing use of massage as part of the sexual abuse scheme).

Second, later in the deposition, Giuffre's counsel asked the defendant a series of questions in an attempt to identify other underage girls that the defendant met and brought to Epstein. Specifically:

> Q. Can you list for me all the girls that you have met and brought to Jeffrey Epstein's house that were under the age of 18?
>
> MR. PAGLIUCA: Objection to the form and foundation.

A. I could only recall my family members that were there and I could not make a list of anyone else because that list -- it never happened that I can think of.

Q. I'm talking about the time you were working for Jeffrey Epstein, can you list all girls that you found for Jeffrey Epstein that were under the age of 18 to come work for him in any capacity?

MR. PAGLIUCA: Objection to the form and foundation.

A. I didn't find the girls.

Q. You choose the word.

MR. PAGLIUCA: If you have a question ask it, you don't choose the word.

Q. List all of the girls you met and brought to Jeffrey Epstein's home for the purposes of employment that were under the age of 18?

MR. PAGLIUCA: Objection to the form and foundation.

A. I've already characterized my job was to find people, adults, professional people to do the jobs I listed before; pool person, secretary, house person, chef, pilot, architect.

Q. I'm asking about individuals under the age of 18, not adult persons, people under the age of 18.

A. I looked for people or tried to find people to fill professional jobs in professional situations.

Q. So Virginia Roberts was under the age of 18, correct?

A. I think we've established that Virginia was 17.

Q. Is she the -- sorry, go ahead. Is she the only individual that you met for purposes of hiring someone for Jeffrey that was under the age of 18?

MR. PAGLIUCA: Objection to form and foundation. Mischaracterizes her testimony.

A. I didn't hire people.

Q. I said met.

A. I interviewed people for jobs for professional things and I am not aware of anyone aside from now Virginia who clearly was a masseuse aged 17 but that's, at least that's how far we know that I can think of that fulfilled any professional capacity for Jeffrey.

Q. List all the people under the age of 18 that you interacted with at any of Jeffrey's properties?

A. <u>I'm not aware of anybody that I interacted with, other than obviously Virginia who was 17 at this point?</u>

(Ex. 10 at 382:4-384:20).

The defendant argues that this question was "grossly ambiguous: who was 'Jeffrey'; what were 'Jeffrey's properties;' to what time frame did the question apply; what was the basis for Ms. Maxwell to determine who may or may not have been 'under the age of 18'; and what did 'interact with' mean?"  (Def. Mot. 4 at 11).  These arguments only underscore the principle that perjury prosecutions are an inquiry into "the natural meaning in the context in which words were used," *Bonacorsa*, 528 F.2d at 1221, and not an opportunity for defense counsel to "plumb[] a question for *post hoc* ambiguity," *Strohm*, 671 F.3d at 1178.  A reasonable jury, after hearing the evidence, could readily conclude that the natural meaning of those words in context is abundantly clear.  For instance, at the end of trial, a jury could conclude that "Jeffrey" is Jeffrey Epstein; "Jeffrey's properties" are Jeffrey Epstein's properties, including his houses in Palm Beach, New York, New Mexico, and the United States Virgin Islands (*see, e.g.*, Ex. 10 at 248:17-20 (naming those properties)); and "interact" is an expansive word aimed at capturing any encounter, that was used after the defendant resisted words like "met," "found," and "hired" in the prior questions, *see Interact*, *Oxford English Dictionary Online*, https://oed.com/view/Entry/97518 (last visited February 25, 2021) ("To act reciprocally, to act on each other.").  Such inferences will be particularly easy for a jury to reach after hearing multiple victims testify about their own

interactions with the defendant and Epstein at Epstein's various properties. *See, e.g.*, Indictment ¶ 7(a) ("MAXWELL subsequently interacted with Minor Victim-1 on multiple occasions at Epstein's residences."). Accordingly, a rational juror, after hearing the evidence, could find that the question called for the names of minors that the defendant interacted with at any of Jeffrey Epstein's properties, that the defendant answered that she was aware of no such minors other than Giuffre, and therefore that her answer was false. And even if the defendant identifies some plausible ambiguity—and she has not—the terms in this question are ones "with a meaning about which [people] of ordinary intellect could agree," and therefore are not fundamentally ambiguous. *Lighte*, 782 F.2d at 375 (internal quotation marks omitted).

The defendant points out that, in response to an earlier question asking her to list the underage girls she "met and brought" to Epstein's house, she said that she could not do so. (Def. Mot. 4 at 12-13). She argues that the charged question was "improper" because it asked her to generate a list "from events that had happened nearly two decades previously." (*Id.*). Her unpersuasive after-the-fact efforts to justify her answer provide no basis to keep this question from the jury. As noted above, the transcript makes clear (and a jury could find) that when the defendant did not understand or could not answer a question, she said so. To the extent the defendant is arguing that her answer was literally true, a reasonable jury could find otherwise. In this respect, the Government notes, among other things, that in response to the earlier question, the defendant said that she could not make a list not because she could not remember events from that long ago but "because that list -- *it never happened* that I can think of." (Ex. 10 at 382:4-13) (emphasis added). And in response to the charged question, the defendant said that she "was not aware of anybody" under 18—that is, the list would be empty. *See Forde*, 740 F. Supp. 2d at 413 ("Olivieri, if truly confused, could also have asked for clarification. Instead he replied with a strong

denial . . .").  A properly instructed jury could conclude after hearing all of the evidence at trial

that the defendant intended the natural meaning of the words she used, not the allegedly truthful

answer she suggests now, and therefore that she lied.  In sum, the defendant's post-hoc efforts to

inject confusion into clear questioning are unavailing and should be rejected, and the jury should

decide whether the defendant's answers were false.

### 2.       July 2016 Deposition

Count Six charges the defendant with perjury arising from three colloquies at the second

deposition. ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████  Following that line of questioning, the following

colloquy occurred:



███████

Q. Were you aware of the presence of sex toys or devices used in sexual activities in Mr. Epstein's Palm Beach house?

████████████████████████████

A. <u>No, not that I recall.</u>

████████████████

████████████████████████████ Giuffre's lawyer asked the following question:

Q. Do you know whether Mr. Epstein possessed sex toys or devices used in sexual activities?

████████████████████████████

A. <u>No.</u>

████████████

The defendant now argues that these questions are ambiguous because they contain "numerous undefined terms," such as "sex toy or device" and "sexual activities." (Def. Mot. 4 at 14). She asks, for instance, whether "bath oil" would count as a sex toy or device. (*Id.*). Yet this argument is simply another attempt to imbue ambiguity after the fact into commonly used words with common sense meanings. The mere fact that a term could apply equally to several different objects does not automatically mean that the question is impermissibly vague and can never form the basis of a perjury charge. *See, e.g.*, H.L.A. Hart, *Positivism and the Separation of Law and Morals*, 71 Harv. L. Rev. 593, 607 (1958) ("A legal rule forbids you to take a vehicle into the public park. Plainly this forbids an automobile, but what about bicycles . . . ?"). Instead, it is well-settled that "[t]he jury should determine whether the question—as the declarant must have understood it, giving it a reasonable reading—was falsely answered." *Lighte*, 782 F.2d at 372. So

long as the question involves a phrase "which could be used with mutual understanding by a questioner and answerer," it is not fundamentally ambiguous. *Id.* at 375 (internal quotation marks omitted); *see United States v. Jenkins*, 727 F. App'x 732, 735 (2d Cir. 2018) ("An individual of ordinary intelligence would not think that a question asking for information regarding 'real estate, stocks, bonds, . . . or other valuable property' would allow omission of information regarding money market funds . . . .").

The use of broad or inclusive terms does not render the question fundamentally ambiguous. As the Second Circuit explained in the context of the term "employment activities," "[t]he broad language of the question is not fundamentally ambiguous; it is instead designed to capture *all* employment activities in an applicant's recent history." *United States v. Polos*, 723 F. App'x 64, 65-66 (2d Cir. 2018). So too here. A "sex toy or device" is an intelligible phrase with an understood meaning. *See Sex Toy, Oxford English Dictionary Online*, https://www.oed.com/view/Entry/176989 (last visited February 12, 2021) ("[A] device or object designed for sexual stimulation (as a dildo, vibrator, etc.) or to enhance sexual pleasure or performance.").



The defendant's objections to the next colloquy in the indictment are similarly unavailing. Shortly after the above exchange, the following conversation occurred:

A. Can you repeat the question?

███████████████████████████████████████████
███████████████████████████████

MR. PAGLIUCA: Same objection.

A.  No.

Q. Other than yourself and the blond and brunette that you have identified as having been involved in three-way sexual activities, with whom did Mr. Epstein have sexual activities?

███████████████████████████████████

A. <u>I wasn't aware that he was having sexual activities with anyone when I was with him other than myself.</u>

Q. I want to be sure that I'm clear. Is it your testimony that in the 1990s and 2000s, you were not aware that Mr. Epstein was having sexual activities with anyone other than yourself and the blond and brunette on those few occasions when they were involved with you?

A. <u>That is my testimony, that is correct.</u>

███████████████████

The defendant primarily argues that her answers were literally true.  In the defendant's telling, the phrase "[w]hen I was with him," refers not to the duration of the defendant's relationship with Epstein, but instead to only those moments when she was in the act of having sex with Epstein and either the blond or brunette identified above.  (Def. Mot. 4 at 16).  ██████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████  And in any event, she further argues, because the question asked the defendant about the 1990s and 2000s, it therefore covered any "'sexual activities' spanning more than a millennium." (*Id*. at 16-17).

The defendant, therefore, argues that the questioner asked whether a logically impossible event occurred or will occur at some point over the course of a millennium.  But the defendant's professed confusion—which again was not raised during the deposition itself—ignores the plain and obvious context of the question, which did not refer to a time period far exceeding the human life span, and was not limited to only the times in which the defendant was in the act of having sex with Epstein.  Plainly, a jury could find that the defendant correctly understood the question when she answered it in July 2016, and that she ascribed a natural meaning to the words used in the questions, and not the tortured illogical meaning she now assigns to those questions: whether, during the course of her relationship with Epstein, she was aware of anyone other than herself having sexual relations with Epstein.  The Government expects its evidence to show that she was. *See, e.g.*, Indictment ¶ 1 (stating that the defendant "assisted, facilitated, and contributed to" Epstein's sexual abuse of minors).  At a minimum, the defendant's answers were not "literally true under any conceivable interpretation of the questions."  *Lighte*, 782 F.2d at 374.   And the defendant's professed confusion now and proposed illogical reading of the questions in the instant motion does not render them fundamentally ambiguous.  *See Bonacorsa*, 528 F.2d at 1221 ("A defense to a charge of perjury may not be established by isolating a statement from context, giving it in this manner a meaning entirely different from that which it has when the testimony is considered as a whole.").   Accordingly, a jury should be permitted to determine what meaning the defendant ascribed to those questions and whether her answers were in fact false.

Finally, the defendant answered the following questions:

> Q. Did you ever give a massage to anyone other than Mr. Epstein at any of Mr. Epstein's properties?
>
> A. First of all, I never said I gave Mr. Epstein a massage.

Q. I will ask that question if you want, but I was focusing on people other than Mr. Epstein right now.

A. I don't give massages.

Q. Let's just tie that down. It is your testimony that you've never given anybody a massage?

A. I have not given anyone a massage.

Q. You never gave Mr. Epstein a massage, is that your testimony?

A. That is my testimony.

Q. You never gave [Minor Victim-2] a massage is your testimony?

A. I never gave [Minor Victim-2] a massage.

(Ex. 11 at 112:17-113:12).

The defendant argues that these questions were fundamentally ambiguous because the deposition elsewhere discussed both sexual and professional massages.  It was unclear, she explains, what kind of massage the questioner meant.  (Def. Mot. 4 at 17.)  The defendant's argument is, yet again, misguided.  This line of questioning used broad language, and at no point during this set of questions did Giuffre's counsel suggest that the questions were limited to sexual or professional massages.  *Cf. Lighte*, 782 F.2d at 376 (concluding that the word "you" was ambiguous when the prior two questions asked about the defendant "as an individual" and then switched "without indication" to the defendant "as trustee").  The defendant's answers were unequivocal, with no expressions of confusion or internal contradictions.  *Cf. Markiewicz*, 978 F.2d at 809 (explaining that a question was ambiguous as to whether it asked about the deponent's personal or professional capacities, in light of the deponent's confusion in the next questions).  A properly instructed jury could conclude that the defendant meant what she said: she never gave anyone a massage, including Epstein and Minor Victim-2.

The defendant is, of course, free to testify on her own behalf to her professed confusion or otherwise argue to the jury that the questions were ambiguous or the answers truthful.  The issue before the Court is whether the questions were so fundamentally ambiguous that a jury, after hearing the trial evidence, could not conclude that the "response given was false as the defendant understood the question."  *Lighte*, 782 F.2d at 375 (internal quotation marks omitted).  The defendant has failed to establish such a fundamental defect.[49]

### 3.      Materiality

Finally, the defendant argues that none of these answers was material to the defamation action.  As a threshold issue, however, materiality is also not appropriate for resolution on a motion to dismiss the indictment.  As noted above, materiality is a jury question "except in the most extraordinary circumstances."  *Forde*, 740 F.Supp.2d at 412 (citing *Gaudin*, 515 U.S. at 522–23).  As the Supreme Court explained in *Johnson v. United States*, 520 U.S. 461 (1997), "there is no doubt that materiality is an element of perjury under § 1623," and its precedent "therefore dictates that materiality be decided by the jury, not the court."  *Id.* at 465.

The Second Circuit has explained that it is inappropriate for courts to resolve questions relating to the sufficiency of the evidence on a motion to dismiss the indictment.  The Federal Rules of Criminal Procedure contain no "analogue for summary judgment under Federal Rule of Civil Procedure 56" for several reasons.  *United States v. Sampson*, 898 F.3d 270, 280 (2d Cir. 2018).  First, "[p]ermitting civil 'summary judgment'-like motions . . . would enable an end-run around the calibrated framework for discovery in criminal cases," and thereby "upset the policy

---

[49] Even if the Court concludes that any of the individual statements charged in the Indictment cannot sustain a perjury conviction, the count survives so long as some statement can properly be presented to the jury.  *See Bonacorsa*, 528 F.2d at 1221 ("It is customary, and ordinarily not improper, to include more than one allegedly false statement in a single count. . . . Where there are several such specifications of falsity in a single count, proof of any of the specifications is sufficient to support a verdict of guilty." (citations omitted)).

choices reflected in the criminal discovery rules." *Id.*  Second, doing so "risks invading 'the inviolable function of the jury' in our criminal justice system.'"  *Id*. at 281 (citation omitted). Accordingly, if the "defense raises a factual dispute that is inextricably intertwined with a defendant's potential culpability, a judge cannot resolve that dispute on a Rule 12(b) motion." *Id*.

The exception to this rule is "extraordinarily narrow" because, in the normal course, the "government must make a detailed presentation of the entirety of the evidence before a district court can dismiss an indictment on sufficiency grounds," which the Government is not required to do at the motion-to-dismiss stage. *Id.* at 282 (internal quotation marks and citation omitted).  That point is underscored by *United States v. Nitsche*, 843 F. Supp. 2d 4 (D.D.C. 2011), on which the defendant relies.  There, the district court dismissed an indictment in a child enticement case for insufficiency of the evidence.  First, however, the court explained that the question was ripe because "(1) Defendant has stipulated to the entire record that is relevant to Count I; (2) the Government has had several opportunities to make a proffer of any additional facts, to conduct any subsequent investigation, and to ask the Court for further delay to seek more evidence; and (3) because the record is limited to the chat." *Id.* at 9.  Accordingly, "[t]he transcripts themselves provide the Court with all of the relevant undisputed facts to decide the motion." *Id.*  Here, of course, that is simply not the case and, in particular, there is no stipulation as to the entire relevant record.

Under the relevant legal standard, the defendant's statements were material if they could have led to the discovery of other evidence or could influence the factfinder in the defendant's civil case.  Evaluating that standard necessarily implicates facts beyond the deposition testimony itself and Judge Preska's unsealing order,[50] such as identification of the allegedly defamatory

---

[50] The defendant observes that Judge Preska redacted some of the statements that form the basis of Count Six, stating that the "testimony is . . . far afield from the sex trafficking and sexual abuse

statements at the heart of that case and the evidence that might have been uncovered had the defendant answered the questions truthfully.  A jury should be allowed to hear the questions in context to evaluate their materiality, which cannot be done at this stage.[51]  The Court therefore should deny the motion.

In any event, the perjurious statements were material in both senses of the definition.  First, the questions were aimed at developing a record in the civil suit that Epstein and the defendant recruited Giuffre to Epstein's Palm Beach property in the guise of hiring her as a masseuse, and then sexualized that massage.  Honest answers to those questions—for instance that Epstein in fact had a scheme to recruit underaged girls for sexual massages—would have been corroborative of some of Giuffre's claims.  Second, had the defendant honestly answered the deposition questions, Giuffre could have located other victims or witnesses who may have corroborated her testimony.  But in any event, the question of materiality should be put to the jury and is inappropriate for the Court to resolve on a motion to dismiss without the benefit of the full factual record.  The motion should be denied.

---

allegations that were central to the dispute in *Giuffre v. Maxwell*."  (Def. Mot. 4, Ex. I at 7:3-6.) (The last colloquy has been unsealed except for Minor Victim-2's name. (*See* 15 Civ. 7433 (LAP), Dkt. No. 1212-1).)  Yet Judge Preska's opinion as to the propriety of certain redactions in a civil case is not controlling as to whether the Government can meet the elements of a criminal perjury charge here.  First, before Judge Preska were the defendant's denials of various sexual activities, not honest answers that would have been quite different.  In part for that reason, Judge Sweet authorized the deposition at the outset.  Second, the Government was not a party to the civil unsealing litigation and did not have an opportunity to be heard on this issue before Judge Preska.

[51] While the Government is open to crafting a stipulation on the background of the *Giuffre* lawsuit to streamline presentation of these issues to the jury, it notes that the defendant's summary of that suit as set forth in her motion is incorrect.  (*E.g.*, Def. Mot. 4 at 20 (erroneously asserting that the defamation claims at issue turned on Giuffre's ability to prove salacious allegations about public officials)).

In sum, the defendant asks this Court to dismiss Counts Five and Six by stretching to read ambiguity into clear questions and encouraging the Court to resolve questions committed to the jury. The Court should reject those arguments and permit the jury to resolve these issues of fact.

## VI.   Counts Five and Six Are Properly Joined and Should Not Be Severed

The Indictment charges the defendant with participating in a scheme to sexually abuse minors, and with committing perjury to conceal her crimes. All six counts of the Indictment are properly joined: they are logically connected, subject to overlapping proof, and connected by a common scheme or plan. To sever the counts and justify holding a second trial at which a second jury will be convened and the same witnesses—including victims of sexual abuse—will testify a second time, the defendant must carry a heavy burden by showing substantial prejudice from the joinder. She has not done so, and the severance motion should be denied.

### A.   Applicable Law

Federal Rule of Criminal Procedure 8(a) permits the joinder of offenses that "are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a). This rule establishes three tests for joinder, each "reflect[ing] a policy determination that gains in trial efficiency outweigh the recognized prejudice that accrues to the accused." *United States v. Turoff*, 853 F.2d 1037, 1042 (2d Cir. 1988).

