# DEPARTMENT OF JUSTICE



# OFFICE OF PROFESSIONAL RESPONSIBILITY

# REPORT

Investigation into the
U.S. Attorney's Office for the Southern District of Florida's
Resolution of Its 2006–2008 Federal Criminal Investigation of
Jeffrey Epstein and Its Interactions with Victims during the Investigation

November 2020

NOTE: THIS REPORT CONTAINS SENSITIVE, PRIVILEGED, AND PRIVACY ACT PROTECTED INFORMATION. DO NOT DISTRIBUTE THE REPORT OR ITS CONTENTS WITHOUT THE PRIOR APPROVAL OF THE OFFICE OF PROFESSIONAL RESPONSIBILITY.

# EXECUTIVE SUMMARY

The Department of Justice (Department) Office of Professional Responsibility (OPR) investigated allegations that in 2007-2008, prosecutors in the U.S. Attorney's Office for the Southern District of Florida (USAO) improperly resolved a federal investigation into the criminal conduct of Jeffrey Epstein by negotiating and executing a federal non-prosecution agreement (NPA). The NPA was intended to end a federal investigation into allegations that Epstein engaged in illegal sexual activity with girls.[1] OPR also investigated whether USAO prosecutors committed professional misconduct by failing to consult with victims of Epstein's crimes before the NPA was signed or by misleading victims regarding the status of the federal investigation after the signing.

## I.     OVERVIEW OF FACTUAL BACKGROUND

The Palm Beach (Florida) Police Department (PBPD) began investigating Jeffrey Epstein in 2005, after the parents of a 14-year-old girl complained that Epstein had paid her for a massage. Epstein was a multi-millionaire financier with residences in Palm Beach, New York City, and other United States and foreign locations. The investigation led to the discovery that Epstein used personal assistants to recruit girls to provide massages to him, and in many instances, those massages led to sexual activity. After the PBPD brought the case to the State Attorney's Office, a Palm Beach County grand jury indicted Epstein, on July 19, 2006, for felony solicitation of prostitution in violation of Florida Statute § 796.07. However, because the PBPD Chief and the lead Detective were dissatisfied with the State Attorney's handling of the case and believed that the state grand jury's charge did not address the totality of Epstein's conduct, they referred the matter to the Federal Bureau of Investigation (FBI) in West Palm Beach for a possible federal investigation.

The FBI brought the matter to an Assistant U.S. Attorney (AUSA), who opened a file with her supervisor's approval and with the knowledge of then U.S. Attorney R. Alexander Acosta. She worked with two FBI case agents to develop a federal case against Epstein and, in the course of the investigation, they discovered additional victims. In May 2007, the AUSA submitted to her supervisors a draft 60-count indictment outlining charges against Epstein. She also provided a lengthy memorandum summarizing the evidence she had assembled in support of the charges and addressing the legal issues related to the proposed charges.

For several weeks following submission of the prosecution memorandum and proposed indictment, the AUSA's supervisors reviewed the case to determine how to proceed. At a July 31, 2007 meeting with Epstein's attorneys, the USAO offered to end its investigation if Epstein pled guilty to state charges, agreed to serve a minimum of two years' incarceration, registered as a sexual offender, and agreed to a mechanism through which victims could obtain monetary damages. The USAO subsequently engaged in additional meetings and communications with Epstein's team of attorneys, ultimately negotiating the terms of a state-based resolution of the federal investigation, which culminated in the signing of the NPA on September 24, 2007. The

---

[1]     As used in this Report, including in quoted documents and statements, the word "girls" refers to females who were under the age of 18 at the time of the alleged conduct.   Under Florida law, a minor is a person under the age of 18.

NPA required Epstein to plead guilty in state court to the then-pending state indictment against him and to an additional criminal information charging him with a state offense that would require him to register as a sexual offender—specifically, procurement of minors to engage in prostitution, in violation of Florida Statute § 796.03.   The NPA required Epstein to make a binding recommendation that the state court sentence him to serve 18 months in the county jail followed by 12 months of community control (home detention or "house arrest").   The NPA also included provisions designed to facilitate the victims' recovery of monetary damages from Epstein.   In exchange, the USAO agreed to end its investigation of Epstein and to forgo federal prosecution in the Southern District of Florida of him, four named co-conspirators, and "any potential co-conspirators."   Victims were not informed of, or consulted about, a potential state resolution or the NPA prior to its signing.

The signing of the NPA did not immediately lead to Epstein's guilty plea and incarceration, however.   For the next nine months, Epstein deployed his extensive team of prominent attorneys to try to change the terms that his team had negotiated and he had approved, while simultaneously seeking to invalidate the entire NPA by persuading senior Department officials that there was no federal interest at issue and the matter should be left to the discretion of state law enforcement officials.   Through repeated communications with the USAO and senior Department officials, defense counsel fought the government's interpretation of the NPA's terms.   They also sought and obtained review by the Department's Criminal Division and then the Office of the Deputy Attorney General, primarily on the issue of federal jurisdiction over what the defense insisted was "a quintessentially state matter."   After reviewing submissions by the defense and the USAO, on June 23, 2008, the Office of the Deputy Attorney General informed defense counsel that the Deputy Attorney General would not intervene in the matter.   Only then did Epstein agree to fulfill his obligation under the NPA, and on June 30, 2008, he appeared in state court and pled guilty to the pending state indictment charging felony solicitation of prostitution and, pursuant to the NPA, to a criminal information charging him with procurement of minors to engage in prostitution. Upon the joint request of the defendant and the state prosecutor, and consistent with the NPA, the court immediately sentenced Epstein to consecutive terms of 12 months' incarceration on the solicitation charge and 6 months' incarceration on the procurement charge, followed by 12 months of community control.   Epstein began serving the sentence that day, in a minimum-security Palm Beach County facility.   A copy of the NPA was filed under seal with the state court.

On July 7, 2008, a victim, identified as "Jane Doe," filed in federal court in the Southern District of Florida an emergency petition alleging that the government violated the Crime Victims' Rights Act (CVRA), 18 U.S.C. § 3771, when it resolved the federal investigation of Epstein without consulting with victims, and seeking enforcement of her CVRA rights.[2]   In responding to the petition, the government, represented by the USAO, revealed the existence of the NPA, but did not produce it to the petitioners until the court directed it to be turned over subject to a protective order; the NPA itself remained under seal in the federal district court.   After the initial filings and hearings, the CVRA case was dormant for almost two years while the petitioners pursued civil cases against Epstein.

---

[2]   Emergency Victim's Petition for Enforcement of Crime Victim's [*sic*] Rights Act, 18 U.S.C. Section 3771, *Doe v. United States,* Case No. 9:08-cv-80736-KAM (S.D. Fla. July 7, 2008).   Another victim subsequently joined the litigation as "Jane Doe 2."

Soon after he was incarcerated, Epstein applied for the Palm Beach County Sheriff's work release program, and the Sheriff approved his application. In October 2008, Epstein began spending 12 hours a day purportedly working at the "Florida Science Foundation," an entity Epstein had recently incorporated that was co-located at the West Palm Beach office of one of Epstein's attorneys. Although the NPA specified a term of incarceration of 18 months, Epstein received "gain time," that is, time off for good behavior, and he actually served less than 13 months of incarceration. On July 22, 2009, Epstein was released from custody to a one-year term of home detention as a condition of community control, and he registered as a sexual offender with the Florida Department of Law Enforcement. After victims and news media filed suit in Florida courts for release of the copy of the NPA that had been filed under seal in the state court file, a state judge in September 2009 ordered it to be made public.

By mid-2010, Epstein reportedly settled multiple civil lawsuits brought against him by victims seeking monetary damages, including the two petitioners in the CVRA litigation. During the CVRA litigation, the petitioners sought discovery from the USAO, which made substantial document productions, filed lengthy privilege logs in support of its withholding of documents, and submitted declarations from the AUSA and the FBI case agents who conducted the federal investigation. The USAO opposed efforts to unseal various records, as did Epstein, who was permitted to intervene in the litigation with respect to certain issues. Nevertheless, the court ultimately ordered that substantial records relating to the USAO's resolution of the Epstein case be made public. During the course of the litigation, the court made numerous rulings interpreting the CVRA. After failed efforts to settle the case, the parties' cross motions for summary judgment remained pending for more than a year.

In 2017, President Donald Trump nominated Acosta to be Secretary of Labor. At his March 2017 confirmation hearing, Acosta was questioned only briefly about the Epstein case. On April 17, 2017, the Senate confirmed Acosta's appointment as Labor Secretary.

In the decade following his release from incarceration, Epstein reportedly continued to settle multiple civil suits brought by many, but not all, of his victims. Epstein was otherwise able to resume his lavish lifestyle, largely avoiding the interest of the press. On November 28, 2018, however, the *Miami Herald* published an extensive investigative report about state and federal criminal investigations initiated more than 12 years earlier into allegations that Epstein had coerced girls into engaging in sexual activity with him at his Palm Beach estate.[3] The *Miami Herald* reported that in 2007, Acosta entered into an "extraordinary" deal with Epstein in the form of the NPA, which permitted Epstein to avoid federal prosecution and a potentially lengthy prison sentence by pleading guilty in state court to "two prostitution charges." According to the *Miami Herald*, the government also immunized from prosecution Epstein's co-conspirators and concealed from Epstein's victims the terms of the NPA. Through its reporting, which included interviews of eight victims and information from publicly available documents, the newspaper painted a portrait of federal and state prosecutors who had ignored serious criminal conduct by a wealthy man with powerful and politically connected friends by granting him a "deal of a lifetime" that allowed him both to escape significant punishment for his past conduct and to continue his

---

[3]     Julie K. Brown, "Perversion of Justice," *Miami Herald*, Nov. 28, 2018.   https://www.miamiherald.com/news/local/article220097825.html.

abuse of minors.  The *Miami Herald* report led to public outrage and media scrutiny of the government's actions.[4]

On February 21, 2019, the district court granted the CVRA case petitioners' Motion for Partial Summary Judgment, ruling that the government violated the CVRA in failing to advise the victims about its intention to enter into the NPA.[5]  The court also found that letters the government sent to victims after the NPA was signed, describing the investigation as ongoing, "mislead [*sic*] the victims to believe that federal prosecution was still a possibility."  The court also highlighted the inequity of the USAO's failure to communicate with the victims while at the same time engaging in "lengthy negotiations" with Epstein's counsel and assuring the defense that the NPA would not be "made public or filed with the court."  The court ordered the parties to submit additional briefs regarding the appropriate remedies.  After the court's order, the Department recused the USAO from the CVRA litigation and assigned the U.S. Attorney's Office for the Northern District of Georgia to handle the case for the government.  Among the remedies sought by the petitioners, and opposed by the government, was rescission of the NPA and federal prosecution of Epstein.

On July 2, 2019, the U.S. Attorney's Office for the Southern District of New York obtained a federal grand jury indictment charging Epstein with one count of sex trafficking of minors and one count of conspiracy to commit sex trafficking of minors.  The indictment alleged that from 2002 until 2005, Epstein created a vast network of underage victims in both New York and Florida whom he sexually abused and exploited.  Epstein was arrested on the charges on July 6, 2019.  In arguing for Epstein's pretrial detention, prosecutors asserted that agents searching Epstein's Manhattan residence found thousands of photos of nude and half-nude females, including at least one believed to be a minor.  The court ordered Epstein detained pending trial, and he was remanded to the custody of the Bureau of Prisons and held at the Metropolitan Correctional Center in Manhattan.

Meanwhile, after publication of the November 2018 *Miami Herald* report, the media and Congress increasingly focused attention on Acosta as the government official responsible for the NPA.  On July 10, 2019, Acosta held a televised press conference to defend his and the USAO's actions.  Acosta stated that the Palm Beach State Attorney's Office "was ready to allow Epstein to walk free with no jail time, nothing."  According to Acosta, because USAO prosecutors considered this outcome unacceptable, his office pursued a difficult and challenging case and obtained a resolution that put Epstein in jail, forced him to register as a sexual offender, and provided victims with the means to obtain monetary damages.  Acosta's press conference did not end the controversy, however, and on July 12, 2019, Acosta submitted to the President his resignation as

---

[4]     *See, e.g.*, Ashley Collman, "Stunning new report details Trump's labor secretary's role in plea deal for billionaire sex abuser," *The Business Insider*, Nov. 29, 2018; Cynthia McFadden, "New Focus on Trump Labor Secretary's role in unusual plea deal for billionaire accused of sexual abuse," *NBC Nightly News*, Nov. 29, 2018; Anita Kumar, "Trump labor secretary out of running for attorney general after Miami Herald report," *McClatchy Washington Bureau*, Nov. 29, 2018; Emily Peck, "How Trump's Labor Secretary Covered For A Millionaire Sex Abuser," *Huffington Post*, Nov. 29, 2018; Julie K. Brown, et al., "Lawmakers issue call for investigation of serial sex abuser Jeffrey Epstein's plea deal," *Miami Herald*, Dec. 6, 2018.

[5]     *Doe v. United States,* 359 F. Supp. 3d 1201 (S.D. Fla., Feb. 21, 2019) (Opinion and Order, 9:08-80736-CIV-Marra).

Secretary of Labor.  In a brief oral statement, Acosta explained that continued media attention on his handling of the Epstein investigation rather than on the economy was unfair to the Labor Department.

On August 10, 2019, Epstein was found hanging in his cell and was later pronounced dead. The New York City Chief Medical Examiner concluded that Epstein had committed suicide.

As a result of Epstein's death, the U.S. Attorney's Office for the Southern District of New York filed a *nolle prosequi* to dismiss the pending indictment against Epstein.  On August 27, 2019, the district court held a hearing at which more than a dozen of Epstein's victims—including victims of the conduct in Florida that was addressed through the NPA—spoke about the impact of Epstein's crimes.  The court dismissed the Epstein indictment on August 29, 2019.

After Epstein's death, the federal district court in Florida overseeing the CVRA litigation denied the petitioners their requested remedies and closed the case as moot.  Among its findings, the court concluded that although the government had violated the CVRA, the government had asserted "legitimate and legally supportable positions throughout this litigation," and therefore had not litigated in bad faith.  The court also noted it expected the government to "honor its representation that it will provide training to its employees about the CVRA and the proper treatment of crime victims," as well as honoring its promise to meet with the victims.

On September 30, 2019, CVRA petitioner "Jane Doe 1" filed in her true name a petition for a writ of mandamus in the United States Court of Appeals for the Eleventh Circuit, seeking review of the district court's order denying all of her requested remedies.  In its responsive brief, the government argued that "as a matter of law, the legal obligations under the CVRA do not attach prior to the government charging a case" and thus, "the CVRA was not triggered in [the Southern District of Florida] because no criminal charges were brought."  Nevertheless, during oral argument, the government conceded that the USAO had not been "fully transparent" with the petitioner and had "made a mistake in causing her to believe that the case was ongoing when in fact the NPA had been signed."  On April 14, 2020, a divided panel of the Court of Appeals denied the petition, ruling that CVRA rights do not attach until a defendant has been criminally charged. On August 7, 2020, the court granted the petition for rehearing *en banc* and vacated the panel's opinion; as of the date of this Report, a briefing schedule has been issued, and oral argument is set for December 3, 2020.

## II.      THE INITIATION AND SCOPE OF OPR'S INVESTIGATION

After the *Miami Herald* published its investigative report on November 28, 2018, U.S. Senator Ben Sasse, Chairman of the Senate Judiciary Subcommittee on Oversight, Agency Action, Federal Rights and Federal Courts, sent a December 3, 2018 letter to OPR, citing the *Miami Herald*'s report and requesting that OPR "open an investigation into the instances identified in this reporting of possible misconduct by Department of Justice attorneys."  On February 6, 2019, the Department of Justice Office of Legislative Affairs advised Senator Sasse that OPR had opened

an investigation into the matter and would review the USAO's decision to resolve the federal investigation of Epstein through the NPA.[6]

After the district court issued its ruling in the CVRA litigation, on February 21, 2019, OPR included within the scope of its investigation an examination of the government's conduct that formed the basis for the court's findings that the USAO violated the CVRA in failing to afford victims a reasonable right to confer with the government about the NPA before the agreement was signed and that the government affirmatively misled victims about the status of the federal investigation.

During the course of its investigation, OPR obtained and reviewed hundreds of thousands of records from the USAO, the FBI, and other Department components, including the Office of the Deputy Attorney General, the Criminal Division, and the Executive Office for U.S. Attorneys. The records included emails, letters, memoranda, and investigative materials. OPR also collected and reviewed materials relating to the state investigation and prosecution of Epstein. OPR also examined extensive publicly available information, including depositions, pleadings, orders, and other court records, and reviewed media reports and interviews, articles, podcasts, and books relating to the Epstein case.

In addition to this extensive documentary review, OPR conducted more than 60 interviews of witnesses, including the FBI case agents, their supervisors, and FBI administrative personnel; current and former USAO staff and attorneys; current and former Department attorneys and senior managers, including a former Deputy Attorney General and a former Assistant Attorney General for the Criminal Division; and the former State Attorney and former Assistant State Attorney in charge of the state investigation of Epstein. OPR also interviewed several victims and attorneys representing victims, and reviewed written submissions from victims, concerning victim contacts with the USAO and the FBI.

OPR identified former U.S. Attorney Acosta, three former USAO supervisors, and the AUSA as subjects of its investigation based on preliminary information indicating that each of them was involved in the decision to resolve the case through the NPA or in the negotiations leading to the agreement. OPR deems a current or former Department attorney to be a subject of its investigation when the individual's conduct is within the scope of OPR's review and may result in a finding of professional misconduct. OPR reviewed prior public statements made by Acosta and another subject. All five subjects cooperated fully with OPR's investigation. OPR requested that all of the subjects provide written responses detailing their involvement in the federal investigation of Epstein, the drafting and execution of the NPA, and decisions relating to victim notification and consultation. OPR received and reviewed written responses from all of the subjects, and subsequently conducted extensive interviews of each subject under oath and before a court reporter. Each subject was represented by counsel and had access to relevant contemporaneous documents before the subject's OPR interview. The subjects reviewed and provided comments on their respective interview transcripts and on OPR's draft report. OPR

---

[6]    The federal government was closed from December 22, 2018, to January 25, 2019. After initiating its investigation, OPR also subsequently received other letters from U.S. Senators and Representatives inquiring into the status of the OPR investigation.

carefully considered the comments and made changes, or noted comments, as OPR deemed appropriate; OPR did not, however, alter its findings and conclusions.

Finally, OPR reviewed relevant case law, statutes, regulations, Department policy, and attorney professional responsibility rules as necessary to resolve the issues presented in this case and to determine whether the subjects committed professional misconduct.

As part of its investigation, OPR examined the interactions between state officials and the federal investigators and prosecutors, but because OPR does not have jurisdiction over state officials, OPR did not investigate, or reach conclusions about, their conduct regarding the state investigation.[7]   Because OPR's mission is to ensure that Department attorneys adhere to the standards of professional conduct, OPR's investigation focused on the actions of the subject attorneys rather than on determining the full scope of Epstein's and his assistants' criminal behavior.  Accordingly, OPR considered the evidence and information regarding Epstein's and his assistants' conduct as it was known to the subjects at the time they performed their duties as Department attorneys.  Additional evidence and information that came to light after June 30, 2008, when Epstein entered his guilty plea under the NPA, did not affect the subjects' actions prior to that date, and OPR did not evaluate the subjects' conduct on the basis of that subsequent information.

OPR's investigation occurred approximately 12 years after most of the significant events relating to the USAO's investigation of Epstein, the NPA, and Epstein's guilty plea.  As a result, many of the subjects and witnesses were unable to recall the details of events or their own or others' actions occurring in 2006-2008, such as conversations, meetings, or documents they reviewed at the time.[8]   However, OPR's evaluation of the subjects' conduct was aided significantly by extensive, contemporaneous emails among the prosecutors and communications between the government and defense counsel.  These records often referred to the interactions among the participants and described important decisions and, in some instances, the bases for them.

## III.    OVERVIEW OF OPR'S ANALYTICAL FRAMEWORK

OPR's primary mission is to ensure that Department attorneys perform their duties in accordance with the highest professional standards, as would be expected of the nation's principal law enforcement agency.  Accordingly, OPR investigates allegations of professional misconduct against current or former Department attorneys related to the exercise of their authority to

---

[7]     In August 2019, Florida Governor Ron DeSantis announced that he had directed the Florida Department of Law Enforcement to open an investigation into the conduct of state authorities relating to Epstein.  As reported, the investigation focuses on Epstein's state plea agreement and the Palm Beach County work release program.

[8]     OPR was cognizant that Acosta and the three managers all left the USAO during, or not long after resolution of, the Epstein case, while the AUSA remained with the USAO until mid-2019.  Moreover, as the line prosecutor in the Epstein investigation and also as co-counsel in the CVRA litigation until the USAO was recused from that litigation in early 2019, the AUSA had continuous access to the USAO documentary record and numerous occasions to review these materials in the course of her official duties.  Additionally, in responding to OPR's request for a written response, and in preparing to be interviewed by OPR, the AUSA was able to refresh her recollection with these materials to an extent not possible for the other subjects, who were provided with relevant documents by OPR in preparation for their interviews.

investigate, litigate, or provide legal advice.[9]   OPR also has jurisdiction to investigate allegations of misconduct against Department law enforcement agents when they relate to a Department attorney's alleged professional misconduct.

In its investigations, OPR determines whether a clear and unambiguous standard governs the challenged conduct and whether a subject attorney violated that standard.   Department attorneys are subject to various legal obligations and professional standards in the performance of their duties, including the Constitution, statutes, standards of conduct imposed by attorney licensing authorities, and Department regulations and policies.   OPR finds misconduct when it concludes by a preponderance of the evidence that a subject attorney violated such a standard intentionally or recklessly.   Pursuant to OPR's analytical framework, when OPR concludes that (1) no clear and unambiguous standard governs the conduct in question or (2) the subject did not intentionally or recklessly violate the standard that governs the conduct, then it concludes that the subject's conduct does not constitute professional misconduct.   In some cases, OPR may conclude that a subject attorney's conduct does not satisfy the elements necessary for a professional misconduct finding, but that the circumstances warrant another finding.   In such cases, OPR may conclude that a subject attorney exercised poor judgment, made a mistake, or otherwise acted inappropriately under the circumstances.   OPR may also determine that the subject attorney's conduct was appropriate under the circumstances.[10]

## IV.   ISSUES CONSIDERED

In this investigation, OPR considered two distinct sets of allegations.   The first relates to the negotiation, execution, and implementation of the NPA.   The second relates to the USAO's interactions with Epstein's victims and adherence to the requirements of the CVRA.   The two sets of issues are described below and are analyzed separately in this Report.

### A.   The Negotiation, Execution, and Implementation of the NPA

In evaluating whether any of the subjects committed professional misconduct, OPR considered whether any of the NPA's provisions violated a clear or unambiguous statute, professional responsibility rule or standard, or Department regulation or policy.   In particular, OPR considered whether the NPA violated standards relating to (1) charging decisions, (2) declination of criminal charges, (3) deferred or non-prosecution agreements, (4) plea agreements, (5) grants

---

[9]      28 C.F.R. § 0.39a(a)(1).   OPR has authority to investigate the professional conduct of attorneys occurring during their employment by the Department, regardless of whether the attorney left the Department before or during OPR's investigation.   Over its 45-year history, OPR has routinely investigated the conduct of former Department attorneys.   Although former Department attorneys cannot be disciplined by the Department, OPR's determination that a former Department attorney violated state rules of professional conduct for attorneys could result in a referral to an appropriate state attorney disciplinary authority.   Furthermore, findings resulting from investigations of the conduct of Department attorneys, even former employees, may assist Department managers in supervising future cases.

[10]      In some instances, OPR declines to open an investigation based upon a review of the initial complaint or after a preliminary inquiry into the matter.   In December 2010, one of the attorneys representing victims in the CVRA litigation raised allegations that Epstein may have exerted improper influence over the federal criminal investigation and that the USAO had deceived the victims of Epstein's crimes about the existence of the NPA.   Pursuant to its standard policy, OPR declined to open an investigation into those allegations at that time in deference to the then-pending CVRA litigation.

of immunity, or (6) the deportation of criminal aliens. The potentially applicable standards that OPR considered as to each of these issues are identified and discussed later in this Report. OPR also examined whether the evidence establishes that any of the subjects were influenced to enter into the NPA, or to include in the NPA terms favorable to Epstein, because of an improper motive, such as a bribe, political consideration, personal interest, or favoritism. OPR also examined and discusses in this Report significant events that occurred after the NPA was negotiated and signed that shed additional light on the USAO's handling of the Epstein investigation.

### B.   The District Court's Conclusion That the USAO Violated the CVRA

To address the district court's adverse judicial findings, OPR assessed the manner, content, and timing of the government's interactions with victims both before and after the NPA was signed, including victim notification letters issued by the USAO and the FBI and interviews conducted by the USAO. OPR considered whether any of the subject attorneys violated any clear and unambiguous standard governing victim consultation or notification. OPR examined the government's lack of consultation with the victims before the NPA was signed, as well as the circumstances relating to the district court's finding that the USAO affirmatively misled Epstein's victims about the status of the federal investigation after the NPA was signed.

## V.   OPR'S FINDINGS AND CONCLUSIONS

OPR evaluated the conduct of each subject and considered his or her individual role in various decisions and events. Acosta, however, made the pivotal decision to resolve the federal investigation of Epstein through a state-based plea and either developed or approved the terms of the initial offer to the defense that set the beginning point for the subsequent negotiations that led to the NPA. Although Acosta did not sign the NPA, he participated in its drafting and approved it, with knowledge of its terms. During his OPR interview, Acosta acknowledged that he approved the NPA and accepted responsibility for it. Therefore, OPR considers Acosta to be responsible for the NPA and for the actions of the other subjects who implemented his decisions. Acosta's overall responsibility for the government's interactions or lack of communication with the victims is less clear, but Acosta affirmatively made certain decisions regarding victim notification, and OPR evaluates his conduct with respect to those decisions.

### A.   Findings and Conclusions Relating to the NPA

With respect to all five subjects of OPR's investigation, OPR concludes that the subjects did not commit professional misconduct with respect to the development, negotiation, and approval of the NPA. Under OPR's framework, professional misconduct requires a finding that a subject attorney intentionally or recklessly violated a clear and unambiguous standard governing the conduct at issue. OPR found no clear and unambiguous standard that required Acosta to indict Epstein on federal charges or that prohibited his decision to defer prosecution to the state. Furthermore, none of the individual terms of the NPA violated Department or other applicable standards.

As the U.S. Attorney, Acosta had the "plenary authority" under established federal law and Department policy to resolve the case as he deemed necessary and appropriate, as long as his decision was not motivated or influenced by improper factors. Acosta's decision to decline to

initiate a federal prosecution of Epstein was within the scope of his authority, and OPR did not find evidence that his decision was based on corruption or other impermissible considerations, such as Epstein's wealth, status, or associations. Evidence shows that Acosta resisted defense efforts to have the matter returned to the state for whatever result state authorities deemed appropriate, and he refused to eliminate the incarceration and sexual offender registration requirements. OPR did not find evidence establishing that Acosta's "breakfast meeting" with one of Epstein's defense counsel in October 2007 led to the NPA, which had been signed weeks earlier, or to any other significant decision that benefited Epstein. The contemporaneous records show that USAO managers' concerns about legal issues, witness credibility, and the impact of a trial on the victims led them to prefer a pre-charge resolution and that Acosta's concerns about the proper role of the federal government in prosecuting solicitation crimes resulted in his preference for a state-based resolution. Accordingly, OPR does not find that Acosta engaged in professional misconduct by resolving the federal investigation of Epstein in the way he did or that the other subjects committed professional misconduct through their implementation of Acosta's decisions.

Nevertheless, OPR concludes that Acosta's decision to resolve the federal investigation through the NPA constitutes poor judgment. Although this decision was within the scope of Acosta's broad discretion and OPR does not find that it resulted from improper factors, the NPA was a flawed mechanism for satisfying the federal interest that caused the government to open its investigation of Epstein. In Acosta's view, the federal government's role in prosecuting Epstein was limited by principles of federalism, under which the independent authority of the state should be recognized, and the federal responsibility in this situation was to serve as a "backstop" to state authorities by encouraging them to do more. However, Acosta failed to consider the difficulties inherent in a resolution that relied heavily on action by numerous state officials over whom he had no authority; he resolved the federal investigation before significant investigative steps were completed; and he agreed to several unusual and problematic terms in the NPA without the consideration required under the circumstances. In sum, Acosta's application of federalism principles was too expansive, his view of the federal interest in prosecuting Epstein was too narrow, and his understanding of the state system was too imperfect to justify the decision to use the NPA. Furthermore, because Acosta assumed a significant role in reviewing and drafting the NPA and the other three subjects who were supervisors left the USAO, were transitioning to other jobs, or were absent at critical junctures, Acosta should have ensured more effective coordination and communication during the negotiations and before approving the final NPA. The NPA was a unique resolution, and one that required greater oversight and supervision than Acosta provided.

### B.    Findings and Conclusions Relating to the Government's Interactions with Victims

OPR further concludes that none of the subject attorneys committed professional misconduct with respect to the government's interactions with victims. The subjects did not have a clear and unambiguous duty under the CVRA to consult with victims before entering into the NPA because the USAO resolved the Epstein investigation without a federal criminal charge. Significantly, at the time the NPA was signed, the Department did not interpret CVRA rights to attach unless and until federal charges had been filed, and the federal courts had not established a clear and unambiguous standard applying the CVRA before criminal charges were brought. In addition, OPR did not find evidence that the lack of consultation was for the purpose of silencing victims. Nonetheless, the lack of consultation was part of a series of government

interactions with victims that ultimately led to public and court condemnation of the government's treatment of the victims, reflected poorly on the Department as a whole, and is contradictory to the Department's mission to minimize the frustration and confusion that victims of a crime endure.

OPR determined that none of the subjects was responsible for communications sent to certain victims after the NPA was signed that described the case as "under investigation" and that failed to inform them of the NPA. The letters were sent by an FBI administrative employee who was not directly involved in the investigation, incorporated standard form language used by the FBI when communicating with victims, and were not drafted or reviewed by the subjects. Moreover, the statement that the matter was "under investigation" was not false because the government in fact continued to investigate the case in anticipation that Epstein would not fulfill the terms of the NPA. However, the letters risked misleading the victims and contributed to victim frustration and confusion by failing to provide important information about the status of the investigation. The letters also demonstrated a lack of coordination between the federal agencies responsible for communicating with Epstein's victims and showed a lack of attention to and oversight regarding communication with victims.

After the NPA was signed, Acosta elected to defer to the State Attorney the decision whether to notify victims about the state's plea hearing pursuant to the state's own victim's rights requirements. Although Acosta's decision was within his authority and did not constitute professional misconduct, OPR concludes that Acosta exercised poor judgment when he failed to make certain that the state notified to and would notify victims identified through the federal investigation about the state plea hearing. His decision left victims uninformed about an important proceeding that resolved the federal investigation, an investigation about which the USAO had communicated with victims for months. It also ultimately created the misimpression that the Department intentionally sought to silence the victims. Acosta failed to ensure that victims were made aware of a court proceeding that was related to their own cases, and thus he failed to ensure that victims were treated with forthrightness and dignity.

OPR concludes that the decision to postpone notifying victims about the terms of the NPA after it was signed and the omission of information about the NPA during victim interviews and conversations with victims' attorneys in 2008 do not constitute professional misconduct. Contemporaneous records show that these actions were based on strategic concerns about creating impeachment evidence that Epstein's victims had financial motives to make claims against him, evidence that could be used against victims at a trial, and were not for the purpose of silencing victims. Nonetheless, the failure to reevaluate the strategy prior to interviews of victims and discussions with victims' attorneys occurring in 2008 led to interactions that contributed to victims' feelings that the government was intentionally concealing information from them.

After examining the full scope and context of the government's interactions with victims, OPR concludes that the government's lack of transparency and its inconsistent messages led to victims feeling confused and ill-treated by the government; gave victims and the public the misimpression that the government had colluded with Epstein's counsel to keep the NPA secret from the victims; and undercut public confidence in the legitimacy of the resulting agreement. The overall result of the subjects' anomalous handling of this case understandably left many victims feeling ignored and frustrated and resulted in extensive public criticism. In sum, OPR concludes

that the victims were not treated with the forthrightness and sensitivity expected by the Department.

## VI.  ORGANIZATION OF THE REPORT

The Report is divided into three chapters.  In Chapter One, OPR describes the relevant federal, state, and local law enforcement entities involved in investigating Epstein's criminal conduct, as well as the backgrounds of the five subjects and their roles in the events in question. OPR provides a brief profile of Epstein and identifies the defense attorneys who interacted with the subjects.

In Chapter Two, OPR sets forth an extensive account of events relating to the federal investigation of Epstein.  The account begins with the initial complaint in March 2005 by a young victim and her parents to the local police—a complaint that launched an investigation by local law enforcement authorities—and continues through the mid-2006 opening of the federal investigation; the September 2007 negotiation and signing of the NPA; Epstein's subsequent efforts to invalidate the NPA through appeals to senior Department officials; Epstein's June 2008 guilty plea in state court; and, finally, efforts by the AUSA to ensure Epstein's compliance with the terms of the NPA during his incarceration and until his term of home detention ended in July 2010.  After describing the relevant events, OPR analyzes the professional misconduct allegations relating to the decisions made regarding the development and execution of the NPA.  OPR describes the relevant standards and sets forth its findings and conclusions regarding the subjects' conduct.

Chapter Three concerns the government's interactions with victims and the district court's findings regarding the CVRA.  OPR describes the relevant events and analyzes the subjects' conduct in light of the pertinent standards.

OPR sets forth the extensive factual detail provided in Chapters Two and Three, including internal USAO and Department communications, because doing so is necessary for a full understanding of the subjects' actions and of the bases for OPR's conclusions.

# TABLE OF CONTENTS

EXECUTIVE SUMMARY ................................................................................ i

I.      OVERVIEW OF FACTUAL BACKGROUND ............................................. i

II.     THE INITIATION AND SCOPE OF OPR'S INVESTIGATION...................... v

III.    OVERVIEW OF OPR'S ANALYTICAL FRAMEWORK ............................ vii

IV.     ISSUES CONSIDERED ........................................................................ viii

        A.    The Negotiation, Execution, and Implementation of the NPA ........................... viii

        B.    The District Court's Conclusion That the USAO Violated the CVRA ................ ix

V.      OPR'S FINDINGS AND CONCLUSIONS ................................................ ix

        A.    Findings and Conclusions Relating to the NPA ..................................... ix

        B.    Findings and Conclusions Relating to the Government's Interactions
              with Victims ............................................................................ x

VI.     ORGANIZATION OF THE REPORT ..................................................... xii

CHAPTER ONE:  SIGNIFICANT ENTITIES AND INDIVIDUALS........................... 1

I.      THE FEDERAL AND LOCAL LAW ENFORCEMENT AGENCIES ............. 1

        A.    The Department of Justice, the U.S. Attorney's Office for the
              Southern District of Florida, and the Federal Bureau of Investigation ............... 1

        B.    The State and Local Law Enforcement Agencies ................................... 4

II.     THE SUBJECT ATTORNEYS AND THEIR ROLES IN THE EPSTEIN CASE ............. 4

III.    JEFFREY EPSTEIN AND HIS DEFENSE ATTORNEYS................................ 8

        A.    Jeffrey Epstein ......................................................................... 8

        B.    Epstein's Defense Attorneys ........................................................... 8

CHAPTER TWO:  THE NON-PROSECUTION AGREEMENT ............................... 11

PART ONE:  FACTUAL BACKGROUND ....................................................... 11

I.      OVERVIEW ..................................................................................... 11

II.     MARCH 2005 – MAY 2006:  EPSTEIN IS INVESTIGATED BY THE PALM
        BEACH POLICE DEPARTMENT AND THE PALM BEACH COUNTY
        STATE ATTORNEY'S OFFICE ............................................................ 11

        A.    The Initial Allegations and the PBPD Investigation ............................... 11

        B.    The State Attorney's Office Decides to Present the Case to a State
              Grand Jury .............................................................................. 14

        C.    Florida State Procedure for Bringing Criminal Charges ........................... 15

        D.    PBPD Chief Reiter Becomes Concerned with the State Attorney's Office's
              Handling of the State Investigation and Seeks a Federal Investigation ............ 16

III.    THE FBI AND THE USAO INVESTIGATE EPSTEIN, AND THE
        DEFENSE TEAM ENGAGES WITH THE USAO ........................................................ 16

    A.    May 2006 – February 2007:  The Federal Investigation Is Initiated,
          and the USAO Opens a Case File ................................................................ 16

        1.    The PBPD Presents the Matter to the FBI and the USAO ....................... 17

        2.    May 2006:  The USAO Accepts the Case and Opens a Case File ............ 18

        3.    July 14, 2006:  Villafaña Informs Acosta and Sloman about the Case ...... 18

        4.    Late July 2006:  The State Indicts Epstein, and the USAO
              Moves Forward with a Federal Investigation ......................................... 20

        5.    October 2006 – February 2007:  Epstein's Defense Counsel
              Initiate Contact with Villafaña, Lourie, and Sloman, and
              Press for a Meeting ............................................................................ 22

        6.    February 2007:  Defense Counsel Meet with Lourie and
              Villafaña and Present the Defense Objections to a Federal Case ............. 24

    B.    February – May 2007:  Villafaña and the FBI Continue to Investigate;
          Villafaña Drafts a Prosecution Memorandum and Proposed Indictment
          for USAO Managers to Review .................................................................... 24

    C.    May – June 2007:  Miami Managers Consider the Prosecution Memorandum
          and Proposed Charges ............................................................................... 27

    D.    Defense Counsel Seek a Meeting with Senior USAO Managers, which
          Villafaña Opposes ..................................................................................... 30

    E.    June 2007:  Villafaña Supplements the Prosecution Memorandum ..................... 33

    F.    The June 26, 2007 Meeting with Defense Counsel ......................................... 33

IV.    ACOSTA DECIDES TO OFFER EPSTEIN A TWO-YEAR STATE PLEA TO
        RESOLVE THE FEDERAL INVESTIGATION .................................................... 35

    A.    June – July 2007:  The USAO Proposes a State Plea Resolution,
          which the Defense Rejects .......................................................................... 36

        1.    Acosta's Explanation for His Decision to Pursue a
              State-based Resolution ........................................................................ 37

        2.    July 2007:  Villafaña and Menchel Disagree about the
              Proposed State Resolution ................................................................... 40

    B.    Villafaña Attempts to Obtain the Computer Equipment Missing from
          Epstein's Palm Beach Home, but the Defense Team Opposes Her Efforts .......... 45

    C.    July 2007:  The Defense Continues Its Efforts to Stop the
          Federal Investigation ................................................................................. 47

    D.    Acosta Decides on a Resolution That Includes a Two-Year Term of
          Incarceration ............................................................................................ 48

        1.    The July 26, 2007 Meeting in Miami ...................................................... 48

2.      The Subjects' Explanations for the Decision to Offer Epstein
        a Sentence with a Two-Year Term of Incarceration ....................................49

E.      Villafaña Drafts a "Term Sheet" Listing the Requirements of a Potential
        Agreement with the Defense.................................................................51

V.      THE USAO PRESENTS EPSTEIN WITH KEY TERMS OF A DEAL:  PLEAD
        GUILTY TO STATE CHARGES REQUIRING A TWO-YEAR TERM OF
        INCARCERATION AND SEXUAL OFFENDER REGISTRATION, AND AGREE
        TO A MEANS FOR THE VICTIMS TO OBTAIN MONETARY DAMAGES ............ 53

A.      July 31, 2007:  The USAO Presents Its Proposal to the Defense Team,
        which Makes a Counteroffer.................................................................54

B.      In an August 3, 2007 Letter, the USAO States That a Two-Year Term of
        Imprisonment Is the Minimum That Will Vindicate the Federal Interest ............55

C.      August – September 2007:  Epstein Hires Additional Attorneys, Who
        Meet with Acosta...............................................................................59

        1.      Acosta Agrees to Meet with Epstein's New Attorneys ...........................59

        2.      Leading to the Meeting with Defense Counsel, Investigative
                Steps Are Postponed, and the Defense Continues to Oppose
                Villafaña's Efforts to Obtain the Computer Evidence ..............................60

        3.      September 7, 2007:  Acosta, Other USAO Attorneys, and
                FBI Supervisors Meet with Epstein Attorneys Starr, Lefkowitz,
                and Sanchez ......................................................................62

VI.     SEPTEMBER 2007:  THE PLEA NEGOTIATIONS INTENSIFY, AND IN THE
        PROCESS, THE REQUIRED TERM OF IMPRISONMENT IS REDUCED .................. 63

A.      The Incarceration Term Is Reduced from 24 Months to 20 Months ....................63

B.      September 12, 2007:  The USAO and Defense Counsel Meet with
        the State Attorney .............................................................................64

C.      The Evidence Does Not Clearly Show Why the Term of Incarceration
        Was Reduced from 24 Months to 20 Months to 18 Months................................66

D.      The Parties Continue to Negotiate but Primarily Focus on a Potential Plea
        to Federal Charges .............................................................................68

E.      The Parties Appear to Reach Agreement on a Plea to Federal Charges................72

F.      Defense Counsel Offers New Proposals Substantially Changing the
        Terms of the Federal Plea Agreement, which the USAO Rejects ........................73

G.      Villafaña and Lourie Recommend Ending Negotiations, but Acosta
        Urges That They "Try to Work It Out" ....................................................76

H.      Acosta Edits the Federal Plea Agreement, and Villafaña Sends a
        Final Version to the Defense.................................................................77

I.      The Defense Rejects the Federal Plea Agreement, Returns to the NPA
        "State-Only" Resolution, and Begins Opposing the Sexual Offender
        Registration Requirement ........................................................................78

J.      The USAO Agrees Not to Criminally Charge "Potential Co-Conspirators".........79

K.      The USAO Rejects Defense Efforts to Eliminate the Sexual Offender
        Registration Requirement ........................................................................81

L.      The Defense Adds a Confidentiality Clause ..........................................83

VII.    SEPTEMBER 24, 2007:  ACOSTA MAKES FINAL EDITS, AND THE
        NPA IS SIGNED ...............................................................................84

VIII.   POST-NPA NEGOTIATIONS ..........................................................87

A.      September – October 2007:  Sloman's Concerns about Selection of an
        Attorney Representative Lead to a Proposed NPA Addendum ...........................87

B.      October 12, 2007:  Acosta and Defense Attorney Lefkowitz
        Meet for Breakfast ...............................................................................89

C.      Acosta Agrees to the Defense Request to Postpone Epstein's Guilty Plea;
        the Parties Continue to Negotiate Issues concerning the Attorney
        Representative and Finally Reach Agreement on the NPA Addendum ...............91

D.      Epstein Further Delays His Guilty Plea ...................................................94

E.      Epstein Seeks Departmental Review of the NPA's § 2255 Provision
        Relating to Monetary Damages for the Victims ......................................94

F.      Despite Affirming the NPA, Defense Counsel Intensify Their Challenges
        to It and Accuse Villafaña of Improper Conduct .....................................98

        1.      December 7 and 11, 2007:  Starr and Lefkowitz Send to
                Acosta Letters and "Ethics Opinions" Complaining about
                the Federal Investigation and Villafaña ....................................98

        2.      As a Result of the Starr and Lefkowitz Submissions, the New
                USAO Criminal Chief Begins a Full Review of the Evidence,
                and Acosta Agrees to Meet Again with Defense Counsel .....................99

        3.      The Defense Notifies Acosta That It May Pursue a Department
                Review of the USAO's Actions ..............................................99

        4.      Acosta Attempts to Revise the NPA § 2255 Language concerning
                Monetary Damages, but the Defense Does Not Accept It ..................100

        5.      January 7, 2008:  Acosta and Sloman Meet with Sanchez, Who
                Makes Additional Allegations of USAO Misconduct .......................101

        6.      Acosta Asks CEOS to Review the Evidence ...............................102

IX.     FEBRUARY – JUNE 2008:  THE DEPARTMENT'S REVIEW ...................................103

A.      February – May 15, 2008:  Review by CEOS and the Criminal Division..........104

    B.      May – June 23, 2008:  Review by the Office of the Deputy
            Attorney General ........................................................................108

X.     JUNE 2008 – JUNE 2009:  EPSTEIN ENTERS HIS PLEAS AND
       SERVES HIS CUSTODIAL SENTENCE ....................................... 110

    A.      June 30, 2008:  Epstein Enters His Guilty Pleas in State Court .........................111

    B.      Epstein Is Placed on Work Release ....................................................113

XI.    POST-RELEASE DEVELOPMENTS ........................................................... 117

PART TWO:  APPLICABLE STANDARDS ....................................................... 119

I.      OPR'S ANALYTICAL FRAMEWORK ....................................................... 119

II.     APPLICABLE STANDARDS OF CONDUCT ............................................ 120

    A.      The United States Attorneys' Manual .................................................120

        1.      USAM Provisions Relating to the Initiation and Declination
              of a Federal Prosecution .................................................120

        2.      USAM § 9-2.031:  The Petite Policy ....................................122

        3.      USAM Provisions Relating to Plea Agreements ....................................123

        4.      USAM Provisions Relating to Non-Prosecution Agreements ................124

        5.      USAM Provisions Relating to Grants of Immunity ...............................125

        6.      USAM/C.F.R. Provisions Relating to Financial Conflicts of Interest .....125

    B.      Other Department Policies .................................................................125

        1.      Department Policies Relating to the Disposition of Charges ...................125

        2.      Department Policy Relating to Deportation of Criminal Aliens ..............127

    C.      Case Law .........................................................................................127

        1.      Prosecutorial Discretion .................................................................127

        2.      Plea Agreement Promises of Leniency towards a Third Party ...............128

    D.      State Bar Rules .................................................................................129

        1.      FRPC 4-1.1 – Competence ...............................................................130

        2.      FRPC 4-1.3 – Diligence ....................................................................130

        3.      FRPC 4-4.1 – Candor in Dealing with Others .........................................130

        4.      FRPC 4-8.4 – Conduct Prejudicial to the Administration of Justice .......131

PART THREE:  ANALYSIS .......................................................................... 133

I.      OVERVIEW ..................................................................................... 133

II.     ACOSTA REVIEWED AND APPROVED THE TERMS OF THE NPA AND IS
       ACCOUNTABLE FOR IT ................................................................ 133

III.   OPR FOUND THAT NONE OF THE SUBJECTS VIOLATED A CLEAR AND
       UNAMBIGUOUS STATUTE, PROFESSIONAL RESPONSIBILITY RULE OR
       STANDARD, OR DEPARTMENT REGULATION OR POLICY, IN
       NEGOTIATING, APPROVING, OR ENTERING INTO THE NPA ........................... 134

       A.   U.S. Attorneys Have Broad Discretion to Resolve Investigations or
            Cases as They Deem Appropriate, and Acosta's Decision to Decline
            to Prosecute Epstein Federally Does Not Constitute Professional
            Misconduct............................................................................................135

       B.   No Clear and Unambiguous Standard Precluded Acosta's Use of a
            Non-Prosecution Agreement to Resolve the Federal Investigation
            of Epstein ..............................................................................................136

       C.   The NPA's Individual Provisions Did Not Violate Any Clear and
            Unambiguous Standards .........................................................................137

            1.   Acosta Had Authority to Approve an Agreement That Required
                 Epstein to Plead to Offenses Resulting in an 18-Month Term of
                 Incarceration ............................................................................137

            2.   The USAO's Agreement Not to Prosecute Unidentified "Potential
                 Co-Conspirators" Did Not Violate a Clear and Unambiguous
                 Department Policy ....................................................................139

            3.   The NPA Did Not Violate Department Policy Relating to
                 Deportation of Criminal Aliens ................................................140

IV.    THE EVIDENCE DOES NOT ESTABLISH THAT THE SUBJECTS WERE
       INFLUENCED BY IMPROPER MOTIVES TO INCLUDE IN THE NPA
       TERMS FAVORABLE TO EPSTEIN OR TO OTHERWISE EXTEND
       BENEFITS TO EPSTEIN ..................................................................................... 140

       A.   OPR Found No Evidence of Criminal Corruption, Such as Bribery, Gratuity,
            or Illegal Political or Personal Consideration .....................................141

       B.   Contemporaneous Written Records and Witness and Subject Interviews
            Did Not Reveal Evidence Establishing That the Subjects Were
            Improperly Influenced by Epstein's Status, Wealth, or Associations ................142

            1.   The Contemporaneous Records Did Not Reveal Evidence
                 Establishing That the NPA Resulted from Improper Factors .................142

            2.   The Subjects Asserted That They Were Motivated by
                 Reasonable Strategic and Policy Considerations, Not
                 Improper Influences .................................................................143

            3.   Subject and Witness Interviews and Contemporaneous Records
                 Identified Case-Specific Considerations Relating to Evidence,
                 Legal Theories, Litigation Risk, and a Trial's Potential Impact
                 on Victims ................................................................................144

       C.   Other Significant Factors Are Inconsistent with a Conclusion That
            the Subjects' Actions Were Motivated by Improper Influences.........................149

D. OPR Does Not Find That the Subjects' Preexisting Relationships with Defense Counsel, Decisions to Meet with Defense Counsel, and Other Factors Established That the Subjects Acted from Improper Influences or Provided Improper Benefits to Epstein ...............................................................150

   1. The Evidence Does Not Establish That the Subjects Extended Any Improper Benefit to Epstein because of Their Preexisting Relationships with His Attorneys ............................................................150

   2. The Subjects Asserted That Their Relationships with Defense Counsel Did Not Influence Their Actions ...................................................151

E. The Evidence Does Not Establish That the Subjects' Meetings with Defense Counsel Were Improper Benefits to Epstein .........................................155

   1. The Evidence Shows That the Subjects' Decisions to Meet with Epstein's Legal Team Were Warranted by Strategic Considerations......155

   2. The Evidence Does Not Establish That Acosta Negotiated a Deal Favorable to Epstein over Breakfast with Defense Counsel ..........160

F. Villafaña's Emails with Defense Attorney Lefkowitz during the NPA Negotiations Do Not Establish That Villafaña, or Other Subjects, Intended to Give Epstein Preferential Treatment or Were Motivated by Favoritism or Other Improper Influences ...........................................................163

G. The Evidence Does Not Establish That Acosta, Lourie, or Villafaña Agreed to the NPA's Provision Promising Not to Prosecute "Potential Co-conspirators" in Order to Protect Any of Epstein's Political, Celebrity, or Other Influential Associates ...........................................................................166

H. OPR's Investigation Did Not Reveal Evidence Establishing That Epstein Cooperated in Other Federal Investigations or Received Special Treatment on That Basis ..............................................................................................168

V. ACOSTA EXERCISED POOR JUDGMENT BY RESOLVING THE FEDERAL INVESTIGATION THROUGH THE NPA ............................................................169

A. Acosta's Decision to Resolve the Federal Investigation through a State Plea under Terms Incorporated into the NPA Was Based on a Flawed Application of the Petite Policy and Federalism Concerns, and Failed to Consider the Significant Disadvantages of a State-Based Resolution .....................................170

B. The Assessment of the Merits of a Potential Federal Prosecution Was Undermined by the Failure to Obtain Evidence or Take Other Investigative Steps That Could Have Changed the Complexion of the Case ...........................175

C. OPR Was Unable to Determine the Basis for the Two-Year Term of Incarceration, That It Was Tied to Traditional Sentencing Goals, or That It Satisfied the Federal Interest in the Prosecution .....................................179

D. Acosta's Decisions Led to Difficulties Enforcing the NPA ...............................182

E. Acosta Did Not Exercise Sufficient Supervisory Review over the Process ........182

CHAPTER THREE:  ISSUES RELATING TO THE GOVERNMENT'S INTERACTIONS AND COMMUNICATIONS WITH VICTIMS ........................................................ 189

PART ONE:  FACTUAL BACKGROUND ........................................................ 189

I.      OVERVIEW ........................................................................................... 189

II.     THE CVRA, 18 U.S.C. § 3771 ............................................................ 189

        A.      History ...........................................................................................189

        B.      Enumerated Rights .......................................................................191

III.    THE DEPARTMENT'S INTERPRETATION OF THE CVRA'S DEFINITION OF "CRIME VICTIM" AT THE TIME OF THE EPSTEIN INVESTIGATION ............... 192

        A.      April 1, 2005 Office of Legal Counsel "Preliminary Review"............................192

        B.      2005 Attorney General Guidelines for Victim and Witness Assistance.............193

IV.     USAO AND FBI VICTIM/WITNESS NOTIFICATION PRACTICE AT THE TIME OF THE EPSTEIN INVESTIGATION ................................................. 194

        A.      USAO Training ............................................................................194

        B.      The Automated Victim Notification System .........................................195

        C.      FBI Victim Notification Pamphlets .......................................................196

V.      THE INTRODUCTORY USAO AND FBI LETTERS TO VICTIMS.......................... 196

        A.      August 2006:  The FBI Victim Notification Letters....................................196

        B.      August 2006:  The USAO's Letters to Victims ......................................198

        C.      USAO and FBI Letters Are Hand Delivered ..........................................200

VI.     AUGUST 2006 – SEPTEMBER 2007:  FBI AND USAO CONTACTS WITH VICTIMS BEFORE THE NPA IS SIGNED.................................................... 200

        A.      The Case Agents and Villafaña Solicit Some Victims' Opinions about Resolving the Federal Investigation..................................................201

        B.      Before the NPA Is Signed, Villafaña Expresses Concern That Victims Have Not Been Consulted..........................................................202

                1.      July 2007:  Villafaña's Email Exchanges with Menchel ........................202

                2.      Villafaña Asserts That Her Supervisors Gave Instructions Not to Consult Victims about the Plea Discussions, but Her Supervisors Do Not Currently Recall Such Instructions ..............................................204

                3.      September 6, 2007:  Villafaña Informs Sloman, Who Informs Acosta, of Oosterbaan's Opinion That Consultation with Victims Was Required......................................................................204

VII.    SEPTEMBER 24, 2007 – JUNE 30, 2008:  AFTER THE NPA IS SIGNED, THE USAO MAKES VARIOUS VICTIM NOTIFICATION DECISIONS.......................... 206

A.  September – October 2007:  The Case Agents Notify Some Victims about the NPA, but Stop When the Case Agent Becomes Concerned about Potential Impeachment..........................................................................207

B.  October 2007:  Defense Attorneys Object to Government Victim Notifications.................................................................................................210

C.  October – November 2007:  The FBI and the USAO Continue to Investigate, and the FBI Sends a Notice Letter to One Victim Stating That the Case is "Under Investigation" ...............................................211

D.  The USAO Informs the Defense That It Intends to Notify Victims by Letter about Epstein's State Plea Hearing and the Resolution of the Federal Investigation, but the Defense Strongly Objects to the Notification Plan ..........212

E.  December 19, 2007:  Acosta Advises the Defense That the USAO Will Defer to the State Attorney the Decision Whether to Notify Victims of the State Plea Hearing, but the USAO Would Notify Them of the Federal Resolution, "as Required by Law"....................................................................216

F.  January – June 2008:  While the Defense Presses Its Appeal to the Department in an Effort to Undo the NPA, the FBI and the USAO Continue Investigating Epstein ...........................................................220

   1.  Villafaña Prepares to Contact Victims in Anticipation That Epstein Will Breach the NPA ............................................................220

   2.  The FBI Uses VNS Form Letters to Re-Establish Contact with Victims.................................................................................................221

   3.  Villafaña, the FBI, and the CEOS Trial Attorney Interview Victims......224

   4.  February – March 2008:  Villafaña Takes Additional Steps to Prepare for a Prosecution of Epstein, Arranges for *Pro Bono* Attorneys for Victims, and Cautions about Continued Delay ................227

   5.  March – April 2008:  Villafaña Continues to Prepare for Filing Federal Charges ........................................................................227

VIII.  USAO SUPERVISORS CONSIDER CVRA OBLIGATIONS IN AN UNRELATED MATTER AND IN LIGHT OF A NEW FIFTH CIRCUIT OPINION........................... 228

IX.  JUNE 2008:  VILLAFAÑA'S PRE-PLEA CONTACTS WITH THE ATTORNEY REPRESENTING THE VICTIMS WHO LATER BECAME THE CVRA PETITIONERS ....................................................................... 229

X.  JUNE 2008:  EFFORTS TO NOTIFY VICTIMS ABOUT THE JUNE 30, 2008 PLEA HEARING........................................................................... 231

XI.  JUNE 30, 2008:  EPSTEIN ENTERS HIS GUILTY PLEAS IN A STATE COURT HEARING AT WHICH NO VICTIMS ARE PRESENT................................. 234

XII.  SIGNIFICANT POST-PLEA DEVELOPMENTS........................................... 235

A.  Immediately After Epstein's State Guilty Pleas, Villafaña Notifies Some Victims' Attorneys.................................................................................235

B.      July 7, 2008:  The CVRA Litigation Is Initiated ...................................................236

C.      July 2008:  Villafaña Prepares and Sends a Victim Notification Letter
        to Listed Victims.................................................................................................237

D.      July – August 2008:  The FBI Sends the Victim Notification Letter to
        Victims Residing Outside of the United States...................................................238

E.      August – September 2008:  The Federal Court Orders the USAO to
        Disclose the NPA to Victims, and the USAO Sends a Revised Victim
        Notification Letter...............................................................................................239

F.      2010 – 2011:  Department and Congressional Actions Regarding
        Interpretation of the CVRA .................................................................................241

G.      The CVRA Litigation Proceedings and Current Status ......................................242

PART TWO:  APPLICABLE STANDARDS ............................................................................ 247

I.      STATUTORY PROVISIONS ........................................................................................ 247

A.      The CVRA, 18 U.S.C. § 3771 ............................................................................247

B.      The Victims' Rights and Restitution Act of 1990 (VRRA), 34 U.S.C. § 20141,
        Services to Victims (formerly cited as 42 USCA § 10607)................................248

II.     DEPARTMENT POLICY:  THE 2005 ATTORNEY GENERAL GUIDELINES
        FOR VICTIM AND WITNESS ASSISTANCE (2005 GUIDELINES)....................... 249

III.    FLORIDA RULES OF PROFESSIONAL CONDUCT.................................................. 253

A.      FRPC 4-4.1 – Candor in Dealing with Others ...................................................253

B.      FRPC 4-8.4 – Conduct Prejudicial to the Administration of Justice .................253

PART THREE:  ANALYSIS.................................................................................................... 255

I.      OVERVIEW .................................................................................................................... 255

II.     THE SUBJECTS DID NOT VIOLATE A CLEAR AND UNAMBIGUOUS
        STANDARD BY ENTERING INTO THE NPA WITHOUT CONSULTING
        THE VICTIMS .............................................................................................................. 255

A.      At the Time, No Clear and Unambiguous Standard Required the USAO
        to Notify Victims Regarding Case-Related Events until after the Filing
        of Criminal Charges............................................................................................256

B.      OPR Did Not Find Evidence Establishing That the Lack of Consultation
        Was Intended to Silence Victims.........................................................................258

III.    LETTERS SENT TO VICTIMS BY THE FBI WERE NOT FALSE
        STATEMENTS BUT RISKED MISLEADING VICTIMS ABOUT THE
        STATUS OF THE FEDERAL INVESTIGATION........................................................ 261

A.      The USAO Was Not Responsible for Victim Notification Letters Sent
        by the FBI in October 2007, January 2008, and May 2008 Describing
        the Status of the Case as "Under Investigation" ................................................262

B.     Because the Federal Investigation Continued after the NPA Was Signed, the FBI Letters Were Accurate but Risked Misleading Victims regarding the Status of the Federal Investigation .................................................................263

IV.   ACOSTA'S DECISION TO DEFER TO THE STATE ATTORNEY'S DISCRETION WHETHER TO NOTIFY VICTIMS ABOUT EPSTEIN'S STATE COURT PLEA HEARING DID NOT VIOLATE A CLEAR OR UNAMBIGUOUS STANDARD; HOWEVER, ACOSTA EXERCISED POOR JUDGMENT BY FAILING TO ENSURE THAT VICTIMS IDENTIFIED IN THE FEDERAL INVESTIGATION WERE ADVISED OF THE STATE PLEA HEARING ................. 265

A.     Acosta's Decision to Defer to the State Attorney's Discretion Whether to Notify Victims about Epstein's State Court Plea Hearing Did Not Violate Any Clear or Unambiguous Standard .....................................................265

B.     Acosta Exercised Poor Judgment When He Failed to Ensure That Victims Identified in the Federal Investigation Were Informed of the State Plea Hearing ...............................................................................................269

V.    VILLAFAÑA DID NOT COMMIT PROFESSIONAL MISCONDUCT IN HER ORAL COMMUNICATIONS TO VICTIMS AND VICTIMS' ATTORNEYS, IN WHICH SHE DESCRIBED THE CASE AS "UNDER INVESTIGATION" BUT DID NOT DISCLOSE THE EXISTENCE OF THE NPA TO SOME VICTIMS .................................................................................................................273

VI.   THE GOVERNMENT FAILED TO TREAT VICTIMS FORTHRIGHTLY AND WITH SENSITIVITY WHEN IT FAILED TO TIMELY PROVIDE VICTIMS WITH IMPORTANT INFORMATION ABOUT THE RESOLUTION OF THE FEDERAL INVESTIGATION ......................................................................... 280

CONCLUSION.................................................................................................... 283

METHODOLOGY ............................................................................................... 287

Exhibit 1:  State Indictment

Exhibit 2:  September 6, 2007 Draft Non-Prosecution Agreement

Exhibit 3:  September 24, 2007 Non-Prosecution Agreement

Exhibit 4:  Addendum to the Non-Prosecution Agreement

Exhibit 5:  State Information

[Page Intentionally Left Blank]

# CHAPTER ONE

# SIGNIFICANT ENTITIES AND INDIVIDUALS

## I.      THE FEDERAL AND LOCAL LAW ENFORCEMENT AGENCIES

### A.      The Department of Justice, the U.S. Attorney's Office for the Southern District of Florida, and the Federal Bureau of Investigation

The Department of Justice (Department) is a cabinet-level executive branch department headed by the United States Attorney General.  The stated mission of the Department is to enforce federal law and defend the interests of the United States; ensure public safety; provide federal leadership in preventing and controlling crime; seek just punishment for those guilty of unlawful behavior; and ensure the fair and impartial administration of justice.  The Department enforces federal criminal law through investigations and prosecutions of violations of federal criminal statutes.  It also engages in civil litigation.  During the period relevant to this Report, the Department had approximately 110,000 employees in 40 components.  The Department's headquarters are in Washington, D.C., and it conducts most of its work through field locations around the nation and overseas.

The prosecution of federal criminal laws is handled primarily through 94 U.S. Attorney's Offices, each headed by a presidentially appointed (with advice and consent of the U.S. Senate) U.S. Attorney who has independent authority over his or her office but is overseen by the Attorney General through the Deputy Attorney General.[1]  The Department's Criminal Division, headed by an Assistant Attorney General, includes components with specialized areas of expertise that also prosecute cases, assist in the prosecutions handled by U.S. Attorney's Offices, and provide legal expertise and policy guidance.  Among the Criminal Division components mentioned in this Report are the Appellate Section, the Office of Enforcement Operations, the Computer Crime and Intellectual Property Section, and, most prominently, the Child Exploitation and Obscenity Section (CEOS).

CEOS, based in Washington, D.C., comprises attorneys and investigators who specialize in investigating and prosecuting child exploitation crimes, especially those involving technology, and they assist U.S. Attorney's Offices in investigations, trials, and appeals related to these offenses.  CEOS provides advice and training to federal prosecutors, law enforcement personnel, and government officials. CEOS also works to develop and refine proposals for prosecution policies, legislation, government practices, and agency regulations.

The U.S. Attorneys' Manual (USAM) (revised in 2018 and renamed the Justice Manual) is a compilation of Department rules, policies, and guidance governing the conduct of Department employees.  It includes requirements for approval by, or consultation with, the Criminal Division

---

[1]        Two U.S. Attorney's Offices, in the judicial districts of Guam and of the Northern Mariana Islands, are headed by a single U.S. Attorney.  The Attorney General and the U.S. District Court have authority to appoint acting and interim U.S. Attorneys.

or other divisions having responsibility for specific criminal enforcement, such as the Civil Rights Division. In this Report, OPR applies the USAM provisions in effect at the relevant time.

During the period most relevant to this Report, the Attorney General was Michael Mukasey, the Deputy Attorney General was Mark Filip, and the Assistant Attorney General for the Criminal Division was Alice Fisher. The Chief of CEOS was Andrew Oosterbaan.

The U.S. Attorney's Office for the Southern District of Florida (USAO) handles federal matters in the Southern District of Florida judicial district, which covers the counties of Miami-Dade, Broward, Monroe, Palm Beach, Martin, St. Lucie, Indian River, Okeechobee, and Highlands, an area of over 15,000 square miles. During the period relevant to this Report, the USAO had a staff of approximately 200 Assistant U.S. Attorneys (AUSAs) and 200 support personnel. The main office is in Miami; staffed branch offices are located in Fort Lauderdale, West Palm Beach (covering Palm Beach County), and Fort Pierce; and an unstaffed branch office is located in Key West. The West Palm Beach USAO office is approximately 70 miles from the Miami office. The USAO is headed by the U.S. Attorney; the second-in-command is the First Assistant U.S. Attorney (FAUSA), who serves as principal advisor to the U.S. Attorney and supervises all components of the USAO, including the Criminal, Civil, and Appellate Divisions, each of which is headed by a Chief. During the period relevant to this Report, the West Palm Beach office consisted of two criminal sections and was headed by a Managing AUSA.

The Federal Bureau of Investigation (FBI) is the principal federal law enforcement agency and is part of the Department. It maintains field offices that work with U.S. Attorney's Offices. The FBI field office in Miami, headed by a Special Agent in Charge, has satellite offices, known as Resident Agencies, one of which is located in West Palm Beach and covers Palm Beach County. The Epstein investigation was handled by Special Agents assigned to a particular West Palm Beach Resident Agency squad, headed by a Supervisory Special Agent. FBI responsibility for advising crime victims of their rights and of victim services available to them is handled by non-agent Victim Specialists.

The following chart shows the Department's organizational structure during the period relevant to this Report:



**U.S. Department of Justice 2006 - 2008**

Attorney General

Deputy Attorney General

SOLICITOR GENERAL

ASSOCIATE ATTORNEY GENERAL

OFFICE OF THE SOLICITOR GENERAL

OFFICE OF LEGAL POLICY

OFFICE OF PUBLIC AFFAIRS

OFFICE OF JUSTICE PROGRAMS

COMMUNITY ORIENTED POLICING SERVICES

CIVIL RIGHTS DIVISION

CIVIL DIVISION

OFFICE OF LEGISLATIVE AFFAIRS

OFFICE OF LEGAL COUNSEL

FEDERAL BUREAU OF INVESTIGATION

CRIMINAL DIVISION

NATIONAL SECURITY DIVISION

OFFICE OF PROFESSIONAL RESPONSIBILITY

EXECUTIVE OFFICE FOR THE UNITED STATES

OFFICE OF INFORMATION AND PRIVACY

ANTITRUST DIVISION

ENVIRONMENT AND NATURAL RESOURCES DIVISION

OFFICE OF INTER-GOVERNMENTAL AND PUBLIC LIASON

DRUG ENFORCEMENT ADMINISTRATION

BUREAU OF PRISONS

OFFICE OF THE INSPECTOR GENERAL

OFFICE OF THE PARDON ATTORNEY

OFFICE OF DISPUTE RESOLUTION

FOREIGN CLAIMS SETTLEMENT COMMISSION

TAX DIVISION

COMMUNITY RELATIONS SERVICE

EXECUTIVE OFFICE FOR UNITED STATES ATTORNEYS

UNITED STATES MARSHALS SERVICE

JUSTICE MANAGEMENT DIVISION

UNITED STATES PAROLE COMMISSION

OFFICE OF VIOLENCE AGAINST WOMEN

UNITED STATES ATTORNEYS

U.S. NATIONAL CENTRAL BUREAU INTERPOL

EXECUTIVE OFFICE FOR IMMIGRATION REVIEW

NATIONAL DRUG INTELLIGENCE CENTER

BUREAU OF ALCOHOL, TOBACCO, FIREARMS, & EXPLOSIVES

OFFICE OF THE FEDERAL DETENTION TRUSTEE

PROFESSIONAL RESPONSIBILITY ADVISORY OFFICE

### B.      The State and Local Law Enforcement Agencies

Florida state criminal prosecutions are primarily managed by an Office of State Attorney in each of the state's 20 judicial circuits, headed by a State Attorney who is elected to a four-year term.  Palm Beach County constitutes the 15th Judicial Circuit.  Barry Krischer was the elected State Attorney for that circuit from 1992 until January 2009.  During the period relevant to this Report, the Palm Beach County State Attorney's Office, based in the City of West Palm Beach, had more than 100 attorneys and several investigators, and a Crimes Against Children Unit headed by Assistant State Attorney Lanna Belohlavek.

The incorporated Town of Palm Beach occupies the coastal barrier island off the city of West Palm Beach.  Its law enforcement agency is the Palm Beach Police Department (PBPD). Michael Reiter, who joined the PBPD in 1981, served as PBPD Chief from 2001 to February 2009.

The Palm Beach County Sheriff's Office (PBSO), based in the City of West Palm Beach, is the largest law enforcement agency in the county.  Through its Department of Corrections, the PBSO operates the Main Detention Center and, during the period relevant to this Report, housed minimum-security detainees, including those on work release, at its Stockade facility.  The current Sheriff has served continuously since January 2005.

## II.     THE SUBJECT ATTORNEYS AND THEIR ROLES IN THE EPSTEIN CASE

**R. Alexander Acosta** was appointed Interim U.S. Attorney for the Southern District of Florida in June 2005, at age 36.  In June 2006, President George W. Bush formally nominated Acosta, and after Senate confirmation, Acosta was sworn in as the U.S. Attorney in October 2006.

After graduating from law school, Acosta served a federal appellate clerkship; an 18-month term as an associate at the firm of Kirkland & Ellis in Washington, D.C.; approximately four years as a policy fellow and law school lecturer; and nearly two years as a Deputy Assistant Attorney General in the Department's Civil Rights Division.  He was presidentially appointed in 2002 as a member of the National Labor Relations Board, and in 2003 as Assistant Attorney General in charge of the Department's Civil Rights Division, where he served from August 2003 until his appointment as Interim U.S. Attorney, and where he oversaw, among other things, the prosecution of human trafficking and child sex-trafficking cases.  As U.S. Attorney, Acosta's office was in the USAO's Miami headquarters, although he traveled to the USAO's branch offices.

During Acosta's tenure as U.S. Attorney, the USAO initiated the federal investigation of Epstein, engaged in plea discussions with Epstein's counsel, and negotiated the federal non-prosecution agreement (NPA) that is the subject of this Report.  Acosta made the decision to resolve the federal investigation into Epstein's conduct by allowing Epstein to enter a state plea. Acosta was personally involved in the negotiations that led to the NPA, reviewed various iterations of the agreement, and approved the final agreement signed by the USAO.  Acosta continued to provide supervisory oversight and to have meetings and other communications with Epstein's attorneys during the nine-month period between the signing of the NPA on September 24, 2007, and Epstein's entry of guilty pleas in state court pursuant to the terms of the agreement, on June 30, 2008. On December 8, 2008, after the presidential election and while Epstein was serving his state prison sentence, Acosta was formally recused from all matters involving the law firm of

Kirkland & Ellis, which was representing Epstein, because Acosta had begun discussions with the firm about possible employment.

After leaving the USAO in June 2009, Acosta became the Dean of the Florida International University College of Law. In April 2017, Acosta became the U.S. Secretary of Labor, but he resigned from that post effective July 19, 2019, following public criticism of the USAO's handling of the Epstein case.

**Jeffrey H. Sloman** joined the USAO in 1990 as a line AUSA. In 2001, he became Deputy Chief of the USAO's Fort Lauderdale branch office Narcotics and Violent Crimes Section, and in 2003, became the Managing AUSA for that branch office. In early 2004, Sloman was appointed Chief of the USAO's Criminal Division. In October 2006, Sloman became the FAUSA, and Sloman's office was located with Acosta's in the Miami office's executive suite.

As FAUSA, Sloman was responsible for supervising the Civil, Criminal, and Appellate Divisions, and he was part of the supervisory team that oversaw the Epstein investigation. Although Sloman had relatively little involvement in the decisions and negotiations that led to the NPA and did not review it before it was signed, he personally negotiated an addendum to the NPA, which he signed on behalf of the USAO in October 2007. After subordinates Matthew Menchel and Andrew Lourie left the USAO, Sloman directly engaged with the line AUSA, Marie Villafaña, on Epstein matters, and participated in meetings and other communications with defense counsel. After Acosta was formally recused from the Epstein matter in December 2008, Sloman became the senior USAO official supervising the matter. When Acosta left the USAO, Sloman became the Acting U.S. Attorney for the Southern District of Florida, and in January 2010, the Attorney General appointed Sloman to be the Interim U.S. Attorney for the district. Sloman left the USAO to enter private practice in June 2010.

**Matthew I. Menchel** joined the USAO in 1998 after having served as a New York County (Manhattan) Assistant District Attorney for 11 years. After several years as a line AUSA, Menchel became Chief of the USAO's Major Crimes Section. In October 2006, Menchel became the Chief of the USAO's Criminal Division, based in Miami. As Criminal Division Chief, Menchel was part of the supervisory team that oversaw the Epstein investigation, and he participated in meetings and other communications with defense counsel. Menchel participated in the decision to extend a two-year state-based plea proposal to Epstein and communicated it to the defense. Shortly after that plea offer was extended to Epstein in early August 2007, and before the precise terms of the NPA were negotiated with defense counsel, Menchel left the USAO to enter private practice.

**Andrew C. Lourie** joined the USAO as a line AUSA in 1994, after having served for three years as an AUSA in New Jersey. During his 13-year tenure at the USAO, Lourie served two terms on detail as the Acting Chief of the Department's Criminal Division's Public Integrity Section, first from September 2001 until September 2002, and then from February 2006 until July 2006. Between those two details, and again after his return to the USAO in July 2006, Lourie was a Deputy Chief of the USAO's Criminal Division, serving as the Managing AUSA for the West Palm Beach branch office. Lourie was part of the supervisory team that oversaw the Epstein investigation and negotiated the NPA, participating in meetings and other communications with defense counsel. During September 2007, while the NPA was being negotiated, Lourie transitioned out of the USAO to serve on detail as the Principal Deputy Assistant Attorney General

for the Department's Criminal Division, a position in which he served as Chief of Staff to Assistant Attorney General Alice Fisher. Lourie left the Department in February 2008 to enter private practice.

**Ann Marie C. Villafaña** joined the USAO in September 2001 as a line AUSA. She served in the Major Crimes Section in Miami until January 2004, when she transferred to the West Palm Beach branch office. Villafaña handled the majority of the child exploitation cases in West Palm Beach, along with other criminal matters. In 2006, she was designated as the USAO's first coordinator for Project Safe Childhood, a new Department initiative focusing on child sexual exploitation and abuse.[2]

In 2006, Villafaña assumed responsibility for the Epstein investigation. As the line AUSA, Villafaña handled all aspects of the investigation. Villafaña determined the lines of inquiry to pursue, identified the witnesses to be interviewed, conducted legal research to support possible charges, and sought guidance from others at the USAO and in the Department. Villafaña, along with the FBI case agents and the FBI Victim Specialist, had direct contact with Epstein's victims. She handled court proceedings related to the investigation. She drafted a prosecution memorandum, indictment, and related documents, and revised those documents in response to comments from those in her supervisory chain of command. Villafaña participated in meetings between members of the USAO and counsel for Epstein, and prepared briefing materials for management in preparation for those meetings and in response to issues raised during those meetings. Although Acosta made the decision to utilize a non-prosecution agreement to resolve the federal investigation and approved the terms of the NPA, Villafaña was the primary USAO representative negotiating with defense counsel and drafting the language of the NPA, under her supervisors' direction and guidance, and she signed the NPA on behalf of the USAO. Thereafter, Villafaña monitored Epstein's compliance with the NPA and addressed issues relating to his conduct. After two victims pursued a federal civil lawsuit seeking enforcement of their rights under the Crime Victims' Rights Act (CVRA), 18 U.S.C. § 3771 ("the CVRA litigation" or "the CVRA case"), in July 2008, Villafaña served as co-counsel to the lead attorney representing the USAO until February 2019, when the USAO was recused from handling the litigation.[3] Villafaña left the USAO in August 2019 to join another federal government agency.

The following chart shows the USAO positions filled by the subjects, or other USAO personnel, during the period of the Epstein investigation.

---

[2]    Project Safe Childhood is a nationwide initiative launched by the Department in May 2006 to combat the growing epidemic of technology-facilitated child sexual exploitation and abuse. Led by the U.S. Attorneys' Offices and CEOS, Project Safe Childhood marshals federal, state, and local resources to locate, apprehend, and prosecute individuals who exploit children via the internet, as well as to identify and rescue victims.

[3]    After the district court issued its February 21, 2019 opinion finding misconduct on the part of the government, the Department re-assigned the CVRA case to the U.S. Attorney's Office for the Northern District of Georgia.



USAO Roles and Responsibilities in Epstein Investigation
Mid-2006 through Mid-2009

III.   **JEFFREY EPSTEIN AND HIS DEFENSE ATTORNEYS**

A.   **Jeffrey Epstein**

Jeffrey Epstein was born in Brooklyn, New York, in 1953.[4]  Although he did not graduate from college, he taught physics and mathematics to teens at an elite private school in Manhattan from 1974 until 1976.  Through connections made at the school, he was hired at the Wall Street firm of Bear Stearns, where he rose from junior assistant to a floor trader to become a limited partner before leaving in 1981.  An enigmatic individual whose source of wealth was never clear, Epstein reportedly provided wealth management and advisory services to a business entrepreneur through whom Epstein acquired a mansion in midtown Manhattan, where he resided.  In the early 1990s, Epstein acquired a large residence in Palm Beach, Florida.  He also owned a private island in the U.S. Virgin Islands, a ranch in New Mexico, and a residence in Paris, France.  He traveled among his residences in a private Boeing 727 jet.

Epstein reportedly was an investor, founder, or principal in myriad businesses and other entities, in numerous locations.  Although frequently referred to as a billionaire, the sources and extent of his wealth were never publicly established during his lifetime.[5]  He associated with prominent and wealthy individuals from business, political, academic, and social circles, and engaged in substantial philanthropy.  Epstein maintained a large corps of employees, including housekeeping staff and pilots, as well as numerous female personal assistants, several of whom traveled with him.

B.   **Epstein's Defense Attorneys**

Jeffrey Epstein employed numerous criminal defense attorneys in responding to the allegations that he had coerced girls into engaging in sexual activity with him at his Palm Beach, Florida estate.  As different law enforcement entities became involved in investigating the allegations, he added attorneys having particular relevant knowledge of, or connections with, those entities.  At the outset of the state investigation, Epstein retained nationally prominent Miami criminal trial attorney **Roy Black**.  He was also represented by a local criminal defense attorney who was a former Palm Beach County Assistant State Attorney, and by nationally prominent Harvard Law School professor and criminal defense attorney **Alan Dershowitz**, who was a self-described close friend of Epstein.  After initial plea negotiations with the State Attorney's Office, Epstein replaced the local attorney with **Jack Goldberger**, a prominent West Palm Beach criminal defense attorney whose law partner was married to the Assistant State Attorney handling the Epstein case; once Epstein hired Goldberger, the Assistant State Attorney was removed from the Epstein case on the basis of that conflict of interest.  Another prominent attorney who began representing Epstein during the state investigation was New York City attorney **Gerald Lefcourt**,

---

[4]   Epstein's background has been extensively researched and reported in the media.  *See, e.g.,* Landon Thomas Jr., "Jeffrey Epstein: International Moneyman of Mystery," *New York*, Oct. 28, 2002; Vicky Ward, "The Talented Mr. Epstein," *Vanity Fair*, Mar. 2003; James Barron, "Who Is Jeffrey Epstein? An Opulent Life, Celebrity Friends and Lurid Accusations," *New York Times*, July 9, 2019; Lisette Voytko, "Jeffrey Epstein's Dark Façade Finally Cracks," *Forbes*, July 12, 2019.

[5]   After Epstein's death, his net worth was estimated to be approximately $577 million, based on his will and trust documents.  https://time.com/5656776/jeffrey-epstein-will-estate/.

whose law firm website cites his "national reputation for the aggressive defense" of "high-profile defendants in criminal matters."

In late 2006, after the USAO opened its investigation, Epstein hired Miami criminal defense attorneys who were former AUSAs.  One, **Guy Lewis**, had also served as the U.S. Attorney for the Southern District of Florida and as Director of the Department's Executive Office for United States Attorneys, the component charged with providing close liaison between the Department and the U.S. Attorneys.  Another, **Lilly Ann Sanchez**, had served in the USAO and as a Deputy Chief in the Major Crimes Section before leaving in 2005.   In August 2007, immediately after the USAO offered the terms that ultimately led to the NPA, two attorneys from the firm of Kirkland & Ellis, one of the largest law firms in the country, contacted the USAO on Epstein's behalf:  **Kenneth Starr**, former federal judge and Solicitor General, who was serving as Dean of Pepperdine University School of Law while of counsel to the firm; and **Jay Lefkowitz**, a litigation partner who had served in high-level positions in the administrations of Presidents George H.W. Bush and George W. Bush.  They were joined by nationally prominent Boston criminal defense attorney **Martin Weinberg**.  After the NPA was signed, former U.S. Attorney **Joe D. Whitley** joined the defense team, as did the former Principal Deputy Chief of CEOS and another former U.S. Attorney, who was also a retired federal judge.

[Page Intentionally Left Blank]

# CHAPTER TWO

# THE NON-PROSECUTION AGREEMENT

## PART ONE:  FACTUAL BACKGROUND

## I.    OVERVIEW

In the following sections in this chapter, the Office of Professional Responsibility (OPR) details the significant events leading to, and during, the federal investigation of Epstein; the negotiation and signing of the NPA; and the defense's subsequent nine-month effort to stop the NPA from taking effect.  OPR also describes more briefly the events occurring after Epstein pled guilty in state court, as the USAO sought to hold him to the terms of the agreement.  In describing events, OPR relies heavily on contemporaneous documents, particularly emails.  In many instances, the emails not only describe meetings and identify the participants, but also set forth the issues under discussion, the alternatives considered, and the basis for certain decisions.  When helpful to explain the actions taken by the subjects, OPR also includes the subjects' explanations as provided in their written responses to, or interviews with, OPR, or explanations provided by witnesses.

A timeline of key events is set forth on the following page.

## II.   MARCH 2005 – MAY 2006:  EPSTEIN IS INVESTIGATED BY THE PALM BEACH POLICE DEPARTMENT AND THE PALM BEACH COUNTY STATE ATTORNEY'S OFFICE

### A.    The Initial Allegations and the PBPD Investigation

In March 2005, the parents of a 14-year-old girl reported to the PBPD that a man had paid their daughter $300 to give him a massage in his Palm Beach home.[6]  The PBPD began investigating Epstein, identified as the recipient of the massage, and two of his personal assistants, who were also implicated by the complainant.  The investigation soon expanded beyond the initial claim, to encompass allegations that during 2004 and 2005, Epstein, through his female assistants

---

[6]    As previously noted, "girls" refers to females under the age of 18.  Epstein's contacts with girls and young women previously had come to the attention of the PBPD.  In March 2004, a PBPD officer documented a telephone complaint that a 17-year-old girl had been giving Epstein topless massages at his residence for several months for $200 per massage.  The girl claimed that there were nude photos of other girls throughout Epstein's home and offered to cooperate with a police investigation.  The PBPD report relating to this complaint described the information as "unverified," and it was not pursued.

On November 28, 2004, the police received and recorded information that young women had been observed coming and going from Epstein's residence.  The police suspected Epstein was procuring prostitutes, but because the PBPD did not have evidence that the women seen entering Epstein's home were minors, and typically did not investigate prostitution occurring in private residences, it did not open an investigation into the matter.

# Timeline of Key Events for Federal Epstein Investigation – May 2006 through October 2008



and some of the victims as well, regularly recruited local high-school-age girls to give him massages in his home that, in some cases, led to sexual activity.

Through their interviews with victims, the police learned more about Epstein's conduct. Some girls had only one encounter with Epstein, while others had many encounters with him. The nature of the massages varied. According to victims, some girls remained fully clothed while they massaged Epstein, some wore only their underwear, and some were fully nude. Victims stated that during these massages, Epstein masturbated himself. Some victims alleged that he touched them during the massage, usually fondling their breasts or touching their vaginas directly or through their clothing. Some victims reported that Epstein used a vibrator to masturbate them, and some stated that he digitally penetrated them. Some victims who stated that they saw him more often alleged that Epstein engaged in oral and vaginal sex with them. According to one victim, an Epstein female assistant participated, on at least one occasion, in sexual activity with the victim at Epstein's direction.[7]

Although the allegations varied in the specific details, for the most part they were consistent in describing a general pattern of conduct by Epstein and several of his assistants. According to the information provided to, and evidence gathered by, the PBPD, Epstein's assistants scheduled up to three massage appointments each day, often contacting the girls to make an appointment while Epstein was en route to Palm Beach from one of his other residences. Typically, when a girl arrived at Epstein's home for a massage, she was taken upstairs to the master bedroom and bathroom area by one of Epstein's assistants, who set up a massage table and massage oils. When the assistant left the room, Epstein entered, wearing only a robe or a towel. After removing his clothing, Epstein lay face down and nude on the massage table, instructed the girl to remove her clothing, and then explained to her how he wished her to perform the massage. During the massage, Epstein masturbated himself, often while fondling the girl performing the massage. When Epstein climaxed, the massage was over. Usually, Epstein paid the girl $200 for the massage, and if she had not been to his home before, Epstein asked for her phone number to contact her in the future. Epstein encouraged the girls who performed these massages to find other girls interested in performing massages for him, and promised that if a girl brought a friend along to perform a massage, each girl would receive $200. Several of the victims acknowledged to the PBPD that they had recruited other girls on Epstein's behalf.

The evidence regarding Epstein's knowledge of the girls' ages was mixed. Some girls who recruited other girls reportedly instructed the new recruits to tell Epstein, if asked, that they were over 18 years old. However, some girls informed the PBPD that they told Epstein their real ages. Police were able to corroborate one girl's report that Epstein sent flowers to her at her high school after she performed in a school play. In addition, an employee of Epstein told the PBPD that some of the females who came to Epstein's residence appeared to be underage.

Epstein was aware of the PBPD investigation almost from the beginning. He retained local criminal defense counsel, who in turn hired private investigators. In October 2005, the PBPD, with the assistance of the State Attorney's Office, obtained a search warrant for Epstein's residence. When police arrived at Epstein's home on October 20, 2005, to execute the warrant,

---

[7]   According to the PBPD records, investigators obtained no allegations or evidence that any person other than this female assistant participated in the sexual activity with the girls.

they found computer monitors and keyboards in the home, as well as disconnected surveillance cameras, but the computer equipment itself—including video recordings and other electronic storage media—were gone. Nonetheless, the PBPD retrieved some evidence from Epstein's home, including notepads on which Epstein's assistants documented messages from many girls over a two-year span returning phone calls to confirm appointments. The police also found numerous photographs of naked young females of indeterminate age. Police photographs taken of the interior of Epstein's home corroborated the victims' descriptions to police of the layout of the home and master bedroom and bathroom area. The police also found massage tables and oils, one victim's high school transcript, and items the police believed to be sex toys.

### B. The State Attorney's Office Decides to Present the Case to a State Grand Jury

State Attorney Barry Krischer explained to OPR that the Epstein case was unusual in that police brought the case to his office without having made an arrest. Krischer was unfamiliar with Epstein, and the case was assigned to the Crimes Against Children Unit. PBPD Chief Michael Reiter stated in a 2009 civil deposition that when the PBPD initially brought the case to the State Attorney's Office in 2005, Krischer was supportive of the investigation and told Reiter, "Let's go for it," because, given the nature of the allegations, Epstein was "somebody we have to stop." Krischer told OPR, however, that both the detectives and the prosecutors came to recognize that "there were witness problems."

Assistant State Attorney and Crimes Against Children Unit Chief Lanna Belohlavek told OPR that she and an experienced Assistant State Attorney who initially worked with her on the case "were at a disagreement" with the PBPD "over what the state . . . could ethically charge." According to Belohlavek, she did not believe the evidence the police presented would satisfy the elements of proof required to charge Epstein with the two felony crimes the police wanted filed, unlawful sexual activity with a minor (Florida Statute § 794.05(1)) and lewd and lascivious molestation of a minor (Florida Statute § 800.04(5)), and the police "were not happy with that."[8] In addition, victims had given contradictory statements to police, and the original complainant, who could have supported a charge requiring sexual offender registration, recanted her allegation of sexual contact. Belohlavek offered Epstein a resolution that would result in a five-year term of probation, which he rejected.[9]

Records publicly released by the State Attorney's Office show that, beginning in early 2006, attorneys for Epstein sought to persuade the state prosecutors to allow Epstein to plead "no contest" rather than guilty. To that end, the defense team aggressively investigated victims and presented the State Attorney's Office with voluminous material in an effort to undermine some of the victims' credibility, including criminal records, victims' social media postings (such as MySpace pages) about their own sexual activity and drug use, and victim statements that appeared to undercut allegations of criminal activity and Epstein's knowledge of victims' ages. Krischer

---

[8]     Belohlavek stated that she did not consider charging procurement of a minor for prostitution—the charge Epstein ultimately pled to pursuant to the NPA—because the police had not presented it.

[9]     In April 2006, the State Attorney's Office offered Epstein an opportunity to plead guilty to the third degree felony of aggravated assault with the intent to commit a felony, with adjudication withheld and five years of probation with no unsupervised contact with minors.

told OPR that Epstein's local counsel brought attorney Alan Dershowitz to see Krischer and the Assistant State Attorney, but Dershowitz was "overly aggressive" and threatened, "We're going to destroy your witnesses; don't go to court because we're going to destroy those girls." According to Krischer, Dershowitz so "tainted the waters" that Epstein also hired local attorney Jack Goldberger, with whom Krischer had "a working relationship." Because the husband of the Assistant State Attorney was Goldberger's law partner, Belohlavek recused the Assistant State Attorney to remove "even the appearance of any kind of conflict" of interest, and Belohlavek took over the case. Goldberger, together with Gerald Lefcourt, a nationally known New York criminal defense attorney also representing Epstein, then directed their efforts at Belohlavek and Krischer to dissuade the office from prosecuting Epstein, largely by attacking the credibility of the victim witnesses.

Meanwhile, the State Attorney's Office took the unusual step of preparing to present the case to a grand jury. Krischer told OPR that under state law as it existed until changed in 2016, his office prosecuted minors as young as 14 for prostitution.[10] The possibility that Epstein's victims themselves could have been prosecuted caused "great consternation within the office," and according to Krischer, resulted in the decision to put the case before the grand jury.[11] Belohlavek told OPR that her office took the allegations against Epstein "seriously, because . . . it was an organized scheme to involve young girls by offering them money. And I wouldn't say that we . . . thought they were prostitutes . . . [but] I think there was solicitation." However, she said, although Epstein's "behavior was reprehensible, . . . I'm limited by . . . the state statutes as to what I can charge." Krischer told OPR, "There were so many issues involving the victim-witnesses that to my mind, in consultation with my [prosecutors], the only way to achieve, to my mind, real justice was to present the case to the grand jury and not to direct-file" criminal charges against Epstein.

### C.    Florida State Procedure for Bringing Criminal Charges

Federal criminal procedure requires that a felony charge—that is, any charge punishable by imprisonment for one year or more—be brought by a grand jury unless waived by a defendant.[12] Under Florida law, however, a grand jury is required to bring criminal charges only in a death penalty case.[13] For all other cases, a State Attorney has concurrent authority to file criminal charges by means of a document called an "information" or to seek a grand jury indictment. Although Florida criminal cases are routinely charged by information, state grand juries are often utilized in sensitive or high-profile cases, such as those involving allegations of wrongdoing by public officials.[14] Florida grand jury proceedings are subject to strict secrecy rules that, among

---

[10]    Belohlavek told OPR that prostitution was a misdemeanor charge, and she did not handle misdemeanors.

[11]    Because the Florida Department of Law Enforcement investigation into the State Attorney's Office's handling of the Epstein case was pending at the time OPR interviewed Krischer, he declined to further explain to OPR his office's prosecutive decisions.

[12]    U.S. Const. amend. V; Fed. R. Crim. P. 7(a), (b). The sole exception under the rule is felony criminal contempt, which need not be charged by indictment. Fed. R. Crim. P. 7(a)(1).

[13]    Fla. Const. Art. I, § 15(a).

[14]    The Florida Bar, The Grand Jury, Reporters Handbook – The Grand Jury, available at https://www.floridabar.org/news/resources/rpt-hbk/rpt-hbk-13/.

other things, prohibit anyone from being present while grand jurors deliberate and vote, and proscribe the release of the notes, records, and transcripts of a grand jury.[15]

### D.   PBPD Chief Reiter Becomes Concerned with the State Attorney's Office's Handling of the State Investigation and Seeks a Federal Investigation

In 2006, PBPD Chief Reiter perceived that Krischer's attitude had changed and, according to Reiter's statements in his 2009 deposition, Krischer said that he did not believe the victims were credible.  Reiter was disturbed when Krischer suggested that the PBPD issue a notice for Epstein to appear in court on misdemeanor charges, leading Reiter to begin questioning Krischer's objectivity and the State Attorney's Office's approach to the case.  As Reiter explained in his deposition:

> This was a case that I felt absolutely needed the attention of the State Attorney's Office, that needed to be prosecuted in state court.  It's not generally something that's prosecuted in a federal court.  And I knew that it didn't really matter what the facts were in this case, it was pretty clear to me that Mr. Krischer did not want to prosecute this case.

On May 1, 2006, Reiter submitted to Krischer probable cause affidavits and a case filing package relating to Epstein, one of his personal assistants, and a young local woman whom Epstein first victimized and then used to recruit other girls.  In his transmittal letter, which was later made public, Reiter criticized Krischer, noting that he found the State Attorney's Office's "treatment of these cases [to be] highly unusual."[16]  Reiter urged Krischer "to examine the unusual course that your office's handling of this matter has taken" and to consider disqualifying himself from prosecuting Epstein.[17]

## III.   THE FBI AND THE USAO INVESTIGATE EPSTEIN, AND THE DEFENSE TEAM ENGAGES WITH THE USAO

### A.   May 2006 – February 2007:  The Federal Investigation Is Initiated, and the USAO Opens a Case File

In early 2006, a West Palm Beach FBI Special Agent who worked closely with AUSA Ann Marie Villafaña on child exploitation cases—and who is referred to in this Report as "the case agent"—mentioned to Villafaña in "casual conversations" having learned that the PBPD was investigating a wealthy Palm Beach man who recruited minors for sexual activity.  The case agent told Villafaña that the PBPD had reached out to the FBI because the State Attorney's Office was considering either not charging the case or allowing the defendant to plead to a misdemeanor

---

[15]   Fla. Stat. § 905.27 (2007).

[16]   *See* Larry Keller, "Palm Beach chief focus of fire in Epstein case," *Palm Beach Post*, Aug. 14, 2006.

[17]   As noted, Krischer generally declined in his OPR interview to explain his office's prosecutive decisions; however, regarding allegations of favoritism to Epstein's defense counsel, Krischer told OPR, "I just don't play that way."

charge.  Villafaña suggested meeting with the PBPD, but the case agent explained that before formally presenting the case to the FBI, the PBPD wanted to see how the State Attorney's Office decided to charge Epstein.

### 1.      The PBPD Presents the Matter to the FBI and the USAO

In May 2006, the lead Detective handling the state's investigation met with Villafaña and the FBI case agent to summarize for them the information learned during the state's investigation.[18]  At the time, neither Villafaña nor the case agent had heard of Epstein or had any knowledge of his background.

According to Villafaña, during this meeting, the Detective expressed concern that "pressure had been brought to bear on . . . Krischer by Epstein's attorneys," and he and Chief Reiter were concerned the state would charge Epstein with only a misdemeanor or not at all.[19]  The Detective explained that the defense had hired private investigators to trail Reiter and the Detective, had raised claims of various improprieties by the police, and, in the view of the PBPD, had orchestrated the removal of the Assistant State Attorney initially assigned to handle the matter, who was viewed as an aggressive prosecutor, by hiring a defense attorney whose relationship with the Assistant State Attorney created a conflict of interest for the prosecutor.  Further, given the missing computer equipment and surveillance camera videotapes, the Detective believed Epstein may have been "tipped off" in advance about the search warrant.

During the meeting, Villafaña reviewed the U.S. Code to see what federal charges could be brought against Epstein.  She focused on 18 U.S.C. §§ 2422 (enticement of minors into prostitution or other illegal sexual activity and use of a facility of interstate or foreign commerce to persuade or induce a minor to engage in prostitution or other illegal sexual activity) and 2423 (travel for purposes of engaging in illegal sexual conduct).  As they discussed these charges, the Detective told Villafaña that Epstein and his assistants had traveled out of the Palm Beach International Airport on Epstein's private airplane, and flight logs sometimes referred to passengers as "female" without a name or age, which the Detective suspected might be references to underage girls.  However, the Detective acknowledged that he was unable to confirm that suspicion and did not have firm evidence indicating that Epstein had transported any girls interstate or internationally.  Nevertheless, Villafaña believed Epstein could be prosecuted federally, in part because of his own interstate and international travel to the Southern District of Florida to abuse girls.  Villafaña discussed with the Detective and the case agent the additional investigation needed to prove violations of the federal statutes she had identified.  She told them that if the evidence supported it, the case could be prosecuted federally, but she assured them that opening a federal investigation would not preclude the State Attorney's Office from charging Epstein should it choose to do so.

---

[18]      The Detective died in May 2018.

[19]      In his 2009 deposition, Reiter testified that after he referred the Epstein matter to the FBI, a Town of Palm Beach official approached Reiter and criticized his referral of the investigation to the FBI, telling Reiter that the victims were not believable and "Palm Beach solves its own problems."

## 2.      May 2006:  The USAO Accepts the Case and Opens a Case File

On May 23, 2006, Villafaña prepared the paperwork to open a USAO case file.  Villafaña told OPR that several aspects of the case implicated federal interests and potentially merited a federal prosecution:  (1) the victimization of minors through the use of facilities of interstate commerce (the telephone and airports); (2) the number of victims involved; (3) the possibility that Epstein had been producing or possessing child pornography (suggested by the removal of the computer equipment from his residence); and (4) the possibility that improper political pressure had affected the State Attorney Office's handling of the case.  The investigation was named "Operation Leap Year" because the state investigation had identified approximately 29 girls as victims of Epstein's conduct.[20]

Villafaña told OPR that from the outset of the federal investigation, she understood that the case would require a great deal of time and effort given the number of potential victims and Epstein's financial resources.  Nonetheless, Villafaña was willing to put in the effort and believed that the FBI was similarly committed to the case.  Villafaña discussed the case with her immediate supervisor, who also "thought it would be a good case" and approved it to be opened within the USAO's file management system, and on May 23, 2006, it was formally initiated.

## 3.      July 14, 2006:  Villafaña Informs Acosta and Sloman about the Case

Because Villafaña was not familiar with Epstein, she researched his background and learned that he "took a scorched earth approach" to litigation.  Villafaña was aware that Epstein had hired multiple lawyers to interact with the State Attorney's Office in an effort to derail the state case, and she believed he would likely do the same in connection with any federal investigation.

Therefore, Villafaña arranged to meet with U.S. Attorney Alexander Acosta and Jeffrey Sloman, who at the time was the Criminal Division Chief.[21]  Villafaña told OPR that she had never before asked to meet with "executive management" about initiating a case, but the allegations that Epstein had improperly influenced the State Attorney's Office greatly troubled her.  Villafaña explained to OPR that she wanted to ensure that her senior supervisors were "on board" with the Epstein investigation.  In addition, she viewed Sloman as a friend, in whom she had particular confidence.  At this point, although Villafaña's immediate supervisor was aware of the case, Villafaña did not inform Andrew Lourie, who was then in charge of the West Palm Beach office and her second-line supervisor, about the matter or that she was briefing Acosta and Sloman.

Villafaña met with Acosta and Sloman in Miami on July 14, 2006.  She told OPR that at the meeting, she informed them that the PBPD had identified a group of girls who had provided to

---

[20]      Villafaña opened "Operation Leap Year" during the same month in which the Department launched its "Project Safe Childhood" initiative, and Acosta designated Villafaña to serve as the USAO's Project Safe Childhood coordinator.

[21]      Although Acosta had been formally nominated to the U.S. Attorney position on June 9, he was not confirmed by the Senate until August 3, 2006, and was not sworn in until October 2006.  In September 2006, Acosta announced the appointments of Sloman as FAUSA and Matthew Menchel as Chief of the USAO's Criminal Division, and they assumed their respective new offices in October 2006.

Epstein massages that were sexual in nature, and that Epstein had used "various types of pressure" to avoid prosecution by the state, including hiring attorneys who had personal connections to the State Attorney. Villafaña said that part of her goal in speaking to Acosta and Sloman at the outset of the federal investigation was to sensitize them to the tactics Epstein's legal team would likely employ. Villafaña explained, "When you have a case that you know people are going to be getting calls about . . . you just want to make sure that they know about it so they don't get . . . a call from out of the blue." According to Villafaña, she told Acosta and Sloman that the FBI was willing to put the necessary resources into the case, and she was willing to put in the time, but she "didn't want to get to the end and have [the] same situation occur" with a federal prosecution as had occurred with the state. She told OPR, "I remember specifically saying to them that I expected the case would be time and resource-intensive and I did not want to invest the time and the FBI's resources if the Office would just back down to pressure at the end." According to Villafaña, Acosta and Sloman promised that "if the evidence is there, we will prosecute the case." In a later email to Lourie and her immediate supervisor, Villafaña recounted that she spoke with Acosta and Sloman because she "knew that what has happened to the state prosecution can happen to a federal prosecution if the U.S. Attorney isn't on board," but Acosta and Sloman had given her "the green light" to go forward with the Epstein investigation.

Both Acosta and Sloman told OPR that they did not recall the July 2006 meeting with Villafaña. Each told OPR that at the time the federal investigation was initiated, he had not previously heard of Epstein.[22]

Acosta told OPR that he understood from the outset that the case involved a wealthy man who was "doing sordid things" with girls, and that it "seemed a reasonable matter to pursue" federally. Epstein's wealth and status did not raise any concern for him, because, as Acosta told OPR, the USAO had prosecuted "lots of influential folks." When asked by OPR to articulate the federal interest he perceived at the time to be implicated by the case, Acosta responded, "the exploitation of girls or minor females." Regarding Villafaña's view that she had been given a "green light" to proceed with the investigation, Acosta told OPR that he would not likely have explicitly told Villafaña to "go spend your time" on the case; rather, his practice would have been simply to acknowledge the information she shared about the case and confirm that a federal investigation "sound[ed] reasonable."

Sloman told OPR that he could not recall what he initially knew about the Epstein investigation, other than that he had a basic understanding that the State Attorney's Office had "abdicated their responsibility" to investigate and prosecute Epstein. In his OPR interview, Sloman did not recall with specificity Villafaña's concern about Epstein's team pressuring the State Attorney's Office, but he said he was never concerned that political pressure would affect the USAO, noting that as of July 2006, the USAO had recently prosecuted wealthy and politically connected lobbyist Jack Abramoff.

---

[22]     Lourie told OPR that when he first heard about the Leap Year investigation, he likewise was unaware of Epstein. On July 24, 2006, Villafaña emailed to Sloman a link to a *Palm Beach Post* article that described Epstein as a "Manhattan money manager" and "part-time Palm Beacher who has socialized with Donald Trump, Bill Clinton and Kevin Spacey." Sloman forwarded the article to Acosta.

4.  **Late July 2006:  The State Indicts Epstein, and the USAO Moves Forward with a Federal Investigation**

Several days after Villafaña spoke with Acosta and Sloman, on July 19, 2006, Assistant State Attorney Belohlavek presented the case to the state grand jury.[23]  Krischer told OPR that "the whole thing" was put before the grand jury.  According to a statement made at the time by the State Attorney's Office spokesman, the grand jury was presented with a list of charges from highest to lowest, without a recommendation by the prosecutor, and deliberated with the prosecutor out of the room.[24]  The state grand jury returned an indictment charging Epstein with one count of felony solicitation of prostitution, in violation of Florida Statute § 796.07, a felony under state law because it alleged three or more instances of solicitation.[25]  The indictment did not identify the person or persons solicited and made no mention of the fact that Epstein had solicited minors.[26]  On July 23, 2006, Epstein self-surrendered to be arrested on the indictment, but was not detained, and the charges were made public.

Villafaña told OPR that she decided to move forward with the federal investigation at that point because she believed the State Attorney's Office would permit Epstein to enter a plea to a reduced misdemeanor charge and that once he entered a guilty plea, the Department's Petite policy might preclude a federal prosecution.[27]  Villafaña told OPR that at the time, she "definitely believed that we were going to proceed to [a federal] indictment, assuming that . . . we had sufficient evidence."

---

[23]     Villafaña and the FBI obtained and examined records of the state grand jury proceeding, and Lourie reviewed them.  Because the grand jury records have not been ordered released publicly, OPR does not discuss their substance in this Report.

[24]     Larry Keller, "Police say lawyer tried to discredit teenage girls," *Palm Beach Post*, July 29, 2006, citing statement by State Attorney's Office spokesman Michael Edmondson.

[25]     Indictment in *State v. Epstein*, 2006CF9454AXX (July 19, 2006), attached as Exhibit 1 to this Report.

[26]     In pertinent part, the state indictment read, "[B]etween the 1st day of August [2004] and October 31, 2005, [Epstein] did solicit, induce, entice, or procure another to commit prostitution lewdness, or assignation, . . . on three or more occasions."  The 15-month time frame and lack of detail regarding the place or manner of the offense made it impossible to identify from the charging document which victim or victims served as the basis for the charge in the state indictment.  Belohlavek explained to OPR that the charge did not list specific victims so that she could go forward at trial with whichever victim or victims might be available and willing to testify at that time.

[27]     The Petite policy is a set of guidelines used by federal prosecutors when considering whether to pursue federal charges for defendants previously prosecuted for state or local offenses.  The Constitution does not prohibit the federal government from prosecuting defendants who have been charged, acquitted, or convicted on state charges based on the same criminal conduct.  The Supreme Court has repeatedly upheld the long-standing principle that the prohibition against double jeopardy does not apply to prosecutions brought by different sovereigns.  *See, e.g., Gamble v. United States*, 587 U.S. ___, 139 S. Ct. 1960, 1966-67 (2019) (and cases cited therein); *Abbate v. United States*, 359 U.S. 187, 195 (1959) (and cases cited therein); and *United States v. Lanza,* 260 U.S. 377, 382 (1922).  Nonetheless, to better promote the efficient use of criminal justice resources, the Department developed policies in 1959 and 1960 to guide federal prosecutors in the use of their charging discretion.  *See* Chapter Two, Part Two, Section II.A.2, for a more detailed discussion of the Petite policy.

On July 24, 2006, Villafaña alerted Sloman, who informed Acosta, that the State Attorney's Office had charged and arrested Epstein.[28]  On that same day, the FBI in West Palm Beach formally opened the case, assigning the case agent and, later, a co-case agent, to investigate it.  Villafaña told Sloman that the FBI agents "are getting copies of all of the evidence and we are going to review everything at [the] FBI on Wednesday," and she noted that her target date for filing federal charges against Epstein was August 25, 2006.  Acosta emailed Sloman, asking whether it was "appropriate to approach [State Attorney Krischer] and give him a heads up re where we might go?"  Sloman replied, "No for fear that it will be leaked straight to Epstein."[29]

Although Lourie learned of the case at this point from Sloman, and eventually took a more active role in supervising the investigation, Villafaña continued to update Acosta and Sloman directly on the progress of the case.[30]  Villafaña's immediate supervisor in West Palm Beach had little involvement in supervising the Epstein investigation, and at times, Villafaña directed her emails to Sloman, Menchel, and Lourie without copying her immediate supervisor.   In the immediate supervisor's view, however, "Miami" purposefully assumed all the "authority" for the case, which the immediate supervisor regarded as "highly unusual."[31]

By late August 2006, Villafaña and the FBI had identified several additional victims and obtained "some flight manifests, telephone messages, and cell phone records that show the communication and travel in interstate commerce" by Epstein and his associates.  Villafaña reported to her supervisors that the State Attorney's Office would not provide transcripts from the state grand jury voluntarily, and that she would be meeting with Chief Reiter "to convince him to relinquish the evidence to the FBI."  Villafaña also told her supervisors that she expected "a number of fights" over her document demands, and that some parties were refusing to comply "after having contact with Epstein or his attorneys."

Villafaña's reference to anticipated "fights" and lack of compliance led Sloman to ask whether she was referring to the victims.  Villafaña responded that the problems did not involve victims, but rather a former employee of Epstein and some business entities that had objected to document demands as overly burdensome.  Villafaña explained to Sloman and Lourie that some victims were "scared and/or embarrassed," and some had been intimidated by the defense, but "everyone [with] whom the agents have spoken so far has been willing to tell her story."  Villafaña

---

[28]     On the same day, Sloman emailed Lourie, whom Villafaña had not yet briefed about the case, noting that Operation Leap Year was "a highly sensitive case involving some Palm Beach rich guy."

[29]     During his OPR interview, Sloman did not recall what he meant by this remark, but speculated that it was likely that "we didn't trust the Palm Beach State Attorney's Office," and that he believed there may have been "some type of relationship between somebody in the [State Attorney's Office] and the defense team."

[30]     After Villafaña sent a lengthy substantive email about the case to her immediate supervisor, Lourie, Sloman, and Acosta on August 23, 2006, Lourie emailed Sloman:  "Do you and Alex [Acosta] want her updating you on the case?"  Sloman responded, "At this point, I don't really care.  If Alex says something then I'll tell her to just run it through you guys."

[31]     OPR understood "Miami" to be a reference to the senior managers who were located in the Miami office, that is, Acosta, Sloman, and Menchel.  Records show, and Villafaña told OPR, that she believed Epstein's attorneys "made a conscious decision to skip" her immediate supervisor and directed their communications to the supervisory chain above the immediate supervisor—Lourie, Menchel, Sloman, and Acosta.

also informed Sloman and Lourie that the FBI was re-interviewing victims who had given taped statements to the PBPD, to ensure their stories "have not changed," and that "[a]ny discrepancies will be noted and considered." She conceded that "[g]etting them to tell their stories in front of a jury at trial may be much harder," but expressed confidence that the two key victims "will stay the course." She acknowledged that the case "needs to be rock solid."

The case agent told OPR that in this initial stage of the investigation, the FBI "partnered up very well" with the USAO. She recalled that there was little higher-level management oversight either from the FBI or the USAO, and "we were allowed to do what we needed to do to get our job done." This included continuing to identify, locate, and interview victims and Epstein employees, and obtaining records relating to Epstein's travel, communications, and financial transactions. The case agent viewed the case as "strong."

### 5. October 2006 – February 2007: Epstein's Defense Counsel Initiate Contact with Villafaña, Lourie, and Sloman, and Press for a Meeting

Just as Epstein had learned of the PBPD investigation at its early stage, he quickly became aware of the federal investigation, both because the FBI was interviewing his employees and because the government was seeking records from his businesses. One of Epstein's New York attorneys, Gerald Lefcourt, made initial contact with Villafaña in August 2006. As the investigation progressed, Epstein took steps to persuade the USAO to decline federal prosecution.[32] As with the state investigation, Epstein employed attorneys who had experience with the Department and relationships with individual USAO personnel.[33] One of Epstein's Miami lawyers, Guy Lewis, a former career AUSA and U.S. Attorney for the Southern District of Florida, made an overture on Epstein's behalf in early November 2006.[34] Lewis telephoned Villafaña, a call that Sloman joined at Villafaña's request. Lewis offered to provide Villafaña

---

[32]    Villafaña told OPR that Epstein's lawyers wanted to stop the investigation "prematurely."

[33]    Chapter One, Section III.B of this Report identifies several of the attorneys known to have represented Epstein in connection with the federal investigation, along with a brief summary of their connections to the Department, the USAO, or individuals involved in the investigation. At least one former AUSA also represented during civil depositions individuals associated with Epstein. Menchel told OPR that he and his colleagues recognized Epstein was selecting attorneys based on their perceived influence within the USAO, and they viewed this tactic as "ham-fisted" and "clumsy." Menchel told OPR, "[O]ur perspective was this is not going to . . . change anything."

[34]    Lewis served in the USAO for over 10 years, and was U.S. Attorney from 2000 to 2002. He then served for two years as Director of the Executive Office for U.S. Attorneys, the Department's administrative office serving the U.S. Attorneys.

Early in the investigation, Lourie voluntarily notified the USAO's Professional Responsibility Officer that Lourie was friends with Lewis and also had a close friendship with Lewis's law partner, who also was a former AUSA and also represented Epstein. Lourie requested guidance as to whether his relationships with Lewis and Lewis's law partner created either a conflict of interest or an appearance of impropriety mandating recusal. The Professional Responsibility Officer responded that Lourie's relationships with the two men were not "covered" relationships under the conflict of interest guidelines but deferred to Sloman or Menchel "to make the call." Thereafter, Sloman authorized Lourie to continue supervising the case. During his OPR interview, Lourie asserted that his personal connection to Lewis did not influence his handling of the case.

"'anything' she wanted" without the necessity of legal process.  Lewis asked to meet with Villafaña and Sloman to discuss the Epstein investigation, but Villafaña declined.

Shortly thereafter, Lilly Ann Sanchez, a former AUSA, contacted Sloman and advised him that she also represented Epstein.  Sanchez was employed by the USAO from 2000 to September 2005 and had been a Deputy Chief of the USAO's Major Crimes section at the time Menchel was the Chief.  According to Sloman's contemporaneous email recounting the conversation, when Sanchez indicated to him that his participation in Lewis's call with Villafaña led the defense team to believe that the matter had been "elevated" within the USAO, Sloman tried to "disabuse" her of that notion.  Sanchez said that Epstein "wanted to be as transparent and cooperative as possible" in working with the USAO.  Despite the fact that Lewis had already made contact with the USAO on Epstein's behalf, Sanchez sent a letter to Villafaña on November 15, 2006, in which she asserted that she and Gerald Lefcourt were representing Epstein and asked that the USAO direct all contact or communications about Epstein to them.  In response, Villafaña requested that the defense provide documents and information pertinent to the federal investigation, including the documents and information that Epstein had previously provided to the State Attorney's Office, and "computers, hard drives, CPUs [computer processing units], and any other computer media" removed from Epstein's home before the PBPD executed its search warrant in October 2005.  In January 2007, Sanchez contacted Villafaña to schedule a meeting, but Villafaña responded that she wanted to receive and review the documents before scheduling a meeting with Sanchez.

Immediately after receiving Villafaña's response, Sanchez bypassed Villafaña and phoned Lourie, with whom she had worked when she was an AUSA, to press for a meeting.  Lourie agreed to meet with Sanchez and Lefcourt.  Lourie explained to Villafaña that Sanchez was concerned that federal charges were "imminent," wanted to meet with the USAO and "make a pitch," and promised that once given the opportunity to do so, if the USAO "wanted to interview Epstein, that would be a possibility."  Villafaña told Lourie that Sanchez had not yet provided the documents she had promised, and Villafaña wanted "the documents not the pitch."  Lourie explained to OPR, however, that it was his practice to grant meetings to defense counsel; he considered it "good for us" to learn the defense theories of a case and believed that "information is power."  Lourie further explained that learning what information the defense viewed as important could help the USAO form its strategy and determine which counts relating to which victims should be charged.  Lourie also believed that as a general matter, prosecutors should grant defense requests to make a presentation, because "[p]art of [the] process is for them to believe they are heard."  In addition to agreeing to a meeting, Lourie sent Sanchez a narrowed document request, which responded to Sanchez's complaint that the USAO's earlier request was overbroad but which retained the demand for the computer-related items removed from Epstein's home.  The meeting was scheduled for February 1, 2007, and Lourie asked Sanchez to provide the documents and materials to the USAO by January 25, 2007.

Villafaña did not agree with Lourie's decision to meet with Sanchez and Lefcourt.  Indeed, two days after Lourie agreed to the meeting, Villafaña alerted him that she had spoken again with Sanchez and learned that Epstein was not going to provide the requested documents.  As Villafaña told Lourie, "I just get to listen to the pitch and hear about how the girls are liars and drug users."  She told OPR that in her view, "it was way too early to have a meeting," she already knew what the defense would say, and she could not see how a meeting would benefit the federal investigation.  She explained to Lourie the basis for her objections to the meeting, but Lourie "vehemently"

disagreed with her position. Villafaña and a West Palm Beach AUSA with whom she was consulting about the investigation, and who served for a time as her co-counsel, both recalled meeting with Lourie in his office to express their concerns about meeting with defense counsel. They perceived Lourie to be dismissive of their views.[35] According to Villafaña, Lourie believed that a meeting with the defense attorneys would be the USAO's chance to learn the defense's legal theories and would position the USAO to arrange a debriefing of Epstein, through which the USAO might learn information helpful to a prosecution. Villafaña told OPR, however, that while this strategy might make sense in a white-collar crime case, she did not believe it was appropriate or worthwhile in a child exploitation case, in which the perpetrator would be unlikely to confess to the conduct. Villafaña also told OPR that she did not believe the USAO could extract information about the defense legal theories without telling the defense the precise crimes the USAO intended to charge, which Villafaña did not want to reveal.

### 6.     February 2007:  Defense Counsel Meet with Lourie and Villafaña and Present the Defense Objections to a Federal Case

At the February 1, 2007 meeting with Lourie and Villafaña, Sanchez and Lefcourt set out arguments that would be repeated throughout the months-long defense campaign to stop the federal investigation. In support of their arguments, the defense attorneys provided a 25-page letter, along with documents the defense had obtained from the state's investigative file and potential impeachment material the defense had developed relating to the victims.

In the letter and at the meeting, defense counsel argued that (1) the allegations did not provide a basis for the exercise of federal jurisdiction; (2) the evidence did not establish that Epstein knew girls who provided him with massages were minors; (3) no evidence existed proving that any girl traveled interstate to engage in sex with Epstein; (4) the USAO would violate the Petite policy by initiating federal prosecution of a matter that had already been addressed by the state; and (5) there were "forensic barriers" to prosecution, referring to witness credibility issues. The letter suggested that "misleading and inaccurate reports" from the PBPD "may well have affected" the USAO's view of the case. The letter also claimed that the State Attorney's Office had taken into account the "damaging histories of lies, illegal drug use, and crime" of the state's two principal victims (identified by name in the letter), and argued that "with witnesses of their ilk," the state might have been unable "to make any case against Epstein at all." Lourie told OPR that he did not recall the meeting, but Villafaña told OPR that neither she nor Lourie was persuaded by the defense presentation at this "listening session."

### B.     February – May 2007:  Villafaña and the FBI Continue to Investigate; Villafaña Drafts a Prosecution Memorandum and Proposed Indictment for USAO Managers to Review

Correspondence between Villafaña and defense counsel show that Villafaña carefully considered the defense arguments concerning the victims' credibility, and she reviewed audiotapes

---

[35]     Villafaña told OPR that in a "heated conversation" on the subject, Lourie told them they were not being "strategic thinkers." Her fellow AUSA remembered Lourie's "strategic thinker" comment as well, but recalled it as having occurred later in connection with another proposed action in the Epstein case. Lourie did not recall making the statement but acknowledged that he could have.

of the state's victim interviews and partial transcripts provided by defense counsel.[36]  Villafaña also pursued other investigative steps, which included working with the FBI to locate an expert witness to testify about the effect of sexual abuse on victims.  She also continued collecting records relating to Epstein's business entities, in part to help establish the interstate nexus of Epstein's activity.  On several occasions, Villafaña sought guidance from CEOS, which had considerable national expertise in child exploitation cases, about legal issues relating to the case, such as whether charges she was considering required proof that the defendant knew a minor victim's age.

USAO procedures generally required that a proposed indictment be accompanied by a prosecution memorandum from the AUSA handling the case.  The prosecution memorandum was expected to explain the factual and legal bases for the proposed charges and address any significant procedural, factual, and legal issues of which the AUSA was aware; witness-related issues; expected defenses; and sentencing issues.  Routine prosecutions could be approved by lower-level supervisors, but in high-profile or complex cases, proposed indictments might require review and approval by the Criminal Division Chief, the FAUSA, or even the U.S. Attorney.

Accordingly, Villafaña drafted an 82-page prosecution memorandum directed to Acosta, Sloman, Menchel (who had replaced Sloman as the USAO's Criminal Division Chief the previous October, when Sloman became the FAUSA), Lourie, and her immediate supervisor, dated May 1, 2007, supporting a proposed 60-count indictment that charged Epstein with various federal crimes relating to sexual conduct with and trafficking of minors.  The prosecution memorandum set forth legal issues and potential defenses relating to each proposed charge; explained why certain other statutes were rejected as proposed charges; described the evidence supporting each count and potential evidentiary issues; and addressed the viability and credibility of each of the victims who were expected to testify at trial.

Villafaña's immediate supervisor told OPR that she read the prosecution memorandum, had only a few small edits to the indictment, and advised Lourie that she approved of it.  The immediate supervisor told OPR that she viewed the case as prosecutable, but recognized that the case was complex and that Villafaña would need co-counsel.

In his OPR interview, Lourie recalled thinking that the prosecution memorandum and proposed indictment "were very thorough and contained a lot of hard work," but that he wanted to employ a different strategy for charging the case, focusing initially only on the victims that presented "the toughest cases" for Epstein—meaning those about whom Epstein had not already raised credibility issues to use in cross-examination.  Lourie told OPR that although he had some concerns about the case—particularly the government's ability to prevail on certain legal issues and the credibility challenges some of the victims would face—he did not see those concerns as insurmountable and was generally in favor of going forward with the prosecution.

Although indictments coming out of the West Palm Beach office usually did not require approval in Miami, in this case, Lourie understood that "[b]ecause there was front office involvement from the get-go," he would not be the one making the final decision whether to go

---

[36]     Lefcourt and Sanchez provided the recordings during a follow-up meeting with Lourie and Villafaña on February 20, 2007, and thereafter furnished the transcripts.

forward with charges in this case.  Lourie forwarded a copy of the prosecution memorandum to Menchel.  Lourie's transmittal message read:

> Marie did a 50 [*sic*] page pros memo in the Epstein case.  I am going to start reading it tonight. . . .  It's a major case because the target is one of the richest men in the country and it has been big news.  He has a stable of attorneys, including Dershowitz, [Roy] Black, Lefcourt, Lewis, and Lily [*sic*] Sanchez.  Jeff Sloman is familiar with the investigation.  The state intentionally torpedoed it in the grand jury so it was brought to us.  I am going to forward the pros memo to you so you can start reading it at the same time I do.  The FBI is pushing to do it in Mid [*sic*] May, which I think is not critical, but we might as well get a jump on it.  I have some ideas about the indictment (needs to be ultra lean with only clean victims), so I am not sending that yet.

Lourie explained to OPR that by "clean" victims, he meant those for whom the defense did not have impeachment evidence to use against them.

A few days later, Lourie emailed Menchel, asking if Menchel had read the prosecution memorandum.  Lourie directed Menchel's attention to particular pages of the prosecution memorandum, noting that the "keys" were whether the USAO could prove that Epstein traveled for the purpose of engaging in sexual acts, and the fact that some minor victims told Epstein they were 18.[37]  Lourie asked for Menchel's "very general opinion as to whether this is a case you think the office should do," and reminded Menchel that the State Attorney's Office "went out of their way to get a no-bill on this . . . and thus only charged adult solicitation, which they would bargain away to nothing."

During his OPR interview, Menchel said that Lourie's email transmitting the prosecution memorandum was his "official introduction" to the case and at that point in time, he had never heard of Epstein and had no information about his background.  He recalled that the USAO had been asked to review the case because the state had not handled it appropriately.  Menchel told OPR, however, that he had little memory about the facts of the case or what contemporaneous opinions he formed about it.

Acosta told OPR that he could not recall whether he ever read Villafaña's prosecution memorandum, explaining that he "would typically rely on senior staff," who had more prosecutorial experience, and that instead of reading the memorandum, he may have discussed the case with Sloman, Menchel, and Lourie, who he assumed would have read the document.  Acosta

---

[37]   In various submissions to the USAO, the defense contended that the federal statute required proof that engaging in a sexual act was the "paramount or dominant purpose" of Epstein's travel, but that Epstein's travel was motivated by his desire to live outside of New York for over half of each year for tax purposes.  The defense also asserted that the federal statutes at issue required proof that the defendant knew the victims were under 18, but that Epstein "took affirmative steps to ensure that every woman was at least 18 years of age."  In her prosecution memorandum, however, Villafaña set forth her conclusion that the statute only required proof that engaging in a sexual act was one of the motivating factors for the travel.  She also concluded that the statutes did not require proof that the defendant knew the victims were minors.

recalled generally having conversations with Sloman and Menchel about the Epstein case, but he could not recall with specificity when those conversations took place or the details of the discussions.

Sloman told OPR that because of his broad responsibilities as FAUSA, he left it to Menchel, as a highly experienced trial attorney and the Criminal Division Chief, to work directly with Acosta, and Sloman recalled that it was Menchel and Lourie who conducted a "granular review" of the charging package.  Acosta confirmed to OPR that Sloman and Menchel "were a team" who became involved in issues as needed, and if Sloman perceived that Menchel was taking the lead on the Epstein matter, Sloman may have deferred to Menchel.

## C.    May – June 2007:  Miami Managers Consider the Prosecution Memorandum and Proposed Charges

When she submitted the prosecution memorandum, Villafaña intended to file charges by May 15, 2007, and the FBI planned to arrest Epstein immediately thereafter. Villafaña, however, had not obtained authorization to indict on that schedule.  The managers in Miami wanted more time to analyze the lengthy prosecution memorandum and consider the potential charges and charging strategy. Just a few days after he received the prosecution memorandum, and after learning that the FBI was planning a press conference for May 15, Sloman advised Villafaña that "[t]his Office has not approved the indictment.  Therefore, please do not commit us to anything at this time."[38]

On May 10, 2007, with Menchel's concurrence, Lourie sent a copy of Villafaña's prosecution memorandum to CEOS Chief Andrew Oosterbaan, who in turn sent it to his deputy and another CEOS attorney, asking them to assess the legal issues involved in the case and describing it as a "highly sensitive" case involving "a high profile, very rich defendant."[39]  After CEOS reviewed the materials, Oosterbaan responded to Lourie with an email stating that the memorandum was "exhaustive" and "well done" and noting that Villafaña "has correctly focused on the issues as we see them."  He summarized CEOS's analysis of the application of key facts to the statutes she proposed charging, concurring in Villafaña's assessments but noting that further research was needed to determine whether certain statutes required proof of a defendant's knowledge of victims' ages.  Oosterbaan offered to assign a CEOS attorney to work with Villafaña on the case.  Lourie forwarded Oosterbaan's email to Menchel and Villafaña.

Meanwhile, contemporaneous emails show that Lourie, at least, was already considering an early resolution of the case through a pre-indictment plea agreement.[40]  After Lourie spoke with

---

[38]    Lourie later reported to Menchel that the FBI had "wanted to arrest [Epstein] in [the] Virgin Islands during a beauty pageant . . . where he is a judge."  The case agent recalled that she and her co-case agent were disappointed with the decision, and that the Supervisory Special Agent was "extremely upset" about it.  After the federal investigation began, and except for his self-surrender to face the state indictment in July 2006, Epstein largely stayed away from West Palm Beach, only returning occasionally.

[39]    Before becoming Chief of CEOS, Oosterbaan was an AUSA at the USAO for about ten years and was good friends with Lourie.

[40]    In her prosecution memorandum, Villafaña argued against pre-charge plea negotiations, arguing that it "may undermine our arguments for pretrial detention."  Menchel, however, told OPR that he did not consider strengthening a bail argument to be a valid ground to decline to meet with defense counsel about a case.

the FBI squad supervisor on May 9, 2007, to explain that charges against Epstein would not be quickly approved, he reported to Menchel that the FBI was "not happy" about the delay, adding, "I did not even tell them I think we should bring [Epstein] in, once we decide to charge him, and offer a pre-indictment deal, figuring a judge might never agree to such a deal post indictment. That would have sent them thru the roof." Lourie explained to OPR that he thought a judge, after seeing an indictment charging the full nature and scope of Epstein's conduct, might not agree to a plea involving substantially less time or to dismiss substantive charges.[41]

Lourie told OPR that despite Oosterbaan's favorable opinion of the case, "[t]his was . . . a bit of uncharted territory," involving facts that were unlike the case law Oosterbaan had cited. Although Lourie had some concerns about the legal issues and about the witnesses, he "probably" did not see any impediment to going forward with the case; in fact, Lourie "was not in favor of walking away, which is what the defense wanted [the USAO] to do." But while Lourie "thought we could have won and we could have prevailed through appeal," he "didn't think the odds were nearly as good as you want in a criminal case, and . . . the things that we had to gain [through a plea agreement] were much more than [in] a normal criminal case," in which the only cost of a loss would be that the defendant did not go to jail. Lourie told OPR that to the best of his recollection, he thought a plea agreement would be a good result, and although the government might have to "give up some jail time," there were other benefits to a plea, such as the ability to require Epstein to register as a sex offender and the availability of monetary damages for the victims. Lourie recalled "thinking that this case should settle and we should set it up so we can settle it" by, for example, charging Epstein by complaint and then negotiating a plea to limited charges in a criminal information. Villafaña told OPR that she agreed with Lourie that a criminal complaint charging an "omnibus conspiracy" containing "all of the information related to what the case was about" would be a good way to "get things moving" toward a pre-indictment plea.

Although Lourie and Villafaña believed a pre-indictment plea agreement was a desired resolution, there was no guarantee that Epstein would agree to plead guilty, and they continued to work together to shape an indictment. On May 10, 2007, Lourie emailed Villafaña:

> [M]arie
> I believe that Epstein's att[orneys] are scared of the victims they don't know. Epstein has no doubt told them that there were many. Thus I believe the f[ir]st indictment should contain only the victims they have nothing on at all. We can add in the other ones that have myspace [*sic*] pages and prior testimony in a [superseding indictment]. I think for the first strike we should make all their nightmare[]s come true. Thoughts?[42]

---

[41]    Lourie explained to OPR that the government's dismissal of counts in an indictment required the court's approval, and that, while "it's rare," it was possible that a judge, seeing the nature and extent of Epstein's conduct as set forth in an extensive indictment, might not allow substantive counts to be dismissed.

[42]    Lourie's references to MySpace pages and "prior testimony" referred to the impeachment information brought forward by defense counsel.

28

Lourie followed up his email to Villafaña with one to Menchel, in which Lourie reiterated the potential benefits of a pre-indictment plea, explaining that he and Villafaña believed "the best thing to do is charge Epstein by complaint, assuming we decide to charge him. . . .   The [sentencing] guidelines will be in the 20 year range, so we would need to plead him to one or two conspiracies to cap him and there is no telling if a judge would go for that once we indict."[43] Menchel responded that he and Acosta would read the prosecution memorandum and "[w]e can discuss after that."

Later that afternoon, Villafaña sent Lourie an email, which Lourie forwarded to Menchel, explaining that a "conservative calculation" of Epstein's potential sentencing exposure under the U.S. Sentencing Guidelines would be 168 to 210 months, and that in her view, the facts warranted an upward departure from that range.  Villafaña told OPR that although Lourie proposed some changes to the draft indictment, at that point no one had told her that the evidence was insufficient to support the proposed charges or that the office did not want to go forward with the case.

In an email to Acosta and Menchel on May 11, 2007, Lourie recommended charging Epstein by complaint and seeking a pre-indictment plea:

> My current thoughts are that we should charge him.  Not sure that I agree with the charging strategy as it is now, but at this point I think we only need to get on the same page as to whether the statutes cover the conduct and whether the conduct is the type we should charge. I think the answer to both is yes, although there is some risk on some of the statutes as this is uncharted territory to some degree.  We can decide later what the [charging document] should look like precisely and which victims should be charged.
>
> I also think if we choose to go forward, we should start with a complaint, arrest him, detain him . . . and then try to see if he wants a pre-indictment resolution.  That would give us more control [over] a plea than if we indict him and need the court's approval to dismiss counts.  We will need to cap him with conspiracy counts to make a plea attractive and the court could give us a hard time with that if we try to dismiss indicted counts.

Although her supervisors were communicating among themselves about the case, Villafaña was unaware of those discussions and was frustrated that she was not receiving more feedback. She continued preparing to charge Epstein.   Two weeks after submitting the prosecution memorandum, on May 14, 2007, Villafaña informed Lourie and Menchel by email that Epstein was flying to New Jersey from the Virgin Islands, and she asked whether she could file charges the next day.  Menchel responded that "[y]ou will not have approval to go forward tomorrow," and explained that Acosta "has your [prosecution] memo," but was at an out-of-town conference, adding, "This is obviously a very significant case and [A]lex wants to take his time making sure

---

[43]     Lourie told OPR that he was referring to one or two counts of conspiracy under 18 U.S.C. § 371, the general "omnibus" federal conspiracy statute that carries a maximum sentence of five years.

he is comfortable before proceeding." Menchel told Villafaña he had "trouble understanding" why she was in a "rush" "given how long this case has been pending."[44]

OPR questioned Lourie, Menchel, Sloman, and Acosta about the timeline for reviewing the prosecution memorandum and the proposed charges. Acosta and Menchel believed Villafaña's timeline was unrealistic from the start. Acosta told OPR that Villafaña was "very hard charging," but her timeline for filing charges in the case was "really, really fast." Menchel described Villafaña as "out over her skis a little bit" and "ahead of" Acosta in terms of his analysis of the case.[45] Menchel said it was clear to him that Acosta "was going to be the one making the call" about whether to go forward with charges, and Acosta needed more time to make a decision. Menchel told OPR, "This [was] not a case [we were] going to review in two weeks and make a decision on." Sloman told OPR that although he did not conduct a "granular review" of the proposed charges, he believed Menchel and Lourie had done so and "obviously" had concluded that "the facts and the law didn't suggest that the right thing to do was to automatically indict." Lourie told OPR that he believed "the case was moving ahead."

Villafaña continued to seek direction from her managers. On May 15, 2007, she emailed Sloman, noting that "[i]t seemed from our discussion yesterday that pestering Alex [Acosta] will not do any good. Am I right about that?" Sloman responded, "Yes." On May 21, 2007, three weeks after submitting the prosecution memorandum, Villafaña emailed Sloman and Menchel asking for "a sense of the direction where we are headed–i.e., approval of an indictment something like the current draft, a complaint to allow for pre-indictment negotiations, an indictment drastically different from the current draft?" Sloman responded only, "Taken care of."[46]

### D.     Defense Counsel Seek a Meeting with Senior USAO Managers, which Villafaña Opposes

Meanwhile, Epstein's defense counsel continued to seek additional information about the federal investigation and a meeting with senior USAO managers, including Acosta. In a May 10, 2007 email to Menchel, Lourie reported that Epstein's attorneys "want me to tell them the statutes

---

[44]     Villafaña explained to OPR that the "rush" related to her concern that Epstein was continuing to abuse girls: "In terms of the issue of why the hurry, because child sex offenders don't stop until they're behind bars. That was our time concern." Menchel, however, told OPR that he did not recall Villafaña offering this explanation to him. OPR notes that in their respective statements to OPR and in their comments on OPR's draft report, Menchel and Villafaña expressed contradictory accounts or interpretations of certain events. When it was necessary for OPR to resolve those conflicts in order to reach its findings and conclusions, OPR considered the extensive documentary record and the testimony of other subjects and witnesses, to the extent available.

[45]     Sloman similarly recalled that Menchel thought Villafaña was "ahead of where the office was internally" and that caused "discontent" between Villafaña and Menchel. Villafaña was not the only one, however, who was surprised that the indictment was not approved immediately. The case agent told OPR that it seemed "everything changed" after Villafaña submitted the prosecution memorandum, and the momentum towards an indictment abated. Villafaña's immediate supervisor told OPR that from her perspective, it appeared "Miami didn't want the case prosecuted." However, Menchel rebuked Villafaña in his July 5, 2007 email to her for having "led the agents to believe that [filing charges in] this matter was a foregone conclusion."

[46]     Sloman could not recall during his OPR interview what he meant by this remark, but he speculated that he had spoken to Menchel, and Menchel was going to take care of it.

we are contemplating so Dershowitz can tell us why they don't apply."[47]  Lourie told Menchel, "I don't see the downside," but added, "Marie is against it."  Menchel responded that it was "premature" to provide the information.  During his OPR interview, Menchel could not specifically recall why he believed it was "premature" to provide the defense with the requested information, but speculated that it was too soon after the prosecution memorandum had been circulated for Acosta to have made a decision about how he wanted to proceed.  This recollection is consistent with the May 2007 emails reflecting that Acosta wanted time to consider the proposed prosecution.

On May 22, 2007, defense counsel Lefcourt emailed Lourie a letter to "confirm" that Epstein's attorneys would be given an opportunity to meet with Lourie before the USAO reached a final decision on charging Epstein.  Lourie forwarded the letter to Menchel and Sloman, but noted that Epstein's defense team was "really ready for the next level," rather than another meeting with him.  Lourie suggested that Menchel meet with defense counsel, adding, "Whether Alex would be present or grant them another meeting after that is his call."  Lourie also emailed Lefcourt, clarifying that Lourie had not promised to call Epstein's counsel before filing charges, and suggesting that Epstein's counsel make their next presentation to Menchel.

Although Lourie's emails show that he had no objection to more senior USAO managers meeting with defense counsel, Villafaña opposed such a meeting.  Several emails indicate that Menchel traveled to West Palm Beach to meet with Lourie and Villafaña on the afternoon of May 23, 2007.[48]  On that same date, Villafaña drafted an email, which she planned to send to Sloman and Menchel, expressing her disagreement with meeting with defense counsel.  Although the email was written for Sloman and Menchel, Villafaña sent it as a draft only to her immediate supervisor, seeking her "guidance and counsel" as to how to proceed.

> Hi Jeff and Matt – I just want to again voice my disagreement with promising to have a meeting or having a meeting with Lefcourt or any other of Epstein's attorneys.  As I mentioned, this is not a case where we will be sitting down to negotiate whether a defendant will serve one year versus two years of probation.  This is a case where the defendant is facing the possibility of dozens of years of prison time.  Just as the defense will defend a case like that differently than they would handle a probation-type case, we need to handle this case differently.  Part of our prosecution strategy was already disclosed at the last meeting, and I am concerned that more will be disclosed at a future meeting.
>
> My co-chair . . . who has prosecuted more of these cases than the rest of us combined and who actually worked on the drafting of some of the child exploitation statutes, also opposes a meeting.  We have been accused of not being "strategic thinkers" because of our

---

[47]     Dershowitz had joined Lefcourt and Sanchez in representing Epstein for the federal case.

[48]     During her OPR interview, Villafaña could not recall the meeting with specificity, but believed the purpose was to discuss whether the USAO should agree to additional meetings with Epstein's counsel.  Menchel, similarly, told OPR that he could not remember anything specific about the meeting.

> opposition to these meetings, but we are simply looking at this case as a violent crime prosecution involving stiff penalties rather than as a white collar or public corruption case where the parties can amicably work out a light sentence.[49]
>
> With respect to the "policy reasons" that Lefcourt wants to discuss, those were already raised in his letter (which is part of the indictment package) and during his meeting with Andy and myself.  Those reasons are:  (1) he wants the Petit [*sic*] policy to trump our ability to prosecute Epstein, (2) this shouldn't be a federal offense, and (3) the victims were willing participants so the crime shouldn't be prosecuted at all.  Unless the Office thinks that any of those arguments will be persuasive, a meeting will not be beneficial to the prosecution, it will only benefit the defense.  With respect to Lefcourt's promised legal analysis, that also has already been provided.  The only way to get additional analysis is to expose to the defense the other charges that we are considering.  In my opinion this would seriously undermine the prosecution.
>
> The defense is anxious to have a meeting in order to delay the investigation/prosecution, to find out more about our investigation, and to use political pressure to stop the investigation.
>
> I have no control over the Office's decisions regarding whether to meet with the defense or to whom the facts and analysis of the case will be disclosed.  However, if you all do decide to go forward with these meetings in a way that is detrimental to the investigation, then I will have to ask to have the case reassigned to an AUSA who is in agreement with the handling of the case.

After receiving this draft, the immediate supervisor cautioned Villafaña, "Let's talk before this is sent, please."[50]  Villafaña told OPR that the supervisor counseled Villafaña not to send the email to Sloman or Menchel because Villafaña could be viewed as insubordinate.  She also told Villafaña that if Villafaña did not stay with the case, "the case would go away" and Epstein "would never serve a day in jail."

Villafaña told OPR that at that point in time, she believed the USAO was preparing to file charges against Epstein despite agreeing to accommodate the defense request for meetings.  She also told OPR, on the other hand, that she feared the USAO was "going down the same path that the State Attorney's Office had gone down."  Villafaña believed the purpose of the defense request

---

[49]      In commenting on OPR's draft report, Menchel's counsel noted Menchel's view that the nature of a defendant's crimes and potential penalty does not affect whether prosecutors are willing to meet with defense counsel to discuss the merits of a case.

[50]      The immediate supervisor recalled telling Villafaña that she and Villafaña were "not driving the ship," and once "the bosses" made the decision, "there's nothing else you can do."

for meetings was to cause delay, but "the people in my office either couldn't see that or didn't want to see that," perhaps because of "their lack of experience with these types of cases" or a misguided belief "that [Epstein's] attorneys would not engage in this behavior."  Villafaña told OPR that she "could not seem to get [her supervisors] to understand the seriousness of Epstein's behavior and the fact that he was probably continuing to commit the behavior, and that there was a need to move with necessary speed."  Nonetheless, Villafaña followed the guidance of her immediate supervisor and did not send the email.

Like Lourie, Menchel told OPR that he believed meeting with defense counsel was good practice.  Menchel told OPR that he saw "no downside" to hearing the defense point of view. Defense counsel might make a persuasive point "that's actually going to change our mind," or alternatively, present arguments the defense would inevitably raise if the case went forward, and Menchel believed it would be to the USAO's advantage to learn about such arguments in advance. Menchel also told OPR that he did not recall Villafaña ever articulating a concern that Epstein was continuing to offend, and in Menchel's view, Epstein was "already under a microscope, at least in Florida," and it would have been "the height of stupidity" for Epstein to continue to offend in those circumstances.

### E.      June 2007:  Villafaña Supplements the Prosecution Memorandum

While Villafaña's supervisors were considering whether to go forward with the proposed charges, Villafaña took additional steps to support them.  On June 14, 2007, she supplemented the prosecution memorandum with an addendum addressing "credibility concerns" relating to one of the victims.  In the email transmitting the addendum to Lourie, Menchel, Sloman, and her immediate supervisor, Villafaña reported, "another Jane Doe has been identified and interviewed," and the "different strategies" about how to structure the charges left Villafaña unsure whether "to make . . . changes now or wait until we have received approval of the current charging strategy." The addendum itself related to a particular victim referred to as the minor who "saw Epstein most frequently" and who had allegedly engaged in sexual activity with both Epstein and an Epstein assistant.  In the addendum, Villafaña identified documents she had found corroborating four separate statements made by this victim.

Villafaña told OPR that the only victim about whom any supervisor ever articulated specific credibility issues was the victim discussed in the addendum.  Lourie told OPR that he had no specific recollection of the addendum, but it was "reasonable" to assume that the addendum addressed one particular victim because no one had identified specific concerns relating to any other victim.  Villafaña's immediate supervisor similarly told OPR that to her recollection, the discussions about credibility issues were generic rather than tied to specific victims.

### F.      The June 26, 2007 Meeting with Defense Counsel

Menchel agreed to meet with defense counsel on June 26, 2007, communicating directly with Sanchez about the arrangements.  At Menchel's instruction, on June 18, 2007, Villafaña sent a letter to defense counsel identifying what she described as "the statutes under consideration."[51]

---

[51]      Villafaña sent copies of this letter to both Menchel and Sanchez.  Villafaña told OPR that she objected to sending this information to the defense.  Although Menchel did not recall directing Villafaña to send the letter to

On that same day, Villafaña emailed Lourie, Menchel, Sloman, and her immediate supervisor complaining that she had received no reply to her query about making changes to the proposed indictment and asking again for feedback.  During his OPR interview, Lourie observed that Villafaña's request for feedback reflected her desire to "charge this case sooner than . . . everybody else," but Acosta was still considering what strategy to pursue.  Sloman told OPR that he did not know whether Villafaña received any response to her request, but he believed that at that point in time, Menchel and Lourie were evaluating the case to make a decision about how to proceed.

The day before the June 26 meeting, defense counsel Lefcourt transmitted to the USAO a 19-page letter intended to provide "an overview of our position and the materials we plan to present in order to demonstrate that none of the statutes identified by you can rightly be applied to the conduct at issue here."  Reiterating their prior arguments and themes, defense counsel strongly contested the appropriateness of federal involvement in the matter.  Among other issues, Lefcourt's letter argued:

- Voluntary sexual activity involving "young adults–16 or 17 years of age"–was "strictly a state concern."

- Federal statutes were not meant to apply to circumstances in which the defendant reasonably believed that the person with whom he engaged in sexual activity was 18 years of age.

- One of the chief statutes the USAO had focused upon, 18 U.S.C. § 2422(b), was intended to address use of the internet to prey upon child victims through "internet trolling," but Epstein did not use the internet to lure victims.

- The "travel" statute, 18 U.S.C. § 2423(b), prohibits travel "for the purpose of" engaging in illicit sexual conduct, but Epstein traveled to Florida to visit family, oversee his Florida-based flight operations, and "engage in the routine activities of daily living."

Lefcourt also argued again that "irregularities" had tainted the state's case and would "have a significant impact on any federal prosecution."[52]

Lourie sent to Menchel, with a copy to Villafaña, an email dividing the defense arguments into "weaker" and "stronger" points.  Lourie disagreed with the argument that 18 U.S.C. § 2422(b) was limited to "internet trolling," and described this as "our best charge and the most defensible for federal interest."  On the other hand, Lourie believed the defense argument that Epstein did not travel to Florida "'with the purpose'" of engaging in illicit sex with a minor was more persuasive.

---

Lefcourt, he told OPR that he "wouldn't take issue" with Villafaña's claim that he had done so.  Menchel also told OPR that he did not recall Villafaña objecting at that point to providing the information to the defense.

[52]    Lefcourt claimed there were deficiencies in the PBPD search warrant and "material misstatements and omissions" in the PBPD probable cause affidavit.  As an example, he contended that the police had lacked probable cause to search for videotapes, "since all the women who were asked whether they had been videotaped *denied knowledge* of any videotaping."  (Emphasis in original).

Lourie opined that the government could argue "that over time [Epstein] set up a network of illegal high school massage recruits that would be difficult to duplicate anywhere else," which supported the conclusion that the massages must have been a motivating purpose of his travel, if not the sole purpose. However, Lourie expressed concern about "getting to the jury" on this issue and noted that he had not found a legal case factually on point. Villafaña told OPR that she disagreed with Lourie's analysis of the purpose of travel issue and had discussed the matter with him.[53] Villafaña also recalled that there were aspects of the defense submissions she and her colleagues considered "particularly weak."

On June 26, 2007, Sloman, Menchel, Lourie, Villafaña, the case agent, and the West Palm Beach squad supervisor met at the Miami USAO with Epstein attorneys Dershowitz, Black, Lefcourt, and Sanchez. Dershowitz led the defense team's presentation. From the USAO perspective, the meeting was merely a "listening session."[54] Echoing the arguments made in Lefcourt's letter, Dershowitz argued that the USAO should permit the state to handle the case because these were "traditionally state offenses." The case agent recalled being uncomfortable that the defense was asking questions in an attempt to gain information about the federal investigation, including the number of victims and the types of sexual contact that had been involved.

Villafaña told OPR that when Epstein's attorneys left the meeting, they appeared to be "under the impression that they had convinced us not to proceed." But Menchel told OPR, "[T]hey obviously did not persuade" the USAO because "we . . . didn't drop the investigation." According to Villafaña, Lourie, and Menchel, during a short post-meeting discussion at which Lourie expressed concern about the purpose of travel issue and Menchel raised issues related to general credibility of the victims, the prevailing sense among the USAO participants was that the defense presentation had not been persuasive. Villafaña told OPR that she "left [the meeting] with the impression that we were continuing towards" filing charges.

## IV.  ACOSTA DECIDES TO OFFER EPSTEIN A TWO-YEAR STATE PLEA TO RESOLVE THE FEDERAL INVESTIGATION

USAO internal communications show that in July 2007, Acosta developed, or adopted, the broad outline of an agreement that could resolve the federal investigation. The agreement would leave the case in state court by requiring Epstein to plead guilty to state charges, but would accomplish three goals important to the federal prosecutors: Epstein's incarceration; his registration as a sexual offender; and a mechanism to provide for the victims to recover monetary

---

[53]     Villafaña also told OPR that Lourie had, at times, expressed concern about the prosecution's ability to prove Epstein's knowledge of the victims' ages, particularly with regard to those who were 16 or 17 at the time they provided massages.

[54]     In his written response to OPR, Menchel indicated that he had no independent recollection of the June 26, 2007 meeting. In his OPR interview, Menchel said that although he had little memory of the meeting, to the best of his recollection the USAO simply listened to the defense presentation, and in a contemporaneous email, Menchel opined that he viewed the upcoming June 26 meeting as "more as [the USAO] listening and them presenting their position."

damages.[55]  During a two-month period, the subject attorneys were involved to varying degrees in converting the broad outline into specific terms, resulting in the NPA signed by Epstein on September 24, 2007.  The subjects, including Acosta, were generally able to explain to OPR both the larger goals and the case-related factors they likely considered during the process of conceptualizing, negotiating, and finalizing this resolution.  However, the contemporaneous emails and other records do not reflect all of the conversations among the decision makers, and their deliberative and decision-making process is therefore not entirely clear.  In particular, Menchel and Acosta had offices located near each other and likely spoke in person about the case, but neither had a clear memory of their conversations.  Therefore, OPR could not determine all of the facts surrounding the development of the two-year state plea resolution or the NPA.

In the following account, OPR discusses the initial key decision to resolve the federal investigation through state, rather than federal, charges, and sets forth many of the numerous communications that reflect the negotiations between the parties that led to the final NPA.  OPR questioned each of the subjects about how the decision was reached to pursue a state resolution, and OPR includes below the subjects' explanations.  The subjects' memories of particular conversations about this topic were unclear, but from their statements to OPR, a general consensus emerged that there were overlapping concerns about the viability of the legal theories, the willingness of the victims to testify, the impact of a trial on the victims, the overall strength of the case that had been developed at that time, and the uncertainty about the USAO's ability to prevail at trial and through appeal.  In addition, Acosta was concerned about usurping the state's authority to prosecute a case involving an offense that was traditionally handled by state prosecutors.  Based on this evidence, OPR concludes that Acosta may well have formulated the initial plan to resolve the matter through a state plea.  In any event, Acosta acknowledged to OPR that, at a minimum, he approved of the concept of a state-based resolution after being made aware of the allegations and the evidence against Epstein as set forth in Villafaña's prosecution memorandum.  Furthermore, Acosta approved of the final terms of the NPA.

### A.  June – July 2007:  The USAO Proposes a State Plea Resolution, which the Defense Rejects

A few days after the June 26, 2007 meeting, Sanchez emailed Villafaña, advising her that Epstein's defense team would submit additional material to the USAO by July 11, 2007, and hoped "to be able to reach a state-based resolution shortly thereafter."[56]  In a July 3, 2007 email, Villafaña told Sloman, Menchel, Lourie, and her immediate supervisor that she intended to initiate plea discussions by inviting Sanchez "to discuss a resolution of the federal investigation that could

---

[55]     State laws require that a person convicted of specified sexual offenses register in a database intended to allow law enforcement and the public to know the whereabouts of sexual offenders after release from punitive custody, and, in some cases, to restrict such individuals' movements and activities.  The Florida Sexual Offender/Predator Registry is administered by the Florida Department of Law Enforcement.  The Adam Walsh Child Protection and Safety Act of 2006 established a comprehensive, national sex offender registration system called the Sex Offender Registration and Notification Act (SORNA), to close potential gaps and loopholes that existed under prior laws and to strengthen the nationwide network of sex offender registrations.

[56]     In this email, Sanchez also requested a two-week extension of time for compliance with the USAO's demands for records, which included a demand for the computer equipment that had been taken from Epstein's residence before the October 2005 state search warrant and that Villafaña had been requesting from the defense since late 2006.

include concurrent time." The email primarily concerned other issues, and Villafaña did not explain what the resolution she had in mind would entail.[57] Villafaña requested to be advised, "[i]f anyone has communicated anything to Epstein's attorneys that is contrary to this." Villafaña, who was aware that Menchel and Lourie had been in direct contact with defense counsel about the case, explained to OPR that she made this request because "people were communicating with the defense attorneys," and she suspected that those communications may have included discussions about a possible plea.

In response to Villafaña's email, Menchel notified Villafaña that he had told Sanchez "a state plea [with] jail time and sex offender status may satisfy the [U.S. Attorney]," but Sanchez had responded that it "was a non-starter for them."[58] During his OPR interview, Menchel had no independent recollection of his conversation with Sanchez and did not remember why the defense deemed the proposal a "non-starter." However, Menchel explained that he would not have made the proposal to Sanchez without Acosta's knowledge. He also pointed out that in numerous emails before the June 26, 2007 meeting, he repeatedly noted that Acosta was still deciding what he wanted to do with the Epstein case. Acosta agreed, telling OPR that although he did not remember a specific conversation with Menchel concerning a state-based resolution, Menchel would not have discussed a potential resolution with Sanchez "without having discussed it with me."

### 1. Acosta's Explanation for His Decision to Pursue a State-based Resolution

Subsequent events showed that the decision to resolve the case through state charges was pivotal, and OPR extensively questioned Acosta about his reasoning. In his OPR interview, Acosta explained the various factors that influenced his decision to pursue a state-based resolution. Acosta said that although he, Sloman, and Menchel "believed the victims" and "believed [Epstein] did what he did," they were concerned "about some of the legal issues . . . and some of the issues in terms of testimony."[59] Acosta also recalled discussions with his "senior team" about how the victims would "do on the stand."

Acosta told OPR that "from the earliest point" in the investigation, he considered whether, because the state had indicted the case, the USAO should pursue it.

---

[57] Villafaña explained to OPR that she intended to recommend a plea to a federal conspiracy charge and a substantive charge, "consistent with the Ashcroft Memo, which would be the most readily provable offense," with "a recommendation that the sentence on the federal charges run concurrent with the state sentence, or that [Epstein] would receive credit for time in state custody towards his federal release date." *See* n.65 for an explanation of the Ashcroft Memo.

[58] Villafaña was then in trial and on July 4, 2007, likely before reading Menchel's email, Villafaña responded to defense counsel regarding the demand for records and also noted, "If you would like to discuss the possibility of a federal resolution . . . that could run concurrently with any state resolution, please leave a message on my voicemail."

[59] In commenting on OPR's draft report, Sloman stated he had no involvement in assessing the Epstein case or deciding how to resolve it, and that OPR should not identify him as among the people upon whom Acosta relied in reaching the two-year-state-plea resolution through the NPA. However, Sloman also told OPR that he had little recollection of the Epstein case, while Acosta specifically recalled having discussed the case with both Sloman and Menchel.

> [The prosecution] was going forward on the part of the state, and so
> here is the big bad federal government stepping on a sovereign . . .
> state, saying you're not doing enough, [when] to my mind . . . the
> whole idea of the [P]etite policy is to recognize that the []state . . .
> is an independent entity, and that we should presume that what
> they're doing is correct, even if we don't like the outcome, except
> in the most unusual of circumstances.

Acosta told OPR that "absent USAO intervention," the state's prosecution of Epstein would have become final, and accordingly, it was "prudent" to employ Petite policy analysis.  As Acosta explained in a public statement he issued in 2011, "the federal responsibility" in this unique situation was merely to serve as a "backstop [to] state authorities to ensure that there [was] no miscarriage of justice."[60]  Furthermore, Acosta saw a distinction between a case that originated as a federal investigation and one that had already been indicted by the state but was brought to the federal government because of a perception that the state charge was inadequate.  In the latter circumstance, Acosta viewed the USAO's role only as preventing a "manifest injustice."[61]  Acosta explained that "no jail time" would have been a manifest injustice.  But it was his understanding that if Epstein had pled guilty to state charges and received a two-year sentence to a registrable offense, "it would never have come to the office in the first place," and therefore would not be viewed as a manifest injustice.

Acosta also told OPR he was concerned that a federal prosecution in this case would result in unfavorable precedent, because the Epstein case straddled the line between "solicitation" or "prostitution," which Acosta described as a traditional state concern, and "trafficking," which was an emerging matter of federal interest.  Acosta contended that in 2006, "it would have been extremely unusual for any United States Attorney's Office to become involved in a state solicitation case, even one involving underage teens," because solicitation was "the province of state prosecutors."  Acosta told OPR, "I'm not saying it was the right view -- but there are at least some individuals who would have looked at this and said, this is a solicitation case, not a trafficking case."  Acosta was concerned that if the USAO convicted Epstein of a federal charge, an appeal might result in an adverse opinion about the distinction between prostitution and sex trafficking.

Acosta also told OPR that he was concerned that a trial would be difficult for Epstein's victims.  In Acosta's estimation, a trial court in 2007 might have permitted "victim shaming," which would have been traumatic for them.  In addition, the fact that the state grand jury returned a one-count indictment with a charge that would not require jail time suggested to Acosta that the state grand jury found little merit to the case.[62]  Acosta told OPR:

---

[60]     Letter from R. Alexander Acosta "To whom it may concern" at 1 (Mar. 20, 2011), published online in *The Daily Beast*.

[61]     Acosta was referring to the Petite policy provision allowing the presumption that a prior state prosecution has vindicated the relevant federal interest to be "overcome . . . if the prior [state] sentence was manifestly inadequate in light of the federal interest involved and a substantially enhanced sentence . . . is available through the contemplated federal prosecution."  USAM § 9-2.031.D.

[62]     Acosta told OPR he was unaware that USAO prosecutors believed the State Attorney's Office had deliberately undermined the case before the state grand jury.  Menchel told OPR that he understood that the State

> I do think it's important to look back on this, and try to be in the shoes of the thought process in 2006 and '07 when trafficking prosecutions were fairly new, when . . . more so than today, some jurors may have looked at this as prostitution, and . . . [a] judge's tolerance for victim shaming may have . . . caused more hesitation on the part of victims . . . .[63]

Finally, Acosta told OPR that a state-based resolution offered more flexibility in fashioning a sentence, because he believed prosecutors would have difficulty persuading a federal district court in the Southern District of Florida to approve a federal plea for a stipulated binding sentence that differed from the otherwise applicable federal sentencing guidelines range.[64]

In summarizing his thinking at the time, Acosta told OPR,

> The way the matter came to the office was, the state wasn't doing enough.  It didn't provide for prison time. It didn't provide for registration, and then you had the restitution issue.  There were legal issues . . . . There were witness issues.  And . . . we could go to trial . . . and we may or may not prevail.  Alternatively, we could look at a pre-indictment resolution, and at various points, the office went back and forth between a federal pre-indictment resolution, and a state pre-indictment resolution.

Acosta told OPR that, in the end, "there was a preference for deferring to the state" because, in part, the facts of the Epstein case at the time appeared to constitute solicitation or prostitution rather than trafficking, and a federal prosecution would be "uncharted territory."  Acosta explained that he did not view it as problematic to defer resolution of the case to the state, although as the Epstein case played out, the federal role became "more intrusive" than he had anticipated, because the defense tried to get the state to "circumvent and undermine" the outcome.

---

Attorney's Office could have proceeded against Epstein by way of an information, but decided to go into the grand jury because the State Attorney's Office "didn't like the case" and wanted "political cover" for declining the case or proceeding on a lesser charge.

[63]   Menchel told OPR, however, that the federal judges in West Palm Beach were highly regarded and were generally viewed as "pro-prosecution."

[64]   Acosta said that "dismissing a number of counts and then doing a [R]ule 11 is not something that [South Florida federal district] judges tend to do."  Other subjects also told OPR that the federal judges in the Southern District of Florida were generally considered averse to pleas that bound them on sentencing, commonly referred to as "Rule 11(c) pleas."

Federal Rule of Criminal Procedure 11(c)(1)(C) allows the parties to agree on a specific sentence as part of a plea agreement.  The court is required to impose that sentence if the court accepts the plea agreement; if the court does not accept the agreed upon plea and sentence, the agreement is void.  Villafaña told OPR that Rule 11(c) pleas were "uncommon" in the Southern District of Florida, as the "judges do not like to be told . . . what sentence to impose."  Menchel similarly told OPR that the USAO viewed federal judges in the Southern District of Florida as averse to Rule 11(c) pleas, although Menchel had negotiated such pleas.  Villafaña told OPR that she had never offered a Rule 11(c) plea in any of her cases and had no experience with such pleas.

Menchel could not recall who initially suggested a state plea, but noted to OPR that his own "emails . . . make clear that this course of action was ultimately decided by Alex Acosta." He referenced, among others, his May 14, 2007 email to Villafaña informing her that Acosta was deciding how he wanted to handle the case. Menchel surmised that a state resolution accomplished two things that Acosta viewed as important: first, it resolved any Petite policy concerns, and second, it afforded more flexibility in sentencing than a federal plea would have allowed. Menchel told OPR that the state plea proposal did not reflect any minimization of Epstein's conduct and that any state plea would have been to an offense that required sexual offender registration. He told OPR, "I don't think anybody sat around and said, you know, it's not that big a deal. That was not the reaction that I think anybody had from the federal side of this case." Rather, Menchel said, "The concern was if we charge him [as proposed], there's going to be a trial."

### 2. July 2007: Villafaña and Menchel Disagree about the Proposed State Resolution

Villafaña told OPR that she was angry when she received Menchel's July email explaining that he had proposed to Sanchez resolving the federal investigation through a state plea. In Villafaña's view, the proposed state resolution "didn't make any sense" and "did not correspond" to Department policy requiring that a plea offer reflect "the most serious readily provable offense."[65] In her view, a plea to a state charge "obviously" would not satisfy this policy. Villafaña also told OPR that in her view, the USAM required the USAO to confer with the investigative agency about plea negotiations, and Villafaña did not believe the FBI would be in favor of a state plea. Villafaña also believed the CVRA required attorneys for the government to confer with victims before making a plea offer, but the victims had not been consulted about this proposal. Villafaña told OPR she had met with some of the victims during the course of the investigation who had negative impressions of the State Attorney's Office, and she believed that "sending them back to the State Attorney's Office was not something" those victims would support.

---

[65]     This policy was set forth in a September 22, 2003 memorandum from then Attorney General John Ashcroft regarding "Department Policy Concerning Charging Criminal Offenses, Disposition of Charges, and Sentencing" (known as the "Ashcroft Memo"), which provided, in pertinent part:

> [I]n all federal criminal cases, federal prosecutors must charge and pursue the most serious, readily provable offense or offenses that are supported by the facts of the case, except as authorized by an Assistant Attorney General, United States Attorney, or designated supervisory attorney in the limited circumstances described below. The most serious offense or offenses are those that generate the most substantial sentence under the Sentencing Guidelines, unless a mandatory minimum sentence or count requiring a consecutive sentence would generate a longer sentence. A charge is not "readily provable" if the prosecutor has a good faith doubt, for legal or evidentiary reasons, as to the Government's ability readily to prove a charge at trial. Thus, charges should not be filed simply to exert leverage to induce a plea. Once filed, the most serious readily provable charges may not be dismissed except to the extent permitted [elsewhere in this Memorandum].

*See also* Chapter Two, Part Two, Section II.B.1.

In light of these concerns, Villafaña emailed Menchel, expressing her strong disagreement with the process:

> [I]t is inappropriate for you to enter into plea negotiations without consulting with me or the investigative agencies, and it is more inappropriate to make a plea offer that you know is completely unacceptable to the FBI, ICE [Immigration and Customs Enforcement], the victims, and me.  These plea negotiations violate the Ashcroft memo, the U.S. Attorney[s'] Manual, and all of the various iterations of the victims' rights legislation.  Strategically, you have started the plea negotiations as though we are in a position of weakness, anxious to make the case go away, by telling the defense that we will demand no federal conviction.  We left the meeting on June 26th in a stronger position than when we entered, and your statement that a state resolution would satisfy us takes away that advantage.  If you make it seem like the U.S. Attorney doesn't have faith in our investigation, Epstein has no incentive to make a deal.
>
> Second, your discussion makes it appear that my investigation is for "show" only and completely undermines my ability to deal with Epstein's attorneys directly. . . .
>
>      . . . .
>
> I would like to make a presentation to the U.S. Attorney, Jeff [Sloman], Andy [Lourie], and you with our side of the investigation and a revised indictment.  The presentation will address the points raised by Epstein's counsel and will convince you all of the strength of the case.
>
> In the meantime, please direct all communications from Epstein's counsel to me.

Menchel told OPR he realized Villafaña was "very anxious" to file charges in the case.  Villafaña had put a "tremendous" amount of effort into the investigation, and Menchel "was not unsympathetic at all to her desires" to pursue a federal case.  However, as Menchel told OPR, Villafaña's supervisors, including Acosta, were "trying to be a little bit more dispassionate," and her urgency was "not respectful" of Acosta's position.  Menchel viewed the tone of Villafaña's email as "highly unacceptable," and her understanding of applicable law and policy incorrect.  In particular, Menchel pointed out that although the Ashcroft Memo requires prosecutors to charge the "most readily provable offense," there is nevertheless room for "flexibility," and that the U.S. Attorney has discretion—directly or through a designated supervisor such as Menchel—to waive the policy.

Menchel's reply email began with a rebuke:

> Both the tone and substance of your email are totally inappropriate and, in combination with other matters in the past, it seriously calls your judgment into question.
>
> As you well know, the US Attorney has not even decided whether to go forward with a prosecution in this matter, thus you should have respected his position before engaging in plea negotiations.
>
> Along that same line, despite whatever contrary representations you made to the agents in this matter, it was made clear to you by the US Attorney and the First Assistant from the time when you were first authorized to investigate Mr. Epstein that the office had concerns about taking this case because of petit [*sic*] policy and a number of legal issues. Despite being told these things, you prepared a pros memo and indictment that included a definitive date for indictment. It has come to my attention that you led the agents to believe that the indictment of this matter was a foregone conclusion and that our decision to put off that date and listen to the defense attorneys' concerns is indicative of the office having second thoughts about indicting. As you well knew, you were never given authorization by anyone to seek an indictment in this case.[66]

In the email, Menchel went on to explain the circumstances of his conversation with Sanchez and respond to Villafaña's complaints:

> Lilly Sanchez called me before, not after, the June 26th meeting. It was an informal discussion and not in the nature of an official plea offer but rather a feeling out by both sides as to what it might take to resolve the matter. As you are also well aware, the only reason why this office even agreed to look into the Epstein matter in the first instance was because of concerns that the State had not done an adequate job in vindicating the victims' rights. As you and the agents conceded, had Epstein been convicted of a felony that resulted in a jail sentence and sex offender status, neither the FBI nor our office ever would have interceded. You should also know that my discussion with Lilly Sanchez was made with the US Attorney's full knowledge. Had Lilly Sanchez expressed interest in pursuing this avenue further, I certainly would have raised it with all the interested individuals in this case, including you and the agents. In any event, I fail to see how a discussion that went nowhere has hurt our bargaining position. I am also quite confident that no one

---

[66]     Menchel also sent this message to Sloman and copied Lourie.

on the defense team believes that the federal investigation in this matter has been for show.

Nor are your arguments that I have violated the Ashcroft memo, the USAM or any other policy well taken.  As Chief of the Criminal Division, I am the person designated by the US Attorney to exercise appropriate discretion in deciding whether certain pleas are appropriate and consistent with the Ashcroft memo and the USAM – not you.

As for your statement that my concerns about this case hurting Project Safe Childhood are unfounded, I made it clear to you that those concerns were voiced by the US Attorney.[67]  Whether or not you are correct, matters of policy are always within his purview and any decisions in that area ultimately rest with him.

Finally, you may not dictate the dates and people you will meet with about this or any other case.  If the U.S. Attorney or the First Assistant desire to meet with you, they will let you know.  Nor will I direct Epstein's lawyers to communicate only with you.  If you want to work major cases in the district you must understand and accept the fact that there is a chain of command – something you disregard with great regularity.

Villafaña acknowledged to OPR that as Criminal Division Chief, Menchel had authority to deviate from the Ashcroft Memo requiring that guilty pleas be to the most serious readily provable offense.  She disagreed, however, with his representation about her initial meeting with Acosta and Sloman regarding the Epstein investigation, noting that Menchel had not been at that meeting.[68]  Villafaña told OPR that no one had communicated to her the "concerns" Menchel mentioned, and she had not been given an opportunity to respond to those concerns.[69]

A week later, Villafaña replied to Menchel's email, reiterating her concerns about the process and that filing charges against Epstein was not moving forward:

Hi Matt -- My trial is over, so I now have [ ] time to focus back on this case and our e-mail exchange.  There are several points in your

---

[67]     Neither Menchel nor Villafaña could recall for OPR to what concerns they were referring.  In commenting on OPR's draft report, Acosta's attorney noted that Acosta's concerns were "the possibility that bringing a case with serious evidentiary challenges pressing novel legal issues could result in an outcome that set back the development of trafficking laws and result in an aggregate greater harm to trafficking victims."

[68]     Menchel confirmed to OPR that he was not involved in the decision to initiate the federal investigation.

[69]     Villafaña characterized Menchel's email as "meant to intimidate" and told OPR that she felt "put in [her] place" by him.  She perceived that Menchel was making it clear that she should not "jump the chain of command."  Menchel, however, asserted to OPR that Villafaña had a "history of resisting supervisory authority" that warranted his strong response.

e-mail that I would like to address, and I also would like to address where we are in the case.

First, I wanted to address the comment about jumping the chain of command.  After that concern was brought to my attention several months ago, I have tried very hard to be cognizant of the chain of command. . . .  If there is a particular instance of violating the chain of command that you would like to discuss, I would be happy to discuss it with you.

> . . . .

The statement that I have not respected Alex's position regarding the prosecution of the case demonstrates why you hear the frustration in the tone of my e-mail.  For two and a half months I have been asking about what that position is.  I have asked for direction on whether to revise the indictment, whether there are other issues that Alex wants addressed prior to deciding, whether there is additional investigation that needs to be done, etc.  None of that direction has been forthcoming, so I am left with . . . victims, and agents all demanding to know why we aren't presenting an indictment.  Perhaps that lack of direction is through no fault of yours, but I have been dealing with a black box, so I do not know to whom I should address my frustration.  My recollection of the original meeting with Alex and Jeff is quite different than your summary.  In that meeting, I summarized the case and the State Attorney's Office's handling of it.  I acknowledged that we needed to do work to collect the evidence establishing a federal nexus, and I noted the time and money that would be required for an investigation.  I said that I was willing to invest that time and the FBI was willing to invest the money, but I didn't want to get to the end and then have the Office be intimidated by the high-powered lawyers.  I was assured that that would not happen.  Now I feel like there is a glass ceiling that prevents me from moving forward while evidence suggests that Epstein is continuing to engage in this criminal behavior.  Additionally, the FBI has identified two more victims.  If the case is not going to go forward, I think it is unfair to give hope to more girls.

As far as promising the FBI that an indictment was a foregone conclusion, I don't know of any case in the Office where an investigation has been opened with the plan NOT to indict.  And I have never presented an indictment package that has resulted in a declination.  I didn't treat this case any differently.  I worked with the agents to gather the evidence, and I prepared an indictment package that I believe establishes probable cause that a series of crimes have been committed.  More importantly, I believe there is

proof beyond a reasonable doubt of Epstein's criminal culpability. Lastly, I was not trying to "dictate" a meeting with the U.S. Attorney or anyone else.  I stated that I "would like" to schedule a meeting, asking to have the same courtesy that was extended to the defense attorneys extended to the FBI and an Assistant in the Office.  With respect to your questions regarding my judgment, I will simply say that disagreements about strategy and raising concerns about the forgotten voices of the victims in this case should not be classified as a lapse in judgment.  This Office should seek to foster spirited debate about the law and the use of prosecutorial discretion . . . . [M]y first and only concern in this case (and my other child exploitation cases) is the victims.  If our personality differences threaten their access to justice, then please put someone on the case whom you trust more, and who will also protect their rights.

In the meantime, I will be meeting with the agents on Monday to begin preparing a revised indictment package containing your suggestions on the indictment and responding to the issues raised by Epstein's attorneys. . . .  If there are any specific issues that you or the U.S. Attorney would like to see addressed, please let me know.[70]

Villafaña did not get the meeting with Acosta that she requested.  She viewed Menchel's message as a rejection of her request to make a presentation to Acosta, and she told OPR that even though she regarded Sloman as a friend, she did not feel she could reach out even to him to raise her concerns.[71]  Menchel, however, told OPR that he did not "order" Villafaña to refrain from raising her concerns with Acosta, Sloman, or Lourie, and he did not believe his email to Villafaña foreclosed her from meeting with Acosta.  Rather, "the context of this exchange is, she is running roughshod over the U.S. Attorney, and what I am saying to her is, there is a process.  You're not in charge of it.  I'm not in charge of it.  [Acosta's] in charge of it."  Acosta, who was apparently not aware of Villafaña's email exchange with Menchel, told OPR that from his perspective, Villafaña was not "frozen out" of the case and that he would have met with her had she asked him directly for a meeting.

### B.     Villafaña Attempts to Obtain the Computer Equipment Missing from Epstein's Palm Beach Home, but the Defense Team Opposes Her Efforts

As the USAO managers considered in July 2007 how to resolve the federal investigation, one item of evidence they did not have available to assist in that decision was the computer equipment removed from Epstein's home before the PBPD executed its search warrant.  Although Villafaña took steps to obtain the evidence, defense counsel continued to oppose her efforts.

---

[70]      Menchel forwarded this email to Sloman.

[71]      Villafaña told OPR that she later spoke to Menchel, asking Menchel to redirect Sanchez to Villafaña, but that Menchel responded it was not Villafaña's "place" to tell him to whom he should direct communications.

Early in the federal investigation, Villafaña recognized the potential significance of obtaining the missing computer equipment. Villafaña told OPR that she and the FBI agents went through every photograph found in Epstein's house, but found none that could be characterized as child pornography. Nevertheless, Villafaña told OPR that investigators had learned that Epstein used hidden cameras in his New York residence to record his sexual encounters, and she believed he could have engaged in similar conduct in his Palm Beach home. In addition, the computer equipment potentially contained surveillance video that might have corroborated victim statements about visiting Epstein's home. More generally, in Villafaña's experience, individuals involved in child exploitation often possessed child pornography.[72]   Villafaña's co-counsel, who had substantial experience prosecuting child pornography cases, similarly told OPR, "Epstein was a billionaire. We knew his house was wired with video, it would be unusual [for] someone with his capabilities not to be video recording" his encounters.

As the investigation continued, Villafaña took various steps to acquire the computer equipment removed from Epstein's Palm Beach residence. As noted previously in this Report, in her initial request to Epstein's counsel for documents, she asked defense counsel to provide "[t]he computers, hard drives, CPUs, and any other computer media (including CD-ROMs, DVDs, floppy disks, flash drives, etc.) removed from" the residence. Although Lourie subsequently narrowed the government's request for documents, the request for computer equipment remained. The defense, however, failed to comply with the request.

Villafaña learned that the computer equipment was in the possession of a particular individual. After consulting the Department's Computer Crime and Intellectual Property Section and Office of Enforcement Operations about the appropriate legal steps to obtain the computer equipment, Villafaña described her plan in an email to Menchel. She asked Menchel for any comments or concerns, but OPR did not find an email response from him, and Menchel told OPR that he did not recall Villafaña's efforts to obtain the computer equipment.

In May 2007, following the plan she had outlined to Menchel, Villafaña initiated action requiring production of the computer equipment by a particular date. In her email to Villafaña on June 29, 2007, Sanchez requested a two-week extension, indicating that she hoped a "state-based resolution" to the case would soon be reached.[73] Villafaña advised her supervisors of the request, and responded to Sanchez that she "would like to get the computer equipment as soon as possible." Nonetheless, Villafaña eventually agreed to an extension.

Meanwhile, Epstein attorney Roy Black wrote separately to Villafaña, demanding to know whether Villafaña had complied with applicable Department policies before seeking the computer

---

[72]   In addition, Villafaña became aware that in August 2007, FBI agents interviewed a minor victim who stated that she had been photographed in the nude by Epstein's assistant, who told the victim that Epstein took pictures of the girls.

[73]   This email led Villafaña to ask her supervisors if any of them had discussed with the defense a possible resolution of the case, which resulted in Villafaña's exchange of emails with Menchel about their respective views of the case. *See* Section IV.A.2 in this Part.

equipment.[74]  After further communications on this issue involving Black, Sanchez, Villafaña, and Lourie, Black took legal action that effectively halted production of the computer equipment to the USAO until the issue could be decided by the court—which, as explained below, never happened because the parties entered into the NPA.

**C.      July 2007:  The Defense Continues Its Efforts to Stop the Federal Investigation**

In addition to their efforts to stop the government from obtaining the computer equipment, defense counsel also sent letters to the USAO, dated July 6, 2007, and July 25, 2007, reiterating their objections to a federal investigation of Epstein.  The July 25, 2007 letter included a lengthy "case analysis chart" purporting to support the defense argument that Epstein had committed no federal offense.  The July 25 letter also noted that the defense had been consulting with the former Principal Deputy Chief of CEOS, reporting that she "supports our position without reservation that this is not a matter upon which the federal statu[t]es should be brought to bear."[75]

While the defense was reiterating its objections to the federal investigation, CEOS expressed its endorsement of Villafaña's legal analysis and proposed charges.  On July 18, 2007, CEOS Chief Oosterbaan emailed Sloman, Menchel, and Lourie, stating that he had read Villafaña's prosecution memorandum "closely," and noting that "[s]he did a terrific job.  As we opined to Andy [Lourie] back in May, [CEOS] agree[s] with her legal analysis.  Her charging decisions are legally sound."  Oosterbaan observed:

> I have also reviewed the arguments contained in the letters from defense counsel.  Their legal analysis is detailed and comprehensive, but I find none of their arguments persuasive.  That is not to say that all the arguments are completely devoid of merit.  I expect the judge to consider some of the arguments closely.  Nevertheless, while the law applicable here is not always crystal clear, the balance of available precedent favors us.  From the prosecution memorandum it is clear that Marie has anticipated the strongest legal arguments, scrutinized the applicable law, and has charged the case accordingly.  And, while with this prosecution the government clearly faces a strong and determined defense team, it is a challenge well worth facing.  I also happen to know that there is absolutely no concern . . . about facing the challenges this case presents.

In closing, Oosterbaan renewed his offer to have CEOS "help you with this prosecution," and to send "whatever and whoever you need" to assist.

---

[74]      Villafaña forwarded Black's letter to Menchel, explaining the circumstances relating to the removal of the computer equipment from Epstein's home, the steps she had taken to make the required consultations in the Department, and that she and Lourie had worked together on her response to Black.

[75]      The news that the former CEOS Principal Deputy Chief was advising the Epstein team led to an email exchange between Sloman and CEOS Chief Oosterbaan, who commented, "By the way, let me know if you want me to put something in writing to you with our position and detailing all of the child prostitution cases she supervised with similar facts."

### D.    Acosta Decides on a Resolution That Includes a Two-Year Term of Incarceration

The next critical step in the development of the NPA was the decision to propose a two-year term of imprisonment.  Although presented to the defense as the "minimum" the USAO would accept, in actuality the two-year proposal became only the starting point for the negotiations, with the result that the defense continued to chip away at it as the negotiations continued.  The contemporaneous emails make no mention of any rationale for the decision to propose two years as the government's beginning negotiating position, and nobody with whom OPR spoke was able to recall how the decision was made.  As discussed below, Acosta did offer OPR an explanation, but OPR was unable to find contemporaneous evidence supporting it.[76]

While the defense was communicating its objections to the federal investigation to Villafaña, Lourie, Menchel, and Sloman, Villafaña continued moving toward filing charges.  On July 19, 2007, the day after receiving Oosterbaan's email supporting a potential prosecution, Villafaña emailed Lourie and Menchel seeking approval to take further investigative steps regarding three of Epstein's assistants.  However, Menchel directed Villafaña to "hold off . . . until we decide what course of action we are going to take on [E]pstein which should happen next week."  Menchel told OPR that he did not specifically recall why he asked Villafaña to wait, but he assumed it was because Acosta was deciding what course of action to take on the case.

On Monday, July 23, 2007, Menchel submitted a resignation notice to Acosta, stating that he would be leaving the USAO effective August 6, 2007.[77]

### 1.    The July 26, 2007 Meeting in Miami

Early on the morning of Thursday, July 26, 2007, Villafaña informed Menchel that she was preparing a new draft indictment containing revisions he had suggested, including removal of all but three of the "travel counts" and "a large number of [the] overt acts," and the addition of overt acts and counts relating to two additional victims; she would not, however, have the revised indictment ready in time "for our discussion today" at their 2:00 p.m. meeting.  Menchel told OPR that the fact that he had both proposed revisions to the indictment and also directed Villafaña to delay the investigative steps involving the assistants indicated that he was "trying to do something" with the case, but was waiting for Acosta to decide the "underlying issue" of whether to proceed with federal charges.

Acosta made that decision on or before July 26, 2007.  On that afternoon, Villafaña met in Miami with Menchel.  She told OPR that Sloman, as well as the FBI case agents and their supervisors, were also present, with Lourie participating by telephone.  Villafaña told OPR that she expected that the meeting, requested by Menchel, would address the direction of the investigation.  However, Villafaña told OPR that after everyone had assembled, Menchel entered the room and stated that Acosta "has decided to offer a two-year state deal."  According to

---

[76]    *See* Section IV.D.2 in this Part.

[77]    As early as May 4, 2007, Menchel had informed Acosta that he was intending to leave the USAO to enter private practice.

Villafaña, Menchel left the meeting after almost no discussion, leaving Villafaña "shocked and stunned."

Menchel told OPR that he did not recall the July 26, 2007 meeting. Nonetheless, he strongly disputed Villafaña's description of events, asserting that it would have been "directly at odds with his management style" to convene such a meeting, announce Acosta's decision, and leave without discussion. Acosta told OPR that he had "decided and endorsed this resolution at some point," but he did not recall being aware that Menchel was going to announce the decision at the July 26 meeting; in addition, although Acosta did not recall the circumstances of Menchel's relaying of that decision, he said it "would have been consistent with" his decision for Menchel to do so. Neither Sloman nor Lourie recalled the meeting. The FBI case agent recalled attending a meeting at the USAO in Miami with her co-case agent and supervisors, together with Villafaña, Lourie (by telephone), Menchel, and Sloman, at which they discussed how to proceed with the Epstein case. According to the case agent, at this meeting the FBI insisted that Epstein be registered for life as a sexual offender, and the co-case agent advocated for waiting until the court had ruled on the USAO's ability to obtain Epstein's computer equipment.

Regardless of exactly how Acosta's decision regarding the two-year term was communicated to Villafaña and the FBI agents, and regardless of who initially proposed the specific term, the record shows that Acosta ultimately made the decision to offer Epstein a resolution that included a two-year term of imprisonment, as he acknowledged.[78]

### 2. The Subjects' Explanations for the Decision to Offer Epstein a Sentence with a Two-Year Term of Incarceration

Villafaña asserted that she was not consulted about the specific two-year term before the decision was made.[79] Villafaña told OPR that she had worked hard to develop a strong case, and none of her supervisors had identified to her any specific problem with the case that, in her view, explained the decision to extend an offer for a two-year sentence. Villafaña also told OPR that Menchel provided no explanation for this decision during the July 26, 2007 meeting, and Villafaña did not ask for an explanation because she accepted his statement that it was Acosta's decision. Villafaña described the proposal as "random," and told OPR, "[W]e're all [sentencing] guidelines people, so 24 months just makes no sense in the context of the guidelines. There's no way to get to 24 months with this set of offenses."[80]

---

[78]     OPR notes that Villafaña did not appear hesitant to send emails to her supervisors setting forth her views and objections, and there is no reference before this meeting in any of her emails indicating that a decision had been made to offer a two-year term of incarceration. Therefore, given that a meeting had been arranged involving Menchel and Villafaña, and possibly most of the other primary USAO and FBI participants, it seems logical that Acosta made a decision to resolve the case with a two-year state plea not long before the meeting.

[79]     OPR found no evidence in the documentary record indicating that Villafaña had knowledge of Acosta's decision or the two-year term before the July 26, 2007 meeting at which she said she learned of it.

[80]     From the time the U.S. Sentencing Guidelines went into effect in 1987, they have been the mechanism for calculating federal criminal sentences. Since 2005, the Guidelines have been non-binding, but the federal courts are required to consider them. As noted in the commentary to USAM § 9-27.710,

Sloman also told OPR that he did not know how the decision to offer a two-year plea offer was reached, but he believed that Acosta made the decision based on recommendations from Menchel, Lourie, and Villafaña.  He opined to OPR that the decision was likely based on an assessment by Menchel and Lourie of the litigation risks presented by the case.[81]  Sloman added that he did not know how a two-year sentence might have related to specific charges or to either state or federal sentencing guidelines.  Lourie likewise told OPR he did not recall how the two-year term was decided upon, or by whom, but he speculated that it may have been presented by the defense as the most Epstein would accept, and that the decision would have been reached by Acosta following "extended consideration, research, and discussion," among Acosta, Sloman, Menchel, Lourie, and Villafaña.[82]

Menchel told OPR that he did not recall discussing a two-year plea deal with Acosta or who reached the decision that two years was an appropriate sentence.  Menchel also told OPR, however, that he recalled believing that if the USAO had filed the contemplated federal charges, Epstein would have felt he had "nothing to lose" and "undoubtedly" would have chosen to take the case to trial.  Menchel recalled believing there was a real risk that the USAO might lose at trial, and in so doing, might cause more trauma to the victims, particularly those who were reluctant to testify.  Menchel told OPR that he did not believe that anyone at the time looked at two years "as a fair result in terms of the conduct.  I think that was not the issue.  The issue was whether or not if we took this case to trial, would we risk losing everything," and "if we . . . felt we could have gotten more time, we would have, without having to press it to the trial."

Acosta told OPR that "I had decided and endorsed" the two-year resolution "at some point," and that it resulted from "back and forth" discussion "over the course of some days or a week or two."  As noted earlier in this Report, Acosta viewed the USAO's role in this case merely as a "backstop" to the state's prosecution, which he explained to OPR was "a polite way of saying[, ']encouraging the state to do a little bit more.[']"[83]  Acosta said that he understood two years' imprisonment to have represented the sentence Epstein faced under one of the original charges the PBPD was considering at the outset of the state investigation.[84]  Acosta also told OPR that he

---

the attorney for the government has a continuing obligation to assist the court in its determination of the sentence to be imposed.  The prosecutor must be familiar with the guidelines generally and with the specific guideline provisions applicable to his or her case.  In discharging these duties, the attorney for the government should . . . endeavor to ensure the accuracy and completeness of the information upon which the sentencing decisions will be based.

[81]    In Sloman's view, Menchel and Lourie were "two of the finest trial lawyers" in the USAO.

[82]    Lourie noted that Sloman and Menchel were "two extraordinarily experienced people in [Acosta's] front office who had tried . . . gobs and gobs of cases."

[83]    In commenting on OPR's draft report, Acosta's attorney asserted that OPR's use of Acosta's quote, "a little bit more," "unfairly minimized" Acosta's and the USAO's efforts to achieve justice in this case.  Acosta's attorney also asserted that the phrase was "clearly soft-spoken understatement," that the terms obtained were "substantially more onerous than the state's alternative resolution," and that Acosta was "clearly declining the invitation to take the State to task and soft-pedaling an obvious distinction."

[84]    OPR examined this assertion and was unable to verify that the proposed two-year term of imprisonment corresponded with the charges that the PBPD considered at the outset of the state investigation or with the charge in

understood that the PBPD would not have asked the FBI to investigate Epstein if the state had pursued the appropriate charges. In other words, in Acosta's view, "[T]his was, rightly or wrongly, an analysis that distinguished between what is necessary to prevent manifest injustice, versus what is the appropriate federal outcome to that." Acosta told OPR that he believed he had discussed his concerns about the case with Lourie, Sloman, or Menchel, although he could not recall any specific conversation with them.

### E.   Villafaña Drafts a "Term Sheet" Listing the Requirements of a Potential Agreement with the Defense

A meeting with defense counsel was scheduled for Tuesday, July 31, 2007. Villafaña told OPR that between July 26 and July 30, 2007, she had "some sort of discussion" with her supervisors that resulted in her creation of a "term sheet" identifying the proposed terms for resolving the federal investigation through state charges. Sometime during that period, Villafaña left a voicemail message for Menchel. During their OPR interviews, neither Villafaña nor Menchel could recall what Villafaña said in that message. On July 30, 2007, Menchel emailed Villafaña:

> I received your voicemail this morning. I don't see any reason to change our approach. I think telling them that unless the state resolves this in a way that appropriately vindicates our interests and the interests of the victims, we will seek [federal charges] conveys that we are serious. While Lilly [Sanchez] has represented in the past that this would likely not happen, I never conveyed it in quite these terms before. In any event, this is the course of action that the US Attorney feels comfortable taking at this juncture.

The following day, July 31, 2007, Villafaña emailed a one-page "Terms of Epstein Non-Prosecution Agreement" to Sloman, Menchel, and Lourie. Villafaña told OPR she had never before seen or heard of a non-prosecution agreement and that it was a concept "completely foreign" to her.[85] Villafaña told OPR that the idea of styling the two-year state plea agreement with Epstein

---

the state indictment. OPR considered various potential state charges involving various numbers of victims and found no obvious reasonable state sentencing guidelines calculation that would have resulted in a two-year sentence.

[85]    Deferred prosecution and non-prosecution agreements were standard, though infrequently used, vehicles for resolving certain federal criminal cases against corporate entities. A 2008 Departmental memorandum explained:

> The terms "deferred prosecution agreement" and "non-prosecution agreement" have often been used loosely by prosecutors, defense counsel, courts and commentators. As the terms are used in these Principles [of Federal Prosecution of Business Organizations], a deferred prosecution agreement is typically predicated upon the filing of a formal charging document by the government, and the agreement is filed with the appropriate court. In the non-prosecution agreement context, formal charges are not filed and the agreement is maintained by the parties rather than being filed with a court. Clear and consistent use of these terms will enable the Department to more effectively identify and share best practices and to track the use of such agreements. These Principles do not apply

as a "non-prosecution agreement" came from Acosta, although Menchel may have communicated that terminology to her.  According to Villafaña, she asked that it include a mechanism for the victims to be provided monetary compensation through 18 U.S.C. § 2255 in lieu of the restitution that would have been available if Epstein were pleading guilty to federal charges.[86]  Acosta told OPR that he "developed and approved" the term sheet."

Before the document was presented to defense counsel, two terms were dropped from Villafaña's draft—one providing that the agreement would apply only to already-identified victims, and another requiring the deal to be accepted, and Epstein to plead guilty, within the month.  The final term sheet was as follows:

---

to plea agreements, which involve the formal conviction of a corporation in a court proceeding.

Memorandum from Acting Deputy Attorney General Craig S. Morford to Heads of Departmental Components and United States Attorneys at n.2 (Mar. 7, 2008), available at https://www.justice.gov/archives/jm/criminal-resource-manual-163-selection-and-use-monitors.  Villafaña did not have significant experience prosecuting corporate entities.

[86]     A civil remedy for personal injuries suffered by victims of certain crimes is provided for in the federal criminal code at 18 U.S.C. § 2255.  Subsection (a) of the statute, as in effect from July 27, 2006, to March 6, 2013, provided as follows:

> Any person who, while a minor, was a victim of a violation of section 2241(c), 2242, 2243, 2251, 2251A, 2252, 2252A, 2260, 2421, 2422,  or  2423 of this title and who suffers personal injury as a result of such violation, regardless of whether the injury occurred while such person was a minor, may sue in any appropriate United States District Court and shall recover the actual damages such person sustains and the cost of the suit, including a reasonable attorney's fee.  Any person as described in the preceding sentence shall be deemed to have sustained damages of no less than $150,000 in value.

Villafaña also told OPR that she asked that the terms include the requirement that Epstein plead to an offense that required him to register as a sexual offender; however, sex offender status was also mentioned in Menchel's July 3, 2007 email to Villafaña recounting his preliminary discussions with Sanchez.

**CONFIDENTIAL PLEA NEGOTIATIONS**

TERMS OF EPSTEIN NON-PROSECUTION AGREEMENT

■   Epstein pleads guilty (not nolo contendere) to an Information filed by the Palm Beach County State Attorney's Office charging him with:
   (a)   lewd and lascivious battery on a child, in violation of Fl. Stat. 800.04(4);
   (b)   solicitation of minors to engage in prostitution, in violation of Fl. Stat. 796.03; and
   (c)   engaging in sexual activity with minors at least sixteen years of age, in violation of Fl. Stat. 794.05.

■   Epstein and the State Attorney's Office make a joint, binding recommendation that Epstein serve at least two years in prison, without any opportunity for withholding adjudication or sentencing; and without probation or community control in lieu of imprisonment.

■   Epstein agrees to waive all challenges to the information filed by the State and the right to appeal.

■   Epstein agrees that, if any of the victims identified in the federal investigation file suit pursuant to 18 U.S.C. § 2255, Epstein will not contest the jurisdiction of the U.S. District Court for the Southern District of Florida over his person and the subject matter.   Epstein will not contest that the identified victims are persons who, while minors, were victims of violations of Title 18, United States Code, Sections(s) 2422 and/or 2423.

■   After Epstein enters his state court plea and is sentenced, the FBI and the U.S. Attorney's Office will close their investigations.

## V.   THE USAO PRESENTS EPSTEIN WITH KEY TERMS OF A DEAL:  PLEAD GUILTY TO STATE CHARGES REQUIRING A TWO-YEAR TERM OF INCARCERATION AND SEXUAL OFFENDER REGISTRATION, AND AGREE TO A MEANS FOR THE VICTIMS TO OBTAIN MONETARY DAMAGES

Although the USAO term sheet was presented to Epstein's defense team on July 31, 2007, it took almost another two months to reach a final agreement in the form of the NPA.  The contemporaneous emails show that over the course of those two months, defense counsel offered multiple counter-proposals to the USAO's stated terms, and alternated between working out the state plea disposition and seeking an alternative federal plea arrangement.  The emails make clear that as the negotiations intensified in September 2007, the prosecutors became increasingly frustrated, particularly with what they perceived as the defense tactic of agreeing to terms and provisions but then backtracking or altering the agreed-upon terms in subsequent communications. It is apparent that the defense persistence achieved some measure of success, at least concerning

53

the period of imprisonment, because the USAO failed to hold firm to its proposal of "at least two years in prison." The USAO did, however, consistently reject defense proposals to change other terms, particularly the requirement that Epstein register as a sexual offender.

### A.    July 31, 2007:  The USAO Presents Its Proposal to the Defense Team, which Makes a Counteroffer

Menchel, Sloman, Lourie, Villafaña, and the case agents met with Epstein attorneys Lefcourt, Sanchez, and Black on July 31, 2007, with Menchel "leading the meeting" for the USAO.[87]    The USAO presented the term sheet, and Villafaña distributed a federal sentencing guidelines calculation showing that if prosecuted federally, Epstein faced a sentencing range of 188 to 235 months' incarceration.

Villafaña recalled that during the meeting, Epstein's attorneys opposed the requirement of sexual offender registration, argued that Epstein would not be safe in prison, suggested that Epstein serve a sentence of home confinement or "community control"[88] in lieu of incarceration, and emphasized that a state resolution provided greater sentencing flexibility.[89]    Villafaña told OPR that when Epstein's attorneys expressed concern during the meeting about Epstein's security in a state prison and argued for a home confinement sentence, Menchel suggested Epstein plead to a federal charge so that he could serve his time in a federal facility.  A few days after the meeting, Villafaña emailed Menchel, stating that she had "figured out a way to do a federal plea with a 2-1/2 year cap."

Although Acosta had authorized a plea to state charges, emails and other correspondence show that during the negotiations, the parties also considered structuring a plea around federal

---

[87]    Villafaña was the only witness with whom OPR spoke who had a substantive memory of this meeting.

[88]    According to the Florida Department of Corrections fact sheet for defendants subjected to community control,

> The Community Control supervision program was created as a diversion to incarceration or imprisonment; therefore it is an intensive supervision program where you are confined to your home unless you are working, attending school, performing public service hours, participating in treatment or another special activity that has been approved in advance by your officer. The program was designed to build accountability and responsibility along with providing a punishment alternative to imprisonment. While on Community Control supervision (also known as "house arrest") you will not be allowed to leave your home to visit family or friends, go out to dinner or to the movies, go on vacation, or many of the other activities you are used to being able to do . . . , but it does allow you to continue to work to support yourself and your family or attend school in lieu of being incarcerated and away from loved ones.

Florida Dept. of Corrections, Succeeding on Community Control at 1, http://www.dc.state.fl.us/cc/ccforms/ Succeeding-on-Community-Control.pdf.

[89]    Villafaña told OPR that she was concerned about a state resolution because the defense team "had a lot of experience with the state system.  We did not."  Villafaña anticipated there would be ways to "manipulate" a state sentence and the USAO would be "giving up all control," and she told OPR that she discussed this concern with Lourie, although she could not recall when that discussion occurred.

charges in addition to state charges.  On behalf of the defense team, Sanchez followed up on the July 31, 2007 meeting with an August 2, 2007 letter to Menchel:

> We welcomed your recognition that a state prison sentence is neither appropriate for, nor acceptable to, Mr. Epstein, as the dangers of the state prison system pose risks that are clearly untenable.  We acknowledge that your suggestion of a plea to two federal misdemeanors was an attempt to resolve this dilemma.  Our proposal is significantly punitive, and if implemented, would, we believe, leave little doubt that the federal interest was demonstrably vindicated.[90]

Sanchez added, "We must keep in mind that Jeffrey Epstein is a 54-year-old man who has never been arrested before.  He has lived an otherwise exemplary life."

The "significantly punitive" proposal described in the defense letter involved no period of mandatory incarceration.  Instead, Sanchez suggested two years of home confinement, with regular reporting to and visits from a community control officer; payment of restitution, damages, court and probationary costs, and law enforcement costs; random drug testing; community service; psychological counseling; and a prohibition on unsupervised contact with the victims.  The letter specifically referred to the victim damages-recovery procedure that the government had proposed under 18 U.S.C. § 2255 and represented that Epstein was "prepared to fully fund the identified group of victims which are the focus of the [USAO] – that is, the 12 individuals noted at the meeting on July 31, 2007."  Under the defense proposal, the state would incarcerate Epstein only if he failed to comply with the terms of supervised custody.  Sanchez also advised that the defense team was seeking a meeting with Acosta.

**B.    In an August 3, 2007 Letter, the USAO States That a Two-Year Term of Imprisonment Is the Minimum That Will Vindicate the Federal Interest**

Villafaña told OPR that she and her managers agreed the counteroffer was unacceptable, and she conferred with Lourie or Menchel about the government's response.  Villafaña drafted for Menchel's signature a letter asserting that the USAO considered a two-year term of imprisonment to be the minimum sentence that would "vindicate" the federal interest in the Epstein investigation.  Villafaña's draft stated that the USAO "has never agreed that a state prison sentence is not appropriate for Mr. Epstein," but was willing to allow Epstein to enter a guilty plea under Federal Rule of Criminal Procedure 11(c)(1)(C) to a federal felony charge with a binding recommendation for a two-year term of incarceration.  Villafaña specified that Epstein would also be required to concede liability under 18 U.S.C. § 2255 for all of the victims identified during the federal investigation, "not just the 12 that formed the basis of an initial planned charging instrument."

---

[90]    The USAO countered, however, that it "never agreed that a state prison sentence is not appropriate" and that "a plea to two federal misdemeanors was never extended or meant as an offer."  Records show that throughout the Epstein matter, the USAO attorneys identified instances when defense attorneys misstated or otherwise did not accurately describe events or statements.  Accordingly, in evaluating the subject attorneys' conduct, OPR did not rely on uncorroborated defense assertions.

Menchel made several substantive changes to Villafaña's draft letter. He specified that "a two-year term of *state* imprisonment" was the minimum sentence that would satisfy the federal interest in the case. (Emphasis added.) With regard to the option of a federal plea, Menchel wrote that the USAO "would be willing to explore a federal conviction" and retained the reference to a Rule 11(c) plea. Menchel also removed the reference to the specific state offenses to which Epstein would be required to plead guilty. Menchel forwarded the redraft to Acosta, suggesting that they speak about it the next morning, as well as to Sloman, Lourie, and Villafaña.

The final letter, as shown on the following pages, was identical to Menchel's redraft, except that it omitted all reference to a federal plea under Rule 11(c).[91]

---

[91]    Menchel told OPR that he did not disfavor Rule 11(c) pleas but knew that the USAO believed the judges were generally averse to them. He did not recall why the provision was dropped from the letter, but "assumed" it was a decision by Acosta. In a September 6, 2007 email, Villafaña told Sloman that she and Menchel had discussed a Rule 11(c) plea, but she opined that Menchel "must have asked Alex about it and it was nixed." Villafaña told OPR that Lourie, too, had told her Acosta did not want to do a Rule 11(c) plea.



**U.S. Department of Justice**

*United States Attorney*
*Southern District of Florida*

R. ALEXANDER ACOSTA
UNITED STATES ATTORNEY

*99 N.E. 4 Street*
*Miami, FL 33132*
*(305) 961-9100 - Telephone*
*(305) 530-6444 - Facsimile*

August 3, 2007

<u>VIA FACSIMILE</u>
Lilly Ann Sanchez, Esq.

[ redacted ]

      Re:    <u>Jeffrey Epstein</u>

Dear Lilly:

      Thank you for your letter of August 2nd regarding your proposal on how to resolve the Epstein matter.

      As we explained at our meeting on July 31, 2007, the Office believes that the federal interest will not be vindicated in the absence of a two-year term of state imprisonment for Mr. Epstein. That offer was not meant as a starting point for negotiations, it is the minimum term of imprisonment that will obviate the need for federal prosecution. The Office has never agreed that a state prison sentence is not appropriate for Mr. Epstein. Rather we simply stated that if Mr. Epstein preferred to serve his sentence in a federal penetentiary, we would be willing to explore a federal conviction that may allow that in lieu of any state resolution. Further, as I made clear in our follow up telephone conversation after the meeting, a plea to two federal misdemeanors was never extended or meant as an offer.

      We also would reiterate that the agreement to Section 2255 liability applies to all of the minor girls identified during the federal investigation, not just the 12 that form the basis of an initial planned charging instrument.

      As you know, the ability to engage in flexible plea negotiations is dramatically changed upon the return of an indictment. Once an indictment is returned, the Office does not intend to file a Superseding Information containing a lesser charge or to dismiss the case in favor of state prosecution.

LILLY ANN SANCHEZ, ESQ.
AUGUST 3, 2007
PAGE 2

       Please let us know your client's decision by no later than August 17. I have conferred with U.S. Attorney Acosta who has asked me to communicate that the two-year term of incarceration is a non-negotiable minimum to vindicate a federal interest, and, at this time, he is not inclined to meet with counsel for Mr. Epstein.

                    Sincerely,

                    R. Alexander Acosta
                    United States Attorney

By:

                    Matthew Menchel
                    Chief, Criminal Division

cc:    Roy Black
       Gerald B. Lefcourt
       R. Alexander Acosta
       Jeffrey Sloman
       Andrew Lourie
       A. Marie Villafaña

       Menchel told OPR that in his view, the two-year sentence established a "floor" for negotiations and if Epstein rejected the offer, subsequent offers would require him to accept more jail time rather than less. Menchel told OPR that the USAO was "leaving our options open" by retaining the option of a federal plea because he thought the defense was "trying . . . to get him into a federal penitentiary." The letter's deadline of August 17, 2007, for acceptance of the government's offer was intended to accommodate Villafaña's request that the deadline provide her with enough time to go to New York, pursue investigative steps involving two of Epstein's assistants, do witness interviews, and take additional legal steps to obtain Epstein's computers if Epstein rejected the deal. Menchel told OPR he considered August 17 to be a firm deadline: "[I]f you tell someone they have two weeks, it should be two weeks." Menchel signed and sent the letter on Friday, August 3, 2007, which was his last day at the USAO before joining a private law firm.[92]

       The following Monday, August 6, 2007, Villafaña contacted Menchel by email at his new firm to inquire whether the letter to Epstein's counsel had gone out on Friday. Villafaña explained

---

[92]    Menchel told OPR that the timing of the letter to Sanchez was a "total coincidence," and had nothing to do with his impending departure from the USAO.

to OPR that she "wanted to know whether this letter went out. Because . . . if the letter didn't go out we can make this all go away and restart." Menchel confirmed to her that he had sent the letter out by email.

Later that day, the West Palm Beach FBI squad supervisor told Sloman that he understood Epstein had rejected the USAO's proposal, and he asked when Epstein would be charged. Villafaña told OPR that the squad supervisor "yelled at" Sloman about the USAO's decision not to prosecute Epstein federally. Sloman similarly told OPR that the squad supervisor "like [Villafaña] . . . [a]nd the agents felt very strongly about the case."[93]

### C.   August – September 2007:  Epstein Hires Additional Attorneys, Who Meet with Acosta

#### 1.   Acosta Agrees to Meet with Epstein's New Attorneys

Villafaña told OPR that Epstein's team was "incensed" that Acosta would not meet with them and that the USAO had set such a short deadline to respond to its offer. Around this time, Epstein added to his team Kenneth Starr and Jay Lefkowitz, two prominent attorneys from the law firm Kirkland & Ellis, whom Acosta knew from his employment a decade earlier as an associate at the firm.[94]  On the evening of August 6, 2007, Sloman emailed Acosta: "Just saw Menchel. I didn't know Kirkland made a call into you. You were right. Unbelievable." During their OPR interviews, neither Acosta nor Sloman remembered the call from Kirkland & Ellis and could provide no additional information about the contact.[95]  A reply email from Acosta to Sloman indicates that the Kirkland & Ellis attorneys were considering elevating to the Department their objections to the USAO's involvement in the Epstein matter. In that email, Acosta stated, "They are likely to go to DC. We should strategize a bit. We are not changing positions, and that should be made clear."

The next day, Acosta wrote to Sloman:

> [Epstein's] attorneys want to go to DC on the case, on the grounds of a process foul, *i.e.*, that I have not met with them. I'm concerned that this will delay matters.
>
> I am thinking of heading this off, by (i) agreeing to meet to discuss general legal policy only (the only matter in which DC has arguable

---

[93]    In an email to Lourie reporting the conversation, Sloman reported that he told the squad supervisor that "it's a tad more complicated" and commented, "The guy is killing me." The squad supervisor told OPR that he did not remember this exchange with Sloman, but he recalled the agents being "upset" with the proposed resolution of the case and he likely would have told Sloman, "When do we indict? Why don't we just move forward?"

[94]    Acosta told OPR that as a junior associate with Kirkland & Ellis from September 1995 to March 1997, he had worked on at least one matter each with Starr and Lefkowitz, and since that time, he had professional acquaintanceships with both.

[95]    Menchel told OPR that he did not remember the timing of the call, but he did remember an occasion on which he entered Acosta's office as Acosta was finishing a phone conversation, and Acosta stated, "[T]hat was Ken Starr," and told Menchel the call related to the Epstein case.

jurisdiction), while making clear that we are not talking about the
details of the case, and (ii) asking [CEOS Chief] Oosterba[an] to
participate by teleconference, thereby intercepting the DC meeting.

Thoughts?

Acosta told OPR that he had no concern about Departmental "scrutiny of the NPA scheme" and
that "[i]f anything," he was concerned whether the Department might direct the USAO to "drop
this case."[96]

### 2.      Leading to the Meeting with Defense Counsel, Investigative Steps Are Postponed, and the Defense Continues to Oppose Villafaña's Efforts to Obtain the Computer Evidence

On August 8, 2007, Villafaña informed Acosta that she had spoken with Oosterbaan, who
was willing to join a meeting with the defense; although he could not do so in person until after
August 21, he was willing to participate by phone in order "to stay firm on our August 17th
deadline." Villafaña also reiterated that she wanted to contact Epstein's assistants in New York
and to interview some of Epstein's colleagues and former employees there. Noting that "there was
some concern about [taking the proposed investigative steps] while we are trying to negotiate a
plea," Villafaña asked Acosta for guidance. Lourie also emailed Acosta and Sloman, asking that
the USAO "stick to our deadline if possible." Lourie pointed out that CEOS "has no approval
authority" and opined it was "a bit extreme to allow the defense to keep arguing this [case] to
different agencies." Acosta replied, "This will end up [at the Department] anyhow, if we don't
meet with them. I'd rather keep it here. Brin[g]ing [the Chief of CEOS] in visibly does so. If our
deadline has to slip a bit . . . it's worth it."

As a result, the investigative steps were postponed. On August 10, 2007, Villafaña emailed
Lourie inquiring whether she could "still go ahead" with the New York trip and whether she could
oppose Black's request to stay the litigation concerning the government's efforts to obtain
Epstein's computer equipment until after Acosta's meeting with the defense team. Villafaña was
reluctant to delay the litigation and reported to Lourie that agents recently had interviewed a girl
who began seeing Epstein at age 14 and who was photographed in the nude by an Epstein assistant.
On August 13, 2007, Villafaña advised Black that the USAO was not willing to agree to a stay of
the litigation. However, Sanchez reached out to Lourie on August 22, 2007, and obtained his
agreement to a joint request for a stay until the week after Acosta's meeting with defense counsel,
which was scheduled for September 7, 2007.

Villafaña told OPR that, in her opinion, the defense efforts to put off the litigation
concerning the computers was "further evidence of the importance of [this] evidence."[97] Villafaña
suspected the computers contained evidence that "would have put this case completely to bed."

---

[96]      In context, Acosta appeared to mean that although he was not concerned about the Department reviewing the
NPA or its terms, he did have concerns that the Department would decide the USAO should not have accepted the
case because of a lack of federal interest and might direct the USAO to end its involvement in the matter.

[97]      Menchel told OPR, on the other hand, "there could be a lot of reasons why" defense counsel would resist
"turn[ing] over an entire computer."

She believed that access to the computer evidence would strengthen the government's negotiating position, but that her supervisors "did not seem to recognize that." Villafaña said she did not understand why her supervisors were uninterested in determining what the computers contained. Instead, they instructed Villafaña to "keep calling the judge" to ask for a delay in the litigation proceedings.

Sloman told OPR that he recalled an issue about the computers, but did not recall "what the thinking was at the time" about pursuing that evidence or why Villafaña was "ordered to stand down." Acosta, Menchel, and Lourie all told OPR that they did not recall Villafaña's effort to obtain the computer evidence or that there had been litigation relating to it. Lourie, however, told OPR that the computers might have contained "very powerful evidence" that possibly "could have changed our advice to [Acosta], or his decision making." In his OPR interview, Menchel was uncertain whether the computer evidence would have been useful, but also acknowledged to OPR, "You always want more as a prosecutor."

On August 31, 2007, in preparation for the upcoming September 7, 2007 meeting with defense counsel that he planned to attend, CEOS Chief Oosterbaan traveled to West Palm Beach to meet with Villafaña and the case agents and to examine the case file. He explained to OPR that he wanted to see the file before meeting with the defense so that he could best "represent[] the interests of the prosecution team," and that he was in favor of going forward with the case. According to Villafaña, during his review of the file, Oosterbaan told her that the case was "really good" and offered to assist Villafaña at trial.

On September 6, 2007, the day before the meeting with defense counsel, Sloman sent Villafaña an email asking, "Please refresh my recollection. What is the 'deal' on the table?" Sloman told OPR that his question reflected the fact that in his capacity as FAUSA, he was involved in "a hundred other things" at that time.[98] Villafaña sent Sloman the term sheet and explained to him, "You and Matt [Menchel] and I had also discussed a possible federal plea to an Information charging a 371 conspiracy, with a Rule 11 plea with a two-year cap, but I think Matt must have asked Alex about it and it was nixed." Villafaña continued:

> There are three concerns that I hope we can address tomorrow. First, that there is an absolute drop-dead date for accepting or rejecting because it is strategically important that we indict before the end of September, which means . . . September 25th. Second, the agents and I have not reached out to the victims to get their approval, which as Drew [Oosterbaan] politely reminded me, is required under the law. And third, I do not want to make any promises about allowing Epstein to self-surrender because I still believe that we have a good chance of getting him detained.[99]

---

[98]     Sloman noted that with the attention given to the Epstein investigation, "it seems like . . . this was the only case [in the office], but there were other cases."

[99]     As Villafaña explained in her OPR interview, when a violent crime defendant self-surrenders, the government may have difficulty winning an argument for pretrial detention or bond. Contrary to Villafaña's assertion in the email, the CVRA, even when applicable, required only victim consultation, not victim approval, and as is explained in

Villafaña added that the PBPD Chief had alerted the FBI that an upcoming news article would report that Epstein was "going to plead to a state charge" and the PBPD Chief "wanted to know if the victims had been consulted about the deal." Sloman forwarded Villafaña's email to Acosta with a note that read simply, "fyi."

Later that evening, Villafaña circulated to Sloman, Lourie, and Oosterbaan two alternative documents: a draft federal plea agreement and a draft NPA.[100] The draft federal plea agreement, following the USAO's standard format, called for Epstein to plead guilty to a five-year conspiracy under 18 U.S.C. § 371 to entice minors to engage in prostitution, an offense requiring registration as a sexual offender, with a Rule 11(c) binding sentence of two years' imprisonment. The draft NPA contained the terms presented to the defense team on July 31, 2007, and called for Epstein to enter a state plea by September 28, 2007. Villafaña told OPR that because she had never seen a non-prosecution agreement before, she relied on a template she found either using USAO or the Department's internal online resources, but she did not do any additional research regarding the use of non-prosecution agreements.[101]

### 3. September 7, 2007: Acosta, Other USAO Attorneys, and FBI Supervisors Meet with Epstein Attorneys Starr, Lefkowitz, and Sanchez

On Friday, September 7, 2007, Acosta, Sloman, Villafaña, Villafaña's co-counsel, Oosterbaan, and one or two supervisory FBI agents met at the USAO's West Palm Beach office with defense attorneys Sanchez and, for the first time, Starr and Lefkowitz.[102] This was Acosta's first meeting with Epstein's defense team. Villafaña understood the purpose of this meeting was to afford Epstein's counsel an opportunity to "make a pitch" as to why the case should not be prosecuted federally. Villafaña recalled that at a "pre-meet" before defense counsel arrived, Acosta did not express concern about the viability of the prosecution or the strength of the case.

Acosta told OPR that the meeting was not "a negotiation," but a chance for the defense to present their arguments, which were made by Starr and focused primarily on federalism. Villafaña similarly recalled that the meeting mainly consisted of the defense argument that the Epstein case should remain a state matter in which the USAO should not interfere. Both Villafaña and her co-counsel recalled that Starr addressed himself directly to Acosta, and that Starr, who had held Senate-confirmed positions in the government, commented to Acosta that he and Acosta were "the only people in this room who have run the [gantlet] of confirmation by the Senate." Acosta did not recall the comment, but he told OPR, "[B]ack in July, we had decided that we were going

---

Chapter Three, the Department's position at the time was that victim consultation was not required in matters in which the government did not pursue a federal charge. The USAO's actions with respect to victim consultation and the Department's interpretation of the CVRA are discussed in detail in Chapter Three of this Report.

[100]   The initial draft NPA is attached as Exhibit 2 to this Report.

[101]   OPR was unable to identify a template upon which she might have relied.

[102]   Lourie was not present. During September 2007, he was traveling between Florida and Washington, D.C., as he transitioned to his new detail post as Principal Deputy Assistant Attorney General and Chief of Staff to the head of the Department's Criminal Division, Assistant Attorney General Alice Fisher. He served in that detail until he left the Department in February 2008.

forward, that either there is this pre-indictment resolution, or we go forward with an indictment. The September meeting did not alter or shift our position."[103]

Villafaña told OPR that after hearing the defense argument, Acosta reiterated that the federal interest in the case could be vindicated only by a state plea to an offense that required sexual offender registration, resulted in a two-year term of incarceration, and was subject to the 18 U.S.C. § 2255 process for providing compensation to the victims. When defense counsel objected to the registration requirement, Acosta held firm, and he also rejected the defense proposal for a sentence of home confinement. In a subsequent email exchange with Criminal Division Deputy Assistant Attorney General Sigal Mandelker, who supervised CEOS, Oosterbaan reported that the meeting was "non-eventful," noting that defense counsel argued "federalism" and might approach Criminal Division Assistant Attorney General Alice Fisher to present that argument directly to her.

## VI.    SEPTEMBER 2007: THE PLEA NEGOTIATIONS INTENSIFY, AND IN THE PROCESS, THE REQUIRED TERM OF IMPRISONMENT IS REDUCED

Acosta had dispensed with the August 17, 2007 plea deadline specified in Menchel's August 3, 2007 letter, in order to allow the defense to meet with him. After that meeting, and although Villafaña continued to plan to file charges on September 25, no new plea deadline was established, and the negotiations continued through most of September.

The defense used that time to push the USAO to make concessions. Because Acosta was not willing to compromise on the issue of sexual offender registration or providing a means through which the victims could seek monetary damages, the negotiations focused on the term of imprisonment. As the contemporaneous emails show, the USAO did not hold to its position that a two-year term of imprisonment was "the minimum" that the USAO would accept. To reach an agreement with the defense on Epstein's sentence, the USAO explored possible pleas in either federal or state court, or both, and Villafaña spent considerable time and effort working with defense counsel on developing alternative pleas with various outcomes. In the course of that process, the agreement was revised to require that Epstein accept a sentence of 18 months, with the understanding that under the state's sentencing procedures, he would likely serve just 15 months.

### A.    The Incarceration Term Is Reduced from 24 Months to 20 Months

Shortly after the September 7, 2007 meeting, Epstein attorney Gerald Lefcourt, who had not been present at the meeting, spoke with both Acosta and Lourie, and made a new counteroffer, proposing that Epstein serve 15 months in jail followed by 15 months in home confinement. On the afternoon of Monday, September 10, 2007, Villafaña emailed Sloman, identifying issues she wanted to discuss with him, including her concern that defense counsel was pushing for a resolution that would allow Epstein to avoid incarceration and possibly sexual offender registration. Villafaña stated that Lefcourt's counteroffer was "a reasonable counteroffer in light of our starting position of 24 months," but added that it was "a really low sentence." Villafaña

---

[103]    Sloman echoed this point, telling OPR that Starr's presentation focused on the issue of federalism, but the USAO had already decided to defer prosecution to the state and after the meeting, the USAO continued on that path.

noted that the revised charges involved 19 victims, so the defense proposal for a 15-month sentence amounted to less than one month per victim. Villafaña requested that "whatever the U.S. Attorney decides to do," the agreement with Epstein should "follow . . . a version of my written non-prosecution agreement" in order to "avoid any state shenanigans and . . . keep the defense on a strict timeline."

Later that day, Villafaña circulated to Acosta and Sloman a revised NPA that called for a 20-month jail sentence to be followed by 10 months of home confinement. This redrafted NPA contained a provision that specified, "With credit for gain time, Epstein shall serve at least 17 months in a state correctional institution."[104] Acosta reviewed the revised NPA and amended it to include a statement clarifying that it was Epstein's obligation "to undertake discussions with the State of Florida to ensure compliance with these procedures." Villafaña sent her version of the revised NPA to Lefcourt that afternoon and forwarded Acosta's proposed change to him the following day, after she learned of it.

On September 11, 2007, the court contacted Villafaña to inquire whether the USAO would be prepared to proceed with the litigation concerning the computers the following day. At Sloman's direction, Villafaña asked the court to delay the hearing, and the court rescheduled it for the following week. At the same time, anticipating that plea negotiations would fail, Villafaña circulated a revised indictment to her co-counsel and Oosterbaan, seeking their feedback before sending it "through the chain of command." Villafaña also sent Oosterbaan the revised NPA and told him she was "still shooting for 9/25" to bring charges, assuming the defense declined the USAO's offer. Oosterbaan responded, "The counter-offering is unfortunate, but I suppose it's understandable."[105]

That afternoon, Lourie asked Villafaña, "What is our latest offer?" Villafaña responded, "Plead to the three specified [state] charges, a 30-month sentence, split 20 in jail and 10 in 'community control,' and agree that the girls are victims for purposes of damages. We also put in deadlines for a plea and sentencing date."

**B.      September 12, 2007:  The USAO and Defense Counsel Meet with the State Attorney**

Although the USAO and defense counsel had been discussing resolving the federal investigation with a plea to state charges, there is no evidence that the USAO involved the State Attorney's Office in those discussions until September 12, 2007. On that day, Lourie, Villafaña, and another USAO supervisor who would be replacing Lourie as manager of the USAO's West Palm Beach office, and Epstein attorneys Lefkowitz, Lefcourt, and Goldberger met with State Attorney Barry Krischer and Assistant State Attorney Lanna Belohlavek. Other than Villafaña, few of the participants had any memory of the meeting or the results of it. The available evidence indicates that the USAO made additional concessions during the meeting.

---

[104]      Through "gain time," Florida inmates can earn a reduction in their sentence for good behavior.

[105]      Oosterbaan told OPR that he did not recall having read the NPA at this juncture and "had no involvement with it."

Villafaña told OPR that during the meeting, the group discussed the draft NPA, but she did not think they gave a copy to Krischer and Belohlavek. Neither Krischer nor Belohlavek expressed concern about proceeding as the USAO was proposing. According to Villafaña, Belohlavek explained that a plea to the three state counts identified in the draft NPA would affect the state's sentencing guidelines, and that it would be better for the guidelines calculation if Epstein pled guilty to just one of the three counts. Villafaña recalled that when Belohlavek confirmed that Epstein would be required to register as a sexual offender if he pled to any one of the three charges, Lourie, speaking for the USAO, agreed to allow Epstein to enter his plea to just one state charge in addition to the pending state indictment, and the defense attorneys selected the charge of procurement of minors to engage in prostitution.[106] Lourie, however, disputed Villafaña's recollection that he made the final decision, stating that it was "illogical" to conclude that he had the authority to change the terms of agreement unilaterally.[107]

During the meeting, defense counsel raised concerns about Epstein serving time in state prison. Villafaña also told OPR that Lourie, the other supervisor, and she made clear during the meeting that they expected Epstein to be incarcerated 24 hours a day, seven days a week, during the entirety of his sentence, and they did not "particularly care" whether it was in a state or local facility. Belohlavek explained to OPR that in order for Epstein to serve his time in a county facility, rather than state prison, his sentence on each charge could be no more than 12 months, so that, for example, consecutive terms of 12 months and 6 months—totaling 18 months—could be served in the county jail. Villafaña told OPR:

> Our thing was incarceration 24 hours a day. So during this meeting, I remember [the defense] talking about . . . a one year count followed by a six-month count . . . that [Epstein] could serve them back to back but at the county jail, rather than having to go to a state facility. But then I said, "But if you do that, it's still going to have to be round the clock incarceration." And Barry Krischer said yes. And [he] said that to avoid [Epstein being extorted while incarcerated], he would be kept in solitary confinement.

Villafaña did not recall whether she and Lourie agreed to an 18-month sentence during that meeting, but she told OPR that in her view, allowing Epstein to serve his sentence in the county jail was not a "concession" because he would be incarcerated regardless.

Neither Lourie nor the other USAO supervisor present could recall any substantive details of the September 12, 2007 meeting, and Krischer and Belohlavek told OPR they did not remember the meeting at all. Krischer did, however, recall that he was "not offended at all" when he learned of the proposed federal resolution, requiring Epstein to plead to both the pending state indictment and an additional charge requiring sexual offender registration, explaining to OPR that Epstein "was going to plead guilty to my indictment, we were going to add an additional charge, he was

---

[106]    Later, the defense would claim that they had mistakenly understood that the selected charge would not involve sexual offender registration.

[107]    As noted below, a contemporaneous email indicates that shortly after the meeting, Lourie and Villafaña spoke with Acosta and Sloman, who concurred with the agreement.

going to become a registered sex offender, and he was going to go actually do time—which he hadn't done up to this point." Krischer asked, "Why would I turn that down?" Krischer also noted that at that time, sexual offender registration "was not the norm" in Florida, and he recognized that "it was clearly something that was important to the U.S. Attorney's Office."[108]

Acosta told OPR that he did not recall if he learned what transpired at the September 12 meeting, nor did he recall why the USAO team agreed to permit Epstein to plead guilty to only one charge. Acosta told OPR, however, that he recognized that Villafaña and Lourie needed "some degree of discretion to negotiate"; that "in the give and take" of negotiations, they might propose a concession; and he was comfortable with the concession as long as the charge to which Epstein ultimately pled "captured the conduct" in an "appropriate" way.

Although Epstein's attorneys expressed interest in Epstein serving his time in a county facility (rather than state prison), one of Epstein's attorneys alternatively expressed interest in Epstein serving his time in a federal facility, and along with discussions about the possible state resolution, the USAO and Epstein's counsel also discussed a possible federal plea with a sentence running concurrently to the sentence Epstein would receive on the already indicted state charge. Later that day, Villafaña sent Lefkowitz an email advising that she and Lourie had talked with Acosta and Sloman, and they were "all satisfied in principle with the agreement."[109] The next day, September 13, 2007, Villafaña sent an email to Acosta, Sloman, Lourie, and two other supervisors, identifying potential federal offenses that would yield a two-year sentence. Villafaña also emailed defense counsel, stating that she had been "spending some quality time with Title 18"—referring to the code of federal criminal statutes—to make sure there would be a "factual basis" for any federal plea, and identifying the federal statutes she was considering.

## C.  The Evidence Does Not Clearly Show Why the Term of Incarceration Was Reduced from 24 Months to 20 Months to 18 Months

OPR reviewed the contemporaneous records and asked Acosta, Villafaña, and Lourie to explain how the jail term Epstein would have to accept came to be reduced from two years to 18 months. Lourie had no recollection of the process through which the term of incarceration was reduced. Villafaña and Acosta offered significantly different explanations.

Villafaña told OPR:

> We had this flip flop between is it going to be a state charge, is it going to be a federal charge, is it going to be [a] state charge, is it going to be a federal charge? And to get to a federal charge, there was no way to do 24 months that made any sense. So somehow it ended up being 20 months and then it got to be 18 months. And these were calls that if I remember correctly, Jay Lefkowitz was

---

[108]   Belohlavek, however, told OPR that sexual offender registration "was a common occurrence" for enumerated state crimes, but the state crime charged in the state indictment against Epstein was not one of them.

[109]   The email does not indicate what the parties meant by "the agreement."

having directly with Alex Acosta, and Alex Acosta agreed to 18 months.

Villafaña further explained to OPR:

> Regarding going from 24 months to 20 months, I recall a discussion that 24 months of federal time was really 20 months after gain time, so Epstein should be allowed to plead to 20 months' in the state. Epstein's counsel represented that he wouldn't get gain time like that in the [s]tate, and someone above me agreed. Later, of course, as shown in the agreements, Epstein's counsel (Jay Lefkowitz) got Alex to agree that Epstein should be allowed to earn gain time in the [s]tate, so the 20 months in the state became at least 17 months.

> Regarding going from 20 months' to 18 months, . . . this came from a negotiation between Epstein's counsel and Andy or Alex where the federal statutory max could only be 24 or 18, so 18 was agreed to. I also recall that, after Epstein's counsel decided that they wanted to proceed with an NPA and only a state guilty plea, I asked Alex why we didn't return to 20 months because the reason why we went to 18 months was because that was the only way to end up with a federal statutory maximum.[110]

However, a subsequent account of the history of negotiations with Epstein's attorneys, drafted by Villafaña for Acosta several weeks after the September 12, 2007 meeting with the State Attorney's Office, stated that "a significant compromise" reached at the meeting "was a reduction in the amount of jail time – from [the originally proposed] twenty-four months down to eighteen months, which would be served at the Palm Beach County Jail rather than a state prison facility." Acosta also noted to OPR that Villafaña was engaged in a "tough negotiation," and he was willing to allow her the discretion to reduce the amount of incarceration time without him "second-guessing" her. Acosta acknowledged that he "clearly approved it at some point."

Based on this record, OPR could not definitively determine when, how, or by whom the decision was made to reduce the required term of imprisonment from 24 months to 18 months. It is possible that the reduction was connected to Epstein's effort to achieve a result that would allow him to serve his time in a county facility, but it may also have resulted from the parties' attempts to reach agreement on federal charges that would not result in a sentence of incarceration greater than what had been discussed with respect to state charges. In the end, the evidence shows that Acosta approved of a reduced term of incarceration from 24 months to 18 months, and the USAO understood at the time that the state gain time requirement would further reduce the actual amount of time Epstein would spend incarcerated.

---

[110] By "federal statutory maximum," Villafaña referred to 12-month and 6-month misdemeanors.

### D.    The Parties Continue to Negotiate but Primarily Focus on a Potential Plea to Federal Charges

During the remainder of September, Villafaña conducted plea negotiations and drafted the final NPA, mainly with Epstein attorney Jay Lefkowitz.  In a September 13, 2007 email to CEOS Chief Oosterbaan, Villafaña reported that the plea negotiations were "getting fast and furious." She said that the defense wanted to establish a "victim's fund" through which Epstein could make payments to the victims, rather than having the victims file individual § 2255 court actions for damages, which she speculated was "to keep this stuff out of the public [c]ourt files."

According to the email documentation, by Friday, September 14, 2007, the parties had moved toward a "hybrid" federal plea agreement, incorporating a plea to state charges, which would allow Epstein to serve his sentence for all the charges concurrently in a federal prison. Villafaña informed Acosta, Sloman, Lourie, and other colleagues that negotiations with Lefkowitz had resulted in a tentative agreement for Epstein to plead to two federal charges:  harassment to prevent a witness from reporting a crime (18 U.S.C. § 1512(d)(2), which was then a one-year misdemeanor), and simple assault on an airplane (18 U.S.C. § 113(a)(5), a six-month misdemeanor).  Villafaña reported that Lefkowitz "put in a pitch for only 12 months, I put in a pitch that [Epstein] plead to 24 with a 20-month recommendation, and we decided that we would be stuck with the 18 months."

Later that day, Villafaña sent to Lefkowitz a draft "hybrid" plea agreement and information mirroring the agreement in principle she had described to her supervisors, but which she noted had "not yet been blessed" by them.  The agreement provided that Epstein would plead guilty to the two federal charges for which the parties would jointly recommend that he be sentenced to the statutory maximum penalty of 18 months' imprisonment followed by 2 years of supervised release, and that he would also plead guilty to the state registrable offense of procurement of minors to engage in prostitution, for which Epstein and the State Attorney's Office would make a joint, binding recommendation that he be sentenced to serve at least 20 months in prison followed by 10 months of community control (home confinement).  Although not specified in the draft agreement, the negotiations evidently expected the federal and state terms would run concurrently.  In addition to payment of restitution, Epstein would not oppose jurisdiction or victim status for any of the victims identified in the federal investigation—at that point specified as numbering 40—who elected to file suit for damages under 18 U.S.C. § 2255.  A guardian *ad litem* would be appointed to communicate with the defense on the victims' behalf.

Lourie, however, quickly made clear that he was not in favor of the proposal.  In response to Villafaña's email about the potential federal charges, but after Villafaña sent the proposal to Lefkowitz, Lourie told her, "The assault [charge] sounds like a stretch and factually [is] sort of silly."[111]  Lourie also told Sloman, Acosta, and another supervisor that he did not "like the assault charge" and believed that it would not "go smooth with every judge."  Acosta responded, "If we need[,] let's find a different charge."  On Saturday, September 15, 2007, Villafaña emailed Lefkowitz, using her personal email address, reporting that she had "gotten some negative reaction

---

[111]    The charge was to be based on "an incident in which Epstein 'put great pressure' . . . on [one of his female assistants] to call the girls to set up appointments."

to the assault charge" and suggesting a different factual scenario to support a federal charge.[112]  At this point, Sloman left on vacation, and he informed Acosta and Villafaña that in his absence Lourie had agreed "to help finalize this."  Lourie spent the following work week at his new post at the Department in Washington, D.C., but communicated with his USAO colleagues by phone and email.

In a Sunday, September 16, 2007 email, Villafaña informed Lefkowitz that she had drafted a factual proffer to accompany a revised "hybrid" federal plea proposal.  In that email, Villafaña also noted that she was considering filing charges in the federal district court in Miami, "which will hopefully cut the press coverage significantly."  This email received considerable attention 12 years later when it was made public during the CVRA litigation and was viewed as evidence of the USAO's efforts to conceal the NPA from the victims.  Villafaña, however, explained to OPR that she was concerned that news media coverage would violate the victims' privacy.  She told OPR, "[I]f [the victims] wanted to attend [the plea hearing], I wanted them to be able to go into the courthouse without their faces being splashed all over the newspaper," and that such publicity was less likely to happen in Miami, where the press "in general does not care about what happens in Palm Beach."

Lefkowitz responded to Villafaña with a revised version of her latest proposed "hybrid" plea agreement, in a document entitled "Agreement."  Significantly, this defense proposal introduced two new provisions.  The first related to four female assistants who had allegedly facilitated Epstein in his criminal scheme.  The defense sought a government promise not to prosecute them, as well as certain other unnamed Epstein employees, and a promise to forego immigration proceedings against two of the female assistants:

> Epstein's fulfilling the terms and conditions of the Agreement also precludes the initiation of any and all criminal charges which might otherwise in the future be brought against [four named female assistants] or any employee of [a specific Epstein-owned corporate entity] for any criminal charge that arises out of the ongoing federal investigation . . . . Further, no immigration proceeding will be instituted against [two named female assistants] as a result of the ongoing investigation.

The second new provision related to the USAO's efforts to obtain Epstein's computers:

> Epstein's fulfilling the terms and conditions of the Agreement resolves any and all outstanding [legal process] that have requested witness testimony and/or the production of documents and/or computers in relation to the investigation that is the subject of the Agreement.  Each [legal process] will be withdrawn upon the execution of the Agreement and will not be re-issued absent reliable

---

[112]  Villafaña told OPR that she sometimes used her home email account because "[n]egotiations were occurring at nights, on weekend[s], and while I was [away from the office for personal reasons], . . . and this occurred during a time when out of office access to email was very limited."  Records show her supervisors were aware that at times she used her personal email account in communicating with defense counsel in this case.

evidence of a violation of the agreement. Epstein and his counsel agree that the computers that are currently under [legal process] will be safeguarded in their current condition by Epstein's counsel or their agents until the terms and conditions of the Agreement are fulfilled.

Later that day, Villafaña sent Lefkowitz a lengthy email to convey two options Lourie had suggested: "the original proposal" for a state plea but with an agreement for an 18-month sentence, or pleas to state charges and two federal obstruction-of-justice charges. Villafaña also told Lefkowitz she was willing to ask Acosta again to approve a federal plea to a five-year conspiracy with a Rule 11(c) binding recommendation for a 20-month sentence. Villafaña explained:

> As to timing, it is my understanding that Mr. Epstein needs to be sentenced in the state after he is sentenced in the federal case, but not that he needs to plead guilty and be sentenced after serving his federal time. Andy recommended that some of the timing issues be addressed only in the state agreement, so that it isn't obvious to the judge that we are trying to create federal jurisdiction for prison purposes.

With regard to prosecution of individuals other than Epstein, Villafaña suggested standard federal plea agreement language regarding the resolution of all criminal liability, "and I will mention 'co-conspirators,' but I would prefer not to highlight for the judge all of the other crimes and all of the other persons that we could charge." Villafaña told OPR that she was willing to include a non-prosecution provision for Epstein's co-conspirators, who at the time she understood to be the four women named in the proposed agreement, because the USAO was not interested in prosecuting those individuals if Epstein entered a plea. Villafaña told OPR, "[W]e considered Epstein to be the top of the food chain, and we wouldn't have been interested in prosecuting anyone else." She did not consider the possibility that Epstein might be trying to protect other, unnamed individuals, and no one, including the FBI case agents, raised that concern. Villafaña also told OPR that her reference to "all of the other crimes and all of the other persons that we could charge" related to her concern that if the plea agreement contained information about uncharged conduct, the court might ask for more information about that conduct and inquire why it had not been charged, and if the government provided such information, Epstein's attorneys might claim the agreement was breached.[113]

With regard to immigration, Villafaña told OPR that the USAO generally did not take any position in plea agreements on immigration issues, and that in this case, there was no evidence that either of the two assistants who were foreign nationals had committed fraud in connection with their immigration paperwork, "and I think that they were both in status. So there wasn't any reason

---

[113]   OPR understood Villafaña's concern to be that if the government were required to respond to a court's inquiry into additional facts, Epstein would object that the government was trying to cast him in a negative light in order to influence the court to impose a sentence greater than the agreed-upon term.

for them to be deported."[114]  As to whether the foreign nationals would be removable by virtue of having committed crimes, Villafaña told OPR she did not consider her role as seeking removal apart from actual prosecution.

Villafaña concluded her email to Lefkowitz by expressing disappointment that they were not "closer to resolving this than it appears that we are," and offering to meet the next day to work on the agreement:

> Can I suggest that tomorrow we either meet live or via teleconference, either with your client or having him within a quick phone call, to hash out these items?  I was hoping to work only a half day tomorrow to save my voice for Tuesday's hearing . . . , if necessary, but maybe we can set a time to meet.  If you want to meet "off campus" somewhere, that is fine.  I will make sure that I have all the necessary decision makers present or "on call," as well.[115]

Villafaña told OPR that she offered to meet Lefkowitz away from the USAO because conducting negotiations via email was inefficient, and Villafaña wanted "to have a meeting where we sat down and just finalized things. And what I meant by off campus is, sometimes people feel better if you go to a neutral location" for a face-to-face meeting.

On the morning of Monday, September 17, 2007, the USAO supervisor who was taking over Lourie's duties as manager of the West Palm Beach office asked Villafaña for an update on the plea negotiations, and she forwarded to him the email she had sent to Lefkowitz the previous afternoon.  Villafaña told the manager, "As you can see . . . there are a number of things in their last draft that were unacceptable.  All of the loopholes that I sewed up they tried to open."

Shortly thereafter, Villafaña alerted the new manager, Acosta, and Lourie that she had just spoken with Lefkowitz, who advised that Epstein was leaning towards a plea to state charges under a non-prosecution agreement, and she would be forwarding to Lefkowitz "our last version of the Non-Prosecution Agreement."  Acosta asked that Villafaña "make sure they know it[']s only a draft" and reminded her that "[t]he form and language may need polishing."  Villafaña responded, "Absolutely.  There were a lot of problems with their last attempt.  They tried to re-open all the loopholes that I had sewn shut."  Villafaña sent to Lefkowitz the draft NPA that she had provided to Lefcourt on September 11, 2007, noting that it was the "last version" and would "avoid [him] having to reinvent the wheel."  She also updated the FBI case agents on the status of negotiations, noting that she had told her "chain of command . . . that we are still on for the [September] 25th [to bring charges] . . . , no matter what."

After receiving the draft NPA, Lefkowitz asked Villafaña to provide for his review a factual proffer for a federal obstruction of justice charge, and, with respect to the NPA option, asked, "[I]f

---

[114]     According to the case agents, the West Palm Beach FBI office had an ICE agent working with them at the beginning of the federal investigation, and the ICE agent normally would have looked into the immigration status of any foreign national, but neither case agent recalled any immigration issue regarding any of the Epstein employees.

[115]     Lefkowitz was based in New York City but traveled to Miami in connection with the case.

we go that route, would you intend to make the deferred [*sic*] prosecution agreement public?" Villafaña replied that while a federal plea agreement would be part of the court file and publicly accessible, the NPA "would not be made public or filed with the Court, but it would remain part of our case file.  It probably would be subject to a FOIA [Freedom of Information Act] request, but it is not something that we would distribute without compulsory process."[116]  Villafaña told OPR that she believed Epstein did not want the NPA to be made public because he "did not want people to believe him to have committed a variety of crimes."  As she explained to OPR, Villafaña believed the NPA did not need to be disclosed in its entirety, but she anticipated notifying the victims about the NPA provisions relating to their ability to recover damages.

### E.    The Parties Appear to Reach Agreement on a Plea to Federal Charges

Negotiations continued the next day, Tuesday, September 18, 2007.  Responding to Villafaña's revised draft of the NPA, Lefkowitz suggested that Epstein plead to one federal charge with a 12-month sentence, followed by one year of supervised release with a requirement for home detention and two years of state probation, with the first six months of the state sentence to be served under community control.  Villafaña replied, "I know that the U.S. Attorney will not go below 18 months of prison/jail time (and I would strongly oppose the suggestion)."  Shortly thereafter, Villafaña emailed Acosta, Lourie, and the incoming West Palm Beach manager:

> Hi all – I think that we may be near the end of our negotiations with Mr. Epstein, and not because we have reached a resolution.  As I mentioned yesterday, I spent about 12 hours over the weekend drafting Informations, changing plea agreements, and writing factual proffers.  I was supposed to receive a draft agreement from them yesterday, which never arrived.  At that time, they were leaning towards pleading only to state charges and doing all of the time in state custody.

> Late last night I talked to Jay Lefkowitz who asked about Epstein pleading to two twelve-month federal charges with half of his jail time being spent in home confinement pursuant to the guidelines.  I told him that I had no objection to that approach but, in the interest of full disclosure, I did not believe that Mr. Epstein would be eligible because he will not be in Zone A or B.[117]  This morning Jay Lefkowitz called and said that I was correct but, if we could get Mr. Epstein down to 14 months, then he thought he would be eligible.

> My response:  have him plead to two separate Informations.  On the first one he gets 12 months' imprisonment and on the second he gets

---

[116]    FOIA requires disclosure of government records upon request unless an exemption applies permitting the government to withhold the requested records.  *See* 5 U.S.C. § 552.

[117]    Sentences falling within Zones A or B of the U.S. Sentencing Guidelines permit probation or confinement alternatives to imprisonment.

> twelve months, with six served in home confinement, to run consecutively.
>
> I just received an e-mail asking if Mr. Epstein could just do 12 months imprisonment instead.
>
> As you can see, Mr. Epstein is having second thoughts about doing jail time. I would like to send Jay Lefkowitz an e-mail stating that if we do not have a signed agreement by tomorrow at 5:00, negotiations will end. I have selected tomorrow at 5:00 because it gives them enough time to really negotiate an agreement if they are serious about it, and if not, it gives me one day before the Jewish holiday to get [prepared] for Tuesday . . . [September 25] , when I plan to [file charges], and it gives the office sufficient time to review the indictment package.
>
> Do you concur?

A few minutes later, the incoming West Palm Beach manager emailed Lourie, suggesting that Lourie "talk to Epstein and close the deal."[118]

Within moments, Lourie replied to the manager, with a copy to Villafaña, reporting that he had just spoken with Lefkowitz and agreed "to two fed[eral] obstruction[] charges (24 month cap) with nonbinding recommendation for 18 months. When [Epstein] gets out, he has to plead to state offenses, including against minor, registrable, and then take one year house arrest/community confinement." By reply email, Villafaña asked Lourie to call her, but there is no record of whether they spoke.

### F.    Defense Counsel Offers New Proposals Substantially Changing the Terms of the Federal Plea Agreement, which the USAO Rejects

Approximately an hour after Lourie's email reporting the deal he had reached with Lefkowitz, Lefkowitz sent Villafaña a revised draft plea agreement. Despite the agreement Lourie believed he and Lefkowitz had reached that morning, Lefkowitz's proposal would have resulted in a 16-month federal sentence followed by 8 months of supervised release served in the form of home detention. Lefkowitz also inserted a statement in his proposal explicitly prohibiting the USAO from requesting, initiating, or encouraging immigration authorities to institute immigration proceedings against two of Epstein's female assistants.

Villafaña circulated the defense's proposed plea agreement to Lourie and two other supervisors, and expressed frustration that the new defense version incorporated terms that were "completely different from what Jay just told Andy they would agree to." Villafaña also pointed out that the defense "wants us to recommend an improper calculation" of the sentencing guidelines

---

[118]    The manager told OPR that he probably meant this as a joke because in his view the continued back-and-forth communications with defense counsel "was ridiculous," and the only way to "get this deal done" might be to have a direct conversation with Epstein.

and had added language waiving the preparation of a presentence investigation (PSI) "so he can keep all of his information confidential. I have already told Jay that the PSI language . . . was unacceptable to our office." Of even greater significance, in a follow-up email, Villafaña noted that the defense had removed both the requirement that Epstein plead to a registrable offense and the entire provision relating to monetary damages under 18 U.S.C. § 2255.

In the afternoon, Villafaña circulated her own proposed "hybrid" plea agreement, first internally to the management team with a note stating that it "contains the 18/12 split that Jay and Andy agreed to," and then to Lefkowitz. Regarding the prosecution of other individuals, she included the following provision: "This agreement resolves the federal criminal liability of the defendant and any co-conspirators in the Southern District of Florida growing out of any criminal conduct by those persons known to the [USAO] as of the date of this plea agreement," including but not limited to the conspiracy to solicit minors to engage in prostitution.

In her email to Lefkowitz, transmitting the plea agreement, Villafaña wrote:

> Could you share the attached draft with your colleagues. It is in keeping with what Andy communicated to me was the operative "deal." The U.S. Attorney hasn't had a chance to review all of the language, but he agrees with it in principle.
>
> . . . .
>
> [The West Palm Beach manager] and I will both be available at 2:00. . . . One of my suggestions is going to be (again) that we all sit down together in the same room, including Barry [Krischer] and/or Lanna [Belohlavek], so we can hash out the still existing issues and get a signed document.

Villafaña also emailed Acosta directly, telling him she planned to meet with Epstein's attorneys to work on the plea agreement, and asking if Acosta would be available to provide final approval. Acosta replied, "I don't think I should be part of negotiations. I'd rather leave it to you if that's ok." Acosta told OPR that "absent truly exceptional circumstances," he believed it was important for him "to not get involved" in negotiations, and added, "You can meet, like I did in September, [to] reaffirm the position of the office, [and] back your AUSA, but ultimately, I think your trial lawyer needs discretion to do their job." Villafaña told OPR, however, that she did not understand Acosta to be giving her discretion to conduct the negotiations as she saw fit; rather, she believed Acosta did not want to engage in face-to-face negotiations because "he wanted to have an appearance of having sort of an arm's length from the deal."[119] Villafaña replied to Acosta's

---

[119]     As noted throughout the Report, Villafaña's interpretation of her supervisors' motivations for their actions often differed from the supervisors' explanations for their actions. Because it involved subjective interpretations of individuals' motivations, OPR does not reach conclusions regarding the subjects' differing views but includes them as an indication of the communication issues that hindered the prosecution team. *See* Chapter Two, Part Three, Section V.E.

message, "That is fine.  [The West Palm Beach manager] and I will nail everything down, we just want to get a final blessing."

Negotiations continued throughout the day on Wednesday, September 19, 2007, with Villafaña and Lefkowitz exchanging emails regarding the factual proffer for a plea and the scheduling of a meeting to finalize the plea agreement's terms.   During that exchange, Villafaña made clear to Lefkowitz that the time for negotiating was reaching an end:

> I hate to have to be firm about this, but we need to wrap this up by Monday.  I will not miss my [September 25 charging] date when this has dragged on for several weeks already and then, if things fall apart, be left in a less advantageous position than before the negotiations.   I have had an 82-page pros memo and 53-page indictment sitting on the shelf since May to engage in these negotiations.   There has to be an ending date, and that date is Monday.

Early that afternoon, Lourie—who was participating in the week's negotiations from his new post at the Department in Washington, D.C.—asked Villafaña to furnish him with the last draft of the plea agreement she had sent to defense counsel, and she provided him with the "18/12 split" draft she had sent to Lefkowitz the prior afternoon.  After reviewing that draft, Lourie told Villafaña it was a "[g]ood job" but he questioned certain provisions, including whether the USAO's agreement to suspend the investigation and hold all legal process in abeyance should be in the plea agreement.  Villafaña told Lourie that she had added that paragraph at the "insistence" of the defense, and opined, "I don't think it hurts us."   Villafaña explained to OPR that she held this view because "Alex and people above me had already made the decision that if the case was resolved we weren't going to get the computer equipment."

At 3:44 p.m. that afternoon, Lefkowitz emailed a "redline" version of the federal plea agreement showing his new revisions, and noted that he was "also working on a deferred [*sic*] prosecution agreement because it may well be that we cannot reach agreement here."  The defense redline version required Epstein to plead guilty to a federal information charging two misdemeanor counts of attempt to intentionally harass a person to prevent testimony, the pending state indictment charging solicitation of prostitution, and a state information charging one count of coercing a person to become a prostitute, in violation of Florida Statute § 796.04 (without regard to age).  Neither of the proposed state offenses required sexual offender registration.  Epstein would serve an 18-month sentence and a concurrent 60 months on probation on the state charges.  The redline version again deleted the provisions relating to damages under 18 U.S.C. § 2255 and replaced it with the provision requiring creation of a trust administered by the state court.   It retained language proposed by Villafaña, providing that the plea agreement "resolves the federal criminal liability of the defendant and any co-conspirators in the Southern District of Florida growing out of any criminal conduct by those persons known to the [USAO] as of the date of this plea agreement," but also re-inserted the provision promising not to prosecute Epstein's assistants and the statement prohibiting the USAO from requesting, initiating, or encouraging immigration proceedings.   It also included a provision stating the government's agreement to forgo a presentence investigation and a promise by the government to suspend the investigation and withdraw all pending legal process.

### G. Villafaña and Lourie Recommend Ending Negotiations, but Acosta Urges That They "Try to Work It Out"

In the late afternoon of Wednesday, September 19, 2007, Villafaña expressed her increasing frustration to her supervisors.  She emailed the defense redline version of the plea agreement to Lourie and the incoming West Palm Beach manager, identifying all of the provisions she had "specifically discussed with [the defense team] and rejected, that they have re-inserted into the agreement."  (Emphasis in original).  Villafaña opined, "This is NOT good faith negotiations." Lourie responded that he would "reach out to Alex to discuss."

Lourie immediately emailed Acosta the following:

> I looked at the latest draft from Jay [Lefkowitz] and I must agree with Marie.  Based on my own conversations with him, his draft is out of left field.  He claims to orally agree to our terms and then sends us a document that is the opposite.  I suggest we simply tell him that his counter offer is rejected and that we intend to move forward with our case.

Acosta replied:

> Why don't we just call him.  Tell him
>
> 1.     You agree, and then change things.
>
> 2.     That's not acceptable, and is in bad faith.  Stop it or we'll indict.
>
> 3.     Try to work it out.
>
> It seems that we are close, and it[']s worth trying to overcome what has to be painfully . . . annoying negotiating tactics.

Acosta explained to OPR that he recognized,

> [t]his negotiation was a pain, but if it was the right position, the fact that you've got annoying counsel on the other side doesn't it make it less of a right position.  You tell them stop being annoying, you try to work it out, and if not, then you indict.

In response to Acosta's instruction, Lourie responded, "Ok will do."  He also forwarded to Acosta the latest version of the USAO draft "hybrid" plea agreement that Villafaña had sent to Lefkowitz the previous day, which Lourie had requested and obtained from Villafaña earlier that afternoon.

Meanwhile, Villafaña sent to Lourie and his successor West Palm Beach manager a draft message she proposed to send to Lefkowitz with her objections to the defense revisions, explaining, "I know that you keep saying he is going to plead, and he will plead if we cave on

everything, but I really do not think that Mr. Epstein is going to engage in serious negotiations until he sees the Indictment and shows up in mag [federal magistrate judge] court." She suggested charging Epstein on a federal conspiracy charge, and if he refused to plead to that offense, superseding with additional charges and going to trial. She complained that after seven weeks of negotiations, "we are just spinning our wheels." Her proposed email to Lefkowitz detailed all of the objectionable provisions in his draft, and concluded, "If you or your client insists on these, there can be no plea agreement."

### H.   Acosta Edits the Federal Plea Agreement, and Villafaña Sends a Final Version to the Defense

The next day, Thursday, September 20, 2007, Villafaña emailed Assistant State Attorney Belohlavek and informed her:

> Our deadline is Monday evening for a signed agreement and arraignment in the federal system. At this time, things don't look promising anyway, but I will keep you posted. In their latest draft, they changed what they agreed to plead to in the state from solicitation of minors for prostitution (a registrable offense) to forcing adults into prostitution (a non-registrable offense). We will not budge on this issue, so it is looking unlikely that we will reach a mutually acceptable agreement. If that changes, I will let you know.

Acosta sent Lourie "[s]ome thoughts" about the USAO version of the proposed "hybrid" federal plea agreement he had received from Lourie the evening before, commenting that "it seems very straightforward" and "we are not changing our standard charging language" for the defense.[120] Noting that the draft was prepared for his signature, Acosta told Lourie that he did not typically sign plea agreements and "this should not be the first," adding that the USAO "should only go forward if the trial team supports and signs this agreement."[121] Lourie forwarded the email to Villafaña with a transmittal message simply reading, "I think Alex's changes are all good ones. Please try to incorporate his suggestions, change the signature block to your name and send as final to Jay." Lourie also noted to Acosta and Villafaña that he believed the defense would want to go back to the initial offer of a state plea with a non-prosecution agreement. When Villafaña sent the revised plea agreement to Lefkowitz later that afternoon, she advised him that if the defense wanted to return to the original offer of a state plea only, the draft NPA she had sent to him on September 17, 2007, would control.

---

[120]   The USAO had standard federal plea agreement language, from which this "hybrid" plea agreement had substantially diverged.

[121]   The standard procedure was for documents such as plea agreements to be signed by an AUSA under the name of the U.S. Attorney. In his OPR interview, Acosta further explained that wanted to give "the trial team" an opportunity to voice any objections because "if it's something they don't feel comfortable with we . . . shouldn't go forward with it."

I.     **The Defense Rejects the Federal Plea Agreement, Returns to the NPA "State-Only" Resolution, and Begins Opposing the Sexual Offender Registration Requirement**

After having spent days negotiating the federal charges to be included in a plea agreement, by the afternoon of September 20, 2007, the defense rejected the federal plea option, and the parties resumed negotiations over the details of an NPA calling for Epstein to plead to only state charges. Through multiple emails and attempts (some successful) to speak directly with Acosta and other supervisors, defense attorneys vigorously fought the USAO's insistence that Epstein plead to a state charge requiring sexual offender registration.

After receiving the federal plea agreement, Lefkowitz spoke with Villafaña.  She reported to Acosta and Lourie that Lefkowitz told her the defense was "back to doing the state-charges-only agreement" and wanted until the middle of the following week to work out the details, but that she had told defense counsel that "we need a signed agreement by tomorrow [Friday] or we are [filing charges] on Tuesday."

Lefkowitz emailed Villafaña about the draft NPA that she had sent to him, pointing out that it called for a 20-month jail sentence followed by 10 months of community control, rather than 18 months in jail and 12 under community control, and to ask if the USAO had "any flexibility" on the § 2255 procedure.  Villafaña responded:

> The 18 and 12 has already been agreed to by our office, so that is not a problem.  On the issue about 18 [U.S.C. §] 2255, we seem to be miles apart.  Your most recent version not only had me binding the girls to a trust fund administered by the state court, but also promising that they will give up their [§] 2255 rights.
>
> I reviewed the e-mail that I sent you on Sunday with the comments on some of your other changes.  In the context of a non-prosecution agreement, the office may be more willing to be specific about not pursuing charges against others.  However, as I stated on Sunday, the Office cannot and will not bind Immigration.
>
> Also, your timetable will need to move up significantly.  As [State Attorney] Barry [Krischer] said in our meeting last week, his office can put together a plea agreement, [and an] information, and get you all before the [state] judge on a change of plea within a day.

Villafaña alerted Krischer that evening that negotiations were "not going very well" and that defense counsel "changed their minds again, and they only want to plead to state charges, not concurrent state and federal."  She added, "If we cannot reach . . . an agreement, then I need to [charge] the case on Tuesday [September 25] and I will not budge from that date."

In response to Villafaña's report of her conversation with Lefkowitz about the defense preference for a "state-charges-only agreement," Lourie alerted her that, "He wants to get out of [sexual offender] registration which we should not agree to."  Lourie emailed Acosta:

> I think Jay [Lefkowitz] will try to talk you out of a registrable offense. Regardless of the merits of his argument, in order to get us down in time they made us an offer that included pleading to an offense against a minor (encouraging a minor into prostitution) and touted that we should be happy because it was registrable. For that reason alone, I don't think we should consider allowing them to come down from their own offer, either on this issue or on time of incarceration.

Lefkowitz attempted to reach Acosta that night, but Acosta directed Villafaña to return the call, and told Lourie that he did not want to open "a backchannel" with defense counsel. Lourie instructed Villafaña, "U can tell [J]ay that [A]lex will not agree to a nonregistration offense."

On the morning of Friday, September 21, 2007, Villafaña emailed Acosta informing him that "it looks like we will be [filing charges against] Mr. Epstein on Tuesday," reporting that the charging package was being reviewed by the West Palm Beach manager, and asking if anyone in the Miami office needed to review it. Villafaña also alerted Lourie that she had spoken that morning to Lefkowitz, who "was waffling" about Epstein pleading to a state charge that required sexual offender registration, and she noted that she would confer with Krischer and Belohlavek "to make sure the defense doesn't try to do an end run."

That same morning, Epstein attorney Sanchez, who had not been involved in negotiations for several weeks, emailed Sloman, advising, "[I] want to finalize the plea deal and there is only one issue outstanding and [I] do not believe that [A]lex has read all the defense submissions that would assist in his determination on this point . . . [U]pon resolution, we will be prepared to sign as soon as today." From his out-of-town vacation, Sloman forwarded the email to Acosta, who replied, "Enjo[y] vacation. Working with [M]arie on this." Sloman also forwarded Sanchez's email to Lourie and asked, "Do you know what she's talking about?" Lourie responded that Sanchez "has not been in any negotiations. Don't even engage with yet another cook."

### J.     The USAO Agrees Not to Criminally Charge "Potential Co-Conspirators"

Lefkowitz, in the meantime, sent Villafaña a revised draft NPA that proposed an 18-month sentence in the county jail, followed by 12 months of community control, and restored the provision for a trust fund for disbursement to an agreed-upon list of individuals "who seek reimbursement by filing suit pursuant to 18 U.S.C. § 2255." This defense draft retained the provision promising not to criminally charge Epstein's four female assistants and unnamed employees of the specific Epstein-owned corporate entity, but also extended the provision to "any potential co-conspirators" for any criminal charge arising from the ongoing federal investigation. This language had evolved from similar language that Villafaña had included in the USAO's earlier proposed draft federal plea agreement.[122] Lefkowitz also again included the sentence

---

[122]     The language in the USAO's draft federal plea agreement stated, "This agreement resolves the federal criminal liability of the defendant and any co-conspirators in the Southern District of Florida growing out of any criminal conduct by those persons known to the [USAO] . . . ."

precluding the government from requesting, initiating, or recommending immigration proceedings against the two assistants who were foreign nationals.

At this point, Lefkowitz again sought to speak to Acosta, who replied by email:  "I am happy to talk.  My caveat is that in the middle of negotiations, u try to avoid[] undermining my staff by allowing 'interlocutor[]y' appeals so to speak so I'd want [M]arie on the call[.]  I'll have her set something up."

Villafaña sent to Lefkowitz her own revised NPA, telling him it was her "attempt at combining our thoughts," but it had not "been approved by the office yet."  She inserted solicitation of minors to engage in prostitution, a registrable offense, as the charge to which Epstein would plead guilty; proposed a joint recommendation for a 30-month sentence, divided into 18 months in the county jail and 12 months of community control; and amended the § 2255 provision.[123] Villafaña's revision retained the provision suspending the investigation and holding all legal process in abeyance, and she incorporated the non-prosecution provision while slightly altering it to apply to "any potential co-conspirator of Epstein, including" the four named assistants, and deleting mention of the corporate entity employees.  Finally, Villafaña deleted mention of immigration proceedings, but advised in her transmittal email that "we have not and don't plan to ask immigration" proceedings to be initiated.[124]

Later that day, Villafaña alerted Lourie (who had arrived in Florida from Washington, D.C. early that afternoon) and the new West Palm Beach manager (copying her first-line supervisor and co-counsel) that she had included language that defense counsel had requested "regarding promises not to prosecute other people," and commented, "I don't think it hurts us."  There is no documentation that Lourie, the West Palm Beach manager, or anyone else expressed disagreement with Villafaña's assessment.  Rather, within a few minutes, Villafaña re-sent her email, adding that defense counsel was persisting in including an immigration waiver in the agreement, to which Lourie responded, "No way.  We don't put that sort of thing in a plea agreement."  Villafaña replied to Lourie, indicating she would pass that along to defense counsel and adding, "Any other thoughts?"  When Lourie gave no further response, Villafaña informed defense counsel that Lourie had rejected the proposed immigration language.

OPR questioned the subjects about the USAO's agreement not to prosecute "any potential co-conspirators."  Lourie did not recall why the USAO agreed to it, but he speculated that he left that provision in the NPA because he believed at the time that it benefited the government in some way.  In particular, Lourie conjectured that the promise not to prosecute "any potential co-conspirators" protected victims who had recruited others and thus potentially were co-conspirators in Epstein's scheme.  Lourie also told OPR, "I bet the answer was that we weren't going to charge" Epstein's accomplices, because Acosta "didn't really want to charge Epstein" in

---

[123]     Villafaña noted that she had consulted with a USAO employee who was a "former corporate counsel from a hospital" about the § 2255 language, and thought that the revised language "addresses the concern about having an unlimited number of claimed victims, without me trying to bind girls who I do not represent."

[124]     Villafaña gave OPR an explanation similar to that given by the case agents—that an ICE Special Agent had been involved in the early stages of the federal investigation of Epstein, and Villafaña believed the agent knew two of Epstein's female assistants were foreign nationals and would have acted appropriately on that information.  Villafaña also said that the USAO generally did not get involved in immigration issues.

federal court.  Sloman similarly said that he had the impression that the non-prosecution provision was meant to protect named co-conspirators who were also victims, "in a sense," of Epstein's conduct.  Although later press coverage of the Epstein case focused on Epstein's connection to prominent figures and suggested that the non-prosecution provision protected these individuals, Sloman told OPR that it never occurred to him that the reference to potential co-conspirators was directed toward any of the high-profile individuals who were at the time or subsequently linked with Epstein.[125]  Acosta did not recall the provision or any discussions about it.  He speculated that if he read the non-prosecution provision, he likely assumed that Villafaña and Lourie had "thought this through" and "addressed it for a reason."  The West Palm Beach manager, who had only limited involvement at this stage, told OPR that the provision was "highly unusual," and he had "no clue" why the USAO agreed to it.

Villafaña told OPR that, apart from the women named in the NPA, the investigation had not developed evidence of "any other potential co-conspirators.  So, . . . we wouldn't be prosecuting anybody else, so why not include it? . . .  I just didn't think that there was anybody that it would cover."  She conceded, however, that she "did not catch the fact that it could be read as broadly as people have since read it."

### K.    The USAO Rejects Defense Efforts to Eliminate the Sexual Offender Registration Requirement

On the afternoon of Friday, September 21, 2007, State Attorney Krischer informed Villafaña that Epstein's counsel had contacted him and Epstein was ready to agree "to all the terms" of the NPA—except for sexual offender registration.  According to Krischer, defense counsel had proposed that registration be deferred, and that Epstein register only if state or federal law enforcement felt, at any point during his service of the sentence, that he needed to do so.  Krischer noted that he had "reached out" to Acosta about this proposal but had not heard back from him.  Villafaña responded, "I think Alex is calling you now."  Villafaña told OPR that, to her knowledge, Acosta called Krischer to tell him that registration was not a negotiable term.[126]

Later that afternoon, Villafaña emailed Krischer for information about the amount of "gain time" Epstein would earn in state prison.  Villafaña explained in her email that she wanted to include a provision in the NPA specifying that Epstein "will actually be in jail at least a certain number of days to make sure he doesn't try to 'convince' someone with the Florida prison authorities to let him out early."  Krischer responded that under the proposal as it then stood, Epstein would serve 15 months.  He also told Villafaña that a plea to a registrable offense would not prevent Epstein from serving his time "at the stockade"—the local minimum security detention facility.[127]

---

[125]    Sloman also pointed out that the NPA was not a "global resolution" and other co-conspirators could have been prosecuted "by any other [U.S. Attorney's] office in the country."

[126]    Krischer told OPR that he did not recall meeting or having interactions with Acosta regarding the Epstein case or any other matter.

[127]    The State Attorney concluded his email:  "Glad we could get this worked out for reasons I won't put in writing.  After this is resolved I would love to buy you a cup at Starbucks and have a conversation."  Villafaña responded, "Sounds great."  When asked about this exchange during her OPR interview, Villafaña said:  "Everybody

At some point that day, Acosta spoke with Lefkowitz by phone regarding the need for Epstein to plead to a registrable offense. Throughout the weekend, with Villafaña's Monday deadline looming, defense counsel pressed hard to eliminate the sexual offender requirement. On Saturday, September 22, 2007, Sanchez sent a series of emails to Lourie. In the first, she provided details from a press report about a Florida public official who the previous day had pled guilty to child sex abuse charges and was sentenced to a term of probation. She noted that she "spoke to [M]att [Menchel]" and asked Lourie to call her. Two hours later she sent Lourie a second, lengthy email, strongly objecting to the registration requirement, and outlining "all arguments against registration [as a sexual offender] in this case." In this email, Sanchez claimed that there had been a "miscommunication" during the September 12, 2007 meeting, and that "we only agreed to the solicitation with minors because we believed and [Krischer] and [Belohlavek] confirmed it was NOT registrable." Sanchez complained that lifetime sexual offender registration was a "life sentence" that was "uncalled for," "does not make sense," and was "inappropriate" to impose "simply [because] the FBI wants it, in return for all there [*sic*] efforts." She listed numerous reasons why Epstein should not have to register, including his lack of a prior record or history of sexual offenses; the lack of any danger of recidivism; the ease with which he could be "tracked" without registering; and that it would be "virtually impossible to comply" with four separate state registration requirements. A few minutes later, Sanchez sent Lefcourt's phone number to Lourie "in case you want to speak to him directly."

In another email sent less than two hours later, Sanchez told Lourie she was writing again because "you are a very fair person. This resolution in the Epstein case is not reasonable. [I]t is a result of a misunderstanding at a meeting." She stated that Epstein's attorneys had "consistently emphasized their goal of 18 months in a federal camp" and "[e]veryone knew that a registerable offense precluded" a camp designation. Sanchez added, "Therefore it would have been wholly inconsistent with that primary goal of [Epstein's] safety to lightly concede to registration at that meeting." Sanchez concluded, "[I]mposing a life sentence on him is not something anyone will eventually be proud of. Please reconsider and help me get a fair result."

Lourie responded to none of the Sanchez emails, but he did reach out to Acosta for a phone conversation. By email late that night, at 10:26 p.m., Lefkowitz asked Lourie to phone him.

The next day, Lefkowitz emailed Acosta—with copies to Sloman, Lourie, and Villafaña—to "follow up on our conversation Friday," asking Acosta again to reconsider the requirement that Epstein plead to a registrable offense. Lefkowitz wrote that there had been a "misunderstanding" at the September 12, 2007 meeting:

> Before the meeting, Mr. Krischer and Ms. Belohlavek, a sex prosecutor for 13 years, told us that solicitation of a minor . . . is not a registrable offense. However, as it turned out, [i]t is a registerable offense and our discussion at the meeting was based on a mistaken assumption. We suggest that Mr. Epstein enter two pleas—one to the Indictment and a second to a non-registrable charge.

---

has offered to buy me a cup of coffee. I have had coffee with no one." Krischer told OPR that the "reasons" to which he referred related to the pressure he had been getting from Chief Reiter about the Epstein case.

Lefkowitz set forth arguments similar to those Sanchez had presented to Lourie, as to why registration "based on the facts alleged in this case . . . simply does not make sense." In the event that Acosta did not agree to their proposed charges, Lefkowitz offered as an alternative "to stipulate that the state offense" would "constitute a prior sexual offense for purposes of enhanced recidivist sentencing" should Epstein ever again commit a federal sex offense against minors. As Lefkowitz further argued, "By accepting this option, you would be substituting the certainty of recidivist sentencing for the humiliation of registration." Emails reflect that, early that afternoon, Acosta, Lourie, and Villafaña discussed the matter in a conference call.

Lefkowitz also sent a revised version of the NPA to Villafaña that omitted identification of the charge to which Epstein would plead guilty. Later that day, Lefkowitz emailed Acosta:

> I got a call from [M]arie who said you had rejected our proposal. Does that mean you are not even prepared to have [Epstein] commit now to plead to the registerable offense near the end of his 18 month sentence and then be sentenced to 12 month[s] community control for that charge? I thought that was exactly what you proposed [F]riday (although you wanted, but were not able, to do it with some kind of federal charge).
>
> But that still gives you a registerable sex offense, 30 months total, and 18 in jail.
>
> How can that not satisfy you—while still ensuring that [E]pstein is not unduly endangered in jail?

Acosta responded, "I do not mean to be difficult, but our negotiations must take place with the AUSAs assigned to the case." Acosta added that he had spoken with Lourie and Villafaña, and they had "discretion to proceed as they believe just and appropriate." Acosta copied Villafaña, and she emailed Acosta to thank him "for the support."

### L. The Defense Adds a Confidentiality Clause

Throughout that Sunday evening, Lefkowitz had numerous email exchanges with Villafaña, and apparently a conference call with Lourie (who was returning to Washington, D.C.) and Villafaña. Later that evening, Lefkowitz sent Villafaña a new version of the NPA that, for the first time, included a confidentiality term:

> It is the intention of the parties to this Agreement that it not be disseminated or disclosed except pursuant to court order. In the event the Government must disclose this Agreement in response to a request pursuant to the Freedom of Information Act, the Government agrees to provide Epstein notice before the disclosure of this Agreement.

After making additional revisions, Villafaña sent this NPA to Acosta and Lourie as the "final" version, asking Acosta to let her know what he thought of it. Among her revisions, she changed the confidentiality provision to the following:

The parties anticipate that this agreement will not be made part of any public record.  If the United States receives a Freedom of Information Act request or any compulsory process commanding the disclosure of the agreement, it will provide notice to Epstein before making that disclosure.[128]

## VII.   SEPTEMBER 24, 2007:  ACOSTA MAKES FINAL EDITS, AND THE NPA IS SIGNED

The contemporaneous emails show that Villafaña continued to update Acosta as the parties negotiated the final language and that Acosta reviewed and edited the NPA.  Shortly after midnight on Monday, September 24, 2007, Acosta sent Villafaña "[s]mall edits" to the "final" NPA she had sent to him.  Among his changes was language modifying provisions that appeared to require the State Attorney's Office or the state court to take specific actions, such as requiring that Epstein enter his guilty plea by a certain date.  Acosta explained in his email, "I'm not comfortable with requiring the State Attorney to enter into a [joint sentencing] recommendation" or "requiring a State court to stick with our timeline" for entry of the guilty plea and sentencing.  Accordingly, Acosta substituted language that required Epstein alone to make a binding sentencing recommendation to the state court, and required Epstein to use his "best efforts" to enter his guilty plea and be sentenced by the specified dates.  Acosta also instructed Villafaña to restore a reference to Epstein's wish "to reach a global resolution of his state and federal criminal liabilities."  Lourie, who had returned to the Department in Washington, D.C., had a phone conversation with Lefkowitz and sent additional comments on the final draft to Acosta and Villafaña.  Villafaña sent a new revision, incorporating edits from Acosta and Lourie, to Lefkowitz later that morning.

On the afternoon of September 24, 2007, Villafaña circulated the new "final" version of the NPA to Acosta, Sloman, Lourie, and other supervisors, and asked Lefkowitz to send her the signed agreement.  After Lefkowitz electronically transmitted to Villafaña a copy of the NPA signed by Epstein, she emailed her immediate supervisor and her co-counsel:  "They have scanned and emailed the signed agreement.  It is done."

In his transmittal email, Lefkowitz asked Villafaña to "[p]lease do whatever you can to keep this from becoming public."  Villafaña responded:

> I have forwarded your message only to Alex, Andy, and [the West Palm Beach manager].  I don't anticipate it going any further than that.  When I receive the originals, I will sign and return one copy to you.  The other will be placed in the case file, which will be kept confidential since it also contains identifying information about the girls.
>
> When we reach an agreement about the attorney representative for the girls, we can discuss what I can tell him and the girls about the

---

[128]   In commenting on OPR's draft report, Lourie observed that because the NPA contained names of uncharged co-conspirators and other protected information, the USAO would have a duty to redact the information before disclosing the NPA.

> agreement.  I know that Andy promised Chief Reiter an update when
> a resolution was achieved. . . .  [The West Palm Beach manager] is
> calling, but [he] knows not to tell Chief Reiter about the money
> issue, just about what crimes Mr. Epstein is pleading guilty to and
> the amount of time that has been agreed to.  [He] also is telling Chief
> Reiter not to disclose the outcome to anyone.

OPR questioned Villafaña about this email.  She explained that she generally kept confidential the terms of the resolution of any case.  She understood that "the way that the [Epstein] case was resolved" needed to remain confidential, but the victims could be informed about what happened because by the NPA's terms, they needed to know what the agreement was about.

Villafaña emailed the West Palm Beach manager, asking him to tell PBPD Chief Reiter "the good news" but "leave out the part about damages," and explained that she wanted to meet with the victims herself to explain how the damages provision would work.  Villafaña also told him that Lourie had asked that Reiter share information about the NPA only with the PBPD Detective who had led the state investigation of Epstein.[129]  Villafaña forwarded to Acosta, Lourie, and the West Palm Beach manager Lefkowitz's email asking that the USAO try to keep the NPA from becoming public.  Acosta responded that the agreement "already binds us not to make public except as required by law under [the Freedom of Information Act]," and asked, "[W]hat more does he want?"  Villafaña replied, "My guess is that if we tell anyone else (like the police chief or FBI or the girls), that we ask them not to disclose."  Soon thereafter, Acosta emailed Lourie, Villafaña, and the West Palm Beach manager to set up a call to discuss "who we tell and how much," adding, "Nice job with a difficult negotiation."

The final NPA, as signed by Epstein, his attorneys Lefcourt and Sanchez, and Villafaña, contained the following pertinent provisions:

| Charges: | Epstein would plead guilty to the pending Palm Beach County indictment, plus one count of solicitation of minors to engage in prostitution, a registrable offense. |
|---|---|
| Sentence: | The parties would make a joint, binding recommendation for a 30-month sentence divided as follows:  consecutive terms of 12 months and 6 months in the county jail, without opportunity for withholding adjudication or sentencing and without community control or probation, followed by 12 months of community control, consecutive.[130] |
| Damages: | As long as the identified victims proceeded exclusively under 18 U.S.C. § 2255, Epstein would not contest federal court jurisdiction or the victims' status as victims.  The USAO would provide to Epstein a list of individuals |

---

[129]   The West Palm Beach manager told OPR that he called Chief Reiter, who was "fine" with the outcome.

[130]   Withholding adjudication or sentencing referred to a special sentence in which the judge orders probation but does not formally convict the defendant of a criminal offense.  *See* Fla. Stat. § 948.01 (2007).

it had identified as victims.[131]  The USAO, with the good faith approval of Epstein's counsel, would select an attorney representative for the victims, whom Epstein would pay.

Timing:      Epstein would make his best efforts to enter his guilty plea and be sentenced by October 26, 2007.  The USAO had no objection to Epstein self-reporting to begin serving his sentence by January 4, 2008.

Immunity:    The USAO would not initiate criminal charges against "any potential co-conspirator of Epstein," including four named personal assistants.

Other:       Epstein was obligated to undertake discussions with the State Attorney's Office to ensure compliance with this agreement.

             Epstein waived his right to appeal.

             Epstein agreed that he would not be afforded any benefits with respect to gain time or other rights, opportunities, and benefits not available to any other inmate.

             The federal investigation would be suspended and all pending legal process held in abeyance unless and until Epstein violated any term of the agreement.  Evidence "requested by or directly related to" the pending legal process, "including certain computer equipment," would be kept inviolate until all the NPA terms had been satisfied.

Breach:      The USAO would be required to notify Epstein of any alleged breach of the agreement within 90 days of the expiration of the term of home confinement, and would be required to initiate prosecution within 60 days thereafter.

Disclosure:  The parties "anticipate[d]" that the agreement would not be made part of any public record, and if the USAO received a Freedom of Information Act request or compulsory process commanding disclosure of the agreement, it would provide notice to Epstein before making any disclosure.[132]

That evening, Lefkowitz emailed Lourie to express concern about the notification he understood would be given to Chief Reiter, stating, "I am very concerned about leaks unduly prejudicing Jeffrey [Epstein] in the media."[133]  He added, "I have enjoyed working with you on

---

[131]    The USAO had not informed the defense of the victims' identities at this point.  The parties anticipated that the USAO would send Epstein's attorneys a list of victims when Epstein fulfilled his obligation under the NPA to enter his state guilty pleas.

[132]    The final NPA is attached as Exhibit 3 to this Report.

[133]    On October 3, 2007, the Miami FBI media officer notified the USAO that the *New York Post* had reported that federal authorities were not going to pursue federal charges against Epstein.  According to the *Post*, Epstein would plead guilty to soliciting underage prostitutes, "in a deal that will send him to prison for about 18 months," followed by "a shorter period of house confinement," and, according to "sources," federal authorities had "agreed to drop their

this matter." Lourie responded with an assurance that the Reiter notification was only "so he does not find out about it in the paper," and he concluded: "I enjoyed it as well. Mr. Epstein was fortunate to have such excellent representation."

## VIII.   POST-NPA NEGOTIATIONS

Almost immediately after the NPA was signed, conflicts arose about its terms, and the difficult negotiation process began anew. The USAO quickly realized that there were numerous issues concerning the monetary damages provision that were not resolved in the NPA, and the parties differed in their interpretations of the § 2255 provision, in particular the role and duties of the attorney representative for the victims. As negotiations regarding the damages provision continued, the defense was able to delay having Epstein enter his guilty plea in state court.

### A.   September – October 2007:   Sloman's Concerns about Selection of an Attorney Representative Lead to a Proposed NPA Addendum

The first controversy centered on the appointment of an attorney representative for the victims. Initially, Villafaña reached out to a private attorney who was one of several suggested to her for that role. Villafaña notified Lefkowitz that she was recommending the attorney to serve as the victims' representative and suggested a phone conference to discuss what information the USAO could disclose to the attorney about the case. Villafaña told Lefkowitz that she had never met the attorney, but he had been recommended by "a good friend in our appellate section" and by one of the district judges in Miami.[134] Over the next few days, Villafaña exchanged messages with the attorney about the possibility of his serving as the attorney representative. She also exchanged emails with Lefkowitz, passing along procedural questions raised by the attorney.

By this time, Lourie had fully transitioned to his detail at the Department's Criminal Division. Sloman, who had been on vacation during the week the NPA was finalized, returned to the office, reviewed the final agreement, and immediately expressed his disapproval of the provision authorizing the USAO to select an attorney representative for the victims, which he believed might raise the appearance of a conflict of interest. Instead, he proposed that a special master make the selection. Although evidently frustrated by Sloman's belated proposal, Villafaña conveyed to Lefkowitz the suggestion that a special master be appointed to select the attorney representative, rather than having the USAO make the selection.[135] She provided Lefkowitz with

---

probe into possible federal criminal violations in exchange for the guilty plea to the new state charge, with the understanding that he will do prison time." Dan Mangan, "'Unhappy Ending' Plea Deal—Moneyman to Get Jail For Teen Sex Massages," *New York Post*, Oct. 1, 2007. *ABC News* later reported that federal charges "could carry more substantial prison time. Now, Epstein's high-powered lawyers, including Kenneth Starr, . . . may try to get him out of registering as a sex offender . . . ." Scott Michels, "Money Manager Said to Plan to Plead Guilty to Prostitution Charges: Jeffrey Epstein may serve about 18 months in prison for soliciting prostitutes," *ABC News*, Oct. 11, 2007.

[134]    The "good friend" was an AUSA whom Villafaña was dating. The defense subsequently raised this as a misconduct issue, alleging that Villafaña was "closely associated" with the individual nominated for the victims' representative position.

[135]    In a separate email to the proposed attorney representative, Villafaña commented, "[O]f course they tell me this now."

a proposal regarding the special master's responsibilities, along with a draft letter to send to the special master explaining the procedure for selecting an attorney representative.

Lefkowitz objected to this proposal in a letter to Villafaña, pointing out that the NPA did not provide for the appointment of a special master.  More importantly, Lefkowitz used the discussion of the special master as an opening to press for other alterations to the language of the NPA or, at least, to its interpretation.  Focusing on the attorney representative, Lefkowitz argued that the attorney's role should be viewed as limited to negotiating settlements and that the attorney was precluded from filing lawsuits on behalf of victims who could not reach a negotiated settlement with Epstein.  Lefkowitz proposed:

> [T]he selected attorney should evaluate the claims of each identified individual, negotiate a total fund amount with Mr. Epstein, then distribute the monies based on the strength of each case.  For those identified individuals who elect not to settle with Mr. Epstein, they may proceed on their own, but by doing so, they would not be suing under § 2255 as contemplated by [the NPA] and therefore may not continue to be represented by the selected attorney.

Lefkowitz also objected to Villafaña's draft letter to the special master, asserting that it was essential for the defense to participate in crafting a "mutually acceptable communication" to the victims.  Going further, Lefkowitz claimed that any contact between the USAO and the victims about the § 2255 provision would violate the agreement's confidentiality provision.  Lefkowitz admonished the government not to contact the victims "to inform them of the resolution of the case, including [the] appointment of the selected attorney and the settlement process."

Villafaña forwarded Lefkowitz's letter to Sloman, complaining that the defense interpretation of the § 2255 procedure violated the clear language of the NPA and asking, "Can I please just indict him [Epstein]?"  Days later, Sanchez emailed Sloman, and then sent a follow-up letter, asking that Sloman "help resolve" the issue regarding the attorney representative's role, and arguing that Epstein had never intended by signing the NPA to promise to pay fees for the victims' civil lawsuits in the event a settlement could not be reached.  When Villafaña explained to Sloman her views on Sanchez's arguments, Sloman responded, "I suggest that you communicate your proposal back to [Sanchez].  The more 'voices' they hear the more wedges they try to drive between us."  Villafaña agreed, noting that "[t]here are so many of them over there, I am afraid we are getting triple-teamed."[136]

Villafaña sent Sanchez a letter regarding the roles of the special master and attorney representative.  The next day, October 10, 2007, Lefkowitz sent a six-page letter to Acosta,  as a "follow up to our conversation yesterday," expressing "serious disagreements" with Villafaña's view of the process for victims to claim § 2255 damages under the NPA.  Lefkowitz reiterated the defense position that the attorney representative's role was meant to be limited to negotiating settlements for the victims, rather than pursuing litigation.  Lefkowitz claimed that a requirement

---

[136]     Villafaña also alerted Sloman that a newspaper was reporting that defense counsel was writing a letter to Acosta asking for reconsideration of the requirement that Epstein register as a sexual offender.  Villafaña commented, "It appears they don't understand that a signed contract is binding."

that Epstein pay the victims' legal fees incurred from contested litigation would "trigger profound ethical problems," in that the attorney representative would have an incentive to reject settlement offers in order to incur more fees. In addition, Lefkowitz rejected Villafaña's view that Epstein had waived the right to challenge § 2255 liability as to victims who did not want to settle their claims, and contended that any such victims "will have to prove, among other things, that they are victims under the enumerated statutes." Finally, Lefkowitz again argued that the USAO should not discuss the settlement process with the victims who were to be identified as eligible for settlement under § 2255:

> Ms. Villafaña proposes that either she or federal agents will speak with the [victims] regarding the settlement process. We do not think it is the government's place to be co-counsel to the [victims], nor should the FBI be their personal investigators. Neither federal agents nor anyone from your Office should contact the [victims] to inform them of the resolution of the case, including appointment of the attorney representative and the settlement process. Not only would that violate the confidentiality of the Agreement, but Mr. Epstein also will have no control over what is communicated to the [victims] at this most critical stage. We believe it is essential that we participate in crafting a mutually acceptable communication to the [victims]. We further believe that communications between your Office or your case agents and the [victims] might well violate Rule 6(e)(2)(B) of the Federal Rules of Criminal Procedure. The powers of the federal grand jury should not, even in appearance, be utilized to advance the interests of a party to a civil lawsuit.[137]

Lefkowitz concluded, "I look forward to resolving these open issues with you during our 4:30 call today."[138]

Villafaña was at that time on sick leave, and Sloman and Acosta exchanged emails about crafting an addendum to the NPA to address the method of appointing an attorney representative and to articulate the representative's duties. The next day, October 11, 2007, Sloman exchanged emails with Lefkowitz about the text of a proposed addendum.

### B.   October 12, 2007: Acosta and Defense Attorney Lefkowitz Meet for Breakfast

On the morning after his scheduled afternoon phone call with Lefkowitz, Acosta exchanged emails with Lefkowitz, arranging to meet for breakfast the following day, on October 12, 2007, at a Marriott hotel in West Palm Beach. Contemporaneous records show that Acosta was previously scheduled to be in West Palm Beach for a press event on October 11 and to speak at the Palm Beach County Bench Bar conference the following midday, and that he stayed overnight at the Marriott.

---

[137]   Federal Rule of Criminal Procedure 6(e)(2)(B) relates to secrecy of federal grand jury matters.

[138]   OPR did not locate any emails indicating what happened on the call.

However, as with Villafaña's publicly released emails to Lefkowitz, this meeting between Acosta and Lefkowitz drew criticism when the media learned of it during the CVRA litigation.  It was seen either as further evidence of the USAO's willingness to meet with Epstein's attorneys while simultaneously ignoring the victims, or as a meeting at which Acosta made secret agreements with the defense.

Two letters written later in 2007 refer to the breakfast meeting.  In a December 2007 letter to Sanchez, Acosta stated that he had "*sua sponte* proposed the Addendum to Mr. Lefkowitz at an October meeting in Palm Beach . . . . in an attempt to avoid what I foresaw would likely be a litigious selection process."[139]  In an October 23, 2007 letter from Lefkowitz to Acosta, less than two weeks after the breakfast meeting, Lefkowitz represented that during the meeting, Acosta

> assured me that [the USAO] would not intervene with the State Attorney's Office regarding this matter; or contact any of the identified individuals, potential witnesses, or potential civil claimants and their respective counsel in this matter; and that neither [the USAO] nor the [FBI] would intervene regarding the sentence Mr. Epstein receives pursuant to a plea with the State, so long as the sentence does not violate state law.[140]

However, two days after receiving this letter, Acosta revised a response letter drafted by Sloman, adding the term "inaccurate" to describe Lefkowitz's claims that Acosta had promised not to intervene with the State Attorney's Office, contact individual witnesses or claimants, or intervene regarding Epstein's sentence.[141]  The draft response stated, "[S]uch a promise equates to the imposition of a gag order.  Our Office cannot and will not agree to this."[142]

Acosta told OPR that he did not remember the breakfast meeting, but he speculated that the meeting may have been prompted by defense complaints that Villafaña had recommended "her boyfriend's partner" to serve as attorney representative.[143]  Acosta said that "the way this was reported [in the press] was that I negotiated [the NPA] over breakfast," which was inaccurate because the NPA had been signed weeks before the breakfast meeting.[144]  When asked about

---

[139]     In fact, Sloman and Lefkowitz had been working on language for the Addendum before Acosta's breakfast meeting with Lefkowitz.  It is possible that Acosta was not aware of Sloman's efforts or had forgotten about them when writing the December 7, 2007 letter.

[140]     This letter is discussed further in the following section of this Report.

[141]     OPR did not find evidence establishing that the response was ever sent.

[142]     Sloman's initial draft response referred to a conversation the previous day in which Acosta had "clarified" Lefkowitz's claims about what Acosta had purportedly said in the October 12, 2007 breakfast meeting.

[143]     As noted previously, the attorney whom Villafaña recommended was a friend of another AUSA whom Villafaña was then dating, but had no professional relationship with either Villafaña or the other AUSA.

[144]     For example, the *Miami Herald*'s November 2018 investigative report stated that "on the morning of the breakfast meeting, a deal was struck—an extraordinary plea agreement that would conceal the full extent of Epstein's crimes and the number of people involved. . . . [T]he deal—called a non-prosecution agreement—essentially shut down an ongoing FBI probe . . . ."  Julie K. Brown, "Perversion of Justice: How a future Trump cabinet member gave a serial sex abuser the deal of a lifetime," *Miami Herald*, Nov. 28, 2018.  The NPA, however, was finalized and signed

Lefkowitz's description of their breakfast meeting discussion, Acosta told OPR that there were "several instances" in which Lefkowitz and other defense counsel mischaracterized something he or an AUSA said, in a way that was misleading.

Emails show that, immediately after the breakfast, Acosta phoned Sloman, who then emailed to Lefkowitz a revision to the Addendum language they had been negotiating and who also later reported to Villafaña that Lefkowitz's "suggested revision has been rejected." Other emails show that the parties continued to be at odds about the proposed language for the NPA addendum for several days after the breakfast meeting.

C.     **Acosta Agrees to the Defense Request to Postpone Epstein's Guilty Plea; the Parties Continue to Negotiate Issues concerning the Attorney Representative and Finally Reach Agreement on the NPA Addendum**

A week after his breakfast meeting with Acosta, Lefkowitz—citing a scheduling conflict—sent Acosta an email seeking his agreement to postpone Epstein's entry of his guilty plea in state court from October 26, 2007, the date agreed to in the NPA, to November 20, 2007. In his email, Lefkowitz reported that the State Attorney's Office had agreed to the postponement, and he noted that Acosta had said during the breakfast meeting that he "didn't want to dictate a schedule to the state."[145] Acosta solicited input from Sloman, who later that day emailed Lefkowitz and agreed to the postponement.

With Lourie having departed from the USAO, Sloman became more involved in negotiating the NPA addendum than he had been in the negotiations leading to the NPA, and he quickly came up against the problem Villafaña and Lourie had faced: the defense attorneys continued to negotiate provisions to which they had seemingly already agreed. Between October 12 and 19, 2007, in a series of email exchanges and phone conversations, Acosta, Sloman, Villafaña, and Lefkowitz continued working on language for the NPA addendum addressing the process for selection of the attorney representative and describing which of the representative's activities Epstein would be required to reimburse. Although it appeared that progress was being made towards reaching agreement on the terms of an addendum, on October 19, 2007, Lefkowitz emailed Sloman identifying "areas of concern" with a proposal the USAO had made days before. Sloman forwarded this email to Acosta, noting that it "re-ploughs some of what we accomplished this week," and raised "unnecessary" issues. Sloman reported to Acosta that a victim in New York had filed a civil lawsuit against Epstein, and Villafaña was concerned that "this may be the real reason for the delay in the . . . plea. She thinks that [Epstein] . . . want[s] to knock that lawsuit out before the guilty plea to deter others." Sloman also alerted Acosta that newspaper reports indicated that Epstein had planted false stories in the press in an attempt to discredit the victims.

---

almost three weeks before the breakfast meeting occurred. OPR discusses the breakfast meeting further in its analysis at Chapter Two, Part Three, Section IV.E.2.

[145]     Assuming Acosta made the remark Lefkowitz attributed to him, it was consistent with the position Acosta had taken before the NPA was signed. As noted previously, during the NPA negotiations, Acosta had instructed Villafaña to omit language requiring the State Attorney's Office to take action by a certain date, because he was "not comfortable with requiring the State" to comply with a specific deadline. During his interview, Acosta told OPR that "we as federal prosecutors are not going to walk in and dictate to the state attorney."

On October 22, 2007, Sloman responded to the issues Lefkowitz had raised, rejecting some defense proposals but agreeing to modify certain language in the proposed addendum to "satisfy your concern."[146]   Noting that the addendum and a revised letter to the special master were attached, Sloman ended by stating, "[T]his needs to be concluded.  Alex and I believe that this is as far as we can go.  Therefore, please advise me whether we have a deal no later than COB tomorrow . . . ."

Nonetheless, the next day, Lefkowitz sent Acosta a three-page letter reiterating the Epstein team's disagreements with the USAO's interpretation of the NPA.  Lefkowitz noted, however, that Epstein had "every intention of honoring the terms of [the NPA] in good faith," and that the defense letter was not intended to be "a rescission or withdrawal from the terms of the [NPA]."  Lefkowitz added:

> I also want to thank you for the commitment you made to me during our October 12 meeting in which you promised genuine finality with regard to this matter, and assured me that your Office would not intervene with the State Attorney's Office regarding this matter; or contact any of the identified individuals, potential witnesses, or potential civil claimants and their respective counsel in this matter; and that neither your Office nor the [FBI] would intervene regarding the sentence Mr. Epstein receives pursuant to a plea with the State, so long as that sentence does not violate state law.  Indeed, so long as Mr. Epstein's sentence does not explicitly violate the terms of the Agreement, he is entitled to any type of sentence available to him, including but not limited to gain time and work release.

Sloman forwarded the letter to Villafaña, commenting, "Wait [until] you see this one."  Villafaña replied:

> Welcome to my world.  I love the way that they want to interpret this agreement.
>
> . . . .
>
> It also looks like they are planning to ask for and receive a sentence far lower than the one we agreed to.  Has anyone talked to Barry [Krischer] about this?  Maybe this is the real reason for the delay in entering the guilty plea?  We also have to contact the victims to tell [them] about the outcome of the case and to advise them than an attorney will be contacting them regarding possible claims against Mr. Epstein.  If we don't do that, it may be a violation of the Florida Bar Rules for the selected attorney to "cold call" the girls.

---

[146]     The defense raised issues concerning the attorney representative, the statutory limit on damages, and inclusion of certain victims.

. . . .

Why don't we agree to mutual recission [*sic*] and indict him?

Acosta also weighed in, sending both Villafaña and Sloman an email with a subject line that read "This has to stop," in which he stated:

> Just read the letter.
>
> 1.      We specifically refused to include the provision saying that we would not communicate.  If I recall the conference call, we told him we could not agree to a gag order using those words.
>
> 2.      The purpose of the agreement was not an out of court settlement.  Seems that they can't take no.  Let's talk re how to proceed.  I'm not sure we will ever agree on a letter [to the special master about how to select an attorney representative] at this point.

Notwithstanding Acosta's assessment and prediction, after Sloman sent to Lefkowitz a new draft addendum and they spoke by phone, the parties reached agreement on the addendum's terms.[147]

On October 25, 2007, Sloman sent a letter to the person whom the USAO had selected to serve as special master, outlining the special master's duties.  A few days later, on October 29, 2007, Epstein and his attorneys Lefcourt and Sanchez signed the NPA addendum.[148]  Villafaña's name was printed as the USAO representative, but at Villafaña's request, Sloman signed the addendum for her on behalf of the USAO.

Villafaña later emailed Sloman thanking him for "the advice and the pep talk," which apparently related to the defense attorneys' allegation of impropriety concerning her initial selection of the private attorney to assist the victims.  Villafaña explained to Sloman:

> The funny thing is that I had never met (and still haven't met) or spoken to [the private attorney] before I asked him if he would be willing to take on this case. . . . But as soon as you mentioned the appearance problem, I saw where the problem would arise and agreed that the Special Master would be a safer route.  I just worry that the defense's attacks on me could harm the victims.

Sloman responded that defense counsel had "put an . . . insidious spin" on Villafaña's role in proposing the private attorney, but Sloman added, "I hope that you understand that these ad hominem attacks against you do not diminish in our eyes what you and the agents have accomplished."

---

[147]      Acosta and Villafaña were copied on this email.

[148]      The Addendum is attached as Exhibit 4 to this Report.

### D.    Epstein Further Delays His Guilty Plea

The addendum did not bring the case to conclusion.  Instead, the matter entered a new, protracted phase, which involved the upper echelons of the Department of Justice.  Despite the fact that Epstein and his attorneys had signed the NPA, they pursued a new strategy of appealing to senior Department managers with the goal of setting aside the NPA entirely.  Although ultimately unsuccessful, the strategy delayed the entry of Epstein's guilty plea by months.

On October 29, 2007, Villafaña emailed Sloman, raising several issues that she wanted Sloman to address with Lefkowitz.  Among other things, Villafaña pointed out that the NPA required Epstein to use his "best efforts" to comply with the agreement, but he had failed to comply with the timeline established by the NPA when he sought and obtained a plea hearing postponement from October 26 to November 20.  Responding to Lefkowitz's attempts to limit the USAO's communications with various entities and individuals, Villafaña noted that the USAO needed to be able to communicate with the State Attorney's Office and the victims' attorney "to [e]nsure that Epstein is abiding by the terms of the agreement."

That same day, Assistant State Attorney Belohlavek informed Sloman that the state judge assigned to the case had scheduled Epstein's plea and sentence in early January 2008.  Belohlavek assured Sloman that the "plea and sentence will definitely occur before the January 4th date that was agreed on by all for the sentencing."[149]  Nonetheless, emails over the course of the next month show that the USAO, the State Attorney's Office, and defense counsel continued to communicate regarding the date of the guilty plea, with the USAO asserting that a proposed January 7, 2008 date for the entry of Epstein's guilty plea was "unacceptable," while the defense contended that Epstein had not agreed to any date.  Finally, after multiple communications referring to various potential dates, on December 7, 2007, Epstein attorney Jack Goldberger issued a Notice of Hearing, setting the case for January 4, 2008.[150]

### E.    Epstein Seeks Departmental Review of the NPA's § 2255 Provision Relating to Monetary Damages for the Victims

With Epstein's plea hearing delayed, he launched a new effort to undermine the validity of the NPA, this time within the Department.  On November 16, 2007, Epstein attorney Kenneth Starr called the office of Assistant Attorney General for the Criminal Division Alice Fisher and left a message that he was calling regarding Epstein.[151]  At Fisher's request, Lourie, who in late September 2007 had begun serving his detail as Fisher's Principal Deputy and Chief of Staff, returned the call.  Fisher told OPR that she had no recollection of this call, and Lourie also could

---

[149]    The NPA had required Epstein's plea and sentencing to occur by October 26, 2007, but provided that Epstein could report to begin serving his sentence on January 4, 2008.

[150]    *State v. Epstein*, No. 2006-CF-9454, Notice of Hearing (Fifteenth Judicial Circuit, Dec. 7, 2007).

[151]    In a meeting with Acosta and Sloman on November 21, 2007, Lefkowitz informed them that Starr had placed a call to Fisher.

not recall for OPR the substance of his conversation with Starr, other than that it was likely about Epstein's wish to have the Department review the case.[152]

On November 28, 2007, Starr requested, by letter, a meeting with Fisher. In his letter, Starr argued that the USAO improperly had compelled Epstein to agree to pay civil damages under 18 U.S.C. § 2255 as part of a state-based resolution of a criminal case. On the same day, Lefkowitz emailed Sloman, complaining about the USAO's plan to notify victims about the § 2255 provision and alerting Sloman that Epstein's counsel were seeking a meeting with the Assistant Attorney General "to address what we believe is the unprecedented nature of the section 2255 component" of the NPA. After Lourie sent to Sloman a copy of the Starr letter, Sloman forwarded it to Villafaña, asking her to prepare a chronology of the plea negotiations and how the § 2255 provision evolved. Villafaña responded that she was "going through all of the ways in which they have tried to breach the agreement to convince you guys to let me indict."

In Washington, D.C., Lourie consulted with CEOS Chief Oosterbaan, asking for his thoughts on defense counsel's arguments. At the same time, at Lourie's request, Villafaña sent the NPA and its addendum to Lourie and Oosterbaan. Oosterbaan responded to Lourie that he was "not thrilled" about the NPA; described Epstein's conduct as unusually "egregious," particularly because of its serial nature; and observed that the NPA was "pretty advantageous for the defendant and not all that helpful to the victims." He opined, however, that the Assistant Attorney General would not and should not consider or address the NPA "other than to say that she agrees with it." During her OPR interview, Fisher did not recall reading Starr's letter or discussing it with Oosterbaan, but believed the comment about her "agree[ing] with it" referred to a federal prosecution of Epstein, which she believed was appropriate. She told OPR, however, that she "played no role in" the NPA and did not review or approve the agreement either before or after it was signed.

As set forth in more detail in Chapter Three of this Report, Villafaña planned to notify the victims about the NPA and its § 2255 provision, as well as about the state plea hearing, and she provided a draft of the notification letter to Lefkowitz for comments. On November 29, 2007, Lefkowitz sent Acosta a letter complaining about the draft notification to the victims. Lefkowitz asked the USAO to refrain from notifying the victims until after defense counsel met with Assistant Attorney General Fisher, which he anticipated would take place the following week. Internal emails indicate that Lourie contacted Oosterbaan about his availability for a meeting with Starr, but both Fisher and Lourie told OPR that such a meeting never took place, and OPR found no evidence that it did.

Acosta promptly responded to Lefkowitz by letter, directing him to raise his concerns about victim notification with Villafaña or Sloman. Acosta also addressed Epstein's evident efforts to stop the NPA from being enforced:

---

[152]    In a short email to Fisher, the next day, Lourie reported simply: "He was very nice. Kept me on the phone for [a] half hour talking about [P]epperdine," referring to the law school where Starr served as Dean.

> [S]ince the signing of the September 24th agreement, more than two months[] ago, it has become clear that several attorneys on your legal team are dissatisfied with that result.
>
> . . . .
>
> [You], Professor Dershowitz, former Solicitor [General] Starr, former United States Attorney Lewis, Ms. Sanchez and Messrs. Black, Goldberger and Lefcourt previously had the opportunity to review and raise objections to the terms of the Agreement.  The defense team, however, after extensive negotiation, chose to adopt the Agreement.  Since then counsel have objected to several steps taken by the U.S. Attorney's Office to effectuate the terms of the Agreement, in essence presenting collateral challenges to portions of the Agreement.
>
> It is not the intention of this Office ever to require a defendant to enter a plea against his wishes.  Your client has the right to proceed to trial.  If your client is dissatisfied with his Agreement, or believes that it is unlawful or unfair, we stand ready to unwind the Agreement.

In a separate, seven-page letter to Starr, with Villafaña's and Sloman's input, Acosta responded to the substance of Starr's November 28 letter to Assistant Attorney General Fisher. Fisher told OPR that she did not recall why Acosta, rather than her office, responded to the letter, but she conjectured that "probably I was trying to make sure that somebody responded since [the Criminal Division wasn't] going to respond."[153]

In his seven-page letter, sent to Starr on December 4, 2007, Acosta wrote:

> The Non-Prosecution Agreement entered into between this Office and Mr. Epstein responds to Mr. Epstein's desire to reach a global resolution of his state and federal criminal liability.  Under this Agreement, this District has agreed to defer prosecution for enumerated sections of Title 18 in favor of prosecution by the State of Florida, provided . . . Mr. Epstein satisfies three general federal interests:   (1) that Mr. Epstein plead guilty to a "registerable" offense; (2) that this plea include a binding recommendation for a sufficient term of imprisonment; and (3) that the Agreement not harm the interests of his victims.

Acosta explained in the letter that the USAO's intent was "to place the identified victims in the same position as they would have been had Mr. Epstein been convicted at trial. No more; no less."  Acosta documented the USAO's understanding of the operation of the NPA's § 2255

---

[153]    The USAO may have been asked to respond because Starr's letter raised issues that had not been previously raised with the USAO, and it would normally fall to the USAO to address them in the first instance.

provision, recounted the history of NPA negotiations, and described the post-signing efforts by Epstein's counsel to challenge portions of the NPA. Acosta's letter concluded:

> Although it happens rarely, I do not mind this Office's decision being appealed to Washington, and have previously directed our prosecutors to delay filings in this case to provide defense counsel with the option of appealing our decisions. Indeed, although I am confident in our prosecutors' evidence and legal analysis, I nonetheless directed them to consult with the subject matter experts in [CEOS] to confirm our interpretation of the law before approving their [charges]. I am thus surprised to read a letter addressed to Department Headquarters that raises issues that either have not been raised with this Office previously or that have been raised, and in fact resolved, in your client's favor.
>
> I am troubled, likewise, by the apparent lack of finality in this Agreement. The AUSAs who have been negotiating with defense counsel have for some time complained to me regarding the tactics used by the defense team. It appears to them that as soon as resolution is reached on one issue, defense counsel finds ways to challenge the resolution collaterally. My response thus far has been that defense counsel is doing its job to vigorously represent the client. That said, there must be closure on this matter. Some in our Office are deeply concerned that defense counsel will continue to mount collateral challenges to provisions of the Agreement, even after Mr. Epstein has entered his guilty plea and thus rendered the agreement difficult, if not impossible, to unwind.
>
>                . . . .
>
> I would reiterate that it is not the intention of this Office ever to force the hand of a defendant to enter into an agreement against his wishes. Your client has the right to proceed to trial. Although time is of the essence . . . I am directing our prosecutors not to issue victim notification letters until this Friday . . . to provide you with time to review these options with your client. . . . We expect a written decision by [December 7, 2007] at 5 p.m., indicating whether the defense team wishes to reaffirm, or to unwind, the Agreement.

Acosta explained to OPR that he did not view his letter as "inviting" Departmental review, but he believed the Department had the "right" to address Epstein's concerns. Moreover, the USAO's only option at that time was to declare Epstein in breach of the NPA, which would have prompted litigation as to whether Epstein was, in fact, in breach. Acosta noted that defense counsel repeatedly proclaimed Epstein's intent to abide by the agreement, making any USAO effort to declare him in breach more difficult. In fact, the day after receiving Acosta's letter, Starr and Lefkowitz responded to Acosta (with copies to Sloman and Assitant Attorney General Fisher) that

the defense "[f]irst and foremost" reaffirmed the NPA and that Epstein "has no intention of unwinding the agreement."

On December 7, 2007—the deadline set by Acosta in his December 4, 2007 letter to Starr— the defense transmitted to the USAO a one-sentence "Affirmation" of the NPA and its addendum, signed by Epstein.[154]

### F.   Despite Affirming the NPA, Defense Counsel Intensify Their Challenges to It and Accuse Villafaña of Improper Conduct

#### 1.   December 7 and 11, 2007:  Starr and Lefkowitz Send to Acosta Letters and "Ethics Opinions" Complaining about the Federal Investigation and Villafaña

On the same day that the defense team sent Epstein's "Affirmation" to the USAO, Starr and Lefkowitz sent to Acosta two "independent ethics opinions"—one authored by prominent criminal defense attorney and former U.S. Attorney Joe Whitley, which assessed purported improprieties in the federal investigation of Epstein, and the other, by a prominent retired federal judge and former U.S. Attorney, arguing against the NPA's use of the civil damages recovery provision under 18 U.S.C. § 2255 "as a proxy for traditional criminal restitution."

Days later, on December 11, 2007, Starr sent a letter to Acosta transmitting two lengthy submissions authored by Lefkowitz presenting substantive challenges to the NPA and to the "background and conduct of the investigation."  These submissions repeated arguments previously raised by the defense but also asserted new issues.  In one submission, 20 pages long, Lefkowitz addressed the "improper involvement" of federal authorities in the investigation and criticized Villafaña for a number of alleged improprieties, including having engaged in "unprecedented federal overreaching" by seeking to prosecute Epstein federally, "insist[ing]" that the State Attorney's Office "charge Mr. Epstein with violations of law and recommend a sentence that are significantly harsher than what the State deemed appropriate," and requiring that Epstein plead guilty to a registrable offense, a "harsh" condition that was "unwarranted."[155]

Lefkowitz also argued that the federal investigation relied upon a state investigation that was "tainted" by the lead PBPD Detective's misrepresentation of key facts in affidavits and interview summaries, leading the USAO to make its charging decision based on flawed information that "compromised the federal investigation."  Finally, Lefkowitz criticized federal involvement in the state plea process as a violation of "the tenets of the Petite Policy."  In a second, 13-page submission, Lefkowitz reiterated Epstein's complaints about the § 2255 component of the NPA, arguing, among other things, that federal prosecutors "should not be in the business of helping alleged victims of state crimes secure civil financial settlements."

---

[154]   The Affirmation read: "I, Jeffrey E. Epstein do hereby re-affirm the Non-Prosecution Agreement and Addendum to same dated October 30, 2007."

[155]   Villafaña sent Lefkowitz a five-page letter responding to the accusations made against her personally.

Notwithstanding these voluminous submissions, Lefkowitz added that Epstein "unconditionally re-asserts his intention to fulfill and not seek to withdraw from or unwind" the NPA.

### 2. As a Result of the Starr and Lefkowitz Submissions, the New USAO Criminal Chief Begins a Full Review of the Evidence, and Acosta Agrees to Meet Again with Defense Counsel

After reviewing Starr's and Lefkowitz's letters, Sloman notified Villafaña that "in light of the recent Kirkland & Ellis correspondence" he had asked Robert Senior, who had succeeded Menchel as Chief of the USAO's Criminal Division, to review *de novo* the evidence underlying the proposed revised indictment, and Sloman asked Villafaña to provide Senior with all the state and FBI investigative materials.

In the meantime, Acosta agreed to meet with Starr and other Epstein defense attorneys to discuss the defense complaints raised in Lefkowitz's December 11, 2007 submissions.[156]  The meeting took place in Miami on December 14, 2007.  The defense team included Starr, Dershowitz, Lefcourt, and Boston attorney Martin Weinberg.  The USAO side included Acosta, Sloman, Villafaña, and another senior AUSA, with the Miami FBI Special Agent in Charge and Assistant Special Agent in Charge also present.  In addition to previously raised arguments, during this meeting, Epstein's attorneys raised a new argument—that the state charge to which Epstein had agreed to plead guilty did not apply to the facts of the case.

### 3. The Defense Notifies Acosta That It May Pursue a Department Review of the USAO's Actions

Shortly after the December 14, 2007 meeting, Lefkowitz notified Acosta that if the issues raised at the meeting could not be resolved promptly, the defense team may "have no alternative but to seek review in Washington."  Acosta notified Assistant Attorney General Fisher that the defense team might make an appeal to her, and he asked her to grant such a request for review and "to in fact review this case in an expedited manner [in order] to preserve the January 4th plea date."  Starr and Lefkowitz then sent to Acosta a lengthy letter, with numerous previously submitted defense submissions, reviewing issues discussed at the meeting, and advising that Epstein sought a "prompt, independent, expedited review" of the evidence by "you or someone you trust."  The letter reiterated Epstein's position that his conduct did not amount to a registrable offense under state law or a violation of federal law, and with respect to the NPA's § 2255 provision, that it was "improper" to require Epstein to pay damages "to individuals who do nothing but simply assert a claim" under the statute.

---

[156]     As Assistant Attorney General Fisher's Chief of Staff, Lourie had informed Starr that Fisher hoped Starr would speak to Acosta to "resolve the[] fairly narrow issues" raised in Starr's correspondence with Acosta.  Acosta had the Starr and Lefkowitz submissions of December 11 forwarded to Fisher.

### 4.    Acosta Attempts to Revise the NPA § 2255 Language concerning Monetary Damages, but the Defense Does Not Accept It

Acosta undertook to respond to defense counsel's continuing concern about the § 2255 provision.  He sent to Deputy Assistant Attorney General Sigal Mandelker language that he proposed including in a revision to the NPA's § 2255 implementation section.  Mandelker forwarded the language to her counterpart in the Civil Division, who responded to Mandelker and Acosta that he did not have "any insight" to offer.  On December 19, 2007, after Acosta and Sloman had a phone conversation with Starr and Lefkowitz, Acosta sent to Sanchez a letter proposing to resolve "our disagreements over interpretation[]" by replacing the existing language of the NPA relating to § 2255 with a provision that would read:

> Any person, who while a minor, was a victim of a violation of an offense enumerated in Title 18, United States Code, Section 2255, will have the same rights to proceed under Section 2255 as she would have had, if Mr. Epstein [had] been tried federally and convicted of an enumerated offense.  For purposes of implementing this paragraph, the United States shall provide Mr. Epstein's attorneys with a list of individuals whom it was prepared to name . . . as victims of an enumerated offense by Mr. Epstein.  Any judicial authority interpreting this provision, including any authority determining which evidentiary burdens if any a plaintiff must meet, shall consider that it is the intent of the parties to place these identified victims in the same position as they would have been had Mr. Epstein been convicted at trial.  No more; no less.

Acosta also noted that he had resisted his prosecutors' urging to declare the NPA breached by the defense delays.[157]

Lefkowitz responded by letter a few days later, suggesting that Acosta's proposal raised "several troubling questions" and that "the problem arises from the incongruity that exists when attempting to fit a federal civil remedies statute into a criminal plea agreement."[158]  In a follow-up letter to Acosta, to address the USAO's concern that Epstein was intentionally delaying the entry of his guilty plea, Lefkowitz asserted that "any impediment to the resolution at issue is a direct cause of the disagreements between the parties," and that defense counsel had "at all times made and will continue to make sincere efforts to resolve and finalize issues as expeditiously as possible."

Acosta told OPR that despite this assurance from defense counsel, he was "increasingly frustrated" by Epstein's desire to take an "11th hour appeal" to the Department so soon before the

---

[157]    As described in detail in Chapter Three, Acosta's December 19, 2007 letter also addressed defense objections to notifying the victims about the NPA and the state plea.

[158]    After Starr and Lefkowitz had another conversation with Acosta and Sloman, Lefkowitz sent a second letter to Acosta reiterating concerns with the § 2255 provision and asserting that the provision was "inherently flawed and becoming truly unmanageable."  In the end, the defense team rejected Acosta's December 19, 2007 NPA modification letter.

scheduled January 4, 2008 plea hearing.  As soon became apparent, Acosta was unable to achieve an expedited review so that Epstein could plead guilty and be sentenced by January 4, 2008, and the plea and sentencing date was rescheduled.  On January 2, 2008, Sloman spoke with Assistant State Attorney Belohlavek, who confirmed that the change of plea hearing had been postponed.  In an email reporting this to Acosta and Villafaña, Sloman said that Epstein's local defense attorney Goldberger had told Belohlavek the postponement was because the facts "did not fit the proposed state charge," and that Belohlavek told Sloman she agreed with that assessment.[159]   The next day, Villafaña sent to Acosta and Sloman a local newspaper article reporting that Epstein's state plea hearing was reset for March and in exchange for it the federal authorities would drop their investigation of him.  Acosta also sent to Sloman and Villafaña an email memorializing a statement made to him by Lefkowitz in a phone call that day:  "'I [Lefkowitz] may have made a mistake 6 months ago.  [Belohlavek] told us solicitation [is] not registrable.  It turns out that the actual offense charged is.'"[160]

### 5.  January 7, 2008:  Acosta and Sloman Meet with Sanchez, Who Makes Additional Allegations of USAO Misconduct

On January 7, 2008, Acosta and Sloman met with defense attorney Sanchez at her request.  According to meeting notes made by Sloman, among other things, Sanchez alleged that the USAO's media spokesperson had improperly disclosed details of the Epstein case to a national news reporter, and Sanchez "suggested that the USAO could avoid any potential ugliness in DC by agreeing to a watered-down resolution for Epstein."  After Acosta excused himself to attend another meeting and Sloman refused to speak further with Sanchez "without a witness present," she left.  Later that day, Acosta and Sloman spoke by phone with Starr, Lefkowitz, and Sanchez, who expressed concern about the "leak" to the news media, reiterated their objections to the NPA, and pressed for the "watered-down resolution," which they specified would mean allowing Epstein to plead to a charge of coercion instead of procurement, avoid serving time in jail, and not register as a sexual offender.  A note in the margin of Sloman's handwritten notes of the conversation reads:  "We're back to where we started in September."

That evening, Villafaña expressed concern that the delay in resolving the matter was affecting the USAO's ability to go forward with a prosecution should Epstein renege on his agreement, and she outlined for Acosta and Sloman the steps she proposed to take while Epstein was pursuing Departmental review.  Those steps included re-establishing contact with victims, interviewing victims in New York and one victim who lived in a foreign country, making contact with "potential sources of information" in the Virgin Islands, and re-initiating proceedings to obtain Epstein's computers.

In the meantime, USAO Criminal Division Chief Robert Senior performed a "soup to nuts" review of the Epstein investigation, reviewing the indictment package and all of the evidence Villafaña had compiled.  He told OPR that he could not recall the reason for his review, but opined

---

[159]     Belohlavek told OPR that she did not recall this incident, but she noted that the PBPD report did set forth facts supporting the charge of procurement of a minor.

[160]     Although the meeting Lefkowitz had with Lourie, Villafaña, Krischer, and Belohlavek to discuss the state resolution was only four months prior, not six, Lefkowitz's reference was likely to the September 12, 2007 meeting.

that it was to establish whether, if the plea fell apart, he, as Chief, would agree "that we can go forward with" the charges. He did recall being concerned, after completing the review, that "we did not have . . . a lot of victims . . . lined up and ready to testify" and that some victims might "not be favorable for us." Nevertheless, he concluded that the proposed charges were sound, and he told Acosta that he would approve proceeding with a federal case.

### 6.    Acosta Asks CEOS to Review the Evidence

Notwithstanding Senior's favorable review, Acosta and Sloman told Starr and Lefkowitz that they "appreciate[d]" that the defense wanted a "fresh face" to conduct a review, and noted that the Criminal Chief had not undertaken the "in-depth work associated with the issues raised by the defense." They told the defense team that Acosta had asked CEOS to "come on board" and that CEOS Chief Oosterbaan would designate an attorney having "a national perspective" to conduct a fresh review in light of the defense submissions. Oosterbaan assigned a CEOS Trial Attorney who Villafaña understood was to review the case and prepare for trial in the event Epstein did not "consummate" the NPA. The CEOS Trial Attorney traveled to Florida to review the case materials, and to meet with Villafaña to discuss the case and interview some of the victims. After one such meeting, Villafaña wrote to Acosta and Sloman:

> We just finished interviewing three of the girls. I wish you could have been there to see how much this has affected them.
>
> One girl broke down sobbing so that we had to stop the interview twice within a 20 minute span. She regained her composure enough to continue a short time, but she said that she was having nightmares about Epstein coming after her and she started to break down again, so we stopped the interview.
>
> The second girl . . . told us that she was very upset about the 18 month deal she had read about in the paper. She said that 18 months was nothing and that she had heard that the girls could get restitution, but she would rather not get any money and have Epstein spend a significant time in jail.
>
> . . . .
>
> These girls deserve so much better than they have received so far, and I hate feeling that there is nothing I can do to help them.[161]

The CEOS Trial Attorney had substantial experience prosecuting child exploitation cases. She told OPR that in her view, the victim witnesses in this case presented a number of challenges for a prosecution: some of the victims did not want to admit they had sexual contact with Epstein; some had recruited other victims to provide Epstein massages, and thus could have been charged as accomplices; some had "drug histories and . . . things like that"; some could appear to have been "complicit"; and there was no evidence of physical violence against the victims. She did not regard

---

[161]    Villafaña added, "We have four more girls coming in tomorrow. Can I persuade you to attend?"

these victim issues as insurmountable but, based on these alone, the CEOS Trial Attorney considered a potential prosecution of Epstein to be a "crap shoot."  In addition, she told OPR that there were novel legal issues in the case that also presented difficulties, although she believed these difficulties could be overcome.  Shortly after the CEOS Trial Attorney met with the victims, however, "things just stopped" when Oosterbaan instructed her to cease her involvement in the case and CEOS engaged in the Criminal Division review sought by Epstein's defense team.

## IX.   FEBRUARY – JUNE 2008:  THE DEPARTMENT'S REVIEW

Epstein's defense attorneys sought a broad review from the Department, one that would encompass the defense complaints about federal jurisdiction, specific terms in the NPA, and the various allegations of professional misconduct by USAO attorneys and other personnel.  The Department, however, only reviewed the issue of federal jurisdiction and never reviewed the NPA or any specific provisions.[162]  Nonetheless, the process took several months as the defense appealed first to CEOS and the Department's Criminal Division, and then to the Office of the Deputy Attorney General.  The chart set forth on the following page shows the positions and relationships among the individuals in those offices involved in communicating with the USAO or defense beginning in November 2007 or in those offices' reviews, which continued through June 2008.

---

[162]    On February 28, 2008, USAO Criminal Division Chief Senior sent to the Civil Rights Division written notification of the USAO's "ongoing investigation of a child exploitation matter" involving Epstein and others "that may result in charges of violations of 18 U.S.C. § 1591."  USAM § 8-3.120 required a U.S. Attorney to notify the Civil Rights Division, in writing, "[a]t the outset of a criminal investigation . . . that may implicate federal criminal civil rights statutes, . . . and in no event later than ten days before the commencement of the examination of witnesses before a grand jury."  The provision also required notification to CEOS in cases involving sex trafficking of minors. The written notification was to identify the targets of the investigation, the factual allegations to be investigated, the statutes which may have been violated, the U.S. Attorney's assessment of the significance of the case, whether the case was of "national interest," and the U.S. Attorney's proposed staffing of the matter.

Villafaña became aware of this requirement in late February 2008, and she prepared a written notification that was edited by Sloman, who discussed it with Acosta.  After briefly summarizing the facts, Senior advised:

> The Office anticipates charges of violations of Title 18, United States Code, Sections 371, 2422, 2423, and 1591.  The investigation of the case by the City of Palm Beach Police Department has resulted in press coverage because of the titillating nature of the facts, but we see this case as similar to other "child prostitution" cases charged by our office, and not a matter of "national interest" as defined by the U.S. Attorney's Manual.

In the notification, Senior stated that CEOS "has been involved and is currently reviewing the matter," he anticipated the case would be staffed by USAO and Department personnel, and "[i]f we determine that the case should be [charged], a copy [of the charging document] will be forwarded to you."  OPR did not locate a response from the Civil Rights Division to the notification.



## A.      February – May 15, 2008:  Review by CEOS and the Criminal Division

On February 21, 2008, soon after the CEOS Trial Attorney met with victims, Oosterbaan spoke with Lefkowitz about CEOS's role.  In a subsequent email to Villafaña, Sloman, and Senior, Oosterbaan explained:

> I told [Lefkowitz] that all I want to do is help the process move forward, and if they think we best help the process by taking a fresh and objective look at the case and their arguments [then] that is what I want to do.  I told him that if that's what they want – if that is what will help the process to move forward – then I don't think it's advisable for CEOS to partner with the USAO on the case.  He wants to think about that (and probably talk to his co-counsel about

whether it is better to have us partnered in the case or just serve a review function) and he said he'd get back to me later today.

Oosterbaan told OPR that this email reflects that he likely told Acosta that he intended to limit CEOS's role to review only, and Acosta asked him to "make sure the defense is okay with that," to preempt a possible defense complaint about CEOS's involvement in the review. Oosterbaan explained to OPR that "the defense ke[pt] bringing up new arguments and new problems and [the USAO was saying] look if we're going to do this, if you've got a problem with it, tell us now."

By February 25, 2008, Lefkowitz told Oosterbaan, who informed Sloman, that the CEOS role should be "review only." Lourie had just then left the Department to enter private practice, and Oosterbaan continued to keep his direct supervisor, Deputy Assistant Attorney General Mandelker, informed of the defense team contacts. Sloman emailed Lefkowitz that CEOS was "ready to proceed immediately" with a review of the matter. Sloman advised Lefkowitz that "in the event CEOS decides that a federal prosecution should not be undertaken against Mr. Epstein, this Office will close its investigation," but that, "should CEOS disagree with Mr. Epstein's position, Mr. Epstein shall have one week to abide by [the NPA]." Sloman forwarded this email to Villafaña, who responded, "Why would we possibly let him keep the same deal after all he has put us through? And after we have discovered 6 new girls . . . ."

The defense soon signaled that the CEOS review would not end Epstein's requests for the Department's involvement. On February 29, 2008, Lefkowitz requested a defense meeting with Oosterbaan on March 12, 2008.[163] Starr spoke to Assistant Attorney General Fisher and "made it clear that [the defense team would] want an audience with her if [CEOS] decid[ed] to support the prosecution." On March 6, 2008, Acosta alerted Sloman and Oosterbaan that Starr and Lefkowitz had called him to express "concern" about Oosterbaan's participation in the case, and indicated that "they may ask for more senior involvement." Acosta "informed them that they certainly had the right to ask whomever they wanted for whatever they thought appropriate, and that whatever process would be given them was up to whomever they asked."

The next day, Lefkowitz followed up with Acosta in an email:

> We appreciate that you will afford us as much time as Main Justice determines is appropriate for it to conduct a review of this matter. As you have suggested, we will initiate that review process with Drew Oosterbaan, and engage in a discussion with him about all of the facts and circumstances, as well as the legal and policy issues associated with this case. . . . However, due to our misgivings (engendered because Drew has told us that he sees himself as a prosecutor and has already made clear he would be ready and willing to prosecute this case himself[)] we may well find it necessary to

---

[163]    The defense team meeting with CEOS was originally to be set for late January, but never got scheduled for that time. On February 25, Sloman informed Lefkowitz that the USAO was "very concerned about additional delays" in the Departmental review process, but would agree to a short extension of the March 3 deadline "to provide CEOS time to engage in a thorough review."

appeal an adverse determination by him within the DOJ. Ken [Starr]
and I appreciate that you understand this and have no objection to
our seeking appellate review within DOJ.

Starr, Lefkowitz, and Martin Weinberg attended the March 12, 2008 meeting, as well as
the former Principal Deputy Chief of CEOS, who had joined the Epstein defense team.
Oosterbaan, Mandelker, and a current CEOS Deputy Chief represented the Department. The
current CEOS Deputy Chief told OPR that it was primarily a "listening session" with Starr doing
most of the presentation. Oosterbaan told OPR that he recalled "some back and forth" because the
defense team was saying "some outrageous things." Both Oosterbaan and his Deputy Chief were
disturbed that the former CEOS Principal Deputy Chief, who had been an aggressive advocate for
child exploitation prosecutions, was supporting the defense position, although according to the
CEOS Deputy Chief, the former Principal Deputy Chief gave only a "weak pitch" that was not
effective.

After the meeting, Starr and Lefkowitz made multiple written submissions to the Criminal
Division. One submission provided a lengthy list of USAO actions that "have caused us serious
concern," including the following:

"Federal involvement in a state criminal prosecution without any
communication with state authorities";[164]

the issuance of legal process and document requests for items that
"had no connection to the conduct at issue";

the nomination "of an individual closely associated with one of the
Assistant United States Attorneys involved in this case" to serve as
the victims' attorney representative;

the "insistence" on a victim notification letter inviting the victims to
make sworn statements at Epstein's sentencing; and

the purported existence of a "relationship" between Sloman and a
law firm representing several of the alleged victims in civil suits
against Epstein.[165]

---

[164]     This complaint appeared to be at odds with Villafaña's understanding that the defense objected to USAO
communications with the state authorities. In November 2007, Sloman noted to Lefkowitz, "Your recent
correspondence attempting to restrict our Office from communicating with the State Attorney's Office . . . raises
concern." In a March 2008 email reporting to CEOS about the state case, Villafaña noted that she did not know
whether a state "misdemeanor deal [was] back on the table because the defense demanded that we have no contact
with the State Attorney's Office, so I haven't spoken with the [Assistant State Attorney] in over 6 months." Villafaña
later reported to Acosta and Sloman that when Krischer complained to her that the USAO had not been communicating
with him, she explained to Krischer that "it was the defense who were blocking the channels of communication."

[165]     In approximately 2001, Sloman briefly left the USAO and for a few months was in private practice with a
Miami attorney, whose practice specialized in plaintiffs' sexual abuse claims. During 2007-2008, the attorney

In another letter, Starr renewed the defense accusation that the USAO improperly disclosed information about the case to the media, and accused Sloman and Villafaña of "encouraging civil litigation" against Epstein.   Finally, in a letter to Assistant Attorney General Fisher on May 14, 2008, Starr thanked her for having spoken with him the previous day, reiterated the defense team's various complaints, and asked her to meet with him, Lefkowitz, and Whitley.

Meanwhile, Oosterbaan's Deputy Chief drafted a decision letter to be sent from Oosterbaan to Lefkowitz, and over the course of several weeks, it was reviewed by and received input from Deputy Assistant Attorney General Mandelker and Assistant Attorney General Fisher, as well as the Criminal Division's Appellate Section (regarding certain legal issues) and Office of Enforcement Operations (regarding the Petite policy).   Oosterbaan told OPR that, notwithstanding the defense submissions on a wide variety of issues and complaints, CEOS's review was limited to determining whether there was a basis for a federal prosecution of Epstein.

Oosterbaan's letter, sent to Lefkowitz on May 15, 2008, notified the defense team that CEOS had completed its independent evaluation of whether prosecution of Epstein for federal criminal violations "would contradict criminal enforcement policy interests."   The letter specified that CEOS's review addressed the "narrow question" of whether a legitimate basis existed for a federal prosecution, and that CEOS did not conduct a *de novo* review of the facts, analyze issues relating to federal statutes that did not pertain to child exploitation, or review the terms of the NPA or the prosecutorial misconduct allegations.   The letter stated that based on its examination of the material relevant to its limited review of the matter, CEOS had concluded that "federal prosecution in this case would not be improper or inappropriate" and that Acosta "could properly use his discretion to authorize prosecution in this case."

On May 19, 2008, Lefkowitz reached out to Acosta to request a meeting and specifically asked that Acosta "not shunt me off to one of your staff."   Lefkowitz made several points in support of the request for a meeting:   (1) CEOS's letter acknowledged that federal prosecution of Epstein would involve a "novel application" of relevant federal statutes;[166] (2) CEOS's conclusion that federal prosecution would not be "an abuse of discretion" was "hardly an endorsement" of the case;[167] (3) CEOS did not address Epstein's prosecutorial misconduct allegations; and (4) "critical new evidence," in the form of recent defense counsel depositions of victims confirmed "that

---

represented Epstein victims.   The Epstein defense team alleged in the letter that Sloman's past association with the attorney caused Sloman to take actions to favor victims' potential civil lawsuits against Epstein.

[166]      Oosterbaan's letter stated, "Mr. Acosta can soundly exercise his authority to decide to pursue a prosecution even though it might involve a novel application of a federal statute."   This statement referred to a defense argument based on a prior Departmental expression of concern about a Congressional proposal to expand federal law to "adult prostitution where no force, fraud or coercion was used."   Oosterbaan stated that "the Department's efforts are properly focused on the commercial sexual exploitation of children"—even if wholly local—and "the exploitation of adults through force, fraud, or coercion."   He then observed that the fact "that a prosecution of Mr. Epstein might not look precisely like the cases that came before it is not dispositive."

[167]      Oosterbaan began his letter, however, by making it clear that CEOS had considered "the narrow question as to whether there is a legitimate basis for the U.S. Attorney's Office to proceed with a federal prosecution of Mr. Epstein."

federal prosecution is not appropriate in this case."[168]  Lefkowitz alluded to the possibility of seeking further review of the matter by the Deputy Attorney General or Attorney General, should the defense be unable to "resolve this matter directly with" Acosta.

Acosta declined the request to respond personally and directed Lefkowitz to communicate with the "trial team."  That same day, Sloman sent Lefkowitz a letter asking that all further communication about the case be made to Villafaña or her immediate supervisor, and reiterating that Acosta would not respond personally to counsel's email or calls.  Sloman noted that the USAO had "bent over backwards to exhaustively consider and re-consider" Epstein's objections, but "these objections have finally been exhausted."  Sloman advised that the USAO would terminate the NPA unless Epstein complied with all of its terms by the close of business on June 2, 2008.

## B.    May – June 23, 2008:  Review by the Office of the Deputy Attorney General

Also on May 19, 2008, Starr and Whitley co-authored a letter to Deputy Attorney General Mark Filip asking for review "of the federal involvement in a quintessentially state matter."[169]  In the letter, they acknowledged that CEOS had recently completed "a very limited review" of the Epstein case, but contended that "full review of all the facts is urgently needed at senior levels of the Justice Department."  They argued that federal prosecution of Epstein was "unwarranted," and that "the irregularity of conduct by prosecutors and the unorthodox terms of the [NPA] are beyond any reasonable interpretation of the scope of a prosecutor's responsibilities."  They followed up with a second letter on May 27, 2008, in which they asserted "the bedrock need for integrity in the enforcement of federal criminal laws" and "the profound questions raised by the unprecedented extension of federal laws . . . to a prominent public figure who has close ties to President Clinton" required Departmental review.  On this latter point, they argued that Epstein "entered the public arena only by virtue of his close personal association with former President Bill Clinton," and that there was "little doubt" that the USAO "never would have contemplated a prosecution in this case if Mr. Epstein were just another 'John.'"  This was the first defense submission mentioning Epstein's connection to President Clinton and raising the insinuation that the federal involvement in the investigation was due to politics.

In the May 27, 2008 letter to the Deputy Attorney General, Starr and Whitley used the existing June 2, 2008 deadline for the entry of Epstein's guilty plea to argue that it made the need for review of the case "all the more exigent."  John Roth, a Senior Associate Deputy Attorney General who was handling the matter, instructed the USAO to rescind the deadline, and on May 28, 2008, Sloman notified Lefkowitz that the USAO had postponed the deadline pending completion of the review by the Deputy Attorney General's office.[170]  Meanwhile, the Criminal

---

[168]     Under Florida Rule of Criminal Procedure 3.220, defendants are permitted to depose victims, and Epstein's counsel utilized that procedure aggressively and expansively to conduct sworn interviews of multiple victims, including victims who were not part of the state prosecution, to learn information about the federal investigation.

[169]     In addition to having served as U.S. Attorney in two different districts, Whitley had served as Acting Associate Attorney General, the Department's third-highest position.

[170]     On May 28, 2008, Attorney General Mukasey was in Miami for unrelated events and had lunch at the USAO with Acosta and other senior managers.  OPR found no indication that the Epstein matter was discussed.

Division forwarded to Roth the prior defense submissions, describing them as "an enormous amount of material" regarding the Epstein matter. On June 3, 2008, Sloman sent to Roth a lengthy letter from Sloman to the Deputy Attorney General, recounting in detail the history of negotiations with Epstein's counsel culminating in the NPA, and addressing Epstein's claims of professional misconduct. Among the documents submitted with the letter were the prosecution memorandum, one of the proposed charging documents, and the NPA with its addendum and Acosta's December 19, 2007 letter to Sanchez.

As the review was ongoing in the Office of the Deputy Attorney General, State Attorney Krischer mentioned to the USAO's West Palm Beach manager that Krischer and Epstein's local defense attorney Jack Goldberger had arrived at a resolution of Epstein's case that would involve a 90-day jail term, but Krischer provided no further information. Upon learning of this, Villafaña wrote to her immediate supervisor: "Please tell me that you are joking. Maybe we should throw him [Epstein] a party and tell him we are sorry to have bothered him." Villafaña and her immediate supervisor later had phone and email exchanges with Krischer and with Epstein's local counsel to insist that the state plea comply with the terms of the NPA, or "we will consider it a breach of the agreement and proceed accordingly."[171]

Deputy Attorney General Filip told OPR he had never heard of Epstein before receiving Starr's letter. Following the office's standard protocol, Starr's letter was handled by John Roth, an experienced senior federal prosecutor who had served some years before as an AUSA in the USAO. Roth also told OPR that he had never before heard of Epstein. Roth explained to OPR that he did not conduct an independent investigation, interview witnesses, or meet with Epstein's counsel, and instead limited his review to written materials submitted by Epstein's attorneys and by Sloman to the Deputy Attorney General's office, as well as materials that the defense team and the USAO had previously provided to CEOS and the Criminal Division front office, and that CEOS furnished to him. Roth discussed the matter with two senior staff colleagues, as well as with the Deputy Attorney General, who also reviewed the submissions.

Roth told OPR that it was his understanding that Epstein had reneged on the NPA, and because he believed the NPA was a "dead letter," he did not review the terms of the agreement or ratify it *post hoc*. On the other hand, Deputy Attorney General Filip told OPR he understood that the NPA was still in effect and that Epstein was trying to undermine the federal jurisdictional basis for the agreement. Apart from addressing Epstein's federalism arguments, however, Deputy Attorney General Filip did not believe it was the "mission" of the Office of the Deputy Attorney General to review the Epstein case *de novo* or to examine the NPA's terms or determine whether the NPA reached the "right balance" between state and federal punishment. He told OPR, "[W]e heard an appeal. . . . [Epstein] wanted a meeting to argue for relief. We didn't give him a meeting and we didn't give him [any] relief." Deputy Attorney General Filip told OPR that no one in his office who looked at Epstein's arguments "felt that it was a sympathetic appeal." In particular, he told OPR that defense counsel's argument that there was no basis for a federal prosecution was "ludicrous," and the assertion that the USAO's investigation of Epstein was politically motivated "just seemed unserious."

---

[171]     Villafaña urged Sloman, "Someone really needs to talk to Barry."

On Monday, June 23, 2008, Roth sent a brief letter to Starr and Lefkowitz informing them that the office had "completed a thorough review" of the USAO's handling of the Epstein matter and did not believe intervention by the Deputy Attorney General was warranted in view of the "considerable discretion" vested by the Department in U.S. Attorneys.  He added, "Even if we were to substitute our judgment for that of the U.S. Attorney, we believe that federal prosecution of this case is appropriate."

Immediately after receiving a copy of Roth's letter, Villafaña notified defense counsel that Epstein would have until close of business on Monday, June 30, 2008, to comply with the NPA by entering his guilty plea, being sentenced, and surrendering to begin serving his sentence.  On June 26, 2008, Roth alerted the Office of the Attorney General that Epstein's counsel might try to contact the Attorney General to request additional review and urged the Attorney General not to take defense counsel's calls.  Roth told OPR that he was concerned that Epstein's team would try to take a further appeal in order to delay resolution of the case.

Meanwhile, Starr sent a concluding email to Acosta, acknowledging they had reached "the end of a long and arduous road" and adding, "While I am obviously very unhappy at what I believe is the government's treatment of my client, a man whom I have come to deeply admire, I recognize that we have filed and argued our 'appellate motions' and lost. . . .  I would like to have . . . some closure with you on this matter so that in the years to come, neither of us will harbor any ill will over the matter."

## X.     JUNE 2008 – JUNE 2009:  EPSTEIN ENTERS HIS PLEAS AND SERVES HIS CUSTODIAL SENTENCE

On Friday, June 27, 2008, Villafaña renewed her requests to Epstein's local attorneys Goldberger and Black for a copy of the state plea agreement reached with the State Attorney's Office, noting that their failure to provide it was a material breach of the NPA.  After receiving and reviewing the plea agreement form, which was not yet signed, Villafaña sent another letter to Goldberger and Black, informing them that the proposed sentencing provision did not comply with the requirements of the NPA.  Specifically, as written, the plea agreement called for a sentence of 12 months in "the Palm Beach County Detention Facility," followed consecutively by "18 months Community Control" with a special condition that the defendant serve "the first 6 months [of community control] in the Palm Beach County Detention Facility."  Villafaña objected to the community control provision, reminding Goldberger and Black that the NPA required Epstein to "make a binding recommendation of eighteen months *imprisonment*, which means confinement twenty-four hours a day at the County Jail."  In a subsequent email to Sloman, Villafaña recounted that she had spoken about the issue with Goldberger, who "'swore' that Epstein would be in custody 24-hours-a-day during the community confinement portion of his sentence."  Villafaña added that Goldberger "let it slip that Epstein would not be at the jail, he would be at the stockade . . . . Since we specifically discussed this at the meeting with [the State Attorney] months ago that Epstein would be at [the] jail], this certainly violates the spirit of the [NPA] agreement."[172] Villafaña told Sloman, "[S]omething smells very bad."

---

[172]     The Main Detention Center for Palm Beach County is a facility housing maximum, medium, and minimum custody adult males, as well as juvenile and special population male and female inmates.  *See*

The next day, Villafaña asked Goldberger to change the plea agreement by inserting the word "imprisoned" after "6 months," and Goldberger agreed to do so. Villafaña, however, did not ask that the agreement be amended to clarify that the reference to "the Palm Beach County Detention Facility" meant the jail, rather than the Stockade. The final signed plea agreement form further clarified the sentence, providing that after serving 12 months in the Palm Beach County Detention Facility, Epstein would be "sentenced to 6 months in the Palm Beach County Detention Facility . . . to be served consecutive to the 12 month sentence," followed by "12 months Community Control." The word "imprisoned" was hand written after "6 months" but then crossed out and replaced by "jail sentence."[173]

### A.   June 30, 2008:  Epstein Enters His Guilty Pleas in State Court

Epstein, with his attorney Jack Goldberger, appeared in Palm Beach County court on June 30, 2008, and entered guilty pleas to the indictment charging him with one felony count of solicitation of prostitution and to a criminal information charging him with one felony count of procurement of a minor to engage in prostitution.[174]  At the plea hearing, which Villafaña and the FBI case agent attended as spectators, Assistant State Attorney Belohlavek did not proffer the facts of the case; instead she only recited the charging language in the indictment and the criminal information:

> [B]etween August 1, 2004 and October 31, 2005, the defendant in Palm Beach County did solicit or procure someone to commit [prostitution] on three or more occasions.  And . . . between August 1, 2004 and October 9, 2005, the defendant did procure a minor under the age of 18 to commit prostitution in Palm Beach County also.[175]

The court found this to be "a sufficient factual basis to support the pleas," and engaged in a colloquy with Belohlavek regarding Epstein's victims:

| The Court: | Are there more than one victim? |
| --- | --- |
| Ms. Belohlavek: | There's several. |

. . . .

---

http://www.pbso.org/inside-pbso/corrections/general/.  The "Stockade" was a "lower security 'camp-style' facility" co-located with the Palm Beach County Sheriff's Office.  Both were administered by the Sheriff's Office.

[173]   Plea in the Circuit Court, signed June 30, 2008, and filed in court.  Villafaña complained to Goldberger when she learned later about the change from "imprisoned" to "jail sentence."

[174]   The Information is attached as Exhibit 5.

[175]   *State v. Epstein*, case nos. 06-CF-9454 and 08-CF-9381, Transcript of Plea Conference at 41-42 (Fifteenth Judicial Circuit, June 30, 2008) (Plea Hearing Transcript).  Belohlavek told OPR that reciting the statutory language of the charge as the factual basis for the plea was the typical practice for a state court plea.

| | |
|---|---|
| The Court: | Are all the victims in both these cases in agreement with the terms of the plea? |
| Ms. Belohlavek: | I have spoken to several myself and I have spoken to counsel, through counsel as to the other victim, and I believe, yes. |
| The Court: | And with regard to the victims under age eighteen, is that victim's parents or guardian in agreement with the plea? |
| Ms. Belohlavek: | That victim is not under age 18 any more and that's why we spoke with her counsel. |
| The Court: | And she is in agreement with the plea? |
| Ms. Belohlavek: | Yes.[176] |

When the court asked if the plea was "in any way tied to any promises or representations by any civil attorneys or other jurisdictions," Goldberger and Belohlavek, with Epstein present, spoke with the judge at sidebar and disclosed the existence of the "confidential" non-prosecution agreement with the USAO, and the court ordered that a copy of it be filed under seal with the court.

After the court accepted Epstein's guilty pleas, and imposed sentence on him pursuant to the plea agreement, Epstein was taken into custody to begin serving his sentence immediately.

In the aftermath of the plea, numerous individuals familiar with the investigation expressed positive reactions to the outcome, and Villafaña received several congratulatory messages. Oosterbaan wrote, "Congratulations, Marie—at long last!  Your work on this matter was truly exceptional, and you obtained a very significant result that will serve the victims well."  One senior colleague who was familiar with the case noted, "This case only resolved with the filthy rich bad guy going to jail because of your dedication and determination."  Another wrote, "If it had not been for you, he would have gotten away with it."   The CEOS Trial Attorney who had worked briefly with Villafaña told her, "But for your tenacity, he'd be somewhere ruining another child's life."  One victim's attorney stated, "[G]reat job of not letting this guy off."  But Villafaña was not satisfied with the outcome, responding to one colleague, "After all the hell they put me through, I don't feel like celebrating 18 months.  He should be spending 18 years in jail."

Acosta later publicly stated that the FBI Special Agent in Charge called him "to offer congratulations" and "to praise our prosecutors for holding firm against the likes of Messrs. Black,

---

[176]   Plea Hearing Transcript at 20, 42.  OPR was unable to determine to which victims Belohlavek was referring, and Belohlovek did not recall during her OPR interview, but it is possible that she was referring only to the victims of the charged crimes rather than to all of the victims identified in either the state or federal investigations.  Belohlavek told OPR that because of the nature of the charges (that is, involving prostitution), she did not know whether "technically under the law" the girls were "victims" whom she was required to notify of the plea hearing.

Dershowitz, Lefkowitz and Starr."[177]   In that same later public statement, Acosta noted that he received communications from Dershowitz, Starr, and Lefkowitz, who "all sought to make peace" with him; Acosta referred to it as "a proud moment."

On July 7, 2008, an Epstein victim filed an emergency petition against the Department, in federal court in Miami, alleging violation of her rights under the CVRA; a second victim joined the petition soon thereafter.  The history of the litigation and issues relating to it are discussed in Chapter Three of this Report.

### B.      Epstein Is Placed on Work Release

A few days after Epstein's guilty plea, Villafaña reported to Sloman that Epstein was incarcerated at the low-security Stockade, rather than the Main Detention Center where county prisoners were usually housed.  She also told Sloman that according to the Sheriff's Office, Epstein was eligible for work release.  Although the USAO had made clear that it expected Epstein to be incarcerated 24 hours a day, every day, the subject of work release had not been addressed explicitly during the NPA negotiations, and the NPA itself was silent on the issue.  Epstein's acceptance into the work release program as a convicted sexual offender was seen by many as another special benefit given to Epstein.  Because the decision to allow Epstein into the work release program was made by the Palm Beach Sheriff's Office, OPR did not investigate whether any state, county, or Sheriff's Office rules were violated.  OPR did examine the USAO's consideration of work release prior to signing the NPA and its subsequent unsuccessful efforts to ensure that Epstein remained incarcerated 24 hours a day.

The first specific reference to work release was made weeks after the NPA was signed, when Lefkowitz asserted, in his October 23, 2007 letter to Acosta, that, "so long as Mr. Epstein's sentence does not explicitly violate the terms of the [NPA] he is entitled to any type of sentence available to him, including but not limited to gain time and work release."

In November 2007, Sloman had an exchange of letters with Lefkowitz about the USAO's understanding that Epstein had agreed to serve his full jail term in "continuous confinement," pointing out that the NPA "clearly indicates that Mr. Epstein is to be incarcerated."  Sloman noted that Florida's Department of Corrections's rules did not allow individuals registered as sexual offenders to participate in work release, and thus Epstein would not be eligible for a work release program.  Sloman concluded that the USAO "is putting you on notice that it intends to make certain that Mr. Epstein is 'treated no better and no worse than anyone else' convicted of the same offense," and that if Epstein were to be granted work release, the USAO would "investigate the reasons why an exception was granted in Mr. Epstein's case."[178]

However, also in November, State Attorney Krischer told Sloman that Epstein was, in fact, eligible to petition for work release because his sexual offender registration would not take place

---

[177]      Letter from R. Alexander Acosta "To whom it may concern" (Mar. 20, 2011), published online in *The Daily Beast*.  The FBI Special Agent in Charge told OPR that he had no recollection of such a call, but acknowledged that it could have occurred.

[178]      Sloman provided a draft of this letter to Acosta for his approval before the letter was sent to Lefkowitz.

until after Epstein completed his sentence, but that Krischer would oppose such a petition "if it is in the agreement."[179]  On November 16, 2007, the case agents met with Belohlavek and asked if the State Attorney's Office would oppose a request that Epstein be granted work release. Belohlavek was noncommittal, and when the agents asked that she include language in the state's plea agreement prohibiting Epstein from participating in work release, she responded that she would have to discuss the issue with the State Attorney.[180]  Krischer later told OPR that work release was "within the control of the Sheriff's Office, not my office."  The state's plea agreement with Epstein did not address the issue of work release.

The day after Epstein entered his June 30, 2008 plea, Villafaña and her immediate supervisor met with a Palm Beach Sheriff's Office official to discuss work release.  According to Villafaña, the official told them, "Epstein would be eligible for work release and will be placed on work release," a statement that contradicted the information the case agents had been given by a jail supervisor the previous November, as well as statements made by defense attorney Jack Goldberger to Villafaña just days before the plea was entered, when he "*specifically* told [Villafaña] that [Epstein] would *not* get work release."  Villafaña alerted the Sheriff's Office official that although Epstein told the court during his plea proceeding that he had worked "every day" for a "couple of years" at the "Florida Science Foundation," that entity did not even exist until November 2007.[181]  Moreover, the address Epstein provided to the court for the "Florida Science Foundation" was the office of Epstein's attorney Jack Goldberger.  Villafaña and her supervisor asked that the Sheriff's Office notify the USAO if Epstein applied for work release.

Acosta told OPR that he was aware Villafaña was trying to ensure that Epstein did not get work release, and he would not have contradicted her efforts.  Acosta explained that the USAO expected Epstein would be "treated just like everyone else," but that, as shown by "our subsequent communications with the [S]tate [A]ttorney's [O]ffice," having Epstein on work release "was not what our office envisioned."

In August 2008, Villafaña spoke with defense attorney Black about ensuring Epstein's compliance with the NPA, and raised the issue of work release.  Villafaña later reported to Acosta and Sloman that Black assured her he had "reminded the team that . . . 18 months IN JAIL is a material term of the agreement."

The USAO never received notice of Epstein's work release application.  On October 10, 2008, less than three-and-a-half months after Epstein entered his guilty plea, the Palm Beach Sheriff's Office placed him into the work release program, permitting him to leave the Stockade

---

[179]    According to Sloman, Krischer explained that even without registration Epstein would be "treated" as a "sex offender" and that "just like any other sex offender, he can petition the court for work release."

[180]    In the November 16, 2007 email, on which she copied Acosta, Villafaña also indicated that she was "reviewing all of the statutes" to determine whether there was any impediment to a state judge granting Epstein work release.  In a subsequent email, the FBI case agents informed Villafaña that they had also spoken with a "jail supervisor," who advised them that although Epstein, as a sexual offender, would not qualify for work release, the judge could nevertheless order him placed on work release if he was sentenced to a year or less of incarceration.

[181]    During the plea hearing, Epstein told the court he was "President" of the Florida Science Foundation, it had been in existence for 15 years, and he worked there "every day."  Plea Hearing Transcript at 27-29.

for up to 12 hours per day, six days per week, to work at the "Florida Science Foundation" office in West Palm Beach.[182]  In mid-November 2008, Villafaña learned that Epstein was on work release.  She notified Acosta, Sloman, and the USAO Criminal Division Chief of this development in an email, and asked, "Can I indict him now?"

On November 24, 2008, Villafaña sent defense attorney Black a letter, notifying him that the USAO believed Epstein's application to and participation in the work release program constituted a material breach of the NPA.  Villafaña reminded Black that she had "more than a dozen e-mails" expressing the USAO's "insistence" that Epstein be incarcerated for 18 months, and that her June 27, 2008 letter to counsel made clear that this meant "confinement for twenty-four hours a day."  Villafaña noted that Goldberger had not inserted the word "imprisoned" into the plea agreement, as he had agreed to do, but instead inserted the term "jail sentence."  Villafaña told counsel:

> The [USAO's] Agreement not to prosecute Mr. Epstein was based upon its determination that eighteen months' incarceration (i.e., confinement twenty-four hours a day) was sufficient to satisfy the federal interest in Mr. Epstein's crimes.  Accordingly, the U.S. Attorney's Office hereby gives notice that Mr. Epstein has violated the [NPA] by failing to remain incarcerated twenty-four hours a day for the eighteen-month term of imprisonment.  The United States will exercise any and all rights it has under the [NPA] unless Mr. Epstein immediately ceases and desists from his breach of this agreement.

According to Villafaña, the FBI case agent spoke with the Stockade's work release coordinator and reported back that that the work release coordinator told her he had been led to believe the government knew Epstein had applied for the program, and that he had been threatened with legal action if he did not allow Epstein to participate in work release.

On November 26, 2008, the USAO advised the Department that Acosta was recused from all matters involving the law firm of Kirkland & Ellis, which was still heavily involved in the Epstein case, because Acosta was discussing with the firm the possibility of employment.[183]  As a result, Sloman became the senior USAO official responsible for making final decisions related to Epstein.

Also on November 26, 2008, Black responded to Villafaña's letter, acknowledging that Epstein was serving his sentence in the Palm Beach County Work Release Program, but denying that Epstein was in breach of the NPA.[184]  Black noted that the NPA did not prohibit work release; the NPA expressly provided that Epstein was to be afforded the same benefits as any other inmate;

---

[182]    Michele Dargan and David Rogers, "Palm Beach sex offender Jeffrey Epstein 'treated differently,'" *Palm Beach Daily News*, Dec. 13, 2008.

[183]    The recusal was formally approved by the Department on December 8, 2008.

[184]    Black forwarded the email to Sloman, noting that Villafaña "is very concerned about anything Epstein does" and that the defense team would "abide by" Sloman's decision on the issue.

Florida law treated work release as part of confinement; and the Palm Beach County Sheriff's Office had discretion to grant work release to any inmate. Black also claimed that Acosta "recognized that Mr. Epstein might serve a portion of his sentence through the Work Release Program" and pointed out that the December 6, 2007 draft victim notification letter sent to Lefkowitz for review specifically referred to the victim's right to be notified "if [Epstein] is allowed to participate in a work release program."

On December 3, 2008, in advance of a scheduled meeting with Black, Villafaña sent Sloman and Criminal Division Chief Senior an email about Epstein's participation in the work release program:

> It appears that, since Day 1, Goldberger and Krisher [*sic*] . . . have been scheming to get Epstein out on work release. For example, the indictment incorrectly charges Epstein for an offense that would have made him ineligible for work release if it had been charged correctly. (Remember that Krisher [*sic*] also went along with letting us believe that Epstein was pleading to a registrable offense when Epstein's folks and Krisher [*sic*] believed that . . . the offense was not registrable.) Krisher [*sic*] and Goldberger also told us that Epstein would be housed at the Palm [Beach County] Jail, not the Stockade, but he would not have been eligible for work release if at the jail. . . .

> As part of his work release, Epstein has hired off-duty Sheriff's deputies to provide him with "protection." It appears that he is paying between $3000 and $4100 per week for this service, despite the work release rules barring anyone from the Sheriff's Office (and the Sheriff's Office itself) from having "any business transactions with inmates . . . while they are in the custody or supervision of the Sheriff . . . ."

Villafaña added that she and her immediate supervisor believed that the USAO "should not budge on the 24-hour-a-day incarceration" requirement. Referring to the CVRA litigation, Villafaña also pointed out that two victims had brought suit against the USAO "for failing to keep them informed about the investigation," and the office had "an obligation to inform all of the victims upon Epstein's release."

On December 11, 2008, Villafaña wrote to the Corrections Division of the Palm Beach County Sheriff's Office to express the USAO's view that Epstein was not eligible for work release and to alert the Sheriff's Office that Epstein's work release application contained several inaccuracies and omitted relevant information. Villafaña pointed out that Epstein's application identified his place of employment as the "Florida Science Foundation," and the telephone number listed in the application for the "Florida Science Foundation" was the telephone number to the law firm of Epstein's attorney Jack Goldberger. Villafaña also noted that the individual identified in the work release file as Epstein's "supervisor" at the "Florida Science Foundation" had submitted publicly available sworn filings to the Internal Revenue Service indicating that Epstein worked only one hour per week and earned no compensation, but that same individual had represented to

the Sheriff's Office that Epstein's duties required him to work six days a week for 12 hours per day.    Finally, Villafaña pointed out that Epstein's purported "supervisor"—who as the Foundation's vice president was subordinate to Epstein, the Foundation's president—had promised to alert the Sheriff's Office if Epstein failed to comply with his work schedule, but the "supervisor" lived and worked in the New York metropolitan area and was unable to monitor Epstein's activities on a day-to-day basis.    The Sheriff's Office neither acknowledged nor responded to Villafaña's letter.

In March 2009, Sloman met in Miami with Dershowitz for, as Dershowitz characterized it in a subsequent email, "a relaxed drink and conversation," which included a discussion of the Epstein case.    After that encounter, Dershowitz emailed Sloman, expressing appreciation for Sloman's "assurance that the feds will not interfere with how the Palm Beach sheriff administers" Epstein's sentence "as long as he is treated like any similarly situated inmate."  Sloman responded:

> Regarding Mr. Epstein, the United States Attorney's Office will not interfere with how the Palm Beach Sheriff's Office administers the sentence imposed by the Court.  That being said, this does not mean that the USAO condones or encourages the PBSO to mitigate the terms and conditions of his sentence.  Furthermore, it does not mean that, if contacted for our position concerning alternative custody or in-home detention, we would not object.  To be clear, if contacted we will object.  Naturally, I also expect that no one on behalf of Mr. Epstein will use my assurance to you to affirmatively represent to PBSO that the USAO does not object to an alternative custody or home detention.

A week later, Dershowitz emailed Sloman again, this time expressing appreciation for Sloman's "willingness to call the sheriff and advise him that your office would take no position on how he handled Epstein's sentence," as long as Epstein did not receive special treatment, but adding, "[L]et's put any call off for a while."

Epstein's sentence required that he be confined to his home for a 12-month period following his release from prison.  On July 22, 2009, almost 13 months after he began serving his sentence, Epstein was released from the Stockade and placed on home confinement.[185]   At this time, he registered as a sexual offender.

## XI.    POST-RELEASE DEVELOPMENTS

In the summer of 2009, allegations surfaced that Epstein had cooperated with the U.S. Attorney's Office for the Eastern District of New York's investigation of investment bank Bear Stearns, and that he had been released early from his 18-month imprisonment term because of that

---

[185]     In Florida, what is commonly referred to as house arrest is actually the Community Control supervision program.  Florida Statute § 948.001(3) defines the program as "a form of intensive, supervised custody in the community."

cooperation.[186]   When Villafaña spoke with attorneys in the Eastern District of New York, however, an AUSA there told Villafaña that "[t]hey had never heard of" Epstein, and he had not cooperated with the Bear Stearns case.[187]   During her OPR interview, Villafaña told OPR that to her knowledge, the rumor of Epstein's cooperation was "completely false."

Villafaña and the USAO continued to monitor Epstein's compliance with the terms of the NPA.  In August 2009, Villafaña alerted her supervisors that Epstein was in apparent violation of his home detention—he had been spotted walking on the beach, and when stopped by the police, he claimed that he was walking "to work" at an office nearly eight miles from his home.  Villafaña passed this information along to the Palm Beach County probation office.[188]   By letter dated September 1, 2009, Black wrote to Sloman seeking the USAO's agreement to transfer supervision of the community control phase of Epstein's sentence to the U.S. Virgin Islands, where Epstein maintained his "primary residence."  In response, Villafaña notified Black that the USAO opposed such a request and would view it as a violation of the NPA.  Three months later, Sloman met with Dershowitz and, among other issues, informed him that the USAO opposed early termination of Epstein's community control supervision and would object to a request to transfer Epstein's supervision to the U.S. Virgin Islands.

After serving his year on home detention in Florida, Epstein completed his sentence on July 21, 2010.

---

[186]     *See* "Out of Prison," *New York Post*, July 23, 2009.

[187]     The New York AUSA had emailed Villafaña, "We're the prosecutors in [the Bear Stearns case] . . . .  We saw the below article from the New York Post and wanted to ask you about this defendant, Epstein, who we had never heard of until this morning.  We've since learned that he is pretty unsavory."  Villafaña reported to Sloman and other supervisors that she "just got off the phone with the prosecutors from the Bear Stearns case in [the Eastern District of] New York.  They had seen the NY Post article that claimed that Epstein got such a low sentence because he was cooperating with the feds on the Bear Stearns prosecution.  They had never heard of him."  In a second email, she confirmed, "There has been absolutely no cooperation here or in New York, from what they told me."

[188]     Black later wrote a letter to Villafaña claiming that Epstein had "specific authorization to walk to work," the distance between his home and office was "less than three miles," and when the matter was "fully investigated," Epstein was found to be in "total compliance" with the requirements of his sentence.

# CHAPTER TWO

## PART TWO:  APPLICABLE STANDARDS

## I.    OPR'S ANALYTICAL FRAMEWORK

OPR finds professional misconduct when an attorney intentionally violates or acts in reckless disregard of a known, unambiguous obligation imposed by law, rule of professional conduct, or Department regulation or policy.  In determining whether an attorney has engaged in professional misconduct, OPR uses the preponderance of the evidence standard to make factual findings.

An attorney intentionally violates an obligation or standard when the attorney (1) engages in conduct with the purpose of obtaining a result that the obligation or standard unambiguously prohibits; or (2) engages in conduct knowing its natural or probable consequence, and that consequence is a result that the obligation or standard unambiguously prohibits.  An attorney acts in reckless disregard of an obligation or standard when (1) the attorney knows or should know, based on his or her experience and the unambiguous nature of the obligation or standard, of an obligation or standard; (2) the attorney knows or should know, based on his or her experience and the unambiguous applicability of the obligation or standard, that the attorney's conduct involves a substantial likelihood that he or she will violate, or cause a violation of, the obligation or standard; and (3) the attorney nonetheless engages in the conduct, which is objectively unreasonable under all the circumstances.  Thus, an attorney's disregard of an obligation is reckless when it represents a gross deviation from the standard of conduct that an objectively reasonable attorney would observe in the same situation.

If OPR determines that an attorney did not engage in professional misconduct, OPR determines whether the attorney exercised poor judgment, engaged in other inappropriate conduct, made a mistake, or acted appropriately under all the circumstances.  An attorney exercises poor judgment when, faced with alternative courses of action, he or she chooses a course of action that is in marked contrast to the action that the Department may reasonably expect an attorney exercising good judgment to take.  Poor judgment differs from professional misconduct in that an attorney may act inappropriately and thus exhibit poor judgment even though he or she may not have violated or acted in reckless disregard of a clear obligation or standard.  In addition, an attorney may exhibit poor judgment even though an obligation or standard at issue is not sufficiently clear and unambiguous to support a professional misconduct finding.  A mistake, on the other hand, results from an excusable human error despite an attorney's exercise of reasonable care under the circumstances.

An attorney who makes a good faith attempt to ascertain the obligations and standards imposed on the attorney and to comply with them in a given situation does not commit professional misconduct.  Evidence that an attorney made a good faith attempt to ascertain and comply with the obligations and standards imposed can include, but is not limited to, the fact that the attorney reviewed materials that define or discuss one or more potentially applicable obligations and standards, consulted with a supervisor or ethics advisor, notified the tribunal or the attorney representing a party or person with adverse interests of an intended course of conduct, or took

affirmative steps the attorney reasonably believed were required to comply with an obligation or standard.

## II.   APPLICABLE STANDARDS OF CONDUCT

### A.   The United States Attorneys' Manual

Among its many provisions, the United States Attorneys' Manual (USAM) includes general statements of principles that summarize appropriate considerations to be weighed, and desirable practices to be followed, by federal prosecutors when discharging their prosecutorial responsibilities.[189]   The goal of the USAM is to promote "the reasoned exercise of prosecutorial authority and contribute to the fair, evenhanded administration of the Federal criminal laws," and to promote public confidence that important prosecutorial decisions will be made "rationally and objectively on the merits of each case."  USAM § 9-27.001.

Because the USAM is designed to assist in structuring the decision-making process of government attorneys, many of its principles are cast in general terms, with a view to providing guidance rather than mandating results.  *Id.*; *see also* USAM § 9-27.120, comment ("It is expected that each Federal prosecutor will be guided by these principles in carrying out his/her criminal law enforcement responsibilities . . . . However, it is not intended that reference to these principles will require a particular prosecutorial decision in any given case."); USAM § 9-27.110, comment ("Under the Federal criminal justice system, the prosecutor has wide latitude in determining when, whom, how, and even whether to prosecute for apparent violations of Federal criminal law."). However, USAM § 9-27.130 provides that AUSAs who depart from the principles of federal prosecution articulated in the USAM may be subject to internal discipline.  In particular, USAM § 9-27.130 states that each U.S. Attorney should establish internal office procedures to ensure that prosecutorial decisions are made at an appropriate level of responsibility and are consistent with the principles set forth in the USAM, and that serious, unjustified departures from the principles set forth in the USAM are followed by remedial action, including the imposition of disciplinary sanctions when warranted and deemed appropriate.

U.S. Attorneys have "plenary authority with regard to federal criminal matters" and may modify or depart from the principles set forth in the USAM as deemed necessary in the interest of fair and effective law enforcement within their individual judicial districts.  USAM §§ 9-2.001, 9.27-140.  The USAM provisions are supplemented by the Department's Criminal Resource Manual, which provides additional guidance relating to the conduct of federal criminal prosecutions.

#### 1.   USAM Provisions Relating to the Initiation and Declination of a Federal Prosecution

Federal prosecutors do not open a case on every matter referred to them.  USAM § 9-2.020 explicitly authorizes a U.S. Attorney "to decline prosecution in any case referred directly to

---

[189]      In 2018, the USAM was revised and reissued as the Justice Manual.  In assessing the subjects' conduct, OPR relies upon the standards of conduct in effect at the time of the events in issue.  Accordingly, unless otherwise noted, citations in this Report are to the 1997 edition of the USAM, as revised through January 2007.

him/her by an agency unless a statute provides otherwise." Whenever a U.S. Attorney closes a case without prosecution, the file should reflect the action taken and the reason for it. USAM § 9-27.220 sets forth the grounds to be considered in making the decision whether to commence or decline federal prosecution. A federal prosecutor should commence or recommend prosecution if he or she believes that admissible evidence will probably be sufficient to obtain and sustain a conviction of a federal offense, unless (1) the prosecution would serve no federal interest; (2) the person is subject to effective prosecution in another jurisdiction; or (3) there exists an adequate alternative to prosecution. A comment to this provision indicates that it is the prosecutor's task to determine whether these circumstances exist, and in making that determination, the prosecutor "should" consult USAM §§ 9-27.230, 9-27.240, or 9-27.250, as appropriate.

USAM § 9-27.230 sets forth a non-exhaustive list of considerations that a federal prosecutor should weigh in determining whether a substantial federal interest would be served by initiating prosecution against a person:

1.   Federal law enforcement priorities;[190]

2.   The nature and seriousness of the offense;[191]

3.   The deterrent effect of prosecution;

4.   The person's culpability in connection with the offense;

5.   The person's history with respect to criminal activity;

6.   The person's willingness to cooperate in the investigation or prosecution of others; and

7.   The probable sentence or other consequences if the person is convicted.

The USAM contemplates that, on occasion, a federal prosecutor will decline to open a case in deference to prosecution by the state in which the crime occurred. USAM § 9-27.240 directs that in evaluating the effectiveness of prosecution in another jurisdiction, the federal prosecutor should weigh "all relevant considerations," including the strength of the other jurisdiction's interest in prosecution, the other jurisdiction's ability and willingness to prosecute effectively, and the probable sentence or other consequences the person will be subject to if convicted in the other jurisdiction. A comment to this provision explains:

---

[190]   A comment to this provision directs the prosecutor to consider carefully the extent to which a federal prosecution would be consistent with established federal prosecutorial priorities.

[191]   A comment to this provision explains that an assessment of the nature and seriousness of the offense must also include consideration of the impact on the victim. The comment further cautions that when restitution is at issue, "care should be taken . . . to ensure against contributing to an impression that an offender can escape prosecution merely by returning the spoils of his/her crime."

> Some offenses, even though in violation of Federal law, are of particularly strong interest to the authorities of the state or local jurisdiction in which they occur, either because of the nature of the offense, the identity of the offender or victim, the fact that the investigation was conducted primarily by state or local investigators, or some other circumstance. Whatever the reason, when it appears that the Federal interest in prosecution is less substantial than the interest of state or local authorities, consideration should be given to referring the case to those authorities rather than commencing or recommending a Federal prosecution.

Another comment cautions that in assessing whether to defer to state or local authorities, "the Federal prosecutor should be alert to any local conditions, attitudes, relationships or other circumstances that might cast doubt on the likelihood of the state or local authorities conducting a thorough and successful prosecution."

USAM § 9-27.260 identifies impermissible considerations relating to the decision whether to initiate or decline a federal prosecution. Specifically, the decision may not be based on consideration of the person's race, religion, sex, national origin, or political association, activities, or beliefs; the prosecutor's "own personal feelings" about the person or the victim; or the possible effect of the decision on the prosecutor's own professional or personal circumstances. When opting to decline federal prosecution, the prosecutor should ensure that the reasons for that decision are communicated to the investigating agency and reflected in the office files. USAM § 9-27.270.

### 2.   USAM § 9-2.031:  The Petite Policy

Although the Constitution does not prohibit prosecutions of a defendant by both state and federal authorities, even when the conduct charged is identical in both charging jurisdictions, the Department has a long-standing policy, known as the Petite policy, governing federal prosecutions charged after the initiation of a prosecution in another jurisdiction based on the same or similar conduct.[192]  The general principles applicable to the prosecution or declination decision are set forth in USAM § 9-2.031, "Dual and Successive Prosecution Policy ('Petite Policy')," which contains guidelines for a federal prosecutor's exercise of discretion in determining whether to bring a federal prosecution based on the substantially same act or transaction involved in a prior state or federal proceeding.  The policy applies "whenever there has been a prior state or federal prosecution resulting in an acquittal, a conviction, including one resulting from a plea agreement, or a dismissal or other termination on the merits after jeopardy has attached."

In circumstances in which the policy applies, a prosecutor nonetheless can initiate a new federal prosecution when three substantive prerequisites exist.  The prerequisites are as follows:

(1)   The matter must involve a substantial federal interest.  The determination whether a substantial federal interest is involved is made on a case-by-case basis.  Matters

---

[192]   *See Rinaldi v. United States*, 434 U.S. 22, 27-29 (1977); *Petite v. United States*, 361 U.S. 529 (1960).

that come within the national investigation and prosecution priorities established by the Department are more likely to satisfy this requirement than other matters.

(2)     The prior prosecution must have left the substantial federal interest "demonstrably unvindicated."  In general, the Department presumes that a prior prosecution has vindicated federal interests, but that presumption may be overcome in certain circumstances.  As relevant here, the presumption may be overcome when the choice of charges in the prior prosecution was based on factors such as incompetence, corruption, intimidation, or undue influence.  The presumption may be overcome even when the prior prosecution resulted in a conviction, if the prior sentence was "manifestly inadequate in light of the federal interest involved and a substantially enhanced sentence—including forfeiture and restitution as well as imprisonment and fines—is available through the contemplated federal prosecution."

(3)     The government must believe that the defendant's conduct constitutes a federal offense, and that the admissible evidence probably will be sufficient to obtain and sustain a conviction.

However, the satisfaction of the prerequisites does not require a prosecutor to proceed with a federal investigation or charges nor is the Department required to approve the proposed prosecution.

The Petite policy cautions that whenever a matter involves overlapping federal and state jurisdiction, federal prosecutors should consult with their state counterparts "to determine the most appropriate single forum in which to proceed to satisfy the substantial federal and state interests involved."  If a substantial question arises as to whether the Petite policy applies to a particular prosecution, the prosecutor should submit the matter to the appropriate Assistant Attorney General for resolution.  Prior approval from the appropriate Assistant Attorney General must be obtained before bringing a prosecution governed by this policy.

### 3.      USAM Provisions Relating to Plea Agreements

Federal prosecutors have discretion to resolve an investigation or pending case through a plea agreement.  USAM §§ 9-27.330; 9-27.400.  Negotiated pleas are also explicitly sanctioned by Federal Rule of Criminal Procedure 11(c)(1).[193]  Regardless of whether the plea agreement is offered pre-charge or post-charge, the prosecutor's plea bargaining "must honestly reflect the totality and seriousness of the defendant's conduct."  USAM § 9-27.400, comment.[194]  The importance of selecting a charge that reflects the seriousness of the conduct is echoed in USAM § 9-27.430, which directs the prosecutor to require a defendant to plead to an offense that represents the most serious readily provable charge consistent with the nature and extent of the

---

[193]     As previously noted, Rule 11(c)(1)(C) permits the parties to agree to resolve the case in exchange for a specific sentence, subject to the court's acceptance of the agreement.

[194]     *See also* USAM § 9-27.300 ("Once the decision to prosecute has been made, the attorney for the government should charge . . . the most serious offense that is consistent with the nature of the defendant's conduct, and that is likely to result in a sustainable conviction.").

defendant's criminal conduct, has an adequate factual basis, makes likely the imposition of an appropriate sentence and order of restitution, and does not adversely affect the investigation or prosecution of others.  USAM § 9-27.420 specifies:

> In determining whether it would be appropriate to enter into a plea agreement, the attorney for the government should weigh all relevant considerations, including:
>
> > 1.   The defendant's willingness to cooperate in the investigation or prosecution of others;
> >
> > 2.   The defendant's history with respect to criminal activity;
> >
> > 3.   The nature and seriousness of the offense or offenses charged;
> >
> > 4.   The defendant's remorse or contrition and his/her willingness to assume responsibility for his/her conduct;
> >
> > 5.   The desirability of prompt and certain disposition of the case;
> >
> > 6.   The likelihood of obtaining a conviction at trial;
> >
> > 7.   The probable effect on witnesses;
> >
> > 8.   The probable sentence or other consequences if the defendant is convicted;
> >
> > 9.   The public interest in having the case tried rather than disposed of by a guilty plea;
> >
> > 10.   The expense of trial and appeal;
> >
> > 11.   The need to avoid delay in the disposition of other pending cases; and
> >
> > 12.   The effect upon the victim's right to restitution.

### 4.   USAM Provisions Relating to Non-Prosecution Agreements

USAM § 9-27.600 authorizes government attorneys to enter into a non-prosecution agreement in exchange for a person's cooperation.  The provision explains that a non-prosecution agreement is appropriate for this purpose when, in the prosecutor's judgment, the person's timely cooperation "appears to be necessary to the public interest and other means of obtaining the desired cooperation are unavailable or would not be effective."  A comment to this provision explains that such "other means" include seeking cooperation after trial and conviction, bargaining for

cooperation as part of a plea agreement, or compelling cooperation under a "use immunity" order. The comment observes that these alternative means "are clearly preferable to permitting an offender to avoid any liability for his/her conduct" and "should be given serious consideration in the first instance." USAM §§ 9-27.620 and 9-27.630 set forth considerations a prosecutor should take into account when entering into a non-prosecution agreement. Generally, the U.S. Attorney has authority to approve a non-prosecution agreement. USAM § 9-27.600 comment. However, USAM § 9-27.640 directs that a government attorney should not enter into a non-prosecution agreement in exchange for a person's cooperation without first obtaining the approval of the appropriate Assistant Attorney General, or his or her designee, when the person is someone who "is likely to become of major public interest."

These USAM provisions do not address the uses of non-prosecution agreements in circumstances other than when needed to obtain cooperation.

### 5.    USAM Provisions Relating to Grants of Immunity

Nothing in the USAM directly prohibits the government from using the criminal exposure of third parties in negotiating with a criminal defendant. Instead, the provision that addresses immunity relates only to the exchange of limited immunity for the testimony of a witness who has asserted a Fifth Amendment privilege against self-incrimination. *See* USAM §§ 9-23.100 *et seq.*

### 6.    USAM/C.F.R. Provisions Relating to Financial Conflicts of Interest

Department employees are expected to be aware of, and to comply with, all ethics-related laws, rules, regulations, and policies. *See, generally,* USAM § 1-4.000 *et seq.* Specifically, a government attorney is prohibited by criminal statute from participating personally and substantially in any particular matter in which he has a financial interest or in which such an interest can be imputed to him. *See* 18 U.S.C. § 208 and 5 C.F.R. §§ 2635.401-402. In addition, a Department employee should seek advice from an ethics official before participating in any matter in which his impartiality could be questioned. If a conflict of interest exists, in order for the employee to participate in the matter, the head of the employee's component, with the concurrence of an ethics official, must make a determination that the interest of the government in the employee's participation outweighs the concern that a reasonable person may question the integrity of the Department's programs and operations. The determination must be made in writing. *See* 5 C.F.R. §§ 2635.501-502.

## B.    Other Department Policies

### 1.    Department Policies Relating to the Disposition of Charges

The Attorney General has the responsibility for establishing prosecutorial priorities for the Department. Over the span of several decades, each successive Attorney General has articulated those priorities in policy memoranda issued to all federal prosecutors. As applicable here, on September 22, 2003, Attorney General John Ashcroft issued a memorandum regarding "Department Policy Concerning Charging Criminal Offenses, Disposition of Charges, and Sentencing" (Ashcroft Memo). The Ashcroft Memo, which explicitly superseded all previous Departmental guidance on the subject, set forth policies "designed to ensure that all federal

prosecutors adhere to the principles and objectives" of the Sentencing Reform Act of 1984, the Sentencing Guidelines, and the PROTECT Act "in their charging, case disposition, and sentencing practices."[195]

The Ashcroft Memo directed that, "in all federal cases, federal prosecutors must charge and pursue the most serious, readily provable offense or offenses that are supported by the facts of the case," except as authorized by an Assistant Attorney General, U.S. Attorney, or designated supervisory authority in certain articulated limited circumstances. The Ashcroft Memo cautioned that a charge is not "readily provable" if the prosecutor harbors a good faith doubt, based on either the law or the evidence, as to the government's ability to prove the charge at trial. The Ashcroft Memo explains that the "basic policy" "requires federal prosecutors to charge and pursue all charges that are determined to be readily provable" and would yield the most substantial sentence under the Sentencing Guidelines.

The policy set forth six exceptions, including a catch-all exception that permits a prosecutor to decline to pursue readily provable charges "in other exceptional circumstances" with the written or otherwise documented approval of an Assistant Attorney General, U.S. Attorney, or "designated supervisory attorney." As examples of circumstances in which such declination would be appropriate, the Ashcroft Memo cites to situations in which a U.S. Attorney's Office is "particularly over-burdened," the trial is expected to be of exceptionally long duration, and proceeding to trial would significantly reduce the total number of cases the office could resolve. The Ashcroft Memo specifically notes that "[c]harges may be declined . . . pursuant to a plea agreement only to the extent consistent" with the policies established by the Memo.

On January 28, 2005, Deputy Attorney General James Comey issued a memorandum entitled "Department Policies and Procedures Concerning Sentencing." That memorandum reiterated that federal prosecutors "must continue to charge and pursue the most serious readily provable offenses," and defined that term as the offenses that would "generate the most substantial sentence" under the Sentencing Guidelines, any applicable mandatory minimum, and any statutorily required consecutive sentence.

Importantly, although the Ashcroft and Comey memoranda limit an individual line prosecutor's ability to decline "readily provable" charges in their entirety, no such restriction is placed upon the U.S. Attorneys, who retained authority to approve exceptions to the policy. In addition, the policy applies to "readily provable" charges, thus inherently allowing a prosecutor

---

[195]    The Ashcroft Memo was issued before the Supreme Court decided *United States v. Booker*, 543 U.S. 220 (2005), which struck down the provision of the federal sentencing statute that required federal district judges to impose a sentence within the applicable Federal Sentencing Guidelines range. Those Guidelines were the product of the United States Sentencing Commission, which was created by the Sentencing Reform Act of 1984. The Prosecutorial Remedies and Other Tools to End the Exploitation of Children Today (PROTECT) Act of 2003, Pub. L. 108–21, 117 Stat. 650, was directed at preventing child abuse. It included a variety of provisions designed to improve the investigation and prosecution of violent crimes against children. Among other things, the PROTECT Act provided for specific sentencing considerations for certain sex-related offenses, such as those involving multiple occasions of prohibited sexual conduct or those involving material with depictions of violence or with specified numbers of images.

flexibility to decline to bring a particular charge based on a "good faith doubt" that the law or evidence supports the charge.

### 2.  Department Policy Relating to Deportation of Criminal Aliens

On April 28, 1995, the Attorney General issued a memorandum to all federal prosecutors entitled "Deportation of Criminal Aliens," directing federal prosecutors to actively and directly become involved in the process of removing criminal aliens from the United States.  In pertinent part, this memorandum notes that prosecutors can make a major contribution to the expeditious deportation of criminal aliens by effectively using available prosecution tools for dealing with alien defendants.   These tools include (1) stipulated administrative deportation orders in connection with plea agreements; (2) deportation as a condition of supervised release under 18 U.S.C. § 3853(d); and (3) judicial deportation orders pursuant to 8 U.S.C. § 1252a(d).   The memorandum further directs:

> All deportable criminal aliens should be deported unless extraordinary circumstances exist.    Accordingly, absent such circumstances, Federal prosecutors should seek the deportation of deportable alien defendants in whatever manner is deemed most appropriate in a particular case.  Exceptions to this policy must have the written approval of the United States Attorney.

*See also* USAM § 9-73.520.  A "criminal alien" is a foreign national who has been convicted of a crime.[196]

Stipulated administrative deportation orders can be based "on the conviction for an offense to which the alien will plead guilty," provided that the offense is one of those enumerated in 8 U.S.C. § 1251 as an offense that causes an alien to be deported.   Under 8 U.S.C. § 1251(a)(2)(A)(i), any alien who is convicted of a crime of "moral turpitude" within five years after the date of entry (or 10 years in the case of an alien provided lawful permanent resident status), and is either sentenced to confinement or confined to prison for one year or longer, is deportable.

### C.    Case Law

### 1.    Prosecutorial Discretion

On many occasions, the Supreme Court has discussed the breadth of the prosecutor's discretion in deciding whether and whom to prosecute.  In *Bordenkircher v. Hayes*, 434 U.S. 357 (1978), the Court considered the propriety of a prosecutor's threat during plea negotiations to seek more serious charges against the accused if the accused did not plead guilty to the offense originally charged.   The defendant, Hayes, opted not to plead guilty to the original offense, and

---

[196]    According to the U.S. Customs and Border Protection, "The term 'criminal alien' refers to aliens who have been convicted of one or more crimes, whether in the United States or abroad, prior to interdiction by the U.S. Border Patrol."  *See* U.S. Dept. of Homeland Security, U.S. Customs and Border Protection, CBP Enforcement Statistics, Criminal Alien Statistics Fiscal Year 2020, available at https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics/criminal-alien-statistics.

the prosecutor indicted him on more serious charges. Hayes was thereafter convicted and sentenced under the new indictment. The state court of appeals rejected Hayes's challenge to his conviction, concluding that the prosecutor's decision to indict on more serious charges was a legitimate use of available leverage in the plea-bargaining process. Hayes filed for review of his conviction and sentence in federal court, and although Hayes lost at the district court level, the U.S. Court of Appeals for the Sixth Circuit concluded that the prosecutor's conduct constituted impermissible vindictive prosecution.

The Supreme Court reversed the Sixth Circuit's ruling. The Court opined that "acceptance of the basic legitimacy of plea bargaining necessarily implies rejection of any notion that a guilty plea is involuntary in a constitutional sense simply because it is the end result of the bargaining process." *Id.* at 363. A long as the prosecutor has probable cause to believe a crime has been committed, "the decision whether or not to prosecute, and what charge to file or bring before a grand jury, *rests entirely in his discretion*." *Id.* at 364 (emphasis added). The Court explained that selectivity in enforcement of the criminal law is not improper unless based upon an unjustifiable standard such as race, religion, or other arbitrary classification. *Id.*

These principles were reiterated in *Wayte v. United States*, 470 U.S. 598 (1985), a case involving the government's policy of prosecuting only those individuals who reported themselves as having failed to register with the Selective Service system. The petitioner in *Wayte* claimed that the self-reported non-registrants were "vocal" opponents of the registration program who were being punished for the exercise of their First Amendment rights. The Supreme Court rejected this argument, stating that the government has "broad discretion" in deciding whom to prosecute, and that the limits of that discretion are reached only when the prosecutor's decision is based on an unjustifiable standard. *Id.* at 607-08. Because the passive enforcement policy was not intended to have a discriminatory effect, the claim of selective prosecution failed.

In *Imbler v. Pachtman*, 424 U.S. 409 (1976), the Supreme Court considered whether a state prosecutor acting within the scope of his duties could be sued under 42 U.S.C. § 1983 for violation of the defendant's constitutional rights when the defendant alleged that the prosecutor and others had unlawfully conspired to charge and convict him. The Court held that "in initiating a prosecution and in presenting the State's case," conduct that is "intimately associated with the judicial phase of the criminal process," the prosecutor enjoyed absolute immunity from a civil suit for damages. *Id.* at 430-31. In *Harrington v. Almy*, 977 F.2d 37 (1st Cir. 1992), the court applied *Imbler* to a challenge to a prosecutor's decision not to prosecute. The court noted that "given the availability of immunity for the decision *to* charge, it becomes even more important that symmetrical protection be available for the decision *not to* charge." *Id.* at 41 (emphasis in original).

Finally, in an analogous area of the law, in *Heckler v. Chaney,* 470 U.S. 821 (1985), the Supreme Court concluded that an agency's decision not to undertake an enforcement action is not reviewable under the federal Administrative Procedure Act, 5 U.S.C. §§ 500-706.

## 2.     Plea Agreement Promises of Leniency towards a Third Party

Case law regarding promises made during plea negotiations not to prosecute a third-party arises in two contexts. First, defendants have challenged the voluntariness of the resulting plea

when prosecutors have used third parties as leverage in plea negotiations. Numerous courts have made clear, however, that a plea is not invalid when entered under an agreement that includes a promise of leniency towards a third party or in response to a prosecutor's threat to prosecute a third party if a plea is not entered. *See, e.g., United States v. Marquez*, 909 F.2d 738, 741-42 (2d Cir. 1990) (rejecting claim that plea was involuntary because of pressure placed upon a defendant by the government's insistence that a defendant's wife would not be offered a plea bargain unless he pled guilty); *Martin v. Kemp*, 760 F.2d 1244, 1248 (11th Cir. 1985) (in order to satisfy "heavy burden" of establishing that the government had not acted "in good faith," a defendant challenging voluntariness of his plea on grounds that the prosecutor had threatened to bring charges against the defendant's pregnant wife had to establish that government lacked probable cause to believe the defendant's wife had committed a crime at the time it threatened to charge her); *Stinson v. State*, 839 So. 2d 906, 909 (Fla. App. 2003) ("In cases involving . . . a promise not to prosecute a third party, the government must act in good faith . . . [and] must have probable cause to charge the third party.").

The second context concerns situations in which courts have enforced prosecutors' promises of leniency to third parties. For example, in *State v. Frazier*, 697 So. 2d 944 (Fla. App. 1997), as consideration for the defendant's guilty plea, the prosecutor agreed and announced in open court that the government would dismiss charges against the defendant's niece and nephew, who had all been charged as a result of the same incident. When the state reneged and attempted to prosecute the niece and nephew, the trial court dismissed the charges against them, and the state appealed. The appellate court affirmed the dismissal, concluding that under contract law principles, the niece and nephew were third-party beneficiaries of the plea agreement and were therefore entitled to enforce it.

Apart from voluntariness or enforceability concerns, courts have not suggested that a prosecutor's promise not to prosecute a third party amounts to an inappropriate exercise of prosecutorial discretion.

## D.    State Bar Rules

During the period relevant to this Report, the five subject attorneys were members of the bar in several different states and were subject to the rules of professional conduct in each state in which they held membership.[197] In determining which rules apply, OPR applied the local rules of the U.S. District Court for the Southern District of Florida (Local Rules) and the choice-of-law provisions of each applicable bar. Local Rule 11.1(f) incorporates rules governing the admission, practice, peer review, and discipline of attorneys (Attorney Admission Rules).[198] Attorney Admission Rule 4(d) provides that any U.S. Attorney or AUSA employed full-time by the government may appear and participate in particular actions or proceedings on behalf of the United States in the attorney's official capacity without petition for admission. Any attorney so appearing

---

[197]    The subjects' membership in state bars other than Florida would not affect OPR's conclusions in this case.

[198]    These rules have been in effect since December 1994.

is subject to all rules of the court.[199]   Attorney Admission Rule 6(b)(2)(A) makes clear that attorneys practicing before the court are subject to the Florida Bar's Rules of Professional Conduct (FRPC).   Moreover, the choice-of-law provisions contained within the relevant state's rules of professional conduct make the FRPC applicable to their conduct.

## 1.   FRPC 4-1.1 – Competence

FRPC 4-1.1 requires that a lawyer provide competent representation to a client.[200] Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation.   A comment to the rule clarifies that the factors relevant to determining a lawyer's competence to handle a particular matter include "the relative complexity and specialized nature of the matter, the lawyer's general experience, the lawyer's training and experience in the field in question, the preparation and study the lawyer is able to give the matter, and whether it is feasible to refer the matter to, or associate or consult with, a lawyer of established competence in the field."   The comment further notes that "[i]n many instances the required proficiency is that of a general practitioner." With respect to particular matters, competence requires inquiry into and analysis of the factual and legal elements of the problem. The comment to Rule 4-1.1 explains that "[t]he required attention and preparation are determined in part by what is at stake; major litigation and complex transactions ordinarily require more extensive treatment than matters of lesser complexity and consequence."

## 2.   FRPC 4-1.3 – Diligence

FRPC 4-1.3 specifies that a lawyer should act with reasonable diligence and promptness in representing a client.   A comment to this rule explains, "A lawyer should pursue a matter on behalf of a client despite opposition, obstruction, or personal inconvenience to the lawyer and take whatever lawful and ethical measures are required to vindicate a client's cause or endeavor."   A lawyer must exercise "zeal" in advocating for the client, but is not required "to press for every advantage that might be realized for a client."

## 3.   FRPC 4-4.1 – Candor in Dealing with Others

FRPC 4-4.1 prohibits a lawyer from knowingly making a false statement of material fact or law to a third person during the course of representation of a client.   A comment to this rule explains that "[m]isrepresentations can also occur by partially true but misleading statements or omissions that are the equivalent of affirmative false statements," and "[w]hether a particular statement should be regarded as one of fact can depend on the circumstances."

---

[199]   *See also* 28 U.S.C. § 530B(a), providing that government attorneys are subject to state laws and state and local federal court rules governing attorneys in each state where the government attorney engages in his duties.

[200]   The federal prosecutor does not have an individual "client," but rather represents the people of the United States.   *See generally* 28 U.S.C. § 547 (duties of U.S. Attorney); 28 C.F.R. § 0.5(b) (the Attorney General represents the United States in legal matters).

### 4.     FRPC 4-8.4 – Conduct Prejudicial to the Administration of Justice

FRPC 4-8.4(c) states that a lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

FRPC 4-8.4(d) prohibits a lawyer from engaging in conduct in connection with the practice of law that is prejudicial to the administration of justice.

In *Florida Bar v. Frederick*, 756 So. 2d 79, 87 (Fla. 2000), the court noted that FRPC 4-8.4(d) is not limited to conduct that occurs in a judicial proceeding, but can be applied to "conduct in connection with the practice of law."  In *Florida Bar v. Shankman*, 41 So. 3d 166, 172 (Fla. 2010), for example, an attorney's continuous hiring and firing of firms to assist in the client's matter resulted in delayed resolution of the case and constituted a violation of FRPC 4-8.4(d) due to the delay in the administration of justice and the increased costs to the client.[201]

---

[201]     OPR also examined FRPC 4-3.8, Special Responsibilities of a Prosecutor.  Nothing in the text of that rule, however, was relevant to the issues addressed in this Report.  A comment to FRPC Rule 4-3.8 notes that Florida has adopted the American Bar Association (ABA) Standards of Criminal Justice Relating to the Prosecution Function.  These "standards," however, are not binding rules of conduct but rather provide guidance to prosecutors.  Indeed, the ABA has expressly stated that these standards "are not intended to serve as the basis for the imposition of professional discipline, to create substantive or procedural rights for accused or convicted persons, to create a standard of care for civil liability, or to serve as a predicate for a motion to suppress evidence or dismiss a charge."  OPR does not consider the ABA standards as binding on the conduct of Department prosecutors.

[Page Intentionally Left Blank]

# CHAPTER TWO

## PART THREE:  ANALYSIS

## I.    OVERVIEW

Following the *Miami Herald* report in November 2018, media scrutiny of and public attention to the USAO's handling of its Epstein investigation has continued unabated.  At the heart of the public's concern is the perception that Epstein's 18-month sentence, which resulted in a 13-month term of actual incarceration, was too lenient and inadequately punished Epstein's criminal conduct.  Although many records have been released as part of civil litigation stemming from Epstein's conduct, the public has received only limited information regarding the decision-making process leading to the signed NPA.  As a result, questions have arisen about Acosta and his staff's motivations for entering into the NPA.  Publicly released communications between prosecutors and defense counsel, the leniency of the sentence, and an unusual non-prosecution provision in the NPA have led to allegations that Acosta and the USAO gave Epstein a "sweetheart deal" because they were motivated by improper influences, such as their preexisting and personal relationships with his attorneys, or even corrupt influences, such as the receipt of personal benefits from Epstein.

Through its investigation, OPR has sought to answer the following core questions:  (1) who was responsible for the decision to resolve the federal investigation through the NPA and for its specific terms; (2) did the NPA or any of its provisions violate Department policies or other rules or regulations; and (3) were any of the subjects motivated to resolve the federal investigation by improper factors, such as corruption or favoritism.  To the extent that available records and witness interviews shed light on these questions, OPR shows in detail the process that led to the NPA, from the initial complaint to the USAO through the intense and often confusing negotiation process.  After a thorough and detailed examination of thousands of contemporaneous records and extensive interviews of subjects and witnesses, OPR is able to answer most of the significant questions concerning the NPA's origins and development.  Although some questions remain, OPR sets forth its conclusions and the bases for them in this Part.

## II.    ACOSTA REVIEWED AND APPROVED THE TERMS OF THE NPA AND IS ACCOUNTABLE FOR IT

Although Acosta did not sign the NPA, he approved it, with knowledge of its terms.  He revised drafts of the NPA and added language that he thought appropriate.  Acosta told OPR that he either was informed of, or had access to information concerning, the underlying facts of the case against Epstein.  OPR did not find any evidence suggesting that any of his subordinates misled him about the facts or withheld information that would have influenced his decision, and Acosta did not make such a claim to OPR.  As Acosta affirmed in his OPR interview, the "three pronged resolution, two years . . . , registration and restitution, . . . ultimately that was approved on my authority. . . .  [U]ltimately, I approved it, and so, I . . . accept that.  I'm not . . . pushing away responsibility for it."

In making its misconduct assessments, OPR considers the conduct of subjects individually.  Menchel, Sloman, Lourie, and Villafaña were involved in the matter to varying degrees, at

different points in time, and regarding different decisions.  Menchel, for example, participated in formulating the USAO's initial written offer to the defense, but he had no involvement with actions or decisions made after August 3, 2007.  Sloman was absent during part of the most intense negotiations in September 2007 and did not see the final, signed version of the NPA until he returned.  Villafaña and Lourie participated in the negotiations, and Lourie either made decisions during the September 12, 2007 meeting with the defense and State Attorney's Office, or at least indicated agreement pending Acosta's approval.  In any event, whatever the level of Sloman's, Menchel's, Lourie's, and Villafaña's involvement, they acted with the knowledge and approval of Acosta.

Under OPR's analytical framework, an attorney who makes a good faith attempt to ascertain the obligations and standards imposed on the attorney and to comply with them in a given situation does not commit professional misconduct.  Evidence that an attorney made a good faith attempt to ascertain and comply with the obligations and standards imposed can include, but is not limited to, the fact that the attorney consulted with a supervisor.[202]  In this regard, OPR's framework is similar to a standard provision of the professional conduct rules of most state bars, which specify that a subordinate lawyer does not engage in misconduct if that lawyer acts in accordance with a supervisory lawyer's reasonable resolution of an arguable question of professional duty.  *See, e.g.*, FRPC 4-5.2(b).  Therefore, in addition to the fact that OPR did not find a violation of a clear and unambiguous standard as discussed below, OPR concludes that Menchel, Sloman, Lourie, and Villafaña did not commit professional misconduct with respect to any aspect of the NPA because they acted under Acosta's direction and with his approval.

### III.  OPR FOUND THAT NONE OF THE SUBJECTS VIOLATED A CLEAR AND UNAMBIGUOUS STATUTE, PROFESSIONAL RESPONSIBILITY RULE OR STANDARD, OR DEPARTMENT REGULATION OR POLICY, IN NEGOTIATING, APPROVING, OR ENTERING INTO THE NPA

A central issue OPR addressed in its investigation relating to the NPA was whether any of the subjects, in developing, negotiating, or entering into the NPA, violated any clear and unambiguous standard established by rule, regulation, or policy.  OPR does not find professional misconduct unless a subject attorney intentionally or recklessly violated a clear and unambiguous standard.  OPR considered three specific areas:  (1) standards implicated by the decision to decline a federal court prosecution; (2) standards implicated by the decision to resolve the federal investigation through a non-prosecution agreement; and (3) standards implicated by any of the NPA's provisions, including the promise not to prosecute unidentified third parties.  As discussed below, OPR concludes that in each area, and in the absence of evidence establishing that his decisions were based on corrupt or improper influences, the U.S. Attorney possessed broad discretionary authority to proceed as he saw fit, authority that he could delegate to subordinates, and that Acosta's exercise of his discretionary authority did not breach any clear and unambiguous standard.  As a result, OPR concludes that none of the subject attorneys violated a clear and

---

[202]    The failure to fully advise a supervisor of relevant and material facts can warrant a finding that the subordinate attorney has not acted in "good faith."  OPR did not find evidence supporting such a conclusion here, and Acosta did not claim that he was unaware of material facts needed to make his decision.

unambiguous standard or engaged in professional misconduct in developing, negotiating, or entering into the NPA, including its addendum.

## A.   U.S. Attorneys Have Broad Discretion to Resolve Investigations or Cases as They Deem Appropriate, and Acosta's Decision to Decline to Prosecute Epstein Federally Does Not Constitute Professional Misconduct

The U.S. Attorneys exercise broad discretion in enforcing the nation's criminal laws.[203] As a general matter, federal prosecutors "are designated by statute as the President's delegates to help him discharge his constitutional responsibility to 'take Care that the Laws be faithfully executed.'" *United States v. Armstrong,* 517 U.S. 456, 464 (1996) (quoting U.S. Const. art. II, § 3).   Unless based on an impermissible standard such as race, religion, or other arbitrary classification, a prosecutor's charging decisions—including declinations—are not dictated by law or statute and are not subject to judicial review. *See United States v. LaBonte,* 520 U.S. 751, 762 (1997) ("Such discretion is an integral feature of the criminal justice system, and is appropriate, so long as it is not based upon improper factors.").

Department policy guidance in effect at the time the USAO was handling the Epstein case helped ensure "the reasoned exercise of prosecutorial authority," but did not require "a particular prosecutorial decision in any given case."  USAM §§ 9-27.001, 9-27.120 (comment).  Rather than mandating specific actions, the USAM identified considerations that should factor into a prosecutor's charging decisions, including that the defendant was "subject to effective prosecution in another jurisdiction."  USAM § 9-27.220.  Importantly, U.S. Attorneys had "plenary authority with regard to federal criminal matters" and could modify or depart from the principles set forth in the USAM as deemed necessary in the interest of fair and effective law enforcement within their individual judicial districts.  USAM §§ 9-2.001, 9-27.140.  As stated in the USAM, "[t]he United States Attorney is invested by statute and delegation from the Attorney General with the broadest discretion in the exercise of such [prosecutive] authority," which includes the authority to decline prosecution.  USAM § 9-2.001.

In addition, the USAM contemplated that federal prosecutors would sometimes decline federal prosecution in deference to a state prosecution of the same conduct and provided guidance in the form of factors to be considered in making the decision, including the strength of the other jurisdiction's interest in prosecution, the other jurisdiction's ability and willingness to prosecute effectively, and the probable sentence or other consequences if the person is convicted in the other jurisdiction.  USAM § 9-27.240.[204]  A comment to this provision stated that the factors are "illustrative only, and the attorney for the government should also consider any others that appear relevant to hi[m]/her in a particular case."

---

[203]      *See, e.g.*, *Wayte,* 470 U.S. at 607; *United States v. Goodwin,* 457 U.S. 368, 380 n.11 (1982); *Bordenkircher,* 434 U.S. at 364; *Imbler,* 424 U.S. 409.

[204]      The discretionary authority under USAM § 9-27.240 to defer prosecution in favor of another jurisdiction is distinct from the Petite policy, which establishes guidelines for the exercise of discretion in determining whether to bring a federal prosecution based on conduct substantially the same as that involved in a prior state or federal proceeding.  *See* USAM § 9-2.031.

As the U.S. Attorney, and in the absence of evidence establishing that his decision was motivated by improper factors, Acosta had the "plenary authority" under federal law and under the USAM to resolve the case as he deemed necessary and appropriate.  As discussed in detail below, OPR did not find evidence establishing that Acosta, or the other subjects, were motivated or influenced by improper considerations.  Because no clear and unambiguous standard required Acosta to indict Epstein on federal charges or prohibited his decision to defer prosecution to the state, OPR does not find misconduct based on Acosta's decision to decline to initiate a federal prosecution of Epstein.

### B.    No Clear and Unambiguous Standard Precluded Acosta's Use of a Non-Prosecution Agreement to Resolve the Federal Investigation of Epstein

OPR found no statute or Department policy that was violated by Acosta's decision to resolve the federal investigation of Epstein through a non-prosecution agreement.

The prosecutor's broad charging discretion includes the option of resolving a case through a non-prosecution agreement or a related and similar mechanism, a deferred prosecution agreement.  *United States v. Fokker Servs. B.V.*, 818 F.3d 733 (D.C. Cir. 2016).  These agreements "afford a middle-ground option to the prosecution when, for example, it believes that a criminal conviction may be difficult to obtain or may result in unwanted collateral consequences for a defendant or third parties, but also believes that the defendant should not evade accountability altogether."  *Id.* at 738.  As with all prosecutorial charging decisions, the choice to resolve a case through a non-prosecution agreement or a deferred prosecution agreement "resides fundamentally with the Executive" branch.  *Id.* at 741.

OPR found no clear and unambiguous standard in the USAM prohibiting the use of a non-prosecution agreement in the circumstances presented in Epstein's case.  The USAM specifically authorized and provided guidance regarding non-prosecution agreements or deferred prosecution agreements made in exchange for a person's timely cooperation when such cooperation would put the person in potential criminal jeopardy and when alternatives to full immunity (such as testimonial immunity) were "impossible or impracticable."  USAM § 9-27.600 (comment).[205]  The "cooperation" contemplated was cooperation in the criminal investigation or prosecution of another person.  In certain circumstances, government attorneys were required to obtain approval from the appropriate Assistant Attorney General before entering into a non-prosecution agreement in exchange for cooperation.

Epstein, however, was not providing "cooperation" as contemplated by the USAM, and the USAM was silent as to whether a prosecutor could use a non-prosecution agreement in circumstances other than in exchange for cooperation in the investigation or prosecution of another.  Notably, although the USAM provided guidance and approval requirements in cases involving cooperation, the USAM did not prohibit the use of a non-prosecution agreement in other situations.  Accordingly, OPR concludes that the USAM did not establish a clear and unambiguous obligation prohibiting Acosta from ending the federal investigation through a non-prosecution

---

[205]    USAM § 9-27.650 required that non-prosecution agreements in exchange for cooperation be fully memorialized in writing.  Although this requirement was not applicable for the reasons given above, the NPA complied by fully memorializing the terms of the agreement.

agreement that did not require Epstein's cooperation nor did the USAM require Acosta to obtain Departmental approval before doing so.

### C.   The NPA's Individual Provisions Did Not Violate Any Clear and Unambiguous Standards

Although Acosta, as U.S. Attorney, had discretion generally to resolve the case through a non-prosecution agreement that deferred prosecution to the state, OPR also considered whether a clear and unambiguous standard governed any of the individual provisions of the NPA. Specifically, OPR examined Acosta's decision to permit Epstein to resolve the federal investigation by pleading guilty to state charges of solicitation of minors to engage in prostitution and solicitation to prostitution, with a joint, binding recommendation for an 18-month sentence of incarceration.   Because, as noted above, OPR found no clear guidance applicable to non-prosecution agreements not involving cooperation, OPR examined Departmental policies relating to plea offers to assess the propriety of the NPA's charge and sentence requirements.   OPR also examined the provision declining to prosecute Epstein's unidentified "potential co-conspirators," to determine whether that provision violated Departmental policy regarding grants of immunity. Finally, OPR considered whether there was a clear and unambiguous obligation under the Department's policy regarding the deportation of criminal aliens, which would have required further action to be taken against the two Epstein assistants who were foreign nationals.

After considering the applicable rules and policies, OPR finds that Acosta's decision to resolve the federal investigation through the NPA did not violate any clear and unambiguous standards and that Acosta had the authority to resolve the federal investigation through a state plea and through the terms that he chose.   Accordingly, OPR concludes that Acosta did not commit professional misconduct in developing, negotiating, or approving the NPA, nor did the other subjects who implemented his decisions with respect to the resolution.[206]

### 1.   Acosta Had Authority to Approve an Agreement That Required Epstein to Plead to Offenses Resulting in an 18-Month Term of Incarceration

Federal prosecutors have discretion to resolve a pending case or investigation through a plea agreement, including a plea that calls for the imposition of a specific, predetermined sentence. USAM §§ 9-27.330, 9-27.400; *see also* Federal Rule of Criminal Procedure 11(c)(1).

---

[206]   OPR also considered whether Acosta, Sloman, Menchel, Lourie, or Villafaña failed to comply with professional ethics standards requiring that attorneys exercise competence and diligence in their representation of a client.   Attorneys have a duty to provide competent, diligent representation to their clients, which generally requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation. *See, e.g.*, FRPC 4-1.1, 4-1.3.   The requirement of diligence obligates an attorney to exercise "zeal" in advocating for the client, but does not require the attorney "to press for every advantage that might be realized for a client." *See* FRPC 4-1.3 (comment).   Although OPR criticizes certain decisions made during the USAO's investigation of Epstein, those decisions, even if flawed, did not violate the standard requiring the exercise of competence or diligence.   The subjects exhibited sufficient knowledge, skill, preparation, thoroughness, and zeal during the federal investigation and the NPA negotiations to satisfy the general standards established by the professional responsibility rules.   An attorney may attain a flawed result but still exercise sufficient competence and diligence throughout the representation to meet the requirements of the standard.

Longstanding Department policy directs prosecutors to require the defendant to plead to the most serious readily provable charge consistent with the nature and extent of the defendant's criminal conduct, that has an adequate factual basis, is likely to result in a sustainable conviction, makes likely the imposition of an appropriate sentence and restitution order, and does not adversely affect the investigation or prosecution of others.   *See* USAM §§ 9-27.430, 9-27-300, 9-27.400 (comment).   The genesis of this policy, the Ashcroft Memo, specifically requires federal prosecutors to charge and pursue all readily provable charges that would yield the most substantial sentence under the Sentencing Guidelines.   However, the Ashcroft Memo articulates an important exception:  a U.S. Attorney or a "designated supervisory attorney" may authorize a plea that does not comport with this policy.[207]   Moreover, the Ashcroft Memo explains that a charge is not "readily provable" if the prosecutor harbors "a good faith doubt," based on either the law or the evidence, as to the government's ability to prove the charge at trial.

By its plain terms, the NPA arguably does not appear to satisfy the "most serious readily provable charge" requirement.   The draft indictment prepared by Villafaña proposed charging Epstein with a variety of federal crimes relating to sexual conduct with and trafficking of minors, and Epstein's sentencing exposure under the federal guidelines was in the range of 168 to 210 months' imprisonment.   The original "term sheet" presented to the defense proposed a "non-negotiable" requirement that Epstein plead guilty to three state offenses, in addition to the original state indictment, with a joint, binding recommendation for a two-year term of incarceration.   Instead, Epstein was permitted to resolve his federal criminal exposure with a plea to the state indictment and only one additional state offense, and an 18-month sentence.

As discussed more fully later in this Report, Acosta, Sloman, Menchel, and Lourie perceived risks to going forward to trial on the federal charges Villafaña outlined in the prosecution memorandum and identified for OPR concerns with both the evidence and legal theories on which a federal prosecution would be premised.   On the other hand, Villafaña felt strongly that federal charges should be brought, and the CEOS Chief reviewed the prosecution memorandum and twice opined that the charges were appropriate.   OPR found it unnecessary to resolve the question whether federal charges against Epstein were readily provable, however, because Acosta had

---

[207]   In addition to specified "Limited Exceptions," this authorization is available in "Other Exceptional Circumstances," as follows:

> Prosecutors may decline to pursue or may dismiss readily provable charges in other exceptional circumstances with the written or otherwise documented approval of an Assistant Attorney General, United States Attorney, or designated supervisory attorney. This exception recognizes that the aims of the Sentencing Reform Act must be sought without ignoring the practical limitations of the federal criminal justice system.  For example, a case-specific approval to dismiss charges in a particular case might be given because the United States Attorney's Office is particularly over-burdened, the duration of the trial would be exceptionally long, and proceeding to trial would significantly reduce the total number of cases disposed of by the office.  However, such case-by-case exceptions should be rare; otherwise the goals of fairness and equity will be jeopardized.

Ashcroft Memo at § I.B.6.  *See also* USAM §§ 9-2.001 and 27.140 (U.S. Attorneys' authority to depart from the USAM).

authority to deviate from the Ashcroft Memo's "most serious readily provable offense" requirement.

Although Acosta could not recall specifically how or by whom the decision was made to allow Epstein to plead to only one of the three charges identified on the original term sheet, or how or by whom the decision was made to reduce the sentencing requirement from two years to 18 months, Acosta was aware of these changes. He reviewed and approved the final NPA before it was signed. Department policy gave him the discretion to approve the agreement, notwithstanding any arguable failure to comply with the "most serious readily provable offense" requirement. Furthermore, the Ashcroft Memo does not appear to preclude a U.S. Attorney from deferring to a state prosecution, so it is not clear that the Memo's terms apply to a situation involving state charges. Accordingly, OPR concludes that the negotiation of an agreement that allowed Epstein to resolve the federal investigation in return for the imposition of an 18-month state sentence did not violate a clear and unambiguous standard and therefore does not constitute professional misconduct.

### 2. The USAO's Agreement Not to Prosecute Unidentified "Potential Co-Conspirators" Did Not Violate a Clear and Unambiguous Department Policy

Several witnesses told OPR that they believed the government's agreement not to prosecute unidentified "potential co-conspirators" amounted to "transactional immunity," which the witnesses asserted is prohibited by Department policy. Although "use immunity" protects a witness only against the government's use of his or her immunized testimony in a prosecution of the witness, and is frequently used by prosecutors, transactional immunity protects a witness from prosecution altogether and is relatively rare.

OPR found no policy prohibiting a U.S. Attorney from declining to prosecute third parties or providing transactional immunity. One section of the USAM related to immunity but applied only to the exchange of "use immunity" for the testimony of a witness who has asserted a Fifth Amendment privilege. *See* USAM § 9-23.100 *et seq.* Statutory provisions relating to immunity also address the same context. *See* 18 U.S.C. § 6002; 21 U.S.C. § 884. Moreover, apart from voluntariness or enforceability concerns, courts have not suggested that a prosecutor's promise not to prosecute a third party amounts to an inappropriate exercise of prosecutorial discretion. *See, e.g., Marquez*, 909 F.2d at 741-43; *Kemp*, 760 F.2d at 1248; *Stinson*, 839 So. 2d at 909; *Frazier*, 697 So. 2d 945. OPR found no clear and unambiguous standard that was violated by the USAO's agreement not to prosecute "potential co-conspirators," and therefore cannot conclude that negotiating or approving this provision violated a clear and unambiguous standard or constituted professional misconduct.

Notwithstanding this finding, in Section IV of this Part, OPR includes in its criticism of Acosta's decision to approve the NPA his approval of this provision without considering its potential consequences, including to whom it would apply.

### 3.   The NPA Did Not Violate Department Policy Relating to Deportation of Criminal Aliens

During the negotiations, the USAO rejected a defense-offered provision prohibiting the USAO from "request[ing], initiat[ing], or in any way encourag[ing] immigration authorities to institute immigration proceedings" against two female assistants.  However, OPR considered whether the April 28, 1995 memorandum imposed any obligation on the USAO to prosecute Epstein's two female assistants who were known to be foreign nationals—as Villafaña urged in her prosecution memorandum—and thus trigger their removal, or conversely, whether it precluded the USAO from agreeing not to prosecute them as part of a negotiated resolution.  OPR found nothing in the policy that created a clear and unambiguous standard in either regard.

The Attorney General's April 28, 1995 memorandum regarding "Deportation of Criminal Aliens" directed federal prosecutors to become involved actively and directly in the process of removing criminal aliens from the United States, and, along with USAM § 9-73.520, provided that "[a]ll deportable criminal aliens should be deported unless extraordinary circumstances exist." However, Epstein's two assistants were not "deportable" unless and until convicted of a crime that would have triggered their removal.  But neither the policy memorandum nor the USAM imposed an obligation on the USAO to prosecute or secure a conviction against a foreign national nor did either provision preclude the USAO from declining to prosecute an alien using the same broad discretion that otherwise applies to charging decisions.

The policy guidance also requires "prompt and close coordination" with immigration officials in cases involving alien defendants and specifies that prosecutors must notify immigration authorities before engaging in plea negotiations with alien defendants.  OPR learned during its investigation that an ICE agent participated in the Epstein investigation in its early stages. Moreover, because the USAO never engaged in plea negotiations with the two female assistants, who, in any event, had not been charged and were therefore not "defendants," no further notification was required.

## IV.   THE EVIDENCE DOES NOT ESTABLISH THAT THE SUBJECTS WERE INFLUENCED BY IMPROPER MOTIVES TO INCLUDE IN THE NPA TERMS FAVORABLE TO EPSTEIN OR TO OTHERWISE EXTEND BENEFITS TO EPSTEIN

OPR investigated whether any of the subjects—Acosta, Sloman, Menchel, Lourie, or Villafaña—was influenced by corruption, bias, or other improper motive, such as Epstein's wealth, status, or political associations, to include terms in the NPA that were favorable to Epstein, or whether such motives otherwise affected the outcome of the federal investigation.  OPR considered the case-specific reasons the subjects identified as the motivation for the USAO's July 31, 2007 "term sheet" and Acosta's approval of the NPA in September 2007.  OPR also thoroughly examined various factors forming the basis for allegations that the subjects were motivated by improper influences, including the subjects' preexisting relationships with defense counsel; the subjects' numerous meetings with Epstein's team of nationally known attorneys; emails between the subjects—particularly Villafaña—and defense counsel that appeared friendly, casual, and deferential to defense counsel; and inclusion in the NPA of a broad provision declining

to prosecute all of Epstein's co-conspirators. These factors are analyzed in the following discussions throughout this Section of the Report.

As a threshold matter, OPR's investigation of the subjects' decisions and actions in the Epstein matter uncovered no evidence of corruption such as bribery, gratuity, or illegal political or personal consideration. In addition, OPR examined the extensive contemporaneous documentary record, interviewed witnesses, and questioned the subject attorneys. The evidence shows three sets of issues influenced Acosta's decision to resolve the case through the NPA. The first—of main concern to Acosta—involved considerations of federalism and deference to state authority. The second arose from an assessment by Acosta's senior advisers—Sloman, Menchel, and Lourie—that the case carried substantial litigation risks, including both witness issues and what some viewed as a novel application of certain federal statutes to the facts of the Epstein case.[208] The third was Acosta's aim of obtaining a greater measure of justice for victims of Epstein's conduct and for the community than that proposed by the state.

Although the NPA and the process for reaching it can be criticized, as OPR does, OPR did not find evidence supporting a conclusion that the subjects were motivated by a desire to benefit Epstein for personal gain or because of other improper considerations, such as Epstein's wealth, status, or associations. That is not to say that Epstein received no benefit from his enormous wealth. He was able to hire nationally known attorneys who had prestige, skill, and extensive experience in federal and state criminal law and in conducting negotiations. He had the resources to finance an aggressive approach to the case that included the preparation of multiple written submissions reflecting extensive research and analysis, as well as multiple in-person meetings involving several of his attorneys and USAO personnel. He assembled a defense team well versed in the USAO and the Department, with the knowledge to maneuver through the Department's various levels and offices, a process unknown to many criminal defense attorneys and infrequently used even by those familiar with the Department's hierarchy. Access to highly skilled and prominent attorneys is not unusual in criminal cases involving corporations and their officers or certain other white collar defendants, but it is not so typical for defendants charged with sex crimes or violent offenses. Nonetheless, while recognizing that Epstein's wealth played a role in the outcome because he was able to hire skilled and assertive attorneys, OPR concludes that the subjects were not motivated to resolve the federal investigation to Epstein's benefit by improper factors.

A.    **OPR Found No Evidence of Criminal Corruption, Such as Bribery, Gratuity, or Illegal Political or Personal Consideration**

Some public criticism of the USAO's handling of the Epstein matter implied that the subjects' decisions or actions may have been motivated by criminal corruption, although no specific information substantiating such implications was identified. Throughout its investigation,

---

[208]    Sloman asserted throughout his OPR interview that he did not participate in substantive discussions about the Epstein investigation before the NPA was signed, and his attorney argued in his comments on OPR's draft report that OPR should not attribute to Sloman any input in Acosta's decisions about how to resolve the case. However, Sloman was included in numerous emails discussing the merits of and issues relating to the investigation, participated in meetings with the defense team, and, according to Acosta, was one of the senior managers whom Acosta consulted in determining how to resolve the Epstein investigation.

OPR was attentive to any evidence that any of the subjects was motivated by bribes, gratuities, or other illegal political or personal considerations, and found no such indication.[209]  Witnesses, including law enforcement officials, were specifically asked whether they had any information indicating such corruption, and all—notwithstanding the harsh criticism by some of those same witnesses of the Epstein matter's outcome—stated that they did not.  Specifically, the FBI case agent told OPR that she did not believe there had been any illegal influence, and that if she had perceived any, she "would have gone screaming" to the FBI's public corruption unit.  The co-case agent and the FBI supervisors up through the Special Agent in Charge likewise told OPR that they were unaware of any indication that a prosecutor acted in the matter because of illegal factors such as a gratuity or bribe or other corrupt influence, and that any such indication would immediately have been referred for criminal investigation by the FBI.

**B.**     **Contemporaneous Written Records and Witness and Subject Interviews Did Not Reveal Evidence Establishing That the Subjects Were Improperly Influenced by Epstein's Status, Wealth, or Associations**

Although Epstein's name is now nationally recognized, in 2006 and 2007, he was not a familiar national figure or even particularly well known in Florida.  All five subjects told OPR that when they first learned of the investigation, they had not heard of Epstein.  Similarly, the FBI case agent told OPR that when the investigation began, no one in the FBI appeared to have heard of Epstein, and other witnesses also told OPR that they were initially unfamiliar with Epstein.  However, news reports about Epstein's July 2006 arrest on the state indictment, which where contemporaneous with the beginning of the federal investigation, identified him as a wealthy Palm Beach resident with influential contacts, including William Clinton, Donald Trump, Kevin Spacey, and Alan Dershowitz, and other "prominent businessmen, academics and scientists."[210]  Villafaña, Lourie, Sloman, and Acosta learned of this press coverage early in the investigation, and thus understood that Epstein was wealthy and associated with notable public figures.[211]  The FBI case agent also told OPR that "we knew who had been on his plane, we knew . . . some of his connections."

**1.**     **The Contemporaneous Records Did Not Reveal Evidence Establishing That the NPA Resulted from Improper Factors**

OPR found no evidence in the extensive contemporaneous documentary record that the terms of the NPA resulted from improper factors, such as Epstein's wealth or influential connections.  Epstein's legal team overtly raised Epstein's financial status in arguing for a sentence that did not include a term of imprisonment on the ground that Epstein would be extorted in prison, but the USAO insisted that Epstein serve a term of incarceration.  Defense counsel mentioned former President Clinton in one pre-NPA letter, but that reference was made in the context of a

---

[209]     OPR's jurisdiction does not extend to the investigation of allegations of criminal activity.  If OPR had found indication of criminal activity, it would have referred the matter to the appropriate Department investigative agencies.

[210]     Larry Keller, "Billionaire solicited prostitutes three times, indictment says," *Palm Beach Post*, July 24, 2006; Nicole Janok, "Consultant to the rich indicted, jailed," *Palm Beach Post*, July 24, 2006.

[211]     Lourie later made Menchel aware of Epstein's prominence in the course of forwarding to Menchel the initial prosecution memorandum.

narrative of Epstein's philanthropic activities, rather than presented as a suggestion that Epstein's association to the former President warranted leniency and, in any case, the USAO rejected the defense argument that the matter should be left entirely to the state's discretion.[212]   The defense submission to the Deputy Attorney General contained a direct reference to Epstein's connection to former President Clinton, but that submission was made well after the NPA was negotiated and signed, and in it, counsel contended that the USAO had treated Epstein too harshly because of his association with the former President.[213]

## 2.    The Subjects Asserted That They Were Motivated by Reasonable Strategic and Policy Considerations, Not Improper Influences

In addition to reviewing the documentary evidence, OPR questioned the five subject attorneys, all of whom denied being personally influenced by Epstein's wealth or status in making decisions regarding the investigation, in the decision to resolve the case through an NPA, or in negotiating the NPA.   Villafaña, in particular, was concerned from the outset of the federal investigation that Epstein might try to employ against the USAO the same pressure that she understood had been used with the State Attorney's Office, and she proactively took steps to counter Epstein's possible influence by meeting with Acosta and Sloman to sensitize them to Epstein's tactics.   Both Acosta and Sloman told OPR that the USAO had handled cases involving wealthy, high-profile defendants before, including the Abramoff case.   Acosta told OPR, "[W]e tried to treat [the case] fairly, not looking at . . . how wealthy is he, but also not saying we need to do this because he is so wealthy."   Menchel expressed a similar view, telling OPR that he did not believe "it's appropriate to go after somebody because of their status one way or the other."   Lourie told OPR that Epstein's status may have generated more "front office" involvement in the case, but it did not affect the outcome, and Sloman "emphatically disagree[d]" with the suggestion that the USAO's handling of the case had been affected by Epstein's wealth or influential connections. Other witnesses corroborated the subjects' testimony on this point, including the FBI case agents, who told OPR that no one ever communicated to them that they should treat Epstein differently because of his wealth.   The CEOS Chief told OPR that he did not recall anyone at the USAO expressing either qualms or enthusiasm about proceeding against Epstein because of his wealth and influence.

OPR takes note of but does not consider dispositive the absence of any affirmative evidence that the subjects were acting from improper motivations or their denial of such motivations.   Of more significance, and as discussed more fully below, was the fact that contemporaneous records support the subjects' assertions that the decision to pursue a pre-charge resolution was based on various case-specific legal and factual considerations.[214]   OPR also

---

[212]    In the pre-NPA letter to the USAO, counsel recited a litany of Epstein's purported good deeds and charitable works, including a trip Epstein took to Africa with former President Clinton to raise awareness of AIDS, and counsel also noted that the former President had been quoted by *New York Magazine* describing Epstein as "a committed philanthropist."

[213]    In the letter to the Deputy Attorney General, counsel suggested that the prosecution may have been "politically motivated" due to Epstein's "close personal association with former President Bill Clinton."

[214]    OPR also considered that all five subjects provided generally consistent explanations regarding the factors that influenced Acosta's decision to resolve the federal investigation through the NPA.   Sloman, Menchel, Lourie, and Villafaña all had long careers with the Department, and OPR considers it unlikely that they would all have joined with

considered that the USAO's most pivotal decisions—to resolve the case through an NPA requiring Epstein to serve time in jail, register as a sexual offender, and provide monetary damages to victims—had been made by July 31, 2007, when the USAO presented its "term sheet" to the defense.  This was before Acosta had ever met with defense counsel and when he had not indicated any plans to do so.  It also was well before Acosta's October 12, 2007 breakfast meeting with defense counsel Lefkowitz, which received strong public and media criticism.  OPR also considered significant the fact that although the USAO made numerous concessions in the course of negotiating the final NPA, the USAO did not accede to the defense request that the USAO end federal involvement altogether and return the matter to the state authorities to handle as they saw fit, and the USAO refused to eliminate its requirement that Epstein register as a sexual offender, despite a strong push by the defense that it do so.

### 3.    Subject and Witness Interviews and Contemporaneous Records Identified Case-Specific Considerations Relating to Evidence, Legal Theories, Litigation Risk, and a Trial's Potential Impact on Victims

Acosta, Sloman, Menchel, and Lourie told OPR that they did not recall the specific content of discussions about the challenges presented by a potential federal prosecution or reasons for Acosta's decision to resolve the federal investigation through the NPA, but they and Villafaña identified for OPR several case-specific factors, unrelated to Epstein's wealth or associations, that either did or likely would have been included in those discussions and that OPR concludes likely influenced Acosta's decision-making.  These considerations included assessment of the evidentiary risks and the potential impact of a trial on the victims.  For the most part, however, these factors appear more aptly to pertain to the decision to resolve the case through a pre-charge disposition, but do not directly explain why Acosta chose to resolve the federal investigation through a guilty plea in state court.  That decision appears to have stemmed from Acosta's concerns about intruding into an area he believed was traditionally handled by state law enforcement authorities.

In a declaration submitted to the district court in 2017 in connection with the CVRA litigation, Villafaña explained the USAO's rationale for terminating the federal investigation through the NPA:

> Prior to the Office making its decision to direct me to engage in negotiations with Epstein's counsel, I discussed the strengths and weaknesses of the case with members of the Office's management, and informed them that most of the victims had expressed significant concerns about having their identities disclosed. . . .  It is my understanding from these and other discussions that these factors, that is, the various strengths and weaknesses of the case and the various competing interests of the many different victims (including the privacy concerns expressed by many), together with the Office's desire to obtain a guaranteed sentence of incarceration for Epstein, the equivalent of uncontested restitution for the victims,

---

Acosta to improperly benefit Epstein or would have remained silent if they suspected that Acosta, or any of their colleagues, was motivated by improper influences.

and guaranteed sexual offender registration by Epstein . . . were among the factors [that led to the NPA].[215]

During her OPR interview, Villafaña similarly described the victims' general reluctance to go forward with a trial:

> [W]hen we would meet with victims, we would ask them how they wanted the case to be resolved. And most of them wanted the case to be resolved via a plea. Some of them wanted him not to be prosecuted at all. Most of them did not want to have to come to court and testify. They were very worried about their privacy rights.[216]

In his written response to OPR, Lourie stated that although he did not specifically recall the issues Villafaña set forth in her declaration, he believed they would have been important to the USAO in 2007. Lourie also told OPR that he generally recalled concerns within the USAO about the charges and a potential trial:

> [M]y vague recollection is that I and others had concerns that there was a substantial chance we would not prevail at both trial and on appeal after a conviction, resulting in no jail time, no criminal

---

[215]   *Doe v. United States*, No. 9:08-cv-80736 (S.D. Fla.), Declaration of A. Marie Villafaña in Support of Government's Response and Opposition to Petitioners' Motion for Partial Summary Judgment and Cross-Motion for Summary Judgment at 8-9 (June 2, 2017).

[216]   These concerns are also reflected in a 2017 declaration filed by the FBI case agent in the CVRA litigation, in which she stated, "During interviews conducted from 2006 to 2008, no victims expressed a strong opinion that Epstein be prosecuted." She further described the concerns of some of the victims:

> Throughout the investigation, we interviewed many [of Epstein's] victims . . . . A majority of the victims expressed concern about the possible disclosure of their identities to the public. A number of the victims raised concerns about having to testify and/or their parents finding out about their involvement with Mr. Epstein. Additionally, for some victims, learning of the Epstein investigation and possible exposure of their identities caused them emotional distress. Overall, many of the victims were troubled about the existence of the investigation. They displayed feelings of embarrassment and humiliation and were reluctant to talk to investigators. Some victims who were identified through the investigation refused even to speak to us. Our concerns about the victims' well-being and getting to the truth were always at the forefront of our handling of the investigation.

In addition, during the CVRA litigation, an attorney representing several victims filed a pleading to protect the anonymity of his clients by preventing disclosure of their identities to the CVRA petitioners. *See* Response to Court Order of July 6, 2015 and United States' Notice of Partial Compliance (July 24, 2015). It is noteworthy that in 2020, when OPR attempted to contact victims, through their counsel, for interviews or responses to written questions regarding contacts with the USAO, OPR was informed that most of the victims were still deeply concerned about remaining anonymous. One victim described to OPR how she became distraught when, during the USAO's investigation, the FBI left a business card at her parents' home and, as a result, her parents learned that she was a victim of Epstein. At the time, the victim was a teenager; was "nervous, scared, and ashamed"; and did not want her parents to know about the case.

145

record, no restitution, no sex offender status, publication at a trial of the names of certain victims that didn't want their names revealed and the general difficulties of a trial for the victims and their families.

Although his emails showed that, at the time, he advocated for prosecution of Epstein, Lourie told OPR it was also his general recollection that "everybody at the USAO working on the matter had expressed concerns at various times about the long-term viability of a federal prosecution of Epstein due to certain factual and legal hurdles, as well as issues with the cooperation and desires of the victims."

Similarly, Menchel—who had experience prosecuting sexual assault crimes—recalled understanding that many of the victims were unwilling to go forward and would have experienced additional trauma as a result of a trial, and some had made statements exonerating Epstein. Menchel told OPR he believed that if the USAO had filed the proposed charges against Epstein, Epstein would have elected to go to trial. In Menchel's view, the USAO therefore had to weigh the risk of losing at trial, and thereby re-traumatizing the victims, against the benefits gained through a negotiated result, which ensured that Epstein served time in jail, registered as a sexual offender, and made restitution to his victims.

Sloman also recalled witness challenges and concerns about the viability of the government's legal theories. He told OPR:

> [I]t seemed to me you had a tranche of witnesses who were not going to be reliable. You had a tranche [of] witnesses who were going to be severely impeached. People who loved Jeffrey Epstein who thought he was a Svengali . . . who were going to say I told him I was 18 years old.
>
> You had witnesses who were scared to death of the public light being shown on them because their parents didn't even know -- had very vulnerable victims. You had all of these concerns.

Acosta told OPR that he recalled discussions with his senior managers about the victims' general credibility and reluctance to testify and the evidentiary strength of the case, all of which factored into the resolution. He acknowledged that his understanding of the facts was not "granular" and did not encompass a detailed understanding of each victim's expected testimony, but he trusted that his "team" had already "done the diligence necessary" to make recommendations about the evidentiary strength of the case. Acosta recalled discussing the facts with Sloman and Menchel, and possibly Lourie, none of whom had as detailed an understanding of the facts as Villafaña. Nevertheless, OPR credits Acosta's statement that he reasonably believed, based on his conversations with others who expressed this view, that a trial would pose significant evidentiary challenges.

Other witnesses corroborated the subjects' testimony regarding witness challenges, including the FBI co-case agent, who recalled during his OPR interview that some of the victims had expressed concern for their safety and "a lot of them d[id]n't want to take the stand, and

146

d[id]n't want to have to relive what happened to them."[217]   The co-case agent told OPR that one of the "strategies" for dealing with the victims' fear was "to keep them off the stand," and he generally remembered discussions about resolving the Epstein case in a way that protected the victims' identities.   In addition, the CEOS Trial Attorney who briefly worked with Villafaña on the case after the NPA was signed told OPR that in her meetings with some of the victims, she formed the impression that they were not interested in the prosecution going forward.   The CEOS Trial Attorney told OPR that "[the victims] would have testified," but would have required an extensive amount of "victim management" because they were "deeply embarrassed" about potentially being labeled as prostitutes.   The CEOS Trial Attorney also told OPR that "there were obvious weaknesses in the case," from an evidentiary perspective.[218]

The contemporaneous records also reflect discussions of, or references to, various legal and factual issues or other concerns about the case.   For example, in an early email to Menchel, Lourie noted that two key issues raised by Villafaña's proposed charges were whether the USAO could prove that Epstein traveled for the purpose of engaging in sex acts, and the fact that some minor victims had told Epstein they were 18.   He later opined to Acosta and Menchel that "there is some risk on some of the statutes [proposed in Villafaña's prosecution memorandum] as this is uncharted territory to some degree."   In his July 5, 2007 email to Villafaña, Menchel cited Acosta's and Sloman's "concerns about taking this case because of [the P]etit policy and a number of legal issues" and Acosta's concerns about "hurting Project Safe Childhood."   Defense counsel raised myriad legal and factual challenges in their voluminous letters to the USAO.   Defense submissions attacked the legal theories for a federal prosecution and detailed factors that could have undermined victims' credibility, including victim statements favorable to Epstein and evidence of victim drug and alcohol use, as well as the fact that some victims recruited other victims and purportedly lied to Epstein about their ages.

Acosta also recalled that although his "team" had expressed concern about the "trial issues," his own focus had been on "the legal side of things."   Notably, during his prior tenure as the Assistant Attorney General in charge of the Department's Civil Rights Division, Acosta had been involved in efforts to address sex trafficking.   He told OPR that one of the "background issues" that the Civil Rights Division addressed under his leadership, and which influenced his view of the Epstein case, was the distinction between sex trafficking and solicitation of prostitution.   Specifically, he was concerned about avoiding the creation of potentially unfavorable federal precedent on the point of delineation between prostitution, which was traditionally a matter of state concern, and sex trafficking, which remained a developing area of federal interest in 2007.[219]

---

[217]      In an affidavit filed in the CVRA litigation, the co-case agent noted that in early 2007, when he located a victim living outside of the United States, she claimed only to "know Jeffrey Epstein," and stated that she "moved away to distance herself from this situation," and "asked that [the agent] not bother her with this again."

[218]      In April 2007, a victim who was represented by an attorney paid by Epstein participated in a video-recorded interview with the FBI, with her attorney and his investigator present.   This victim denied being involved in, or being a victim of, criminal activity.   Later, the victim obtained new counsel and joined the CVRA litigation as "Jane Doe #2."

[219]      In his March 20, 2011 letter, addressed "To whom it may concern," and published online in *The Daily Beast*, Acosta described "a year-long assault on the prosecution and the prosecutors" by "an army of legal superstars."   Most of the allegations made against the prosecutors occurred after the NPA was signed and certainly after Acosta approved

The USAO might have been able to surmount the evidentiary, legal, and policy issues presented by a federal prosecution of Epstein. Villafaña, in particular, believed she could have prevailed had she taken the case to trial, and even after the NPA was negotiated, she repeatedly recommended declaring Epstein in breach and proceeding with an indictment, because she continued to have confidence in the case.[220]   Oosterbaan and others also believed that the government would succeed at trial. Furthermore, the victims were not a uniform group. Some of them were afraid of testifying or having their identities made public; others wanted Epstein prosecuted, but even among those, it is not clear how many expressed a willingness to testify at a trial; and still others provided information favorable to Epstein.   In the end, Acosta assumed responsibility for deciding how to resolve the Epstein investigation and weighing the risks and benefits of a trial versus those of a pre-charge disposition.   His determination that a pre-charge disposition was appropriate was not unreasonable under the circumstances.

Although evidentiary and witness issues explain the subject supervisors' concerns about winning a potential trial and why the USAO would have sought some sort of pre-charge disposition, they do not fully explain why Acosta decided to pursue a state-based resolution as opposed to a traditional federal plea agreement.  OPR did not find in the contemporaneous records a memorandum or other memorialization of the reasoning underlying Acosta's decision to offer a state-based resolution or the terms offered to the defense on July 31, 2007.

According to Acosta, "In 2006, it would have been extremely unusual for any United States Attorney's Office to become involved in a state solicitation case, even one involving underage teens," because solicitation was "the province of state prosecutors."   Acosta told OPR that he developed "a preference for deferring to the state" to "make it clear that [the USAO was] not stepping on something that is a purely local matter, because we [didn't] want bad precedent for the sake of the larger human trafficking issue." Acosta also told OPR that it was his understanding that the PBPD would not have brought the case to federal investigators if the State Attorney's Office had pursued a sanction against Epstein that included jail time and sexual offender registration.  Acosta viewed the USAO's role in the case as limited to preventing the "manifest injustice" that, in Acosta's view, would have resulted from the state's original plea proposal. Acosta acknowledged that if the investigation had begun in the federal system, he would not have viewed the terms set out in the NPA as a satisfactory result, but it was adequate to serve as a "backstop" to the state's prosecution, which he described as "a polite way of saying[, ']encouraging the state to do a little bit more.[']"   In sum, Acosta told OPR that the Epstein case lay in "uncharted territory," there was no certainty that the USAO would prevail if it went to trial, and a potentially unfavorable outcome had to be "weighed against a certain plea with registration that would make sure that the public knew that this person was a sex offender."

Acosta told OPR that he discussed the case primarily with Sloman and Menchel, and both told OPR that while they did not share Acosta's federalism concerns, they recalled that Acosta had

---

the terms offered to the defense on July 31, 2007.  Therefore, any allegations against the prosecutors could not have played a significant role in Acosta's decisions as reflected in the term sheet.

[220]      Sloman told OPR that Villafaña "always believed in the case."

been concerned about policy and federalism issues.[221]  Sloman told OPR that although he did not remember specific conversations, he generally recalled that Acosta had been "sensitive to" Petite policy and federalism concerns, which Sloman described as whether the USAO was "overstepping our bounds by taking what is a traditional state case that was in the State Attorney's Office that was resolved by the State Attorney's Office at some level."  During his OPR interview, Menchel remembered that Acosta approached the case from "a broader policy perspective" and was worried about "the impact that taking the case in federally may have on . . . other programs," although Menchel did not recall specifically what those programs were.

### C.   Other Significant Factors Are Inconsistent with a Conclusion That the Subjects' Actions Were Motivated by Improper Influences

OPR considered additional aspects of the Epstein case that were inconsistent with a suggestion that Acosta's decision to offer the July 31, 2007 terms was driven by corruption, a desire to provide an improper benefit to Epstein, or other improper influences.

First, OPR considered highly significant the fact that if Acosta's primary motivation was to benefit Epstein, he had an option even more favorable to Epstein available to him.  The NPA required Epstein to serve time in jail and register as a sexual offender, and provided a mechanism for the victims to seek monetary damages—outcomes unlikely if the matter had been abandoned and sent back to the state for whatever result state authorities deemed appropriate.  Epstein's attorneys had vehemently argued to the USAO that there was no federal interest in the investigation and that his conduct was exclusively a matter of state concern.  If the USAO had declined to intervene in the case, as Epstein's counsel repeatedly and strongly argued it should, the state would have meted out the sole punishment for his behavior.  Under the state's original plan, Epstein likely would have received a sentence of probation.  Menchel described such a result as a mere "slap on the wrist," with "no jail time, no felony sex offense, no sexual offender registration, [and] no restitution for the victims."  Instead of acceding to Epstein's proposal, however, the USAO devised a resolution of the federal investigation that, although widely criticized as inadequate to address the seriousness of Epstein's conduct, nevertheless penalized Epstein more than a guilty plea to the state's original charge, standing alone, would have done.  Acosta's affirmative decision to intervene and to compel a more stringent and just resolution than the state had proposed, rather than exercising his discretion to quietly decline prosecution, is strong circumstantial evidence that he was not acting for the purpose of benefiting Epstein.[222]  Similarly, despite defense counsel's repeated requests to eliminate the sexual offender registration requirement, Acosta refused to

---

[221]   Sloman stated that although Acosta "was sensitive to [P]etite policy concerns, federalism concerns, . . . I was not."  Menchel commented, "I don't think it would have been a concern of mine."

[222]   Menchel also pointed out during his OPR interview that Acosta was Republican and "had nothing to gain" by showing favoritism to Epstein, who had been portrayed in the media as "this big Democratic donor."  Villafaña recounted for OPR an exchange between the USAO team and a defense attorney who argued in one meeting that—

> we were prosecuting [Epstein] because he was Jewish.  We then pointed out that a number of members of [the USAO] chain of command were Jewish.  Then he said, well we're prosecuting him because he was a Democrat.  And again, we pointed out that a number of us were Democrats.  So then it went to, we were prosecuting him because he was wealthy. . . .  That one didn't work so well.

149

reconsider the provision.  Acosta could certainly have modified or eliminated the provision entirely if his motivation was to benefit Epstein or Epstein's attorneys.

Second, Epstein himself was not satisfied with the NPA.  Immediately after signing the agreement, he sought to have the Department nullify it by declaring federal involvement in the investigation inappropriate.  In addition to repeatedly attacking the NPA in his submissions to the Department, Epstein added to his evidentiary challenges and federalism claims allegations of misconduct and improper bias on the part of specific USAO personnel.  Epstein's dissatisfaction with the NPA, and his personal attacks on individual prosecutors involved in negotiating the agreement, appear inconsistent with a conclusion that the subjects designed the NPA for Epstein's benefit.

### D. OPR Does Not Find That the Subjects' Preexisting Relationships with Defense Counsel, Decisions to Meet with Defense Counsel, and Other Factors Established That the Subjects Acted from Improper Influences or Provided Improper Benefits to Epstein

In evaluating the subjects' conduct, OPR considered various other factors featured in media accounts to show that the subjects provided improper benefits to Epstein or which purportedly suggested that the subjects acted from improper influences.  OPR examined these factors but did not find that they supported a finding that the subjects were influenced by favoritism, bias, or other improper motivation.

### 1. The Evidence Does Not Establish That the Subjects Extended Any Improper Benefit to Epstein because of Their Preexisting Relationships with His Attorneys

Epstein's wealth enabled him to hire multiple attorneys who had preexisting personal connections to some of the government attorneys involved in his case, in the State Attorney's Office, in the USAO, and elsewhere in the Department.  Based on the attorneys Epstein selected to represent him, a reasonable inference can be drawn that Epstein believed that hiring attorneys with relationships to the prosecutors would be beneficial to him.  One of the first attorneys who contacted the USAO on Epstein's behalf was Guy Lewis, a former AUSA in and U.S. Attorney for the Southern District of Florida.  Villafaña and Lourie had worked for Lewis, and Lourie was close friends with one of Lewis's law partners.  Epstein also retained Lilly Ann Sanchez, a former AUSA who had been Menchel's deputy and with whom he had socialized.  Later, when Epstein was seeking Acosta's personal involvement in the case, Epstein hired Kenneth Starr and Jay Lefkowitz, prominent attorneys from Kirkland & Ellis with whom Acosta was acquainted from his previous employment with that firm.

Villafaña told OPR that she believed Acosta "was influenced by the stature of Epstein's attorneys."  Critically, however, other than the information regarding Menchel that is discussed in the following subsection, neither Villafaña nor any of the other individuals OPR interviewed identified any specific evidence suggesting that Acosta, or any of the other subjects, extended an improper favor or benefit to Epstein because of a personal relationship with defense counsel (or for any other improper reason).  Villafaña explained how, in her view, the "legal prowess" of Epstein's attorneys had an impact on the case:

> [O]ne of the issues in the case was the . . . defense's ability to
> describe the case or characterize the case as being legally complex.
> It was not as legally complex as they made it out to be. But because
> they were able to convince members of our office that it was
> somehow extremely novel and legally complex, the issue became
> who was likely to succeed in arguing these legal issues. And
> because of that, the legal prowess, if you will, of the attorneys [ ]
> [became] something to consider.
>
> . . . .
>
> I think that the ability of Alan Dershowitz and Ken Starr and Jay
> Lefkowitz to convince Alex Acosta that I didn't know what I was
> talking [about] also, all came into play. So I think there were a
> number of factors and it all came together.

Although Villafaña was critical of Acosta's consideration of the defense arguments, she conceded that the defense team's tactics demonstrated effective advocacy. Certainly, throughout the case, Epstein's attorneys prepared lengthy memoranda analyzing the evidence and arguing nuanced legal points concerning federalism, the elements of numerous federal criminal statutes, and the evidence relevant to those statutes, but it is not unusual or unreasonable for prosecutors to carefully consider well-crafted legal arguments from defense counsel.

There is little question that Epstein's extensive team of attorneys was able to obtain negotiated benefits for Epstein—although the USAO never wavered from its three core requirements, it did agree to a reduction in prison time from its original offer, and it granted Epstein certain other concessions during the negotiations. Epstein's wealth provided him with skilled, experienced negotiators who continually sought various incremental concessions, and with attorneys who knew how to obtain Department review of a USAO matter, thereby delaying undesired outcomes for as long as possible.[223] Despite Epstein's evident intentions, however, OPR did not find evidence warranting a conclusion that the NPA or its terms resulted from the subjects' relationships with the attorneys he had selected to represent him.

### 2.    The Subjects Asserted That Their Relationships with Defense Counsel Did Not Influence Their Actions

Acosta, Menchel, Sloman, and Lourie each asserted that Epstein's choice of counsel did not affect his handling of the case. Menchel told OPR that once in private practice, former colleagues often became adversaries. In Menchel's view, such preexisting relationships were useful because they afforded a defense attorney initial credibility and an insight into the issues a prosecutor would likely view as areas of concern, which enabled the defense attorney to "tailor" arguments in a way that would maximize their persuasive impact on the USAO. Menchel told OPR, however, that these advantages did not "move the needle in any major way," and he "reject[ed] the notion" that anyone in the USAO had been "swayed" because of preexisting

---

[223]    As Chief Reiter later observed in his deposition testimony, "[T]he Epstein case was an instance of a many million dollars defense and what it can accomplish."

friendships or associations with any of Epstein's attorneys.  In fact, Menchel told OPR that he and his USAO colleagues viewed Epstein's attempt to exert influence through his choice of counsel as "ham-fisted" and "clumsy."

Sloman told OPR that although he became aware that Lourie was friends with Guy Lewis and Lewis's law partner, he was unaware of personal relationships between any of his other colleagues and any of Epstein's attorneys, but that in any event his attitude regarding cases involving former colleagues "was that we would give them process, but we didn't pull any punches with them."  In Sloman's view, preexisting relationships with defense counsel did not "change the equation" because as AUSAs, he and his colleagues were motivated by what they perceived to be best for the case.

Lourie told OPR that his preexisting associations with Epstein's attorneys "didn't influence anything."  Notably, at the outset of the Epstein case, Lourie sought guidance from the USAO's Professional Responsibility Officer about the propriety of his role as a supervisor in the investigation, because of his acquaintance with Lewis and long-time friendship with Lewis's law partner.  OPR considered Lourie's caution in seeking and obtaining the Professional Responsibility Officer's advice as an indication that he was alert to his ethical responsibilities regarding relationships with defense counsel, including avoiding the appearance of a conflict of interest.

Acosta said during his OPR interview that he "developed" the three criteria reflected on the term sheet—a sentence of incarceration, sexual offender registration, and monetary damages for the victims—before he engaged directly with any of Epstein's attorneys and before Epstein added Starr and Lefkowitz, the Kirkland & Ellis attorneys, to his team.  Acosta pointed out that the USAO continued to insist on a resolution that satisfied all three of those criteria even after Kirkland & Ellis became involved in the case.

Acosta took other actions that appear inconsistent with an intent to benefit Starr and Lefkowitz.  On several occasions, when directly appealed to by Lefkowitz or Starr, he directed them to address their communications to Villafaña, Sloman, and other subordinates.  After his October 12, 2007 breakfast meeting with Lefkowitz, Acosta immediately communicated with Sloman about their conversation.  In late 2008, when Acosta anticipated leaving the USAO and was considering pursuing employment with Kirkland & Ellis, he recognized the conflict of interest and instructed Sloman to stop copying him on emails relating to the Epstein matter.  On Acosta's behalf, the USAO's Professional Responsibility Officer sought and obtained formal Department approval of Acosta's recusal from the case based on the fact that he had "begun to discuss possible employment" with Kirkland & Ellis.  These actions support Acosta's assertion that he was cognizant of his ethical responsibilities concerning relationships with defense counsel.[224]

---

[224]    In addition, in May 2008, the USAO's Professional Responsibility Officer consulted with the Department's Professional Responsibility Officer about whether Acosta should recuse from the Epstein matter because he was considering seeking a visiting professorship at Harvard Law School in 2009, and Dershowitz—a Harvard Law School professor—was representing Epstein "as a private, paying client, and not as any part of a Harvard Law School clinic or law school teaching program" and "should have no role in deciding whether Mr. Acosta is offered any position as a visiting professor."  The Department advised that these facts provided no basis for recusal.

In its review of the documentary record, OPR examined an email written by Villafaña in 2018, more than a decade after the NPA was negotiated, in which she suggested that the two-year sentence requirement in the initial "term sheet" provided to the defense was developed by Menchel as a favor to defense attorney Sanchez.  OPR examined the facts surrounding this allegation and determined that there was no merit to it.  Specifically, in December 2018, after the *Miami Herald* investigative report renewed public attention to the case, Villafaña recounted in an email to a supervisory AUSA, a conversation she recalled having had with Sloman about the case.[225]  In the email, Villafaña stated that she had not been a participant in discussions that led to Acosta's decision to offer a two-year plea deal, but she added the following:  "Months (or possibly years) later, I asked former First Assistant Jeff Sloman where the two-year figure came from.  He said that Lily [*sic*] Ann Sanchez (attorney for Epstein) asked Mr. Menchel to 'do her a solid' and convince Mr. Acosta to offer two years."

OPR questioned both Villafaña and Sloman about the purported "do her a solid" remark.  Villafaña told OPR that she had been aware that Menchel and Sanchez were friends.  During her OPR interview, Villafaña explained:

> [A] lot later, I asked Jeff.  I said, you know, "Jeff, where did this two years come from?"  And he said, "Well, I always figured that . . . Lilly asked Matt to do her a solid," which I thought was such a strange term, . . . "and to get her a good deal so that she would be in Epstein's good graces" and that that's where the two years came from.  Although strangely enough, then several years after that, Jeff Sloman asked me where the two years came from, and I had to remind him of that conversation.  So Jeff doesn't know where the two years came from.

Because the email had been expressed in more definitive terms, OPR asked Villafaña whether Sloman had affirmatively asserted that the two-year deal was a favor from Menchel to defense counsel, or whether he had stated that he merely "figured" that was the case, but Villafaña could not recall precisely what Sloman had said.  At a follow-up interview, Villafaña again said that she was unable to recall whether Sloman's specific statement was "Lilly asked Matt to do her a solid, and he did it," or "I always figured Matt just wanted . . . to do her a solid."  Villafaña stated that she was unaware of any information that "expressly [indicated] that there was any sort of exchange of . . . a favor in either direction."

During his OPR interview, Sloman did not recall making such a remark, although he could not rule out the possibility that Villafaña, for whom he repeatedly expressed great respect, "heard that in some fashion."  He told OPR that if he did say something to Villafaña about Menchel having done "a solid" for Epstein's counsel, he could not have meant it seriously, and he explained, "[I]t's not something that I would have believed.  Him doing her a solid.  I mean that's the furthest thing from my recollection or impression even after years later."

---

[225]     Villafaña's email stemmed from a congressional inquiry received by the Department concerning the Epstein investigation and the NPA, to which the USAO had been asked to assist in responding.  In her email, Villafaña addressed several issues that she perceived to be the "three main questions" raised by the press coverage.

Menchel told OPR that when he and Sanchez were in the USAO, they had a social relationship, which included, in 2003, "a handful of dates over a period of two to three weeks. We decided that . . . this was probably best not to pursue, and we mutually agreed to not do that."[226] Apart from that, he stated they were "close" and "hung out," and he asserted that this was known in the office at the time. Menchel said that his relationship with Sanchez "changed dramatically" when she left the office for private practice, and that by the time he became involved in the Epstein investigation, he had dated and married his wife, and his contact with Sanchez would "most likely" have been at office events and when she attended his wedding.[227] Menchel added, "[T]hat was three and a half years [prior] for a very brief period of time, and I don't think I gave it a moment's thought."

When asked by OPR about the basis for the decision to make an offer of a two-year term of incarceration, Menchel said that he did not recall discussions about the two-year offer and did not recall how the office arrived at that figure. In response to OPR's question, Menchel stated that his relationship with Sanchez did "[n]ot at all" affect his handling of the Epstein case. Moreover, Menchel asserted that the contemporaneous documentary record supports a conclusion that it was Acosta, not Menchel, who made the decision to resolve the case with the two-year term.

OPR carefully considered the documentary record on this point, as well as the statements to OPR from Menchel, Villafaña, Sloman, and Acosta, and concludes that there is no evidence supporting the suggestion that the plea was instigated by Menchel as a favor to defense counsel. The USAO's first plea overture to defense counsel, which took place sometime before June 26, 2007, occurred when Menchel spoke with Sanchez about the possibility of resolving the federal case with a state plea that required jail time and sexual offender registration. According to the email, "[i]t was a non-starter" for the defense. In the lengthy email exchange with Villafaña in early July 2007, Menchel told her that his discussion with Sanchez about a state-based resolution was made with Acosta's "full knowledge." Acosta corroborated this statement, telling OPR that although he did not remember a specific conversation with Menchel concerning a state-based resolution, he was certain Menchel would not have discussed this potential resolution with defense counsel "without having discussed it with me."[228] Moreover, the defense did not immediately

---

[226]    Acosta, Sloman, and Lourie each told OPR that in 2007, he was not aware that Menchel had previously dated Sanchez. OPR questioned the USAO's Professional Responsibility Officer regarding whether Menchel had an obligation to inform his supervisors of his dating relationship. The Professional Responsibility Officer said that it would depend on "how long the relationship was and how compromised the individual felt he might appear to be," but he would have expected Menchel to raise the issue with Acosta. The Professional Responsibility Officer told OPR that if he had been approached for advice at the time, he would have asked for more facts, but "[g]iven the sensitivity of the [Epstein] matter, [my advice] would probably have been to tell him to step back and let somebody else take it over." Menchel told OPR that if his relationship with Sanchez had turned into something more than a handful of dates, he would have advised his supervisors. Although OPR does not conclude Menchel's prior relationship with Sanchez influenced the Epstein investigation, OPR assesses that it would have been prudent for Menchel to have informed his supervisors so they could make an independent assessment as to whether his continued involvement in the Epstein investigation might create the appearance of a loss of impartiality.

[227]    Menchel's Outlook records also indicate he scheduled lunch with Sanchez on at least one occasion, in early 2006, after she left the USAO.

[228]    In addition, Villafaña recalled Menchel stating at the July 26, 2007 meeting that "Alex has decided to offer a two year state deal."

accept the two-year proposal when it was made, but instead continued to press for a sentence of home confinement, suggesting that the defense had not requested the two-year term as a favor and did not view it as such. The defense had previously rejected the state's offer of a sentence of probation, and there is no indication in the contemporaneous records that Epstein viewed any jail sentence favorably and certainly that did not appear to be the view of the defense team in the early stages of the negotiations.

As discussed below, after extensive questioning of the subjects about the basis for the two-year offer, and a thorough review of the documentary record, OPR was unable to determine the reasoning underlying the decision to offer two years as the term of incarceration, as opposed to any other term of years. Nonetheless, OPR concludes from the evidence that Acosta was aware of and approved the initial offer to the defense, which included the two-year term of incarceration. The only evidence suggesting that the offer of two years stemmed from an improper motivation of Menchel's was a single second-hand statement in an email drafted many years later. Sloman, the purported declarant, told OPR that he could not recall whether he made the statement, but he firmly disputed that the email accurately reflected either the reason for the two-year proposal or his understanding of that reason. Villafaña herself could remember little about the critical conversation with Sloman, including whether she had recorded accurately what Sloman had said. Given the lack of any corroborating evidence, and the evidence showing Epstein's vigorous resistance to the proposal, OPR concludes that there is no evidence to support the statement in Villafaña's 2018 email that Menchel had extended a two-year plea deal as a favor to one of Epstein's attorneys.

### E.   The Evidence Does Not Establish That the Subjects' Meetings with Defense Counsel Were Improper Benefits to Epstein

OPR considered whether decisions by Acosta, Sloman, Menchel, and Lourie to meet with defense counsel while possible charges were under consideration or during the period after the NPA was signed and before Epstein entered his state guilty pleas evidenced improper favoritism toward or the provision of an improper benefit to the Epstein defense team.

#### 1.   The Evidence Shows That the Subjects' Decisions to Meet with Epstein's Legal Team Were Warranted by Strategic Considerations

Although pre-indictment negotiations are typical in white-collar criminal cases involving financial crimes, witnesses told OPR that pre-charge meetings with defense counsel are infrequent in sex offense cases. As the lead prosecutor, Villafaña vehemently opposed meeting with Epstein's attorneys and voiced her concerns to her supervisors, but was overruled by them. In Villafaña's view, the significance of the early meetings granted to the defense team was that, but for those meetings, the USAO would not have offered the disposition set forth in the July 31, 2007 "term sheet" and, moreover, "that term sheet would never have been offered to anyone else."

OPR's investigation established that while the defense attorneys persistently contacted the subjects through emails, correspondence, and phone calls, relatively few in-person meetings actually occurred with the USAO personnel involved in the matter. As shown in the chart on the following page, while the case was under federal investigation and before the NPA was signed, the subject supervisors and defense counsel had five substantive meetings about the case—

155

including one called by the USAO to offer the NPA term sheet resolution—and a sixth meeting together with the State Attorney and the lead state prosecutor to discuss the state plea. Acosta attended only one pre-NPA meeting. After the NPA was signed and before Epstein entered his state guilty pleas, the subject supervisors and the defense team had one substantive meeting, one unscheduled meeting on a procedural matter, and a meeting with one defense attorney in preparation for a conference call; in addition, Acosta had the breakfast meeting with Lefkowitz.[229]

| Date | USAO Participants | Defense Participants | Topic/Purpose |
|---|---|---|---|
| **Pre-NPA** | | | |
| Feb. 1, 2007 | Lourie / Villafaña | Lefcourt / Sanchez | Defense presents investigation improprieties and federal jurisdiction issues |
| Feb. 20, 2007 | Lourie / Villafaña | Lefcourt / Sanchez | Defense presents witness issues |
| June 26, 2007 | Sloman / Menchel / Lourie / Villafaña | Dershowitz / Black / Lefcourt / Sanchez | Defense presents legal issues, investigation improprieties, and federal jurisdiction issues |
| July 31, 2007 | Sloman / Menchel / Lourie / Villafaña | Black / Lefcourt / Sanchez | USAO presents NPA term sheet |
| Sept. 7, 2007 | Acosta / Oosterbaan / Sloman / Villafaña / Villafaña's co-counsel | Starr / Lefkowitz / Sanchez | Defense presents counteroffer |
| Sept. 12, 2007 | Lourie / Lourie successor / Villafaña | Lefkowitz/ Lefcourt / Goldberger | Joint meeting with Krischer / Belohlavek re state plea provision of NPA |
| **Post-NPA** | | | |
| Oct. 12, 2007 | Acosta | Lefkowitz | Defense discussion of NPA terms and likely appeal to Department |
| Nov. 21, 2007 (unscheduled) | Sloman (possibly Acosta) | Lefkowitz (possibly Dershowitz) | Defense discussion of victims' attorney representative procedure |
| Dec. 14, 2007 | Acosta / Sloman / Villafaña / another senior AUSA | Starr / Weinberg / Dershowitz / Lefcourt | Defense presents federal jurisdiction issues, legal issues, and request for *de novo* review |
| Jan. 7, 2008 | (1) Acosta / Sloman (2) Acosta / Sloman (conference call) | (1) Sanchez (2) Starr / Lefkowitz/ Sanchez | Defense presents USAO improprieties and "watered-down" resolution |

---

[229]    In addition, all of the subjects took phone calls from various defense attorneys, and although numerous documentary records refer to such calls, there may have been others for which OPR located no record.

OPR explored the subject supervisors' reasoning for accommodating the defense requests for in-person meetings and whether such accommodation was unusual. OPR questioned each of the four supervisory subject attorneys about his rationale for engaging in multiple meetings with the defense.

Lourie could not recall his reasoning for meeting with Epstein's defense counsel, but he told OPR that his general practice was to meet with defense counsel when asked to do so. Lourie recognized that some prosecutors—like Villafaña—viewed meeting with the defense as a sign of "weakness," but in Lourie's view, "information is power," and as long as the USAO did not share information with the defense but rather listened to their arguments, meetings were "all power to us." Lourie explained that by meeting with the defense, "[Y]ou're getting the information that they think is important; that they're going to focus on. The witnesses that they think are liars . . . . And so you can form all of that into your strategy." Lourie also told OPR that giving defense counsel the opportunity to argue the defense position is an important "part of the process" that helped ensure procedural fairness, allowing them to "believe that they are getting heard." When asked whether he afforded the same access to all defendants, Lourie responded, "I don't recall ever getting . . . so many requests for meetings . . . and so many appeals and so many audiences that [Epstein's attorneys] got. But this was I think the first time that that's really happened."

Menchel, too, told OPR that his general view was that "ethically it's appropriate" to give a defense attorney "an audience," and there was no real "downside" to doing so. Menchel added, "[W]hat happens a lot of times is the government will carve around those points that are being raised by the defense, and it's good to know" what the defense will be.

During his OPR interview, Acosta rejected the notion that his meeting with defense counsel was unusual or outside the norm. He told OPR that his initial meeting with the defense team, before the NPA was signed, was "not the first and only time that I granted a meeting . . . to defense attorneys" who requested one. Acosta did not believe it was "atypical" for a U.S. Attorney to meet with opposing counsel, particularly as a case was coming to resolution. Sloman corroborated Acosta on this point, telling OPR that Acosta typically met with defense attorneys, and that the USAO handled requests for meetings from Epstein's counsel "in the normal course." Furthermore, Acosta said that notwithstanding that meeting and all the other "process" granted to the defense by the USAO and the Department, "we successfully held firm in our positions" on the key elements of the resolution—that is, the requirements that Epstein be incarcerated, register as a sexual offender, and provide monetary damages to the victims.

OPR examined the circumstances surrounding each subject's decisions to have the individual meetings with defense counsel to determine if those meetings had a neutral, strategic purpose. The first meeting, on February 1, 2007, followed a phone call between Lourie and one of Epstein's attorneys, in which the attorney asked for a chance to "make a pitch" about the victims' lack of credibility and suggested that Epstein might agree to an interview following that pitch. Villafaña objected to meeting with the defense, but she recalled that Lourie told her she was not being a "strategic thinker," and that he believed the meeting could lead to a debriefing of Epstein. The meeting did not result in a debriefing of Epstein, but in advance of the follow-up meeting on February 20, 2007, defense counsel gave the USAO audio recordings of the state's witness interviews. Contemporaneous documents indicate that Lourie was unpersuaded by the defense arguments. After Villafaña circulated the prosecution memorandum, Lourie suggested

preparing a "short" charging document "with only 'clean' victims that they have not dirtied up already."[230]  The fact that Lourie apparently used information gleaned from the defense about the victims' credibility to formulate his charging recommendation supported his statements to OPR that such meetings were, in his experience, a useful source of information that could be factored into the government's charging strategy.

The two February 2007 Villafaña/Lourie-level meetings focused on witness issues and claims of misconduct by state investigators, but in late May 2007, defense attorneys requested another meeting—this time with higher-level supervisors Menchel and Sloman—to make a presentation concerning legal deficiencies in a potential federal prosecution.  The request was granted after Lourie recommended to Menchel and Sloman that "[i]t would probably be helpful to us . . . to hear their legal arguments in case we have missed something."  The requested meeting took place on June 26, 2007.  Before the meeting, at Menchel's direction, Villafaña provided to the defense a list of statutes the USAO was considering as the basis for federal charges.  Defense counsel used that information to prepare a 19-page letter, submitted to the USAO the day before the June 26 meeting, as "an overview" of the defense position.  In an email to his colleagues, Lourie evaluated the defense submission, noting its weaker and stronger arguments.  A contemporaneous email indicates that Menchel, Lourie, and Villafaña viewed the meeting itself as primarily a "listening session."[231]  After the meeting, Epstein's team submitted a second lengthy letter to the USAO detailing Epstein's "federalism" arguments that the USAO should let the state handle the matter.

Menchel apparently scheduled the next meeting with defense counsel, on July 31, 2007, to facilitate the USAO's presentation to the defense team of the "term sheet" describing the proposed terms of a non-prosecution agreement.

By early August, after the Kirkland & Ellis attorneys—Starr and Lefkowitz—joined the defense team, Acosta believed they would likely "go to DC on the case, on the grounds . . . that I have not met with them."  A meeting with the defense team was eventually scheduled for September 7, 2007, when Acosta, Sloman, Villafaña, and Oosterbaan met with Starr, Lefkowitz, and Sanchez.  In an email to Sloman, Acosta explained that he intended to meet with the defense, with Oosterbaan participating, "to discuss general legal policy only."  In another email to Sloman and Lourie, Acosta explained, "This will end up [in the Department] anyhow, if we don't meet with them.  I'd rather keep it here.  Bringing [the CEOS Chief] in visibly does so.  If our deadline has to slip a bit to do that, it's worth it."  Acosta told OPR that the meeting "was not a negotiation," but a chance for the defense to present their federalism arguments.  Acosta said that he had already decided how he wanted to resolve the case, and "[t]he September meeting did not alter or shift our position."

---

[230]   Lourie also recommended that the initial charging document "should contain only the victims they have nothing on at all."

[231]   During her OPR interview, the FBI case agent recalled that defense counsel asked questions about the government's case, including the number of victims and the type of sexual contact involved, and that during a break in the meeting, she engaged in a "discussion" with Menchel about providing this information to the defense.  She did not recall specifics of the discussion, however.

The meeting of USAO representatives and Epstein's defense attorneys, together with the State Attorney and the lead state prosecutor on September 12, 2007, was a necessary part of the NPA negotiation process.

Even after the NPA was signed, the defense continued to request meetings and reviews of the case, both within the USAO and by the Department's Criminal Division and the Deputy Attorney General. Although limited reviews were granted, during this period there was only one substantive meeting with Acosta, on December 14, 2007.[232] This meeting occurred in lieu of the meeting Starr had requested of Assistant Attorney General Fisher, most likely because the defense submissions to the Department's Criminal Division had raised issues not previously raised with the USAO and the Department determined that Acosta should address those in the first instance.[233] Acosta told OPR that he did not ask for the Department review, but he also did not want to appear as if he "fear[ed]" that review. Acosta's nuanced position, however, was not clear to the Department attorneys who responded to Epstein's appeals and who perceived Acosta to be in favor of a Department review, rather than merely tolerant of it. Notably, though, none of those meetings or reviews resulted in the USAO abandoning the NPA, and Epstein gained no substantial advantage from his continued entreaties.

In sum, in evaluating the subjects' conduct, OPR considered the number of meetings, their purpose, the content of the discussions, and decisions made afterwards. OPR cannot say that the number of meetings, particularly those occurring before the NPA was signed, was so far outside the norm—for a high profile case with skilled defense attorneys—that the quantity of meetings alone shows that the subjects were motivated by improper favoritism. In evaluating the subjects' conduct, OPR considered that the meetings were held with different levels of USAO managers and that the explanations for the decisions to participate in the meetings reflected reasonable strategic goals. Although OPR cannot rule out the possibility that because Acosta, Menchel, Lourie, or Sloman knew or knew of the defense attorneys, they may have been willing to meet with them, it is also true that prosecutors routinely meet with defense attorneys, including those who are known to them and those who are not. Furthermore, meetings are more likely to occur in high profile cases involving defendants with the financial resources to hire skilled defense counsel who request meetings at the highest levels of the USAO and the Department. Most significantly, OPR did not find evidence supporting a conclusion that the meetings themselves resulted in any substantial benefit to the defense. At each meeting, defense counsel strongly pressed the USAO—on factual, legal, and policy grounds—to forgo its federal investigation and to return the matter to the state to proceed as it saw fit. The USAO never yielded on that point. Accordingly, OPR did not find evidence supporting a conclusion that Acosta, Sloman, Menchel, Lourie, or Villafaña met with defense counsel for the purpose of benefiting Epstein or that the meetings themselves caused Acosta or the other subjects to provide improper benefits to Epstein.

---

[232]   Acosta's October 12, 2007 breakfast meeting with Lefkowitz is discussed separately in the following section.

[233]   Starr and other defense attorneys only obtained one meeting at the Department level, with Deputy Assistant Attorney General Mandelker and CEOS Chief Oosterbaan in March 2008. Although Starr requested a meeting with Assistant Attorney General Fisher and another with Deputy Attorney General Filip, those requests were not granted.

2.    **The Evidence Does Not Establish That Acosta Negotiated a Deal Favorable to Epstein over Breakfast with Defense Counsel**

OPR separately considered the circumstances of one specific meeting that has been the subject of media attention and public criticism. The *Miami Herald*'s November 2018 reporting on the Epstein investigation opened with an account of the October 12, 2007 breakfast meeting that defense counsel Jay Lefkowitz arranged to have with Acosta at the West Palm Beach Marriott hotel. According to the *Miami Herald* article, "a deal was struck" at the meeting to allow Epstein to serve "just 13 months" in the county jail in exchange for the shuttering of the federal investigation, and Acosta also agreed to "conceal" the full extent of Epstein's crimes from the victims and the public.[234] Although public criticism of the meeting has focused on the fact that the meeting occurred in a hotel far from Acosta's Miami office, the evidence shows that Acosta traveled to West Palm Beach on October 11 for a press event and stayed overnight at the hotel, near the USAO's West Palm Beach office, because at midday on October 12 he was to speak at the Palm Beach County Bench Bar Conference. After carefully considering the evidence surrounding the breakfast meeting, including contemporaneous email communications and witness accounts, OPR concludes that Acosta did not negotiate the NPA, or make any significant concessions relating to it, during or as a result of the October breakfast meeting.

Epstein and his attorneys signed the NPA on September 24, 2007—more than two weeks before the October 12 breakfast meeting. The signed NPA contained all of the key provisions resulting from the preceding weeks of negotiations between the parties, and despite a later addendum and ongoing disputes about interpreting the damages provision of the agreement, those key provisions remained in place thereafter. Acosta told OPR that throughout the negotiations with the defense, he sought three goals: (1) Epstein's guilty plea in state court to an offense requiring registration as a sexual offender; (2) a sentence of imprisonment; and 3) a mechanism through which victims could obtain monetary damages from Epstein. As noted previously, the USAO's original plea offer in Menchel's August 3, 2007 letter expressed a "non-negotiable" demand that Epstein agree to a two-year term of imprisonment, and the final NPA required only an 18-month sentence, but the decision to reduce the required term of imprisonment from 24 to 18 months was made well before Acosta's breakfast meeting with counsel. The NPA signed on September 24, 2007, required 18 months' incarceration, sexual offender registration, and a mechanism for the victims to obtain monetary damages from Epstein, and OPR found that these terms were not abandoned or materially altered after the breakfast meeting.

At the time of Acosta's October breakfast meeting with Lefkowitz, two issues involving the NPA were in dispute. Neither of those issues was ultimately resolved in a way that materially changed the key provisions of the NPA. First, at Sloman's instigation, the USAO sought to change the mechanism for appointing an attorney representative for the victims. This USAO-initiated request had prompted discussions about an "addendum" to the NPA. Sloman sent the text of a proposed NPA addendum to Lefkowitz on October 11, 2007.[235] Although OPR found no decisive

---

[234]    Julie K. Brown, "Perversion of Justice: How a future Trump Cabinet member gave a serial sex abuser the deal of a lifetime," *Miami Herald*, Nov. 28, 2018.

[235]    In his December 19, 2007, letter to defense attorney Sanchez, Acosta represented that he had proposed the addendum at the breakfast meeting, but it is clear the addendum was being developed before then.

proof that this led to the breakfast meeting, email exchanges between Lefkowitz and Acosta show that it was under discussion at the time they were scheduling the meeting.  Shortly after the breakfast meeting, Sloman, in Miami, sent an email to Lefkowitz (copying Acosta and Villafaña), noting that he "just got off the phone with Alex" and offering a slightly revised portion of the addendum relating to the mechanism for selection of the attorney representative.  Sloman later clarified for Villafaña that "Jay's suggested revision has been rejected."

A second area of continuing negotiation arose from the defense claim that Epstein's obligation under the NPA to pay the attorney representative's fees did not obligate him to pay the fees and costs of contested litigation filed against him.  Although this was at odds with the USAO's interpretation of the provision, the USAO and defense counsel reached agreement and clarified the provision in the NPA addendum that was finalized several weeks after the October breakfast meeting.  Although the revised provision was to Epstein's advantage, the revision concerned attorney's fees and did not materially impede the victims' ability to seek damages from Epstein under § 2255.   The fact that the negotiations continued after the breakfast meeting indicates that Acosta did not make promises at the meeting that resolved the issue.

OPR found limited contemporaneous evidence concerning the discussion between Acosta and Lefkowitz.  In a letter sent to Acosta on October 23, 2007, two weeks after the breakfast meeting, Lefkowitz represented that Acosta made three significant concessions during the meeting.  Specifically, Lefkowitz claimed that Acosta had agreed (1) not to intervene with the State Attorney's Office's handling of the case, (2) not to contact any of the victim-witnesses or their counsel, and (3) not to intervene regarding the sentence Epstein received.  Acosta told OPR that he did not remember the breakfast meeting and did not recall making the commitments defense counsel attributed to him.  Acosta also told OPR that Lefkowitz was not a reliable narrator of events, and on several occasions in written communications had inaccurately and misleadingly characterized conversations he had with Acosta.

Of more significance for OPR's evaluation was a contemporaneous document—an October 25, 2007 draft response to Lefkowitz's letter, which Sloman drafted, and Acosta reviewed and edited for signature by Sloman—that disputed Lefkowitz's claims.  The draft letter stated:

> I specifically want to clarify one of the items that I believe was inaccurate in that October 23rd letter.  Your letter claimed that this Office
>
> > would not intervene with the State Attorney's Office regarding this matter; or contact any of the identified individuals, potential witnesses, or potential civil claimants and their respective counsel in this matter; and neither your Office nor the [FBI] would intervene regarding the sentence Mr. Epstein receives pursuant to a plea with the State, so long as that sentence does not violate state law.
>
> As we discussed and, hopefully, clarified, and as the United States Attorney previously explained in an earlier conference call, such a

>promise equates to the imposition of a gag order.  Our Office cannot
>and will not agree to this.

>It is the intent of this Office to treat this matter like any other case.

Acosta told OPR that this was a polite way of chastising Lefkowitz for mischaracterizing what Acosta said during the breakfast meeting.  Although OPR could not find evidence that the letter was sent to Lefkowitz, OPR nonetheless considers it persuasive evidence that Acosta, shortly after the breakfast meeting, disagreed with Lefkowitz's description of their discussions and had discussed those disagreements with Sloman.

Nevertheless, OPR examined the three specific concessions that Lefkowitz described in the October 23 letter, to determine whether evidence reflected that Acosta had made them during the breakfast meeting.  First, Lefkowitz claimed that Acosta agreed during the breakfast meeting that he did not intend to interfere with the state's handling of the case.  Contemporaneous documents show that well before the breakfast meeting, Acosta had expressed the view that he did not want to "dictate" actions to the State Attorney or the state court.  For example, during the NPA negotiations, Acosta asked Villafaña to "soften" certain language that appeared to require the State Attorney's Office or the state court to take specific actions, such as requiring that Epstein enter his guilty plea or report to begin serving his sentence by a certain date.  Although Acosta may have made a statement during the breakfast meeting expressing his disinclination to interfere with the state's proceedings, such a statement would have been a reiteration of his prior position on the subject, rather than any new concession.

Lefkowitz also claimed in his October 23, 2007 letter that Acosta agreed not to contact any of the victims or potential witnesses or their counsel.  For the reasons discussed more fully in Chapter Three, OPR concludes that the decision not to notify the victims about the NPA did not stem from the breakfast meeting, but rather reflected an assessment of multiple issues and considerations discussed internally by the subjects who participated in that decision: Acosta, Sloman, and Villafaña.

Finally, Lefkowitz's October 23 letter suggested that Acosta had agreed not to intervene regarding the sentence Epstein received from the state court, and it asserted that Epstein was "entitled to any type of sentence available to him, including but not limited to gain time and work release."  Later communications between the USAO and defense counsel, however, show clearly that Acosta did not abandon the NPA's explicit sentencing provision.  The NPA required Epstein to make a joint recommendation with the State Attorney's Office for an 18-month jail sentence, although the parties understood that he would receive the same "gain time" benefits available to all state inmates.  After the October breakfast meeting, Sloman and Villafaña, on behalf of the USAO, repeatedly made clear that it would hold Epstein to that requirement, and the USAO also subsequently insisted that Epstein was ineligible for work release.  For example, in a November 5, 2007 letter, Sloman requested confirmation from defense counsel that "Epstein intends to abide by his agreement to plead guilty to the specified charges and to make a binding recommendation that the Court impose a sentence of *18 months of continuous confinement* in the county jail."  Shortly before Epstein entered his plea in June 2008, Villafaña wrote to the State Attorney to remind him that the NPA required Epstein to plead in state court to an offense that required an 18-month

sentence of incarceration, and the USAO would consider a plea that differed from that requirement a breach of the NPA and would "proceed accordingly."

The guilty plea Epstein entered in state court in June 2008 was consistent with the dictates of the NPA, and pursuant to that plea, the court imposed a sentence of 18 months' incarceration. Epstein, however, applied for and was accepted into the work release program, and was able to serve a substantial portion of his sentence outside of the jail.  The NPA did not reference work release nor authorize Epstein to receive such benefits during his tenure at the Palm Beach County Stockade.  Moreover, Villafaña received assurances from defense counsel that Epstein would serve his entire sentence of confinement "in custody."  Responsibility for the decision to afford Epstein work release privileges during his incarceration rested with state officials, who had the sole authority for administering the work release program.

After considering the substantial record documenting the decisions made after Acosta's October 12, 2007 breakfast meeting with Lefkowitz, OPR found nothing in the record to suggest that the meeting resulted in a material change to the NPA, affected the sentence Epstein served pursuant to the NPA, or contributed to state officials' decision to permit him to participate in work release.

### F.   Villafaña's Emails with Defense Attorney Lefkowitz during the NPA Negotiations Do Not Establish That Villafaña, or Other Subjects, Intended to Give Epstein Preferential Treatment or Were Motivated by Favoritism or Other Improper Influences

During the CVRA litigation, the petitioners obtained from Epstein's attorney, and filed under seal, a redacted series of email exchanges between Epstein attorney Lefkowitz and Villafaña (and others with Acosta and Sloman) during September 2007 when the NPA was being finalized, and thereafter.  These emails had been redacted to delete most of Lefkowitz's side of the communications, and consequently they did not reflect the full context of Villafaña's communications to Lefkowitz.  The redacted emails were later unsealed and made public over Epstein's objections.[236]  Media coverage pointed to the content and tone of Villafaña's emails as proof that Villafaña and the USAO worked in concert with Epstein's attorneys to keep the "sweetheart" deal a secret from the victims and the public.  Statements in several emails in particular were cited as evidence of the USAO's improper favoritism towards Epstein.  In one example, Villafaña told Lefkowitz that she was willing to include in the NPA a provision agreeing not to prosecute others, but would "prefer not to highlight for the judge all of the other crimes and all of the other persons that we could charge."  She also offered to meet with him "'off campus'" to finalize negotiations.  She also proposed, "[o]n an 'avoid the press' note," that filing federal charges against Epstein in Miami rather than West Palm Beach would substantially reduce press coverage.

---

[236]   The USAO did not object to the unsealing but requested additional redactions of portions that would reveal protected information.  United States' Response to Petitioners' Motion to Use Correspondence to Prove Violations of the [CVRA] and to Have Their Unredacted Pleadings Unsealed (Apr. 7, 2011).  The court declined to order the additional redactions.

OPR asked Villafaña about these emails and about the tenor of her interactions with Lefkowitz during the NPA negotiations and with other defense attorneys generally.  Villafaña acknowledged that their tone was collegial and collaborative, and explained that generally, the tone of these emails reflected her personality and her commitment to complete the task her supervisors had assigned to her:

> [I]f you were to pull all my e-mails on every case, you would find that that is how I communicate with people.  I'm a Minnesota girl, and I prefer not to be confrontational until I have to be.  And I can be when I need to be.  But my instructions from my supervisors were to engage in these negotiations and to complete them.  So I felt that given that task, the best way to complete them was to reach the agreement and, keeping in mind the terms that . . . our office had agreed to, and do that in a way that is civil.  So . . . although my language in the kind of introductory or prefatory communications with Mr. Lefkowitz was casual and was friendly, when you look at the terms and when he would come back to me asking for changes, my response was always, "No, I will not make that change."

Villafaña denied any intention to keep the victims uninformed about the NPA or to provide an improper benefit for Epstein, and she explained the context of the emails in question.  The email in which Villafaña expressed reluctance to "highlight for the judge all of the other crimes and all of the other persons that we could charge" was written in response to a defense proposal to include in the federal plea agreement the parties were then considering a promise by the government not to prosecute Epstein's assistants and other employees.  Lefkowitz had proposed that the plea agreement state, "Epstein's fulfilling the terms and conditions of the Agreement also precludes the initiation of any and all criminal charges which might otherwise in the future be brought against [four named female assistants] or any employee of [a specific Epstein-owned corporate entity] for any criminal charge that arises out of the ongoing federal investigation."  Villafaña told OPR that the USAO was not intending to charge Epstein's assistants and was not aware of anyone else who could be charged, and thus did not oppose the request not to prosecute third parties.  However, Villafaña was concerned that an overly detailed federal plea agreement would prompt the court to require the government to provide further information about the uncharged conduct, which might lead Epstein to claim the government breached the agreement by providing information to the court not directly connected to the charges to which he was pleading guilty.  Villafaña was not the only one to express concern about how deeply a federal court might probe the facts, and whether such probing would interfere with the viability of a plea agreement.  In an earlier email, Lourie had suggested charging Epstein by complaint to allow the USAO more flexibility in plea negotiations and avoid the problem that a court might not accept a plea to a conspiracy charge that required dismissal of numerous substantive counts.

As to Villafaña's offer to meet with Lefkowitz "off campus" to resolve outstanding issues in the NPA negotiation, she explained to OPR that she believed a face-to-face meeting at a "neutral" location—with "all the necessary decision makers present or 'on call'"— might facilitate completion of the negotiations, which had dragged on for some time.

With regard to her comment about "avoid[ing] the press," Villafaña told OPR that her goal was to protect the anonymity of the victims. She said that the case was far more likely to be covered by the Palm Beach press, which had already written articles about Epstein, than in Miami, and "if [the victims] wanted to attend [the plea hearing], I wanted them to be able to go into the courthouse without their faces being splashed all over the newspaper."

In evaluating the emails, OPR reviewed all the email exchanges between Villafaña, as well as Sloman and Acosta, and Lefkowitz and other defense counsel, including the portions redacted from the publicly released emails (except for a few to or from Acosta, copies of which OPR did not locate in the USAO records). OPR also considered the emails in the broader context of Villafaña's overall conduct during the federal investigation of Epstein. The documentary record, as well as witness and subject interviews, establishes that Villafaña consistently advocated in favor of prosecuting Epstein and worked for months toward that goal. She repeatedly pressed her supervisors for permission to indict Epstein and made numerous efforts to expand the scope of the case. She opposed meetings with the defense team, and nearly withdrew from the case because her supervisors agreed to those meetings. Villafaña objected to the decision to resolve the case through a guilty plea in state court, and she engaged in a lengthy and heated email exchange with Menchel about that subject. When she was assigned the task of creating an agreement to effect that resolution, Villafaña fought hard during the ensuing negotiations to hold the USAO's position despite defense counsel's aggressive tactics.

OPR also considered statements of her supervisors regarding her interactions with defense counsel. Sloman, in particular, told OPR that reports that Villafaña "was soft on Epstein . . . couldn't have been further from the truth." Sloman added that Villafaña "did her best to implement the decisions that were made and to hold Epstein accountable." Lourie similarly told OPR that when he read the district court's February 2019 opinion in the CVRA litigation and the emails from Villafaña cited in that opinion, he was "surprised to see how nice she was to them. And she winds up taking it on the chin for being so nice to them. When I know the whole time she was the one who wanted to go after him the most." The AUSA who assisted Villafaña on the investigation told OPR "everything that [Villafaña] did . . . was, as far as I could tell, [ ] completely pro prosecution."

Because the emails in question were publicly disclosed without context and without other information showing Villafaña's consistent efforts to prosecute Epstein and to assist victims, a public narrative developed that Villafaña colluded with defense counsel to benefit Epstein at the expense of the victims. After thoroughly reviewing all of the available evidence, OPR finds that narrative to be inaccurate. The USAO's and Villafaña's interactions with the victims can be criticized, as OPR does in several respects in this Report, but the evidence is clear that any missteps Villafaña may have made in her interactions with victims or their attorneys were not made for the purpose of silencing victims. Rather, the evidence shows that Villafaña, in particular, cared deeply about Epstein's victims. Before the NPA was signed, she raised to her supervisors the issue of consulting with victims, and after the NPA was signed, she drafted letters to notify victims identified in the federal investigation of the pending state plea proceeding and inviting them to appear. The draft letters led defense counsel to argue to Department management that Villafaña and Sloman committed professional misconduct by "threaten[ing] to send a highly improper and unusual 'victim notification letter' to all" of the listed victims. Given the full context of Villafaña's conduct throughout her tenure on the case, OPR concludes that her explanations for her emails are

entitled to significant weight, and OPR credits them.  OPR finds, therefore, that the emails in question do not themselves establish that Villafaña (or any other subject) acted to improperly benefit Epstein, was motivated by favoritism or other improper influences, or sought to silence victims.

### G. The Evidence Does Not Establish That Acosta, Lourie, or Villafaña Agreed to the NPA's Provision Promising Not to Prosecute "Potential Co-conspirators" in Order to Protect Any of Epstein's Political, Celebrity, or Other Influential Associates

OPR examined the decision by the subjects who negotiated the NPA—Villafaña, Lourie, and Acosta—to include in the agreement a provision in which the USAO agreed not to prosecute "any potential co-conspirators of Epstein," in addition to four named individuals, to determine whether that provision resulted from the subjects' improper favoritism towards Epstein or an improper effort to shield from prosecution any of Epstein's known associates.  Other than various drafts of the NPA and of a federal plea agreement, OPR found little in the contemporaneous records mentioning the provision and nothing indicating that the subjects discussed or debated it— or even gave it much consideration.  Drafts of the NPA and of the federal plea agreement show that the final broad language promising not to prosecute "any potential co-conspirators of Epstein" evolved from a more narrow provision sought by the defense.  The provision expanded as Villafaña and defense counsel exchanged drafts of, first, a proposed federal plea agreement and, then, of the NPA, with apparently little analysis and no substantive discussion within the USAO about the provision.[237]

As the NPA drafting process concluded, Villafaña circulated to Lourie and another supervisor a draft that contained the non-prosecution provision, telling Lourie it was "some of [defense counsel's] requested language regarding promises not to prosecute other people," and commenting only, "I don't think it hurts us."  In a reply email, Lourie responded to another issue

---

[237]    As set forth in OPR's factual discussion, early in the negotiations over a federal plea agreement, the defense sought a non-prosecution provision applicable to only four female named assistants of Epstein and to unnamed employees of one of his companies.  Villafaña initially countered with "standard language" referring to unnamed "co-conspirators" so as to avoid "highlight[ing] for the judge all of the other crimes and all of the other persons that we could charge."  Nonetheless, drafts of the NPA sent by Lefkowitz after Villafaña's email continued to include language referring to the four named assistants and unnamed employees.  Villafaña, however, internally circulated drafts of a federal plea agreement that included language stating, "This agreement resolves the federal criminal liability of the defendant and any co-conspirators in the Southern District of Florida growing out of any criminal conduct by those persons known to the [USAO] as of the date of this plea agreement."  The federal plea agreement draft revised by Lourie and Acosta on September 20, 2007, included that language.  When the defense team reverted to negotiation of state charges, Villafaña advised them, "In the context of a non-prosecution agreement, the [USAO] may be more willing to be specific about not pursuing charges against others."  The next day, Lefkowitz sent a revised draft NPA referring to the four named assistants, "any employee" of the named company, and "any unnamed co-conspirators for any criminal charge that arises out of the ongoing federal investigation."  The language was finally revised by Villafaña to prohibit prosecution of "any potential co-conspirators of Epstein, including but not limited to [the four named assistants]."

In commenting on OPR's draft report, Villafaña's counsel and Lourie both noted that the non-prosecution provision could bind only the USAO, and Lourie further opined that it was limited to certain specified federal charges and a time-limited scope of conduct.  Although the non-prosecution provision in the NPA did not explicitly contain such limitations, those limitations were included in other parts of the agreement.

Villafaña had raised (defense counsel's attempt to insert an immigration waiver into the agreement), but Lourie did not comment on the provision promising not to prosecute co-conspirators or ask Villafaña to explain why she believed the provision did not harm the government's interests.  In a subsequent email about the draft NPA, Villafaña asked Lourie for "[a]ny other thoughts," but there is no indication that he provided further input.  OPR found no document that suggested Villafaña and Lourie discussed the provision further, or that the other individuals who were copied on Villafaña's email referencing the provision—her immediate supervisor, the supervisor designated to succeed Lourie as manager of the West Palm Beach office, and Villafaña's co-counsel—commented on or had substantive discussions about it.  Villafaña told OPR that because none of the three supervisors responded to her observation that the non-prosecution provision "doesn't hurt us," Villafaña assumed that they agreed with her assessment.

Villafaña told OPR that she could not recall a conversation specifically about the provision agreeing not to prosecute "any potential co-conspirators," but she remembered generally that defense counsel told her Epstein wanted "to make sure that he's the only one who takes the blame for what happened."  Villafaña told OPR that she and her colleagues believed Epstein's conduct was his own "dirty little secret."  Villafaña said that press coverage at the time of Epstein's 2006 arrest did not allege that any of his famous contacts participated in Epstein's illicit activity and that none of the victims interviewed by the case agents before the NPA was signed told the investigators about sexual activity with any of Epstein's well-known contacts about whom allegations arose many years later.[238]  Villafaña acknowledged that investigators were aware of Epstein's longtime relationship with a close female friend who was a well-known socialite, but, according to Villafaña, in 2007, they "didn't have any specific evidence against her."[239]  Accordingly, Villafaña believed that the only "co-conspirators" of Epstein who would benefit from the provision were the four female assistants identified by name.[240]  Villafaña also told OPR that the focus of the USAO's investigation was Epstein, and the office was not inclined to prosecute his four assistants if he entered a plea.[241]  Because Villafaña was unaware of anyone else who could or would be charged, she perceived no reason to object to a provision promising not to prosecute other, unspecified "co-conspirators."  Villafaña told OPR that given her understanding of the facts at that time, it did not occur to her that the reference to other "potential co-conspirators" might be used to protect any of Epstein's influential associates.

Lourie, who was transitioning to his detail at the Department's Criminal Division at the time Villafaña forwarded to him the draft NPA containing the non-prosecution provision, told OPR that he did not know how the provision developed and did not recall any discussions about it.

---

[238]     Villafaña told OPR that "none of . . . the victims that we spoke with ever talked about any other men being involved in abusing them.  It was only Jeffrey Epstein."

[239]     The FBI had interviewed one victim who implicated the female friend in Epstein's conduct, but the conduct involving the then minor did not occur in Florida.

[240]     The FBI had learned that one of Epstein's female assistants had engaged in sexual activity with at least one girl in Epstein's presence; this assistant was one of the named individuals for whom the defense sought the government's agreement not to prosecute from the outset.  Villafaña explained to OPR that this individual was herself believed to also have been at one time a victim.

[241]     Villafaña told OPR that the USAO had decided that girls who recruited other girls would not be prosecuted.

Lourie described the promise not to prosecute "potential co-conspirators" as "unusual," and told OPR that he did not know why it was included in the agreement, but added that it would be "unlike me if I read that language to just leave it in there unless I thought it was somehow helpful." Lourie posited that victims who recruited other underage girls to provide massages for Epstein "theoretically" could have been charged as co-conspirators. He told OPR that when he saw the provision, he may have understood the reference to unnamed "co-conspirators" as "a message to any victims that had recruited other victims that there was no intent to charge them."

Acosta did not recall any discussions about the non-prosecution provision. But he told OPR that Epstein was always "the focus" of the federal investigation, and he would have viewed the federal interests as vindicated as long as Epstein was required to face "meaningful consequences" for his actions. Acosta told OPR that when he reviewed the draft NPA, "[t]o the extent I reviewed this co-conspirator provision, I can speculate that my thinking would have been the focus is on Epstein[ ] . . . going to jail. Whether some of his employees go to jail, or other, lesser involved [individuals], is not the focus of this." Acosta also told OPR that he assumed Villafaña and Lourie had considered the provision and decided that it was appropriate. Finally, Sloman, who was not involved in negotiating the NPA, told OPR that in retrospect, he understood the non-prosecution provision was designed to protect Epstein's four assistants, and it "never dawned" on him that it was intended to shield anyone else.

This broad provision promising not to prosecute "any potential co-conspirators" is troubling and, as discussed more fully later in this Report, OPR did not find evidence showing that the subjects gave careful consideration to the potential scope of the provision or whether it was warranted given that the investigation had been curtailed and the USAO lacked complete information regarding possible co-conspirators. Villafaña precipitously revised a more narrow provision sought by the defense. Given its evolution from a provision sought by the defense, it appears unlikely to have been designed to protect the victims, and there is no indication that at the time, the subjects believed that was the purpose. However, the USAO had not indicated interest in prosecuting anyone other than the four named female assistants, and OPR found no record indicating that Epstein had expressed concern about the prosecutive fate of anyone other than the four assistants and unnamed employees of a specific Epstein company. Accordingly, OPR concludes that the evidence does not show that Acosta, Lourie, or Villafaña agreed to the non-prosecution provision to protect any of Epstein's political, celebrity, or other influential associates.[242]

### H.   OPR's Investigation Did Not Reveal Evidence Establishing That Epstein Cooperated in Other Federal Investigations or Received Special Treatment on That Basis

One final issue OPR explored stemmed from media reports suggesting that Epstein may have received special treatment from the USAO in return for his cooperation in another federal

---

[242]   As previously stated, Sloman was on vacation when Villafaña included the provision in draft plea agreements and did not monitor the case or comment on the various iterations of the NPA that were circulated during his absence. Menchel left the USAO on August 3, 2007, before the parties drafted the NPA.

investigation.[243]   Media reports in mid-2009 suggested Epstein was released from his state incarceration "early" because he was assisting in a financial crimes investigation in the Eastern District of New York involving Epstein's former employer, Bear Stearns.  At the time, Villafaña was notified by the AUSAs handling the matter that they "had never heard of" Epstein and he was providing "absolutely no cooperation" to the government.  In 2011, Villafaña reported to senior colleagues that "this is urban myth.  The FBI and I looked into this and do not believe that any of it is true."  Villafaña told OPR that the rumor that Epstein had cooperated with the case in New York was "completely false."  Acosta told OPR that he did not have any information about Epstein cooperating in a financial investigation or relating to media reports that Epstein had been an "intelligence asset."[244]

In addition to the contemporaneous record attesting that Epstein was not a cooperating witness in a federal matter, OPR found no evidence suggesting that Epstein was such a cooperating witness or "intelligence asset," or that anyone—including any of the subjects of OPR's investigation—believed that to be the case, or that Epstein was afforded any benefit on such a basis.  OPR did not find any reference to Epstein's purported cooperation, or even a suggestion that he had assisted in a different matter, in any of the numerous communications sent by defense counsel to the USAO and the Department.  It is highly unlikely that defense counsel would have omitted any reason warranting leniency for Epstein if it had existed.

Accordingly, OPR concludes that none of the subjects of OPR's investigation provided Epstein with any benefits on the basis that he was a cooperating witness in an unrelated federal investigation, and OPR found no evidence establishing that Epstein had received benefits for cooperation in any matter.

## V.   ACOSTA EXERCISED POOR JUDGMENT BY RESOLVING THE FEDERAL INVESTIGATION THROUGH THE NPA

Although OPR finds that none of the subjects committed professional misconduct in this matter, OPR concludes that Acosta exercised poor judgment when he agreed to end the federal investigation through the NPA.  Acosta's flawed application of Petite policy principles to this case and his concerns with overstepping the boundaries of federalism led to a decision to resolve the federal investigation through an NPA that was too difficult to administer, leaving Epstein free to manipulate the conditions of his sentence to his own advantage.  The NPA relied on state authorities to implement its key terms, leading to an absence of control by federal authorities over the process.  Although the prosecutors considered certain events that they addressed in the NPA, such as gain time and community control, many other key issues were not, such as work release and mechanisms for implementing the § 2255 provision.  Important provisions, such as promising not to prosecute all "potential co-conspirators," were added with little discussion or consideration by the prosecutors.  In addition, although there were evidentiary and legal challenges to a

---

[243]     *See, e.g.*, Julie K. Brown, "Perversion of Justice: How a future Trump Cabinet member gave a serial sex abuser the deal of a lifetime," *Miami Herald*, Nov. 28, 2018.

[244]     When OPR asked Acosta about his apparent equivocation during his 2019 press conference, in answering a media question about whether he had knowledge of Epstein being an "intelligence asset," Acosta stated to OPR that "the answer is no."  Acosta was made aware that OPR could use a classified setting to discuss intelligence information.

successful federal prosecution, Acosta prematurely decided to resolve the case without adequately addressing ways in which a federal case potentially could have been strengthened, such as by obtaining Epstein's missing computer equipment.  Finally, a lack of coordination within the USAO compounded Acosta's flawed reasoning and resulted in insufficient oversight over the process of drafting the NPA, a unique document that required more detailed attention and review than it received.  These problems were, moreover, entirely avoidable because federal prosecution, and potentially a federal plea agreement, existed as viable alternatives to the NPA resolution.

In evaluating Acosta's conduct, OPR has considered and taken into account the fact that some of Epstein's conduct known today was not known in 2007 and that other circumstances have changed in the interim, including some victims' willingness to testify.  OPR has also evaluated Acosta's decisions in a framework that recognizes and allows for decisions that are made in good faith, even if the decision in question may not have led to the "best" result that potentially could have been obtained.  Nonetheless, after considering all of the available evidence and the totality of the then-existing circumstances, OPR concludes that Acosta exercised poor judgment in that he chose an action or course of action that was in marked contrast to that which the Department would reasonably expect of an attorney exercising good judgment.

A.  **Acosta's Decision to Resolve the Federal Investigation through a State Plea under Terms Incorporated into the NPA Was Based on a Flawed Application of the Petite Policy and Federalism Concerns, and Failed to Consider the Significant Disadvantages of a State-Based Resolution**

The Department formulated the Petite policy in response to a series of Supreme Court opinions holding that the Constitution does not deny state and federal governments the power to prosecute for the same act.  Responding to the Court's concerns about the "potential for abuse in a rule permitting duplicate prosecutions," the Department voluntarily adopted a policy of declining to bring a federal prosecution following a completed state prosecution for the same conduct, except when necessary to advance a compelling federal interest.  *See Rinaldi v. United States*, 434 U.S. at 28.  On its face, the Petite policy applies to federal prosecutions that follow completed state prosecutions.  USAM § 9-2.031 ("This policy applies whenever there has been a prior state . . . prosecution resulting in an acquittal, a conviction, including one resulting from a plea agreement, or a dismissal or other termination of the case on the merits after jeopardy has attached.").  When a state investigation or prosecution is still pending, the policy does not apply.  Indeed, even when a state prosecution has resulted in a decision on the merits, the policy permits a subsequent federal prosecution when three substantive prerequisites are satisfied:  a "substantial federal interest" exists, "the result in the prior state prosecution was manifestly inadequate in light of the federal interest involved," and there is sufficient admissible evidence to obtain and sustain a conviction on federal charges.  The policy also does not apply when "the prior prosecution involved only a minor part of the contemplated federal charges."

No one with whom OPR spoke disputed that the federal government had a substantial interest in prosecuting Epstein.  In her prosecution memorandum, Villafaña identified five federal statutes that Epstein had potentially violated.  The CEOS Chief described Villafaña's assessment of these statutes as "exhaustive," and he concurred with her analysis of their applicability to the facts of the case.  Epstein's crimes involved the sexual exploitation of children, interstate travel, and the use of a facility of interstate commerce, all of which were areas of federal concern.

Notably, in the early 2000s, the Department had begun pursuing specific initiatives to combat child sex trafficking, including Project Safe Childhood, and Congress had then recently passed the PROTECT Act. Acosta himself told OPR that the exploitation of minors was "an important federal interest," which in Epstein's case was compounded by the "sordidness" of the acts involved and the number of victims.

It is also clear that because the state case against Epstein was still pending and had not reached a conviction, acquittal, or other decision on the merits, the Petite policy did not apply and certainly did not preclude a federal prosecution of Epstein. He had been charged with one state charge of solicitation to prostitution on three occasions, involving one or more other persons without regard to age—a charge that would have addressed only a scant portion of the conduct under federal investigation. Acosta acknowledged to OPR that the Petite policy "on its face" did not apply. Moreover, the State Attorney did not challenge the federal government's assumption of prosecutorial responsibility, and despite having obtained an indictment, held back on proceeding with the state prosecution in deference to the federal government's involvement. In these circumstances, the USAO was free to proceed with a prosecution sufficient to ensure vindication of the federal interest in prosecuting a man who traveled interstate repeatedly to prey upon minors. The federal government was uniquely positioned to fully investigate the conduct of an individual who engaged in repeated criminal conduct in Florida but who also traveled extensively and had residences outside of Florida. Even if the Petite policy had applied, OPR has little doubt that the USAO could have obtained authorization from the Department to proceed with a prosecution under the circumstances of this case.[245]

Despite the undeniable federal interest in prosecuting Epstein, the fact that the Petite policy did not apply, and the State Attorney's willingness to hold the state prosecution in abeyance pending the federal government's assumption of the case, Acosta viewed the federal government's role in prosecuting Epstein as limited by principles of federalism.[246] In essence, Acosta believed that a federal prosecution would have interfered improperly with the state's authority. He explained his reasoning to OPR:

---

[245]   In 2008, the Office of Enforcement Operations, the office charged with reviewing Petite policy waiver requests, opined that even if the Petite policy applied with respect to the victims of the indicted state charges, it would not apply to federal prosecution of charges relating to any other victim. The office also noted that if other factors existed, such as use of the internet to contact victims, those factors might warrant a waiver of the policy, if it did apply.

[246]   In commenting on OPR's draft report, Acosta's counsel argued that OPR inappropriately bifurcated Acosta's concerns from those of the other subjects. However, OPR's investigation made clear that, although Acosta shared his subordinates' concerns about the strength of the case, victim-witness credibility, and the novelty of some legal theories, he alone focused on federalism issues. Acosta's counsel also asserted that OPR "misunderstands and devalues Secretary Acosta's very real and legitimate interest in the development of human trafficking laws," and counsel further noted Acosta's concerns that "bringing a case with serious evidentiary challenges pressing novel legal issues could result in an outcome that set back the development of trafficking laws and resulted in an aggregate greater harm to trafficking victims." Although OPR carefully considered counsel's arguments and agrees that it was appropriate to consider any implications the proposed prosecution of Epstein might have for the Department's anti-trafficking efforts, OPR does not believe that those concerns warranted resolving the matter through the NPA, which, for the reasons discussed in this Section, failed to satisfy the federal interest and allowed Epstein to manipulate the state system to his benefit.

> [The prosecution] was going forward on the part of the state, and so
> here is the big bad federal government stepping on a sovereign . . .
> state, saying you're not doing enough, [when] to my mind . . . the
> whole idea of the [P]etite policy is to recognize that the []state . . .
> is an independent entity, and that we should presume that what
> they're doing is correct, even if we don't like the outcome, except
> in the most unusual of circumstances.

Acosta told OPR that "absent USAO intervention," the state's prosecution of Epstein would have become final, and accordingly, it was "prudent" to employ Petite policy analysis.  In Acosta's view, "the federal responsibility" in this unique situation was merely to serve as a "back-stop [to] state authorities to ensure that there [was] no miscarriage of justice."[247]  Acosta told OPR that he understood the PBPD would not have brought Epstein to the FBI's attention if the State Attorney had pursued charges that required Epstein's incarceration.  Acosta therefore decided that the USAO could avert a "manifest injustice" by forcing the state to do more and require Epstein to serve time in jail and register as a sexual offender.

Acosta's reasoning was flawed and unduly constricted.  Acosta's repeated references to a "miscarriage of justice" or "manifest injustice" echoes the "manifestly inadequate" language used in the Petite policy to define the circumstances in which the federal government may proceed with a criminal case *after* a completed state prosecution.  Nothing in the Petite policy, however, requires similar restraint when the federal government pursues a case in the absence of a completed state prosecution, even if the state is already investigating the same offense.  The goal of the Petite policy is to prevent multiple prosecutions for the same offense, not to compel the federal government to defer to a parallel state interest in a case, particularly one in which state officials involved in the state prosecution expressed significant concerns about it, and there were questions regarding the state prosecutor's commitment to the case.  Acosta told OPR that "there are any number of instances where the federal government or the state government can proceed, and state charges are substantially less and different, and . . . the federal government . . . stands aside and lets the state proceed."  The fact that the federal government can allow the state to proceed with a prosecution, however, does not mean the federal government is compelled to do so, particularly in a matter in which a distinct and important federal interest exists.  Indeed, the State Attorney told OPR that the federal government regularly takes over cases initiated by state investigators, typically because federal charges result in "the best sentence."

Epstein was facing a substantial sentence under the federal sentencing guidelines.[248]  Despite the Ashcroft Memo's directive that federal prosecutors pursue "the most serious readily provable offense," Acosta's decision to push "the state to do a little bit more" does not approach that standard.  In fact, Acosta conceded during his OPR interview that the NPA did not represent an "appropriate punishment" in the federal system, nor even "the best outcome in the state system," and that if the investigation of Epstein had originated with the FBI, rather than as a referral from the PBPD, the outcome might have been different.  As U.S. Attorney, Acosta had the authority to

---

[247]    Letter from R. Alexander Acosta "To whom it may concern" at 1 (Mar. 20, 2011), published online in *The Daily Beast*.

[248]    Villafaña estimated that the applicable sentencing guidelines range was 168 to 210 months' imprisonment.

depart from the Ashcroft Memo.  He told OPR, however, that he did not recall discussing the Ashcroft Memo with his colleagues and nothing in the contemporaneous documentary record suggests that he made a conscious decision to depart from it when he decided to resolve the federal investigation through the NPA.  Instead, it appears that Acosta simply failed to consider the tension between federal charging policy and the strong federal interest in this case, on the one hand, and his broad reading of the Petite policy and his general concerns about "federalism," on the other hand.  OPR concludes that Acosta viewed the federal government's role in prosecuting Epstein too narrowly and through the wrong prism.

Furthermore, Acosta's federalism concerns about intruding on the state's autonomy resulted in an outcome—the NPA—that intruded far more on the state's autonomy than a decision to pursue a federal prosecution would have.[249]  By means of the NPA, the federal government dictated to the state the charges, the sentence, the timing, and certain conditions that the state had to obtain during the state's own prosecution.  Acosta acknowledged during his OPR interview that his "attempt to backstop the state here[] rebounded, because in the process, it . . . ended up being arguably more intrusive."

Acosta's concern about invading the state's authority led to additional negative consequences.  Acosta revised the draft NPA in several respects to "soften" its tone, by substituting provisions requiring Epstein to make his "best efforts" for language that appeared to dictate certain actions to the state.  In so doing, however, Acosta undermined the enforceability of the agreement, making it difficult later to declare Epstein in breach when he failed to comply.

OPR found no indication that when deciding to resolve the federal prosecution through a mechanism that relied completely on state action, Acosta considered the numerous disadvantages of having Epstein plead guilty in the state court system, a system in which none of the subjects had practiced and with which they were unfamiliar.  Villafaña recognized that there were "a lot of ways to manipulate state sentences," and she told OPR that she was concerned from the outset of negotiations about entering into the NPA, because by sending the case back to the state the USAO was "giving up all control over what was going on."  Villafaña also told OPR that defense counsel "had a lot of experience with the state system.  We did not."  Epstein's ability to obtain work release, a provision directly contrary to the USAO's intent with respect to Epstein's sentence, is a clear example of the problem faced by the prosecutors when trying to craft a plea that depended on a judicial system with which they were unfamiliar and over which they had no control.  Although the issue of gain time was considered and addressed in the NPA, none of the subject attorneys negotiating the NPA realized until *after* the NPA was signed that Epstein might be eligible for work release.  Acosta, in particular, told OPR that "if it was typical to provide that kind of work release in these cases, that would have been news to me."  Because work release was not anticipated, the NPA did not specifically address it, and the USAO was unable to foreclose Epstein from applying for admission to the program.

---

[249]     The Petite policy only applies to the Department of Justice and federal prosecutions.  It does not prevent state authorities from pursuing state charges after a federal prosecution.  *See, e.g., United States v. Nichols* and *State v. Nichols* (dual prosecution for acts committed in the bombing of the Oklahoma City federal building).  However, in practice and to use their resources most efficiently, state authorities often choose not to pursue state charges if the federal prosecution results in a conviction.

The sexual offender registration provision is yet another example of how Acosta's decision to create an unorthodox mechanism that relied on state procedures to resolve the federal investigation led to unanticipated consequences benefitting Epstein. Acosta told OPR that one of the core aspects of the NPA was the requirement that Epstein plead guilty to a state charge requiring registration as a sexual offender. He cited it as a provision that he insisted on from the beginning and from which he never wavered. However, the USAO failed to anticipate certain factors that affected the sexual offender registration requirement in other states where Epstein had a residence. In selecting the conduct for the factual basis for the crime requiring sexual offender registration, the state chose conduct involving a victim who was at least 16 at the time of her interactions with Epstein, even though Epstein also had sexual contact with a 14-year old victim. The victim's age made a difference, as the age of consent in New Mexico, where Epstein had a residence, was 16; therefore, Epstein was not required to register in that state. As a 2006 letter from defense counsel Lefcourt to the State Attorney's Office made clear, the defense team had thoroughly researched the details and ramifications of Florida's sexual offender registration requirement; OPR did not find evidence indicating similar research and consideration by the USAO.

Finally, Acosta was well aware that the PBPD brought the case to the FBI's attention because of a concern that the State Attorney's Office had succumbed to "pressure" from defense counsel. Villafaña told OPR that she informed both Acosta and Sloman of this when she met with them at the start of the federal investigation. Although Acosta did not remember the meeting with Villafaña, he repeatedly told OPR during his interview that he was aware that the PBPD was dissatisfied with the State Attorney's Office's handling of the case. Shortly before the NPA was signed, moreover, additional information came to light that suggested the State Attorney's Office was predisposed to manipulating the process in Epstein's favor. Specifically, during the September 12, 2007 meeting, at the state prosecutor's suggestion, the USAO team agreed, with Acosta's subsequent approval, to permit Epstein to plead guilty to one state charge of solicitation of minors to engage in prostitution, rather than the three charges the USAO had originally specified. The state prosecutor assured Lourie that the selected charge would require Epstein to register as a sexual offender. Shortly thereafter, the USAO was told by defense counsel that despite the assurances made to Lourie, the state prosecutor had advised Epstein—incorrectly, it turned out—that a plea to that particular offense would *not* require him to register as a sexual offender. Yet, despite this evidence, which at least suggested that the state authorities should not have been considered to be a reliable partner in enforcing the NPA, Acosta did not alter his decision about proceeding with a process that depended completely on state authorities for its successful execution.

OPR finds that Acosta was reasonably aware of the facts and circumstances presented by this case. He stated that he engaged in discussions about various aspects of the case with Sloman and Menchel, and relied upon them for their evaluation of the legal and evidentiary issues and for their assessment of trial issues. Acosta was copied on many substantive emails, reviewed and revised drafts of the NPA, and approved the final agreement. Yet, rather than focusing on whether the state's prosecution was sufficient to satisfy the federal interest in prosecuting Epstein, Acosta focused on achieving the minimum outcome necessary to satisfy the *state's* interest, as defined in part by the state's indictment, by using the threat of a federal prosecution to dictate the terms of

174

Epstein's state guilty plea.[250]  As U.S. Attorney, Acosta had the authority to resolve the case in this manner, but OPR concludes that in light of all the surrounding circumstances, his decision to do so reflected poor judgment.  Acosta's application of Petite policy principles was too expansive, his view of the federal interest in prosecuting Epstein was too narrow, and his understanding of the state system was too imperfect to justify the decision to use the NPA.[251]

**B.      The Assessment of the Merits of a Potential Federal Prosecution Was Undermined by the Failure to Obtain Evidence or Take Other Investigative Steps That Could Have Changed the Complexion of the Case**

The leniency resulting from Acosta's decision to resolve the case through the NPA is also troubling because the USAO reached agreement on the terms of the NPA without fully pursuing evidence that could have changed the complexion of the case or afforded the USAO significant leverage in negotiating with Epstein.  Acosta told OPR that his decision to resolve the federal investigation through the NPA was, in part, due to concerns about the merits of the case and concerns about whether the government could win at trial.  Yet, Acosta made the decision to resolve the case through a state-based resolution and extended that proposal to Epstein's defense attorneys before the investigation was completed.  As the investigation progressed, the FBI continued to locate additional victims, and many had not been interviewed by the FBI by the time of the initial offer.  In other words, at the time of Acosta's decision, the USAO did not know the full scope of Epstein's conduct; whether, given Epstein's other domestic and foreign residences, his criminal conduct had occurred in other locations; or whether the additional victims might implicate other offenders.  In addition, Villafaña planned to approach the female assistants to attempt to obtain cooperation, but that step had not been taken.[252]  Most importantly, Acosta ended the investigation without the USAO having obtained an important category of potentially significant evidence:  the computers removed from Epstein's home prior to the PBPD's execution of a search warrant.

The PBPD knew that Epstein had surveillance cameras stationed in and around his home, which potentially captured video evidence of people visiting his residence, and that before the state

---

[250]     Acosta told OPR that he understood that if Epstein had pled to the original charges contemplated by the state, he would have received a two-year sentence, and in that circumstance, the PBPD would not have brought the case to the FBI.  OPR was unable to verify that charges originally contemplated by the state would have resulted in a two-year sentence.  OPR's investigation confirmed, however, that the PBPD brought the case to the FBI because the PBPD Chief was dissatisfied with the state's handling of the matter.

[251]     In commenting on OPR's draft report, Acosta's attorney stated that Acosta "accept[ed] OPR's conclusion that deferring prosecution of Jeffrey Epstein to the State Attorney rather than proceeding with a federal indictment or a federal plea was, in hindsight, poor judgment."  Acosta also acknowledged that the USAO's handling of the matter "would have benefited from more consistent staffing and attention.  No one foresaw the additional challenges that the chosen resolution would cause. And the [NPA] relied too much on state authorities, who gave Epstein and his counsel too much wiggle-room."  Acosta's counsel also noted that Acosta welcomed the public release of the Report, "did not challenge OPR's authority, welcomed the review, and cooperated fully."

[252]     Although the FBI interviewed numerous employees of Epstein and Villafaña identified three of his female assistants as potential co-conspirators, at the time that the USAO extended the terms of its offer, there had been no significant effort to obtain these individuals' cooperation against Epstein.  The FBI attempted unsuccessfully to make contact with two female assistants on August 27, 2007, as Epstein's private plane was departing for the Virgin Islands, but agents were unable to locate them on board the plane.

search warrant was executed on that property, the computer equipment associated with those cameras had been removed.  Villafaña knew who had possession of the computer equipment. Surveillance images might have shown the victims' visits, and photographic evidence of their appearance at the time of their encounters with Epstein could have countered the anticipated argument that Epstein was unaware these girls were minors.  The surveillance video might have shown additional victims the investigators had not yet identified.  Such images could have been powerful visual evidence of the large number of girls Epstein victimized and the frequency of their visits to his home, potentially persuasive proof to a jury that this was not a simple "solicitation" case.

Epstein's personal computers possibly contained even more damning evidence.  Villafaña told OPR that the FBI had information that Epstein used hidden cameras in his New York residence to record his sexual encounters, and one victim told agents that Epstein's assistant photographed her in the nude.  Based on this evidence, and experience in other sex cases involving minors, Villafaña and several other witnesses opined to OPR that the computers might have contained child pornography.  Moreover, Epstein lived a multi-state lifestyle; it was reasonable to assume that he may have transmitted still images or videos taken at his Florida residence over the internet to be accessed while at one of his other homes or while traveling.  The interstate transmission of child pornography was a separate, and serious, federal crime that could have changed the entire complexion of the case against Epstein.[253]  Villafaña told OPR, "[I]f the evidence had been what we suspected it was . . . [i]t would have put this case completely to bed.  It also would have completely defeated all of these arguments about interstate nexus."

Because she recognized the potential significance of this evidence, Villafaña attempted to obtain the missing computers.  After Villafaña learned that an individual associated with one of Epstein's attorneys had possession of the computer equipment that was removed from Epstein's home, she consulted with Department subject matter experts to determine how best to obtain the evidence.  Following the advice she received and after notifying her supervisors, Villafaña took legal steps to obtain the computer equipment.

Epstein's team sought to postpone compliance with the USAO's demand for the equipment.  In late June 2007, defense attorney Sanchez requested an extension of time to comply; in informing Sloman, Menchel, and Lourie of the request, Villafaña stressed that "we want to get the computer equipment that was removed from Epstein's home prior to the state search warrant as soon as possible."  She agreed to extend the date for producing the computer equipment by one week until July 17, 2007.  On that day, Epstein initiated litigation regarding the computer equipment.  That litigation was still pending at the end of July, when Acosta decided to resolve

---

[253]   18 U.S.C. § 2251(a) provides, in pertinent part:

> Any person who . . . induces . . . any minor to engage in . . . any sexually explicit conduct for the purpose of producing any visual depiction of such conduct, shall be punished . . . if such person knows or has reason to know that such visual depiction will be . . . transmitted using any means or facility of interstate . . . commerce or in or affecting interstate . . . commerce . . . [or] if that visual depiction was produced or transmitted using materials that have been mailed, shipped, or transported in or affecting interstate or . . . commerce by any means, including by computer.

the federal investigation in exchange for a plea in state court to a charge that carried a two-year sentence. The FBI co-case agent told OPR that, in a meeting to discuss the resolution, at which the FBI was present, the co-case agent specifically suggested that the USAO wait to pursue a resolution until after the litigation was resolved, but this suggestion was "pushed under the rug" without comment. Although the co-case agent could not recall who was present, the case agent recalled that Menchel led the meeting, which occurred while the litigation was still pending.

Even after the NPA two-year state plea resolution was presented to the defense, Villafaña continued to press ahead to have the court resolve the issue concerning the defense production of the computer equipment. On August 10, 2007, she asked Lourie for authorization to oppose Epstein's efforts to stay the litigation until after an anticipated meeting between the USAO and the defense, informing Lourie that a victim interviewed that week claimed she started seeing Epstein at age 14 and had been photographed in the nude. A few days later, Villafaña told defense counsel that she had "conferred with the appropriate people, and we are not willing to agree to a stay." Defense counsel then contacted Lourie, who agreed to postpone the hearing until after the upcoming meeting with Acosta. After the meeting, and when the court sought to reschedule the hearing, Villafaña emailed Sloman to ask if she should "put it off"; he replied, "Yes," and the hearing was re-set for September 18, 2007. As negotiations towards the NPA progressed, however, the hearing was postponed indefinitely. Ultimately the NPA itself put the issue to rest by specifying that all legal process would be held in abeyance unless and until Epstein breached the agreement.

Villafaña told OPR that she had learned through law enforcement channels that the defense team had reviewed the contents of Epstein's computers. She told OPR that, in her view, "the fact that the defense was trying desperately to put off the hearing . . . was further evidence of the importance of the evidence."

OPR questioned Acosta about the decisions to initiate, and continue with, the NPA negotiations while the litigation concerning the computers was still pending, and to agree to postpone the litigation rather than exhausting all efforts to obtain and review the computer evidence. Acosta told OPR that he had no recollection of Villafaña's efforts to obtain the missing computers, but he believed that "there was a desire to move quickly as opposed to slowly" regarding the plea.

Menchel, Sloman, and Lourie also all told OPR that they did not remember Villafaña's efforts to obtain the computers or recalled the issue only "vaguely." Menchel expressed surprise to OPR that a prosecutor could obtain "an entire computer" through the method utilized by Villafaña, telling OPR, "I had not heard of that." However, the contemporaneous records show that Sloman, Menchel, and Lourie had each been aware in 2007 of Villafaña's efforts to obtain Epstein's missing computer equipment.

Villafaña kept Menchel, in particular, well informed of her efforts to obtain the computer equipment. She sent to Menchel, or copied him on, several emails about her plan to obtain the computer equipment; specifically, her emails on May 18, 2007, July 3, 2007, and July 16, 2007, all discussed her proposed steps. Villafaña told OPR that Lourie was involved in early discussions about her proposal to obtain the evidence. Lourie also received Villafaña's July 16, 2007 email discussing the computer equipment and the plan to obtain it, and on one occasion he spoke directly

with one of Epstein's defense attorneys about it.  Sloman told OPR during his interview that he "vaguely" remembered the computer issue.  The documentary evidence confirms that he had at least some contemporaneous knowledge of the issue—when asked by Villafaña whether to put off a September 12, 2007 hearing on the litigation, he told her to do so.  Finally, as noted previously, the FBI co-case agent proposed at a meeting with USAO personnel that the USAO wait until the litigation was resolved before pursuing plea negotiations.

Contemporaneous records show that Acosta was likely aware before the NPA was signed of the USAO's efforts to obtain custody of Epstein's computers and that after the NPA was signed, he was informed about the use of legal process for obtaining the computer equipment.  The NPA itself provides that "the federal . . . investigation will be suspended, and all pending [legal process] will be held in abeyance," that Epstein will withdraw his "motion to intervene and to quash certain [legal process]," and, further, that the parties would "maintain . . . evidence subject to [legal process] that have been issued, and *including certain computer equipment,* inviolate" until the NPA's terms had been fully satisfied, at which point the legal process would be "deemed withdrawn."  (Emphasis added.)  Acosta's numerous edits on the NPA's final draft suggest that he gave it a close read, and OPR expects that Acosta would not have approved the agreement without understanding what legal process his office was agreeing to withdraw, or why the only type of evidence specified was "certain computer equipment."  In addition, Acosta told OPR that he worked closely with Sloman and Menchel, consulted with them, and relied on their counsel about the case.  Among other things, Acosta said he discussed with them concerns about the law and the evidentiary issues presented by a federal criminal trial.  Therefore, although it is possible that Sloman made the decision to postpone the hearing concerning the USAO's efforts to obtain the computer equipment without consulting Acosta, once Acosta reviewed the draft NPA, Acosta was on notice of the existence of and the ongoing litigation concerning Epstein's missing computer equipment.

Villafaña knew where the computers were; litigation over the demand for the equipment was already underway; there was good reason to believe the computers contained relevant—and potentially critical—information; and it was clear Epstein did not want the contents of his computers disclosed.  Nothing in the available record reveals that the USAO benefitted from abandoning pursuit of this evidence when they did, or that there was any significant consideration of the costs and benefits of forgoing the litigation to obtain production of the computers.[254] Instead, the USAO agreed to postpone and ultimately to abandon its efforts to obtain evidence that could have significantly changed Acosta's decision to resolve the federal investigation with a state guilty plea or led to additional significant federal charges.  By agreeing to postpone the litigation, the USAO gave away leverage that might have caused the defense to come to an agreement much earlier and on terms more favorable to the government.  The USAO ultimately agreed to a term in the NPA that permanently ended the government's ability to obtain possible evidence of significant crimes and did so with apparently little serious consideration of the potential cost.

---

[254]    If the USAO had significant concerns about its likelihood of prevailing, postponing the litigation to use it as leverage in the negotiations might have been strategically reasonable.  Lourie suggested in his response to his interview transcript that the court might have precluded production of the computers.  However, OPR saw no evidence indicating that Villafaña or her supervisors were concerned that the court would do so, and Villafaña had consulted with the Department's subject matter experts before initiating her action to obtain the equipment.

To be clear, OPR is not suggesting that prosecutors must obtain all available evidence before reaching plea agreements or that prosecutors cannot reasonably determine that reaching a resolution is more beneficial than continuing to litigate evidentiary issues. Every case is different and must be judged on its own facts. In this case, however, given the unorthodox nature of the state-based resolution, the fact that Acosta's decision to pursue it set the case on a wholly different track than what had been originally contemplated by his experienced staff, the nature and scope of Epstein's criminal conduct, the circumstances surrounding the removal of the computers from Epstein's residence, and the potential for obtaining evidence revealing serious additional criminal conduct, Acosta had a responsibility to ensure that he was fully informed about the consequences of pursing the course of action that he proposed and particularly about the consequences flowing from the express terms of the NPA. In deciding to resolve the case pre-charge, Acosta lost sight of the bigger picture that the investigation was not completed and viable leads remained to be pursued. The decision to forgo the government's efforts to obtain the computer evidence and to pursue significant investigative steps should have been made only after careful consideration of all the costs and benefits of the proposed action. OPR did not find evidence that Acosta fully considered the costs of ending the investigation prematurely.[255]

### C.   OPR Was Unable to Determine the Basis for the Two-Year Term of Incarceration, That It Was Tied to Traditional Sentencing Goals, or That It Satisfied the Federal Interest in the Prosecution

The heart of the controversy surrounding the Epstein case is the apparent undue leniency afforded him concerning his sentence. After offering a deal that required a "non-negotiable" 24-month term of incarceration, Acosta agreed to resolve it for an 18-month term of incarceration, knowing that gain time would reduce it further, and indeed, Epstein served only 13 months. Epstein ultimately did not serve even that minimal sentence incarcerated on a full-time basis because the state allowed Epstein into its work release program within the first four months of his sentence. As Lourie told OPR, "[E]verything else that happened to [Epstein] is exactly what should have happened to him. . . . He had to pay a lot of money. He had to register as a sex offender," but "in the perfect world, [Epstein] would have served more time in jail."

Due to the passage of time and the subjects' inability to recall many details of the relevant events, OPR was unable to develop a clear understanding of how the original two-year sentence requirement was developed or by whom. Two possibilities were articulated during OPR's subject interviews: (1) the two years represented the sentence Epstein would have received had he pled guilty to an unspecified charge originally contemplated by the state; or (2) the two years represented the sentence the USAO determined Epstein would be willing to accept, thus avoiding the need for a trial. As to the former possibility, Acosta told OPR that his "best understanding" of the two-year proposal was that it correlated to "one of the original state charges." He elaborated,

---

[255]   In commenting on OPR's draft report, Acosta's attorney objected to OPR's conclusion that Acosta knew or should have known about the litigation regarding the computers and that he should have given greater consideration to pursuing the computers before the NPA was signed. Acosta's attorney asserted that Acosta was not involved in that level of "granularity"; that his "'small thoughts' edits" on the NPA were limited and focused on policy; and that it was appropriate for him to rely on his staff to raise any issues of concern to him. For the reasons stated above, OPR nonetheless concludes that having developed a unique resolution to a federal investigation, Acosta had a greater obligation to understand and consider what the USAO was giving up and the appropriateness of doing so.

"I'm reconstructing memories of . . . 12 years ago.  I can speculate that at some point, the matter came up, and I or someone else said . . . what would the original charges have likely brought?  And someone said this amount."  Acosta told OPR that he could not recall who initially proposed this method, but he believed that it likely did not result from a single specific discussion but rather from conversations over a course of time.  Acosta could not recall specifically with whom he had these discussions, other than that it would have been Lourie, Menchel, or Sloman.  Villafaña was not asked for her views on a two-year sentence, and she had no input into the decision before it was made.  Villafaña told OPR that she examined the state statutes and could not validate that a state charge would have resulted in a 24-month sentence.  OPR also examined applicable state statutes and the Florida sentencing guidelines, but could not confirm that Epstein was, in fact, facing a potential two-year sentence under charges contemplated by the PBPD.

 On the other hand, during his OPR interview, Lourie "guess[ed]" that "somehow the defense conveyed . . . we're going to trial if it's more than two years."  Menchel similarly told OPR that he did not know how the two year sentence was derived, but "obviously it was a number that the office felt was palatable enough that [Epstein] would take" it.  Sloman told OPR that he had no idea how the two-year sentence proposal was reached.

The contemporaneous documentary record, however, provides no indication that Epstein's team proposed a two-year sentence of incarceration or initially suggested, before the USAO made its offer, that Epstein would accept a two-year term of incarceration.  As late as July 25, 2007—only days before the USAO provided the term sheet to defense counsel—Epstein's counsel submitted a letter to the USAO arguing that the federal government should not prosecute Epstein at all.  Furthermore, after the initial "term sheet" was presented and negotiations for the NPA progressed, Epstein's team continued to strongly press for less or no time in jail.

The USAO had other charging and sentencing options available to it.  The most obvious alternative to the two-year sentence proposal was to offer Epstein a plea to a federal offense that carried a harsher sentence.  If federally charged, Epstein was facing a substantial sentence under the federal sentencing guidelines, 168 to 210 months' imprisonment.  However, it is unlikely that he would have agreed to a plea that required a guidelines sentence, even one at the lower end of the guidelines.  Menchel told OPR that he and his colleagues had been concerned that Epstein would opt to go to trial if charged and presented with the option of pleading to a guidelines sentence, and as previously discussed, there were both evidentiary and legal risks attendant upon a trial in this case.  If federally charged, Epstein's sentencing exposure could have been managed by offering him a plea under Federal Rule of Criminal Procedure 11(c) for a stipulated sentence, which requires judicial approval.  Acosta rejected this idea, however, apparently because of a perception that the federal district courts in the Southern District of Florida did not view Rule 11(c) pleas favorably and might refuse to accept such a plea and thus limit the USAO's options.

Another alternative was to offer Epstein a plea to conspiracy, a federal charge that carried a maximum five-year sentence.  Shortly after Villafaña circulated the prosecution memorandum to her supervisors, Lourie recommended to Acosta charging Epstein by criminal complaint and offering a plea to conspiracy "to make a plea attractive."  Similarly, before learning that Menchel had already discussed a state-based resolution with Epstein's counsel, Villafaña had considered offering Epstein a plea to one count of conspiracy and a substantive charge, to be served concurrently with any sentence he might receive separately as a result of the state's outstanding

indictment. Given Epstein's continued insistence that federal charges were not appropriate and defense counsel's efforts to minimize the amount of time Epstein would spend in jail, it is questionable whether Epstein would have accepted such a plea offer, but the USAO did not even extend the offer to determine what his response to it would be.

Weighed against possible loss at trial were some clear advantages to a negotiated resolution that ensured a conviction, including sexual offender registration and the opportunity to establish a mechanism for the victims to recover damages. These advantages, added to Acosta's concern about intruding on the state's authority, led him to the conclusion that a two-year state plea would be sufficient to prevent manifest injustice. Menchel told OPR, "I don't believe anybody at the time that this resolution was entered into was looking at the two years as a fair result in terms of the conduct. I think that was not the issue. The issue was whether or not if we took this case to trial, would we risk losing everything?"

During the course of negotiations over a potential federal plea, the USAO agreed to accept a plea for an 18-month sentence, a reduction of six months from the original "non-negotiable" two-year term. The subjects did not have a clear memory of why this reduction was made. Villafaña attributed it to a conversation between Acosta and Lefkowitz, but Acosta attributed it to a decision made during the negotiating process by Villafaña and Lourie, telling OPR that he understood his attorneys needed flexibility to reach a final deal with Epstein.

OPR found no contemporaneous documents showing the basis for the two-year term. Despite extensive subject interviews and review of thousands of contemporaneous records, OPR was unable to determine who initially proposed the two-year term of incarceration or why that term, as opposed to other possible and lengthier terms, was settled on for the initial offer. The term was not tied to statutory or guidelines sentences for potential federal charges or, as far as OPR could determine, possible state charges. Furthermore, while the USAO initially informed the defense that the two-year term was "non-negotiable," Acosta failed to enforce that position and rather than a "floor" for negotiations, it became a "ceiling" that was further reduced during the negotiations. OPR was unable to find any evidence indicating that the term of incarceration was tied either to the federal interest in seeking a just sentence for a serial sexual offender, or to other traditional sentencing factors such as deterrence, either of Epstein or other offenders of similar crimes. Instead, as previously noted, it appears that Acosta primarily considered only a punishment that was somewhat more than that to which the state had agreed. As a result, the USAO had little room to maneuver during the negotiations and because Acosta was unwilling to enforce the "non-negotiable" initial offer, the government ended up with a term of incarceration that was not much more than what the state had initially sought and which was significantly disproportionate to the seriousness of Epstein's conduct.

In sum, it is evident that Acosta's desire to resolve the federal case against Epstein led him to arrive at a target term of incarceration that met his own goal of serving as a "backstop" to the state, but that otherwise was untethered to any articulable, reasonable basis. In assessing the case only through the lens of providing a "backstop" to the state, Acosta failed to consider the need for a punishment commensurate with the seriousness of Epstein's conduct and the federal interest in addressing it.

### D.    Acosta's Decisions Led to Difficulties Enforcing the NPA

After the agreement was reached, the collateral attacks and continued appeals raised the specter that the defense had negotiated in bad faith.  At various points, individual members of the USAO team became frustrated by defense tactics, and in some instances, consideration was given to whether the USAO should declare a unilateral breach.  Indeed, on November 24, 2008, the USAO gave notice that it deemed Epstein's participation in work release to be a breach of the agreement but ultimately took no further action.  Acosta told OPR:  "I was personally very frustrated with the failure to report on October 20, and had I envisioned that entire collateral attack, I think I would have looked at this very differently."

Once the NPA was signed, Acosta could have ignored Epstein's requests for further review by the Department and, if Epstein failed to fulfill his obligations under the NPA to enter his state guilty plea, declared Epstein to be in breach and proceeded to charge him federally.  When questioned about this issue, Acosta explained that he believed the Department had the "right" to address Epstein's concerns.  He told OPR that because the USAO is part of the Department of Justice, if a defendant asks for Departmental review, it would be "unseemly" to object.  During his OPR interview, Sloman described Acosta as very process-oriented, which he attributed to Acosta's prior Department experience.  Sloman, however, believed the USAO gave Epstein "[t]oo much process," a result of the USAO's desire to "do the right thing" and to the defense team's ability to keep pressing for more process without triggering a breach of the NPA.  Furthermore, Epstein's defense counsel repeatedly and carefully made clear they were not repudiating the agreement.  Acosta told OPR that the USAO would have had to declare Epstein in breach of the NPA in order to proceed to file federal charges, and Epstein would undoubtedly have litigated whether his effort to obtain Departmental review constituted a breach.  Acosta recalled that he was concerned, as was Sloman, that a unilateral decision to rescind the non-prosecution agreement would result in collateral litigation that would further delay matters and make what was likely a difficult trial even harder.

Acosta's and Sloman's concerns about declaring a breach were not unreasonable.  A court would have been unlikely to have determined that defense counsel's appeal of the NPA to the Department and unwillingness to set a state plea date while that appeal was ongoing was sufficient to negate the agreement.  However, some of the difficulty the USAO faced in declaring a breach was caused by decisions Acosta made before and shortly after the NPA was signed.  For example, and significantly, it was Acosta who changed the language, "Epstein shall enter his guilty plea and be sentenced not later than October 26, 2007" to "Epstein shall use [his] *best efforts* to enter his guilty plea and be sentenced not later than October 26, 2007."  (Emphasis added.)  Acosta also agreed not to enforce the NPA's October 26, 2007 deadline for entry of Epstein's plea, and he told defense counsel that he had no objection if they decided to pursue an appeal to the Department.  Following these decisions, the USAO would have had significant difficulty trying to prove that Epstein was not using his "best efforts" to comply with the NPA and was intentionally failing to comply, as opposed to pursuing a course to which the U.S. Attorney had at least implicitly agreed.

### E.    Acosta Did Not Exercise Sufficient Supervisory Review over the Process

The question at the center of much of the public controversy concerning the USAO's handling of its criminal investigation of Epstein is why the USAO agreed to resolve a case in which

the defendant faced decades in prison for sexual crimes against minors with such an insignificant term of incarceration, and made numerous other concessions to the defense. As OPR has set forth in substantial detail in this Report, OPR did not find evidence to support allegations that the prosecutors sought to benefit Epstein at the expense of the victims. Instead, the result can more appropriately be tied to Acosta's misplaced concerns about interfering with a traditionally state crime and intruding on state authority. Acosta was also unwilling to abandon the path that he had set, even when Villafaña and Lourie advocated to end the negotiations and even though Acosta himself had learned that the state authorities may not have been a reliable partner.

Many of the problems that developed might have been avoided had Acosta engaged in greater consultation with his staff before making key decisions. The contemporaneous records revealed problems with communication and coordination among the five key participants. Acosta was involved to a greater extent and made more decisions than he did in a typical case. Lourie told OPR that it was "unusual to have a U.S. Attorney get involved with this level of detail." Menchel told OPR, "I know we would have spoken about this case a lot, okay? And I'm sure with Jeff as well, and there were conversations -- a meeting that I had with Marie and Andy as well." Lourie similarly told OPR:

> Well, . . . he would have been talking to Jeff and Matt, talking to me to the extent that he did, he would have been looking at the Pros Memo and . . . the guidance from CEOS, he would have been reading the defense attorney's letters, maybe talking to the State Attorney, I don't know, just . . . all these different sources of information he was -- I'm comfortable that he knew the case, you know, that he was, he was reading everything. Apparently, he, you know, read the Pros Memo, he read all the stuff . . . .

At the same time, Acosta was significantly removed, both in physical distance and in levels in the supervisory chain, from the individuals with the most knowledge of the facts of the case—Villafaña and, to a lesser extent, Lourie. Lourie normally would have signed off on the prosecution memorandum on his own, but as he told OPR, he recognized that the case was going to go through the front office "[b]ecause there was front office involvement from the get go." Yet, although Acosta became involved at certain points in order to make decisions, he did not view himself as overseeing the investigation or the details of implementing his decisions. OPR observed that as a consequence, management of the case suffered from both an absence of ownership of the investigation and failures in communication that affected critical decisions.

On occasion, Villafaña included Acosta directly in emails, but often, information upon which Acosta relied for his decisions and information about the decisions Acosta had made traveled through multiple layers between Acosta and Villafaña. Villafaña did draft a detailed, analytical prosecution memorandum, but it is not clear that Acosta read it and instead may have relied on conversations primarily with Menchel and later with Sloman after Menchel's departure. Despite these discussions, though, it is not clear that Acosta was aware of certain information, such as Oosterbaan's strong opinion from the outset in favor of the prosecution or of Villafaña's concerns and objections to a state-based resolution or the final NPA. Acosta interpreted the state indictment on only one charge as a sign that the case was weak evidentially, but it is not clear that when making his decision to resolve the matter though a state-based plea, he knew the extent to

which Villafaña and Lourie believed that the state had intentionally failed to aggressively pursue a broader state indictment.

One example illustrates this communication gap.  In a September 20, 2007 email to Lourie asking him to read the latest version of the proposed "hybrid" federal plea agreement (calling for Epstein to plead to both state and federal charges), Acosta noted, "I don't typically sign plea agreements.  *We should only go forward if the trial team supports and signs this agreement.*  I didn't even sign the public corruption or [C]ali cartel agreements, so this should not be the first." (Emphasis added.)   In his email to Villafaña, Lourie attached Acosta's email and instructed Villafaña to "*change the signature block to your name*" and send as final to Jay [Lefkowitz]." (Emphasis added.)  Villafaña raised no objection to signing the agreement.  Acosta told OPR that he wanted to give the "trial team" a chance to "speak up and let him know" if they did not feel comfortable with the agreement.  Villafaña, however, told OPR that she did not understand that she was being given an opportunity to object to the agreement; rather, she believed Acosta wanted her to sign it because he was taking an "arm's length" approach and signaling this "was not his deal."  The fact that the top decision maker believed he was giving the line AUSA an opportunity to reflect and stop the process if she believed the deal was inappropriate, but the line AUSA believed she was being ordered to sign the agreement because her boss wanted to distance himself from the decision, reflects a serious communication gap.

As another example, at one point, Villafaña, frustrated and concerned about the decisions being made concerning a possible resolution, requested a meeting with Acosta; in a sternly worded rebuke, Menchel rejected the request.  Although Menchel told OPR that he was not prohibiting Villafaña from speaking to Acosta, Villafaña interpreted Menchel's email to mean that she could not seek a meeting with Acosta.  As a consequence, Acosta made his decision about a state resolution and the term of incarceration without any direct input from Villafaña.  Acosta told OPR that he was unaware that Villafaña had sought a meeting with him and he would have met with her if she had asked him directly.  OPR did not find any written evidence of a meeting involving both Acosta—the final decision maker—and Villafaña—the person most knowledgeable about the facts and the law—before Acosta made his decision to resolve the case through state charges or to offer the two-year term, and Villafaña said she did not have any input into the decision.  Although a U.S. Attorney is certainly not required to have such direct input, and it may be that Menchel presented what he believed to be Villafaña's views, OPR found no evidence that Acosta was aware of Villafaña's strong views about, and objections to, the proposed resolution.[256]

Two logistical problems hindered effective communication.  First, the senior managers involved in the case—Acosta, Sloman, and Menchel—had offices located in Miami, while the offices of the individuals most familiar with facts of the case—Villafaña and, to a lesser extent, Lourie—were located in West Palm Beach.  Consequently, Villafaña's discussions with her senior

---

[256]      In her 2017 Declaration in the CVRA litigation, Villafaña stated that, given the challenges of obtaining victims' cooperation with a federal prosecution, "I believed and still believe that a negotiated resolution of the matter was in the best interests of the [USAO] and the victims as a whole.  The [USAO] had also reached that same conclusion."  Several subjects pointed to this statement as indicating that Villafaña in fact supported the NPA.  In her OPR interview, however, Villafaña drew a distinction between resolving the investigation through negotiations that led to what in her view was a reasonable outcome, which she would have supported, and "this negotiated resolution"— that is, the NPA—which she did not support.

managers required more effort than in other offices, where a line AUSA can more easily just stop by a supervisor's office to discuss a case.[257]

Second, key personnel were absent at varying times. Menchel's last day in the office was August 3, 2007, the day he sent to the defense his letter making the initial offer, and presumably in the immediate period before his departure date, Menchel would have been trying to wrap up his outstanding work. Yet, this was also the time when Acosta was deciding how to resolve the matter. Similarly, in the critical month of September, the NPA and plea negotiations intensified and the NPA evolved significantly, with the USAO having to consider multiple different options as key provisions were continuously added or modified while Villafaña pressed to meet her late-September deadline. Although Lourie was involved with the negotiations during this period, he was at the same time transitioning not only to a new job but to one in Washington, D.C., and was traveling between the two locations. Sloman was on vacation in the week preceding the signing, when many significant changes were made to the agreement, and he did not participate in drafting or reviewing the NPA before it was signed. Accordingly, during the key negotiation period for a significant case involving a unique resolution, no one involved had both a thorough understanding of the case and full ownership of the decisions that were being made. Villafaña certainly felt that during the negotiations, she was only implementing decisions made by Acosta. Acosta, however, told OPR that when reviewing the NPA, "I would have reviewed this for the policy concerns. Did it do the . . . bullet points, and my assumption, rightly or wrongly, would have been that Andy and Marie would have looked at this, and that this was . . . appropriate."

The consequences flowing from the lack of ownership and effective communication can be seen in the NPA itself. As demonstrated by the contemporaneous communications, the negotiations were at times confusing as the parties considered multiple options and even revisited proposals previously rejected. Meanwhile, Villafaña sought to keep to a deadline that would allow her to charge Epstein when she had planned to, if the parties did not reach agreement. In the end, Acosta accepted several terms with little apparent discussion or consideration of the ramifications.

The USAO's agreement not to prosecute "any potential co-conspirators" is a notable example. As previously noted, the only written discussion about the term that OPR found was Villafaña's email to Lourie and the incoming West Palm Beach manager, with copies to her co-counsel and direct supervisor, stating that she did not believe the provision "hurts us," and neither Acosta, Lourie, nor Villafaña recalled any further discussion about the provision. Although OPR did not find evidence showing that Acosta, Lourie, or Villafaña intended the scope of the provision to protect anyone other than Epstein's four assistants, the plain language of the provision precluded the USAO from prosecuting anyone who engaged with Epstein in his criminal conduct, within the limitations set by the overall agreement. This broad prosecution declination would likely be unwise in most cases but in this case in particular, the USAO did not have a sufficient investigative basis from which it could conclude with any reasonable certitude that there were no other individuals who should be held accountable along with Epstein or that evidence might not be developed implicating others. Prosecutors rarely promise not to prosecute unidentified third

---

[257]     In his OPR interview, Acosta commented that although Menchel's office was on the same floor as Acosta's, he was in a different suite, which "affects interaction."

parties.[258]  The rush to reach a resolution should not have led the USAO to agree to such a significant provision without a full consideration of the potential consequences and justification for the provision.  It is highly doubtful that the USAO's refusal to agree to that term would have itself caused the negotiations to fail; the USAO's rejection of the defense proposal concerning immigration consequences did not affect Epstein's willingness to sign the agreement.  The possibility that individuals other than Epstein's four female assistants could have criminal culpability for their involvement in his scheme could have been anticipated and should have caused more careful consideration of the provision.

Similarly, the confidentiality provision was also accepted with little apparent consideration of the implications of the provision for the victims, and it eventually became clear that the defense interpreted the provision as precluding the USAO from informing the victims about the status of the investigation.  Agreeing to a provision that restricted the USAO's ability to disclose or release information as it deemed appropriate mired the USAO in disputes about whether it was or would be violating the terms of the NPA by disclosing information to victims or the special master.  Decisions about disclosure of information should have remained within the authority and province of the USAO to decide as it saw fit.

There is nothing improper about a U.S. Attorney not having a meeting with the line AUSA or other involved members of the prosecution team before he or she makes a decision in a given case; indeed, U.S. Attorneys often make decisions without having direct input from line AUSAs.  And Acosta did have discussions with Menchel, and possibly Sloman, before making the critical decision to resolve the matter through a state plea, although the specifics of those discussions could not be recalled by the participants due to the passage of time.  This case, however, was different from the norm, and Acosta was considering a resolution that was significantly different from the usual plea agreement.  Contemporaneous records show that Acosta believed the case should be handled like any other, but Acosta's decision to fashion an unorthodox resolution made the case unlike any other, and it therefore required appropriate and commensurate oversight.  Acosta may well have decided to proceed in the same fashion even if he had sought and received a full briefing

---

[258]      CEOS Chief Oosterbaan told OPR this provision was "very unusual."  Principal Associate Deputy Attorney General John Roth commented, "I don't know how it is that you give immunity to somebody who's not identified.  I just don't know how that works."  Villafaña's co-counsel told OPR:

> [I]t's effectively transactional immunity which I didn't think we were supposed to do at the Department of Justice. . . .  I've never heard of anything of the sort. . . . [W]e go to great lengths in most plea agreements to go and not give immunity for example, for crimes of violence, . . . for anything beyond the specific offense which was being investigated during the specific time periods and for you and nobody else.  I mean on rare occasion I've seen cases where say someone was dealing drugs and their wife was involved. . . . And they've got kids. . . . [and] it's understood that the wife probably could be prosecuted and sent to jail too, but you know the husband's willing to go and take the weight . . . .  This is not one of those.

Deputy Attorney General Filip called the provision "pretty weird."  Menchel's successor as Criminal Chief told OPR that he had never heard of such a thing in his 33 years of experience as a prosecutor.  A senior AUSA with substantial experience prosecuting sex crimes against children commented that it was "horrendous" to provide immunity for participants in such conduct.

from Villafaña and others, but given the highly unusual procedure being considered, his decision should have been made only after a full consideration of all of the possible ramifications and consequences of pushing the matter into the state court system, with which neither Villafaña nor the other subjects had experience, along with consideration of the legal and evidentiary issues and possible means of overcoming those issues. OPR did not find evidence indicating that such a meeting or discussion with the full team was held before the decision was made to pursue the state-based resolution, before the decision was made to offer a two-year term of incarceration, or before the NPA, with its unusual terms, was signed. As Acosta later recognized and told OPR, "And a question that I think is a valid one in my mind is, did the focus on, let's just get this done and get a jail term, mean that we didn't take a step back and say, let's evaluate how this train is moving?"

Many features of the NPA were given inadequate consideration, including core provisions like the term of incarceration and sexual offender registration, with the result that Epstein was able to manipulate the process to his benefit. Members of his senior staff held differing opinions about some of the issues that Acosta felt were important and that factored into his decision-making. There does not seem to be a point, however, at which those differing opinions were considered when forming a strategy; rather, Acosta seems to have made a decision that everyone beneath him followed and attempted to implement but without a considered strategy beyond attaining the three core elements. As the U.S. Attorney, Acosta had authority to proceed in this manner, but many of the problems that developed with the NPA might have been avoided with a more thoughtful approach. As Acosta belatedly recognized, "[I]f I was advising a fellow U.S. Attorney today, I would say, think it through."[259]

No one of the individual problems discussed above necessarily demonstrates poor judgment by itself. However, in combination, the evidence shows that the state-based resolution was ill conceived from the start and that the NPA resulted from a flawed decision-making process. From the time the USAO opened its investigation, Acosta recognized the federal interest in prosecuting Epstein, yet after that investigation had run for more than a year, he set the investigation on a path not originally contemplated. Having done so, he had responsibility for ensuring that he received and considered all of the necessary information before putting an end to a federal investigation into serious criminal conduct. Acosta's failure to adequately consider the full ramifications of the NPA contributed to a process and ultimately a result that left not only the line AUSA and the FBI case agents dissatisfied but also caused victims and the public to question the motives of the prosecutors and whether any reasonable measure of justice was achieved. Accordingly, OPR concludes that Acosta exercised poor judgment in that he chose a course of action that was in marked contrast to the action that the Department would reasonably expect an attorney exercising good judgment to take.

---

[259]    In commenting on OPR's draft report, Acosta's attorney acknowledged that "[t]he matter would have benefited from more consistent staffing and attention."

[Page Intentionally Left Blank]

# CHAPTER THREE

# ISSUES RELATING TO THE GOVERNMENT'S INTERACTIONS AND COMMUNICATIONS WITH VICTIMS

## PART ONE: FACTUAL BACKGROUND

## I.    OVERVIEW

Chapter Three describes the events pertaining to the federal government's interactions and communications with victims in the Epstein case, and should be read in conjunction with the factual background set forth in Chapter Two, Part One.  This chapter sets forth the pertinent legal authorities and Department policies and practices regarding victim notification and consultation, as well as OPR's analysis and conclusions.  OPR discusses key events relating to the USAO's and the FBI's interactions with victims before and after the signing of the NPA, beginning with the FBI's initial contact with victims through letters informing them that the FBI had initiated an investigation.  A timeline of key events is provided on the following page.

## II.    THE CVRA, 18 U.S.C. § 3771

### A.    History

In December 1982, the President's Task Force on Victims of Crime issued a final report outlining recommendations for the three branches of government to improve the treatment of crime victims.  The Task Force concluded that victims have been "overlooked, their pleas for justice have gone unheeded, and their wounds—personal, emotional and financial—have gone unattended."[260]  Thereafter, the government enacted various laws addressing victims' roles in the criminal justice system:  the Victim and Witness Protection Act of 1982, the Victims of Crime Act of 1984, the Victims' Rights and Restitution Act of 1990 (VRRA), the Violent Crime Control and Law Enforcement Act of 1994, the Antiterrorism and Effective Death Penalty Act of 1996, the Victim Rights Clarification Act of 1997, and the Justice for All Act of 2004.[261]

The CVRA, enacted on October 30, 2004, as part of the Justice for All Act, was designed to protect crime victims and to make them "full participants in the criminal justice system."[262]  The CVRA resulted from a multi-year bipartisan effort to approve a proposal for a constitutional amendment guaranteeing victims' rights, some of which had previously been codified as a victims'

---

[260]    President's Task Force on Victims of Crime Final Report at ii (Dec. 1982).

[261]    *See* Pub. L. No. 97-291 (Victim and Witness Protection Act) (1982); Pub. L. No. 98-473 (Victims of Crime Act) (1984); Pub. L. No. 101-647 (Victims' Rights and Restitution Act) (1990); Pub. L. No. 103-322 (Violent Crime Control and Law Enforcement Act) (1994); Pub. L. No. 104-132 (Antiterrorism and Effective Death Penalty Act) (1996); Pub. L. No. 105-6 (Victim Rights Clarification Act) (1997); and Pub. L. No. 108-405 (Justice for All Act) (2004).

[262]    *Kenna v. U.S. Dist. Court*, 435 F.3d 1011, 1016 (9th Cir. 2006); *United States v. Moussaoui*, 483 F.3d 220, 234 (4th Cir. 2007); and Justice for All Act.

# Timeline of Key Events for Crime Victims' Rights Act Analysis



Bill of Rights in the VRRA.[263]  Following multiple Senate Judiciary Committee subcommittee hearings and various revisions of the proposed amendment, the Senators determined that such an amendment was unlikely to be approved and, instead, they presented the CVRA as a compromise measure.[264]

## B.    Enumerated Rights

The CVRA defines the term "crime victim" as "a person directly and proximately harmed as a result of the commission of a Federal offense or an offense in the District of Columbia."[265] Initially, and at the time relevant to the federal Epstein investigation, the CVRA afforded crime victims the following eight rights:

> (1) The right to be reasonably protected from the accused.
>
> (2) The right to reasonable, accurate, and timely notice of any public court proceeding, or any parole proceeding, involving the crime or of any release or escape of the accused.
>
> (3) The right not to be excluded from any such public court proceeding, unless the court, after receiving clear and convincing evidence, determines that testimony by the victim would be materially altered if the victim heard other testimony at that proceeding.
>
> (4) The right to be reasonably heard at any public proceeding in the district court involving release, plea, sentencing, or any parole proceeding.
>
> (5) The reasonable right to confer with the attorney for the Government in the case.

---

[263]    *See* 150 Cong. Rec. S4260-01 at 1, 5 (2004).  The VRRA identified victims' rights to (1) be treated with fairness and with respect for the victim's dignity and privacy; (2) be reasonably protected from the accused offender; (3) be notified of court proceedings; (4) be present at all public court proceedings that relate to the offense, unless the court determines that testimony by the victim would be materially affected if the victim heard other testimony at trial; (5) confer with an attorney for the Government in the case; (6) restitution; and (7) information about the conviction, sentencing, imprisonment, and release of the offender.  42 U.S.C. § 10606(b) (1990).  The relevant text of the VRRA is set forth in Chapter Three, Part Two, Section 1.B of this Report.

[264]    150 Cong. Rec. S4260-01 at 1, 5 (2004).  Although nine congressional hearings were held between 1996 and 2003 concerning amending the Constitution to address victims' rights, neither chamber of Congress voted on legislation proposing an amendment.  United States Government Accountability Office (GAO), GAO-09-54, *Report to Congressional Committees:  Crime Victims' Rights Act – Increasing Awareness, Modifying the Complaint Process and Enhancing Compliance Monitoring Will Improve Implementation of the Act* at 16 (Dec. 2008) (GAO *CVRA Awareness Report*).

[265]    The relevant text of the CVRA is set forth in Chapter Three, Part Two, Section I.A of this Report.

(6) The right to full and timely restitution as provided in law.

(7) The right to proceedings free from unreasonable delay.

(8) The right to be treated with fairness and with respect for the victim's dignity and privacy.

Although many of the rights included in the CVRA already existed in federal law as part of the VRRA, the CVRA afforded crime victims standing to assert their rights in federal court or by administrative complaint to the Department, and obligated the court to ensure that such rights were afforded. The passage of the CVRA repealed the rights portion of the VRRA (42 U.S.C. § 10606), but kept intact the portion of the VRRA directing federal law enforcement agencies to provide certain victim services, such as counseling and medical care referrals (42 U.S.C. § 10607(c)). Department training emphasizes that the VRRA obligates the Department to provide victim services, which attach upon the detection of a crime, while the CVRA contains court-enforceable rights that attach upon the filing of a charging instrument.

In 2015, Congress amended the CVRA and added the following two rights:[266]

(9) The right to be informed in a timely manner of any plea bargain or deferred prosecution agreement.

(10) The right to be informed of the rights under this section and the services described in section 503(c) of the Victims' Rights and Restitution Act of 1990 (42 U.S.C. 10607(c)) and provided contact information for the Office of the Victims' Rights Ombudsman of the Department of Justice.

## III. THE DEPARTMENT'S INTERPRETATION OF THE CVRA'S DEFINITION OF "CRIME VICTIM" AT THE TIME OF THE EPSTEIN INVESTIGATION

### A. April 1, 2005 Office of Legal Counsel "Preliminary Review"

In 2005, Department management requested informal guidance from the Department's Office of Legal Counsel (OLC) regarding interpretation of the CVRA's definition of "crime victim."[267] On April 1, 2005, OLC provided "preliminary and informal" guidance by email, concluding that "the status of a 'crime victim' may be reasonably understood to commence upon the filing of a complaint, and that the status ends if there is a subsequent decision not to indict or prosecute the Federal offense that directly caused the victim's harm."[268]

---

[266]   H. Rep. No. 114-7 (Jan. 27, 2015).

[267]   OLC is responsible for providing legal advice to the President, Department components, and other executive branch agencies.

[268]   The OLC 2005 Informal Guidance is summarized in a Memorandum Opinion to the Acting Deputy Attorney General from Deputy Assistant Attorney General John E. Bies (Dec. 17, 2010), published as Office of Legal Counsel,

OLC concluded that because the CVRA defines "'crime victim' as a 'person directly and proximately harmed by the commission of a Federal offense,' . . . the definition of victim is thus tethered to the identification of a 'Federal offense,' an event that occurs with the filing of a complaint." OLC further concluded that because the House Report stated that the CVRA codifies the "'rights of crime victims in the Federal judicial system'" and a complaint "commences the 'judicial process' and places an offense within the 'judicial system,'" the legislature must have intended for CVRA rights to commence upon the filing of a complaint.

OLC also found that the language of the CVRA rights supported its interpretation. For example, the first right grants a victim protection from "the accused," not a suspect. Additionally, the second, third, and fourth rights refer to "victim notification, and access to, public proceedings involving release, plea, sentencing or parole—none of which commence prior to the filing of a complaint."

### B.     2005 Attorney General Guidelines for Victim and Witness Assistance

In May 2005, the Department updated its Attorney General Guidelines for Victim and Witness Assistance (2005 Guidelines) to include the CVRA.[269] The 2005 Guidelines specifically cited the CVRA requirement that agencies "engaged in the detection, investigation, or prosecution of crime shall make their best efforts to see that crime victims are notified of, and accorded" their CVRA rights, which in 2005 encompassed the initial eight CVRA rights.

The 2005 Guidelines provided detail regarding implementation of the Department's CVRA duties and divided criminal cases into an "investigation stage," a "prosecution stage," and a "corrections stage." The individuals responsible for notifying crime victims of their CVRA rights varied depending on the stage of the proceedings.

During the "investigation stage" of cases in which the FBI was the investigating agency, the Special Agent in Charge was responsible for identifying the victims "[a]t the earliest opportunity after the detection of a crime" and notifying them of their rights under the CVRA and services available under the VRRA and other federal statutes.

> [D]uring the investigative stage, [the Department] mandates compliance with the Victims' Rights and Restitution Act, 42 U.S.C § 10607, which requires federal officials to, among other things, identify victims, protect victims, arrange for victims to receive reasonable protection from suspected offenders, and provide

---

*The Availability of Crime Victims' Rights Under the Crime Victims' Rights Act of 2004* (Dec. 17, 2010) ("OLC *Availability of Crime Victims' Rights* (2010)") and available at https://www.justice.gov/sites/default/files/olc/opinions/2010/12/31/availability-crime-victims-rights.pdf. "That [2005] informal guidance did not foreclose the possibility that other definitions would also be reasonable." OLC *Availability of Crime Victims' Rights* (2010) at 1.

[269]     The 2005 Guidelines are set forth in relevant part in Chapter Three, Part Two, Section II of this Report. The Department promulgated the guidelines in response to a congressional directive in a predecessor statute to the CVRA, which instructed the Attorney General to develop and implement such guidelines. Victim and Witness Protection Act, Pub. L. No. 97-291, § 6, 96 Stat. 1248 (1982). The 2005 Guidelines were superseded in October 2011, as explained below.

information about available services for victims. Therefore, even though [the Department] may not afford CVRA rights to victims if charges have not been filed in their cases, the [D]epartment may provide certain services to victims that may serve the same function as some CVRA rights.[270]

The 2005 Guidelines stated that the "prosecution stage" of the case began when "charges are filed and continue[d] through postsentencing legal proceedings." The "U.S. Attorney in whose district the prosecution is pending" was responsible for making "best efforts to see that crime victims are notified" of their rights under the CVRA.

During the prosecution stage, the 2005 Guidelines required the U.S. Attorney, or a designee, to notify crime victims of case events, such as the filing of charges; the release of an offender; the schedule of court proceedings; the acceptance of a guilty plea or nolo contendere or rendering of a verdict; and any sentence imposed. The 2005 Guidelines required the responsible official to "provide the victim with reasonable, accurate, and timely notice of any public court proceeding . . . that involves the crime against the victim."

The 2005 Guidelines specifically required federal prosecutors to "be available to consult with victims about [their] major case decisions," such as dismissals, release of the accused, plea negotiations, and pretrial diversion. In particular, the 2005 Guidelines required the responsible official to make reasonable efforts to notify identified victims of, and consider victims' views about, prospective plea negotiations. Nevertheless, the 2005 Guidelines cautioned prosecutors to "consider factors relevant to the wisdom and practicality of giving notice and considering [the victim's] views" in light of various factors such as "[w]hether the proposed plea involves confidential information or conditions" and "[w]hether the victim is a possible witness in the case and the effect that relaying any information may have on the defendant's right to a fair trial." Lastly, the 2005 Guidelines stated that "[a] strong presumption exists in favor of providing rather than withholding assistance and services to victims and witnesses of crime."

The "corrections stage" involved both pretrial detention of the defendant and incarceration following a conviction. Depending on the agency having custody of the defendant, the U.S. Attorney or other agencies were responsible for victim notifications during this stage.

## IV.   USAO AND FBI VICTIM/WITNESS NOTIFICATION PRACTICE AT THE TIME OF THE EPSTEIN INVESTIGATION

### A.   USAO Training

As U.S. Attorney, Acosta disseminated the May 2005 updated Guidelines to USAO personnel with a transmittal memorandum dated February 27, 2006, stating that he expected each recipient "to read and become familiar with the [2005] Guidelines." Acosta noted in the memorandum that the USAO had recently held an "all office training" addressing the 2005 Guidelines and that new USAO attorneys who missed the training were required to view a videotaped version of the training "immediately." Acosta further noted that the USAO's

---

[270]   GAO *CVRA Awareness Report* at 66.

victim/witness staff were "ready to assist you with the details of victim notification, and other areas for which United States Attorney[']s Offices are now explicitly responsible under the act." The USAO's Victim Witness Program Coordinator told OPR that the USAO provided annual mandatory office-wide training on victim/witness issues and training for new employees.

## B.     The Automated Victim Notification System

Both the FBI and the USAO manage contacts with crime victims through the Victim Notification System (VNS), an automated system maintained by the Executive Office for United States Attorneys. The 2005 Guidelines mandated that "victim contact information and notice to victims of events . . . shall, absent exceptional circumstances (such as cases involving juvenile or foreign victims), be conducted and maintained using VNS." The VNS is separate from agency case management systems maintained by the FBI and the USAO. Both the FBI and the USAO use the VNS to generate form letters to victims at various points in the investigation and the prosecution of a criminal case. Although each form letter can be augmented to add some limited individual matter-specific content, the letters contain specific language concerning the purpose of the contact that cannot be removed (such as the arrest of the defendant or the scheduling of a sentencing hearing).[271]

In the usual course of a criminal case, the FBI collects victim contact information during the investigation stage, which it stores in its case management system. The FBI's Victim Specialist exports the victim information data from the FBI's case management system into the VNS database. Victim information stored in the VNS is linked to the investigation's VNS case number. At the time of the Epstein investigation, the FBI's Victim Specialist could use the VNS to generate seven different form notification letters:  (1) initial notification; (2) case is under investigation; (3) arrest of the defendant; (4) declination of prosecution; (5) other; (6) advice of victim rights; and (7) investigation closed.

After a charging document has been filed and the "prosecution stage" begins, the USAO's Victim Witness Specialist assumes responsibility for victim notification.[272] The USAO imports data from its case management system into the VNS and links to the previously loaded FBI VNS data. The USAO's Victim Witness Specialist uses the VNS to generate form letters providing notice of case events, such as charges filed; an arraignment; a proposed plea agreement; change of plea hearings; sentencing hearings; and the result of sentencing hearings.

---

[271]     U.S. Dept. of Justice Office of the Inspector General Audit Division Audit Report 08-04, *The Department of Justice's Victim Notification System* at 29 (Jan. 2008), available at https://oig.justice.gov/reports/EOUSA/a0804/ final.pdf. The 2008 audit identified concerns with the VNS templates, including that "VNS users . . . cannot alter the format to ensure that it fits with the specific case for which it is being sent," and many users had noted that "information in notifications became confusing and sometimes contradictory when various types of notifications were combined in the same letter."

[272]     The FBI and the USAO have different titles for the individual who maintains victim contact:  the FBI title is "Victim Specialist," and the USAO title is "Victim Witness Specialist."

### C.     FBI Victim Notification Pamphlets

The 2005 Guidelines recommended that "victims be given a printed brochure or card that briefly describes their rights and available services . . . and [contact information for] the victim-witness coordinator or specialist . . . ."  At the time of the Epstein investigation, FBI agents nationwide routinely followed a practice of providing victims with pamphlets entitled, "Help for Victims of Crime" and "The Department of Justice Victim Notification System."  The "Help for Victims of Crime" pamphlet contained a listing of the eight CVRA rights.  The pamphlet stated: "Most of these rights pertain to events occurring after the indictment of an individual for the crime, and it will be the responsibility of the prosecuting United States Attorney's Office to ensure you are afforded those rights."  The case agent in the Epstein investigation told OPR that she provided victims with the FBI pamphlet upon the conclusion of an interview.  The pamphlet entitled "The Department of Justice Victim Notification System" provided an overview of the VNS and instructions on how to access the system.

## V.     THE INTRODUCTORY USAO AND FBI LETTERS TO VICTIMS

### A.     August 2006:  The FBI Victim Notification Letters

On August 8, 2006, shortly after the FBI opened its investigation into Epstein, the Victim Specialist for the West Palm Beach FBI office, under the case agent's direction, prepared a "Victim Notification Form" naming 30 victims in the Epstein investigation and stating that "additional pertinent information" about them was available in the VNS.[273]  Thereafter, the Victim Specialist entered individual victim contact information she received from the case agent into the VNS whenever the case agent directed the Victim Specialist to generate an initial letter to a particular victim.  The FBI case agent told OPR that formal victim notification was "always handled by the [FBI's Victim Specialist]."[274]

According to the VNS records, beginning on August 28, 2006, the FBI Victim Specialist used the VNS to generate FBI letters to be sent to the victims, over her signature, identifying the eight CVRA rights and inviting victims to provide updated contact information in order to receive current status information about the matter.  The FBI letters described the case as "currently under investigation" and noted that "[t]his can be a lengthy process and we request your continued patience while we conduct a thorough investigation."  The letters also stated that some of the CVRA rights did not take effect until after an arrest or indictment:  "We will make our best efforts to ensure you are accorded the rights described.  Most of these rights pertain to events occurring after the arrest or indictment of an individual for the crime, and it will become the responsibility of the prosecuting United States Attorney's Office to ensure you are accorded those rights."  A sample letter follows.

---

[273]     These 30 were drawn from the PBPD investigative file and included individuals that the PBPD had not designated as victims and individuals the PBPD had identified but not interviewed.

[274]     The case agent told OPR, "[O]nce we identify a victim, then we bring [the FBI Victim Specialist] in, and as far as anything pertaining to victim rights . . . and any resources, federal resources these victims may need comes from [her], the Victim Specialist."



**U.S. Department of Justice**
Federal Bureau of Investigation
FBI - West Palm Beach
Suite 500
505 South Flagler Drive
West Palm Beach, FL  33401
Phone: (561) 833-7517
Fax: (561) 833-7970

August 28, 2006



Re: Case Number: ▮▮▮▮▮▮▮▮

Dear ▮▮▮▮▮▮

     Your name was referred to the FBI's Victim Assistance Program as being a possible victim of a federal crime. We appreciate your assistance and cooperation while we are investigating this case. We would like to make you aware of the victim services that may be available to you and to answer any questions you may have regarding the criminal justice process throughout the investigation. Our program is part of the FBI's effort to ensure the victims are treated with respect and are provided information about their rights under federal law. These rights include notification of the status of the case. The enclosed brochures provide information about the FBI's Victim Assistance Program, resources and instructions for accessing the Victim Notification System (VNS). VNS is designed to provide you with information regarding the status of your case.

     This case is currently under investigation. This can be a lengthy process and we request your continued patience while we conduct a thorough investigation.

     As a crime victim, you have the following rights under 18 United States Code § 3771:  (1) The right to be reasonably protected from the accused; (2) The right to reasonable, accurate, and timely notice of any public court proceeding, or any parole proceeding, involving the crime or of any release or escape of the accused; (3) The right not to be excluded from any such public court proceeding, unless the court, after receiving clear and convincing evidence, determines that testimony by the victim would be materially altered if the victim heard other testimony at that proceeding; (4) The right to be reasonably heard at any public proceeding in the district court involving release, plea, sentencing, or any parole proceeding; (5) The reasonable right to confer with the attorney for the Government in the case; (6) The right to full and timely restitution as provided in law; (7) The right to proceedings free from unreasonable delay; (8) The right to be treated with fairness and with respect for the victim's dignity and privacy.

     We will make our best efforts to ensure you are accorded the rights described. Most of these rights pertain to events occurring after the arrest or indictment of an individual for the crime, and it will become the responsibility of the prosecuting United States Attorney's Office to ensure you are accorded those rights. You may also seek the advice of a private attorney with respect to these rights.

     The Victim Notification System (VNS) is designed to provide you with direct information regarding the case as it proceeds through the criminal justice system. You may obtain current information about this matter on the Internet at WWW.Notify.USDOJ.GOV or from the VNS Call Center at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. In addition, you may use the Call Center or Internet to update your contact information and/or change your decision about participation in the notification program. If you update your information to include a current email address, VNS will send information to that address. You will need the following Victim Identification Number (VIN) ▮▮▮▮▮▮and Personal Identification Number (PIN) ▮▮▮▮anytime you contact the Call Center and the first time you log on to VNS on the Internet. In addition, the first time you access the VNS Internet site, you will be prompted to enter your last name (or ▮▮▮▮ business name) as currently contained in VNS. The name you should enter is ▮▮▮▮▮▮▮▮▮▮▮▮

If you have additional questions which involve this matter, please contact the office listed above. When you call, please provide the file number located at the top of this letter. Please remember, your participation in the notification part of this program is voluntary. In order to continue to receive notifications, it is your responsibility to keep your contact information current.

Sincerely,



Victim Specialist

VNS data logs, correspondence maintained in the FBI's case management system, and FBI interview reports for the Epstein investigation reflect that, during the Epstein investigation, the FBI generally issued its victim notification letters after the victim had been interviewed by FBI case agents, but its practice was not uniform.[275]

## B.     August 2006:  The USAO's Letters to Victims

During the time that the FBI Victim Specialist was preparing and sending FBI victim notification letters, Villafaña was also preparing her own introductory letter in anticipation of meeting with each victim receiving the letter.  Villafaña told OPR that she was "generally aware that the FBI sends letters" but believed the FBI's "process didn't . . . have anything to do with my process."  Villafaña told OPR the "FBI had their own victim notification system and their own guidelines for when information had to be provided and what information had to be provided."  Moreover, Villafaña "didn't know when [FBI] letters went out" or "what they said."[276]  Nevertheless, Villafaña told OPR that she did not intend for the letters she drafted to interfere with the FBI's notification responsibilities.

In August 2006, Villafaña drafted her letters to victims who had been initially identified by the FBI based on the PBPD investigative file.  Villafaña told OPR that she "made the decision to make contact with victims early," and she composed the introductory letter and determined to whom they would be sent.  Although these letters contained CVRA rights information, Villafaña mainly intended to use them as a vehicle to "introduce" herself and let the victims know the federal investigation "would be a different process" from the State Attorney's Office investigation in which "the victims felt they had not been particularly well-treated."  Villafaña told OPR that in a case in which she "needed to be talking to young girls frequently and asking them really intimate

---

[275]     OPR found no uniformity in the time lapse between the FBI's interview of a victim and the issuance of an FBI letter to that particular victim, as the span of time between the two events varied from a few days to months. Furthermore, not every victim interviewed by the FBI received an FBI letter subsequent to her interview, and some FBI letters were sent to victims who had not been interviewed by the case agents.  Finally, OPR's review of FBI VNS data revealed some letters that appeared to have been generated in the VNS and not included in the FBI case file.  OPR could not confirm whether such letters were mailed or delivered.

[276]     Villafaña, who did not have supervisory authority over the FBI's Victim Specialist, told OPR that she did not review the FBI notification letters and did not see them until she gathered them for production in the CVRA litigation, which was initiated after Epstein pled guilty on June 30, 2008.

questions," she wanted to "make sure that they . . . feel like they can trust me." Villafaña directed the FBI case agents to hand deliver the letters "as they were conducting interviews." Villafaña told OPR that the USAO had "no standardized way to do any victim notifications prior to" the filing of federal charges, and therefore Villafaña did not use a template or VNS-generated letter for content, but instead used a letter she "had created and crafted [herself] for another case."[277]

The letters contained contact information for Villafaña, the FBI case agent, and the Department's Office for Victims of Crime in Washington, D.C., and itemized the CVRA rights. The USAO letters described the case as "under investigation" and stated that the victim would be notified "[i]f anyone is charged in connection with the investigation." The letters stated that, in addition to their rights under the CVRA, victims were entitled to counseling, medical services, and potential restitution from the perpetrator, and that, upon request, the government would provide a list of counseling and medical services.[278] Lastly, the letters advised that investigators for the defense might contact the victims and those who felt threatened or harassed should contact Villafaña or the FBI case agent.

Although the USAO letters did not contain any language limiting CVRA rights to the post-arrest or indictment stage, Villafaña told OPR that she did not intend for the letters to activate the USAO's CVRA obligations, which she believed attached only after the filing of a criminal charge. Villafaña told OPR that she did not think that victims potentially receiving both an FBI letter and a USAO letter would be confused about their CVRA rights because the USAO letter "was coming with an introduction from the agents [who were hand delivering them]." Later, in the course of the CVRA litigation, Villafaña stated that she and the investigative team "adopted an approach of providing more notice and assistance to potential victims than the CVRA may have required, even before the circumstances of those individuals had been fully investigated and before any charging decisions had been made."[279]

Villafaña informed Lourie and Sloman about the letters, but the letters were not reviewed by any of Villafaña's supervisors, who considered such correspondence to be a non-management task. Acosta told OPR, "I've had no other case where I'm even aware of victims being notified, because I assume it all operates without it rising to management level." Similarly, Menchel told OPR,

---

[277]     Villafaña told OPR that she thought that "at one point," she showed the letter to the USAO's Victim Witness Specialist who "said it was fine." The USAO's Victim Witness Specialist told OPR that because the USAO did not file a charging document in the Epstein matter, the USAO did not obtain VNS information from the FBI and did not assume responsibility for victim contact. The USAO's Victim Witness Specialist had no contact with Epstein's victims, and OPR's examination of VNS data revealed no USAO case number linked to the FBI's VNS data concerning the Epstein investigation. OPR did locate some victim contact information in the VNS relating to the USAO's case number associated with the Epstein-related CVRA litigation filed in July 2008.

[278]     Through its administration of the Crime Victims Fund, the Department's Office for Victims of Crime supports programs and services to help victims of crime.

[279]     Villafaña informed OPR that, as the USAO Project Safe Childhood Coordinator [focusing on prosecutions of individuals who exploit children through the internet], she "treated the [Guidelines] as a floor and tried to provide a higher standard of contact."

[A]s Chief of the Criminal Division of the USAO, I did not consider it to be within my purview to ensure that appropriate victim notifications occurred in every matter investigated or brought by the Office.  I also recall that the USAO employed one or more victim-witness coordinators to work with line prosecutors to ensure that appropriate victim notifications occurred in every matter investigated or brought by the Office.

### C.    USAO and FBI Letters Are Hand Delivered

The FBI case agent told OPR that the FBI made its notifications "at the time that we met [with] the girls."  The case agent recalled that she hand delivered the USAO letters and FBI letters to some victims following in-person interviews, and in the instances when she did not provide a victim with a letter, she provided an FBI pamphlet containing CVRA rights information similar to that set forth in the FBI letters.[280]  The co-case agent also recalled that he may have delivered "a few" letters to victims.  The FBI Victim Specialist told OPR that she mailed some FBI letters to victims and she provided some FBI letters to the case agent for hand delivery.

Nevertheless, the case agent told OPR that she "did not sit there and go through every right" with the victims.  She stated, however, "[I]n the beginning whether it was through [the FBI Victim Specialist] giving the letter, me giving a letter, the pamphlet, I believed that the girls knew that they were victims and had rights, and they had a resource, [the FBI Victim Specialist], that they could call for that."  The FBI case agent further explained that once the case agents connected the FBI Victim Specialist with each victim, the Victim Specialist handled the victims' "rights and resources."

## VI.    AUGUST 2006 – SEPTEMBER 2007:  FBI AND USAO CONTACTS WITH VICTIMS BEFORE THE NPA IS SIGNED

Early in the investigation, Villafaña informed her supervisors that, up to that point, "everyone whom the agents have spoken with so far has been willing to tell her story.  Getting them to tell their stories in front of a jury at trial may be much harder."  Between August 2006 and September 24, 2007, when the NPA was signed, the FBI case agents interviewed 22 victims.  On a few occasions, Villafaña met with victims together with the FBI.  Villafaña's May 1, 2007 draft indictment included substantive crimes against multiple victims, and Villafaña described the circumstances of each of their encounters with Epstein in her prosecution memorandum.

There is some evidence indicating that during interviews, some of the victims expressed to the FBI case agents and Villafaña concerns about participating in a federal trial of Epstein, and those discussions touched upon, in broad terms, the victims' views regarding the desired outcome of the investigation.  Before the USAO entered into the NPA, however, no one from the

---

[280]    The case agent told OPR, "I remember giving letters to the girls when we would talk to them at . . . the conclusion, or . . . if I didn't have the file on me[,] I had pamphlets in my car, or I made sure [the victims had contact information for the FBI's Victim Specialist]."

government informed any victim about the potential for resolving the federal investigation through a state plea.

### A.    The Case Agents and Villafaña Solicit Some Victims' Opinions about Resolving the Federal Investigation

Villafaña told OPR that when she and the case agents met with victims, "we would ask them how they wanted the case to be resolved."[281]

> And most of them wanted the case to be resolved via a plea.  Some of them wanted him not to be prosecuted at all.  Most of them did not want to have to come to court and testify.  They were very worried about their privacy rights.  Some of them wanted him to go to jail.  But . . . [s]ome of them talked about bad experiences with the State Attorney's Office.  And so, I felt like sending them back to the State Attorney's Office was not something that they would have supported.

Villafaña told OPR that she also recalled that some victims "expressed . . . concern about their safety," and were worried that Epstein would find out about their participation in the investigation.  In her 2017 declaration submitted in the CVRA litigation, Villafaña stated that the two CVRA petitioners "never communicated [their] desires to me or the FBI case agents and my role was to evaluate the entire situation, consider the input received from all of the victims, and allow the Office to exercise its prosecutorial discretion accordingly."[282]  She also noted that some victims "fear[ed] having their involvement with Epstein revealed and the negative impact it would have on their relationships with family members, boyfriends, and others."

In the FBI case agent's 2017 declaration filed in the CVRA litigation, she stated, "During interviews conducted from 2006 to 2008, no victims expressed a strong opinion that Epstein be prosecuted."  She further described the concerns of some of the victims:

> Throughout the investigation, we interviewed many [of Epstein's] victims . . . .  A majority of the victims expressed concern about the possible disclosure of their identities to the public.  A number of the victims raised concerns about having to testify and/or their parents finding out about their involvement with Mr. Epstein.  Additionally,

---

[281]    Villafaña created for OPR a chart listing victims identified in the state and federal investigations, with notations indicating several with whom Villafaña recalled discussing their opinions about resolving the case.  The chart, however, does not indicate what the victims said, and Villafaña told OPR that the information contained in the chart was based on her memory of her interactions with each victim.  OPR was unable to determine the details or extent of any such discussions occurring before September 24, 2007, because Villafaña did not have contemporaneous notes of the interviews, and the FBI reports and corresponding notes of the interviews did not contain information about the victims' desired outcomes.  The victims who provided information to OPR did not recall discussing potential resolution of the federal investigation with anyone from the government.

[282]    In the declaration, Villafaña stated, "Jane Doe 2 specifically told me that she did not want Epstein prosecuted."

for some victims, learning of the Epstein investigation and possible exposure of their identities caused them emotional distress. Overall, many of the victims were troubled about the existence of the investigation. They displayed feelings of embarrassment and humiliation and were reluctant to talk to investigators. Some victims who were identified through the investigation refused even to speak to us. Our concerns about the victims' well-being and getting to the truth were always at the forefront of our handling of the investigation.

The case agent told OPR that although she encountered victims who were "strong" and "believable," she did not encounter any who vigorously advocated for the prosecution of Epstein. Rather, "they were embarrassed," "didn't want their parents to know," and "wanted to forget."[283]

As of September 24, 2007, the date the NPA was signed, Villafaña informed Epstein attorney Lefkowitz that she had compiled a preliminary list of victims including "34 confirmed minors" and 6 other potential minor victims who had not yet been interviewed by the FBI.[284] Although the government had contacted many victims before the NPA was signed, Villafaña acknowledged during the CVRA litigation that "individual victims were not consulted regarding the agreement."

### B.   Before the NPA Is Signed, Villafaña Expresses Concern That Victims Have Not Been Consulted

Before the NPA was signed, Villafaña articulated to her supervisors concerns about the government's failure to consult with victims.

### 1.   July 2007:  Villafaña's Email Exchanges with Menchel

In July 2007, Villafaña learned that Menchel had discussed with defense counsel Sanchez a possible state resolution to the federal investigation of Epstein. Villafaña was upset by this information, and sent a strongly worded email to Menchel voicing her concerns. (A full account of their email exchange is set forth at Chapter Two, Part One, Section IV.A.2.) In that email, she told him that it was "inappropriate [for you] to make a plea offer that you know is completely unacceptable to the FBI, ICE, the victims, and me. These plea negotiations violate . . . all of the

---

[283]   The case agent also noted that the victim who became CVRA petitioner Jane Doe #2 had expressed in her April 2007 video-recorded FBI interview her opinion that "nothing should happen to Epstein."

[284]   The "victims' list" for purposes of the NPA was intended to include the names of all individuals whom the government was prepared to name in a charging document "as victims of an offense enumerated in 18 U.S.C. § 2255." Although the charges Villafaña proposed on May 1, 2007, were based on crimes against 13 victims, thereafter, as explained in Chapter Two of this Report, she continued to revise the proposed charges, adding and removing victims as the federal investigation developed further evidence. At the time the NPA was signed, the proposed charges were based on crimes against 19 victims, but others had been identified for potential inclusion.

various iterations of the victims' rights legislation."[285]   Villafaña explained to OPR her reference to the victims:

> [M]y concern was that [Menchel] was violating the CVRA which requires the attorneys for the government, which[] includes me[,] to confer with the victims, and the [VRRA], which requires the agents to keep the victims apprised of what's happening with the case.  So in essence, I felt like he was exposing both myself and the agents to allegations of not abiding by our obligations by engaging in these plea negotiations without letting us know about it.[286]

In his reply to Villafaña's email, and after noting that he found her email "totally inappropriate," Menchel denied that he had violated any Departmental policy, and he noted that "[a]s Chief of the Criminal Division, I am the person designated by the U.S. Attorney to exercise appropriate discretion in deciding whether certain pleas are appropriate and consistent with" Departmental policy.  Perceiving Menchel's rebuke as a criticism of her judgment, Villafaña responded, "[R]aising concerns about the forgotten voices of victims in this case should not be classified as a lapse in judgment" and that her "first and only concern in this case . . . is the victims."

Menchel told OPR that he did not view his conversation with Sanchez as a plea offer, asserted that he was not obligated to consult with victims during preliminary settlement negotiations, and noted that he left the USAO before the NPA was fully negotiated or signed. Menchel told OPR that "you have discussions . . . with [the] defense all the time, and the notion that even just having a general discussion is something that must be vetted with victims . . . is not even . . . in the same universe as to how I think about this."  Menchel also observed that on the very day that Villafaña criticized him for engaging in settlement negotiations without consulting her, the FBI, or the victims, Villafaña had herself sent an email to Sanchez offering "to discuss the possibility of a federal resolution of Mr. Epstein's case that could run concurrently with any state resolution," without having spoken to the victims about her proposal.[287]

---

[285]      Villafaña told OPR that "some victims, I felt strongly, would have objected to [a state-only disposition]." Villafaña stated to OPR that at the time Menchel engaged in such negotiations, he would only have been aware of the victim information contained in her prosecution memorandum, which included information about the "effects on the victims" but did not likely contain information as to "how they would like the case resolved."  Villafaña asserted that Menchel "never reached out to any of the victims to find out what their position would be."  Menchel told OPR that the allegations in Villafaña's email that he violated the Ashcroft Memo, USAM, and the CVRA were "way out of line in terms of what the law is and the policies are."

[286]      As discussed, the Department's position at the time was that the CVRA did not apply before charges were filed against a defendant.

[287]      In commenting on OPR's draft report, Villafaña's counsel asserted that her email to Sanchez was intended only to determine whether Epstein was interested in opening plea negotiations.

2.  **Villafaña Asserts That Her Supervisors Gave Instructions Not to Consult Victims about the Plea Discussions, but Her Supervisors Do Not Currently Recall Such Instructions**

Villafaña told OPR that during an "early" meeting with Acosta, Sloman, and Menchel, which took place when "we were probably just entering into plea negotiations," she raised the government's obligation to confer with victims.[288]   Initially, Villafaña told OPR she was instructed, "Don't talk to [the victims].  Don't tell them what's happening," but she was not told why she should not speak to the victims, and she could not recall who gave her this instruction.  In a subsequent OPR interview, Villafaña recalled that when she raised the issue of notification during the meeting, she was told, "Plea negotiations are confidential.  You can't disclose them."[289] Villafaña remained uncertain who gave her this instruction, but believed it may have been Acosta.

Neither Acosta, Sloman, nor Menchel recalled a meeting at which Villafaña was directed not to notify the victims.  Acosta told OPR that the decision whether to solicit the victims' view "is something [that] I think was the focus of the trial team and not something that I was focused on at least at this time," and he did not "recall discussions about victim notification until after the NPA was signed."  Sloman also told OPR that he did not recall a meeting at which victim notification was discussed.  Menchel wrote in his response to OPR, "I have no recollection of any discussions or decisions regarding whether the USAO should notify victims of its intention to enter into a pre-charge disposition of the Epstein matter."  Furthermore, Menchel told OPR he could not think of a reason why the issue of victim notification would have arisen before he left the USAO, because "we were way off from finalizing or having anything even close to a deal," and it would have been "premature" to consider notification.[290]

3.  **September 6, 2007:  Villafaña Informs Sloman, Who Informs Acosta, of Oosterbaan's Opinion That Consultation with Victims Was Required**

On September 6, 2007, in a lengthy email to Sloman responding to his question about the government's then-pending offer to the defense, Villafaña raised the victim consultation issue, advising that, "the agents and I have not reached out to the victims to get their approval, which as [CEOS Chief Oosterbaan] politely reminded me, is required under the law" and that "the [PBPD]

---

[288]     Villafaña could not recall the specific date of the meeting, but Menchel left the USAO on August 3, 2007.

[289]     Villafaña also recalled Menchel raising a concern that "telling them about the negotiations could cause victims to exaggerate their stories because of their desire to obtain damages from Epstein."

[290]     In commenting on OPR's draft report, Menchel's counsel reiterated his contention that Villafaña's claim about a meeting involving Menchel in which she was instructed not to consult with victims was inaccurate and inconsistent with other evidence.  OPR carefully considered the comments but did not conclude that the evidence to which Menchel's attorney pointed necessarily refuted Villafaña's assertion that she had received an instruction from a supervisor not to inform victims about the plea negotiations.  However, it is also true that OPR did not find any reference in the emails and other documents dated before the NPA was signed to a meeting at which victim consultation was discussed or to a specific instruction not to consult with the victims.  This is one of several events about which Menchel and Villafaña disagreed, but given OPR's conclusion that the Department did not require prosecutors to consult with victims before charges were brought, OPR does not reach a conclusion regarding the alleged meeting and instruction.

Chief wanted to know if the victims had been consulted about the deal."[291]  Sloman forwarded this email to Acosta.  Villafaña recalled that Sloman responded to her email by telephone, possibly after he had spoken to Acosta, and stated, "[Y]ou can't do that now."  Villafaña did not recall Sloman explaining at the time the reason for that instruction.

Villafaña told OPR that shortly before the NPA was signed, Sloman told her, "[W]e've been advised that . . . pre-charge resolutions do not require victim notification."  Sloman did not recall any discussions, before the NPA was signed, about contacting the victims or conferring with them regarding the potential resolution of the case.  Sloman told OPR that he "did not think that we had to consult with victims prior to entering into the NPA," and "we did not have to seek approval from victims to resolve a case.  We did have an obligation to notify them of the resolution in . . . filed cases."  Sloman said that no one other than Villafaña raised the notification issue, and because the USAO envisioned a state court resolution of the matter, Sloman "did not think that we had to consult with victims prior to entering into the NPA."  Lourie told OPR that he had no memory of Villafaña being directed not to speak to the victims about the NPA.[292]  Similarly, the attorney who assumed Lourie's supervisory duties after Lourie transitioned to his detail in the Department told OPR that he did not recall any discussions regarding victim notification and he "assumed that was being handled."[293]

Acosta did not recall the September 6, 2007 email, but told OPR that "there is no requirement to notify [the victims], because it's not a plea, it's deferring in favor of a state prosecution."  Acosta told OPR that he could not recall any "pre-NPA discussions" regarding victim notification or any particular concern that factored into the decision not to consult with the victims before entering into the NPA.[294]  Ultimately, Acosta acknowledged to OPR, "[C]learly, given the way it's played out, it may have been much better if we had [consulted with the victims]."

CEOS Chief Oosterbaan told OPR that he disagreed with the USAO's stance that the CVRA did not require pre-charge victim consultation, but in his view the USAO "posture" was not "an abuse of discretion" or "an ethical issue," but rather reflected a "serious and legitimate

---

[291]     Villafaña told OPR that she referred to Oosterbaan in the email because "he was the head of CEOS and because I think they were tired of hearing me nag them [to notify the victims]."  As previously noted, Villafaña's statement that victim approval had to be obtained was incorrect.  Even when applicable, the CVRA only requires consultation with victims, not their approval of a plea agreement.  Moreover, Villafaña's comments concerning the pre-charge application of the USAO's CVRA obligation to consult with the victims appear at odds with her statement to OPR that the CVRA applied to the USAO only after a defendant was charged and that she did not intend to activate the USAO's CVRA obligations when she sent letters to victims in August 2006.

[292]     Lourie noted that during this period, he had left Florida and was no longer the supervising AUSA in the office, but was "help[ing] [] out" from offsite because he had "historical knowledge" of the case.

[293]     The AUSA who for a time served as Villafaña's co-counsel on the Epstein investigation similarly did not "know anything about" discussions in the USAO regarding the need to inform victims of the likely disposition of the case.  The AUSA stated that he stopped working on the case "months earlier" and that he "didn't have anything to do with the [NPA] negotiations."

[294]     Villafaña told OPR that she was not aware of any "improper pressure or promise made to [Acosta] in order to . . . instruct [her] not to make disclosures to the victim[s]."

disagreement" regarding the CVRA's requirements.[295]  Oosterbaan's disagreement was based on policy considerations, and he told OPR that "from a policy perspective," CEOS would not "take a position that you wouldn't consult with [the victims]."  Oosterbaan also told OPR that whether or not the law required it, the victims should have been given an opportunity "to weigh in directly," but he did not fault the USAO's motivations for failing to provide that opportunity:

> The people I know, Andy [Lourie], Jeff [Sloman], . . . were trying to do the right thing. . . . [T]hey weren't acting unethically.  I just disagree with the outcome . . . but the point is they weren't trying . . . to do anything improper . . . it was more of this question of . . . you can let the victims weigh in on this, you can get their input on this and maybe it doesn't sway you.  You still do what you're going to do but . . . it's hard to say it was a complete, completely clean exercise of . . . prosecutorial discretion when [the USAO] didn't really know what [the victims] would say.

Sloman told OPR, "I don't think we had a concern about entering into the NPA at that point in terms of notifying victims. . . . I was under the perception that once the NPA was entered into and [Epstein] was going to enter a guilty plea in state court that we were going to notify the victims."

## VII.  SEPTEMBER 24, 2007 – JUNE 30, 2008:  AFTER THE NPA IS SIGNED, THE USAO MAKES VARIOUS VICTIM NOTIFICATION DECISIONS

The contemporaneous emails make clear that once the NPA was signed, Villafaña and the case agents planned to inform the victims about the resolution of the federal investigation. However, the emails also show that the USAO was unclear about how much information could be given to the victims in light of the NPA's nondisclosure provision and consulted with Epstein's defense counsel regarding victim notifications.[296]  As a result, although the expectation in the USAO was that the victims would be informed about the NPA, the monetary damages provision, and the state plea, the USAO became entangled in more negotiations with the defense attorneys, who strongly objected to the government's notification plan.  In addition, Villafaña and the case agents grew concerned that notifying the victims about the NPA monetary damages provision would damage the victims' credibility if Epstein breached the NPA and the case went to trial.  In the end, Acosta decided to defer to the State Attorney's discretion whether to notify the victims about the state plea, and information about the NPA and the monetary damages provision was not provided to victims until after Epstein pled guilty in June 2008.

---

[295]    Oosterbaan stated that, in retrospect, "maybe I should have been more aggressive with how . . . I dealt with [the USAO]."

[296]    The NPA nondisclosure provision stated:  "The parties anticipate that this agreement will not be made part of any public record.  If the United States receives a Freedom of Information Act request or any compulsory process commanding the disclosure of the agreement, it will provide notice to Epstein before making that disclosure."

**A.      September – October 2007:  The Case Agents Notify Some Victims about the NPA, but Stop When the Case Agent Becomes Concerned about Potential Impeachment**

In transmitting the signed NPA to Villafaña on September 24, 2007, defense attorney Lefkowitz asked Villafaña to "do whatever you can to prevent [the NPA] from becoming public."[297]  Villafaña forwarded this email to Acosta, Lourie, and the new West Palm Beach manager noting that, "I don't intend to do anything with it except put it in the case file."  Acosta responded that he "thought the [NPA] already binds us not to make [it] public except as required by law or [FOIA]" and noted that because the USAO would not proactively inform the media about the NPA, "this is the State Attorney[']s show."[298]  Acosta added, "In other words, what more does he want?"  Villafaña responded, "My guess is that if we tell anyone else (like the police chief or FBI or the girls), that we ask them not to disclose."  Lourie agreed, noting that "there really is no reason to tell anyone all the details of the non pros or provide a copy.  The [PBPD] Chief was only concerned that he not get surprised by all this."[299]  Acosta responded that he would set up a call on September 26, 2007, to talk "about who we can tell and how much."[300]

Also on September 24, 2007, Villafaña emailed the new West Palm Beach manager to inform him that once the attorney representative was appointed for the victims, she planned to "meet with the girls myself to explain how the system [for obtaining relief under 18 U.S.C. § 2255] will work."  Villafaña also emailed Lefkowitz stating that she planned to discuss with him "what I can tell [the attorney representative] and the girls about the agreement," and she assured Lefkowitz that her office "is telling Chief Reiter not to disclose the outcome to anyone."  Villafaña also provided Lefkowitz with a list of potential candidates for the attorney representative position and advocated for an attorney representative who would minimize press coverage of the matter.

On September 26, 2007, Villafaña emailed Lefkowitz to request guidance on informing the victims about the NPA:  "Can you give me a call . . . I am meeting with the agents and want to give them their marching orders regarding what they can tell the girls."  Villafaña told OPR that because the government and the defense had not agreed on the attorney representative for the victims, she reached out to the defense at the direction of either Acosta or Sloman in order to coordinate how to inform the victims about the resolution of the case and the fact that there would be an attorney to assist them in recovering monetary damages from Epstein.  Villafaña told OPR that the defense responded to her email by complaining to her supervisors that she should not be

---

[297]      Villafaña had assured Lefkowitz that the NPA "would not be made public or filed with the Court, but it would remain part of our case file.  It probably would be subject to a FOIA request, but it is not something that we would distribute without compulsory process."

[298]      Acosta told OPR that he believed that the NPA "would see the light of day" because the victims would have to "hear about [their] § 2255 rights from somewhere" and "given the press interest, eventually this would be FOIA'd."

[299]      Lourie told OPR that the § 2255 provisions of the NPA "that benefitted the victims were there for the victims to take advantage of. . . . and they did.  How . . . they were going to receive that information and when they were going to receive it is a different question, but there's no . . . issue with the fact that they were going to get that information."

[300]      OPR was unable to determine whether the call took place.

involved in such notifications.  According to Villafaña, Sloman then directed her to have the case agents make the victim notifications.

Accordingly, Villafaña directed the case agents to "meet with the victims to provide them with information regarding the terms of the [NPA] and the conclusion of the federal investigation."  The case agent told OPR, "[T]here was a discussion that Marie and I had as to . . . how we would tell them, and what we would tell them, and what that was I don't recall, but it was the terms of the agreement."  Villafaña believed that if "victims were properly notified of the terms [of the NPA] that applied to them, regarding their right to seek damages from [Epstein], and he paid those damages, that the rest of the [NPA] doesn't need to be disclosed."  Villafaña "anticipated that [the case agents] would be able to inform the victims of the date of the state court change of plea [hearing], but that date had not yet been set by state authorities at the time the first victims were notified [by the FBI]."  Villafaña told OPR that it was her belief that because the USAO had agreed to a confidentiality clause, the government could not disclose the NPA to the general public, but victims could be informed "because by its terms they needed to be told what the agreement was about."  Villafaña told OPR that no one in her supervisory chain expressed a concern that if victims learned of the NPA, they would try to prevent Epstein from entering a plea.

Within a week after the NPA was signed, news media began reporting that the parties had reached a deal to resolve the Epstein case.  For example, on October 1, 2007, the *New York Post* reported that Epstein "has agreed to plead guilty to soliciting underage prostitutes at his Florida mansion in a deal that will send him to prison for about 18 months," and noted that Epstein would plead guilty in state court and that "the feds have agreed to drop their probe into possible federal criminal violations in exchange for the guilty plea to the new state charge."[301]

The case agent recalled informing some victims that "there was an agreement reached" and "we would not be pursuing this federally."  In October 2007, for example, the case agents met with victim Courtney Wild, "to advise her of the main terms of the Non-Prosecution Agreement."  According to the case agent, during that meeting, the case agents told Wild "that an agreement had been reached, Mr. Epstein was going to plead guilty to two state charges, and there would not be a federal prosecution."[302]  However, in a declaration filed in 2015 in the CVRA litigation, Wild described the conversation differently:

> [T]he agents explained that Epstein was also being charged in State court and may plea [*sic*] to state charges related to some of his other victims. I knew that State charges had nothing to do with me.

---

[301]     Dan Mangan, "'Unhappy Ending' Plea Deal—Moneyman to Get Jail For Teen Sex Massages," *New York Post*, Oct. 1, 2007.  *See also* "Model Shop Denies Epstein Tie," *New York Post*, Oct. 6, 2007; "Andrew Pal Faces Sex List Shame," *Mail on Sunday*, Oct. 14, 2007; "Epstein Eyes Sex-Rap Relief," *New York Post*, Oct. 9, 2007; "Sex Case 'Victims' Lining Up," *New York Post* "*Page Six*," Oct. 15, 2007; Dareh Gregorian and Mathew Nestel, "I Was Teen Prey of Pervert Tycoon," *New York Post*, Oct. 18, 2007.  The following month, the Palm Beach Post reported the end of the federal investigation as well.  *See* "Epstein Has One Less Worry These Days," *Palm Beach Post*, Nov. 9, 2007; "How Will System Judge Palm Beach Predator?," *Palm Beach Post* "Opinion," Nov. 16, 2007.

[302]     The co-case agent recalled meeting with the victims about the resolution of the case, but could not recall the specifics of the discussions.

> During this meeting, the Agents did not explain that an agreement had already been signed that precluded any prosecution of Epstein for federal charges against me.  I did not get the opportunity to meet or confer with the prosecuting attorneys about any potential federal deal that related to me or the crimes committed against me.
>
> My understanding of the agents' explanation was that the federal investigation would continue.  I also understood that my own case would move forward towards prosecution of Epstein.

In addition, the case agent spoke to two other victims and relayed their reactions to Villafaña in an email:

> Jane Doe #14 asked me why [Epstein] was receiving such a lite [*sic*] jail sentence and Jane Doe #13 has asked for our Victim Witness coordinator to get in touch with her so she can receive some much needed [p]rofessional counseling.  Other than that, their response was filled with emotion and grateful to the Federal authorities for pursuing justice and not giving up.[303]

The case agent told OPR that when she informed one of these victims, that individual cried and expressed "a sense of relief."  Counsel for "Jane Doe #13" told OPR that while his client recalled meeting with the FBI on a number of occasions, she did not recall receiving any information about Epstein's guilty plea.  In a letter to OPR, "Jane Doe #14's" attorney stated that although her client recalled speaking with an FBI agent, she was not told about the NPA or informed that Epstein would not face federal charges in exchange for his state court plea.

After meeting with these three victims, the FBI case agent became concerned that, if Epstein breached the NPA and the case went to federal trial, the defense could use the victims' knowledge of the NPA's monetary damages provision as a basis to impeach the victims.[304]  The case agent explained to OPR that she became "uncomfortable" talking to the victims about the damages provision, and that as the lead investigator, "if we did end up going to trial . . . [if] Mr. Epstein breached this that I would be on the stand" testifying that "I told every one of these girls that they could sue Mr. Epstein for money, and I was not comfortable with that, I didn't think it was right."

Similarly, the co-case agent told OPR, "[T]hat's why we went back to Marie [Villafaña] and said we're not comfortable now putting this out there . . . because . . . it's likely that [the case agent] and I are going to have to take the stand if it went to trial, and this could be a problem."  Villafaña told OPR that the case agents were concerned they would be accused of "offering a bribe

---

[303]    The case agent did not record any of the victim notifications in interview reports, because "it wasn't an interview of them, it was a notification. . . . [I]f there was something . . . relevant [that] came up pertaining to the investigation, or something that I thought was noteworthy . . . I might have [recorded it in an interview report]."

[304]    Within limitations set by the Federal Rules of Evidence, a defendant may attack the credibility of a witness through evidence of bias, which may include the witness having received money, or expecting to receive money, from the government, the defendant, or other sources as a result of the witness's allegations or testimony.

for [victims] to enhance their stories" and that the defense would try to have Villafaña or the case agents removed from the case.

Both the lead case agent and Villafaña told OPR that after the FBI raised with Villafaña the concern that notifying the victims would create potential impeachment material in the event of a breach and subsequent trial, they contacted the USAO's Professional Responsibility Officer for advice.   Villafaña recalled that during a brief telephone consultation, the Professional Responsibility Officer advised her and the case agent that "it's not really that big a concern, but if you're concerned about it then you should stop making the notification."[305]   In her 2017 CVRA declaration, the case agent stated that after conferring with the USAO, the case agents stopped notifying victims about the NPA.

### B.      October 2007:  Defense Attorneys Object to Government Victim Notifications

While the case agents and Villafaña considered the impact that notifying the victims about the resolution of the case might have on a potential trial, defense counsel also raised concerns about what the victims could be told about the NPA.  As discussed in Chapter Two, after the NPA was signed on September 24, 2007, the USAO proposed using a special master to select the attorney representative for the victims, which led to further discussions about the § 2255 provision. On October 5, 2007, when defense attorney Lefkowitz sent Villafaña a letter responding to the USAO's proposal to use a special master, he cautioned that "neither federal agents nor anyone from your Office should contact the identified individuals to inform them of the resolution of the case" because such communications would "violate the confidentiality of the agreement" and would prevent Epstein from having control over "what is communicated to the identified individuals at this most critical stage."  Lefkowitz followed this communication with an October 10, 2007 letter to Acosta, arguing that "[n]either federal agents nor anyone from your Office should contact the identified individuals to inform them of the resolution of the case."[306]   Rather, Lefkowitz wanted to "participate in crafting a mutually acceptable communication to the identified individuals."

On October 23, 2007, Villafaña raised the issue of victim notification with Sloman, stating:

> We also have to contact the victims to tell [them] about the outcome of the case and to advise them that an attorney will be contacting them regarding possible claims against Mr. Epstein.  If we don't do that, it may be a violation of the Florida Bar Rules for the selected attorney to 'cold call' the girls.

As discussed in greater detail in Chapter Two, on October 23, 2007, Lefkowitz sent Acosta a letter stating that Epstein expected to enter a guilty plea in state court on November 20, 2007,

---

[305]      The Professional Responsibility Officer told OPR that he did not recall the case agent contacting him about victim notification, nor did he recall being involved in the Epstein matter before the CVRA litigation was instituted in July 2008 and he was assigned to handle the litigation.  Villafaña told OPR that they consulted the Professional Responsibility Officer over the telephone, the call took no more than "five minutes," and the Professional Responsibility Officer had no other exposure to the case and thus "wouldn't have [any] context for it."

[306]      Lefkowitz also argued that direct contact with the victims could violate grand jury secrecy rules.

and thanking Acosta for agreeing on October 12, 2007, not to "contact any of the identified individuals, potential witnesses, or potential civil claimants and their respective counsel in this matter."[307]   Shortly thereafter, Sloman drafted a response to Lefkowitz's letter, which Acosta revised to clarify the "inaccurate" representations made by Lefkowitz, in particular noting that Acosta did not agree to a "gag order" with regard to victim contact.  The draft response, as revised by Acosta, stated:

> You should understand, however, that there are some communications that are typical in these matters.  As an example, our Office has an obligation to contact the victims to inform them that either [the Special Master], or his designee, will be contact[ing] them.  Rest assured that we will continue to treat this matter as we would any similarly situated case.[308]

In a November 5, 2007 letter, Sloman complained to Lefkowitz that private investigators working for Epstein had been contacting victims and asking whether government agents had discussed financial settlement with them.  Sloman noted that the private investigators' "actions are troublesome because the FBI agents legally are required to advise the victims of the resolution of the matter, which includes informing them that, as part of the resolution, Mr. Epstein has agreed to pay damages in some circumstances."  The same day, Villafaña emailed Sloman expressing her concern that "if we [file charges] now, cross-examination will consist of- 'and the government told you that if Mr. Epstein is convicted, you are entitled to a large amount of damages, right?'"[309]

### C.   October – November 2007:  The FBI and the USAO Continue to Investigate, and the FBI Sends a Notice Letter to One Victim Stating That the Case is "Under Investigation"

Although Villafaña and the FBI case agents decided to stop informing victims about the NPA, the FBI continued its investigation of the case, which included locating and interviewing potential victims.  In October and November 2007, the FBI interviewed 12 potential new victims, 8 of whom had been identified in a "preliminary" victim list in use at the time Epstein signed the

---

[307]   Villafaña later emailed Sloman stating that she planned to meet with the case agents to have a "general discussion about staying out of the civil litigation."

[308]   Sloman's draft also stated that Acosta had informed the defense in a previous conference call that the USAO would not accept a "gag order."  OPR recovered only a draft version of the communication and was unable to find any evidence that the draft letter was finalized or sent to defense counsel.

[309]   Subsequent records also referred to the prosecutors' concerns about creating impeachment evidence and that such concerns played a role in their decision not to notify victims of the NPA until after Epstein pled guilty.  In August 2008, the AUSA handling the CVRA litigation emailed Villafaña, Acosta, and Sloman expressing his understanding that the "victims were not consulted [concerning the NPA] . . . because [the USAO] did not believe the [CVRA] applied."  Acosta responded:  "As I recall, we also believed that contacting the victims would compromise them as potential witnesses.  Epstein argued very forcefully that they were doing this for the money and we did not want to discuss liability with them, which was [a] key part of [the] agree[ment]."

NPA.[310]  The FBI reports of the victim interviews do not mention the NPA or indicate that the victims were asked for their input regarding the resolution of the case.  Villafaña acknowledged that she and the case agents did not tell any of the "new" post-NPA-signing victims about the agreement because "at that point we believed that the NPA was never going to be performed and that we were in fact going to be [charging] Mr. Epstein."

On October 12, 2007, the FBI Victim Specialist sent a VNS form notice letter to a victim the case agents had interviewed two days earlier.  This letter was identical to the VNS form notice letter the FBI Victim Specialist sent to other victims before the NPA was signed, describing the case as "under investigation" and requesting the victim's "patience."  The letter listed the eight CVRA rights, but made no mention of the NPA or the § 2255 provision.  Villafaña told OPR she was unaware the FBI sent the letter, but she knew "there were efforts to make sure that we had identified all victims of the crimes under investigation."  In response to OPR's questions about the accuracy of the FBI letter's characterization of the case as "under investigation," Villafaña told OPR that the NPA required Epstein to enter a plea by October 26, 2008, and "at this point we weren't actively looking for additional charges," but "the investigation wasn't technically suspended until he completed all the terms of the NPA."

### D.   The USAO Informs the Defense That It Intends to Notify Victims by Letter about Epstein's State Plea Hearing and the Resolution of the Federal Investigation, but the Defense Strongly Objects to the Notification Plan

In anticipation of Epstein's state court plea, Villafaña reported on November 16, 2007, to Acosta, Sloman, and other supervisors that she had learned, from FBI agents who met with Assistant State Attorney Belohlavek, that the State Attorney's Office wanted the USAO to notify victims of the state plea hearing.

> [Belohlavek] would still like us to do the victim notifications.  The State does not have a procedure (like we do federally) where the Court has to provide a separate room for victims who want to attend judicial proceedings, so I do not know how many victims will actually want to be present.[311]

Belohlavek told OPR that she did not recall the conversation referenced by the FBI nor any coordination between her office and federal officials to contact or notify victims about Epstein's state plea hearing.

On November 19, 2007, Villafaña decided that to avoid any misconduct accusations from the defense about the information given to victims, she "would put the victim notification in writing."  She provided Sloman with a draft victim notification letter, in which among other things,

---

[310]   Not all the individuals interviewed qualified for inclusion on the victim list.  For example, one would not cooperate with investigators; a second claimed to have simply massaged Epstein with no sexual activity; and a third claimed she had no contact with Epstein.

[311]   Villafaña told OPR that she understood the state took the position that because "there was either only one or two victims involved in their case," they "could not do victim notifications to all of the victims."

she would inform victims of the terms of the resolution of the federal case, including Epstein's agreement to plead guilty to state charges and serve 18 months in county jail, and the victims' ability to seek monetary damages against Epstein.  The letter also would invite victims to appear at the state court hearing and make a statement under oath or provide a written statement to be filed by the State Attorney's Office.  Sloman and Villafaña exchanged edits on the draft victim notification letter, and Villafaña also informed Sloman that "[t]here are a few girls who didn't receive the original letters, so I will need to modify the introductory portion of the letter for those."[312]

Sloman informed Lefkowitz of the government's need to meet its "statutory obligation (Justice for All Act of 2004) to notify the victims of the anticipated upcoming events and their rights associated with the agreement" and his intent to "notify the victims by letter after COB Thursday, November 29."  Lefkowitz objected to the proposal to notify the victims, asserting that it was "incendiary and inappropriate" and not warranted under the Justice for All Act of 2004.  He argued that the defense "should have a right to review and make objections to that submission prior to it being sent to any alleged victims."  He also insisted that if any notification letters were sent to "victims, who still have not been identified to us, it should happen only after Mr. Epstein has entered his plea" and that the letter should come from the attorney representative rather than the government.  On November 28, 2007, at Sloman's instruction, Villafaña provided Lefkowitz with the draft victim notification letter, which would advise victims that the state court plea was to occur on December 14, 2007.[313]

In a November 29, 2007 letter to Acosta, Lefkowitz strongly objected to the proposed draft notification letter, arguing that the government was not obligated to send any letter to victims until after Epstein's plea and sentencing.  Lefkowitz also contended that the victims had no right to appear at Epstein's state plea hearing and sentencing or to provide a written statement for such a proceeding.  In a November 30, 2007 reply letter to Lefkowitz, Acosta did not address the substance of Lefkowitz's arguments, but accused the defense team of "in essence presenting collateral challenges" delaying effectuation of the NPA, and asserted that if Epstein was dissatisfied with the NPA, "we stand ready to unwind the Agreement" and proceed to trial.  Shortly thereafter, Acosta informed defense counsel Starr by letter that he had directed prosecutors "not to issue victim notification letters until this Friday [December 7] at 5 p.m., to provide you with time to review these options with your client."  In the letter, Acosta also refuted defense allegations that Villafaña had acted improperly by informing the victims of the potential for receiving monetary damages, stating that "the victims were not told of the availability of Section 2255 relief during the investigation phase of this matter."

On December 5, 2007, Starr and Lefkowitz sent a letter to Acosta, with copies to Sloman and Assistant Attorney General Fisher, "reaffirm[ing]" the NPA, but taking "serious issue" with

---

[312]   On November 28, 2007, two months after the NPA was signed, the lead case agent informed Villafaña that only 15 of the then-known victims had received victim notification letters from either the FBI or the USAO.  On December 6, 2007, the lead case agent reported to Villafaña that she was "still holding many of the original V/W letters addressed to victims from the USAO."

[313]   Villafaña understood the state prosecutors had set the December 14, 2007 date, and emailed them for confirmation, stating, "[I]f the matter is set for the 14th, please let me know so I can include that in my victim notifications."

the USAO's interpretation of the agreement and "the use of Section 2255." The Starr and Lefkowitz letter asserted it was "wholly inappropriate" for the USAO to send the proposed victim notification letter "under any circumstances," and "strongly urg[ed]" Acosta to withhold the notification letter until after the defense was able "to discuss this matter with Assistant Attorney General Fisher."

The following day, Sloman sent a letter to Lefkowitz, with copies to Acosta and Villafaña, asserting that the VRRA obligated the government to notify victims of the 18 U.S.C. § 2255 proceedings as "other relief" to which they were entitled. Sloman also stated that the VRRA obligated the government to provide the victims with information concerning restitution to which they may be entitled and "*the earliest possible*" notice of the status of the investigation, the filing of charges, and the acceptance of a plea.[314] (Emphasis in original). Sloman added:

> Just as in 18 U.S.C. § 3771 [the CVRA], these sections are not limited to proceedings in a *federal* district court. Our Non-Prosecution Agreement resolves the federal investigation by allowing Mr. Epstein to plead to a state offense. The victims identified through the federal investigation should be appropriately informed, and our Non-Prosecution Agreement does not require the U.S. Attorney's Office to forego [*sic*] its legal obligations.[315]

Sloman also addressed the defense objection to advising the victims to contact Villafaña or the FBI case agent with questions or concerns: "Again, federal law requires that victims have the 'reasonable right to confer with the attorney for the Government in this case.'" Sloman advised the defense: "The three victims who were notified prior to your objection had questions directed to Mr. Epstein's punishment, not the civil litigation. Those questions are appropriately directed to law enforcement."

Along with this letter, Sloman forwarded to Lefkowitz for comment a revised draft victim notification letter that was substantially similar to the prior draft provided to the defense. The letter stated that "the federal investigation of Jeffrey Epstein has been completed," Epstein would plead guilty in state court, the parties would recommend 18 months of imprisonment at sentencing, and Epstein would compensate victims for damage claims brought under 18 U.S.C. § 2255. The letter provided specific information concerning the upcoming change of plea hearing:

> As I mentioned above, as part of the resolution of the federal investigation, Mr. Epstein has agreed to plead guilty to state charges. Mr. Epstein's change of plea and sentencing will occur on December 14, 2007, at ___ a.m., before Judge Sandra K. McSorley,

---

[314]   *See* 42 U.S.C. § 10607(c)(1)(B) and (c)(3).

[315]   Emphasis in original. Sloman also stated that the USAO did not seek to "federalize" a state plea, but "is simply informing the victims of their rights." Villafaña informed OPR that Sloman approved and signed the letter, but she was the principal author of the document. OPR notes that Villafaña was the principal author of most correspondence in the Epstein case, and that following the signing of the NPA, regardless of whether the letter went out with her, Sloman's, or Acosta's signature, the three attorneys reviewed and edited drafts of most correspondence before a final version was sent to the defense.

in Courtroom 11F at the Palm Beach County Courthouse, 205 North Dixie Highway, West Palm Beach, Florida.  Pursuant to Florida Statutes Sections 960.001(1)(k) and 921.143(1), you are entitled to be present and to make a statement under oath.  If you choose, you can submit a written statement under oath, which may be filed by the State Attorney's Office on your behalf.  If you elect to prepare a written statement, it should address the following:

> the facts of the case and the extent of any harm, including social, psychological, or physical harm, financial losses, loss of earnings directly or indirectly resulting from the crime for which the defendant is being sentenced, and any matter relevant to an appropriate disposition and sentence.  Fl[a]. Stat. [§] 921.143(2).

Sloman told OPR that he was "proceeding under the belief that we were going to notify [the victims], even though it wasn't a federal case.  Whether we were required or not."  Sloman also told OPR that while "we didn't think that we had an obligation to send them victim notification letters . . . I think . . . Marie and . . . the agents . . . were keeping the victims apprised at some level."

On December 7, 2007, Villafaña prepared letters containing the above information to be sent to multiple victims and emailed Acosta and Sloman, requesting permission to send them.[316] Sloman, however, had that day received a letter from Sanchez, advising that Epstein's plea hearing was scheduled for January 4, 2008, and requesting that the USAO "hold off" sending the victim notification letters until "we can further discuss the contents."  Also that day, Starr and Lefkowitz submitted to Acosta the two lengthy "independent ethics opinions" supporting the defense arguments against the federal investigation and the NPA's use of 18 U.S.C. § 2255.  Sloman responded to Villafaña's request with an email instructing her to "Hold the letter."[317]  Sloman told OPR that he "wanted to push the [victim notification] letter out," but his instruction to Villafaña was "the product of me speaking to somebody," although he could not be definitive as to whom. Sloman further told OPR that once the NPA "looked like it was going to fall apart," the USAO "had concerns that if we g[a]ve them the victim notification letter . . . and the deal fell apart, then the victims would be instantly impeached by the provision that you're entitled to monetary compensation."

On December 10, 2007, Villafaña contacted the attorney who at the time represented the victim who later became CVRA petitioner "Jane Doe #2" to inform him that she "was preparing victim notification letters."  In her 2017 declaration filed in the CVRA litigation, Villafaña noted that she reached out to Jane Doe #2's counsel, despite the fact that the USAO no longer considered

---

[316]     The FBI case agent had emailed Villafaña the day before stating, "The letter that is currently being revised needs to take into account that several victims have never been notified by your office or mine."  The case agent also stated, "I do not feel that [the defense] should have anything to do with the drafting or issuing of this letter.  My primary concern is that we meet our federal obligations to the victims in accordance with federal law."

[317]     Villafaña told OPR that she did not recall asking Sloman for an explanation for not sending the letters; rather, she "just remember[ed] putting them all in the Redweld and putting them in a drawer and being disgusted."

her a victim for purposes of the federal charges, and continued to treat her as a victim because she wanted "to go above and beyond in terms of caring for the victims."[318]

**E.     December 19, 2007:  Acosta Advises the Defense That the USAO Will Defer to the State Attorney the Decision Whether to Notify Victims of the State Plea Hearing, but the USAO Would Notify Them of the Federal Resolution, "as Required by Law"**

On December 11, 2007, Starr transmitted to Acosta two lengthy submissions authored by Lefkowitz presenting substantive challenges to the NPA and to "the background and conduct of the investigation" into Epstein.  Regarding issues relevant to victim notification, in his transmittal letter, Starr asserted that the "latest episodes involving [§] 2255 notification to the alleged victims put illustratively in bold relief our concerns that the ends of justice, time and time again, are not being served."  By way of example, Starr complained the government had recently inappropriately provided "oral notification of the victim notification letter" to one girl's attorney, even though it was clear from the girl's recorded FBI interview that she "did not in any manner view herself as a victim."

In his submissions, Lefkowitz argued that the government was not required to notify victims of the § 2255 provision:

> Villafaña's decision to utilize a civil remedy statute in the place of a restitution fund for the alleged victims eliminates the notification requirement under the Justice for All Act of 2004, a federal law that requires federal authorities to notify victims as to any available restitution, not of any potential civil remedies.  Despite this fact, [she] proposed a Victims Notification letter to be sent to the alleged federal victims.

Lefkowitz also argued that a victim trust fund would provide a more appropriate mechanism for compensating the victims than the government's proposed use of 18 U.S.C. § 2255, and a trust fund would not violate Epstein's due process rights.  Lefkowitz took issue with the government's "assertion" that the USAO was obligated to send a victim notification letter to the alleged victims, or even that it was appropriate for the USAO to do so.  Lefkowitz further argued that the government misinterpreted both the CVRA and the VRRA, because neither applied to a public, state court proceeding involving the entry of a plea on state charges.

In a letter from Villafaña to Lefkowitz, responding to his allegations that she had committed misconduct, she specifically addressed the "false" allegations that the government had

---

[318]     As noted previously, in April 2007, this victim gave a video-recorded interview to the FBI that was favorable to Epstein.  Villafaña told OPR she was instructed by either Sloman or Acosta "not to consider [this individual] as a victim for purposes of the NPA because she was not someone whom the Office was prepare[d] to include in" a federal charging document.  Accordingly, the victim who became "Jane Doe #2" was not included on the victim list ultimately furnished to the defense.  The attorney who was representing this victim at the time of her FBI interview was paid by Epstein, and she subsequently obtained different counsel.

informed victims "of their right to collect damages prior to a thorough investigation of their allegations against Mr. Epstein":

> None of the victims were informed of the right to sue under Section 2255 prior to the investigation of the claims. Three victims were notified shortly after the signing of the [NPA] of the general terms of that Agreement. You raised objections to any victim notification, and no further notifications were done. Throughout this process you have seen that I have prepared this case as though it would proceed to trial. Notifying the witnesses of the possibility of damages claims prior to concluding the matter by plea or trial would only undermine my case. If my reassurances are insufficient the fact that not a single victim has threatened to sue Mr. Epstein should assure you of the integrity of the investigation.

On December 14, 2007, Villafaña forwarded to Acosta the draft victim notification letter previously sent to the defense, along with two draft letters addressed to State Attorney Krischer; Villafaña's transmittal email to Acosta had the subject line, "The letters you requested." One of the draft letters to Krischer, to be signed by Villafaña, was to advise that the USAO had sent an enclosed victim notification letter to specified identified victims and referred to an enclosed "list of the identified victims and their contact information, in case you are required to provide them with any further notification regarding their rights under Florida law."[319] The second draft letter to Krischer, for Acosta's signature, requested that Krischer respond to defense counsel's allegations that the State Attorney's Office was not comfortable with the proposed plea and sentence because it believed that the case should be resolved with probation and no sexual offender registration. OPR found no evidence that these letters were sent to Krischer.[320]

A few days later, in an apparent effort to move forward with victim notifications, Villafaña emailed Sloman, stating, "[Is there] anything that I or the agents should be doing?" Villafaña told Sloman that "[the FBI case agent] is all worked up because another agent and [a named AUSA] are the subject of an OPR investigation for failing to properly confer with and notify victims [in an unrelated matter]. We seem to be in a Catch 22."[321] OPR did not find a response to Villafaña's email.

In their December 14, 2007 meeting with Acosta and other USAO personnel and in their lengthy follow-up letter to Acosta on December 17, 2007, Starr and Lefkowitz continued to press their objections to the USAO's involvement in the Epstein matter. They requested that Acosta

---

[319]    The draft victim notification letter was identical to the draft victim notification letter sent to the defense on December 6, 2007, except that it contained a new plea date of January 4, 2008.

[320]    Moreover, the letters were not included in the publicly released State Attorney's file, which included other correspondence from the USAO. *See* Palm Beach State Attorney's Office Public Records/Jeffrey Epstein, available at http://sa15.org/stateattorney/NewsRoom/indexPR.htm.

[321]    OPR was unable to locate any records indicating that such allegations had ever been referred to OPR. Villafaña told OPR that "Catch 22" was a reference to instructions from supervisors "[t]hat we can't go forward on" filing federal charges and "I was told not to do victim notifications and confer at the time."

review the appropriateness of the potential federal charges and the government's "unprecedentedly expansive interpretation" of 18 U.S.C. § 2255.

In a December 19, 2007 response to the defense team, Acosta offered to revise two paragraphs in the NPA to resolve "disagreements" with the defense and to clarify that the parties intended Epstein's § 2255 liability to "place these identified victims in the same position as they would have been had Mr. Epstein been convicted at trial. No more; no less." Acosta also advised that although the USAO intended to notify the victims of the resolution of the federal investigation, the USAO would leave to the State Attorney the decision whether to notify victims about the state proceedings:

> I understand that the defense objects to the victims being given notice of [the] time and place of Mr. Epstein's state court sentencing hearing. I have reviewed the proposed victim notification letter and the statute. I would note that the United States provided the draft letter to the defense as a courtesy. In addition, First Assistant United States Attorney Sloman already incorporated in the letter several edits that had been requested by defense counsel. I agree that [the CVRA] applies to notice of proceedings and results of investigations of federal crimes as opposed to the state crime. We intend to provide victims with notice of the federal resolution, as required by law. We will defer to the discretion of the State Attorney regarding whether he wishes to provide victims with notice of the state proceedings, although we will provide him with the information necessary to do so if he wishes.

Acosta told OPR that he "would not have sent this letter without running it by [Sloman], if not other individuals in the office," and records show he sent a draft to Sloman and Villafaña. Acosta explained to OPR that he was not concerned about deferring to Krischer on the issue of whether to notify the victims of the state proceedings because he did not view it as his role, or the role of the USAO, "to direct the State Attorney's Office on its obligations with respect to the state outcome."[322] Acosta further explained to OPR that despite the USAO's initial concerns about the State Attorney's Office's handling of the Epstein case, he did not believe it was appropriate to question that office's ability to "fulfill whatever obligation they have," and he added, "Let's not assume . . . that the State Attorney's Office is full of bad actors." Acosta told OPR that it was his understanding "that the victims would be aware of what was happening in the state court and have an opportunity to speak up at the state court hearing." Acosta also told OPR that the state would

---

[322]   Sloman's handwritten notes from a December 21, 2007 telephone conference indicate that Acosta asked the defense, "Are there concerns re: 3771 lang[uage]," to which Lefkowitz replied, "The state should have their own mechanism." At the time of the Epstein matter, under the Florida Constitution, upon request, victims were afforded the "right to reasonable, accurate, and timely notice of, and to be present at" a defendant's plea and sentencing. Fla. Const. art. I, § 16(b)(6). Similarly, pursuant to state statute, "Law enforcement personnel shall ensure" that victims are given information about "[t]he stages in the criminal or juvenile justice process which are of significance to the victim[.]" Fla. Stat. § 960.001(1)(a) (2007). Victims were also entitled to submit an oral or written impact statement. Fla. Stat. § 960.001(1)(k) (2007). Moreover, "in a case in which the victim is a minor child," the guardian or family of the victim must be consulted by the state attorney "in order to obtain the views of the victim or family about the disposition of any criminal or juvenile case" including plea agreements. Fla. Stat. § 960.001(1)(g) (2007).

have "notified [the victims] that that was an all-encompassing plea, that that state court sentence would also mean that the federal government was not proceeding."

Sloman told OPR that he thought Acosta and Criminal Division Deputy Assistant Attorney General Sigal Mandelker had agreed that the decision whether to notify the victims of the state court proceedings should be "left to the state."[323] Mandelker, however, had no memory of advising Acosta to defer the decision to make notifications to the State Attorney, and she noted that the "correspondence [OPR] provided to me from that time period" discussing such a decision "demonstrates that all of the referenced language came from Mr. Acosta and/or his team, and that I did not provide, suggest, or edit the language." Sloman told OPR that he initially believed that "the victims were going to be notified at some level, especially because they had restitution rights under § 2255"; but, his expectations changed after "there was an agreement made that we were going to allow the state, since it was going to be a state case, to decide how the victims were going to be notified."

Assistant State Attorney Belohlavek told OPR that she did not at any time receive a victim list from the USAO. She further said she did not receive any request from the USAO with regard to contacting the victims.

In response to Acosta's December 19, 2007 letter, Lefkowitz asserted that the FBI should not communicate with the victims, and that the state, not the USAO, should determine who can be heard at the sentencing hearing:

> [Y]our letter also suggests that our objection to your Office's proposed victims notification letter was that the women identified as victims of federal crimes should not be notified of the state proceedings. That is not true, as our previous letter clearly states. Putting aside our threshold contention that many of those to whom [CVRA] notification letters are intended are in fact not victims as defined in the Attorney General's 2000 Victim Witness Guidelines—a status requiring physical, emotional or pecuniary injury of the [victim]—it was and remains our position that these women may be notified of such proceedings but since they are neither witnesses nor victims to the state prosecution of this matter, they should not be informed of fictitious "rights" or invited to make sworn written or in-court testimonial statements against Mr. Epstein at such proceedings, as Ms. Villafaña repeatedly maintained they had the right to do. Additionally, it was and remains our position that any notification should be by mail and that all proactive efforts by the FBI to have communications with the witnesses after the execution of the Agreement should finally come to an end. We agree, however, with your December 19 modification of the previously drafted federal notification letter and agree that the

---

[323]     In his June 3, 2008 letter to Deputy Attorney General Mark Filip, Sloman wrote, "Acosta again consulted with DAAG Mandelker who advised him to make the following proposal [to defer notification to the State Attorney's Office]." OPR found no other documentation relating to Mandelker's purported involvement in the decision.

decision as to who can be heard at a state sentencing is, amongst many other issues, properly within the aegis of state decision making.[324]

Following a conversation between Acosta and Lefkowitz, in which Acosta asked that the defense clarify its positions on the USAO proposals regarding, among other things, notifications to the victims, Lefkowitz responded with a December 26, 2007 letter to Acosta, objecting again to notification of the victims.  Lefkowitz argued that CVRA notification was not appropriate because the Attorney General Guidelines defined "crime victim" as a person harmed as a result of an offense charged in federal district court, and Epstein had not been charged in federal court.  Nevertheless, Lefkowitz added that, despite their objection to CVRA notification, "[W]e do not object (as we made clear in our letter last week) that some form of notice be given to the alleged victims."  Lefkowitz requested both that the defense be given an opportunity to review any notice sent by the USAO, and that "any and all notices with respect to the alleged victims of state offenses should be sent by the State Attorney rather than [the USAO]," and he agreed that the USAO "should defer to the discretion of the State Attorney regarding all matters with regard to those victims and the state proceedings."

Months later, in April 2008, Epstein's attorneys complained in a letter to Mandelker that Sloman and Villafaña committed professional misconduct by threatening to send a "highly improper and unusual 'victim notification letter' to all" victims.

### F.    January – June 2008:  While the Defense Presses Its Appeal to the Department in an Effort to Undo the NPA, the FBI and the USAO Continue Investigating Epstein

As described in Chapter Two of this Report, from the time the NPA was signed through the end of June 2008, the defense employed various measures to delay, or avoid entirely, implementation of the NPA.  Ultimately, defense counsel's advocacy resulted in the USAO's decision to have the federal case reviewed afresh.  A review of the evidence was undertaken first by USAO Criminal Chief Robert Senior and then, briefly, by an experienced CEOS trial attorney.  A review of the case in light of the defense challenges was then conducted by CEOS Chief Oosterbaan, in consultation with his staff and with Deputy Assistant Attorney General Sigal Mandelker and Assistant Attorney General Alice Fisher, and then by the Office of the Deputy Attorney General.  Each review took weeks and delayed Epstein's entry of his state guilty plea.

As set forth below, during that time, Villafaña and the FBI continued investigating and working toward potential federal charges.

### 1.    Villafaña Prepares to Contact Victims in Anticipation That Epstein Will Breach the NPA

On January 3, 2008, the local newspaper reported that Epstein's plea conference in state court, at that point set for early January, had been rescheduled to March 2008, at which time he would plead guilty to felony solicitation of prostitution, and that "in exchange" for the guilty plea,

---

[324]    The 2000 Guidelines were superseded by the 2005 Guidelines.

"federal authorities are expected to drop their probe into whether Epstein broke any federal laws."[325]

Nevertheless, as Epstein's team continued to argue to higher levels of the Department that there was no appropriate federal interest in prosecuting Epstein and thus no basis for the NPA, and with his attorneys asserting that "the facts had gotten better for Epstein," Villafaña came to believe that Epstein would likely breach the NPA.[326]  In January 2008, Villafaña informed her supervisors that the FBI "had very tight contact with the victims several months ago when we were prepared to [file charges], but all the shenanigans over the past few months have resulted in no contact with the vast majority of the victims."  Villafaña then proposed that the FBI "re-establish contact with all the victims so that we know we can rely on them at trial."[327]  Villafaña told OPR that at this point, "[w]hile the case was being investigat[ed] and prepared for indictment, I did not prepare or send any victim notification letters—there simply was nothing to update.  I did not receive any victim calls during this time."

## 2.    The FBI Uses VNS Form Letters to Re-Establish Contact with Victims

On January 10, 2008, the FBI Victim Specialist mailed VNS generated victim notification letters to 14 victims articulating the eight CVRA rights and inviting recipients to update their contact information with the FBI in order to obtain current information about the matter.[328]  The case agent informed Villafaña in an email that the Victim Specialist sent a "standard form [FBI] letter to all the remaining identified victims."  These 2008 letters were identical to the FBI form letters the Victim Specialist had sent to victims between August 28, 2006, and October 12, 2007.  Like those previous letters, most of which were sent before the NPA was signed on September 24, 2007, the 2008 letters described the case as "currently under investigation" and noted that "[t]his can be a lengthy process and we request your continued patience while we conduct a thorough investigation."  The letters also stated:

---

[325]    Michele Dargan, "Jeffrey Epstein Plea Hearing Moved to March," *Palm Beach Daily News* "The Shiny Sheet," Jan. 3, 2008.

[326]    Epstein's attorneys used discovery proceedings in the state case to depose federal victims, and as they learned unflattering details or potential impeachment information concerning likely federal victims, they argued for the exclusion of those victims from the federal case.  For example, defense attorneys questioned one victim as to whether the federal prosecutors or FBI agents told her that she was entitled to receive money from Epstein.  *See* Exhibit 9 to Villafaña June 2, 2017 Declaration: Deposition of [REDACTED], *State v. Epstein,* Case No. 2006-CF-9454, at 44, 50, 51 (Feb. 20, 2008).  One victim's attorney told OPR that the defense attorneys tried to "smear" victims by asking highly personal sexual questions about "terminations of pregnancies . . . sexual encounters . . . masturbation."  Epstein's attorney used similar tactics in questioning victims who filed civil cases against their client.  For example, the *Miami Herald* reported that, "One girl was asked about her abortions, and her parents, who were Catholic and knew nothing about the abortions, were also deposed and questioned."  *See* Julie Brown, "Perversion of Justice: Cops Worked to Put a Serial Sex Abuser in Prison.  Prosecutors Worked to Cut Him a Break," *Miami Herald*, Nov. 28, 2018.

[327]    Villafaña also told her supervisors that she wanted the FBI to interview two specific victims.

[328]    The Victim Specialist later generated an additional letter dated May 30, 2008.  After Epstein's June 30, 2008 state court pleas, she sent out substantially similar notification letters to two victims who resided outside of the United States.

> We will make our best efforts to ensure you are accorded the rights described.  Most of these rights pertain to events occurring after the arrest or indictment of an individual for the crime, and it will become the responsibility of the prosecuting United States Attorney's Office to ensure you are accorded those rights.  You may also seek the advice of a private attorney with respect to these rights.

The FBI case agent informed Villafaña that the Victim Specialist sent the letters and would follow up with a phone call "to offer assistance and ensure that [the victims] have received their letter." A sample letter is shown on the following pages.

Villafaña told OPR that she did not recall discussing the content of the letters at the time they were sent to the victims, or reviewing the letters until they were collected for the CVRA litigation, sometime after July 2008.  Rather, according to Villafaña, "The decision to issue the letter and the wording of those letters were exclusively FBI decisions."  Nevertheless, Villafaña asserted to OPR that from her perspective, the language regarding the ongoing investigation "was absolutely true and, despite being fully advised of our ongoing investigative activities, no one in my supervisory chain ever told me that the case was not under investigation."  Villafaña identified various investigative activities in which she engaged from "September 2007 until the end of June 2008," such as collecting and reviewing evidence; interviewing new victims; re-interviewing victims; identifying new charges; developing new charging strategies; drafting supplemental prosecution memoranda; revising the charging package; and preparing to file charges.  Similarly, the FBI case agent told OPR that at the time the letters were sent the "case was never closed and the investigation was continuing."  The co-case agent stated that the "the case was open . . . it's never been shut down."

Victim Courtney Wild received one of the January 10, 2008 FBI letters; much later, in the course of the CVRA litigation, she stated that her "understanding of this letter was that [her] case was still being investigated and the FBI and prosecutors were moving forward on the Federal prosecution of Epstein for his crimes against [her]."[329]

---

[329]     CVRA petitioner Jane Doe #2 also received a January 10, 2008 FBI letter that was sent to her counsel.



**U.S. Department of Justice**
Federal Bureau of Investigation
FBI - West Palm Beach
Suite 500
505 South Flagler Drive
West Palm Beach, FL  33401
Phone: (561) 833-7517
Fax: (561) 833-7970

January 10, 2008



Re: Case Number: ▇▇▇▇▇▇▇▇

Dear ▇▇▇▇▇▇▇▇

    This case is currently under investigation.  This can be a lengthy process and we request your continued patience while we conduct a thorough investigation.

    As a crime victim, you have the following rights under 18 United States Code § 3771:  (1) The right to be reasonably protected from the accused; (2) The right to reasonable, accurate, and timely notice of any public court proceeding, or any parole proceeding, involving the crime or of any release or escape of the accused; (3) The right not to be excluded from any such public court proceeding, unless the court, after receiving clear and convincing evidence, determines that testimony by the victim would be materially altered if the victim heard other testimony at that proceeding; (4) The right to be reasonably heard at any public proceeding in the district court involving release, plea, sentencing, or any parole proceeding; (5) The reasonable right to confer with the attorney for the Government in the case; (6) The right to full and timely restitution as provided in law; (7) The right to proceedings free from unreasonable delay; (8) The right to be treated with fairness and with respect for the victim's dignity and privacy.

    We will make our best efforts to ensure you are accorded the rights described.  Most of these rights pertain to events occurring after the arrest or indictment of an individual for the crime, and it will become the responsibility of the prosecuting United States Attorney's Office to ensure you are accorded those rights.  You may also seek the advice of a private attorney with respect to these rights.

    The Victim Notification System (VNS) is designed to provide you with direct information regarding the case as it proceeds through the criminal justice system.  You may obtain current information about this matter on the Internet at WWW.Notify.USDOJ.GOV or from the VNS Call Center at ▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇  In addition, you may use the Call Center or Internet to update your contact information and/or change your decision about participation in the notification program.  If you update your information to include a current email address, VNS will send information to that address.  You will need the following Victim Identification Number (VIN) ▇▇▇▇▇ and Personal Identification Number (PIN) ▇▇▇▇ anytime you contact the Call Center and the first time you log on to VNS on the Internet.  In addition, the first time you access the VNS Internet site, you will be prompted to enter your last name (or business name) as currently contained in VNS.  The name you should enter is ▇▇▇▇▇▇

If you have additional questions which involve this matter, please contact the office listed above.  When you call, please provide the file number located at the top of this letter.  Please remember, your participation in the notification part of this program is voluntary.  In order to continue to receive notifications, it is your responsibility to keep your contact information current.

Sincerely,



Victim Specialist

### 3.  Villafaña, the FBI, and the CEOS Trial Attorney Interview Victims

As Villafaña resumed organizing the case for charging and trial, the FBI case agent provided Villafaña with a list of "the 19 identified victims we are planning on using in" the federal charges and noted that she and her co-case agent wanted to further evaluate some additional victims.[330]  In Washington, D.C., CEOS assigned a Trial Attorney to the Epstein case in order to bring expertise and "a national perspective" to the matter.[331]

On January 18, 2008, one attorney representing a victim and her family contacted Sloman by telephone, stating that he planned to file civil litigation against Epstein on behalf of his clients, who were "frustrated with the lack of progress in the state's investigation" of Epstein.  The attorney asked Sloman if the USAO "could file criminal charges even though the state was looking into the matter," but Sloman declined to answer his questions concerning the investigation.[332]  In late January, the *New York Post* reported that the attorney's clients had filed a $50 million civil suit against Epstein in Florida and that "Epstein is expected to be sentenced to 18 months in prison when he pleads guilty in March to a single charge of soliciting an underage prostitute."[333]

Between January 31, 2008, and May 28, 2008, the FBI, with the prosecutors, interviewed additional victims and reinterviewed several who had been interviewed before the NPA was signed.[334]  In late January 2008, as Villafaña and the CEOS Trial Attorney prepared to participate

---

[330]    The case agent also informed Villafaña that she expected to ask for legal process soon in order to obtain additional information.

[331]    The CEOS Trial Attorney told OPR that she was under the impression that she was brought in to help prepare for the trial because the "plea had fallen through."

[332]    Because Sloman and the attorney were former legal practice partners, Sloman reported the interaction to Acosta, and the USAO reported the incident to OPR shortly thereafter.   OPR reviewed the matter as an inquiry and determined that no further action was warranted.

[333]    Dareh Gregorian, "Tycoon Perved Me at 14 - $50M Suit Hits NY Creep Over Mansion Massage," *New York Post*, Jan. 25, 2008.

[334]    An FBI interview report from May 28, 2008, indicates that one victim "believes Epstein should be prosecuted for his actions."

in FBI interviews of Wild and other victims, Villafaña informed CEOS Chief Oosterbaan that she anticipated the victims "would be concerned about the status of the case."

On January 31, 2008, Villafaña, the CEOS Trial Attorney, and the FBI interviewed three victims, including Wild. Prior to the interview, Wild had received the FBI's January 10, 2008 letter stating that the case was under investigation; however, according to the case agent, Wild and two other victims had also been told by the FBI, in October 2007, that the case had been resolved. In her 2015 CVRA-case declaration, Wild stated that after receiving the FBI letter, she believed that the FBI was investigating the case, and she was not told "about any [NPA] or any potential resolution of the federal criminal investigation I was cooperating in. If I had been told of a[n NPA], I would have objected." In Villafaña's 2017 declaration in the CVRA litigation, Villafaña recalled interviewing Wild on January 31, 2008, along with FBI agents, and Villafaña told OPR she "asked [Wild] whether she would be willing to testify if there were a trial." Villafaña recalled Wild responding that she "hoped Epstein would be prosecuted and that she was willing to testify."[335]

After the first three victim interviews on January 31, 2008, Villafaña described for Acosta and Sloman the toll that the case had taken on two of the victims:

> One girl broke down sobbing so that we had to stop the interview twice . . . she said she was having nightmares about Epstein coming after her and she started to break down again so we stopped the interview.

> The second girl . . . was very upset about the 18 month deal she had read about in the paper.[336] She said that 18 months was nothing and that she had heard that the girls could get restitution, but she would rather not get any money and have Epstein spend a significant time in jail.[337]

Villafaña closed the email by requesting that Acosta and Sloman attend the interviews with victims scheduled for the following day, but neither did so.[338] Acosta told OPR that it "wasn't typical"

---

[335]   The FBI report of the interview did not reflect a discussion of Wild's intentions.

[336]   *See* Dareh Gregorian, "Tycoon Perved Me at 14 - $50M Suit Hits NY Creep Over Mansion Massage," *New York Post*, Jan. 25, 2008. As early as October 2007, the New York Post reported the 18-month sentence and that "[t]he feds have agreed to drop their option from possible federal criminal violations in exchange for the guilty plea to the new state charge." Dan Mangan, "'Unhappy Ending' Plea Deal – Moneyman to Get Jail For Teen Sex Massages," *New York Post*, Oct. 1, 2007.

[337]   Acosta told OPR, "The United States can't unwind an agreement just because . . . some victim indicates that they don't like it." The CEOS Trial Attorney recalled that she did not "think that any one of these girls was interested in this prosecution going forward." Furthermore, as previously noted, the CEOS Trial Attorney also opined that "[the victims] would have testified for us," but the case would have required an extensive amount of "victim management," as the girls were "deeply embarrassed" that they "were going to be called prostitutes."

[338]   OPR located FBI interview reports relating to only one February 1, 2008 victim interview. Although Villafaña's emails indicated that two additional victims were scheduled to be interviewed on February 1, 2008, OPR located no corresponding reports for those victim interviews. OPR located undated handwritten notes Villafaña

for him, as U.S. Attorney, to attend witness interviews, and further, that no one in the USAO "was questioning the pain or the suffering of the victims."  Sloman told OPR that he himself had "never gone to a line assistant's victim or witness interview."

Villafaña told OPR that although three of the victims interviewed during this period had been notified by the FBI in October 2007 about the resolution of the case, at this point Villafaña did not specifically tell these victims that "there was a signed non-prosecution agreement that had these terms."  Villafaña also told OPR she "didn't talk about money" because she "didn't want there to be an allegation at the time of trial . . . that [the victims] were either exaggerating their claims or completely making up claims in order to increase their damages amount."  Rather, according to Villafaña, she told the three victims that "an agreement had been reached where [Epstein] was going to be entering a guilty plea, but it doesn't look like he intends to actually perform . . . [and] now it looks like this may have to be charged, and may have to go to trial."  Villafaña recalled "explaining that the case was under investigation," that they "were preparing the case [for charging] again," and "expressing our hope that charges would be brought."  Villafaña recalled one victim "making a comment about the amount of [imprisonment] time and why was it so low" and Villafaña answered, "that was the agreement that the office had reached."[339]

With regard to the victims Villafaña interviewed who had not received an FBI notification in October 2007, Villafaña recalled discussing one victim's safety concerns but not whether they discussed the agreement.  She recalled telling another victim that "we thought we had reached an agreement with [Epstein] and then we didn't," but was "pretty sure" that she did not mention the agreement during the interview of the third victim.  Villafaña explained that she likely did not discuss the agreement because

> at that point I just felt . . . like it was nonexistent.  [The victim] didn't know anything about it beforehand, and as far as I could tell it was going to end up being thrown on the heap, and I didn't want to -- . . . if you tell people, oh, look, he's already admitted that he's guilty, like, I didn't want that to color her statement.  I just wanted to get the facts of the case.

The CEOS Trial Attorney told OPR that she did not recall any discussion with the victims about the NPA or the status of the case.[340]  She did remember explaining the significance of the prosecution to one victim who "did not think anything should happen" to Epstein.  The FBI case agent told OPR that she did not recall the January 2008 interviews.  OPR located notes to an FBI interview report, stating that one of the victims wanted another victim to be prosecuted.  Attorneys for the two victims other than Wild who had been notified by the FBI in October 2007 about the resolution of the case informed OPR that as of 2020, their clients had no memory of meeting with

---

authored concerning one of the two victims that contained no information regarding a discussion of the status of the investigation or the resolution of the case.  Through her attorney, this victim told OPR that she did not recall having contact with anyone from the USAO.

[339]    Villafaña did not recall any other specific questions from victims.

[340]    The CEOS Trial Attorney noted that CEOS did not issue victim notifications; rather, such notifications were generally handled by a Victim Witness Specialist in the assigned USAO.

prosecutors and did not recall learning any information about Epstein's guilty plea until after the plea was entered on June 30, 2008.

When asked whether she was concerned that her statements would mislead the victims, Villafaña told OPR:

> From my perspective we were conducting an investigation and it was an investigation that was going to lead to an indictment. You know, I was interviewing witnesses, I was issuing [legal process], . . . I was doing all [these] things to take the case to a federal indictment and a federal trial. So to me, saying to a victim the case is now back under investigation is perfectly accurate.

### 4.  February – March 2008:  Villafaña Takes Additional Steps to Prepare for a Prosecution of Epstein, Arranges for *Pro Bono* Attorneys for Victims, and Cautions about Continued Delay

In February 2008, Villafaña revised the prosecution memorandum and supplemental memorandum. Villafaña removed some victims known to Epstein from the PBPD investigation and others subject to impeachment as a result of civil suits they filed against Epstein, added newly discovered victims, and made changes to the proposed indictment.

While the defense appealed the USAO's decision to prosecute Epstein to higher levels of the Department, Villafaña sought help for victims whom defense investigators were harassing and attempting to subpoena for depositions as part of Epstein's defense in civil lawsuits that some victims had brought against him, as well as purportedly in connection with the state criminal case. Villafaña reported to her supervisors that she was able to locate a "national crime victims service organization" to provide attorneys for the victims, and the FBI Victim Specialist contacted some victims to provide contact information for the attorneys.[341]  During this period, an attorney from the victims service organization was able to help Courtney Wild avoid an improper deposition. Villafaña also informed her supervisors, including Sloman, that "one of the victims tried to commit suicide last week," and advocated aggressively for a resolution to the case: "I just can't stress enough how important it is for these girls to have a resolution in this case. The 'please be patient' answer is really wearing thin, especially when Epstein's group is still on the attack while we are forced to wait on the sidelines."

### 5.  March – April 2008:  Villafaña Continues to Prepare for Filing Federal Charges

Villafaña continued to revise the proposed charges by adding new victims and by removing others who had filed civil suits against Epstein. Villafaña also prepared search warrants for digital

---

[341]    The FBI Victim Specialist informed Villafaña that she spoke "directly to seven victims" and informed them of the *pro bono* counsel and explained that her "job as a Victim Specialist is to ensure that victims[] of a Federal crime are afforded their rights, information and resource referral."

camera memory cards seized by the PBPD in order to have them forensically examined for deleted images that could contain child pornography.[342]

By early April 2008, as the defense pursued its appeal to the Department's Criminal Division, Acosta predicted in an email to Villafaña and Sloman that federal charges against Epstein were "more and more likely." Villafaña asked Oosterbaan for help to "move this [Criminal Division review] process along," noting that the defense continued to undermine the government's case by deposing the victims "under the guise of 'trial prep' for the state case" and that the "agents and the victims" were "losing their patience."

On April 24, 2008, Villafaña emailed Sloman and USAO Criminal Division Chief Senior asking whether she had the "green light" to file charges and raising the same concerns she had expressed to Oosterbaan. Villafaña further cautioned that, although she was planning to file charges on May 6, if that was not going to happen, "then we all need to meet with the victims, the agents, and the police officers to decide how the case will be resolved and to provide them with an explanation for the delay." Because the Department's Criminal Division did not conclude its review of Epstein's appeal by May 6, however, Villafaña did not file charges that day.

## VIII. USAO SUPERVISORS CONSIDER CVRA OBLIGATIONS IN AN UNRELATED MATTER AND IN LIGHT OF A NEW FIFTH CIRCUIT OPINION

During the period after the NPA was signed, and before Epstein complied with the NPA by entering his state guilty pleas, the USAO supervisors were explicitly made aware of a conflict between the Department's position that CVRA's victims' rights attached upon the filing of a criminal charge and a new federal appellate ruling to the contrary. The contemporaneous communications confirm that in 2008, Acosta and Sloman were aware of the Department's policy regarding the issue.

Unrelated to the Epstein investigation, on April 18, 2008, Acosta and Sloman received a citizen complaint from an attorney who requested to meet with them regarding his belief that the Florida Bar had violated his First Amendment rights. The attorney asserted that the CVRA guaranteed him "an absolute right to meet" with USAO officials because he believed that he was the victim of a federal crime. Acosta forwarded the message to the USAO Appellate Division Chief, who informed Acosta and Sloman that, according to the 2005 Guidelines, "our obligations under [the CVRA] are not triggered until charges are filed." On April 24, 2008, the Appellate Division Chief emailed Acosta and Sloman, stating that she had "confirmed with DOJ that [her] reading of [the 2005 Guidelines] is correct and that our obligations under [the CVRA] are not triggered until a case is filed."[343]

On May 7, 2008, the Appellate Division Chief sent Acosta and Sloman a copy of a U.S. Court of Appeals for the Fifth Circuit opinion issued that day, *In re Dean*, holding that a victim's

---

[342]   The forensic examination did not locate useful evidence on the memory cards.

[343]   The Appellate Division Chief advised Acosta that Acosta could inform the complainant that, prior to the initiation of charges, the investigating agency was responsible for carrying out the Department's statutory obligations to the victim.

CVRA rights attach prior to the filing of criminal charges.[344]  The Appellate Division Chief noted that, although the holding conflicted with the 2005 Guidelines, the "court's opinion makes sense."

*Dean* involved a federal prosecution arising from a 2005 explosion at an oil refinery operated by BP Products North America, Inc. (BP) that killed 15 people and injured more than 170.  Before bringing criminal charges, the government negotiated a guilty plea with BP without notifying the victims.  The government filed a sealed motion, alerting the district court to the potential plea and claiming that consultation with all the victims was impractical and that such notification could result in media coverage that would undermine the plea negotiations.  The court then entered an order prohibiting the government from notifying the victims of the pending plea agreement until after it had been signed by the parties.  Thereafter, the government filed a criminal information, the government and BP signed the plea agreement, and the government mailed notices of the plea hearing to the victims informing them of their right to be heard.  One month later, 12 victims asked the court to reject the plea because it was entered into in violation of their rights under the CVRA.  The district court denied their motion, but concluded that the CVRA rights to confer with the prosecutor in the case and to be treated with fairness and respect for the victim's dignity and privacy vested prior to the initiation of charges.[345]  The district court noted that the legislative history reflected a view that "the right to confer was intended to be broad," as well as being a "mechanism[]" to ensure that victims were treated with fairness.

In denying the victims relief, the Fifth Circuit nevertheless concluded that the district court "failed to accord the victims the rights conferred by the CVRA."[346]  In particular, the Fifth Circuit cited the district court's acknowledgement that "[t]here are clearly rights under the CVRA that apply before any prosecution is underway."  The Fifth Circuit also noted that such consultation was not "an infringement" on the government's independent prosecutorial discretion, but "it is only a requirement that the government confer in some reasonable way with the victims before ultimately exercising its broad discretion."  In the wake of the *Dean* opinion, two Department components wrote separate memoranda to the Solicitor General with opposing views concerning whether the CVRA right to confer with the prosecution vests prior to the initiation of a prosecution.

## IX.   JUNE 2008:  VILLAFAÑA'S PRE-PLEA CONTACTS WITH THE ATTORNEY REPRESENTING THE VICTIMS WHO LATER BECAME THE CVRA PETITIONERS

According to an affidavit filed in the CVRA litigation by her attorney, Bradley Edwards, Wild retained Edwards in June 2008 to represent her "because she was unable to get anyone from the [USAO] to tell her what was actually going on with the federal criminal case against Jeffrey Epstein."[347]  Villafaña told OPR that Wild did not contact her directly and she was not aware of

---

[344]     *In re Dean*, 527 F.3d 391 (5th Cir. 2008).  The Fifth Circuit opinion was not binding precedent in Florida, which is within the Eleventh Circuit.

[345]     *United States v. BP Products North America, Inc.,* 2008 WL 501321, at *11 (S.D. Tex. 2008).  Victims who wished to be heard were permitted to speak at the plea hearing.

[346]     *Dean*, 527 F.3d at 394.

[347]     Before Epstein's state court plea hearing, Edwards also began representing the victim who became Jane Doe #2.  Although OPR focuses on Villafaña's communications with Edwards in this section, OPR notes that Villafaña

an instance in which Wild "asked a question that wasn't answered" of anyone in the USAO or of the FBI case agents.

Edwards contacted Villafaña by email and telephone in mid-June, stating that he had "information and concerns that [he] would like to share."[348]  In his affidavit, Edwards alleged that during multiple telephone calls with Villafaña, he "asked very specific questions about what stage the investigation was in," and Villafaña replied that she could not answer his questions because the matter "was an on-going active investigation[.]"  Edwards attested that Villafaña gave him "the impression that the Federal investigation was on-going, very expansive, and continuously growing, both in the number of identified victims and [in] complexity."[349]

In her written response to OPR, Villafaña said that she "listened more than [she] spoke" during these interactions with Edwards, which occurred before the state court plea:

> Given the uncertainty of the situation – Epstein was still challenging our ability to prosecute him federally, pressing allegations of prosecutorial misconduct, and trying to negotiate better plea terms, while the agents, my supervisors, and I were all moving towards [filing charges] – I did not feel comfortable sharing any information about the case.  It is also my practice not to talk about status before the grand jury.

In her 2017 declaration in the CVRA litigation, Villafaña explained that during these exchanges, Villafaña did not inform Edwards of the existence of the NPA because she "did not know whether the NPA remained viable at that time or whether Epstein would enter the state court guilty plea that would trigger the NPA."[350]  Villafaña told OPR that she did not inform Edwards

---

also had interactions with other victims' attorneys.  For example, another attorney informed OPR that he spoke to Villafaña two to five times concerning the status of the case and each time was told that the case was under investigation.  The attorney noted, "[W]e never got any information out of [Villafaña].  We were never told what was happening or going on to any extent."  Villafaña's counsel told OPR that Villafaña did not have any interaction with the attorney or his law partner until after Epstein's state court plea hearing, and that in her written communications responding to the attorney's inquiries, she provided information to the extent possible.  OPR found no documentation that Villafaña's communications with the attorney occurred prior to June 30, 2008.  Villafaña also had more ministerial interactions with other victims' counsel, as well as contact regarding their ongoing civil cases.  For example, in March 2008, one victim's attorney informed Villafaña of his representation of a victim and requested that the government provide him with photographs of the victim and information concerning the tail registration number for Epstein's airplane.  Villafaña responded that she was unable to provide the requested information, but asked that counsel keep her updated about the civil litigation.

[348]    Villafaña later stated in a July 9, 2008 declaration filed in the CVRA litigation that, although she invited Edwards to provide her with information, "[n]othing was provided."

[349]    Edwards did not respond to OPR's request to interview him, although he did assist OPR in locating other attorneys who were representing victims.

[350]    The government later admitted in court filings that Villafaña and Edwards "discussed the possibility of federal charges being filed in the future and that the NPA was not mentioned."  *Doe*, Government's Response to Petitioners' Statement of Undisputed Material Facts in Support of Petitioners' Motion for Partial Summary Judgment at 14, ¶101 (June 6, 2017).

about the NPA because it was "confidential" and because the case was under "investigation and leading towards" the filing of charges. Villafaña recalled mentioning the conversation to her supervisors and the case agents because she "thought he was somebody who could be of assistance to us and . . . could perhaps persuade Alex Acosta that this was a case that was meritorious and should be prosecuted."

Nevertheless, when OPR asked Villafaña why she did not inform Edwards of the same information that the FBI and she had provided to Wild in October 2007 and January 2008, Villafaña explained that she felt "prohibited":

> At the time that I spoke with him, you know, there had been all of this . . . letter writing or all of these concerns and instructions that I had been given by Alex [Acosta] and Jeff [Sloman] not to disclose things further and not to have any involvement in victim notification, and so I felt like that prohibited me from telling him about the existence of the NPA.

## X.    JUNE 2008:  EFFORTS TO NOTIFY VICTIMS ABOUT THE JUNE 30, 2008 PLEA HEARING

The Epstein team's appeals through the Department ended on June 23, 2008, when the Deputy Attorney General determined that "federal prosecution of this case is appropriate" and Epstein's allegations of prosecutorial misconduct did not rise to a level that would undermine such a decision. Immediately thereafter, at Sloman's instruction, Villafaña notified Lefkowitz that Epstein had until "the close of business on Monday, June 30, 2008, to comply with the terms and conditions of the agreement . . . including entry of a guilty plea, sentencing, and surrendering to begin his sentence of imprisonment." That same day, Villafaña made plans to file charges on July 1, 2008, if Epstein did not enter his guilty plea by the June 30 deadline.

On Friday, June 27, 2008, Villafaña received a copy of the proposed state plea agreement and learned that the plea hearing was scheduled for 8:30 a.m. on Monday, June 30, 2008. Also on that Friday, Villafaña submitted to Sloman and Criminal Division Chief Senior a "final final" proposed federal indictment of Epstein.

Villafaña and the FBI finalized the government's victim list that they intended to disclose, for § 2255 purposes, to Epstein after the plea and, at Sloman's instruction, Villafaña contacted PBPD Chief Reiter to ask him to notify the victims of the plea hearing. Villafaña told OPR that Sloman said, "Chief Reiter could contact the victims from the state case, and tell them about the plea."[351] On Saturday, June 28, 2008, Villafaña emailed Sloman to inform him that PBPD Chief Reiter "is going to notify victims about the plea."[352]

---

[351]    Villafaña further stated, "I requested permission to make oral notifications to the victims regarding the upcoming change of plea, but the Office decided that victim notification could only come from a state investigator, and Jeff Sloman asked PBPD Chief Reiter to assist."

[352]    Sloman replied, "Good."

Villafaña told OPR that before the state plea hearing, she sent Reiter a list of the victims, including their telephone numbers, to notify and asked him to destroy the list. Villafaña recalled that Reiter told her that he would "try to contact as many as he could" and that he would destroy the list afterwards. Villafaña did not recall being "asked [to] provide a list of all our victims to the State Attorney's Office."

In his 2009 deposition, Reiter stated that Villafaña sent him a letter "around the time of sentencing," listing the victims in the federal investigation, and that she asked him to destroy the letter after he reviewed it. Reiter recalled that he requested the list because he was aware that the state grand jury's indictment of Epstein did not include all of the victims that the PBPD had identified and he "wanted to make sure that some prosecution body had considered all of our victims."[353]

In her 2017 declaration in the CVRA litigation, Villafaña stated that she and the PBPD "attempted to notify the victims about [the June 30] hearing in the short time available to us."[354] In her 2008 declaration, however, Villafaña conceded that "all known victims were not notified."

Villafaña told OPR that Edwards was the only victim attorney she was authorized to contact—she thought probably by Sloman—about the June 30, 2008 plea hearing because Edwards "had expressed a specific interest in the outcome." Villafaña recalled, "I was told that I could inform [Edwards] of [the plea date], but I still couldn't inform him of the NPA."[355] In her 2008 declaration in the CVRA litigation, Villafaña stated that she called Edwards and informed him of the plea hearing scheduled for Monday; Villafaña stated that Edwards told her that he could not attend the hearing but "someone" would be present. In a later filing in the CVRA litigation, however, Edwards asserted that Villafaña told him only that "Epstein was pleading guilty to state solicitation of prostitution charges involving other victims—not Mr. Edwards' clients nor any of the federally-identified victims."[356] Edwards further claimed that because Villafaña failed to inform him that the "guilty pleas in state court would bring an end to the possibility of federal prosecution pursuant to the plea agreement," his clients did not attend the hearing. Villafaña told OPR that her expectation was that the state plea proceeding would allow Edwards and his clients the ability to comment on the resolution:

---

[353]    Reiter showed the letter to the lead Detective so he could "confirm that all of the victims that we had for the state case were included on that." The Detective "looked at it and he said they're all there and then [Reiter] destroyed it." The Detective recalled viewing the list in Reiter's office, but he could not recall when Reiter showed it to him.

[354]    The FBI co-case agent told OPR that "I don't think the [FBI] reached out to anyone."

[355]    Villafaña told OPR that she thought that it was Sloman who gave her the instructions, but she could not "remember the specifics of the conversation."

[356]    Villafaña stated that she "never told Attorney Edwards that the state charges involved 'other victims,' and neither the state court charging instrument nor the factual proffer limited the procurement of prostitution charge to a specific victim." Although Edwards criticized Villafaña's conduct in his CVRA filings, in his recently published book, Edwards described Villafaña as a "kindhearted prosecutor who tried to do right," noting that she "believ[ed] in the victims and tr[ied] . . . to bring down Jeffrey Epstein." Bradley J. Edwards with Brittany Henderson, *Relentless Pursuit* at 380 (Gallery Books 2020).

> [M]y expectation of what was going [to] happen at the plea was that
> it would be like a federal plea where there would be a factual proffer
> that was read, and where the judge would ask if there were any
> victims present who wanted to be heard, and that at that point if Brad
> Edwards wanted to address the court or if his clients wanted to
> address the court, they would be given the opportunity to do so.[357]

Sloman told OPR that he did not recall directing Villafaña to contact anyone about the plea hearing or directing her specifically not to contact anyone about it.  Acosta told OPR that he believed the state would notify the victims of the "all-encompassing plea" resolving the federal case "and [the victims would] have an opportunity to speak up at the state court hearing."  Nevertheless, Acosta did not know whether the state victims overlapped with the federal victims or whether the USAO "shared that list with them."  Villafaña told OPR that she and Acosta "understood that the state would notify the state victims" but that neither of them were aware "that the state only believed they had one victim."[358]  Villafaña told OPR that there was "very little" communication between the USAO and the State Attorney's Office, and although she discussed a factual proffer with the State Attorney's Office and "the fact that . . . the federal investigation had identified additional victims," she did not recall discussing "who the specific people were that they considered victims in the state case."[359]

Sloman told OPR that the "public perception . . . that we tried to hide the fact of the results of this resolution from the victims" was incorrect.  He explained:

> [E]ven though we didn't have a legal obligation, I felt that the
> victims were going to be notified and the state was going . . . to
> fulfill that obligation, and even as another failsafe, [the victims]
> would be notified of . . . the restitution mechanism that we had set
> up on their behalf.

Sloman acknowledged that although neither the NPA terms nor the CVRA prevented the USAO from exercising its discretion to notify the victims,

> it was [of] concern that this was going to break down and . . . result
> in us prosecuting Epstein and that the victims were going to be
> witnesses and if we provided a victim notification indicating, hey,
> you're going to get $150,000, that's . . . going to be instant
> impeachment for the defense.

---

[357]    Assistant State Attorney Belohlavek told OPR that federal victims who were not a party to the state case would not have been able to simply appear at the state plea hearing and participate in the proceedings.  Rather, such a presentation would have required coordination between the USAO and the State Attorney's Office and additional investigation of the victims' allegations and proposed statements by the State Attorney's Office.

[358]    In an email a few months earlier, Villafaña noted, "The state indictment [for solicitation of adult prostitution] is related to two girls.  One of those girls is included in the federal [charging document], the other is not."

[359]    As noted in Chapter Two, Villafaña had stopped communicating with the State Attorney's Office regarding the state case following Epstein's defense team's objections to those communications.

When asked why the USAO did not simply notify the victims of the change of plea hearing, Sloman responded that he "was more focused on the restitution provisions. I didn't get the sense that the victims were overly interested in showing up . . . at the change of plea."

Also, in late June, Villafaña drafted a victim notification letter concerning the June 30, 2008 plea.[360]  Villafaña told OPR that, because "Mr. Acosta had agreed in December 2007 that we would not provide written notice of the state change of plea, the written victim notifications were prepared to be sent immediately following Epstein's guilty plea."[361]  As she did with prior draft victim notification letters, Villafaña provided the draft to the defense for comments.[362]

Although Epstein's plea hearing was set for June 30, 2008, Villafaña took steps to facilitate the filing of federal charges on July 1, 2008, in the event he did not plead guilty in state court.

OPR reviewed voluminous Epstein-related files that the State Attorney's Office made available online, but OPR was unable to locate any document establishing that before the hearing date, the state informed victims of the June 30, 2008 plea.  On March 12, 2008, the State Attorney's Office issued trial subpoenas to three victims and one non-law enforcement witness commanding the individuals to "remain on call" during the week of July 8, 2008.  However, the Palm Beach County Sheriff was unable to serve one of the victims in person because the victim was "away [at] college."

## XI.   JUNE 30, 2008:  EPSTEIN ENTERS HIS GUILTY PLEAS IN A STATE COURT HEARING AT WHICH NO VICTIMS ARE PRESENT

On June 30, 2008, Epstein appeared in state court in West Palm Beach, with his attorney Jack Goldberger, and pled guilty to an information charging him with procuring a person under 18 for prostitution, as well as the indictment charging him with felony solicitation of prostitution.  The information charged that between August 1, 2004, and October 9, 2005, Epstein "did knowingly and unlawfully procure for prostitution, or caused to be prostituted, [REDACTED], a person under the age of 18 years," and referred to no other victims.  The indictment did not identify any victims and alleged only that Epstein engaged in the charged conduct on three occasions between August 1, 2004, and October 31, 2005.  Although the charges did not indicate whether they applied to multiple victims, during the hearing, Assistant State Attorney Belohlavek informed the court that "[t]here's several" victims.  When the court asked Belohlavek whether "the victims in both these cases [were] in agreement with the terms of this plea," Belohlavek replied, "I have spoken to several myself and I have spoken to counsel, through counsel as to the other victim, and I believe,

---

[360]     Sloman forwarded the draft victim notification letter to Acosta, who responded with his own edited version stating, "What do you think?"  Villafaña edited it further.

[361]     The letter began with the statement, "On June 30, 2008, Jeffrey Epstein . . . entered a plea of guilty."  A week after Epstein's state guilty plea, Villafaña notified Acosta, Sloman, and other supervisors that "[Epstein's local attorney] Jack Goldberger is back in town today, so I am hoping that we will finalize the last piece of our agreement—the victim list and Notification.  If I face resistance on that front, I will let you know."

[362]     According to Villafaña, either Acosta or Sloman made the decision to send the notifications following the state plea and to share the draft notification letters with the defense.

yes." The court also asked Belohlavek if the juvenile victim's parents or guardian agreed with the plea, and Belohlavek stated that because the victim was no longer under age 18, Belohlavek spoke with the victim's counsel, who agreed with the plea agreement.[363]

Both Villafaña and the FBI case agent were present in the courtroom gallery to observe the plea hearing. Later that day, Villafaña met with Goldberger and gave him the list of 31 individuals the government was prepared to name as victims and to whom the § 2255 provision applied.

In her 2015 CVRA case declaration, Wild stated that, "I did not have any reason to attend that hearing because no one had told me that this guilty plea was related to the FBI's investigation of Epstein's abuse of me." She stated that she "would have attended and tried to object to the judge and prevent that plea from going forward," had she known that the state plea "had some connection to blocking the prosecution of my case." Similarly, CVRA petitioner Jane Doe #2 stated that "no one notified me that [Epstein's] plea had anything to do with my case against him."

An attorney who represented several victims, including one whom the state had subpoenaed for the potential July trial, told OPR that he was present in court on June 30, 2008, in order to serve a complaint upon Epstein in connection with a civil lawsuit brought on behalf of one of his clients. The USAO had not informed him about the plea hearing.[364] Moreover, the attorney informed OPR that, although one of the victims he represented had been interviewed in the PBPD's investigation and had been deposed by Epstein's attorneys in the state case (with the Assistant State Attorney present), he did not recall receiving any notice of the June 30, 2008 plea hearing from the State Attorney's Office.[365] Similarly, another of the victims the state had subpoenaed for the July trial told OPR through her attorney that she received subpoenas from the State Attorney's Office, but she was not invited to or aware of the state plea hearing. Belohlavek told OPR that she did not recall whether she contacted any of the girls to appear at the hearing, and she noted that given the charge of solicitation of prostitution, they may not have "technically" been victims for purposes of notice under Florida law but, rather, witnesses. On July 24, 2008, the State Attorney's Office sent letters to two victims stating that the case was closed on June 26, 2008 (although the plea occurred on June 30, 2008) and listed Epstein's sentence. The letters did not mention the NPA or the federal investigation.

## XII.   SIGNIFICANT POST-PLEA DEVELOPMENTS

### A.   Immediately After Epstein's State Guilty Pleas, Villafaña Notifies Some Victims' Attorneys

Villafaña's contemporaneous notes show that immediately after Epstein's June 30, 2008 guilty pleas, she attempted to reach by telephone five attorneys representing various victims in

---

[363]   Villafaña, who was present in court and heard Belohlavek's representation, told OPR that she had no information as to whether or how the state had notified the victims about the plea hearing.

[364]   Villafaña did contact this attorney's law partner later that day.

[365]   When interviewed by OPR in 2020, this same attorney indicated that he was surprised to learn that despite the fact that his client was a minor at the time Epstein victimized her, she was not the minor victim that the state identified in the information charging Epstein.

civil suits that were pending against Epstein.[366]   Villafaña also emailed one of the *pro bono* attorneys she had engaged to help victims avoid defense harassment, informing him that the federal investigation had been resolved through a state plea and that Epstein had an "agreement" with the USAO "requir[ing] him to make certain concessions regarding possible civil suits brought by the victims."  Villafaña advised Goldberger:  "The FBI has received several calls regarding the [NPA]. I do not know whether the title of the document was disclosed when the [NPA] was filed under seal, but the FBI and our Office are declining comment if asked."

### B.   July 7, 2008:  The CVRA Litigation Is Initiated

On July 3, 2008, victims' attorney Edwards spoke to Villafaña by telephone about the resolution of the state case against Epstein "and the next stage of the federal prosecution."[367]  In his 2017 affidavit filed in the CVRA litigation, Edwards asserted that during this conversation, Villafaña did not inform him of the NPA, but that during the call, he sensed that the USAO "was beginning to negotiate with Epstein concerning the federally identified crimes."  However, in an email Villafaña sent after the call, she informed Sloman that during the call, Edwards stated that "his clients can name many more victims and wanted to know if we can get out of the deal." Villafaña told Sloman that after she told Edwards that the government was bound by the agreement, assuming Epstein completed it, Edwards asked that "if there is the slightest bit of hesitation on Epstein's part of completing his performance, that he and his [three] clients be allowed to consult with [the USAO] before making a decision."[368]

That same day, Edwards wrote a letter to Villafaña, complaining that Epstein's state court sentence was "grossly inadequate for a predator of this magnitude" and urged Villafaña to "move forward with the traditional indictments and criminal prosecution commensurate with the crimes Mr. Epstein has committed."

On July 7, 2008, Edwards filed his emergency petition in the U.S. District Court for the Southern District of Florida on behalf of Courtney Wild, who was then identified only as "Jane Doe."  She was soon joined by a second petitioner, and they were respectively referred to as "Jane Doe 1" and "Jane Doe 2."[369]  Edwards claimed that the government had violated his clients' rights under the CVRA by negotiating to resolve the federal investigation of Epstein without consulting with the victims.  The petition requested that the court order the United States to comply with the CVRA.  The USAO opposed the petition, arguing that the CVRA did not apply because there were

---

[366]   According to Villafaña's handwritten notes from June 30, 2008, Villafaña left a message for two of the attorneys.

[367]   In his 2017 affidavit filed in the CVRA case, Edwards recalled that his telephone conversation occurred on June 30, 2008, but noted that it could possibly have occurred on July 3, 2008.

[368]   Sloman responded, "Thanks."

[369]   Later attempts by two additional victims to join the ongoing CVRA litigation were denied by the court.

no federal charges filed against Epstein as a result of the government's agreement in mid-2007 to defer prosecution to the state.[370]

### C.     July 2008:  Villafaña Prepares and Sends a Victim Notification Letter to Listed Victims

On July 8, 2008, Villafaña provided Goldberger with an updated victim list for 18 U.S.C. § 2255 purposes, noting that she had inadvertently left off one individual in her June 30, 2008 letter.  Villafaña also informed the defense that, beginning the following day, she would distribute notifications to each of the 32 victims and their counsel informing them that Epstein's attorney would be the contact for any civil litigation, if the victim decided to pursue damages.  Finally, the letter informed the defense that the government would consider a denial by Epstein that any "one of these victims is entitled to proceed under 18 U.S.C. § 2255" to be considered a breach of the terms of the NPA.

After exchanging emails and letters with the defense concerning the content of the notice letter, Villafaña drafted a letter she sent, on July 9 and 10, to nine victims who had previously retained counsel.  The letter informed the victims and their counsel that, "[i]n light of" Epstein's June 30, 2008 state court plea to felony solicitation of prostitution and procurement of minors to engage in prostitution, and his sentence of a total of 18 months' imprisonment followed by 12 months' community control, "the United States has agreed to defer federal prosecution in favor of this state plea and sentence, subject to certain conditions."  The letter included a reference to the 18 U.S.C. § 2255 provision of the NPA, and although the defense had never agreed to it, used language from Acosta's December 19, 2007 letter to Epstein defense attorney Sanchez clarifying the damages provision.  The paragraph below was described as "[o]ne such condition to which Epstein has agreed":

> Any person, who while a minor, was a victim of a violation of an offense enumerated in Title 18, United States Code, Section 2255, will have the same rights to proceed under Section 2255 as she would have had, if Mr. Epstein had been tried federally and convicted of an enumerated offense.  For purposes of implementing this paragraph, the United States shall provide Mr. Epstein's attorneys with a list of individuals whom it was prepared to name . . . as victims of an enumerated offense by Mr. Epstein.  Any judicial authority interpreting this provision, including any authority determining which evidentiary burdens if any a plaintiff must meet, shall consider that it is the intent of the parties to place these identified victims in the same position as they would have been had Mr. Epstein been convicted at trial.  No more; no less.

On July 10, 2008, Villafaña sent Goldberger a "Final Notification of Identified Victims," highlighting the defendant's obligations under the NPA concerning victim lawsuits pursuant to

---

[370]     As described in Section XII.G of this Part, the matter continued in litigation for years and resulted in the district court's February 21, 2019 opinion concluding that the government violated the victims' rights under the CVRA by failing to consult with them before signing the NPA.

18 U.S.C. § 2255 and again listing the 32 "individuals whom the United States was prepared to name as victims of an enumerated offense."[371]  The same day, Villafaña sent Goldberger a second letter, noting that the defense would receive copies of all victim notifications on a rolling basis.

Villafaña informed her managers that the FBI case agents would reach out by telephone to the listed victims who were unrepresented, to inform them that the case was resolved and to confirm their addresses for notification by mail.  With regard to the content of the telephone calls, Villafaña proposed the following language to the case agents:

> We are calling to inform you about the resolution of the Epstein investigation and to thank you for your help.
>
> Mr. Epstein pled guilty to one child sex offense that will require him to register as a sex offender for life and received a sentence of 18 months imprisonment followed by one year of home confinement. Mr. Epstein also made a concession regarding the payment of restitution.
>
> All of these terms are set out in a letter that AUSA Villafaña is going to send out.  Do you have a lawyer?  Get name or address.  If not[,] where do you want [the] letter sent?  If you have questions when you receive the letter, please understand that we cannot provide legal advice but the lawyers at the following victim rights organizations are able to help you at no cost to you.  (Provide names and phone numbers)
>
> Also ask about counseling and let them know that counseling is still available even though the investigation is closed.

On July 21, 2008, Villafaña sent the letter to the 11 unrepresented victims whose addresses the FBI had by that time confirmed.  Villafaña provided Epstein's defense counsel with a copy of the letter sent to each victim, directly or though counsel (with the mailing addresses redacted).

### D.    July – August 2008:  The FBI Sends the Victim Notification Letter to Victims Residing Outside of the United States

While attempting to locate and contact the unrepresented victims, the FBI obtained contact information for two victims residing outside of the United States.  On July 23 and August 8, 2008, respectively, the FBI Victim Specialist transmitted an automated VNS form notification letter to each victim through the FBI representative at the U.S diplomatic mission for each country.  This

---

[371]     A month later, in an August 18, 2008 letter to the USAO, the defense sought to limit the government's victim list to those victims who were identified before the September 24, 2007 execution of the NPA.  Villafaña also raised with Acosta, Sloman, and other supervisors the question whether the USAO had developed sufficient evidence to include new victims it had identified since creation of the July 2008 list and whether Jane Doe #2, who had previously given a statement in support of Epstein, should be added back to the list.  Ultimately, Villafaña sent the defense a letter confirming that the government's July 10, 2008 victim list was "the final list."

letter was substantially identical to the previous FBI victim notification letter the FBI had sent to victims (in 2006, 2007, and 2008) in that it identified each recipient as "a possible victim of a federal crime" and listed her eight CVRA rights.

The letter did not indicate that Epstein had pled guilty in state court on June 30, 2008, or that the USAO had resolved its investigation by deferring federal prosecution in favor of the state plea.  Rather, like the previous FBI VNS-generated letter, the letter requested the victims' "assistance and cooperation while we are investigating the case."

For each of the two victims residing outside of the United States, Villafaña also drafted a notification letter concerning the June 30, 2008 plea and the 18 U.S.C. § 2255 process, which were to be hand delivered along with the FBI's letters.  However, FBI records do not reflect whether the USAO's letter was delivered to the two victims.

### E.   August – September 2008:  The Federal Court Orders the USAO to Disclose the NPA to Victims, and the USAO Sends a Revised Victim Notification Letter

On August 1, 2008, the petitioners in the CVRA litigation filed a motion seeking access to the NPA.  The USAO opposed the motion by relying on the confidentiality portion of the NPA.[372] On August 21, 2008, the court ordered the government to provide the petitioners with a copy of the NPA subject to a protective order.  In addition, the court ordered the government to produce the NPA to other identified victims upon request:

> (d) If any individuals who have been identified by the USAO as victims of Epstein and/or any attorney(s) for those individuals request the opportunity to review the [NPA], then the USAO shall produce the [NPA] to those individuals, so long as those individuals also agree that they shall not disclose the [NPA] or its terms to any third party absent further court order, following notice to and an opportunity for Epstein's counsel to be heard[.][373]

In September 2008, the USAO sent a revised notification letter to victims, and attorneys for represented victims, concerning Epstein's state court guilty plea and his agreement to not contest liability in victim civil suits brought under 18 U.S.C. § 2255.[374]  The September letter appeared to address concerns raised by Epstein attorney Lefkowitz that the government's earlier notification letter referenced language concerning 18 U.S.C. § 2255 that the government had proposed in Acosta's December 19, 2007 letter to Epstein attorney Sanchez, but that the defense had not accepted.[375]  As a result of the defense objection, Villafaña determined that she was

---

[372]   Pursuant to paragraph 13 of the NPA, Villafaña made Epstein's attorneys aware of the petitioners' request for the NPA.

[373]   *Doe*, Order to Compel Production and Protective Order at 1-2 (Aug. 21, 2008).

[374]   The USAO also sent a notification letter to additional victims who had not received a notification letter in July.

[375]   This issue is discussed more fully in Chapter Two.

obligated to amend her prior letter to victims to correct the reference to the December letter.[376] Accordingly, the September letter contained no information about the parties' intent in implementing 18 U.S.C. § 2255, but merely referred to the NPA language concerning Epstein's waiver of his right to contest liability under the provision.  In addition, the September letter described the appointment of a special master, the special master's selection of an attorney to represent the victims in their 18 U.S.C. § 2255 litigation against Epstein, and Epstein's agreement to pay the attorney representative's fees arising out of such litigation.  The letter also clarified that Epstein's agreement to pay for attorneys' fees did not extend to contested litigation against him.

The government also intended for the letter to comply with the court's order concerning providing victims with copies of the NPA.  The initial draft included a paragraph advising the victims that they could receive a copy of the NPA:

> In addition, a judge has ordered that the United States make available to any designated victim (and/or her attorney) a copy of the actual agreement between Mr. Epstein and the United States, so long as the victim (and/or her attorney) reviews, signs, and agrees to be bound by a Protective Order entered by the Court.  If [the victim] would like to review the Agreement, please let me know, and I will forward a copy of the Protective Order for her signature.

The government shared draft versions of the September letter with Epstein's counsel and responded to criticism of the content of the proposed letter.  For example, in response to the above language regarding the August 21, 2008 court order in the CVRA litigation, the defense argued that there was "no court order requiring the government to provide the alleged 'victims' with notice that the [NPA] is available to them upon request and doing so is in conflict with the confidentiality provisions of the [NPA]."  In response, and in consultation with USAO management, Villafaña revised the paragraph as follows:

> In addition, there has been litigation between the United States and two other victims regarding the disclosure of the entire agreement between the United States and Mr. Epstein.  [The attorney selected by the special master] can provide further guidance on this issue, or if you select another attorney to represent you, that attorney can review the Court's order in the [CVRA litigation].

On September 18, 2009, a state court judge unsealed the copy of the NPA that had been filed in the state case.[377]

---

[376]     In the letter, Villafaña expressed frustration with defense counsels' claim relative to the December 19, 2007 letter that was included in the July 2008 notification letter, noting that the July 2008 letter had been approved by defense counsel before being sent.

[377]     *See* Susan Spencer-Wendel, "Epstein's Secret Pact With Fed Reveals 'Highly Unusual' Terms," *Palm Beach Post*, Sept. 19, 2009.

F.      2010 – 2011:      Department and Congressional Actions Regarding
        Interpretation of the CVRA

In connection with the Department's 2010 effort to update its 2005 Guidelines, the Office
of the Deputy Attorney General convened a Victim of Crimes Working Group that asked OLC to
revisit its 2005 preliminary review concerning the definition of "crime victim" under the CVRA
and solicited input concerning the issue from Department components and federal law enforcement
agencies.   In response, OLC issued a December 17, 2010 opinion entitled, *The Availability of
Crime Victims' Rights Under the Crime Victims' Rights Act of 2004*.   Based on the CVRA's
language, relevant case law, and memoranda opinions from Department components, OLC
reaffirmed its 2005 conclusion that CVRA rights do not vest until a criminal charge has been filed
(by complaint, information, or indictment) and the rights cease to be available if "all charges are
dismissed either voluntarily or on the merits (or if the [g]overnment declines to bring formal
charges after the filing of a complaint)."[378]

After OLC issued its opinion, the Department revised the 2005 Guidelines in October 2011
but did not change its fundamental position that the CVRA rights did not vest until after criminal
charges were filed.   The 2011 revision did, however, add language concerning victim consultation
before a defendant is charged:   "In circumstances where plea negotiations occur before a case has
been brought, Department policy is that this should include reasonable consultation prior to the
filing of a charging instrument with the court."[379]   The use of the word "should" in the 2011
Guidelines indicates that "personnel are expected to take the action . . . unless there is an
appropriate, articulable reason not to do so."[380]   Nevertheless, the required consultation "may be
general in nature" and "does not have to be specific to a particular plea offer."[381]   The revisions
also specified that AUSAs were to ensure that victims had a right to be reasonably heard at plea
proceedings.[382]

On November 2, 2011, U.S. Senator Jon Kyl, a co-sponsor of the CVRA, sent a letter to
Attorney General Eric Holder, arguing that the 2011 Guidelines revisions "conflict[ed] quite
clearly with the CVRA's plain language" because the 2011 Guidelines did "not extend any rights
to victims until charges have been filed."   The Department's response emphasized that the

---

[378]   OLC "express[ed] no opinion" as to whether it is a matter of "good practice" to inform victims of their CVRA
rights prior to the filing of a complaint or after the dismissal of charges.

[379]   *See* 2011 Guidelines, Art. V, ¶ G.2, available at https://www.justice.gov/sites/default/files/olp/docs/
ag_guidelines2012. pdf.   In its 2011 online training video regarding the Guidelines, the Department encouraged such
consultation when reasonable, but it also continued to maintain that there was no CVRA right to confer for pre-
indictment plea negotiations.

[380]   *See* 2011 Guidelines, Art. I, ¶ B.2.

[381]   *See* 2011 Guidelines, Art. V, ¶ G.2.

[382]   The 2005 Guidelines contained no specific provision requiring AUSAs to ensure that victims were able to
exercise their right to be reasonably heard at plea proceedings, only at sentencing.   *See* 2005 Guidelines, Art. IV,
¶ C.3.b.(2).   However, the 2005 Guidelines generally require AUSAs to use their best efforts to comply with the
CVRA, and the CVRA specifically affords victims the right to be heard at plea proceedings.   The 2011 revision
remedied this omission.

Department had made its "best efforts in thousands of federal and District of Columbia cases to assert, support, and defend crime victims' rights." The response also referenced OLC's December 2010 opinion concluding that CVRA rights apply when criminal proceedings are initiated, noting that "the new AG Guidelines go further and provide that Department prosecutors should make reasonable efforts to notify identified victims of, and consider victims' views about, prospective plea negotiations, even prior to the filing of a charging instrument with the court."[383]

In 2015, Congress amended the CVRA, and added the following two rights:

> (9) The right to be informed in a timely manner of any plea bargain or deferred prosecution agreement.
>
> (10) The right to be informed of the rights under this section and the services described in section 503(c) of the Victims' Rights and Restitution Act of 1990 (42 U.S.C. 10607(c)) and provided contact information for the Office of the Victims' Rights Ombudsman of the Department of Justice.

### G.     The CVRA Litigation Proceedings and Current Status

While the CVRA litigation was pending in the Southern District of Florida, numerous federal civil suits against Epstein, brought in the same district, were transferred to the same judge as "related cases," as a matter of judicial economy pursuant to the Local Rules. As the parties agreed on settlements in those civil cases, they were dismissed.[384] Several of the victims who had settled their civil cases filed a pleading in the CVRA litigation asking the court to "maintain their anonymity" and not "further disseminate[]" their identities to the CVRA petitioners.[385]

In the CVRA case, the petitioners claimed that the government violated their CVRA rights to confer by (1) negotiating and signing the NPA without victim input; (2) sending letters to the victims claiming that the matter was "under investigation" after the NPA was already signed; and (3) not properly informing the victims that the state plea would also resolve the federal investigation. In addition, the petitioners alleged that the government violated their CVRA right to be treated with fairness by concealing the NPA negotiation and also violated their CVRA right to reasonable notice by concealing that the state court proceeding impacted the enforcement of the NPA and resolved the federal investigation.

During the litigation, the USAO argued that (1) the victims had no right to notice or conferral about the NPA because the CVRA rights did not apply pre-charge; (2) the government's

---

[383]     157 Cong. Rec. S7359-02 (2011) (Kyl letter and Department response).

[384]     Epstein also resolved some county court civil cases during this time period as well. In addition, numerous other cases were resolved outside of formal litigation. For example, one attorney told OPR that he resolved 16 victim cases, but did not file all cases with the court. Court data indicate that the attorney filed only 3 of the 16 cases he said he resolved.

[385]     *Doe,* Response to Court Order of July 6, 2015 and United States' Notice of Partial Compliance at 1 (July 24, 2015).

letters to victims sent after the NPA was signed were not misleading in stating that the matter was "under investigation" because the government continued to investigate given its uncertainty that Epstein would plead guilty; and (3) Villafaña contacted the petitioners' attorney prior to Epstein's state plea to advise him of the hearing. Nonetheless, Villafaña told OPR that, while there were valid reasons for the government's position that CVRA rights do not apply pre-charge, "[T]his is a case where I felt we should have done more than what was legally required. I was obviously prepared to spend as much time, energy and effort necessary to meet with each and every [victim]."

Over the course of the litigation, the district court made various rulings interpreting the provisions of the CVRA, including the court's key conclusion that victim CVRA rights "attach before the Government brings formal charges against a defendant." The court also held that (1) "the CVRA authorizes the rescission or 'reopening' of a prosecutorial agreement, including a non-prosecution agreement, reached in violation of a prosecutor's conferral obligations under the statute"; (2) the CVRA authorizes the setting aside of pre-charge prosecutorial agreements"; (3) the CVRA's "reasonable right to confer" "extends to the pre-charge state of criminal investigations and proceedings"; (4) the alleged federal sex crimes committed by Epstein render the *Doe* petitioners "victims" under the CVRA; and (5) "questions pertaining to [the] equitable defense[s] are properly left for resolution after development of a full evidentiary record."

On February 21, 2019, the district court granted the petitioners' Motion for Partial Summary Judgment, ruling that "once the Government failed to advise the victims about its intention to enter into the NPA, a violation of the CVRA occurred." The government did not dispute the fact that it did not confer with the petitioners prior to signing the NPA, and the court concluded that "[a]t a bare minimum, the CVRA required the Government to inform Petitioners that it intended to enter into an agreement not to prosecute Epstein." The court found that the post-NPA letters the government sent to victims describing the investigation as ongoing "misled the victims to believe that federal prosecution was still a possibility" and that "[i]t was a material omission for the Government to suggest to the victims that they have patience relative to an investigation about which it had already bound itself not to prosecute."[386]

The court relied on *Dean* and *BP Products* to support its holding and noted that the government's action with respect to the NPA was especially troubling because, unlike a plea agreement for which the victims could voice objection at a sentencing hearing, "[o]nce an NPA is entered into without notice, the matter is closed and the victims have no opportunity to be heard regarding any aspect of the case." The court also highlighted the inequity of the USAO's failure to communicate with the victims while it simultaneously engaged in "lengthy negotiations" with Epstein's counsel and assured the defense that the NPA would not be "made public or filed with the Court."

Although the USAO defended its actions by citing the 2005 Guidelines for the Department's position that CVRA rights do not attach until after a defendant is charged, the court was "not persuaded that the [G]uidelines were the basis for the Government's decision to withhold information about the NPA from the victims." The court found that the government's reliance on

---

[386]    The court did not resolve the factual question as to whether the victims were given adequate notice of Epstein's state court plea hearing.

the 2005 Guidelines was inconsistent with positions the USAO had taken in correspondence with Epstein's attorneys, in which the government acknowledged that "it had obligations to notify the victims."   The court ordered the parties to submit additional briefs regarding the appropriate remedies.  Accordingly, the petitioners requested multiple specific remedies, including rescission of the NPA; a written apology to all victims from the government; a meeting with Acosta, Villafaña, and her supervisors; access to government records, including grand jury materials; training for USAO employees; and monetary sanctions and attorneys' fees.[387]

Following Epstein's indictment on federal charges in New York and subsequent death while in custody, on September 16, 2019, the district judge presiding over the CVRA case denied the petitioners' motion for remedies and closed the case, stating that Epstein's death "rendered the most significant issue that was pending before the Court, namely, whether the Government's violation of Petitioners' rights under the CVRA invalidated the NPA, moot."[388]  The court did not order the government to take corrective measures, but stated that it "fully expects the Government will honor its representation that it will provide training to its employees about the CVRA and the proper treatment of crime victims."[389]  The court also denied the petitioners' request for attorneys' fees, finding that the government did not act in bad faith, because, "[a]lthough unsuccessful on the merits of the issue of whether there was a violation of the CVRA, the Government asserted legitimate and legally supportable positions throughout this litigation."

On September 30, 2019, Wild appealed the district court's rejection of the requested remedies, through a Petition for a Writ of Mandamus filed with the U.S. Court of Appeals for the Eleventh Circuit.[390]  In its responsive brief, the government expressed sympathy for Wild and "regret[] [for] the manner in which it communicated with her in the past."[391]  Nevertheless, the government argued that, "as a matter of law, the legal obligations under the CVRA do not attach prior to the government charging a case" and thus, "the CVRA was not triggered in SDFL because no criminal charges were brought"[392]  The government conceded, however, that with regard to the New York prosecution in which Epstein had been indicted, "[p]etitioner and other Epstein

---

[387]    *Doe*, Jane Doe 1 and Jane Doe 2's Submission on Proposed Remedies (May 23, 2019).

[388]    *Doe*, Opinion and Order (Sept. 16, 2019).  Among other things, the court rejected the petitioners' contention that it did not address whether the government had violated the victims' CVRA right to be treated with fairness and to receive fair notice of the proceedings, noting that "[t]hese rights all flow from the right to confer and were encompassed in the Court's ruling finding a violation of the CVRA."

[389]    The Department's Office of Legal Programs provided a training entitled Crime Victims' Rights in the Federal System to the USAO on January 10, 2020.

[390]    *See In re Wild*, No. 19-13843, Petition for a Writ of Mandamus Pursuant to the Crime Victims' Rights Act, 18 U.S.C. § 3771(d)(3) (Sept. 30, 2019).

[391]    *Wild*, Brief of the United States of America in Response to Petition for Writ of Mandamus Under the Crime Victims Rights Act at 14 (Oct. 31, 2019).  As previously noted, at this point, the litigation was being handled by the U.S. Attorney's Office for the Northern District of Georgia.

[392]    The government also noted that although the CVRA was amended in 2015 to include a victim's right to be notified in a timely manner of plea bargains and deferred prosecution agreements, "the amendment did not extend to non-prosecution agreements" which, unlike plea agreements and deferred prosecution agreements, do not require court involvement.

victims deserve to be treated with fairness and respect, and to be conferred with on the criminal case, not just because the CVRA requires it, but because it's the right thing to do." During oral argument on January 16, 2020, the government apologized for the USAO's treatment of Wild:

> The issue is whether or not the office was fully transparent with Ms. Wild about what it is that was going on with respect to the NPA, and they made a mistake in causing her to believe that the case was ongoing when in fact the NPA had been signed. The government should have communicated in a straightforward and transparent way with Ms. Wild, and for that, we are genuinely sorry.[393]

On April 14, 2020, a divided panel of the Court of Appeals for the Eleventh Circuit denied Wild's petition for a writ of mandamus, concluding that "the CVRA does not apply before the commencement of criminal proceedings—and thus, on the facts of this case, does not provide the petitioner here with any judicially enforceable rights."[394] The court conducted a thorough analysis of the language of the statute, the legislative history, and previous court decisions. The court distinguished *In re Dean* as "dictum" consisting of a "three-sentence discussion . . . devoid of any analysis of the CVRA's text, history, or structural underpinnings." The court noted that its interpretation of the CVRA was consistent with the Department's 2010 OLC opinion concerning victim standing under the CVRA and the Department's efforts in "implementing regulations." Finally, the court raised separation of powers concerns with Wild's (and the dissenting judge's) interpretation of victim standing under the CVRA, noting that such an interpretation would interfere with prosecutorial discretion.

Nevertheless, the court was highly critical of the government's conduct in the underlying case, stating that the government "[s]eemingly . . . defer[red] to Epstein's lawyers" regarding information it provided victims about the NPA and that its "efforts seem to have graduated from passive nondisclosure to (or at least close to) active misrepresentation." The court concluded that although it "seems obvious" that the government "should have consulted with petitioner (and other victims) before negotiating and executing Epstein's NPA," the court could not conclude that the government was obligated to do so. In addition, the dissenting judge filed a lengthy and strongly worded opinion asserting that the majority's statutory interpretation was "contorted" because the "plain and unambiguous text of the CVRA does not include [a] post-indictment temporal restriction."

On May 5, 2020, Wild filed a petition for rehearing *en banc*. On August 7, 2020, the court granted the petition for rehearing *en banc* and vacated the panel's opinion; as of the date of this Report, a briefing schedule has been issued and oral argument is set for December 3, 2020.

---

[393]     Audio recording of Oral Argument, *Wild*, No. 19-13843 (Jan. 16, 2020).

[394]     *In re Wild*, 955 F.3d 1196, 1220 (11th Cir. 2020).

[Page Intentionally Left Blank]

# CHAPTER THREE

## PART TWO:  APPLICABLE STANDARDS

## I.    STATUTORY PROVISIONS

Pertinent sections of the CVRA and the VRRA, applicable during the relevant time period, are set forth below.

### A.    The CVRA, 18 U.S.C. § 3771

(a)  Rights of Crime Victims. —A crime victim has the following rights:

(1)  The right to be reasonably protected from the accused.

(2)  The right to reasonable, accurate, and timely notice of any public court proceeding, or any parole proceeding, involving the crime or of any release or escape of the accused.

(3)  The right not to be excluded from any such public court proceeding, unless the court, after receiving clear and convincing evidence, determines that testimony by the victim would be materially altered if the victim heard other testimony at that proceeding.

(4)  The right to be reasonably heard at any public proceeding in the district court involving release, plea, sentencing, or any parole proceeding.

(5)  The reasonable right to confer with the attorney for the Government in the case.

(6)  The right to full and timely restitution as provided in law.

(7)  The right to proceedings free from unreasonable delay.

(8)  The right to be treated with fairness and with respect for the victim's dignity and privacy.

. . . .

(c)  Best Efforts To Accord Rights.—

(1)  Government.—Officers and employees of the Department of Justice . . . shall make their best efforts to see that crime victims are notified of, and accorded, the rights described in subsection (a).

. . . .

(e)  Definitions.

. . . .

(2)  Crime victim.—

(A)  In general. —The term "crime victim" means a person directly and proximately harmed as a result of the commission of a Federal offense or an offense in the District of Columbia.

247

### B.   The Victims' Rights and Restitution Act of 1990 (VRRA), 34 U.S.C. § 20141, Services to Victims (formerly cited as 42 USCA § 10607)

(b)  Identification of victims

At the earliest opportunity after the detection of a crime at which it may be done without interfering with an investigation, a responsible official shall—

(1)  identify the victim or victims of a crime;
(2)  inform the victims of their right to receive, on request, the services described in subsection (c); and
(3)  inform each victim of the name, title, and business address and telephone number of the responsible official to whom the victim should address a request for each of the services described in subsection (c).

(c)  Description of services

(1)  A responsible official shall—

(A)  inform a victim of the place where the victim may receive emergency medical and social services;
(B)  inform a victim of any restitution or other relief to which the victim may be entitled under this or any other law and manner in which such relief may be obtained;
(C)  inform a victim of public and private programs that are available to provide counseling, treatment, and other support to the victim; and
(D)  assist a victim in contacting the persons who are responsible for providing the services and relief described in subparagraphs (A), (B), and (C).

(2)  A responsible official shall arrange for a victim to receive reasonable protection from a suspected offender and persons acting in concert with or at the behest of the suspected offender.

(3)  During the investigation and prosecution of a crime, a responsible official shall provide a victim the earliest possible notice of—

(A)  the status of the investigation of the crime, to the extent it is appropriate to inform the victim and to the extent that it will not interfere with the investigation;
(B)  the arrest of a suspected offender;
(C)  the filing of charges against a suspected offender;
(D)  the scheduling of each court proceeding that the witness is either required to attend or, under section 10606(b)(4) of Title 42, is entitled to attend;
(E)  the release or detention status of an offender or suspected offender;
(F)  the acceptance of a plea of guilty or nolo contendere or the rendering of a verdict after trial; and
(G)  the sentence imposed on an offender, including the date on which the offender will be eligible for parole.

(4)  During court proceedings, a responsible official shall ensure that a victim is provided a waiting area removed from and out of the sight and hearing of the defendant and defense witnesses.

. . . .

(e)  Definitions

. . . .

(2) the term "victim" means a person that has suffered direct physical, emotional, or pecuniary harm as a result of the commission of a crime . . . .

## II.   DEPARTMENT POLICY:  THE 2005 ATTORNEY GENERAL GUIDELINES FOR VICTIM AND WITNESS ASSISTANCE (2005 GUIDELINES)

In 2005, the Department revised its guidelines for victim and witness assistance in order to incorporate the provisions of the CVRA.  The purpose of the 2005 Guidelines was "to establish guidelines to be followed by officers and employees of Department of Justice investigative, prosecutorial, and correctional components in the treatment of victims of and witnesses to crime." The relevant portions of the 2005 Guidelines are as follows:

Article IV:  Services to Victims and Witnesses

A.  Investigation Stage

The investigative agency's responsibilities begin with the report of the crime and extend through the prosecution of the case. In some instances, when explicitly stated, the investigative agency's responsibility for a certain task is transferred to the prosecuting agency when charges are filed.

. . . .

2.  Identification of Victims. At the earliest opportunity after the detection of a crime at which it may be done without interfering with an investigation, the responsible official of the investigative agency shall identify the victims of the crime.

3.  Description of Services.

a.  Information, Notice, and Referral

(1)  Initial Information and Notice. Responsible officials must advise a victim pursuant to this section at the earliest opportunity after detection of a crime at which it may be done without interfering with an investigation.  To comply with this requirement, it is recommended that victims be given a printed brochure or card that briefly describes their rights and the available services, identifies the local

249

service providers, and lists the names and telephone numbers of the victim-witness coordinator or specialist and other key officials.  A victim must be informed of—

(a)  His or her rights as enumerated in 18 U.S.C. § 3771(a).

(b)  His or her right entitlement, on request, to the services listed in 42 U.S.C. § 10607(c).

(c)  The name, title, business address, and telephone number of the responsible official to whom such a request for services should be addressed.

(d)  The place where the victim may receive emergency medical or social services.

(e)  The availability of any restitution or other relief (including crime victim compensation programs) to which the victim may be entitled under this or any other applicable law and the manner in which such relief may be obtained.

(f)  Public and private programs that are available to provide counseling, treatment, and other support to the victim.

. . . .

(i)  The availability of services for victims of domestic violence, sexual assault, or stalking.

(j)  The option of being included in VNS.

(k)  Available protections from intimidation and harassment.

. . . .

(3) Notice during the investigation. During the investigation of a crime, a responsible official shall provide the victim with the earliest possible notice concerning—

(a)  The status of the investigation of the crime, to the extent that it is appropriate and will not interfere with the investigation.

(b)  The arrest of a suspected offender.

B.  Prosecution Stage

The prosecution stage begins when charges are filed and continues through postsentencing legal proceedings, including appeals and collateral attacks.

250

1. Responsible Officials. For cases in which charges have been instituted, the responsible official is the U.S. Attorney in whose district the prosecution is pending.

2. Services to Crime Victims

. . . .

b. Information, Notice, and Referrals

(1)  Notice of Rights. Officers and employees of the Department of Justice shall make their best efforts to see that crime victims are notified of the rights enumerated in 18 U.S.C. § 3771(a).

(2)  Notice of Right To Seek Counsel. The prosecutor shall advise the crime victim that the crime victim can seek the advice of an attorney with respect to the rights described in 18 U.S.C. § 3771(a).

(3)  Notice of Right To Attend Trial. The responsible official should inform the crime victim about the victim's right to attend the trial regardless of whether the victim intends to make a statement or present any information about the effect of the crime on the victim during sentencing.

(4)  Notice of Case Events. During the prosecution of a crime, a responsible official shall provide the victim, using VNS (where appropriate), with reasonable notice of—

(a)  The filing of charges against a suspected offender.

(b)  The release or escape of an offender or suspected offender.

(c)  The schedule of court proceedings.

(i)  The responsible official shall provide the victim with reasonable, accurate, and timely notice of any public court proceeding or parole proceeding that involves the crime against the victim. In the event of an emergency or other last-minute hearing or change in the time or date of a hearing, the responsible official should consider providing notice by telephone or expedited means. This notification requirement relates to postsentencing proceedings as well.

(ii)  The responsible official shall also give reasonable notice of the scheduling or rescheduling of any other court proceeding that the victim or witness is required or entitled to attend.

(d)  The acceptance of a plea of guilty or nolo contendere or the rendering of a verdict after trial.

(e)  If the offender is convicted, the sentence and conditions of supervised release, if any, that are imposed.

. . . .

(6)  Referrals. Once charges are filed, the responsible official shall assist the victim in contacting the persons or offices responsible for providing the services and relief [previously identified].

c.  Consultation With a Government Attorney

(1)  In General. A victim has the reasonable right to confer with the attorney for the Government in the case.  The victim's right to confer, shall not be construed to impair prosecutorial discretion.  Federal prosecutors should be available to consult with victims about major case decisions, such as dismissals, release of the accused pending judicial proceedings (when such release is for noninvestigative purposes), plea negotiations, and pretrial diversion.  Because victims are not clients, may become adverse to the Government, and may disclose whatever they have learned from consulting with prosecutors, such consultations may be limited to gathering information from victims and conveying only nonsensitive data and public information. Consultations should comply with the prosecutor's obligations under applicable rules of professional conduct.

Representatives of the Department should take care to inform victims that neither the Department's advocacy for victims nor any other effort that the Department may make on their behalf constitutes or creates an attorney-client relationship between such victims and the lawyers for the Government.

Department personnel should not provide legal advice to victims.

(2)  Prosecutor Availability. Prosecutors should be reasonably available to consult with victims regarding significant adversities they may suffer as a result of delays in the prosecution of the case and should, at the appropriate time, inform the court of the reasonable concerns that have been conveyed to the prosecutor.

(3)  Proposed Plea Agreements. Responsible officials should make reasonable efforts to notify identified victims of, and consider victims' views about, prospective plea negotiations. In determining what is reasonable, the responsible official should consider factors relevant to the wisdom and practicality of giving notice and considering views in the context of the particular case, including, but not limited to, the following factors:

(a)  The impact on public safety and risks to personal safety.
(b)  The number of victims.
(c)  Whether time is of the essence in negotiating or entering a proposed plea.

252

(d) Whether the proposed plea involves confidential information or conditions.
(e)  Whether there is another need for confidentiality.
(f)  Whether the victim is a possible witness in the case and the effect that relaying any information may have on the defendant's right to a fair trial.

## III.    FLORIDA RULES OF PROFESSIONAL CONDUCT

### A.    FRPC 4-4.1 – Candor in Dealing with Others

FRPC 4-4.1 prohibits a lawyer from knowingly making a false statement of material fact or law to a third person during the course of representation of a client.  A comment to this rule explains that "[m]isrepresentations can also occur by partially true but misleading statements or omissions that are the equivalent of affirmative false statements," and "[w]hether a particular statement should be regarded as one of fact can depend on the circumstances."

### B.    FRPC 4-8.4 – Conduct Prejudicial to the Administration of Justice

FRPC 4-8.4(c) states that a lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

FRPC 4-8.4(d) prohibits a lawyer from engaging in conduct in connection with the practice of law that is prejudicial to the administration of justice.

As previously noted, courts have determined that FRPC 4-8.4(d) is not limited to conduct that occurs in a judicial proceeding, but can be applied to "conduct in connection with the practice of law." *Frederick*, 756 So. 2d at 87; *see also Shankman*, 41 So. 3d at 172.

253

[Page Left Intentionally Blank]

# CHAPTER THREE

## PART THREE:  ANALYSIS

## I.    OVERVIEW

In addition to criticism of Acosta's decision to end the federal investigation by means of the NPA, public and media attention also focused on the government's treatment of victims.  In the CVRA litigation and in more recent media reports, victims complained that they were not informed about the government's intention to end its investigation of Epstein because the government did not consult with victims before the NPA was signed; did not inform them of Epstein's state plea hearing and sentencing, thereby denying them the opportunity to attend; and actively misled them through statements that the federal investigation was ongoing.  The district court overseeing the CVRA litigation concluded that the government violated the Crime Victims' Rights Act and "misl[ed] the victims to believe that federal prosecution was still a possibility" and that "[i]t was a material omission for the Government to suggest to the victims that they have patience relative to an investigation about which it had already bound itself not to prosecute."[395] The government's conduct, which involved both FBI and USAO actions, led to allegations that the prosecutors had purposefully failed to inform victims of the NPA to prevent victims from complaining publicly or in state court.

OPR examined the government's course of conduct when interacting with the victims, including the lack of consultation with the victims before the NPA was signed; Acosta's decision to defer to state authorities the decision to notify victims of Epstein's state plea; and the decision to delay informing victims about the NPA until after Epstein entered his plea on June 30, 2008. OPR considered whether letters sent to victims by the FBI after the NPA was signed contained false or misleading statements.  OPR also evaluated representations Villafaña made to victims in January and February 2008, and to an attorney for a victim in June 2008.

## II.    THE SUBJECTS DID NOT VIOLATE A CLEAR AND UNAMBIGUOUS STANDARD BY ENTERING INTO THE NPA WITHOUT CONSULTING THE VICTIMS

During the CVRA litigation, the government acknowledged that the USAO did not consult with victims about the government's intention to enter into the NPA.  In its February 21, 2019 opinion, the district court concluded that "once the Government failed to advise the victims about its intention to enter into the NPA, a violation of the CVRA occurred."  OPR considered this finding as part of its investigation into the USAO's handling of the Epstein case, and examined whether, before the NPA was signed on September 24, 2007, federal prosecutors were obligated to consult with victims under the CVRA, and if so, whether any of the subject attorneys—Acosta, Sloman, Menchel, Lourie, or Villafaña—intentionally violated or recklessly disregarded that obligation.

---

[395]       *Doe v. United States,* 359 F. Supp. 3d 1201, 1219, 1221 (S.D. Fla. Feb. 21, 2019).

As discussed below, OPR concludes that none of the subject attorneys violated a clear and unambiguous duty under the CVRA because the USAO resolved the Epstein investigation without a federal criminal charge.  In September 2007, when the NPA was signed, the Department did not interpret CVRA rights to attach unless and until federal charges had been filed, and the federal courts had not established a clear and unambiguous standard applying the CVRA before criminal charges were brought.  Pursuant to OPR's established analytical framework, OPR does not find professional misconduct unless a subject attorney intentionally or recklessly violated a clear and unambiguous standard.  Accordingly, OPR finds that the subject attorneys' conduct did not rise to the level of professional misconduct.  OPR nevertheless concludes that the lack of consultation was part of a series of government interactions with victims that ultimately led to public and court condemnation of the government's treatment of the victims, reflected poorly on the Department as a whole, and is contradictory to the Department's mission to "minimize the frustration and confusion that victims of a crime endure in its wake."[396]

A.    **At the Time, No Clear and Unambiguous Standard Required the USAO to Notify Victims Regarding Case-Related Events until after the Filing of Criminal Charges**

Although the rights enumerated in the CVRA are clear on their face, the threshold issue of whether an individual qualifies as a victim to whom CVRA rights attach was neither clear nor unambiguous at the time the USAO entered into the NPA with Epstein in September 2007.  At that time, the Department interpreted the CVRA in a way that differed markedly from the district court's later interpretation in the CVRA litigation.

The CVRA defines a "crime victim" as "a person directly and proximately harmed as a result of the commission of a Federal offense or an offense in the District of Columbia."  On April 1, 2005, soon after the CVRA was enacted, OLC concluded that "the status of a 'crime victim' may be reasonably understood to commence upon the filing of a criminal complaint, and that the status ends if there is a subsequent decision not to indict or prosecute the Federal offense that directly caused the victim's harm."  Beginning with the 2005 OLC guidance, the Department has consistently taken the position that CVRA rights do not apply until the initiation of criminal charges against a defendant, whether by complaint, indictment, or information.  OLC applied its definition to all eight CVRA rights in effect in 2005, but noted that the obligation created by the eighth CVRA right—to "treat[] victims with fairness and respect"—is "always expected of Federal officials, and the Victims' Rights and Restitution Act of 1990 [(VRRA)] indicates that this right applies 'throughout the criminal justice process.'"[397]  Consistent with the OLC interpretation, in May 2005, the Department issued the 2005 Guidelines to implement the CVRA.

The 2005 Guidelines assigned CVRA-related obligations to prosecutors only after the initiation of federal charges.  Specifically, the 2005 Guidelines stated that during the "prosecution stage," the "responsible official" should make reasonable efforts to notify identified victims of,

---

[396]    2005 Guidelines, Foreword.

[397]    Nevertheless, the portion of the VRRA referenced in the OLC 2005 Informal Guidance, 42 U.S.C. § 10606, had been repealed upon passage of the CVRA.

and consider victims' views about, prospective plea negotiations.[398]   The "prosecution stage" began when charges were filed and continued through all post-sentencing legal proceedings.[399]

At the time the parties signed the NPA in September 2007, few courts had addressed victim standing under the CVRA.  Notably, district courts in New York and South Carolina had ruled that standing attached only upon the filing of federal charges.[400]  Two cases relied upon by the court in its February 2019 opinion—*Dean* and its underlying district court opinion, *BP Products*—were decided after the NPA was signed.

The CVRA litigation and proposed federal legislation—both pending as of the date of this Report—show that the interpretation of victim standing under the CVRA continues to be a matter of debate.[401]   In a November 21, 2019 letter to Attorney General William Barr, a Congressional Representative stated that she had recently introduced legislation specifically to "[c]larify that victims of federal crimes have the right to confer with the Government and be informed about key pre-charging developments in a case, such as . . . non-prosecution agreements."[402]  The CVRA litigation arising from the Epstein case shows the lack of clarity regarding when CVRA rights apply:  the district court concluded that CVRA rights applied pre-charge, but a sharply divided panel of the Eleventh Circuit Court of Appeals came to a contrary conclusion, a decision that has now been vacated while the entire court hears the case *en banc*.

Because the Supreme Court had not addressed the issue of when CVRA rights apply, the lower courts had reached divergent conclusions, and the Department had concluded that CVRA rights did not apply pre-charge, OPR concludes that the subjects' failure to consult with victims before signing the NPA did not constitute professional misconduct because at that time, the CVRA did not clearly and unambiguously require prosecutors to consult with victims before the filing of federal criminal charges.[403]

---

[398]     2005 Guidelines, Art. IV, ¶ B.2.c.(3).  Under the 2005 Guidelines, the term "should" means that "the employee is expected to take the action or provide the service described unless there is an appropriate, articulable reason not to do so."  *Id.*, Art. II, ¶ C.

[399]     *Id.*, Art. IV, ¶ B.1.

[400]     *Searcy v. Paletz*, 2007 WL 1875802, at *5 (D.S.C. June 27, 2007) (an inmate is not considered a crime victim for purposes of the CVRA until the government has filed criminal charges); *United States v. Turner*, 367 F. Supp. 2d 319, 326-27 (E.D.N.Y. 2005) (victims are not entitled to CVRA rights until the government has filed charges, but courts have discretion to take a more inclusive approach); and *United States v. Guevara-Toloso,* 2005 WL 1210982, at *2 (E.D.N.Y. May 23, 2005) (order *sua sponte*) (in case involving a federal charge of illegal entry after a felony conviction, the court determined that victims of the predicate state conviction were not victims under the CVRA).

[401]     *See Wild*, 955 F.3d at 1220; Courtney Wild Crime Victims' Rights Reform Act of 2019, H.R. 4729, 116th Cong. (2019).

[402]     165 Cong. Rec. E1495-01 (2019).

[403]     Violations of an unambiguous obligation concerning victims' rights could result in a violation of the rules of professional responsibility.  For example, in *Attorney Griev. Comm'n of Md. v. Smith*, 109 A.3d 1184 (Md. 2015), the Court of Appeals of Maryland concluded that a prosecutor's failure to provide any notice to the minor victim's foster family about the resolution of a sex abuse case during the ten months the prosecutor was responsible for the matter was a "consistent failure" amounting to "gross negligence in the discharge of the prosecutorial function" that deprived the victim of his rights under the Maryland Constitution.  The court found violations of Maryland Rules of Professional

In *Wild*, the Eleventh Circuit panel compared the language of the CVRA to the language of the VRRA, noting that the VRRA "clearly extends victim-notice rights into the pre-charge phase" and opining that the government "may well have violated" the VRRA with regards to its investigation of Epstein. As a predecessor to the CVRA, the VRRA afforded victims various rights and services; however, it provided no mechanism for a victim to assert such rights in federal court or by administrative complaint. Like the CVRA, the rights portion of the VRRA established the victims' right to be treated with fairness and respect and the right to confer with an attorney for the government. However, the rights portion of the VRRA was repealed upon passage of the CVRA and was not in effect at the time of the Epstein investigation.

The portion of the VRRA directing federal law enforcement agencies to provide certain victim services such as counseling and medical care referrals remained in effect following passage of the CVRA. Furthermore, two of the VRRA requirements—one requiring a responsible official to "inform a victim of any restitution or other relief to which the victim may be entitled," and another requiring that a responsible official "shall provide a victim the earliest possible notice of the status of the investigation of the crime, to the extent it is appropriate to inform the victim and to the extent that it will not interfere with the investigation"—may have applied to the Epstein investigation. However, the VRRA did not create a clear and unambiguous obligation on the part of the subject attorneys, as the 2005 Guidelines assigned the duty of enforcing the two requirements to the investigative agency rather than to prosecutors. Moreover, the VRRA did not require notice to victims before the NPA was signed because, at that point, the case remained "under investigation," and the victims did not become entitled to pursue monetary damages under the NPA until Epstein entered his guilty pleas in June 2008. Once Epstein did so, and the victims identified by the USAO became entitled to pursue the § 2255 remedy, the USAO furnished the victims with appropriate notification.

## B.   OPR Did Not Find Evidence Establishing That the Lack of Consultation Was Intended to Silence Victims

During her OPR interviews, Villafaña recalled more than one discussion in which she raised with her supervisors the issue of consulting with the victims before the NPA was signed on September 24, 2007. Acosta, Sloman, Menchel, and Lourie, however, had no recollection of discussions about consulting victims before the NPA was signed, and Menchel disputed Villafaña's assertions. OPR found only one written reference before that date, explicitly raising the issue of consultation. Given the absence of contemporaneous records, OPR was unable to conclusively determine whether the lack of consultation stemmed from an affirmative decision made by one or more of the subjects or whether the subjects discussed consulting the victims about the NPA before it was signed. Villafaña's recollection suggests that Acosta, Menchel, and Sloman may have been concerned with maintaining the confidentiality of plea negotiations and did not believe that the government was obligated to consult with victims about such negotiations. OPR

---

Conduct 1.3, lack of diligence, and 8.4(d), conduct prejudicial to the administration of justice. The holding in *Smith* was based on Article 47 of the Maryland Constitution and various specific statutes affording victims the right, among others, to receive various notices and an opportunity to be heard concerning "a case originating by indictment or information filed in a circuit court." However, both the underlying statutory provisions and, significantly, the facts are substantially different from the Epstein investigation. In *Smith*, the criminal defendant had been arrested and charged before entering a plea.

did not find evidence showing that the subjects intended to silence victims or to prevent them from having input into the USAO's intent to resolve the federal investigation.

Although the contemporaneous records provide some information about victim notification decisions made after the NPA was signed on September 24, 2007, the records contain little about the subjects' views regarding consultation with victims before the NPA was signed.   In a September 6, 2007 email primarily addressing other topics, as the plea negotiations were beginning in earnest and almost three weeks before the NPA was signed, Villafaña raised the topic of victim consultation with Sloman:   "The agents and I have not reached out to the victims to get their approval, which as [CEOS Chief Oosterbaan] politely reminded me, is required under the law. . . . [A]nd the [PBPD] Chief wanted to know if the victims had been consulted about the deal."[404] Sloman forwarded the email to Acosta with a note stating, "fyi."  Villafaña recalled that after she sent the email, Sloman told her by telephone, "[Y]ou can't do that now."[405]  Villafaña also told OPR that shortly before the NPA was signed, Sloman told her, "[W]e've been advised that . . . pre-charge resolutions do not require victim notification."  Villafaña also recalled a discussion with Acosta, Menchel, and Sloman, during which she stated that she would need to get victims' input on the terms being proposed to the defense, and she was told, "Plea negotiations are confidential. You can't disclose them."[406]

None of the other subjects recalled a specific discussion before the NPA was signed about the USAO's CVRA obligations.  Menchel told OPR he believed the USAO was not required to consult with victims during the preliminary "general discussion" phase of settlement negotiations; moreover, he left the USAO before the terms of the NPA were fully developed.

Sloman told OPR that he "did not think that we had to consult with victims prior to entering into the NPA" and "we did not have to seek approval from victims to resolve a case."  Sloman believed the USAO was obligated only to notify victims about resolution of "the cases that we handled, filed cases."  Sloman recalled that because the USAO envisioned a state court resolution of the matter, he did not "think that that was a concern of ours at the time to consult with [the victims] prior to entering into . . . the NPA."

Lourie told OPR that he did not recall any discussions about informing the victims about the terms of the NPA or any instructions to Villafaña that she not discuss the NPA with the victims. He stated that everything the USAO did was "to try and get the best result as possible for the victims. . . . [O]nce you step back and look at the whole forest . . ., you will see that. . . . [I]f you look at each tree and say, well, you didn't do this right for the victim, you didn't tell the victim this and that, you're missing the big picture."

---

[404]     As noted, the Department's position at the time was that the CVRA did not require consultation with victims because no criminal charges had been filed.  In addition, Villafaña's reference to victim "approval" was inaccurate because the CVRA, even when applicable, requires only "consultation" with victims about prosecutorial decisions.

[405]     Villafaña did not recall Sloman explaining the reason for the decision.

[406]     Villafaña also told OPR that she recalled Menchel raising a concern that "telling them about the negotiations could cause victims to exaggerate their stories because of their desire to obtain damages from Epstein."  Villafaña was uncertain of the date of the conversation, but Menchel's presence requires it to have occurred before August 3, 2007.

Acosta told OPR that there was no requirement to notify the victims because the NPA was "not a plea, it's deferring in favor of a state prosecution." Acosta said, "[W]hether or not victims' views were elicited is something I think was the focus of the trial team and not something that I was focused on at least at this time." Acosta could not recall any particular concern that factored into the decision not to consult with the victims before entering into the NPA, but he acknowledged to OPR, "[C]learly, given the way it's played out, it may have been much better if we had [consulted with the victims]."[407]

As indicated, the contemporaneous records reflect little about decisions made regarding victim consultation prior to when the NPA was signed. Villafaña raised the issue in writing to her supervisors in early September, but there is no evidence showing whether her supervisors affirmatively rejected Villafaña's contention that the USAO was obligated to consult with victims, ignored the suggestion, or failed to address it for other reasons, possibly because of the extended uncertainty as to whether Epstein would ever agree to the government's plea proposal. OPR notes that its subject interviews were conducted more than a decade after the NPA was signed, and the passage of time affected the recall of each individual OPR interviewed. Although Villafaña recalled discussions with her supervisors about notifying victims, her supervisors did not, and Menchel contended that Villafaña's recollection is inaccurate. Assuming the discussions occurred, the timing is unclear. Sloman was on vacation before the NPA was signed, so a call with Villafaña about victim notification at that point in time appears unlikely. Any discussion involving Menchel necessarily occurred before August 3, 2007, when it was unclear whether the defense would agree to the government's offer. Supervisors could well have decided that at such an early stage, there was little to discuss with victims.

To the extent that Villafaña's supervisors affirmatively made a decision not to consult victims, Villafaña's recollection suggests that the decision arose from supervisors' concerns about the confidentiality of plea negotiations and a belief that the government was not obligated to consult with victims about a pre-charge disposition. That belief accurately reflected the Department's position at the time about application of the CVRA. Importantly, OPR did not find evidence establishing that the lack of consultation was for the purpose of silencing victims, and Villafaña told OPR that she did not hear any supervisor express concerns about victims objecting to the agreement if they learned of it. Because the subjects did not violate any clear and unambiguous standard in the CVRA by failing to consult with the victims about the NPA, OPR concludes that they did not engage in professional misconduct.

However, OPR includes the lack of consultation in its criticism of a series of government interactions with victims that ultimately led to public and court condemnation of the government's treatment of the victims. Although the government was not obligated to consult with victims, a more straightforward and open approach would have been consistent with the government's goal to treat victims of crime with fairness and respect. This was particularly important in a case in which victims felt excluded and mistreated by the state process. Furthermore, in this case, consulting with the victims about a potential plea would have given the USAO greater insight into the victims' willingness to support a prosecution of Epstein. The consultation provision does not

---

[407]     Villafaña told OPR that she was not aware of any "improper pressure or promise made to [Acosta] in order to . . . instruct [her] not to make disclosures to the victim[s]."

require victim approval of the prosecutors' plans, but it allows victims the opportunity to express their views and to be heard before a final decision is made. The lack of consultation in this case denied the victims that opportunity.[408]

## III.   LETTERS SENT TO VICTIMS BY THE FBI WERE NOT FALSE STATEMENTS BUT RISKED MISLEADING VICTIMS ABOUT THE STATUS OF THE FEDERAL INVESTIGATION

After the NPA was signed on September 24, 2007, Villafaña and the FBI separately communicated with numerous victims and victims' attorneys, both in person and through letters. Apart from three victims who likely were informed in October or November 2007 about a resolution ending the federal investigation, victims were not informed about the NPA or even more generally that the USAO had agreed to end its federal criminal investigation of Epstein if he pled guilty to state charges until after Epstein entered his guilty plea in June 2008. Despite the government's agreement on September 24, 2007, to end its federal investigation upon Epstein's compliance with the terms of the NPA, the FBI sent to victims in October 2007, January 2008, and May 2008, letters stating that the case was "currently under investigation." In its February 21, 2019 opinion in the CVRA case, the district court found those letters "misl[ed] the victims to believe that federal prosecution was still a possibility" and that "[i]t was a material omission for the Government to suggest to the victims that they have patience relative to an investigation about which it had already bound itself not to prosecute."[409]

In the discussions throughout this section, OPR examines the government's course of conduct with victims after the NPA was signed. As set forth in the previous subsection, OPR did not find evidence supporting a finding that Acosta, Sloman, or Villafaña acted with the intent to silence victims. Nonetheless, after examining the full scope and context of the government's interactions with victims, OPR concludes that the government's inconsistent messages concerning the federal investigation led to victims feeling confused and ill-treated by the government.

In this section, OPR examines and discusses letters sent to victims by the FBI that were the subject of the district court's findings. OPR found no evidence that Acosta, Sloman, or Villafaña was aware of the content of the letters until the USAO received them from the FBI for production for the CVRA litigation. OPR determined that the January 10, 2008 and May 30, 2008 letters that the district court determined to be misleading, as well as the October 12, 2007 letter OPR located during its investigation, were "standard form letter[s]" sent by the FBI's Victim Specialist. As noted previously in this Report, after the NPA was signed, Villafaña and the FBI agents continued to conduct their investigation in anticipation that Epstein would breach the NPA; absent such a

---

[408]    Villafaña told OPR that she recalled speaking to several victims along with FBI agents before the NPA was signed and "ask[ing] them how they wanted the case to be resolved." FBI interview reports indicate that Villafaña was present with FBI agents for some of the interviews occurring well in advance of the NPA negotiations. *See* 2005 Guidelines, Art. IV, ¶ B.2.c (1) (consultations may be limited to gathering information from victims and conveying only nonsensitive data and public information). However, Villafaña did not meet with all of the victims identified in the federal investigation, including the CVRA litigation petitioners, and the government conceded during the CVRA litigation that it entered into the NPA without conferring with the petitioners. *Doe,* 359 F. Supp. 3d at 1218.

[409]    *Doe,* 359 F. Supp. 3d at 1219, 1221.

breach, however, Epstein would enter his state guilty plea and the federal investigation would end. Thus, the statement that the case was "currently under investigation" was literally true, but the omission of important contextual information about the existence of the NPA deprived the victims of important information about the exact status of the investigation.

### A.   The USAO Was Not Responsible for Victim Notification Letters Sent by the FBI in October 2007, January 2008, and May 2008 Describing the Status of the Case as "Under Investigation"

The 2005 Guidelines charged the FBI with informing the victims of CVRA rights and available services during the "investigative stage" of a case.  During the Epstein investigation, the FBI case agents complied with the agency's notification obligation by hand delivering pamphlets to victims following their interviews and through computer-generated letters sent to the victims by the FBI's Victim Specialist.  The FBI's notification process is independent of the USAO's.  The USAO has its own Victim Witness Specialist who assumes the responsibility for victim notification after an indictment or complaint moved the case into the "prosecution stage."

The FBI's Victim Specialist used the VNS to prepare the October 2007, January 2008, and May 2008 letters, a system the FBI regularly employs to comply with its obligations under the 2005 Guidelines to inform the victims of their rights and other services during the "investigative stage."  The stock language of that letter, however, was generic and failed to communicate the unique case-specific status of the Epstein investigation at that time.  The FBI Victim Specialist who sent the letters acted at the case agent's direction and was not aware of the existence of the NPA at the time she created the letters.[410]  Neither FBI case agent reviewed any of the letters sent by the FBI's Victim Specialist.[411]  According to Villafaña, "The decision to issue the letters and the wording of those letters were exclusively FBI decisions."  Although the FBI case agents informed Villafaña after the fact that the FBI's Victim Specialist sent her "standard form letter," Villafaña had never reviewed an FBI-generated victim notification letter and was not aware of its contents.[412]  Villafaña told OPR she was unaware of the content of the FBI letters until they were collected for the CVRA litigation, sometime after July 2008.

---

[410]   The case agent told OPR that she did not recall specifically directing the Victim Specialist to send a letter, but acknowledged that "she would come to us before she would approach a victim."

[411]   The case agent told OPR that she had no role in drafting the letters and believed them to be "standard form letters."  Similarly, the co-case agent told OPR, "I can't think that I've ever reviewed any of them . . . they just go from the victim coordinator."

[412]   Villafaña's lack of familiarity with the language in the FBI letters led to some inconsistency in the information provided to victims concerning their CVRA rights.  Beginning in 2006, the FBI provided to victims standard letters advising victims of their CVRA rights but which also noted that only some of the rights applied pre-charge.  During this period, Villafaña also crafted her own introductory letters to the victims to let them know of their CVRA rights and that the federal investigation "would be a different process" from the prior state investigation in which "the victims felt they had not been particularly well-treated by the State Attorney's Office."  Villafaña told OPR that in a case in which she "need[ed] to be talking to young girls frequently and asking them really intimate questions," she wanted to "make sure that they . . . feel like they can trust me."  Villafaña's letter itemized the CVRA rights, but it did not explain that those rights attached only after a formal charge had been made.  The letter was hand

### B.   Because the Federal Investigation Continued after the NPA Was Signed, the FBI Letters Were Accurate but Risked Misleading Victims regarding the Status of the Federal Investigation

As described previously, given Epstein's appeal to the Department and continued delay entering his guilty plea, Villafaña and other subjects came to believe that Epstein did not intend to comply with the NPA and that the USAO would ultimately file charges against Epstein.  By April 2008, Acosta predicted in an email that charging Epstein was "more and more likely."  As a result, Villafaña and the case agents continued their efforts to prepare for a likely trial with additional investigative steps.  Among other actions, Villafaña, her supervisors, CEOS, and the case agents engaged in the following investigative activities:

- The FBI interviewed victims in October and November 2007 and between January and May 2008, and discovered at least six new victims.

- In January 2008, CEOS assigned a Trial Attorney to bring expertise and "a national perspective" to the matter.

- In January and February 2008, Villafaña and the CEOS Trial Attorney participated in victim interviews.

- Villafaña revised the prosecution memorandum to focus "on victims who are unknown to Epstein's counsel."

- The USAO informed the Department's Civil Rights Division "pursuant to USAM [§] 8-3.120," of the USAO's "ongoing investigation of a child exploitation matter" involving Epstein and others.

- Villafaña secured *pro bono* legal representation for victims whose depositions were being sought by Epstein's attorneys in connection with the Florida criminal case.[413]

- Villafaña prepared a revised draft indictment.

- Villafaña sought and obtained approval to provide immunity to a potential government witness in exchange for that witness's testimony.

- Even after Epstein's state plea hearing was set for June 30, 2008, Villafaña took steps to facilitate the filing of federal charges on July 1, 2008, in the event he did not plead guilty.

Villafaña told OPR that from her perspective, the assertion in the FBI victim letter that the case was "currently under investigation" was "absolutely true."  Similarly, the FBI case agent told OPR that at the time the letters were sent the "case was never closed and the investigation was

---

delivered, along with the FBI's own victim's rights pamphlet and notification letter, to victims following their FBI interviews.

[413]   According to the 2017 affidavit filed by Wild's CVRA-case attorney, Edwards, the *pro bono* counsel that Villafaña secured assisted Wild in "avoiding the improper deposition."

continuing."  The co-case agent also told OPR that, as of the time of his OPR interview in 2019, the "the case was open . . . it's never been shut down."

OPR found no evidence that the FBI's victim letters were drafted with the intent to mislead the victims about the status of the federal investigation.  The "ongoing investigation" language generated by the VNS was generic template language in use nationwide at the time and identical to that contained in standard form notification letters the FBI generated and distributed from August 2006 through the 2007 signing of the NPA.[414]  Nevertheless, the FBI's letters omitted important information about the status of the case because they failed to notify the victims that a federal prosecution would go forward *only if* Epstein failed to fulfill his obligations under an agreement he had reached with the USAO.  Victims receiving the FBI's letter would logically conclude that the federal government was continuing to gather evidence to support a federal prosecution.  CVRA petitioner Wild stated during the CVRA litigation that her "understanding of this letter was that [her] case was still being investigated and the FBI and prosecutors were moving forward on the Federal prosecution of Epstein for his crimes against" her.  Furthermore, when the fact that the USAO had agreed to end its federal investigation in September 2007 eventually came to light, the statement in the subsequent letters contributed to victims' and the public's conclusions that the government had purposefully kept victims in the dark.

In sum, OPR concludes that the statement in the FBI victim letters that the matter was "currently under investigation" was not false because the USAO and the FBI did continue to investigate and prepare for a prosecution of Epstein.  The letters, however, risked misleading the victims, and contributed to victim frustration and confusion, because the letters did not provide important information that would have advised victims of the actual status of the investigation.  Nonetheless, OPR found no evidence that Villafaña or her supervisors participated in drafting those letters or were aware of the content of the FBI's letters until the Department gathered them for production in the CVRA litigation.  The use of FBI form letters that gave incomplete information about the status of the investigation demonstrated a lack of coordination between the federal agencies responsible for communicating with Epstein's victims and showed a lack of attention to and oversight regarding communication with victims.  Despite the fact that the case was no longer on the typical path for resolving federal investigations, form letters continued to be sent without any review by prosecutors or the case agents to determine whether the information provided to the victims was appropriate under the circumstances.[415]

---

[414]     The Department of Justice Inspector General's Audit Report of the Department's Victim Notification System indicates that letters the FBI system generated in 2006 contained stock language for the notification events of "Initial (Investigative Agency)" and "Under Investigation" and letters generated in 2008 contained stock language for the notification events of "Advice of Victims Rights (Investigative)" and "Under Investigation."

[415]     After Epstein entered his guilty pleas, the FBI sent a similar form letter requesting "assistance and cooperation while we are investigating the case" to the two victims living outside the United States.

IV.   **ACOSTA'S DECISION TO DEFER TO THE STATE ATTORNEY'S DISCRETION WHETHER TO NOTIFY VICTIMS ABOUT EPSTEIN'S STATE COURT PLEA HEARING DID NOT VIOLATE A CLEAR OR UNAMBIGUOUS STANDARD; HOWEVER, ACOSTA EXERCISED POOR JUDGMENT BY FAILING TO ENSURE THAT VICTIMS IDENTIFIED IN THE FEDERAL INVESTIGATION WERE ADVISED OF THE STATE PLEA HEARING**

As set forth in the factual discussion, within a few weeks of the NPA's signing, it became clear that the defense team disagreed with, and strongly objected to, the government's plan to inform victims of their ability to recover monetary damages from Epstein, under the 18 U.S.C. § 2255 provision of the NPA, and about Epstein's state court plea hearing. The USAO initially took the position that it was obligated to, and intended to, inform victims of both the NPA, including the § 2255 provision, and Epstein's change of plea hearing and sentencing, so that victims who wanted to attend could do so.

In November and December 2007, Epstein's attorneys challenged the USAO's position regarding victim notification. Ultimately, Acosta made two distinct decisions concerning victim notifications. Consistent with Acosta's concerns about intruding into state actions, Acosta elected to defer to state authorities the decision whether to notify victims about the state's plea hearing pursuant to the state's own victim's rights requirements. Acosta also determined that the USAO would notify victims about their eligibility to obtain monetary damages from Epstein under § 2255, a decision that was implemented by letters sent to victims after Epstein entered his state pleas. This decision, which postponed notification of the NPA until after Epstein entered his guilty pleas, was based, at least in part, on Villafaña's and the case agents' strategic concerns relating to preserving the victims' credibility and is discussed further in Section V, below.

In this section, OPR analyzes Acosta's decision to defer to the state the responsibility for notifying victims of Epstein's plea hearing and sentencing. OPR concludes that neither the CVRA nor the VRRA required the government to notify victims of the state proceeding and therefore Acosta did not violate any statutes or Department policy by deferring to the discretion of the State Attorney whether to notify victims of Epstein's state guilty pleas and sentencing. However, OPR also concludes that Acosta exercised poor judgment because by failing to ensure that the state intended to and would notify victims of the federal investigation, he failed to treat victims forthrightly and with the sensitivity expected by the Department. Through counsel, Acosta "strongly disagree[d]" with OPR's conclusion and argued that OPR unfairly applied a standard "never before expected of any U.S. Attorney." OPR addresses Acosta's criticisms in the discussion below.

A.   **Acosta's Decision to Defer to the State Attorney's Discretion Whether to Notify Victims about Epstein's State Court Plea Hearing Did Not Violate Any Clear or Unambiguous Standard**

In November 2007, Villafaña sought to avoid defense accusations of misconduct concerning her interactions with the victims by preparing a written notice to victims informing them of the resolution of the federal case and of their eligibility for monetary damages, and inviting them to appear at the state plea hearing. Villafaña and Sloman exchanged edits of the draft letter and, at Sloman's instruction, she provided the draft to defense attorney Lefkowitz, who, in turn,

strongly objected to the government's plan to notify victims of the state proceedings, which he described as "highly inappropriate" and an "intrusion into state affairs, when the identified individuals are not even victims of the crime for which Mr. Epstein is being sentenced."

Thereafter—at a time when the USAO believed Epstein's plea to be imminent—Villafaña drafted, and Sloman signed, the December 6, 2007 letter to Lefkowitz rejecting the defense arguments regarding notification and reiterating the USAO's position that the victims identified in the federal investigation be invited to appear at the state plea hearing.  The letter took an expansive view of the applicable statutes by contending that both the CVRA and the VRRA required the USAO to notify the victims of the state proceedings:

> [T]hese sections are not limited to proceedings in a *federal* district court.   Our Non-Prosecution Agreement resolves the federal investigation by allowing Mr. Epstein to plead to a state offense. The victims identified through the federal investigation should be appropriately informed, and our Non-Prosecution Agreement does not require the U.S. Attorney's Office to forego [*sic*] its legal obligations.[416]

The letter also asserted that the VRRA obligated the USAO to provide the victims with information concerning restitution to which they may be entitled and "the *earliest possible*" notice of the status of the investigation, the filing of charges, and the acceptance of a plea.  Along with the letter, Sloman forwarded a revised draft victim notification letter to Lefkowitz for his comments.  This draft victim notification letter stated that the federal investigation had been completed, Epstein would plead guilty in state court, the parties would recommend 18 months of imprisonment at sentencing, and Epstein would compensate victims for monetary damages claims brought under 18 U.S.C. § 2255.  The draft victim notification letter provided specific information concerning the upcoming change of plea hearing and invited the victims to attend or provide a written statement to the State Attorney's Office.  When Lefkowitz asked Sloman to delay sending victim notifications until after a discussion of their contents, Sloman instructed Villafaña, who was preparing letters for transmittal to 30 victims, to "Hold the letter."  During his OPR interview, Sloman recalled that he had "wanted to push the letter out," but he "must have had a conversation with somebody" about whether the CVRA applied, and based on that conversation he directed Villafaña to hold the letter.

In his response letter to Acosta, Lefkowitz contended that the government had misinterpreted both the CVRA and VRRA because neither applied to the "public proceeding in this matter [which] will be in state court for the purpose of the entry of a plea on state charges."

---

[416]   Sloman told Lefkowitz the USAO did not seek to "federalize" a state plea, but "is simply informing the victims of their rights."  Sloman also addressed the defense attorneys' objection to advising the victims that they could contact Villafaña or the FBI case agent with questions or concerns by referencing the CVRA, noting, "Again, federal law requires that victims have the 'reasonable right to confer with the attorney for the Government in this case.'"

Thereafter, in his December 19, 2007 letter to defense counsel mainly addressing other matters, Acosta informed the defense that the USAO would defer to the State Attorney's discretion the responsibility for notifying victims about Epstein's state plea hearing:

> I understand that the defense objects to the victims being given notice of [the] time and place of Mr. Epstein's state court [plea and] sentencing hearing. I have reviewed the proposed victim notification letter and the statute. I would note that the United States provided the draft letter to the defense as a courtesy. In addition, First Assistant United States Attorney Sloman already incorporated in the letter several edits that had been requested by defense counsel. I agree that Section 3771 applies to notice of proceedings and results of investigations of federal crimes as opposed to the state crime. We intend to provide victims with notice of the federal resolution, as required by law. *We will defer to the discretion of the State Attorney regarding whether he wishes to provide victims with notice of the state proceedings, although we will provide him with the information necessary to do so if he wishes*.

(Emphasis added.)

Acosta told OPR that he "would not have sent this [letter] without running it by [Sloman], if not other individuals in the office." Acosta explained that it was "not for me to direct the State Attorney, or for our office to direct the State Attorney's Office on its obligations with respect to the state outcome." Acosta acknowledged that the USAO initially had concerns about the state's handling of the case, but he told OPR, "that doesn't mean that they will not fulfill whatever obligation they have. Let's not assume. . . that the State Attorney's office is full of bad actors." Sloman initially believed that "the victims were going to be notified at some level, especially because they had restitution rights under [§] 2255"; but his expectations changed after "there was an agreement made that we were going to allow the state, since it was going to be a state case, to decide how the victims were going to be notified."[417] Sloman told OPR he had been "proceeding under the belief that we were going to notify the victims," even though "this was not a federal case," but once the NPA "looked like it was going to fall apart," the USAO "had concerns that if we g[a]ve them the victim notification letter . . . and the deal fell apart, then the victims would be instantly impeached by the provision that you're entitled to monetary compensation."

OPR could not determine whether the State Attorney's Office notified any victims in advance of the June 30, 2008 state plea hearing. Krischer told OPR that the State Attorney's Office had a robust and effective victim notification process and staff, but he was not aware of whether or how it was used in the Epstein case. Belohlavek told OPR that she could not recall whether victims were notified of the hearing nor whether the state law required notification for the

---

[417] Sloman stated in his June 3, 2008 letter to Deputy Attorney General Filip that Acosta made the decision together with the Department's Criminal Division Deputy Assistant Attorney General Mandelker. Acosta did consult with Mandelker about the § 2255 civil damages recovery process, but neither Acosta nor Mandelker recalled discussing the issue of victim notification, and OPR found no other documentation indicating that Mandelker played a role in the deferral decision.

particular charges and victims at issue. Once the hearing was scheduled, Sloman told Villafaña to contact PBPD Chief Reiter about notifying the victims, and on June 28, 2008, she reported back to Sloman that Reiter "is going to notify victims about the plea."[418] Villafaña recalled that she sent Reiter a list of the girls identified as victims during the federal investigation, and Reiter said he would "contact as many as he could." The contemporaneous records do not show how many or which victims, if any, Reiter contacted, and no victims were present in the courtroom. No victim who provided information to OPR, either in person or through her attorney, recalled receiving notice of the plea hearing from federal or state officials. At the time Epstein pled guilty in state court, no one in the USAO knew exactly who, if anyone, Reiter or the State Attorney's Office had notified about the proceeding. Accordingly, Villafaña, who was present in the courtroom for the hearing, had no knowledge to whom Belohlavek referred when she told the court that the victims were "in agreement with the terms of this plea."[419]

OPR considered whether Acosta's decision to defer to the State Attorney's Office the decision to notify victims of the scheduled date for Epstein's plea hearing constituted professional misconduct. OPR could not conclude that the CVRA or VRRA provisions in question, requiring notice of any public proceeding involving the crime against the victim or that the victim is entitled to attend, unambiguously required federal prosecutors to notify victims of state court proceedings. Furthermore, as discussed previously, OLC had issued guidance stating that the CVRA did not apply to cases in which no federal charges had been filed.[420] Moreover, the section of the VRRA requiring notice of court proceedings that the victim is "entitled to attend" referred specifically to proceedings under 42 U.S.C. § 10606(b)(4), which, at the time of the Epstein case, had become part of the CVRA (18 U.S.C. § 3771(a)(2)).[421]

Because Acosta had no clear or unambiguous duty to inform victims identified in the federal investigation of the state plea hearing, OPR concludes that his decision to defer to the State Attorney the decision to notify victims of the state's plea hearing and the responsibility for doing so did not constitute professional misconduct.[422]

---

[418]    Sloman replied, "Good." In her written response to OPR, Villafaña stated, "I requested permission to make oral notifications to the victims regarding the upcoming change of plea, but the Office decided that victim notification could only come from a state investigator, and Jeff Sloman asked PBPD Chief Reiter to assist."

[419]    Plea Hearing Transcript at 42.

[420]    OLC 2005 CVRA Informal Guidance; *see also United States v. Guevara-Toloso,* No. 04-1455, 2005 WL 1210982, at *2 (E.D.N.Y. May 23, 2005) (in case involving a federal charge of illegal entry after a felony conviction, the court determined that victims of the predicate state conviction were not victims under the CVRA).

[421]    In *Wild*, the Eleventh Circuit panel noted that the petitioner argued "only in passing" that the government violated her CVRA right "to reasonable, accurate, and timely notice of any public court proceeding . . . involving the crime"; however, the court concluded this provision "clearly appl[ies] only after the initiation of criminal proceedings." *Wild*, 955 F.3d at 1205 n.7, 1208.

[422]    The government's letter to victims, following Epstein's guilty pleas, informing them of the resolution of the case by state plea and the availability of § 2255 relief, also appear to satisfy the potentially applicable VRRA requirements to "inform a victim of any restitution or other relief to which the victim may be entitled," and to "provide a victim the earliest possible notice of the status of the investigation of the crime, to the extent it is appropriate to

### B.   Acosta Exercised Poor Judgment When He Failed to Ensure That Victims Identified in the Federal Investigation Were Informed of the State Plea Hearing

Although Acosta (or the USAO) was not required by law or policy to notify victims of the state's plea hearing, he also was not *prohibited* by law or policy from notifying the victims that the federal investigation had been resolved through an agreement that included pleas to state charges.   As the contemporary records indicate, Acosta consistently expressed hesitancy to interfere in the state's processes or to "dictate" actions to the State Attorney.   His decision that the USAO refrain from notifying victims about the state plea hearing and defer to the State Attorney's judgment regarding whether and whom to notify was consistent with this view.   However, OPR found no evidence that Acosta's decision to defer victim notification "to the discretion of the State Attorney" was ever actually communicated to any state authorities or that Acosta recognized that the state, absent significant coordination with federal authorities, was unlikely to contact all of the victims identified in the state and federal investigations or that the state would inform the victims that it did notify that the state plea hearing was part of an agreement that resolved the federal investigation into their own cases.[423]

Even taking into account Acosta's views on principles of federalism and his reluctance to interfere in state processes, Acosta should have recognized the problems that would likely stem from passing the task of notifying victims to the State Attorney's Office and made appropriate efforts to ensure that those problems were minimized.   Appropriate notification would have included advising victims identified in the federal investigation that the USAO had declined to bring charges and that the matter was being handled by the State Attorney, and, at a minimum, provided the victims with Belohlavek's contact information.   Acosta could have interacted with the State Attorney, or instructed Villafaña or others to do so, to ensure the state intended to make notifications in a way that reached the most possible victims and that it had the information necessary to accomplish the task.   Instead, Acosta deferred the responsibility for victim notification entirely to the State Attorney's discretion without providing that office with the names of individuals the USAO believed were victims and, apparently, without even informing the state prosecutors that he was deferring to them to make the notifications, if they chose to do so.

Epstein was required by the NPA to plead to only two state charges, and even assuming that each charge was premised on a crime against a different victim, and the solicitation charge involved three separate victims, there were thus only at most four victims of the charged state offenses.   Without at least inquiring into the state's intentions, Acosta had no way of determining whether the state intended to notify more than those few victims.   Moreover, the federal investigation had resulted in the identification of several victims who had not been identified by

---

inform the victim and to the extent that it will not interfere with the investigation."   *See* 42 U.S.C. §§ 10607(c)(1)(B) and (c)(3)(A).

[423]   Through counsel, Acosta argued that OPR's criticism of him for "electing to 'defer' the notification obligation to the state" was inappropriate and "a *non sequitur"* because "where no federal notification obligation exists, it cannot be deferred."   OPR's criticism, as explained further below, is not with the decision itself, but rather with the fact that although Acosta intended for the federal victims to be notified of the state plea hearing, and believed that they should receive such notification, he nonetheless left responsibility for such notification to the state without ensuring that it had the information needed to do so and without determining the state's intended course of action.

the PBPD during its investigation into Epstein's conduct.  Absent information from the USAO, the state would not have been in a position to notify those additional victims of the state plea proceeding, even if the State Attorney had decided to include other victims identified during the state investigation.  Furthermore, at the time he made his decision, Acosta had already been advised by Villafaña that Belohlavek, in November 2007, had requested that the USAO notify victims, presumably those identified during the federal investigation, about the state plea hearing.

Acosta told OPR that it had been his understanding at the time of Epstein's plea that the victims would be made aware of the proceeding and would have an opportunity to speak.  Acosta also told OPR that he expected the state would have "notified [the victims] that that was an all-encompassing plea, that the state court sentence would also mean that the federal government was not proceeding."  There is no evidence, however, that he verified this understanding with Sloman or Villafaña, let alone the State Attorney.  OPR found no indication that Acosta ever communicated, or directed Sloman or Villafaña to communicate, his decision to the State Attorney or to provide the State Attorney's Office with a complete list of victims identified during the federal investigation.  OPR located a draft letter to the State Attorney's Office that Villafaña prepared and forwarded to Acosta in December 2007, which did provide such information, but OPR found no evidence that the letter was ever sent, and it was not among materials publicly released from the State Attorney's Office.[424]  OPR also found evidence that both Sloman and Villafaña interacted with the State Attorney's Office in the months leading up to the June 30, 2008 plea hearing, but there is no indication that they discussed victim notification issues with that office, and Villafaña's last minute request to PBPD Chief Reiter to notify victims indicates that the USAO had not coordinated with the State Attorney's Office.  Belohlavek told OPR that no one from the USAO provided her with a list of victims or coordinated any notification of victims to appear at the hearing.

Krischer and Belohlavek were thus evidently unaware that Acosta had decided to leave it to them to decide whether to notify victims about the state proceeding.  In the absence of some discussion of which or how many victims the state intended to notify, what the state intended to tell them about Epstein's plea, and whether the state intended to let the victims speak at the plea hearing, Acosta had no way to ensure that his assumption about victim notification was accurate.  In other words, Acosta failed to plan for how all of the identified victims of Epstein's crimes, both federal and state, "would be aware of what was happening in the state court and have an opportunity to speak up at the state court hearing."

OPR did not find evidence that Acosta acted for the purpose of excluding victims from the plea hearing, and Acosta's assumption that the state would handle victim notification appropriately was not unsupported.  State prosecutors are subject to victim notification requirements under the Florida Constitution, and the state prosecution offices have victim witness personnel, resources, and processes to help accomplish notification.  However, Acosta was aware—through the prosecution memoranda, the draft indictment, and email communications from Villafaña—that the USAO's investigation had expanded beyond those victims identified in the original PBPD

---

[424]    The text of the letter indicated that Epstein's attorneys asked the USAO not to inform victims of "any rights they may have as victims of the charges filed by the State Attorney's Office" and that the USAO was providing the State Attorney's Office with a list of the 33 identified federal victims "in case you are required to provide them with any further notification regarding their rights under Florida law."

investigation. Because the state indictment and information appeared to pertain to far fewer than the total victims identified in either the state or the federal investigation, and no one at the USAO was certain which victims were covered by the state charges, it should have been apparent to Acosta that without advance planning between the USAO and the State Attorney's Office, there was a substantial risk that most of the victims identified in the federal investigation would not receive notice of the hearing.[425] Notification to the broadest possible number of identified victims could only have been successful if there was appropriate communication between the USAO and the state prosecutors, communication that had previously been lacking regarding other significant issues relating to Epstein. Villafaña and Sloman's hastily arranged effort to enlist in the notification process PBPD Chief Reiter, who likely played little role in complying with the state's victim notification obligations in a typical case, was not an adequate substitute for careful planning and coordination with the State Attorney's Office.[426]

Even if the State Attorney's Office had notified all of the identified victims of the upcoming plea hearing, there was no guarantee that such notification would have included information that the state plea was resolving not just the state's investigation of Epstein, but the federal investigation as well. The State Attorney was not obligated by state statutes to inform the victims of the status of the federal investigation, and there was little reason to assume Krischer, or one of his staff, would voluntarily do so, thereby putting the State Attorney's Office in the position of fielding victim questions and concerns about the outcome. Furthermore, as both the USAO and the defense had differing views as to who could lawfully participate in the state plea hearing, there is no indication that Acosta, Sloman, or Villafaña took steps to confirm that, if victims appeared, they could actually participate in the state court proceeding when they were not victims of the charged crimes.[427]

Through counsel, Acosta asserted to OPR that because Villafaña and Sloman both told OPR that they believed that state officials would notify the victims, "OPR identified no reason why Secretary Acosta should have distrusted his team on these points." Acosta's counsel further

---

[425]     Krischer told OPR that the state's notification obligation extended to all victims identified in the state investigation. Nonetheless, which victims were encompassed in the state's investigation was unclear. The PBPD's probable cause affidavit included crimes against only 5 victims, not the 19 identified in the state investigation. According to state records made public, the state subpoenaed to the grand jury only 3 victims. After Epstein's guilty plea, the state sent notification letters to only 2 victims. Belohlavek told OPR that because of the nature of the charges, she did not know whether "technically under the law" the girls were "victims" she was required to notify of the plea hearing.

[426]     The State Attorney's Office had its own procedures and employees who handled victim notification, and Belohlavek told OPR that the Chief of the Police Department would not regularly play a role in the state victim notification process.

[427]     Although Villafaña's notes indicate that she researched Florida Statutes §§ 960.001 and 921.143 when she drafted unsent letters to victims in November and December 2007 inviting them to participate in the state plea hearing pursuant to those statues, the caselaw was not clear that all federal victims would have been allowed to participate in the state plea hearing. In Lefkowitz's November 29, 2007 letter to Acosta, he argued that the statutes afforded a right to speak at a defendant's sentencing or to submit a statement only to the victims of the crime for which the defendant was being sentenced. In April 2008, a Florida District Court of Appeal ruled against a defendant who argued that Florida Statute § 921.143(l) did not allow the testimony of the victim's relatives at the sentencing hearing. The court ruled that § 921.143(l) "should not be read as limiting the testimony Rule 3.720(b) allows trial courts to consider at sentencing hearings." *Smith v. State*, 982 So. 2d 69, 72 (Fla. Dist. Ct. App. 2008).

argued that Acosta should have been able to rely on his staff to accomplish the victim notification task, and thus had no responsibility to personally confirm that Chief Reiter would notify the victims of the hearing.[428]  Acosta is correct that under usual circumstances, USAO management played no role in the victim notification process; however, in this case, the issue of victim notification had been elevated from a rote administrative task to a major area of dispute with the defense.  Acosta personally involved himself by resolving the notification dispute with defense counsel in his December 19, 2007 letter.  Villafaña provided Acosta with a draft letter to state officials that would have opened a dialogue concerning the notification of all the victims identified in the federal investigation.  OPR found no evidence, however, that Acosta sent the letter or any similar communication to the State Attorney's Office or that he provided Villafaña and Sloman with instructions concerning victim notification other than those contained in his December 19, 2007 letter.  Having inserted himself into the notification process, Acosta had a responsibility to ensure that his expectation that the victims would be notified could be accomplished through the state process.

Many victims only learned of Epstein's state court pleas when they later received a letter from the USAO informing them that those pleas had resolved the federal investigation, and some victims only learned of the state court pleas and sentencing from the news media.  In the end, although Villafaña and Sloman hastily attempted to ensure victim notification through Chief Reiter, their effort was too little and too late to ensure that victims had the opportunity to attend the plea hearing or were given sufficient information about its significance to their own cases.[429]  Although Acosta may have conferred with others about the decision to defer the responsibility for notifying victims to the State Attorney, Acosta was responsible for choosing this course of action.  OPR concludes that under these unique circumstances, its criticisms are warranted because Acosta personally decided to change the process initiated by his staff, and although he expected that the federal victims would be notified, he did not take the necessary steps to ensure that they would be.  Acosta could have authorized disclosure of the plea hearing to victims, even if he did not believe the CVRA required it, to ensure that the victims identified in the federal investigation were aware of the state court proceeding.  Because the state pleas ended the federal investigation into Epstein's conduct, ensuring that the victims were notified of the state plea hearing would have been consistent with the Department's overarching commitment to treat victims with fairness, dignity, and sensitivity.  Acosta's failure to prioritize notification and coordinate communication about the

---

[428]     As noted, in his comments on OPR's draft report, Acosta's counsel strongly objected to OPR's finding of poor judgment with respect to victim notification, arguing that OPR "unwarrantedly applies a standard never before expected of any US Attorney," and inappropriately criticizes Acosta for "not personally confirming that the State Attorney had the information needed" to notify the victims and for "not personally confirming" that Chief Reiter had actually notified the victims.  For the reasons discussed, the issue is not whether Acosta "personally" took certain specific steps but that he stopped his staff from implementing a notification plan they had devised, and instead, shifted responsibility for notification to another entity while failing to consider how or even whether that entity would be able to accomplish the notification that Acosta expected to happen.

[429]     OPR notes that Villafaña contacted Reiter soon after the state plea hearing was scheduled, and the resulting window of time for Reiter to make any notifications was short.  Had the USAO coordinated with the State Attorney at some point in time closer to Acosta's December 19, 2007 letter and decision, the USAO could have ensured that the State Attorney had an appropriate notification process in place to act quickly when the hearing was scheduled and that issues concerning the victims' appearance at the hearing were appropriately considered by state authorities.  Similarly, if the USAO believed that Reiter should make the notifications, it could have coordinated with Reiter in the months that the matter was under review by the Department.

resolution of the case to ensure Epstein's victims were given an opportunity to attend the plea hearing, and to possibly speak about the impact of Epstein's crimes, presented a glaring contrast with Acosta's responsiveness to the demands of Epstein's attorneys, which included the unusual courtesy of allowing them to preview and respond to the USAO's draft victim notifications. This contrast added to the victims' perception that they had been treated unfairly, a view shared by the public.

Nothing in the documentary record suggests that Acosta thought through the issue of determining which victims would be notified by the state, or that he took any steps to ensure that all of the known federal victims received information about the state plea hearing. Instead, as with his decision to resolve the federal investigation through a state-based resolution, Acosta exercised poor judgment when he made critical decisions affecting the federal investigation and the victims, but also failed to consider the full consequences of those decisions or what was needed to implement them. Acosta's failure to consider these issues before simply leaving the responsibility for making notifications entirely to the State Attorney's discretion reflected poorly on the USAO and the Department as a whole. It left victims in the dark about an important proceeding that resolved the federal investigation, an investigation about which the USAO had communicated with victims for months. It also ultimately created the misimpression that the Department intentionally sought to silence the victims by keeping them uninformed about the NPA and the resulting state proceeding. Acosta failed to ensure that victims were afforded an opportunity to attend a hearing that was related to their own cases and thus failed to ensure that victims were treated with forthrightness and dignity.

## V.   VILLAFAÑA DID NOT COMMIT PROFESSIONAL MISCONDUCT IN HER ORAL COMMUNICATIONS TO VICTIMS AND VICTIMS' ATTORNEYS, IN WHICH SHE DESCRIBED THE CASE AS "UNDER INVESTIGATION" BUT DID NOT DISCLOSE THE EXISTENCE OF THE NPA TO SOME VICTIMS

From September 24, 2007, when the NPA was signed, until after Epstein's June 30, 2008 state court plea, the case agents, acting under Villafaña's direction, directly informed only three victims that the government had signed an NPA and that, if Epstein complied with its terms, the federal investigation would be closed. During this time period, Villafaña and the case agents interacted with several victims and their attorneys, and Villafaña contacted victims' attorney Bradley Edwards to encourage him to attend the state court plea hearing, but she did not inform victims or Edwards of the NPA or the resolution of the federal investigation.

As described in Part One of this chapter, after the NPA was signed, the FBI case agent and co-case agent began notifying victims about the NPA.[430] After speaking to three victims, however, the FBI case agent became concerned that informing the victims about the NPA and the monetary damages provision would create potential impeachment material for the victims and the agent should Epstein breach the NPA and the case proceed to indictment and trial. As the case agent told OPR, "I would . . . have to testify that I told every one of these girls that they could sue Mr. Epstein for money, and I was not comfortable with that, I didn't think it was right." The case

---

[430]   Although Wild disputed that she was informed of the resolution of the federal case, the case agent's email to Villafaña from this time period reflects that at least one victim understood that the federal case was resolved and that she was unhappy with the resolution.

agent and Villafaña consulted with the USAO's Professional Responsibility Officer about the matter, and thereafter stopped notifying the victims about the NPA and their ability to pursue monetary damages according to its terms.

Villafaña advised Sloman by email of her concerns regarding the potential impeachment evidence, telling him, "One thing I am concerned about is that, if we [file charges] now, cross-examination will consist of- 'and the government told you that if Mr. Epstein is convicted, you are entitled to a large amount of damages right?'"   Explaining the decision in her later CVRA declaration, Villafaña said that after Epstein's attorneys "complained that the victims were receiving an incentive to overstate their involvement with Mr. Epstein in order to increase their damages claims," she "concluded that informing additional victims could compromise the witnesses' credibility at trial if Epstein reneged on the agreement."   Acosta was aware of these concerns as he referred to them in an August 2008 email, "[W]e also believed that contacting the victims would compromise them as potential witnesses.  Epstein argued very forcefully that they were doing this for the money, and we did not want to discuss liability with them, which was [a] key part of [the] agree[ment]."

The case agents interviewed victims in October and November 2007, but did not inform them about the NPA.[431]   On January 31, 2008, the FBI agents, Villafaña, and the CEOS Trial Attorney interviewed three victims, including Courtney Wild, and they interviewed at least one more victim the next day.[432]   Wild and two others had been contacted by the FBI in the fall of 2007 and may have been informed about the resolution of the federal investigation.

Villafaña told OPR that during the January 31, 2008 interviews, she did not specifically tell the victims that "there was a signed non-prosecution agreement that had these terms."   She stated that she would not use "terminology" such as "NPA" because "most people don't understand what that means."   Instead, with respect to the three victims who, according to Villafaña, had been informed by the FBI about the resolution, she stated that "an agreement had been reached where [Epstein] was going to be entering a guilty plea, but it doesn't look [like] he intends to actually perform . . . [and] now it looks like this may have to be charged . . . and may have to go to trial."   Villafaña recalled telling some victims that Epstein "was supposed to enter a plea in state court" that would end the investigation, but she did not recall distinguishing between the "federal investigation versus a state investigation."   Villafaña told OPR she explained "the case was under investigation," she and the agents "were preparing . . . again" to file charges, and they hoped "that charges would be brought."   An email from Villafaña to Sloman and Acosta during this time period reflects that she had such discussions with at least one victim interviewed on this date:  "The second girl . . . was very upset about the 18 month deal she had read about in the paper. . . . [S]he would rather not get any money and have Epstein spend a significant time in jail."   Villafaña, however, did not recall telling all of the victims interviewed at this time of the state plea; rather, she likely only told those who knew about the resolution from the FBI.  In her own 2015 CVRA-case declaration, Wild stated that she "was not told about any [NPA] or any potential resolution of

---

[431]   FBI agents also interviewed victims in March and May of 2008, without prosecutors, and did not inform the victims of the NPA.

[432]   Two additional victims were scheduled to be interviewed on February 1, 2008, but the evidence is unclear as to whether the interviews occurred.

the federal investigation I was cooperating in. If I had been told of a[n NPA], I would have objected." Wild further stated in her declaration that, "Based on what the FBI had been telling me, I thought they were still investigating my case."

Neither the CEOS Trial Attorney nor the FBI case agent recalled the specifics of the victim interviews. The FBI reports memorializing each interview primarily addressed the facts elicited from the victim regarding Epstein's abuse and did not describe any discussion about the status of the case or the victim's view about the prosecution of Epstein.[433]

When asked whether she was concerned that failing to tell victims about the NPA when she was interviewing them would mislead victims, as previously noted, Villafaña told OPR that she believed she and the agents were conducting an investigation because they continued "interviewing witnesses" and "doing all these things" to file charges and prepare for a federal trial. As Villafaña stated, "So to me, saying to a victim the case is now back under investigation is perfectly accurate."

Villafaña was also aware that some victims were represented by counsel in connection with civil lawsuits against Epstein, but did not proactively inform the victims' attorneys about the NPA. In a 2017 affidavit filed in the CVRA litigation, victims' attorney Bradley Edwards alleged that during telephone calls with Villafaña, he "asked very specific questions about what stage the investigation was in," and Villafaña replied that she could not answer his questions because the matter "was an on-going active investigation." Edwards stated that Villafaña gave him "the impression that the Federal investigation was on-going, very expansive, and continuously growing, both in the number of identified victims and complexity." Edwards also stated, "A fair characterization of each call was that I provided information and asked questions and Villafaña listened and expressed that she was unable to say much or answer the questions I was asking."

In her written response to OPR, Villafaña stated that she "listened more than [she] spoke" during her interactions with Edwards and that due to the "uncertainty of the situation" and the possibility of a trial, she "did not feel comfortable sharing any information about the case." Villafaña also told OPR that because of "all of these concerns and instructions that I had been given by Alex [Acosta] and Jeff [Sloman] not to disclose things further and not to have any involvement in victim notification," she felt "prohibited" from providing additional information to Edwards.

 Sloman told OPR that although neither the NPA terms nor the CVRA prevented the USAO from exercising its discretion to notify the victims, "[I]t was [of] concern that this was going to break down and . . . result in us prosecuting Epstein and that the victims were going to be witnesses and if we provided a victim notification indicating, hey, you're going to get $150,000, that's . . . going to be instant impeachment for the defense."[434] Acosta told OPR that, because Epstein did

---

[433]     As noted above, the FBI agent's notes for one victim's interview reported that she wanted another victim to be prosecuted.

[434]     When asked why the USAO did not simply notify the victims of the change of plea hearing, Sloman responded that he "was more focused on the restitution provisions. I didn't get the sense that the victims were overly interested in showing up . . . at the change of plea."

not plead guilty in October 2007 as the USAO expected, it was a "very open question" whether the case would go to trial, and Acosta thought that "where there is no legal requirement[,] [t]here has to be discretion to judge how much you can tell the victims and when."

Epstein's attorneys' conduct during the period between the signing of the NPA and Epstein's entry of his state guilty pleas illustrated the risk that Acosta, Sloman, and Villafaña all identified. As Epstein's counsel deposed victims related to the state court criminal charges and civil cases against Epstein, counsel suggested that the victims were motivated to testify against Epstein by the government's promises of financial gain. For example, during a February 20, 2008 state deposition of a victim, defense counsel asked her whether the federal prosecutors or FBI agents told her that she was entitled to receive money from Epstein.[435] In her 2017 declaration in the CVRA litigation, Villafaña identified that line of questioning as a motivating factor in the government's decision to stop notifying the victims about the potential for 18 U.S.C. § 2255 recovery.

On June 27, 2008, the Friday before Epstein's Monday, June 30, 2008 state court guilty plea hearing, Villafaña contacted Edwards to inform him about that upcoming hearing. Villafaña told OPR she "was not given authorization to contact" any victim's attorney other than Edwards about the scheduled state plea hearing.[436] In his 2017 affidavit prepared for the CVRA litigation, Edwards stated that Villafaña "gave the impression that she was caught off-guard herself that Epstein was pleading guilty or that this event was happening at all."

Edwards said in a 2016 court filing that Villafaña told him only that "Epstein was pleading guilty to state solicitation of prostitution charges involving other victims—not Mr. Edward's clients nor any of the federally-identified victims." Villafaña stated in her 2017 declaration that she "never told Attorney Edwards that the state charges involved 'other victims,' and neither the state court charging instrument nor the factual proffer limited the procurement of prostitution charge to a specific victim." Villafaña told OPR she "strongly encouraged [Edwards] and his clients to attend" the plea hearing but "could not be more explicit" because she was not "authorized by the Office to disclose the terms of the NPA." In his 2017 affidavit, Edwards acknowledged that "Villafaña did express that this hearing was important, but never told me why she felt that way." Edwards claimed that Villafaña's failure to inform him that the "guilty pleas in state court would bring an end to the possibility of federal prosecution pursuant to the plea agreement" resulted in his clients not attending the hearing. Edwards himself was out of town and not able to

---

[435]     As previously noted, the defense used Florida criminal procedure to depose potential federal victims to learn information concerning the federal investigation even though those individuals were not involved in the state prosecution. For example, in a March 2008 email, Villafaña informed her managers that she spoke to a victim who had received a subpoena "issued in connection with the state criminal case, which, as you know, doesn't involve most of the victims in our case (including the girl who was subpoenaed)." Villafaña further observed that because Epstein is "going to plead to the solicitation of adults for prostitution charge [in state court], [the act of subpoenaing the victim] seems to be a clear effort to find out about our case through the state case."

[436]     Villafaña's June 30, 2008 handwritten notes reflect that, at the time of Epstein's state court guilty plea, Villafaña was aware of the identities of a least five other attorneys representing Epstein's victims. In her written response to OPR, Villafaña stated, "I requested permission to make oral notifications to the victims regarding the upcoming change of plea, but the Office decided that victim notification could only come from a state investigator, and Jeff Sloman asked PBPD Chief Reiter to assist." On Saturday, June 28, 2008, Villafaña emailed Sloman to inform him that PBPD Chief Reiter "is going to notify victims about the plea." Sloman replied, "Good."

attend the hearing. In his affidavit, Edwards asserted, "[T]here was no possible way I could have believed that this state plea could affect the federal investigation or the rights of my clients in that federal investigation."

In *Wild*, the Eleventh Circuit panel stated that the government "seemingly" deferred to Epstein's attorneys' requests not to notify the victims about the NPA, and that in sending the January and May 2008 FBI letters, the government's efforts "seem to have graduated from passive nondisclosure to (or at least close to) active misrepresentation."[437] Although both the appellate court and district court focused on the FBI's letters for which OPR concludes that neither Villafaña, Sloman, nor Acosta was responsible, OPR considered the courts' analyses in evaluating whether similar representations Villafaña made to the victims whom she interviewed on January 31 and February 1, 2008, and to Edwards, were misleading. Therefore, OPR considered whether Villafaña's statements that the matter was "under investigation" and her failure to inform all of the victims whom she interviewed or Edwards about the NPA violated FRPC 4-4.1(a), 4-8.4(c), or 4-8.4(d).

FRPC 4-4.1(a) prohibits an attorney from "knowingly mak[ing] a false statement of material fact or law to a third person" during the representation of a client. The FRPC defines "knowingly" as "denot[ing] actual knowledge of the fact in question" and states that such knowledge may be "inferred from circumstances."[438] The comment to FRPC 4-4.1 states that "[m]isrepresentations can also occur by partially true but misleading statements or omissions that are the equivalent of affirmative false statements." The comment references FRPC 4-8.4 "[f]or dishonest conduct that does not amount to a false statement." Like FRPC 4-4.1(a), Rule 4-8.4(c) requires evidence that the attorney knew the statement in question was false. Under FRPC 4-8.4(c), the intent requirement can be satisfied "merely by showing that the conduct was deliberate or knowing" and the "motive underlying the lawyer's conduct is not determinative; instead the issue is whether he or she purposefully acted."[439] In *Feinberg*, the court concluded that the prosecutor violated FRPC 4-4.1 and 4-8.4(c) and (d) by deliberately making untruthful statements to a defense attorney, despite evidence that the prosecutor intended to help the defendant by making the statements.[440] In this case, Villafaña was fully aware of the signed NPA when she interviewed the victims on January 31 and February 1, 2008, and when she spoke to Edwards on the telephone, but she did not inform them specifically of the signed NPA. The question is whether this omission amounted to a knowing false statement or misrepresentation.

One difficulty is determining what Villafaña actually said during conversations that participants were asked to recall many years later. With respect to three of the victims whom she interviewed in January and February 2008, Villafaña contended that she discussed the agreement with them, even if she did not specifically refer to it as the NPA or discuss all of its terms, and as

---

[437]   *Wild,* 955 F.3d at 1199-1200.

[438]   *See* R. Regulating Fla. Bar 4-Preamble: A Lawyer's Responsibilities, "Terminology."

[439]   *Florida Bar v. Schwartz*, 284 So. 3d 393, 396 (Fla. 2019) (citing *Florida Bar v. Berthiaume*, 78 So. 3d 503, 510 n.2 (Fla. 2011); *Florida Bar v. Riggs*, 944 So. 2d 167, 171 (Fla. 2006); *Florida Bar v. Smith*, 866 So. 2d 41, 46 (Fla. 2004)).

[440]   *Florida Bar v. Feinberg*, 760 So. 2d 933, 937-38 (Fla. 2000).

previously noted, there is some contemporaneous evidence supporting her assertion. Villafaña's mention of the agreement, even if not described in specific terms, would have been sufficient to apprise those victims of the status of the federal investigation.

Nevertheless, Villafaña did not recall discussing the NPA specifically or in general terms with other victims interviewed at that time, nor did she do so with Edwards or any other victim's attorney. OPR therefore considered whether the omission of information about the existence of the NPA during these interactions rose to the level of professional misconduct in violation of FRPC 4-4.1 or 4-8.4.[441]

OPR evaluated Villafaña's conduct in light of the comment to FRPC 4-4.1:

> A lawyer is required to be truthful when dealing with others on a client's behalf, but generally has no affirmative duty to inform an opposing party of relevant facts. A misrepresentation can occur if the lawyer incorporates or affirms a statement of another person that the lawyer knows is false. Misrepresentations can also occur by partially true but misleading statements or omissions that are the equivalent of affirmative false statements.

The victims and their attorneys were certainly not "opposing part[ies]" to the USAO, but the comment indicates that the rule recognizes that omissions made during discussions with third parties, even of relevant facts, are not always treated as false statements.

Here, the evidence does not show that Villafaña knowingly made an affirmative false statement to the victims or Edwards or that her omissions were "the equivalent of affirmative false statements" about material facts. First, Villafaña told OPR that she believed the investigation was ongoing and her statement to that effect truthful, and as discussed earlier in this Chapter, the evidence shows that Villafaña and the agents did continue to investigate the case until Epstein entered his guilty plea in state court in June 2008. Villafaña's email correspondence with her supervisors reflects her strong advocacy during that timeframe to declare Epstein in breach and to charge him. The evidence similarly does not show that Villafaña knowingly made any affirmative false statement to Edwards when she informed him of the state court plea, although she declined to provide additional information in response to his questions.[442]

Second, in reaching its conclusion, OPR considered the full context in which Villafaña interacted with the victims and Edwards. Prosecutors routinely make decisions about what information will be disclosed to witnesses, including victims, for a variety of strategic reasons. In many cases, prosecutors must make difficult decisions about providing information to witnesses,

---

[441]   In *Florida Bar v. Joy,* the court affirmed a referee's conclusion that Joy violated FRPCs 4-4.1(a) and 4-8.4(c) "for making false statements by omission of material facts in his representations [to counsel]." *Florida Bar v. Joy*, 679 So. 2d 1165, 1166-68 (Fla. 1996). *See also Florida Bar re Webster,* 647 So. 2d 816 (Fla. 1994) (petition for reinstatement denied due to "misrepresentation by omission").

[442]   In *Feinberg*, 760 So. 2d at 938, the court found that an Assistant State Attorney lacked candor and violated ethics rules when, after meeting with a defendant outside his attorney's presence, the prosecutor falsely stated to the defense attorney that he (the prosecutor) had not met with the defendant.

and they often cannot fully reveal either the facts or the status of an investigation, even with victims.  The 2005 Guidelines advise that in consulting with a victim, prosecutors may be limited in their disclosures:  "Because victims are not clients, may become adverse to the Government, and may disclose whatever they have learned from consulting with prosecutors, such consultations may be limited to gathering information from victims and conveying only nonsensitive data and public information."[443]

Villafaña's concern about generating potential impeachment evidence by informing victims of their potential to recover monetary damages from Epstein was not unreasonable.  Indeed, the case agents initially raised the impeachment issue, and after considering the problem, Villafaña agreed with the agents' concerns.  Villafaña raised those concerns with the USAO's Professional Responsibility Officer in October 2007 after the agents brought the issue to her attention, and she ultimately raised the issue with Sloman and Acosta as well, neither of whom advised her that those concerns were improper or unsound.  OPR also considered that although Villafaña had sought to notify the victims in writing of the NPA soon after it was signed, her supervisor, the U.S. Attorney, had decided otherwise.  When authorized to inform Edwards of the scheduled change of plea hearing, she did so.  Although she did not inform Edwards that the plea was part of a global resolution that would end the federal investigation, the evidence does not show that Villafaña acted for the purpose of deceiving Edwards or preventing him from attending the hearing.  Had she sought to exclude him from the state proceedings, she could have elected not to inform Edwards at all, or she could have discouraged him from attending the state proceedings.  Rather, as Edwards confirmed, Villafaña told him the hearing was "important."  Villafaña sought to strike a difficult balance of securing Edwards's (and his clients') attendance at the state court plea, while obeying her management's directive that informing victims of the resolution of the federal investigation should not be done until completion of the state plea.

Therefore, after carefully considering all of the circumstances, OPR concludes that the evidence does not establish that Villafaña violated her obligations under FRPC 4-4.1 or 4-8.4(c) or (d).[444]  Nonetheless, as discussed below, Villafaña's interactions with victims and victims' attorneys without informing them of the NPA and the potential conclusion of the federal investigation contributed to the likelihood that the victims would feel that the government was

---

[443]     2005 Guidelines, Art. IV, ¶ B.2.c(1).  As noted, some victims continued to express favorable views of Epstein during interviews with the government and they, or their attorneys, could have provided information to Epstein about the government's communications.  For example, within a day of Villafaña contacting a victim's attorney about a potential victim notification letter, Starr complained to Acosta that the government had recently inappropriately provided "oral notification of the victim notification letter" to one girl's attorney, even though it was clear from the girl's recorded FBI interview that she "did not in any manner view herself as a victim."

[444]     The case most directly on point is *Smith*, 109 A.3d 1184, in which the Maryland Court of Appeals affirmed a violation of Maryland Rule of Professional Conduct 8.4(d) based on a prosecutor's failure to notify the victim of the resolution of a sex abuse case.  However, as noted previously, in *Smith*, the criminal defendant had been arrested and charged before entering a plea, and various specific statutes afforded victims the right to receive notices and an opportunity to be heard concerning "a case originating by indictment or information in a circuit court."  In this case, for the reasons previously discussed, Villafaña did not have a clear and unambiguous obligation to inform the victims or Edwards of the NPA.

intentionally concealing information from them and was part of a series of interactions with victims that led to condemnation of the government's treatment of victims.[445]

## VI.  THE GOVERNMENT FAILED TO TREAT VICTIMS FORTHRIGHTLY AND WITH SENSITIVITY WHEN IT FAILED TO TIMELY PROVIDE VICTIMS WITH IMPORTANT INFORMATION ABOUT THE RESOLUTION OF THE FEDERAL INVESTIGATION

Although OPR does not conclude that any of the subjects committed professional misconduct, either by failing to consult with the victims before the NPA was signed or in interactions afterwards, OPR's findings are not an endorsement of the government's course of action.  The government's interactions with victims confused and frustrated many of the victims, particularly the two CVRA petitioners and the two victims who had unsuccessfully attempted to join in the CVRA litigation.  As a result, the victims' and the public's perception of the matter is that the prosecutors worked with Epstein's attorneys to disenfranchise and silence the victims.  It is unfortunate, and appears fundamentally unfair to the victims, that Acosta and Sloman (after Menchel and Lourie departed) took the unusual step of deciding to vet the USAO victim notification letters with the defense after the NPA was signed, but failed to go beyond the requirements of the CVRA or the 2005 Guidelines to consult with the victims before the NPA was signed.  This result is contrary to the Department's intent, as set forth in the 2005 Guidelines, that Department employees work to "minimize the frustration and confusion that victims of crime endure in its wake."  When considering the entirety of the government's interactions with victims, OPR concludes that victims were not treated with the forthrightness and sensitivity expected by the Department.

Wild's criticisms of the government's conduct were based on interactions that are similar to and generally representative of the government's interactions with other Epstein victims and that demonstrate an overall lack of sensitivity to the victims by the government.  Wild experienced a series of confusing and inconsistent communications in her interactions with Villafaña and the case agents.  Wild received Villafaña's letter in June 2007 stating inaccurately that she was a federal victim entitled to CVRA rights.  She was interviewed by the FBI in August 2007 but was not told that a potential outcome was a state plea.  Shortly after the September 24, 2007 signing of the NPA, the FBI contacted her to inform her of the resolution of the federal case.  Nonetheless, on January 10, 2008, the FBI sent her a victims' rights letter indicating that the case was under investigation and that some of her CVRA rights may not apply until after the defendant was charged.  On January 31, 2008, Villafaña re-interviewed Wild, along with a CEOS attorney and the FBI agents, and told Wild that the case was under investigation, but did not specifically mention the NPA, although she may have mentioned a possible resolution.  In mid-June 2008, when Edwards contacted Villafaña on Wild's behalf, Villafaña informed him that the case was under investigation but did not mention the NPA.  Just before Epstein's June 30, 2008 state court plea,

---

[445]    OPR notes that, similar to Villafaña, Sloman interacted with a victim's attorney during the time period between the signing of the NPA and Epstein's state guilty plea.  In January 2008, Sloman received a telephone call from his former law partner, who represented one of the victims and who asked Sloman whether the federal government could bring charges against Epstein.  Sloman, concerned about the potential for conflict of interest allegations due to his prior business relations with the attorney, refused to answer any questions regarding Epstein.  Because Sloman refused to provide any information, OPR found no basis for finding that Sloman misled the attorney.

Villafaña informed Edwards about the state plea, but did not mention the NPA or the fact that the state pleas would resolve the federal investigation. Edwards then filed the CVRA petition and learned about the NPA signed months earlier and that the federal investigation of Epstein had concluded with Epstein's state guilty pleas. Wild only received access to the NPA when a judge permitted it in August 2008 pursuant to a protective order. After considering this series of interactions, it is not surprising that Wild came away from the experience feeling confused and believing she had been misled.

OPR did not find evidence supporting a conclusion that Villafaña, Acosta, Sloman, Menchel, or Lourie opted not to consult with the victims in order to protect Epstein or shield the NPA from public scrutiny. Although neither Sloman nor Acosta could recall a specific discussion of CVRA obligations before the NPA was signed, both recalled knowing that victim consultation was not required, and Menchel also told OPR that consultation was not required, at least not up to the point when he left the USAO. The evidence is clear that Villafaña sought at various points to consult with and to notify victims about the details of the NPA but was constrained before the NPA was signed by managers who either made a decision to not consult victims or did not address the issue after it was raised, and after the signing by her own concern about creating possible impeachment evidence that would damage the victims' credibility at a possible trial.

Nonetheless, a more open and straightforward approach with the victims, both before and after the signing of the NPA, would have been the better practice. Before the NPA was signed, victims could have been asked for their views about the general terms the USAO was contemplating offering, including that a plea to state charges was one of the options being considered; asked for their views in general about a guilty plea; or, at a minimum, asked to share their views of how the case should be resolved. Even if the USAO ultimately determined to proceed with the NPA, the government would have had the benefit of the victims' thoughts and concerns, particularly on the issue of punishment, and victims would have felt included in the process. OPR found no evidence that the benefits of victim consultation were discussed or considered before the NPA was signed.

After the NPA was signed, no one from the government explained the agreement to the majority of the victims until months later and only after the entry of Epstein's guilty plea. Although the evidence supports Villafaña's assertion that she acted from a good faith belief that Epstein might breach the NPA and a potential trial would be harmed if information about the NPA was divulged to the victims and their counsel, she, Sloman, and Acosta failed to consider how the desire to shield the victims from that potential impeachment might impact the victims' sense of the openness and fairness of the process. As Wild stated during the CVRA litigation, she believed she had been "mistreated in the process." When deciding not to inform the victims of the NPA to avoid creating impeachment evidence, Villafaña, Sloman, and Acosta do not appear to have carefully considered possible alternatives to, or all of the ramifications of, that decision, nor did they revisit the decision before Villafaña met the victims in person to discuss a potential trial or spoke to Edwards or other attorneys representing victims.[446] Furthermore, more attention needed

---

[446]    It is not at all clear whether a court would have permitted impeachment of the victims concerning one provision in a plea agreement that otherwise could not be used as evidence. *See* Fed. R. Crim. P. 11(f) ("The admissibility or inadmissibility of a plea, a plea discussion, and any related statement is governed by Federal Rule of Evidence 410."). In any case, the victims could have been impeached regarding the possibility of their obtaining monetary damages through either a civil suit or through 18 U.S.C. § 2255 (if Epstein were convicted after a trial),

to be paid to the FBI's communications to ensure that the victims were receiving accurate and timely information that was consistent with the status of the case and with the USAO's communications with victims.[447]

The decision not to inform victims and their attorneys about the existence of the NPA gave victims and the public the misimpression that the government had colluded with Epstein's counsel to keep the agreement secret from the victims.  Moreover, the lack of openness about the NPA gave the impression that the USAO lacked sensitivity for the victims in resolving the matter and undercut public confidence in the legitimacy of the resulting plea agreement.  The overall result of the subjects' anomalous handling of this case left at least some of the victims feeling ignored and frustrated, failed to promote their healing process, and resulted in extensive public criticism.  Although OPR credits Villafaña's statements that she wanted to go beyond her obligations in dealing with victims, the end result nonetheless was that communications with victims were not prioritized by the USAO.  In part this was due to the fact that interactions with victims are generally handled by staff in the USAO and the FBI who are trained and have expertise in dealing with victims and other witnesses.  However, decisions made by Acosta, Sloman, and Villafaña also contributed to the problems.  The government, as it ultimately acknowledged in the CVRA litigation, could have, and should have, engaged with the victims in a more transparent and unified fashion.

OPR recognizes that the Epstein investigation occurred soon after the passage of the CVRA.  In the years since, the Department's prosecutors and personnel have become more familiar with its provisions.  OPR encourages the Department as a whole to take the issues discussed above into account when providing training and direction to its employees regarding victims' rights to ensure that in the future, Department attorneys' actions promote victim inclusion whenever possible.[448]  For example, although the division of responsibility between the FBI and the USAO for communicating with victims works efficiently and appropriately in the average case, the USAO failed to consider that in a case involving a pre-charge disposition, the victims were receiving inconsistent and confusing communications from the separate entities.  In certain cases, such as the Epstein case, prosecutors may need to provide more oversight when multiple Department components are communicating with victims to avoid providing confusing and contradictory messages.

---

independent of the NPA provision.  OPR also notes that impeachment regarding the NPA provision may have permitted the government to rehabilitate the victims through their prior statements to law enforcement.  In other words, while the USAO's view concerning potential impeachment was not unreasonable, more extensive consideration of the case agent's concerns might have led the prosecutors to conclude that the risk of the information being used to significantly damage the credibility of the victims was low.

[447]     In addition to the FBI letters previously discussed, another example of the inconsistent communication can be seen in letters that were to be sent after Epstein entered his guilty plea to two victims residing in foreign countries.  Although OPR was unable to confirm that the two victims actually received the letters, it appears from the records OPR reviewed that the government intended to provide them with a standard FBI letter stating that the case was under investigation while also providing them with a USAO letter stating that the case had been resolved through Epstein's state guilty plea.

[448]     OPR understands that the Department is in the process of revising the 2011 Guidelines.

# CONCLUSION

In November 2018, the *Miami Herald* published an extensive investigative report about state and federal criminal investigations initiated more than 12 years earlier into allegations that Jeffrey Epstein, a wealthy financier with residences in Florida, New York, and other United States and foreign locations, had coerced girls into engaging in sexual activity with him at his Palm Beach, Florida estate. The *Miami Herald* reported that in 2007, the U.S. Attorney for the Southern District of Florida, R. Alexander Acosta, entered into an "extraordinary" deal with Epstein that permitted Epstein to avoid federal prosecution and a potentially lengthy prison sentence by pleading guilty in state court to "two prostitution charges," immunized from prosecution Epstein's co-conspirators, and concealed from Epstein's victims the terms of the NPA.

Following the *Miami Herald's* report, and after receiving a Congressional request to investigate, OPR initiated an investigation into the allegations that prosecutors in the USAO improperly resolved the federal investigation into the criminal conduct of Jeffrey Epstein by negotiating and executing the NPA. OPR subsequently included in its investigation allegations stemming from judicial criticism of the government's conduct relating to federal prosecutors' and law enforcement agents' interactions with Epstein's victims. In July 2008, a victim, later joined by a second victim, filed in federal court in the Southern District of Florida an emergency petition for enforcement of her rights under the CVRA. In February 2019, the district court found that the government violated the CVRA by failing to advise victims about its intention to enter into the NPA. The court also found that letters the government sent to victims after the NPA was signed, describing the investigation as ongoing, were misleading.

During the course of its investigation, OPR obtained and reviewed hundreds of thousands of records from the USAO, the FBI, and other Department of Justice components. The records included emails, letters, memoranda, and investigative materials. OPR also collected and reviewed materials relating to the state investigation and prosecution of Epstein, including sealed pleadings, grand jury transcripts, and grand jury audio recordings; examined extensive publicly available information, including depositions, pleadings, orders, and other court records; and reviewed media reports and interviews, articles, podcasts, and books relating to the Epstein case. OPR conducted more than 60 interviews of witnesses, including the FBI case agents, their supervisors, and FBI administrative personnel; current and former USAO staff and attorneys; current and former Department attorneys and senior managers; and the former State Attorney and Assistant State Attorney in charge of the state investigation of Epstein. OPR also interviewed or received written information from several victims and attorneys representing victims concerning victim contacts with the USAO and federal law enforcement.

OPR identified the following five former USAO attorneys as subjects of its investigation based on information indicating that each of them was involved in the decision to resolve the case through the NPA or in the negotiations leading to the agreement: former U.S. Attorney R. Alexander Acosta, and former AUSAs Jeffrey H. Sloman, Matthew I. Menchel, Andrew C. Lourie, and Ann Marie C. Villafaña. Each subject submitted written responses detailing their involvement in the federal investigation of Epstein, the drafting and execution of the NPA, and decisions relating to victim notification and consultation. OPR conducted extensive interviews of all five subjects. The subjects also submitted comments on OPR's draft report.

OPR evaluated the conduct of each subject based on his or her individual role in various decisions and events and assessed that conduct pursuant to OPR's analytical framework. OPR found that Acosta made the pivotal decision to resolve the federal investigation of Epstein through a state-based plea and either developed or approved the terms of the initial offer to the defense that set the beginning point for the subsequent negotiations that led to the NPA. Although Acosta did not sign the NPA, he participated in its drafting and approved it, with knowledge of its terms. Therefore, OPR considers Acosta to be responsible for the NPA and for the actions of the other subjects who implemented his decisions.

Based on its extensive investigation, OPR concludes that the subjects did not commit professional misconduct with respect to the development, negotiation, and approval of the NPA. Under OPR's framework, professional misconduct requires a finding that a subject attorney intentionally or recklessly violated a clear and unambiguous standard governing the conduct at issue. OPR found no clear and unambiguous standard that required Acosta to indict Epstein on federal charges or that prohibited his decision to defer prosecution to the state. Furthermore, none of the individual terms of the NPA violated Department or other applicable standards.

As the U.S. Attorney, Acosta had the "plenary authority" under established federal law and Department policy to resolve the case as he deemed necessary and appropriate, as long as his decision was not motivated or influenced by improper factors. Acosta's decision to decline to initiate a federal prosecution of Epstein was within the scope of his authority, and OPR did not find evidence that his decision was based on corruption or other impermissible considerations, such as Epstein's wealth, status, or associations. Evidence shows that Acosta resisted defense efforts to have the matter returned to the state for whatever result state authorities deemed appropriate, and he refused to eliminate the incarceration and sexual offender registration requirements. OPR did not find evidence establishing that Acosta's "breakfast meeting" with one of Epstein's defense counsel in October 2007 led to the NPA, which had been signed weeks earlier, or to any other significant decision that benefited Epstein. The contemporaneous records show that USAO managers' concerns about legal issues, witness credibility, and the impact of a trial on the victims led them to prefer a pre-charge resolution and that Acosta's concerns about the proper role of the federal government in prosecuting solicitation crimes resulted in his preference for a state-based resolution. Accordingly, OPR does not find that Acosta engaged in professional misconduct by resolving the federal investigation of Epstein in the way he did or that the other subjects committed professional misconduct through their implementation of Acosta's decisions.

Nevertheless, OPR concludes that Acosta's decision to resolve the federal investigation through the NPA constitutes poor judgment. Although this decision was within the scope of Acosta's broad discretion and OPR does not find that it resulted from improper factors, the NPA was a flawed mechanism for satisfying the federal interest that caused the government to open its investigation of Epstein. In Acosta's view, the federal government's role in prosecuting Epstein was limited by principles of federalism, under which the independent authority of the state should be recognized, and the federal responsibility in this situation was to serve as a "backstop" to state authorities by encouraging them to do more. However, Acosta failed to consider the difficulties inherent in a resolution that relied heavily on action by numerous state officials over whom he had no authority; he resolved the federal investigation before significant investigative steps were completed; and he agreed to several unusual and problematic terms in the NPA without the consideration required under the circumstances. In sum, Acosta's application of federalism

principles was too expansive, his view of the federal interest in prosecuting Epstein was too narrow, and his understanding of the state system was too imperfect to justify the decision to use the NPA. Furthermore, because Acosta assumed a significant role in reviewing and drafting the NPA and the other three subjects who were supervisors left the USAO, were transitioning to other jobs, or were absent at critical junctures, Acosta should have ensured more effective coordination and communication during the negotiations and before approving the final NPA. The NPA was a unique resolution, and one that required greater oversight and supervision than Acosta provided.

OPR further concludes that none of the subject attorneys committed professional misconduct with respect to the government's interactions with victims. The subjects did not intentionally or recklessly violate a clear and unambiguous duty under the CVRA by entering into the NPA without consulting with victims, because the USAO resolved the Epstein investigation without a federal criminal charge. Significantly, at the time the NPA was signed, the Department did not interpret CVRA rights to attach unless and until federal charges had been filed, and the federal courts had not established a clear and unambiguous standard applying the CVRA before criminal charges were brought. In addition, OPR did not find evidence that the lack of consultation was for the purpose of silencing victims. Nonetheless, the lack of consultation was part of a series of government interactions with victims that ultimately led to public and court condemnation of the government's treatment of the victims, reflected poorly on the Department as a whole, and is contradictory to the Department's mission to minimize the frustration and confusion that victims of a crime endure.

OPR determined that none of the subjects was responsible for communications sent to certain victims after the NPA was signed that described the case as "under investigation" and that failed to inform them of the NPA. The letters were sent by an FBI administrative employee who was not directly involved in the investigation, incorporated standard form language used by the FBI when communicating with victims, and were not drafted or reviewed by the subjects. Moreover, the statement that the matter was "under investigation" was not false because the government in fact continued to investigate the case in anticipation that Epstein would not fulfill the terms of the NPA. However, the letters risked misleading the victims and contributed to victim frustration and confusion by failing to provide important information about the status of the investigation. The letters also demonstrated a lack of coordination between the federal agencies responsible for communicating with Epstein's victims and showed a lack of attention to and oversight regarding communication with victims.

After the NPA was signed, Acosta elected to defer to the State Attorney the decision whether to notify victims about the state's plea hearing pursuant to the state's own victim's rights requirements. Although Acosta's decision was within his authority and did not constitute professional misconduct, OPR concludes that Acosta exercised poor judgment when he failed to make certain that the state intended to and would notify victims identified through the federal investigation about the state plea hearing. His decision left victims uninformed about an important proceeding that resolved the federal investigation, an investigation about which the USAO had communicated with victims for months. It also ultimately created the misimpression that the Department intentionally sought to silence the victims. Acosta failed to ensure that victims were made aware of a court proceeding that was related to their own cases, and thus he failed to ensure that victims were treated with forthrightness and dignity.

285

OPR concludes that the decision to postpone notifying victims about the terms of the NPA after it was signed and the omission of information about the NPA during victim interviews and conversations with victims' attorneys in 2008 do not constitute professional misconduct. Contemporaneous records show that these actions were based on strategic concerns about creating impeachment evidence that Epstein's victims had financial motives to make claims against him, evidence that could be used against victims at a trial, and were not for the purpose of silencing victims. Nonetheless, the failure to reevaluate the strategy prior to interviews of victims and discussions with victims' attorneys occurring in 2008 led to interactions that contributed to victims' feelings that the government was intentionally concealing information from them.

After examining the full scope and context of the government's interactions with victims, OPR concludes that the government's lack of transparency and its inconsistent messages led to victims feeling confused and ill-treated by the government; gave victims and the public the misimpression that the government had colluded with Epstein's counsel to keep the NPA secret from the victims; and undercut public confidence in the legitimacy of the resulting agreement. The overall result of the subjects' anomalous handling of this case understandably left many victims feeling ignored and frustrated and resulted in extensive public criticism. In sum, OPR concludes that the victims were not treated with the forthrightness and sensitivity expected by the Department.

# METHODOLOGY

### A.    Document Review

As referenced in the Executive Summary, OPR obtained and reviewed hundreds of thousands of pages of documents from the U.S. Attorney's Office for the Southern District of Florida (USAO), other U.S. Attorney's offices, the FBI, and other Department components, including the Office of the Deputy Attorney General, the Criminal Division, and the Executive Office for U.S. Attorneys (EOUSA).  The categories of documents reviewed by OPR, and their sources, are set forth below.

### 1.    USAO Records

The USAO provided OPR with access to all of its records from its handling of the Epstein investigation and the CVRA litigation.  The records included, but were not limited to, boxes of material that Villafaña updated and maintained through the course of both actions, which contained pleadings from the Epstein investigation, the CVRA litigation, and other related cases; extensive compilations of internal and external correspondence, including letters and emails; evidence such as telephone records, FBI reports, material received from the state investigation, and other confidential investigative records; court transcripts; investigative transcripts; prosecution team handwritten notes; research material; and draft and final case documents such as the NPA, prosecution memoranda, and federal indictments.

The USAO also provided OPR with access to filings, productions, and privileged material in the CVRA litigation; Outlook data collected to respond to production requests in that case; a set of Epstein case documents maintained by Acosta and Sloman; computer files regarding the Epstein case collected by Sloman; Villafaña's Outlook data; Acosta's hard drive; and the permanently retained official U.S. Attorney records of Acosta held by the Federal Records Center.

### 2.    EOUSA Records

EOUSA provided OPR with Outlook data from all five subjects and six additional witnesses.  This information, dating back to 2005, included all inbox, outbox, sent, deleted, and saved emails, and calendar entries that it maintained.  EOUSA provided OPR with over 850,000 Outlook records in total (not including email attachments or excluding duplicate records).  OPR identified key time periods and fully reviewed those records.  OPR applied search terms to the remainder of the records and reviewed any responsive documents.

After reviewing the emails, OPR identified a data gap in Acosta's email records:  his inbox contained no emails from May 26, 2007, through November 2, 2008.  This gap, however, was not present with respect to Acosta's sent email.  OPR requested that EOUSA investigate.  During its investigation, EOUSA discovered a data association error that incorrectly associated Acosta's data with an unrelated employee who had a similar name.  Once the data was properly associated, EOUSA found and produced 11,248 Acosta emails from April 3, 2008, through the end of his tenure at the USAO.  However, with respect to the remaining emails, EOUSA concluded that the emails were not transferred from the USAO when, in 2008 and 2009, Outlook data for all U.S.

Attorney's Offices was migrated to EOUSA's centralized system to be maintained. The USAO's data was migrated between March and June 2008.

EOUSA and OPR separately confirmed with the USAO that it was unable to locate any additional emails. OPR questioned Acosta, as well as numerous administrative staff, about the email gap. Acosta and the witnesses denied having any knowledge of the problem, or that they or, to their knowledge, anyone else made any efforts to intentionally delete the emails. In addition, at OPR's request, EOUSA conducted an analysis of records migrated from four other U.S. Attorney's Offices and found that each office provided data that also contained significant gaps in their U.S. Attorney email records, although the time periods varied for each office. OPR found no evidence indicating that the gap in Acosta's emails was caused by any intentional act or for the purpose of concealing evidence relating to the Epstein investigation and concludes that it was most likely the result of a technological error.

Although a gap in Acosta's email inbox from May 26, 2007, through April 2, 2008, remained, OPR was nonetheless able to examine a significant number of Acosta's emails from this time due to the extensive case files kept by the USAO; the availability of Acosta's sent email, which did not contain a similar gap; and the availability of emails of other USAO subjects and witnesses who were included on emails with Acosta.

### 3.  Federal Bureau of Investigation Records

OPR worked with the FBI's Palm Beach Office, including with two case agents and the Victim Witness Specialist who worked on the Epstein matter, to obtain relevant FBI documents. In addition, the FBI searched its Automated Case Support system and also provided documentation concerning its victim notification system.

### 4.  Criminal Division Records

The Office of the Assistant Attorney General for the Criminal Division provided OPR with Outlook data for the four individuals from that Office who examined issues connected to the USAO's Epstein investigation. The data included the individuals' inbox, outbox, sent, deleted, and saved emails, and calendar entries.

CEOS also provided OPR with Outlook data for the four individuals from that office who worked on, or examined issues connected to, the USAO's Epstein investigation. The data included the individuals' inbox, outbox, sent, deleted, and saved emails. CEOS also conducted a check of its shared hard drive and provided documents that were potentially relevant to OPR's investigation.

### 5.  Office of the Deputy Attorney General Records

OPR obtained Outlook data for the three individuals from the Office of the Deputy Attorney who examined issues connected to the USAO's Epstein investigation, including the former Deputy Attorney General. The data included the individuals' inbox, outbox, sent, deleted, and saved emails, and calendar entries.

### 6. U.S. Attorney's Office for the Middle District of Florida Records

The U.S. Attorney's Office for the Middle District of Florida provided OPR with records related to its review of evidence against Epstein, after he concluded his Florida state sentence, when the Department recused the USAO in August 2011 from "all matters, to include the investigation and potential prosecution, relating to Jeffrey Epstein's alleged sexual activities with minor females," and assigned the matter to the Middle District of Florida U.S. Attorney's Office for further consideration.  The records included a declination of the matter due to the NPA.

### 7. U.S. Attorney's Office for the Northern District of Georgia Records

The U.S. Attorney's Office for the Northern District of Georgia provided OPR with records related to its work on the CVRA litigation after the recusal of the USAO.

### 8. Public Records

OPR obtained and reviewed a variety of public records, including publicly released records of the Palm Beach Police Department, the State Attorney's Office for the 15th Judicial Circuit, and the Palm Beach Sheriff's Office; documents pertaining to the CVRA litigation and other court proceedings involving Epstein and related individuals; and books and media reports.

### B. Information from Subjects, Witnesses, and Victims

### 1. Subjects

OPR requested that all five subjects provide written responses detailing their involvement in the federal investigation of Epstein, the drafting and execution of the NPA, and decisions relating to victim notification and consultation.  In addition, OPR conducted extensive interviews of each subject under oath and before a court reporter.  Each subject was represented by counsel and had access to relevant contemporaneous documents before the subject's OPR interview.  The subjects reviewed and provided comments on their interview transcripts and on OPR's draft report.

### 2. Witnesses

OPR conducted more than 60 interviews of witnesses, including the FBI case agents, their supervisors, and FBI administrative personnel.  OPR interviewed current and former USAO staff and attorneys and current and former Department attorneys and senior managers, including former Deputy Attorney General Mark Filip and former Assistant Attorney General for the Criminal Division Alice Fisher.  OPR also interviewed former State Attorney Barry Krischer and former Assistant State Attorney Lanna Behlolovick.

### 3. Communications with Victims and Victims' Attorneys

OPR contacted attorneys known to represent 26 victims among the 30 surviving individuals who were identified in the USAO's July 2008 listing of 32 victims the USAO was prepared to include in federal charges against Epstein and who accordingly were entitled to the benefits of the 18 U.S.C. § 2255 monetary damages provision of the NPA.  OPR contacted the attorneys to invite

289

the victims to provide OPR with information regarding their contacts with, and notification received from, the FBI and USAO, during the period before the NPA was signed or before Epstein's state plea hearing, about the status of the federal investigation, about Epstein's state plea, or about the NPA.  OPR received information from or pertaining to 13 victims.

# EXHIBIT 1

## State Indictment

[Page Intentionally Left Blank]

# INDICTMENT

A TRUE BILL   06-9454CF
A-2

## IN THE NAME OF AND BY THE AUTHORITY OF THE STATE OF FLORIDA

### IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT OF THE STATE OF FLORIDA

For Palm Beach County, at the Spring Term thereof, in the year of our Lord Two Thousand and Six, to-wit:

The Grand Jurors of the State of Florida, inquiring in and for the body of said County of Palm Beach, upon their

oaths do present that JEFFREY E. EPSTEIN in the County of Palm Beach aforesaid, in the Circuit and State

aforesaid,

## COUNT ONE
## FELONY SOLICITATION OF PROSTITUTION

on or about or between the 1st day of August in the year of our Lord Two Thousand and Four and October 31,

2005, did solicit, induce, entice, or procure another to commit prostitution lewdness, or assignation, contrary to

Florida Statute 796.07(1) on three or more occasions between August 01, 2004 and October 31, 2005,

contrary to Florida Statute 796.07(2)(f) and (4)(c).  (3 DEG FEL)(LEVEL 1)

against the form of the statute, to the evil example of all others, and against the peace and dignity of the State

of Florida.

I hereby certify that I have advised the Grand Jury returning this indictment as authorized and required by law.

STATE OF FLORIDA
I hereby certify that the
foregoing is a true copy
for the record in my office.
THIS _____ DAY OF _____, 20 ___
SHARON R. BOCK
CLERK & COMPTROLLER
BY _____ DEPUTY CLERK

Assistant State Attorney of the
Fifteenth Judicial Circuit of the State
of Florida, prosecuting for the said
State

GRAND JURY FOREPERSON

July 19, 2006
DATE

Jeffrey E. Epstein, Race: White, Sex: Male, DOB: ▓▓▓▓▓▓   SS#: ▓▓▓▓▓▓   Issue Warrant

[Page Intentionally Left Blank]

# EXHIBIT 2

September 6, 2007
Draft Non-Prosecution
Agreement

[Page Intentionally Left Blank]

**IN RE:**
**INVESTIGATION OF**
**JEFFREY EPSTEIN**
_____/


## <u>NON-PROSECUTION AGREEMENT</u>

IT APPEARING that Jeffrey Epstein (hereinafter "Epstein") is reported to have committed offenses against the United States from in or around 2001 through in or around October 2005, including:

(1)     knowingly and willfully conspiring with others known and unknown to commit an offense against the United States, that is, to use a facility or means of interstate or foreign commerce to knowingly persuade, induce, or entice minor females to engage in prostitution, in violation of Title 18, United States Code, Section 2422(b); all in violation of Title 18, United States Code, Section 371;

(2)     knowingly and willfully conspiring with others known and unknown to travel in interstate commerce for the purpose of engaging in illicit sexual conduct, as defined in 18 U.S.C. § 2423(f), with minor females, in violation of Title 18, United States Code, Section 2423(b); all in violation of Title 18, United States Code, Section 2423(e);

(3)     using a facility or means of interstate or foreign commerce to knowingly persuade, induce, or entice minor females to engage in prostitution; in violation of Title 18, United States Code, Sections 2422(b) and 2;

(4)     traveling in interstate commerce for the purpose of engaging in illicit sexual conduct, as defined in 18 U.S.C. § 2423(f), with minor females; in violation of Title 18, United States Code, Section 2423(b); and

(5)     knowingly, in and affecting interstate and foreign commerce, recruiting, enticing, and obtaining by any means a person, knowing that the person had not attained the age of 18 years and would be caused to engage in a commercial sex act as defined in 18 U.S.C. § 1591(c)(1); in violation of Title 18, United States Code, Sections 1591(a)(1) and 2; and

IT APPEARING that Epstein has accepted responsibility for his behavior by his

signature on this Agreement; and

IT APPEARING, after an investigation of the offenses and Epstein's background, that the interest of the United States and Epstein's own interest and the interest of justice will be served by the following procedure;

THEREFORE, on the authority of R. Alexander Acosta, United States Attorney for the Southern District of Florida, prosecution in this District for these offenses shall be deferred in favor of prosecution by the State of Florida, provided that Epstein abides by the following conditions and the requirements of this Agreement set out below.

Should Epstein violate any of the conditions of this Agreement, the United States Attorney may at any time initiate prosecution against Epstein for any offense.  In this case, the United States Attorney will furnish Epstein with notice specifying the conditions of the Agreement which he has violated.

After timely fulfilling all the terms and conditions of the Agreement, no prosecution for the offenses set out on page 1 of this Agreement will be instituted in this District, and the charges against Epstein if any, will be dismissed.

Neither this Agreement nor any other document filed with the United States Attorney as part of this Agreement will be used against Epstein, except for impeachment purposes, in connection with any prosecution for the above-described offenses.

Terms of the Agreement:

1.   Epstein shall plead guilty (not nolo contendere) to an Information filed by the State Attorney's Office for the 15th Judicial Circuit in and for Palm Beach County (hereinafter, the "State Attorney's Office") charging violations of the following Florida Statutes:

(a)   lewd and lascivious battery on a child, in violation of Fl. Stat. 800.04(4);

(b)   solicitation of minors to engage in prostitution, in violation of Fl. Stat. 796.03; and

(c)   engaging in sexual activity with minors at least sixteen years of age, in violation of Fl. Stat. 794.05.

2.   Epstein and the State Attorney's Office shall make a joint, binding recommendation that Epstein serve at least two years in prison, without any opportunity for withholding adjudication or sentencing; and without probation or community control in lieu of imprisonment.

3.     Epstein shall waive all challenges to the Information filed by the State Attorney's Office and shall waive the right to appeal his conviction and sentence.

4.     Epstein agrees that, if any of the victims identified in the federal investigation file suit pursuant to 18 U.S.C. § 2255, Epstein will not contest the jurisdiction of the U.S. District Court for the Southern District of Florida over his person and/or the subject matter, and Epstein will not contest that the identified victims are persons who, while minors, were victims of violations of Title 18, United States Code, Sections(s) 2422 and/or 2423.

5.     The United States shall provide Epstein's attorneys with a list of the identified victims, which will not exceed forty, after Epstein has signed this agreement and entered his guilty plea.  The United States shall make a motion with the United States District Court for the Southern District of Florida for the appointment of a guardian ad litem for the identified victims and Epstein's counsel may contact the identified victims through that counsel.

6.     Epstein shall enter his guilty plea and be sentenced not later than September 28, 2007, and shall begin service of his sentence not later than October 15, 2007.

By signing this agreement, Epstein asserts and certifies that each of these terms is material to this agreement and is supported by independent consideration and that a breach of any one of these conditions allows the United States to elect to terminate the agreement and to investigate and prosecute Epstein for any and all federal offenses.

By signing this agreement, Epstein asserts and certifies that he is aware of the fact that the Sixth Amendment to the Constitution of the United States provides that in all criminal prosecutions the accused shall enjoy the right to a speedy and public trial.  Epstein further is aware that Rule 48(b) of the Federal Rules of Criminal Procedure provides that the Court may dismiss an indictment, information, or complaint for unnecessary delay in presenting a charge to the Grand Jury, filing an information, or in bringing a defendant to trial.  Epstein hereby requests that the United States Attorney for the Southern District of Florida defer such prosecution.  Epstein agrees and consents that any delay from the date of this Agreement to the date of initiation of prosecution, as provided for in the terms expressed herein, shall be deemed to be a necessary delay at his own request, and he hereby waives any defense to such prosecution on the ground that such delay operated to deny him rights under Rule 48(b) of the Federal Rules of Criminal Procedure and the Sixth Amendment to the Constitution of the United States to a speedy trial or to bar the prosecution by reason of the running of the statute of limitations for a period of months equal to the period between the signing of this agreement and the breach of this

agreement.  Epstein further asserts and certifies that he understands that the Fifth Amendment and Rule 7(a) of the Federal Rules of Civil Procedure provide that all felonies must be charged in an indictment presented to a grand jury.  Epstein hereby agrees and consents that, if a prosecution against him is instituted, it may be by way of an Information signed and filed by the United States Attorney, and hereby waives his right to be indicted by a grand jury.

By signing this agreement, Epstein asserts and certifies that the above has been read and explained to him.  Epstein hereby states that he understands the conditions of this non-Prosecution Agreement and agrees to comply with them.


Dated: _____          _____
                            Jeffrey Epstein


Dated: _____          _____
                            Roy Black, Esq.
                            Counsel to Jeffrey Epstein

                            R. ALEXANDER ACOSTA
                            UNITED STATES ATTORNEY


Dated: _____          _____
                       By:  A. Marie Villafaña
                            Assistant United States Attorney

# EXHIBIT 3

## September 24, 2007 Non-Prosecution Agreement

[Page Intentionally Left Blank]

IN RE:
INVESTIGATION OF
JEFFREY EPSTEIN

_____/

## NON-PROSECUTION AGREEMENT

IT APPEARING that the City of Palm Beach Police Department and the State Attorney's Office for the 15th Judicial Circuit in and for Palm Beach County (hereinafter, the "State Attorney's Office") have conducted an investigation into the conduct of Jeffrey Epstein (hereinafter "Epstein");

IT APPEARING that the State Attorney's Office has charged Epstein by indictment with solicitation of prostitution, in violation of Florida Statutes Section 796.07;

IT APPEARING that the United States Attorney's Office and the Federal Bureau of Investigation have conducted their own investigation into Epstein's background and any offenses that may have been committed by Epstein against the United States from in or around 2001 through in or around September 2007, including:

(1)     knowingly and willfully conspiring with others known and unknown to commit an offense against the United States, that is, to use a facility or means of interstate or foreign commerce to knowingly persuade, induce, or entice minor females to engage in prostitution, in violation of Title 18, United States Code, Section 2422(b); all in violation of Title 18, United States Code, Section 371;

(2)     knowingly and willfully conspiring with others known and unknown to travel in interstate commerce for the purpose of engaging in illicit sexual conduct, as defined in 18 U.S.C. § 2423(f), with minor females, in violation of Title 18, United States Code, Section 2423(b); all in violation of Title 18, United States Code, Section 2423(e);

(3)     using a facility or means of interstate or foreign commerce to knowingly persuade, induce, or entice minor females to engage in prostitution; in violation of Title 18, United States Code, Sections 2422(b) and 2;

(4)     traveling in interstate commerce for the purpose of engaging in illicit sexual conduct, as defined in 18 U.S.C. § 2423(f), with minor females; in violation

Page 1 of 7

of Title 18, United States Code, Section 2423(b); and

(5)    knowingly, in and affecting interstate and foreign commerce, recruiting, enticing, and obtaining by any means a person, knowing that the person had not attained the age of 18 years and would be caused to engage in a commercial sex act as defined in 18 U.S.C. § 1591(c)(1); in violation of Title 18, United States Code, Sections 1591(a)(1) and 2; and

IT APPEARING that Epstein seeks to resolve globally his state and federal criminal liability and Epstein understands and acknowledges that, in exchange for the benefits provided by this agreement, he agrees to comply with its terms, including undertaking certain actions with the State Attorney's Office;

IT APPEARING, after an investigation of the offenses and Epstein's background by both State and Federal law enforcement agencies, and after due consultation with the State Attorney's Office, that the interests of the United States, the State of Florida, and the Defendant will be served by the following procedure;

THEREFORE, on the authority of R. Alexander Acosta, United States Attorney for the Southern District of Florida, prosecution in this District for these offenses shall be deferred in favor of prosecution by the State of Florida, provided that Epstein abides by the following conditions and the requirements of this Agreement set forth below.

If the United States Attorney should determine, based on reliable evidence, that, during the period of the Agreement, Epstein willfully violated any of the conditions of this Agreement, then the United States Attorney may, within ninety (90) days following the expiration of the term of home confinement discussed below, provide Epstein with timely notice specifying the condition(s) of the Agreement that he has violated, and shall initiate its prosecution on any offense within sixty (60) days' of giving notice of the violation. Any notice provided to Epstein pursuant to this paragraph shall be provided within 60 days of the United States learning of facts which may provide a basis for a determination of a breach of the Agreement.

After timely fulfilling all the terms and conditions of the Agreement, no prosecution for the offenses set out on pages 1 and 2 of this Agreement, nor any other offenses that have been the subject of the joint investigation by the Federal Bureau of Investigation and the United States Attorney's Office, nor any offenses that arose from the Federal Grand Jury investigation will be instituted in this District, and the charges against Epstein if any, will be dismissed.

Terms of the Agreement:

1.  Epstein shall plead guilty (not nolo contendere) to the Indictment as currently pending against him in the 15th Judicial Circuit in and for Palm Beach County (Case No. 2006-cf-009495AXXXMB) charging one (1) count of solicitation of prostitution, in violation of Fl. Stat. § 796.07. In addition, Epstein shall plead guilty to an Information filed by the State Attorney's Office charging Epstein with an offense that requires him to register as a sex offender, that is, the solicitation of minors to engage in prostitution, in violation of Florida Statutes Section 796.03;

2.  Epstein shall make a binding recommendation that the Court impose a thirty (30) month sentence to be divided as follows:

    (a)  Epstein shall be sentenced to consecutive terms of twelve (12) months and six (6) months in county jail for all charges, without any opportunity for withholding adjudication or sentencing, and without probation or community control in lieu of imprisonment; and

    (b)  Epstein shall be sentenced to a term of twelve (12) months of community control consecutive to his two terms in county jail as described in Term 2(a), *supra*.

3.  This agreement is contingent upon a Judge of the 15th Judicial Circuit accepting and executing the sentence agreed upon between the State Attorney's Office and Epstein, the details of which are set forth in this agreement.

4.  The terms contained in paragraphs 1 and 2, *supra*, do not foreclose Epstein and the State Attorney's Office from agreeing to recommend any additional charge(s) or any additional term(s) of probation and/or incarceration.

5.  Epstein shall waive all challenges to the Information filed by the State Attorney's Office and shall waive the right to appeal his conviction and sentence, except a sentence that exceeds what is set forth in paragraph (2), *supra*.

6.  Epstein shall provide to the U.S. Attorney's Office copies of all

proposed agreements with the State Attorney's Office prior to entering into those agreements.

7.    The United States shall provide Epstein's attorneys with a list of individuals whom it has identified as victims, as defined in 18 U.S.C. § 2255, after Epstein has signed this agreement and been sentenced. Upon the execution of this agreement, the United States, in consultation with and subject to the good faith approval of Epstein's counsel, shall select an attorney representative for these persons, who shall be paid for by Epstein. Epstein's counsel may contact the identified individuals through that representative.

8.    If any of the individuals referred to in paragraph (7), *supra*, elects to file suit pursuant to 18 U.S.C. § 2255, Epstein will not contest the jurisdiction of the United States District Court for the Southern District of Florida over his person and/or the subject matter, and Epstein waives his right to contest liability and also waives his right to contest damages up to an amount as agreed to between the identified individual and Epstein, so long as the identified individual elects to proceed exclusively under 18 U.S.C. § 2255, and agrees to waive any other claim for damages, whether pursuant to state, federal, or common law. Notwithstanding this waiver, as to those individuals whose names appear on the list provided by the United States, Epstein's signature on this agreement, his waivers and failures to contest liability and such damages in any suit are not to be construed as an admission of any criminal or civil liability.

9.    Epstein's signature on this agreement also is not to be construed as an admission of civil or criminal liability or a waiver of any jurisdictional or other defense as to any person whose name does not appear on the list provided by the United States.

10.   Except as to those individuals who elect to proceed exclusively under 18 U.S.C. § 2255, as set forth in paragraph (8), *supra*, neither Epstein's signature on this agreement, nor its terms, nor any resulting waivers or settlements by Epstein are to be construed as admissions or evidence of civil or criminal liability or a waiver of any jurisdictional or other defense as to any person, whether or not her name appears on the list provided by the United States.

11.   Epstein shall use his best efforts to enter his guilty plea and be

sentenced not later than October 26, 2007. The United States has no objection to Epstein self-reporting to begin serving his sentence not later than January 4, 2008.

12.     Epstein agrees that he will not be afforded any benefits with respect to gain time, other than the rights, opportunities, and benefits as any other inmate, including but not limited to, eligibility for gain time credit based on standard rules and regulations that apply in the State of Florida. At the United States' request, Epstein agrees to provide an accounting of the gain time he earned during his period of incarceration.

13.     The parties anticipate that this agreement will not be made part of any public record. If the United States receives a Freedom of Information Act request or any compulsory process commanding the disclosure of the agreement, it will provide notice to Epstein before making that disclosure.

Epstein understands that the United States Attorney has no authority to require the State Attorney's Office to abide by any terms of this agreement. Epstein understands that it is his obligation to undertake discussions with the State Attorney's Office and to use his best efforts to ensure compliance with these procedures, which compliance will be necessary to satisfy the United States' interest. Epstein also understands that it is his obligation to use his best efforts to convince the Judge of the 15th Judicial Circuit to accept Epstein's binding recommendation regarding the sentence to be imposed, and understands that the failure to do so will be a breach of the agreement.

In consideration of Epstein's agreement to plead guilty and to provide compensation in the manner described above, if Epstein successfully fulfills all of the terms and conditions of this agreement, the United States also agrees that it will not institute any criminal charges against any potential co-conspirators of Epstein, including but not limited to 
. Further, upon execution of this agreement and a plea agreement with the State Attorney's Office, the federal Grand Jury investigation will be suspended, and all pending federal Grand Jury subpoenas will be held in abeyance unless and until the defendant violates any term of this agreement. The defendant likewise agrees to withdraw his pending motion to intervene and to quash certain grand jury subpoenas. Both parties agree to maintain their evidence, specifically evidence requested by or directly related to the grand jury subpoenas that have been issued, and including certain computer equipment, inviolate until all of the terms of this agreement have been satisfied. Upon the successful completion of the terms of this agreement, all outstanding grand jury subpoenas shall be deemed withdrawn.

By signing this agreement, Epstein asserts and certifies that each of these terms is material to this agreement and is supported by independent consideration and that a breach of any one of these conditions allows the United States to elect to terminate the agreement and to investigate and prosecute Epstein and any other individual or entity for any and all federal offenses.

By signing this agreement, Epstein asserts and certifies that he is aware of the fact that the Sixth Amendment to the Constitution of the United States provides that in all criminal prosecutions the accused shall enjoy the right to a speedy and public trial. Epstein further is aware that Rule 48(b) of the Federal Rules of Criminal Procedure provides that the Court may dismiss an indictment, information, or complaint for unnecessary delay in presenting a charge to the Grand Jury, filing an information, or in bringing a defendant to trial. Epstein hereby requests that the United States Attorney for the Southern District of Florida defer such prosecution. Epstein agrees and consents that any delay from the date of this Agreement to the date of initiation of prosecution, as provided for in the terms expressed herein, shall be deemed to be a necessary delay at his own request, and he hereby waives any defense to such prosecution on the ground that such delay operated to deny him rights under Rule 48(b) of the Federal Rules of Criminal Procedure and the Sixth Amendment to the Constitution of the United States to a speedy trial or to bar the prosecution by reason of the running of the statute of limitations for a period of months equal to the period between the signing of this agreement and the breach of this agreement as to those offenses that were the subject of the grand jury's investigation. Epstein further asserts and certifies that he understands that the Fifth Amendment and Rule 7(a) of the Federal Rules of Criminal Procedure provide that all felonies must be charged in an indictment presented to a grand jury. Epstein hereby agrees and consents that, if a prosecution against him is instituted for any offense that was the subject of the grand jury's investigation, it may be by way of an Information signed and filed by the United States Attorney, and hereby waives his right to be indicted by a grand jury as to any such offense.

/ / /

/ / /

/ / /

By signing this agreement, Epstein asserts and certifies that the above has been read and explained to him. Epstein hereby states that he understands the conditions of this Non-Prosecution Agreement and agrees to comply with them.

R. ALEXANDER ACOSTA
UNITED STATES ATTORNEY

Dated: _____          By:     _____
                                      A. MARIE VILLAFAÑA
                                      ASSISTANT U.S. ATTORNEY

Dated: 9/24/07                        _____
                                      JEFFREY EPSTEIN

Dated: _____                  _____
                                      GERALD LEFCOURT, ESQ.
                                      COUNSEL TO JEFFREY EPSTEIN

Dated: _____                  _____
                                      LILLY ANN SANCHEZ, ESQ.
                                      ATTORNEY FOR JEFFREY EPSTEIN

By signing this agreement, Epstein asserts and certifies that the above has been read and explained to him. Epstein hereby states that he understands the conditions of this Non-Prosecution Agreement and agrees to comply with them.

R. ALEXANDER ACOSTA
UNITED STATES ATTORNEY

Dated: 9/27/07

By:

A. MARIE VILLAFAÑA
ASSISTANT U.S. ATTORNEY

Dated: _____

JEFFREY EPSTEIN

Dated: 9/24/07

GERALD LEFCOURT/ESQ.
COUNSEL TO JEFFREY EPSTEIN

Dated: _____

LILLY ANN SANCHEZ, ESQ.
ATTORNEY FOR JEFFREY EPSTEIN

By signing this agreement, Epstein asserts and certifies that the above has been read and explained to him. Epstein hereby states that he understands the conditions of this Non-Prosecution Agreement and agrees to comply with them.

R. ALEXANDER ACOSTA
UNITED STATES ATTORNEY

Dated: _____    By:    _____

A. MARIE VILLAFAÑA
ASSISTANT U.S. ATTORNEY

Dated: _____      _____

JEFFREY EPSTEIN

Dated: _____      _____

GERALD LEFCOURT, ESQ.
COUNSEL TO JEFFREY EPSTEIN

Dated: 9-24-07      _____

LILLY ANN SANCHEZ, ESQ.
ATTORNEY FOR JEFFREY EPSTEIN

Page 7 of 7

[Page Intentionally Left Blank]

# EXHIBIT 4

# Addendum to the
# Non-Prosecution Agreement

[Page Intentionally Left Blank]

IN RE:

**INVESTIGATION OF**

**JEFFREY EPSTEIN**

_____/

## ADDENDUM TO THE NON-PROSECUTION AGREEMENT

IT APPEARING that the parties seek to clarify certain provisions of page 4, paragraph 7 of the Non-Prosecution Agreement (hereinafter "paragraph 7"), that agreement is modified as follows:

7A.    The United States has the right to assign to an independent third-party the responsibility for consulting with and, subject to the good faith approval of Epstein's counsel, selecting the attorney representative for the individuals identified under the Agreement. If the United States elects to assign this responsibility to an independent third-party, both the United States and Epstein retain the right to make good faith objections to the attorney representative suggested by the independent third-party prior to the final designation of the attorney representative.

7B.    The parties will jointly prepare a short written submission to the independent third-party regarding the role of the attorney representative and regarding Epstein's Agreement to pay such attorney representative his or her regular customary hourly rate for representing such victims subject to the provisions of paragraph C, infra.

7C.    Pursuant to additional paragraph 7A, Epstein has agreed to pay the fees of the attorney representative selected by the independent third party. This provision, however, shall not obligate Epstein to pay the fees and costs of contested litigation filed against him. Thus, if after consideration of potential settlements, an attorney representative elects to file a contested lawsuit pursuant to 18 U.S.C. s 2255 or elects to pursue any other contested remedy, the paragraph 7 obligation of the Agreement to pay the costs of the attorney representative, as opposed to any statutory or other obligations to pay reasonable attorneys fees and costs such as those contained in s 2255 to bear the costs of the attorney representative, shall cease.

By signing this Addendum, Epstein asserts and certifies that the above has been read and explained to him. Epstein hereby states that he understands the clarifications to the Non-Prosecution Agreement and agrees to comply with them.

R. ALEXANDER ACOSTA
UNITED STATES ATTORNEY

Dated: _10/30/07_

By: _____ FAUSA
for A. MARIE VILLAFAÑA
ASSISTANT U.S. ATTORNEY

Dated: _1/29/07_

_____
JEFFREY EPSTEIN

Dated: _____

_____
GERALD LEFCOURT, ESQ.
COUNSEL TO JEFFREY EPSTEIN

Dated: _____

_____
LILLY ANN SANCHEZ, ESQ.
ATTORNEY FOR JEFFREY EPSTEIN

By signing this Addendum, Epstein asserts and certifies that the above has been read and explained to him.  Epstein hereby states that he understands the clarifications to the Non-Prosecution Agreement and agrees to comply with them.

R. ALEXANDER ACOSTA
UNITED STATES ATTORNEY

Dated: *10/30/07*

By: _____ FAUSA
    A. MARIE VILLAFAÑA
    ASSISTANT U.S. ATTORNEY

Dated: _____

JEFFREY EPSTEIN

Dated: *10/29/07*

_____
GERALD LEFCOURT, ESQ.
COUNSEL TO JEFFREY EPSTEIN

Dated: _____

_____
LILLY ANN SANCHEZ, ESQ.
ATTORNEY FOR JEFFREY EPSTEIN

By signing this Addendum, Epstein asserts and certifies that the above has been read and explained to him.  Epstein hereby states that he understands the clarifications to the Non-Prosecution Agreement and agrees to comply with them.

R. ALEXANDER ACOSTA
UNITED STATES ATTORNEY

Dated: _10/30/07_　　　By: _____ FAUSA

A. MARIE VILLAFAÑA
ASSISTANT U.S. ATTORNEY

Dated: _____　　　_____

JEFFREY EPSTEIN

Dated: _____　　　_____

GERALD LEFCOURT, ESQ.
COUNSEL TO JEFFREY EPSTEIN

Dated: _10-29-07_　　　_____

LILLY ANN SANCHEZ, ESQ.
ATTORNEY FOR JEFFREY EPSTEIN

# EXHIBIT 5

# State Information

[Page Intentionally Left Blank]

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, STATE OF FLORIDA
CRIMINAL DIVISION "W" (LB)

08 CF 9381

STATE OF FLORIDA

ARISES FROM BOOKING NO.:
2006036744

vs.

JEFFREY E EPSTEIN, W/M, ▮▮▮▮▮▮▮▮

**INFORMATION FOR:**

1)   PROCURING PERSON UNDER 18 FOR PROSTITUION

In the Name and by Authority of the State of Florida:
BARRY E. KRISCHER, State Attorney for the Fifteenth Judicial Circuit, Palm Beach County, Florida, by and
through his undersigned Assistant State Attorney, charges that JEFFREY E EPSTEIN on or about or between
the 1st day of August in the year of our Lord Two Thousand and Four and October 9, 2005, did knowingly and
unlawfully procure for prostitution, or caused to be prostituted, ▮▮▮, a person under the age of 18 years,
contrary to Florida Statute 796.03. (2 DEG FEL)

LANNA BELOHLAVEK
FL. BAR NO. 0776726
Assistant State Attorney

STATE OF FLORIDA
COUNTY OF PALM BEACH
        Appeared before me, LANNA BELOHLAVEK Assistant State Attorney for Palm Beach County,
Florida, personally known to me, who, being first duly sworn, says that the allegations as set forth in the
foregoing information are based upon facts that have been sworn to as true, and which, if true, would constitute
the offense therein charged, that this prosecution is instituted in good faith, and certifies that testimony under
oath has been received from the material witness or witnesses for the offense.

Assistant State Attorney

Sworn to and subscribed to before me this 26th day of June, 2008.

NOTARY PUBLIC, State of Florida

Damaris Pina
MY COMMISSION # DD580798 EXPIRES
August 2, 2010
BONDED THRU TROY FAIN INSURANCE, INC.

LB/dp

FCIC REFERENCE NUMBERS:
1) FELONY SOLICITATION OF PROSTITUTION 3699

STATE OF FLORIDA · PALM BEACH COUNTY
I hereby certify that the
foregoing is a true copy
of the record in my office.
JUL 22 2008
THIS _____ DAY OF _____, 20 ___
SHARON R. BOCK
CLERK & COMPTROLLER
By _____
DEPUTY CLERK

CA▮       JUN 26 2008

[Page Intentionally Left Blank]