UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------ x
UNITED STATES OF AMERICA,

                v.

GHISLAINE MAXWELL,

                Defendant.

------------------------------------------------------ x

:
:
:
:
:
:
:
:
:
:
:
:

20 Cr. 330 (AJN)


**REPLY MEMORANDUM OF LAW IN SUPPORT OF MS. MAXWELL'S
MOTION TO DISMISS COUNTS FIVE AND SIX OF THE SUPERSEDING
INDICTMENT BECAUSE THE ALLEGED MISSTATEMENTS ARE NOT
PERJURIOUS AS A MATTER OF LAW**

Jeffrey S. Pagliuca
Laura A. Menninger
HADDON, MORGAN & FOREMAN P.C.
150 East 10th Avenue
Denver, CO 80203
Phone: 303-831-7364

Christian R. Everdell
COHEN & GRESSER LLP
800 Third Avenue New
York, NY 10022
Phone: 212-957-7600

Bobbi C. Sternheim
Law Offices of Bobbi C. Sternheim
33 West 19th Street - 4th Floor
New York, NY 10011
Phone: 212-243-1100


*Attorneys for Ghislaine Maxwell*

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................... i

TABLE OF AUTHORITIES ........................................................................................... ii

TABLE OF EXHIBITS .................................................................................................... iii

I.      The Defamation Action.......................................................................................... 1

II.     The Questions Were Fundamentally, and Fatally, Ambiguous ........................... 6

III.    The Questions and Answers Were Immaterial ................................................... 10

CONCLUSION................................................................................................................. 10

Certificate of Service ...................................................................................................... 12

# TABLE OF AUTHORITIES

**Cases**

*Bronston v. United States,* 409 U.S. 352 (1973) .................................................................. 6, 7, 10

*Giuffre v. Maxwell*, 325 F. Supp. 3d 428 (S.D.N.Y. 2018) ........................................................ 1

*United States v. Bonacorsa,* 528 F.2d 1218 (2d Cir. 1976) ........................................................ 6

*United States v. Bonds*, 580 F. Supp. 2d 925 (N.D. Cal. 2008) .................................................. 9

*United States v. Chujoy,* 207 F. Supp. 3d 626 (W.D. Va. 2016) ................................................ 8

*United States v. Cicalese*, 863 F. Supp. 2d 231 (E.D.N.Y. 2012) ............................................ 7, 9

*United States v. Earp*, 812 F.2d 917 (4th Cir. 1987) .................................................................. 8

*United States v. Edlind*, 887 F.3d 166 (4th Cir. 2018) ................................................................ 8

*United States v. Landau*, 737 F. Supp. 778 (S.D.N.Y. 1990) ...................................................... 7

*United States v. Lighte,* 782 F.2d 367 (2d Cir.1986) .................................................................. 6

*United States v. Litvak*, 808 F.3d 160 (2d Cir. 2015) ................................................................ 10

*United States v. Manapat,* 928 F.2d 1097 (11th Cir.1991) .......................................................... 7

*United States v. Naegele,* 341 B.R. 349 (D.D.C. 2006) .............................................................. 8

*United States v. Reveron Martinez*, 836 F.2d 684 (1st Cir. 1988) .............................................. 8

*United States v. Ruedlinger*, 990 F. Supp. 1295 (D. Kan. 1997) ................................................ 9

**Rules**

Fed. R. Civ. P. 32(1)(b) .............................................................................................................. 6

## TABLE OF EXHIBITS

EXHIBIT L: Order Denying Motion to Join Under Rule 21 *Doe v. United States*, No. 08-80736-Civ-Marra/Johnson (S.D. Fla. Apr. 7, 2016)

EXHIBIT M: Motion for Joinder *Doe v. United States*, No. 08-80736-Civ-Marra/Johnson (S.D. Fla. Jan. 2, 2015)

EXHIBIT N: Ross Gow Email re. statement on behalf of Ghislaine Maxwell dated Jan. 2, 2015

The government misunderstands both the law and the facts related to the *Giuffre v. Maxwell* defamation litigation. Although the government aspires to present "a more streamlined presentation" at trial (Resp. 118 fn. 46), it is unlikely to meet this goal. What follows is a very truncated discussion of some of the facts to place the questions and answers in Ms. Maxwell's depositions from that civil action in context:

## I.   The Defamation Action

In 2008, two alleged Epstein victims brought an action under the Crime Victims' Rights Act (CVRA) against the United States government purporting to challenge Epstein's plea agreement. They alleged the government violated their CVRA rights by entering into the agreement.

