UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x

UNITED STATES OF AMERICA,

       v.

GHISLAINE MAXWELL,

             Defendant.

----------------------------------------------------------------x

20 Cr. 330 (AJN)

**REPLY MEMORANDUM OF GHISLAINE MAXWELL
IN SUPPORT OF HER MOTION TO DISMISS THE SUPERSEDING INDICTMENT
<u>FOR BREACH OF THE NON-PROSECUTION AGREEMENT</u>**

Christian R. Everdell
COHEN & GRESSER LLP
800 Third Avenue New
York, NY 10022
Phone: 212-957-7600

Jeffrey S. Pagliuca
Laura A. Menninger
HADDON, MORGAN & FOREMAN P.C.
150 East 10th Avenue
Denver, CO 80203
Phone: 303-831-7364

Bobbi C. Sternheim
Law Offices of Bobbi C. Sternheim
33 West 19th Street - 4th Floor
New York, NY 10011
Phone: 212-243-1100

*Attorneys for Ghislaine Maxwell*

## <u>TABLE OF CONTENTS</u>

**Page**

I.     The NPA Applies to Ms. Maxwell, and She Has Standing to Enforce It. .......................... 2

II.    The Co-Conspirator Immunity Provision is Not Limited to the SDFL. ............................ 7

III.   The Co-Conspirator Immunity Provision Is Not Limited to the 2001-07 Time
       Period or to Violations of Specific Statutes. ...................................................... 13

IV.    In the Alternative, the Court Should Conduct Discovery and an Evidentiary Hearing
       Regarding the Parties' Intent. ......................................................................... 16

       CONCLUSION .......................................................................................... 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bank of New York Mellon Trust Co. v. Morgan Stanley Mortg. Capital, Inc.*,
    821 F.3d 297 (2d Cir. 2016)....................................................................................... 8, 9

*Collins v. Univ. of Notre Dame Du Lac*,
    929 F.3d 830 (7th Cir. 2019) ...................................................................................... 8, 9

*Penncro Assocs., Inc. v. Sprint Spectrum, L.P.*,
    499 F.3d 1151 (10th Cir. 2007) .................................................................................. 8, 9

*United States v. Aleman*,
    286 F.3d 86 (2d Cir. 2002)............................................................................................ 17

*United States v. Annabi*,
    771 F.2d 670 (2d Cir. 1985).................................................................................... passim

*United States v. CFW Const. Co.*,
    583 F. Supp. 197 (D.S.C. 1984), *aff'd,* 749 F.2d 33 (4th Cir. 1984) .......................... 6

*United States v. El-Sadig*,
    133 F. Supp. 2d 600 (N.D. Ohio 2001)..................................................................... 3, 6

*United States v. Feldman*,
    939 F.3d 182 (2d Cir. 2019)......................................................................... 5, 6, 10, 17

*United States v. Florida West Int'l Airways, Inc.*,
    853 F. Supp. 2d 1209 (S.D. Fla. 2012) .................................................................. 3, 4, 6

*United States v. Gebbie*,
    294 F.3d 540 (3d Cir. 2002)........................................................................................... 12

*United States v. Gonzalez*,
    93 F. App'x 268 (2d Cir. 2004) ..................................................................................... 8

*United States v. Harvey*,
    791 F.2d 294 (4th Cir. 1986) ........................................................................................ 12

*United States v. Mariamma Viju (01)*,
    No. 3:15-CR-0240-B, 2016 WL 107841 (N.D. Tex. Jan. 11, 2016) .......................... 6

*United States v. Padilla*,
    186 F.3d 136 (2d Cir. 1999).......................................................................................... 10

*United States v. Sattar,*
  272 F. Supp. 2d 348 (S.D.N.Y. 2003)........................................................................... 17

*United States v. Van Thornout,*
  100 F.3d 590 (8th Cir. 1996) .................................................................................... 12

**Other Authorities**

Dienst, J., Valiquette, J., Winter, T., and Fitzpatrick, S. "Jeffrey Epstein Confidante Ghislaine
  Maxwell Arrested on Sex Abuse Charges." *NBC New York.* July 3, 2020 ............................ 15

Ghislaine Maxwell respectfully submits this Memorandum in Support of her Motion to Dismiss the Superseding Indictment for Breach of the Non-Prosecution Agreement ("Motion").

As though it were wielding an invisible ink pen, the government adds language to its Non-Prosecution Agreement ("NPA") with Jeffrey Epstein that does not exist in the text, and then pretends no one can see the clear, unambiguous language that *does* appear there.  The plain language of the NPA states, without limitation, that "the United States . . . will not institute any criminal charges against any potential co-conspirators of Epstein."  Because the Superseding Indictment ("Indictment") contends that Ms. Maxwell was a co-conspirator of Epstein, the NPA, on its face, applies here.  Thus, the government's only argument, which it makes throughout its opposition, is that the NPA means something other than what it says.

