

**Haddon, Morgan and Foreman,** P.C
**Jeffrey Pagliuca**

150 East 10th Avenue
Denver, Colorado  80203
PH  303.831.7364  FX  303.832.2628
www.hmflaw.com
jpagliuca@hmflaw.com

April 2, 2021

**VIA ECF**

The Honorable Alison J. Nathan
United States District Court
Southern District of New York
40 Foley Square
New York, NY 10007

Re:   Response to Letter Motion to Quash Rule 17 Subpoena to Boies Schiller Flexner LLP
        *United States v. Ghislaine Maxwell*, 20 Cr. 330 (AJN)

Dear Judge Nathan,

      Ms. Maxwell's Rule 17 subpoena directed to Boies Schiller Flexner LLP ("BSF") seeks discrete sets of material relevant to legal issues before the Court now and relevant to the jury at trial.  Each item sought by the subpoena is identified with specificity and is admissible as relevant evidence in this case. The Court should therefore deny BSF's Motion to Quash ("Motion") (Dkt. No. 191) and direct BSF to comply with the subpoena with one narrowing modification to Request 12, the Epstein Victim's Compensation Program ("EVCP") Material. Ms. Maxwell agrees, based on BSF's representations, that the subpoena should be narrowed at this time in one respect.  BSF proffered that they "submitted claims and supporting evidence to the Epstein Victim's Compensation Program on behalf of several Epstein survivors who have not made separate claims against Maxwell." Motion at 5.  BSF acknowledged that that it represents alleged victim 2 and potential trial witnesses Virginia Giuffre and Maria Farmer.  *Id*. at 1, 5.  Ms. Maxwell does not seek production of EVCP materials from any person who is not testifying as a

The Honorable Alison J. Nathan
April 2, 2021
Page 2

government witness in this case. Presumably, BSF is in communication with the government and knows which of their clients will testify. This narrowing language was offered to BSF but rejected during the Court ordered conferral. As to the rest of the items, BSF's boiler-plate arguments fail for the reasons discussed below.

Requests 1-5

BSF argues that Requests 1-5, communications between BSF and the government about Ms. Maxwell, are "overbroad and non-specific." To advance this argument BSF carefully ignores the actual language of Requests 1-5 which are specific as to date and limited by the identified individuals and subject matter. Request 1 is for communications between BSF and the United States Attorney for the Southern District of New York ("USAO-SDNY") starting in 2015 about Ms. Maxwell including the meeting that former SDNY-AUSA-turned-BSF lawyer Peter Skinner (and others) had with then AUSA ▮▮▮▮▮. Request 2 similarly narrowly requests communications regarding ▮▮▮▮▮, an alleged witness against Maxwell being promoted by BSF to the government. Requests 3, 4, and 5 are for communications between BSF and lawyers Brad Edwards, Stanley Pottinger, and Paul Cassell about any meeting with the USAO-SDNY concerning Ghislaine Maxwell or ▮▮▮▮▮.

This is no fishing expedition. The government admits that there were, in fact, meetings and communications between these individuals and the USAO-SDNY about Ms. Maxwell and ▮▮▮▮▮. We know that ▮▮▮▮▮ had at least one in-person meeting (and possibly another) and that she communicated by email and telephone with Mr. Pottinger about ▮▮▮▮▮ who was being proffered to the government as a witness against Ms. Maxwell.

As these requests are narrowly limited by time, subject matter, and participants, it is disingenuous to argue that they fall into the disfavored "any and all" document subpoenas. In

The Honorable Alison J. Nathan
April 2, 2021
Page 3

fact, none of the requests contains the words "any" or "all" because they are specifically limited to communications between BSF and the USAO-SDNY about Ms. Maxwell and ▮▮▮▮▮ and communications between BSF and their co-counsel in the *Giuffre v. Maxwell* matter about those known meetings. BSF tries to cobble an "any or all" argument together by picking the word "any" from the definition section of the subpoena identifying the two entities, BSF and the USAO-SDNY, and attaching it to the word "all" from a separate paragraph defining "communication." Of course, absent these definitions, BSF would be complaining that the subpoena was vague because it failed to define either the entities involved or what was meant by "communication."

