UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------- x

      :

   UNITED STATES OF AMERICA,      :

           v.      :   20 Cr. 330 (AJN)

      :

   GHISLAINE MAXWELL,      :

       Defendant.      :

      :

-------------------------------------------------- x

**REPLY MEMORANDUM OF GHISLAINE MAXWELL
IN SUPPORT OF HER MOTION UNDER THE DUE PROCESS CLAUSE TO
SUPPRESS ALL EVIDENCE OBTAINED FROM THE GOVERNMENT'S SUBPOENA
TO BOIES SCHILLER AND TO DISMISS COUNTS FIVE AND SIX**

Jeffrey S. Pagliuca
Laura A. Menninger
HADDON, MORGAN & FOREMAN P.C.
150 East 10th Avenue
Denver, CO  80203
Phone: 303-831-7364

Christian R. Everdell
COHEN & GRESSER LLP
800 Third Avenue
New York, NY  10022
Phone: 212-957-7600

Bobbi C. Sternheim
Law Offices of Bobbi C. Sternheim
33 West 19th Street - 4th Floor
New York, NY  10011
Phone: 212-243-1100

*Attorneys for Ghislaine Maxwell*

**Table of Contents**

Table of Contents ........................................................................................................... i

Table of Authorities ...................................................................................................... ii

Table of Exhibits .......................................................................................................... iv

Introduction and Summary of the Argument .......................................................... 1

I.      The Facts ........................................................................................................... 2

II.     The Government's Response to Maxwell's Motion. .............................................. 6

  A.    The Government's Defenses Are Not Credible. .................................................... 7

  B.    Assuming the Government's Defenses Are Worthy of Belief, the Government
        Still Misled the Court. ......................................................................................... 17

III.    The Materiality of the Government's False Statements. ...................................... 18

IV.     The Remedy for the Government's Misconduct. ................................................. 20

  A.    Pursuant to its Inherent Power, this Court Should Suppress the Evidence Obtained
        from Boies Schiller and Dismiss Counts Five and Six, which are the Fruits of that
        Evidence. .......................................................................................................... 20

  B.    At a Minimum, this Court Should Order a Hearing at which Maxwell May Inquire
        into the Circumstances Surrounding the Government's Misrepresentation to
        Judge McMahon. ................................................................................................ 26

Conclusion .................................................................................................................. 27

Certificate of Service .................................................................................................. 29

# Table of Authorities

**Cases**

*Abdell v. City of New York*, No. 05 CIV. 8453 KMK JCF, 2006 WL 2664313
(S.D.N.Y. Sept. 14, 2006)................................................................................ 8

*Berger v. United States*, 295 U.S. 78 (1935) .............................................. 24

*Brady v. Maryland*, 373 U.S. 83 (1963) ..................................................... 11

*Brown v. Maxwel*, 929 F.3d 4 (2d Cir. 2019) ....................................... 19, 20

*Chemical Bank v. Affiliated FM Ins. Co.*, 154 F.R.D. 91 (S.D.N.Y. 1994)..................... 14, 18, 19

*Elkins v. United States*, 364 U.S. 206 (1960)............................................... 20

*Four Star Fin. Servs., LLC v. Commonwealth Mgmt. Assocs.*, 166 F. Supp. 2d 805
(S.D.N.Y. 2001)............................................................................................. 25

*Franks v. Delaware*, 438 U.S. 154 (1978)............................................. 20, 22

*Giuffre v. Maxwell*, 325 F. Supp. 3d 428 (S.D.N.Y. 2018) ...................... 8, 15

*Hampton v. United States*, 425 U.S. 484 (1976)......................................... 20

*In re WinNet R CJSC*, 2017 WL 1373918 (S.D.N.Y. No. 16MC484(DLC), Apr. 13, 2017)....... 24

*Martindell v. Int'l Tel. & Tel. Corp.*, 594 F.2d 291 (2d Cir. 1979) ...................... 18, 21

*McNabb v. United States*, 318 U.S. 332 (1943).......................................... 20

*Morales v. Portuondo*, 165 F. Supp. 2d 601 (S.D.N.Y. 2001) ................... 24

*Rea v. United States*, 350 U.S. 214 (1956) ................................................. 20

*United States v. Bout*, 731 F.3d 233 (2d Cir. 2013).................................... 23

*United States v. Cortina*, 630 F.2d 1207 (7th Cir. 1980)......................... 20, 22, 25, 26

*United States v. Falso*, 544 F.3d 110 (2d Cir. 2008) ................................. 22

*United States v. Lambus*, 897 F.3d 368 (2d Cir. 2018)........................ 23, 25

*United States v. Ming He*, 94 F.3d 782 (2d Cir. 1996) .............................. 20

*United States v. Paredes-Cordova*, No. S1 03 CR. 987DAB, 2009 WL 1585776
(S.D.N.Y. June 8, 2009) ................................................................................ 25

*United States v. Payner*, 447 U.S. 727 (1980) ............................................................. 20

*United States v. Pena*, 961 F.2d 333 (2d Cir. 1992) .................................................... 25

*United States v. Russell*, 411 U.S. 423 (1973) .............................................................. 21

*United States v. Schmidt*, 105 F.3d 82 (2d Cir. 1997) ................................................. 23

*Wang v. Reno*, 81 F.3d 808 (9th Cir. 1996) ................................................................... 2

*Young v. United States*, 481 U.S. 787 (1987) ............................................................... 24

**Other Authorities**

Stephen Rex Brown, *Manhattan federal prosecutors declined to pursue Jeffrey Epstein and Ghislaine Maxwell case in 2016*, New York Daily News (Oct. 13, 2020) ............................ 11

U.S. Dept. of Justice, JUSTICE MANUAL, JM § 9-11.151 ............................................ 15

**Rules**

Fed. R. Civ. P. 5.2 ............................................................................................................ 19

N.Y. Rules of Professional Conduct, Rule 3.3(d) ........................................................... 24

N.Y. Rules of Professional Conduct, Rule 3.8, cmt. [6A] .............................................. 16

**Constitutional Provisions**

U.S. CONST. amend. IV .................................................................................................... 22

U.S. CONST. amend. V .................................................................................................... 21

U.S. CONST. amend. VI .................................................................................................... 26

## Table of Exhibits

EXHIBIT J: Notes of Feb. 11, 2021 Call with AUSA ███████ (Sealed)

EXHIBIT K: Handwritten Notes by AUSA ██████ of Meeting and Contacts with Peter Skinner, Stan Pottinger, and Brad Edwards

EXHIBIT L: Email String Between Peter Skinner and AUSA ██████, cc'ing Stan Pottinger, Brad Edwards, and Sigrid McCawley (Feb. 29, 2016–Mar. 5, 2016) (Sealed)

EXHIBIT M: Emails between AUSA ██████ and Chief of the Criminal Division (Mar. 3, 2016) (Sealed)

EXHIBIT N: Emails between AUSA ██████ and AUSA ████████ and other AUSAs (Nov. 30, 2018–Dec. 6, 2018) (Sealed)

EXHIBIT O: Email from Stan Pottinger to AUSA █████, cc'ing Brad Edwards and Sigrid McCawley, re Daniel Siad (Mar. 3, 2016) (Sealed)

EXHIBIT P: Giuffre Supplemental Privilege Log, Apr. 4, 2016

EXHIBIT Q: Defendant's Response in Opposition to Motion to Exceed Presumptive Ten Deposition Limit, *Giuffre v. Maxwell*, No. 15-cv-07433-RWS (S.D.N.Y.) (June 16, 2016)

Ghislaine Maxwell submits this reply in support of her Motion to suppress all evidence the government obtained from a grand jury subpoena it issued to Boies Schiller Flexner LLP and to dismiss Counts Five and Six, which are the fruits of that unlawful subpoena.

