# LAW OFFICES OF BOBBI C. STERNHEIM

212-243-1100 • Main
917-306-6666 • Cell
888-587-4737 • Fax

33 West 19th Street - 4th Floor
New York, New York 10011
bc@sternheimlaw.com

June 15, 2021

Honorable Alison J. Nathan
United States District Judge
United States Courthouse
40 Foley Square
New York, NY 10007

Re: *United States v. Ghislaine Maxwell*
S2 20 Cr. 330 (AJN)

Dear Judge Nathan:

This letter is submitted in response to the government's letter of June 7, 2021, updating the Court concerning Ghislaine Maxwell's conditions of detention. This letter, like the ones before it, contains second- and third-hand information and presents a one-sided review, giving the Court and the public the false impression that Ms. Maxwell is detained under favorable and privileged conditions. Each time, the defense feels compelled to respond to give the Court and the public a complete and accurate picture of Ms. Maxwell's unacceptable conditions of confinement. This is not the purpose that these updates were designed to serve. Accordingly, the defense requests that any further updates be limited to changed circumstances.

Counsel for Ms. Maxwell can personally attest to many problems that are not reported to the government, not conveyed to the Court, and not docketed for public review. The following is a sample of new and recurring problems:

- Last week, raw sewage permeated Ms. Maxwell's isolation cell, necessitating her removal to another cell.

- Vermin droppings fell from air vents.

- Guards now prevent Ms. Maxwell from removing legal documents from the videoconferencing room for review during the lunch hour.

- On Sunday, guards initially refused to allow Ms. Maxwell to bring a notebook to a scheduled in-person legal conference, disbelieving her assertion that it contained legal material.  A guard reviewed the contents of the notebook, reading pages containing confidential and privileged work product, before permitting Ms. Maxwell to bring the notebook to the legal visit.

- Contrary to previous legal conferences, neither counsel nor Ms. Maxwell were permitted to have any water in the individual conference room during Sunday's four-hour legal conference.

- Three to six guards watched Ms. Maxwell and counsel for the entirety of the conference.

- Neither counsel nor Ms. Maxwell were permitted to use the most rudimentary of earbuds to listen to audio files on counsel's laptop, requiring the volume to be raised to maximum level.  Ms. Maxwell cannot have privileged communications with her counsel and adequately prepare for trial if the prison guards can hear what she is reviewing and discussing with counsel.

- The prison guards ordered counsel to reposition her portfolio, which was being used to shield glare from the plexiglass divider separating counsel from Ms. Maxwell to permit counsel to have a clearer view of the laptop, because the portfolio was restricting the guards' view of counsel.

- At one point, a prison guard interrogated counsel about what she was doing with her hands. (Counsel was blotting a bleeding finger with note paper.)

- At the conclusion of Sunday's legal visit, counsel requested that the guards inventory Ms. Maxwell's documents in the presence of counsel to avoid the problem that ensued following the April 24th visit when counsel was falsely accused of improperly leaving documents with Ms. Maxwell.

- Yesterday, the monitor which has been used for video conferencing for months was repositioned to a distance further away from Ms. Maxwell impacting her ability to review screen-shared documents with counsel.  The request was immediately denied.

- Today's videoconferencing was reduced by 90 minutes while changes were made to MDC equipment. These changes have disrupted videoconferencing, which had been working well, and now severely impact attorney-client communication and the ability to prepare the case for trial. On counsel's end, the audio is impacted by a whirling, whistling sound - like water going down a drain. The video is completely blurred, causing eye strain, and compromising the sharing of documents, which are too hazy to decipher. On the MDC end, the audio is loud and echoes, making it difficult to understand and audible to staff, compromising attorney-client confidentiality. The monitor- now enclosed in a box with a plastic cover - is now positioned some three to four feet away from Ms. Maxwell. This distance impacts Ms. Maxwell's ability to view screen-shared documents and requires her to contort her body - back and neck - and risk further injury while attempting to see shared legal documents.

During a recent sentencing in which defense counsel described deplorable conditions at the MCC, Judge McMahon acknowledged that the defendant had been subjected to conditions as "disgusting, inhuman as anything I've heard about any Colombian prison, but more so because we're supposed to be better than that." *United States v. Tiffany Days*, 19 Cr. 619 (CM), Sentencing Transcript at 19 (annexed as Exhibit A.)  Addressing both the MCC and the MDC, Judge McMahon boldly stated:

> [T]here is no excuse for the conditions in those two institutions. . .. [Detainees] shouldn't suffer for the incompetence of the United States Department of Justice and its subsidiary agency, the Bureau of Prisons. I will do what I can to bring your situation to the people who, if they give a damn, might do something.

Exhibit A at 20.

Numerous complaints have been brought to the Court's attention regarding recurring problematic conditions at the MDC and over-management of Ms. Maxwell.  Little if anything has been done to improve Ms. Maxwell's conditions; and the government's updates to the Court embolden the MDC to maintain the status quo. The ever-changing rules are negatively impacting Ms. Maxwell's ability to prepare for trial and are interfering with privileged attorney-client communication. The hyper-surveillance of Ms. Maxwell and counsel during legal visits is highly inappropriate and invasive.  At a minimum, this should not be sanctioned by the Court.

