UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

GHISLAINE MAXWELL,

　　　　　Defendant.

S2 20 Cr. 330 (AJN)

**THE GOVERNMENT'S OMNIBUS MEMORANDUM  IN OPPOSITION
TO THE DEFENDANT'S MOTIONS *IN LIMINE***

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Alison Moe
Lara Pomerantz
Andrew Rohrbach
Assistant United States Attorneys
　　*Of Counsel*

# Table of Contents

PRELIMINARY STATEMENT ..................................................................................................3

ARGUMENT...........................................................................................................................4

I. The Court Should Admit the Testimony of Dr. Lisa Rocchio.............................................4

    A.    Applicable Law ...............................................................................................5

    B.    Discussion .......................................................................................................9

        1.    Dr. Rocchio's Opinions on Coercion and Attachment are Admissible...................................10

        2.    Dr. Rocchio's Opinion on the Relationship Between Trust and Victim Awareness of Their Abuse is Admissible.................................................22

        3.    Dr. Rocchio's Opinion on the Long-Term Consequences of Abuse is Admissible ...............23

        4.    Dr. Rocchio's Opinion About the Significance of the Presence of Third Parties is Admissible .................................................................................25

        5.    Dr. Rocchio's Opinion on Delayed Disclosure is Admissible ...................................27

II. The Evidence Contained in the Government's October 11, 2021 Letter is Admissible........................32

    A.    Applicable Law .............................................................................................33

    B.    Discussion .....................................................................................................35

        1.    The Evidence is Admissible As Direct Evidence, or in the Alternative, Under Rule 404(b)..35

        2.    The Government Has Met and Exceeded Its Notice Obligations...........................................39

III. The Testimony of Minor Victim-3 is Admissible ...........................................................41

    A.    Background ...................................................................................................41

    B.    Applicable Law .............................................................................................44

    C.    Discussion....................................................................................................45

IV. There is No Basis to Preclude Co-Conspirator Statements at Trial....................................54

    A.    Background ...................................................................................................55

    B.    Discussion .....................................................................................................58

V. There is No Basis to Suppress Minor Victim-4's Identification of the Defendant ............................... 63

    A.      Background ................................................................................................................ 63

    B.      Applicable Law ......................................................................................................... 65

    C.      Discussion ................................................................................................................ 67

VI. The Court Should Deny the Defense Motions to Preclude the Government's Exhibits ...................... 71

    A.      Applicable Law ......................................................................................................... 71

    B.      Discussion ................................................................................................................ 72

VII. There is No Basis to Preclude Discussion of "Victims" or Rape ........................................................ 76

    A.      References to Victims ............................................................................................... 76

    B.      Evidence of Rape ..................................................................................................... 79

VIII.     The Remaining Defense Motions are Aimed at Evidence the Government Does Not Plan to Elicit ........................................................................................................................................ 81

**CONCLUSION** ...................................................................................................................... **83**

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in opposition to the defendant's thirteen motions *in limine*, dated October 18, 2021.  For the reasons that follow, the defendant's motions should be denied.

*First*, the Government has given notice of a qualified expert who will provide reliable and relevant opinions, as required by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  (*See* Def. Mot. 3).  *Second*, evidence relating to Minor Victim-3 is admissible both as direct evidence of the charged crimes, and admissible in the alternative under Rule 404(b).  (*See* Def. Mot. 4). *Third*, the Government has provided adequate notice pursuant to Rule 404(b), and in any event, all evidence for which it has provided such notice is also admissible as direct evidence of the charged crimes.  (*See* Def. Mot. 2).  *Fourth*, there is no basis to preclude the introduction of co-conspirator statements under Fed. R. Evid. 801(d)(2)(E). (*See* Def. Mot. 1).  *Fifth*, Minor Victim-4's confirmatory identification of the defendant was not unduly suggestive, and it should not be suppressed.  (*See* Def. Mot. 9).  *Sixth*, the Government's various exhibits are relevant, and the Government will authenticate them at trial.  (*See* Def. Mots. 7, 8, 13).  *Seventh*, it is entirely proper for the word "victim" and for discussion of rape to be used in a trial about the sexual exploitation of minor victims.  (*See* Def. Mots. 11, 12).  *Eighth*, and finally, the Government does not intend to offer evidence of the defendant's flight, her false exculpatory statements, or law enforcement expert testimony in its case in chief, unless the defendant opens the door or otherwise puts this evidence in issue.  (*See* Def. Mots. 5, 6, 10).

## ARGUMENT

**I.    The Court Should Admit the Testimony of Dr. Lisa Rocchio**

The Government intends to call Dr. Lisa Rocchio as an expert witness.  Dr. Rocchio is the

President-Elect of the Division of Trauma Psychology at the American Psychological Association.

She is currently a clinical instructor at the Alpert Medical School of Brown University, and she

has practiced psychology for approximately 25 years, specializing in treating patients with trauma,

including sexual trauma in childhood and adolescence.  Dr. Rocchio has treated hundreds of

victims of trauma, including many victims of child sexual abuse, and she has written, presented,

and taught about the assessment and treatment of trauma.  She has also received continuing

education on trauma and the treatment of trauma in a clinical setting.  (*See generally* Curriculum

Vitae, Def. Mot. 3 Ex. 2).

On April 23, 2021, the Government timely notified the defendant of its intent to call Dr.

Rocchio in its case-in-chief.  As the notice explains, Dr. Rocchio is expected to testify, based on

her relevant education, training, experience, and research, and offer the following opinions:

> Individuals with particular vulnerabilities are often targeted by
> perpetrators of sexual abuse.  Sexual abuse of minors frequently
> occurs through the use of manipulation or coercion in the context of
> an established relationship that is developed over time, rather than
> through the use of forcible rape. Minor victims are often subject to
> a strategic pattern of behaviors, often called grooming, that can take
> a variety of forms and function to render the victims vulnerable to
> abuse, to obscure the nature of the abuse, and to build trust and
> attachment with their abuser. The relationship of trust and
> attachment can prevent victims from being aware that what they are
> experiencing is abuse and can prevent disclosure. Minor victims
> therefore may not identify themselves as victims of abuse while it is
> ongoing, and may not recognize the consequences of that abuse until
> adulthood. Repeated exploitation and abuse can increase the
> likelihood of victimization later in life and can result in long-term

4

> traumatic and psychological consequences, especially when it occurs in the context of complex trauma. The presence of other individuals can facilitate the sexual abuse of minors. Dr. Rocchio is also expected to testify that nondisclosure, incremental disclosure, and secrecy are common among victims of sexual abuse for a variety of reasons, and that memory and disclosure of traumatic or abusive events is impacted by a number of factors, including the circumstances surrounding the trauma.

(Expert Notice, Def. Mot. 3 Ex. 1 at 2).  As the notice also explained, Dr. Rocchio has not evaluated any of the victims in this case, and the Government does not currently intend to offer Dr. Rocchio's testimony regarding any specific victim.  (*See id.*).

There is nothing controversial about this testimony.  It is well supported by established scientific principles, and it is the kind of testimony frequently admitted in cases involving sexual abuse.  This Court should do the same.

### A.  Applicable Law

District courts have a "gatekeeper function" in analyzing the admissibility of expert testimony.  *Phelps v. CBS Corp.*, No. 17 Civ. 8361 (AJN), 2020 WL 7028954, at *3 (S.D.N.Y. Nov. 30, 2020) (quoting *Restivo v. Hessemann*, 846 F.3d 547, 575 (2d Cir. 2017)).  Although the proponent of the evidence carries a burden of proof to establish its admissibility by a preponderance of the evidence, *see, e.g.*, *United States v. Jones*, 965 F.3d 149, 161 (2d Cir. 2020), courts apply a "presumption of admissibility of evidence."  *Felix v. City of New York*, No. 16 Civ. 5845 (AJN), 2020 WL 6048153, at *6 (S.D.N.Y. Oct. 13, 2020) (quoting *Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir. 1995)).  Accordingly, the relevant rule of evidence, Rule 702, reflects "the 'liberal thrust' of the Federal Rules and their 'general approach of relaxing the traditional barriers to 'opinion' testimony.'"  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S.

579, 588 (1993) (quoting *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 169 (1988)).

Under *Daubert*, a district court must first determine whether an expert is qualified. *See* Fed. R. Evid. 702 ("A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise . . . ."); *United States v. Kidd*, 385 F. Supp. 3d 259, 263 (S.D.N.Y. 2019) ("At the first step of the *Daubert* inquiry, courts are instructed to consider the expert's qualifications."). Courts then must determine whether the testimony "will be not only relevant, but reliable." *United States v. Romano*, 794 F.3d 317, 330 (2d Cir. 2015); *see Daubert*, 509 U.S. at 597 (explaining that courts must ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand"). On reliability, Rule 702 identifies three "indicia of reliability": (1) "that the testimony is grounded on sufficient facts or data; (2) that the testimony is the product of reliable principles and methods; and (3) that the witness has applied the principles and methods reliably to the facts of the case." *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002)). "[T]hese criteria," however, "are not exhaustive." *Id.* *Daubert* itself, which "dealt with a scientific theory," offered additional factors, such as whether the theory "'has been subjected to peer review and publication,'" and the "'known or potential rate of error.'" *Romano*, 794 F.3d at 330 (quoting *Daubert*, 509 U.S. at 593-94). And "there are many different kinds of experts, and many different kinds of expertise." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999). "[W]hether the specific expert testimony focuses upon specialized observations, the specialized translation of those observations into theory, a specialized theory itself, or the application of such a theory in a

6

particular case, the expert's testimony will often rest upon an experience confessedly foreign in kind to the jury's own." *Id.* at 149 (alterations and internal quotation marks omitted); *see United States v. Felder*, 993 F.3d 57, 71-72 (2d Cir. 2021) ("Such specialized knowledge can be grounded in scientific or other particularized training, but it can also derive from personal observations or experience, see id., so long as those observations or experience are outside the ken of the average person." (internal quotation marks and citations omitted)); Fed. R. Evid. 702, Advisory Committee's Note (2000) (explaining that expert testimony may be based on "experience alone—or experience in conjunction with other knowledge, skill, training or education").

The key question is whether "an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152; *see Williams*, 506 F.3d at 160 (explaining that the *Daubert* test is "flexible"). In particular, if an expert's testimony is within "the range where the experts might reasonably differ," the jury, not the trial court, should be the one to decide among the conflicting views of different experts. *Kumho Tire*, 526 U.S. at 153. So long as the testimony is not "speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison . . . any other contentions that the assumptions are unfounded go to the weight, not the admissibility of the testimony." *Phelps*, 2020 WL 7028954, at *3 (citations and internal quotation marks omitted). Thus, "'the rejection of expert testimony is the exception rather than the rule.'" *Floyd v. City of New York*, 861 F. Supp. 2d 274, 287

(S.D.N.Y. 2012) (citing Fed. R. Evid. 702 Advisory Committee's Notes (2000 Amendments)).

"[T]he law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire*, 526 U.S. at 142 (emphasis in original); *see United States v. Requena*, 980 F.3d 30, 47 (2d Cir. 2020). Thus a district court may properly exercise its gatekeeping function without the "formality of a separate hearing[.]" *Williams*, 506 F.3d at 161; *see also United States v. Barnes*, 411 F. App'x 365, 370 (2d Cir. 2011) (summary order). "This is particularly true if, at the time that the expert testimony is presented to the jury, a sufficient basis for allowing the testimony is on the record." *Williams*, 506 F.3d 161 (citing 4 Weinstein's Federal Evidence § 702.02 [2] (2d ed. 2006)).

Finally, even if the expert testimony is reliable, it must also be relevant. *See, e.g.*, *United States v. Torres*, No. 20 Cr. 608 (DLC), 2021 WL 1947503, at *6 (S.D.N.Y. May 13, 2021). In this context, the testimony must "concern matters that the average juror is not capable of understanding on his or her own." *United States v. Mejia*, 545 F.3d 179, 194 (2d Cir. 2008); *see Faulkner v. Arista Records LLC*, 46 F. Sup. 3d 365, 375 (S.D.N.Y. 2014) ("Weighing whether the expert testimony assists the trier of fact goes primarily to relevance.").

Courts have frequently admitted expert testimony on the psychological relationship between perpetrators and victims of sex crimes. For instance, in *United States v. Kidd*, 385 F. Supp. 3d 259 (S.D.N.Y. 2019), the Government gave notice of expert testimony on "the psychology of the pimp-prostitute relationship," including concepts such as "trauma bonding." *Id.* at 263. The defendant interposed a *Daubert* challenge, arguing that the expert's testimony was not based on "studies or empirical data" and so could not "be assessed for reliability." *Id.* (internal

quotation marks omitted).  The district court rejected that argument, explaining that "case law quite commonly upholds this type of testimony against *Daubert* challenges," and that the expert's experience writing about, treating, and speaking to prostitutes was sufficiently reliable.  *Id.* at 263-64; *see also, e.g.*, Letter, *United States v. Kelly*, No. 19 Cr. 286 (AMD) (E.D.N.Y. July 23, 2021) (Dkt. No. 134); *United States v. Torres*, No. 20 Cr. 608 (DLC), 2021 WL 1947503, at *6 (S.D.N.Y. May 13, 2021) (permitting expert testimony on "domestic abuse and coercive control"); Feb. 25, 2020 Tr. at 24:1-40:15, *United States v. Randall*, 19 Cr. 131 (PAE) (S.D.N.Y.), Dkt. No. 335 (permitting expert testimony on "[t]rauma and coercive control in the context of sex trafficking, including the psychological relationship between pimps and the women prostituted by them"); Notice and Oct. 17, 2019 Tr. at 27:1-12, *United States v. Dupigny*, No. 18 Cr. 528 (JMF) (S.D.N.Y.), Dkt. Nos. 180-1, 198 (permitting expert testimony on "the psychological relationship between a pimp and the woman prostituted by him" and "why prostituted women do not leave their pimp").

### B. Discussion

The defendant does not contest that Dr. Rocchio is a qualified expert.  Nor could she: Dr. Rocchio is a leader in her field, teaching others as a professor at Brown University, and she has approximately twenty-five years of clinical experience.  She is testifying in general about core concepts in her field, based on her "extensive study of the relevant data and literature and her clinical experience treating hundreds of trauma and abuse patients over the past twenty years."

*United States v. Raniere*, No. 18 Cr. 204 (NGG), 2019 WL 2212639, at *7 (E.D.N.Y. May 22, 2019).

Instead, the defendant suggests that Dr. Rocchio's opinions are unreliable, irrelevant, or prejudicial. To the contrary, and as explained in greater detail below, each of the Dr. Rocchio's five challenged opinions is well supported and would aid the jury in understanding the evidence at trial. The Court should permit Dr. Rocchio to testify.

**1. Dr. Rocchio's Opinions on Coercion and Attachment are Admissible**
    **a. Reliability**

As described in the expert notice, Dr. Rocchio will testify about the role that trust and attachment play in relationships between a victim and an abuser:

> Sexual abuse of minors frequently occurs through the use of manipulation or coercion in the context of an established relationship that is developed over time, rather than through the use of forcible rape. Minor victims are often subject to a strategic pattern of behaviors, often called grooming, that can take a variety of forms and function to render the victims vulnerable to abuse, to obscure the nature of the abuse, and to build trust and attachment with their abuser. The relationship of trust and attachment can prevent victims from being aware that what they are experiencing is abuse and can prevent disclosure.

(Expert Notice, Def. Mot. 3 Ex. 1 at 2). Dr. Rocchio will opine that victims are often abused in the context of a coercive and manipulative relationship which develops over time through the building of victims' trust and attachment. One aspect of this relationship is "often called grooming." (Def. Mot. 3 Ex. 1 at 2). However, the concepts of attachment and coercion go beyond grooming, and encompass both the trust-building aspect of the relationship and the ways in which

10

that bonds victims to their abusers and prevents victims from disclosing that they have been abused.[1]

These opinions stem in part from Dr. Rocchio's personal familiarity and experience treating victims of sexual abuse for decades. She is trained in trauma psychology, she has expertise in treating victims of sexual abuse who have been subject to this pattern of behavior, and she teaches residents about trauma psychology. *Cf. Bosco v. United States*, No. 14 Civ. 3525 (JFK), 2016 WL 5376205, at *11 (S.D.N.Y. Sept. 26, 2016) (expert testimony about "common knowledge among urologists" require the expert to "draw upon the defining characteristics that make him a member of that community: his training as a urological surgeon, his practical experience performing several hundred ureteroscopies, and his knowledge as a clinical instructor of surgery").

