# Exhibit A

*Journal of Child Sexual Abuse*, 23:957–976, 2014
Copyright © Taylor & Francis Group, LLC
ISSN: 1053-8712 print/1547-0679 online
DOI: 10.1080/10538712.2014.960632



# The Construct of Grooming in Child Sexual Abuse: Conceptual and Measurement Issues

NATALIE BENNETT and WILLIAM O'DONOHUE

*University of Nevada, Reno, Reno, Nevada, USA*

*There have been claims that some child molesters engage in a "seduction stage" prior to committing abuse. These behaviors, commonly known as "grooming," are understood as methods child molesters use to gain access to and prepare future victims to be compliant with abuse. However, there is a lack of consensus regarding exactly what this process entails and how it is clearly distinguished from normal adult–child interactions. It is important to devise an accurate definition of grooming for scientific, clinical, and forensic purposes. We critically evaluate the various definitions and reveal problematic heterogeneity. Furthermore, there are no methods of known psychometrics to validly assess grooming. We review the empirical literature regarding the occurrence of grooming and propose future directions for research.*

*KEYWORDS   grooming, child sexual abuse, measurement*

Understanding the process of child sexual abuse (CSA) is important for both its prevention and treatment. Some clinicians and researchers (e.g., Budin & Johnson, 1989; Burgess & Holmstrom, 1980; Conte, Wolf, & Smith, 1989; Elliott, Browne, & Kilcoyne, 1995) agree that a type of seduction stage, commonly called "grooming" but also variously known as "entrapment," "engagement," or "subjection" often precedes the actual sexual abuse. Offenders have admitted that they use techniques such as identifying a particularly vulnerable child, gift giving, and sexual desensitization to prepare the child for the abuse (Seto, 2008).

Understanding grooming has both important clinical and legal implications. First, it is possible that if professionals were able to identify grooming

Received 23 May 2013; revised 28 January 2014; accepted 10 April 2014.

Address correspondence to William O'Donohue, Department of Psychology, University of Nevada, Reno, Mail Stop 298, Reno, NV 89557. E-mail: wto@unr.edu

before abuse has actually taken place the abuse may be prevented. Second, in a forensic context, sexual abuse allegations might be partially substantiated when it is established that grooming did indeed occur. However, without a clear grooming definition and a valid way of measuring grooming, this judgment that a behavior constitutes grooming becomes problematic. For example, a recently convicted sex offender in Las Vegas, Nevada, is seeking to appeal his conviction on the grounds that the testimony provided by a psychologist regarding his grooming behavior is unreliable (Mower, 2012). His defense attorney claimed that "[Grooming] is not a proven science. It's a behavioral thing. . . . How can you tell that this was in the mind of this guy?"

There have been attempts to criminalize grooming in several countries. In the United States, a federal law (18 USC § 2252A(a)(6)) has made it illegal and thus adds years onto a sentence for people who knowingly offer child pornography to a minor to persuade the minor to participate in an illegal activity such as adult–child sexual contact (18 USC § 2252A, certain activities relating to material constituting or containing child pornography). In the United Kingdom, Section 15 of the Sexual Offences Act 2003 has covered "the behavior of an offender who meets, or seeks to meet, a child with the intention of committing a sexual assault, if he has met or communicated with that child on at least two earlier occasions" (McAlinden, 2006, p. 342). However, as Gillespie (2004) noted, definitional problems with the construct of grooming limit the use of this law, as grooming is "a transient feature that is difficult to capture and virtually impossible to decide when it begins and ends" (p. 586). McAlinden also described another law designed to criminalize grooming in the UK:

> Sections 123-9 introduce the risk of sexual harm order—a new civil preventative order which can be used to prohibit specified behaviours, including the 'grooming' of children. . . . This order effectively criminalizes acts which may be carried out for the purposes of sexual grooming, but only after an individual had been identified as posing a risk to children. (p. 342)

O'Callaghan (2011) described that in Wales a man pled guilty and was sentenced to a year in prison for one count of meeting a child following sexual grooming that consisted of inappropriate communication via Facebook. In addition, Vance (2012) described a proposed law in New Zealand that provides a sentence of three years in prison for anyone who participates in online "indecent communication with anyone under 16." This law is aimed at sexual offenders who use Internet chatrooms or other social media websites to find victims.

It is evident that these legal definitions of grooming are both varied and limited. The sorts of activities that these laws target do not actually

capture the notion of grooming because these already involve illegal and abusive contract with a child. Grooming is generally regarded as prior activities intended to prepare the child for abuse, not actual illegal or abusive activities themselves. Thus, legitimate questions can be raised about whether showing a child pornography ought not to be regarded as grooming because it constitutes abuse itself. Clarifying a definition of grooming can thus make these laws applicable to many more behaviors that are used by offenders intending to sexually abuse children.

It is important to note that clarifying key constructs is a difficult yet important process. The prominent philosopher of science Larry Laudan (1977) suggested that science has both empirical and conceptual problems and that scientific progress is made when either type of problem is addressed. Conceptual analysis is particularly difficult as it is traditionally not included as a part of the research method in the social sciences and also because it involves the inherent complexity of language (O'Donohue, 2013). Here, conceptual analysis of the grooming construct is necessary in the research process, as it is a salient example where the complexity of language contributes to definitional confusion and leads to problematic implications in clinical and forensic fields.

The aim of this paper is to highlight the need for a clearer definition of the grooming construct that may be applied to both clinical and forensic work. The courts are currently unable to take much legal action against grooming as it is not well understood and clearly demarcated. Furthermore, psychologists are currently using clinical judgment to determine whether an alleged perpetrator's behaviors are considered grooming. The reliability and validity of these judgments are largely unknown, leaving concerns of unacceptable rates of false positives and false negatives. An additional aim is to review the empirical literature regarding what is known about the occurrence of grooming so that a clear definition can be constructed. With a clearer definition of grooming, a more scientific assessment of such behavior can be established. This article proposes future directions for research, including validation of the proposed definition and development of an assessment device.

## CURRENT DEFINITIONS

The three tables presented here list various definitions of the construct of "grooming" currently found in the literature. Table 1 provides various general definitions of the term, Table 2 provides subcategories of grooming that some authors have proposed, and Table 3 provides stages of grooming that several authors have suggested.

Thus there is a wide variability that exists in defining sexual grooming as well as possible subtypes or stages of grooming. Although many of the

**TABLE 1** General Definitions of Grooming

| Author(s) | Definition of Grooming (taken directly from reference) |
| --- | --- |
| Sgroi (1982) | "How does [the perpetrator] get the child to participate in some type of sexual behavior? Usually in a low-key, nonforcible fashion, possibly by presenting the activity as a game or something that is 'special' and fun. This always entails misrepresentation of moral standards, either verbally or implicitly. . . . Perhaps rewards or bribes will be offered." |
| Salter (1995) | "The establishment (and eventual betrayal) of affection and trust occupies a central role in the child molester's interactions with children. The grooming process itself often seems similar from offender to offender, largely because it takes little to discover that emotional seduction is the most effective way to manipulate children." |
| Howitt (1995) | "The steps taken by paedophiles to 'entrap' their victims and is in some ways analogous to adult courtship." |
| Leberg (1997) | "The offender plans to make the victim less likely to resist, to make others unaware of what he is doing, or even to make them likely to help him, without their knowledge, to molest a child." |
| Gallagher (1999) | "Entrapment involves the use of an array of material, illicit and emotional 'inducements' to draw children into abusive situations and increases their difficulty in disclosing." |
| Brackenridge (2001) | "The process by which a perpetrator isolates and prepares an intended victim." |
| Gillespie (2002) | "The process by which a child is befriended by a would-be abuser in an attempt to gain the child's confidence and trust, enabling them to get the child to acquiesce to abusive activity. It is frequently a pre-requisite for an abuser to gain access to a child." |
| Berson (2003) | "Grooming involves a clever process of manipulation, typically initiated through a nonsexual approach, which is designed to entice a victim into a sexual encounter (Brown, 2001). The inhibitions of a child are lowered through active engagement, desensitization, power and control. It is often characterized as a seduction, involving a slow and gradual process of learning about a child and building trust. This also contributes to the difficulty in detecting the activity. Grooming is also a deceptive process in which a child is unprepared to interpret cues which signal danger of risk. Predators are skilled at gaining the trust of a child before luring them into interactions. The process of grooming through the formation of a close bond creates a victim who is more likely to comply with sexual advances." |
| O'Connell (2003) | "A course of conduct enacted by a suspected paedophile, which would give a reasonable person cause for concern that any meeting with a child arising from the conduct would be for unlawful purposes." |
| Spiegel (2003) | "Subjection is the process of predisposing a boy to sexual abuse by means of subtle or blatant interactions that lead to boundary diffusion and role confusion." |
| Craven, Brown, and Gilchrist (2006) | "A process by which a person prepares a child, significant adults and the environment for the abuse of this child. Specific goals include gaining access to the child, gaining the child's compliance and maintaining the child's secrecy to avoid disclosure. This process serves to strengthen the offender's abusive pattern, as it may be used as a means of justifying or denying their actions." |
| Knoll (2010) | "The process by which sex offenders carefully initiate and maintain sexually abusive relationships with children. Grooming is a conscious, deliberate, and carefully orchestrated approach used by the offender. The goal of grooming is to permit a sexual encounter and keep it a secret." |

**TABLE 2** Proposed Subtypes of Grooming

| Author | Types of Grooming |
| --- | --- |
| Leberg (1997) | 1. Physically grooming the victim<br>2. Psychologically grooming the victim and family<br>3. Grooming the social environment and community |
| Craven, Brown, and Gilchrist (2006) | 1. Self-grooming<br>2. Grooming the environment and significant others<br>3. Grooming the child |
| McAlinden (2006) | 1. Personal<br>2. Familial<br>3. Institutional |
| Wyre (1987) as discussed in Howitt (1995) | 1. Extrafamilial<br>2. Intrafamilial |

definitions share some key similarities, many behaviors may be classified as grooming under some definitions but not under others. Some of these similarities in definition include the criterion of preparing a child for abuse (Brackenridge, 2001; Craven, Brown, & Gilchrist, 2006; Gallagher, 1999), gaining a child's trust (Berson, 2003; Craven et al., 2006; Gillespie, 2002; Salter, 1995), making it more difficult to the child to resist or disclose the abuse (Berson, 2003; Craven et al., 2006; Gallagher, 1999; Gillespie, 2002; Knoll, 2010; Leberg, 1997), and the enumeration of specific tactics used to groom the child (Berson, 2003; Gallagher, 1999; Sgroi, 1982).

Furthermore, a variety of different kinds of definitional features are proposed. For example, one definition mentions "betrayal" (Salter, 1995) while another references "courtship" (Howitt, 1995). Some proposed definitions give concrete examples of grooming (Gallagher, 1999; Sgroi, 1982), while others try to give abstract properties to capture what the authors take to be the essential properties of grooming (O'Connell, 2003; Spiegel, 2003). Some definitions are fairly brief and more vague (Brackenridge, 2001; Howitt, 1995; Spiegel, 2003), whereas others are much longer and more detailed about what grooming looks like (Berson, 2003; Craven et al., 2006; Sgroi, 1982). Obviously this heterogeneity presents serious challenges for forensic and clinical work.

