

Haddon, Morgan and Foreman, P.C
Jeffrey S. Pagliuca

150 East 10th Avenue
Denver, Colorado  80203
PH  303.831.7364
FX  303.832.2628
www.hmflaw.com
JPagliuca@hmflaw.com

November 1, 2021

**VIA EMAIL**

Maurene Comey
Alison Moe
Lara Pomerantz
Andrew Rohrbach
United States Attorney's Office
Southern District of New York
1 St. Andrew's Plaza
New York, NY 10007

Re:   *United States v. Ghislaine Maxwell*, 20 Cr. 330 (AJN)

Dear Counsel:

Defendant Ghislaine Maxwell through counsel, submit the following summary pursuant to Fed. R. Crim. P. 16(b)(1)(C).

## I. EXPERT DISCLOSURE BY THE DEFENSE

### A. Dr. Elizabeth Loftus

Dr. Loftus is the Distinguished Professor of Psychological Science and Law at the University of California, Irvine School of Law. Dr. Loftus is one of the nation's leading experts on the science of memory.  In addition to her experience as an academic and clinical researcher, she has been an expert witness or consultant in hundreds of cases. Her extensive experience and credentials are recited in her curriculum vitae.  Exhibit A.

It is expected that Dr. Loftus, a psychologist who specializes in the study of memory, will focus on the memory aspects of this case. Based on her education, training, experience, and research, her testimony will concern the workings of human memory, the effects of suggestion on memory, the mechanism of creation of false memories, the characteristics of false memories, how memory fades and weakens over time, and how memory becomes more vulnerable to contamination.  She will describe scientific research showing that false memories can be

Comey, Moe, Pomerantz and Rohrbach
November 1, 2021
Page 2

described with confidence, detail, and emotion, just like true memories.  This can occur when people come to believe in these experiences and are not deliberately lying. Dr. Loftus would identify some of the suggestive activities that occurred in the current case.

Suggestive activities can explain how it is that a person might go from having no memory of sexual abuse, and even denying sexual abuse, to later having "memories" for numerous abusive acts, if the memories are false. She will explain the mechanism by which false and/or distorted memories can be created as a result of post-event information and occurrences, suggestion, influence or the like.  She will also testify about the characteristics of false and/or distorted memories.  In particular "memories" can be described with confidence, detail and emotion, even when they are false.  She will point out some of the suggestive activities that occurred in this case. She will explain how media coverage and other publications (including but not limited to newspaper and magazine articles, news reports, television shows, documentaries, books, podcasts, websites, etc.) and discussions/ conversations with others, can be sources of suggestion.  She will explain how, in a case like this one, suggestion can lead individuals to the construction of distorted memories.

### B.  Park Dietz, M.D., M.P.H., PH.D.

Dr. Park Dietz is a psychiatrist specializing in forensic psychiatry with over 40 years of experience. He has been previously qualified as an expert in psychiatry and forensic psychiatry.

Dr. Dietz received a bachelor's degree in psychology and biology from the Cornell University College of Arts and Sciences (1970), an M.D. degree from the Johns Hopkins University School of Medicine (1975), a Master's degree in Public Health from the Johns Hopkins School of Hygiene and Public Health (1975), and a Ph.D. in sociology from the Johns Hopkins University (1984).  He completed psychiatric residency at the Johns Hopkins Hospital (1975-77) and the Hospital of the University of Pennsylvania (1977-78), where he was Chief Fellow in Forensic Psychiatry.  He has been board certified in psychiatry by the American Board of Psychiatry and Neurology since 1979.

He is a Clinical Professor of Psychiatry and Biobehavioral Sciences at the UCLA School of Medicine.  From 1986 to 1989, he was a Professor of Law at the University of Virginia School of Law and a Professor of Behavioral Medicine and Psychiatry at the University of Virginia School of Medicine.  From 1982 to 1986, he was an Associate Professor of Law and of Behavioral Medicine and Psychiatry at the University of Virginia Schools of Law and Medicine.  From 1978 to 1982, he was an Assistant Professor of Psychiatry at Harvard Medical School.  In those positions he taught and lectured on forensic psychiatry for diverse audiences, including law students, practicing attorneys, law enforcement officers, psychiatry residents, forensic psychiatry fellows, and practicing forensic psychiatrists and psychologists.

He is a Past President of the American Academy of Psychiatry and the Law, a Distinguished Life Fellow of the American Psychiatric Association, and a Fellow of the American Academy of Forensic Sciences.  He has served on the editorial boards of the Bulletin of the American Academy of Psychiatry and the Law, the Journal of Forensic Sciences, Behavioral Sciences and the Law, the Journal of Threat Assessment and Management, and other

professional publications.  He has authored more than 100 articles and book chapters, primarily on forensic psychiatry.

