UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

GHISLAINE MAXWELL,

Defendant.

S2 20 Cr. 330 (AJN)

# THE GOVERNMENT'S MEMORANDUM OF LAW
## IN SUPPORT OF ITS MOTION *IN LIMINE* TO PRECLUDE EXPERT TESTIMONY OF DR. PARK DIETZ AND DR. ELIZABETH LOFTUS

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Maurene Comey
Alison Moe
Lara Pomerantz
Andrew Rohrbach
Assistant United States Attorneys
    *Of Counsel*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................. 1

I.   THE COURT SHOULD PRECLUDE CERTAIN OPINIONS FROM DR. DIETZ ............... 1

    A.   Background ............................................................................................................. 1

    B.   Legal Standard ....................................................................................................... 6

    C.   Discussion .............................................................................................................. 9

        1.   Response to the Opinions of Dr. Rocchio ................................................... 9

        2.   Opinions as to Hindsight Bias ................................................................... 12

        3.   Opinions as to the "Halo Effect" .............................................................. 15

        4.   Opinions as to "Pathways to False Allegations of Sexual Assault" .......... 18

        5.   Opinions Regarding the Credibility of Witnesses ..................................... 22

        6.   Opinions Regarding Post-Traumatic Stress Symptoms ............................. 23

II.  CERTAIN ASPECTS OF THE PROPOSED EXPERT TESTIMONY OF  DR.
    ELIZABETH LOFTUS SHOULD BE PRECLUDED ................................................. 25

    A.   Background ........................................................................................................... 25

    B.   Applicable Law ..................................................................................................... 26

    C.   Discussion ............................................................................................................ 30

        1.   Opinions as to False Memory Formation .................................................. 30

        2.   Commonsense Principles Within the Ken of the Jury ............................... 33

        3.   Opinions Bearing on Witness Credibility and Demeanor .......................... 34

        4.   Factual Narratives About the Case ............................................................ 35

III. IF DEFENSE CHALLENGES TO DR. ROCCHIO ARE ACCEPTED, THE DEFENSE
    EXPERTS SHOULD BE EXCLUDED ..................................................................... 35

CONCLUSION ............................................................................................................... 37

## **TABLE OF AUTHORITIES**

**Cases**

*Adams v. Lab. Corp. of Am.*, 760 F.3d 1322 (11th Cir. 2014)......................................... 14
*Amorgianos v. Nat'l R.R. Pass. Corp.*, 303 F.3d 256 (2d Cir. 2002) ................................. 8
*Barnette v. United States*, No. 12 Civ. 327, 2021 WL 949848 (W.D.N.C. March 12, 2021) ...... 19
*Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18 (2d Cir. 1996)........................................... 10, 26
*Bourjaily v. United States*, 483 U.S. 171 (1987) ............................................................ 6
*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)........................................ passim
*deWit v. UPS Ground Freight, Inc.*, No. 16 Civ. 36, 2017 WL 5905575 (N.D. Fl. Jul. 25, 2017)
........................................................................................................................... 16
*Doe by and through Pike v. Pike*, 405 F. Supp. 3d 243 (D. Mass. 2019) ............................. 15, 16
*Doe by and through Pike v. Pike*, No. 17 Civ. 40021 (D. Mass.).................................... 16
*Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997) ............................................................... 7
*Highland Capital Mgmt.* v. *Schneider*, 551 F. Supp. 2d 173 (S.D.N.Y. 2008) ..................... 9
*Hygh v. Jacobs*, 961 F.2d 359 (2d Cir. 1992) .......................................................... passim
*Island Intell. Prop. LLC v. Deutsche Bank AG*, No. 09 Civ. 2675 (KBF), 2012 WL 526722
   (S.D.N.Y. Feb. 14, 2012) ...................................................................................... 8, 20, 39
*Kumho Tire Co., Inc. v. Carmichael*, 526 U.S. 137 (1999) .......................................... 7, 10
*Lam v. City of San Jose*, No. 14 Civ. 877 (PSG), 2015 WL 6954967 (N.D. Cal. Nov. 10, 2015) 32
*LaSalle Bank Nat'l Ass'n v. CIBC Inc.*, No. 08 Civ. 8426 (WHP) (HBP), 2012 WL 466785
   (S.D.N.Y. Feb. 14, 2012) ...................................................................................... 9
*Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110 (2d Cir. 2006)................................. 1
*LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612 (S.D.N.Y. 2016)... 10,
   24, 26
*Marx & Co. v. Diners Club, Inc.*, 550 F.2d 505 (2d Cir. 1977)................................... 9
*Nimely v. City of New York*, 414 F.3d 381 (2d Cir. 2005).......................................... 7, 22
*P.S. ex rel. Nelson v. The Farm, Inc.*, 658 F. Supp. 2d 1281 (D. Kan. 2009)............................. 27
*R.D. v. Shohola, Inc.*, 16 Civ. 01056, 2019 WL 6053223 (M.D. Pa. Nov. 15, 2019) ...... 32, 33, 38
*United States v. Amaral*, 488 F.2d 1148 (9th Cir. 1973) .......................................... 31
*United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991)........................................... 21
*United States v. Carter*, 410 F.3d 942 (7th Cir. 2005)................................................. 29
*United States v. Curry*, 977 F.2d 1042 (7th Cir. 1992)........................................... 30, 31
*United States v. Duncan*, 42 F.3d 97 (2d Cir. 1994)............................................... 9
*United States v. George*, 975 F.2d 1431 (9th Cir. 1992).......................................... 31
*United States v. Heine*, No. 15 Cr. 238 (SI), 2017 WL 5260784 (D. Or. Nov. 13, 2017) 30, 31, 33
*United States v. Labansat*, 94 F.3d 527 (9th Cir. 1996) .......................................... 29, 37
*United States v. Libby*, 461 F. Supp. 2d 3 (D.D.C. 2006)....................................... passim
*United States v. Lumpkin*, 192 F.3d 280 (2d Cir. 1999) ..................................... 23, 24, 25, 38
*United States v. Mathis*, 264 F.3d 321 (3d Cir. 2001) ............................................... 33
*United States v. Moore*, 798 F.2d 1308 (5th Cir. 1986).......................................... 31
*United States v. Mulder*, 273 F.3d 91 (2d Cir. 2001)............................................ 14, 22
*United States v. Mustaga*, 753 F. App'x 22 (2d Cir. 2018) (summary order) ......................... 18
*United States v. Randall*, No. 19 Cr. 131 (PAE) (S.D.N.Y.)........................................ 10
*United States v. Redwood*, 216 F. Supp. 3d 890 (N.D. Ill. 2016)................................ 30
*United States v. Seltzer*, 794 F.2d 1114 (6th Cir. 1986) .......................................... 32

*United States v. Shiraishi*, No. 17 Cr. 582 (JMS) (RLP), 2019 WL 1386365 (D. Haw. Mar. 27, 2019) ................................................................................................................... 30, 31, 32

*United States v. Smith*, 148 F. App'x 867 (11th Cir. 2005) ............................................ 29

*United States v. Stroming*, 838 F. App'x 624 (2d Cir. 2021) (summary order) ......................... 18

*United States v. Thomas*, 116 F.3d 606 (2d Cir. 1997) ................................................ 18

*United States v. Valle*, No. 12 Cr. 847 (PGG), 2013 WL 440687 (S.D.N.Y. Feb. 2, 2013) .......... 3

*United States v. Washington*, 705 F.2d 489 (D.C. Cir. 1983) ....................................... 18

*United States v. Welch*, 368 F.3d 970 (7th Cir. 2004) .............................................. 37

*United States v. Yousef*, 327 F.3d 56 (2d Cir. 2003) ............................................. 7, 10

*Yates v. State*, 171 S.W.3d 215 (Tex. App. 2005) ................................................... 19

## Other Authorities

Bennett & O'Donohue, "The Construct of Grooming in Child Sexual Abuse, 23 J. Child Sexual Abuse 957 (2014) .......................................................................................... 11

Craven et al., "Sexual grooming of children," 12 J. Sexual Aggression 287 (2006) .................. 11

Park Dietz, "Grooming and Seduction", 33 J. Interpersonal Violence 28 (2018) ...................... 24

R. Schmechel, T. O'Toole, C. Easterly, & E. Loftus, *Beyond the Ken? Testing Jurors' Understanding of Eyewitness Reliability Evidence,* 46 Jurimetrics J. 177-214 (2006) ........... 31

## Rules

Fed R. Evid. 70 ............................................................................. passim

Fed. R. Evid. 704(a) .............................................................................. 8

Fed. R. Crim. P. 26.2 ............................................................................ 25

Fed. R. Evid. 401 ................................................................................ 7

Fed. R. Evid. 403 .......................................................................... passim

Fed. R. Evid. 703 ........................................................................ 30, 33, 35

Fed. R. Evid. 704 adv. comm. n. ................................................................... 8

## PRELIMINARY STATEMENT

The Government respectfully moves to preclude certain opinions from Dr. Park Dietz and Dr. Elizabeth Loftus.  Rather than focus narrowly on reliable opinions that would be relevant to issues in this case, the defendant proposes to have Dr. Dietz and Dr. Loftus testify broadly about a wide variety of topics, from testimony about various psychological disorders to testimony regarding the generation of false memories in laboratory settings, that are not helpful to the jury. Many of those opinions are also unreliable, squarely within the ken of the average juror, or would invade the province of the Court and the jury if offered.

