# Exhibit C





**Journal of Forensic Psychology Practice**

ISSN: 1522-8932 (Print) 1522-9092 (Online) Journal homepage: https://www.tandfonline.com/loi/wfpp20

# Pathways to False Allegations of Sexual Assault

Jessica Engle BA & William O'Donohue PhD

**To cite this article:** Jessica Engle BA & William O'Donohue PhD (2012) Pathways to False Allegations of Sexual Assault, Journal of Forensic Psychology Practice, 12:2, 97-123, DOI: 10.1080/15228932.2012.650071

**To link to this article:** https://doi.org/10.1080/15228932.2012.650071

Published online: 22 Mar 2012.

Submit your article to this journal ↗

Article views: 2099

View related articles ↗

Citing articles: 5 View citing articles ↗

Full Terms & Conditions of access and use can be found at
https://www.tandfonline.com/action/journalInformation?journalCode=wfpp21

*Journal of Forensic Psychology Practice*, 12:97–123, 2012
Copyright © Taylor & Francis Group, LLC
ISSN: 1522-8932 print/1522-9092 online
DOI: 10.1080/15228932.2012.650071



## AREA REVIEWS

# Pathways to False Allegations of Sexual Assault

JESSICA ENGLE, BA
*Department of Clinical Psychology, University of Nevada, Reno, Nevada*

WILLIAM O'DONOHUE, PhD
*Department of Psychology, University of Nevada, Reno, Nevada*

*Not all allegations of sexual assault are true. Unfortunately, there has been little work on understanding the prevalence of false allegations or pathways to these. This paper proposes 11 pathways to false allegations of sexual assault: (a) lying, (b) implied consent, (c) false memories, (d) intoxication, (e) antisocial personality disorder, (f) borderline personality disorder, (g) histrionic personality disorder, (h) delirium, (i) psychotic disorders, (j) dissociation, and (k) intellectual disability. These pathways originate in the psychological diatheses of the individual. Further research is needed into the frequency of these pathways, ways to accurately detect these, and whether other pathways exist.*

*KEYWORDS   false allegations, sexual assault, psychological pathways, rape, lying, mental disorders*

In many sexual assault cases, there is little, if any, unequivocal physical evidence of a crime and no third-party eyewitnesses to bring decisive testimony to the event in question (Binder & McNeil, 2007), complicating the task of discerning the truth of a claim. Without clear physical evidence, the decisions of the legal system are based merely on the relative credibility of the narratives of the persons involved. In addition, physical evidence can be ambiguous: Medical evidence may allow a determination of whether intercourse occurred, and perhaps whether the intercourse was "rough," but not whether that sexual contact was consensual. Thus, in cases such as these

Address correspondence to William O'Donohue, Department of Psychology, University of Nevada Reno, Mail Stop 298, Reno, NV 89557. E-mail: wto@unr.edu

that lack clear corroborating evidence, an understanding of pathways to false allegations may be useful to help determine the accuracy of the claims.

Binder and McNeil (2007) presented several civil cases in which the alleged perpetrator of sexual assault and/or boundary violations completely denied all wrongdoing, and there was no corroborating evidence to help verify the claims of either party. The authors contended that in cases such as these, carefully administered and interpreted psychological evaluations may provide a context for allegations by allowing the court to understand personality traits, personality disorders, cognitive disability, and psychotic symptoms that may affect the alleged victim's allegations. Certain psychological processes have in past cases explained the lack of corroborating accounts between a plaintiff and a defendant. Some relevant psychological processes that have been suggested are psychosis, hypersensitivity when interacting with others, tendency toward exaggeration, and serious cognitive problems (Binder & McNeil). The authors also suggested that there may be several additional psychological markers to consider when determining the credibility of a complaint. We believe that a more thorough identification of these pathways is important and can be partly achieved by understanding the role of psychological disorders, as currently specified by the *Diagnostic and Statistical Manual* (DSM-IV-TR; American Psychiatric Association, 2000), in explicating specific motivations and cognitive distortions that may be associated with false allegations and malingering behaviors. Some of these variables may interact in a complex manner. For instance, an individual with borderline personality may place herself in riskier situations and may, therefore, have an increased risk of actual sexual assault. Conversely, as we discuss below, the individual with borderline personality disorder may also suffer from certain key cognitive distortions that lead to false reports. We caution against a simplistic reading of this analysis in that it never is the case that because a person suffers from a certain diagnosis that her allegations are, therefore, false. In addition, it can be useful for the forensic mental health professional to understand these pathways in context with the alleged perpetrator's mental health status. Again, no diagnosis would mean that the perpetrator is guilty of the accusations; however, mental health professionals can offer expertise in helping to understand the pathways to false allegations and false denials. Part of the focus of the present paper, then, is to bring attention to the dearth of psychological literature investigating correlates and causal mechanisms of false allegations of sexual assault and to propose a model specifying the major causal pathways to false allegations. These pathways are intended as a model for further empirical investigation.

Therefore, a legitimate concern about enumerating such pathways is the misuse of psychological diagnoses in determining the accuracy of specific accusations. It is important to recognize that a model that comprehensively and accurately identifies pathways provides information regarding necessary

but not sufficient conditions for false allegations. There is no psychological diagnosis that alone could preclude the possibility that a sexual assault occurred. Rather, these generate rival plausible hypotheses that need to be evaluated to thoroughly evaluate all the possible candidates for explaining the allegation. That is, an investigation into a contested sexual assault charge is more complete and accurate when two overarching hypotheses are considered: (a) This individual with psychological condition x was indeed sexually assaulted or (b) this individual with psychological condition x is making a false allegation due to condition x (x can be equal to 0). This is more complete than considering only one of these possibilities. Of course, when no relevant psychological condition is present, the second need not be considered. In addition, where there is overwhelming evidence (witnesses) that make condition (b) obviously false, then again, this condition need not be evaluated. Other methodologies such as lie detection (Gruben & Madsen, 2005) may be used to make assessments, but a review of these methods is beyond the scope of this paper.

A person falsely convicted (or even accused) of an alleged crime will experience significant psychological, financial, and social consequences. Prevention of both false convictions and false acquittals should be the utmost priority in any sexual assault case. Considering the dearth of forensic research on causal mechanisms of false allegations by claimants, it appears that this work is needed to offset the bulk of forensic practice that is not guided by a model to understand how false allegations may be generated. We make no claim regarding the moral equivalency of a true allegation that is not believed versus a false allegation that is believed. Rather, we do suggest that minimizing both of these kinds of errors is a worthy goal.


## LEGAL AND CULTURAL HISTORY OF SEXUAL ASSAULT IN THE UNITED STATES

It is no surprise that merely raising the issue of false allegations may evoke tension and unease in some; for some, this question is not politically correct. To be sure, historically claims of sexual assault were handled relatively unfairly for the victims both legally and socially. In early America, many people looked upon rape perpetration as little more than a sexual misdeed on the level of premarital sex and as an unfortunate consequence of sexual desire (Block, 2006). Women's claims of sexual assault were often unfairly doubted. In fact, *psuedologia phantastica* was the legally and scientifically acknowledged term used to describe a delusional state in which a woman falsely believed that she had been raped (Bessmer, 1984).

Beginning in the 1960s, a public counteraction to the prevailing treatment of rape victims gained prominence, largely spurred by the feminist

movement (Spohn & Horney, 1992). As a result, the nation underwent significant changes in the legal handling of sexual assault cases. Sweeping new laws were adopted in all 50 states aimed at decreasing complainant attrition, increasing rates of reporting, and improving the overall treatment of victims filing complaints. Despite these efforts, recent studies on the outcome of rape reform laws have shown mixed results about their impact, indicating partial effectiveness at best (see Clay-Warner & Burt, 2005; Spohn and Horney, 1992). Furthermore, studies on the number of unreported sexual assaults reveal consistently low rates of reporting to the police, from 15% of all rapes (Wolitzky-Taylor et al., 2011; Tjaden & Theonnes, 2006) down to 5% in some samples (see Fisher, Cullen, & Turner, 2000).

