LB1TMAX1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4              v.                        20 CR 330 (AJN)

5  GHISLAINE MAXWELL,

6              Defendant.

7  ------------------------------x
                                  New York, N.Y.
8                                 November 1, 2021
                                  11:05 a.m.
9
   Before:
10
                  HON. ALISON J. NATHAN,
11
                                  District Judge
12

13                    APPEARANCES

14  DAMIAN WILLIAMS
         United States Attorney for the
15       Southern District of New York
    ALISON MOE
16  MAURENE COMEY
    ANDREW ROHRBACH
17  LARA POMERANTZ
         Assistant United States Attorney
18
    COHEN & GRESSER
19       Attorneys for Defendant
    CHRISTIAN EVERDELL
20
    HADDON MORGAN FOREMAN
21       Attorneys for Defendant
    JEFFREY PAGLIUCA
22  LAURA MENNINGER

23  BOBBI C. STERNHEIM
         Attorney for Defendant
24

25

LB1TMAX1

1          (Case called)

2          DEPUTY CLERK:  Counsel, please state your name for the

3     record, starting with the government.

4          MS. MOE:  Good morning, your Honor, Alison Moe for the

5     government, joined at counsel table by Lara Pomerantz, Maurene

6     Comey, Andrew Rohrbach and Sunny Drescher, a paralegal

7     specialist in our office.

8          THE COURT:  Good morning.

9          MS. STERNHEIM:  Good morning, Judge Nathan, Bobby C.

10    Sternheim appearing for Ghislaine Maxwell.  Next to me at

11    counsel table also present are part of the defense team,

12    Jeffrey Pagliuca, Laura Menninger and Christian Everdell.

13         THE COURT:  Good morning, everyone.

14         Good morning, Ms. Maxwell.  Please be seated.

15         I am told, consistent with the protocols, that I can

16    remove my mask while seated here at the bench, and counsel,

17    when they're at the podium, if you wish to speak from the

18    podium, you may remove your mask.  So I will do that.

19         We're here today for a pretrial conference in this

20    matter.  Trial is scheduled to commence with the jury

21    questionnaire process beginning this Thursday, November 4.  As

22    I have indicated, we will begin trial on November 29.

23         As I see it, the primary purpose of today's conference

24    is largely to address the parties' motions in limine and then

25    discuss some additional logistical issues.

LB1TMAX1

1          Counsel, I'm prepared to turn to the motions first,

2     unless there's any reason to deviate from that.

3          Ms. Moe?

4          MS. MOE:  No, your Honor, thank you.

5          THE COURT:  Ms. Sternheim?

6          MS. STERNHEIM:  Not at this time, Judge.

7          THE COURT:  All right.  I am in receipt of the

8     parties' various motions in limine, responses in opposition,

9     and replies in support.  I did require the parties to file the

10    papers on the public docket with their proposed redactions so

11    that the public could have immediate access to the documents.

12         I'll rule on the proposed redactions as quickly as I

13    can, including some that I will discuss today, but we will use

14    the same process going forward so as not to delay public access

15    to the bulk of materials related to pretrial filings.  And I

16    thank counsel for that, as well as the submission to me of the

17    unredacted versions with the color coding indicating requested

18    redactions.

19         The government filed 11 motions in limine and the

20    defense 13, so there's a lot of ground to cover.  I am prepared

21    to discuss all the motions now with the exception of the

22    *Daubert* motion.  As I indicated in an order that was docketed

23    this morning, I will hold a *Daubert* hearing before resolving

24    that motion.

25         As to the rest, some I want to hear further from the

LB1TMAX1

1   parties on issues, some I'm prepared to resolve without further

2   discussion.  For all of them, to the extent I can resolve them

3   or give guidance today, I will.  In some cases, by necessity, I

4   will reserve.

5          Of course, as with all in limine motions, those are

6   preliminary rulings based on what I know now about the

7   anticipated evidence and arguments.  My preliminary rulings are

8   to guide the parties in advance of trial, to guide opening

9   statements and the like.  Facts on the ground, of course, can

10  change during trial and you must reraise issues if you think

11  the other side has opened the door or that premises of certain

12  pretrial holdings no longer hold.

13         With that, I'm going to move slightly out of order and

14  begin with the defendant's 12th motion in limine because it

15  involves terminology questions that apply throughout.  After

16  that motion I will address the government's motions in order

17  and then address the remaining defense motions in order.

18         In the defendant's 12th motion in limine, the defense

19  asked the Court to preclude use of the terms "victim" and

20  "minor victim."  The motion is denied.  Government counsel can

21  use the word "victim" if they're referring to someone alleged

22  to be a victim of the crimes charged in the indictment, and

23  they may use the word "minor" to describe individuals that

24  were, at the relevant time period, under the age of consent.

25         As my colleague, Judge Furman, has explained,

LB1TMAX1

1    precluding the term "victim" is both unnecessary and

2    impractical.  *United States v. Dupigny*, 18 CR 528, transcript

3    of October 17, 2019, Docket No. 198 at 50.  It is appropriate

4    for the government to use the terms as representative of its

5    litigating position.  If the government does this in any way

6    that is atypical or unduly prejudicial, I will revisit.

7         Defense only cites out-of-circuit or state court

8    decisions for the proposition that those terms are inherently

9    prejudicial and harm the presumption of innocence.  Numerous

10   courts of appeal disagree with that argument, particularly when

11   the presentation of evidence and the court's instructions

12   "taken as a whole clarify the government's burden of proving

13   all elements of the crime."  *United States v. Washburn*, 444

14   F.3d, 1007, 1113 (8th Cir. 2006); *see also*, *Server v. Mizell*,

15   902 F.2d 611, 615, (7th Cir. 1990); *United States v. Granbois*,

16   119 F.App'x 35, 38-39 (9th Cir. 2004).

17        Defendant's lone district court opinion does not tip

18   the balance of this authority.  I will, of course, instruct the

19   jury repeatedly that the defendant is presumed innocent and

20   that it is the government's burden and the government's burden

21   alone to prove guilt beyond a reasonable doubt.  Those

22   instructions will eliminate any potential prejudice.  See again

23   Judge Furman's decision in *Dupigny*, Docket No. 198 at 49

24        That matter resolved, I will turn to the government's

25   first motion.  This goes to pseudonyms.  The government moves

LB1TMAX1

1    pursuant to the Crime Victims Rights Act, 18 USC Section 3771,

2    to permit certain witnesses and certain non-testifying

3    witnesses to be referred to by pseudonyms.  And there is also

4    the issue of redacting related exhibits that contain the names

5    or specifically identifying information.  Specifically, the

6    government requests that eight individuals be referred to by

7    pseudonyms or their first name.

8            The defense is already aware of the identities of all

9    of these individuals, and as the government proposes it, the

10   jury will also be aware of the individuals' real identities.

11   The request only implicates how those individuals are referred

12   to in open court.

13           This is well-tread territory, and I will grant the

14   request for the following reasons:

15           The burden to justify this type of request, of course,

16   starts with the government.  It "must provide a reason for the

17   limitation."  *United States v. Marcus*, which is 2007 WL 330388

18   at *1, an Eastern District decision citing *United States v.*

19   *Marti*, 421 F.2d 1283 (2d Cir. 1970).

20           I agree with the government that limiting disclosure

21   here would protect the alleged victims from potential

22   harassment from the media and others, undue embarrassment and

23   other adverse consequences.  The Court has an obligation under

24   the Crime Victims Rights Act to take certain measures at trial

25   to protect the dignity and privacy of alleged victims.  18 USC

LB1TMAX1

1   Section 3771(a)(8).

2           It is quite common for alleged victims, both in cases

3   that have garnered media attention and those involving

4   allegations of sex abuse, to testify or be referred to by

5   pseudonyms or first names.  Courts have allowed this whether or

6   not the alleged victims are minors or adults or adults

7   testifying about abuse that allegedly occurred when they were

8   minors.

9           Let me give a bit of a string cite here.  *See*, *for*

10  *example*, *United States v. Kelly*, No. 19 CR 286, which is a high

11  publicity trial involving adults testifying about sex abuse as

12  minors, and that's in the Eastern District of New York; *United*

13  *States v. Raniere*, No. 18 CR 204, a high-publicity trial

14  involving at least one adult testifying about sex abuse as

15  minor; *United States v. Dupigny*, No. 18 CR 528, involving sex

16  trafficking, *United States v. Kelly*, No. 7 CR 374, and that

17  could be found at 2008 WL 5068820, which is an Eastern District

18  case involving an adult testifying about sex abuse as a minor;

19  *United States v. Graham*, No. 14 CR 500, found at 2015 WL

20  6161292 (S.D.N.Y., October 2015), that involved adults

21  testifying about sex trafficking as minors; *United States v.*

22  *Gardner*, No. 16 CR 20135, found at 2016 WL 5404207, an Eastern

23  District case from 2016 involving adults and adults testifying

24  about sex abuse as a minor, and collecting similar cases.

25          The practice has been widely permitted because

LB1TMAX1

1  requiring alleged victims to publicly provide their names could

2  chill their willingness to testify for fear of having their

3  personal histories publicized.  *Raniere*, Docket No. 622 at 32.

4          Given the sensitive and inflammatory nature of the

5  conduct alleged, such publicity may cause further harassment or

6  embarrassment, and other alleged victims of sex crimes may be

7  deterred from coming forward.  *See*, *Martinez*, 17 CR 281,

8  (E.D.N.Y. 2017), Docket No. 34.

9          Limiting the disclosure of alleged victims' identities

10  in this case furthers these important interests.  The same is

11  true with the identities of certain witnesses, although not

12  alleged victims themselves, because the disclosure of their

13  identities would necessarily reveal the identities of the

14  alleged victims.

15          I'm not persuaded by defense counsel's arguments to

16  the contrary.  First, the defense notes that Ms. Maxwell does

17  not pose a threat to any of the witnesses.  That is plainly

18  true, and the government does not argue or suggest or allege

19  otherwise, but just because that reason for limiting

20  disclosures is absent in this case does not eliminate the

21  possibility of other justifications.  And again, there is a

22  need here to prevent undue embarrassment, harassment from the

23  press and third parties, and any resistance of others to come

24  forward and report alleged abuse.  Cases establish that this is

25  sufficient

LB1TMAX1

1          Moreover, any potential prejudice in this regard can

2     be cured with an appropriate instruction explaining that the

3     reason for the precaution is regard for the witnesses' and

4     alleged victims' privacy, and that no inference can or should

5     be drawn against the defendant because of these precautions

6          My colleagues in this district and elsewhere have used

7     such an instruction in similar cases.  The defense's concern

8     that this sort of instruction affords "Court-sanctioned

9     sympathy and credibility" is unfounded.  My instructions on the

10    law will clearly and repeatedly instruct the jury on the

11    presumption of innocence and their sole role in assessing

12    witness credibility

13         Nor am I persuaded by the defense's arguments that the

14    fact that some alleged victims have previously publicly

15    disclosed some of their allegations obviates the need to limit

16    disclosure.  As another district court has held, "just because

17    some victims' names are publicly available does not mean that

18    the details of their experience are already available."

19    *Raniere*, Docket No. 662 at 34, n. 17

20         As I acknowledged in my protective order for this

21    case, "Not all accusations and public statements are equal.

22    Deciding to participate in or contribute to a criminal

23    investigation or prosecution is a far different matter than

24    simply making a public statement relating to Ms. Maxwell or

25    Jeffrey Epstein."  Docket No. 37 in this case at 2.

LB1TMAX1

1        The government anticipates that the alleged victims

2   will "testify in explicit detail and/or be the subject of

3   highly sensitive and personal testimony concerning illegal

4   sexual abuse.  Thus, there's good reasons to limit public

5   disclosure of their names and specifically identifying

6   information during trial in this highly publicized case

7   involving highly sensitive issues."

8        Since there is a valid reason to limit disclosure in

9   this case, the defense must proffer a particularized need for

10  the disclosure of the relevant information, which is weighed

11  against the risks to the witnesses.  I'll cite here, for

12  example, *United States v. Marcus*, again citing the Second

13  Circuit case in *United States v. Marti*.

14       As both parties acknowledge, the government's request

15  potentially implicates the defendant's right under the Sixth

16  Amendment's confrontation clause which guarantees defendants

17  the right to cross-examine adverse witnesses.  The Second

18  Circuit has identified two central interests defendants have in

19  the public airing of identifying information about witnesses.

20  Again referencing the *Marti* case, 421 F.2d 1263.

21       The first is not relevant here because, as I have

22  noted, the defense is aware of the alleged victims' and

23  witnesses' identities.

24       The defendant argues that the second interest,

25  however, is implicated.  Namely, defense may need the witness

LB1TMAX1

 1   to reveal identifying information because knowledge of that

 2   information by the jury might be important to its deliberations

 3   as to the witness's credibility or knowledgability.  That's

 4   quoting the *Marti* case again.  In particular, the defense

 5   argues that revealing the alleged victims' and witnesses'

 6   identities is necessary to probe the nature of the alleged

 7   victims' occupations as relevant to the credibility and elicit

 8   certain impeachment evidence.

 9           I agree that such cross-examination cannot be unduly

10   limited and the government concedes the same.  The government's

11   motions in limine 15, n. 6; government reply at 17 to 18.  And

12   I will ensure that it is not.

13           My decision today grants the government's request to

14   limit the public disclosure of the alleged victims and some

15   witnesses' names and other specifically identifying

16   information, such as the specific names of current and past

17   employers, names of family members and addresses.

18           Limiting disclosure of the specifically identifying

19   information does not limit the anticipated cross-examination

20   that the defense described in its papers.  All lines of inquiry

21   the defense outlined in its response are available without

22   disclosing specific names of employers or other specifically

23   identifying information.  For example, the defense can probe

24   the genre, nature, and trajectories of witnesses' careers

25   without eliciting the specific employer name, but the defense's

LB1TMAX1

 1   cross-examination should not include specifically identifying

 2   information, and counsel must act responsibly doing so.  If,

 3   after good faith effort in that regard is made and the defense

 4   at some point feels they have hit a wall and can articulate a

 5   specific need with respect to a particular line of questioning,

 6   they can reraise the issue with opposing counsel and with me.

 7         So that's my ruling on that motion.  That said, I do

 8   strongly encourage the government to speak candidly with the

 9   anticipated witnesses so that they're clear eyed about what

10   this process will entail, the fact that cross-examination will

11   not be curtailed beyond the specific identifying information

12   that form the basis of the government's request, and the

13   possibility that despite these measures their identities may

14   become known and revealed to the public.

15         Should any of those witnesses or the government choose

16   not to proceed by pseudonym, the government shall let defense

17   counsel and the Court know.  In the meantime, the government

18   and defense counsel shall confer about names that will be used

19   and any additional process for facilitating the clear

20   presentation of evidence.  The Court will adopt a clear and

21   straightforward approach and the parties are admonished to come

22   to agreement on the use of pseudonyms and/or first names.

23         First assignment, there will be others, by November 10

24   the parties shall submit a joint letter to the Court under seal

25   explaining the nomenclature that they propose be employed with

LB1TMAX1

1    respect to the actual identity of each witness.

2            As I mentioned, I do agree with the government that a

3    limiting instruction explaining the reasons for the precautions

4    is appropriate.  In light of my ruling, I expect the parties to

5    confer and jointly propose such a limiting instruction.

6    Homework No. 2.  This shall also be filed jointly by

7    November 10, and that can be filed on ECF.

8            There are some logistics of voir dire related to this.

9    Some of my colleagues have used the list method that the

10   government proposes on page 15, footnote 5 of their motion, and

11   I agree that this proposal makes sense.  Once again, the

12   parties shall confer and submit on ECF by November 10 a joint

13   proposal for any logistical issues related to this for voir

14   dire.

15           That leaves the issue of sealing unredacted exhibits

16   and the limited redacting of exhibits containing specific

17   personal identifying information.  The government shall manage

18   the logistics of this process throughout trial.  So think

19   through and include in your November 10 submission on ECF the

20   specifics of this part of the process so that the trial

21   exhibits can be contemporaneously marked with the appropriate

22   limited redactions, and the government will need to manage this

23   on an ongoing basis throughout trial.

24           Government's motion 2, the alleged victims' prior

25   consistent statements.  So this goes to the admissibility of

LB1TMAX1

1    any alleged victims' prior consistent statements.  As I can

2    tell from the cross papers here, I don't think there's an issue

3    to resolve now.  The government's reply notes it's not seeking

4    to admit any particular prior consistent statements at this

5    time.

6           Ms. Moe, let me confirm there will be no mention of

7    any such statements in the government's openings, is that

8    correct?

9           MS. MOE:  That's correct, your Honor.

10          THE COURT:  Okay.  Of course, the admissibility of any

11   prior consistent statement hinges on defense counsel's

12   arguments and the purpose for which any statements are being

13   offered.

14          I think the parties agree on the applicable law here.

15   If this does become an issue, as they have outlined in their

16   papers, Rule 801(d)(1)(B)(i) excludes from the rule against

17   hearsay a witness's prior consistent statement offered to rebut

18   the charge of recent fabrication or improper influence or

19   motive.  Of course, the prior consistent statement, should the

20   government seek to have any admitted, must have been made

21   before the motive to fabricate that's alleged arose, or else it

22   has no relevance in rebutting the fabrication charge.  *Tome v.*

23   *U.S.*, 513 U.S. 150, (1995).

24          The rule's second subsection excludes prior consistent

25   statements from the rule against hearsay when they're offered

LB1TMAX1

to rehabilitate a witness attacked on another ground.  It's

801(d)(1)(B)(ii).  For example, the statement could be admitted

to explain what would otherwise appear to be an inconsistency

in the witness's statement and rebut a charge of faulty memory.

*United States v. Purcell*, 967 F.3d 159, (2d Cir. 2020).

If it becomes relevant, the government may offer prior

statements before the witness testifies if the defense attacks

the credibility in opening statements and it's clear that the

witness will be subject to cross-examination.  *United States v.*

*Flores*, 945 F.3d 687, (2d Cir. 2019).  That's restating the

applicable law here that the parties appear to agree to in the

briefs.  The government doesn't anticipate any such effort to

offer such statements at this time and won't mention any in

opening beyond that.

Is there anything specific to flag or discuss here,

from the government's perspective?

MS. MOE:  No, your Honor, thank you.

THE COURT:  Ms. Sternheim?

MS. MENNINGER:  Your Honor, Laura Menninger.  None for

the defense at this time.  Thank you.

THE COURT:  All right.  Thank you.

The government's 3 and 4, which I'm going to group,

the government seeks to preclude evidence and arguments by the

defense, (1) about the investigation in Florida, including the

non-prosecution agreement, (2) that Ms. Maxwell was not charged

LB1TMAX1

by the U.S. Attorney's Office in the Southern District of

Florida, (3) about the scope and timeline of investigation in

New York, and (4) other evidence that demonstrates the

government's motives for investigating Ms. Maxwell.

