UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------x
                                     :

  UNITED STATES OF AMERICA        :

             v.                   :     20 Cr. 330 (AJN)

                                       :

  GHISLAINE MAXWELL,           :

          Defendant.        :

                                     :
----------------------------------------------------x

## GHISLAINE MAXWELL'S RESPONSE TO THE GOVERNMENT'S MOTION *IN LIMINE* TO PRECLUDE EXPERT TESTIMONY OF DR. PARK DIETZ AND DR. ELIZABETH LOFTUS

Jeffrey S. Pagliuca
Laura A. Menninger
HADDON, MORGAN & FOREMAN P.C.
150 East 10th Avenue
Denver, CO 80203
Phone: 303-831-7364

Christian R. Everdell
COHEN & GRESSER LLP
800 Third Avenue New York,
NY 10022
Phone: 212-957-7600

Bobbi C. Sternheim
Law Offices of Bobbi C. Sternheim
225 Broadway, Suite 715
New York, NY 10007
Phone: 212-243-1100


*Attorneys for Ghislaine Maxwell*

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................... ii

INTRODUCTION AND SUMMARY OF THE ARGUMENT ..................................................... 1

ARGUMENT .................................................................................................................... 2

I.   Dr. Dietz's Testimony is Admissible. .......................................................................... 3

    A.   Response to Dr. Rocchio's Proposed Testimony ............................................... 4

    B.   Hindsight Bias .................................................................................................. 8

    C.   The Halo Effect ................................................................................................ 9

    D.   Pathways to False Allegations of Sexual Assault. ........................................... 11

    E.   Dr. Dietz's Alleged Opinions about the Accusers' "Credibility." ................... 13

    F.   Post-Traumatic Stress Disorder. ....................................................................... 15

II.  Dr. Loftus's Testimony is Admissible .......................................................................... 16

CONCLUSION ................................................................................................................. 22

Certificate of Service ...................................................................................................... 24

# TABLE OF AUTHORITIES

**Cases**

*Brooklyn Waterfront Terminal Corp. v. Int'l Terminal Operating Co. Inc.*, 311 F.2d 221 (2d Cir. 1962) ............................................................................................................................... 8

*Brooklyn Waterfront Terminal Corp. v. Int'l Terminal Operating Co.*, 211 F. Supp. 702 (S.D.N.Y.) ............................................................................................................................ 8

*California v. Trombetta*, 467 U.S. 479 (1984) ............................................................................ 2

*Campbell v. People*, 814 P.2d 1 (Colo. 1991) ......................................................................... 21

*Commonwealth v. Walker*, 92 A.2d 766 (Pa. 2014) ................................................................ 21

*Crane v. Kentucky*, 476 U.S. 683 (1986) .................................................................................. 2

*Davis v. Alaska*, 415 U.S. 308 (1974) ....................................................................................... 2

*Delaware v. Van Arsdall*, 475 U.S. 673 (1986) ....................................................................... 2

*Gersten v. Senkowski*, 426 F.3d 588 (2d Cir. 2005) ................................................................ 8

*Hygh v. Jacobs*, 961 F.2d 359 (2d Cir. 1992) ........................................................................ 11

*In re Fosamax Prod. Liab. Litig.*, 645 F. Supp. 2d 164 (S.D.N.Y. 2009) .................................. 12

*In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717 (3d Cir. 1994) ........................................... 5

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) .............................................................. 12

*Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558 (S.D.N.Y. 2007) .............................. 10

*Nimely v. City of New York*, 414 F.3d 381 (2d Cir. 2005) ......................................................... 11

*Olden v. Kentucky*, 488 U.S. 227 (1988) .................................................................................. 2

*Ruiz-Troche v. Pepsi Cola*, 161 F.3d 77 (1st Cir. 1998) ............................................................ 5

*State v. Buell*, 22 Ohio St.3d 124, 489 N.E.2d 795 (1986) ...................................................... 18

*State v. Chapple*, 135 Ariz. 281, 660 P.2d 1208 (1983) .......................................................... 18

*United States v. Brown*, 557 F.2d 541 (6th Cir. 1977) .............................................................. 9

*United States v. Cronic*, 466 U.S. 648 (1984) .......................................................................... 2

*United States v. Downing*, 753 F.2d 1224 (3d Cir. 1985) ......................................................... 18

*United States v. Heine*, No. 3:15-CR-00238-SI-2, 2017 WL 5260784 (D. Or. Nov. 13, 2017) ... 16

*United States v. Johnson*, 860 F.3d at 1140 (8th Cir. 2017) ..................................................... 14

*United States v. Jordan*, 924 F. Supp. 443 (W.D.N.Y. 1996 ....................................................... 22

*United States v. Lumpkin*, 192 F.3d 280 (2d Cir. 1999) ............................................................... 14

*United States v. Mathis*, 264 F.3d 321 (3d. Cir. 2001) ................................................................ 21

*United States v. Moore,* 786 F.2d 1308 (5th Cir. 1986)................................................................ 17

*United States v. Randall*, No. 19 Cr. 131 (PAE) (S.D.N.Y.) ........................................................ 9

*United States v. Rodriguez-Felix*, 450 F.3d 1117 (10th Cir. 2006) ............................................. 21

*United States v. Smith*, 156 F.3d 1046 (10th Cir. 1998) ............................................................... 21

*United States v. Smith*, 621 F. Supp.2d 1207 (M.D. Ala. 2009)................................................... 21

*United States v. Smith*, 736 F.2d 1103 (6th Cir. 1984) ................................................................ 18

*United States v. Smithers*, 212 F.3d 306 (6th Cir. 2000) ....................................................... 18, 21

*United States v. Stevens,* 935 F.2d 1380 (3d Cir. 1991) .............................................................. 18

*United States v. Telles*, 6 F.4th 1086 (9th Cir. 2021).................................................................. 14

