# EXHIBIT 2

LBAAMAX1ps

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4               v.                         20-cr-330 (AJN)

5    GHISLAINE MAXWELL,

6                    Defendant.            Hearing

7    ------------------------------x

8                                          New York, N.Y.
                                           November 10, 2021
9                                          9:20 a.m.

10   Before:

11                  HON. ALISON J. NATHAN

12                                         District Judge

13                       APPEARANCES

14   DAMIAN WILLIAMS
          United States Attorney for the
15        Southern District of New York
     BY:  MAURENE COMEY
16        ALISON MOE
          LARA POMERANTZ
17        ANDREW ROHRBACH
          Assistant United States Attorneys
18
     HADDON MORGAN AND FOREMAN
19        Attorneys for Defendant
     BY:  JEFFREY S. PAGLIUCA
20        CHRISTIAN R. EVERDELL
          LAURA A. MENNINGER
21        -and-
     Bobbi C. Sternheim
22        Attorney for Defendant

23   Also Present:  Sarah Drescher
                    Paralegal, U.S. Attorney's Office
24
                    Camille Delgado
25                  Paralegal, Haddon Morgan and Foreman
```

LBAAMAX1ps

1          (Case called)

2          THE CLERK:  Counsel, please state your name for the

3    record, starting with the government.

4          MS. POMERANTZ:  Good morning, your Honor.  Lara

5    Pomerantz, Andrew Rohrbach, Alison Moe, and Maureen Comey for

6    the government.

7          THE COURT:  Good morning.

8          For the defendant.

9          MS. STERNHEIM:  Good morning, Judge.  Bobbi C.

10   Sternheim appearing with Ghislaine Maxwell at counsel table,

11   along with Jeffrey Pagliuca, Laura Menninger, Christian

12   Everdell.  And we're assisted by Camille Delgado.

13         THE COURT:  Good morning, everyone.  Thank you.

14   Please be seated.

15         All right.  We are here for a number of things.  Let

16   me just get myself organized.

17         This is a pretrial conference.  Our jury selection

18   process began on November 4th with the questionnaires, trial to

19   commence on November 29th.

20         Today, we will address the defendant's motion under

21   Federal Rule of Evidence 412, the defendant's motion in limine

22   to exclude under Federal Rule of Evidence 702 and *Daubert*, and

23   the other outstanding issues that overlap with these motions,

24   as we discussed at our last conference on November 1st.

25         Just for clarity, I explained this in my order

LBAAMAX1ps

1    regarding public access yesterday:  The 412 piece of these

2    proceedings will be sealed, as is expressly required by Federal

3    Rule of Evidence 412.  That rule requires certain categories of

4    evidence to be discussed at a sealed, in camera hearing.  My

5    plan is to hold that part of the hearing last, do what we need

6    to do with respect to logistical issues and *Daubert* here first,

7    and then seal the courtroom, having everyone who is a

8    nonparticipant leave and shutting down the overflow access at

9    that point, as required by law.

10            Given this, I want to address a few logistical issues

11    at the outset, and then we'll move into *Daubert*.

12            I should say, to the extent we run into any overlap

13    during the *Daubert* hearing on any 412 issues, we have arranged

14    space to do the equivalent of a sealed sidebar in the jury

15    room, I believe.  But, again, we can bifurcate.

16            OK.  Before I turn to the logistical issues, any

17    matters I should take up with what I have indicated,

18    Ms. Pomerantz?

19            MS. POMERANTZ:  Not from the government.  Thank you.

20            THE COURT:  Ms. Sternheim?

21            MS. STERNHEIM:  No.  Thank you.

22            THE COURT:  OK.  First, on logistics, as you know,

23    counsel, we had a very successful return rate on the jury

24    summons, and in the two days that the questionnaire has been

25    filled out we had 565 prospective jurors fill it out.  Given

1    that, my plan is to just do the morning session on Friday,

2    which would give us about another hundred or so people filling

3    out the questionnaire, which is what the target was in the 6 to

4    7 hundred range, presumably about 650 or so.  And that will

5    give additional time for the parties to confer after they have

6    reviewed and a fewer number of questionnaires to review, given

7    that we got there sooner.

8              Any concerns with that, Ms. Pomerantz?

9              MS. POMERANTZ:  No.  Thank you, your Honor.

10             THE COURT:  Ms. Sternheim?

11             MS. STERNHEIM:  No.

12             THE COURT:  Great.  Thank you.

13             I did previously set a tentative hearing for November

14   15th, which is Monday, at 9:30.  So that's firm.  We'll have

15   that hearing, to the extent we need to, to go over any pre voir

16   dire process resolution of disputed questionnaires and the like

17   if we need to, and talk about that process more.

18             I'll also use it to address any outstanding motions in

19   limine if I can.  In particular I think I will then have full

20   briefing, and hopefully be able to address defense motion 1, on

21   co-conspirator statements; defense motion 4, regarding alleged

22   victim 3; and defense motion 7, on Exhibit 52.

23             If I'm able to, I'll also address the government's

24   motions regarding exclusion of at least some testimony of

25   Dr. Loftus and Dr. Dietz.

LBAAMAX1ps

1          And as I said, we'll discuss voir dire and take up

2     questionnaire issues as needed.

3          So that's Monday, November 15th.

4          I would also like to just go ahead and schedule what

5     will be our final pretrial conference for November 23rd, is

6     what I propose, in the afternoon.  I still need to work through

7     the logistics and space and timing on that, use that to clear

8     out any remaining issues or motions in advance of trial.

9          Ms. Pomerantz, how does that sound to the government?

10          MS. POMERANTZ:  That all sounds fine.  Thank you.

11          THE COURT:  Ms. Sternheim?

12          MS. STERNHEIM:  That sounds fine.  I just have a

13     question with regard to the commencement --

14          THE COURT:  Could you pull up the mike.

15          MS. STERNHEIM:  Oh.  Sorry.

16          With regard to the commencement of voir dire, what

17     time will we begin on the 16th?

18          THE COURT:  I believe 9, but I will confirm and see

19     what time I believe -- what time we think the jurors will

20     actually be ready to go, checked in and ready to go, and I'll

21     work backwards from that, give us time to get set up and

22     address any preliminary issues.  So let's assume 9 and I'll

23     confer with the jury department.

24          MS. STERNHEIM:  Thank you.

25          Just a moment.

LBAAMAX1ps

1      Your Honor, Mr. Pagliuca has a hearing in Colorado.

2 Would it be permissible for him not to appear at the final

3 pretrial conference?  Ms. Menninger, Mr. Everdell, and I will

4 be present.

5      THE COURT:  That's fine with me.

6      MS. STERNHEIM:  Thank you.

7      THE COURT:  And I do plan to put out a logistics order

8 after today that confirms the details of the conferences I've

9 just discussed and rooms and the like.

10      Do the parties have any other logistical matters or

11 questions to raise before we return to the motions?

12      MS. POMERANTZ:  No, your Honor.

13      MS. STERNHEIM:  No.  Thank you.

14      THE COURT:  OK.  So we can proceed to the *Daubert* with

15 respect to the government's proposed expert.  Ms. Pomerantz.

16      MS. POMERANTZ:  Yes, your Honor.  The government calls

17 Dr. Lisa Rocchio.

18      THE COURT:  I didn't catch -- I have been saying row

19 "Rodocchio" in my head, but it sounds like that's not right.

20 Could you say the name again?

21      MS. POMERANTZ:  It's "ROCK-ee-oh," your Honor.

22      THE COURT:  Rocchio.

23      And I will ask everyone, please speak into the

24 microphones, because that's the only way we can all hear you.

25      Counsel can question from the podium and remove masks.

LBAAMAX1ps                    Rocchio - Direct

1    And the witness can come into the witness box and remove her

2    mask as well.

3            Dr. Rocchio may come forward.

4            MS. POMERANTZ:  Thank you, your Honor.

5    LISA ROCCHIO,

6         called as a witness by the government,

7         having been duly sworn, testified as follows:

8            THE COURT:  And Dr. Rocchio, I know it's a little

9    awkward; to the extent you can speak directly into the

10   microphone, we can hear you.  And I apologize if I have to

11   remind you of that as we go, because the acoustics are

12   challenging.

13           THE WITNESS:  OK.

14           THE COURT:  Thank you.

15           Ms. Pomerantz.

16           MS. POMERANTZ:  Thank you, your Honor.

17           THE COURT:  And, Ms. Pomerantz, you need that mike in

18   front of you.

19           MS. POMERANTZ:  Thank you.

20           Is this all right, your Honor?

21           THE COURT:  Yes, but point it directly at you.

22           MS. POMERANTZ:  OK.  Thank you.

23   DIRECT EXAMINATION

24   BY MS. POMERANTZ:

25   Q.  Good morning, Dr. Rocchio.

1          Dr. Rocchio, can you please describe your educational

2    background.

3    A.   I have a master's degree and a doctoral degree in clinical

4    psychology.

5          THE COURT:   I need you to speak up.  Sorry.

6    A.   I have a master's degree and a doctoral degree in clinical

7    psychology.

8          THE COURT:   Thank you.

9    Q.   And taking a step back, before your master's degree and

10   your other, and your Ph.D., did you receive an undergraduate

11   degree?

12   A.   I have a bachelor's degree with a dual major in psychology

13   and English.

14   Q.   Where did you receive your master's from?

15   A.   The University of Rhode Island.

16   Q.   And you mentioned your Ph.D.  Where did you receive that

17   from?

18   A.   That was also from the University of Rhode Island.

19   Q.   What is clinical psychology?

20   A.   Clinical psychology is the study of human thoughts and

21   behaviors, both abnormal and normal.  We also study

22   psychopathology, treatment methods.  But it's generally the

23   study of human behavior.

24   Q.   Can you describe your coursework and training in connection

25   with your master's and Ph.D. degree.

1    A.   Sure.  So in a doctoral program such as the one I attended,

2    it's the scientist-practitioner model.  So I took about three

3    to four years of coursework in a broad range of subject

4    matters, such as assessment and treatment, psychopathology,

5    ethics, professional practice, family systems, forensic

6    psychology, tests and measurements, things like that, as well

7    as specialty courses, electives, if you will, in areas of

8    particular interest to me, which would have included at the

9    time hostility and violence in the lives of women, psychology

10   of poverty, forensic psychology.

11          In addition to the structured coursework, we, during

12   the graduate period, took courses in methods of practice, saw

13   patients, and had clinical supervision, again in a variety of

14   types of treatment.  So individual therapy, marital couple

15   therapy, for example.

16   Q.   During the course of your graduate studies at the

17   University of Rhode Island, what if any topics in particular

18   did you focus on?

19   A.   I focused in particular on areas related to social

20   psychology, traumatic stress, interpersonal violence, and

21   eating disorders.

22   Q.   What is traumatic stress?

23   A.   "Traumatic stress" refers to a stressor that overwhelms an

24   individual's person -- ability to cope.  In the DSM-V it's

25   defined as a stressor that is severe enough, quite severe, and

1   involves witnessing or experiencing an event that involves

2   actual or threatened harm, threatened death, or sex -- and/or

3   sexual violence.

4   Q.  You also mentioned interpersonal violence.  What is

5   interpersonal violence?

6   A.  Violence that one person does to another person.  It's a

7   term in the field that refers to things such as rape and sexual

8   assault, intimate-partner violence, sexual harassment, child

9   sexual abuse.  And although it's an umbrella term, using the

10  term "interpersonal violence," it also refers to dynamics

11  related to coercion and emotional abuse or child abuse that may

12  not necessarily involve violence in a way that is commonly

13  understood.

14  Q.  And what is forensic psychology?

15  A.  Forensic psychology is the application of the science of

16  psychology to a particular legal matter, so using -- using

17  psychology to answer or to assist a court in answering a legal

18  question.

19  Q.  As part of your work in your connection with your master's

20  and Ph.D. degrees, did you perform clinical work with patients?

21  A.  I did.

22  Q.  About how much time did you spend working with patients?

23  A.  So prior to doing -- while I was taking my coursework and

24  taking the classes and treating patients, I would say a minimum

25  of 500 to 1,000 hours of face-to-face clinical time, and then,

1  prior to receiving my degree, one of the requirements for my

2  degree was a full-time one-year doctoral fellowship, which was

3  roughly the equivalent of 1500 to 2,000 hours.

4  Q.  Approximately how many patients did you work with during

5  your graduate studies?

6  A.  During my graduate studies, so that would have been over a

7  period of about six years, hundreds.

8  Q.  What issues did you treat those patients for?

9  A.  A broad range.  So issues related to eating disorders,

10  grief, traumatic stress.  I, during my internship, I also

11  worked in both inpatient and partial hospital settings, so

12  those individuals were dealing with sometimes major mental

13  illness, issues pertaining to suicidality.  A number of them

14  had significant histories of traumatic stress and violence in

15  their childhood and adult lives.

16  Q.  You mentioned a predoctoral fellowship.

17  A.  Yes.

18  Q.  Where did you do your predoctoral fellowship?

19  A.  At the Yale University School of Medicine.

20  Q.  During the course of your predoctoral fellowship at Yale,

21  what kind of work did you do?

22  A.  I spent six months working at Yale New Haven Hospital in a

23  partial hospital program treating adults who needed a high

24  level of care and on an outpatient basis.  Again, they

25  presented with a wide range of issues.

LBAAMAX1ps                    Rocchio - Direct

1          I then also spent another six months working at the

2    Yale Psychiatric Institute on an inpatient and partial hospital

3    unit, treating adolescents.  In the course of that work, I also

4    had some specialized training in the area of forensic

5    psychology -- psychiatry.

6    Q.  After you received your Ph.D., what did you do next in your

7    career?

8    A.  I had a full-year equivalent of a postdoctoral fellowship.

9    During that year I worked in a partial hospital program.  I

10   treated patients in an outpatient psychotherapy practice, and I

11   taught courses at the college level in psychology.

12   Q.  Where did you do your postdoctoral fellowship?

13   A.  It was in Rhode Island.  I worked in a private practice

14   setting in Rhode Island, as well as Butler Hospital.

15   Specifically I worked in a partial hospital program that

16   utilized dialectical behavior therapy in the treatment of

17   women.

18   Q.  What issues did you focus on during your postdoctoral

19   fellowship?

20   A.  So dialectical behavior therapy is the primary issue that I

21   focused on, in terms of my training, and it's a treatment

22   method that has been found -- there's a lot of evidence; it was

23   developed and has been shown to be highly effective for a

24   chronically suicidal and self-injurious population of women.

25   It's since been generalized to a variety of populations.  But

1  that particular population is also known to have very high

2  degrees of histories of childhood trauma of various kinds,

3  including sexual abuse, neglect, physical abuse.

4  Q.  During your postdoctoral fellowship, did you perform

5  clinical work?

6  A.  I did.

7  Q.  During your postdoctoral fellowship, what if any research

8  groups did you participate?

9  A.  I participated in an eating-disorder research group at

10  Butler Hospital.  And then I also participated in an informal

11  research group with a number of professionals from varying

12  degrees.  There was an attorney, there was a political science

13  professor, and other practitioners, social worker,

14  psychologist.  And we would meet on a monthly basis to discuss

15  issues relevant to the field of trauma psychology.

16  Q.  After your fellowship, what did you do next in your career?

17  A.  I founded an independent practice in psychology.

18  Q.  What is your role in that practice?

19  A.  I currently am -- I'm the owner.  I am responsible for

20  hiring both clinical and administrative staff, providing

21  supervision, setting policies and procedures, and then of

22  course treating patients.  And within that setting I also

23  maintain an independent forensic practice.

24  Q.  Approximately when did you start the practice?

25  A.  Upon becoming licensed, in -- just after becoming licensed,

1    so around January of 1998.

2    Q.  Do you supervise anyone in your practice?

3    A.  I supervise all of my employees, yes.

4    Q.  How many employees do you have?

5    A.  I have seven clinicians who are working for me at the

6    present time.

7    Q.  What are your responsibilities for supervising those

8    employees?

9    A.  Providing them with education about the patients that

10   they're seeing.  They are all independently licensed

11   themselves, but to the extent that they're treating patients

12   on -- where issues come up that are particularly complex or

13   involve some level of risk, they come to me and talk to me.  I

14   provide clinical and professional guidance on how to manage

15   that.

16          I also lead a weekly team meeting in which we discuss

17   cases and review, review, review patient care.

18   Q.  Can you briefly describe the work you do in connection with

19   your practice.

20   A.  So, in terms of my clinical work, I treat individual adult

21   patients currently, although I've treated adolescents in the

22   past.  The majority of my personal caseload are patients who

23   have experienced some form of traumatic stress, largely

24   interpersonal violence, but I also treat other forms of

25   traumatic stress, such as first responders or individuals who

1   have been involved in motor vehicle accidents or traumatic

2   loss, for example.  And then I also have a smaller number of

3   patients who are presenting due to issues in their life.  They

4   might be going through a transition.  It might be a college

5   student who's struggling to adapt, someone going through a

6   divorcement general life issues, anxiety, depression, coping

7   with a health problem, that sort of thing.

8   Q.   You mentioned a forensic practice.  In your forensic

9   practice, what sort of work do you do?

10  A.   I provide expert consultation, psychological, forensic

11  psychological evaluations, and expert witness testimony in

12  civil and criminal cases, most typically where traumatic stress

13  and/or interpersonal violence are somehow related to the matter

14  at hand, although I've also done other types of forensic work.

15  Q.   How does your clinical -- excuse me -- your forensic

16  practice compare to your clinical practice?

17  A.   My forensic practice is very different.  As a clinician,

18  I'm working with individuals in the clinical room providing

19  evidence-based treatment for the problems that they're

20  presenting to me and developing a relationship over time.  As a

21  forensic psychologist, I'm taking on more of an investigative

22  role, and my work is to answer some particular psycho-legal

23  question from an objective perspective, and it involves

24  certainly never taking what someone has to say at face value

25  but, rather, a fairly well-established process of multiple

1    techniques to arrive at the -- my professional opinion.

2    Q.   What if any licenses do you have?

3    A.   I'm licensed to practice psychology currently in the states

4    of Rhode Island, Massachusetts, and New York.

5    Q.   In your career, for approximately how many years --

6            THE COURT:   Sorry.   May I ask, Dr. Rocchio, that point

7    you made about not taking what someone says at face value, you

8    distinguish that as part of your forensic practice?

9            THE WITNESS:   Yes.

10           THE COURT:   And what about in your clinical practice?

11           THE WITNESS:   In my clinical practice, it's not -- I

12   have to deal with what the patients tell me in the room.   It's

13   not my job to go out and verify any part of what's being told

14   in the clinical room, but, rather, to hear what they're telling

15   me and then relate that back to my other skills-training

16   experience, the scientific literature.   Someone, for example,

17   might report to me symptoms of depression.   I could ask them

18   how that's manifesting in their life, but I don't go to their

19   house to see if they're actually staying in bed all day.   That

20   kind of thing.

21           THE COURT:   Thank you.

22   BY MS. POMERANTZ:

23   Q.   Dr. Rocchio, in your career, for approximately how many

24   years have you treated and assessed patients?

25   A.   30, maybe slightly more than 30 years at this point.

1    Q.  As a clinical psychologist, what issues or areas have you

2    specialized in?

3    A.  Earlier in my career, as I said, I specialized in the

4    assessment and treatment of eating disorders, and throughout my

5    career I've specialized in the area of traumatic stress and

6    interpersonal violence.

7    Q.  Since about when have you focused on traumatic stress and

8    interpersonal violence?

9    A.  Since graduate school.

10   Q.  In the course of your career, have you treated and

11   evaluated individuals who have experienced or reported

12   experiencing childhood sexual abuse?

13   A.  I have.

14   Q.  What is childhood sexual abuse?

15   A.  "Childhood sexual abuse" refers to a process by which a

16   child is involved, engaged in sexual activity by an adult or

17   sometimes by a peer who's generally three to five years older

18   than them, but it involves engaging the child in sexual

19   activity when they either do not consent or are unable to

20   consent.

21   Q.  And when you refer to "child," what are you referring to?

22   A.  Under the age of 18.

23   Q.  Approximately how many victims of childhood sexual abuse

24   have you evaluated and treated in your career?

25   A.  I've treated hundreds upon hundreds of individuals who have

1   either reported to me that they've been sexually abused or have

2   been referred to me after criminal proceedings have convicted a

3   perpetrator.  So those would be cases where it's been

4   established that they've been abused.

5   Q.  During the course of your career, how old are the patients

6   you've treated and evaluated who experienced childhood sexual

7   abuse?

8   A.  I've treated, over the course of my career, individuals

9   ages 13 and up.

10  Q.  And if this -- in your current practice, how old are the

11  patients you treat?

12  A.  I'm currently working with individuals predominantly who

13  are 18 and older.

14  Q.  In addition --

15          THE COURT:  Sorry.  What you're describing generally,

16  is there a distinction to be made here in terms of your

17  practice regarding childhood sexual abuse between your clinical

18  side of your work and the forensic side?  You're talking about

19  your clinical work, I presume.

20          THE WITNESS:  I'm talking about my clinical work, but

21  it is true that in both my clinical and forensic practice I

22  have done a fair amount of work with adolescents as well as

23  adults and that currently I am predominantly working in both

24  settings with the evaluation of adults.

25          THE COURT:  OK.

1    BY MS. POMERANTZ:

2    Q.  In addition to your group practice, do you work anywhere

3    else?

4    A.  I do.

5    Q.  Where do you work?

6    A.  I'm on the voluntary faculty at Brown University, Alpert

7    School of Medicine, in the department of psychiatry.

8    Q.  What is your title?

9    A.  I'm a clinical assistant professor.

10   Q.  How long have you been at the Alpert Medical School of

11   Brown University?

12   A.  Since July 2020.

13   Q.  What are your current responsibilities in your employment

14   there?

15   A.  I supervise psychiatry fellows in their efforts to learn

16   how to conduct adult psychotherapy, and I also teach at some of

17   the seminars that the psychiatry fellows attend.

18   Q.  What sorts of things do you teach on?

19   A.  When I'm asked to teach, I teach on areas related to

20   traumatic stress and interpersonal violence.

21   Q.  Dr. Rocchio, I'd like to show you Government Exhibit 1.

22        MS. POMERANTZ:  Ms. Durocher, can you pull that up.

23   Q.  Dr. Rocchio, what is that?

24   A.  My curriculum vitae.

25   Q.  Does it accurately describe your education and

1    qualifications?

2    A.   It does, although it doesn't reflect my recent promotion at

3    Brown from clinical instructor to clinical assistant professor.

4            MS. POMERANTZ:  Your Honor, the government would offer

5    Government Exhibit 1.

6            THE COURT:  No objection?

7            MR. PAGLIUCA:  No objection for purposes of this

8    hearing, your Honor.

9            THE COURT:  OK.  For the purposes of this hearing,

10   Government Exhibit 1 is admitted.  Thank you.

11           (Government's Exhibit 1 received in evidence)

12   Q.   Turning to page 4, what is listed there?

13   A.   Publications and professional presentations.

