UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 11/21/21
```

United States of America,

—v—

Ghislaine Maxwell,

Defendant.

20-CR-330 (AJN)

OPINION & ORDER

ALISON J. NATHAN, District Judge:

The Defense on November 1, 2021, noticed eight expert witnesses.  Def. Br., Ex. 1 ("Notice").  Two of those experts, Dr. Park Dietz and Dr. Elizabeth Loftus, are expected to offer opinions that rebut opinions of the Government's expert witness, Dr. Lisa Rocchio.  The Court on November 11, 2021, issued an Opinion and Order that denied in part and granted in part the Defense's motion to preclude Dr. Rocchio's testimony.  Dkt. No. 435.

The Government on November 8, 2021, filed a motion to partially preclude the testimony of Dr. Dietz and Dr. Loftus.  Gov't Br., Dkt. No. 424.  The Defense filed a response on November 12, 2021.

I.    **Legal standard**

Federal Rule of Evidence 702 governs the admissibility of expert testimony. That rule states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

1

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

The Court exercises a "gatekeeper function" in assessing the admissibility of expert testimony. *Restivo v. Hessemann*, 846 F.3d 547, 575 (2d Cir. 2017). To determine whether an expert's method is reliable, the Court considers the non-exhaustive list provided by the Supreme Court in *Daubert*, including whether the expert's method has been tested, whether it has been subjected to peer review, the rate of error, standards controlling the method's operation, and whether the method is accepted by the expert community. *United States v. Kidd*, 385 F. Supp. 3d 259, 263 (S.D.N.Y. 2019) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593–94 (1993)).

But Rule 702 ultimately sets a "liberal" and "permissive" standard of admissibility. *Nimely v. City of New York*, 414 F.3d 381, 395–96 (2d Cir. 2005). In particular, not every expert admissible under *Daubert* need rely on a method that conforms with "the exactness of hard science methodologies." *E.E.O.C. v. Bloomberg L.P.*, No. 07-CV-8383 (LAP), 2010 WL 3466370, at *13–14 (S.D.N.Y. Aug. 31, 2010) (quoting *United States v. Simmons*, 470 F.3d 1115, 1123 (5th Cir. 2006)).

## II.    The testimony of Dr. Park Dietz

In its notice, the Defense proffers approximately ten opinions to which Dr. Dietz would testify at trial. Gov't Br., Ex. A ("Notice") at 2–11. As an initial matter, the Government does not dispute that Dr. Dietz has the formal qualifications to offer these opinions. As his CV demonstrates, Dr. Dietz is well-qualified to speak on a range of psychological concepts, including extensive experience evaluating allegations of sexual abuse. Def. Br., Ex. 1 at 62–165.

2

The Government instead objects to the reliability of his methods, the fit of his opinions to this case, and the risk of Rule 403 prejudice. The Court will deny in part and grant in part the Government's motion as to Dr. Dietz.

To start, several of Dr. Dietz's opinions criticize the basis of Dr. Rocchio's grooming opinion. First, he states that "grooming has no consistent definition" and that "there is no valid method to assess whether grooming has occurred." Notice at 4. The Government agrees that this opinion is relevant to respond to Dr. Rocchio's testimony and is otherwise admissible. Gov't Br. at 9. The Court agrees.

Second, Dr. Dietz states that studies of grooming have "no known error rate" and "cannot be tested" because they rely on the reports of alleged victims. Notice at 4. The Government does not expressly respond to this opinion except to say that Dr. Dietz's and Dr. Loftus's opinions similarly lack error rates. Gov't Br. at 36. The Court concludes that this criticism of Dr. Rocchio's grooming opinion is relevant and admissible.

Third, Dr. Dietz would provide several opinions about the relationship between grooming and intent. He states that the term grooming "imputes motive and intent without adequate evidence of either," that it "imput[es] motive and intent to the Defendant," that "there is considerable risk of misleading the fact finder in believing that" innocent conduct is grooming, and that a determination of grooming is a "subjective judgment." Notice at 3–4. The Government argues that these opinions are inadmissible because it is the jury's role to determine the Defendant's intent. Gov't Br. at 10–11. Rule 704(b) "expressly forbids opinion testimony by an expert as to the state of mind of a defendant in a criminal case where that mental state is an element of the crime." *United States v. Rea*, 958 F.2d 1206, 1215 (2d Cir. 1992) (citing Fed. R. Evid. 704(b)).

