UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
                                          :
UNITED STATES OF AMERICA                  :
                                          :         S2 20 Cr. 330 (AJN)
           v.                             :
                                          :
GHISLAINE MAXWELL,                        :
                                          :
                    Defendant.            :
                                          :
                                          :
--------------------------------------------------------x


## OMNIBUS MEMORANDUM OF GHISLAINE MAXWELL
## IN SUPPORT OF HER POST-TRIAL MOTIONS

Christian R. Everdell
COHEN & GRESSER LLP
800 Third Avenue
New York, NY 10022
Phone: 212-957-7600


Jeffrey S. Pagliuca
Laura A. Menninger
HADDON, MORGAN & FOREMAN P.C.
150 East 10th Avenue
Denver, Colorado 80203
Phone: 303-831-7364


Bobbi C. Sternheim
Law Offices of Bobbi C. Sternheim
33 West 19th Street - 4th Floor
New York, NY 10011
Phone: 212-243-1100


*Attorneys for Ghislaine Maxwell*

## <u>TABLE OF CONTENTS</u>

**Page**

ARGUMENT ..................................................................................................... 1

I.  The Court Must Vacate Ms. Maxwell's Convictions on the Mann Act Counts Due
to a Constructive Amendment/Variance from the Crimes Charged in the Indictment....... 1

    A.  Background Facts ........................................................................... 3

        1.  Legal Instructions to the Jury ................................................. 3

        2.  The Jury Note ....................................................................... 6

    B.  Applicable Law ............................................................................. 7

    C.  The "Core of Criminality" of the Mann Act Counts Was a Scheme to Entice
or Cause Underaged Girls to Travel to New York with an Intent to Violate
New York Law ............................................................................... 9

    D.  There is a Substantial Likelihood that Ms. Maxwell Was Convicted on
Three of the Mann Act Counts Based on Conduct Not Charged in the
Indictment. ................................................................................... 11

    E.  The Variance Between the Proof at Trial and the Allegations in the
Indictment Substantially Prejudiced Ms. Maxwell. ............................... 16

II.  The Court Should Enter Judgment on Only One of the Three Conspiracy Counts
Because They Are Multiplicitous. .................................................................. 18

    A.  Applicable Law ............................................................................. 19

    B.  The Proof at Trial Established, at Most, a Single Conspiracy. ................... 21

        1.  Overlap of Participants and Time ............................................ 22

        2.  Similarity of Operation, Common Objectives, and Geographic Scope .... 23

        3.  Common Overt Acts .............................................................. 24

        4.  Degree of Interdependence Between the Conspiracies ..................... 24

III.  The Court Should Vacate Ms. Maxwell's Conviction and Dismiss the S2 Indictment
Due to Pre-Indictment Delay. ....................................................................... 25

    A.  Flight Records – Passenger Manifests and Shoppers Travel Records ............ 26

    B.  Financial Documents – Bank Records and Credit Card Records ................... 27

C.      Phone Records ........................................................................................... 28

D.      Property Records ....................................................................................... 28

E.      Deceased Witnesses .................................................................................. 29

IV.   The Court Should Enter a Judgment of Acquittal as to All Counts Because the
      Government Failed to Prove Each Element of the Charges Beyond a Reasonable
      Doubt ..................................................................................................................... 30

CONCLUSION ................................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ball v. United States,*
    470 U.S. 856 (1985)................................................................................................21

*Braverman v. United States,*
    317 U.S. 49 (1942)................................................................................................20

*People v. Carvajal,*
    6 N.Y.3d 305 (2005)............................................................................................11

*United States v. Attanasio,*
    870 F.2d 809 (2d Cir. 1989)..............................................................................8, 10

*United States v. Broce,*
    488 U.S. 563 (1989)............................................................................................20

*United States v. Chacko,*
    169 F.3d 140 (2d Cir. 1999)...........................................................................19, 20

*United States v. Colton,*
    231 F.3d 890 (4th Cir. 2000) ...............................................................................20

*United States v. Cooper,*
    886 F.3d 146 (D.C. Cir. 2018)........................................................................21, 22

*United States v. D'Amelio,*
    683 F.3d 412 (2d Cir. 2012)................................................................7, 8, 12, 16

*United States v. Diallo,*
    507 F. App'x 89 (2d Cir. 2013) ...........................................................................21

*United States v. Dixon,*
    509 U.S. 688 (1993)............................................................................................20

*United States v. Estrada,*
    320 F.3d 173 (2d Cir. 2003)...........................................................................20, 21

*United States v. Gross,*
    No. 15-cr-769 (AJN), 2017 WL 4685111 (S.D.N.Y. Oct. 18, 2017) ............................ *passim*

*United States v. Johansen,*
    56 F.3d 347 (2d Cir. 1995)...................................................................................20

*United States v. Josephburg*,
    459 F.3d 350 (2d Cir. 2006)..................................................................................19, 21

*United States v. Korfant*,
    771 F.2d 660 (2d Cir. 1985)..................................................................................21, 22

*United States v. Macchia*,
    35 F.3d 662 (2d Cir. 1994)..............................................................................21, 23, 24

*United States v. Miller*,
    471 U.S. 130 (1985)......................................................................................................9

*United States v. Millstein*,
    401 F.3d 53 (2d Cir. 2005)..........................................................................................9, 11

*United States v. Reid*,
    475 F. App'x 385 (2d Cir. 2012) ...............................................................................22

*United States v. Roshko*,
    969 F.2d 1 (2d Cir. 1992) .........................................................................................8, 11

*United States v. Sattar*,
    314 F. Supp. 2d 279 (S.D.N.Y. 2004)........................................................................20

*United States v. Wozniak*,
    126 F.3d 105 (2d Cir. 1997).............................................................................8, 10, 11, 18

**Statutes**

18 U.S.C. § 371.................................................................................................18, 20, 21, 22

21 U.S.C. § 846.............................................................................................................21

Mann Act ............................................................................................................. *passim*

New York Penal Law, Section 130.55 ................................................................. *passim*

**Other Authorities**

Federal Rule of Criminal Procedure 29 .............................................................1, 30, 31

Federal Rule of Criminal Procedure 33 .............................................................1, 2, 30

Ghislaine Maxwell respectfully submits this Omnibus Memorandum in Support of her Post-Trial Motions.  For the reasons set forth below, Ms. Maxwell moves the Court, in the alternative, to:

1. Vacate her convictions as to the Mann Act counts (Counts One through Four) and grant a new trial under Rule 33 because the convictions were based on a constructive amendment/variance from the allegations in the S2 Indictment (the "Indictment").

2. Enter judgment on only one of the three conspiracy counts because they are multiplicitous.

3. Vacate her convictions as to all counts and dismiss the Indictment due to pre-indictment delay.

4. Enter a judgment of acquittal as to all counts under Rule 29 because the government failed to prove each element of the crimes charged beyond a reasonable doubt.

## **ARGUMENT**

### I.    **The Court Must Vacate Ms. Maxwell's Convictions on the Mann Act Counts Due to a Constructive Amendment/Variance from the Crimes Charged in the Indictment.**

Throughout this case, the government has consistently maintained that to convict Ms. Maxwell on the Mann Act Counts (Counts One through Four), it was necessary to prove that Ms. Maxwell enticed or caused underaged girls to travel to *New York*, or conspired to do the same, with the intent that they would engage in illegal sexual activity that violated *New York* law.  The government further acknowledged that evidence of sexual activity that occurred in locations outside of New York, like Epstein's residences in New Mexico and Florida, was not, by itself, sufficient to convict Ms. Maxwell on the Mann Act charges.

