UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| -v.- | **S2 20 Cr. 330 (AJN)** |
| GHISLAINE MAXWELL, | |
| Defendant. | |

**THE GOVERNMENT'S MEMORANDUM  IN OPPOSITION
TO THE DEFENDANT'S OMNIBUS POST-TRIAL MOTIONS**

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Maurene Comey
Alison Moe
Lara Pomerantz
Andrew Rohrbach
Assistant United States Attorneys
    *Of Counsel*

## Table of Contents

PRELIMINARY STATEMENT ................................................................................................ 2

LEGAL STANDARD ........................................................................................................... 2

ARGUMENT ....................................................................................................................... 3

I.      The Defendant Was Convicted of the Crimes Charged in the Indictment, So No
Constructive Amendment or Variance Occurred ................................................................ 3

        A.   Applicable Law ........................................................................................... 4
        B.   Discussion ................................................................................................... 6

II.     The Court Should Enter Judgment on Counts Three and Five ......................................... 24

        A.   Applicable Law ......................................................................................... 25
        B.   Discussion ................................................................................................. 26

III.    The Defendant's Motion to Vacate Her Conviction and Dismiss the Indictment Based on
Alleged Improper Pre-Trial Delay Should Be Denied ....................................................... 33

        A.   The Defendant Has Failed to Demonstrate Actual and Substantial Prejudice .......... 34

        B.   The Defendant Has Failed to Establish that the Government Delayed the Indictment
        for an Improper Purpose ..................................................................................... 44

IV.     The Court Should Deny the Defendant's Motion for Judgment of Acquittal Under Rule
29      ............................................................................................................................ 47

        CONCLUSION ............................................................................................. 50

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in opposition to the defendant's four post-trial motions, dated February 11, 2022 ("Def. Mot.") (Dkt. No. 599).

## LEGAL STANDARD

Under Rule 29 of the Federal Rules of Criminal Procedure, a court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). "In reviewing a Rule 29 motion, the court 'must view the evidence in a light that is most favorable to the government, and with all reasonable inferences resolved in favor of the government.'" *United States v. Joseph*, No. 20 Cr. 603 (PKC), 2022 WL 336975, at *1 (S.D.N.Y. Feb. 4, 2022) (quoting *United States v. Anderson*, 747 F.3d 51, 60 (2d Cir. 2014)). The court "must 'defer to the jury's evaluation of the credibility of witnesses, its choices between permissible inferences, and its assessment of the weight of the evidence.'" *Id.* (quoting *United States v. Jones*, 482 F.3d 60, 68 (2d Cir. 2006)). A conviction must be upheld "if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Peters*, 843 F. App'x at 372; *see also United States v. Cuti*, 720 F.3d 453, 461 (2d Cir. 2013) ("A judgment of acquittal can be entered only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt.").

Rule 33 provides, in relevant part, that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P.

33(a).[1]  "The defendant bears the burden of proving that he is entitled to a new trial under Rule 33[.]" *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009).  Because motions for a new trial are strongly disfavored, "the standard for granting such a motion is strict," *United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995), and it should be granted "sparingly and in the most extraordinary circumstances, and only in order to avert a perceived miscarriage of justice." *United States v. Gramins*, 939 F.3d 429, 444 (2d Cir. 2019).  In deciding the motion, courts "should generally defer to the jury's resolution of conflicting evidence and assessment of witness credibility." *United States v. Landesman*, 17 F.4th 298, 330 (2d Cir. 2021).  The "ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice." *United States v. Peters*, 843 F. App'x 369, 374 (2d Cir. 2021) (quoting *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001)).

## **ARGUMENT**

### I.   **The Defendant Was Convicted of the Crimes Charged in the Indictment, So No Constructive Amendment or Variance Occurred**

In her motion, the defendant claims that the Government's proof at trial differed from the crimes charged in the Second Superseding Indictment (the "S2 Indictment" or "Indictment"), and that the Government therefore constructively amended Counts One, Three, and Four of the Indictment.  Not so.  At all times—before trial, in its presentation of the evidence, at closing argument, and in seeking jury instructions—the Government consistently argued that the

---

[1] Unless otherwise noted, case text quotations omit all internal quotation marks, citations, and alterations.

defendant enticed and transported Jane to New York with the intent that Jane engage in illegal sexual activity, and that the defendant conspired to do so regarding Jane and the other Minor Victims. That is the issue the Court instructed the jury to resolve. And that is the criminal conduct charged in Counts One through Four of the S2 Indictment. Accordingly, no constructive amendment or variance occurred.

## A. Applicable Law

Under the Fifth Amendment's Grand Jury Clause, "an indictment must contain the elements of the offense charged and fairly inform the defendant of the charge against which he must defend." *United States v. Khalupsky*, 5 F.4th 279, 293 (2d Cir. 2021). "[W]hen the charge upon which the defendant is tried differs significantly from the charge upon which the grand jury voted," a constructive amendment occurs and reversal is required. *Id*. "Not every alteration of an indictment, however, rises to the level of a constructive amendment." *United States v. Dove*, 884 F.3d 138, 146 (2d Cir. 2018). Instead, "[t]o prevail on a constructive amendment claim, a defendant must demonstrate that the terms of an indictment are in effect altered by the presentation of evidence and jury instructions which so modify *essential elements* of the offense that there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment." *United States v. Gross*, No. 15 Cr. 769 (AJN), 2017 WL 4685111, at *20 (S.D.N.Y. Oct. 18, 2017), *aff'd sub. nom United States v. Lebedev*, 932 F.3d 40 (2d Cir. 2019). That is, a defendant "must show that the evidence and jury instructions at trial completely shifted the core of criminality—i.e. proved behavior *entirely separate* from that identified in the indictment." *Id.* at *23.

This analysis begins by identifying the "core of criminality," that is, "the essence of a

4

crime, in general terms," but not "the particulars of how a defendant effected the crime." *Id.* at

*20. The "object of a conspiracy constitutes an essential element of the conspiracy offense."

*Id.* However, text in an indictment, such as "factual allegations that do not prove essential

elements of a charge" and "general factual allegations leading into the statutory allegations" are

not limitations on the core of criminality alleged in an indictment. *Id.*

Once a court identifies the core of criminality, the court "must then determine whether the

evidence or jury instructions at trial created a substantial likelihood that the defendant was not

convicted of the crime described in that core, but of a crime 'distinctly different' from the one

alleged." *Id.* The Second Circuit has "consistently permitted significant flexibility in proof,

provided that the defendant was given *notice* of the *core of criminality* to be proven at trial."

*Lebedev*, 932 F.3d at 53. Accordingly, a defendant "cannot simply show that the facts diverged

greatly from those alleged in the indictment," but rather that "the evidence and jury instructions

created a substantial likelihood that a defendant was convicted for behavior *entirely separate* from

that identified in the indictment." *Gross*, 2017 WL 4685111, at *21; *see United States v. McGinn*,

787 F.3d 116, 128 (2d Cir. 2015) ("[T]he proof at trial need not, indeed cannot, be a precise replica

of the charges contained in an indictment . . . ."). "[T]he Second Circuit has made clear that a

constructive amendment does not occur where the facts at trial involve not a 'distinctly different

complex set of uncharged facts' but 'a single set of discrete facts consistent with the charge in the

indictment.'" *Id.* (quoting *United States v. D'Amelio*, 683 F.3d 412, 419 (2d Cir. 2012)).

"In contrast to a constructive amendment, a variance occurs when the charging terms of

the indictment are left unaltered, but the evidence offered at trial proves facts materially different

5

from those alleged in the indictment." *Gross*, 2017 WL 4685111, at \*31.  Reversal due to a variance is appropriate only when the defendant can establish "that substantial prejudice occurred at trial as a result of the variance," a showing that cannot be made "where the pleading and the proof substantially correspond, where the variance is not of a character that could have misled the defendant at trial, and where the variance is not such as to deprive the accused of his right to be protected against another prosecution for the same offense." *Khalupsky*, 5 F.4th at 294.  "The Second Circuit has repeatedly held that, so long as a defendant receives notice of the Government's theory of the case before trial, he is not prejudiced by a variance." *Gross*, 2017 WL 4685111, at \*32.

## B. Discussion

No constructive amendment or variance occurred in this case.  The grand jury returned the S2 Indictment charging the defendant with knowingly transporting Jane with the intent that Jane engage in criminal sexual activity in New York, and aiding and abetting the same, and with conspiring to entice and transport minors in interstate commerce with the intent that they engage in criminal sexual activity in New York.  That is the core of criminality charged in the S2 Indictment, and it is what the Government proved at trial and the Court captured in its jury instructions.

### 1.  The Proof at Trial and Jury Instructions Captured the Core of Criminality

The defendant argues that the core of criminality for the Mann Act counts "was a scheme by Epstein and [the defendant] to entice or cause underage girls to travel to *New York* with the intent that they would engage in sexual activity in violation of *New York* law."  (Def. Mot. at 9). That is precisely the theory the Government advanced at trial.  As the defendant correctly states,

the Government "consistently maintained that to convict [the defendant] on the Mann Act Counts (Counts One through Four), it was necessary to prove that [the defendant] enticed or caused underaged girls to travel to *New York*, or conspired to do the same, with the intent that they would engage in illegal sexual activity that violated *New York* law." (Def. Mot. at 1). The Government never advanced a theory that the illegal sexual activity identified in the S2 Indictment was sexual activity that occurred outside New York.

At trial, the Government marshalled evidence that the defendant knowingly transported Jane to New York, and aided and abetted Epstein in doing so, with the intent that Jane engage in criminal sexual activity there in violation of New York law. That evidence included testimony from Jane in detail about Epstein's New York residence (Tr. 316-19) and specific sexual acts that took place in New York while Jane was a minor (Tr. 319-20). As the defendant rightly concedes, "most of [Jane's] trips were to New York" and "the majority of Jane's testimony about the trips consisted of a description of Epstein's house in New York and the sexual abuse she experienced there." (Def. Mot. at 13). The Government also offered significant corroborating evidence, including flight records and photographs of Epstein's New York residence. On the conspiracy counts, the Government also offered evidence that the defendant and Epstein transported another victim, Virginia Roberts, to New York while she was a minor. (*See, e.g.* Tr. 1862 (describing a flight from 2001 in which Epstein, the defendant, and Virginia flew from Maine to Teterboro, New Jersey)).

