UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------x
                            :

UNITED STATES OF AMERICA,      :

        v.                  :     20 Cr. 330 (AJN)

                            :

GHISLAINE MAXWELL,         :

      Defendant.         :

                            :

-------------------------------------------------x


## GHISLAINE MAXWELL'S MOTION FOR A NEW TRIAL

Jeffrey S. Pagliuca
Laura A. Menninger
HADDON, MORGAN & FOREMAN P.C.
150 East 10th Avenue
Denver, CO 80203
Phone: 303-831-7364

Christian R. Everdell
COHEN & GRESSER LLP
800 Third Avenue
New York, NY 10022
Phone: 212-957-7600

Bobbi C. Sternheim
Law Offices of Bobbi C. Sternheim
225 Broadway, Suite 715
New York, NY 10007
Phone: 212-243-1100


*Attorneys for Ghislaine Maxwell*

# Table of Contents

Table of Contents..............................................................................................................ii

Table of Authorities.........................................................................................................iv

Introduction .....................................................................................................................1

Factual Background .........................................................................................................2

I.   Jury Selection. ........................................................................................................2

   A.  The jury questionnaire. .....................................................................................2

   B.  Juror No. 50's questionnaire. ...........................................................................5

   C.  Juror No. 50's *voir dire*...................................................................................6

   D.  The final composition of the jury. ....................................................................9

II.  Juror No. 50's admissions that he wasn't truthful with the Court...........................11

   A.  Juror No. 50's statements to the media...........................................................12

     1.   The interview with the Independent. ...........................................................12

     2.   The interview with the Daily Mail. .............................................................13

     3.   The interview with Reuters..........................................................................14

     4.   The partial video of the interview with the Daily Mail. ...............................14

   B.  Juror No. 50's social media activity. ...............................................................15

   C.  A second juror admits to disclosing during deliberations that they were a victim of sexual assault. .............................................................................................21

Applicable Law...............................................................................................................21

I.   Juror No. 50's misconduct deprived Ms. Maxwell of her constitutional right to a fair trial by an impartial jury. ........................................................................................21

   A.  A party alleging unfairness based on undisclosed juror bias must demonstrate first, that the juror's *voir dire* response was false and second, that the correct response would have provided a valid basis for a challenge for cause. ...............................21

B.  An intentionally false answer during *voir dire* is not a prerequisite to obtaining a new trial. .................................................................................................... 23

Argument ................................................................................................................... 28

I.  Ms. Maxwell is entitled to a new trial. ................................................................ 28

A.  Juror No. 50 did not truthfully answer material questions during *voir dire*, including Questions 25 and 48. ................................................................... 28

B.  Had Juror No. 50 answered Questions 25 and 48 truthfully, his answers would have provided a valid basis for a challenge for cause. .......................................... 29

1.  Implied bias. ...................................................................................... 30

2.  Inferable bias. .................................................................................... 37

3.  Actual bias. ........................................................................................ 38

C.  Juror No. 50's answers to Questions 25 and 48 were intentionally false. .............. 39

D.  Had Juror No. 50 answered Questions 25 and 48 truthfully, the parties and the Court would have explored whether his other answers were false. ........................ 43

E.  The scope of any evidentiary hearing. ...................................................... 48

1.  Pre-hearing discovery. ...................................................................... 48

2.  The hearing itself. ............................................................................ 49

II.  Juror No. 50 has no right to intervene. ................................................................ 51

A.  Juror No. 50 lacks standing. ...................................................................... 51

B.  This Court should refuse Juror No. 50's discovery request because Juror No. 50 is under investigation and the release of the information requested would prejudice that investigation. ....................................................................................... 52

C.  Juror No. 50's filings should be stricken or, alternatively, remain under seal. ....... 53

Conclusion ................................................................................................................. 56

Certificate of Service ................................................................................................. 59

# Table of Authorities

**Cases**

*Adams v. Texas*, 448 U.S. 38 (1980) ............................................................... 28

*Arizona v. Fulminante*, 499 U.S. 279 (1991) .................................................... 22

*Brown v. Maxwell*, 929 F.3d 41 (2d Cir. 2019) ................................................. 54

*Burton v. Johnson*, 948 F.2d 1150 (10th Cir. 1991) ..................................... 29, 30

*Clark v. United States*, 289 U.S. 1 (1933) ........................................................ 27

*Cunningham v. Shoop*, __ F.4th __, 2022 WL 92594 (6th Cir. Nos. 11-3005/20-3429,

    Jan. 10, 2022) ................................................................................................ 50

*Davis v. Bombardier Recreational Prod., Inc., No. 3*:11CV236-TSL-MTP, 2012 WL

    112202 (S.D. Miss. Jan. 12, 2012) ............................................................... 52

*Dyer v. Calderon*, 151 F.3d 970 (9th Cir.1998) .......................................... 27, 30

*Gonzales v. Thomas*, 99 F.3d 978 (10th Cir. 1996) ........................................... 36

*Hunley v. Godinez*, 975 F.2d 316 (7th Cir. 1992) ............................................. 29

*In re Gucci*, 126 F.3d 380 (2d Cir. 1997) ......................................................... 52

*In re Sealed Search Warrants Issued June 4 & 5, 2008*, No. 08–M–208 (DRH),

    2008 WL 5667021 (N.D.N.Y. July 14, 2008) .............................................. 55

*John Doe Agency v. John Doe Corp.*, 493 U.S. 146 (1989).............................. 52

*Linda R.S. v. Richard D.*, 410 U.S. 614 (1973) ................................................. 51

*Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110 (2d Cir. 2006) ............... 54

*Mazzeo v. Gibbons*, No. 2:08-CV-01387-RLH-PA, 2010 WL 3910072

    (D. Nev. Sept. 30, 2010)................................................................................ 53

iv

*McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548 (1984) ............... passim

*Metzger v. Hussman,* 682 F. Supp. 1109 (D. Nev. 1988) ................................................... 53

*Murphy v. Adm'r E. Jersey State Prison*, No. 18-2825, 2021 WL 2822179

   (3d Cir. July 7, 2021) ..................................................................................................... 46

*Murphy v. Nogam*, No. CV 14-4268 (KM), 2018 WL 278735 (D.N.J. Jan. 3, 2018) ...... 46

*Neder v. United States*, 527 U.S. 1 (1999) ....................................................................... 28

*Pena-Rodriguez v. Colorado*, 137 S. Ct. 855 (2017) ....................................................... 50

*Rosales-Lopez v. United States*, 451 U.S. 182 (1981) ................................................ 38, 45

*Russell v. United States*, 141 S. Ct. 2601 (2021) .............................................................. 47

*SEC v. The Street.Com*, 273 F.3d 222 (2d Cir.2001) ....................................................... 53

*Skaggs v. Otis Elevator Co.*, 164 F.3d 511 (10th Cir. 1998) ...................................... 29, 35

*Smith v. Phillips*, 455 U.S. 209 (1982) ....................................................................... 21, 25

*State v. Ashfar*, 196 A.3d 93 (N.H. 2018) .................................................................. 33, 41

*State v. Scher*, 278 N.J. Super. 249, 263, 650 A.2d 1012 (App. Div. 1994) .............. 45, 46

*State v. Thompson*, 142 N.J. Super. 274 (App. Div. 1976) ............................................... 46

*State v. Williams*, 190 N.J.Super. 111 (App. Div. 1983) .................................................. 46

*United States v. All Right, Title & Int. in Prop., Appurtenances, & Improvements Known*

   *as 479 Tamarind Drive, Hallendale, Fla.*, No. 98 CIV. 2279 DLC,

   2011 WL 1045095 (S.D.N.Y. Mar. 11, 2011) ............................................................. 52

*United States v. Amodeo*, 44 F.3d 141 (2d Cir. 1995) ...................................................... 53

*United States v. Aref*, 533 F.3d 72 (2d Cir. 2008) ........................................................... 51

*United States v. Barnes*, 604 F.2d 121 (2d Cir. 1979) ................................................ 22, 55

*United States v. Collins*, 2013 WL 4780927 (E.D. Wis. 2013)..........................................51

*United States v. Colombo*, 869 F.2d 149 (2d Cir. 1989) ....................................................27

*United States v. Daugerdas*, 867 F. Supp. 2d 445 (S.D.N.Y. 2012) .........................passim

*United States v. Eubanks*, 591 F.2d 513 (9th Cir. 1979) ....................................................30

*United States v. French*, 904 F.3d 111 (1st Cir. 2018).......................................................47

*United States v. Greer*, 285 F.3d 158 (2d Cir. 2002) .........................................................36

*United States v. Haynes*, 398 F.2d 980 (2d Cir. 1968)..................................................29, 38

*United States v. Langford*, 990 F.2d 65(2d Cir. 1993)..................................................23, 26

*United States v. Martinez-Salazar*, 528 U.S. 304 (2000) ...................................................22

*United States v. Nelson*, 277 F.3d 164 (2d Cir. 2002)........................................................21

*United States v. Parse*, 789 F.3d 83 (2d Cir. 2015)...........................................................21

*United States v. RMI Co.*, 599 F.2d 1183 (3d Cir. 1979) ...................................................51

*United States v. Sampson*, 820 F. Supp. 2d 151 (D. Mass. 2011) ............................passim

*United States v. Smith*, 985 F. Supp. 2d 506 (S.D.N.Y. 2013)...........................................53

*United States v. Stewart*, 433 F.3d 273 (2d Cir. 2006)...............................................passim

*United States v. Stoerr*, 695 F.3d 271 (3d Cir. 2012) .........................................................51

*United States v. Thomas*, 116 F.3d 606 (2d Cir. 1997) ................................................28, 35

*United States v. Torres*, 128 F.3d 38 (2d Cir. 1997) ..................................................passim

*United States v. Wood*, 299 U.S. 123 (1936)................................................................29, 37

*Wainwright v. Witt*, 469 U.S. 412 (1985) .....................................................................28, 43

*Warth v. Seldin,* 422 U.S. 490 (1975)................................................................................52

*Wright v. Bernstein*, 23 N.J. 284 (1957)............................................................................46

**Constitutional Provisions**

U.S. Amend. VI ........................................................................................... 21, 22

**Rules**

Fed. R. Civ. P. 12 ...................................................................................... 53, 54

Fed. R. Crim. P. 24 .......................................................................................... 45

Fed. R. Crim. P. 33 ..................................................................................... 1, 21

Fed. R. Evid. 606(b) ................................................................................... 49, 50

Ghislaine Maxwell moves under Federal Rule of Criminal Procedure 33 for a new trial.

