UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

UNITED STATES OF AMERICA                     :

   -v.-                                                        :         S2 20 Cr. 330 (AJN)

GHISLAINE MAXWELL,                           :

                 Defendant.         :

-----------------------------------------------------------------x

## THE GOVERNMENT'S MEMORANDUM IN OPPOSITION TO THE DEFENDANT'S MOTION FOR A NEW TRIAL

DAMIAN WILLIAMS
United States Attorney
Southern District of New York
Attorney for the United States of America

Maurene Comey
Alison Moe
Lara Pomerantz
Andrew Rohrbach
Assistant United States Attorneys
- Of Counsel -

# TABLE OF CONTENTS

**PRELIMINARY STATEMENT** ..................................................................... 1

**BACKGROUND** ........................................................................................... 2

I.   The Jury Selection Process ....................................................................... 2

II.  Juror 50's Questionnaire and Voir Dire .................................................. 6

III. Juror 50's Public Statements Following the Verdict ............................... 8

**ARGUMENT** ................................................................................................. 10

I.   The Defendant's Motion for a New Trial Should Be Denied on the Current Record ........... 10
   A.  Applicable Law ................................................................................. 10
   B.  Discussion ......................................................................................... 13
      1.  The Defendant Has Failed To Satisfy the First Prong of *McDonough* .......................... 13
      2.  The Defendant Has Failed to Satisfy the Second Prong of *McDonough* ....................... 19

II.  The Court Should Schedule a Limited Hearing Regarding Juror 50 ..................................... 30
   A.  Applicable Law ................................................................................. 30
   B.  Discussion ......................................................................................... 31
      1.  The Court Should Conduct the Questioning ............................................. 32
      2.  The Scope of the Hearing Should Be Limited ......................................... 33
      3.  There Is No Basis to Call Any Other Juror as a Witness ....................... 37
      4.  The Defendant's "Discovery" Request Should Be Denied ..................... 40

III. The Court Should Provide Juror 50 with a Copy of His Questionnaire
     Before Any Hearing ............................................................................... 42

**CONCLUSION** ............................................................................................. 47

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

UNITED STATES OF AMERICA                          :

   -v.-                                                        :          S2 20 Cr. 330 (AJN)

GHISLAINE MAXWELL,                                 :

                  Defendant.        :

------------------------------------------------------------------x

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in opposition to the defendant's

motion for a new trial, dated January 19, 2022 (the "Defense Motion").

A defendant "is entitled to a fair trial but not a perfect one, for there are no perfect trials."

*McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 553 (1984) (quotations and

citations omitted).  "A trial represents an important investment of private and social resources, and

it ill serves the important end of finality to wipe the slate clean simply to recreate the peremptory

challenge process because counsel lacked an item of information which objectively he should have

obtained from a juror on *voir dire* examination."  *Id.* at 555.  In keeping with these principles, a

defendant seeking a new trial based on a juror's statements during voir dire faces the heavy burden

of establishing *both* that the juror deliberately lied, *and* that the juror otherwise would have been

struck for cause.  *Id.* at 556; *United States v. Shaoul*, 41 F.3d 811, 818 (2d Cir. 1994).  On the

present record, the defendant has not come close to establishing that the extraordinary remedy of

a new trial is warranted.

For the reasons set forth below, the Court should deny the defendant's motion based on the

present record.  The Court should further deny the defendant's alternative requests for extensive

discovery and an expansive hearing—requests that present exactly the sort of "evil consequences" of which the Second Circuit has warned: "subjecting juries to harassment, inhibiting juryroom deliberation, burdening courts with meritless applications, increasing temptation for jury tampering and creating uncertainty in jury verdicts." *United States v. Ianniello*, 866 F.2d 540, 543 (2d Cir. 1989). While the Government consents to a hearing, its scope "should be limited to only what is absolutely necessary to determine the facts with precision." *Id.* at 544. Such a hearing should be limited to questioning of Juror 50 by the Court, in order to determine: (1) whether he deliberately lied in response to Question 48, regarding being a victim of sexual abuse, and, if so, (2) whether the Court would have struck Juror 50 for cause if he had accurately responded to that question, *i.e.*, based on a finding that he could not be fair and impartial.

## BACKGROUND

### I.     The Jury Selection Process

Before trial, the jury department for the Southern District of New York conducted five sessions over the course of November 4, 5, and 12, 2021 during which 694 jurors completed a juror questionnaire approved by the Court. Nov. 15, 2021 Tr. at 2:20-21. The juror questionnaire was 29 pages and comprised of 51 questions, many of which contained subparts. The parties reviewed the completed questionnaires and then conferred, submitting a joint list delineating four categories of prospective jurors: (1) prospective jurors that both the Government and defense counsel agreed should proceed to voir dire; (2) prospective jurors that both the Government and defense counsel agreed should be excused or struck for cause; (3) prospective jurors that defense counsel, but not the Government, believed should be excused or struck for cause; and (4) prospective jurors that the Government, but not defense counsel, believed should be excused or struck for cause. *Id.* at 2:22-3:4. In addition, the Court sent the parties a list of 13 prospective

jurors—that were included on the list of jurors that the parties agreed should proceed to voir dire—that the Court "thought should be considered for excusing." *Id.* at 3:5-11.  While the Government did not object to the Court's proposal, defense counsel objected to excusing four of the 13 prospective jurors; those four proceeded to voir dire.  *Id.* at 3:12-16.  On November 15, 2021, the Court calculated that the parties had agreed that 231 of the 694 prospective jurors should proceed to voir dire, which the Court determined was a "sufficient number to get to the number of jurors that we need."  *Id.* at 4:9-13.  Thus, the Court had no occasion to and did not rule on whether to strike the prospective jurors whom only one party had challenged for cause.[1]  The Court indicated at the November 15 conference that it planned to qualify 50 to 60 of the 231 jurors after voir dire. *Id.* at 4:19-20.

On November 16, 2021, the Court commenced the voir dire portion of the jury selection process.  The Court asked prospective jurors several follow-up questions to questions in the jury questionnaire which prospective jurors had answered affirmatively, including, for example, the prospective jurors' familiarity through the media with the defendant and Jeffrey Epstein; the prospective jurors' history (or that of a friend or family member) of prior sexual harassment, sexual abuse, or sexual assault; and the prospective jurors' experience (or that of a relative or close friend)

---

[1] The defendant is therefore incorrect when she asserts that "[t]he Court granted all 23 of the[] challenges for cause made by the defense" that the Government did not agree with.  (Def. Mem. at 10).  Similarly misleading is the defendant's statement that "the parties jointly agreed to excuse 67 of the 114 who answered 'yes' when asked if they had been a victim of sexual abuse, sexual assault, or sexual harassment." (Def. Memo. at 9).  That assertion fails to note that a significant number of those prospective jurors had stated that they could *not* be fair and impartial for a number of reasons, including their familiarity through the media with the defendant and Epstein; that the Government agreed to strike or excuse many of those jurors for reasons other than their responses to Question 48; and that the Court did not ultimately rule on whether any of those jurors should be struck for cause.

of being a victim of a crime.  The Court asked the prospective jurors whether that information or those experiences would interfere with their ability to be fair and impartial.

At the conclusion of voir dire, the Court qualified 58 jurors.  Nov. 18, 2021 Tr. at 717.  Of the 58 individuals who were qualified to serve as jurors, eight individuals responded to Question 48 of the juror questionnaire that they themselves had been a victim of sexual harassment, sexual abuse, or sexual assault, and that this experience would not affect their ability to serve fairly and impartially as a juror in the case.[2]  In particular:

- Juror 8 answered Question 48 in the affirmative.  During voir dire, Juror 8 stated that she and other women she knows have experienced sexual harassment, but that neither she nor anyone she knows has been the victim of "serious sexual harassment or assault or abuse." Nov. 16, 2021 Tr. at 18:13-22.  Neither the Government nor defense counsel challenged Juror 8 for cause.
- Juror 21 wrote in response to Question 48 in her juror questionnaire that ████████████████ ████████████████████████████████████████████████. Juror 21 also reported that a friend of hers was sexually harassed and coerced into a sexual relationship with his professor.  Juror 21 indicated that these experiences would not affect her ability to be fair and impartial.[3] ██████████████████████████████████ ████████

  █ In response to additional questioning, she explained that she had reported to her school that her friend was "coerced into a sexual relationship with their professor, kind of blackmailed into it, and then paid off by the school to keep it quiet."  Id. at 54:6-12.  She reiterated that this would not affect her ability to serve as a juror.  Id.  Defense counsel requested that the Court inquire further into whether Juror 21's role in the reporting would "color her views."  Id. at 56:8-11.  In response, the Court inquired whether Juror 21's ability to be fair and impartial would be affected "[t]o the extent there may be issues in the case that arise around reporting or not reporting allegations related to sexual abuse or harassment or the like," to which Juror 21 responded no.  Neither the Government nor defense counsel challenged Juror 21 for cause.
- Juror 62 wrote in response to Question 48 in his juror questionnaire ███████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████

---

[2] Twelve of the 58 qualified prospective jurors indicated that a friend or family member had been a victim of sexual harassment, sexual abuse, or sexual assault.



██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
████████████████

- Juror 63 also answered Question 48 in the affirmative and said her experience would not affect her ability to be fair and impartial. ██████████████████████████████
  ██████████████████████████████████████████████████████████
  ████████████████████████████████████████████████████ She
  indicated several times during voir dire that she could be fair and impartial in the case. *See, e.g., id.* at 216:19-217:2. Neither the Government nor defense counsel challenged Juror 63 for cause.

- Juror 93 wrote that █████████████
  ███████████████████████████████████████████████████████████
  During voir dire, in response to questioning, Juror 93 said that she was sexually molested by an uncle when she was 12 or 13, as was her sister and an aunt, but that would not affect her ability to be fair and impartial in the case and that the allegations in the case would not upset her in a way that would distract from her duty as a juror. *Id.* at 259:4-13. Neither the Government nor defense counsel challenged Juror 93 for cause.

- Juror 113 indicated that he had experienced sexual harassment, along with "pretty much every woman I know," but that would not affect his ability to be fair and impartial. During voir dire, Juror 113 stated that he did not believe his experience would make it difficult for him to serve as a juror and that he could be fair and impartial. *Id.* at 293:10-20. Neither the Government nor defense counsel challenged Juror 113 for cause.

- Juror 189 wrote about ████████████
  ███████████████████████████████████ She indicated that it
  would not affect her ability to be fair and impartial. During voir dire, Juror 189 reiterated that her experiences would not interfere in any way with her ability to be fair and impartial. Nov. 17, 2021 Tr. at 532:13-18. ████████████████████████████
  ██████████████████████████████████████████████████████████
  ██████████████████████████████████████████████████████████
  ██████████████████████████████████████████████████████████
  ████████████████

- Juror 239 wrote in response to Question 48 of the juror questionnaire ████████████
  ███████████████ During voir dire, Juror 239 reiterated that her experience would not interfere in any way with her ability to be fair to both sides. Nov. 18, 2021 Tr. at 635:2-8. Neither the Government nor defense counsel challenged Juror 239 for cause.

