# EXHIBIT 3

# 13-1388-cr

IN THE

## United States Court of Appeals

### FOR THE SECOND CIRCUIT

❖

UNITED STATES OF AMERICA,

*Appellee,*

—against—

PAUL M. DAUGERDAS, ERWIN MAYER, DONNA GUERIN, DENIS FIELD,
ROBERT GREISMAN, RAYMOND CRAIG BRUBAKER, BDO USA, LLP,

*Defendants,*

DAVID PARSE,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## APPENDIX
## VOLUME XVI OF XVII
## (Pages A-5633 to A-6085)

UNITED STATES ATTORNEY'S
  OFFICE FOR THE SOUTHERN
  DISTRICT OF NEW YORK
One St. Andrew's Plaza
New York, New York 10007
(212) 637-2346

UNITED STATES DEPARTMENT
  OF JUSTICE
TAX DIVISION, APPELLATE SECTION
P.O. Box 502
Washington, DC 20044
(202) 514-8030

*Attorneys for Appellee*
  *United States of America*

SHAPIRO, ARATO & ISSERLES LLP
500 Fifth Avenue, 40th Floor
New York, New York 10110
(212) 257-4880

*Attorneys for Defendant-Appellant*
  *David Parse*

**TABLE OF CONTENTS**

PAGE

Docket Entries ..................................................... A-1

Indictment—Redacted S3 ........................................... A-84

Email from William Kermode to Adam Hollander and others,
    November 2, 2010, attaching bill of particulars .................. A-157

Transcript—Conference, December 8, 2010 ......................... A-166

Transcript—Conference, February 9, 2011 ......................... A-182

Transcript—Conference, February 28, 2011 ........................ A-207

Transcript—Jury Selection, Day 1, March 1, 2011 ................. A-222

Transcript—Jury Selection, Day 2, March 2, 2011 ................. A-290

Transcript—Jury Selection, Day 3, March 3, 2011 ................. A-338

Transcript—Trial, Day 1, March 3, 2011 .......................... A-345

Transcript—Trial, Day 2, March 4, 2011 .......................... A-378

Transcript—Trial, Day 3, March 7, 2011 .......................... A-404

Transcript—Trial, Day 4, March 8, 2011 .......................... A-462

Transcript—Trial, Day 5, March 9, 2011 .......................... A-525

Transcript—Trial, Day 6, March 10, 2011 ......................... A-587

Transcript—Trial, Day 7, March 11, 2011 ......................... A-642

Transcript—Trial, Day 8, March 14, 2011 ......................... A-677

ii

| | PAGE |
|---|---|
| Transcript—Trial, Day 9, March 15, 2011 ......................... | A-730 |
| Transcript—Trial, Day 10, March 16, 2011 ....................... | A-788 |
| Transcript—Trial, Day 11, March 17, 2011 ....................... | A-851 |
| Transcript—Trial, Day 12, March 18, 2011 ....................... | A-913 |
| Transcript—Trial, Day 13, March 21, 2011 ....................... | A-949 |
| Transcript—Trial, Day 14, March 23, 2011 ....................... | A-958 |
| Transcript—Trial, Day 15, March 24, 2011 ....................... | A-1020 |
| Transcript—Trial, Day 16, March 25, 2011 ....................... | A-1089 |
| Transcript—Trial, Day 17, March 28, 2011 ....................... | A-1139 |
| Transcript—Trial, Day 18, March 29, 2011 ....................... | A-1204 |
| Transcript—Trial, Day 19, March 31, 2011 ....................... | A-1274 |
| Transcript—Trial, Day 20, April 1, 2011 ......................... | A-1342 |
| Transcript—Trial, Day 21, April 4, 2011 ......................... | A-1383 |
| Transcript—Trial, Day 22, April 5, 2011 ......................... | A-1449 |
| Transcript—Trial, Day 23, April 11, 2011 ....................... | A-1514 |
| Transcript—Trial, Day 24, April 12, 2011 ....................... | A-1580 |
| Transcript—Trial, Day 25, April 13, 2011 ....................... | A-1645 |
| Transcript—Trial, Day 26, April 14, 2011 ....................... | A-1724 |
| Transcript—Trial, Day 27, April 15, 2011 ....................... | A-1786 |

iii

PAGE

Transcript—Trial, Day 28, April 26, 2011 ......................... A-1826

Transcript—Trial, Day 29, April 27, 2011 ......................... A-1897

Transcript—Trial, Day 30, April 28, 2011 ......................... A-1962

Transcript—Trial, Day 31, April 29, 2011 ......................... A-2022

Transcript—Trial, Day 32, May 2, 2011 ........................... A-2060

Transcript—Trial, Day 33, May 3, 2011 ........................... A-2128

Transcript—Trial, Day 34, May 4, 2011 ........................... A-2200

Transcript—Trial, Day 35, May 5, 2011 ........................... A-2288

Transcript—Trial, Day 36, May 6, 2011 ........................... A-2356

Transcript—Trial, Day 37, May 9, 2011 ........................... A-2389

Transcript—Trial, Day 38, May 10, 2011 .......................... A-2445

Transcript—Trial, Day 39, May 11, 2011 .......................... A-2499

Transcript—Trial, Day 40, May 12, 2011 .......................... A-2566

Transcript—Trial, Day 41, May 13, 2011 .......................... A-2594

Transcript—Trial, Day 42, May 16, 2011 .......................... A-2598

Transcript—Trial, Day 43, May 17, 2011 .......................... A-2610

Transcript—Trial, Day 44, May 18, 2011 .......................... A-2616

Transcript—Trial, Day 45, May 19, 2011 .......................... A-2625

Transcript—Trial, Day 46, May 20, 2011 .......................... A-2632

iv

PAGE

Transcript—Trial, Day 47, May 23, 2011 .......................... A-2637

Transcript—Trial, Day 48, May 25, 2011 .......................... A-2644

Requests To Charge Of The United States, May 2, 2011 ............. A-2652

Letter from Stanley J. Okula, Jr. to Judge Pauley, May 3, 2011 ...... A-2734

Letter from Laurie Edelstein to Judge Pauley, May 4, 2011 .......... A-2742

Letter from Laurie Edelstein to Judge Pauley, May 5, 2011 .......... A-2746

Email from Nicholas Cutaia, May 6, 2011, attaching revised draft
    jury charge ................................................... A-2814

Letter from Laurie Edelstein to Judge Pauley, May 8, 2011 .......... A-2882

Court Exhibit 3—Note from Catherine Conrad, May 10, 2011 ....... A-2955

Defendant David Parse's Motion For Judgment Of Acquittal Pursuant
    To Rule 29, June 7, 2011 ..................................... A-3021

**Government's Trial Exhibits**

GX12-60 Deutsche Bank Alex. Brown Confirmation ............ A-3027

GX24-5A Fax from Carrie Yackee to John Beery,
August 29, 2002 .............................................. A-3035

GX24-16 Deutsche Bank Alex. Brown Client Statement ........ A-3076

GX24-22 Letter from Matt Coleman to David Parse,
December 24, 2001 .......................................... A-3083

GX24-23 Letter from Matt Coleman to David Parse,
December 28, 2001 .......................................... A-3085

GX37-4 Documents Relating To C.R. Gibb ..................... A-3360

v

PAGE

GX43-1 Letter from Paul M. Daugerdas to Michael Hammer,
August 28, 2002 .............................................. A-3486

GX54-1 Letter from Donna Guerin to David K. Parse,
January 24, 2001 ............................................. A-3594

GX73-5 Documents Relating To Oxford Bloomfield Investors,
Inc. ......................................................... A-3875

GX82-2a Letter from Donna Guerin to Michael Toporek,
February 18, 2002 ............................................ A-3984

GX82-20 Deutsche Bank Alex. Brown Client Statement ......... A-4149

GX82-21 Deutsche Bank Alex. Brown Client Statement ........ A-4159

GX201-3a Letter from Michael Toporek to David Parse,
December 28, 2001 ............................................ A-4168

GX201-39a Letter from Michael Toporek to David Parse,
December 28, 2001 ............................................ A-4325

GX201-253 Fax from John Beery to Michael Hammer,
December 4, 2001 ............................................. A-4327

GX300-28a Email from Robert Greisman to Charles Bee
and others, November 6, 2001 ................................. A-4446

GX300-40 Email from Lisa Hurley to Nicole Bencik,
February 26, 2001 ............................................ A-4449

GX400-23 Email from Carrie Yackee to Sheila D. Denzler,
April 4, 2002 ................................................ A-4450

GX400-24 Email from Carrie Yackee to Sheila D. Denzler,
February 9, 2001 ............................................. A-4457

GX400-29 Email from Carrie Yackee to Heather Loeser,
February 11, 2002 ............................................ A-4461

GX400-43 Email from Carrie Yackee to Dawn Forbes,
December 21, 1999 ............................................ A-4463

vi

PAGE

GX400-50 Email from Carrie Yackee to Sheila D. Denzler,
February 11, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-4464

GX400-195 Email from R. Craig Brubaker to Todd Clendening,
November 15, 2000 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-4473

GX400-260 Email from R. Craig Brubaker to
emayer@jenkens.com, October 18, 1999 . . . . . . . . . . . . . . . . . . . . . . A-4475

GX401-9 Deutsche Bank Alex. Brown Client Statement . . . . . . . . A-4492

GX401-10 Fax from Carrie Yackee to Judy Gagnon,
April 25, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-4496

GX401-44 Letter from Matt Coleman to David Parse . . . . . . . . . . . A-4499

GX401-47a Letter from Daniel Aronoff to David Parse,
December 19, 2000 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-4500

GX401-48 Deutsche Bank Alex. Brown Client Statement . . . . . . . A-4503

GX401-74 Deutsche Bank Alex. Brown Client Statement . . . . . . . . A-4508

GX401-97 Fax from Carrie Yackee to Nicole Bencik,
March 13, 2001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-4513

GX401-98 Letter from Daniel Aronoff to David Parse,
December 19, 2000 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-4544

GX401-99 Letter from Daniel Aronoff to David Parse,
December 19, 2000 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-4545

GX401-100 Letter from Daniel Aronoff to David Parse,
December 19, 2000 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-4546

GX401-101 Change Form . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-4547

GX700-19 Fax from Judi Gagnon to John Beary, April 29, 2002 . A-4549

GX1000-52 IRS Certificate Of Official Record, March 11, 2009 A-4565

GX1001-209 Fax from John V. Ivsan to John Beery,
April 6, 2001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-4756

vii

PAGE

GX1002-64 Fax from Lisa Hurley to James D. Beumel,
May 16, 2003 ................................................. A-4777

GX1002-122 Letter from Lisa Hurley to James D. Beumel,
March 3, 2003 ............................................... A-4810

GX1002-124 IRS Form 4564 for Larry H. and Nancy C. Moore . A-4816

**Defendants' Trial Exhibits**

DX2169 Letter from Erwin Mayer to R. Craig Brubaker,
December 16, 1998 .......................................... A-4852

DX2635a Letter from Erwin Mayer to Bob Price,
December 17, 1998 .......................................... A-4886

DX2667 Email from r.craig.brubaker@db.com to
emayer@jenkens.com, November 5, 1999 ..................... A-4887

DX2703 Memorandum from Michael L. Cook and Bryan W. Lee
to Board of Directors, Roger Hayse, November 16, 2000 ........ A-4891

DX3278 Confidential J&G Notes ............................. A-4892

DX3396 Email from R. Craig Brubaker to Ross Crawford,
October 27, 1999 ............................................ A-4894

DX5577 Change Form ....................................... A-4913

Letter from Stanley J. Okula, Jr. to Judge Pauley, June 22, 2011 ...... A-4936

Memorandum Of Law In Support Of Defendants' Motion For A New
Trial Or, In The Alternative, For An Evidentiary Hearing
Concerning Juror No. 1, July 8, 2011 .......................... A-4941

Declaration Of Theresa Trzaskoma In Support Of Defendants' Motion
For A New Trial Or, In The Alternative, For An Evidentiary
Hearing, Concerning Juror No. 1, redacted version, July 8, 2011 . A-4979

Exhibit 1 to Trzaskoma Declaration—
Page 6 from the Jury Department's Panel Selection Report ....... A-4984

viii

PAGE

Exhibit 2 to Trzaskoma Declaration—
Juror Questionnaire . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-4986

Exhibit 3 to Trzaskoma Declaration—
Letter from Catherine Conrad to Stanley J. Oklua [sic], Esq.,
May 25, 2011 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-4989

Exhibit 4 to Trzaskoma Declaration—
Attorney Registration Information for Catherine M. Conrad
as of June 24, 2011 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-4994

Exhibit 5 to Trzaskoma Declaration—
*In the Matter of Catherine M. Conrad*, 48 A.D.3d 187
(1st Dep't Dec. 18, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-4996

Exhibit 6 to Trzaskoma Declaration—
*In the Matter of Catherine M. Conrad*, 80 A.D.3d 187
(1st Dep't Dec. 9, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-4999

Exhibit 7 to Trzaskoma Declaration—
Deed for 16 Parkview Drive, Eastchester, New York. . . . . . . . . . . . . A-5003

Exhibit 8 to Trzaskoma Declaration—
Mortgage, December 27, 2004, recorded on 16 Parkview Drive,
Bronxville, New York . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-5006

Exhibit 9 to Trzaskoma Declaration—
Nevada Marriage License for Frank Rosa and
Catherine Morgan Conrad, June 20, 2007 . . . . . . . . . . . . . . . . . . . . . A-5021

Exhibit 10 to Trzaskoma Declaration—
Nevada Marriage Certificate for Frank Rosa and
Catherine Morgan Conrad, June 20, 2007 . . . . . . . . . . . . . . . . . . . . . A-5023

Exhibit 11 to Trzaskoma Declaration—
New York Criminal History Record Search results for
Catherine Conrad . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-5026

Exhibit 12 to Trzaskoma Declaration—
Certificate of Disposition, Criminal Court of the
City of New York, County of Bronx, *People v. Catherine
Conrad*, August 21, 1998 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-5031

ix

PAGE

Exhibit 13 to Trzaskoma Declaration—
Certificate of Disposition from the Criminal Court of the City of
New York, County of Bronx, *People v. Catherine Conrad*,
May 17, 1998 ................................................. A-5033

Exhibit 14 to Trzaskoma Declaration—
Winslow, Arizona Police Department records for
Catherine Conrad ............................................. A-5035

Exhibit 15 to Trzaskoma Declaration—
Records from the Criminal Court of the City of Yonkers related
to May 6, 2009 arrest of Catherine Rosa, Docket No. 09-2763 .... A-5057

Exhibit 16 to Trzaskoma Declaration—
Records from the Criminal Court of the City of New Rochelle for
the May 6, 2009 arrest of Catherine Rosa ...................... A-5061

Exhibit 17 to Trzaskoma Declaration—
Records from New Jersey and Westlaw relating to Frank Rosa ... A-5076

Exhibit 18 to Trzaskoma Declaration—
State of New Jersey Department of Corrections information sheet
for Frank J. Rosa ............................................ A-5124

Exhibit 19 to Trzaskoma Declaration—
Criminal records from Nassau County, New York for Frank Rosa  A-5127

Exhibit 20 to Trzaskoma Declaration—
Summons and Verified Complaint, *Conrad v. Manessis, et al.*,
Index No. 27056-03 (N.Y. Sup. Ct., Bronx County),
November 10, 2003 ........................................... A-5183

Exhibit 21 to Trzaskoma Declaration—
Note of Issue, *Conrad v. Manessis*, March 7, 2009 .............. A-5192

Exhibit 22 to Trzaskoma Declaration—
Order with Notice Of Entry, *Conrad v. Manessis*,
December 5, 2008 ............................................ A-5198

Exhibit 23 to Trzaskoma Declaration—
Affidavit of Catherine Conrad, *Conrad v. Manessis*,
January 19, 2009 ............................................ A-5205

x

PAGE

Exhibit 24 to Trzaskoma Declaration—
Order, *Conrad v. Manessis*, February 5, 2009 ................... A-5212

Exhibit 25 to Trzaskoma Declaration—
Affirmation of Victor M. Serby in Opposition to Defendants'
Motion to Dismiss the Complaint, *Conrad v. Manessis*,
June 4, 2010................................................ A-5215

Exhibit 26 to Trzaskoma Declaration—
Judgment, Verdict Sheet and Exhibit List, *Conrad v. Manessis* ... A-5257

Exhibit 27 to Trzaskoma Declaration—
Excerpts of the trial testimony of Catherine Conrad,
*Conrad v. Manessis* .......................................... A-5267

Exhibit 28 to Trzaskoma Declaration—
Order, *Conrad v. Manessis*, March 24, 2011..................... A-5315

Exhibit 29 to Trzaskoma Declaration—
Federal Election Commission contribution records for
Robert J. Conrad at 16 Parkview Drive, Bronxville, NY 10708 ... A-5392

Transcript—Conference regarding motion for new trial (unsealed),
July 15, 2011 ............................................... A-5399

Letter from Susan E. Brune to Judge Pauley, July 21, 2011
attaching Westlaw Report ..................................... A-5416

Affidavit of Paul H. Schoeman, Esq., dated August 17, 2011 ........ A-5438

Affidavit of Susan E. Brune, dated September 15, 2011 ............. A-5441

Exhibit A to Brune Affidavit—
Juror Questionnaire .......................................... A-5446

Exhibit B to Brune Affidavit—
Email from Randy Kim to Viviann Stapp, February 25, 2011..... A-5449

Exhibit C to Brune Affidavit—
Juror Snapshot............................................... A-5451

xi

PAGE

Exhibit D to Brune Affidavit—
Email from Viviann Stapp to Randy Kim, March 1, 2011 ........ A-5466

Exhibit E to Brune Affidavit—
Jury Selection Materials ...................................... A-5475

Exhibit F to Brune Affidavit—
Jury Selection Materials ...................................... A-5479

Exhibit G to Brune Affidavit—
Jury Selection Materials ...................................... A-5481

Exhibit H to Brune Affidavit—
Jury Selection Materials ...................................... A-5489

Exhibit I to Brune Affidavit—
Email from Suann Ingle to Kendra Melrose, May 11, 2011 ....... A-5494

Exhibit J to Brune Affidavit—
Internal Brune & Richard emails .............................. A-5496

Exhibit K to Brune Affidavit—
Memorandum from DB to Parse File, May 17, 2011 ............. A-5559

Supplemental Memorandum Of Law Of United States In Opposition
    To Defendants' Motion For A New Trial Pursuant To Rule 33 Of
    The Federal Rules Of Criminal Procedure, October 7, 2011 ...... A-5563

Exhibit 1—
Affidavit of Daniel Nardello, September 28, 2011 ............... A-5593

Transcript—Telephone Conference, August 8, 2011.................. A-5595

Transcript—New Trial Hearing, Day 1, February 15, 2012 ......... A-5608

Transcript—New Trial Hearing, Day 2, February 16, 2012 ......... A-5699

Hearing Exhibit 20—*In re Conrad*, 80 A.D.3d 168
(1st Dep't 2010) ............................................. A-5840

Declaration of Steven Gillers, April 6, 2012 ...................... A-5843

xii

PAGE

Exhibit A to Gillers Declaration—
    Curriculum Vitae of Stephen Gillers ............................ A-5852

Affidavit of David Parse, August 3, 2012 .......................... A-5872

Transcript—Oral Argument, October 12, 2012 ...................... A-5903

Letter from Paul Shechtman to Judge Pauley, March 7, 2013 ........ A-5930

Exhibit G to Government's Sentencing Memorandum,
    March 15, 2013—
    Jenkens and Gilchrist Clients—Restitution Calculation .......... A-6041

Amended Sentencing Memorandum of the United States Regarding
    Defendant David Parse, March 18, 2013 ....................... A-6074

Letter from Paul Schechtman to Judge Pauley, March 18, 2013 ...... A-6115

Reply Of The United States Regarding Defendant David Parse,
    March 20, 2013 ............................................. A-6125

Transcript—Sentencing of David Parse, March 22, 2013 ............ A-6134

Letter from Paul Schechtman to Judge Pauley, March 22, 2013 ...... A-6161

Notice Of Appeal, March 29, 2013 ................................ A-6163

Judgment, April 12, 2013 ........................................ A-6168

February 15, 2012

**C2frdau3          Trzaskoma - redirect          Page 93**

1  A. No. I actually thought that the more likely explanation
2  was that the Westlaw report was conflating two people, two
3  people named Catherine Conrad, one who was our juror and one
4  who was the suspended lawyer.
5  Q. During your conversation with Ms. Edelstein and Ms. Brune
6  or at any point afterwards, did anyone discourage you from
7  pursuing any additional information about Catherine Conrad or
8  the Westlaw report that had been sent to you?
9  A. No. I believe, as I told you earlier, at the conclusion of
10  my discussion with Ms. Edelstein and Ms. Brune I said something
11  along the lines of, do we need to do anything further, and Ms.
12  Brune said, no, just leave it. Based on that, I called Mr.
13  Benhamou.
14          I went to my children's school to pick them up for the
15  first time in many months, maybe years, and on my way to pick
16  them up at school, my recollection is I called Mr. Benhamou to
17  ask him whether he had gotten the lawsuit. He said that he
18  hadn't, that they couldn't find it online, and if we wanted to
19  get it, our managing clerk would have to go to the Bronx in the
20  morning. I said, we don't think it is her, so you can stand
21  down.
22  Q. Did at any point anyone suggest that you not send any
23  emails about Conrad any further?
24  A. No.
25  Q. You said that you weren't aware of any other juror

**C2frdau3          Trzaskoma - redirect          Page 94**

1  misconduct case where the lies of this magnitude were involved.
2  Do you remember that testimony?
3  A. I do.
4  Q. Do you recall on direct you testified that in your mind on
5  May 12th there were two possibilities: There was either the
6  possibility that Conrad had lied during voir dire or the
7  information you had for the wrong person?
8  A. Yes.
9  Q. Is it fair to say that in your mind on May 12th they were
10  not just lies that you were contemplating but in your mind
11  unprecedented lies as one possibility?
12  A. I think that what I understood Mr. Shechtman to be asking
13  me was about the totality of Ms. Conrad's lies. I can tell you
14  that on May 12th I certainly did not contemplate that Ms.
15  Conrad was not only a suspended lawyer but was on criminal
16  probation, had been arrested numerous times, had a bench
17  warrant for her arrest, was a severe alcoholic, and was married
18  to a man who himself had served 7 years in a New Jersey state
19  prison. That never entered my head.
20  Q. Those facts that you had you didn't have during the trial,
21  right?
22  A. We did not.
23  Q. If you had researched Ms. Conrad's civil lawsuit, you might
24  have learned about them during the trial, right?
25  A. It's possible, but it took us a long time to put things

**C2frdau3          Trzaskoma - redirect          Page 95**

1  together. And we were benefited greatly by the fact that Ms.
2  Conrad had included her phone number at the top of her letter
3  to Mr. Okula.
4  Q. You are conflating two issues. My question is about the
5  civil lawsuit. You had a chance to review those documents
6  after the trial, right?
7  A. I did.
8  Q. You know that in Ms. Conrad's testimony in that suit she
9  says she has a law degree, right?
10  A. I did. But it took me days to pull all that together and
11  to find that in the files.
12  Q. Weren't there several days between May 12th and the jury
13  verdict?
14  A. Yes.
15  Q. With respect to the motion that you filed, did you make a
16  conscious decision not to disclose the information that you had
17  in your possession during the trial in your motion?
18  A. No, it was not, in my mind.
19          MR. HERNANDEZ: May I have a moment, your Honor?
20          THE COURT: Yes. Take your time.
21          MR. HERNANDEZ: No further questions, your Honor.
22          THE COURT: Go ahead, Mr. Shechtman.
23  RECROSS-EXAMINATION
24  BY MR. SHECHTMAN:
25  Q. Ms. Trzaskoma, at any time were you trying to sandbag the

**C2frdau3          Trzaskoma - recross          Page 96**

1  Court or plant error in the record as to Juror No. 1, Ms.
2  Conrad?
3  A. Absolutely not.
4          MR. SHECHTMAN: No further questions.
5          THE COURT: Ms. Trzaskoma, I have a question for you.
6  On the third day of jury deliberations, May 16th, this Court
7  was confronted with a juror who needed to have an emergency
8  medical procedure. After conferring with all counsel and over
9  the government's objection, I excused Juror No. 11, replaced
10  Juror No. 11 with an alternate, and instructed the jury to
11  restart anew their jury deliberations. During that entire
12  episode did you ever revisit the question of Juror No. 1 and
13  the possibility that she might be someone other than who she
14  said she was in voir dire?
15          THE WITNESS: I did not. I genuinely believed that
16  Juror No. 1 was who she said she was.
17          THE COURT: Any further inquiry based upon the Court's
18  inquiry?
19          MR. HERNANDEZ: No, your Honor.
20          MR. SKLARSKY: No, your Honor.
21          MR. SHECHTMAN: No, your Honor.
22          MR. ROTERT: No, your Honor.
23          MS. McCARTHY: No, your Honor.
24          THE COURT: Ms. Trzaskoma, you are excused as a
25  witness. You may step down.

UNITED STATES OF AMERICA, v
PAUL M. DAUGERDAS, ET AL.,

| C2frdau3 | Page 97 |
|---|---|

1   (Witness excused)
2        THE COURT: Before the defendants call Juror No. 1, I
3   have before me an application on behalf of Juror No. 1
4   concerning closure of the courtroom. I have reviewed the
5   letter submissions of the parties. Ms. Sternheim, do you wish
6   to be heard further on that application?
7        MS. STERNHEIM: Very brief briefly, your Honor.
8        THE COURT: Please. Take the podium.
9        MS. STERNHEIM: I am aware that aspects of Ms.
10  Conrad's alcohol dependence are in the record, as we have heard
11  today. However, I maintain that she does have the right to
12  confidentiality regarding her condition and any treatment she
13  may have received. I do not suggest that it should not be an
14  area of inquiry, but I don't believe that it needs to be an
15  area disclosed publicly. The record can be created so that all
16  the parties of interest in this matter have the facts that they
17  need to make their respective arguments.
18       The other part of my letter, which I don't have with
19  me for the moment, concerns aspects -- does the Court have the
20  letter there? May I see it? Or does any counsel have a copy?
21       THE COURT: I've got it.
22       MS. STERNHEIM: Thank you.
23       THE COURT: These letters will be docketed and filed
24  if they haven't already been.
25       MS. STERNHEIM: The other aspects were HIPAA concerns

| C2frdau3 | Page 98 |
|---|---|

1   regarding her personal medical conditions.
2        With regard to inquiry concerning the disciplinary
3   committee, my request is based on the fact that disciplinary
4   proceedings, at least in the First Department, are not public
5   proceedings, and it is my understanding that sealed records
6   were unsealed for the purpose of this matter. However, again,
7   that I believe was so that the parties would have opportunity
8   to make their record here. I still maintain because it is a
9   pending matter in the First Department, it should not be opened
10  to the public.
11       Once again, I am not stating in any way that counsel
12  for either party should not be permitted to inquire. I
13  understand the relevance of it. However, again, I do not
14  believe that the inquiry into a matter which in and of itself
15  was a closed proceeding, although revealed for purposes of
16  this, and still pending should be a matter dealt with in open
17  court.
18       So, my request again is should counsel wish to inquire
19  into the underlying aspects of an alcohol dependency and the
20  disciplinary committee and the proceedings, that that be a
21  matter that is not for public consideration.
22       THE COURT: Thank you, Ms. Sternheim. Is there any
23  other matter that you want to bring to the Court's attention
24  before the witness is called?
25       MS. STERNHEIM: Yes, your Honor. In connection with

| C2frdau3 | Page 99 |
|---|---|

1   my letter, which I know the Court has furnished to counsel, I
2   informed the Court prior to today that on advice of counsel Ms.
3   Conrad will be asserting her Fifth Amendment right against
4   self-incrimination. She will be doing that once called into
5   this courtroom. Obviously, if she is granted immunity, she
6   will answer the questions as ordered.
7        THE COURT: Thank you, Ms. Sternheim.
8        Does any other counsel wish to be heard further on the
9   question of the sealing of the courtroom?
10       MR. GAIR: No, your Honor.
11       MR. OKULA: No, your Honor.
12       MR. ROTERT: No, your Honor.
13       A VOICE: Your Honor, may I be heard?
14       THE COURT: It's really not necessary. Have a seat.
15       By letter dated February 8, 2012, Catherine Conrad
16  requests that any questioning during this hearing concerning
17  her medical suspension in proceedings held before the
18  departmental disciplinary committee of the First Judicial
19  Department be conducted in a closed courtroom.
20       A party seeking to close the courtroom to the public
21  must demonstrate "an overriding interest that is likely to be
22  prejudiced, the closure must be no broader than necessary to
23  protect that interest, the trial court must consider reasonable
24  alternatives to closing the proceeding, and the trial court
25  must make findings adequate to support the closure." Presley

| C2frdau3 | Page 100 |
|---|---|

1   v. Georgia, 130 S.Ct 721, 724 (2010) quoting Walker v. Georgia,
2   467 U.S. 39, 48 (1984).
3        The information Ms. Conrad seeks to shield from public
4   view has already been disseminated. But the various court
5   filings in support of the defendants' motion for a new trial
6   include, among other things, Conrad's disciplinary records and
7   related court filings and her psychological evaluations. Given
8   these prior disclosures, there is no overriding interest of Ms.
9   Conrad that is likely to be prejudiced. Moreover, the rights
10  of the defendants in this criminal case to a public proceeding
11  trump Ms. Conrad's own parochial interest. Accordingly, her
12  application is denied.
13       I'd ask at this time that the marshals bring Ms.
14  Conrad out.
15       MR. OKULA: Your Honor, before they bring her out, may
16  I be heard briefly?
17       THE COURT: Certainly.
18       MR. OKULA: I have spoken with Mr. Gair, and we
19  understand that the procedure is that Mr. Gair is going to call
20  Ms. Conrad and that she is going to invoke her Fifth Amendment
21  rights. Your Honor has before you an application that we have
22  submitted requesting that she be compelled to testify and be
23  given use immunity in connection with that testimony.
24       I want to be perfectly clear that in connection with
25  this hearing, although Mr. Gair is calling Ms. Conrad as a

**A-5635**

---

C2frdau3     Page 101

1  witness, we would have otherwise called Ms. Conrad in order to
2  elicit these facts, so somebody looking back on this record
3  later has no misimpression of a defendant calling a witness
4  who the government selectively decides to immunize. We are
5  going to call this witness ourselves. We made a decision that
6  her testimony is in the public interest; that's why we are
7  seeking the immunity. I just wanted to make that clear to your
8  Honor.
9      THE COURT: Fine. Ms. Sternheim, if you would like,
10  you may take a seat in the jury box during her examination.
11      MS. STERNHEIM: Thank you, Judge.
12      THE COURT: Let's bring out Ms. Conrad.
13      MS. STERNHEIM: Your Honor, may I take the seat
14  closest?
15      THE DEFENDANT: Yes, come on down.
16  CATHERINE M. CONRAD,
17      called as a witness by the defendant,
18      having been duly sworn, testified as follows:
19      THE COURT: Would you take a seat and state your full
20  name and spell your name slowly for the court reporter.
21      THE WITNESS: Catherine with a C, C-A-T-H-E-R-I-N-E,
22  Conrad, C-O-N-R-A-D.
23      THE COURT: Mr. Gair, you may inquire.
24  DIRECT EXAMINATION
25  BY MR. GAIR:

---

C2frdau3     Conrad - direct     Page 103

1  this proceeding?
2  A. Yes, sir.
3  Q. Ms. Conrad, did you take the same oath on March 1, 2011, to
4  tell the truth in this courtroom that you took a few moments
5  ago?
6  A. I can't answer that. I'm not sure of the date.
7  Q. Apart from the date, do you recall that in connection with
8  United States v. Daugerdas, you appeared as a juror, a
9  prospective juror, correct?
10  A. Yes, sir.
11  Q. At the beginning of the trial you took an oath, did you
12  not?
13  A. I'm not exactly sure when, sir.
14  Q. At some point during the voir dire, did you take an oath to
15  tell the truth, the whole truth, and nothing but the truth?
16  A. Probably, yes, sir.
17  Q. You didn't do that, did you?
18  A. There were omissions, yes, sir.
19  Q. There were omissions in your testimony, is that correct?
20  A. Yes, sir.
21  Q. There were lies in your testimony, were there not?
22  A. Yes, sir.
23  Q. So you didn't tell the truth, the whole truth, and nothing
24  but the truth, isn't that correct?
25  A. Yes, sir.

