132:5,5;138:11,12;176:11;190:17;199:22;220:12
**lines (10)** 58:22;63:6;85:20;93:11;145:8;157:18;191:18;217:2,9;218:23
**link (4)** 41:9;47:16;80:20;82:18
**linking (1)** 71:1
**links (1)** 80:10
**liquor (2)** 109:11,12
**list (4)** 13:16;77:19,20;83:11
**listed (1)** 48:21
**listened (1)** 213:8
**listening (1)** 35:20
**lists (1)** 46:1
**literally (2)** 7:21;173:25
**literature (3)** 167:21;171:23;202:6
**litigation (4)** 9:12;52:23;62:24;218:4
**litigator (1)** 52:25
**little (12)** 28:18;35:7;43:25;67:6;111:13;130:10;148:11;152:2;153:8;158:20;201:20;238:19
**live (19)** 137:2;144:5,20;146:10,19,21,22;147:8;148:5,5,12,22;153:1,1,5;158:11,17,18;161:15
**lived (44)** 50:18,20;51:3,5;59:9;71:2;87:5,5,6;144:11,15,22;146:14,15;147:12,14,18;150:12;151:14;152:9,22;153:3,12,13,16;156:6,8,11;157:23;158:3,8;159:18,20,22,23;160:1,5,9,10;161:18,20,23;162:5;168:3
**lives (1)** 46:9
**living (10)** 43:12;147:1;148:20;152:3,9,21;153:4,15;157:7;196:16
**LLP (2)** 77:7,8
**load (1)** 240:8
**local (1)** 215:17
**located (2)** 196:2,5
**logical (3)** 113:7,20;133:2
**logically (1)** 210:24
**logistics (1)** 11:21
**long (11)** 44:13;58:15;89:15;94:25;157:22;158:8;160:5,10;168:3;216:25;236:24
**longer (1)** 58:16
**look (53)** 10:10;17:3;18:17,18;20:4,10;21:23;22:23;26:18;31:1;36:15;39:11;40:8;43:1;49:5;60:3;63:15;64:23;65:9;71:3;75:11;76:1;80:15;115:1;124:23;125:10,14;126:13;130:21;131:10,12;132:5;138:10;139:10;150:1,16;151:9;154:21;157:18;176:11;177:17,17;178:10;180:3;181:2;191:22;194:10;199:22;204:16;207:23;218:23;227:2;230:2
**looked (18)** 22:5;24:14;37:6;43:8;47:2;49:7,11;54:15;55:23;56:5,13;58:23,23;62:2;70:11,25;71:4;87:1
**looking (15)** 14:21;19:7;20:9;24:16;43:18;49:23,25;50:6;55:24;60:19;62:24;91:14;92:21;101:2;218:22
**lookout (1)** 32:21
**looks (1)** 27:5
**lose (1)** 34:20
**losers (1)** 112:1
**lost (3)** 34:17;70:12;219:11
**lot (6)** 35:23;49:20;83:10;86:5;137:19;237:5
**lots (1)** 206:19
**love (2)** 111:6;148:21
**lower (1)** 180:3
**Ltd (3)** 52:11,14;77:8
**lull (2)** 83:16;92:21
**lunch (5)** 69:24,25,25;70:2;86:21
**luncheon (5)** 128:25;129:2,4,9,13
**lunchtime (1)** 7:7
**lying (9)** 89:5;143:23;158:23;159:1,2;160:23;161:12;226:22;232:1
**Lynn (2)** 59:13;171:18

**M**

**ma'am (22)** 114:7;120:21;139:11;141:23;144:9,19;146:12;147:18;153:3;154:18;156:11;157:10;158:1;161:7,11;163:4;179:7;196:6,23;197:3;198:6;200:20
**Madam (1)** 122:12
**magnitude (2)** 89:10;94:1
**mail (4)** 129:14,14,16,19
**main (2)** 35:12;158:22
**maintain (2)** 97:11;98:8
**maintaining (1)** 44:20
**makes (1)** 78:5
**making (6)** 14:24;46:11;49:10;172:11,24;189:13
**man (1)** 94:18
**managing (2)** 66:17;93:19
**Manhattanville (1)** 189:17
**manner (1)** 220:20
**many (12)** 20:7;29:11;39:4;51:10;54:20;93:15;108:1;120:4;156:11;159:20;168:12;223:3
**March (35)** 21:21;23:13,19;52:18;53:1;61:16;69:16;102:2,5;103:3;115:15;140:1;146:2,15,15,20,21;147:14,16;149:13;150:1,2;151:15;153:13;154:24;156:3;176:2,8;185:3,6;189:2;190:25;191:1,11,15
**MARIE (2)** 8:2,7
**marital (1)** 190:14
**Mark (1)** 4:11
**marked (2)** 10:10;129:12
**marketable (7)** 153:17,20;160:20;208:17,24;230:24;236:19
**marriage (1)** 66:7
**married (12)** 46:2,22;47:3,7,11,19,21;94:17;193:8;207:3,5;229:16
**marshal (4)** 6:21;238:10;239:4,11
**Marshals (14)** 5:5;6:1,18,21;100:13;117:17;157:3;170:5,7,9;238:6,12;239:1,17
**Massachusetts (1)** 43:6
**match (2)** 45:11;62:22
**matches (1)** 49:23
**material (1)** 236:18
**maternal (1)** 230:17
**math (1)** 47:6
**matter (30)** 13:3;17:22;23:4;24:22;25:19;40:17;41:13;52:17;63:12;97:16;98:6,9,14,16,21,23;114:25;115:2;119:5;127:18;133:3;142:20;146:14;152:8;203:7;211:2;215:15,23;221:25;222:6
**matters (12)** 9:12;38:2,2;117:7;129:9,24;135:2;193:13;218:5;234:7,9;240:15
**maximize (1)** 53:24
**Maxwell (2)** 180:8,10
**may (88)** 7:23;8:9;13:24;14:4;15:6;22:2,12;25:1;26:21;31:2;36:12;37:18;38:23,24;39:14;42:14;44:8;47:4,15,19;52:18,19;53:1,1,17;54:4,5;55:2;57:15;58:5;59:2,18,25;63:16;64:1,6;68:23,24;69:18,21,21,23;70:14;72:8;79:22;84:19,21;86:15,15,20;87:16,22;90:7,22;92:5,16;94:5,9,14;95:12,19;96:6,25;97:13,20;99:13;100:15;101:10,13,23;102:22;106:21;126:15;130:12,23;193:3;194:3,11;199:13;200:23;203:15;211:12;216:25;217:13,13;238:5;239:20;240:2
**maybe (36)** 13:14;15:15;22:19;40:1;49:12,13;58:16;59:22;60:17;63:2;69:4,24;71:3,7;82:2,8;84:6;86:22;87:11;93:15;109:9;126:7;157:6;163:2,7;164:12;170:22;197:24;198:4;205:25;209:5;230:7;235:13;236:24;237:4,6
**McCARTHY (20)** 4:15,16,17;7:20;11:8;17:15;19:23;36:23;65:20;73:5;75:21;76:10;84:11;96:23;211:1,2,7;236:10,13;237:20
**McDonough (3)** 72:11,19,23
**McGuire (1)** 175:22
**meager (1)** 221:12
**mean (21)** 11:18;15:24;22:5;47:24;67:10;70:18;72:16;91:3;92:10;111:23;113:13;115:6,8,11;121:20;123:22;180:19,20;186:18;207:20,21
**meaning (6)** 16:19;48:2,3;81:21;112:21;205:15
**means (21)** 71:6;113:4,12;117:24;120:14;127:14;134:18,23;136:25;140:13;144:2;149:7,8;159:7;164:6,7;186:5;193:19;202:8;224:25;233:20
**meant (4)**

16:11;90:25;115:4;188:7
**measure (1)** 191:24
**meat (1)** 116:17
**medical (4)** 6:25;96:8;98:1;99:17
**medication (3)** 121:1,5,8
**medications (2)** 120:24;121:3
**meet (1)** 107:21
**meeting (6)** 58:1,3,9;63:1,22;70:13
**Melrose (1)** 40:1
**member (4)** 9:6,20;32:3;188:18
**members (4)** 21:3,12;35:16;161:14
**memo (5)** 63:16,21,22;64:1;82:9
**memorable (1)** 185:20
**memorialize (1)** 58:17
**memory (4)** 63:4;138:14;139:13,19
**mental (4)** 120:17;128:7;175:14;180:5
**mentally (2)** 236:24;239:7
**mention (3)** 153:22;188:15;226:25
**mentioned (12)** 11:25;12:3;59:2;61:2,16;68:21;74:21;162:8;191:7;219:5;225:11;236:21
**merit (3)** 115:8,11,14
**Mersa (1)** 45:23
**message (3)** 83:2;129:14,16
**met (5)** 23:19;92:17;108:1,3;190:10
**midday (1)** 238:23
**middle (9)** 13:21;23:12;43:5,8;50:15;67:6;178:11,15;239:12
**might (26)** 15:16;26:5,12;28:9,14;31:19;71:14;86:18;94:23;96:13;107:7;114:8;120:7;131:13;137:7;141:4,11;144:23;173:6,22;174:5,7;182:16;189:14;224:11;233:9
**million (2)** 23:24,24
**mind (28)** 15:13;43:14;47:16;51:1;63:5;71:22;72:5;80:2;94:4,9,10;95:18;143:15,16,22;164:14;168:14;169:7,13,17;183:21;191:17;199:19;200:2;210:21;211:21;212:25;213:6
**mindful (1)** 43:3
**minds (3)** 210:2,3;229:4
**mine (1)** 116:9
**minute (3)** 7:22;41:9;170:22
**minutes (7)** 58:16;84:6;90:5;104:2;153:7,22;238:14
**minutiae (1)** 197:17
**mischaracterization (1)** 127:20
**mischaracterize (3)** 128:23;141:18,19
**mischaracterized (1)** 127:21
**mischaracterizing (1)** 227:7
**misconduct (3)** 87:24;88:10;94:1
**misdemeanor (2)** 89:14;210:12
**misdemeanors (1)** 181:8
**misimpression (1)** 101:3
**mislead (3)** 141:20;148:4,6
**misleading (8)** 163:18,23;164:2,5,7,8,11,15
**misrepresented (1)** 236:17
**misrepresenting (1)** 237:1
**miss (4)** 43:16;70:21,23;202:2
**missed (3)** 43:2;239:25;240:13
**misstatement (1)** 155:4
**mistaken (1)** 47:16
**Mm-hm (1)** 178:9
**Mm-hmm (2)** 141:15;196:13
**moment (21)** 6:2,17;19:1;27:1;31:3;37:12;53:24;70:9;79:23;81:11;95:19;97:19;130:23;133:1;167:24;198:20;203:15;218:15;221:1;233:11;240:2
**moments (2)** 103:4;226:21
**Monday (2)** 147:16;185:3
**money (10)** 124:18,21;130:19;131:1,8,16,23;133:22;135:6,15
**month (3)** 92:6;131:19;137:14
**months (9)** 93:15;131:4;172:15;173:5;189:25;190:5,6;192:4;223:4
**more (49)** 11:23;13:25;31:17;41:3,3;50:8;54:22;57:9,12;61:3;81:13;83:14,18;85:13;86:16,17,22;87:14;91:5;92:24;93:1;102:8;113:8;132:4;144:21;152:2,5,9,21;153:4,9,17,20;158:16;159:10;160:20;172:15;173:6;174:6,11;191:18;208:17,24;210:7;219:19;220:6;221:2;225:12;230:24
**Moreover (1)** 100:9
**morning (34)** 4:3,9,11,13,15,17,21,24,25;8:13,14;23:19,20;42:21,23;43:14;61:18;69:3,16,16;86:16;93:20;104:2;106:25;109:4;133:24;134:9;137:17;146:1;233:18,21;237:23;238:16;239:15
**most (17)** 7:11;16:12,15;41:9;69:11;75:6;85:9;148:15;197:2,5,9;206:19;207:1,2,10;218:6;240:11
**mother (4)** 32:1;134:18,22,24
**motion (47)** 40:16;42:10;46:4;52:13;64:16,19,23,24;65:3,4,12;66:13,25;67:1,9,16;72:10,11,14,22;73:14;74:14,19;75:3;78:1;80:6,13,16,18;81:9;83:19;85:24,25;87:25;88:4;95:15,17;100:5;111:8;113:25;114:17,18,19,24;115:3,14;239:10
**motivating (1)** 232:11
**motivation (2)** 221:18;231:1
**motivations (1)** 222:14
**motive (2)** 214:24;231:18
**motives (5)** 222:8;231:4,14,16,23
**mouth (1)** 210:10
**mouths (1)** 229:5
**move (16)** 6:12;7:2;19:11;31:4;34:25;44:6;125:4;145:1;148:8;157:13;173:14;175:19;179:15;180:20;194:4;203:22
**moved (3)** 25:24;89:18;234:25
**moves (5)** 11:3;36:19;65:15;75:18;76:7
**Mrs (1)** 4:14
**much (11)** 29:6;46:8;49:13;109:8;129:15;134:14;135:6,11,15;230:5;240:8
**multipage (1)** 179:16
**multiple (2)** 18:15;54:16
**Murphy (1)** 4:19
**must (7)** 99:21,22,23,25;138:18;203:18;235:2
**myself (16)** 49:13;78:9;137:9;139:4,22;142:21;148:6;149:6;151:20;153:15;155:10;158:15;194:17;199:23;234:7;237:1
**mystery (1)** 71:8

N

**name (27)** 8:5,5,7,18;14:5,6;16:24;17:2;23:22;24:24;25:3;45:21;50:9,10,14;61:4,19;85:22;101:20,20;162:19;179:23;180:1;193:7,8,13;230:18
**named (16)** 14:20;24:6,19;25:18;45:23;55:5,8;61:7,9;67:17;68:19;69:1;70:20;79:12;93:3;116:11
**Namely (1)** 87:10
**names (4)** 13:25;14:2,10;69:7
**Nanette (1)** 4:5
**Nardelli (1)** 175:22
**Nardello (24)** 12:23;13:9,11,12,25;14:3,8,15;15:22;24:22;25:3,8;26:25;29:23;30:4;45:2,3,15;57:18;59:23;66:17,22;88:19,22
**narrow (1)** 50:15
**near (2)** 48:14;178:11
**necessarily (1)** 205:5
**necessary (2)** 99:14,22
**need (12)** 49:12;60:18;71:3;92:12;93:11;97:17;116:8;137:19,25;227:16;239:4;240:6
**needed (4)** 63:5;86:6;96:7;125:24
**needs (1)** 97:14
**negatively (1)** 180:11
**neighborhood (1)** 145:11
**neighbors (1)** 156:14
**Neither (2)** 77:5;196:4
**New (40)** 9:20;23:2,11,25;27:23;40:16;42:10;45:24;46:4;51:19;52:13;54:11;55:5;64:16,19;65:13;71:2;72:10,23;80:6,13,16,18;83:19;85:24;92:10;94:18;100:5;114:19;151:11;157:4;163:13;179:17;189:19;196:9;203:17,20;221:6;230:10,23
**newspapers (1)** 182:1
**next (24)** 20:5;33:12;35:5,12;69:23;78:13;85:11;86:16;90:12;104:7;118:5;131:19;149:15;157:13;186:10,12,14,16,

25;195:2;196:7;220:23; 238:8;239:14
**nexus (2)** 141:13,14
**nice (2)** 67:3;159:3
**Nicole (1)** 4:7
**night (4)** 109:7,8;110:4;156:18
**Nobody (3)** 123:9;166:15;171:3
**nobody's (1)** 192:10
**None (10)** 36:22;136:3;138:4,12, 16,21;211:9;214:14; 215:14,18
**Nonjury (1)** 153:19
**non-responsive (1)** 148:8
**noon (1)** 110:6
**nope (1)** 70:22
**nor (1)** 77:6
**normal (1)** 21:14
**Normally (1)** 44:14
**norms (1)** 183:21
**notarized (1)** 151:1
**note (28)** 4:9,13,17,21;36:11,13, 16,17;37:1,3,4,5,5,7; 38:15;39:6,8;42:22; 59:3;60:6,6;70:19;80:2; 83:11;86:16;88:24; 169:2;214:1
**noted (3)** 49:9;218:1;219:12
**notes (4)** 18:7;35:23;46:11; 131:14
**notice (1)** 53:6
**notions (1)** 218:11
**notwithstanding (1)** 212:9
**noun (2)** 202:15,20
**number (32)** 17:25;18:3;19:9; 20:18;28:21;29:2,6,14; 66:1;87:23;95:2;151:9; 157:20;179:13,16; 180:3;189:3;196:19,21, 23,25;197:1,13,15; 198:9,11;199:20;200:3; 204:18;216:7,20;236:18
**numbers (7)** 125:12;206:6,6,9; 218:16,21,24
**numerous (1)** 94:16
**NYSID (1)** 193:14

**O**

**o0o (1)** 129:5
**oath (14)** 102:1,2;103:3,11,14; 138:24,25;143:14; 156:2;167:3;174:15; 176:16;181:6;220:9
**obey (1)** 117:19
**Object (2)** 106:18;199:12
**objection (66)** 11:5,6,7,8;17:11,12; 19:12,15,19;36:21; 65:17,20;75:20,21,22; 76:9,10,11;77:21;89:20; 96:9;106:2,2,4,19;112:4; 113:2;115:17;117:2; 119:13;122:4;125:6; 134:17;136:15;141:5; 145:3;152:17;154:8; 156:20;159:8;160:24; 161:8;162:7;173:17; 175:23;176:5;179:19, 20;181:24;183:23; 190:14;192:19;194:6,7; 201:4;202:7;203:24; 209:21;211:8;221:20; 226:5;228:19;233:4; 234:10;235:17;236:4
**objective (1)** 205:22
**obligation (3)** 36:3;208:2,9
**observe (2)** 35:19;48:25
**observed (1)** 36:6
**obtain (1)** 13:4
**obtained (2)** 34:16;218:2
**obtaining (1)** 11:21
**obvious (2)** 86:3,5
**obviously (5)** 7:5;99:5;153:10; 181:18;191:9
**occasions (2)** 216:7,20
**occur (8)** 52:20;68:8,11,12; 73:24;79:16;80:23; 191:19
**occurred (5)** 74:9;108:4;161:1,5; 224:11
**October (1)** 180:10
**odd (5)** 42:24;59:3;60:6; 161:2;205:19
**off (9)** 90:23;91:8;110:5; 136:22;137:5;185:8; 188:1;211:16;235:3
**offense (3)** 215:7,8,11
**offenses (4)** 215:7,8,17,17
**offer (2)** 85:12;176:1
**offered (2)** 211:4,4
**offering (1)** 211:6
**offers (1)** 17:9
**offhand (1)** 138:9
**office (7)** 5:6;11:19,20;12:2; 27:23;70:4;137:20
**officer (6)** 47:13;121:18;123:10, 11;157:4;216:6
**official (2)** 144:18,19
**often (3)** 67:7;157:1;230:20
**OK (6)** 157:21;158:11; 160:13;165:5;171:24; 229:14
**OKULA (100)** 4:3,3;6:15;7:16;30:22; 95:3;99:11;100:15,18; 102:14,15;106:2,4,19; 112:4;113:2;115:17; 117:2;119:13;122:4; 125:7;130:4;134:17; 135:9;136:15;141:5; 145:4;152:17;154:8; 155:7;156:20;159:8; 160:24;161:8;162:7; 173:18;175:23;176:5; 179:20;181:24;183:23; 190:14;192:19;194:7; 195:2,17;197:1,11,19; 198:3;199:5,11,12,15; 200:6,22;201:4;202:7; 203:24;204:5,6,16; 205:3,9;209:19;211:9, 12,13,15;221:1,22; 222:23;223:16,19,21,22; 224:17;225:10;226:5; 228:19;230:14;231:1, 14;232:9;233:4,6; 234:10,22;235:17;236:4, 14,15;237:15,25;238:11, 21;239:13;240:2,10,17
**Okula's (2)** 223:13;226:1
**old (4)** 47:8;49:3;189:20; 190:24
**older (1)** 162:17
**omission (9)** 78:8;142:12;143:17, 25;144:1;208:12,13; 209:1;230:1
**omissions (6)** 103:18,19;167:10; 208:16;228:4;229:24
**omit (1)** 142:1
**omitted (7)** 142:2;143:12,15,21; 171:6;183:18;230:23
**omitting (1)** 143:23
**Once (7)** 98:11;99:4;181:13; 196:8;212:25;224:11; 230:21
**One (88)** 10:7;11:18,25;12:18, 18;16:9;20:11;21:9,14; 22:5,7;26:10,14;29:13; 31:23;32:12;38:19; 39:21;41:8;45:14;49:9; 50:7;53:6,24;54:16,22, 23;56:12,15;60:1;62:4; 66:7;67:10;69:7;80:13; 83:18;87:4;88:12;93:3, 3;94:11;102:8;107:5,7; 124:16;126:15;134:3; 144:21;151:23;153:19; 155:25;156:1,14; 159:10;166:20,23; 170:20;171:1;172:8; 182:8,10;183:4,8; 184:18,19;185:23; 192:15;194:13;201:1,2, 23;205:10;206:16; 208:15;210:16;212:15, 21;215:22;218:15; 221:1;222:14,17;225:8; 229:10;231:4,14,15,22
**ones (5)** 14:11;16:15;162:20; 225:2,10
**One's (1)** 174:10
**ongoing (1)** 180:12
**online (1)** 93:18
**only (25)** 6:3;58:2;70:15;72:4; 85:12,16;94:15;124:15; 135:1;137:7;142:2; 172:1;173:4;182:5; 183:5;193:25;195:17; 199:8,17;200:8;217:14; 224:23;225:2,5;239:3
**open (6)** 62:8;82:20;98:16; 129:17;133:18;177:21
**opened (2)** 83:16;98:9
**opening (2)** 69:15;92:21
**open-minded (1)** 15:3
**operational (1)** 11:16
**opinion (9)** 41:10,13;42:9;73:2,6; 135:1;202:14;228:21; 235:4
**opinions (1)** 60:22
**opportunities (1)** 48:25
**opportunity (3)** 84:12;98:7;195:6
**opposed (4)** 131:18,18,19;148:1
**opposite (2)** 232:9;233:17
**oranges (1)** 224:9
**OR'd (1)** 186:7
**order (42)** 6:13;24:1,2,3,5,8,19; 25:9,10,14,19;40:10,13, 16;42:11;61:7;101:1; 102:16,17,19;105:1,15, 18,20;106:14;107:13; 117:15,19;125:25; 130:15;153:4;168:15; 170:5;175:21;184:12; 190:19;212:1;225:20; 232:4,12;240:4,14
**ordered (8)** 99:6;110:25;118:8; 119:10;120:4,11;123:6, 13
**ordering (1)** 116:19
**orders (4)** 55:7;61:2;80:9,17
**original (1)** 208:11
**others (2)** 41:1;228:12

**otherwise (2)**
101:1;167:14
**ourselves (1)**
101:5
**out (44)**
24:17;28:24;39:19;41:10;50:6;51:13;55:24,25;60:1;69:9,24;71:15;80:9;83:12;84:16;86:15;92:13;100:14,15;101:12;107:24;118:1;126:5;129:25;133:17;137:22;141:4,11;146:2,2;153:25;170:5,9,14;174:13;179:9;190:7;199:6,15;206:25;212:1;218:10;221:15;240:4
**outcome (1)**
214:24
**outright (1)**
181:11
**outset (1)**
141:2
**outside (5)**
34:11;36:7;58:13;164:18;170:17
**outstanding (3)**
89:17;202:3;210:14
**over (24)**
28:24;29:4;35:7;40:7;43:24;49:16;59:18;70:4,6,7;77:3;92:6;96:8;116:15;129:9;135:17;165:4;177:4;178:21;184:15;193:21;206:5;208:1;230:7
**overriding (2)**
99:21;100:8
**overrule (1)**
106:22
**Overruled (16)**
113:3;119:14;122:8;135:10;141:6;154:9;155:9;156:21;162:9;177:23;183:24;192:20;199:14;202:9;226:6;235:18
**overseeing (1)**
11:16
**oversight (1)**
155:6
**overstated (1)**
91:4
**overstates (1)**
87:11
**overwhelming (1)**
159:5
**own (16)**
15:13;29:24;44:17;47:16;78:3;100:11;112:15;123:15;136:23;138:11;160:8,14,15;162:16,22;164:12
**owned (10)**
138:3;162:2,5,14,25;163:21,23,25;164:12;207:8
**ownership (1)**
138:15
**owning (1)**
168:3
**owns (2)**
162:22;163:19