Charges are "similar" if they are "somewhat alike" or "hav[e] a general likeness to each other." *United States v. Rivera*, 546 F.3d 245, 253 (2d Cir. 2008) (quoting *United States v. Werner*, 620 F.2d 922, 926 (2d Cir. 1980) (internal quotation marks omitted). "Rule 8(a) does not require 'too precise an identity between the character of the offenses.'" *United States v. Pizarro*, No. 17 Cr. 151, 2018 WL 1737236, at *3 (S.D.N.Y. Apr. 10, 2018) (Nathan, J.) (quoting *Werner*, 620

F.2d at 929).  Offenses may be joined "where the same evidence may be used to prove each count or if the counts have a sufficient logical connection." *United States v. Page*, 657 F.3d 126, 129 (2d Cir. 2011) (internal quotation marks and citations omitted).  "For purposes of analysis under Rule 8(a)," however, "no one characteristic is always sufficient to establish 'similarity' of offenses, and each case depends largely on its own facts." *United States v. Blakney*, 941 F.2d 114, 116 (2d Cir. 1991) (internal quotations and citations omitted).  For instance, in *United States v. Werner*, 620 F.2d 922 (2d Cir. 1980), the "Second Circuit found sufficient similarity between two cargo thefts that occurred two years apart and only one of which was violent in nature," because "'both offenses arose out of [defendant's] scheme to use his position as an insider . . . to obtain money or property carried by it.'" *United States v. Smith*, No. 05 Cr. 922 (DLC), 2007 WL 980431, at *2 (S.D.N.Y. Apr. 3, 2007), *aff'd*, 348 F. App'x 636, 638 (2d Cir. 2009) (first alteration in original) (quoting *Werner*, 620 F2d at 927).

Joinder is also proper for "distinct criminal acts where they originated from a common scheme." *United States v. Ying Lin*, No. 15 Cr. 601 (DLI), 2018 WL 5113139, at *2 (E.D.N.Y. Oct. 19, 2018) (citing *Werner*, 620 F.2d at 927).  Specifically in the context of perjury, "[t]he law in this circuit clearly supports the joinder of underlying substantive crimes with perjury counts where, as here, the false declarations concern the substantive offenses." *United States v. Potamitis*, 739 F.2d 784, 791 (2d Cir. 1984); *see United States v. Sweig*, 441 F.2d 114, 118 (2d Cir. 1971).  False statements can "concern" or be connected with substantive offenses even if they were not made as part of an investigation into the specific substantive conduct.  *See United States v. Ruiz*, 894 F.2d 501, 505 (2d Cir. 1990) (joining false statements on loan applications with perjury about "attempts to secure Senate Ethics Committee approval" of "consulting fees'); *United States v. Broccolo*, 797 F. Supp. 1185, 1190-91 (S.D.N.Y. 1992) (joining fraud counts with a false statement

in a bankruptcy proceeding).  Similarly, "[c]ourts have repeatedly recognized the appropriateness of trying perjury or obstruction charges together with the underlying crimes to which the perjury relates, where proof of the alleged perjury requires proof of knowledge of the underlying crime." *United States v. Butler*, No. 04 Cr. 340, 2004 WL 2274751, at *4 (S.D.N.Y. Oct. 7, 2004) (Lynch, J.) (permitting joinder of defendants under Rule 8(b)).

In the event that properly joined counts "appear[] to prejudice a defendant or the government," Rule 14(a) permits a court to "order separate trials of counts . . . or provide any other relief that justice requires."  Fed. R. Crim. P. 14(a).  "[I]n order to prevail" on a Rule 14 motion, "the defendant must show not simply some prejudice but *substantial* prejudice." *United States v. Sampson*, 385 F.3d 183, 190 (2d Cir. 2004) (quoting *Werner*, 620 F.2d at 928).  The defendant carries this "heavy burden" because Rule 8(a) already strikes a "balance" between "considerations of economy and speed" and "possible unfairness" to the defendant. *United States v. Amato*, 15 F.3d 230, 237 (2d Cir. 1994).  Accordingly, "the principles that guide the district court's consideration of a motion for severance usually counsel denial," *Pizarro*, 2018 WL 1737236, at *5 (alteration, internal quotation marks, and citation omitted), and severance should be granted "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence," *Zafiro v. United States*, 506 U.S. 534, 539 (1993).[52]  But "Rule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." *Id*. at 538-39.  "[L]ess drastic measures . . . such as limiting instructions,

---

[52] While *Zafiro* involved a motion to sever defendants, rather than counts, the Supreme Court's construction of Rule 14(a) applies in either case.  *See Page*, 657 F.3d at 129 (relying on *Zafiro*); *United States v. Gracesqui*, No. 10 Cr. 74 (PKC), 2015 WL 5231168, at *4 n.2 (S.D.N.Y. Sept. 8, 2015), *aff'd*, 730 F. App'x 25 (2d Cir. 2018) (citing *Page* for the proposition that *Zafiro* applies both to motions to sever counts and motions to sever defendants).

often will suffice to cure any risk of prejudice and permit joinder." *Page*, 657 F.3d at 129 (internal quotation marks omitted).

## B.   Discussion

The perjury counts should be tried jointly with Counts One through Four.  The offenses are of similar character, are logically connected and will be proved through much of the same evidence because the perjury counts concern at least some of the same conduct relevant to the crimes charged in Counts One through Four and, as such, are properly joined.  *See generally Potamitis*, 739 F.2d at 791.  Severing the counts would waste judicial resources by requiring a second trial at which the Government would offer similar proof, including by calling the same victims of sexual abuse to testify again at a second trial.  The defendant has identified no prejudice sufficient to justify imposing that burden on the victims, the Court, and the Government.

*First*, the Government expects to prove the offenses charged in Counts One through Four and those charged in Counts Five and Six with much of the same evidence.  *See United States v. Hester*, No. 19 Cr. 324 (NSR), 2020 WL 3483702, at *21 (S.D.N.Y. June 26, 2020) ("Notably, the fact that evidence of the crime charged in one count may be admissible in the Government's direct case in the trial of the other will typically defeat the need to severe the counts.").  At trial, some of the most critical evidence that the defendant committed the offenses charged in Counts One through Four will also form the crux of the Government's proof of the falsity of the defendant's deposition testimony.  In particular, victim testimony and related evidence offered to prove the existence of Epstein's scheme to abuse underage girls, and Maxwell's participation therein, will also provide much of the evidence demonstrating the falsity of the statements charged in Count Five.  *Compare, e.g.*, Indictment ¶ 4(c), (e) (discussing massages resulting in sexual abuse), *with id.* ¶ 21 (denying interacting with underage girls and a denying a "scheme to recruit underage girls for sexual massages").  Similarly, aspects of that proof, such as testimony regarding the sexualized

massages that were part of the scheme, will also prove the falsity of the statements charged in Count Six.  Indeed, were severance to be granted, the facts involving Counts One through Four "would be central to a separate trial" on Counts Five and Six.  *Butler*, 2004 WL 2274751, at *4; *see Sweig*, 441 F.2d at 118-19 ("Virtually every overt act alleged in the conspiracy count formed the subject matter of one of the eight perjury counts, and would therefore be admissible in a perjury trial to show the falsity of Sweig's denial before the grand jury.").

Critically, the Government expects that proof to include testimony from victims of sexual abuse.  For instance, the Government anticipates that Minor Victim-2 will testify that the defendant gave her an unsolicited massage during which Minor Victim-2 was topless.  Indictment ¶ 7(b).  That is an overt act charged in Counts One and Three.  *Id.* ¶¶ 11(c), 17(c).  It is also strong evidence that the defendant's statement "I never gave [Minor Victim-2] a massage" was false, as charged in Count Six.  *Id.* ¶ 23.  If the Court severs the Indictment into two trials, it will require Minor Victim-2 to testify about her abuse twice.  *Cf. Richardson v. Marsh*, 481 U.S. 200, 210 (1987) (recognizing that joint trials of multiple defendants avoid "requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying").

Similarly, the defendant's efforts to conceal her crimes by lying in a deposition is itself compelling evidence of her consciousness of guilt as to the offenses charged in Counts One through Four and indeed would almost certainly be relevant and admissible at a trial as to those counts even if severance were granted.  In particular, and among other examples, the defendant's false denial of the existence of a scheme to recruit underage girls for sexual massages, and her specific (and equally false) denials as to Minor Victim-2, would be admissible as evidence of the defendant's consciousness of guilt, even at a trial focused exclusively on Counts One through Four.  *See, e.g.*, *United States v. Anderson*, 747 F.3d 51, 60 (2d Cir. 2014) ("[A]cts that exhibit a

consciousness of guilt, such as false exculpatory statements, may also tend to prove knowledge and intent of a conspiracy's purpose . . . ." (internal quotation marks and citations omitted)).

*Second*, the offenses are logically connected and are part of the same common plan or scheme. It is settled law in this Circuit that joinder of "underlying substantive crimes with perjury counts" is appropriate "where, as here, the false declarations concern the substantive offenses." *Potamitis*, 739 F.2d at 791; *see also United States v. Ruiz*, 894 F.2d 501 (2d Cir. 1992) (same). In *Ruiz*, the defendant was a New York state senator who founded a nonprofit that was developing a mall in the Bronx, and for which he provided consulting services. In 1984 and 1985, he made two loan applications for funds to invest in the project, on which he made false statements. *Id.* at 503-04. In 1986, the defendant also lied about his possession of a letter from the Senate Ethics Committee to a grand jury that was investigating his consulting activities for the nonprofit. *Id.* at 503. He was charged with two counts of false statements on the loan applications and one count of perjury, and he moved to sever the perjury charge. The district court denied the motion, explaining that, although the "alleged perjury did not occur during a specific investigation by the grand jury into the alleged bank fraud," the statements nonetheless "'concerned the defendant's scheme to maximize his personal gain from the [project], as well to cover any improprieties that scheme might involve.'" *Broccolo*, 797 F. Supp. at 1190 (quoting *United States v. Ruiz*, 702 F. Supp. 1066, 1076-77 (S.D.N.Y. 1989)) (emphasis omitted). And the Second Circuit affirmed, explaining that the counts had "sufficient logical connection" because they all "relate to [the defendant's] extra-senatorial activities through the [nonprofit]," and therefore were "part of a common scheme or plan." *Ruiz*, 894 F.2d at 505. So too here: the defendant's perjury did not occur in the context of a grand jury investigation into the same sexual offenses charged in the Indictment, but the statements concerned those offenses and sought to conceal the defendant's role

therein.  *See Broccolo*, 797 F. Supp. at 1190-91 (joining counts involving use of businesses to commit fraud with a count of falsely swearing in bankruptcy court that the defendant "had not engaged in any business activity during the preceding six years").[53]  Accordingly, and consistent with the holdings in *Ruiz* and *Broccolo*, this Court should deny the severance motion.

The defendant argues that the offenses are not connected because they involve different time periods.  To be sure, Counts One through Four charge conduct involving certain victims from 1994 to 1997, while the perjury counts charge statements made in 2016 in a case concerning Giuffre's abuse from 1999 to 2002.  However, the specific statements charged in Count Five and Count Six directly relate to the conduct charged in Counts One through Four, including, in one instance, a specific victim identified as relevant to those counts.  And those statements were not time-bound or restricted to Giuffre.  For instance, the defendant denied the existence of *any* scheme to recruit underage girls for sexual massages, not the existence of such a scheme between 1999 and 2002, or a scheme specifically focused on Giuffre.  The defendant also denied ever giving anyone a massage, specifically including Epstein and Minor Victim-2.  She did not limit her denial to Giuffre or to a particular time period.  There is, accordingly, a strong connection between the truth or falsity of the defendant's broad denials and her acts in the period at issue in the substantive counts.  The cases on which the defendant relies are factually inapposite and do not support her argument, because they involve wholly unrelated events.  *See, e.g.*, *United States v. Halper*, 590 F.2d 422, 431 (2d Cir. 1978) (severing a Medicaid fraud indictment from a tax evasion indictment where the only similarly was the defendant's manipulation of people he had employed—different

_____

[53] While the defendant may argue that the fact that her deposition, unlike *Ruiz*, did not involve criminal authorities counsels in favor of a different outcome, as discussed further below, the prospect of a criminal prosecution was nonetheless plainly on her mind at the time of the depositions, as evidenced by the myriad arguments she herself makes in support of her motions to suppress the fruits of the grand jury subpoena to Boies Schiller.  (*See, e.g.*, Def. Mot. 3 at 3-4, Def. Mot. 11 at 2).

in each indictment—to his personal profit); *United States v. Brown*, No. 07-0296, 2008 WL

161146, at *5 (E.D. Pa. Jan. 16, 2008) (severing an "isolated" firearms possession charge on a

certain day from other narcotics and firearms charges); *United States v. Martinez*, No. 92 Cr. 839

(SWK), 1993 WL 322768, at *8-9 (S.D.N.Y. Aug. 19, 1993) (similar).

The defendant also contends that her false statements were not connected to the substantive

offenses because they were made in a civil deposition, rather than "to the grand jury or the FBI to

derail its investigation." (Def. Mot. 5 at 8). As an initial matter, and as evidenced by the

defendant's own motions to suppress the fruits of the grand jury subpoena issued to Boies Schiller,

the defendant herself professes to have been concerned about the prospect of a criminal

investigation at the time of her depositions, which strongly suggests that, on these facts, the

distinction is of little moment. (*See, e.g.*, Def. Mot. 3 at 3-4 (explaining that the defendant "flatly

rejected" a law enforcement exception to the civil protective order); Def. Mot. 11 at 2 (arguing

that the defendant "declined to invoke" her Fifth Amendment privilege against self-incrimination

at the deposition after negotiating the protective order)). More important, and whatever moment

that distinction may have in other contexts, it has little bearing on the severance analysis which

turns instead on whether the substance of the false statement relates to the substantive offense, and

is thereby provable through overlapping evidence and part of the speaker's effort to conceal the

offense. *See Ruiz*, 894 F.2d at 505; *Potamitis*, 739 F.2d at 791 (citing *United States v. Carson*,

464 F.2d 424, 436 (2d Cir. 1972); *Sweig*, 441 F.2d at 118-19) (affirming denial of a severance

motion where the false statements "concern the substantive offenses" and citing cases where the

perjury count's proof overlapped with the evidence on the substantive counts). With respect to

that analysis, the defendant cites no case for the proposition that the setting in which the statement

is made is significant, much less determinative. *Cf. Broccolo*, 797 F. Supp. at 1190 (false statement

in bankruptcy proceeding).  And the cases the defendant cites in which a perjury or false statements count was severed only underscore this point.  In both cases, the statement itself concerned an entirely different subject matter, provable through largely if not entirely different evidence.  *See United States v. Botti*, No. 08 Cr. 230 (CSH), 2009 WL 3157582, at *1, *5 (D. Conn. Sept. 25, 2009) (severing a structuring conspiracy and false statements related to that conspiracy from a "separate" corruption conspiracy); *United States v. Mitan*, No. 08-760, 2009 WL 2328870, at *3 (E.D. Pa. July 28, 2009) (severing counts charging a fraud scheme from perjury count for an affidavit submitted as part of a bail motion, which "was not as an attempt to cover up the scheme to defraud, but rather an attempt to show that Court had erred" in its bail decision).

Finally, the defendant argues that the counts are unrelated because the defendant's testimony was given in response to questions "tangential to the defamation action," and her answers "concealed" no crimes because they were "true and reflective of the poor questioning by the plaintiff's lawyers."  (Def. Mot. 5 at 8-9).  The defendant is free to make at least some of these arguments to the jury, but these assertions are not a lawful basis for severing Counts Five and Six. This is merely an attempt to refashion the defendant's claim that she gave truthful, immaterial answers to ambiguous questions.  But, as discussed in detail in Section V, those arguments have no merit.

*Third*, the defendant has failed to carry her heavy burden under Rule 14(a) to show prejudice.  At the outset, "[t]he contention that there is some inherent prejudice in joining perjury and related counts with substantive charges has been widely rejected."  *Potamitis*, 739 F.2d at 791. And courts routinely hold that there is no prejudice where the evidence in support of the two counts is "interconnected."  *Blakney*, 941 F.2d at 116; *see Carson*, 464 F.2d at 436 ("[T]he commonality

of proof of the conspiracy and perjury crimes permitted joinder of the offenses . . . and denial of appellant's Rule 14 pretrial motion for severance."); *Pizarro*, 2018 WL 1737236, at *6-*7.

The defendant argues that the trial on the perjury counts will require a "full-blown re-litigation of the defamation action." (Def. Mot. 5 at 9). That is a significant exaggeration. To litigate the perjury counts, the parties will need to present evidence about the basic substance of the civil suit—in particular, Giuffre's allegations and the defendant's denials—such that the jury will be able to assess materiality and the statements' context. This can be done briefly—as stated in Section V, the Government is amenable to presenting that information through a stipulation—and, in any event, through minimal additional evidence. The stipulation or other evidence could be crafted to minimize the risk of spillover prejudice, for instance by referring to Giuffre by a pseudonym to avoid any connection she might have to testimony on the substantive counts. And any remaining prejudice could be vitiated by a limiting instruction that the jury should not consider Giuffre's allegations as evidence of the substantive counts. *See Page*, 657 F.3d at 130-31 (approving of similar precautions when introducing evidence of a defendant's prior felony conviction); *Pizarro*, 2018 WL 1737236, at *7; *see also Zafiro*, 506 U.S. at 540 ("[J]uries are presumed to follow their instructions." (citation and internal quotation marks omitted)). There is every reason to think a jury could and would follow such an instruction. *See, e.g.*, *Rivera*, 546 F.3d at 254 (using a limiting instruction to prevent spillover prejudice for counts involving the sexual exploitation of different children, especially in light of admissibility across counts); *United States v. Pena*, 932 F. Supp. 2d 464, 467 (S.D.N.Y. 2013) (using a limiting instruction to address spillover prejudice from two murder for hire conspiracies). Indeed, even if the counts were severed, as noted above, the Government would still seek to offer evidence of the defendant's false denials of conduct relevant to Counts One through Four as evidence of her consciousness of guilt

as to those counts, and would consent to a similar limiting instruction, which a jury would be presumed to follow.  And, of course, in a severed trial exclusively on the perjury counts, the defendant would surely argue that a limiting instruction is necessary to prevent the jury from concluding that the defendant's statements were false based in part on the substance of Giuffre's unproven allegations.  Just as a jury would set aside the substance of Giuffre's allegations for that purpose, so can the jury set aside the substance of Giuffre's allegations for Counts One through Four.