Seven years later, on December 30, 2014, Ms. Giuffre moved to join the CVRA action, claiming she too had her CVRA rights violated by the government. On January 1, 2015, Ms. Giuffre filed a "corrected" joinder motion. The issue presented in her joinder motion was narrow: whether she should be permitted to join the CVRA action as a party under Federal Rule of Civil Procedure 21, specifically, whether she was a "known victim[] of Mr. Epstein and the Government owed them CVRA duties," Ex. L at 5. Yet, the court noted, "the bulk of the [motion] consists of copious factual details that [Giuffre] and [her co-movant] 'would prove . . . if allowed to join.'" *Id.* (brackets omitted). Ms. Giuffre gratuitously included provocative and "lurid details" of her alleged sexual activities as an alleged victim of sexual trafficking. *Id.*

At the time they filed the motion, Ms. Giuffre and her lawyers knew that the media had been following the Epstein criminal case and the CVRA action. While they deliberately filed the motion without disclosing Ms. Giuffre's name, claiming the need for privacy and secrecy, they made no attempt to file the motion under seal. Quite the contrary, they filed the motion publicly. As the district court noted in ruling on the joinder motion, Ms. Giuffre "name[d] several

1

individuals, and she offers details about the type of sex acts performed and where they took place." Ex. L at 5. The court ruled the lurid details are unnecessary": "The factual details regarding whom and where the Jane Does engaged in sexual activities are immaterial and impertinent . . ., especially considering that these details involve non-parties who are not related to the respondent Government." *Id.* Accordingly, "[t]hese unnecessary details shall be stricken." *Id.* The court then struck all Ms. Giuffre's factual allegations relating to her alleged sexual activities and her allegations of misconduct by non-parties. *Id.* at 5-6. The court said the striking of the "lurid details" was a sanction for Ms. Giuffre's improper inclusion of them in her motion. *See id.* at 6-7. The district court found not only that the "lurid details" were unnecessary but also that the entire joinder motion was "entirely unnecessary." *Id.* at 7.

Ms. Giuffre and her lawyers knew the motion with all its "lurid details" was unnecessary because, as the court pointed out, the motion itself recognized that she would be able to participate as a fact witness to achieve the same result she sought as a party. *See id.* at 7-8; *see also id.* at 8 (noting that in the motion, Ms. Giuffre's lawyers said that "regardless of whether this Court grants the . . . Motion, 'they will call [her] as a witness at any trial'"). The court denied Giuffre's joinder motion. *Id.* at 10. One of the non-parties Ms. Giuffre "named" repeatedly in the joinder motion was Ms. Maxwell. Ex. M, at 3-6. According to the "lurid details" Ms. Giuffre included in the motion, Ms. Maxwell personally was involved in a "sexual abuse and sex trafficking scheme" created by Epstein:

- Ms. Maxwell "approached" Giuffre in 1999 when Giuffre was "fifteen years old" to recruit her into the scheme. *Id.* at 3.

- Ms. Maxwell was "one of the main women" Epstein used to "procure under-aged girls for sexual activities." *Id.*

- Ms. Maxwell was a "primary co-conspirator" with Epstein in his scheme. *Id.*

- She "persuaded" Giuffre to go to Epstein's mansion "in a fashion very similar to the manner in which Epstein and his other co-conspirators coerced dozens of other children." *Id*.

- Ms. Maxwell "appreciated the immunity" she acquired under Epstein's plea agreement, because the immunity protected her from prosecution "for the crimes she committed in Florida." *Id*.

- Ms. Maxwell "assist[ed] in internationally trafficking" Giuffre and "numerous other young girls for sexual purposes." *Id*.