In suggesting that the parties to the NPA intended to immunize only the four individuals specifically named in the co-conspirator immunity provision, the government flagrantly ignores the express statement that immunity is "not limited to" those individuals.  In arguing that the provision binds only the United States Attorney's Office for the Southern District of Florida ("USAO-SDFL"), the government asks the Court to add the words "in this District" to that provision, on the thin suggestion that the parties must have meant to include the same limitation on location of prosecution that they included in Epstein's immunity provision, even though they failed to do so.  And for good measure, the government asks the Court to find that the parties must have intended to limit co-conspirator immunity to specific statutory offenses committed between 2001 and 2007, even though—again—no such limitation appears in the text of the co-conspirator immunity provision.

Notwithstanding the bedrock principle that plea agreements are construed strictly against the government, the government asks the Court to simply assume that the parties intended the

NPA to be read more narrowly than the language provides, arguing that following the NPA's plain language would contradict "common sense."  (Opp.[1] 8, 16.)  But a non-prosecution agreement is not an ordinary contract.  Federal prosecutors know how to draft clear limitations on promises made to criminal defendants, and they have a unique obligation to do so.  What strains "common sense" is the notion that any reasonable prosecutor who intended the NPA to be read as the government contends would have omitted the limitations and modifications the government now seeks—particularly when dealing with a defendant who sought to "resolve globally" his criminal liability.  NPA at 2.  The Court should therefore decline the government's invitation to rewrite the NPA to its liking, should enforce the NPA as written, and should grant Ms. Maxwell's Motion.

In the alternative, the Court should permit discovery and hold an evidentiary hearing to determine the parties' intent with respect to the co-conspirator immunity provision.  While Ms. Maxwell contends that the NPA unambiguously bars her prosecution here, and that neither discovery nor a hearing is necessary for the Court to grant this motion, the government's arguments regarding the NPA parties' intent simply cannot be credited without the consideration of evidence.  Because Ms. Maxwell, as a nonparty, has no personal knowledge regarding the parties' intent and no access to relevant documents, she should be permitted to take discovery in advance of any hearing.

I.      **The NPA Applies to Ms. Maxwell, and She Has Standing to Enforce It.**

The NPA's co-conspirator immunity provision forecloses "any criminal charges against *any* potential co-conspirators of Epstein, including but not limited to" four named individuals.  NPA at 5 (emphasis added).  The phrase "potential co-conspirators of Epstein" obviously includes Ms. Maxwell.  As the opening statement of the Indictment makes clear:  "The charges

---

[1] "Opp." refers herein to the Government's Omnibus Opposition to the Defendant's Pre-Trial Motions.

set forth herein stem from the role of [Ms. Maxwell] in the sexual exploitation and abuse of multiple minor girls by Jeffrey Epstein."  Indictment ¶ 1.  The Indictment also contains two conspiracy counts that charge Ms. Maxwell with conspiring with Epstein.  *Id.* ¶¶ 9, 15.

According to the government, however, Ms. Maxwell's status as an alleged co-conspirator of Epstein is somehow insufficient for an NPA that immunizes "potential co-conspirators of Epstein" to apply to her.  The government claims that there is "no evidence that the parties intended to confer a benefit on her in particular."  Opp. 20.  In essence, the government implausibly argues that even though the parties expressly agreed to immunize "any potential co-conspirators of Epstein," only those individuals whom the parties were thinking about "in particular" qualify for immunity.  The government cites no support for the rule it has concocted, and case law is to the contrary.

For example, in *United States v. Florida West Int'l Airways, Inc.,* 853 F. Supp. 2d 1209 (S.D. Fla. 2012), where a corporation had entered into a plea agreement that immunized its employees, the court held that one of those employees had standing to enforce the agreement as a third-party beneficiary by virtue of his employment; the court did not require a showing that the parties thought about protecting that employee "in particular" when they agreed to immunize the class.  *Id.* at 1228.  Similarly, in *United States v. El-Sadig,* 133 F. Supp. 2d 600 (N.D. Ohio 2001), where a Saudi prince had entered into an agreement with the government that none of the individuals involved in purchasing guns for two members of the Saudi royal family would be prosecuted, the court did not require the defendant to show that the government and the prince intended to immunize him "in particular"; to the contrary, as the court noted, the parties to the agreement did not even discuss the defendant.  *Id.* at 604.