Significantly, BSF already identified some of the communications between itself and the government. According to its so called "Plaintiff Virginia Giuffre's Revised Supplemental Privilege Log Dated April 29, 2016," BSF refused to produce as privileged "approx. 57" documents that it identified as "correspondence re the currently ongoing criminal investigation of the Defendant [Ms. Maxwell] and others."[1] Entry 153 in the log identified "email and letter

---

[1] The privilege log was produced in response to an interrogatory, served by Ms. Maxwell's counsel on BSF, as counsel for Virginia Roberts, which asked in relevant part that they "[i]dentify each Communication, including the transmission of any Document, that You or Your Attorneys have had with any local, state or federal law enforcement agent or agency, whether in the United States or any other country, whether in Your capacity as a purported victim, witness, or perpetrator of any criminal activity, and whether as a juvenile or as an adult, including without limitation:
  a. the date of any such Communication;
  b. the form of any such Communication, whether oral or written and if written, the format of any such Communication;
  c. the identities of all persons involved in the Communication, including the identity of the law enforcement agency with whom the agent is or was affiliated;
  d. the case number associated with any such Communication;
  e. the subject matter of any such Communication;
  f. the disposition of any case associated with any such Communication, irrespective of whether the matter was sealed, expunged or later dismissed."

The Honorable Alison J. Nathan
April 2, 2021
Page 4

communications" between "the law enforcement entity, Virginia Giuffre, David Boies, Stan Pottinger, Sigrid McCawley, Paul Cassell, [and] Brad Edwards." Curiously, although the government purportedly subpoenaed all of the BSF files relating to *Giuffre v. Maxwell*,[2] the production from the government to Ms. Maxwell does not contain these 57 documents reflecting communications between these lawyers and a "law enforcement entity." Only **after** Ms. Maxwell filed her pre-trial motions did the government produce a few of its communications with BSF and their co-counsel from 2016. The peculiar failure of the government to produce these items in connection with the "entire" BSF file has yet to be explained. Clearly, BSF knew what the terms meant when it used them to block the production of this information in the civil litigation and it should not be allowed to profess confusion or ignorance here.

The cases cited by BSF are not helpful to its cause. For example, the court in *United States v. Avenatti*, No. (S1) 19 CR. 373 (PGG), 2020 WL 86768, at *6 (S.D.N.Y. Jan. 6, 2020), quashed the subpoena because it did "not satisfy the initial requirement of relevance."  In *United States v. Mendinueta-Ibarro,* 956 F. Supp. 2d 511, 512 (S.D.N.Y. 2013), the defendant requested "any and all writings and records" related to the NYPD's contact with a particular confidential witness who, according to the defendant, provided relevant information.  The subpoena was unlimited in time or  scope and, to the extent a time or scope were determined, production of the information was limited by 18 U.S.C. § 3500.  *Id.* at 513.

*United States v. Barnes,* No. S9 04 CR 186 SCR, 2008 WL 9359654, at *1 (S.D.N.Y. Apr. 2, 2008), involved a subpoena served by the Defendant on the Metropolitan Detention

---

[2]  Judge McMahon described the subpoena as a "general subpoena…I mean, everything that's in Boies Schiller's files, other than privileged documents, which of course you don't exclude from your subpoena."

Center that demanded production of telephone recordings and various types of prison records for another inmate. Notably, the subpoena was issued after the government produced all *Brady* and § 3500 material and was for "[a]ll disciplinary records, booking records, inmate records, transfer movement records, and telephone call recordings and log for … [the]inmate at the Metropolitan Detention Center Brooklyn from about April 2006 to the Present." Of course, the court found the subpoena did not call for relevant evidence and was also deficient under all three *Nixon* prongs. *Id*. at 5.