## Introduction and Summary of the Argument

If the government meant to reassure this Court that nothing improper happened, its Response was anything but reassuring.

The government now confesses that it had significant and substantial contact with Virginia Giuffre's attorneys in 2016—while the Giuffre defamation suit against Maxwell was on-going—as part of an effort to instigate a criminal prosecution of Maxwell for allegedly trafficking Giuffre and others and then lying under oath. Doubling down on an increasingly farfetched story, however, the government insists that nothing improper occurred when it misrepresented these contacts to the Chief Judge of the Southern District of New York.

Contrary to the government's portrayal of events, what happened here is that a prosecutor from the *public corruption* unit of the United States Attorney's Office, in an *ex parte* proceeding, affirmatively misled Chief Judge McMahon to circumvent a Protective Order entered by one of her colleagues. The prosecutor then exploited the material he obtained to indict Maxwell.

Had the prosecutor not affirmatively misled Judge McMahon, the government would never have obtained the 90,000 pages of material it now possesses, material that is central— indeed, essential—to its case against Maxwell. It would be the height of irony, not to mention injustice, to allow the government to convict Maxwell of testifying falsely when the government could not have indicted Maxwell but for the false statements it made to a federal judge.

"In a situation like this, the judiciary . . . may exercise its supervisory power to make it clear that the misconduct was serious, that the government's unwillingness to own up to it was more serious still, and that steps must be taken to avoid a recurrence of this chain of events."

*Wang v. Reno*, 81 F.3d 808, 821 (9th Cir. 1996). For the reasons given below, the exercise of this Court's supervisory authority is called for here.

## I.  The Facts

Pressed into some minimal measure of candor, the government now admits the following facts are true:

- On February 29, 2016, AUSA ███████, the Human Trafficking Coordinator and Project Safe Childhood Coordinator for the U.S. Attorney's Office for the Southern District of New York, Ex. J, p 1, met with Peter Skinner of Boies Schiller, Stan Pottinger, and Brad Edwards, who represented Virginia Giuffre, Ex. K, p 1.

- The meeting concerned Giuffre's allegations of sexual abuse and trafficking by Jeffrey Epstein and Maxwell. Ex. J, pp 1–3.

- At the meeting, Giuffre's attorneys told AUSA ███████ the following:

  - That Maxwell was Epstein's "head recruiter" of underage victims. *Id.* at 2.

  - That Giuffre was underage when she was brought to New York "for training by Maxwell and Epstein [in] how to service men." *Id.* at 3.

  - That Giuffre had a pending civil lawsuit against Maxwell for defamation alleging that Maxwell had recruited Giuffre to be trafficked and abused by Epstein. *Id.* at 4, 7.

  - That Maxwell was asserting truth as a defense to Giuffre's defamation claim. *Id.* at 4, 7.

  - That Maxwell had photos of naked underage girls on her computer. *Id.* at 6.[1]

---

[1] No such photos were found on or produced from any computers associated with Maxwell.

o  That Maxwell and Epstein-friend ███████ "took sexually explicit photos of [Giuffre] regularly."[2] *Id.*

o  That, as a birthday present, Maxwell gave Epstein a sexually explicit photo of Giuffre taken when Giuffre was sixteen.[3] *Id.*

o  That Epstein hung the photo on one of his walls.[4] *Id.*

o  That Giuffre has a note in Maxwell's handwriting with the name of another victim. *Id.* at 8.[5]

o  That Giuffre was "live in" sex slave from 2000-2002.[6] *Id.* at 3.

o  That there were other victims of Epstein and Maxwell, including ████ ████, *id.* at 7, who is apparently Accuser-1 in this case, and another woman whose description matches ████████, *id.* at 9, who is apparently Accuser-3.

o  That Accuser-1 was "highly credible." *Id.* at 7.

o  That Epstein and Maxwell used "the same MO with" Accuser-3 that they used with Giuffre. *Id.* at 7, 9.

o  And that Giuffre "wants [a] prosecution." *Id.* at 7.

---

[2] Maxwell denies ever taking any photos of Giuffre, and we have seen no sexually explicit photo of Giuffre in any of the civil or criminal document productions.

[3] Not only did Maxwell not meet Giuffre until Giuffre was seventeen years old, Maxwell never provided any such photo to Epstein, nor, to our knowledge, has any such photo ever been produced, in the civil or criminal cases.

[4] Again, we have not seen any such photo produced in any discovery, either in the civil or criminal cases.

[5] We are aware of no note in Maxwell's handwriting being produced in the *Giuffre* action, or the criminal discovery.

[6] Giuffre was in fact living with her fiancé at the time and held multiple other jobs, as later confirmed through depositions and documents in the *Giuffre* action.

- The attorneys promised to send AUSA ███████ "affidavits and depositions" to support their request for a prosecution. *Id.* at 8.

- Calling the meeting "intriguing," AUSA ███████ emailed the Chief of the Criminal Division three days later and proposed to "talk over" the facts with him. Ex. M, pp 1–2. He agreed. *Id.* at 1.

- In the days and weeks after the February 29 meeting, there were several emails between Giuffre's attorneys and AUSA ███████. Exs. L & N.

- There was also at least one phone call. Ex. K, at 4.

- Giuffre's attorneys provided AUSA ███████ with documents as promised. *Id.* at 2; *see also* Ex. L, p 2.

Most importantly, the government now admits that AUSA ███████, the prosecutor in charge of the case who appeared before Chief Judge McMahon on April 9, 2019, *knew all of this* and still denied that Boies Schiller had any role in fomenting the investigation and claimed that there had been no contacts between Boies Schiller and his office before November 2018, when he claimed the investigation first began.

None of these statements by AUSA ███████ to Judge McMahon were true.

As described above, Giuffre's attorneys pressed the U.S. Attorney's Office for the Southern District of New York to investigate and prosecute Epstein and Maxwell. Ex. J.