Very truly yours,


BOBBI C. STERNHEIM

cc: Counsel for both parties

# EXHIBIT A

L4TPDAYS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

       v.                          19 CR 0619(CM)
                          Videoconference

TIFFANY DAYS,

          Defendant.

------------------------------x

                          New York, N.Y.
                          April 29, 2021
                          11:23 a.m.

Before:

               HON. COLLEEN McMAHON,

                          District Judge

          APPEARANCES VIA VIDEOCONFERENCE

AUDREY STRAUSS,
    United States Attorney for the
    Southern District of New York
BY:  NICHOLAS W. CHIUCHIOLO
    Assistant United States Attorney

DONALDSON, CHILLIEST & McDANIEL, LLP
    Attorneys for Defendant
BY:  XAVIER R. DONALDSON

L4TPDAYS

1          (The Court and all parties appearing via videoconference)

2          THE COURT:  19 CR 619, United States of America v.

3     Tiffany Days.  Your appearances, counsel?

4          MR. CHIUCHIOLO:  Good morning, your Honor.  Nicholas

5     Chiuchiolo on behalf of the government.

6          THE COURT:  Good morning, Mr. Chiuchiolo.

7          MR. DONALDSON:  Good morning, your Honor.  Xavier R.

8     Donaldson on behalf of Ms. Days.  Good morning, Mr. Chiuchiolo.

9     Good morning, everyone else.

10         THE COURT:  Good morning, Mr. Donaldson.

11         Good morning, Ms. Days.

12         THE DEFENDANT:  Good morning, Judge.

13         THE COURT:  The court reporter.

14         I'm very sorry about the technical difficulty.

15     Mr. O'Neil may be looking at himself on five screens.

16         THE DEPUTY CLERK:  I'm going to try again, Judge.

17         THE COURT:  I'm going to proceed.  This matter is on

18     for sentencing under docket number 19 CR 619, United States of

19     America v. Tiffany Days.

20         Ms. Days, having pled guilty to one count of

21     conspiracy to distribute and to possess with intent to

22     distribute narcotics, a class B felony, in violation of 21,

23     United States Code, Section 846, 841(b)(1)(B) and 841(a)(1).

24     This crime carries a statutory mandatory minimum sentence of

25     five years, to a statutory mandatory -- not mandatory,

L4TPDAYS

statutory maximum of 40 years' imprisonment, a minimum term of
four years to a maximum term of lifetime supervised release, a
maximum fine of $5 million, and a $100 special assessment.

          In connection with this matter, I have received and
reviewed the presentence sentence investigation report prepared
by United States Probation Officer Sandra Vella Garcia.  It was
filed with the Court on October 15, 2020.  I have a letter on
the stationery of the United States Attorney's Office dated
March 27, 2020.  That looks to me like the plea agreement.  So
I have a copy of the plea agreement.  I have a memo dated
April 22nd, 2021, on the stationery of the United States
Attorney's Office, which is in the nature of a sentencing
memorandum from the government.  I have a sentencing memorandum
filed on April 21st, 2021 from Mr. Donaldson.

          Aside from the waiver, which we'll talk about in one
minute, is there anything else I should have seen in writing
prior to today's proceeding?  I should note that
Mr. Donaldson's memorandum has, I believe, some attachments to
it.  No, it doesn't.  It does not.  That's the other one.
Okay.

          Is there anything else I should have seen in writing
prior to today's proceeding from the government?

          MR. CHIUCHIOLO:  Not from the government, your Honor.

          THE COURT:  From the defense?

          MR. DONALDSON:  No, I don't believe so, your Honor.

L4TPDAYS

1    Thank you.  You have everything.

2           THE COURT:  Okay.  Now, I have in front of me a

3    document entitled Waiver of Right to be Present at Criminal

4    Proceeding and Consent to Proceed Via Video or Telephone

5    Conference.

6           I make the findings required of me under the CARES

7    Act.  I make the findings required of me under the CARES Act

8    that it is necessary to hold this proceeding remotely, and I

9    understand, by the way, that this is also being done at

10   Ms. Days' request.

11          Is that correct, Mr. Donaldson?

12          MR. DONALDSON:  That is correct, your Honor.  Yes.

13          THE COURT:  Okay.  So, Ms. Days, I have in front of me

14   this waiver of your right to be present at this proceeding.  Do

15   you understand that you have the right to be in the courtroom

16   physically present with me, physically present, at the time of

17   your sentence?

18          THE DEFENDANT:  Yes.

19          THE COURT:  Do you understand that you have the right

20   to speak directly in that courtroom to me?

21          THE DEFENDANT:  Yes.

22          THE COURT:  Is it your wish to proceed with your

23   sentencing via this video and teleconference?