These opinions also stem from the relevant literature. This pattern of coercive attachment is not a novel or outlier concept in the literature of trauma psychology. For instance, attached as Exhibit A are some of the articles that have been provided by Dr. Rocchio and inform her testimony. *See* Dietz, "Grooming and Seduction," 33 J. of Interpersonal Violence 28, 34 (2018)

---

[1] The concepts of attachment and grooming encompass a variety of established techniques, including: (1) the use of attention, love, and affection; (2) using bribery and gift giving; (3) sexual desensitization—that is, talking to children about sex and engaging in touching; (4) isolating the victim; and (5) engaging in emotional manipulation. Grooming efforts can also extend to "grooming the environment." Craven et al., "Sexual grooming of children: Review of literature and theoretical considerations," 3 J. of Sexual Aggression 287, 292-93 (2006) ("Some offenders groom the environment by targeting single-parent families to gain [a position of trust].] Offenders may do this because they believe that these children are more vulnerable and because they believe it will be easier to create opportunities to be alone with the child. Alternatively, offenders may target children or young people who have absent parents, and hence have less protection." (citation omitted)).

11

("Since its introduction to the peer-reviewed professional literature in 1984, the term 'grooming' has become so widely adopted that it will remain in widespread use for decades to come."); Bennett & O'Donohue, "The Construct of Grooming in Child Sexual Abuse: Conceptual and Measurement Issues," 23 J. Child Sexual Abuse 957, 964-68 (2014) (reviewing the literature on the prevalence of various grooming techniques); Craven et al., "Sexual grooming of children: Review of literature and theoretical considerations," 3 J. of Sexual Aggression 287, 292-93 (2006) ("[R]etrospective identification of sexual grooming, i.e. after a sexual offence has been committed, is much easier than prospective identification, i.e. before a sexual offence"). To be clear, however, her review of the literature—and therefore the basis of her testimony—extends beyond these articles.

Accordingly, Dr. Rocchio came to her opinions through her clinical experience on this specific issue, as informed by her education and study of the relevant literature. That is a sufficient demonstration of "how the expert came to [her] conclusion and what methodologies or evidence substantiate that conclusion." *Riegel v. Medtronic Inc.*, 451 F.3d 104, 127 (2d Cir. 2006); *see* Feb. 25, 2020 Tr. at 24:1-40:15, *United States v. Randall*, 19 Cr. 131 (PAE) (S.D.N.Y.), Dkt. No. 335 (rejecting the notion that "the many studies that have validated trauma bonding and coercive controls as established phenomena are unreliable for want of laboratory-like statistical vetting"); Oct. 17, 2019 Tr. at 27:1-12, *United States v. Dupigny*, No. 18 Cr. 528 (JMF) (S.D.N.Y.), Dkt. Nos. 180-1, 198 (explaining that "the basis for the testimony—namely, the witness's training and experience—is not such that it would be subject to exclusion on the grounds that it's not based on

some sort of empirical scientific testing," and that "those arguments go to the weight, not the admissibility, of her proposed testimony").

As noted above, courts have frequently admitted testimony about the psychological relationship between victims of sexual abuse and their perpetrators. *See supra* pp. 7-8. Courts have also specifically authorized expert testimony on the subject of grooming. *See, e.g.*, *United States v. Telles*, 6 F.4th 1086, 1097-1098 (9th Cir. 2021) (holding that admission of expert testimony on grooming did not violate Federal Rules of Evidence 702 or 403 nor violate due process and finding that the expert "'merely gave a straightforward account of relevant background information based on [the expert's] own knowledge and experience'" (quoting *United States v. Johnson*, 860 F.3d 1133, 1141 (8th Cir. 2017)); *United States v. Halamek*, 5 F.4th 1081, 1087-89 (9th Cir. 2021) (holding that expert testimony on grooming was "relevant, reliable, and properly admitted"); *United States v. Isabella*, 918 F.3d 816, 833 n.15 (10th Cir. 2019) ("Grooming can be established by use of an expert witness who testifies about psychological tactics that are common in cases of child sex abuse."); *United States v. Hitt*, 473 F.3d 146, 158 (5th Cir. 2006) (affirming expert testimony on the "grooming process"); *Morris v. State*, 361 S.W.3d 649, 656-69 (Tx. Ct. Crim. App. 2011) (collecting cases showing that "grooming evidence has been received by courts from numerous types of experts"); *see also United States v. Brand*, 467 F.3d 179, 203 (2d Cir. 2006), *abrogated on other grounds by United States v. Cabrera*, 13 F.4th 140 (2d Cir. 2021) (noting that evidence of grooming supported the jury's verdict).

Against this weight of authority, the defendant relies principally on one case from the District of Maine. *United States v. Raymond*, 700 F. Supp. 2d 142 (D. Me. 2010). The proposed

testimony in this case is readily distinguishable from that in *Raymond*. There, the government gave notice of expert testimony about the "behavior of child molesters" from a veteran FBI agent who had reviewed case studies of child abuse and had written one book and one article. *Id.* at 143, 145, 147. The purported expert's book, in turn, merely made assertions about the "profile" of child molesters, with no information about how his experiences reliably led to his conclusions. *Id.* at 147-48. In the same breath, however, the book "disavow[ed] [its] reliability . . . for legal use," and his article similarly offered generalized views on what "many" offenders were "more likely or less likely to do." *Id.* at 148 (emphasis omitted). Accordingly, at bottom, the purported expert's testimony was based only on his subjective conclusions after reviewing case studies. *See id.* at 147 n.5 (explaining that the expert "troubling[ly]" wrote that "data is not the plural of anecdote," but "the information and opinions are based primarily on the totality of my acquired knowledge and expertise").

The situation here is quite different. Dr. Rocchio's conclusions are not anecdotal; they are grounded in the academic literature and her formal and informal education. Moreover, she will be testifying about concepts she regularly employs as a practicing clinician. Again, the defense *does not contest* that Dr. Rocchio is qualified to be an expert on this subject. And Dr. Rocchio's opinions are not an attempt to offer a "profile" of perpetrators of child sexual abuse or their activities. Instead, Dr. Rocchio will testify about the psychological underpinnings of an

14

established pattern of victimization—attachment and coercion—experienced by victims of sexual abuse.

The defense would read *Raymond* to stand for the proposition that expert testimony is unreliable if it does not explain "what testing was involved, what data she considered, or how her conclusions can be verified." (Def. Mot. 3 at 8). For instance, the defense criticizes Dr. Rocchio for opining that sexual abuse of minors occurs "frequently," without specifying whether it occurs "half the time" or "two-thirds of the time." (*Id.* at 7; *see id.* at 8 (quoting *Raymond*, 700 F. Supp. 2d at 148-49)). That is not what is required by *Daubert* in the context of qualitative social science, and it is not what many courts have held in the context of precisely this form of testimony, as explained above. To the extent *Raymond* stands for such a broad proposition, it is contrary to the law of this Circuit. *See United States v. Joseph*, 542 F.3d 13, 21-22 (2d Cir. 2008), *abrogated on other grounds as recognized by United States v. Ferguson*, 676 F.3d 260, 276 n.14 (2d Cir. 2011) (recognizing that social science research "cannot have the exactness of hard science methodologies, and expert testimony need not be based on statistical analysis in order to be probative" (citation and internal quotation marks omitted)).[2]

The defendant's remaining critiques of Dr. Rocchio's opinion miss the mark. First, the defendant asserts that Dr. Rocchio's patients are uncorroborated, and she "simply assumes her

---

[2] Even in *Raymond*, the Court left open the possibility that the Government could call the expert in rebuttal to "counter a defense case that victim testimony in this case should not be believed because the victim delayed in reporting the abuse or did not report it consistently." 700 F. Supp. 2d at 156. Even were the Court inclined to follow *Raymond* rather than the cases in this District, it should similarly revisit permitting Dr. Rocchio to testify about the opinion at issue if the defense attacks victim credibility.

patients are telling the truth." (Def. Mot. 3 at 6). The defendant claims that this "fatally undermines the reliability of her opinion" because her conclusion has "no known or identified rate of error . . . nor is there a reliable method or a series of factors guiding Rocchio's conclusion as to whether an individual victim is fabricating her abuse." (*Id.* (alterations and quotation marks omitted)). Clinical psychologists are not so credulous. As part of Dr. Rocchio's work as a practicing clinician, she examines consistencies and inconsistencies in the information provided by patients and assesses patient self-reporting in the context of literature and knowledge that she has developed in her years of practice. As the Government's expert notice makes clear, Dr. Rocchio has treated hundreds and hundreds of patients in her decades of experience, and her opinions are based in part on the significant patterns she has observed among the patients she has treated. The Court should reject the defendant's speculative claim that Dr. Rocchio has been misled by hundreds of patients who sought professional treatment for traumatic events that did not occur.

In any event, the defendant's argument about error rates misunderstands the nature of a *Daubert* inquiry. An error rate is but one of the *Daubert* factors that may or may not be applicable in every case. *See Romano*, 794 F.3d at 330. And in cases such as this, where a social science expert is testifying based on qualitative methodology, that factor is inapplicable. *See Torres*, 2021 WL 1947503, at *6 n.8. As the Second Circuit has explained, "Peer review, publication, potential error rate, etc. . . . . are not applicable to this kind of testimony, whose reliability depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it. In such cases, the place to quibble with [an expert's] academic training is on cross-examination . . .

16

." *Joseph*, 542 F.3d at 21-22 (first and second alterations in original) (citations and internal quotation marks omitted).

That point is particularly true in sex trafficking cases. As Judge Engelmayer explained when evaluating the testimony of a similar expert in a sex trafficking case, analyzing error rates is an "unusually poor fit" in this area:

> [S]tudying the circumstances and psychological drivers of trafficked women is not like studying diseases or potential cures in laboratory animals. . . . Given the necessarily retrospective nature of such a study, given the small size of the populations under review, and given the inherently individualized circumstances presented by different perpetrators, victims, and contexts in this tumultuous and emotionally fraught area of criminal conduct, the vocabulary of error rates . . . is an unusually poor fit. . . . The testing that has been done as to trauma bonding and coercive control, instead, necessarily uses more qualitative research methodologies. These involve interviews and case studies and clinical examinations conducted over time."

Feb. 25, 2020 Tr. at 29:4-30:20, *United States v. Randall*, 19 Cr. 131 (PAE) (S.D.N.Y.), Dkt. No. 335. Because statistical rigor is not a useful method for evaluating the reliability of qualitative research like Dr. Rocchio's, statistical tools like error rates are irrelevant to the *Daubert* analysis.

Contrary to the defendant's next claim, these opinions are not "impregnable for purposes of cross examination." (Def. Mot. 3 at 7 (citation and internal quotation marks omitted)). The defendant is free to cross Dr. Rocchio on how frequently she sees grooming in her patients and how she evaluates whether they are telling the truth. The defendant is also free to explore, in cross examination, the difficulties in assessing whether a patient has been groomed. The defense can also make arguments—in cross examination and in jury addresses—about the lack of quantitative rigor in this qualitative area of science. That is the point: it is for the *jury*, after hearing the

17

evidence, to evaluate what weight to give it. But that does not change whether Dr. Rocchio's opinions are squarely within the mainstream of psychological practice.

The defendant next argues that Dr. Rocchio's patients are "self-selected," and she has not established the "representativeness of her patients as typical victims of so-called grooming behavior." (Def. Mot. 3 at 7). But the defendant makes no argument that the minor victims in this case are distinctive in some way such that general principles of psychology may diverge as to them. And in any event, that argument is for the jury to evaluate, and not a basis to preclude Dr. Rocchio's testimony. *See* Feb. 25, 2020 Tr. at 36:13-37:5, *United States v. Randall*, 19 Cr. 131 (PAE) (S.D.N.Y.), Dkt. No. 335 (rejecting a defense attempt to distinguish between native-born and domestic-born women because, "while a court is to be a gatekeeper as to reliability so as to keep 'junk science' away from juries, the Court must not overstep that role. Whether or not the Court would be persuaded that adult native-born women can be subject to trauma bonding, the Court is not to arrogate to itself that judgment.")

Finally, the defendant argues that Dr. Rocchio has no experience treating perpetrators of sexual assault, so she cannot testify as to the psychology of perpetrators and their "so-called 'grooming' techniques." (Def. Mot. 3 at 7-8). Many of the opinions the defendant challenges concern the experiences of victims, not perpetrators. Dr. Rocchio will testify about the pattern to which "*minor victims* are often subject," which makes "*victims* vulnerable to abuse," and builds *their* "trust and attachment with their abuser." (Expert Notice, Def. Mot. 3 Ex. 1 at 2 (emphasis added)). Grooming creates *in the victims* "a relationship of trust and attachment" that "can prevent *victims* from being aware that what they are experiencing is abuse and can prevent disclosure. (*Id.*

18

(emphasis added)).  Dr. Rocchio's testimony will also include discussion of techniques used by perpetrators.  Dr. Rocchio's testimony regarding such techniques is supported by Dr. Rocchio's review of the relevant literature, *see* Exhibit A, and through her clinical work.  By virtue of her experience treating victims, Dr. Rocchio is necessarily informed about perpetrators' actions.  *See Halamek*, 5 F.4th at 1088 ("Extensive experience interviewing victims can qualify a person to testify about the relationships those victims tend to have with their abusers.").  Dr. Rocchio will testify squarely within her expertise and experience.[3]

### b. Relevance and Rule 403

Dr. Rocchio's opinions will assist the trier of fact in understanding the evidence at trial. This case concerns an "unusual area of human interaction."  *See* Feb. 25, 2020 Tr. at 39:8-9, *United States v. Randall*, 19 Cr. 131 (PAE) (S.D.N.Y.), Dkt. No. 335.  The Minor Victims in this case were trafficked over many years, and none were physically restrained.  An average juror, with no experience with sexual abuse victims, may not understand why the Minor Victims continued to

---

[3] In *United States v. Raniere*, No. 18 Cr. 204 (NGG), 2019 WL 2212639 (E.D.N.Y. May 22, 2019), Judge Garaufis questioned whether an expert on grooming with experience focused on victims *may* have been able to testify reliably about how "perpetrators often use 'grooming' techniques on adult and child victims . . . ." *Id.* at *7.  Even then, he did not exclude the testimony—he simply ordered a *Daubert* hearing.  *Id.* at *8.  The Government ultimately declined to proceed with that testimony rather than conduct a mid-trial *Daubert* hearing.  Here, and as noted above, Dr. Rocchio's proposed testimony concerns the experience of manipulated and coerced victims, rather than the intentions of perpetrators.

return to Epstein's home for sexual abuse, or why some occasionally expressed affection for the defendant and Epstein.

Although Dr. Rocchio will not testify about these specific Minor Victims, her testimony will help the jurors understand the "psychological dynamic often seen in abusive relationships that leads an abuse victim to behave in counterintuitive ways, such as by declining to take opportunities to leave an abusive situation or by expressing gratitude to an abuser." *Torres*, 2021 WL 1947503, at *7.  This psychological dynamic between a victim of child sexual abuse and her abusers is "beyond the knowledge of the average juror and would or could plainly be helpful in understanding the psychological dynamics at play."  Oct. 17, 2019 Tr. at 27:3-7, *United States v. Dupigny*, No. 18 Cr. 528 (JMF) (S.D.N.Y.), Dkt. No. 198; *cf. See* Feb. 25, 2020 Tr. at 38:13-20, *United States v. Randall*, 19 Cr. 131 (PAE) (S.D.N.Y.), Dkt. No. 335 ("[B]y and large the relationship between prostitutes and pimps is not the subject of common knowledge.  Jurors are not apt to intuitively understand the mechanisms that may lead a woman who is not physically restrained or confined to heed the demands of a pimp to traffic herself.").  Accordingly, Dr. Rocchio's testimony will help the jury understand and contextualize the other testimony it will hear.[4]

The defendant expresses concern that a lay jury will be unable to apply Dr. Rocchio's analyses to the facts of this case, stating "[t]hat is not how Rule 702 works."  (Def. Mot. at 10).