Some of these definitions involve additional difficulties in that the terms used to define grooming present additional serious definitional problems themselves. For example, Salter (1995) used the phrase "emotional seduction" in her grooming definition. This requires further delineation of what exactly emotional seduction entails as well as a measurement strategy to validly capture this alleged dimension. As another example, Spiegel's (2003) definition involves constructs such as "boundary diffusion" and "role confusion." These constructs are not part of the standard scientific lexicon and thus create further impediments to enhancing our scientific understanding of the grooming process. Finally, some definitions propose stages of grooming,

*N. Bennett and W. O'Donohue*

**TABLE 3** Proposed Stages of Grooming

| Author | Stages of Grooming |
|---|---|
| van Dam (2001) | 1. Identify vulnerable child<br>2. Engage that child in peerlike environment<br>3. Desensitize the child to touch<br>4. Isolate the child<br>5. Make the child feel responsible |
| Brackenridge (2001)<br>*Applies to grooming in sport.* | 1. Targeting a potential victim<br>2. Building trust and friendship<br>3. Developing isolation and control, building loyalty<br>4. Initiation of sexual abuse and securing secrecy |
| Wyre (1987) as discussed in Howitt (1995) | *Applies to extrafamilial grooming:*<br>1. The offender masturbates and fantasizes about future contacts, a boy is befriended while an effort is made to earn his parents' trust, outings are common to achieve intimacy<br>2. The offender finds out about the boy's home/school problems—a "counseling" role is created<br>3. Physical contact of a nonsexual sort begins, offender's masturbation and fantasy continue, sexual touches begin and gradually increase in severity<br><br>*Applies to intrafamilial grooming:*<br>1. Tickling the child<br>2. Bathing<br>3. The offender's sexual arousal and fantasy<br>4. The child going to the offender's bed<br>5. The offender knows the child likes being tickled<br>6. "Sex education"<br>7. Tickling reaches child's sexual parts<br>8. Offender masturbates the child's genitals<br>9. The child is trapped into silence<br>10. Sexual contact is increased<br>11. Offenders cognitive distortions increase<br>12. Becomes difficult to end sexual contact<br>13. Offending behavior reinforced through masturbation to fantasies |
| Christiansen and Blake (1990)<br>*Applies to father–daughter grooming.* | 1. Trust<br>2. Favoritism<br>3. Alienation<br>4. Secrecy<br>5. Boundary violations |
| O'Connell (2003)<br>*Applies to online grooming.* | 1. Friendship-forming<br>2. Relationship-forming<br>3. Risk assessment<br>4. Exclusivity<br>5. Sexual |

which makes the definitional and measurement process even more complex as each of these stages must be delineated and validly measured, and this must be done with the proposed sequencing as well. For example, Wyre's (1987) proposed stages for intrafamilial abuse involved 13 separate steps, the first 10 of which according to the author can be identified as grooming behaviors. As Howitt (1995) pointed out, this account of the abuse cycle makes it "appear a relatively short-term and repetitive process" (p. 85), which certainly is not representative of all cases of child sexual abuse.

## GROOMING AS A DEVIANT PROCESS

Part of the difficulty in identifying and clarifying a useful definition of grooming is the fact that many behaviors used by perpetrators appear quite similar to behaviors seen in normal adult–child relationships. Buying gifts for children or taking them on private outings obviously are not always precursors to sexual abuse. Using the male sports world as an example, Hartill (2009) wrote that "in preparing for the abuse, the perpetrator is able to use such 'disinhibiting' techniques through drawing on practices and discourses that are, to varying degrees, a normative feature within many, if not all, male sports contexts" (p. 239). Obviously part of the reason for this similarity to normative behavior is that the potential abuser does not want to be detected and thus wants to disguise what he is setting out to accomplish. In addition, it must be recognized that not all sexual offenders use grooming techniques. Groth, Hobson, and Gary (1982) differentiated between "child molesters" and "child rapists." Part of this distinction for these authors stems from their observation that child molesters use a grooming process on their victims, whereas child rapists do not, as their assaults occur suddenly. These authors also pointed out that child molesters are much more common than child rapists. Alternatively, some authors seem to construe grooming behaviors as mirroring behaviors seen in dating relationships between two consenting adults. For example, Herman (1981) wrote that sexually abusive fathers make an attempt to "court" their daughters by giving them flowers or presents (e.g., expensive jewelry or lingerie).

## THE PREVALENCE OF GROOMING

Because the definition of grooming varies from study to study, currently there is no way to know precisely how prevalent grooming is because each study employs some variant of the definition. Nevertheless, there have been several empirical studies conducted with child molesters to determine what specific methods they frequently use to choose their victims, initiate the abuse, and keep their victims from disclosing. Other researchers have chosen to focus

on the victims and ask them what techniques their abusers used prior to the abuse. It is important to note that in this article, examples of grooming with different genders of perpetrator and genders of victim are not readily distinguished. This is primarily due to the fact that the grooming literature reviewed did not always provide statistics about which grooming behaviors were used on boys versus girls. In addition, most of the grooming literature reviewed discussed male offenders.

## Identifying Potential Victims

Elliott and colleagues (1995) interviewed 91 child sex offenders about the strategies they used when committing their offenses. They found that 33% of the offenders explicitly worked on becoming welcome in the child's home and 18% offered incentives or threatened their victims to recruit other children and then gave bribes to the recruits.

Conte, Wolf, and Smith (1989) interviewed 26 offenders about their crimes. They found that offenders often admitted to being able to identify what they considered a vulnerable child—often one who was "needy" and seemed "quiet." For example, one offender stated that his tactic was to "look for a kid who is easy to manipulate. They will go along with anything you say. I would approach them by being friendly, letting them think I was someone they could confide in and talk to" (Conte et al., 1989, p. 298).

In her review of literature about sexual abuse involving teachers, Shakeshaft (2004) noted that selection of a victim is "influenced by the compliance of the student and the likelihood of secrecy" (p. 32). Teachers usually look to victimize students whom they have control over. Shakeshaft also identified factors that make a child vulnerable to educator sexual abuse, such as problems at home with parents, lack of confidence, and participation in other risky behavior. However, it also must be remembered that nonoffending adults could see the same needs in these vulnerable children and want to help them in legitimate ways. Thus the child's vulnerability and needs cannot be a sufficient condition for defining grooming.

## The Use of Attention, Bribery, and Coercion

Elliott and colleagues (1995) found that 53% of the offenders in their sample offered to play games, teach a sport, or teach how to play a musical instrument. Forty-six percent gave bribes, took the child for an outing, or drove the child home. Thirty percent admitted to using affection and love to gain the child's trust. Forty-six percent of the offenders used gifts as bribes in exchange for sexual favors.

The offenders interviewed by Conte and colleagues (1989) also claimed they used bribery and coercive strategies prior to sexual contact. For example, one sex offender stated that his specific methods included "play,

talking, giving special attention, trying to get the child to initiate contact with me. Get the child to feel safe to talk with me" (p. 297).

In his literature review on teacher sexual misconduct, Knoll (2010) found that educator sexual offenders tend to use bribery by giving their students special attention or rewards. According to Knoll, "the power of such rewards to affect the student should not be underestimated. Rewards from a teacher may have a crucial impact on the student's motivation and cognitions" (p. 376).

Budin and Johnson (1989) interviewed 72 sex offenders about methods they used to gain access to and abuse their victims. When asked what they did to gain their victims' trust, the majority of offenders admitted to acting like the child's friend and playing games with them. Other strategies included giving money, toys, candy, cigarettes, beer, or drugs to the child.

In his study of institutional sexual abuse, Gallagher (2000) looked at a sample of 65 substantiated cases of abuse. He found that grooming, or "entrapment," which he defined as "the process by which perpetrators draw children into abusive situations and make it difficult for them to disclose" (p. 810) was reported in 35% of cases. In these cases, he found that 39% of perpetrators took the child away from the institution (thus isolating the child), 22% gave the child extra attention, 22% gave money to the child, 9% provided the child with illicit goods, and 4% provided the child with games or toys.

In their interviews with 23 CSA victims, Berliner and Conte (1990) found that many children shared similar experiences with bribery and coercion prior to their abuse. Sixty-one percent of children reported that their abusers made excuses to spend time alone with them; 61% indicated that they were told that they were special, different, or the only one who understood the abuser; 61% said that their abuser treated them as an adult or he acted as a child toward them; 57% reported that their abusers gave them special privileges that made them feel obligated to be compliant in the abuse; 39% indicated that their abuser shared private information about spouses with them; 39% reported that their abuser prevented them from having friends or doing activities that other children do; and 30% reported that their abuser treated them "meaner" than other children.

Shakeshaft (2004) wrote that in educator sexual abuse, teachers usually "coerce" their student victims by providing additional help (e.g., advisement on a project or taking on an outing) that not only allows for time alone with the victim but are also activities for which the victim's parents tend to be grateful to the teacher. Furthermore, she pointed out that because these acts do not yet constitute recognizable sexual abuse and because they share similarities with legitimate activities, any complaint about these activities cannot lead to much disciplinary action.

Christiansen and Blake (1990) discussed that in father–daughter incest, most fathers purposely build a trusting relationship with their daughters

prior to beginning any sexual abuse. However, this is a somewhat flawed analysis, as there ought to be a trusting relationship in all father–daughter relationships, at least prior to any abuse. Seventy-three percent of perpetrating fathers viewed this trust as crucial to the sexual relationship to reduce the risk of the daughter disclosing the abuse (Warner-Kearney, 1987, as cited in Christiansen & Blake, 1990). Many fathers also show clear signs of favoritism toward their victimized daughter relative to their other children. Burgess and Holmstrom (1980) wrote that molesters tend to use three types of pressure to make their victims compliant: material goods, misrepresentation of moral standards, and the need for human contact. They noted that material goods are the most frequent tool that offenders use.

One difference has been found between genders of the victim in this emotional coercion type of grooming. Spiegel (2003) noted that in male victims, emotional coercion can take on a negative tone. For example, perpetrators may use name-calling words such as "fag" or "whore" to put the male child down and make him feel ashamed and thus less likely to disclose the abuse.

## Sexual Desensitization

Elliott and colleagues (1995) found that of those offenders who used babysitting as a strategy to gain access to their victims, 27% started talking to the child about sex, 21% misrepresented the abuse as educational or loving (which again may not be part of grooming because some of this would be postabuse), and 20% offered to bathe or clothe the child. Furthermore, these authors found that 40% of all offenders said the first move they made was sexual touching or genital kissing. Thirty-two percent of the offenders asked the child for help with undressing or lying down. Forty-four percent of the offenders used coercion and persuasion, 49% talked about sex with the child, and 47% used "accidental" touch. Sixty-one percent of the offenders would stop the abuse if the child became resistant and then persuaded the child to let them begin again. Many offenders committed the abusive acts in their own homes, where 33% used pornographic videos and magazines to desensitize the child.

Conte and colleagues (1989) found that sexual desensitization was commonly used among the offenders in their sample. For example, one offender stated,

> Most of the time I would start by giving them a rub down. When I got them aroused, I would take the chance and place my hand on their penis to masturbate them. If they would not object, I would take this to mean it was OK. I would isolate them. I might spend the night with them. Physical isolation, closeness, contact are more important than verbal seduction. (p. 297)

Knoll (2010) found that while a teacher is using bribery to gain the trust of a victim, typically conversation about sexual matters with the student is also starting to emerge. Physical contact is then gradually increased. Furthermore, Gallagher (2000) found that in cases where "entrapment" behaviors were reported, 43% of perpetrators initiated physical contact with the child and 17% behaved in a sexual manner with the child.

Furthermore, differences between genders of the victim have also been noted in the sexual desensitization type of grooming. Spiegel (2003) noted that the use of pornography to sexually desensitize children is more common with male victims than with female victims.

## Boundary Violations

Berliner and Conte (1990) found that 70% of children reported that their abusers "accidentally" came into their bedroom or bathroom while they were undressing; 61% indicated that their abusers "accidentally" touched their private parts; 61% said that their abusers did not respect their privacy or let them close doors; 61% reported that their abusers "accidentally" showed their naked body to them; 57% indicated that their abusers would purposely do things with the child that involved physical contact; 48% said that their abusers made sexual comments about the child's body or clothing; 44% reported that their abusers asked them to do things that involved physical contact; 30% said that their abusers would inspect the child's body "to see how it was developing"; 30% indicated that their abusers "taught sex education" by showing pornographic pictures and touching the child's body; 26% reported that their abusers told the child about sexual things he had previously done; and 22% indicated that their abusers put lotion or ointment on the child when they were alone but said he was doing nothing wrong.

According to Christiansen and Blake's (1990) stages of grooming in father–daughter incest, the last step involves the father violating his daughter's boundaries. In particular, fathers may insist on bathing their daughters and do not allow other family members to do this. These baths frequently involve inappropriate sexual behavior. Fathers also insist on dressing their daughters or on watching them get dressed. In addition, fathers will tend to watch the child use the bathroom. Finally, perpetrating fathers will have sexually explicit conversations with the daughter to further desensitize them.

## Grooming the Child's Environment

Elliott and colleagues (1995) found that 20% of the offenders in their sample admitted they gained the trust of the child's family with the purpose of abusing the child. Forty-eight percent isolated their victims through babysitting. Furthermore, Knoll (2010) found that a teacher can also manipulate the

relationship with her victim's parents to gain their approval of spending time with their child.

Van Dam (2001) pointed out that many child molesters spend years gaining the trust of members in the community before actually sexually abusing any children. She hypothesized that these offenders use several social psychological techniques to groom the community effectively. As an example, they may use "foot-in-the-door technique" by showing up uninvited to a child's birthday party and spending time playing games with the children. The parents would feel uncomfortable asking this person to leave and have thus subtly cooperated with the offender. From then on it would be easier for the offender to gain cooperation from the parents on spending time with the children. Offenders can also use conformity against these parents—it would go against social norms and be rude to ask a person to leave a party when the children are enjoying spending time with an offender. In addition, cognitive dissonance can play a role as the parents will try to make their beliefs about the offender consistent with their actions of letting their children around him or her (they will believe that they think he or she is a good person). Finally, confirmation bias can also play a role as the parents will tend to only accept information that is confirming their existing beliefs about the offender.