He has conducted more than 1,000 evaluations of persons charged with crime and, in his role as President of Park Dietz & Associates, Inc., has evaluated or supervised over 1,000 evaluations of allegations of sexual victimization.  He has testified as an expert witness in forensic psychiatry on hundreds of occasions, including testimony in criminal matters in federal courts throughout the U.S. and the trial courts of nearly every state.

Dr. Dietz will be qualified as an expert in the areas of psychiatry and behavioral science.  Dr. Dietz's curriculum vitae is attached as Exhibit B. Attached as Exhibit C is a list of material reviewed by Dr. Dietz.

His testimony may include, but will not be limited to, the following:

### a.  Opinions about Dr. Rocchio's Disclosed Opinions

The first use of the word "grooming" to refer to strategies that sometimes enable nonforceful, nonthreatening, and nonviolent sexual victimization of minors was the proposition that "the perpetrator involves children in sexual abuse through a grooming process in which a combination of kindness, attention, material enticement, special privilege, and coercion are expertly applied" (Conte, 1984, p. 558).  Since then, this usage has been widely adopted by social scientists, clinicians, journalists, and others.  But this usage has some unintended consequences that threaten the integrity of the adjudicative process, including these:

> (1) Because use of the term "grooming" commonly assumes that the grooming party is intentionally using these strategies to gain sexual access to children, to abuse them, and to prevent them from disclosing the abuse, the word "grooming" has acquired meaning beyond an objective description of behaviors; it imputes motive and intent without adequate evidence of either.

> (2) In the litigation context, "when 'grooming' is applied to such common and desirable behaviors as being kind or attentive or helpful or caring, there is considerable risk of misleading the fact finder into believing that these latter behaviors are well established predictors of child sexual abuse," when they are not.  Park Dietz, Grooming and Seduction, 33 J. Interpersonal Violence, 28, 31 (2018). Dr. Rocchio characterizes "grooming" as "a strategic pattern of behavior[] . . . that can take a variety of forms and function to render the victims vulnerable to abuse, to obscure the nature of the abuse, and to build trust and attachment with their abuser."  This vague opinion about "grooming" carries the risk of imputing motive and intent to the Defendant, when the determination of motive and intent is a task for the fact finder charged with determining the credibility of witnesses, the weight of the evidence, and the ultimate issues.  Moreover, this opinion carries the risk of implying that innocuous and even desirable behaviors are associated with nefarious or criminal conduct.

Comey, Moe, Pomerantz and Rohrbach
November 1, 2021
Page 4

Moreover, grooming has no consistent definition, and concerns have been raised that "there is no valid method to assess whether grooming has occurred or is occurring." Natalie Bennett & William O'Donohue, The Construct of Grooming in Child Sexual Abuse, 23 J. Child Sexual Abuse 957, 974 (2014).

In any particular population of alleged victims, patients, or plaintiffs—including those whom Dr. Rocchio has treated or evaluated—the determination of whether grooming has occurred is a subjective judgment hinging largely on the credibility of the individuals. Such judgments have no known error rate and cannot be tested, verified, or reproduced.

Although the Government's Expert Notice regarding Dr. Rocchio's proposed testimony is silent as to whether she is expected to impute a theory of "grooming-by-proxy" to the Defendant, it is important to note that there is no generally accepted theory of grooming by third parties or empirical evidence regarding the prevalence, characteristics, or mechanisms of such a phenomenon. Ms. Maxwell is not accused of soliciting or enticing sexualized massages for herself. Instead, the claim appears to be that Ms. Maxwell recruited and groomed minors to provide sexualized massages for Mr. Epstein, which would amount to grooming-by-proxy.

Dr. Dietz is aware of no authority—no journal articles, no studies, no tests, nothing—to support a theory of grooming-by-proxy. Such a theory has not gained any acceptance (let alone general acceptance) in the relevant community; it has not been peer-reviewed; it has not and cannot be tested; and there is no known or potential rate of error.