To the extent Dr. Rocchio is permitted to testify on her opinions, the Court should admit reliable opinions on the same topics by defense experts.  But the defense's expert notice for Dr. Dietz and Dr. Loftus is far more expansive, and some of the defense's responsive opinions are not reliable.  The Court should preclude many of their opinions.

## I.   THE COURT SHOULD PRECLUDE CERTAIN OPINIONS FROM DR. DIETZ

### A. Background

As described in the defense expert notice, attached as Exhibit A[1], the defense offers the opinions of Dr. Dietz, an expert psychiatrist, both in response to the Government's expert Dr. Lisa Rocchio and on several other subjects.

---

[1] The Government moves to file a redacted version of Exhibit A and to seal Exhibit B.  The proposed redactions are consistent with the three-part test articulated by the Second Circuit in *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110 (2d Cir. 2006).  Although these exhibits are judicial documents subject to the common law presumption of access, the proposed redactions are narrowly tailored to protect the privacy interests of victims, including victims who have not been publicly identified, and who are a subject of the Court's order granting the motion to let certain victims and witnesses testify under pseudonyms, and third parties.  Because the Government has already moved to file a redacted version of Exhibit A (*see* Dkt. No. 418), the same version is attached to this motion.

As to Dr. Rocchio's opinions, Dr. Dietz offers the following responsive opinions:

- The word "grooming" "imputes motive and intent without adequate evidence of either," including to the defendant.  (Ex. A at 3).

- "[G]rooming has no consistent definition, and concerns have been raised that there is no valid method to assess whether grooming has occurred or is occurring."  (*Id.* at 4 (citation and internal quotation marks omitted)).

- "In any particular population of alleged victims, patients, or plaintiffs—including those whom Dr. Rocchio has treated or evaluated—the determination of whether grooming has occurred is a subjective judgment hinging largely on the credibility of individuals. Such judgments have no known error rate and cannot be tested, verified, or reproduced."

- "There is no generally accepted theory of grooming by third parties," and it is not accepted in the relevant community.  "[I]t has not and cannot be tested; and there is no known or potential rate of error."

- The notion that "individuals with particular vulnerabilities are often targeted by perpetrators of sexual abuse" is "a commonly accepted bit of clinical lore" that is "not based on empirical data."

As explained below, the Government agrees that Dr. Dietz may offer an opinion on the difficulty of accurately determining whether an act constitutes grooming, in response to Dr. Rocchio. Although his remaining opinions purport to respond to Dr. Rocchio, however, they are themselves unreliable or invade the province of the jury, and should be precluded.

Beyond his response to Dr. Rocchio's opinions, Dr. Dietz offers several additional opinions, to which the Government objects as discussed herein.  As to "hindsight bias," Dr. Dietz opines:

- Hindsight bias, or "the tendency to overestimate how predictable or foreseeable an event is after being informed about the outcome of an event," exists and has been found in various experiments.  (Ex. A at 4-5).

- Hindsight bias "affects legal judgments."  (*Id.* at 5).

2

- Awareness of the impact of hindsight bias "should temper any claims that so called 'grooming' behaviors should have been noticed and either reported or avoided and that failing to do so constitutes knowledge or intent." (*Id.*).

As set forth below, the Government objects that these opinions are within the ken of the jury and invade the province of the jury and the Court.

Dr. Dietz also offers the following opinions as to the "Halo effect":

- The "Halo effect" is "a cognitive bias in impression formation whereby the positive evaluation of one characteristic has a radiating effect on how other, non-related characteristics of the individual are evaluated." (*Id.*).

- "Like many people who achieve great power and wealth, Jeff[re]y Epstein exploited the Halo effect to surround himself with people who would serve his needs." (*Id.* at 6).

- Epstein's personality flaws "allowed him to use his brilliance to manipulate people to do his bidding and to compartmentalize people into isolated cells in which none had complete information about his activities." (*Id.* at 7).[2]

As set forth below, the Government objects that these opinions are an irrelevant invitation to jury nullification and an improper vehicle for introducing a factual narrative.

Dr. Dietz offers a lengthy series of objectionable opinions as to "Multiple Pathways to False Sex Assault Allegations." (*Id.* at 7).  In relevant part, Dr. Dietz opines:

- "False allegations of sexual assault do occur, and there are multiple pathways to these false allegations of sexual assault." (*Id.* at 7).

---

[2] The disclosure also notes that "Dr. Dietz is also prepared to address Jeffrey Epstein's sexual behavior should it prove relevant" (*id.* at 7), but as he has not disclosed what opinions he may have about Epstein's sexual behavior, he has not provided adequate notice as to them and the Government does not address them further herein except to note that it will object if he attempts to offer them.  *See, e.g.*, *United States v. Valle*, No. 12 Cr. 847 (PGG), 2013 WL 440687, at *5 (S.D.N.Y. Feb. 2, 2013) ("Merely identifying the general topics about which the expert will testify is insufficient; rather, the summary must reveal the expert's actual opinions.").

3

He also lists these "pathways," in terms at times "drawn nearly verbatim" from a 2012 article in a forensic psychology journal, along with conjectures of ways in which these mental conditions or circumstances could hypothetically lead to false claims of sexual assault, including the following examples:

- "Lying": "Often, humans lie because of what they perceive as the favorable consequences for lying; for sexual assault these consequences could be . . . the severe negative consequences that the alleged perpetrator experiences . . . secondary gain from victim status . . . excusing behaviors or characteristics of the alleged victim (e.g., sexual activity, pregnancy, sexually transmitted diseases) [or] financial gain."  (Ex. A at 7).

- "Implied Consent": "A false allegation can arise when it was reasonable to believe consent was given but the alleged victim falsely believes that it was not."  (*Id.* at 7-8).

- "False Memory": Dr. Dietz cites principally to the work of Dr. Loftus in describing the existence of false memories.  (*Id.* at 8).

- "Intoxication": "A person who does not accurately recall events that occurred while he or she was under the influence or while experiencing the side effects of withdrawal . . . may confabulate or fill in the memory lapses with events that seem probable or which for some reason they come to believe 'must have' taken place."  (*Id.*).

- "Antisocial Personality Disorder": "If an individual with antisocial personality disorder is likely to lie to achieve power and pleasure, a false allegation of sexual assault might be the means by which he or she attempts to achieve power over the falsely accused."  (*Id.*).

- "Borderline Personality Disorder": "[A]n individual with BPD may use a sexual assault allegation as a way of impacting a third party for some desired outcome."  (*Id.* at 8-9).

- "Histrionic Personality Disorder": "In times when attention is not being received to the desired level, a false allegation of sexual assault may help to pull individuals with histrionic personality disorder out of their depressed state."  (*Id.* at 9).

- "Delirium": "Relevant to this pathway are the perceptual disturbances that may be present, including misinterpretations, illusions, or even hallucinations."  (*Id.*).

- "Psychotic Disorders": "[D]elusions may lead a person to claim adamantly that sexual relations or events occurred that may be impossible or highly improbable."  (*Id.* at 9).

- "Dissociation": "[I]t is possible that in the event of a sexual assault, dissociation may cause a person to fill in the parts of the experience that are not clearly remembered with events that for them feasibly could have occurred." (*Id.* at 10).

- "Intellectual disability": "Intellectually disabled individuals, compared to individuals without ID, have vulnerabilities related to memory and communication that the legal system may not be equipped to handle adequately." (*Id.*).

As set forth below, the Government objects that these opinions invade the province of the jury, are within the ken of the jury, are unhelpful and prejudicial, are unreliable, and lack fit to any issue to be tried in this case.

Dr. Dietz also offers several opinions generally related to the evaluation of witness credibility:

- "Changes in the core details of the allegation are often used by professionals as indices in determining the credibility of a victim's claims." (Ex. A at 10).

- "Additional research is needed, but at this point there is little empirical support to indicate that being emotionally upset, distressed, or crying while reporting an assault indicates that the report is more likely to be true." (*Id.* at 11).

- "Individuals who have been sexually assaulted have higher rates of mental disorders than individuals who have not been sexually assaulted," and such disorders "can affect memory and recall, requiring assessment on a case-by-case basis." (*Id.* at 11).

As set forth below, the Government objects that these opinions invade the province of the jury and are prejudicial.

Finally, Dr. Dietz offers the following opinions regarding post-traumatic stress disorder ("PTSD"):

- Significant portions of victims following sexual assault exhibit "[v]arying degrees of post-traumatic stress symptomatology." (Ex. A at 11).

- Post-traumatic stress symptoms include (but are not limited to) "distressing memories of the event; intense or prolonged psychological distress at exposure to cues that symbolize or resemble an aspect of the traumatic event; marked physiological reactions to cues that symbolize or resemble an aspect of the traumatic event; avoidance or efforts to avoid distressing memories, thoughts, or feelings about or closely associated with

5

the traumatic event(s); and avoidance of or efforts to avoid external reminders (people, places, conversations, activities, objects, situations) that arouse distressing memories, thoughts, or feelings about or closely associated with the traumatic events(s)." (*Id.*)

- Individuals with this subset of post-traumatic stress symptoms "are particularly unlikely to engage in continued communication or friendly gestures with an alleged perpetrator, to wear clothing provided by an alleged perpetrator, or to unnecessarily recreate a sexual assault event, any of which would be expected to elicit intense distress." (*Id.*).