Study findings have identified several reasons for the low rates of reporting. In a national sample of U.S. women, the most commonly endorsed reason for choosing not to report was fear of reprisal by the perpetrator (Wolitzky-Taylor et al., 2011), indicating an endemic distrust of case processing and protection services for the victim. Among victims who reported the rape and those who did not, the most frequently endorsed concern about reporting was the belief that others would blame the victim for the rape. Indeed, the acceptance of *rape myths*, or widely held and generally false beliefs about rape that serve to deny and justify male sexual aggression (Lonsway & Fitzgerald, 1994), is associated with a higher tendency to ascribe responsibility for sexual assault to the victim (Burt, 1980). Examples of rape myths include the incorrect beliefs that women routinely lie about being raped, that most rapes are perpetrated by strangers, and that only women who have certain characteristics (e.g., poor moral character, promiscuous, unsafe) are victims of rape (Lonsway & Fitzgerald, 1994).

Given the mixed performance of rape reform laws and the persistence of rape myths, it is no surprise that empirical investigations of false rape allegations would be subject to heated contention. Past studies of false allegations have been carefully inspected for methodological, definitional, and ideological mistakes, and many have been found (Lisak, Gardiner, Nicksa, & Cote, 2010). The significant variability in estimates of false rape allegations has reflected these methodological weaknesses, with study estimates ranging from 1% to 90% of all reported cases (Gross, 2009; Kelly, 2010; Lonsway, 2010; Lisak et al., 2010). These differences were generally related to discrepancies between researchers about definitions of terms and methodology of data collection (Lisak et al., 2010). One predominant criticism of the literature has been the inaccurate categorization of rape investigation results by the police. It has been suggested that law enforcement agencies have been known to incorrectly categorize "unfounded" cases, among other cases, as "false allegations" (Lisak et al., 2010). As articulated by the International Association of Chiefs of Police (IACP), during police investigations a false allegation may be determined only using the following process:

> The determination that a report of sexual assault is false can be made only if the evidence establishes that no crime was committed or attempted. *This determination can be made only after a thorough investigation.* This should not be confused with an investigation that fails to prove a sexual assault occurred. In that case, the investigation would be labeled unsubstantiated. *The determination that a report is false must be supported by evidence that the assault did not happen.* (IACP, 2005, pp. 12–13; emphasis in original)

"Evidence that the assault did not happen" must consist of the existence of physical or eyewitness evidence as opposed to the mere absence of evidence (IACP, 2005). Lisak et al (2005) compiled findings from studies that addressed the aforementioned issues of categorization, terminology, and methodology and placed a narrower estimate of the frequency of false rape allegations between 2% and 10%. Thus, the most recent, more methodologically adequate studies have indicated that false allegations are somewhat rare. However, it is important to note that law enforcement agencies cannot always identify false allegations during the investigation process, as it is often the case that little or no physical or eyewitness evidence exists to substantiate that sex was consensual or that the rape never occurred. However uncommon, false accusations of sexual assault, indeed, occur, and falsely alleged perpetrators are thus subject to besmirched reputations, interruptions in important life functions and, in some cases, incarceration. In the event that an investigation fails to identify a false allegation and the case proceeds to prosecution, a psychologically informed conceptualization of the etiology of false allegations could bolster existing evidence that supports the falsehood of a claim.

A brief description of one infamous and controversial legal case may help to elucidate the potential contribution of psychological pathways of false allegations of sexual assault and the initial and lingering consequences for accused persons. In the following case, the alleged victim never recanted her claim, and her allegations were never determined to be false. However, an understanding of the psychological functioning of the alleged victim as considered in the context of available evidence could have informed the investigators about potential motives or cognitive distortions that could lead the accuser to file a false rape allegation. On March 13, 2006, the lacrosse team at Duke University hired two exotic dancers, Crystal Magnum and Kim Roberts, to perform at a house party (Hemmens, 2008). While at the house, Magnum fell unconscious for a short while after which an exchange of insults occurred between the lacrosse team and the two strippers. Roberts then drove Magnum to a store where she was dropped off. After being arrested for public drunkenness, Magnum accused three of the Duke lacrosse teammates of rape. The allegations were pursued over the

course of 1 year in which all three men were charged with rape and publicly vilified. The lacrosse season was cancelled, and the coach was fired. According to some, a large amount of evidence was withheld from the public that may have cast suspicion on the accusation, all while the reputations of the three accused men were continually besmirched (Hemmens, 2008; Setrakian, 2007). DNA evidence revealed no physical evidence that any of the three men had raped her. Magnum also came under the suspicion of the authorities by telling conflicting versions of the sexual assault. In one instance, Magnum reported that she was gang raped by five men in the bathroom; at another time, she reported that she was not forced to have intercourse with anyone, although the men did pull her from her car and groped her (Taylor & Johnson, 2007).

The discrepancies in Magnum's account are considered "core" discrepancies in that they are central details of the case and, thereby, any variation in these details is considered a strong indication of a false account of events. Research on the accuracy of emotional memories indicates that in an emotional event, individuals are more likely to remember core features of the event (e.g., forced intercourse occurred, whether the event occurred inside or outside) than peripheral features (e.g., which street the rape occurred on, what perpetrators were wearing) and, in fact, memory for core features of the event is actually enhanced by the emotionality of the situation whereas memory of peripheral features tends to be poorer (Kensinger, 2007).

It is noteworthy that Magnum's initial claim that she was raped occurred when she was being admitted to an inpatient ward for psychiatric observation and treatment—a fact that did not receive much attention by the prosecution or others (Taylor & Johnson, 2007). Knowing the details of the mental health report could have helped investigators determine whether there were (a) motives for knowingly filing a false allegation or (b) reasons why Magnum would have unknowingly misinterpreted the events that took place.

Later, the men were exonerated in what the judge called, "a tragic result of a rush to accuse." This rush to accuse should have been mediated by a fair consideration of the possibility of a false accusation and an examination of pathways to false accusations. Despite this ruling, the case could still be labeled "unfounded," as the term *false allegation* is often reserved for cases in which a claimant knowingly filed allegations that were false; either the claimant knowingly identified the wrong perpetrator, or she fabricated the entire event (Gross, 2009). In this case, Magnum never recanted her claims, and it cannot be determined whether she actually believed the events occurred or whether she knew that she had fabricated her story. However, an increased understanding of possible psychological pathways could have helped explain core inconsistencies in her statement and potential motivations to file a false allegation.

For the purposes of our paper, we will define the term *false allegations* as either knowingly fabricated *or* claims based on abnormal information processing, because in some cases, the claimant may actually believe that a coerced sexual experience occurred in ways that it did not occur. In this paper, we suggest that some psychological disorders may increase the likelihood of believing a sexual assault occurred when it did not. Additionally, some psychological disorders may be related to an increase in motivation to fabricate an allegation of sexual assault in an effort to achieve what may be believed are the positive consequences of a false report.

## PATHWAYS TO FALSE ACCUSATIONS OF SEXUAL ASSAULT

The pathways introduced in this section require further empirical investigation and validation. These may not be an exhaustive list of possible pathways, although many pathways worth careful consideration have been included.

### Lying for Conscious and Unconscious Secondary Gain

That the alleged victim is knowingly making a false claim of sexual assault is a pathway that is usually considered, and sometimes this is the only pathway considered by key individuals in the case. Humans do lie, and their lies can be difficult to detect. Often, humans lie because of what they perceive as the favorable consequences for lying; for sexual assault these consequences could be

1. the severe negative consequences that the alleged perpetrator experiences,
2. secondary gain from victim status,
3. excusing behaviors or characteristics of the alleged victim (e.g., sexual activity, pregnancy, sexually transmitted diseases), and
4. financial gain.

In sections below, we consider lying that comes out of other psychiatric diagnoses (e.g., the chronic lying associated with an individual with antisocial personality disorder). In this pathway, we acknowledge that lying also occurs with "normal" individuals (i.e., individuals who have no psychiatric diagnosis, who seek certain consequences through their lying). Thus, the victim knowingly lying about the assault is a rather obvious pathway to false allegations. Deception is difficult to detect, but the alleged victim's history of truthfulness, current motivations, and gain from the allegations need to be considered.

Denial of Consent

A key issue in sexual assault is whether consent was given for the sexual contact. Consent is complex and, in real-world situations, may have significant variability and may be rather subtle and, in general, an intricate process. Rarely do sexual interactions begin with individuals explicitly stating "I give you permission to do x, y, and z" (Hall, 1998). Consent in sexual situations is often implied, sometimes by the absence of a negative ("She didn't say no or move away") or inferred ("She seems to be enjoying this" or "We did this in the past so I assumed she was ok with it"). Hickman and Muehlenhard (1999) found that nonverbal tactics were used more often than verbal consent. Consent is thought to involve both knowledge of what is being consented to and a belief that the person is free to either assent or not. Thus, a claim of lack of consent can also come from the person's "feeling trapped" or "coerced," which, again, the two parties may interpret differently. However, mistakes can be made in these situations and given the motivations of the parties, these mistakes can be motivated ("I want this, so I interpret her silence as consent" or "She was free to leave at anytime; I was on top of her because I thought she wanted that").