The Court's analysis here is guided by four principles

set by the Second Circuit and the Supreme Court.

First, because the government has no duty to employ,

in the course of a single investigation, any particular

investigative technique, the failure to utilize some particular

technique does not tend to show that a defendant is not guilty

of the crime of which he's been charged and is therefore

irrelevant. *United States v. Saldarriaga*, 204 F.3d 50, (2d

Cir. 2000). That's the first legal principle that frames the

discussion here.

Second, arguments that the government had an improper

motive generally must be directed to the Court rather than the

jury. *United States v. Regan*, 103 F.3d 1072, (2d Cir. 1997);

*see also*, *United States v. Farhane*, 634 F.3d 127 (2d Cir.

2011).

Third legal principle:  There is no per se bar on

admitting evidence of the government's charging decisions.

Rather, the Court must -- I will quote here -- "inquire into

its relevance and probative value to the respective case."

*United States v. White*, 692 F.3d 235 (2d Cir. 2012); *see also*,

*United States v. Ngono*, 801 F.App'x. 19 (2d Cir. 2020).

LB1TMAX1

1          Fourth, the confrontation clause of the Sixth

2     Amendment guarantees a criminal defendant the right to

3     meaningful cross-examination of government witnesses at trial.

4     *United States v. Figueroa*, 548 F.3d 222, (2d Cir. 2008).

5     Indeed, cross-examination is the principal means by which the

6     believability of a witness and the truth of his testimony are

7     tested.  *Davis v. Alaska*, 415 U.S. 308, 316, (1974).

8          With this legal framework in mind, and in light of the

9     parties' extensive briefing on these issues, I think the

10     admissibility of some of the proposed evidence can be

11     determined now, but the admissibility of other evidence will

12     require additional facts and the context of trial to decide,

13     but I think it's important for me to give guidance.

14          Based on the papers before me, I provide the following

15     guidance:  First, the Court will preclude affirmative evidence

16     by the defense that goes to the thoroughness of the

17     investigation.  Although evidence that goes to the thoroughness

18     of the government's investigation can in some cases be relevant

19     and may in some cases be admissible, it's not relevant or

20     admissible if not probative of the defendant's guilt of the

21     crimes charged.

22          In its briefing, the defense relies heavily on *Kyles*

23     *v. Whitley*, 514 U.S. 4 (1995), in which the Supreme Court held

24     that an informant's statements to police were material for

25     purposes of *Brady* disclosures because the statements could be

LB1TMAX1

used to "attack the thoroughness and even the good faith of the investigation."

That holding has only limited relevance here.  First, the statement at issue in *Kyles* was probative because it suggested the defendant's innocence, not because it was evidence of the reasons for the charging decision or the investigation's timeline.

Second, the Second Circuit in *Watson v. Greene* narrowly construed the holding in *Kyles* by clarifying that it "addresses only the prosecution's obligations to disclose *Brady* material" and "provides no guidance about what evidence must be admitted at trial or what lines of questioning must be permitted to ensure a meaningful opportunity to cross-examine adverse witnesses."  *Watson v. Greene*, 640 F.3d 501, 512, n. 11 (2d Cir. 2011).

Now the Second Circuit's decision in *Watson* does, however, suggest that some arguments about the thoroughness of the investigation are probative of guilt in some circumstances. In that case, law enforcement had received a tip that the defendant was innocent because another individual shot the victim.  The Second Circuit stated that cross-examination of the lead investigating officer on that tip was probative because the jury could conclude that law enforcement had prematurely concluded the defendant was the shooter and it failed to investigate diligently the possibility that it was

LB1TMAX1

1    the other individual.  *Watson*, 640 F.3d, 511-12.

2            Other courts in this Circuit have described challenges

3    to the thoroughness of the investigation as a "common method of

4    undermining a prosecution" by, for example, cross-examining

5    officers on which leads they followed and which they did not.

6    *See, for example, Gray v. Ercole* -- I don't have that full

7    quote -- 2011 WL 5082868 (E.D.N.Y 2008).  Or defense counsel

8    may, on cross, examine investigating officers if they

9    considered alternative suspects.  *United States v. Birbal*, 92

10   CR 98, 1996 WL 192924 at *7, that's the District of the

11   Vermont, 1996.  That was affirmed by the Second Circuit at 113

12   F.3d 1230.  And I will quote here, "The length of the

13   investigation, the investigative techniques used, and the fact

14   that the defendant was not initially a target of the

15   investigation are all irrelevant pursuant to" the principle

16   that the government's failure to use particular investigative

17   techniques does not tend to show that the defendant is not

18   guilty.  *See*, *for example*, *United States v. Duncan*, No. 18 CR

19   289, 2019 WL 2210663 (S.D.N.Y. 2019); see also, *United States*

20   *v. Aleynikov*, 785 F.Supp.2d 46, 65 (S.D.N.Y. 2011).

21           The other two cases the defense cites, neither of

22   which is binding on the Court, don't suggest anything different

23   than the law I just referred to.  In *Bowen v. Maynard*, the 10th

24   Circuit held that *Brady* evidence in the government's possession

25   was material because it suggested that another likely suspect

LB1TMAX1

did not have an alibi and suggested that a photo lineup was unduly suggestive.  799 F.2d 593, (10th Cir. 1986).  The court stated that, if disclosed, "the defense could have cross-examined the detectives about their decision to use the photographs" that they did as well about their failure to corroborate the other suspect's alibi.

And the defense cites another *Brady* violation in *Lindsey v. King* where the Fifth Circuit found that a police report was material under *Brady* because it showed key witnesses to a murder had changed their story, which on cross-examination would have meant the destruction of the witness's identification and the discrediting in some degree of the police methods employed in assembling the case against the defendant.  *Lindsey v. King*, 769 F.2d 1034, (5th Cir. 1985).

These two examples of focused cross-examination to impeach a witness that testified to the defendant's guilt and thereby throw the product of the government's investigation into doubt are far afield from the specifics of what the defense proposed here.  In its brief, the defense seeks to affirmatively -- and I will quote from their brief -- "call FBI case agents as witnesses" to ask who they talked to, what documents they subpoenaed, and when.  *See*, defense's response at 40.  But as the Second Circuit explained in *Saldarriaga*, the government's use or non-use of certain investigative techniques does not tend to show the defendant's innocence of the charges.

LB1TMAX1

1          The defense also seeks to elicit evidence of the

2     public outcry and scrutiny that preceded the decision to charge

3     the defendant.  The defense refers to public statements made by

4     assistant United States attorneys -- not those appearing in the

5     case -- to suggest that Ms. Maxwell was charged for improper

6     reasons.

7          The Court finds that this specific proffered evidence

8     is irrelevant to the charged conduct and, therefore,

9     inadmissible.

10          To the extent that the defense's affirmative evidence

11     in this regard would have some marginal probative value, it is

12     substantially outweighed by 403 prejudice.  *See*, *for example*,

13     *United States v. Hill*, 12 CR 214, 2014 WL 198813 (E.D.N.Y.

14     2014), affirmed by the Second Circuit, 658 Fed. Appx. 600.

15          Here's the reason for that 403 analysis:

16          First, investigative details are likely to confuse the

17     jury about the proper standard for determining Ms. Maxwell's

18     guilt by suggesting that the government's choices of

19     investigative techniques are relevant to whether guilt is

20     proved beyond a reasonable doubt.  Moreover, I will instruct

21     jurors, as is standard, to the effect that the government is

22     not on trial.  And that standard charge can be found in many

23     cases.  Admitting testimony on the investigation would confuse

24     the jury once it's received that instruction.

25          Second, these lines of argument are likely to

LB1TMAX1

        1    substantially confuse and delay the trial.  The evidence

        2    outlined in the defense's papers, including who was interviewed

        3    and when, what documents were subpoenaed and other details of

        4    investigations in two different states and different time

        5    periods would substantially expand the scope of the trial.

        6    Exactly what steps investigators took is not a simple question,

        7    of course.  The government would likely present a contrary

        8    account of events, leading to trials within trials on what law

        9    enforcement did over the course of years.  This prejudice would

       10    substantially outweigh any minimum probative value that might

       11    be gained from such a far-flung endeavor.

       12            Third, as to prejudice, the evidence would be

       13    cumulative, demonstrating that an investigation was "hasty" and

       14    not thorough is at best repetitive of the defense's arguments

       15    that the government collected insufficient evidence of guilt.

       16    That point is made most clearly and directly by focusing on the

       17    evidence or lack of evidence and credibility or lack of

       18    credibility of the witnesses presented at trial.

       19            The second piece of guidance I can provide now is that

       20    the Court will exclude much of the evidence outlined in the

       21    defense's papers of the government's alleged motives for

       22    investigating and charging Ms. Maxwell.  This evidence includes

       23    but is not limited to the Miami Herald article, statements from

       24    Attorney General William Barr and the like.

       25            The evidence presented by the government in this trial

LB1TMAX1

1    is the relevant basis for the jury's determination of guilt or

2    innocence.  Why and when the government conducted the

3    investigation is not relevant.  If the defense believes the

4    government has a legally improper motive for prosecuting

5    Ms. Maxwell or somehow fabricating evidence or suborning

6    perjury or the like, the Second Circuit has made clear that the

7    proper remedy is to file a motion for the Court to consider.

8    *See*, *Regan*, 103 F.3d 1082.  Absent that, the law is clear that

9    for purposes of the jury, "the government is not on trial."

10   *United States v. Knox*, 687 F.App'x 51, (2d Cir. 2017).

11          Moreover, evidence of motive would be highly

12   prejudicial.  For the reasons I explained a moment ago, it

13   would confuse jurors as to the proper standard of guilt to be

14   applied in the case.  Indeed, the defense's outlined evidence

15   of improper motives is strongly suggestive of jury

16   nullification because it suggests a vindictive or political

17   prosecution which is rightly a matter reserved to the Court.

18          Calling witnesses to testify to the government's

19   motive would substantially expand the scope of trial, rely

20   likely on hearsay and other inadmissible evidence.  So what

21   motivated a particular investigative step or charging decision

22   of course doesn't have a black or white answer, and the defense

23   would have one story and the government another, neither of

24   which would assist of the jury in deciding Ms. Maxwell's guilt

25   or innocence of the charges here based on of the government's

LB1TMAX1

1    ability to prove its case beyond a reasonable doubt.

2            Third piece of guidance:  The Court will exclude from

3    evidence the non-prosecution agreement, both its existence and

4    its particular terms.  The defense argues the NPA is relevant

5    to the bias and financial interest of two witnesses.  One

6    anticipated witness received immunity from criminal prosecution

7    under the NPA.  Additionally, under the NPA, Epstein agreed to

8    pay for a lawyer for an alleged victim who was anticipated to

9    testify and agreed not to contest her civil suit against him.

10   The civil suit ended in a settlement with respect to an alleged

11   victim.

12           Of course, defendants are always able to cross-examine

13   witnesses about relevant bias.  For example, cross-examination

14   about civil litigation or civil claims against Epstein or

15   others and related financial incentive are fair grounds.

16   Moreover, cooperating witnesses are commonly cross-examined

17   about how testimony may affect the sentence that they receive.

18   And if it were the case that any witness were to receive

19   testimonial immunity in this case, the defense may

20   cross-examine about that.  But the defense has not explained

21   any bias or incentive to fabricate that results from or relates

22   to the NPA.  Regardless of how the witness covered by the NPA

23   might testify, that witness will remain protected under the NPA

24   in the Southern District of Florida, and as I already ruled,

25   the NPA does not provide protection in the Southern District of

LB1TMAX1

New York.

Similarly, no matter how a witness who has a
settlement or financial incentive testifies, those benefits are
not received under the NPA, so I don't see any theory of bias
that would be relevant that the defense has articulated with
respect to the NPA.

Moreover, even if there were some relevance, it would
be substantially outweighed by a significant risk of 403
prejudice from introducing the NPA.  The jury would need to be
instructed on what the non-prosecution agreement is, and would
need to have its terms explained.  In particular, NPA, of
course, is controversial and complicated and has a complicated
background.  There's a risk of undue delay, juror confusion,
and improper suggestions of sympathy or nullification made to
the jury on the basis of the NPA.

I will be clear, it's not clear to me the NPA could
never be admitted, but the rationale now provided by the
defense in its papers does not justify admission based on the
balancing of 401 and 403 factors.

Fourth guidance:  The government's charging decisions
are likely not relevant and therefore inadmissible.  The
government didn't indict Ms. Maxwell by the end of the Florida
investigation, and the government didn't indict Ms. Maxwell
when it indicted Jeffrey Epstein originally in New York.  As
the Second Circuit stated in *White*, charging decisions can be

LB1TMAX1

admissible under the usual rules of relevance.  In *White*, the

court determined that a prior charging decision was admissible

because it bore directly on the credibility of a witness that

testified at the defendant's trial.

As currently proffered by the defense, the rationale

doesn't apply here.  For example, according to the defense, an

alleged victim's statement to the FBI previously did not

implicate or exculpate Ms. Maxwell, but her statement today

does implicate her.  On the basis of that statement, and

assumedly other evidence available to them and a host of

reasons, officials in the Southern District of Florida decided

to not indict Ms. Maxwell at that time.  That charging decision

could be understood as a determination that in 2008 the

government lacked sufficient evidence of Ms. Maxwell's guilt,

but the decision not to charge -- or it could mean any number

of a host of reasons, but the decision not to charge has little

probative value that the Court can see as to this case.

Charging decisions, as I said, are made for a host of

reasons.  Trying to sort through those reasons would be

prejudicial pursuant to 403 both because they would require

significant time to explore and because juror confusion would

be likely.  Any consideration of the government's decisions

would also likely rely on hearsay or other inadmissible

evidence.  More importantly, unlike in *White*, those officials'

assessments of the evidence in Florida in 2008 is not relevant

LB1TMAX1

to the jury's decision now, which is whether there is evidence

of Ms. Maxwell's guilt beyond a reasonable doubt as the

government will put its case to the jury.

          Now there is a difference between admitting a witness'

prior statements for impeachment purposes, which is protected

by the confrontation clause, and admitting prior charging

decisions.  In a case analogous to this one on this issue,

*United States v. Borrero*, another district court judge held

that a defendant could permissibly cross-examine a witness

about their prior statement to law enforcement in which they

accused a different individual of the crime for which the

defendant was later charged.  2013 WL 6020773 (S.D.N.Y. 2013).

That case docket is 13 CR 58.  But the court there did not

admit the charging decision that the early investigation had

ended in a nolle, because it would confuse jurors, require

extended factual disputes, and was, at best, cumulative of the

witness's statement.  As I have explained, the same would

appear to be true here.

          Fifth piece of guidance:  In contrast to what I

indicated may not come in, the Court will permit relevant

cross-examination of the government's witnesses.  Defense seeks

to impeach the credibility of some witnesses by admitting those

witnesses' prior statements to the government that purportedly

did not implicate Ms. Maxwell.  This use of cross-examination

to impeach a witness that has allegedly changed her story to

LB1TMAX1

1    law enforcement is exactly the kind of attack on the

2    thoroughness of the government's investigation that the Fifth

3    Circuit approved in *Lindsey v. King*.  Provided that the rules

4    for admitting prior inconsistent statements are satisfied, the

5    Court concludes that this line of evidence is relevant and

6    admissible.

7         The defense may also cross-examine about witnesses'

8    motives or biases for testifying, including, for example, the

9    witnesses' motives for implicating Ms. Maxwell after Jeffrey

10   Epstein's death.  Admitting prior statements on

11   cross-examination may require providing the jury some

12   background information about the prior investigations so that

13   the prior statements are understood in the proper context and

14   the jury is provided necessary background to understand that

15   evidence.

16        (Continued on next page)

17

18

19

20

21

22

23

24

25

LB15MAX2

1    THE COURT:  (Continuing)

2        I imagine this can be done through cross-examination

3    questions if the witness has personal knowledge.  I would also

4    encourage the parties to discuss stipulations in this regard to

5    provide the jury any necessary and non-prejudicial context or

6    background, or other proposals for permitting the jury to

7    understand the background or context without crossing over into

8    the 403 prejudice line.

9        I also would permit the defense to cross-examine law

10   enforcement officers about the investigative steps that were

11   taken if the government puts the thoroughness of the

12   investigation into issue as this, too, would be permissible

13   impeachment and cross.

14       These articulated lines of cross-examination of

15   government witnesses would be relevant to impeach a witness by

16   suggesting bias or otherwise implicating their credibility.

17   Moreover, denying Ms. Maxwell these lines of questioning would

18   have implications under the confrontation clause.  The Court

19   expects that the probative value would not be substantially

20   outweighed by 403 prejudice if done along the lines of what I

21   have indicated, especially if accompanied by a limiting

22   instruction by the Court that, for example, prior inconsistent

23   statements are to be considered for their impeachment value and

24   the like.

25       Similarly, the Court may instruct the jury that

LB15MAX2

1    counsel made only a good faith -- actually, I will retract that

2    last sentence.

3          At base, the Court encourages the parties to confer on

4    appropriate process for putting background information in front

5    of the jury, as necessary, to allow the kinds of

6    cross-examination that would be permissible and required under

7    the relevant law.

8          Let me pause and ask counsel if they have any

9    questions with respect to the guidance I have offered at this

10   time.  Obviously there may be issues we will need to take up as

11   we go.

12         Ms. Moe?

13         MS. MOE:  Not from the government, your Honor.  Thank

14   you.

15         MR. EVERDELL:  Your Honor, Christian Everdell.

16         Not at this time, your Honor.

17         THE COURT:  Thank you.

18         No. 6, evidence that goes to consent issues.

19         The government requests to exclude evidence or

20   argument regarding consent.  Now let me ask counsel, it seems

21   to me the issues implicated in this motion overlap, at least

22   potentially, to the issues raised and to be discussed in the

23   412 motion and I am wondering if we should at least begin by

24   taking it up at that time, as necessary.

25         MS. MOE:  Your Honor, the government agrees that makes

LB15MAX2

1    sense to address this issue at the same time.

2              MS. STERNHEIM:  We agree.

3              THE COURT:  So we will defer on that.  In light of the

4    overlap on the 412 issues we will take that up at the 412

5    hearing.

6              Government's 7.  The government argues that before

7    offering evidence or argument of Ms. Maxwell's failure to

8    commit other bad acts it should require the defense to proffer

9    the basis and the relevance of such evidence.  Let me hear from

10   the government what the specific concern is here and then I

11   will speak to the defense.

12             MS. MOE:  Yes, your Honor.  Thank you.

13             The concern here is what the defense has flagged in

14   its opening papers relating to statements by other victims who

15   were interviewed during the course of the government's

16   investigation.  Evidence along those lines, if proffered in an

17   opening statement, or if asked about in cross-examination of a

18   law enforcement officer, would be inappropriate and hearsay.