*United States v. Torres*, No. 20-CR-608 (DLC), 2021 WL 1947503 ........................................... 14

**Other Authorities**

Jed Rakoff and Thomas Albright, *Identifying the Culprit: Assessing Eyewitness Identification* (Natl. Res. Counc. 2014) .......................................................................................................... 18

Rakoff J & Loftus EF, *The intractability of inaccurate eyewitness identification* (2018) .......... 18

**Rules**

Fed. R. Evid. 702 ........................................................................................................... passim

Fed. R. Evid. 702, Advisory Committee Notes, 2000 Amendments ............................. 5, 7, 10, 12

Fed. R. Evid. 703 ............................................................................................................................. 6

Fed. R. Evid. 704 ............................................................................................................................. 5

**Constitutional Provisions**

U.S. Const. Amend. V .................................................................................................................. 2, 3

U.S. Const. Amend. VI................................................................................................................. 2, 3

Ghislaine Maxwell submits this Response to the Government's Motion *in Limine* to Preclude Expert Testimony of Dr. Park Dietz and Dr. Elizabeth Loftus.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

The government asks this Court to drastically limit the expert opinions of Dr. Park Dietz and Dr. Elizabeth Loftus. The government's motion seeks to unfairly capitalize on this Court's decision largely overruling Ms. Maxwell's *Daubert* challenge to the government's expert, Dr. Lisa Rocchio. If the government gets its way, Dr. Rocchio will present the jury with a one-sided version of events while Ms. Maxwell will be crippled in her ability to respond. This Court should not permit the asymmetry the government hopes to create.

There is no dispute that Drs. Dietz and Loftus are supremely qualified in their respective areas of expertise. Attached as Exhibit 1 is the defense disclosure of the expert opinions of Dr. Dietz and Dr. Loftus. That 374-page document includes eleven exhibits (Exhibits A – K) describing the qualifications and bases of the opinions Ms. Maxwell's experts will offer at trial. Dr. Dietz is so well-regarded that Dr. Rocchio herself has relied on his opinions, Exhibit 2, p 58:1-24 (transcript of Nov. 10, 2021 hearing), and Dr. Loftus all but wrote the book on the science of memory.

Unable to challenge the qualifications of either Dr. Dietz or Dr. Loftus, the government's motion mischaracterizes their proposed opinions in an effort persuade this Court that they either invade the province of the jury or are unhelpful to the finder of fact. This Court should not fall for the government's construction of strawmen.

Beyond their responsiveness to Dr. Rocchio's testimony, Dr. Dietz's and Dr. Loftus's expert opinions are independently relevant because they will help the jury understand the facts of this case. To the extent the government contends these opinions don't "fit," that objection is flat-out wrong or at least premature, since the government hasn't put any evidence on yet. Because

the government's true objection is a question of fit, and because there is no dispute Dr. Dietz and

Dr. Loftus are qualified, this Court should deny the government's motion.

## ARGUMENT

"Whether rooted directly in the Due Process Clause . . . , or in the Compulsory Process or

Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants

"a meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690

(1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)); *see* U.S. Const. amends. V,

VI. A court violates a defendant's right to present a defense when it excludes competent and

reliable evidence that is central to the defense. *See Crane*, 476 U.S. at 690. The exclusion of such

evidence "deprives a defendant of the basic right to have the prosecutor's case encounter and

'survive the crucible of meaningful adversarial testing.'" *Id.* at 690-91 (quoting *United States v.

Cronic*, 466 U.S. 648, 656 (1984)).

The Constitution also affords Ms. Maxwell the right to confront her accusers. U.S.

amend. VI; *Olden v. Kentucky*, 488 U.S. 227, 231 (1988). "[A] criminal defendant states a

violation of the Confrontation Clause by showing that [she] was prohibited from engaging in

otherwise appropriate cross-examination designed to show a prototypical form of bias on the part

of the witness, and thereby 'to expose to the jury the facts from which jurors . . . could

appropriately draw inferences relating to the reliability of the witness.'" *Delaware v. Van

Arsdall*, 475 U.S. 673, 680 (1986) (quoting *Davis v. Alaska*, 415 U.S. 308, 318 (1974)).

Federal Rule of Evidence 702 governs the admissibility of Dr. Deitz and Dr. Loftus's

proposed testimony.

> A witness who is qualified as an expert by knowledge, skill, experience, training,
> or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the
> trier of fact to understand the evidence or to determine a fact in issue;

2

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

As elaborated below, the proposed testimony of Dr. Dietz and Dr. Loftus fall squarely within the ambit of Rule 702.

## I. Dr. Dietz's Testimony is Admissible.

The government agrees that Dr. Dietz is qualified to offer expert opinion testimony under Rule 702. Even so, the government hopes to limit his testimony by claiming that six categories of his proposed opinions are either unreliable, irrelevant, or invade the province of the jury.

The government, though, is trying to have it both ways, by eliciting testimony from its expert Dr. Rocchio while unfairly precluding Ms. Maxwell from responding. The government also seeks to foreclose Dr. Dietz from offering opinions that are independently relevant to this case, irrespective of Dr. Rocchio's testimony. To make its case, the government engages in the time-honored practice of mischaracterizing a defendant's position and then responding to the strawman.

This Court should reject the government's efforts, which, if successful, will deprive Ms. Maxwell of her constitutional right to present a complete defense and to confront and cross-examine her accusers. U.S. Const. amends. V, VI.

### A.   Response to Dr. Rocchio's Proposed Testimony.

The government challenges what it characterizes as four opinions Dr. Dietz might offer in response to testimony from Dr. Rocchio.[1] As explained below, though, Dr. Dietz's testimony is responsive to Dr. Rocchio's testimony in more than the four narrow ways identified by the government. In addition, much of his proposed testimony has independent relevance. In any event, none of the government's challenges is persuasive.