14   Q.   Can you summarize the subject of some of your published

15   work.

16   A.   My published work generally deals in some way with

17   traumatic stress, ethics, and professional practice issues.  So

18   a recent article was looking at the forensic assessment of

19   individuals who have experienced complex trauma, childhood

20   trauma, severe and repeated childhood trauma.  I've also

21   written issues related to ethics as part of a public service

22   for education of junior members in the newsletter for the Rhode

23   Island Psychological Association.

24   Q.   Have you had any public articles published in a

25   peer-reviewed journal?

LBAAMAX1ps                      Rocchio - Direct

1    A.  I have.

2    Q.  What does it mean to be in a peer-reviewed journal

3    generally?

4    A.  So the peer-review process in my field involves generally

5    people would either solicit or send -- either the journal would

6    solicit requests for articles or people would submit articles

7    to a journal for publication.  The journal would -- editors

8    would then take those articles and send them out to

9    professionals in the field who have agreed to serve as

10   reviewers, who have some sort of expertise related to the topic

11   of the particular article.  Generally in that process it's

12   known as a blind review -- that is, the reviewers don't know

13   who the author is, to help protect from bias.  They then are

14   asked to review and comment on the article, and then to make a

15   recommendation regarding whether the article should be

16   accepted, whether it should be -- whether the author should be

17   asked to make either minor or major revisions to the article

18   and then resubmit, or whether the article should be declined.

19   Q.  You also mentioned professional presentations.

20   A.  Yes.

21   Q.  Have you given any professional presentations?

22   A.  Yes, I have.

23   Q.  Focusing on pages -- sorry.  Just let me back up one

24   moment.  What is a professional presentation?

25   A.  It's a presentation that is given at a professional

conference, where I'm providing either information and

knowledge in the course of a presentation or I'm conducting a

workshop, either by myself or as part of a symposium, a panel

of presenters, on a given topic.

Q.   Are your professional presentations peer reviewed?

A.   Yes, they are.

Q.   What does it mean for a professional presentation to be

peer reviewed?

A.   So it's the same peer-review process or it's analogous to

the process I described for publication.  In other words,

people will submit, I would submit a presentation.  There's a

call for proposals.  I would provide a proposal of what it is I

would like to present to the program coordinator.  They

typically would have a team of individuals who then review all

of the submissions and rate them.  And then they would select

those that they feel are most relevant and worthy and

professional to present.

Q.   Focus on page 7 of Government Exhibit 1, have any of your

professional presentations focused on trauma psychology or

interpersonal violence?

A.   The vast majority of them have, yes.

Q.   Then turning to pages 7 and 8, have you given any invited

addresses?

A.   I have.

Q.   What are invited addresses?

1    A.   Those are talks where, rather than my submitting to a

2    peer-review process, individuals or organizations and

3    institutions have requested that I give a presentation within

4    my areas of expertise.

5    Q.   Have any of your invited addresses focused on trauma

6    psychology and interpersonal violence?

7    A.   The vast majority, yes.

8    Q.   You testified about the peer-review process.  Have you ever

9    served as a peer reviewer for publications?

10   A.   Yes.  I serve as a peer reviewer for several.

11   Q.   What types of publications?

12   A.   I'm on the editorial board for the journal for the Division

13   of Trauma psychology, so it's a trauma psychology journal, and

14   my role there is to conduct regular peer reviews for that

15   journal.  I also serve as a peer reviewer, kind of as a guest

16   peer reviewer, for a variety of other journals, when it's

17   related to my topic matter.  So I believe I've done that for

18   psychological injury and the law as well as the journal of

19   professional practice, recent -- journal -- professional

20   journal research and practice, for example.

21   Q.   When did you start serving as a peer reviewer for

22   publications?

23   A.   I've served as a peer reviewer for either professional

24   presentations or publications for much of my career.  I'm not

25   sure when I first started doing it for journals, but I know

1    I've been doing it for conferences from, you know, 20, 25 years

2    minimally.

3    Q.  Do you have any other involvement in professional

4    publications?

5    A.  I, apart from serving on the editorial board for the

6    journal of trauma psychology, not at the moment, no.

7    Q.  Do you hold --

8    A.  Oh, can I actually correct that answer?

9             Yes.  Actually, the other thing is that for the

10   publication I recently had, in addition to submitting articles

11   for peer review, I was an invited guest editor in that

12   particular edition -- special issue of that journal, so that

13   meant that I had to, with my co-editor, solicit articles and

14   then review them for publication.

15   Q.  Do you belong to any professional organizations?

16   A.  I do.

17   Q.  Do you hold any leadership positions with those

18   organizations?

19   A.  I do.

20   Q.  What are those leadership positions that you hold?

21   A.  I'm currently the president-elect for the division of

22   trauma psychology for the American Psychological Association.

23   I am also a member of the ethics committee for the American

24   Psychological Association.  I serve as a -- on the executive

25   board of the Rhode Island Psychological Association, where I am

1     their counsel representative to the National American

2     Psychological Association.

3               I believe those are my current leadership roles.  I've

4     held others in the past.

5     Q.  What do you do in your capacity as the president-elect of

6     the division of trauma psychology?

7               THE COURT:  Ms. Pomerantz, you've gotten a little

8     quieter, so into the mike and speak up.

9               MS. POMERANTZ:  Yes, your Honor.

10    Q.  What do you do in your capacity as president-elect of the

11    division of trauma psychology?

12    A.  So I was elected to the position.  It's a three-year term.

13    I serve as part of what's called the presidential trio, which

14    consists of the past president, the current president, and the

15    president-elect.  So I'll begin my term as president next year.

16              And then, during my presidential year, I'm responsible

17    for planning the topic and organizing and -- the theme of the

18    program -- our division's program at the annual conference for

19    the American Psychological Association.

20              I sit on the executive board.  I work closely with the

21    executive director, overseeing, managing things related to

22    finance, policy, particular outstanding projects or projects

23    that -- ad hoc projects that I wish to execute during my

24    presidential year.

25              (Continued on next page)

LBAGmax2                      Rocchio - Direct

1   BY MS. POMERANTZ:

2   Q.  What is the division of trauma psychology?

3   A.  So the national organization for –- professional

4   organization for psychology, within that organization, there

5   are 56 separate divisions that each focus on a distinct area,

6   specialized area of psychology.  And I belong to a number of

7   those divisions of psychology.

8   Q.  Have you served in a leadership position with other

9   professional organizations?

10  A.  Yes, I have.

11  Q.  Can you briefly describe?

12  A.  I served on the Rhode Island psychological association.

13  I've served on the committee for state leaders, which is an

14  organization within the American psychological association

15  dealing with various states and advocacy for issues related to

16  psychology.

17  Q.  How do you keep up to date on the subjects in which you

18  specialize?

19  A.  In a variety of ways.  Certainly, I regularly review the

20  scientific and legal literature.  I attend programming.  I

21  consult with peers in my field.  I attend trainings.  And then

22  of course, I bring that information back to my experience, both

23  in clinical and forensic settings, and learn from my patients

24  and the people that I evaluate in my experience.

25  Q.  In what areas have you received additional education and

1    training?

2    A.   Various treatment methods specific to treating individuals

3    who have experienced various kinds of traumatic stress and

4    personal violence, childhood abuse, complex trauma, specialized

5    practice in forensic psychology, predominantly.

6    Q.   What kinds of training have you received?

7    A.   Attending numerous workshops conducted by reputable experts

8    in the field that typically have been vetted so that I can

9    receive continuing education credits and are required on an

10   annual basis for various forms of licensure.  Also, there have

11   been some trainings that I have done online.  For example, I

12   participate in a weekly webinar on issues relevant to the signs

13   and practice of forensic psychology that is conducted by

14   experts in the field.  I think that covers it.

15   Q.   In what way do you train others?

16   A.   I have done a variety of things.  So I have been on the

17   ethics committee for the psychological association and also on

18   the American psychological association.  So part of what I do

19   is we have a call in opportunity for our members, and we

20   provide education about ethical issues to -- and consultation

21   to individuals who request that form of assistance.  As I

22   mentioned, I'm a clinical supervisor for psychology fellows in

23   medical school at Brown University.  I do provide consultation,

24   supervision to all of my employees.  And there are also times

25   where others in the field may contact me on a professional

1   basis to consult with them on my area of expertise.  A recent

2   colleague who is a forensic psychologist, but not a forensic

3   expert, contacted me to ask to teach her and talk with her

4   about some of the traumatic stress issues that were involved in

5   her case.

6   Q.  What types of training and presentations have you given in

7   the area of childhood sexual abuse?

8   A.  I've given a number of trainings on complex trauma.  And

9   complex trauma refers to repeated abuse that occurs during

10  childhood perpetrated generally by caregivers of the

11  individual.  I've also given -- so I've given trainings on --

12  for general clinicians -- on how to assess trauma and that may

13  include assessing for a history of childhood sexual abuse.  And

14  I have given trainings, for example, at the Department of DCYF

15  to investigators on how to manage the effects of being exposed

16  to details related to traumatic stress in the course of their

17  work.  Those would be some examples of trainings I have done.

18  Q.  How do you keep up with the scientific literature in your

19  field?

20  A.  So from my membership in a number of different divisions

21  and, of course, international and national traumatic stress

22  organizations, most of those journals have some combination --

23  most of those organizations have professional journals, in

24  which they publish literature, scientific peer review

25  literature, or they also have newsletters.  They also have

1    listservs to provide communication, and then creating a healthy

2    clinical picture as well.

3    Q.  Dr. Rocchio, have you testified in court before?

4    A.  I have.

5    Q.  How many times?

6    A.  Twice.

7    Q.  Were you qualified as an expert when you testified

8    previously?

9    A.  I was.

10   Q.  On what subject were you qualified as an expert?

11   A.  I was qualified as an expert in psychology with a

12   specialized expertise in traumatic stress and complex trauma.

13   Q.  Dr. Rocchio, I want to ask you about the specific opinions

14   you have offered in this case.

15        How are most instances of childhood sexual abuse

16   committed?

17   A.  Majority are committed without the use of force.  They're

18   committed with the use of nonviolence, coercive and controlling

19   tactics, but without the use of physical force and violence.

20   Q.  Are most instances of childhood sexual abuse committed by

21   strangers or people known to children?

22   A.  They're generally committed by people known to the children

23   in the context of a relationship between the perpetrator and

24   the child.

25   Q.  Based on your experience, research and training, are you

1  familiar with the term grooming?

2  A.  I am.

3  Q.  What is grooming?

4  A.  Grooming is a term that is used in the professional

5  literature and in the field to refer to a series of tactics and

6  strategies that are commonly experienced by victims and

7  utilized by offenders in the course of deceiving the child,

8  building a relationship of trust, and then eventually sexually

9  abusing the child.

10 Q.  Can you please describe specific grooming strategies?

11 A.  So various researchers have identified grooming strategies

12 involving a series of tactics that typically fit into several

13 stages.  They typically involve strategies to identify a

14 victim, strategies to have access and to isolate the victim.

15 So for example, many offenders put themselves purposefully in

16 situations where they're going to have a great deal of access,

17 whether that's a boy scout troop or a school setting or that

18 type of thing, a coach.  And then there are various coercive

19 and manipulative strategies that are utilized to develop a

20 relationship of trust, prosocial behaviors, things that might

21 be gift giving or letting the child know how special they are,

22 showering the child with affection.  There's been some

23 comparison in the literature, a significant amount of

24 comparison to strategies that are basically akin to what two

25 adults might do in a courtship process.  But basically the

1    offender is trying to win over the trust and affection of the

2    child.  Then there's another stage where the child is gradually

3    exposed to greater levels of physical touch and sexual content

4    and material that slowly escalates over time, and then

5    strategies that keep the relationship going and help to prevent

6    exposure.

7    Q.  Based on your experience, research and training are you

8    familiar with the term grooming the environment?

9    A.  I am.

10   Q.  What is grooming the environment?

11   A.  It's a term that applies to commonly recognized phenomenon

12   and strategies, tactics, modus operandi used by perpetrators in

13   the service of getting them access to victims and building that

14   relationship of trust.  So in addition to manipulating the

15   child, they'll manipulate individuals or institutions in that

16   child's life so that they're able to have greater access.  So

17   they might, for example, befriend a child's parent and hold

18   themselves out as a trustworthy person who is going to help,

19   say, a single mom and he'll serve as a father figure to the

20   kid.  Or they might groom an institution, they might work their

21   way up through the boy scouts, for example, and become a leader

22   there, become a pillar in the community to give them an air of

23   respectability, disarming, gaining trust.

24   Q.  Are you familiar with the term attachment?

25   A.  I am.

1    Q.  What is that term?

2    A.  Attachment basically refers to the relationship between one

3    person, one individual and another.  The original research was

4    conducted looking at the attachment as a connection between an

5    infant and a caregiver, her mother.  But since has expanded

6    into talking about the relational dynamics between either

7    children and caregivers, children and family members or, for

8    example, two intimate partners as adults.

9    Q.  Can you please explain the relationship, if any, between

10   attachment and grooming?

11   A.  So when I talked about some of the strategies that are

12   utilized, tactics, modus operandi in order to build that

13   relationship within the context of childhood sexual abuse, the

14   function and end result of that is to create a relationship or

15   attachment and connection between the perpetrator and the

16   child, whereby the child trusts and becomes dependent upon the

17   perpetrator.

18   Q.  Based on your experience, research and training are you

19   familiar with the term coercive control?

20   A.  I am.

21   Q.  What is coercive control?

22   A.  Coercive control refers to a strategic pattern of behavior

23   that's designed to attain and maintain control in a

24   relationship.  So coercion means getting somebody to either do

25   or not do something that they wouldn't ordinarily do otherwise.

And it is combined with control tactics like isolation or
building access to resources so that the power in the
relational dynamic lies with the person who is using coercive
control.

It was initially developed and conceptualized to help
understand part of intimate partner violent relationships, but
has since been found to exist in multiple forms of
victimization.

Q.   You mentioned specific grooming strategies earlier.  Can
you give examples or specific examples of specific grooming
strategies?

A.   Gift giving, spending time alone, giving hugs, giving
massages that gradually escalate to disrobing or more overtly
sexualized behavior, talking about sex.  Basically, normalizing
behaviors and then over time -- normalizing sexualized
behaviors and then over time moving that line of what's normal,
what's appropriate, what's happening within this relationship
closer and closer to sexual abuse.

But the strategies that are utilized for the building
of relationship are the same types of things that anyone might
do to build trust and attachment.  Again, giving attention,
making the child feel special, gift giving, spending -- taking
them out to special places, purchasing things for them.  Also
things that make them perhaps more dependent upon you.  So if
you are offering to pay for things and this person is in need

1      of money, and if you are giving them something that will

2      increase their dependency.  Also the adult-child relationship,

3      the power differential.

4             THE COURT:  The specific examples you are mentioning,

5      are those found in the literature?

6             THE WITNESS:  They are.

7             THE COURT:  So you derive your views as to those

8      specific examples from -- not from your clinical work or your

9      forensic work or maybe both -- but the ones you have cited just

10     now, you find in peer-reviewed literature?

11            THE WITNESS:  Yes.  It's an interaction.  So

12     everything I'm talking about today is derived from my education

13     and experience, as well as my knowledge of the literature.  But

14     yes, for many years, those specific tactics and strategies have

15     been described in numerous peer-reviewed articles.

16            And your Honor, if I may, it's also, I believe

17     important to know that those are articles that have studied

18     reports and behaviors that offenders talk about doing as well

19     as things that victims have talked about experiencing.

20            THE COURT:  Thank you.

21     BY MS. POMERANTZ:

22     Q.  Dr. Rocchio, you gave an example of gift giving, how can

23     you tell if that is grooming or innocent behavior?

24     A.  As I said, it depends on the context in which the gift

25     giving is happening.  And you have to look at the entire

1  relationship.  As I said, child sexual abuse is a process.

2  It's not an isolated event.  To the extent that gift giving is

3  being done in the service of increasing someone's dependency on

4  you for the purposes of increasing your ability to coerce and

5  control them, ultimately, for sexual abuse, then that gift

6  giving would be considered part of -- to be part of the

7  grooming process.

8  Q.  How long has the concept of grooming been in the scientific

9  literature?

10  A.  Grooming itself has been in the scientific literature at

11  least since the 80s.  But the scientific literature that has

12  looked at the relational components of child sexual abuse and

13  the ways in which victims become coerced into, quote, unquote,

14  complying with sexual activity by an adult has been well

15  established in the study of child sexual abuse for quite some

16  time.

17  Q.  At a high level, what are your opinions on grooming based

18  on?

19  A.  They're based on the interaction between my education, my

20  training, the skills I have developed over time, certainly my

21  ongoing review of the scientific literature and my practice.

22  Q.  In your education, how did you learn about the concept of

23  grooming?

24  A.  So again, in my education part of how I learned that, it

25  was from my study of the process of child sexual abuse and both

1    what that typically entails, not just the sexual components,

2    but also the psychological and emotional components and their

3    effects.  And also, certainly, in my reviews of the literature

4    and things that we talked about in graduate school and in other

5    trainings, what sorts of behaviors offenders commonly use in

6    order to engage children in that relationship.

7    Q.  In your clinical practice, have you treated and evaluated

8    patients who have reported being groomed in connection with

9    sexual abuse?

10   A.  I have.  Although they don't typically use that word.  As I

11   said, most patients, including patients I treat, who have been

12   abused as children, have had abuse happen in the context of a

13   relationship.  The abuse hasn't involved explicit force.  So to

14   the extent that they talk about the ways that they came to

15   know, love and depend upon the perpetrator, yes, they talk and

16   describe at length the types of behaviors that would meet the

17   definition of grooming.

18   Q.  Approximately how many patients have you treated, evaluated

19   who have reported behaviors consistent with grooming?

20   A.  I would say the vast majority of patients I have treated

21   who have reported childhood sexual abuse, again, that would be

22   hundreds upon hundreds.

23   Q.  What are the ages of the patients you have treated who have

24   reported behaviors consistent with grooming?

25   A.  I have treated patients who are adolescents and patients

1    who are adults.

2    Q.  Are you aware of other psychologists treating and

3    evaluating patients that reported behaviors consistent with

4    grooming?

5    A.  Absolutely.  It's common in the field.

6    Q.  How do you know that?

7    A.  Through my review of the clinical research, it's something

8    that's well documented in articles or books, chapters that have

9    been written, for example, about how to provide treatment to

10   patients.  It's written in the literature around what sorts of

11   symptoms might patients present with and why, what are some of

12   the common difficulties.  Of course, it's written in case

13   studies.  And then through my conversations with peers and, of

14   course, trainings I have attended conducted by experts in the

15   field.

16   Q.  In your forensic practice, have you evaluated survivors of

17   childhood sexual abuse?

18   A.  I have.

19   Q.  What does forensic evaluation of someone who has reported

20   childhood sexual abuse entail?

21   A.  So in general, a forensic evaluation is a multistep

22   process.  As I mentioned before, it's not just talking to

23   someone.  So a forensic evaluation, as I conduct it, involves

24   first reading all of the relevant external collateral

25   information relevant to the case.  So if it's a criminal case,

that might be crime scene photos, autopsy photos, that might be

transcripts of grand jury testimony, state police interviews.

In a civil case, I might also look at things like medical

records and psychotherapy records.  So any and all documents

relevant to the case.

Then I typically do somewhere between eight and ten

hours of face-to-face evaluation, that involves both

psychological testing and clinical interviewing.  I also

conduct collateral interviews with others who have information

that's relevant to the case and to the issues at hand.

And then I synthesize all of that information.  And if

requested will prepare a report.  Most cases don't end up going

to trial.  But if they do and I'm asked to testify, I would

then testify in those cases.

Q.  Do you evaluate issues of grooming in connection with your

forensic practice?

A.  Yes, I have.

Q.  Can you give me an example of a forensic evaluation that

has involved grooming-related issues?

A.  Sure.  So for example, in the civil arena where I am asked

to -- say somebody has alleged that they've been sexually

abused as a child or maybe we know that they have been sexually

abused as a child because the perpetrator has been criminally

convicted, I may be asked to assess, does this individual at

the present time have any current psychiatric difficulties or

1    impairments.  And if so, to what degree, if any, are those

2    attributable in whole or in part to the alleged sexual abuse.

3            So as part of that assessment, I'm looking at the

4    dynamics in the relationship between the individual and the

5    perpetrator.  And we know that the grooming behaviors that

6    induce that relationship of trust and attachment have a

7    significant negative affect on an individual's psyche and can

8    strongly and negatively impact their functioning afterwards.

9    So those are things I'm looking for.

10   Q.  Dr. Rocchio, to be clear, in your forensic work, do you

11   assume that everything a victim reports is true?

12   A.  Absolutely not.