The Court will partially admit and partially preclude these opinions.  Dr. Dietz may testify that Dr. Rocchio's definition runs the risk of suggesting that innocent conduct is grooming and that the label "grooming" carries within it a subjective judgment of an alleged perpetrator's intent.  These opinions, when limited to a criticism of Dr. Rocchio's definition of grooming, bolster Dr. Dietz's opinion that grooming does not have a settled definition and is hard to measure.  They are therefore relevant and admissible opinions.

But the Court will preclude any opinion testimony that there is inadequate evidence of an intent to groom as applied to Ms. Maxwell.  In particular, Dr. Dietz's disclosed opinions that there is not "*adequate evidence of either*" motive or intent, that grooming imputes intent "*to the Defendant*," and that "*there is considerable risk of misleading the fact finder*" into finding intent, all suggest that Dr. Dietz would testify that there is inadequate evidence of Ms. Maxwell's intent. Notice at 3 (emphasis added).  Testimony to that effect would plainly violate Rule 704(b).  The Court therefore precludes these three aspects of Dr. Dietz's opinion as well as any other testimony that would similarly go beyond criticizing Dr. Rocchio's definition of grooming and instead suggest that there is inadequate evidence of intent in this case.

Fourth, Dr. Dietz states that there is not empirical data on whether minors with particular vulnerabilities are more likely to be targeted by perpetrators of sexual abuse. *Id.* at 4.  The Government responds that this opinion itself is unsupported in the academic literature.  Gov't Br. at 11.  If experts disagree on the proper interpretation of evidence, "it is not the Court's role to resolve the dispute through exclusion of one of the expert's opinions." *In re Digital Music Antitrust Litig.*, 321 F.R.D. 64, 80 (S.D.N.Y. 2017).  The Court concludes that Dr. Dietz's extensive experience in the field provides an adequate basis for this opinion criticizing Dr. Rocchio's opinion.  It therefore admits this opinion.

4

Fifth, Dr. Dietz states that Dr. Rocchio's opinion about grooming for a third party—so-called grooming-by-proxy—is not accepted in the field. Notice at 4. The Court has excluded Dr. Rocchio's testimony on this issue. Dkt. No. 435 at 10. The Defense apparently admits that Dr. Dietz's testimony on this point would be admissible only if it responds to Dr. Rocchio's testimony. Def. Br. at 5 n.2, 7 n.3. The Court therefore excludes Dr. Dietz's testimony on grooming for a third party or "grooming-by-proxy" because it is not relevant to the jury's determination.

Next, Dr. Dietz offers an opinion about hindsight bias. Specifically, he says that behaviors can be labeled as "grooming" only in hindsight once the event of sexual abuse is known. Notice at 4–5. Dr. Dietz's notice cites to a series of articles that examine hindsight bias in a variety of contexts and he concludes that an awareness of hindsight bias "should temper any claims that so called 'grooming' behaviors should have been noticed and either reported or avoided." *Id.* at 5. The Government argues that this opinion improperly instructs the jury on how to assess evidence and that hindsight bias is a common-sense concept that does not require expert testimony. Gov't Br. at 12–14. The Defense responds that this opinion on hindsight bias is another basis to criticize Dr. Rocchio's definition of grooming, as a determination of grooming can be made only after the fact. Def. Br. at 8–9.

The Court will admit Dr. Dietz's hindsight-bias opinion insofar as it is a criticism of Dr. Rocchio's grooming opinion. Much like Dr. Dietz's opinion on intent and grooming, this opinion states that behavior can be labelled as grooming only if the outcome is known. For the same reasons the Court admits Dr. Dietz's opinion that a determination of grooming imputes intent, the Court admits this opinion.