Nevertheless, the government repeatedly resisted numerous efforts by the defense to clarify these points for the jury, both in limiting instructions or in the jury charge itself.  The government stressed over and over that the jury could not possibly be confused that the Mann Act counts had to involve a violation of New York law because the jury instructions charged

them with respect to only one, and only one, criminal statute – New York Penal Law, Section 130.55.  In the final jury charge, the Court denied several of the defense requests for clarifying language, including that the Mann Act charges were premised on travel to New York and that sexual activity that occurred outside of New York could not be considered "illegal sexual activity" as charged in the Indictment.

It is evident from the record, however, that there is a substantial likelihood that Ms. Maxwell was convicted on three of the four Mann Act counts based on Jane's testimony about sexual abuse she experienced at Epstein's ranch in *New Mexico* when she was 15 or 16 years old. A jury note sent during their deliberations (Court Exhibit #15) clearly indicated that the jurors were considering convicting Ms. Maxwell on Count Four of the Indictment based solely on the New Mexico conduct.  The Court denied the defense's request to give a clarifying instruction to the jury that the New Mexico conduct could not form the basis of a conviction on the substantive Mann Act counts because it was not a violation of New York law.  Instead, the Court directed the jury to the existing jury charge for Count Four.  The jury ultimately convicted Ms. Maxwell on Count Four and the two Mann Act conspiracies charged in Counts One and Three.

Jane's testimony about sexual abuse in New Mexico presented the jury with an alternative basis for conviction on the Mann Act counts that was entirely distinct from the charges in the Indictment, which were premised on a violation of New York law.  The Court's instructions to the jury were insufficient to prevent them from convicting on this basis, which constituted a constructive amendment and/or a variance from the charges in the Indictment. Accordingly, Ms. Maxwell moves under Rule 33 of the Federal Rules of Criminal Procedure for the Court to vacate her convictions on Counts One, Three, and Four and grant a new trial.

A.      **Background Facts**

1.      **Legal Instructions to the Jury**

The possible bases for conviction on the Mann Act counts was an issue that came up repeatedly and litigated extensively in the context of the motions *in limine*, the Court's limiting instructions at trial, and the jury charge.  On these occasions, the government repeatedly confirmed that a conviction on the Mann Act counts could only be based on an intent to violate New York law—specifically, New York Penal Law, Section 130.55—and not any other state's penal laws.  Yet the government also repeatedly objected to defense efforts to clarify that point and ensure that the jury did not improperly consider evidence of sexual conduct that took place outside of New York.

For example, when the defense moved *in limine* to preclude Kate's testimony on the grounds that she was above the age of consent in the relevant jurisdictions and therefore her testimony was not probative of the Mann Act conspiracies, the government confirmed that Ms. Maxwell could only be convicted on the Mann Act conspiracies based on a violation of New York law:

> THE COURT: … [I]f the only evidence in the case pertained to [Kate], if all the testimony of [Kate] is accepted by the jury, could the defendant be found guilty of any crimes charged in the indictment?
>
> *          *          *
>
> MS. MOE: …The answer is no…. With respect to the Mann Act conspiracies, the particular criminal sexual activity relates to a particular statute in New York….
>
> THE COURT: The particular statute in New York … that's [130.55] right?
>
> MS. MOE: Yes, your Honor.
>
> *          *          *
>
> THE COURT: So the Mann Act … the case that the government is going to prove here is going to incorporate that as the illegal sexual conduct.

3

MS. MOE: That's correct, your Honor.

THE COURT: So [Ms. Maxwell] couldn't be convicted with respect to that count [based solely on Kate's testimony].

MS. MOE: That's correct, your Honor.

11/1/2021 Tr. 67:15-68:19.  As a result, the Court agreed, over the objection of the government, to give the jury a limiting instruction before the start of Kate's testimony which stated, among other things, that "any sexual conduct she says occurred with Mr. Epstein was not 'illegal sexual activity' as the government has charged in the indictment."  Tr. 1167:23-1168:2.  The Court also gave a similar limiting instruction before Annie Farmer's testimony because she testified about sexual contact in New Mexico, which could not have violated New York law.  Tr. 2048:22-2049:1.

Similarly, when the parties submitted their proposed joint requests to charge, the defense requested that the instructions for the substantive Mann Act counts specify that the government must prove that Jane traveled "from Florida to New York, as charged in the Indictment," as opposed to simply that Jane traveled "in interstate commerce."  Dkt. 410-1 at 19.  The defense highlighted that the addition was necessary because it was expected that Jane would testify "about traveling to, among other places, Epstein's ranch in New Mexico" and "the elements should make clear that the relevant travel for purposes of Count Two is travel from Florida to New York, as alleged in the S2 Indictment."  Id.  The government objected to the addition, stating it was unnecessary because travel to New York was already in the "to wit" clause of the Indictment and that "there [was] no need to include words like 'travel from Florida to New York' … to avoid any suggestion of a variance."  Tr. 2759:12-2760:9.  The Court agreed with the government.  The final jury charge did not specifically mention travel "to New York" and

4

instead instructed the jury that the government needed to prove travel "in interstate commerce, as alleged in the Indictment."  Dkt. 565 at 22.

The government also objected to the defense's request that the jury instructions for the Mann Act conspiracy counts specify the ages of consent in the relevant jurisdictions, stating the following: "The Government's proposed instructions *only permit the jury to convict on a violation of New York Penal Law Section 130.55*.  Accordingly, there is no reason to inform the jury about the ages of consent in other jurisdictions."  Dkt. 410-1 at 52 (emphasis added).  The Court agreed with the government and did not include this instruction.

Finally, the defense requested that the jury charge reiterate the Court's limiting instructions for Kate and Annie Farmer in the section of the charge that addressed the violation of New York law.  Tr. 2773:5-2774:14.  The defense also requested a separate instruction in the same section to address Jane's testimony that she was sexually abused at Epstein's ranch in New Mexico when she was 15 or 16 – information that was disclosed for the first time just before trial.  Tr. 2775:14-2777:6.[1]  The defense pointed out that this conduct was not alleged in the Indictment and could not be a violation of New York law, and therefore the jury should be instructed, similar to Kate and Annie Farmer, that this evidence could not be considered "illegal sexual activity" as charged in the Indictment.  Tr. 2775:24-2776:4.

In responding to both requests, the government stressed that there was no risk that the jury would convict Ms. Maxwell on the Mann Act counts based solely on conduct that did not violate New York law, such as sexual activity in New Mexico.  With regard to Annie Farmer's testimony, the government stated:

---

[1] According to the FBI reports of her prior interviews, Jane initially denied that she was sexually abused in New Mexico.  *See* 3509-008 at 7-11.  Shortly before trial, after being questioned by the government on this topic, Jane recalled for the first time being led to Epstein's room in New Mexico and being sexually abused.  *See* 3509-033 at 1.  She then reiterated this in her testimony.  *See* Tr. 323:15-16 ("I just remember being led to his bedroom and, you know, the same thing would happen.").

> MR. ROHRBACH: Annie only relates to the conspiracy counts, at least as to these Mann Act charges, and the jury is going to be instructed here that the relevant illegal sexual activity has to be the violation of the New York offense. So again, there's no risk that the jury will think that the sexual contact that happened in New Mexico is something that on its own is sufficient to show the illegal sexual activity required by the statute.

Tr. 2775:2-9.  With regard to Jane's testimony, the government reiterated the same point:

> MR. ROHRBACH: Your Honor, these instructions do not put before the jury any violation of any New Mexico offense whatsoever above or below the age of consent, so I think there's no risk that the jury is going to convict the defendant based on their concerns about a violation of a New York offense.

Tr. 2776:5-10.  The Court agreed with the government and declined to include the requested instructions.  Tr. 2777:12-25.