The Government's summation similarly discussed the Mann Act offenses as encompassing conduct directed at New York. The Government explained that Count Two "is about Jane and

how Maxwell and Epstein enticed her to . . . go across state lines *to New York* to be abused." (Tr. 2889 (emphasis added)).  On that Count, the Government reminded the jury that "Jane told you about traveling with Maxwell *to New York*," and argued that "Jane didn't end up *in New York* by accident." (Tr. 2889-90 (emphasis added)).  The Government also argued that the pattern of Jane's relationship with the defendant and Epstein showed that the defendant "enticed Jane *to New York*." (Tr. 2890 (emphasis added)).  And the Government argued that the evidence showed the defendant "absolutely intended that Jane would be abused *in New York*." (*Id.* (emphasis added)).  The Government explained that Count Four differed from Count Two in that it involved travel, and not enticement to travel.  So, the Government argued, the evidence showed that "Jane was transported *to New York*," and that the defendant was involved in making travel arrangements. (Tr. 2891 (emphasis added)).  The Government also made clear that, in order to show a violation of New York law, the Government did not have to show "that abuse *in New York* actually happened," so long as the defendant had the requisite intent. (Tr. 2892 (emphasis added)).  Accordingly, "[t]he crime happened the moment [the defendant, Epstein, and Jane] crossed state lines," and "to be very clear, when Epstein flew Jane *to New York* and Maxwell aided and abetted him, that's enough too." (*Id.* (emphasis added)).  For the conspiracy counts, the Government referenced its earlier discussion of the elements of the substantive Mann Act offenses.  And the Government argued that, "even though Carolyn and Annie were not sexually abused *in New York* . . . that is what [the defendant and Epstein] both intended." (Tr. 2895 (emphasis added); *see* Tr. 2895-96 (arguing that the defendant "groomed Annie for abuse after she had already visited Epstein *in New York*." (emphasis added))).

8

The Court's Mann Act jury instructions also permitted the jury to determine only whether the defendant had intended that Jane (for the substantive counts) or the conspiracy victims were intended to engage in sexual activity in New York. During trial, the Court granted defense requests for limiting instructions at the time evidence came in to avoid the precise concern the defendant now articulates. (Tr. 1167-68 (Kate); 2048-49 (Annie)). *See Gross*, 2017 WL 4685111, at *27 (explaining that the Court identified no case "in which the Second Circuit has ever found a constructive amendment when a district court issued limiting instructions properly defining the scope of the alleged crime"). And at the conclusion of trial, the Court explained that Count Two alleged that the defendant "enticed Jane to travel across state lines with the intent that she would engage in sexual activity for which a person could be charged with a crime under the penal law of New York State." (Tr. 3034; *see* Tr. 3031 (describing the third element of Count Two to require proof of an intent to violate "New York law as alleged in the indictment")). Similarly, the Court explained that Count Four alleged that the defendant knowingly transported Jane "with the intent that Jane engage in sexual activity for which any person can be charged with a criminal offense in violation of New York law." (Tr. 3037; *see* Tr. 3035 (describing the second element of Count Four to require proof of an intent to violate "New York law as alleged in the indictment")). For both Counts, the Court specifically instructed the jury on one and only one predicate state offense: a violation of New York Penal Law Section 130.55. (Tr. 3034, 3037). The instructions on Counts One and Three incorporated this discussion of the elements of Counts Two and Four, and the only statute the Court identified in its discussion of the relevant overt acts was New York Penal Law Section 130.55. (Tr. 3049-50, 3056-57).

**2. There is No Substantial Likelihood That The Jury Convicted The Defendant Solely Because Jane was Sexually Abused in New Mexico**

The defendant argues that a constructive amendment or variance occurred because the jury "improperly based their conviction solely on the sexual abuse that Jane experienced in New Mexico." (Def. Mot. at 13). That argument can be readily rejected. There is no likelihood—much less a substantial likelihood—that the jury disregarded the Court's instructions and applied an unidentified New Mexico law to brief testimony about Jane's abuse in New Mexico and convicted the defendant solely on that basis.

Neither the Government's proof at trial nor the Court's jury instructions provide a basis for that conclusion. At no point during the trial, including its summation, did the Government argue that the jury could convict on a theory that the defendant intended Jane to be abused in New Mexico.

Similarly, the Court's charge required the jury to decide whether the defendant intended to violate *New York* law. The jury was not informed of the age of consent in New Mexico or any particular criminal statute in New Mexico. The defendant does not explain how the jury charge permitted the jury to convict the defendant for transporting Jane to New Mexico with the intent that she engage in sexual activity violative of some unidentified New Mexican criminal law.[2]

In support of her argument, the defendant relies on (1) the fact that Jane testified about being sexually abused in New Mexico, and (2) the jury note regarding New Mexico. (*Id.*) Neither

---

[2] Ironically, it is the defendant who proposed instructing the jury on the relevant ages of consent in states other than New York. (*See* Dkt. No. 410-1 at 51-52). Such an instruction would have provided the jury *some* state law to compare to the facts and determine whether it was violated,

of these provide any likelihood, much less a substantial likelihood, that the jury convicted the defendant solely because she intended for Jane to be sexually abused in New Mexico.

### a. Jane's Testimony About Sexual Abuse in New Mexico

Jane's testimony about her abuse in New Mexico cannot provide the basis for any constructive amendment argument. That testimony was entirely proper. As the Court recognized, the evidence of Jane's abuse in New Mexico was relevant to the jury's decision on the Mann Act counts. (Tr. 3149-50; *see* Dkt. No. 566 at 5 n.1 (stating that the defense does "not contest that alleged sexual activity that occurred in other states can be evidence of [the Mann Act] conspiracies")). That evidence was probative of the defendant's knowledge that Epstein was having sexual encounters with Jane while she was a minor and that the abuse occurred while traveling to Epstein's various properties; and it was probative of the defendant's role in facilitating the abuse. This evidence "fell squarely within the charged scheme" and "was entirely consistent with the indictment," and was "thus no constructive amendment." *United States v. Jones*, 847 F. App'x 28, 30 (2d Cir. 2021); *see Gross*, 2021 WL 4685111, at *28 (noting that if the jury determined that "inarguably *relevant*" evidence "described a *different* conspiracy, the jury instructions ensured that the jury would not convict Gross of *this other conspiracy*"). Indeed, that evidence was no less relevant and proper than evidence of Jane's abuse in Florida, or evidence of Annie, Kate, Carolyn, and Virginia's abuse at Epstein's properties outside New York—none of

---

enhancing the risk of conviction based on that conduct. But the Court did not give such an instruction, since the Government proceeded only on the theory that it had to prove an intent to violate New York law.

which gave rise to a constructive amendment.  Relative to that evidence, Jane's testimony about New Mexico, spanning less than three pages of the transcript of her direct examination, was brief and general.  (Tr. 321-23).  All of this evidence was a "a single set of discrete facts consistent with the charge in the indictment."  *Gross*, 2017 WL 4865111, at *21 (quoting *D'Amelio*, 683 F.3d at 419).  And even if that were not so, the Government is permitted "significant flexibility in proof" so long as the defendant has "notice of the core of criminality to be proven at trial," as the defendant undoubtedly did.  *Lebedev*, 932 F.3d at 53.

The defendant overstates the issue by suggesting that a constructive amendment would have occurred if the jury "based their conviction solely on the sexual abuse that Jane experienced in New Mexico."  (Def. Mot. at 13).  In fact, the jury was free to rely principally on that evidence to satisfy elements of Counts One, Three and Four.  That is, the jury could have convicted even if no sexual abuse occurred in New York, so long as it concluded that the defendant *intended* for abuse to occur in New York.  And evidence of the defendant's knowledge of sexual abuse that occurred in New Mexico would support such a conclusion about the defendant's intent as to what would happen in New York.  But there is no substantial likelihood that the jury erroneously convicted the defendant of transporting Jane to New Mexico *with the intent that she be abused in violation of some law in New Mexico*.  That theory of guilt was neither pursued by the Government nor available under the Court's jury instructions.  *See Lebedev*, 932 F.3d at 54 ("[T]he evidence at trial directly addressed the core of criminality charged in the indictment . . . .").  It is not a constructive amendment that the Government presented relevant evidence that could lead to a

conviction outside of the scope of the S2 Indictment only if taken entirely in isolation and applied by a jury that disobeyed the Court's instructions.

### b. The Second Jury Note

The defendant argues that, notwithstanding the tight connection between the Indictment, evidence at trial, and jury instructions, the jury in fact actually convicted the defendant for transporting Jane to New Mexico to engage in criminal sexual activity there. This argument relies almost entirely on a single jury note.

During deliberations, the jury sent the following note:

> Under Count Four, if the defendant aided in the transportation of Jane's return flight, but not the flight to New Mexico, where/if the intent was for Jane to engage in sexual activity, can she be found guilty under the second element?

(Tr. 3126). The note led to a lengthy discussion, at the conclusion of which the Court concluded it should refer the jury back to the jury charge on the second element of Count Four because the jury note was otherwise "too difficult to parse factually and legally." (Tr. 3126-40).