## Introduction

Juror No. 50 says he was a victim of sexual assault and sexual abuse as a child. When he told his fellow jurors of this abuse during deliberations, "[t]he room went dead silent." Juror No. 50 has told several media outlets that he drew on his personal experience as a victim to persuade fellow jurors to believe Ms. Maxwell's accusers, despite the inconsistencies and holes in their stories, even though they delayed disclosing their allegations against Ms. Maxwell, and in spite of expert testimony from Dr. Elizabeth Loftus casting significant doubt on the reliability of their claimed memories.

This was unfair and prejudicial to Ms. Maxwell, and it all would have been avoided if Juror No. 50 had told the truth during *voir dire*. But he didn't. To the contrary, Juror No. 50 repeatedly and unequivocally denied having been the victim of sexual abuse, and he denied having any experience that would affect his ability to serve fairly and impartially as a juror. Had Juror No. 50 told the truth, he would have been challenged, and excluded, for cause.

The Sixth Amendment to the United States Constitution guarantees trial by jury. Fundamental to that guarantee is the promise that the jury will be comprised of twelve dispassionate individuals who will fairly and impartially decide, based on the evidence or lack of evidence and not on their personal predilections and biases, whether the government has proved its case beyond a reasonable doubt. *Voir dire* plays an essential

role in this process, and it depends on potential jurors to truthfully answer material questions put to them by the Court and the parties.

That did not happen here. Juror No. 50 did not truthfully respond to perhaps the most important question put to potential jurors about their personal experiences – a question that pertained directly to the core allegations against Ms. Maxwell: Whether they had been a victim of sexual assault or abuse. Juror No. 50's false answer undermined *voir dire*, resulted in a jury that was not fair and impartial, and deprived Ms. Maxwell of her constitutional right to trial by jury.

This Court should vacate the judgment and order a new trial.

## Factual Background

### I. Jury Selection

#### A. The jury questionnaire

This Court summoned about seven hundred potential jurors, providing each of them with a 22-page questionnaire containing 50 questions. Groups of 100 or more jurors were gathered in the courthouse in morning and afternoon sessions over the course of three days.  They were given as much time as needed to complete the questionnaires. Potential jurors signed the questionnaires and swore to the accuracy of their responses under penalty of perjury.

The questionnaire's purpose was to provide the parties with information about potential jurors and to discern whether any potential juror could not be fair and impartial. The Court assured the parties that any affirmative answers to questions would be the subject of follow up questioning during the oral *voir dire*.

The questionnaire began with a summary of the indictment and the allegations against Ms. Maxwell, including allegations of sexual trafficking, enticement, and transportation.

Given the accusations and the sensitivity of sexual assault, sexual abuse, or sexual harassment, and the powerful effects such assault, abuse, and harassment can have, the questionnaire included several questions designed to elicit whether a potential juror had ever been abused, assaulted, or harassed, and how that might affect their ability to be an unbiased fact finder.

For example, Question No. 13 asked potential jurors if they could decide the case purely the evidence or lack of evidence and not based on any biases, sympathies, or prejudices.

Question 25 asked potential jurors if they were ever a victim of a crime and, if so, whether that experience would prevent them from being fair and impartial.

Questions 42-50 asked jurors about their feelings and experiences with the types of alleged conduct at issue in the case, including sexual assault, sexual abuse, and sexual harassment.

Question 42 asked whether the nature of the allegations against Ms. Maxwell "might make it difficult" for potential jurors to be fair and impartial. Question 43 asked potential jurors if they had views about the laws concerning the age of consent and if those views would affect their ability to be fair and impartial. Question 44 asked potential jurors if they had views about the laws governing sex trafficking and sex crimes against minors and if those views would affect their ability to be fair and impartial. Question 47

asked potential jurors if they would have any difficulty assessing the credibility of alleged victims of sexual assault or abuse just as they would assess the credibility of any other witness.

Prior to finalizing the questionnaire, Ms. Maxwell proposed specific questions to identify potential jurors who had been victims of sexual assault, sexual abuse, or sexual harassment. The defense proposed to ask potential jurors: (1) "Whether reported or not, have you, any family member or anyone close to you, including a child/minor, ever been the victim of any form of sexual abuse? (This includes actual or attempted sexual assault or other unwanted sexual advance, including by a stranger, acquaintance, supervisor, teacher, or family member;" and (2) "Whether reported or not, have you, or anyone close to you, including a child/minor, ever felt in danger of being sexually assaulted by another person, including a stranger, acquaintance, supervisor, teacher, or family member?" Doc. 367, p 21. The government objected to Ms. Maxwell's proposed questions. *Id.* The Court partially agreed with the prosecution, asking a single question about whether potential jurors had been actual victims of sexual assault, sexual abuse, or sexual harassment.

Specifically, Question 48 asked:

Have you or a friend or family member ever been the victim of sexual harassment, sexual abuse, or sexual assault? (This includes actual or attempted sexual assault or other unwanted sexual advance, including by a stranger, acquaintance, supervisor, teacher, or family member.)

The questionnaire offered three answers: "Yes (self)," "Yes (friend or family member)," and "No."

If a potential juror selected either "yes" option, the questionnaire asked individuals to explain their answer in writing, to state whether having been a victim of sexual assault, sexual abuse, or sexual harassment would affect their ability to serve fairly and impartially, and if so, to explain why.

Finally, Question 50 asked potential jurors if there was any experience that they had that might affect their ability to serve fairly and impartial as a juror.

Six-hundred and ninety-four individuals answered the questionnaire.

### B.  Juror No. 50's questionnaire

Juror No. 50's questionnaire is attached as EXHIBIT 1. Under the penalty of perjury, Juror. No. 50 answered these questions as follows:

- Question 13: "Yes," Juror No. 50 could decide the case solely based on the evidence or lack of evidence and not based on bias, sympathy, or prejudice.

- Question 25: "No," Juror No. 50 had never been the victim of a crime.

- Question 42: "No," there was nothing about the nature of the allegations against Ms. Maxwell that "might make it difficult" for Juror No. 50 to be fair and impartial.

- Question 43: "No," Juror No. 50 did not have any views about laws concerning the age of consent that would affect his ability to be fair and impartial.

- Question 44: "No," Juror No. 50 did not have any views about the laws governing sex trafficking and sex crimes against minors that would affect his ability to be fair and impartial.

5

- Question 47, "No," Juror No. 50 would not have any difficulty assessing the credibility of alleged victims of sexual assault or abuse just as he would assess the credibility of any other witness.

- Finally, and most importantly, Juror No. 50 answered "no" when asked in Question 48 if he had ever been the victim of victim of sexual harassment, sexual abuse, or sexual assault, including actual or attempted sexual assault or other unwanted sexual advance, including by a stranger, acquaintance, supervisor, teacher, or family member.

### C.  Juror No. 50's *voir dire*

Prior to trial, defense counsel moved the Court to permit limited, attorney-conducted *voir dire* of potential jurors. Doc. 342. Defense counsel explained that given the nature of the allegations, the stakes involved, and the omnipresent media coverage, attorney-conducted *voir dire* to supplement the Court's *voir dire* was necessary to ensure a fair and impartial jury. *Id.* at 7-15. Defense counsel pointed specifically to the potential that certain jurors could not be fair if they had been a victim of sexual assault or sexual abuse. *Id.* at 9-10. The Court declined to permit attorney-conducted *voir dire*. TR 10/21/2021, p 8.

Prior to trial, defense counsel also proposed that the Court individually ask each juror in person several questions including "Have you or anyone close to you ever been the victim of a crime?" and "Have you or has anyone close to you ever been the victim of a sexual crime?"  Doc. 367-1 at 14.  The government objected that the questions were "duplicative of questions included in the proposed *voir dire*" and should not be asked

again.  *Id.* at 13.  The defense responded in part that "asking the questions live when the jurors' reactions, hesitations, explanations can be explored by the Court and observed by the parties will aid in the selection of an impartial and fair jury."  *Id.*  The Court denied the defense's request.

Juror No. 50 appeared for his *voir dire* on November 16. Because Juror No. 50 answered "no" to all the relevant questions about sexual abuse, sexual assault, sexual harassment and being the victim of a crime, his *voir dire* was very brief, spanning just seven pages of transcript. TR 11/6/2021, pp 128-34; EXHIBIT 2. The Court did not ask Juror No. 50 whether the abuse he suffered would make it difficult to be a fair and impartial juror, whether he would be biased against Ms. Maxwell, whether he could set aside any bias he might have, or whether he could fairly and impartially evaluate Ms. Maxwell's defense, which challenged, in part, the reliability of her accusers' memories.

As to the questions the Court did ask (most of which addressed his personal background), Juror No. 50 was not always truthful. For example, the Court asked Juror No. 50 if he used social media. Juror No. 50 said that he recently ended a relationship so he "deleted them" and was "fully off it right now." TR 11/16/2021, p 133. Asked "[w]hat do you use, Facebook, Twitter," Juror No. 50 answered, "I *used* Facebook and Instagram," but he did not mention any Twitter account. *Id.* (emphasis added). Juror No. 50 said he deleted his accounts the week before. *Id.*

In fact, as described below, Juror No. 50 had a Twitter account (created in April 2021) that he did not delete, and he used the account to Tweet about the interviews he gave following this case and to communicate directly to Annie Farmer.

It also appears that Juror No. 50 did not delete his Instagram account, despite what he told the Court, since he posted about his jury service after the verdict was returned.

At the end of the very brief *voir dire* examination, the Court asked Juror No. 50 if he had "[a]ny doubt about [his] ability to" be fair to both sides. *Id.* at 134. Juror No. 50 said, "no." *Id.* The Court concluded: "Other than what I have asked you, do you have any reason to think that you can't be fair and impartial here?" *Id.* Juror No. 50 responded, "I do not." *Id.*

The Court inquired whether the parties had any follow-up questions. Because Juror No. 50 denied any bias or inability to be fair and impartial, and because his answers to the questionnaire did not raise any red flags about his ability to serve as a fair and impartial juror in a case involving alleged sexual assault and sexual abuse, Ms. Maxwell's attorneys did not propose any follow-up questions.

The lack of follow-up questions for Juror No. 50 contrasts with other jurors who honestly disclosed their history as victims of sexual abuse, sexual assault, or sexual harassment. *E.g.*, TR 11/16/2021, pp 18-19, ███████████, 293; TR 11/17/2021, pp ██████, 436-37, 532, 587-88; TR 11/18/2021, pp 635.

Also, the lack of follow-up questions put to Juror No. 50 contrasts with Juror No. 55, whom the Court struck for cause ███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

8

████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████    ████

### D.  The final composition of the jury

Six-hundred and ninety-four potential jurors answered the 50-question

questionnaire.

- ███████████████████████████████████████

  ████████████████████████████████████████████

  ████████████████████████████████████████

  █████████████████

- ████████████████████████████████████████████

  ████████████████████████████████████████████

  ████████████████████████████████████████ █

---

[1] Despite attempts, defense counsel was unable to locate Juror No. 50's Twitter account at the time of *voir dire* because his Twitter handle (@ScottyDavidNYC) did not include his last name and may have included an inaccurate middle name.