In sum, there were eight jurors who were ultimately qualified who had answered Question 48 affirmatively. Each confirmed that he or she could be fair and impartial. Defense counsel

moved to strike only one of these jurors for cause—for reasons unrelated to Question 48—and the Court denied that motion.

Fifty-eight jurors were qualified at the conclusion of voir dire on November 18, 2021.  Nov. 18, 2021 Tr. at 717.  The Court agreed to ask the qualified jurors before the parties exercised their peremptory strikes on November 29, 2021 whether they had read or heard anything about the defendant or Epstein and, at defense counsel's suggestion, whether there was any reason they could not be fair and impartial.  *See* Nov. 17, 2021 Tr. at 622:23-625:2; Nov. 29, 2021 Tr. 727:2-14.  At the conclusion of that process, the parties exercised their peremptory strikes.  Twelve jurors and six alternates were seated.

## II.     Juror 50's Questionnaire and Voir Dire

Juror 50 completed the juror questionnaire and was questioned by the Court during voir dire.  In his juror questionnaire, Juror 50 repeatedly made clear that he could be fair and impartial.  For example, in response to Question 13, he indicated that he could decide the case "based solely on the evidence or lack of evidence presented in Court, and not on the basis of conjecture, suspicion, bias, sympathy, or prejudice."  *See* Def. Ex. 1.  He also indicated that he accepted the principle that the law provides that a defendant in a criminal case is presumed innocent and the Government is required to prove guilt beyond a reasonable doubt.  *See* Def. Ex. 1, Question 11.

Juror 50 disclosed in his questionnaire that he had read on CNN's website that the defendant was Epstein's girlfriend, but he stated that he had not formed an opinion about the defendant's guilt or innocence, and that he had not formed any opinions that might make it difficult for him to be fair and impartial.  *See* Def. Ex. 1, Questions 34-35.  He also wrote that he learned about Epstein from CNN, but that he could be fair and impartial and render a verdict based solely on the evidence presented at trial.  *See* Def. Ex. 1, Questions 36-41.

Juror 50 indicated that there was nothing about the nature of the case and the accusations as summarized in the questionnaire that might make it difficult for him to be fair and impartial. *See* Def. Ex. 1, Question 42.  He also wrote that he did not have any views about laws concerning the age of consent or laws governing sex trafficking and sex crimes against minors that would affect his ability to be fair and impartial.  *See* Def. Ex. 1, Questions 43-44.  Juror 50 answered that he would not have any difficulty assessing the credibility of a witness claiming sexual assault or abuse just like he would any other witness.  *See* Def. Ex. 1, Question 47.  Juror 50 checked the "no" box in response to the question of whether he or a friend or family member had ever been the victim of sexual harassment, sexual abuse, or sexual assault, including actual or attempted sexual assault or other unwanted sexual advance, including by a stranger, acquaintance, supervisor, teacher, or family member.  *See* Def. Ex. 1, Question 48.  He also checked the "no" box in response to the question of whether he or any of his relatives or close friends had ever been a victim of a crime.  *See* Def. Ex. 1, Question 25.

Juror 50 was one of the 231 prospective jurors that the parties agreed should proceed to voir dire.  During voir dire, Juror 50 confirmed that he was able to follow the Court's instruction that the defendant is "presumed innocent of all charges unless and until the government proves her guilt beyond a reasonable doubt."  Nov. 16, 2021 Tr. at 128:15-19.  In response to questioning by the Court about his knowledge of the defendant from the media, Juror 50 explained that he "heard when Jeffrey Epstein had died that he had a girlfriend," and reaffirmed that he was "[a]bsolutely" able to put aside anything that he read or heard about the defendant and decide the case based on the facts and evidence, or lack of evidence, presented in court, and follow the Court's instructions as to the law.  *Id.* at 130:3-18; *see also id.* at 130:19-131:7.

When asked "[d]o you use social media," he responded: "I do, but I actually just deleted them because I got out of a relationship and I didn't want to see anything regarding them. So I am fully off of it right now." The Court asked, "What did you use, Facebook, Twitter?" Juror 50 responded, "I used Facebook and Instagram," but that he had deleted his accounts "last week" and that before that his use consisted of "[p]ersonal stuff, like selfies." *See id.* at 133:10-21.

At the conclusion of voir dire, in response to questions from the Court, Juror 50 stated that he had no doubt about his ability to be fair to both sides and that he did not have any reason to think he could not be fair and impartial. *See id.* at 134:15-22.

Juror 50 was one of the 58 qualified prospective jurors and was ultimately one of the 12 jurors who deliberated.

### III.    Juror 50's Public Statements Following the Verdict

Following the verdict in this case, Juror 50 discussed his experience as a juror during interviews with multiple journalists.

First, on or about January 4, 2022, *The Independent* published an article reporting an interview with Juror 50 regarding his jury service. (*See* Gov't Ex. A). According to the article, Juror 50 stated during this interview that he is "a survivor of sexual abuse." (*Id.* at 2). Juror 50 reportedly indicated that he did not disclose the sexual abuse he experienced until "high school." (*Id.* at 2). According to the article, Juror 50 "said he could not remember the details" of the juror questionnaire, "but felt he had answered all questions honestly." (*Id.* at 5).

Second, on or about January 5, 2022, *The Daily Mail* published an article reporting another interview with Juror 50 regarding his jury service. (*See* Gov't Ex. B). The online version of this article was accompanied by an approximately 19-minute video of Juror 50 discussing his jury

service.[4]  According to this article, Juror 50 "went into the trial firmly believing that Maxwell was

'innocent until proven guilty' and viewing the victims with a skeptical eye." (*Id.* at 2).  During

this same interview, Juror 50 indicated that he "could not remember" the part of the questionnaire

asking whether he had experienced sexual abuse, but he "was certain that he had answered all

questions honestly." (*Id.* at 8).  Juror 50 also told this interviewer that his own experience of sexual

abuse "did not affect his ability to view Maxwell as innocent until proven guilty." (*Id.*).

Third, on or about January 5, 2022, *Reuters* published an article reporting an interview with

Juror 50 regarding his jury service.  (*See* Gov't Ex. C).  When asked about the juror questionnaire,

Juror 50 reportedly said "he 'flew through' the initial questionnaire and also did not recall being

asked on the form about personal experiences with sexual abuse, but that he would have answered

honestly." (*Id.* at 3).[5]

---

[4] This video is different from the video attached as Defense Exhibit 3 to the defense's motion.  The lengthier video is viewable at https://www.dailymail.co.uk/news/article-10370193/Ghislaine-Maxwell-juror-says-evidence-convinced-panel-predator.html.

[5] Pursuant to Federal Rule of Evidence 606(b), the foregoing recitation of Juror 50's public statements excludes any reference to statements that Juror 50 made about what "occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment."  The defendant's brief, in an apparent attempt to show bias or prejudice, contains a recitation of certain of Juror 50's statements about what happened during deliberations.  (*See* Def. Mem. at 12-15). Those statements are not admissible in these proceedings.  *See Warger v. Shauers*, 574 U.S. 40, 44 (2014).  But the Court should not be misled by the defendant's selective presentation of Juror 50's statements, because a review of the full interviews reveals the impartiality with which he approached this case and the care that the jury took when deliberating.  For example, Juror 50 told *The Independent* that the jury "didn't see enough direct evidence to convict on count two" because "there just wasn't any direct evidence for any specific trip that Maxwell took any action to entice Jane to get on those flights." (Gov't Ex. A at 5).  During that same interview, Juror 50 explained that he voted to convict the defendant on the remaining counts because "he believed all of the victims who testified" because "the accusers corroborated each other and were backed up by other evidence." (*Id.* at 2).  He further explained that he rejected Professor Loftus's testimony because "she had never conducted a study on whether [the tactics she studied] would work with memories of sexual abuse." (*Id.* at 4).

# ARGUMENT

## I.     The Defendant's Motion for a New Trial Should Be Denied on the Current Record

### A.     Applicable Law

Federal Rule of Criminal Procedure 33(a) provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." "The defendant bears the burden of proving that he is entitled to a new trial under Rule 33, and before ordering a new trial pursuant to Rule 33, a district court must find that there is 'a real concern that an innocent person may have been convicted.'" *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009) (quoting *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001)). "It is well settled that motions for new trials are not favored and should be granted only with great caution." *United States v. Costello*, 255 F.2d 876, 879 (2d Cir. 1958). "[Rule 33] motions are granted only in 'extraordinary circumstances,' and are committed to the trial court's discretion." *McCourty*, 562 F.3d at 475 (citing *United States v. Torres*, 128 F.3d 38, 48 (2d Cir. 1997)) (alterations in

---

Similarly, Juror 50 told *The Daily Mail* that the jury "did our due diligence" before reaching a verdict, and that the defendant's decision not to testify "was simply set to one side and not discussed during deliberations." (Gov't Ex. B at 5). Juror 50 also indicated that he "[a]bsolutely" felt "sympathy" for the defendant, and that the jury took their job "very seriously because we took it as, this could be our sister, our sister could be on trial here," and therefore "[w]e really have to comb through the evidence and make sure we have enough proof to say that she's either guilty or not." (*Id.* at 5). When describing deliberations, Juror 50 indicated that the jury began its deliberations "by reading the instructions page by page" and then "worked methodically through each count starting with count 2," which was the only charge on which the jury did not convict. (*Id.* at 8-9). Juror 50 further explained how the jury "wrote out lists of evidence on a white board and attached post-it notes as they built the case for each as they saw it and deliberated towards consensus." (*Id.* at 9). He also "said he never felt pressure from either the judge or the rest of the jurors to reach a verdict," and that "[t]he prosecution proved their case beyond a reasonable doubt." (*Id.* at 9, 12).

To be clear, the Government does not believe that the foregoing statements are admissible in this proceeding; they are described here in response to the defendant's selective presentation of Juror 50's description of deliberations.

original).  "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice."  *Ferguson*, 246 F.3d at 134.

Courts strongly disfavor post-verdict inquiries into juror conduct.  As the Supreme Court explained: "Allegations of juror misconduct, incompetency, or inattentiveness, raised for the first time . . . after the verdict, seriously disrupt the finality of the process.  Moreover, full and frank discussion in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of laypeople would all be undermined by a barrage of post-verdict scrutiny of juror conduct."  *Tanner v. United States*, 483 U.S. 107, 120-21 (1987) (citations omitted).  The Second Circuit has cautioned that "post-verdict inquiries may lead to evil consequences: subjecting juries to harassment, inhibiting juryroom deliberation, burdening courts with meritless applications, increasing temptation for jury tampering and creating uncertainty in jury verdicts."  *Ianniello*, 866 F.2d at 543.