---

C2frdau3     Conrad - direct     Page 102

1  Q. Ms. Conrad, the oath that you just took, is that the same
2  oath that you took to tell the truth in voir dire on March 1st
3  of 2011 in this case?
4  A. Upon advice of my counsel, I plead the Fifth. Thank you.
5  Q. On March 1st and 2nd of 2011, were you present in this
6  courtroom for the trial of United States v. Daugerdas?
7  A. Upon advice of my counsel, I plead the Fifth. Thank you.
8  Q. Let me ask you one more question. Is it your intention to
9  assert your Fifth Amendment privilege to any question that I
10  ask you concerning your service in United States v. Daugerdas?
11  A. Yes, sir.
12      MR. GAIR: Your Honor?
13      THE COURT: Does the government have an application at
14  this time, Mr. Okula?
15      MR. OKULA: We do, your Honor. We have submitted to
16  your Honor papers applying for an immunity order, and we
17  respectfully ask that your Honor sign that order.
18      THE COURT: Ms. Conrad, in view of your assertion of
19  the Fifth Amendment privilege, I have signed just now an order
20  granting you immunity, that is, use immunity, with respect to
21  your testimony in this proceeding.
22      You may proceed, Mr. Gair.
23  BY MR. GAIR:
24  Q. Do you understand, Ms. Conrad, that given the grant of use
25  immunity, you are required to answer appropriate questions in

---

C2frdau3     Conrad - direct     Page 104

1  Q. Today did you call the chambers of Judge Pauley at about 10
2  minutes to 8:00 this morning?
3  A. Yes, sir.
4  Q. Did you inform the deputy clerk in Judge Pauley's chambers
5  that you would not be coming to court today?
6  A. Yes, sir.
7      (Continued on next page)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**UNITED STATES OF AMERICA, v**
**PAUL M. DAUGERDAS, ET AL.,**

February 15, 2012

| C2FFDAU4 | Conrad - direct | Page 105 |
|---|---|---|

1 Q. Did you know that you were under court order to appear in
2 court today?
3 A. Yes, sir.
4 Q. And did you know that a United States --
5 A. Well, there was a subpoena.
6 Q. Did you know that a United States district judge had the
7 power to subpoena you to court today?
8 A. Probably.
9 Q. Well, you're a trained lawyer. You know that the Court can
10 issue a subpoena, correct?
11 A. Yes, sir.
12 Q. And you were standing in front of Judge Pauley when the
13 subpoena was served on you on December 20th, is that right?
14 A. The 20th, yes.
15 Q. Okay. So you knew you were under court order to appear
16 today, correct?
17 A. Yes, sir.
18 Q. And you knew that court order was lawful. In other words,
19 you knew by your training as a lawyer that Judge Pauley had the
20 power to issue that order to you, correct?
21 A. Yes, sir.
22 Q. And yet you told Judge Pauley's clerk that you were not
23 coming today, did you not?
24 A. Yes.
25 Q. And you would agree with me that that is irrational

| C2FFDAU4 | Conrad - direct | Page 107 |
|---|---|---|

1 A. I don't know how to answer that question, I'm sorry.
2 Q. Do you understand what rational behavior is?
3 A. I'm not a psychologist, but yes, I understand you.
4 Q. And you don't know whether that was a rational thing for
5 you to say or an irrational one?
6 A. I don't know how to answer you.
7 Q. It might have been either one?
8 A. I don't know how to answer you.
9 Q. Okay. And did you further tell the deputy clerk that you
10 would not be testifying today?
11 A. I believe so.
12 Q. And did you understand that the government had prepared an
13 order of immunity that when conferred by Judge Pauley would
14 require you to testify?
15 A. No.
16 Q. So you had no idea that you were going to receive immunity
17 when you came here to testify today?
18 A. That's correct, sir.
19 Q. You're represented by counsel?
20 A. Yes, sir and it was -- yes, sir.
21 Q. And it's your testimony -- have you had a chance to meet
22 with your counsel?
23 A. Yes, sir.
24 Q. Can you point her out?
25 A. Right to my left.

| C2FFDAU4 | Conrad - direct | Page 106 |
|---|---|---|

1 behavior, is it not?
2 MR. OKULA: Objection, objection.
3 A. I'm not University of Chicago trained --
4 MR. OKULA: Objection.
5 THE COURT: Sustained as to form.
6 Q. Interesting question. How did you know I was University of
7 Chicago trained --
8 A. I Googled you after the trial.
9 Q. After the trial, is that correct?
10 A. Yes, sir.
11 Q. You didn't Google me during the trial, is that correct?
12 A. No. Yes, you're correct.
13 Q. Okay. Now, Ms. Conrad, can you explain how a person with
14 legal training recognizing that they are under court order to
15 appear could call a federal judge and say "I'm not coming"?
16 A. No.
17 Q. There's no rational explanation for that conduct is there--
18 A. Object --
19 MR. OKULA: Objection, your Honor. What kind of
20 question is that?
21 MR. GAIR: May I be heard, your Honor?
22 THE COURT: On this question I'm going to overrule the
23 government. All right? She can answer that question.
24 Q. There's no rational basis for your having stated to the
25 deputy this morning that you were not coming to court, correct?

| C2FFDAU4 | Conrad - direct | Page 108 |
|---|---|---|

1 Q. How many times have you met with Ms. Sternheim?
2 A. Six.
3 Q. And in the six times you met with Ms. Sternheim -- strike
4 that. All those times occurred before today, correct?
5 A. Yes, sir.
6 Q. And you came into this courtroom today not understanding
7 that you were going to be immunized so that you could testify
8 here today?
9 A. You're correct.
10 Q. Would you agree with me that telling the Court I'm not
11 coming and I'm not going to testify shows a lack of respect for
12 the judicial process?
13 A. No, not at all.
14 Q. Can you explain to me your thinking and telling the deputy
15 clerk "I will not be coming today"?
16 A. No.
17 Q. Is that because you do not wish to or for some other
18 reason?
19 A. I don't know how to answer you.
20 Q. What was the reason for your saying to the deputy clerk I
21 will not be coming today?
22 A. I don't know.
23 Q. Do you know if you had a reason?
24 A. I'm not sure.
25 Q. Do you find yourself at times doing things that you do not

| C2FFDAU4 | Conrad - direct | Page 109 |
|---|---|---|

1   know whether you have a reason for doing or not?
2   A. I'm not sure how to answer that if you're not a
3   psychologist.
4   Q. Had you been drinking this morning, Ms. Conrad?
5   A. No.
6   Q. When was the last time you were drinking?
7   A. Last night.
8   Q. How much did you have to drink last night?
9   A. A cup and a half, maybe.
10   Q. Of?
11   A. A liquor.
12   Q. What kind of liquor?
13   A. A very cheap vodka.
14   Q. And before that when was the last time you had been
15   drinking?
16   A. Sunday, January 8th.
17   Q. How is it that you remember the date Sunday, January 8th?
18   A. Because alcoholics generally do that.
19   Q. Now, Ms. Conrad, you last appeared in the federal
20   courthouse on December 20th to appear before Judge Pauley and
21   received instructions, is that correct?
22   A. Yes, you're correct.
23   Q. Now, during that court appearance, were you intoxicated?
24   A. No.
25   Q. Had you had anything to drink?

| C2FFDAU4 | Conrad - direct | Page 110 |
|---|---|---|

1   A. No.
2   Q. When was the last time before your court appearance on
3   December 20th that you had anything to drink?
4   A. The night before.
5   Q. And had the effects of that alcohol worn off by the time
6   you arrived in court at noon on December 20th?
7   A. Yes.
8   Q. And so whatever you did in that court appearance on
9   December 20th was not caused by alcohol intoxication, is that
10   correct?
11   A. I believe it was caused by a subpoena that I had to appear
12   here, sir.
13   Q. The things that you said to the Court on that day were not
14   influenced by being intoxicated at the time, is that correct?
15   A. I believe you're correct.
16   Q. And was your behavior, would you characterize your behavior
17   as rational or irrational?
18   A. I can't answer that. That's in your eyes, sir.
19   Q. Now, do you recall that you received some instructions from
20   the Court?
21   A. I don't know what you're talking about. When?
22   Q. On December 20th did you receive some instructions from
23   Judge Pauley?
24   A. Of course. I received a subpoena.
25   Q. And Judge Pauley ordered you to appear today, is that

| C2FFDAU4 | Conrad - direct | Page 111 |
|---|---|---|

1   correct?
2   A. Yes, I'm here.
3   Q. And do you remember you made some statements at that time.
4   A. I'm sure I did. Thank you.
5   Q. Did you say, and I quote, "You're being very stupid, Judge,
6   and I know you went to Duke and God bless you because I love
7   all the players there, but, you know, come on, this is anything
8   in favor of the defendants and they brought the motion against
9   the prosecution. It's ridiculous. If you want another Clinton
10   appointment, it's not going to happen."
11   A. I absolutely said that. Thank you for refreshing my
12   recollection.
13   Q. Now, let me break that down a little bit. When you said,
14   "You're being very stupid, Judge," what were you referring to?
15   A. I don't recall.
16   Q. Well, were you referring to anything?
17   A. I don't recall.
18   Q. And when you said, "I know you went to Duke and God bless
19   you," what were you referring to there?
20   A. I like his football team.
21   Q. You like Duke's football team?
22   A. Yes, sir.
23   Q. You mean its basketball team?
24   A. No. Football.
25   Q. You like Duke's football?

| C2FFDAU4 | Conrad - direct | Page 112 |
|---|---|---|

1   A. I know, they're sort of losers, but that's okay.
2   Q. Is that what you like about them?
3   A. I'm not going to answer this.
4         MR. OKULA: Objection, your Honor. Why she likes the
5   Duke football team?
6         THE COURT: Sustained.
7   Q. Are you under the impression as you sit up there today that
8   you are the judge of deciding what questions you will and you
9   will not answer?
10   A. No, sir.
11   Q. And yet that's what you just did, correct?
12   A. I think even yourself sees the ridiculosity (sic) of that
13   question.
14   Q. Let me try to repeat that question again. Didn't you just
15   state, contrary to your own knowledge of legal procedures, that
16   you were not going to answer my question?
17   A. I don't understand your question. I'm sorry.
18   Q. Now, do you feel like you have the same level of
19   understanding of what's going on around you today that you had
20   during the trial?
21   A. I don't understand the meaning of that question.
22   Q. Now, can you explain to us what Judge Pauley having
23   attended Duke University had to do with the discussion about
24   your appearing for a hearing today?
25   A. Absolutely nothing.

| C2FFDAU4 | Conrad - direct | Page 113 |
|---|---|---|

1 Q. It was irrational, was it not?

2          MR. OKULA: Objection, your Honor.

3          THE COURT: Overruled.

4 A. I don't know what "irrational" means. I'm not a

5 psychologist.

6 Q. And would you agree with me that at least there was no

7 logical connection between Judge Pauley having attended Duke

8 University 30 years or more ago and the hearing that you were

9 present for and the instructions you were receiving on

10 December 20th.

11 A. You went there too, but I really don't know what your

12 question means.

13 Q. When you say you went there too, you mean I went there too?

14 A. Yes. I Googled you.

15 Q. And you know that I attended that as an undergraduate?

16 A. I believe so.

17 Q. Is that responsive to the question I just asked you?

18 A. I told you, I can't answer your question, sir.

19 Q. I have now posed a different question. I am now asking you

20 to explain for us whether there's a logical connection between

21 Judge Pauley's attendance at Duke University and your statement

22 to the Court in the proceedings on December 20th?

23 A. I can't parse it down. I'm not a psychologist, sir.

24 Q. Now, then you went on to say, "Come on, this is anything in

25 favor of the defendants and they brought the motion against the

| C2FFDAU4 | Conrad - direct | Page 114 |
|---|---|---|

1 prosecution. It's ridiculous." Now, what were you trying to

2 get at when you said "this is anything in favor of the

3 defendants"?

4 A. I don't recall.

5 Q. Well, what you were trying to get at is --

6 A. Are you testifying for me, sir?

7 Q. What you were trying to get at, ma'am, you thought that

8 anything that might be in favor of the defendants would be

9 ridiculous, is that correct?

10 A. Absolutely not.

11 Q. Because you had decided that they were fricken crooks,

12 isn't that correct?

13 A. Absolutely not.

14 Q. You haven't decided that?

15 A. Absolutely not.

16 Q. Did you think -- and when you said and they brought the

17 motion against the prosecution did you think that Judge Pauley

18 was unaware of who filed the motion and who was responding to

19 the motion concerning the request for a new trial?

20 A. You have to break that question down for me, because Pacer

21 is a public record, sir.

22 Q. Can you explain to me what the fact that Pacer is a public

23 record has to do with the question of whether Judge Pauley

24 would know who filed the motion?

25 A. Of course. It's a matter of public record and it's what's

| C2FFDAU4 | Conrad - direct | Page 115 |
|---|---|---|

1 filed in the court, sir. Everyone can look it up. It's a

2 matter of public record.

3 Q. And in your judgment the motion was ridiculous, is that

4 what you meant to convey?

5 A. I don't recall, no. I don't recall.

6 Q. Well, when you said it was ridiculous, what did you mean?

7 A. I don't recall.

8 Q. Well, did you mean that you thought there was no merit to

9 it?

10 A. I don't recall.

11 Q. I mean, you know there's merit to it, right?

12 A. I don't recall.

13 Q. Do you know -- I'm not asking about your recall right now.

14 I'm asking you whether or not there is merit to a motion that

15 said you came into court and lied and lied and lied on March 1,

16 2011.

17          MR. OKULA: Objection to the form, your Honor.

18          THE COURT: Sustained as to form.

19 Q. So you don't know why you said it was ridiculous?

20 A. You're correct. I'm not a psychologist.

21 Q. Now, when you went on to tell Judge Pauley "If you want

22 another Clinton appointment, it's not going to happen" -- do

23 you remember saying that?

24 A. I don't recall.

25 Q. So you do not remember saying that?

| C2FFDAU4 | Conrad - direct | Page 116 |
|---|---|---|

1 A. If it's in the record, I probably did say that, sir.

2 Q. Okay, so it's in the record. So why did you say it?

3 A. Probably just being smart.

4 Q. Just being smart.

5 A. Smart a-s-s.

6 Q. So you were being a smart ass to a federal judge, is that

7 what you call it?

8 A. If you need to say it that way, that's your words, not

9 mine.

10 Q. Okay, well, let me ask you this: Are you under the

11 impression that the President of the United States is named

12 Clinton?

13 A. I Googled -- no. Please, stop. No.

14 Q. Why did you refer to another Clinton appointment?

15 A. Because I Googled the judge after the trial was over and I

16 saw he was a Clinton appointee. End of story. Why don't we

17 get on to the meat of this?

18 Q. Ms. Conrad, can you explain for us the connection between

19 Judge Pauley ordering you to appear for a hearing on

20 February 15th and the prospect that Judge Pauley would receive

21 another appointment to the bench from somebody --

22 A. No.

23 Q. -- who is not President?

24 A. No.

25 Q. Would you agree with me that in the common parlance that

| C2FFDAU4 | Conrad - direct | Page 117 |
|---|---|---|

1 was crazy talk?
2     MR. OKULA: Objection.
3 A. No, I'm not a psychologist.
4     THE COURT: Sustained.
5 Q. Can you explain the connection, if any, between what you
6 said about Judge Pauley receiving another Clinton appointment
7 and the matters that were going to be discussed?
8 A. No.
9 Q. And did you have any special insight when you said "it's
10 not going to happen" that Judge Pauley would not receive
11 another appointment?
12 A. No.
13 Q. Now, when you came to the hearing on December 20th, did you
14 understand that you had been compelled to come to that hearing
15 by having an order served on you at your home?
16 A. Yes, I had a subpoena served upon me.
17 Q. By two deputy U.S. marshals, correct?
18 A. I believe so, yes.
19 Q. And you understood that you had to obey that order,
20 correct?
21 A. Yes, sir.
22 Q. And you understood that you couldn't leave, correct, till
23 Judge Pauley told you you could leave?
24 A. I don't really know what that means.
25 Q. Well, do you remember telling the deputy clerk at that time

| C2FFDAU4 | Conrad - direct | Page 118 |
|---|---|---|

1 that your time was being wasted and you were going to walk out
2 of the courtroom?
3 A. No, I don't.
4 Q. Did you do that?
5 A. If I told you I don't remember, how can you ask me the next
6 question?
7 Q. Did Judge Pauley explain to you at that hearing you're
8 ordered to appear as a witness at a hearing on February 15th
9 concerning your role as a juror in United States v. Daugerdas?
10 A. I don't specifically recall him.
11 Q. Do you recall something like that?
12 A. Yes, sir.
13 Q. And do you recall that your response, or do you recall that
14 later in that hearing he told you again you're going to have to
15 testify at a hearing. Do you recall that?
16 A. Not specifically, no, sir.
17 Q. Do you recall that your initial response to being told that
18 you had to appear at a hearing is to say, "No, I don't. No,
19 no, no"?
20 A. If you're reading from the transcript, then that's what I
21 said, sir.
22 Q. And do you recall that when the Judge gave you instructions
23 about retaining a lawyer you said, and I quote, "For what? I'm
24 no, I'm not. I'm not going to court for anything. I'm not
25 testifying for anything, sir." Do you remember saying that?

| C2FFDAU4 | Conrad - direct | Page 119 |
|---|---|---|

1 A. I can't dispute if you're reading from the transcript, sir.
2 So --
3 Q. I'm asking if you remember saying it.
4 A. If you're reading from the transcript then I said it. It
5 doesn't matter, I guess, if I remember it or not. But I recall
6 that.
7 Q. You do recall?
8 A. Vaguely.
9 Q. Now, would you agree with me in your career as a lawyer
10 that it is an uncommon response for a person ordered by a judge
11 to appear in court to testify to say no, I'm not going to do
12 that?
13     MR. OKULA: Objection, your Honor.
14     THE COURT: Overruled.
15 A. Could you please repeat the question?
16 Q. Based on your experience as a lawyer, would you agree with
17 me that your conduct in responding to the judge's instructions
18 by saying you were not going to appear was unusual?
19 A. I'm not a psychologist. I don't know. I don't know how to
20 answer you, sir.
21 Q. Well, you are a lawyer, correct?
22 A. No. I was.
23 Q. Have you been disbarred?
24 A. No.
25 Q. So you're a suspended lawyer?

| C2FFDAU4 | Conrad - direct | Page 120 |
|---|---|---|

1 A. Correct.
2 Q. You had legal training?
3 A. Yes. I went to law school.
4 Q. How many times have you ever heard a person ordered by a
5 judge to appear and testify say "I'm not going to"?
6 A. I have no idea.
7 Q. It might happen all the time?
8 A. I don't know how to answer your question, sir.
9 Q. Would you agree that that is not -- to tell a federal
10 judge, and I quote, "I'm not showing up" when you've been
11 ordered to show up is conduct that is not rational?
12 A. I am not a psychologist. I am not part of the disciplinary
13 committee, so I don't know how to answer your question, sir.
14 Q. Do you know what the word "rational" means?
15 A. I'm not a psychologist. There are variations that are
16 shades of gray.
17 Q. Have you ever been treated for a mental illness?
18 A. I'm not going to answer this.
19     THE COURT: You are directed to answer it.
20 A. No.
21 Q. Ma'am, has anybody ever told you that you suffer from
22 bipolar disorder?
23 A. Not at all.
24 Q. What medications do you take?
25 A. Water.

UNITED STATES OF AMERICA, v
PAUL M. DAUGERDAS, ET AL.,

February 15, 2012

| C2FFDAU4 | Conrad - direct | Page 121 |
|---|---|---|

1 Q. Do you regard water as a medication?
2 A. It calms me down. Sure.
3 Q. Besides water, what other medications do you take?
4 A. Tylenol for PMS.
5 Q. Do you take any prescription medication?
6 A. Not at all.
7 Q. At any time in the last, say, two years have you taken any
8 prescription medication?
9 A. No, sir.
10 Q. Now, did you tell the judge that, after he reminded you
11 that a subpoena had just been served on you on December 20, did
12 you tell the judge, "I reject the subpoena. I reject it and
13 you're going to have to arrest me because nothing is going to
14 change."
15 A. I don't specifically remember that, but I'm sure I told him
16 that if it's in your record.
17 Q. Would you agree with me that that is uncommon conduct for
18 an officer of the Court?
19 A. I'm not a psychologist. I don't know what common conduct
20 quote-unquote, what your terms mean.
21 Q. So you're not really in a position to judge whether
22 something is common or uncommon, correct?
23 A. I'm not a judge, like you just said.
24 Q. And you're not in a position to judge whether something is
25 rational or irrational, right?

| C2FFDAU4 | Conrad - direct | Page 123 |
|---|---|---|

1 Q. Would your conduct be sane if irrational?
2 A. I'm not going to answer that. Of course not. Insanely?
3 Is that what you said, sir?
4 THE COURT: Why don't you put another question?
5 Q. Was your conduct in rejecting the subpoena that the judge
6 ordered served on you and saying that you were not going to
7 appear and the judge would have to have you arrested, was that
8 conduct irrational?
9 A. Absolutely not. Nobody wants a subpoena served on them.
10 Q. Now, have you ever witnessed an officer of the court in
11 your career as a lawyer, have you ever witnessed an officer of
12 the court telling a judge that the judge would have to have
13 them arrested because they weren't going to appear as ordered?
14 A. I don't know how to answer that. I don't know.
15 Q. Do you know what your own experiences are?
16 A. If you're asking if I did it? You just told me I did it.
17 Q. I'm asking you -- are you able to understand my question?
18 A. Yes, but these questions are ridiculous.
19 Q. Why are they ridiculous?
20 A. Pose it again, please.
21 Q. Can you answer me why -- you just said my questions are
22 ridiculous. What did you mean when you said they were
23 ridiculous?
24 A. How would I know whether an attorney, what another attorney
25 said to another judge? I don't understand your questions.

| C2FFDAU4 | Conrad - direct | Page 122 |
|---|---|---|

1 A. Common knowledge is common knowledge, sir.
2 Q. Are you in a position to judge whether something is
3 rational or irrational?
4 MR. OKULA: Objection, Judge. We're getting into this
5 rational/irrational. Different people have different ideas
6 about it.
7 THE COURT: And he's exploring the witness' view of
8 that. Overruled.
9 A. Can you please say that again, sir?
10 MR. GAIR: Your Honor, can I ask that the court
11 reporter read back the question?
12 THE COURT: Madam court reporter, would you kindly
13 read back the question for Ms. Conrad?
14 (Record read)
15 A. In what context, sir?
16 Q. In the context of conduct of a lawyer appearing before a
17 federal judge, do you know what kind of conduct is rational and
18 what kind of conduct is irrational?
19 A. Probably, sir.
20 Q. Was your conduct irrational when you said, "I reject the
21 subpoena. I reject it and you're going to have to arrest me
22 because nothing is going to change"?
23 A. I consider it irrelevant.
24 Q. I beg your pardon?
25 A. Irrelevant, not irrational.

| C2FFDAU4 | Conrad - direct | Page 124 |
|---|---|---|

1 Q. Okay. Now, would you agree with me that a good part of
2 that hearing on December 20th was about Judge Pauley advising
3 you that you should get a lawyer?
4 A. Yes, sir. I understand the underlying reason why we're
5 here is not lawyer or lawyer up, whether I did or didn't, it's
6 whether the underlying fact of the verdict.
7 Q. Did you understand that the hearing on December 20th was to
8 give you instructions which included instructing you about your
9 right to a lawyer?
10 A. I guess partly, sir.
11 Q. Okay. And Judge Pauley told you that he would appoint a
12 lawyer for you if you qualified financially, correct?
13 A. I don't recall specifically. I don't recall.
14 Q. Well, didn't you -- you don't recall whether the judge told
15 you that you would have to -- that he could only appoint a
16 lawyer if you couldn't afford to hire one yourself?
17 A. Sir, I don't specifically remember that.
18 Q. Did you say that you didn't have the money to pay for
19 counsel?
20 A. Oh, I don't recall.
21 Q. Did you have the money to pay for counsel?
22 A. No.
23 Q. Well, let me just ask you to look, there's a big black
24 binder in front of you, and I'm going to ask you about a
25 document in that binder, Exhibit 3.

| C2FFDAU4 | Conrad - direct | Page 125 |
|---|---|---|

1 A. Sir, tab 3?

2 Q. Tab 3, yes.

3 A. All right.

4     MR. GAIR: Your Honor, at this time I would move the

5 admission of PMD3.

6     THE COURT: Any objection?

7     MR. OKULA: No, your Honor.

8     THE COURT: PMD 3 is received in evidence.

9     (Exhibit PMD 3 received in evidence)

10 Q. If you would look at page 10 of the transcript, it's got

11 page 5 at the bottom, but then on the right side there are page

12 numbers 9, 10 and 11. Tell me when you've got that.

13 A. Okay. Yes, sir.

14 Q. Okay, and if you look at beginning at line 8, the Court

15 says, "Do you want to complete this affidavit now so that I can

16 make a determination as to whether or not you can afford

17 counsel?"

18     And you said, "I can't afford counsel, that's correct,

19 sir."

20     Do you remember that happening?

21 A. If it's here then it happened, sir.

22 Q. And I'm asking you now do you remember it?

23 A. Yeah, probably.

24 Q. Okay. And you understood that you needed to qualify in

25 order to have an attorney appointed for you, correct?

| C2FFDAU4 | Conrad - direct | Page 126 |
|---|---|---|

1 A. I didn't know specifically, specifically what the

2 qualifications are or were.

3 Q. But you knew it was a financial qualification, correct?

4 A. Probably.

5 Q. Okay. And you understood that you would have to fill out a

6 financial affidavit, did you not?

7 A. I don't know how to answer that. Maybe eventually.

8 Q. Well, when the Court said do you want to complete this

9 affidavit now so that I can make a determination as to whether

10 or not you can afford counsel, did you understand at that point

11 that you had to complete a financial affidavit?

12 A. I don't know, sir.

13 Q. All right. Look back on page 8. It's on the facing page

14 of this exhibit, line 6, Judge Pauley says if you would like a

15 lawyer but do not have the funds to retain one, you may make an

16 application to this Court to have an attorney appointed

17 provided that you make such application and submit a completed

18 financial affidavit that demonstrates your inability to retain

19 counsel by December 23rd 2011, and then a form was tendered to

20 you. Do you remember that happening?

21 A. Oh, yes sir.

22 Q. And do you remember what you said to Judge Pauley when you

23 got the form?

24 A. Oh, yes. "This is garbage."

25 Q. You said, "this is garbage"?

| C2FFDAU4 | Conrad - direct | Page 127 |
|---|---|---|

1 A. Yes, sir.

2 Q. Why did you say "this is garbage"?

3 A. I really don't know why.

4 Q. So that's another instance where you did something but you

5 don't know why you did it, correct?

6 A. I'm not going to adopt your characterization of anything,

7 sir.

8 Q. Is that an instance in which you said something but you

9 don't know why you said it?

10 A. I give you my same answer, sir.

11 Q. I can do this all day, Ms. Conrad. Did you in fact make a

12 statement to the Court, "this is garbage," without knowing why

13 you were saying it?

14 A. I really don't know what your question means.

15 Q. Why did you say to the Court "this is garbage"?

16 A. I don't know, sir.

17 Q. So this would be an instance where you did something in a

18 matter you knew was important and you don't know why you did

19 it, correct?

20 A. No. I'm not going to adopt your mischaracterization, sir.

21 Q. What have I mischaracterized?

22 A. That you're implying that I do things that I don't know

23 what I'm doing.

24 Q. Didn't you just tell us that you didn't know why you were

25 doing what you just did?

| C2FFDAU4 | Conrad - direct | Page 128 |
|---|---|---|

1 A. It was probably a kneejerk reaction, sir.

2 Q. So you do know why you did it, it was a kneejerk reaction?

3 A. If you want to characterize it that way.

4 Q. Was it irrational for you to tell Judge Pauley --

5 A. I'm not a psychologist.

6 Q. Because you're not a psychologist you can't penetrate

7 mental states of other people and yourself, correct?

8 A. I don't know how to answer that.

9 Q. Are you able to form a conclusion whether or not somebody

10 is acting rational or irrationally?

11 A. Yes, and I was a very unbiased juror.

12 Q. Ms. Conrad, would you agree with me that your conduct in

13 telling Judge Pauley that the affidavit was garbage was

14 irrational?

15 A. No. And it has nothing to do with the jury verdict that

16 was rendered against your client.

17 Q. Are you under the impression that you are the determinant

18 in this proceeding of what is relevant and irrelevant

19 information?

20 A. I'm not the judge, sir.

21 Q. But yet you just told me that my question was in essence

22 irrelevant, correct?

23 A. I'm not going to mischaracterize your statements.

24     THE COURT: Mr. Gair, is this an appropriate place for

25 a luncheon recess?

UNITED STATES OF AMERICA, v
PAUL M. DAUGERDAS, ET AL.,

February 15, 2012

| C2FFDAU4 | Conrad - direct | Page 129 |
|---|---|---|

1　　　MR. GAIR: Yes, your Honor.
2　　　THE COURT: We're going to take a luncheon recess at
3　this time. We'll resume at 2:05.
4　　　(Luncheon recess)
5　　　　　　　　o0o
6　　　　　AFTERNOON SESSION
7　　　　　　2:05 p.m.
8　　　THE COURT: I want to draw to counsel's attention two
9　matters that developed over the luncheon recess. First,
10　Ms. Sternheim presented me with a financial affidavit which she
11　received from Ms. Conrad. Copies have been made and circulated
12　to all counsel and I've marked it as Court Exhibit 1.
13　　　Second, during the luncheon recess we discovered on
14　our voice mail system that there is a voice mail message from
15　Ms. Conrad. Much like a picture that's worth a thousand words
16　I'm going to play the voice mail message for all parties in
17　open court now.
18
19　　　MS. CONRAD: (Voice mail) "Hi, it's Catherine Conrad.
20　I won't be showing up to the hearing today. Thank you."
21　　　THE COURT: Play the time.
22　　　"8:33 a.m. on February 15th."
23　　　All right. There you have it. That was after her
24　conversation with my deputy at 7:52. Are there any matters
25　that counsel want to raise before we bring Ms. Conrad out and

| C2FFDAU4 | Conrad - direct | Page 131 |
|---|---|---|

1　Q. Did you refuse to tell Judge Pauley whether you had money
2　in checking or savings accounts?
3　A. I don't recall.
4　Q. And this was just about two months ago that you had this
5　conversation with Judge Pauley, correct?
6　A. If we've established it was December 20th, right.
7　Q. And you don't recall whether he asked you whether you had
8　money in checking or savings accounts and you refused to
9　answer?
10　A. Are you directing me to look at a specific page of the
11　transcript?
12　Q. Actually, I was directing you to look at what I thought was
13　on page 11, but I am not finding it right now. It might be --
14　oh, yeah, I'm sorry. My notes were wrong. It's the bottom of
15　page 10 of the transcript.
16　　　"The Court: Have you any cash on hand or money in
17　savings or checking accounts?"
18　　　And your answer was, "As opposed to what? As opposed
19　to paying my rent next month or as opposed to what? That's not
20　a fair question. I don't understand what you're saying, sir."
21　　　Now, do you recall, does that refresh your
22　recollection that you were asked about whether you had cash or
23　money in checking or savings accounts?
24　A. Yes. Now it does, sir.
25　Q. And did you tell the judge that your personal finances had

| C2FFDAU4 | Conrad - direct | Page 130 |
|---|---|---|

1　resume the inquiry?
2　　　MR. GAIR: No, your Honor.
3　　　THE COURT: All right.
4　　　MR. OKULA: Judge, do you anticipate that we'll go to
5　5 today?
6　　　THE COURT: Do you anticipate finishing with
7　Ms. Conrad this afternoon?
8　　　MR. GAIR: I do so anticipate.
9　　　THE COURT: Good. Then I anticipate going to five.
10　If we have to work a little later to complete Ms. Conrad, I'd
11　like to do that.
12　　　Mr. Gair, you may continue with your examination.
13　BY MR. GAIR:
14　Q. On December 20th when you were here pursuant to the Court's
15　order, Judge Pauley attempted to determine whether you had the
16　financial ability to hire a lawyer. Do you recall that?
17　A. Generally. Not specifically.
18　Q. And you understood -- well, he asked you whether you had
19　any money in checking or savings account, did he not?
20　A. I don't recall.
21　Q. If we can look at Exhibit 3, it's tab 3, page 11 of the
22　transcript --
23　　　MR. GAIR: If I may have a moment, your Honor.
24　　　THE COURT: Take your time.
25　　　(Pause)

| C2FFDAU4 | Conrad - direct | Page 132 |
|---|---|---|

1　nothing to do with this?
2　A. I can't read as quickly as you're trying to lead me to,
3　but --
4　Q. I don't want to make you go any more quickly than you can.
5　If you look on page 11, line 19, did you say, beginning line
6　19, "My personal finances have nothing to do with this. Thank
7　you. They have nothing to do with this. I can get counsel any
8　time I want, federal or state. Thank you, sir." Did you say
9　that to Judge Pauley?
10　A. Yes, before he told me to sit down.
11　Q. We're going to get to where he told you to sit down, but
12　when you told Judge Pauley your personal finances have nothing
13　to do with this, did you understand that in fact your personal
14　finances had a great deal to do with whether or not he could
15　appoint a lawyer for you?
16　A. Had nothing to do with the guilty verdict I rendered
17　against your client.
18　Q. So you were not telling the judge that your personal
19　finances had nothing to do with whether or not you could be
20　appointed a lawyer?
21　A. Can you please rephrase that?
22　Q. Sure. What you said is that your personal finances had
23　nothing to do with it and you could get a lawyer federal or
24　state any time you wanted. Isn't that what you said?
25　A. If that's what it sets, then that's what I said, sir.

February 15, 2012

UNITED STATES OF AMERICA, v
PAUL M. DAUGERDAS, ET AL.,

| C2FFDAU4 | Conrad - direct | Page 133 |
| --- | --- | --- |

1  Q. So my question is, did you understand at that moment that
2  there was a logical connection between the question Judge
3  Pauley was asking you about your finances and the matter he was
4  discussing with you, that is, appointment of a lawyer?
5  A. Yes, sir.
6  Q. You did understand?
7  A. Yes, sir.
8  Q. And yet you refused to answer those questions, correct?
9  A. At that time.
10 Q. And in fact, you said your personal finances have nothing
11 to do with this, correct?
12 A. And had nothing to do with the guilty verdict I rendered
13 against your client.
14 Q. But it did have something to do with what you were being
15 asked about, that is, your right to a lawyer, correct?
16 A. I guess if that's what it says.
17 Q. Now, it turns out that you do have some cash resources?
18 A. I'm not discussing my finances in open court, sir.
19        THE COURT: I'm directing you to answer questions that
20 are put before you.
21 Q. Ms. Conrad, isn't it true that you have cash on hand or
22 money in savings or checking accounts of approximately $12,000?
23 A. If that's the affidavit of financial statement you received
24 from my attorney this morning, then that is correct.
25 Q. Well, I'm not -- I didn't make any reference to an

| C2FFDAU4 | Conrad - direct | Page 134 |
| --- | --- | --- |

1  affidavit --
2  A. I didn't have to, sir. How else would you know that?
3  Q. Ms. Conrad, my question for you is a simple one. Do you
4  have $12,000 cash on hand?
5  A. Approximately. That has nothing to do with the guilty
6  verdict I rendered against Mr. Daugerdas, your client.
7  Q. And do you also have about $2,000 in stocks and bonds?
8  A. You can read my affidavit very correctly, yes. That you
9  received this morning.
10 Q. Is the answer to my question, yes, you do have $2,000?
11 A. I don't know the exact amount. Approximately.
12 Q. So all together you have about $14,000 in either cash or
13 stocks and bonds, is that correct?
14 A. Correct. Much less than your client.
15 Q. You haven't been a very successful person, have you,
16 Ms. Conrad?
17        MR. OKULA: Objection, your Honor.
18 A. I don't know what that means. Ask my mother.
19        THE COURT: Sustained as to form.
20 Q. Have you been a successful -- have you achieved financial
21 success as a lawyer?
22 A. Ask my mother. I have no idea. I don't know what that
23 means.
24 Q. I have to ask your mother whether or not you have achieved
25 financial success as a lawyer?

| C2FFDAU4 | Conrad - direct | Page 135 |
| --- | --- | --- |

1  A. She's the only person that I care about whose opinion
2  matters to me.
3  Q. Do you know whether you are a financial success as a
4  lawyer?
5  A. No, I have no idea. It's a sliding scale.
6  Q. How much money did you make as a lawyer the last year you
7  were practicing law?
8  A. Could I make? I have no idea.
9        MR. OKULA: Judge, relevance.
10       THE COURT: Overruled.
11 Q. How much did you make practicing as a lawyer in 2007?
12 A. I wasn't a practicing lawyer.
13 Q. What were you doing in 2007?
14 A. Being a suspended lawyer.
15 Q. How much money did you make in 2006 as a lawyer?
16 A. I don't recall.
17 Q. Was it over $400?
18 A. An hour?
19 Q. No, $400 total in the year.
20 A. Probably, sir.
21 Q. Probably. And were you self-employed?
22 A. Yes, at that time.
23 Q. When was the last time you filed a tax return, Ms. Conrad?
24 A. 2008 or 2009.
25 Q. 2008 or 2009. Didn't you tell the Bar in a sworn affidavit

| C2FFDAU4 | Conrad - direct | Page 136 |
| --- | --- | --- |

1  on February 28th of 2011 that you hadn't been -- the question
2  attach your last two years federal and state tax returns the
3  answer was none, not applicable.
4  A. Absolutely, because that was the truth.
5  Q. So you filed a tax return in 2009?
6  A. I filed the document about which you are speaking on
7  February 28, 2011.
8  Q. When was the last time you filed a tax return?
9  A. Either 2008 or 2009. I'm not sure.
10 Q. Well, if it was filed in 2009, then your answer to the
11 disciplinary committee question would have been untruthful,
12 correct?
13 A. If you want to parse semantics.
14 Q. Well, that's kind of what we do in court, Ms. Conrad.
15       MR. OKULA: Objection, your Honor.
16       THE COURT: Sustained.
17       MR. GAIR: Sorry, your Honor. My apologies.
18 Q. Ms. Conrad, do you know whether you gave a truthful answer
19 to that question on the disciplinary committee affidavit you
20 filed on February 28th of 2011?
21 A. I believe I did.
22 Q. Now, can you give us an idea, just to go back to finish off
23 this issue, would you characterize yourself by your own
24 standards as a financially successful lawyer?
25 A. I don't know what your question means.

UNITED STATES OF AMERICA, v
PAUL M. DAUGERDAS, ET AL.,                                    February 15, 2012

| C2FFDAU4 | Conrad - direct | Page 137 |
|---|---|---|

1 Q. Okay.

2 A. I don't live an extravagant lifestyle like Mr. Daugerdas.

3 Q. Would you consider that Mr. Daugerdas was a financially

4 successful lawyer?

5 A. Sure, ripping off the government.

6 Q. And would you consider that --

7 A. And this was only after the trial, might I add.

8 Q. Would you consider --

9 A. In keeping with the verdict that myself and eleven other

10 jurors rendered against your client.

11 Q. Would you agree with me that you have not been very

12 financially successful as a lawyer?

13 A. I am fine, thank you.

14 Q. Okay. How is it that you're able to pay your $800 a month

15 in rent?

16 A. You got that from the financial affidavit as well this

17 morning. Yes. From savings.

18 Q. And is that how you pay all your expenses, from savings?

19 A. I don't have a lot of expenses, so, yes. I'm going to need

20 a job soon. I'm sure your office is not going to hire me,

21 but --

22 Q. Now, Ms. Conrad, when you filled out this affidavit today

23 did you understand that the purpose of this affidavit was to

24 allow the Court to determine whether or not you had the

25 financial need for Ms. Sternheim to be appointed and funded by

| C2FFDAU4 | Conrad - direct | Page 138 |
|---|---|---|

1 the federal court?

2 A. However that's relevant, but yes.

3 Q. Now, when you were asked back on December 20th if you owned

4 any stocks or bonds, you replied to the Court "none of your

5 business." Is that correct?

6 A. If it's in the transcript, I probably said it, sir. I

7 don't specifically recall.

8 Q. First I'm just asking if you remember it.

9 A. No, not offhand.

10 Q. So let's look at the transcript on page 12. You are asked

11 on line 13, "Do you own any stocks or bonds?"

12        And you said to the Court on line 14, "None of your

13 business."

14        Does that refresh your memory that when the Court

15 asked a question about your ownership of stocks and bonds you

16 said "none of your business"?

17 A. Not specifically, but I see it written in front of me, so I

18 must have said it.

19 Q. But it was the Court's business, was it not?

20 A. That I -- I don't know.

21 Q. Why did you say "none of your business"?

22 A. It's probably what I felt at the time.

23 Q. Now, when Judge Pauley asked you or instructed you to take

24 the oath so that he could ask you questions about your

25 financial situation, you refused to take the oath, is that

| C2FFDAU4 | Conrad - direct | Page 139 |
|---|---|---|

1 correct?

2 A. I don't recall.

3 Q. And when Judge Pauley advised you that you should get a

4 lawyer, retain a lawyer, you told him, "I'll retain myself or

5 my husband, the convicted felon," is that correct?

6 A. If it's written somewhere I probably said it. I don't

7 specifically recall, sorry.

8 Q. So you don't remember telling the Court that you would

9 either retain yourself or your husband the convicted felon?