**P**

**Pacer (2)**
114:20,22
**page (59)**
17:6;18:19;19:3;20:11;21:23;22:1,10;24:2;26:18;31:3,4;33:12;39:11,11;40:19,21;42:12,13,19;48:11;50:24;51:16,23;53:21;54:7;55:10;66:6;77:3,3;78:13;82:15,16,21;104:7;125:10,11,11;126:13,13;130:21;131:10,13,15;132:5;138:10;145:7;149:15;151:9,9;157:18;172:8;176:11;178:10,16;180:3;186:25;199:22;220:23;226:23
**pages (4)**
18:23;19:10;20:5;63:15
**paid (1)**
25:16
**pancreatitis (2)**
176:14,18
**panel (9)**
17:20;23:15;28:24;29:5;172:5;173:22;188:20;191:3;208:6
**panels (1)**
208:6
**panic (1)**
6:23
**paper (2)**
10:11;65:9
**papers (3)**
74:19;102:16;177:3
**paragraph (7)**
77:5;178:11,14,15,15;181:3;202:1
**paralegal (5)**
7:13;12:14;14:4;41:8;45:4
**paralegals (6)**
9:17;12:11,18,18;13:23;39:25
**pardon (1)**
122:24
**parents (2)**
148:23;152:25
**parents' (2)**
161:23;196:22
**Parkview (5)**
196:3,9,11,23;198:10
**parlance (1)**
116:25
**parochial (1)**
100:11
**Paroled (1)**
190:7
**Parse (28)**
4:20;8:21,22;11:1,14;28:4;30:7,15;35:10;39:17,18,22,24;40:4;42:22;63:19;113:23;136:13;199:7,16,20,25;203:3;213:12,24;214:7;220:3,17
**Parse's (3)**
4:22;15:6;206:12
**part (26)**
11:16,17;26:25;28:12;40:4;45:9;53:21;54:8;74:3;82:8,9,19;97:18;120:12;124:1;140:5;154:18,20;178:1;180:9;188:15;218:6;224:15,15;230:10;231:3
**partial (1)**
220:16
**Partially (2)**
222:16;231:25
**participants (1)**
58:2
**participated (5)**
67:2;74:11;79:11;191:12,16
**participating (1)**
67:8
**participation (1)**
67:14
**particular (9)**
14:17;15:11;30:14;33:6;44:7;54:25;177:17;216:24;222:1
**particularly (3)**
28:4;30:23;43:3
**parties (6)**
7:15;74:12;97:5,16;98:7;129:16
**partly (2)**
124:10;232:10
**partner (6)**
9:6,8,8;12:1;42:2;43:12
**partners (1)**
9:18
**party (6)**
72:23;83:19;98:12;99:20;212:15;215:23
**past (2)**
32:23;147:19
**paste (1)**
199:2
**pasted (5)**
42:17;45:18;198:18,21,25
**pathological (1)**
239:6
**Paul (4)**
4:7,19;212:17;219:17
**Pauley (84)**
33:6;34:10,16;37:3,17;74:17,21;75:2;77:25;104:1;105:12,19;107:13;109:20;110:23,25;112:22;113:7;114:17,23;115:21;116:19,20;117:6,10,23;118:7;124:2,11;126:14,22;128:4,13;130:15;131:1,5;132:9,12;133:3;138:23;139:3;140:10,16;141:8;143:5;144:4,8,8,11,15,19;145:9;151:6,16,23;153:13;157:22;158:8;160:4;165:7,9,24;174:1;185:4;187:24;188:6,14,17;194:21;196:25;199:19;200:4,21;214:3,8;216:20;217:23;219:24;220:7,18;222:18;223:5;224:18;226:7
**Pauley's (14)**
104:4;105:22;113:21;183:15;216:4;221:24;224:20,23;225:1,5;227:5,12;228:3,7
**Pause (1)**
130:25
**pay (5)**
124:18,21;137:14,18;219:9
**paying (1)**
131:19
**penance (1)**
192:5
**pending (7)**
38:17;51:14;52:18;53:1;60:8;98:9,16
**penetrate (1)**
128:6
**penitentiary (1)**
163:14
**people (30)**
11:25;13:21,25;15:24;45:5,8,13;56:12;77:19;82:17;87:4;91:23;93:2,3;122:5;128:7;168:17,20,23;179:17;181:23;187:18,21;194:23;203:6,12;206:19;209:9;210:22;238:13
**people's (1)**
210:2
**per (1)**
231:3
**percent (3)**
199:8,17;214:10
**peremptory (3)**
30:3;32:13;86:8
**perfect (2)**
62:7;239:4
**perfectly (1)**
100:24
**performed (1)**
192:7
**Perhaps (5)**
5:10;45:13;56:7,11;209:10
**period (7)**
5:11;11:12;53:19;88:13,18;181:9;182:13
**perjure (2)**
192:9;231:6
**perjured (5)**
192:16;227:21;232:23;235:9;236:20
**perjuring (1)**
239:9
**perjury (7)**
228:21;231:11;233:3;234:3,14;235:11;237:1
**permanent (4)**
158:4,6;159:20;160:7
**permitted (3)**
68:2;98:12;167:15
**perpendicular (1)**
35:8
**person (53)**
11:13,15;14:7;16:25;18:3;34:9;43:17,21;46:5,15;47:21;50:3,5,10;54:13;55:2;56:15;61:21,24;62:1,4,10;65:6;69:9;70:23;71:18,23;72:2;75:8;79:15;80:2;86:1,1,13;90:15,24;91:2,6,16;92:9;94:7;106:13;119:10;120:4;134:15;135:1;154:22;158:16;193:13;200:25;201:1;210:16,16
**personal (25)**
38:16,20,23;39:1;51:13;60:8,10;98:1;131:25;132:6,12,13,18,22;133:10;159:10,15;187:4;191:18;212:1,17,21;214:12,15;218:5
**personally (5)**
25:7,8;214:6;219:2,5
**perspective (1)**
229:15
**pertinent (2)**
171:6;191:9
**petit (1)**

179:25
**petition (7)**
177:15;178:1;181:3,3, 4;191:20;224:3
**phone (11)**
5:14,15;95:2;184:15; 196:19,22;197:13,15,18; 198:9,11
**phonecalls (1)**
184:14
**phoned (1)**
5:14
**phrase (2)**
26:7,8
**physical (2)**
175:14;187:19
**physically (2)**
18:14;187:20
**physician (1)**
6:9
**pick (5)**
93:14,15;211:16; 213:11;228:17
**picked (7)**
45:10,14;56:12;210:7, 9;228:7,14
**picture (2)**
129:15;206:16
**piece (1)**
23:8
**pieces (2)**
20:10;91:12
**pinpoint (1)**
172:22
**pique (1)**
232:15
**piqued (5)**
222:9;231:15,23; 232:2,13
**PJI (5)**
223:6;225:9;226:24, 25;227:2
**place (13)**
9:4;32:21;34:23; 59:10;64:6;69:15;70:14; 92:15;128:24;158:17; 168:4;185:16;192:22
**places (9)**
91:14;149:12;150:5,7; 153:15,16;159:20,24; 160:1
**plaintiff (4)**
60:10;149:9;153:22; 187:4
**plaintiffs (2)**
149:10;153:24
**plaintiffs' (1)**
218:8
**plan (2)**
7:2;178:22
**planners (1)**
207:15
**plant (1)**
96:1
**plausible (2)**
13:19,22
**play (3)**
10:24;129:16,21
**players (1)**
111:7
**playful (1)**
197:22
**playing (1)**
198:7
**plaza (4)**
58:12,13;87:16;92:17
**plead (2)**
102:4,7
**pleaded (1)**
181:7
**pleasant (1)**
207:24
**please (19)**
55:16;97:8;116:13; 119:15;122:9;123:20; 132:21;141:7,24; 159:25;161:9;163:10; 169:11;170:8;191:13; 197:25;198:8;200:12; 235:19
**pleasure (1)**
195:9
**plenty (1)**
48:24
**plucked (2)**
55:24;91:13
**pm (8)**
55:11,13;57:10;58:6; 62:5,15;83:7;129:7
**PMD (37)**
31:1;36:24,25;64:23; 65:2,16,21,24;125:8,9; 145:1,5,6;173:15,19,20; 175:19,24,25;176:1,6,7; 179:15,21,22;194:4,8,9; 203:23,25;204:2,19,20; 211:3,6,10,11
**PMD3 (1)**
125:5
**PMD40 (3)**
36:15,15,20
**PMS (1)**
121:4
**podium (4)**
88:15;97:8;209:16,23
**point (45)**
10:24;24:21;25:24; 27:6,10,20,23;28:12,15; 29:11;30:10,15;31:23; 33:8;34:6;41:16;45:3; 49:18;50:1,12;55:4; 56:4;60:16;61:14;67:5, 15;69:18;72:25;79:25; 83:15;90:18,20;92:20; 93:6,22;103:14;107:24; 126:10;165:22;167:5; 168:2;173:14;192:3; 205:10,14
**pointed (1)**
51:13
**poles (1)**
16:17
**police (6)**
156:23;157:1,4;180:1; 185:22;216:6
**popped (1)**
70:21
**pored (1)**
206:4
**portion (2)**
57:1;239:2
**portions (1)**
47:25
**portray (3)**
152:8,20;153:4
**portrayed (1)**
210:17
**Pose (2)**
123:20;171:16
**posed (2)**
113:19;172:2
**posing (1)**
171:2
**position (5)**
35:13;121:21,24; 122:2;188:3
**possessed (1)**
18:14
**possession (5)**
67:17;80:7;95:17; 189:9,16
**possibilities (5)**
71:17,21;72:5,9;94:5
**possibility (33)**
43:16;59:15;60:1; 61:14;62:9;63:2,10; 71:11;72:2;74:10;86:18, 21,24;87:7,13,24;88:10; 90:18,20;91:2,6,7,11; 92:13,24;94:6,11;96:13; 233:8,23;234:2,13;236:6
**possible (9)**
28:11,19;50:5;58:25; 62:4,9;70:10;71:14; 94:25
**possibly (2)**
34:7;145:14
**Post-it (1)**
18:7
**post-trial (2)**
25:17;87:25
**potential (8)**
28:24;29:9,11;49:23; 62:22;88:12;165:12; 191:14
**potentially (3)**
62:10;80:3;92:10
**power (2)**
105:7,20
**practice (11)**
21:17;44:19;54:18; 55:9;64:8;79:13;150:18; 175:13;176:22;177:1; 218:4
**practicing (4)**
89:16;135:7,11,12
**precise (1)**
57:15
**precisely (2)**
48:7;140:17
**prejudged (1)**
213:2
**prejudice (3)**
140:23;217:24;220:10
**prejudiced (2)**
99:22;100:9
**prelitigation (1)**
9:13
**preparation (2)**
65:4;76:25
**prepare (1)**
8:17
**prepared (3)**
5:7;107:12;238:19
**preparing (6)**
11:13,16;12:11;20:15; 80:15;85:24
**preprinted (1)**
195:18
**prescription (2)**
121:5,8
**presence (6)**
4:9,14,18,22;34:11; 36:7
**present (11)**
4:7,12,20;58:9;102:5; 113:9;161:16;168:14; 169:7,13,16
**presented (3)**
129:10;217:3,22
**President (2)**
116:11,23
**Presiding (1)**
175:21
**Presley (1)**
99:25
**pretty (6)**
28:6;61:20;64:10; 185:20;223:15;235:6
**preventing (3)**
67:23;73:21,24
**previous (1)**
83:6
**previously (4)**
40:7;44:18;68:21; 218:12
**primarily (5)**
11:13,15;65:6,7;218:5
**primary (2)**
72:17;73:8
**printed (1)**
80:9
**printout (1)**
20:6
**printouts (1)**
10:19
**prior (9)**
32:15;48:8;99:2; 100:8;150:10;165:11; 211:22,22;216:2
**prison (6)**
94:19;181:23;189:5, 25;190:4,8
**private (1)**
13:1
**privilege (3)**
102:9,19;233:25
**pro (7)**
15:16;16:15;26:4,7, 11;87:18,18
**probability (1)**
233:14
**probably (43)**
16:22;18:15;27:6; 53:3;60:13;83:10; 103:16;105:8;116:1,3; 122:19;125:23;126:4; 128:1;135:20,21;138:6, 22;139:6;146:20;152:2; 153:17;154:5;155:1; 156:7,16,22,23;168:16; 174:18;185:6,10; 189:20;192:21;198:18, 21;199:2;205:17; 209:13,14;210:21; 225:7;239:7
**probation (4)**
33:1,3;94:16;189:12
**problems (2)**
139:13,19
**procedure (2)**
96:8;100:19
**procedures (1)**
112:15
**proceed (5)**
7:2,13,15;54:4;102:22
**proceeding (10)**
59:13;85:4;98:15; 99:24;100:10;102:21; 103:1;128:18;191:8,12
**proceedings (8)**
98:4,5,20;99:17; 113:22;181:20;191:16; 216:10
**process (13)**
5:25;6:22;12:20; 13:15;29:2;76:19; 108:12;154:18,20; 167:17;231:10;234:14, 20
**processing (1)**
11:22
**produced (1)**
81:24
**product (1)**

44:15
**production (1)** 82:1
**professional (1)** 210:20
**professor (2)** 143:19;227:3
**profiles (2)** 10:19,21
**pro-government (1)** 26:12
**program (2)** 179:9;180:11
**programs (1)** 174:13
**promise (2)** 57:1;186:9
**promptly (1)** 36:4
**proof (1)** 187:19
**proper (4)** 175:4;202:15,17,19
**property (3)** 66:7;189:6,22
**propose (1)** 19:10
**proposing (2)** 71:13,14
**prosecution (8)** 15:17;16:15;30:20;87:18;111:9;114:1,17;229:12
**prosecutor (1)** 195:15
**prosecutors (9)** 193:16,18,20,25;194:1,11,15,19;214:18
**prospect (1)** 116:20
**prospective (24)** 11:21;13:5,6,16;14:22,24;15:23,25;17:7;19:7;20:9;28:9,18,21,25;30:11,13;31:6,11,24;34:8;61:21;69:8;103:9
**protect (1)** 99:23
**protection (1)** 184:12
**protocol (1)** 39:20
**provide (1)** 56:4
**provided (3)** 13:8;54:19;126:17
**provides (1)** 20:18
**providing (1)** 15:22
**psychiatric (1)** 176:23
**psychological (1)** 100:7
**psychologist (12)** 107:3;109:3;113:5,23;115:20;117:3;119:19;120:12,15;121:19;128:5,6
**public (18)** 14:1;23:10;28:22;32:24;33:4;66:20;69:11;98:4,10,21;99:20;100:3,10;101:6;114:21,22,25;115:2
**publicly (4)** 13:4,10,12;97:15
**pull (3)** 31:2;70:5;95:10
**pulled (2)** 21:6;55:25
**pulling (1)** 55:2
**punched (1)** 183:10
**purist (1)** 218:24
**purpose (9)** 29:16;88:22;98:6;137:23;140:10,20,21;157:11;238:20
**purposes (3)** 29:13;98:15;193:10
**pursuant (2)** 48:5;130:14
**pursuing (1)** 93:7
**put (27)** 64:6;78:11,11,11;79:2,3;81:20;82:4;94:25;123:4;133:20;151:21,23;152:18;161:9;196:8,11,20;197:1,8,13,15;201:8,11;210:10;229:4;235:3
**putting (5)** 78:3;198:9,11,13,16

**Q**

**qualification (1)** 126:3
**qualifications (1)** 126:2
**qualified (1)** 124:12
**qualify (3)** 125:24;172:4;210:5
**quantum (1)** 171:2
**quarrel (1)** 26:7
**questionnaire (2)** 13:17;24:15
**quick (3)** 70:2;83:12;238:25
**quickly (7)** 20:10;23:20,23;47:6;61:20;132:2,4
**quite (1)** 43:7
**quote (5)** 111:5;118:23;120:10;199:5;218:24
**quote-unquote (1)** 121:20
**quoting (2)** 100:1;235:23

**R**

**rabbit (1)** 60:17
**raise (6)** 31:23;32:5;63:12;129:25;207:15;240:16
**raised (2)** 36:9;191:10
**raising (4)** 30:22;31:8;87:24;88:10
**ran (2)** 187:5,5
**random (4)** 17:25;18:3;24:18;228:11
**randomly (1)** 24:12
**Randy (9)** 11:18,25;12:13;14:4;23:21;27:17;40:1,25;41:18
**Randy's (2)** 13:15;14:21
**range (1)** 18:23
**rare (1)** 53:8
**rather (2)** 91:1;221:12
**rating (6)** 25:22;26:1,2,14,16;27:13
**ratings (1)** 27:13
**rational (13)** 106:17,24;107:2,4;110:17;120:11,14;121:25;122:3,17;128:10;184:17,19
**rational/irrational (1)** 122:5
**reached (5)** 47:6;165:17;205:6;214:7;219:2
**reaching (1)** 218:12
**reaction (2)** 128:1,2
**read (16)** 31:4;37:2,3,12,18;39:8;41:19;72:14;83:6;122:11,13,14;132:2;134:8;210:2,3
**readily (1)** 44:18
**reading (11)** 37:17,18;72:15;73:1;118:20;119:1,4;145:13;173:1;199:18;200:5
**readmission (1)** 224:3
**ready (7)** 7:12,15,17;221:3;238:14;239:5,13
**real (2)** 198:13,15
**reality (1)** 16:22
**realize (1)** 91:13
**realized (1)** 91:24
**really (39)** 45:14;47:18;49:21;56:7;70:12;71:5;99:14;113:11;117:24;121:21;127:3,14;142:15;151:22;152:11,23;160:21;162:21;163:2;164:6;168:13;170:17;172:18,20;186:21;188:5;192:5,11;194:3;195:3;200:2,2;203:5;208:1;209:25;231:5;234:7,15;236:7
**reason (23)** 5:20;6:11;12:9;25:1;33:10;34:1;47:4;88:3;91:4;108:18,20,23;109:1;124:4;153:7;175:14;187:16;195:14,15;198:25;203:5;237:22;239:4
**reasonable (2)** 99:23;210:8
**reasons (3)** 26:14;232:17,25
**recall (76)** 14:16;17:21;22:3,5,6;23:25;30:18;31:10;32:9;33:4;54:21;58:14;59:1;60:4,5;67:14;72:15;73:1;81:14;85:2,7;90:15;92:21;94:4;103:7;110:19;111:15,17;114:4;115:5,5,7,10,12,13,24;118:10,11,13,13,15,17,22;119:5,7;124:13,13,14,20;130:16,20;131:3,7,21;135:16;138:7;139:2,7;142:25;143:2,7;150:13;156:10;168:19;170:17,19,22;182:10;188:17,19;199:21;204:23;213:19;215:12;217:5;218:21
**recalled (1)** 41:18
**receipt (3)** 87:22;88:5,8
**receive (6)** 55:17;64:1;107:16;110:22;116:20;117:10
**received (55)** 5:11;11:9;13:16;14:20;17:7,16,18,22;18:9;19:24;20:1;23:16;30:7;36:24,25;48:19;65:22,23,24;70:1;75:23,25;76:12,14;80:1;88:24;97:13;109:21;110:19,24;125:8,9;129:11;133:23;134:9;145:5,6;173:19,20;175:24,25;176:6,7;179:21,22;194:8,9;204:1,2;211:10,11;216:19;217:15;221:12;223:3
**receiving (5)** 113:9;117:6;180:8;189:6,22
**recent (1)** 41:9
**Recess (11)** 6:19;84:3,18,20;128:25;129:2,4,9,13;192:25;193:2
**recognizance (1)** 186:3
**recognize (9)** 10:15,21;17:5,6;18:21;19:3;36:16,17;72:12
**recognizing (1)** 106:14
**recollection (11)** 12:7;31:5;58:12,21;69:3;70:7;77:1;83:12;93:16;111:12;131:22
**recommended (2)** 180:14,16
**reconvene (1)** 192:25
**record (17)** 14:1;32:16;66:20;96:1;97:10,15;98:8;101:2;114:21,23,25;115:2;116:1,2;121:16;122:14;212:13
**records (10)** 44:15,16;66:7,8,8,8,10;69:11;98:5;100:6
**recovery (1)** 178:22

RECROSS-EXAMINATION (1) 95:23
redacted (8) 46:25,25;47:25;48:1, 5,15,19,21
redirect (5) 89:24;90:1;222:24,25; 236:9
refer (9) 24:8;25:14,20;37:15; 38:2,4;77:10;116:14; 235:15
reference (6) 25:12;27:2;41:5; 62:16;78:5;133:25
referenced (3) 52:13;61:2;213:15
referred (7) 166:20;207:21;208:4; 213:19;218:16;219:4; 221:17
referring (14) 22:21,22;36:13;39:15; 41:24;83:3;111:14,16, 19;199:7;206:7,12,15; 223:10
refers (2) 20:21;40:13
reflect (1) 12:7
reflecting (1) 91:9
refresh (2) 131:21;138:14
refreshes (1) 31:5
refreshing (1) 111:11
refuse (1) 131:1
refused (3) 131:8;133:8;138:25
regard (2) 98:2;121:1
regarding (4) 7:4;97:12;98:1;227:11
regret (4) 74:5,5,8;79:17
regular (1) 158:18
rehabilitated (1) 32:24
reinstated (5) 150:18;176:22;177:1, 6,9
reinstatement (7) 177:3,12,13,15;178:2; 191:20;224:3
reject (4) 121:12,12;122:20,21
rejected (1) 176:22
rejecting (1) 123:5
relate (1) 66:2
related (4) 40:22;42:14;100:7; 176:18
relating (1) 179:16
relative (1) 191:4
release (1) 238:4
released (2) 186:3;237:24
relented (1) 214:2
relevance (5) 98:13;135:9;156:20; 175:8,11
relevant (9) 73:7,8,17;74:4;81:8; 128:18;138:2;173:4,11
relied (5) 11:23;28:23;29:21,21; 30:1
reluctant (1) 229:25
remember (105) 12:5;15:11;29:7,8; 30:13,13,22,22,23;31:8, 8,9;38:22;43:7;58:21; 61:1;62:24;63:4;68:17, 21;69:5;73:4;78:9; 79:11;83:10;85:14,15, 19;90:5,24;94:2;109:17; 111:3;115:23,25; 117:25;118:5,25;119:3, 5;121:15;124:17; 125:20,22;126:20,22; 138:8;139:8,11,16,21; 140:1,4,7,9,13,14,16,20, 24;142:16;144:1,3,23, 25;156:1,4;161:5; 165:17;166:3,4;167:24; 169:23,25;170:2,9; 172:12;182:15,20; 185:21;189:14;190:25; 199:8;205:22;206:20; 211:19;213:13,16;215:4, 8;216:19,24;217:1,1,15, 17;218:17;220:7,11; 221:24;223:2,4,23; 224:18,19
remembered (3) 25:12;59:8,13
reminded (1) 121:10
remission (3) 175:3,3;177:10
remote (6) 59:15;63:9;71:15; 86:24;87:14;92:13
render (2) 217:21;225:22
rendered (7) 128:16;132:16; 133:12;134:6;137:10; 148:7;169:16
rendering (5) 154:11;192:12; 226:11;227:18;237:8
renderings (1) 175:18
renew (1) 239:10
rent (4) 131:19;137:15;160:8, 14
repeat (5) 112:14;119:15;140:8; 141:7;159:25
repeatedly (5) 192:17;227:22; 232:23;233:9;234:20
rephrase (5) 77:24;132:21;141:24; 221:22;235:19
replaced (2) 34:22;96:9
replied (1) 138:4
report (79) 5:1,8;6:9;9:17;17:20; 45:10,18;46:5,7,8,10,17, 21;47:15;48:9,12;49:5,7, 8,18;50:2,3,6,9,24;51:8, 19;53:21;54:8,10,13,15, 19,20,24;55:24;56:5,13; 59:20;60:7,9;61:25; 62:2,3,20;63:24;70:17, 24;71:1,5,22;80:12,15; 82:17,18;83:1,5,7,9,16; 87:1;91:16,20;92:18,21, 23;93:2,8;173:16; 177:18,24;178:1,4,6,8, 11;180:4,15,23
reported (8) 38:16;46:10;50:17,18; 51:3;54:13,14;180:10
reporter (5) 8:6;101:20;122:11,12; 145:15
reporting (6) 6:3;54:16;55:1,14; 56:15;91:15
reports (3) 52:1;54:10;55:4
represent (1) 38:7
represented (5) 8:15,22;107:19; 149:10;153:24
representing (1) 10:4
reputable (2) 152:2,5
request (4) 42:14;98:3,18;114:19
requested (1) 237:11
requesting (1) 100:22
requests (1) 99:16
require (1) 107:14
required (2) 43:11;102:25
requires (1) 217:10
research (9) 14:3,11;24:22;25:3; 29:23;44:25;57:19; 59:23;90:14
researched (1) 94:23
researching (3) 28:12;29:13,16
reside (4) 145:11,21;147:24; 151:10
resided (11) 145:17,18;147:25; 149:11;150:4,4,5,7; 151:16;154:24;155:24
residence (8) 6:2;144:21;151:10; 159:20;160:7,7;168:3; 172:1
residences (6) 151:20;155:10,14,18, 21;158:15
resisting (1) 183:13
resolved (3) 52:19;53:1,19
resource (1) 28:23
resources (2) 133:17;237:5
respect (18) 30:19;31:11;58:19; 83:18;95:15;102:20; 108:11;200:15;212:2, 22;213:7,12;214:7,12; 218:17;220:6;221:19; 227:13
respectfully (2) 6:12;102:17
respecting (1) 88:11
respective (1) 97:17
respond (3) 199:13;200:18;239:13
respondeat (7) 37:8,20;38:21;42:25; 60:12;169:2;240:14
responded (1) 45:7
responding (3) 47:18;114:18;119:17
response (14) 40:8,9;41:8;55:13,22; 70:6,12;76:4;118:13,17; 119:10;143:8;157:14; 184:22
responses (6) 43:9,19;59:5,6;60:4; 64:20
responsible (4) 11:13,15,17;65:6
responsive (2) 113:17;183:15
rest (4) 8:20;14:14;35:8;239:2
restart (1) 96:11
restate (2) 169:11;170:8
result (1) 219:1
results (1) 77:6
resume (2) 129:3;130:1
retain (7) 126:15,18;139:4,4,9, 21;199:23
retaining (1) 118:23
retired (7) 161:15;162:11,12; 163:3,8,19,24
retrospect (1) 191:7
return (5) 135:23;136:5,8;196:8; 213:16
returns (1) 136:2
reveal (7) 36:3;140:3;141:22; 167:6;185:1;212:13; 229:1
revealed (4) 98:15;166:11;172:6; 184:21
revealing (1) 184:2
review (10) 10:15;22:8;42:19; 49:18;68:6;73:14;76:20; 83:1;95:5;178:4
reviewed (16) 43:19;49:20;55:4,6,7; 59:8;62:20;70:17,22; 73:11,12,13;83:9;92:18, 23;97:4
reviewing (2) 23:25;50:1
revised (1)