The defendant contends instead that the perjury counts require a "collateral trial" on the truth of Giuffre's statements and resolution of "more than 50 substantive motions . . . pending before the District Court."  (Def. Mot. 5 at 9-10).  As described in Section V, a false statement in a civil deposition is material (1) if a "truthful answer might reasonably be calculated to lead to the discovery of evidence admissible at the trial of the underlying suit," *United States v. Kross*, 14 F.3d 751, 753 (2d Cir. 1994), or (2) if it has "a natural tendency to influence, or [be] capable of influencing, the decision of the decisionmaking body to which it was addressed," *United States v. Gaudin*, 515 U.S. 506, 509 (1995) (alteration in original) (internal quotation marks omitted).  Neither of these standards requires the jury to determine whether the defendant's statements would have tipped the scales in the defamation suit or would likely have led to the discovery of evidence.  *See Kungys v. United States*, 485 U.S. 759, 771 (1988) ("It has never been the test of materiality that the misrepresentation or concealment would *more likely than not* have produced an erroneous decision, or even that it would *more likely than not* have triggered an investigation."); *United States v. An Antique Platter of Gold*, 184 F.3d 131, 135-36 (2d Cir. 1999) (distinguishing the "natural tendency test" from a but-for test); *Kross*, 14 F.3d at 754 (rejecting, in a civil forfeiture case, the argument that the defendant's true testimony would not itself have justified a forfeiture because

"such evidence might lead to evidence . . . which would justify forfeiture").  The jury need not decide the outcome of the defamation case in order to evaluate whether truthful answers were capable of influencing the decisionmaker or could reasonably have led to the discovery of admissible evidence.[54]

Finally, the defendant argues that severance is appropriate because including the perjury counts "will necessarily introduce into the trial the issue of Ms. Maxwell's credibility."  (Def. Mot. 5 at 13).  That is true anytime perjury or false statements counts are joined with other offenses, yet joining perjury or false statements counts to the substantive crimes they concern is the rule, not the exception.  And more generally, the "adverse effect of being tried for two crimes rather than one" is not prejudice.  *Werner*, 620 F.2d at 929.

Trying the perjury counts with the Mann Act counts they concern makes eminent sense. Doing so greatly advances judicial efficiency by avoiding the need for two trials at which the same evidence would be presented, including testimony from the same victims.  Just as the counts are similar in character, the trial would not be unwieldy.  Against these efficiencies, endorsed by the liberal joinder principles behind Rule 8, the defendant identifies at most only "generalized claim[s] of prejudice," *Rivera*, 546 F.3d at 254, that can be cured by an appropriate limiting instruction. She thus falls far short of meeting her heavy burden, and her motion should be denied.

---

[54] The defendant relatedly suggests that her counsel from the defamation suit may have to testify regarding the perjury counts, denying her counsel of her choice.  She has not identified what factual issue they might testify to and why it must come from one of the lawyers who represented her on both that case and this one.  The Government notes, in this respect, that three of the defendant's attorneys in this case had no involvement in the civil suit.  Even if such testimony were necessary by one of the defendant's lawyers, it would only disqualify the firm if that lawyer is called "on a significant issue other than on behalf of the client, and it is apparent that the testimony may be prejudicial to the client."  N.Y. R.P.C. 3.7(b); *see generally Murray v. Met. Life Ins. Co.*, 583 F.3d 173, 177-80 (2d Cir. 2009) (discussing the advocate-witness rule).

**VII.  The Indictment Contains the Elements of Each Offense and Provides the Defendant More Than Adequate Notice of the Charges Against Her**

The defendant also moves to dismiss Counts One through Four on the grounds that the Indictment lacks specificity because it does not name minor victims, does not include specific dates, and uses language that the defendant claims not to understand.  (Def. Mot. 12).  The motion is meritless and should be denied.  The plain language of the Indictment clearly and sufficiently sets forth every element of each crime charged, and the extensive details contained in the Indictment as further amplified through the voluminous discovery and the Government's various pre-trial filing describing the case and its anticipated proof at trial provide the defendant with more than sufficient notice of the charges against her.

**A.  Applicable Law**

It is well-established that "[a]n indictment is sufficient if it contains the elements of the offense(s) charged and fairly informs a defendant of the charge(s) against which he must defend."  *United States v. Rahimi*, No. 16 Cr. 760 (RMB), 2017 WL 2984169, at *1 (S.D.N.Y. June 22, 2017) (citing *United States v. Chalmers*, 474 F. Supp. 2d 555, 559 (S.D.N.Y. 2007); *Hamling v. United States*, 418 U.S. 87, 117 (1974)).  As a result, "'an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime'" in order to be sufficient.  *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992) (quoting *United States v. Tramunti*, 513 F.2d 1087, 1113 (2d Cir. 1975)).  As such, "[a] defendant faces a high standard in seeking to dismiss an indictment."  *United States v. Nejad*, No. 18 Cr. 224 (AJN), 2019 WL 6702361, at *3 (S.D.N.Y. Dec. 9, 2019) (internal quotation marks omitted) (quoting *United States v. Post*, 950 F. Supp. 2d 519, 527 (S.D.N.Y. 2013)).  Additionally, "when deciding a motion to dismiss, a court must accept all factual allegations in the indictment as true."  *Chalmers*, 474 F. Supp. 2d at 559.  "A court should not look beyond the face

of the indictment and draw inferences as to proof to be adduced at trial, for 'the sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment.'" *Id.* (quoting *United States v. Alfonso*, 143 F.3d 772, 776-77 (2d. Cir. 1998)).

Federal Rule of Criminal Procedure 7 states in part that an indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged . . . ." Fed. R. Crim. P. 7(c)(1). There are two constitutional requirements an indictment must satisfy in order to be sufficient: first, it must "contain[] the elements of the offense charged and fairly inform[] a defendant of the charge against which [s]he must defend," and second, it must "enable[]" a defendant "to plead an acquittal or conviction in bar of future prosecutions for the same offense." *United States v. Resendiz-Ponce*, 549 U.S. 102, 108 (2007) (internal quotation mark omitted) (quoting *Hamling*, 418 U.S. at 117). "[A]n indictment parroting the language of a federal criminal statute is often sufficient . . . ." *Id.* at 109. As a general matter, "[a]n indictment does *not* . . . 'have to specify evidence or details of how the offence was committed.'" *United States v. Wey*, No. 15 Cr. 611 (AJN), 2017 WL 237651, at *5 (S.D.N.Y. Jan, 18, 2017) (emphasis in original) (quoting *United States v. Coffey*, 361 F. Supp. 2d 102, 111 (E.D.N.Y. 2005)). "When the charges in an indictment have stated the elements of the offense and provided even minimal protection against double jeopardy," the Second Circuit "has repeatedly refused, in the absence of any showing of prejudice, to dismiss . . . charges for lack of specificity." *United States v. Stringer,* 730 F.3d 120, 124 (2d Cir. 2013) *(ellipses in original) (internal quotation marks omitted) (quoting United States v. Walsh,* 194 F.3d. 37, 45 (2d Cir. 1999)).

Although courts have identified certain crimes for which an indictment may require greater specificity beyond tracking the language of the statute, such cases are "very rare." *Stringer*, 730 F.3d at 125. For example, the Second Circuit has clarified that within this "less-common category"

is the "specification of what statements are alleged to be false, and in what respect they are false, in charges of criminal falsity," as well as "the subject matter of the congressional inquiry" for charges of "refusal to answer questions in a congressional inquiry." *Id.* at 125-26 (citing, *inter alia*, *Russell v. United States*, 369 U.S. 749 (1962)). *Similarly, "*where an indictment charges a crime that depends in turn on violation of another statute, the indictment must identify the underlying offense." *United States v. Pirro*, 212 F.3d 86, 93 (2d Cir. 2000). When delineating the contours of this narrow category of crimes requiring additional specificity in an indictment, the Second Circuit has previously found that the failure to name a specific victim of fraud does not render an indictment inadequate under this standard. *See Stringer*, 730 F.3d at 127. In other words, absent some affirmative indication that additional specificity is required when charging a particular statute, there is no basis to conclude that an indictment need contain more than the elements of the offense and the approximate time and place of the alleged violation. *See Wey*, 2017 WL 237651 at *5 (declining to "depart from the usual sufficiency framework" where defendant "cites no authority" suggesting that the statutes at issue fall into the narrow exception to the general rule when considering motion to dismiss for lack of specificity).

### B.     Discussion

Because each of the four counts at issue—Counts One, Two, Three, and Four—clearly lays out each element of the charged offense and adequately informs the defendant of the accusations against her, the Indictment easily satisfies the standard for sufficiency. Tellingly, the defendant does not claim that any of these counts fails to allege an essential element or to track the language of the relevant statute. Nor could she, as the face of the Indictment not only contains each and every essential element of the crimes charged, but also goes beyond the basic requirements for pleading each charge by providing additional factual background. Instead, the defendant baldly

asserts that the crimes charged in Counts One through Four require additional specificity without citing any authority in support of such a broad claim.  (*See* Def. Mot. 12 at 2).  In particular, the defendant suggests that the failure to identify each minor victim by name, the presence of a date range rather than specific dates, and the use of certain language that the defendant claims not to understand render Counts One through Four so deficient that they must be dismissed.  Because the defendant cites no authority indicating that violations of 18 U.S.C. §§ 371, 2422, or 2423 fall into the rare exception to "the rule that 'an indictment need do little more than to track the language of the statute charged,'" her motion should be denied.  *United States v. Murgio*, 209 F. Supp. 3d 698, 716 (S.D.N.Y. 2016) (Nathan, J.) (quoting *Stringer*, 730 F.3d at 124).

*First*, the use of pseudonyms to refer to minor victims of the charged conduct does not warrant dismissal of the Indictment.  *See Stringer*, 730 F.3d at 124 (affirming sufficiency of fraud indictment "[n]otwithstanding its failure to specify the names of persons whose identifying documents were used" in scheme where prosecution provided victims' names in advance of trial). The identity of a victim is not required to be included on the face of a charging instrument, and the "lack of any identity or date of birth information of the alleged victims does not warrant dismissal" of charges alleging sexual abuse.  *United States v. Kidd*, 386 F. Supp.3d 364, 369 (S.D.N.Y. 2019). The defendant cites no law to the contrary and has not identified a single indictment in this District that includes the full names of minor victims of sexual abuse.  Indeed, it makes good sense that a charging instrument alleging sexual abuse of minors would not include the full names of minor victims, whose privacy Congress has emphasized should be protected.  *See* 18 U.S.C. § 3509(d) (delineating privacy protections for child victims and witnesses).

Judge Marrero's decision in *Kidd*, which denied a motion to dismiss a sex trafficking charges in violation of 18 U.S.C. § 1591 where the indictment referred to victims by pseudonyms,

is particularly instructive here.  *See* 386 F. Supp.3d at 366.  In denying the motion to dismiss, Judge Marrero found *Stringer*'s holding "that the identity of a victim was not required to be contained in an indictment, despite the centrality of the victim's identity to the charge" to be equally applicable in a case involving sex trafficking charges.  *Id.* at 369.  The same logic follows here.  The use of pseudonyms to refer to the minor victims of sexual abuse in Counts One through Four is no more prejudicial to the defendant here than the absence of victim identities was to the defendants in *Kidd* or *Stringer*.  This is especially so when the Government has already provided the defendant with the birth month and year of each victim, provided discovery regarding each victim, and has repeatedly indicated that it will provide the defendant with the names of its witnesses, including the minor victims referenced in the Indictment, four weeks in advance of trial.  Such disclosure will ensure that the defendant is readily able to bar future prosecutions for the same offense, and together with the elements of each crime and additional details contained in in the Indictment, is more than sufficient to survive a motion to dismiss.

*Second*, the Indictment "state[s] the time and place (in approximate terms)" of the conduct alleged in Counts One through Four.  *Stavroulakis*, 952 F.2d at 693 (quoting *Tramunti*, 513 F.2d at 1113).  In particular, Counts One through Four each allege that the defendant engaged in a continuing course of conduct involving the enticement and transportation of minors with intent to commit illegal sex acts, as well as conspiracies to do so, between in or about 1994 and in or about 1997.  *See* Indictment ¶¶ 1, 6, 7, 9-11, 13, 15-17, 19.  Courts in the Second Circuit have consistently upheld indictments containing a range of time rather than a specific date.  *See, e.g.*, *Kidd*, 386. F. Supp. 3d at 369 ("[Th]e Second Circuit routinely upholds the 'on or about' language used to describe the window of when a violation occurred." (citing *United States v. Nersesian*, 824 F.2d 1294, 1323 (2d Cir. 1987)); *United States v. Vickers*, No. 13 Cr. 128 (RJA) (HKS), 2014 WL

1838255, at *1, 4-6 (W.D.N.Y. May 8, 2014) (denying motion to dismiss indictment charging enticement of a minor, in violation of 18 U.S.C. 2423(a), "between in or about 2000 to in or about 2004," because "the Indictment states all the elements of the crime charged by tracking the statutory language," as well as "the nature of the criminal activity" and "the underlying facts").

"This is especially true in cases of sexual abuse of children: allegations of sexual abuse of underage victims often proceed without specific dates of offenses," including "[i]n cases of continuing sexual abuse," for which "it is sufficient for the indictment to specify a period of time—rather than a specific date—in which defendant committed the acts at issue . . . ." *United States v. Young*, No. 08 Cr. 285 (KMK), 2008 WL 4178190, at *2 (S.D.N.Y. Sept. 4, 2008) (internal quotation mark omitted) (quoting *Edwards v. Mazzuca*, No. 00 Civ. 2290 (RJS), 2007 WL 2994449, at *5 (S.D.N.Y. Oct. 15, 2007)).  Indeed, "[b]ecause minors often are not capable of remembering the exact dates when the alleged acts occurred, 'fairly large time windows in the context of child abuse prosecutions are not in conflict with constitutional notice requirements.'" *Young*, 2008 WL 4178190, at *2 (quoting *Valentine v. Konteh*, 395 F.3d 626, 632 (6th Cir. 2005)). The same is true here.  The minor victims in this case cannot reasonably be expected to recall the exact dates when particular instances of abuse took place during their adolescence.  This is especially so for Minor Victim-1, who experienced numerous instances of abuse over multiple years of her youth.  Providing the approximate ranges of dates during which the offenses took place fully satisfies the requirements of an adequately pled charging instrument.  The defendant cites no authority to the contrary, and her motion to dismiss should accordingly be denied.

*Third*, the Indictment lists in clear detail the allegations relevant to each element of every criminal statute for which she is charged.  Beyond simply "parroting the language of a federal criminal statute," *Resendiz-Ponce*, 549 U.S. at 108, the Indictment provides extensive detail

regarding how the defendant is alleged to have committed the crimes charged in Counts One through Four.  *See* Indictment ¶¶ 1-11.  Indeed, "by providing Defendant with a narrative of the manner in which Defendant is alleged to have committed the charged offenses, the Indictment provides Defendant with more detail than is strictly necessary" under the governing law.  *United States v. Kozel*, No. 19 Cr. 460 (KMW), 2020 WL 4751498, at *2 (S.D.N.Y. Aug. 17, 2020).

Although the defendant complains that some of the terms used in the speaking portions of the Indictment are somehow vague, she cites no authority to suggest that her difficulty comprehending basic language in portions of a charging instrument that do not speak to the elements of the offense requires dismissal.[55]  Counts One and Three, charging the defendant with violations of 18 U.S.C § 371, "clearly contain[] the elements of the offense charged, fairly inform[] [her] of the charge[s] against [her], and enable[] [her] to plead an acquittal or conviction in bar of future prosecution for the same offense." *United States v. Bunn*, 154 F. App'x 227, 229 (2d Cir. 2005). Counts Two and Four, charging violations of 18 U.S.C §2422 and § 2243, respectively, similarly contain the elements of those offenses and adequately inform the defendant of the charges

---

[55] Alternatively, the defendant claims that the acts listed throughout the Indictment do not constitute illegal behavior.  In this vein, the defendant makes specific reference to "grooming" as conduct that is not illegal.  (Def. Mot. 12 at 4). The defendant cites no authority for this argument, which is contrary to Second Circuit law.  In particular, the Second Circuit has for many years found grooming behavior to be a means to "persuade, induce, or entice" minors to engage in illegal sexual activity.  *See, e.g.*, *United States v. Thompson*, 896 F.3d 155, 173 (2d Cir. 2018) ("Our precedent, however, supports applying a broad definition of enticement in this context: that definition would reasonably include Thompson's grooming of the minor victims to act as he desired with regard to many matters over the months before he made the video."); *United States v. Dorvee*, 616 F.3d 174, 180 (2d Cir. 2010) ("We do not believe that the district court was clearly erroneous in finding, as a matter of fact, that these images were sent as part of a grooming process to persuade the agent to engage in the type of sexual conduct depicted in the images." (internal quotation marks and citation omitted)); *United States v. Brand*, 467 F.3d 179, 203 (2d Cir. 2006) ("Brand's sexual advances and grooming behavior provide additional evidence in support of the jury's finding that Brand attempted to entice a minor.").  In any event, whether grooming *alone* constitutes a crime is immaterial to the instant motion, and it will be for the jury to decide whether the evidence at trial, as a whole, establishes the elements of the crime beyond a reasonable doubt.

against her.  The Indictment also cites the relevant state criminal statute under which the defendant is charged constituting "sexual activity" within the language of both § 2422 and § 2243, specifically, violations of New York Penal Law § 130.55.  Indictment ¶¶ 11(b), 13, 17(b), 19.  The defendant cites no authority for her suggestion that by providing additional detail regarding how the defendant committed the charged crimes, the Government is somehow required to provide even more specificity beyond the basic elements of the crimes charged.  Absent any such authority, and where there is no suggestion that the Indictment fails to allege the essential elements of each crime charged, there is no basis to dismiss any of the counts in the Indictment.

For the foregoing reasons, the defendant's sufficiency challenges to the Indictment fail as a matter of law, and her motion to dismiss Counts One through Four should be denied.

## VIII.   There Is No Basis to Strike Any Portion of the Indictment

The defendant moves to strike any reference to Minor Victim-3 from the Indictment, claiming that—contrary to the plain terms of the Indictment—the events involving Minor Victim-3 are unrelated to the conspiracies charged in Counts One and Three and that some of that the allegations regarding Minor Victim-3 are unduly prejudicial.  (Def. Mot. 6).  The motion is baseless.  *First*, as the Indictment itself makes clear, the defendant's and Epstein's interactions with Minor Victim-3 were part of a broader scheme and agreement to entice and transport minor victims with intent to commit illegal sex acts.  Even if Minor Victim-3 was not ultimately transported as a minor, the core of a conspiracy is an agreement to engage in criminal conduct; there is no legal requirement that the agreed upon crime be completed.  Although Minor Victim-3's experiences cannot alone form the basis of a timely substantive charge, both charged conspiracies include timely overt acts, and it is well established that a charged conspiracy can encompass otherwise time-barred acts so long as at least one overt act in furtherance of the

conspiracy is timely.  *Second*, the description of Minor Victim-3's experiences in the Indictment is no more inflammatory or prejudicial than those regarding Minor Victim-1 and Minor Victim-2. *Finally*, even if evidence regarding Minor Victim-3 were not admissible as direct evidence of the charged conspiracies—which it is—that evidence will be admissible under Federal Rule of Evidence 404(b) to prove the defendant's knowledge, intent, and *modus operandi*.  Accordingly, the motion to strike references to Minor Victim-3 as surplusage should be denied.

### A.    Relevant Facts

As alleged in the Indictment, Minor Victim-3 was one of the minor girls whom the defendant groomed to engage in sexual activity with Jeffrey Epstein.  Minor Victim-3 was born in ███████████.  At trial, the Government expects that Minor Victim-3 will testify,[56] in substance and in part, that when she was ██████████, she met the defendant.  After meeting Minor Victim-3, the defendant befriended Minor Victim-3 by, among other things, discussing Minor Victim-3's life and family with Minor Victim-3.  As a result, the defendant came to know Minor Victim-3's age. ████████████████████████████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

---

[56] While the Government is proffering these facts for purposes of this Motion, the underlying information, which is contained in the FBI 302 reports of interviews with Minor Victim-3, will be produced to the defense as 3500 material in advance of trial.