- Giuffre was "forced" to watch Epstein, Ms. Maxwell and others "engage in illegal sexual acts with dozens of underage girls." *Id*.

In the joinder motion, Giuffre also alleged she was "forced" to have sex with Harvard law professor Alan Dershowitz, "model scout" Jean Luc Brunel, and "many other powerful men, including numerous prominent American politicians, powerful business executives, foreign presidents, a well-known Prime Minister, and other world leaders." *Id.* at 4-6.

Giuffre said after serving for four years as a "sex slave," she "managed to escape to a foreign country and hide out from Epstein and his co-conspirators for years." *Id*. at 3.

Giuffre suggested the government was part of Epstein's "conspiracy" when it "secretly" negotiated a non-prosecution agreement with Epstein precluding federal prosecution of Epstein and his "co-conspirators." *Id.* at 6. The government's secrecy, Giuffre alleged, was motivated by its fear that Giuffre would raise "powerful objections" to the agreement that would have "shed tremendous public light on Epstein and other powerful individuals." *Id*. at 6-7.

As Giuffre and her lawyers expected, before District Judge Marra in the CVRA action could strike the "lurid details" of Giuffre's allegations in the joinder motion, members of the media obtained copies of the motion, printed the "lurid" details in tabloid news publications, and sought comment from Ms. Maxwell, Professor Dershowitz and others.

On January 2, 2015, UK lawyers for Ms. Maxwell sent representatives of British media organizations an email containing "a quotable statement on behalf of Ms. Maxwell." The email

was sent to more than 6 and probably less than 30 media representatives. The email to the media

members read:

> To Whom It May Concern,
>
> Please find attached a quotable statement on behalf of Ms. Maxwell.  No further
> communication will be provided by her on this matter.
>
> Thanks for your understanding.
>
> Best
>
> Ross
>
> Ross Gow
>
> ACUITY Reputation
>
> Jane Doe 3 is Virginia Roberts—so not a new individual. The allegations made by
> Victoria Roberts against Ghislaine Maxwell are untrue. The original allegations
> are not new and have been fully responded to and shown to be untrue.
>
> Each time the story is re told [sic] it changes with new salacious details about
> public figures and world leaders and now it is alleged by Ms Roberts [sic] that
> Alan Derschowitz [sic] is involved in having sexual relations with her, which he
> denies.
>
> Ms Roberts claims are obvious lies and should be treated as such and not
> publicised as news, as they are defamatory.
>
> Ghislaine Maxwell's original response to the lies and defamatory claims remains
> the same. Maxwell strongly denies allegations of an unsavoury nature, which
> have appeared in the British press and elsewhere and reserves her right to seek
> redress at the repetition of such old defamatory claims.

Ex. N.

Eight years after Epstein's guilty plea, Giuffre brought the defamation action, repeating

many of the allegations she made in her CVRA joinder motion. The complaint alleged that the

January 2015 statement "contained the following deliberate falsehoods":

> (a) That Giuffre's sworn allegations "against Ghislaine Maxwell are untrue."
>
> (b) That the allegations have been "shown to be untrue."
>
> (c) That Giuffre's "claims are obvious lies."

The defamation litigation was legally very complicated and New York law afforded many statutory, common law, and constitutional defenses to Ms. Maxwell (which may become relevant at another time). In addition to strong legal defenses Ms. Maxwell's defense of truth was exceptional. It was clear that given the wording of Mr. Gow's statement, proof of falsity of one or more of Giuffre's claims would be enough to defeat the civil action.  Very quickly there were many provable "obvious lies." A few examples:

- Contrary to her claim of "slavery," Giuffre lived independently from her parents with her fiancé long before meeting Epstein or Ms. Maxwell and held a number of jobs in 2001 and 2002.
- Giuffre's employment at the Mar-a-Lago spa began in fall 2000 when she was **17**, not **15**. (This falsity was important to Giuffre's story for many reasons.)
- Palm Beach Police investigation revealed no evidence that Ms. Maxwell was involved in sexual abuse of minors, sexual trafficking or production or possession of child pornography.
- No nude photograph of Giuffre was displayed in Epstein's home.
- Giuffre's tales about foreign presidents and prime ministers were untrue.
- All of the famous people Giuffre claimed to have been sexually trafficked to denied these claims, which were completely implausible.