Ms. Maxwell thus need not show that the parties to the NPA were thinking of her "in particular"; rather, it is sufficient that she falls within the class of individuals the parties to the NPA intended to benefit.  *See, e.g., Florida West,* 853 F. Supp. 2d at 1228 ("the signatory parties unmistakably intended to confer immunity on a discrete class of corporations and individuals . . . that could include the Defendants").   And that class is clear from the face of the NPA:  "any potential co-conspirators of Epstein," *i.e.,* anyone else who might be prosecuted in connection with Epstein's conduct.  NPA at 5.

Although the NPA expressly provides that that class is "including but not limited to" the four individuals named in the co-conspirator immunity provision (NPA at 5), the government asks the Court to disregard this plain language and instead credit a passage from the report of the Department of Justice's Office of Professional Responsibility ("OPR Report"[2]) stating that the line prosecutor who negotiated the NPA "believed" that only the four individuals expressly named in the co-conspirator immunity provision "would benefit."  Opp. 20-21 (quoting OPR Report at 167).  Regardless of the truth of this decade-after-the-fact and self-serving "belief," it is immaterial.  By agreeing to immunize "potential" co-conspirators "including but not limited to" the four named individuals, the government explicitly agreed that the NPA would apply to any others who might be charged as co-conspirators in the future—a class that includes Ms. Maxwell.

The OPR Report itself re-affirms the intent to extend immunity beyond those already identified as potential co-conspirators.  In reviewing the negotiating history of the parties over this provision, the OPR Report notes that the government had not specifically contemplated other potential co-conspirators, yet it also demonstrates that the Epstein defense lawyers consistently

---

[2] The OPR Report, of which only the executive summary had been released previously, has been submitted as Exhibit 3 to the government's opposition.

and successfully pushed back against the government's attempts to limit the scope of the provision. Epstein's lawyers, in fact, insisted on a proposal that would have immunized the four individuals, "any employee" of one of Epstein's companies, *and* "any unnamed co-conspirators for any criminal charge that arises out of the ongoing federal investigation." OPR Report at 166 n.237. Defense counsel's efforts were in line with their representations to the government that Epstein "wanted to make sure that he's the only one who takes the blame for what happened." *Id.* at 167 (internal quotations omitted). When the government "finally revised" the language to the provision that appears in the signed NPA, it obviously acceded to defense's counsel's desire to leave open the possibility that other "potential co-conspirators" might someday have occasion to invoke the immunity provision. *Id.* at 166.

In addition to being irrelevant, the government's argument that Ms. Maxwell had largely escaped its attention at the time of the NPA is demonstrably incorrect. The government's own file demonstrates that the FBI had interviewed Accuser-2[3] in 2006 (Opp. 16 n.9; Dkt. 148, Ex. B (sealed)), and thus had obviously learned of Accuser-2's claims regarding Ms. Maxwell now included in the Indictment. Indeed, an internal FBI document expressly names Ms. Maxwell as one of the individuals that the FBI's Miami office "began investigating" in 2006 as part of the investigation that led to the NPA. (*See* Ex. A). Thus, the government was clearly aware of Ms. Maxwell at the time it executed the NPA and agreed to extend the immunity provision to "any potential co-conspirators." She is covered by the NPA.

As a third party immunized by the NPA, Ms. Maxwell has third-party beneficiary status to enforce it. While the government cites *United States v. Feldman*, 939 F.3d 182 (2d Cir. 2019), for the proposition that "plea agreements differ from commercial contracts" (Opp. 18), the "differ[ence]" to which the Second Circuit was referring was that in construing a plea agreement,

---

[3] Accuser-2 is identified in the Indictment as Minor Victim-2.

courts hold the government to an even *higher* standard than parties to a commercial contract. *Feldman,* 939 F.3d at 189 (describing "meticulous standards of performance" to which prosecutors are held in negotiating plea agreements). As the government acknowledges, at least three courts have applied the third-party beneficiary doctrine to confer standing on third parties to enforce immunity provisions in plea agreements. *Florida West*, 853 F. Supp. 2d at 1228; *El-Sadig,* 133 F. Supp. 2d at 608-09; *United States v. CFW Const. Co.*, 583 F. Supp. 197, 203 (D.S.C. 1984)*, aff'd,* 749 F.2d 33 (4th Cir. 1984). The government's attempt to distinguish these cases on the ground that they did not "analyze" the applicability of the third-party beneficiary doctrine to plea agreements (Opp. 19) is utterly nonsensical. As demonstrated in Ms. Maxwell's opening memorandum ("Mem."), all three courts expressly held that the doctrine applies. Mem. 16-17.