Nor does this Court's decision in *United States v. Pena*, No. 15-CR-551 (AJN), 2016 WL 8735699, at *1 (S.D.N.Y. Feb. 12, 2016), help BSF. There, Mr. Pena requested that this Court issue five subpoenas to the MDC, MCC, and the DOC seeking records relating to two cooperating witnesses expected to testify at trial. Those subpoenas lacked any specificity and were for:

> Any and all records relating to inmate [cooperator name], including but not limited to: (a) name and address of all [Bureau of Prisons/DOC] locations in which [cooperator name] was housed, the dates when [cooperator name] was housed in such facilities, and all records relating to the transfer of [cooperator name] between and among [Bureau of Prisons/DOC] facilities; (b) all records of phone calls made to and from [cooperator name] from [Bureau of Prisons/DOC] custody, including but not limited to: call logs and audio recordings; and (c) all Corrlinks emails sent to and from [cooperator name's] account.

As this Court correctly pointed out, the subpoenas were unlimited in time or scope and called for the production of either inadmissible hearsay or privileged information. *Id*. at *2. Additionally, this Court observed in *Pena,* at *3, as applicable here, that:

> [T]he Court trusts that the Government is aware of its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States,* 405 U.S. 150 (1972), and 18 U.S.C. § 3500, and that it will be prepared to make all necessary disclosures at the appropriate time to minimize any delay at trial. Moreover, although the government is not obligated to obtain information not presently in its possession, it may be improper for the government to remain willfully ignorant to key

The Honorable Alison J. Nathan
April 2, 2021
Page 6

impeachment material. Accordingly, the Court "encourages the government to obtain evidence that may be relevant to the credibility and impeachment of its witnesses and disclose this information" to the defendants as soon as practicable.

By contrast, in this case, the government has scrupulously avoided looking for or acquiring any information favorable to Ms. Maxwell. To the contrary, the government met with lawyers for civil litigants, took possession of selective items of their information and only disclosed what information it views necessary to justify its current dilemma. The investigation it conducted to determine the scope of its communication with BSF was incomplete and entirely self-serving.

Subpoena Requests 1-5 are substantially like those approved by this Court in *United States v. Wey,* 252 F. Supp. 3d 237, 243 (S.D.N.Y. 2017), which called for "all correspondence and records sent or received" between identified individuals and entities over specific periods of time.[3]

Although BSF admits it cannot make any cogent argument that the communications sought in Requests 1-5 are not relevant (Motion at 4), the relevance is clear: pending before the Court are two motions to suppress based on misrepresentations made by the government to Chief Judge McMahon and a motion to dismiss the indictment for prejudicial delay. These communications *are the evidence* necessary for resolution of those motions. They are

---

[3] The language authorized by the Court was for:

> All correspondence and records sent or received by Keely Walter, William Slattery, or Andrew Hall relating to, interpreting or applying NASDAQ's 300 round-lot shareholder requirement, with respect to the listing applications of:
>
> 1. [SmartHeat], during the period of June 20, 2008 through January 27, 2009;
> 2. [Deer], during the period of May 4, 2009 through July 16, 2010; and
> 3. [CleanTech], during the period July 13, 2010 through December 10, 2010.

The Honorable Alison J. Nathan
April 2, 2021
Page 7

admissible, either as a written supplement to the motions, or at any motion hearing under Fed. R. Evid. 104 and 803(6). Ms. Maxwell has requested, and is entitled to, an evidentiary hearing on her motions to suppress. The requested information would establish the substance and frequency of the communications between BSF and the government prior to the government's end run around *Martindell*.

Relegated to footnote 2 is BSF's half-hearted attempt to claim that communications between civil plaintiffs' lawyers who are conspiring to obtain an indictment against a civil defendant (to further their own economic interests) are "work product." This footnote is, in fact, an astonishing admission. First, BSF admits that these communications occurred. Second, the communications about trying to get Ms. Maxwell indicted were "prepared in anticipation of litigation or for trial," admitting both relevance and admissibility. BSF does not and cannot plausibly explain how a joint effort to procure a civil opponent's indictment is protected by the work product doctrine. BSF's *ipse dixit* fails because the

> "burden of justifying the application of the work product doctrine is on the asserting party, and the burden is a heavy one because privileges are neither lightly created nor expansively construed. In particular, the burden of showing a document is entitled to work-product protection may not be discharged by mere conclusory or *ipse dixit* assertions."