Then, two months after the meeting with AUSA ███████, Giuffre's attorneys told Judge Sweet—who was presiding over Giuffre's defamation against Maxwell—that there was an

"ongoing criminal investigation" into Maxwell, and they withheld from discovery 57 separate documents, invoking the "law enforcement privilege." Ex. P.[7]

In late November 2018 and early December 2018—just two months before AUSA ████████ filed the *ex parte* request before Judge McMahon seeking modification of the civil Protective Order entered by Judge Sweet—AUSA ████ shared with AUSA ████████, as well as one other member of the trial team and the heads of the Public Corruption Unit, everything she learned from her contacts with Giuffre's attorneys. Ex. N.

AUSA ████ gave AUSA ████████ and his colleagues: (1) nine pages of detailed, hand-written notes from the February 29 meeting; (2) the emails she received from Giuffre's attorneys; and (3) all the documents provided to her by Giuffre's attorneys. *Id.* Some of what she gave AUSA ████ included material Boies Schiller attorneys designated a short time later as "confidential" under Judge Sweet's Protective Order, including flight records and Palm Beach Police Department Records.

AUSA ████████ took an active role in gathering these materials from AUSA ████. Copying AUSA ████████, AUSA ████ had emailed AUSA ████ on December 5, 2018, to obtain all the records of the February 29 meeting with Giuffre's attorneys. *Id.* at 1. In that email, AUSA ████ also asked AUSA ████ whether, after February 29, she met "again with [Peter Skinner] or anyone else." *Id.*

---

[7] Two other aspects to the privilege log are notable:  (a) In the *Giuffre* litigation, Boies Schiller did not produce its emails with the U.S. Attorney's Office to Maxwell, despite the fact that they were directly responsive to a Request for Production of Documents Maxwell served just a couple of weeks after those emails were sent; and (b) Peter Skinner, the Boies Schiller attorney at the AUSA ████ meeting who also sent emails to AUSA ████ after the meeting, Ex. L, is not even listed on the privilege log, though the log purports to reflect *all* email communications about the "ongoing criminal investigation" that Boies Schiller had tried to initiate just a couple of weeks earlier.

Barely twelve hours later, when AUSA ███ hadn't responded, AUSA ███████

took it upon himself to follow up, emailing AUSA ██████: "Just quickly following up on this –

we're trying to get a complete handle on the landscape – thanks!" *Id.*

AUSA ██████ responded one hour later: "Just went through my files and found a folder

w/ the notes I took and the documents they brought me." *Id.* She turned everything over to

AUSA ██████ and other prosecutors in the office, including one other prosecutor on this trial

team. *Id.* AUSA ████ did not answer AUSA ██████ original question: "[D]id [she] meet

again with [Peter Skinner] or anyone else" after the February 29, 2016 meeting with Giuffre's

attorneys. *Id.* But AUSA ████ certainly did not deny a second meeting or a subsequent phone

call occurred. *Id.*

By the end of the day on December 6, 2018, AUSA ████████ had in his possession

everything Giuffre and her attorneys provided to AUSA ██████ as well as AUSA ███████

extensive hand-written notes. He also had access to AUSA ██████ herself for any follow up

questions. By the end of the day, AUSA ██████ had a "complete handle on the landscape,"

just as he asked for a couple hours earlier.

When AUSA ███████ appeared before Judge McMahon barely four months later,

however, he told her none of this, unequivocally and falsely disavowing any role by Boies

Schiller in fomenting the investigation and denying any contacts between Boies Schiller and his

office before November 2018. Even though AUSA ██████ had a "complete handle on the

landscape," he painted an entirely different, false picture for Judge McMahon.

## II. The Government's Response to Maxwell's Motion.

Confronted with evidence of AUSA ██████ misrepresentations to Judge McMahon,

the government has filed a Response reluctantly admitting that the U.S. Attorney's Office had

sustained contact with Boies Schiller in 2016. Even so, the government tries its best to minimize

the significance of those interactions and of AUSA ███████ misrepresentations to an Article III federal judge. This Court should not permit the government to whitewash its conduct.

The discovery provided to Maxwell in response to her Motion rebuts every defense the government now offers of its conduct. And if that weren't enough, the government's defense fails on its own terms, because if this Court were to assume its truth (an assumption the government has not earned), AUSA ███████ statements to Judge McMahon would still have been demonstratively and materially false.

### A. The Government's Defenses Are Not Credible.

Discovery provided to Maxwell in response to her Motion rebuts every defense the government now offers of its conduct.

- **Defense 1: The February 29, 2016 meeting was only about Epstein.**

AUSA ███████ contemporaneous hand-written notes entirely undermine the government's claim that the February 29, 2016 meeting was about Epstein only and had nothing to do with Maxwell. Resp. at 89 & n.39. *See* Ex. J. AUSA ███████ notes refer to Maxwell as Epstein's "head recruiter" of underage girls; they document allegations that Maxwell "regularly" took sexually explicit photos of Giuffre and other underage girls, which she kept on her computer; they allege that Maxwell gave one such photo to Epstein as a birthday present, which he hung on his wall; they claim that Maxwell, along with Epstein, brought Giuffre to New York to personally "train[] [her] . . . [in] how to service men;" and they assert that Maxwell used the "same MO" to recruit other girls to the sex trafficking scheme. The contents of AUSA ███████ notes belie any notion that Giuffre's attorneys—who at that very moment were suing Maxwell

for defamation for *denying* she had trafficked and abused Giuffre—were focused only on Epstein and not on Maxwell.

Despite AUSA ███████ contemporaneous notes showing that the meeting very much concerned Maxwell, the government now claims that "the pitch was to investigate Epstein, not Maxwell," and that the discussion included only "passing references to Maxwell." Resp. at 89 n.39. The government bases this argument *exclusively* on a phone call prosecutors conducted with AUSA ██████ on February 11, 2021, five years *after* the February 29 meeting actually took place. Ex. K. This Court should reject the government's revisionist history.

The best evidence of what happened on February 29, 2016—at least the best evidence the government has produced so far—is AUSA ███████ contemporaneous notes.[8] Ex. J.; *Abdell v. City of New York*, No. 05 CIV. 8453 KMK JCF, 2006 WL 2664313, at *7 (S.D.N.Y. Sept. 14, 2006) (denying motion to quash third-party subpoena because "contemporaneous statements of witnesses constitute best evidence"). Although the government attached these notes to its Response, Resp. Ex. 5, the government does not rely on them as part of its argument, choosing instead to rely on AUSA ███████ 2021 recollection of what happened, Resp. at 62–66, 89 & n.39, 92 (citing Ex. 4).

---

[8] It appears the government does not actually want to know anything beyond what AUSA ███████ remembers (or doesn't remember) of 2016. All the government did in response to Maxwell's Motion was telephone AUSA ███████ The government apparently: (1) did not search its system for any and all emails from, to, or about David Boies, Sigrid McCawley, Stan Pottinger, Brad Edwards, or Peter Skinner; and (2) did not interview anyone other than AUSA ███████, such as the other attendees of the meeting (Pottinger, Edwards, and Skinner), or any of the other AUSAs whom AUSA ███████ talked to about her contacts with Giuffre's attorneys.