24          THE DEFENDANT:  Yes, your Honor.

25          THE COURT:  Have you discussed these issues with

L4TPDAYS

1   Mr. Donaldson?

2          THE DEFENDANT:  Yes, several times.

3          THE COURT:  And have you authorized Mr. Donaldson to

4   sign this document in which you waive your right to be present

5   in the courtroom at your sentencing?

6          THE DEFENDANT:  Yes.  Yes, your Honor.

7          THE COURT:  Mr. Donaldson, did you, in fact, sign this

8   document on behalf of your client?

9          MR. DONALDSON:  I did, your Honor.

10          THE COURT:  Ms. Days, you should understand that you

11   will have the right, anytime you want to, to speak privately to

12   Mr. Donaldson.  One of the ways in which this device works,

13   this CourtCall works, is we can put you in a breakout room with

14   your lawyer if you need to speak to him privately during the

15   sentencing.  Do you understand that?

16          THE DEFENDANT:  Yes.

17          THE COURT:  All right.  Has the government reviewed

18   the presentence report?

19          MR. CHIUCHIOLO:  Yes, your Honor.

20          THE COURT:  Any additions, deletions or corrections?

21          MR. CHIUCHIOLO:  No, your Honor.

22          THE COURT:  Does the government wish to be heard on

23   sentencing?

24          MR. CHIUCHIOLO:  Your Honor, the government will rely

25   on its sentencing submission, which the Court has reviewed.

L4TPDAYS

1          As the Court is aware, this is the defendant's fourth

2    felony conviction for narcotics offense, and we agree with the

3    probation office that a guidelines sentence would be

4    appropriate in this case.

5          THE COURT:  Thank you very much.

6          Mr. Donaldson, have you reviewed the presentence

7    report?

8          MR. DONALDSON:  Yes, I have, your Honor.

9          THE COURT:  Have you gone over it with Ms. Days?

10         MR. DONALDSON:  Several times, your Honor.

11         THE COURT:  I will hear you on sentencing, sir.

12         MR. DONALDSON:  Thank you very much, your Honor.

13         As the Court is aware, the Court read the PSR, as we

14   all did, and the guideline range that came back from the PSR

15   was 63 to 78 months, similar to what we agreed to in our plea

16   agreement.  The probation department recommended 63 months of

17   incarceration.

18         We are recommending -- requesting that the Court

19   sentence Ms. Day to 60 months, approximately three months below

20   what the probation department is recommending and which would

21   be the statutory minimum.

22         In our writing to the Court, we tried to provide the

23   Court a background of Ms. Days and, we hope, some indication of

24   why we believe 60 months is appropriate, rather than 63 months

25   or rather than a guidelines sentence.

L4TPDAYS

1          First and foremost, we believe, I think, this case

2    pretty much revolves around deterrence and whether Ms. Days

3    will be a productive member of society when she returns or when

4    she gets released.  I think that's probably the central issue

5    for the sentencing proceeding.

6          We do agree -- there's no way we can disagree -- that

7    Ms. Days does have several prior convictions.  That's a given,

8    and we agree that Ms. Days has been convicted of a felony

9    narcotics, that's a given as well.  I guess, it's my opinion in

10   doing these sentencing proceedings so many times, I think the

11   focus of this particular case, if we isolate it, would be

12   whether or not -- or what would be deterrence to Ms. Days and

13   what we believe would be sufficient to ensure that when she

14   comes back out, that she's productive.  The minimum of that,

15   not the maximum.  What the least we can do to make sure she's

16   deterred.

17         In our opinion, we believe the 60 months is

18   appropriate for a number of reasons.  One, we believe that,

19   like most defendants when they get arrested in Federal Court,

20   we believe that rehabilitation starts at the time that they are

21   arrested and, generally, if they're detained, at the time when

22   they are detained.

23         In this particular situation, we think that Ms. Days'

24   rehabilitation and her deterrence started at that time, while

25   in MCC and MDC.  Start with MCC.  Ms. Days made sure that she

L4TPDAYS

1   got involved in as many programs as she could to make sure that

2   she was preparing herself for when she got released.

3          I think as soon as she got arrested and as soon as she

4   got detained and as soon as she was at MCC, she realized that

5   it's time to start making herself a better person.  So in order

6   to do that, as I indicated on page 6 of my writing submission,

7   she must have completed at least nine or ten different

8   programs.

9          Just to name a few, the first one I thought was really

10  important was the inmate companion program.  The reason why I

11  put that first, and I think that's probably, in my opinion, the

12  most important, is because not only does it help herself out,

13  but she was trying to help others.  And I think that's

14  important going forward, that Ms. Day understands that's

15  important to better herself while she's incarcerated.

16         If she can help someone else out, that's good as well,

17  and we need those kind of people when we get outside, people

18  who not only help themselves but people who help others.  So

19  the fact that she participated in this inmate companion program

20  for at least 16 or 17 months is very important.

21         She also completed the Focus Forward project, which I

22  know the courts in this district really take some good solace

23  and put some weight behind that.  She completed that program as

24  well.