---

[4] Relying again on *Raymond*, the District of Maine case, the defendant argues that expert testimony about "general principles is helpful only when it 'describes widely recognized and highly predictable and verifiable phenomena.'"  (Def. Mot. 10 (quoting *Raymond*, 700 F. Supp. 2d at 150 n.12 (alterations omitted)).  That proposition comes from footnote 12 of *Raymond*, which attempted to distinguish that expert's "profile" testimony from the Federal Rules Advisory Committee's observation that the 2000 amendment "does not alter the venerable practice of using

That is precisely how Rule 702 works in cases where experts testify about general principles, which the Rule contemplates.  *See* Fed. R. Evid. 702 Advisory Committee note ("[I]t might also be important in some cases for an expert to educate the factfinder about general principles, without ever attempting to apply these principles to the specific facts of the case.").  Dr. Rocchio will provide reliable opinions about principles of coercion and attachment in abusive relationships that will help the jury understand the psychological factors underlying the relationships that the jury will learn about at trial.

Finally, the defendant argues that the Court should preclude Dr. Rocchio's testimony under Rule 403.  In so arguing, she expresses concern that Dr. Rocchio's testimony will "'radically simplify' an otherwise complex case" by "'foist[ing] a damning teleology on a series of actions each of which might have been motivated by a variety of ends or no ends at all.'"  (Def. Mot. at 11 (quoting *United States v. Burns*, No. 07 Cr. 556, 2009 WL 3617448, at *5 (N.D. Ill. Oct. 27, 2009)).[5]  There is nothing prejudicial or simple about Dr. Rocchio's testimony.  The jury will not conclude that the defendant is guilty because Dr. Rocchio explains that acts which "might have been motivated by a variety of ends" are sometimes part of the process of sexual abuse.  Whether

---

expert testimony to educate the factfinder on general principles."  *Raymond*, 700 F. Supp. 2d at 150 n.12 (quoting Fed. R. Evid. 702 Advisory Committee note).  The defendant cites no place containing this limitation in the text of the Rule, its advisory committee notes, *Daubert*, or the law of this Circuit or District.  Nor does it make sense on its own terms: "how financial markets respond to corporate reports" or the "principles of thermodynamics" are sometimes highly predictable, but not always, depending on the context.

[5] *Burns*, a case about a district court's application at sentencing of a Guidelines enhancement, says nothing about whether the jury would be confused by learning about grooming.

they were in this case will depend on the other evidence.  That is not a prejudicial simplification—that is the trial.

There is nothing unreliable, irrelevant, or unusual about Dr. Rocchio's opinion on coercion and attachment.  Drawing on her decades of clinical experience and her familiarity with the relevant literature, Dr. Rocchio will give opinion testimony that will help the jury understand witness testimony.  That is all Rule 702's gatekeeping requirements demand.

## 2. Dr. Rocchio's Opinion on the Relationship Between Trust and Victim Awareness of Their Abuse is Admissible

At trial, the Government intends to offer Dr. Rocchio's testimony about how victims process their abuse and how that can prevent or delay disclosure.  As the Government set forth in its expert notice, Dr. Rocchio will testify that:

> The relationship of trust and attachment can prevent victims from being aware that what they are experiencing is abuse and can prevent disclosure.  Minor victims therefore may not identify themselves as victims of abuse while it is ongoing, and may not recognize the consequences of that abuse until adulthood.

(Def. Mot. 3 Ex. 1 at 2).  This opinion is part and parcel of Dr. Rocchio's other opinions about the relationship between attachment and coercion.  Specifically, and as noted above, victims develop relationships of trust and attachment with their abusers that leave victims vulnerable to coercion.  This opinion adds that, as part of this relationship, victims may not recognize that they are experiencing abuse and may not see themselves as victims while they are in this relationship, and therefore may not disclose their abuse or recognize the consequences of their abuse until later in life.  As the defense correctly observes, this opinion is intertwined with Dr. Rocchio's opinions about coercion and attachment.  (Def. Mo. 3 at 12).  Just as those are reliable, so is this one.

22

The defense argues that this opinion is outside Dr. Rocchio's expertise because she has "no experience treating alleged perpetrators," so "her view . . . is entirely one-sided." (*Id.*). As is clear from the above excerpt, her testimony is about largely about trust and attachment built in victims, and the resultant ways in which victims process abuse. But she is also an expert in the actions and techniques of perpetrators through her review of the literature and the lens of what she has learned through victims. This opinion is therefore squarely within Dr. Rocchio's expertise.

Finally, the defendant argues that this testimony violates Rule 704, because it is an "opinion that the alleged victims in this case are testifying truthfully," and 403, because it "risks jurors accepting her 'expert' opinion as gospel at the expense of their duty to evaluate the evidence." (Def. Mot. 3 at 13). Dr. Rocchio has not evaluated the victims in this case and will not express an opinion as to whether they are testifying truthfully. And the defense motion is entirely unclear on the features of this expert opinion that create risk that the jurors would abdicate their responsibilities. To the contrary, the defense concerns underscore how relevant this opinion will be in aiding the jurors in understanding the testimony at trial.

### 3. Dr. Rocchio's Opinion on the Long-Term Consequences of Abuse is Admissible

Dr. Rocchio will also testify that "[r]epeated exploitation and abuse can increase the likelihood of victimization later in life and can result in long-term traumatic and psychological consequences, especially when it occurs in the context of complex trauma." (Def. Mot. 3 Ex. 1 at 2). As Dr. Rocchio will explain, and as is detailed in her Jencks Act material[6], experiencing child

---

[6] The Government produced Dr. Rocchio's Jencks Act material to the defense at the time of the expert notice. (*See* Def. Mot. 3 Ex. 1 at 2 ("The Government is producing notes from the Government's interviews with Dr. Rocchio today as well.")).

sexual abuse can lead to a variety of psychological difficulties, including substance use and participation in risky sexual behavior.  Complex trauma—trauma involving repetitive or prolonged exposure to or experiences of multiple traumatic stressors, involving harm or abandonment by trusted adults, and occurring at developmentally vulnerable times—can lead to various psychological consequences, including dysregulation in emotional control, difficulties in relationships or with behavioral control, and distorted perceptions of the self and others.

This opinion is highly relevant.  It is likely that jurors will not be intimately familiar with the consequences of child sexual abuse.  Accordingly, the causal connection between these psychological problems and child sexual abuse is outside the experience of the average juror.  Yet that information will aid the jury in two respects: First, it will help jurors assess the credibility of Minor Victims, to the extent they have had some of these psychological symptoms or had other difficulties described by Dr. Rocchio in the years since their abuse.  For instance, the Government expects the defense to attack the credibility of a Minor Victim by cross0-examining her about her substance abuse.  Dr. Rocchio's testimony will provide the jury with a fuller picture by showing that substance abuse can be a consequence of sexual trauma.  Second, experiencing certain psychological difficulties is consistent with past child sexual abuse and complex trauma.  It is evidence that Minor Victims in fact experienced child sexual abuse that they suffered known consequences of such abuse.  *See Raniere*, 2019 WL 2212639, at *3, *7 (admitting expert

testimony that "sexual assault can result in severe, long-lasting and wide-ranging psychological consequences and related difficulties").

The defendant argues that this evidence is nonetheless prejudicial because it will inflame the passions and emotions of the jury.  (Def. Mot. 3 at 14).  The Minor Victims, however, will be the ones testifying about the abuse they experienced and observed, and—whether on direct or cross—about the psychological consequences of their experiences.  The question is only whether the jury will hear from an expert about the causal connection between those two concepts— testimony about concepts not specifically applied to any victim, and testimony about a causal connection whose reliability the defense does not challenge.  There is nothing inflammatory about this expert testimony, much less something sufficiently prejudicial to substantially outweigh the probative value of the testimony.  *See* Fed. R. Evid. 403.

### 4. Dr. Rocchio's Opinion About the Significance of the Presence of Third Parties is Admissible

As noted above, Dr. Rocchio will opine that "[t]he presence of other individuals can facilitate the sexual abuse of minors."  (Def. Mot. 3 Ex. 1 at 2).  For instance, and as Dr. Rocchio will explain, the presence of a third party can disarm an intended victim and make perpetrators appear safe and trustworthy, or can create a false sense of security on the part of a minor victim that sexualized situations are normal and acceptable.  Based on her experience as a clinician, Dr. Rocchio will testify that young children in particular often feel more comfortable in the presence of a woman.

The defendant objects to this testimony on the grounds that it concerns a lay matter "which a jury is capable of understanding and deciding without the expert's help."  (Def. Mot. 3 at 14

25

(citation and internal quotation marks omitted)).  Dr. Rocchio, however, is not testifying about common experience or from common experience.  Her testimony stems from her *clinical* experience, and it concerns the psychological experiences of *victims* when a third person is present during parts of their sexual abuse, as part of her broader opinion on attachment and coercion.  The average juror will not have knowledge of or experience in the psychology of abuse victims, and Dr. Rocchio's testimony will aid their understanding.

The defendant relatedly seeks to preclude Dr. Rocchio from testifying about "grooming-by-proxy," a term which appears nowhere in the Government's expert notice.  (Def. Mot. 3 at 9). By that term, the defendant appears to argue that Dr. Rocchio will opine that an individual can groom a victim for abuse by another perpetrator, and that such an opinion is unreliable and "prejudicial speculation."  (*Id.*).  This argument misses the mark in three respects.  First, Dr. Rocchio's testimony primarily concerns the experience of *victims*, not perpetrators, as explained above.  If the victim experienced attachment and grooming, it makes no analytical difference whether the perpetrator intends to engage in sexual contact with the victim or, instead, is preparing the victim for abuse by a third party.  *See* Feb. 25, 2020 Tr. at 31:1-34:12, *United States v. Randall*, 19 Cr. 131 (PAE) (S.D.N.Y.), Dkt. No. 335 (explaining that, where there is a "reliable basis for . . . testi[mony] about trauma bonding and coercive control as phenomena that exist more broadly," the expert may testify, and defendants "are at liberty to vigorously cross-examine [the expert] to attempt to cabin or limit trauma bonding and coercive control to populations predominately outside of the alleged victims in this case").  Indeed, expert testimony is commonly offered in sex trafficking cases on the pimp-prostitute relationship, which is specifically designed to permit the

26

pimp to arrange sex acts for third parties.  *See, e.g.*, *Kidd*, 385 F. Supp. 3d at 263; Oct. 17, 2019 Tr. at 27:1-12, *United States v. Dupigny*, No. 18 Cr. 528 (JMF) (S.D.N.Y.), Dkt. No. 198.  Second, in any event, the Government did not provide expert notice on "grooming by proxy."  Dr. Rocchio will give an opinion on grooming, and she will discuss how "[t]he presence of other individuals can facilitate the sexual abuse of minors."  (Expert Notice, Def. Mot. 3 Ex. 1 at 2).  The former is a reliable opinion, as explained above, and the defendant does not challenge the reliability of the latter opinion.  (*See* Def. Mot. 3 at 14).  Third, trial testimony will show that the defendant (1) in fact participated in sexual abuse of minors, (2) facilitated that abuse through her presence, and (3) conspired with a predator who groomed and sexually abused minors.  None of that involves "grooming by proxy."

### 5.  Dr. Rocchio's Opinion on Delayed Disclosure is Admissible

Finally, Dr. Rocchio will offer the opinion that "nondisclosure, incremental disclosure, and secrecy are common among victims of sexual abuse for a variety of reasons, and that memory and disclosure of traumatic or abusive events is impacted by a number of factors, including the circumstances surrounding the trauma."  (Def. Mot. 3 Ex. 1 at 2).

Much of the basis for this opinion is set forth in Dr. Rocchio's Jencks Act material.  For instance, extensive psychological literature supports the idea that individuals who are harmed as children may come to disclose their experiences incrementally or not until much later, as they may only realize that their experiences were abusive later in life, among other reasons.  Selected articles from that literature are attached as Exhibit B.  *See* Alaggia et al., "Facilitators and Barriers to Child Sexual Abuse (CSA) Disclosures: A Research Update (2000-2016)," 20 Trauma, Violence & Abuse 260, 276 (2016) ("Disclosure is now generally accepted as a complex and lifelong process,

with current trends showing that CSA disclosures are too often delayed until adulthood"); McElvaney, "Disclosure of Child Sexual Abuse: Delays, Non-disclosure, and Partial Disclosure," 24 Child Abuse Rev. 159, 160 (2015) (There is consensus in the research literature that most people who experience sexual abuse in childhood do not disclose this abuse until adulthood, and when disclosure does occur in childhood, significant delays are common."); Bicanic et al., "Predictors of delayed disclosure of rape in female adolescents and young adults," 6 Euro. J. of Psychotraumatology 25883 (2015) (listing among the predictors of delayed disclosure "age category 12-17 years"). Children who do disclose may choose to share information with a peer, but are less likely to go to an adult. Especially where a child has been groomed, the perpetrator has become a trusted adult for a child, reducing the likelihood of the child's disclosure. Incremental disclosure depends on a variety of factors, including how safe the victim feels with the recipient of the disclosure, how voluntary the disclosure is, and psychological factors that may prevent the victim from accessing their full memories. Victims may also experience significant shame or self-blame that prevents them from sharing certain information, and they may still be attached to the perpetrators, such that they try to protect the perpetrators.

Sexual abuse also impacts the way memory is encoded. In traumatic circumstances, often only the most salient details are encoded, and over time, specific details may be lost. With traumatic memory in particular, adrenaline and cortisol responses in the context of fear and trauma cause people to narrow their focus to the most salient and relevant details. If someone is abused multiple times or by multiple people, it is very common for memories of similar occurrences to

jumble together, although the victim can remember the perpetrator and maybe some of the locations where the abuse occurred.

Taken together, Dr. Rocchio's expert testimony explains why victims of child sexual abuse—and especially repeated sexual abuse—may disclose their abuse in a delayed and incremental fashion, and why their memories may lack some level of detail when the disclosure finally occurs.

The defendant argues that testimony about delayed disclosure is unreliable, repeating some of the defendant's earlier arguments about whether the testimony is "based entirely on her treatment of a self-selected group of individuals she assumes are telling the truth" and how the opinion lacks an error rate. (Def. Mot. 3 at 15). Here, as with her opinions on attachment and coercion, Dr. Rocchio is testifying based on her training, clinical experience, and the academic literature. *See* Exhibit B. That victims of childhood sexual abuse delay disclosure is a well-established phenomenon the fact of which—though not the underlying psychological explanation—is readily visible in the news. *See also* 2 Mod. Sci. Evid. § 19:15 (explaining that "a large literature over the years has demonstrated that individuals frequently fail to disclose autobiographical information in numerous different settings," including disclosure of "episodes of sexual abuse").

Courts have specifically authorized experts to provide testimony on delayed disclosure. *See, e.g.*, *United States v. Gaudet*, 933 F.3d 11, 15-16 (1st Cir. 2019) ("Moreover, the government provided expert testimony from Dr. Ann Burgess . . . in which she testified that delayed disclosures are '[v]ery common' in abuse victims and stem from the way the brain processes, stores, and recalls

traumatic experiences" (second alteration in original)); *Raniere*, 2019 WL 2212639, at *3, *7 (admitting expert testimony that "disclosure by sexual assault victims often unfolds over time, and the process of disclosure is influenced by multiple and changing factors including, but not limited to, the specific characteristics of the experience, the victim's psychological vulnerabilities, the victim's relationship to her perpetrator and her pattern of recovery and coping"); *United States v. Young*, 623 F. App'x 863, 865-66 (9th Cir. 2015) ("[The expert] testified that . . . delayed disclosures, piecemeal disclosures and/or even recanted disclosures are coping mechanisms. . . . [The expert]'s testimony was helpful and probative because [the defendant] had attacked the victims' credibility based on their delayed and incomplete reports of abuse." (citations and internal quotation marks omitted)); *United States v. Betcher*, 534 F.3d 820, 826 (8th Cir. 2008) ("In this case, Dr. Levitt's testimony as to delayed disclosure helped the jury understand why the girls did not reveal they had been photographed until they were confronted with the images.").

The defendant suggests that Dr. Rocchio's opinions on delayed disclosure are not helpful to the jury because they are too generic. As set forth here and more fully in Dr. Rocchio's Jencks Act material, Dr. Rocchio has elaborated on her opinions about the relationship between child sexual abuse and traumatic memory.[7] The defendant adds that, because Dr. Rocchio's opinion is that delayed disclosure is consistent with sexual abuse but not a necessary consequence of sexual abuse, jurors have no means to determine whether a Minor Victim is lying or telling the truth.