## Commonalities

The two major commonalities in the definitions reviewed as well as the empirical studies of grooming are (a) some sort of inappropriate behavior on the part of the prospective abuser (whether it is a bribe, boundary violation, invasion of privacy, misstatement of morality, mischaracterizing an interaction as a "game," isolation, emotional manipulation, etc.) and (b) the function of this inappropriate behavior is to increase the likelihood that the adult can sexually abuse the child (by, for example, gaining access to them, gaining their trust, silencing them, isolating them, desensitizing them to nudity or sex, etc.). Each component of the definition may have different topographies in individual cases (e.g., sometimes the inappropriate behavior is removing a door to the child's bedroom, or sometimes it may be buying the child a bikini), but the function of the behavior is to increase the likelihood of future abusive contact.

## A PROPOSED DEFINITION

Any definition ought to use the empirical findings reviewed previously about common strategies used by sexual molesters. In addition, we believe that the most useful definition of grooming would attempt to instantiate the following definitional meta-criteria:

1. Minimize false negatives. Thus, we wanted the definition to be sensitive to all occurrences of grooming.
2. Minimize false positives. Thus we also wanted the definition at the same time to be specific and not overinclusive (including perfectly appropriate behaviors as invalid examples of grooming).
3. Be capable of providing the basis for a valid assessment procedure.
4. Not include constructs that in themselves bring about further definitional problems.
5. Minimize judgment, although not completely avoid it as we believe that determining a behavior to be grooming essentially requires some complex judgments regarding appropriateness.
6. Show interrater reliability (have a high degree of agreement across raters).
7. Allow the rater to have multiple choices regarding final decisions given the complexity of individual cases, such as clearly grooming, probably grooming, uncertain, or not grooming.
8. Allow a third party to understand the logic of these judgments and conclusions by explicating the decision pathway for these final judgments.

We propose that grooming be defined as "antecedent inappropriate behavior that functions to increase the likelihood of future sexual abuse." There are no stages of grooming as there are in some definitions as proposing stages necessitates additional definitions and demarcations of each stage. Therefore, there are two individual criteria that must be met to consider a behavior to be "grooming:" (a) the behavior being evaluated must in and of itself be inappropriate and a case for this inappropriateness must be made, and (b) a sound argument must be presented that the behavior or behaviors increases the likelihood of future sexual abuse. The definition is further elucidated by providing a number of exemplars of grooming:

1. Any sexualization of the relationship such as talking about sex in a way that is not permissible given the adult's relationship with the child (e.g., it is permissible for parents to provide sex education to their children) or exposing the child to sexually explicit materials such as R rated movies (showing the child pornography would be abusive in and of itself and therefore not grooming).
2. Inappropriate gift giving (developmentally or socially inappropriate, such as bikinis or bras purchased by a neighbor or teacher).
3. Inappropriate nonsexual communication with the child (e.g., telling the child she is the only one who understands the offender, or telling her "I love you" when the social role is not appropriate for this type of communication), particularly when an adult uses these statements to manipulate the child to do something (e.g., "I love you and people who love each other touch each other").

*N. Bennett and W. O'Donohue*

4. Inappropriate touching of the child (e.g., excessive tickling, hugging, wrestling, sitting on lap).
5. Bribes for inappropriate contact (e.g., bribes for nonsexual or sexual touching or bribes to meet the adult secretly).
6. Threats related to not participating in inappropriate contact.
7. Inappropriate isolation of the child (e.g., trips where the offender and victim are alone that are not part of the normal adult–child relationship. It is permissible for a father to drive a child to school), or inappropriately discouraging the child to play with friends or be with family. For parents or other caretakers, the threshold for what is considered inappropriate behavior is higher than for other adults.
8. Favoritism directed toward the child (e.g., the child is treated much better than siblings or classmates, particularly when this is intimate or isolating).
9. Boundary violations such as inappropriately bathing the child, clothing the child, sleeping with the child, the adult being in underwear around the child, the adult acting like a child, or the adult sharing private information with the child, particularly sexual or relationship information (e.g., "my wife and I are not having sex"). Again, for parents, family members or caregivers the threshold is much higher for defining a boundary violation than for others.
10. Asking the child to keep secrets, particularly about their contact (e.g., the mother's Christmas present would not be regarded as a problematic secret, whereas asking the child to not tell that she was with the offender would be).
11. Providing the child drugs or alcohol (note: although this behavior is already abusive, it is not *sexually* abusive; thus, it can be considered a grooming behavior as it is inappropriate and serves to facilitate compliance with the intended sexual abuse).
12. Misstating moral standards regarding touching, contact, or sex, particularly when these relate to adult–child sexual contact or sexualizing a situation.
13. Repeated violations of the child's privacy (e.g., walking into bathroom when child is in there, watching her get dressed, etc.).

The more of these features present, the more likelihood the individual's behavior represents grooming. To further clarify the grooming definition, it may be helpful to also look at a few specific exemplars of nongrooming behaviors that may be misinterpreted:

1. Purchasing appropriate gifts for the child (e.g., for birthdays).
2. Engaging in appropriate hand-holding (e.g., to cross the street).
3. Bathing a young child by a legitimate caregiver without any inappropriate touching.

4. Having age-appropriate and relationship-appropriate discussions of body parts.
5. A care-giving figure saying "I love you" without the goal of manipulation (not using the phrase to get the child to do something inappropriate).

## THE ASSESSMENT OF GROOMING

Because grooming is a set of common behaviors seen in child sexual offenders (as the previous reviewed literature seems to support this conclusion), it should be possible to assess behaviors to determine whether they are indicative that sexual abuse is likely to occur. We have reviewed the published literature and have not been able to find any measures that validly assess grooming behaviors (by any definition of grooming). This greatly reduces the value of any definition as the practical usefulness of a definition is seen in its ability to be operationalized in valid measurement processes. It is important to develop valid measures as it is not ideal for the detection of grooming to be an entirely post hoc process—that is, only after the abuse occurs are the gifts seen as inappropriate and thus as part of a grooming process. The grooming acts should seem at least somewhat inappropriate at the time they are occurring and thus ideally adults can intervene to stop future abuse. To resolve this problem, grooming requires a valid definition and a psychometrically adequate assessment procedure to reduce both the number of false positives and false negatives.

We are currently developing an assessment device that would aid a clinician in coming to a valid conclusion as to whether an individual's behaviors can be considered grooming. As mentioned, an assessment of grooming in our proposed definition would involve a two-step process: (a) determining that the adult's behavior is inappropriate in and of itself, such as if the tickling is excessive or the bikini gift is not justified by the nature of the relationship; and (b) reasonably arguing that the function of this inappropriate behavior is to increase the likelihood of future abusive contact.

What is "inappropriate" admittedly is somewhat of a vague term that requires judgment because we need to clearly differentiate the behavior from normal adult–child relationships. However, this judgment requirement currently exists for other psychological constructs as well. For example, the diagnosis of a major depressive episode might require that a clinician judges the client's guilt as "excessive." In addition, under our criteria these judgments of inappropriateness should be explicit (there must be a clear argument as to *why* the behavior is inappropriate). Since the argument must be explicated, others would be able to evaluate it and decide whether it is a nonproblematic judgment of the behavior.

To illustrate, a male coach buying an eight-year-old girl a bikini would generally be considered inappropriate, but the act of buying her a pair of

gym shoes with her mother's consent generally would not. A criticism of this definition is that "appropriate" behaviors may be used by some perpetrators to groom (e.g., buying a poor child gym shoes may still be performed to gain the child's trust to eventually abuse her). However, because this behavior can be entirely unrelated to abuse and because the assessment ought to strive to minimize false positives, we have chosen to require that all grooming behaviors be inappropriate in and of themselves. Second, we recognize that not all inappropriate behaviors ought to be considered grooming—an adult offering cigarettes to a child may be inappropriate but in addition we narrow the class of these inappropriate behaviors to those that are related to increasing the probability of sexual contact.

It is important to note that there may be instances in which the questionable behavior falls in some gray area between grooming and nongrooming. For example, a father buying his daughter a bikini may or may not be considered inappropriate. Unless more details are known about the context of this purchase (perhaps it was just impossible for the mother or some other female to do this and the need for a bathing suit was urgent), one could explicate reasonable arguments that the behavior is and is not representative of grooming. The most logical judgment to come to, then, is that this behavior is an indeterminate case and that it is unclear whether it should be considered grooming.

Arguments also need to be made regarding the second criterion of the definition: whether the function of the inappropriate behavior was to increase the likelihood of abuse in the future. Interpreting behavior and the intentions of a person performing a behavior is admittedly complex. The rational appraisal of behavior involves setting up a universe of plausible interpretations and gathering evidence in the individual case to rule in or rule out each. As an example, if a male neighbor has a pool and buys a bikini for a five-year-old girl to come over to swim and has her change into the bikini at his house while they are alone (the purchase of the bikini and having her change in his house without her guardian present would be considered inappropriate and thus meet the first criterion of the definition), the set of major plausible interpretations regarding the function of the behavior include:

1. Buying a bikini for the girl was the only way to allow the child to engage in the appropriate activity of swimming. Changing at his house was the only way to have the child dressed appropriately for swimming. These facts do not function to set the occasion for abuse to occur.
2. Buying a bikini and having the child change alone is not appropriate as there are more appropriate, prudent alternatives. In addition, bikinis can be thought of as sexualized clothing and changing alone without a guardian present is also a boundary violation. For example, giving money to the child's guardian to buy whatever bathing suit the guardian thought

appropriate (perhaps a one piece) is a better way to allow the child to engage in the healthy activity of swimming. In addition, the child's guardian should always be present when the child is swimming in the pool or changing into her bathing suit. This pathway does not increase the probability that abuse will occur in the future.

In this case, clearly the second alternative explanation is superior due to the fact that it respects the guardian's control, enhances the guardian's ability to supervise the child, does not isolate the child, might involve a less revealing swimsuit, and allows the guardian to exercise his or her discretion regarding what is appropriate swimwear. In addition, because the first alternative contains false assertions and can set the occasion for abuse, while the second alternative contains true assertions and is consistent with decreasing the likelihood of abuse, it is concluded that the behavior under question meets the second criterion of our definition of grooming as it is functioning to increase the likelihood of future abuse.

Again, the advantage of this approach is that it explicates the arguments for a person's behavior as meeting or not meeting the definitional criteria. The situation is complex because often grooming is meant to be disguised or ambiguous by the would-be abuser. However, this approach does allow the generation of alternatives that would be more prudent and reasonable and thus both the inappropriateness and function of the behavior can be rationally identified.

Finally, before this assessment method is accepted it must be evaluated with respect to its interrater reliability, predictive validity, sensitivity, and specificity. Currently, it is unfortunate that the field has no assessment methods to properly identify grooming and thus understanding the psychometrics of this definitional approach (as well as others) ought to be a priority.

Obviously the proposal of this definition is just a first step, and it generates a large research agenda. Validity studies need to be run on a sample of what experts clearly identify as instances of grooming and instances of normal behavior to see the extent to which professionals trained in this definition can correctly identify these two kinds of behaviors. The rates of false positives and false negatives need to be identified in these sorts of studies and modifications in the definition, assessment, or training need to occur in attempts to minimize these. Randomly controlled studies can be used to compare the accuracy of this method as compared to other proposed methods and definitions. Studies need to be conducted investigating different types of abuse (e.g., familial versus nonfamilial, boys versus girls, young children versus teenagers, majority versus minority culture) to see the extent to which this definition is robust across these varying dimensions. Again, modifications would need to be made when problems or limitations are found. It would also be useful to conduct some longitudinal research with high-risk samples to determine the likelihood of accurate detection of

grooming and the prevention of future abuse (by perhaps a comparison with a no treatment control). Another important issue is to investigate what sort of training programs or materials need to be developed so that a wide variety of professionals can faithfully implement the definition and proposed assessment methods.

## CONCLUSIONS

Currently there is no consensus regarding how to define grooming. In addition, there is no valid method to assess whether grooming has occurred or is occurring. The field possesses an insufficient amount of knowledge about key issues such as the interrater reliability of these judgments or the error rates of these judgments including the frequency of false negatives or false positives. Thus currently it appears that grooming is not a construct that ought to be used in forensic settings as it does not meet some of the criteria in the Daubert standard. The Daubert standard indicates that in court an expert witness may only testify if (a) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case" (Rule 702: Testimony by expert witness). Right now it does not appear to be the case that there are "reliable principles and methods" to define and detect grooming.