Dr. Rocchio's opinion that "[i]ndividuals with particular vulnerabilities are often targeted by perpetrators of sexual abuse" is a commonly accepted bit of clinical lore derived from the frequent observation of highly vulnerable children among those children who allege sexual abuse, but it is not based on empirical data regarding the likelihood of abuse among children with varying degrees of vulnerability. To the extent that less vulnerable children, such as those with intact families, attentive parents, good social support, little psychopathology, less prior trauma, no substance use, and higher resilience are less likely to allege abuse than the more vulnerable, the generalization could be proved weak or false, if only there were such empirical data. And even if there were such data, it would be important to devise a means of verifying that abuse did occur to those who allege it, which is a difficult task at best because of the pains so many abusers take to avoid confession, witnesses, or physical evidence. The clinical, criminal justice, and forensic populations from which the observation of prevalent vulnerabilities is derived—including those clients whom Dr. Rocchio has treated or evaluated—rarely represent groups in which all allegations of abuse have been verified by confession, witnesses, physical evidence, or other means.

Other opinions put forth in the disclosure of Dr. Rocchio's proposed testimony also rest on assertions that are untestable, cannot be reproduced, and have no known error rate.

    b.  **Opinions About Hindsight Bias**

Hindsight bias must be considered when evaluating sex abuse allegations and or "grooming behavior." Many claims of sexual abuse of minors involve behaviors that are, in

Comey, Moe, Pomerantz and Rohrbach
November 1, 2021
Page 5

hindsight, labeled "grooming" or otherwise imputed as knowledge to onlookers. Hindsight bias refers to the tendency to overestimate how predictable or foreseeable an event is after being informed about the outcome of an event. Simply put, knowledge of the outcome of the event, i.e. Epstein pleaded guilty to having sexual contact with post-pubescent minors, makes the importance of pre-conviction behaviors obvious. Retrospective judgments about the predictability or foreseeability of the outcome are systemically inflated or biased compared to judgments made without information about the outcome. Hindsight bias refers to the tendency to overestimate how predictable an event is after learning the outcome of the event (Fischhoff, 1975). For example, after a political election, people believe their pre-election estimates of the outcome were closer to the outcome than they actually were (Blank, Fischer, & Erdfelder, 2003). Hindsight bias has been discussed in over 800 scholarly articles across a variety of different domains including medicine, financial decision making, consumer satisfaction, and within the legal domain (see Roese & Vohs, 2012; Arkes, 2013; Strohmaier et al., 2021) and using a variety of different experimental designs (Pohl & Erdfelder, 2016) and a variety of different stimuli such as written vignettes, visual stimuli (e.g., Bernstein & Harley, 2007), and auditory stimuli (e.g., Bernstein, Wilson, Pernat, & Meilleur, 2012). Even individuals with specialized training and expertise succumb to hindsight bias (Musch & Wagner, 2007). One notable study detected hindsight bias among actual judges making civil liability decisions, in which judges with outcome knowledge perceived the harm to be significantly more foreseeable than judges who did not receive outcome information and were thus more likely to render a finding of negligence (Oeberst & Goeckenjan, 2016). Another notable study detected hindsight bias in a sample of mental health professionals who gauged the dangerousness of a psychiatric patient; again, outcome knowledge affected the reported dangerousness and predictably of harm posed by the patient (Beltrani et al., 2018).

Hindsight bias affects legal judgments. Civil or criminal prosecutions related to events occurring decades ago may be compromised by this bias in many ways, from the investigation—either ignoring evidence or attributing significance in hindsight—through the presentation of evidence, to the deliberation of any factfinder. Awareness of the impact of the hindsight bias should temper any claims that so called "grooming" behaviors should have been noticed and either reported or avoided and that failing to do so constitutes knowledge or intent.

   c. **Opinions Related to the Halo Effect**

The term "Halo effect" was coined by Thorndike (1920) a century ago. The Halo effect is a cognitive bias in impression formation whereby the positive evaluation of one characteristic has a radiating effect on how other, non-related characteristics of the individual are evaluated. For example, one classic study found that physical attractiveness influenced evaluations of the target's personality, life satisfaction, and expected future personal and occupational success — despite the fact that no information about any of these attributes was provided (Dion et al., 1972). Physical attractiveness has also been found to influence culpability judgments, with attractive individuals being held less-responsible than unattractive individuals (Dion, 1972; Efran, 1974). Halo effects have been found to be cued by factors other than attractiveness, such as the described status of the target (Wilson, 1968), the name of the target (Harari & McDavid, 1973), and even one's mood when evaluating the target (Forgas, 2011). Studies have documented

Comey, Moe, Pomerantz and Rohrbach
November 1, 2021
Page 6

halo effects when making diagnoses of psychopathology, such that symptoms of one mental disorder influence the interpretation of other symptoms indicative of other mental disorders and vice versa (see e.g., DeVries, Hartung, & Golden, 2017).