As discussed below, the Government objects that these opinions are either irrelevant or—to the extent intended to be applied to the context of this case—unreliable.

### B. Legal Standard

Rule 702 of the Federal Rules of Evidence provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

The party that proffers the testimony bears the burden of showing that it is admissible by a preponderance of the evidence. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 & n.10 (1993) (citing *Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987)). A district court's exclusion of expert testimony will be affirmed unless it constitutes an abuse of discretion. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997).

A threshold issue is, of course, whether the witness "is qualified to be an 'expert'" in the subject matter at issue. *See Nimely v. City of New York*, 414 F.3d 381, 396 n.11 (2d Cir. 2005). Testimony from a qualified expert is admissible only if the trial court determines that it is both relevant and reliable. *Daubert*, 509 U.S. at 589-90; *see Kumho Tire Co., Inc. v. Carmichael*, 526 U.S. 137 (1999). Specifically, in *Daubert*, the Supreme Court held that the Federal Rules of Evidence "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." 509 U.S. at 597. "*Daubert* applies to both defense and government experts." *United States v. Yousef*, 327 F.3d 56, 148 (2d Cir. 2003).

Applying Rule 702, the Court must determine whether the expert's reasoning and methodology underlying his testimony is valid, and whether that reasoning or methodology was applied reliably to the facts, so as to be relevant and helpful to the jury. *See Kumho Tire*, 526 U.S. 137. The reliability inquiry is flexible and "must be tied to the facts of a particular case." *Id.* at 150 (citations and internal quotation marks omitted). The Second Circuit has emphasized that "it is critical that an expert's analysis be reliable at every step." *Amorgianos v. Nat'l R.R. Pass. Corp.*, 303 F.3d 256, 267 (2d Cir. 2002). "In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Id.* Minor flaws with an otherwise reliable expert opinion will not bar admission of that evidence; however, the Court should exclude the expert evidence "if the flaw is large enough that the expert lacks 'good grounds' for his or her conclusions." *Id.* (quotation marks omitted).

Rules 401 and 403 of the Federal Rules of Evidence state that relevant evidence is admissible when it tends to make the existence of any fact that is of consequence more or less probable than it would be without the evidence, but it may be excluded if its probative value is substantially outweighed by, among other things, the danger of unfair prejudice, confusion of the issues, and misleading the jury.  "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it.  Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595 (quoting authority omitted).

Among other things, the Court "must consider whether an expert's proposed testimony would usurp the province of the judge to instruct on the law, or of the jury to make factual determinations." *Island Intell. Prop. LLC v. Deutsche Bank AG*, No. 09 Civ. 2675 (KBF), 2012 WL 526722, at *2 (S.D.N.Y. Feb. 14, 2012) (citations omitted).  While Federal Rule of Evidence 704(a) provides that "[a]n opinion is not objectionable just because it embraces an ultimate issue," the Second Circuit has admonished courts to take care "lest [the expert] be allowed to usurp the function of the judge."  *Marx & Co. v. Diners Club, Inc.*, 550 F.2d 505, 511 (2d Cir. 1977). Accordingly, courts must not admit "opinions which would merely tell the jury what result to reach." *Hygh v. Jacobs*, 961 F.2d 359, 363-64 (2d Cir. 1992) (quoting Fed. R. Evid. 704 advisory committee's note); *see also United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) ("When an expert undertakes to tell the jury what result to reach, this does not *aid* the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's." (emphasis in original)).  Nor may an expert opine as to a party's state of mind, credibility, intent, or motive. *See LaSalle Bank Nat'l Ass'n v. CIBC Inc.*, No. 08 Civ. 8426 (WHP) (HBP), 2012 WL 466785, at *7

(S.D.N.Y. Feb. 14, 2012) (collecting cases); *see, e.g.*, *Highland Capital Mgmt.* v. *Schneider*, 551 F. Supp. 2d 173, 182-183, 187 (S.D.N.Y. 2008).

Finally, expert opinion should not be offered where it does not fit the facts of the case. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591 (internal quotation marks omitted); *cf. Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) ("expert testimony should be excluded if it is . . . [*inter alia*] in essence an 'apples and oranges comparison'" (quoting *Shatkin v. McDonnell Douglas Corp.*, 727 F.2d 202, 208 (2d Cir.1984))); *see also LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 642 (S.D.N.Y. 2016) (expert opinion inadmissible where it is "a mismatch for the facts" of the case).

## C. Discussion

### 1. Response to the Opinions of Dr. Rocchio

Although some opinions by Dr. Dietz respond to Dr. Rocchio, each opinion must itself be reliable and relevant, as required by Rule 702. *See Yousef*, 327 F.3d at 148. The Government agrees that at least one of these opinions can meet this test: it is "within the range where experts might reasonably differ," *Kumho Tire Co.*, 526 U.S. at 153, and can be tested through "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert*, 509 U.S. at 596. Specifically, the Government agrees that Dr. Dietz can respond to Dr. Rocchio's testimony about grooming behaviors by suggesting that grooming does not have one settled definition. *See* 2/25/20 Tr. at 36:13-37:14, *United States v. Randall*, No. 19 Cr. 131 (PAE) (S.D.N.Y.) (explaining that, in such a case, "the jury, not the trial court, should be the one to decide among conflicting experts").

That opinion is only one of those noticed by the defense, however.  The defense expert notice includes four other sets of opinions that supposedly respond to Dr. Rocchio but do not satisfy the *Daubert* standard.  *First*, the expert notice—which closely parallels the defense's *Daubert* motion—improperly discusses the facts of this particular case and comments on various legal documents, even though it offers no basis whatsoever to conclude that Dr. Dietz has any legal expertise or has reliably applied any expertise to the facts of this case.  In particular, the notice states that Dr. Dietz will opine that Dr. Rocchio's opinion on grooming "carries the risk of imputing motive and intent to the Defendant" (Ex. A at 3), that "Dr. Rocchio's proposed testimony is silent as to whether she is expected to impute a theory of 'grooming-by-proxy' to the defendant," and that "Ms. Maxwell is not accused of soliciting or enticing sexualized massages for herself," but instead that she "recruited and groomed minors to provide sexualized massages for Mr. Epstein" (*id*. at 4).  These opinions, while potentially relevant to the Court's consideration of a *Daubert* motion, are not properly put before a jury.

*Second*, certain of Dr. Dietz's opinions about grooming are not themselves reliable or invade the province of the jury.  In particular, it is circular to say that "grooming" "imputes motive and intent," because grooming is defined to be a strategic pattern of behavior used to develop relationships of attachment and coercion between perpetrators and victims.  (Ex. A at 3).  That is, if the behaviors lack the requisite motive and intent, they are not grooming behaviors.  If Dr. Dietz's point is that determining motive and intent is for the factfinder (*id.*), the Government agrees—and Dr. Dietz should not be permitted to testify that grooming behaviors "impute[] motive and intent without adequate evidence."  (*Id.*)  The adequacy of the evidence is a question for the jury.  Dr. Rocchio's testimony will inform the jury about the existence of grooming behaviors, but

10

leave to the jury whether such behaviors occurred in this case.  Dr. Dietz is free to tell the jury that, in his view, assessing whether grooming occurred is difficult and subjective.  (*Id.* at 4).  But it invades the province of the jury to go a further step and tell the jury that it lacks evidence to impute motive or intent.  This is, in the most direct way possible, simply telling the jury "what result to reach."  *Hygh*, 961 F.2d at 364 (internal quotation marks omitted).

 *Third*, Dr. Dietz proposes to opine that the notion that perpetrators target vulnerable victims is "a commonly accepted bit of clinical lore" that is unsupported by any empirical data and cannot be verified.  (Ex. A at 4).  *This* claim is itself unsupported by any evidence.  It is also wrong.  For instance, an article cited by Dr. Dietz describes a literature review of sexual abuse involving teachers, which identified "factors that make a child vulnerable to educator sexual abuse, such as problems at home with parents, lack of confidence, and participation in other risky behavior."  (*See* Bennett & O'Donohue, "The Construct of Grooming in Child Sexual Abuse, 23 J. Child Sexual Abuse 957, 964 (2014), Dkt. No. 397 Ex. A; Ex A at 4 (citing the same)).  Other scholars have recognized that "[g]rooming the child begins with recognizing a vulnerable child," such as children with "a poor relationship with their parents," who "do not have many friends," or who "have already been victimized."  (Craven et al., "Sexual grooming of children," 12 J. Sexual Aggression 287, 292 (2006), Dkt. No. 397 Ex. A (citations omitted)).  Dr. Rocchio's clinical experience is supported by the academic literature, in which perpetrators' targeting of vulnerable victims is well established.  Dr. Dietz must do more to show the reliability of his view than simply call this literature "clinical lore" and complain about the lack of data.