Understanding whether consent was given is made more complex by the fact that consent early in the interaction for a certain kind of sexual contact is not consent for any and all further sexual contact in that episode. In addition, consent for the same act (consent last week) is not consent for all future contact. This complexity led to the infamous Antioch College consent policy that stated that there were multiple levels of sexual intimacy and every time someone wants to proceed to another level, they must explicitly ask and receive explicit verbal permission to proceed to this level (Francis, 1996):

> If the level of sexual intimacy increases during an interaction (i.e., if two people move from kissing while fully clothed—which is one level—to undressing for direct physical contact, which is another level), the people involved need to express their clear verbal consent before moving to that new level. If one person wants to *initiate* moving to a higher level of sexual intimacy in an interaction, *that person is responsible for getting the verbal consent of the other person(s) involved before moving to that level*. (p. 137)

This policy was critiqued on the grounds of its impracticality, but it raises the question how explicit and how often does consent need to be conveyed? This ambiguity creates a pathway for a false allegation in which the alleged victim engaged in behaviors that can plausibly be interpreted as providing consent, but the victim herself may not understand or realize this. Thus, a false allegation can arise when it was reasonable to believe consent was given but the alleged victim falsely believes that it was not.

In this situation, the controversy is not whether sexual content occurred but whether consent for this sexual content occurred.

The final level of complexity regarding this pathway occurs in the attempt of professionals involved in the case to accurately understand after the fact the details of whatever consent process did or did not take place. By its nature, this will generally be a "he said, she said" matter in which it is very difficult to resolve conflicting claims. However, much can ride on the heuristics individuals use to resolve this indeterminate matter.

## A False Memory

The theory of *repression*, according to Freud (1910), posits that traumatic memories can be pushed out of conscious awareness and essentially forgotten for long periods of time. Though some psychologists argue there is a lack of empirical support for the theory of repression (Loftus, 1993), many psychologists do believe that repression is a real process by which memories can be forgotten and later remembered (Boag, 2010). One psychological process that may resemble repression is false memory.

The existence and prevalence of repressed memories is a source of controversy (McNally & Geraerts, 2009), and yet research does exist demonstrating the successful implantation of fabricated memories. In one of the first studies on the implantation of false memories, participants were given short narratives of childhood experiences, purportedly obtained from relatives, and asked to try to remember these experiences (Loftus, Coan, & Pickrell, 1996). Participants' relatives were contacted and asked to provide childhood stories about the participants. However, researchers created one fabricated narrative: The participant, at age 5 or 6, had been lost in a public place (e.g. a shopping mall) for an extended period of time and eventually rescued. Participants were encouraged to try to remember both true and fabricated events over the course of several weeks. When participants were asked later whether they recalled the events, nearly one-fourth of them reported having memories of the fabricated event. Though some individuals reported remembering being lost only vaguely, others reported remembering vivid visual details and emotional experiences. Since this study, several researchers have successfully replicated these results using different suggestive techniques and scenarios (e.g. Mazzoni, Loftus, Seitz, & Lynn, 1999; Hyman & Billings, 1998; Hyman & Pentland, 1996; Garry, Manning, Loftus, & Sherman, 1998). Many of the suggestive methods used in these experiments are similar to those employed by some therapists during psychotherapy (Ofshe & Watters, 1994; Pesant & Zadra, 2004).

It has been argued that suggestive therapeutic techniques could cause a client to create a false traumatic memory (Loftus, 1993). An example of this type of suggestion would be for a therapist to conclude that the client shows signs of abuse despite no memory of abuse, and thus the client should try

harder to remember whether any abuse may have occurred (as cited in Loftus, 2003).

Indeed, there have been several legal cases in which therapy clients or their relatives successfully sued or received settlements from their therapists for using therapy techniques that may have induced patients into creating false memories of past abuse (Loftus, 1997). In one such case in 1986, Nadeen Cool sued her therapist who used hypnosis and other suggestive therapeutic techniques to uncover "lost memories" of abuse (Loftus, 1997). Through therapy, Cool remembered being in a satanic cult, eating babies, and being raped, among other horrific events. She came to believe she had more than 120 different personalities and even underwent an exorcism led by her therapist who sprinkled holy water and demanded Satan to leave her body. Later, Cool realized that her memories were not real and were planted by her therapist. The therapist settled out of court for $2.4 million.

Though the false memories discussed thus far have all been entirely fabricated, some false memories are created surrounding real events. Memories of an event can be tampered by exposure to subtle misinformation after the event has occurred (Loftus & Palmer, 1974; Loftus, 1975; Loftus, Miller, & Burns, 1978). In one famous study by Loftus and Palmer (1974), researchers showed participants short clips of traffic accidents and were asked to rate the speed at which the accident happened. However, when questioning the participants, researchers cleverly manipulated the use of verbs. For instance, some participants were asked the speed at which vehicles *smashed* into each other. Other participants were asked to report the speed at which vehicles *hit*, *collided with*, *bumped*, or *contacted* each other. Participants responding to the word *smashed* not only reported a higher speed at which the cars were travelling but weeks later were more likely to recall having seen broken glass at the scene. These findings in addition to Loftus's later work on the nature of leading questions (Loftus, 1975; Loftus et al., 1978) revealed how subtle information introduced after an event may alter the memory of that event. Loftus and her students have since conducted more than 200 studies with more than 20,000 participants demonstrating how misinformation introduced after an event can induce people into creating false memories (Loftus, 1997).

Repressed memories have not been disproved. However, scientific studies have demonstrated that significant errors in memory and the creation of false memories of traumatic events are possible. When the claimant suddenly recovers a memory of a past sexual assault, investigation of the events surrounding the recovery of the memory, including suggestive therapy and investigative techniques (e.g. events surrounding police lineups and questioning), must be examined and may shed light on the validity of the recovered memory.

Intoxication

As a prerequisite for this pathway, the consumption of intoxicating substances must have led to distortions in information processing. There are currently many drugs that are used by sexual assault perpetrators to incapacitate victims (Horvath & Brown, 2005). These drugs may include Rohypnol (e.g., "roofies") and amphetamines, muscle relaxants, alcohol, or antihistamines. Other drugs, such as gamma hydroxybutyrate, cocaine, and ketamine have also been indicated in drug-assisted sexual assault cases (see Horvath & Brown, 2005; Hindmarch & Brinkmann, 1999). In a forensic case, it is important to determine whether the accuser voluntarily or involuntarily consumed drugs. If the drugs were not voluntarily consumed, it is likely that the individual who drugged the claimant had premeditated plans to control the claimant (Welner, 2001), regardless of whether the perpetrator assaulted the claimant.

Though consent issues are clearly important considerations when determining the nature of sexual behaviors while intoxicated, they are superfluous considerations in this pathway. Under most state laws, a person cannot legally consent to sexual activity while intoxicated (Davis & Loftus, 2008). In fact, even if consent to engage in sexual activity is *ex ante* (before the first dose of the intoxicating substance), the act of engaging in sexual activity while intoxicated can later be determined to be non-consensual sexual activity and is often sufficient evidence to convict someone of rape. Therefore, issues of consent, for these reasons, will not be discussed in the context of this pathway.

A key issue in this pathway is whether the claimant believes that he or she was sexually assaulted while under the influence of intoxicating substances, when in reality no sexual activity took place or activity occurred very different from what she is now claiming (e.g., she claimed penetration when no penetration occurred). Some drugs, when consumed at sufficient levels, may cause impairments in information processing—sensation, perception, storage, or retrieval. Substances known to cause these effects are alcohol, sedatives/hypnotics (e.g., benzodiazepines, soporifics), and anxiolytics (American Psychiatric Association, 2000). High doses of alcohol have been shown to inhibit memory in humans and animals (Bisby, Leitz, Morgan, & Curran, 2010; Crego et al., 2009; Spinetta et al., 2008). Moreover, upon ceasing to use these drugs, withdrawal symptoms may include delirium and psychotic disorders (American Psychiatric Association, 2000; Lin, Heacock, & Fogel, in press)—two additional pathways to false allegations that will be discussed later in this paper.