19   Such evidence could only come in at trial, if at all, if the

20   defense called, as defense witnesses, victims who were not at

21   issue in this case.  And so, for that reason, your Honor, the

22   defense should be precluded from opening on this issue unless

23   and until they proffer which victims these statements would

24   come through, who they would anticipate calling as defense

25   witnesses at trial so the Court can assess whether that is

LB15MAX2

1    relevant at all.

2              As the government set forth in its moving papers, the

3    defendant is not charged with trafficking certain victims and

4    so whether or not the defendant is guilty of those crimes is

5    irrelevant before this jury.

6              THE COURT:  Ms. Sternheim, any mention on opening with

7    respect to this line of --

8              We will ask everyone please make sure your masks are

9    on -- counsel, fully on -- unless you are at the podium.

10             MS. STERNHEIM:  Judge, I just want to say that we are

11   honoring your one counsel rule but we have designated various

12   topics.

13             THE COURT:  Appreciate it.

14             MS. STERNHEIM:  So if you will allow us?

15             THE COURT:  Go ahead.

16             MS. MENNINGER:  Your Honor, I don't believe that we

17   will be opening on these issues but I think the government is

18   understating what is charged in the indictment.  They have put

19   forth an indictment that does not just allege the four main

20   accusers, rather they have set forth a conspiracy that they

21   claim involves a number of other unnamed individuals, and I

22   believe they have proffered an intent to put other evidence

23   about unnamed individuals in their exhibits, in their trial

24   testimony.  For example, there are a number of exhibits that

25   they've set forth that come from a time period outside of the

LB15MAX2

1    conspiracy and so forth.  So it is our position that if they

2    open the door to evidence about anyone other than these four

3    then we would, likewise, be able to talk about the fact that

4    those other individuals were interviewed by the government and

5    said that Ms. Maxwell is not involved, was not there, and was

6    not a part of the activities that they're talking about.  None

7    of the cases that the government cited had to do with a

8    co-conspirator.  The evidence was just because a defendant did

9    not act in conformity with the charged conduct on a separate

10   occasion, couldn't be set forth by the defense.

11             THE COURT:  Do you agree with that principle?

12             MS. MENNINGER:  Yes, your Honor.  If it is good

13   character evidence, generally I understand the rules of

14   evidence wouldn't apply, but what we have here is a 10-year

15   charged conspiracy with an intent by the government to allude

16   to other individuals.  To the extent they try to put on

17   evidence in the form of message pads or other types of evidence

18   that refer to other people, then I think we have the ability to

19   confront that evidence with the fact that Ms. Maxwell was

20   reported by those individuals not to have been involved.

21             THE COURT:  Ms. Moe?

22             MS. MOE:  Thank you, your Honor.

23             The government agrees that this issue can be deferred

24   until trial unless and until this becomes an issue, provided

25   the defense counsel doesn't intend to open on this issue.

LB15MAX2

1   However, even if this became an issue at the trial, the remedy

2   would be to permit the defense to call these relevant witnesses

3   to talk about whether the defendant was or was not involved in

4   their sex trafficking.  The remedy would not be to permit

5   defense from cross-examining law enforcement agents about

6   hearsay statements that other individuals provided to them.  It

7   would be extremely confusing for the jury to be hearing,

8   through law enforcement agents, the statements of these

9   individuals to assess whether or not those individuals

10   implicated the defendant or simply said nothing about the

11   defendant.  And so, the government submits that the only way

12   that this could come in at trial would be if the defense called

13   those witnesses themselves and, of course, it is difficult to

14   determine the potential relevance, if any, of testimony along

15   those lines, and so the government respectfully submits that

16   none of this should be offered at trial unless and until there

17   is an offer of proof along those lines.

18          THE COURT:  Ms. Menninger?

19          MS. MENNINGER:  Your Honor, whether someone said no

20   one else involved or didn't implicate our client is not

21   hearsay, it is the absence of a statement.  So I don't

22   understand the government's position that if an investigator --

23          THE COURT:  It is not the absence of the statement,

24   right?  If you are trying to put in an out-of-court statement

25   from someone who said that Ms. Maxwell wasn't involved, it is

LB15MAX2

1    an out-of-court statement you are putting on for the truth, it

2    is hearsay.

3              MS. MENNINGER:  Slightly different, your Honor.

4              If a witness says they interviewed -- if a law

5    enforcement says they interviewed another accuser and that

6    accuser never said that Ms. Maxwell was involved, that's not a

7    hearsay statement.  They just didn't mention her, it is the

8    absence of a statement.  And as your Honor just ruled in terms

9    of the thoroughness of the investigation, if there is evidence

10   that the government puts on about these other accusers I think

11   that's what opens the door.  It is not us opening the door, it

12   would be them submitting evidence that other people were

13   victims without putting those people on, putting on message

14   pads that had their names on it, and then precluding us from

15   introducing evidence that none of those individuals implicated

16   Ms. Maxwell.

17             THE COURT:  Right.  So, if the government does that

18   you are not precluded from putting other evidence on.  The

19   question is what evidence would it be and would it be

20   admissible under the relevant rules of evidence.  I am not sure

21   I can resolve that in the abstract.  It sounds like neither

22   side intends to open with respect to this issue and I think we

23   largely agree on the legal principles.  Tell me if you need

24   more guidance for purposes of opening or preparing your case.

25             Ms. Menninger?

LB15MAX2

1          MS. MENNINGER:  No, your Honor.  I think it depends on

2    the trial testimony.

3          THE COURT:  Ms. Moe?

4          MS. MOE:  No, your Honor.  Thank you.

5          THE COURT:  It sounds like the government does need to

6    think about its opening and whether reference to non-testifying

7    alleged victims would open the door, potentially, to the issue.

8          MS. MOE:  Yes, your Honor.  And it remains the

9    government's position that, to the extent the defense is

10   offering anything along these lines, it would be for the truth

11   and, therefore, hearsay.  But given the fact that the parties

12   don't intend to open on this issue, we don't believe our

13   opening statements would open the door to this issue either, we

14   are happy to raise this issue at the appropriate time.

15         THE COURT:  OK.

16         MS. MOE:  Thank you, your Honor.

17         THE COURT:  OK.  Thank you.

18         Next is government 8 which are prior statements of

19   Ms. Maxwell.  I think I come away from the papers agreeing with

20   the defense that this one may be premature but, Ms. Moe, what

21   is the specific concern?  What are prior statements that you

22   are worried about here?

23         MS. MOE:  Yes, your Honor.

24         For example, the government has produced to the

25   defense in discovery a large volume of electronically-stored

LB15MAX2

1     information including e-mails between the defendant and Jeffrey

2     Epstein.  It is difficult for the government to determine in

3     the abstract what the defense might point to, but that night

4     include, for example, a false exculpatory statement.  And so

5     the government's view is unless and until there is a proffer

6     from the defense about a specific statement, that the defense

7     should be precluded from offering a statement along those lines

8     in opening statements or otherwise.

9                 THE COURT:  Who is taking this one?

10                MR. PAGLIUCA:  Your Honor, good morning.  Jeffrey

11    Pagliuca for Ms. Maxwell.

12                Your Honor, this is a trial time decision.  It depends

13    on what witness is testifying and whether or not there is a

14    relevant exception to the hearsay rule.  I mean, we understand

15    the rules, we will follow the rules, and if the witness

16    testifies and it becomes relevant, we will ask the question.

17    If there is an objection, the Court will resolve the objection.

18                THE COURT:  And you understand you are going to be

19    restrained by what one might say is an asymmetry between the

20    government's ability to use out-of-court statements by the

21    defendant and the defense's inability to do that, absent some

22    other --

23                MR. PAGLIUCA:  Absolutely, your Honor.

24                THE COURT:  OK.

25                MR. PAGLIUCA:  We understand the hearsay rules.

LB15MAX2

1            THE COURT:  From your perspective, anything further

2       that could be addressed at this time or needs to be addressed?

3            MR. PAGLIUCA:  On this topic your Honor?

4            THE COURT:  Yes.

5            MR. PAGLIUCA:  No.

6            THE COURT:  Ms. Moe?

7            MS. MOE:  No, your Honor.  Thank you.

8            THE COURT:  The next is government 9 which is to

9       preclude evidence or argument sounding in nullification.  I

10      agree with the defense that there is no need for me to rule on

11      this presently.  I trust that defense counsel knows well the

12      clear rules around any such arguments so it is a bit hard to

13      think about what guidance I can offer here.

14           Ms. Moe, is there a specific concern you want to

15      raise?

16           MS. MOE:  Thank you, your Honor.

17           Aside from the examples we proffered in our motion,

18      there is nothing in particular that this motion is aimed at and

19      so I don't think anything more along those lines to address

20      today.

21           MS. STERNHEIM:  Nothing at this time.

22           THE COURT:  OK.  So nothing referenced with respect to

23      the government's concerns about nullification would be

24      implicated in the anticipated opening?

25           MS. STERNHEIM:  That is correct.

LB15MAX2

1              THE COURT:  Government 10.  Let me say, as a

2      preliminary matter, the government requests that the entirety

3      of this motion be sealed.  I have read the government's letter

4      and the footnote 11 in the motion.  In my mind they don't

5      justify sealing.  As best I can understand the argument the

6      government is saying that the defense should be precluded from

7      make a certain argument because there is no evidence in support

8      of it.  If the government is right about that then pretrial

9      publicity would amount to coverage that there is no evidence of

10     that argument.  If the government is wrong about that then the

11     evidence in argument comes in so there is no prejudice either

12     way.  Frankly, I think the theory of prejudice here runs

13     counter to the whole project of pretrial motion *in limine*

14     practice which is to litigate, for purposes of trial

15     preparation and trial efficiency and opening statements and the

16     like, what's in and what's out.  That's going to sometimes

17     require litigation on what's out.  So I don't see a basis to

18     seal this and I think we can discuss it today.

19             But let me begin by simply asking the defense if it

20     intends to make the argument that is outlined in the

21     government's motion 10.

22             MS. STERNHEIM:  Your Honor, it is too soon to say what

23     we are going to do at trial.  Certainly we have no burden of

24     putting on a case and I know the government is well aware of

25     that, but insofar as the government seeks to preclude us from

LB15MAX2

1    raising any issues concerning Ms. Maxwell, I think it is

2    entirely premature and it will depend upon testimony from their

3    witnesses and they know well what their witnesses have said

4    that could support that.  I don't think we need to delve into

5    that at this point.  It is not anything that we are opening on.

6    We need to see how the evidence plays out.

7              THE COURT:  OK.

8              MS. MOE:  Your Honor, if the defense is not opening on

9    this issue we are certainly happy to raise it during the trial.

10   We would ask that the defense be required to front this issue

11   before asking witnesses questions about this on

12   cross-examination because for the reasons set forth in the

13   government's moving papers, the government submits that

14   evidence along these lines would not be relevant.

15             Briefly, your Honor, with respect to the sealing

16   issue, the government understands the Court's concerns and

17   would certainly not object to unseeing this portion of the

18   motion at the conclusion of the trial but I --

19             THE COURT:  I don't see why -- I just don't see how --

20   obviously some sealing on issues is appropriate in order to

21   protect interests that are in play during the course of the

22   trial.  This just doesn't fall within that.  So my inclination

23   is, no -- and I have not had the ability to go through the

24   complicated set of sometimes overlapping, sometimes not

25   overlapping redaction requests contained throughout these

LB15MAX2

papers which is why I ordered you just get them up on the

docket rather than deprive the public of seeing the bulk of

what is contained in the motions, but I looked at this one and

I don't see a basis for sealing it in its entirety and I don't

see a basis for redaction so I'm not going to grant that

request.

          MS. MOE:  Understood, your Honor.

          THE COURT:  I think there is nothing further on 10.

No issue for opening.  We will figure out a process, once I

have had a chance to rule on the remainder of the sealing

requests, for putting on the docket any redactions that I don't

approve of and we will take this up if it arises.  I think

everybody understands, obviously, that I trust, again, the

defense will have a basis for an argument that they're making

and to the extent this issue arises, raise it, so that we can

deal with it.

          MS. STERNHEIM:  We will.

          THE COURT:  Thank you.

          Government 11.  The final issue in the government's

motion is request to preclude the defense from arguing that the

defendant was a "prevailing party in civil litigation."  I will

grant this motion.  The fact that the defendant was deemed a

prevailing party after a settlement in civil litigation seems

irrelevant and highly prejudicial.  The defendant, as I

understand it, was deemed a prevailing party following a

LB15MAX2

voluntary dismissal of civil litigation pursuant to a

settlement agreement, and after the dismissal the defendant

sought costs as a prevailing party under Federal Rule of Civil

Procedure 54(d)(1), and at least as described in the papers the

alleged victims opted to pay the fairly minimal amount sought

rather than burden the court and other resources with continued

litigation.

          The fact that the defendant received costs pursuant to

civil procedure 54(d) after a civil settlement just has no

relevance to the charges at hand as far as I can tell and there

is substantial danger of confusing the issues and misleading

the jury.  If the defense elicited that the defendant was the

prevailing party, a layjuror would almost certainly assume that

that was some kind of adjudication on the merits relevant to

this case but there is no evidence that there was any relevance

adjudication on the merits and certainly none relevant to the

case.  Any probative value gained by the introduction would be

substantially outweighed by juror confusion and the waste of

time needed to explain the differing postures of the current

case and the prior civil litigation.  So on those 401/403

balancing grounds the government's motion in this regard is

granted.

          Any questions before I turn to the defense motions?

          MS. MOE:  Not from the government, your Honor.  Thank

you.

LB15MAX2

1              MS. MENNINGER:  Your Honor, very briefly on the last

2      issue.  I assume that there won't be any argument by the

3      government or their witnesses that they believe that they had

4      an adjudication on the merits, in other words both the victims'

5      compensation fund and the civil litigation, there was no right

6      of confrontation, Ms. Maxwell wasn't a party to those

7      settlement agreements.  So, to the extent the government tries

8      to suggest to the jury that they somehow had an adjudication,

9      someone else found that their claims had merit, I think that

10     would be confusing to the jury as well and I assume it would

11     also be deemed by this Court to open the door to an explanation

12     from the defense about what really happened in those

13     proceedings.

14              MS. MOE:  Thank you, your Honor.

15              The government does not intend to elicit any testimony

16     from the victims about being a prevailing party in any civil

17     litigation or otherwise.  To the extent the government elicits

18     any testimony about civil litigation from the victims it would

19     only be in order to front that issue for the jury in

20     anticipation of cross-examination along those lines.

21              THE COURT:  Right.

22              MS. MOE:  The government certainly wouldn't be

23     offering that evidence to suggest to the jury in any way that

24     those were adjudications on the merits, nor could we, those

25     were civil settlements.

LB15MAX2

```
 1          THE COURT:  Anything further on that, Ms. Menninger?

 2          MS. MENNINGER:  I didn't hear any reference to the

 3   victim's compensation fund but there certainly was no

 4   adjudication on the merits by a fund that Ms. Maxwell had no

 5   party to the settlement.

 6          THE COURT:  Correct.

 7          Same response, Ms. Moe?

 8          MS. MOE:  Yes, your Honor.  And in fact, again, we

 9   would only be eliciting information about that on direct

10   examination to front that issue for the jury in anticipation of

11   cross-examination along those lines.  To the extent the defense

12   wishes not to cross-examine the victims about the victims

13   compensation program, we certainly agree not to address that at

14   all on direct examination.

15          THE COURT:  I imagine the defense does anticipate

16   referring to civil settlements and the victims' compensation

17   fund as part of its cross of anticipated witnesses, correct?

18          MS. MENNINGER:  That is correct, your Honor.

19          THE COURT:  So the government can front those issues

20   to take out the sting.  To the extent there is any

21   implication -- it would not be remitted to make any implication

22   as to what those settlements or receiving of funds would mean

23   as to the issues relevant here.  The only issue relevant here,

24   as I see it, goes to incentive for bias and credibility issues.

25          MS. MENNINGER:  It just depends on what the witness
```

LB15MAX2

1    says, your Honor.  I agree that these are issues that it's

2    important for the Court to be aware of before trial but I can't

3    predict, and I'm not really sure that the government can

4    predict, what their witnesses will say or suggest in their

5    actual testimony.  When they open the door through fronting it,

6    it may be that they say something that suggests that there was

7    someone who believed them, that there was a victims'

8    compensation fund that believed them.  If those kinds of words

9    are used by the witness, then that becomes problematic in terms

10   of our ability to be hamstrung in cross-examination that there

11   was no actual confrontation during that process.  So, depending

12   upon what the witnesses say we would re-raise this but I do

13   think it's important for the Court to sort of have that in mind

14   when the government is trying to use evidence to front an issue

15   but then potentially opening the door to us being open to cross

16   on the same type of language that their witnesses used.

17            THE COURT:  Ms. Moe?

18            MS. MOE:  Your Honor, again, the government doesn't

19   anticipate that the testimony would come out that way but, in

20   any event, I think with respect to the specific concern defense

21   counsel has raised, to the extent it opened the door I don't

22   believe it would open the door to separate collateral issues

23   about a separate civil lawsuit and resolution of that civil

24   lawsuit.

25            THE COURT:  Yes.

LB15MAX2

1          MS. MOE:  But, beyond that, your Honor, we don't

2     anticipate this would be an issue.

3          THE COURT:  OK.  I think we are in agreement.

4          My clerk noted I inadvertently skipped over Government

5     5 so we will return to that.  This is the government's

6     expectation that the testimony of certain witnesses would

7     include statements by individuals that are not testifying and

8     the government argues that the defense can't attack the

9     credibility of those non-testifying individuals because their

10    statements would not be admitted for their truth but, for

11    example, their effect on the testifying witness and the like.

12         Again, I think without more specificity it is

13    difficult to make a definitive ruling but I'm happy to hear

14    examples to give some guidance.

15         Ms. Moe?

16         MS. MOE:  Thank you, your Honor.

17         I think there will be limited testimony from a victim

18    about her interaction with other victims.  I think the

19    statements that would come in from those other victims would be

20    offered not for their truth but because they are instructions,

21    they would be offered for that effect on listener and to

22    explain the course of events that followed.  We don't

23    anticipate offering any statements from non-testifying victims

24    for their truth and so we don't anticipate opening the door to

25    a line of cross-examination about their credibility.  And so,

LB15MAX2

```
1    for that reason, we would ask that the defense be precluded
2    from opening on this issue or otherwise raising issues related
3    to the credibility of individuals who would not be testifying
4    at this trial including not only non-testifying victims but
5    also attorneys.
6            MS. MENNINGER:  Your Honor, even the statement "a
7    non-testifying victim" is very loaded because who is going to
8    testify that that person is a victim and on what ground?
9    That's the problem.
10           THE COURT:  Well, I wouldn't allow testimony by a
11   witness about a characterization that goes to a legal issue so
12   of course they could testify about observations involving other
13   people.  I can imagine instances in which they testify about
14   statements of others not offered for the truth but I wouldn't
15   anticipate the government would attempt to do any of that via
16   any characterization of those individuals that go to legal
17   conclusions relevant to the jury's role.
18           Do I have that right, Ms. Moe?
19           MS. MOE:  Yes, your Honor.
20           MS. MENNINGER:  It is interesting, because in their
21   offer of proof they actually say that one witness is going to
22   talk about another person being a victim of sexual abuse and
23   that second person isn't going to testify, and the question of
24   whether that person was a victim of sexual abuse would turn on
25   the age at which they were conducting certain activities.  And
```

LB15MAX2

1   so, just as we were arguing earlier, your Honor, if the

2   government is trying to put on evidence about other people

3   being victims, then that opens the door to us challenging that

4   other person's credibility.  I don't have any issue with the

5   way we briefed it which was it just depends on what is said by

6   the witness and we will certainly re-raise these issues.  But,

7   the government can't have their cake and eat it, too.  If they

8   want to put on evidence about a broad number of supposed

9   victims then we have the obligation, ethically, to challenge

10  whether or not those other individuals are in fact victims.