*First,* the government challenges Dr. Dietz's proposed testimony (1) that Dr. Rocchio's opinion on grooming "carries the risk of imputing motive and intent to the Defendant," that "Dr. Rocchio's proposed testimony is silent as to whether she is expected to impute a theory of 'grooming-by-proxy' to the defendant," and that "Ms. Maxwell is not accused of soliciting or enticing sexualized massages for herself," but instead that she allegedly "recruited and groomed minors to provide sexualized massages for Mr. Epstein." Mot. at 10. The government says these three opinions are inadmissible "legal" conclusions suitable only for a *Daubert* hearing and not for the jury trial.

It is perfectly appropriate for Dr. Dietz to opine that Dr. Rocchio's definition of "grooming" risks "imputing motive and intent" to the defendant because that is precisely *why* there is no settled, clinical definition of grooming, which the government has conceded is a proper subject of Dr. Dietz's expert opinions. *Supra* Note 1; Ex. 1, p 3-4. Surely Dr. Dietz can inform the jury *why* the science does not support Dr. Rocchio's definition of grooming.

Dr. Dietz will not himself (and Dr. Rocchio cannot herself) ascribe motive or intent to Ms. Maxwell, nor will he testify that the jury lacks sufficient evidence to ascribe motive and

---

[1] The government agrees Dr. Dietz can inform the jury that Dr. Rocchio is wrong to suggest that grooming has a settled definition. Mot. at 9.

intent to Ms. Maxwell. *Cf.* Fed. R. Evid. 704 ("In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense."). Those are questions for the jury. *Id.* But the very purpose of Dr. Dietz's testimony on this point is to caution the jury about improperly inferring motive and intent from Dr. Rocchio's unreliable opinions because, as even Dr. Rocchio recognized in her testimony, behavior cannot be called "grooming" if it is not in furtherance of "attempted sexual abuse or actual sexual abuse or exploitation." Ex. 2, p 118:22-14.

Accordingly, if Dr. Dietz's opinions about Dr. Rocchio's conclusions are reliable—as the government does not dispute they are—"*Daubert* neither requires nor empowers trial courts to determine which of several competing scientific theories has the best provenance." Fed. R. Evid. 702, Advisory Committee Notes, 2000 Amendments (quoting *Ruiz-Troche v. Pepsi Cola*, 161 F.3d 77, 85 (1st Cir. 1998)). A court must admit competing expert opinions that are reliable and relevant, and then it's for the jury to decide which expert is correct. *Id.* ("[P]roponents 'do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable. . . . The evidentiary requirement of reliability is lower than the merits standard of correctness'" (quoting *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 744 (3d Cir. 1994)).

As for informing the jury that "Dr. Rocchio's proposed testimony is silent as to whether she is expected to impute a theory of 'grooming-by-proxy' to the defendant"[2] and that "Ms.

---

[2] It's not clear that Dr. Rocchio will be permitted to testify on this subject, as this Court has precluded her from opining that the presence of a third party can facilitate grooming. (Dkt.

Maxwell is not accused of soliciting or enticing sexualized massages for herself," Ex. 1, p 4, these are proper subjects of Dr. Dietz's testimony because they form the basis of his principal responsive opinion:  Dr. Rocchio's opinions are unreliable generally and particularly in the context of this case. The Rules of Evidence are clear that an expert can inform the jury of the bases of his opinions. *See* Fed. R. Evid. 703.

 **Second**, the government claims that Dr. Dietz's reasoning is "circular." Mot. at 10. The government characterizes Dr. Dietz's opinion as follows:

> [I]t is circular to say that "grooming" "imputes motive and intent," because grooming is defined to be a strategic pattern of behavior used to develop relationships of attachment and coercion between perpetrators and victims. That is, if the behaviors lack the requisite motive and intent, they are not grooming behaviors.

*Id.* (citing Ex. 1, p 3). In an unconsciously revealing way, the government misunderstands Dr. Dietz's opinion.

 The government's objection to Dr. Dietz's opinion is the very objection that Dr. Dietz has to Dr. Rocchio's opinion. Dr. Dietz is critical of Dr. Rocchio's view of "grooming" because it risks imputing motive and intent to innocuous conduct "without adequate evidence of either." Ex. 1, p 3. Dr. Dietz proposes to identify this circular reasoning for the jury, so jurors can evaluate Dr. Rocchio's testimony and decide whether it is worth of belief.

 The risk of imputing motive and intent is not abstract. After all, the government itself does so. In response to Ms. Maxwell's Rule 412 motion, the government flat out said that "[e]vidence of grooming is evidence of intent." Gov't Resp. to Rule 412 Mot., p 7.

---

435, p 11). To the extent Dr. Rocchio offers testimony, however, addressing or implying "grooming-by-proxy," (terminology aside, *id.* at 10), Dr. Dietz's opinion is admissible as described herein.

**Third**, the government says Dr. Dietz should not be permitted to testify that it is a "commonly accepted bit of clinical lore" that perpetrators often target vulnerable victims. Mot. at 11. The government's argument misconstrues and misunderstands Dr. Dietz's point. Dr. Dietz does not dispute that vulnerable people can be and are targeted. Ex. 1, p 4. But what the science does not know, and what there is no data about, is how often perpetrators target individuals who are not characterized as "vulnerable." *Id.* There is no comparator, and there is thus no way to know how representative "vulnerable victims" are of all victims of abuse. *Id.* As Dr. Dietz will testify, experts do not know the empirical relationship between vulnerability and abuse. *Id.* Again, Dr. Dietz should be able to challenge the reliability of Dr. Rocchio's opinions by explaining how they lack scientific support. Fed. R. Evid. 702, Advisory Committee Notes, 2000 Amendments (Rule 702 "is broad enough to permit testimony that is the product of competing principles or methods in the same field of expertise.).