13   Q.  Can you explain that?

14   A.  My role in a forensic capacity is to provide an objective

15   answer based upon my evaluation and my review of the

16   literature.  And it is not dependent on who is hiring me, for

17   example.  So as I mentioned, the reason that I look at all of

18   these other documents and the reason I administer psychological

19   tests and talk to third parties is precisely because I'm

20   looking for consistencies and inconsistencies in what the

21   individual is telling me in order to form an opinion.  As part

22   of my duty in that role is to investigate various hypotheses,

23   in a forensic setting, it has to be that I'm not being told the

24   truth.

25   Q.  To take a step back, to be clear, in your clinical work, do

1    you assume everything a victim reports is true?

2    A.  No, I do not.

3    Q.  Can you explain?

4    A.  So in a clinical setting, it is not my role to determine

5    whether something is or is not true.  Of course, when someone

6    is telling me something, I'm using my skill and experience to

7    take that information in and also to inquire, as I communicate

8    to that individual and provide treatment.  But as I mentioned

9    earlier, I don't go out and try to see, well, this person is

10   having trauma related to a motor vehicle accident or a shooting

11   on the job, I don't go and ask them to provide me with

12   newspaper articles to verify whether that event happened.

13   Q.  How do the grooming that you have seen in your forensic

14   practice compare to what you have seen in your clinical

15   practice?

16   A.  There's remarkable consistency in what I see in my work

17   over time in my forensic practice, my clinical practice and

18   what I have been trained and what's in the literature.

19   Q.  Can you describe at a high level the scientific literature

20   upon which your opinions on grooming are based?

21   A.  So there have been a number of studies over time that have

22   looked at the tactics, modus operandi, skill, manipulative

23   techniques that have been used by perpetrators.  And those

24   studies have been published in peer-review journals.  So there

25   are studies that have done interviews with offenders, who have

1    been convicted and who admit to their crimes, asking them what

2    sorts of techniques they utilized in order to perpetuate the

3    sexual abuse.  There have been studies that have been done with

4    victims, in terms of asking them what sorts of experiences they

5    had.  There have also been studies that have been conducted

6    with professionals in various fields; law and human services

7    and psychology about the types of tactics and strategies that

8    have been used.

9    Q.  How do the results of those studies compare?

10   A.  There's remarkable consistency.  And even though

11   definitions may vary in studies, as they always do, there are

12   common -- a clear set of common strategies, techniques and

13   behaviors that have been identified in the literature across

14   time and across various samples.

15   Q.  When you review articles about grooming, what sorts of

16   things are you looking for to determine the quality of articles

17   you are relying on?

18   A.  I'm looking at whether or not it's in a peer review

19   journal.  I'm looking at how a particular study was conducted.

20   So for example, if they're doing content analysis of an

21   interview, are they making sure that ways that that interview

22   has been coded by multiple individuals to get some sort of

23   consistency there.  I'm looking at how they chose the sample

24   size.  I'm looking at if it's a review that summarizes the

25   state of the literature, is the literature review

comprehensive.  I might go back to some of the original sources

cited in the reference list, for example, and look at those

articles to see if in the article I'm reading, when they

describe article X, when I read article X, is that actually

what article X is saying.  Also, there are researchers who have

come to be known in a particular field, so I might look at who

the authors are and where the research is being conducted.

Q.  Beyond what you have already described, can you give any

examples of how studies are conducted?

A.  They're conducted in a variety of ways.  So for example --

I think I may have already described it -- but there are a

variety of ways people might interview offenders and ask them

what they do, what strategies and tactics they use.  There

might be studies that look at victims reporting what their

experiences are.  Or there might be studies where you're

looking at treatment of victims and what are some of the issues

that patients are bringing to treatment that need to be

addressed, so the strategies that they experienced might come

out that way.  Certainly, studies have been done interviewing

various experts, asking them what are strategies.  And then

looking for what are the strategies that experts from a variety

of different fields agree upon, to a degree of certainty, and

what do these professionals agree are part of what they see.

Q.  Do studies use the same or different definitions of

grooming?

1  A.  So the definitions can vary.  They're all generally

2  referring to the same process.  But the specific definition may

3  vary in different studies.  So you have to be sure that the

4  literature, when reviewing it, you have to understand what

5  definition they're using.

6  Q.  How can you rely on the empirical studies when there is

7  variance across the different definitions of grooming used in

8  those studies?

9  A.  To the extent they're talking about the same kind of

10  process in the context of childhood sexual abuse.  And again,

11  grooming, not only may there be variances in definition of

12  grooming, but the same patterns and behavior are sometimes

13  referred to by different names.  But what you really want to

14  look for are the commonalities.  So for example, are what

15  offenders tell us they do, does that -- to what degree of

16  overlap is there between that and what victims tell us that

17  they have experienced.  When professionals talk about the kinds

18  of behaviors, how much overlap and agreement is there between

19  professionals, say, in similar fields, but also in different

20  fields in characterizing these common phenomenon, the common

21  phenomenon.

22  Q.  Do studies look at samples of substantiated cases of abuse?

23  A.  Yes.

24  Q.  What does that mean?

25  A.  So some of the research has been done that has looked at

1    and interviewed individuals where the abuse has been known,

2    either because the perpetrator has offended —— has admitted ——

3    I apologize —— or has been found guilty.  So that would be an

4    example of a legally substantiated case.  Other times, they

5    find studies where it's been substantiated in other ways; there

6    have been interviews done with children who presented in

7    medical settings with gonorrhea and talking with them about

8    sexual abuse or abuse with kids in real time.

9             MS. POMERANTZ:  Can you pull up Government Exhibit 2,

10   please.

11   Q.  Dr. Rocchio, do you recognize this?

12   A.  I do.

13   Q.  What is it?

14   A.  It's an article about coercive control.

15   Q.  Who is the author?

16   A.  Jacquelynn Duron, Laura Johnson, Gretchen Hoge and Judy

17   Postmus.

18            MR. ROHRBACH:  Your Honor, the government would offer

19   Government Exhibit 2.

20            THE COURT:  Any objection?

21            MR. PAGLIUCA:  Not for purposes of this hearing, your

22   Honor.

23            THE COURT:  Government Exhibit 2 is admitted for the

24   hearing.

25            (Government's Exhibit 2 received in evidence)

1    BY MS. POMERANTZ:

2    Q.  Dr. Rocchio, to prepare for this hearing, did you provide

3    the government with samples of literature?

4    A.  I did.

5    Q.  Is this one of the samples you provided?

6    A.  Yes.

7    Q.  Is this article peer-reviewed?

8    A.  Yes.

9    Q.  At a high level, can you describe this article?

10   A.  So what this article did, it reviewed information provided

11   by a variety of professionals who had expertise, specifically

12   in offender behavior and tactics that are utilized by offenders

13   in sexual abuse, professionals from a variety of fields.  And

14   it asked them to talk about some of the tactics used in

15   furthering the relationship and developing a dynamic of

16   coercive control.

17          What was significant in particular about this article

18   is not only did they look at coercive control as it applies to

19   childhood sexual abuse, but they also looked at how coercive

20   control, patterns of behavior play out in multiple forms of

21   victimization; trafficking, elder abuse or pimp and sex worker

22   relationships, intimate partner violence, rape, sexual assault,

23   that sort of thing.

24   Q.  Does this article talk about grooming?

25   A.  It does.

1  Q.  Does this article use any particular sampling?

2  A.  The sampling was of professionals from a variety of fields.

3  And it looked for content analysis and commonalities in what

4  these professionals reported were common behaviors and tactics

5  that were used across types of victimization.

6  Q.  How, if at all, does that impact your assessment of the

7  study and article?

8  A.  It impacts it significantly.  Because what this article is

9  doing is not only is it replicating what has previously been

10  found about tactics that are used, it's extending that

11  literature and saying that these are common patterns of

12  behavior that are used in the service of coercive control in a

13  variety of types of victimization.  So it's identifying a

14  common tactic that's used in a number of settings to gain and

15  maintain power and to coerce a victim into some form of

16  behavior.

17          THE COURT:  Let me ask on that, one of the examples

18  you gave was the pimp and sex worker relationship.  In some of

19  the literature and in the cases, trauma bonding is the phrase

20  that's used?

21          THE WITNESS:  Yes.

22          THE COURT:  What's your understanding of the

23  similarity, the overlap and prevalence of understanding of

24  these two concepts in the field?

25          THE WITNESS:  In the field, there's significant -- so

1    trauma bonding is typically referring to a relationship of

2    attachment and connection between the pimp and the sex worker.

3    We know that the majority of sex workers are under some

4    third-party control.  And we know that the trauma bonding is

5    often the means by which the pimp has coerced the sex worker to

6    get them to do their bidding, similar to the kinds of

7    techniques that traffickers might use.  So there's a

8    significant amount of overlap.  And there has been actually

9    some recent research -- this is one example -- but others have

10   specifically looked at grooming as it applies to trafficking,

11   for example.

12             THE COURT:  Thank you.

13   BY MS. POMERANTZ:

14   Q.  Dr. Rocchio -- withdrawn.

15             MS. POMERANTZ:  Can we pull up Government Exhibit 3,

16   please.

17   BY MS. POMERANTZ:

18   Q.  Dr. Rocchio, do you recognize this?

19   A.  I do.

20   Q.  What is it?

21   A.  It's an article validating a model of child sexual abusers.

22   Q.  Who wrote this?

23   A.  Georgia Winters, Elizabeth Jeglic and Leah Kaylor.

24             MS. POMERANTZ:  The government offers Government

25   Exhibit 3.

1            MR. PAGLIUCA:  No objection.

2            THE COURT:  Government Exhibit 3 is admitted to the

3     hearing record.

4            (Government's Exhibit 3 received in evidence)

5     BY MS. POMERANTZ:

6     Q.  Dr. Rocchio, is this one of the articles you provided to

7     the government?

8     A.  It is.

9     Q.  When was this article published?

10    A.  2020 or 2021.  I can't read the date right now.  I think it

11    was 2020.

12    Q.  Is this article peer reviewed?

13    A.  It is.

14            It was published in October 2020.  Thanks.  I don't

15    have my glasses on.

16    Q.  What was the conclusion of this study?

17    A.  So what these authors did is a two-part study.  So the

18    first thing that they did is they did an extensive literature

19    review to look for commonalities in the literature about what

20    are the commonly described stages that a perpetrator engages in

21    and what are the behaviors that are associated with those

22    stages.  So they did a very comprehensive literature review.

23    They identified a number of specific behavioral and observable

24    strategies that individuals have identified in the literature.

25            They then got a group of recognized individuals in

1    various fields with a high level of expertise —- I believe

2    there were about 18 professionals; 15 of them had doctoral

3    degrees and they all had a significant number of publications

4    having to do with offender behavior —- they did a scientific

5    analysis, whereby they had the professionals rate the relevance

6    of not only the stages of grooming to their understanding of

7    tactics and strategies utilized by offenders, but also the

8    specific developments of very specific behaviors.

9         So they had each of those behaviors rated on a four

10   point scale by all of the professionals.  And then they

11   conducted analysis to see which of the items for which there

12   was a high level, statistically significant level of agreement

13   between the professionals, as to which of these behaviors were

14   relevant.  And they then went back and they asked, of those

15   behaviors, where was their agreement on which stages that these

16   specific behaviors belonged to.

17        So I think they were able, through that analysis, to

18   get a statistically significant agreement about behaviors.  I

19   think they narrowed it down to about 43 specific behaviors in

20   this particular model.

21   Q.  I want to direct your attention to Page 3.

22   A.  Okay.

23   Q.  What is this table?

24   A.  So this is a table that, if you can see, there are five

25   stages of the model; the first being the victim selection, then

1    gaining access and isolation, trust development,

2    desensitization, sexual contact and physical contact.  And then

3    beneath each stage level, there is a list of the behavioral and

4    the observable and measurable behaviors where there was a high

5    level of statistical significance in agreement among varying

6    professionals as to the relevance both to the grooming process

7    and to the stages.

8    Q.  I want to direct your attention to Page 4.  What is this

9    table?

10   A.  So these, as I mentioned, there was an original list of

11   about 77 specific behaviors that have been found associated

12   with grooming in the literature fairly consistently.  These are

13   the behaviors that were part of that original list, where

14   perhaps there were more differences of opinion, but the level

15   of agreement among the professionals in this particular study

16   did not reach the level of statistical significance.

17   Q.  What is your takeaway from the study in the article?

18   A.  I think this is a study that has really done a good job of

19   integrating what we know and pulling together the literature,

20   and then putting it to an empirical test.  There have been

21   other ways to empirically understand and test what is referred

22   to as grooming.  I think this is another way that provides some

23   validation of a proposed model of the ways in which grooming

24   works.

25           MS. POMERANTZ:  You can pull that down.  I'd like to

1  show Dr. Rocchio Exhibit 4.

2  BY MS. POMERANTZ:

3  Q.  Do you recognize this?

4  A.  I do.

5  Q.  What is it?

6  A.  It's an article on the construct of grooming in child

7  sexual abuse that identifies both a summary of literature as

8  well as some of the conceptual and measurement issues that were

9  present at the time the article was written.

10  Q.  Who wrote this article?

11  A.  Natalie Bennett and William O'Donohue.

12          MS. POMERANTZ:  The government offers Exhibit 4.

13          MR. PAGLIUCA:  No objection.

14          THE COURT:  Thank you.  Government Exhibit 4 is

15  admitted into the hearing record.

16          (Government's Exhibit 4 received in evidence)

17  BY MS. POMERANTZ:

18  Q.  Is this one of the articles that you provided the

19  government?

20  A.  It is.

21  Q.  Why did you provide the government with this article?

22  A.  I think that this article does a really good job of

23  summarizing much of the previous literature that has been

24  published and peer-reviewed sources about the grooming process.

25  It identified some of the issues and varying definitions.  It

1    provided data supporting that this is a process that is well

2    known and well established in the literature, and then it

3    pointed to directions that were needed for future work.  It

4    pointed to some of the concerns about definitions and things

5    that -- suggestions, basically, for issues that needed to be

6    addressed in future research.

7    Q.  Do you agree with all of the conclusions of this article?

8    A.  I do not.

9    Q.  I want to direct your attention to Page 959.  And I want to

10   zoom in on the paragraph above current definitions.  It's about

11   four lines down.  It starts with "Furthermore."

12   A.  Okay.

13         MS. POMERANTZ:  We can highlight those next two

14   sentences.

15   Q.  Dr. Rocchio, could you review the highlighted text.

16   A.  Okay.

17         MS. POMERANTZ:  And for purposes of the record, your

18   Honor, I'm happy to read that.

19         THE COURT:  The sentence beginning with "Furthermore"

20   and ending with "negatives."

21         MS. POMERANTZ:  Thank you, your Honor.

22   BY MS. POMERANTZ:

23   Q.  Dr. Rocchio, what is your reaction to this?

24   A.  I think it's incomplete and I disagree with the conclusion.

25   Q.  Can you explain?

A.   Sure.  I think that certain things -- some psychologists
use clinical judgment on whether or not a perpetrator's
behaviors are considered grooming.  But that certainly doesn't
at all reference the scientific literature to determine what is
and is not considered grooming.  In addition, we also have data
that's been provided by offenders themselves.

        In terms of reliability and validity of these
judgments, the validity in psychological science refers to the
degree to which you are measuring this particular thing, what
you think you're measuring.  So for example, the degree to
which there is significant overlap between what victims say
they experience and what offenders say that they have done
provides us with a measure of validity.

        The degree to which different groups of individuals,
whether that's groups of professionals or groups of victims
agree in studies what it is that -- the process, what kinds of
behaviors, what's been done to the victim, what kinds of
behaviors are associated with the grooming process, to the
extent those professionals agree, that's a measure of
reliability.  Because you're getting different studies,
different groups, different samples where there's significant
overlap in what this dynamic and what this concept is.

        MS. POMERANTZ:  I want to turn to Page 974.
Q.  I want you to focus on the section under conclusions and
the first two sentences, so "Currently."

1              THE COURT:  Can you repeat that, please.

2              MS. POMERANTZ:  The first two sentences of that

3    paragraph starting with "currently" and ending with "has

4    occurred or is occurring."

5              THE COURT:  Thank you.

6    BY MS. POMERANTZ:

7    Q.   Dr. Rocchio, what is your response to those two sentences?

8    A.   Again, I think that I would not agree with those

9    conclusions.  I also think it's important to recognize that

10   this article was published many years ago.  And there's

11   certainly been evolutions and additional literature since the

12   time of publication.  But even at the time of publication, I

13   think it's a little misleading.  If they're defining consensus

14   there as universal agreement as to exact -- everything within

15   the process of grooming, then sure.  But when we're talking

16   about any pattern of behavior or any phenomenon within the

17   social science, it's a complicated phenomenon.  You're never

18   going to get universal agreement among experts.  That's why you

19   have to look at what's the particular definition used within a

20   study.

21             But most definitely, there's consensus within the

22   scientific literature about the phenomenon not only of

23   grooming, but the phenomenon of child sexual abuse itself, what

24   the experiences are of the victim and what the behaviors are of

25   the offender and also the impact of those behaviors, in terms

of how it affects an individual.  So if we know that it's a

relationship of trust, for example, that typically results in

feelings of shame on the part of the victim, obviously, we had

to study how that trust was built up and how that relationship

developed over time.  That's well established.  And there's

consensus that that is a significant part of the dynamics of

child sexual abuse.

Q.  I want to turn to the next two sentences starting with "The

field possesses" and going through "does not meet some of the

criteria in the Daubert standard."

A.  Okay.

Q.  Do you see that, Dr. Rocchio?

A.  Mm-hmm.

Q.  What is your reaction to the statement that grooming is not

a construct that ought to be used in forensic settings?

A.  As I indicated, I think that it is absolutely part and

parcel of a forensic evaluation to look at what are the

behaviors, what is their impact and what was their function.

So I think that to the extent that we have the ability in a

forensic setting, in particular, to look for corroboration, to

look for consistency among different data points, between what

you are being told by an individual, between what other people

have observed, for example, what people are reporting on

measures and tests, what individuals have told in a

contemporaneous setting.  I think there are a lot of ways you

1    can get consistency.  And it's a concept that is frequently

2    referred to in forensic studies.

3    Q.  Do more recent articles respond to some of the concerns

4    raised by this Bennett and O'Donohue article?

5    A.  They do.

6    Q.  Can you please explain?

7    A.  The article we looked at earlier by Winters attempted

8    specifically to address some concerns.  So she attempted to

9    validate the grooming model.  And she very specifically wanted

10   to see, okay, of course there's not going to be universal

11   agreement on every single behavior, but she did a statistical

12   study to find out specifically what behaviors do the

13   professionals and the experts agree upon.  And again,

14   remembering that all of the behaviors -- even the ones that, in

15   that particular study, didn't meet the statistical significance

16   in that study, all of those behaviors were behaviors that have

17   been commonly referred to and described in the literature.

18   Q.  Dr. Rocchio, how do error rates factor into this

19   literature?

20   A.  So I think when we talk about error rates within the field

21   of psychology, the kind of gold standard is when you have a

22   particular technique or a drug and you ideally would randomly

23   assign people, one who receives the drug, one who doesn't

24   receive the drug, and I would kind of compare whether -- how

25   effective it is.  For obvious reasons, you can't assign some

1    people as sexually abused and others not.  So you have to look

2    for other ways to assess acceptability within the scientific

3    literature; peer review and general thoughts about concepts.

4    And so that's where you look at the reliability as in what do

5    the experts consistently agree to among themselves.  You look

6    at the degree of overlapping studies, perhaps studying it in

7    different ways, but are they still coming up with the same

8    clear description of the types of things that happen in the

9    context of child sexual abuse.

10          So for example, there was a content analysis done

11   through interviews to pull out what some of those studies have

12   found and to the degree that they're rated by multiple

13   reviewers, and then compare the ratings of those reviewers,

14   that's an indices of reliability.

15          MS. POMERANTZ:  I think we're done with Government

16   Exhibit 4.

17          Can we pull up Government Exhibit 5, please.

18   Q.  Dr. Rocchio, do you recognize this?

19   A.  I do.

20   Q.  What is it?

21   A.  It's an article describing the evolution of the word

22   grooming and how it's been used, as well as the term seduction,

23   to describe this commonly understood pattern of behavior and

24   the strategies used by child perpetrators in the service of

25   sexual exploitation and abuse.

LBAGmax2                          Rocchio - Direct

1   Q.   Who wrote this article?

2   A.   Park Dietz.

3          MS. POMERANTZ:   Your Honor, we move to admit

4   Government Exhibit 5.

5          MR. PAGLIUCA:   No objection.

6          THE COURT:   Government Exhibit 5 is received.

7          (Government's Exhibit 5 received in evidence)

8   BY MS. POMERANTZ:

9   Q.   Dr. Rocchio, did you provide the government with this

10  article?

11  A.   I did.

12  Q.   Why did you provide the government with this article?

13  A.   I was asked to provide examples to the government of

14  literature in the field that I thought might be helpful to the

15  court to understand the concepts that I'm talking about.  This

16  does a really nice job of pointing to the part that the terms

17  grooming and seduction refer to a pattern of behavior that's

18  widely known and well established to be part of the dynamics of

19  sexual abuse.  But in particular, I appreciated the author's

20  emphasis later on in the article of some of the problems with

21  the words seduction and some of the ways that much earlier