But the Court would preclude Dr. Dietz's testimony on hindsight bias to the extent that it instructs the jury to be cognizant of hindsight bias in their own decision making.  First, "[h]indsight bias is a common-sense concept—everyone knows that 'hindsight is 20/20.'" *Adams v. Lab'y Corp. of Am.*, 760 F.3d 1322, 1335 (11th Cir. 2014).  Because the expert's "opinion is one that the jury could reach with their own 'common knowledge and common sense,' no expert testimony is warranted."  *Edmondson v. RCI Hosp. Holdings, Inc.*, No. 16-CV-2242 (VEC), 2020 WL 1503452, at *6 (S.D.N.Y. Mar. 30, 2020) (quoting 4 Weinstein's Federal Evidence § 702.03 (2019)).  Indeed, neither the Government nor the Court could identify a federal court that has admitted expert testimony on the jury's hindsight bias.  Gov't Br. at 14. The Defense cites no such case law in its response.  Second, even if the jury's hindsight bias were a relevant topic of expert testimony, the Court would exclude it because of Rule 403 prejudice.  The Court will instruct the jury on how to assess evidence and determine Ms. Maxwell's intent.  An expert instruction on hindsight bias risks confusing the jury and usurping the Court's role in instructing the jury as to the law.  *Nimely*, 414 F.3d at 397.

Next, Dr. Dietz offers an opinion on the so-called halo effect.  Specifically, the Defense expects that Dr. Dietz would testify that an individual's positive traits—like attractiveness, charisma, intelligence, and status—can cause other people to overlook the individual's negative traits.  Notice at 5–6.  Dr. Dietz would testify that Jeffrey Epstein "exploited the Halo effect to surround himself with people who would serve his needs" while "compartmentaliz[ing]" what they knew about his activities.  *Id.* at 6–7.  The Defense argues that the opinion is relevant to Ms. Maxwell's knowledge of Epstein's conspiracy.  Def. Br. at 9–10.  The Government argues that such testimony is irrelevant to any defense and that it improperly suggests sympathy and nullification.  Gov't Br. at 15–16.  It further argues that Dr. Dietz's opinion on Epstein

specifically is inadmissible as a vehicle for factual narrative based on only limited written records. *Id.* at 17.

The Court first concludes that Dr. Dietz's general opinion on the existence of a phenomenon called "the halo effect" is admissible. The testimony may be relevant to the jury's determination of Ms. Maxwell's knowledge because it could explain how, for example, Ms. Maxwell took actions that resulted in sexual abuse but without any intent or knowledge of that result. The risk of improper sympathy or the suggestion of nullification can be addressed with a limiting instruction.

The Court will, however, without a further showing by the Defense, likely preclude Dr. Dietz from applying the halo effect to Epstein. In the notice, Dr. Dietz diagnoses Epstein with "antisocial, narcissistic, borderline, and histrionic personality disorders" that "allowed him to use his brilliance to manipulate people." Notice at 6–7. Dr. Dietz never met or examined Epstein but instead bases this opinion on documents that he reviewed, including media interviews of Epstein, evidence from the Florida investigation of Epstein, and materials produced in this litigation. *Id.* at 6; Def. Br., Ex. 1 at 166–68. But neither Dr. Dietz nor the Defense has offered support for the claim that this is a reliable means by which an expert in Dr. Dietz's field would diagnose an individual. Typically, federal courts admit an expert diagnosis of a personality disorder only if the expert personally interviewed the diagnosed individual. *E.g.*, *Tchatat v. City of New York*, 315 F.R.D. 441, 445–47 (S.D.N.Y. 2016); *United States v. Falcon*, 245 F. Supp. 2d 1239, 1244 (S.D. Fla. 2003); *see also Tardif v. City of New York*, 344 F. Supp. 3d 579, 600 (S.D.N.Y. 2018); *O'Loughlin v. USTA Player Dev. Inc.*, No. 14 CV 2194 (VB), 2016 WL 5416513, at *5 (S.D.N.Y. Sept. 28, 2016). In *Tchatat v. City of New York*, for example, the court precluded an expert's diagnosis of antisocial personality disorder reached only on written

records.  315 F.R.D. at 445.  The Court would exclude Dr. Dietz's diagnosis for much the same

reasons that court identified.  First, the Defense has offered no evidence that diagnosis without

any in-person interview is a reliable and accepted method in Dr. Dietz's field.  *Id.* at 446.

Second, even if reliable, the opinion risks significant Rule 403 prejudice because the jury is

likely to overweigh Dr. Dietz's diagnosis.  *Id.* at 447.  Expert testimony may not act as a vehicle

to "offer[ ] a narrative history" of the case to the jury or to simply "'regurgitate' the evidence"

already available in the record.  *In re Fosamax Prod. Liab. Litig.*, 645 F. Supp. 2d 164, 192

(S.D.N.Y. 2009).  Instead, jurors may consider the applicability of the halo effect based on

evidence in the record, including the anticipated testimony of multiple individuals that interacted

directly with Epstein.