### 2.      The Jury Note

During their deliberations, the jury sent a note inquiring about the proper basis to convict under Count Four of the Indictment (the substantive transportation count) (the "Jury Note" or the "Note").  The Jury Note read as follows:

> Under Count Four (4), if the defendant aided in the transportation of Jane's return flight, but not the flight to New Mexico where/if the intent was for Jane to engage in sexual activity, can she be found guilty under the second element?

Court Exhibit #15 (Dkt. 593 at 23).  The defense argued that the Note indicated that the jury was already contemplating convicting Ms. Maxwell on Count Four based on Jane's testimony about sexual abuse *in New Mexico*, which was not a violation of New York law, and that their question focused on whether Ms. Maxwell's help planning Jane's return flight from New Mexico, assuming they found she gave any, was sufficient to satisfy the second element of Count Four. Tr. 3128:6-3140:18.  The Court disagreed and did not offer any clarifying instructions, and simply referred the jury to the charge for the second element of Count Four.  Tr. 3140:20-3141:3.

The defense followed up with a letter requesting that the Court give the jury the following additional instruction to avoid a conviction on the substantive Mann Act counts based on a constructive amendment or a prejudicial variance:

> As to the third element of Count Two, you must determine whether the Government has proven beyond a reasonable doubt that the Defendant acted with the intent that Jane would engage in sexual activity within the state of New York in violation of New York Penal Law 130.55.

> As to the second element of Count Four, you must determine whether the Government has proven beyond a reasonable doubt that the Defendant transported Jane with the intent that Jane would engage in sexual activity within the state of New York in violation of New York Penal Law 130.55.

> An intent that Jane engage in sexual activity in any state other than New York cannot form the basis of these two elements of Counts Two and Four.

(Dkt. 566). The defense further argued that it would be insufficient and improper for the jury to convict Ms. Maxwell based solely on New Mexico conduct and that the instruction was necessary to prevent that outcome. Tr. 3152:11-3154:10. The Court declined to give the supplemental instruction. The jury ultimately convicted Ms. Maxwell on Count Four and the two Mann Act conspiracies charged in Counts One and Three.

## B.    Applicable Law

"To prevail on a constructive amendment claim, a defendant must demonstrate that the terms of [an] indictment are in effect altered by the presentation of evidence and jury instructions which so modify *essential elements* of the offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment." *United States v. Gross*, No. 15-cr-769 (AJN), 2017 WL 4685111, at *20 (S.D.N.Y. Oct. 18, 2017) (cleaned up). "Because the doctrine of constructive amendment protects a defendant's Grand Jury Clause rights, a constructive amendment constitutes a 'per se violation' of the defendant's constitutional rights—*i.e.* there is no requirement that a defendant make a

specific showing of prejudice." *Id.* at *20 (quoting *United States v. D'Amelio*, 683 F.3d 412, 417 (2d Cir. 2012)).

Although the Second Circuit has "consistently permitted significant flexibility" in how the government proves the crime alleged, the defendant must be "given notice of the core of criminality to be proven at trial." *Id*. (cleaned up). Accordingly, the first step in evaluating whether a constructive amendment has occurred is for the Court to define the "core of criminality" of the crimes alleged. *Id*. (cleaned up). It is well settled that "the object of a conspiracy constitutes an essential element of the conspiracy offense." *Id*. (quoting *United States v. Roshko*, 969 F.2d 1, 5 (2d Cir. 1992). Moreover, "although an indictment 'drawn in general terms' may articulate a broad core of criminality, an indictment that is drawn in specific terms may be read to specify a narrower set of facts—such that the proof of completely distinct facts at trial could lead to a constructive amendment." *Id*. (quoting *United States v. Wozniak*, 126 F.3d 105, 109-10 (2d Cir. 1997)). For example, specific overt acts alleged in the indictment may narrow the scope of the core of criminality because they "effect the object of the [charged] conspiracy." *United States v. Attanasio*, 870 F.2d 809, 816-17 (2d Cir. 1989) (citation omitted). By contrast, general factual allegations in an indictment that are not part of the specific statutory allegations of a particular count may not limit the core of criminality of that offense. *Id*. Similarly, the "essential elements" do not include "the *specific means* used by a defendant to effect his or her crime." *D'Amelio*, 683 F.3d at 422.

"After identifying the core of criminality, a court must then determine whether the evidence or jury instructions at trial created a substantial likelihood that the defendant was not convicted of the crime described in that core, but of a crime 'distinctly different' from the one alleged." *Gross*, 2017 WL 4685111, at *21 (citing *D'Amelio*, 683 F.3d at 419-21). It is not

sufficient for the defendant to show simply that the proof at trial diverged from the allegations in the indictment.  To establish a constructive amendment, the defendant must show that the evidence and jury instructions created a substantial likelihood that she was convicted for "behavior *entirely separate* from that identified in the indictment." *Id*. (cleaned up).

The fundamental principle of constructive amendment is clear: "When the trial evidence or the jury charge operates to 'broaden [ ] the possible bases for conviction from that which appeared in the indictment,' the indictment has been constructively amended." *United States v. Millstein*, 401 F.3d 53, 65 (2d Cir. 2005) (quoting *United States v. Miller*, 471 U.S. 130, 138 (1985) (emphasis omitted)).

In contrast to a constructive amendment, "[a] variance occurs when the charging terms of the indictment are left unaltered, but the evidence at trial proves facts materially different from those alleged in the indictment." *Gross*, 2017 WL 4685111, at *31 (cleaned up).  A defendant alleging variance must show "substantial prejudice" to warrant reversal.  *Id*. (cleaned up).  "The determination of whether a variance between an indictment and the proof at trial is prejudicial turns on whether the variance infringes on the substantial rights that indictments exist to protect—to inform an accused of the charges against him so that he may prepare his defense and to avoid double jeopardy."  *Id*. (cleaned up).

C.  **The "Core of Criminality" of the Mann Act Counts Was a Scheme to Entice or Cause Underaged Girls to Travel to New York with an Intent to Violate New York Law.**

There can be no serious dispute that the "core of criminality" of the Mann Act offenses charged in Counts One through Four of the Indictment was a scheme by Epstein and Ms. Maxwell to entice or cause underage girls to travel to *New York* with the intent that they would engage in sexual activity in violation of *New York* law.  The Indictment itself was clear on its face.  The substantive Mann Act offenses (Counts Two and Four) specifically alleged in the "to

wit" clauses that the charges were based on Jane's travel "from Florida to New York, New York" where Ms. Maxwell intended for her to engage in sex acts with Epstein "in violation of New York Penal Law, Section 130.55." Ind. ¶¶ 15, 21. The Mann Act conspiracy counts (Counts One and Three) alleged generally that the object of the conspiracies was to entice or cause underage girls to travel across state lines with the intent that they "engage in sexual activity for which a person can be charged with a criminal offense." Ind. ¶¶ 12, 18. However, each count specified in the overt acts that the relevant criminal offense was a "violation of New York Penal Law, Section 130.55." Ind. ¶¶ 13b, 19b. *See Attanasio*, 870 F.2d at 816 (overt acts can narrow the core of criminality of a conspiracy offense); *Gross*, 2017 WL 4685111, at *20 ("[A]lthough an indictment 'drawn in general terms' may articulate a broad core of criminality, an indictment that is drawn in specific terms may be read to specify a narrower set of facts[.]" (quoting *Wozniak*, 126 F.3d at 109-10)).