That night, the defense filed a letter seeking reconsideration of the Court's response and raising the possibility of a constructive amendment or prejudicial variance. (Dkt. No. 566 at 2-3). The defense asked the Court to give an additional instruction in the morning. (*Id.* at 7). That proposal instructed the jury as to the intent elements of Counts Two and Four, and ended with the sentence that "[a]n intent that Jane engage in sexual activity in any state other than New York cannot form the basis of these two elements of Counts Two and Four." (*Id.*)

The Court rejected the defendant's request. The Court noted that the jury did not inquire about Count Two, so there was no basis to respond to the jury note with information about Count

13

Two. (Tr. 3149). The Court also rejected the defense's proposed final sentence as "just wrong," because it suggested that an intent that Jane engage in sexual activity outside of New York "may have no relevance." (*Id.*). As the Court explained, "This is the same discussion we've had a couple of times . . . . Sexual activity with respect to Jane in New Mexico under the age of 17 can be relevant to an intent to transport to New York to engage in sexual activity under the age of 17, I think." (Tr. 3149-50). The Court repeated that it did "not know how to parse the jury's question exactly," but that its instruction directing the jury to the original charge included a reminder that "it's a violation of New York penal law that's charged and is the illegal sexual activity that they're considering." (Tr. 3150). The defense made a further record of its views, including that "travels to and from New Mexico, solely in New Mexico cannot form the basis for a violation of New York law." (Tr. 3152-53). The Court explained that the defense suggestion was "wrong as a legal matter" because it suggests that the testimony was "irrelevant," and the Court also pointed out that the defense did not "seek to exclude that testimony, nor did you seek a limiting instruction with respect to that testimony." (Tr. 3153). The Court added that "[t]he reading of the note that you've suggested, I have no idea if that's what the jury is asking or many other plausible readings, and what you've proposed, as you just indicated, would be incorrect. So, I think that's why precisely we sent them back to the charge." (Tr. 3154).

The defendant renews her arguments now, urging that the jury note shows that "the jurors had the mistaken impression that it would be sufficient to satisfy the second element of Count Four

14

if they found that Ms. Maxwell had intended Jane to engage in sexual activity *in New Mexico*." (Def. Mot. at 13).  The Court was right to reject these arguments during trial.

First, the meaning of the jury note is entirely ambiguous.  It is at a minimum unclear (1) which flights are referenced in the note, (2) where the sexual activity was intended to occur, and (3) what question is posed by the note.

The defendant argues that the note's mention of a flight to New Mexico is a specific reference to a 1997 flight from New York to New Mexico captured in the flight logs that lists both the defendant and Jane as passengers.  (*See* Def. Mot. at 14 (citing GX 662-R at 48)).  The jury may have considered that flight, or some other flight.  (*See, e.g.*, GX 662 at 51 (flight to Santa Fe from Palm Beach with Epstein, the defendant, and "1 female"); Tr. 316 (testimony from Jane that she sometimes traveled on commercial flights)).  If it was that flight, the subsequent flight record departing Santa Fe did not include the defendant or Jane (*see* GX 662 at 48), providing no information about the flight that the defendant thinks was the focus of the jury's attention.  And to the extent it was a "return" trip, the origin of the trip to New Mexico was New York, so the jury could easily have inferred that the "return" trip was also to New York.  That is, the defendant may or may not be right about which flight the jury had in mind.  And *if* the jury was asking about this trip, the jury could well have been asking about a flight to New York—which, if the defendant arranged, could have been highly significant and proper evidence of guilt.  The defendant's presumption that the jury was focused on this particular trip and specifically on a return flight to Florida with no relevance to the case is mere conjecture.

15

That fact is compounded by the lack of clarity about where the jury believed the sexual activity occurred.  It is not clear whether the flight on which the "intent was for Jane to engage in sexual activity" references the flight to New Mexico, as the defendant suggests, or the return flight. If it is the flight to New Mexico, it would still be probative evidence on Count Two, albeit not sufficient for conviction.  If it is a flight from New Mexico, it would also still be probative and would not pose any risk that the jury convicted based on conduct occurring in New Mexico.  And if the jury thought that the defendant intended Jane to engage in sexual activity at the conclusion of a return flight from New Mexico *to New York*, it could well have been sufficient for conviction on Count Two.

The issue is further confused by the uncertainty about the question posed by the jury.  The defendant understands the question to be about whether sexual activity in New Mexico is sufficient to find the defendant guilty.  First, the jury's question does not ask whether certain facts are sufficient for guilt; it asks whether the defendant "can be found guilty" if a certain fact is true.  The defendant "can" be found guilty based in part on sexual activity occurring in New Mexico, as described above.  That is a perfectly sensible question for the jury to ask—indeed, it was repeatedly raised by defense counsel to the Court at trial.  (*See, e.g.*, Tr. 3149 (Court stating: "This is the same discussion we've had a couple of times [defense counsel].  Sexual activity with respect to Jane in New Mexico under the age of 17 can be relevant to an intent to transport to New York to engage in sexual activity under the age of 17, I think.  I think this is the same basic discussion that we've had.  So . . . I think the proposal made by the defense is wrong.").  And second, the question specifically uses the word "aided," suggesting that the jury note may have been a question about

16

the scope of accomplice liability, and specifically, whether the defendant is culpable for all conduct related to a trip even if her role was limited to arranging the return flight. Indeed, the defendant's current understanding of the note's question was not her initial view, which triggered the defense to repeatedly request an instruction about the "purpose of the travel." (Tr. 3138; *see* Tr. 3131 (requesting that the Court direct the jury's attention to the requirement that illegal activity was a "significant and motivating purpose" of the travel)).

It is therefore too difficult to parse the note into a particular set of facts and a question about those facts. The defendant's contrary understanding is brimming with speculation. The defendant presumes that the jury note indicates that the jurors "decided that there was no corroborating evidence that Ms. Maxwell was present for, or helped arrange, any of Jane's trips to New York, but that the flight logs did corroborate that Ms. Maxwell was present for her trip to New Mexico," so "the jury began evaluating Ms. Maxwell's involvement in the New Mexico trip to see if it supported a conviction under Count Four, which led to the question posed by the jury note." (Def. Mot. at 14-15). Nothing in the note explains why the jury was asking the question it did. Indeed, it would be odd for the jury to reject all of Jane's testimony about travel to New York and the ensuing sexual abuse in New York for lack of corroboration, and then conclude that the defendant arranged an unidentified commercial return flight for which there is no specific evidence in the record, including no specific corroboration of the defendant's role in arranging that flight. (*See* Tr. 3133 (defense argument that there is "no evidence" the defendant arranged a return flight from New Mexico)). And there is no reason the jury would have rejected Jane's testimony about sexual abuse in New York due to lack of corroboration, even though a flight record shows she was

17

flown to New York on Epstein's private jet (*see* Def. Mot. at 14 (citing GX-662-R at 44)), but would have accepted her much briefer and less detailed testimony about abuse in New Mexico solely because it was corroborated by a flight record.[3]

The defendant also speculates that the jury then decided to acquit the defendant on Count Two but not on Count Four because the jury convicted based on the evidence related to the New Mexico trip. Specifically, the defendant argues that the jury acquitted the defendant of enticement because the flight logs showed that "she was *present* on the trip [to New Mexico] but said nothing about whether she 'persuaded, induced, enticed, or coerced' Jane to take the trip. Indeed, Jane did not testify about having any interaction with Ms. Maxwell prior to the flight to New Mexico in which they discussed the trip." (Def. Mot. at 15). In contrast, the defendant suggests that the jury must have "found that Ms. Maxwell had some role in arranging Jane's return flight from New Mexico," which they took to be sufficient. But there is no specific evidence—not a flight record, and not in Jane's testimony—of how and to where Jane returned from that particular New Mexico trip, much less that the defendant participated in or made Jane's travel arrangements. (*See* Tr. 3129-30 (defense referring to the return flight as "going somewhere away from . . . New Mexico" and as "some other flight besides the flight to New Mexico")). In the defendant's view, the jury rejected nearly all of the evidence relating to Jane for lack of corroboration, and then convicted the

---

[3] The defendant says that the "critical difference" between those trips is that the defendant was not listed as a passenger on the trip to New York but is listed on the second trip to New Mexico. (Def. Mot. at 14). That difference, however, says nothing about whether the jury required a corroborative flight record before crediting Jane's account of travel to and abuse in New York or New Mexico.

defendant based on an unsupported speculative leap from Jane's testimony.  That is not plausible, and it certainly is not a "substantially likely" conclusion that can be drawn from an inscrutable jury note.

Second, even if the jury was so confused, the Court's response ameliorated that confusion. The Court did not tell the jury that it could convict based solely on conduct occurring in New Mexico.  Instead, it referred the jury to the instruction that explained that the second element of Count Four requires the Government to prove the defendant's intent "that Jane engage in sexual activity for which any person can be charged with a criminal offense in violation of New York Law," and further stated that "Count Four alleges sexual activity for which an individual could be charged with a violation of New York Penal Law, Section 130.55."  (Inst. No. 21).  The defendant does not argue that this instruction incorrectly states the law.[4]  Nor does the instruction make any reference to New Mexico whatsoever, much less does it suggest that conviction is available if the defendant intended to violate some New Mexican statute.  The jury is presumed to have followed this instruction correctly.  *See United States v. Joyner*, 313 F.3d 40, 47 (2d Cir. 2002) (reciting the

---

[4] The defendant complains that the jury instructions were "stripped of any mention of travel to New York," such as a limitation that the travel be "from Florida to New York."  (Def. Mot. at 1-2, 15).  The defendant tried to incorporate several limitations from the "to wit" clause of the Indictment into the jury charge, and the Court correctly rejected that attempt, because the Government is not strictly bound by facts in the "to wit" clause of an indictment.  *See, e.g.*, *United States v. Little*, 828 F. App'x 34, 38 (2d Cir. 2020) ("Such a discrepancy, however, does not rise to the level of a constructive amendment because 'to wit' clauses do not modify essential elements of the offense.").  For instance, if the jury had concluded that the defendant transported Jane from New Mexico to New York with intent to violate New York law—which is one available reading of the jury note—that would be a permissible basis for conviction, but outside the limitations proposed by the defendant.  The defendant's proposed instructions containing those limitations would have been erroneous.

"almost invariable assumption of the law . . . that jurors follow their instructions").  Accordingly, even if the jury note suggests some confusion, the Court's response did not constructively amend the S2 Indictment.  *See Jones*, 847 F. App'x at 30 (finding no constructive amendment in a sex trafficking case where the indictment did not contain the verb "advertise" but the evidence included evidence of advertising and the Court mistakenly used that verb in parts of the instructions, because the advertising evidence "fell squarely within the charged scheme" and the Court otherwise correctly instructed the jury); *Lebedev*, 932 F.3d at 54 ("The jury instructions described a conspiracy substantially the same as the one charged in the indictment.").