[2] The parties submitted this joint list before reviewing the second round of questionnaires.



- Of the 5 jurors seated as alternates, *none* disclosed on their questionnaires that they were victims of sexual abuse, sexual assault, or sexual harassment.[4]

- Of the 12 deliberating jurors, *none* disclosed on their questionnaires that they were victims of sexual abuse, sexual assault, or sexual harassment.

As we now know, however, Juror No. 50 was not telling the truth when he denied being a victim of a crime or being a victim of sexual abuse, sexual assault, or sexual harassment. And as explained below, it appears a second deliberating juror was also untruthful when they denied being a victim of sexual abuse, sexual assault, or sexual harassment.



**II.   Juror No. 50's admissions that he wasn't truthful with the Court**

---

[4] The court originally seated 6 alternates, but one alternate became a deliberating juror when an original juror was excused due to a family commitment. None of the 18 individuals selected for service as a deliberating or alternate juror answered "yes" when asked if they were a victim of sexual abuse, sexual assault, or sexual harassment.

### A.  Juror No. 50's statements to the media

#### 1.  The interview with *The Independent*

On January 4, 2022, less than one week after the jury returned its verdict, Lucia Osborne-Crowley of *The Independent* published an article based on an interview with Juror No. 50.[5] Going by the name Scotty David, Juror No. 50 told Ms. Osborne-Crowley that "[t]his verdict is for all the victims" and "shows that you can be found guilty no matter your status." Juror No. 50 admitted to being a victim of sexual assault and abuse, telling Ms. Osborne-Crowley that he revealed the abuse to the jury and that his story was fundamental to the jury's verdict. According to Juror No. 50, the "jury room went dead silent when he shared his story."

Juror No. 50 explained to Ms. Osborne-Crowley how his own experience helped the jury come to believe the alleged victims despite the holes and inconsistencies in their stories. "I know what happened when I was sexually abused. I remember the colour of the carpet, the walls. Some of it can be replayed like a video."

Relying on his own experiences, Juror No. 50 refused to credit the testimony of Dr. Elizabeth Loftus, Ms. Maxwell's expert witness on memory. None of Dr. Loftus's testimony, said Juror No. 50, "relate[d]to traumatic memory." Juror No. 50 explained all of this to the jury. Ms. Maxwell's accusers "were all believable," Juror No. 50 said. "Nothing they said felt to me like a lie." Sometimes, he said, you can misremember trivial details of a traumatic event without every doubting the core of the memory.

---

[5] https://www.independent.co.uk/news/world/americas/maxwell-juror-account-abuse-b1986478.html

Juror No. 50 also explained, again based on his personal experience, why it was immaterial to him and the jury that the alleged victims did not disclose Ms. Maxwell's alleged involvement until very recently, some twenty years after the alleged abuse. "I didn't disclose my abuse until I was in high school," he said.

Juror No. 50 also had an excuse for why the alleged victims in this case kept going back to Mr. Epstein and Ms. Maxwell and accepting help from them even after they had been abused. The alleged victims' conduct, explained Juror No. 50, was irrelevant to their credibility. In Juror No. 50's view, Ms. Maxwell's defense team was continually attacking the alleged victims and trying to get the jury to judge them for their decisions, as opposed to arguing that their stories were not worthy of belief.

### 2.   The interview with the *Daily Mail*

On January 5, the *Daily Mail* published an article based on its interview with Juror No. 50,[6] in which he described Ms. Maxwell as a "predator." Juror No. 50 also shared that he helped other members of the jury understand things from a victim's point of view and explained how "you can't remember all the details" of traumatic memories: "there are some things that run together." When Juror No. 50 told his fellow jurors of the abuse he suffered, the room "went silent." Although he couldn't remember every detail, there were others that stuck with him: "I know what happened when I was sexually abused. I remember the color of the carpet, the walls. Some of it can be replayed like a video." Juror No. 50 said the verdict was for "all the victims."

---

[6] https://www.dailymail.co.uk/news/article-10370193/Ghislaine-Maxwell-juror-says-evidence-convinced-panel-predator.html

### 3.    The interview with Reuters

The same day the *Daily Mail* published its article, Reuters also published a story based on an interview Juror No. 50 provided to journalist Luc Cohen.[7] In the Reuters interview, Juror No. 50 elaborated about the purpose and effect of his disclosing to the jury that he was a victim of sexual assault. According to Juror No. 50, coming to a unanimous verdict "wasn't easy, to be honest." In fact, several jurors doubted the credibility of Jane and Carolyn. "When I shared that [I had been sexually abused]," recounted Juror No. 50, the jurors who had doubts "were able to sort of come around on, they were able to come around on the memory aspect of the sexual abuse."

### 4.    The partial video of the interview with the *Daily Mail*

On January 7, the *Daily Mail* published a video of a portion of the interview with Juror No. 50. This video is submitted to the Court as EXHIBIT 3. The video shows the moment when the interviewer confronts Juror No. 50 about whether he disclosed to the Court and the parties that he was a victim of sexual assault. The interviewer asks whether Juror No. 50's history of being sexually abused was "something that [he'd] said yes to in the questionnaire" such that it "was something people were aware of when [he was] selected as a juror."

Juror No. 50 denied being asked such a question, saying, "No, they don't ask your sexual abuse history. They didn't ask it in the questionnaire."

---

[7] https://www.reuters.com/world/us/some-ghislaine-maxwell-jurors-initially-doubted-accusers-juror-says-2022-01-05/

The interviewer challenges Juror No. 50 on this response, saying, "I thought in the questionnaire, there was a question that asked if you were a victim or if you were a friend or a relative of a victim." "Pretty sure it was number 48," the interviewer concludes.

"Interesting," Juror No. 50 responds, his face turning red.

The interviewer notices that Juror No. 50's face is flushing, saying, "You're not out in the sun right now [inaudible]."

Juror No. 50 stumbles to respond: "No, No! I know my face is red because I can feel the blood but, I honestly—that's why I answered it that way. I don't remember it being there but. Um… I did answer, I definitely remember a family or relative or something but—being sexually abused. I was honest on all my questions."

### B.  Juror No. 50's social media activity

On January 4, after Ms. Osborne-Crawley first published her interview with Juror No. 50, Annie Farmer quote-Tweeted a Tweet from Ms. Osborne-Crawley, linking to the interview. Ms. Farmer said:



A short time later, Juror No. 50 "liked" Ms. Farmer's Tweet. Juror No. 50 then Tweeted

directly to Ms. Farmer in response:



Juror No. 50 also "liked" Ms. Osborne-Crawley's Tweet linking to his interview.

At the time Juror No. 50 Tweeted to Ms. Farmer, his Twitter handle was the same name he used in his press interviews: "@ScottyDavidNYC."



Shortly after Tweeting Ms. Farmer, however, Juror No. 50 changed his Twitter handle to

"@NycSsddd." He also attempted to delete his Tweet to Ms. Farmer.



Juror No. 50 did not "unlike" Ms. Farmer's Tweet, or the Tweet by Ms. Osborne-Crawley linking to his interview.

In early January, Juror No. 50 also posted about his jury service on his Instagram account, despite having told the Court during *voir dire* that he deleted his Instagram account.



(It is possible Juror No. 50 deleted his Instagram account before the trial as he told the Court and then reactivated it or created a new account after the trial. If this Court holds a hearing, that will be one question Juror No. 50 must answer.)

Shortly thereafter, Juror No. 50 predictably deleted his Twitter account and his Instagram account. He also appears to have deleted his Facebook and LinkedIn accounts.

### C.   A second juror admits to disclosing during deliberations that they were a victim of sexual assault

During his press tour, Juror No. 50 revealed in interviews that he was not alone in revealing to jurors that he was a victim of sexual assault, describing to reporter that a second juror also disclosed that they were a victim of sexual abuse.[8] On January 5, the New York Times published an article confirming Juror No. 50's statement, reporting that "a second juror described in an interview . . . having been sexually abused as a child."[9] "This juror, who requested anonymity, said that they, too, had discussed the experience during deliberations and that the revelation had appeared to help shape the jury's discussions." To date, this juror has not publicly revealed their identity, and Ms. Maxwell does not know who it is.[10]

## Applicable Law

### I.   Juror No. 50's misconduct deprived Ms. Maxwell of her constitutional right to a fair trial by an impartial jury.

#### A.   A party alleging unfairness based on undisclosed juror bias must demonstrate first, that the juror's *voir dire* response was false and

---

[8] https://www.dailymail.co.uk/news/article-10379445/Ghislaine-Maxwells-lawyers-fought-ask-jurors-detailed-questions-sexual-abuse.html

[9] https://www.nytimes.com/2022/01/05/nyregion/maxwell-trial-jury-inquiry.html

[10] 

> **second, that the correct response would have provided a valid basis for a challenge for cause.**

Federal Rule of Criminal Procedure 33 provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a).

The Sixth Amendment guarantees a criminal defendant the right to a trial by an impartial jury. U.S. Const. amend. VI. In *McDonough Power Equipment, Inc. v. Greenwood*, the Supreme Court recognized that "[o]ne touchstone of a fair trial is an impartial trier of fact—'a jury capable and willing to decide the case solely on the evidence before it.'" 464 U.S. 548, 554 (1984) (quoting *Smith v. Phillips*, 455 U.S. 209, 217 (1982)). "The right to trial before an impartial trier of fact—be it a jury or a judge— therefore implicates Due Process as well as Sixth Amendment rights." *United States v. Nelson*, 277 F.3d 164, 201 (2d Cir. 2002).

In turn, "*[v]oir dire* plays an essential role in protecting the right to trial by an impartial jury." *United States v. Daugerdas*, 867 F. Supp. 2d 445, 468 (S.D.N.Y. 2012) (granting new trial to three defendants based on juror dishonesty during *voir dire* and concluding one defendant, Parse, waived his new trial motion), *vacated and remanded sub nom. United States v. Parse*, 789 F.3d 83 (2d Cir. 2015) (reversing district court's conclusion that the defendant Parse waived his new trial motion). It is bedrock constitutional law that defendants have a right to "a full and fair opportunity to expose bias or prejudice on the part of veniremen" and that "there must be sufficient information elicited on *voir dire* to permit a defendant to intelligently exercise not only his challenges

for cause, but also his peremptory challenges." *United States v. Barnes*, 604 F.2d 121, 139 (2d Cir. 1979) (internal quotations and citations omitted). "A juror's dishonesty during *voir dire* undermines a defendant's right to a fair trial." *Daugerdas*, 867 F. Supp. 2d at 468; U.S. Const. amend. VI.

"[A] party alleging unfairness based on undisclosed juror bias must demonstrate first, that the juror's *voir dire* response was false and second, that the correct response would have provided a valid basis for a challenge for cause." *United States v. Stewart*, 433 F.3d 273, 303 (2d Cir. 2006) (citing *McDonough*, 464 U.S. at 556).