A defendant seeking Rule 33 relief based on alleged juror misrepresentations during voir dire must satisfy a two-part test: "a party must first demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause."  *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 (1984).   The Second Circuit has held that these two requirements are conjunctive: "in order to obtain a new trial, a defendant must show *both* that a juror gave a dishonest answer, *and* that the correct answer would have provided a basis for the defendant to challenge the juror for cause."  *Shaoul*, 41 F.3d at 816 (emphasis in original).  The first prong requires a deliberate misconduct, not an honest mistake.  *See id.*; *see also* Part II.B.1.a, *infra*.  The second prong requires the Court to determine whether, if the juror had answered truthfully, it would have granted a hypothetical strike for cause.  *See United States v. Stewart*, 433 F.3d 273, 304 (2d

Cir. 2006); *see also* Part II.B.2.a, *infra*.  The *McDonough* test is "an exacting hurdle" because "motions to set aside a jury verdict are disfavored."  *United States v. Ventura*, No. 09 Cr. 1015 (JGK), 2014 WL 259655, at *3 (S.D.N.Y. Jan. 21, 2014).  Indeed, the Second Circuit "has only on rare occasions overturned a verdict or remanded for an evidentiary hearing" based on the failure of a juror to disclose information during jury selection.  *United States v. Teman*, 465 F. Supp. 3d 277, 330 (S.D.N.Y. 2020); *see also United States v. Sattar*, 395 F. Supp. 2d 66, 72 (S.D.N.Y. 2005) (describing the "difficulty" of meeting both prongs of the test).[6]

During any inquiry into the validity of a verdict, "a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment.  The court may not receive a juror's affidavit or evidence of a juror's statement on these matters."  Fed. R. Evid. 606(b)(1).  Thus, with limited exceptions not relevant here,[7] statements or testimony from jurors about what happened or was said during deliberations may not be offered in support of a motion for a new trial based on alleged juror lies during voir dire.

---

[6] The Court should reject the defendant's invitation to apply New Jersey state law instead of the *McDonough* test.  (Def. Mem. at 46-48).  In New Jersey state court, a defendant may seek a new trial "where a juror's inaccurate answer to a question propounded in the jury *voir dire* precluded a litigant from exercising a peremptory challenge."  *State v. Scher*, 278 N.J. Super. 249, 263 (App. Div. 1994).  The Supreme Court rejected that standard in *McDonough*, as a New Jersey decision cited in the defendant's brief acknowledges.  *Id.* at 265 ("Our rule differs from its federal counterpart."); (Def. Mem. at 46-47 (citing *Scher*, 278 N.J. Super. at 263)).

[7] The only exceptions to this are inquiries as to whether "(A) extraneous prejudicial information was improperly brought to the jury's attention; (B) an outside influence was improperly brought to bear on any juror; or (C) a mistake was made in entering the verdict on the verdict form."  Fed. R. Evid. 606(b)(2).  "A juror's personal experience . . . does not constitute 'extraneous prejudicial information.'"  *Marquez v. City of Albuquerque*, 399 F.3d 1216, 1223 (10th Cir. 2005) (quoting 3 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 606.03(1)(b) (Joseph M. McLaughlin, ed., Matthew Bender 2d ed. 2004)); *see also U.S. ex rel. Owen v. McMann*, 435 F.2d 813, 818 n.5 (2d Cir. 1970) (distinguishing between "any matters not of record" and "specific extra-record facts relating to the defendant"—the latter of which are not permissible influences on jury deliberations if prejudicial).

*See Warger v. Shauers*, 574 U.S. 40, 44 (2014).  This rule promotes "the public interest in maintaining both the finality of verdicts and full and free discussion within the confines of the jury room." *United States v. Radonjich*, 1 F.3d 117, 120 (2d Cir. 1993).

**B.    Discussion**

Based on the current record, the defendant has failed to satisfy either prong of the *McDonough* test.  However, the Government consents to a limited hearing, as set forth in more detail in Part II, *infra*.

**1.   The Defendant Has Failed to Satisfy the First Prong of *McDonough***

**a.   The Defendant Must Prove a Deliberate Falsehood**

The defendant argues that, under the *McDonough* test, "[a]n intentionally false answer during *voir dire* is not a prerequisite to obtaining a new trial." (Def. Mem. at 23).  This argument is foreclosed by binding Second Circuit precedent, which requires "dishonesty," *i.e.*, a deliberate falsehood or deceit, rather than an honest mistake.  *Shaoul*, 41 F.3d at 815-16.  "In other words, the Court must assess whether [the juror] deliberately lied or consciously deceived the Court, as opposed to providing inaccurate responses as a result of a mistake, misunderstanding or embarrassment." *United States v. Nix*, 275 F. Supp. 3d 420, 437 (W.D.N.Y. 2017) (citing *Shaoul*, 41 F.3d at 815), *aff'd sub nom. United States v. McCoy*, 995 F.3d 32 (2d Cir. 2021).  That rule exists for good reason: "To invalidate the result of a three-week trial because of a juror's mistaken, though honest response to a question, is to insist on something closer to perfection than our judicial system can be expected to give." *McDonough*, 464 U.S. at 555.

In *Shaoul*, the Second Circuit considered *McDonough* and, specifically, its holding "'that to obtain a new trial in . . . a situation [where a juror makes a mistaken response to a question], a party must first demonstrate that a juror failed to answer honestly a material question on *voir dire*,

and then further show that a correct response would have provided a valid basis for a challenge for cause.'" *Id.* at 815 (quoting *McDonough*, 464 U.S. at 556). The Second Circuit held: "Clearly, this is a two-part test." *Id.* Specifically, "in order to obtain a new trial, a defendant must show *both* that a juror gave a dishonest answer, *and* that the correct answer would have provided a basis for the defendant to challenge the juror for cause." *Id.* at 816 (emphasis in original). Because the defendant in *Shaoul*, as in *McDonough*, had failed to satisfy the "threshold requirement" of dishonesty, the Circuit affirmed the district court's denial of his motion for a new trial. *Id.*

In so doing, the Second Circuit specifically rejected the argument that "a new trial is mandated when the correct disclosure would have sustained a challenge for cause, regardless of the juror's honesty in failing to answer the question correctly." *Id.* at 815 (quotation omitted). As the Circuit explained, that argument relied on a "contorted" and "incorrect" reading of its prior decision in *United States v. Langford*, 990 F.2d 65 (2d Cir. 1993). *Shaoul*, 41 F.3d at 815. Here, the defendant's argument relies in significant part on the very same reading of *Langford* that was explicitly rejected in *Shaoul*. *Compare Shaoul*, 41 F.3d at 815, *with* Def. Mem. at 24, 27.

The defendant's reliance on two concurring opinions in *McDonough* fares no better. Justice Rehnquist's opinion for the Court in *McDonough* was joined by six other justices.[8] That opinion, and not the concurrences, therefore sets forth the Court's holding. *Cf. Marks v. United States*, 430 U.S. 188, 193 (1977) (determining court's holding by reference to concurring opinions only "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices"). And to the extent those concurrences may be considered in construing the holding of *McDonough*, they were clearly available to the Second Circuit when it did so in

---

[8] While the vote count is not always clearly listed on Westlaw or other legal research sites, the official version in the U.S. Reports indicates as much. *See* https://tile.loc.gov/storage-services/service/ll/usrep/usrep464/usrep464548/usrep464548.pdf.

*Shaoul*.  Thus, in the Second Circuit,[9] it is a "threshold requirement" to establish that a juror intentionally lied or consciously deceived the court.  *See Shaoul*, 41 F.3d at 815; *Nix*, 275 F. Supp. 3d at 437; *Sattar*, 395 F. Supp. 2d at 72 ("The failure to answer honestly must be deliberate; a 'juror's good faith failure to respond, though mistaken, [does] not satisfy even the first prong of the test.'" (quoting *Shaoul*, 41 F.3d at 815)); *United States v. Ruggiero*, No. 97 Civ. 2925 (HB), 2001 WL 286751, at *3 (S.D.N.Y. Mar. 22, 2001) (rejecting claim of juror misconduct in *voir dire*, concluding "it is not clear that [the juror's] failure to respond to the Court's question was a deliberate attempt at dishonesty, as she only failed to answer the court's question."); *Perez v. Manhattan Jeep Eagle*, No. 92 Civ. 9521 (DLC), 1997 WL 403458, at *5 (S.D.N.Y. July 17, 1997) ("[T]he first prong of the test requires a determination of whether juror number one deliberately lied to the Court during *voir dire*, or whether his answer was the result of a good faith misunderstanding of the question.").

In sum, to satisfy the first prong of the governing test, the defendant must establish dishonesty by Juror 50—a deliberate falsehood or deceit, rather than an honest mistake.

### b.  The Current Record Does Not Support a Finding of Deliberate Falsehood

On the current record, there is no basis for the Court to find that Juror 50 gave any deliberately false answer during voir dire.  To be sure, if his public statements regarding being a victim of sexual abuse were truthful,[10] it would appear that Juror 50 answered Question 48

---

[9] While some circuits have reached a different result, the Second Circuit's view appears to be the prevailing one.  *See, e.g.*, *Fitzgerald v. Greene*, 150 F.3d 357, 364 n.3 (4th Cir. 1998) (collecting cases).

[10] It is of course possible that Juror 50's unsworn public statements were not truthful, while his sworn answers on the questionnaire were.  This is a threshold fact that must be determined at a hearing.  But for purposes of discussion in this brief, the Government assumes that Juror 50's public statements on this subject were truthful.

inaccurately.  But, as noted, that is not the end of the inquiry.  And based on the currently available information, there is substantial reason to believe that any inaccuracy was an honest mistake, not a deliberate falsehood.

Juror 50's only statements on the subject to date undermine the defendant's claim that he lied.  Juror 50 has publicly stated that he "flew through" the questionnaire and did not recall being asked about his own history of sexual abuse.  (Gov't Ex. C at 3).  He repeatedly stated that he believed he had answered all the questions honestly.  (Gov't Ex. A at 4; Gov't Ex. B at 8; Gov't Ex. C at 3).  Indeed, when asked by an interviewer about whether he had disclosed his history of sexual abuse on the questionnaire, he confidently replied: "No, they don't ask your sexual abuse history."  (Def. Ex. 3 at :21).  When the interviewer said that Question 48 asks about sexual abuse history, Juror 50 responded, in a puzzled tone, "I don't remember."  (*Id.* at :35).  He continued, "I would have definitely marked 'yes' but I honestly don't remember that question."  (*Id.* at :54).  The defendant makes much of the fact that Juror 50 apparently began blushing, but that reaction is perfectly consistent with someone realizing they had just made a serious though honest mistake.

Indeed, Juror 50 remembered a question about a family member or relative being sexually abused.  (*Id.* at 1:09).  And Question 48 asks: "Have you *or a friend or family member* ever been the victim of sexual harassment, sexual abuse, or sexual assault?"  This question was nearly the last in a lengthy questionnaire composed of 51 questions, many with multiple sub-questions.  Thus, a juror who was indeed flying through the questionnaire may have, by the 48th question (not including sub-questions), failed to notice that this question also asked about personal experiences.  Though careful lawyers may have difficulty crediting that explanation, jurors can and do make mistakes.  *See, e.g.*, *McDonough*, 464 U.S. at 555 ("[J]urors are not necessarily experts in English usage. Called as they are from all walks of life, many may be uncertain as to the meaning of terms

which are relatively easily understood by lawyers and judges."); *Dyer v. Calderon*, 151 F.3d 970, 973 (9th Cir. 1998) ("[W]e must be tolerant, as jurors may forget incidents long buried in their minds, misunderstand a question or bend the truth a bit to avoid embarrassment."); *United States v. Fell*, No. 01 Cr. 12, 2014 WL 3697810, at *13 (D. Vt. July 24, 2014) ("[T]he written juror questionnaires must be viewed in context. The long questionnaire in particular consisted of 75 questions not including sub-parts.").[11]  And, in any event, the credibility of Juror 50's explanation as to why, if he was indeed a victim of sexual abuse, he answered this question in the negative is properly resolved not based on a review of unsworn public statements, but at a hearing at which the Court can question him on this subject and assess his credibility.