10 A. Where are you directing me to look at?

11 Q. I'm asking you if you remember it, ma'am?

12 A. Not specifically.

13 Q. Do you have memory problems?

14 A. Certainly not.

15 Q. Certainly not. Never had blackouts, I take it?

16 A. I remember every day of this trial.

17 Q. Have you ever had a blackout?

18 A. No.

19 Q. And you have no memory problems?

20 A. No, sir.

21 Q. And yet you don't remember telling the Court, "I'll retain

22 myself or my husband the convicted felon"?

23 A. Not specifically.

24 Q. Is your husband a convicted felon?

25 A. Yes, sir.

| C2FFDAU4 | Conrad - direct | Page 140 |
|---|---|---|

1 Q. Did you remember that on March 1 and 2nd of 2011 or did you

2 forget?

3 A. Sir, I did not reveal that to the Court.

4 Q. Did you remember it was my question.

5 A. Well, I'm answering part two of your question that's not

6 asked yet, but yes.

7 Q. So you did remember that, right?

8 A. To repeat it a third time, yes.

9 Q. Now, Ms. Conrad, do you remember that at the start of the

10 voir dire in this case Judge Pauley explained the purpose of

11 voir dire?

12 A. I believe so, yes.

13 Q. Do you remember that he explained that voir dire means to

14 speak the truth. Do you remember that?

15 A. Yes, sir.

16 Q. And do you remember that Judge Pauley explained to you and

17 everybody else on the venire that that's precisely what you had

18 just been sworn to do, to speak the truth.

19 A. Veneer, yes.

20 Q. Do you remember that he explained to you that the purpose,

21 the purpose of voir dire was to make sure that we have a jury

22 of citizens who will decide the issues in this case fairly and

23 impartially and without any bias or prejudice in favor of

24 either side or against either side. Do you remember saying

25 that?

February 15, 2012

C2FFDAU4    Conrad - direct    Page 141

1 A. Exactly. Yes. And that's what we did.
2 Q. So you knew from the outset of this trial that there was a
3 connection between speaking the truth on voir dire and
4 ferreting out jurors who might have biases, didn't you, then?
5      MR. OKULA: Objection, your Honor.
6      THE COURT: Overruled.
7 A. Can you please repeat that?
8 Q. You understood based on what Judge Pauley told you in voir
9 dire that there was a connection between speaking the truth in
10 answer to what you were being asked and the ability of the
11 Court to ferret out biases or other things that might make a
12 juror unsuitable?
13 A. Yes, there is a nexus.
14 Q. There is a nexus?
15 A. Mm-hmm.
16 Q. And yet you deliberately decided to defy the Court, isn't
17 that correct?
18 A. If you want to mischaracterize it like that.
19 Q. I don't want to mischaracterize anything. I want you to
20 tell me whether you deliberately decided to mislead the Court
21 here.
22 A. I did not reveal that I was an attorney.
23 Q. That was not my question, ma'am.
24 A. Then please rephrase it.
25 Q. Did you make a deliberate decision to lie to this Court?

C2FFDAU4    Conrad - direct    Page 142

1 A. I did omit the fact that I had a JD.
2 Q. Was that the only fact you omitted?
3 A. No.
4 Q. We're going to come back to that, but right now I'd like to
5 try to get an answer to my question. Did you make the
6 deliberate decision I'm going to lie to the Court?
7 A. Not at first.
8 Q. Not at first.
9 A. I --
10 Q. When did you make the deliberate decision that you were
11 going to lie to the Court?
12 A. It was omission.
13 Q. So you did not tell any active lie to the Court, is that
14 correct?
15 A. I'm not really sure.
16 Q. Is that because you don't remember what you said or because
17 you don't know the difference between truth and lie?
18 A. Of course I know the difference, and the character
19 assassination is, you know, well done, but the fact of the
20 matter is that you're here to discredit me and to discredit the
21 fact that myself and eleven other jurors convicted your client
22 across the board.
23 Q. Ms. Conrad, when did you make the deliberate decision to
24 lie to the Court?
25 A. I don't recall.

C2FFDAU4    Conrad - direct    Page 143

1 Q. Was it during the voir dire?
2 A. I don't recall.
3 Q. Was it before you showed up for court the first day?
4 A. No, I don't think so.
5 Q. Was it after Judge Pauley told you that you had to speak
6 the truth?
7 A. I don't recall, sir.
8 Q. In response to what question did you make the decision to
9 lie to the Court?
10 A. I didn't lie.
11 Q. You did not lie?
12 A. I omitted the fact that I was an attorney.
13 Q. I just want to make sure I heard you right. You did not
14 lie under oath, is that correct?
15 A. In my mind I didn't. I omitted the fact that I had a JD.
16 Q. And that was not a lie in your mind?
17 A. It was an omission.
18 Q. Is it a lie?
19 A. You're the evidence professor.
20 Q. Did you lie to the Court --
21 A. I omitted.
22 Q. Okay. So there's a distinction in your mind between
23 omitting a truth and lying, is that correct?
24 A. I'm not sure.
25 Q. Well, is the lie that you, or the omission that you

C2FFDAU4    Conrad - direct    Page 144

1 remember an omission about being a lawyer?
2 A. I don't know what that question means, sir.
3 Q. Well, let me try another question. Do you remember that
4 the very first question that Judge Pauley asked you was where
5 do you live.
6 A. Yes. And we had to, I believe, state the county.
7 Q. Okay, and in answer to the very first question that Judge
8 Pauley asked you, you told a deliberate lie to Judge Pauley,
9 isn't that true, ma'am?
10 A. No. I don't know what you're talking about.
11 Q. Well, didn't you tell Judge Pauley that you lived in Bronx
12 Village in Westchester?
13 A. There is no such thing as Bronx Village.
14 Q. Well, that's what the transcript says. Did you tell Judge
15 Pauley that you lived in Bronxville in Westchester?
16 A. Yes.
17 Q. And that's a lie, wasn't it?
18 A. No, it's my official address.
19 Q. Ma'am, Judge Pauley didn't ask you what your official
20 address is, he asked you where you live, right?
21 A. Anyone can have more than one residence.
22 Q. Did he ask you where you lived?
23 A. I don't remember the exact question. It might have been --
24 no, it was, you had to give your county. No, he didn't ask.
25 No, I remember that.

UNITED STATES OF AMERICA, v
PAUL M. DAUGERDAS, ET AL.,

February 15, 2012

| C2FFDAU4 | Conrad - direct | Page 145 |
|---|---|---|

1      MR. GAIR: Your Honor, I move the admission of PMD
2 Exhibit 2.
3      THE COURT: Any objection?
4      MR. OKULA: No, your Honor.
5      THE COURT: PMD Exhibit 2 is received in evidence.
6      (Exhibit PMD 2 received in evidence)
7 Q. Let me ask you to direct your attention to page 203 of the
8 transcript. And I just want you to focus on lines 4 through 9.
9 Judge Pauley asked you, I think Ms. Conrad, Juror No. 3, that I
10 was about to begin with you when we suspended yesterday. So
11 first, would you tell us what neighborhood you reside in? And
12 you answered Bronxville in Westchester. Is that correct?
13 A. No, you're reading it incorrectly. It says Bronx Village.
14 Q. Okay, was your answer at the time Bronxville but possibly
15 the court reporter got it down wrong?
16 A. Absolutely.
17 Q. So in answer to the question where you resided, you said
18 you resided in Bronxville, that's Westchester County, correct?
19 correct?
20 A. Yes.
21 Q. And you don't reside in Bronxville in Westchester County,
22 isn't that correct?
23 A. No.
24 Q. No, it's not correct?
25 A. I have two addresses.

| C2FFDAU4 | Conrad - direct | Page 146 |
|---|---|---|

1 Q. Let me ask you this: When you woke up on the morning of
2 March 1 of 2011 and you got out of bed and you walked out the
3 front door, were you on Barker Avenue in the Bronx?
4 A. That's confidential.
5 Q. Or were you in Bronxville in Westchester?
6 A. Same answer.
7      THE COURT: It's not confidential. I'm directing you
8 to answer the question.
9 A. Barker.
10 Q. Because that's where you live.
11 A. And what does this have to do with convicting your client?
12 Q. Ma'am --
13 A. I --
14 Q. Do you -- the truth of the matter is that you lived on
15 March 1 and 2nd and every other day in March of 2011, you lived
16 at 2385 Barker Avenue, apartment 3H in the Bronx, isn't that
17 correct?
18 A. No.
19 Q. What days did you not live there?
20 A. Probably the beginning of March.
21 Q. At the beginning of March you did not live in, you did not
22 live in the Bronx?
23 A. That's my address and I also have a Westchester address,
24 sir.
25 Q. I didn't ask what your addresses were. I asked where you

| C2FFDAU4 | Conrad - direct | Page 147 |
|---|---|---|

1 were living.
2 A. I sometimes stay in Bronxville as well.
3 Q. And my question to you was on the day of voir dire when you
4 woke up --
5 A. Oh, but that wasn't your question. The day of voir dire,
6 then that was in the Barker Avenue address, correct.
7 Q. Okay. How about on February 28th, the day before voir
8 dire. Where did you live on that day?
9 A. The same.
10 Q. The same what?
11 A. Address.
12 Q. You lived on Barker Avenue in the Bronx?
13 A. Yes, sir.
14 Q. And we know you lived there on March 1 because that's the
15 first day of voir dire, right?
16 A. I'm not sure. I think March 1 was a Monday or a Tuesday.
17 I'm not specifically sure.
18 Q. In fact, ma'am, you had lived on Barker Avenue in the Bronx
19 for the past two years at least, correct?
20 A. Oh, sure.
21 Q. Oh, sure.
22 A. And this has everything to do with why Mr. Daugerdas, your
23 client, is guilty or not?
24 Q. And when the Judge said where do you reside, you made a
25 deliberate decision to tell the judge that you resided in

| C2FFDAU4 | Conrad - direct | Page 148 |
|---|---|---|

1 Bronxville as opposed to on Barker Avenue in the Bronx,
2 correct?
3 A. That -- both are correct.
4 Q. So you were not trying to mislead this Court when you said
5 I live in -- I live in Bronxville in Westchester County?
6 A. And myself and the other eleven jurors did not mislead this
7 Court when we rendered our fair and just and unbiased verdict.
8      MR. GAIR: Move to strike as non-responsive, your
9 Honor.
10      THE COURT: Application granted.
11 Q. Okay, Ms. Conrad, the fact is -- let me just get a little
12 background. Do you live with your husband?
13 A. Yes.
14 Q. Your husband is a career criminal, right?
15 A. So are most attorneys.
16 Q. And, Ms. Conrad, your father is an immigration judge for
17 the United States Department of Justice?
18 A. DOJ.
19 Q. Yeah. Are you trying to tell me that sometimes you and
20 your husband, the convicted felon, are living with your father?
21 A. Love has no bounds.
22 Q. So do sometimes you and your husband live in the Bronx?
23 A. We don't sleep in the same bedroom as my parents, sir.
24 Q. Do you sometimes sleep in the Bronx with your husband, same
25 house?

**February 15, 2012**

| C2FFDAU4 | Conrad - direct | Page 149 |
|---|---|---|

1 A. I hope so.

2 Q. Let me --

3 A. These are semantics, sir. Your client is still guilty as

4 charged with our verdict, and that's it.

5 Q. Well, I think --

6 A. Myself and eleven other unbiased jurors determined that.

7 Q. Do you have a better handle on what the word "bias" means

8 than you do on what the word "irrational" means?

9 A. Absolutely. I've been a plaintiff and a defendant and I've

10 also represented plaintiffs and defendants.

11 Q. Okay. So is it your testimony that you resided at both

12 places, both the Bronx and Bronxville, when you were questioned

13 on voir dire on March 1?

14 A. If that was the date, yes.

15 (Continued next page)

16

17

18

19

20

21

22

23

24

25

| C2frdau5 | Conrad - direct | Page 150 |
|---|---|---|

1 Q. Look at the heading "March 2nd." Do you see the heading on

2 the transcript "March 2, 2011"?

3 A. Oh, yes.

4 Q. You were asked where you resided, and you said you resided

5 in Bronxville, but you actually resided in two places?

6 A. Both, yes.

7 Q. You resided both places, I see. Now, you filed two days

8 earlier a sworn affidavit with the First Department

9 disciplinary committee, is that correct?

10 A. Yes. I don't know if it was two days prior, but around

11 there.

12 Q. They asked you where you lived, didn't they?

13 A. I don't specifically recall.

14 Q. Let's see if we can help.

15 A. Thank you.

16 Q. If you would look at Exhibit 21, tab 21 in your book. Is

17 this the affidavit you filed in support of your application to

18 be reinstated to the practice of law?

19 A. It seems to be, yes, sir.

20 Q. Was it filed on February 28th in the Supreme Court

21 Appellate Division First Department?

22 A. Yes.

23 Q. Was the affidavit executed by you two days earlier, on

24 February 26th?

25 A. Let me get there. If that's the date I signed, it is.

| C2frdau5 | Conrad - direct | Page 151 |
|---|---|---|

1 Yes, that's the date it was signed and notarized.

2 Q. This was a statement that was sworn by you before you

3 submitted it to the First Department, correct, before you

4 submitted it to the disciplinary authorities?

5 A. Yes, sir.

6 Q. They asked you the same question Judge Pauley asked you

7 three or four days later, didn't they?

8 A. I'm not specifically sure.

9 Q. Let's look at the second page. Page 2, item number 2, asks

10 for your residence, and it says, "I reside at 2385 Barker

11 Avenue, apartment 3H, Bronx, New York, 10467," correct?

12 A. Yes.

13 Q. When you were asked that question on February 26th, the

14 date you executed the affidavit, you lived on Barker Avenue in

15 the Bronx, but a few days later, on March 2nd, when Judge

16 Pauley asked you the identical question, you resided in

17 Bronxville in Westchester, correct?

18 A. Yes, I answered that, correct.

19 Q. Why?

20 A. Because I just thought of myself having two residences.

21 Q. Why didn't you put them both down?

22 A. I really don't know. At that time I don't know.

23 Q. Why did you put the Bronx down on one and tell Judge Pauley

24 Bronx Village on the other.

25 A. Bronxville.

| C2frdau5 | Conrad - direct | Page 152 |
|---|---|---|

1 Q. Bronxville.

2 A. Probably because it was a little more reputable.

3 Q. Were you embarrassed by living in the Bronx?

4 A. No.

5 Q. What does the fact that Bronxville is more reputable than

6 the Bronx have to do with anything?

7 A. The average household income.

8 Q. Why did it matter to you that you portray yourself in this

9 court as living in a more affluent area than you actually lived

10 in?

11 A. You're from Chicago. You don't really know that. So I

12 don't know how to answer your question.

13 Q. You don't know how to answer my question because you don't

14 know what I don't know?

15 A. I don't know how to answer that even.

16 Q. That I'm not surprised by.

17 MR. OKULA: Objection, your Honor.

18 THE COURT: Sustained. Put a question to the witness.

19 The last question was unanswerable.

20 Q. Ms. Conrad, was it your intention to portray yourself to

21 this Court as living in a more affluent area than you actually

22 lived in?

23 A. No, not really. No, I never thought of it like that.

24 Q. Isn't that what you just said?

25 A. Bronxville is an affluent community. My parents are there,

UNITED STATES OF AMERICA, v
PAUL M. DAUGERDAS, ET AL.,

| C2frdau5 | Conrad - direct | Page 153 |
|---|---|---|

1  I'm from there. I live there sometimes. I live at my Bronx
2  address also.
3  Q. Ma'am, my question is, did you say that you lived in
4  Bronxville in order to portray yourself as living in a more
5  affluent community than you actually live in?
6  A. No, not specifically, no.
7  Q. When you said a few minutes ago that the reason that you
8  gave the Bronxville address was because it was a little bit
9  more of an affluent community, that wasn't true?
10 A. My statement was true, but you're twisting it, obviously.
11 Q. Why don't you tell me why, having sworn to the bar
12 authorities on February 26th that you lived in the Bronx, you
13 swore to Judge Pauley on March 2nd that you lived in
14 Bronxville. Tell us why.
15 A. I consider myself living in both places.
16 Q. Why didn't you tell the Court that you lived both places?
17 A. Probably so I would be more marketable as a juror.
18 Q. Have you done any jury trials as a lawyer?
19 A. Nonjury. No. One a few years ago.
20 Q. Why did you want to be more marketable as a juror?
21 A. Because I knew I could be fair and unbiased. As I did
22 mention a few minutes ago, I've been a plaintiff and a
23 defendant on both the civil and the criminal sides, and I have
24 also represented plaintiffs and defendants on both sides, and
25 been unemployed, out of the courtroom. And I had never had a

| C2frdau5 | Conrad - direct | Page 154 |
|---|---|---|

1  tax shelter case or experience with tax law, and I knew I could
2  be an unbiased juror.
3  Q. Because you knew that you could be an unbiased juror, you
4  decided to lie to get on a jury, is that right?
5  A. Probably subconsciously.
6  Q. Subconsciously, Ms. Conrad, you wanted to do something
7  worthwhile, is that right?
8        MR. OKULA: Objection to the form, your Honor.
9        THE COURT: Overruled.
10 A. I don't know how you can characterize "worthwhile." If
11 it's sending a -- rendering a verdict which I felt was just,
12 then I can agree with you. But if there's something ulterior
13 to your question, I don't know how to answer that.
14 Q. When you started just then to say "sending a" and then you
15 stopped, were you going to say sending a criminal to jail? Is
16 that what you were about to say?
17 A. No.
18 Q. You wanted to be part of the process, didn't you, ma'am?
19 A. Sure.
20 Q. You wanted to be part of this process so badly that you
21 made yourself look like a different juror than you were,
22 different person than you were?
23 A. That's not for me to judge.
24 Q. Can we agree that you lied about where you resided on March
25 2nd?

| C2frdau5 | Conrad - direct | Page 155 |
|---|---|---|

1  A. I did not wake up in Bronxville that day, probably not.
2  Q. So you told a deliberate lie that day, correct?
3  A. No.
4  Q. Was it an accidental misstatement?
5  A. No.
6  Q. Was it an oversight?
7        MR. OKULA: Judge, we have been through this several
8  times.
9        THE COURT: Overruled.
10 A. No. I consider myself having two residences.
11 Q. Then why didn't you tell the truth when you were asked that
12 question?
13 A. I did.
14 Q. Did you say, I have two residences and, by the way, I've
15 been on both sides of criminal cases? Did you say that?
16 A. I wasn't asked that, sir.
17 Q. We'll come to that. Did you say that you had two
18 residences?
19 A. No.
20 Q. Did you tell the disciplinary authorities that you had two
21 residences?
22 A. They know.
23 Q. Did you tell the disciplinary authorities in your affidavit
24 that you resided in Bronxville?
25 A. Not in this one.

| C2frdau5 | Conrad - direct | Page 156 |
|---|---|---|

1  Q. Not in this one. Do you remember that a couple of years
2  before this you were sworn to give a deposition under oath?
3  A. March 24, 2009.
4  Q. You do remember, don't you.
5  A. Yes, I do.
6  Q. You were asked where you lived, weren't you?
7  A. Probably.
8  Q. You said, truthfully, that you lived on Barker Avenue in
9  the Bronx, didn't you?
10 A. I don't recall specifically.
11 Q. Ma'am, you've lived on Barker Avenue in the Bronx for many
12 years, isn't that true?
13 A. Sure.
14 Q. And every one of your neighbors on the third floor knows
15 who you are, don't they?
16 A. Probably.
17 Q. Because you and your husband are constantly, every day and
18 night, engaged in screaming and fights and insults and threats,
19 right?
20       MR. OKULA: Objection, your Honor. Relevance.
21       THE COURT: Overruled.
22 A. Probably.
23 Q. Yeah, probably. The police are there all the time, aren't
24 they?
25 A. No.

| C2frdau5 | Conrad - direct | Page 157 |
|---|---|---|

1 Q. How often do the police come to your apartment?
2 A. The last time someone came to my apartment was when the
3 marshals served me to come here back in December.
4 Q. When was the last time a New York police officer came to
5 your apartment?
6 A. Maybe three, four years ago.
7 Q. So, you have been living there for at least three or four
8 years, right?
9 A. Haven't we established this?
10 Q. I guess we have, ma'am. Have we established that you told
11 this lie on purpose?
12 A. No.
13 Q. Let's move on to the next question you were asked. You
14 told a deliberate lie in response to that question, did you
15 not?
16 A. You didn't ask me a question. What are you talking about,
17 sir?
18 Q. Let's look at again page 203, lines 10 through 12.
19 A. Of what exhibit? I'm sorry.
20 Q. Exhibit number 2.
21 A. OK.
22 Q. The second question Judge Pauley asked you was, "How long
23 have you lived at your current address?" and your answer was,
24 "My whole life"?
25 A. That's correct.

| C2frdau5 | Conrad - direct | Page 158 |
|---|---|---|

1 Q. Now, ma'am, am I right in thinking that that was a lie?
2 A. No.
3 Q. Had you lived in Bronxville your whole life?
4 A. It's my permanent address my whole life. I went to school
5 in Boston, I went to school in Brooklyn, I studied abroad for
6 two summers in Israel. That has been my permanent address,
7 sir.
8 Q. When Judge Pauley asked you how long you have lived at your
9 current address, you said your whole life, correct?
10 A. I just said that, correct.
11 Q. OK. We have established that you live on a day-to-day
12 basis on Barker Avenue and that you have for years, right?
13 A. Correct.
14 Q. So you lied to the judge?
15 A. I consider myself having two residences.
16 Q. Let me try and ask a more specific question. If a person
17 were to say "Where do you live?" and you were to say a place
18 where you do not live on a regular basis as the answer to that,
19 do you consider that to be a lie?
20 A. I consider your hypothetical a little silly.
21 Q. It's actually what happened, right? Let me ask you this.
22 Do you understand that the main job of a juror is to determine
23 who is telling the truth and who is lying?
24 A. Of course.
25 Q. Did you apply that same acumen in determining whether you

| C2frdau5 | Conrad - direct | Page 159 |
|---|---|---|

1 were telling the truth or lying to determining whether
2 witnesses were telling the truth or lying?
3 A. That's a nice spin on it.
4 Q. Do you have an answer to it?
5 A. After all the evidence in the trial, it was overwhelming,
6 and our verdict was a true, unbiased, fair verdict.
7 Q. So the end justifies the means, is that right?
8     MR. OKULA: Objection, your Honor.
9     THE COURT: Sustained as to form.
10 Q. Let me try one more time. Did you apply your personal
11 sense of truthfulness to your evaluation of the witnesses who
12 testified in this case?
13 A. I believe all 12 of us jurors did.
14 Q. I didn't ask about anybody but you. Did you apply your
15 personal sense of truthfulness to evaluating the witnesses that
16 you heard in this case?
17 A. I can say so.
18 Q. You agree with me that when you said you had lived in
19 Bronxville your whole life, that was not true, correct?
20 A. I've lived many places. That is my permanent residence
21 and -- the horse is dead.
22 Q. Did you make a deliberate decision to say that you lived
23 there your whole life when in fact you had lived in the Bronx
24 or Brooklyn or other places?
25 A. Please repeat it. I didn't say Brooklyn on voir dire.

| C2frdau5 | Conrad - direct | Page 160 |
|---|---|---|

1 Q. You have lived various places in your life, have you not?
2 A. Oh, yes.
3 Q. That statement that you just made, "oh, yes," is
4 inconsistent with the statement that you made to Judge Pauley
5 when he asked how long have you lived in Bronxville?
6 A. I consider it my whole life because that is my other
7 residence and that's my permanent residence.
8 Q. Then the Court asked you, "Do you own or rent?" So we have
9 two questions. You were asked where you lived, and you didn't
10 tell the truth about that. You were asked how long you lived
11 there --
12 A. That's your interpretation.
13 Q. OK. And you didn't tell the truth about that either.
14 Let's go to the third question, "Do you own or rent?" You said
15 "We own."
16 A. That was a lie, to skip questions 10 to a hundred.
17 Q. That was a lie, too?
18 A. Correct.
19 Q. Why did you tell it?
20 A. I thought I would seem more juror marketable (gesturing).
21 Q. You really wanted to be on this jury?
22 A. Yeah. I knew I could do a fair, unbiased job.
23 Q. Seems like a strange way to start, by lying, doesn't it?
24     MR. OKULA: Objection.
25     THE COURT: Sustained.

**UNITED STATES OF AMERICA, v
PAUL M. DAUGERDAS, ET AL.,**

| C2frdau5 | Conrad - direct | Page 161 |
|---|---|---|

1  Q. Had it occurred to you when you were telling these lies
2  that it was an odd way to start service as a juror, to lie to
3  the Court?
4  A. I don't know.
5  Q. You don't remember whether it occurred to you or not?
6  A. It's a weird question, sir.
7  Q. It's a weird answer, ma'am.
8      MR. OKULA: Objection, Judge.
9      THE COURT: Sustained. Please put a question to the
10  witness.
11  Q. Ma'am, was it a deliberate lie? Did you know you were
12  lying when you said it?
13  A. Yes.
14  Q. Then the judge asked you "Who are the other members of your
15  household?" You said, "I live with my husband. He's retired
16  at the present time," correct?
17  A. Yes.
18  Q. That was true, that you lived with your husband, correct?
19  A. Yes.
20  Q. But you never lived with your husband at the address you
21  had given, correct?
22  A. I didn't give any address on voir dire.
23  Q. You never lived with your husband at your parents' house in
24  Bronxville, did you?
25  A. No, no.

| C2frdau5 | Conrad - direct | Page 162 |
|---|---|---|

1  Q. So, you created a false impression that you and your
2  husband owned a house there, correct?
3  A. I don't know what the judge's impression was.
4  Q. You were trying to create a false impression that you and
5  your husband were homeowners who owned a house and lived in
6  Bronxville, correct?
7      MR. OKULA: Objection, your Honor. I don't think
8  there is anything mentioned about a house there.
9      THE COURT: Overruled.
10  A. I don't know.
11  Q. You told the juror that he was retired, and the Court said,
12  "What is he retired from"?
13  A. Yes.
14  Q. You said he owned some bus companies?
15  A. Bus companies, yes.
16  Q. What bus companies does he own?
17  A. That was 30 years ago. My husband is 21 years older than I
18  am. Somewhere in Jersey.
19  Q. Do you know the name of a bus company?
20  A. Chinese ones that explode on I-95. I don't know. No, not
21  really.
22  Q. You said he owns some bus companies. Did he own any bus
23  companies at the time of the voir dire?
24  A. Oh, no, no.
25  Q. He had not owned any bus companies for some 30 years before

| C2frdau5 | Conrad - direct | Page 163 |
|---|---|---|

1  that date?
2  A. Maybe 25. I'm not really sure.
3  Q. What was the truthful answer to "What is he retired from,"
4  ma'am?
5  A. Being a businessman.
6  Q. When was the last time he was a businessman?
7  A. I guess maybe 20 years ago.
8  Q. What he was actually retired from was being a criminal,
9  right?
10  A. Please.
11  Q. Well --
12  A. I don't understand your question.
13  Q. What has your husband done since he left the New Jersey
14  penitentiary in 2004?
15  A. He's been a very faithful, good husband.
16  Q. Has he had a job?
17  A. No.
18  Q. Did you think that you were misleading the Court by saying,
19  in answer to the question "What is he retired from," "He owns
20  some bus companies"?
21  A. Owned.
22  Q. That's not what the transcript says. But let's say you
23  said "owned." Did you think you were misleading the Court when
24  the judge said, "What is he retired from?" and you said, "He
25  owned some bus companies"?

| C2frdau5 | Conrad - direct | Page 164 |
|---|---|---|

1  A. No, of course not.
2  Q. That wasn't misleading at all?
3  A. No.
4  Q. Did you apply that same standard of what is or is not
5  misleading in acquitting your function as a juror?
6  A. I don't really know what your question means.
7  Q. My question means you have an idea of what is misleading
8  and what is not misleading, right?
9  A. Of course.
10  Q. You think that what you said here about the bus companies
11  is not misleading, correct?
12  A. Not at all. Maybe it's a transcription, "own" or "owned."
13  That's it.
14  Q. In fact, did you apply that same standard in your mind of
15  what is or is not misleading in evaluating the evidence in this
16  case?
17  A. Of course we had to, and I had to, and I did.
18  Q. Then the Court asked you, "Do you work outside the home?"
19  And you answered, "No, I'm a stay-at-home wife," right?
20  A. Correct.
21  Q. Then the Court asked you, "Do you have any children," and
22  you said, "No."
23  A. I should have said that I know of. But no, you're correct.
24  Q. Then the judge said, "What is the highest level of
25  education you have attained?"

| C2frdau5 | Conrad - direct | Page 165 |
|---|---|---|

1 A. Sir, are we still on 203?

2 Q. Yes.

3 A. All right.

4 Q. Actually, it goes over to 204.

5 A. OK, thank you. Yes.

6 Q. Did you have any trouble understanding the question that

7 Judge Pauley asked you?

8 A. Not at all.

9 Q. Did you know that Judge Pauley was going to ask you that

10 question or something very like it?

11 A. Yes, because the prior day the same questions were asked of

12 the other potential jurors.

13 Q. When did you make the decision about how you were going to

14 answer that question? Was it right then when he asked you or

15 was it before then?

16 A. I think it was during the break between the two days.

17 Q. Can you remember how you reached the conclusion that you

18 should tell a lie in answer to that question?

19 A. Because I knew that anybody with a JD or legal experience

20 would be bounced.

21 Q. That's because there were lawyers who were on trial, right?

22 A. I don't think the jury knew at that point that there were

23 attorneys on trial. I'm not sure. I'm not sure.

24 Q. You knew, because Judge Pauley summarized the charges for

25 you before the voir dire started, that there were lawyers on

| C2frdau5 | Conrad - direct | Page 166 |
|---|---|---|

1 trial charged with tax fraud in connection with a tax shelter

2 scheme, didn't you?

3 A. Yes, I remember now, yes.

4 Q. Now that you remember, you knew that there's no way that a

5 lawyer would be left on a jury to decide the conduct of lawyers

6 who were being charged with a crime, right?

7 A. No, I didn't know that.

8 Q. Didn't you just say that?

9 A. I didn't know that for a fact.

10 Q. Did you strongly suspect that you would not be allowed to

11 sit on the jury if you revealed that you were a lawyer?

12 A. Of course.

13 Q. That was connected, was it not, to the fact that there were

14 lawyers on trial here, right?

15 A. No, no. In any jury nobody wants an attorney. A jury

16 trial does not want an attorney sitting as a juror.

17 Q. If you were trying a case as a lawyer, you wouldn't want an

18 attorney on your jury either, would you?

19 A. That's incorrect.

20 Q. So you're not included in the "no one" you just referred

21 to?

22 A. I'm not sure.

23 Q. Didn't you just say no one would want an attorney on their

24 jury?

25 A. That generally seems to be the trend, yes.

| C2frdau5 | Conrad - direct | Page 167 |
|---|---|---|

1 Q. Because you suspected that it would stop you from getting

2 on the jury, you made a deliberate decision, having sworn an

3 oath to tell the truth, you made a deliberate decision to lie

4 to this Court?

5 A. I don't know if I was sworn at that point, but I did not

6 reveal the fact that I had a JD and was an attorney.

7 Q. No, no, that's not the question I asked. The question I

8 asked is, did you make a deliberate decision to lie to the

9 Court?

10 A. Are we getting into the semantics of omissions again?

11 Q. Did you make a deliberate decision to lie to the Court

12 about your highest level of education?

13 A. Yes.

14 Q. Did you do that because you believed that otherwise you

15 would not be permitted to be on this jury?

16 A. Yes.

17 Q. So it was your idea to thwart the voir dire process by

18 telling the Court something that wasn't true about your

19 background?

20 A. I guess if you want to characterize it that way.

21 Q. You said, "I have a BA in English literature in classics

22 and I studied archeology abroad," right?

23 A. Correct.

24 Q. Did you remember at that moment that you studied law at the

25 Brooklyn Law School?

| C2frdau5 | Conrad - direct | Page 168 |
|---|---|---|

1 A. Of course.

2 Q. At any point after you told these lies about your

3 residence, about how long you lived there, about your owning

4 your place, about your highest level of education, at any time

5 did you think to yourself, wow, what I just did was wrong?

6 A. Of course I knew it was wrong.

7 Q. But did you think to yourself, what I just did was wrong?

8 A. You just asked me that question.

9 Q. And I'm asking it again because I didn't get an answer.

10 Did you think that?

11 A. Yes.

12 Q. How many times did you think that?

13 A. I really don't know, sir.

14 Q. Was it present in your mind throughout the trial that you

15 had lied in order to get on the jury?

16 A. Probably.

17 Q. Did you tell other people that you had lied to get on the

18 jury?

19 A. I don't think so, not that I recall.

20 Q. Did you tell other people that you had concealed things to

21 get on the jury?

22 A. I don't think so.

23 Q. Did you tell other people you were a lawyer?

24 A. I don't know how to construe your question. But if your

25 question is did the other jurors know that I was an attorney,

UNITED STATES OF AMERICA, v
PAUL M. DAUGERDAS, ET AL.,

February 15, 2012

| C2frdau5 | Conrad - direct | Page 169 |

1 the answer is no.
2 Q. How did you explain the note about respondeat superior?
3 A. Common knowledge. Actually, I didn't have to explain it.
4 I just handed it to Juror No. 2, who was our forewoman, and she
5 submitted it to the Court.
6 Q. When you were deliberating in this case, did you have it
7 present in your mind that you had lied to get on to this jury?
8 A. I don't think I'm supposed to answer questions about jury
9 room deliberations, sir.
10        THE COURT: You can answer that question.
11 A. Could you please restate it.
12 Q. When you were deliberating in this case, did you have it
13 present in your mind that you had lied to get on the jury?
14 A. No, no.
15 Q. Between the time when you told the lies and the time you
16 rendered your verdict, when did you stop having it present in
17 your mind thinking about the fact that you had lied to get on
18 the jury?
19 A. Oh, sir, I don't know.
20 Q. Was it when we were cross-examining witnesses and exposing
21 untruths that they had told?
22 A. I don't have a time estimate for it.
23 Q. Do you remember when Mr. Shambrom was on the witness stand?
24 A. Shambron, yes.
25 Q. Do you remember what a liar he was?

| C2frdau5 | Conrad - direct | Page 170 |

1 A. I'm not the judge.
2 Q. Do you remember at that time thinking, wow, I've told lies
3 just like he did?
4 A. No, I never thought that.
5 Q. When the marshals came out to serve you with an order on
6 December 15th to tell you to come to court, did you tell the
7 marshals that you had lied about not being a lawyer?
8 A. Will you please restate the question.
9 Q. Yes, I can. Do you remember when the marshals came out to
10 serve you at your house?
11 A. Yes, of course.
12 Q. By the way, was that on Barker Avenue?
13 A. Yes.
14 Q. When they came out to serve you, did you tell them, I think
15 I know what this is about?
16 A. Oh, first I told them we have cats, and if you're allergic,
17 stay outside. But specifically I don't really recall what I
18 said.
19 Q. Do you recall telling them that in your view you had not
20 lied, because no one asked you about whether or not you were a
21 lawyer?
22 A. I don't recall. They were there for maybe a minute handing
23 me the subpoena, and that was about it.
24 Q. At any time since last August, have you thought, have you
25 had the belief that you didn't lie about being a lawyer because

| C2frdau5 | Conrad - direct | Page 171 |

1 no one asked you about being a lawyer?
2 A. Sir, that's posing the quantum theory if the tree doesn't
3 fall and nobody sees it. No, of course the answer is no.
4 Q. Do you believe that you lied to the Court about being a
5 lawyer?
6 A. I know I omitted that very pertinent fact.
7 Q. Do you believe that was a lie?
8 A. Yes.
9 Q. Do you believe that it was the Court's fault for not asking
10 you whether you were a lawyer?
11 A. No, of course not.
12 Q. No, because if you had told the Court that you went to law
13 school, you would have been asked, right?
14 A. I would have been asked or axed, like they would have axed
15 me from the jury?
16 Q. Let me pose a different question. In voir dire when you
17 were being asked specific questions, did you tell the judge
18 anything that was true besides your admiration for Lynn Swann,
19 the fact that you have no children? Did you tell him that
20 that was true?
21 A. Of course.
22 Q. What?
23 A. I have a BA in English literature.
24 Q. OK.
25 A. And I studied archeology abroad. And I consider my

| C2frdau5 | Conrad - direct | Page 172 |

1 residence in Bronxville, not Bronx Village. There were only
2 seven questions that were posed, I believe.
3 Q. You told the truth in just about all of them, right?
4 A. You have to qualify your question, because there were
5 questions that were asked to the jury panel as a whole and then
6 individually. I revealed the fact that -- well, whatever you
7 said before.
8 Q. One question we haven't covered from page 204 is the
9 last question. That question is, "The Court: All right. Is
10 there anything you think it would be important for us to know
11 about you in making a decision as to whether you should serve
12 as a juror in this case?" Do you remember him asking that
13 question?
14 A. Absolutely.
15 Q. You said, "If the trial lasts more than three months, I'm
16 still available."
17 A. Correct.
18 Q. Because you really wanted to be on this jury?
19 A. And I was available.
20 Q. You said it because you really wanted to be on this jury,
21 right?
22 A. I can't pinpoint at that time. I'm sorry.
23 Q. Did you think that there was nothing else that was
24 important for us to know about you in making a decision as to
25 whether you should serve as a juror?