73:11
**revisit (1)**
96:12
**Richard (13)**
9:2,6,9,17;12:1;16:1;21:11;38:7;44:24;63:19;67:20;77:2,5
**ridiculosity (1)**
112:12
**ridiculous (11)**
111:9;114:1,9;115:3,6,19;123:18,19,22,23;203:12
**right (116)**
6:11,18;28:10;33:2;35:11;36:1;37:24;48:7,17,25;49:3;52:10;54:14;62:13;63:8,13;67:1;72:5,23;73:23;74:19;77:19;80:18;81:9;91:21;92:1,6;94:21,24;95:6,9;97:11;99:3;105:13;106:23;107:25;115:11,13;121:25;124:9;125:3,11;126:13;129:23;130:3;131:6,13;133:15;140:7;142:4;143:13;144:20;147:15;148:14;154:4,7;156:19;157:8;158:1,12,21;159:7;163:9;164:8,19;165:3,14,21;166:6,14;167:22;171:13;172:3,9,21;175:9;177:7,10;180:18;181:4;182:14;183:19;185:9,20;186:1;188:9;190:22;192:24;193:15;195:2,9,13,18;196:14,20,22;197:16,24;199:10;203:25;206:25;208:7,20;209:13;211:10;221:23;223:25;225:8,11;226:22;228:5;229:17;235:5;238:20;239:19;240:4
**right-hand (1)**
180:3
**rights (2)**
100:9,21
**ripping (1)**
137:5
**rival (1)**
184:13
**Robert (8)**
46:2,18,22;47:5,9,12,17,21
**role (7)**
10:24;14:17,19;60:15;76:18;118:9;218:10
**roll (2)**
17:7;18:9
**romantic (1)**
184:13
**room (2)**
169:9;194:22
**ROR'd (2)**
186:6,8
**Rosa (7)**
6:7,7;179:18,23;180:1;193:8,9
**Rosa's (1)**
66:8
**Rotert (20)**
4:11,11,13;7:19;11:6;17:14;19:22;65:19;75:22;76:11;77:7;84:10;96:22;99:12;204:9;236:9,11;237:18,19;240:20
**route (1)**
239:14
**Rule (4)**
4:16;6:12;187:1;213:4
**ruled (2)**
69:9;177:22
**run (2)**
45:15;69:4
**rushed (1)**
68:20

**S**

**Sachs (6)**
30:12,16,19,25;31:7;175:21
**same (51)**
20:18,21;21:24;34:9;43:15,17,21;45:12;46:15;50:5,21;51:5;54:19;56:9,14;59:10;61:21;62:4,10;69:9;70:23;71:18,23;72:2;79:14;85:22;88:5,18;90:15,24;91:2,6,16;102:1;103:3;112:18;127:10;146:6;147:9,10;148:23,24;151:6;158:25;164:4,14;165:11;183:19;223:7;226:23;231:11
**San (2)**
11:19;12:2
**sanctity (1)**
200:15
**sandbag (1)**
95:25
**sane (1)**
123:1
**Saranta (2)**
52:11,14
**sat (4)**
35:5;46:11;92:5;222:11
**save (2)**
19:16;89:21
**saved (1)**
23:6
**savings (8)**
130:19;131:2,8,17,23;133:22;137:17,18
**saw (13)**
21:1;22:2,6;24:4,5;25:9;70:25;80:8;82:7,7,8;116:16;219:22
**saying (25)**
41:18;47:20;59:1;60:5,23;75:7;85:14,15;91:17;108:20;115:23,25;118:25;119:3,18;123:6;127:13;131:20;140:24;163:18;177:9;205:24;206:2,20;227:19
**saysAttached (1)**
45:10
**scale (1)**
135:5
**scene (1)**
183:13
**SCHECTMAN (19)**
36:22;48:4,7;53:3;65:18;72:6;75:20;76:9;204:11,12,15;209:17,22,24;210:25;211:16;215:2;218:20;219:4
**Schectman's (1)**
218:17
**schedule (1)**
7:8
**scheduling (1)**
7:5
**scheme (2)**
28:6;166:2
**Schoeman (7)**
69:5,10,10;70:3,8;77:14;78:6
**school (14)**
12:8;32:24;33:4;37:24;42:4;93:14,16;120:3;158:4,5;167:25;171:13;218:2;240:7
**screaming (1)**
156:18
**screen (4)**
10:12;31:3;65:1;196:7
**SCt (1)**
100:1
**sealed (1)**
98:5
**sealing (1)**
99:9
**Sean (1)**
8:19
**search (11)**
14:1;23:23;24:25;25:8;41:24;45:5,8;77:6,14;78:6;85:20
**searched (1)**
23:12
**searches (7)**
13:24;23:11;28:16,22;66:20;69:12;71:23
**searching (1)**
14:8
**seasoned (5)**
9:25;52:17,25;89:3,4
**seasoning (1)**
89:3
**seat (7)**
49:2;99:14;101:10,13,19;185:4;190:19
**seated (13)**
8:24;32:9;35:9,10,11,12;49:2,12;50:10;71:18,23;75:9;225:21
**seating (1)**
35:6
**second (13)**
22:11;40:7;129:13;151:9;157:22;178:10,15;183:4,7;184:4;185:5;189:22;202:1
**section (10)**
51:16;65:7;72:16,16;73:7,8,17;81:9;85:25;213:11
**seeing (5)**
22:3,5;50:2;224:6,11
**seeking (2)**
99:20;101:7
**seeks (1)**
100:3
**seem (3)**
55:25;160:20;230:23
**seemed (3)**
45:11;87:3;236:22
**seems (6)**
60:11;86:3;150:19;160:23;166:25;210:20
**sees (2)**
112:12;171:3
**select (2)**
14:25;15:2
**selected (6)**
29:5;31:12;212:25;213:3;214:11;221:5
**selecting (1)**
15:5
**selection (2)**
17:20;182:17
**selectively (1)**
101:4
**self-employed (1)**
135:21
**self-evident (1)**
235:6
**self-incrimination (1)**
99:4
**Seligman (2)**
177:19;180:23
**Seligman's (2)**
177:24;178:10
**semantics (5)**
136:13;149:3;167:10;226:2,4
**semester (1)**
240:10
**send (7)**
14:2;57:9,12;83:7;93:22;181:23;240:7
**sending (3)**
154:11,14,15
**sends (1)**
22:23
**senior (1)**
12:18
**sense (7)**
29:17,17;56:1;159:11,15;176:24;182:14
**sent (29)**
13:25;14:6,10,15;23:7;39:9;40:25;41:9;56:4;58:5;62:11,15;64:3,4;70:24;80:10;81:14,22;83:1,9,12;86:15;87:2;91:12,15;92:16,19;93:8;213:15
**sentence (10)**
77:4,4;85:4,9,11;190:4;202:6,14;207:4,5
**sentenced (1)**
189:5
**sentencing (2)**
234:25;235:2
**separate (1)**
13:11
**separated (1)**
13:17
**September (1)**
184:3
**series (3)**
40:6,22;42:13
**serve (9)**
170:5,10,14;172:11,25;173:5;214:11;221:5;237:10
**served (13)**
33:3;94:18;105:13;117:15,16;121:11;123:6,9;157:3;190:4,6;218:7;237:7
**server (1)**
21:11
**servers (1)**
21:10
**Service (11)**
5:5,11;6:1;31:12;32:9;102:10;161:2;221:12,13;238:6;239:17
**serving (4)**
191:23;192:4;222:8;224:6
**SESSION (2)**
129:6;217:13
**sessions (1)**
240:11

set (2)
13:19,20
sets (1)
132:25
setting (1)
73:22
seven (8)
74:14;172:2;190:5,5,6,6;207:3;210:13
seventh (1)
12:4
several (4)
89:14;95:12;155:7;203:23
severe (1)
94:17
severely (1)
239:7
shades (1)
120:16
Shambron (1)
169:24
Shanbrom (4)
169:23;219:11,13,17
share (2)
60:21;68:2
shared (6)
21:15,18;68:12,13,15;77:6
sharing (1)
67:23
Sharon (1)
4:15
Shechtman (38)
4:19,19,21;7:4,9,14,21,23;11:5;17:12;19:14;81:25;82:3;84:4,5,21,22,24;88:14,17;89:22;90:3;94:12;95:22,24;96:4,21;229:20,21,23;236:8;237:21;239:19,20,25;240:2,5,13
shed (1)
71:8
shelter (2)
154:1;166:1
shelters (3)
215:19;221:19;222:3
shield (1)
100:3
shock (1)
91:9
shocking (2)
173:10,23
shoplifting (3)
181:13,16;215:8
short (2)
53:19;239:21
show (4)
6:12;120:11;187:18,21
showed (1)
143:3
showing (3)
67:17;120:10;129:20
shown (1)
239:6
shows (1)
108:11
shrimp (4)
182:3,6,8,11
sic (1)
112:12
side (10)
26:5;30:23;125:11;140:24,24;205:4,9;210:21;214:9;237:11
sidebar (1)
34:14
sides (3)
153:23,24;155:15
sign (1)
102:17
signed (6)
6:20;76:22;102:19;150:25;151:1;177:4
silly (1)
158:20
similarly (1)
212:7
simple (3)
6:15;134:3;227:8
simply (4)
43:15;47:20;186:9;227:20
single (2)
30:2;225:8
sit (10)
35:3;112:7;132:10,11;166:11;204:22;233:2;234:19,24;235:7
sitting (7)
43:6;80:3;166:16;185:4;188:20;195:24;235:24
situation (1)
138:25
Six (2)
108:2,3
skip (1)
160:16
skipped (1)
187:25
Sklarsky (8)
4:6,6;11:7;17:13;19:13,21;84:9;96:20
slanting (1)
202:22
sleep (2)
148:23,24
sliding (1)
135:5
slightly (1)
31:16
slowly (2)
8:6;101:20
small (3)
35:8;70:4;181:16
smaller (2)
29:6,14
smart (7)
116:3,4,5,6;206:22,22;207:11
snapshot (7)
19:6;20:2,8,16,21;22:2,4
snapshots (1)
22:8
Socially (2)
179:24;193:9
solely (5)
199:6,15;217:10,21;220:10
somebody (4)
101:2;116:21;128:9;229:15
somehow (3)
43:16;55:22;192:1
someone (15)
8:17;25:17;31:18;34:23;39:23;45:23;47:7;55:8;61:4;67:17;69:7;71:1;96:13;157:2;232:23
someone's (1)
14:5
sometime (1)
80:1
sometimes (8)
9:12;28:9;147:2;148:19,22,24;153:1;179:23
somewhat (1)
216:25
somewhere (6)
21:9;81:21,22;139:6;162:18;187:14
soon (5)
5:4;6:7;7:3,7;137:20
sorry (15)
62:14;65:1;89:1;107:1;112:17;131:14;136:17;139:7;157:19;172:22;173:1;201:20;210:10;221:2;230:14
sort (6)
112:1;182:14;192:5;205:19,21;223:6
sounds (1)
17:21
sources (1)
13:13
South (1)
196:2
Southern (3)
203:17,19;235:24
sovereign (1)
187:2
space (1)
70:4
speak (14)
5:2;6:8;77:17;86:6;140:14,18;143:5;194:21,22,24;195:1;225:20;233:11;237:11
speaking (6)
70:17;87:7;136:6;141:3,9;238:24
special (2)
16:19;117:9
specially (3)
201:8,12,21
specific (10)
20:10;25:12;61:6;131:10;158:16;171:17;176:10;188:5;206:10;223:3
specifically (26)
22:6;24:5;61:2;74:21;118:10,16;121:15;124:13,17;126:1,1;130:17;138:7,17;139:7,12,23;147:17;150:13;151:8;153:6;156:10;170:17;179:11;181:3;190:25
speculating (1)
38:22
speeching (1)
209:19
spell (2)
8:5;101:20
spent (3)
60:15;85:23;237:5
spin (1)
159:3
spite (1)
220:14
split (1)
200:15
Splitting (2)
226:2,3
spoke (4)
5:3;71:6;77:19;220:15
spoken (2)
100:18;223:21
sports (1)
205:12
spot (2)
80:3;90:11
spouse (4)
43:6;66:4,5;188:18
spreadsheet (2)
20:6,7
Square (1)
58:12
St (1)
180:9
stability (1)
224:8
stamp (4)
201:8,11,19,21
stamps (4)
201:15,23,25,25
stand (3)
93:20;169:23;219:22
standard (3)
164:4,14;210:8
standards (1)
136:24
standing (2)
9:21;105:12
Stanley (1)
4:3
Stapp (8)
11:20;12:3,7;14:13;18:8;26:22;27:4,9
start (12)
16:24;17:23;18:11;21:20;24:17;25:9;48:11;140:9;160:23;161:2;225:19;227:5
started (5)
28:24;154:14;165:25;185:5;213:1
starting (2)
51:16;91:8
starts (4)
24:2;42:19;57:10;90:22
State (14)
8:5;9:14;81:4;89:17;94:18;101:19;112:15;132:8,24;136:2;144:6;179:17;209:22;223:7
stated (1)
106:24
statement (14)
35:1;72:24;113:21;127:12;133:23;151:2;153:10;160:3,4;200:20,22;218:14,20;230:4
statements (3)
69:15;111:3;128:23
States (12)
4:4,4;8:21;102:6,10;103:8;105:4,6;116:11;118:9;128:7;148:17
stating (1)
98:11
stationery (1)
195:18
status (2)
212:13;221:6
stay (6)
52:7;88:15;147:2;170:17;209:16,22
stay-at-home (1)
164:19
steal (3)
182:1,8,11
stealing (1)
182:4
step (5)
4:24;13:14;84:19;

96:25;238:5
**Sternheim (30)**
4:23,24,25;5:8,10,22,24;6:3,6;54:1,2,3;84:12,14,17;97:5,7,9,22,25;98:22,25;99:7;101:9,11,13;108:1,3;129:10;137:25
**Stetler (1)**
77:7
**still (11)**
6:2;44:11;46:7;67:8;87:7;98:8,16;149:3;165:1;172:16;196:18
**stimulation (1)**
232:19
**stipend (3)**
232:8,10,12
**stipulate (1)**
73:5
**stocks (5)**
134:7,13;138:4,11,15
**stole (3)**
182:5,5,15
**stolen (2)**
189:6,22
**stomach (1)**
183:10
**stop (7)**
27:1;37:12;116:13;167:1;169:16;209:19;210:25
**stopped (2)**
154:15;205:14
**store (3)**
182:2,9,15
**stored (1)**
21:8
**stores (1)**
181:17
**story (1)**
116:16
**straightforward (1)**
223:15
**strange (1)**
160:23
**strategic (2)**
10:4;15:19
**Street (1)**
70:5
**stressed (4)**
31:12,13,15,17
**strike (4)**
34:25;89:18;108:3;148:8
**strikes (1)**
29:8
**strong (1)**
91:9
**strongly (1)**
166:10
**struck (4)**
30:3;32:6;42:24;50:4
**student (1)**
239:22
**studied (4)**
158:5;167:22,24;171:25
**stuff (2)**
198:7;207:1
**stupid (4)**
111:5,14;199:25;203:3
**subconsciously (2)**
154:5,6
**subject (3)**
215:15;221:25;222:6
**submission (1)**
177:18
**submissions (1)**
97:5
**submit (5)**
77:17;85:7;126:17;177:11,13
**submitted (14)**
36:11;74:14;76:3;78:4;100:22;102:15;151:3,4;169:5;176:23;177:3;178:1,4;180:23
**subpoena (13)**
105:5,7,10,13;110:11,24;117:16;121:11,12;122:21;123:5,9;170:23
**subsequent (1)**
73:10
**subsequently (3)**
62:20;79:18;186:15
**substance (6)**
189:9;206:11,13;217:17;219:7;223:3
**substantial (1)**
238:22
**substantive (3)**
11:17,23;239:5
**substantivelywise (1)**
236:22
**subways (1)**
58:14
**success (3)**
134:21,25;135:3
**successful (5)**
134:15,20;136:24;137:4,12
**suddenly (1)**
62:8
**suffer (2)**
120:21;174:9
**suffered (3)**
174:6,11,20
**suffering (1)**
6:23
**sufficient (1)**
32:5
**suggest (5)**
45:14;53:3;63:2;93:22;97:13
**suggested (3)**
35:20;41:4;231:14
**suggesting (1)**
41:20
**suggestion (2)**
55:22;232:4
**suit (4)**
38:20,23;52:14;95:8
**suits (1)**
39:1
**summarized (1)**
165:24
**summers (1)**
158:6
**Sunday (7)**
19:8;21:1,22;22:2,4;109:16,17
**superior (7)**
37:8,20;38:21;42:25;60:12;169:2;240:14
**supervised (1)**
20:7
**support (5)**
65:12;80:6;99:25;100:5;150:17
**suppose (1)**
21:1
**supposed (2)**
169:8;238:12
**Supreme (9)**
38:17;51:14;52:8;62:13,16;72:11;150:20;175:20;176:3
**sure (65)**
12:14;15:2;25:11;31:2;43:2;44:19;45:7,8,15;68:5;72:7;79:20;103:6,13;108:24;109:2;111:4;121:2,15;132:22;136:9;137:5,20;140:21;142:15;143:13,24;147:16,17,20,21;151:8;154:19;156:13;163:2;165:23,23;166:22;174:16;176:10;183:7;186:11;189:11;190:19;194:3,25;197:23;199:10;201:22;203:14,18;205:25;206:10,24;207:12;211:3,5;226:2,9;230:12,25;231:13;233:16;234:25;237:3
**surprise (1)**
91:22
**surprised (2)**
43:7;152:16
**Susan (4)**
8:25;71:10,12;86:6
**suspect (2)**
84:15;166:10
**suspected (1)**
167:1
**suspend (1)**
240:16
**suspended (69)**
22:19;24:19;26:15;33:9,11;34:6,7;43:17,21;45:12;50:4;54:11,14,18;55:5,9;56:9;58:25;59:16;60:23;61:4,7,9,15,19;63:3,11;67:18;69:1,7;70:10,20;71:3;72:2;75:9;79:13,21;80:3;85:22;86:2,9,18,22;87:4;89:13,13,16;90:21;91:1,25;92:2,4,24;93:4;94:15;119:25;135:14;145:10;175:13;177:8;203:17,19;208:7;210:11;212:14;216:16;221:6;231:9;236:24
**suspending (1)**
24:6
**suspension (1)**
99:17
**suspicious (1)**
69:11
**sustain (1)**
190:16
**Sustained (19)**
77:23;89:21;106:5;112:6;115:18;117:4;134:19;136:16;152:18;159:9;160:25;161:9;181:25;201:6;228:20;233:7;234:11,23;236:5
**Swan (1)**
59:13
**Swann (1)**
171:18
**swayed (1)**
220:9
**sweater (1)**
31:25
**Sweeney (1)**
175:22
**swing (1)**
236:25
**switch (2)**
7:22;83:18
**swore (1)**
153:13
**sworn (10)**
8:4;101:18;135:25;140:18;150:8;151:2;153:11;156:2;167:2,5
**sympathetic (2)**
15:1,6
**sympathy (2)**
217:24;220:10
**system (8)**
15:22;16:1,6,7,23;129:14;173:11,24

**T**

**tab (5)**
125:1,2;130:21;150:16;194:10
**table (5)**
8:24;35:7,8,12,13
**tables (1)**
35:9
**talk (6)**
59:1;117:1;194:15,19;195:6,12
**talked (3)**
59:9,14;71:10
**talking (9)**
42:24;57:15;71:11;110:21;144:10;157:16;201:13;202:20;226:24
**tax (14)**
135:23;136:2,5,8;154:1,1;166:1,1;215:19,19;221:19;222:1,3,10
**taxes (1)**
215:19
**team (15)**
6:21;12:19;13:23;14:14,21;20:13;21:3;39:9,19,25;44:15;111:20,21,23;112:5
**technology (1)**
30:12
**telephone (1)**
85:1
**telling (17)**
57:5;108:10,14;117:25;123:12;128:13;132:18;139:8,21;158:23;159:1,2;161:1;167:18;170:19;205:3,9
**tells (1)**
50:7
**template (1)**
63:21
**ten (2)**
60:16;189:20
**tend (1)**
229:16
**tendered (1)**
126:19
**ten-minute (1)**
192:25
**ten-year (1)**
190:4
**term (1)**
33:3
**terms (10)**
37:21,23;38:1,10;84:6;91:25;121:20;187:5;195:3;221:25
**terrible (1)**
174:6
**terroristic (2)**
189:13;190:1
**testified (10)**
8:4;24:12;86:20,23;