**B.      Applicable Law**

"Although the Federal Rules of Criminal Procedure grant the Court authority to strike surplusage from an indictment, *see* Fed. R. Crim. P. 7(d), '[i]t has long been the policy of courts within the Southern District to refrain from tampering with indictments.'"  *United States v. Bin Laden*, 91 F. Supp. 2d 600, 621 (S.D.N.Y. 2000) (quoting *United States v. Jimenez*, 824 F. Supp. 351, 369 (S.D.N.Y. 1993)).  "Motions to strike surplusage from an indictment will be granted only where the challenged allegations are 'not relevant to the crime charged and are inflammatory or prejudicial.'"  *United States v. Scarpa*, 913 F.2d 993, 1013 (2d Cir. 1990) (quoting *United States v. Napolitano*, 552 F. Supp. 465, 480 (S.D.N.Y. 1982)).  "'[I]f evidence of the allegation is admissible and relevant to the charge, then regardless of how prejudicial the language is, it may not be stricken.'"  *Id.* (brackets in original) (quoting *United States v. DePalma*, 461 F. Supp. 778, 797 (S.D.N.Y. 1978)); *see also United States v. Mulder*, 273 F.3d 91, 99 (2d Cir. 2001).  "This standard is an exacting one, and only rarely is alleged surplusage stricken from an indictment."

*Murgio*, 209 F. Supp. 3d at 724 (internal quotation marks omitted) (quoting *United States v. Smith*, 985 F. Supp. 2d 547, 610 (S.D.N.Y. 2014)).

In setting forth allegations in an indictment, the Government is not limited to description of only the bare elements of a crime; rather, an indictment may be used to provide background to the charged criminal conduct, to describe the circumstances, means, and methods of an offense, and to describe evidence that is otherwise admissible at trial. Simply put, "[s]tatements providing background are relevant and need not be struck." *United States v. Mostafa*, 965 F. Supp. 2d 451, 466 (S.D.N.Y. 2013) (*citing Mulder*, 273 F.3d at 100). Allegations also will not be stricken where they elucidate the circumstances, means, and methods of a charged scheme or would be admissible, in the alternative, under Rule 404(b) of the Federal Rules of Evidence. *See United States v. Hernandez*, 85 F.3d 1023, 1030 (2d Cir. 1996) (affirming denial of motion to strike surplusage where "[d]efendants' cocaine-related activity was clearly relevant evidence of the organizational structure and method of operation of their heroin conspiracy, and it also tended to establish the nature of the relationship between Defendants and their supplier of heroin, defendant Jose Antonio Hernandez," and citing Rule 404(b)).

In terms of timing, "[c]ourts in this district routinely await presentation of the Government's evidence at trial before ruling on a motion to strike." *Mostafa*, 965 F. Supp. 2d at 467 (citing, *inter alia*, *Scarpa*, 913 F.2d at 1012); *see also United States v. Ahmed*, No. 10 Cr. 131 (PKC), 2011 WL 5041456, at *3 (S.D.N.Y. Oct. 21, 2011). As multiple courts have concluded, "'[t]here is little or no purpose in attempting to predict in advance of trial what evidence will prove admissible or how specific allegations relate to the overall charges.'" *Smith*, 985 F. Supp. 2d at 612 (brackets in original) (*quoting United States v. Butler*, 351 F. Supp. 121, 124 (S.D.N.Y. 2004)).

### C.     Discussion

The defendant's motion to strike should be denied—or at a minimum deferred until after the conclusion of the Government's direct case—because all of the challenged allegations pertain to evidence that will be relevant and admissible at trial, and are not unduly prejudicial.

*First*, the allegations regarding Minor Victim-3 are properly included in the Indictment's description of the conspiracies charged in Counts One and Three because evidence of those incidents is relevant and admissible at trial as direct evidence of the crimes charged.  Counts One and Three allege that the defendant participated in conspiracies with Epstein both to transport minor victims and to entice minor victims to travel with the intent to commit illegal sex acts. Indictment ¶¶ 9-11, 15-17.  In the course and as part of those conspiracies, the defendant groomed multiple minor victims for sexual abuse by Epstein through multiple methods, including befriending victims and encouraging minor victims to provide massages to Epstein knowing he would engage in sex acts with them.  *Id.* ¶¶ 1, 4, 7, 14.  As detailed in the Indictment, that grooming was a fundamental part of both conspiracies because it encouraged minor victims to be alone with and to engage in sex acts with Epstein.  *Id.* ¶¶ 1, 4, 14.  It follows that the defendant's role grooming Minor Victim-3 to engage in sex acts with Epstein was a part of and therefore constitutes evidence of these conspiracies.  *Id.* ¶¶ 7(c), 11(d), 17(d).

The defense claims that because the Indictment does not allege that each element of substantive violations of 18 U.S.C. §§ 2422 and 2423(a) was met as to Minor Victim-3, her experiences cannot be direct evidence of the conspiracies to violate those statutes charged in Counts One and Three.  But that argument ignores a fundamental tenet of conspiracy law.  It is axiomatic that a conspiracy does not require a completed substantive crime.  *See Salinas v. United States*, 522 U.S. 52, 65 (1997) ("It is elementary that a conspiracy may exist and be punished whether or not the substantive crime ensures, for the conspiracy is a distinct evil, dangerous to the

public, and so punishable in itself.").  Indeed, "[i]t is well settled that the essential elements of the crime of conspiracy are: (1) that the defendant agreed with at least one other person to commit an offense; (2) the defendant knowingly participated in the conspiracy with the specific intent to commit the offenses that were the objects of the conspiracy; and (3) that during the existence of the conspiracy, at least one of the overt acts set forth in the indictment was committed by one or more of the members of the conspiracy in furtherance of the objectives of the conspiracy." *United States v. Salameh*, 152 F.3d 88, 145-46 (2d Cir. 1998).

Because a conspiracy does not require the completion of a substantive crime, it does not matter whether Minor Victim-3 was ever in fact transported as a minor, or whether the elements of the substantive crimes of transportation an enticement are satisfied as to her.  *See Salinas*, 522 U.S. at 65.  What matters is whether the Indictment properly alleges that the defendant agreed to participate in schemes to transport and entice minors to travel with the intent that an illegal sex act would be committed, and whether the allegations at issue are relevant and admissible evidence of that conspiracy.  Here, that is plainly the case.  As alleged, the defendant's participation in recruiting and grooming Minor Victim-3 to engage in sex acts as a minor with Epstein during the period charged in the Indictment, is itself evidence of the defendant's agreements with Epstein to identify minor girls to entice and transport for purposes of illegal sex acts.[57]  Moreover, the

---

[57] The defendant takes issue with the Indictment's reference to these sex acts as "abuse" because, she asserts, Minor Victim-3 was above the age of consent in the United Kingdom at the time they occurred.  The description in the Indictment is factually accurate, however, because Minor Victim-3 will testify to her subjective experience of these acts with a much older man as traumatic, exploitative, and abusive at trial.  While the Government will be careful to avoid suggesting to the jury that any consensual act committed after Minor Victim-3 was at or above the age of consent was itself criminal (as opposed to evidence of the charged conspiracies), to the extent defense counsel wishes to request a particular limiting instruction or to seek authorization for a particular line of cross-examination regarding the legality of any sex acts that took place in London, the appropriate forum to do so is in a motion *in limine*.

Government further expects Minor Victim-3 will testify that ████████████████████
████████████████████████████████████████, which is probative of the
defendant's intent, in her initial interactions with Minor Victim-3, to entice Minor Victim-3 to
travel and be transported for the purpose of engaging in sexual acts.[58]  Thus, even if Minor Victim-
3 did not travel as a minor, the events involving Minor Victim-3 outlined in the Indictment
constitute direct and admissible evidence of the agreements between and the relationship of the
defendant and Epstein.  Because evidence regarding Minor Vitim-3 is therefore relevant and
admissible at trial, there is no basis to strike these allegations from the Indictment.  *See Scarpa*,
913 F.2d at 1013.  Given the relevance of these allegations, the defendant has not satisfied the
"exacting" standard required to justify striking portions of an Indictment.  *Murgio*, 209 F. Supp.
3d at 724 (quoting *Smith*, 985 F. Supp. 2d at 610).  Accordingly, the motion should be denied, or,
at the very least, deferred until "presentation of the Government's evidence at trial" after which
the Court will have a full understanding of how Minor Victim-3's experiences fit into the charged
conspiracies.  *Mostafa*, 965 F. Supp. 2d at 467.

The fact that the Government would be precluded, by virtue of the statute of limitations,
from bringing a charge based exclusively on the experience of Minor Victim-3 is immaterial.  It is
well-established that a prosecution for a conspiracy is timely so long as the conspiracy exists and
at least one timely overt act is committed in furtherance of the conspiracy within the applicable
statute of limitations.  *See United States v. Salmonese*, 352 F.3d 608, 614 (2d Cir. 2003) (citing
*Grunewald v. United States*, 353 U.S. 391, 396-97 (1957)); *United States v. Rutkoske*, 506 F.3d
170, 174-75 (2d Cir. 2007); *United States v. Mason*, 479 F. App'x 397, 398 (2d Cir. 2012).

---

[58] ████████████████████████████████████████████████████████
████████████  Regardless, the subsequent invitation demonstrates that the grooming
and sex acts in London were part of conspiracies to entice and transport minors.

Accordingly, overt acts that may, on their own, be untimely can nevertheless serve as direct evidence of the existence of a charged conspiracy. *See, e.g.*, *United States v. Benussi*, 216 F. Supp. 2d 299, 301-07, 309 (S.D.N.Y. 2002) (admitting evidence of otherwise untimely acts during conspiracy trial); *cf. United States v. Marcus*, 628 F.3d 36, 43 (2d Cir. 2010) (declining to vacate a conviction on a statute with only prospective application when "the Government presented post-enactment evidence sufficient to satisfy the elements" in addition to evidence of relevant pre-enactment conduct). Evidence regarding Minor Victim-3 is thus admissible to prove the existence of the conspiracy, even if a conviction could not be supported based on her experiences alone.[59]

The Government agrees with the defendant that Minor Victim-3 turned 25 before 2003 and, as a result, a substantive count based exclusively on conduct involving Minor Victim-3 is time-barred. As discussed above, however, the conduct involving Minor Victim-1 and Minor Victim-2 alleged in the Indictment is timely. Thus, if the jury concludes that the conspiracies existed, involved either Minor Victim-1 or Minor Victim-2, and included at least one overt act as to either Minor Victim-1 or Minor Victim-2, then Counts One and Three are not time-barred. *See Salmonese*, 352 F.3d at 614. Moreover, and so as to ensure that any count of conviction is based on timely conduct, the Government would have no objection to an appropriate instruction from

---

[59] As a fallback argument, the defense cites *United States v. Hsia*, 24 F. Supp. 2d 14 (D.D.C. 1998), in which a District Judge concluded that alleged overt acts involving concealment or "cover-ups" were not obviously within the scope of the charged conspiracy to defraud the United States by impairing and impeding the Immigration and Naturalization Service. *Id.* at 20, 24-26. Although the Court denied the motion to strike the alleged surplusage, it ordered the prosecution to provide a bill of particulars regarding the alleged acts of concealment. *Id.* at 26, 33. The case is readily distinguishable because the alleged surplusage in *Hsia* involved a completely different type of conduct—obstruction—than that charged in the indictment—fraud. Here, by contrast, the allegations regarding Minor Victim-3 involve conduct that falls within the heartland of the conspiracy: grooming a minor girl to engage in sex acts with Jeffrey Epstein. Moreover, in both the Indictment and in this memorandum, the Government has provided extensive detail regarding Minor Victim-3's anticipated testimony, which avoids any concern that the defendant will be surprised at trial, which was the animating concern in *Hsia*. *See id.* at 33. As such, this motion does not offer a basis for a bill of particulars.

the Court informing the jury that, to convict on any conspiracy count, it must find at least one overt

act in furtherance of the conspiracy that occurred within the statute of limitations. *See Benussi*,

216 F. Supp. 2d at 309 (describing a similar jury instruction provided for a conspiracy containing

some allegations that were time-barred and others that were timely).

*Second*, the allegations regarding Minor Victim-3 in the Indictment are no more

inflammatory or prejudicial than those describing the experiences of Minor Victim-1 and Minor

Victim-2.  The references to "sexual abuse" accurately describe Minor Victim-3's experience of

sex acts with Epstein as traumatic, exploitative, and abusive, and she will testify to that effect at

trial.  Moreover, because these acts were committed in furtherance of the criminal conspiracies

charged in the Indictment, it is neither misleading nor prejudicial to imply that this activity

involved illegal conduct.  More to the point, because evidence regarding Minor Victim-3 "is

admissible and relevant to the charge[s]" contained in Counts One and Three of the Indictment,

the language describing Minor Victim-3's experiences in the Indictment "may not be stricken"

"regardless of how prejudicial the language is . . . ." *Scarpa*, 913 F.2d at 1013 (quoting *DePalma*,

461 F. Supp. at 797).

*Finally*, even if Minor Victim-3's experiences did not constitute direct evidence of the

crimes charged—which they do—this same evidence will also be admissible pursuant to Rule

404(b) to prove the defendant's knowledge, intent, and *modus operandi*.  Federal Rule of Evidence

404(b) provides, in pertinent part:

> Evidence of any other crime, wrong, or act is not admissible to prove
> a person's character in order to show that on a particular occasion
> the person acted in accordance with the character.  This evidence
> may be admissible for another purpose, such as proving motive,
> opportunity, intent, preparation, plan, knowledge, identity, absence
> of mistake, or lack of accident.

"[E]vidence of uncharged criminal conduct is not evidence of 'other crimes, wrongs, or acts' under Rule 404(b) if that conduct is 'inextricably intertwined with the evidence regarding the charged offense.'" *United States v. Quinones*, 511 F.3d 289, 309 (2d Cir. 2007) (quoting *United States v. Towne*, 870 F.2d 880, 886 (2d Cir. 1989)).  Where "the indictment contains a conspiracy charge, uncharged acts may be admissible as direct evidence of the conspiracy itself." *United States v. Diaz*, 176 F.3d 52, 79 (2d Cir. 1999) (internal quotation marks omitted) (quoting *United States v. Miller*, 116 F.3d 641, 682 (2d Cir. 1997)); *see also United States v. Thai*, 29 F.3d 785, 812 (2d Cir. 1994).  "An act that is alleged to have been done in furtherance of the alleged conspiracy . . . is not an 'other' act within the meaning of Rule 404(b); rather, it is part of the very act charged." *United States v. Concepcion*, 983 F.2d 369, 392 (2d Cir. 1992).

The Second Circuit "follows the 'inclusionary' approach to 'other crimes, wrongs, or acts' evidence, under which such evidence is admissible unless it is introduced for the sole purpose of showing the defendant's bad character, or unless it is overly prejudicial under Fed. R. Evid. 403 or not relevant under Fed. R. Evid. 402." *United States v. Pascarella*, 84 F.3d 61, 69 (2d Cir. 1996) (internal citation omitted); *see also United States v. Paulino*, 445 F.3d 211, 221 (2d Cir. 2006); *United States v. Zackson*, 12 F.3d 1178, 1182 (2d Cir. 1993).  Under this approach, uncharged acts are admissible in a conspiracy case where they are used to (i) explain the development of the illegal relationship between coconspirators; (ii) explain the mutual criminal trust that existed between coconspirators; and/or (iii) complete the story of the crime charged. *See Diaz*, 176 F.3d at 80; *United States v. Pipola*, 83 F.3d 556, 566 (2d Cir. 1996); *United States v. Rosa*, 11 F.3d 315, 334 (2d Cir. 1993).  In addition, evidence of "other acts" is admissible under Rule 404(b) if it (i) is advanced for a proper purpose, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident," Fed. R. Evid.

404(b)(2); (ii) is relevant to the crime for which the defendant is on trial; (iii) has probative value that is not substantially outweighed by any unfair prejudicial effect; and (iv) is admitted with a limiting instruction to the jury, if requested.  *See Huddleston v. United States*, 485 U.S. 681, 691-92 (1988); *United States v. LaFlam*, 369 F.3d 153, 156 (2d Cir. 2004).

Here, evidence regarding the defendant's interactions with Minor Victim-3 is admissible to prove the defendant's knowledge, intent, and *modus operandi*, all of which are permissible purposes under Rule 404(b).  Testimony regarding the defendant's efforts to recruit and encourage Minor Victim-3 to engage in sex acts with Epstein in the context of massages establishes that the defendant knew of Epstein's attraction to minor girls and knew that Epstein used massage to initiate sexual contact with minor girls.  Similarly, testimony regarding the defendant's interactions with Minor Victim-3, including how the defendant befriended Minor Victim-3 and then encouraged her to engage in sex acts with Epstein, establishes that the defendant intended for minor girls to engage in sex acts with Epstein when she befriended them, invited them to travel, and arranged for their travel.[60]  Finally, the details of how the defendant interacted with Minor Victim-3 demonstrates that the defendant had a specific *modus operandi* when grooming minor girls to engage in sexual activity with Epstein.  As with Minor Victim-1 and Minor Victim-2, the defendant asked minor girls details about their lives, normalized sexual topics and activity, and used her presence as an adult woman to convince minor girls that the sexual activity Epstein initiated was normal and acceptable.  "The similarity sufficient to admit evidence of past acts to establish a recurring *modus operandi* need not be complete; it is enough that the characteristics relied upon are sufficiently idiosyncratic to permit a fair inference of a pattern's existence."  *United*

---

[60] Such evidence is particularly probative when it seems apparent from defense filings that the defendant plans to argue that even if she were somehow involved in transporting or traveling with minors, she had no knowledge or intent that they engage in sexual conduct with Epstein.

*States v. Sliker*, 751 F.2d 477, 487 (2d Cir. 1984).  Here, the defendant's specific and unique approach to preparing minor girls to engage in sex acts with Epstein demonstrate the existence of such an idiosyncratic pattern warranting admission.

Other acts evidence is, like all other evidence, inadmissible under Rule 403 if its probative value is substantially outweighed by the danger of unfair prejudice. *See* Fed. R. Evid. 403. Evidence is unfairly prejudicial, however, "only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence." *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980).  Other acts evidence is typically not unfairly prejudicial where it is not "any more sensational or disturbing than the crimes" with which the defendant has been charged.  *United States v. Rolan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990). Here, as already discussed, evidence regarding Minor Victim-3's experiences with the defendant and Epstein are no more inflammatory or upsetting than those of Minor Victim-1 and Minor Victim-2.  Those experiences include a wide range of abuse at the hands of Epstein, including abuse that the defendant witnessed and participated in herself.  Evidence regarding similar events involving Minor Victim-3, who was of a similar age and experienced similar types of sexual contact, is no more "sensational or disturbing" than the other acts detailed in the Indictment.  *Id.* Evidence of other acts involving the grooming or abuse of minor victims is regularly admitted for similar purposes in cases where charges allege sexual activity with minors.  *See, e.g.*, *United States v. Vickers*, 708 F. App'x 732, 737 (2d Cir. 2017) ("As to the testimony concerning Vickers' 'grooming' of his victims, we conclude that such evidence was admissible even under Rule 404(b), because it was probative of Vickers' knowledge of how to secure adolescent boys' trust so that he could sexually abuse them.  We identify no abuse of discretion in the district court's decision to admit all of the challenged testimony [regarding uncharged acts of sexual abuse] under Rule

403."); *United States v. McDarrah*, 351 F. App'x 558, 563 (2d Cir. 2009) (affirming admission pursuant to Rule 404(b) of defendant's "e-mail responses to the Craigslist advertisements" for erotic services because the e-mails "were relevant to his knowledge and intent, because he wrote those emails to girls he knew could be minors (he enthusiastically indicated that girls younger than 18 are acceptable) and his e-mails showed his interest in actual sexual conduct"); *United States v. Brand*, No. 04 Cr. 194 (PKL), 2005 WL 77055, at *5 (S.D.N.Y. Jan. 12, 2005) (admitting "evidence that Brand exhibited an interest in child erotica and child pornography on the internet in the period leading up to the charged conduct" under Rule 404(b) because evidence was "pertinent to whether he used the internet in an attempt to engage in sexual conduct with" victim). Accordingly, Rule 403 does not bar the admission of evidence regarding Minor Victim-3, especially given its probative value in demonstrating the defendant's knowledge, intent, and *modus operandi*.