Importantly, Giuffre post-dates the allegations contained in the superseding indictment ("Indictment") by three years.  By her claims, and admissions, she did not meet Epstein until 2000, long after the accusers named in the Indictment. Her strong connection with these accusers developed through her lawyers who likely represent at least two of the accusers and some of the witnesses.

Virtually every issue in the defamation action was contested. A review of the docket, unfortunately, reflects over one-thousand entries. The parties disagreed about the scope and meaning of virtually all of Judge Sweet's discovery orders, including those related to Ms. Maxwell's depositions.  Significantly, Judge Sweet's Order prefaced all the listed categories with the words "sexual activity" an "sexual activities."

As expected, both depositions were hostile. The questions posed to Ms. Maxwell were poorly phrased without regard to the rules of evidence. Accordingly, counsel for Ms. Maxwell was required to object many times.  As this court knows, civil litigants are limited to three types of objections:  form, foundation, and privilege. When those objections are posed, the examiner has the opportunity to ask for the basis of the objection. It is not incumbent, indeed it is not permitted, for the objecting lawyer to expound on the basis for the objection unless asked.

Virtually all of the questions that form the basis of Counts Five and Six were the subject of valid objections.  A prerequisite to use of deposition testimony at trial is that the testimony must be admissible under the Federal Rules of Evidence as if the deponent were present and testifying. Fed. R. Civ. P. 32(1)(b).  The form and foundation of the questions asked were improper and largely not relevant in the context of the defamation action. It is unlikely that any of the answers would have been admitted at any trial.

## II.  The Questions Were Fundamentally, and Fatally, Ambiguous

In addition to being poorly phrased, the questions were unquestionably ambiguous. "[W]hen a line of questioning is so vague as to be 'fundamentally ambiguous,' the answers associated with the questions posed may be insufficient as a matter of law to support [a] perjury conviction." *United States v. Lighte,* 782 F.2d 367 (2d Cir. 1986); *see also United States v. Bonacorsa,* 528 F.2d 1218, 1221 (2d Cir. 1976). "Precise questioning is imperative as a predicate for the offense of perjury." *Bronston v. United States,* 409 U.S. 352, 362 (1973).  "A question is fundamentally ambiguous when it is not a phrase with a meaning about which men of ordinary intellect could agree, nor one which could be used with mutual understanding by a questioner and answerer unless it were defined at the time it were sought and offered as testimony." *Lighte*, 782 F.2d at 375 (cleaned up).  Here, the questions were "fundamentally ambiguous," containing particular undefined terms, "scheme" and "recruit" for example.

The government complains that Ms. Maxwell has not cited any cases where a perjury count was dismissed pretrial for "fundamental ambiguity." Resp. 120. Of course, the government must know that myriad examples exist. *United States v. Cicalese*, 863 F. Supp. 2d 231, 236–37 (E.D.N.Y. 2012), is instructive:

> Succinctly, the prosecutor did not fulfill her obligation to "pin the witness down to the specific object of [her] inquiry." *Bronston*, 409 U.S. at 360. Any number of straightforward follow-up questions could have clarified the object of inquiry. For example, in addition to the "attempt" question mentioned earlier, the government could have cured the ambiguity by supplying the date, time or location of the target meeting, focusing Cicalese's attention on the specific events at issue. *See Razzaia,* 370 F.Supp. at 578–79. Left naked, the government's imprecise question did not meet the standard set in *Bronston*. It cannot provide a jury with a sufficient basis to reasonably conclude that Cicalese willfully lied by answering as he did. *Id.* at 579. Asking simple follow-up questions could have resolved the imprecision and fulfilled the government's obligation under *Bronston.* Whether by strategy or inadvertence, the government did not do so.

The Court granted Cicalese's motion to dismiss the charges against him. *Id.* at 232.