The lone case cited by the government to the contrary does not suggest a different result here. In *United States v. Mariamma Viju (01),* the court held that a third party may not enforce rights under a plea agreement "[w]here the defendant himself can obtain relief" from a broken plea deal." No. 3:15-CR-0240-B, 2016 WL 107841, *4 (N.D. Tex. Jan. 11, 2016). Here, Epstein cannot obtain relief for the government's breach of the NPA; not only is he deceased, but he served the sentence stemming from his guilty plea long before his death, paid millions of dollars to accusers under the NPA's claims provision, and thus would have had no occasion to enforce the NPA by withdrawing his guilty plea. Nor is it clear that Epstein could have withdrawn his plea had the NPA been breached while he was serving his sentence, given that the NPA—unlike a plea agreement—was not submitted to the state court in which Epstein entered his plea.

In sum, the Indictment itself establishes Ms. Maxwell as a "potential co-conspirator of Epstein," and the clear weight of authority vests her with standing to enforce the co-conspirator immunity provision as a third-party beneficiary.

## II.      The Co-Conspirator Immunity Provision is Not Limited to the SDFL.

Ms. Maxwell demonstrated in her opening brief that the NPA, read as a whole, creates an affirmative appearance that the parties intended the co-conspirator immunity provision—unlike Epstein's immunity provision—to apply outside the Southern District of Florida ("SDFL").  In arguing that the NPA's selective use of language limiting the scope of Epstein's immunity applies to the *entire* NPA, the government inverts fundamental principles of contract law and asks the Court to read nonexistent limitations into the NPA.  The government then, incredibly, proceeds to fault Ms. Maxwell—a nonparty to the NPA—for failing to possess and produce evidence regarding the parties' intent in negotiating the agreement.  While the text of the NPA, read using basic principles of contractual interpretation, unambiguously prohibits the government from prosecuting Epstein's potential co-conspirators in any district, to the extent that the Court finds it necessary to consider extrinsic evidence, that evidence is in the hands of the government and Epstein's attorneys—and thus Ms. Maxwell should be permitted to obtain it through discovery.

The government argues that application of the co-conspirator immunity provision beyond the SDFL is barred by *United States v. Annabi*, 771 F.2d 670 (2d Cir. 1985) (per curiam), in which the Second Circuit stated that "[a] plea agreement binds only the office of the United States Attorney for the district in which the plea is entered unless it affirmatively appears that the agreement contemplates a broader restriction." *Id.* at 672.[4]  Ms. Maxwell's opening brief

---

[4] Contrary to the government's suggestion, no court has held that an "affirmative[] appear[ance]" requires an explicit "promise to bind other districts." *See* Opp. 4.  Rather, in interpreting a plea agreement, "[t]he court looks to the

demonstrated that the NPA, as a whole, gives rise to such an appearance—and the government offers no reasonable alternative interpretation.

Unlike *Annabi* and its progeny, the NPA here contains significant evidence of the parties' intent to apply the co-conspirator immunity provision outside the SDFL.  While the provision granting immunity to Epstein himself expressly limits his immunity to prosecutions "in this District," NPA at 2, the co-conspirator immunity provision contains no such limitation. "[W]here contract provisions use different language, courts must assume the parties intended different meanings." *Bank of New York Mellon Trust Co. v. Morgan Stanley Mortg. Capital, Inc.*, 821 F.3d 297, 309 (2d Cir. 2016); *see also Collins v. Univ. of Notre Dame Du Lac,* 929 F.3d 830, 841 (7th Cir. 2019) (noting "common, if not automatic presumption" that "when parties to the same contract use such different language to address parallel issues, it is reasonable to infer that they intend this language to mean different things") (internal punctuation and citation omitted); *Penncro Assocs., Inc. v. Sprint Spectrum, L.P.*, 499 F.3d 1151, 1156-57 (10th Cir. 2007) (same).  Thus, the appropriate inference here is that the parties intended to limit Epstein's immunity, but not immunity for potential co-conspirators, to prosecutions in the Southern District of Florida ("SDFL").

The government offers no reasonable alternative explanation for the contrasting language in the two provisions.  Instead, it argues that because the parties limited Epstein's immunity to the SDFL, they must have meant to limit co-conspirators' immunity to the SDFL as well, but must have forgotten to include the appropriate language.  This argument—that the use of different language in parallel provisions compels an inference that *identical*, rather than different meanings, are intended—turns fundamental contract interpretation on its head.  *See, e.g., Bank of*

---

reasonable understanding of the parties as to the terms of the agreement."  *United States v. Gonzalez,* 93 F. App'x 268, 270 (2d Cir. 2004) (internal citations and emphasis omitted).