*In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*, 293 F.R.D. 568, 574 (S.D.N.Y. 2013) (cleaned up); *see also Wey,* 252 F.Supp.3d at 251 (party asserting privilege may not discharge its burden with mere conclusory or *ipse dixit* assertions but rather must present those facts that are the essential elements of the privileged relationship). It is also noteworthy that when it claimed investigative privilege in its 2016 privilege log, BSF did not invoke the work product exception.

The Honorable Alison J. Nathan
April 2, 2021
Page 8

Regardless, the government has failed to produce, or even look for these communications and Ms. Maxwell has no other means to obtain them.

Requests 6 and 7

Requests 6 and 7 request the engagement agreements between BSF and alleged victim 2 and her sister. BSF has previously claimed that it represented these individuals. *Farmer v. Indyke*, No. 19-cv-10475 (LGS-DCF); *Farmer v. Indyke*, 19-cv-10474-NRP. The scope and dates of these engagements are relevant to Ms. Maxwell's pending motions and are relevant and admissible for many of the reasons articulated with respect to Requests 1-5. Moreover, these agreements are exculpatory evidence that, as discussed below in connection with Request 12, are procurable in advance of trial.

Request 8

Request 8 seeks the grand jury subpoena the government served on BSF. This is hardly a controversial, sensitive or speculative item. It is however relevant to Ms. Maxwell's pending motions to suppress because it is the document reviewed by Judge McMahon commanding production of the entire BSF file including confidential materials subject to a strict protective order in *Giuffre*. The subpoena is admissible either as part of the written motion practice or in a hearing on the motions to suppress. Indeed, the Court could take judicial notice of the document which is in the SDNY court files. Ms. Maxwell would then be the only party to the motion practice that was in the dark about the content of the subpoena. What the subpoena commands, when it was served, and who accepted service are all relevant to the issues before the Court. BSF's only retort is that Ms. Maxwell should get the subpoena from the government. Ms. Maxwell asked the government for the subpoena and the government refused this request. She has no other recourse but to ask this Court for assistance.

Requests 9-11

Requests 9, 10, and 11seek evidence for inspection in advance of trial. A subpoena issued pursuant to Rule 17(c)(1) "may order the witness to produce designated 'books, papers, documents, data, or other objects'" so long as they are "evidentiary." *Bowman Dairy Co. v. United States,* 341 U.S. 214, 219 (1951). Rule 17(c)(1) further provides that "[t]he court may direct the witness to produce the designated items in court before trial or before they are to be offered in evidence." When the items arrive, the court may permit the parties and their attorneys to inspect all or part of them. *Id.*

The Rule operates to "expedite the trial by providing a time and place before trial for the ***inspection*** of subpoenaed materials," rather than "provide a means of discovery for criminal cases." *United States v. Nixon*, 418 U.S. 683, 698-99 (1974) (citing *Bowman Dairy*, 341 U.S. at 220)) (emphasis added). Here, Ms. Maxwell's subpoena strictly adheres to that which Rule 17 allows: production of admittedly relevant and admissible items of evidence in advance of trial. Item 9, the journal, purports to be an account of alleged victim 2's interactions with Epstein that form the basis of multiple counts in the indictment. It is exculpatory because the journal contains no reference to Ms. Maxwell. Partial pages of the journal were produced in civil litigation *against* Epstein, not to help Ms. Maxwell. Inspection of the entire journal is necessary to establish whether the journal is authentic and complete and whether or not spoliation has occurred. This examination requires the services of a qualified forensic document examiner and cannot be performed in the middle of trial without a significant disruption in the proceedings. Given that alleged victim 2 placed the document in issue when she was trying to collect money from Epstein and Ms. Maxwell, BSF's argument that the journal is irrelevant or inadmissible is

The Honorable Alison J. Nathan
April 2, 2021
Page 10

not credible. And, once again, the government has turned a blind eye to the existence of the journal, refusing to collect clearly relevant and exculpatory evidence.