Most conspicuous, of course, is the government's failure to interview AUSA ███████ or secure an affidavit from him. If this Court does not grant Maxwell's Motion on the papers, only an evidentiary hearing can address these issues.

But in her 2021 interview, AUSA ███ mostly disclaimed a memory of what happened in 2016. Ex. K. The phrases "does not recall," "does not remember," or some similar expression of lack of memory appear at least ***thirty-two*** times in the notes of the government's 2021 call with AUSA ███. *Id.*

Many of AUSA ███ disclaimers, however, are simply not credible. For example, AUSA ███ claimed not to "have an independent memory of the *Giuffre v. Maxwell* [defamation] lawsuit being mentioned" during the meeting, *id.* at 1, even though her notes are replete with references to the lawsuit, Ex. J. After reviewing her notes, AUSA ███ denied that they refreshed her memory. Ex. K, p 1.

AUSA ███ similarly denied remembering whether Giuffre's attorneys ever provided her with documents, *id.* at 6, despite the email from Peter Skinner just hours after the February 29 meeting providing AUSA ███ with numerous documents, Ex. L, p 1–2, and despite the fact that AUSA ███ in 2018 personally delivered those documents to AUSA ███ AUSA ███, and one member of the prosecution team in this case, Ex. N, p 1 (12/6/2018 Email to AUSA ███: "Just went through my files and found a folder w/ the notes I took and the documents they brought me. Want to come by?").

When AUSA ███ did claim to remember what transpired, her memory was often inconsistent with the contemporaneous evidence. Take just one example. "To [her] knowledge," AUSA ███ said, she did "not receive[] any discovery materials from any civil case." Ex. K, p 6. That is not correct. The government admits that AUSA ███ received from Giuffre's attorneys, and turned over to AUSA ███ and others in the office, including flight records and Palm Beach Police Department Records. Resp. at 66 & n.2. Both of these documents were produced in discovery in the civil case.

From any perspective, therefore, AUSA ████ 2021 version of events is not worthy of credence, nor is the government's Response to Maxwell's Motion, which adopts AUSA ████ version of events (to the extent she claims to remember them) while ignoring the contemporaneous evidence of what actually happened. The record is surpassingly clear:  In February 2016 and the weeks and months after, Giuffre's attorneys "pitched" a prosecution of Maxwell and Epstein.[9]

- **Defense 2: The government was not asked to consider a perjury charge against Maxwell.**

Noting that the February 29, 2016 meeting occurred before Maxwell's two depositions (April and July 2016), the government insists that Giuffre's attorneys did not ask (indeed could not have asked) the government to consider charging Maxwell with perjury. Resp. at 63. Again, the documentary evidence belies this claim.

First, AUSA ████ contemporaneous notes say that "Giuffre wants prosecution." Ex. J, p 7. AUSA ████ knew what Giuffre's attorneys were after, which is why she emailed the Chief of the Criminal Division just days after the meeting to discuss the "intriguing" case, Ex. M.

Second, in the 2021 interview with prosecutors, AUSA ████ did not deny that Giuffre's attorneys asked her to consider a perjury prosecution. Ex. K, p 5. Instead, AUSA ████ said that she "does not remember one way or the other if any of the attorneys referenced the possibility of perjury." *Id.*

---

[9] There are other indications as well that Giuffre's attorneys pressed AUSA ████ to investigate Maxwell. For example, while AUSA ████ notes say ████ "is wanting to cooperate," Ex. J, p 2, they say nothing of the sort about Maxwell, instead describing her as Epstein's "head recruiter," *id. See also* Ex. O.

Third, in the same interview, AUSA ███████ *admitted* that she contemplated a perjury prosecution, and she "recalls thinking that a perjury investigation would have . . . challenges." Ex. K, p 5. Left unexplained by the government in its Response to Maxwell's Motion is why AUSA ███████ would have contemplated a perjury prosecution if Giuffre's attorneys had not proposed one.

There are two possible explanations. Either (1) Giuffre's attorneys knew in February 2016 that they were going to set a perjury trap for Maxwell, and they discussed that plan with AUSA ███████ at the time, or (2) there were additional communications between AUSA ███████ and Giuffre's attorneys (phone calls or even a second meeting) *after* Maxwell was deposed. Either way, the government contemplated a perjury charge against Maxwell in 2016, and the Response's insistence otherwise is not credible.

- **Defense 3: Maxwell's argument relies on nothing but the *Daily News* article.**

The government says that Maxwell's argument "is premised solely on her use of selective snippets from a lone *Daily News* Article that is premised, in meaningful part, on anonymous sources and hearsay." Resp. at 89. This claim is stunningly disingenuous, and it fails on its own terms.

When Maxwell filed her Motion, she did not have access to the government's emails and AUSA ███████ contemporaneous notes, despite their obvious exculpatory value. *See Brady v. Maryland*, 373 U.S. 83, 87–88 (1963). The government did not disclose these materials until Maxwell challenged the government's candor and conduct before Judge McMahon. One wonders whether the government would have provided them to Maxwell had she not filed this Motion.

The government's claim also fails on its own terms. The article is not meaningfully anonymous.[10] Among others, the article quotes David Boies, who said:

> We were saying to anyone who would listen: We've got clients who were abused. Some of them were underage. We have the evidence. There's a whole record that's been developed. We can establish beyond any reasonable doubt there was a massive sex trafficking ring going on.

The article also quotes Brad Edwards, who describes in his self-published memoir the various contacts Giuffre's attorneys had with the U.S. Attorney's Office in 2016.

Finally, as detailed above, AUSA ███████ contemporaneous notes confirm most of the article's substance.[11] Ex. J.

- **Defense 4: There was only one meeting.**

The government denies there was a second meeting between the U.S. Attorney's Office and Giuffre's attorneys. Resp. at 92. This denial, though, is based solely on AUSA ███████ foggy memory and in the absence of any credible investigation. Contrary to the government's claim, the evidence strongly suggests there *was* a second meeting or some further contact between them. At the very least, this Court should hold an evidentiary hearing to find the truth.

---

[10] Stephen Rex Brown, *Manhattan federal prosecutors declined to pursue Jeffrey Epstein and Ghislaine Maxwell case in 2016*, New York Daily News (Oct. 13, 2020), https://www.nydailynews.com/new-york/ny-jeffrey-epstein-maxwell-case-20201013-jmzhl7zdrzdgrbbs7yc6bfnszu-story.html.

To the extent the article relies on unnamed sources, there is no indication those sources are anonymous in the sense that the author is unaware of their identity. In the 2021 call, the government apparently did not ask AUSA ███████ whether she was one of the unnamed sources. *See* Ex. K.

[11] The government also says the article is hearsay. Resp. at 89. This is an odd claim for the government to make while asking this Court to credit double hearsay: someone's notes of statements made by AUSA ███████ during a phone call. The government's hearsay argument does nothing but support Maxwell's request for an evidentiary hearing.