25         She completed the Alternative to Drug Dealing, which

L4TPDAYS

is important because she has a drug-selling history; so she

participated in a program to help her understand the

alternatives to that.  So she did that program as well.

        She did the Square One program, Trauma in Life

workshop.  That's important because Ms. Days suffered

significant trauma while she was growing up.  That's

articulated in my writing.  I won't go through that again, but

there is no doubt that Ms. Days suffered significant trauma

while she was growing up.

        Did that participate into why she committed crimes?

Yes, it did.  When I do my case -- when I represent my clients,

I try to figure out the why and at least articulate the why to

the Court.  The why, I think, is stated in my papers why she

began this track or this road towards criminality.

        I think -- I'm sure that this time at MCC has cut that

and stopped that.  We'll get to that in a second, but I'm sure

that that's stopped at this point.  Women in the 21st Century

program, she did that, creative arts and several other

programs, a lot involving actually reading, understanding and

appreciating literature, which I think is significantly

important.  I think the more folks read different books, read

literature, it's like going on vacation to that particular

place, they learn more and they learn more about themselves.

        I was very interested in knowing that she read books

by very good authors.  Actually, one of my favorites is

L4TPDAYS

1    Mr. Coates, but she read some books by Mr. Coates.  She read a

2    few books by Mr. Baldwin.  So those are fantastic books to

3    read.  The fact that she's reading those books and

4    participating in discussing the topics and the subject matters

5    of those books means a lot.

6            It can take weeks to talk about why, but those books

7    and books like that, when you read them and you talk about

8    them, you discuss them, it opens your mind up and it takes you

9    away from the criminality and more to thought processing and

10   understanding how life really works.  So I thought those were

11   very important.

12           She also has significant community support.  Her

13   mother is in support of -- albeit, very ill, but still

14   supportive.  Her brother is, her aunts are, her uncle is.  I

15   believe some other people, maybe one or two, are on the line

16   right now.  But she does have that family support, and I think

17   and I'm sure will assist her, when she gets released, to ensure

18   that she doesn't come back to court.

19           Finally, and this is most important -- not most

20   important but very important to me.  This Covid-19 lockdown,

21   and she even participated in the other lockdown regarding a

22   particular inmate.  MCC, over the last 18, 19 months, have been

23   nothing short of -- I mean, I'll say it on the record -- I

24   think it's been inhumane.

25           I don't think our society is being as just as it is.

L4TPDAYS

1    I'm a firm believer that any society should be judged and can

2    be, I guess, rated by how they treat its poorest citizens and

3    by how it treats those that are incarcerated.

4            MCC is not a good, for lack of a better word, a good

5    look for America.  Its treatment of its prisoners, the inmates,

6    in the last 14 months have been nothing short, in my opinion,

7    of inhumane, cruel and harsh and unreasonably unjust.  If

8    there's -- if I can say, unreasonably unjust.

9            She has suffered immensely.  She can tell you more

10   about that, and Ms. Days is one of the few clients of mine that

11   can articulate very well what she's experienced and what's

12   going on in there.

13           I firmly agree with Judge Oetken when he ruled just

14   recently in *U.S. v. Gonzalez*, that we should be providing some

15   extra time for anybody who spent time in MCC or MDC during this

16   lockdown.  I will note that several years ago we used to try to

17   articulate, when people spent time in prisons in other

18   countries related to a crime, that they were going to be

19   brought back to America, we sometimes used that to say, well,

20   he spent a year or two in a harsh, Mexico or El Salvadoran

21   prison and that's significantly different than U.S.A.

22           The time that she's spent in MCC is significantly

23   worse than any time that anyone thought possible in the last

24   400 years in a federal jail in America.  It's just been, again,

25   nothing short of inhumane, in my opinion.  And to bring that

L4TPDAYS

1    point home, Ms. Days -- although she's never had a single

2    ticket since she's been locked up in MCC or MDC, and I would be

3    remiss if I didn't say that's been difficult and challenging

4    because the inmates, the officers, everyone is frustrated and

5    their frustrations breeds hostility and breeds, you know,

6    people just coming at each other.

7         She has resisted any of that and has not had any

8    tickets.  In fact, she's tried to help people instead of get

9    tickets, but nonetheless, she spent 75 days in the SHU.  Now,

10   the SHU is normally reserved for persons who get tickets.  It's

11   a disciplinary action.  And I think society, we know that, is

12   now moving away from the isolation because we know that it

13   causes significant mental hardship.  It's debilitating.  It

14   causes future mental hardship once you get released from the

15   SHU.

16        Ms. Days has spent 75 days in the SHU.  That is

17   absolutely, positively incredible, in my opinion, because I've

18   not had a client do that who has not had a ticket.  So because

19   of that, because of the other reasons I've articulated, I

20   firmly believe that Ms. Days has been specifically deterred.

21        I don't like to talk about general deterrence because

22   I don't think that works.  I think it's -- well, that's my own

23   issues, but I do think she's been specifically deterred.  I

24   think that she has been really punished.  I think the five

25   years will be significantly more than time she's spent before.