---

[7] The defendant also argues that Dr. Rocchio is not an expert in "the human brain or memory generally." (Def. Mot. 3 at 17). The Government agrees. But Dr. Rocchio is an expert in trauma psychology, which includes related issues of memory.

(Def. Mot. 3 at 16).  This argument misunderstands the role of the jury.  Jurors are not tasked merely with applying Dr. Rocchio's expertise to facts.  The jury will hear testimony that some Minor Victims did not immediately disclose their sexual abuse.  When evaluating the credibility of those delayed disclosures, they will have the benefit of observing the Minor Victims' testimony, including their cross-examination which is sure to address their delayed disclosure, and the Minor Victims' explanation for those delays.  The jury will also hear general testimony from Dr. Rocchio about various circumstances that may lead victims of sexual abuse to delay disclosure.  In the totality of the circumstances, the jury can then decide who it finds credible.

The defendant also argues it is prejudicial to her that Dr. Rocchio suggests "that delayed reporting is more consistent with truthfulness than fabrication, a determination which the jury must make for itself."  (Def. Mot. 3 at 17).  It is unclear how the defendant can simultaneously argue that (1) Dr. Rocchio's testimony improperly assumes the role of the jury by suggesting that delayed reporting is "more consistent" with child sexual abuse (*id.*); and (2) Dr. Rocchio's testimony would only help the jury if she resolved any ambiguity by saying that delayed reporting is a necessary consequence of child sexual abuse (*id.* at 15-16).

Finally, according to the defendant, Dr. Rocchio's arguments will only prejudice the defendant, because it will serve to bolster the witnesses' credibility.  As the defense acknowledges, however, Dr. Rocchio *will not* offer an opinion regarding any specific victim, and she has not evaluated any victims in this case.  (*Cf.* Def. Mot. 3 at 16 (citing *United States v. Charley*, 189 F.3d 1251, 1266-67 (10th Cir. 1999), in which the expert opined that the victims were in fact abused based "largely on crediting the girls' account," thereby "vouching for their truthfulness").

31

Instead, the Government will seek to offer Dr. Rocchio's testimony as background in this case. "*Daubert* instructs that vigorous cross-examination and the presentation of contrary evidence are the central tools available to an adversary who wishes to debunk an expert's testimony." *Randall*, 19 Cr. 131 (PAE), Dkt. No. 335 at 37 (internal quotation marks omitted) (citing *Daubert*, 509 U.S. at 594-595). Thus, to the extent the defendant wishes to cast doubt on the applicability of Dr. Rocchio's background testimony, she is free to do so through cross-examination or by offering contrary evidence. As discussed above, Dr. Rocchio's testimony is relevant to helping the jury understand key issues in the case, like why the Minor Victims may have returned to the defendant and Epstein without being physically forced to do so, and why they delayed disclosure.

* * *

The parties agree that Dr. Rocchio is a qualified expert. Her opinions are well within the range of reasonable expert opinions, and so are sufficiently reliable to go to the jury. And they will aid the jury in evaluating other testimony in this case. That is enough for the Court to admit Dr. Rocchio's testimony.

## II.    The Evidence Contained in the Government's October 11, 2021 Letter is Admissible

On October 11, 2021, the Government notified the defense of certain evidence it may offer at trial. In particular, the letter addressed ▮▮▮▮▮▮ and the expected testimony of one potential witness. (*See* October 11, 2021 Letter, Def. Mot. 2 Ex. A). As the Government explained in its letter to the defense, the evidence constitutes direct evidence of the charged offenses, but the Government provided notice under Rule 404(b) in the alternative. That same day, the Government provided the defense with ▮▮▮▮▮▮▮▮, along with copies of all other marked Government

exhibits, all of which were in the Government's discovery productions.  The Government also provided the defense with Jencks Act materials for all trial witnesses that same day, including detailed notes and reports of the Government's interviews of the witness referenced in the letter.

The defendant now moves to exclude this evidence, arguing, among other things, that the Government has not provided sufficient notice of the evidence it intends to offer at trial under Rule 404(b).  For the reasons set forth below, the defendant's motion lacks merit, and should be denied. The Government has provided detailed notice, well in advance of trial.  This evidence is admissible on multiple grounds, and the jury should be permitted to consider it.

### A. Applicable Law

Relevant evidence is "not confined to that which directly establishes an element of the crime." *United States v. Gonzalez*, 110 F.3d 941, 942 (2d Cir. 1997).  As the Second Circuit has explained, "[t]o be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency." *Id.*; *accord United States v. Coonan*, 938 F.2d 1553, 1561 (2d Cir. 1991).  The Second Circuit has repeatedly held that actions and statements are admissible as direct evidence of the crimes charged, and are "not considered other crimes evidence under" Federal Rule of Evidence 404(b), if (a) they "arose out of the same transaction or series of transactions as the charged offense," (b) they are "inextricably intertwined with the evidence regarding the charged offense," or (c) they are "necessary to complete the story of the crime on trial." *Carboni*, 204 F.3d at 44; *see also United States v. Quinones*, 511 F.3d 289, 309 (2d Cir. 2007); *United States v. Baez*, 349 F.3d 90, 93-94 (2d Cir. 2003).  In those circumstances, the uncharged crimes evidence is "appropriately treated

33

as part of the very act charged, or, at least, proof of that act." *Quinones*, 511 F.3d at 309 (internal citations and quotations marks omitted).

Federal Rule of Evidence 404(b) allows for the admission of uncharged crimes, wrongs, or other acts for purposes other than proving criminal propensity, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b).  The Second Circuit "has long adopted an 'inclusionary' approach to the admission of uncharged crime evidence, under which evidence of prior crimes, wrongs, or acts is admissible for any purpose other than to show a defendant's criminal propensity." *United States v. Paulino*, 445 F.3d 211, 221 (2d Cir. 2006) (internal quotation marks omitted).  Where the defendant claims her conduct has an innocent explanation, the admission of such evidence of other acts is particularly appropriate.  *See, e.g., United States v. Zackson*, 12 F.3d 1178, 1182 (2d Cir. 1993) ("Where a defendant claims that his conduct has an innocent explanation, prior act evidence is generally admissible to prove that the defendant acted with the state of mind necessary to commit the offense charged.").  Where evidence is offered for a proper purpose under Rule 404(b), it may only be excluded if the probative value of the evidence is "substantially outweighed" by the danger of unfair prejudice.  *Id.* at 1182; *see* Fed. R. Evid. 403.

Until December 1, 2020, the Government was required to provide "reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial."  Fed. R. Evid. 404(b)(2)(A) (2011).  On December 1, 2020, the rule was amended (the "2020 Amendments") to require the Government to also "articulate in the notice the permitted purpose for which the prosecutor intends to offer the evidence and the reasoning that supports the purpose."  Fed. R.

34

Evid. 404(b)(3)(B) (2020).  The 2020 Amendments also removed language permitting notice of the "general nature" of the evidence.

These amendments are "relatively modest."  Wright & Miller, "2020 Amendments to Rule 404(b)," 22B Fed. Prac. & Proc. Evid. § 5242.1 (2d ed.).  They simply require the prosecutor to "articulate a non-propensity purpose for which the evidence is offered and the basis for concluding that the evidence is relevant in light of this purpose."  *Id.* (quoting Fed. R. Evid. 404(b) Advisory Committee note).  The other act evidence should also be "described with helpful specificity."  *Id.*

## B. Discussion

To be clear, in the Government's view, the exhibits and testimony discussed in the Government's October 11, 2021 letter are direct evidence of the offenses charged, such that they do not need to be admitted pursuant to Rule 404(b).  And although notice was not required under Rule 404(b), the Government has provided the defense with notice substantially in advance of trial. The Court should admit this evidence, regardless of whether Rule 404(b) applies.

### 1. The Evidence is Admissible As Direct Evidence, or in the Alternative, Under Rule 404(b)

The Government's October 11 letter identified seven exhibits and one witness whose statements are admissible as direct evidence, or in the alternative under Rule 404(b).  (*See* October 11, 2021 Letter, Def. Mot. 2 Ex. A at 1).  More specifically, the letter explained that the Government may offer at trial ██████████, marked as Government Exhibits 401 through 404, 409 through 410, and 413.  In addition, the Government notified the defense that it may call as a witness an individual ("Employee-1") who worked for Jeffrey Epstein ████████ immediately

35

following the charged conduct.  Both categories of evidence are admissible as direct evidence of

the charged conduct, or in the alternative under Rule 404(b).

### a. Government Exhibits 401 through 404, 409 through 410, and 413

Turning first to the exhibits, the Government has notified the defense that it intends to offer

███████████████████████████████████████████████████████████████████

████████████████████████████████ (October 11, 2021 Letter, Def. Mot. 2 Ex. A at 1).

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

██████████████████████████████████████████

    █████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████

      ███████████████████████████████████████████████

█████████████████████ But the jury could easily draw different inferences from these exhibits.  The

exhibits go directly to the defendant's intent and motive, because they show ████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████

      Accordingly, these exhibits are probative of the issues the jury will be asked to resolve at

trial and should be admitted as direct evidence of the charged crimes.[9]  In the alternative, this

evidence is probative of the defendant's motive, intent, plan, and knowledge, and should be

admitted pursuant to Rule 404(b)(2). ████████████████████████████████████████

---

[8] The remaining exhibits identified in the Government's October 11, 2021 letter are necessary to
identify the parties to the emails.

[9] This evidence would also be admissible to rebut defense arguments concerning similar topics,
and in cross-examination of the defendant.

████████████████████ only highlights that this evidence does "not involve conduct any more sensational or disturbing than the crimes with which [the defendant] was charged," which weighs in favor of admitting these exhibits under Rule 404(b)(2).  *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990).

### b. Testimony of Employee-1

Employee-1 worked as a personal assistant for Epstein for approximately ████████ ███████.  (October 11, 2021 Letter, Def. Mot. 2 Ex. A at 1).  During that time, Employee-1 reported directly to another employee ("Employee-2"), who worked for Epstein during the timeframe of the charged conspiracy, and who is referenced in the Second Superseding Indictment (the Indictment").  (ECF No. 187, ¶¶ 6, 7(b)).  The Government expects that Employee-1 will testify about Employee-1's observations of the close relationship between the defendant and Epstein.  Indeed, Employee-1 will testify that Employee-1 worked out of the defendant's townhouse in Manhattan during the weeks that Employee-1 worked in New York City. The Government also expects Employee-1 to testify about her observations at Epstein's properties, including observations of minor girls at the properties, as well as her knowledge of Epstein's practice to arrange multiple sexualized massages per day.  In addition, although Employee-1's employment post-dates the defendant's conduct with the victims in this case, Employee-1 became familiar with certain items in Epstein's residences during her tenure there, and thus Employee-1 will authenticate certain exhibits relating to the Minor Victims.  Finally, the Government expects

───────────────────

███████████████████████████████████████████████████████████
██████

Employee-1 to testify that in or about October 2005, Epstein and her supervisor directed her to gather the computers and contact books in the house and hand them over to a specified individual.

Employee-1's testimony is admissible for multiple permissible purposes.  Her testimony shows the relationship between Epstein and the defendant ▮▮▮▮, shortly after the end of the conspiracy period, including the defendant's role in Epstein's affairs.  Similarly, it provides background information about the operation of Epstein's homes and lifestyle.  Employee-1's testimony will also show the defendant and Epstein's plan and preparation, because it will describe the process and frequency of obtaining masseuses, including the fact that the masseuses were often underage girls, and that some of the massages developed into sexual abuse.  And Employee-1's testimony tends to show the defendant's knowledge, because it describes the visibility of Epstein's abuse to individuals at his properties.  Finally, Employee-1's testimony will authenticate exhibits that are direct evidence of the charged crimes. Accordingly, Employee-1's testimony is direct evidence of the crimes charged.  Moreover, this evidence is admissible in the alternative under Rule 404(b), for substantially the same reasons.

### 2.  The Government Has Met and Exceeded Its Notice Obligations

Even if Rule 404(b) applies here, the Government's October 11, 2021 letter—and the corresponding Jencks Act disclosures—have satisfied any notice obligations that apply here.

The defense claims that the Government's October 11, 2021 notice was inadequate in light of the 2020 amendments to Rule 404(b).  The Government provided the defense with a letter, and corresponding disclosures, seven weeks before trial.  In fact, the defense has had the seven exhibits for much longer, since they were part of the Government's Rule 16 discovery productions.  The defense now also has this briefing, five weeks before trial.  Thus, any alleged gap in the

Government's notice is remediated by this brief.  This is ample notice of the possible Rule 404(b) evidence in this case.  Indeed, the Rule only requires that the defense receive notice "before trial," or even "during trial . . . for good cause."  Fed. R. Evid. 404(b)(3)(C).

The defense claims, without supporting authority, that Rule 404(b) requires heightened notice that cannot be satisfied here without, essentially, a script of all of the proposed testimony at trial accompanied by detailed expositions of the Government's case-in-chief.  (Def. Mot. 2 at 4-5).  But the Government has provided the defense with marked exhibits and comprehensive Jencks Act materials of the single witness subject to this motion (approximately 400 pages) "unusually early" (Endorsed Letter at 3, Dkt. No. 353), along with a letter specifically highlighting the proffered evidence at trial.  That is all that is required, and the defendant cannot leverage the notice requirements of Rule 404(b) to preclude this evidence at trial.  Indeed, the "Second Circuit generally disfavors the exclusion of otherwise relevant evidence on technical grounds."  *Hart v. BHH, LLC*, No. 15 Civ. 4804 (WHP), 2019 WL 1494027, at *3 (S.D.N.Y. Apr. 4, 2019) (citing *Rodriguez v. Vill. Green Realty, Inc.*, 788 F.3d 31, 47 (2d Cir. 2015)).  Accordingly, the only judge in this District to consider a similar situation concluded that the Government's Rule 404(b) notice was sufficient in combination with the Government's motion papers.  *See United States v. Chandler*, No. 19 Cr. 867 (PKC), 2021 WL 1851996, at *2 n.2 (S.D.N.Y. May 10, 2021).

The defense vaguely asserts that it cannot perform an independent investigation into the Rule 404(b) evidence due to the inadequacy of the Government's notice.  (Def. Mot. 2 at 5-6).  That conclusory assertion cannot support a motion to preclude the jury from hearing evidence of the defendant's guilt. The defense has not identified any specific way that they have been hampered

40

in their ability to investigate or move *in limine*.  The Government's Rule 404(b) notice—and this brief—have been provided far in advance of trial.  In many cases, the Government gives Rule 404(b) notice two weeks before trial, and here the Government's notice concerns a small number of exhibits and only one witness.  *See, e.g.*, *United States v. Tranquillo*, 606 F. Supp. 2d 370, 383 (S.D.N.Y. 2009) ("The Government has indicated that it will make the required disclosure two weeks prior to trial, a practice that typically comports with Rule 404(b)."); *United States v. Fennell*, 496 F. Supp. 2d 279, 284 (S.D.N.Y. 2007) ("The government has in good faith noted its obligations under Rule 404(b), and indicated that it intends to provide notice of the 404(b) evidence it intends to introduce two weeks before the beginning of trial. There is therefore no need to issue the order Defendant seeks.").  The Government has identified the *specific* evidence it will seek to admit—not just the types of evidence—and has explained the connection between that evidence and non-propensity purposes for which it will be offered.  That is all Rule 404(b) requires.

### III.    The Testimony of Minor Victim-3 is Admissible

The defendant has moved to exclude evidence related to Minor Victim-3.  This is nothing more than an attempt to seek reconsideration of the Court's pretrial order denying the defense's motion to strike Minor Victim-3 from the Indictment.  Evidence of the defendant and Jeffrey Epstein's abuse of Minor Victim-3 is direct evidence of the offense charged in the Indictment, including the overt acts in the Indictment that pertain to Minor Victim-3.  And in any event, her testimony would easily satisfy the requirements of Rule 404(b).