We propose a definition of grooming that involves two parts: (a) inappropriate behavior on the part of the adult and (b) sound arguments that this inappropriate behavior functions to increase the probability of future sexual abuse. We then provide exemplars of this kind of inappropriate behavior. Future research on grooming would be more useful to the field if data were collected using a single, clear definition such as the one we have proposed. This would provide a basis for data to be easily aggregated and better understood, which could lead to the admissibility of grooming evidence in forensic settings. Furthermore, we are currently working to develop valid psychometric instruments with known reliability and validity to assess grooming according to this standard.

## REFERENCES

18 USC § 2252A. Certain activities relating to material constituting or containing child pornography. (n.d.). In *Legal Information Institute online*. Retrieved from http://www.law.cornell.edu/uscode/text/18/2252A

Berliner, L., & Conte, J. R. (1990). The process of victimization: The victims' perspective. *Child Abuse and Neglect*, *14*, 29–40.

Berson, I. R. (2003). Grooming cybervictims: The psychosocial effects of online exploitation for youth. *Journal of School Violence*, *2*(1), 5–18.

Brackenridge, C. H. (2001). *Spoilsports: Understanding and preventing sexual exploitation in sport*. London, England: Routledge.

Brown, D. (2001). Developing strategies for collecting and presenting grooming evidence in a high tech world. *National Center for Prosecution of Child Abuse Update, 14*(11). Retrieved from http://www.ndaa-apri.org/publications/newsletters/update_volume_14_number_11_2001.html

Budin, I. E., & Johnson, C. F. (1989). Sexual abuse prevention: Offenders' attitudes about their efficacy. *Child Abuse & Neglect*, *13*, 77–87.

Burgess, A. W., & Holmstrom, L. L. (1980). Sexual trauma of children and adolescents: Pressure, sex, secrecy. In L. G. Schultz (Ed.), *The sexual victimology of youth* (pp. 67–82). Springfield, IL: Charles C. Thomas.

Christiansen, J. R., & Blake, R. H. (1990). The grooming process in father–daughter incest. In A. L. Horton (Ed.), *The incest perpetrator: A family member no one wants to treat* (pp. 88–98). Thousand Oaks, CA: Sage.

Conte, J. R., Wolf, S., & Smith, T. (1989). What sexual offenders tell us about prevention strategies. *Child Abuse and Neglect*, *13*(2), 293–301.

Craven, S., Brown, S., & Gilchrist, E. (2006). Sexual grooming of children: Review of literature and theoretical considerations. *Journal of Sexual Aggression*, *12*(3), 287–299.

Elliott, M., Browne, K., & Kilcoyne, J. (1995). Child sexual abuse prevention: What offenders tell us. *Child Abuse and Neglect*, *19*(5), 579–594.

Gallagher, B. (1999). The abuse of children in public care. *Child Abuse Review*, *8*, 357–365.

Gallagher, B. (2000). The extent and nature of known cases of institutional child sexual abuse. *British Journal of Social Work*, *30*(6), 795–817.

Gillespie, A. (2002). Child protection on the internet: Challenges for criminal law. *Child and Family Law Quarterly*, *14*(4), 411–425.

Gillespie, A. (2004). "Grooming": Definitions and the law. *New Law Journal*, *154*(7124), 586–587.

Groth, A. N., Hobson, W. F., & Gary, T. S. (1982). The child molester: Clinical observations. In J. R. Conic & D. A. Shore (Eds.), *Social work and child sexual abuse* (pp. 129–144). Binghamton, NY: The Haworth Press.

Hartill, M. (2009). The sexual abuse of boys in organized male sports. *Men and Masculinities*, *12*, 225–249.

Herman, J. L. (1981). *Father–daughter incest*. Cambridge, MA: Harvard University Press.

Howitt, D. (1995). *Paedophiles and sexual offences against children*. Oxford, England: John Wiley and Sons.

Knoll, J. (2010). Teacher sexual misconduct: Grooming patterns and female offenders. *Journal of Child Sexual Abuse*, *19*, 371–386.

Laudan, L. (1977). *Progress and its problems*. Berkeley, CA: University of California Press.

Leberg, E. (1997). *Understanding child molesters: Taking charge*. Thousand Oaks, CA: Sage.

McAlinden, A. (2006). "Setting 'em up": Personal, familial and institutional grooming in the sexual abuse of children. *Social & Legal Studies, 15*(3), 339–362.

Mower, L. (2012, July 22). Sex assault conviction may be test case for testimony standards. *Las Vegas Review Journal*. Retrieved from http://www.lvrj.com/news/sex-assault-conviction-may-be-test-case-for-testimony-standards-163325306.html

O'Callaghan, D. (2011, November 7). Jailed after grooming teen online: Facebook groomer is jailed. *South Wales Evening Post*. Retrieved from www.lexisnexis.com/hottopics/lnacademic

O'Connell, R. (2003). A typology of child cybersexploitation and online grooming practices. Retrieved September 2012 from http://www.jisc.ac.uk/uploaded_documents/lis_PaperJPrice.pdf

O'Donohue, W. (2013). *Clinical psychology and the philosophy of science*. New York, NY: Springer.

Rule 702. Testimony by expert witness. (n.d.). In *Legal Information Institute online*. Retrieved from http://www.law.cornell.edu/rules/fre/rule_702

Salter, A. (1995). *Transforming trauma: A guide to understanding and treating adult survivors of child sexual abuse*. Newbury Park, CA: Sage.

Seto, M. (2008). Pedophilia. In D.R. Laws & W. O'Donohue (Eds.), *Sexual deviance: Theory, assessment, and treatment*. New York, NY: Guilford.

Sgroi, S. M. (1982). *Handbook of clinical intervention in child sexual abuse*. Lexington, MS: Lexington Books.

Shakeshaft, C. (2004). *Educator sexual misconduct: A synthesis of existing literature* (U.S. Department of Education Document No. 2004-09). Washington, DC: U.S. Department of Education.

Spiegel, J. (2003). *Sexual abuse of males: The SAM model of theory and practice*. New York, NY: Brunner-Routledge.

Van Dam, C. (2001). *Identifying child molesters: Preventing child sexual abuse by recognizing the patterns of the offenders*. Binghamton, NY: The Haworth Press.

Vance, A. (2012, August 29). Prison for online grooming proposed. *The Dominion Post* (Wellington, New Zealand). Retrieved from www.lexisnexis.com/hottopics/lnacademic

Wyre, R. (1987). *Working with sex offenders*. Oxford, England: Perry Publications.

## AUTHOR NOTES

Natalie Bennett, BS, is a graduate student in the Clinical Psychology Doctoral Program at the University of Nevada, Reno. Her current research interests focus on child sexual abuse and assessment of psychological constructs.

William O'Donohue, PhD, is a professor of psychology at the University of Nevada, Reno. He is also the clinical director of the Victims of Crime Treatment Center, a treatment clinic for victims of sexual abuse or assault, in Reno, Nevada. He received his MA and PhD from the State University of New York at Stony Brook in Stony Brook, New York.

*Commentary*

# Grooming and Seduction

Journal of Interpersonal Violence
2018, Vol. 33(1) 28–36
© The Author(s) 2017
Reprints and permissions:
sagepub.com/journalsPermissions.nav
DOI: 10.1177/0886260517742060
journals.sagepub.com/home/jiv

®SAGE

## Park Dietz[1]

### Abstract

Ken Lanning's recollections of the origins of the use of the term "grooming" to refer to techniques used by acquaintances to gain sexual access to and control over children is an important contribution to the history of the significant recognition that many cases of child sexual abuse occur at the hands of offenders who are acquaintances of the child and who do not need to use force, threats, or violence to gain the compliance of their victims. That this recognition was slow in coming is obvious in retrospect, as is true of any social problem that remains hidden for centuries only to burst into public consciousness over the course of a few years. In this article, I report the results of searches using Google Scholar to look at the introduction of this use of the term "grooming" to the peer-reviewed literature in 1984 and its increasing use through 2016. Since 2008, the usage has been adopted in hundreds of articles in the professional literature each year, suggesting that this usage of the term "grooming" will remain common in the decades ahead. I also examine the history of the term "seduction" in the context of child sexual abuse, particularly two archaic uses of the term: as a euphemism for any sexual or sexually stimulating encounter between child and adult and in the context of suggestions that it was the child who seduced the adult. To avoid resurrecting any confusion over these issues, it would be a mistake to abandon "grooming" in favor of "seduction." I conclude that the best strategy may be that adopted by Lanning of using the terms grooming and seduction in tandem, explaining the parallels between the seduction of one adult by another and the grooming or seduction of a child by an adult.

[1]Park Dietz & Associates, Newport Beach, CA, USA

**Corresponding Author:**
Park Dietz, Park Dietz & Associates, Newport Beach, CA 92663, USA.
Email: expert@parkdietzassociates.com

**Keywords**
grooming, seduction, child sexual abuse, acquaintance molestation, litigation

## Grooming and Seduction

In the development of knowledge of child sexual abuse, few discoveries could outweigh the importance of recognizing that a large proportion of offenses are committed by acquaintances of the child using techniques other than force or threat of force. No individual has done more to share this insight with the international law enforcement community than Ken Lanning, whose writings and teachings have also reached mental health professionals, those who work in the criminal justice and social service systems, those who care for the nation's children, and countless concerned citizens and parents.

The application of the terms "seduction" or "grooming" to these nonforceful, nonthreatening, and nonviolent techniques has been in the service of disseminating this important insight, which first burst into public consciousness as a real possibility in the mid-1980s as a result of partially untrue media reports about the McMartin School case and the case of Father Gilbert Gauthe, both of which stories first broke in 1984. Yet even today, far too many people, including many who should know better, have difficulty grasping the possibility of nonforceful, nonthreatening, and nonviolent acquaintance molestation, as their preconceptions of childhood innocence and predatory molesters are too strong to allow them to accept that children can be so readily manipulated into doing or allowing things that others find abhorrent.

## Grooming

Lanning (2018) is precisely correct in dating to the 1980s the use of the term "grooming" to refer to techniques for gaining sexual access to children and in his observation that during the 1980s, this usage gradually increased. Using the search capabilities of Google Scholar, I found no use of the word "grooming" to mean such techniques in conjunction with the terms "child sexual abuse," "child molestation," or "child molester" in the professional literature from 1850 through 1983. The first publication identified by Google Scholar as using the term "grooming" in this way was an article by Conte (1984) citing Groth and Birnbaum (1979) for the proposition that "[i]n most cases, except those involving abuse by a stranger, the perpetrator involves children in sexual abuse through a grooming process in which a combination of kindness, attention, material enticement, special privilege, and coercion are



**Figure 1.** Use of the term "grooming" in association with "child sexual abuse" in the professional literature accessed by Google Scholar, 1984-2016, as of 25 August, 2017.

expertly applied" (p. 558). Groth and Birnbaum accurately describe the process (at p. 142-143), but do not use the term "grooming."

Figure 1 shows how the maximum number of publications in the database using the term "grooming" for this meaning[1] has increased since 1984. For the remainder of the 1980s, zero to nine publications per year used "grooming" for this meaning. From 1990-1999, the annual frequency rose from eight to 63, and from 2000 to 2009, from 64 to 227. From 2010 to 2016, the annual frequency rose from 282 to 533.

My own recollection of the growing use of the term "grooming" in this context during the 1980s and 1990s is that it spread not only through peer-reviewed literature and books, but also though the teaching and training being conducted by Ken Lanning, Ann Burgess, and other thought leaders of the era, and that it was gradually adopted by journalists and the general public as well. As the term came to be widely applied, it became increasingly obvious that offenders who groom children often groom the parents of those children, the organizations through which they work or volunteer with children, and the communities in which they function. The success of these offenders in doing so makes it all the more difficult for observers to overcome the false belief that such a "nice guy" could not be harming children (Lanning & Dietz, 2014).

Lanning (2018) points to some of the ways in which the term "grooming" has been misapplied (e.g., to refer to the use of "lures" in stranger cases or what might be expected parental behaviors in intrafamilial cases) but does

not mention the misuse of the term in civil litigation. Where a victim is suing an employer or organization in connection with the sexual abuse of a minor by an employee or volunteer, it has become commonplace for the victim's advocate to argue that the failure to detect "grooming" was negligent on the part of the employer or organization. If their use of the term "grooming" always encompassed excessive focus on a particular child, time alone with the child, or inappropriate touching, this usage might not be problematic, but when "grooming" is applied to such common and desirable behaviors as being kind or attentive or helpful or caring, there is considerable risk of mis-leading the fact finder into believing that these latter behaviors are well-established predictors of child sexual abuse when there is no evidence whatsoever that they can help discriminate between good employees and vol-unteers, on the one hand, and risky employees and volunteers, on the other hand. In the litigation context, efforts to expand the concept of "grooming" to encompass desirable behaviors that are not associated with elevated risk is misleading, particularly when coupled with the presumption or suggestion that "grooming" always reflects an intent or plan to offend or, worse, that an offense can be proved by the fact that the accused engaged in "grooming."