Halo effects are a means to achieving cognitive consistency, which roughly refers to a state in which attitudes, perceptions, beliefs, predictions, and thoughts are aligned. Cognitive consistency serves many important goals. As noted by Read and Simon (2012), cognitive consistency is "essential for reasons of parsimony and economy of effort, as well as to allow for the predictability of, and hence adaptability to, subsequent encounters" (p. 67). Indeed, the noted psychologist Leon Festinger "was convinced that the psychological need for cognitive consistency is as basic as hunger and thirst" (Gawronski, 2012, p. 652). But because the world is often not so neat, orderly, or unequivocal, humans engage in complicated reasoning processes to impose consistency. These processes involve bi-directional reasoning in which "decisions follow from evidence, and evaluations of the evidence shift toward coherence with the emerging decision" (Simon, Snow, & Read, 2004, p. 814; Greenspan & Scurich, 2016). As a result, perceptions and decisions become highly skewed toward one interpretation while alternatives are neglected or dismissed, hence consistency is achieved. This reasoning process occurs unconsciously, i.e., outside conscious awareness, and is not intentional self-deception.

Halo effects can have serious practical consequences. As noted by Forgas and Laham (2016):

> Once unjustified initial expectations are formed about a person, they can easily become self-perpetuating with serious implications for how a target is treated. If we expect a person to have positive characteristics, we may selectively look for and find such features from the rich array of information available (a self-fulfilling prophecy), and positive impressions may in turn lead to preferential treatment in a range of domains:
>
> interpersonal relations, the work place, the health and legal systems, and even for decision making and consumer choices. (p. 286)

Like many people who achieve great power and wealth, Jeffery Epstein exploited the Halo effect to surround himself with people who would serve his needs. At the most primitive level, his wealth attracted those seeking for themselves some of what he had. At the most sophisticated level, others with halos of their own—through any combination of power, influence, fame, brilliance, attractiveness, social standing, or other positive characteristics—mingled with Epstein for reasons of their own, and being seen in their company empowered him and made him look above suspicion. In a videotaped interview with Steve Bannon, Epstein differentiated between different kinds of power—such as Bill Clinton's political power, wrestlers' and weight lifters' physical power, and Gerry Edelman's intellectual power—and acknowledged that he gravitated to people of power. [CONFIDENTIAL] SDNY_GM_SUPP_00219000.mov.

The materials reviewed reflect that Jeffrey Epstein was a brilliant man who was flawed by enduring personality traits familiar to psychiatrists as "Cluster B personality traits," found among those with antisocial, narcissistic, borderline, and histrionic personality disorders.

American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 5th Ed., Arlington, VA: American Psychiatric Association (2013), pp. 659-672. These flaws allowed him to use his brilliance to manipulate people to do his bidding and to compartmentalize people into isolated cells in which none had complete information about his activities. These were not his only flaws, and Dr. Dietz is also prepared to address Jeffrey Epstein's sexual behavior should it prove relevant.

### d. Opinions Related to the Multiple Pathways to False Sex Assault Allegations

Studies concerning the accurate reporting of alleged sexual assaults undermine the assertions made by Dr. Rocchio to the extent they are based on uncorroborated allegations and are also otherwise relevant here. False allegations of sexual assault do occur, and there are multiple pathways to these false allegations of sexual assault.

Not all allegations of sexual assault are true. Unfortunately, there has been little work on understanding the prevalence of false allegations or pathways to these, particularly in a sample most relevant to a jury—currently adjudicated cases. A peer reviewed journal article has proposed 11 pathways to false allegations of sexual assault: (a) lying, (b) implied consent, (c) false memories, (d) intoxication, (e) antisocial personality disorder, (f) borderline personality disorder, (g) histrionic personality disorder, (h) delirium, (i) psychotic disorders, (j) dissociation, and (k) intellectual disability. Jessica Engle and William O'Donohue, Pathways to False Allegations of Sexual Assault, 12 J. Forensic Psychology Practice, 97. These pathways originate in the psychological proclivities or state of the individual making these false allegations. The descriptions of these pathways that follow include material drawn nearly verbatim from the article by Engle and O'Donohue (2012), which was published before the latest edition of the Diagnostic and Statistical Manual of Mental Disorders but nonetheless remains accurate in characterizing certain personality disorders.

<u>Lying</u>: Lying involves the alleged victim knowingly making a false claim of sexual assault. Humans do lie, and their lies can be difficult to detect. Often, humans lie because of what they perceive as the favorable consequences for lying; for sexual assault these consequences could be:

- 1. the severe negative consequences that the alleged perpetrator experiences,
- 2. secondary gain from victim status,
- 3. excusing behaviors or characteristics of the alleged victim (e.g., sexual activity, pregnancy, sexually transmitted diseases)
- 4. financial gain.