 *Fourth*, Dr. Dietz states that "no authority . . . support[s] a theory of grooming-by-proxy."  (Ex. A at 4).  To the extent that Dr. Dietz is pointing to the fact that the term "grooming-by-

proxy"—a term that Dr. Rocchio does not employ and that the defense has attempted to inject into the case—is not supported by the literature, that terminological claim is of course irrelevant to any issue. To the extent that Dr. Dietz purports to claim that there is no authority supporting the notion that a perpetrator can groom a victim for the purpose of making the victim engage in sexual activities with others, this claim is patently unreliable, as Dr. Rocchio will explain at the *Daubert* hearing; there is in fact ample literature on the pimp-prostitute relationship and other instances in which third parties groom an individual for the benefit of someone else. And if the Court excludes Dr. Rocchio's opinion on this issue, Dr. Dietz's opinion is irrelevant.

The Government acknowledges that Dr. Dietz can offer reliable, relevant opinions in response to Dr. Rocchio. But Dr. Dietz's proposed opinions include legal argument, opinions that invade the province of the jury, and opinions that are themselves unreliable. Those should be excluded.

### 2. Opinions as to Hindsight Bias

Dr. Dietz's opinions that hindsight bias exists and should "temper" conclusions about whether to impute knowledge to an individual (Ex. A at 5) do not convey any relevant information beyond the ken of the average juror and are not helpful to the jury. Instead, they are a virtually unprecedented attempt to psychoanalyze *the jurors* and to supplant both their role as judges of the facts and the Court's role in instructing them.

The only possible relevance of hindsight bias in this case is the supposed bias of the jurors themselves. This is not a case where it matters whether the opinion of a witness or a party at some point suffered from hindsight bias. The primary purpose of the testimony is to convince the jurors to "temper" any conclusion that the defendant formed the requisite intent because *the jurors* might be suffering from hindsight bias. (Ex. A at 5). Of course a factfinder should not confuse the

12

benefit of hindsight with what was known at the time.  But this commonplace truth does not need testimony from a psychiatric expert.

The concept of hindsight bias is well within the ken of the average juror.  "Hindsight bias is a common-sense concept—everyone knows that 'hindsight is 20/20.'"  *Adams v. Lab. Corp. of Am.*, 760 F.3d 1322, 1335 (11th Cir. 2014).  The prevalence of this common saying shows that jurors plainly understand the ways in which hindsight can bias one's perspective.  As such, expert testimony on it is unnecessary and inappropriate.  *See id.*  ("[C]ommon-sense concepts are especially appropriate for consideration by a jury."); *see also, e.g.*, *United States v. Mulder*, 273 F.3d 91, 101 (2d Cir. 2001) ("[T]he district court should not admit testimony that is directed solely to lay matters which a jury is capable of understanding and deciding without the expert's help." (citations and internal quotation marks omitted)).  To whatever extent the Court believes further emphasis on this point is helpful, it can give the jury appropriate and neutral instructions to guide its deliberations.  What the defense cannot do is skew the jury's deliberations by putting an expert imprimatur on testimony that states, in effect, that the jurors should second-guess their assessments of the evidence because they are subject to hindsight bias.  This inversion of the courtroom roles— in which a party's witness sits in judgment of the jurors—is prejudicial and usurps the function both of the jurors and of the Court in instructing the jury.  *See, e.g.*, *Hygh*, 961 F.2d at 364 ("Whereas an expert may be uniquely qualified by experience to assist the trier of fact, he is not qualified to compete with the judge in the function of instructing the jury.").

If Dr. Dietz's testimony on hindsight bias is helpful to the jury in this case, testimony of this sort would become central to the court system.  Every single trial involves a retrospective adjudication.  The bulk of trials—civil and criminal—involve an assessment of a party's

knowledge at some point in time before the trial. If a psychiatrist can testify as an expert that the jurors should second-guess their assessments of what was known to a party because the jurors suffer from hindsight bias, surely many litigants—at least those with the resources—would rush to offer such evidence.

Instead of being routine, as it would be if accepted here, expert testimony regarding the hindsight bias of jurors is vanishingly rare. The Government has not been able to find a single reported decision in a federal criminal case in which it was admitted. Indeed, the only instance the Government has located of such evidence being arguably admitted in any federal case was in *Doe by and through Pike v. Pike*, 405 F. Supp. 3d 243, 250 (D. Mass. 2019). In that civil case, however, the issue was scarcely even before the court—the initial motion did not even mention hindsight bias at all, and the movant mentioned the concept in passing only in reply but devoted virtually no substantive argument to it. *See Doe by and through Pike v. Pike*, No. 17 Civ. 40021 (D. Mass.) (ECF Nos. 47 & 50) (memorandum of law and reply). And even in that case the Court did not actually admit the testimony, but "reserve[d] making a final ruling until trial," *Pike*, 405 F. Supp. 3d at 250, before which the case settled. There is thus scant authority countenancing the introduction of opinions such as this.

Indeed, even in the somewhat less prejudicial context of evaluating a *witness's* hindsight bias (instead of the jurors'), expert testimony on hindsight bias has been rejected. In *DeWit v. UPS Ground Freight, Inc.*, the court found that an expert opinion on hindsight bias "merely takes a commonsense concept and applies it to a specific field," and thus did not "concern matters that are beyond the understanding of the average lay person," and ultimately excluded it, reasoning that it "therefore would not be helpful to the jury and offers nothing more than what lawyers for the

14

parties can argue in closing arguments." *deWit v. UPS Ground Freight, Inc.*, No. 16 Civ. 36, 2017 WL 5905575, at *2 (N.D. Fl. Jul. 25, 2017) (citations and internal quotation marks omitted). So too here.[3]

The defense's offer of Dr. Dietz's opinions on hindsight bias to "temper" the jurors' assessment of the evidence is thus virtually unprecedented. If this Court allowed such testimony in this case, however, it would likely become much more common. This Court should decline to open the door to the routine psychoanalysis of the jury in this way.

### 3. Opinions as to the "Halo Effect"

Dr. Dietz's opinions concerning the "Halo effect"—i.e., that "the positive evaluation of one characteristic has a radiating effect on how other, non-related characteristics of the individual are evaluated" (Ex. A at 5)—are irrelevant to any issue to be considered by the jury and appear to be offered in an effort to encourage jury nullification by engendering sympathy for the defendant, as well as to offer a factual narrative based on no reliable evidence through a witness plainly incompetent to do so.

None of the charges in this case relate in any way to the defendant's appraisal of Jeffrey Epstein's character or whether the defendant did or did not view him in the manner suggested by the Halo effect. Simply put, if every word that Dr. Dietz said regarding the "Halo effect" and Epstein's "brilliance" in exploiting it were taken as true, the defendant would be guilty if she met the elements of the charged offenses—exactly as she would be if every word Dr. Dietz said on this

---

[3] Accordingly, even if the defense somehow put at issue whether a witness's opinion on some matter was affected by hindsight bias—and the Government cannot currently envision how this is likely—the proper way of litigating an issue so squarely within the ken of the jury is through lay evidence and argument, not expert testimony. *See deWit*, 2017 WL 5905575, at *2.

subject were disbelieved.  Her knowledge and intent are no different if she participated in the conspiracy due to the Halo effect or for some other reason.[4]  Dr. Dietz's opinions on this topic simply do not tend to negate any element or establish any defense.

Instead of serving any proper purpose, the apparent intent behind offering Dr. Dietz's opinion on the "Halo effect" is to engender sympathy for the defendant.  But juries are not "to act based on their . . . sympathy."  *United States v. Stroming*, 838 F. App'x 624, 627 (2d Cir. 2021) (summary order); *see, e.g.*, *United States v. Mustaga*, 753 F. App'x 22, 37 (2d Cir. 2018) (summary order) ("The district court correctly recognized that evidence of solitary confinement could be used for the improper purpose of provoking juror sympathy.").  Any attempt to encourage such sympathy is therefore an attempt at nullification, which is itself plainly improper.  *See, e.g.*, *United States v. Thomas*, 116 F.3d 606, 615 (2d Cir. 1997) (Jury nullification is "by no means a right or something that a judge should encourage or permit if it is within his authority to prevent."); *id.* at 614 ("We categorically reject the idea that, in a society committed to the rule of law, jury nullification is desirable or that courts may permit it to occur when it is within their authority to prevent."); *see also United States v. Washington*, 705 F.2d 489, 494 (D.C. Cir. 1983) (per curiam) ("A jury has no more '*right*' to find a 'guilty' defendant 'not guilty' than it has to find a 'not guilty' defendant 'guilty,' and the fact that the former cannot be corrected by a court, while the latter can be, does not create a right out of the power to misapply the law.  Such verdicts are lawless, a denial of due process and constitute an exercise of erroneously seized power." (emphasis in original)).

---

[4] Evidence of the defendant's motive may be relevant evidence proving the offense, but evidence that a "Halo effect" gave the defendant a motive to commit the crime has no relevance as *defense* evidence at trial.