The information-processing errors of the intoxicating substances mentioned above may cause confusion surrounding events that occurred while a person was intoxicated. A person who does not accurately recall events

that occurred while he or she was under the influence or while experiencing the side effects of withdrawal from a substance may attempt to make sense out of the disjointed and seemingly incoherent memories of events that occurred while intoxicated. In an effort to make sense of and organize what memories are intact, a person may confabulate or fill in the memory lapses with events that seem probable or which for some reason they come to believe "must have" taken place. For example, waking up naked but not remembering how his or her clothes were removed, a person may conclude that someone else removed the clothes without his or her consent, even if the individual had, while intoxicated, actually removed his or her own clothes without remembering having done so. In addition, some drugs can artificially affect sexual interest (e.g., ecstasy, cocaine) or modify the individual's normal disinhibitions regarding sexuality that can affect the analysis of sexual consent. Thus, an individual may not normally have been sexually interested or may typically have been more sexually inhibited and not given consent. She may come to be puzzled after a sexual interaction and conclude that she was sexually assaulted because her behavior did not fit with her expectations.

## Antisocial Personality Disorder (or Conduct Disorder in Adolescents)

The DSM-IV-TR (American Psychiatric Association, 2000) explains the essential feature of antisocial personality disorder as "a pervasive pattern or disregard for, and violation of, the rights of others that begins in early childhood or early adolescence and continues into adulthood." Diagnostic criteria consist of the following:

1. failure to conform to social norms with respect to lawful behaviors as indicated by repeatedly performing acts that are grounds for arrest;
2. deceitfulness, as indicated by repeated lying, use of aliases, or conning others for personal profit or pleasure;
3. impulsivity or failure to plan ahead;
4. irritability and aggressiveness, as indicated by repeated physical fights or assaults;
5. reckless disregard for safety of self or others;
6. consistent irresponsibility, as indicated by repeated failure to sustain consistent work behavior or honor financial obligations; and
7. lack of remorse, as indicated by being indifferent to or rationalizing having hurt, mistreated, or stolen from another.

Diagnostic criteria 1, 2, 4, and 7 are of particular importance in this pathway. If an individual with antisocial personality disorder is likely to lie

to achieve power and pleasure, a false allegation of sexual assault might be the means by which he or she attempts to achieve power over the falsely accused. Falsely claiming someone sexually assaulted you can be an aggressive act fitting diagnostic criterion 4. Furthermore, a lack of remorse could allow the individual to file an allegation of sexual assault and maintain this allegation with few, if any, conflicts of conscience. Thus, a pathway to a false allegation of sexual assault can occur when an individual with antisocial personality disorder makes a false claim of assault.

Antisocial personality disorder occurs more in men than women (Lamont & Brunero, 2009; American Psychiatric Association, 2000), with prevalence rates of 3% and 1%, respectively, based on data from community samples (American Psychiatric Association, 2000). Though women are the most frequent reporters of being victims of sexual assault, men may also report sexual assault. It is important to note that individuals with antisocial personality disorder are more likely than individuals without antisocial personality disorder to report having experienced sexual assault during their lifetime and are believed to be at a higher risk for sexual victimization (Burnam et al., 1988).

## Borderline Personality Disorder

Borderline personality disorder (BPD) is a serious mental condition characterized by affective dysregulation, impulsiveness, difficulties in interpersonal relationships, and difficulties with self-image (Lieb, Zanarini, Schmahl, Linehan, & Bohus, 2004). Prevalence estimates for BPD from community and clinical samples have ranged from .6% to 3.9% of the general population (American Psychiatric Association, 2000; van Asselt, Dirksen, Arntz, & Severen, 2007; as cited in Lenzenweger, Lane, Loranger, & Kessler, 2007), and the majority diagnosed with BPD—an estimated 75% of people—are women (American Psychiatric Association, 2000).

The DSM-IV-TR (American Psychiatric Association, 2000) includes nine diagnostic criteria for this disorder, which for simplicity can be narrowed down to four domains (Lieb et al., 2004). The first domain is affective disturbance that includes intense emotions, rapidly shifting emotions, and mood reactivity. The second domain is disturbed cognition that includes three levels of symptomatology: troubling but non-psychotic problems including dissociation (discussed above) and intense feelings of being bad (relevant to this pathway); quasi-psychotic and psychotic-like symptoms of delusions and hallucinations (further discussed below) that are somewhat reality-based; and psychotic symptoms of delusions and hallucinations. The third domain is impulsivity, either physically destructive to the self or generalized impulsivity. The fourth domain involves the existence of unstable and erratic relationships, in which the borderline individual struggles to avoid either real or imagined abandonment.

When parsing these domains, it can be more clearly seen how BPD may serve as a pathway for false allegations of sexual assault. The first domain (Leib et al., 2004) includes the diagnostic criterion of quickly switching from idealization to devaluation of relationship (American Psychiatric Association, 2000). The instability of relationships experienced by an individual with BPD may be rooted in the tendency to quickly switch from idealizing significant others or lovers to devaluing them (American Psychiatric Association, 2000). This sudden change in conceptualization of a partner is often caused by feeling that the partner is not caring enough or giving enough or by suspicion of abandonment. The rapid shifting between idealizing and demonization may bring about a change in perspective such that a relationship that was viewed idealistically in the past is now seen through the devalued lens of abuse or mistreatment. Past events then may become construed as "abuse" and may lead a person with BPD to believe he or she is a victim of sexual assault.

As Kanin (1994) found in his longitudinal study, two of the three major motivations to file a false allegation of rape were attention-seeking and revenge. The switch from idealization to devaluation of the relationship and/or relationship partner (American Psychiatric Association, 2000) may spur a desire for revenge for any past behaviors that are, in the devaluation phase, newly construed as mistreatment. In addition an individual with BPD who is feeling fear of abandonment may seek frantically to achieve the attention that is craved from the partner who is perceived to be neglectful (American Psychiatric Association, 2000). The impulsive nature of a person with BPD may also lead them to act on these motivations for attention or revenge by filing a false allegation of sexual assault before carefully considering the consequences. Also, there is some evidence that individuals with BPD engage in behaviors that are viewed as "manipulative" (Linehan, 1993). Manipulative behaviors are often outside the conscious awareness of the individual and are learned through positive reinforcement, as manipulation frequently results in positive outcomes for the manipulator. Thus, an individual with BPD may use a sexual assault allegation as a way of impacting a third party for some desired outcome.

The second domain (Lieb et al., 2004), consisting of symptoms of reality-based delusions and hallucinations, may lead to false beliefs of sexual assault, and clinical experience suggests that sexuality is a common theme in delusions and hallucinations. The DSM-IV-TR (American Psychiatric Association 2000, p. 299) defines delusions as "erroneous beliefs that usually involve misinterpretations of perceptions or experiences." Hallucinations involve sensory experiences that do not appear to be externally caused.

Thus, individuals with BPD may represent a "perfect storm" of symptoms in which an impulsive, emotionally dysregulated individual who is demonizing someone and has loose contact with reality and who is seeking

attention and revenge makes a false allegation of sexual assault. However, when considering this pathway, it is important to keep in mind that individuals with BPD are more likely to have experienced sexual or physical assault (Lieb, et al., 2004) due to the same characteristics of the disorder. Thus, it is important to fairly and adequately weigh the evidence presented in an allegation of sexual assault.

## Histrionic Personality Disorder

The DSM-IV-TR (American Psychiatric Association, 2000) defines histrionic personality disorder as "pervasive and excessive emotionality and attention-seeking behavior" (p. 711). Prevalence estimates range from .6% to 2.9% of the general population (as cited in Lenzenweger et al., 2007; American Psychiatric Association, 2000). Diagnosis is indicated by the presence of five or more of the following diagnostic criteria:

1) is uncomfortable in situations in which he or she is not the center of attention;
2) interaction with others is often characterized by inappropriate sexually seductive or provocative behavior;
3) displays rapidly shifting and shallow expressions;
4) consistently uses physical appearance to draw attention to the self;
5) has a style of speech that is excessively impressionistic and lacking in detail;
6) shows self-dramatization, theatricality, and exaggerated expression of emotion;
7) is suggestible (i.e., easily influenced by others or circumstances), and
8) considers relationships to be more intimate than they actually are (p. 714).