11          THE COURT:  Well, I think maybe speaking in the

12  abstract is where the fine points get lost.  So if a testifying

13  witness testifies about something that she observed involving

14  the defendant and another individual, that doesn't open the

15  door to attacking the credibility of that other individual.

16          Agree to that basic premise?

17          MS. MENNINGER:  Correct, your Honor; an observation

18  alone.

19          THE COURT:  And if the witness testifies that another

20  individual, using the name or pseudonym -- if that is what is

21  appropriate in light of the Court's ruling, I don't have it

22  firmly in mind at this point but, just as an example:  Someone

23  told me to go to somebody's home.  That doesn't put the

24  credibility of the out-of-court witness in issue, does it?

25  Because that is not being offered for the truth.  Now, if it

LB15MAX2

1    says go to so and so's home at the following address --

2                MS. MENNINGER:  Or what is going to happen there and

3    why do I think it is going to happen there -- those kinds of

4    things -- that is really getting into the circumventing the

5    not-for-the-truth issue.

6                THE COURT:  I don't think those other points could

7    come in because they would be for the truth.

8                MS. MENNINGER:  Hearsay, right.

9                THE COURT:  So they don't come in, obviously you can't

10   attack credibility.

11               Ms. Moe, do you disagree with any of that?

12               MS. MOE:  No, your Honor.  The government agrees.  And

13   if this issue arises, we would certainly agree to a limiting

14   instruction about those out-of-court statements not being

15   offered for their truth.  We don't anticipate that there would

16   be any testimony from an out-of-court declarant who is a victim

17   offered for its truth at this trial, and so we don't anticipate

18   option the door.

19               THE COURT:  If the government thinks any of these, of

20   what it does intend to offer, is close to the line on that

21   question, it must raise them before inquiring or raising it in

22   opening.

23               MS. MOE:  Certainly, your Honor.

24               THE COURT:  OK.

25               Anything further on that?

LB15MAX2

1          MS. MENNINGER:  No.  Thank you, your Honor.

2          THE COURT:  All right.

3          Anything else before turning to the defense motion?

4          MS. MOE:  No, your Honor.

5          MS. STERNHEIM:  No, thank you.

6          THE COURT:  Defense 1 relates to the government's

7    disclosure of co-conspirator statements.  The parties spill a

8    lot of ink about the meaning of prior orders and whether the

9    government has fully met its disclosure obligations as set out

10   by those orders.  The government did not violate my orders and

11   the defense motion to preclude the government from introducing

12   any alleged co-conspirator statements is denied.

13          I do think the schedule, as set out in this case, has

14   provided for certainly a vastly earlier disclosure schedule

15   than any other trial over which I have previously presided and

16   I do think the defense is well equipped to know what is coming

17   and can responsibly raise issues that can be dealt with in

18   advance of trial.  Here, the defense has the names of the

19   co-conspirators who will be mentioned by the government at

20   trial and it has the government's marked exhibits, and although

21   it doesn't feel like it, we still have a month to go before

22   trial.  That said, here is how we will proceed on this point --

23   and this is another homework assignment.

24          By this Thursday, November 4, the government will

25   provide to the defense the categories of the kinds of

LB15MAX2

1    co-conspirator statements that it intends to introduce at trial

2    pursuant to 801(d)(2)(E) and specifically representative

3    exemplars of each category whether by exhibit number or

4    anticipated testimony.  That is a process that I have used

5    before, I think not infrequently used, in order to try to

6    litigate anything that could be litigated.  So the government

7    will do that by November 4th.  The defense, bearing fully in

8    mind the well-established law regarding conditional admission

9    of the co-conspirator statements, the defense should indicate

10   to the government, by November 8, any good faith, non-frivolous

11   objections to the introduction of any such statements.  After

12   conferring, if there are disputes remaining that wouldn't

13   obviously fall into the law regarding conditional admission,

14   the government shall file a letter, by November 10, justifying

15   admission of exemplars and statements over which the parties

16   disagree.  So that's the 10th, and then the defense could put

17   in an opposition, in writing, by November 12th.

18            Any questions about that, Ms. Moe?

19            MS. MOE:  No, your Honor.  Thank you.

20            THE COURT:  Ms. Sternheim?

21            MR. PAGLIUCA:  We are clear, your Honor.  Thank you.

22            THE COURT:  I think it is probably worth maybe just a

23   moment, because it impacts this issue and some other ones, to

24   just discuss one category of potential statements that's been

25   flagged and that's alleged co-conspirator statements that date

LB15MAX2

1    after what's alleged in the indictment as of the date of the

2    conspiracy.

3           Let me ask, Ms. Moe, if are you in position to say,

4    does the government intend to seek admission of alleged

5    co-conspirator statements that post-date the dates of the

6    conspiracy alleged in the indictment?

7           MS. MOE:  Your Honor, I think I would want a moment to

8    confer with my colleagues about that and so, if possible, we

9    would like to address that in our November 10th letter.

10          In brief, as a preview, I think to the extent there

11   were any statements that post-dated the time frame of the

12   charged conspiracy we would be offering them only to the extent

13   they reference the charged conduct.  But, again, I would like

14   to confer with my colleagues and think through that in detail

15   before making a representation to the Court, and so we ask to

16   brief that as well at the same time.

17          THE COURT:  Anyone want to take this now?  Or just

18   wait?

19          MR. PAGLIUCA:  Your Honor, I am happy to wait but it

20   is clear to me that there are post-alleged-conspiracy

21   statements that the government will attempt to introduce and I

22   think we attach what were the representative samples of those

23   statements.  And so I don't think it should be a surprise, as

24   we sit here today, what those statements may or may not be.  I

25   think whether or not you want to say that those statements go

LB15MAX2

1    to something alleged in the indictment doesn't change the

2    801(d)(2)(E) analysis and that is it has to be made in the

3    course of and in furtherance of a conspiracy.  So post-event

4    statements that don't have anything to do with furtherance of

5    the conspiracy are simply hearsay and inadmissible.

6          I think that's a pretty simple proposition, your

7    Honor.

8          MS. MOE:  Your Honor, among other reasons why we would

9    like time to think about this further and address it in more

10   detail, is that Rule 801(d)(2)(E) is not limited to the charged

11   conspiracy at trial, a statement said in furtherance of the

12   conspiracy even if it is not the charged conspiracy.  And so we

13   would want to think through that as well.  And we would also

14   want to think through, even if a statement is offered by a

15   co-conspirator, whether it is being offered under Rule

16   801(d)(2)(E) at all.  And so we would just ask for additional

17   time to think through that to make sure we give an accurate and

18   thorough representation to the Court.

19         THE COURT:  So, I will stick with the process and

20   schedule that I have indicated but I do think we will separate

21   out statements that post-date the conspiracy as charged in the

22   indictment and the government will indicate grounds for the

23   specific introduction of any of those anticipated statements.

24   OK, Ms. Moe?

25         MS. MOE:  Yes, your Honor.  Thank you.

LB15MAX2

1           MR. PAGLIUCA:  Yes, your Honor.  That's fine.

2           THE COURT:  Thank you.

3           Defendants 2 is the admission of certain evidence

4    outlined in the government's 404(b) letter dated October 11,

5    2021.  First, as to the defense argument that there has been an

6    inadequate notice under 404(b), I disagree because the

7    government's letter and briefing between the government's

8    letter and the briefing here, the defendant has "reasonable

9    notice" of any 404(b) evidence so the question is whether the

10   evidence can be properly admitted.  I think there is two

11   categories of evidence, the first goes to e-mails, and I will

12   speak in the just general description which I think is

13   appropriate.  The government may have attempted to redact some

14   general description and to the extent that you have, I disagree

15   with that but I will speak generally -- I'm sorry, the defense

16   requested redaction as to some general description but I don't

17   think it's appropriate.  So I'm going to ask the government, if

18   this understanding is correct, that the e-mails reflect

19   instances of the defendant setting up dates that involve women

20   over the age of consent.

21           MS. MOE:  Your Honor, I think as we noted in our

22   briefing, for some of the documents it is unclear what the age

23   range is.

24           THE COURT:  So you wouldn't be able to prove that it

25   was under the age of consent?

LB15MAX2

1          MS. MOE:  Exactly, your Honor.

2          THE COURT:  For our purposes I think we need to assume

3     over the age of consent, correct?

4          MS. MOE:  Your Honor, I think it would be ambiguous

5     from the evidence but we are not proffering them as evidence of

6     conduct with respect to other minors.

7          THE COURT:  OK.  So, let's just start with the

8     following statement:  You are seeking to introduce e-mails that

9     involve the defendant setting up people on dates with women

10     over the age of consent?

11          MS. MOE:  Your Honor, because we are not able to

12     determine the age of those individuals --

13          THE COURT:  Let's assume that you could for some of

14     them.  Right?  Are you seeking to introduce those?  It is clear

15     that the women involved are over the age of the consent.  Are

16     you seeking to introduce those e-mails?

17          MS. MOE:  I think the e-mails that the defense has

18     moved to preclude don't say one way or the other the age --

19          THE COURT:  You are fighting my hypo.  So, to be

20     clear, it is a hypothetical.  If you have an e-mail involving

21     the defendant setting someone up on a date with someone who the

22     government knows is over the age of consent on the basis of the

23     argument made here, are you seeking to introduce it?

24          MS. MOE:  Yes, your Honor.

25          THE COURT:  And why?

LB15MAX2

1          MS. MOE:  The government respectfully submits that

2     although the defense is free to characterize these as dates,

3     the tenor of the e-mail suggests that she is offering up women

4     largely based on descriptions based on physical descriptions

5     and not in sort of a matchmaking capacity.  And so, I think the

6     jury would be free to conclude from those e-mails that the

7     defendant is serving a particular role with respect to the men

8     that she is e-mailing with.

9          THE COURT:  Are you suggesting like some kind of

10    financial arrangement?

11         MS. MOE:  No, your Honor.

12         I think the issue, as reflected in our briefing, is

13    that a jury may wonder at this trial about the relationship

14    between Ms. Maxwell and Mr. Epstein and why Ms. Maxwell would

15    be willing to serve in a particular role with respect to

16    Mr. Epstein, and it is probative of that issue that she is

17    serving a similar role, albeit in a different context, with

18    other men during that same time frame.

19         THE COURT:  On the e-mails, I am excluding them.

20         The indictment charges the defendant with conspiring

21    and aiding and abetting the transport and enticement of minors

22    to engage in illegal sex acts and the commercial sex act

23    e-mails setting up dates between non-minors or meetings,

24    however you want to describe it, involving non-minors are not

25    direct evidence of the crimes charged, they don't arise out of

LB15MAX2

the same transaction or series of transactions as the charged

offenses, they're not inextricably intertwined with the

evidence nor necessary to complete the story of the crime on

trial.  The government doesn't allege that the individuals in

these e-mails have anything to do with the crimes charged nor

could they on the assumption that they can't establish that any

of the individuals are below the age of consent.

As for 404(b), I am also not convinced.  The

government argues that the e-mails show motive, intent, plan,

and knowledge.  Any potential probative value here would be

substantially outweighed by the possibility of confusing the

jury.  Thus, I grant the defendant's motion as to Government's

Exhibits 401 through 404, 409, 410, and 413.

The next category is the anticipated testimony that --

and this involves someone who has knowledge based -- this goes

to the post-date conspiracy charged.  This is someone who, as I

understand it, has knowledge that post dates the conspiracy

alleged; is that right?

MS. MOE:  That's correct, your Honor; and that

testimony will be proffered principally authenticate certain

evidence relevant to the charged conduct.

THE COURT:  OK.

Who is taking this?  With respect to authenticating

evidence, do you have an objection, Ms. Menninger?

MS. MENNINGER:  Yes, your Honor, because it is

LB15MAX2

1    post-dating the alleged conspiracy.  For example, there are

2    documents -- I don't know, they weren't specified which

3    documents that this witness intends to authenticate, but among

4    the documents that I believe the witness may attempt to

5    authenticate, they are dated in 2005 and beyond.  And so the

6    question really is whether you can -- it is an authentication,

7    one, whether that relates to the conspiracy or not.  As we set

8    forth in our reply, your Honor, there is a real concern because

9    a number of, I think, the entire first series of exhibits, are

10   largely taken from a period outside of the charged conspiracy.

11   I think this witness may attempt to authenticate some of those

12   exhibits and they haven't established why that will be relevant

13   to the charged time period of the conspiracy.  They really

14   didn't argue 404(b) on this point and we asked for additional

15   time in terms of the direct evidence because we had just

16   received these 400 pages that relate to that particular

17   witness, your Honor.

18           THE COURT:  So the basic contention would be if we

19   have a document that, on its face, that post-dates the charged

20   conspiracy.  I mean that, alone, is I think the first point of

21   your objection, right?

22           MS. MENNINGER:  Yes, your Honor.

23           THE COURT:  The authentication issue aside.  What is

24   the relevance of a document that, on its face, post-dates the

25   charged conspiracy?  Let's start with that, Ms. Moe.

LB15MAX2

1          MS. MOE:  Yes, your Honor.

2          The category of exhibits that this witness would be

3    authenticating would include, among other things, contact

4    information for the minor victims and so the fact that that

5    contact information and messages from those victims was in

6    Mr. Epstein's residence and, in part, in the defendant's

7    possession is relevant regardless of the time frame and is

8    corroborative of the other evidence at trial.

9          THE COURT:  The charged conspiracy ends and then

10   Mr. Epstein maintains addresses of individuals alleged to be

11   victims here.  Is that the context?

12         MS. MOE:  Yes, your Honor; but more specifically with

13   respect to the two categories of exhibits, the first would

14   include messages that were left at the residence during the

15   time frame of the charged conspiracy, they are dated and

16   include a name of a victim and her contact information and so

17   this witness will be authenticating those.  Those documents

18   come from the time frame of the charged conspiracy and were

19   created at the time frame of the charged conduct.

20         With respect to a second category of information --

21         THE COURT:  And you have a witness who would

22   authenticate that they were created at the time of the charged

23   conduct which, presumably, wouldn't be somebody who doesn't

24   come onto the scene until after the time period of the charged

25   conduct.  Fair to say?

LB15MAX2

1          MS. MOE:  Your Honor, those records would be

2     authenticated through number of different witnesses; in part,

3     law enforcement officer describing those exact records being

4     seized from the residence in 2005 in their general description

5     and format, witnesses describing the practice for maintaining

6     those records contemporaneously and doing so in the course of

7     their employment.

8          THE COURT:  Contemporaneous to what?

9          MS. MOE:  At the time the message was made.

10          THE COURT:  During the period of the conspiracy?

11          MS. MOE:  Yes, your Honor.  And that testimony would

12     include testimony about the format of these documents, where

13     they were kept, and the practice for keeping messages along

14     these lines.  We think that is consistent with the Second

15     Circuit's rulings on authentication being based on the

16     particulars of a document and their formatting and their

17     contents.  So I think this would come in through a number of

18     witnesses and, collectively, at the conclusion of that

19     testimony, we would offer those exhibits based on that

20     foundation.

21          THE COURT:  And I don't think I can rule on that in

22     advance until we hear the authentication evidence being

23     offered.  What you have proffered I think -- I will hear from

24     the defense -- but it seems like those pieces could add up to

25     authentication.

LB15MAX2

1    But take the example, if you would, that a document

2    that, on its face, post-dates the charged conspiracy, for what

3    purpose would you be offering that?  And let's use the address

4    book as an example.

5        MS. MOE:  Yes, your Honor.

6        With respect to that particular document, the

7    testimony would be that that document belonged to the defendant

8    and that she -- and the document itself would include contact

9    information for some minor victims under a certain heading that

10   has relevance to the case and organized in a certain way that

11   is consistent with victim testimony.  So, whether the defendant

12   held on to that or maintained it following the conclusion of

13   the charged conspiracy, it would nonetheless be relevant to

14   establish the defendant's knowledge to confirm her contact with

15   those victims and to be corroborative of other exhibits at

16   trial.

17       THE COURT:  If the evidence were that it wasn't

18   created or maintained until after the charged conspiracy, is it

19   relevant?

20       MS. MOE:  Yes, your Honor.

21       If, at the conclusion of the conspiracy, the defendant

22   nonetheless memorialized that information about those victims,

23   it would nonetheless be relevant to her knowledge to rebut

24   arguments that she didn't know the victims or have contact with

25   them and so certainly that would be relevant, your Honor.

LB15MAX2

1           THE COURT:  Ms. Menninger?

2           MS. MENNINGER:  Your Honor, I am a little confused but

3   what I think I understand the government is saying is that

4   knowledge after the conspiracy is relevant to the time frame of

5   the conspiracy.  I don't believe that the witness we are

6   talking about, who didn't start working until after the time of

7   the conspiracy for Mr. Epstein, would be able to set forth the

8   foundation that they're claiming.  I believe that this is more

9   likely to be a trial-time testimony decision because I think

10  there will be some pretty substantial objections to the ability

11  of this witness to authenticate the document which I know your

12  Honor is aware from other briefing, is what we consider to be

13  from a very suspect source and obtained years later.  There is

14  a lot of notations and things on it that will not be anything

15  that this witness can attest to.  I think it is Exhibit 52.

16          THE COURT:  Yes.

17          MS. MENNINGER:  I don't think it is relevant to the

18  time period of the conspiracy.

19          THE COURT:  Right.

20          I guess the question, given the pieces of

21  authentication that the government intends to offer through

22  different witnesses and what sounds like lines of

23  cross-examination as to those pieces, I think at that point I

24  am potentially -- at least the government will have to proffer,

25  put forward questions and get answers from the witness that

LB15MAX2

 1    would go to authentication.  I just don't know if I am in a

 2    position to rule at this point but let me ask both sides if

 3    anybody intends -- I mean, take Exhibit 52, is that going to be

 4    mentioned in opening?

 5          MS. MOE:  Your Honor, the government doesn't

 6    anticipate opening with respect to Government Exhibit 52 but

 7    may address, in opening, other categories of exhibits, for

 8    example, the message pads that I just referenced.