**Fourth**, the government disputes Dr. Dietz's opinion that there is no authority supporting a "theory of grooming by proxy." Mot. at 11-12.[3] Once again, though, the government misunderstands Dr. Dietz's point, and its argument is correspondingly non-responsive. The government says, for example, there is "ample literature on the pimp-prostitute relationship." Mot. at 12. Dr. Dietz does not deny this. But unless the government (to use its crude vernacular) is saying that the accusers were the prostitutes, Ms. Maxwell was the pimp, and Mr. Epstein was the John, this literature is beside the point and not applicable to this case. Ex. 1, p 4.

\* \* \*

---

[3] To the extent Dr. Rocchio offers testimony on this point, addressing or implying "grooming-by-proxy," Dr. Dietz's opinion is admissible as described herein. *See also supra* note 2.

The government hopes Dr. Rocchio will fill in the gaps in the accusers' stories by lending the imprimatur of an "expert" to their allegations. The likely importance of her testimony to the government's case cannot be overstated.[4] Dr. Dietz, who the government admits is supremely qualified, should be allowed to challenge the reliability of Dr. Rocchio's opinions, explain why they lack support, and opine about their limits. *See Brooklyn Waterfront Terminal Corp. v. Int'l Terminal Operating Co.*, 211 F. Supp. 702, 707 (S.D.N.Y.), *aff'd sub nom. Brooklyn Waterfront Terminal Corp. v. Int'l Terminal Operating Co. Inc.*, 311 F.2d 221 (2d Cir. 1962) ("As in all cases, this sharp conflict between the experts must be resolved by the trier of the fact.").

### B. Hindsight Bias.

The government appears to have two objections about Dr. Dietz's opinions on hindsight bias: First, that the testimony improperly attempts to inform the jury what result to reach, and second that the testimony is "well within the ken of the average juror." Mot. at 13-14. The government does not dispute the reliability of Dr. Dietz's opinions, and as explained below, Dr. Dietz's testimony is independently relevant and relevant in response to Dr. Rocchio's testimony.

The government's first argument once again misunderstands Dr. Dietz's point. Dr. Dietz's opinion is about grooming. In his expert opinion, and at most, behavior can be labeled "grooming" only *after* the fact and retrospectively—that is, only *after* it is clear abuse occurred. Ex. 1, p 4-5. But the government's burden in this case is to prove that, at the time the abuse allegedly occurred, Ms. Maxwell knew about it and intended to facilitate it. If Ms. Maxwell

---

[4] So important are Dr. Dietz's and Dr. Loftus's opinions to the defense that the failure to consult with and call them as witnesses would amount to ineffective assistance of counsel. *See Gersten v. Senkowski*, 426 F.3d 588, 607-08 (2d Cir. 2005) (defense counsel was ineffective in failing "to call as a witness, or even to consult in preparation for trial and cross-examination of the prosecution's witnesses, any medical expert on child sexual abuse").

lacked actual knowledge of and intent to facilitate the alleged grooming and abuse, she is not

guilty, even if, as a matter of hindsight, it should have been obvious.

The government's second argument falls short as well. Although the phrase "20/20

hindsight" might be well-known, the power of hindsight bias and the degree to which it might

unreliably affect the outcome of this case is not. To be sure, as Dr. Dietz laid out in his

disclosure, the scientific literature about hindsight bias is voluminous. Ex. 1, p 4-5. These expert

articles wouldn't exist if the concept were obvious to everyone, and surely it wouldn't be the

case that, as Dr. Dietz notes, "[e]ven individuals with specialized training and expertise succumb

to hindsight bias," *id.* at 5.

The government concedes that "the jury, and not the court, should be the one to decide

among conflicting experts." Mot. at 9 (quoting *United States v. Randall*, No. 19 Cr. 131 (PAE)

(S.D.N.Y.)). But for the jury to do that job, it must be equipped with the necessary tools. And

one of those tools is Dr. Dietz's perfectly permissible opinion that Dr. Rocchio's testimony

cannot carry the water the government wants it to because it is tainted by hindsight bias. *See*

*United States v. Brown*, 557 F.2d 541, 556 (6th Cir. 1977) ("Conflicting testimony concerning

the conclusions drawn by experts, so long as they are based on a generally accepted and reliable

scientific principle, ordinarily go to the weight of the testimony rather than to its admissibility.").

### C.  The Halo Effect.

The government has two objections to Dr. Dietz's opinions on the "halo effect." The first

is that it is irrelevant (though, again, not unreliable). The second is that it improperly seeks to

engender sympathy for Ms. Maxwell.

First, the government is wrong to argue the testimony is irrelevant. Take just one

(representative) example. Dr. Dietz opines that Mr. Epstein's

> flaws allowed him to use his brilliance to manipulate people to do his bidding and to compartmentalize people into isolated cells in which none had complete information about his activities.

Ex. 1, p 7. This testimony is patently relevant to Ms. Maxwell's knowledge and intent and to the conspiracy counts. If this "compartmentalization" prevented Ms. Maxwell from having the required knowledge or intent (an ultimate issue for the jury to decide, on which Dr. Dietz will not opine), then she will be not guilty. The government after all intends to ask the Court to instruct the jury on "willful blindness." The jury should have the benefit of a scientific understanding of the manner in which a skilled manipulator could have eluded exposure to those around him.

The government obviously disagrees with Dr. Dietz in his evaluation of Mr. Epstein. But just because the government has a different view of the facts does not mean Dr. Dietz's testimony is inadmissible. Rule 702's emphasis on "sufficient facts or data" does not "authorize a trial court to exclude an expert's testimony on the ground" that the government "believes one version of the facts and not the other." *See* Fed. R. Evid. 702, Advisory Committee Notes, 2000 Amendments.