22  literature erroneously used terminology that could

23  inappropriately indicate a victim is blamed for the abuse that

24  they have been subjected to.

25         MS. POMERANTZ:   Can you pull up Page 31, please.

Q.  I wanted to direct your attention to the use of the term

grooming, so in that top paragraph.  If you could review the

section of the article that starts with "If their use of the

term grooming" and all the way to the end of that paragraph and

let me know when you have had a chance to review it, please.

A.  Okay.

Q.  Dr. Rocchio, what is your response, reaction to this

passage?

A.  It's a bit confusing as to the point that's being made.  I

feel like they're trying to -- the author here seems to be

mixing different applications of the term that they use

grooming, so it looks like in part he's talking about what is

true in the literature, which is that we're not particularly

good as a field of taking, frankly, many behaviors at all and

predicting future behaviors.  So he's saying accurately that we

can't look at specific behaviors alone as predictors.

        And certainly, the use of the term grooming, again, is

used to describe a process, a pattern of behaviors.  I'm not

here today to say that if somebody engages in any one of these

particular behaviors, yes, we know you're a child abuser.  So

he's making that point.  But I don't think anybody -- I don't

think that -- if that's his point, I wouldn't disagree with

that.  Except that he's then going on -- I disagree where he

says that grooming then can't involve behaviors that might in

fact be prosocial or normal.

1    Again, we're talking about a use of a variety of
2    strategies for the purpose of sexual abuse.  So these are ways
3    in which -- tactics, ways in which an offender might manipulate
4    a child to developing a relationship of trust and attachment.
5    Obviously, one can develop a relationship of trust and
6    attachment in a variety of contexts.  But when we're talking
7    about grooming, the specific context, is when there's been
8    coercive control and some form of organization.
9    Q.  Dr. Rocchio, taking a step back --
10       MS. POMERANTZ:  You can pull down Exhibit 5.
11   Q.  -- how have some of the behaviors you have seen in grooming
12   literature compare to behaviors you have seen in your forensic
13   practice and your clinical practice?
14   A.  Again, there's remarkable similarity in the impact of those
15   behaviors.  In my clinical practice victims talk about, I
16   really trusted him, I thought he was a nice guy, he paid so
17   much attention to me, he helped me out, he drove me places, he
18   bought me sneakers when I didn't have any, he was the only
19   person who cared about me.  And that significantly -- in a
20   clinical arena, that significantly impacts the individual's
21   confusion and self-blame and often experiences of shame.
22       Similarly, in a forensic setting, it can often
23   contribute to an increase in the kinds of damage and harm that
24   I need to assess that have stemmed from an incident.
25   Q.  In your view, is the concept of grooming generally accepted

1  within the scientific community?

2  A.  Yes, absolutely.

3  Q.  Based on your experience, research and training, are

4  certain individuals at higher risk of being sexually abused as

5  children?

6  A.  There are certain groups who are more vulnerable and

7  there's a higher prevalence of child sexual abuse, yes.

8  Q.  What factors contribute to increased risk or higher

9  vulnerabilities?

10  A.  So there are factors that have been studied and found in

11  literature that have to do with the individual themselves.  So

12  for example, individuals who are particularly needy and

13  vulnerable, individuals who have a prior history of

14  victimization, you know, are at much higher risk of

15  revictimization, individuals who are part of marginalized

16  groups.  For example, we know there's very high rates of sexual

17  assault, childhood sexual abuse among especially minority

18  children or among intellectually and cognitively disabled

19  children.

20          We know that individuals who come from certain types

21  of family structures can be also at higher risk.  For example,

22  where there's only one parent, or children who come from home

23  environments where there's abuse of other types going on in the

24  home.  So there might be other siblings who are being abused or

25  the parents might be engaged -- one of the parents might be

LBAGmax2                          Rocchio - Direct

1    abusing another parent or another child, so where there's other

2    violence, those groups are also at higher risk.

3            There have been other studies that look at poverty as

4    a risk factor.  So those are just examples of the types of

5    vulnerabilities that have been well established in the

6    literature.

7            (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LBAAMAX3ps                    Rocchio - Direct

1    Q.  At a high level, what are your opinions on which

2    individuals are at higher risk of child sexual abuse based on?

3    A.  My training and my education, certainly my clinical and

4    forensic experience, as well as my review of the clinical and

5    scientific literature.

6    Q.  In your education and training, did you learn about the

7    concept of certain groups being at higher risk of childhood

8    sexual abuse?

9    A.  Yes, because, again, in the phenomenon of child sexual

10   abuse in general, not -- we're looking at vulnerability

11   factors, i.e., who's more at risk.  So to the extent that I was

12   learning about ways that you might want to target prevention,

13   for example, where you might want to make those interventions,

14   but then also, we know that an individual's prior

15   vulnerabilities interact with their subsequent experiences of

16   victimization and have a profound effect on the outcome, the

17   adverse outcomes of the abuse itself.

18          So it was covered in a number of different ways

19   through the course of my education and training.

20   Q.  In your clinical practice, have you treat and evaluated

21   patients who belong to higher-risk groups?

22   A.  Yes.

23   Q.  Can you please explain.

24   A.  In particular, we know that gender is a higher-risk group,

25   and we know that women and girls are at higher risk for child

1    sexual abuse.  So to the extent that more of my patients are

2    women than men, certainly that's a vulnerability.

3           But also, because, especially now, I'm working with

4    adults, I'm working with people who have been repeatedly

5    victimized at various points in time in their lives.  And you

6    can really clearly see the pattern, and it's something I often

7    have to address with patients because they inquire about it,

8    they don't understand.  You know, why is it that this has

9    happened to me so many times.  And, again, we know from the

10   revictimization literature that when someone is abused, they

11   are at higher risk of being abused at later points in time.

12          Also, you know, sometimes the clinical literature

13   individuals will talk about the specific issues in their family

14   that perhaps increase their vulnerability:  They were always

15   alone.  They, you know, their mom was sick and this person had

16   lots of opportunity to kind of befriend the family and, you

17   know, therefore had greater access as a result of that

18   vulnerability, or perhaps they were desperate for attention,

19   care, love, and concern from another person because those are

20   common childhood needs and maybe they weren't getting that at

21   home.

22          So those are all the kinds of things that would come

23   up in, and have come up in, my over 30 years of treating

24   patients.

25   Q.  In your forensic practice, do you examine the impact of

1    prior vulnerabilities with respect to childhood sexual abuse?

2    A.   I do.

3    Q.   Can you explain.

4    A.   So, again, I'll use an example in the civil arena.  If I'm

5    asked, as part of my forensic evaluation, to opine about the

6    impact of an alleged event, say childhood sexual abuse, and the

7    degree to which a person's current difficulties are related to

8    that event, I have to take prior vulnerability into account,

9    because part of what I'm looking at is, how can I determine

10   which of these persons' current difficulties are related to the

11   sexual abuse or maybe related to other things that have

12   happened in their past.  So we know, because of the

13   vulnerability literature, that if somebody is being abused in

14   adolescence, it wouldn't be at all unusual for them also to

15   have a history of earlier childhood sexual abuse.

16          So I have to look at the interaction of those prior

17   vulnerabilities and ways in which those prior vulnerabilities

18   both may have made the individual more vulnerable to the

19   grooming behavior and to the subsequent sexual abuse, and also

20   ways in which those prior vulnerabilities may have interacted

21   with the abuse to create more adverse outcomes for the

22   individual I'm evaluating.

23   Q.   How does what you have observed in your forensic practice

24   compare to your clinical practice with respect to individuals

25   in higher-risk groups?

A.   Again, it's highly, high consistent, in both my criminal
and civil, civil practices.  Even if I'm not -- even if the
issues specific to the sexual abuse are not the issue at hand,
certainly when I'm doing a comprehensive evaluation, I'm taking
a history and people are describing their prior experiences,
the kinds of experiences they talk about in the context of
having experienced childhood sexual abuse, the relationship
they've had with the perpetrator, the kinds of things that the
perpetrator has done to kind of engage them into that
relationship for the purposes of sexual abuse are very
consistent.

Q.   Is there empirical data to support your view that certain
groups of children are at higher risk of being sexually abused?

A.   There is.

Q.   Can you explain?

A.   Sure.  When we're studying any phenomenon, I want to look
at the prevalence, which is, you know, how often does this
thing, in this case child sexual abuse, occur.  We can never
have a perfect understanding, because some people will deny,
you know, not everybody will report.  But to the degree that we
can look at national samples and, you know, on average how
often does this occur in a national sample and then how
often -- what is the rate of occurrence in other subgroups, so,
you know, is the rate of sexual abuse higher, for example, from
a prevalence perspective, in some marginalized individuals.

1    When you look at who reports that they've been sexually abused,

2    is it reported more often by individuals who are members -- who

3    are women versus men.  Is it reported, you know, more often or

4    found to have occurred more often, for example, in a group of

5    individuals who are cognitively or intellectually disabled.

6         MS. POMERANTZ:  Ms. Durocher, can we pull up

7    Government Exhibit 3, please.  Can we turn to page 3.

8    Q.   Dr. Rocchio, we looked at this table before.  Can you

9    please explain, what if anything does the table tell you about

10   particular vulnerabilities.

11   A.   So the particular vulnerabilities in particular are most

12   relevant to the first stage of the grooming model, which is the

13   victim-selection model, in terms of looking at who are the

14   individuals that offenders choose to abuse or who end up

15   abusing.  And, again, I think it's important to bear in mind

16   that this whole list was initially established from literature

17   looking at what offenders have told us they look for as well as

18   what kinds of prevalence rates have occurred in certain

19   populations.

20        And then these, in that top section of victim

21   selection, are the factors, vulnerability factors, that there

22   has been statistically significant agreement by professionals

23   factor into victim selection.

24   Q.   And when you say "the top section," you're referring to

25   the -- what part of the table are you referring to?

1   A.  I'm sorry.  I'm referring to the list of behaviors

2   specifically that are under the category entitled "Victim

3   Selection."

4   Q.  Thank you.

5          MS. POMERANTZ:  Can we turn to page 4.

6   Q.  And directing your attention to the table on page 4, what

7   does this table show and how does that impact your view on

8   vulnerabilities?

9   A.  So this table shows, again, specific behaviors that there's

10  widespread agreement in this particular group of professionals

11  that are relevant to a particular stage of the grooming

12  process.  And, again, these are also behaviors that have been

13  commonly and repeatedly found to exist in the scientific

14  literature as being associated with the grooming process.

15  Q.  And how does the information on this table compare to the

16  table we were just looking at?

17  A.  There are similar types of behaviors that can be done in

18  the service of building a relationship of trust and attachment,

19  and in -- and have been found to be utilized by offenders.  But

20  there was not as much agreement among the professionals that

21  these specific behaviors -- about the relevance of these

22  specific behaviors and/or the stage to which they were part of.

23         MS. POMERANTZ:  Thank you.  Ms. Durocher, we can pull

24  that down.

25  Q.  Dr. Rocchio, the defense has stated that your opinion that

individuals with particular vulnerabilities are often targeted

by sexual abuse is a commonly accepted bit of clinical lore

derived from the frequent observation of highly vulnerable

children among those children who allege sexual abuse, but it

is not based on empirical data regarding the likelihood of

abuse among children with varying degrees of vulnerability.

What's your response to that?

A.  I believe that's a false statement.

Q.  Can you explain.

A.  As I just indicated, there are a variety of ways that we

can look at whether or not individuals with particular

vulnerabilities are targeted and/or at higher risk for being

sexually abused.  We can look at the prevalence data, the rates

in which these behaviors occur.  You can look at both

allegations as well as crimes that are reported.  You can look

at what offenders tell us.  There has been extensive

interviewing that's been done and studies that have been done

with offenders about what they look for.  And, again, this

would not just be offenders of childhood sexual abuse but, you

know, there have been studies done with pimps, for example, on

what they look for.  So in a variety of forms of victimization.

        So there are multiple data sources that exist in

addition to clinical experience that can substantiate this

phenomenon.

Q.  How does what you've observed in your review of the

1   literature compare to your clinical practice and your forensic

2   practice with respect to the question of individuals with

3   particular vulnerabilities being at higher risk of childhood

4   sexual abuse?

5   A.   It's highly consistent.

6   Q.   The defense has argued that a victim's prior sexual

7   behavior is relevant to the concept of grooming.  What's your

8   reaction to that?

9   A.   In what way?  I mean, I've talked about, certainly their

10  experiences of victimization can make them more vulnerable, but

11  I'm not sure what you mean.

12  Q.   Does whether a person, whether or not a person has had

13  sexual experience, putting aside prior victimization, make them

14  more or less vulnerable to being groomed?

15  A.   I'm not aware of any literature on that issue, nor do I

16  even understand how that would theoretically make sense.  To

17  the extent that you're suggesting that somebody who has been

18  sexually active in the past can or cannot be groomed, I'm not,

19  even theoretically, I don't understand why that would be the

20  case.

21          But, no, certainly I don't believe that there is any

22  literature that would support that statement.

23          THE COURT:  So to the extent you've seen in your

24  practice and studies the impact of prior sexual conduct on the

25  phenomenon of grooming, you understand it to potentially

1   increase the likelihood of grooming or susceptibility to

2   grooming?  Do I have that right?

3           THE WITNESS:  No.  I'm sorry.  What increases

4   susceptibility to grooming would be prior victimization.  I

5   believe I'm being asked here now about consensual sexual

6   activity.  And I'm not aware of any known or studied

7   relationship between consensual sexual activity and grooming.

8           THE COURT:  Right.  So to the extent prior sexual

9   conduct of any kind that you're aware of impacts grooming, it's

10  that prior victim -- prior victimization, prior subjecting to

11  sexual abuse increases the likelihood of one being susceptible

12  to grooming tactics.

13          THE WITNESS:  Can increase the likelihood of being

14  sexually abused later, not necessarily susceptibility to

15  grooming per se, but we know that it increases the likelihood

16  of subsequent victimization.

17          We also know that one of the effects of victimization

18  in and of itself can be an increase in risky behavior.  And for

19  adolescents in particular that risky behavior can often take

20  the form of risky sexual behavior.

21          So I think that, to the extent that there might be a

22  relationship between sexual abuse and grooming and sexual

23  behavior, it's actually the inverse of what you've talked

24  about, which is, you might see a lot of high-risk sexual

25  behavior being engaged in, in someone who has been previously

LBAAMAX3ps                    Rocchio - Direct

groomed and victimized.

             THE COURT:  So given that there's a history of prior

sexual abuse, would that be relevant -- is that relevant for

you to understanding whether grooming occurred?

             THE WITNESS:  Not necessarily, because when I'm

looking at whether or not grooming occurred and when the

literature is looking about whether or not grooming occurred,

they're going to look at the specific circumstances associated

with whatever it is you're looking at.  It's relevant in that I

know that prior victimization could increase vulnerability, but

just because someone is --

             THE COURT:  Well, vulnerability to what?

             THE WITNESS:  Vulnerability to subsequent sexual

abuse.  But just because somebody is more vulnerable, that can

provide me with some information, but it's not going to factor

into my specific conclusions around the facts, say, in a

forensic setting if I'm being asked.  Did grooming occur here.

I'm going to take into account prior victimization and

vulnerability.  But that prior victimization and vulnerability

isn't going to tell me whether or not it happened here.

             THE COURT:  I guess I just want to understand that

piece.  The point you made about prior sexual abuse can lead to

certain kinds of behaviors, is there anything in that analysis

that would impact how one understands whether grooming tactics

would be successful or whether the individual might be

1    susceptible or not to grooming?

2              THE WITNESS:  To the degree that someone is engaging

3    in risky sexual behavior, that could -- they could end up then

4    being in circumstances where they're more vulnerable to being

5    targeted by offenders.  It could be in that way.

6              THE COURT:  No other way that you can think of, or

7    have seen in the literature.

8              THE WITNESS:  No, not that I'm aware of right now.

9              THE COURT:  All right.  Thank you.

10   BY MS. POMERANTZ:

11   Q.  Dr. Rocchio, the defense has referred to a theory of

12   grooming by proxy.  Have you heard of that term in scientific

13   or clinical literature?

14   A.  No, I have not.

15   Q.  Is there anything about what you're testifying about here

16   today that says grooming can only be done for the benefit of

17   the person doing the grooming?

18   A.  No, there's not.

19   Q.  What is your opinion based on?

20             THE COURT:  And just to clarify, the opinion, so that

21   we not have a fight about terminology, the opinion is that the

22   presence of another individual can facilitate the sexual abuse

23   of minors.  Is that the opinion?

24             THE WITNESS:  What, what I was asked was whether or

25   not there's anything that, in what I've testified about the

1    tactics and strategies of the grooming process, that would

2    preclude or require that those strategies be utilized for the

3    sexual gratification of the person who's doing the grooming as

4    opposed to a third party.  And my answer to that question is

5    no.

6              THE COURT:  OK.  So you don't have an opinion on

7    whether the presence -- let me just get the language -- the

8    presence of a third -- of another individual can facilitate

9    sexual abuse of minors.

10             THE WITNESS:  To the extent that we know that

11   offenders do put themselves in situations where they're more

12   likely to be viewed as trustworthy, surrounding themselves with

13   individuals who a child or an intended victim might trust is

14   going to increase the child's trust, perhaps.

15             THE COURT:  Is there any literature that you can point

16   to that goes from that sort of broad statement about

17   trustworthiness to the inclusion of a third individual in order

18   to build that trust, any literature that you can point to that

19   suggests that?

20             THE WITNESS:  The literature that just points to, more

21   generally, perpetrators putting themselves in environments

22   where they have a wider array of access or the grooming of

23   institutions and other individuals for the purpose of getting

24   greater access to the child.

25             THE COURT:  So, well, let me ask it this way.  In your

1   experience, what is the frequency with which -- not in the

2   institutional setting, but in your experience, in which the

3   presence of another individual helps create -- a single

4   individual, helped create that trustworthiness that facilitated

5   the abuse?

6           THE WITNESS:  I'm not aware of a particular study that

7   would investigate that specific situation.

8           THE COURT:  Or any discussion of that phenomenon in

9   the literature, specifically, not more broadly.

10          THE WITNESS:  Specifically the use of a single

11  individual, unless you're talking about a co-offender.  I mean,

12  there is some literature, obviously, on co-offenders.  There's

13  literature that looks at, for example, in the pimping and

14  trafficking literature, it's very common for individuals to

15  engage in group activity.  But specifically looking at child

16  sexual abuse and the presence of a single other adult, I'm not

17  aware of particular studies about that exact point.

18          THE COURT:  And how about in your clinical and

19  forensic experience?

20          THE WITNESS:  Certainly in my clinical and forensic

21  experience I have definitely seen that.

22          THE COURT:  With what frequency?

23          THE WITNESS:  A high degree, because oftentimes

24  offenders surround themselves with other people.  So I'm

25  thinking of a foren -- a Boy Scout case I did, where in

particular the person I was evaluating talked about how he

thought that the person who eventually abused him was a really

good guy because there was another older person involved in the

troop, and they were best friends.  And so he really thought

this other guy was really cool, and that was how he, you know,

came to kind of be introduced and involved in the relationship.

There's a -- there was a -- in a clinical setting,

I've certainly talked with individuals where, you know, I've

talked about that part of, why they came to trust someone and

initially started the relationship with them was because either

they looked cool or they knew someone that they knew or they

were introduced by a friend or a teacher.  So in those settings

certainly I've -- it's something that happens.

THE COURT:  Does it surprise you, then, there's no

discussion in the literature of that specific phenomenon?

THE WITNESS:  I think that it's -- no, because I think

what I'm talking about is specific ways in which individuals

are kind of disarmed or come to trust others, so within the

literature the phenomenon of what kinds of things, like -- can

create an aura of trust and respectability, that is certainly

discussed in the literature.  But I think that the example

you're asking me about is so highly specific, I think it would

fall under the category of a number of things that are

discussed, but I'm not aware of it having been discussed that

specifically.

LBAAMAX3ps                    Rocchio - Direct

1           THE COURT:  So in a sense what the field, the

2     scientific field tell us is that there are scenarios that help

3     create an aura of trust and respectability, and then one could,

4     using some common sense, figure out what specific examples

5     might fall within that?

6           THE WITNESS:  Sure.  Or there is literature to say,

7     you know, where, for example, do we find that perpetrators

8     access victims?  And so we know that they end up in leadership

9     roles in various kinds of child organizations -- counselors,

10    schools, Boy Scouts, church.  So --

11          THE COURT:  But those phenomena are discussed in the

12    literature.

13          THE WITNESS:  Those phenomena are discussed in the

14    literature.

15          THE COURT:  OK.  Thank you.  Go ahead.

16          MS. POMERANTZ:  Thank you.

17    Q.  We've been talking about whether grooming only be done for

18    the benefit of the person doing the grooming.  What if anything

19    in scientific literature addresses the concept of grooming not

20    having to be done for the benefit of the person doing the

21    grooming?

22    A.  So the article that we had spoken about earlier, looking at

23    dynamics of coercive control, which refer to some of the