 Next, Dr. Dietz expects to testify that because victims of sexual assault often develop

post-traumatic stress disorder, they avoid situations and feelings that are likely to bring on

symptoms of PTSD, including contact with their abusers or wearing clothes gifted by their

abusers.  Notice at 11.  The Defense explains that this testimony is relevant because it would

mean that evidence of alleged victims interacting with Ms. Maxwell or Epstein after they have

allegedly been abused is probative of whether their allegations of abuse are credible.  Def. Br. at

15–16.  The Government argues that this opinion blames victims for their abuse, that it does not

fit the facts of this case because the abuse was not accomplished by physical force, and that Dr.

Dietz does not have a reliable basis for the opinion.  Gov't Br. at 23–25.

 The Court will admit this opinion.  Dr. Dietz's notice includes several citations to studies

that link victims of sexual abuse to PTSD, which the Court finds to be a reliable basis for the

opinion.  Notice at 11.  The Government may of course cross-examine Dr. Dietz about contrary

research.  The Government's other two objections—that the opinion is victim blaming and that it

does not match the particular facts of this case—are similarly appropriate grounds for cross-examination but not for outright exclusion. *See In re Mirena IUD Prod. Liab. Litig.*, 169 F. Supp. 3d 396, 419 (S.D.N.Y. 2016).

Next, Dr. Dietz provides several opinions on "indices in determining the credibility of a victim's claims." Notice at 10. The first of these indices is whether "the core details" of an accusation remain constant over time. *Id.* The second is that an alleged victim's "emotional distress [is not] predictive of the truthfulness of the allegation." *Id.* at 11. And third, that victims of sexual assault "have higher rates of mental disorders," which "can affect memory and recall." *Id.* As the Court explained in its opinion admitting Dr. Rocchio, "expert opinions that constitute evaluations of witness credibility, even when such evaluations are rooted in scientific or technical expertise, are inadmissible under Rule 702." *Nimely*, 414 F.3d at 398. "And, a witness's *demeanor* on the stand . . . impacts the assessment of credibility" by the jury. *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999) (emphasis added).

With this law in mind, the Defense explains that Dr. Dietz's credibility testimony is relevant primarily to argue that Dr. Rocchio improperly believed her clients' claims of sexual abuse. Def. Br. at 13–14. The Defense says that professionals in Dr. Rocchio's field would evaluate their client's claims in a clinical setting and that in a forensic setting Dr. Rocchio erred in believing alleged victim's claims based on their outward emotions. *Id.*

The Court will exclude Dr. Dietz's opinions on witness credibility. First, they have only marginal relevance. At the *Daubert* hearing, Dr. Rocchio made clear that when serving clients in her clinical capacity, she does not "go out and verify any part of what's being told in the clinical room." Nov. 10 Tr. at 16. As she explained, "in a clinical setting, it is not [her] role to determine whether something is or is not true." *Id.* at 40. Therefore, Dr. Dietz's opinion about

how to verify victims' claims is not responsive to Dr. Rocchio's testimony from her clinical experience.  And contrary to the Defense's briefing, nothing in Dr. Dietz's expert notice contradicts this description of Dr. Rocchio's role in a clinical setting.  He lists "indices" that "professionals often use."  Notice at 10.  But Dr. Dietz does *not* say that psychologists in a clinical setting must use these indices to verify their patients' claims.  On the forensic side, Dr. Rocchio takes on "an investigative role" and does not accept claims "at face value."  Nov. 10 Tr. at 15.  But Dr. Dietz's opinion about evaluating victims' credibility still has little relevance to Dr. Rocchio's forensic evaluations.  In explaining her method, Dr. Rocchio did not say that she "base[s] her opinions" on victims' emotional distress.  Def. Br. at 14.  Rather, she testified that she looks at a significant volume of documentation, conducts an 8 to 10-hour in-person evaluation, and "conduct[s] collateral interviews with others."  Nov. 10 Tr. at 37–38.  And consistent with Dr. Dietz's opinion, Dr. Rocchio said that she looks "for consistencies and inconsistencies in what the individual is telling [her] in order to form an opinion." *Id.* at 39.  In sum, Dr. Dietz's opinion of determining witnesses' credibility has little relevance to rebut or "critique" Dr. Rocchio's methods.  Def. Br. at 13.