Even more important than the language of the Indictment were the government's own statements to the Court about the scope of the Mann Act counts. As set forth above, the government consistently represented to the Court, in numerous conferences and filings, that a conviction under the Mann Act counts had to be based on an intent or an agreement to violate New York law, specifically New York Penal Law, Section 130.55. *See, e.g.*, 11/1/2021 Tr. 68:2-4 ("With respect to the Mann Act conspiracies, the particular criminal sexual activity relates to a particular statute in New York."); Dkt. 410-1 at 52 ("The Government's proposed instructions *only permit the jury to convict on a violation of New York Penal Law Section 130.55.*" (emphasis added)); Tr. 2775:3-6 ("[A]t least as to these Mann Act charges, and the jury is going to be instructed here that the relevant illegal sexual activity has to be the violation of the New York offense.").

The government therefore affirmatively stated on several occasions that the "core of criminality" of the Mann Act offenses was a scheme to cause underaged girls to travel to New York to engage in sexual activity that violated New York law.  It follows, then, that evidence that an underaged girl traveled to any other state besides New York and engaged in sexual activity that was illegal under that state's laws would be insufficient, by itself, to convict Ms. Maxwell of the Mann Act counts.[2]  If Ms. Maxwell were convicted on the Mann Act counts based solely on such conduct, that would be a constructive amendment of the charges in the Indictment.  *See Millstein*, 401 F.3d at 65 ("When the trial evidence or the jury charge operates to broaden the possible bases for conviction from that which appeared in the indictment, the indictment has been constructively amended." (cleaned up)); *see also id.* at 65 (constructive amendment found when defendant was convicted of misbranding drugs on an entirely distinct misbranding theory than the one charged in the indictment); *Wozniak*, 126 F.3d at 106-08 (constructive amendment found when defendant was charged with possession with intent to distribute cocaine and methamphetamines, but the proof at trial showed possession with intent to distribute marijuana); *Roshko*, 969 F.2d at 4-6 (constructive amendment found when defendant was charged with a conspiracy to change the immigration status of an alien, but the proof at trial related to a conspiracy with an entirely distinct object).

**D.      There is a Substantial Likelihood that Ms. Maxwell Was Convicted on Three of the Mann Act Counts Based on Conduct Not Charged in the Indictment.**

Yet there is a substantial likelihood that this is exactly what happened in this case: Jane's testimony about sexual activity that occurred in New Mexico, which did not violate New York law, combined with insufficient jury instructions and the Court's refusal to give the jury

---

[2] Engaging in sexual activity in any other state cannot form the basis for a violation of New York law.  *See People v. Carvajal*, 6 N.Y.3d 305, 312 (2005) ("CPL 20.20[] has codified the general principle that, for New York to exercise criminal jurisdiction, some alleged conduct or a consequence of that conduct must have occurred in the state.").

additional clarifying instructions in response to the Jury Note, constructively amended the Indictment and allowed the jury to convict Ms. Maxwell on three of the four Mann Act counts based on "distinctly different" crimes than those charged in the Indictment. *See Gross*, 2017 WL 4685111, at *21 ("After identifying the core of criminality, a court must then determine whether the evidence or jury instructions at trial created a substantial likelihood that the defendant was not convicted of the crime described in that core, but of a crime 'distinctly different' from the one alleged." (citing *D'Amelio*, 683 F.3d at 419-21)).

Count Four of the Indictment, which was the subject of the Jury Note, charged Ms. Maxwell with the substantive offense of transporting an underaged individual in interstate commerce with the intent that the individual engage in sexual activity for which a person can be charged with a criminal offense. Ind. ¶ 21. The "to wit" clause of Count Four specified that the underaged individual was Jane, the transportation in interstate commerce was Jane's travel "from Florida to New York, New York," and the illegal sexual activity was a violation of New York Penal Law, Section 130.55. *Id*.

Pursuant to the Court's practice, the jurors were not given the Indictment. The jury charge, which was given to the jury, included most, but not all, of these allegations. The jury charge specified that Count Four related "solely to Jane" and instructed the jury that to convict on this count, the government had to prove that (1) Ms. Maxwell knowingly transported Jane "in interstate commerce, as alleged in the Indictment"; (2) Ms. Maxwell did so with the intent that Jane would engage in sexual activity in violation of New York Penal Law, Section 130.55; and (3) Ms. Maxwell knew that Jane was under the age of 17 years old. Dkt. 565 at 26-29. The jury charge did not include, however, that the relevant interstate travel "as charged in the Indictment"

was travel "from Florida to New York, New York," despite the defense's request to include that language.  Dkt. 410-1 at 19; Tr. 2758:23-2760:9.

The evidence at trial concerning Count Four rested exclusively on the testimony of Jane and evidence that corroborated her testimony.  Jane testified primarily about being sexually abused by Epstein in Epstein's house in Palm Beach.  Tr. 298:16-315:19.  Jane also testified that she traveled several times with Epstein and Ms. Maxwell when she was 14, 15 and 16 and was sexually abused in Epstein's residences in New York and New Mexico.  Tr. 316:2-324:20.  As most of these trips were to New York, the majority of Jane's testimony about the trips consisted of a description of Epstein's house in New York and the sexual abuse she experienced there.  Tr. 317:2-321:5.  But Jane did recall one trip to New Mexico when she was "15 or 16."  Tr. 321:6-321:13.  Jane testified that she flew to New Mexico with Epstein and Ms. Maxwell and stayed at Epstein's ranch.  Tr. 321:14-322:6.  She further testified that, at some point while she was there, someone came to her room and escorted her to Epstein's room where she was sexually abused.  Tr. 322:7-323:19.

Based on this testimony and the text of the Jury Note, there is a substantial likelihood that the jury did not convict Ms. Maxwell based on Jane's testimony about the New York trips, and instead improperly based their conviction solely on the sexual abuse that Jane experienced in New Mexico.  According to the Jury Note, the jurors had the mistaken impression that it would be sufficient to satisfy the second element of Count Four if they found that Ms. Maxwell had intended Jane to engage in sexual activity *in New Mexico*, even though such conduct was not and could not have been "sexual activity in violation of New York Penal Law, Section 130.55":

> Under Count Four (4), if the defendant aided in the transportation of Jane's return flight, but not the flight to *New Mexico where/if the intent was for Jane to engage in sexual activity*, can she be found guilty under the second element?

Court Exhibit #15 (Dkt. 593 at 23) (emphasis added).  Indeed, the only question the jury raised in

the Note was whether it would be sufficient to satisfy the second element if they found that Ms.

Maxwell helped arrange Jane's return flight *from* New Mexico as opposed to her flight *to* New

Mexico.  *Id*.  Any sexual abuse that occurred in New Mexico was not a violation of New York

law and was therefore an entirely distinct offense from the one charged in the Indictment.

 The corroborating evidence supports the interpretation that the jury did not credit Jane's

testimony that Ms. Maxwell participated in or helped arrange Jane's sexual abuse in New York

and was instead focused on her involvement in the New Mexico conduct.  The most important

piece of evidence corroborating Jane's testimony were the flight logs kept by Epstein's pilot,

Dave Rodgers.  *See* GX-662-R.  The flight logs were the only contemporaneous evidence offered

at trial that could corroborate that Jane, in fact, traveled to New York and New Mexico and when

those trips may have taken place.  According to the flight logs, there were only two trips that

Jane may have taken while she was under the age of 17, which was significant because to convict

under Count Four, the jury had to find that Jane was under 17 years old when the abuse took

place.  The first was a trip from Palm Beach to New York (Teterboro) on November 11, 1996,

when Jane was 16 years old.  GX-662-R at 44.  The second was a trip from New York

(Teterboro) to Santa Fe, New Mexico on May 9, 1997, also when Jane was 16 years old.  GX-

662-R at 48.  The critical difference between the two trips was that Ms. Maxwell was not a

passenger on the first trip to New York but was a passenger on the second trip to New Mexico.