Third, the defendant's argument is better framed as a challenge to the Court's response to the jury note or a challenge to the jury instructions in the form of a constructive amendment argument.  *See, e.g.*, *United States v. Muraca*, 803 F. Appx' 545, 546 (2d Cir. 2020) ("[T]he trial court enjoys considerable discretion construing the scope of a jury inquiry and in framing a response tailored to the inquiry," and "If a supplemental charge is legally correct, the district court enjoys broad discretion in determining how, and under what circumstances, that charge will be given.").  Rather than challenge what she takes to be an error, however, the defendant argues instead that the Court's response to the jury note worked a constructive amendment.  In so doing, the defendant must surmount the high bar of showing that, notwithstanding the focus of the trial evidence, the Court's limiting instructions at trial, and the Court's jury instructions taken as a whole, the Court's response to the jury note "so modif[ied] *essential elements* of the offense that there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment."  *Gross*, 2017 WL 4685111, at *20.  The original instructions

did not modify any essential element of the offense or permit conviction based on an entirely different theory. Referring the jury back to the same instructions could not have caused a different result.

The S2 Indictment charged the defendant with Mann Act offenses with an intent to engage in sexual activity in violation of a New York statute. The Government put on evidence that the defendant engaged in a course of conduct with the intent to violate that New York statute. The Court charged the jury that the Government had to prove an intent to violate that New York statute beyond a reasonable doubt. "[T]he allegations in the indictment and the proof and jury instructions 'substantially correspond' with each other, as they involve a single course of conduct." *D'Amelio*, 683 F.3d at 424. "It therefore follows that [the defendant] was convicted of conduct that was the subject of the grand jury's indictment, and there was no constructive amendment of the indictment." *Id.*[5]

---

[5] Even if the Court agreed with the defendant that the proof as to Count Four was constructively amended, vacatur of the Mann Act conspiracy counts would be inappropriate. The jury note asked specifically about Count Four, and suggested no confusion as to the conspiracy counts. Moreover, the jury notes—which are of primary importance under the defendant's theory—reveal that the jury was focused on Annie Farmer's testimony as to the Mann Act conspiracy counts (Tr. 3102-07). And Annie's testimony of abuse in New Mexico is no less significant than Jane's. Finally, it is entirely unclear how the jury's erroneous understanding of the law relating to a substantive transportation offense could prejudice the jury's understanding for the *enticement* conspiracy charge. *See United States v. Pfaff*, 407 F. App'x 506, 510 (2d Cir. 2010) ("Constructive amendment of the conspiracy charge would have warranted vacatur of that charge only; the remainder of the indictment would have stood."); *United States v. Milstein*, 401 F.3d 53, 66 (2d Cir. 2005) (per curiam) (reversing on one count due to a constructive amendment but rejecting the contention that it required reversal "as a result of prejudicial spillover").

### 3. No Variance Occurred

For similar reasons, no variance occurred at trial. The evidence at trial did not prove any facts materially different from those alleged in Counts One through Four of the S2 Indictment. *See Gross*, 2017 WL 4685111, at *31 (explaining that a variance occurs when "the evidence offered at trial proves facts materially different from those alleged in the indictment"). The S2 Indictment alleged that the defendant was Epstein's close associate and co-conspirator who groomed minor victims, including Jane between in or about 1994 and in or about 1997, and that the defendant and Epstein groomed minor victims for abuse in various places, including Epstein's ranch in New Mexico. (*See* S2 Indictment ¶¶ 5, 9, 13). That is exactly what the Government proved at trial. It was no variance that the S2 Indictment did not specifically allege that Jane was abused in New Mexico—especially where, as here, that fact was offered as evidence of the conduct charged in the S2 Indictment, but was not by itself sufficient to convict the defendant. This proof does not differ from the S2 Indictment, much less materially. Accordingly, the S2 Indictment and proof "substantially correspond," the defendant could not have been misled, and there is no variance. *Khalupsky*, 5 F.4th at 294.

The defendant argues that she was prejudiced because Jane recalled that she was abused during her New Mexico trip shortly before trial, which prevented the defendant from filing a motion to preclude the testimony or giving a limiting instruction before Jane's testimony. (Def. Mot. at 16-18). This argument is belied by the record. As the defendant concedes, Jane has long recalled traveling to New Mexico. (*Id.* at 16-17). The defendant therefore had "fair and adequate notice" that the Mann Act conspiracies included conduct at Epstein's New Mexico home, which

is all that is required. *United States v. Salmonese*, 352 F.3d 608, 622 (2d Cir. 2003). And in any event, Jane recalled the incident of abuse at least as early as November 3, 2021. (*See* Def. Mot. at 5 n.1 (citing 3509-033 at 1)). Notes from that interview were provided to the defense on November 6, 2021—more than three weeks before trial. At the time, the parties were still litigating whether Kate could testify at all. (*See, e.g.*, Dkt. No. 417 (order dated November 6, 2021, requiring the Government to brief whether Kate was a "victim" for any legal purpose, including restitution)). The Court did not permit Kate to testify until November 19, 2021—almost two weeks after the defendant received the relevant notes. (Dkt. No. 477). And following that decision, the parties continued to litigate the limiting instructions for Kate and Annie in advance of trial. (*See, e.g.*, 11/23/21 Tr. at 28-38).

Accordingly, the defendant had ample notice to seek a limiting instruction as to this portion of Jane's testimony. *See Lebedev*, 932 F.3d at 54 ("rejecting a prejudice argument in part because "[t]he government disclosed the evidence and exhibits . . . four weeks prior to trial"). The Court's failure to give one *sua sponte* is not a prejudicial variance. The defendant is simply characterizing her failure to ask for a limiting instruction at the time of Jane's testimony as an argument that she was prejudiced. To the contrary, the Court did not err—much less plainly so. *See United States v. Petit*, 19 Cr. 850 (JSR), 2021 WL 673461, at *9 (S.D.N.Y. Feb. 21, 2021) (applying the plain error standard to a constructive amendment claim in a Rule 33 motion that was not made at trial).

Finally, even if the defendant had been entitled to a limiting instruction but was deprived of the opportunity to request it, she still was not prejudiced. As the Court agreed at the charge conference, although the Court gave the limiting instructions for Annie and Kate, there was no

need to repeat those instructions in the context of the full charge, which clarified that "the violation of law is as charged in New York." (Tr. 2774-75, 2777). And the fact that the defense failed to seek or receive a limiting instruction before Jane's testimony did not provide a separate basis for including a limiting instruction in the final charge. (Tr. 2777). The Court, the Government, and the defense were painstaking during trial to ensure that the jury understood that the Mann Act counts required an intent to commit a criminal sexual act in New York. That the defense missed an additional opportunity for a limiting instruction is not a prejudicial variance, much less a constructive amendment.

## II.     The Court Should Enter Judgment on Counts Three and Five

The S2 Indictment charged three conspiracies under 18 U.S.C. § 371. Counts One and Three were predicated on two different provisions of the Mann Act, whereas Count Five charged a conspiracy based on the Trafficking Victims Protection Act. As the Court held in an April 16, 2021 Order, the Government was entitled to present these three different counts to the jury. (Dkt. No. 207 at 27). Following the verdict, however, the Government agrees that the Court should enter judgment on only one of the Mann Act conspiracy counts, given the similarities between those counts. Accordingly, of the three conspiracy counts charged in the S2 Indictment, the Government submits that the Court should enter judgment on Count Three, which was predicated on 18 U.S.C. § 2423(a), and Count Five, which was predicated on 18 U.S.C. § 1591.

Counts Three and Five are not multiplicitous, and the Court should enter judgment on both counts. In particular, as discussed in greater detail below, Counts Three and Five arose from different criminal schemes, involving different criminal conduct, different statutory predicates, and a different modus operandi. The defendant ignores these important distinctions, claiming, in

her motion, that these counts are "virtually identical."  (Def. Mot. at 22).  But charges that cover different schemes under different statutes are not "virtually identical."  The Court should reject this argument.

### A.  Applicable Law

The Double Jeopardy Clause of the Fifth Amendment to the Constitution "protects against multiple punishments for the same offense." *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969). Accordingly, a defendant cannot be sentenced for multiplicitous charges covering the same crime. "An indictment is multiplicitous when it charges a single offense as an offense multiple times, in separate counts, when, in law and fact, only one crime has been committed." *United States v. Chacko*, 169 F.3d 140, 145 (2d Cir. 1999); *see also United States v. Jones*, 482 F.3d 60, 72 (2d Cir. 2006) ("A claim of multiplicity cannot succeed, however, 'unless the charged offenses are the same in fact and in law.'" (quoting *United States v. Estrada*, 320 F.3d 173, 180 (2d Cir. 2003)). Although the Double Jeopardy Clause does not protect against simultaneous prosecutions for the same offense, a defendant has a right not to be punished twice for the same crime. *United States v. Josephberg*, 459 F.3d 350, 355 (2d Cir. 2006) (per curiam).  Accordingly, "[i]f the jury convicts on more than one multiplicitous count, the defendant's right not to suffer multiple punishments for the same offense will be protected by having the court enter judgment on only one of the multiplicitous counts."  *Id.*  Similarly, where the judgment of conviction has already been entered on multiplicitous counts, that right is protected by vacating the convictions on all but one multiplicitous count.  *Id.*

"For purposes of a multiplicity analysis, the determinative issue is not whether the same conduct underlies separate counts, but whether the offense charged in one count is the same as the

offense charged in another count." *United States v. Rigas*, 281 F. Supp. 2d 660, 666 (S.D.N.Y. 2003) (citing *Chacko*, 169 F.3d at 146). With respect to conspiracy counts, if the two counts charge distinct conspiracies, "there is no double jeopardy problem regardless of an overt act or other evidentiary overlap." *Estrada*, 320 F.3d at 180. In the Second Circuit, courts apply the factors set forth in *United States v. Korfant* to determine whether two conspiracy counts are distinct. *Id.* at 180-81 (citing *United States v. Korfant*, 771 F.2d 660, 662 (2d Cir. 1985)). The factors include "the criminal offenses charged, overlap of participants, overlap of time, similarity of operation, common overt acts, geographic scope, common objectives, and degree of interdependence." *United States v. Guzman*, 7 F. App'x 45, 54-55 (2d Cir. 2001) (citing *Korfant*, 771 F.2d at 662); *Estrada*, 320 F.3d at 181.