A defendant need not demonstrate prejudice when a juror gives a false answer to a material question during *voir dire* if the juror would have been subject to a challenge for cause if he had answered honestly. *See United States v. Martinez-Salazar*, 528 U.S. 304, 316 (2000) (the "seating of any juror who should have been dismissed for cause" "would require reversal"). When a biased juror deliberates on a jury, structural error occurs, and a new trial is required without a showing of actual prejudice. *See Arizona v. Fulminante*, 499 U.S. 279, 307-10 (1991).

### B.  An intentionally false answer during *voir dire* is not a prerequisite to obtaining a new trial.

"Intentionally false" juror answers are not a prerequisite to a finding that a defendant's constitutional right to a fair and impartial jury have been violated. *McDonough*, 464 U.S. at 553-56; *id.* at 556-57 (Blackmun, J., concurring); *id.* at 557-59 (Brennan, J., concurring in judgment). So long as a truthful answer would have subjected the juror to a challenge for cause based on bias, an inadvertent false answer is just as

invidious as an intentionally false answer. *United States v. Langford*, 990 F.2d 65, 68 (2d

Cir. 1993).[11] As the Second Circuit held in *Langford*:

> We read [*McDonough*] multi-part test as governing not only inadvertent nondisclosures but also nondisclosures or misstatements that were deliberate, for though the *McDonough* Court began with the inadvertent response before it, it stated that the further showing of cause must be made even after a juror's "failure to answer honestly," and it hypothesized that there could be various "motives for concealing." Concurring in the judgment, Justice Brennan similarly stated that a second element—bias—should be required even if the juror's erroneous response was deliberate. Thus, he stated that the
>
>> proper focus when ruling on a motion for new trial in this situation should be on the bias of the juror and the resulting prejudice to the litigant. . .
>>
>> . . . Whether the juror answered a particular question on *voir dire* honestly or dishonestly, or whether an inaccurate answer was inadvertent or intentional, are simply factors to be considered in th[e] . . . determination of actual bias.

*Langford*, 990 F.2d at 68 (quoting *McDonough*, 464 U.S. at 557-58 (Brennan, J.,

concurring in judgment)).

The seminal case addressing a juror's false answers during *voir dire* is

*McDonough Power Equipment, Inc. v. Greenwood*. *McDonough* was a products liability

action in which Juror Payton remained silent when the district court asked, "how many of

you [potential jurors] have yourself or any members of your immediate family sustained

any severe injury [in] an accident at home, or on the farm or at work that result in any

disability or prolonged pain and suffering?" 464 U.S. at 550. After trial, it was discovered

---

[11] This caselaw uses "deliberate" and "intentional" interchangeably.

that Juror Payton's son had been injured in an explosion of a fire truck. *Id.* at 551. The district court denied a motion for a new trial without holding a hearing. *Id.*

The court of appeals reversed, ordering a new trial instead of remanding for a hearing. *Id.* at 551-52. The court of appeals held that if "an average prospective juror would have disclosed the information, and that information would have been significant and cogent evidence of the juror's probable bias, a new trial is required to rectify the failure to disclose it." *Id.* at 552. "Good faith," said the court, was "irrelevant to the inquiry." *Id.*

The Supreme Court reversed the court of appeals, concluding that it employed the wrong standard and erred in reaching the merits instead of remanding the case to the district court for an evidentiary hearing. *Id.* at 556. As for the correct legal standard, the Court said that

> to obtain a new trial in such a situation, a party must first demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause.

*Id.* The Court remanded to the court of appeals to consider any outstanding issues and, assuming the judgment wasn't reversed for other reasons, to remand to the district court for an evidentiary hearing applying the new legal standard. *Id.*

The court emphasized that "*[v]oir dire* examination serves to protect [the fair trial] right by exposing possible biases, both known and unknown, on the part of potential jurors" and that the "necessity of truthful answers by prospective jurors if [*voir dire*] is to serve its purpose is obvious." *Id.* at 554. The Court did not expressly disavow the court of

appeals' statement that the good faith of a potential juror was "irrelevant" to the inquiry. *Id.* at 553-56.

There were two concurring opinions in *McDonough*, joined by a total of five justices, which make clear that an intentionally false answer is not a prerequisite to obtaining a new trial. Writing for himself and Justices Stevens and O'Connor, Justice Blackmun said:

> I agree with the Court that the proper inquiry in this case is whether the defendant had the benefit of an impartial trier of fact. I also agree that, in most cases, the honesty or dishonesty of a juror's response is the best initial indicator of whether the juror in fact was impartial. I therefore join the Court's opinion, *but I write separately to state that I understand the Court's holding not to foreclose the normal avenue of relief available to a party who is asserting that he did not have the benefit of an impartial jury. Thus, regardless of whether a juror's answer is honest or dishonest,* it remains within a trial court's option, in determining whether a jury was biased, to order a post-trial hearing at which the movant has the opportunity to demonstrate actual bias or, in exceptional circumstances, that the facts are such that bias is to be inferred. *See Smith v. Phillips*, 455 U.S. 209, 215-16 (O'Connor, J., concurring).

*Id.* at 556-57 (Blackmun, J., concurring (emphasis added)). This was the entirety of Justice Blackmun's dissent. *Id.*

For his part, Justice Brennan joined by Justice Marshall recognized that "the bias of a juror will rarely be admitted by the juror himself, 'partly because the juror may have an interest in concealing his own bias and partly because the juror may be unaware of it.'" *Id.* at 558 (Brennan, J., concurring in judgment) (quoting majority opinion). "Necessarily," then, Justice Brennan explained, bias "must be inferred from surrounding facts and circumstances." *Id.* "Whether the juror answered a particular question on *voir dire* honestly or dishonestly, or whether an inaccurate answer was inadvertent or

intentional, are simply factors to be considered in this latter determination of actual bias." *Id.* "One easily can imagine cases in which a prospective juror provides what he subjectively believes to be an honest answer, yet that same answer is objectively incorrect and therefore suggests that the individual would be a biased juror in the particular case." *Id.* at 559.

The Second Circuit adopted this reading of *McDonough*, endorsing the view expressed by Justice Brennan (and shared by Justice Blackmun) that an intentionally false answer is not a prerequisite to obtaining a new trial. *United States v. Langford*, 990 F.2d 65, 68 (2d Cir. 1993) ("We read this multi-part test as governing not only inadvertent nondisclosures but also nondisclosures or misstatements that were deliberate."); *id.* at 68 (adopting Justice Brennan's reasoning). Accordingly, in the Second Circuit, "a party alleging unfairness based on undisclosed juror bias must demonstrate first, that the juror's *voir dire* response was false and second, that the correct response would have provided a valid basis for a challenge for cause." *United States v. Stewart*, 433 F.3d 273, 303 (2d Cir. 2006).

Of course, individuals cannot be allowed to lie their way onto a jury. Writing for a unanimous Supreme Court, Justice Cardozo concluded: "If the answers to the questions [during *voir dire*] are willfully evasive or knowingly untrue, the talesman, when accepted, is a juror in name only . . . His relation to the court and to the parties is tainted in its origin; it is a mere pretense and sham." *Clark v. United States*, 289 U.S. 1, 11 (1933). "[A] juror who lies [his] way onto a jury is not really a juror at all; []he is an interloper akin 'to a stranger who sneaks into the jury room.'" *Daugerdas*, 867 F. Supp.

27

2d at 468 (quoting *Dyer v. Calderon*, 151 F.3d 970, 983 (9th Cir.1998) (*en banc*)).

"[C]ourts cannot administer justice in circumstances in which a juror can commit a

federal crime in order to serve as a juror in a criminal case and do so with no fear of

sanction so long as a conviction results." *United States v. Colombo*, 869 F.2d 149, 152

(2d Cir. 1989).

## Argument

### I.   Ms. Maxwell is entitled to a new trial.

This Court must order a new trial if Ms. Maxwell can make two showings: First,

that Juror No. 50's *voir dire* response was false and second, that the correct response

would have provided a valid basis for a challenge for cause. *Stewart*, 433 F.3d at 303.

Even without an evidentiary hearing, Ms. Maxwell has made that showing here.

### A.   Juror No. 50 did not truthfully answer material questions during *voir dire*, including Questions 25 and 48.

There is no reasonable dispute that Juror No. 50's *voir dire* responses were false.

Juror No. 50 has told several media outlets that he was a victim of sexual assault and

sexual abuse as a child. Necessarily, then, Juror No. 50 did not provide truthful answers

when he denied being the victim of a crime (Question 25) or being a victim of sexual

harassment, sexual abuse, or sexual assault (Question 48).

And because being a victim of sexual assault or sexual abuse is material to an

individual's ability to serve as a fair and impartial juror in a case about sexual assault and

sexual abuse, Ms. Maxwell has satisfied the first prong of the *McDonough* test. *See*

*United States v. Sampson*, 820 F. Supp. 2d 151, 172 (D. Mass. 2011) ("[A] matter is

material if it has a natural tendency to influence, or be capable of influencing, the judge who must decide whether to excuse a juror for cause." (citing *Neder v. United States*, 527 U.S. 1, 16 (1999) (giving general definition of materiality))).

### B.   Had Juror No. 50 answered Questions 25 and 48 truthfully, his answers would have provided a valid basis for a challenge for cause.

The second question is whether truthful responses from Juror No. 50 would have provided a valid basis for a challenge for cause. *See Stewart*, 433 F.3d at 303. "[T]he test is not whether the true facts would compel the Court to remove a juror for cause, but rather whether a truthful response 'would have provided a valid basis for a challenge for cause.'" *Daugerdas*, 867 F. Supp. 2d at 470 (quoting *McDonough*, 464 U.S. at 556).

"An impartial jury is one in which every juror is 'capable and willing to decide the case solely on the evidence before [him].'" *Id.* (quoting *McDonough*, 464 U.S. at 554). "Jurors are instructed that they are to decide the question of a defendant's guilt based solely on the evidence presented." *Id.* (citing *United States v. Thomas*, 116 F.3d 606, 616-17 n.10 (2d Cir. 1997). A juror is biased—*i.e.*, not impartial—if his experiences "would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)); *see also United States v. Torres*, 128 F.3d 38, 43 (2d Cir. 1997) (juror who structured financial transactions properly excused for cause in case involving structuring of cash deposits).

Challenges for cause can be based on implied bias, inferable bias, or actual basis. *See Torres*, 128 F.3d at 43; *see also Sampson*, 820 F. Supp. 2d at 162–67 (discussing at length each type of bias).