Furthermore, the defendant's suggestion that Juror 50 deliberately lied in order to serve on the jury is undermined by several aspects of Juror 50's conduct.  For example, when answering the questions about exposure to pretrial publicity, Juror 50 disclosed that he had read about the defendant and her connection to Epstein.  If a juror was willing to lie about sexual abuse to ensure that he was seated on the jury, he would, presumably, have lied about other potentially disqualifying facts, too.  Similarly, if Juror 50 deliberately lied under penalty of perjury in order to serve on the jury, it would make little sense for him to immediately publicize that fact, thus exposing himself to criminal liability.  *See Perez*, 1997 WL 403458, at *6 ("I find it improbable that a juror who lied on voir dire in order to be empaneled on a jury in an age discrimination case to avenge himself against a discriminatory employer who was not a party to the lawsuit would reveal this motivation after rendering a verdict. If this had been the juror's intent, there was no reason why he would expose himself to defense counsel immediately following the verdict.").

---

[11] Indeed, Juror 50's counsel, in his motion to intervene, discussed *infra* at Part III, wrote that Juror 50 "does not recall answering questions [in the questionnaire] regarding his prior experience with sexual assault."  (Juror 50 Mem. at 5).

The defendant also fails to establish that Juror 50 falsely answered Question 25, when he gave a negative response to the question whether he or relatives or close friends have been the victim of a crime.  Juror 50 has not publicly disclosed the particulars of any sexual abuse that he suffered, and thus it is not apparent whether it was in fact a crime.  Nor is it apparent that, if the abuse was criminal, Juror 50 deliberately lied when he answered Question 25 in the negative, as lay persons often may not think of themselves as victims of a crime even where lawyers and judges would.  *See, e.g.*, *Fell*, 2014 WL 3697810, at *6-7, *13 (crediting juror's explanation that she did not disclose past sexual abuse in response to question about whether she had been a victim of a crime because she did not consider the abuse, for which the abuser was never prosecuted, a crime); *see also McDonough*, 464 U.S. at 555.

Finally, the available information does not support the defendant's claim that Juror 50 lied during voir dire when he (1) stated that he used Facebook and Instagram, without mentioning that he had a Twitter account, and (2) stated that he had deleted his social media accounts prior to trial.  (*See* Nov. 16, 2021 Tr. at 133).  First, the screenshot of Juror 50's Twitter account provided by the defense states that he joined Twitter in April 2021, had only *one* follower, and only followed 39 people.  (Def. Mem. at 18).  That hardly bespeaks an active Twitter user, so it was not even inaccurate, much less deliberately false, for Juror 50 not to mention Twitter when asked "What did you *use*, Facebook, Twitter?"  (Nov. 16, 2021 Tr. at 133 (emphasis added)).  Second, in support of the argument that Juror 50 lied about deleting his Facebook and Instagram accounts, the defendant cites only *post-trial* activity on his Instagram account, but as the defendant must acknowledge (Def. Mem. at 20), a deleted account can be reactivated with a few clicks.  Indeed,

one can delete the Instagram app from one's phone without deleting the account at all.[12]  And the defendant's screenshots show that Juror 50 was not hiding anything: His Instagram use did appear, as he stated, to consist of "[p]ersonal stuff, like selfies."  (Nov. 16, 2021 Tr. at 133; *see* Def. Mem. at 20).  There is no basis for concluding that Juror 50 deliberately lied during voir dire about his social media activity.

In sum, the defendant's argument that the Court should grant her motion based purely on unsworn public statements by Juror 50 is unpersuasive.  That said, given the apparent inconsistency between Juror 50's public statements that he was a victim of sexual abuse and his answer to Question 48 on the questionnaire, the Government believes that a limited evidentiary hearing on that subject is warranted to determine whether he answered Question 48 falsely and, if so, whether that answer was deliberate or inadvertent.  The Government addresses the proper scope of that hearing in Part II, *infra*.

### 2.   The Defendant Has Failed to Satisfy the Second Prong of *McDonough*

#### a.   The Second Prong of *McDonough* Requires the Court to Determine Whether It Would Have Granted a Hypothetical Challenge

The defendant's brief states: "The second question is whether truthful responses from Juror No. 50 would have provided a valid basis for a challenge for cause."  (Def. Mem. at 29 (citing *Stewart*, 433 F.3d at 303)).  This omits an important aspect of the relevant standard, which provides that in order to make that decision, "the district court must 'determine if it would have granted the hypothetical challenge.'"  *Stewart*, 433 F.3d at 304 (quoting *United States v. Greer*, 285 F.3d 158, 171 (2d Cir. 2002)).  Critically, that determination is reviewed for abuse of discretion, and "'[t]here

---

[12]  *See,  e.g.*,  https://www.guidingtech.com/what-happens-when-you-uninstall-instagram-from-phone/.

are few aspects of a jury trial where [the Second Circuit] would be less inclined to disturb a trial judge's exercise of discretion, absent clear abuse, then in ruling on challenges for cause in the empanelling of a jury.'" *Id.* (quoting *Greer*, 285 F.3d at 172).  This is because the district court "observes the jury on a day to day basis" and therefore "is in the best position to sense the atmosphere of the courtroom."  *Greer*, 285 F.3d at 171 (quotations and citations omitted) .

How, then, would the Court have ruled on a hypothetical for cause challenge if Juror 50 had disclosed that he was a survivor of sexual abuse?  The Court's decisions with respect to similarly situated jurors provide clear evidence.  Of the 58 jurors who were ultimately qualified, eight jurors disclosed that they themselves had been a victim of sexual harassment, sexual abuse, or sexual assault.  With respect to each, the Court asked a few follow-up questions (and sometimes only one question), focusing on the ultimate issue of whether the juror could be fair and impartial notwithstanding the juror's experience.  (*See* Nov. 16, 2021 Tr. at 18-19, 52-57, 200, 207-08, 259, 293, 532, 635).  In each case, the juror affirmed that he or she could be fair, and not only did the Court not strike the juror for cause, neither party even moved to do so on these grounds.  For good reason: People who have experienced sexual harassment, sexual abuse, or sexual assault can be fair and impartial jurors.

Thus, if Juror 50 had disclosed a history of sexual abuse, the Court would not have immediately granted a challenge for cause, as the defendant's brief suggests.  Instead, the Court properly would have asked follow-up questions designed to determine whether Juror 50 could be fair and impartial notwithstanding that experience and could decide the case based on the evidence and the law.  Here, because Juror 50 did not disclose any history of sexual abuse, the Court did not have occasion to ask such follow-up questions.  Accordingly, the Government believes that a limited hearing is warranted to ask Juror 50 such questions.  If Juror 50 credibly states that he

20

would have truthfully affirmed that he could be fair and impartial, then the record is clear that the Court would not have struck him for cause, and the defendant's motion should be denied.

### b.  The Defendant's Arguments Regarding Bias Are Unpersuasive

A party may challenge a juror for cause based only on "narrowly specified, provable and legally cognizable bases." *United States v. Torres*, 128 F.3d 38, 43 (2d Cir. 1997) (quotation and citation omitted).  In the context of voir dire, challenges for cause generally fall into one of three "limited" categories: actual bias, implied bias, or inferable bias. *Id.*  However, in the different context presented here—a post-trial allegation of juror bias, in a retrospective determination of a hypothetical challenge for cause—the Second Circuit has stated that it is an open question whether the second and third of these categories are applicable. *See Greer*, 285 F.3d at 172.  That is, "the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove *actual* bias," *Smith v. Phillips*, 455 U.S. 209, 215 (1982) (emphasis added), and, as such, it is unclear that bias may be implied or inferred, *see Greer*, 285 F.3d at 172.  The Government submits that actual bias is the only relevant inquiry in this context, *see Smith*, 455 U.S. at 215, but nevertheless addresses each category in turn.

### i.  Actual Bias

"Actual bias is 'bias in fact'—the existence of a state of mind that leads to an inference that the person will not act with entire impartiality." *Torres*, 128 F.3d at 43 (quoting *United States v. Wood*, 299 U.S. 123, 133 (1936)).  "[A] finding of actual bias is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province." *Id.* at 44 (quotation and citation omitted).  Actual bias "cannot be found unless a prospective juror is adequately questioned on voir dire with respect to his or her ability to apply the law impartially." *Id.* at 44. The district court has "broad discretion" in such questioning and "[t]here is no particular script

that must be followed," but a standard question, approved by the Second Circuit, is: "If you are selected to sit on this case, will you be able to render a verdict solely on the evidence presented at the trial and in the context of the law as I will give it to you in my instructions, disregarding any other ideas, notions, or beliefs about the law that you may have encountered in reaching your verdict?" *Id.* at 43-44.

With respect to Juror 50, the defendant has presented no evidence to support a claim of actual bias. In a public interview, Juror 50 stated that he "went into the trial firmly believing that Maxwell was 'innocent until proven guilty' and viewing the victims with a skeptical eye" and that his own experience of sexual abuse "did not affect his ability to view Maxwell as innocent until proven guilty." (Gov't Ex. B at 2, 8). These statements are corroborated by the apparent care with which the jury approached its deliberations—asking for testimony and other evidence in numerous questions submitted over the course of multiple days of deliberations—and by its return of a split verdict, in which it acquitted the defendant on one count. *See United States v. Aiello*, 771 F.2d 621, 631 (2d Cir. 1985) (citing apparent care with which jury approached deliberations and split verdict as evidence of impartiality); *Greer*, 285 F.3d at 174 (citing split verdict as evidence of impartiality). And Juror 50's public statements are further corroborated by his answers during voir dire, during which he unequivocally stated that he would be able to follow the law as instructed by the Court, that he would decide the case based on the facts and evidence, or lack of evidence, presented in court, and that, other than what he had been asked, there was no reason to think he could not be fair and impartial. *See* Nov. 16, 2021 Tr. at 128, 130, 134.

While the defendant has not argued for a finding of actual bias (Def. Mem. at 38-39), she at times alludes to the argument. For example, the defendant makes much of the fact that Juror 50 called the defendant a "predator," said the verdict was for "all the victims," and commented on a

Twitter post by Annie Farmer.  (Def. Mem. at 13, 15-16).  But he did these things *after* trial, having heard all the evidence that proved that, as the Government argued, the defendant was in fact a predator and that the victims, including Farmer, were credible.  Juror 50's attitudes towards the defendant and the victims *after* he heard compelling evidence of the defendant's guilt and the victims' credible testimony says nothing about the relevant inquiry here: whether he was biased "*before* he heard the evidence presented."  *United States v. Stewart*, 317 F. Supp. 2d 432, 440 (S.D.N.Y. 2004), *aff'd*, 433 F.3d 273, 306 (2d Cir. 2006) (emphasis in original); *see also id.* at 439 n.4 (finding no bias where juror in Martha Stewart trial said the verdict was "a victory for the little guy who loses money in the markets" and that the defendant "thought she was above everything").