# A-5653

C2frdau5        Conrad - direct        Page 173

1  A. I'm sorry. Are you reading from the transcript?
2  Q. Just asking you a question.
3  A. Oh.
4  Q. When you said that the only thing you thought was relevant
5  for us to know was that you were willing to serve three months
6  or more, did you think there was anything else that we might be
7  interested in?
8  A. Of course. The fact that I had a JD.
9  Q. The fact that the Appellate Division had found in December
10  2007 that your conduct "evinces a shocking disregard for the
11  judicial system," would that have been relevant?
12  A. No, because it's boilerplate in the First Department to say
13  that.
14       MR. GAIR: Your Honor, at this point I move the
15  admission of PMD Exhibit 14, which is the December 18, 2007
16  report.
17       THE COURT: Any objection?
18       MR. OKULA: No, your Honor.
19       THE COURT: PMD Exhibit 14 is received in evidence.
20       (Exhibit PMD 14 received in evidence)
21  Q. Whether or not you think it is boilerplate, do you think
22  that I might want to know that an appellate panel had found
23  that your conduct evinces a shocking disregard for the judicial
24  system?
25  A. If you take the boilerplate language literally.

C2frdau5        Conrad - direct        Page 174

1  Q. Do you think Judge Pauley would have wanted to know that?
2  A. Of course.
3  Q. But you didn't tell him that, did you?
4  A. No.
5  Q. Did you think that we might want to know that you had
6  suffered from a terrible disease of alcoholism for more than a
7  decade? Did you think we might want to know that?
8  A. That's your twist on it.
9  Q. Do you suffer from alcoholism?
10  A. One's never cured.
11  Q. Have you suffered from alcoholism for more than a decade?
12  A. I don't know.
13  Q. Have you been in and out of treatment programs?
14  A. Yes, I did.
15  Q. Have you admitted under oath you're an alcoholic?
16  A. I'm not sure.
17  Q. Are you an alcoholic?
18  A. Probably.
19  Q. Do you think that we would have wanted to know, that the
20  Court would have wanted to know, that you had suffered from
21  alcoholism?
22  A. I'm not the Court. I can't judge that.
23  Q. I'm asking you what you think. The Court asked you a
24  question, which was, "Is there anything else you think it would
25  be important for us to know?"

C2frdau5        Conrad - direct        Page 175

1  A. I answered the question.
2  Q. Did you think it would be important for us to know that?
3  A. No, because remission is remission.
4       THE WITNESS: And I don't think this is the proper
5  forum to me to give a blank HIPAA authorization for the world,
6  Judge.
7  Q. Let me just ask my questions and go from there. Your
8  belief was it would not have been of any relevance to us to
9  know that you were an alcoholic, is that right?
10  A. However you want to characterize it.
11  Q. Would it have been of any relevance to the Court, do you
12  think it would have been of importance to the Court to know
13  that you had been suspended from the practice of law on grounds
14  of disability by reason of mental or physical infirmity?
15  A. Do I think it would have been important?
16  Q. Yes.
17  A. It's not the truth. It's the boilerplate First Department
18  renderings.
19       MR. GAIR: Your Honor, I move the admission of PMD
20  Exhibit 20, which is the Supreme Court Appellate Division's
21  order of December 9, 2010, Presiding Justice Sachs, Justices
22  Friedman, Sweeney, Nardelli, and McGuire.
23       MR. OKULA: No objection, your Honor.
24       THE COURT: PMD Exhibit 20 is received in evidence.
25       (Exhibit PMD 20 received in evidence)

C2frdau5        Conrad - direct        Page 176

1       MR. GAIR: Your Honor, I'd also like to offer PMD 17,
2  which is the March 29, 2009, testimony of Catherine Conrad in
3  the Supreme Court Appellate Division departmental disciplinary
4  committee.
5       MR. OKULA: No objection.
6       THE COURT: PMD Exhibit 17 is received in evidence.
7       (Exhibit PMD 17 received in evidence)
8  Q. Now, you told the disciplinary committee in March of 2009
9  that you were an alcoholic, correct?
10  A. I'm not sure of my specific words, sir.
11  Q. If you look at Exhibit 17, page 54, line 3, the question
12  was asked of you, "Have you been diagnosed by any doctor or any
13  facility as an alcoholic?
14  "A. Yes, and I have pancreatitis."
15       Was that the question and did you give that answer
16  under oath?
17  A. Yes, sir.
18  Q. The pancreatitis in fact is related to alcoholism?
19  A. Yes.
20  Q. Did you think it would be important for the Court to know,
21  in judging your fitness as a juror, that your first attempt to
22  be reinstated to the practice of law was rejected by the court
23  after you had submitted a psychiatric evaluation?
24  A. Your chronology of events doesn't make sense, first of all.
25  And the answer to the question is no.

UNITED STATES OF AMERICA, v
PAUL M. DAUGERDAS, ET AL.,

February 15, 2012

| C2frdau5 | Conrad - direct | Page 177 |
|---|---|---|

1 Q. Did you attempt to be reinstated to the practice of law
2 before February of 2011?
3 A. I submitted my reinstatement papers, which we have already
4 gone over, on February 28th, and they were signed on February
5 26th of 2011.
6 Q. Before that, though, you had tried to be reinstated a
7 couple of years earlier, right?
8 A. I was suspended indefinitely.
9 Q. You tried to be reinstated, saying that your alcoholism was
10 in remission, right?
11 A. The chronology of it is that you have to formally submit
12 the reinstatement documents, which happened on February 28,
13 2011. I did not submit any reinstatement documents before that
14 time.
15 Q. Let's go to this reinstatement petition, which is
16 Exhibit 21, which I believe is already in evidence. Can you
17 look at Exhibit 21. In particular I'd like you to look at
18 Exhibit 4 to that submission, which is a report from Dr. Warren
19 Seligman.
20    THE WITNESS: Judge, do I have to go through this in
21 open court?
22    THE COURT: Yes. I have ruled on that. I'm directing
23 you to answer. I overruled your counsel's application.
24 Q. Do you see Dr. Seligman's report?
25 A. Yes, sir.

| C2frdau5 | Conrad - direct | Page 178 |
|---|---|---|

1 Q. You submitted this report as part of your petition for
2 reinstatement, correct?
3 A. Yes.
4 Q. Did you review the report before you submitted it?
5 A. Yes.
6 Q. Did you write the report or did he?
7 A. I think it was a combination of him and my attorney.
8 Q. Him and your attorney wrote the report?
9 A. Mm-hm.
10 Q. If you would look on the second page of Dr. Seligman's
11 report, it says near the bottom of the middle paragraph, "She
12 has taken the appropriate and effective actions to help
13 herself." Do you see that?
14 A. Which paragraph, sir?
15 Q. The middle paragraph, the third paragraph on the second
16 page.
17 A. Oh, yes.
18 Q. "She has taken the appropriate and effective actions to
19 help herself," correct?
20 A. Yes.
21 Q. Then it says, "She has been abstinent for over 2½ years and
22 has been committed to her recovery plan."
23 A. Yes.
24 Q. Correct?
25 A. Yes.

| C2frdau5 | Conrad - direct | Page 179 |
|---|---|---|

1 Q. 2½ years before February of 2011 would have been --
2 A. August 2009.
3 Q. No, that would have been August 2008. 2½ years before
4 February of 2011?
5 A. Yes, you're correct.
6 Q. You were not abstinent from August 2008 on, were you,
7 ma'am?
8 A. No.
9 Q. In fact, you got kicked out of a treatment program in
10 August 2009 because you were drinking, correct?
11 A. It was either 2008 or 2009. I'm not specifically certain
12 on that.
13 Q. Let's see if we can help you on that. Exhibit Number 29,
14 if you would.
15    MR. GAIR: Your Honor, I move the admission of PMD
16 number 29, which is a multipage document relating to a case
17 called the People of the State of New York v. Catherine M.
18 Rosa?
19    THE COURT: Any objection?
20    MR. OKULA: No objection, your Honor.
21    THE COURT: PMD Exhibit 29 is received in evidence.
22    (Exhibit PMD 29 received in evidence)
23 Q. Do you sometimes go by the name of Catherine Rosa?
24 A. Socially.
25 Q. When you were arrested for petit larceny in 2009, did you

| C2frdau5 | Conrad - direct | Page 180 |
|---|---|---|

1 give the name to the police Catherine Rosa?
2 A. Yes, sir.
3 Q. If you look at page 4, a number at the lower right-hand
4 corner of the document says 16-4. It's a report from the
5 Westchester Department of Community Mental Health. Do you see
6 that?
7 A. Yes.
8 Q. You were receiving treatment at the Maxwell Institute?
9 A. Yes. It was part of St. Vincent's, yes.
10 Q. Maxwell Institute reported in October of 2009 that you were
11 negatively discharged from the program in August 2009 due to
12 ongoing use of alcohol?
13 A. Yes, that's true.
14 Q. You were recommended for a higher level of care, correct?
15 A. That's what the report says.
16 Q. Were you recommended for a higher level of care?
17 A. No.
18 Q. You didn't get it, right, a higher level of care?
19 A. Clinically what do you mean?
20 Q. If you don't understand what I mean, I'll move on to
21 another question.
22 A. Thank you.
23 Q. You submitted a report from Dr. Seligman that was
24 inaccurate in that it said that you had been abstinent for 2½
25 years when you had not been abstinent for 2½ years?

February 15, 2012

C2frdau5          Conrad - direct          Page 181

1  A. I was at that time, yes, I was.
2  Q. Now I'd like you to look at Exhibit 21, which is your
3  petition, and specifically paragraph 24 of that petition. This
4  is the petition you filed at the end of February 2011, right?
5  A. February 28, correct.
6  Q. Under oath. You said that you had not been arrested,
7  charged with, indicted, convicted, tried, and/or pleaded guilty
8  to the following violations, misdemeanors, and/or felonies
9  during the period of your discipline, correct?
10 A. Correct.
11 Q. An outright lie, correct?
12 A. Yes.
13 Q. Because you were arrested not once but twice in shoplifting
14 cases, were you not?
15 A. Yes.
16 Q. You were shoplifting very small items from convenience
17 stores, correct?
18 A. They obviously weren't that convenient.
19 Q. Is there something that you think is funny about these
20 proceedings?
21 A. Not at all.
22 Q. Do you know that you lied your way on to a jury and your
23 conduct could send people to prison?
24        MR. OKULA: Objection, your Honor.
25        THE COURT: Sustained.

C2frdau5          Conrad - direct          Page 182

1  Q. Why did you steal envelopes and newspapers and greeting
2  cards from a convenience store?
3  A. I didn't. It was a bag of shrimp.
4  Q. So, if the indictment said that you were stealing greeting
5  cards, you never stole any greeting cards, you only stole a bag
6  of shrimp?
7  A. Yes, sir.
8  Q. In both cases, did you steal two bags of shrimp, one in
9  each store?
10 A. I don't recall what the other one was.
11 Q. Why did you steal a bag of shrimp?
12 A. I was drunk.
13 Q. Was that during the period of your abstinence?
14 A. The question sort of doesn't make sense, right?
15 Q. Do you even remember what you stole from the other store?
16 A. It might have been a videotape.
17 Q. The whole venire was asked questions at jury selection
18 about whether or not they had ever been arrested for or
19 convicted of a crime, correct?
20 A. I remember, correct.
21 Q. You knew at the time that that question was asked that the
22 truthful answer was that you had been arrested and convicted of
23 crimes, correct?
24 A. Yes.
25 Q. You had been arrested and convicted for driving under the

C2frdau5          Conrad - direct          Page 183

1  influence, correct?
2  A. 1997?
3  Q. In April of 1998 you were convicted of DUI, correct?
4  A. That was the second one, yes, sir.
5  Q. In the first incident you were charged not only with DUI
6  but with assault, correct?
7  A. Either the first or the second. I'm not sure.
8  Q. In the one where you were charged with assault, who did you
9  assault?
10 A. I believe I punched the cop in his stomach. But that was
11 dropped.
12 Q. That conviction for DUI that involved an arrest for
13 assault, resisting arrest, harassment, and leaving the scene of
14 the accident, do you think that would have been something that
15 was responsive to Judge Pauley's question about arrests?
16 A. Yes.
17 Q. Did you make a deliberate decision to lie about that?
18 A. I omitted deliberating, yes.
19 Q. That's the same as a lie, right?
20 A. If it has to be folded into that characterization.
21 Q. In your mind, in your norms, does that have to be folded
22 into that characterization?
23        MR. OKULA: Objection to the form, your Honor.
24        THE COURT: Overruled.
25 A. Yes.

C2frdau5          Conrad - direct          Page 184

1  Q. So, you lied about that first arrest and conviction, and
2  then you lied by not revealing that you had another arrest and
3  conviction in September of 1998, correct?
4  A. Oh, no. It was I believe April of '98 was the second DUI.
5  Q. So you had two DUI convictions?
6  A. Yes, sir.
7  Q. You also had a conviction for aggravated harassment,
8  correct?
9  A. Yes.
10 Q. And criminal contempt?
11 A. I believe so.
12 Q. That was because you had violated the protection order and
13 you were threatening a romantic rival?
14 A. It was phonecalls.
15 Q. You were threatening her over the phone?
16 A. Correct.
17 Q. Would you say that that was rational behavior?
18 A. Not when one is drinking.
19 Q. It's not even rational when one is not drinking, correct?
20 A. I can't be the judge of that.
21 Q. Did you think that you should have revealed that answer in
22 response to the Court's question?
23 A. Yes.
24 Q. You made a deliberate decision not to do so, correct?
25 A. Yes.

UNITED STATES OF AMERICA, v
PAUL M. DAUGERDAS, ET AL.,

February 15, 2012

| C2frdau5 | Conrad - direct | Page 185 |
|---|---|---|

1 Q. When you did you make the deliberate decision not to reveal
2 your criminal arrests and convictions?
3 A. Monday, March 1st, I believe was the first day of voir
4 dire, and I was sitting in the third seat. Judge Pauley
5 started the questioning the second day, I believe that was
6 Tuesday, March 2nd, with me. It was probably that evening
7 between the 1st and the 2nd.
8 Q. You thought that you would get thrown off the jury if you
9 told the truth, right?
10 A. Probably.
11 Q. That's why you lied about it?
12 A. Yes.
13 Q. You also lied in not disclosing the fact that you were
14 arrested in Winslow, Arizona, on August 4th of 2007, correct?
15 A. I have no idea what the date was.
16 Q. Do you know that you were arrested in a place called
17 Winslow, Arizona?
18 A. Yes, where I was -- yes.
19 Q. When you were arrested in Winslow, Arizona, that was a
20 pretty memorable incident, right?
21 A. I remember it, of course.
22 Q. Of course, because you called the police and told them that
23 your husband was beating you, but you ended up being the one
24 who got arrested, correct?
25 A. Yes, sir.

| C2FFDAU6 | Conrad - direct | Page 187 |
|---|---|---|

1 Q. How did a judge in the Bronx come to rule upon whether or
2 not a warrant was issued by a different sovereign was defective
3 or not?
4 A. Because I was a plaintiff in a personal injury case, and
5 the defense, I guess ran, ran me, for lack of better terms, and
6 they came up with this warrant and they wanted to bring it up
7 at trial, and the judge said it's a defective warrant.
8 Q. I see. So the judge excluded it from evidence, correct?
9 A. Yes, sir.
10 Q. Did the judge tell you that the warrant -- when was this
11 hearing that the judge did this on?
12 A. July 2, 2010.
13 Q. Now --
14 A. Somewhere about.
15 Q. At any time between August 4, 2007 and July 2, 2010, did
16 you have reason to believe that there was a warrant for your
17 arrest?
18 A. Just because I know what happens to people who don't show
19 up for court, but besides that, no physical proof, no.
20 Q. So although you did not physically have a copy of the
21 warrant, you knew that people who do not show up for court get
22 a warrant issued by the Court, correct?
23 A. Yes, sir.
24 Q. Did you think that that is something that if Judge Pauley
25 knew about it that you had skipped on an OR bond and a warrant

| C2frdau5 | Conrad - direct | Page 186 |
|---|---|---|

1 Q. For disorderly conduct, right?
2 A. Yes.
3 Q. You were released on a recognizance bond, correct?
4 A. There was no bond.
5 Q. Do you know what a cognizance bond means?
6 A. I know I was ROR'd.
7 Q. OR'd?
8 A. ROR'd.
9 Q. So you were let go on a bond that was simply your promise
10 to appear for the next hearing, correct?
11 A. I'm not sure.
12 Q. Did you appear for the next hearing?
13 A. Oh, no.
14 Q. Have you ever appeared for the next hearing?
15 A. I've never subsequently been in Arizona.
16 Q. So you have never appeared for that next hearing, correct?
17 A. There was a defective warrant.
18 Q. There was a defective warrant, what does that mean?
19 A. I believe there was no date or time or address on it.
20 Q. So you knew a warrant was issued for you?
21 A. Not really.
22 Q. How do you know it was defective if you don't know if it
23 was issued?
24 A. The judge in the Bronx deemed it that.
25        (Continued on next page)

| C2FFDAU6 | Conrad - direct | Page 188 |
|---|---|---|

1 had been issued, did you think that would keep you off this
2 jury?
3 A. I'm not in a position to answer that.
4 Q. Why did you hide it, then?
5 A. I wasn't really thinking about that specific instance.
6 Q. Had you -- when Judge Pauley asked those questions about
7 your being -- you understood what the word "arrest" meant?
8 A. Yes, sir.
9 Q. And you were arrested in August 2007 in Arizona, right?
10 A. If that's the date, yes.
11 Q. Had you forgotten about that incident?
12 A. Of course not.
13 Q. So did you make a deliberate decision not to disclose that
14 incident to Judge Pauley?
15 A. No. It was part of the larger decision not to mention any
16 of the arrests, sir.
17 Q. Now, you recall that Judge Pauley also asked whether
18 anybody's spouse or family, close family member had any arrests
19 or convictions. Do you recall that?
20 A. He addressed the chosen panel that was sitting there, yes,
21 correct.
22 Q. And you understood that that included you.
23 A. And my husband.
24 Q. You understood that you were being asked has your husband
25 ever been arrested or convicted.

C2FFDAU6          Conrad - direct          Page 189

1 A. I understood that, sir.
2 Q. And did you know in March of 2011 that your husband had
3   been in fact arrested and convicted a number of times?
4 A. Yes, sir.
5 Q. And did you know that he had been sentenced to prison in
6   1980 for receiving stolen property?
7 A. No, not 1980.
8 Q. Did you know that in 1981 he had been convicted of
9   possession of a controlled substance?
10 A. Sir, I don't know the dates. I thought it was in the '70s.
11   I'm not sure.
12 Q. Did you know that he had been convicted of a probation
13   violation and of making terroristic threats?
14 A. That might have been '93. Vaguely I remember.
15 Q. Did you know that he'd been indicted for check fraud and
16   unlawful possession of weapons?
17 A. That was in Manhattanville, Kentucky in like 1976 when he
18   tried to board an airplane with a gun.
19 Q. So that's not the incident in August of 1985 in New Jersey?
20 A. Sir, I was ten years old probably then. I don't know. I
21   can't tell you.
22 Q. Was he indicted a second time for receiving stolen property
23   and burglary?
24 A. Sir, I don't know.
25 Q. Did he get 18 months in prison in 1993 for harassment,

C2FFDAU6          Conrad - direct          Page 190

1   burglary and terroristic threats?
2 A. I don't know.
3 Q. Did you know that he was convicted for auto theft and
4   served, got a ten-year prison sentence for that?
5 A. No. Seven years, seven months.
6 Q. Served seven years and seven months.
7 A. Paroled out, yes.
8 Q. Did you know him while he was in prison?
9 A. No.
10 Q. You met him afterwards?
11 A. Yes, sir.
12 Q. And he disclosed his criminal history to you?
13 A. Yes.
14      MR. OKULA: Objection, your Honor, to marital
15   communications.
16      THE COURT: I'll sustain any further inquiry along
17   that line.
18 Q. And you concealed your knowledge about your husband's
19   criminal career in order to make sure that you would get a seat
20   on this jury, is that correct?
21 A. Yes, I concealed his career.
22 Q. Does your father work for the Justice Department right now?
23 A. Yes, sir.
24 Q. How old is he?
25 A. On March 1 he'll be 80. And I remember specifically that

C2FFDAU6          Conrad - direct          Page 191

1   voir dire commenced a year ago on March 1, because that was his
2   birthday.
3 Q. Now, another question that was asked of the whole panel was
4   whether you or a close relative had ever been involved in or
5   appeared as a witness in a variety of types of investigations
6   including investigations by licensing authorities.
7 A. Yes, sir. And in retrospect, I should have mentioned the
8   disciplinary committee proceeding. I didn't just connect the
9   two at that time. And that was obviously a pertinent issue
10   that should have been raised.
11 Q. I see. So on March 1st or 2nd, you didn't think about the
12   fact that you'd participated in a disciplinary proceeding?
13 A. Please say it again.
14 Q. When you were testifying as a juror, potential juror here
15   on March 1 and 2nd, you weren't thinking about the fact that
16   you had participated in disciplinary proceedings?
17 A. No. I thought about testifying in my mind about having my
18   personal injury case and more along those lines. No, it didn't
19   occur to me.
20 Q. Even though you had filed your petition for reinstatement a
21   day or two before that?
22 A. I just didn't look at it that way.
23 Q. You believed that by serving on this jury you could get
24   some measure of vindication for yourself, didn't you?
25 A. Not at all. Vindication for what?

C2FFDAU6          Conrad - direct          Page 192

1 Q. You believed that you could somehow vindicate yourself as
2   having done something worthwhile after a career that was in
3   disgrace at that point?
4 A. Are you trying to say that serving three months on a jury
5   is akin to some sort of penance? I don't understand really
6   what you're trying to tell me. It was my civic duty, which I
7   performed to the best of my capability and ability and I
8   believe I did it fairly, justly and unbiased.
9 Q. Was it your civic duty to perjure yourself in this court?
10 A. It's nobody's.
11 Q. So you didn't really do your civic duty, did you?
12 A. Of course. Rendering the just verdict in an unbiased
13   fashion, I certainly did.
14 Q. If you were on trial for a crime, would you want to know
15   that one of the jurors who was judging the credibility of
16   witnesses and had your fate in his or her hands had perjured
17   themselves repeatedly at voir dire? Would you want to know
18   that?
19      MR. OKULA: Objection, your Honor.
20      THE COURT: Overruled.
21 A. Probably not, if I was a good criminal.
22      MR. GAIR: Your Honor, this would be a good place to
23   break.
24      THE COURT: All right. We're going to take a
25   ten-minute recess and then we'll reconvene and endeavor to

UNITED STATES OF AMERICA, v
PAUL M. DAUGERDAS, ET AL.,

February 15, 2012

| C2FFDAU6 | Conrad - direct | Page 193 |
|---|---|---|

1 complete the witness.
2     (Recess)
3         THE COURT: Mr. Gair, you may continue.
4 BY MR. GAIR:
5 Q. Ms. Conrad, do you have a driver's license?
6 A. Yes.
7 Q. What name is on your drivers license?
8 A. My married name, Rosa.
9 Q. So when you said you use Rosa socially, in fact you use it
10 for legal purposes too, correct?
11 A. Just on my license.
12 Q. And when you were arrested, correct?
13 A. I don't think it matters what name a person uses when
14 they're arrested. Your NYSID follows you.
15 Q. Now, would I be right in thinking that you identified with
16 the prosecutors in this case?
17 A. I don't know what you think, sir.
18 Q. Did you identify with the prosecutors in this case?
19 A. I don't know what that question means.
20 Q. Well, you wrote to the prosecutors after the trial was
21 over, correct?
22 A. Correct.
23 Q. You didn't write to any of the defense lawyers, correct?
24 A. That's correct.
25 Q. And not only did you write to the prosecutors, but you

| C2FFDAU6 | Conrad - direct | Page 195 |
|---|---|---|

1 Q. And you were so anxious to speak with them that you wrote a
2 letter to Mr. Okula the very next day, right?
3 A. I don't know couching in those terms "so anxious" really is
4 the correct way to do it, but --
5 Q. Well, you wrote a letter to him in which you told him you
6 wished that you would have had the opportunity to talk to him,
7 correct?
8 A. Oh, that's correct, yes.
9 Q. And you would have welcomed the pleasure to do so, right?
10 A. Yes.
11 Q. Now, you never made any attempt to contact any of the
12 defense lawyers and tell them you would have liked to talk to
13 them, right?
14 A. There was no reason to.
15 Q. But there was a reason to contact the prosecutor?
16 A. Yes.
17 Q. And not only -- now, and you wrote a letter to Mr. Okula,
18 now, this is not preprinted stationery, right, that you wrote
19 on?
20 A. No, no.
21 Q. This is just a caption that you made up for the letter,
22 correct?
23 A. Yeah, on my computer, yes.
24 Q. On your computer. And where were you sitting when you
25 wrote that letter on your computer?

| C2FFDAU6 | Conrad - direct | Page 194 |
|---|---|---|

1 wrote to the prosecutors the very day after the verdict, isn't
2 that correct?
3 A. I'm not really sure the exact date, sir. It was late May.
4         MR. GAIR: Your Honor, I'd move the admission of PMD
5 Exhibit 7.
6         THE COURT: Any objection?
7         MR. OKULA: No objection, your Honor.
8         THE COURT: PMD Exhibit 7 is received in evidence.
9         (Exhibit PMD 7 received in evidence)
10 Q. And if you would look at Exhibit 7, tab 7, you wrote the
11 prosecutors on May 25th of 2011, is that correct?
12 A. Yes.
13 Q. And that was one day after the verdict, the very day after.
14 A. I believe the verdict was the 24th. Correct.
15 Q. And you were very anxious to talk to the prosecutors,
16 weren't you?
17 A. Not just myself.
18 Q. Of course, I didn't ask you about anybody else. Were you
19 very anxious to talk to the prosecutors?
20 A. Yes. And along with the other eleven jurors, we had wanted
21 to speak with them after the verdict, when Judge Pauley had
22 come into the jury room to speak with us after.
23 Q. Without worrying about what the eleven other people wanted
24 or didn't want, were you anxious to speak with them?
25 A. Oh, sure.

| C2FFDAU6 | Conrad - direct | Page 196 |
|---|---|---|

1 A. In front of my cat.
2 Q. In front of your cat. Was your cat located at 2385 South
3 Barker Avenue or at 16 Parkview Drive at the time?
4 A. Neither. It's Barker.
5 Q. Where was your cat located at the time you wrote this
6 letter, ma'am?
7 A. Next to my screen. On Barker Avenue, sir.
8 Q. Yeah. And yet you put, once again, that the return address
9 was 16 Parkview Avenue in Bronxville, New York, correct?
10 A. No, Drive.
11 Q. You put the address was 16 Parkview Drive in Bronxville,
12 correct?
13 A. Yes, mm-hmm. Yes.
14 Q. That's not where you were when you wrote the letter, right?
15 A. Correct.
16 Q. And that was not the address you were living at when you
17 wrote the letter, correct?
18 A. I still consider it both.
19 Q. And that is not the address that goes with the phone number
20 that you put right under that, is it?
21 A. Excuse me, that's my cell number.
22 Q. That's exactly right. That is not your parents' home phone
23 number at 16 Parkview Drive, is it, ma'am?
24 A. No, it's my cell.
25 Q. It's your cell number. Why don't you tell Judge Pauley why

| C2FFDAU6 | Conrad - direct | Page 197 |
| --- | --- | --- |

1  you put your cell number on your letter to Mr. Okula?
2  A. Because that's how I'm most accessible, sir.
3  Q. Because you wanted him to call you, didn't you, ma'am?
4  A. No, not at all.
5  Q. Well, then why did you care if you were most accessible
6  that way or not?
7  A. Just a heading I use. That's all.
8  Q. No, you just told us that you put that on that letter
9  because that's where you're most accessible.
10 A. That's true. But not with any forethought to an
11 expectation of a call from Mr. Okula.
12 Q. Why did you care whether you were accessible or not? Why
13 did you put a phone number on there?
14 A. Because that's usually what a heading has.
15 Q. And you made a conscious decision to put your phone number
16 on there, right?
17 A. Sir, this is minutiae. I don't know. I can't answer that.
18 Q. You were hoping to be accessible for a phone call from
19 Mr. Okula, correct?
20 A. Absolutely not.
21 Q. And would you agree with me that at times the tone of your
22 letter was playful?
23 A. Oh, sure.
24 Q. Maybe even flirtatious, right?
25 A. That's -- please. Judge.

| C2FFDAU6 | Conrad - direct | Page 198 |
| --- | --- | --- |

1       THE COURT: You can answer the question.
2  A. Absolutely not.
3  Q. Did you tell Mr. Okula that something, words to the effect
4  that maybe he was on track to take Mr. Bharara's job from him?
5  A. Oh, yes.
6  Q. Now, did you hope that he would call you back, ma'am?
7  A. I'm not playing into this fantasy stuff. No, not at all.
8  Please.
9  Q. Did you feel, did you think about putting the phone number
10 that went with this address 16 Parkview Drive, did you think
11 about putting that phone number on the letterhead?
12 A. No.
13 Q. Did you think about putting your real address on the
14 letterhead?
15 A. That is my real address as well.
16 Q. Did you think about putting your Barker Avenue address on
17 the letterhead?
18 A. Sir, it was probably just cut and pasted from another
19 letter I had done. It wasn't conscious.
20 Q. Did you just make it up, just this moment, it was
21 probably cut and pasted from another letter? Did you just make
22 that up?
23 A. I'm answering your question, sir.
24 Q. No, I want to know if you just made that up or if you had
25 any reason to believe that you cut and pasted this from another

| C2FFDAU6 | Conrad - direct | Page 199 |
| --- | --- | --- |

1  letter.
2  A. Yes, I probably did cut and paste it.
3  Q. What other letter?
4  A. I have no idea.
5  Q. Okay. Now, in this letter you told Mr. Okula, and I quote,
6  "I solely held out for two days on the conspiracy charge for
7  him," referring to David Parse. "I wanted to convict
8  100 percent not only on that charge." Do you remember that?
9  A. Yes.
10 Q. And you're sure about that, right? You wouldn't lie to
11 Mr. Okula, would you?
12      MR. OKULA: Judge, object on 606 grounds.
13      MR. GAIR: May I respond, your Honor?
14      THE COURT: No. Overruled.
15 Q. Did you tell Mr. Okula, "I solely held out for two days on
16 the conspiracy charge for Parse. I wanted to convict
17 100 percent not only on that charge." Did you tell him that?
18 A. You're reading it correctly.
19 Q. Did you tell Judge Pauley on December 20th that "in my mind
20 Parse should not have been convicted of number 1"?
21 A. Oh, I don't recall, sir.
22 Q. Well, let's look at Exhibit 3, page 16. Beginning at line
23 3. "For what? For what? I'll retain myself or my husband,
24 the convicted felon. For what? For what, sir? To say that I
25 convicted everybody except the stupid Brubaker? Parse was an

| C2FFDAU6 | Conrad - direct | Page 200 |
| --- | --- | --- |

1  idiot but we let him go because I had evidence enough that he
2  really, he didn't really, in my mind he shouldn't have been
3  convicted of number 1."
4       Did you say that to Judge Pauley on December 20th?
5  A. Yes, you're reading correctly.
6  Q. And that's a contradiction of what you said to Mr. Okula
7  the day after the trial, correct?
8  A. I wasn't the only holdout.
9       MR. GAIR: Your Honor, I'm going to ask that this
10 witness be instructed not to discuss the jury deliberations. I
11 didn't ask about them.
12      THE COURT: Please --
13 A. But in essence --
14      THE COURT: Don't discuss the deliberations or the
15 split of the vote among the jury. Respect the sanctity of jury
16 deliberations, Ms. Conrad.
17      THE WITNESS: Yes.
18      THE COURT: And respond directly to counsel's
19 questions.
20 Q. Ma'am, isn't it true that the statement you made to Judge
21 Pauley on December 20th was directly contradictory to the
22 statement you made to Mr. Okula in his letter, in your letter
23 of May 25th?
24 A. I don't know.
25 Q. Well, is it contradictory to say that a person should have

UNITED STATES OF AMERICA, v
PAUL M. DAUGERDAS, ET AL.,

February 15, 2012

| C2FFDAU6 | Conrad - direct | Page 201 |
| --- | --- | --- |

1 been convicted of Count One and that a person should not have
2 been convicted of Count One? Do you see the contradiction
3 there?
4      MR. OKULA: Objection, Judge. Those are not the
5 facts.
6      THE COURT: Yes, sustained.
7 Q. Now, in the letter, in the letter you say -- by the way,
8 did you choose the stamp specially for this letter that you put
9 on?
10 A. What?
11 Q. Did you choose the stamp that you put on the letter
12 specially?
13 A. I don't know what you're talking about.
14 Q. Well, do you see the copy of the envelope?
15 A. That was, that was the eternity stamps or something like
16 that.
17 Q. Do you see --
18 A. Oh --
19 Q. Do you see what the stamp says?
20 A. Sorry. You're going a little too far here, Mr. Gair.
21 Q. I'm just asking you if you chose that stamp specially.
22 A. I'm sure I didn't.
23 Q. So you didn't have any other stamps, this was just one that
24 was laying around?
25 A. A book of stamps is a book of stamps, sir.

| C2FFDAU6 | Conrad - direct | Page 202 |
| --- | --- | --- |

1 Q. Now, in the letter in the second paragraph, you say, "I
2 thought that you, Miss Davis and Mr. Hernandez did an
3 outstanding job on behalf of our government." Do you see that?
4 A. Yes, sir.
5 Q. Is there anything unusual that you see with your knowledge
6 of English literature in that sentence?
7      MR. OKULA: Objection to the form, your Honor.
8 A. I don't know what that means.
9      THE COURT: Overruled.
10 Q. Okay. Did you capitalize the word "our"?
11 A. Oh, yes.
12 Q. And did you capitalize the word "government"?
13 A. Yes.
14 Q. Is it your opinion that in that sentence "our government"
15 is a proper noun?
16 A. Government is.
17 Q. Is "our government" a proper known?
18 A. I don't know.
19 Q. You capitalized it not because you believed it was a proper
20 noun, but because you wanted to emphasize that you were talking
21 about his government and your government, correct?
22 A. You're slanting that. No.
23 Q. Well, I didn't use the word "our government" and I didn't
24 capitalize it. Why did you do it?
25 A. I don't know.

| C2FFDAU6 | Conrad - direct | Page 203 |
| --- | --- | --- |

1 Q. Did you believe that Mr. Brubaker was an idiot?
2 A. Yes.
3 Q. Did you believe Mr. Parse was just stupid?
4 A. For the backdating, yes.
5 Q. And do you believe that there's really no reason for this
6 hearing to be undertaken at all because these people are just
7 fricken crooks and it doesn't matter?
8 A. Is that a question?
9 Q. Yes, it is.
10 A. Well, the answer is no.
11 Q. Did you tell the Court that you thought this was all
12 ridiculous on December 20th because these people are fricken
13 crooks?
14 A. I'm not sure.
15      MR. GAIR: May I have a moment, your Honor?
16      THE COURT: Yes. Take your time.
17 Q. Were you suspended in the Southern District of New York?
18 A. Sure. I must have been. Yes.
19 Q. Did you know you were suspended in the Southern District of
20 New York when you testified at voir dire?
21 A. Yes. Yes.
22      MR. GAIR: Your Honor, I would move the admission of
23 several exhibits. PMD 1, 24, 25, 26 and 45.
24      MR. OKULA: No objection, your Honor.
25      THE COURT: All right. PMD Exhibits 1, 24, 25, 26 and

| C2FFDAU6 | Conrad - direct | Page 204 |
| --- | --- | --- |

1 45 are received in evidence.
2      (Exhibits PMD 1, 24, 25, 26 and 45 received in
3 evidence)
4      MR. GAIR: Nothing further, your Honor. Thank you.
5      THE COURT: Mr. Okula.
6      MR. OKULA: I didn't know if there were any other
7 defense lawyers who intend to question.
8      THE COURT: Any other defense counsel wish to inquire?
9      MR. ROTERT: Thank you, your Honor, no inquiry for
10 Ms. Guerin.
11      THE COURT: Mr. Schectman?
12      MR. SCHECTMAN: Briefly, Judge.
13      THE COURT: Go ahead.
14 DIRECT EXAMINATION
15 BY MR. SCHECTMAN:
16 Q. Ms. Conrad, could you look at your letter to Mr. Okula
17 again, Government Exhibit 1, I believe.
18 A. Number 7, correct?
19      THE COURT: PMD 7.
20 Q. PMD 7. Do you have that?
21 A. Yes, sir.
22 Q. And I think your testimony was that as you sit here today
23 you don't recall why you capitalized "our government," is that
24 correct?
25 A. Yes.