90:25;94:4;101:18;159:12;203:20;232:6
**testify (9)** 5:4;100:22;107:14,17;108:7,11;118:15;119:11;120:5
**testifying (5)** 107:10;114:6;118:25;191:14,17
**testimonies (1)** 37:11
**testimony (22)** 45:12;79:19;84:16;91:3;94:2;95:8;100:23;101:6;102:21;103:19,21;107:21;149:11;176:2;204:22;218:1;219:7,9,13;233:17,18;240:6
**Texas (1)** 37:23
**theft (1)** 190:3
**theories (3)** 38:4,21;39:1
**theory (4)** 16:12,21;21:6;171:2
**there- (1)** 106:17
**Therefore (2)** 227:14;228:7
**Theresa (4)** 7:25;8:2,7;41:5
**T-H-E-R-E-S-A (1)** 8:8
**thinking (10)** 53:12;68:15;87:14;108:14;158:1;169:17;170:2;188:5;191:15;193:15
**third (6)** 96:6;140:8;156:14;160:14;178:15;185:4
**though (11)** 46:21;47:15;49:18;73:2;77:18;92:9;177:6;191:20;214:1;221:11;240:12
**thought (67)** 14:25;15:3,16;16:12,14;26:4,5,10,12;27:6,10;28:6,22;31:16;38:6,10;41:3;43:15;44:1,2;47:20;55:1;56:13;59:3,3;70:9,11,21;71:3,5,11,16,25,25;79:22;86:16,17,24;87:7,13;88:13,19;90:20;91:16;92:11;93:1;114:7;115:8;131:12;151:20;152:23;160:20;170:4,24;173:4;185:8;189:10;191:17;202:2;203:11;209:4;226:23;228:24;229:7;232:1;233:8;236:6
**thoughts (2)** 224:9;229:4
**thousand (1)** 129:15
**threatening (2)** 184:13,15
**threats (3)** 156:18;189:13;190:1
**Three (14)** 7:9,12;9:2;13:18;58:9;151:7;157:6,7;172:15;173:5;192:4;207:5;210:12;238:14
**three- (1)** 92:5
**three-month (1)** 48:24
**threw (2)** 205:11,16
**throughout (1)** 168:14
**thrown (2)** 185:8;206:2
**thwart (1)** 167:17
**till (1)** 117:22
**times (10)** 94:16;108:1,3,4,25;120:4;155:8;168:12;189:3;197:21
**timing (1)** 84:6
**title (1)** 17:21
**TM82757 (1)** 82:17
**to/head (2)** 47:3,19
**today (44)** 8:16;89:2;97:11;99:2;104:1,5;105:2,7,16,23;107:10,17;108:4,6,8,15,21;110:25;112:7,19,24;129:20;130:5;137:22;204:22;206:17,25;207:10;208:15;220:15;223:19;233:2,13;234:1,12,19,24;235:7;236:1,17;238:22;239:9,25;240:9
**together (7)** 27:24;70:4,5,8;95:1,10;134:12
**told (53)** 5:3;6:6;25:6;29:15;30:4;47:13;50:20;86:12;93:9;105:22;113:18;117:23;118:5,14,17;120:21;121:15;123:16;124:11,14;128:21;132:10,11,12;139:4;141:8;143:5;144:8;155:2;157:10,14;162:11;168:2;169:15,21;170:2,16;171:12;172:3;176:8;185:9,22;195:5;197:8;199:5;206:17;222:18;225:22;226:14;229:14;230:3;233:21,22
**tomorrow (8)** 238:16,19,23,24;239:15,23;240:20,22
**tone (1)** 197:21
**took (10)** 9:4;69:14;70:14;81:18;94:25;95:10;102:1,2;103:4,11
**top (7)** 40:7,9;48:14;54:10;55:10;82:23;95:2
**topic (1)** 59:22
**tort (3)** 38:2,11,13
**torts (1)** 39:4
**total (1)** 135:19
**totality (2)** 94:13;219:25
**totally (2)** 43:20;208:23
**towards (2)** 58:14;229:11
**towel (3)** 205:11,16;206:2
**track (10)** 55:17;56:2,17;62:18;82:24;83:13,14;91:5;92:19;198:4
**trained (4)** 60:14;105:9;106:3,7
**training (3)** 105:19;106:14;120:2
**transactions (2)** 206:11,13
**transcript (17)** 31:3;75:13;118:20;119:1,4;125:10;130:22;131:11,15;138:6,10;144:14;145:8;150:2;163:22;173:1;223:12
**transcription (1)** 164:12
**transmitted (1)** 6:21
**travel (6)** 230:3,5,8,10,10,22
**traveled (1)** 230:6
**treated (1)** 120:17
**treatment (4)** 97:12;174:13;179:9;180:8
**tree (1)** 171:2
**tremendous (1)** 85:23
**trend (1)** 166:25
**trial (103)** 8:21,22,24;9:4,10,20;12:21;14:14;16:25;20:13;21:3;34:17,18,20;35:3,20;36:17;38:19;39:20;40:17;42:10;43:4,5,8;46:4,12;48:24;52:13;63:8,13;64:9,17,19;65:13;67:17;70:4;72:10,24,25;74:19,24;75:3,8;79:16,20;80:6,7,8,14,16,18,21;81:1;83:19;85:24;92:1,6,10;94:20,24;95:6,17;99:23,24;100:5;102:6;103:11;106:8,9,11;112:20;114:19;116:15;137:7;139:16;141:2;159:5;165:21,23;166:1,14,16;168:14;172:15;187:7;192:14;193:20;200:7;214:22;215:15;216:21,22;217:22;222:14;223:23;224:3,6,7;225:19;226:24;227:6;234:14;236:23
**trials (1)** 153:18
**tried (5)** 15:21;177:6,9;181:7;189:18
**trier (2)** 225:3,3
**trouble (3)** 165:6;223:8,13
**true (25)** 26:16;28:14;29:13;30:15;92:14;133:21;144:9;153:9,10;156:12;159:6,19;161:18;167:18;171:18,20;180:13;197:10;200:20;209:2;212:24;213:6;220:14;230:4;233:23
**truly (1)** 49:13
**trump (1)** 100:11
**truth (40)** 29:15;102:2;103:4,15,15,15,23,23,24;136:4;140:14,18;141:3,9;142:17;143:6,23;146:14;155:11;158:23;159:1,2;160:10,13;167:3;172:3;175:17;185:9;212:12;224:23;225:20;226:8,10,12,14,14,15,19;227:9;239:7
**truthful (3)** 136:18;163:3;182:22
**truthfully (1)** 156:8
**truthfulness (2)** 159:11,15
**try (12)** 29:17;50:6;112:14;142:5;144:3;158:16;159:10;209:8,18;210:8;211:25;227:20
**trying (18)** 14:25;15:2;69:14;75:7;91:19;95:25;114:1,5,7;132:2;148:4,19;162:4;166:17;192:4,6;208:24;231:10
**Trzaskoma (41)** 8:1,2,7,13,15,20;10:13;11:11;15:5;17:19;18:11;20:2;28:24;29:8;30:6,10;41:5;50:22;51:11;52:6;53:10,14;54:7;56:16,22;57:1;59:17;65:25;76:15;79:6,19;80:5;81:13;84:8,19,25;87:21;90:3;95:25;96:5,24
**T-R-Z-A-S-K-O-M-A (1)** 8:8
**Trzaskoma's (1)** 84:16
**TT (2)** 41:3,5
**Tuesday (2)** 147:16;185:6
**turn (4)** 40:19;42:12;48:11;55:10
**turned (1)** 92:13
**turning (2)** 22:10;40:6
**turns (1)** 133:17
**turnstile (1)** 32:18
**turtleneck (2)** 31:24;32:4
**twice (3)** 55:4;181:13;230:21
**twist (1)** 174:8
**twisting (1)** 153:10
**two (47)** 16:16;56:12;60:14;

71:16,21;72:4;80:17;
81:21;86:25;87:4;91:23;
93:2,2;94:5;95:4;
117:17;121:7;129:8;
131:4;136:2;140:5;
145:25;147:19;150:5,7,
10,23;151:20;155:10,14,
17,20;158:6,15;160:9;
165:16;182:8;184:5;
191:9,21;199:6,15;
207:21;208:4,6;224:2,9
**Tylenol (1)**
121:4
**type (1)**
88:5
**types (2)**
13:7;191:5

**U**

**ulterior (1)**
154:12
**ultimately (2)**
63:7;214:2
**unanswerable (1)**
152:19
**unaware (1)**
114:18
**unbiased (15)**
128:11;148:7;149:6;
153:21;154:2,3;159:6;
160:22;192:8,12;206:3;
209:7;226:11;229:13;
236:22
**uncommon (3)**
119:10;121:17,22
**unconvincing (1)**
219:18
**under (23)**
23:4;51:16,19,21;
52:10;54:10;66:13;
73:17;105:1,15;106:14;
112:7;116:10;128:17;
143:14;156:2;174:15;
176:16;181:6;182:25;
196:20;215:6;220:9
**undergraduate (1)**
113:15
**underlying (5)**
78:1;98:19;124:4,6;
214:21
**Underneath (1)**
52:7
**understood (21)**
13:15;37:19,20;41:18,
24;44:8;56:11;77:16;
78:2;81:20;94:12;
117:19,22;125:24;
126:5;130:18;141:8;
188:7,22,24;189:1
**undertaken (1)**
203:6
**undertakes (1)**
42:7
**undestroy (1)**
231:10
**unemployed (3)**
153:25;207:6;232:17
**Unfair (1)**
233:6
**unfortunately (2)**
67:7;73:25
**unit (1)**
6:25
**United (11)**
4:4,4;8:21;102:6,10;
103:8;105:4,6;116:11;
118:9;148:17
**Unity (4)**
52:11,14;62:12,17
**University (6)**
37:23;106:3,6;112:23;
113:8,21
**unlawful (1)**
189:16
**unless (2)**
43:20;239:5
**unnecessarily (1)**
60:17
**unpleasant (4)**
207:14,18;208:3;
235:8
**unprecedented (1)**
94:11
**unsealed (1)**
98:6
**unsuitable (1)**
141:12
**untruthful (1)**
136:11
**untruths (1)**
169:21
**unusual (2)**
119:18;202:5
**unwritten (1)**
68:1
**up (51)**
6:21;7:1;11:12;15:11;
21:6;23:24;30:19;31:2;
39:4;42:23;44:19;59:23;
60:13;61:6,7,13;64:11,
12;65:1;79:18;92:14;
93:14,16;112:7;115:1;
120:10,11;124:5;
129:20;143:3;146:1;
147:4;155:1;185:23;
187:6,6,19,21;195:21;
198:20,22,24;211:16,21;
212:25;213:6,11;229:7;
235:1;236:7;238:15
**upon (7)**
5:19;50:1;96:17;
102:4,7;117:16;187:1
**urged (1)**
5:13
**use (17)**
16:1;18:15;24:7;
53:24;100:23;102:20,
24;180:12;193:9,9;
197:7;202:23;229:25;
233:11,12,22;234:1
**used (4)**
15:25;18:6,10;19:7
**useful (1)**
28:17
**uses (1)**
193:13
**using (5)**
14:21;21:7;31:18;
45:3;230:1
**Usually (4)**
9:13;35:23;197:14;
230:9

**V**

**vacate (1)**
238:2
**vacation (5)**
67:2,3,4,7,12
**vague (1)**
69:3
**Vaguely (3)**
119:8;189:14;222:5
**validated (1)**
46:13
**variations (1)**
120:15
**variety (1)**
191:5
**various (2)**
100:4;160:1
**vendetta (2)**
212:1,4
**Veneer (1)**
140:19
**venire (2)**
140:17;182:17
**verdict (40)**
24:21;57:16;68:10;
73:19,23;83:21;87:21;
88:5,8,18;95:13;124:6;
128:15;132:16;133:12;
134:6;137:9;148:7;
149:4;154:11;159:6,6;
169:16;192:12;194:1,13,
14,21;205:6;213:16;
217:21;218:12;219:21;
220:15;222:21;225:22;
226:11;227:11,18;237:8
**version (2)**
47:1;48:22
**versions (1)**
37:18
**versus (2)**
13:10,11
**via (2)**
14:13;39:6
**VIC (2)**
37:10,15
**vicarious (5)**
37:15,21;38:21;42:25;
60:12
**videotape (1)**
182:16
**view (10)**
70:16,18;100:4;
102:18;122:7;170:19;
210:15,22;219:16;235:7
**viewed (1)**
213:23
**views (1)**
70:1
**Village (5)**
144:12,13;145:13;
151:24;172:1
**Vincent's (1)**
180:9
**vindicate (1)**
192:1
**vindication (2)**
191:24,25
**violated (1)**
184:12
**violation (1)**
189:13
**violations (1)**
181:8
**Viviann (7)**
11:20;12:3,13;14:4;
26:22;27:12,13
**Vivien (1)**
40:1
**vodka (1)**
109:13
**VOICE (5)**
99:13;129:14,14,16,19
**voir (126)**
11:12,13,16,17,22,23;
12:12,19;13:2,13;14:17,
19;16:24;17:23;18:6,11,
16;19:8;20:13,14,15,23,
25;21:5,7,21;22:4,18;
23:10,12,14,15;24:17,
20;25:9;28:1,5,9,23;
29:2,15,18,21;30:1,5,7,
10,18;32:15;33:5;34:2,
3;35:3;38:16;42:18;
43:2,9,16,19;44:2,9;
47:13;49:22,24;50:18,
20;59:4;60:4;64:20;
69:4,8,17;70:22;71:13,
19,24;72:20;83:4;86:15;
89:5,12;92:10;94:6;
96:14;102:2;103:14;
140:10,11,13,21;141:3,
8;143:1;147:3,5,7,15;
149:13;159:25;161:22;
162:23;165:25;167:17;
171:16;185:3;191:1;
192:17;203:20;207:16;
216:21;222:8;226:16;
227:13,22;228:1,2,13,
21;229:1;230:2;232:16;
234:14,17,19;236:18;
237:12
**vote (1)**
200:15
**voted (3)**
212:8;220:1,3

**W**

**waited (2)**
67:11;222:18
**waiting (1)**
238:16
**waive (1)**
72:23
**waiver (2)**
7:4;239:2
**wake (1)**
155:1
**walk (1)**
118:1
**walked (4)**
59:4;67:5;70:4;146:2
**Walker (1)**
100:1
**walking (4)**
58:7;70:3,5,8
**wants (3)**
123:9;166:15;239:21
**warrant (22)**
5:6,21;6:11,18,20;
89:17;94:17;186:17,18,
20;187:2,6,7,10,16,21,
22,25;210:14;237:23;
238:1,3
**Warren (1)**
177:18
**wasted (1)**
118:1
**Water (3)**
120:25;121:1,3
**way (46)**
7:13;16:9;19:16;
38:19;50:7,7;58:10,17;
60:1;61:17;69:4;70:6,7,
18;75:6;80:13;85:18;
93:15;98:11;116:8;
128:3;155:14;160:23;
161:2;166:4;167:20;
170:12;181:22;191:22;
195:4;197:6;201:7;
205:3,8,17,19,19,21,21,
24,24;206:2;207:23;
212:21;216:7;219:1
**weapons (1)**
189:16
**wearing (1)**
31:24
**website (1)**
10:20
**week (1)**

230:21
**weeks (3)**
60:16;67:3,3
**weigh (1)**
216:13
**weighing (1)**
216:4
**weird (3)**
35:7;161:6,7
**Weiss (2)**
238:10;239:15
**welcomed (1)**
195:9
**weren't (13)**
15:5;28:21;49:23;60:25;93:25;95:12;123:13;156:6;181:18;191:15;194:16;214:21;231:6
**Westchester (10)**
144:12,15;145:12,18,21;146:5,23;148:5;151:17;180:5
**Westlaw (56)**
45:5,10,12;46:5,7,8,10,16,21;48:11;49:5,7;50:2,3,6,24;51:8;53:21;54:8,13,15,18,20,24;55:1,14,23;56:5,9,13;59:20;61:24;62:2,3,20;63:24;70:17,24;71:1,5,22;80:12,15;82:18;83:1,5,16;87:1;91:13,16,20;92:18,21,23;93:2,8
**what's (5)**
10:10;34:4;41:17;112:19;114:25
**whereby (1)**
68:2
**whittled (1)**
29:2
**whole (18)**
35:3;59:10;87:6;92:5;103:15,23;157:24;158:3,4,9;159:19,23;160:6;172:5;182:17;191:3;206:16;226:14
**who's (2)**
58:25;69:7
**whose (4)**
10:21;61:4,19;135:1
**wife (1)**
164:19
**wild (2)**
208:1;210:18
**willfully (1)**
214:3
**willing (1)**
173:5
**Winslow (4)**
185:14,17,19;215:12
**wish (6)**
81:10;97:5;98:18;99:8;108:17;204:8
**wished (2)**
6:8;195:6
**withholding (1)**
43:10
**within (1)**
5:10
**without (5)**
127:12;140:23;194:23;213:21;214:8
**witness (40)**
4:23;7:6,24;8:3,7;59:12;82:4;96:15,25;97:1;98:24;101:1,3,5,17,21;118:8;152:18;161:10;169:23;175:4;177:20;191:5;193:1;200:10,17;219:17,22;221:11;236:21;237:17,24;238:5,7,8,8;239:6,14,22;240:4
**witness' (1)**
122:7
**witnessed (2)**
123:10,11
**witnesses (8)**
7:3,10;159:2,11,15;169:20;192:16;219:10
**WITS (1)**
37:11
**woke (3)**
42:23;146:1;147:4
**woman (3)**
46:11;49:11;58:25
**wonder (1)**
53:16
**word (15)**
57:10;90:23;91:8;120:14;149:7,8;188:7;202:10,12,23;206:22;217:1;219:18;229:25;230:1
**word-for-word (1)**
217:16
**words (12)**
105:18;116:8;129:15;176:10;198:3;208:19,23;209:1;210:10;213:2;215:17;229:4
**work (13)**
9:9,10,14;42:6;44:15;72:15,16;130:10;164:18;190:22;221:15;222:10;238:19
**worked (11)**
9:2;13:15;23:16;26:2;30:9,11,15,19,24;32:1,3
**working (4)**
14:19;32:24;33:3;221:9
**world (1)**
175:5
**worn (1)**
110:5
**worrying (1)**
194:23
**worst (1)**
16:14
**worth (2)**
129:15;232:1
**worthwhile (3)**
154:7,10;192:2
**wow (2)**
168:5;170:2
**write (9)**
23:7;27:9,15,19;46:18;57:5;178:6;193:23,25
**writes (2)**
41:9;45:9
**writing (1)**
205:8
**written (4)**
47:2;138:17;139:6;223:12
**wrong (12)**
23:8;27:12,14;45:14;56:12;94:7;131:14;145:15;168:5,6,7;237:2
**wrongdoing (1)**
59:12
**wrote (24)**
22:18;41:22,23,23;43:19;44:1,5;47:4;55:16;62:3,5;90:22;178:8;193:20;194:1,10;195:1,5,17,18,25;196:5,14,17

**Y**

**year (15)**
9:4;12:4,5,7,9;48:15,15;49:9,10,12;135:6,19;191:1;207:4;230:7
**years (29)**
47:8;49:3;93:15;94:18;113:8;121:7;136:2;147:19;153:19;156:1,12;157:6,8;158:12;162:17,17,25;163:7;177:7;178:21;179:1,3;180:25,25;189:20;190:5,6;207:5,8
**years' (1)**
33:1
**yesterday (3)**
7:5;70:9;145:10
**York (17)**
9:20;23:2,11,25;27:23;45:24;51:19;54:11;55:5;71:2;151:11;157:4;179:17;196:9;203:17,20;221:6
**younger (2)**
49:10,12

**A-5699**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v. 09 Cr. 581 (WHP)

PAUL M. DAUGERDAS, DONNA M. GUERIN, DENIS M. FIELD, DAVID K. PARSE,

Hearing re Catherine M. Conrad

Defendants.

------------------------------x

New York, N.Y.
February 16, 2012
9:45 a.m.

Before:

HON. WILLIAM H. PAULEY III

District Judge

APPEARANCES

PREET BHARARA
United States Attorney for the Southern District of New York
BY: STANLEY J. OKULA, ESQ.
NANETTE DAVIS, ESQ.
JASON HERNANDEZ, ESQ.
Assistant United States Attorneys

JENNER & BLOCK LLP
Attorneys for Defendant Daugerdas
BY: CHRIS C. GAIR, ESQ.
CHARLES B. SKLARSKY, ESQ.
NICOLE ALLEN

STETLER DUFFY & ROTERT, LTD.
Attorneys for Defendant Guerin
BY: MARK L. ROTERT, ESQ.

C2GFDAU1                              Hearing

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

APPEARANCES (Cont'd)

KOSTELANETZ & FINK, LLP
Attorneys for Defendant Field
BY: CAROLINE RULE, ESQ.
SHARON McCARTHY, ESQ.

PAUL SHECHTMAN
ADAM MURPHY
Attorneys for Defendant Parse

BOBBI C. STERNHEIM, ESQ.
Attorney for Ms. Conrad

Also Present: Christine Mazzella, Special Agent - IRS

THE DEPUTY CLERK: Continued case of United States of America v. Paul Daugerdas.

THE COURT: Are you ready to call your next witness?

MR. GAIR: Your Honor, the government and the defense have reached a stipulation that would supplant the necessity for Deputy Weiss to testify. We simply agreed that Deputy Weiss would testify consistently with his report which is marked as PMD Exhibit 4, which we would now move into evidence.

MR. OKULA: No objection, your Honor, and we can confirm on behalf of the government that we have reached that stipulation with Mr. Gair.

THE COURT: Very well, then. PMD Exhibit 4 is received in evidence.

MR. GAIR: There was one other document I forgot to put in yesterday, the Winslow police records, PMD 27. I would move their admission.

THE COURT: Any objection?

MR. OKULA: No, your Honor.

THE COURT: All right, PMD 27 is received in evidence.

(Exhibits PMD 4 and PMD 27 received in evidence)

MR. GAIR: The defense rests.

THE COURT: Is the government ready to proceed?

MS. DAVIS: We are, your Honor. The government calls Susan Brune.

SUSAN BRUNE,

called as a witness by the Government,
having been duly sworn, testified as follows:

THE COURT: Take a seat, state your full name and spell your last name slowly for the court reporter.

THE WITNESS: My name is Susan Elizabeth Brune. My last name is spelled B-r-u-n-e.

THE COURT: You may inquire, Ms. Davis.

MS. DAVIS: Thank you, your Honor.

DIRECT EXAMINATION

BY MS. DAVIS:

Q. Good morning Ms. Brune.
A. Good morning.
Q. Are you represented by counsel for purposes of this hearing?
A. No.
Q. You went to Harvard Law School, correct?
A. Correct.
Q. Graduating in 1988?
A. That's right.
Q. So you've been a practicing lawyer for almost 25 years, is that right?
A. That's right.
Q. And you're a member of the New York Bar?
A. I am.
Q. And you were an Assistant United States Attorney for

approximately seven years, correct?
A. That's correct, too.
Q. And that was here in the Southern District of New York?
A. Yes.
Q. And you handled many white collar cases while you were an assistant?
A. Yes.
Q. And then you left the United States Attorney's Office and you started your own firm, is that correct?
A. That's right.
Q. And did you immediately jump to your own firm out of the United States Attorney's Office?
A. I -- yes.
Q. And that was approximately 1998, correct?
A. I left the United States Attorney's Office around November of 1997 and we started the firm February 2nd of 1998.
Q. The law firm is Brune & Richard, correct?
A. That's correct.
Q. And you are the Brune in Brune Richard?
A. I am indeed.
Q. And Richard is Hillary Richard, correct?
A. Yes.
Q. She's primarily a civil lawyer, do I have that right?
A. Yes. She's done criminal cases, but she's primarily a civil lawyer.

Q. Do I understand correctly that she generally was not involved in the litigation of this matter on trial?
A. She helps out. She helped me certainly with the closing statement, but you're right, she was not on the trial team.
Q. She generally did not appear at court appearances, though, is that correct?
A. That's correct.
Q. And you've had many trials, both in your government experience and your experience as private counsel, correct?
A. You know, I've had three trials as a defense lawyer. So I don't know if that would qualify as many. But I certainly have handled quite a few between work in the government and work on the defense.
Q. And I take it that when you were an assistant you also conducted many Grand Jury investigations, correct?
A. Many.
Q. And you know that an important part of any Grand Jury investigation are the details, correct?
A. That's certainly so.
Q. And you know how to pay attention to details, is that correct?
A. I try very hard to pay attention to detail.
Q. And I take it that you would agree that you were vested in the success of you law firm, correct?
A. I am very vested, very proud of it.

Q. And part of the success of your law firm lies in the success that you have in any particular case, correct?
A. I think that that's certainly part of what I hope is the success of our firm, yes.
Q. Well, am I correct in assuming that in your view the more cases that you win the more likely you might get additional clients, correct?
A. That's certainly so, yes.
Q. And your website, you have a website for Brune & Richard, correct?
A. Right.
Q. And it has a biography for you?
A. Yes.
Q. And it touts your ability to make sound strategic choices, is that correct?
A. I don't know if "tout" is the word I would use, but I certainly describe myself in favorable terms on my own website, correct.
Q. Well, it certainly talks about your ability to make sound strategic choices, correct?
A. I don't remember exactly, but I certainly do think of myself as a person who makes sound strategic choices.
Q. And your website biography also emphasizes your meticulous preparation and forceful advocacy, correct?
A. That part I recall, it does.

Q. And making strategic choices is a major part of representing any client, correct?
A. That's right.
Q. And that was a major part of representing David Parse in this case?
A. Certainly.
Q. And you didn't necessarily clear every decision that you made with Mr. Parse, correct?
A. That's right.
Q. And he in fact trusted you to make decisions on his behalf as his lawyer, correct?
A. Yes.
Q. And that was true of the other attorneys in your firm who worked on this case, correct?
A. I'm sorry, what was true?
Q. That Mr. Parse trusted not only you but the people in your employ, correct?
A. I believe so. We had a very good working relationship.
Q. Now, you're not afraid, are you, to raise issues with a Court about any issues that might come up with regard to your clients, correct?
A. Well, I'm certainly not afraid to speak to the Court if that's what you're asking.
Q. You raised many issues with the Court, with this Court before trial, correct?

A. Oh, I did indeed, yes, understood.
Q. And during trial?
A. Yes.
Q. And you don't hesitate to do that if it helps your client, correct?
A. Certainly not.
Q. And you're not afraid of being aggressive on behalf of your client, correct?
A. That's correct.
Q. That's what you mean in part when you use the phrase "forceful advocacy" on your website, correct?
A. Yes. It's important to be aggressive but not too aggressive. You want to be a forceful advocate.
Q. And many times you and the other defense counsel in this case raised issues with the Court about which you had less than a hundred percent certainty, correct?
A. I disagree.
Q. Is it your testimony here that with regard to every issue, every question that you raised with the Court you knew with a hundred percent certainty what the underlying facts were?
A. No, that's not what I'm saying. What I am saying is that if I made a representation to the Court I tried very hard to make it accurate and I did not raise issues with the Court if I didn't think that they had merit.
Q. Now, with regard to David Parse, you represented him for a

long time prior to the start of the criminal case, correct?
A. I have represented him since 2004.
Q. And you've gotten close to him as a person, correct?
A. Yes.
Q. And you wanted to obtain an acquittal for him on a professional level, is that right?
A. Both on a personal and professional level.
Q. And on a personal level because you like and care about him as a person, correct?
A. And I believe in his innocence.
Q. But you like and care about him as a person?
A. I do.
Q. Now, with regard to the hierarchy of Brune & Richard, as the named partners I would take it that you and Ms. Richard are basically at the top of the heap there?
A. Well, we try to treat everyone with respect, but you're right, it's our firm in the sense that we're the named partners and we're certainly at the top of the hierarchy.
Q. And everyone answers to you on your particular cases who work for you, correct?
A. That's typically the way it's structured.
Q. And you are the ultimate decision maker?
A. Not on every case, but on those where I'm the lead counsel working, yes.
Q. And that was true of this case, correct?