In sum, because evidence regarding Minor Victim-3's experience is admissible both as direct evidence of the conspiracies charged in Counts One and Three and pursuant to Rule 404(b), there is no basis to strike the allegations regarding Minor Victim-3 from the Indictment.

## IX.    The Defendant's Motion to Dismiss Count One or Count Three as Multiplicitous Is Premature

The defendant moves to dismiss Counts One or Three on the ground that they are multiplicitous.  (Def. Mot. 8).  Because the Second Circuit has made clear that a multiplicity challenge does not become timely until after trial, this motion should be denied as premature.

### A.    Relevant Facts

Count One charges the defendant with participating in a conspiracy, in violation of 18 U.S.C. § 371, to transport minors with the intent to commit an illegal sex act, in violation of 18 U.S.C. § 2422.  *See* Indictment ¶¶ 9-11.  Count Three charges the defendant with participating in

a conspiracy, in violation of 18 U.S.C. § 371, to entice minors to travel with the intent to commit

an illegal sex act, in violation of 18 U.S.C. § 2423(a).  *See* Indictment ¶¶ 15-17.  In other words,

Count One and Count Three charge the defendant with agreeing to commit two separate and

distinct federal crimes.

### B.      Applicable Law

The Double Jeopardy Clause of the Fifth Amendment to the Constitution "protects against

multiple punishments for the same offense." *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969).

Accordingly, a defendant cannot be sentenced for multiplicitous charges covering the same crime.

"An indictment is multiplicitous when it charges a single offense as an offense multiple times, in

separate counts, when, in law and fact, only one crime has been committed." *United States v.*

*Chacko*, 169 F.3d 140, 145 (2d Cir. 1999); *see also United States v. Jones*, 482 F.3d 60, 72 (2d

Cir. 2006) ("A claim of multiplicity cannot succeed, however, 'unless the charged offenses are the

same in fact and in law.'" (quoting *United States v. Estrada*, 320 F.3d 173, 180 (2d Cir. 2003)).

Although the Double Jeopardy Clause does not protect against simultaneous prosecutions for the

same offense, a defendant does have a right not to be punished twice for the same crime.  *United*

*States v. Josephberg*, 459 F.3d 350, 355 (2d Cir. 2006) (per curiam).  Accordingly, "[i]f the jury

convicts on more than one multiplicitous count, the defendant's right not to suffer multiple

punishments for the same offense will be protected by having the court enter judgment on only

one of the multiplicitous counts." *Id.*  Similarly, where the judgment of conviction has already

been entered on multiplicitous counts, that right is protected by vacating the convictions on all but

one count.  *Id.*

The Second Circuit has clarified that District Courts should not rule on a motion to dismiss

a charge on multiplicity grounds until the time of sentencing.  *See id.* (vacating district court's

dismissal of count as multiplicitous prior to trial, as such a determination before trial is "at best premature"). Among other reasons, courts look to "the record as a whole in determining whether an indictment is in fact multiplicitous," and the record cannot be fully established until trial is complete. *United States v. McCourty*, 562 F.3d 458, 469 (2d Cir. 2009). Additionally, because double jeopardy is meant to protect a defendant from successive punishments for the same offense, a multiplicitous count does not violate the Clause unless and until sentence is imposed. *See Josephberg*, 459 F.3d at 355 ("Where there has been no prior conviction or acquittal, the Double Jeopardy Clause does not protect against simultaneous prosecutions for the same offense, so long as no more than one punishment is eventually imposed.").

Following the Second Circuit's directive, courts in this Circuit regularly defer ruling on a multiplicity motion until after the conclusion of trial. *See, e.g.*, *United States v. Halkbank*, No. 15 Cr. 867 (RMB), 2020 WL 5849512, at *9 (S.D.N.Y. Oct. 1, 2020) (denying pretrial motion to dismiss multiplicitous count and noting that "'[c]ourts in this Circuit have routinely denied pre-trial motions to dismiss potentially multiplicitous counts as premature.'" (quoting *United States v. Medina*, No. 13 Cr. 272 (PGG), 2014 WL 3057917, at *3 (S.D.N.Y. July 7, 2014))); *United States v. Dumitru*, No. 18 Cr. 243 (LAK), 2018 WL 3407703, at *1 (S.D.N.Y. June 26, 2018) (denying pretrial motion to dismiss multiplicitous count in light of "the Circuit's controlling view that the question of multiplicitousness is properly considered only at a later point in the proceedings"); *United States v. Mostafa*, 965 F. Supp. 2d 451, 464 (S.D.N.Y. 2013) ("[M]ultiplicity is properly addressed by the trial court at the sentencing stage."); *United States v. Ghavami,* No. 10 Cr. 1217 (KMW), 2012 WL 2878126, at *11 (S.D.N.Y. July 13, 2012) ("To the extent that the Indictment alleges more than one conspiracy . . . , Defendants' multiplicity challenge is premature. Should the jury convict Defendants on what the Court ultimately determines to be multiplicitous counts,

the Court will enter judgment on only one of the multiplicitous convictions." (citations omitted));
*United States v. Rivera*, No. 09 Cr. 619 (SJF), 2011 WL 1429125, at *4 (E.D.N.Y. Apr. 13, 2011)
("Since it is possible that the jury will convict defendants on only one (1) of the respective counts
that they allege are multiplicitous, and acquit defendants on all of the counts with which they allege
that count is multiplicitous, the issue of whether the counts are multiplicitous in violation of the
Double Jeopardy Clause is premature at the pretrial stage.").

### C.    Discussion

The defendant's motion to dismiss Counts One or Three of the Indictment as multiplicitous
is, at best, premature.  Consistent with the directive of the Second Circuit, this Court should defer
ruling on this motion until after the completion of trial.  The additional time will ensure that the
full factual record is developed before the Court conducts the multiplicity analysis, and the motion
may become moot depending on the jury's verdict.

First, the Court cannot conduct the multiplicity analysis before hearing all of the evidence
regarding the charges contained in the Indictment.  Prior to trial, the record will not be fully
developed, and the Court cannot conduct the necessary analysis to determine whether the counts
are in fact multiplicitous.  Consistent with the directive of the Second Circuit and the consistent
practice in this District, the Court should defer conducting any multiplicity analysis until after
hearing all of the evidence at trial.  *See Josephberg*, 459 F.3d at 355.

Second, the motion may become moot because it is possible that the jury could conclude
that the defendant is guilty of one of the charged conspiracies but not guilty of the other.  That is
because each charged conspiracy alleges that the defendant agreed to violate a different criminal
statute.  Count One alleges that the defendant agreed to transport minors with the intent that they
engage in illegal sex acts.  Count Three alleges that the defendant agreed to entice minors to travel

with the intent that they engage in illegal sex acts.  In other words, Count One requires proof of an agreement to transport, while Count Three requires proof of an agreement to entice.  Transportation does not necessarily require enticement, and likewise enticement to travel does not necessarily require transportation.  *See United States v. Griffith*, No. 99 Cr. 786 (HB), 2000 WL 1253265, at *4 (S.D.N.Y. Sept. 5, 2000) (denying post-trial motion to dismiss as multiplicitous 18 U.S.C. § 2422 transportation charge and 18 U.S.C. § 2423(a) enticement charge involving same alleged conduct and noting "[t]hat persuasion and transportation involve proof of different facts is hardly contentious").

Here, it is possible that the jury could conclude, after hearing all the evidence, that the defendant agreed to transport one or more minors interstate, but that she did not agree to entice minors to travel.  For example, the jury could theoretically conclude that although the defendant agreed to arrange transportation for a minor victim, the defendant herself did not agree to persuade or entice a minor victim to travel.  Likewise, the jury could theoretically conclude that the defendant agreed to entice, or encourage, one or more minors to travel interstate, but she did not agree to actually transport or assist in the transportation itself.  Although the Government expects to prove beyond a reasonable doubt that the defendant in fact agreed both to entice and to transport one or more minor victims, it is possible that the jury may reach a different conclusion.  Depending on the inferences the jury draws from the evidence presented at trial, it could convict on one conspiracy count while acquitting on the other, or it could conclude that the defendant agreed both to transport and to entice, in which case it could convict on both counts.  That possibility means that a motion to dismiss counts as multiplicitous is premature.  Because the Government has the discretion to present to the jury both the theory that the defendant agreed to transport and the theory that the defendant agreed to entice, the defense motion is premature.  *See Josephberg*, 459 F.3d at

355 ("It is well established that '[w]hether to prosecute and what charge to file or bring before a grand jury are decisions that generally rest in the prosecutor's discretion,' and 'a defendant has no constitutional right to elect which of two applicable federal statutes shall be the basis of his indictment and prosecution . . . .'" (brackets and ellipses in original) (quoting *United States v. Batchelder,* 442 U.S. 114, 124 (1979)).

Only after the Court has heard all of the evidence at trial and received the jury's verdict will the defense motion be ripe. Accordingly, the motion should be denied as premature.

## X.     The Defendant's Various Disclosure Motions Should be Denied

Maxwell's motions also include an assortment of requests for orders requiring the Government to make various disclosures, all of which are meritless or, at best, premature.

### A.     Bill of Particulars Is Not Warranted

First, the defendant moves for a bill of particulars, demanding the Government set out an array of details regarding the Government's theory of its case and anticipated witness testimony. The defendant, like all defendants, is entitled to sufficient information to understand the charges against her, to prepare a defense, and to protect against double jeopardy. However, the Government has provided such information, and much more, in the Indictment, extensive discovery, and various pretrial filings, including this memorandum. The defendant will also receive trial exhibits, a witness list, and Jencks Act material reasonably in advance of trial. As such, she has not established an entitlement to a bill of particulars under well-established governing law.

#### 1.     Applicable Law

The proper purpose of a bill of particulars under Federal Rule of Criminal Procedure 7(f) is "to provide defendant with information about the details of the charge against him if this is

*necessary* to the preparation of his defense, and to avoid prejudicial surprise at trial." *United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990), *abrogated on other grounds by United States v. Marcus*, 628 F.3d 36, 41 (2d Cir.2010) (emphasis added) (internal quotation mark omitted). Accordingly, "[a] bill of particulars is required 'only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused.'" *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999) (quoting *Torres*, 901 F.2d at 234); *see United States v. Mahabub*, No. 13 Cr. 908 (AJN), 2014 WL 4243657, at *2 (S.D.N.Y. Aug. 26, 2014).

In exercising its broad discretion to determine whether the charges are so general that they require supplementation through a bill of particulars, the Court should consider not just the text of the Indictment, but also discovery and other information supplied to the defendant to date. *See United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987); *see also, e.g.*, *Pierre-Louis*, 2018 WL 4043140, at *7 (denying request for bill of particulars where indictment charged sex trafficking conspiracy spanning two decades because indictment and discovery "would suggest that defendant has enough information to apprise him of the charges with enough precision to enable him to prepare a defense, avoid unfair surprise at trial, and preclude a second prosecution for the same offense"); *United States v. Block*, No. 16 Cr. 595 (JPO), 2017 WL 1608905, at *6-7 (S.D.N.Y. Apr. 28, 2017) (denying request for bill of particulars as to alleged fraud and unindicted co-conspirators where indictment sufficiently advised defendant of nature of charges against him and described with specificity acts he allegedly committed, nature of conspiracy, and explained in language closely tracking statute crimes alleged); *United States v. Monserrate*, No. 10 Cr. 965 (CM), 2011 WL 3480957, at *4 (S.D.N.Y. Aug. 4, 2011) (denying request for bill of particulars where discovery and indictment was "sufficient to apprise the defendant of the charge" and to allow him to prepare for trial); *United States v. Trippe*, 171 F. Supp. 2d 230, 240 (S.D.N.Y. 2001)

(denying bill of particulars request in stock fraud case where indictment was fifteen pages long and substantial discovery had been provided).

Although the Government cannot provide "mountains of documents to defense counsel" as a substitute for a bill of particulars where one would otherwise be required, *see Bortnovsky*, 820 F.2d at 575, the provision of voluminous discovery in combination with some guidance about what is most relevant can vitiate a need for further particulars, *see, e.g.*, *United States v. Mandell*, 710 F. Supp. 2d 368, 385 (S.D.N.Y. 2010) (denying request for particularization of alleged misrepresentations where the indictment was thirty-four pages long and Government had provided voluminous, organized discovery). In no event should volume of discovery alone warrant a bill of particulars; "[w]hile [a] [c]ourt may sympathize with counsel's task of reviewing a large quantity of materials that continue to be produced," that concern is addressed by granting the defense sufficient time in which to conduct the review in advance of trial. *See United States v. Levy*, No. 11 Cr. 62 (PAC), 2013 WL 664712, at *13 (S.D.N.Y. Feb. 25, 2013).

A bill of particulars would undoubtedly be helpful to the defense in any case. But "the law does not impose upon the Government an obligation to preview its case or expose its legal theories," *United States v. Leonelli*, 428 F. Supp. 880, 882 (S.D.N.Y. 1977), and therefore "[t]he ultimate test must be whether the information sought is *necessary*, not whether it is helpful." *United States v. Mitlof*, 165 F. Supp. 2d 558, 569 (S.D.N.Y. 2001) (emphasis added); *Mahabub*, 2014 WL 4243657, at *2 ("The purpose of a bill of particulars is to ensure that a defendant has the information necessary to prepare a defense, not to turn over all information that would aid the defendant."); *United States v. Rittweger*, 259 F. Supp. 2d 275, 292-93 (S.D.N.Y. 2003) (denying bill of particulars request as "'an impermissible attempt to compel the Government to provide the

evidentiary details of its case'" (quoting *United States v. Biaggi*, 675 F. Supp. 790, 810 (S.D.N.Y. 1987)).

A bill of particulars should not be misused to compel the Government to disclose "the manner in which it will attempt to prove the charges, the precise manner in which the defendant committed the crime charged, or a preview of the Government's evidence or legal theories." *Mitlof*, 165 F. Supp. 2d at 569; *see also Torres*, 901 F.2d at 234 ("'Acquisition of evidentiary detail is not the function of the bill of particulars.'" (quoting *Hemphill v. United States*, 392 F.2d 45, 49 (8th Cir. 1968))).  The "'wheres, whens and with whoms'" are "beyond the scope of a bill of particulars."  *Mitlof*, 165 F. Supp. 2d at 569 (citing *Torres*, 901 F.2d at 233-34; *Jimenez*, 824 F. Supp. 351, 363 (S.D.N.Y. 1993)); *see also, e.g.*, *United States v. D'Amico*, 734 F. Supp. 2d 321, 335 (S.D.N.Y. 2010) ("'A bill of particulars is not a general investigative tool, a discovery device or a means to compel the government to disclose evidence or witnesses to be offered prior to trial.'" (quoting *United States v. Gibson*, 175 F. Supp. 2d 532, 537 (S.D.N.Y. 2001))); *United States v. Bellomo*, 263 F. Supp. 2d 561, 580 (E.D.N.Y. 2003) ("A bill of particulars is not designed to: obtain the government's evidence; restrict the government's evidence prior to trial; assist the defendant's investigation; obtain the precise way in which the government intends to prove its case; interpret its evidence for the defendant, or disclose its legal theory."); *United States v. Henry*, 861 F. Supp. 1190, 1197 (S.D.N.Y. 1994) ("This instrument should not function to disclose evidence, witnesses, and legal theories to be offered by the Government at trial or as a general investigative tool for the defense.").

There are good reasons why bills of particulars are warranted only where the allegations in the indictment, as supplemented by discovery and other disclosures, are so general as to render it impossible to prepare a defense.  Because "a bill of particulars confines the Government's proof

to particulars furnished," it can "restrict unduly the Government's ability to present its case." *Henry*, 861 F. Supp. at 1197; *see also Mitlof*, 2014 WL 4243657, at *2 (recognizing that "care must be taken" because "[t]he government's presentation of evidence at trial is limited to the particulars contained in the bill"); *United States v. Samsonov*, No. 07 Cr. 1198 (CM), 2009 WL 176721, at *3 (S.D.N.Y. Jan. 23, 2009) ("The vehicle of a bill of particulars serves to inform a defendant of the nature of the charge, when he is otherwise insufficiently informed, and must not be misused to compel disclosure of how much the Government can prove, nor to foreclose the Government from using proof it may develop as the trial approaches."). Moreover, where the Government's provision of particulars is tantamount to an itemized preview of its proof, it creates the very real danger that a defendant will "tailor her testimony to explain away the Government's case." *Henry*, 861 F. Supp. at 1197. These concerns animate the rule that "if the defendant has been given adequate notice of the charges against her and can prepare fully for trial with reasonably diligent efforts, the Government cannot be required to disclose additional details about its case." *Id.*

## 2.    Discussion

There is no basis for a bill of particulars in this case. The charges against the defendant are clear from the face of the Indictment, which provides significant detail regarding the charged crimes. As is apparent from the 18-page Indictment, the charges concern the defendant's participation in conspiracies to transport and entice minor girls to travel with the intent that they engage in illegal sex acts with Jeffrey Epstein from 1994 through 1997, and the defendant's attempt to cover up that conduct during her civil deposition testimony in 2016. Specifically, the Indictment makes plain that the defendant is charged with engaging in a conspiracy to transport minor girls with intent that they engage in sexual activity with Epstein, engaging in a conspiracy to entice

minor girls to travel with the intent that they engage in sexual activity with Epstein, aiding and abetting the transportation and enticement of a particular minor girl interstate for the purpose of engaging in sex acts with Epstein, and lying about those same crimes during her 2016 civil deposition testimony.  The charged time periods are made plain in each count, as is the statute she is accused of violating.

The speaking Indictment in this case goes above and beyond a mere recitation of the elements of each offense by detailing the defendant's specific role in the crimes charged.  Among other things, it specifies three minor victims in particular and describes the steps the defendant took with respect to each as part of the charged crimes.  *See, e.g.,* Indictment ¶ 7.  Additionally, the Indictment details the types of sex acts that Epstein committed with the minor victims as part of the charged crimes and the locations where those acts occurred.  *See, e.g., id.* ¶ 5-6.  In this way, the Indictment makes clear the Government's theory that the defendant groomed three minor girls to engage in sex acts in Florida, New Mexico, New York, and London with Epstein between 1994 and 1997.  The Indictment further specifies during which portion of that period each of those three victims interacted with the defendant and Epstein as minors.  *See id.* ¶ 7.  Additionally, the Indictment identifies the precise answers that the Government alleges constituted perjury, and alleges facts, in the earlier portions of the Indictment, that indicate how and why the Government will seek to prove the answers were false.  *Compare id.* ¶¶ 21, 23 *with id.* ¶¶ 1-11.  Simply put, this is not a case in which the allegations in the Indictment "are so general that they do not advise the defendant of the specific acts of which he is accused." *Walsh*, 194 F.3d at 47 (internal quotation mark omitted) (quoting *Torres*, 901 F.2d at 234).  Thus, the Indictment itself provides a sufficient basis to deny the defendant's motion in its entirety.  *See, e.g.*, *United States v. Bonventre*, 646 F App'x 73, 79 (2d Cir. 2016) ("'[E]videntiary detail is not the function of the bill of particulars.'