Similarly, in *United States v. Landau*, 737 F. Supp. 778 (S.D.N.Y. 1990), the court dismissed a perjury indictment, holding "*the context of all the preceding questions and Landau's grand jury testimony as a whole*, the prosecutor's questions here are fundamentally ambiguous and cannot as a matter of law to support a perjury conviction. Landau's motion is therefore granted and the indictment is dismissed." *Id.* at 784–85 (emphasis added).  The same is true here. In the context of the questions preceding the selectively quoted testimony in Counts Five and Six and the transcripts as a whole, the selected questions were fundamentally ambiguous.

In *United States v. Manapat,* 928 F.2d 1097 (11th Cir.1991), the Eleventh Circuit affirmed an acquittal on the grounds of fundamental ambiguity as a result of the content of the form that was the basis of the prosecution. There, the defendant applied for an Airman Medical Certificate to the Federal Aviation Administration. The application included a section entitled "Medical History" that contained twenty-four questions regarding "conditions." The first twenty-

one "conditions" questions were all medical in nature. The twenty-second and twenty-third

questions, however, inquired about convictions (one about "traffic convictions," the other about

"other convictions").  Manapat answered in the negative to both question twenty-two and

question twenty-three, and these answers became the basis for his prosecution for "knowingly

and willfully" making false statements to any department or agency of the United States. In

affirming the district court's decision to dismiss the indictment, the Eleventh Circuit stated:

> Although the single statements "Record of traffic convictions," or "Record of other
> convictions" may not be ambiguous standing alone, they become quite confusing
> when buried in a list headed "Medical History" and purportedly concerned with
> medical conditions.... In order to successfully prosecute an indictment for making
> a false statement, the government must not remove questions from the context in
> which their answers were given in an attempt to prove their clarity.

*Id.* at 1101.

Also helpful is *United States v. Chujoy,* 207 F. Supp. 3d 626, 654–55 (W.D. Va.

2016), *aff'd sub nom. United States v. Edlind*, 887 F.3d 166 (4th Cir. 2018), *and aff'd*, 770 F.

App'x 33 (4th Cir. 2019), where the court dismissed multiple perjury and false statement claims,

holding:

> Moreover, it is not perjurious for [the defendant] to give an evasive answer to a
> broadly-worded question, so long as her response was not false. *See United States
> v. Reveron Martinez*, 836 F.2d 684, 689 (1st Cir. 1988) ("In order to sustain a
> perjury charge, evasions are not enough. The government must show more than that
> the interdicted statement was unresponsive or guarded. At a bare minimum, the
> remark must have been literally false."); *United States v. Earp*, 812 F.2d 917, 919
> (4th Cir. 1987) ("The burden is on the questioner to pin the witness down to the
> specific object of the questioner's inquiry."); *United States v. Naegele,* 341 B.R.
> 349, 359 (D.D.C. 2006) ("[I]n the context of perjury charges based on adversarial
> questioning, it is not the declarant's burden to provide candid answers.").
> Accordingly, the government failed to offer sufficient evidence that Edlind's first
> two answers—that she had dinner with Kwiatkowski in April—were false. No
> reasonable juror could conclude otherwise.

In *United States v. Ruedlinger*, 990 F. Supp. 1295, 1303–04 (D. Kan. 1997), the court after

"carefully review[ing] the allegations" found that the perjury charge must be dismissed. The

8

court held that the ambiguity of both questions rendered the answers insufficient as a matter of

law to support a perjury conviction.  The courts holding is equally applicable here:

> Precise questioning is imperative as a predicate for the offense of perjury. A perjury
> conviction cannot be based upon evasive answers or even upon misleading answers
> so long as they are literally true. In the face of evasion or misleading answers, it is
> the lawyer's duty to bring the witness back to the mark, to flush out the whole truth
> with the tools of adversary examination. When a line of questioning is so vague as
> to be fundamentally ambiguous, the answers associated with the questions posed
> may be insufficient as a matter of law to support a perjury conviction (cleaned up).