*New York Mellon Trust Co.*, 821 F.3d at 309; *Collins,* 929 F.3d at 841; *Penncro Assocs.*, 499 F.3d at 1156-57.  Here, the NPA contains only two immunity provisions:  one for Epstein, which is expressly limited to the SDFL, and one for co-conspirators, which is not.  The government's claim that this distinction reflects an intent to apply the limitation universally strains credulity.[5] It is simply inconceivable that any reasonable prosecutor who intended to limit the co-conspirator immunity provision to the SDFL—and who had thought to include precisely such limiting language in Epstein's immunity provision—would have found it unnecessary to include identical language in the co-conspirator immunity provision.  Indeed, the omission reveals an intent *not* to so limit that provision.

Ms. Maxwell's opening memorandum pointed out a second indication in the text of the NPA that the parties intended to apply the co-conspirator immunity provision outside the SDFL: where a provision in the NPA is intended to refer only to the USAO-SDFL, it does so explicitly. *See* Mem. at 8-9 (citing examples of NPA's explicit references to USAO-SDFL).  While the government is correct that the use of the term "the United States" in a plea agreement, *without more,* is insufficient under *Annabi* and its progeny to demonstrate an intent to bind other districts, the NPA's references to *both* the USAO-SDFL *and* "the United States" require an inference that a distinction between the two is intended—and that where "the United States" is used, the intent is to refer to the government as a whole.  Again, "where contract provisions use different language, courts must assume the parties intended different meanings."  *Bank of New York Mellon Trust Co.*, 821 F.3d at 309.  The government does not even attempt to offer an

---

[5] The government incorrectly cites to a brief filed by the USAO-SDFL in 2013 as taking the position that "the NPA did not bind other districts."  Opp. 13 (quoting Government Brief, 08 Civ. 80736 (KAM), Dkt. No. 205-2, at 10-11 (S.D. Fla.)).  But the cited passage in that brief argued only that the NPA did not bar the prosecution of *Epstein* in other districts, which is not in dispute; it made no such argument with respect to the prosecution of potential co-conspirators.  In any event, any self-serving attempts by the USAO-SDFL to limit the NPA's applicability years after it was executed—after the NPA had been widely criticized and scrutinized—are no more probative of the parties' intent in 2007 than the arguments made by the government here.

alternative explanation for this difference in terminology, reasonable or otherwise—presumably because it cannot.

Thus, a drafting prosecutor who intended to limit the co-conspirator immunity provision to the SDFL clearly knew how to do so, using either of two methods employed elsewhere in the document.  The government could have used the same language in the co-conspirator immunity provision that it used in the Epstein immunity provision, providing that "the United States . . . will not institute any criminal charges *in this District* against any potential co-conspirators of Epstein."  It did not.  Alternatively, it could have referred expressly to the USAO-SDFL, as it did elsewhere in the NPA, and provided that "the *United States Attorney's Office* . . . will not institute any criminal charges against any potential co-conspirators of Epstein."  Again, it did not.  It would be absurd to conclude that a reasonable prosecutor who had used both drafting tools to limit other provisions of the NPA, yet failed to use either of them in the co-conspirator immunity provision, intended to impose the same limitations on the co-conspirator immunity provision—let alone that Epstein would reasonably have understood this intent.

The government's inability to provide a reasonable alternative explanation for its use of different language in the different provisions of the NPA removes any potential ambiguity from the co-conspirator immunity provision.  But to the extent there remains any doubt, plea agreements must be construed "strictly against the government," *Feldman,* 939 F.3d at 189 (internal citations omitted), and the government is held "responsible for imprecisions or ambiguities in the agreement."  *United States v. Padilla,* 186 F.3d 136, 142 (2d Cir. 1999).  While the government argues that *Annabi* relieves it of this responsibility where the "imprecisions or ambiguities" relate to the geographic applicability of a plea agreement (Opp. 6 n.2), it cites no authority for this proposition.  While *Annabi* requires an affirmative appearance

that the NPA is binding outside the SDFL, any ambiguity as to whether such an appearance exists must still be resolved against the government.[6]

Nor does the idea that the government agreed to broader immunity for Epstein's potential co-conspirators than for Epstein himself "strain[] common sense," as the government argues. *See* Opp. 8. According to the OPR Report, the line prosecutor stated that her office "considered Epstein to be the top of the food chain, and we wouldn't have been interested in prosecuting anyone else." OPR Report at 70. She also reportedly said that Epstein "wanted to make sure that he's the only one who takes the blame for what happened." *Id.* at 167 (internal quotations omitted). And Epstein and his counsel were clearly aware that the investigation had extended beyond the SDFL and involved New York-based witnesses. Under such circumstances, any competent defense lawyer would have sought the broadest immunity possible for Epstein's potential co-conspirators, in order to limit the potential that he would become embroiled in the prosecution of a third party—and in fact, Epstein did not agree to the NPA until the co-conspirator immunity provision was included. And it is entirely logical that the government agreed to a broader immunity for potential co-conspirators, whom it had no interest in prosecuting, than for Epstein himself, who was the sole focus of the government's prosecution efforts. This outcome is consistent with the language of the NPA.