This type of evidence, "journals," or "diaries" is, without question, exculpatory material that the government would have to provide to the defense in advance of trial if it were in their possession. The government's failure to obtain the journal contravenes Second Circuit law:

> If the diary had contained exculpatory information or other material that would have been useful to the defense for the purpose of impeaching [the witness's] credibility, the government would have been required under *Brady v. Maryland*, *supra*, to turn over such material to the defense. *See*, *e.g., United States v. Seijo*, 514 F.2d 1357 (2d Cir. 1975). By allowing a potential source of such material to remain in the possession of the very witness whose credibility it might be used to impeach, the government created a serious risk that significant material would be destroyed or tampered with.[4] Under the circumstances, the diary should have been impounded with the court, subject to use and inspection by both sides under conditions that would protect the defendants from destruction or alteration, and the witness from unwarranted invasions of privacy or disclosure of information that might jeopardize his safety. Under no circumstances should the diary have been returned to the unsupervised possession of the witness.

*United States v. Cheung Kin Ping*, 555 F.2d 1069, 1079 (2d Cir. 1977); *see also White v. McKinley*, 519 F.3d 806, 810, 814 (8th Cir. 2008) (where diary contained no entries related to the defendant's alleged sexual abuse the failure to preserve the diary deprived the defendant of his right to a fair trial); *United States v. Rios,* No. 88-CR-186, 1989 WL 9289, at *2 (N.D.N.Y. Feb. 6, 1989) ("[T]o the extent that this diary contains evidence favorable to one of the

---

[4] Ms. Maxwell's concerns about spoliation and authenticity of an accuser's diary are far from speculative. BSF's client Virginia Roberts testified at her depositions that she had (a) burned her "diary" containing her allegations against Jeffrey Epstein and Ghislaine Maxwell in a 2013 bonfire with her husband to rid herself of the "bad memories," while she was represented by counsel, and (b) created another "fake" diary, 15 years after the fact, concerning her supposed sexual interactions with Prince Andrew that journalist Sharon Churcher printed in Radar Online as though they were a contemporaneous "diary." *See* Exhibit A.

The Honorable Alison J. Nathan
April 2, 2021
Page 11

defendants and material either to his guilt or eventual punishment such evidence must be made available to that defendant as *Brady* material.").

Request 10 is another piece of physical evidence, boots purportedly purchased by Epstein for alleged victim 2. Once again, the government has scrupulously avoided actually obtaining the evidence, and Ms. Maxwell seeks to use Rule 17 as it is intended, to examine the boots in advance of trial. The examination will identify the make and provenance of the boots, something which would be difficult to do during any trial without significant delay.

Similarly, the photographs listed in Request 11 are physical evidence that exists -- copies were produced by BSF in civil litigation, the photographs are admittedly relevant, and admissible as evidence. Again, the government has not obtained the originals. Accordingly, no one knows the dates of creation or any other specifics related to these items of evidence. Because the government is failing at its job to seek justice, not a conviction, Ms. Maxwell needs the Court's help in establishing her innocence.

Request 12

Request 12 asks for EVCP Material, the submissions by BSF on behalf of witnesses who will testify for the government in this matter, and the settlement materials obtained as a result. We know that alleged victim 2 and her sister, along with Virginia Giuffre, are all represented by BSF and made claims against Epstein which in some fashion involved Ms. Maxwell. BSF argues that the request for this information is premature because according to BSF it is merely "impeachment" evidence and that the information should be classified as "witness statements" not reachable by a Rule 17 (c) subpoena.

BSF is wrong on both counts. First, the documents do not meet the definition of "witness statements." These are submissions to a fund requesting large sums of money and the

The Honorable Alison J. Nathan
April 2, 2021
Page 12

justification for payment of the funds. BSF does not explain why it claims the submissions are "witness statements" and cites no authority for this proposition. Second, because the material is not in the possession of the government it is not a "statement" falling within Rule 17(h).

> "Witness Statements" covered by Rule 17 are defined by Fed. R. Crim. P. 26.2(f):
>
> **(1)** a written statement that the witness makes and signs, or otherwise adopts or approves;
>
> **(2)** a substantially verbatim, contemporaneously recorded recital of the witness's oral statement that is contained in any recording or any transcription of a recording; or
>
> **(3)** the witness's statement to a grand jury, however taken or recorded, or a transcription of such a statement.