Two of the sources in the Daily News article insisted there was a second meeting in the summer of 2016.[12]

In addition, as described above, AUSA ███████ in 2021 said she recalls contemplating a perjury prosecution of Maxwell. Ex. K, p 5. But if there were only the one meeting, it makes little sense for AUSA ███████ to have been thinking about a potential perjury prosecution in February of 2016, before Maxwell had even been deposed (unless the plan was to set a perjury trap for Maxwell). It is more likely that AUSA ███████ contemplated a perjury prosecution after a second meeting with Giuffre's attorneys, which took place after at least one of Maxwell's depositions. As reported in the *Daily News*, "David [Boies] was particularly frustrated by the failure to pursue a perjury charge."[13] "We have her dead to rights," he said.[14]

This Court cannot accept without further inquiry the government's assertion that there wasn't a second meeting or any further contact between the U.S. Attorney's Office and Giuffre's attorneys. At a minimum, an evidentiary hearing is required.

- **Defense 5: AUSA ███████ had no idea what was in Boies Schiller's files.**

The government stands by the claim that AUSA ███████ had "either little or no additional information than [Judge McMahon did] in terms of what materials there are [and] who was deposed" and, for all the government knew, the deposition transcripts would show "page after page of people taking the Fifth." *See* Resp. at 70. The government's Response is not credible.

---

[12] *Supra* Note 10.

[13] *Supra* Note 10.

[14] *Supra* Note 10.

For one thing, the government admits that Giuffre's attorneys turned over several documents in 2016, which were in the government's possession when AUSA ▮▮▮▮ claimed to Judge McMahon that he did not know what was in Boies Schiller's file. Moreover, by the time AUSA ▮▮▮▮ told Judge McMahon that, for all he knew, the deposition transcripts would show "page after page of people taking the Fifth," it was already a matter of public record that Maxwell had been deposed and that she had *not* invoked the Fifth Amendment. Ex. Q, p 1.

The government's argument also defies logic. The government was asking Judge McMahon to authorize a subpoena of Boies Schiller's *entire* file. At a minimum, the government had to have asked Boies Schiller about the size of the file and issues related to privilege to determine if Boies Schiller would contest the subpoena or notify either the civil court or Maxwell when the subpoena was issued and responsive documents produced. In fact, the government issued *two* subpoenas to Boies Schiller: the first for material covered by the Protective Order, and the second for material outside the Protective Order's reach. Clearly, the government knew more about Boies Schiller's file than AUSA ▮▮▮▮ let on.

- **Defense 6: The "subject of your investigation" to whom Judge McMahon referred was Jeffrey Epstein.**

According to the government, when Judge McMahon asked AUSA ▮▮▮▮ "about contacts between the United States Attorney's Office and the Boies Schiller firm prior to the issuance of the subpoena on the subject of your investigation," Mot. Ex. E, p 2, Judge McMahon was referring only to Epstein. Resp. at 71. This is not a plausible reading of the transcript.

After his first appearance before her, Judge McMahon haled AUSA ▮▮▮▮ back to court for one reason. "I'll be very up-front with you," she said. Mot. Ex. E, p 2.

14

> I want to make sure I'm not in a *Chemical Bank*[15] kind of situation, so I would like to know about contacts between the United States Attorney's Office and the Boies Schiller firm prior to the issuance of the subpoena on the *subject of your investigation*.

*Id.* (emphasis added).

"Tellingly,"[16] Judge McMahon did not ask AUSA ███████ about the "target" of his investigation; she asked about its "subject." The "subject of [the] investigation" is much broader than its "target."

"A 'target' is a person as to whom the prosecutor or the grand jury has substantial evidence linking him or her to the commission of a crime and who, in the judgment of the prosecutor, is a putative defendant."[17] "A 'subject' of an investigation is a person whose conduct is within the scope of the grand jury's investigation."[18] The scope of an investigation, in turn, includes not only potential defendants and potential victims, but also the conduct at issue and the locations involved.

Were there any doubt about Judge McMahon's meaning, she put that doubt to rest in her written order authorizing the subpoena. Mot. Ex. G, p 21. The "subject of the investigation," she explained, was "the matters that were the subject of the *Giuffre* [defamation] Action." *Id.* And having asked AUSA ███████ about his office's contacts with Boies Schiller about "the

---

[15] *Chemical Bank v. Affiliated FM Ins. Co.*, 154 F.R.D. 91 (S.D.N.Y. 1994).

[16] "Tellingly," claims the government in the Response, "Maxwell omits [the phrase 'subject of your investigation'] of this question from her motion." Resp. at 70 n.34.  Not true. On page 13 of Maxwell's Motion, in arguing that AUSA ███████ mislead Judge McMahon, Maxwell fully and completely quotes Judge McMahon's question, just as she does above. Mot. at 13 (quoting Ex. E, p 2).

[17] United States Department of Justice, JUSTICE MANUAL, JM § 9-11.151, *Grand Jury, Advice of "Rights" of Grand Jury Witnesses* (updated Jan. 2020), available at: https://www.justice.gov/jm/jm-9-11000-grand-jury#9-11.151 (last accessed Mar. 11, 2021).

[18] *Id.*

matters that were the subject of the *Giuffre* [defamation] Action," and having been misled by

AUSA ██████████ response, Judge McMahon erroneously (though blamelessly) concluded that

> [n]othing in this record suggests to me that Giuffre or Boies Schiller had anything
> to do with the Government's decision to convene a grand jury to look into *the
> matters that were the subject of the Giuffre Action*. . . There is no evidence of
> "collusion," to invoke a term of the moment, and it is quite clear that Boies Schiller
> did not foment the Government's investigation.

*Id.* (emphasis added).

For her part, AUSA ██████ shared the very concern Judge McMahon later expressed to

AUSA ██████████: that Boies Schiller was trying to instigate an investigation of Maxwell to

leverage its position in the "*Giuffre* Action." Mot. Ex. K, p 3. In the 2021 call, AUSA ██████

recalled that the

> pending CVRA civil case and other civil litigation . . . gave [her] some pause
> because she had other occasions where civil litigants have decided to report
> something to the USAO because they think it will help them in their civil case.

AUSA ██████ even mentioned this concern to the Chief of the Criminal Division. *Id.* If AUSA

██████ and the Chief of the Criminal Division recognized what was going on, AUSA ██████████

can hardly feign ignorance.[19]

If the government means to suggest that when Judge McMahon asked about any prior

contacts concerning "the subject of your investigation," she was somehow confining her inquiry

to the time period surrounding November 2018, *see* Resp. at 90–91, that too is an implausible

reading of the transcript. If Judge McMahon meant "subject" to be a term of art ("subject" of the

investigation as opposed to a "target" of the investigation), then the government should have

---

[19] Of course, if AUSA ██████ honestly did not understand Chief Judge McMahon's question,
once she issued her opinion there could no longer be any doubt. And at that point, AUSA ██████
would have been duty-bound to correct the misimpression he had created. N.Y. Rules of Professional
Conduct, Rule. 3.8, cmt. [6A] ("Like other lawyers, prosecutors are subject to Rule 3.3, which requires a
lawyer to take reasonable remedial measures to correct material evidence that the lawyer has offered
when the lawyer comes to know of its falsity.").

disclosed the Boies Schiller contacts for the reasons given above. And if Judge McMahon meant "subject" to have its everyday meaning, then she was asking about something even broader: Whether the U.S. Attorney's Office had contacts with Boies Schiller about the "subject"—i.e., the "conduct"—being investigated.