L4TPDAYS

1    I think it will serve to ensure that she does not come back to

2    court.

3            If the Court has any other questions, I'd be happy to

4    answer them, but I do believe 60 months is appropriate and

5    sufficient for Ms. Days for this particular case.

6            THE COURT:  Thank you very much, Mr. Donaldson.

7            Anything else from the government?

8            MR. CHIUCHIOLO:  No, your Honor.

9            THE COURT:  Ms. Days, is there anything that you want

10   to say to me before I sentence you?

11           THE DEFENDANT:  Yes, your Honor, I would like to.

12           First, I would like to say thank you for even allowing

13   me to be on video court.  I haven't been in your courtroom

14   since 2019, and it's been a long haul, the time that I've spent

15   in federal prison.

16           Your Honor, I just would like to focus a couple of

17   things and reiterate in my letter and speak to you because I

18   haven't seen you in all this time, in all these years.  Doing

19   time in MCC has been very hard for me.  It seems like doing

20   time in MCC was three times harder than doing time in MDC's

21   dorm setting.

22           In MCC, we were locked in for anything from minor to

23   major.  I was locked up during the Jeffrey Epstein

24   investigation, and I went straight to being locked in a cell,

25   unable to speak to my family or my son.  I was arrested and

1     kept inside of the cell and unable to even make a phone call to
2     speak to anyone.

3             In February 2020, during the firearm lockdown, we were
4     locked down for 14 days.  In those 14 days we were given three
5     showers, and that's because we begged for them.  We kicked and
6     screamed on the doors, and the exact words were "Use the sink."
7     No phones, no computers, or things that we used to communicate
8     with the outside world were denied to us.

9             We were totally ignored.  No water, no sanitary
10    napkins.  Girls that caught their period, were bleeding and had
11    to sleep in garments and stay in those sheets, and were unable
12    to use the laundry.  And for the most part, we just got totally
13    ignored every time we would scream and bang and ask for anybody
14    to tell us what was going on.

15            When George Floyd got killed, we were locked in for
16    another ten days.  We were not given showers again, no phone
17    calls, no recreation, no commissary.

18            I also survived the disgusting feces flood that we
19    were actually told to clean with our own hands.  It was
20    humiliating.  Floating, dead water bugs, mice, chunks of
21    defecation coming out of the pipes and urine-filled water
22    gushing all through the area.  The water was as high as my
23    ankles, and the smell was as bad.  It was so bad, the inmates
24    were vomiting due to nausea.  Chunks of feces.  And officers
25    telling us that we had to clean it and clean it quick because

L4TPDAYS

1   lunch was on the way.

2          I froze in a cell for seven-and-a-half months with no

3   heat, sleeping with a hat, gloves, sweat pants and sweatshirts.

4   The cell that they put me in MCC, the ventilation was totally

5   broke.  I would cry myself to sleep, teeth chattering, thinking

6   at times I would die.  I would wake up with white lines on my

7   eyes.  The tears I cried, they were frozen on my face.

8          My roommates were mice.  They would come out of large

9   holes in the wall that were as big as tennis balls, jumping

10  around, running around the cells, just playing on the vents.

11         On April 20th -- excuse me -- on April 20th, 2020, I

12  was the first female inmate to catch Covid-19.  I was put in a

13  room, a SHU room that's used for disciplinary, with no water,

14  no medication, and I wasn't seen for six days.  It wasn't until

15  five days after I was sick that the women in the unit were

16  provided with facemasks.

17         I was so sick and dehydrated that my lips were

18  cracking and bleeding through the mask.  When a nurse noticed,

19  she asked the officer if I could have a cup because cups are

20  not provided in SHU.  So I was unable to take in water like I

21  needed.  Two days later, she came back and said she had given

22  me the wrong medication.

23         I was so weak from suffering from fever and diarrhea,

24  that I was even unable to be on the phone for my own bail

25  hearing that was conducted with all of you guys.  They had me

1    on full quarantine and full isolation and said I was not going

2    to be able to use the phone because I was infected.

3           During the lockdown and the time that I was in SHU, I

4    was without a cup to drink water.  I was fed frozen boxes of

5    baloney sandwiches that most of the time came molded because it

6    was expired.  They gave us frozen peanut butter, lunch and

7    dinner, jelly sandwiches that were frozen -- they hurt your

8    teeth -- potato chips that had expiration dates of 2019.

9           At MCC, no matter how much I complained or told them

10   the pain that I was going through, nobody cared.  I was left in

11   the SHU cell and people would just come by to see the person

12   that was sick from Covid.  They wasn't trying to help me.  They

13   just wanted to see who was the person in the cell that was

14   infected so they know who to stay away from.  The solitude of

15   lockdown drove me insane, and came to the point that I started

16   talking to myself and seeing shadows.