### A.  Background

Both the first and second superseding indictments described the defendant and Epstein's sexual abuse of Minor Victim-3.  As set forth in the Indictment, the defendant "groomed and

41

befriended Minor Victim-3 in London, England between approximately 1994 and 1995, including during a period of time in which [the defendant] knew that Minor Victim-3 was under the age of 18." (Indictment ¶ 9(c)). The defendant "introduced Minor Victim-3 to Epstein and arranged for multiple interactions between Minor Victim-3 and Epstein," during which the defendant "encouraged Minor Victim-3 to massage Epstein, knowing that Epstein would engage in sex acts with Minor Victim-3 during those massages." (*Id.*) Minor Victim-3 provided those massages, during which Epstein sexually abused Minor Victim-3. (*Id.*) Two overt acts in those Indictments concerned the defendant and Epstein's sexual abuse of Minor Victim-3 in London. (*Id.* ¶¶ 13(d), 19(d)).

The defendant moved to strike the portions of the S1 Indictment involving Minor Victim-3, arguing that the events involving Minor Victim-3 were unrelated to the conspiracies charged in Count One and Count Three. (*See generally* Mem. of Law, Dkt. No. 146). In response, the Government explained that the defendant and Epstein's "interactions with Minor Victim-3 were part of a broader scheme and agreement to entice and transport minor victims with the intent to commit illegal sex acts," and in any event, admissible under Rule 404(b) as evidence of the defendant's knowledge, intent, and *modus operandi*. (Gov't Opp. at 157-169, Dkt. No. 204). The Government expects Minor Victim-3 to testify, in substance and in part, that she met the defendant when she was ▮▮▮▮▮▮. The defendant befriended Minor Victim-3 by, among other things, discussing Minor Victim-3's life and family with Minor Victim-3. ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████

    ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████

The Court denied the defendant's prior motion to strike portions of the Indictment related to Minor Victim-3 (Op. & Order at 33, Dkt. No. 207), explaining that it was premature to strike any language from the Indictment, because Minor Victim-3's allegations "may reflect conduct

43

undertaken in furtherance of the charged conspiracy or be relevant to prove facts such as Maxwell's state of mind." (*id.* at 26-27).

### B. Applicable Law

It is axiomatic that the Government may offer proof of acts included within the indictment. Those are the very acts the Government seeks to prove at trial. *See United States v. Dugue*, 763 F. App'x 93, 94 (2d Cir. 2019) (summary order) ("[A]n act that is alleged to have been done in furtherance of the alleged conspiracy is not an 'other' act within the meaning of Rule 404(b); rather, it is part of the very act charged." (alterations and citation omitted)); *Quinones*, 511 F.3d at 308 ("While Rule 404(b) identifies various rationales . . . for which evidence of bad acts *other* than those charged in the indictment may be admitted at trial, the rule has no bearing on the admissibility of acts that are part of the charged crime." (emphasis in original) (footnote omitted)).

As discussed above, *see supra* Section II, direct evidence is "not confined to that which directly establishes an element of the crime." *Gonzalez*, 110 F.3d at 942, *see id.* at 942 (rejecting a claim that the evidence fell under Rule 404(b)). It also includes actions or statements that (a) "arose out of the same transaction or series of transactions as the charged offense," (b) are "inextricably intertwined with the evidence regarding the charged offense," or (c) are "necessary to complete the story of the crime on trial." *Carboni*, 204 F.3d at 44.

In addition, in a conspiracy case, "the Government need not set out with precision each and every act in furtherance of the conspiracy." *United States v. LaSpina*, 299 F.3d 165, 182 (2d Cir. 2002) (citation, alterations, and internal quotation marks omitted). Instead, "where the Government must prove a conspiracy existed, evidence of acts committed in furtherance of the conspiracy is . . . direct evidence of the acts charged in the Indictment." *United States v. Townsend*,

No. S1 06 Cr. 34 (JFK), 2007 WL 1288597, at *1 (S.D.N.Y. May 1, 2007) (citing *United States v. Concepcion*, 983 F.2d 369, 392 (2d Cir. 1992)); *United States v. Van Putten*, No. 04 Cr. 803 (PKL), 2005 WL 612723, at *3 (S.D.N.Y. Mar. 15, 2005) (similar).

As also discussed in Section II, *supra*, evidence of "other acts" is admissible under Rule 404(b) if it is (1) advanced for a proper purpose, such as to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident"; (2) relevant to the crimes for which the defendant is on trial; and (3) has probative value which is not substantially outweighed by any unfair prejudicial effect. *See Zackson*, 12 F.3d at 1182. If requested, such evidence must be admitted with limiting instructions to the jury. *See United States v. Edwards*, 342 F.3d 168, 176 (2d Cir. 2003). The Second Circuit "ha[s] adopted an inclusionary approach to evaluating Rule 404(b) evidence, which allows evidence to be received at trial for any purpose other than to attempt to demonstrate the defendant's criminal propensity." *Id.* (internal quotation marks and citations omitted).

## C. Discussion

Minor Victim-3's testimony is direct evidence of the charged criminal conduct—specifically, the conspiracies in Counts One and Three of the Indictment. ███████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████. The Government expects that Minor Victim-3's testimony, which concerns a period of time overlapping with or in close proximity to other Minor Victims' experiences with the defendant and Epstein and concerns teenagers of similar ages, will significantly overlap with the testimony of those other Minor Victims. Put simply, Minor Victim-3's account is

corroborative of the accounts of the other Minor Victims. It is also direct evidence of the operation of the conspiracy that is probative of the defendant's intent at the time of the offense. *See* Op. & Order at 10, Dkt. No. 106 ("[I]t is anticipated that the three witnesses will provide detailed and corroborating accounts of the Defendant's alleged role in enticing minors to engage in sex acts."); *see also United States v. Curley*, 639 F.3d 50, 59 (2d Cir. 2011) (explaining in an interstate stalking case that evidence of earlier abuse that was "similar in nature and severity" demonstrated a "pattern of activity that was probative of [the defendant's] intent").

Minor Victim-3's testimony is also direct evidence of the offense because it concerns acts taken by the defendant in furtherance of the conspiracies. In particular, ███████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████

Indeed, at a minimum, the defense motion should be denied because the Government's proffered evidence relating to Minor Victim-3 is admissible to prove the overt acts involving Minor Victim-3 contained in the Indictment. (Indictment ¶¶ 13(d), 19(d)). Evidence proving overt acts in the Indictment is direct evidence of the offense, and not other-acts evidence. *See United States v. James*, 520 F. App'x 41, 45 (2d Cir. 2013) (summary order) ("James's possession of five pounds of marijuana on December 22, 2005, and December 2, 2010, were charged as overt acts in the indictment. Accordingly, evidence of James's possession of marijuana on these occasions was not subject to the structures of Rule 404(b)."). The Court previously denied the defense's motion to strike the overt acts involving Minor Victim-3 as surplusage, explaining that it "may reflect conduct undertaken in furtherance of the charged conspiracy or be relevant to prove facts such as

46

Maxwell's state of mind."  (Op. & Order at 26-27, Dkt. No. 207 ("Courts in this district generally delay ruling on any motion to strike until after the presentation of the Government's evidence at trial, because that evidence may affect how specific allegations relate to the overall charges.")). Having concluded that it should delay striking these overt acts until after presentation of the Government's evidence, the Court should not now effectively reverse its decision by precluding that very evidence.  If the Government's proof at trial does not establish the relevance of Minor Victim-3's testimony, if anything, the proper course is for the defense to move to strike the relevant overt acts and Minor Victim-3's testimony at that time.

Even if evidence of Minor Victim-3 were uncharged criminal activity, it would still be necessary to understand the other aspects of the charged conspiracies.   Minor Victim-3 experienced the pattern of abuse in close temporal proximity to the other Minor Victims: the conduct involving Minor Victim-1 spans 1994 to 1997, the conduct involving Minor Victim-3 spans 1994 to 1995, and the conduct involving Minor Victim-2 occurred in 1996.  The defendant's acts toward Minor Victim-3 show (1) the defendant's relationship with Epstein, including her willingness to procure teenagers to give Epstein massages, (2) the defendant's knowledge of both the sexual nature of those massages and the need to procure additional victims, and (3) her willingness to transport minors to further their abuse.  This evidence is therefore direct proof of the defendant's state of mind and agreement to participate in a conspiracy with Epstein.  Moreover, her relationship with Minor Victim-3 was "part of [her] continued effort" to commit the offenses charged in Counts One and Three.  *Carboni*, 204 F.3d at 44; *see United States v. Romero-Padilla*, 583 F.3d 126, 130 (2d Cir. 2009) ("We reject Romero-Padilla's contention that evidence of his

previous plans with Ferro to import narcotics . . . was evidence of 'other crimes' . . . . [I]t corroborated the charge that Ferro and Romero-Padilla were partners during the charged conspiracy and established that Romero-Padilla's participation in the charged conspiracy was at least in part motivated by his desire to acquire [certain] funds . . .").[11]

Minor Victim-3's testimony is also necessary to complete the story of the offense conduct in light of expected defenses at trial.  To the extent that the defense argues, for instance, that the defendant played no role in obtaining girls to massage Epstein or was unaware that Epstein's

---

[11] The cases the defendant cites (Def. Mot. 4 at 8-9) conclude that the admission of evidence about distinct criminal incidents are not direct evidence of the conspiracy.  *See United States v. Cummings*, 60 F. Supp. 3d 434, 438 (S.D.N.Y. 2014), *vacated on other grounds*, 858 F.3d 763 (2d Cir. 2017) (evidence of prior narcotics arrest and firearms conviction in narcotics and firearms case "could be . . . connected to the charged conspiracy, but the Government has not provided enough detail"); *Townsend*, 2007 WL 1288597, at *2 (stating that the Government did not show that uncharged firearm and drug transactions involving the same confidential informant outside the time period of the charged conspiracy, described "rather generically" as a sale of firearms and "narcotics transactions," are "part and parcel of" the charged conduct or sufficiently similar to them); *United States v. Mahaffy*, 477 F. Supp. 2d 560, 566 (E.D.N.Y. 2007) (stating that, although the facts between two fraud schemes were "quite similar," the other acts were "a separate, discrete offense that may be conceptually segregated from the charged offenses without impairing the jury's ability to understand the facts underlying the schemes alleged in the indictment"), *vacated in part on other grounds* 285 F. App'x 797 (2d Cir. 2008); *United States v. Nektalov*, 325 F. Supp. 2d 367, 370 (S.D.N.Y. 2004) ("[T]he transactions took place as early as three years prior to the charged conspiracy and appear to involve a series of distinct cash for gold transactions . . . .").  That is not the case here, where the abuse of Minor Victim-3 occurred during the charged conspiracy period, overlaps temporally with the testimony of other Minor Victims, whose admissibility the defendant does not contest, and is direct proof of the operation of the conspiracy.  But in any event, in each case, the Court admitted at least some evidence under Rule 404(b).  *See Cummings*, 60 F. Supp. 3d at 438 (evidence admissible under Rule 404(b)); *Townsend*, 2007 WL 1288597, at *5-6 (some evidence admissible under Rule 404(b), some evidence "far too vague" for the Court to resolve, evidence of later marijuana possession irrelevant); *Mahaffy*, 477 F. Supp. 2d at 566  (evidence admissible under Rule 404(b)); *Nektalov*, 325 F. Supp. 2d at 372 (evidence admissible under Rule 404(b)).

massages were sexualized, evidence that she did so in the case of Minor Victim-3—at roughly the same time as Epstein was abusing Minor Victim-1 and Minor Victim-2—is "necessary to complete the story of the crime on trial." *United States v. Robinson*, 702 F.3d 22, 37 (2d Cir. 2012) ("Robinson argued at trial that Jane Doe was his 'girlfriend' and that he had no control over her prostitution activities. Evidence that Robinson was in the prostitution business and controlled prostitutes other than Jane Doe was therefore 'necessary to complete the story of the crime on trial.'").

The defense focuses on allegations involving Minor Victim-3 in isolation.  In its attempt to confuse the issues, the defense argues that the defendant's conduct with Minor Victim-3 was lawful in the United Kingdom, and that Minor Victim-3 was an adult when she ultimately traveled to the United States and was abused by Epstein.  The defense states that "[a]s to [Minor Victim-3], the completed endeavor—*i.e.*, her alleged sex acts with Epstein—was *not* a substantive criminal offense." (Def. Mot. 4 at 8 (emphasis in original)).  The defense then claims—without any basis— that the allegations relating to Minor Victim-3 in the Indictment are "of no consequence," because "the government evidently charged the conduct under the mistaken belief that [Minor Victim-3] was a minor when she engaged in sex acts with Epstein." (*Id.* at 9-10).  According to the defense, the government "*did not know* that [Minor Victim-3] was above the [age] of consent in the U.K.  The government presented [Minor Victim-3]'s allegations to the grand jury incorrectly assuming that she was a minor and that the alleged sex acts between Epstein and [Minor Victim-3] were illegal." (*Id.* at 1-2).

Not so.  The defendant's argument entirely misunderstands the charges in the Indictment and the jury's task at trial.  The defendant is charged with conspiring to transport and entice minors for the purpose of sexual abuse.  The question at trial will be whether the defendant took steps to provide Jeffrey Epstein with access to girls under the age of 18, knowing that Epstein intended to have sexual contact with those girls.  The defendant's acts involving Minor Victim-3 were part of that scheme and are highly relevant to demonstrating the existence of the conspiracy and the defendant's role in the scheme.  That is all that is required for evidence relating to the defendant's exploitation of Minor Victim-3 to be direct evidence of the charged offenses. The defendant is not charged with an offense under United Kingdom law, and the age of consent in the United Kingdom is irrelevant.  The defendant is also not charged with any substantive offenses with respect to Minor Victim-3, and thus it makes no difference whether the defendant could have, attempted to, or did successfully transport Minor Victim-3 in violation of those statutes.[12]

In any event, this evidence is all admissible under Rule 404(b).[13]  Testimony regarding the defendant's efforts to recruit and encourage Minor Victim-3 to engage in sex acts with Epstein in the context of massages establishes that the defendant knew of Epstein's attraction to minor girls

---

[12] Indeed, there is no risk at trial that the jury will convict the defendant based on the testimony of Minor Victim-3 alone.  As the Government has made clear, the jury may not convict the defendant of the conspiracy offense solely based on Minor Victim-3 due to the statute of limitations.  (Gov't Opp. at 157-58, 163, Dkt. No. 204).  The jury should be appropriately instructed at the conclusion of the trial.

[13] To the extent this evidence is properly admissible under Rule 404(b) rather than as direct evidence, the Government's detailed memorandum in opposition to the defense pretrial motions, which described theories of 404(b) admissibility (Gov't Opp. at 165-69, Dkt. No. 204), and this memorandum, filed five weeks before trial, is more than sufficient notice for the defense.

and knew that Epstein used massage to initiate sexual contact with minor girls.  Minor Victim-3's testimony shows the defendant's intent, through her acts befriending Minor Victim-3, encouraging Minor Victim-3 to provide Epstein massages, and asking Minor Victim-3 to find other girls.  And it shows the defendant's specific *modus operandi* of the conspiracies in the Indictment.  For these and the other reasons described above, Minor Victim-3's testimony easily satisfies Rule 404(b)'s requirements.  Evidence of other acts involving the grooming or abuse of minor victims is regularly admitted for similar purposes in cases where charges allege sexual activity with minors.  *See, e.g.*, *United States v. Vickers*, 708 F. App'x 732, 737 (2d Cir. 2017) ("As to the testimony concerning Vickers' 'grooming' of his victims, we conclude that such evidence was admissible even under Rule 404(b), because it was probative of Vickers' knowledge of how to secure adolescent boys' trust so that he could sexually abuse them.  We identify no abuse of discretion in the district court's decision to admit all of the challenged testimony [regarding uncharged acts of sexual abuse] under Rule 403."); *United States v. McDarrah*, 351 F. App'x 558, 563 (2d Cir. 2009) (affirming admission pursuant to Rule 404(b) of defendant's "e-mail responses to the Craigslist advertisements" for erotic services because the e-mails "were relevant to his knowledge and intent, because he wrote those emails to girls he knew could be minors (he enthusiastically indicated that girls younger than 18 are acceptable) and his e-mails showed his interest in actual sexual conduct"); *United States v. Brand*, No. 04 Cr. 194 (PKL), 2005 WL 77055, at *5 (S.D.N.Y. Jan. 12, 2005) (admitting "evidence that Brand exhibited an interest in child erotica and child pornography on the internet in the period leading up to the charged conduct" under Rule 404(b)

because evidence was "pertinent to whether he used the internet in an attempt to engage in sexual conduct with" putative victim).