## Seduction

Although I agree with Lanning (2018) that the term "seduction" is preferable to the term "grooming," at least when there is an opportunity to explain how similar the seduction of a child is to the seduction of an age-appropriate part-ner, there is ample historical reason to be cautious about the use of the term "seduction" in this context without further explanation. This is because of two archaic usages of "seduction" in the older literature.

### Archaic Usage #1: Seduction as a Euphemism for the Offense

One of the archaic usages of "seduction," found often in the older scientific literature, is as a vague euphemism for any occurrence of child sexual abuse or an event that may have been sexually simulating to the child, as in these passages:

- "[A] shock of some kind is held responsible for the neurosis—an attack by an animal, a threat of castration, a seduction, an actual view-ing of parental coitus . . ." (Isaacs, 1928, p. 193).
- ". . . I wondered whether the precocity of these fantasies and their frequency might not be due to actual seduction that the child had expe-rienced . . ." (Rank, 1942, p. 56).

- ". . . It was expected that a connection would be found between the child's symptom and the seduction, which was assumed to be the traumatic factor . . ." (Bornstein, 1946, p. 230).
- ". . . [W]here father or mother, either consciously or unconsciously, elevate the child into a substitute sexual partner or commit real acts of seduction with him . . ." (A. Freud, 1968, p. 45).
- "If we assume that the term 'seduction' refers to any kind of sexual encounter, it can range from milder types, such as exposing oneself and enticing the child to follow suit, all the way to forcible rape" (Finch, 1974, p. 34).
- "She was then able to use the dolls to reveal the drama of her own seduction and the ensuing family chaos . . ." (Mrazek, 1980, p. 279).

Here "seduction" is not referring to the process by which a child is groomed or seduced but to the offensive event itself. Freud's seduction hypothesis ". . . generalized that the roots of all adult neuroses lay in childhood sexual contacts with adults" (Gagnon, 1965, p. 177). The vagueness of this use of "seduction" makes it impossible to determine which child sexual abuse behaviors are and are not encompassed by the term and suggests that "seduction" may mean different specific things to different authors.

Authors sometimes imply that "seduction" does not include violence, as when they distinguish it from rape or other violent assaults, as in these examples:

- "Klein has stated that an experience of seduction or rape by a grown-up person may have serious effects upon the child's psychic development . . ." (Bender & Blau, 1937, p. 500).
- "[T]he possible . . . event of seduction, incest, or rape . . ." (Lewis & Sarrel, 1969, p. 606).
- "Violence is rarely found to accompany the incestuous act, possibly because seduction, passive compliance, or sexual curiosity or exploration promote such relationships" (Singer, 1979, p. 8).
- "Children can be broken much more easily than adults, and the effect on them of torture, hatred, seduction, and rape—or even of indifference, of deprivation of love and care—is the devastating one of developmental arrest . . ." (Shengold, 1979, p. 537).

Although this usage comports with the modern idea of seduction or grooming insofar as it is to be distinguished from the use of force, threats, or violence, we would not today distinguish seduction from rape but rather would view seduction (or grooming) as a means of completing a rape or other sexual offense with minimal resistance or risk of disclosure.

Cioffi (1976) interpreted Freud as using the concept of seduction to refer only to nonviolent sexual assaults, writing ". . . he duly reported that he had discovered the specific cause of psychoneurotic disorder: A passive sexual experience before puberty. In other words, a seduction" (p. 275). Cioffi's (1976) quotations of Freud in the same article support this interpretation: "Freud later assigned to his patients in phrases like: 'hysterics trace back their symptoms to fictitious traumas'—or patients 'ascribe their symptoms to passive sexual experiences in early childhood'" (p. 277). Even here, however, what constitutes a "passive sexual experience" is unclear, as it could mean the offender did not use violence, that the child did not resist, or that the child was not an active participant.

### Archaic Usage #2: The Child as Seducer

A second archaic usage of "seduction" is to refer to the child's tempting of the offender. This is diametrically opposed to our current thinking about child sexual abuse in its suggestion that it is the child who is at fault, as in these examples:

- ". . . [A] most striking feature was that these children were distinguished as unusually charming and attractive in their outward personalities. Thus, it is not remarkable that frequently we considered the possibility that the child might have been the actual seducer rather than the one innocently seduced" (Bender & Blau, 1937, p. 514).
- "The majority of pedophiles are harmless individuals and their victims are usually known to be aggressive and seductive children" (Revitch & Weiss, 1962, p. 78).
- "In many [cases] it was highly probable that the child had used his charm in the role of seducer rather than that he had been the innocent one who had been seduced . . ." (Bender & Grugett, 1952, p. 826).
- "Abraham (1907) and Bender and Blau (1937) have commented on how charming and seductive these children can be" (Rosenfeld, Nadelson, Krieger, & Backman, 1977, p. 332).

Three examples of authors attempting to remedy this archaic view are as follows:

- ". . . Although there may be a different quality to a seduction than to an attack, it must be remembered that even a seductive child cannot have full adult comprehension of the act she is courting and cannot be viewed as responsible in this area" (Lipton & Roth, 1969, p. 859).

"Because the affectional needs of the child are not adequately met by the parents, the child may indiscriminately relate to adults in an affection-seeking manner in an effort to ensure her emotional survival.

Numerous other investigators have characterized this behavior of the child as 'seductive'. However, our study indicates that this behavior is instead the child's often desperate attempt to meet her needs for care and attention . . . The child's behavior may often appear sexualized to an adult . . . As a result, it is more appropriate to describe this behavior as affection-seeking rather than seductive" (Johnston, 1979, pp. 948-949).

- "'Everybody knows' that adults must protect themselves from groundless accusations of seductive or vindictive young people. . . . What everybody does not know, and would not want to know, is that the vast majority of investigated accusations prove valid and that most of the young people were less than eight years old at the time of initiation" (Summit, 1983, p. 178).

## Conclusion

Since its introduction to the peer-reviewed professional literature in 1984, the term "grooming" has become so widely adopted that it will remain in widespread use for decades to come. We can and should clarify the meaning of the term wherever possible to avoid misuse or misleading of our audiences. We could benefit from prospective studies of the frequency of grooming-like behaviors among adults in target-rich environments such as schools, youth sports, and youth groups, which could help distinguish behaviors portending risk from those that do not, though it would require a large sample and a long time to reveal at least some of the offenders in the sample.

The two archaic uses of the term "seduction" in the context of child sexual abuse identified here are too recent and too widely known to justify completely abandoning the term "grooming" in favor of "seduction," even if it were possible to do so. Perhaps the best strategy is that adopted by Lanning (2018) of explaining the parallel between the courtship and mating rituals that adults use with one another and the courtship and mating rituals that some use with children.

### Declaration of Conflicting Interests

The author(s) declared no potential conflicts of interest with respect to the research, authorship, and/or publication of this article.

## Funding

The author(s) received no financial support for the research, authorship, and/or publication of this article.

## Note

1. The data on which Figure 1 is based are derived from year-by-year searches of Google Scholar for the combination of the terms "child sexual abuse" and "grooming," excluding citations and patents. One should not assume that the underlying database is complete or that all the publications included in the count use "grooming" in this way or represent peer-reviewed literature, as newsletters, government reports, books, and other documents also make their way into such searches. Nonetheless, the graph gives an adequate representation of the growing use of the term "grooming" for this purpose.

## References

Abraham, K. (1907). The experiencing of sexual traumas as a form of sexual activity. In E. Jones (Ed.), *Selected papers on psycho-analysis* (pp. 47-63). London, England: Hogarth Press.

Bender, L., & Blau, A. (1937). The reaction of children to sexual relations with adults. *American Journal of Orthopsychiatry*, *7*, 500-518.

Bender, L., & Grugett, Jr., A. E. (1952). A follow-up study of children who had atypical sexual experience. *American Journal of Orthopsychiatry*, *22*, 825-837.

Bornstein, B. (1946). Hysterical twilight states in an eight-year-old child. *The Psychoanalytic Study of the Child*, *2*, 229-240.

Cioffi, F. (1976). Was Freud a liar? *Orthomolecular Psychiatry*, *5*, 275-280.

Conte, J. R. (1984). The justice system and sexual abuse of children. *Social Service Review*, *58*, 556-568.

Finch, S. M. (1974). Effects of adult sexual seduction on children. *Journal of Clinical Child Psychology*, *3*, 33-35.

Freud, A. (1968). Indications and contraindications for child analysis. *The Psychoanalytic Study of the Child*, *23*, 37-46.

Gagnon, J. H. (1965). Female child victims of sex offenses. *Social Problems*, *13*, 176-192.

Groth, A. N., & Birnbaum, H. J. (1979). *Men who rape: The psychology of the offender*. New York, NY: Plenum Press.

Isaacs, S. S. (1928). The mental hygiene of the pre-school child. *British Journal of Medical Psychology*, *8*, 186-193.

Johnston, M. S. K. (1979). The sexually mistreated child: Diagnostic evaluation. *Child Abuse & Neglect*, *3*, 943-951.

Kris, E. (1950). The significance of Freud's earliest discoveries. *The International Journal of Psychoanalysis*, *31*, 108-116.

Lanning, K. V. (2018). The evolution of grooming: Concept and term. *Journal of Interpersonal Violence*, *33*, 5-16.

Lanning, K. V., & Dietz, P. (2014). Acquaintance molestation and youth-serving organizations. *Journal of Interpersonal Violence*, *29*, 2815-2838. doi: 10.1177/0886260514532360

Lewis, M., & Sarrel, P. M. (1969). Some psychological aspects of seduction, incest, and rape in childhood. *Journal of the American Academy of Child Psychiatry*, *8*, 606-619.

Lipton, G. L., & Roth, E. I. (1969). Rape: A complex management problem in the pediatric emergency room. *The Journal of Pediatrics*, *75*, 859-866.

Mrazek, D. A. (1980). The child psychiatric examination of the sexually abused child. *Child Abuse & Neglect*, *4*, 275-284.

Rank, B. (1942). Where child-analysis stands today. *American Imago; A Psychoanalytic Journal for the Arts and Sciences*, *3*(3), 41-60.

Revitch, E., & Weiss, R. G. (1962). The pedophiliac offender. *Diseases of the Nervous System*, *23*, 73-78.

Rosenfeld, A. A., Nadelson, C. C., Krieger, M., & Backman, J. H. (1977). Incest and sexual abuse of children. *Journal of the American Academy of Child Psychiatry*, *16*, 327-339.

Shengold, L. L. (1979). Child abuse and deprivation: Soul murder. *Journal of the American Psychoanalytic Association*, *27*, 533-559.

Singer, M. (1979). Perspective on incest as child abuse. *Australian & New Zealand Journal of Criminology*, *12*, 3-16.

Summit, R. C. (1983). The child sexual abuse accommodation syndrome. *Child Abuse & Neglect*, *7*, 177-193.

## Author Biography

**Park Dietz,** MD, MPH, PhD, was educated at Cornell, Johns Hopkins, and the University of Pennsylvania, and taught for 10 years at Harvard Medical School and the University of Virginia School of Law and School of Medicine. He is now a clinical professor of psychiatry and biobehavioral sciences at University of California, Los Angeles (UCLA). As president of Park Dietz & Associates, Inc., he regularly oversees forensic evaluations of psychological damages and expert assessments of liability in child sexual abuse litigation, and as president of Threat Assessment Group, Inc., he regularly participates in the development and implementation of programs to prevent and respond to misconduct in organizations and institutions.