<u>Implied Consent</u>: A fact finder's determination of whether consent was competently given is often problematic, and some allegations are regarded as unfounded or false based on determinations regarding consent before cases reach the stage of adjudication. A false allegation

Comey, Moe, Pomerantz and Rohrbach
November 1, 2021
Page 8

can arise when it was reasonable to believe consent was given but the alleged victim falsely believes that it was not.

<u>False Memory</u>: The existence and prevalence of repressed memories is a source of controversy, and yet research does exist demonstrating the successful implantation of fabricated memories. In one of the first studies on the implantation of false memories, participants were given short narratives of childhood experiences, purportedly obtained from relatives, and asked to try to remember these experiences. Research by Elizabeth Loftus has revealed how subtle information introduced after an event may alter the memory of that event. Loftus and her students have conducted more than 200 studies with more than 20,000 participants demonstrating how misinformation introduced after an event can induce people into creating false memories.

<u>Intoxication</u>: Intoxication can substantially increase the likelihood of a false allegation of sexual assault. Alcohol and other intoxicants pose a significant problem in sorting out the validity of a sexual assault allegation. The information-processing errors induced by intoxicating substances may cause confusion surrounding events that occurred while a person was intoxicated. A person who does not accurately recall events that occurred while he or she was under the influence or while experiencing the side effects of withdrawal from a substance may attempt to make sense out of the disjointed and seemingly incoherent memories of events that occurred while intoxicated. In an effort to make sense of and organize what memories are intact, a person may confabulate or fill in the memory lapses with events that seem probable or which for some reason they come to believe "must have" taken place.

<u>Antisocial Personality Disorder:</u> The essential feature of antisocial personality disorder is a pervasive pattern of behavior that disregards and violates of the rights of others. It often begins in early childhood or early adolescence and continues into adulthood. If an individual with antisocial personality disorder is likely to lie to achieve power and pleasure, a false allegation of sexual assault might be the means by which he or she attempts to achieve power over the falsely accused. Falsely claiming someone sexually assaulted you can be an aggressive act and a lack of remorse could allow the individual to file an allegation of sexual assault and maintain this allegation with few, if any, conflicts of conscience. Thus, a pathway to a false allegation of sexual assault can occur when an individual with antisocial personality disorder makes a false claim of assault.

<u>Borderline Personality Disorder</u>: Borderline personality disorder (BPD) is a serious mental condition characterized by affective dysregulation, impulsiveness, difficulties in interpersonal relationships, and difficulties with self-image.  Of particular note is the rapid switching from idealization to devaluation, impulsivity, and manipulative features of borderline personality disorder. The instability of relationships experienced by an individual with BPD may be rooted in the tendency to quickly switch from idealizing significant others or lovers to devaluing them. This sudden change in conceptualization of a partner is often caused by feeling that the partner is not caring enough or giving enough or by suspicion of abandonment. The rapid shifting between idealizing and demonization may bring about a change in perspective such that a relationship that was viewed idealistically in the past is now seen through the devalued lens of abuse or mistreatment. Past events then may become construed as "abuse" and may lead a person

Comey, Moe, Pomerantz and Rohrbach
November 1, 2021
Page 9

with BPD to believe he or she is a victim of sexual assault. Previous research has found that two of the three major motivations to file a false allegation of rape were attention-seeking and revenge. The switch from idealization to devaluation of the relationship and/or relationship partner may spur a desire for revenge for any past behaviors that are, in the devaluation phase, newly construed as mistreatment. Also, there is some evidence that individuals with BPD engage in behaviors that are viewed as "manipulative." Manipulative behaviors are often outside the conscious awareness of the individual and are learned through positive reinforcement, as manipulation frequently results in positive outcomes for the manipulator. Thus, an individual with BPD may use a sexual assault allegation as a way of impacting a third party for some desired outcome.