Compounding the improper nature of this testimony, the defense appears to seek to use Dr. Dietz to opine as to a complex factual narrative that no reliable process of psychiatric evaluation could produce. Dr. Dietz is not remotely competent to opine that Epstein would "surround himself with people who would serve his needs" (Ex. A at 6), or that he was able to "use his brilliance to manipulate people to do his bidding" or "compartmentalize people into isolated cells in which none had complete information about his activities" (*id.* at 7-8). Dr. Dietz has absolutely no basis to make such broad and sweeping factual claims about Epstein or his relationships with anyone, much less anyone in this case. It appears that Dr. Dietz has reached his conclusions based solely on one interview of Epstein with Steve Bannon in which Epstein "acknowledged that he gravitated to people of power" (Ex. A at 6) and some case documents exchanged in discovery (Def. Expert Notice Ex. C, attached as Exhibit B). This "evidence" does not even support the point—it suggests that Epstein looked to the halos of others, not that he generated one himself. And it is no basis, at all, for Dr. Dietz to suggest to the jury that anyone involved in this case did anything because of Epstein's "halo."[5]

This factual narration of Epstein's life and apparently the lives of other people who interacted with him, a defense summation based on a nullification defense masquerading as an expert witness opinion, is not based on any competent evidence, and in any event is patently not the product of reliable psychiatric methods reliably applied to this case. *See, e.g.*, *Island Intell.*

---

[5] This would not be the first unreliable factual claim made by Dr. Dietz, who testified in a previous criminal case that a defendant got the idea of drowning her children in the bathtub from an episode of Law & Order in which a defendant did so and was acquitted on an insanity defense, when in fact no such episode existed. *See generally e.g.*, *Barnette v. United States*, No. 12 Civ. 327, 2021 WL 949848, *9-10 (W.D.N.C. March 12, 2021). This led to the reversal of the trial conviction of the defendant in that case. *See Yates v. State*, 171 S.W.3d 215, 222 (Tex. App. 2005).

*Prop.*, 2012 WL 526722, at \*2 ("It is also inappropriate for experts to act as . . . vehicles for factual narrative").  This "opinion" should be precluded.

### 4.   Opinions as to "Pathways to False Allegations of Sexual Assault"

The defense's offer of Dr. Dietz's opinions regarding the existence of false allegations of sexual assault and the "multiple pathways to these false allegations of sexual assault" (Ex. A at 7) is a remarkable departure from permissible practice in a criminal trial.  The very form and nature of all of these opinions is highly prejudicial and seeks to invade the province of the jury and displace the Court; the offer of these opinions, which are largely lifted "nearly verbatim" from a single journal article (attached as Exhibit C), is not the product of reliable methods applied to the case; the opinions are well within the ken of the jury; and there is no showing whatsoever of any "fit" between these opinions and the evidence to be presented at trial.

The form of Dr. Dietz's opinions—listing a number of disparate circumstances and personality traits, with no showing of any connection to the evidence of this case, and conjecturing various ways in which they could lead to false allegations of sexual assault—is a breathtaking inversion of proper expert opinion.  To appreciate the audacity of the defense approach, consider if the Government attempted to do something similar.  If the defense put on witnesses at trial, and the Government then called in rebuttal an expert psychiatrist to offer opinions on "Pathways to False Exculpatory Testimony" who opined that a variety of circumstances or mental conditions could hypothetically lead individuals to testify in ways that falsely exculpated a defendant, it is safe to assume that the defense would object.  What the defense offers here is no less inappropriate.

Beyond the obvious problems with the form of the opinions, the opinions themselves are plainly not admissible under Rule 702.  Dr. Dietz's opinion that "[f]alse allegations of sexual assault do occur" (Ex. A at 7), is not helpful to the jury.  There will be no dispute that allegations

18

can be either true or false, and offering an "expert" opinion that allegations can be false is simply prejudicial, not only inviting the jury to speculate about the frequency of false allegations but giving the incorrect impression that they are common.  Indeed, if Dr. Dietz seeks to offer such testimony that false accusations "do occur," it will open the door for the Government to elicit on cross-examination that Dr. Dietz's principal source, which he relies on "nearly verbatim" (Ex. A at 7), concludes that "the most recent more methodologically adequate studies have indicated that false allegations are somewhat rare" (Ex. C at 101 (citing study estimating the frequency of false rape allegations between 2% and 10%)).[6]  Of course, the Government's view is that this entire topic can serve only to distract the jury from its task of determining whether these specific allegations are in fact proven beyond a reasonable doubt, and thus Dr. Dietz should be precluded from offering this opinion.

Many of the "pathways" Dr. Dietz describes are not just within the ken of the jury, they are at the core of the jury's role.  It is not helpful to the jury or permissible under Rule 702 for an expert to testify that "lying," a mistake of "implied consent," or "intoxication" could lead to a false accusation of a crime.  Sorting out witness credibility, mistake, or other such circumstances is squarely the function of the jury, which will be instructed by the Court and which does not need the help of a psychiatrist to assess such possibilities.  *See, e.g.*, *United States v. Mulder*, 273 F.3d

---

[6] The Government typically cannot introduce evidence of the statistical infrequency of false accusations, but if Dr. Dietz is allowed to create a false impression of their *frequency*, it is only fair to allow the Government to correct the record.  *United States v. Bilzerian*, 926 F.2d 1285, 1296 (2d Cir. 1991) ("The weighing of relevance under Rule 403 may be altered when a false impression is created by earlier testimony.  That is, evidence whose probative value might not ordinarily outweigh its prejudicial effect if offered on direct examination is admiss[i]ble to rebut testimony elicited on cross examination that created a false impression." (citations omitted)).

91, 101 (2d Cir. 2001) ("[T]he district court should not admit testimony that is directed solely to lay matters which a jury is capable of understanding and deciding without the expert's help." (internal quotation marks omitted)).

Even as to the opinions that involve psychological conditions, Dr. Dietz's opinions are not helpful to the jury. While Dr. Dietz's descriptions of antisocial personality disorder, borderline personality disorder, histrionic personality disorder, psychotic disorders, delirium, dissociation, and intellectual disability at least involve Dr. Dietz's psychiatric training in some way (unlike pathways such as "lying"), it is hardly beyond the ken of juries to know that mental disorders or altered mental states may at times motivate people to dissemble or to believe things that are not true. Attempting to put the imprimatur of an expert on a variety of ways in which mental disorders can lead to unreliable testimony is simply an attempt to invade the province of the jury by putting a thumb on the scale in their assessment of witness credibility.[7] *See, e.g.*, *Nimely*, 414 F.3d at 398 ("[E]xpert opinions that constitute evaluations of witness credibility, even when such evaluations are rooted in scientific or technical expertise, are inadmissible under Rule 702"); *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999) (barring expert from testifying as to scientific principle related to the assessment of witness credibility as impinging on jury's role).

To the extent Dr. Dietz's opinions include something outside the ken of the average jury—specifically, that these "pathways" purportedly occur frequently in sexual assault cases—they are

---

[7] Dr. Dietz should in any event not offer his opinions on false memory, which are apparently derivative of Dr. Loftus's. Given that the defense has noticed Dr. Loftus as a witness, if any false memory testimony is appropriate, it should come from Dr. Loftus, whose research it is based on, not from Dr. Dietz summarizing Dr. Loftus's research. The admissibility of Dr. Loftus's testimony on false memory is discussed in Section II, *infra*.

not reliable.   The article that Dr. Dietz relies on—in fact "nearly verbatim" (Ex. A at 7)—was intended as a research agenda to explain the (undoubted) instances of false accusations, not to provide a roadmap for establishing the falsity of any allegation.  (*See* Ex. C at 98 ("Part of the focus of the present paper, then, is to bring attention to the dearth of psychological literature investigating correlates and causal mechanisms of false allegations of sexual assault and to propose a model specifying the major causal pathways to false allegations.  These pathways are *intended as a model for further empirical investigation*." (emphasis added))).   Indeed, the authors were emphatic that their article not be misused as a simplistic means of "determining the accuracy of specific accusations."  (Ex. C at 98 ("[A] legitimate concern about enumerating such pathways is the misuse of psychological diagnoses in determining the accuracy of specific accusations.")).

Finally, even to the extent that Dr. Dietz's opinions on any of these "pathways" offers any expertise that is truly beyond the ken of the jury, there is no justification for allowing him to offer these opinions in the abstract without any fit to the facts of the case.  At a minimum, unless and until there is any evidence creating a predicate for the relevance of any of these mental disorders, it is simply irrelevant—and highly prejudicial—for a psychiatric expert to enumerate a number of mental disorders and conjecture that they could cause unreliable testimony.  *See, e.g.*, *LVL XIII Brands, Inc.*, 209 F. Supp. 3d at 642 (finding testimony fails *Daubert*'s "fit" requirement where there is a lack of "record foundation").[8]  Thus even if, contrary to the arguments above, the Court believed some of the opinions on these "pathways" could under some circumstances be helpful to the jury, the Court should defer on the admissibility of such opinions until the evidence at trial

---

[8] Of course, to the extent a witness's mental condition is relevant, it should not be simply the subject of lay diagnosis by the jury, as Dr. Dietz's notice seems to suggest.

creates a predicate that a witness has a condition creating such a "pathway."  And even then, as described above, it is likely that such an opinion, based on one article, would be unreliable, only marginally helpful to a jury that can understand the relationship between mental illness and truth-telling, and highly prejudicial by having an expert witness testify to the credibility of other witnesses.  *See* Fed. R. Evid. 403..