The primary diagnostic criteria of interest in this pathway are diagnostic criteria 1, 2, 5, 7, and 8. Other relevant behaviors include the tendency to play out stereotyped roles in their relationships with others; an intense desire for novelty and excitement; and the upset and depression that may follow periods in which they received little attention (American Psychiatric Association, 2000).

Filing a false allegation of sexual assault may serve to benefit individuals with histrionic personality disorder in several important ways. The sexualized behavior of individuals with histrionic personality disorder can lead to sexual relationships that may be used to seek attention (e.g., having sex with a person and telling all of their friends about it). Filing a false sexual assault claim may regain lost attention, either from the desired partner or from other

individuals, providing a novel and exciting environment that may be stimulating to a person who is histrionic. They may enjoy the large amounts of attention received for filing a sexual assault charge and for the "victim" role that can be played out in other relationships. In times when attention is not being received to the desired level, a false allegation of sexual assault may help to pull individuals with histrionic personality disorder out of their depressed state.

The misperception that relationships are more intimate than they actually are may lead a person with histrionic personality disorder to misconstrue nonsexual interactions as events that are sexual in nature. For example, a person who is histrionic may, after a co-worker complements her clothing and accidentally bumps into her during the day, construe these actions as intentional communications of sexual interest. This misperception can lead her to feel that if the individual had touched her chest while bumping into her, it was an intentional action of unwanted assault. Thus, a pathway to false allegations of sexual assault may be through individuals with a diagnosis of histrionic personality disorder who for reasons of attention and misinterpretation may knowingly or unknowingly make a false allegation of sexual assault.

## Delirium

According to the DSM-IV-TR (American Psychiatric Association, 2000, p. 136), delirium is a "disturbance of consciousness that is accompanied by a change in cognition that cannot be better accounted for by a preexisting or evolving dementia." Relevant to this pathway are the perceptual disturbances that may be present, including misinterpretations, illusions, or even hallucinations.

Delirium may be caused by medical conditions, substance use, or withdrawal or may have multiple etiologies (American Psychiatric Association, 2000). An individual suffering from delirium is out of contact with reality and thus may make statements or allegations that are not veridical, including false allegations of sexual assault. In these circumstances, an individual with delirium may be under the care and protection of hospital staff, family members, friends, or even law enforcement. In such situations, caregivers may be in close physical proximity to the patient. The care provided could be construed as sexual, even though the care may have been nonsexual.

## Psychotic Disorders

The term *psychotic* generally refers to conditions that are marked by delusions and hallucinations (American Psychiatric Association, 2000). Psychotic disorders include the following: schizophrenia, schizophreniform disorder, schizoaffective disorder, delusional disorder, brief psychotic disorder, shared

psychotic disorder, psychotic disorder due to a general medical condition, substance-induced psychotic disorder, and psychotic disorder not otherwise specified. Each of these disorders is known to cause gross impairment in functioning.

The DSM-IV-TR (American Psychiatric Association, 2000) details common delusions that may be pervasive in individuals with delusional disorder. Other psychotic disorders may be associated with these delusional themes as well. *Erotomatic* delusions involve irrational, unsubstantiated, or impossible claims that some person is in love with the delusional individual. The individual may claim that a movie star or superior at work is secretly in love with him or her and that there is a spiritual tie between them. Another delusional theme of interest is the *persecutory* type. This delusional theme is characterized by irrational, unsubstantiated, or impossible claims that the individual has been wronged and that some injustice has taken place. Frequent appeals to the court system are common in which the individual attempts to persecute the central person in the delusion. *Mixed* types of delusions involve delusions in which no one type predominates. A mixed erotomatic and persecutory type might be the type of delusion that would lead to a false allegation of sexual assault. However, delusions can be complex and difficult to categorize, even when they are sexual in nature.

Studies investigating the content of delusions have found delusions that are sexual in nature are not uncommon and are occur more often in women than in men (Galdos & van Os, 1995; Meloy, 1989). Some cases of sexual delusions have been documented. In one case, Rosenthal and McGuinness (1986), two psychiatric nurses, wrote about a client with delusions centered on sex. "When her hydrotherapist offered her a backrub one day, she exclaimed, 'Don't touch me! I am not your homosexual lover'"(p. 149). These delusions may lead a person to claim adamantly that sexual relations or events occurred that may be impossible or highly improbable.

## Dissociation

Dissociation is "the lack of the normal integration of thoughts, feelings, and experiences into the stream of consciousness and memory" (Berstein & Putnam, 1986). According to the DSM-IV-TR (American Psychiatric Association, 2000), dissociation involves a disruption or splitting off of memory, personality, identity, consciousness, or general perceptions of the self and surroundings; it can be recurring, gradual, or transient. Currently, there is some controversy concerning the function, antecedents and etiology of dissociation (Candel, Merckelbach, & Kuijpers, 2003).

Dissociative tendencies have been thought to exist as a stable trait in some individuals (Waller, Putnam, & Carlson, 1996), though most research has looked only at dissociation in relation to traumatic experiences. Much of the focus on the relationship between trauma and dissociation may be the result of earlier studies that found a relationship

between reports of childhood trauma and high levels of dissociation (e.g. Sanders & Giolas, 1991). Dissociation can occur either during the traumatic experience (*peritraumatic dissociation)* or afterward (*posttraumatic dissociation*). *Peritraumatic dissociation* is characterized by numbness, detachment, derealization, depersonalization, and reduced responsiveness during the traumatic event (Tichenor, Marmar, Weiss, Metzler, & Ronfeldt, 1996). A meta-analysis comparing the results of 35 empirical studies on the relationship between levels of peritraumatic dissociation and posttraumatic stress disorder (PTSD) found that peritraumatic dissociation was a moderate predictor of PTSD (Breh & Seidler, 2009).

Some psychologists have conceptualized dissociation as a coping mechanism in response to trauma-related stress (Gershuny & Thayer, 1999). However, others have argued that dissociation is a trait that precedes a traumatic experience and may contribute to psychological responses in trauma survivors (Tichenor et al., 1996). Whatever the case may be, dissociation has been shown in multiple studies to be related to memory fragmentation (Kindt, Van den Hout, & Buck, 2005; van der Kolk & Fisler, 1995) and to two prominent correlates: fantasy proneness (Merckelbach, Campo, Hardy, & Geisbrecht, 2005) and absentmindedness (Merckelbach, Muris, Rassin, & Horselenberg, 2000).

In one study (Candel et al., 2003), low and high dissociators were read stories of a traumatic nature and asked to freely recall the story. Even after controlling for fantasy proneness, high dissociators provided more errors of commission—that is, added false content—than low dissociators, though the two groups did not differ on errors of omission. In another study by Merckelbach and colleagues (Merckelbach, Horselenberg, & Schmidt, 2002), participants were read a story and asked to recall the content of the story. They were then asked several misleading questions meant to test suggestibility. As hypothesized, participants who were high dissociators were more likely to endorse story elements that were fabricated than low dissociators. Also, participants who were high dissociators were also more likely to have trait absentmindedness but were not more likely to have fantasy proneness. Similar studies have shown a small trend toward a relationship between fantasy proneness and memory commissions (Giesbrecht, Geraerts, & Merckelbach, 2007). The results of these studies indicate that dissociators are capable of "remembering" events that did not happen and that absentmindedness may be a mediator in the relationship between traumatic events and commission errors of memory. The results of these studies suggest that it may be important to consider the possibility that the memory of the event may include false details if the claimant has high levels of dissociation.

A review of the literature on dissociation and memory (Giesbrecht, Lynn, Lillienfild, & Merckelbach, 2008) cited evidence that trait dissociation is likely to be associated with memory distortions. In an effort to align

fragmented memories with an individual's self-concept and worldview, the likelihood of altering memories of events, either consciously or unconsciously, increases (Eisen & Lynn, 2001). Thus, it is possible that in the event of a sexual assault, dissociation may cause a person to fill in the parts of the experience that are not clearly remembered with events that for them feasibly could have occurred. Of course, memory lapses will not necessarily be filled in with a confabulated event, let alone a sexual one. However, high dissociators may seek to make their stories more coherent by adding details to an incomplete memory that would make sense to them when considered in the context of the event. Thus, these confabulations may lead to erroneous claims that have forensic relevance, including who the perpetrator was, what happened, where, and how many times.