 9          MS. MENNINGER:  Your Honor, that's a problem.  In

10    terms of the message pads that have a post-conspiracy date on

11    them without a witness who can authenticate them under any

12    exception under hearsay in opening statements, we would

13    strongly object to that.  I still have not heard appropriate

14    grounds to lay a foundation or relevance for those.

15          THE COURT:  Yes.  Let's take the message pads.  Who

16    will authenticate?

17          MS. MOE:  Your Honor, a number of witnesses.  I think

18    we would be offering those messages at the conclusion of a

19    series of witnesses laying foundation for their authenticity

20    including law enforcement witnesses and employees talking about

21    the circumstances under which messages were maintained but we

22    don't anticipate offering messages in those message books that

23    post-date the time frame of the charged conspiracy.

24          THE COURT:  OK.  So the government will not mention

25    any message pads that post-date the charged conspiracy in its

LB15MAX2

1    opening.

2              MS. MOE:  That's correct, your Honor.

3              THE COURT:  Ms. Menninger, anything further on that?

4              MS. MENNINGER:  Nothing further on that, your Honor.

5              THE COURT:  OK.

6         Anything further in this general category that needs

7    to be addressed now, Ms. Menninger?

8              MS. MENNINGER:  If there is no other evidence that the

9    government intends to offer via Rule 404(b), then no.  There

10   was a reference to another exhibit -- GX- 416 -- in the

11   government's briefing.  That was not one of the exhibits that

12   was mentioned in the Rule 404(b) letter.  I assume because it

13   was not mentioned in that letter it cannot be offered through

14   404(b).  It is of a same type and characteristic of the e-mail

15   that your Honor has excluded so I don't know what the intent is

16   there.

17             THE COURT:  Ms. Moe?

18             MS. MOE:  Yes, your Honor.

19        We didn't include that exhibit in our notice.  We are

20   offering it as direct evidence, unlike the other evidence which

21   were included in our notice.  That document is a series of

22   notes.  The metadata for that exhibit reflects that the

23   defendant created that series of notes but, unlike the other

24   exhibits outlined in our letter, it doesn't appear that that

25   was directed at a third-party as opposed to Mr. Epstein,

LB15MAX2

1    although it is not clear from the document to whom it's

2    directed.

3         MS. MENNINGER:  It relates to individuals in their 30s

4    and 20s, your Honor.  I'm just unclear how it relates to

5    charged conduct or direct evidence of a conspiracy to abuse

6    underage females.

7         THE COURT:  It seems like it falls within my -- it

8    wasn't specifically moved for exclusion but because of the

9    government not including it in its notice but I'm not seeing --

10   I am pulling it up but I'm not seeing a notice -- a basis, from

11   what I am hearing, distinguishing it from my ruling on the

12   e-mails.

13        MS. MOE:  Your Honor, the government submits that

14   along with other exhibits at trial, which will establish the

15   defendant's role with respect to Mr. Epstein and her role in

16   particular in setting up sexualized massages for him, that this

17   is corroborative of other exhibits and other testimony at trial

18   that the defendant did in fact serve that role, was willing to

19   do -- take steps along those lines.  And so, for that reason --

20        THE COURT:  But it involves, clearly, people over the

21   age of consent?

22        MS. MOE:  That's correct, your Honor.

23        THE COURT:  Let me just pull it up.

24        For the same reasons, 416 is excluded.

25        MS. MOE:  Understood, your Honor.

LB15MAX2

1          THE COURT:  Anything else on this?

2          MS. MENNINGER:  No, your Honor.  Thank you.

3          THE COURT:  Next is Defendant's Exhibit 3 which is the

4    motion to exclude the excerpt which, as I have indicated, we

5    will take up at the Daubert hearing.

6          Let's take a short comfort break.  10-minute break.

7          (Recess)

8          (Continued next page)

LB1TMAX3

1      THE COURT:  We'll pick up with Defense 4.  This is the

2  issue of evidence related to alleged Victim-3.

3      Defense seeks to exclude evidence related to this

4  individual that's not probative of the charged conspiracy and

5  inadmissible under 404(b) and 403.  There are redactions issues

6  here.  Redactions of specific identifying information is

7  permissible here.  I don't think that redactions as to some

8  general background information that does not reveal specific

9  identifying information regarding the alleged victims is

10  necessary, but we'll proceed bearing in mind the requested

11  redactions.

12      I want to begin this one with questions for the

13  government.  Ms. Moe, so it's a hypothetical.  I gather there's

14  statute of limitations issues, but setting the statute of

15  limitations issue aside, if the only evidence in the case

16  pertained to this individual, if all the testimony of this

17  individual is accepted by the jury, could the defendant be

18  found guilty of any crimes charged in the indictment?

19      MS. MOE:  With respect, just so I understand the

20  hypothetical, if the only count in the indictment were the Mann

21  Act conspiracy ––

22      THE COURT:  No, any of the crimes charged, just

23  stipulate to that, but if the only evidence pertains to this

24  individual.

25      MS. MOE:  Yes, your Honor.  The answer is no.  In

LB1TMAX3

1    particular, because with respect to -- that's why I was

2    clarifying, your Honor.  With respect to the Mann Act

3    conspiracies, the particular criminal sexual activity relates

4    to a particular statute in New York.  And with respect to the

5    sex trafficking --

6              THE COURT:  The particular statute in New York that

7    the government here -- that's 130.053(a), right?

8              MS. MOE:  Yes, your Honor.

9              THE COURT:  And that establishes 17 as the age of

10   consent for the underlying sexual activity that's charged in

11   the indictment.

12             MS. MOE:  That's correct, your Honor.

13             THE COURT:  So the Mann Act is going to -- the case

14   that the government is going to prove here is going to

15   incorporate that as the illegal sexual conduct.

16             MS. MOE:  That's correct, your Honor.

17             THE COURT:  So couldn't be convicted with respect to

18   that count.

19             MS. MOE:  That's correct, your Honor.  And that's

20   among the many reasons why we submit there's very little

21   potential prejudice of offering this testimony considering its

22   relevance to the counts charged, because given the elements of

23   the offense standing alone and the statute of limitations

24   issue, we think there's no 403 issue here.

25             THE COURT:  Well, not just with respect to the Mann

LB1TMAX3

Act, there's no count charged in the indictment for which the

defendant could be convicted -- again, setting aside -- I'm not

dealing with the statute of limitations issue, put it out of

your mind.  So assuming no statute of limitations issue, could

the defendant be convicted of any count charged in the

indictment based on the evidence as it pertains to this?

MS. MOE:  No, your Honor, we have not charged the case

that way, and that testimony alone wouldn't satisfy those

crimes charged.

THE COURT:  And is the government's position that this

individual could be deemed a victim for restitution purposes or

any legal purpose with respect to the crimes charged in this

case and the case that the government is going to put on?

MS. MOE:  Your Honor, with apologies, I haven't

thought through the restitution issue.  I would want to confer

with my office about that.  I'm not certain, your Honor.

THE COURT:  Well, if the defendant can't be indicted

based on this conduct -- again, assuming no statute of

limitations issue, assuming that the jury adopts and accepts

all of the testimony as true, the defendant couldn't be

convicted of any of the crimes charged based on that conduct,

how could that individual be deemed a victim of the crime

charged?

MS. MOE:  I understand the Court's point, your Honor.

I guess my concern is that the distinction between charging

LB1TMAX3

1    based on that conduct alone and the evidence based on that

2    conduct alone, we submit that, given the course of conduct in

3    the charged conspiracy, that Minor Victim-3 is a victim of an

4    ongoing conspiracy, which is one of agreement and intent.

5          We submit that her testimony alone wouldn't establish

6    a violation of the Mann Act, and without the other

7    circumstances of other victim testimony, we couldn't establish

8    that there was an ongoing intent to transport minor victims.

9    But given that the crime here is conspiracy and one of

10   agreements and mental states and not about attempts to violate

11   certain statutes or agreements to do so, it's about the

12   intention at the time of agreement during the course of a span

13   of conduct.

14         THE COURT:  But it has to be an intention to engage in

15   an illegal act.

16         MS. MOE:  That's correct, your Honor.

17         THE COURT:  And so I think I need an answer to the

18   question.  There is a distinction, surely, between criminality

19   and evidence of criminality.  You have evidence of criminality,

20   which is not itself criminality, for sure.  You have 403

21   questions and the like.  But I need to know the government's

22   position I think for a number of things in issue, including

23   Defendant's 4.  So you have confirmed that the defendant

24   couldn't be found guilty of any crimes charged based on the

25   conduct alleged with respect to what you refer to as alleged

LB1TMAX3

Victim-3.

      MS. MOE:  Yes, your Honor.

      THE COURT:  And you're not sure what the government's position is as to whether alleged Victim-3 could in any legal sense be deemed a victim of any of the counts charged, despite the I think necessary, but I wasn't sure of the government's position, with respect to the illegality of conduct involving the victim.

      MS. MOE:  Your Honor, with apologies, may I have one moment to confer with my colleagues?  I want to make sure I'm not misunderstanding the Court's question and want to confer with them about a specific issue.

      THE COURT:  Okay.

      (Pause)

      MS. MOE:  Thank you, your Honor.

      THE COURT:  One moment, because I want to pull up this portion of the government's briefing on this which triggered these questions.

      (Pause)

      THE COURT:  Okay, go ahead.

      MS. MOE:  Thank you, your Honor.  As my colleagues have pointed out to me, the definition of a victim for purposes of the element of the statute and pursuant to the restitution statute are different.  And part of our hesitation in speaking to issues of restitution is because that implicates the Crime

LB1TMAX3

1    Victims' Rights Act, so we want to confer with victims' counsel

2    on that issue as well before we reach a conclusion on that.

3           The definition set forth in the restitution statute,

4    which is 18 USC 3663(a)(2), for purposes of the section, the

5    term "victim" means a person directly and proximately harmed as

6    a result of the commission of an offense for which restitution

7    may be ordered.

8           So that's the particular issue that we just want to

9    think through before we reach a conclusion on in particular

10   because we're mindful of the Crime Victims' Rights Act.  So I

11   apologize, it's not my intention, certainly, to fight the

12   hypothetical, we wanted to be thoughtful about that issue.

13          THE COURT:  You will get me your views on that

14   question with respect to restitution, but as I understand your

15   initial point, for purposes, as you said, of the elements of

16   establishing any of the offenses, the government's view is that

17   this individual is not a victim in the sense -- granting that

18   restitution's definition of "victim" could be broader than

19   those for whom the government's proof of elements as to the

20   charged account would show to be victims, I think that's the

21   distinction you're trying to draw.

22          MS. MOE:  Your Honor, our position is that we

23   recognize Minor Victim-3's testimony alone would not satisfy

24   the elements of the conspiracy count in which the overt acts

25   appear, our view is nonetheless that it's direct evidence.

LB1TMAX3

1        THE COURT:  That's because the relevant age of consent

2   for purposes of the case that the government is trying to prove

3   is the New York statute, which sets 17 as the age of consent,

4   and this individual was -- sorry, under 17 is the age of

5   consent, and this individual, when the government understands

6   sexual conduct to have occurred, was 17, correct?

7        MS. MOE:  That's correct, your Honor.

8        THE COURT:  Okay.

9        MS. MOE:  It's nonetheless our position this is direct

10   evidence for a number of reasons.  First, it's --

11        THE COURT:  Direct evidence of what?

12        MS. MOE:  Of the charged conspiracy.  In part because

13   this conduct occurred at the same time the defendant was

14   engaged in conduct with respect to the other victims, and her

15   testimony will establish a pattern that is corroborative of

16   their testimony and demonstrates the defendant's knowledge and

17   intent.

18        With respect to the issue --

19        THE COURT:  You've slid between direct evidence and

20   404(b), right, knowledge and intent?

21        MS. MOE:  No, your Honor.  The government will

22   certainly be required to prove at trial the defendant's

23   knowledge and intent to commit these crimes.  So the

24   defendant's conduct with respect to this victim goes directly

25   to that issue.  In particular, I take the Court's point with

LB1TMAX3

respect to the issue of 17 or under 17, but more broadly, I

think the question at trial will be about, among other things,

the defendant's knowledge of Jeffrey Epstein's preference for

very young girls.

THE COURT:  Well, let's say this individual were 20,

is it direct evidence of the crimes being charged?

MS. MOE:  Yes, your Honor, but for a different reason.

Under those circumstances, it would nonetheless be our

position, even if the victim were 18, 19 or 20, that the

defendant's specific conduct towards that victim proves other

aspects of the course of conduct.  In other words, the

particular pattern --

THE COURT:  This seems to move into the email issue,

which I have excluded.  That is to say, you wanted to put in

emails of the defendant setting up individuals with other

individuals over -- in some cases well over the age of consent,

and I have excluded that.  So is there a basis for

distinguishing this here?

MS. MOE:  Yes, your Honor, there certainly is for a

number of reasons.  Here, the course of conduct is closely

intertwined.  In other words, the defendant's interactions with

this victim closely mirror actions with other victims, for

example, introducing sexual topics in a slow and gradual way.

THE COURT:  When you say "victim" there, do you mean

that in a legal sense?  Because I still want to understand the

LB1TMAX3

1        point.

2                Now one might have all kinds of moral judgments and

3        concerns, but is there a legal sense in which the government

4        right now in talking to me is just identify the person, or is

5        there a legal sense in which you're proffering this individual

6        as an victim of the crimes charged, setting aside you don't

7        have an answer yet as to whether they may meet some basis for

8        restitution should the defendant be convicted.

9                MS. MOE:  Yes, your Honor, I'm using that term both

10       for identification purposes and because I think, as the

11       victim's testimony will illustrate, she will describe a course

12       of unwanted conduct, and the way in which she came to engage in

13       that conduct is as a direct result of the defendant's behavior

14       in a way that closely mirrors the way the defendant secured

15       access for Mr. Epstein to the other minor victims in this case.

16               THE COURT:  That is an argument about consent being

17       the basis for which -- we have put it aside to 412, but as a

18       general matter you have argued consent is irrelevant because

19       the age of consent is the only thing in issue for these

20       charges, but you're saying the relevance of this individual's

21       testimony turns on the government establishing nonconsensual

22       sexual conduct?

23               MS. MOE:  No, your Honor, I'm simply explaining why we

24       are using that term "victim," because that's the way she

25       characterizes that experience, and I think that will come

LB1TMAX3

across when she describes it.

What I mean is not that the relevance turns on whether or not she consented to that conduct, but the way in which that occurred closely mirrors exactly how that occurred with other victims.  So in terms of proving the methods of the conspiracy, the means they employed, the defendant's role in the conspiracy, all of which is direct proof of the defendant's guilt, this victim's testimony will be corroborative and establish the defendant's knowledge.

THE COURT:  You're saying that would be true regardless of the age of this individual.  I could keep doing a hypothetical, 25, 30, it doesn't matter, from your perspective, it would be relevant to establishing the conspiracy because it occurred at the same time?

MS. MOE:  Your Honor, I could see universe in which there were an outer limit on the age a hypothetical victim where this would be relevant.  Our view is that the age of this victim makes it particularly relevant, but it's the other aspects of the course of conduct which are corroborative and make this direct evidence.  Here, this victim was 17, in close proximity to the age of the other victims, and so her testimony, among other things, establishes the defendant's knowledge and awareness of a certain sexual preference for girls under the age of 18.

THE COURT:  But under the age of 18 is legally

LB1TMAX3

1    irrelevant to the crimes charged, correct?  Under the age of 17

2    is what is legally relevant.

3         MS. MOE:  That's certainly true with respect to the

4    elements as to the other victims, but I think as a matter of

5    common sense, a jury understanding that the defendant is

6    willing to provide Epstein with a girl at the age of 17 would

7    certainly speak to her knowledge of his sexual preferences.

8         THE COURT:  Why doesn't it speak to a knowledge of

9    sexual preferences to someone just above the age of consent?

10        MS. MOE:  Well, your Honor, I think the close

11   proximity of ages, it speaks to her knowledge about his

12   preference for very young girls.

13        I would also note that, although the age of 17 is

14   relevant with respect to the Mann Act counts, with respect to

15   the trafficking counts, the applicable age is there is 18.

16        THE COURT:  I began this whole series by asking, like

17   eight times and very clearly, is there any sense in which this

18   individual, the conduct that's -- assuming it to all be true

19   with respect to this individual, could establish an element of

20   any of the crimes charged?

21        MS. MOE:  Yes, your Honor.  With respect to that

22   victim, that's certainly the case.  But speaking to direct

23   evidence of knowledge and preferences, it's certainly also

24   direct evidence of the defendant's knowledge with respect to

25   the sex trafficking counts where the age of consent there is

LB1TMAX3

18.  And so the fact that the defendant was taking these steps

towards a girl who was 17 years old certainly speaks to her

knowledge and willingness to provide such a girl to Epstein

with respect to the sex trafficking counts as well.

THE COURT:  So to prove the sex trafficking count,

we're talking Count Five and Count Six, right?

MS. MOE:  Yes, your Honor.

THE COURT:  On this one, for sex trafficking, you have

to prove what with respect to H in order to get a conviction?

MS. MOE:  That the victims were less than 18 years

old.

I would note on that score, your Honor, with respect

to the trafficking counts, the issue is about commercial sex

acts in exchange for something of value involving individuals

under 18.  Minor Victim-3 would testify about participating in

sexualized massages with Epstein at the defendant's urging and

receiving compensation in part.  And that's one of the many

other reasons why her testimony is corroborative of other

victim testimony in this case and direct evidence of the

charged crimes.

THE COURT:  So the conduct took place -- the sexual

conduct took place at the age of 17.  Factually, this is an

individual who says -- the government can't establish under the

age of 18 for purposes of travel.  I guess that goes to the

Mann Act, not to the trafficking count.

LB1TMAX3

1          So on trafficking, the government would seek to have

2     this testimony as direct evidence with respect to the

3     trafficking count, because the individual of legal age in all

4     relevant jurisdictions was under the age of 18.  You're going

5     to have to spell it out for me.

6          MS. MOE:  Yes, your Honor.  If the defense were to

7     argue that the defendant didn't know that victims with respect

8     to the trafficking count were under the age of 18 or wouldn't

9     have done this if they were under 18 or that she did not know

10    that Epstein had a preference for underage girls or his

11    sexualized massages were with girls under the age of 18, this

12    would certainly speak to that issue.

13          In particular, if the defendant were to argue that she

14    didn't know that the massages she was arranging were

15    sexualized, I think the testimony of the victim speaking to

16    that issue would certainly make that all the more relevant.

17          THE COURT:  Right.  Okay.  I'm not sure the government

18    had previously argued this constituted direct evidence of the

19    trafficking count, is that right?

20          MS. MOE:  Your Honor, I would have to review our

21    briefing.  I believe we said that it was direct evidence of the

22    charged crimes.  I apologize if we were vague about that, but

23    our view is the entire course of conduct speaks to the

24    defendant's role and knowledge, and the proof here is mutually

25    sufficient.