The government's second objection is easily addressed. The point of the testimony is not to suggest jury nullification, which would be improper as defense counsel and Dr. Dietz well know. Mot. at 17. The testimony is relevant, as explained above. In any case, if the Court is concerned about any potential for Dr. Dietz's testimony to engender sympathy for Ms. Maxwell, the Court can give a limiting instruction. That limiting instruction would be in addition to the Court's written instructions, which already will instruct the jury not to decide the case based on sympathy or bias. *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 571 (S.D.N.Y. 2007) ("This Court has routinely relied upon limiting instructions to remind the jury of its role and of the limits of expert testimony and clarify the extent of their consideration of such

testimony." (cleaned up)). The government's speculative concern about the effect of Dr. Dietz's testimony is no reason to exclude it when the Court has ample tools at its disposal to address the governments (ill-founded) worries.

Almost as an aside, the government disingenuously suggests that Dr. Dietz's opinion is inadmissible because "it appears" to be based "solely on one interview of Epstein with Steven Bannon." Mot. at 17. As the government well knows, Dr. Dietz's opinion is based on much more. To be sure, Dr. Dietz quoted the interview in his disclosure, Ex. 1, p 6, but he also reviewed and considered thousands of pages of material before reaching his opinion, including most significantly all the material available to him about the Palm Beach Investigations of Mr. Epstein, Ex. 1, p 166-69.

### D.  Pathways to False Allegations of Sexual Assault.

The government misses the mark in its hyperbolic objection to Dr. Dietz's opinions about the multiple pathways to false sex assault allegations. Mot. at 18-22. The government claims these opinions invade the province of the jury are unreliable and unhelpful. Not so.

First, the opinions do not invade the province of the jury because Dr. Dietz is not offering an opinion on the truthfulness of the accusers' allegations in this case. *See Nimely v. City of New York*, 414 F.3d 381, 395–96 (2d Cir. 2005) (expert testimony is inadmissible if it "comment[s] directly, under the guise of expert opinion, on the credibility of trial testimony from" specific fact witnesses.); *cf. Hygh v. Jacobs*, 961 F.2d 359, 364 (2d Cir. 1992) (expert not permitted to offer testimony that "merely [tells] the jury what result to reach"). Dr. Dietz's opinions rely on his clinical experience and the vast body of literature explaining how an accuser might come to falsely allege sexual assault.

One point (but by no means the only one) of Dr. Dietz's opinion is to challenge the reliability of Dr. Rocchio's opinions, which she bases on the untested assumption that her

patients are telling the truth when they claim to have been abused. *See* Ex. 1, p 7 ("Studies concerning the accurate reporting of alleged sexual assaults undermine the assertions made by Dr. Rocchio to the extent they are based on uncorroborated allegations and are also otherwise relevant here."). Because, in Dr. Dietz's opinion, Dr. Rocchio does not make sufficient allowance for the potential that her patients are not telling the truth, the jury is entitled to know how and why that analytical flaw undermines her opinions. As even the government concedes, Mot. at 9, "the jury, and not the trial court, should decide among the conflicting views of different experts." *In re Fosamax Prod. Liab. Litig.*, 645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153 (1999)).

Moreover, Dr. Dietz's opinions are directly relevant to evaluate the nature and timing of the disclosures by the alleged victims in this case. As Dr. Rocchio admitted during her testimony at her *Daubert* hearing, there are numerous reasons why a report of sexual assault might not surface immediately, including the various pathways to a false allegation identified by Dr. Dietz. Ex. 2, p 153-54.

Nor are Dr. Dietz's opinions unreliable, as the government claims. Mot. at 20-21. First, Dr. Rocchio essentially admitted they were reliable during her testimony. Ex. 2, p 153-54.

Second, if Dr. Dietz's reliance on the Engle and O'Donohue article weren't enough (which it is), Dr. Dietz will testify as well based on his extensive clinical experience. In his own practice, he has personally seen ten of the eleven pathways to false allegations identified by Engle & O'Donohue. Dr. Dietz thus could reliably offer these opinions even if the absence of the article. *See* Fed. R. Evid. 702, Advisory Committee Notes, 2000 Amendments. ("Nothing in this [rule] is intended to suggest that experience alone--or experience in conjunction with other knowledge, skill, training or education--may not provide a sufficient foundation for expert

testimony. To the contrary, the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience.").

Third, in admitting Dr. Rocchio's testimony over an objection by Ms. Maxwell similar to the one offered here by the government, this Court said as follows:

> Dr. Rocchio's opinions speak only to concepts and will not (and indeed may not) suggest that the jury find any alleged victim witness to be credible or to find Ms. Maxwell guilty. . . . It is the jury's role to determine whether and how Dr. Rocchio's opinions apply to the facts of this case and the credibility of the witnesses.

(Dkt. 435, p 10). The same logic applies to Dr. Dietz's opinions.

Finally, the government says the Dr. Dietz's opinions don't "fit the facts of the case." Mot. at 21. But because the accusers' stories have changed so much over the last twenty years, and because it's still unclear what they will testify to at trial, this objection is premature at best. If the government believes Dr. Dietz's opinions do not "fit" the facts, this Court can consider that argument once there is evidence of what the facts really are.

### E.  Dr. Dietz's Alleged Opinions about the Accusers' "Credibility."

Nowhere in Dr. Dietz's expert disclosure does he propose to opine on the credibility of Ms. Maxwell's accusers. Ex. 1. The government can argue otherwise only by mischaracterizing his opinions. *See* Mot. at 22-23.

For one thing, Dr. Dietz should be able to critique Dr. Rocchio's methods and conclusions by opining that experts in the field would not be "so credulous" as Dr. Rocchio is. *See* Gov't Omnibus Resp. to Maxwell Mot. *in Limine*, at 16; Ex. 2, p 16:11-16 (Dr. Rocchio: "In my clinical practice, it's not – I have to deal with what the patients tell me in the room. It's not my job to go out and verify any part of what's being told in the clinical room, but, rather, to hear what they're telling me and then relate that back to my other skills-training experience, the scientific literature."). Dr. Dietz proposes to opine that Dr. Rocchio erred in assuming that her

patients were telling the truth without evaluating, for example, "the changes in the core details of the allegations" of her patients, which is something "professionals" in the field do. Ex. 1, p 10.