24    strategies and dynamics that commonly occur in the context of

25    grooming, we can see that coercive control, which are

1  describing the same kinds of strategies and tactics as grooming

2  refers to, happens in a variety of other settings.  So in the

3  pimp-and-sex-worker relationship, we know, for example, that

4  the grooming strategies are happening, and typically a pimp is

5  working not for their own, necessarily, sexual gratification

6  but to provide -- to procure and provide for the sexual

7  gratification of another, for example.

8        THE COURT:  And that's how it's discussed in the field

9  and in the literature, that, to the extent that trauma bonding

10  has been studied in the pimp-sex worker context, it is plainly

11  about, at least largely about, the coercive techniques being

12  used to facilitate sexual conduct with a third party.

13        THE WITNESS:  Exactly.

14        THE COURT:  And, again, nothing like that in the

15  grooming child sexual abuse context beyond sort of the

16  institutional authority positions that you've discussed.

17        THE WITNESS:  There have been studies, though, that

18  have looked at specifically comparing the behaviors associated

19  with grooming for the purposes of sexual abuse and those being

20  the same behaviors, techniques, and strategies as utilized by

21  the pimps.  So to the extent that what we're talking about are

22  groups of behaviors, they're the same behaviors, so they're

23  being -- you're describing behavior that doesn't depend on

24  whose sexual gratification the behaviors are being done in

25  service of.  You're talking about principles of coercion and

1    manipulation to get somebody to do anything that you want them

2    to do, for your benefit or for someone else's.  And that's what

3    the scientific literature talks about, that the grooming is

4    really a pattern of coercive control, manipulative behavior,

5    strategies and techniques that are done to increase one's

6    ability to coerce another.

7                THE COURT:  Thank you.

8                MS. POMERANTZ:  Dr. Rocchio, switching gears --

9                THE COURT:  Let's actually break before we switch

10   gears, to extend the metaphor.  We'll take a ten-minute comfort

11   break.

12               MS. POMERANTZ:  Thank you, your Honor.

13               (Recess)

14               THE COURT:  All right, Ms. Pomerantz, you may proceed.

15   And, Dr. Rocchio, you can take your mask off.

16               THE WITNESS:  Thank you, your Honor.

17   BY MS. POMERANTZ:

18   Q.  Dr. Rocchio, does the relationship of trust and attachment

19   between a victim and a perpetrator impact disclosure?

20   A.  Yes.

21   Q.  How so?

22   A.  In a couple ways.  First, in a relationship of trust and

23   attachment between a victim and a perpetrator, that can and has

24   been established to cause a great deal of confusion on the part

25   of the victim about what is and is not abusive.  So to the

1    extent that someone doesn't recognize that what's happening to

2    them or doesn't cognitively label it as abuse, obviously that's

3    not something that can be reported.

4           But then of course the relationship itself also

5    functions to make disclosure less likely, because either the

6    individual has been made, in the course of the relationship, to

7    feel somewhat responsible, they might feel shame, or they may

8    blame themselves; or to the extent that they've come to care

9    for the person who's harming them, they may be afraid of

10   getting that individual in trouble; or to the extent that the

11   relationship as a whole clearly has positive elements to it

12   apart from and distinct from the abusive elements, they may --

13   it's fulfilling some need on the part of the victim, they may

14   be fearful of losing those pieces.

15   Q.  Based on your experience, research, and training, are you

16   familiar with delayed disclosure?

17   A.  I am.

18   Q.  What is delayed disclosure?

19   A.  "Delayed disclosure" is a term that's used in the

20   literature to refer to telling about an experience of, well, in

21   this case, sexual assault at some point after the event has

22   occurred.

23   Q.  Does disclosure of childhood sexual abuse depend on the

24   victim's age?

25   A.  So there have been a number of studies that have looked at

1    what are some of the predictors of delayed disclosure and to --

2    the studies that have been done that have looked at different

3    age groups have found that those ages 12 to 18, that is,

4    adolescents, are much more likely to have a delayed disclosure,

5    as opposed to adults.  So rates of disclosure kind of match up

6    closer to the time of event as somebody ages.

7    Q.  And in terms of adolescents, can you explain how common

8    disclosure is and why.

9    A.  So the rates of delays disclosure have been studied a lot

10   in various populations.  And so we know most of the studies

11   show that the majority of victims of childhood sexual abuse who

12   are abused during adolescence don't disclose until sometime

13   later, typically in adulthood.  And there are other factors

14   that are associated with delayed disclosure in adolescents, but

15   in terms of age that would be one.

16   Q.  Can you explain why disclosure of childhood sexual abuse is

17   not common among adolescents?

18   A.  Part of it has to do with the developmental life stage of

19   an adolescent individually.  I mean, they -- we know that even

20   if an adolescent does tell, for example, anyone, they're

21   likely, most likely to tell a peer.  Adolescents tend not to

22   like to talk to adults.

23        Also, adolescents often like to think of themselves as

24   older and more competent.  To the extent that they are involved

25   in a sexually abusive relationship with an older person, they

1    may not believe that relationship to be abusive.  They may

2    believe that the two of them are in love.  They may have been

3    deliberately misled to believe that it is somehow a love, a

4    love relationship.  So they, they don't identify it or label it

5    as abuse.

6            Also, there's, as with any form of sexual abuse,

7    sexual assault, in childhood or otherwise, there's a great deal

8    of shame and stigma, and adolescents are, again,

9    developmentally as a group notoriously sensitive to fear of

10   being judged.

11           And then finally, they don't want to get in trouble.

12   They don't want their freedom restricted.  There are, you know,

13   studies that have been done talking to teenagers or adults

14   about why they did or didn't disclose at various points in

15   time, have identified all of these as factors, among others.

16   Q.  Based on your experience, research, and training, how do

17   people who have experienced childhood sexual abuse talk about

18   or disclose the abuse?

19   A.  So this is something that's really been studied in terms of

20   the literature looking at how and why do people disclose or not

21   disclose.  And one of the consistent findings is that

22   disclosure most often takes place to appear not -- for an

23   adolescent to appear and for adults -- to friends, not to

24   formal agencies.

25           I'm sorry.  Can you repeat the question?

Q.  Yes.  The question was, when -- based on your experience,
research, and training, how do people who have experienced
childhood sexual abuse talk about or disclose the abuse?
A.  Basically that is something that occurs in the context of a
relationship, and the disclosure comes out kind of over time in
the context of that relationship.
Q.  What doctors contribute to how much a person discloses
about the sexual abuse they experienced?
A.  That will depend on the level of safety that they feel in
the relationship.  That will also depend on the response that
they're getting from the person that they're making --
beginning to make the initial disclosure to.  So, for example,
research that's been done on barriers to disclosure, as well as
research that's been done to train and teach people on how to
respond when receiving the disclosure, has found, you know,
things that imply any sort of blame, shame, minimization, or
negative response will certainly shut down the process of
disclosure quite -- and think, you know, to the extent that
you're responding empathically to the extent that you're
listening and attending to these, to the extent that that
disclosure is happening in the context of a relationship of
trust and safety, then the disclosure is more likely to evolve
over time.
Q.  How if at all does memory play a role in disclosure?
A.  So when we're talking about child sexual abuse, when we're

1    talking about any event, there are general principles of

2    memory, and those would apply to memory, general well-accepted

3    principles of memory, that would apply to experiences of sexual

4    abuse as well.

5            So to the extent that we know everybody pays attention

6    to and attaches significance to some aspects of an event more

7    so than others, what a sexual abuse survivor discloses and the

8    pieces of the story that they -- or their experiences, I'm

9    sorry -- that they remember are going to be those things that

10   were central details.  They are going to have relatively good

11   memory most of the time for the gist of the event and for the

12   details that they attended to and were most significant to

13   them.  But their memory for peripheral details, we know, can

14   fade away and weaken or change with time.

15   Q.  You just mentioned peripheral details.  What do you mean by

16   that?

17   A.  So in the memory literature, again, there is often a

18   distinction made between what are considered to be central

19   details and peripheral details.  So the central details are

20   subjectively defined as whatever it is an individual is paying

21   attention to and attaching significance to at the time of an

22   event.  And those are the details that get encoded in memory

23   and are then later available for retrieval at the time of

24   recall.

25   Q.  Can you give an example.

A.   Sure.  If we're talking about child sexual abuse, someone

may have attended to the -- and known full well that they were

being sexually abused and they may have very clear memory of

certain sounds, certain smells, breath, certain physical

sensations.  Alternatively, someone who is dissociating and

trying very hard not -- to not think and not attend to what's

happening to them, they may have very vivid details of the

swirls on the ceiling or the pattern on the wallpaper.

Q.   Dr. Rocchio, how do the topics of memory that you just

testified about fit into your expertise?

A.   So as a psychologist, again, these general principles of

memory are part of what I've been trained in throughout my

career and, as a trauma psychologist in particular, certainly

how individuals talk about their experiences, how they remember

what's happened to them and what is typical, in terms of

memory.  Again, what are the general principles about memory is

absolutely part of the literature and the research within the

field of trauma psychology, as well as psychology generally,

more broadly.

Q.   In your education, did you learn about delayed disclosure?

A.   We taught -- we learned certainly about how people tell

their stories.  And certainly when I was trained in assessment

techniques, for example, in my training, and I was taught about

how to ask about abuse experiences, I was also told, you know,

be mindful that if someone answers your questions, this may be

1    the first time they've ever talked about it.

2                Similarly, through trainings and readings and in my

3    graduate program, also being taught that when you make an

4    assessment it's really important, when someone is talking about

5    their experiences, to inquire of them what their experiences

6    were like with disclosure, because that can be so impactful.

7    Q.  In your clinical practice, have you treated and evaluated

8    patients who did not disclose sexual abuse they experienced as

9    children but disclosed such abuse later?

10   A.  Yes.

11   Q.  Can you explain.

12   A.  I've, as I mentioned, when I do an assessment and I'm

13   talking with people about experiences of child sexual abuse,

14   one of the common and important questions I will ask is: and at

15   the time that this was happening or at some point later, did

16   you share your experiences with anyone; did you tell anyone.

17   And as I said, in terms of a -- in a clinical setting, that

18   information is very important.  We know that the responses of

19   the person that they told have significant impact on the

20   adverse, potentially adverse outcomes.

21               Also, of course we know that if people don't tell,

22   then that also means they likely didn't get medical care or

23   assistance at the time of the event.  And that also is highly

24   relevant.

25               So I see that a lot in my clinical practice.  And

1   often I've had individuals who, as, you know, older adults, say

2   to me, this is the first time I've ever told anyone, I've never

3   told anyone that this happened.

4   Q.   How common is delayed disclosure in the patients you treat

5   and evaluate in connection with your clinical practice?

6   A.   It's very common.  The majority of the patients that I work

7   with who've -- who've experienced childhood sexual abuse, like

8   all victims of child sexual abuse, the abuses, a majority that

9   has occur, most likely will occur in the context of a

10  relationship.  And we know that the closer the relationship

11  between the victim and the perpetrator, the more delayed the

12  disclosure is.

13       So I would say that it's -- it's certainly not rare

14  but it's not common necessarily that I am always the first

15  person that the individual has told, but it's definitely more

16  common than not that they did not tell someone at the time that

17  it was occurring, that they told at some point significantly

18  later in time.

19  Q.   When patients have disclosed that they experienced

20  childhood sexual abuse to you for the first time, were your

21  patients adults or children?

22  A.   I would say that when they're making an initial disclosure

23  for the first time, they have been adults, although, when I was

24  working in an inpatient setting at times I, I certainly worked

25  with adolescents who had made disclosure while they were still

1    kids around the time, so not as much delayed.

2    Q.   Approximately what percentage of the patients you treated

3    and assessed disclosed that they experienced childhood sexual

4    abuse at the time of the abuse?

5    A.   A very, very small number.  I, I can probably count on one

6    hand the number of patients, in my private practice, who said

7    that they told right away.  With younger children in

8    particular, we also know that it's more likely with very young

9    children not so much that they're just going to spontaneously

10   go to someone and tell them but that's it's going to be

11   accidentally discovered or someone else finds out about it and

12   then inquires, and that's how that information comes out.  But,

13   again, we know that most victims of childhood sexual abuse

14   don't end up disclosing until some significant point in time

15   after the event, and that's consistent with what I've

16   experienced in my practice.

17   Q.   You just mentioned very young children.  What are you

18   referring to?

19   A.   We know that delayed disclosure happens over time.  But we

20   also know that the younger the child, the more likely it is

21   that the disclosure or the discovery of the abuse happens

22   accidentally.

23   Q.   Are you aware of other psychologists treating and evaluate

24   patients who have delay disclosing childhood sexual abuse?

25   A.   Yes.

1   Q.   How?

2   A.   Through the clinical literature, through the training.

3   Again, if either I'm conducting training and I'm teaching

4   others or I'm participating in the training that's talking

5   about what are some of the common themes and issues and things

6   that you need to deal with in a psychotherapy and clinical and

7   assessment context, we'll often talk about disclosure, and in

8   particular things like, we also know that so many individuals

9   of child sexual abuse but also of rape and sexual assault of

10  all kinds don't necessarily label their experiences as such.

11  So when I'm teaching, or ways that I've been taught and trained

12  is to use behavioral descriptors of what I'm asking about.  So,

13  for example, there have been numerous studies that say, you

14  know, if you ask a group of individuals, say college students,

15  have you ever had an experience where someone physically forced

16  you to engage in sexual activity against your will, they'll,

17  you know, a certain percentage of them will say yes.  And then

18  if you follow you and say, have you ever been raped, no.  So

19  you have to use behavioral descriptors, because people for a

20  variety of reasons don't necessarily label their experiences as

21  abuse.  And that's also true with varying kinds of violence as

22  well.  Have you been abused, versus, have these behaviors

23  happened to you.

24  Q.   Is your clinical experience regarding disclosure consistent

25  or inconsistent with that of other psychologists who treat and

1    evaluate patients who have delayed disclosing childhood sexual

2    abuse?

3    A.   It's consistent with my peers and reports that I've read in

4    the clinical literature, yes.

5    Q.   In your forensic practice, have you dealt with

6    disclosure-related issues?

7    A.   I have.

8    Q.   Can you explain.

9    A.   Disclosure-related issues in a forensic setting can come up

10   particularly, for example, when there are issues related to the

11   statute of limitations.  So in a recent case, I was asked to

12   evaluate the time at which an individual reasonably came to be

13   aware of a connection between their present difficulties or

14   potential connection between their present difficulties and the

15   alleged abuse.  And part of that case involved my looking at,

16   you know, were there any reports made about the abuse at the

17   time, because I'm working with an adult who's alleging

18   something during childhood, and if so to whom and under what

19   circumstances.  And, you know, even if the reports weren't made

20   at the time of the abuse, for example, did this person talk

21   about their experiences with their therapist or when they were

22   hospitalized for substance abuse, what did they have to say.

23          So I'm looking at what they disclosed, how they

24   disclosed it.  I'm obviously, in a forensic setting, comparing

25   that to what they're telling me now and with what the fact

1   pattern is from other data sources.

2   Q.  How common is it for you to consider disclosure-related

3   issues in your forensic practice?

4   A.  Very.

5   Q.  How do the disclosure-related behaviors you've seen in your

6   forensic practice compare to those you've seen in your clinical

7   practice?

8   A.  Very similar.  Very, very similar.

9   Q.  Are your opinions on disclosure based in part on your

10  review of the scientific literature?

11  A.  Scientific and clinical literature, yes.

12  Q.  Can you describe at a high level the literature upon which

13  your opinion is based?

14  A.  So there's different ways that the literature has looked at

15  the issue of disclosure.  I spoke earlier about prevalence

16  rates where you're asking people, often in anonymous surveys

17  but sometimes in interview settings, but in research studies,

18  about a variety of experiences.  And typically in those

19  studies, you will ask -- people are asked about their

20  experiences with rape, sexual assault, childhood sexual abuse.

21  And so you can get some idea of what percentage of people in

22  various studies across time report particular events in their

23  lives.  So you get an estimate of prevalence.

24          You can compare that to look at disclosure in two

25  different ways.  You can look, for example, if you're talking

1    about disclosure to formal agencies, you can then compare that

2    with uniform crime reports and look at the statistics for what

3    rate, what percentage, what is the prevalence of these

4    particular crimes being reported to -- through, through the

5    legal system.

6          Also, when you're doing the interviews, you can look

7    at asking individuals: and did you disclose, and if so, to

8    whom.

9          So there are lots of different studies that can look

10   at disclosure.  There's also research that's been done looking

11   at, again, how people tell and, you know, closer in time, not

12   just with adults looking back retrospectively, but times when

13   there's been -- someone has been known to have been abused, and

14   there have been studies that have been done looking at, do they

15   tell or not.  I referred earlier to the study of very young

16   children who had presented with sexually transmitted diseases,

17   for example, who were later asked about their experiences, and

18   you can look at, in real time, studies of what they say and to

19   whom.

20         THE COURT:  Ms. Pomerantz, let's move to the next

21   opinion.

22   BY MS. POMERANTZ:

23   Q.  Dr. Rocchio, does childhood sexual abuse create higher

24   risks for victims?

25   A.  Yes, it does.

1   Q.   Can you please explain.

2   A.   So there's about been a lot of literature looking at what

3   are some of the adverse outcomes in populations of individuals

4   who have been sexually abused, among other adverse childhood

5   events.   So there's really two primary bodies of literature.

6   One is the general well-established literature on adverse

7   childhood events that -- of which childhood sexual abuse is

8   one, that has documented that individuals who have had higher

9   numbers of adverse events that have occurred to them during

10  childhood are at much higher risk of a whole range of health

11  difficulties -- gastrointestinal difficulties, heart problems,

12  all kinds of health-related issues -- as well as psychological

13  and psychiatric difficulties, in particular depression,

14  anxiety, post-traumatic stress disorder.   So there's that body

15  of literature.

16        And then there have been numerous studies that have

17  looked more specifically at and narrowly at populations of

18  individuals who have been sexually abused or who have reported

19  to have been sexually abused.   And then they have looked over

20  time and found that individuals who have reported histories of

21  childhood sexual abuse have both much higher frequencies of

22  various psychiatric illnesses and difficulties, as well as

23  higher severity of symptoms.

24        And then, thirdly, the post-traumatic stress disorder

25  literature has found that, when individuals have experienced a

1    traumatic event, which is part of the criteria for later

2    developing post-traumatic stress disorder, those who

3    experienced childhood sexual abuse and sexual abuse generally,

4    as compared to those who have experienced other types of

5    traumatic events, are at higher risk for developing

6    post-traumatic stress disorder.

7    Q.  Is there empirical data to support your views about the

8    prevalence of adverse effects of childhood sexual abuse?

9    A.  Yes.  There's a significant body of literature.

10   Q.  Can you explain briefly.

11   A.  Yes.  The literature I just talked about, the adverse-

12   childhood-events literature, as well as the scientific study of

13   consequences and sequelae of childhood sexual abuse.

14   Q.  When you review articles and studies about the adverse

15   effects of childhood sexual abuse, what sorts of things are you

16   looking for to determine the quality of the studies and

17   articles that you're relying on.

18   A.  Things like, is it appearing in a peer-reviewed journal,

19   how large was the sample, have the findings been replicated

20   over time, have they been replicated in various studies.  You

21   want to know, is this something that is generally accepted

22   within the scientific community as well as within the

23   profession.  And to the extent that those concepts then are

24   recurring in the literature and the studies are continuing to

25   advance our understanding and knowledge and finding similar

1    kinds of things over time and across populations.

2              THE COURT:  Ms. Pomerantz, I have what I need on this

3    opinion, which I think is the last?

4              MS. POMERANTZ:  That's right, your Honor.  If I may

5    just have a moment to consult with my colleagues?

6              THE COURT:  You may.

7              MS. POMERANTZ:  Thank you.

8              (Counsel confer)

9              MS. POMERANTZ:  Thank you, your Honor.  Nothing

10   further from the government.

11             THE COURT:  All right.  Thank you.

12             Mr. Pagliuca.

13             MR. PAGLIUCA:  May I inquire, your Honor?

14             THE COURT:  You may.

15             MR. PAGLIUCA:  Thank you.

16   CROSS-EXAMINATION

17   BY MR. PAGLIUCA:

18   Q.  Dr. Rocchio, I just want to start with some process here.

19   I show that you met with the government 14 times in the last

20   year or so.  Is that correct?

21   A.  If you're including telephone contacts, perhaps.  I'm not

22   sure how many times we've spoken.

23   Q.  OK.  Does that sound about right, 14?

24   A.  It could be.  A number of those were around scheduling and

25   things, so sure.

1    Q.  OK.

2    A.  I'm not sure, though.

3    Q.  Have you reviewed any of the notes taken by the government

4    during your interviews?

5    A.  No, I have not.

6    Q.  Did you take any notes during any of your interviews?

7    A.  Only on topics that I wanted to go and pursue, like subject

8    headings of areas that they wanted me to speak about and

9    educate the Court about.