Second, there is a significant risk of prejudice.  As explained, expert testimony that evaluates witnesses' credibility is inadmissible.  For example, the Second Circuit in *Lumpkin* affirmed the exclusion of an expert opinion that a witness's "confidence in identification is not a good predictor of accuracy" because it "would effectively have inserted [the expert's] own view of the [testifying witness's] credibility for that of the jurors, thereby usurping their role."  192 F.3d at 288–89.  Dr. Dietz's opinions that the consistency of core details is predictive of accurate claims and that emotional distress is not predictive of accuracy are very similar to the "demeanor" opinion excluded in *Lumpkin*. *Id.*  Even if the Defense intends Dr. Dietz's

testimony for a permissible purpose, the Court finds a substantial risk that jurors will instead use

Dr. Dietz's testimony to evaluate the credibility of witnesses before them.  This risk of confusing

or misleading the jury substantially outweighs the little permissible relevance that the opinion

has.

The Defense in its response does not mention the third piece of Dr. Dietz's opinion on

witness credibility, which is that victims of sexual abuse have higher rates of mental illness and

substance abuse that "can affect memory and recall."  Notice at 11.  It is unclear to the Court

why this opinion is helpful to the jury or relevant to the Defense's case.  Indeed, it seems directly

contrary to the Defense's position at the *Daubert* hearing that it intends to *impeach* the

credibility of some alleged victims because of their substance abuse.  Nov. 10 Tr. at 156–57.

Without more, the Court excludes this opinion under Rules 401 and 403 as irrelevant, as

needlessly cumulative with Dr. Rocchio's opinion about substance abuse, and because it is likely

to confuse the jury or needlessly inflame biases about individuals with mental illness.

Dr. Dietz's last opinion is "drawn nearly verbatim" from an academic article that lists

eleven "pathways to false sexual assault allegations," which are: lying, implied consent, false

memories, intoxication, antisocial personality disorder, borderline personality disorder, histrionic

personality disorder, delirium, psychotic disorders, dissociation, and intellectual disability.

Notice at 7–10; Gov't Br., Ex. C ("Pathways Article").  The Government argues that this

testimony should be excluded because it is not based on reliable methods, it involves lay topics

within the ken of the jury, and it does not fit the facts of the case.  Gov't Br. at 18–21.

Based on the facts currently before it, the Court will not admit this opinion.  First, Dr.

Dietz's opinion relies on a single article that presents these explanations for false accusations but

provides no empirical basis for how frequent any of them are.  *E.g.*, Pathways Article at 97

("Further research is needed into the frequency of these pathways . . . ."). Indeed, the article suggests that false accusations are "somewhat rare," accounting for two to ten percent of all rape accusations. *Id.* at 101. By contrast, Dr. Rocchio's opinions are drawn both from empirical studies and from her forensic and clinical experience. She stated, for example, that the "majority" of her patients delayed disclosing their abuse. Nov. 10 Tr. at 87, 151. In its response brief, the Defense states that Dr. Dietz "has personally seen ten of the eleven pathways to false allegations identified by" the article. Def. Br. at 12. But that assertion is "merely the statement of counsel . . . unaccompanied by any citation." *Tchatat*, 315 F.R.D. at 446. Dr. Dietz's lengthy summary of his expected pathways testimony makes no reference to his own experience. And even if he did reference his experience, Dr. Dietz would need to explain how that experience provides a basis for concluding that these pathways are more than rare explanations for false accusations. *See 523 IP LLC v. CureMD.Com*, 48 F. Supp. 3d 600, 643 (S.D.N.Y. 2014). Because the Defense has provided no such evidence of experience, it has failed to carry its burden of proof under Rule 702. *Daubert*, 509 U.S. at 592 n.10.

Second, most, if not all, of Dr. Dietz's opinion on false accusations falls within "the ken of the average person," and so is not proper expert testimony. *United States v. Felder*, 993 F.3d 57, 72 (2d Cir. 2021). The Court finds that jurors do not require expert testimony that, for example, lying, intoxication, or severe personality disorders that cause hallucinations can lead to false accusations. *E.g.*, *Doe v. Hartford Sch. Dist.*, No. 2:16-CV-00206, 2018 WL 1064572, at *5 (D. Vt. Feb. 26, 2018) (excluding expert testimony that "people involved in child abuse cases have a motive to lie").