 Given the text of the Jury Note, it is likely that the jurors decided that there was no

corroborating evidence that Ms. Maxwell was present for, or helped to arrange, any of Jane's

trips to New York, but that the flight logs did corroborate that Ms. Maxwell was present for her

trip to New Mexico.  As a result, the jury began evaluating Ms. Maxwell's involvement in the

New Mexico trip to see if it supported a conviction under Count Four, which led to the question posed by the Jury Note.

This is also consistent with the jury's decision to acquit Ms. Maxwell on the substantive enticement offense (Count Two). The jury likely determined that the only corroborating evidence linking Ms. Maxwell to the New Mexico trip was a flight log showing that she was *present* on the trip but said nothing about whether she "persuaded, induced, enticed, or coerced" Jane to take the trip. Indeed, Jane did not testify about having any interaction with Ms. Maxwell prior to the flight to New Mexico in which they discussed the trip. Hence, the acquittal on Count Two. By contrast, the jury likely believed that if they found that Ms. Maxwell had some role in arranging Jane's return flight from New Mexico, after the sexual abuse had already taken place, they could convict her on the substantive transportation count (Count Four), assuming that arranging the return flight was sufficient to satisfy the second element of Count Four. Hence, the question in the Jury Note.

Regardless, it is clear from the Jury Note that the jurors were deliberating with a mistaken understanding of the law – namely, that it would be sufficient to satisfy the second element of Count Four if they found that Ms. Maxwell had intended Jane to engage in sexual activity in New Mexico, without finding any intent to violate New York law. The Court's response to refer the jurors to the existing instructions was insufficient because the jury charge, which had been stripped of any mention of "travel to New York," did not adequately instruct the jury that a conviction on Count Four could not be based solely on sexual abuse in New Mexico or any other jurisdiction outside of New York. It was necessary for the Court to give the jury a supplemental instruction, as requested by the defense, to clarify the correct basis for conviction under Count Four. The Court's refusal to do so allowed the jury to modify the essential elements of the

15

charged offense and created a substantial likelihood that Ms. Maxwell was convicted of a crime other than the one alleged in the Indictment.  *D'Amelio*, 683 F.3d at 419-21.

Moreover, given the substantial likelihood that the jury convicted Ms. Maxwell on Count Four based on the New Mexico conduct, there is also a substantial likelihood that they improperly convicted her on the Mann Act conspiracy counts (Counts One and Three) based on the same conduct.  The substantive transportation offense charged in Count Four was the object of the conspiracy charged in Count Three, and both conspiracy counts required an agreement to violate New York law.  *See Gross*, 2017 WL 4685111, at *23 (citing examples where the Second Circuit found a constructive amendment "where the district court either refused to give a limiting instruction defining the scope of a conspiracy or relevance of certain evidence, or where it gave an instruction defining the conspiracy too broadly").

For the foregoing reasons, Ms. Maxwell's convictions on Counts One, Three, and Four were based on a constructive amendment to the charged offenses.  The Court must vacate these convictions and grant a new trial on these counts.

**E.**    **The Variance Between the Proof at Trial and the Allegations in the Indictment Substantially Prejudiced Ms. Maxwell.**

In the alternative, the Court must vacate Ms. Maxwell's convictions on Counts One, Three, and Four because the record demonstrates a variance between the proof at trial and the allegations in the Indictment that substantially prejudiced Ms. Maxwell.  *See Gross*, 2017 WL 4685111, at *31 (cleaned up) ("A variance occurs when the charging terms of the indictment are left unaltered, but the evidence at trial proves facts materially different from those alleged in the indictment" which causes "substantial prejudice" to the defendant).

Here, the Mann Act counts did not contain any allegations concerning Jane's sexual abuse in New Mexico.  Indeed, although Jane had previously told the FBI about the trip to New

16

Mexico, she had denied being sexually abused there.  It was not until just before trial, after the government had questioned her about the New Mexico trip in her preparation for trial, that Jane claimed for the first time that she had engaged in sexual activity with Epstein while she was at the ranch.  *See supra* note 1.

Jane's new recollection about the New Mexico trip was disclosed at the eleventh hour and substantially prejudiced Ms. Maxwell's ability to prepare her defense.  *See id*. ("The determination of whether a variance between an indictment and the proof at trial is prejudicial turns on whether the variance infringes on the substantial rights that indictments exist to protect—to inform an accused of the charges against him so that he may prepare his defense and to avoid double jeopardy.").  Because the Mann Act counts as charged in the Indictment were based on a violation of New York law, the defense vigorously litigated the extent to which the government could introduce evidence of sexual activity that occurred in jurisdictions outside of New York in support of the Mann Act counts.  As part of that effort, the defense requested limiting instructions with respect to the testimony of Kate and Annie Farmer.  The limiting instructions, which were read to the jury immediately before the witnesses began their testimony, specifically instructed the jury that any sexual conduct that Kate or Annie Farmer said occurred with Mr. Epstein "was not 'illegal sexual activity' as the government has charged in the indictment."  Tr. 1167:23-1168:2; Tr. 2048:22-2049:1.

Had the defense been given sufficient notice that Jane would testify that she was sexually abused in New Mexico, we would have litigated this issue before trial and, at the very least, made an application to the Court to give a limiting instruction before the start of Jane's testimony similar to the one given for Annie Farmer, who also testified about a single instance of sexual contact at the ranch in New Mexico when she was 16 years old, which could not have violated

New York law.  Tr. 2048:20-2049:1.  *See Wozniak*, 126 F.3d at 110 (vacating conviction for constructive amendment because the defense was not aware that the government would elicit evidence of marijuana distribution and may have modified its defense strategy had it known).

Instead, the only option left to the defense after Jane's testimony was to request a similar instruction in the jury charge, which the Court denied.  Tr. 2775:14-2777:25.  The Court further denied the defense's request for a clarifying instruction in response to the Jury Note, which made clear that the jury had likely done exactly what the limiting instruction would have prevented – namely, concluded that Jane's sexual abuse in New Mexico could constitute the "illegal sexual activity" charged in the Indictment, even though it did not violate New York law.  This resulted in the ultimate prejudice against Ms. Maxwell: a conviction on three of the four Mann Act counts.  Accordingly, Ms. Maxwell was convicted on Counts One, Three, and Four based on a prejudicial variance from the charges in the Indictment.  The Court must therefore vacate these convictions and order a new trial.

## II.  The Court Should Enter Judgment on Only One of the Three Conspiracy Counts Because They Are Multiplicitous.[3]

Since the very first indictment in this case, the government's conspiracy charges have been premised on a <u>single</u> criminal scheme between Epstein and Ms. Maxwell to recruit and "groom" underage females to engage in illegal sexual activity with Epstein.  *See* Ind. ¶¶ 1-2.  Although Counts One, Three, and Five of the S2 Indictment (the "Indictment") charged Ms. Maxwell with three separate conspiracies under the general conspiracy statute, 18 U.S.C. § 371, the allegations in the indictment were based on a <u>single</u> conspiratorial agreement to sexually abuse minors, not three separate agreements to violate three different statutes.  *See* Ind. ¶ 2 ("As

---

[3] We accept the jury's verdict on the conspiracy counts solely for the purposes of this motion.  Ms. Maxwell maintains her position that the conspiracy counts should be vacated or dismissed for the reasons stated in her other post-trial motions set forth in this memorandum.

a part and furtherance of their scheme to abuse minor victims, [Ms. Maxwell] and Jeffrey

Epstein enticed and caused minor victims to travel to Epstein's residences in different states,

which [Maxwell] knew and intended would result in their grooming for and subjection to sexual

abuse.").