When applying the *Korfant* factors, the Second Circuit has emphasized that "'no dominant factor or single touchstone determines whether' the compared conspiracies are in law and fact the same." *Id.* (quoting *United States v. Macchia*, 35 F.3d 662, 668 (2d Cir. 1994)). Moreover, "[a]t a certain level of generality,' the fact that two conspiracies 'overlap with respect to a number of characteristics, including time frame, geographic locale, participants, and criminal objective' does not negate the existence of two conspiracies if '[t]here exist sufficient distinctions between the schemes charged." *Guzman*, 7 F. App'x at 55 (quoting *Macchia*, 35 F.3d at 668).

**B.    Discussion**

Counts Three and Five charged different offenses. The Court should reject the defendant's multiplicity claim and enter judgment on Counts Three and Five.

1. **Offenses Charged**

Turning to the first *Korfant* factor, the "criminal offenses charged," Counts Three and Five plainly charge different criminal offenses under 18 U.S.C. § 371.  In particular, Count Three is predicated on 18 U.S.C. § 2423(a), a provision of the Mann Act that makes it a crime to transport minors for illegal sexual activity, whereas Count Five is predicated on 18 U.S.C. § 1591, a provision of the Trafficking Victims Protection Act that makes it a crime to traffic minors for commercial sex acts.  As charged in the S2 Indictment, these counts have different legal objects: Count Three concerned transporting girls under the age of seventeen to New York for purposes of sexual abuse in violation of New York Penal Law § 130.55, and Count Five concerned commercial sex acts with girls under the age of eighteen.

When two counts charge conspiracies under § 371, "[s]imilarity at this general level . . . is of limited import," where the objects of the conspiracies differ.  *United States v. Villa*, No. 12 Cr. 40 (JBA), 2014 WL 252013, at *4 (D. Conn. Jan. 22, 2014), *aff'd*, 744 F. App'x 716 (2d Cir. 2018) (quoting *Macchia,* 35 F.3d at 669).  For example, in *Villa*, the district court concluded that, under the first *Korfant* factor, two § 371 offenses were distinct, because the aim of one count was "to commit theft from an interstate shipment and to transport stolen property across state lines," whereas the other conspiracy was "to sell stolen property."  *Id.*  Similarly, in *United States v. Sattar*, Judge Koeltl concluded that two conspiracies charged under § 371 were distinct under *Korfant*, in part because the two counts "charge a separate conspiracy under the defraud clause and the offense clause of § 371, respectively."  *United States v. Sattar*, 314 F. Supp. 2d 279, 308 (S.D.N.Y. 2004), *aff'd sub nom. United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009).

Here, not only are Counts Three and Five predicated on different statutes, but the legal distinctions between these counts are substantial.  First, these counts had a different age of consent, as the age of consent for Count Three was seventeen (by operation of New York law), whereas the age of consent for the conspiracy charged in Count Five was eighteen.  Second, the conspiracies had a different geographic locus as a result of the different legal objects of the conspiracies: Count Three concerned travel to New York, whereas Count Five did not require interstate transportation, and concerned acts mostly in Florida.  Third, the scheme charged in Count Three concerned transporting minors to Epstein's residence in New York for sexual abuse in violation of state law, whereas Count Five concerned commercial sex acts with victims, who were paid to participate in so-called "massage" appointments.  Indeed, the Government legally could not have charged these conspiracies together, because the Trafficking Victims Protection Act was not enacted until 2000, years after the defendant and Epstein victimized Jane and Annie Farmer, as charged in the Mann Act conspiracy.  Moreover, the proof at trial established that Virginia Roberts was a victim of the sex trafficking conspiracy at age 17, when flight records[6] established that she travelled with the defendant and Epstein, but that conduct could not have been charged under the Mann Act conspiracies, which had a lower age of consent.  In short, Counts Three and Five charged categorically different crimes.

---

[6] *See* Tr. at 1855-57 (testimony of pilot David Rodgers regarding Virginia Roberts as a passenger on flight logs); Government Exhibit 662 (flight records); Government Exhibit 14 (birth certificate of Virginia Roberts).

The defendant asks the Court to ignore these legal distinctions. In particular, the defendant urges the Court not to apply the first *Korfant* factor, claiming—without explanation—that this first factor applies to claims arising from successive prosecutions, and not multiplicity claims. (Def. Mot. at 22 n.4). But the *Korfant* factors are applied both when courts compare indictments in successive prosecutions and when courts analyze counts in the same indictment.[7] *See, e.g.*, *Guzman*, 7 F. App'x at 54-55 (applying the *Korfant* factors to a claim of multiplicity arising from multiple conspiracy counts in the same indictment); *United States v. Diallo*, 507 F. App'x 89, 91 (2d Cir. 2013) (holding that two narcotics conspiracy counts charged in the same case were not multiplicitous under the *Korfant* factors); *Estrada*, 320 F.3d at 180-81 (applying the *Korfant* factors to a successive prosecution); *Sattar*, 314 F. Supp. 2d at 307 (applying the *Korfant* factors to a successive prosecution). For good reason: it would make little sense to ignore the legal distinctions between counts when determining whether those counts are different in law and fact for double jeopardy purposes. *See United States v. Hicks*, 5 F.4th 270, 275 (2d Cir. 2021) (citing *Blockburger v. United States*, 284 U.S. 299 (1932)). The defendant asks this Court to ignore the first *Korfant* factor because it is fatal to her multiplicity claim. The two counts are legally distinct, and the Court can and should reject the defendant's multiplicity claim for this reason alone.

---

[7] The lone case cited by the defendant, *United States v. Cooper*, 886 F.3d 146 (D.C. Cir. 2018), held that two § 371 counts in the same indictment were multiplicitous. (Def. Mot. at 22 n.4). In reaching that conclusion, the Court did not hold that the first *Korfant* factor was inapplicable to that particular procedural posture. The defendant otherwise cites no case in which a court held that it was inappropriate to examine the legal differences between counts when evaluating a multiplicity claim.

### 2.  Overt Acts

Counts Three and Five of the S2 Indictment charged different overt acts.  There is no overlap whatsoever in the overt acts between these two counts in the S2 Indictment.  The defendant does not appear to argue otherwise, (*see* Def. Mot. at 24), nor could she.  The absence of overlapping overt acts underscores the fact that these counts charged different conspiracies. Accordingly, this factor weighs strongly against the defendant's claim of multiplicity.

### 3.  Overlap in Participants

Turning to the overlap of participants, the evidence at trial established that some—but importantly, not all—participants overlapped between the two conspiracy schemes charged in Counts Three and Five.  In any event, even if the participants had been identical in both conspiracies, the identity of the participants alone would be insufficient to support a claim of multiplicity.  *See United States v. Coleman Com. Carrier, Inc.*, 219 F. Supp. 2d 563, 565 (S.D.N.Y. 2002) ("[T]he existence of a single conduit does not establish proof of a single conspiracy[.]") (quoting *Macchia*, 35 F.3d at 669).

Here, although the conspiracies charged in Counts Three and Five both involved the defendant and Epstein, the S2 Indictment charged that, with respect to Count Five, Epstein's employees participated in contacting a minor victim to schedule appointments for sexualized massages.  *See* Dkt. No. 187, ¶ 25(d).  At trial, a victim who testified under her first name, Carolyn, testified about receiving such calls from Sarah Kellen, who worked as a personal assistant to Epstein.  (Tr. 1527).  The evidence at trial established that Kellen started working for Epstein in or about the early 2000s.  (*See, e.g.*, Tr. 832, 1889).  Carolyn also testified about an incident in

which Kellen took nude photographs of Carolyn for Epstein. (Tr. 1529). In short, the S2 Indictment charged—and the proof at trial established—that there was an additional participant in the sex trafficking conspiracy who was not involved in the Mann Act conspiracies.

### 4. Overlap of Time

Count Three charged conduct spanning from 1994 to 2004. Count Five charged conduct spanning from 2001 to 2004. Of the multiple overt acts charged in Count Three of the S2 Indictment, only one occurred during the timeframe of the conspiracy charged in Count Five: an overt act regarding efforts to solicit Carolyn to travel with the defendant and Epstein. (Dkt. No. 187, ¶ 19(e)). Aside from that single overt act, no other overt act charged in Count Three occurred within the timeframe of the conspiracy charged in Count Five. Put simply, the gravamen of the offense conduct in Count Three occurred in the 1990s, while the offense conduct charged in Count Five took place in the 2000s. Thus, although there is some degree of overlap in time frames between the two counts, it is minimal at best. Accordingly, this factor weighs against a claim of multiplicity, or at best is neutral.

### 5. Geographic Scope

Although the evidence at trial concerned events in multiple states, at Epstein's multiple properties, the offense conduct in Count Three concerned transporting minors from Florida to New York, for purposes of sexually abusing victims in New York. By contrast, Count Five charged a sex trafficking conspiracy which, as the Court instructed the jury, could be established by proof of conduct that had a minimal effect on interstate commerce, irrespective of whether victims crossed state lines. (Tr. 3041-42). As a result, the conspiracy in Count Three was focused on travel to

31

New York, whereas the conspiracy charged in Count Five largely concerned conduct that took place in Florida.  Although the conspiracy overlapped in geographic scope, the locus of each count was distinct and weighs against a claim of multiplicity.

### 6.   Similarity of Operation, Common Objectives, and Degree of Interdependence

Finally, the conspiracies charged in Counts Three and Five were fundamentally independent schemes, with different objectives and modes of operation.  While the defendant claims that the Government argued at trial that only one scheme existed, the trial record proves otherwise.