### 1.   Implied bias

"Implied or presumed bias is 'bias conclusively presumed as a matter of law.'" *Torres*, 128 F.3d at 45 (quoting *Wood*, 299 U.S. at 133). "It is attributed to a prospective juror regardless of actual partiality." *Id.* "In contrast to the inquiry for actual bias, which focuses on whether the record at *voir dire* supports a finding that the juror was in fact partial, the issue for implied bias is whether an average person in the position of the juror in controversy would be prejudiced." *Id.* (citing *Haynes*, 398 F.2d at 984). "And in determining whether a prospective juror is impliedly biased, 'his statements upon *voir dire* [about his ability to be impartial] are totally irrelevant." *Id.* (quoting *Haynes*, 398 F.2d at 984).

As is relevant here, there are two ways in which courts imply bias. First, "[c]ourts imply bias 'when there are similarities between the personal experiences of the juror and the issues being litigated.'" *Daugerdas*, 867 F. Supp. 2d at 472 (quoting *Sampson*, 820 F. Supp. 2d at 163-64); *see also Skaggs v. Otis Elevator Co.*, 164 F.3d 511, 517 (10th Cir. 1998) (collecting cases where bias was implied based on the juror's experiences); s*ee, e.g.*, *Hunley v. Godinez*, 975 F.2d 316, 319-20 (7th Cir. 1992) (holding, in a case charging murder in the course of a burglary, that bias should be implied where two jurors were the victims of similar burglaries during deliberations); *Burton v. Johnson*, 948 F.2d 1150, 1159 (10th Cir. 1991) (holding, in murder case in which the defendant presented a

defense based on having suffered domestic violence at the hands of the victim, that a juror living in similarly abusive circumstances at the time of trial, and who gave dishonest answers regarding that subject at *voir dire*, was impliedly biased); *United States v. Eubanks*, 591 F.2d 513, 517 (9th Cir. 1979) (*per curiam*) (implying bias where, in a trial for participation in a heroin distribution conspiracy, a juror failed to disclose at *voir dire* that he had two sons who were serving long prison sentences for heroin-related crimes).

Second, courts imply bias when "repeated lies in *voir dire* imply that the juror concealed material facts in order to secure a spot on the particular jury." *Daugerdas*, 867 F. Supp. 2d at 472 (quotation omitted). "A juror . . . who lies materially and repeatedly in response to legitimate inquiries about her background introduces destructive uncertainties into the process." *Dyer*, 151 F.3d at 983.

Under both theories, Juror No. 50 was impliedly biased. First, bias should be implied because this is a case in which "there are similarities between the personal experiences of the juror and the issues being litigated.'" *Daugerdas*, 867 F. Supp. 2d at 472. "When a juror has life experiences that correspond with evidence presented during the trial, that congruence raises obvious concerns about the juror's possible bias." *Sampson v. United States*, 724 F.3d 150, 167 (1st Cir. 2013) (citing *Torres*, 128 F.3d at 47-48; *Burton*, 948 F.2d at 1158-59). "In such a situation, the juror may have enormous difficulty separating her own life experiences from evidence in the case." *Id.* The First Circuit has commented, for example, that "it would be natural for a juror who had been

31

the victim of a home invasion to harbor bias against a defendant accused of such a crime." *Id.*

The same is true here: "It would be natural for a juror who had been the victim of [sexual assault and sexual abuse] to harbor bias against a defendant accused of such a crime." *See id.* Like Jane, Carolyn, Kate, and Annie Farmer, Juror No. 50 claims to be a victim of child sexual abuse. Like Jane, Carolyn, Kate, and Annie Farmer, Juror No. 50 delayed disclosing the abuse he suffered. Like Jane, Carolyn, Kate, and Annie Farmer, Juror No. 50 says the memories of the abuse he suffered can be "replayed like a video." And like Jane, who described Mr. Epstein's New York apartment and said it had a "red mood," TR at 320, Juror No. 50 says he can remember the "color of the carpet, [of] the walls" in the room where he was abused.

These similarities are profound because they bear on the principal argument Ms. Maxwell made against her accusers' claimed memories: They were corrupted and unreliable. Juror No. 50's claim that the memory of his abuse can be "replayed like a video" is perhaps most significant, because it directly contradicts Dr. Loftus's expert testimony:

Q. Memory has been termed a constructive process; correct?

A. Yes.

Q. Could you explain what that means to the jury.

A. What we mean by that is as I testified earlier, we don't just record events and play it back later like a recording device would work, like a video machine, but rather, we are actually constructing our memories when we retrieve memories. We often take bits and pieces of experience sometimes

that occurred at different times and places, bring it together, and construct
what feels like a recollection.

TR at 2427. Given Juror No. 50's personal experience and belief about memory and its
reliability, there was no way he could fairly evaluate Ms. Maxwell's challenge to the
credibility of her accusers' memories or the expert testimony of Dr. Loftus.[12]

Several decisions support this conclusion. In *Sampson v. United States*, for
example, the First Circuit affirmed the district court's decision to order a new penalty-
phase hearing in a death penalty case after a juror falsely denied, among other things,
having been a victim of a crime. 724 F.3d at 154, 162. In fact, however, the juror
repeatedly had been menaced by her husband with a shotgun. *Id.* at 168. But because the
juror had not told the truth during *voir dire*, she was seated on a jury in a case involving a
bank robbery in which the defendant threatened bank tellers at gunpoint. *Id.* "These
parallels," the Court said, "raise a serious concern as to whether an ordinary person in
[the juror's] shoes would be able to disregard her own experiences in evaluating the
evidence." *Id.*

To be sure, the juror in *Sampson* did not limit her false answers to a single
question. She also answered falsely to several other questions during *voir dire*, some
material and some not. *Id.* at 162-63, 166. A combination of factors led the First Circuit
to affirm the order for a new penalty-phase hearing. *Id.* at 168. Here, Juror No. 50's false

---

[12] Juror No. 50's confidence in his memory is not necessarily a predictor of the
memory's reliability. As Dr. Loftus testified, "when you have post-event suggestion or
intervention, people get very confident about their wrong answers, and you can see that
even wrong answers or false information, false memories can be expressed with a high
degree of confidence." TR at 2430.

answers to Questions 25 and 48 are reason enough to order a new trial because they relate to the core allegations against Ms. Maxwell. Moreover, if this Court orders an evidentiary hearing, it is likely additional false answers will come to light, further supporting the conclusion that Ms. Maxwell is entitled to a new trial.

In *State v. Ashfar*, the defendant was convicted of aggravated sexual assault based on the allegation that he touched the genitals of his 12-year-old client during a therapy session. 196 A.3d 93, 94 (N.H. 2018).[13] The empaneled jury, however, included an individual who had been sexually assaulted by a babysitter when he was five or six years old. *Id.* at 95. The juror had not disclosed this during *voir dire* and had, instead, answered "no" when asked if "[he] or a close member of your family or a close friend ever been a victim of a crime?" *Id.* at 95. The trial court ordered a new trial, relying both on the juror's false answer during *voir dire* but also his post-verdict conduct, which included communications with a female victim of sexual assault who wrote a book on the subject and the juror's self-identification as "an advocate for people." *Id.* at 96. The New Hampshire Supreme Court affirmed.

The decisions in *Sampson* and *Ashfar* support a new trial here. Like those cases, Juror No. 50 falsely denied having a personal experience strikingly similar to the conduct at issue in the criminal case. Juror No. 50's experience as a sexual assault victim "raise[s]

---

[13] Because state courts are more often the venue for prosecution of crimes involving sexual assault, state court decisions are particularly helpful. The New Hampshire Supreme Court "assum[ed] without deciding that *McDonough* provides the applicable analytical framework" and concluded that the trial court "sustainably exercised its discretion in finding the juror "was not impartial." 196 A.3d at 97.

a serious concern as to whether an ordinary person in [Juror No. 50's] shoes would be able to disregard [his] own experiences in evaluating the evidence." *Id.* Moreover, like the juror in *Ashfar*, Juror No. 50's post-trial conduct further supports a finding of implied bias. The juror in *Ashfar* communicated with a victim of sexual assault; here, Juror No. 50 communicated with Annie Famer. The juror in *Ashfar* viewed himself as "advocate for people;" here, Juror No. 50 proclaimed that the verdict against Ms. Maxwell was a verdict "for all the victims."

The bias of Juror No. 50 should be implied for another reason: "[R]epeated lies in *voir dire* imply that the juror concealed material facts in order to secure a spot on the particular jury." *Daugerdas*, 867 F. Supp. 2d at 472. Here, not only did Juror No. 50 falsely deny on the questionnaire that he had been a victim of a crime and a victim of sexual assault and sexual abuse, he also falsely answered the Court's questions about social media. According to Juror No. 50, he used only Facebook and Instagram and he deleted all his social media accounts. In fact, Juror No. 50 was a Twitter user, having joined Twitter in April 2021. His Twitter account appears to have been active during trial and *voir dire*, notwithstanding his claim that he deleted all his social media accounts. Moreover, after trial, Juror No. 50 used Twitter to publicize his interviews with the press and to communicate directly to Annie Farmer. It also appears Juror No. 50 did *not* delete his Instagram account.

Crucially, "[e]ven when prospective jurors are dishonest for reasons other than a desire to secure a seat on the jury, dishonest answers to *voir dire* questions indicate that a juror is unwilling or unable 'to apply the law as instructed by the court to the evidence

presented by the parties' and, therefore, are indicative of a lack of impartiality because a fundamental instruction in every federal case is that a juror must render a verdict 'solely on the evidence presented at trial.'" *Sampson*, 820 F. Supp. 2d at 165 (quoting *Thomas*, 116 F.3d at 617 & n.10 (citing The Federal Judicial Center's Benchbook for U.S. District Court Judges)). Therefore, dishonest answers are a factor that can contribute to a finding of implied bias. *See Skagg*s, 164 F.3d at 517.

The false answers Ms. Maxwell knows about so far, by themselves, provide a basis for a new trial because, if they had been exposed during *voir dire*, this Court would have treated Juror No. 50 just as it treated Juror No. 55. As explained above, Juror No. 55 was dismissed for cause when the Court, at defense counsel's request, confronted him with his Twitter account after he falsely denied using Twitter. TR 11/16/2021, pp 155-59.

Here, too, Juror No. 50 falsely denied having a Twitter account. It also appears that he was not telling the truth when he said he deleted his Instagram account. But he also did much more, falsely denying that he had been a victim of sexual assault or sexual abuse. If Juror No. 55's false answers "provided a valid basis for a challenge for cause," *Stewart*, 433 F.3d at 303, Juror No. 50's false answers do as well.

This Court should treat Juror No. 50 just as it treated Juror No. 55, and on that ground order a new trial. Should this Court hold a hearing, however, it would not be surprising if additional false answers come to light.