Similarly, the defendant gestures at an actual bias argument when she states that it is "clear," based on Juror 50's statements to the media,[13] that he was not fair and impartial "because his personal experiences 'prevent[ed] or substantially impair[ed] the performance of his duties as a juror.'"  (Def. Mem. at 44 (quoting *Wainwright v. Witt*, 469 U.S. 412, 424 (1985))).  There and elsewhere, the defendant's brief seems to suggest that jurors are required to check their lived experiences at the jury room door.  Not so:

> We cannot expunge from jury deliberations the subjective opinions of jurors, their additudinal expositions, or their philosophies. These involve the very human elements that constitute one of the strengths of our jury system, and we cannot and should not excommunicate them from jury deliberations.

*U.S. ex rel. Owen v. McMann*, 435 F.2d 813, 818 (2d Cir. 1970); *see also United States v. Bangiyev*, No. 07 Cr. 331 (NG) (RLM), 2008 WL 4240005, at *10 (E.D.N.Y. Sept. 12, 2008) (explaining

---

[13] As noted above, many if not all of the statements upon which the defendant relies describe deliberations and are thus inadmissible under Rule 606(b).  And even if they were not, Juror 50's public statements about deliberations in fact demonstrate that he (and the jury more generally) was impartial.  *See infra* n.5.

that "personal experiences" are "permissible influences on jury deliberations"); *Arreola v. Choudry*, 533 F.3d 601, 606 (7th Cir. 2008) (jurors "are entitled to evaluate the evidence presented at trial in light of their own experience"). Thus, so long as they do not introduce extra-record facts about the defendant, there is nothing improper about jurors bringing their personal experiences to bear during deliberations. *McMann*, 435 F.2d at 818 & n.5.

Here, if Juror 50 had disclosed a history of sexual abuse, there is every indication that the voir dire would have proceeded as it did with the numerous similarly situated jurors. The Court would have asked follow-up questions—substantially similar to the Second Circuit-approved question above—designed to determine whether he could be fair and impartial. If he had credibly disclaimed partiality, he would not have been struck from the jury.

### ii.   Implied Bias

Implied bias, also called "presumed bias," is "'bias conclusively presumed as a matter of law.'" *Torres*, 128 F.3d at 45 (quoting *Wood*, 299 U.S. at 133). That is, a finding of implied bias does not turn on the juror's answers to questions during voir dire, but rather whether an "average man" in a similar situation would be biased. *Id.* at 45-46. The Second Circuit has emphasized that this category is "narrow," and "reserved for 'exceptional situations.'" *Id.* at 46. Generally, it is limited to circumstances in which there is a relationship between the juror and the parties or the crime itself. *See id.* at 45 ("[A]utomatically presumed bias deals mainly with jurors who are related to the parties or who were victims of the alleged crime itself."); *Greer*, 285 F.3d at 172 ("[T]he District Court refused to find implied bias because it found the issues affecting juror Baker to be insufficiently 'drastic.' Juror Baker was, after all, neither related to a party nor a victim of the defendants' crimes.").

Keeping with that "narrow" view of implied bias, the Second Circuit has "consistently refused to create a set of unreasonably constricting presumptions that jurors be excused for cause due to certain occupational or other special relationships which might bear directly or indirectly on the circumstances of a given case, where . . . there is no showing of actual bias or prejudice." *Torres*, 128 F.3d at 46 (quotations and citations omitted).  For example, the Second Circuit has declined to follow a Ninth Circuit precedent stating that it was error not to excuse two bank tellers as jurors in a bank robbery case.  *United States v. Brown*, 644 F.2d 101, 104-05 (2d Cir. 1981) (declining to follow *United States v. Allsup*, 566 F.2d 68 (9th Cir. 1977)); *see also Mikus v. United States*, 433 F.2d 719, 724 (2d Cir. 1970) (similar).  And it has held that a juror's prior service at a trial involving similar but unrelated offenses which involved the testimony of a common witness does not give rise to implied bias.  *See United States v. Garcia*, 936 F.2d 648, 652 (2d Cir. 1991); *see also Curry v. Lynch*, 323 F. App'x 63, 65 (2d Cir. 2009) (rejecting argument that a juror had implied bias because he owned a printing business that did business with defense counsel).

Here, there is no suggestion that Juror 50 is related to a party in this case, or that he is a victim of or has any personal knowledge of the defendant's crimes.  Accordingly, the circumstances of this case do not fall within the narrow categories of implied bias that the Second Circuit has recognized.  This is not one of the rare, extreme circumstances where a mandatory presumption of bias may be applied.  *See, e.g.*, *Torres*, 128 F.3d at 45; *Greer*, 285 F.3d at 172.

The defendant principally argues that implied bias should be found based on alleged similarities between the personal experiences of Juror 50 and the issues being litigated.  (Def. Mem. at 30-35).  But the Second Circuit has not recognized this as a proper basis to make a finding of mandatory, presumed bias.  Indeed, it has specifically rejected such a notion:

> Just as we have refused to carve out an overly broad category of
> presumed bias based on occupational or status relationships, so we

> also decline to hold as a general matter that, where a juror has
> engaged in conduct similar to that of the defendant at trial, the trial
> judge *must* presume bias. Such cases are unlikely to present the
> "extreme situations" that call for mandatory removal.

*Torres*, 128 F.3d at 46; *see also id.* at 46 & n.11 (rejecting *Allsup* decision from Ninth Circuit that court must presume that jurors who had "particular . . . prior experiences were biased").  Thus, to the extent the cases cited by the defendant purport to require such a presumption of bias, they are inconsistent with binding Second Circuit precedent.  (*See, e.g.*, Def. Mem. at 31 (citing *United States v. Eubanks*, 591 F.2d 513, 517 (9th Cir. 1979), which relied on *Allsup*)).

The remaining cases cited by the defendant are inapposite.  Some merely state a general proposition that similarity of experiences may give rise to a presumption of bias, but then go on to resolve the case on other grounds.  *See, e.g.*, *Skaggs v. Otis Elevator Co.*, 164 F.3d 511, 517-18 (10th Cir. 1998); *United States v. Daugerdas*, 867 F. Supp. 2d 445, 472 (S.D.N.Y. 2012), *vacated by United States v. Parse*, 789 F.3d 83 (2d Cir. 2015).  Others find that a juror should have been struck not merely because of similarity of experiences, but also based on a number of other factors not present here.  For example, in one case prominently cited by the defendant, a juror in the penalty phase of a death penalty case told a "litany of lies," and the First Circuit declined to rest its decision on any particular category of bias, but instead cited the combination of the juror's interpersonal relationships, inability to separate emotion from duty, similarity of experiences, scope and severity of dishonesty, and motive for lying, any one of which "taken in isolation, may be insufficient to ground a finding of a valid basis for a challenge for cause." *Sampson v. United States*, 724 F.3d 150, 161, 166-68 (1st Cir. 2013); *see also Hunley v. Godinez*, 975 F.2d 316, 319-20 (7th Cir. 1992) (citing combination of factors in "extreme" case where two jurors were burglarized during deliberations and then changed their votes as a result, and stating that "our holding is limited to the very unique facts stated herein" and "[i]t is unlikely these rare

circumstances will ever recur"). And the New Hampshire state decision prominently cited by the defendant does not hold that a mandatory presumption of bias applies based on similarity of experiences, but merely finds that the trial court acted within its discretion when it found, after a post-verdict hearing, that the juror's demeanor, actions, and communications before, during, and after trial demonstrated bias. *See State v. Ashfar*, 196 A.3d 93, 94 (N.H. 2018); *see also id.* at 98 (noting that "when called for jury service in another sexual assault case involving an alleged victim who was a minor, Juror 6 acknowledged that he could not sit on that jury due to his feelings about his daughter; and . . . there appears to be little in the way of logical explanation for how he could have differentiated between the two cases.").

Moreover, this Court's handling of similarly situated jurors in this case is again relevant to the hypothetical inquiry at issue. *See, e.g.*, *Torres*, 128 F.3d at 45 (implied bias finding based on "average man" test). If it were correct that a juror's experience with sexual abuse required a mandatory presumption of bias in a sexual abuse case, the defense would have sought to strike, and the Court would have struck, the numerous other jurors who reported a history of sexual abuse (or at the very least would have pursued detailed follow-up questioning to establish the particulars of the abuse and the extent of any similarities to the charged conduct). But that is not what happened here: Where jurors indicated a history of sexual abuse or harassment, the Court conducted a targeted follow-up inquiry, focused on whether they can be fair and impartial. And rightly so: It is not the law in this Circuit that a victim of sexual abuse is presumed to be biased. On that score, it bears emphasizing how prevalent sexual abuse is, and how common federal trials involving sex trafficking and child enticement are. If it were the law that survivors of sexual abuse—who make up a significant percentage of the prospective jury pool in any trial—could not

serve as jurors in such cases, the defendant would have cited case law that actually supports that proposition.

Finally, the defendant also argues that bias should be implied because she alleges that Juror 50 has repeatedly lied.  (Def. Mem. at 35-36 (citing *Daugerdas*, 867 F. Supp. 2d at 472)).  As discussed in greater detail above, the record does not support this, and, as a result, this is a far cry from the extreme circumstances in *Daugerdas*, where Judge Pauley concluded after a hearing that the juror "created a totally fictitious persona in her drive to get on the jury" and was "a pathological liar who does not know the difference between truth and lie."  *Id.* at 473, 475.

The record also does not support the defendant's attempt to compare Juror 50 to Juror 55, who was dismissed for cause ████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████  As noted above, there is no evidence that Juror 50 lied about his social media accounts.  Moreover, the defendant's analogy misunderstands the nature of the current inquiry, in which the Court must consider the hypothetical question whether, if the juror had truthfully answered the relevant question, the Court would have struck him for cause.  *See Stewart*, 433 F.3d at 304. ████████████████████████████████████████████  But here, in a post-verdict posture, if the Court were to find that Juror 50 intentionally lied about using social media accounts, the question would be whether the Court would have struck him if he had *truthfully* answered that question.  There is nothing in the record about Juror 50's use of social media accounts that would have supported a challenge for cause at voir dire.

In sum, the defendant has failed to establish implied bias.

### iii.  Inferred Bias

While the category of cases in which bias *must* be implied or presumed is limited to "exceptional" or "extreme situations," the district court retains discretion to dismiss a juror for cause when "a juror discloses a fact that bespeaks a risk of partiality sufficiently significant to warrant granting the trial judge discretion to excuse the juror for cause, but not so great as to make mandatory a presumption of bias." *Torres*, 128 F.3d at 46-47.  This doctrine of "inferred bias" is "closely linked" to the "traditional categories" of actual and implied bias, and a finding of inferred bias is permitted "only after having received responses from the juror that permit an inference that the juror in question would not be able to decide the matter objectively." *Id.* at 47.  "[A] finding of inferred bias is, by definition, within the discretion of the trial court." *Greer*, 285 F.3d at 172. And, as with actual bias, "a district court's evaluation of the juror's impartiality is accorded deference." *Id.*; *see also id.* ("There are few aspects of a jury trial where we would be less inclined to disturb a trial judge's exercise of discretion, absent clear abuse, than in ruling on challenges for cause in the empanelling of a jury." (quoting *United States v. Ploof*, 464 F.2d 116, 118-19 n.4 (2d Cir. 1972))).