C2FFDAU6    Conrad - direct    Page 205

1 Q. You also say that you fought the good fight, correct?
2 A. Yes.
3 Q. And that was your way of telling Mr. Okula that you were
4 fighting for his side.
5 A. Not necessarily. After all of the evidence and
6 deliberations, the jury felt that we reached a fair verdict.
7 Q. I'm not asking about the jury. I'm asking about your
8 writing "I fought the good fight." That was your way of
9 telling Mr. Okula that you were fighting for his side.
10 A. At one point.
11 Q. And when you say you threw in the towel, I take it that's
12 also a sports image?
13 A. I can't answer that.
14 Q. At some point you stopped fighting the good fight.
15 A. Meaning?
16 Q. That's when you threw in the towel.
17 A. That was probably an incorrect way to describe the taking
18 into consideration all of the evidence at the end of the day.
19 Q. What did you call it? An odd way? A what sort of way?
20 A. I said at the end of the day.
21 Q. You said some sort of way, improper way? I couldn't
22 remember the objective.
23       MR. GAIR: Incorrect.
24 Q. An incorrect way. That was an incorrect way of saying it.
25 A. Maybe I said improper, I'm not sure.

C2FFDAU6    Conrad - direct    Page 206

1 Q. So when you said you fought the good fight and you've
2 thrown in the towel that was just an incorrect way of saying
3 you were unbiased.
4 A. At the end of the day after all the evidence was pored
5 over.
6 Q. When you say numbers don't lie, what numbers were you
7 referring to?
8 A. From Dr. DeRosa, the expert.
9 Q. His numbers.
10 A. Sure, and, to not get specific, but the lack of economic
11 substance in the transactions.
12 Q. So that's what you were referring to, Mr. Parse's knowledge
13 of the lack of economic substance in the transactions?
14 A. No. Not at all.
15 Q. So what is it you were referring to?
16 A. It was one component of the whole big picture.
17 Q. I see. Now, I think you told us earlier today you were
18 asked whether your husband is a convicted felon, and you said
19 so are most lawyers. And lots of people laughed. Do you
20 remember saying that?
21 A. Yes.
22 Q. And was that being, I think your word is smart a-s or smart
23 A-blank-blank?
24 A. Sure. Mr. Gair was asking me things about my husband that
25 I'm finding out right now today.

C2FFDAU6    Conrad - direct    Page 207

1 Q. Well, you knew most of that stuff.
2 A. I don't even know if I knew most of it.
3 Q. You knew when you married him that he just finished a seven
4 and a half year sentence.
5 A. We got married three years after he finished his sentence.
6 Q. And you knew he was unemployed.
7 A. Yes.
8 Q. And you knew he hadn't owned a bus company since 25 years?
9 A. About that.
10 Q. And so when you said today "so are most lawyers," that was
11 just smart ass.
12 A. Sure.
13 Q. And when you were asked and the jurors were asked whether
14 you had any unpleasant experiences with lawyers, accountants,
15 financial planners, you didn't raise your hand on that question
16 or in voir dire, did you?
17 A. That's correct.
18 Q. And you had had unpleasant experiences with lawyers, hadn't
19 you?
20 A. I don't know what you mean.
21 Q. Well, I mean, two of them referred you to the Bar
22 Association for disciplinary action.
23 A. I don't look at it that way, sir.
24 Q. That was a pleasant experience?
25 A. It's just an experience. I don't have my endorphins go

C2FFDAU6    Conrad - direct    Page 208

1 wild over it, so I don't really know what you're getting at.
2 Q. So you didn't feel you had any obligation to tell the Court
3 when the Court asked whether you had any unpleasant experiences
4 with lawyers that two had referred you to the disciplinary
5 committee, that the disciplinary committee brought charges
6 against you and that a panel of judges, indeed two panels,
7 right, suspended you?
8 A. A job's a job, sir. That's how I see it.
9 Q. So you didn't think you had any obligation to tell the
10 Court any of that because a job's a job.
11 A. I don't think that was your original question, but -- that
12 was another omission, sir.
13 Q. That was an omission?
14 A. Yes.
15 Q. Now, I take it that one of the things we've learned today,
16 Ms. Conrad, is that all of your omissions and lies, whatever
17 you call them, were done to make you more marketable as a
18 juror, is that correct?
19 A. Those were my words.
20 Q. And that would be correct, right?
21 A. That's what I said. Whether it was correct or not, that's
22 not for me to decide.
23 Q. No, that's totally for you to decide. Are those words
24 accurate? Were you trying to be a more marketable juror?
25 A. I said this, yes.

UNITED STATES OF AMERICA, v
PAUL M. DAUGERDAS, ET AL.,

February 15, 2012

| C2FFDAU6 | Conrad - direct | Page 209 |
|---|---|---|

1 Q. So those words are not an omission and they're not a lie,
2 they're true?
3 A. Correct.
4 Q. And that is to say that you thought that if these lawyers
5 knew who you actually were, and maybe if that judge knew who
6 you actually were, you wouldn't have been a juror in this case.
7 A. I knew I could be unbiased and fair.
8 Q. No, no. Let's try to answer some questions. You knew if
9 people knew who you actually were, if these lawyers knew who
10 you actually were, perhaps if that judge knew who you actually
11 were, you wouldn't have been a juror in this case? You knew
12 that.
13 A. Probably not, right.
14 Q. Let's not say probably. Let's see if we can get you to be
15 accurate.
16        THE COURT: Just stay back by the podium,
17 Mr. Schectman.
18 Q. Let's try to be accurate.
19        MR. OKULA: Judge, could we stop the speeching, have
20 him ask a question?
21        THE COURT: If you have an objection as to form, you
22 can state it. And Mr. Schectman is going to stay behind the
23 podium.
24        MR. SCHECTMAN: He is indeed.
25 Q. You knew that if these lawyers knew who you really were,

| C2FFDAU6 | Conrad - direct | Page 210 |
|---|---|---|

1 there was no chance of your being on this jury?
2 A. I can't read people's minds, sir.
3 Q. Well, you read their minds well enough to keep an enormous
4 amount of information from them, didn't you?
5 A. I can't qualify enormous.
6 Q. Ms. Conrad, I don't want to go through it --
7 A. More likely than not I wouldn't have been picked, yes.
8 Q. Try a higher standard. Beyond a reasonable doubt you
9 wouldn't have been picked.
10 A. I can't put words into your mouth, I'm sorry.
11 Q. If they knew you were a suspended lawyer with a history of
12 alcoholism with three misdemeanor convictions, with a husband
13 who had seven felony convictions, who had involvement with
14 licensing authorities, who had an outstanding warrant from
15 Arizona, is it your view that these lawyers would have seen you
16 as a different person, a far different person than the one you
17 portrayed yourself to be?
18 A. I would think the defense counsel would be wild to have me.
19 Q. Why is that, Ms. Conrad?
20 A. Well, my husband seems to be a professional defendant, so I
21 probably would have in their mind been a keeper for their side.
22 Q. Because your view is that they wanted people who were crooks
23 because they were crooks.
24 A. If that's connecting the dots logically.
25        MR. SCHECTMAN: I'll stop there.

| C2FFDAU6 | Conrad - direct | Page 211 |
|---|---|---|

1        THE COURT: Any inquiry, Ms. McCarthy?
2        MS. McCARTHY: Your Honor, just a housekeeping matter.
3 I'm not sure if this is admitted. PMD 23. Has that been
4 offered in evidence yet? Mr. Gair offered some at the end.
5 I'm not sure.
6        THE COURT: No. You're offering PMD 23?
7        MS. McCARTHY: I am your Honor.
8        THE COURT: Any objection?
9        MR. OKULA: None, your Honor.
10        THE COURT: All right, PMD 23 is received in evidence.
11        (Exhibit PMD 23 received in evidence)
12        THE COURT: Mr. Okula, you may inquire.
13        MR. OKULA: Thank you, your Honor.
14 CROSS-EXAMINATION
15 BY MR. OKULA:
16 Q. Ms. Conrad, let me pick up where Mr. Schectman left off
17 where he asked you a question and you answered something about
18 connecting the dots about determining whether the defendants
19 were crooks. Do you remember that question?
20 A. Yes.
21 Q. Did you make up your mind about those defendants that you
22 found guilty prior to hearing all of the evidence and prior to
23 hearing the judge's instructions in this case?
24 A. Absolutely not.
25 Q. Ms. Conrad, you didn't attempt to try to get on this jury

| C2FFDAU6 | Conrad - cross | Page 212 |
|---|---|---|

1 in order to carry out some personal vendetta or agenda with
2 respect to the defendants, did you?
3 A. No, sir.
4 Q. And you didn't have any vendetta against the government,
5 correct?
6 A. Correct.
7 Q. And similarly, you didn't think that you would cast
8 yourself in a good light with the government if you voted in
9 favor of the government, notwithstanding what the evidence was,
10 is that correct?
11 A. I believe so.
12 Q. So when you failed to tell the truth about your education
13 and failed to reveal your criminal record and your status as a
14 suspended attorney, it was not because you were biased against
15 one party or another, is that correct?
16 A. Correct.
17 Q. Did you have any personal bias or animus against Paul
18 Daugerdas at the beginning of the case?
19 A. No, not at all. I didn't know anybody.
20 Q. So you didn't know any of the defendants, is it fair to say
21 that you had no personal bias or animus or feelings one way or
22 another with respect to them, is that fair?
23 A. That's absolutely correct.
24 Q. And it's true, isn't it, Ms. Conrad, that you hadn't made
25 up your mind once you were selected to be a juror in this case

| C2FFDAU6 | Conrad - cross | Page 213 |
| --- | --- | --- |

1 before you started hearing any evidence, is that correct? In
2 other words, you hadn't prejudged the case after you were
3 selected that you were going to find the defendants guilty or
4 rule in favor of the government, is that correct?
5 A. That's correct, yes.
6 Q. And is it also true that you didn't make up your mind with
7 respect to the guilt or innocence of any of the defendants
8 until you heard all the evidence in the case and listened to
9 the judge's instructions, is that fair?
10 A. Absolutely.
11 Q. Let me pick up on a section where Mr. Gair was asking you
12 about things you said with respect to David Parse. Do you
13 remember those questions?
14 A. Yes.
15 Q. And Mr. Gair referenced the letter that you sent to me
16 after the return of the verdict, do you remember that?
17 A. Yes.
18 Q. And you were also asked questions about the fact that you
19 referred to fighting the good fight. Do you recall that?
20 A. Yes.
21 Q. Without getting into your deliberations with the other
22 jurors, is it correct that as you said in the letter that you
23 viewed initially during your, when you began deliberating, that
24 Mr. Parse should have been found guilty?
25 A. Yes.

| C2FFDAU6 | Conrad - cross | Page 215 |
| --- | --- | --- |

1 A. No.
2 Q. Now, Mr. Gair went through and Mr. Schectman did also to
3 some extent some of your criminal cases with you. Do you
4 remember that?
5 A. Yes.
6 Q. For instance, you went through the driving under the
7 influence offenses and your harassment offense, the contempt
8 offense and the shoplifting offenses. Do you remember that?
9 A. Yes.
10 Q. And were you also asked about the disorderly conduct
11 offense that you were arrested for that you didn't appear on in
12 Winslow, Arizona. Do you recall that?
13 A. Yes, sir.
14 Q. Now, none of those cases, Ms. Conrad, had anything to do
15 with the subject matter involved in this trial, correct?
16 A. That's correct.
17 Q. In other words, these offenses, those local offenses that
18 you were arrested for, none of them had anything to do with
19 taxes or tax evasion or tax shelters, is that fair?
20 A. That's correct.
21 Q. And is it also fair, Ms. Conrad, that your involvement in
22 those criminal cases did not cause you to be biased in one
23 matter or another against any party or any attorney in this
24 case?
25 A. That's correct.

| C2FFDAU6 | Conrad - cross | Page 214 |
| --- | --- | --- |

1 Q. And you also note in your letter, though, that you
2 ultimately relented after hearing a jury charge from Judge
3 Pauley about the definition of knowingly and willfully,
4 correct?
5 A. Yes.
6 Q. So is it fair to say that when you personally deliberated
7 with respect to Mr. Parse, you reached your conclusion based on
8 the legal instruction that Judge Pauley gave you and without
9 bias to any side. Fair?
10 A. 100 percent. Correct.
11 Q. Now, when you were selected to serve on the jury, did you
12 have any personal knowledge with respect to any of the
13 defendants in this case?
14 A. No, none.
15 Q. And is it also fair that you didn't have any personal
16 knowledge of any of the defense lawyers, correct?
17 A. Correct.
18 Q. You didn't know any of the prosecutors in the case or any
19 of the IRS agents, correct?
20 A. No. That's correct.
21 Q. And you weren't factually involved in any of the underlying
22 events at trial, correct?
23 A. Never.
24 Q. And did you have any financial motive in the outcome of the
25 case?

| C2FFDAU6 | Conrad - cross | Page 216 |
| --- | --- | --- |

1 Q. Now, let me ask you this, Ms. Conrad. Did the fact that
2 you were a criminal defendant in a prior case affect you from
3 fairly and impartially judging the evidence in this case and
4 weighing and applying Judge Pauley's legal instruction?
5 A. Absolutely not.
6 Q. Did the fact that you were arrested by a police officer on
7 a number of occasions in your criminal cases in any way affect
8 your ability to be fair and impartial?
9 A. No.
10 Q. Did your involvement in the disciplinary proceedings where
11 lawyers made complaints about you and you were asked questions
12 by disciplinary counsel, did that affect your ability to
13 carefully and appropriately and fairly weigh the evidence and
14 the legal instructions in this case?
15 A. No, not at all.
16 Q. Did the fact that you were a suspended attorney affect your
17 impartiality in this case?
18 A. No.
19 Q. Now, do you remember you received legal instructions from
20 Judge Pauley on a number of occasions during the case, both
21 during voir dire at the beginning of the trial and at the end
22 of the trial?
23 A. Yes.
24 Q. And in particular, do you remember a jury instruction that
25 went somewhat, I know it's a long time ago and you may not

UNITED STATES OF AMERICA, v
PAUL M. DAUGERDAS, ET AL.,

February 15, 2012

| C2FFDAU6 | Conrad - cross | Page 217 |
|---|---|---|

1 remember every word, but do you remember an instruction that
2 went along these lines: You will have to decide what the facts
3 are from the evidence that will be presented in this courtroom
4 and then apply those facts to the law as I give it to you.
5      Do you recall that?
6 A. Yes.
7 Q. Did you follow that instruction, Ms. Conrad?
8 A. Yes.
9 Q. And another instruction went something along the lines that
10 the law requires your decision be based solely on the evidence
11 before you. Anything I direct you to disregard as being
12 excluded because it's not legally admissible, further, anything
13 that you may see or hear when the Court is not in session may
14 not be considered. The only competent evidence is evidence
15 received in this courtroom. Do you remember that instruction?
16 A. Not word-for-word, but the general gist, yes.
17 Q. The substance of it, do you remember that?
18 A. Yes.
19 Q. And did you follow that instruction?
20 A. Yes.
21 Q. Did you render your verdict, Ms. Conrad, based solely on
22 the evidence presented at trial and in the context of the law
23 that Judge Pauley gave to you in his instructions and not based
24 on any bias, prejudice or sympathy?
25 A. Yes.

| C2FFDAU6 | Conrad - cross | Page 219 |
|---|---|---|

1 Q. And that was in a way justifying the result that you
2 reached, correct, personally?
3 A. That's fair, yes.
4 Q. And when you referred to Dr. DeRosa when Mr. Schectman was
5 asking you, I think you mentioned that you found it personally,
6 not going into your deliberations, but convincing, Dr. DeRosa's
7 testimony about the lack of economic substance, is that fair?
8 A. Oh, yes.
9 Q. Did you pay careful attention to the testimony of all
10 witnesses?
11 A. Shanbrom lost me, but yes.
12 Q. And in fact you noted in your letter that you didn't find
13 very compelling the testimony of Mr. Shanbrom, correct?
14 A. That's correct.
15 Q. So is it fair to say that that example is emblematic of
16 your view that you didn't call everything in the government's
17 favor because you found government witness Paul Shanbrom
18 unconvincing, is that a fair word?
19 A. More than fair.
20 Q. Now, is that indicative, Ms. Conrad, of what you said
21 earlier, that you based your verdict in this case based on what
22 you saw in this courtroom from the witness stand and the
23 evidence you heard and applying the instructions from Judge
24 Pauley?
25 A. Yes, in totality.

| C2FFDAU6 | Conrad - cross | Page 218 |
|---|---|---|

1 Q. Now, Ms. Conrad, you noted earlier in your testimony that
2 you obtained your law degree from Brooklyn law school, correct?
3 A. Yes.
4 Q. Your practice consisted, did it not, of litigation,
5 primarily in personal injury matters, is that fair?
6 A. For the most part yes.
7 Q. And you served as a contract attorney for certain
8 plaintiffs' lawyers, is that correct?
9 A. Yes.
10 Q. In carrying out your role as a juror is it fair to say that
11 you disregarded any other ideas or notions or beliefs about the
12 law that you previously had in reaching your verdict in this
13 case?
14 A. That's a fair statement, yes.
15 Q. Let's go back for just one moment to the letter that you
16 were asked about and you referred to Dr. DeRosa and the numbers
17 with respect to Mr. Schectman's questions, do you remember
18 that?
19 A. Yes.
20 Q. He asked you, Mr. Schectman did, about a statement that you
21 made that numbers don't lie. Do you recall that?
22 A. Just from looking at the letter.
23 Q. Yes, if you look four lines from the bottom where you said,
24 quote, "I'm a purist and numbers don't lie"?
25 A. Yes.

| C2FFDAU6 | Conrad - cross | Page 220 |
|---|---|---|

1 Q. After all, you voted to acquit Mr. Brubaker, correct?
2 A. Yes.
3 Q. And you voted to acquit Mr. Parse on certain charges,
4 correct?
5 A. Correct.
6 Q. Just a few more questions with respect to some of the
7 instructions you were given. Do you remember Judge Pauley
8 instructed you at the end of the case in his instructions that
9 under your oath as jurors you are not to be swayed by fear,
10 prejudice, bias or sympathy, you're to be guided solely by the
11 evidence in the case. Do you remember an instruction along
12 that line?
13 A. Yes.
14 Q. And is it true, Ms. Conrad, that in spite of all that we
15 spoke about earlier today that you based your verdict which
16 involved an acquittal of Mr. Brubaker and a partial acquittal
17 of Mr. Parse based on the evidence in this courtroom and the
18 instructions that Judge Pauley gave you?
19 A. That's correct.
20 Q. Were you biased against the defendants in any manner or
21 form?
22 A. Not at all.
23      (Continued next page)
24
25

| C2frdau7 | Conrad - cross | Page 221 |
|---|---|---|

1      MR. OKULA: Let me have one moment, your Honor.
2  Q. Ms. Conrad, a few more questions. I'm sorry. Are you
3  ready?
4  A. Yes.
5  Q. At the time that you were selected to serve as a juror in
6  this case, your status was a suspended New York attorney,
7  correct?
8  A. Yes.
9  Q. You were not working, correct?
10 A. Correct.
11 Q. Is it fair to say that even though the daily witness fee
12 that you received for your service was rather meager, is
13 not irrelevant to you in your service as a juror?
14 A. Yes, that's correct.
15 Q. After all, you were basically out of work, correct?
16 A. Yes.
17 Q. You referred earlier during Mr. Gair's questioning to a
18 motivation that you had in the form of intellectual curiosity
19 with respect to tax shelters, is that correct?
20     MR. GAIR: Objection to the form of the question, your
21 Honor.
22     MR. OKULA: I'll rephrase it, your Honor.
23     THE COURT: All right.
24 Q. You remember in Judge Pauley's initial instructions he
25 described in general terms the subject matter of the case, in

| C2frdau7 | Conrad - cross | Page 222 |
|---|---|---|

1  particular tax charges, correct?
2  A. Yes.
3  Q. You heard certain things about tax shelters in the
4  introductory instructions, correct?
5  A. Vaguely.
6  Q. Is it correct that the subject matter of the case was of
7  some interest to you when you were answering questions during
8  voir dire and considering your motives for serving on the jury?
9  A. Yes, it piqued my curiosity. I had no experience ever with
10 tax work.
11 Q. Had you ever sat as a juror in a federal criminal case
12 before?
13 A. No.
14 Q. Was one of your motivations a desire to see a trial through
15 with this complexity from beginning to end?
16 A. Partially.
17 Q. One final question, Ms. Conrad. Is it correct that you
18 waited until Judge Pauley told you it was appropriate for you
19 to begin your deliberations and the consideration of the
20 evidence based on his instructions, and that's what guided your
21 verdict in this case?
22 A. Yes.
23     MR. OKULA: I have nothing further, Judge.
24     THE COURT: Redirect examination, Mr. Gair.
25 REDIRECT EXAMINATION

| C2frdau7 | Conrad - redirect | Page 223 |
|---|---|---|

1  BY MR. GAIR:
2  Q. Can you explain to us how it is you can remember the
3  substance of many specific jury instructions that you received
4  8½ months ago when you cannot remember things that you said to
5  Judge Pauley on December 20th when you appeared in this court?
6  A. Because I'm familiar with the PJI and they are sort of
7  basically the same IN state court as in federal court.
8  Q. Did you have any trouble understanding my questions when I
9  was asking you questions earlier?
10 A. To which are you referring?
11 Q. Any of them.
12 A. I don't have the transcript written in my head.
13 Q. You certainly didn't have any trouble with Mr. Okula's
14 questions, correct?
15 A. He's pretty straightforward.
16 Q. You didn't find anything that Mr. Okula said that you
17 disagreed with, correct?
18 A. Correct.
19 Q. Did you know what Mr. Okula was going to ask you today?
20 A. No, I don't. This is the first time I've ever actually
21 spoken to Mr. Okula.
22 Q. Mr. Okula asked you about whether or not you wanted to see
23 through this trial as a juror. Do you remember that question?
24 A. Yes.
25 Q. You did, right?

| C2frdau7 | Conrad - redirect | Page 224 |
|---|---|---|

1  A. Yes.
2  Q. You did that in the context of just a day or two before the
3  trial having filed a petition for readmission or reinstatement
4  to the bar, is that correct?
5  A. That's the correct chronology, yes.
6  Q. You believed that by seeing through this trial, by serving
7  as a juror for a lengthy trial, you could help demonstrate your
8  stability to the bar authorities, correct?
9  A. No. It's apples and oranges. The two thoughts never
10 crossed.
11 Q. Never occurred to you once that seeing this through might
12 be something that would be helpful to you with the bar
13 authorities?
14 A. Not at all. It was my civic duty.
15 Q. Which part was your civic duty? The part where you lied?
16 A. No, of course not.
17 Q. Mr. Okula asked you some questions about the instructions
18 that Judge Pauley gave you. Do you remember those?
19 A. I remember both.
20 Q. You said that you had followed Judge Pauley's instructions,
21 correct?
22 A. Yes.
23 Q. But the truth is you only followed those of Judge Pauley's
24 instructions that you wanted to follow, correct?
25 A. I don't know what that question means, sir.

UNITED STATES OF AMERICA, v
PAUL M. DAUGERDAS, ET AL.,

February 15, 2012

| C2frdau7 | Conrad - redirect | Page 225 |
|---|---|---|

1 Q. Well, did you follow all of Judge Pauley's instructions or
2 only the ones that you wanted to follow?
3 A. That's the job of the trier of fact, which I was a trier of
4 fact.
5 Q. Did you follow all of Judge Pauley's instructions or only
6 those instructions that you wanted to follow?
7 A. Probably all of them.
8 Q. All of them, every single one, right?
9 A. I don't have the PJI in front of me.
10 Q. But as far as you know, of all the ones Mr. Okula
11 mentioned, you followed them, right?
12 A. More likely than not.
13 Q. And of all the other instructions he gave you, you followed
14 them, is that correct?
15 A. I can't answer that.
16 Q. You know for a fact you didn't follow all those
17 instructions, don't you?
18 A. No, I don't think that's correct.
19 Q. Didn't he tell you at the very start of the trial that you
20 had to speak the truth to tell about your background in order
21 to even be seated as a juror?
22 A. He also told us to render a fair verdict --
23 Q. No, no.
24 A. -- which we did.
25 Q. Do you see the difference between your answers to my

| C2frdau7 | Conrad - redirect | Page 226 |
|---|---|---|

1 questions and Mr. Okula's questions?
2 A. Sure: Splitting hairs and semantics.
3 Q. Exactly. You're splitting hairs and you're engaging in
4 semantics?
5        MR. OKULA: Objection, your Honor.
6        THE COURT: Overruled.
7 Q. Let me ask you this, Ms. Conrad. Did Judge Pauley give you
8 an instruction as a juror to tell the truth?
9 A. I'm sure he did, yes.
10 Q. Did you tell the truth?
11 A. By rendering an unbiased verdict.
12 Q. Did you tell the truth?
13 A. Yes.
14 Q. You told the truth, the whole truth, and nothing but the
15 truth?
16 A. You're asking me about the voir dire?
17 Q. Yes. That was an instruction he gave you, wasn't it?
18 A. That's correct.
19 Q. Did you tell the truth? Did you follow that instruction?
20 A. No.
21 Q. So, when you just said a couple of moments ago that you
22 followed those instructions, you were lying right then?
23 A. That's incorrect. I thought we were on the same page
24 talking about the PJI at the end of the trial.
25 Q. Did I ever mention the PJI?

| C2frdau7 | Conrad - redirect | Page 227 |
|---|---|---|

1 A. No, but I did.
2 Q. Do I look like I know what the PJI is?
3 A. Yes. You're a professor.
4 Q. Would you agree with me then that since you did for the
5 follow Judge Pauley's initial instruction at the start of the
6 trial, you did not in fact follow all of his instructions?
7 A. You're mischaracterizing it.
8 Q. It's a simple question, yes or no. Since you did not
9 follow the instruction to tell the truth, did you follow all of
10 his instructions?
11 A. Regarding the verdict, yes.
12 Q. Did you follow all of Judge Pauley's instructions?
13 A. Not with respect to the voir dire.
14 Q. Therefore, you did not follow all of his instructions, is
15 that correct?
16 A. If you need to connect the dots like that.
17 Q. Did you follow all of his corrections?
18 A. Yes. In rendering a correct verdict, yes.
19 Q. Now you're saying you did follow all of his instructions.
20 Let me try and get this very simply. Can you answer my
21 question? Taking into account the fact that you perjured
22 yourself repeatedly at voir dire, did you follow all of his
23 instructions?
24 A. I think you just answered the question.
25 Q. Why don't you answer it.

| C2frdau7 | Conrad - redirect | Page 228 |
|---|---|---|

1 A. Besides the voir dire, yes.
2 Q. Including the voir dire, did you follow all of Judge
3 Pauley's instructions?
4 A. Not with my omissions, no.
5 Q. Not with your lies, right?
6 A. However you want to characterize it.
7 Q. Therefore, you picked which of Judge Pauley's instructions
8 you were going to follow and which of those that you were not
9 going to follow, is that correct?
10 A. No.
11 Q. Was it random that you followed some of his instructions
12 and didn't follow others?
13 A. I didn't follow the instructions in voir dire.
14 Q. You chose, you picked that instruction not to follow,
15 correct?
16 A. Yes.
17 Q. You want us to take your assurance that you didn't pick any
18 other instructions not to follow, correct?
19        MR. OKULA: Objection.
20        THE COURT: Sustained.
21 Q. In your opinion, Ms. Conrad, did your perjury in voir dire
22 affect your ability to act as a fair and impartial juror?
23 A. No, not at all.
24 Q. Ms. Conrad, did I understand you to say that you thought
25 that it was basically no harm/no foul as far as the defense was

| C2frdau7 | Conrad - redirect | Page 229 |
| --- | --- | --- |

1  concerned at the voir dire that you didn't reveal your criminal
2  history because the defendants would want criminals on the
3  jury?
4  A.  I can't put thoughts or words in the defendants' minds and
5  mouths.
6  Q.  Isn't that what you said?  Didn't you say something like
7  you thought at the time that they would be jumping up and down
8  if they knew that you had a husband for a criminal -- a
9  criminal for a husband?  Didn't you say that?
10 A.  Yes, to be taken in the context of, if anything, one would
11 think I would have been biased towards the defendants, in favor
12 of the defendants, which I was not, either the prosecution or
13 the defense.  I was unbiased.
14 Q.  You told yourself at the time that it was OK from the
15 defendants' perspective because, if anything, somebody who was
16 married to a criminal would tend to favor other criminals,
17 right?
18 A.  I guess it can be characterized as that.
19          MR. GAIR:  Nothing further, your Honor.
20          THE COURT:  Mr. Shechtman?
21          MR. SHECHTMAN:  I'll be brief, your Honor.
22 CROSS-EXAMINATION
23 BY MR. SHECHTMAN:
24 Q.  Ms. Conrad, you continue to call these omissions, am I
25 correct, and you're reluctant to use the word "lie"?

| C2frdau7 | Conrad - cross | Page 230 |
| --- | --- | --- |

1  A.  I have been using the word "omission," that's correct.
2  Q.  If you can look at your voir dire, which I think is
3  Government Exhibit 2, when you told the Court, "we travel," you
4  and your husband, was that a true statement?
5  A.  It was.  We don't travel much anymore.
6  Q.  Since when have you not traveled?
7  A.  Maybe about over a year ago.
8  Q.  Where did you travel to?
9  A.  Usually Jersey.
10 Q.  So the "we travel" part of this was we travel to New
11 Jersey?
12 A.  Sure.
13 Q.  The elderly aunt that you take care of is who?
14          MR. OKULA:  I'm sorry.  I'm having a hard time
15 hearing.
16 Q.  The elderly aunt that you take care of is who?
17 A.  My maternal aunt.
18 Q.  Her name?
19 A.  Grace.
20 Q.  How often do you take care of her?
21 A.  Once to twice a week.
22 Q.  I take it you said both those things, the "we travel" but
23 omitted New Jersey and the elderly aunt, so that you would seem
24 like you were a more marketable juror?
25 A.  I don't know.  I'm not sure.

| C2frdau7 | Conrad - cross | Page 231 |
| --- | --- | --- |

1  Q.  Mr. Okula asked you some questions about your motivation
2  for being on the jury, and he said that you were interested in
3  part, and you agreed, on the $40 per day, is that correct?  Was
4  that one of your motives for wanting to be on the jury?
5  A.  It wasn't a conscious factor, no.  Not really, no.
6  Q.  You weren't going to perjure yourself and destroy your
7  legal career for $40 a day, were you?
8  A.  It's already been destroyed, sir.  It was destroyed
9  December 18, 2007, when I got suspended.
10 Q.  You were in the process of trying to undestroy it at the
11 very same time you came into this court and committed perjury,
12 didn't you?
13 A.  Sure.
14 Q.  Mr. Okula suggested that one of your motives was that the
15 description of the case piqued your curiosity.  Was that one of
16 your motives?
17 A.  That was an added bonus.
18 Q.  But not a motive for being on the jury?
19 A.  I knew I could be a fair and just juror.
20 Q.  That you have said.
21 A.  Excuse me?
22 Q.  I said I've heard you say that.  But was one of your
23 motives that you wanted to be on this case because it piqued
24 your curiosity?
25 A.  I guess partially.

| C2frdau7 | Conrad - cross | Page 232 |
| --- | --- | --- |

1  Q.  And you thought it was worth lying about your background to
2  be on a case because it piqued your curiosity?
3  A.  No, that's not a correct characterization of it.
4  Q.  So, if there is a suggestion that you lied in order to get
5  the $40 a day --
6  A.  I never said that.  I never testified about that.
7  Q.  Or you lied --
8  A.  I said the stipend was not a factor.
9  Q.  Didn't you tell Mr. Okula just the opposite, that the
10 stipend was partly a factor?
11 A.  It wasn't a motivating factor.
12 Q.  You didn't lie in order to get the $40 stipend and you
13 didn't lie because the case piqued your curiosity, are we
14 correct on that?
15 A.  No.  It did pique my curiosity.
16 Q.  Is that why you lied on voir dire?
17 A.  There are a few reasons.  I was unemployed.
18 Q.  So the $40 a day was a factor?
19 A.  No.  It's the intellectual stimulation, sir, beyond the
20 dollars and cents, the $40 and change or whatever, and keeping
21 busy.  And I hadn't been in a courtroom, and I enjoy and like
22 the dynamics of it.
23 Q.  If someone asked you why you perjured yourself repeatedly,
24 you would say, because I wanted to be in a courtroom?
25 A.  I think I just enumerated the other reasons to you as well,

UNITED STATES OF AMERICA, v
PAUL M. DAUGERDAS, ET AL.,

February 15, 2012

| C2frdau7 | Conrad - cross | Page 233 |
|---|---|---|

1 sir.
2 Q. You know as you sit here today that the government is
3 considering bringing perjury charges against you?
4     MR. OKULA: Objection, your Honor.
5 A. No, I'm not.
6     MR. OKULA: Unfair characterization.
7     THE COURT: Sustained.
8 Q. Have you thought that there is a possibility that since you
9 lied repeatedly in this courtroom, the government might bring
10 criminal charges against you?
11 A. Sir, that's why I have use immunity at the moment we speak.
12 Q. But you didn't know you had use immunity when you came here
13 today, did you?
14 A. I knew it was a large probability that I would.
15 Q. Can I ask you a question?
16 A. Sure.
17 Q. If that testimony is completely the opposite of the
18 testimony you gave this morning, what conclusions should we
19 draw from that?
20 A. I don't know what your question means, sir.
21 Q. This morning you told us you had no idea you were going to
22 get use immunity, and this afternoon you told us, just now, it
23 was a large possibility. Which of those is true?
24 A. I guess both. The judge didn't confer immunity until I
25 invoked my Fifth Amendment privilege.

| C2frdau7 | Conrad - cross | Page 234 |
|---|---|---|

1 Q. When you came here today, did you know that there was use
2 immunity or not, a distinct possibility that you would be
3 charged with perjury?
4 A. No.
5 Q. You have convinced yourself there is no chance of such a
6 charge?
7 A. I don't really think it matters what I convince myself of,
8 sir.
9 Q. It matters enormously.
10     MR. OKULA: Objection.
11     THE COURT: Sustained.
12 Q. When you entered this courtroom today, did you believe
13 there was a possibility that charges would be brought against
14 you for perjury during the voir dire process of this trial?
15 A. Not really.
16 Q. That's because you think the government doesn't care that
17 jurors lie during voir dire?
18 A. I'm not in their heads. I can't answer that.
19 Q. As you sit here today, you think you have lied during voir
20 dire repeatedly, caused this entire process, and that there
21 will be no consequences for it?
22     MR. OKULA: To the form, your Honor.
23     THE COURT: Sustained as to form.
24 Q. As you sit here today --
25 A. Sure there are consequences. The sentencing date was moved

| C2frdau7 | Conrad - cross | Page 235 |
|---|---|---|

1 up.
2 Q. That must disappoint you, that the sentencing date has been
3 put off?
4 A. I have no opinion as to that, sir.
5 Q. But it's a fact you know, right?
6 A. It's pretty self-evident, sir.
7 Q. Is it your view as you sit here today that there are no
8 likely consequences to you other than this unpleasant hearing
9 for having perjured yourself in this courtroom?
10 A. I don't know what the government is going to do, sir.
11 Q. You know the government could bring perjury charges against
12 you?
13 A. Maybe. I don't know.
14 Q. You know that whether criminal charges are brought against
15 you will be determined by what you refer to as "our
16 government," is that correct?
17     MR. OKULA: Objection.
18     THE COURT: Overruled.
19 A. Can you rephrase that, please?
20 Q. You know that the decision as to whether criminal charges
21 will be brought against you will be made by what you call "our
22 government"?
23 A. You're quoting from my letter. I don't know who else's
24 government it would be. But we're sitting here in the Southern
25 District, so kudos, I guess you're correct.

| C2frdau7 | Conrad - cross | Page 236 |
|---|---|---|

1 Q. Which is to say you also know that if your answers today
2 displease the government, there is no likelihood of those
3 criminal charges being brought?
4     MR. OKULA: Objection, your Honor.
5     THE COURT: Sustained.
6 Q. Have you thought about that possibility, Ms. Conrad?
7 A. Not really until your questions brought it up.
8     MR. SHECHTMAN: No further questions.
9     THE COURT: Anything further on redirect, Mr. Rotert
10 or Ms. McCarthy?
11     MR. ROTERT: Thank you, your Honor, no, nothing for
12 Ms. Guerin.
13     MS. McCARTHY: Nothing further.
14     THE COURT: Anything further, Mr. Okula?
15     MR. OKULA: Nothing. Thank you, your Honor.
16     THE COURT: Ms. Conrad, I would like to ask you, given
17 your acknowledgment here today that you misrepresented any
18 number of material things about yourself during voir dire
19 because you wanted to make yourself marketable for the jury,
20 and you perjured yourself, why did you do that?
21     THE WITNESS: As I had mentioned, I knew I could be a
22 fair, unbiased juror, and substantivelywise it seemed as if it
23 would be an interesting trial experience. And having been
24 suspended for so long, I guess mentally I would think maybe I'm
25 back in the swing of things now.