A. That's right.
Q. And everyone at your firm knew and understood that, correct?
A. Sure.
Q. Now, Ms. Trzaskoma is a partner at your firm, correct?
A. Yes, she is.
Q. And one of her responsibilities with regard to this particular case was jury selection details, correct?
A. That's right.
Q. And you entrusted her with that task, correct?
A. Well, yes and no. I'm ultimately responsible and I was responsible at trial for jury selection, but you're correct that she was much more immersed in the details and in the effort.
Q. One of the things that your team did was to gather information about potential jurors?
A. Yes.
Q. And Ms. Trzaskoma was supervising other people within the firm about gathering information?
A. Well, it was a combination. There were two lawyers from San Francisco who were doing a lot of the work, but then ultimately it was Theresa who was going to be responsible for the courtroom work.
Q. And you were supervising her in that regard, correct?
A. That's right.

Q. And she communicated to you about the issues that came up during jury selection?
A. She did.
Q. Now, Ms. Edelstein was also a partner who was part of the team of this case, correct?
A. Yes.
Q. She's in San Francisco, is that right? Or, well, theoretically she lived in San Francisco?
A. She moved to New York for the trial, but in general she works in the San Francisco office.
Q. And you assembled a large team to assist you on this case, correct?
A. We did.
Q. That would include Adam Hollander?
A. That's right.
Q. At that time he was an associate in your New York office?
A. Yes.
Q. And Randy Kim I think you referenced a partner in San Francisco?
A. Yes.
Q. And Vivienne Stapp?
A. Yes, Vivienne Stapp.
Q. She's an associate in the San Francisco office?
A. That's correct.
Q. And Kendra Melrose?

A. That's right.
Q. You also had paralegals working on the case?
A. We did.
Q. Let me ask you, did I cover all the attorneys assigned to work on the Parse matter?
A. Melissa Desori, who I think at the time was an associate also worked with Ms. Edelstein on the legal issues. I believe David Elbaum worked briefly on the expert testimony issues that came up with Dr. DeRosa and I think others may have pitched in over the many years when we worked on the matter, but I think you've gotten the core team.
Q. And then you had non-attorney personnel as well, correct? Paralegals?
A. Paralegals, yes.
Q. David Benhamou?
A. Yes.
Q. Tell me, who is Brendan Henry?
A. There's a paralegal named Brendan in our office and I assume this is Brendan Henry, but as I sit here, I can't recall Brendan's last name.
Q. And who is Jenson Smith?
A. Jenson Smith is a paralegal in our office.
Q. Ariel Stoddard?
A. The same.
Q. Nancy Ma?

A. Nancy is a paralegal from the San Francisco office.
Q. You also had someone with the title of managing clerk, is that correct?
A. Correct.
Q. What does the managing clerk do for your office?
A. He is, he works primarily on the civil side, and is responsible for making sure that our filings go in properly. He also does sort of the last cite check on any brief that goes in, and he just helps out in any way on to sort of make sure things get to court and get filed properly.
Q. What's his name?
A. Ken Renta.
Q. And you also, I take it, have secretaries and other administrative staff at your firm, correct?
A. We have one secretary at the firm.
Q. And with regard to this specific case, you also hired outside help, is that correct?
A. Can you explain? By "help," do you mean were there contract lawyers or some other kind of help you're thinking of?
Q. Let's talk about the jury consultants.
A. Okay.
Q. Did you specifically hire a jury consultant for this case?
A. I hired Dennis Donahue.
Q. And Mr. Donahue was present during voir dire, correct?
A. He was.

Q. And provided assistance to you up to the point of voir dire, correct?
A. He --
Q. Prior to trial?
A. He provided assistance through voir dire, correct.
Q. And there was also Julie Blackman who was hired by Kramer Levin, correct?
A. Correct.
Q. You all were working somewhat collaboratively at least with Kramer Levin?
A. That's right.
Q. And tell me about your hiring of the Nardello firm?
A. That was something that was done together with the Kramer Levin firm. Mr. Nardello, as you may know, was an Assistant United States Attorney and is now a private investigator.
Q. And his motto, at least according to his website, is "We find out." Do you recall that?
A. I have to say it's been a while since I've looked at his site, but that sounds like an accurate description of what he strives to do.
Q. Although he is obviously a lawyer having been an assistant, he specializes now investigative work, is that correct?
A. That's my understanding of what he does.
Q. And you all -- I'll use that south of the Mason Dixon line term for you and the Kramer Levin firm -- hired him to do

research about the jurors in this case, is that correct, potential jurors?
A. That was one of the things that he did for us. And to be clear, when I say research, what I'm talking about is accessing computer databases concerning the jurors. There was a relatively short period to accomplish that, and so a combination of the paralegal team and the Nardello firm accomplished that.
Q. And are you distinguishing that from, say, out in the field work, going to visit people, talking to them?
A. Yes. His specific instructions were that no one should leave his office, that it was to be simply database research.
Q. And were those your instructions?
A. Those were my instructions, although I think Mr. Nardello is an ethical man and I don't think he would have done otherwise, but I wanted to be very clear with him.
Q. You also had Suann Ingle of Ingle Communications work on your team?
A. Yes.
Q. What was her role for your team?
A. Suann did graphics for the opening statement and the closing statement and perhaps some for Dr. DeRosa, and in addition she was in court to just sort of play the PowerPoint during the opening and the closing.
Q. So she was one of the people along the wall, is that right?

A. She wasn't there every day. That was someone else we shared with Kramer Levin. But when it came to the jury addresses, she was there, because she was the person who made the graphics.

Q. And who was that someone else that you just referenced?

A. I'm blacking on her name.

Q. Does Donna Kane ring a bell?

A. Yes, Donna Kane.

Q. She was with a firm called Decision Quest, is that right?

A. That's correct.

Q. You made sure your team had courtroom access to e-mails and internet here in the courtroom, right?

A. I think Ms. Trzaskoma handled it, but yes, we made those arrangements.

Q. So you had from voir dire forward access to the internet, correct?

A. That's right.

Q. Your e-mails, correct?

A. I didn't have a computer and I tried very hard not to look at my BlackBerry other than far from the courtroom, but those on our team, I think both Lori Edelstein and Theresa Trzaskoma, had laptops and access to e-mails in court.

Q. And you had that same access during jury deliberations?

A. Yes.

Q. And in fact your team used the internet and e-mail during,

from voir dire all the way through the verdict, right?
A. Yes.
Q. Now, Ms. Brune, you are an officer of this court, correct?
A. I am.
Q. And as an officer of the court you have ethical obligations, correct?
A. I do indeed.
Q. And you have an obligation to be truthful to the Court?
A. Yes.
Q. And you have an obligation to promptly disclose to the court any information that you might have suggesting juror misconduct, correct?
A. I don't agree with your characterization. I had an ethical obligation to bring whatever material that I thought was accurate to the Court and that's what I tried to do throughout the trial.
Q. On May 12, 2011, you received information, significant information that related potentially to Juror No. 1, correct?
A. On May 12 I had a discussion with Theresa Trzaskoma in which she described her sort of wondering whether the juror who had sent that note referring to respondeat superior and vicarious liability was the lawyer whom she'd earlier located by a Google search. I don't think that I received significant information, but I did have a conversation with Ms. Trzaskoma about the note, which was at that point new to us.

Q. All right. Well, let's talk about the pre voir dire stage. Now, your firm received the juror list from the juror clerk, correct?
A. That's my understanding, yes.
Q. And your team analyzed it and other information that you all had gathered at that point, correct?
A. I think what happened, and I wasn't as close to it as others, is that we received the questionnaires together with the jury list and then started kind of focusing on the questionnaires. But I agree with you that we received both.
Q. And the Nardello firm provided to you the results of the research that it was asked to do prior to the start of voir dire, correct?
A. That's right.
Q. Now, you conceded in your papers that you had in your possession the 2010 suspension opinion related to Catherine M. Conrad prior to the start of voir dire, correct?
A. I certainly said that and it's so.
Q. And in fact, Theresa Trzaskoma told you and showed you that opinion prior to the start of voir dire, correct?
A. I don't think it was prior to the start of voir dire, but it was in the morning before court, maybe some point mid-voir dire, and I don't know that she showed it to me, but we certainly discussed it in the presence of Dennis Donahue, the jury consultant.

Q. What were those discussions?
A. We didn't have really any information about Catherine Conrad. And I think it was sort of not on the list to search because it was sort of a common name, and Theresa explained, and I can't do this verbatim because at the time this was not such a huge event, but I think Theresa explained that she had gotten on Google, that she had found that there was a suspended lawyer with the name Catherine Conrad and we were going to be doing voir dire of this Catherine Conrad that day. So we talked about it with the jury consultant, and I said something to the jury consultant to the effect of, wow, this is very interesting and odd, because the trial is going to be about the law of economic substance and virtually every defendant in the case has a law degree, and so which way does that cut?
And my best recollection is that the jury consultant said you do not want this lady on your jury because a recovering alcoholic tends to be all about taking and imposing personal responsibility and that she'll be more focused on that than on the government's burden of proof, so if this is the same person you should strike her for cause and if that doesn't work you should get her off with a peremptory.
Q. Now, this opinion that your firm had in its hand had not just a first name and last name but a middle initial, correct?
A. When you say in hand, I don't know that I ever saw the thing and I certainly never saw a printout. But we certainly,

Ms. Trzaskoma certainly accessed it on the computer, and I now know that that opinion or decision includes the middle initial.
Q. And it was the identical name, Catherine M. Conrad, that appeared on the potential juror list that the clerk's office provided, correct?
A. I now know that to be so.
Q. Well, and that opinion was not just any suspension opinion, it was a New York court opinion, correct?
A. That's right.
Q. And you could have asked your team prior to the start of voir dire to do additional research on this issue, correct?
A. I certainly could have.
Q. And you chose not to?
A. I don't think I put it that way. The plan was to hear from her on voir dire and find out based on her answers to Judge Pauley whether she was the same person.
Q. Well, you didn't do it, correct, Ms. Brune?
A. If the question is --
Q. It's a simple question.
A. I know, and I'm trying really hard to answer it.
Q. It's really a yes or no. Did you or did you not ask any of your team prior to voir dire to do additional research?
A. Oh, I did not. That's absolutely so.
Q. You had everybody, you had a team of literally almost two dozen people available to you, correct?

A. Well, not necessarily all at once, but we certainly had resources and I certainly did not ask that more be done awaiting the answers from the prospective juror on voir dire.
Q. And you could have told the Court at that point, correct?
A. I certainly could have said to the Court that there is a Google search out there that reveals that there's a suspended lawyer by the name of Catherine Conrad.
Q. And you didn't do that?
A. I did not do that.
Q. Now you appreciated, it sounds to me just from what you said, pretty instantly, that this is potentially significant information, correct?
A. If it's the same person, it's very significant information. I certainly appreciated that.
Q. No one -- you didn't require anyone to have to explain that to you, correct?
A. No. I mean, we had a lot of Google-type information on a lot of jurors and, you know, it's a big metropolitan area. Some of that --
Q. Ms. Brune, I asked you a very specific question.
A. Can --
Q. You did not require anybody else to explain to you the significance of that information. Is that true?
A. If that's your question, the answer is no, I did not ask anyone to do any further research.

Q. And you didn't -- that is actually not answering the question I asked.
A. I'm sorry. Do it again and I'll try to get it.
Q. You understood this was significant information potentially, yes?
MR. GAIR: Objection, asked and answered, your Honor.
THE COURT: Overruled.
A. If it was the same person it was significant information, that's correct.
Q. And you didn't need anyone to explain to you that it was potentially significant information?
A. No.
Q. And that it would be significant to Judge Pauley, correct?
A. I believe that it was certainly going to be significant to Judge Pauley if it was the same person.
Q. And one way you find out if it's the same person is to ask Judge Pauley to ask the potential juror, correct?
A. No. If the person has sworn under oath that her highest level of education is college and has disclaimed any contact with any disciplinary authority, I don't think that was the reasonable course at all. What happened --
Q. Let me stop you there, Ms. Brune. Are you saying --
MR. SCHECTMAN: Judge, I'm okay with some stopping, but really not in the middle of answers.
THE COURT: Right. Did you complete your answer,

Ms. Brune?

THE WITNESS: I didn't, your Honor.

THE COURT: Go ahead and complete your answer, please.

A. We had a lot of Google-type information on a lot of different jurors. There were occasions where the information was obviously pertaining to the same person. That was fine. There was certainly situations where we were able to say, well, just not the same person and set it aside. I didn't sort of go to the judge each time and say, you know, Mr. Smith there says that he's -- and now I'm just giving the example -- a retired car mechanic, but I know there's a Mr. Smith who has some other occupation. I listened to the voir dire responses and I credited them.

Q. The question, though, Ms. Brune, and just so I'm clear about what your testimony is, are you saying that you could not have asked Judge Pauley to ask the question, just a very specific question of the juror, right then and there?

A. I certainly understood that I could have asked Judge Pauley to inquire.

Q. And you didn't do that?

A. I did not.

Q. And you knew you could have done that, correct?

A. Of course.

Q. Now, you had ways to narrow down the information that you had, correct?

A. My primary method of narrowing the information was to listen to the sworn testimony on voir dire. But certainly if what your question is could I have launched some kind of full scale private investigative effort on each member of the voir dire or each seated juror, I did not do that.
Q. Did you even ask Ms. Trzaskoma what was the middle initial? Because you had a middle initial, correct?
A. I did not ask that question.
Q. That would have been one way to narrow down the information, correct?
A. You know, when you say you had the middle initial, I'm answering the firm had the middle initial. As to whether Ms. Trzaskoma was focusing on the middle initial at that point, I don't know, but I did not focus on the middle initial until after the juror sent her letter to the government and then three weeks later the government disclosed it to us.
Q. Well, when you're asking -- I mean, I think you said that Nardello did not search Catherine Conrad, correct?
A. That's so.
Q. You had a Catherine M. Conrad of Bronxville, that was what was on the juror list, correct?
A. That's my understanding now.
Q. And in voir dire you understood going into, before it ever started, what the process is all about, correct?
A. I did.

Q. That's based on your experience as a trial attorney, correct?
A. I certainly understand the voir dire process.
Q. And I take it one of your goals of jury selection, primary goal was to get jurors that you believed would be sympathetic to the case that you were going to be presenting to the jury, correct?
A. I believed in our case and I wanted to be sure to have jurors I thought would be attentive and understand the arguments we were presenting, and of course you want to find jurors who are more likely to be sympathetic or open minded to defense themes.
Q. And you try to eliminate jurors you don't like for whatever the reason, correct?
A. That's certainly right.
Q. And the more information that you have, I take it, the better you can shape or try to shape the jury, correct?
A. That's the reason for the database and Google efforts that I've described.
Q. And hiring the Nardello firm, correct?
A. The Nardello firm, as I explained, was for the database effort, correct.
Q. And Dennis Donahue as well?
A. Yes.
Q. And it's why you submitted a lengthy proposed juror

questionnaire, correct?
A. I did. I wanted as much information as we were able to get about every prospective juror.
Q. Now, you understood that the voir dire process would be the judge asking the questions of the potential jurors, correct?
A. I did, but I also understood that the Court would likely ask other questions if we proposed them.
Q. So you understood that you could request of Judge Pauley to further inquire?
A. Yes.
Q. And you also understood that sometimes jurors don't give a full picture when they're giving the answers in response to voir dire questions, correct?
A. Yes. I certainly think that it's something that's within the realm of possibility that a juror might not be complete.
Q. And it's also possible, would you agree, during voir dire, that you could ask the judge to inquire about a completely new area if it occurs to you as the questioning is going on, correct?
A. Sure.
Q. And it was the Court's decision, would you agree, whether or not to ask any particular question.
A. Of course.
Q. It's not a decision that rests with you or the other defense counsel, correct?

A. That's correct, it's Judge Pauley's courtroom.
Q. And other than the peremptory challenges it was not your decision whether or not to seat any particular juror, correct?
A. He was the arbiter of the challenges for cause.
Q. And you and your team in fact raised questions and concerns with the Court during the voir dire?
A. Yes, we did.
Q. That includes Ms. Trzaskoma raising a concern about a, or an issue about a potential juror who worked at Goldman Sachs, correct?
A. I'm sure it's so. I can't remember this as I sit here, but she certainly raised questions about prospective jurors.
Q. And prior to the -- well, you recall, do you not, that the voir dire extended over several days?
A. I do.
Q. And prior to the start of the second day of voir dire, Judge Pauley solicited of counsel whether or not they had any additional questions to pose to the jury pool?
A. I'm sure he did. I can't remember it, but he certainly was open to questions proposed by defense counsel and government counsel.
Q. And do you recall that at that point Ms. Trzaskoma specifically asked the Court to ask another question of the jurors, that was, did they have any negative experiences with lawyers or accountants or financial advisers?

A. I do remember that.
Q. And at that point you could have asked Judge Pauley to inquire specifically of Juror No. 1, if I could call her Juror No. 1, I know the juror numbers changed, but Catherine Conrad?
A. I know who you mean.
Q. About the potentiality that she was a suspended attorney, correct?
A. Certainly could have asked him to do that.
Q. You had this potentially highly pertinent piece of information in your hands at that point and you did nothing with it with regard to what the Court was asking of the jurors.
A. As I think you know, we concluded it was a different person and therefore did not view it as the highly significant information that, unfortunately, it turned out to be.
Q. Well, you had a way, you had information in your hand that could have further illuminated this issue, correct?
A. When you say "in your hand" I think what you mean is that we knew it. We did not have in our hands a printout. But certainly we had the discussion that I've described and Ms. Trzaskoma had done the Google search that we've talked about.
Q. And that Google search resulted in her finding a document, correct?
A. That's my understanding, yes.
Q. And even if she didn't have a printout of it in court, she had it on the computer that she had sitting in front of her,

correct?
A. I don't know about that. I know that we had it or she had it or had read it on the computer that morning in the office. My recollection is that we were kind of laptops down during jury selection.
Q. Did you have access to a printer here in court?
A. We did.
Q. It was back somewhere in the nether regions?
A. Yes, it was back in that room that's right in the entryway.
Q. Now, at the beginning of the third day of voir dire, do you recall Ms. Trzaskoma raising a concern about the person I'll called Juror No. 20 whose mother worked at the FBI and who showed up the third day wearing the FBI turtleneck?
A. I will never forget that. I remember it very clearly.
Q. You found that very significant?
A. I did indeed.
Q. More significant can than the potentiality that someone might be a suspended attorney?
A. I think you understand I didn't believe there was a potentiality.
Q. You didn't know, Ms. Brune, did you?
A. At the time based on the juror's sworn statements, I believed she was someone else entirely. I obviously didn't know that she was the suspended lawyer.
Q. Well, you acquire knowledge by asking questions in many

instances, correct, Ms. Brune?
A. I think you know what I did is I listened to the voir dire that the juror gave and her answers and I credited her answers.
Q. Well, that wasn't my question, Ms. Brune. My question was, you can acquire knowledge by asking questions, correct?
A. I certainly cannot disagree with you. One way of acquiring knowledge is to ask questions.
Q. Did you tell the other defense counsel about the suspension opinion that you all had found?
A. During voir dire, I don't believe that we did.
Q. And at some point in time, and correct me if I'm wrong, but I believe based on something I think you had said in court that all the defense counsel met with Dennis Donahue prior to voir dire or prior to the actual selection of the jury?
A. Prior to the actual selection of the jury, all defense counsel did meet with Dennis Donahue.
Q. And you could have raised it at that point in time with the other defense counsel, correct?
A. And had I believed it was the same person I certainly would have.
Q. But you could have?
A. Oh, I certainly could have raised that this was information that I had discarded as not pertaining to the prospective juror, which would be true of a whole host of other information that we discarded.

Q. You could have, but you didn't, correct?
A. That's correct.
Q. Now, other defense counsel raised questions or concerns about various potential jurors, correct?
A. Now, you know that there was a joint defense agreement and I'm not by my answers in any way intending to waive it, but there certainly was a discussion and I think all of the defense counsel spoke their minds about prospective jurors. We were making our challenges collectively, so we had to work it out.
Q. And here in court during the process of voir dire with the judge, various defense counsel were raising issues and concerned, correct?
A. That's right.
Q. And some of those issues and concerns were not based on a hundred percent knowledge, correct?
A. That's certainly so.
Q. And some of it was just based on gut feelings about the way people were acting or looking, correct?
A. That's right.
Q. So it wasn't based on perfect knowledge, correct?
A. Unfortunately, that's true of jury selection in general. It certainly was not based on perfect knowledge.
Q. Now, you recall Mr. Aponte?
A. I think so.
Q. Well, do you recall that there was a juror who had criminal

convictions, correct?
A. Yes.
Q. He was the one who had the turnstile jumping conviction, correct?
A. Did he have a burglary case as well?
Q. Yes, the one who was the lookout for the burglary, correct?
A. Sounds like I'm right. That's what I recollect.
Q. And you didn't object to someone with a criminal conviction serving on the jury, correct?
A. We had to make choices among the panel and he wasn't my favorite, but we did not use a challenge for him.
Q. So am I correct, Ms. Brune, that the fact that someone has a criminal conviction in and of itself was not dispositive for you, correct?
A. It was not.
Q. And one of the issues that was raised from the very beginning and ran through the voir dire process was any particular person's availability to sit for what promised and in fact turned out to be a very long trial, correct?
A. The availability issue was a big one during voir dire.
Q. And in fact Judge Pauley opened up with the statement about the length of the trial and the scheduling issues, correct?
A. That's right.
Q. And you recall that Judge Pauley asked many jurors about, specifically about their availability during the three-month

trial?
A. Yes.
Q. You would agree it was an appropriate area for the Court to inquire?
A. Yes.
Q. Indeed a necessary area?
A. Yes.
Q. And it was appropriate for the jurors to tell the Court whether or not they would be available, correct?
A. Not only was it appropriate, I think that the Court's instructions to them were that they had to.
Q. Now, you were present for every day of the trial, correct?
A. Yes.
Q. And because of the way the tables were set up, you indeed had a direct view of the jury box, correct?
A. That's right.
Q. Unlike virtually anyone else in the courtroom, you were squarely facing them, correct?
A. Yes. I couldn't see the witness stand at all, but I could see the jury very well.
Q. And that included Ms. Conrad, correct?
A. Yes.
Q. You saw that during the trial she was an attentive juror?
A. Yes.
Q. She took a lot of notes?

A. I noticed that, yes.
Q. And you saw nothing that caused you concern about her demeanor or behavior during the trial, correct?
A. No. To the contrary, she seemed to be who she had presented herself to be.
Q. You in fact did not raise any concerns with the Court at any point during trial about her behavior as a juror?
A. No, I saw no cause for concern.
Q. Now, you were also present for the process leading up to jury deliberations, correct?
A. When you say the process, I'm sorry.
Q. I'll withdraw the question. You were present in court when Juror No. 1 sent I think a note, I think it might have been marked as Court Exhibit 3, prior to the start of jury deliberations, correct?
A. I was present in court, although I don't think I knew at that point what -- because I think what happened, I may be getting it a little wrong, but on May 10th, judging from the date on the note, she sent the note and then I recollect that Judge Pauley disclosed the note after all counsel had summed up and my recollection was that he did that because he didn't think it was fair to provide the note in the middle of summations. So he must have received it somewhere along the middle of the summations.
Q. And you were present when the judge read the note to

counsel, correct?

A. I was.

Q. And that prompted, that note prompted Ms. Trzaskoma and others in your firm to do additional research on Catherine Conrad, correct?

A. That's now my understanding, yes.

Q. Did you know that at the time?

A. No, I don't think so. But I'm not, I really don't think so.

Q. So is it your testimony here today that from 7:30 in the morning when Ms. Trzaskoma sends out the first e-mail --

MR. SCHECTMAN: Judge, just for the record, that 7:30 is the west coast time on the note, I'm almost certain it's 10:30 and I think we can probably stipulate to that.

MS. DAVIS: I'm not willing to stipulate to that, your Honor, and I'll move on, but I'm not willing to stipulate to that.

A. I'm sorry --

THE COURT: Why don't you put a new question to the witness?

Q. So is it your testimony here today that you were neither included on the e-mail traffic nor made aware of the e-mail traffic up through the beginning of jury deliberations?

A. I certainly was not included on any e-mail traffic. What I'm saying is I don't have a recollection of being made aware

that Ms. Trzaskoma was, as I now know, investigating via the internet.
Q. At what point did you become aware?
A. I think it was May 18th.
Q. Are you telling us that on May 12th you knew nothing about the research that Ms. Trzaskoma did?
A. Well, as I have already said, I certainly knew that she had looked on Google and had found this disciplinary decision or opinion, and on May 12th I knew that she had sort of thought about it and I assumed looked at it again.
Q. Let's talk about the conversation that you had with Ms. Trzaskoma.
A. Okay.
Q. On May 12th.
A. Yes.
Q. It was you and Ms. Trzaskoma and Ms. Edelstein present, correct?
A. That's correct.
Q. And it was at the end of the court day on May 12th.
A. That's correct.
Q. And you were in the process of leaving court, correct?
A. We had left court and as far as I can recollect we were across Foley Square, maybe close to 52 Duane.
Q. Where you had some sort of satellite office, is that right?
A. Yes.

Q. And as best as you can recall and with as much precision as you can muster, what exactly did Ms. Trzaskoma say to you as you were headed to 52 Duane?

A. So the three of us were together and Ms. Trzaskoma said something to me along these lines: You know, I'm starting to wonder in light of the juror note whether this Juror No. 1 could be the same person as this suspended lawyer.