Particulars are necessary only where indictment charges are 'so general that they do not advise the defendant of the specific acts of which he is accused.'" (internal citation omitted) (quoting *Torres*, 901 F.2d at 234; *United States v. Chen*, 378 F.3d 151, 163 (2d Cir. 2004))); *United States v. Wedd*, No. 15 Cr. 616 (KBF), 2016 WL 1055737, at *3 (S.D.N.Y. Mar. 10, 2016) (denying motion for bill of particulars where "the Indictment is a 'speaking' Indictment that provides a significant amount of detail as to the Government's theory of the case and the nature of the proof that will underlie the charges at trial").

Additional particularity relating to the details of the counts in the Indictment might be helpful for the defendant, but that is both true in every case and not the appropriate standard. Instead, the inquiry is properly focused on whether the information already available to her is so general that a bill of particulars is *necessary* to the preparation of her defense. Plainly it is not. In addition to the speaking Indictment, the defendant has received over 2.7 million pages of discovery in this case. Although that is a high volume of discovery, it is clear from the defense's own motion that the defense has apparently already reviewed that material (at least in significant part), identified relevant materials therein, and is aware of their relevance to the allegations in the Indictment. (*See, e.g.*, Def. Mot. 10 at 6). Indeed, much of the discovery is text searchable, and the time period that each document relates to is readily ascertainable.

In this vein, the defendant has received



---

[61] Records of commercial flights were unavailable by the time the Government opened its investigation in this case. Accordingly, the Government has no records of commercial flights that the defendant, Epstein, or any victims may have taken during the relevant period.



and the Government has provided the defense with the birth month and year of each minor victim.[62]

In other words, as the Government has previously indicated, the discovery provides the defendant with more than sufficient information about the three minor victims to permit her to prepare for trial. The discovery also provides the defense the ability to identify specific private plane flights that are relevant to the Indictment. Any remaining detail regarding the specifics of abuse, particular interactions, and additional trips will come from witness testimony. As is to be expected when describing events more than two decades in the past, that testimony will provide approximate time periods when events occurred, rather than specific dates. Given the information the defendant already has from the discovery, the Indictment, and the Government's court filings (including this memorandum), any additional detail would essentially serve as early Jencks Act production, allowing the defendant to tailor any testimony to the Government's case. The discovery gives the defense ample information to assist in its investigation, and given the defense's

---

[62] In this memorandum, the Government has also clarified that Minor Victim-3 was 17 years old at the time of the events described in the Indictment involving her. *See* Section VIII, *supra*.

apparent ability to understand who the three victims are from the productions, there is no real concern that the defense will waste efforts conducting any such investigation before receiving Jencks Act material.[63]

Moreover, with respect to the perjury counts, to the extent there could plausibly be any remaining ambiguity about the nature of the charges, the Government has addressed and resolved such ambiguity in responding to the instant motions.  In this memorandum, the Government has summarized how the defendant's false statements during her deposition were material to the pending civil litigation.  *See* Section V, *supra*.  Perhaps more importantly, the defendant personally participated in that civil litigation, and she is undoubtedly quite familiar with it.

Together, the discovery productions, briefing in which the Government has described aspects of its evidence and theory (*see, e.g.*, Government Memorandum in Opposition to Renewed Bail Motion, Dec. 18, 2020, Dkt. No. 100, at 8-12), the contents of this memorandum, and the details contained in the Indictment more than adequately inform the defendant of the charges against her.  This is simply not a case where the "relevance of key events [are] shrouded in mystery."  *See Bortnovsky*, 820 F.2d at 574.  Accordingly, the Court should deny the motion for a bill of particulars.

**B.    The Defendant's Requests for Early Production of a Witness List and Jencks Act Material Should Be Denied**

**1.    Applicable Law**

Federal Rule of Criminal Procedure 16 "does not require the Government to furnish the names and addresses of its witnesses in general."  *United States v. Bejasa*, 904 F.2d 137, 139 (2d

---

[63] Although the victims' identities are clear from the discovery, and the defendant's motion makes clear that she strongly suspects their identities, there is no basis to require the Government to turn over the names of its witnesses, including its victim-witnesses in advance of its Jencks Act production, which is customary in this District.  *See* Section X.B., *infra*.

Cir. 1990). Thus, "'[i]n the absence of a specific showing that disclosure [of a witness list] [is] both material to the preparation of [the] defense and reasonable in light of the circumstances surrounding [the] case,' the request for a witness list should be denied." *United States v. Russo*, 483 F. Supp. 2d 301, 309 (S.D.N.Y. 2007) (quoting *Bejasa*, 904 F.2d at 139-40). "Courts in the Second Circuit typically deny motions for the early disclosure of witness lists where, as here, Defendants have not made a specific showing of need." *United States v. Rivera*, No. 16 Cr. 175 (LGS), 2017 WL 1843302, at *2 (S.D.N.Y. May 8, 2017). The claim that "given the complexity of the case, disclosure of the government witness list will level the playing field" amounts to an "abstract statement of need" that does not justify provision of a witness list. *Russo*, 483 F. Supp. 2d at 309.

The Jencks Act, 18 U.S.C. § 3500, covers disclosure of statements or reports made by Government witnesses, and the rule mandates that such materials not be the subject of discovery or inspection "until said witness has testified on direct examination in the trial of the case." 18 U.S.C. § 3500(a); *see also United States v. Coppa*, 267 F.3d 132, 145 (2d Cir. 2001) ("[T]he Jencks Act prohibits a District Court from ordering the pretrial disclosure of witness statements."); *United States v. Thompson*, No. 13 Cr. 378 (AJN), 2013 WL 6246489, at *9 (S.D.N.Y. Dec. 3, 2013) (denying request for early production of Jencks Act material in light of *Coppa*).

Typically in this District, and as is the case here, the Government confirms that it will produce 3500 material and *Giglio* (or impeachment) material reasonably in advance of trial, and will engage in good faith discussions with the defense regarding a schedule for pretrial disclosures. *See United States v. Sergentakis*, No. 05 Cr. 230 (JFK), 2005 WL 1994014, at *1-2 (S.D.N.Y. Aug. 17, 2005) ("18 U.S.C. § 3500(b) calls for production of Government witness statements after the witness 'has testified on direct examination.' The Government response . . . that '[c]onsistent

with the regular practice in this District, the Government intends to make Section 3500 material available to the defense at the same time as impeachment material, [and that] in order to avoid any delay in the trial, the Government will produce such material sufficiently in advance of each Government witness's testimony' . . . is more than adequate."); *United States v. Gallo*, No. 98 Cr. 338 (JGK), 1999 WL 9848, at *8 (S.D.N.Y. Jan. 11, 1999) ("[T]he Government has indicated that it is aware of its obligations under *Giglio* . . . and the Jencks Act and that it will provide the required information to the defendants in accordance with its responsibilities under *Giglio* and the Jencks Act sufficiently in advance of each witness's testimony to allow adequate time to prepare for cross-examination.  These representations are sufficient.").

## 2.    Discussion

Trial is still more than four months away.  The degree of complexity to this case, and the volume of discovery, is on par with other recent high-profile trials in this District, and in those cases witnesses have typically been disclosed approximately three to four weeks before trial.  *E.g.*, *Gatto*, 17 Cr. 686 (LAK); *Blaszczak*, 17 Cr. 357 (LAK); *Skelos*, 15 Cr. 317 (KMW); *Silver*, 15 Cr. 93 (VEC); *Ulbricht*, 14 Cr. 68 (KBF).  As the Government has noted for some time now, the Government intends to match or even go above and beyond that practice in this case.  Specifically, the Government has offered repeatedly to provide non-testifying witness statements to the defense as much as eight weeks before trial, thereby allowing extra time for the defense to determine whether it wishes to call any of the witnesses the Government does not intend to present at trial, and to provide testifying witness statements and *Giglio* material as much as four weeks in advance of trial.  Given that the defense has already been able to initiate its investigation of the charges, and given that the discovery makes clear who the three minor victims are, eight weeks should be ample time to review non-testifying witness statements, and four weeks is more than enough time

to review the statements of testifying witnesses.  The Government remains open to engaging in good faith discussions with the defense to mutually agree on a schedule for reciprocal pretrial disclosures.[64]  Accordingly, the motion for a witness list and early production of Jencks Act material should be denied.

### C.   The Defendant's Additional Requests for Disclosure Should Be Denied

The defendant also makes a variety of motions seeking disclosures to which she is not entitled, all of which should be denied.



*First*, the defendant requests ███████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████, which the defense attached to their motion as Exhibit B.  (Def. Mot. 10 at 7-8).  The defense assumes that because █████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████ thereby, according to the defense, rendering any record of those interviews exculpatory.  But that defense theory rests on a faulty premise.  The Government has reviewed the document memorializing ███████████████████████████ and confirmed that it *inculpates* the defendant and contains nothing exculpatory.  The Government has also reviewed ████████████████████████████████████ and confirmed that it also *inculpates* the defendant.  The Government has, however, identified a single line in ████████████████████████ that could arguably be considered helpful to the defense.[65]  With the possible exception of that one line, there is nothing exculpatory contained

---

[64] The Government has requested reciprocal discovery from the defendant and, to date, she has produced nothing.

[65] In particular, ████████████████████████████████████████████████████
███████████████████████████████████████████████████████████

in ███████████████████████████████████████.   Accordingly, the records of

these interviews constitute witness statements covered by the Jencks Act and are not subject to

disclosure by statute until after each witness has completed direct examination at trial.  *See* 18

U.S.C. § 3500.  As noted above, however, the Government fully intends to provide all Jencks Act

material of both testifying and non-testifying witnesses, which will of course include the records

relating to these interviews, to the defense multiple weeks in advance of trial.  The Government

respectfully submits that is sufficient to meet its obligations with respect to these documents, and

the defendant's motion for their immediate disclosure should be denied.

*Second*, the defendant's request for an unredacted copy of the FBI report attached to the

Defense Motion as Exhibit C should be denied as moot because the Government has already

produced an unredacted copy of that report to the defense.  (Def. Mot. 10 at 8-9).  Specifically, the

document was produced *without* redactions under bates numbers SDNY_GM_00380550 through

SDNY_GM_00380554 as part of the Government's discovery production dated November 9,

2020.[66]  This motion should accordingly be denied as moot.

*Third*, the defendant's request for unredacted copies of the FBI report regarding ████████

██████████████████████████ is based purely on her speculation that the redacted portions

of those materials contain exculpatory information.  (Def. Mot. 10 at 8-9).  Once again, the



████████.  Out of an abundance of caution, today the Government has informed defense counsel
of this single line ███████████████████████████████████████████████████████

---

[66] Notably, the unredacted report does *not* contain ████████████████████████████
██████████ demonstrating that defense counsel's speculation about
supposed *Brady* material lurking beneath redactions is inaccurate.  The redacted copy defense
counsel attached as Exhibit C was recovered during the execution of a search warrant for one of
Epstein's devices and was produced to defense counsel in the form in which it was recovered from
the device.  In other words, defense counsel has received two copies of this same document: the
redacted version that Epstein had on one of his devices, and the unredacted version from the FBI's
files.

Government has reviewed the full report and confirmed that there is nothing exculpatory contained therein.  To the contrary, the report *inculpates* the defendant.  Accordingly, the defendant is not entitled to its immediate disclosure.  The Government will produce an unredacted version of this document together with all other witness statements in advance of trial.[67]

*Fourth*, the defense requests production of pages from a personal diary that is in the custody of a civilian third party and is not in the custody or control of the Government.  (Def. Mot. 10 at 10).  Leaving aside the fact that the defense cites no authority for the proposition that the Government has an obligation to obtain the personal papers of a third party, *see United States v. Collins*, 409 F. Supp. 3d 228, 239 (S.D.N.Y. 2019) ("The Government's '*Brady* obligations extend only to materials within prosecutors' possession, custody or control or, in appropriate cases, that of the Department of Justice, perhaps another part of the Executive Branch, or a comparable state authority involved in the federal prosecution.'" (quoting *United States v. Blaszczak*, 308 F. Supp. 3d 736, 742 (S.D.N.Y. 2018))), the Government has already represented that it has asked the third party at issue about the materials the defendant purports to seek and that no such materials exist. In particular, to the extent the defense is concerned with whether there are diary entries from the spring of 1996, the Government has already indicated in response to the defendant's second bail motion that it is aware of none.  (*See* Dkt. No. 100 at 11 n. 2 ("Because this victim stopped writing in her journal about a month after that first meeting with Epstein, there are no entries regarding the subsequent trip she took months later to visit Epstein, during which she met the defendant.  This victim provided the Government with copies of her journal entries relating to Epstein and informed the Government that the remaining entries are personal in nature and have nothing to do with

---

[67] As is the case with the other redacted document referenced in this motion, the redacted copy defense counsel attached as Exhibit D was recovered during the execution of a search warrant for one of Epstein's devices and was produced to defense counsel in the form in which it was recovered from the device.

Epstein or the defendant.")).  In other words, the defendant again seeks supposedly exculpatory evidence that does not exist.  The defendant offers no basis on which to conclude that this representation is false or that any such evidence does in fact exist.  As such, this motion should be denied.

*Fifth*, the defendant asks this Court, again without citing any legal authority, to order the Government to produce copies of *all* subpoenas it has issued for the defendant's records as part of its investigation in this case.  (Def. Mot. 10 at 11).  This incredibly broad request is nothing more than a fishing expedition inappropriately seeking the details of investigative requests made through the grand jury process.  The defense has cited no legal basis for the Court to direct the Government to provide the defense with copies of the subpoenas themselves (as opposed to records or other materials received in response to such subpoenas), let alone *every subpoena* issued for the defendant's records during a multi-year and ongoing grand jury investigation.  The types of requests issued by the grand jury have no conceivable bearing on the defense or on any motion the defense may seek to bring.  The Government has already produced to the defense all discoverable material that it has received in response to subpoenas issued to date during this investigation.  In the absence of any legal authority justifying this request, it should be denied.  Additionally, for the reasons discussed above in Sections I and IV, the defendant is not entitled to discovery or a hearing relating to her motion to dismiss the Indictment based on the NPA or her motion to suppress subpoena returns.

*Sixth*, the defendant asks the Court to direct the Government to immediately disclose any *Brady* and *Giglio* material.  (Def. Mot. 10 at 11-13).  The motion for disclosure of *Brady* material should be denied as moot because the Government has conducted a search for any such material and has already disclosed any potentially exculpatory information in its possession of which it is

aware, consistent with the Rule 5(f) *Brady* order previously issued by the Court in this case.  *See* Fed. R. Crim. P. 5(f); Dkt. No. 68.  The Government recognizes its continuing obligation to disclose any *Brady* material, and to make a diligent search for any relevant material that may be in the possession of the prosecution team, including investigating agents and officers.  As the Government has already emphasized in this case, the Government takes its disclosure obligations very seriously and has committed to being transparent with the Court and the defense regarding its approach to obtaining and reviewing files, including other agency files, that may be relevant to this case.  (*See, e.g.,* Gov't Letter dated October 7, 2020, Dkt. No. 63).  Consistent with that commitment, the Government has completed an initial review of its files for *Brady* material and Rule 16 material and has produced more than 2.7 million pages of discovery as a result of that review.  These productions have included specific disclosures of certain witness statements that may arguably be exculpatory.  The Government also intends to produce all statements and potential impeachment material in its possession regarding any potential witness identified during its investigation, including those individuals whom the Government does not intend to call at trial.  As discussed below, the Government is in the process of reviewing all files in its possession for potential impeachment material.  The Government remains cognizant of its *Brady* obligations and will promptly produce any potentially exculpatory material if any is identified during that review.

The Government is not currently aware of any undisclosed *Brady* material in its possession, but it will certainly provide timely disclosure of any additional *Brady* material if any such material comes to light.  Courts in this Circuit routinely deny specific requests for *Brady* material where, as here, the Government has made a good-faith representation to the court and defense counsel that it recognizes and has complied with its disclosure obligations under *Brady*.  *See, e.g.*, *Thompson*, 2013 WL 6246489 at *9 ("In light of the Government's 'good-faith representation to

the court and defense counsel that it recognizes and has complied with its disclosure obligations under *Brady*,' defendants' request for immediate or otherwise early production of *Brady* materials is denied." (internal citation omitted) (quoting *United States v. Perez,* 940 F. Supp. 540, 553 (S.D.N.Y.1996))); *Gallo*, 1999 WL 9848, at *8 (denying defendant's motion to compel production of purported *Brady* material based on Government's representations that "it is aware of its obligations under *Brady* . . . and will produce any *Brady* material to the defense well before trial"); *United States v. Campo Flores*, No. 15 Cr. 765 (PAC), 2016 WL 5946472, at *11 (S.D.N.Y. Oct. 12, 2016) ("The Government represents that it is aware of its obligation under *Brady*; that it has complied; and will continue to comply.  That is sufficient to deny Defendants' motion for *Brady* relief." (internal citations omitted)).  Given the Government's extensive efforts to review its files for any material warranting disclosure, and its commitment to continue meeting its disclosure obligations, the motion should be denied.

For similar reasons, the motion for disclosure of *Giglio* material should be denied as premature.  The Government is fully aware of its obligation to disclose impeachment material, is in the process of reviewing all files in its possession for any such material, and will produce any such material several weeks in advance of trial.  As noted above, that is consistent with governing law in this Circuit, and the defendant cites no authority for the proposition that she is entitled to such material as much as four months in advance of trial.  Courts in this Circuit have repeatedly refused to compel disclosure of impeachment or *Giglio* material well in advance of trial, and the defense has provided no particularized basis for even earlier disclosure here.  *See United States v. Nixon*, 418 U.S. 683, 701 (1974) ("Generally, the need for evidence to impeach witnesses is insufficient to require its production in advance of trial."); *Campo Flores*, 2016 WL 5946472, at *11 ("The Government has represented that it will make impeachment material relating to its

anticipated witnesses available . . . ten days before trial. There is no need to depart from the customary rule in this district of disclosure shortly before trial."); *United States v. Seabrook*, No. 10 Cr. 87 (DAB), 2010 WL 5174353, at *4 (S.D.N.Y. Dec. 14, 2010) ("The Government represents to the Court that it is aware of its *Brady, Giglio,* Jencks Act, and 404(b) obligations and will comply with them in a timely fashion, as appropriate. Based on the Government's representations, and on the current posture of this case, the Court expects that the Government will comply timely with all of its obligations under *Brady, Giglio,* the Jencks Act, and Rule 404(b), and does not find a need to order compliance at this time." (internal citation omitted)); *Russo*, 483 F. Supp. 2d at 308 ("Here the government has represented that it intends to produce *Giglio* material no later than the Friday of the week before a witness is scheduled to testify at trial, in accordance with its usual practice. To the extent that the government's disclosure in this case proves unusually voluminous or complex, the government has in good-faith represented that it intends to produce *Giglio* material sufficiently in advance of their witnesses' testimony so as to avoid any delay in trial. At the time of those disclosures, to the extent that Defendants feel that additional time is necessary given the volume or complexity of the materials provided, the Court will consider applications to continue or recall witnesses. It is unnecessary, however, to order early disclosure at this time."); *United States v. Canter*, 338 F. Supp. 2d 460, 461-62 (S.D.N.Y. 2004) (denying analogous motion and noting that "[i]t has been the practice of this Court and of other courts in this district to require that the Government produce these materials a few days before the start of trial"). Because the Government has committed to providing the defense with *Giglio* material multiple weeks in advance of trial, which is ample time for the defense to prepare its cross-examination of the Government's witnesses, this motion should be denied.