And, finally, although there are more, in *United States v. Bonds*, 580 F. Supp. 2d 925, 931 (N.D.

Cal. 2008), the court ruled that using the terms "anything like" in connection with a perjury

prosecution in a professional baseball steroid investigation created a serious problem. The

government argued, similar to the claims here that, in context, this phrase refers to "anything like

steroids that could have led to a positive steroid test." According to  the court, the use of the

qualifier made the question fundamentally ambiguous requiring dismissal of the count.

      The government, at page 133 of its Response, incorrectly suggests that the burden was on

Ms. Maxwell or her counsel to clarify the confused questions, particularly regarding the infinite

time span. First, that is simply wrong.  The questioner has the responsibility to ask clear

questions and to "pin down" the witness. *Cicalese*, 863 F. Supp. 2d 231, 236–37.  It is the

government, not Ms. Maxwell who is engaging in post-hoc definitions about undefined terms

"scheme" and "interact with" (Count Five); and about the "presence" of certain items, or

Epstein's possession of  "items" used in "activities,"  her "awareness" of what Epstein was doing

when she wasn't with him in a "millennium" and giving a "massage." (Count Six).  Because the

questions were so bad, the government spends significant energy trying to rationalize what the

questioner meant.

      The answers to the bad, ambiguous, objectionable questions were also "literally

true." *Bronston v. United States,* 409 U.S. 352 (1973), makes clear that an individual cannot be

convicted of perjury for an answer given under oath that is literally true, even if it is
unresponsive and intended to mislead. The Court noted that "[t]he burden is on the questioner to
pin the witness down to the specific object of the questioner's inquiry." *Id.* at 360. The answers
to the questions in Counts Five and Six are "literally true" as discussed in detail in Ms.
Maxwell's moving brief.

## III.   The Questions and Answers Were Immaterial

The government is confusing arguable "relevance" and "materiality" which "are not
synonymous." *United States v. Litvak*, 808 F.3d 160, 174 (2d Cir. 2015). It is not enough that any
alleged "misrepresentation" concern "a variable that mattered to the" recipient of the
information. The government must prove that alleged misstatements were "capable of
influencing a decision" of the intended recipient. *Id.* It remains unclear how the government will
argue this issue. However, the questions were improper and could not have produced admissible
evidence for a jury to consider. There was nothing "influenced" on the part of the questioners
who would not have accepted any answer from Ms. Maxwell as true. Moreover, the questions
were not calculated to lead to discoverable evidence.

## CONCLUSION

The Court has the necessary transcripts to decide this issue in Ms. Maxwell's favor,
pretrial. Accordingly, Ms. Maxwell requests that the Court dismiss Counts Five and Six.

Dated: March 15, 2021

Respectfully submitted,


*s/ Jeffrey S. Pagliuca*

Jeffrey S. Pagliuca
Laura A. Menninger
HADDON, MORGAN & FOREMAN P.C.
150 East 10th Avenue
Denver, CO 80203
Phone: 303-831-7364

Christian R. Everdell
COHEN & GRESSER LLP
800 Third Avenue
New York, NY 10022
Phone: 212-957-7600

Bobbi C. Sternheim
Law Offices of Bobbi C. Sternheim
33 West 19th Street - 4th Floor
New York, NY 10011
Phone: 212-243-1100

*Attorneys for Ghislaine Maxwell*

**Certificate of Service**

I hereby certify that on March 15, 2021, I served by email, pursuant Rule 2(B) of the Court's individual practices in criminal cases, the *Reply Memorandum of Law in Support of Ms. Maxwell's Motion to Dismiss Counts Five and Six of the Superseding Indictment Because the Alleged Misstatements are not Perjurious as a Matter of Law* upon the following:

Alison Moe
Maurene Comey
Andrew Rohrbach
Lara Pomerantz
U.S. Attorney's Office, SDNY
One Saint Andrew's Plaza
New York, NY 10007
Alison.moe@usdoj.gov
Maurene.comey@usdoj.gov
Andrew.Rohrbach@usdoj.gov
Lara.Pomerantz@usdoj.gov

*s/ Christian R. Everdell*