The text of the NPA, read as a whole, thus creates an affirmative appearance that the co-conspirator immunity provision is not limited to the SDFL, and it is unnecessary for the Court to

---

[6] Notwithstanding the mountain of authority, in this Circuit and elsewhere, articulating the exacting standards to which the government is to be held in negotiating a plea agreement, the government implies that such standards somehow do not apply when the plea agreement is enforced by a third party. Opp. 6 n.2. This suggestion is unsupported by any authority, and the government offers no explanation why its promises of third-party immunity should be held to a lower standard than other provisions of a plea agreement.

consider extrinsic evidence of the parties' intent.[7]  To the extent that the Court finds that extrinsic evidence is relevant, however, the government's argument demonstrates precisely why the Court should permit discovery in this action.  While the government ludicrously faults Ms. Maxwell for failing to produce "documentary evidence" of the parties' intent and the scope of the SDFL investigation (Opp. 10), Ms. Maxwell, as a nonparty to the NPA, has no access to such evidence without discovery.  Any evidence of the parties' intent would be in the possession of the government and Epstein's counsel, and at this stage, Ms. Maxwell can only scour the few clues available to the public—such as a privilege log filed in a related civil lawsuit—for crumbs of information about the negotiation and investigation.

The government's response to those crumbs illustrates why any consideration of extrinsic evidence—which, as noted above, is unnecessary given the unambiguous text of the NPA—should be preceded by discovery.  In her opening memorandum, Ms. Maxwell cited to three pages from the above-referenced privilege log in a civil lawsuit filed by one of Epstein's victims, all of which contain entries reflecting the USAO-SDFL's consultation with the United States Attorney's Office for this District, travel by USAO-SDFL attorneys to New York, or interviews and/or subpoenas of New York-based witnesses.  Mem. at 11 (citing Privilege Log, *Doe v. United States,* Case No. 9:08-CV-80736 (S.D. Fla.), Dkt. No. 212-1 (filed July 19, 2013) ("SDFL Privilege Log"), at 4, 5, 7).  In response, the government has focused on only *one* of those three entries and produced the documents referenced in the privilege log.  *See* Opp. 10.

---

[7] The government's argument that a United States Attorney lacks the "authority" to bind other districts (Opp. 13-14)—and that the government can simply walk away from a plea agreement in which a United States Attorney has not received the approvals prescribed by internal Justice Department guidelines—is unavailing.  The government cites *no* case in which a court has invalidated a plea agreement on this basis, and its argument is contradicted not only by the Third, Fourth, and Eighth circuits—in which the *default* rule is that plea agreements bind other districts—but also by the Second Circuit's statement that a United States Attorney may bind other districts in a plea agreement if there is an affirmative appearance to that effect.  *United States v. Gebbie,* 294 F.3d 540, 547-49 (3d Cir. 2002); *United States v. Van Thornout,* 100 F.3d 590, 594 (8th Cir. 1996); *United States v. Harvey,* 791 F.2d 294, 303 (4th Cir. 1986); *Annabi,* 771 F.2d at 672.

The other two documents remain unavailable to Ms. Maxwell—as, presumably, do other documents whose existence cannot be discovered in the public record. Nor has Ms. Maxwell had the opportunity to question those involved in the investigation and negotiation. It is patently unreasonable for the government to blame Ms. Maxwell for failing to produce evidence relating to the investigation and negotiation leading up to the NPA, while simultaneously opposing her request for discovery and cherry-picking its responses to the limited publicly available information she has been able to identify. That limited information has already yielded supportive documents and more will no doubt follow with further discovery.

III.     **The Co-Conspirator Immunity Provision Is Not Limited to the 2001-07 Time Period or to Violations of Specific Statutes.**

The government's argument that the co-conspirator immunity provision does not apply to the time period or the offenses charged in the Indictment consists of (i) asserting that the NPA says things it does not, in fact, say and (ii) attacking a strawman position, never asserted by Ms. Maxwell, that the NPA gives Ms. Maxwell *carte blanche* immunity from federal prosecution for all past and future criminal conduct of any kind, wherever and whenever committed. The co-conspirator immunity provision simply does not contain the limitations the government now seeks to attribute to it, and Ms. Maxwell's position that it prohibits the Mann Act charges against her is entirely reasonable.[8]

First, the government's assertion that "the NPA contains detailed provisions that limit the scope of the crimes immunized in the agreement" is simply not true. *See* Opp. 15. The NPA contains only vague limitations as to the scope of Epstein's immunity, and no limitations whatsoever as to the scope of immunity for potential co-conspirators.