The "statements" are those of a testifying witness in the possession of the party who did not "call the witness," produced upon request after the witness testifies at a qualifying event, such as a pretrial hearing or trial.

Materials held by entities other than the United States generally fall outside the Jencks Act and are therefore not "witness statements." *United States v. Bermudez*, 526 F.2d 89, 100 n.9 (2d Cir. 1975) (no violation of the Jencks Act, 18 U.S.C. § 3500(b), which requires the United States to turn over to defendants the statements of a witness which are "in the possession of the United States"); *see also United States v. Ferguson*, 478 F. Supp. 2d 220, 240 (D. Conn. 2007) (1979 Advisory Committee Note to Fed. R. Crim. P. Rule 26.2: "The rule … is designed to place the disclosure of prior relevant statements of a defense witness in possession of the defense on the same legal footing as is the disclosure of prior statements of prosecution witnesses in the hands of the government under the Jencks Act, 18 U.S.C. § 3500….").

Once again, the government has purposely not obtained any of the EVCP Material. Accordingly, the EVCP Material is not a "statement" covered by Rule 17(h). Ms. Maxwell's

only recourse is to seek production from BSF which admittedly has the material in its possession. Otherwise, once the witness testifies and a request is made for the material the government will simply profess blessed ignorance.

Contrary to BSF's assertion, the EVCP is not "mere" impeachment material; it is *Brady* material that the government would be required to turn over if in their possession. The government knows that it "is under no obligation to turn over that which it does not have," *United States v. Upton*, 856 F. Supp. 727, 746 (E.D.N.Y. 1994), which is why it refuses to obtain the material. Once again, Ms. Maxwell needs the Court's assistance.

Information is "exculpatory and thus 'favorable' to the defense for *Brady* purposes when it directly contradicts the motive theory testified to by prosecution witnesses. *Mendez v. Artuz*, 303 F.3d 411, 414 (2d Cir. 2002). For the reasons articulated in Ms. Maxwell's *ex parte* submission, the EVCP Materials directly contradict the "motive theory" that will be advanced by the prosecution at trial – that Ms. Maxwell was the procurer of underaged women for Epstein.

In addition, even if the materials were deemed "impeachment only" they would remain discoverable by a subpoena as exculpatory evidence. Where, as here, the government's proof depends almost entirely on the uncorroborated testimony of the accusers, "impeachment" evidence is material and discoverable in advance of trial. As discussed in *Poventud v. City of New York*, No. 07 CIV. 3998 DAB, 2015 WL 1062186, at *8 (S.D.N.Y. Mar. 9, 2015),

> [I]mpeachment evidence constitutes exculpatory evidence that must be disclosed. The disclosure of impeachment evidence, where "the [g]overnment's case depended almost entirely on [the victim's] testimony," *Giglio v. United States,* 405 U.S. 150, 154–55 (1972), goes to the heart of *Brady* and *Giglio. See Napue v. People of State of Illinois,* 360 U.S. 264, 269 (1959) ("The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence.").

*See also United States v. Petrillo,* 821 F.2d 85, 90 (2d Cir.1987) (explaining impeachment evidence of uncorroborated testimony is material where the witness "whose credibility was at issue supplied the only evidence linking the defendant[ ] to the crime"); *Grant v. Alldredge,* 498 F.2d 376, 382 (2d Cir.1974) (finding a *Brady* violation occurred where the prosecution did not disclose that a witness identified someone other than the accused); *United States v. Wilkins,* 326 F .2d 135, 140 (2d Cir.1964) (where the state's case depended on the positive identification by two witnesses, the existence of two other witnesses who would testify the defendant was not the perpetrator of the crime was material).

Because the EVCP Material constitutes exculpatory evidence, it is procurable by subpoena in advance of trial.

Conclusion

For the foregoing reasons, this Court should deny BSF's Motion to Quash and enforce the proposed subpoena on BSF.

                                        Respectfully Submitted,

                                        Jeffrey S. Pagliuca

CC: Sigrid McCawley, David Boies