Nothing about the transcript supports the government's overly narrow, hindsight-based interpretation of Judge McMahon's question.

* * *

For these reasons, this Court should reject the government's attempt to rewrite the history of its investigation and its affirmative misrepresentations to Judge McMahon.

### B.  Assuming the Government's Defenses Are Worthy of Belief, the Government Still Misled the Court.

Even if the government's account were worthy of belief (which it is not), that doesn't get the government off the hook.

The government would like this Court to believe that: (1) the February 29 meeting concerned a prosecution of Epstein *only* and not Maxwell; and (2) when Judge McMahon asked AUSA ███████ about his office's prior contacts with Boies Schiller concerning "the subject of its investigation," Judge McMahon was referring to Epstein *only* and not Maxwell.

Even if those two assertions were true, however, then AUSA ███████ still misled Judge McMahon and misrepresented the origins of the investigation. Under the government's version of events, "the pitch was to investigate Epstein, not Maxwell." Resp. at 89 n.39. If that's true, AUSA ███████ unquestionably should have told Judge McMahon about the February 2016 meeting when she asked him "about contacts between the United States Attorney's Office and the Boies Schiller firm prior to the issuance of the subpoena on the *subject of your investigation*"—i.e., Epstein. AUSA ███████ did not tell Chief Judge McMahon about the

contacts with Boies Schiller on the topic of Epstein any more than he shared the contacts on the topic of Maxwell—he simply denied any contacts had occurred, something that is demonstrably false.

Whether Boies Schiller "pitched" a prosecution of Epstein only or of Epstein and Maxwell as a duo, AUSA ███████ misled Judge McMahon by denying there was any "pitch" whatsoever.

## III.   The Materiality of the Government's False Statements.

The government halfheartedly suggests that "there is no reason to believe that a description of the February 2016 meeting would have been material to Chief Judge McMahon's analysis of whether she was facing a '*Chemical Bank* kind of situation.'" Resp. at 91. Hardly. In fact, there is *every reason* to believe Judge McMahon would have refused to authorize the subpoena if AUSA ██████ had not so misled her.

How do we know? Because Judge McMahon said so—at least twice.

Judge McMahon first made this clear by haling AUSA ████████ back in for one and only one reason: To ask him about the contacts between Boies Schiller and his office before November 2018. So crucial was this question to Judge McMahon's decision that the transcript of the AUSA ██████ second appearance before her is just three pages long. Mot. Ex. E.

Judge McMahon made her thinking even clearer in her written order authorizing the subpoena. Mot. Ex. G. On page 12 of her opinion, when attempting to reconcile *Chemical Bank* with *Martindell*,[20] Judge McMahon found that "nothing in the record suggests that the Government's investigation in this case was occasioned by Boies Schiller—a point to which I will return later in this opinion." Mot. Ex. G, p 12.

---

[20] *Martindell v. Int'l Tel. & Tel. Corp.*, 594 F.2d 291 (2d Cir. 1979).

Judge McMahon "returned" to that point when discussing whether Maxwell could have reasonably relied on the Protective Order:

> [T]he only thing on which Maxwell or anyone else might reasonably have relied is that Giuffre or her lawyers would not do what the defendant in *Chemical Bank* did—that is, forward discovery materials in their possession to prosecutors for the purpose of fomenting an investigation. But I am not faced with that situation. Nothing in this record suggests to me that Giuffre or Boies Schiller had anything to do with the Government's decision to convene a grand jury to look into the matters that were the subject of the *Giuffre* Action. On the contrary—the Government has advised the Court that it contacted Boies Schiller as part of its search for parties who might have been victims in its investigation; and that Boies Schiller told the Government that it could not consensually produce at least some documents in its files because of the existence of the Protective Order. There is no evidence of "collusion," to invoke a term of the moment, and it is quite clear that Boies Schiller did not foment the Government's investigation. Moreover, the Assistant United States Attorney has represented to this Court that he has no idea what is in Boies Schiller's files, and that for all he knows every witness who was deposed stood on his/her Fifth Amendment rights and refused to answer questions.

*Id.* at 21.

Contrary to Judge McMahon's understanding, Boies Schiller contacted the government (not the other way around); there was ample evidence of "collusion"; it was "quite clear that Boies Schiller *did* . . . foment the Government's investigation"; and AUSA ██████ knew much more about what was in Boies Schiller's files than he let on.

The *Chemical Bank* situation Judge McMahon was worried about— when civil litigant attempts to foment a criminal investigation of her opponent—is exactly what occurred.

Judge McMahon cannot be faulted for not knowing all the facts. AUSA ██████, on the other hand, had a "complete handle on the landscape," and he withheld the truth from Judge McMahon. Had AUSA ██████ not misled her, it is clear Judge McMahon would not have authorized the subpoena.[21]

---

[21] It's notable that even without the benefit of truth from AUSA ██████, Judge McMahon wrongly concluded that Maxwell could not have reasonably relied on the Protective Order. In fact, the

IV.   **The Remedy for the Government's Misconduct.**

A.   **Pursuant to its Inherent Power, this Court Should Suppress the Evidence Obtained from Boies Schiller and Dismiss Counts Five and Six, which are the Fruits of that Evidence.**

This Court has inherent authority to regulate the administration of criminal justice among the parties. *McNabb v. United States*, 318 U.S. 332, 340 (1943). "Judges have an obligation to exercise supervision over the administration of criminal justice in federal courts, a responsibility that 'implies the duty of establishing and maintaining civilized standards of procedure and evidence.'" *United States v. Ming He*, 94 F.3d 782, 789 (2d Cir. 1996) (quoting *McNabb*, 318 U.S. at 340). As the Supreme Court held in *United States v. Payner*, "Federal courts may use their supervisory power in some circumstances to exclude evidence taken from the defendant by 'willful disobedience of law.'" 447 U.S. 727, 735 (1980) (quoting *McNabb*, 318 U.S. at 345) (citing *Elkins v. United States*, 364 U.S. 206, 223 (1960); *Rea v. United States*, 350 U.S. 214, 216–17 (1956); *Hampton v. United States*, 425 U.S. 484, 495 (1976) (Powell, J., concurring in judgment)). A court should invoke its supervisory power of suppression when "there has been a fraud upon the court in addition to a violation of the defendant's rights." *United States v. Cortina*, 630 F.2d 1207, 1216 (7th Cir. 1980).