17          After being transferred to MDC Brooklyn, I was tested

18   for Covid-19, and I tested positive again in December 2020.  I

19   was put in SHU for five days.  I was there for five days, on a

20   23-hour lockdown, handcuffed to come out and shower, fed

21   through a hole in the door, in a cell with no windows, mentally

22   broken inside out again.

23          Later, they came back and said it was a false

24   positive.  Anytime the doctors called me for anything, I'm

25   paranoid, I'm nervous, my hands start sweating, I get dry

L4TPDAYS

1   mouth, and I just think, for some reason, I was going to be

2   brought back to the SHU again.

3           I've been incarcerated since August 2019, and I never

4   received a disciplinary ticket, but I've been housed in SHU for

5   over 75 days.  MCC and MDC are the most degrading and

6   humiliating memories of my life.  I will hold onto these

7   memories forever, but these memories are my motivation to stay

8   out of trouble, your Honor.

9           I want to apologize directly to the Court.  I want to

10  apologize to you, and I want to take full responsibility for my

11  actions.  I am guilty.  I am guilty for the crimes committed,

12  but through this experience, I've matured.  I recognize my

13  values, and I promise to live my life with integrity.

14          I'm asking you to please give me a chance to do

15  something with my life.  In life, you come across so many

16  challenges, but the truth will always persevere.  Everything I

17  suffered, everything I shared in this horrific place will be a

18  reminder and strength to me to do the right thing.  My

19  incarceration has been very painful.

20          I have suffered tremendously, and I'm still suffering.

21  Your Honor, I have not been outside since February 2020.  I

22  don't see the sun.  I don't feel the rain.  I don't feel the

23  snow.  We are locked in here all day.  That is one of the

24  rights that we are supposed to have, to even be able to go out

25  for rec, but I have not been outside since February 2020.  I

L4TPDAYS

1     have not seen my family.  We're not allowed visits.

2              But even through all I've been through, I still

3     focused on taking all the programs that I'm allowed, and I try

4     to keep myself as busy in a positive way, educate myself even

5     more for the reentry into society.  My biggest goal has been

6     staying drug free and not using drugs.

7              I am also in the RDAP program, which has taught me how

8     to recognize my criminal thinking errors and has strengthened

9     me by teaching me and incorporating my learning to focus on

10    smart goals, smart goals and positive ways of thinking,

11    principles to apply to my daily life that will help me to avoid

12    repeated problematic behaviors.

13             I want to thank my lawyer, and I want to thank you,

14    your Honor, for giving me a chance to express myself.  I've

15    been compliant ever since I've been locked up.  I've tried to

16    help people ever since I've been in here, and I've been taking

17    courses to prepare myself for reentry, and I'm truly sorry for

18    my mistakes.

19             THE COURT:  So I can't give Ms. Days a just sentence.

20    I can give her a five-year sentence.  My hands are tied.  I

21    have to give her a five-year sentence and that I will do, 60

22    months.  The 75 days that she spent in the SHU takes care of

23    the other three.  Ms. Days is a very educated and eloquent

24    woman, and I have, sadly, heard, both as a sentencing judge and

25    in my capacity as the chief judge that I've just relinquished,

L4TPDAYS

1    entirely too many stories like the one she just recounted on

2    the record.

3           I wish that the Attorney General, whoever, head of the

4    Bureau of Prisons and the leader of the Congress, would have

5    heard that presentation.  The single thing in the five years

6    that I was chief judge of this court that made me the craziest

7    was my complete and utter inability to do anything meaningful

8    about the conditions at the MCC, especially at the MCC and the

9    MDC, two federal correctional facilities located in the City of

10   New York that are run by morons, which wardens cycle

11   repeatedly, never staying for longer than a few months or even

12   a year.  So there is no continuity, there is no leadership,

13   there is no ability to get anything done.  They lurch from

14   crisis to crisis, from the gun smuggling to Jeffrey Epstein,

15   none of which is the fault of Ms. Days or any of the other

16   inmates I have sentenced or will sentence.

17          It is the finding of this Court that the conditions to

18   which she was subjected are as disgusting, inhuman as anything

19   I've heard about any Colombian prison, but more so because

20   we're supposed to be better than that.

21          So if I could, Ms. Days, I would say you've been

22   punished enough, and I would send you home, but I can't.  The

23   law doesn't allow me to sentence you to less than five years.

24   Some of what you've endured has been endured by prisoners even

25   in well-run facilities, some of it.

L4TPDAYS

1          The fact that you haven't been out for a year is a

2     result of the pandemic.  Nobody's been out for a year.

3     Nobody's had visitors.  People have gotten locked up all over

4     the country in the SHU when they've gotten sick, and you had

5     the great misfortune to not only to get Covid but to get Covid

6     in the earliest days, when we didn't know what we were doing.

7     And that being so, I think you've suffered triply as a result.

8          But there is no excuse for the conditions in those two

9     institutions.  There is no excuse for the serial leadership

10    that does not allow the office of warden to take control and

11    get control of those facilities, that they just cycle through,

12    most of them at the end of their careers, and it is unfair and

13    unjust.  You shouldn't have to suffer for the incompetence of

14    the United States Department of Justice and its subsidiary

15    agency, the Bureau of Prisons.