The defense argues that this testimony will be unfairly prejudicial to the defendant. *See* Fed. R. Evid. 403. According to the defense, if Minor Victim-3 testifies that she had sex with a "much older man when she was 17 years old" or that she was sexually abused, the jury will assume that Epstein engaged in illegal conduct, which will somehow prejudice the defendant. (Def. Mot. 4 at 13). The Court should not assume that the jury will speculate about principles of United Kingdom law and apply them to this case. The Court will properly instruct the jury on the elements of the offenses charged in the Indictment and the evidence that the jury can—and cannot— consider. Those instructions will not ask the jury to consider or pass upon any aspect of United Kingdom law, which will not be in evidence at trial. And in any event, as discussed in the Government's opposition to the defendant's pretrial motion to strike references to Minor Victim-3 in the Indictment, evidence regarding Minor Victim-3's experiences with the defendant and Epstein are no more inflammatory or upsetting than those of Minor Victim-1 and Minor Victim-2. The risk of unfair prejudice is therefore minimal.

In the alternative, the defense seeks three rulings: (1) precluding the Government from referring to Minor Victim-3 as a "minor," (2) precluding the Government and Minor Victim-3 from representing that she was "sexually abused" by Epstein, and (3) giving a limiting instruction about United Kingdom law. The defense's requested rulings are not grounded in law or reason.

First, the defense claims that Minor Victim-3 should not be referred to as a "minor" because she was above the age of consent in the relevant jurisdictions at the times she had sexual contact

with Epstein.  When Minor Victim-3 began having sexual contact with Epstein, she was 17.  The issue at trial will be the defendant's knowledge of Epstein's preference for girls under the age of 18.  Under federal law, there is a term for individuals under the age of 18: minors.  There is nothing inappropriate about using that term at trial.

Similarly, the phrase "sexual abuse" is accurate, and the Government should be permitted to use it.  Minor Victim-3 is expected to testify about her experiences with the defendant and Epstein, including that she was sexually abused by Epstein numerous times.  Regardless of whether she uses the term "sexual abuse," her testimony will capture her experience—that she was exploited sexually.  And it is fair for the Government to argue that those acts were sexual abuse. The defense argues that the phrase "sexual abuse" is misleading because it suggests to the jury that Epstein engaged in "criminal sexual activity" with Minor Victim-3. (Def. Mot. 4 at 14-15).  To justify that proposition, the defense cites a single Supreme Court case in which (1) the parties were engaged in the task of statutory interpretation, not argument in a jury address or description of a victim's lived experience, and (2) the Court rejected that proposed definition of "sexual abuse of a minor" as "flatly inconsistent with the definition of sexual abuse contained in th[at] very dictionary." *Esquivel-Quintana v. Sessions*, 137 S. Ct. 1562, 1569 (2017).  Again, the Government is confident that the Court will properly instruct the jury regarding the elements of the crimes in the Indictment.

Finally, there is no basis for an instruction about United Kingdom law.  The defense has demonstrated no unfair prejudice that might warrant a limiting instruction, and the defense's proposed instructions would only confuse the jury.  The jury will be instructed to consider only

53

the elements of the crimes the Court provides them, so any assumptions the jury might make about United Kingdom law are irrelevant.[14] *See United States v. Vasquez*, 82 F.3d 574, 577 (2d Cir. 1996) (appropriate to reject defense request for an instruction if it does not "represent[] a theory of the defense with a basis in the record that would lead to acquittal").  And the proposed jury instruction that the sexual activity involving Minor Victim-3 "cannot be considered 'illegal' or 'criminal' or 'unlawful' for purposes of the crimes charged in the indictment" (Def. Mot. 4 at 15), is wrong on the law.  The sexual activity involving Minor Victim-3 *can* be considered criminal for purposes of the crimes charged in the Indictment, because it is probative proof of the defendant's guilt of those crimes.  The instruction the defense proposes, in contrast, creates serious risk that the jury will think the Court is telling them that the conduct is lawful and therefore irrelevant to the case.  It is not irrelevant: it is direct evidence of the crimes charged, and it should be put before the jury.

### IV.   There is No Basis to Preclude Co-Conspirator Statements at Trial

On October 11, the Government provided the defense with comprehensive Jencks Act material for trial witnesses and its exhibits, along with a letter telling the defense, consistent with the Court's order, the identities of the individuals the Government intends to argue are co-conspirators at trial.  The defense nonetheless asks the Court to enter an order precluding the Government from introducing any co-conspirator statements under Federal Rule of Evidence

---

[14] In the event the Court instructs the jury on the age of consent in the United Kingdom, the Government requests that the Court also instruct the jury that the United Kingdom's age of consent is irrelevant and they should not consider it.

802(d)(2)(E) because it claims the Government failed to comply with the Court's September 3, 2021 Order.  (Def. Mot. 1 at 1).  The defense misreads this Court's September 3, 2021 Order to require the Government to do something unprecedented: identify and itemize for the defense each and every co-conspirator statement it plans to use at trial, seven weeks in advance of trial.  Then, complaining that the Government has not complied with the defense's peculiar reading, the defense seeks an extraordinary remedy: precluding the Government from offering any co-conspirator statements at trial.  Each step of this analysis is erroneous, and the Court should deny the motion.

### A.  Background

The defendant first sought to compel the Government to identify the co-conspirator statements it plans to use at trial in its initial round of pretrial motions.  There, the defendant argued that the Second Circuit's practice of conditional admission of co-conspirator statements at trial would prejudice her because "any cautionary instruction would be of doubtful utility."  (Mem. of Law at 13, Dkt. No. 148).  She therefore asked the Court to order a "proffer from the government or conduct a pretrial hearing to determine if the statements are admissible."  (*Id.* at 13-14).

In response, the Government observed that the practice of conditional admission of co-conspirator statements is the law of the Circuit, notwithstanding the defense's preference to the contrary.  (Gov't Opp. at 192, Dkt. No. 204).  The Government also explained that "the Second Circuit has rejected the suggestion that non-exculpatory co-conspirator statements are discoverable under Rule 16 or by any means other than the Jencks Act."  (*Id.*).  *See In re U.S.*, 834 F.2d 283, 284-87 (2d Cir. 1987) (issuing a writ of mandamus reversing District Court's order directing the Government to "produce all oral statements made by the defendants and coconspirators that the

Government planned to offer at trial as admissions of a defendant" under Fed. R. Evid. 801). Accordingly, the Government argued that "the defense will receive notice of any co-conspirator statements that the Government may seek to introduce through witness statements" in its Jencks Act production. (Gov't Opp. at 192, Dkt. No. 204).

The Court denied the motion, explaining that the Court lacked the power to order pretrial disclosure of non-exculpatory co-conspirator statements. (Op. & Order at 30, Dkt. No. 207). The Court also explained that the "[c]o-conspirator statements may often be admitted at trial on a conditional basis," and to the extent that "can pose a problem, a pretrial hearing is unnecessary here because the Government has committed to producing co-conspirator statements at least six weeks in advance of trial to allow Maxwell to raise any objections." (*Id.* at 30-31).

The defendant's second bite at the apple came in the parties' joint scheduling letter. (Letter, Dkt. No. 291). There, the defense requested that the Government "identify any co-conspirator's names and statements (whether via witness testimony or documentary evidence) at the same time as it discloses []3500 material," so it could "litigate their admissibility before trial." (*Id.* at 11-12). The Government responded that it is "entirely appropriate for defense counsel to receive notice of any co-conspirator statements through Jencks Act materials and marked exhibits," because any co-conspirator statements will be contained therein. (*Id.* at 5). The Government also noted that the defendant cited no cases "directing separate notice of coconspirator statements that the Government may introduce at trial." (*Id.*)

On June 2, 2021, the Court adopted the "Government's proposal" and set a deadline of October 11, 2021, for the "disclosure of Jencks Act and *Giglio* material, Rule 404(b) evidence and

notice, co-conspirator statements, and Government witness list," as well as the "Defendant's proposal" that the Government disclose its proposed exhibit list that same day.  (Order at 1, Dkt. No. 297).  This order did not expressly require the Government to specifically identify co-conspirator statements within its other productions.

In the defendant's second round of pretrial motions, she asked the Court to order the Government to disclose a series of information about the Indictment.  That list contained a renewed request for the Government to identify uncharged co-conspirators, but it did not contain a new request for the Government to separately identify co-conspirator statements within its discovery production.  (Mem. of Law at 23-24, Dkt. No. 293).  On August 13, 2021, the Court denied the defense's motion, but in a footnote, explained that it "presume[d] the Government intends to disclose" the "identi[ties of] the unnamed co-conspirators who allegedly participated in the conspiracies charged in the S2 Indictment," since the Government had not previously opposed that request.  (Op. & Order, Dkt. No. 317 at 12 n.1).  The order said nothing about identifying co-conspirator's statements. (*Id.*).

The Government filed a letter opposing the request for the Government to "identify [the defendant]'s unnamed co-conspirators." (Letter at 1, Dkt. No. 320).  The defendant filed a new letter in response, raising "two issues." (Letter at 1, Dkt. No. 331).  First, the defendant sought the identities of co-conspirators.  (*Id.* at 1-2).  Second, the defendant took a third bite at the apple, once again seeking "disclosure of the purported co-conspirator statements [the Government] intends to offer at trial." (*Id.* at 3).  The defendant also argued that the Court's scheduling order had already required the Government to specifically identify co-conspirator statements.  (*Id.* at 3-4).

On September 3, 2021, the Court ordered the Government to "disclose to the Defendant the identities of all unnamed co-conspirators alleged in the S2 indictment to whom it will refer at trial." (Order at 1, Dkt. No. 335). The Court further ordered the Government to "disclose *all* co-conspirator statements it intends to offer at trial no later than October 11, as consistent with this Court's scheduling order." (*Id.* at 2).

Accordingly, on October 11, 2021, the Government produced its exhibit list and Jencks Act material to the defendant. The Jencks Act materials and exhibits contained the only co-conspirator statements in the Government's possession that will be offered at trial. It also disclosed the identities of the individuals to whom it may refer at trial as co-conspirators and informed the defendant that it "has produced all co-conspirator statements which it intends to offer at trial . . . in the Government's production [that day] or in its previous productions." (Def. Mot. 1 Ex. 1 at 1). The Government further noted that "[t]o the extent the Government learns of additional co-conspirator statements as it continues to prepare for trial, it will produce those statements in connection with its ongoing obligation to produce Jencks Act material." (*Id.*).

## B. Discussion

The Government has complied with its pre-trial disclosure obligations, consistent with the Court's orders and on a schedule with deadlines well in advance of trial. As of October 11, the Government produced all co-conspirator statements in its possession that it intends to offer at trial. To the extent that the Government learns of additional co-conspirator statements as it prepares for trial—such as in a session preparing a witness for trial—it will produce those statements as part of its ongoing Jencks Act obligations.

The defense errs when it suggests that the Court ordered the Government to specifically itemize any co-conspirator statements contained in its disclosures.  When the Court first set a disclosure schedule for Jencks Act material, it adopted the "Government's proposal," which *opposed* any requirement that the Government isolate co-conspirator statements from other witness statements.  (Order at 1, Dkt. No. 297).  When the Court ordered the Government to produce the identities of co-conspirators, it again ordered the Government to "disclose" all co-conspirator statements, citing the Court's earlier order.  (Order at 2, Dkt. No. 335).  Neither order expressly directed the Government to produce a set of co-conspirator statements it would offer at trial separately from the other evidence it would offer at trial.

A requirement to "disclose statements" is not a requirement to isolate statements.  For one, the Court denied the defense request for effectively that relief in the first round of pretrial motions.  (Op. & Order at 30-31, Dkt. No. 207).  For another, in the defense's many rounds of briefing on this issue, it has cited no case—not from this District, nor any other—in which a Court ordered the Government to segregate and itemize co-conspirator statements from other statements for the convenience of the defense.  The Government is aware of no such case—likely because such an order would be in considerable tension with Circuit precedent, *see In re U.S.*, 834 F.2d at 286.  For a third, the guiding principle of the defense's justification for its request is to facilitate litigation of those statements' admissibility pre-trial.  But the law of the Second Circuit is that such statements can be conditionally admitted during the trial, and their admissibility litigated thereafter.  *See, e.g.*, *United States v. Ferguson*, 676 F.3d 260, 273 n.8 (2d Cir. 2011) (citing *United States v. Geaney*, 417 F.2d 1116, 1120 (2d Cir. 1969)); Op. & Order at 30, Dkt. No. 207.  As much

59

as the defense might like the Government to create such an index, that is simply not how the litigation of co-conspirator statements is handled.  And it is not what the Court's order, requiring "disclos[ur]e" of co-conspirator statements, required.

The Government's obligation is to make disclosures.  The Government is not obligated to serve as members of the defense team, reviewing Jencks Act materials for the defense and itemizing and indexing disclosures for them.  The Government is no more obligated to itemize Jencks Act materials containing co-conspirator statements than it is obligated to exhaustively detail for the defense the basis for offering any other type of witness statement contained in the Jencks Act material it has produced.  Such an obligation would extremely burdensome and is both without precedent and entirely unnecessary.  The defense team has ample resources to review the Government's disclosures and file any motions they wish to make regarding the admission of certain testimony.  And there is ample time before trial for the defense to do so, and no basis in the record to believe the defense will be unable to raise these issues and seek a ruling before trial.

The defense argues that the Court did order the Government to itemize co-conspirator statements contained in its Jencks Act production.  In support, however, the defense cites to orders relating to the disclosure of the *identities* of co-conspirators.  (*Compare* Def. Mot. 1 at 2 (citing Dkt. No. 317 at 12 n.1) *and* Def. Mot. 1 at 3 (citing Dkt. No. 335 at 3) (stating that the Court rejected the defendant's arguments "because of '*the need for the parties to litigate co-conspirator issues in advance of trial*'" (emphasis in Def. Mot. 1))*, with* Op. & Order at 12 n.1, Dkt. No. 317 ("Additionally, Maxwell includes in her motion for a bill of particulars a request to require the government to identify the unnamed co-conspirators who allegedly participated in the conspiracies

60

charged in the S2 indictment."), *and* Order at 3, Dkt. No. 335 (following the above sentence with "In light of the interests discussed above . . . the Court will require the Government to disclose the identities of any unnamed co-conspirators . . . .").

The defense also argues that failure to provide an index of co-conspirator statements permits "the presentation of false testimony" and is "an invitation to manufacture evidence," because a witness will offer a co-conspirator statement for the first time. (Def. Mot. 1 at 4). This argument is nonsensical and offensive. It is deeply unfortunate that defense counsel would so casually resort to baseless allegations that the Government would manufacture evidence and present false testimony at trial. And in any event, the Government produced to the defense Jencks Act material containing co-conspirator statements in its possession on October 11 and will continue to make Jencks Act productions as it prepares for trial. To the extent the defense is concerned that a witness will say something on the stand for the first time, the Government cannot disclose that in advance because no lawyer can know a witness's verbatim answer in advance. But were that to occur, the defense would be well positioned to cross-examine the witness.[15]

---

[15] The defendant's motion also makes the puzzling argument that co-conspirator statements are problematic in this case because the defense is limited in its ability to call co-conspirators to testify as defense witnesses. (Def. Mot. 1 at 4). That is true in essentially every criminal case, as the Court has previously noted. (*See* Op. & Order at 17-18, Dkt. No. 207 ("There are also serious doubts under all of the relevant circumstances that a jury would have found testimony from Epstein credible even if he had waived his right against self-incrimination and testified on her behalf.")). In any event, to the extent the defense takes issue with the rule that co-conspirator statements can be admitted without requiring the declarant to testify, that complaint is properly directed to the drafters of the Federal Rules of Evidence.