*Journal of Sexual Aggression*
(November 2006), Vol. 12, No. 3, pp. 287 299



# Sexual grooming of children: Review of literature and theoretical considerations

Samantha Craven,[1,*] Sarah Brown[1] & Elizabeth Gilchrist[2]

[1]*Department of Psychology, Coventry University, Coventry, UK, and* [2]*Department of Psychology, University of Kent, Canterbury, Kent, UK*

**Abstract**   *The current review aims to outline the existing understanding of sexual grooming. Issues of poor definition, the adoption of the term "grooming" and the prevalence of sexual grooming will be discussed. Consideration will be given to how prominent theories of child sexual abuse often neglect sexual grooming. This will be followed by a detailed account of the existing knowledge within the literature. Three types of sexual grooming were thus identified: self-grooming, grooming the environment and significant others and grooming the child. Based on these findings, a new definition of sexual grooming is suggested. Furthermore, the findings correspond well with current models of the sexual offence process. A more comprehensive understanding of sexual grooming is required to facilitate a preventative approach to child protection.*

**Keywords**   *Sexual grooming; theory of child sexual abuse*

## Introduction

The complex nature of the tactics used by child sex offenders in their efforts to sexually abuse children is increasingly evident in the accounts of the people affected by this predatory behaviour. Sexual grooming is a pertinent issue evident in society, but there is still little understanding about this phenomenon. This is reflected in problems relating to definition, which will be discussed in addition to the evolution of the term "grooming". This review will consider whether present aetiological theories of child sexual abuse can account for "sexual grooming" behaviour, and further determines what knowledge has already been established about the phenomenon of sexual grooming. Based on these findings, a new definition is presented and consideration is given to how current knowledge of sexual grooming relate to models of the sexual offence process.

## Definition

Professionals are yet to agree on a definition of sexual grooming of children (Gillespie, 2004). Previous literature has provided three specific definitions of grooming. The strengths and

*Corresponding author: Samantha Craven, Department of Psychology, Coventry University, Priory Street, Coventry CV1 5FB, UK. Tel: 02476 887 048. Fax: 02476 888300. E-mail: s.craven@coventry.ac.uk

ISSN 1355 2600 print/1742 6545 online © 2006 National Organisation for the Treatment of Abusers
DOI: 10.1080/13552600601069414

weaknesses of these definitions are discussed in turn below. First, O'Connell defines sexual grooming as:

> A course of conduct enacted by a suspected paedophile, which would give a reasonable person cause for concern that any meeting with a child arising from the conduct would be for unlawful purposes. (O'Connell, 2003, p. 6)

Second, Howitt suggests that:

> Grooming ... is the steps taken by paedophiles to "entrap" their victims and is in someways analogous to adult courtship. (Howitt, 1995, p. 176)

These two definitions are problematic, because they both refer to the term paedophile. Most sexual offenders who target child victims use sexual grooming, not just those classified as paedophiles. The term "paedophile" is a very specific clinical diagnosis, clearly not applicable to all offenders, and the association of grooming behaviour with paedophilia may prevent some offenders from acknowledging their own grooming behaviours. In addition, people known to the offender may not identify the grooming behaviour because they do not consider the individual to fit their image of a "paedophile". The public perception of a paedophile is littered with stereotypes that they are "dirty old men" or strangers; these perceptions may affect an individual's judgement of whether the behaviour they have observed is grooming. These misperceptions distract from the truth that most victims know their abuser. It is important that the wording of a definition does not thwart the identification of sexual grooming and the subsequent prevention or ending of abuse.

Furthermore, the phrase "a course of conduct" requires subsequent definition. Additional problems include reference to "a reasonable person" and "cause for concern". Although legal precedent defines these phrases, they are ambiguous to the lay reader and hence they are open to misinterpretation and confusion. These definitions are confusing, at best, and at worst they reinforce the myth that strangers are the biggest risk to children. Consequently, this ambiguity may hinder the identification of the full range of sexual grooming behaviours.

Gillespie (2002) provides the third definition:

> The process by which a child is befriended by a would-be abuser in an attempt to gain the child's confidence and trust, enabling them to get the child to acquiesce to abusive activity. It is frequently a pre-requisite for an abuser to gain access to a child. (Gillespie, 2002, p. 411; based on van Dam, 2001)

This definition avoids the use of the term paedophile. It also provides some clarity about the purpose of sexual grooming behaviour and identifies some of the stages that it involves. This appears to be the most appropriate published definition to date. Further evaluation of this definition will follow consideration of previous literature and current understanding about sexual grooming.

## Prevalence

Canter, Hughes and Kirby (1998) provide evidence for the prevalence of the sexual grooming phenomenon. They used Small Space Analysis on a behaviour matrix of the interaction between 97 incarcerated child sex offenders and their victims. They identified three distinct behaviour repertoires of offender–victim interaction. The different types of offender–victim interaction acknowledged were aggressive, which was identifiable by the use of extreme

violence, threat and force; criminal–opportunist, which tended to be one-off offences on strangers; and intimate, which was categorized by the identified use of sexual grooming behaviours.

Forty-five per cent of Canter et al.'s (1998) sample were classified as being intimate offenders. Thus, 45% of the child sex offenders employed an intimate behaviour repertoire and sexual grooming behaviours. This figure is likely to be unrepresentative of the child sex offender population as a whole. Intimate offenders tend to cause less physical harm to their victims than the other categories of offenders and the very nature of the behaviour used to categorize the intimate offenders implies that they would be less likely to be reported, identified and convicted, because these grooming behaviours are used to avoid disclosure and conviction. Hence, it is likely that intimate offenders were under-represented in this prison sample.

Figures show that eight of 10 sex abuse victims know their abuser (Stop it Now, 2003). In such cases, offenders have substantial interest in preventing disclosure, because in the event of disclosure the victim would be able to easily identify them as their abuser. This is supported by offenders' accounts about the strategies they employed to victimize the children they sexually abused; fear of disclosure affected how and when they victimized their victims (Conte, Wolf & Smith, 1989).

## Aetiology of a motivation to abuse

Before an individual begins to groom a child, some level of motivation to abuse a child needs to be present. Furthermore, adequate theories of sexual offending should be able to account for the phenomenon of sexual grooming. Until recently there have been three dominant theories of child sexual abuse, namely Finkelhor's Pre-condition Model (1984); Marshall and Barbaree's Integrated Theory (1990); and Hall and Hirschman's Quadripartite Model (1992). In 2002, Ward and Siegert proposed a more comprehensive theory of child sexual abuse by "knitting together" the strengths of each of the above theories. They propose that there are five pathways to sexual offending against children; hence, the theory is called The Pathways Model. This review shall consider each of these only briefly, because Ward and colleagues have already provided in-depth reviews (see Ward, 2001, 2002; Ward & Hudson, 2001). Herein, more emphasis will be placed on how these theories relate to the phenomenon of sexual grooming.

### Marshall and Barbaree's Integrated Theory

Marshall and Barbaree's (1990) Integrated Theory of the aetiology of sexual offending proposes that the presence of vulnerabilities, which develop as a result of adverse early developmental experiences, leave offenders unprepared to deal with the surge of hormones at puberty, and unable to understand the emotional world. As a resultant, offenders satisfy their emotional and sexual needs inappropriately in deviant ways. This theory suggests that sexual offending occurs as a consequence of an individual's sex and aggression drives becoming fused, as these functions share the same structure in the brain. Ward and Siegert (2002) state that this need not be the case, as there are many functions that are close in proximity but that do not affect each other. Furthermore, this theory suggests that sexual offending would be aggressive. Therefore, it would seem that it does not account for the phenomenon of sexual grooming, because the process of sexual grooming is generally not aggressive in nature.

However, this criticism may be countered if a definition of aggression were to include indirect aggression, which sexual grooming could be considered to be.

### Hall and Hirschman's Quadripartite Model

Hall and Hirschman's (1992) Quadripartite Model was first developed as a theory of rape, but it was applied subsequently to child sexual abuse. This model suggests that someone commits an act of child sexual abuse because of four vulnerability factors and the presence of opportunity. The vulnerability factors are physiological sexual arousal, distorted cognitions that act to justify sexual aggression, affective dyscontrol, and personality problems. It is suggested that offending will occur when the presence of these vulnerability factors exceed a threshold, this could include one or all of these vulnerabilities. There are several problems with this model; first, it does not explain why someone chooses to offend against a child rather than an adult. Second, sexual grooming is not an impulsive act and the threshold would need to be maintained over a long period of time in order to explain sexual grooming, because it can occur over weeks, months or even years. Hence, this theory can account for sexual grooming if it is accepted that, for example, sexual arousal persists over long periods of time, so once sexually aroused to children/child the offender would be continually aroused to them. A further problem with this theory relates to the presence of opportunity; offenders often create their own opportunities to offend.

### Finkelhor's Pre-condition Model

Finkelhor's Pre-condition Model (1984) suggests that there are four pre-conditions to sexual offending. The first is the motivation to sexually abuse; it is suggested that this develops as a result of emotional congruence (a fit between the offender's emotional needs and the child's ability to meet them), deviant sexual arousal and blockage (the sexual needs of the offender not being met by appropriate adults). The second is to be able to overcome internal inhibitors; the third is to be able to overcome external inhibitors; and the fourth is to overcome the child's resistance. Before an incidence of abuse would take place, these pre-conditions need to be satisfied. Although Finkelhor does not use the term sexual grooming, others (e.g. Morrison, Erooga & Beckett, 1994; Sampson, 1994) have reviewed his work using this term. They referred to overcoming the child's resistance as grooming.

### Ward and Siegert's Pathways Model

Ward and Siegert's (2002) model is based on the dysfunction of one or more psychological mechanisms—emotional regulation, intimacy deficits, cognitive distortions and sexual arousal (deviant sexual scripts). All the aforementioned psychological mechanisms are involved to some degree. There is evidence of these dysfunctional mechanisms being present typically in child molesters, although to different degrees and for different functions. The five possible pathways are specified by whichever dysfunctional psychological mechanism is the most dominant; in turn this will affect the others. In the case of the fifth pathway, all the psychological mechanisms would be similarly dysfunctional. A sexual offence occurs when the above is present in conjunction with sexual need. In addition, Ward and Siegert still emphasize the importance of there being an opportunity to offend; however, the nature of sexual grooming is to create an opportunity to offend. Successful theory would need to account for this.

Despite Ward and Siegert presenting their Pathways Model as a comprehensive theory of sexual offending, it still only considers aetiology and no consideration is given to the offence process. In a comprehensive theory it is necessary to consider the whole journey from initial onset to the offence and beyond. In a similar way that the Transtheoretical Model (Prochaska & DiClemente, 1982) of change considers not only the action stage, where the overt behaviour is changed, but also the precontemplation, contemplation, preparation and maintenance stages, a theory of sexual offending against children needs to consider the whole journey. As demonstrated above, it is necessary that theories of aetiology are coherent with the phenomenon they are attempting to explain. While endeavouring to explain sexual offending it is important that sexual grooming is also factored into the equation, because it is part of the sexual offending phenomenon. Of the above theories, only Finkelhor's (1984) Pre-condition Model has taken this approach.

## Offence process

In addition to the Pre-condition Model (Finkelhor, 1984) there is one other model that considers the offence process of sexual offending. This is the Descriptive Model of the Offence Chain (Ward, Louden, Hudson & Marshall, 1995). Ward et al.'s model provides a much more detailed account of the offence process than the Pre-condition Model. While little evidence has been found to support Finkelhor's Pre-condition Model, Ward et al. used a grounded theory approach and developed their model directly from offenders' experiences. They identified nine stages of the offence chain. Stage one relates to the offender's background factors, including their perception of themselves and their life at the beginning of the offence chain and whether these factors caused positive or negative affect. Stage two describes distal planning of access to their victim; this could take the form of implicit, or explicit planning or chance. Contact with the victim takes place in stage three. Stage four involves cognitive restructuring, which will result in either positive or negative affect. Stage five entails proximal planning, which would either be self-focused, victim-focused or a mutual-focus. This leads to stage six and the sexual offence, which is followed by further cognitive restructuring at stage seven. This results in negative or positive evaluation and future resolutions regarding continued offending at stage eight. This resolution will be to either avoid future offending or to persist in an abusive pattern. Stage nine depicts the impact of these resolutions on the offender's life.

It is important to consider how sexual grooming fits into, and facilitates, the offence process, as this understanding is likely to aid the management of offenders and potential offenders by identifying the offence process prior to an sexual offence taking place. In addition, it is reasonable to suggest that motivation is not static but could be affected by later stages of the grooming and offence process, e.g. cognitive distortions developed later in the process could serve to reinforce prior motivation resulting in an entrenched deviant sexual interest. This may prove valuable to treatment programmes efforts of reducing motivation to offend.

## The grooming process

The current review has identified three types of sexual grooming present in the literature— self-grooming, grooming the environment and significant others and grooming the child. Each of these will be discussed to explore current understanding of sexual grooming. Understanding of the grooming process and an ability to identify sexual grooming behaviour

is crucial in order to prevent child sexual abuse. However, retrospective identification of sexual grooming, i.e. after a sexual offence has been committed, is much easier than prospective identification, i.e. before a sexual offence. Nevertheless, the latter is necessary in order to prevent the sexual abuse from taking place. The reason for this is because the behaviours used to groom a child for sexual abuse are not dissimilar to innocent behaviour intended to broaden a young person's experiences. The only difference may be the motivation underlying the behaviour.