<u>Histrionic Personality Disorder</u>: Diagnostic criteria for histrionic personality disorder include: 1) feeling uncomfortable in situations in which he or she is not the center of attention; 2) interactions with others are often characterized by inappropriate sexually seductive or provocative behavior; 3) displaying rapidly shifting and shallow expressions; 4) consistently uses physical appearance to draw attention to the self; 5) has a style of speech that is excessively impressionistic and lacking in detail; 6) shows self-dramatization, theatricality, and exaggerated expression of emotion; 7) is suggestible (i.e., easily influenced by others or circumstances), and 8) considers relationships to be more intimate than they actually are. Other relevant behaviors include the tendency to play out stereotyped roles in their relationships with others; an intense desire for novelty and excitement; and the upset and depression that may follow periods in which they received little attention. Filing a false allegation of sexual assault may serve to benefit individuals with histrionic personality disorder in several important ways. The sexualized behavior of individuals with histrionic personality disorder can lead to sexual relationships that may be used to seek attention (e.g., having sex with a person and telling all of their friends about it). Filing a false sexual assault claim may regain lost attention, either from the desired partner or from other individuals, providing a novel and exciting environment that may be stimulating to a person who is histrionic. They may enjoy the large amounts of attention received for filing a sexual assault charge and for the "victim" role that can be played out in other relationships (a dynamic also common in false allegations by those with borderline personality disorder). In times when attention is not being received to the desired level, a false allegation of sexual assault may help to pull individuals with histrionic personality disorder out of their depressed state.

<u>Delirium</u>: Delirium is a disturbance of consciousness that is accompanied by a change in cognition that cannot be better accounted for by a preexisting or evolving dementia.  Relevant to this pathway are the perceptual disturbances that may be present, including misinterpretations, illusions, or even hallucinations.  Many substances induce delirium, particularly in excessive doses.

<u>Psychotic Disorders</u>: The term psychotic generally refers to conditions that are marked by delusions, hallucinations, or markedly illogical thinking. Such conditions cause gross impairments in functioning. Studies investigating the content of delusions have found delusions that are sexual in nature are not uncommon and occur more often in women than in men. Some cases of sexual delusions have been documented. These delusions may lead a person to claim adamantly that sexual relations or events occurred that may be impossible or highly improbable.

Comey, Moe, Pomerantz and Rohrbach
November 1, 2021
Page 10

<u>Dissociation</u>: Dissociation is 'the lack of the normal integration of thoughts, feelings, and experiences into the stream of consciousness and memory. Dissociation involves a disruption or splitting off of memory, personality, identity, consciousness, or general perceptions of the self and surroundings; it can be recurring, gradual, or transient. It is likely associated with memory distortions. Thus, it is possible that in the event of a sexual assault, dissociation may cause a person to fill in the parts of the experience that are not clearly remembered with events that for them feasibly could have occurred. Of course, memory lapses will not necessarily be filled in with a confabulated event, let alone a sexual one. However, individuals who dissociate at a high frequency may seek to make their stories more coherent by adding details to an incomplete memory that would make sense to them when considered in the context of the event. Thus, these confabulations may lead to erroneous claims that have forensic relevance, including who the perpetrator was, what happened, where, and how many times.

<u>Intellectual Disability</u>: Intellectual disability, is characterized by below average IQ and adaptive functioning. Limitations in functioning include deficits in the acquisition of social, occupational, academic, and general self-care skills. Intellectual disability has several etiologies that often are related to biological or pathological processes affecting the central nervous system. Many of the specific vulnerabilities that arise from intellectual disability overlap to some extent with other disorders (e.g., autism spectrum disorders, cerebral palsy, fetal alcohol syndrome) and individuals with other developmental disabilities may also have intellectual disability. Intellectually disabled individuals, compared to individuals without ID, have vulnerabilities related to memory and communication that the legal system may not be equipped to handle adequately. Individuals with moderate-to-profound ID may have significant difficulty communicating about the events that occurred because of language skills deficits or other communication-interfering conditions (e.g., related neurological conditions). Research findings indicate that communications skills are essential in filing a sexual assault charge; alleged victims with mild ID were more likely than individuals with moderate or severe ID not only to file sexual assault charges but to have their allegations confirmed. Difficulties with memory may also complicate the investigation process for individuals with ID.

Changes in the core details of the allegation are often used by professionals as indices in determining the credibility of a victim's claims. Peace and colleagues (2015) conducted a narrative analysis of 147 sets of allegations of sexual assault across short (3 month) and long (6 month) intervals since the alleged event took place. In reviewing the existing literature, Peace and colleagues found that genuine traumatic experiences have a demonstrable resiliency to drastic impairments in recall. However, some inconsistencies especially in less core matters are to be expected due to some less important details fading or varying over time. In examining their sample of 147 allegations, the researchers discovered that truthful allegations contained more detail relative to false allegations at each of the assessment intervals. Specifically, the researchers found that fabricated allegations of traumatic experiences contained more inconsistent details both at 3 months and 6 months. The total amount of detail for each type of allegation (true or false) does tend to decrease over time. Additionally, as these figures suggest, the researchers found that the number of details present in genuine reports continued to decrease over time whereas fabricated stories 'levelled off' in detail.