### 5.  Opinions Regarding the Credibility of Witnesses

Dr. Dietz also offers several different opinions regarding the assessment of the credibility of witnesses.  These are also not helpful to the jury.

Dr. Dietz's opinion that emotional distress is not predictive of the truthfulness of an allegation invades the core of a jury's competency—the evaluation of a witness's demeanor. Indeed, in very similar circumstances, the Second Circuit has affirmed the exclusion of scientific expert testimony instructing the jury in how to assess a witness's demeanor.  *See Lumpkin*, 192 F.3d at 289 (barring expert from testifying that "confidence bears little or no relationship to accuracy in identifications," reasoning that "Fundamental to the role of juror as trier of fact is the task of assessing witness credibility.  And, a witness's demeanor on the stand, including his or her confidence, impacts the assessment of credibility.").  The same result should apply here.

Similarly, Dr. Dietz's opinion that "professionals" evaluate "[c]hanges in the core details of the allegations" to determine credibility (Ex. A at 10), also invades the province of the jury. How to reconcile inconsistencies in witness accounts, as part of assessing the credibility of witnesses, is at the core of the jury's function.  *See, e.g.*, *Lumpkin*, 192 F.3d at 289.  The Government expects that the Court will instruct the jury on how to assess the credibility of witnesses, and having one party's witness lay down a set of expert-endorsed rules can only make it more difficult for the jurors to follow the Court's instructions.  *See, e.g.*, *Hygh*, 961 F.2d at 364.

22

Dr. Dietz's opinion that individuals who have been sexually assaulted have higher rates of mental disorders than individuals who have not been sexually assaulted, and that these disorders can affect memory and recall, is prejudicial and unhelpful. Offering this opinion in this form can only serve to prejudice the jury into making generalizations that certain witnesses, as a category, are more likely to be less worthy of belief by reason of mental illness. Given that Dr. Dietz acknowledges that witness credibility should be assessed on a "case-by-case basis" (Ex. A at 11), that case-by-case assessment is best made by precluding him from offering this prejudicial and stereotyping opinion before the jury.

### 6. Opinions Regarding Post-Traumatic Stress Symptoms

Finally, Dr. Dietz opines that "significant proportions" of victims exhibit post-traumatic stress symptomology for "varying durations" and that victims with certain symptoms are "particularly unlikely to engage in continued communication or friendly gestures with an alleged perpetrator, to wear clothing provided by an alleged perpetrator, or to unnecessarily recreate a sexual assault event." (Ex. A at 11).

This opinion is confusing and appears not to be relevant to the facts of the case. First, Dr. Dietz's conclusion that victims with certain post-traumatic stress symptoms are unlikely to "unnecessarily recreate a sexual assault event" is illogical given that it appears to place the responsibility on the victim for experiencing repeated assaults, and at a minimum he should be required to disclose comprehensibly exactly what behavior he is referring to as unlikely.

Second, a critical distinction in this case involves the difference between victims of sexual assaults who are involved an ongoing relationship of attachment and coercion with their abusers— including the power imbalance arising from the age differential between them and the abusers— and those who are not. To the extent Dr. Dietz's testimony primarily addresses the latter category,

23

such an opinion is irrelevant and should be precluded for lack of fit with the facts of the case. *See,*
*e.g.*, *LVL XIII Brands, Inc.*, 209 F. Supp. 3d at 642; *Boucher*, 73 F.3d at 21 ("expert testimony
should be excluded if it is [*inter alia*] in essence an apples and oranges comparison" (internal
quotation marks and ellipsis omitted)).

To the extent Dr. Dietz intends instead to opine on the former category, that opinion is not
reliable.  Such an opinion—essentially that it is highly unlikely for abuse victims to continue
relationships with their abusers after the first act of sexual assault—is patently implausible and
inconsistent with the extensive literature on grooming, the pimp-prostitute relationship, delayed
disclosure of sexual assaults, and delayed onset of PTSD, all of which recognize the relative
frequency with which victims of sexual assaults continue contact with their abusers.  Indeed, such
opinions would seem in great tension even with Dr. Dietz's own writings on grooming; if he truly
believes that abused children are unlikely to continue contact with their abusers or wear clothing
provided by their abusers, it would be hard to see how he could express surprise that "even today,
far too many people, including many who should know better, have difficulty grasping the
possibility of nonforceful, nonthreatening, and nonviolent acquaintance molestation, as their
preconceptions of childhood innocence and predatory molesters are too strong to allow them to
accept that children can be so readily manipulated into doing or allowing things that others find
abhorrent."  (*See* Park Dietz, "Grooming and Seduction", 33 J. Interpersonal Violence 28, 29
(2018), Ex. D; *see also* Ex. A at 3 (citing *id.*)).  .

To the extent Dr. Dietz's opinion is intended to apply to the context of this case, the defense
has clearly not to date carried the burden of establishing that the methods that led Dr. Dietz to offer
this uncited and implausible opinion are subject to peer review and publication, have attained

widespread or general acceptance, or are otherwise reliable. *See Daubert*, 509 U.S. at 593-95, 592 & n.10. Accordingly, unless the defense meets its burden of affirmatively establishing that this opinion, as applied to the context of this case, meets the *Daubert* reliability standard, it should be precluded. *See, e.g.*, *P.S. ex rel. Nelson v. The Farm, Inc.*, 658 F. Supp. 2d 1281, 1288 (D. Kan. 2009) (excluding as unreliable an expert's opinion that children typically report abuse in response to direct questioning without holding hearing). Should the defense come forward with some evidence of reliability in its response papers, the Government would respectfully request an opportunity to reply or, in the alternative, a *Daubert* hearing to probe the issue.

To the extent Dr. Dietz seeks to apply his opinions to the context of this case, the defendant has not established the reliability of these opinions, which should be precluded or, at a minimum, explored at a hearing. And to the extent Dr. Dietz seeks to apply his opinions to other contexts, they are irrelevant.[9]

## II.   CERTAIN ASPECTS OF THE PROPOSED EXPERT TESTIMONY OF DR. ELIZABETH LOFTUS SHOULD BE PRECLUDED

### A. Background

The defense seeks to offer expert opinions of Dr. Loftus on "the workings of human memory." (Ex. A at 1). Specifically, the defense seeks to offer testimony from Dr. Loftus regarding:

1. "[H]ow memory fades and weakens over time."

---

[9] The Government understands that Dr. Dietz is not planning on attending the November 10, 2021 *Daubert* hearing of Dr. Rocchio, and the Government has not to date received any Rule 26.2 disclosures from Dr. Dietz, or even a complete bibliography of the sources cited in his disclosure. The Government respectfully requests that, should a hearing be scheduled on the reliability of Dr. Dietz's opinions, that hearing be held after the defense's response to this motion and after all necessary Rule 26.2 disclosures are made.

2. "[H]ow memory becomes more vulnerable to contamination."

3. "[T]he mechanism by which false and/or distorted memories can be created as a result of post-event information and occurrences, suggestion, influence or the like."

4. "[T]he effects of suggestion on memory," including how "[s]uggestive activities can explain how it is that a person might go from having no memory of sexual abuse, and even denying sexual abuse, to later having [memories] for numerous abusive acts, if the memories are false."

5. "[T] he characteristics of false and/or distorted memories" . . . "[i]n particular," that:

    a.    Such memories "**can be described with confidence, detail and emotion, even when they are false**"; and

    b.    "[P]eople come to believe in these experiences and **are not deliberately lying**."

6. "[Identification of] some of the suggestive activities **that occurred in the current case**," including "media coverage and other publications (including but not limited to newspaper and magazine articles, news reports, television shows, documentaries, books, podcasts, websites, etc.) and discussions/conversations with others, can be sources of suggestion."

7. "[H]ow, **in a case like this one**, suggestion can lead individuals to the construction of distorted memories."

(Ex. A at 1-2 (emphasis added)).  As set forth below, the Government objects that some of these opinions (paragraphs 1, 2, 5(b), and 6) are commonsense principles within the ken of the jury; some (paragraphs 5(a) and 5(b)) invade the province of the jury in assessing witness credibility and demeanor; some (paragraphs 6 and 7) are vehicles to insert factual narrative about the case; and some (paragraph 3) are unreliable and lack fit with the case.