## Intellectual Disability

Intellectual disability (ID; Schalock, 2007), also known as mental retardation (American Psychiatric Association, 2000), is characterized by below-average IQ and adaptive functioning (Schalock, 2007; American Psychiatric Association, 2000). Limitations in functioning include deficits in the acquisition of social, occupational, academic, and general self-care skills. ID has several etiologies that often are related to biological or pathological processes affecting the central nervous system. Many of the specific vulnerabilities that arise from ID overlap to some extent with other disorders (e.g., autism spectrum disorders, cerebral palsy, fetal alcohol syndrome) and thus, in many cases, individuals with other developmental disabilities may also have ID.

Rates of sexual assault are higher in intellectually disabled populations than populations without ID (Mitra, Mouradian, & Diamond, 2011). It is hypothesized that the true rate of sexual assault among individuals with ID is higher than indicated in studies (Joyce, 2003). There are many reasons to believe that study findings are an underrepresentation of the actual amount of sexual assaults that occur against intellectually disabled people. Difficulties with communication and comprehension of language faced by individuals with ID may interfere with the ability to report a sexual assault (Ahlgrim-Delzell & Dudley, 2001). Fear of repercussions for reporting—as caregivers are often the perpetrators—may also discourage reporting (Joyce, 2003). Another reason why individuals with ID may not report a sexual assault is because of a misunderstanding of the legal process. For instance, Joyce (2003) briefly mentioned one alleged victim with ID who was reluctant to continue with an allegation because she was afraid she would get into trouble if the alleged perpetrator was found "not guilty." Finally, it can be assumed that individuals with ID may choose not to report a sexual assault for the same reasons that individuals without ID choose not to report:

because the legal process can be daunting and there may be repercussions from filing the allegation.

Studies have indicated that sexual assaults among populations with ID are most likely to be perpetrated by peer service users (Brown, Stein, & Turk, 1995). Abuse by family members and care providers is also common, whereas perpetration by strangers is the least common. In cases where peer service users are the alleged perpetrators, issues of consent are often the focus of the investigation. Establishing the capacity to consent can be challenging in this population as it may be unclear whether individuals have sufficient knowledge and understanding to provide fully informed consent (Joyce, 2003). For instance, in some sexual assault cases, individuals with ID do not have the ability to name the body parts that were involved in the assault. Clear protocols for determining informed consent in this population would be useful, as adults with ID have specific challenges that increase their potential for coercion and exploitation.

Intellectually disabled individuals, compared to individuals without ID, have vulnerabilities related to memory and communication that the legal system may not be equipped to handle adequately. Individuals with moderate-to-profound ID may have significant difficulty communicating about the events that occurred because of language skills deficits or other communication-interfering conditions (e.g., related neurological conditions). Ahgrim-Delzell and Dudley's (2001) findings indicate that communications skills are essential in filing a sexual assault charge; alleged victims with mild ID were more likely than individuals with moderate or severe ID not only to file sexual assault charges but to have their allegations confirmed. Difficulties with memory may also complicate the investigation process for individuals with ID (Gudjonsson & Henry, 2003) who have been shown to have poorer memory than control groups and are more likely than control participants to fill in memory gaps with confabulated material (Clare & Gudjonsson, 1993). However, memories of individuals with ID are not necessarily unreliable; rather, when information is gathered in a non-leading way, they are likely to provide accurate, although usually more limited, information about the event (Ternes & Yuille, 2008). In other words, individuals with ID are less likely to remember the details of the event (Kebbel & Hatton, 1999).

Specific vulnerabilities in individuals with ID, in addition to poorer memory, may account for inaccurate reporting of events (Gudjonsson & Joyce, 2011). Individuals with ID have been shown to be significantly more suggestible to leading questions (Gudjonsson & Henry, 2003; Everington & Fulero, 1999) and significantly more likely to acquiesce (Clare & Gudjonsson, 1993) compared to individuals without ID, although there is variability among individuals with ID on these traits. Suggestibility refers to a tendency toward accepting information communicated by others and incorporating this information into beliefs and memories. Acquiescence refers to the predisposition to passively accept or actively agree with information that is presented (Chronbach, 1946). Thus, investigative procedures that involve

focused and suggestive questions may elicit both agreement with interviewer assumptions and confabulations, thereby decreasing the accuracy of responses (Cederborg & Lamb, 2008; Clare & Gudjonsson, 1993; Joyce, 2003; Kebbel & Hatton, 1999; Kebbel, Hatton, & Johnson, 2004). Partly because of these vulnerabilities, there is a disproportionately high rate of false confessions in ID populations compared to the average population, and this is believed to be associated with (a) misunderstanding the potential consequences of a false confession and (b) the use of interrogative techniques that elicit compliance with the interrogator (Kassin et al., 2010). It is, therefore, a concern that individuals with ID may be prone to providing positive response sets, changing their account of events in response to leading questions, and having misunderstandings about the legal process.

Therefore, a heightened potential for suggestibility and acquiescence in individuals with ID may be relevant in cases of false allegations of sexual assault in which (a) the alleged victim did not initiate the complaint and is consequently questioned in a manner that elicits positive responses and confabulation or (b) suspicion of sexual abuse was conveyed to the victim in a suggestive way by an individual or group that would potentially benefit from an allegation by proxy. In the first case, the individual who initiates the false complaint may have suspicions about sexual abuse related to perceived indications that a sexual assault occurred (e.g., a change in the disabled person's sexual behavior, signs that a sexual relationship may be occurring). In the second case, care providers who serve to benefit from filing a false allegation—perhaps traceable to another psychological pathway for filing a false allegation—might take advantage of the suggestible and acquiescent nature of an individual with ID. In either case, the individual with ID is at a higher risk of submitting a false allegation in these situations than individuals without ID because of this population's greater tendency toward suggestibility and acquiescence.

In a false allegation of sexual assault, shifts in the reporting of core features of the sexual assault (e.g., the general location, features of the assault) may indicate that the methods of questioning were suggestive or that the alleged victim is confabulating. Furthermore, the involvement of a litigation-minded advocate of the alleged victim who has the potential to gain from his or her association with the case might warrant a further investigation into the motives and actions of this individual. If evidence suggests that the origin of the false allegation is related to high suggestibility or acquiescence and thus a false belief that a sexual assault occurred, suggestibility may be assessed by examining the alleged victim's response sets for significantly high levels of agreement with the interviewer and patterns of inconsistent responses emerging after suggestive questioning. Additionally, the Gudjonsson Suggestibility Scale (GSS; Gudjonsson, 1984) has shown to be a reliable and valid (Merckelbach et al., 1998) measure of suggestibility and may be employed as an adjunctive measure of susceptibility to suggestive questioning.

## SUMMARY AND CONCLUSIONS

These 11 pathways merit further investigation and supplementation if additional pathways are identified. Ascertaining the psychological processes and functioning of a claimant may help explain possible motivations and information processing errors that could lead to an untruthful claim. Binder and McNeil (2007) underline the utility of psychological evaluation as a tool in the assessment of accusers and the accused, though they also stress the importance of examining these in the context of the presence or absence of corroborating evidence. Without corroborating evidence, forensic evaluators must acknowledge that "he said, she said" sexual assault cases are inherently difficult to assess for truth and that truth is unlikely to be found in its entirety within the results of psychological evaluation. Nevertheless, psychological evaluations may inform forensic evaluators of psychological processes by which a person may either intentionally or unintentionally file a false allegation of sexual assault. The results of a psychological evaluation are not intended merely as a useful tool for the defense; evaluation may also help establish the veracity of a claimant's account of events and may be relevant for a prosecutor's decisions to pursue an indictment.

In proposing these pathways, it is important to acknowledge that psychological evaluations should serve only as corroborating evidence and should not be construed as sufficient evidence upon which to determine truth. All evidence must be weighed appropriately to assess the veracity of a claim. Forensic evaluators must also be aware that some psychological disorders are more likely to be associated with experiences of sexual assault and abuse. For example, certain populations such as the intellectually disabled and other populations with cognitive difficulties may be at an increased risk of sexual assault. These risks should be assessed and weighed appropriately in conjunction with all of the evidence in cases where the claimant may have difficulty communicating or recalling the entire event.

The legal system has an obligation to be mindful of discrimination faced by victims and biases faced by the accused. Further investigation of pathways and other possible causal mechanisms of false allegations may help elucidate more evidence that can be utilized in the determination of truth in a sexual assault case.

## REFERENCES

Ahlgrim-Delzell, L., & Dudley, J.R. (2001). Confirmed, unconfirmed, and false allegations of abuse made by adults with mental retardation who are members of a class action lawsuit. *Child Abuse and Neglect*, *25*, 1121–1132.