LB1TMAX3

| | |
|---|---|
| 1 | THE COURT:  Who am I hearing from on this one? |
| 2 | MR. EVERDELL:  Me, your Honor.  Thank you, your Honor. |
| 3 | I think your Honor hit it right on the head right from |
| 4 | the outset, which is if all we had were allegations related to |
| 5 | this particular individual, we would not have a charged crime |
| 6 | here because there was no criminal activity at all. |
| 7 | The only basis for which -- I think the government has |
| 8 | tried to articulate some basis for its relevance as direct |
| 9 | evidence of the charged crimes is her subjective experience of |
| 10 | what happened to her.  She was of legal age in every single |
| 11 | jurisdiction where these events allegedly took place.  So the |
| 12 | issue of consent, while we may have moral objections to this, |
| 13 | it was entirely legal and the government can't prove otherwise. |
| 14 | So all she's going to testify to, presumably, is how she felt |
| 15 | about those instances, and that is not proof that is probative |
| 16 | of the defendant's guilt of these charges. |
| 17 | Moreover, your Honor, it is quite inflammatory and |
| 18 | misleads the jury to hear when someone feels a certain way what |
| 19 | happened to her, even though legally it doesn't make a |
| 20 | difference, that is going to encourage them to feel sympathy |
| 21 | for her and convict the defendant potentially on a false ground |
| 22 | because there is no illegal conduct here. |
| 23 | Your Honor, I think the government has articulated or |
| 24 | at least tried to articulate at the Court's urging a basis why |
| 25 | this may be direct evidence of the sex trafficking conspiracy. |

LB1TMAX3

That really was not spelled out in the briefing.

THE COURT:  I think for sure it wasn't, because just hearing it for the first time, it strikes me as having potential plausibility.  That was not present in the papers, so I certainly will need briefing and to think about that question more.

MR. EVERDELL:  I can assure you if it had been really teed up, I would have addressed it.  But I would note that there is a time difference between the Mann Act conspiracies and the sex trafficking counts.

The sex trafficking counts are 2001 to 2004, and this particular individual was well over the age of consent by the time 2001 to 2004 is going on.  She's alleging events that took place in '94 and '95 when she's 17 and 18.  2001 to 2004 is well past the age of consent in any of these relevant jurisdictions.

I don't see how it is probative of the defendant's intent -- when someone is presumably allegedly engaging in perfectly legal sex acts, how that is probative of intent, knowledge, or any of the above of a sex trafficking conspiracy.  And by the way, there's no allegation that she got paid, so how are we talking about sex trafficking?

It seems like the government is trying to take an episode of legal conduct and make it sound salacious for the jury and use it as direct evidence of conspiracies for which it

LB1TMAX3

1    is entirely irrelevant, every single one of them.

2          So our view, Judge, is that her testimony should not

3    come in as direct evidence of the conspiracy.  At best, what

4    the government has articulated -- they keep talking about

5    pattern, intent, knowledge.  That's classic 404(b).  So if

6    we're going to talk about this witness's testimony at all, we

7    should be talking about it in terms of 404(b) and whether it

8    meets that test.  And it doesn't, your Honor.  It is not

9    probative of knowledge or intent.

10          For a crime that charges causing someone to travel to

11   engage in a legal sex act as a minor, if that person is neither

12   a minor, did not travel with the intent of doing something

13   illegal because it was not illegal in any of those

14   jurisdictions, whatever happened, according to her own

15   testimony, it is not probative of any of those crimes and for

16   404(b) purposes, too.

17          Pattern, Judge, if it's modus operandi, that need to

18   be extremely specific before that can come in as modus operandi

19   evidence.  We can't talk about engaging in social pleasantries

20   and polite conversation with someone as a pattern.  That is not

21   a pattern that passes muster.

22          Furthermore, there are huge 403 issues with this

23   witness's testimony.  If she talks about how she felt about

24   these experiences, that is eliciting sympathy from the jury.

25   It is not legally probative and it will lead them to think that

LB1TMAX3

1     she felt, in her words, sexually abused in these circumstances,

2     that she was in fact engaging in illegal conduct.  And it

3     raises a real problem that the jury will convict on a false

4     premise, on a legally incorrect assumption that the conduct

5     that was occurring was illegal when it wasn't.

6          So your Honor, we object to her testimony for any

7     purpose at this trial.

8          MS. MOE:  Thank you, your Honor.  Just to taking those

9     points one by one, with respect to the time difference, we

10    think that it is nonetheless relevant with respect to the sex

11    trafficking counts.

12         THE COURT:  Am I right -- point me to the page.  It's

13    not argued in the papers.

14         MS. MOE:  I apologize, your Honor, we should have been

15    more specific, and I do apologize about that.  I do think that

16    the way we framed it was about preference for girls under the

17    age of 18 and about the course of conduct, but I apologize, we

18    should have been more specific about that.

19         But with respect to the timeframe and the course of

20    conduct, I think the jury would be free to conclude, based on

21    this direct evidence, that in 2002 and 2003 when Minor Victim-4

22    was being trafficked, that the defendant knew that Epstein had

23    a preference for girls under the age of 18 and knew that he

24    would engage in sexual contact with them because she knew in

25    1994 when she was involved in transporting Minor Victim-1 that

LB1TMAX3

she knew about that preference because of her conduct with

respect to Minor Victim-2 and with respect to Minor Victim-3.

That course of conduct continued throughout a decade and is

consistent.  And I think the consistency of that is part of why

that is powerful proof of her knowledge and intent and why it's

direct evidence of the crimes charged.

         With respect to the question of prejudice, the

government doesn't see any risk that this jury could convict on

this conduct for a number of reasons.

         First, with respect to the concern that there's a risk

that the jury would convict based on this conduct alone, I

think we're confident that the Court's jury instructions will

explain to the jury what the elements of the charges in the

indictment are and what they aren't.  And it's certainly the

case in many trials that there's evidence of lawful conduct

that is nonetheless offered as direct evidence of the charged

crimes.  For example, if this were a case involving a Hobbs Act

robbery and there were evidence that on the morning of the

robbery the defendant bought a ski mask, that would be lawful

conduct but nonetheless offered as direct evidence of the

crimes charged, and it would be peculiar to either exclude that

evidence or introduce it with a limiting instruction that that

is lawful conduct to suggest that in some way the Court

endorses that conduct.

         THE COURT:  The hypo is interesting.  If the ski mask

LB1TMAX3

1   is bought that day, it's direct evidence, if it's bought three

2   years earlier or three years later, at best it's 404(b)

3   evidence, not direct evidence.

4            MS. MOE:  Well, here the pattern would be much

5   stronger, that the defendant participated -- again, to play out

6   the analogy -- in a robbery in 1994 involving ski masks, and

7   another robbery in 1995 involving ski masks, and again another

8   robbery in which the defendant bought ski masks, and then a

9   robbery years later in which the perpetrator was wearing a very

10  similar ski mask.  That's the pattern here and why this is

11  direct evidence of the defendant's methods and her knowledge

12  and intent.

13           THE COURT:  That's 404(b), evidence of methods, of MO.

14           MS. MOE:  Here, your Honor, the government certainly

15  submits that this would otherwise be admissible under Rule

16  404(b), but here where the conduct is intertwined with the

17  conduct on trial, that it speaks to her knowledge about

18  preferences and the role that she played and the similarity,

19  and the fact this happened during the course of the charged

20  conspiracy the same time the defendant was involved in this

21  conduct with respect to other --

22           THE COURT:  During the time of the Mann Act charged

23  conspiracy.

24           MS. MOE:  That's correct, your Honor.

25           THE COURT:  Not the trafficking charged conspiracy.

LB1TMAX3

1          MS. MOE:  That's correct, your Honor.

2          THE COURT:  So I need to get something in writing on

3     the trafficking count, because you haven't raised it directly

4     before and the defense hasn't had an opportunity to respond to

5     it before.

6          With respect to how this has been argued, I don't

7     think there's a basis to exclude entirely, but let me tell you

8     my thinking and I will hear a reaction to it.

9          The evidence related to alleged Victim-3, as the

10    government describes her, is not direct evidence of the

11    conspiracy charged in Counts One and Three of the indictment.

12    Counts One and Three charge the defendant with conspiracy to

13    entice minors to travel to engage in illegal sex acts and

14    conspiracy to transport minors with intent to engage in

15    criminal sexual activity.

16          The parties agree that alleged Victim-3 was 17 at the

17    time she was acquainted with the defendant and Epstein in

18    London, England where the age of consent is 16.  Moreover, she

19    can't recall, and the government wouldn't be able to establish

20    that she was invited to travel with the defendant when she was

21    17 or 18.  And because the alleged victim was over the age of

22    consent in all relevant jurisdictions and, therefore, any

23    alleged sexual activity was lawful, the alleged conduct does

24    not arise out of the same transactions or series of

25    transactions as the charged offense.  It's not inextricably

LB1TMAX3

intertwined with the evidence, again with respect to the Mann

Act, and it's not necessary to complete the story of the crime

on trial, so I don't think it can be direct evidence of the

Mann Act counts.

There's a prejudice analysis that I will get to in a

moment, but as proffered, it strikes me the testimony may serve

a proper purpose under 404(b) as relevant testimony of the

defendant's knowledge, intent and alleged MO.  For example, the

proffered testimony could tend to establish that the defendant

was aware of, for example, the sexualized nature of the alleged

massages.  So if the argument is massages are not sexual or

there's no knowledge, this witness might have evidence and

testimony that could refute that point.  The testimony could

support that the defendant asked the witness to recruit

underage girls to engage in similar sexualized massages which

tends to make the alleged MO more probable.

The testimony that this witness was allegedly groomed

by the defendant does not tend to establish the defendant's

knowledge, intent or MO to groom minor victims alone without

more, the kind of testimony I indicated, because this witness

was not a minor pursuant to the age of consent laws in any of

the relevant jurisdictions.

I will say I think there may be room for 404(b)

testimony, but there's a risk of a prejudice, the risk of

confusing issues and misleading the jury.  A limiting

LB1TMAX3

1    instruction that makes clear that any alleged conduct was

2    lawful and cannot form the basis of a conviction in this case

3    certainly would be required to ensure that probative value is

4    not substantially outweighed by potential prejudice.

5         So that's my thinking.  I'm going to need more from

6    the government on the anticipated testimony.  I want to see a

7    proposed limiting instruction that would go to that, and I want

8    briefing on whether there might be a basis for direct evidence

9    as to the trafficking count.

10        So I will ask the government here for a submission

11   that outlines anticipated testimony that would be potentially

12   404(b) with respect to the Mann Act counts, as I've indicated,

13   a proposed limiting instruction in that regard, and to the

14   extent the government does have I think a not-yet-really-

15   thought-through argument about direct evidence as to the

16   trafficking act, I'm open to hearing it.

17        So let me look at the calendar.  I will get briefing

18   from the government and then a response time from the defense.

19        Government by the 5th, defense response by the 10th.

20        Questions about that, Ms. Moe?

21        MS. MOE:  No, your Honor, thank you.

22        THE COURT:  Mr. Everdell?

23        MR. EVERDELL:  No questions on this schedule or the

24   Court's direction.  We would like to clarify one thing, which I

25   believe the Court said that the parties agree that this

LB1TMAX3

1    particular individual was 17.  We agree that she alleges that

2    she was 17.  It's quite possible, in fact likely, that she was

3    older than that, but I wanted to clarify that.

4              THE COURT:  Fair enough.  At least 17, the parties

5    agree.  Thank you.

6              And I should say on that, Ms. Moe, I don't know if the

7    government anticipated putting in evidence about the sort of

8    subjective feelings of the individual.  I can't say I see the

9    relevance in light of the fact of the legality of the conduct

10   here and my ruling, and certainly 403 prejudice would be a

11   concern.  So if that is something that the government is still

12   contemplating, despite what I've indicated here, you'll have to

13   include briefing with respect to that.

14             MS. MOE:  Yes, your Honor.  My point was simply I

15   think it would be obvious based on the way that she presents

16   that this is a difficult thing to discuss, and so that was my

17   point on that issue.  But I take the Court's point, if we were

18   intending to elicit any testimony about that, we would

19   certainly find that for the Court, particularly in light of the

20   Court's ruling.

21             THE COURT:  You see the potential, given the legality

22   of the conduct with respect to this individual, that the sort

23   of feelings as to the immorality or wrongness or damage done to

24   this individual, all of which may be true, would have the

25   potential to prejudice the jury by convicting on a basis for

LB1TMAX3

1  which conviction the government has conceded would be

2  inappropriate, would be unlawful.

3          MS. MOE:  I understand the Court's concern and we

4  certainly don't anticipate eliciting testimony about the

5  victim's conclusions about the event or suggesting that it was

6  unlawful or satisfied certain elements.  My point was simply in

7  describing it, which would be difficult for Minor Victim-3,

8  that sort of her feelings about that or the circumstances that

9  that -- in narrating the facts of the event would I think come

10  to light at trial, but we certainly don't intend to elicit

11  testimony about conclusions, about things like consent or

12  whether it was lawful, and particularly in light of the Court's

13  ruling, and in any event, we wouldn't be seeking to proffer

14  legal conclusions from a witness.

15          THE COURT:  Okay.  Anything further on that, counsel?

16          MS. MOE:  Not from the government, your Honor.

17          MR. EVERDELL:  No, your Honor, thank you.

18          THE COURT:  Defendant's 5 I think we determined is a

19  non-issue.  This goes to evidence that the defense was

20  concerned in the government presenting regarding flight, and

21  the government has represented that it will not offer evidence

22  as to flight.  Is that correct, Ms. Moe?

23          MS. MOE:  Yes, your Honor.

24          THE COURT:  Anything else we need to address here?

25          MR. EVERDELL:  No, your Honor.

LB1TMAX3

1          THE COURT:  Defendant's 6 is evidence of the

2     defendant's alleged false statements and regarding redacting

3     allegations related to the perjury counts in the indictment,

4     which I severed.  The government has agreed not to introduce

5     evidence of these alleged false statements and agrees to the

6     proposed redaction.

7          Anything else that we need to address here, Ms. Moe?

8          MS. MOE:  No, your Honor.

9          MR. EVERDELL:  No, your Honor, thank you.

10          THE COURT:  Thank you.

11          Defendant's 7 is Exhibit 52, which I think we have

12     addressed.  Do we need to discuss that any further at this

13     point?

14          MS. MOE:  Nothing further from the government, your

15     Honor, thank you.

16          MR. PAGLIUCA:  Your Honor, I think we do need to

17     discuss this a little bit further.

18          The problem that we have on the defense side of this

19     is that the government says that we can establish a foundation

20     for this, but I'm quite frankly very skeptical about the

21     provenance of that foundation.

22          This is an exhibit that surfaces in 2009, and we don't

23     know how it surfaced.  Assuming it was stolen by now deceased,

24     twice convicted felon Alfredo Rodriguez and sold to the

25     government, assume that for a moment, we don't know where it

LB1TMAX3

1    came from or how it was created.

2            The government says that it has a witness that is

3    going to say that that was Ms. Maxwell's book.  I'm highly

4    suspect of that to begin with.  And secondarily, that witness

5    wasn't around in 2004.  And so we have now two witnesses for

6    this purported foundation, both of whom were not employed

7    during the relevant timeframe of the conspiracy.  So I'm at a

8    loss, frankly, to understand how anyone could either

9    authenticate that document or admit it as some non-hearsay

10   document.

11           The government says well, even if it's not admissible,

12   then they will say as a business record -- the government says

13   we'll admit it for some other purpose, which I don't know what

14   that is.  And if they're admitting it for another purpose, I

15   don't understand the relevance of this, given the inability to

16   establish a foundation and to tie it with any alleged conduct

17   that is part of the indictment in this case.

18           So I don't think we can just leave this here and then

19   have a discussion about this in the middle of trial.  And it

20   seems to me that in this type of hearing, a pretrial hearing,

21   the government should say here's the witness that is going to

22   authenticate it, here's how they're going to authenticate it,

23   that is what we're authenticating it for, here are the pages

24   that we think are relevant and here's why.

25           We don't have anything of that information.  We are

LB1TMAX3

1     left with:  Yeah, we think we can admit this.  Given this lack

2     of evidentiary foundation, I think we should address this issue

3     now.

4              MS. MOE:  Thank you, your Honor.

5              With respect to the particulars in the exhibit, the

6     government has marked and produced to the defense excerpts from

7     that book that it intends to offer at trial.  So the defense

8     knows the limited number of pages from that book that the

9     government intends to offer at trial.

10             THE COURT:  What pages?

11             MS. MOE:  Your Honor, I don't have the exhibit numbers

12    in front of me, but they're included in the subset that we

13    provided to the Court.  I think there are about -- I don't want

14    to guess, but somewhere between four and six particular pages,

15    one in particular relating to victims in this case.  So we are

16    happy to confer with the defense about those particular

17    exhibits and then raise those issues to the Court if there is

18    still confusion on that score.

19             With respect to the question of authentication, I

20    think the defense's argument confuses the question of chain of

21    custody with the question of authentication.  I know the Second

22    Circuit has rejected essentially exactly the argument that the

23    defense is advancing here.  For example, in a case of *United

24    States v. Al Farekh*, 810 F.App'x 21, (2d Cir. 2020), the

25    defense argued the government shouldn't be able to offer

LB1TMAX3

1    certain documents that were obtained by an FBI agent on a USB

2    drive, and the authentication testimony was about the

3    familiarity with the witnesses with things like handwriting on

4    the documents, their structure and the like.  The same will be

5    true here.

6         And in that case, the Second Circuit said although the

7    government did not present evidence regarding the circumstances

8    surrounding the seizure of the USB drive, Federal Rule of

9    Evidence 901(b)(4) permits authentication based on the

10   appearance, contents, substance, internal patterns or other

11   distinctive characteristics of the items taken together with

12   all the circumstances.  And the government submits that the

13   testimony at trial will satisfy all of the aspects of Rule 901

14        We're happy to submit additional briefing on this

15   during the trial, but in particular, given we don't intend to

16   offer any evidence from this book in our opening statement --

17        THE COURT:  What is it going to be offered for?

18        MS. MOE:  Your Honor, the evidence from that book will

19   be offered in particular related to the minor victims in this

20   case, so that's the relevance of those documents.

21        THE COURT:  But why?

22        MS. MOE:  It would be a page of that book that

23   contains contact information for several victims, including

24   their names, in a section marked "Massage" that includes the

25   names of -- I think it's exclusively female girls with

LB1TMAX3

1  parentheticals like "Mom" or "Parents," showing that the

2  contact number for the individuals in a section marked

3  "Massage" is for people's parents.  That list includes some of

4  the minor victims in this case that the jury will learn about

5  in this trial.

6          THE COURT:  It's not going to be talked about in

7  openings, but before in front of the jury this full

8  authentication process happens, I would like the government to

9  put out specifically what it intends to enter into evidence

10  with respect to this, and with specificity, who will provide

11  authentication and the proffer as to that testimony.  And you

12  will deal with the timeframe questions that have been raised as

13  well.