If, however, Dr. Rocchio testifies that she does not merely assume alleged victims are telling the truth (as when, for example, Dr. Rocchio is acting in a forensic rather than clinical capacity, *see* Ex. 2, p 39-40), and that her expert opinions are based on a rigorous inquiry into the veracity the claims, Dr. Dietz's opinions are still reliable and admissible. He can testify, for example, that because the literature does not support the hypothesis that emotional distress (e.g., crying) is predictive of truthfulness, Ex. 1, p 11, Dr. Rocchio is wrong to base her opinions about her patients on such conduct.

For another thing, Dr. Dietz does not propose to tell the jury who is telling the truth and who is not telling the truth. Thus, to use this Court's words,

> Dr. [Dietz's] testimony is appropriate because []he does not testify as to any specific witness's credibility. *See, e.g., Torres*, No. 20-CR-608 (DLC), 2021 WL 1947503, at *7; *Johnson*, 860 F.3d at 1140 (8th Cir. 2017) (explaining that an expert may testify "regarding the general characteristics that sexually abused children exhibit" but may not usurp the jury's role of assessing the credibility of any specific victim); *United States v. Telles*, 6 F.4th 1086, 1097–98 (9th Cir. 2021) (same).

(Dkt. 435, p 5).

The government is wrong to rely on *United States v. Lumpkin* (distinguishable on other grounds in any event), in which the Court affirmed the district court's decision to exclude "testimony on witness confidence in identifications." 192 F.3d 280, 289 (2d Cir. 1999). Mot. at 22. Not only did *Lumpkin* concern eyewitness identification (a concept far afield from the testimony at issue here), but the expert witness there proposed to evaluate the credibility of witnesses who made the identification of the defendant. Dr. Dietz does not propose to testify to the credibility of accusers in this case.

14

Finally, the government points to Dr. Dietz's "acknowledgement" that credibility should be judged on a "case-by-case basis." Mot at 23. That is exactly right. And it is exactly what Dr. Rocchio does not do in her clinical practice, which is one reason why Dr. Dietz's testimony is admissible.

### F.   Post-Traumatic Stress Disorder.

Dr. Dietz's opinions on PTSD are relevant, reliable, and admissible.

The government's first argument is that it doesn't understand Dr. Dietz's proposed testimony, particularly Dr. Dietz's statement that victims with PTSD symptoms are unlikely "to unnecessarily recreate a sexual assault event." Mot. at 23. To be clear, the point Dr. Dietz was making in this statement and this paragraph of his disclosure is that victims with PTSD will likely avoid reminders of the event that caused the trauma in the first place—for example, they will avoid continued communication with the alleged perpetrator and they are unlikely to wear clothing provided by the alleged perpetrator. Dr. Dietz is not saying, as the government claims, that victims should bear "responsibility for experiencing repeated assaults."

> According to the government, the
>
> critical distinction in this case involves the difference between victims of sexual assaults who are involved an ongoing relationship of attachment and coercion with their abusers—including the power imbalance arising from the age differential between them and the abusers—and those who are not. To the extent Dr. Dietz's testimony primarily addresses the latter category, such an opinion is irrelevant and should be precluded for lack of fit with the facts of the case. . . . To the extent Dr. Dietz intends instead to opine on the former category, that opinion is not reliable.

Mot. at 23-24 (citations omitted). This argument fails as well.

On the one hand, the government says Dr. Dietz's opinion does not "fit the facts" of the case because this case is about alleged "victims of sexual assaults who are involved an ongoing relationship of attachment and coercion with their abusers." But this argument begs the

15

question—are the accusers in this case telling the truth? The government obviously thinks they are. And that's fine. But it will be up to the jury to decide.

On the other hand, if the alleged "victims of sexual assaults . . . [were not] involved an ongoing relationship of attachment and coercion with their abusers"—that is, if the victims are not telling the truth—then according to the government Dr. Dietz's opinions are unreliable. In either scenario, says the government, Dr. Dietz can't testify. As explained above, and as the government concedes when it admits that Dr. Dietz can testify about his disagreement with Dr. Rocchio's definition of "grooming," there is ample room for debate about what constitutes grooming behavior and how it manifests.

Accordingly, this Court should reject this "heads the government wins, tails Ms. Maxwell loses" argument.

## II.   Dr. Loftus's Testimony is Admissible.

The government goes to great lengths to present cases where memory testimony was precluded. Excepting one civil negligence claim based on exposure to sexual abuse, the cases cited by the government almost exclusively focus on reliability of eyewitness testimony or failed memory regarding specific time or documents. The simplicity of the issues in the cited cases were deemed by the court not to require expert testimony. None of these cases involved the *government* proffering its own expert to testify about why an accuser or witness might not remember things or remember them inconsistently. Moreover, the cases recognize that, in circumstances like those present in this case, even absent a government "trauma/memory" witness, defense expert testimony is appropriate. *See, e.g., United States v. Heine*, No. 3:15-CR-00238-SI-2, 2017 WL 5260784, at *2 (D. Or. Nov. 13, 2017) (expert testimony regarding memory would be allowed if the case involved issues of suggestive questioning, drug use, hallucinations, or repressed or recovered memories).

The issues in this case, by contrast, are far from simple: accusers making allegations decades after the alleged events after reading, hearing, and speaking about the events with others, barraged by media coverage, and motivated by monetary gain. Most of the accusers have spoken publicly and all have received large settlements from the Epstein Victim Compensation Fund. Their "memories" have changed dramatically over time and conveniently began to include Ms. Maxwell after retaining many of the same personal injury lawyers. None of the cases cited by the government comes close to the issues presented here.