10   Q.  And did you record those topics in some sort of file?

11   A.  No, I did not.

12   Q.  Do you have those notes?

13   A.  No, I do not.

14   Q.  What did you do with those notes?

15   A.  At the time that we were talking, I wrote, like, "grooming"

16   as a subject matter, and then when I went and researched the

17   literature, I threw those notes away.

18   Q.  OK.  So is that your practice, to take notes and then throw

19   them away?

20   A.  It depends on the purpose of the note.  If the note is just

21   a reminder to me, there's no reason for me to keep it.

22   Q.  And do you have a file in connection with your retention in

23   this case?

24   A.  I do.

25   Q.  What do you have in your file?

A.  I have a copy of the agreement, my agreement with the

government, my engagement agreement.  I have a copy of the time

spent, the date and the time spent and what activity I engaged

in.  I have copies of various filings that the government has

provided me with, relevant to this hearing today.

Q.  And did you review that file in anticipation of testifying

here today?

A.  I can.

        MR. PAGLIUCA:  Your Honor, I'm going to ask for

production of that file at this point, please.

        THE COURT:  Ms. Pomerantz.

        MS. POMERANTZ:  Your Honor, may I just have one

moment, please?

        THE COURT:  You may.

        (Counsel confer)

        MS. POMERANTZ:  Your Honor, the government has

produced the materials that were in the possession of the

government, the notes that the government had taken in

connection with its meetings and phone calls with Dr. Rocchio.

That is what we are required to produce under the Jencks Act.

        And I would note, your Honor, that I just -- I don't

have, in terms of what the defense counsel is requesting, as I

noted, I would just -- it is about the Jencks Act, and we have

produced the materials that are in the government's possession,

including the notes, and have indicated what materials we

1   provided to Dr. Rocchio.

2            MR. PAGLIUCA:  Do you need a response from me, your

3   Honor?

4            THE COURT:  Go ahead.

5            MR. PAGLIUCA:  Well, your Honor, I understand Jencks

6   Act production, but this is a separate issue.  She relied on

7   this in preparation for her testimony today, and I believe that

8   under Rule 16 I am allowed to examine whatever she relied on in

9   anticipation and preparation for her testimony here today.

10            This would be part of the bases for her opinion, your

11   Honor.

12            THE COURT:  Well, I don't know if it is.  Notes that

13   have a subject heading "grooming," for example, that she threw

14   away which are not in the file are not a bases for her opinion.

15   So I don't know that the whole file is subject to that theory.

16            The contract between her and the government is not a

17   basis for opinion, but you've asked for that since she's

18   included that in the file.

19            MR. PAGLIUCA:  I have that, your Honor.

20            THE COURT:  Right.  But you see the point.

21            MR. PAGLIUCA:  I understand.  But I don't know what is

22   in her file, is my point.

23            THE COURT:  Right.  Well, so then the question, I

24   think, is:  What is in your file that forms the basis for your

25   opinion?  That will get us to where we need to get.

1   BY MR. PAGLIUCA:

2   Q.  What is it in your file that forms the basis of your

3   opinion?

4   A.  There's nothing in my file that forms the basis of my

5   opinion.  What's in my file are, for example, the motion for

6   today's hearing, a copy of the disclosure for some of the

7   witnesses, a redacted copy of those sorts of things, but

8   nothing from which I'm basing my opinion on today.

9   Q.  OK.  You mentioned a contract.  You're billing the

10  government at a rate of $450 an hour.  Is that correct?

11  A.  That is correct.

12  Q.  And your initial government contract is from $45,000.  Is

13  that right?

14  A.  Up to $45,000.

15  Q.  And how much have you been paid up to today?

16  A.  Nothing.

17  Q.  And so you need to complete your contract before you

18  receive your $45,000; is that right?

19  A.  No.  That's not my understanding.  I need to prepare an

20  invoice and provide it to the government.  And I haven't had a

21  chance to do that yet.

22  Q.  OK.  And do you know what your final invoice will look like

23  in terms of hours spent up till today?

24  A.  I don't at this point, no.

25  Q.  How many hours have you spent up till today?

1    A.  I haven't tabulated them.  I, I could make an estimate if

2    you like, but I --

3    Q.  Sure.

4    A.  -- don't know for sure.

5             About 25.

6    Q.  25 hours.

7             And do you keep time records of what you do?

8    A.  I do.

9             MR. PAGLIUCA:  I'd ask for production of those time

10   records, your Honor.

11            It doesn't have to be today.

12            THE COURT:  On what grounds?

13            MR. PAGLIUCA:  Well, your Honor, it goes to the motive

14   and bias of the witness, as a financial gain through this

15   contract.

16            THE COURT:  It's a perfectly acceptable question in

17   front of the jury.  But what's your entitlement to the time

18   records?

19            MR. PAGLIUCA:  So we know how much time she's spent on

20   this and what her anticipated compensation is.

21            THE COURT:  I'm just asking, I mean, this sounds like

22   broad-reaching discovery.  Under what rule or other authority

23   are you entitled to that?

24            MR. PAGLIUCA:  I believe, your Honor, I'm entitled to

25   this under *Brady* and *Giglio*, because this is motive and bias

LBAAMAX3ps                    Rocchio - Cross

1   for testimony.

2             THE COURT:  You can submit authority on that.  I mean,

3   certainly appropriate grounds for cross.  I'm not sure, absent

4   some specific motion for discovery, that I've ever seen expert

5   time records turned over.

6             MR. PAGLIUCA:  Understood, your Honor.

7   BY MR. PAGLIUCA:

8   Q.  Dr. Rocchio, I'd like to talk to you about some of the

9   terms that you've been using here today.  The first one I want

10  to ask you about is the definition of "child."  Do you recall,

11  when you discussed this case with the government on April 9th

12  of this year, that you defined "child" for the government as

13  someone under the age of consent?  Do you recall that?

14  A.  I don't specifically recall that, no, I'm sorry.

15  Q.  Is that a definition of "child," someone under the age of

16  consent?

17  A.  I would -- I would define "child" as someone under the age

18  of 18.

19  Q.  Well, I'm looking at page 3 of the interview notes produced

20  in connection with your interview on April 9, 2021.

21            THE COURT:  Do you have a 3500?

22            MR. PAGLIUCA:  I do, your Honor.  I'm at page

23  3502-004.  That's the beginning of this interview, April 9,

24  2021.  And if we go to -- well, that's the page 3 of that

25  interview.  The top of the page.

LBAAMAX3ps                    Rocchio - Cross

1   Q.  Did you recall discussing this with Ms. Comey, Ms. Moe,

2   Ms. Pomerantz, Mr. Rohrbach, and telling them that "child" is

3   anyone below the age of consent?  Do you recall that?

4   A.  I don't have anything on the screen in front of me, so I --

5   I'm not sure what you're referring to.

6   Q.  I'm just asking if you recall that at this point.

7   A.  No.  Sorry.  I don't.

8   Q.  OK.  Do you have any reason to believe that any of those

9   AUSAs would take that down incorrectly?

10  A.  I'm not sure of the context under which it was taken.  I

11  think, you know, for -- I haven't reviewed it.  I didn't have a

12  chance to correct it.  I, I really have no idea.

13  Q.  OK.  Also, you used the term "sexual abuse," and that's

14  nonconsensual sexual touch.  Is that correct?

15  A.  That is one of the definitions, yes.  It doesn't have to

16  be.

17  Q.  Well, is that the definition that you gave the government

18  in April of 2021; do you recall?

19  A.  I don't recall specifically what I said during the phone

20  call in April, no.

21  Q.  Do you recall defining -- do you define "nonconsensual"

22  as -- when someone says no or the person is too intoxicated to

23  give consent or the person is below the age of consent, is that

24  a definition of "nonconsensual"?

25  A.  Those are examples of "nonconsensual."  It's not an

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

LBAAMAX3ps                    Rocchio - Cross

1    exhaustive definition.

2    Q.  OK.  And when you say "below the age of consent," you

3    haven't defined that.  Correct?

4    A.  In, in what you're reading to me?

5    Q.  You know that the age of consent varies from state to state

6    and country to country, correct?

7    A.  Correct.

8    Q.  And so when you're talking about "below the age of

9    consent," you're talking about a --

10             MS. POMERANTZ:  Objection, your Honor.

11             THE COURT:  Overruled.

12             Overruled.  Go ahead.

13             MR. PAGLIUCA:  Thank you, your Honor.

14   Q.  When you're talking about "below the age of consent,"

15   you're talking about whatever the age is in the particular

16   jurisdiction for someone to be able to consent to sexual

17   contact, correct?

18   A.  As one example, yes.

19   Q.  OK.  You also talked about "trauma," which I understand you

20   define as "exposure by either directly experiencing or

21   witnessing serious bodily injury, death, or sexual violation."

22   Is that correct?

23   A.  "Sexual violence," I believe.  That's the definition in the

24   DSM-V, criterion of trauma.

25   Q.  And that's the definition you've been using here today in

1    connection with your testimony, correct?

2    A.   It's one of the definitions I've been using here today in

3    connection with my testimony, yes.

4    Q.   When you talk about "trauma," that's the definition you've

5    been using, correct?

6    A.   Trauma is a continuum, so that is one of the definitions of

7    "trauma," but other things have been found to be traumatic in

8    individuals' experiences that do not necessarily rise to the

9    level of criterion A in PTSD.  For example, there's a whole

10   'nother section in the DSM called "Other Stressor and Trauma

11   Disorders" that could refer to other traumatic events that

12   don't fit that specific definition, but childhood sexual abuse

13   is commonly understood to fall under the definition of "sexual

14   violence."  So to that degree, yes.

15   Q.   OK.  You've described that you're a clinical psychologist,

16   and that is someone who treats clients for presenting

17   psychological issues, correct?

18   A.   That's part of what I do, yes.

19   Q.   Right.  And the job of a clinical psychologist is to assess

20   the client, treat the client with the expectation proving --

21   improving that person, correct?

22   A.   In a treatment capacity, yes.  But I do a lot of things as

23   a clinical psychologist in addition to that.

24   Q.   Now, I know you've described this, but I want to make sure

25   we're all on the same page, that your job as a clinical

1    psychologist is to not independently investigate what the

2    client may or may not be telling you, correct?

3    A.   In a treatment setting for the patients that I'm treating,

4    yes, that's correct.

5    Q.   You don't go out and talk to witnesses or try to prove or

6    disprove whatever your client is telling you in the treatment

7    setting, correct?

8    A.   Correct.

9    Q.   It wouldn't be appropriate for you to do that, correct?

10   A.   Correct.

11   Q.   And generally, you're accepting what the client is telling

12   you as the presenting problem and then you are trying to treat

13   that presenting problem during the course of your therapy,

14   correct?

15   A.   Yes.

16   Q.   I want -- you talked a bit about your job as a forensic

17   psychologist.  How many times have you testified as a forensic

18   psychologist?

19   A.   In a courtroom or also in depositions?

20   Q.   Both.  Let's start with courtroom.  I think you said twice.

21   Correct?

22   A.   Yes.

23   Q.   And one of those was a criminal case where you testified on

24   behalf of the defendant; is that right?

25   A.   Yes.

LBAAMAX3ps                    Rocchio - Cross

 1   Q.  And then the other one there was no transcript of; is that

 2   correct?

 3   A.  That is correct.

 4   Q.  In either of those cases -- well, let me put it the other

 5   way.  In neither of those cases were you qualified as an expert

 6   on grooming, correct?

 7   A.  Grooming is part of the dynamic, well established to be

 8   under the rubric of interpersonal violence, so it would fall

 9   into the category in which I was declared an expert.

10   Q.  That wasn't my question.  My question was, in neither of

11   those cases were you qualified as an expert in the subject, the

12   specific subject of grooming, correct?

13   A.  Correct.

14        THE COURT:  Did you testify about grooming in those

15   instances?

16        THE WITNESS:  I testified about grooming in one of

17   those, and I testified about coercive control and dynamics in a

18   relationship in another.

19   Q.  And how many times have you been actually deposed in your

20   role as a forensic psychologist?

21   A.  I believe four.  I'm not positive, but around that.

22   Q.  So in your capacity as a forensic psychologist, you've

23   testified maybe six times; is that right?

24   A.  Correct.

25   Q.  OK.  Now, as a forensic psychologist, you are typically

1   hired by a party in the litigation.  Correct?

2   A.  Or in a criminal matter, yes.

3   Q.  Well, so that would either be the defendant or the

4   prosecutor, right?

5   A.  Yes.

6   Q.  Which is a party in the litigation, correct?

7   A.  Yes.

8   Q.  OK.  And in a civil case, you're going to be either hired

9   by the plaintiff or the defendant's lawyer, correct?

10  A.  Correct.

11  Q.  Now, they don't tell you to go out and just do an

12  independent investigation on your own and then report back to

13  them, whoever hires you.  True?

14  A.  I -- I'm asked to do an independent investigation as it

15  pertains to the specific question I'm being asked to answer in

16  the course of my evaluation.

17  Q.  Yes, I understand that.  But whoever hires you gives you

18  material to review and then asks you a specific question based

19  on the material that that party has given you, correct?

20  A.  Not necessarily, no.

21  Q.  Have you ever had a lawyer who hired you just say, go out

22  and do whatever you want to do, bill me however much you want

23  to bill me, and then tell me what your findings are?  Has that

24  ever happened in your career?

25  A.  In that specific way, no.

LBAAMAX3ps                    Rocchio – Cross

1  Q.  "Forensic psychology" refers to the professional practice
2  by any psychologist when applying psychology to the law to
3  assist to address legal matters.  Is that the definition?
4  A.  Yes.
5  Q.  And forensic and therapeutic roles are very different,
6  correct?
7  A.  Yes, they are.
8  Q.  And a therapeutic role typically is not going to involve a
9  forensic component, correct?
10 A.  Correct.
11 Q.  And that would be somewhat of a boundary violation,
12 correct?
13 A.  It would be a dual role.
14 Q.  OK.  Do you consider yourself to be in a forensic capacity
15 here?
16 A.  Here today, yes.
17 Q.  Yes.  And so subject to the forensic guidelines by the APA,
18 correct?
19 A.  That's correct.
20 Q.  On April 23rd, the government sent a letter outlining what
21 the government said were your opinions in this matter.  Did you
22 review that letter before the government sent it?
23 A.  I've reviewed that letter, I'm not sure at what stage in
24 the process.  I believe so, though, yes.
25                (Continued on next page)

LBAGmax4                    Rocchio - Cross

1    BY MR. PAGLIUCA:

2    Q.  I want to talk a little bit about some of the opinions that

3    are in your letter from the government of April 23rd, 2021.  So

4    I think the first opinion that I have identified relates to

5    individuals with particular vulnerabilities are often targeted

6    by perpetrators of sexual abuse.

7              Do you recall that?

8    A.  I do.

9    Q.  So let's identify some of the categories of people that

10   have particular vulnerabilities.

11             So that could include economically and disadvantaged

12   people; right?

13   A.  Yes.

14   Q.  That would include people who don't have any family at all;

15   correct?

16   A.  It could, sure.

17   Q.  It could include people who have one parent; correct?

18   A.  Yes.

19   Q.  It could include people who have two parents but one of

20   them is abusive; right?

21   A.  Yes.

22   Q.  It could include people who have cognitive disabilities;

23   correct?

24   A.  Yes.

25   Q.  It could include people who have emotional disabilities;

LBAGmax4                    Rocchio - Cross

1    correct?

2    A.  Depending on the type of emotional disability.  I would

3    have to look at the literature, but it could.

4    Q.  How about a personality disorder?

5    A.  I'm sorry, so what is the question?

6    Q.  Would that be somebody who is in this vulnerable

7    population?

8    A.  I'm not sure whether there's been specific research on

9    personality disorder and risk of victimization, so I couldn't

10   speak to that.

11   Q.  What about people who have unstable lives?

12   A.  Again, depending on the specific nature of the instability.

13   Q.  People with low self-esteem, would that fall under the

14   category of particular vulnerabilities?

15   A.  Those have been spoken about in the literature.  Again, I'm

16   not sure about that particular construct and the degree to

17   which it's been studied.

18   Q.  People who abuse drugs and alcohol, are they in a

19   vulnerable position?

20   A.  Research in child and sexual abuse has looked more at the

21   parental use of drugs and alcohol.  I would have to go back to

22   the science to look at an individual's personal use of drugs

23   and alcohol as to whether that specifically is or is not found

24   to be a risk factor.

25   Q.  People who have been previously sexually assaulted, are

LBAGmax4                          Rocchio - Cross

1    they in the particularly vulnerable category?

2    A.  They're at much higher risk for revictimization, yes.

3    Q.  So that's a yes?

4    A.  Yes.

5    Q.  There's not like a list I can go to to say, these are all

6    vulnerable people who are more likely to be sexually abused?

7    A.  Actually, there are descriptions of lists of vulnerable

8    populations in the scientific literature.

9    Q.  But they're not necessarily all the same; correct?

10   A.  I don't understand.

11         THE COURT:  I don't understand your question.

12   BY MR. PAGLIUCA:

13   Q.  If I go to the DSM 5, for example, and I try to look up

14   populations of people with particular vulnerabilities, I'm not

15   going to find a list that the American Psychological

16   Association has come up with to say that these are people with

17   particular vulnerabilities; correct?

18   A.  There are a number of problems with that question.  I can't

19   answer it.

20   Q.  Do you have a list, a definitive list of the vulnerable

21   population?

22   A.  To the extent that I have reviewed -- I haven't written it

23   down.  To the extent that I have knowledge and am informed by

24   my education, background, skills and training, I'm aware of the

25   vulnerable populations that have been consistently identified

1   in the literature to be at higher risk for sexual abuse.

2   Q.  And vulnerable populations are at higher risk for many

3   things; correct?

4   A.  Depending on what you're talking about, sure.

5   Q.  Well, vulnerable population?

6   A.  Vulnerability implies higher risk, yes.

7   Q.  Vulnerable populations could be at higher risk for being

8   physically assaulted; correct?

9   A.  Yes.  But the research has differentially looked at risk

10  for, for example, sexual victimization versus other kinds of

11  victimization.

12  Q.  Vulnerable populations can be at higher risk for dropping

13  out of school; right?

14  A.  Certain ones, sure.

15  Q.  Vulnerable populations can be at higher risk for substance

16  abuse?

17  A.  Sure, yes.

18  Q.  Vulnerable populations can be at higher risk for health

19  issues; right?

20  A.  Yes.

21  Q.  So being in a vulnerable population means basically that

22  you're at a higher risk for something bad happening to you in

23  the future; correct?

24  A.  No.  Because you're using the term more generally than what

25  I was trying to say in my opinion.  So I'm looking at the

1   literature around which specific vulnerabilities have been

2   found to be associated with which particular outcomes or

3   adverse outcomes.  So it's not that every single vulnerability

4   has been found to increase vulnerability for every potential

5   outcome.  There's a relationship between particular types of

6   vulnerability and particular types of outcome.

7   Q.  It's also true that there can be more than one

8   vulnerability in a human being?

9   A.  Of course, yes.

10  Q.  One can be a victim of sexual abuse and have other

11  vulnerability factors; correct?

12  A.  Yes.

13  Q.  Or conversely, somebody can have vulnerability factors and

14  then become a victim of sexual abuse; correct?

15  A.  Yes.

16  Q.  I want to turn now to some of your questions about

17  grooming, okay, some of your opinions about grooming.

18          What is your definition of grooming?

19  A.  The definition that's commonly used in the literature is --

20  Q.  I didn't ask that question.

21          THE COURT:  You may answer.  Go ahead.

22          THE WITNESS:  The term grooming refers to a set of

23  deceptive strategies that are utilized by an individual to

24  establish a relationship of coercion and control for the

25  purposes of subsequent sexual exploitation and sexual abuse.

1   Q.   And is that your definition?

2   A.   It's my understanding of the definitions that have been

3   talked about in the literature.  I mean, I haven't written and

4   published a specific set definition.  It's a common definition

5   and the one I'm using in my testimony, yes.

6   Q.   I was going to ask you that question.  You have not

7   published anything specifically about grooming; correct?

8   A.   Specifically about grooming, no.  But I have certainly

9   published and made reference to grooming.

10  Q.   And you have not done any metadata studies on your own to

11  collect data about grooming; correct?

12  A.   Correct.

13  Q.   Grooming can consist of the actions that you're talking

14  about, can consist of -- I think we saw a list of 77 things on

15  it as part of your testimony; is that right?

16  A.   Those were 77 specific behaviors that had been identified

17  in the literature as potentially being part of the grooming

18  process, yes.

19  Q.   But I think we were talking about things like taking an

20  interest in another human being could be considered grooming?

21  A.   Not in and of itself.  It would depend on the pattern of

22  behavior and the context in which it's occurring.

23  Q.   Let's talk about that for a second.  Because what you're

24  saying is, it depends on the groomer's intent in doing a

25  specific act is what, in your view, makes it grooming or not

1   grooming; is that correct?

2   A.   So it -- grooming, the tactics you're referring to are a

3   series of manipulative strategies.  And to the extent that

4   those manipulative strategies are being used to increase the

5   likelihood of sexual exploitation and sexual abuse, then we

6   would describe it as sexual grooming.

7   Q.   Let me ask you a question.  In order for something to

8   become grooming, you are looking at the intent of the groomer

9   relative to the act; correct?

10  A.   So the intent and the function of the behavior relative to

11  the act has always been part of the definition of grooming,

12  yes.

13  Q.   So the answer to my question is yes; is that right?

14  A.   Yes.

15  Q.   So absent the intent to sexually abuse someone, there are a

16  myriad of actions that one could consider grooming?

17  A.   The actions themselves are in the function of the

18  establishment of a relationship of trust and attachment or

19  trauma bonding.  So to the extent that those behaviors build a

20  relationship, then yes, they could be in another context

21  normative behaviors.

22  Q.   And normative behaviors being normal behaviors; right?

23  A.   It could be.

24  Q.   So for example, a parent wants to take an interest in their

25  child; correct?

1   A.  Yes.

2   Q.  And a parent wants to provide for their child; correct?

3   A.  Yes.

4   Q.  And a parent wants their child to go to school; correct?

5   A.  Usually, yes.

6   Q.  And if a parent can afford for school or after-school

7   activities, the parent wants to provide for those activities;

8   correct?

9   A.  Many parents, yes.

10   Q.  And let's call them good parents, right, good parents want

11   their children to eat; right?

12   A.  Yes.

13   Q.  Good parents want to buy their children appropriate

14   presents; correct?

15   A.  Yes.

16   Q.  Good parents want everything they can get for their

17   children in a positive way; correct?

18   A.  Good parents want good outcomes for their kids, yes.

19   Q.  None of that would be considered grooming absent an intent

20   to use that conduct to manipulate the child; correct?

21   A.  Again, the grooming is about the coercion.  So to the

22   extent that those behaviors are not being done in a coercive,

23   controlling context, they would not be considered grooming,

24   correct.

25   Q.  Have you had mentors in your career?

1    A.  I have.

2    Q.  Are those mentors grooming you?

3    A.  Not for the purposes of sexual abuse, no.

4    Q.  But they could be grooming you for a job, for example;

5    right?

6    A.  Mentoring is probably the word I would use, but yes, to

7    your point -- at least the point I think you're making -- sure.