Dr. Rocchio's testimony at the *Daubert* hearing demonstrates the point. When cross-examined by Defense counsel, Dr. Rocchio agreed that "many reasons," including "outright

12

lying," "false memories," "intoxication," and "a variety of psychiatric disorders" can lead to false accusations. Nov. 10 Tr. at 154. This exchange shows that cross-examination is an adequate basis for testing Dr. Rocchio's opinion and that jurors do not require an expert to understand the content of that cross-examination. Because this testimony goes to "lay matters which a jury is capable of understanding and deciding without the expert's help," the Court excludes testimony on these matters. *United States v. Mulder*, 273 F.3d 91, 101 (2d Cir. 2001) (quoting *United States v. Castillo*, 924 F.2d 1227, 1232 (2d Cir. 1991)).

Third, Dr. Dietz's opinion on false memories rests on the research of Dr. Loftus. Because the Court will admit Dr. Loftus's testimony on false memories, the Court will preclude Dr. Dietz's testimony on the same issue as needlessly cumulative and causing undue delay.

Fourth, in the second pathway, Dr. Dietz states that implied consent can lead to false accusations. Notice at 7–8. Based on the offenses charged, the alleged victims' willingness or verbal consent to engage in sexual conduct is irrelevant here: Whether there was consent turns entirely on the alleged victims' ages. *See Kidd*, 385 F. Supp. 3d at 252–53. The Court therefore excludes this opinion under Rules 401 and 403 because it is not probative but risks confusing jurors about the proper standard of guilt.

In sum, on the present record, the Court will exclude Dr. Dietz's "pathways to false accusations" opinion.

## III.    The testimony of Dr. Elizabeth Loftus

The Defense also seeks to admit the testimony of Dr. Elizabeth Loftus as an expert on the science of memory. The Defense's notice listed approximately five opinions. Notice at 1–2. First, the "creation" and "characteristics of false memories." Second, "how memory fades and weakens over time." Third, "how memory becomes more vulnerable to contamination." Fourth,

"that false memories can be described with confidence, detail, and emotion" without "deliberately lying."  And fifth, that "suggestive activities" can explain how alleged victims of sexual assault can develop later "memories" of sexual abuse that did not actually happen.  As part of this last opinion, the notice states that "Dr. Loftus would identify some of the suggestive activities that occurred in the current case."  *Id.* at 2.

The Government seeks to exclude most or all of these opinions because they are unreliable, fall within the ken of the jury, impermissibly bear on witness credibility, or act as vehicles for factual narratives of the case.  Def. Br. at 30–35.

As a preliminary matter, based on her expert notice and the attached CV, the Court finds Dr. Loftus to be qualified to offer these opinions based on both her experience and formal education.  Dr. Loftus is a frequent expert witness in state courts.  *Id.* at 19 (collecting cases).  But the Court also observes that a significant number of federal courts have excluded her expert opinions for lack of reliability and fit.  *E.g.*, *United States v. Shiraishi*, No. CR 17-00582 JMS-RLP, 2019 WL 1386365, at *4 (D. Haw. Mar. 27, 2019); *R.D. v. Shohola, Inc.*, No. 3:16-CV-01056, 2019 WL 6053223, at *10 (M.D. Pa. Nov. 15, 2019) ("[P]roffered expert testimony by Dr. Loftus which simply restates matters within the common understanding of lay jurors is inadmissible."); *United States v. Libby*, 461 F. Supp. 2d 3, 4 (D.D.C. 2006); *United States v. Carter*, 410 F.3d 942, 950 (7th Cir. 2005); *United States v. George*, 975 F.2d 1431, 1432 (9th Cir. 1992) (affirming denial of funds to hire Dr. Loftus); *United States v. Curry*, 977 F.2d 1042, 1051–52 (7th Cir. 1992).  *But see Lam v. City of San Jose*, No. 14-CV-00877-PSG, 2015 WL 6954967, at *2 (N.D. Cal. Nov. 10, 2015) (admitting Dr. Loftus's testimony).