      Ms. Maxwell moved to dismiss the multiplicitous conspiracy counts in her pretrial

motions.  (Dkt. 122, 210, 293).  The Court, citing the Second Circuit's holding in *United States v.*

*Josephburg*, 459 F.3d 350, 355 (2d Cir. 2006), found that the motion was premature because Ms.

Maxwell had not been convicted on the conspiracy counts and, hence, was not yet in jeopardy of

receiving multiple punishments for the same offense.  (Dkt. 207 at 27-28; Dkt 317 at 9-10).  The

Court denied Ms. Maxwell's motion without prejudice, deferring the resolution of the

multiplicity claim until after the conclusion of the trial.  *Id*.

      The trial is now over, and Ms. Maxwell was convicted on all three conspiracy counts.

The government's theory of prosecution and the proof elicited at trial were entirely aligned with

the allegations in the Indictment – that Ms. Maxwell participated in a <u>single</u> criminal conspiracy

with Epstein, which may have evolved slightly over time, but always maintained the same

overarching objective, the same core participants, and the same method of operation throughout

the entire time period in the Indictment.  Ms. Maxwell now faces the prospect of being punished

multiple times for the same offense in violation of her rights under the Double Jeopardy Clause.

Accordingly, we move the Court to impose judgement on only one of the three conspiracy

counts.

      **A.**    <u>**Applicable Law**</u>

      "An indictment is multiplicitous when it charges a single offense as an offense multiple

times, in separate counts, when, in law and fact, only one crime has been committed."  *United*

*States v. Chacko*, 169 F.3d 140, 145 (2d Cir. 1999).  Multiplicitous indictments violate the

Double Jeopardy Clause of the Fifth Amendment because they subject a person to punishment for a single crime more than once. *United States v. Sattar*, 314 F. Supp. 2d 279, 307 (S.D.N.Y. 2004) (citing *United States v. Dixon*, 509 U.S. 688, 696 (1993); *Chacko*, 169 F.3d at 145); *see also United States v. Colton*, 231 F.3d 890, 910 (4th Cir. 2000) ("[T]he principle danger created by multiplicity is that a defendant will receive multiple punishments for a single offense.").

The offense in a charge of conspiracy is "the agreement or confederation of the conspirators to commit one or more unlawful acts." *Sattar*, 314 F. Supp. 2d at 307 (quoting (*Braverman v. United States*, 317 U.S. 49, 53 (1942)). Therefore, "[a] single agreement to commit several crimes constitutes one conspiracy," but "multiple agreements to commit separate crimes constitute multiple conspiracies." *Id*. (quoting *United States v. Broce*, 488 U.S. 563, 570-71 (1989). In determining whether a defendant engaged in a single conspiracy or multiple conspiracies, the focus must be "on what agreement, if any, the jury could reasonably have found to exist vis-à-vis each defendant." *Id*. (quoting *United States v. Johansen*, 56 F.3d 347, 351 (2d Cir. 1995).

When an accused is charged with two or more conspiracies in violation of the same statutory provision—in this case, the general conspiracy statute, 18 U.S.C. § 371—the Second Circuit has adopted a multifactor test for determining whether the conspiracies amount to the same offense for double jeopardy purposes. These factors include:

> (1) the criminal offenses charged in successive indictments;
> (2) the overlap of participants;
> (3) the overlap of time;
> (4) the similarity of operation;
> (5) the existence of common overt acts;
> (6) the geographic scope of the alleged conspiracies or location where overt acts occurred;
> (7) common objectives; and
> (8) the degree of interdependence between alleged distinct conspiracies.

*United States v. Estrada*, 320 F.3d 173, 180-81 (2d Cir. 2003) (citing the "*Korfant* factors" from

*United States v. Korfant*, 771 F.2d 660, 662 (2d Cir. 1985) (*per curiam*)); *accord United States v.*

*Macchia*, 35 F.3d 662, 667-68 (2d Cir. 1994); *see also United States v. Diallo*, 507 F. App'x 89

(2d Cir. 2013) (applying the *Korfant* factors to determine whether two narcotics conspiracies

charged under 21 U.S.C. § 846 in same indictment were multiplicitous); *United States v. Cooper*,

886 F.3d 146, 155 (D.C. Cir. 2018) (applying the *Korfant* factors to determine whether two

conspiracies charged under 18 U.S.C. § 371 in the same indictment were multiplicitous).

"[N]o dominant factor or single touchstone determines whether the compared

conspiracies are in law and fact the same." *Estrada*, 320 F.3d at 181 (internal quotation marks

and citation omitted).  "If a defendant makes a non-frivolous showing on a double jeopardy

claim that the two conspiracies under review are not distinct, the burden shifts to the Government

to prove by a preponderance of evidence that the conspiracies are separate." *Id*.  If the Court

determines that the conspiracies are the same offense, the proper remedy post-conviction is for

the Court to enter judgment on only one of the multiplicitous counts.  *Josephburg*, 459 F.3d at

355 (citing *Ball v. United States*, 470 U.S. 856, 865 (1985)).

**B.**     **The Proof at Trial Established, at Most, a Single Conspiracy.**

From the outset of the trial, the government framed the criminal conduct it sought to

prove as a single conspiracy between Epstein and Ms. Maxwell to sexually abuse young girls.  In

its opening statement, the government told the jury:

> For a decade, the defendant played an essential role *in this scheme*. . . . She was
> setting young girls up to be molested by a predator.  That's what we expect the
> evidence will show, that the defendant enticed and groomed multiple young girls
> to engage in sex acts with Jeffrey Epstein, that the defendant and Epstein enticed
> some of those girls to travel to Epstein's homes in different states, which the
> defendant knew would result in sexual abuse.

Tr. 41:7-16 (emphasis added).  The government was correct that the proof at trial established, at most, a single decade-long conspiracy between Epstein and Ms. Maxwell with multiple objects, rather than multiple independent conspiracies.  An analysis of the *Korfant* factors confirms that the three conspiracies charged in Counts One, Three, and Five are virtually identical and are therefore multiplicitous.[4]

### 1.    Overlap of Participants and Time

There is no dispute that the central co-conspirators in all three charged conspiracies were Epstein and Ms. Maxwell.  According to the government, Epstein and Ms. Maxwell were "partners in crime" who sexually exploited young girls throughout the entire ten-year time period charged in the Indictment.  Tr. 33:7-34:13; Tr. 2842:11-2845:9.  Epstein was the principal abuser and Ms. Maxwell was his "best friend and right hand" and his "closest associate and second in command."  *Id*.  Although other participants later joined the scheme, such as Sarah Kellen, Epstein and Ms. Maxwell were the core of the conspiracy from its inception in 1994 through its conclusion in 2004.  *See United States v. Reid*, 475 F. App'x 385, 387 (2d Cir. 2012) ("[C]hanges in membership do not necessarily convert a single conspiracy into multiple conspiracies, and there is no requirement that the same people be involved throughout the duration of the conspiracy." (cleaned up)).

Furthermore, the Mann Act conspiracies related to all four accusers who testified at trial—Jane, Kate, Carolyn, and Annie Farmer—and spanned the same relevant ten-year period, 1994-2004.  Although the sex trafficking conspiracy (Count Five) related only to Carolyn and lasted for a shorter time period from 2001-2004, that count, which was later added to the S2 Indictment, did not describe a separate conspiratorial agreement.  Rather, it was simply a subset

---

[4] The first factor, an analysis of the criminal offenses charged in "successive indictments," is inapplicable here because Ms. Maxwell has been charged with two § 371 conspiracies in the same indictment. The multifactor test, however, remains applicable.  *See Cooper*, 886 F.3d at 155.

of the same overarching conspiracy charged in Counts One and Three, with the same co-defendants, the same method of operation, and the same objectives. *See Macchia*, 35 F.3d at 669 ("The Government cannot be permitted to retry defendants on smaller and smaller conspiracies, wholly contained within the scope of a large conspiracy, until it finds one small enough to be proved to the satisfaction of a jury." (citation omitted)).