In particular, the Government's opening statement made clear that the Government intended to prove that the defendant sexually exploited underage girls through different conspiratorial schemes.  The first scheme, charged in Count Three, occurred largely in the 1990s, and involved establishing mentoring relationships with victims to groom them to travel to Epstein's properties for sexual abuse.  *See* Tr. 40:8-25 (describing an "earlier phase" of the defendant's crimes that involved developing relationships with victims, and the defendant's later participation in a "pyramid scheme of abuse" in which victims recruited other victims for so-called "massage" appointments).  The second scheme, in the 2000s, involved paying victims for so-called "massage" appointments, where they were sexually exploited.  *Id.*  The Government described the different schemes in the same manner during summations.  *See* Tr. 2885-87 (describing the timeline of events, and the shift between an earlier scheme and a later pyramid scheme involving victims recruiting victims).

It makes no difference, as the defendant argues, that both crimes involved grooming minors for sexual abuse. (Def. Mot. at 23-24). As Dr. Rocchio testified at trial, the use of grooming techniques is common among perpetrators of child sexual abuse. (*See* Tr. 713). But using a common tool among sexual offenders does not render the distinct conspiracies here multiplicitous; if that were true, presumably many federal crimes against children would be multiplicitous.

The Government was clear at trial that, while the defendant and Epstein committed crimes together for years, they did so through different schemes, in violation of different laws. That is what the S2 Indictment charged, and that is what the Government proved at trial: different conspiracy crimes. The Court should deny the motion and enter judgment on Counts Three and Five.

### III. The Defendant's Motion to Vacate Her Conviction and Dismiss the Indictment Based on Alleged Improper Pre-Trial Delay Should Be Denied

The defendant contends that the Court should vacate her conviction and dismiss the Indictment because the Government's allegedly excessive delay in bringing the charges violates her due process rights. (Def. Mot. at 25). The defendant's contention should be swiftly rejected. The Court has twice evaluated the defendant's speculative and baseless arguments and twice concluded that the defendant could not meet the "stringent standard" necessary to prevail on a claim that any alleged pre-indictment delay violates her due process rights. (Dkt. No. 207 at 17; Dkt. No. 317 at 10). Her arguments fare no better post-trial.

The defendant has not and cannot successfully establish a violation of the Due Process Clause of the Fifth Amendment. First, the defendant has not established that any alleged pre-indictment delay caused actual prejudice to the defense. Her speculative assertions about lost

33

witnesses and records are hardly the sort of evidence that she can use to carry her heavy burden. Without proof of actual prejudice, the motion fails. Second, even if the Court finds actual prejudice to the defense, the defendant has not established that the Government's purpose in any alleged pre-indictment delay was improper or designed to gain any sort of tactical advantage. As the Court previously found, "nothing in the record indicates that the Government's delay in bringing these charges was designed to thwart Maxwell's ability to prepare a defense." (Dkt. No. 317 at 10; *see also* Dkt. No. 207 at 17). The defendant did not previously make any showing of an intentional and deliberate delay caused by the Government for an improper purpose. She fails to address the Court's prior findings and has made no additional showing.

Because the defendant cannot establish either element, let alone both, her due process claim is meritless and should be denied.

**A. The Defendant Has Failed to Demonstrate Actual and Substantial Prejudice**

**1. Applicable Law**

It is well-settled that the statute of limitations is "the primary guarantee against bringing overly stale criminal charges." *United States v. Marion*, 404 U.S. 307, 322 (1971). Thus, when a case has been brought within the statute of limitations, it is "only rarely dismissed," and carries a "strong presumption of validity." *United States v. Cornielle*, 171 F.3d 748, 752 (2d Cir. 1999); *see also United States v. Lawson*, 683 F.2d 688, 694 (2d Cir. 1982).[8]

---

[8] As this Court previously found, the "applicable statute of limitations" does not "bar[] the charges here." (Dkt. No. 207 at 18).

The Second Circuit standard for pre-indictment delay imposes a heavy burden on the defendant to show "both that the Government intentionally delayed bringing charges for an improper purpose and that the delay seriously damaged the defendant's ability defend against the charges." (Dkt. No. 207 at 17 (citing *Cornielle*, 171 F.3d at 752)). The burden for proving both prongs of the standard rests squarely on the defendant. *United States v. Scarpa*, 913 F.2d 993, 1014 (2d Cir. 1990); *United States v. Rubin*, 609 F.2d 51, 66 (2d Cir. 1979); *United States v. Ricco*, 549 F.2d 264, 272 (2d Cir. 1977). The burden is so heavy that it is rarely met by a defendant. *See DeMichele v. Greenburgh Centr. Sch. Dist. No. 7*, 167 F.3d 784, 790-91 (2d Cir. 1999) ("[W]hile the [Supreme] Court may not have shut the door firmly on a contention that at some point the Due Process Clause forecloses prosecution of a claim because it is too old, at most the door is barely ajar.").

Substantial prejudice is just that—substantial, actual, non-speculative prejudice. *See United States v. Birney*, 686 F.2d 102, 105-06 (2d Cir. 1982) (a defendant's "proof of prejudice must be definite and not speculative"); *see also United States v. Henderson*, 337 F.3d 914, 920 (7th Cir. 2003) (prejudice sufficient to warrant dismissal for pre-indictment delay must be "actual and substantial" and "specific, concrete, and supported by evidence"). Prejudice in this context refers to "actual prejudice to the defendant's right to a fair trial." *United States v. Elsbery*, 602 F.2d 1054, 1059 (2d Cir. 1979). It is well-established that the mere loss of evidence or of witnesses, by death or otherwise, without more, is insufficient. *See, e.g.*, *United States v. Snyder*, 668 F.2d 686, 689 (2d Cir. 1982) (death of a defense witness three years before indictment insufficient prejudice); *United States v. King*, 560 F.2d 122, 130-31 (2d Cir. 1977) (death of

35

witness and missing documents insufficient prejudice); *United States v. Pierre-Louis*, No. 16 Cr. 541 (CM), 2018 WL 4043140, at \*4-5 (S.D.N.Y. Aug. 9, 2018) (death of a defense witness and defendant's own memory issues insufficient prejudice). Moreover, even when a claim of prejudice is based upon the complete loss of a witness's testimony or other evidence, a defendant nevertheless must show how that testimony or evidence would have affected the outcome or otherwise have assisted the case. *See United States v. Gilbert*, 266 F.3d 1180, 1187 (9th Cir. 2001) (defendant's pre-indictment delay claim rejected due to failure to show "how the testimony from [three absent] witnesses would have benefitted his case"); *United States v. Spears*, 159 F.3d 1081, 1085 (7th Cir. 1998) ("[A] defendant must do more than show that a particular witness is unavailable and that the witness' testimony would have helped the defense. He must also show that the witness would have testified, withstood cross-examination, and that the jury would have found the witness credible."). "Courts have held that 'the defendant also has the burden of showing that the lost testimony or information was not available through other means.'" *Pierre-Louis*, 2018 WL 4043140, at \*4 (quoting *United States v. Sprouts*, 282 F.3d 1037, 1041 (8th Cir. 2002)).

The vast majority of pre-indictment delay cases fail on the first prong. *See, e.g.*, *Marion*, 404 U.S. at 324-26 (fading witness memories insufficient; "no one suggests that every delay-caused detriment to a defendant's case should abort a criminal prosecution"); *Snyder*, 668 F.2d at 689 (death of a defense witness three years before indictment insufficient prejudice); *King*, 560 F.2d at 130-31 (death of witness and missing documents insufficient prejudice); *United States v. Iannelli*, 461 F.2d 483, 485 (2d Cir. 1972) (unavailability of witnesses insufficient prejudice);

*Pierre-Louis*, 2018 WL 4043140, at *4-5 (death of a defense witness and defendant's own memory issues insufficient prejudice).

## 2. Discussion

The defendant contends that she has suffered substantial prejudice due to the death of certain witnesses and the unavailability of certain documentary records. (Def. Mot. at 25-30). The defendant's speculative claims fail to establish substantial and actual prejudice caused by the allegedly excessive pre-indictment delay. *See Birney*, 686 F.2d at 105-06.

The defendant claims she has suffered substantial prejudice as a result of pre-indictment delay due to the unavailability of (1) Alberto Pinto and Roger Salhi, architects who worked for Epstein; (2) Sally Markham, "a property manager hired to help run Epstein's properties in the early 2000s"; and (3) Lynn Fontanilla, the live-in housekeeper in Epstein's New York townhouse. (Def. Mot. at 29-30).[9] The defendant's speculative claims of prejudice do not withstand scrutiny. First, the fact that certain deceased witnesses cannot testify does not compel a finding of actual prejudice. "[U]navailable witnesses are inherent in any delay, even if justifiable. To merit dismissal a defendant must demonstrate a substantial, actual prejudice to his ability to defend himself." *United*

---

[9] The defendant also reasserts that the witnesses "already mentioned in [her] previous filings"—namely, Jeffrey Epstein, Epstein's mother, Michael Casey (the alleged agent of Minor Victim-1), and Palm Beach Police Department Detective Joseph Recarey—"could have provided evidence contradicting the government's proof." (Def. Mot. at 29). The Court already rejected the defendant's claims of actual prejudice as to these witnesses, finding that the defendant "provide[d] no indication of what many of these potential witnesses might have testified to" and noting "serious doubts under all of the relevant circumstances that a jury would have found testimony from Epstein credible even if he had waived his right against self-incrimination and testified on her behalf." (Dkt. No. 207 at 18). The defendant offers no new arguments as to these witnesses, and her claims certainly fare no better after the trial in this matter.