## 2. Inferable bias

"'Inferable' or 'inferred' bias exists 'when a juror discloses a fact that bespeaks a risk of partiality sufficiently significant to warrant granting the trial judge discretion to excuse the juror for cause, but not so great as to make mandatory a presumption of bias.'" *Daugerdas*, 867 F. Supp. 2d at 474 (quoting *United States v. Greer*, 285 F.3d 158, 171 (2d Cir. 2002)). A court should dismiss a potential juror for inferable bias "after having received responses from the juror that permit an inference that the juror in question would not be able to decide the matter objectively." *Torres*, 128 F.3d at 47. "[T]his is so even though the juror need not be asked the specific question of whether he or she could decide the case impartially." *Id.*

"Moreover, once facts are elicited that permit a finding of inferable bias, then, just as in the situation of implied bias, the juror's statements as to his or her ability to be impartial become irrelevant." *Id.* "The crux of the implied bias analysis in a case like this one is found in an examination of the similarities between the juror's experiences and the incident giving rise to the trial." *Torres*, 128 F.3d at 48 (quoting *Gonzales v. Thomas*, 99 F.3d 978, 989 (10th Cir. 1996)). Assuming this Court does not imply bias, it should nevertheless infer bias.

In *United States v. Torres*, the defendant was convicted of conspiracy to launder the proceeds of a heroin trafficking scheme by structuring financial transactions. 128 F.3d at 41. Over the defense's objection, the district court (Judge Preska) dismissed for cause a potential juror who admitted that she "had at one time engaged in the 'structuring' of cash transactions." *Id.* at 42. On appeal, the Second Circuit affirmed, concluding that the

district court did not err in inferring bias. *Id.* at 47-48. "Given the similarity of Juror No. 7's structuring activity to the conduct alleged against appellant Devery in this case, it was reasonable for Judge Preska to conclude that the average person in Juror No. 7's position might have felt personally threatened." *Id.* at 48. Although the Court in *Torres* declined to define the "precise scope of a trial judge's discretion to infer bias," Judge Calabresi further explained:

> It is enough for the present to note that cases in which a juror has engaged in activities that closely approximate those of the defendant on trial are particularly apt. *The exercise of the trial judge's discretion to grant challenges for cause on the basis of inferred bias is especially appropriate in such situations.*

*Id.* at 47 (emphasis added).

Just as it is "especially appropriate" for a court to infer bias when a potential juror has engaged in "activities that closely approximate those of the defendant on trial," so too is it "especially appropriate" for a court to infer bias when a potential juror has been subject to conduct "that closely approximate[d] [that] of the defendant on trial." *See id.* In such a case, there is just too great a risk that such a juror will not be able to decide the case purely based on the applicable law and the evidence or lack of evidence, even though that inability may be unconscious. This is one such case.

### 3.   Actual bias

"Actual bias is 'bias in fact'—the existence of a state of mind that leads to an inference that the person will not act with entire impartiality." *Torres*, 128 F.3d at 43 (citing *United States v. Wood*, 299 U.S. 123, 133 (1936)). "A juror is found by the judge to be partial either because the juror admits partiality, or the judge finds actual partiality

based upon the juror's *voir dire* answers." *Id.* (citing *United States v. Haynes*, 398 F.2d

980, 984 (2d Cir. 1968) (actual bias is "based upon express proof, e.g., by a *voir dire*

admission by the prospective juror of a state of mind prejudicial to a party's interest");

*Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981) (plurality opinion) ("Without

an adequate *voir dire* the trial judge's responsibility to remove prospective jurors who

will not be able impartially to follow the court's instructions and evaluate the evidence

cannot be fulfilled.")).

This Court need not decide whether Juror No. 50 was actually biased, since this

Court can and should imply and infer bias. Assuming this Court holds an evidentiary

hearing at which Juror No. 50 is compelled to give truthful answers to the questions he

would have been asked if he had not falsely responded to the questionnaire, Ms. Maxwell

reserves the right to argue that Juror No. 50 was actually biased.

### C.  Juror No. 50's answers to Questions 25 and 48 were intentionally false.

Ms. Maxwell does not need to prove that Juror No. 50's *voir dire* answers were

intentionally false. As explained above, she need only prove "first, that the juror's *voir

dire* response was false and second, that the correct response would have provided a valid

basis for a challenge for cause." *Stewart*, 433 F.3d at 303. Nevertheless, assuming this

Court concludes that Ms. Maxwell must prove Juror No. 50 intentionally misled the

Court in falsely answering Questions 25 and 48, Ms. Maxwell has easily met that burden.

There are at least six reasons to believe Juror No. 50 acted intentionally. ***First***, this

Court need only watch the video of Juror No. 50 being confronted with his false answers

to appreciate that he acted intentionally. Juror No. 50's face immediately flushed and

turned red, and he grasped for words when the *Daily Mail* reporter told him about Question 48. "Interesting," Juror No. 50 said, struggling for an explanation. Unable to credibly explain away his false answer, Juror No. 50 eventually put together a nonsensical response: "No, No! I know my face is red because I can feel the blood but, I honestly—that's why I answered it that way."

   ***Second***, Juror No. 50's attempt to justify his false answer by claiming he "flew through" the questionnaire is not worthy of belief. The questionnaire instructed potential jurors to "carefully" compete it. No time limitation was imposed for completion of the questionnaire. It emphasized that only the parties and the Court would know the identities of the jurors. It advised that there are no "right or wrong" answers, "only <u>truthful</u> answers." And it assured jurors that their privacy would be respected and that if an answer to any question was embarrassing or caused the juror particular concern, they could alert the Court. The Court must presume Juror No. 50 heeded these instructions. Indeed, there is compelling evidence that Juror No. 50 carefully followed these instructions and did not "fly through" the questionnaire, as he now claims.  For example, he correctly skipped follow-up questions that he did not need to answer if he answered "no" to the initial question and provided written explanations for some questions when called to do so. Ex. 1, p 17 (Question 34.a); p 18 (Question 37.a). Juror No. 50 also certified, under the penalty of perjury, that his answers were "true and correct." Ex. 1, p 27.

   ***Third***, it is simply not credible that Juror No. 50 would not recognize and then not remember that the questionnaire asked if he was a victim of sexual assault, sexual abuse,

or sexual harassment. Juror No. 50 said he *did* remember the questionnaire's asking whether his family or friends had been victims of sexual assault, sexual abuse, or sexual harassment. But as the questionnaire itself explained and as this Court told Juror No. 50 during his *voir dire*, the entire point of the process was to evaluate whether Juror No 50 could be fair and impartial. Ex. 1, p 3 ("The purpose of this questionnaire is to determine whether prospective jurors can decide this case impartially based upon the evidence presented at trial and the legal instructions given by the presiding judge."). The questionnaire also told potential jurors that it would ask personal questions. *Id.* ("Although some of the questions may appear to be of a personal nature, please understand that the Court and the parties must learn enough information about each juror's background and experience to select a fair and impartial jury."). A personal experience as a victim of sexual assault, sexual abuse, or sexual harassment is far more relevant to fairness and impartiality than a family member's or friend's experience with such assault, abuse, or harassment. Given the content of the questionnaire and its obvious purpose, remembering a question about the latter but not the former is simply not credible.

   ***Fourth***, Juror No. 50's post-verdict conduct shows his false answers to the questionnaire were intentional. Juror No. 50 went on a media press to promote himself, his experience as a victim, and his role on the jury. He has given multiple interviews to

several different news outlets (some of which he was likely paid for) [14], and he sat for an interview as part of an hour-long "documentary" called "Ghislaine, Prince Andrew and the Paedophile," which aired on the British channel ITV. He has engaged on Twitter with the journalist who wrote about him, and he has communicated directly with Annie Farmer. *See Ashfar*, 196 A.3d at 95-96 (relying on juror's post-trial conduct as a basis for concluding juror was biased and new trial was required because juror falsely answered material question during *voir dire*). Juror No. 50's publicity tour appears to have stopped (at least temporarily) only because the government publicly filed a letter asking this Court to inquire into Juror No. 50's truthfulness and suggesting that he needed a lawyer. The clear message from the government to Juror No. 50 was to stop talking.[15]

---

[14] It is common for the British press to pay for crime victims' stories. *See, e.g,* https://www.mirror.co.uk/sell-my-story/; https://trianglenews.co.uk/sell-my-story-to-the-daily-mail/; https://www.dailymail.co.uk/home/contactus/index.html

[15] Juror No. 50 was clearly enjoying his fifteen minutes of fame in early January 2022, giving multiple interviews in which he congratulated himself as the person who persuaded the other jurors to adopt his biased view of the evidence and to vote to convict Ms. Maxwell.

The government recognized that Juror No. 50 had dug a very deep hole—a hole that looked to be getting deeper. Without conferring as to either the submission of the letter or any redactions, the government publicly filed Docket No. 568. This letter communicated to Juror No. 50, and the media, that Juror No. 50 had done something wrong, that his conduct would be subject to scrutiny, and that the conduct was serious enough to warrant appointment of a lawyer, free of charge if necessary.

Had Ms. Maxwell been asked, she would have objected to the public filing of this letter, which caused Juror No. 50 to delete his social media accounts and alerted Juror No. 50 that he needed to stop giving media presentations and to work on his story.

The government knows how to file a letter under seal, and this Court's protocol throughout this case has been for the parties to file letters or pleadings under restriction with a conferral and briefing as to what portion of the document should be redacted. The

**Fifth**, Juror No. 50's false answer to question 48 was not a one-off mistake. He also falsely answered question 25. Then, during *voir dire*, he claimed that he used only Facebook and Instagram and that he had deleted both. In fact, he also used Twitter, and it appears he did *not* delete his Instagram account. This pattern of false answers supports a finding of intent and belies mere inadvertence.

**Finally**, this case is not like other cases in which a juror may have given a false answer to avoid embarrassment,. Juror No. 50 has spoken to numerous media outlets about his service as a juror, has freely admitted that he is the victim of sexual abuse and sexual assault, and has done the bare minimum to conceal his identity, allowing himself to be identified by his first name while posing for pictures and being video recorded. Juror No. 50 has not shunned the limelight. He has reveled in it.

### D. Had Juror No. 50 answered Questions 25 and 48 truthfully, the parties and the Court would have explored whether his other answers were false.

Regardless of whether Juror No. 50's answers were intentional lies or inadvertent misstatements, his false answers to Questions 25 and 48 cast doubt on the truthfulness of *all* his answers, including most particularly those questions designed to expose bias based on the nature of charges against Ms. Maxwell—Questions 42-50.

At the October 21 hearing, this Court emphasized the importance of *voir dire*, and it expressed confidence that it could "smoke out" jurors who did not tell the truth:

---

letter was written by the government with full knowledge that it would be published by the media and effectively silence Juror No. 50. The submission of the letter was an end run around this Court's orders regarding Local Rule 23.1 and Rule 3.6 of the Rules of Professional Conduct.