Here, the record refutes any suggestion that, had Juror 50 disclosed a history of sexual abuse, the Court would have struck him based on a finding of inferred bias.  As set forth above, the record is clear that the Court would have in fact conducted targeted follow-up questioning and, absent some indication in such questioning that would have permitted an inference of bias, the Court would not have struck him.  *See Torres*, 128 F.3d at 47 (finding of inferable bias "must be grounded in facts developed at voir dire").

*Torres*, upon which the defendant exclusively relies, is not to the contrary.  In that case, the district court struck a juror for cause where she had engaged in the structuring of cash deposits,

conduct which was similar to the charged offenses such that the juror may have felt that she was "confronting the legality of [her] own past acts as well." *Torres*, 128 F.3d at 48. While the Second Circuit held that the district court did not abuse its discretion in inferring bias under the circumstances presented there, it also made clear that the district would *not* have erred in declining to infer bias. *Id.* *Torres* thus underscores the ample discretion which district judges have in striking jurors for cause—discretion which this Court has properly exercised *not* to infer bias where jurors have disclosed being victims of sexual abuse or harassment.

The defendant has failed to establish inferred bias.

## II.     The Court Should Schedule a Limited Hearing Regarding Juror 50

### A.     Applicable Law

A post-verdict hearing into alleged juror misconduct is proper only where there is "clear, strong, substantial and incontrovertible evidence . . . that a specific, non-speculative impropriety has occurred." *United States v. Stewart*, 590 F.3d 93, 133 (2d Cir. 2009) (quoting *Ianniello*, 866 F.2d at 543). This standard can only be met by "concrete allegations of inappropriate conduct that constitute competent and relevant evidence," though such allegations "need not be irrebuttable because if the allegations were conclusive, there would be no need for a hearing." *United States v. Baker*, 899 F.3d 123, 130 (2d Cir. 2018) (quoting *Ianniello*, 866 F.2d at 543).

In the rare instances where an inquiry into potential juror misconduct is warranted, the scope of the hearing must be narrowly tailored. The Second Circuit has emphasized that the inquiry "should be limited to only what is absolutely necessary to determine the facts with precision." *Ianniello*, 866 F.2d at 544. "A hearing is not held to afford a convicted defendant the opportunity to 'conduct a fishing expedition.'" *United States v. Sun Myung Moon*, 718 F.2d 1210, 1234 (2d Cir. 1983) (quoting *United States v. Moten*, 582 F.2d 654, 667 (2d Cir. 1978)). Instead,

"[t]he object of the proceeding is to permit the truth to be discovered with the least possible harm to other interests." *United States v. Gagnon*, 282 F. App'x 39, 40 (2d Cir. 2008) (quoting *Moten*, 582 F.2d at 666); *see also Miller v. United States*, 403 F.2d 77, 82 (2d Cir. 1969) (court should avoid "dangers presented by inquiries that go beyond objective facts: inhibition of jury-room deliberations, harassment of jurors, and increased incidence of jury tampering.").  Indeed, "the proper functioning of the jury system requires that the courts protect jurors from being harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict."  *Moten*, 582 F.2d at 664 (quotation omitted).  Thus, "when and if it becomes apparent that the . . . reasonable grounds to suspect prejudicial jury impropriety do not exist, the inquiry should end."  *Sun Myung Moon*, 718 F.2d at 1234.

The district court "has the power and the duty to supervise and closely control such inquiries."  *United States v. Calbas*, 821 F.2d 887, 896 (2d Cir. 1987).  For example, the Court may choose to personally conduct the questioning of a juror in order to avoid intruding on the jury's deliberations.  *See, e.g.*, *Calbas,* 821 F.2d at 896.  A district court may also determine to hold the hearing in camera.  *See Ianniello*, 866 F.2d at 544; *see also United States v. Shakur*, 723 F. Supp. 925, 928 (S.D.N.Y. 1988), *aff'd* 888 F.2d 234 (2d Cir. 1989).

**B.    Discussion**

For the reasons set forth above, the Government believes that the exacting standard for a post-verdict hearing has been met only with respect to Juror 50 and the apparent inconsistency between his several public statements (including one on video) about being a victim of sexual abuse and his answer to Question 48 on the juror questionnaire.  Thus, the Government consents to a hearing in order to determine (1) whether Juror 50 deliberately lied in response to Question

48, and, if so, (2) whether the Court would have struck Juror 50 for cause if he had accurately responded to that question, *i.e.*, whether he was actually biased.

For the reasons set forth below, the Government submits that: (1) the Court should conduct the questioning; (2) the questions for Juror 50 should be narrowly tailored; (3) there is no basis to call any other jurors as witnesses; and (4) the defendant's request for "pre-hearing discovery" should be denied.

### 1.    The Court Should Conduct the Questioning

First, as noted, given the dangers of harassment and embarrassment presented by juror inquiries, the Court has the power and duty to closely control the proceedings.  The Court can—and courts in this District frequently do—choose to personally question the jurors, often giving the parties an opportunity to propose to the Court questions for the Court to ask.  *See, e.g.*, *Calbas*, 821 F.2d at 896 (district court conducted examination of juror, and Second Circuit concluded that the district court "wisely refrained from allowing the inquiry to become an adversarial evidentiary hearing, so as to minimize intrusion on the jury's deliberations"); *Loliscio v. Goord*, 263 F.3d 178, 191 (2d Cir. 2001) ("[T]he scope of such a post-verdict inquiry, and the extent, if any, to which the parties may participate therein are matters left to the sound discretion of the trial court."); *Chase Manhattan Bank, N.A. v. T&N*, No. 87 Civ. 4436 (JGK), 1997 WL 221203, at *8 (S.D.N.Y. Apr. 28, 1997) ("The Court examined Juror No. 5 under oath in the presence of counsel for both parties, after both parties were given the opportunity to submit proposed questions.  To protect the juror from harassment or embarrassment, the Court personally conducted the questioning of the juror."); *United States v. Shakur*, 723 F. Supp. 925, 928 (S.D.N.Y. 1988) (district court examined juror in camera, after permitting counsel to file suggested questions), *aff'd* 888 F.2d 234 (2d Cir. 1989); *United States v. Greer*, 998 F. Supp. 399, 404 (D. Vt. 1998) ("All of the jurors were

interviewed by the Court; the parties were permitted to propose questions before and during the hearing."), *aff'd*, 285 F.3d 158 (2d Cir. 2002).

That course of action is especially appropriate here for several reasons. First, the subject matter—the juror's history of sexual abuse—presents a particularly high danger of harassment or embarrassment. Second, as noted above, the defendant's brief is littered with information barred by Rule 606(b), suggesting a real danger she will seek to question Juror 50 about improper and inadmissible subjects. The Court should exercise its discretion to supervise the hearing by conducting the questioning itself.

### 2.     The Scope of the Hearing Should Be Limited

The scope of the hearing should be tightly limited to "only what is absolutely necessary to determine the facts with precision." *Ianniello*, 866 F.2d at 544; *see also Sun Myung Moon*, 718 F.2d at 1234; *Gagnon*, 282 F. App'x at 40.[14] Here, the only issues relevant under *McDonough* are whether Juror 50 intentionally lied in response to Question 48, and whether Juror 50 was actually biased against the defendant. No other subjects are appropriate for inquiry.[15]

---

[14] In particular, Juror 50 cannot be asked to testify about what was said by any juror (including him) in the jury room, or what his mental process was as a deliberating juror. He also cannot be asked whether he or any other juror discussed personal experiences with sexual abuse during deliberations. Fed. R. Evid. 606(b); *Warger*, 574 U.S. at 43-44 ("We hold that Rule 606(b) applies to juror testimony during a proceeding in which a party seeks to secure a new trial on the ground that a juror lied during *voir dire*.").

[15] For the reasons discussed above, the defendant has not met her burden with respect to Juror 50's voir dire statements about his social media use and accordingly a hearing regarding such statements is not warranted. Similarly, as discussed above, the defendant has also not met her burden with respect to whether Juror 50 answered Question 25 incorrectly, namely, whether Juror 50 considers himself to be a victim of a crime. However, in the event that Juror 50's testimony at the hearing regarding Question 48 makes clear that Juror 50 answered Question 25 incorrectly as well, the Government would consent to the Court questioning Juror 50 regarding that question. However, that questioning should be limited in the same manner as discussed throughout with respect to Question 48.

This inquiry should be tightly focused.  As a threshold matter, the Court should inquire whether Juror 50's public statements are true—*i.e.*, whether he was in fact a victim of sexual abuse.[16]  If the answer is yes, then the Court should determine why Juror 50 nevertheless answered "no" to Question 48.  Finally, the Court should ask such questions as to permit it to make the hypothetical determination posed by *McDonough*'s second prong: If Juror 50 had accurately answered Question 48, would the Court have struck him for cause?

On this last subject, the defendant claims that had Juror 50 answered Question 48 in the affirmative, the Court and the parties would have "probed" him about various topics, which the defendant suggests are necessary topics of examination.  (Def. Mem. at 44).  The record refutes that assertion, and inquiry along the lines proposed by the defendant is not necessary.

The defendant argues that the Court would have inquired whether Juror 50 was able to assess the credibility of a witness claiming sexual assault or abuse just like he would any other witness.  (*Id.*).  As an initial matter, Juror 50 already stated in the juror questionnaire that he could assess the credibility of a witness claiming sexual assault or abuse just like he would any other witness. (Def. Ex. 1, Question 47).  Moreover, the Court did not ask jurors who answered Question 48 in the affirmative any follow up questions about Question 47.  Accordingly, there is no need to inquire about this subject any further at a hearing, beyond perhaps reaffirming that Juror 50's answer to Question 47 was correct.

---

[16] The Court need not inquire about the details of the victim's sexual abuse, just as the Court did not probe such details with respect to other jurors who answered Question 48 affirmatively.  (*See* Nov. 16, 2021 Tr. at 18-19, 52-57, 200, 207-08, 259, 293, 532, 635).  In the event the Court believes that details need to be elicited, beyond those few details Juror 50 has provided publicly, such inquiry should be conducted at sidebar or in camera.  *See Ianniello*, 866 F.2d at 544; *Shakur*, 723 F. Supp. at 928.

The defendant also argues that the Court and the parties would have "probed" Juror 50 about whether he was able to "set aside his own traumatic experience" when evaluating whether the Government met its burden of proof.  (Def. Mem. at 44).  Juror 50 confirmed both in writing and during oral voir dire that he could "[a]bsolutely" "decide the case based on the facts and evidence, or lack of evidence, [] presented in court."  Nov. 16, 2021 Tr. at 130:12-16; *see id.* at 131:1-7 (stating that he had "[n]o doubt" that he "could decide the case based on the facts and evidence, or lack of evidence, here presented in court"); *see also* Def. Ex. 1, Questions 13 & 41. There is no need for any further inquiry on this subject, beyond perhaps reaffirming that Juror 50 was truthful when he stated that he could decide the case based on the facts and evidence presented in court.