| C2frdau7 | Conrad - cross | Page 237 |
|---|---|---|

1    I know misrepresenting myself and the perjury was
2  wrong, and I apologize to the Court and to everybody else who
3  has, I'm sure, devoted immeasurable amount of time, hours.
4  Maybe it just wasn't for the $40. That's basically it. I know
5  a lot of resources were spent because of this, and I apologize
6  to everybody. It wasn't a calculated folly, it was just maybe
7  folly. But I know I served and I did my civic duty and I
8  believe I was fair and just in rendering the verdict.
9    I know my disclosures definitely would not have
10  allowed me to serve as a juror. I also know that I could have
11  requested a side bar to speak with your Honor and the other
12  attorneys during the voir dire, and I didn't do that. I
13  apologize to everybody.
14    THE COURT: Anything further from counsel?
15    MR. OKULA: No, your Honor.
16    THE COURT: Mr. Gair?
17    MR. GAIR: Not of this witness, your Honor.
18    THE COURT: Mr. Rotert?
19    MR. ROTERT: No, your Honor.
20    MS. McCARTHY: No.
21    MR. SHECHTMAN: No, your Honor.
22    THE COURT: Is there any reason at this juncture that
23  the arrest warrant that was issued this morning to bring the
24  witness to court should not at this time be released?
25    MR. OKULA: No, your Honor.

| C2frdau7 | | Page 238 |
|---|---|---|

1    MR. GAIR: Not the arrest warrant, your Honor.
2    THE COURT: I'm not going to vacate it. It's an
3  existing arrest warrant. She was arrested. But I'm going to
4  release her now.
5    You're free to go. You may step down as a witness. I
6  think the Marshals Service will assist you. You are excused.
7    (Witness excused)
8    THE WITNESS: Would the defense call its next witness.
9    MR. GAIR: Yes, your Honor. The defense calls deputy
10  U.S. Marshal Eric Weiss.
11    MR. OKULA: Your Honor, I understand that he was
12  supposed to be communicating with the other marshals because he
13  let the people in the courtroom know that he was downstairs and
14  ready to go. I think it is going to take three or four minutes
15  for him to get up. I don't know if counsel is in favor of
16  waiting until tomorrow morning.
17    MR. GAIR: Fine with me, Judge.
18    THE COURT: I just want to make certain that we
19  complete this hearing tomorrow. I'm prepared to work a little
20  later right now to get that, to achieve that purpose.
21    MR. OKULA: Judge, I think, based on getting through
22  Ms. Conrad today, there is a substantial likelihood that we
23  will be done by midday tomorrow. I am highly confident we will
24  get done tomorrow if we break now. I understand from speaking
25  with Mr. Gair or indirectly that he is going to be fairly quick

| C2frdau7 | | Page 239 |
|---|---|---|

1  with the marshals, and then we are going to head into I think
2  the rest of the waiver portion.
3    MR. GAIR: Judge, as far as I'm concerned, the only
4  reason to call the marshal, I need to to perfect impeachment
5  unless the Court is ready to decide the substantive issue that
6  the witness has shown herself to be a pathological liar, not to
7  know what the truth is, probably to be severely mentally
8  disabled, and to have committed innumerable direct contempts in
9  front of your Honor today by perjuring herself. So I would
10  renew our motion at this time, and then we could dispense with
11  the marshal.
12    THE COURT: We are in the middle of a hearing. I can
13  see that Mr. Okula is ready to respond, but we are not going to
14  go down that route. You will call your next witness and you
15  will do it tomorrow morning. We'll have Deputy Weiss here at
16  that time.
17    Are you calling anyone else from the Marshals Service?
18    MR. GAIR: No, your Honor.
19    THE COURT: All right. Mr. Shechtman?
20    MR. SHECHTMAN: Judge, it may be that we should all
21  call it a day. If the Court wants what I think is a short
22  witness, Mr. Benhamou is here. He is a law student, he has
23  classes tomorrow.
24    THE COURT: He is in class?
25    MR. SHECHTMAN: He missed today.

| C2frdau7 | | Page 240 |
|---|---|---|

1    THE COURT: Bring him on.
2    MR. OKULA: May I have a moment with Mr. Shechtman,
3  your Honor?
4    THE COURT: Right. We'll take a witness out of order.
5    MR. SHECHTMAN: Judge, I think we are even better. We
6  have just decided that we don't need his testimony and we are
7  going to send him back to school.
8    THE COURT: I hope he didn't have much of a class load
9  today.
10    MR. OKULA: It's early in the semester, your Honor.
11    THE COURT: It's those early sessions that are most
12  important though.
13    MR. SHECHTMAN: I would say that he missed the classes
14  on respondeat superior by order of the Court.
15    THE COURT: Are there any matters that counsel want to
16  raise before we suspend for the evening?
17    MR. OKULA: No, your Honor.
18    THE COURT: Anything from defense counsel?
19    MR. GAIR: No, your Honor.
20    MR. ROTERT: 9:30 tomorrow, Judge?
21    THE COURT: Let's make it 9:45, since I'm assured that
22  we are going to comfortably finish tomorrow. Have a good
23  evening.
24    (Adjourned to 9:45 a.m., February 16, 2012)
25

UNITED STATES OF AMERICA, v
PAUL M. DAUGERDAS, ET AL.,

February 15, 2012

Page 241

INDEX OF EXAMINATION

Examination of:                                    Page

THERESA MARIE TRZASKOMA
        Direct By Mr. Hernandez . . . . . . . . . . 8
        Cross By Mr. Shechtman . . . . . . . . . .84
        Redirect By Mr. Hernandez . . . . . . . . .90
        Recross By Mr. Shechtman . . . . . . . . .95

CATHERINE M. CONRAD
        Direct By Mr. Gair . . . . . . . . . . . 101
        Direct By Mr. Schectman . . . . . . . . . 204
        Cross By Mr. Okula . . . . . . . . . . . 211
        Redirect By Mr. Gair . . . . . . . . . . 223
        Cross By Mr. Shechtman . . . . . . . . . 229


                GOVERNMENT EXHIBITS

Exhibit No.                                    Received
4    . . . . . . . . . . . . . . . . . . . . . .65
5    . . . . . . . . . . . . . . . . . . . . . .17
9    . . . . . . . . . . . . . . . . . . . . . .75
14   . . . . . . . . . . . . . . . . . . . . . .20
28   . . . . . . . . . . . . . . . . . . . . . .76

Page 242

                PMD EXHIBITS

Exhibit No.                                    Received
PMD 1, 24, 25, 26 and 45  . . . . . . . . . . 204
PMD 2   . . . . . . . . . . . . . . . . . . . 145
PMD 3   . . . . . . . . . . . . . . . . . . . 125
PMD 7   . . . . . . . . . . . . . . . . . . . 194
PMD 14  . . . . . . . . . . . . . . . . . . . 173
PMD 17  . . . . . . . . . . . . . . . . . . . 176
PMD 20  . . . . . . . . . . . . . . . . . . . 175
PMD 23  . . . . . . . . . . . . . . . . . . . 211
PMD 29  . . . . . . . . . . . . . . . . . . . 179
PMD 40  . . . . . . . . . . . . . . . . . . . .36
PMD 54  . . . . . . . . . . . . . . . . . . . .65

This Page Intentionally Left Blank

UNITED STATES OF AMERICA, v
PAUL M. DAUGERDAS, ET AL.,

February 15, 2012

**$**

**$12,000 (2)**
133:22;134:4
**$14,000 (1)**
134:12
**$2,000 (2)**
134:7,10
**$40 (7)**
231:3,7;232:5,12,18,
20;237:4
**$400 (2)**
135:17,19
**$800 (1)**
137:14

**1**

**1 (76)**
16:25;18:4,5;21:21;
27:2;31:1;33:9,10;
34:22;35:17,19;36:9;
38:16;39:7;42:24;46:6,
11;49:2,11;50:11,20;
51:2,3,13;57:10,12;
58:25;61:15,25;62:2;
63:3;70:10;71:18,18,24,
24;75:9;77:3;79:21;
80:3;83:3;86:1,9,22;
87:18,23;88:11;89:13;
90:15,21;91:21,24;
92:24;96:1,12,16;97:2,3;
103:3;115:15;129:12;
140:1;146:2,15;147:14,
16;149:13;190:25;
191:1,15;199:20;200:3;
203:23,25;204:2,17
**1:30 (1)**
69:24
**10 (8)**
36:12;84:6;104:1;
125:10,12;131:15;
157:18;160:16
**10:25 (1)**
39:14
**10:55 (1)**
22:16
**100 (3)**
199:8,17;214:10
**104 (2)**
53:21;54:7
**10467 (1)**
151:11
**10-minute (1)**
84:18
**11 (8)**
69:18;86:15;96:9,10;
125:12;130:21;131:13;
132:5
**11:02 (3)**
22:24;26:23;40:9
**11:06 (1)**

40:25
**11:15 (1)**
42:17
**11:17 (1)**
44:8
**11:22 (1)**
45:4
**113 (2)**
55:10;82:21
**118 (2)**
63:15;82:15
**11th (2)**
39:8;42:21
**12 (16)**
18:19,25;19:1,3;
22:12;26:22;39:14;
42:14;57:15;58:5;59:18;
72:8;86:15;138:10;
157:18;159:13
**120 (3)**
63:15;82:15,16
**12th (23)**
39:9;42:21,24;43:14;
44:8;49:19;64:6;68:23,
24;69:21,23;70:14;
79:22;86:17,20;87:16;
90:7,22;92:17;94:5,9,14;
95:12
**13 (1)**
138:11
**130 (1)**
100:1
**13th (1)**
69:21
**14 (12)**
18:17;19:20,24;20:1,
5;26:19;39:11;82:15;
138:12;173:15,19,20
**14-12 (1)**
19:11
**15 (2)**
75:13;84:6
**15th (7)**
74:12;77:24;85:1;
116:20;118:8;129:22;
170:6
**16 (7)**
196:3,9,11,23;198:10;
199:22;240:24
**16-4 (1)**
180:4
**16th (1)**
96:6
**17 (6)**
63:16;64:1;176:1,6,7,
11
**18 (3)**
173:15;189:25;231:9
**19 (2)**
132:5,6
**1932 (1)**
47:5
**1976 (1)**

189:17
**1980 (2)**
189:6,7
**1981 (1)**
189:8
**1984 (1)**
100:2
**1985 (1)**
189:19
**1993 (1)**
189:25
**1997 (2)**
42:4;183:2
**1998 (2)**
183:3;184:3
**1999 (1)**
9:24
**1's (6)**
25:13;38:20;49:22;
59:4;60:4;92:15
**1st (6)**
23:13;102:2,5;185:3,
7;191:11

**2**

**2 (17)**
23:24;43:4,6,11;66:6;
77:4;145:2,5,6;150:2;
151:9,9;157:20;169:4;
187:12,15;230:3
**2:05 (2)**
129:3,7
**2:24 (3)**
45:9;55:13;62:15
**2:32 (1)**
46:18
**2:36 (5)**
55:11;57:10;58:6;
62:5;83:7
**20 (6)**
49:15;121:11;163:7;
175:20,24,25
**2004 (1)**
163:14
**2006 (1)**
135:15
**2007 (10)**
24:3;40:10;135:11,13;
173:10,15;185:14;
187:15;188:9;231:9
**2008 (6)**
135:24,25;136:9;
179:3,6,11
**2009 (14)**
135:24,25;136:5,9,10;
156:3;176:2,8;179:2,10,
11,25;180:10,11
**2010 (8)**
24:1,5;25:10;42:11;
100:1;175:21;187:12,15
**2011 (37)**
9:4,7;21:21;22:12;

26:22;36:12;39:14;
52:18,19;53:2;64:19;
69:18;72:8;74:12;75:13;
76:3;78:5;102:3,5;
103:3;115:16;126:19;
136:1,7,20;140:1;146:2,
15;150:2;177:2,5,13;
179:1,4;181:4;189:2;
194:11
**2012 (2)**
99:15;240:24
**203 (3)**
145:7;157:18;165:1
**204 (2)**
165:4;172:8
**20th (22)**
88:6,18;105:13,14;
109:20;110:3,6,9,22;
113:10,22;117:13;124:2,
7;130:14;131:6;138:3;
199:19;200:4,21;
203:12;223:5
**2½ (5)**
178:21;179:1,3;
180:24,25
**21 (8)**
76:3;78:4;150:16,16;
162:17;177:16,17;181:2
**23 (4)**
211:3,6,10,11
**2385 (3)**
146:16;151:10;196:2
**23rd (1)**
126:19
**24 (5)**
156:3;181:3;203:23,
25;204:2
**24th (1)**
194:14
**25 (6)**
18:24;163:2;203:23,
25;204:2;207:8
**25th (3)**
87:22;194:11;200:23
**26 (3)**
203:23,25;204:2
**26th (4)**
150:24;151:13;
153:12;177:5
**27 (6)**
10:11,13,22;11:4,9;
12:6
**27th (1)**
19:8
**28 (8)**
76:1,8,12,14,25;136:7;
177:12;181:5
**28th (6)**
67:4;136:1,20;147:7;
150:20;177:4
**29 (5)**
176:2;179:13,16,21,22
**2nd (14)**

23:19;34:2;69:16;
102:5;140:1;146:15;
150:1;151:15;153:13;
154:25;185:6,7;191:11,
15

**3**

**3 (11)**
124:25;125:1,2,8,9;
130:21,21;145:9;
176:11;199:22,23
**30 (4)**
49:15;113:8;162:17,
25
**39 (1)**
100:2
**3H (2)**
146:16;151:11

**4**

**4 (10)**
65:10,16,21,23,25;
80:5;145:8;177:18;
180:3;187:15
**40 (4)**
29:12;36:24,25;49:14
**400 (2)**
13:16;28:24
**41 (2)**
48:21;49:3
**45 (3)**
203:23;204:1,2
**467 (1)**
100:2
**48 (1)**
100:2
**4th (1)**
185:14

**5**

**5 (9)**
17:3,10,16,18;20:19,
22;33:1;125:11;130:5
**50 (4)**
49:14,16,16,17
**52 (3)**
31:3,4;70:5
**54 (5)**
64:23;65:16,21,24;
176:11

**6**

**6 (1)**
126:14
**606 (1)**
199:12

**7**

**7 (9)**
94:18;194:5,8,9,10,10;
204:18,19,20
**7:52 (2)**
5:2;129:24
**70s (1)**
189:10
**72 (4)**
21:23;22:10;39:11,12
**721 (1)**
100:1
**724 (1)**
100:1
**73 (1)**
24:2
**78 (1)**
26:18

**8**

**8 (4)**
64:19;99:15;125:14;
126:13
**8:00 (1)**
104:2
**8:33 (1)**
129:22
**80 (2)**
47:8;190:25
**8½ (1)**
223:4
**81 (1)**
40:19
**89 (2)**
42:12,13
**8th (2)**
109:16,17

**9**

**9 (8)**
75:11,19,23,25;85:2;
125:12;145:8;175:21
**9:30 (1)**
240:20
**9:45 (2)**
240:21,24
**90 (1)**
42:19
**93 (1)**
189:14
**94 (1)**
48:11
**95 (1)**
51:16
**96 (1)**
51:23
**97 (5)**
18:1,3;20:18;24:13,18
**98 (1)**
184:4

**A**

**abide (1)**
7:6
**ability (6)**
130:16;141:10;192:7;
216:8,12;228:22
**A-blank-blank (1)**
206:23
**able (5)**
47:16;57:2;123:17;
128:9;137:14
**above (2)**
22:23;47:3
**abroad (3)**
158:5;167:22;171:25
**absolutely (19)**
18:13;64:14;96:3;
111:11;112:25;114:10,
13,15;123:9;136:4;
145:16;149:9;172:14;
197:20;198:2;211:24;
212:23;213:10;216:5
**abstinence (1)**
182:13
**abstinent (4)**
178:21;179:6;180:24,
25
**accelerate (1)**
7:7
**access (5)**
20:25;21:2,2,3,12
**accessible (6)**
21:18;197:2,5,9,12,18
**accident (1)**
183:14
**accidental (1)**
155:4
**accomplice (1)**
32:20
**according (1)**
71:1
**accordingly (2)**
53:25;100:11
**account (2)**
130:19;227:21
**accountants (1)**
207:14
**accounts (5)**
131:2,8,17,23;133:22
**accuracy (1)**
28:13
**accurate (6)**
46:8,17;79:19;208:24;
209:15,18
**accused (1)**
59:12
**achieve (1)**
238:20
**achieved (2)**
134:20,24
**acknowledge (3)**

38:12;91:7,10
**acknowledging (1)**
91:6
**acknowledgment (1)**
236:17
**acquit (2)**
220:1,3
**acquittal (2)**
220:16,16
**acquitted (1)**
74:24
**acquitting (1)**
164:5
**across (1)**
142:22
**act (1)**
228:22
**acting (2)**
32:20;128:10
**action (4)**
38:17;53:10,14;
207:22
**actions (2)**
178:12,18
**active (1)**
142:13
**actual (1)**
80:20
**actually (24)**
13:9;20:9;28:6;53:12;
60:8,14;68:17;87:1;
93:1;131:12;150:5;
152:9,21;153:5;158:21;
163:8;165:4;169:3;
209:5,6,9,10,10;223:20
**acumen (1)**
158:25
**Adam (2)**
4:19;40:1
**add (2)**
76:18;137:7
**added (1)**
231:17
**addition (1)**
13:14
**additional (9)**
14:3,11;18:23;34:10;
44:25;57:18;59:23;
85:12;93:7
**address (38)**
6:22;45:11;50:17,21,
25;51:5,8,9,9,11,20,22;
52:3;56:2;85:13;144:18,
20;146:23,23;147:6,11;
153:2,8;157:23;158:4,6,
9;161:20,22;186:19;
196:8,11,16,19;198:10,
13,15,16
**addressed (2)**
5:17;188:20
**addresses (4)**
51:10,21;145:25;
146:25

**addressing (1)**
72:19
**adequate (1)**
99:25
**Adjourned (1)**
240:24
**admin (5)**
39:17,18,22,24;40:4
**admiration (1)**
171:18
**admired (1)**
59:13
**admissible (1)**
217:12
**admission (13)**
11:4;19:11;36:20;
65:15;75:18;76:7;125:5;
145:1;173:15;175:19;
179:15;194:4;203:22
**admit (1)**
19:10
**admitted (3)**
9:23;174:15;211:3
**adopt (2)**
127:6,20
**advance (4)**
11:22;19:7;20:14;
29:18
**advice (3)**
99:2;102:4,7
**advised (3)**
5:4;6:1;139:3
**advising (1)**
124:2
**affect (5)**
216:2,7,12,16;228:22
**affidavit (20)**
125:15;126:6,9,11,18;
128:13;129:10;133:23;
134:1,8;135:25;136:19;
137:16,22,23;150:8,17,
23;151:14;155:23
**affluent (5)**
152:9,21,25;153:5,9
**afford (4)**
124:16;125:16,18;
126:10
**afternoon (17)**
7:5;49:6;56:5,19;
69:22;70:14;83:15;
86:20,23;87:15,16;
90:22;92:16,20;129:6;
130:7;233:22
**afterwards (2)**
93:6;190:10
**again (19)**
20:23;55:6;71:20;
80:2;92:6;98:6,11,13,18;
112:14;118:14;122:9;
123:20;157:18;167:10;
168:9;191:13;196:8;
204:17
**against (26)**

10:25;52:14;62:12,16;
99:3;111:8;113:25;
114:17;128:16;132:17;
133:13;134:6;137:10;
140:24;208:6;212:4,14,
17;215:23;220:20;
233:3,10;234:13;235:11,
14,21
**age (1)**
48:21
**agenda (1)**
212:1
**agents (1)**
214:19
**aggravated (1)**
184:7
**ago (15)**
90:5;103:5;113:8;
131:4;153:7,19,22;
157:6;162:17;163:7;
191:1;216:25;223:4;
226:21;230:7
**agree (30)**
9:25;21:20;26:10;
29:20;30:6;46:10;56:6;
67:23;73:2,21;81:8;
87:2;90:7;92:23;105:25;
108:10;113:6;116:25;
119:9,16;120:9;121:17;
124:1;128:12;137:11;
154:12,24;159:18;
197:21;227:4
**agreed (2)**
31:21;231:3
**agreement (1)**
68:1
**ahead (2)**
95:22;204:13
**airplane (1)**
189:18
**akin (1)**
192:5
**al (1)**
8:21
**alcohol (7)**
24:7;25:13;97:10;
98:19;110:5,9;180:12
**alcoholic (8)**
41:4,21;94:17;174:15,
17;175:9;176:9,13
**alcoholics (1)**
109:18
**alcoholism (9)**
25:13;89:14;174:6,9,
11,21;176:18;177:9;
210:12
**alerted (1)**
5:15
**alerting (1)**
63:2
**alleged (2)**
74:19;75:3
**Allen (1)**

**SOUTHERN DISTRICT REPORTERS**

UNITED STATES OF AMERICA, v
PAUL M. DAUGERDAS, ET AL.,

February 15, 2012

4:7
allergic (1)
170:16
allow (1)
137:24
allowed (2)
166:10;237:10
almost (2)
16:22;53:6
alone (1)
67:11
along (11)
44:6;58:22;63:5;
85:20;93:11;190:16;
191:18;194:20;217:2,9;
220:11
aloud (2)
37:3,18
alternate (6)
34:16;90:11,12;92:8,
14;96:10
alternates (2)
29:5;34:24
alternatively (1)
71:24
alternatives (1)
99:24
although (4)
50:12;98:15;100:25;
187:20
amended (1)
75:16
Amendment (5)
99:3;100:20;102:9,19;
233:25
among (2)
100:6;200:15
amongst (1)
74:1
amount (5)
69:12;85:23;134:11;
210:4;237:3
and/or (2)
181:7,8
anew (1)
96:11
animus (2)
212:17,21
answered (6)
145:12;151:18;
164:19;175:1;211:17;
227:24
anticipate (4)
130:4,6,8,9
anxious (5)
194:15,19,24;195:1,3
anymore (1)
230:5
apart (2)
9:9;103:7
apartment (5)
146:16;151:11;157:1,
2,5

apologies (1)
136:17
apologize (4)
88:17;237:2,5,13
Aponte (2)
32:10,15
appear (22)
5:13;10:12;40:21;
42:22;48:14;105:1,15;
106:15;109:20;110:11,
25;116:19;118:8,18;
119:11,18;120:5;123:7,
13;186:10,12;215:11
appearance (5)
5:19;8:16;109:23;
110:2,8
appearances (2)
4:2;9:14
appeared (6)
103:8;109:19;186:14,
16;191:5;223:5
appearing (2)
112:24;122:16
Appellate (9)
23:1;24:1;88:11,12;
150:21;173:9,22;
175:20;176:3
apples (1)
224:9
applicable (2)
42:22;136:3
application (12)
7:4;35:2;97:3,6;
100:12,21;102:13;
126:16,17;148:10;
150:17;177:23
apply (6)
158:25;159:10,14;
164:4,14;217:4
applying (3)
102:16;216:4;219:23
appoint (3)
124:11,15;132:15
appointed (4)
125:25;126:16;
132:20;137:25
appointee (1)
116:16
appointment (7)
111:10;115:22;
116:14,21;117:6,11;
133:4
appreciate (1)
49:8
appreciated (3)
92:4,7,7
appropriate (7)
85:7,14;102:25;
128:24;178:12,18;
222:18
appropriately (1)
216:13
approximately (3)

133:22;134:5,11
April (2)
183:3;184:4
archeology (2)
167:22;171:25
area (4)
97:14,15;152:9,21
argument (2)
46:5;89:21
arguments (1)
97:17
Arizona (7)
185:14,17,19;186:15;
188:9;210:15;215:12
arose (1)
37:11
around (3)
112:19;150:10;201:24
arrangement (1)
35:6
arrest (17)
5:6,21;6:11,13,20;
94:17;121:13;122:21;
183:12,13;184:1,2;
187:17;188:7;237:23;
238:1,3
arrested (24)
6:23;89:18;94:16;
123:7,13;179:25;181:6,
13;182:18,22,25;185:14,
16,19,24;188:9,25;
189:3;193:12,14;215:11,
18;216:6;238:3
arrests (4)
183:15;185:2;188:16,
18
arrived (2)
6:8;110:6
artful (2)
75:6;85:9
A's (1)
16:22
a-s (1)
206:22
ascertain (1)
74:18
ascribed (1)
41:17
Aside (3)
13:12,20,20
aspects (5)
11:23;97:9,19,25;
98:19
ass (2)
116:6;207:11
a-s-s (1)
116:5
assassination (1)
142:19
assault (4)
183:6,8,9,13
assert (1)
102:9

asserting (1)
99:3
assertion (1)
102:18
assessment (1)
90:13
assigned (2)
18:1;24:13
assist (8)
13:2,13;15:22;20:13,
14;65:4;66:12;238:6
assistance (2)
12:11;66:22
Assistant (1)
4:4
assisted (1)
12:13
assisting (2)
10:25;12:21
associate (4)
11:19;12:3,4,5
associates (1)
9:17
Association (1)
207:22
assume (1)
21:9
assumed (1)
27:18
assurance (1)
228:17
assured (1)
240:21
ate (1)
70:2
attach (1)
136:2
attached (7)
16:19;40:16;46:7;
66:1,13;80:17;83:6
attaches (5)
40:10;41:10;42:9;
80:6,8
attachment (1)
22:24
attack (1)
6:23
attained (1)
164:25
attempt (4)
176:21;177:1;195:11;
211:25
attempted (1)
130:15
attendance (1)
113:21
attended (3)
112:23;113:7,15
attention (16)
11:11;17:19;22:11;
25:16;26:21;36:1;40:6;
63:8,13;64:16;66:6;
90:8;98:23;129:8;145:7;

219:9
attentive (1)
35:24
Attorney (23)
4:5;54:11,14;123:24,
24;125:25;126:16;
133:24;141:22;143:12;
166:15,16,18,23;167:6;
168:25;178:7,8;212:14;
215:23;216:16;218:7;
221:6
attorneys (3)
148:15;165:23;237:12
Attorney's (1)
5:6
August (10)
170:24;179:2,3,6,10;
180:11;185:14;187:15;
188:9;189:19
aunt (4)
230:13,16,17,23
authorities (8)
151:4;153:12;155:20,
23;191:6;210:14;224:8,
13
authorization (1)
175:5
auto (1)
190:3
available (8)
7:7;13:5,10,12;39:21;
44:18;172:16,19
Avenue (16)
146:3,16;147:6,12,18;
148:1;151:11,14;156:8,
11;158:12;170:12;
196:3,7,9;198:16
average (1)
152:7
avoid (1)
82:3
aware (14)
14:10;28:15;34:16;
36:3;72:22,24;75:4;
78:1;85:5;89:5,10,11;
93:25;97:9
axed (2)
171:14,14

B

BA (2)
167:21;171:23
bachelor's (3)
44:3;59:11;86:13
back (38)
5:12,16;13:15;23:7;
27:9,15,19;31:4;43:1,8,
20;44:13;45:7,9;46:18;
57:5;58:23;61:15;67:4,
12;71:12;72:10;81:3;
83:13;86:4;101:2;
122:11,13;126:13;

136:22;138:3;142:4;
157:3;198:6;209:16;
218:15;236:25;240:7
**backdating (1)**
203:4
**background (5)**
34:5;148:12;167:19;
225:20;232:1
**badly (1)**
154:20
**bag (3)**
182:3,5,11
**bags (1)**
182:8
**bar (10)**
9:21,23;30:23;135:25;
153:11;207:21;224:4,8,
12;237:11
**Barker (17)**
146:3,9,16;147:6,12,
18;148:1;151:10,14;
156:8,11;158:12;
170:12;196:3,4,7;198:16
**based (23)**
24:6;28:8,22;30:3,4;
64:19;91:11,17;93:12;
96:17;98:3;119:16;
141:8;214:7;217:10,21,
23;219:21,21;220:15,17;
222:20;238:21
**basically (6)**
32:21;91:17;221:15;
223:7;228:25;237:4
**basis (6)**
16:9;24:6;88:4;
106:24;158:12,18
**basketball (1)**
111:23
**Bates (13)**
18:19,23;19:3;21:23;
22:10;24:2;26:18;39:11;
40:19;54:7;55:10;82:15,
21
**beating (1)**
185:23
**became (2)**
16:25;18:3
**become (1)**
18:5
**bed (1)**
146:2
**bedroom (1)**
148:23
**been/is (1)**
41:4
**beg (1)**
122:24
**began (1)**
213:23
**begin (2)**
145:10;222:19
**beginning (11)**
42:13;59:25;103:11;

125:14;132:5;146:20,
21;199:22;212:18;
216:21;222:15
**behalf (7)**
4:7,12,16;6:16;11:14;
97:3;202:3
**behavior (5)**
106:1;107:2;110:16,
16;184:17
**behind (2)**
88:15;209:22
**belief (2)**
170:25;175:8
**beliefs (1)**
218:11
**below (1)**
52:4
**bench (3)**
35:9;94:16;116:21
**benefited (1)**
95:1
**Benhamou (38)**
12:15;22:12,23;23:7;
26:22;40:8,9;41:8,17;
42:9,17;44:22;45:4,9;
49:8;55:18;56:8,17;
57:5;62:11,15;63:16;
64:3;70:24;81:14;82:7,
13,24;83:2,6,13;87:1;
91:4,11;92:19;93:13,16;
239:22
**Benhamou's (4)**
55:13;56:6;62:23;87:2
**besides (5)**
76:24;121:3;171:18;
187:19;228:1
**best (4)**
12:7;82:11;86:24;
192:7
**Beth (1)**
90:12
**better (4)**
85:18;149:7;187:5;
240:5
**Beyond (2)**
210:8;232:19
**Bharara's (1)**
198:4
**bias (8)**
26:12;140:23;149:7;
212:17,21;214:9;
217:24;220:10
**biased (5)**
15:4;212:14;215:22;
220:20;229:11
**biases (2)**
141:4,11
**big (3)**
91:25;124:23;206:16
**binder (2)**
124:24,25
**bio (1)**
12:6

**biographical (1)**
66:2
**bipolar (1)**
120:22
**birth (7)**
47:5;48:1,8,15,15;
49:10;54:20
**birthday (1)**
191:2
**bit (2)**
111:13;153:8
**black (1)**
124:23
**blackout (1)**
139:17
**blackouts (1)**
139:15
**blank (1)**
175:5
**bless (2)**
111:6,18
**Block (1)**
77:7
**board (5)**
18:7;24:16;29:21;
142:22;189:18
**Bobbi (1)**
4:23
**boilerplate (4)**
173:12,21,25;175:17
**bond (5)**
186:3,4,5,9;187:25
**bonds (5)**
134:7,13;138:4,11,15
**bonus (1)**
231:17
**book (3)**
150:16;201:25,25
**born (2)**
54:25;55:2
**Borough (1)**
52:8
**Boston (1)**
158:5
**both (18)**
61:17;148:3;149:11,
12;150:6,7;151:21;
153:15,16,23,24;155:15;
182:8;196:18;216:20;
224:19;230:22;233:24
**bother (1)**
57:6
**bottom (9)**
17:25;20:22;39:14;
47:2;77:3;125:11;
131:14;178:11;218:23
**bounced (1)**
165:20
**bounds (1)**
148:21
**box (2)**
35:14;101:10
**boxes (1)**

48:14
**break (8)**
64:9,13;86:21;111:13;
114:20;165:16;192:23;
238:24
**brief (15)**
25:16,17;67:2,10;
68:5,6,8;73:14,22;74:6,
8;79:11,23;97:7;229:21
**briefly (14)**
5:3;21:1;24:1;30:17;
49:7,20;55:6,7;67:2;
84:5;92:22;97:7;100:16;
204:12
**bring (13)**
7:1;84:16;92:8;98:23;
100:13,15;101:12;
129:25;187:6;233:9;
235:11;237:23;240:1
**bringing (1)**
233:3
**broader (1)**
99:22
**Bronx (43)**
38:17;45:13;50:25;
51:9,14,22;52:5,8;53:4,
18;56:10;60:8,9;62:13,
16;87:5;93:19;144:11,
13;145:13;146:3,16,22;
147:12,18;148:1,22,24;
149:12;151:11,15,23,24;
152:3,6;153:1,12;156:9,
11;159:23;172:1;
186:24;187:1
**Bronxville (47)**
18:1;45:11,24;46:9;
50:17,18,22;51:3,6,7,8,
11,20;52:3,7;56:1;71:2;
87:6;144:15;145:12,14,
18,21;146:5;147:2;
148:1,5;149:12;150:5;
151:17,25;152:1,5,25;
153:4,8,14;155:1,24;
158:3;159:19;160:5;
161:24;162:6;172:1;
196:9,11
**Brooklyn (6)**
51:9;158:5;159:24,25;
167:25;218:2
**brother (1)**
32:21
**brought (17)**
6:24;10:25;36:1;
52:14;53:25;61:13;63:7;
90:7;111:8;113:25;
114:16;208:5;234:13;
235:14,21;236:3,7
**Brubaker (9)**
68:14,16,23;69:19;
74:24;199:25;203:1;
220:1,16
**Brubaker's (5)**
69:2,25;74:22;77:25;

78:2
**Brune (48)**
8:25;9:2,6,9,17;12:1;
16:1;21:11;35:4,11,12;
38:7;40:2;42:2;44:24;
56:20,24;57:8;58:2;
59:18;60:18,19,21;
61:17,23;63:1,19,23;
67:20;69:22;70:13;
73:12;74:1;76:22,24;
77:1,5;79:24;86:7;87:8,
12,17,24;88:10;92:17;
93:5,10,12
**Bureau (1)**
31:25
**burglarizing (1)**
32:21
**burglary (2)**
189:23;190:1
**Burke (2)**
69:5;77:14
**bus (1)**
162:14,15,16,19,22,
22,25;163:20,25;164:10;
207:8
**business (5)**
138:5,13,16,19,21
**businessman (2)**
163:5,6
**busy (1)**
232:21

---

**C**

**calculated (1)**
237:6
**call (25)**
5:11,16;7:24;43:13;
70:8;74:11;97:2;100:19;
101:5;104:1;106:15;
116:7;197:3,11,18;
198:6;205:19;208:17;
219:16;229:24;235:21;
238:8;239:4,14,21
**called (17)**
4:1;5:2,12,12;8:3;
19:6;57:7;64:5;93:12,
16;98:24;99:4;101:1,17;
179:17;185:16,22
**calling (4)**
60:25;100:25;101:3;
239:17
**calls (2)**
7:25;238:9
**calms (1)**
121:2
**came (23)**
13:9,11;23:24;30:19;
49:7;67:4;71:12,13;
87:8,12;107:17;108:6;
115:15;117:13;157:2,4;
170:5,9,14;187:6;
231:11;233:12;234:1

UNITED STATES OF AMERICA, v
PAUL M. DAUGERDAS, ET AL.,

can (83)
6:25;7:3,7,9;8:18;
10:15;13:7,14;14:17;
16:6,11;19:5;21:12;
22:3;26:1;29:15;31:4;
38:4;39:11;44:6;55:16;
71:4,20;72:23;73:6;
79:10;81:11,25;82:6;
85:7,13;88:15;93:20;
94:13;97:15;105:9;
106:13,23;107:24;
108:14;112:22;114:22;
115:1;116:18;117:5;
118:5;122:9,10;123:21;
125:15,16;126:9,10;
127:11;130:21;132:4,7,
21;134:8;136:22;141:7;
144:21;150:14;154:10,
12,24;159:17;165:17;
169:10;170:9;177:16;
179:13;198:1;209:14,
22;223:2,2;227:20;
229:18;230:2;233:15;
235:19;239:12
candid (1)
10:8
capability (1)
192:7
capitalize (3)
202:10,12,24
capitalized (2)
202:19;204:23
caption (2)
23:4;195:21
cards (3)
182:2,5,5
care (1)
30:6;45:14;135:1;
180:14,16,18;197:5,12;
230:13,16,20;234:16
career (7)
119:9;123:11;148:14;
190:19,21;192:2;231:7
careful (2)
42:6;219:9
carefully (1)
216:13
Caroline (1)
4:16
carry (1)
212:1
carrying (2)
77:3;218:10
Case (70)
4:1;6:10;10:25;11:12;
15:1,4;29:9;38:9;44:15,
17;51:13;60:15;61:22;
62:12,16;68:1,10;72:11,
12,19,21;74:12;87:21;
94:1;100:10;102:3;
140:10,22;154:1;159:12,
16;164:16;166:17;
169:6,12;172:12;