And Ms. Edelstein said, "Well, what did she say in voir dire?" And Theresa reminded us of the stay at home wife and the education and the other aspects of the voir dire and she reminded us that this person had some kind of a personal injury suit in the Bronx. And at that point, I think it was Ms. Edelstein, but I may have been the person who said it, one of us said well, that makes perfect sense. That explains why she's making references to these concepts. They must have been at issue in her case, and here I'm having a little bit of a hard time separating what I thought and what was said, but I either thought or said, well, you know, Judge Pauley will set her straight in the jury charge and, you know, it's sort of just a silly note.

I thought that it all made sense because of the personal injury suit and that no lawyer would be so dumb as to think that vicarious liability or respondeat superior had any place in a criminal case.

So then, so back to the conversation, and again I got

the same problem of trying to remember what was said versus what was thought, but I think what was discussed is, look, it's not her. She's sworn before Judge Pauley,the note doesn't change the picture and, you know, this is kind of crazy. You can't start sending a private investigator out on a juror. She said she's someone else, she seems like a housewife from Bronxville. It would be unfathomable or inconceivable or something for a person who was in fact a lawyer to have sworn under oath that she was someone else. It was something where we discussed it and concluded that it made no sense, and Juror No. 1 was who she said she was.

Q. So just so I'm clear, Ms. Brune, Ms. Trzaskoma did tell you in that conversation that she thought Juror No. 1 could be Catherine Conrad the suspended attorney?

A. What she said is that note makes me wonder if it could be the same person.

Q. And are you telling me that Ms. Trzaskoma made no mention whatsoever of the Westlaw report that she had found?

A. I'm confident that's so, and here's why. Laurie Edelstein is the kind of person who will always kind of say, well, show me the case, show me the document. She's extremely thorough, and if she had referenced the document in the conversation that's what Ms. Edelstein would have said. So I know that there was no reference to it in the conversation.

Q. So even as you're standing there, Ms. Brune, the thought

occurred to you that you could have your team look into this, correct?
A. I certainly thought, well, here's this information on Google. Here's the sworn statement. We could have certainly done more. I didn't think it was proper in light of the fact that I didn't think there was anything to the idea that she was a suspended lawyer.
Q. Based on what information, actual information?
A. I credited her sworn voir dire responses. I went through the reasoning that I described that the note in a way ruled out the idea that she was a lawyer, and matched up with the idea that she was a litigant in the personal injury suit, and it made no sense that a lawyer would sit in a voir dire and lie that way.
Q. Did you read the indictment in this case, Ms. Brune?
A. I read the indictment in this case.
Q. And you understood that much of the indictment focused around the misconduct of lawyers, correct?
A. That is certainly what the indictment alleged.
Q. And a number of the defendants were lawyers, correct?
A. Yes.
Q. And a number of the cooperators and codefendants who pleaded guilty were lawyers, correct?
A. If what you're asking me is --
Q. It's a simple question, Ms. Brune.

A. Okay, that's fine. It's certainly so that many of the government witnesses were lawyers and that some of them had pleaded guilty.
Q. And their pleas included pleas to making false statements to the IRS, correct?
A. That's true.
Q. So it's not inconceivable that attorneys lie, correct?
A. I don't think that's what I said, but it's certainly not inconceivable that lawyers lie.
Q. And at the end of that conversation, you told Theresa Trzaskoma to leave it, correct?
A. I don't remember the words, but something to that effect.
Q. Now, she had been the partner in charge of the jury selection, correct, in terms of the detail work?
A. I was in charge of the jury selection. But you're right, she was closer to it than I.
Q. Did she tell you in that conversation that she had had basically an "oh, Jesus" moment?
A. She certainly did not say that.
Q. There was a possibility, Ms. Brune, that this was in fact true information. As you're standing there out in the plaza, that information existed, correct?
A. I didn't believe that at the time.
Q. Well, you didn't know, bottom line is you didn't know one way or the other, correct?

A. I certainly did not know.
Q. And you could have turned right around and contacted chambers about it, correct?
A. Had I thought that the information was accurate, I would have immediately contacted chambers.
Q. Why the qualifier, Ms. Brune? Bottom line is, you have a significant piece of information. You could have brought it to the Court's attention, then, correct?
A. I did not accord it significance at the time.
Q. You had an entire team and an investigative firm at your disposal, correct?
A. There's no question that we had resources.
Q. And you had a telephone with you, correct?
A. I did.
Q. And a BlackBerry?
A. My phone and my BlackBerry are the same thing, but yes.
Q. And you had access to, immediate access to e-mail, correct?
A. I certainly could have communicated with chambers.
Q. And you're confident, are you not, that if you had said to your team let's investigate this further, this is important, they would have done so, correct?
A. Yes. The team was very diligent.
Q. And they would have worked as long as it took to get the job done to your satisfaction, correct?
A. They worked hard, and they would have done whatever I asked

them to do, I believe.
Q. And that would have included working late at night, correct?
A. That is for sure.
Q. And you were present in court when the judge had to restart jury deliberations the next week, correct?
A. Yes.
Q. Because of a juror's illness, correct, or health condition?
A. Was that when Mr. Rosenbaum had to leave?
Q. Correct.
A. Yes.
Q. And there were still alternates left at that point in time, correct?
A. There were.
Q. More than one?
A. There were a whole row of alternates. I don't know how many, but at least four.
Q. Exactly. Did you think at that point in time that you might want to raise with the Court, hey, there's this issue out here, we don't know one way or the other, but it's important so wouldn't you like to know?
A. I did not believe there was an issue. Had I believed there was one, I would have raised it immediately with the Court. I certainly is not a benefit that I waited until Mr. Rosenbaum had taken ill. If I believed it was so, I would have let the

Court know.

Q. And you understood that the Court had the resources and ability to get information on its own, correct?

A. Oh, yes.

Q. And you chose not to bring either what you had found before voir dire or what you had found on March 12th to the Court's attention, correct?

A. I made no particular choice relating to May 12th because I didn't know that there was any more out there, but I certainly did not bring the Google search results to the Court.

Q. When you were an AUSA, would you have felt an obligation to bring that kind of information to the Court's attention?

A. I have the same obligation to the Court now as I did when I was an AUSA and had I believed that that information was accurate, I would have immediately brought it to the Court's attention.

Q. But you had no basis to know, Ms. Brune, one way or the other, about the accuracy of the information, correct?

A. I believed, based on the juror's sworn statements and the other factors, that she was someone else entirely.

Q. Let me ask you this question: In the papers and in court you all -- talking about her, oh, she was a stay at home wife. That does not preclude the possibility that she's an attorney, correct?

A. I think that's so. There certainly people are who are

lawyers who choose not to practice. What I was very focused on was her highest level of education that did not include any law school.
Q. You said that you found out more on May 18th?
A. That's right.
Q. What happened on May 18th?
A. Well, on May 15th while I was out of the country, Ms. Trzaskoma handled the telephone conference with the Court where this issue was first raised. Is this right? Is this right? No. I'm wrong. What I'm talking about, the first time I learned about the voir dire is I think July 18th. What I'm trying to say is that --
Q. Could I stop you there? Because I'm trying to keep in somewhat chronological order.
A. I'm sorry, I got it wrong what I said earlier. What I'm trying to say is I learned about the Westlaw report after that conference with the Court that Ms. Trzaskoma handled so I think that puts us to July 18th.
Q. All right, so now that we've got the days straightened out --
A. Sorry about that.
Q. You said a moment ago that Ms. Edelstein is the kind of person who wants to see documents, cases.
A. She's a very thorough person.
Q. Did she ask to see the suspension opinion that had been

found prior to voir dire?
A. Now we're back to the conversation on Foley Square?
Q. I'm just asking a question, I'm not putting a date on it.
MR. SCHECTMAN: Judge, it would be helpful if we had a date.
Q. I don't know the answer so I'm going to ask the broad question.
A. Okay.
Q. At the time, around the time before the verdict came in --
A. Okay, that's helpful.
Q. Do you know whether Ms. Edelstein asked to see the suspension opinion?
A. I don't think that she did, but I don't know one way or the other. She certainly didn't in the conversation on Foley Square that we've been talking about.
Q. You do know, don't you, though, that on May 12th, Ms. Trzaskoma told not the Court about the suspension issue but Mr. Schoeman and Mr. Berke, correct?
MR. SCHECTMAN: Judge, I object. I don't think the date is accurate. I think it's leading. I mean, I don't object to much leading, but the date's not accurate.
MS. DAVIS: Your Honor if I might, 611(c) allows us to lead with a witness identified as an adverse party.
THE COURT: He's not objecting to leading. He's objecting to leading with an erroneous assumption or statement

of fact in the question, that's all. He's concerned about the date. I don't know whether he's right or wrong, but why don't you see if you can establish a date with the witness.
A. I'm sorry.
Q. Ms. Brune, you know that Ms. Trzaskoma had a conversation with Barry Berke and Paul Schoeman about the possibility that she was a suspended attorney.
A. I know that now because I've seen these affidavits that have come in. I don't think I knew it at the time.
Q. She did not tell you?
A. I don't have a very clear recollection of this, but I don't think she did.
Q. Now, let's move to June 23rd. Let me -- withdrawn. You will agree, would you not, that jury deliberations took a relatively long time in this case.
A. It took eight days, as I recall.
Q. And pursuant to the judge's order, a member of your team was in court or nearly in court that whole time, correct?
A. I personally was there throughout the deliberations.
Q. And at any point in time prior to the time of the verdict you could have raised what your firm had learned both before voir dire started and on May 12th, correct?
A. There is no question --
Q. And it's a could have. It's a could have.
A. There is no question that we could have addressed the Court

at any point.
Q. Now, when you got a copy of Ms. Conrad's letter to Mr. Okula, you subsequently had conversations with the defense counsel, correct?
A. I did.
Q. And did you tell them at or around that time what you previously found out?
A. The communications were joint defense communications. I don't mind answering the question so long as there's no contention that there's a broader waiver of the joint defense privilege and so long as no other party to the --
MR. GAIR: We have no objection, your Honor, on behalf of Mr. Daugerdas.
A. I got the jury note, read it, very upset, set it aside. Ms. Edelstein looked at the letter which had the phone number and went on the Bar website and saw that the phone number matched. We still --
Q. Can I stop you there, Ms. Brune?
A. Yes, I'm sorry, I'm trying to answer your question and you're right that it does not in the way that you want me to. What I'm trying to say is it took us a couple of days after we received the note to communicate with our co-counsel.

(Continued next page)

Q. But my question was a far more specific one that you still haven't answered, Ms. Brune.
A. I'm going to.
Q. Which was, just so we are clear, did you tell the defense counsel within that several-day period about what you had previously learned from Google, the suspension opinion, and the Westlaw report?
A. I did not at that point know anything about the Westlaw report. I did not discuss the Google search with co-counsel.
Q. Did you at any point advise them about the Google search?
A. No.
Q. At some point in time am I correct in assuming that you actually reviewed the Westlaw report?
A. Here is where I got the dates wrong. There was the conference with the Court which Ms. Trzaskoma handled and we had to submit a letter to the Court. So then on that Monday, which I think is July 18th, I had a discussion with Ms. Edelstein and Ms. Trzaskoma, and at that point I learned that there was this Westlaw report floating around.
Q. You learned specifically that this was the Westlaw report that Ms. Trzaskoma had found or had been provided by Mr. Benhamou on May 12th, correct?
A. Yes. We were very focused on making sure what we said in the letter was accurate, and that was a part of it.
Q. Before this time period you had filed a brief, right?

A. That's right.
Q. It was filed under your signature?
A. It was.
Q. With your ECF number?
A. That's so.
Q. You were ultimately responsible for the factual assertions in that brief, correct?
A. Yes. I reviewed it and I signed it and I am responsible for it.
Q. That set of facts was not accurate and complete, was it, Ms. Brune?
A. When I reflect on that brief, and I certainly have done so repeatedly and at length, it's the thing that I regret. What I mean by that is we kind of missed it. There were two things that were going on. One is we were spending a lot of energy trying to persuade ourselves that what we were going to say to the judge was right, that is, that there was this fraud that happened, and we were very focused on not having Mr. Parse's application kicked out the way that it was kicked out in Martha Stewart for not sort of having proved it enough.

I certainly thought about the waiver issue. But what I really missed is I thought that the government would likely inquire and we would say we didn't know, because we didn't know. I certainly never imagined that the reality that we did not know was going to assume the sort of debate level

prominence it has here. I missed the issue, and I really regret that. It was, I think, a good brief, but it missed it.
Q. Do you think good briefs omit material facts, Ms. Brune?
A. I certainly do not think that about briefs.
Q. You knew when you wrote that brief about the suspension opinion that Ms. Trzaskoma had found, correct?
A. That's correct.
Q. There is no mention of that in the brief, correct?
MR. SHECHTMAN: Judge, there is mention of the suspension opinion in the brief.
THE COURT: Overruled.
A. You are right that the brief does not include a discussion of our having accessed the suspension opinion during the trial.
Q. In fact, it's worse than that, Ms. Brune. You claim in that brief that it was the letter of Ms. Conrad that prompted you to investigate. That was simply not accurate, correct?
A. I think it was accurate in that we did not launch an investigation of the sort that was described in the brief until after the government disclosed the letter. But as I've said, I missed that issue in terms of how the brief was written.
Q. Ms. Trzaskoma drafted in the first instance the set of facts for that brief, correct?
A. Yes, that's right.
Q. She was well aware of the investigation that she asked be done on May 12th, correct?

A. She certainly was aware of what had been done, that's correct.
Q. Are you shying away from using the word "investigate" to describe what it was that you and Mr. Benhamou and Mr. Kim and Ms. Stapp were doing on the morning of May 12th?
A. It's not that I'm shying away. I just don't think it is accurate. To me "investigation" means more than looking at a database search. What I think of as an investigation is what we ended up doing once we received the jury letter.
Q. You also stated in your memorandum at page 32 note 13 that the defendants had no basis to inquire whether Conrad was lying in response to the Court's questions. That is just wrong, Ms. Brune.
A. I have I think already said that having reflected on all this, I think there are a number of things that I wish had been said differently. What I was trying to convey to the Court in the brief was the reality, which is that we didn't think it was the same person and we were shocked when we received the note and found out about the phone number matching.
Q. Had you seen the email traffic at that point in time when you filed the brief, Ms. Brune?
A. No, I had not.
Q. But you know now that Ms. Trzaskoma knew about that email traffic, correct?
A. She did.

Q. She is under the same ethical obligations that you are, correct?
A. She is.
Q. She is a partner in the law firm, correct?
A. That's right.
Q. She made an appearance in this court, correct?
A. She did.
Q. She, notwithstanding your role as the ultimate supervisor, cannot evade those ethical obligations by claiming that you're the person in charge, correct?
A. No. She has independent ethical obligations, there's no question.
Q. Obligations to bring material information to the Court's attention, correct?
A. She has the same ethical obligations as I do or any other lawyer in this court does.
Q. Did she review the final brief?
A. I'm certain she did.
Q. I may have it wrong, so correct me if I am wrong, Ms. Brune -- but let me ask you, on what date did you see the email traffic?
A. We gathered the email traffic as part of this period leading up to our submitting the July 21st letter. So I saw I think all of it before we submitted the letter. I was very focused on making sure that I had the information to convey to

the Court.
Q. Do you think it was before the July 15th conference call with the Court?
A. I did not see it before the July 15th conference call with the Court.
Q. Do you think it was before you filed your July 21st letter?
A. Yes, it was.
Q. You were not on the July 15th conference call, correct?
A. That's correct.
Q. You saw a transcript of the conference call?
A. Ms. Trzaskoma let me know about it immediately after that, and I also read the transcript when it became available.
Q. Approximately when was that? Was that before you filed your July 21st letter?
A. Oh, yes, within a day.
Q. You're accustomed to get daily or -- in other words, this was not an instance where you ordered like a 30-day-out transcript?
A. Oh, no. We had to respond, so I read the transcript to make sure that I knew what Judge Pauley was directing us to do.
Q. At the point at which you saw those emails, Ms. Brune, at the very least you knew that Ms. Trzaskoma's statements to the Court in that conference call were not correct?
A. I disagree.
Q. Did she reveal to the Court what she knew?

A. What she did was what the judge had sort of given people the option of saying that they would do, which is that she said that she would submit a letter, and then we worked very hard to submit a letter that was accurate.

MR. DAVIS: Mr. Wooten, could I have Government Exhibit 9, page 12, please.

Could I have a moment, your Honor?

THE COURT: Take your time.

Q. Can you see it up there?

A. Yes.

Q. Do you see where Ms. Trzaskoma, in response to the Court's inquiry, said, "Your Honor, we were not aware of the facts that have come to light, and I think if your Honor deems it appropriate, we can submit a letter"? Correct?

A. She did say that.

Q. One of the facts that had come to light was the very same suspension opinion that she had found before voir dire ever started, correct?

A. I think what she is trying to convey there --

Q. That's not my question.

A. I'm sorry. If you could say it again.

Q. I'm just asking a very straightforward question, Ms. Brune.

A. I know it, but it's not a yes or no, I don't think.

Q. Sure it is. The question is, one of the facts that came to light that you attached was the Westlaw report, correct? You

attached that to your July 21st letter, correct?
A. When we submitted the letter, as she had promised to do, we certainly attached the Westlaw opinion.
Q. That was a fact that had come to light, correct?
A. Yes, that's correct.
Q. She's telling the Court, we were not aware of them, clearly trying to imply that you all found this well after the trial was over, correct?
A. I don't think that's what she meant to imply at all. I think what she is saying is that we were going to submit a letter and the plan was then to submit a letter laying it out, which is what we did.
I don't believe Ms. Trzaskoma was trying to mislead the Court. I think she was not as precise as she should have been, and she would have done better to say we are going to submit a letter, but I don't believe she was trying to mislead the Court. Indeed, we laid it out in the letter.
Q. Let me stop you there. You are so far beyond the question that I asked that I would like to get us back on track, if I could. In your brief you told this Court and painted a picture like the beginning of your knowledge was the letter from Ms. Conrad. You omitted everything that had happened prior to that, correct?
A. I believe that it's true that our knowledge came after we received the letter. That's what the brief was intended to

convey. As I think I've already said, though, when I reflect on the brief, I think we missed it. And it's something that I greatly regret, there is no question about that.
Q. The Court convened a conference call on July 22nd, correct?
A. Yes, that's right.
Q. You participated on that call, correct?
A. I did.
Q. Indeed, the Court inquired of the defense counsel why he was getting two different versions of the facts, correct?
A. Something along those lines, yes.
Q. When you compare what you said in the July 21st letter to the facts as laid out in the brief, those are two very different set of facts, correct?
A. I can't sort of say for sure what Judge Pauley was thinking, but he certainly was conveying that he wanted to get to the bottom of things and that he was not happy with us.
Q. That wasn't my question, Ms. Brune. My question was, if you compare the facts as they are laid out in your letter to the facts as they are laid out in the brief, those are two very different sets of facts, correct?
A. I don't agree with you. I thought what you were asking me to say was what Judge Pauley was thinking.
Q. No, that wasn't my question. Is it your testimony here, Ms. Brune, that you did not find it a material fact, the things that you uncovered prior to the return of the jury's verdict?

It's a simple question.

A. The standard under McDonough is actual knowledge. We didn't know. I don't think it is material to the legal analysis. That having been said, I think if had we to do it over again, the equivalent of the July 21st letter should have been submitted alongside the brief. I missed the issue of what the government's position was going to be.

Q. You're familiar, are you not, Ms. Brune, with the cases subsequent to McDonough that have held that full knowledge is not required, that defense counsel has an obligation to bring potential misconduct to the Court's attention so that the court can deal with it, correct?

A. I've certainly read a lot more of the waiver cases since this whole issue has been joined. As an ethical matter, though, the standard is if the lawyer has actual knowledge of juror misconduct. We did not have actual knowledge of juror misconduct. Indeed, we believed, erroneously it now appears for certain, there was no juror misconduct.

Q. I wasn't asking about the New York ethical rule that I think you're referring to, Ms. Brune.

A. I'm sorry. If you asked me about an ethical matter, that's my understanding.

Q. I'll withdraw the question. You acknowledged in that July 22nd telephone call that you, your firm, or defendant Parse, was differently situated than other defendants, correct?

A. Yes.
Q. You knew that at the time you filed the brief?
A. I believed it to be so. My basis for that is when I called the other lawyers in the case to let them know what our several days of investigating in the wake of the letter made us believe could be true -- we still weren't sure but we were getting a lot surer -- they all expressed complete surprise. Based on that, I believed that we were somewhat differently situated. Although, as I think you know, we were surprised.
Q. You could have filed a separate brief, correct?
A. We could have, yes.
Q. With an accurate statement of the facts, correct?
A. We certainly could have filed a separate brief. As it turned out, because the resources were different, we took by far the laboring oar with the brief.
Q. Isn't it true that on that July 22nd call you said essentially, and I can bring up the transcript if you would like to see it, that you intended to lay out the facts as it related to waiver essentially when and if the government asked?
A. That is pretty much what I said. I certainly thought it was the case that the government might well raise the waiver issue. As I said, I kind of missed where this was all going. But I certainly thought the government was likely going to inquire did we know. I didn't know and I don't believe anyone else at our firm did, so I certainly planned to answer the

government and the Court accurately when the issue was presented.

Q. Is that the ethical standard that governed you when you were an AUSA, Ms. Brune?

A. That I was supposed to raise the other side's point in my brief when I didn't know what position they were taking? I don't think that governs any Assistant U.S. Attorney.

Q. No, I think it is really more that you were willing to lay out the accurate set of facts if and only if the government would ask you to do so.

A. We've already talked about the brief and how I in some respects missed the issue, which I regret. Of course, both defense counsel AUSA's are obliged to lay things out for the court accurately. It is something that throughout my career I have always strived to do.

Q. But for the Court's pressing and the government's pressing, you would have never disclosed those facts to the government, isn't that right, Ms. Brune?

A. If the government chose not to raise the waiver issue, and as I thought about it I actually thought that the government had far more information or at least had access to far more information, my sense at the time was that the government had probably Googled her, too. But I thought that if the government chose to make it an issue, I was prepared to respond and respond accurately, which I tried very hard to do.

Q. The question was that you were willing to provide a complete and accurate set of facts if and only if the government asked, is that what you are saying?
A. No, that's not what I'm saying at all. I tried very hard to be accurate in the brief that we submitted. It has the shortcomings that we have talked about.
Q. It has material omissions, Ms. Brune?
A. I certainly have tried to be accurate.
Q. It has material omissions, correct?
A. I do not believe that it was written with the goal of making a material omission. I believed then and believe now that the standard is actual knowledge. We did not have actual knowledge or anything near that. We were shocked when we received the letter.
Q. It has material omissions in it?
MR. SHECHTMAN: Asked and answered.
MR. DAVIS: No, I don't believe she has answered it, your Honor.
THE COURT: Overruled.
A. I did not believe that it had material omissions in the sense that anyone writing the brief or in my case signing the brief intended to make material omissions. I think that what we were trying to do was we were trying to describe the post-letter investigation that we undertook and we were trying to convey what is accurate, which is that it was the letter that

prompted us to doubt the voir dire and to investigate.
Q. One of the questions that the judge asked on the July 22nd phonecall related to the jury consultants in this case, correct?
A. That's right.
Q. You identified Mr. Donohue, correct?
A. That's right.
Q. I believe Mr. Gair also made some statements about Mr. Donohue's relationship with his law firm, correct?
A. Right.
Q. Julie Blackman was identified, correct?
A. That's right.
Q. The Court specifically said that he was looking to understand who was involved in the process, meaning the voir dire process, between the time that the juror questionnaires were completed and the time the voir dire commenced on March 1st. Do you recall that?
A. I looked back at the transcript in preparation for the hearing. I think the Court in context was asking about the jury consultants, which is Mr. Schoeman responded to the Court's question by saying -- either he responded or it was in the whole thing. We were talking about the jury consultants, and Mr. Nardello was simply not a jury consultant.
Q. He did investigated work related to the very topic that the judge had just indicated he was interested in, correct?

A. There was no question that he did investigative work in the wake of the letter, and I think that's laid out in our brief. But he did no work pertaining to Juror No. 1 until we received the letter.
Q. Is it your claim that the Nardello firm's work was identified in your brief?
A. I think so. I think what our brief says is we hired a private investigator. It lays out the materials that we gathered.
Q. You didn't see fit to tell Judge Pauley on the conference call, by the way, we had this investigative firm?
A. I was involved. I really think it was in the brief. I could be mistaken, but I think it was in the brief. The question was, who are your jury consultants, which is what Mr. Schoeman and I were trying to respond to.
Q. The judge says he's trying to understand who was involved. He didn't say which jury consultants. He was trying to understand who was involved. Natdello was involved, correct?
MR. GAIR: I'm going to object to the compound form of the question.
THE COURT: Sustained.
Q. You knew Nardello had done jury research, correct? It's a very simple yes or no.
A. That is certainly so.
Q. It's a very simple question.