*Seventh*, the defendant seeks a proffer of all co-conspirator statements that the Government intends to offer at trial pursuant to Federal Rule of Evidence 801(d)(2)(E).  (Def. Mot. 10 at 13-14).  In making this motion, the defense cites authority confirming that co-conspirator statements may be admitted at trial on a conditional basis without the need for any pretrial consideration of their admissibility.  *See United States v. Tracy*, 12 F.3d 1186, 1199 (2d Cir. 1993) ("The decision as to whether the four prerequisites have been met, like all other preliminary questions of admissibility, is to be made by the court.  If the government succeeds in persuading the court that the conditionally admitted coconspirator statements were made during and in furtherance of a conspiracy of which both the declarant and the defendant were members, the statements are allowed to go to the jury.  If the court is not so persuaded, it either should instruct the jury to disregard the statements, or, if those statements were 'so large a proportion of the proof as to render a cautionary instruction of doubtful utility,' should declare a mistrial." (internal citations omitted) (quoting *United States v. Geaney,* 417 F.2d 1116, 1120 (2d Cir. 1969))).  Indeed, the Second Circuit has rejected the suggestion that non-exculpatory co-conspirator statements are discoverable under Rule 16 or by any means other than the Jencks Act.  *See In re U.S.*, 834 F.2d 283, 284-87 (2d Cir. 1987) (issuing a writ of mandamus reversing District Court's order directing the Government "to produce all oral statement made by the defendants and coconspirators that the Government planned to offer at trial as admissions of a defendant" under Fed. R. Evid. 801).  Consistent with the Government's intention to produce Jencks Act material several weeks in advance of trial, the defense will receive notice of any co-conspirator statements that the Government may seek to introduce through witness statements with sufficient time to raise any objections with the Court.  Accordingly, this motion should be denied

*Finally*, the defendant requests early disclosure of Rule 404(b) material that the Government may seek to introduce at trial. (Def. Mot. 10 at 17). As is customary in this district, the Government will provide notice to the defense of its intent to use any such evidence at least 45 days in advance of trial, which will leave sufficient time for the defense may file any motions *in limine* to be considered at the final pretrial conference. *See Thompson*, 2013 WL 6246489 at *9 ("The Government has represented that it will disclose the substance of [the 404(b) evidence it intends to introduce at trial] . . . in a timely fashion in order to permit the defendants the opportunity to challenge admission and to permit the Court to make an appropriate finding. This is all that Rule 404(b) requires." (alterations in original) (internal citation omitted)); *United States v. Tranquillo*, 606 F. Supp. 2d 370, 383 (S.D.N.Y. 2009) ("The Government has indicated that it will make the required disclosure two weeks prior to trial, a practice that typically comports with Rule 404(b)); *United States v. Fennell*, 496 F. Supp. 2d 279, 284 (S.D.N.Y. 2007) ("The government has in good faith noted its obligations under Rule 404(b), and indicated that it intends to provide notice of the 404(b) evidence it intends to introduce two weeks before the beginning of trial. There is therefore no need to issue the order Defendant seeks."). Accordingly, this motion should be denied.

## XI.    The Use of a Grand Jury Siting in White Plains Was Entirely Proper

On June 29, 2020, amidst a global pandemic that suspended grand juries across the country, the Government sought and obtained an indictment from a grand jury of the Southern District of New York (the "Southern District" or "SDNY") sitting in White Plains. The defendant now challenges the pool from which that grand jury was drawn, alleging that it does not reflect a "fair-cross section of the community," and moves to dismiss the Indictment under the Sixth Amendment. (Def. Mot. 9 at 1). As set forth below, the defendant's arguments rely on faulty

premises, and at any rate fail to meet the elements of a claim under the Sixth Amendment. Therefore, the defendant's motion must be denied.

### A.    Background

####     1.    The SDNY and Local Rules for the Division of Business

The defendant's brief repeatedly uses the term "Division" to describe a "White Plains Division" and a "Manhattan Division."   (*See, e.g.*, Def. Mot. 9 at 2 ("On June 29, 2020, the government filed a sealed indictment of Ms. Maxwell in the Manhattan Division of this Court. The government has conceded that Ms. Maxwell's indictment was obtained using a grand jury seated in White Plains, apparently with jurors drawn exclusively from the White Plains Division.")).  Her use of the term "division" is imprecise and attributes legal significance where there is none. Understanding how that is so requires some background.

District courts in each state in the United States are prescribed by statute.  United States district courts in New York State are divided between four districts: Northern, Southern, Eastern and Western.  28 U.S.C. § 112.  While certain districts in other states are further divided into "divisions" by statute, *see, e.g.*, *id.* § 81 (dividing Alabama into three "districts" and multiple "divisions" within each district), the federal districts in New York State are not so divided.  That is, in the Southern District, no "divisions" have been created by statute.  *Id.* § 112(b).  The statute provides only that "Court for the Southern District shall be held at New York, White Plains, and in the Middletown-Wallkill area of Orange County or such nearby location as may be deemed appropriate."  *Id.*

In the Southern District, the only authority determining whether particular cases are heard in the Manhattan or White Plains courthouse is the SDNY Business Division Rules.  These rules begin with an important preface: they "shall not be deemed to vest any rights in litigants . . . ."

SDNY Business Division Rules, *available at https://www.nysd.uscourts.gov/sites/default/files/ local_rules/ rules-2018-10-29.pdf*. Moreover, the Rules do not describe—much less limit—what matters may be heard by what grand jury. *Cf.* SDNY Business Division Rule 6 (describing proceedings *after* an indictment has been returned). Rather, the Rules provide only that *once an indictment is returned*, "[t]he U.S. attorney designates on the criminal cover sheet that the case is to be assigned to White Plains if the crime was allegedly committed in whole or in predominant part in the Northern Counties." SDNY Business Division Rule 18(b)). Furthermore, the Rules specifically contemplate that cases may be reassigned from one courthouse to another. SDNY Business Division Rule 19. Consistent with these Rules, it is common for cases to be indicted by grand juries sitting in the White Plains courthouse and tried in the Manhattan courthouse. *See, e.g.*, *United States v. Israel*, 05 Cr. 1039 (CM), Dkt. No. 25; *United States v. Cromitie, et al.*, 09 Cr. 558 (CM), Dkt. No. 183, 200; *United States v. Annabi*, 10 Cr. 07 (CM), Dkt. No. 45; *United States v. Arici*, 12 Cr. 24 (LAP), Dkt. No. 115, 117; *United States v. Reeves, et al.*, 16 Cr. 372 (VEC), Dkt. No. 51; *United States v. Guerrier*, 18 Cr. 284 (JSR), Dkt. No. 98.

## 2. The SDNY Jury Plan

The Jury Selection and Service Act of 1968, 28 U.S.C. § 1861 *et seq.* (the "JSSA"), provides the structure for the selection of juries in federal district courts. The JSSA requires each district to "devise and place into operation a written plan for random selection of grand and petit jurors . . . ." 28 U.S.C. § 1863(a). Each district in New York selects grand and petit juries pursuant to a plan adopted by the judges of the district and approved by the Judicial Conference of the Second Circuit. *Id.*; *see also United States v. Bahna*, 68 F.3d 19, 23 (2d Cir. 1995). The plan for the Southern District has been in place since February 2009. *See* Amended Plan for the Random Selection of Grand and Petit Jurors in the Southern District of New York, *available at*

*https://www.nysd.uscourts.gov/sites/default/files/pdf/juryplan_feb_2009.pdf* (the "SDNY Jury Plan," or the "Plan").

Under the terms of the SDNY Jury Plan, the initial selection of persons to be considered for service as grand and petit jurors are made at random from voter registration lists. SDNY Jury Plan at Art. III.A. Two Master Jury Wheels are constructed from these lists: one for the Manhattan courthouse and one for the White Plains courthouse. *Id.* at Art. III.B. The Manhattan Master Jury Wheel draws from voter lists from the following counties: New York, Bronx, Westchester, Putnam, and Rockland. *See id.* at Art. III.C. The White Plains Master Jury Wheel draws from voter lists from the following counties: Westchester, Putnam, Rockland, Orange, Sullivan, and Dutchess. *See id.* Both Master Jury Wheels are emptied and refilled no later than September 1 following the date of each Presidential Election. *Id.* at Art. III.B.

To meet anticipated demand for jurors, names are drawn randomly from the Master Jury Wheels. *Id.* at Art. III.D. These individuals are sent a questionnaire to examine their qualifications and availability for jury service. *Id.* Pursuant to 28 U.S.C. § 1865(b), all persons are qualified for jury service unless he or she:

> (1) Is not a citizen of the United States at least eighteen years old who has resided for a period of one year within the judicial district;
>
> (2) Is unable to read, write, and understand English with a degree of proficiency sufficient to fill out the juror qualification questionnaire;
>
> (3) Is unable to speak English;
>
> (4) Is incapable, by mental or physical infirmity, to render satisfactory jury service; or
>
> (5) Has a charge pending for the commission of, or has been convicted in a State or Federal court, of a felony and his or her civil rights have not been restored.

*Id.* at Art. VII. Additionally, certain persons are declared exempt from jury service, including active service members in the Armed Forces of the United States, members of fire or police

departments, and public officers in the executive, legislative, or judicial branches of the State or

Federal Government who are actively engaged in the performance of official duties.  *Id.* at Art. V;

28 U.S.C. § 1863(b)(6).  Finally, because jury service for certain groups of individuals would

"entail undue hardship or extreme inconvenience," those individuals are excused or deferred upon

individual request.  SDNY Jury Plan at Art. VI.  These groups include:

> (1) Persons over 70 years of age;
>
> (2) Persons having legal custody and active daily care of a child under the age of 12, or who are essential to the daily care of aged or infirm persons;
>
> (3) Persons who have satisfactorily served as grand or petit jurors in a State or Federal court within the last four years;
>
> (4) Volunteer safety personnel; and
>
> (5) Persons as to whom a judge finds, for any other reason, that jury service would constitute an undue hardship and extreme inconvenience.

*Id.*

The names of individuals who are determined to be qualified to serve as jurors, and are not

"exempt, excused, or deferred," comprise the Qualified Jury Wheels—one for service at the

Manhattan courthouse and one for service at the White Plains courthouse.  *Id.*, Art. IV.A-B.  When

jurors are needed, names are drawn randomly from the Qualified Jury Wheels, and summonses are

sent to those whose names are drawn.  *Id.*, Art. IV.C.  After being summoned, these individuals

are randomly assigned to jury panels as needed, for individual trials and grand juries at the

courthouse corresponding to the Qualified Wheel from which they were drawn.  *Id.*

## B.   Applicable Law

"The Sixth Amendment guarantees a criminal defendant a jury selected from a fair cross

section of the community."  *United States v. Rioux*, 97 F.3d 648, 654 (2d Cir. 1996).  In *Duren v.*

*Missouri*, the Supreme Court articulated a three part test that defendants must meet in order to

establish a prima facie violation of the fair cross-section requirement: (1) the excluded group is "distinctive"; (2) "representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community;" and (3) the "underrepresentation is due to systematic exclusion of the group in the jury-selection process." 439 U.S. 357, 364 (1979).

### C.       Discussion

The Government's decision to seek an indictment of the defendant from a grand jury sitting in White Plains was entirely appropriate and consistent with the Constitution, the JSSA, and the SDNY local rules.  The defendant's claims to the contrary rest on a faulty premise: That a defendant who is likely to be tried in the Manhattan courthouse must be indicted by a grand jury sitting in that same courthouse.  That is not the law.  *See* Section XI.C.1, *infra*.

That foundational error is fatal to the defendant's fair cross-section claim.  When the proper comparators are considered—the White Plains Master (or Qualified) Wheels to the voting age population of the counties from which juries in White Plains are drawn, rather than the defendant's apples-to-oranges comparison of the White Plains Qualified Jury Wheel to the population of the Manhattan "Division"—the defendant fails to establish unfair underrepresentation under the second prong of the *Duren* test.  Moreover, the defendant has not established that any disparity resulted from systemic exclusion of a particular group.  Accordingly, the motion should be denied.

### 1.       The Defendant Was Properly Indicted by a Grand Jury Sitting in White Plains

At the heart of the defendant's fair cross-section claim is her contention that the Government seeking an indictment from a grand jury sitting in White Plains—which was the only

available grand jury that day, due to the global pandemic[68]—"was a deviation from the established

practice of indicting defendants in the division where the offense is alleged to have occurred and

where the case will be tried." (Def. Mot. 9 at 2). Because the offense is alleged to have occurred

in the "Manhattan Division" and the defendant assumes that her jury trial will occur there too, she

argues that the "appropriate comparison," for the purpose of her fair cross-section claim, "is

therefore between the Manhattan Division and the qualified wheel for White Plains." (Def. Mot.

9 at 6). This premise is faulty.

"It is well-settled that neither the jury selection statute nor the Constitution requires that

jurors be drawn from an entire district." *Bahna*, 68 F.3d at 24 (collecting cases); *see also United*

*States v. Plaza-Andrades*, 507 F. App'x 22, 26 (2d Cir. 2013) ("[O]ur precedent makes clear that

the Sixth Amendment does not entitle a defendant to be tried in a geographic location any more

---

[68] This case was indicted on June 29, 2020, on which date the grand jury sitting in White Plains
was the only available grand jury in the District. Beginning on or about June 25, 2020, grand jury
quorums returned in Manhattan, but with substantially less availability than before the pandemic.
As a result, the Government has sought indictments from grand juries sitting in White Plains and
Manhattan, as availability permits. In this instance, the Government was prepared to indict on
June 29, 2020, and the only grand jury available in this District on that day sat in White Plains.
The global pandemic's effect on grand jury availability continues to evolve, but at no point have
grand juries in White Plains or Manhattan resumed normal activity.

The defendant speculates that the Government sought an indictment on June 29, 2020
because of some arbitrary desire to arrest the defendant on July 2, 2020, one year to the day after
a grand jury returned a sealed indictment charging Jeffrey Epstein with federal crimes on July 2,
2019. (*See, e.g.*, Def. Mot. 9 at 1, 8). Setting aside the silliness of marking the anniversary of an
indictment's return, as opposed to the anniversary of the arrest itself, which took place on July 6,
2019, there is no reality in the defense's conspiracy theories. As the defense knows full well, the
Government attempted to locate and arrest the defendant on July 1, 2020 but was unable to confirm
her location until obtaining cellphone location data identifying her location and enabling her arrest
on July 2, 2020. The defense knows this because they have the warrant application that the
Government submitted on July 1, 2020 for the defendant's cellphone location information, in
which the Government stated that it had been unable to confirm the defendant's location. In other
words, the Government indicted the defendant as soon as it was prepared to present the evidence
it had gathered to a grand jury, and the Government arrested the defendant as soon as it was able
to locate her after obtaining that indictment.

specific than the District where the offense was allegedly committed.").  Rather, "[c]ourts have broad latitude in defining the geographic area from which juries will be selected."  *United States v. Yonkers Contracting Co., Inc.*, 682 F. Supp. 757, 768 (S.D.N.Y. 1988).  Consistent with the foregoing, the SDNY Jury Plan creates two separate Master Wheels—one for the White Plains courthouse and one for the Manhattan courthouse, each of which draws from certain counties, with some overlapping counties.  SDNY Jury Plan Art. III.B, III.C.  This is perfectly consistent with the JSSA, *see* 28 U.S.C. § 1869(e), and with longstanding precedent, as Judge Hand has explained:

> [T]he district and circuit courts have had power since the first Judiciary Act of 1789 to divide a district territorially in the interest of an impartial trial, of economy, and of lessening the burden of attendance.   There cannot be the faintest question of the constitutionality of this statute; the courts have again and again recognized its validity. Furthermore, it would be impossible in practice to administer it, if it were a condition that that the divisions made must be so homogeneous that they showed an equal percentage of all possible groups.  There are probably no districts in the Union, which can be divided without disclosing in the sections different racial, religious, political, social or economic percentages.  To demand that they shall not, would be a fantastic pedantry which would serve no purpose and would put an end to the statute.

*United States v. Gottfried*, 165 F.2d 360, 364 (2d Cir. 1948); *accord Bahna*, 68 F.3d at 24-25.

There is accordingly no constitutional or statutory basis for the defendant's claimed entitlement to a grand jury drawn from the population of the same "division" in which the offense occurred and she assumes she will ultimately be tried.  To the contrary, the Second Circuit has rejected a similar claim.  In *Bahna*, a defendant in the Eastern District of New York was initially convicted at a trial held at the Brooklyn courthouse; after that conviction was vacated, he was again convicted, this time at a trial held at the Uniondale courthouse.  68 F.3d at 20.  Under the relevant jury plan, jurors for trials held in Brooklyn were drawn from the entire Eastern District, while jurors for trials held in the "Long Island Division," which included the Uniondale

courthouse, were drawn from Nassau and Suffolk Counties.  *Id.* at 24.  The defendant argued that the district court erred by selecting the jury from the "Long Island Division" wheel because there was under-representation of Blacks and Hispanics in that "division" as compared to the Eastern District as a whole.  *Id.* at 23-24.  The Second Circuit rejected the argument, finding that it "[wa]s based upon an improper premise."  *Id.* at 24.  Contrary to the defendant's claims, "[w]here a jury venire is drawn from a properly designated division, we look to *that division* to see whether there has been any unlawful or unconstitutional treatment of minorities."  *Id.* (emphasis added).

Consistent with *Bahna*, courts have repeatedly found that defendants in criminal cases have no constitutional or statutory right to a jury drawn from the entire district or from a particular geographic area within a district, such as the county or "division" where the offense was committed.  *See, e.g.*, *Rutenberg v. United States*, 245 U.S. 480, 482 (1918) (rejecting claim that defendant had Sixth Amendment right to jury drawn from entire district); *United States v. Miller*, 116 F.3d 641, 659 (2d Cir. 1997) ("Th[e] [Sixth] Amendment's guarantees of an impartial jury 'of the State and district' in which the crime was committed does not require a narrower geographical focus than the district itself."); *United States v. Richardson*, 537 F.3d 951, 959 (8th Cir. 2008) (a criminal defendant "does not have a right to have his trial in or jurors summoned from a particular division of the state and district where the crime was committed"); *United States v. Herbert*, 698 F.2d 981, 984 (9th Cir. 1983) (finding that "[a] petit jury may be drawn constitutionally from only one division and not the whole district"); *Zicarelli v. Dietz*, 633 F.2d 312, 318 (3d Cir. 1980) ("[T]here is no constitutional right to a jury chosen from the division where the offense was committed or from the entire district which includes that division."); *United States v. Florence*, 456 F.2d 46, 49-50 (4th Cir. 1972) (holding that a defendant has no constitutional or statutory right to a jury selected from the entire district or from a particular division).