---

[8] To be clear, Ms. Maxwell does not assert that the NPA forecloses the perjury counts of the Indictment, which arise out of alleged post-NPA conduct.

As to Epstein, the NPA prescribes immunity for three categories of offenses:  (i) "the offenses set out on pages 1 and 2 of this Agreement"; (ii) "any other offenses" that were the subject of the "joint investigation" by the FBI and the USAO-SDFL; and (iii) "any offenses that arose from the Federal Grand Jury investigation."  NPA at 2.  The government's assertion that the NPA bars prosecution only for "the specific offenses enumerated in the NPA" (Opp. 15-16) deliberately ignores the second and third categories listed above.  The second category is significant because, contrary to the government's argument, the NPA does *not* purport to "list[] each and every statutory offense under investigation" (*see* Opp. 15); rather, it states only that the investigation involved offenses "including" those enumerated.  NPA at 1.  Moreover, the NPA expressly states that the joint investigation included not only offenses committed from approximately 2001 to 2007, but also "Epstein's background."[9] *Id.*  The scope of the third category—offenses that arose "from the Federal Grand Jury investigation"—is completely unknown, as the NPA neither defines the term "Federal Grand Jury investigation" nor describes its scope.  But the text of the NPA provides no basis for the government's assertion that Epstein was immunized only as to the specific offenses enumerated on the first two pages.

As an example, the USAO-SDFL acknowledges that it interviewed Accuser-2 as part of its investigation.  Opp. 16 n.9.  Thus, the USAO-SDFL obviously was aware of the allegations by Accuser-2 against Epstein as set forth in the Indictment, allegations that entail the 1994-97 time period at issue in this case and the offenses with which Ms. Maxwell is charged.  If the NPA were strictly limited to the 2001-07 time period and to the specific offenses enumerated, as

---

[9] Contrary to the government's argument, Ms. Maxwell does not contend that the NPA "immunize[d] Epstein for his 'background.'"  *See* Opp. 16 n.9.  On its face, however, it immunized Epstein for offenses that were the subject of the joint investigation—an investigation that, according to the NPA, included Epstein's background.  NPA at 1.  To the extent that the joint investigation of Epstein's background uncovered offenses prior to 2001 (such as the conduct underlying the charges against Ms. Maxwell here), the plain language of the NPA immunized Epstein from prosecution for those offenses.

the government claims, it would not have precluded even the SDFL from bringing charges arising out of Accuser-2's allegations of conduct in the 1990s.  The government cannot seriously make such an argument.

Even the vague contours of the limitations on Epstein's immunity, however, are absent from the co-conspirator immunity provision.  And while the government claims it would be "exceedingly strange" to interpret the co-conspirator immunity provision more broadly than Epstein's immunity provision (Opp. 16), as explained in Part II above, such an interpretation is entirely consistent with the government's focus on Epstein vis-à-vis potential co-conspirators.  It would be "exceedingly strange," however, for a federal prosecutor who intended to limit co-conspirator immunity to specific conduct or specific offenses to omit such limitations from the text of an immunity provision in a non-prosecution agreement.

Unable to explain the absence of such limiting language, the government resorts to the *reductio ad absurdum* argument that unless the Court writes into the NPA the language the government now wishes had been included in 2007, Ms. Maxwell can claim that "she is immune from prosecution for *any* federal crime, during *any* time period, *anywhere,* in the United States." Opp. 3 (emphasis in original).  Ms. Maxwell makes no such argument, and a faithful interpretation of the NPA leads to no such conclusion.  Ms. Maxwell contends only that a provision that immunizes "potential co-conspirators of Epstein" precludes their prosecution for conduct allegedly done in conspiracy with Epstein—conduct that even the United States Attorney for this District has characterized as a "prequel" to offenses by Epstein that the NPA undisputedly immunizes.  *See, e.g.,* Dienst, J., Valiquette, J., Winter, T., and Fitzpatrick, S. "Jeffrey Epstein Confidante Ghislaine Maxwell Arrested on Sex Abuse Charges." *NBC New York*. July 3, 2020 (https://www.nbcnewyork.com/news/local/crime-and-courts/ghislaine-

maxwell-arrested-jeffrey-epstein-aide/2495762/).  Such an interpretation, rather than an insertion

into the co-conspirator immunity provision of arbitrary limitations designed to satisfy the

government's interests here, is the "common-sense way to read the NPA" that the Court should

adopt.  *See* Opp. 16.