In *United States v. Cortina*, a magistrate issued a search warrant based upon an affidavit subscribed by FBI Agent Linda Stewart, which itself was based on the reports and investigation of FBI Agent William Brown. *Id.* at 1208. Unbeknownst to Agent Stewart, Agent Brown's

---

Second Circuit in *Brown v. Maxwell* held a few months after Judge McMahon's ruling that Maxwell had reasonably relied on the Protective Order's guarantee of confidentiality in substantial part, and it therefore redacted *sua sponte* from the summary judgment material those "deposition responses concerning intimate matters where the questions were likely only permitted—and the responses only compelled— because of a strong expectation of continued confidentiality. 929 F.3d 4, 48, n.22 (2d Cir. 2019) (citing Fed. R. Civ. P. 5.2). So, too, has Judge Preska redacted substantial material from the documents she has released on remand from the Second Circuit, again reflecting that Maxwell reasonably relied on the Protective Order.

reports were replete with misrepresentations and outright lies about the conversations he had with, and information provided by, a confidential informant. *Id.* at 1212–13. The Court of Appeals affirmed the district court's order suppressing the evidence obtained from the search conducted under the warrant. *Id.* at 1213. "This search," said the Court, "never should have taken place." *Id.*

The Court offered two bases for its decision. It first invoked the *Franks* analysis to affirm the district court's conclusion that Agent Brown intentionally or recklessly misrepresented material information in Agent Stewart's affidavit. *Id.* But the Court went further, concluding that suppression was independently required as a matter of inherent authority. *Id.* at 1214–17. Because Agent Brown lied in the affidavit (in addition to lying at the *Franks* hearing), "[t]he call for the court's supervisory power under the[] circumstances is at its strongest and most defensible." *Id.* at 1214.

The Court recognized that the inherent authority doctrine is not a free pass for courts to suppress evidence or "merely [to] disagree with the method[s] of law enforcement." *Id.* "[T]he federal supervisory power does not give 'the federal judiciary a 'chancellor's foot' veto over law enforcement practices of which it (does) not approve.'" *Id.* (quoting *United States v. Russell*, 411 U.S. 423, 435 (1973)). Even so, inherent authority is properly invoked to "prevent[] the court from condoning a fraud perpetrated upon it." *Id.* Suppression serves both to deter unlawful governmental conduct and to protect judicial integrity. *Id.* (weighing "the deterrent values of preventing the incrimination of those whose rights the police have violated . . . and the need to protect the integrity of the federal courts against the cost to society of excluding 'probative but tainted evidence'").

Maxwell had a due process right to notice and an opportunity to be heard on the government's request to modify the Protective Order and issue a subpoena to Boies Schiller. Mot. Ex. A, ¶ 14 (permitting modification of the Protective Order only "for good cause shown following notice to all parties and an opportunity to be heard"); Mot. Ex. H (Judge Netburn denying the government's *ex parte* request to modify the Jane Doe 43 Protective Order in part because the government was attempting to deprive Maxwell of notice and an opportunity to be heard); *Martindell*, 594 F.2d at 294; *see* U.S. CONST. amend. V. Maxwell also had a privacy interest in the materials subject to the subpoena, including most especially her deposition transcripts. Mot. Ex. A (defining "confidential" material as that which "implicates common law and statutory privacy interests of . . . Ghislaine Maxwell"); *see* U.S. CONST. amend. IV. The government violated these rights when it secured an *ex parte* modification of the Protective Order based on materially false statements to Judge McMahon. In resisting any sanction for its misconduct, and in denying that Maxwell should even be afforded a hearing, the government asks this Court to "condon[e] a fraud perpetrated upon it." *See Cortina*, 630 F.2d at 1214.

To be sure, AUSA ███████ misled Judge McMahon in answering the singular question she posed, and he did so with full knowledge of the facts. AUSA ███████ misrepresentations were material to Judge McMahon's decision, because she would not have modified the Protective Order if AUSA ███████ had been candid about Boies Schiller's role in initiating the investigation. As Judge McMahon put it, "the only thing on which Maxwell . . . might reasonably have relied is that Giuffre or her lawyers" would not approach prosecutors and "foment the Government's investigation." Mot. Ex. G, p 21. I. That is, in fact, exactly what happened. As in *Cortina*, the modification of the Protective Order "never should have taken place." *Id.* When, as here, a prosecutor—from the public corruption unit no less—misrepresents

material information to a federal judge in an *ex parte* proceeding, "[t]he call for the court's supervisory power . . . is at its strongest and most defensible." *Cortina*, 630 F.2d at 1214.

Maxwell need not satisfy the standard of *Franks v. Delaware*, 438 U.S. 154 (1978) in order to obtain relief. But even if *Franks* applies, Maxwell has easily met her burden. To obtain a *Franks* hearing, a defendant must make a "substantial preliminary showing," *United States v. Falso*, 544 F.3d 110, 125 (2d Cir. 2008) (quoting *Franks*, 438 U.S. at 155–56), that (i) there were "inaccuracies or omissions" in the affidavit, (ii) "the alleged falsehoods or omissions were necessary to the issuing judge's probable cause or necessity finding," and (iii) "the claimed inaccuracies or omissions [were] the result of the affiant's deliberate falsehood or reckless disregard for the truth." *United States v. Lambus*, 897 F.3d 368, 397 (2d Cir. 2018). Here, there is no dispute that (i) AUSA █████████ representations to Judge McMahon were false and misleading, (ii) Judge McMahon would not have modified the Protective Order to authorize the subpoena if AUSA █████████ had been honest with her, and (3) AUSA █████████ statements were deliberately false, since he had a "complete handle on the landscape" months before he appeared in front of and misled Judge McMahon.

Nor need Maxwell prove "outrageous government conduct" to obtain relief. Were that her burden, however, Maxwell would have easily satisfied it. "The concept of fairness embodied in the Fifth Amendment due process guarantee is violated by government action that is fundamentally unfair or shocking to our traditional sense of justice." *United States v. Schmidt*, 105 F.3d 82, 91 (2d Cir. 1997). To prevail on an outrageous government conduct claim, "a defendant must show that the government's conduct is 'so outrageous that common notions of fairness and decency would be offended were judicial processes invoked to obtain a

conviction.'" *United States v. Bout*, 731 F.3d 233, 238 (2d Cir. 2013) (quoting *United States v. Schmidt*, 105 F.3d 82, 91 (2d Cir. 1997)).

Here, it would "shock the conscience" to permit a prosecutor to make false statements to a federal judge to circumvent another judge's duly-entered order, all in violation of the defendant's due process, privacy, and Fourth and Fifth Amendment rights. The only way to prevent Maxwell from suffering unconstitutional prejudice because of the government's misconduct is to suppress the evidence the government unlawfully obtained and to dismiss Counts 5 and 6.

                                        * * *

AUSA ███████ breached two separate but equally consequential duties: The duty of a public prosecutor and the duty of candor.