16         I will do what I can to bring your situation to the

17    people who, if they give a damn, might do something.

18         You have committed a serious crime under circumstances

19    that were particularly difficult for me to swallow what was

20    done and everything, but I am convinced that no good would be

21    served by keeping you incarcerated for one minute more than I

22    am required to do by law.  And so I conclude that a mandatory

23    minimum sentence of 60 months is hardly any different from the

24    guidelines lower end sentence of 63 months.  It is sufficient

25    but not greater than necessary to punish you for your sins.

L4TPDAYS

1    I have reviewed the presentence report.  I accept and

2  adopt as my findings the described offense and offense conduct,

3  the calculation of the guidelines.  The total offense level is

4  25.  The defendant's criminal history category is II.  I accept

5  and adopt as my findings the description of the offender

6  characteristics as are set forth beginning at paragraph 56 of

7  the presentence report.

8    I want to thank Mr. Donaldson for his eloquent

9  memorandum.  I'm not going to put all of the details on the

10 record, but it is pretty clear to me that Ms. Days' life might

11 have been very, very different if she had not been subjected to

12 the abuse she was subjected to as a young teenager.  I have no

13 reason to believe that she was on that path.

14   I have considered all of the section 3553(a) factors,

15 and I conclude that the mandatory minimum sentence meets the

16 parsimony goals of the statute and is sufficient to provide

17 deterrence to this defendant and to punish her for the crimes

18 committed.

19   Accordingly, under docket number 19 CR 619, a total

20 offense level of 25 and a criminal history category of II, I

21 hereby sentence you, Tiffany Days, to the mandatory minimum

22 term of 60 months' imprisonment, to be followed by a term of

23 four years' supervised release.  I am not imposing a fine.  The

24 defendant has no ability to pay.  Restitution is not

25 applicable.

L4TPDAYS

1          Is the government seeking forfeiture?

2          MR. CHIUCHIOLO:  No, your Honor.

3          THE COURT:  Ms. Days, you're required to pay $100 in

4   court costs.  That will be taken out of your prison wages at

5   the rate of $25 per calendar quarter, or 50 percent of your

6   gross monthly earnings if you're in a Unicor grade one through

7   four program.

8          I should interrupt myself to say that Ms. Days has

9   done two very admirable things.  First of all, she's

10  accomplished a pretty impressive record, under pandemic

11  circumstances, of coursework; and, second, she has completed

12  this Court's Focus Forward program, run by our pretrial

13  division, and I'm a big fan of that program.  It was started on

14  my watch, and I'm a big supporter of that program.

15          I'm glad, Ms. Days, that they let you into the

16  program, and I'm proud of you for having completed the program.

17  I believe that it is one of the best tools that you will have

18  going forward.

19          Mr. Donaldson, did you have any recommendation for

20  place of incarceration?

21          MR. DONALDSON:  Yes, your Honor.  We are asking for as

22  near to New York City as possible, and I would say that one

23  very near, but that has problems sometimes; so I say the

24  nearest one to New York City as possible.  I'm sure, hopefully,

25  at some point, Tiff will start getting some family visits so

1    she can see somebody.

2            I also neglected to mention that I would ask the Court

3    to strongly suggest to the Bureau of Prisons that Ms. Days be

4    allowed to continue with any of her drug treatment.  She's

5    taking drug treatment programs, as well as any vocational or

6    educational programs that she is allowed to participate in.  I

7    think it will only help.  She is going to try to get into any

8    program she can as much as she can, but --

9            THE COURT:  It is my recommendation that she be

10   incarcerated at Danbury, but as close as possible to the

11   New York City Metropolitan area in order to have facilitate

12   family visitation, which as a result of the pandemic, she has

13   been denied for over a year.

14           It's my recommendation that Ms. Days be considered for

15   the RDAP program.  It's my recommendation that Ms. Days be

16   given continuing drug treatment, and as Ms. Days has proven

17   that she is someone who benefits from coursework and from being

18   put in a position to assist other inmates, it is my hope that

19   the Bureau of Prisons will take note of that and make sure that

20   she has plenty to do, both education-wise and mentoring-wise.

21           MR. DONALDSON:  Thank you.

22           THE COURT:  Ms. Days, when you are released, you will

23   have 72 hours to report to a United States probation officer

24   here at the courthouse on the sixth floor, and for four years

25   you'll meet on a regular basis with your probation officer.

L4TPDAYS

1    You'll do everything the probation officer tells you to do.

2    You can't do anything the probation officer tells you you're

3    not allowed to do.  Do you understand that?

4              THE DEFENDANT:  Yes.  Yes, your Honor.

5              THE COURT:  Okay.  During your period of supervised

6    release, you may not commit another federal, state or local

7    crime, unlawfully possess a controlled substance, and you must

8    comply with all of the standard conditions that have been

9    adopted by this Court.