Even if the Government has misread the Court's order, the defense's claims of prejudice are exaggerated. Although the defense complains that the Government seized "multiple electronic devices" containing "hundreds of thousands of statements spanning decades" (Def. Mot. 1 at 3), any statements contained in emails or other documents that the Government plans to use at trial have been marked as Government exhibits and produced to the defense. The defense need look no further than the Government's exhibit list to discover what documents will be offered at trial. Similarly, although the defense complains of "document dumps" (*id.* at 2) and the need to review "thousands of pages of newly provided discovery material" (*id.* at 7), any witness testimony containing co-conspirator statements is contained in the Government's Jencks Act production— and specifically, the Government's production of material for testifying witnesses. Although the Government produced as a courtesy prior statements of non-testifying witnesses, by definition the Government does not plan to call those individuals at trial. And the Government has informed the defense of the limited number of co-conspirators to whom it may refer at trial, so the defense knows exactly which declarants' statements are possibly subject to the co-conspirator exception. *See* Fed. R. Evid. 801(d)(2)(E).[16]

Finally, and in any event, suppression is not a proper remedy. The defense relies principally on *Taylor v. Illinois*, 484 U.S. 400 (1988), in which the Supreme Court upheld an order

---

[16] To be clear, the defendant's motion concerns the admission of statements under Rule 801(d)(2)(E). The majority of the statements made by co-conspirators that will be offered at trial have other bases for admissibility. For example, witnesses will testify regarding promises, offers, instructions, and directions they received from Epstein. Those statements are not factual assertions subject to hearsay rules. Rather, they are offered for the effect on the listener, among other reasons.

excluding the testimony of a defense witness as a sanction for counsel's (i) noncompliance with a discovery rule that required notice of intention to call the witness, and (ii) misleading the court concerning his knowledge of the witness's whereabouts. The Supreme Court found the discovery violation was "both willful and blatant." *Id.* at 416. *Taylor* does not support the defense's position. The defense, citing *Taylor*, accuses the Government of willfully violating the Court's September 3, 2021 Order. (*See* Def. Mot. 1 at 6-7; *see id.* at 3 (accusing the Government of "attempting to overstuff an already full sandbag")). The Government did no such thing. The Government has simply read the word "disclose" to mean "disclose," consistent with the uniform practice in this District. The defense's accusations are baseless and offensive.

The defense has all of the co-conspirator statements the Government plans to use at trial. They have these records "unusually early"—seven weeks before trial. (Endorsed Letter at 3, Dkt. No. 353). The defense also knows the identities of the limited number of co-conspirators to whom the Government may refer at trial, a highly unusual circumstance that makes the defense's task even easier. And they are free to litigate the admissibility of any such statement during trial. The Government has complied with its obligations, and the defense is fully equipped to prepare for trial. The Court should deny the motion.

## V.    There is No Basis to Suppress Minor Victim-4's Identification of the Defendant

The defendant claims that Minor Victim-4's identification of her was unduly suggestive and should be suppressed. (Def. Mot. 9). That argument finds support in neither fact nor law. Minor Victim-4 knew the defendant personally, and she has consistently described the defendant for decades. The identification was not suggestive, and the motion should be denied.

### A.  Background

63

As set forth in Counts Five and Six of the Indictment, Minor Victim-4 was trafficked by the defendant and Jeffrey Epstein from approximately 2001 to 2004.   (Indictment ¶¶ 22-27). During that time, Minor Victim-4 personally interacted with the defendant—for instance, the defendant paid Minor Victim-4 following Minor Victim-4's sexual encounters with Epstein.  (*Id.* 25(a)).

In 2007, Minor Victim-4 was interviewed by the Federal Bureau of Investigation.  In that interview, she described meeting "an older lady with short black hair and an unknown accent"—a description that is consistent with the defendant's appearance—at her first meeting with Epstein. In ███, Minor Victim-4 was deposed, during which she explained that she sometimes called the house to get work, and she would talk to an employee or "Maxwell."  Later in the deposition, she added that the same employee or "Maxwell" would contact her when Epstein wanted her to come.

This Office first interviewed Minor Victim-4 in July 2020.  During that meeting, Minor Victim-4 spoke about her many interactions with the defendant.  She did so again at the Government's meetings with her in August 2020, and at multiple meetings in January 2021.

The Government met Minor Victim-4 again in June 2021 for several meetings.  During one of those meetings, the Government showed Minor Victim-4 a photo book containing 20 photos. The Government asked Minor Victim-4 to review each photograph in the book and to indicate whether she recognized anyone in the book.  The Government explained that just because someone is in the book, it does not mean that Minor Victim-4 knowns that person or that the person is in trouble.  The Government instructed Minor Victim-4 just to let the Government know if she recognized anyone.

Minor Victim-4 identified photo █ as possibly depicting the defendant, but indicated that she was not sure.  When she reached photo █ Minor Victim-4 said it depicted the defendant. After completing her review of the book, Minor Victim-4 returned to compare photos ████ and she confirmed that she believed photo █ was a photo of the defendant, and she was not sure whether she knew the person in photo █. ████████████████████ ████████████████████████

## B. Applicable Law

As a general matter, the Constitution "protects a defendant against a conviction based on evidence of questionable reliability, not by prohibiting introduction of the evidence, but by affording the defendant means to persuade the jury that the evidence should be discounted as unworthy of credit."  *Perry v. New Hampshire*, 565 U.S. 228, 237 (2012).   Eyewitness identifications should therefore be excluded only where "improper police conduct" occurred that was "so unnecessarily suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Id.* at 238-39; *see Manson v. Brathwaite*, 432 U.S. 98, 112-14 (1977); *Simmons v. United States*, 390 U.S. 377, 384 (1968).

Federal courts follow a two-step analysis in ruling on the admissibility of identification evidence.  *Perry*, 565 U.S. at 238-40; *Brisco v. Ercole*, 565 F.3d 80, 88 (2d Cir. 2009).  First, the defendant must show that the identification was "so unnecessarily suggestive and conducive to irreparable mistaken identification that [the defendant] was denied due process of law."  *United States v. DiTommaso*, 817 F.2d 201, 213 (2d Cir. 1987) (citation and internal quotation marks omitted); *see Raheem v. Kelly*, 257 F.3d 122, 134 (2d Cir. 2001).  This is a high threshold to meet, as the defendant must show that, under the totality of the circumstances, there is "a very substantial

likelihood of irreparable misidentification." *United States v. Maldonado-Rivera*, 922 F.2d 934, 973 (2d Cir. 1990).  If the defendant cannot make such a showing, "the trial identification testimony is generally admissible without further inquiry into the reliability of the pretrial identification.  In that circumstance, any question as to the reliability of the witness's identifications goes to the weight of the evidence, not its admissibility." *Id.*

Second, an unduly suggestive identification procedure does not alone require suppression of the identification evidence.  *See Brathwaite*, 432 U.S. at 110-14.  Instead, the court must then determine whether the identification evidence is nevertheless "independently reliable" based on the totality of the circumstances.  *Brisco*, 565 F.3d at 89; *United States v. Simmons*, 923 F.2d 934, 950 (2d Cir. 1991) ("[E]ven a suggestive out-of-court identification will be admissible if, when viewed in the totality of the circumstances, it possesses sufficient indicia of reliability.").  Among the factors to be considered are: "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972). No single factor is dispositive. *See Kelly*, 257 F.3d at 135.

## C. Discussion

There was nothing unduly suggestive about the identification procedure used here. Accordingly, there is no basis to suppress Minor Victim-4's identification of the defendant, and Minor Victim-4 should be permitted to identify the defendant at trial.[17]

First, the identification procedure was not suggestive because it was merely a "confirmatory identification" of a person Minor Victim-4 had known and identified by name over the years. There is no "improper police conduct" creating a "substantial likelihood of identification" by showing a person in that position even a single photograph, much less a photo array or photo book. *See, e.g.*, *United States v. Hardy*, No. 10 Cr. 1123 (JSR), 2011 WL 7782582 (S.D.N.Y. Jan. 25, 2011) ("Displaying a confirmatory photograph of a person the witness has indicated that he already knows is perfectly acceptable."); *Gilbert v. Sup't of Collins Corr. Fac.*, No. 03 Civ. 3866 (LBS), 2004 WL 287683, at *8 (S.D.N.Y. Feb. 11, 2004) (upholding confirmatory identification following street canvass on the grounds that "'police suggestiveness does not require suppression of an identification if the witness was not thereby influenced, as, for example, when the witness's identification was already positive.'" (quoting *Jarrett v. Headley*, 802 F.2d 34, 41-42 (2d Cir. 1986))); *see also, e.g.*, *Franco v. Lee*, No. 12 Civ. 1210 (SJF), 2013 WL 704655, at *10 (E.D.N.Y. Feb. 26, 2013) ("In cases in which the defendant's identity is not in issue, or those in which the protagonists are known to one another, suggestiveness is not a concern

---

[17] Even if the Minor Victim-4's identification of the defendant were suppressed, that would not preclude Minor Victim-4 from testifying about her abuse and the name and physical description of the person involved.

and the identification is merely confirmatory." (citation and internal quotation marks omitted));

*Stallings v. Wood*, No. 04 Civ. 4714 (RLM), 2006 WL 842380, at *11 (E.D.N.Y. Mar. 27, 2006)

(collecting cases).

Minor Victim-4's personal knowledge of the defendant is well established. The defendant

and Minor Victim-4 met in person and interacted multiple times between 2001 and 2004. Minor

Victim-4 then mentioned the defendant by description or by name in 2007, 2009, 2020, and 2021,

all prior to being shown the photo book. And the circumstances of the identification were not

suggestive. Minor Victim-4 was shown 20 photos, ████████████████████████████

████████████. She was not asked to locate the defendant, or asked whether a particular photo

depicted the defendant, but just whether she recognized anyone, although she was told that she

was not expected to recognize someone just because their photo was in the book. And, indeed,

Minor Victim-4 said she did not recognize some photos in the book. Regarding the defendant

specifically, Minor Victim-4 carefully considered whether a different photo depicted the person

she believed to be the defendant before seeing and selecting a photo of the defendant. This

procedure was cautious and not suggestive—much less unduly suggestive.

The reality is straightforward: Minor Victim-4 knows exactly who the defendant is and

confirmed that the person in the photograph was the defendant. In response, the defense argues

that the photo "looks like a mug shot" and "is different than the others." (Def. Mot. 9 at 3). Of

course, as is often the case with photo arrays or photo books, *all* of the photos generally resemble

mug shots, so there is nothing suggestive about the fact that the defendant's photo does. And it is

not in fact different from the others: While the defendant's photo is lower resolution than some,

there are several similar quality photos in the book. (*See* Ex. A, photos ▮▮▮▮).  In any event, these highly conclusory statements fall well short of transforming the careful confirmatory identification used in this case into an unduly suggestive procedure.  The motion to suppress should be denied on this basis, and the identification should be admitted at trial, where the defendant will have a full opportunity to contest the persuasiveness of that evidence through cross-examination and attorney argument.  *See Maldonado-Rivera*, 922 F.2d at 973 (where there has been no showing of suggestiveness, "any question as to the reliability of the [identification] goes to the weight of the evidence, not its admissibility").

Even if the "confirmatory identification" procedure was impermissibly suggestive as the defendant claims, which it was not, Minor Victim-4's identification had clear independent reliability because Minor Victim-4 stated that she knew the defendant by name from previous interactions.  For example, in *Wiggins v. Greiner*, the Second Circuit declined to address a disputed question about a confirmatory identification's suggestiveness because the independent basis for the in-court identification was so clear.  *See Wiggins*, 132 F. App'x 861, 864-66 (2d Cir. 2005) (witness saw defendant at distance of 50 feet under "streetlight illumination" but was familiar with defendant from seeing him previously in neighborhood); *accord United States v. Lumpkin*, 192 F.3d 280, 288 (2d Cir. 1999) (officers' in-court identifications reliable where officers had unobstructed views of the defendant selling narcotics on two occasions, one of which was during daylight at close range); *United States v. Crumble*, No. 18 Cr. 32 (ARR), 2018 WL 1737642, at *2 (E.D.N.Y. Apr. 11, 2018) (collecting cases finding that "in-court identification is [] admissible, despite an improper pre-trial identification procedure, if the witness is familiar with the defendant

prior to the incident," or alternatively, if "if a witness gets a good look at the defendant during the course of a crime"); *United States v. Reed*, No. 11 Cr. 487 (RJS), 2012 WL 2053758, at *5 (S.D.N.Y. June 6, 2012) (noting that a "witness's familiarity with a suspect may establish that the identification . . . is independently reliable").

This is not a crime in which a victim captures a fleeting glance of the perpetrator.  Minor Victim-4 interacted with the defendant personally on multiple occasions between 2001 and 2004.  She knew the defendant by name and gave a description.  In the totality of the circumstances, it is plain that Minor Victim-4's identification of the defendant is sufficiently independently reliable to permit the jury to decide its persuasiveness.

The defense merely replies, again in conclusory fashion, that Minor Victim-4 (1) never identified the defendant as an abuser, (2) did not have an opportunity to view her during the crime because the defendant was not involved in a crime, (3) never described the defendant, and (4) the time between the abuse and the identification was extraordinarily long.  (Def. Mot. 9 at 4).  The first three of these points are inaccurate, as set forth above.  And the delay in time is untroubling given Minor Victim-4's contacts with the defendant and consistent references in the intervening time.  The defense is free to attempt to argue these points to the jury, but none of these arguments supports a motion to suppress Minor Victim-4's identification of the defendant.

Minor Victim-4 knows who participated in the sexual abuse she experienced, as she has for the decades since it happened.  This Court should deny the motion.

## VI.    The Court Should Deny the Defense Motions to Preclude the Government's Exhibits

The defense has filed several motions to preclude certain Government exhibits.  (Def. Mots. 7, 8, and 13).  The Court should deny the defense authentication arguments without prejudice because the Government expects its witnesses will be able to authenticate the exhibits at trial before it offers them.  The defendant's arguments regarding relevance and Rule 403, however, are meritless, and the Court should deny them.

### A. Applicable Law

In general, "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."  Fed. R. Evid. 901(a).  The Second Circuit has made clear that "the bar for authentication of evidence is not particularly high."  *United States v. El Gammal*, 831 F. App'x 539, 542 (2d Cir. 2020) (summary order) (quoting *United States v. Gagliardi*, 506 F.3d 140, 151 (2d Cir. 2007)).  Rule 901 is "satisfied if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification," *El Gammal*, 831 F. App'x at 542 (quoting *United States v. Tin Yat Chin*, 371 F.3d 31, 38 (2d Cir. 2004)), and such "proof of authentication may be direct or circumstantial," *United States v. Al-Moayad*, 545 F.3d 139, 172 (2d Cir. 2008) (citations and internal quotation marks omitted).

For instance, in *United States v. Al Farekh*, 810 F. App'x 21 (2d Cir. 2020) (summary order), the defendant challenged the authenticity of "handwritten letters that were found in a USB drive that was handed to an agent of the Federal Bureau of Investigation in Afghanistan."  *Id.* at 24.  The Second Circuit rejected the challenge.  "Although the Government did not present

71

evidence regarding the circumstances surrounding the seizure of the USB drive, Federal Rule of Evidence 901(b)(4) permits authentication based on '[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances.'" *Id.* (alteration in original) (quoting Fed. R. Evid 901(b)(4)). Witness testimony about the content of the letters was "sufficient to pass the relatively low bar for authentication of evidence," and "any remaining questions as to the reliability of the letters go to their evidentiary weight, not their admissibility." *Id.* at 24-25.

Similarly, although physical evidence may be authenticated through a chain of custody, "any flaws in the chain of custody bear only on the weight of the evidence, and not on its admissibility." *United States v. Stuckey*, No. 06 Cr. 339 (RPP), 2007 WL 2962594, at *7 (S.D.N.Y. 2007) (citing *United States v. Morrison*, 153 F.3d 34, 57 (2d Cir. 1998)); *see also United States v. Hemmings*, 482 F. App'x 640, 643 (2d Cir. 2012) (summary order) (similar). "Evidence should be excluded on a motion *in limine* only when the evidence is clearly inadmissible on all potential grounds." *United States v. Cilins*, No. 13 CR. 315 (WHP), 2014 WL 173414, at *2 (S.D.N.Y. Jan. 15, 2014) (citation and internal quotation marks omitted).

## B.  Discussion

The defense's challenges to the Government's exhibits largely turn on the Government's ability to authenticate them. Those arguments are premature. At trial, the Government expects that witnesses familiar with the exhibits will testify that the items are what the Government claims they are. The defendant is not entitled to a preview of the Government's case-in-chief at this juncture.

*First,* the defendant moves to exclude Government Exhibit 52, which it says was obtained by the Government "as part of discovery in *Guiffre v. Maxwell* civil litigation . . . with no explanation about its origin." (Def. Mot. 7 at 1). The defendant misidentifies the exhibit. Government Exhibit 52 is a physical contact book belonging to the defendant. The records attached by the defense as Exhibit 1 appear to be a scan of Government Exhibit 52 that was produced in discovery in *Giuffre v. Maxwell*. But the Government will not offer that scan at trial. It will offer the physical book itself, along with scans taken by the Government of the physical book. A witness with personal knowledge of the physical book is expected to testify to its authenticity.