### Self-grooming

van Dam (2001) reports that during treatment, offenders' talk about "grooming themselves". They were referring to the justification or denial of their offending behaviour. It therefore seems important to consider this as part of the grooming process. However, it may be more agreeable to refer to this phenomenon by another name, avoiding the use of the term "grooming". Nevertheless, self-grooming is likely to play a part in the move from being motivated to sexually abuse a child to the subsequent targeting of a child, through the justification or denial of the steps child sexual offenders take towards abusing a child. Furthermore, self-grooming is likely to be affected by the response from the community and the child, and the success or failure of the efforts to victimize the child. "Success" is likely to result in further justification or denial of their actions and more entrenched sexual interest in children and motivation to offend. "Failure", on the other hand, is likely to result in the desistence of offending or the offender developing/enahancing his skills/strategies to ensure success.

Justification and denial of offenders' behaviour manifests in cognitive distortions. Ward and Keenan (1999) propose that child sex offenders have cognitive distortions in the form of implicit theories, which relate to themselves, the victim and the world. Implicit theories help individuals to understand the world around them. Problems arise because offenders' implicit theories are maladaptive and supportive of sex with children. These implicit theories subsequently affect encoding and interpretation of future behaviours and events. Ward and Keenan have identified five implicit theories that account for most of the cognitive distortions held by child sex offenders: children as sexual objects; entitlement; dangerous world; uncontrollability; and nature of harm.

Of course, it is not only offenders who have maladaptive implicit theories. For example, many people have an implicit theory that children are at most risk from strangers, which is not consistent with research findings. However, it is easier to believe that strangers sexually abuse children than accept that friends and family do; hence, this implicit theory helps to shelter people from the harsh nature of reality. Offenders' implicit theories work in a similar way, because it is easier for offenders to believe that the child seduced them than to accept that they sexually abused a child.

### Grooming the environment and significant others

Grooming the child begins with identifying a vulnerable child (van Dam, 2001). Child sex offenders seem to have a special ability in recognizing vulnerable children (Conte et al., 1989). These vulnerabilities may be that the children have a poor relationship with their parents, do not have many friends (Berliner & Conte, 1990), or have already been victimized (Leberg, 1997). Alternatively, offenders may target women who were sexually abused as children, because the offender considers them easier to re-victimize.

In order to gain access to their victim(s), offenders groom the environment and their potential victim's significant others (e.g. parents, carers, teachers, etc). This may mean the offender integrating themselves into society and places where they are likely to meet children. This will often be a position of trust. Offenders then begin grooming the adults in this community, specifically those who are significant to their potential victim, with the aim of creating an opportunity to access and abuse a child or children. van Dam (2001) reports that offenders are frequently charming, very helpful, and have insider status. This is often an important factor in gaining access to potential victim(s). As offenders help out in the community, they are considering how their efforts will be rewarded later when they can then abuse the children in that community. Offenders are often able to "read the community like a book" in that they assess what they "need" and fulfil these needs accordingly (Hare & Hart, 1993). They can make themselves indispensable, too good to be true and will freely undertake jobs that others do not want to do (Leberg, 1997).

A desire on the part of parents to avoid cognitive dissonance may assist offenders' grooming efforts. A parent may suffer cognitive dissonance as a result of concerns about the trustworthiness of the offender alongside their hospitality and acceptance of the offender. When thoughts do not match behaviour, cognitive dissonance manifests, and often thoughts are changed to be consistent with behaviour (van Dam, 2001). Thus, offenders gain insider status long before they start abusing a victim (van Dam, 2001). Grooming is therefore a well-organized long-term activity (Sanford, 1982). Offenders groom the community so well that if a victim discloses their abuse, the community may support the offender rather than the victim, because they deem the offender to be more believable than the child.

In the case of intrafamilial child sexual abuse, offenders are already in a position of trust and integrated in an environment where they can access potential victims. Some offenders groom the environment by targeting single-parent families to gain this status (Elliott, Browne & Kilcoyne, 1995). Offenders may do this because they believe that these children are more vulnerable and because they believe it will be easier to create opportunities to be alone with the child. Alternatively, offenders may target children or young people who have absent parents, and hence have less protection. In this incidence there is no need for the offender to groom the parents. They can become the child's friend and more easily arrange to have time alone with the child.

Intrafamilial offenders often isolate the victim from their non-abusing parent, siblings and the outside world by developing an exclusive relationship with the child. For instance, they may encourage mothers to have more of a life outside the home, which then gives themselves increased opportunities to abuse their victims. Alternatively, they may isolate non-abusing parents from the outside world in order to prevent them from having people in whom to confide about any concerns (Leberg, 1997). Some offenders encourage mothers to develop an alcohol dependency, in part so that any future disclosures made lack credibility (Leberg, 1997). Other similar strategies employed to limit credibility include questioning the mother's parenting ability in front of friends and other family members. This may constitute part of their strategy for grooming the environment and significant others.

Grooming the environment and significant others can occur as a result of implicit or explicit planning; alternatively, access to a child may occur by chance. Ward and Hudson (2000) have developed a conceptual model of how child sex offenders' implicit planning or seemingly unimportant decisions (SUDs) implicate their offending behaviour by leading them to high-risk situations, i.e. contact with children. This appears to be automatic, because although offenders are conscious of their specific behaviours, they are often unconscious of the effect of implicit goals on these behaviours.

Gollwitzer and Schaal (1998, cited in Ward & Hudson, 2000) suggest that it is through automatic goal-dependent action plans that these SUDs manifest. Ward and Hudson (2000) propose that there are two such action plans: offence scripts and mental simulations. Offence scripts manifest as a result of associations that have developed between situations and behaviours; subsequently, in the presence of certain cues, offence scripts may be activated without any conscious awareness. This is a possible explanation of continued offending and relapse following treatment.

Automatic goal-dependent action plans can be activated regardless of whether an individual has committed any previous sexual crimes. This alternative involves mental simulation. Mental simulation is where an individual plans out in detail how he would commit an offence. As with offence scripts, the presence of certain cues may activate this implicit planning, resulting in the enactment of the individual's fantasies. The notion of implicit planning may provide a possible explanation why the majority of victims know their abuser, because the cues that activate the implicit planning are more likely to be present within the family or in relation to children in the immediate locality (i.e. the places where an individual spends the majority of his time).

It is reasonable to suggest that the fundamental human need to belong may present one possibility to further understand offenders' ability to identify a victim and groom the environment and significant others. Research has shown that a need to belong can affect very basic cognitive functions, e.g. attention and encoding of social information (Pickett, Gardner & Knowles, 2004). Pickett et al. found a positive relationship between a need to belong and sensitivity to social cues. Sexual offenders often come from neglectful, violent and dysfunctional backgrounds (Craissati, McClurg & Browne, 2002). This environment is unlikely to provide an abundance of opportunities for emotional closeness and thus offenders are likely to have a need to belong. In addition, a need to belong is related to low self-esteem (Pickett et al., 2004) and research to date suggests that child sex offenders typically have low self-esteem (Marshall, Anderson & Champagne, 1997). This is supportive of the idea that a need to belong facilitates offenders' identification and access to a victim, because of the associated increased sensitivity to social cues. Children may be approached because the offender perceives them to be less threatening than peers. Alternatively, offenders may be able to identify vulnerabilities in other people because they themselves are vulnerable and thus recognize these signs in others. This explanation would relate to offenders that commit offences following implicit planning. Offenders using explicit planning may also have a need to belong and the associated increased sensitivity to social cues, as a result of a need to belong to the family of community in order to groom and subsequently abuse a child. It is therefore suggested that, in the presence of a motivation to sexually abuse a child, a need to belong often facilitates the identification of a victim and grooming of the environment and significant others.

*Grooming the child*

Grooming the child is the most commonly recognized form of sexual grooming. In addition to a desire for sexual gratification, there may or may not be a relational aspect to the grooming process, depending on the offender's motivation to abuse. Sexual grooming has been considered by some to be analogous to adult courtship (e.g. Howitt, 1995). In addition, Herman (1981) and Christiansen and Blake (1990) talk about sexually abusive fathers adopting the role of suitor towards their daughter. In the case of intrafamilial abuse, the offender promotes the child in place of the mother (Leberg, 1997). Alternatively, the offender may interact with the child on the child's wavelength (van Dam, 2001). Wilson (1999) found

that offenders who abused boys showed a preference for interacting at the child's level, and incest offenders tended to raise the victim's status to that of an adult, while offenders who abused girls were more concerned with sexual gratification. The types of behaviour that constitute grooming the child take two different forms—physical and psychological.

*Physical grooming* involves the gradual sexualization of the relationship between the offender and the victim (Berliner & Conte, 1990). *Psychological grooming* is used to achieve this increased sexualization. At first, the offender may justify the sexual behaviour through providing the child with his version of sex education, which states that sex between children and adults is acceptable and that the offender has a responsibility to train the child for later life (Berliner & Conte, 1990; Leberg, 1997). The abuser builds the child's trust (Christiansen & Blake, 1990; Leberg, 1997; Wyre, 1987, cited in Howitt, 1995; van Dam, 2001), makes him or her feel good (Warner, 2000) and then starts to violate boundaries (Christiansen & Blake, 1990; van Dam, 2001). This may involve intentionally entering the bedroom while the child or young person is undressed, or getting dressed together and exposing himself to the child.

Offenders often desensitize a child to touch by beginning with non-sexual touching such as tickling or stroking the child's head. Conversation may also become more sexual. Alternatively, offenders may confuse victims by continuing to talk to the child about a positive unrelated issue while they begin touching the child sexually (Leberg, 1997). The child may have no idea that something inappropriate is happening. The aim is to progress to sexual touching, first on top of clothes and later under or without clothes (Berliner & Conte, 1990; Christiansen & Blake, 1990; Leberg, 1997; van Dam, 2001). Thus, the intention is to make the child compliant with the offender's sexual demands and overcome the child's resistance (Finkelhor, 1984; Leberg, 1997; Warner, 2000).

In addition to using psychological grooming to increase compliance, it is also used to avoid disclosure. Children are groomed to want to be around the adult who is grooming them (Wolf, 1985). Offenders need to maintain the child's cooperation and secrecy to achieve this. One way that the offender does this is by isolating the child and alienating them from others (Warner, 2000). Leberg (1997) refers to this factor as something separate from grooming, others (e.g. van Dam, 2001) consider it to be part of the grooming process. Isolating the child creates a barrier which prevents the child from having a confidant in whom to disclose (Warner, 2000). In addition, the keeping of secrets acts as a source of further isolation (Lerner, 1993, cited in van Dam, 2001). Children are very good at keeping secrets when asked to. Peters (1991, cited in Ceci & Bruck, 1993) found that 82% of children in his study delayed or did not report an event that they had witnessed, because the thief in the scenario asked them not to tell anyone. The thief in this scenario was a stranger, to whom the children had no loyalty, and so it is likely that children would be even more likely to protect a known and loved adult.

Further strategies used by offenders to maintain the child's compliance include issuing threats and bribes (Berliner & Conte, 1990; Christiansen & Blake, 1990). Bribes may take the form of material gifts or extra privileges (Christiansen & Blake, 1990). In addition, offenders are skilled at using children's natural vulnerabilities against them. For instance, children very often have a strong desire to protect their parents. When the offender informs them that their parents would be very hurt if they found out what they had been doing, children may remain silent (Berliner & Conte, 1990). Offenders may also demonstrate their potential for violence through violence towards others, e.g. other family members. Thereby offenders reinforce the message that they will enact their threats about hurting the child and/or the child's family.

Offenders frequently make the child feel responsible for the abuse (Leberg, 1997; van Dam, 2001; Warner, 2000). They convince the child that they are to blame for letting the abuse happen and that they should have stopped it (Leberg, 1997). This is reinforced by stereotypes in society, which emphasize that men cannot control their sex drive (Warner, 2000). Additional guilt may be felt if the child has been made to perform sexual acts on the abuser or another child (Warner, 2000). However, this feeling of responsibility and guilt is overshadowed by the self-betrayal the child feels as their body reacts to sexual stimulation against their will (Warner, 2000) which children may interpret as evidence that they are enjoying themselves. This is internalized and resultantly may have an impact on the child's developing identity. Disclosure is avoided because the child feels that it is "all their fault", that he/she is bad and that no one will believe them (Warner, 2000).