Comey, Moe, Pomerantz and Rohrbach
November 1, 2021
Page 11

Hunt and Bull (2012) reviewed signs that can be used to differentiate true allegations of sexual assault from false ones and concluded that the literature did not support the hypothesis that emotional distress was predictive of the truthfulness of the allegation. This is consistent across the literature, and emotional distress (e.g., crying) is not regarded as a reliable predictor of the accuracy or truthfulness of an allegation. Additional research is needed, but at this point there is little empirical support to indicate that being emotionally upset, distressed, or crying while reporting an assault indicates that the report is more likely to be true. This is likely due to the fact that such reactions can also occur in false allegations for various reasons, including a false memory or an attempt to mislead by those who know this sort of reaction would be expected of a true allegation.

Individuals who have been sexually assaulted have higher rates of mental disorders than individuals who have not been sexually assaulted, and this includes significantly higher rates of post-traumatic stress disorder, depression, bipolar disorder, drug use disorders, and alcohol use disorders. Emily R. Dworkin, Risk for Mental Disorders Associated with Sexual Assault: A Meta-Analysis, 21 Trauma, Violence, & Abuse (2020), pp. 1011-1028. Any of these mental disorders that occur more frequently among those who have been sexually assaulted can affect memory and recall, requiring assessment on a case-by-case basis.

Varying degrees of post-traumatic stress symptomatology occur in significant proportions of victims following sexual assault and last for varying durations. Emily R. Dworkin, Anna E. Jaffe, Michele Bedard-Gilligan, and Skye Fitzpatrick, PTSD in the Year Following Sexual Assault: A Meta-Analysis of Prospective Studies, Trauma, Violence, & Abuse (2021) https://doi.org/10.1177/15248380211032213. A substantial number of people never fully remit from their PTSD even after many years, and variables associated with a longer time to remit from an episode of chronic PTSD include a history of alcohol abuse and a history of childhood trauma. Caron Zlotnick, Meredith Warshaw, et al., Chronicity in Posttraumatic Stress Disorder (PTSD) and Predictors of Course of Comorbid PTSD in Patients with Anxiety Disorders,12 J. Traumatic Stress (1999), 89-100.

Symptoms of PTSD include distressing memories of the event; intense or prolonged psychological distress at exposure to cues that symbolize or resemble an aspect of the traumatic event; marked physiological reactions to cues that symbolize or resemble an aspect of the traumatic event; avoidance or efforts to avoid distressing memories, thoughts, or feelings about or closely associated with the traumatic event(s); and avoidance of or efforts to avoid external reminders (people, places, conversations, activities, objects, situations) that arouse distressing memories, thoughts, or feelings about or closely associated with the traumatic event(s). American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 5th Ed., Arlington, VA: American Psychiatric Association (2013), pp. 271-272. Individuals with any of these symptoms are particularly unlikely to engage in continued communication or friendly gestures with an alleged perpetrator, to wear clothing provided by an alleged perpetrator, or to unnecessarily recreate a sexual assault event, any of which would be expected to elicit intense distress.

### C. Dr. Ryan Hall

███████████████████████████████████████████████████████████████ Dr. Hall's curriculum vitae is attached as Exhibit D. His report is attached as Exhibit E. Attached as Exhibit F is a list of material reviewed by Dr. Hall.

Dr. Hall is an expert in the field of forensic psychiatry and will offer opinions as such. He will offer the opinions and diagnoses contained in his report, the bases for those opinions, and the significance of the diagnoses and opinions. █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

### D. Bennett Gershman

Professor Gershman is a Distinguished Professor of Law at the Elisabeth Haub School of Law of Pace University since its founding as the Pace Law School in 1976. He has also taught as a visiting professor at Cornell Law School and Syracuse Law School. Prior to coming to Pace, he was a prosecutor in the Manhattan District Attorney's Office and the New York State Anti-Corruption Office. Professor Gershman's extensive scholarship has had an essential role in establishing the study of prosecutorial misconduct, a subject at the intersection of criminal procedure and professional ethics. He is a leading authority on prosecutorial misconduct and the author of the treatise, Prosecutorial Misconduct, a preeminent resource for scholars and practitioners.

We expect Professor Gershman to provide testimony on best practices to ensure the integrity of any prosecution, focusing on investigation, witness preparation, media contact, neutrality, obligations to provide accurate information, and relationship with crime victims, their counsel, and case-related civil litigation. His extensive experience and credentials are recited in his curriculum vitae, annexed as Exhibit G.