## B. Applicable Law

As a general matter, memory, perception, and the fallibility of human recall—that is, how people may remember, misremember, or forget past events—are within the ken of the jury.  *See United States v. Carter*, 410 F.3d 942, 950 (7th Cir. 2005) ("In general . . . jurors understand that memory can be less than perfect."); *United States v. Smith*, 148 F. App'x 867, 872 (11th Cir. 2005)

(affirming district court's exclusion of expert testimony on memory and perception, including the impact of stress on memory, in context of eyewitness reliability because proposed testimony would not assist the jury); *United States v. Labansat*, 94 F.3d 527, 530 (9th Cir. 1996) ("It is common knowledge that memory fades with time."); *United States v. Curry*, 977 F.2d 1042, 1050-53 (7th Cir. 1992) ("[S]uch testimony may be properly excluded where the testimony addresses an issue of which the jury is generally aware."); *United States v. Shiraishi*, No. 17 Cr. 582 (JMS) (RLP), 2019 WL 1386365, at *5 n.7 (D. Haw. Mar. 27, 2019) (where testimony "falls within the common knowledge of the average layman, [it] is improper testimony under Rule 702"); *United States v. Heine*, No. 15 Cr. 238 (SI), 2017 WL 5260784, at *3 (D. Or. Nov. 13, 2017) (finding expert testimony concluding that memories are fallible and may deteriorate over time to be "within the ken of the ordinary juror"); *United States v. Redwood*, 216 F. Supp. 3d 890, 897-99 (N.D. Ill. 2016) (excluding memory expert under Rules 702 and 403, and noting that "[w]hile in unique circumstances expert testimony regarding memory and perception may be warranted, this is not one of those cases"); *United States v. Libby*, 461 F. Supp. 2d 3, 12 (D.D.C. 2006) ("[J]urors inevitably encounter the frailties of memory as a commonplace matter of course.").

Federal courts—typically in the context of proposed expert testimony regarding witness identifications—have historically evinced skepticism of so-called memory expert testimony and have routinely excluded such testimony as unhelpful and because it invades the province of the jury. *See, e.g.*, *United States v. Moore*, 786 F.2d 1308, 1311-13 (5th Cir. 1986) ("Until recently, courts were uniformly skeptical about admitting expert testimony concerning the reliability of eyewitness identifications," discussing *United States v. Amaral*, 488 F.2d 1148 (9th Cir. 1973),

which affirmed the district court's exclusion of expert testimony and finding that witness cross-examination was adequate to "reveal any faults in the identification").

With respect to Dr. Loftus specifically, several federal courts have excluded Dr. Loftus's testimony on memory as either unhelpful to the jury or as irrelevant given the facts of the case. *See, e.g.*, *Curry*, 977 F.2d at 1050-52 (affirming district court's exclusion of Dr. Loftus's testimony about memory in the context of witness identifications, including the fading of memories, witness confidence in memories, distortion of memories); *United States v. George*, 975 F.2d 1431, 1432 (9th Cir. 1992) (affirming district court's denial of funds to defendant to hire Dr. Loftus to testify regarding eyewitness identification); *Moore*, 798 F.2d at 1311-13 (affirming district court's exclusion of Dr. Loftus's testimony about memory in context of eyewitness identifications, including testimony about diminished memory and the incorporation of inaccurate post-event information); *Shiraishi*, 2019 WL 1386365, at *5-6 (excluding Dr. Loftus's testimony regarding the corruption of memory and related topics); *Heine*, 2017 WL 5260784, at *2 (excluding memory expert and discussing Dr. Loftus and *Libby*); *Libby*, 461 F. Supp. 2d at 14 (excluding expert testimony of one expert in a case where the defendant also offered Dr. Loftus's research and testimony that the "principles which [the expert] would testify to are not commonly understood by jurors"); *see also R.D. v. Shohola, Inc.*, 16 Civ. 01056, 2019 WL 6053223, at *10-13 (M.D. Pa. Nov. 15, 2019) (in civil case, excluding Dr. Loftus's testimony because it "simply restates matters within the common understanding of lay jurors" and because her opinions were speculative).[10]

---

[10] It appears that Dr. Loftus has also testified as an expert in federal cases. *See, e.g.*, *United States v. Seltzer*, 794 F.2d 1114, 1118 (6th Cir. 1986) (discussing defense expert testimony of Dr. Loftus that it is not unusual for individuals to forget events); *Lam v. City of San Jose*, No. 14 Civ. 877 (PSG), 2015 WL 6954967, at *2 (N.D. Cal. Nov. 10, 2015) (denying motion to preclude Dr.

More recently, federal courts have been more receptive to allowing expert testimony beyond general principles of human recall on a case-by-case basis, depending on the special circumstances or particular facts of a case and only when such opinions are based on reliable science and fit the facts of the case. *See, e.g.*, *Libby*, 461 F. Supp. 2d at 9-10 ("There is no clear case authority, or absolute rule, on when an expert should be permitted to testify on issues regarding memory and perception. . . . [T]here is no *per se* rule for or against the admissibility of such testimony [on memory and perception].   And a court presented with a proffer of expert testimony must determine its admissibility on a case-by-case basis." (citing cases)); *Shiraishi*, 2019 WL 1386365, at *3 (discussing the need for the expert testimony to "fit" the evidence or facts of the particular case); *Shohola*, 2019 WL 6053223, at *10-13 ("First, courts have recognized that expert testimony concerning the vagaries of human recollection that is stated with sufficient certainty, is grounded upon reliable science, and fits the facts of the case satisfies the *Daubert* standard and should be admitted at trial.   In contrast, expert opinions regarding the science of human recollection that are not presented with certainty, lack scientific rigor, or possess only a tenuous factual fit are often excluded from evidence." (citing *United States v. Mathis*, 264 F.3d 321, 336 (3d Cir. 2001))).

Courts, however, must exercise "judicial oversight" in this area. *See Shohola*, 2019 WL 6053223, at *10-13.   "Left unregulated, memory expert testimony can invade the fundamental province of the jury—determining witness credibility," and must be excluded as unduly prejudicial

---

Loftus's testimony and noting that the issues identified were more appropriate to explore during cross-examination).

under Rule 403. *Id.* at \*6 (citing cases); *see also Heine*, 2017 WL 5260784, at \*2 (excluding expert testimony under Rules 702 and 403 under the same principles as *Libby* because it would not be helpful to the jury and would "invad[e] the jury's role in assessing the credibility of witnesses," and because the trial did "not involve issues of repressed or recovered memories," among other things); *Libby*, 461 F. Supp. 2d at 14 (excluding memory expert's testimony because it would not be helpful to the jury, invaded the province of the jury, and was likely to confuse, mislead, or unduly influence the jury, among other things).

## C. Discussion

As set forth herein, although the Government acknowledges that testimony about memory may be proper in response to Dr. Rocchio, Dr. Loftus's proposed testimony does not satisfy the *Daubert* standard. Specifically, the Government objects to any attempt by the defense to offer her testimony as to (a) opinions as to false memory formation that are unreliable or do not fit the facts of the case, (b) commonsense principles within the ken of the jury, (c) opinions bearing on witness credibility and demeanor, and (d) factual narratives about the case.

### 1. Opinions as to False Memory Formation

Dr. Loftus offers the following opinion on false memory formation that is unreliable and lacks fit to the case:

- How false memories may be created through post-event information and occurrences, suggestion, and influence, as described in Paragraph 3 above.

This opinion on false memory formation is central to Dr. Loftus's testimony, but the defense has not carried its burden of establishing its reliability. *See* Fed. R. Evid. 702, 703; *Daubert*, 509 U.S. at 589. As an initial matter, the defense expert notice provides no information

about the bases or details of Dr. Loftus's opinion—it simply states that she is testifying "[b]ased on her education, training, experience, and research." (Ex. A at 1).[11]

Moreover, there is specific reason to doubt the reliability of Dr. Loftus's opinions as to false memory formation. A number of Dr. Loftus's opinions were tested and rejected in *United States v. Libby*, 461 F. Supp. 2d at 8-18. There, the defendant relied on Dr. Loftus's research regarding alleged juror misperceptions of the reliability of eyewitness identifications, presented in a 2006 article. *See id.* at 10-11 (citing*, e.g.*, R. Schmechel, T. O'Toole, C. Easterly, & E. Loftus, *Beyond the Ken? Testing Jurors' Understanding of Eyewitness Reliability Evidence,* 46 Jurimetrics J. 177-214 (2006)). The district court rejected such research, concluding that "the design of these surveys demonstrates their limited value." *Libby*, 461 F. Supp. 2d at 11. The court found that the survey design used in Loftus's article was "based primarily on hypothetical situations involving eyewitness identification and the credibility of eyewitnesses." *Id.* The court also found—and Dr. Loftus "reluctantly agreed in part"—that the some of the studies were in part "structurally flawed" because certain questions asked of respondents were "unclear." *Id.* at 16. The Government, moreover, understands that much of Dr. Loftus's research involves controlled laboratory experiments rather than clinical work because studies about, for instance, the creation of false memories, may be unethical in the clinical context. *See, e.g.* Elizabeth F. Loftus, UCI

_____

[11] While the Government's expert notice for Dr. Rocchio contained similar language, it also explained that Dr. Rocchio was testifying based on her "extensive clinical experience treating individuals who suffered s]exual abuse and trauma in childhood and adolescence, as well as Dr. Rocchio's experience conducting forensic psychological evaluations of people who have experienced sexual abuse and trauma." (Def. Mot. 3 Ex. A at 2). The Government also produced its notes from its interviews with Dr. Rocchio simultaneously with its expert notice. The defense expert notice identifies no particular form of training, experience, or research on which Dr. Loftus is relying, nor has the defense produced any notes of its conversations with Dr. Loftus.

School of Social Ecology, https://faculty.sites.uci.edu/eloftus/ ("[Dr. Loftus's] experiments reveal how memories can be changed by things that we are told."). Such research may thus be inapplicable to the facts of this case.