American Psychiatric Association. (1994). *Diagnostic and statistical manual of mental disorders* (3rd ed.). Washington, DC: Author.

American Psychiatric Association. (2000). *Diagnostic and statistical manual of mental disorders* (4th ed., text rev.). Washington, DC: Author.

Bernstein, E., & Putnam, F. W. (1986). Development, reliability, and validity of a dissociation scale. *Journal of Nervous & Mental Disease*, *174*, 318–323.

Bessmer, S. (1984). *The laws of rape*. New York, NY: Praeger.

Binder, R. L., & McNiel, D. E. (2007). "He said-She said": The role of the forensic evaluator in determining credibility of plaintiffs who allege sexual exploitation and boundary violations. *The Journal of the American Academy of Psychiatry and the Law*, *35*, 211–218.

Bisby, J., Leitz, J., Morgan, C., & Curran, V. (2010). Decreases in recollective experiences following acute alcohol: A dose-response study. *Psychopharmacology*, *208*, 67–74.

Block, S. (2006). *Rape and sexual power in early America*. Chapel Hill, NC: University of North Carolina Press.

Boag, S. (2010). Repression, suppression, and conscious awareness. *Psychoanalytic Psychology*, *27*, 164–181.

Breh, D. C., & Seidler, G. H. (2009). Is peritraumatic dissociation a risk factor for PTSD? *Journal of Trauma and Dissociation*, *8*, 53–69.

Brown H., Stein J., & Turk V. (1995). The sexual abuse of adults with learning disabilities: Report of a second two-year incidence survey. *Mental Handicap Research*, *8*, 3–23.

Burnam, M. A, Stein, J. A., Golding, J. M., Siegel, J. M. Sorenson, S. B., Forsythe, A. B., . . . Telles, C. A. (1988). Sexual assault and mental disorders in a community population. *Journal of Consulting and Clinical Psychology*, *56*, 843–850.

Burt, M. R. (1980). Cultural myths and support for rape. *Journal of Personality and Social Psychology*, *38*, 217–230.

Candel, I., Merckelbach, H., & Kuijpers, M. (2003). Dissociative experiences are related to commissions in emotional memory. *Behaviour Research and Therapy*, *41*, 71–725.

Cederborg, A.-C., & Lamb, M. (2008). Interviewing alleged victims with intellectual disabilities. *Journal of Intellectual Disability Research*, *52*, 49–58.

Chronback, L.J. (1946). Response sets and test validity. *Educational and Psychological Measurement*, *6*, 475–494.

Clare, I. C. H., & Gudjonsson, G. H. (1993). Interrogative suggestibility, confabulation and acquiescence in people with mild learning difficulties (mental handicap): Implications for reliability during police interrogation. *British Journal of Clinical Psychology*, *32*, 295–301.

Clay-Warner, J., & Burt, C. H. (2005). Rape reporting after reforms: Have times really changed? *Violence Against Women*, *11*, 150–176.

Crego, A., Holguín, S. R., Parada, M., Mota, N., Corral, M., & Cadaveira, F. (2009). Binge drinking affects attentional and visual working memory processing in young university students. *Clinical and Experimental Research*, *33*, 1870–1879.

Davis, D., & Loftus, E. F. (2008). What's good for the goose cooks the gander: Inconsistencies between the law and psychology of voluntary intoxication and sexual assault. In W. O'Donohue & E. Levensky (Eds.), *Handbook of forensic psychology*. London, UK: Elsevier.

Eisen, M. L., & Lynn, S. J. (2001). Dissociation, memory and suggestibility in adults and children. *Applied Cognitive Psychology*, *15*, S49–S73.

Everington, C., & Fulero, S. M. (1999). Competence to confess: Measuring understanding and suggestibility of defendants with mental retardation. *Mental Retardation*, *37*, 212–220.

Fisher, B. S., Cullen, F. T., & Turner, M. G. (2000). *The sexual victimization of college women*. Washington, DC: U.S. Department of Justice, National Institute of Justice and Bureau of Justice Statistics.

Francis, L. (1996). Appendix 1. In L. Francis (Ed.), *Date rape: Feminism, philosophy, and the law*. University Park, PA: The Pennsylvania State University Press.

Freud, S. (1910). The origin and development of psychoanalysis. *The American Journal of Psychology*, *21*, 181–218.

Galdos, P., & van Os, J. (1995). Gender, psychopathology, and development: from puberty to early adulthood. *Schizophrenia Research*, *14*, 105–112.

Garry, M., Manning, C. G., Loftus, E. F., & Sherman, S. J. (1998). Imagination inflation: Imagining a childhood event inflates confidence that it occurred, *Psychonomic Bulletin and Review*, *3*, 208–214.

Gershuny, B. S., & Thayer, J. F. (1999). Relations among psychological trauma, dissociative phenomena, and trauma-related distress: A review and integration. *Clinical Psychology Review*, *19*, 631–657.

Giesbrecht, T., Geraerts, E., & Merckelbach, H. (2007). Dissociation, memory commission errors, and heightened autonomic reactivity, *Psychiatry Research*, *150*, 277–285.

Giesbrecht, T., Lynn, S. J., Lillienfild, S. O., & Merckelbach, H. (2008). Cognitive processes in dissociation: An analysis of core theoretical assumptions. *Psychological Bulletin*, *134*, 617–647.

Gross, B. (2009). False rape allegations: An assault on justice. *Forensic Examiner*, *18*, 66–70.

Gruben, D., & Madsen, L. (2005). Lie detection and the polygraph: A historical review. *Journal of Forensic Psychiatry and Psychology*, *16*, 357–369.

Gudjonsson, G. H. (1984). A new scale of interrogative suggestibility. *Personality and Individual Differences*, *5*, 303–314.

Gudjonsson, G. H., & Henry, L. (2003). Child and adult witnesses with intellectual disability: The importance of suggestibility. *Legal and Criminological Psychology*, *8*, 241–252.

Gudjonsson, G. H., & Joyce, T. (2011). Interviewing adults with intellectual disabilities. *Advances in Mental Health and Intellectual Disabilities*, *5*, 16–21.

Hall, D. S. (1998). Consent for sexual behavior in a college student population. *Electronic Journal of Human Sexuality*, *1*. Retrieved from http://www.ejhs.org/tocv1.htm

Hemmens, C. (2008). American skin: The Duke lacrosse scandal and the intersection of race, class, gender, and injustice. *American Journal of Criminal Justice*, *33*, 297–306.

Hickman, S. E., & Muehlenhard, C. L. (1999). By the semi-mystical appearance of a condom: How young women and men communicate sexual consent in heterosexual situations. *The Journal of Sex Research*, *36*, 258–272.

Hindmarch, I., & Brinkmann, R. (1999). Trends in the use of alcohol and other drugs in cases of sexual assault. *Human Psychopharmacology, 14,* 225–231.

Horvath, M., & Brown, J. (2005). Drug-assisted rape and sexual assault: Definitional, conceptual and methodological developments. *Journal of Investigative and Offender Profiling*, *2*, 203–210.

Hyman, I. E. J., & Billings, F. J. (1998). Individual differences and the creation of false childhood memories, *Memory*, *6*, 1–20.

Hyman, I. E. J., & Pentland, J. (1996). The role of mental imagery in the creation of false childhood memories, *Journal of Memory and Language*, *35*, 101–117.

International Association of Chiefs of Police. (2005). *Investigating sexual assaults: Concepts and issues paper*. Alexandria, VA: Author.

Joyce, T. A. (2003). An audit of investigations into allegations of abuse involving adults with intellectual disability. *Journal of Intellectual Disability Research*, *47*, 606–616.

Kanin, E. J. (1994). False allegations of rape. *Archives of Sexual Behavior*, *23*, 81–92.

Kassin, M. K., Drisin, S. A., Grisso, T., Gudjonsson, G. H., Leo, R. A., & Redlich, A. D. (2010). Police-induced confessions: Risk factors and recommendations. *Law and Human Behavior*, *34*, 3–38.

Kebbel, M.vR., & Hatton, C. (1999). People with mental retardation as witnesses in court: A review. *Mental Retardation*, *37*, 179–187.

Kebbel, M. R., Hatton, C., & Johnson, S. D. (2004). Witnesses with intellectual disabilities in court: What questions are asked and what influence do they have? *Legal and Criminological Psychology*, *9*, 23–35.