14          MS. MOE:  Certainly, your Honor.

15          THE COURT:  I need to see a little bit more than

16  what's been suggested, and I need to have a better

17  understanding of what is potentially being offered for.

18          MS. MOE:  Understood, your Honor, certainly.

19          THE COURT:  So when would you like to do that?

20          MS. MOE:  Your Honor, may I confer with my colleagues?

21          THE COURT:  Sure.

22          (Pause)

23          MS. MOE:  Thank you, your Honor.  Could we possibly

24  submit it on November 10, along with other briefing that date?

25          THE COURT:  That's fine.

LB1TMAX3

1          MR. PAGLIUCA:  That's fine, your Honor.

2          THE COURT:  Respond in the same timeframe.

3          MR. PAGLIUCA:  Understood.

4          THE COURT:  Defendant's 8 is the search, the El Brillo

5     Way search.  The defendant seeks to prohibit the introduction

6     of any items seized during an October 2000 search of Jeffrey

7     Epstein's Palm Beach residence.

8          The defense raises concerns, including how and where

9     the evidence was maintained, the lack of authenticating

10     witnesses and the lack of relevance to the charges against

11     Ms. Maxwell.  Here, again, the government states that it

12     intends to call witnesses to establish the authenticity of the

13     evidence.

14          So how do we take this up now, Ms. Moe?

15          MS. MOE:  Yes, your Honor.  The government submits

16     that at trial law enforcement witnesses will discuss the search

17     and lay a foundation for the admission of this evidence.

18          THE COURT:  So as to authentication, you have

19     witnesses that did exactly what with respect to the search?

20          MS. MOE:  They were personally involved in the search.

21          THE COURT:  Okay.  So they will describe the process

22     by which they engaged in the search and the evidence that they

23     obtained and how it was maintained and the like.

24          MS. MOE:  Yes, your Honor.

25          THE COURT:  And the relevance of the search result

LB1TMAX3

evidence is what?

MS. MOE:  Your Honor, a number of exhibits were seized from that residence and there are a number of marked photographs from the interior of that residence which are relevant both to give context to the jury about what the interior looked like but in particular about certain decorations in the residence that are both consistent with what witnesses will describe but also illustrate for the jury the number of, for example, nude images in the house and otherwise that give context to sort of the knowledge that certain people would have while inside the house.  I think all that will be corroborative of witness testimony and, for the same reasons, certain items seized from the residence will be as well.  For example, a massage table was seized from that residence and is marked as a government exhibit.

THE COURT:  Okay.  Who is taking this one?

MR. PAGLIUCA:  This would be me, your Honor.  Again, this is very, I suppose, aspirational by the government that they can lay these foundations.

THE COURT:  This sounds like pretty standard stuff.  Law enforcement had a search warrant, engaged in a search, this is what they found, here's how they marked it, here it is.

MR. PAGLIUCA:  The affiant who conducted the search and who took the items into evidence is deceased.  There are, I believe, two officers who participated in the search, but in a

LB1TMAX3

discrete fashion, and I believe they do not have knowledge

about what the other officers did or didn't do as part of that

search.  So what we end up with is this piecemeal approach of:

I was over here and did this, somebody over there did that, but

I can't put it all together for you 20 years after the fact.

And look, I understand if they have a witness who

could say I was there, I saw this, I can authenticate, that's

fine.  I don't have a problem with that.  But again, they

haven't identified that witness or what pieces of this that

witness is going to talk about.  So that's problem number one.

Problem number two is the timing of this.  This is an

October 2005 search where they seized items that they're trying

to now relate back to a 1994 to 2004 timeframe.  What that

table has to do with 1994, I don't know.  2004, I don't know.

Whether it was there in 2004, we don't know.  All we know is

that in a moment in time, in October 2005, someone says these

items were seized and that ends up on a search warrant

inventory from a deceased detective that doesn't have any

foundation to it.  That's my problem, your Honor.

And there may be discrete pieces of evidence that a

certain witness might be able to identify, but I think we're

just short shrifting the whole evidentiary process here with

these proffers where they're saying we can do it, and I'm not

convinced they can.

THE COURT:  We're not short shrifting because it

LB1TMAX3

1    hasn't happened yet.  What you're making are cross points.

2              Ms. Moe, obviously you're dealing with a time

3    question, and it sounds like one of the primary investigators

4    or law enforcement who engaged in the search is deceased.  So

5    what's the proffer to the Court as to what specifically the

6    government will do to authenticate these items?

7              MS. MOE:  Yes, your Honor.  On this score, I would

8    note there is a difference, certainly, between authentication

9    and chain of custody.  With respect to authentication, law

10   enforcement witnesses who personally participated in the search

11   will describe what they observed in the search and how they --

12             THE COURT:  The government's proffer to the Court is

13   that even though one of the law enforcement relevant here is

14   deceased, that you have other law enforcement who have personal

15   knowledge of these items being found where they were and seized

16   when they were, et cetera?

17             MS. MOE:  Yes, your Honor.  I additionally note that

18   the search was video recorded, that video has been produced to

19   the defense, and so some of these items also appear on the

20   video walk through of that search.  And so our view is that

21   their direct testimony about their experiences in the search

22   satisfies our obligations with respect to authenticity.

23             THE COURT:  I'm not going to prohibit this in limine,

24   but questions remain as to the government's ability to

25   authenticate the items, and there will be an opportunity for

LB1TMAX3

1     the defense to engage in the full set of questions that counsel

2     has indicated, but for purposes of the in limine motion, it's

3     denied.

4          Defense 19.  Here, the defense seeks to suppress

5     alleged Victim-4's identification of Ms. Maxwell on the ground

6     that the government used unduly suggestive photo array

7     procedures that violate due process rights.

8          I am prepared to deny this motion.  Eyewitness

9     identifications should be excluded when improper police conduct

10    created a substantial likelihood of misidentification.  *Perry*

11    *v. New Hampshire*, 565 U.S. 228, (2012).

12         I follow a two-step analysis in ruling on the

13    admissibility of identification evidence.  First, I must

14    determine whether the pretrial identification procedures were

15    unduly suggestive.  Some examples of suggestive procedures

16    include using a very small number of photographs, making

17    suggestive comments, or the display of the accused in a way

18    that so stood out from all other photographs to suggest to an

19    identifying eyewitness that the person was more likely to be

20    the culprit.  *See*, *United States v. Concepcion*, 983 F.2d 369,

21    (2d Cir. 1992).

22         Looking at the photo array, neither the photos used or

23    the procedure itself was unduly suggestive.  The array

24    contained a sufficient number of photos larger than many arrays

25    that courts have held were not unduly suggestive.  Defense's

LB1TMAX3

argument that the Ms. Maxwell's photo looks like a mugshot and
is different from the others doesn't persuade me here.  Alleged
Victim-4 identified at least one other photo in the array that
she thought could be Ms. Maxwell but she ultimately chose
Ms. Maxwell's photo, and there were several photos in the array
that were of roughly the same quality and angle as
Ms. Maxwell's photo.

          The defense fails to identify any suggestive comments
made during the identification that would deem the procedures
unduly suggestive.  The government appears to have asked
whether the individual recognized anyone in the book.  So I
conclude the identification procedure was not unduly
suggestive.

          Even assuming the photo array was unduly suggestive,
the identification here had independent reliability factors I
must consider under the totality of circumstances that include
the opportunity of the witness to view the individual at the
time of the alleged crime, the witness's degree of attention,
the accuracy of the the witness's prior description of the
individual, the level of uncertainty demonstrated, the length
of time between the alleged crime and the confrontation.  *See*,
*Neil v. Biggers*, 409 U.S. 188, (1972).

          Here, the alleged Victim-4 had the opportunity to view
Ms. Maxwell.  They interacted several times over the span of
years.  As the government points out, the alleged interactions

LB1TMAX3

1    with Ms. Maxwell make the alleged victim's identification more

2    accurate than other instances where identification has been

3    deemed admissible, like when a witness saw the defendant in the

4    distance under street-lit illumination and was familiar with

5    the individual seeing them in the neighborhood.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LB15max4

1          THE COURT:  (Continuing)

2          The government also correctly notes that the delay in

3    time between the alleged misconduct and identification is not

4    determinative because of the frequency of interactions between

5    the alleged individual and Ms. Maxwell.  Alleged Victim 4 was

6    able to identify Ms. Maxwell when she got to the photo in the

7    array with little hesitation.  The argument that -- I will

8    leave it at that.

9          The defense requested an evidentiary hearing on this

10   issue but I don't see facts put forward by the defense that

11   puts, in genuine dispute, any facts that would support

12   suppression of the identification so there would be nothing

13   gained from an evidentiary rehearing, see *United States v.*

14   *Brown*, 784 F. App'x 1 (2d Cir. 2019) so the request is denied.

15         Defense 10.  Expert testimony by law enforcement

16   officers which the defense moves to exclude and the government

17   has noticed intent to call three law enforcement officers as

18   fact witnesses but not as experts.  The government represents

19   that it will not elicit expert testimony from any of them.

20         So, the law enforcement officers can testify as fact

21   witnesses to the facts that they personally perceived but not

22   provide testimony that summarizes parts of the investigation

23   which the officer did not personally experience and may not

24   provide testimony that relies on specialized training and

25   experience.  The government's example of a law enforcement

LB15max4

1   officer testifying as to what the officer himself found and

2   participated in while executing a search seems to me

3   permissible fact testimony.

4          Anything to take up here from the defense,

5   Ms. Menninger?

6          MS. MENNINGER:  No, your Honor.  Thank you.

7          THE COURT:  Ms. Moe?

8          MS. MOE:  No, your Honor.  Thank you.

9          THE COURT:  Defense 11 is anticipated testimony

10  regarding an alleged rape by Jeffrey Epstein.  Let me ask the

11  government to explain what it intends to do with respect to

12  this and for what purpose the testimony would be sought to be

13  introduced.

14          MS. MOE:  Certainly, your Honor.

15          As a threshold matter, your Honor, I would note that

16  there is an overlap here between the arguments in the

17  defendant's motion *in limine* and the 412 motion.  I think one

18  motion seeks to introduce some of this evidence but

19  characterize it as consensual and the other motion seeks to

20  preclude it, reference it to be non-consensual.  And so, I

21  would be happy to address that now, but it may be easier to

22  address that issue in the context of the 412 briefing.

23          THE COURT:  Counsel, do you agree?

24          MR. EVERDELL:  Your Honor, we can wait until the 412

25  briefing.

LB15max4

1        THE COURT:  So to the extent there is overlap in these

2    issues, it's best to take it up in the 412 proceeding so that

3    we can discuss the issues without violating that rule.

4        Defendant's 13.  This is a motion to preclude the

5    admission of several exhibits.  I'm going to grant the motion

6    with respect to Exhibit 251 and 288.  Based on the briefing

7    before me, 401 relevance is minimal, at best, and outweighed by

8    403 prejudice.  294, so some of the same questions around the

9    authentication issue so I think that ruling holds.  I won't

10   otherwise preclude this evidence.  It is potentially

11   corroborative evidence of testimony and 403 prejudice does not

12   rule out 401 but the defense can maintain the search and

13   authentication issues that we have discussed.

14       Exhibit 403 I won't preclude, it's potentially

15   probative of the relationship between the defendant and

16   Mr. Epstein.  The government proffers that it will corroborate

17   and that the photo would corroborate anticipated witness

18   testimony and I don't -- so, there is 401 relevance and not

19   substantially outweighed by any 403 prejudice.

20       On this last one I may have said the wrong number.  I

21   had 403 on mine.  So, Exhibit 313 is the photograph that I have

22   indicated I am not excluding, it is potentially probative of

23   the relationship between the defendant and Mr. Epstein and not

24   outweighed by prejudice.

25       And then 606, this is the issue on authentication and

LB15max4

1    hearsay grounds that I have already indicated I'm going to have

2    the parties address further, correct?

3              MR. PAGLIUCA:  Yes, your Honor.

4              THE COURT:  All right.

5              Any questions about any of those rulings?

6              MS. MOE:  Not from the government, your Honor.  Thank

7    you.

8              MR. PAGLIUCA:  No, your Honor.  Thank you.

9              THE COURT:  And about the time frames I have set on

10   the different pieces that I require briefing on after everybody

11   has.  And, you will get the transcript.

12             MS. MOE:  Understood, your Honor.  Thank you.

13             THE COURT:  All right.

14             With that, I think we can pick up some outstanding

15   logistics issues and I will hear from counsel as to any issues

16   they want to raise.

17             So, we begin our questionnaire process on Thursday.

18   The government -- my chambers will produce the copies as an

19   original matter.  The government will take the completed copies

20   from the jury department -- the completed questionnaires with

21   no identifying information and make copies for the defense and

22   for the Court.  My request is to give both a paper copy and an

23   electronic copy.  I think that will aid everybody's use of the

24   document since we have got multiple people looking at them, and

25   then of course return the originals to the Court.

LB15max4

```
1          Any questions from the government on its obligations

2    there?

3          MS. MOE:  No, your Honor.  Thank you.

4          THE COURT:  The video remarks, at our last conference,

5    as we discussed, my plan is to video record the preliminary

6    instructions to be played for each panel before the

7    questionnaire.  I sent the parties my script and there were no

8    objections.  I'm actually going to record that tomorrow.  I

9    just want, does either party request to see the video before

10   it's played for the prospective jurors on Thursday?  Obviously

11   I'm going to record it exactly as stated in the script.

12         MS. MOE:  No, your Honor.

13         MS. STERNHEIM:  Judge, unless you are wearing some

14   funky t-shirt, no.

15         THE COURT:  It's just a robe.  Thank you.

16         Just in thinking ahead to the voir dire process, I

17   have preliminary instructions that I'm drafting that I will

18   give to each panel before they are individually brought in for

19   the voir dire.  Thinking ahead again, just for time-saving

20   purposes, what I propose is we do another video of that so that

21   it is played for each panel -- there is a morning panel and

22   afternoon panel.  And the logistics of all of this is

23   complicated.  So, what I propose I will send out, again, my

24   script, let me know if you have any comments or objections, and

25   once we all agree I will record it so that the jury staff can
```

LB15max4

 1   just play it once each panel is assembled.

 2              Any concerns with that, Ms. Moe?

 3              MS. MOE:  No, your Honor.  Thank you.

 4              THE COURT:  Ms. Sternheim?

 5              MS. STERNHEIM:  No.

 6              THE COURT:  I think what I am also going to do, we

 7   haven't talked through the specifics of the logistics of the

 8   voir dire days -- I think I did generally -- but we are going

 9   to have a morning panel, the jurors are going to come in to a

10   courtroom which is sort of the holding courtroom.  The

11   preliminary instructions will be played and then we bring them

12   in one at a time.  The afternoon panel is going to assemble

13   somewhere else so there is no overlap, they'll be played the

14   instructions.  Once we are finished with the morning panel,

15   they'll be brought in and the like.

16              We will do the individual voir dire, obviously if

17   anyone is struck for cause following that they'll be excused.

18   Those who are not struck for cause, what I propose is that we

19   give them an instruction sheet that tells them where and when

20   they're returning for the final stage of the process and remind

21   them the basic instructions about media restrictions and the

22   like just so they have that and they take it with them.  Of

23   course I would show you what I am thinking before we do it but

24   that basic idea.

25              I want to see if anybody has any concerns or

LB15max4

1    objections.

2           MS. MOE:  No, your Honor.  Thank you.

3           MS. STERNHEIM:  No objection.

4           THE COURT:  I do think once we do that, the non-struck

5    jurors, with that information, can then be excused for the day

6    and returning on -- and obviously I haven't indicated yet --

7    the 19th or the 29th, those instructions.  But they don't need

8    to sit around for the rest of the day while we do the other

9    individuals.

10          Any objections to that process, Ms. Moe?

11          MS. MOE:  No.  Thank you.

12          THE COURT:  Ms. Sternheim?

13          MS. STERNHEIM:  No, thank you.

14          THE COURT:  There are logistical issues we are dealing

15   with for bringing the full panel back for the exercised

16   peremptories as well as setting up the courtroom with

17   distancing issues which turns, to some extent, on the vaccine

18   status of the individuals because we have different spacing

19   requirements under the current protocols for the vaccinated

20   versus unvaccinated.  Now, the parties have proposed that I ask

21   that question in voir dire and I rejected that because I don't

22   think there is any proper basis for striking based on

23   vaccination status.  But what I would propose, in order to

24   facilitate the Court's logistical process which is complicated,

25   is that for our non-struck jurors, as we give them the

1    instruction, they're handed a sheet of paper which says write

2    your juror number and check a box, vaccinated, not vaccinated,

3    I don't want to say, and the Court gets that but not the

4    parties.  And that way we can set up the courtroom, we can

5    figure out where we are going to put everybody for peremptories

6    and the like.

7              Ms. Moe?

8              MS. MOE:  The government has no objection to that,

9    your Honor.

10             MS. STERNHEIM:  No objection.

11             THE COURT:  I do think we are going to do the

12   peremptories on the 29th, as I have indicated.  We are still

13   working through the logistics.  This piece helps.  As I said,

14   there are pros and cons to both, but I think that the safest

15   course for proceeding with a full jury is to bring them back on

16   the 29th -- I will give you my final resolution as to that when

17   I have it -- but my thinking is we are in the courtroom, all of

18   us.  The panel, approximately 50 to 60 people who I will bring

19   back are in two other courtrooms because we can't get them all

20   in one place, with a video, in which I ask some very

21   preliminary questions:  Does anybody need to change any answers

22   and has anybody had media exposure, etc.  Hands raised.  If

23   anybody does raise their hands, we will have staff in each of

24   those rooms who we can bring in one at a time to deal with.

25   And assuming not, or once we deal with that, that's our panel,

LB15max4

1    the parties exercise the peremptories by list, and we are done.

2          So, as I say, I am still working through the specific

3    logistics of that but that's my thinking as to how we will do

4    it.

5          Any reactions, Ms. Moe?

6          MS. MOE:  No, your Honor.  Thank you.

7          THE COURT:  Ms. Sternheim?

8          MS. STERNHEIM:  Yes.  My only reaction is are we going

9    to be able to see the jurors as they respond to the Court's

10   questioning?

11         THE COURT:  So, I think what we can do is have staff

12   in each of the courtrooms, I will ask my question, anyone who

13   raises their hand will be brought in individually.  If you

14   would like to have someone in each of those rooms for the

15   hand-raising, that's fine with me.

16         MS. STERNHEIM:  OK.

17         THE COURT:  We would be happy to do that.

18         MS. STERNHEIM:  Thank you.

19         THE COURT:  But because there are other trials being

20   selected on the 29th we can't use the jury assembly room and,

21   in any event, it would slow us down.  So I think this is the

22   way to go logistically but that's what it will entail for the

23   exercised peremptories.