Dr. Elizabeth F. Loftus, Ph.D., is a distinguished professor and preeminent expert on memory science, with extensive credentials and academic and research experience spanning decades. She has published more than 20 books and over 600 scientific articles and chapters, the majority of which focus on the subject of memory.

She has been qualified as an expert and testified approximately 300 times in civil and criminal court cases and approximately 100 times during depositions. Like Dr. Rocchio, she would be testifying as a "blind" expert. Dr. Loftus will not testify about the credibility or lack thereof of any witness in this case nor will she testify about whether any particular memory of any witness is true or false or credible or mistaken. She will testify about how human memory operates, the nature of the process of remembering as a reconstructive process, and the factors that can cause memory distortion over time.

Admission of expert testimony on eyewitness identification and memory has significantly evolved, catalyzed by reversals due to DNA exoneration.[5] In 2013, the National Academy of

---

[5] *See, e.g.*, *United States v. Smithers*, 212 F.3d 306, 311–12 (6th Cir. 2000) (noting the view that, "since the 1980's . . . expert testimony may be offered," "on the subject of the psychological factors which influence the memory process) (citing *United States v. Moore,* 786 F.2d 1308, 1313 (5th Cir. 1986) (finding that "[i]n a case in which the sole testimony is casual

Sciences was asked to conduct a thorough study of scientific research relating to eyewitness testimony and memory. In response, the National Research Council formed a committee, co-chaired by the Honorable Jed Rakoff and Thomas Albright, a prominent cognitive scientist at the Salk Institute for Biological Studies. In 2014, the committee published its report: *Identifying the Culprit: Assessing Eyewitness Identification* (Natl. Res. Counc. 2014): "Human visual perception and memory are changeable, the ability to recognize individuals is imperfect, and policies governing law enforcement procedures are not standard—and any of these limitations can produce mistaken identifications with serious consequences" *Id.* The committee recommended that judges admit expert testimony as a way of educating juries on the science of memory. An alternative recommendation, having the court deliver a carefully crafted jury instructions that could accomplish this same educational goal, requires the daunting task of devising the right instructions. *See* Rakoff J & Loftus EF, *The intractability of inaccurate eyewitness identification* (2018).

---

eyewitness identification, expert testimony regarding the accuracy of that identification is admissible and properly may be encouraged ... "); *United States v. Downing*, 753 F.2d 1224, 1232 (3d Cir. 1985) (reasoning that "expert testimony on eyewitness perception and memory [should] be admitted at least in some circumstances"); *United States v. Smith*, 736 F.2d 1103, 1107 (6th Cir. 1984) ("The day may have arrived, therefore, when Dr. Fulero's testimony can be said to conform to a generally accepted explanatory theory.")). As also noted by the court in *Smithers*, "[s]tate court decisions also reflect this trend." (citing *State v. Buell*, 22 Ohio St.3d 124, 489 N.E.2d 795 (1986) (overruling per se rule and holding expert testimony admissible to inform jury about factors generally affecting memory process)). Moreover, the court noted that "several courts have held that it is an abuse of discretion to exclude such expert testimony." (citing *United States v. Stevens,* 935 F.2d 1380, 1400–01 (3d Cir. 1991) (reversing and remanding for new trial); *Smith*, 736 F.2d at 1107 (holding error harmless in light of other inculpatory evidence); *Downing*, 753 F.2d at 1232 (holding error harmless in light of other inculpatory evidence); *State v. Chapple*, 135 Ariz. 281, 660 P.2d 1208 (1983) (reversing and remanding for new trial)).

Admission of expert testimony rests with the discretion of the court. Exclusion of expert testimony, especially regarding the reliability of eyewitness testimony, has been deemed error resulting in reversals. *See, e.g.*, supra note 5 & cases cited *infra*. The admission of expert testimony on the subject of memory, especially in sex abuse cases, has been prominent in state court, where most prosecutions regarding sex-based offenses are brought. In the last decade, for example, Dr. Loftus has given expert testimony regarding memory science in numerous sex abuse cases:

- *People v. Weinstein* (NY Cty, NY 2020)
- *People v. Heely* (San Fernando, CA 2019)
- *People v. Dudley* (Orange Cty, CA 2018)
- *State v. Ross* (Douglas Cty, Neb 2017)
- *State v. Howard* (Douglas Cty, Neb 2017)
- *Doe v. Hosey* (Spokane Cty, WA (2016)
- *People v. Armstrong* (Broomfield Cty, CO 2016)
- *GM v. LAUSD* (Los Angeles, CA 2015)
- *People v. Martinson* (Denver Cty, CO 2014)
- *State v. Carson* (Tulsa Cty, OK 2013)
- *People v. Manzanares* (Broomfield Cty, CO 2013)
- *People v. Barreto* (Monterey Cty, CA 2012)
- *People v. Tortorelli* (San Bernardino Cty, CA 2011)
- *People v. Wellen* (Orange Cty, CA 2011)
- *People v. Borbon* (Orange Cty, CA 2011)

Dr. Loftus's testimony is based on decades of social science research that she personally conducted as well as upon the body of scientific research and literature in the field of memory science. In contrast, Dr. Rocchio relies on literature of others, mostly non-identified and some that do not support the science of grooming, and upon anecdotal reporting by patients engaged in talk therapy.

Although Dr. Rocchio is not an expert on memory or neuroscience (as she admitted at her *Daubert* hearing, Ex. 2, p 121), the government intends to have her testify about the impact of

trauma on memory. The government does not explain how it can be fair to oppose the testimony

of an actual memory expert.

According to the government, (Dkt. 397), Dr. Rocchio's testimony about memory is

proper under Fed. R. Evid. 702 because:

> Sexual abuse also impacts the way memory is encoded. In traumatic circumstances, often only the most salient details are encoded, and over time, specific details may be lost. With traumatic memory in particular, adrenaline and cortisol responses in the context of fear and trauma cause people to narrow their focus to the most salient and relevant details. If someone is abused multiple times or by multiple people, it is very common for memories of similar occurrences to jumble together, although the victim can remember the perpetrator and maybe some of the locations where the abuse occurred.