8    Q.  It's a positive thing if I'm trying to groom someone to get

9    ahead at work; correct?

10   A.  Yes.

11   Q.  Have you had mentees?

12   A.  I have.

13   Q.  Have you taken an interest in them?

14   A.  Yes.

15   Q.  And have you shown them special treatment because you're

16   interested in their professional development?

17   A.  Yes.

18   Q.  And that's not bad grooming, is it?

19   A.  That wouldn't be grooming for the purpose of sexual

20   exploitation or abuse, no.

21   Q.  Similarly, a teacher taking an interest in a student,

22   unless it's for a sexual purpose, wouldn't be grooming,

23   correct?

24   A.  Sexual and/or coercive purpose.

25   Q.  Lawyers and judges have law clerks, and they take an

1   interest in their professional development.  That's not

2   grooming, is it?

3   A.  No.

4   Q.  And the same would be true for grandparents; right?  Taking

5   a positive interest in your grandchildren, taking them to the

6   zoo, buying them presents, being there for them, reading them

7   books, having them sit on your lap, none of that would be

8   considered grooming behavior unless it's for an improper sexual

9   purpose; correct?

10  A.  Correct.

11  Q.  And the only way that you can back into this grooming

12  opinion is if you assume that the conduct that's being done is

13  being done for an improper sexual purpose; correct?

14  A.  Well, it's not an assumption.  It's part of the definition.

15  So if I'm looking at the dynamics of sexual abuse, then of

16  course I'm looking at the behaviors that occurred in the

17  context of that relationship.

18  Q.  And it assumes that sexual abuse occurred; correct?

19  A.  No.  The definition says that it's for the purposes of

20  sexual exploitation or abuse, but that could be attempted.  It

21  doesn't necessarily have to have occurred.

22  Q.  So it assumes that it's either attempted sexual abuse or

23  actual sexual abuse or exploitation; correct?

24  A.  Yes.

25  Q.  And you're not there physically when any of these behaviors

1  that you're describing occur; correct?

2  A.   Correct.

3  Q.   So you are making an assumption that whatever you are

4  hearing is accurate; correct?

5  A.   It depends on the context whether or not I'm making that

6  assumption.

7  Q.   You would make that assumption in order to label it

8  grooming; correct?

9  A.   I would, for example, in a forensic context, I wouldn't say

10 this is grooming or grooming happened.  I would say the

11 individual described behaviors that are consistent with

12 grooming, for example.

13 Q.   But for purposes of your testimony in this case, when

14 you're talking about what you're describing as grooming,

15 there's an underlying assumption that either there's an

16 attempted sexual assault or exploitation or actual sexual

17 assault or exploitation, otherwise it's not grooming; correct?

18 A.   I wouldn't agree that it's an assumption.  It's part of the

19 definition.  So --

20 Q.   We're kind of going circular here.

21          THE COURT:  Yes.  So we'll move on.  There are

22 fruitful arguments in cross-examination here, I hope you'll get

23 to that soon.

24          MR. PAGLIUCA:  Thank you, your Honor.

25 BY MR. PAGLIUCA:

1   Q.   You also talked about delayed disclosures; correct?

2   A.   Yes.

3   Q.   Now, the studies vary over when disclosure occurs for a

4   number of reasons.  First, the definition of disclosure, the

5   studies have disclosures to law enforcement, right, which is

6   one definition of disclosure?

7   A.   That's generally referred to in the literature as

8   reporting.

9   Q.   And then there's disclosure to a parent; right?

10  A.   Correct.

11  Q.   Then there's disclosure to a friend; right?

12  A.   Mm-hmm.

13  Q.   Disclosure to a teacher or other third person?

14  A.   Yes.

15  Q.   And there's really no set term of what disclosure in this

16  context means; correct?

17  A.   No, that's not correct.

18  Q.   There's also no set term on what delay means; correct?

19  A.   No, that's not correct.

20  Q.   Well, some of the studies have one week as delay; right?

21  A.   Yes.

22  Q.   And some of the studies have one month as a delay; right?

23  A.   Yes.

24  Q.   Some of the studies have one year as delay, up to one year;

25  right?

1  A.  Yes, many of the studies specifically look at disclosure

2  that is delayed, as in not occurring at the time of the abuse.

3  And then look at what are those rates at various points in

4  time, so it could be a week later, it could be a month later,

5  it could be a year later or five years later.

6  Q.  So those are all variables in this idea of when disclosure

7  occurs; right?

8  A.  They are variables in the dynamics of the delay.  They are

9  all examples of delayed disclosure at various points in time.

10  Because delayed disclosure refers to disclosure at some point

11  after the incident that's being disclosed.

12  Q.  I want to ask you some questions about memory now, which is

13  another area of your opinion.

14          You agree with me that memory is a complex topic?

15  A.  I do.

16  Q.  Memory is generally regarded as the mental registration,

17  retention and recollection of past experiences, sensations or

18  thoughts; would you agree with that?

19  A.  I would.

20  Q.  And there are a number of parts of the brain that work in

21  connection to form memories; would you agree with that?

22  A.  I would.

23  Q.  Do you know what those parts are?

24  A.  I'm not an expert on neuroscience, so I would not -- I

25  could certainly go and review the literature and get back to

1   you, but off the top of my head, no.

2   Q.  And would you agree with me that there are many things that

3   can interfere with accurate memories?

4   A.  Yes.

5   Q.  You're not a neuropsychologist; correct?

6   A.  Correct.

7   Q.  Neuropsychology is the study of human behavior as it

8   relates to the normal and abnormal functioning of the central

9   nervous system, which includes the brain; right?

10  A.  Correct.

11  Q.  You're familiar with the term confabulation?

12  A.  I am.

13  Q.  And confabulation is a brain under certain circumstances

14  will fill in gaps to make a whole picture; correct?

15  A.  An individual will fill in gaps, yes.

16  Q.  Their brain will do that; right?

17  A.  Their brain, their mouths.  I mean, semantics at this

18  point.  But generally, the way I understand confabulation is

19  consistent with your description, yes.

20  Q.  And those may or may not be accurate pieces of information,

21  but the person actually believes them; right?

22  A.  Are you asking if that's possible?  Yes.

23  Q.  That's part of what confabulation is; correct?

24  A.  That those gaps may or may not be accurate, yes.

25  Q.  I want to talk now about some of the exhibits that you

LBAGmax4                          Rocchio - Cross

1  reviewed with the government.

2          MR. PAGLIUCA:  If I could borrow Ms. Durocher, if that

3  would be okay, to display these.

4          THE COURT:  It's fine with me.

5          MR. PAGLIUCA:  Exhibit 2.

6  BY MR. PAGLIUCA:

7  Q.  This is the article that you talked about "Observing

8  Coercive Control Beyond Intimate Partner Violence:  Examining

9  the Perceptions of Professionals About Common Tactics Used in

10 Victimization."

11 A.  Yes.

12 Q.  This study involves 22 participants; do you see that in the

13 abstract?

14 A.  Yes.  N equals 22.

15         THE COURT:  I'm sorry, I couldn't hear you.

16         THE WITNESS:  Yes, the sample size in this particular

17 study is 22.

18 BY MR. PAGLIUCA:

19 Q.  And that's the total sample size here; right?

20 A.  The sample of professionals that were involved in this

21 particular survey, yes.

22 Q.  And these are unidentified professionals; right?

23 A.  They're not identified by name.  They're identified in

24 other ways, though.

25 Q.  Well, there's no list of who the people are who are these

1   professionals that are giving these answers; right?

2   A.   Again, not by name, but certainly there are descriptors of

3   who these individuals are.

4   Q.   Well, if we go to those descriptors, we're just talking

5   about a general description of the people that are involved in

6   the study; right?

7   A.   I'm not entirely sure.  I'd have to look at the article,

8   but I believe there are descriptions about the basis for which

9   they were identified as experts, their level of education and

10  training and the foundation for their publications and areas of

11  expertise.

12          MR. PAGLIUCA:  If we could go to Page 3 of this

13  exhibit.

14  Q.   Do you see where it's talking about method there?

15  A.   I do.

16  Q.   So let's start first with this paragraph.  "This

17  qualitative study took a phenomenological approach based on

18  data collected as part of a statewide initiative to understand

19  predatory alienation -- a new term created by an advocacy group

20  to describe" and this definition below it.

21          Do you see that?

22  A.   I do.

23  Q.   Phenomenological means the psychological study of

24  subjective experience; right?

25  A.   Yes.

1    Q.  And that is explaining the experience from the point of

2    view of the subject; right?

3    A.  Yes.

4    Q.  And then they talk about why they're doing this study and

5    it's to collect data to define a new term created by an

6    advocacy group.

7            Do you see that?

8    A.  I'm sorry, could you repeat the question.

9    Q.  Under method --

10   A.  Yes.

11   Q.  -- it says that this study is this phenomenological study,

12   it's data collected as part of a statewide initiative to

13   understand predatory alienation -- a new term created by an

14   advocacy group.

15           Do you see that?

16   A.  Yes.

17   Q.  So that's what's being undertaken here, is this subjective

18   study to determine this term created by an advocacy group in

19   this study; right?

20   A.  I wouldn't call it a subjective study.  I'd call it a

21   qualitative study.  But it's investigating the phenomenon of

22   predatory alienation, which it looks like was a term created by

23   an advocacy group.

24   Q.  If you go down to the second part here, it says, "All

25   experts identified as cisgender females between early 20s and

1    late 50s and identified as white or Latina."

2                Do you see that?

3    A.  I do.

4    Q.  So those are the experts; right?

5    A.  Those are some of the qualities of the experts, yes, the

6    demographics.

7    Q.  And then if we go down to the participants section here,

8    the last part says, "A few professionals, those in law

9    enforcement" -- on the next page -- "also worked with

10   perpetrators of interpersonal abuse and coercion."

11               Do you see that?

12   A.  I do.

13   Q.  And then we go on to talk about the professionals who were

14   over the age of 40, et cetera, et cetera.  So that's the

15   identification of these folks in this article; right?

16   A.  Again, that's the description of their -- some of their

17   backgrounds and demographics, yes.

18   Q.  And then in terms of how this data was collected,

19   initially, if we go to data collection, which is the next

20   paragraph, there were 33 professionals contacted by email, and

21   only 22 of these people responded; right?

22   A.  Yes.

23   Q.  So we have a dropout rate here of roughly a third to begin

24   with; correct?

25   A.  That wouldn't be referred to as a dropout rate in the field

LBAGmax4                    Rocchio - Cross

1   of social science research.  Because dropout rate refers to

2   something else.  This would be a response rate.

3   Q.  So we have a response rate that's a third less than was

4   asked; right?

5   A.  Yes.

6   Q.  And then I want to go to the Page 11 of this study that

7   you're relying on here, which is the appendix.

8           Do you see that?

9   A.  I do.

10  Q.  Now, this is the interview guide that was given to these 22

11  unidentified professionals to guide the interview of the

12  subjects here; correct?

13  A.  No.  I believe that it was the professionals, the experts

14  who were interviewed.  So I believe that the -- these are the

15  questions that were asked of the experts --

16  Q.  Right.

17  A.  -- in their interviews.

18  Q.  That's right.

19          You know what a leading question is; right?

20  A.  As it's used, yes.

21  Q.  That was just a leading question; right?

22  A.  Yes.

23  Q.  So let's look at question seven here -- and these are nine

24  questions that were given out as part of this study to ask for

25  the data that was used for this study; right?

LBAGmax4                    Rocchio - Cross

1   A.   Nine questions that were asked during the interviews to

2   elicit data, yes.

3   Q.   Right.   Question seven:   "How do online predators, human

4   traffickers, con artists, gangs, cults, and other groups use

5   predatory alienation (term used by interviewee) to isolate

6   young adults and senior citizens?"

7        Do you see that?

8   A.   I do.

9   Q.   That's a leading question; right?

10       MS. POMERANTZ:   Objection, your Honor.

11       THE COURT:   I'll sustain because I'm hoping you'll get

12   to something that is helpful here.

13   BY MR. PAGLIUCA:

14   Q.   Well, this study has serious flaws, does it not?

15   A.   I don't -- I don't think that the study has serious flaws.

16   I think it has a lot of useful information.

17       As I said, there's no study I would agree with every

18   single part of.   To the extent they're asking experts in the

19   field about groups of behavior strategies, techniques and modus

20   operandi that have been well established and studied and

21   they're asking a group of experts to what degree and what ways

22   have they observed these well-studied phenomena in their

23   respective fields, I think that's an appropriate question that

24   can elicit useful information.

25   Q.   And this is something you are relying on in support of your

1    opinions here today; is that right?

2    A.  It's one piece as an example of the scientific literature.

3    But my opinions are not relying upon any one individual piece

4    in its entirety, no.

5         MR. PAGLIUCA:  Can we turn to Exhibit 3, please.

6    Again, thank you for doing this.

7    Q.  This is another study that you gave to the government that

8    you're relying on as part of your opinions; correct?

9    A.  It's an example of the type of literature -- among a lot of

10   literature -- that I'm using in the formation of my opinion,

11   yes.

12   Q.  Well, let's look at the abstract for this exhibit.  This

13   was accepted May 19th, 2020, it's about a year old, this study;

14   correct?

15   A.  Yes.

16   Q.  Let's read the first part of this abstract.

17        "Sexual grooming has been deemed an integral part of

18   the child sexual abuse process.  However, there has yet to be a

19   universally accepted model for this process and, as a

20   consequence, there is no clear understanding of which behaviors

21   constitute sexual grooming."

22        Do you see that?

23   A.  I do.

24   Q.  That's the conclusion of this study; correct?

25   A.  That is an opinion of the author.  That is not the primary

1    conclusion of the study, no.

2    Q.  Well, are you just saying you ignore the conclusion of the

3    author who did this study because you don't agree with it?

4    A.  I'm not saying this is the conclusion.  The purpose of the

5    study -- a conclusion generally refers to the concluding

6    comments summarizing the main findings of the study.  So this

7    is actually not part of her -- their conclusion.  It's part of

8    their rationale for why this particular piece of research is

9    important and needed in the field.

10   Q.  So let's go through the methodology of this particular

11   study as well.

12        THE COURT:  We'll take about a 20-minute, 30-minute

13   break for lunch.  It's 12:55, I think we probably need 30

14   minutes, just logistically, so we'll resume at 1:25.

15        I do want to encourage you, Mr. Pagliuca, to focus

16   your cross less on what you might do in front of a jury --

17   because you are ably demonstrating to me so far that the points

18   you made in your papers are cross-examination points -- so to

19   the extent there are any of the opinions you want to focus on

20   the underlying Daubert questions -- and you did a little bit at

21   the end here -- the time would be much more effectively used.

22        MR. PAGLIUCA:  Understood, your Honor.

23        THE COURT:  Thank you.  We'll resume in 30 minutes.

24        (Luncheon recess)

25

1          A F T E R N O O N   S E S S I O N

2                          1:25 p.m.

3     LISA ROCCHIO, resumed.

4              THE COURT:  Mr. Pagliuca, you may proceed.

5              MR. PAGLIUCA:  Thank you, your Honor.

6     CROSS EXAMINATION (Cont'd)

7     BY MR. PAGLIUCA:

8     Q.  Dr. Rocchio, we were talking about Exhibit 3, and as I

9     understand it, this is the most recent attempt to validate the

10    sexual grooming model of child sexual abusers; is that correct?

11    A.  That's the most recent attempt to validate this particular

12    model, yes.

13    Q.  OK.  Well --

14    A.  Actually, it's *a* recent.  I'm not sure what research has

15    been done since that.

16    Q.  You were asked by the government to give the government

17    whatever articles you thought were helpful with regard to your

18    testimony here today.  Is that correct?

19    A.  I was asked by the government to give examples of articles

20    that pertained to the subject matter of my testimony today.

21    Q.  OK.  And as I understand it, this is a hearing to determine

22    whether or not there were scientifically valid principles under

23    federal law to admit this testimony.  You understand that.

24    A.  Yes, I do.

25    Q.  And one of the things that you did was provide the

1    government with this article, Exhibit 3, "Validation of Sexual

2    Grooming Model of Child Sex Abusers," which I think you said

3    that you thought that these authors, Winters and Jeglic, were

4    credible.  Is that right?

5    A.  I said I believed that they have done a lot of research in

6    the field.  I don't think I used the word "credible."

7    Q.  OK.  It's something, though, that you provided to the

8    government as support for your testimony here today.  Is that

9    right?

10   A.  It is some information pertaining to my testimony, yes.

11   Q.  So let's continue a little bit in terms of what this study

12   involved.  First of all, there were a total of 18 people that

13   responded to this survey.  Is that right?

14   A.  That was the second half, I believe, of the study that

15   you're referring to.  This was a two-part study.  So my

16   understanding is in the second part, there were 18 individuals

17   who are experts in the field, yes.

18   Q.  All right.  The pertinent one is the literature review.

19   Right?

20   A.  It was done in a structured way, though.  It wasn't just a

21   summary of the literature.  But, yes.  The first part was a

22   culling of scientific literature to identify particular

23   behaviors that have been established in the literature to be

24   associated with the process of various tactics, such as

25   grooming and abuse by offenders.

LBAAMAX5ps                    Rocchio - Cross

1   Q.  And of those 77 items, we basically cut that in half, and

2   then we had 18 people that were ultimately interviewed about

3   those items.  Is that right?

4   A.  It was in the other order.  If they used the 18 people to

5   get the list down from the 77 items to the 42.

6   Q.  Right.  And the author, if we can go to page 17 of Exhibit

7   3, please, at the start of page 16, bottom.  So that the

8   authors conclude, "This study is the first to validate a model

9   of grooming and behaviors involved in the process, which is a

10  major step toward developing a more universally accepted

11  framework for these pre-offense behaviors."  Do you see that?

12  A.  Yes.

13  Q.  And do you agree that this is the first to validate a

14  model?

15  A.  Validate a model, yes.

16  Q.  OK.  And then the authors go on to the rest of the

17  conclusion here.  I'm going to pick it up in the middle of that

18  paragraph.  "This study has established the content validity of

19  a model of sexual grooming, therein laying the groundwork for

20  further validation of an evidence-based model of sexual

21  grooming."  Do you see that?

22  A.  I do.

23  Q.  OK.  They go on to say, "the model" -- this is the model

24  we're talking about here, correct?

25  A.  This particular model.

1   Q.  Yes.  "The model should undergo rigorous testing to ensure

2   the stages accurately represent the complex process of sexual

3   grooming."  Do you see that?

4   A.  I do.

5   Q.  "Further, a standardized measure of grooming behaviors

6   should be developed based on behaviors and stages delineated in

7   the SGM," which is what they're talking about here.  Right?

8   A.  Yes.

9   Q.  So as we stand here today, there has been no further

10  rigorous testing of this model that you're aware of.  Correct?

11  A.  There is an enormous amount of testing and scientific study

12  that led up to this particular model.  I'm not aware -- I

13  don't -- I can't speak as to whether or not they've done

14  research subsequent to this, no.

15  Q.  But even these authors say that this isn't good enough for

16  evidence-based grooming testimony.  Right?

17  A.  That's not my reading of the paper, no.

18  Q.  OK.  And you don't -- have you ever asked these authors

19  about their opinion?

20  A.  No, I have not.

21          MR. PAGLIUCA:  If we can turn to Exhibit 4, please.

22  Q.  I'm not going to spend a lot of time on this.  You've

23  talked about it.  This is the Bennett and O'Donohue opinions,

24  or article, in which Bennett and O'Donohue say that there's a

25  lack of consensus regarding what grooming is and talk about it

1  not meeting the *Daubert* standard.  Correct?

2  A.  That was one of their opinions at the conclusion of the

3  article.

4  Q.  Right, which you did not agree with.  Is that right?

5  A.  I, I wouldn't presume to make an opinion about -- to offer

6  an opinion about *Daubert* specifically, but certainly I'm here

7  to talk about the state of the scientific literature in my

8  areas of expertise.

9  Q.  OK.  But the most recent state of the scientific literature

10  is Exhibit 3.  Is that right?

11  A.  No.  That's an example of *a* recent article that was done

12  and not the most recent, nor is it the only.

13  Q.  Well, did you give any other more recent article to the

14  government in support of your testimony here today?

15  A.  I would have to look at the dates of all of the articles I

16  gave them.  I'm not sure of the order of publication.  It's

17  possible that this was pub -- the Winters article we've been

18  talking about was published, I believe, in 2020.  So I would --

19  certainly there have been articles published since that time.

20  Q.  Do you know of one that does anything with the Winters

21  study to move it forward, to validate it in any way?

22  A.  Not specifically.  I would have to look for that.  At the

23  moment no.

24  Q.  OK.  Thank you.

25          Exhibit 5 --

LBAAMAX5ps                    Rocchio - Cross

1        THE COURT:  Can I ask, do you agree with the

2   proposition that this was -- a version of it is that the

3   meaning of grooming or an understanding of what constitutes

4   grooming strategies and the like is contested in the

5   literature?

6        THE WITNESS:  I wouldn't say that it's contested.  I

7   would say that there's actually substantial agreement and

8   there's more agreement than disagreement.  So I would say that

9   the concept is well accepted.  Exactly how to define it is the

10  piece that I think they're working on.  And also which specific

11  stages or what order and the process by which it happens, I

12  think, is something that these authors -- well, the Winters

13  authors -- are trying to move forward on.  But I think the very

14  concept of the idea that offenders use a variety of tactics,

15  modus operandi, and behaviors in the process of developing a

16  relationship with their intended victims is well established

17  and accepted in the peer-reviewed literature and scientific

18  community.

19       THE COURT:  To the extent you're familiar with the

20  body of literature around trauma bonding in the sex-worker

21  context, is there a comparable sort of dialogue and discussion

22  among -- within the field as to what is an appropriate model,

23  what counts as -- deemed strategies and the like?

24       THE WITNESS:  I'm aware of some research that's been

25  done looking at the types of behaviors and groomings, which

1    would be various stages in the pimp and prostitute literature

2    that are analogous to this.  So, for example, how victims are

3    targeted and selected, how the relationship develops over time,

4    what sorts of behaviors are done to influence and coerce, and

5    then to develop that trauma bond and attachment, which may get

6    harder, for example, tactics that involve isolation and

7    increased dependency and things like that.

8             THE COURT:  Do you have a sense, is the state of the

9    literature on that subject more settled or more advanced than

10   it is on the concept of grooming in child sexual abuse?

11            THE WITNESS:  I, I'm not sure that I can answer that.

12   I think it's analogous literature.  They're talking about the

13   same things, so I'm not -- I can't comment on that area of the

14   literature specifically.

15            THE COURT:  Go ahead.

16            MR. PAGLIUCA:  Thank you, your Honor.

17            Ms. Drescher, if you could pull up Exhibit 5 for me,

18   please.

19   Q.  This is the article that you talked about by Dr. Dietz.

20   And, again, Dr. Dietz wrote this in 2017, published in 2018.

21   Is that right?

22   A.  Yes.

23   Q.  And Dr. Dietz warns, on page 31, that "there is

24   considerable risk of misleading the fact finder into believing