The Court will deny in part and grant in part the Government's motion as to Dr. Loftus.  To start, the Court will admit Dr. Loftus's opinions about how memories can become

contaminated over time, how false memories can be created through suggestive activities, and how alleged victims can testify to false memories they believe to be true.  Each of these opinions derives from Dr. Loftus's expertise in memory science and is supported by significant research she has conducted.  *See Shiraishi*, 2019 WL 1386365, at *4.  Additionally, the Court finds that opinions on suggestive activities and creation of false memories are "beyond the knowledge of the average juror."  *Doe*, 2018 WL 1064572, at *5 (collecting cases that admitted expert testimony on the effects of suggestive questioning of alleged sexual abuse victims).  Nor do these opinions about suggestion and false memory, as currently proffered by the Defense, invade the jury's fact-finding role.  Much like Dr. Rocchio may inform jurors that victims of sexual assault often delay disclosure, Dr. Loftus may inform jurors that the literature indicates that false accusations can result from suggestive activities or false memory creation.

The Court will, however, limit or preclude altogether several of Dr. Loftus's opinions. First, Dr. Loftus's opinion that "memory fades and weakens over time" falls within the ken of the average juror.  Notice at 1.  "It is common knowledge that memory fades with time."  *United States v. Labansat*, 94 F.3d 527, 530 (9th Cir. 1996); *see also United States v. Welch*, 368 F.3d 970, 973–75 (7th Cir. 2004), *judgment vacated on other grounds*, 543 U.S. 1112 (2005) ("[I]t does not require an expert witness to point out that memory decreases over time."); *United States v. Heine*, No. 3:15-CR-00238-SI-2, 2017 WL 5260784, at *3 (D. Or. Nov. 13, 2017) ("[T]hat memories are fallible and may deteriorate over time . . . is within the ken of the ordinary juror."). It is therefore inadmissible as expert testimony.  *Mulder*, 273 F.3d at 101.

Second, the notice of Dr. Loftus's expert testimony refers three times to Dr. Loftus's expected testimony on "the suggestive activities that occurred *in the current case*."  Notice at 2 (emphasis added).  The Court would preclude such testimony on the specific facts of this case

because an expert witness may not "simply transmit . . . hearsay to the jury" or otherwise serve as a vehicle for the factual history of the case. *United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008); *see In re Fosamax*, 645 F. Supp. 2d at 192. Testifying as to specific suggestive activities would also likely violate the rule against expert testimony on specific witnesses' credibility. *Nimely*, 414 F.3d at 398.

But in its response brief, the Defense states that "[l]ike Dr. Rocchio, [Dr. Loftus] would be testifying as a 'blind' expert" and so will not testify about any particular witness in this case. Def. Br. at 17. Based on this representation, the Court will admit Dr. Loftus's opinion on the general concepts of suggestive activities and false memory creation. The Defense may on cross-examination ask witnesses about activities or events that the Defense believes led to false memories. And the jury may then determine whether the general concepts in Dr. Loftus's opinions are applicable to the evidence before it.

Last, the Court clarifies that this decision as to Dr. Loftus is by no means an invitation for memory experts to be admitted in every future case. As other federal courts have observed, expert testimony of this type is relevant only in unusual circumstances. *See Carter*, 410 F.3d at 950; *United States v. Redwood*, 216 F. Supp. 3d 890, 899 (N.D. Ill. 2016) ("While in unique circumstances expert testimony regarding memory and perception may be warranted, this is not one of those cases."); *Heine*, 2017 WL 5260784, at *2 (explaining that other courts have excluded memory experts "in ordinary cases"). The Court finds this case to be one such unusual circumstance, both because of the long period of time that has elapsed since the charged conduct and because of the public attention that conduct has received. Important, too, is that the Court has admitted the Government's expert, Dr. Rocchio, who expects to testify on delayed disclosure

of sexual abuse.  That testimony partially opens the door to memory-based explanations for the alleged victims' later disclosures of abuse.

## IV.    Conclusion

The Court therefore denies in part and grants in part the Government's motion to preclude Dr. Dietz's testimony and denies in part and grants in part the Government's motion to preclude Dr. Loftus's testimony.

This resolves docket number 424.


SO ORDERED.


Dated: November 21, 2021
       New York, New York                          _____
                                                              ALISON J. NATHAN
                                                           United States District Judge