### 2.     Similarity of Operation, Common Objectives, and Geographic Scope

The government's charging theory in the Indictment and its presentation of the evidence at trial was that Epstein and Maxwell engaged in a <u>single</u> criminal scheme with a common method of operation to recruit and "groom" underage females to engage in illegal sexual activity in multiple locations, including Epstein's residences in New York, Palm Beach, New Mexico, and the U.S. Virgin Islands.  Indeed, in summarizing the evidence for the jury, the government highlighted that Epstein and Ms. Maxwell used the same "playbook" with all four of the accusers and argued that this common method of operation was one of the principal reasons that the jury could convict Ms. Maxwell on all counts:

> The second reason that you know that Maxwell is guilty is that *she ran the same playbook over and over and over again* as she exploited young girls. The similarities between what happened to Jane and Annie and Carolyn and Kate are incredibly powerful evidence of the defendant's guilt. So I want to talk to you about *the playbook that Maxwell ran again and again and again*.

Tr. 2848:16-22 (emphasis added); *see also* Tr. 2853:14-16 ("The patterns you saw throughout this trial, the playbook that Maxwell ran for years, is just one of the many ways that you know that Maxwell is guilty.").

The common "playbook" that the government described started by targeting vulnerable kids, like the four accusers, who all came from single-mother households with financial or other hardships.  Tr. 2849:18-2850:17.  Epstein and Ms. Maxwell then isolated the girls from their parents and began "grooming" them for sexual abuse by taking an interest in their lives, making

them feel special, giving them gifts or much-needed cash, or promising to help with their futures. Tr. 2850:18-2851:17. The final step was for Epstein and Ms. Maxwell to normalize sexual situations and sexual touching so that it would eventually escalate to more serious sexualized massages. Tr. 2851:18-2852:24.

Moreover, this common method of operation to recruit and "groom" minors was all in service of the same objective: to sexually abuse underage girls. Although this common scheme violated three different statutes and the incidents of abuse took place in different locations, the government's theory as presented to the jury was that it was a single criminal agreement between Epstein and Ms. Maxwell, not separate independent conspiracies.

### 3. Common Overt Acts

The Mann Act conspiracies charged in Counts One and Three alleged identical overt acts, which pertained to each of the four accusers. Ind. ¶¶ 13a-e and 19a-e. Because the sex trafficking conspiracy charged in Count Five did not involve Jane, Kate, or Annie Farmer, that count alleged separate overt acts related solely to Carolyn. Ind. ¶¶ 25a-d. As discussed above, however, Count Five was simply a subset of the larger conspiracy charged in Counts One and Three involving Carolyn and other accusers in Florida and did not represent a separate conspiracy. *See* discussion *supra*.

### 4. Degree of Interdependence Between the Conspiracies

This factor requires the Court to consider the extent to which the success or failure of one alleged conspiracy is independent of a corresponding success or failure by the other. *Macchia*, 35 F.3d at 671. The conspiracy alleged in Count Three was logically dependent on the success of the conspiracy alleged in Count One. The object of both was to first entice and then transport minors across state lines for the purpose of engaging in illegal sexual activity. If the conspiracy to entice failed there would, logically, be no one to transport. Similarly, the object of the sex

trafficking conspiracy was to "recruit, entice, harbor, transport, provide, or obtain" a minor to engage in a commercial sex act.  If the "grooming" had failed to entice Carolyn and others to give sexualized massages to Epstein in exchange for cash, there would be no sex trafficking count.

For these reasons, Counts One, Three, and Five describe a single conspiracy, not multiple conspiracies, and are therefore multiplicitous.  Accordingly, the Court should enter judgment on only one of these counts.

## III.    The Court Should Vacate Ms. Maxwell's Conviction and Dismiss the S2 Indictment Due to Pre-Indictment Delay.

The Court should vacate Ms. Maxwell's convictions as to all counts and dismiss the Indictment due to the government's excessive and prejudicial delay in bringing this prosecution against Ms. Maxwell in violation of her due process rights.  Ms. Maxwell previously made this claim in her initial and supplemental pretrial motions.  (Dkt. 138, 293).  The Court denied the motion each time on the grounds that Ms. Maxwell failed to show "actual and substantial prejudice" caused by the delay.  (Dkt. 207 at 16-18; Dkt. 317 at 10).  The Court, however, granted Ms. Maxwell leave to renew the motion after the conclusion of trial.  (Dkt. 207 at 18; Dkt. 317 at 10).  Ms. Maxwell now reasserts the same motion and incorporates the arguments previously made to the Court.

In addition, the record at trial highlighted numerous other examples of how the delay in charging this case substantially prejudiced Ms. Maxwell's defense.  For example, critical documentary records and witnesses that would have allowed Ms. Maxwell to effectively challenge the government's proof were no longer available, including the following:

### A.      Flight Records – Passenger Manifests and Shoppers Travel Records

Exactly when the accusers traveled across state lines and when the instances of illegal sexual activity took place were critical issues at trial.  Not only were these dates relevant for the jury to assess the accuracy of the witness' recollections of events that had occurred over 20 years ago, but they were also important because the accusers needed to be younger than 17 years old for the sexual activity to be illegal under New York law.  Contemporaneous flight records would have offered the best possible evidence to show exactly when accusers traveled.  The only such records admitted at trial were the flight logs kept by David Rodgers, which were incomplete and often identified passengers simply by their first names or generic identifiers like "1 female" or "1 male."  Rodgers and Larry Visoski testified that the passenger manifests also contained information about the names of the passengers on the flights.  Tr. 1819; 171-73.  Because of the passage of time, however, the flight manifests did not go back to the time period charged in the Indictment.

Of particular interest were entries in Rodgers' flight logs which showed that someone with Jane's true first name was a passenger on two flights when Jane was 16 years old – one to New York on November 11, 1996, and another to Santa Fe, New Mexico on May 9, 1997.  However, because only the first name was listed, the flight logs did not conclusively establish that it was Jane on those flights.  Had the passenger manifests been available, the defense could have used them to challenge whether Jane was on those flights as well as the accuracy of Jane's recollection of events.

Similarly, Cimberly Espinosa testified that Epstein often had his assistants buy commercial plane tickets for people and that they used a travel service called Shoppers Travel to book them.  Tr. 2349.  Annie Farmer testified that Epstein bought her a commercial ticket to fly to New Mexico in the spring of 1996, which was the trip where she claimed she was given a

topless massage.  Tr. 2075.  However, because of the passage of time, the available Shoppers

Travel records only went back as far as 1999.  Tr. 2393.  As a result, the defense did not have

access to Shoppers Travel records to challenge Annie Farmer's recollection of when the trip to

New Mexico occurred.  Likewise, Jane testified that she traveled with Epstein approximately ten

times when she was under the age of 17 on both his private jet and on commercial flights, and

that she was first sexually abused in New York when she was 14.  Tr. 316.  As discussed, the

flight logs showed only two such trips on Epstein's plane.  The Shoppers Travel records would

have shed light on the number of commercial flights that Jane took when she was a minor and

could have been used to challenge her recollection of events, including whether she even

traveled to New York before she was 16 years old.

**B.      Financial Documents – Bank Records and Credit Card Records**

Critical financial documents were also unavailable to the defense.  In its summation, the

government gave particular emphasis to bank records which seemed to show that Epstein

transferred approximately $30 million to Ms. Maxwell from 1999-2007, arguing that it was Ms.