*States v. Long*, 697 F. Supp. 651, 657 (S.D.N.Y. 1988).   The defendant has not made such a showing.   Her abstract assertions simply do not rise to that level, and the law is clear that "proof of prejudice must be definite and not speculative."   *Birney*, 686 F.2d at 105-06; *see also Long*, 697 F. Supp. at 657 (finding that "perceived prejudice is speculative" where there was "no way of knowing what [the unavailable witness's] testimony would have been"); *United States v. Valona*, 834 F.2d 1334, 1339 (7th Cir. 1987) (noting that prejudice analysis must consider whether the missing witness "would have withstood cross-examination," whether the jury would have found him a "credible witness," and whether the testimony, when compared to other trial evidence "would affect the trial outcome"); *Spears*, 159 F.3d at 1085.   "Courts have generally found that vague assertions that a deceased witness might have provided favorable testimony do not justify dismissing an indictment for delay."   (Dkt. No. 207 at 17); *see also United States v. Scala*, 388 F. Supp. 2d 396, 399-400 (S.D.N.Y. 2005) ("Counsel's unsworn assertions as to vague generalities" that witnesses, "if alive, would give testimony helpful to [the defendant] do not show that [the defendant's] ability to present a defense has been substantially and actually prejudiced.").   Here, "there is no evidence before the Court as to what [the deceased witnesses] would have testified, much less specific evidence of how losing that testimony has caused [the defendant] actual prejudice."   *Id.* at 400.   The defense's unsworn assertions about what "the defense believes" these witnesses "could have established" or "could have testified" to do not justify dismissing the Indictment or vacating the defendant's conviction.   (Def. Mot. at 29-30).

Second, even assuming that Pinto, Salhi, Markham, and Fontanilla would have testified as the defendant contends, such testimony would have no bearing on whether the defendant did, in

fact, participate in the sexual abuse of the victims in the manner described in the Indictment. As a factual matter, the record is crystal clear that these witnesses were not with the defendant and Epstein at "every moment" during the period charged in the Indictment. *See Pierre-Louis*, 2018 WL 4043140, at \*4. It would thus be "impossible" for them "to testify that [the] defendant did not commit the charged crimes, so whatever helpful testimony [they] might have offered (the details of which are sparse in the motion) would be easily undermined on cross-examination." *Id.* (citing *Spears*, 159 F.3d at 1081-85). Moreover, even assuming that these witnesses would have testified as the defendant claims and that such testimony would have been admissible, the defendant does not address why the unavailability of these particular individuals has caused her actual prejudice when other employees who worked for Epstein and the defendant were available to offer (and did offer) testimony about Epstein's residences and the defendant's role and time spent at such residences. It is the defendant's burden to establish that these witnesses' testimony could not be put before the jury through other means, and the defendant has not established—and cannot establish—that these four witnesses were "key" witnesses who would have testified at her trial in an irreplaceable way that would have helped, rather than hurt, her. *Cornielle*, 171 F.3d at 752.

In particular, the defendant cites the absence of Pinto and Salhi, "architects who built, renovated, and decorated many of Epstein's residences" and speculates that their testimony "would have cast significant doubt on Jane's recollection of events." (Def. Mot. at 29). The defendant has not set forth what Pinto and Salhi would have attested to had the charges been brought sooner. Moreover, at trial, the defendant cross-examined other employees who worked for Epstein during the relevant time periods—such as Juan Alessi and pilots Larry Visoski and David Rodgers—and

39

inquired about Epstein's residences in an effort to cast doubt on Jane's recollections of events. In addition, the defendant listed as a defense witness one employee who worked for Epstein in his New York residence at East 71st Street in the mid-1990s, but tellingly elected to not call that witness. (Def. Dec. 14, 2021 Letter to Court). The defendant also cites the absence of Sally Markham, claiming that she "could have testified that the household manual [Government Exhibit 606] was not created by Ms. Maxwell, but by another individual known as 'the Countess,' whom Epstein brought in to 'professionalize' his staff." (Def. Mot. at 30). The defendant conveniently ignores Alessi's testimony about the manual (Tr. 807-09) and Government Exhibit 424, an email chain in which the defendant and Markham discussed the household manual, which made abundantly clear that the defendant was involved in developing the manual. The defendant's bald assertions about Markham's testimony are speculative and belied by the trial record. Finally, the defendant's musings about what Fontanilla "could have testified" about (Def. Mot. at 30)—the details of which are sparse—do not "demonstrate a substantial, actual prejudice to [her] ability to defend [herself]." *Long*, 697 F. Supp. at 657. Even assuming that Fontanilla would have testified as the defendant now contends, such testimony would also have no bearing on whether the abuse, in fact, occurred.

In sum, the defendant "fail[s] to identify what [these] witnesses would have attested to had the case been brought sooner; [she] fail[s] to substantiate the proposition that the testimony would have been favorable to [her]; and [she] fail[s] to provide any proof to support [her] claims of actual and substantial prejudice." *United States v. Berry*, No. 20 Cr. 84 (AJN), 2021 WL 2665585, at *3 (S.D.N.Y. June 29, 2021). "Moreover, even assuming *arguendo* that the [defendant] had

established that the testimony would have been favorable to [her], [she has] not shown that the witnesses would have been 'key' and not peripheral." *Id.*; *see also id.* ("The rule in this Circuit has long been that 'missing peripheral witnesses are not enough[.]'" (quoting *Rubin*, 609 F.2d at 66)).

The defendant also claims to have suffered prejudice regarding what she calls "critical documentary records" that were no longer available to challenge certain Government assertions or "test critical dates." (Def. Mot. at 25, 27). She specifically points to the unavailability of certain flight records, financial documents, phone records, and property records as proof of actual and substantial prejudice. (*Id.* at 26-29). Her unsubstantiated claims fail for at least three reasons.

First, the defendant's motion either speculates about or lacks any suggestion of what such records would have shown. For example, the defendant argues that "[c]ritical financial documents" were unavailable to her. (*Id.* at 27). The defendant—who herself knows about the nature of the financial transactions between herself and Epstein—fails to indicate or suggest what the financial documents would have shown. The defendant also argues that property records about Epstein's homes could have rebutted Jane's testimony about the appearance of his homes at various points in time. (*Id.* at 28-29). But ample evidence about the appearance of Epstein's homes was offered at trial, and the defendant's motion offers no non-speculative information about what property records would specifically have provided that was absent from trial testimony and could not have been obtained another way.

Second, the defendant's "motion does not provide any basis to conclude that the evidence, if available, would have been favorable to the [defendant]." *Berry*, 2021 WL 2665585, at *2. As

41

one example, the defendant claims that Carolyn's trial testimony that the defendant called her to

set up massage appointments "*could have* been disproven with contemporaneous phone records."

(Def. Mot. at 28) (emphasis added).   The defendant's claim is entirely speculative; she makes no

claim about what Carolyn's phone records, or those of her mother or then-boyfriend, would have

shown, and she ignores that the records may well have helped the Government, not her, if they

were available.

As another example, the defendant argues that had the flight manifests been available for

the time period charged in the Indictment,[10] she "could have used them to challenge whether Jane

was on those flights as well as the accuracy of Jane's recollection of events."   (*Id.* at 26).   The

defendant does not establish how the flight manifests would have helped her.   She claims that she

needed the flight manifests because the flight logs are incomplete.   (*Id.*).   In so arguing, the

defendant assumes that the flight manifests were complete[11] and contained information that would

---

[10] The defendant baldly argues that the flight manifests "did not go back to the time period charged in the Indictment" "[b]ecause of the passage of time." (Def. Mot. at 26).  However, at trial, Visoski testified that between approximately 1994 and 2004, he would drop off the passenger manifests he personally completed at Epstein's main office in New York.  (Tr. 172).  Similarly, Rodgers testified that he turned over the passenger manifests that he completed to one of Epstein's attorneys.  (Tr. 1819).  The defendant has not established that such manifests were not available due to any intentionally manufactured delay.  *See United States v. Dornau*, 356 F. Supp. 1091, 1094 (S.D.N.Y. 1973) ("The fact that evidence may be lost or destroyed during the pre-indictment stage is inherent in any delay, no matter what the duration.  Furthermore, there has been no allegation in this case that the destruction of the records was deliberate on the part of either the government or trustee.").

[11] The defendant complains that the flight logs kept by Rodgers "were incomplete and often identified passengers simply by their first names or generic identifiers like '1 female' or '1 male'" in her efforts to argue that the unavailability of the passenger manifests was material.  (*Id.*).  The defendant ignores Visoski's testimony that when completing the manifest, he "tried to be as accurate as [he] could," but that if he "didn't know a passenger name, [he] wanted to put whether

be helpful to her.  Indeed, she again ignores that the flight manifests may well have helped the Government.  Once again, the defendant's argument is entirely speculative and unsupported by the record.  The defendant offers no proof or basis for concluding that the flight manifests would be helpful and merit the extreme relief she seeks.

Third, the defendant's "motion is unsupported by any proof that might substantiate a finding of actual and substantial prejudice as a result of the delay." *Berry*, 2021 WL 2665585, at *2 (citing *Birney*, 686 F.2d at 106). The defendant's "bare assertions do not satisfy the 'definite and not speculative' requirements attendant on the [defendant's] 'heavy burden' to show actual prejudice." *Id.* Instead, the defendant appears to "rely on the proposition that the loss of evidence merits an inference that the evidence would have been both favorable and material." *Id.* The defendant, however, is "not entitled to any such inference" "[a]s the side that bears the burden." *Id.* "Without even a cursory showing of *what* the evidence would have shown, the [defendant] raise[s] 'at most the *possibility* of prejudice,' but '[n]o actual prejudice is established.'" *Id.* (quoting *United States v. Foddrell*, 523 F.2d 86, 88 (2d Cir. 1975)).

In short, the defendant's complaints are nothing more than the type of self-serving, vague, speculative, and conclusory claims of prejudice that courts have consistently rejected as insufficient to warrant dismissal of charges based upon pre-indictment delay.  The motion should therefore be denied.

---

they were male or female."  (Tr. 172-73).  Thus, there is no basis to conclude that the manifests would have contained the information as the defendant speculates, much less that they would have been helpful to the defense.