> I will individually, one-on-one, question[] the jurors, and with the parties present, I feel confident that I can discern any clear dishonesty. This is not just going to be a summary *voir dire*; it will be probing. . . . If a juror's going to lie and be dishonest, we will smoke that out.

TR 10/21/2021, p 25-26. Because Juror No. 50 did not honestly answer these material questions, however, the Court and the defense were not alerted to probe these issues and instead relied on Juror No. 50's claim that he could be fair and impartial. In hindsight, that claim is not credible.

This is not speculation. Rather, based on what Juror No. 50 has said to the media, it's clear he *was not* fair and impartial because his personal experiences "prevent[ed] or substantially impair[ed] the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright*, 469 U.S. at 424. If Juror No. 50 had truthfully disclosed that he was a victim of sexual assault and sexual abuse as a child, the Court and parties would have probed, among other things, whether he was able (1) to assess the credibility of alleged sex assault victim like all other witnesses; (2) to fairly evaluate the testimony of Dr. Loftus; (3) to impartially assess Ms. Maxwell's defense that her accusers' memories were unreliable and tainted by money and manipulation; and (4) set aside his own traumatic experience when evaluating whether the government met its burden of proof beyond a reasonable doubt.

Juror No. 50's failure to disclose that he was a victim of sexual abuse (Question 48) was further compounded by his failure to disclose that he was merely a victim of a crime (Question 25). Disclosing that he was a crime victim would have invited inquiry by counsel and the Court regarding the nature of the crime and would have provided a

basis for a cause challenge or a peremptory challenge.  Juror No. 50's false answers to both questions deprived the Court of any basis for any meaningful inquiry on a topic bearing directly on his ability to serve impartially and the basis for a cause challenge.  In addition, the failure to be truthful on both questions cannot be purely accidental; rather, it suggests the juror's intention to shield disqualifying information to advance a desire to serve, which he has now exploited for self-promotion.[16]

We know, moreover, that Juror No. 50 gave at least one other false answer during *voir dire*. He falsely said he only used Facebook and Instagram, and he did not mention Twitter, despite being specifically asked about it. He also said that he deleted his social media accounts. That was not true since, as we now know, he used Twitter to publicize his interviews with the press and to communicate directly to Annie Farmer and then posted on Instagram about his service as a juror.

Truthful answers from Juror No. 50 would have led the Court and the parties to probe much more deeply into his biases and prejudices, both known and unknown.[17] Had that happened, the record shows that he would have been removed as a potential juror.

---

[16] Juror No. 50 continues his media exploits despite being the subject of this Motion and represented by counsel.  On January 18, 2022, he appeared in a documentary produced by ITV. *See* https://www.youtube.com/watch?v=SvnwRuDfrdM at timestamps 01:53, 02:32, 04:10, 05:10, 34:36, 38:41, 39:15.

[17] This follow-up questioning would not have been a mere formality. We know, for example, that that Juror No. 55 did not truthfully answer the Court's questions about social media use, and it took follow-up questioning proposed by defense counsel to "smoke out" his falsehoods.

### E. Juror 50's material misstatements (and those of the second unidentified juror) prevented Ms. Maxwell from exercising her peremptory challenges, denying her a fair trial.

Proper *voir dire* plays a vital role in assuring a defendant's Sixth Amendment right to an impartial jury. Without an adequate *voir dire* the trial judge's responsibility to remove prospective jurors who may not be able impartially serve cannot be fulfilled. "Similarly, lack of adequate *voir dire* impairs the defendant's right to exercise peremptory challenges where provided by statute or rule, as it is in the federal courts." *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981) (citation omitted).

The role of peremptory challenges in a criminal trial cannot be overstated:

Peremptory challenges have been an integral aspect of criminal trial procedure for over six hundred years and continue to be universally employed throughout the country. The underlying thesis is that, with the exception of challenges for cause, the suitability of a particular juror is counsel's decision and not the court's. Consistent with that thesis and subject to constitutional strictures, a peremptory challenge can rest on a good reason, a bad reason, or no reason at all.

*State v. Scher*, 278 N.J. Super. 249, 263, 650 A.2d 1012, 1019 (App. Div. 1994) (cleaned up).

Fed. R. Crim. P. 24 entitles a number of peremptory challenges to prospective jurors. Here, Ms. Maxwell exercised all of her peremptory challenges and, whether for cause or peremptory, would not have knowing allowed a juror who: (1) claimed to be a victim of sexual abuse; or (2) neglected to disclose that the juror had been a victim of sexual abuse; (3) misrepresented the status of the juror's social media to remain on the jury. Had Juror 50 disclosed any of these issues, Ms. Maxwell would have used a peremptory challenge against this juror and not as to any of the other remaining jurors.

As discussed in *Murphy v. Nogam*, No. CV 14-4268 (KM), 2018 WL 278735, at

*25 (D.N.J. Jan. 3, 2018), *aff'd sub nom. Murphy v. Adm'r E. Jersey State Prison*, No. 18-

2825, 2021 WL 2822179 (3d Cir. July 7, 2021), New Jersey courts have repeatedly

> invalidated judgments where a juror's inaccurate answer to a question
> propounded in the jury *voir dire* precluded a litigant from exercising a
> peremptory challenge. *State v. Scher*, 278 N.J. Super. 249, 263
> (App.Div.1994), cert. denied, 140 N.J. 276 (1995) (citing *Wright v.
> Bernstein*, 23 N.J. 284 (1957); *State v. Williams*, 190 N.J.Super. 111 (App.
> Div. 1983); *State v. Thompson*, 142 N.J. Super. 274 (App. Div. 1976)).

Of course, the material omissions by Juror 50 were not made in New Jersey. The

prejudice to Ms. Maxwell and the concept of fundamental fairness, however, are the same

regardless of which side of the Hudson the misstatements occurred. In a very close,

contested trial where the only real issue was the credibility of the accusers, the failure of

Juror 50 to disclose his claimed victim status in jury selection cheated Ms. Maxwell of

her ability to intelligently exercise her peremptory challenges and robbed her of a fair

trial. In this case truthful responses would have revealed Juror 50's claimed victim status.

He would have been excused for cause on that basis alone and would never answered any

questions in person.

Even if Juror 50 had claimed on the questionnaire that he could be fair, despite his

victim status, the result would have been the same. He would have been asked to describe

to the Court and the parties, under oath, what he claimed happened to him, when it

happened, the impact on him, and how he could still be fair. Had Juror 50 revealed to the

Court, as he did to the media, that he believed that his memory "was like a video" and

that he would advocate that the alleged victims here were credible, based on his own

experiences, he would have been excused, if not for cause, then as a defense peremptory strike.

## II.   The scope of any evidentiary hearing

Ms. Maxwell does not believe an evidentiary hearing is required because the undisputed evidence shows (1) that Juror No. 50 falsely answered a material question during *voir dire* and (2) that, had he answered truthfully, he would have been subject to a challenge for cause. If this Court disagrees, however, a formal evidentiary hearing is appropriate.

When, as here, there is a plausible claim of juror misconduct, "an unflagging duty falls to the district court to investigate the claim." *United States v. French*, 904 F.3d 111, 117 (1st Cir. 2018) (quotation omitted). "[A] formal evidentiary hearing [is] the gold standard for an inquiry into alleged juror misconduct." *United States v. French*, 977 F.3d 114, 122 (1st Cir. 2020), *cert. denied*, 141 S. Ct. 2601 (2021), *cert. denied sub nom. Russell v. United States*, 141 S. Ct. 2601 (2021).

### A.   Pre-hearing discovery

Ms. Maxwell requests that the Court authorize subpoenas to:

1.   Juror No. 50 to produce:

    a.   Emails or other written communications between Juror No. 50 and any alleged victim or witness in this case;

    b.   Emails or other written communications between Juror No. 50 and any other juror in this case;

    c.  Non-privileged emails or other written communications between Juror No. 50 and any other person, including any news or media organization about Juror No. 50's service as a juror in this case;

    d.  Any record of payments to Juror No. 50 in exchange for any interview or information about his service as a juror in this case;

2.    Facebook, Twitter, LinkedIn, Instagram, or other social media networking platforms identified by the parties, to produce:

    a.  All communications to and from Juror No. 50 regarding his service as a juror in this case;

    b.  All posts, comments, or photographs posted by Juror No. 50 regarding his service as a juror in this case.

    c.  All documents reflecting dates on which Juror No. 50 opened or closed his accounts.

### B.   The hearing itself

The misconduct identified potentially implicates all 12 jurors who rendered a verdict here. According to Juror No. 50 and the *New York Times*, one other juror did not disclose that he or she was the victim of sexual abuse as a child. Nevertheless, that juror's experiences were discussed apparently in support of Juror No. 50's position. What these two jurors disclosed to the (presumably) ten jurors who responded to the questionnaire truthfully will be relevant to determine the identity of the second juror and what Juror No. 50 said to the other jurors.

Ms. Maxwell requests that any hearing begin with the questioning of Juror No. 50. Ms. Maxwell requests that the Court first advise Juror No. 50 about the nature of the hearing and then allow defense counsel to question Juror No. 50 followed by questioning from the government, re-cross examination by defense counsel, followed by any questions from the Court and any additional questions from counsel based on the Court's questions.

If, after this examination further inquiry is required, Ms. Maxwell suggests that the second juror be summoned to Court for an identical process. If necessary, this process should be repeated as to all remaining jurors.

After the examination of the jurors the parties should be afforded a period of time to conduct any further investigation warranted by the information presented at the hearing followed by post-hearing arguments, either oral or written.

Federal Rule of Evidence 606(b) does not prohibit this inquiry, because Ms. Maxwell does not seek to impeach the verdict based on the content of deliberations. *Cf.* Fed. R. Evid. 606(b) (providing that, with certain exceptions, "a juror may not testify about any statement made or incident that occurred during the jury's deliberations" during "an inquiry into the validity of a verdict"). Instead, she intends to show that her jury was not fair and impartial as required by the Sixth Amendment because at least two jurors gave false answers during *voir dire* to material questions that, if answered truthfully, would have subject them to a challenge for cause.

To the extent Rule 606 might apply to certain questions asked at the hearing, Ms. Maxwell need not inquire into the content of deliberations to establish her jury bias

claim. *See Cunningham v. Shoop*, __ F.4th __, 2022 WL 92594, at *14-15 (6th Cir. Nos. 11-3005/20-3429, Jan. 10, 2022) (granting habeas relief as to juror bias claim because it is "possible for Cunningham to prove that [the juror] was actually biased without relying on juror testimony in violation of Federal Rule of Evidence 606(b)"); *compare Pena-Rodriguez v. Colorado*, 137 S. Ct. 855 (2017) ("Where a juror makes a clear statement indicating that he or she relied on racial stereotypes or animus to convict a criminal defendant, the Sixth Amendment requires that the no-impeachment rule give way in order to permit the trial court to consider the evidence of the juror's statement and any resulting denial of the jury trial guarantee."). Without relying on juror testimony, it is already clear that Juror No. 50 did not truthfully answer the questionnaire; Juror No. 50 has publicly admitted he is a victim of sexual assault and sexual abuse.