Finally, the defendant claims that the Court and the parties would have specifically inquired as to whether Juror 50 was able to fairly evaluate Dr. Loftus's testimony and impartially assess the defendant's "defense that her accusers' memories were unreliable and tainted by money and manipulation."  (Def. Mem. at 44).  This claim is belied by the voir dire record.  The Court did not ask jurors who answered Question 48 in the affirmative such follow up questions, and rightly so. The purpose of voir dire is not to educate prospective jurors on the defense theories of the case or to determine if prospective jurors agree with such theories or would credit specific, as-yet-uncalled witnesses.  Instead, the purpose of voir dire is to "screen individuals who are unable to sit in a fair and impartial manner."  *United States v. Pirk*, 15 Cr. 142 (EAW), 2018 WL 1027441, at *4 (W.D.N.Y. Feb. 21, 2018); *see also United States v. Barnes*, 604 F.2d 121, 138 (2d Cir. 1979) ("[T]he purpose of the voir dire is to ascertain disqualifications, not to afford individual analysis in depth to permit a party to choose a jury that fits into some mold that he believes appropriate for his case." (quotation marks and citation omitted)).  Accordingly, it is clear that the Court would

not have questioned Juror 50 during voir dire about his views about Dr. Loftus or memory, and it would be inappropriate to do so now.

Instead, the inquiry of Juror 50 should be similar to the inquiry the Court conducted of other prospective jurors who answered "yes" to Question 48 of the juror questionnaire.  For example, during the voir dire inquiry of Juror 189, after directing the prospective juror to a blank version of the questionnaire, the Court's examination on this subject was as follows:

> THE COURT: Based on your response, what I want to ask is if there is anything about what you describe here that would interfere in any way with your ability to be fair and impartial here?
>
> JUROR: No.

(Nov. 17, 2021 Tr. at 532:11-18).  Similarly, the following is the voir dire inquiry of Juror 239, who answered "yes" to Question 48:

> THE COURT: The first tab is just a blank version of the questionnaire that you filled out.  If you turn to page 24, question 48.  Do you recall your response to question 48?
>
> JUROR: Yes.
>
> THE COURT: Anything about that experience, in light of what I have told you about this case, that would interfere in any way with your ability to be fair to both sides?
>
> JUROR: There is nothing there.

(Nov. 18, 2021 Tr. at 634:25-635:8).  These jurors were not asked any further questions about their experiences as victims of sexual abuse, and they were qualified as jurors without objection from either party.  Thus, while the defendant claims that Juror 50's responses to the questionnaire deprived the Court of the opportunity to conduct a probing voir dire examination of Juror 50 regarding his views about the defense's theories in this case, the record proves otherwise.  (Def.

Mem. at 44).   Instead, the questioning of Juror 50 should be limited to only what is strictly necessary to determine the relevant issues.

### 3.        There Is No Basis to Call Any Other Juror as a Witness

There is no basis to call any other witness at a hearing aside from Juror 50.  The questioning of Juror 50 is sufficient to address the only questions as to which the rigorous standard for an evidentiary hearing has been met.

The defendant nevertheless proposes calling each of the twelve jurors for testimony about whether they have experienced sexual abuse.  (Def. Mem. at 50, 57).  It would be difficult to imagine a spectacle more damaging to the jury process than requiring each of the jurors to return to court weeks or months after their service was complete to testify about such a deeply personal and sensitive subject.  The defendant's request is exactly the sort of "fishing expedition" that presents the "evil consequences" of which the Second Circuit has repeatedly warned.  *See Ianniello*, 866 F.2d at 543; *Moon*, 718 F.2d at 1234.

The defendant's request for such an inquisition is based on a single sentence in a newspaper article, which reports that an anonymous "second juror described in an interview with The New York Times having been sexually abused as a child." *See* https://www.nytimes.com/2022/01/05/nyregion/maxwell-trial-jury-inquiry.html.[17]        It     is questionable that this report itself may be considered under Rule 606(b), insofar as the next sentence refers to the juror's experience in the context of jury deliberations, so it is not clear from the article whether the anonymous juror made any statements to the reporter that were separate

---

[17] The defendant's motion also states that Juror 50 has made public statements about another juror who discussed experiences with sexual abuse in the context of deliberations.  Rule 606(b) precludes the Court from considering this. *See Warger*, 574 U.S. at 43 (affirming denial of motion for a new trial under *McDonough*, where the only evidence of juror dishonesty was an affidavit from another juror regarding statements a juror had made during deliberations).

from his or her discussion of deliberations.  But even if it were properly considered, this one-sentence, hearsay report of an anonymous speaker is not a sufficient basis for dragging the entire jury in for questioning at a hearing in an effort to root out the identity of this particular juror.  As noted, a hearing is warranted only where there is "clear, strong, substantial and incontrovertible evidence that a specific, non-speculative impropriety has occurred." *Stewart*, 590 F.3d at 133-34 (quotation omitted).  "Gossip and anonymous tips do not satisfy this standard." *United States v. Stewart*, 317 F. Supp. 2d 432, 443 (S.D.N.Y. 2004), *aff'd*, 433 F.3d 273, 306 (2d Cir. 2006).  The Second Circuit and courts in this district have thus repeatedly found that a hearing is not necessary on similar facts.

For example, in *United States v. Guzman Loera*, a magazine article published shortly after the verdict stated that an unnamed juror alleged that jurors followed media coverage of the trial in violation of the court's instructions, and that they heard prejudicial information not admitted during the trial, including that the defendant had drugged and raped underaged girls.  No. 19-2239, 2022 WL 211199, at *12 (2d Cir. Jan. 25, 2022).  During trial, the district court had repeatedly instructed the jury to avoid media coverage and on two occasions had canvassed the jury and spoke with jurors individually about particular articles.  *Id.*  One juror acknowledged seeing the relevant headline before turning away and another acknowledged seeing part of a headline before closing the application.  *Id.* & n.15.  The anonymous juror's statements in the magazine article, however, suggested that the extent of juror exposure to this prejudicial media information was far more extensive, and that some jurors had discussed lying to the judge when he inquired about their exposure to that coverage.  *See* Brief for Appellant, 2020 WL 5757930, at *157-*61 (2d Cir. Sept. 4, 2020) (quoting article).  Nevertheless, the district court concluded that the defendant had failed to meet his burden to establish that an evidentiary hearing was warranted, and the Second Circuit

affirmed, holding that "the unsworn, uncorroborated statements that one unidentified juror made to a magazine reporter do not constitute the 'clear, strong, substantial and incontrovertible evidence' requiring any juror inquiry beyond that already made." *Guzman Loera*, 2022 WL 211199, at *12 (quoting *Moon*, 718 F.2d at 1234). The same is true here: a newspaper report about an anonymous juror who had experienced sexual abuse is not "incontrovertible evidence" that juror misconduct occurred.

Similarly, in *United States v. Bin Laden*, one defendant sought a new trial based on a sentence in a newspaper article, which, based on interviews with jurors, stated that "[o]ne juror used the internet at home to research a difficult legal concept concerning [one] defendant." The district court declined to hold an evidentiary hearing, holding that "[t]his single sentence, an unsworn snippet of hearsay within a newspaper article, is far less substantial than the sworn affidavits present in cases where evidentiary hearings have been ordered." *United States v. Bin Laden*, No. S7R 98 Cr. 1023 (KTD), 2005 WL 287404, at *2 (S.D.N.Y. Feb. 7, 2005), *aff'd sub nom. In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 93 (2d Cir. 2008).

Finally, in *Martha Stewart*, the defendant brought a post-trial motion alleging a host of deliberate omissions by a juror. 317 F. Supp. 2d at 438. Among the alleged deliberate omissions was that the juror had been fired from his job at Citibank for abusing drugs or improper expense accounting. *Id.* at 442. The district court denied a hearing with regard to this (and the other) allegations, as it was based on (a) statements of an individual who "appears to be reporting rumors," and (b) an anonymous call to the defendant's lawyer from an individual purporting to work for Citibank. *Id.* The Second Circuit affirmed that decision, noting that the defendant's factual proffer as to this (and certain other) allegations was "insufficient." *Stewart*, 433 F.3d at 305 & n.7. And although the Second Circuit stated in dicta that it might have held a hearing in the

first instance, it held that the district court's decision not to do so was within its broad discretion. *Id.* at 306.

As the foregoing cases reflect, given the dangers of post-verdict hearings into jurors' conduct, to warrant a hearing, allegations of impropriety must be "concrete allegations of inappropriate conduct that constitute competent and relevant evidence." *Baker*, 899 F.3d at 130 (quotation omitted).  A single, anonymous sentence found in a newspaper article does not meet that standard.  Such a report is classic hearsay and suffers from the risks inherent on relying on such information. *See Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 232 (2d Cir. 1999) (describing the "four classes of risk peculiar to this kind of evidence: those of (1) insincerity, (2) faulty perception, (3) faulty memory and (4) faulty narration").  As such, in the foregoing cases and numerous others, courts have routinely declined to grant evidentiary hearings based solely on hearsay statements. *See also, e.g.*, *United States v. Sattar*, 395 F. Supp. 2d 66, 77 (S.D.N.Y. 2005), *aff'd sub nom. United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009); *Daniels v. Hollins*, No. CV-02-4495FBLB, 2006 WL 47412, at *8 (E.D.N.Y. Jan. 9, 2006); *United States v. Menendez*, 440 F. App'x 906, 911-12 (11th Cir. 2011).  As one court observed, "to permit an inquiry based on such scant evidence in a case that continues to receive an unprecedented level of publicity would do serious damage to the policies that justify limitations on postverdict juror scrutiny." *Stewart*, 317 F. Supp. 2d at 443.  So too here.

The Court should deny the defendant's request to expand the hearing to call *every* juror merely to inquire into a single anonymous statement in a newspaper article.

### 4.    The Defendant's "Discovery" Request Should Be Denied

The Court should deny the defendant's motion for "pre-hearing discovery" in its entirety. Given the "evil consequences" of post-verdict juror inquiries, courts may not permit such inquiries

to become a "fishing expedition" but rather must limit the scope of any inquiry "to only what is absolutely necessary to determine the facts with precision." *Ianniello*, 866 F.2d at 543-44.  It is hard to imagine a request more likely to "subject[] juries to harassment" and "inhibit juryroom deliberation," *id.* at 543, than the defendant's request to compel production of a juror's emails and other written communications, as well as content from his Facebook, Twitter, LinkedIn, Instagram, and other social media accounts.  (Def. Mem. at 48-49).  Not surprisingly, the defendant cites no precedent for this sweeping and invasive request.  The Court should reject it.