179:16;187:4;191:18;
193:16,18;209:6,11;
211:23;212:18,25;213:2,
8;214:13,18,25;215:24;
216:2,3,14,17,20;
218:13;219:21;220:8,
11;221:6,25;222:6,11,
21;231:15,23;232:2,13
cases (9)
38:8;89:8;155:15;
181:14;182:8;215:3,14,
22;216:7
cash (6)
131:16,22;133:17,21;
134:4,12
cast (1)
212:7
cat (4)
196:1,2,2,5
Catherine (89)
6:13;17:1,2;18:1,7;
20:16,21;22:21,22;23:4,
11,23,25;24:6,8,9,11,13,
18,19,23,25;25:3,4,13,
14,18,20;40:13;41:13,
19,20;42:17;45:10,21,
23;46:9,11,21;48:9;50:9,
14;52:1,5;54:16,16,17,
25;55:3,5,8;57:9;58:23,
24;60:23,25;61:1,5,7,10,
16,19;62:19;67:18;
68:19;69:1,2,17,20;
70:20;71:2;77:15;78:6;
79:8,12,20;83:21;90:4,
14;93:3,7;99:15;101:16,
21;129:19;176:2;
179:17,23;180:1
C-A-T-H-E-R-I-N-E (1)
101:21
cats (1)
170:16
cause (8)
6:13;31:23;32:5,6,12;
86:7;89:19;215:22
caused (6)
23:17,18;70:16;110:9,
11;234:20
cell (4)
196:21,24,25;197:1
cells (1)
54:2
central (2)
72:19;79:14
cents (1)
232:20
certain (15)
13:5,25;28:14;64:20;
67:16;68:9;79:7;81:5;
90:4;91:12;179:11;
218:7;220:3;222:3;
238:18
certainly (7)
60:25;94:14;100:17;

139:14,15;192:13;
223:13
chairs (1)
7:22
challenge (5)
15:20,20;31:23;32:5,
13
challenged (1)
32:12
challenges (3)
30:3;86:7,8
chambers (6)
5:2,11,14,16;104:1,4
chance (5)
68:6;95:5;107:21;
210:1;234:5
change (4)
70:16;121:14;122:22;
232:20
changed (3)
27:25;28:1;86:24
changes (1)
76:21
character (1)
142:18
characterization (8)
56:6,8;87:3;127:6;
183:20,22;232:3;233:6
characterize (7)
110:16;128:3;136:23;
154:10;167:20;175:10;
228:6
characterized (1)
229:18
charge (6)
199:6,8,16,17;214:2;
234:6
charged (8)
11:20;149:4;166:1,6;
181:7;183:5,8;234:3
charges (11)
165:24;208:5;220:3;
222:1;233:3,10;234:13;
235:11,14,20;236:3
Charles (1)
4:6
cheap (1)
109:13
check (3)
28:13;29:15;189:15
checking (6)
130:19;131:2,8,17,23;
133:22
Chicago (3)
106:3,7;152:11
children (2)
164:21;171:19
children's (1)
93:14
Chinese (1)
162:20
choices (3)
15:19;29:19,24

choose (2)
201:8,11
chose (2)
201:21;228:14
chosen (1)
188:20
Christopher (1)
4:6
chronology (3)
176:24;177:11;224:5
circulated (1)
129:11
circumstance (1)
68:17
circumstances (1)
14:5
cited (1)
24:5
cites (1)
72:11
citizens (1)
140:22
civic (6)
192:6,9,11;224:14,15;
237:7
civil (16)
9:10;38:2,10,12;
51:23;52:6,8,13,17,23,
25;62:16;66:9;94:23;
95:5;153:23
claim (2)
13:19,22
claims (1)
13:20
clarify (2)
22:3;72:6
clarity (1)
56:4
class (3)
12:5;239:24;240:8
classes (2)
239:23;240:13
classics (1)
167:21
clear (6)
13:20;27:18;56:14;
85:25;100:24;101:7
cleared (1)
6:25
clearly (2)
41:4;43:13
clerk (9)
66:17;70:1;93:19;
104:4;105:22;107:9;
108:15,20;117:25
client (14)
5:9;10:5;35:5,10;
128:16;132:17;133:13;
134:6,14;137:10;
142:21;146:11;147:23;
149:3
clients (1)
42:7

Clinically (1)
180:19
Clinton (6)
111:9;115:22;116:12,
14,16;117:6
Close (6)
49:16,16;64:10;99:20;
188:18;191:4
closed (2)
98:15;99:19
closer (2)
16:21;49:14
closest (2)
35:9;101:14
closing (1)
99:24
closure (3)
97:4;99:22,25
Coffee (4)
52:11,15;62:12,17
cognizance (1)
186:5
colleagues (1)
11:18
collect (1)
82:13
collected (2)
26:20;81:17
collection (1)
82:12
Columbia (1)
42:4
combination (1)
178:7
comfortably (1)
240:22
coming (11)
5:4;15:11;64:9;83:12;
104:5;105:23;106:15,
25;108:11,15,21
commenced (1)
191:1
comment (1)
47:18
Commission (1)
66:9
committed (3)
178:22;231:11;239:8
committee (16)
40:10;41:11;60:23;
80:17;98:3,20;99:18;
120:13;136:11,19;
150:9;176:4,8;191:8;
208:5,5
common (12)
14:6;23:22;24:24;
38:10;50:14;53:17;
116:25;121:19,22;122:1,
1;169:3
communicate (2)
14:13;75:7
communicating (3)
67:9;81:19;238:12

**communication (1)**
5:5
**communications (2)**
14:14;190:15
**community (4)**
152:25;153:5,9;180:5
**companies (9)**
162:14,15,16,22,23,
25;163:20,25;164:10
**company (2)**
162:19;207:8
**compelled (2)**
100:22;117:14
**compelling (1)**
219:13
**competent (1)**
217:14
**complaint (2)**
71:7,9
**complaints (1)**
216:11
**complete (7)**
84:15;125:15;126:8,
11;130:10;193:1;238:19
**completed (1)**
126:17
**completely (1)**
233:17
**completing (1)**
80:23
**complexity (1)**
222:15
**component (1)**
206:16
**computer (3)**
195:23,24,25
**concealed (1)**
168:20;190:18,21
**concepts (2)**
60:12,15
**concern (9)**
23:17,18;26:15;30:11,
14;31:6,8,9;36:9
**concerned (3)**
30:24;229:1;239:3
**concerning (7)**
5:9;97:4;98:2;99:16;
102:10;114:19;118:9
**concerns (4)**
5:18,19;97:19,25
**conclude (2)**
47:9;53:18
**concluded (8)**
23:10;31:18;34:8;
61:24;62:1,3;70:22;
79:24
**conclusion (8)**
47:6;54:24;87:9,11;
93:9;128:9;165:17;
214:7
**conclusions (1)**
233:18
**condition (1)**

97:12
**conditions (1)**
98:1
**conduct (23)**
36:4;44:25;57:18;
59:23;106:17;119:17;
120:11;121:17,19;
122:16,17,18,20;123:1,
5,8;128:12;166:5;
173:10,23;181:23;
186:1;215:10
**conducted (3)**
69:17;78:7;99:19
**confer (3)**
54:1;84:13;233:24
**conference (4)**
74:11,17;76:4;85:1
**conferred (1)**
107:13
**conferring (1)**
96:8
**confident (1)**
238:23
**confidential (2)**
146:4,7
**confidentiality (1)**
97:12
**confirmed (1)**
55:7
**conflating (3)**
87:4;93:2;95:4
**conflicting (2)**
49:21;51:1
**confronted (1)**
96:7
**confusing (9)**
45:13;47:3,15,19;
49:9;55:23;56:7,12;71:5
**connect (2)**
191:8;227:16
**connected (1)**
166:13
**connecting (4)**
50:3;91:23;210:24;
211:18
**connection (22)**
7:3;8:15;9:9;13:2;
18:16;32:2,4;44:14;
91:20;92:11;98:25;
100:23,24;103:7;113:7,
20;116:18;117:5;133:2;
141:3,9;166:1
**Conrad (192)**
5:2,12,15,17;6:14;
17:1,2;18:1,7;20:16,21;
22:21,22;23:5,11,14,15,
23,25;24:6,8,9,11,13,18,
19,23,23;25:3,4,14,18,
20,22;28:3;34:22;35:19;
36:12;40:13,23;41:13,
19,20;42:15;43:20;44:9;
45:11,22;46:2,9,11,18,
22,22;47:5,10,12,17,21;

48:9,25;50:10,14;52:1,5,
14;53:25;54:16,17;55:5,
8;57:9,19,23;58:19,24;
19;62:19;66:3;67:18;
68:10,13,19;69:1,2,17,
20;70:21;71:2;73:18,23;
77:15;78:6;79:8,13,20;
81:5,15;83:21;84:16;
86:9,18,22;87:18;89:12;
90:4,10,14;93:3,7,23;
94:6,15;95:2;96:2;99:3,
15;100:3,9,14,20,25;
101:1,12,16,22;102:1,
18,24;103:3;106:13;
109:4,19;116:18;
122:13;127:11;128:12;
129:11,15,19,19,25;
130:7,10;133:21;134:3,
16;135:23;136:14,18;
137:22;140:9;142:23;
145:9;148:11,16;
152:20;154:6;176:2;
193:5;200:16;204:16;
208:16;210:6,19;211:16,
25;212:24;215:14,21;
216:1;217:7,21;218:1;
219:20;220:14;221:2;
222:17;226:7;228:21,
24;229:24;236:6,16;
238:22
**C-O-N-R-A-D (1)**
101:22
**Conrads (3)**
54:17,25;55:3
**Conrad's (13)**
25:13;42:18;59:4;
64:20;66:8,9;87:22;
94:13,23;95:8;97:10;
100:6,11
**conscious (4)**
95:16;197:15;198:19;
231:5
**consensus (1)**
31:21
**consequences (3)**
234:21,25;235:8
**consider (15)**
41:25;74:4;99:23;
122:23;137:3,6,8;
153:15;155:10;158:15,
19,20;160:6;171:25;
196:18
**consideration (3)**
98:21;205:18;222:19
**considered (4)**
15:14;42:6;90:19;
217:14
**considering (2)**
222:8;233:3
**consisted (1)**
218:4
**consistent (1)**

56:1
**conspiracy (2)**
199:6,16
**constantly (1)**
156:17
**construe (1)**
168:24
**consultant (5)**
14:19;23:20;29:22;
61:17;77:6
**contact (2)**
195:11,15
**contacted (2)**
5:5,12
**contemplate (1)**
94:14
**contemplating (1)**
94:10
**contempt (2)**
184:10;215:7
**contempts (1)**
239:8
**content (1)**
79:4
**context (8)**
38:3,6,11;122:15,16;
217:22;224:2;229:10
**continue (5)**
54:5;64:10;130:12;
193:3;229:24
**Continued (6)**
33:12;78:13;104:7;
149:15;186:25;220:23
**contract (1)**
218:7
**contradiction (2)**
200:6;201:2
**contradictory (2)**
200:21,25
**contrary (2)**
35:22;112:15
**controlled (1)**
189:9
**controlling (1)**
72:21
**convenience (2)**
181:16;182:2
**convenient (1)**
181:18
**conversation (32)**
5:16;56:20,21,24;
57:8;58:15,17,21;59:22,
24;60:3,21;61:8;67:10;
68:22,24,25;69:19,22;
70:12;77:13;78:5,10;
79:1,4,23,25;87:12,16;
93:5;129:24;131:5
**conversations (2)**
29:22;66:25
**convey (1)**
115:4
**conveyed (2)**
74:9;80:13

**conveying (1)**
31:16
**convict (2)**
199:7,16
**convicted (23)**
139:5,9,22,24;142:21;
148:20;181:7;182:19,22,
25;183:3;188:25;189:3,
8,12;190:3;199:20,24,
25;200:3;201:1,2;
206:18
**convicting (1)**
146:11
**conviction (7)**
32:18,20;33:1;183:12;
184:1,3,7
**convictions (7)**
89:14,15;184:5;185:2;
188:19;210:12,13
**convince (1)**
234:7
**convinced (1)**
234:5
**convincing (1)**
219:6
**cop (1)**
183:10
**copied (1)**
42:17
**copies (2)**
18:15;129:11
**copy (9)**
36:18;59:6,20;64:25;
65:2;75:13;97:20;
187:20;201:14
**corner (1)**
180:4
**corporate (1)**
38:4
**corporations (2)**
38:7,9
**corrected (1)**
75:16
**corrections (1)**
227:17
**correctly (6)**
33:4;37:13;134:8;
145:13;199:18;200:5
**couching (1)**
195:3
**counsel (51)**
4:23;5:1;6:10;8:15,18,
24;17:22;67:1,15,24;
68:2,6,9,13,16,22;69:19,
19,25;74:22;77:10,25;
78:2;84:7;96:8;97:20;
98:11,18;99:1,2,8;102:4,
7;107:19,22;124:19,21;
125:17,18;126:10,19;
129:12,25;132:7;204:8;
210:18;216:12;237:14;
238:15;240:15,18
**counseled (1)**

# A-5678

UNITED STATES OF AMERICA, v
PAUL M. DAUGERDAS, ET AL.,

5:17
**counsels (1)**
69:2
**counsel's (4)**
35:13;129:8;177:23;
200:18
**Count (2)**
201:1,2
**counts (1)**
74:24
**county (5)**
144:6,24;145:18,21;
148:5
**couple (5)**
22:1;67:3;156:1;
177:7;226:21
**course (26)**
5:13;21:14;48:24;
110:24;114:25;123:2;
142:18;158:24;164:1,9,
17;166:12;168:1,6;
170:11;171:3,11,21;
173:8;174:2;185:21,22;
188:12;192:12;194:18;
224:16
**COURT (321)**
4:2,8,9,12,13,17,21;
5:1,13,17,19,20,23;6:1,5,
9,10,13,17,20;7:14,17,
23;8:5,6,9,9:15;11:9;
13:16;17:7,11,16;19:12,
19,24;35:2;36:4,21,24;
37:3,7,17;38:17;48:5,6;
52:8;53:6,23;54:4;
61:17;63:2;64:12,15;
65:17,21;69:4,17;72:11;
74:12;75:23;76:12;
77:23;79:9;80:25;81:6,
12;82:4;84:3,7,12,15,18,
21;85:1,17;88:14,17;
89:16,21,24;95:20,22;
96:1,5,6,17,24;97:2,8,19,
21,23;98:17,22;99:1,2,7,
14,23,24;100:4,7,17;
101:9,12,19,20,23;
102:13,18;104:5;105:1,
2,7,9,15,18;106:5,14,22,
25;108:10;109:23;
110:2,6,8,13,20;112:6;
113:3,22;115:1,15,18;
117:4;118:24;119:11,
14;120:19;121:18;
122:7,10,12,12;123:4,
10,12;125:6,8,14;126:8,
16;127:12,15;128:24;
129:2,8,12,17,21;130:3,
6,9,24;131:16;133:18,
19;134:19;135:10;
136:14,16;137:24;138:1,
4,12,14;139:8,21;140:3;
141:6,11,16,20,25;
142:6,11,13,24;143:3,9,
20;145:3,5,15;146:7;

148:4,7,10;150:20;
152:9,18,21;153:16;
154:9;155:9;156:21;
159:9;160:8,25;161:3,9;
162:9,11;163:18,23;
164:18,21;167:4,9,11,
18;169:5,10;170:6;
171:4,12;172:9;173:17,
19;174:20,22,23;175:11,
12,20,24;176:3,6,20,22;
177:21,22;179:19,21;
181:25;183:24;187:19,
21,22;190:16;192:9,20,
24;193:3;194:6,8;198:1;
199:14;200:12,14,18;
201:6;202:9;203:11,16,
25;204:5,8,11,13,19;
208:2,3,10;209:16,21;
211:1,6,8,10,12;217:13;
221:23;222:24;223:5,7,
7;226:6;228:20;229:20;
230:3;231:11;233:7;
234:11,23;235:18;236:5,
9,14,16;237:2,14,16,18,
22,24;238:2,18;239:5,
12,19,21,24;240:1,4,8,
11,14,15,18,21
**courthouse (4)**
6:24;58:8,13;109:20
**courtroom (24)**
4:24;7:1;18:16;86:8;
97:4;99:5,9,19,20;102:6;
103:4;108:6;118:2;
153:25;217:3,15;
219:22;220:17;232:21,
24;233:9;234:12;235:9;
238:13
**Court's (10)**
63:7,13;70:1,6;96:17;
98:23;130:14;138:19;
171:9;184:22
**covered (1)**
172:8
**cow (3)**
50:5;91:17,19
**Craig (2)**
68:14;74:22
**crazy (1)**
117:1
**create (1)**
162:4
**created (13)**
19:6;20:3,4,6,12,14;
21:20,22;22:8;64:5;
82:7;97:15;162:1
**creation (1)**
20:7
**credibility (1)**
192:15
**credit (1)**
49:13
**creditor (1)**
52:10

**crime (3)**
166:6;182:19;192:14
**crimes (1)**
182:23
**criminal (34)**
9:10;10:25;11:12;
32:16;38:5,7;66:8,8;
94:15;100:10;148:14;
153:23;154:15;155:15;
163:8;184:10;185:2;
190:12,19;192:21;
212:13;215:3,22;216:2,
7;222:11;229:1,8,9,16;
233:10;235:14,20;236:3
**criminals (2)**
229:2,16
**crooks (6)**
114:11;203:7,13;
210:22,23;211:19
**crossed (2)**
80:2;224:10
**CROSS-EXAMINATION (3)**
84:23;211:14;229:22
**cross-examining (1)**
169:20
**crossing (1)**
63:5
**Crownmayer (1)**
90:12
**cup (1)**
109:9
**cured (1)**
174:10
**curiosity (7)**
221:18;222:9;231:15,
24;232:2,13,15
**current (2)**
157:23;158:9
**currently (1)**
6:22
**cut (4)**
198:18,21,25;199:2

# D

**daily (1)**
221:11
**date (20)**
25:11;47:5;48:8;
54:25;55:2;68:25;103:6,
7;109:17;149:14;
150:25;151:1,14;163:1;
185:15;186:19;188:10;
194:3;234:25;235:2
**dated (4)**
22:12;26:21;63:16;
99:15
**dates (3)**
48:1;54:20;189:10
**Daugerdas (12)**
4:7,10;77:10;102:6,
10;103:8;118:9;134:6;
137:2,3;147:22;212:18

**David (20)**
12:15;22:12,23;26:22;
40:8;41:8;44:22;45:4;
47:2;49:6,8;50:2,3;
55:22;62:11;63:16;
70:24;83:13;199:7;
213:12
**David's (1)**
47:18
**Davis (4)**
4:5;8:21;40:9;202:2
**day (44)**
23:13,13;39:6;57:7;
58:5,7;59:9;61:24;64:5;
69:23;71:9,10;96:6;
110:13;127:11;139:16;
143:3;146:15;147:3,5,7,
8,15;155:1,2;156:17;
165:11;185:3,5;191:21;
194:1,13,13;195:2;
200:7;205:18,20;206:4;
224:2;231:3,7;232:5,18;
239:21
**days (13)**
63:22;74:14;95:10,12;
146:19;150:7,10,23;
151:7,15;165:16;199:6,
15
**day-to-day (1)**
158:11
**dead (1)**
159:21
**deal (3)**
5:18;91:25;132:14
**dealing (1)**
11:20
**dealt (1)**
98:16
**debate (1)**
28:16
**decade (2)**
174:7,11
**December (27)**
105:13;109:20;110:3,
6,9,22;113:10,22;
117:13;121:11;124:2,7;
126:19;130:14;131:6;
138:3;157:3;170:6;
173:9,15;175:21;
199:19;200:4,21;
203:12;223:5;231:9
**decide (6)**
140:22;166:5;208:22,
23;217:2;239:5
**decided (7)**
85:17;114:11,14;
141:16,20;154:4;240:6
**decides (1)**
101:4
**deciding (1)**
112:8
**decision (27)**
14:22;23:1;72:11;

95:16;101:5;141:25;
142:6,10,23;143:8;
147:25;159:22;165:13;
167:2,3,8,11;172:11,24;
183:17;184:24;185:1;
188:13,15;197:15;
217:10;235:20
**decision-making (1)**
10:4
**decisions (1)**
14:24
**declaration (4)**
65:12;66:1;80:5,24
**deemed (1)**
186:24
**deems (1)**
85:6
**deeply (1)**
53:12
**defective (5)**
186:17,18,22;187:2,7
**defendant (8)**
4:18;101:3,15,17;
149:9;153:23;210:20;
216:2
**defendants (22)**
7:17;16:3;74:18;97:2;
100:10;111:8;113:25;
114:3,8;149:10;153:24;
211:18,21;212:2,20;
213:3,7;214:13;220:20;
229:2,11,12
**defendants' (3)**
100:5;229:4,15
**defense (21)**
10:25;15:1,6;16:13,
14,22;68:2,6,18;73:13;
87:19;187:5;193:23;
195:12;204:7,8;210:18;
214:16;228:25;229:13;
238:8,9;240:18
**defensing (1)**
67:24
**definitely (2)**
15:21;237:9
**definition (1)**
214:3
**defy (1)**
141:16
**degree (5)**
44:4;59:11;86:13;
95:9;218:2
**deliberate (18)**
141:25;142:6,10,23;
144:8;147:25;155:2;
157:14;159:22;161:11;
167:2,3,8,11;183:17;
184:24;185:1;188:13
**deliberated (1)**
214:6
**deliberately (5)**
43:10;141:16,20
**deliberating (4)**

February 15, 2012

169:6,12;183:18;
213:23
**deliberations (10)**
96:6,11;169:9;200:10,
14,16;205:6;213:21;
219:6;222:19
**demonstrate (2)**
99:21;224:7
**demonstrates (1)**
126:18
**denied (2)**
35:2;100:12
**Denis (1)**
14:20
**Department (19)**
23:2,16;26:3,6;30:12;
32:1;55:8;89:13;98:4,9;
99:19;148:17;150:8,21;
151:3;173:12;175:17;
180:5;190:22
**departmental (2)**
99:18;176:3
**department's (1)**
17:20
**dependence (1)**
97:10
**dependency (1)**
98:19
**deposition (1)**
156:2
**deputy (11)**
5:3;104:4;106:25;
107:9;108:14,20;117:17,
25;129:24;238:9;239:15
**DeRosa (3)**
206:8;218:16;219:4
**DeRosa's (1)**
219:6
**describe (5)**
14:17;58:20;70:19;
82:6;205:17
**described (3)**
49:8;50:4;221:25
**description (1)**
231:15
**designed (2)**
20:8;29:24
**desire (1)**
222:14
**destroy (1)**
231:6
**destroyed (2)**
231:8,8
**details (2)**
29:7;62:24
**determinant (1)**
128:17
**determination (3)**
14:2;125:16;126:9
**determine (3)**
130:15;137:24;158:22
**determined (3)**
43:10;149:6;235:15

**determining (3)**
158:25;159:1;211:18
**developed (1)**
129:9
**devoted (1)**
237:3
**diagnosed (1)**
176:12
**difference (3)**
142:17,18;225:25
**different (20)**
16:11;19:10;31:10;
51:10;66:1,2,6;76:20;
87:8,11;91:14;113:19;
122:5,5;154:21,22;
171:16;187:2;210:16,16
**dire (126)**
11:12,13,16,17,22,24;
12:12,19;13:2,13;14:18,
19;16:24;17:23;18:6,11,
16;19:8;20:13,14,15,24,
25;21:5,7,21;22:4,18;
23:10,12,14,15;24:17,
20;25:9;28:2,5,9,23;
29:2,15,18,21;30:1,5,7,
11,18;32:15;33:5;34:2,
3;35:3;38:16;42:18;
43:3,9,16,19;44:2,9;
47:13;49:22,24;50:18,
20;59:4;60:4;64:20;
69:4,8,17;70:22;71:13,
19,24;72:20;83:4;86:15;
89:6,12;92:10;94:6;
96:14;102:2;103:14;
140:10,11,13,21;141:3,
9;143:1;147:3,5,8,15;
149:13;159:25;161:22;
162:23;165:25;167:17;
171:16;185:4;191:1;
192:17;203:20;207:16;
216:21;222:8;226:16;
227:13,22;228:1,2,13,
21;229:1;230:2;232:16;
234:14,17,20;236:18;
237:12
**DIRECT (12)**
8:11;11:11;22:11;
26:21;67:14;84:25;94:4;
101:24;145:7;204:14;
217:11;239:8
**directed (4)**
5:6;43:13;67:13;
120:19
**directing (8)**
6:17;17:19;131:10,12;
133:19;139:10;146:7;
177:22
**direction (1)**
48:5
**directly (2)**
200:18,21
**disability (1)**
175:14

**disabled (1)**
239:8
**disagree (1)**
15:12
**disagreed (1)**
223:17
**disappoint (1)**
235:2
**disbarred (1)**
119:23
**discharged (1)**
180:11
**disciplinary (26)**
40:10;41:10;60:22;
80:17;98:2,3,20;99:18;
100:6;120:12;136:11,
19;150:9;151:4;155:20,
23;176:3,8;191:8,12,16;
207:22;208:4,5;216:10,
12
**discipline (1)**
181:9
**disclose (13)**
43:11;67:15;77:13;
79:8,16;80:24;81:6;
83:20,25;85:17,19;
95:16;188:13
**disclosed (7)**
32:15;43:5;44:3;68:9;
83:4;97:15;190:12
**disclosing (1)**
185:13
**disclosures (2)**
100:8;237:9
**discourage (1)**
93:6
**discovered (1)**
129:13
**discovery (1)**
81:24
**discredit (2)**
142:20,20
**discuss (3)**
58:19;200:10,14
**discussed (4)**
7:5;61:20;76:5;117:7
**discussing (3)**
63:4;133:4,18
**discussion (7)**
69:14;74:1,3;83:24;
87:17;93:10;112:23
**discussions (5)**
67:8;83:20;87:23;
88:3,9
**disease (1)**
174:6
**disgrace (1)**
192:3
**disorder (1)**
120:22
**disorderly (2)**
186:1;215:10
**dispense (1)**

239:10
**displease (1)**
236:2
**dispute (1)**
119:1
**disregard (3)**
173:10,23;217:11
**disregarded (1)**
218:11
**disseminated (1)**
100:4
**distinct (1)**
234:2
**distinction (1)**
143:22
**district (5)**
30:20;105:6;203:17,
19;235:25
**Division (6)**
23:1;24:1;52:8;
150:21;173:9;176:3
**Division's (1)**
175:20
**docket (1)**
51:19
**docketed (1)**
97:23
**doctor (1)**
176:12
**document (19)**
17:5,19,22,25;18:8,12,
21,25;19:15;20:2,12,25;
21:4,8,20;124:25;136:6;
179:16;180:4
**documents (12)**
10:16;21:17;66:1,12,
19;80:6,8,21;82:12;
95:5;177:12,13
**DOJ (1)**
148:18
**dollars (1)**
232:20
**Donahue (1)**
14:20
**done (11)**
13:24;23:10;81:8;
142:19;153:18;163:13;
192:2;198:19;208:17;
238:23,24
**Donna (1)**
4:12
**door (1)**
146:3
**dossier (7)**
43:25;44:11,21;81:15,
17;82:6,12
**dots (3)**
210:24;211:18;227:16
**doubt (1)**
210:8
**down (30)**
29:3,6,14;45:15;
50:15;55:17;56:2,17;

60:17;62:18;82:24;
83:14;84:19;91:5;92:20;
93:21;96:25;101:15;
111:13;113:23;114:20;
121:2;132:10,11;
145:15;151:21,23;
229:7;238:5;239:14
**downstairs (1)**
238:13
**Dr (8)**
177:18,24;178:10;
180:23;206:8;218:16;
219:4,6
**drafted (1)**
65:7
**drafter (4)**
65:8;72:17;73:8,9
**drafters (1)**
73:10
**drafting (6)**
25:16;65:6;76:15,18;
79:11;85:24
**drafts (1)**
76:20
**draw (4)**
64:16;66:5;129:8;
233:19
**draws (1)**
52:22
**drink (3)**
109:8,25;110:3
**drinking (6)**
109:4,6,15;179:10;
184:18,19
**Drive (5)**
196:3,10,11,23;198:10
**drivers (1)**
193:7
**driver's (1)**
193:5
**driving (2)**
182:25;215:6
**dropped (1)**
183:11
**drunk (1)**
182:12
**Duane (1)**
70:5
**due (1)**
180:11
**Duffy (1)**
77:7
**DUI (5)**
183:3,5,12;184:4,5
**Duke (6)**
111:6,18;112:5,23;
113:7,21
**Duke's (2)**
111:21,25
**duly (2)**
8:4;101:18
**during (87)**
8:24;12:21;20:23;

UNITED STATES OF AMERICA, v
PAUL M. DAUGERDAS, ET AL.,

February 15, 2012

21:5,7;28:9;30:5,7,10,
18;32:15;33:5;34:17,17,
20;35:3,3,20;36:17;
39:20;42:18;43:2,4;
44:2,9;46:11;47:13;
48:24;50:13;56:5;59:22;
60:21;61:8;63:1,8,13;
64:9,20;66:20;67:17;
69:4,25;71:19,24;72:20,
25;74:17,19;75:3,8;
79:20;80:7,8,21,25;85:4;
88:18;89:5,12;92:10;
93:5;94:6,20,24;95:17;
96:11;99:16;101:10;
103:14;106:11;109:23;
112:20;129:13;143:1;
165:16;181:9;182:13;
213:23;216:20,21;
221:17;222:7;234:14,17,
19;236:18;237:12
**duty (6)**
192:6,9,11;224:14,15;
237:7
**dynamics (1)**
232:22

**E**

**earlier (14)**
59:9;61:23;87:15;
90:25;93:9;150:8,23;
177:7;206:17;218:1;
219:21;220:15;221:17;
223:9
**early (5)**
23:20;69:3;70:14;
240:10,11
**easily (1)**
81:23
**easy (2)**
73:6;85:22
**economic (3)**
206:10,13;219:7
**Edelstein (34)**
8:25;35:4,11;38:22;
40:2;56:20,25;57:8;
58:2;59:1,17;60:5,7,11,
22;61:23;63:1,23;66:16;
67:11;69:22;70:3,7,13;
73:11;77:1;79:24;80:1;
87:8,13,17;92:17;93:5,
10
**educated (1)**
29:19
**education (9)**
34:4;43:21;44:3;
59:11;86:12;164:25;
167:12;168:4;212:12
**educational (1)**
34:5
**effect (1)**
198:3
**effective (2)**

178:12,18
**effects (1)**
110:5
**either (25)**
10:11;20:6;24:22;
29:23;41:16;47:15;
48:22;69:19;71:17,22;
77:14;80:20;94:5;98:12;
107:7;134:12;136:9;
139:9;140:24,24;
160:13;166:18;179:11;
183:7;229:12
**elderly (3)**
230:13,16,23
**Election (1)**
66:9
**eleven (6)**
137:9;142:21;148:6;
149:6;194:20,23
**elicit (1)**
101:2
**else (14)**
44:24;56:17;60:18;
67:20;76:24;83:24;
134:2;140:17;172:23;
173:6;174:24;194:18;
237:2;239:17
**else's (1)**
235:23
**email (25)**
14:13;22:11,11,16,23;
26:21,25;27:4,7,22;
81:14;82:23;83:6,7,7,9,
13;90:22;91:3,4,8,11,15;
92:16,19
**e-mail (27)**
39:6,9,14,14,15,19,22;
40:7,25;42:18;45:9;
47:1,25;48:1,8;50:4;
55:11,13,21;56:4;57:10;
58:6;62:11,15,23;70:1,
15
**emails (3)**
80:10;83:12;93:23
**e-mails (7)**
40:6,21,22;42:13;
57:9,12;59:18
**e-mail's (1)**
43:24
**embarrassed (1)**
152:3
**emblematic (1)**
219:15
**emergency (1)**
96:7
**emphasize (1)**
202:20
**employ (1)**
10:4
**employee (2)**
30:21;31:7
**employment (1)**
26:11

**end (25)**
28:5;30:1;35:9;38:19;
56:19;57:7;58:7;59:24;
60:5;64:5;71:9,10;
86:23;92:14;116:16;
159:7;181:4;205:18,20;
206:4;211:4;216:21;
220:8;222:15;226:24
**endeavor (1)**
192:25
**ended (1)**
185:23
**endorphins (1)**
207:25
**enforcement (2)**
32:2,4
**engaged (1)**
156:18
**engaging (1)**
226:3
**English (3)**
167:21;171:23;202:6
**enjoy (1)**
232:21
**enlisted (1)**
88:22
**enlisting (1)**
88:19
**enormous (2)**
210:3,5
**enormously (1)**
234:9
**enough (7)**
46:22;47:9;49:20;
53:18;88:14;200:1;
210:3
**ensure (1)**
30:7
**entered (2)**
94:19;234:12
**entire (5)**
19:15;50:21;51:5;
96:11;234:20
**entirely (1)**
28:19
**enumerated (1)**
232:25
**envelope (1)**
201:14
**envelopes (1)**
182:1
**episode (1)**
96:12
**Eric (1)**
238:10
**error (1)**
96:1
**essence (2)**
128:21;200:13
**established (4)**
131:6;157:9,10;
158:11
**estimate (1)**

169:22
**et (1)**
8:21
**eternity (1)**
201:15
**evaluate (1)**
16:2
**evaluating (2)**
159:15;164:15
**evaluation (2)**
159:11;176:23
**evaluations (1)**
100:7
**evasion (1)**
215:19
**even (18)**
30:10;31:23;39:4;
46:21;47:15;70:18;
87:14;91:10;112:12;
152:15;182:15;184:19;
191:20;197:24;207:2;
221:11;225:21;240:5
**evening (5)**
69:23;70:14;185:6;
240:16,23
**event (3)**
7:6;34:17;70:15
**events (2)**
176:24;214:22
**eventually (5)**
16:25;18:3,5;49:6;
126:7
**everybody (6)**
39:23;140:17;199:25;
237:2,6,13
**Everyone (1)**
115:1
**eviction (2)**
52:4,6
**evidence (58)**
11:10;17:17,18;19:25;
20:1;35:21;36:24,25;
65:22,23,24;75:24,25;
76:13,14;125:8,9;
143:19;145:5,6;159:5;
164:15;173:19,20;
175:24,25;176:6,7;
177:16;179:21,22;
187:8;194:8,9;200:1;
204:1,3;205:5,18;206:4;
211:4,10,11,22;212:9;
213:1,8;216:3,13;217:3,
10,14,14,22;219:23;
220:11,17;222:20
**evinces (2)**
173:10,23
**exact (3)**
134:11;144:23;194:3
**exactly (8)**
12:13;44:1;58:21;
85:19;103:13;141:1;
196:22;226:3
**EXAMINATION (11)**

8:11,20;44:7;84:25;
90:1;101:10,24;130:12;
204:14;222:24,25
**example (2)**
34:14;38:5;219:15
**examples (1)**
13:7
**except (1)**
199:25
**excerpt (2)**
17:6;70:25
**excerpted (2)**
70:25;91:12
**excluded (2)**
187:8;217:12
**exclusively (2)**
38:1,12
**Excuse (2)**
196:21;231:21
**excused (6)**
90:10;96:9,24;97:1;
238:6,7
**execute (1)**
6:18
**executed (3)**
5:21;150:23;151:14
**exercised (3)**
30:6;32:12;86:7
**exercising (3)**
29:8;30:2
**Exhibit (86)**
10:11,13,15,22;11:4,9;
12:6;17:3,10,16,18;
18:17,18;19:9,11,19,24;
20:1,5,19,22;21:24;
26:19;31:1;36:15,24,25;
39:11;64:23;65:10,16,
21,23,24,25;75:11,19,23,
25;76:1,8,12,14,25;80:5;
82:8,15,20;83:11;85:2;
87:23;124:25;125:9;
126:14;129:12;130:21;
145:2,5,6;150:16;
157:19,20;173:15,19,20;
175:20,24,25;176:6,7,
11;177:16,17,18;179:13,
21,22;181:2;194:5,8,9,
10;199:22;204:17;
211:11;230:3
**exhibits (4)**
65:2;203:23,25;204:2
**existence (2)**
43:11;70:20
**existing (1)**
238:3
**expectation (1)**
197:11
**expected (1)**
62:18
**expenses (2)**
137:18,19
**experience (14)**
10:7;28:8;31:18;

52:23;53:5,8,17;119:16;
154:1;165:19;207:24,
25;222:9;236:23
**experienced (2)**
10:2;89:2
**experiences (4)**
123:15;207:14,18;
208:3
**expert (1)**
206:8
**explain (16)**
13:15;16:6,11;26:1;
35:6;106:13;108:14;
112:22;113:20;114:22;
116:18;117:5;118:7;
169:2,3;223:2
**explained (4)**
140:10,13,16,20
**explanation (3)**
47:23;93:1;106:17
**explode (1)**
162:20
**exploring (1)**
122:7
**exposing (1)**
169:20
**express (2)**
30:11;91:20
**expressing (2)**
44:12;91:22
**expression (1)**
62:7
**extends (1)**
18:23
**extensive (1)**
14:1
**extent (1)**
215:3
**extracted (2)**
49:6;50:2
**extravagant (1)**
137:2
**eyes (1)**
110:18