A. Except by jury research I want to be sure you understand. He had done this database work during jury selection but not pertaining to the juror we were focused on in the call, Catherine Conrad.
Q. That was the point you made before. That wasn't my question. You had knowledge here that he did the jury search, correct?
A. He certainly researched online about prospective jurors, and then, after we got the letter, we retained him to do an investigation about whether this was the same person.
Q. The judge on the July 22nd telephone call was clearly trying to identify all the people who had been involved in that process, correct?
MR. GAIR: Your Honor, I'm going to object to this question.
THE COURT: Sustained.
Q. You didn't identify Mr. Nardello's firm to the judge on that phonecall? Yes or no.
A. I did not on that phonecall talk about Mr. Nardello, you're correct on that.
Q. Subsequently, the government requested discovery specifically about what your firm knew, correct?
A. That's right.
Q. You strongly resisted that discovery, correct?
A. We filed a brief pertaining to our client's work product

doctrine protection for the work we had done.
Q. You knew that those documents would significantly advance the government's position on the waiver issue, correct?
A. No, because the July 21st letter lays it out, lays it out accurately, including the fact that Ms. Trzaskoma had that initial thought that it was one and the same.
Q. Are you referring to the "Jesus, I do think that it's her" email?
A. Yes.
Q. You met with Ms. Trzaskoma and Ms. Edelstein prior to this hearing, correct?
A. We worked together. I've certainly talked with her on many occasions about the issues that are before the judge in this hearing. I'm testifying from my own best recollection, but I've certainly talked with them about the issues.
Q. How many times did you meet with them to discuss this hearing?
A. Never. What I'm saying is I've talked about the issues with them. We worked very hard on the July 21st letter to try to get it accurate, but we did not meet in preparation for this hearing.
Q. So, you didn't discuss what your answers would be?
A. I think that they know what my recollection is, and I think I know what their recollection is, because we worked so hard on the letter to reconstruct what had happened.

Q. Just a few more questions, Ms. Brune. You used the phrase a couple of times in discussing your brief "missed the issue." What precisely do you mean by that?
A. We were so focused on establishing that this was the same person. And on the waiver issue I was very focused on the reality, which is that we didn't know. So, the issue that I missed was that there are things in the brief, without knowing what we knew, could be read to understand that the first time we even did the Google search was after we got the letter. And that's not right and that's the thing that I really regret.
What we were trying to convey was we were shocked, which was true. But I think that there are phrases in the brief which, if you don't know what we knew, could be read differently. That's not the standard that we aspire to as a firm, and in that we fell short.
Q. David Parse was convicted of some of the charges, correct?
A. Two of the six, that's right.
Q. He was acquitted of the other four charges, correct?
A. Yes.
Q. You thought that the jury rendered a fair and impartial verdict on those acquitted charges, didn't you?
A. Yes, I did.
MR. DAVIS: No further questions.
THE COURT: Mr. Shechtman, do you have inquiry to make?

MR. SHECHTMAN: I do, your Honor. Would it be an appropriate time to take a short break?

THE COURT: Yes, it would be.

MS. DAVIS: I apologize, your Honor. I lost track of the time.

THE COURT: It's all right. We'll take a ten-minute recess and resume.

(Recess)

THE COURT: Mr. Shechtman, you may inquire.

MR. SHECHTMAN: Thank you, Judge.

CROSS-EXAMINATION

BY MR. SHECHTMAN:

Q. Ms. Brune, when your firm exercised its challenges for cause and its peremptory challenges, did you believe Catherine Conrad, Juror No. 1, was a suspended lawyer?

A. No.

Q. Why not?

A. During the voir dire we believed that her sworn responses to Judge Pauley's questions ruled that out.

Q. If you had believed that she was a suspended lawyer, indeed a suspended lawyer with an alcohol dependency, would you have wanted her on the jury?

A. No.

Q. Why not?

A. First of all, the case involved lawyers, and I think that

would have been very distracting and would have not made her a good juror. Second, I have a great deal of faith in our jury consultant, and he told us that he did not think it was a good idea to have a recovering alcoholic on the jury.

Third, the most important thing that any juror is supposed to do is follow the judge's instructions. If I had known that a person was prepared to defy the Court by lying on voir dire, I would never have had any confidence that the person would follow the Court's instructions. So there's no way that I wanted this person, if indeed she was a suspended lawyer, to sit on this jury.

Q. Ms. Brune, would I be correct that your firm received Ms. Conrad's letter to Mr. Okula approximately June 20th of 2011?

A. That's right. It was about three weeks after it was posted to the government.

Q. At any time between the verdict in this case on May 24th and the receipt of Ms. Conrad's letter on June 20th, had your firm given any consideration to raising a juror misconduct issue relating to Ms. Conrad as a basis for post-trial motions?

A. No.

Q. Why not?

A. I didn't think there had been juror misconduct.

Q. At any time during that same period did your firm give any consideration to raising a juror misconduct issue as to Ms. Conrad as an appellate issue?

A. No.
Q. I ask you the same question. Why not?
A. We spent a lot of time thinking about appellate issues, but we didn't think that there had been juror misconduct and therefore didn't think that there was an appellate issue.
Q. At any time between the verdict on May 24th and the receipt of the letter on June 20th, did your firm contact the Nardello firm to do additional investigation about Ms. Conrad?
A. No.
Q. Why not?
A. I didn't think there was anything to investigate.
Q. At any time during these proceedings, "these proceedings" meaning between the initial voir dire and today, have you tried to sandbag this Court or plant error in the record as to Juror No. 1, Ms. Conrad?
A. No.
MR. SHECHTMAN: No further questions, Judge.
THE COURT: Redirect, Ms. Davis?
MR. DAVIS: I assume there is no other defense counsel who wishes to inquire?
THE COURT: Does any defense counsel wish to inquire?
MR. GAIR: No, thank you, your Honor.
MR. ROTERT: No, thank you, Judge.
MS. McCARTHY: No, your Honor.
MR. DAVIS: Just briefly, your Honor.

REDIRECT EXAMINATION
BY MR. DAVIS:
Q. Do you have Government Exhibit 28 in front of you, Ms. Brune?
A. I might. Is it in one of these binders?
Q. It should be. If not, we will certainly get you a copy.
A. Let me look.
Q. I think it might be in the folders.
A. There is a tab that says 28. Let me take a look.
Q. I don't know if those are the defense or the government exhibits.
A. This is probably not it. I have it.
Q. Do you recognize that document?
A. I do indeed.
Q. It's your July 21st letter at the Court, correct?
A. That's correct.

MR. DAVIS: Your Honor, the government moves to admit Government Exhibit 28.

THE COURT: Any objection?

MR. SHECHTMAN: No objection.

THE COURT: Government Exhibit 28 is received in evidence.

(Government's Exhibit 28 received in evidence)

Q. If you could, Ms. Brune, turn to the Westlaw report that is attached as an exhibit.

A. OK.
Q. You have had a chance, I take it, to review this Westlaw report prior to this very moment, correct?
A. Yes.
Q. I'd like to take you through it very briefly.
MR. GAIR: Objection, your Honor. Way beyond the scope.
THE COURT: Overruled.
Q. The top of it says Catherine M. Conrad, correct?
A. Yes, it does.
Q. That is the identical name that was provided to your firm with the jury list at the very beginning before voir dire ever started, correct?
A. That's right.
Q. It has the year of birth of 1969, correct?
A. I'm sure you're right.
Q. I'm going front page.
A. OK.
Q. Do you see that?
A. It says that the person's age is 41.
Q. It also has a year of birth 1969?
MR. SHECHTMAN: Objection.
THE COURT: It's redacted in the exhibit.
Q. Very well. It has her age?
A. It does.

Q. Further down, under "Addresses" it has a Bronxville address, correct?

A. At the top it has the Bronx address. Then there are a whole bunch of other addresses, including the Bronxville address.

Q. If you turn the page, there are listings of various lawsuits, correct?

A. I am now on page 2, and you're right, there are some lawsuits listed there.

Q. Including one that relates or has listed a Bronxville address, correct, under New York docket judgment at the bottom there on page 2?

A. Yes.

Q. If you turn to what's numbered as page 9, it's a couple of pages in, do you see there is a head of household description on that page?

A. Yes.

Q. One of the people that's listed as an individual in the household is Robert J. Conrad, correct?

A. Not under "Head of Household." But where it says "Additional Individuals," it has "Robert J. Conrad, spouse."

Q. Spouse, correct?

A. Right.

Q. You know now, looking at the email traffic from May 12th, that Ms. Trzaskoma had identified Robert J. Conrad as an

immigration judge, her father, correct?
A. I certainly read that in the email that we produced.
Q. That's what the email says, correct?
A. That's what the email says.
Q. Going to page 11, it has information from the New York State Office of Court Administration, correct?
A. It does.
Q. It references license status as a suspended attorney, correct?
A. Yes, it does.
Q. You have just testified on cross-examination that you didn't think you had anything to investigate about her, correct?
A. That's right.
Q. If you had seen this Westlaw report on May 12th, you would have thought you had something to investigate, correct?
A. I didn't, but I have to say that I don't believe it would have changed what happened here. By that I mean that this thing to me, without having any particular expertise in these things, looks like it mushed two people with the same name together. I was convinced that she was the Bronxville stay-at-home wife and not the suspended lawyer.

(Continued on next page)

Q. And none of these pieces of information would have been important to you, is that what you're saying?
A. What I'm saying is, is this thing to me looks, and I think would have looked had I seen it at the time, as kind of like a credit report, and I think it would have confirmed what I thought I already knew, which is that there were two people who had the same name. Now that we know the truth, it seems like this is information that could point the other way, but I think if I had it I wouldn't have seen it as changing the picture that we had.
Q. And you wouldn't have chosen to investigate?
A. I would not.
Q. Despite your training as an AUSA conducting many Grand Jury investigations?
A. That's right.
MS. DAVIS: No further questions.
MR. SCHECTMAN: Just one, Judge.
RECROSS EXAMINATION
BY MR. SCHECTMAN:
Q. Ms. Brune, the Social Security numbers are redacted from that document, am I correct?
A. That's correct.
Q. Have you had a chance to look at the unredacted version?
A. Yes.
Q. And what have you learned about the Social Security

numbers?

A. The thing has something that said fraud alert and it indicates that there were two Social Security numbers, and so, of course I'm just testifying about what I would have thought, but I thought that would be consistent with what I thought I knew, that there were two people floating around with the same name.

MR. SCHECTMAN: Thank you.

THE COURT: Anything further, Ms. Davis?

MS. DAVIS: No, your Honor.

THE COURT: Ms. Brune, I have a question for you. Would your firm have disclosed the information in your firm's July 21 letter and the investigation into Juror No. 1 if the Court had not inquired or the government failed to raise the waiver issue?

THE WITNESS: I don't think we would have, your Honor. And as I think about it, we have an ethical obligation to be accurate and honest, and it's something that we take very seriously. But I don't think that we're obliged to identify arguments that the government might make in our opening brief. I mean, when we go through the case law, of course, we have to say the authority and then if we think there's contrary authority out there we have to state that, but as I said to the Court on the call, I kind of assumed it was coming and I was going to respond accurately. So I didn't spend a lot of time

thinking about, well, what will happen if nobody ever raises it. But if nobody ever raised it, I don't think that I would have even been acting ethically if I said on behalf of my client, hey, here's an argument I don't even think is meritorious but the government has omitted to raise it so I on the defense side will raise it.

THE COURT: All right. Any further inquiries? Ms. Davis or Mr. Schectman?

MS. DAVIS: Can I have one brief followup on that, your Honor?

THE COURT: Yes.

MS. DAVIS: Can I just do it from right here?

THE COURT: Yes.

REDIRECT EXAMINATION

BY MS. DAVIS:

Q. Are you talking about facts or argument, Ms. Brune, when you say you wouldn't have -- are you saying you would not have disclosed the underlying facts or wouldn't have made the legal argument?

A. If it was put in issue by the Court or by the government, I would have done and in fact did do what I did. It's a little tangled up. What I'm trying to say is, I would have laid it out, which is what I did.

Q. The facts, though?

A. Well, I also try to lay out the applicable law. I'm not

sure I completely understand your question, but the point is, if it became an issue I of course would lay out the accurate facts.

THE COURT: But then how would the Court or the government have anticipated that your firm had knowledge about certain matters if you didn't disclose it?

THE WITNESS: Well, the way that it came up, Judge, is that the government said something like, well, anybody can see that if you Google this it comes up. And it was sort of lying there right on the surface, that if you Google it, it comes up. And that's why I said to the Court that I assumed it was going to come up. But I didn't think I was supposed to make arguments if the government wasn't going to make it.

It would have been a different matter if we had knowledge. We didn't know. I didn't think it was a meritorious argument or an issue that in any way undercut the application that we made. But if the government wanted to raise the argument and it was sort of their choice, then we followed that wherever it led.

I mean, I really thought that the government had Googled too, and that we were in the same place with respect to Juror No. 1. But the government clearly Googled her at the point that they received the letter. So it was not like it was some mysterious thing that one can conduct a Google search on this juror. I did not know about the Westlaw report at the

time that I took that approach. I don't think it changes the picture because I don't think the Westlaw report itself has the picture. But what I had in making this decision was I figured they'd Googled, I Googled. I figured they didn't think she was a suspended lawyer based on the Google search and the note to the Court. I didn't think it was the suspended lawyer. But I figured if they were going to raise the Google issue, I'd lay it out.

THE COURT: Did you ever consider consulting with the government about the wild possibility that Juror No. 1 was in fact a suspended lawyer, given your testimony right now that it was your assumption that the government was also looking into jurors on the internet?

THE WITNESS: I did not. I think that the government and I come to different conclusions sometimes about things, but I know --

THE COURT: Why not? Why not? If you knew that -- if it was your assumption that they were expending the same kind of resources researching the matter as you were.

THE WITNESS: I'm a little bit in a zone where I'm not describing my thought processes, because I didn't think about raising it with the government. But what I'm trying to say is I assumed that the government and its paralegals and all the rest Googled the jurors and I don't always agree with them, but they're pretty good investigators and they have access to more

information than I do, so I figured if they thought there was something to it, they'd raise it.

So I didn't think, oh, wow, here's the Google search and here's the note, let me bring this to the government's attention. I thought the government had the same thing that we had.

THE COURT: All right. Anything further?

MR. OKULA: No, your Honor, not with respect to this witness. But before we go on to the next witness, I just want to make a representation to the Court and I'd be happy to set forth in a declaration if the Court requires, but Ms. Brune in the end of her testimony was I think speculating about what the state of the government's knowledge was and what we were doing after we received the note.

As a matter of fact, Judge, we didn't think that on the face of the note that it suggested Brady or any violation. We turned it over nonetheless, but we didn't conduct any independent investigation after we got the letter because we viewed it as pretty much innocuous. So to the extent that Ms. Brune was speculating that I assume or I think or I believed the government was doing its own Google research and found the same thing in fact that is not true. The first time we found out about it was when we saw the motion that the defendants filed.

THE COURT: All right. Anything further,

Mr. Schectman?

MR. SCHECTMAN: No, your Honor.

THE COURT: All right, Ms. Brune, you are excused as a witness. You may step down.

(Witness excused)

THE COURT: Would the government call its next witness.

MR. OKULA: Yes, your Honor. United States calls Laurie Edelstein.

LAURA EDELSTEIN,

called as a witness by the Government,

having been duly sworn, testified as follows:

THE COURT: Take a seat. State your full name, spell your last name slowly for the court reporter.

THE WITNESS: Laura Joy Edelstein.

THE COURT: You may inquire, Mr. Okula.

MR. OKULA: Thank you, Judge Pauley.

DIRECT EXAMINATION

BY MR. OKULA:

Q. Good morning Ms. Edelstein.

A. Good morning.

Q. Would you agree with me that if a lawyer in the course of a jury selection or during a trial forms a belief that a jury has engaged in misconduct that that lawyer is under the obligation to bring it to the attention of the Court?

Case 1:12-cr-00973-PGG Document 62-6 Filed 10/26/2012 Page 29 of 43

A. Yes.
Q. Is it not true, Ms. Edelstein, that on May 12, Theresa Trzaskoma, your partner, came to you and articulated to you her belief about possible juror misconduct by Juror No. 1? Yes or no?
A. No.
Q. Did Ms. Trzaskoma tell you that she had sent an e-mail earlier that day to the effect that Jesus, I think she's the one, meaning that she thought Juror No. 1 was the suspended New York attorney. Did she tell you that?
A. No.
Q. Did you learn that at any point during the conversation with her?
A. No.
Q. Would you be surprised, Ms. Edelstein, if Susan Brune, your partner, described you earlier in her testimony today as a person who when confronted with an issue, you're someone who demands the paper, wants to look at the underlying documents. Is that fair?
A. Yes.
Q. So when Theresa Trzaskoma came to you, tell us your best recollection what she said to you?
A. I can't recall exactly. It was after Court that day on May 12th. We were walking across --
Q. We being?

A. -- the plaza. Susan Brune, Theresa Trzaskoma and I were walking across Centre Street and I recall that Theresa said she just wanted to let us know that after receiving the note that we had received from Juror No. 1, which raised certain legal concepts, she had recalled that there was a suspended lawyer with the same name.
Q. And had you previously been aware of the discovery by your firm of the report relating to the suspended New York lawyer?
A. No.
Q. Did you ask Ms. Trzaskoma what she saw, what piece of paper or what information she saw that led her to understand that there was information relating to a suspended New York attorney?
A. As far as I recall, she had just mentioned that during voir dire she knew that there was a suspended lawyer with the same name. I didn't realize that there was any piece of paper or particular document at the time.
Q. But you just agreed that you were a person who asked for the paper when an issue comes up, right?
A. Yes.
Q. Okay.
A. I didn't realize that there was a paper here that I should be asking about.
Q. At what point did you ask Ms. Trzaskoma to show you the paper concerning what formed her belief about the New York

attorney?

A. I don't believe she had formed a belief about the New York attorney. She mentioned that there was an attorney, a suspended attorney with the same name, and that after having received the note from Juror No. 1 that mentioned several legal concepts, she had thought that could it possibly be they were the same person.

Q. And at what point did you ask Ms. Trzaskoma for the evidence, the underlying documents or information that led her to believe that there was a possible connection between Juror No. 1 and the suspended New York attorney?

A. I didn't realize that there was a document that she was basing any belief on. It was the fact that there was a suspended lawyer with the same name.

Q. Well, didn't you ask how did you form this belief or what did you look at to see that there was a suspended New York attorney? Did you ask that question?

MR. GAIR: Objection. Three questions. Compound.

THE COURT: Overruled.

A. No, I did not.

Q. So do you mean to tell us that you at no point asked Theresa Trzaskoma for what underlying information she saw that led her to believe that there was a possible connection between Juror No. 1 and the suspended New York attorney? Yes or no.

A. I'm not sure that was a yes or no question, but she

mentioned there was a suspended lawyer with the name of Catherine Conrad. The connection that I think she was drawing was that we had received a note from Juror No. 1 that raised certain legal concepts, and that was the connection. I did not ask what the basis was for knowing that there was a suspended lawyer named Catherine Conrad, no, I did not.
Q. Wasn't that a highly significant fact to find out that there was a suspended New York attorney with the same name as Juror No. 1?
A. Actually, my reaction was it was, I thought it was impossible that they would be the same person based on Juror No. 1's voir dire responses.
Q. It is correct, is it not, that if you have two people with similar names that you can do simple, take simple steps to try to increase or decrease the possibility that the two people were the same one. Would you agree with me?
A. Hypothetical, if that's what you were doing in a different situation. We were discussing the fact that there was a suspended lawyer with the name of Catherine Conrad. We then were discussing that Juror No. 1 on voir dire in response to the unambiguous question what is your highest level of education said that she had a BA in English. To me that ruled out the possibility that they were the same person.
Q. Ms. Edelstein, could you just answer my question that I asked? Are there steps that you can take if you have one

Catherine Conrad, you have another Catherine Conrad. Can you take some simple steps to try to investigate and look to see whether they're the same people? Can you do that?
A. Yes.
Q. And how about this: Can you look to see if they have a similar middle initial? Do you think that that increases the likelihood that you're going to narrow the chances that it's the same people? Would you agree with me that that's the case?
A. I mean, if you have the tools. I guess I'm not quite sure what you're asking. If you're doing an investigation, yes, you can look to see whether they have the same middle initial.
Q. Did you ask Theresa Trzaskoma what's the middle initial for the suspended New York attorney?
A. No, I did not.
Q. Did you -- well, withdrawn. You were aware, were you not, that your firm was in possession of the information showing that Juror No. 1 was Catherine with middle initial M. Conrad, correct?
A. No, I was not aware of that.
Q. So are you telling me that when Theresa Trzaskoma gives you these two different names or two similar names, Catherine Conrad and Catherine Conrad, you didn't suggest to her any steps that she could take to try to determine whether it's the same person?
A. No. We discussed Juror No. 1's responses to the voir dire,

which was the information that we had and Ms. Conrad had unambiguously stated that she had a BA in English literature, that that was her highest level of education, that she was a stay-at-home wife, and I assumed that Ms. Conrad was telling the truth when she responded on voir dire.

It just was inconceivable to me that she was the same person. I wasn't thinking about middle initials. I know that in hindsight we now know that they're the same person and that they have the same middle initial, but at the time I had no idea that Juror No. 1's middle initial was M.

Q. Theresa Trzaskoma didn't tell you that the report that she had seen on either e-mail or otherwise had the middle initial with M. for Catherine M. Conrad, the suspended New York attorney?

A. Ms. Trzaskoma did not mention any report.

Q. Did Ms. Trzaskoma mention to you the Westlaw printout that she had seen that had various biographical information for someone named Catherine M. Conrad?

A. No.

Q. Did you ask Ms. Trzaskoma for any of the underlying documents that led to her belief that Juror No. 1 may be the same Catherine M. Conrad who was a suspended New York attorney? Yes or no, did you ask for any documents?

A. I did not ask for any documents, no.

Q. How long did this conversation between you and Ms.

Trzaskoma take?
A. Five minutes.
Q. And I think you said earlier, let me take you through this again, that Ms. Trzaskoma articulated something to the effect of, correct me if I'm wrong, that she just wanted to let you know that she saw the suspension report. Is that fair?
A. No. I think what she said was she wanted to let us know that after thinking about the note that we had received from Juror No. 1 she had recalled that there was a suspended lawyer with the same name and that she had wondered whether it was possible that they were the same person.
Q. Did she say anything else to you?
A. Well, we then discussed Juror No. 1's responses on voir dire and after that discussion my response was there's no way they're the same person.
Q. So how would you describe the level of knowledge that Ms. Trzaskoma had when she came to you with respect to her degree of certainty that Juror No. 1 was the Catherine M. Conrad in the suspension report?
A. I think that she had thought that there was a possibility that they were the same person, but she had reviewed the voir dire responses and they were entirely inconsistent with her being a lawyer.
Q. Well, did she tell you, did Ms. Trzaskoma tell you that earlier that day she had reviewed the voir dire responses but

had subsequently looked at a Westlaw report that led her to send an e-mail to somebody else in your firm saying, "Jesus, I think this is the one," meaning Juror No. 1 was the Catherine M. Conrad the suspended attorney? Did she tell that you?
A. No.
Q. Did you learn of the Westlaw report during the conversation with her?
A. No.
Q. At what point did you learn about the Westlaw report conversation?
A. I learned about the Westlaw report --
Q. I'm sorry the report?
A. After we received the letter and jury verdict.
Q. Before the July --
A. By the letter I mean the letter that was written in May and received on June 20.
Q. Did you review the Westlaw report before Theresa Trzaskoma participated in the court conference on July 15?
A. Yes.
Q. Did you yourself notice the similarities between the address for Catherine M. Conrad, Juror No. 1, the existence of a personal injury report, same name for her father? Did you note those things?
A. When --
Q. Did you note those things?

A. I'm not sure I understand --

MR. SCHECTMAN: May I be heard? I object to same name for her father. No one knew her father's name, so I object to that.

MR. OKULA: I'll rephrase it, your Honor.

THE COURT: Very well.

Q. You reviewed the Westlaw report, correct?

A. Yes.

Q. Did you discuss it with Susan Brune?

A. No.

Q. Did you discuss it with Theresa Trzaskoma?

A. No.

Q. Whom did you discuss it with?

A. I discussed it with my partner, Randy Kim in San Francisco.

Q. Did Mr. Kim tell you about the e-mail exchanges that he had had with Theresa Trzaskoma earlier on May 12th that led Ms. Trzaskoma to conclude that Juror No. 1 was the suspended attorney?

A. I discussed several of the e-mail exchanges, but he was only on a number of them.

Q. Did you see the May 12 series of e-mail exchanges involving Theresa Trzaskoma including the Jesus e-mail before Theresa Trzaskoma took part in the July 15 court conference?