Because the defendant has no right to insist that either the grand or petit jury be drawn from any particular geographic area within the Southern District, she is wrong to assert that her fair cross-section claim must be analyzed against the geographic location in which the offense was committed or the trial is expected to occur.  Rather, "[w]here a jury venire is drawn from a properly designated division, we look to *that division* to see whether there has been any unlawful or unconstitutional treatment of minorities."  *Bahna*, 68 F.3d at 24 (emphasis added).   Here, consistent with the SDNY Grand Jury Plan, the venire for the grand jury that indicted the defendant was drawn from the voter lists of the following counties: Westchester, Putnam, Rockland, Orange, Sullivan, and Dutchess.  That is undoubtedly a "properly designated division" pursuant to the JSSA.  As noted, the Southern District is not divided into "divisions" by statute.  *See* 28 U.S.C. § 112(b).  For purposes of the JSSA, district courts in such undivided districts have the authority to determine "divisions" comprised of "counties, parishes, or similar political subdivisions surrounding the places where court is held."  28 U.S.C. § 1869(e).  Accordingly, while the SDNY Jury Plan neither creates nor ever uses the term "White Plains Division" or "Manhattan Division," it contemplates Master Jury Wheels drawn from two geographic areas that satisfy the definition of "division" under the JSSA.  Thus, in evaluating the defendant's fair cross-section claim, this Court must "look to *that division*"—the counties from which the White Plains Master Wheel is drawn— "to see whether there has been any unlawful or unconstitutional treatment of minorities."  *Bahna*, 68 F.3d at 24 (emphasis added).

In the face of this authority, the defendant cites only two district court cases for the proposition that "community" for purposes of a fair cross-section claim is "widely understood to mean the district or division where *the trial* will be held."  (Def. Mot. 9 at 5 (emphasis added) (internal quotation marks and citation omitted)).  Not only is the authority cited non-binding, but

it is inapposite as well: both cases appear to concern instances in which the grand jury and trial jury sat in the same courthouse, and thus there was no cause to consider whether the same "community" was relevant to separate challenges to the grand and petit juries.  *See United States v. Johnson*, 21 F. Supp. 2d 329, 334-35 (S.D.N.Y. 1998); *United States v. Kenny*, 883 F. Supp. 869, 874-75 (E.D.N.Y. 1995).   As such, neither case supports the proposition that where a defendant is challenging the selection of the *grand* jury, the relevant "community" is the population of the location in which her *trial* will be held.   Such a comparison is unjustified, as *Bahna* makes clear: That case appears to involve conduct that occurred in Brooklyn, appears to have been indicted in Brooklyn, was originally tried in Brooklyn, and was later transferred to Uniondale, where it was tried with a jury drawn from the "Long Island Division."   Yet the Second Circuit rejected the defendant's claimed entitlement to a jury drawn from Kings, Queens and Richmond counties, or the entire Eastern District, because that argument—like the defendant's here—was based on a flawed premise.

The defendant's proposed rule—comparing the composition of the *grand jury* venire to the population of the expected *trial* location—makes little legal or practical sense.   Where, as here, the defendant's challenge is to the indictment, the proceeding for which the defendant is entitled to expect a jury drawn from a fair cross-section of the community is not the trial, but the grand jury proceeding itself.   Indeed, that *must* be the case, as it is not yet determined where the trial in this matter will in fact occur.   The defendant assumes that her trial will ultimately be held at the Manhattan courthouse. While that is *likely* to be the case, it is not necessarily so.   *Bahna* again illustrates the point, as a case originally tried in Brooklyn was reassigned to Uniondale for the retrial "to accommodate trial congestion in the court's calendar during a period of judicial emergency . . . ."   *United States v. Soares*, 66 F. Supp. 2d 391, 397 n.2 (E.D.N.Y. 1999).   In the

Southern District, cases are commonly transferred from one courthouse to another, including cases that are indicted in White Plains but tried in Manhattan. *See* Section XI.A.1, *supra* (collecting examples). That is entirely consistent not just with the foregoing authority, but also with the Southern District's Local Rules for the Division of Business. *See* SDNY Business Division Rules 18, 19. Criminal cases are also sometimes transferred to other Districts for trial. *See* Fed. R. Crim. P. 21. Under the defendant's approach, it would be impossible for prosecutors to determine *ex ante* that that they were seeking an indictment from a grand jury drawn from a representative cross-section of the relevant community, because they would not yet know with certainty in which community the case will be tried.

The defendant's argument therefore boils down to an unfounded complaint that it is "a deviation from the established practice" to seek an indictment in a courthouse other than the one in which the case will likely be tried. (Def. Mot. 9 at 2). This argument is inconsistent with the foregoing law that the defendant has no right to jurors drawn from any particular geographic area within the district. *See also Rosencrans v. United States*, 165 U.S. 257, 260-63 (1897) (finding no error in grand jury returning indictment in a division different from the division in which the trial proceeded). It also finds no succor in the SDNY Business Division Rules, which vest no rights in any parties and, in any event, contemplate that judges may reassign cases from one courthouse to another. And it falls exceedingly flat on the facts of this case. The Government did not forum shop to achieve some perceived advantage. Rather, it sought a timely indictment from a grand jury in White Plains because it was the *only* grand jury with a quorum sitting in the Southern District on that date (a relatively rare situation created by an unprecedented public health crisis).

In sum, the decision to indict the defendant in White Plains was entirely proper, and the lack of any constitutional or statutory basis for the defendant's contrary argument is fatal to her fair cross-section claims, as described below.

### 2. The Defendant's Fair Cross-Section Claim Is Meritless

The defendant's fair cross-section claim is based on the assertion that Black or African-American and Hispanic or Latino individuals are unfairly underrepresented in the relevant jury pool.  (Def. Mot. 9 at 5).  While these are "distinctive" groups, satisfying *Duren*'s first prong, the defendant's claim fails on each of the other two prongs.

### a. The Defendant Has Not Established that Blacks or Hispanics Are Unfairly Represented

The second prong of the *Duren* test requires the Court to determine whether representation of either or both of the "distinctive" groups in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community.  *Duren*, 439 U.S. at 364. This requires determining the relevant comparators—*i.e.*, what is the "relevant jury pool" and what is the community "population" against which it is compared—as well as the appropriate method of statistical comparison.  *See Rioux*, 97 F.3d at 656.

Here, the defendant contends that the relevant jury pool is the White Plains Qualified Wheel.  (Def. Mot. 9 at 5-6).  The Government believes that the relevant jury pool is the White Plains *Master* Wheel, but, as set forth below, the defendant's claim fails even using the White Plains Qualified Wheel.

"Neither the Supreme Court nor the Second Circuit has defined the 'relevant jury pool' with any specificity."  *United States v. Rioux* 930 F. Supp. 1558, 1565 (D. Conn. 1995).  In a detailed survey of the case law, the district court in *Rioux* found that cases have examined different relevant pools, including the master wheel, the qualified wheel over a period of time, the venires

appearing around the time of the defendant's trial, or some combination thereof. *Id.* Ultimately, the district court in *Rioux* found that the teaching of *Duren* and the Second Circuit's subsequent cases is that "the court must assess representativeness in the context of the systematic defect identified by the defendant." *Id.* at 1568. In that case, the claimed defects were in the construction of the qualified wheel and, therefore, the "relevant jury pool" was the "qualified wheel over the life of the wheel." *Id.* at 1575.

Affirming that decision, the Second Circuit did not hold that the qualified wheel is necessarily the "relevant jury pool." Rather, after stating that the relevant jury pool "may be defined by: (1) the master list; (2) the qualified wheel; (3) the venires; or (4) a combination of the three," the Circuit noted that the parties had agreed that the district court properly used the qualified wheel over the life of the wheel as the "relevant jury pool." *Rioux*, 97 F.3d at 657. The court's acceptance of the qualified jury wheel as the "relevant jury pool" for that case—an issue which was not in dispute—does not mean it necessarily must be applied in all cases. *Id.* Indeed, in other cases where the claim of error was *not* focused on the construction of the qualified wheel, different "relevant jury pools" have been used by the Second Circuit. Most notably, in *Biaggi*, the main thrust of the defendant's fair cross-section claim was that reliance on voter registration lists systemically excluded African-Americans and Hispanics from jury service—a claim which is directed at the composition of the master wheel—and the Second Circuit identified the district's *master* wheel as the relevant jury pool. *United States v. Biaggi*, 909 F.2d 662, 677 (2d Cir. 1990).

Here, the defendant claims that "the primary reason" for the alleged underrepresentation is the Government's "choice to pursue an indictment from a grand jury drawn from the White Plains Division, as opposed to the Manhattan Division . . . ." (Def. Mot. 9 at 7). Even if this argument described a function of the jury selection process – though it does not – it would be directed at the

how the particular *Master* Wheel is selected.  It says nothing about the process by which a Master Wheel is reduced to the subset of qualified jurors contained in the Qualified Wheel.  Because the "systematic defect" alleged by the defendant relates to the Master Jury Wheel, the White Plains Master Jury Wheel is the appropriate "relevant jury pool."  *Rioux*, 930 F. Supp. at 1566-68.

Although the Master Jury Wheel does not include reliable information regarding the race and ethnicity of the individuals selected from voter registration lists, the racial and ethnic makeup of the White Plains Master Jury Wheel can be estimated using geocoding and Bayesian Improved Surname Geocoding ("BISG").[69]  Taking into account those estimates, the White Plains Master Wheel is 11.20% Black or African-American and 12.97% Hispanic or Latino.  (Siskin Aff. at ¶ 28).  By contrast, the White Plains Qualified Wheel is 8.76% Black or African-American and 10.48% Hispanic or Latino.  (*Id.* at ¶ 17).

The community population for purposes of assessing representativeness is the population eligible for jury service in the community.  *See, e.g.*, *Taylor v. Louisiana*, 419 U.S. 522, 524 (1975) (focusing on population eligible for jury service); *Rioux*, 97 F.3d at 657 ("We conclude that the appropriate measure in this case is the eighteen and older subset of the population . . . .").  But how should the relevant "community" be defined?  The defendant contends that it is the jury eligible population of the "Manhattan Division," because that is where the offense occurred and where she assumes she will be tried.  (Def. Mot. 9 at 6).  As set forth above, she is wrong.  The relevant

---

[69] The defense motion references the expert report of an expert witness named Jeffrey O'Neal Martin ("Martin Aff."), which was prepared for the defense in *United States v. Balde*, No. 20 Cr. 281 (KPF), where a similar motion is currently pending before Judge Failla.  The Government is likewise attaching the expert report of Dr. Bernard R. Siskin, which was prepared for the Government in *Balde*.  As detailed Dr. Skiskin's report, geocoding is based on estimating the proportion of persons who are of a given race or ethnicity based on the racial and ethnic area in which they live.  (*See* Affidavit of Dr. Bernard R. Siskin ("Siskin Aff."), attached hereto as Exhibit 12, at ¶ 26).  BISG enhances the accuracy of geocoding for Hispanic or Latino persons by using information about persons' last names.  (*Id.*).

comparator is the jury eligible population of the five counties from which the White Plains Master Wheel is drawn.

The American Community Survey ("ACS") 2018 data indicate that the jury eligible population for the White Plains counties in 2018 was 12.45% Black or African-American and 14.12% Hispanic or Latino.[70]   (*See* Siskin Aff. at ¶ 19; *see also* Martin Aff. at ¶ 21).

Once the relevant comparators are defined, an additional threshold question is the statistical method by which to compare them.  Courts have applied different approaches over time, such as the statistical decision theory, the comparative disparity theory, and the absolute disparity theory. *See Rioux*, 97 F.3d at 655.  Although no method is perfect, *see Berghuis v. Smith*, 559 U.S. 314, 329 (2010), the Second Circuit has made clear that the comparative disparity theory is disfavored and strongly suggested that the absolute disparity theory is generally appropriate, *see Rioux*, 97 F.3d at 655-56; *see also United States v. Barnes*, 520 F. Supp. 2d 510, 514 (S.D.N.Y. 2007) ("[T]he absolute disparity approach is the primary approach used in this Circuit.").

The "absolute disparity" approach measures the absolute numerical difference between the distinctive group's representation in the community population and the group's representation in the relevant jury pool.  *See Rioux*, 97 F.3d at 655; *United States v. Barlow*, 732 F. Supp. 2d 1, 30-31 (E.D.N.Y. 2010), *aff'd* 479 F. App'x 372, 373 (2d Cir. 2012).   For example, if Blacks represented 10% of the community population but only 2% of the relevant jury pool, the "absolute disparity" would be 8%.

There is no specific numerical threshold that constitutes unacceptable disparity under the "absolute disparity" method.   "[P]erfectly proportional representation is not required, since no

---

[70] The American Community Survey gathers demographic information in between the decennial census, and is published by the United States Census Bureau.  (*See* Siskin Aff. at ¶ 18).  The latest available data is the 2018 five-year survey combining the 2014, 2015, 2016, 2017, and 2018 survey data.  (*Id.*).

source list will be an exact statistical mirror of the community." *United States v. Guzman*, 337 F.

Supp. 140, 143 (S.D.N.Y. 1972); *see also Taylor*, 419 U.S. at 538.   The mere fact that a jury

selection system is imperfect does not make it invalid.   *Swain v. Alabama*, 380 U.S. 202, 209

(1965) (overruled on other grounds).   Accordingly, the Second Circuit has found that absolute

disparities as high as nearly 5% fail to establish a prima facie case of underrepresentation.   *See,*

*e.g.*, *Biaggi*, 909 F.2d at 677-78 (3.6% for Blacks and 4.7% for Hispanics); *United States v.*

*Ramnath*, 131 F.3d 132, 132 (2d Cir. 1997) (3.45% for African-Americans and 4.87% for

Hispanics); *see also Barlow*, 732 F. Supp. 2d at 34-35 (collecting out-of-circuit cases rejecting

claims presenting similar and even higher disparities).[71]

> Properly calculated, the "absolute disparity" in this case falls comfortably within the range
deemed acceptable by the Second Circuit and other courts.   As noted, the "relevant jury pool" is
the White Plains Master Wheel, which is comprised of 11.20% Black or African-American persons
and 12.97% Latino or Hispanic persons.   (Siskin Aff. at ¶ 28).   The "community population" is the
jury eligible population for the five counties from which the White Plains Master Wheel is drawn,
which was comprised of 12.45% Black or African-American persons and 14.12% Hispanic or
Latino persons in 2018.   (*Id*. at ¶ 19).   This yields an "absolute disparity" of 1.25% for Black or
African-American persons and 1.15% for Latino or Hispanic persons. (*Id.* at ¶ 28).   That disparity
does not rise to the level of satisfying the second prong of the *Duren* test.

---

[71] In *United States v. Jackman*, the Second Circuit held that an absolute disparity of 2.5% for Black or African-American persons and 3.4% for Hispanic or Latino persons was sufficient to satisfy the second prong of the *Duren* test. 46 F.3d 1240 (2d Cir. 1995).   The unique facts of *Jackman* make it readily distinguishable.   The jury clerk in *Jackman* relied on a qualified jury wheel that was mostly drawn from a master jury wheel that *completely* excluded potential jurors from two cities in the Division—cities that accounted for 62.93% of the voting-age Black population and 68.09% of the voting-age Hispanic population in the division.   *See id.* at 1242-44.   This resulted in a venire comprised of no Black or African-American persons and one Hispanic or Latino person.   *Id.* at 1244.   *See also id.* at 1252 (Walker, J., dissenting) (stating that the majority's decision was "at odds with every decision in every circuit applying the *Duren* test").

The result is the same even if the defendant's preferred relevant jury pool is used. The White Plains Qualified Wheel is comprised of 8.76% Black or African-American persons and 10.48% Latino or Hispanic persons. (*Id.* at ¶ 17; *see also* Martin Aff. at ¶ 55). This results in absolute disparities of 3.69% and 3.64%, respectively. These figures are also comfortably within the range that the Second Circuit has determined does not satisfy the second prong of the *Duren* test. Moreover, as discussed below, the factors that cause the disparity between the White Plains Qualified Wheel and the White Plains Master Jury Wheel, as well as the voting age population, are not the result of systematic exclusion.

It is only by employing an apples-and-oranges method of comparing the White Plains Qualified Wheel to the jury eligible populations of the "Manhattan Division" or the entire Southern District that the defendant is able to identify disparities that might arguably satisfy the second prong of *Duren*. Because that method has no basis in the law, the defendant's claim fails at the second prong.

> **b.      Any Potential Underrepresentation Is Not Due to Systematic Exclusion**

Even assuming the defendant had satisfied the second prong of the *Duren* test—which she has not—she most certainly has not demonstrated that any underrepresentation is "due to *systematic exclusion* of the group *in the jury-selection process*." *Rioux*, 97 F.3d at 654 (emphasis added). That is, she cannot establish that the exclusion is the product of "the system of jury selection itself, *rather than external forces*." *Id.* at 658 (emphasis added). She therefore cannot satisfy the third prong of *Duren*.

As then-District Judge Bianco explained, "systematic exclusion does not occur simply because a facially neutral disqualification criterion disproportionately impacts a particular group." *Barlow*, 732 F. Supp. 2d at 40; *see also United States v. Barlow*, 479 F. App'x 372, 373 (2d Cir.

2012) (affirming Judge Bianco's "thorough and well-reasoned" opinion). Indeed, "'[a] selection process that is facially neutral is unlikely to demonstrate systematic exclusion.'" *United States v. Savage*, 970 F.3d 217, 259 (3d Cir. 2020) (brackets in original) (quoting *Howell v. Superintendent Rockview SCI*, 939 F.3d 260, 269 (2d Cir. 2019)). Moreover, a defendant cannot "make out a prima facie case merely by pointing to a host of factors that, individually or in combination, *might* contribute to a group's underrepresentation." *Berghuis*, 559 U.S. at 332 (emphasis in original).

Insofar as the underrepresentation here is measured by a comparison of the White Plains Qualified Wheel to the jury eligible population of the "Manhattan Division" or entire Southern District, the defendant's argument rests entirely on the prosecution's decision to pursue an indictment in White Plains rather than Manhattan. (Def. Mot. 9 at 7). That decision was entirely proper, as set forth above. *See* Section XI.C.1, *supra*. And even if it were the case that this decision resulted in substantial underrepresentation, it nevertheless does not amount to "systematic exclusion . . . *in the jury-selection process*." The prosecution's decision as to where to seek an indictment was based entirely on the availability of grand juries during a pandemic, which has nothing to do with the process by which the grand jury is selected. The defendant points to no other source of any supposed systemic exclusion of any identified group. Accordingly, the defendant's claim also fails at the third prong of *Duren*.

**CONCLUSION**

For the foregoing reasons, the Court should deny all twelve of the defendant's pre-trial

motions.

Dated:  New York, New York
        February 26, 2021

                              Respectfully submitted,

                              AUDREY STRAUSS
                              United States Attorney

                    By:    /s_____
                           Alison Moe
                           Maurene Comey
                           Lara Pomerantz
                           Andrew Rohrbach
                           Assistant United States Attorneys
                           (212) 637-2225