**IV.**   **In the Alternative, the Court Should Conduct Discovery and an Evidentiary Hearing Regarding the Parties' Intent.**

For the reasons explained above, Counts One through Four have been brought in breach

of the NPA and should be dismissed.  The text of the NPA, read as a whole, unambiguously bars

Ms. Maxwell's prosecution here, and the government is reduced to arguing that the parties *must*

have meant to write various provisions of the NPA differently than they actually did.  These

arguments are manifestly inadequate, and they should be rejected.

Should the Court have any doubt about the parties' intent, however, discovery and an

evidentiary hearing regarding the parties' intent are warranted.  The government's arguments

regarding the parties' intent simply cannot be credited without the presentation of evidence.  For

example, to the extent that the scope of offenses for which the NPA immunized Epstein is

deemed relevant to the co-conspirator immunity provision, that scope cannot be delineated

without determining precisely which offenses might have arisen out of the investigation by the

FBI and the USAO-SDFL (including the investigation into "Epstein's background"), as well as

which offenses arose out of the undefined "Federal Grand Jury investigation."  Similarly, the

government's claims that the parties did not intend to confer the benefit of immunity on Ms.

Maxwell, and that the parties intended to limit the co-conspirator immunity provision to the

SDFL, raise issues regarding the scope of the SDFL investigation, the USAO-SDFL's awareness

of Ms. Maxwell, and the extent to which the investigation involved this District.  These issues

16

cannot be resolved in the government's favor on this record, and the plain language of the NPA cannot be disregarded without discovery and an evidentiary hearing.

The government argues that Ms. Maxwell is not entitled to an evidentiary hearing because she has not submitted affidavits, and that she is not entitled to discovery because she has offered only "conjecture."  Opp. 22.  But unlike the cases the government cites, Ms. Maxwell has submitted evidence far more powerful than an affidavit claiming an oral agreement:  she has submitted the NPA itself, which, on its face, bars her prosecution.  *See Feldman,* 939 F.3d at 184, 190 (hearing based on oral representations made to defendant); *United States v. Aleman,* 286 F.3d 86, 91 (2d Cir. 2002) (granting hearing where defendant submitted attorney affidavits alleging oral agreement); *United States v. Sattar,* 272 F. Supp. 2d 348, 383 (S.D.N.Y. 2003) (same).  Ms. Maxwell's contention that the plain language of the NPA reflects the parties' intent is not "conjecture," and the Court cannot find to the contrary without hearing evidence— evidence that we anticipate would confirm that the parties intended the NPA to mean exactly what it says and that it bars the prosecution of Ms. Maxwell, but is unavailable to Ms. Maxwell without discovery.[10]

---

[10] In addition, unlike the defendants in the cases the government cites, Ms. Maxwell was a nonparty to the NPA, and her attorneys thus have neither firsthand knowledge of the parties' intent nor access to evidence regarding the parties' intent.  While the government points out that Ms. Maxwell has not submitted an affidavit from Epstein's counsel, defense counsel notes that it has made several unsuccessful attempts to obtain information from Jay Lefkowitz, the attorney who was principally involved in negotiating the language of the NPA on Epstein's behalf.

## CONCLUSION

For the reasons set forth herein, Ms. Maxwell respectfully requests that her motion to dismiss be granted.  In the alternative, Ms. Maxwell respectfully requests discovery and evidentiary hearing regarding the parties' intent in negotiating the NPA.

Dated: March 15, 2021
      New York, New York

      Respectfully submitted,


      */s/ Christian R. Everdell*
      Christian R. Everdell
      COHEN & GRESSER LLP
      800 Third Avenue
      New York, NY 10022
      Phone: 212-957-7600

      Jeffrey S. Pagliuca
      Laura A. Menninger
      HADDON, MORGAN & FOREMAN P.C.
      150 East 10th Avenue
      Denver, Colorado 80203
      Phone: 303-831-7364

      Bobbi C. Sternheim
      Law Offices of Bobbi C. Sternheim
      33 West 19th Street - 4th Floor
      New York, NY 10011
      Phone: 212-243-1100

      *Attorneys for Ghislaine Maxwell*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 15, 2021, I served by email, pursuant Rule 2(B) of the Court's individual practices in criminal cases, the within memorandum and any accompanying exhibits upon the following:

Maurene Comey
Alison Moe
Lara Pomerantz
Andrew Rohrbach
U.S. Attorney's Office, SDNY
One Saint Andrew's Plaza
New York, NY 10007
Maurene.comey@usdoj.gov
Alison.moe@usdoj.gov
Lara.Pomerantz@usdoj.gov
Andrew.Rohrbach@usdoj.gov

                              */s/ Christian Everdell*