"[T]he responsibility of a public prosecutor differs from that of the usual advocate; his duty is to seek justice, not merely to convict." *Young v. United States*, 481 U.S. 787, 803 (1987). Prosecutors are held to a higher standard, and for good reason. "[The prosecutor] is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer." *Berger v. United States*, 295 U.S. 78, 88 (1935).

Moreover, "[i]n light of the prosecutor's public responsibilities, broad authority and discretion, the prosecutor has a heightened duty of candor to the courts and in fulfilling other professional obligations." ABA Criminal Justice Standards, Prosecution Function, Standard 3-1.4 (4th ed. 2017). "While all lawyers owe a duty of honesty and candor to the Court, 'this obligation lies most heavily upon [public prosecutors] who are not merely partisan advocates, but public officials charged with administering justice honestly, fairly and impartially." *Morales v. Portuondo*, 165 F. Supp. 2d 601, 612 (S.D.N.Y. 2001).

In turn, this already high standard ratchets up even higher when a prosecutor appears before the court *ex parte*. "The duty of candor is, if anything, more critical when *ex parte* applications are made to a court." *In re WinNet R CJSC*, 2017 WL 1373918, at *9 (S.D.N.Y. No. 16MC484(DLC), Apr. 13, 2017); *see* N.Y. Rules of Professional Conduct, Rule 3.3(d) ("In an ex parte proceeding, a lawyer shall inform the tribunal of all material facts known to the lawyer that will enable the tribunal to make an informed decision, whether or not the facts are adverse."); *see also id.* cmt. [14]. And it "is not a defense to claim that, while factual statements to the Court were materially misleading, they were not literally false. Attorneys are officers of the Court, and our system of justice cannot operate efficiently if the Court cannot rely on the candor of counsel presenting an application for *ex parte* relief." *Four Star Fin. Servs., LLC v. Commonwealth Mgmt. Assocs.*, 166 F. Supp. 2d 805, 810 (S.D.N.Y. 2001).

AUSA ███████ failed to live up to these standards. In an *ex parte* proceeding, AUSA ███████ affirmatively misled Judge McMahon, with full knowledge of what issue concerned Judge McMahon and what information would be material to her decision. When, as here, "there has been a fraud upon the court," *Cortina*, 630 F.2d at 1216, "[t]he court has inherent authority to regulate the administration of criminal justice among the parties before the bar . . . . [by] exclud[ing] evidence taken from the defendant by willful disobedience of law," *id.* at 1214. *United States v. Lambus*, 897 F.3d 368, 386 (2d Cir. 2018) ("It is within the court's inherent authority to suppress evidence gathered unlawfully in order to maintain the integrity of its own proceedings. . . .").

**B.   At a Minimum, this Court Should Order a Hearing at which Maxwell May Inquire into the Circumstances Surrounding the Government's Misrepresentation to Judge McMahon.**

"An evidentiary hearing is normally required to address motions to suppress where a factual issue is in dispute." *United States v. Paredes-Cordova*, No. S1 03 CR. 987DAB, 2009 WL 1585776, at *1 (S.D.N.Y. June 8, 2009); *United States v. Pena*, 961 F.2d 333, 339 (2d Cir. 1992) ("[A]n evidentiary hearing on a motion to suppress ordinarily is required if the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question." (quotation omitted))). Here, the government has confessed enough facts to demonstrate that Maxwell at least is entitled to a hearing.

There is no merit to the government's assertion that Maxwell is not entitled to a hearing because she has not submitted an affidavit in support of her Motion. An affidavit is not a prerequisite to a hearing when the government has confessed the existence of facts sufficient to entitle a defendant to an evidentiary hearing.

Nor is an affidavit required when information at issue is peculiarly within the possession of the government (*e.g.*, AUSA ███████ and AUSA ███████) or others who are adverse to Maxwell (*e.g.*, Boies, Edwards, Skinner, Pottinger). *See Cortina*, 630 F.2d at 1216 ("The violation here is particularly insidious because it is difficult to uncover misrepresentations in an [*ex parte* submission]. The information needed to prove such assertions false is peculiarly within the hands of the government."). Since Maxwell was not at the February 29 meeting or copied on any of the emails or communications that followed, the Response does not explain how Maxwell could possibly submit an affidavit attesting to the government's misrepresentations based on personal knowledge.

The government of course does not suggest that any of its agents, such as AUSA ███████, would be willing to provide an affidavit to Maxwell or otherwise speak with defense counsel absent compulsion from this Court. Indeed, the government conspicuously did not attach to its Response any affidavits about its interactions with Boies Schiller.

It's plain, therefore, that this Court should hold an evidentiary hearing and effectuate Maxwell's constitutional right to compulsory process because that is the only way to get to the truth.[22]

## Conclusion

For these reasons, as well as those given in the Motion, this Court should: (1) suppress all evidence the government obtained from Boies Schiller and any other evidence derived therefrom; or (2) suppress the April and July 2016 depositions and all evidence derived therefrom; and (3) dismiss Counts Five and Six. Maxwell requests an evidentiary hearing on this Motion.

Dated: March 15, 2021

---

[22] If this Court concludes an affidavit is required *before* it holds a hearing, Maxwell requests leave, as she did in her Motion, to attempt to obtain such an affidavit. But if, as is likely, none of the participants—*e.g.*, AUSA ███████, AUSA ███████, Boies, Edwards, Skinner, Pottinger—voluntarily provides an affidavit, Maxwell invokes her constitutional right to compulsory process and this Court's authority to compel testimony in support of her defense. U.S. CONST. amend. VI.

Respectfully submitted,


*s/ Jeffrey S. Pagliuca*
Jeffrey S. Pagliuca
Laura A. Menninger
HADDON, MORGAN & FOREMAN P.C.
150 East 10th Avenue
Denver, CO  80203
Phone: 303-831-7364


Christian R. Everdell
COHEN & GRESSER LLP
800 Third Avenue
New York, NY  10022
Phone: 212-957-7600


Bobbi C. Sternheim
Law Offices of Bobbi C. Sternheim
33 West 19th Street - 4th Floor
New York, NY  10011
Phone: 212-243-1100


*Attorneys for Ghislaine Maxwell*

**Certificate of Service**

I hereby certify that on March 15, 2021, I served by email, pursuant Rule 2(B) of the Court's individual practices in criminal cases, the *Reply Memorandum of Ghislaine Maxwell in Support of Her Motion Under the Due Process Clause to Suppress All Evidence Obtained from the Government's Subpoena to Boies Schiller and to Dismiss Counts Five and Six* upon the following:

Alison Moe
Maurene Comey
Andrew Rohrbach
Lara Pomerantz
U.S. Attorney's Office, SDNY
One Saint Andrew's Plaza
New York, NY 10007
Alison.moe@usdoj.gov
Maurene.comey@usdoj.gov
Andrew.Rohrbach@usdoj.gov
Lara.Pomerantz@usdoj.gov

*s/ Christian R. Everdell*