10             You'll be required to participate in an outpatient

11   treatment program approved by the probation office, which will

12   include testing to determine whether you've reverted to the use

13   of drugs or alcohol.  You must contribute to the cost of

14   services rendered based on your ability to pay or the

15   availability of third-party payments.  And I authorize release

16   of available drug treatment evaluations and reports, including

17   the presentence investigation report, to the substance abuse

18   treatment provider.

19             You must participate in a cognitive behavioral

20   treatment program under the guidance and supervision of your

21   probation officer, until your probation officer decides that's

22   no longer necessary.

23             You must submit your person and any property,

24   residence, vehicle, papers, computer, electronic

25   communications, data storage devices, cloud storage or media

L4TPDAYS

1    and your personal effects to a search by the United States

2    probation officer, if needed with the assistance of law

3    enforcement, as long as there is reasonable suspicion that you

4    have violated a condition of supervision or engaged in unlawful

5    conduct.

6           Your failure to submit to a search will be grounds for

7    revocation of your supervised release and could result in your

8    re-incarceration.  You need to warn the people that you live

9    with that the place where you live can be subject to searches.

10   I've effectively just signed the warrant pursuant to this

11   condition.

12          It is my recommendation that the defendant be

13   supervised in her district of residence.

14          I want to emphasize a couple of the standard

15   conditions.  Obviously, you can't lie to your probation

16   officer.  You can't leave the judicial district where you're

17   authorized to reside without getting permission from the

18   probation officer.

19          The probation officer gets to have approval rights

20   over where you live and who you live with and where you go to

21   work, what kind of job you have.  And the probation officer can

22   visit you at home at anytime.

23          You're not to communicate or interact with people who

24   are engaged in criminal activity.

25          You have to notify your probation officer if you're

L4TPDAYS

1    arrested or even questioned by a law enforcement officer.

2    You've got to tell your probation officer within 72 hours.

3    This is a big important one.

4          You must not own, possess or have access to a firearm,

5    ammunition, destructive device or any dangerous weapon.  There

6    are no excuses.

7          And you can't act or make any agreement with law

8    enforcement to act as a confidential informant or a human

9    source without getting the permission of the Court.

10          Was there an appeal waiver in the plea agreement?

11          MR. DONALDSON:  Yes, there was.

12          MR. CHIUCHIOLO:  Yes, your Honor.

13          THE COURT:  So, Ms. Days, do you recall that at the

14    time you took your plea of guilty, you also signed a letter of

15    agreement with the government?  It's dated April of last year.

16          THE DEFENDANT:  Yes.

17          THE COURT:  Okay.  In that letter it says that if I

18    sentenced you to 78 months or less in prison, you wouldn't take

19    an appeal from your sentence or file a lawsuit challenging the

20    legality of your sentence.  Do you recall that?

21          THE DEFENDANT:  Yes.

22          THE COURT:  Did Mr. Donaldson explain to you before

23    you signed the letter that you were giving up your right to

24    take an appeal, as long as I didn't sentence you to more than

25    78 months?

L4TPDAYS

1          THE DEFENDANT:  Yes, your Honor.

2          THE COURT:  And did you sign that letter of your own

3   free will?

4          THE DEFENDANT:  Yes, your Honor.

5          THE COURT:  I've sentenced you to 60 months, which is

6   the absolute minimum term I can give you, Ms. Days, and it's my

7   understanding that you have waived your right to take an appeal

8   from that sentence.  Is that also your understanding?

9          THE DEFENDANT:  Yes.

10          THE COURT:  Mr. Donaldson, is there anything else that

11   we need to do for your client today?

12          MR. DONALDSON:  No, your Honor.  I thank the Court for

13   its time.  Thank you very much.

14          THE COURT:  Let me just put on the record that I have

15   countersigned the waiver of Ms. Days' right to be present

16   personally at her sentencing.

17          Is there anything else from the government?

18          MR. CHIUCHIOLO:  Yes, your Honor.  There is an open

19   count; so at this time, the government would move to dismiss

20   all open counts.

21          THE COURT:  Open counts are dismissed as against

22   Ms. Days.

23          Thank you, all, for being here today.

24          Ms. Days, good luck to you.

25          THE DEFENDANT:  Your Honor, can I --

L4TPDAYS

1          THE COURT:  I hope we'll never meet again.

2          THE DEFENDANT:  Can I just say one thing?

3          THE COURT:  Yes, ma'am.

4          THE DEFENDANT:  I just want to thank you for your time

5     today and thank you for the things that you do to help us here

6     in federal prison and the programs and the conditions that

7     we're going through, that you do fight for to make things

8     better.  It is appreciated.  Thank you so much.

9          THE COURT:  Well, I wish I had done something that you

10    could appreciate.  That's one of the great frustrations of my

11    life.  Good luck to you, ma'am.

12          These proceedings are closed.

13          THE DEFENDANT:  Thank you.

14          MR. DONALDSON:  Thank you very much.

15          THE DEFENDANT:  Have a good day.

16          (Adjourned)

17

18

19

20

21

22

23

24

25