The defendant takes issue with the history of the Government's acquisition of Government Exhibit 52. The defendant is correct that the Government came into custody of this exhibit after a former employee of Jeffrey Epstein attempted to sell it to a civil lawyer suing Epstein. (*Id.*). The defense calls this "particularly troubling" (Def. Mot. 7 at 2), but that argument is misplaced. How the Government acquired the exhibit goes, if anything, to its weight and not its admissibility. If a witness can identify the exhibit based on its contents, that is sufficient to pass the relatively low bar for authentication of evidence." *See Al Farekh*, 810 F. App'x at 24-25.

Finally, the defendant argues that the contents of Government Exhibit 52 are hearsay because they are not a business record. (Def. Mot. 7 at 4-6). The exhibit is separately admissible not for the truth of the matters asserted therein (such as the accuracy of the contact information for victims), but to establish that the defendant kept contact information for relevant individuals at trial, including victims. The exhibit has evidentiary value in showing that the defendant

maintained a contact book containing what purports to be this list of names and associated contact information.

*Second*, the defendant moves to preclude any items seized during the 2005 search of Epstein's home in Palm Beach, Florida.  The defense claims, in a conclusory fashion, that "no witness has sufficient personal knowledge about the proposed exhibits" to demonstrate authenticity, because "the evidence collection and retention in this matter is an unreliable mess." (Def. Mot. 8 at 3-5).  The defense further speculates that the Government intends to offer these exhibits without any testimony about their authenticity, in part because the original custodian— Detective Recarey—is dead.  (*Id.* at 4-5).  The defense is mistaken.  The Government intends to call live witnesses to establish the authenticity of the evidence at trial.[18]

*Third*, the defendant argues that ██████████ Government Exhibit 251 and 288 are irrelevant.  (Def. Mot. 13 at 2).  ████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

---

[18] As to Government Exhibit 295 specifically, that exhibit was written by both Detective Recarey and another witness who is expected to testify at trial.  The exhibit is primarily marked for identification, although portions of that document may be offered as a past recollection recorded by that other witness.  *See* Fed. R. Evid. 803(5).  The Government will not offer statements from Detective Recarey.

████████████████████████████████████████

███████

*Fourth*, the defendant argues that Government Exhibit 294 is irrelevant.  (Def. Mot. 13 at 2-3).  Government Exhibit 294 displays a box containing "Twin Torpedos"—sex toys—seized during the search of Epstein's Palm Beach house.  This photograph is corroborative of witness testimony, which is expected to describe the presence of sex toys and that the defendant and Epstein used sex toys during their abuse.

*Fifth*, the defendant argues that Government Exhibit 313 is irrelevant.  (Def. Mot. 13 at 2-3).  Government Exhibit 313 is a photograph of the defendant and Epstein swimming together while nude.  This evidence corroborates witness testimony expected at trial, which will describe topless swimming in the pool at Epstein's Palm Beach House.  It is also relevant to the relationship between the defendant and Epstein.  For instance, to the extent the defense at trial argues that the defendant was merely an employee of Epstein's, this photograph is evidence to the contrary.

*Sixth*, the defense argues that Government Exhibit 606 lacks evidentiary foundation, is hearsay, and is irrelevant because it was created after the events alleged in the Indictment.  (Def. Mot. 13 at 2-3).  Government Exhibit 606 is a manual governing the operations of the Palm Beach house.  A witness at trial is expected to authenticate this document and explain that it was the version in effect at the house in 2005.  Another witness is expected to testify about the rules in effect in the Palm Beach household during the time period of the charged conduct; those rules are

consistent with the rules in this exhibit.[19]  The relevance of the document is self-evident: among other things, it directs employees to "see nothing, hear nothing, say nothing."  (GX 606 at 4).  It is not prejudicial as to her "lifestyle" (Def. Mot. 13 at 3), because the jury will already hear testimony about her and Epstein's various properties, private jet, and employees.  And the document is not hearsay, because the statements are being offered as instructions to staff, not for the truth of the matter asserted.

As described above, each of these exhibits is highly relevant, not hearsay or subject to a hearsay exception, and can be authenticated at trial.  The Court should deny the defense's motion regarding relevance and Rule 403, and deny the motion regarding authentication with leave to renew it at trial.

### VII.    There is No Basis to Preclude Discussion of "Victims" or Rape

Citing no case in the federal system, the defendant moves to preclude any trial participants from referring to the Minor Victims as Victims.  The defendant also moves to preclude testimony concerning a rape committed by Jeffrey Epstein against one of the Minor Victims.  Both of these motions lack merit, and they should be denied.

### A.  References to Victims

---

[19] Here and elsewhere (*see, e.g.* Def. Mot. 2 at 3-4), the defense argues that evidence that post-dates the time period of the conspiracy is irrelevant.  That is incorrect.  What matters is whether the evidence tends to make a fact of consequence more or less probable.  If, for instance, there is evidence showing that Epstein and the defendant were extremely close partners in 2005, that tends to make it more probable that they had such a relationship in 2004, during the time period of the conspiracy.  It is therefore highly relevant.

The defendant moves to preclude any trial participants from using the word "victim" to refer to any of the Minor Victims.  The Government expects that it will use the word "victim," particularly in jury addresses, but such use is not improper vouching or prejudicial to the defense. The Government also expects its expert to use the word "victim," but she will testify about victims generally and not any victims in this case specifically.  The Government does not otherwise expect its witnesses to use the word "victim."  To the extent they do, however, it is not prejudicial to the defense.[20]

The defendant cites no federal case that has accepted its argument.  Nor does this argument make sense.  The erroneous premise in the defense argument is that referring to someone as a "victim" "necessarily conveys the speaker's opinion that a crime in fact occurred and that the accusers are credible."  (Def. Mot. 12 at 1).  That is incorrect.  The Government's references to "victims" are part of its theory of the case.  Use of that term in a jury address is not an expression of counsel's opinion; it is the Government's litigating position, just like referencing someone as the "shooter" in a shooting case or the "dealer" in a narcotics case.  *See United States v. Arias-Javier*, 392 F. App'x 896, 898 (2d Cir. 2010) (summary order) ("The prosecutor is permitted vigorously to argue for the jury to find its witnesses credible as long as it does not link its own credibility to that of the witness or imply the existence of extraneous proof supporting the witness's

---

[20] Notably, the defense motion is entirely premised on the notion that the parties disagree about whether the Minor Victims are in fact victims of any crime.  If the defense concedes at any point that the Minor Victims are victims of any crime—for example, if the defendant concedes the victims were abused by Epstein but disclaims knowledge or involvement—their argument in support of this motion collapses entirely.  (Def. Mot. 12 at 1 (contrasting this case with cases in which "there is no dispute that the person was a victim of something")).

credibility.").  Prosecutors are simply using a term that is consistent with the Government's theory of the case.  *See United States v. Edwards*, No. CR 16-103-BLG-SPW-1, 2017 WL 4159365, at *1 (D. Mont. Sept. 19, 2017) (explaining that "use of the term 'victim' is not prejudicial to the defendant's rights when the presentation of evidence taken as a whole clarifies the government's burden of proving all of the elements of the crime" and finding that the "jury will not be unduly prejudiced against [the defendant] if the government refers to certain witnesses as victims"); (citing *United States v. Washburn*, 444 F.3d 1007, 1013 (8th Cir. 2006) ("[A] number of courts have determined that the use of the term "victim" in jury instructions is not prejudicial to a defendant's rights when, as is the case here, the instructions taken as a whole clarify the government's burden of proving all elements of the crime")); *Server v. Mizell*, 902 F.2d 611, 615 (7th Cir. 1990) ("No logical argument can be made that the mere use of the term 'victim' [in jury instructions] somehow shifted the burden of proof.").  In addition, "[t]he term 'victim' is not inherently prejudicial.  It is a term commonly used in the English language that does not by its nature connote guilt." *United States v. Lussier*, No. 18-CR-281 (NEB), 2019 WL 2489906, at *5 (D. Minn. June 15, 2019).[21] And just as the defense may make arguments attacking the credibility of victims, the Government is free to argue that these witnesses are, in fact, victims of a crime.  *Cf. United States v. Thai*, 29 F.3d 785, 807 (2d Cir. 1994) (explaining that prosecutors may also "respond to an argument that impugns its integrity or the integrity of its case").

---

[21] The same is true with references by the Government to "minor victims."  (*Cf.* Def. Mot. 12 at 4-5).  The Government does not expect any other trial participant to use the phrase "minor victims."

Witnesses may also reference "victims."  But the only witness the Government expects to use the term "victim" is its expert, Dr. Rocchio.  And Dr. Rocchio will not be testifying about the defendant or the Minor Victims in this case, but about victims of sexual abuse generally. Accordingly, she is not vouching for the credibility of anyone in this case, or presuming anything about the truth or falsity of any accusations.

To the extent other Government witnesses use the term "victim," however, it would not be prejudicial to the defense.  The limitation on improper vouching applies to the prosecutor, not to Government witnesses, as even one of the defendant's cases acknowledges.  *See Jackson v. State*, 600 A.2d 21, 25 (De. 1991) ("The opinion does not state, nor does it imply, that the use of the term 'victim' by witnesses, as a term of art or in common parlance, is a basis for objection.").  In particular, some of the witnesses who may use the word "victim" are the Minor Victims themselves, who are testifying about their subjective experiences.  It is not prejudicial to the defense for someone who considers herself a victim to testify as much.[22]

Here, as with other motions, the defendant requests an extraordinary order not seen in other cases in this District.  That request lacks merit, and the Court should deny it.

## B.  Evidence of Rape

The Government expects that at least one minor victim may describe being raped by Jeffrey Epstein.  If that testimony is offered, it is directly relevant to issues before the jury.  The defendant and Epstein are charged with transporting minors, enticing minors, or trafficking minors with the

---

[22] The Government defers to the Court on how it would like to refer to the Minor Victims.  It notes, however, that "Accuser" is an alternative that is prejudicial to the Government.

intention that they would engage in illegal or commercial sex acts, and conspiring to do, and aiding and abetting, the same.  These events occurred during an ongoing course of conduct, in some instances during multi-year relationships.  The ongoing relationships between the defendant, Epstein, and the victims is directly relevant, and the victims' accounts of these events are necessary to complete the story of the crime on trial.  Indeed, given the complex relationships between victims and their abusers, these events are integral to the relationships that will be at the heart of the trial.  The defendant repeatedly claims that there is no evidence she participated in or was aware of a rape specifically (Def. Mot. 11 at 1-2), but defense arguments about her knowledge and involvement are for the jury.

The defense argues that the Indictment does not allege that Epstein raped anyone, and so the rape is irrelevant.  (Def. Mot. 11 at 2).  That is a non sequitur.  Indictments are not documents that contain all of the Government's evidence, and the defense cites no authority for the puzzling argument that witnesses cannot testifying using words that are not contained in an indictment.  To the extent the defense understands the Indictment to allege only conspiracies to arrange for sexualized massages for Epstein (*id.* at 3), the defense is mistaken.  The Indictment charges the defendant with conspiracies to arrange for "sexual activity" (Indictment ¶¶ 12, 18) and "a commercial sex act" (*Id.* ¶ 24).

The defense also argues that evidence of a rape does not satisfy Rule 403 balancing, because evidence of a rape is "highly emotional and inflammatory."  (Def. Mot. 11 at 3).  This conclusory claim is insufficient to show prejudice to the defense.  Testimony from victims in sex crimes trials can be very emotional when describing their abuse and the perpetrator.  But that

evidence—including evidence of rape, where it occurs—is the core conduct in the case.  *See, e.g.*, *United States v. English*, No. 18 Cr. 492 (PGG), 2020 WL 7773606, at *10 (S.D.N.Y. Dec. 30, 2020) (describing evidence of rape in a trial for sex trafficking of minors); *United States v. Graham*, No. 14 Cr. 500 (NSR), 2015 WL 6161292, at *8 (S.D.N.Y. Oct. 20, 2015) (concluding, in response to the argument that "rape" is a legal term, "there is a "critical distinction between a patient telling a physician that she 'had intercourse with three men' and a patient telling the physician that she was 'raped' by three men.").  Its probative value is certainly not outweighed by any unfair prejudice.  Nor is it the case that evidence of a rape—especially at the level of abstraction described by the defense—is significantly more inflammatory than the charged crime: the sexual abuse of minors.

In the event that a Minor Victim testifies that Epstein raped them, it is part of the charged conspiracy in this case, and it should be admitted.

## VIII.   The Remaining Defense Motions are Aimed at Evidence the Government Does Not Plan to Elicit

Three of the defense motions are aimed at precluding the Government from offering evidence it does not intend to offer at trial.

First, the defense seeks to preclude the Government from arguing that the defendant was hiding from, evading, or fleeing from law enforcement between Epstein's arrest and her own. (Def. Mot. 5 at 1).  The Government's view remains that such conduct reflects the defendant's consciousness of her guilt (*see id.* at 2 (citing multiple Government filings)), and the Government does not agree that such evidence lacks an adequate factual basis or is inadmissible under Rule 403.  (*See id.* at 6-9).  However, the Government does not intend—and so will agree not to offer—

81

such evidence in its case-in-chief, unless the defendant opens the door to this evidence or otherwise

puts it at issue at trial. Furthermore, if the defendant testifies, the Government may cross-examine

the defendant about this conduct, depending on the scope of her direct examination. But the

Government will not affirmatively offer this evidence in its case-in-chief.

The same is true for the defense motion to exclude evidence of the defendant's false

statements in her 2016 depositions. (Def. Mot. 6 at 1). Although false exculpatory statements are

admissible as proof of a defendant's consciousness of guilt (*see* Gov't Opp. at 142-43, Dkt. No.

204 (citing, *e.g.*, *United States v. Anderson*, 747 F.3d 51, 60 (2d Cir. 2014)), the Government does

not intend—and so will agree—not to offer this information as part of its case-in-chief, unless the

defense opens the door or otherwise puts these statements at issue. However, the Government may

offer these statements in rebuttal to defense arguments. Moreover, the defendant's prior statements

are of course appropriate material for cross-examination of the defendant. The Government also

consents to the defense request to redact the perjury counts from the Indictment. (Def. Mot. 6 at

6).

Finally, the defense seeks to preclude the Government's law enforcement witnesses from

offering expert testimony. (Def. Mot. 10 at 5). The defense appears to take an improperly broad

view of the scope of expert testimony.[23] However, the Government has not noticed the three law

---

[23] For instance, the defense, citing *United States v. Garcia*, 413 F.3d 201 (2d Cir. 2005), makes
the sweeping claim that "*any* opinion testimony" based on those three law enforcement witnesses'
"specialized 'training and experience' is expert opinion testimony subject to Rule 702 and Rule
16(1)(G) and is inadmissible at trial." (Def. Mot. 10 at 4 (emphasis in original)). But in *Garcia*,
the Second Circuit simply held that an undercover law enforcement agent could not testify as lay
opinion that, based on his knowledge from other drug interdiction cases, the defendant was a

enforcement officers identified by the defense as experts and will not elicit expert testimony from them.  Those witnesses are being called as fact witnesses to describe, for instance, the execution of a search and evidence seized during that search.[24]

## **CONCLUSION**

For the reasons set forth above, the Government respectfully requests that the Court deny the defendant's motions *in limine*.

Dated: October 25, 2021
      New York, New York

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York


By:   _____/s/_____
       Alison Moe
       Lara Pomerantz
       Andrew Rohrbach
       Assistant United States Attorneys

---

partner in the narcotics distribution conspiracy.  *Garcia*, 413 F.3d at 216.  That is distinguishable from cases where, as expected here, witnesses testify based on their personal involvement in certain investigative steps.

[24] It bears noting that the defense's motion is expressly concerned about testimony from case agents (Def. Mot. 10 at 5 n.2), and testimony about "the case, its origins, and the investigation" (*id.* at 3), which it considers to be improper expert testimony.  The Government has moved to preclude the defense from offering such evidence, including by calling the case agents identified in its *Touhy* notice.  (*See* Gov't Motions *in Limine* Section III).  Accordingly, if the defense plans to call case agents for such testimony—which the Court should preclude—the defense must provide expert notice of such testimony.