Each victim's experience of grooming is different, because offenders adapt their strategies dependent on the child, whose response during the grooming process is important. It seems reasonable to suggest that offenders require some level of "empathy" during the grooming process to recognize reactions in the child, so that they can adapt their strategy accordingly. For example, during the desensitization process an offender would need to recognize the limits of the victim and to strategically increase those limits. It is proposed that empathy involves four components: (1) emotion recognition; (2) perspective-taking; (3) emotion replication; and (4) response decision (Marshall, Hudson, Jones & Fernandez, 1995). Continuing with the previous example, offenders recognize the distress in their victim and make a decision based on this, because they choose to stop temporarily as a strategic part of the desensitization process. Thus, offenders appear to have ability in components (1) and (4), which are the cognitive components, but not in the affective components (2) and (3). While early research on empathy in sex offenders concluded that they have empathy deficits, more recent research has found that this empathy deficit to be victim-specific (Fernandez, Marshall, Lightbody & O'Sullivan, 1999; Marshall, Hamilton & Fernandez, 2001; Marshall et al., 1995). This is inconsistent with the suggestion that the grooming process requires some level of empathy. However, Fernandez et al. (1999; Marshall et al., 2001) provide a possible explanation for this. They suggest that victim-specific empathy deficits manifest as cognitive distortions, which protect the offenders from negatively evaluating themselves, thus allowing them to continue abusing a child. Based on this suggestion, victim-specific empathy deficits arise as a consequence rather than a cause of the abuse. These cognitive distortions therefore facilitate self-grooming.

The manifestation of a cognitive distortion relating to a victim-specific empathy deficit may be facilitated by cognitive deconstruction. Cognitive deconstruction (see Ward, Hudson & Marshall, 1995) is a state entered into to escape negative experiences and negative self-evaluation. Cognitive deconstruction involves processing at a lower, more concrete, level, i.e. muscular movements, and rewards of behaviour, rather than social action. Resultantly, the individual has much more focus on feelings of pleasure and less awareness of the consequences of his behaviour. This concrete-level focus may reinforce cognitive distortions such as victims enjoyed the abuse because they became physically aroused, which justifies the offender's lack of empathy toward their victim.

Self-grooming, grooming the environment and significant others, and grooming the child are relevant to situational and preferential offenders, extra-familial and intrafamilial offences. It is important that the different types of sexual grooming apply to these different typologies and classifications of offenders because sexual grooming is not used solely by one group of offenders and, furthermore, these categories are not mutually exclusive (Itzin, 2001).

**Towards a new definition of sexual grooming of children**

The definitions of sexual grooming presented at the start of this review do not reflect the complexity of the sexual grooming of children, which is demonstrated in the previous discussion of the different types of sexual grooming. Based on the above findings it seems necessary to provide a new definition that attempts to encapsulate the complexity of sexual grooming, while still being easy to understand. We propose the following:

> A process by which a person prepares a child, significant adults and the environment for the abuse of this child. Specific goals include gaining access to the child, gaining the child's compliance and maintaining the child's secrecy to avoid disclosure. This process serves to strengthen the offender's abusive pattern, as it may be used as a means of justifying or denying their actions.

**Conclusion**

Despite the wide acceptance of the term, sexual grooming of children is not understood clearly, particularly in the public domain. Testimonies from both victims and perpetrators highlight the pertinence of the problem. Furthermore, the government in England and Wales has introduced legislation in the Sexual Offences Act 2003 regarding "meeting a child following sexual grooming" (see Part 1: section 152003). A greater understanding of the meaning, elements and process of sexual grooming is required to effectively utilize this legislation (for review see Craven, Brown & Gilchrist, in press).

Regardless of the prevalence and pertinence of sexual grooming, most aetiological theories of child sexual abuse neglect the phenomenon. The main reason for this is likely to be because prominent theories of child sexual abuse were devised more than 10 years ago, at a time when sexual grooming was not recognized as it is today. Therefore, it is necessary that theories be reconsidered based on this recent awareness. Ward (2001, 2002; Ward & Hudson, 2001; Ward & Siegert, 2002) has begun the process of theory knitting and development. While Ward and Siegert's Pathways Model is able to account for sexual grooming, it still focuses on the presence of opportunity rather than explicitly recognizing that offenders often create their own opportunities to offend.

The current review has identified three types of sexual grooming discussed in the literature: self-grooming, grooming the environment and significant others and grooming the child. Based on these findings an alternative definition has been suggested, which includes details about offenders' objectives, e.g. gaining access to a child, gaining the child's compliance, maintaining secrecy and avoiding disclosure.

A fuller understanding of sexual grooming is required. Consideration needs to be given to offender–victim interaction (before, during and after the offence), micro behaviours that may indicate to significant adults that a child is being sexually groomed, or indeed that they themselves are being groomed by an offender, and the seemingly impossible task of proving beyond reasonable doubt that the ambiguous behaviour of sexual grooming is sexually motivated. This would provide many benefits to child protection and the policing and treatment of child sex offenders with a specific focus on prevention of child sexual abuse rather than reactive responses to it. To optimize the impact of acquired knowledge and understanding, it is necessary to consider how these findings are disseminated to the relevant groups involved with children, e.g. parents, police, and social workers.

## References

Berliner, L. & Conte, J. R. (1990). The process of victimization: The victims' perspective. *Child Abuse and Neglect*, *14*, 29 40.

Canter, D., Hughes, D. & Kirby, S. (1998). Paedophilia: Pathology, criminality, or both? The development of a multivariate model of offence behaviour in child sexual abuse. *Journal of Forensic Psychiatry*, *9*, 532 555.

Ceci, S. J & Bruck, M. (1993). Suggestibility of the child witness: A historical review and synthesis. *Psychological Bulletin*, *11*, 403 439.

Christiansen, J. R. & Blake, R. H. (1990). The grooming process in father daughter incest. In A. L. Horton (Ed.), *The Incest Perpetrator: A Family Member No One Wants to Treat* (pp. 88 98). Thousand Oaks, CA: Sage Publications, Inc.

Conte, J. R., Wolf, S. & Smith, T. (1989). What sexual offenders tell us about prevention strategies. *Child Abuse and Neglect*, *13*, 293 301.

Craissati, J., McClurg, G. & Browne, K. (2002). Characteristics of perpetrators of child sexual abuse who have been sexually victimized as children. *Sexual Abuse: Journal of Research and Treatment*, *14*, 225 239.

Craven, S., Brown, S. & Gilchrist, E. (in press). Current responses to sexual grooming: Implication for prevention. *The Howard Journal of Criminal Justice*, 46.

Elliott, M., Browne, K. & Kilcoyne, J. (1995). Child sexual abuse prevention: What offenders tell us. *Child Abuse and Neglect*, *19*, 579 594.

Fernandez, Y. M., Marshall, W. L., Lightbody, S. & O'Sullivan, C. (1999). The Child Molester Empathy Measure: Description and examination of its reliability and validity. *Sexual Abuse: Journal of Research and Treatment*, *11*, 17 32.

Finkelhor, D. (1984). *Child Sexual Abuse: New Theory and Research*. New York: Free Press/London: Collier Macmillan.

Gillespie, A. (2002). Child protection on the internet challenges for criminal law. *Child and Family Law Quarterly*, *14*, 411 425.

Gillespie, A. (2004). "Grooming": definitions and the law. *New Law Journal*.

Hall, G. C. N. & Hirschman, R. (1992). Sexual aggression against children: A conceptual perspective of etiology. *Criminal Justice and Behavior*, *19*, 8 23.

Hare, R. D. & Hart, S. D. (1993). Psychopathy, mental disorder, and crime. In S. Hodgins (Ed.), *Mental Disorder and Crime* (pp. 104 115). Thousand Oaks, CA: Sage Publications, Inc.

Herman, J. (1981). Father daughter incest. *Professional Psychology: Research and Practice*, *12*, 76 80.

Home Office (2003). *Sexual Offences Act 2003*. Available at: http://www.hmso.gov.uk/acts/acts2003/20030042.htm (accessed November 2003).

Howitt, D. (1995). *Paedophiles and Sexual Offences Against Children*. Oxford, UK: John Wiley and Sons.

Itzin, C. (2001). Incest, paedophilia, pornography and prostitution: Making familial males more visible as the abusers. *Child Abuse Review*, *10*, 35 48.

Laws, D. R. & Marshall, W. L. (1990). A conditioning theory of the etiology and maintenance of deviant sexual preference and behavior. In W. L. Marshall, D. R. Laws & H. E. Barbaree (Eds.), *Handbook of Sexual Assault: Issues, Theories, and Treatment of the Offender* (pp. 209 230). New York, NY: Plenum Press.

Leberg, E. (1997). *Understanding Child Molesters: Taking Charge*. Thousand Oaks, CA: Sage Publications, Inc.

Marshall, W. L. & Barbaree, H. E. (1990). An integrated theory of the etiology of sexual offending. In W. L. Marshall, D. R. Laws & H. E. Barbaree (Eds.), *Handbook of Sexual Assault: Issues, Theories, and Treatment of the Offender*. New York: Plenum Press.

Marshall, W. L., Anderson, D. & Champagne, F. (1997). Self-esteem and its relationship to sexual offending. Psychology. *Crime and Law*, *3*, 161 186.

Marshall, W. L., Hamilton, K. & Fernandez, Y. (2001). Empathy deficits and cognitive distortions in child molesters. *Sexual Abuse: Journal of Research and Treatment*, *13*, 123 130.

Marshall, W. L., Hudson, S. M., Jones, R. & Fernandez, Y. M. (1995). Empathy in sex offenders. *Clinical Psychology Review*, *15*, 99 113.

Morrison, T., Erooga, M. & Beckett, R. C. (1994). *Sexual Offending Against Children: Assessment and Treatment of Males*. London: Routledge.

O'Connell, R. (2003). *A Typology of Child Cybersexploitation and Online Grooming Practices*. Available at: http://www.safer-internet.net/downloads/UCLAN report release.pdf (accessed September 2003).

Pickett, C. L., Gardner, W. L. & Knowles, M. (2004). Getting a cue: The need to belong and enhanced sensitivity to social cues. *Personality and Social Psychology Bulletin*, *30*, 1095 1107.

Prochaska, J. O. & DiClemente, C. C. (1982). Transtheoretical therapy: Toward a more integrative model of change. Psychotherapy: Theory. *Research and Practice*, *19*, 276 288.

Sampson, A. (1994). *Acts of Abuse: Sex Offenders and the Criminal Justice System*. London: Routledge.

Sanford, L. T. (1982). *The Silent Children: A Parent's Guide to the Prevention of Child Sexual Abuse*: McGraw-Hill.

Stop it Now (2003). *What we all need to know to protect our children*. Available at: http://www.stopitnow.org.uk/ Stop%2002.pdf (accessed December 2003).

van Dam, C. (2001). *Identifying Child Molesters: Preventing Child Sexual Abuse by Recognizing the Patterns of the Offenders*. Binghamton, NY: Haworth Maltreatment and Trauma Press/The Haworth Press, Inc.

Ward, T. (2001). A critique of Hall and Hirschman's quadripartite model of child sexual abuse. *Psychology, Public Policy, and Law*, *7*, 333 350.

Ward, T. (2002). Marshall and Barbaree's integrated theory of child sexual abuse: A critique. *Psychology, Crime and Law*, *8*, 209 228.

Ward, T. & Hudson, S. M. (2000). Sexual offenders' implicit planning: A conceptual model. *Sexual Abuse: Journal of Research and Treatment*, *12*, 189 202.

Ward, T. & Hudson, S. M. (2001). Finkelhor's precondition model of child sexual abuse: A critique. *Psychology, Crime and Law*, *7*, 291 307.

Ward, T., Hudson, S. M. & Marshall, W. L. (1995). Cognitive distortions and affective deficits in sex offenders: A cognitive deconstructionist interpretation. *Sexual Abuse: Journal of Research and Treatment*, *7*, 67 83.

Ward, T. & Keenan, T. (1999). Child molesters' implicit theories. *Journal of Interpersonal Violence*, *14*, 821 838.

Ward, T., Louden, K., Hudson, S. M. & Marshall, W. L. (1995). A descriptive model of the offense chain for child molesters. *Journal of Interpersonal Violence*, *10*, 452 472.

Ward, T. & Siegert, R. (2002). Toward a comprehensive theory of child sexual abuse: A theory knitting perspective. *Psychology, Crime and Law*, *8*, 319 351.

Warner, S. (2000). *Understanding Child Sexual Abuse: Making the Tactics Possible*. Gloucester: Handsell.

Wilson, R. J. (1999). Emotional congruence in sexual offenders against children. *Sexual Abuse: Journal of Research and Treatment*, *11*, 33 48.

Wolf, S. (1985). A multi-factor model of deviant sexuality. *Victimology: An International Journal*, *10*, 359 374.