### E. Robert Kelso

Mr. Kelso is CEO of Forensic Pursuit.  He has over 25 years of experience in computer forensics, engineering and software technology.  He holds Bachelor's and Master's degrees from University of Colorado at Boulder in aerospace engineering and astrodynamics, respectively.  He is currently an adjunct professor at University of Denver teaching computer forensics at the Master's level.  He holds multiple computer forensics certifications including EnCE, CHFI, ACE and AME.  His curriculum vitae is attached.  Exhibit H.  Mr. Kelso has previously testified in federal and state courts as an expert witness in computer forensics and has been appointed a "special master" by the court on multiple occasions.

We anticipate that Mr. Kelso will testify about the user data associated with certain devices seized and searched by the government's team in this case,  documents and photographs extracted from certain of those devices, and the metadata associated with certain documents and photographs.  He may also testify generally about computer forensic principles associated with the creation of documents, storage and retrieval of digital documents and photographs, including

Comey, Moe, Pomerantz and Rohrbach
November 1, 2021
Page 13

the limits to the information that can be gleaned from the metadata. Mr. Kelso may testify in rebuttal to any testimony offered by the government through Stephen Flatley. As trial preparation proceeds, the defense will update the topics for Mr. Kelso if any arise.

### F.  John Lopez

Mr. Lopez was a Special Agent with the United States Department of the Treasury, Internal Revenue Service, Criminal Investigation ("IRS-CI") for over twenty-five years. During his tenure at IRS-CI, Mr. Lopez led the New York Asset Forfeiture Task Force and participated in numerous criminal investigations involving complex fraud, corruption, bribery, tax evasion, money laundering, and asset forfeiture. Since retiring from the IRS in 2013, Mr. Lopez has worked as a financial investigator and consultant for several private investigation companies and government enforcement agencies. He currently runs his own private financial investigation and consulting company called JDL Services, Inc. Mr. Lopez holds a bachelor's degree in Business Administration, Accounting and Finance from Pace University. His curriculum vitae is attached as Exhibit I.

It is expected that Mr. Lopez will testify about his review of certain financial records provided by the government in discovery. Specifically, Mr. Lopez will discuss various transfers of funds that are reflected in the financial records and explain the information contained in the financial records regarding those transfers.[1]

### G.  Gerald LaPorte

Mr. LaPorte is a Forensic Chemist and Document Dating Specialist with the firm Riley Welch LaPorte &Associates Forensic Laboratories. He currently is the Director of Research Innovation for Florida International University, Global Forensic and Justice Center. Prior to that, he was the Director of the U.S. Department of Justice, National Institute of Justice, Office of Investigative and Forensic Sciences. He has testified as an expert witness in numerous cases and has multiple professional honors in this field. His curriculum vitae is attached.  Exhibit J

Defendant anticipates the receipt of documents produced by the government and documents received pursuant to defense subpoena included but not limited to ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ These documents may require analysis regarding the dates of creation, completeness, alteration and manipulation. When these documents are disclosed, Defendant will seek to have them analyzed and present testimony on the analysis as needed.

---

[1] The defense does not believe that the Court needs to qualify Mr. Lopez as an expert to offer the proposed testimony. Nevertheless, we hereby notice Mr. Lopez as a potential expert witness in an abundance of caution.

### H. Jennifer Naso

Ms. Naso is a Forensic Document Examiner who worked for and received specialized training from the United States Secret Service as a Document Analyst. Ms. Naso has a Master's of Science in Forensic Science and a Bachelor of Arts in Psychology. She has over 15 years of experience examining and determining authorship and authentication of documents. Her curriculum vitae is attached as Exhibit K.

Defendant anticipates the receipt of documents produced by the government and pursuant to defense subpoena included but not limited to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ These documents may require analysis regarding the dates of creation, completeness, alteration and manipulation. When these documents are disclosed, Defendant will seek to have them analyzed and present testimony on the analysis as needed.

## II. RESERVATION OF RIGHTS

The defense reserves the right to amplify the disclosures contained herein based on testimony and other evidence presented during the government's case-in-chief. The defense also reserves the right to call additional expert witnesses and will promptly provide additional disclosure notice.

## III. RIGHT TO SUPPLEMENT

Ms. Maxwell reserves the right to supplement these opinions depending on the evidence produced at trial. To the extent that any accuser claims to have been "groomed" or otherwise testifies to the challenged opinions of Dr. Rocchio or other opinions properly rebutted by expert testimony Ms. Maxwell reserves the right to identify and rebut this testimony after the close of the government's case in chief.

Very Truly Yours,

Jeffrey S. Pagliuca

Enclosures