To the extent that the Court believes that the defense may have carried its burden of establishing the reliability of Dr. Loftus's opinions on false memory formation, the Government respectfully requests a *Daubert* hearing to test the reliability of these opinions.[12]

Even if any such opinions are reliable, however, they should not be admitted absent an affirmative showing of "fit" for this case. *See* Fed. R. Evid. 702 advisory committee n. (stating that "generalized" expert testimony must "'fit' the facts of the case"). For example, testimony about the ways in which "false and/or distorted memories can be created as a result of post-event information and occurrences, suggestion, influence, or the like" is irrelevant to this case. At that level of generality, it has no obvious "fit" to the facts of this case. There is no evidence that whatever "occurrences, suggestion, influence, or the like" about which Dr. Loftus intends to testify happened to any witness in this case, much less in a manner that reliably affects memory or would be probative to the jury. Thus, as with Dr. Dietz, any reliable opinions Dr. Loftus seeks to offer on false memory formation should be limited to those as to which there is a clear evidentiary predicate establishing their "fit" to the case.

---

[12] As with Dr. Dietz, *see* footnote 9, *supra*, if a hearing is necessary, the Government similarly requests that it be conducted after receiving the defense response and after all necessary Rule 26.2 disclosures have been made.

### 2.   Commonsense Principles Within the Ken of the Jury

The following opinions by Dr. Loftus are commonsense opinions within the ken of the jury:

- How memory fades and weakens over time, as described in Paragraph 1 above.

- How memory may become vulnerable to contamination, as described in Paragraph 2 above.

- How an individual with a false memory may believe that their memory is accurate, as described in Paragraph 5(b) above.

- Examples of suggestive activities, such as news and media reports and discussions/conversations with others, as listed in Paragraph 6 above.

Any testimony from Dr. Loftus with respect to these commonsense principles of memory and perception should be excluded under Rules 703 and 403 because such testimony would not aid the jury.  "It is common knowledge that memory fades with time." *Labansat*, 94 F.3d at 530 (affirming district court denial of defendant's motion to retain an eyewitness expert).  An expert is simply not needed to "point out that memory decreases over time." *United States v. Welch*, 368 F.3d 970, 973-75 (7th Cir. 2004)  (excluding eyewitness memory and perception expert).  In excluding a memory and perception expert in *Libby*, the court explained:

> [O]n a daily basis the average juror is personally faced with innumerable questions of memory and cognition, as everyone in their daily lives is called upon to store, encode, and retrieve information he or she has been subjected to.  Although the average juror may not understand the scientific basis and labels attached to causes for memory errors, jurors inevitably encounter the frailties of memory as a commonplace matter of course.

*Libby*, 461 F. Supp. 2d at 12-13.  It is similarly common knowledge that memories can be contaminated, including through exposure to news media.  Jurors, like all individuals, may be asked to remember something, and may become confused as to the source of the memory.  And it

is a tautology that someone who has a false memory—that is, unknowingly misremembers something—believes it to be accurate.  Otherwise it would not be a memory.

### 3.  Opinions Bearing on Witness Credibility and Demeanor

The following opinions by Dr. Loftus invade the province of the jury by attempting to instruct it on how to assess witness credibility and demeanor:

- How an individual with a false memory can describe that memory "with confidence, detail and emotion," as described in Paragraph 5(a) above.

- How an individual with a false memory is "not deliberately lying," as described in Paragraph 5(b) above.

Dr. Loftus should be precluded from opining on victim or witness credibility, including by opining as to how a victim with an alleged false memory may testify (*e.g.*, confidently) and describing a victim with an alleged false memory as a "liar" or "not a deliberate liar."  Such opinions would be highly prejudicial and inflammatory, would confuse and mislead the jury, and would invade the fundamental province of the jury in determining witness credibility.  *See Lumpkin*, 192 F.3d at 288-89 (affirming district court's exclusion of expert testimony that a witness's confidence does not correlate to the witness's factual accuracy in the context of an identification because such testimony "might confuse or mislead the jury"); *Shohola*, 2019 WL 6053223, at *10-13 (discussing jury's province of determining witness credibility); Fed. R. Evid. 403.  Such opinions, moreover, are effectively defense arguments to be appropriately made during defense summations.  To allow Dr. Loftus to testify that a victim is essentially a liar (but may not realize she is a liar) or that a witness may testify confidently even when testifying untruthfully would effectively allow the defense to cloak its arguments under the imprimatur of a purported expert.  The Court will instruct the jury on witness credibility.  A defense expert should not provide a dueling instruction.  *See, e.g.*, *Hygh*, 961 F.2d at 364 ("Even if a jury were not misled into

adopting outright a legal conclusion proffered by an expert witness, the testimony would remain objectionable by communicating a legal standard—explicit or implicit—to the jury.").

### 4. Factual Narratives About the Case

The following opinions are objectionable vehicles for factual narrative about the case:

- Identification of "some of the suggestive activities that occurred in the current case," as described in Paragraph 6 above.

- How, "in a case like this one, suggestion can lead individuals to the construction of distorted memories," as described in Paragraph 7 above.

Dr. Loftus should be precluded from embedding a factual narrative about the case in her opinions. Dr. Loftus has not evaluated any of the victims in this case. Unlike Dr. Dietz, Dr. Loftus does not even describe what case-specific materials she has reviewed. (*Cf.* Ex. A at 3 ("Attached as Exhibit C [and Exhibit B to this motion] is a list of material reviewed by Dr. Dietz.")). Dr. Loftus thus has no basis to comment on whether or not certain "suggestive activities" may have influenced any of the victims before the jury, much less a basis to show that she has "reliably applied [her] principles and methods of the facts of the case." Fed. R. Evid. 702. Any such opinions from Dr. Loftus regarding the facts of this particular case would thus lack any scientific basis, would be extremely prejudicial, and would mislead the jury. *See* Fed. R. Evid. 702, 703, 403; *see also, e.g.*, *Island Intell. Prop.*, 2012 WL 526722, at *2 ("It is also inappropriate for experts to act as . . . vehicles for factual narrative . . . .").

## III. IF DEFENSE CHALLENGES TO DR. ROCCHIO ARE ACCEPTED, THE DEFENSE EXPERTS SHOULD BE EXCLUDED

It bears noting that neither Dr. Dietz nor Dr. Loftus's proposed testimony can survive the defense's own understanding of the reliability requirements of *Daubert*. While the Government

does not share the defense's view of the law, to the extent the Court accepts that view, Dr. Loftus and Dr. Dietz should be excluded as well.

This point is valid in a number of respects, but three in particular bear noting. First, the defense criticizes Dr. Rocchio in the strongest terms for opining about principles that "have no associated error rate." (Def. Mot. 3 at 1, 7, 8, 12, 15; *see* Ex. A at 3-4). Neither Dr. Loftus nor Dr. Dietz identify an error rate for a single one of their opinions, much less all of them. Second, the defense argues that Dr. Rocchio's opinions cannot be reliably applied by a jury because she describes phenomena that occur reliably in her practice and the literature, but she does not specify how often. (Def. Mot. 3 at 7-8, 10, 16 ("Rocchio claims grooming 'often' or 'frequently occurs' without providing the jury any explanation of how to decide whether grooming actually occurred in this case.")). The same could be said for Dr. Loftus and Dr. Dietz. (*See* Ex. A at 1 ("[Dr. Loftus] will describe scientific research showing that false memories *can* be described with confidence, detail, and emotion, just like true memories." (emphasis added)); *id.* at 7 ("False allegations of sexual assault do occur . . . .")). Third, the defense argues that Dr. Rocchio's opinion that "memory and disclosure of traumatic and abusive events is impacted by a number of factors, including the circumstances surrounding the trauma," is "so generic as to be meaningless." (Def. Mot. 3 at 17). That opinion is no more generic than the opinion that false memories can be "created as a result of post-event information and occurrences, suggestion, influence, or the like." (Ex. A at 2).

In the Government's view, the defense's view in its *Daubert* motion is unnecessarily cramped, and each expert opinion's reliability can be tested individually. But given the defense's view of *Daubert* and its progeny, if Dr. Rocchio's opinions are excluded based on the defense's arguments, Dr. Loftus and Dr. Dietz should be excluded as well.

## **CONCLUSION**

Accordingly, the Government respectfully requests that:

- Dr. Dietz be permitted to testify in response to Dr. Rocchio, limited to the opinion that grooming does not have one settled definition;

- Dr. Dietz be precluded from offering opinions regarding hindsight bias, the Halo effect, pathways to false allegations of sexual assault, factors bearing on witness credibility, and post-traumatic stress symptoms, or in the alternative that a hearing be held;

- Dr. Loftus be precluded from offering opinions regarding commonsense principles of memory, factors bearing on witness credibility, factual narratives, or false memory formation.

Dated: November 8, 2021
       New York, New York

                              Respectfully submitted,

                              DAMIAN WILLIAMS
                              United States Attorney for the
                              Southern District of New York

                    By:    _____/s/_____
                           Maurene Comey
                           Alison Moe
                           Lara Pomerantz
                           Andrew Rohrbach
                           Assistant United States Attorneys