Kelly, L., (2010). The (In)credible words of women: False allegations in European rape research. *Violence Against Women*, *16*, 1345–1355.

Kensinger, E. A. (2007). Negative emotion enhances memory accuracy: Behavioral and neuroscience evidence. *Current Directions in Psychological Science*, *16*, 213–218.

Kindt, M., Van den Hout, M., & Buck, N. (2005). Dissociation related to subjective memory fragmentation and intrusions but not to objective memory disturbances. *Journal of Behaviour Therapy and Experimental Psychiatry*, *36*, 43–59.

Lamont, S., & Brunero, S. (2009). Personality disorder prevalence and treatment outcomes: A literature review. *Issues in Mental Health Nursing*, *33*, 631–637.

Lenzenweger, M. F., Lane, M. C., Loranger, A. W., & Kessler, R. C. (2007). DSM-IV personality disorders in the National Comorbidity Survey Replication, *Biological Psychiatry*, *62*, 553–564.

Lieb, K., Zanarini, M. C., Schmahl, C., Linehan, M. M., & Bohus, M. (2004). Borderline personality disorder. *Lancet*, *364*, 453–461.

Lin, R. Y., Heacock, L. C., & Fogel, J. F. (in press). Drug-induced, dememtia-associated and non-dememtia, non-drug delirium hospitalizations in the United States, 1998–2005: An analysis of the national inpatient sample. *PubMed*.

Linehan, M. M. (1993). *Cognitive behavioral treatment of borderline personality disorder*. New York, NY: Guilford Press.

Lisak, D., Gardiner, L., Nicksa, S. C., & Cote, A. M. (2010). False allegations of sexual assault: An analysis of ten years of reported cases, *Violence Against Women*, *16*, 1318–1334.

Loftus, E. F. (1975). Leading questions and the eyewitness report. *Cognitive Psychology*, *7*, 560–572.

Loftus, E. F. (1993). The reality of repressed memories. *American Psychologist*, *48*, 518–537.

Loftus, E. F. (1997). Creating false memories. *Scientific American*, *27*, 70–75.

Loftus, E. F., Coan, J. A., & Pickrell, J. E. (1996). Manufacturing false memories using bits of reality. In L. M. Reder (Ed.), *Implicit memory and metacognitionI* (pp. 195–220). Mahwah, NJ: Lawrence Erlbaum Associates,.

Loftus, E. F., Miller, D. G., & Burns, H. J. (1978). Semantic integration of verbal information into visual memory. *Journal of Experimental Psychology*, *Human Learning*, *and Memory*, *4*, 19–31.

Loftus, E. F., & Palmer, J. C. (1974). Reconstruction of automobile destruction: An example of interaction between language and memory. *Journal of Verbal Learning and Verbal Behavior, 13,* 585–589.

Lonsway, K. A. (2010). Trying to move the elephant in the living room: Responding to the challenge of false rape reports. *Violence Against Women*, *16*, 1356–1371.

Lonsway, K. A., & Fitzgerald, L. F. (1994). Rape myths: In review. *Psychology of Women Quarterly*, *18*, 133–164.

Mazzoni, G. A. L., Loftus, E. F., Seitz, A., & Lynn S. J. (1999). Changing beliefs and memories through dream interpretation. *Applied Cognitive Psychology*, *13*, 125–144.

McNally, R. J., & Geraerts, E. (2009). A new solution to the recovered memory debate. *Perspectives on Psychological Science*, *2*, 126–134.

Meloy, J. R. (1989). Unrequited love and the wish to kill: Diagnosis and treatment of borderline eratomania. *Bulletin of the Menninger Clinic*, *53*, 477–492.

Merckelbach, H., Campo, J., Hardy, S., & Geisbrecht, T. (2005). Dissociation and fantasy proneness in psychiatric patients: A preliminary study. *Comprehensive Psychiatry*, *46*, 181–185.

Merckelbach, H., Horselenberg, R., & Schmidt, H. (2002). Modeling the connection between self-reported trauma and dissociation in a student population. *Personality and Individual Differences*, *32*, 695–705.

Merckelbach, H., Muris, P., Rassin, E., & Horselenberg, R. (2000). Dissociative experiences and interrogative suggestibility in college students. *Personality and Individual Differences*, *29*, 1133–1140.

Merckelbach, H., Muris, P., Wessel, I., & van Koppen, P. J. (1998). The Gudjonsson Suggestibility Scare (GSS): Further data on its reliability, validity, and metacognition correlates. *Social Behavior and Personality*, *26*, 203–210.

Mitra, M., Mouradian, V. E., & Diamond, M. (2011). Sexual violence and victimization against men with disabilities. *American Journal of Preventative Medicine*, *41*, 494–497.

Ofshe, R., & Watters, E. (1994). *Making monsters: False memories*, *psychotherapy*, *and sexual hysteria*. New York, NY: Charles Scribner's Sons/MacMillan Publishing Co.

Pesant, N. & Zadra, A. (2004). Working with dreams in therapy: What do we know and what should we do? *Clinical Psychology Review*, *24*, 489–512.

Rosenthal, T. T., & McGuinness, T. M. (1986). Dealing with delusional patients: Discovering the distorted truth. *Issues in Mental Health Nursing, 8,* 143–154.

Sanders, B., & Giolas, M. H. (1991). Dissociation and childhood trauma in psychologically disturbed adolescents. *American Journal of Psychiatry*, *148*, 50–54.

Setrakian, L. (2007, April 1). Charges dropped in Duke lacrosse case; North Carolina Attorney General describes Nifong's case as driven by "bravado." *ABC News*. Retrieved from http://abcnews.go.com

Shalock, R. L. (2007). The renaming of "Mental Retardation": Understanding the change to the term "Intellectual Disability." *Intellectual and Developmental Disabilities*, *45*, 116–124.

Spinetta, M., Woodlee, M., Feinberg, L., Stroud, C., Schallert, K., Cormack, L., . . . Schallert, T. (2008). Alcohol-induced retrograde memory impairment in rats: prevention by caffeine. *Psychopharmacology*, *201*, 361–371.

Spohn, C., & Horney, J. (1992). *Rape law reform: A grassroots revolution and its impact*. New York, NY: Plenum.

Taylor, S., & Johnson, K. C. (2007). *Until proven innocent: Political correctness and the shameful injustices of the Duke lacrosse case*. New York, NY: St. Martin's Press.

Ternes, M., & Yuille, J. C. (2008). Eyewitness memory and eyewitness identification performance in adults with intellectual disabilities. *Journal of Applied Research in Intellectual Disabilities*, *21*, 519–531.

Tichenor, V., Marmar, C. R., Weiss, D. S., Metzler, T. J., & Ronfeldt, H. M. (1996). The relationship of peritraumatic dissociation and posttraumatic stress: Findings in female Vietnam theater veterans. *Journal of Consulting and Clinical Psychology*, *64*, 1054–1059.

Tjaden, P., & Thoennes, N. (2006). *Extent, nature, and consequences of rape victimization: Findings from the National Violence Against Women Survey*. Washington, DC: National Institute of Justice.

van Asselt, A. D. I., Dirksen, C. D., Arntz, A., & Severens, J. L. (2007). The cost of borderline personality disorder: Societal cost of illness in BPD-patients, *European Psychiatry*, *22*, 354–361.

van der Kolk, B. A. (1998). Trauma and memory. *Psychiatry & Clinical Neurosciences*, *52*, 97–109.

van der Kolk, B. A., & Fisler, R. (1995). Dissociation and the fragmentary nature of traumatic memories: Overview and exploratory study. *Journal of Traumatic Stress*, *8*, 505–525.

Waller, N. G., Putnam, F. W., & Carlson, E. B. (1996). Types of dissociation and dissociative types: A taxometric analysis of dissociative experiences. *Psychological Methods*, *7*, 300–321.

Welner, M. (2001). The perpetrators and their modus operandi. In M. LeBeau & A. Mozayani (Eds.), *Drug-facilitated sexual assault: A forensic handbook*. London, UK: Academic Press.

Wolitzky-Taylor, K. B., Resnick, H. S., McCauley, J. L., Amstader, A. B., Kilpatrick, D. G., & Ruggiero, K. J. (2011). Is reporting of rape on the rise? A comparison of women with reported versus unreported rape experiences in the National Women's Study-Replication. *Journal of Interpersonal Violence*, *26*, 807–832.