24         MS. STERNHEIM:  Thank you.

25         THE COURT:  One of the obstacles to the jury selection

LB15max4

1    here is length of trial and the timing of trial.  I would like

2    the parties, in light of -- you have gotten some rulings,

3    obviously not everything yet -- to think about whether what we

4    include in the questionnaire is still the six-week time frame

5    that we have indicated.  And if it is, it is, but if there is

6    any basis to suggest a lower estimate as the parties have

7    continued preparing their cases and in light of any rulings, I

8    would certainly be open to hearing it if we could safely put a

9    shorter time frame in the questionnaire.  Again, maybe we

10   can't.  So I just ask you to think about it and confer and put

11   in a letter by November 2nd, on ECF, indicating whether the

12   parties agree that there should be any different estimate to

13   the trial length than what we have indicated in the current

14   draft of the questionnaire.  I recognize that may change after

15   that but for jury selection purposes it won't help us if a few

16   days later we decide that we could say four weeks instead of

17   six weeks.  So you will let me know and I will ask the parties

18   to confer.  You don't need to put in specific reasons, just if

19   you can put in a joint submission as to the parties' best

20   overall estimate of length of trial is to see if it can be

21   realistically any shorter than what is in the questionnaire to

22   help facilitate jury selection.

23           That's what I have.  I will hear from counsel any

24   other issues.  Ms. Moe?

25           MS. MOE:  Yes, your Honor; very briefly on two

LB15max4

1    administrative items.

2              First, it is the practice in this district to place on

3    the record at a final pretrial conference the status of plea

4    discussions and so I just wanted to place on the record --

5              THE COURT:  I guess I hadn't assumed this is our final

6    pretrial conference and I do usually do that, but there is no

7    point in not at least doing that now in case we don't get

8    together again, which seems unlikely.  But, go ahead.

9              MS. MOE:  Yes, your Honor; for that reason we wanted

10   to place on the record that the government has not issued any

11   plea offers to the defense and the defense has not requested

12   any plea offers from the government, and we would respectfully

13   request that the Court confer with the defendant that that is

14   accurate.

15             THE COURT:  OK.  Ms. Sternheim?

16             MS. STERNHEIM:  Do you want to hear from me?

17             THE COURT:  I will hear from you first and then I will

18   ask Ms. Maxwell.

19             MS. STERNHEIM:  That is correct.  We take the position

20   that our client has not committed a crime so plea bargaining

21   was not an issue.

22             THE COURT:  Ms. Maxwell, what Ms. Sternheim indicated

23   is accurate and correct?

24             THE DEFENDANT:  I have not committed any crime and --

25             THE COURT:  And what Ms. Sternheim indicated is

LB15max4

1    accurate?

2              THE DEFENDANT:  Oh sorry.  Yes, your Honor.

3              THE COURT:  Anything else on that, Ms. Moe?

4              MS. MOE:  No, your Honor.  Thank you.

5              Just with respect to the second administrative item,

6    the government has received the Court's order related to the

7    Daubert hearing.  Because the defense's Daubert briefing was

8    focused on the question of grooming it would be helpful to

9    understand the scope of the hearing and, in particular, whether

10   the Court would like the government to present evidence with

11   respect to the full scope of the expert's findings and

12   conclusions that were addressed in the motions or whether the

13   hearing would be focused on the question of grooming.

14             THE COURT:  I guess I think it goes to each of the

15   proffered opinions being offered --

16             MS. MOE:  Thank you, your Honor.

17             THE COURT:  -- in part because of overlap in those

18   issues.  I don't know that it's obvious to me how to separate

19   them out at this point.

20             MS. MOE:  Thank you, your Honor.  It is very helpful

21   to know in advance of the hearing.

22             THE COURT:  Ms. Sternheim, anything on that?

23             MS. STERNHEIM:  Yes, Judge.

24             These, I guess you put them under the housekeeping

25   category and I know tomorrow the government is to respond to a

LB15max4

1    letter that I raised concerning legal mail, but we still have

2    the issue that Ms. Maxwell has not received trial-related

3    discovery that is imperative for her to review to consult with

4    counsel.  It also has bearing on some of the issues --

5              THE COURT:  What hasn't been received?

6              MS. STERNHEIM:  Recent disclosures that the government

7    has made, she still has not received some of them.  They're

8    sent by the government to the MDC.

9              THE COURT:  Yes.  But, specifically, what are you

10   talking about?

11             MS. STERNHEIM:  3500 material that we -- counsel

12   received electronically the other day.

13             THE COURT:  And by the other day what do you mean,

14   Ms. Sternheim?

15             MS. STERNHEIM:  It was Monday, Judge.  She has still

16   not received the production made by the government which I

17   believe they send via federal express.

18             THE COURT:  So, Ms. Moe, the government made a 3500

19   production a week ago?

20             MS. MOE:  Your Honor, the government has been

21   supplementing its 3500 productions on a rolling basis.  I don't

22   recall the exact date but we have been supplementing them and

23   have made productions last week.

24             THE COURT:  And do you know why -- the representation

25   is a production made a week ago has not made its way to

LB15max4

1    Ms. Maxwell.  Do you know anything about that?

2              MS. MOE:  Your Honor if I could have one moment?

3              THE COURT:  Sure.

4              MS. MOE:  Thank you.

5              (Counsel conferring)

6              MS. MOE:  Your Honor, I don't have particular

7    information about the series of disclosures we made last week

8    and whether or not they've been processed by the MDC but we

9    will certainly be conferring with the MDC in connection with a

10   response to the defense's letter on Friday.  Our understanding

11   is that, generally, that drives have been received by MDC,

12   processed through their warehouse, picked up by legal counsel

13   and produced to the defense in regular time frame.  I can't

14   speak to any particular package that was mailed last week

15   because I am hearing about it now for the first time.

16             THE COURT:  Well, OK.  You will include in your

17   letter -- I mean, I think at this point a week is too long.  I

18   think the representation in the prior letter was one to two

19   days for legal mail, maybe this is different because this is

20   different?

21             MS. MOE:  I don't believe so, your Honor.  Part of the

22   reason why I want to look into this and confer with my

23   colleague is we are not quite sure whether the date was Monday

24   or Wednesday that we produced this material to the defense and

25   we want to just double-check the mailing date to make sure we

LB15max4

```
 1    have all our facts straight about the exact timeline.  So I am
 2    happy to address that in the letter.
 3           THE COURT:  Yes, do address that in the letter.
 4           Is there anything the government can do -- you know,
 5    there is going to be some time built in for the facilities
 6    screening process and it getting to the defendant.  Obviously
 7    there are other individuals in the same situation pretrial,
 8    heading into trial, and there are a lot of inmates, but -- so
 9    you will address what's happening on the institution side in
10    the letter.
11           What can the government do to facilitate the process
12    going forward?
13           MS. MOE:  Your Honor, we have been trying to produce
14    materials as quickly as possible.  We have been FedExing those
15    materials promptly to the facility.  When we do so, we notify
16    the facility that, in particular, a disclosure for this
17    defendant is in-bound to the facility so that legal counsel
18    knows about it and can keep an eye out for it which I think is
19    unusual but we are happy to continue to take that step in this
20    case.
21           My understanding is that materials have been received
22    by the defendant at the facility.  We will continue to check on
23    that issue.  I would note that our rolling productions are
24    going to be frequent but also small as we continue to meet with
25    witnesses and produce small amounts of rolling materials.  I
```

LB15max4

1    think the defense is well equipped to print those materials and

2    meet with the defendant in person about it as they have been

3    doing.  They can certainly discuss those documents in the video

4    conferences that they're having with the defendant.  Our

5    understanding is that this defense team has a large amount of

6    access to video conferencing sessions with this defendant and

7    so when the defense receives those materials, they're certainly

8    free to review those with the defendant in real-time in their

9    sessions.

10            And so, we are taking every step that we can to ensure

11   that the defense and the defendant have those materials but we

12   think those steps are all that is required here and certainly

13   more than is necessary to make sure the defendant is apprised

14   of those materials in anticipation of trial.

15            THE COURT:  As to the steps, if you have a new

16   submission we are talking about newly produced 3500 material,

17   limited volume; correct, Ms. Moe?

18            MS. MOE:  Yes, your Honor.

19            THE COURT:  And you are going to send that by FedEx --

20   so overnight -- to the facility in each instance, correct?

21            MS. MOE:  Yes, your Honor.

22            THE COURT:  And you alert BOP counsel, MDC Legal

23   counsel that something is coming for Ms. Maxwell so they can be

24   on alert.  Do you get indication back from legal counsel that

25   it's been received and delivered?

LB15max4

1        MS. MOE:  No, your Honor.  We have not been asking to

2   do that mindful of their obligations towards all of the other

3   inmates at the facility but we appreciate the steps they have

4   taken to be responsive to our alerts and about the defense's

5   requests.  For example, in some instances I think the defense

6   has been e-mailing legal counsel noting certain tracking

7   numbers and asking them to check at the particular warehouse.

8   So that process seems to be working.  I don't think we can

9   create a system where the defendant is receiving, in jail, on a

10  24-hour basis, all disclosures.  I don't think that is

11  practical but I think especially because, in some instances, we

12  may be uploading to the defense through a file sharing program

13  certain disclosures on one day and they may be meeting with the

14  defendant in person the very next day, they certainly have the

15  ability to talk about those materials with the defendant, to

16  provide her with paper copies if they wish, and I think that is

17  more than sufficient.

18        THE COURT:  Well, you are not suggesting that instead

19  of government sending the materials to the facility and working

20  with the facility to facilitate timely movement of the

21  materials to Ms. Maxwell, are you?

22        MS. MOE:  Of course, your Honor.

23        Our view is in combination of the fact that, in the

24  short-term, the defense has the opportunity to talk to the

25  defendant immediately about it if they wish to, and in longer

LB15max4

term the defendant will have those materials in a reasonable

time frame.  I think in combination with those efforts, that's

sufficient.

          THE COURT:  So in your letter tomorrow you will

indicate your understanding of the time frame including the

specific 3500 material sent last week because, again, the

representation I have is that you sent it to the defense on

Monday and we are here a week later and Ms. Maxwell hasn't

received it.  You will find out what the story is with that and

inquire as to whether there are any additional steps that can

be taken in light of where we are in advance of trial to

further facilitate the speedy transmission of the materials to

Ms. Maxwell.

          MS. MOE:  Yes, your Honor.

          THE COURT:  Ms. Sternheim?

          MS. STERNHEIM:  Judge, the procedure is such that even

if I were to hand-deliver it myself she would not get it.  If

the government hand delivers it, she will get it.  And we have

requested that if they are going to do late-breaking

disclosures, given that we are within weeks now of trial, that

it be hand-delivered with a call to the MDC legal department to

facilitate that.

          I can't just give her papers.  As the Court well

knows, even when I put them in the legal mail box, there is an

issue as to when she gets that.  And I know the government will

LB15max4

respond to those issues tomorrow.  But this is an issue -- and

I will give the government the benefit of the doubt -- they do

not know what we do when we have a conference with Ms. Maxwell

so to assume what we are doing is erroneous.  But, I will

complete that topic and move on to another one.

THE COURT:  I want to understand the specific

suggestion.

So, presumably now, on a daily basis, the government

may be meeting with witnesses and taking notes.  I mean, I get

those notes, an additional 3500 material during trial, it is

one or two pages of chicken scratch, handwriting.  So your

proposal is that every day that one of those is produced it's

hand delivered to the MDC by government staff?

MS. STERNHEIM:  That would be ideal but I'm not asking

that and I don't think it comes that way, I think it comes more

in these clumps.  I'm not asking for every single page to be

hand-delivered but if they know they are making a substantial

production, that should be hand-delivered.

THE COURT:  And what do you mean by substantial?  Over

a hundred pages?  What are we talking about?

MS. STERNHEIM:  Look.  You know, it is not the

quantity, it is what is in it that may have significance here.

THE COURT:  Ms. Sternheim, you have to be realistic on

this.

MS. STERNHEIM:  I'm trying to be.

LB15max4

1          THE COURT:  I mean, you have made a lot of this noise

2     about not having received it, not having received it in time.

3     I am asking for a specific request that's realistic.

4          MS. STERNHEIM:  Every day I would like whatever

5     they're producing to be hand-delivered.

6          THE COURT:  Well, I deny that request.

7          MS. STERNHEIM:  I understand that.  That's why I

8     didn't raise it but I think there needs to be some mechanism

9     either if a FedEx comes to the facility that it be

10    speed-delivered to Ms. Maxwell.  Boxes of legal materials that

11    have been sent to her, when we follow the tracking, they are

12    left in a facility, they're not being picked up.

13         I am not privy to what the mail operation is there.

14    Perhaps the government can get some insight.

15         THE COURT:  When you say they're not being picked up

16    you are saying that there are some that she has never received?

17    You are saying she is not receiving it in the one to two to

18    three-day time frame that you are asking for.

19         MS. STERNHEIM:  I submitted a letter to the Court the

20    other day.  In it there were four indications of items that

21    were available for pickup.  When I alerted the MDC to that,

22    after the second request on Friday, they sent me back

23    something, *We are going to go pick them up.*  I shouldn't have

24    to push them to go to the post office.  I can't deliver the

25    stuff myself because it's not going to be given to her.  So you

LB15max4

1   do it through the United States post office, I don't know what

2   the situation is how the MDC receives its packages, but if the

3   tracking information says available for pick up and days go by

4   and it's not picked up, what am I to do to put a candle under

5   the MDC to get those packages?

6          THE COURT:  I guess I'm still trying to understand

7   what it is that you are asking the Court to do.

8          MS. STERNHEIM:  I'm asking the Court to have the MDC

9   retrieve its mail in a timely manner.  I will notify them if a

10  next-day delivery is on the way, and that it be picked up for

11  next-day and not languish in the post office.

12         THE COURT:  Ms. Moe?

13         MS. MOE:  Your Honor, we will confer with MDC legal

14  about this issue and their practices and happy to provide the

15  Court with additional information about our disclosures last

16  week and the ongoing practices.

17         I can't speak to the particular mail sorting practices

18  of the MDC, but I want to assure the Court we have been working

19  diligently with the defense and with MDC legal on this issue

20  and have been taking extraordinary efforts to make sure the

21  disclosures are produced promptly and that they're sent to the

22  defendant quickly and we will continue to do so.  And if we

23  learn of a practical way of expediting this, we would certainly

24  be open to exploring that but that's all the information that I

25  have at this point.

LB15max4

1          THE COURT:  Thank you.

2          Can I ask the government, if you have a substantial

3    production, let's say over 50 pages of documents to review, can

4    the government have those hand-delivered to the facility?

5          MS. MOE:  No, your Honor.

6          Respectfully, that is extremely resource intensive, it

7    requires asking either a member of the prosecution team or

8    their colleagues who are also working on cases to, instead of

9    pursuing law enforcement activities or preparing for trial,

10   spend the day driving to the MDC to hand deliver a drive to the

11   defendant personally which is a remedy that I'm not aware of

12   being implemented in any other case and would be sort of an

13   extraordinary step for this defendant that would be out of step

14   with the ordinary practice.

15         THE COURT:  We are a month away from trial but if we

16   are a few days away from trial and suddenly the government has

17   a substantial production of material for some reason, 50 pages,

18   a hundred pages, would the government take those steps?

19         MS. MOE:  Your Honor, without having a sense of what

20   those materials are, what their sensitivities are, whether it

21   is sort of a relevant matter that we are producing in an

22   abundance of caution or something that is sensitive that is

23   urgent that is hard to troubleshoot that issue in advance but

24   we are mindful of Court's concern and that, even as we approach

25   trial, that the issue of timing is of particular concern and so

LB15max4

1    would be attentive to that issue in those circumstances but I

2    think it is difficult assess that in a hypothetical.

3           THE COURT:  OK.  I will wait for the government's

4    letter.

5           Ms. Sternheim.

6           MS. STERNHEIM:  One other issue, Judge; it has to do

7    going forward with the production of Ms. Maxwell to the court

8    house.

9           She is woken up at approximately 3:45.  She is taken

10   here and this morning she arrived at 5:38.  She sits in a

11   cellblock, very cold, she cannot bring any warmer garments.

12   She is not allowed to look at her legal materials.  She is

13   given very little food and whatever she is given doesn't even

14   have a utensil for her to use.  And, she is shackled.  Today

15   she had to get on her hands and knees to climb into the van

16   because her leg shackles would not permit her to step up.  This

17   is just not the right thing.  The wear and tear on her going

18   forward to trial five days a week --

19           THE COURT:  What is the application, Ms. Sternheim?

20           MS. STERNHEIM:  The application is for her to be

21   brought here later.  The real application, obviously, is for

22   her to be let out on bail but I'm not going to make that

23   application right here, I will make it in writing, but these

24   conditions are just terrible.  And today, when she was nodding

25   out, she was poked to be woken up just because she's the only

LB15max4

1    person sitting in a cell.  That's not necessary.

2            Nutrition is important, sleep is important.  We all

3    are going to be fatigued but we all get to go home, and

4    something needs to be done to ensure that she is not

5    debilitated during the trial.

6            THE COURT:  Are you making any allegations of

7    differential treatment as to Ms. Maxwell?

8            MS. STERNHEIM:  Yes.  I don't know any other client I

9    have ever had who has been woken up every 15 minutes at night

10   and then --

11           THE COURT:  No, I'm talking about what you are talking

12   about which is the transport to the court house for

13   proceedings.

14           MS. STERNHEIM:  I don't know any clients who have ever

15   arrived that early.  I can't speak to that.  They've never been

16   taken individually as she has so I don't have a big history

17   about that.  In other cases that I have had in this court house

18   either the clients come from the MCC, which is no longer here

19   and they're transported one way, or when I come here in the

20   morning for a court proceeding or trial, and I will get here at

21   9:00, I'm told they haven't arrived yet.  So, the differential

22   between getting here at 5:38 and not being here at 9:00 for

23   another defendant seems extraordinary.

24           THE COURT:  Ms. Moe?

25           MS. MOE:  Your Honor, the government is learning of

LB15max4

1    this concern for the first time at this conference.  I would be

2    happy to reach out to both the MDC and the Deputy U.S. Marshal

3    assigned to this particular trial to ask, as a general matter,

4    what time they anticipate producing the defendant on trial days

5    and can provide the defense with that information.

6            THE COURT:  Yes; and whether there is any differential

7    treatment between Ms. Maxwell and other defendants being

8    produced from the MDC to the court house under COVID protocols

9    and currently.  You will inquire as to that.

10           MS. MOE:  Yes, your Honor.

11           THE COURT:  As well as differential or not, what the

12   timing issue is, availability of food and comfort items, as

13   necessary, and the like.

14           MS. MOE:  Certainly, your Honor.

15           THE COURT:  Ms. Sternheim, anything further?

16           MS. STERNHEIM:  Thank you, Judge.  No.

17           THE COURT:  Anything, Ms. Moe?

18           MS. MOE:  No, your Honor.  Thank you.

19           THE COURT:  We are adjourned.

20                          o0o

21

22

23

24

25