> Taken together, Dr. Rocchio's expert testimony explains why victims of child sexual abuse—and especially repeated sexual abuse—may disclose their abuse in a delayed and incremental fashion, and why their memories may lack some level of detail when the disclosure finally occurs.

The validity of these opinions is debatable. What is not, however, is that these opinions

are a small part of what may or may not affect someone's memory over time. The government

desperately wants to avoid discussing the other factors that may affect memory such as

suggestibility, substance abuse (both short and long term), secondary gain, the effects of time,

psychological disorders, and confabulation (Dr. Rocchio admitted that these things impact

memory during the 702 hearing). *E.g.*, Ex. 2, p 121-22.

These are not topics readily understandable. The government has selected a "trauma"

expert who will present only a small, self-serving part of the science related to memory. Experts

such as Dr. Loftus spend a lifetime researching and writing about these concepts which have

been regularly misunderstood by fact finders. One need only to consider the extraordinary

number of innocent people convicted on what was thought to be reliable testimony based on

faulty memories of witnesses whose convictions were reversed after DNA evidence proved the

"memories" incorrect. Jurors do not understand these scientific concepts and will benefit from

considering the whole picture, not the part that the government believes will serve to help convict Ms. Maxwell. The helpfulness of this type of testimony is well recognized. *See, e.g.*, *United States v. Smith*, 156 F.3d 1046, 1052–53 (10th Cir. 1998) (rejecting, in criminal case involving the reliability of memory and its impact on the reliability of eyewitness identifications, per se rule excluding such expert testimony); *Commonwealth v. Walker*, 92 A.2d 766, 782–83 (Pa. 2014) (collecting cases and noting that 44 states now permit trial courts, in their discretion, to admit expert testimony on factors that affect memory and the reliability of eyewitness testimony, and that "all federal circuits that have considered the issue, with the possible exception of the 11th Circuit, have embraced this approach"). *See also Campbell v. People*, 814 P.2d 1 (Colo. 1991) (reversing trial court decision that used improper test to exclude expert testimony "on how certain factors, such as … post-event information, can affect memory and perception"); *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1124 (10th Cir. 2006) (stating that, if warranted in a particular case, expert testimony may be admissible on "[such] psychological phenomena as the feedback factor" in which "witnesses who discuss a case with each other may unconsciously reinforce mistaken identifications"); *United States v. Mathis*, 264 F.3d 321, 336–38 (3d. Cir. 2001) (holding that district court abused discretion in excluding expert testimony on factors affecting memory, such as witnesses' exposure to "post-event information" that may have distorted witnesses' recollection of prior events); *United States v. Smithers*, 212 F.3d 306, 312 n.1 (6th Cir. 2000) (describing "assimilation factor, which concerns a witness's incorporation of information gained subsequent to an event into his or her memory of that event"); *United States v. Smith*, 621 F. Supp.2d 1207, 1216–17 (M.D. Ala. 2009) (ruling that expert testimony was admissible to show how "post event information" can influence memory, noting that "[r]esearch regarding post-event information shows that access to facts after an

occurrence can, under some circumstances, change a witness's memory and even cause nonexistent details to become incorporated into a previously acquired memory") (citing Fionna Gabbert, et. al, Memory Conformity: Can Eyewitnesses Influence Each Other's Memories for an Event?, 17 Applied Cogn. Psychol. 533 (2003)), and *United States v. Jordan*, 924 F. Supp. 443, 449 (W.D.N.Y. 1996) (where government's case was largely dependent on witness's memory testimony about the formation, storage, retention and retrieval of memories along with factors that influence the accuracy of memories expert testimony would be helpful to the jury).

The government fails to provide compelling reasons to preclude the testimony of Dr. Loftus. The government's bold statement that there is no evidence that "occurrences, suggestion, influences or the like" happened to any witness is this case is pure bolstering that is belied by the 3500 material. Dr. Loftus's extensive experience, expertise, and proposed testimony is the right "fit" for this case. The Court should permit her expert testimony.

## CONCLUSION

The government does not call into question Dr. Dietz's and Dr. Loftus's qualifications, nor does it meaningfully question the reliability of their opinions. Rather, the government claims their opinions invade the province of the jury or do not "fit" the case. A hearing is not necessary or appropriate to resolve the government's arguments. And as explained above, these arguments fail on the merits.

This Court should deny the government's motion.

Dated: November 12, 2021

Respectfully submitted,


*s/ Jeffrey S. Pagliuca*

Jeffrey S. Pagliuca
Laura A. Menninger
HADDON, MORGAN & FOREMAN P.C.
150 East 10th Avenue
Denver, CO 80203
Phone: 303-831-7364

Christian R. Everdell
COHEN & GRESSER LLP
800 Third Avenue
New York, NY 10022
Phone: 212-957-7600

Bobbi C. Sternheim
Law Offices of Bobbi C. Sternheim
225 Broadway, Suite 715
New York, NY 10007
Phone: 212-243-1100

*Attorneys for Ghislaine Maxwell*

## Certificate of Service

I hereby certify that on November 12, 2021, I electronically filed the foregoing *Ghislaine Maxwell's Response to the Government's Motion in Limine to Preclude Expert Testimony of Dr. Park Dietz and Dr. Elizabeth Loftus* with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Alison Moe
Maurene Comey
Andrew Rohrbach
Lara Pomerantz
U.S. Attorney's Office, SDNY
One Saint Andrew's Plaza
New York, NY 10007
Alison.moe@usdoj.gov
Maurene.comey@usdoj.gov
Andrew.Rohrbach@usdoj.gov
Lara.Pomerantz@usdoj.gov

*s/ Nicole Simmons*