25   that these latter behaviors are well-established predictors of

1   child sexual abuse."  Do you see that?

2   A.  Yes.

3   Q.  So that's yet another expert's opinion in this field about

4   there being problems with this grooming moniker.  Correct?

5   A.  No.  I wouldn't agree with that statement.

6   Q.  There are some other studies that you provided to the

7   government that have not been introduced into evidence.  And I

8   just want to ask you if you recall these.  There is the study

9   "Sexual Grooming of Children: Review of Literature and

10  Theoretical Considerations."  Do you recall that?

11  A.  The title is familiar.  I don't recall the contents of that

12  specific article.

13  Q.  Do you recall the conclusion being that there is still no

14  understanding about this phenomena when talking about grooming?

15  A.  Are you talking about the Craven article?

16  Q.  Yes.

17  A.  My understanding is that was written a long time ago.  But,

18  no, I couldn't sit here and tell you that I have a recollection

19  of what specifically the conclusion of any of those specific

20  articles were without having an opportunity to review them

21  again.

22  Q.  Sure.

23          MR. PAGLIUCA:  May I approach the witness, your Honor?

24          THE COURT:  What are you identifying?

25          MR. PAGLIUCA:  I'm identifying Defendant's Exhibit A,

1   which is this article.  If I may approach your clerk and give

2   your clerk some copies.

3           THE COURT:  That's fine.

4           MS. POMERANTZ:  May I have a copy?

5           THE COURT:  The government needs a copy.

6           MR. PAGLIUCA:  Yes.  I've got copies for everybody.

7           THE CLERK:  Do you have another copy?  Do you have an

8   extra copy for us?

9           MR. PAGLIUCA:  I do.

10  BY MR. PAGLIUCA:

11  Q.  This is, as you identified, the Craven article, correct?

12  A.  It is.

13  Q.  And in the introduction, Ms. Craven says that this

14  phenomenon of grooming is little -- "there is little

15  understanding about this phenomenon" correct?

16  A.  Where are you reading from?  I'm sorry.

17  Q.  Introduction, middle of the page.  Fourth line down.

18  A.  "About this phenomenon."  Yes.

19  Q.  And that's the ultimate conclusion of this article,

20  understanding that it was written in 2006.  Right?

21  A.  And whether it was the ultimate conclusion, that is

22  something that they posit in the introduction, yes.

23  Q.  May we go to page 11, to the conclusion.  "Despite the wide

24  acceptance of the term, sexual grooming of children is not

25  understood clearly, particularly in the public domain."  Do you

LBAAMAX5ps                    Rocchio - Cross

1    see that?

2    A.  Yes.

3          MR. PAGLIUCA:  May I approach again with Exhibit B,

4    your Honor?

5          THE COURT:  OK.

6          MR. PAGLIUCA:  Your Honor, I move to admit A, which

7    has been tendered previously.

8          THE COURT:  Which has been entered previously?

9          MR. PAGLIUCA:  Tendered.

10         THE COURT:  Oh, tendered.

11         MR. PAGLIUCA:  Yes.

12         THE COURT:  No objection?

13         MS. POMERANTZ:  No objection.

14         THE COURT:  Defendant's Exhibit A is admitted to the

15   hearing record.

16         (Defendant's Exhibit A received in evidence)

17         THE COURT:  B we already have in, don't we?

18         MR. PAGLIUCA:  I don't believe so.

19         THE COURT:  OK.

20         MS. POMERANTZ:  No, your Honor.

21         THE COURT:  Thank you.

22   BY MR. PAGLIUCA:

23   Q.  Do you see Exhibit B, Doctor?

24   A.  I do.

25   Q.  This is yet another study that you provided to the

1   government in support of your testimony here today, correct?

2   A.  Partially in support, yes.

3   Q.  And this is by the same folks who did the 2020 study,

4   Winters and Jeglic.  Right?

5   A.  Yes.

6   Q.  The abstract here -- this study was actually giving

7   professionals a list, undergraduate students a list of

8   potential grooming behaviors to see if they could identify

9   grooming behaviors.  And there were a total of 393

10  undergraduate students who were provided with this information.

11  Do you recall that?

12  A.  I don't recall specifically.  I recog -- I can recall.

13  This was the article that -- in which -- they did two things.

14  They developed the model, which they later tested.  And then

15  they created a scenario in which they attempted to see whether

16  or not grooming behaviors could be predicted.

17  Q.  Right.  And the results of this study were that grooming

18  behaviors could not be predicted.  Correct?

19  A.  Correct.

20  Q.  And this is what ended up with the 2020 attempt to validate

21  the model, which they're still working on.  Right?

22  A.  So you're talking about two different concepts.  I can't

23  really answer that question.

24  Q.  OK.  Bottom line, "Nobody could predict grooming out of 364

25  people" -- "393 undergraduate students."  Right?

LBAAMAX5ps                    Rocchio – Cross

1    A.  That was the conclusion of the article, yes.

2    Q.  And this is in 2016, this article, correct?

3    A.  It was written in '16, published in '17 perhaps, yes.

4    Q.  And we are talking about, in the conclusion and

5    implications here, which is on page 9, "The present study found

6    that individuals are not able to identify the potential

7    predatory behaviors that a child molester may employ."

8    Correct?

9    A.  Not able to identify it ahead of time, which is different

10   than scientific literature looking at retrospective studies.

11   But, yes, you're correct that this article found that we

12   couldn't predict who is and is not, ahead of time, going to be

13   a predator, based on certain behaviors and grooming.

14   Q.  Right.  And the reason is, once you believe that someone

15   sexually assaulted someone, then you can, in hindsight, go back

16   and look at behavior and characterize it as grooming.  Right?

17   A.  That's actually not what hindsight bias in the -- as

18   referenced in the grooming literature refers to.

19   Q.  So I'd like to take a look at Exhibit 6 now, which has been

20   admitted -- or?

21          MR. PAGLIUCA:  I don't know if I admitted that, your

22   Honor.  But I move for the admission of Exhibit B.

23          THE COURT:  Without objection?

24          MS. POMERANTZ:  I'm so sorry.

25          THE COURT:  Defendant's Exhibit B.

1          MS. POMERANTZ:  No objection, your Honor.

2          THE COURT:  Is admitted to the hearing record.

3          (Defendant's Exhibit B received in evidence)

4          MR. PAGLIUCA:  If we could pull up Exhibit 6, please.

5          THE COURT:  Government 6?

6          MR. PAGLIUCA:  Yes, please.

7  BY MR. PAGLIUCA:

8  Q.  Exhibit 6 is the study that you appear to have relied on

9  with regard to disclosure issues.  Is that correct?

10  A.  It's something I submitted in part, yes.

11  Q.  Well, as you sit here today, can you tell us anything else

12  that you submitted with regard to your testimony about delayed

13  disclosure and supporting literature?

14  A.  I couldn't give you a list, but, again, my opinions are not

15  based on any one article or even solely on my knowledge of the

16  literature.  It's based on an interaction of the totality of my

17  education, training, skills, experience, and knowledge of the

18  scientific and clinical and professional literature.

19  Q.  OK.  So looking at Exhibit 6, this is a survey,

20  essentially, of a number of publications that talk about

21  barriers of disclosure.  Correct?

22  A.  So my understanding is, this was a study that was looking

23  at, understanding that delayed disclosure is very common, they

24  were trying to determine what sorts of things present as

25  barriers to disclosure and as facilitators of disclosure.

1  Q.  And do you recall that initially the authors considered 322

2  articles and selected 33 out of those 332?

3  A.  I don't recall that as we sit here today, specifically, no.

4  I'm sorry.

5  Q.  And if we can go to page 3 of Government Exhibit 6.  Page 3

6  starts a table that has a summary of the various articles that

7  were reviewed.  Is that correct?

8  A.  That's my understanding, yes.

9  Q.  So let's look at some of the -- this study considered males

10  and females, correct?

11  A.  Yes.

12  Q.  And you know that males tend to not report as frequently as

13  females for a variety of psychological issues, correct?

14  A.  Correct.

15         Either not report or delay further.

16  Q.  Right.

17  A.  So that would be one of the predictors or facilitators of

18  delayed disclosure.

19  Q.  And you're aware -- are you aware that this case does not

20  involve any allegation of delayed reporting by males?

21         MS. POMERANTZ:  Objection.

22         THE COURT:  What's the grounds?

23         MS. POMERANTZ:  Your Honor, she doesn't know about

24  this case, the specific details.

25         MR. PAGLIUCA:  Well, I think that's my point, your

1    Honor, part of my point.

2               THE COURT:  If the point is that she doesn't know any

3    of the facts of the specific case and the government concedes

4    that's true, we can move on.

5               MR. PAGLIUCA:  Yes.

6               I guess the other point, your Honor, which I can

7    develop, is, these studies that are included and impact the

8    statistics are really not relevant here because they deal with

9    males or a combination of males and females, and there are only

10   a few of them that deal with females specifically.

11              THE COURT:  OK.

12              MR. PAGLIUCA:  So when we're conflating these things,

13   it conflates the numbers.

14              May I proceed, your Honor?

15              THE COURT:  You may.

16              MR. PAGLIUCA:  Thank you.

17   Q.  So that the first study, which is in 2016, in the last

18   column, is all males.  Do you see that?

19   A.  Could you -- the page is upside down on my screen.  Can we

20   rotate it so that I can look at what you're seeing, please.

21              MR. PAGLIUCA:  I don't know if Ms. Drescher can do

22   that or not.

23              THE WITNESS:  Or I can look at a paper copy.  But I --

24   there's no way I can read that.

25              THE COURT:  I can't read it either.

1              MS. POMERANTZ:  Your Honor, I believe there's a binder

2     for Dr. Rocchio.

3              THE COURT:  OK.  Is it in there?

4              MS. POMERANTZ:  It should be under tab 6, your Honor.

5              THE COURT:  Tab 6.

6              MR. ROHRBACH:  And would your Honor like a copy of it?

7              THE COURT:  I can't hear if you you're not using the

8     mike.

9              MS. POMERANTZ:  Would your Honor like a binder as

10    well?

11             THE COURT:  Sure.

12             All right.  So we're looking at Government 6.

13             MR. PAGLIUCA:  Correct, your Honor, page 3 of 24.

14    Q.  I'm going to skip the next one, Dr. Rocchio, which deals

15    with a discrete set of individuals.  If we go to the third one

16    down, if you go to the right-hand column, which is the summary.

17    A.  Yes.

18    Q.  This includes -- this is a 50 percent disclosure rate, as

19    identified in this summary.  Correct?

20    A.  50 percent did not disclose until after the age of 19, I

21    believe.

22    Q.  "Half of the participants had not disclosed their CSA

23    experiences before the age of 19."  Right?

24    A.  Yes.

25    Q.  That means half did.

1    A.  Yes.

2    Q.  OK.  And of that half, we've got 67 males in that

3    population.  Correct?

4    A.  No.

5    Q.  67 male and female adult survivors.  Right?

6    A.  76 percent of whom were identifying as female.

7    Q.  Right.  So at least 50 percent disclosed before the age of

8    19 according to this study.  Right?

9    A.  Correct.

10   Q.  And we don't know how delayed this reporting was or was

11   not.

12   A.  You mean disclosures that were made prior to the age of 19?

13   Q.  Right.

14   A.  Again, not in this summary.  I'd have to look to see

15   whether that was addressed in the article itself.  But, no,

16   that's not referenced in the summary.

17   Q.  OK.  But you didn't do that in preparation for your

18   testimony here today, correct?

19   A.  This particular study?

20   Q.  Correct.

21   A.  No, I don't believe I did.

22   Q.  OK.  The next one down, Leclerc and Wortley, 2015.  Now,

23   you spent some time talking about offender-generated data as

24   part of the basis for your opinion, correct?

25   A.  Yes.

LBAAMAX5ps                    Rocchio - Cross

1   Q.  All right.  And if we go to the summary here, the author is

2   critical of offender-generated data or questions

3   "offender-generated data through self-reports because it could

4   be subject to cognitive distortions -- minimization or

5   exaggerations," correct?

6   A.  I think that they are identifying potential issues that

7   could be present with offender-generated data.

8   Q.  Right.  If we go to page 4, the McElvaney and Culhane

9   article.

10  A.  The opinions in that study did continue.  You didn't refer

11  to all of their opinions, just part of them.

12  Q.  That's OK.  The government can ask you questions on

13  redirect if they'd like.

14  A.  OK.

15  Q.  In this opinion, in this, the findings are, "Majority of

16  children told their mothers and their peers first."  Do you see

17  that?

18  A.  Of those who disclosed, the majority told mothers and

19  peers, yes.

20  Q.  Right.  Then the next study, 2014, when the --

21  A.  So that study, though, was among -- everybody in that study

22  had already disclosed.  It was a study of children who had

23  already disclosed, to look at who they disclosed to.

24  Q.  Right.

25          Then we have the next study here, "220 minor victims"

1  allege -- when we're talking about people outside of the

2  family, we have a 70 percent disclosure rate before one year as

3  reported here, correct?

4  A.  I'm sorry.  I would have to read where you're reading from.

5  I'm not sure what -- can I take a moment to just read the

6  opinion?

7           THE COURT:  Sure.

8  A.  This is the Dumont article?

9  Q.  Yes.

10 A.  OK.

11 Q.  All right.  I'd like to turn to page 5, to the bottom of

12 the page, the Schonbucher, Maier, Mohler-Kuo study.

13 A.  Did you just ask me a question about the article you just

14 asked me to read?

15 Q.  Yes, 80 percent.

16 A.  When I said I had read it, I wasn't answering your

17 question.  Can you -- if you want an answer to the question,

18 I'll need to hear it again.

19 Q.  That's fine.  The Court can read this.

20           THE COURT:  So the question is withdrawn?

21           MR. PAGLIUCA:  Sure, your Honor.  Yes.  This is

22 admitted into evidence.

23           THE COURT:  And to the extent you asked a question

24 about it, it's withdrawn?

25           MR. PAGLIUCA:  Yes, your Honor.

1           THE COURT:  OK.

2   BY MR. PAGLIUCA:

3   Q.  We're going down to the bottom of page 5.

4   A.  Yes.

5           Actually, you know what, it's on my screen properly

6   now, so it's going to be easier for me to look there, because

7   it's bigger.

8           OK.

9   Q.  So I want to just highlight here one of the problems with

10  these studies that you're relying on is, we've got a comment,

11  "Two-thirds of the sample did not disclose right away."  But we

12  don't define what "right away" means, do we?

13  A.  So to be clear, the article that I submitted was a summary

14  of the literature.  I'm not saying that I have read and

15  examined every study cited in this particular article.  So I

16  really can't speak as to how those in this article identified

17  or defined "rate of disclosure."  I would expect, however, that

18  it would be defined in the full article itself.  It's not

19  defined here in the brief summary.  But typically in scientific

20  literature, it would -- the time period of disclosure that the

21  authors were investigating, I would expect to find that in the

22  article itself.

23  Q.  OK.  But apparently you haven't gone back to look at the

24  underlying data.  Is that right?

25  A.  I have not gone back to look at every reference cited in

1  this particular article.  I have extensively reviewed

2  underlying data as it pertains to this subject over the course

3  of my career.

4  Q.  OK.  But this is the article you gave to the government in

5  support of your testimony.  Right?

6  A.  In partial support, yes.

7  Q.  OK.  Page 7 of 24, the top, the Alaggia study, 2010.  This

8  one we have a -- this involves male -- it says, well, 36

9  percent.  We have a 42 percent disclosure rate identified here

10  during childhood.  Do you see that?

11  A.  Yes.

12  Q.  And then 26 percent claimed repressed memory.  Right?

13  A.  That's what it says there, yes.

14  Q.  I don't need to go through all of these.  But fair to say

15  that it's an overstatement, based on the literature, to claim

16  that a majority of child alleged victims fail to report sex

17  abuse during childhood.

18  A.  I would not agree with that, no.

19  Q.  Can you point to one study that supports your conclusion

20  here, or your opinion here, that a majority fail to report --

21  A.  A study you just cited, the Alaggia 2010, 46 disclosed --

22  42 disclosed, which would mean 58 percent did not.

23  Q.  It says during childhood.  We don't know exactly when the

24  disclosure occurred or didn't.  You're talking about

25  substantial amounts in your government testimony here today,

1   not the difference between 42 and 58 percent.

2   A.  I was talking about the majority.  And they define there, I

3   believe in this article, again assuming this summary is

4   accurate, that they were defining childhood as under the age of

5   18.

6   Q.  And I have two more of these I think we need to look at.

7          THE COURT:  Are we still on disclosure or another

8   opinion?

9          MR. PAGLIUCA:  Yes, we're on disclosure.

10          THE COURT:  I think you can wrap up disclosure.

11          MR. PAGLIUCA:  All right, your Honor.  I get it.

12   BY MR. PAGLIUCA:

13   Q.  So there are other reasons, outside of the statistics, that

14   individuals who, at some point later in life, claim to be

15   sexually assaulted make that claim.  Correct?

16   A.  Outside of what statistics?

17   Q.  Well, you've been talking about delayed disclosure as a

18   predictor of sexual assault.  Is that correct?

19   A.  No, that is incorrect.

20   Q.  What is the significance, as far as you are concerned, with

21   delays in disclosures as part of your opinions?

22          THE COURT:  If you'd like, Mr. Pagliuca, you don't

23   have to, but you can take off your mask in the podium box if

24   you like.

25          MR. PAGLIUCA:  I appreciate it.

1            THE COURT:  And I would suggest that the microphone

2    point directly at you.

3            MR. PAGLIUCA:  Yes.

4            THE COURT:  Go ahead.

5    A.   So the significance of delayed disclosure as it relates to

6    my opinion is, it is part of our understanding of phenomenology

7    of child sexual abuse and the ways in which individuals tell.

8    So I'm not identifying delayed disclosure as a predictor.  I'm

9    simply saying that it is a common phenomenon that is observed

10   in the scientific literature to occur among children who are

11   sexually abused.

12   Q.   Well, there are many other reasons why these reports may

13   surface not immediately.  Correct?

14   A.   Again, I'm commenting at this point my opinion is that

15   delayed disclosure is common.  I'm not -- do you have a

16   question about the reasons why?

17   Q.   Yeah.  There are many reasons why.  There are allegations

18   that are made months, weeks, years, after an alleged event.

19   Correct?

20   A.   Correct.

21   Q.   And they may or may not have anything to do with the

22   veracity of the allegation.  Correct?

23   A.   The reasons may not have -- again, are you -- I mean, are

24   you asking me, can people make false claims?

25   Q.   Yes.

LBAAMAX5ps                    Rocchio - Cross

1    A.  Of course, yes.

2    Q.  For many reasons.  Correct?

3    A.  Sure.

4    Q.  And that could be outright lying, could be a reason?

5    A.  Could be.

6    Q.  False memories could be a reason, correct?

7    A.  Could be.

8    Q.  Intoxication could be a reason?

9    A.  Again, these are reasons that have been hypothesized to

10   explain possibilities for false allegations, yes.

11   Q.  And they are accepted in the literature, correct?

12   A.  That lying exists, or that intoxication can lead to, to

13   distorted claims?  Sure.

14   Q.  Yes.  Or a variety of psychiatric disorders, correct?

15   A.  Again, I'm not aware of the scientific research that has

16   studied specifically these as predictors of false allegations.

17   There's a very large body of scientific literature documenting

18   of course that false allegations can occur, but they are --

19   represent a very small minority of allegations that are made.

20   And I believe the article that you're reviewing, the authors

21   are putting forth some hypotheses as to how or why that might

22   occur.  But I don't believe it's coming from a scientific

23   study, and I'm not aware of one at this point.

24   Q.  OK.  So wrapping up here --

25            THE COURT:  I would again try to point it directly at

LBAAMAX5ps                    Rocchio - Cross

1   you.

2             MR. PAGLIUCA:  OK.

3             THE COURT:  Try that.

4             MR. PAGLIUCA:  All right.

5             THE COURT:  Thank you.

6   Q.  What is the study that you are relying on for your opinions

7   about whether -- that has been tested here?

8   A.  There is no single study that I'm relying upon for my

9   opinion.

10  Q.  OK.  And what is the known potential rate of error for any

11  of your opinions?

12  A.  It would depend on what you're -- how you're defining

13  "error."  So, for example, in the study where they had a bunch

14  of professionals identify, for example, the relevance of

15  particular behaviors to grooming, in that particular study,

16  they looked for, I think the standard in the field was a .78

17  statistical significance or measure of agreement.  So different

18  studies use different measures.  There are other studies that

19  looked at inter-rater reliability.  In other words, if someone

20  is coding the content of a qualitative interview that's been

21  done, they'll look at the degree of agreement and of course

22  potential disagreement, which would be error, in differences of

23  opinion, and attempt to address and resolve those.

24            But, as I had indicated earlier, in this field, a pure

25  error rate, as in many areas of the social sciences, cannot be

LBAAMAX5ps

1    identified, because we can't randomly assign individuals to be

2    sexually abused or not.  So we have to look at other measures

3    of testability and scientific ways to study these issues, as

4    well as acceptance within the commun -- general and

5    professional community.

6    Q.  And finally, what is the study that you're relying on to

7    determine that this theory of grooming has gained general

8    acceptance in the scientific community?

9    A.  As I've said, none of my opinions are based on any single

10   study, alone.

11            MR. PAGLIUCA:  That's all I have, your Honor.  Thank

12   you.

13            THE COURT:  OK.  Thank you.

14            Anything, Ms. Pomerantz?

15            MS. POMERANTZ:  Your Honor, may we have a moment?

16            THE COURT:  You may.

17            (Counsel confer)

18            MS. POMERANTZ:  Nothing from the government, your

19   Honor.

20            THE COURT:  All right.  Thank you.

21            Dr. Rocchio, thank you very much.  You're excused.

22            THE WITNESS:  Thank you, your Honor.

23            (Witness excused)

24            THE COURT:  I just, I have a couple of questions for

25   the defense.  Does the defense intend to impeach witness

LBAAMAX5ps

1  credibility based on failure to disclose at earlier time

2  periods?

3          MR. PAGLIUCA:  Yes, your Honor.

4          THE COURT:  And then do you intend to impeach any

5  witnesses based on substance abuse?

6          MR. PAGLIUCA:  Yes.

7          THE COURT:  OK.  All right.  I think I have what I

8  need.

9          I'm going to give the reasons for my opinion, I think,

10  probably, at our proceeding on Monday, but what I intend to do

11  is deny the *Daubert* motion except with respect to the opinion

12  that expresses that the presence of another individual can

13  facilitate sexual abuse of minors.  But otherwise the motion

14  will be denied.  And as I said, I'll give my reasons for the

15  denial and the reason for the partial grant on Monday.

16          OK.  I think with that we can transition to the 412

17  proceeding.  So we'll break for ten minutes.  We will, as I

18  said, have to seal the courtroom, as required by the rule,

19  which will mean all nine party participants have to leave and

20  the live feed will have to be turn off.  And we'll confirm in

21  the overflow rooms that those are off.

22          So we'll break for ten.  Thank you.

23          (Recess)

24          (Remainder of hearing sealed)

25

```
1                         INDEX OF EXAMINATION

2    Examination of:                              Page

3    LISA ROCCHIO

4    Direct By Ms. Pomerantz  . . . . . . . . . . . 7

5    Cross By Mr. Pagliuca  . . . . . . . . . . . .95

6    Cross By Mr. Pagliuca  . . . . . . . . . . . 131

7                         GOVERNMENT EXHIBITS

8    Exhibit No.                                Received

9    1   . . . . . . . . . . . . . . . . . . . . .20
     2   . . . . . . . . . . . . . . . . . . . . .44
10   3   . . . . . . . . . . . . . . . . . . . . .48
     4   . . . . . . . . . . . . . . . . . . . . .51
11   5   . . . . . . . . . . . . . . . . . . . . .58

12                        DEFENDANT EXHIBITS

13   Exhibit No.                                Received

14   A   . . . . . . . . . . . . . . . . . . . . 140
     B   . . . . . . . . . . . . . . . . . . . . 143
15

16

17

18

19

20

21

22

23

24

25
```