Maxwell's payment for facilitating his sexual abuse of young girls for over a decade.  Tr. 2841,

2884-85.  Because the transactions were between 15-20 years old, there were no bank records

apart from Epstein's Bears Sterns statements that the Palm Beach FBI had obtained in 2006-2007

to explain what the transfers were for.  The defense was unable to obtain any records related to

the accounts into which the money was transferred.  The defense therefore could not challenge

the government's claims about the purpose of the funds or that Ms. Maxwell even controlled the

accounts.

Furthermore, there were no credit card records available for Epstein going back to the

1990s.  Accordingly, the defense could not use these records to test critical dates, like when

Epstein bought the pair of cowboy boots for Annie Farmer or the movie tickets to Primal Fear,

which would have dated her trip to New Mexico, or when Epstein bought tickets to the Broadway production of *The Lion King* for Jane, which she had originally told the FBI she saw on her first trip to New York.  Tr. 503-11.

### C.    Phone Records

Contemporaneous phone records for Epstein, Ms. Maxwell, the accusers, and others that could have been used to rebut the government's proof were also not available to the defense.  For example, Carolyn testified that Ms. Maxwell would call her to set up massage appointments.  Tr. 1527.  This was important evidence linking Ms. Maxwell to the sex trafficking charges in Counts Five and Six.  Carolyn's claim could have been disproven with contemporaneous phone records.  However, because a complete set of Ms. Maxwell's phone records—as well as phone records for Carolyn, her mother, and her boyfriend—were not available, the defense could not challenge this claim.

### D.    Property Records

The defense also did not have access to property records for Epstein's various residences, which would have rebutted the accusers' testimony concerning the timing of the alleged sexual abuse.  For example, Jane testified that she began being sexually molested by Epstein in his home in New York when she was 14 years old.  Tr. 316-320.  Jane described the house as follows:

> [I]t looked more like a building than a house.  It was eight stories, his massive eight-story house building where you walk through these giant doors and then there was, like, another security door to go in. And it had an elevator and it was eight stories.

Tr. 317.  It is clear that Jane was describing Epstein's townhouse on East 71st Street.  Moreover, her description of the massage room where she was molested matched photographs of the massage room at the 71st Street house.  Tr. 320.  Jane turned 14 years old in August 1994.  But

the defense had substantial reason to believe that Epstein did not start living in the 71st Street townhouse until the beginning of 1996. Had property records for the 71St Street townhouse been available, they could have rebutted Jane's testimony and challenged the accuracy of her recollection.

Similarly, when Jane testified about her trip to Epstein's ranch in New Mexico when she was "15 or 16," she recalled staying at a "giant ranch sort of in the middle of nowhere … [which] seemed very empty on the interior." Tr. 321. From her description, it is clear that Jane was referring to the large ranch house that Epstein constructed on the property, and not the triple-wide trailer where he stayed while the large house was under construction. The defense had significant reason to believe that the large ranch house was not completed until the end of the 1990s, when Jane would have been closer to 18 or 19 years old. But because property records showing the dates of construction were not available, the defense could not challenge Jane's recollection with contrary documentary evidence.

### E.    Deceased Witnesses

Finally, in the over 20-year period that elapsed from the time of the charged conduct to the time of trial, numerous potential witnesses who could have provided evidence contradicting the government's proof had died. In addition to the ones already mentioned in our previous filings, the following individuals, among others, were no longer available to the defense:

- <u>Alberto Pinto and Roger Salhi</u> – Mr. Pinto and Mr. Salhi were architects who built, renovated, and decorated many of Epstein's residences, including the house in Palm Beach, the New York residence, and the ranch in New Mexico. The defense believes they could have established (i) when Epstein moved into the 71st Street townhouse and what it looked like inside over the relevant time period, (ii) when the large ranch house was built, and (iii) that the Palm Beach residence was being renovated for almost a year in the mid-1990s and that Epstein had to move into a rental house during renovation. All of this evidence would have cast significant doubt on Jane's recollection of events.

- <u>Sally Markham</u> – Ms. Markham was a property manager hired to help run Epstein's properties in the early 2000s.  In its opening and closing statements, the government gave great emphasis to the household manual as evidence that Ms. Maxwell was the "lady of the house" who insisted on a "culture of silence" among Epstein's employees to hide the sexual abuse going on in his residences.  Tr. 34, 2846-47.  The defense believes that Ms. Markham could have testified that the household manual was not created by Ms. Maxwell, but by another individual known as "the Countess," whom Epstein brought in to "professionalize" his staff.

- <u>Lynn Fontanilla</u> – Ms. Fontanilla was the live-in housekeeper in Epstein's 71st Street townhouse throughout the relevant time period.  The defense believes she could have testified that Ms. Maxwell rarely spent the night at the 71st Street townhouse and could rebut the government's assertion that Ms. Maxwell was always by Epstein's side.

For these reasons and the reasons set forth in Ms. Maxwell's previous submissions, the Court should vacate Ms. Maxwell's convictions as to all counts and dismiss the Indictment due to prejudicial pre-indictment delay.

## IV.   <u>The Court Should Enter a Judgment of Acquittal as to All Counts Because the Government Failed to Prove Each Element of the Charges Beyond a Reasonable Doubt.</u>

Following the close of the government's case-in-chief, Ms. Maxwell moved the Court under Rule 29 of the Federal Rules of Criminal Procedure to enter a judgment of acquittal as to all counts.  Tr. 2266:4-2274:14.  The Court denied the defendant's motion.  Tr. 2274:16. Following the close of the defense case, Ms. Maxwell reasserted her Rule 29 motion for the reasons initially stated.  Tr. 2736:8-9.  Ms. Maxwell now reasserts that same motion and incorporates the arguments previously made to the Court.

## <u>CONCLUSION</u>

For the foregoing reasons, Ms. Maxwell respectfully requests that the Court, in the alternative, (1) vacate Ms. Maxwell's convictions on the Mann Act counts (Counts One through Four) and grant a new trial under Rule 33 because the convictions were based on a constructive amendment and/or variance from the allegations in the Indictment, (2) enter judgment on only

one of the three multiplicitous conspiracy counts, (3) vacate Ms. Maxwell's conviction on all counts and dismiss the S2 Indictment for pre-indictment delay, and (4) enter a judgment of acquittal as to all counts under Rule 29 because the government failed to prove each element of the charges beyond a reasonable doubt.

Dated: February 11, 2022
      New York, New York

           Respectfully submitted,

           */s/ Christian R. Everdell*
           Christian R. Everdell
           COHEN & GRESSER LLP
           800 Third Avenue
           New York, NY 10022
           Phone: 212-957-7600

           Jeffrey S. Pagliuca
           Laura A. Menninger
           HADDON, MORGAN & FOREMAN P.C.
           150 East 10th Avenue
           Denver, Colorado 80203
           Phone: 303-831-7364

           Bobbi C. Sternheim
           Law Offices of Bobbi C. Sternheim
           33 West 19th Street - 4th Floor
           New York, NY 10011
           Phone: 212-243-1100

           *Attorneys for Ghislaine Maxwell*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 11, 2022, I served by ECF the within memorandum upon the following:

Maurene Comey, Esq.
Maurene.Comey@usdoj.gov

Alison Moe, Esq.
Alison.Moe@usdoj.gov

Lara Pomerantz, Esq.
Lara.Pomerantz@usdoj.gov

Andrew Rohrbach, Esq.
Andrew.Rohrbach@usdoj.gov

*/s/ Christian R. Everdell*
Christian R. Everdell