**B.  The Defendant Has Failed to Establish that the Government Delayed the Indictment for an Improper Purpose**

**3.  Applicable Law**

If, and only if, a defendant has established significant, actual prejudice does the inquiry turn to the reason for the delay.  *See, e.g.*, *Pierre-Louis*, 2018 WL 4043140, at *5 ("Because Defendant failed to show prejudice, the Court need not even address the second prong[.]").  The reason for delay violates due process only if it is so extreme that it departs from fundamental notions of "fair play."  *United States v. Lovasco*, 431 U.S. 783, 795 (1977).  The Supreme Court has "defined the category of infractions that violate 'fundamental fairness' very narrowly," *Dowling v. United States*, 493 U.S. 342, 352 (1990), and the Supreme Court has "stressed the importance for constitutional purposes of good or bad faith on the part of the Government when the claim is based on loss of evidence attributable to the Government," *Arizona v. Youngblood*, 488 U.S. 51, 57 (1988).

The Second Circuit has clearly held that a defendant seeking the dismissal of an indictment filed within the statute of limitations must establish that the Government acted intentionally, deliberately, or with some strategy, and that the Government used that delay to gain a tactical advantage over the defendant.  *See, e.g.*, *Cornielle*, 171 F.3d at 752 (delay must be an "intentional device to gain [a] tactical advantage over the accused" (quoting *Marion*, 404 U.S. at 324)); *see also United States v. Alameh*, 341 F.3d 167, 176 (2d Cir. 2003) ("To show unjustifiable conduct, a defendant must demonstrate that the government has intentionally used delay to gain unfair tactical advantage."); *United States v. Delacruz*, 970 F. Supp. 2d 199, 203 (S.D.N.Y. 2013) ("[The defendant's] motion to dismiss would nevertheless fail for the independent reason that he has not

made any showing that the preindictment delay was an intentional device designed by the Government to gain a tactical advantage."); *United States v. Martinez*, No. 94 Cr. 219 (RPP), 1995 WL 10849, at \*4 (S.D.N.Y. Jan. 12, 1995) ("In order to establish improper delay by the Government in filing an indictment, a defendant must show that the delay was the result of an intentional device of the Government to gain tactical advantage over the accused." (citing *United States v. Hoo*, 825 F.2d 667, 671 (2d Cir. 1987))).  Indeed, some version of the phrase "deliberate device" and "tactical advantage" is found in nearly every Second Circuit decision on the issue. *See, e.g.*, *Alameh*, 341 F.3d at 176 ("intentionally used delay to gain unfair tactical advantage"); *Cornielle*, 171 F.3d at 752 (requiring "intentional device" to gain "tactical advantage"); *Lawson*, 683 F.2d at 694 (delay not "engineered by the government for an improper purpose, such as gaining a tactical advantage"); *Snyder*, 668 F.2d at 689; *United States v. Watson*, 599 F.2d 1149, 1156 n.5 (2d Cir. 1979); *United States v. Tanu*, 589 F.2d 82, 89 (2d Cir. 1978); *United States v. Laurenti*, 581 F.2d 37, 40 n.11 (2d Cir. 1978); *United States v. Hillegas*, 578 F.2d 453, 460 (2d Cir. 1978).

### 4.  Discussion

Because the defendant has failed to establish prejudice, the Court need not address the defendant's specious arguments that the Government's purpose in any alleged pre-indictment delay was improper or designed to gain any sort of tactical advantage. *See Pierre-Louis*, 2018 WL 4043140, at \*5.  In any event, in denying the defendant's pre-trial motions and supplemental pre-trial motions, the Court noted the absence of "evidence that the Government's delay in bringing these charges was designed to thwart Maxwell's ability to prepare a defense."  (Dkt. No. 207 at 17; Dkt. No. 317 at 10).  That remains true.

As the Government explained in its memorandum in opposition to the defendant's twelve pre-trial motions, dated February 26, 2021 (Dkt. No. 204 at 41-59), and in its memorandum in opposition to the defendant's supplemental motions, dated May 21, 2021 (Dkt. No. 295 at 13-16), the Indictments in this case were brought in a timely manner upon the Government's collection of evidence to support the charges.  Any suggestion that the Government intentionally delayed obtaining the Indictments to gain some strategic advantage has no basis in fact, and for good reason:  it is not true.  The defendant has not established—and cannot establish—an undue delay, much less an intentional and deliberate delay caused by the Government for an improper purpose.

In her current motion, the defendant offers no additional argument or factual claims whatsoever in support of her argument that the Government's purpose in any alleged pre-indictment delay was improper or designed to gain any sort of tactical advantage.  Indeed, she ignores the second prong of the pre-indictment delay standard and refers the Court back to her prior briefing, which this Court has twice considered and rejected.  (Dkt. No. 207 at 17; Dkt. No. 317 at 10).  If anything, the trial record undermined the defendant's argument on this prong.  In an effort to show the victims' supposed financial motivations for testifying, the defendant repeatedly focused the jury's attention on the fact that victims only recently agreed to cooperate with the Government.  That same evidence precludes any argument of intentional delay by the Government. The defendant's renewed complaints are insufficient to warrant dismissal of charges based upon pre-indictment delay, and accordingly, the motion should be denied.

Because the defendant cannot meet her "heavy burden" of establishing either element of unconstitutional delay, *Cornielle*, 171 F.3d at 752, let alone both, her motion to vacate her conviction or dismiss the Indictment for pre-indictment delay is meritless and should be denied.

### IV.   The Court Should Deny the Defendant's Motion for Judgment of Acquittal Under Rule 29

In a brief paragraph at the end of her motion, the defendant "reasserts th[e] same motion" under Rule 29 she made following the close of the Government's case and the close of her case and "incorporates the arguments previously made to the Court." (Def. Mot. at 30). The Court should reject those arguments as it has before.

The defendant has only offered a specific challenge to the sufficiency of the evidence as to Counts One and Two, the enticement counts. Specifically, the defendant argued that the record lacked sufficient evidence that the defendant "or anyone else who allegedly participated in this conspiracy persuaded, induced, or enticed Jane to travel to New York to engage in illegal sexual activity." (Tr. 2266-67; *see* Tr. 2269-70 ("There is not testimony whatsoever that Ghislaine Maxwell encouraged [Jane] to travel.")). Of course, the jury acquitted the defendant on Count Two, the substantive enticement count. As to Count One, the jury could have readily concluded that the defendant conspired with Epstein to groom minor victims and entice them to travel to Epstein's various properties, including his home in New York, to be sexually abused. For instance, Jane testified that she was abused by Epstein and the defendant in New York. (Tr. 320). And the record is replete with testimony regarding the manner in which the defendant worked with Epstein to groom minor victims and entice them to travel to Epstein's properties. (*See, e.g.*, Tr. 300 (Jane seeing the defendant topless), 348 (making Jane feel special, in part by taking her on "field trips"),

2080-84 (shopping with Annie in New Mexico and teaching her to massage Epstein's feet), 840-45 (recruiting Virginia and instructing Alessi to bring her to Epstein's Florida house), 1524 (Virginia receiving money for sex with Epstein), 1534 (inviting Carolyn to travel)).   The jury evidently credited this testimony, and based on that testimony and the reasonable inferences from it, a rational jury easily could have (and did) find her guilty on Count One.

The defendant has made no substantive argument as to the sufficiency of the evidence on the remaining counts, and for good reason.   Just as the conspiracies in Counts One and Three are multiplicitous because enticement and transportation are dual aims of the same conspiracy, *see supra* Part III, Count Three is amply supported by the evidence underlying Count One.   As to Count Four, the record contains evidence that the defendant made travel arrangements for Jane, including the specific incident in which Jane had difficulty returning from New York to Palm Beach, and that the defendant traveled with Jane on Epstein's private plane.   (Tr. 2268-69; *see* Tr. 316-17 (testimony that the defendant traveled with Jane on Epstein's private jet and would "assist" in "making travel arrangements"); Tr. 323-24 ("[S]ometimes it would be – Jeffrey would ask her, hey, can you get Jane, you know, tickets and the times and whatnot and make the arrangements to be picked up.").   That, in combination with evidence of the defendant's participation in Jane's abuse in New York, is sufficient on its own for the jury to convict on Count Four.   *See United States v. Vargas-Cordon*, 733 F.3d 336 (2d Cir. 2013) ("The record is replete with evidence from which a reasonable jury could infer that sexual access to Jaire was a dominant purpose of Vargas-Cordon's repeated transport of her from his New Jersey home into Brooklyn."); *United States v. Mi Sun Cho*, 713 F.3d 716, 720 (2d Cir. 2013) ("Cho does not dispute that one who arranges

another's transportation across state lines for purposes of prostitution violates § 2421"); *United States v. Holland*, 381 F.3d 80, 86 (2d Cir. 2004) ("A defendant will be deemed to have 'transported' an individual under Section 2421 where the evidence shows that the defendant personally . . . performed the proscribed act of transporting.").  But the jury could also have convicted the defendant by concluding that Epstein transported Jane, as he undoubtedly did by transporting her on his private jet, and that the defendant aided and abetted that transportation by grooming Jane, accompanying her on the plane, and participating in the abuse once she arrived in New York.

Finally, the record contains ample evidence for the jury to convict on Counts Five and Six. Carolyn's testimony, corroborated by testimony from Shawn and physical evidence including message pads, showed that the defendant knew that Carolyn was a minor and made phone calls to arrange for Carolyn to engage in sex acts with Epstein in exchange for money.  That is sufficient for Count Six.  And the evidence showed that the defendant conspired with Epstein to traffic Carolyn and other minors for sex, including evidence that the defendant personally recruited Virginia while she was a minor.  That is sufficient for Count Five.

The defense at trial focused largely on the credibility of the victims who testified against the defendant.  Now that the jury has convicted on five counts, and in a posture in which the Court must defer to the jury's evaluation of the witnesses and take all inferences in favor of the Government, those arguments are not availing.  The evidence at trial is more than sufficient to sustain the jury's verdict.

## <u>CONCLUSION</u>

For the reasons set forth above, the Government respectfully submits that the Court should grant the defendant's motion as to Count One, and otherwise deny the defendant's post-trial motions.

Dated: February 25, 2022
New York, New York

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York


By:     /s/
Maurene Comey
Alison Moe
Lara Pomerantz
Andrew Rohrbach
Assistant United States Attorneys