As for identifying the other juror who was also a victim of sexual assault and abuse, the Court and parties can identify the juror without eliciting testimony about what was said during deliberations. The remaining eleven jurors can be asked, under oath, whether their answer to question 48 is correct and whether they have been a victim of sexual assault or abuse. Presumably the second juror will self-identify.

### III.   Juror No. 50 has no right to intervene.

#### A.   Juror No. 50 lacks standing.

Juror No. 50 seeks to intervene suggesting that "it is indisputable that precedent supports intervention by interested third parties in criminal matters…." Memo. at 8. This claim is not supported by "the long line of precedent hold[ing] that a non-party lacks a judicially cognizable interest in a defendant's prosecution." *United States v. Stoerr*, 695

F.3d 271, 278 (3d Cir. 2012). Juror No. 50 is not a party here and there is no legal basis

for Juror No. 50 to intervene in this matter. This is not a request by a journalist to

intervene for public access. *See United States v. Aref*, 533 F.3d 72, 81 (2d Cir. 2008)

(motion to intervene to assert the public's First Amendment right of access to criminal

proceedings is proper). Nor is the request from a subpoena respondent. *See United States

v. RMI Co.*, 599 F.2d 1183, 1186 (3d Cir. 1979) (persons affected by the disclosure of

allegedly privileged materials may intervene in pending criminal proceedings and seek

protective orders). Although Juror No. 50 has expressed a questionable interest in the

outcome of this case, that does not afford him standing to intervene. Notably, the Federal

Rules of Criminal Procedure make no reference to a motion to intervene in a criminal

case. This is a recognition of the general rule that "a private citizen lacks a judicially

cognizable interest in the prosecution or nonprosecution of another." *Linda R.S. v.

Richard D.*, 410 U.S. 614, 619 (1973). And as one court has noted, "[e]ven crime victims,

who enjoy various statutory rights of participation, have no right to intervene in the

district court in a criminal case." *United States v. Collins*, 2013 WL 4780927, at *1 (E.D.

Wis. 2013).

> **B. This Court should refuse Juror No. 50's discovery request because
> Juror No. 50 is under investigation and the release of the information
> requested would prejudice that investigation.**

It is the conduct of Juror No. 50 that is under investigation here. Like many

suspects, Juror No. 50 would like to learn as much information about the investigation so

that he can tailor responses to any potential questions and change the focus of the

investigation. Once he was thoroughly tipped off by the government, Juror No. 50 has

sought to distance himself from his original statements, attempted to destroy evidence, and tried to flee from the media.

Under analogous circumstances courts have refused discovery to individuals or entities under investigation. *See John Doe Agency v. John Doe Corp.*, 493 U.S. 146, (1989) (recipient of a grand jury subpoena for certain records relating to a cost allocation appropriately denied access to records pursuant to a FOIA request).

Any advance disclosure to Juror No. 50 of the questionnaire will undoubtably color Juror No. 50's testimony and allow him to place himself in the best possible posture. Although there may come a time when Juror No. 50 is entitled to this discovery—if he is charged with perjury, criminal contempt, or some other crime, for example—the time is not now.

### C. Juror No. 50's filings should be stricken or, alternatively, remain under seal.

Whether a claimant has standing is "the threshold question in every federal case, determining the power of the court to entertain the suit." *In re Gucci*, 126 F.3d 380, 387–88 (2d Cir. 1997) (citing *Warth v. Seldin*, 422 U.S. 490, 498, (1975)). Striking the pleading of a putative litigant is appropriate where the litigant lacks standing. *United States v. All Right, Title & Int. in Prop., Appurtenances, & Improvements Known as 479 Tamarind Drive, Hallendale, Fla*., No. 98 CIV. 2279 DLC, 2011 WL 1045095, at *2 (S.D.N.Y. Mar. 11, 2011). A stricken pleading is a nullity with no legal effect. *Davis v. Bombardier Recreational Prod., Inc., No. 3*:11CV236-TSL-MTP, 2012 WL 112202, at *3 (S.D. Miss. Jan. 12, 2012) (stricken amended complaint deemed a nullity and of

no legal effect). Although Rule 12(f) of the Federal Rules of Civil Procedure references "pleadings," "a district court has the inherent power to strike a party's submissions other than pleadings." *Mazzeo v. Gibbons*, No. 2:08-CV-01387-RLH-PA, 2010 WL 3910072, at *3 (D. Nev. Sept. 30, 2010); *see also Metzger v. Hussman,* 682 F. Supp. 1109, 1110 (D. Nev. 1988) (motion to strike granted and motion in opposition not considered by the court). This Court should strike all the filings made by Juror No. 50.

Alternatively, Ms. Maxwell requests that the "Memorandum of Law in Support of Motion to Intervene and for Release of Sealed Jury Questionnaire and Transcript, on Behalf of Proposed Intervenor, Juror 50" and its companion Motion remain under seal, at least until a resolution of Ms. Maxwell's motion for new trial based on this Juror's failure to answer truthfully during jury selection. Juror No. 50's Motion and accompanying Memorandum are an attempt to obtain discovery by a non-party to this criminal case, made by someone who lacks standing to participate in this prosecution. Accordingly, these pleadings are not "judicial documents" and are afforded no presumption of public access. *United States v. Smith*, 985 F. Supp. 2d 506, 519 (S.D.N.Y. 2013) ("experience and logic show that there is no right of access to discovery materials"). *See SEC v. The Street.Com*, 273 F.3d 222, 233 (2d Cir.2001) (rejecting claim that deposition testimony became a "judicial document" "because the Court reviewed it in order to decide whether or not to enter [a] protective order").

The fact that Juror No. 50 filed these pleadings does not make them "judicial documents." *United States v. Amodeo ("Amodeo I")*, 44 F.3d 141, 145 (2d Cir. 1995) ("We think that the mere filing of a paper or document with the court is insufficient to

54

render that paper a judicial document subject to the right of public access. We think that the item filed must be relevant to the performance of the judicial function and useful in the judicial process in order for it to be designated a judicial document."). Moreover, if stricken, the documents enjoy no presumption of public access. *Brown v. Maxwell*, 929 F.3d 41, 51–52 (2d Cir. 2019) ([under Civil Rule 12], "the district court may strike such material from the filings on the grounds that it is "redundant, immaterial, impertinent, or scandalous." Because such rejected or stricken material is not "relevant to the performance of the judicial function" it would not be considered a "judicial document" and would enjoy no presumption of public access.").

The Second Circuit established a framework in *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110 (2d Cir. 2006) for courts to utilize in determining when the public has a right of access to particular documents. The Court of Appeals held that "[b]efore any such common law right can attach, however, a court must first conclude that the documents at issue are indeed 'judicial documents.'" *Lugosch*, 435 F.3d at 119. "Once the court has determined that the documents are judicial documents and that therefore a common law presumption of access attaches, it must determine the weight of that presumption." *Id.* "Finally, after determining the weight of the presumption of access, the court must 'balance competing considerations against it.'" *Id.* at 120.

There exists no compelling reason to release Juror No. 50's pleadings. Any public release of the documents will set off another round of publicity, speculation, and commentary, all of which is prejudicial to the truth finding process and Ms. Maxwell's rights to fair and impartial proceedings.

The submissions by Juror No. 50 have questionable merit, have not been ruled upon, and implicate an ongoing investigation by the parties and the Court into juror misconduct. Certainly, at least at this stage of the proceedings, the submissons are not "judicial documents" and until the issues around Juror No. 50's motion for intervention and discovery have been resolved they should remain sealed. If the Court believes Juror No. 50's requests merit judicial document status the seal should remain. The requests would be afforded the lowest presumption of public access and compelling reasons to maintain the sealed status exist.

Juror No. 50 has demonstrated a lack of reliability and an appetite for publicity. Should the documents be released the *sotto voce* comments regarding Juror No. 50's intent, state of mind, and actions will be fodder for the media and may influence the memories of other potential witnesses. Documents regularly remain sealed where public release would "compromis[e] the interest in the integrity and security of [an] investigation," *In re Sealed Search Warrants Issued June 4 & 5, 2008*, No. 08–M–208 (DRH), 2008 WL 5667021, at *5 (N.D.N.Y. July 14, 2008).

## Conclusion

The purpose of *voir dire* is "to expose bias or prejudice on the part of veniremen," and there "there must be sufficient information elicited on *voir dire* to permit a defendant to intelligently exercise not only his challenges for cause, but also his peremptory challenges." *Barnes*, 604 F.2d at 139. "*Voir dire* [thus] plays an essential role in protecting the right to trial by an impartial jury." *Daugerdas*, 867 F. Supp. 2d at 468.

For its part, this Court expressed "confidence" that its *voir dire* process would "smoke out" a juror who was dishonest. Ms. Maxwell relied on the Court's process. And the Court and the parties relied on the presumption to which everyone is entitled: that potential jurors would carefully and honestly engage in *voir dire*.

Unfortunately, we now know that Juror No. 50 (and at least one other juror) did not honor their obligations to give "only <u>truthful</u> answers." Ex. 1, p 3. They are no longer entitled to the presumption of honesty.

Because Ms. Maxwell's jury was not the fair and impartial one guaranteed her by the United States Constitution, this Court should vacate the jury's verdict and order a new trial. In the alternative, this Court should hold an evidentiary hearing and examine all twelve jurors.

Dated: January 19, 2022

57

Respectfully submitted,

*s/ Jeffrey S. Pagliuca*
Jeffrey S. Pagliuca
Laura A. Menninger
HADDON, MORGAN & FOREMAN P.C.
150 East 10th Avenue
Denver, CO 80203
Phone: 303-831-7364

Christian R. Everdell
COHEN & GRESSER LLP
800 Third Avenue
New York, NY 10022
Phone: 212-957-7600

Bobbi C. Sternheim
Law Offices of Bobbi C. Sternheim
225 Broadway, Suite 715
New York, NY 10007
Phone: 212-243-1100

*Attorneys for Ghislaine Maxwell*

## Certificate of Service

I hereby certify that on January 19, 2022, I electronically filed the foregoing *Ghislaine Maxwell's Motion for a New Trial*, with the Court and counsel for the government:

Alison Moe
Maurene Comey
Andrew Rohrbach
Lara Pomerantz
U.S. Attorney's Office
SDNY One Saint Andrew's Plaza
New York, NY 10007
Alison.moe@usdoj.gov
Maurene.comey@usdoj.gov
Andrew.Rohrbach@usdoj.gov
Lara.Pomerantz@usdoj.gov

*s/ Nicole Simmons*