Moreover, each specific request is improper.   Requests 1(b) and 1(c) call for communications *between jurors* and communications "about Juror No. 50's jury service," and thus call for information that, if it exists, is almost certainly inadmissible under Rule 606(b).  Moreover, the fact that Juror 50 made some public statements about his jury service does not give the defendant license to compel the production of any statements he may have made to anyone—such as a friend or loved one—about his jury service.  This is a classic fishing expedition and should not be permitted.  Request 1(a) calls for communications with victims and witnesses, but this too is a fishing expedition: Juror 50's public comment on a victim's public Twitter post *after* trial does not give the defense license to compel his private communications in the vague hope that, contrary to the Court's instructions, he had some improper communications before or during trial.  And Request 1(d) calls for communications about any payment Juror 50 received for media interviews, but even if he received compensation for post-trial interviews that says nothing whatsoever about whether the Court would have struck him for cause *before* trial based on his alleged experience with sexual abuse.

Requests 2(a) and 2(b) ask the Court to direct numerous social media companies to produce all communications to and from Juror 50 about his jury service and all posts or comments regarding

his jury service.  These requests similarly call for information barred by Rule 606(b).  And the overbreadth of this information is evidenced by the impracticality of production: Even in criminal investigations, the Government cannot obtain such communications with a subpoena; the Government must obtain a search warrant upon a showing of probable cause.  *See* Stored Communications Act, 18 U.S.C. § 2703.  In response to such warrants, social media platforms provide the entirety of the electronic communications within the account for the relevant timeframe—often a high volume of material—and the Government reviews the warrant returns to determine what specific materials are responsive.  Thus, if the subpoena the defendant requests were issued, the defendant would likely obtain a high volume of Juror 50's irrelevant personal social media communications.  A convicted defendant cannot be permitted to invade the privacy of a juror in this manner.  Finally, Request 2(c) seeks documentation of the dates on which Juror 50 opened and closed his social media accounts, but as discussed above, the defendant has failed to establish that a hearing is warranted as to Juror 50's statements about his use of social media, so there is no basis to compel the production of such irrelevant information.

## III.    The Court Should Provide Juror 50 with a Copy of His Questionnaire Before Any Hearing

On January 10, 2022, counsel for Juror 50 filed a motion to intervene and a supporting memorandum of law in the case in order to "protect [Juror 50's] privacy rights and his right to avoid self-incrimination, and to further ensure that he will not be prejudiced by any investigation ordered by this Court."  (Juror 50 Mem. at 4).  Counsel for Juror 50 requested that he be permitted to intervene, in part, to "assist this Court in determining how to conduct an appropriate inquiry

into the subject, by allowing [him] an opportunity to fully and fairly brief the Court on the relevant issues." (*Id.* at 7).

In his motion, Juror 50's counsel requested a copy of Juror 50's questionnaire, as well as the transcript of his testimony during voir dire. (Juror 50 Mem. at 4). The defendant opposes Juror 50's request, describing it as a "discovery request" and claiming that the release of Juror 50's questionnaire would prejudice the "investigation" of Juror 50's "conduct" and "undoubtably color Juror No. 50's testimony and allow him to place himself in the best possible posture." (Def. Mem. at 52-53). As an initial matter, the Government notes that Juror 50's voir dire was conducted in open court and is therefore available to Juror 50 and his counsel. As to the request for his questionnaire, the Government submits that Juror 50 should get a copy of his own questionnaire.

The defendant has characterized Juror 50's request for his own questionnaire as a "discovery request," but Juror 50 is not a defendant and he is not seeking discovery.[18] He is asking for access to his questionnaire: a document that he himself prepared and swore under penalty of perjury, and which, now that trial is complete, is maintained under seal principally if not entirely to protect his own privacy interests. *See, e.g.*, *Press-Enter. Co. v. Superior Ct. of California, Riverside Cty.*, 464 U.S. 501, 511-12 (1984). The privacy concerns that otherwise might require limiting access to Juror 50's questionnaire plainly do not apply to Juror 50 himself or his counsel.[19]

---

[18] The defendant claims that courts have "refused discovery to individuals or entities under investigation" "[u]nder analogous circumstances." (Def. Mem. at 53). But in support of that argument, the defendant cites only *John Doe Agency v. John Doe Corp.*, 493 U.S. 146 (1989), which is clearly not analogous as it involved a request under the Freedom of Information Act and an ongoing grand jury proceeding.

[19] On January 24, 2022, the New York Times Company moved to unseal, among other things, the filled-out questionnaires for the twelve seated jurors. (Dkt. No. 583). The Government intends to address that motion on or before February 11, 2022 in accordance with the Court's January 26, 2022 order (Dkt. No. 585).

Moreover, there can be no real concern, as the defendant claims, that providing Juror 50 with his questionnaire will "color" Juror 50's testimony and interfere with the integrity of a hearing.  (Def. Mem. at 53).  Should the Court decide to conduct a limited hearing, as the Government has proposed, the Court will undoubtedly ask Juror 50 about his questionnaire.  Juror 50 should have access to his own questionnaire in advance of any such hearing so that he can speak with his counsel and assess whether he plans to invoke his rights under the Fifth Amendment. More broadly speaking, "[t]he object of the proceeding is to permit the truth to be discovered with the least possible harm to other interests."  *Gagnon*, 282 F. App'x at 40.  That endeavor is not furthered by surprising Juror 50 on the stand with a document he does not seem to recall with specificity.  *See* Juror 50 Mem. at 4 (stating that Juror 50 "does not recall answering questions [in the questionnaire] regarding his prior experience with sexual assault").  To deny Juror 50 access to his own document means, practically speaking, that after being shown the questionnaire and asked questions about the document at a hearing, Juror 50 will need to speak with his counsel, assuredly delaying the hearing.

To the extent Juror 50's motion seeks leave to submit briefing on the merits of this inquiry, the Government agrees with the defendant that Juror 50 need not be permitted to intervene or be heard on the scope of the Court's inquiry, at least not at this juncture.  The parties are well situated to brief the appropriate scope of any hearing without intervention from the witness at that hearing. However, if the Court does authorize the subpoenas compelling production of Juror 50's communications and other information—though it should not, for the reasons set forth above— Juror 50 should have an opportunity to move to quash those subpoenas.  *See , e.g.*, *City of Almaty, Kazakhstan v. Ablyazov*, No. 1:15 Civ. 05345 (AJN) (KHP), 2020 WL 1130670, at *1 (S.D.N.Y.

Mar. 9, 2020); *Strike 3 Holdings, LLC v. Doe*, 19 Civ.  2552 (LAK) (OTW), 2019 WL 4855039, at *2 (S.D.N.Y. Oct. 2, 2019).

Finally, the defendant requests that that the Court strike Juror 50's motion to intervene and the supporting memorandum of law or, alternatively, permit his filings to remain under seal pending resolution of the Defense Motion.  (Def. Mem. at 53-56).  The cases cited by the defendant in support of its motion to strike are inapposite,[20] and in any event Juror 50's motion, whether or not ultimately granted, is hardly "redundant, immaterial, impertinent or scandalous."  The defendant further claims that the pleadings are not "judicial documents" at the current stage of the proceedings as they have not been ruled upon by the Court and, therefore, "are afforded no presumption of public access."  (*Id.* at 54, 56).  She is wrong.  Juror 50's motion to intervene is quite obviously "relevant to the performance of a judicial function and useful in the judicial process." *United States v. Amodeo*, 44 F.3d 141, 145 (2d Cir. 1995); *see also S.E.C. v. TheStreet.Com*, 273 F.3d 222, 232 (2d Cir. 2001) (noting that a "document which is presented to

---

[20] The defendant cites *United States v. All Right, Title & Int. in Prop., Appurtenances, & Improvements Known as 479 Tamarind Drive, Hallendale, Fla.*, No. 98 Civ. 2279 (DLC), 2011 WL 1045095, at *2 (S.D.N.Y. Mar. 11, 2011), a civil forfeiture action in which the Government filed a motion to strike, which is explicitly governed by Rule G of the Supplemental Rules for Certain Admiralty and Maritime Claims and Asset Forfeiture Actions.  The defendant also cites civil cases involving discussions of Federal Rule of Civil Procedure 12(f) under which "[a] court may strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter."  The defendant ignores that even in that context, "motions to strike are disfavored and should not be granted 'unless there is a strong reason for so doing.'"  *Bailey v. Pataki*, No. 08 Civ. 8563 (JSR), 2010 WL 234995, at *3 (S.D.N.Y. Jan. 19, 2010) (citation omitted); *see also Velez v. Lisi*, 164 F.R.D. 165, 166 (S.D.N.Y. 1995) ("A motion to strike is an extraordinary remedy which will not be granted unless it is clear that the allegations in question can have no possible bearing on the subject matter of the litigation.").  *Metzger v. Hussman*, 682 F. Supp. 1109, 1110 (D. Nev. 1988), which the defendant cites (Def. Mem. at 54), is also inapposite.  *Metzger* is a civil case in which the court granted a motion to strike an opposition to a motion to dismiss that was filed in an untimely manner because "[a]pplicable rules of procedure . . . must be enforced in this case, as in any case, so that the Court may maintain control over the progress of litigation before it." *Metzger*, 682 F. Supp. at 1111.

the court to invoke its powers or affect its decisions" stands on a "different footing" than items merely passed between parties in discovery (quotations omitted)).  The defendant's challenge to the *merits* of Juror 50's motion to intervene ignores that the motion is a judicial document whether or not the Court ultimately grants the motion.  *See Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 121 (2d Cir. 2006) (rejecting the argument that "until a district court knows the disposition of the underlying motion, any attempt at calling something a judicial document is premature").  And the defendant's assertion that the motion is not a judicial document because it is a "discovery request" is supported only by cases addressing whether discovery materials *themselves* should be docketed, not whether a *motion* for discovery can be.  (*See* Def. Mem. at 54).

At bottom, the defendant fails to credibly explain how publicly docketing Juror 50's own motion to intervene will interfere with Juror 50's own testimony.  There is no need to litigate Juror 50's motion to intervene under seal just because the Court and the parties are contemplating a hearing where Juror 50 may be a witness.  Throughout the course of this case, the parties have publicly litigated evidentiary issues implicating witness testimony, such that witnesses or their counsel could access the briefing if they so wished.  There is no reason that Juror 50's motion to intervene should be treated differently and litigated in secret.[21]

---

[21] Contrary to the defendant's suggestion (Def. Mem. at 42 n.15), there is nothing nefarious about the Government's decision to publicly docket the letter in which it brought Juror 50's public statements to the Court's attention and sought an inquiry.  That letter is clearly a judicial document, and as such must be publicly filed unless there are compelling interests for sealing, such as third-party privacy interests and identifying information for witnesses testifying under pseudonyms.  None of those interests were implicated by this short letter, which merely recites public information and sought certain relief.  And contrary to the defendant's representation, the Government sought to confer with the defense counsel before filing the letter, but received no response, as the letter notes. (Dkt. 568 at 2).

**CONCLUSION**

For the foregoing reasons, the Court should deny the defendant's motion for a new trial on

the present record and schedule a hearing to resolve the motion.

Dated: New York, New York
       February 2, 2022

                              Respectfully submitted,

                              DAMIAN WILLIAMS
                              United States Attorney


                    By:    _s/_____
                              Maurene Comey
                              Alison Moe
                              Lara Pomerantz
                              Andrew Rohrbach
                              Assistant United States Attorneys