**F**

**facility (1)**
176:13
**facing (2)**
35:13;126:13
**fact (64)**
26:4;28:20;30:24;
34:20;46:4,6;47:16;
49:4,7;59:14;61:20;
63:12;65:7;68:1;73:7,8;
74:4;85:21;91:15;95:1;
98:3;114:22;124:6;
127:11;132:13;133:10;
142:1,2,19,21;143:12,
15;147:18;148:11;
152:5;159:23;164:14;
166:9,13;167:6;169:17;

171:6,19;172:6;173:8,9;
176:18;179:9;185:13;
189:3;191:12,15;193:9;
213:18;216:1,6,16;
219:12;225:3,4,16;
227:6,21;235:5
**factor (8)**
15:10,11,13;231:5;
232:8,10,11,18
**factors (1)**
26:10
**facts (19)**
32:3;56:23;72:18;
73:17;74:19;75:3,4;
78:1;79:7;81:5,9;85:5,
25;94:20;97:16;101:2;
201:5;217:2,4
**factual (1)**
25:19
**factually (1)**
214:21
**failed (2)**
212:12,13
**fair (39)**
15:3;28:3;30:7;31:20;
66:3,19;71:16,21;94:9;
131:20;148:7;153:21;
159:6;160:22;205:6;
209:7;212:20,22;213:9;
214:6,9,15;215:19,21;
216:8;218:5,10,14;
219:3,7,15,18,19;
221:11;225:22;228:22;
231:19;236:22;237:8
**fairly (5)**
140:22;192:8;216:3,
13;238:25
**faithful (1)**
163:15
**fall (1)**
171:3
**false (5)**
28:19,20;72:24;162:1,
4
**familiar (1)**
223:6
**family (3)**
32:3;188:18,18
**fantasy (1)**
198:7
**far (7)**
63:9;71:15;201:20;
210:16;225:10;228:25;
239:3
**fashion (1)**
192:13
**fate (1)**
192:16
**father (11)**
23:16;26:2;46:19,24;
47:10,12,17,22;148:16,
20;190:22
**father's (1)**

26:11
**fault (2)**
44:17;171:9
**favor (11)**
111:8;113:25;114:2,8;
140:23;212:9;213:4;
219:17;229:11,16;
238:15
**favorable (1)**
28:4
**FBI (1)**
32:4
**fear (1)**
220:9
**February (21)**
99:15;116:20;118:8;
129:22;136:1,7,20;
147:7;150:20,24;
151:13;153:12;177:2,4,
4,12;179:1,4;181:4,5;
240:24
**federal (14)**
9:14;31:25;66:9;
106:15;109:19;116:6;
120:9;122:17;132:8,23;
136:2;138:1;222:11;
223:7
**fee (1)**
221:11
**feel (3)**
112:18;198:9;208:2
**feelings (1)**
212:21
**felon (7)**
139:5,9,22,24;148:20;
199:24;206:18
**felonies (1)**
181:8
**felony (2)**
89:15;210:13
**felt (5)**
60:16;91:10;138:22;
154:11;205:6
**ferret (1)**
141:11
**ferreting (1)**
141:4
**few (16)**
18:23;20:5;37:11;
44:7;67:3;81:13;82:2;
90:5;103:4;151:15;
153:7,19,22;220:6;
221:2;232:17
**Field (3)**
4:16,18;77:11
**fields (1)**
20:8
**Fifth (7)**
99:3;100:20;102:4,7,
9,19;233:25
**fight (5)**
205:1,8,14;206:1;
213:19

**fighting (4)**
205:4,9,14;213:19
**fights (1)**
156:18
**figure (1)**
50:6
**file (7)**
23:6;44:22;63:19;
82:7,9,14,19
**filed (31)**
46:4;53:11,14;62:19;
64:17,19,24;65:12;
66:25;68:5,8;72:10,22;
73:15;95:15;97:23;
114:18,24;115:1;
135:23;136:5,6,8,10,20;
150:7,17,20;181:4;
191:20;224:3
**files (3)**
44:16;66:9;95:11
**filing (4)**
67:1,9;72:14;83:18
**filings (2)**
100:5,7
**fill (1)**
126:5
**filled (1)**
137:22
**final (4)**
29:5;53:8;73:14;
222:17
**finances (9)**
131:25;132:6,12,14,
19,22;133:3,10,18
**financial (15)**
126:3,6,11,18;129:10;
130:16;133:23;134:20,
25;135:3;137:16,25;
138:25;207:15;214:24
**financially (4)**
124:12;136:24;137:3,
12
**find (7)**
60:1;93:18;95:11;
108:25;213:3;219:12;
223:16
**findable (1)**
81:23
**finding (2)**
131:13;206:25
**findings (1)**
99:25
**fine (6)**
19:17,19;84:7;101:9;
137:13;238:17
**finish (4)**
50:24;64:12;136:22;
240:22
**finished (2)**
207:3,5
**finishing (2)**
64:11;130:6
**Fink (1)**

77:8
**firm (37)**
9:2,6;12:6,23;13:1;
16:1;18:11;21:11,12,17;
24:22;25:3,5,8;28:12;
30:4;42:2;44:14,24;
45:2;66:17,23;67:20;
74:2;75:2,4;77:16;78:3,
10;79:2;83:21,24;86:7;
87:24;88:10,19,22
**firms (1)**
77:10
**firm's (3)**
10:19;79:7;81:4
**First (43)**
5:1;6:25;7:11,24;23:1,
13,13;37:7;43:8;50:24;
55:8;65:7;73:9;75:4;
83:9;86:25;89:13;93:15;
98:4,9;99:18;129:9;
138:8;142:7,8;143:3;
144:4,7;145:11;147:15;
150:8,21;151:3;170:16;
173:12;175:17;176:21,
24;183:5,7;184:1;185:3;
223:20
**fit (1)**
31:14
**fitness (1)**
176:21
**five (3)**
58:16;63:22;130:9
**fix (1)**
69:14
**flash (1)**
39:21
**flirtatious (1)**
197:24
**floor (1)**
156:14
**focus (7)**
15:8,9;25:17,18;44:7;
50:12;145:8
**focused (9)**
23:9;24:10,10;25:11;
42:21;49:5;55:6;61:3;
72:18
**folded (2)**
183:20,21
**folders (3)**
21:11,15,18
**Foley (1)**
58:12
**follow (25)**
217:7,19;224:24;
225:1,2,5,6,16;226:19;
227:5,6,9,9,12,14,17,19,
22;228:2,8,9,12,13,14,18
**followed (6)**
224:20,23;225:11,13;
226:22;228:11
**following (1)**
181:8

**follows (3)**
8:4;101:18;193:14
**folly (2)**
237:6,7
**Foods (2)**
52:11,14
**football (5)**
111:20,21,24,25;112:5
**forethought (1)**
197:10
**forewoman (1)**
169:4
**forget (1)**
140:2
**forgotten (1)**
188:11
**form (21)**
10:11;77:21,23;81:17;
106:5;115:17,18;126:19,
23;128:9;134:19;154:8;
159:9;183:23;202:7;
209:21;220:21;221:18,
20;234:22,23
**formally (1)**
177:11
**former (2)**
7:13;30:20
**forth (2)**
31:4;73:22
**forthright (1)**
10:8
**forthwith (2)**
5:21;6:24
**forum (1)**
175:5
**forward (1)**
59:17
**fought (3)**
205:1,8;206:1
**foul (1)**
228:25
**found (18)**
22:18;41:3;44:18;
60:22;61:6,18;66:16,17,
18;68:19;69:6;79:12;
173:9,22;211:22;
213:24;219:5,17
**four (7)**
7:9,12;151:7;157:6,7;
218:23;238:14
**fourth (1)**
7:13
**Francisco (2)**
11:19;12:2
**Frank (1)**
6:7
**frankly (1)**
18:10
**fraud (2)**
166:1;189:15
**free (1)**
238:5
**frequently (1)**

91:7
**fricken (3)**
114:11;203:7,12
**Friday (1)**
69:23
**Friedman (1)**
175:22
**front (11)**
10:12;59:6;73:3;
105:12;124:24;138:17;
146:3;196:1,2;225:9;
239:9
**fruitful (2)**
28:16;69:12
**fruitless (2)**
14:9;24:25
**frustration (1)**
44:12
**full (5)**
8:5;37:18;77:5;82:16;
101:19
**function (1)**
164:5
**funded (1)**
137:25
**funds (1)**
126:15
**funny (1)**
181:19
**furnished (1)**
99:1
**further (22)**
71:4;84:2;88:19;
89:22;93:11,23;95:21;
96:4,17;97:6;99:8;
107:9;190:16;204:4;
217:12;222:23;229:19;
236:8,9,13,14;237:14

**G**

**Gair (59)**
4:6;6:12;7:18;77:21;
99:10;100:18,19,25;
101:23,25;102:12,22,23;
106:21;122:10;125:4;
128:24;129:1;130:2,8,
12,13,23;136:17;145:1;
148:8;173:14;175:19;
176:1;179:15;192:22;
193:3,4;194:4;199:13;
200:9;201:20;203:15,
22;204:4;205:23;
206:24;211:4;213:11,
15;215:2;221:20;
222:24;223:1;229:19;
237:16,17;238:1,9,17,
25;239:3,18;240:19
**Gair's (1)**
221:17
**garbage (6)**
126:24,25;127:2,12,
15;128:13

**gather (1)**
13:22
**gathered (1)**
27:1
**gathering (1)**
66:12
**gave (20)**
6:6;15:24;26:2,14,16;
27:5;28:5;30:4;34:8;
49:24;118:22;136:18;
153:8;214:8;217:23;
220:18;224:18;225:13;
226:17;233:18
**gears (1)**
83:18
**general (4)**
23:15;31:21;217:16;
221:25
**generally (3)**
109:18;130:17;166:25
**genuinely (1)**
96:15
**Georgia (2)**
100:1,1
**gesturing (1)**
160:20
**gist (1)**
217:16
**given (16)**
25:22;26:1;27:5,13;
28:17;33:1;69:12;70:20;
88:13,19;100:7,23;
102:24;161:21;220:7;
236:16
**gives (1)**
50:7
**giving (1)**
49:13
**glanced (2)**
62:21;83:16
**glasses (1)**
49:13
**God (2)**
111:6,18
**goes (5)**
27:4;37:10,11;165:4;
196:19
**Goldman (6)**
30:12,16,19,20,24;
31:7
**Good (29)**
4:3,9,11,13,15,17,21,
24,25:8:13,14;9:21;
16:13;28:6;41:25;67:12;
84:17;124:1;130:9;
163:15;192:21,22;205:1,
8,14;206:1;212:8;
213:19;240:22
**Google (8)**
13:24;41:24;71:23;
77:6,14;78:6;85:20;
106:11
**Googled (11)**

23:20,23,25;26:17;
41:19;61:16;86:4;106:8;
113:14;116:13,15
**Gosnell (2)**
5:14;6:6
**government (82)**
4:2;6:16;7:11,24,25;
8:3;10:11,13,22;11:3,4,
9;12:6;17:3,9,10,16;
18:17;19:11,19,24;20:5,
19,22;26:4,7,11,18;
36:19;39:11;65:9,15,16,
21,25;74:15;75:11,18,
19,23;76:1,7,8,12,25;
79:6;80:5;81:4,24;
82:15;85:2;87:22;101:4;
102:13;106:23;107:12;
137:5;202:3,12,14,16,
17,21,21,23;204:17,23;
212:4,8,9;213:4;219:17;
230:3;233:2,9;234:16;
235:10,11,16,22,24;
236:2
**government's (9)**
7:4;15:4;17:18;20:1;
65:23;75:25;76:14;96:9;
219:16
**grab (1)**
39:23
**Grace (1)**
230:19
**gradations (1)**
16:16
**grade (4)**
16:9,11;27:5,25
**grade-inflated (1)**
16:23
**grades (1)**
16:20
**grading (6)**
15:22,25;16:1,6,7,23
**graduate (1)**
42:4
**graduated (1)**
12:10
**graduation (1)**
12:8
**grant (1)**
102:24
**granted (2)**
99:5;148:10
**granting (1)**
102:20
**gray (1)**
120:16
**great (2)**
30:6;132:14
**greatly (1)**
95:1
**greeting (3)**
182:1,4,5
**grounds (2)**
175:13;199:12

**group (2)**
13:21;39:19
**groups (1)**
13:18
**Guerin (5)**
4:12,14;77:10;204:10;
236:12
**guess (13)**
7:10;119:5;124:10;
133:16;157:10;163:7;
167:20;187:5;229:18;
231:25;233:24;235:25;
236:24
**guided (2)**
220:10;222:20
**guilt (1)**
213:7
**guilty (5)**
132:16;133:12;134:5;
147:23;149:3;181:7;
211:22;213:3,24
**gun (1)**
189:18
**GX-14 (2)**
82:8,9

**H**

**hairs (2)**
226:2,3
**half (2)**
109:9;207:4
**hand (4)**
131:16;133:21;134:4;
207:15
**handed (1)**
169:4
**handing (1)**
170:22
**handle (1)**
149:7
**handling (1)**
11:23
**hands (1)**
192:16
**happen (4)**
111:10;115:22;
117:10;120:7
**happened (6)**
43:4;55:21;56:19;
125:21;158:21;177:12
**happening (4)**
67:5;92:14;125:20;
126:20
**happens (2)**
67:7;187:18
**happy (1)**
64:10
**harassment (4)**
183:13;184:7;189:25;
215:7
**hard (3)**
30:9;65:2;230:14

**hardcopies (1)**
31:2
**hardship (5)**
13:17,19,20,22;29:20
**harm/no (1)**
228:25
**head (7)**
47:6;62:8,8;70:21;
94:19;223:12;239:1
**heading (5)**
66:7;150:1,1;197:7,14
**headings (3)**
66:2,6,13
**heads (1)**
234:18
**Health (1)**
180:5
**hear (2)**
88:15;217:13
**heard (18)**
28:1;36:7;38:10;69:8;
70:19;97:6,10;99:8,13;
100:16;106:21;120:4;
143:13;159:16;213:8;
219:23;222:3;231:22
**hearing (30)**
7:15;99:16;100:25;
112:24;113:8;116:19;
117:13,14;118:7,8,14,
15,18;124:2,7;129:20;
186:10,12,14,16;187:11;
203:6;211:22,23;213:1;
214:2;230:15;235:8;
238:19;239:12
**Hecker (1)**
8:19
**held (3)**
99:17;199:6,15
**help (9)**
8:17;12:14;29:24;
50:15;150:14;178:12,
19;179:13;224:7
**helped (2)**
12:14;13:4
**helpful (3)**
15:12;48:4;224:12
**Hernandez (34)**
4:5;7:25;8:9,10,12,14;
11:3;17:9;19:9,17;
34:25;36:19;50:23;
53:23;54:4,6;64:8,14;
65:15;72:7;75:18;76:7;
81:11;82:2,5;84:2;
89:20,24,25;90:2;95:19,
21;96:19;202:2
**herself (4)**
178:13,19;239:6,9
**Hi (1)**
129:19
**hide (1)**
188:4
**higher (4)**
180:14,16,18;210:8

**highest (8)**
34:4;43:20;44:3;
59:10;86:12;164:24;
167:12;168:4
**highly (1)**
238:23
**Hillary (1)**
77:2
**himself (2)**
32:24;94:18
**HIPAA (2)**
97:25;175:5
**hire (3)**
124:16;130:16;137:20
**history (7)**
62:25;86:2;89:14,15;
190:12;210:11;229:2
**hits (2)**
23:24,24
**hold (1)**
59:1
**holding (1)**
54:2
**holdout (1)**
200:8
**hole (1)**
60:17
**Hollander (1)**
40:1
**holy (3)**
50:5;91:17,19
**home (3)**
117:15;164:18;196:22
**homeowners (1)**
162:5
**honeymoon (1)**
89:18
**Honor (143)**
4:3,11,15,25;5:10;6:3,
14,16;7:9,16,18,19,20;
8:10;11:3,6,7;17:9,13,
14,15;19:9,13,18,21,22,
23;34:25;36:19,23;64:8;
65:18,19;77:22;81:11,
25;84:2,5,9,10,11,22;
85:5,6,12;89:25;95:19,
21;96:19,20,21,22,23;
97:7;98:25;99:10,11,12,
13;100:15,21;101:8,13;
102:12,15,16,17;106:19,
21;112:4;113:2;115:17;
119:13;122:10;125:4,7;
129:1;130:2,23;134:17;
136:15,17;141:5;145:1,
4;148:9;152:17;154:8;
156:20;159:8;162:7;
173:14,18;175:19,23;
176:1;179:15,20;
181:24;183:23;190:14;
192:19,22;194:4,7;
199:13;200:9;202:7;
203:15,22,24;204:4,9;
211:2,7,9,13;221:1,21,

22;226:5;229:19,21;
233:4;234:22;236:4,11,
15;237:11,15,17,19,21,
25;238:1,9,11;239:9,18;
240:3,10,17,19
**hope (3)**
149:1;198:6;240:8
**hoping (2)**
71:7;197:18
**horse (1)**
159:21
**hospital (2)**
5:25;6:8
**hour (1)**
135:18
**hours (2)**
61:23;237:3
**house (6)**
148:25;161:23;162:2,
5,8;170:10
**household (4)**
47:3,19;152:7;161:15
**housekeeping (1)**
211:2
**hundred (1)**
160:16
**husband (35)**
6:7;46:23;47:17;
89:15;139:5,9,22,24;
148:12,14,20,22,24;
156:17;161:15,18,20,23;
162:2,5,17;163:13,15;
185:23;188:23,24;
189:2;199:23;206:18,
24;210:12,20;229:8,9;
230:4
**husband's (1)**
190:18
**hyperlink (1)**
82:17
**hypothetical (1)**
158:20

**I**

**I-95 (1)**
162:20
**idea (13)**
60:1;71:6;107:16;
120:6;134:22;135:5,8;
136:22;164:7;167:17;
185:15;199:4;233:21
**ideas (2)**
122:5;218:11
**identical (1)**
151:16
**identified (1)**
193:15
**identifies (1)**
50:25
**identify (3)**
14:7;46:23;193:18
**identifying (1)**

28:18
**idiot (2)**
200:1;203:1
**illness (1)**
120:17
**image (1)**
205:12
**immeasurable (1)**
237:3
**immediately (1)**
51:1
**immigration (5)**
46:19;47:10,13,14;
148:16
**immunity (14)**
99:5;100:23;101:7;
102:16,20,20,25;107:13,
16;233:11,12,22,24;
234:2
**immunize (1)**
101:4
**immunized (1)**
108:7
**impartial (4)**
30:8;31:20;216:8;
228:22
**impartiality (1)**
216:17
**impartially (2)**
140:23;216:3
**impeachment (1)**
239:4
**implying (1)**
127:22
**importance (1)**
175:12
**important (10)**
10:8;9;127:18;172:10,
24;174:25;175:2,15;
176:20;240:12
**importantly (1)**
7:12
**impression (7)**
74:9;112:7;116:11;
128:17;162:1,3,4
**impressionistic (1)**
58:20
**improper (4)**
35:25;36:4;205:21,25
**improperly (1)**
15:4
**inability (1)**
126:18
**inaccurate (2)**
55:2;180:24
**incident (5)**
183:5;185:20;188:11,
14;189:19
**inclined (1)**
26:5
**include (9)**
9:14;62:12;73:17,25;
74:2,6,22;77:18;100:6

**included (6)**
16:8;42:10;95:2;
124:8;166:20;188:22
**includes (1)**
45:21
**including (3)**
35:16;191:6;228:2
**income (1)**
152:7
**inconsistent (1)**
160:4
**incorrect (9)**
47:4,20;166:19;
205:17,23,24,24;206:2;
226:23
**indeed (3)**
89:16;208:6;209:24
**indefinitely (1)**
177:8
**independent (1)**
18:25
**indicate (1)**
26:12
**indicated (1)**
7:6
**indicates (1)**
6:23
**indicative (1)**
219:20
**indicted (3)**
181:7;189:15,22
**indictment (1)**
182:4
**indirectly (1)**
238:25
**individual (5)**
23:14;24:20;28:1;
34:3;69:17
**individually (1)**
172:6
**infirmity (1)**
175:14
**influence (2)**
183:1;215:7
**influenced (1)**
110:14
**info (2)**
26:25;47:19
**inform (1)**
104:4
**information (99)**
6:4;11:21,22;13:5,7,9,
12,13,22;14:20,22;
15:25;18:10;20:10;
21:12;23:8,21;28:17,18,
20,20;30:12;34:5;39:10;
40:23;42:14,20;43:1,10,
13;44:13,17,20,23;
45:18,21;46:1,13,23;
47:1,3,9;49:5,21;50:1,8;
51:1;53:18;54:10,19;
55:3,14,23,24,25;56:18;
57:3,6;58:24;62:12;

UNITED STATES OF AMERICA, v
PAUL M. DAUGERDAS, ET AL.,

February 15, 2012

63:23;66:3;67:16,24;
68:2,10,13;69:6,13;
70:25;71:17,22;73:18,
22;79:9,12;80:12,12,20,
25;81:6,20,21;83:15,20,
25;85:21;90:4,8;91:5,12,
14,17;93:7;94:7;95:16;
100:3;128:19;210:4
informed (5)
5:18;14:22;53:25;
68:18;99:2
initial (6)
40:22;42:14;50:15;
118:17;221:24;227:5
initially (7)
13:23;25:22;27:4;
29:18;49:4;61:16;
213:23
injury (10)
38:17,20,23;39:1;
51:13;60:8,10;187:4;
191:18;218:5
innocence (1)
213:7
innumerable (1)
239:8
inquire (11)
8:9;33:8;57:23;84:4,8,
21;98:12,18;101:23;
204:8;211:12
inquired (2)
79:6;81:4
inquiry (13)
34:11;40:23;74:22;
76:4;96:17,18;97:14;
98:2,14;130:1;190:16;
204:9;211:1
Insanely (1)
123:2
insight (1)
117:9
instance (5)
127:4,8,17;188:5;
215:6
instances (1)
28:14
instead (1)
47:22
Institute (2)
180:8,10
instruct (1)
37:8
instructed (5)
44:16;96:10;138:23;
200:10;220:8
instructing (1)
124:8
instruction (16)
70:2;214:8;216:4,24;
217:1,7,9,15,19;220:11;
226:8,17,19;227:5,9;
228:14
instructions (41)

6:7;109:21;110:19,22;
113:9;118:22;119:17;
124:8;211:23;213:9;
216:14,19;217:23;
219:23;220:7,8,18;
221:24;222:4,20;223:3;
224:17,20,24;225:1,5,6,
13,17;226:22;227:6,10,
12,14,19,23;228:3,7,11,
13,18
insults (1)
156:18
intellectual (2)
221:18;232:19
intelligence (1)
39:7
intend (3)
84:4,7;204:7
intended (2)
74:18,21
intention (3)
43:1;102:8;152:20
intentional (1)
78:8
interest (7)
97:16;99:21,23;100:8,
11;101:6;222:7
interested (4)
15:5,7;173:7;231:2
Interesting (2)
106:6;236:23
internally (1)
28:16
internet (2)
61:18;69:6
interpretation (1)
160:12
interrupt (1)
53:23
into (30)
4:24;13:18;34:2;
42:18;58:23;60:19;67:5,
6;68:22;69:4,5;71:3;
98:14,19;99:4;108:6;
115:15;122:4;167:10;
183:20,22;194:22;
198:7;205:18;210:10;
213:21;219:6;227:21;
231:11;239:1
intoxicated (2)
109:23;110:14
intoxication (1)
110:9
introductory (1)
222:4
intuitively (1)
15:15
investigate (3)
88:20;92:12,13
investigation (2)
13:1;31:25
investigations (2)
191:5,6

investigator (1)
60:2
invoke (1)
100:20
invoked (1)
233:25
involve (1)
39:1
involved (16)
12:19,21;15:24;27:13;
38:20;76:15,19,24;
87:23;88:9;94:1;183:12;
191:4;214:21;215:15;
220:16
involvement (3)
210:13;215:21;216:10
involving (1)
38:9
irrational (15)
105:25;107:5;110:17;
113:1,4;121:25;122:3,
18,20,25;123:1,8;128:4,
14;149:8
irrationally (1)
128:10
irrelevant (5)
122:23,25;128:18,22;
221:13
IRS (1)
214:19
Israel (1)
158:6
issue (16)
30:19;31:9;37:10;
53:13;61:6;70:2;74:6;
79:14;87:25;88:11,11;
105:10,20;136:23;
191:9;239:5
issued (7)
6:11;186:20,23;187:2,
22;188:1;237:23
issues (3)
88:12;95:4;140:22
item (1)
151:9
items (1)
181:16
iterative (1)
76:19

J

jail (1)
154:15
January (2)
109:16,17
Jason (1)
4:5
JD (5)
142:1;143:15;165:19;
167:6;173:8
Jenner (1)
77:7

Jersey (7)
94:18;162:18;163:13;
189:19;230:9,11,23
Jesus (7)
55:16;57:11;62:5;
90:23;91:8,9,19
jibe (1)
49:21
job (9)
137:20;158:22;
160:22;163:16;198:4;
202:3;208:8,10;225:3
job's (2)
208:8,10
joined (1)
67:16
joint (1)
67:1
Judge (187)
7:21;19:14;33:5,8;
34:10,16;36:6,12;37:3,
17;43:6;46:19;47:10,14;
48:4;53:3;54:3,6;57:23;
72:6;73:5;74:17,21;
75:2;76:4;77:24;78:4;
82:5;89:23;90:10;
101:11;104:1,4;105:6,
12,19,22;106:15;107:13;
109:20;110:23,25;111:5,
14;112:8,22;113:7,21;
114:17,23;115:21;116:6,
15,19,20;117:6,10,23;
118:7,22;119:10;120:5,
10;121:10,12,21,23,24;
122:2,4,17;123:5,7,12,
12,25;124:2,11,14;
126:14,22;128:4,13,20;
130:4,15;131:1,5,25;
132:9,12,18;133:2;
135:9;138:23;139:3;
140:10,16;141:8;143:5;
144:4,7,8,11,14,19;
145:9;147:24,25;
148:16;151:6,15,23;
153:13;154:23;155:7;
157:22;158:8,14;160:4;
161:8,14;163:24;
164:24;165:7,9,24;
170:1;171:17;174:1,22;
175:6;177:20;183:15;
184:20;185:4;186:24;
187:1,7,8,10,11,24;
188:6,14,17;194:21;
196:25;197:25;199:12,
19;200:4,20;201:4;
204:12;209:5,10,19;
214:2,8;216:4,20;
217:23;219:23;220:7,
18;221:24;222:18,23;
223:5;224:18,20,23;
225:1,5;226:7;227:5,12;
228:2,7;233:24;238:17,
21;239:3,20;240:5,20

judges (1)
208:6
judge's (7)
36:1;76:4;90:8;
119:17;162:3;211:23;
213:9
judging (3)
176:21;192:15;216:3
judgment (7)
49:2;51:20,22,24;
52:7;53:9;115:3
judgments (1)
51:17
Judicial (6)
23:2;53:6;99:18;
108:12;173:11,23
July (10)
64:2,19;74:12;75:13;
76:3;77:24;78:4;85:1;
187:12,15
jumping (2)
32:18;229:7
juncture (1)
237:22
June (5)
67:4;80:1,1;88:6,18
Juror (162)
16:25;18:3,5;19:6;
20:2,8,16,18,18,21;
24:13,14,18;25:12;27:2;
28:4,7,9;30:2,11,13,18,
22,24;31:6,10,11,13,14,
14,15,16,24;32:9;33:6,9;
10;34:8,22;35:16,19;
36:4,9;38:16,20;39:7;
42:24;43:4,5,11;46:6,10;
47:7;49:2,11,22;50:10,
18,20;51:2,3,13;56:1;
57:9,12;58:25;59:4,15;
60:4;61:15,21,25;62:2;
63:3,11;69:9;70:10,19;
71:18,18,24,24,25;
72:19,24;75:9;79:15,21;
80:3;83:3,11;85:23;
86:1,9,16,22;87:5,18,24;
88:10,11,20,24;89:12;
90:15,20;91:1,21,24;
92:15,24;93:3,25;96:1,7,
9,10,12,16;97:2,3;103:8,
9;118:9;128:11;141:12;
145:9;153:17,20;154:2,
3,21;158:22;160:20;
161:2;162:11;164:5;
166:16;169:4;172:12,
25;176:21;191:14,14;
208:18,24;209:6,11;
212:25;218:10;221:5,
13;222:11;223:23;
224:7;225:21;226:8;
228:22;230:24;231:19;
236:22;237:10
jurors (54)
11:21;13:5,6,16,17;

February 15, 2012

14:23,24,25;15:3,5,16,
20,23,25;16:2,8,12,13,
14,14;17:8;19:7;20:9;
28:12,18,21,25;29:6,9,
11,14,19,25;30:4;34:11,
11,17,17,20;89:5;
137:10;141:4;142:21;
148:6;149:6;159:13;
165:12;168:25;192:15;
194:20;207:13;213:22;
220:9;234:17
**juror's (5)**
22:2,3;69:7;80:2;88:9
**jury (77)**
14:19;17:6,20;18:9;
23:19;24:21;29:22;30:8;
31:12,19;35:14,16;36:7;
37:8;57:16;61:17;70:2;
73:18;77:6;83:11;92:3,
5;95:12;96:6,10,11;
101:10;128:15;140:21;
153:18;154:4;160:21;
165:22;166:5,11,15,15,
18,24;167:2,15;168:15,
18,21;169:7,8,13,18;
171:15;172:5,18,20;
181:22;182:17;185:8;
188:2;190:20;191:23;
192:4;194:22;200:10,15,
15;205:6,7;210:1;
211:25;214:2,11;
216:24;222:8;223:3;
229:3;231:2,4,18;236:19
**Justice (7)**
23:17;26:3,6;32:2;
148:17;175:21;190:22
**Justices (1)**
175:21
**justifies (1)**
159:7
**justifying (1)**
219:1
**justly (1)**
192:8

**K**

**keep (10)**
21:17;43:24;44:11,15,
16;60:19;81:14;82:20;
188:1;210:3
**keeper (1)**
210:21
**keeping (4)**
44:19;64:8;137:9;
232:20
**Kendra (1)**
40:1
**Kentucky (1)**
189:17
**kept (4)**
21:14;44:21,22;82:10
**kicked (1)**

179:9
**kid's (1)**
35:7
**Kim (13)**
11:18,25;14:13;18:8;
19:6;20:3,6;23:21;
27:19;40:25;41:16,22,25
**kind (8)**
60:6;67:5;88:14;
106:19;109:12;122:17,
18;136:14
**kindly (1)**
122:12
**kneejerk (2)**
128:1,2
**knew (60)**
16:8,24;17:2;18:7;
33:5;34:3,22;37:4,5;
38:1,15;46:22,25;47:9;
50:17;51:2;54:17,18;
74:18;77:24;86:5;
105:15,18,19;126:3;
127:18;141:2;153:21;
154:1,3;160:22;165:19,
22,24;166:4;168:6;
182:21;186:20;187:21,
25;207:1,2,3,6,8;209:5,
5,7,8,9,9,10,11,25,25;
210:11;229:8;231:19;
233:14;236:21
**knowing (1)**
127:12
**knowingly (1)**
214:3
**knowledge (16)**
53:17;75:3;79:7,14;
81:5;82:11;88:23;
112:15;122:1,1;169:3;
190:18;202:5;206:12;
214:12,16
**known (2)**
89:12;202:17
**knows (1)**
156:14
**Kostelanetz (1)**
77:8
**Kramer (4)**
77:16;78:3,10;79:1
**kudos (1)**
235:25

**L**

**lack (5)**
108:11;187:5;206:10,
13;219:7
**language (1)**
173:25
**laptop (2)**
21:6,7
**larceny (1)**
179:25
**large (2)**

233:14,23
**larger (1)**
188:15
**last (21)**
9:4;34:25;58:15;77:4;
109:6,7,8,14,19;110:2;
121:7;135:6,23;136:2,8;
152:19;157:2,4;163:6;
170:24;172:9
**lasts (1)**
172:15
**late (3)**
70:14;80:1;194:3
**later (11)**
40:16;41:9;49:6;58:5;
83:15;101:3;118:14;
130:10;151:7,15;238:20
**latter (1)**
33:1
**laughed (1)**
206:19
**Laurie (4)**
8:25;71:10,12;86:6
**law (28)**
12:8;32:2,4;37:24;
42:4;54:18;55:9;72:16,
16;79:13;95:9;120:3;
135:7;150:18;154:1;
167:24,25;171:12;
175:13;176:22;177:1;
217:4,10,22;218:2,2,12;
239:22
**lawful (1)**
105:18
**lawsuit (19)**
55:17,17;56:2,17,18,
23;57:3;60:10;62:19;
66:9;71:4;82:24;83:3,
14;91:5;92:20;93:17;
94:23;95:5
**lawyer (112)**
9:25;10:2,19;22:19;
24:6,8,19;26:15;27:6,10;
28:8;33:9,11;34:6,7;
41:25;43:17,22;45:13;
50:4;52:17;55:5;56:9;
59:1,16;60:14,24;61:4,7,
9,15,19;63:3,11;67:18;
68:19;69:1,8;70:10,20;
71:3;72:3;75:9;79:12,
21;80:4;85:22;86:2,9,14,
18,23;87:4;89:3,13,16;
90:21;91:1,25;92:2,4,25;
93:4;94:15;105:9,19;
118:23;119:9,16,21,25;
122:16;123:11;124:3,5,
5,9,12,16;126:15;
130:16;132:15,20,23;
133:4,15;134:21,25;
135:4,6,11,12,14,15;
136:24;137:4,12;139:4,
4;144:1;153:18;166:5,
11,17;168:23;170:7,21,

25;171:1,5,10;210:11
**lawyers (25)**
10:21,24;67:8;68:18;
73:13;88:16;165:21,25;
166:5,14;193:23;
195:12;204:7;206:19;
207:10,14,18;208:4;
209:4,9,25;210:15;
214:16;216:11;218:8
**laying (1)**
201:24
**lead (1)**
132:2
**leading (1)**
11:12
**learn (2)**
43:7;61:20
**learned (8)**
10:7;37:23;38:15;
62:22;63:23;90:4;94:24;
208:15
**least (5)**
46:17;98:4;113:6;
147:19;157:7
**leave (4)**
60:20;93:12;117:22,
23
**leaving (1)**
183:13
**left (6)**
58:7;67:11;107:25;
163:13;166:5;211:16
**legal (12)**
37:21;42:6;106:14;
112:15;120:2;165:19;
193:10;214:8;216:4,14,
19;231:7
**legally (1)**
217:12
**lengthy (2)**
18:18;224:7
**less (2)**
84:6;134:14
**letter (55)**
16:7,8;27:25;76:3,16,
22,25;77:13,18;78:4;
85:7,13,17;87:22;88:6,8,
9;89:1;95:2;97:5,18,20;
99:1,15;195:2,5,17,21,
25;196:6,14,17;197:1,8,
22;198:19,21;199:1,3,5;
200:22,22;201:7,7,8,11;
202:1;204:16;213:15,
22;214:1;218:15,22;
219:12;235:23
**letterhead (4)**
63:20;198:11,14,17
**letters (1)**
97:23
**level (12)**
34:4;43:20;44:3;
59:10;86:12;112:18;
164:24;167:12;168:4;

180:14,16,18
**Levin (4)**
77:16;78:3,10;79:2
**LIAB (2)**
37:10,15
**liability (6)**
37:16,21;38:5,21;
42:25;60:12
**liar (2)**
169:25;239:6
**license (3)**
193:5,7,11
**licensing (3)**
54:10;191:6;210:14
**lie (45)**
28:9;141:25;142:6,11,
13,17,24;143:9,10,11,14,
16,18,20,25;144:8,17;
154:4;155:2;157:11,14;
158:1,19;160:16,17;
161:2,11;165:18;167:3,
8,11;170:25;171:7;
181:11;183:17,19;
199:10;206:6;209:1;
218:21,24;229:25;
232:12,13;234:17
**lied (30)**
43:20;44:9;71:18,24;
92:9;94:6;115:15,15,15;
154:24;158:14;168:15,
17;169:7,13,17;170:7,
20;171:4;181:22;184:1,
2;185:11,13;224:15;
232:4,7,16;233:9;234:19
**liens (2)**
51:16,22
**lies (13)**
72:19;89:10;94:1,10,
11,13;103:21;161:1;
168:2;169:15;170:2;
208:16;228:5
**life (12)**
50:21;51:5;59:10;
87:6;157:24;158:3,4,9;
159:19,23;160:1,6
**lifestyle (1)**
137:2
**light (4)**
71:8;75:5;85:6;212:8
**liked (2)**
34:24;195:12
**likelihood (3)**
90:14;236:2;238:22
**likely (10)**
14:8;16:13,15;87:10;
93:1;99:21;100:9;210:7;
225:12;235:8
**likes (1)**
112:4
**limited (2)**
13:17;69:12
**line (11)**
48:15;125:14;126:14;