A. No.

Q. When did you see that e-mail?

A. Subsequent to the July 15th conference.
Q. Can you put a date on that?
A. Actually, I'm not sure when I first saw it. I was informed about it I think July 20th or so. I'm not sure.
Q. So Theresa Trzaskoma never told you about the Jesus e-mail prior to her participation in the July 15th conference, is that fair?
A. Yes.
Q. Did Theresa Trzaskoma tell you that a dossier had been created at her request with respect to Catherine Conrad when she was gathering information on May 12?
A. After we received the letter from Juror No. 1 on June 20th, I had a conversation with Theresa Trzaskoma where she mentioned that there was some information that had been gathered.
Q. And you said in response to that what?
A. I asked where it was and she was actually overseas at the time and didn't have access to the computer, so she didn't, wasn't sure exactly what, the file that was there, what had been gathered, but she let me know where I could try to find it.
Q. Just so we're clear, what date is this?
A. I believe the night of June 20th.
Q. And is it fair to say that you received the dossier?
A. I wouldn't characterize it as a dossier, but the next day I was directed to the memo that David Benhamou our paralegal had

put together and the Westlaw report.
Q. At what point did you become familiar with the fact that your own partner, Theresa Trzaskoma, characterized it as a dossier?
A. Several weeks later.
Q. So you received this information in the form of the file or the memo to file by David Benhamou, is that correct?
A. Yes.
Q. You were where when you received it? San Francisco?
A. I was in San Francisco.
Q. Who sent it to you?
A. I was given a link to it, attachment in the e-mail.
Q. And the link was to what?
A. Was to the memo that David Benhamou had written.
Q. And the memo said what?
A. It just laid out I think Juror No. 1's voir dire responses, it I think mentioned that there was the Appellate Division order and that there was a link to the Westlaw report.
Q. Did you look at the Appellate Division order?
A. Yes.
Q. And did you notice that the Catherine Conrad in the suspension report had a middle initial of M.?
A. Yes.
Q. Did you notice also that the Catherine M. Conrad in the suspension report had a Bronxville address?

A. I don't believe the suspension report has a Bronxville address. If you're referring to the Appellate Division.
Q. Did you look at the Westlaw report?
A. Yes.
Q. And did you notice the Bronxville address in the Westlaw report?
A. There was a Bronxville address listed somewhere in the Westlaw report.
Q. And did you note a reference to someone that had been identified by your firm previously as having the same name as the father of Catherine Conrad, immigration judge?
A. I'm not sure what you're referring to as someone having been identified earlier. There was, I think there was a mention -- well, I don't know that in the report there's a mention of any father. I think that there's talks about head of household of a house that was owned and it lists two people. I didn't know who Catherine Conrad's father was.
Q. That was Robert Conrad, is that correct, the one you saw was head of household?
A. That's correct.
Q. And when you saw the e-mail traffic at some point, did you see there was a reference by people in your firm who had referred to Robert Conrad in the e-mail traffic?
A. Later on when I saw the e-mail exchange.
Q. And those e-mail exchanges existed during the course of the

trial, correct?
A. Yes.
Q. Do you remember who was on those e-mail exchanges that identified Robert Conrad as the father?
A. I believe Theresa Trzaskoma and David Benhamou.
Q. Were you informed of that at the time?
A. No.
Q. By the way, what was your role, what was your principal duty in connection with the trial, the defense of David Parse?
A. I don't know that I had a principal role. I was involved in various parts of it. I focused on the opening and the closing statements, the expert testimony, several of the witnesses.
Q. Voir dire?
A. No.
Q. Did you assist in voir dire?
A. No.
Q. Not at all?
A. Well, I participated in a couple of meetings where jurors were discussed prior to voir dire and then my role really at that time was to focus on the opening statement.
Q. Now, you received the dossier from, well, the link to the dossier and examined it, are you saying after you received a copy of the Catherine Conrad letter?
A. I wouldn't characterize it as a dossier. I received the

memo that had been put together and the link to the Westlaw report after we received the letter from Catherine Conrad.
Q. And did you discuss it with Susan Brune?
A. Discuss what?
Q. The Westlaw report and your examination of it as well as your examination of the suspension report.
A. I believe I -- well, the suspension report, if you mean the Appellate Division order?
Q. Yes.
A. I believe I discussed the Appellate Division order. I did not discuss the Westlaw report with her.
Q. What was the nature of your discussion with her?
A. Well, I believe that after we received the June 20th letter, I first had a conversation with Susan just upon receipt of the letter and reading it and the substance of it, you know, I was very disturbed by the letter. This has nothing to do with Catherine Conrad being the suspended lawyer because at that point I didn't know. When I first received the letter I was sort of, I was disturbed and shocked by it. We had spent three months in the courtroom where everyone wants to know what the jury is thinking about various subjects. We then receive a letter that gives us some insight into the jury deliberations and I was very taken aback by some of the things that she said. I felt that we had sat here trying to read the tea leaves with various juror notes on the one hand and it was just very

surprising and shocking to hear what a member of the jury had to say.

I think when I first called Susan, we spoke about the letter and that was our first conversation of that letter.

Q. And in that first conversation did you and Ms. Brune discuss the feeling that what had been -- or after you received the letter or reviewed the other document, that that related to the exact same issue that Theresa Trzaskoma related to you on May 12. When did you put that together?

MR. GAIR: Objection to the form of the question. Unintelligible.

THE COURT: Sustained as to form.

Q. At some point did you connect the dots as to what Theresa Trzaskoma told you on May 12 and the jury letter that you received?

A. What happened next was that it took me, I sat in my office for a while mulling over the letter. I then was speaking later that afternoon with my partner Randy Kim in our San Francisco office. I mentioned I found the note, the letter, it was very disturbing to me. The tone was very odd, there are all these exclamation points, the underlining, the parentheticals with her speaking to herself, commenting on her own words, and it just seemed so at odds with what I had observed of Juror No. 1 during the trial.

He's the one who mentioned to me, he said, well, come

to think of it, at one point we knew there was a suspended lawyer with the same name, and it was only at that point that I recalled any conversation I had had about the suspended lawyer, and I was sitting at my computer. I put the name Catherine Conrad into Google and I pulled up the Appellate Division orders.
Q. Did you tell Randy Kim, by the way, that refreshes my recollection Theresa Trzaskoma told me the same thing on May 12th?
A. Well, that's not exactly what Theresa had said, but I --
Q. Did you say to him in substance that, yes, Theresa had told me something to that effect on May 12?
A. No. I was -- I looked at the Google search and then opened up the Appellate Division order, I think the 2010 order, and that was the first time I had seen it.
Q. And that led you to do what?
A. So I then said, you know, I said, well, you know, here's a suspended lawyer with the name Catherine Conrad. I went to the New York State Bar Association registration site and put in the name Catherine Conrad and pulled up the registration information.
Q. Which showed?
A. Which showed an address in the Bronx and then it had a phone number, a 646 number and I looked at the letter and couldn't believe it but there was the Parkview Drive address in

Bronxville, but the same phone number.
Q. You would agree with me, would you not, that that's the very same computer research over the course of a couple of minutes that you could have done on May 12th, right?
A. Well, one could have done that on May 12th. We didn't have Ms. Conrad's phone number on May 12.
Q. So the answer is yes, you could have done that research on May 12th, right?
A. I could have done a Google search --
Q. Was there something unintelligible about my question?
MR. SCHECTMAN: There's nothing unintelligible about the answer, if you would allow the witness to finish.
THE COURT: Overruled.
Q. Could you answer? Could you have done that research on May 12?
A. No. I can explain.
Q. Well, you were informed there was a Catherine Conrad suspension report by Theresa Trzaskoma, correct?
A. No.
Q. Didn't Theresa Trzaskoma tell you that she had seen evidence that there was a suspended New York attorney named Catherine Conrad? Didn't you just tell that to us a few minutes ago?
A. No. What I said was she had told me there was a suspended lawyer with the name Catherine Conrad. She did not mention a

suspension report, she did not characterize it in that way. All she said was there was a suspended lawyer with the name Catherine Conrad.

Q. And you asked nothing of her on what facts she had that demonstrated that to her?

A. No, I didn't.

Q. And is it correct that Ms. Trzaskoma asked you or threw out the possibility of doing further research on this Catherine Conrad that she had found information about?

A. I'm sorry, I'm not sure I understand the question.

Q. Did she ask whether anything more should be done to look into this?

A. We discussed after she raised the issue with us, you know, what Juror No. 1's responses were on voir dire. We concluded that we did not believe they were the same person and we decided that we didn't need to do any more research at that point.

Q. Well, you say "we discussed." Tell us your best recollection what was said.

A. I can't recall precisely what was said. I think what we did was we reviewed what Catherine Conrad had said on voir dire, what her responses were and to us that ruled out the possibility that she was the suspended lawyer. It was just inconceivable to me that she was a suspended lawyer. Why would she lie about her highest level of education?

Q. You knew from the voir dire, didn't you, that the Catherine Conrad who sat as Juror No. 1 referred to being involved in a personal injury lawsuit, correct?
A. Yes.
Q. Did Theresa Trzaskoma tell you that document she had seen in the form of the Westlaw report had indicated Catherine M. Conrad as a party to a lawsuit?
A. No.
Q. Would you agree with me that you had the resources available to you, that all you had to do was pick up the phone and call Nardello or anyone else and ask them to go to a courthouse or do investigating for you to try to establish a link, or the link that Theresa Trzaskoma had suggested? Would you agree that you had those resources?
A. We could have done that, but we didn't believe they were the same person. We thought --
Q. So the answer is yes. You had those resources, right? It's a simple question.
A. Yes, we could have called someone to investigate if we thought that there was a reason to investigate.
Q. Now, after you received the juror letter that was sent to you, you did call Nardello in to assist you in gathering information, correct?
A. Yes.
Q. And that led to the preparation of your brief, correct?

A. Yes.
Q. Were you involved in the drafting of the facts section of the brief?
A. I edited that section, yes.
Q. Now, by the way, did you have discussions with Susan Brune or anyone else at the firm about whether people at your firm were going to discuss with other defense counsel what Theresa Trzaskoma had talked to you about on May 12th?
A. No.
Q. Are you telling us that there was no discussion at all about whether you were going to inform your co-counsel about the facts that you had learned or Theresa Trzaskoma had learned during voir dire and during, on or about May 12?
A. I don't recall any discussion about speaking with other defense counsel.
Q. Did you discuss with anyone at your firm about whether you were going to reveal in the brief that you were going to submit to the Court the facts that your firm were aware of that you and Randy Kim talked about?
A. Yes, Susan Brune and I had a discussion.
Q. So you discussed about whether you should or should not include in the facts section of your brief the facts that you learned either during voir dire or on May 12 but prior to receipt of the juror letter, correct?
A. Yes.

Q. Who initiated that discussion?
A. I can't recall who initiated it. I think Susan and I were discussing the brief and how we should structure it, and --
Q. Stop right there. Did that conversation occur before or after you received the draft of the brief from Theresa Trzaskoma?
A. Before.
Q. So you and Susan Brune then specifically discussed about what you should say about your level of knowledge before you received the note, is that correct?
A. Yes.
Q. And what was the ultimate decision that was made?
A. Well, after some discussion and then reviewing the case law about the state of knowledge involved regarding the juror misconduct issue and potential waiver, and seeing that actual knowledge was the standard, we decided that the fact that we knew that there was a suspended lawyer with the same name, we did need to address that in the brief and that the focus of the brief was to be on whether they were the same person, because at that point I wasn't even sure they were the same person and trying to convince everyone else they were the same person. I didn't think people were going to actually believe us.
Q. You ultimately edited the fact section of the brief, correct?
A. Yes.

Q. In the brief, is it fair to say that the facts section conveys the notion that you discovered or you commenced your discovery and attained your knowledge of the Appellate Division suspension report only after you received the letter of Catherine Conrad? Yes or no?
A. I can see now that that might be the impression.
Q. Ms. Edelstein, I asked you a simple question. Weren't you the one who stood at this podium and raised your voice with Dr. DeRosa about him not answering your questions? Do you remember that?
A. Yes.
Q. Okay, can you answer my questions the way I asked them or in response to my question? Would you do that, please?
A. Yes.
Q. Wouldn't you agree with me that the facts as laid out in your brief convey the notion that you learned of the Appellate Division report only after you received the juror note; true or false?
A. I find that a difficult answer, question to answer true or false. I can see now how that might be the impression that is conveyed by the brief.
Q. And that --
A. That certainly was not our intention at the time. I certainly did not, we did not intend to create a misleading impression. Our focus at the time was trying to show that

Catherine Conrad, Juror No. 1, was the suspended lawyer. It took us two weeks to feel sure enough to even start writing the brief that they were the same person. That's why the brief goes through in excruciating detail the overlapping addresses, the phone numbers, the data. I can see now in hindsight in reading it that perhaps that is the impression that was conveyed.

Q. And again you could see --

A. But it was not the intent.

Q. You can see the impression or one reading of the impression that's created is a false one, would you agree with me?

A. No.

Q. Well, the impression that's created in the brief is that you learned of the suspension only after you received the letter from the government, correct?

A. I think the brief can also be read in a different way. I mean, if you start with the premise --

Q. I'm sorry, it was a simple question. It was a simple question. Doesn't the brief convey the notion that you learned of the suspension report after you received the letter from the government, yes or no?

A. I can see now that it may be read that way, but that was not the intent.

Q. Well, it was the intent because you and Ms. Brune had specifically decided that you weren't going to include what you

knew beforehand in the brief, right?
A. No, that's not accurate.
Q. Didn't you tell us a few moments ago that you and Ms. Brune had specifically decided that you were not going to include what your firm knew prior to receiving the government letter in your brief, yes or no?
A. Yes.
Q. So are you saying, then, that you were not trying to convey the notion through the facts section of your brief that you had learned of the Appellate Division report only after you had received the letter from the government?
A. No, we weren't trying to convey that impression.
MR. OKULA: May I have a moment, your Honor?
THE COURT: Take your time.
(Pause)
Q. Could you turn to Government Exhibit -- I'm sorry, it's defense Exhibit PMD 54. Do you recognize that document?
A. Yes.
Q. What is it?
A. It's the brief that we submitted in support of the motion for a new trial.
Q. Can you explain, why does your firm sign it twice? In other words, why do you include it on the front page separate and apart from Susan Brune in New York and you in San Francisco?

A. Simply because there are two different addresses.
Q. Now, could I ask you to look at page 32, footnote 13. And specifically the last sentence of that footnote. Do you see where it says, "Defendants had no basis to inquire whether Conrad was lying in response to each of the Court's, questions," do you see that?
A. Yes.
Q. Do you think that was an accurate statement, Ms. Edelstein?
A. Yes.
Q. Were you aware that Theresa Trzaskoma had been, had discovered the Appellate Division suspension report at that time with the name Catherine Conrad?
A. I was aware that Theresa, when we were writing the brief I was aware that Theresa had known that there was an Appellate Division order.
Q. And would you turn to page 9 and look at the first full paragraph there. Would you read that first sentence aloud for us?
A. "The tone and content of the letter, which were in sharp contrast to the image Conrad had projected through the trial, always head down, taking notes, caused defendants concern and prompted them to investigate."
Q. Well, you were aware when that sentence went into the final version of the brief, that Theresa Trzaskoma had already done a bit of investigation, correct?

A. Yes.
Q. So would you agree with me that to the extent that that sentence suggested that only after the letter was received did you and the others begin investigating, it was untrue because you knew Theresa Trzaskoma had previously done some investigation?
A. Someone might read that that way, but --
Q. Can you answer --
A. This is a truthful statement.
Q. Can you answer my question, please? Yes or no? You just acknowledged that Theresa Trzaskoma had previously done an investigation, some of the results of which she reported to you on May 12th, correct? Correct?
A. On May 12th I knew that there was a suspended lawyer with the same name.
Q. That Theresa Trzaskoma had discovered pursuant to her correspondence with others in your firm in that little mini investigation, correct?
A. I was not aware --
MR. SCHECTMAN: Judge --
THE COURT: Overruled.
A. I was not aware on May 12th of any investigation.
Q. Well, Theresa Trzaskoma didn't tell you that her information about the suspended lawyer came out of thin air, did she?

A. She didn't mention what the basis was.
Q. But she told you that she had learned of it, correct?
A. Yes.
Q. And is it fair that you inferred that she through her Google search or some sort of investigation had learned that fact?
A. Yes.
Q. So that's what led you just a moment ago to say you knew that Theresa Trzaskoma had previously learned certain facts pursuant to an investigation, right?
A. Well, no. What I was trying to distinguish was what I knew on May 12th, versus what I knew by the time we were writing the brief.
Q. Okay, and in this brief, the sentence that you just read conveys the notion, does it not, that you learned of the facts concerning the suspension and the other things only after you received a note, correct?
A. Again, that's a difficult question to answer yes or no. I can see now how it might be construed that way, but when it was written, and I still believe it was accurate, that it's describing what we did when we -- and I think it's what I testified to earlier, that when I received the letter it caused us concern and prompted us to investigate. We were describing that.
I can see now with hindsight -- I see many things now

in hindsight with respect to this proceeding, but I can see with hindsight now how it might be construed in the way you have suggested. But at the time when we were writing it we were describing what happened when we received the letter on June 20th.

Q. Well, it was worded that way because you and Ms. Brune had had a discussion previously about what you were going to omit from this brief, right?

A. No. The discussion I had with Ms. Brune was whether or not we were going to say that prior to voir dire we had information that there was a suspended lawyer named Catherine Conrad.

Q. And you agreed --

A. We discussed it in the context of what was the standard for waiver, what was the standard for juror misconduct cases, which was actual knowledge. I was not focused, when we were writing the brief, I was not focused on waiver. We didn't know they were the same person. We just were trying to actually establish that they were the same person and that, it took me a long time for me to believe that they were the same person.

I really was not thinking about waiver. I know that may be difficult for you to believe now when you're taking a brief and looking at every sentence and trying to impart some meaning to it or an impression that we were trying to create. But that's not how we were writing it.

Q. Can you just answer the question that I asked? You just

said that you had a conversation with Susan Brune, yes or no?
A. Yes.
Q. Okay, and as a result of that discussion you decided what you would omit from the brief, correct?
A. I wouldn't characterize it as omit.
Q. Okay, let's just stop there. You and Susan Brune discussed the fact that you wouldn't include certain things you knew about before the juror note in your brief, yes or no?
A. Yes.
Q. So isn't that a decision that you made with Susan Brune about what you would omit from the brief, yes or no?
A. Yes.
Q. So when you answered my questions a few minutes ago when I asked you whether you decided with Susan Brune that you would omit something, you said no. Was that an untrue answer before?
A. Well, I'm not sure if that was the exact question. I'm not -- I'm not trying to lie here or give you a hard time. These are difficult questions to answer. In looking back and trying to figure out what the process was for writing this brief, if I had to do it over again would I do it differently? Yes. In hindsight should we have dropped a footnote saying that we, you know, knew that there was a suspended lawyer with the same name? If I had to do it over again I would certainly do that. And I'm very sorry for any misimpression the brief has created.

Q. Well, would you agree with me that an omission can be construed as a lie?
A. Yes.
Q. And the omissions that your firm made didn't end with filing a brief, would you agree with me?
A. No.
Q. Well, Theresa Trzaskoma participated in the phone call with the Court on July 15, correct?
A. Yes.
Q. Are you aware that that phone conversation was going to take place?
A. Yes.
Q. Did you talk with Theresa Trzaskoma before she participated in that call?
A. No.
Q. Do you know if Susan Brune did?
A. I don't know.
Q. Do you know if anybody had a conversation with Theresa Trzaskoma where it was discussed that she would not affirmatively tell the Court about the facts that your firm knew prior to the receipt of the letter?
A. No.

MR. OKULA: Just one moment, your Honor.

(Pause)

MR. OKULA: I have nothing else, your Honor.

THE COURT: Mr. Schectman?

MR. SCHECTMAN: Yes, your Honor.

CROSS-EXAMINATION

BY MR. SCHECTMAN:

Q. Ms. Edelstein, on May 12th at the end of the conversation that you had on the plaza with Ms. Brune and Ms. Trzaskoma, why didn't you bring information about there being a suspended lawyer with the same name as Juror No. 1, why didn't you bring that to the Court's attention?

A. At some point during the conversation we had discussed whether we should bring it to the Court's attention, but after we discussed the issue and concluded that it was inconceivable that Juror No. 1 was the suspended lawyer, we didn't see a reason to bring the fact that there was a suspended lawyer with the name Catherine Conrad to the Court's attention, that there was nothing we were going to ask the Court to do at that point.

Q. At any time were you trying to sandbag the Court or tamper with the record?

A. No.

Q. At any time between the juror's verdict on May 24th and the receipt of Ms. Conrad's post-trial letter on June 30, was there any discussion in the Brune firm about raising a juror misconduct issue as an issue on a post-trial motion?

A. There was none.

Q. And why not?

A. We didn't know that Juror No. 1 was the suspended lawyer and we didn't know we had a motion.
Q. Any discussion of raising it as an appellate issue?
A. No.
Q. And why not?
A. For the same reasons. We didn't know that Juror No. 1 was the suspended lawyer.
MR. SCHECTMAN: No further questions, your Honor.
THE COURT: Mr. Okula?
MR. OKULA: I'm waiting for the defense, but I see absence from here. May I ask one or two questions from here, your Honor?
THE COURT: You may.
REDIRECT EXAMINATION
BY MR. OKULA:
Q. Do I understand you to just testify that you specifically discussed with Susan Brune and Theresa Trzaskoma in the park about whether you were going to bring it to the Court's attention or not?
A. Yes.
Q. And you decided you would not?
A. Yes.
Q. And the ultimate decision of that discussion was that you were going to call it off and not even do an investigation, right?

A. Yes.

THE COURT: Mr. Schectman?

MR. SCHECTMAN: And I take it because you thought it was in conceivable that this was the same person.

THE WITNESS: That's right.

THE COURT: Anything further, Mr. Okula?

MR. OKULA: Nothing, thank you, your honor.

MS. DAVIS: Just one housekeeping matter, your Honor?

THE COURT: We don't need housekeeping.

MS. DAVIS: It's in regard to one of the exhibits we want to move into evidence.

THE COURT: Let's complete the inquiry, Ms. Davis, that's the way it proceeds. I have a few questions for the witness.

MS. DAVIS: I apologize, your Honor.

THE COURT: Ms. Edelstein, I want to put a question to you that I put to Ms. Brune. Focusing on the July 21 letter to the Court, would your law firm have disclosed the information set forth in that letter and the investigation of Juror No. 1 if the Court had not inquired or the government failed to raise the waiver issue?

THE WITNESS: I think by that point, I mean, I think yes, that we had thought that it would come out at some point during --

(Continued next page)

THE COURT: No. My question is not whether it would have come out. If it had not come out, if the Court had not pressed your law firm and the government failed to raise the issue, would your law firm have disclosed the information set forth in the July 21 letter?

THE WITNESS: I don't know.

THE COURT: Did you ever have any discussion with anyone in the firm about that?

THE WITNESS: I think that our, at least my, frame of mind was that we didn't know they were the same person, so I just didn't think that there was a waiver issue.

THE COURT: In the middle of jury deliberations, this Court displaced Juror No. 11 because of a health emergency, replaced him with an alternate after much discussion with counsel and over the objection of the government, and directed the jury to restart its jury deliberations. Did you give any consideration at that time to raising the issue that you discussed in the park on May 12 with Ms. Brune and Ms. Trzaskoma regarding Juror No. 1?

THE WITNESS: No. I continued to believe that Juror No. 1 was who she said she was. That didn't occur to me, no.

THE COURT: Any further inquiries?

MR. OKULA: May I follow up on one or two questions, your Honor?

THE COURT: Yes.

BY MR. OKULA:

Q. Do you mean to say that if the government hadn't asked and the Court hadn't asked, you were comfortable from an ethical and a professional standpoint to have the judge decide the motion without ever learning the facts about what Theresa Trzaskoma and you and Susan Brune and the others knew at the firm prior to receiving the government note? Is that what you are saying?

THE WITNESS: I find this a difficult question to answer trying to put out of my mind all the things I now know and where we are. I firmly believe that the standard is actual knowledge. We just didn't know they were the same person.

MR. OKULA: Let me try again. From a professional and ethical standpoint, are you saying that you would have felt comfortable that you had fulfilled all your obligations if the Court had decided this motion without learning of the facts concerning what your firm knew prior to receiving the Catherine Conrad letter? Yes or no.

THE WITNESS: Yes.

MR. OKULA: Nothing further, Judge.

THE COURT: Anything further?

You are excused, Ms. Edelstein.

(Witness excused)

THE COURT: Would the government call its next witness.

MR. OKULA: Your Honor, we have no other witnesses. As a housekeeping matter, I'd like to move into evidence Government Exhibit 10. And we rest at that point.

THE COURT: Any objection to Government Exhibit 10?

MR. SKLARSKY: No, your Honor.

MR. ROTERT: No, your Honor.

MS. McCARTHY: No objection.

MR. SHECHTMAN: None, Judge.

THE COURT: Government Exhibit 10 is received in evidence.

(Government's Exhibit 10 received in evidence)

THE COURT: Mr. Shechtman, do you have evidence to offer the Court?

MR. SHECHTMAN: I do, Judge, two witnesses. It should be short.

THE COURT: Would you call your first witness.

MR. SHECHTMAN: Defendant Parse calls Paul Schoeman.

PAUL SCHOEMAN,

called as a witness by defendant Parse,

having been duly sworn, testified as follows:

THE COURT: State your full name and spell it for the court reporter.

THE WITNESS: My name is Paul Schoeman, S-C-H-O-E-M-A-N.

THE COURT: You may inquire, Mr. Shechtman.