C2grdau4

```
 1              MR. SHECHTMAN:  Thank you, Judge.
 2   DIRECT EXAMINATION
 3   BY MR. SHECHTMAN:
 4   Q.  Mr. Schoeman, how are you employed?
 5   A.  I'm a lawyer at Kramer, Levin, Naftalis & Frankel.
 6   Q.  You're a partner there?
 7   A.  I am.
 8   Q.  How long have you been practicing law?
 9   A.  I graduated from law school in 1995.  I first started at
10   Kramer Levin in 2003.  I left there in 2007 to return to the
11   U.S. Attorney's office in the Eastern District of New York, and
12   I returned back to Kramer Levin in the fall of 2009.
13   Q.  Were you a lawyer in this courtroom during the trial of
14   David Parse and other defendants?
15   A.  I was.
16   Q.  Whom did you and your firm represent?
17   A.  We represented Raymond Craig Brubaker.
18   Q.  What other members -- what other partners, let's keep it
19   simple, at your firm were involved in that trial?
20   A.  Barry Berke.  My partner Barry Berke tried the case with
21   me.
22   Q.  Let me direct your attention, if you would, to May 11,
23   2011, and ask you, did the Court that day, that afternoon, read
24   aloud a note from Juror No. 1, Catherine Conrad?
25   A.  I believe that's the correct date if that is the date on
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

C2grdau4                          Schoeman - direct

1    which we concluded the summations in the case, yes.
2    Q.  Do you recall the subject matter of that note?
3    A.  I recall in general that there was a question regarding
4    respondeat superior.
5    Q.  Again just to be clear, what stage was the trial at?
6    A.  I believe that that was after all of the summations had
7    been concluded, I think including the rebuttal summation.
8    Q.  Do you know a lawyer named Theresa Trzaskoma?
9    A.  I do.
10   Q.  How do you know her?
11   A.  I think I first met Ms. Trzaskoma in approximately 2,000.
12   My babysitter and her babysitter became friends.  Being a
13   first- time parent, I did a little diligence on the parents of
14   my 3 month old's playmate and learned that it was Ms. Trzaskoma
15   and her husband.  We became family friends at that point.
16   Q.  I'm loathe to ask this question, but you Googled her?
17   A.  Actually, I think I knew her husband, who had been an
18   associate with me at Paul Weiss and had clerked in the Eastern
19   District at the same time that my wife had clerked.  So I think
20   I knew them in advance.
21   Q.  Was Ms. Trzaskoma also a lawyer during the course of the
22   trial in this courtroom, the David Parse trial?
23   A.  She was.
24   Q.  Who did she and her firm represent?
25   A.  She and her firm represented David Parse.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

C2grdau4                    Schoeman - direct

```
 1   Q.  Sometime after the reading of the note from Juror No. 1,
 2   did you speak to Ms. Trzaskoma about Ms. Conrad, Juror No. 1?
 3   A.  Yes.
 4   Q.  Would you tell the Court what was said between you and Ms.
 5   Trzaskoma at that time.
 6   A.  Yes.  I recall that we had a conversation.  I believe it
 7   was as we were walking across Foley Square towards Duane
 8   Street.  She told me that there was a person with the same name
 9   as -- I don't recall whether she said Juror No. 1 or Ms.
10   Conrad, but a person with the same name who was a disbarred
11   lawyer but that it was not the same person as Juror No. 1.
12           I began formulating a question to say, how do you
13   know?  She anticipated that question and said, because of the
14   voir dire.  I began formulating the question of, what question
15   during the voir dire would have disclosed that?  She
16   anticipated that question as I was speaking it and said
17   something to the effect that her educational background did not
18   include law school.  I said, then it's not the same person?
19   And she said right.  By that time we had finished crossing the
20   street.
21   Q.  Any further discussion about Juror No. 1?
22   A.  Not with Ms. Trzaskoma during that time period.
23   Q.  Any further discussion with anyone at the Brune firm
24   regarding Juror No. 1 during that time period?
25   A.  No.
```

C2grdau4                          Schoeman - direct

1   Q.  Did you take any action based on that conversation?
2   A.  No.
3   Q.  We know that it was after the juror's note.  Do you recall
4   when it was?
5   A.  I can't say exactly when it was.  I believe it was during
6   the deliberations either that Friday or sometime the following
7   week.
8           MR. SHECHTMAN:  No further questions.
9           THE COURT:  Cross-examination?
10          MR. OKULA:  Briefly, your Honor.
11  CROSS-EXAMINATION
12  BY MR. OKULA:
13  Q.  Good afternoon, Mr. Schoeman.  How are you?
14  A.  Good, thank you.  Good afternoon.
15  Q.  Dr. DeRosa sends his regards?
16  A.  I send mine right back.
17  Q.  You said you had this conversation with Ms. Trzaskoma after
18  the note was received in court, is that correct?
19  A.  Yes.
20  Q.  Was it the same day or the following day?
21  A.  I don't believe it was either the same day or the following
22  day.  I believe it was sometime a couple of days or several
23  days later.
24  Q.  You talked about the follow-up questions that you asked to
25  try to get to the bottom of the information, is that correct?

C2grdau4                    Schoeman - cross

1   A.  Yes.
2   Q.  That's what any good lawyer or investigator does when
3   somebody tells them a broad fact; you ask what supports that,
4   correct?
5   A.  It's the question I asked.
6   Q.  Do you disagree with my proposition that a good
7   investigator or lawyer, when somebody gives them a broad
8   proposition, asks the follow-up question, what is that based
9   on?
10  A.  I don't disagree with it.
11  Q.  Did you ask Ms. Trzaskoma what had led her to conclude or
12  what led to her belief that there was a possible connection
13  between Juror No. 1 and the suspended attorney?
14  A.  I think she told me that there was someone with the same
15  name as Juror No. 1.  I don't recall whether we actually used
16  the person's name.  Then, as I described, I asked questions
17  about why she had determined it was not the same person, and
18  the answer was based on the voir dire responses.
19  Q.  Is it correct that you didn't ask any other follow-up
20  questions that led to her initial belief that there was a
21  connection between Juror No. 1 and the suspended attorney?
22  A.  I think all she told me was that they had the same name,
23  and I inferred that that was the basis of her considering it
24  possible that they were the same person.
25  Q.  Did she tell you that they had the same middle initials?

C2grdau4                    Schoeman - cross

1    A.  No.
2    Q.  Did she tell you that she had viewed a Westlaw report that
3    had certain information on it that was connected to Juror No.
4    1, Catherine Conrad?
5    A.  No.
6    Q.  Did she tell you that she had communicated with somebody
7    internally in her firm where she had exclaimed, "Jesus, I think
8    Juror No. 1 is the suspended attorney"?
9    A.  No.
10   Q.  If you had that information from Theresa Trzaskoma, would
11   you have done further investigation yourself?
12   A.  I don't know.
13   Q.  How many years did you spend as an Assistant U.S. Attorney,
14   Mr. Schoeman?
15   A.  A total of about seven or eight.
16   Q.  I would stipulate to the fact, because I've heard it, that
17   you were a terrific investigator, correct?
18   A.  I'll stipulate with you.
19   Q.  Are you telling us really that you wouldn't have looked
20   into that further yourself if you had seen these further
21   connections tying Juror No. 1 to the suspended attorney?
22   A.  Forgive me.  I thought your question was if I had heard
23   that she had written an email that had that exclamation.  I
24   don't know what I would have done.  I guess I can only tell you
25   what I did do, which was ask about the voir dire.

365
C2grdau4                    Schoeman - cross

1    Q.  Would you have liked to receive that information in order
2    to make a better assessment of your own about whether Juror No.
3    1 was the suspended attorney?  After all, more information is
4    better, isn't it?
5    A.  It did not occur to me at the time to ask for more
6    information.
7    Q.  I didn't ask you whether it occurred to you at the time.
8    Would you have wanted more information?  Would that have helped
9    your analysis?
10   A.  I don't know whether it would have helped my analysis.  I
11   concluded from the fact that she was telling me that the voir
12   dire answer had said that this person had not gone to law
13   school, that this was not an issue.
14   Q.  Do you really mean what you just said, that you don't think
15   more information would have helped your analysis, Mr. Schoeman?
16   A.  I'm telling you I don't know whether more information would
17   have helped my analysis.  I'm telling you that I reached a
18   conclusion based on that information.
19   Q.  Would you agree with me that if you have two people, one
20   named Catherine Conrad, another named Catherine Conrad, and you
21   were given information about their middle initials, that they
22   share the same middle initial, that it made it statistically
23   more likely that was the same person?
24   A.  Yes.
25            MR. OKULA:  Judge, I have nothing further.  Thank you.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

C2grdau4                    Schoeman - cross
1           THE COURT:  Mr. Shechtman.
2    REDIRECT EXAMINATION
3    BY MR. SHECHTMAN:
4    Q.  Mr. Schoeman, just to be clear, on May 13th or sometime
5    thereafter Ms. Trzaskoma told you that she had rejected the
6    conclusion that Juror No. 1 was a suspended attorney, is that
7    correct?
8    A.  Yes.
9           MR. SHECHTMAN:  Very good.
10          MR. OKULA:  Nothing else, your Honor.
11          THE COURT:  Mr. Schoeman, did you get any
12   understanding from Ms. Trzaskoma as to why it was that she was
13   sharing this information or her deliberative process with you?
14          THE WITNESS:  I didn't have an understanding.  We,
15   having spent many months of trial together, often shared
16   information.  It was consistent with our pattern of sharing
17   information during the course of the trial.  But I have
18   described I think the entirety of the conversation.
19          THE COURT:  Anything further?
20          MR. OKULA:  Nothing.  Thank you, your Honor.
21          THE COURT:  You're excused.  You may step down.
22          (Witness excused)
23          MR. SHECHTMAN:  Mr. Parse calls Barry Berke of the
24   same law firm.
25    BARRY H. BERKE,
                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

367

C2grdau4                    Berke - direct
1      called as a witness by defendant Parse,
2          having been duly sworn, testified as follows:
3              THE COURT:  State your full name and spell it slowly
4      for the court reporter.
5              THE WITNESS:  Barry H. Berke, B-E-R-K-E.
6              THE COURT:  Mr. Shechtman, you may inquire.
7      DIRECT EXAMINATION
8      BY MR. SHECHTMAN:
9      Q.  Mr. Berke, how are you employed?
10     A.  I am a partner at Kramer, Levin, Naftalis & Frankel.
11     Q.  How long have you been a partner at that firm?
12     A.  I have been a partner at that firm since I believe 2001.
13     Q.  Prior to that were you involved in the law --
14     A.  I'm sorry.  Since 1999 I was a partner there.  Prior to
15     that I was an associate at Kramer Levin.
16     Q.  Prior to that?
17     A.  Prior to that I began my career as a clerk in this
18     courthouse for a judge here.  I was then at the Federal
19     Defenders office in the Southern District of New York until
20     1995, when I joined Kramer Levin.  I had a brief period when I
21     was a visiting associate professor at NYU teaching courses
22     there right in between.
23     Q.  Were you a lawyer in this courtroom during the trial of
24     David Parse and other defendants?
25     A.  I certainly was.

C2grdau4                    Berke - direct

1   Q.  Whom did you and your firm represent?
2   A.  We represented Craig Brubaker.
3   Q.  Let me direct your attention to May 11th of 2011.  Did the
4   Court that afternoon read a note from Juror No. 1, Catherine
5   Conrad?
6   A.  I recall that.
7   Q.  Do you recall the subject matter of that note?
8   A.  I recall generally that there was a note from Juror 1
9   asking whether the judge was going to instruct I believe on
10  respondeat superior.  I think there were some other things, but
11  I recall that to be the overall gist of the note, as I recall
12  it.
13  Q.  Do you know a lawyer named Susan Brune?
14  A.  I do.
15  Q.  How do you know her?
16  A.  I've known Ms. Brune for a long time.  I can tell you the
17  background, but I certainly know her as counsel for David Parse
18  in this action.
19  Q.  Sometime after the judge's reading of that note from Juror
20  No. 1, did you speak to Ms. Brune about Ms. Conrad?
21  A.  I did.  I'll tell you what I recall.  I recall that after
22  we heard the note that day, I believe it was the following
23  day -- although I can't say that with a hundred percent
24  certainty, it could have been the day after that -- I recall
25  being in the witness room in the back, which we used and had

C2grdau4                        Berke - direct

1   copy machines and other things and often spent time back there,
2   I remember talking to Ms. Brune about the note.
3           I recall her saying that they had identified a person
4   with the same name who had been a disbarred lawyer.  I recall
5   saying to her, well, that can't be, because she certainly isn't
6   a lawyer.  I said, I assume she was asked what her educational
7   background was.  I remember Ms. Brune said she did, she was
8   asked, she said that she had a BA degree.  Ms. Brune told me
9   what it was in.  I don't recall as I sit here.  But it was some
10  humanities.  I recall saying, well, definitely it can't be the
11  same person.  She said, that's what I think as well.
12          That was really the end of it.  I would say the
13  conversation probably did not last more than two, three minutes
14  at most.  Then I recall we left the room and that was it.
15  Q.  She said, that's what I think as well?
16  A.  That's what I recall.
17          MR. SHECHTMAN:  No further questions.
18          THE COURT:  Cross-examination.
19  CROSS-EXAMINATION
20  BY MR. OKULA:
21  Q.  Good afternoon, Mr. Berke.
22  A.  Good afternoon, Mr. Okula.
23  Q.  I get to check one of the things off my bucket list.
24  A.  I just hope you didn't prepare too much for it.
25  Q.  Would you agree with me, Mr. Berke, that if an attorney

C2grdau4                    Berke - cross

1    forms a belief that a juror has engaged in misconduct, that
2    attorney is obligated to bring the misconduct to the attention
3    of the Court?
4    A.  You're asking me an ethical question, a legal opinion.  I
5    will tell you this --
6    Q.  Can you not answer that yes or no, Mr. Berke?
7    A.  Well, I'd like --
8    Q.  I'm asking you a question, and I'll repeat it again.  Maybe
9    you can't answer it yes or no; tell me if that's the case.  If
10   an attorney forms a belief that a juror has engaged in
11   misconduct, do you believe that the attorney has an obligation
12   to bring it to the attention of the court?
13   A.  I can't answer that yes or no.  I can answer it, but I just
14   can't answer it yes or no.
15   Q.  Really?  You can't answer that question yes or no?  That's
16   your testimony?
17   A.  That's not how I would answer that question.
18   Q.  Tell us how you would answer that question.
19   A.  I will tell you that I have never confronted that issue at
20   trial in any trial I have done; that whenever I have an issue
21   that I think raises an ethical issue, I always do the same
22   thing.  I always look to the ethics rules.  I always look to
23   the ethics commentary.
24           I'm very familiar with the ethical rules.  I'm
25   familiar with my obligations to my client, to the court, my

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A-5828**

C2grdau4                           Berke - cross

1   other obligations.  I never will act on a piece of information
2   that I think invokes my duties as an advocate for my client as
3   well as an officer of the court without first looking at the
4   rules.  I will read the rules.
5           As we all know, at times you will read the rules, they
6   will be absolutely clear what my obligations are.  Sometimes
7   they will be less clear and we will research it.  That's what I
8   do.  I never act on information until I do that, and I've never
9   done that on that issue.  That's what I can tell you.
10  Q.  I don't think you answered my question, though.  Can you
11  answer the question that I asked?  If you form a belief as an
12  attorney in a courtroom that a juror has engaged in misconduct,
13  do you have to bring that to the attention of the court?
14  A.  What I can tell you is if I had confronted that issue --
15  Q.  Is this another one that you can't answer yes or no?
16  A.  I'm going to answer your question.
17  Q.  Would you do that.
18  A.  I will.  What I will tell you is my reaction to that
19  information if I confronted it would be that I believe I have
20  an obligation to tell the court.  Before I did anything,
21  though, I would do exactly what I said.  I would look at the
22  rule, look at the law, and make sure I was complying with all
23  my obligations.
24  Q.  Did Susan Brune explain to you why she felt it important to
25  bring the information to your attention that her firm had

372
C2grdau4                    Berke - cross

1  learned about the juror or believed or the connection between
2  the juror?
3  A.  No.  I think I have told you the substance of what I recall
4  of that conversation.
5  Q.  She didn't explain in any fashion why she thought it was
6  important to tell you at that period of time?
7  A.  No.
8  Q.  Did she tell you anything else that her firm had learned
9  that gave rise to the belief by one of their attorneys that
10 there was a connection between Juror No. 1 and the suspended
11 New York attorney?
12 A.  No.
13 Q.  Did she tell you any of the underlying facts?
14 A.  No.  The only other thing that I recall is that when
15 talking about the note, we both noted that we believed that
16 Juror 1 had said she had been a plaintiff in a personal injury
17 case, which might explain the respondeat superior.  I can't say
18 for certain it was in that identical conversation, I believe it
19 was probably was, but I do remember talking about that as well.
20 Q.  Let me ask you this.  If you had learned from somebody at
21 the Brune firm that they had a written report showing somebody
22 named Catherine Conrad had a personal injury or had a private
23 lawsuit, would that be a piece of information that you would
24 want to have had at the time in order to do your own analysis?
25 A.  Just to be clear, what I'm referring to, I believe the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

C2grdau4                              Berke - cross

1    juror herself had said in response to a question about other
2    litigation that she had been involved in a personal injury
3    case.  That's what I'm referring to.
4    Q.  Right.  My question to you is, would that information as
5    background, if Susan Brune came to you and told you that we not
6    only found a Catherine Conrad who was a suspended lawyer but we
7    also found a Catherine Conrad who was involved in a personal
8    injury lawsuit, is that something that you would have wanted to
9    know at the time?
10   A.  I'm not sure I understand.  We knew that Catherine Conrad
11   had said that she was involved in a personal injury suit.  We
12   knew that from her answers in the voir dire.
13   Q.  If you saw a piece of paper that connected Catherine Conrad
14   who was Juror No. 1 and Catherine Conrad who was a personal
15   injury lawyer and a suspended attorney who had the same address
16   as the person involved in the lawsuit, would that have been of
17   interest to you?
18   A.  You know, I really am not comfortable speculating.  What I
19   can tell you is I told you what I knew.  I did not believe that
20   the person who had been a disbarred lawyer could have been or
21   was this Juror No. 1 based on what I knew.  That's really all I
22   can tell you.
23   Q.  So, your answer to my direct question is that you can't
24   answer the question?
25   A.  Well, I would object if I was sitting over there, but I'm
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

C2grdau4                         Berke - cross

1  not.  You're asking me to speculate.  I'm just not comfortable
2  speculating.
3  Q.  I think that's on your bucket list, to move up there,
4  right?
5  A.  No, not at all.  I'm just not comfortable speculating.
6  Q.  Isn't more information better than less when you are trying
7  to make an assessment of possible juror misconduct and a
8  connection in names between a person who may be acting as an
9  imposter and a juror on trial?
10        MR. SHECHTMAN:  Judge, I'm going to object on Mr.
11  Berke's behalf.
12        THE COURT:  Overruled.
13  A.  I wasn't making that assessment.
14  Q.  I didn't ask you if you were making that assessment.  Is
15  more information better when you are trying to find out whether
16  somebody who shares the same name as a suspended attorney is
17  the juror?  Yes or no.
18  A.  I'm going to tell you, Mr. Okula, it sounds like you're
19  arguing with me.  It depends on what that information is.  All
20  I can tell you is what I know from my personal experience.
21  From what I heard, it did not occur to me for a moment that
22  there was any issue with Juror 1 and the suspended lawyer at
23  the time.  That's all I can tell you.  I can't speculate or
24  answer your argument, I really can't.
25  Q.  What is the type of investigation you'd do if you found a
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

375

C2grdau4                    Berke - cross

1   suspended attorney named Catherine Conrad, the same name as
2   Juror No. 1?
3   A.  I was never in a position where I needed to or had to make
4   decisions about the investigation.  I don't understand that I'm
5   here as an expert witness.  I can tell you as a matter of fact
6   what I knew, what I was told, the conversations I had, but I
7   really can't go beyond that, Mr. Okula.
8   Q.  You're not going to answer my question?  You've hired
9   private investigators many times as a lawyer, right?
10  A.  I have.
11  Q.  Are you unwilling to answer the question that I just asked
12  about what steps you would take if you learned that Catherine
13  Conrad, a suspended attorney, was in existence and you knew you
14  had Catherine Conrad sitting in seat number 1?  Are you not
15  going to answer that question?
16  A.  What you are ignoring is it's such a far-fetched idea that
17  any citizen would come in here and lie to be a juror.  I have
18  never experienced it as a practicing lawyer.  It never occurred
19  to me it happened in this trial, and it's not something I have
20  ever thought about it.  When I've used investigators it's
21  because I'm defending someone in a criminal case or civil case
22  and I want to look at facts.  You're asking me to speculate and
23  give opinions about an experience I've never had.
24              MR. OKULA:  Judge, I have no further questions for Mr.
25  Berke.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
        C2grdau4                    Berke - redirect
 1                MR. SHECHTMAN:  I do.
 2                THE COURT:  Mr. Shechtman.
 3      REDIRECT EXAMINATION
 4      BY MR. SHECHTMAN:
 5      Q.  You were told by Ms. Brune that there was a suspended
 6      lawyer with the name Catherine Conrad which was the same as
 7      Juror No. 1?
 8      A.  That is correct.
 9      Q.  And you didn't do any further investigation?
10      A.  I did not.
11      Q.  That's because you agreed with her that based on the voir
12      dire, this couldn't be the same person?
13      A.  Exactly.
14                MR. SHECHTMAN:  No further questions.
15                THE COURT:  Anything further?
16                MR. OKULA:  No, your Honor.  Thank you.
17                THE COURT:  Mr. Berke, you're excused.  You may step
18      down.
19                THE WITNESS:  Thank you, Judge.
20                (Witness excused)
21                THE COURT:  You're still talking as fast as ever.
22                THE WITNESS:  I made a promise I wanted to keep.
23                THE COURT:  Mr. Shechtman, does the defendant Parse
24      have any additional witnesses to call?
25                MR. SHECHTMAN:  No, your Honor.
```

C2grdau4

```
 1              THE COURT:  Does the defendant Parse rest?
 2              MR. SHECHTMAN:  We do, your Honor.
 3              THE COURT:  Does any defendant have any additional
 4      evidence to offer to the Court on this hearing?
 5              MS. McCARTHY:  Not from Mr. Field, your Honor.
 6              MR. ROTERT:  We do not, your Honor.
 7              MR. SKLARSKY:  No, your Honor.
 8              THE COURT:  Does the government have anything further?
 9              MR. OKULA:  Thank you, your Honor.  We do not.
10              THE COURT:  The government rests?
11              MR. OKULA:  We do indeed, your Honor.
12              THE COURT:  I would like to get some post-hearing
13      briefing from the parties.  It seems to me that the simplest
14      way to do it would be to have the parties submit simultaneous
15      briefs and then I give you a very short responsive brief if you
16      felt it was necessary to respond to something that the other
17      side said.  We'll fix a schedule in a moment.
18              Obviously, in the briefs I want the parties to provide
19      the Court with what they believe the strongest results are of
20      this evidentiary hearing.  Second, in the post-hearing briefs
21      I'd like the question of whether the attorneys for Brune &
22      Richard involved in this matter would have satisfied their
23      ethical obligations if they failed to disclose the contents of
24      the July 21 letter and their complete investigation into Juror
25      No. 1.
```

**A-5835**

C2grdau4

1           Finally, in the past I asked the parties to brief what
2    they believed might occur depending upon various rulings by the
3    Court.  It seems to me that one scenario was left out.  You are
4    not to conclude from this request that this is the Court's
5    thinking, but I want to receive briefing on the following
6    question.
7           If this Court were to grant the defendants' motion for
8    a new trial and also conclude that the defendant Parse had
9    waived, what would be the shake-out of that in terms of Parse's
10   ability to take that issue to the Court of Appeals at the same
11   time that the government would be taking the underlying issue
12   on motion for a new trial to the Court of Appeals, as is the
13   government's right under a specific statute?  I have
14   preliminarily looked at the matter, but I'd appreciate your
15   wisdom on the question.
16          Are there any other issues that counsel want to raise?
17   Mr. Shechtman?
18          MR. SHECHTMAN:  Can I try to sharpen that last
19   question?
20          THE COURT:  Go ahead, certainly.
21          MR. SHECHTMAN:  I take it the notion would be could
22   Mr. Parse take that appeal interlocutorily before sentencing?
23          THE COURT:  Bingo.
24          MR. SHECHTMAN:  The after one is easy.  So it's really
25   an interlocutory.

                     SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

C2grdau4

1          THE COURT: Right. In the end, whatever happens with
2   respect to these matters before the Court, I think that it is
3   in everyone's interest that they travel together wherever
4   they're going.
5          Are there any other matters that counsel want to raise
6   at this time before we fix a schedule for the submission of
7   these briefs?
8          MR. OKULA: No, your Honor. I was just going to
9   suggest most respectfully that perhaps if counsel for the
10  government and defendants could confer momentarily about a
11  proposed schedule, then we could propose one to the Court.
12         THE COURT: That's fine with me.
13         MR. GAIR: Judge, Mr. Okula is on vacation next week,
14  so I'd like to suggest one week.
15         MR. SHECHTMAN: Judge, if we might be heard?
16         THE COURT: Go ahead.
17         MR. SHECHTMAN: We want very much to accommodate Mr.
18  Okula's vacation, seriously. He has suggested three weeks. I
19  start a trial on Tuesday, a month-long trial. I fully
20  appreciate that I have to write this brief on weekends, and I
21  will, but an extra week would be very helpful. If we could get
22  a month, that would be grand.
23         THE COURT: Fine. You've got it. Do you want to file
24  your briefs on March 16, your initial briefs, or do you want
25  March 23?

C2grdau4

1           MR. SHECHTMAN:  I'd be happy if we could have March
2    19th so we can't get that extra weekend.
3           THE COURT:  I'll give you until the 23rd if you want.
4           MR. OKULA:  That's fine.  It separates it from St.
5    Patrick's Day more, Judge.
6           THE COURT:  All right.  March 23 for the initial
7    briefs.  Why don't you provide your responses by April 5th.
8           MR. OKULA:  That's fine, Judge.
9           THE COURT:  Will that work?
10           MR. SHECHTMAN:  Yes.
11           THE COURT:  I'll take the matter then on submission.
12           Is there anything else that counsel want to raise?
13           MR. OKULA:  Not other than our thanks, Judge.
14           THE COURT:  My thanks to all of you for conducting the
15    hearing in the customary professional and efficient manner.
16    Certainly there are some aspects of it that have been
17    memorable, and that's an understatement.  Have a good
18    afternoon.
19           (Adjourned)
20
21
22
23
24
25

381

```
1                    INDEX OF EXAMINATION
2    Examination of:                              Page
3    SUSAN BRUNE
4    Direct By Ms. Davis  . . . . . . . . . . . . 246
5    Cross By Mr. Shechtman . . . . . . . . . . . 309
6    Redirect By Mr. Davis  . . . . . . . . . . . 312
7    Recross By Mr. Schectman . . . . . . . . . . 316
8    Redirect By Ms. Davis  . . . . . . . . . . . 318
9    LAURA EDELSTEIN
10   Direct By Mr. Okula  . . . . . . . . . . . . 322
11   Cross By Mr. Schectman . . . . . . . . . . . 353
12   Redirect By Mr. Okula  . . . . . . . . . . . 354
13   PAUL SCHOEMAN
14   Direct By Mr. Shechtman  . . . . . . . . . . 359
15   Cross By Mr. Okula . . . . . . . . . . . . . 362
16   Redirect By Mr. Shechtman  . . . . . . . . . 366
17   BARRY H. BERKE
18   Direct By Mr. Shechtman  . . . . . . . . . . 367
19   Cross By Mr. Okula . . . . . . . . . . . . . 369
20   Redirect By Mr. Shechtman  . . . . . . . . . 376
21
22
23
24
25
```

```
                                                          382
1                      GOVERNMENT EXHIBITS
2    Exhibit No.                                Received
3      10    . . . . . . . . . . . . . . . . . 358
4      28    . . . . . . . . . . . . . . . . . 312
5                      DEFENDANT EXHIBITS
6    Exhibit No.                                Received
7    PMD 4 and PMD 27  . . . . . . . . . . . . . 245
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25


                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
```

Westlaw.

80 A.D.3d 168, 913 N.Y.S.2d 187, 2010 N.Y. Slip Op. 09090
**(Cite as: 80 A.D.3d 168, 913 N.Y.S.2d 187)**

H

Supreme Court, Appellate Division, First Department, New York.
In the Matter of Catherine M. CONRAD, a suspended attorney:
Departmental Disciplinary Committee for the First Judicial Department, Petitioner,
Catherine M. Conrad, Respondent.

Dec. 9, 2010.

**Background:** Departmental Disciplinary Committee instituted disciplinary proceedings against attorney. The Supreme Court, Appellate Division, 48 A.D.3d 187, 846 N.Y.S.2d 912, suspended attorney from practice of law for failure to respond to requests made by Committee pursuant to its investigations of complaints made against her. Committee subsequently moved for order suspending attorney on ground that she suffered from disability by reason of physical or mental infirmity or illness. Attorney cross-moved for order converting her current suspension to medical suspension nunc pro tunc and order vacating suspension and reinstating her to practice of law.

**Holdings:** The Supreme Court, Appellate Division, held that:
(1) attorney's immediate reinstatement was not warranted, and
(2) attorney was required to prove her fitness to be reinstated.

Suspension ordered.

West Headnotes

**[1] Attorney and Client 45 ⚖ 61**

45 Attorney and Client
    45I The Office of Attorney
        45I(C) Discipline
            45k61 k. Reinstatement. Most Cited Cases

Immediate reinstatement of suspended attorney to practice of law was not warranted; alcohol dependence rendered attorney unfit to practice law, and attorney acknowledged during her deposition that her failure to cooperate and her underlying conduct was related to alcohol dependency. N.Y.Ct.Rules, §§ 603.16(c)(1), (f).

**[2] Attorney and Client 45 ⚖ 61**

45 Attorney and Client
    45I The Office of Attorney
        45I(C) Discipline
            45k61 k. Reinstatement. Most Cited Cases

Attorney who was suspended from practice of law due to her alcohol dependence was required to prove her fitness to be reinstated, and that burden could not be satisfied by attorney's own self-assessment; rather, evaluation by

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

80 A.D.3d 168, 913 N.Y.S.2d 187, 2010 N.Y. Slip Op. 09090
**(Cite as: 80 A.D.3d 168, 913 N.Y.S.2d 187)**

mental health provider attesting to attorney's current fitness to re-commence practice of law was necessary.
N.Y.Ct.Rules, §§ 603.16(c)(1), (f).

**\*\*188** Alan W. Friedberg, Chief Counsel, Departmental Disciplinary Committee, New York (Kevin E.F. O'Sullivan, of counsel), for petitioner.

Victor M. Serby, for respondent.

DAVID B. SAXE, Justice Presiding, DAVID FRIEDMAN, JOHN W. SWEENY, JR., EUGENE NARDELLI, JAMES M. McGUIRE, Justices.

PER CURIAM.
  **\*169** Respondent Catherine M. Conrad was admitted to the practice of law in the State of New York by the Second Judicial Department on January 26, 2000, and, at all times relevant to this proceeding, has maintained an office for the practice of law within the First Judicial Department.

  In a previous order dated December 18, 2007, this Court suspended respondent from the practice of law for failure to respond to requests made by the Departmental Disciplinary Committee pursuant to its investigation of two complaints made against her (22 NYCRR 603.4[e][1][i] ). After receiving a response by respondent six months later seeking an opportunity to respond to the complaints, the Committee conducted an investigation. Based upon respondent's admitted problem with alcohol dependency, which she acknowledged was connected to her failure to cooperate and the underlying conduct, the Committee obtained a psychiatric evaluation of respondent in November 2009, and a subsequent re-evaluation in May 2010. The psychiatrist determined that respondent's prognosis is good, but did not go so far as to assert that she is now fit to re-commence the practice of law.

  The Departmental Disciplinary Committee now moves for an order suspending respondent from the practice of law on the ground that she suffers from a "disability by reason of physical or mental infirmity or illness" (22 NYCRR 603.16[c][1] ). In her cross motion respondent seeks to convert the current suspension to a medical suspension nunc pro tunc, but further seeks an order vacating the suspension and reinstating her to the practice of law, due to her year-long sobriety.

  The Committee's motion, and the first branch of respondent's cross motion, are granted to the extent that the prior finding of non-cooperation is vacated and an order **\*\*189** of suspension based upon the attorney's medical disability is granted nunc pro tunc (see _Matter of Kaplan,_ 65 A.D.3d 287, 883 N.Y.S.2d 182 [2009]; _Matter of Fusco,_ 18 A.D.3d 81, 798 N.Y.S.2d 364 [2005] ).

  [1][2] However, that branch of respondent's cross motion seeking immediate reinstatement is denied at this time. The cross motion itself concedes the existence of the alcohol dependence rendering her unfit to practice law; additionally, she acknowledged during her deposition that her failure to cooperate and **\*170** her underlying conduct was related to alcohol dependency. To support her cross motion, respondent implies that the examining psychiatrist failed to satisfy an obligation to establish that she continues to be unfit to resume her practice. However, to be entitled to reinstatement, since the initial infirmity has been conceded, it is respondent who must prove her fitness to be reinstated (see 22 NYCRR 603.16[f] ), and that burden is not satisfied here by her own self-assessment (see _Matter of Stewart,_ 47 A.D.3d 43, 846 N.Y.S.2d 13 [2007] ). The branch of respondent's cross motion seeking reinstatement to the practice of law therefore must be denied at this time, without prejudice to a further application, supported by an evaluation by a mental health provider attesting to her current fitness to re-commence the practice of law (see _Matter of Supino,_ 23 A.D.3d 11, 14, 806 N.Y.S.2d 178 [2005] ).

  Accordingly, the Committee's motion and respondent's cross motion should be granted to the extent that the prior order's finding of non-cooperation is vacated, and respondent is suspended from the practice of law for an indefi-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

80 A.D.3d 168, 913 N.Y.S.2d 187, 2010 N.Y. Slip Op. 09090
**(Cite as: 80 A.D.3d 168, 913 N.Y.S.2d 187)**

nite period until further order of this Court, nunc pro tunc to December 18, 2007, and the branch of respondent's cross motion seeking reinstatement to the practice of law should be denied without prejudice to a further motion for the same relief, supported by an expert's evaluation attesting to her present fitness to practice law.

Respondent suspended from the practice of law in the State of New York for an indefinite period until further order of this Court, effective nunc pro tunc to December 18, 2007. Cross motion denied, without prejudice to a further motion, as indicated. So much of the Opinion Per Curiam and order of this Court entered on December 18, 2007 (M-4837) incorporating a finding of non-cooperation vacated, as indicated.

All concur.

N.Y.A.D. 1 Dept.,2010.
In re Conrad
80 A.D.3d 168, 913 N.Y.S.2d 187, 2010 N.Y. Slip Op. 09090

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,    )
    )
    Plaintiff,    )
    )    Case No. S3 09 Cr. 581 (WHP)
    vs.    )
    )    The Honorable William H. Pauley, III
PAUL M. DAUGERDAS, et al.,    )
    )
    Defendants.    )

## DECLARATION OF STEPHEN GILLERS

I, Stephen Gillers, under penalty of perjury, declare as follows:

### Qualifications

1.    My name is Stephen Gillers. I am a law professor at New York University School of Law, where I have taught the rules and law governing lawyers and judges ("legal ethics") regularly since 1978. I am author of a leading casebook in the field, Regulation of Lawyers: Problems of Law and Ethics (9th ed. 2012). I have spoken hundreds of times on the subject of legal ethics at state and local bar associations nationwide and at American Bar Association meetings, at state and federal judicial conferences, and at law firms and corporate law offices in the United States and abroad. For more than a decade, I have been and remain active in the legal ethics work of the ABA's Center for Professional Responsibility, spending hundreds of hours yearly on this work. Most recently, I have been a member of the ABA's Ethics 20/20 Commission, a three and a half year project to review the rules of ethics governing lawyers in light of globalization and advance in technology. I have written widely in the area, including for law journals and the law and popular press. Legal ethics is the primary focus of my academic research.  My resume is annexed as Exhibit A.

### Question Addressed And Summary Of Conclusion

2.    I have been asked to address the question the Court posed on February 16, 2012 – namely, "whether the attorneys for Brune & Richard involved in this matter would have satisfied their ethical obligations if they failed to disclose the contents of the July 21 letter and their complete investigation into Juror No. 1." The question does not specify a time frame for any possible "fail[ure] to disclose." I have been asked, therefore, to address any disclosure duty in March, May, and July of 2011. I have not been asked to address, and I am not addressing, the

separate question of whether the motion for a new trial based on the conduct of juror Conrad is meritorious. That is not a question of legal ethics.

3.     In summary, my opinion is that (i) the Brune & Richard lawyers had no ethical obligation to disclose the results of their March 2011 research in March, or the results of their March and May 2011 research in May; (ii) the Brune & Richard lawyers had no ethical obligation to disclose the existence or the results of their March and May research in their July 8 motion for a new trial or during the July 15 conference call with the Court; and (iii) nothing the Brune & Richard lawyers said or did in the July 8 memorandum or the July 15 conference call violated their ethical obligations.

## Factual Assumptions

4.     I have read the following documents:

--Catherine Conrad's letter to the Government dated May 25, 2011;

--Defendants' Brief in Support of a New Trial dated July 8.2011;

--Transcript of Telephone Conference with Court dated July 15, 2011;

--Letter from Susan Brune dated July 21, 2011;

--Letter from Susan Brune dated July 29, 2011;

--Affidavit of Susan Brune with Exhibits (including Catherine Conrad's jury questionnaire and voir dire responses) dated September 15, 2011;

--Government's Waiver Brief dated October 7, 2011;

--Defendant Parse's Waiver Brief dated October 27, 2011; and

--Transcript of Hearing dated February 15 and 16, 2012.

5.     My opinion is based on the cited documents and I assume as true the facts that emerge from the sworn testimony at the hearing held February 15 and 16, 2012. I note that the testimony at that hearing was subject to robust adverse direct examination by Government attorneys.

## General Observations And Legal Standards

6.     The New York Rules of Professional Conduct (hereafter "New York Rules") specifically identify when a lawyer is obligated to disclose information to the Court. The New York Rules are incorporated in the local rules of this Court. *See* Southern District of New York Local Rule 1.5(b)(5).

7.     Relevant here is New York Rule 3.3(a) and (b), which provides:

> (a) A lawyer shall not knowingly: (1) make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously

made to the tribunal by the lawyer; (2) fail to disclose to the tribunal controlling legal authority known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel; or (3) offer or use evidence that the lawyer knows to be false.  If a lawyer, the lawyer's client, or a witness called by the lawyer has offered material evidence and the lawyer comes to know of its falsity, the lawyer shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal.  A lawyer may refuse to offer evidence, other than the testimony of a defendant in a criminal matter, that the lawyer reasonably believes is false.

(b) A lawyer who represents a client before a tribunal and who knows that a person intends to engage, is engaging or has engaged in criminal or fraudulent conduct related to the proceeding shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal.

8.      Also relevant is New York Rule 3.5(d), which provides:

A lawyer shall reveal promptly to the court improper conduct by a member of the venire or a juror, or by another toward a member of the venire or a juror or a member of his or her family of which the lawyer has knowledge.

9.      Each of these rules requires knowledge on the part of the lawyer, and that knowledge must be "actual" knowledge.  The standard is a subjective one. New York Rule 1.0(k) contains this definition:

Knowingly, known, know, or knows denotes actual knowledge of the fact in question. A person's knowledge may be inferred from circumstances.[1]

10.      A leading Second Circuit case addresses the knowledge requirement. In Doe v. Federal Grievance Committee, 847 F.2d 57 (2nd Cir. 1988), a district judge in Connecticut disciplined a lawyer who did not report his belief that an opposing witness had lied in a deposition. The Connecticut (and the New York) rule at the time required a "lawyer who receives information *clearly establishing* that…[a] person other than his client has perpetrated a fraud upon a tribunal

---

[1] I have also been asked to address the potential relevance of Rule 8.4(d) of the New York Rules, which says that a "lawyer or law firm shall not…engage in conduct that is prejudicial to the administration of justice." This rule should not be read to expand Rule 3.3's mens rea requirement of knowledge. When the New York Rules of Professional Conduct were adopted to replace the Code of Professional Responsibility, the courts chose the standard of "knowledge," the same standard as in the ABA Model Rules, to replace "clearly established," which the Second Circuit had already interpreted to mean "knowledge" (see ¶¶ 10-11 *infra*). When a specific and considered rule requires knowledge, another and general rule should not be interpreted to impose a duty based on a lower standard. There would be obvious notice and fairness interests implicated in doing so.

shall promptly reveal the fraud to the tribunal." *Id.* at 61 (emphasis added)(quoting DR 7-102(B)(2) of the Code of Professional Responsibility). The district judge concluded that Doe had "information clearly establishing" deposition perjury because he had "clear and convincing evidence of [the] witness's perjury." *Id.* Doe himself testified that "he believed that [the] witness had lied at the deposition." *Id.* at 59.

11.     Without rejecting the lower court's factual finding that Doe had clear and convincing evidence of fraud on the tribunal, the *Doe* Court held that "clearly establishing" required more. It held that "knowledge is required before the disclosure duty arises." *Id.* at 62. Clear and convincing proof, which is an objective test, did not trigger a reporting duty. That a lawyer "strongly suspected" fraud on the tribunal (a subjective test) was also insufficient. *Id.* at 63. As the Court noted:

> Our experience indicates that if any standard less than actual knowledge was adopted in this context [*i.e.*, DR 7-102(B)(2)], serious consequences might follow. If attorneys were bound as part of their ethical duties to report to the court each time they strongly suspected that a witness lied, courts would be inundated with such reports. Court dockets would quickly become overburdened with conducting these collateral proceedings which would necessarily hold up the ultimate disposition of the underlying action. We do not believe that the Code's drafters intended to throw the court system into such a morass. Instead, it seems that the only reasonable conclusion is that the drafters intended disclosure of only that information which the attorney reasonably knows to be a fact and which, when combined with other facts in his knowledge, would clearly establish the existence of a fraud on the tribunal.

> To interpret the rule to mean otherwise would be to require attorneys to disclose mere suspicions of fraud which are based upon incomplete information or information which may fall short of clearly establishing the existence of a fraud. We do not suggest, however, that by requiring that the attorney have actual knowledge of a fraud before he is bound to disclose it, he must wait until he has proof beyond a moral certainty that fraud has been committed. Rather, we simply conclude that he must clearly know, rather than suspect, that a fraud on the court has been committed before he brings this knowledge to the court's attention.

*Id.* Discipline was reversed.[2]

12.     In an adversary legal system like ours, mandatory disclosure rules, which operate as a check on the premises of that system, receive scrutiny and debate from the courts and the bar over their proper scope. Furthermore, American jurisdictions do not all agree on how to reconcile competing interests – those of the client, the tribunal, and the adversary. New York, like most (but not all) jurisdictions, has adopted Rules 3.3 (a) and (b) in identical or substantially

---

[2] I was the expert for Doe in the Connecticut disciplinary hearing.

identical form[3] and it has also adopted Rule 3.5(d). These rules mandate disclosure of certain information to a court even if disclosure may harm the client and, for Rule 3.3 explicitly and Rule 3.5(d) implicitly, even if the information is protected as confidential client information. See New York Rule 3.3(c).[4] But the duty arises only if the lawyer has "actual knowledge."

13.     A second decision also recognizes the delicate balance between the adversary system and duties to a litigation opponent or the tribunal. In re Pennie & Edmonds LLP, 323 F.3d 86 (2nd Cir. 2003) was an appeal of Rule 11 sanctions. When a party seeks Rule 11 sanctions, the target of the motion has a 21-day "safe harbor" within which to withdraw or correct the challenged submission. If it does not, the "mental state applicable to liability for Rule 11 sanctions is objective unreasonableness." *Id.* at 90. When, however, a court initiates a sanction proceeding, as by order to show cause, there is no safe harbor. Because the lawyer cannot take it back, *Pennie & Edmonds* holds that the required mental state is "bad faith," a subjective test like actual knowledge. The Court explained that "[a]ny regime of sanctions for a lawyer's role in the course of representing a client inevitably has implications for the functioning of the adversary system." *Id.* In support of its holding, the Court cited the interest of "[a] vigorous adversary system." Id. at 91.

14.     In sum, from the perspective of a lawyer's ethical obligations, the premises of our "vigorous adversary system" control unless the situation is governed by an express exception in ethics rules, statutes, judicial decisions, or other law. These exceptions, which are written with appreciation of the need for precision, give lawyers notice of the duties that override their adversarial obligations. As the Supreme Court wrote in a different context in Polk County v. Dodson, 454 U.S. 312 (1981):

> Within the context of our legal system, the duties of a defense lawyer are those of a personal counselor and advocate. It is often said that lawyers are "officers of the court." But the Courts of Appeals are agreed that a lawyer representing a client is not, by virtue of being an officer of the court, a state actor "under color of state law" within the meaning of § 1983. In our system a defense lawyer characteristically opposes the designated representatives of the State. The system assumes that adversarial testing will ultimately advance the public interest in truth and fairness. But it posits that a defense lawyer best serves the public, not by acting on behalf of the State or in concert with it, but rather by advancing "the undivided interests of his client."

*Id.* at 318 (footnotes omitted). The question I turn to now is whether lawyers from Brune & Richard LLP acted in violation of any of the exceptions to their duties in the adversary system by not disclosing certain information prior to their July 21, 2011, letter to the Court.

---

[3] See http://www.americanbar.org/content/dam/aba/migrated/cpr/pic/3_3.authcheckdam.pdf (last visited April 5, 2012).

[4] The ABA Model Rules do not contain Rule 3.5(d). In my view, its mandate appears duplicative of a lawyer's obligations under New York and Model Rule 3.3(b).

# DISCUSSION

## Events in March 2011

15.     The Brune & Richard lawyers had no duty to reveal to the court Trzaskoma's discovery of a 2010 court order suspending a Bronx lawyer with the same name as juror Conrad. None of the lawyers had knowledge that the Bronx lawyer and juror Conrad were the same person. None even had "clear and convincing" evidence or "strongly suspected" – the objective and subjective tests *Doe* rejected – they were the same person. Trzaskoma and Brune (who was told of the discovery though not shown the suspension order that Trzaskoma discovered but did not print) resolved to await juror Conrad's voir dire answers. Those answers, including juror Conrad's Bronxville address, directly contradicted any identity between the juror and the lawyer. This was in fact compelling. If the sworn answers were true, the juror was not the lawyer. A contrary conclusion would require the lawyers to believe that a suspended lawyer would repeatedly perjure herself in federal court in order to sit on a jury.

## Events in May 2011

16.     Juror Conrad gave the Court a note asking if the jury was going to be instructed on vicarious liability and respondeat superior. The contents of the note led Trzaskoma, assisted by others at the firm, to take another look at the issue the next day. The 2010 suspension order and an earlier suspension order from 2007 were found. Both identified a Bronx lawyer. A paralegal discovered the Westlaw profile and forwarded it to Trzaskoma in an email that highlighted selected information. After seeing the selected information but before reviewing the entire profile, Trzaskoma wrote "Jesus, I do think it's her," but then, after reviewing the entire profile, changed her mind in light of the contradiction between the juror's voir dire answers and the limited information about lawyer Conrad (different levels of education, different addresses, etc.). In addition, Trzaskoma did not believe that the given age of the Bronx lawyer agreed with the apparent age of juror Conrad.

17.     Trzaskoma discussed the issue with Brune and Edelstein later in the day. All three concluded that juror Conrad was not the suspended lawyer. Co-counsel with whom the matter was thereafter informally discussed thought the question not worth pursuing. Because the Brune & Richard lawyers did not believe – let alone have actual knowledge – that the juror and the suspended lawyer were the same person, they did not present their information to the Court. At least five lawyers, based on what they had seen or been told, reached this conclusion.

18.     At this time, as earlier, no Brune & Richard lawyer had actual knowledge that juror Conrad was lawyer Conrad. Actual knowledge is the mental state that creates the disclosure duty under New York Rules 3.3(b) and 3.5(d). There was no ethical duty to reveal a suspicion, even a strong suspicion.

19.     Any notion that silence was intended to preserve undetected a basis for a new trial motion in the event of conviction is belied by the lawyers' actions. There was no effort to seek a new

trial based on juror misconduct (nor did the firm give any consideration to that possibility) from the time of the verdict and until after receipt on June 20 of juror Conrad's letter to the prosecutor and the ensuing investigation.

## Events in July 2011

### *The July 8 Memorandum of Law*

20.     The memorandum does not reference the discoveries in March or May. There was no duty to do so. I accept that the Brune & Richard lawyers could anticipate a possible waiver claim and could see how the government could cite the information that they had in March and May to bolster that claim. But the lawyer ethics rules impose no *general* duty to volunteer information that an opponent might use to support its argument and the exceptions in the rules cited do not create one specifically.[5]

21.     To put it otherwise, in order to find a duty to reveal there must be a source of the duty. Professional conduct rules *do* impose duties to reveal, but they do so in a way that gives lawyers notice of their requirements. No rule required disclosure of the information discovered in March or May. Any such rule would have to specify the information required to be revealed and the level of confidence in the accuracy of that information. Here, the rules imposing a duty to disclose to the tribunal are Rules 3.3(b) and 3.5(d). These rules use actual knowledge as the level of confidence required for the duty to disclosure. The information the lawyers had about the material they had gathered in March and May negates actual knowledge; the actions of the lawyers are consistent only with a conclusion of a lack of actual knowledge. In sum, only if the lawyers had had actual knowledge in March or May would they have had to reveal that in July, and they did not have actual knowledge.

22.     In certain places, the memorandum contains statements that are apparently alleged to imply that the Brune & Richard lawyers did not have information about juror Conrad's identity prior to June 20, when they received a copy of her letter to the government.

---

[5] Because the premises of the adversary system are central here, instruction from the contiguous world of Rule 11 is again apt:

  The primary purpose of Rule 11 is to deter baseless court filings, but this goal must be considered in light of the fact that, in an adversary system of litigation, the essence of the lawyer's task is to present issues of facts and law "as favorably as fairly possible" in support of the client's claim. See United Nat. Ins. Co. v. R & D Latex Corp., 242 F.3d 1102, 1115 (9th Cir. 2001). Therefore, judges should "impose sanctions on lawyers for their mode of advocacy only in the most egregious situations, lest lawyers be deterred from vigorous representation of their clients." *Id.* (citing Schlaifer Nance & Co., Inc. v. Estates of Warhol, 194 F.3d 323, 341 (2nd Cir. 1999).

Desert Outdoor Advertising, Inc. v. City of Oakland, 2009 WL 943948 at *3 (N.D. Cal. Apr. 7 2009).

23.     The lawyers wrote: "The tone and content of the letter, which were in sharp contrast to the image Conrad had projected through the trial ('always head down, taking notes'), caused defendants concern and prompted them to investigate." Memorandum at 9. And they later wrote: "This is not a situation where Conrad disclosed sufficient information to warrant inquiry by counsel. Defendants had no basis to inquire whether Conrad was lying in response to each of the Court's questions." Memorandum at 32, n.13 (internal citation and parenthetical quote omitted).

24.     In my opinion, these statements should be seen as true, not merely literally true in a hypertechnical or crabbed sense of the word, but true as reasonably read. They do not become untrue because a reader may draw a false inference that the lawyers did not intend. The juror's letter *did* cause concern and *did* prompt an investigation, as the first quotation in the memorandum states. That statement does not disclaim a prior search, whether that prior search is called an investigation or something else. I believe that focus on the word "investigate," which is not a term of art, would be misguided here. The sentence correctly describes what the letter caused the lawyers to do.

25.     The second quote focuses on the voir dire in March and is also true as reasonably read. The lawyers had concluded that the order suspending a lawyer with the same name as juror Conrad was *not* a "basis" for an inquiry into the truthfulness of juror Conrad's answers. Just the opposite. Her voir dire answers, in their view, dispelled reason for inquiry. A suspended lawyer would not lie under oath at voir dire, they reasoned, given the consequences to the lawyer's ability ever to regain admission to practice. In my opinion, this conclusion was compelling.

26.     It is also my opinion that the July 8, 2011, memorandum, taken as a whole, does not show a "knowing[]" violation of the provisions of Rule 3.3. It is true that even when a lawyer does not have a duty to speak, if she does speak, she may not knowingly misrepresent to a court or adversary. But an unintended inference is not a misrepresentation. The lack of disclaimer language in the memorandum's true statements – the fact that the lawyers, while focused on the new trial motion, did not anticipate what a reader might infer and what they did not mean to imply – is not an action that can support a finding of unethical behavior under the New York Rules.

27.     The lawyers understandably now wish they had not included these passages as written. Greater focus might have led them to anticipate how others might read them differently than intended, and to omit them (they were unnecessary to the motion), rephrase them, or add the history of their earlier research.

### The July 15 Telephone Conference

28.     In the July 15 telephone conference, the Court said that it wanted to "ascertain from each of the defendants …whether any of them were aware of the disturbing things that have been revealed by defense on this motion concerning Juror Number One [Conrad]." The Court invited a response on the call or via letter. Trzaskoma's response was:

> Trzaskoma:  We were not aware of the facts that have come to light, and I think if your Honor deems it appropriate, we can submit a letter.

The Court:  All right.  I do.  Because I would like to make certain that any defendant who had a jury consultant on the matter also make certain that the jury consultant did not have any information on Juror Number One.

Trzaskoma:  The only thing additional that I would offer your Honor is—well, we can address this in a letter.  I think it's more appropriate.

29.    This colloquy must be read in its (rather brief) entirety, that is, as a whole. Trzaskoma's statement implies that the answer to the Court's question from Brune & Richard would *not* be that it had no information at all. It would not require a letter to say only that. It is, instead, clear that Trzakoma had something "additional...to offer," and chose to accept the Court's invitation to say it in a letter, which was done on July 21 in a fashion that adequately disclosed the firm's earlier research and internal communications on the subject. "The general rule is that statements must be taken in context, and that related parts of a document must be taken together. That a hasty reader might take the first paragraph out of context is not in the present circumstances enough to brand the memorandum as false." The memorandum must be "read as a whole." Young v. City of Providence, 404 F.3d 33, 40-41 (1st Cir. 2005) (Rule 11 appeal) (citations omitted).


## CONCLUSION

30.    For the reasons stated, my opinion is that the actions of the Brune & Richard lawyers throughout the trial and in the months following with respect to the information they had obtained about Catherine Conrad were entirely consistent with their responsibilities under the lawyer ethics rules.

Stephen Gillers

A-5852

# EXHIBIT A

Stephen Gillers

[January 2012]

### STEPHEN GILLERS

Elihu Root Professor of Law
(vice dean 1999-2004)
New York University
School of Law
40 Washington Square South
New York, NY 10012

(212) 998-6264 (tel)
(212) 995-4658 (fax)
stephen.gillers@nyu.edu

**AREAS OF TEACHING**     Regulation of Lawyers and Professional Responsibility
Evidence; Law and Literature; Media Law

**PRIOR COURSES**     Civil Procedure, Agency, Advocacy of Civil Claims, Federal Courts

**PUBLICATIONS**     BOOKS AND ANTHOLOGIES:

Regulation of Lawyers: Problems of Law and Ethics (Aspen Law &
Business, 9th ed., April 2012). The first edition of this popular
casebook was published in 1985. Norman Dorsen was a co-author on
the first two editions. Stephen Gillers is the sole author of the third
through ninth editions. The first four editions were published by
Little, Brown & Co., which then sold its law book publishing
operation to Aspen.

Regulation of Lawyers: Statutes and Standards (with Roy Simon and
Andrew Perlman) (Aspen Law & Business) This is a compilation with
editorial comment. The first volume was published in 1989. Updated
versions have been published annually thereafter. As of the 2009
edition, Andrew Perlman has joined as a co-editor.

Regulation of the Legal Profession (Aspen 2009). This is 400+ page
book in the Aspen "Essentials" series explains ethics rules and laws
governing American lawyers and judges.

Getting Justice: The Rights of People (Basic Books, 1971; revised
paperback, New American Library, May 1973).

1

Case 1:20-cr-00330-AJN  Document 646-32  Filed 03/14/22  Page 39 of 117
**A-5854**
Case 1:09-cr-00581-WHP   Document 522   Filed 04/06/12   Page 12 of 29

Stephen Gillers

**PUBLICATIONS**
(continued)

Investigating the FBI (co-Editor with P. Watters)
(Doubleday, 1973; Ballantine, 1974)

None of Your Business:  Government Secrecy in America (co-Editor
with N. Dorsen) (Viking, 1974; Penguin, 1975).

I'd Rather Do It Myself:  How to Set Up Your Own Law Firm (Law
Journal Press, 1977).

Looking At Law School:  A Student Guide From the Society of
American Law Teachers (editor and contributor) (Taplinger, 1977;
NAL, 1977; revised ed., NAL, 1984; third ed., NAL, 1990).

The Rights of Lawyers and Clients (Avon, 1979).

"Four Policemen in London and Amsterdam," in R. Schrank (ed.)
American Workers Abroad (MIT Press, 1979).

"Dispute Resolution in Prison:  The California Experience," and
"New Faces in the Neighborhood Mediating the Forest Hills Housing
Dispute," both in R. Goldmann (ed.) Roundtable Justice:  Case
Studies in Conflict Resolution (Westview Press, 1980).

"The American Legal Profession," in A. Morrison (ed.),
Fundamentals of American Law (Oxford University Press 1996).

The Elsinore Appeal: People v. Hamlet (St. Martin's Press 1996).
This book contains the text of Hamlet together with briefs and oral
argument for and against affirmance of Prince Hamlet's (imaginary)
murder convictions.  The book arose out of a symposium sponsored
by the Association of the Bar of the City of New York.

"In the Pink Room," in Legal Ethics: Law Stories (D. Rhode & D.
Luban, eds.) (Foundation Press, 2006) (also published as a
freestanding monograph).

ARTICLES:

Guns, Fruit, Drugs, and Documents: A Criminal Defense Lawyer's
Responsibility for Real Evidence, 63 Stan. L. Rev. 813 (2011)

Is Law (Still) An Honorable Profession?, 19 Professional Lawyer 23
(2009)(based on a talk at Central Synagogue in Manhattan).

Stephen Gillers

PUBLICATIONS
ARTICLES (continued)

Professional Identity: 2011 Michael Franck Award Acceptance Speech, 21 Professional Lawyer 6 (2011).

Choosing and Working with Estate and Foundation Counsel to Secure an Artistic and Philanthropic Legacy, in The Artist as Philanthropist, volume 2, page 293 (The Aspen Institute Program on Philanthropy and Social Innovation 2010)

Virtual Clients:  An Idea in Search of a Theory (with Limits),  42 Valparaiso L. Rev. 797 (2008)  (Tabor lecture).

The "Charles Stimson" Rule and Three Other Proposals to Protect Lawyers From Lawyers, 36 Hofstra L. Rev. 323 (2007)

A Tendency to Deprave and Corrupt:  The Transformation of American Obscenity Law from Hicklin to Ulysses II, 85 Washington U. L. Rev. 215 (2007)

Some Problem with Model Rule 5.6(a), Professional Lawyer (ABA 2007 Symposium Issue).

Monroe Freedman's Solution to the Criminal Defense Lawyer's Trilemma Is Wrong as a Matter of Policy and Constitutional Law, 34 Hofstra L. Rev. 821 (2006)

"In the Pink Room," TriQuarterly 124.

Free the Lawyers:  A Proposal to Permit No-Sue Promises in Settlement Agreements, 18 Georgetown J. Legal Ethics 291 (2005) (with Richard W. Painter).

Lessons from the Multijurisdictional Practice Commission: The Art of Making Change, 44 Ariz. L. Rev. 685 (2002).

Speak No Evil: Settlement Agreements Conditioned On Noncooperation Are Illegal and Unethical, 31 Hofstra L. Rev.  1 (2002) (reprinted at 52 Defense L.J. 769 (2003)).

"If Elected, I Promise [_____]"–What Should Judicial Candidates Be Allowed to Say? 35 Ind. L. Rev. 735 (2002).

Legal Ethics: Art or Theory?, 58 Annual Survey Am. L. 49 (2001).

The Anxiety of Influence, 27 Fla. St. L. Rev. 123 (1999) (discussing rules that restrict multidisciplinary practice.

Can a Good Lawyer Be a Bad Person? 2 J. Inst. Study of Legal

3

Stephen Gillers

PUBLICATIONS
ARTICLES (continued)

Ethics 131 (1999) (paper delivered at conference "Legal Ethics: Access to Justice" at Hofstra University School of Law, April 5-7, 1998).

More About Us: Another Take on the Abusive Use of Legal Ethics Rules, 11 Geo. J. Legal Ethics 843 (1998).

Caveat Client: How the Proposed Final Draft of the Restatement of the Law Governing Lawyers Fails to Protect Unsophisticated Consumers in Fee Agreements With Lawyers, 10 Geo. J. Legal Ethics 581 (1997).

Participant, Ethical Issues Arising From Congressional Limitations on Legal Services Lawyers, 25 Fordham Urban Law Journal 357 (1998) (panel discussion).

The Year: 2075, the Product: Law, 1 J. Inst. Study of Legal Ethics 285 (1996) (paper delivered on the future of the legal profession at Hofstra University Law School's conference "Legal Ethics: The Core Issues").

Getting Personal, 58 Law & Contemp. Probs. 61 (Summer/Autumn 1995) (contribution to symposium on teaching legal ethics).

Against the Wall, 43 J. Legal Ed. 405 (1993) (ethical considerations for the scholar as advocate).

Participant, Disqualification of Judges (The Sarokin Matter): Is It a Threat to Judicial Independence?, 58 Brooklyn L. Rev. 1063 (1993) (panel discussion).

The New Old Idea of Professionalism, 47 The Record of the Assoc Bar of the City of N.Y. 147 (March 1992).

The Case of Jane Loring-Kraft: Parent, Lawyer, 4 Geo. J. Legal Ethics 115 (1990).

Taking L.A. Law More Seriously, 98 Yale L.J. 1607 (1989) (contribution to symposium on popular legal culture).

Protecting Lawyers Who Just Say No, 5 Ga. St. L. Rev. 1 (1988) (article based on Henry J. Miller Distinguished Lecture delivered at Georgia State University College of Law).

Model Rule 1.13(c) Gives the Wrong Answer to the Question of Corporate Counsel Disclosure, 1 Geo. J. Legal Ethics 289 (1987).

4

Stephen Gillers

| | |
|---|---|
| PUBLICATIONS<br>ARTICLES (continued) | The Compelling Case Against Robert H. Bork, 9 Cardozo L. Rev. 33 (1987). |

Ethics That Bite:  Lawyers' Liability to Third Parties, 13 Litigation 8 (Winter 1987).

Can a Good Lawyer Be a Bad Person?, 84 Mich. L. Rev. 1011 (1986).

Proving the Prejudice of Death-Qualified Juries After Adams v. Texas:  An Essay Review of Life in the Balance, 47 Pitt. L. Rev. 219 (1985), cited in Lockhart v. McCree, 476 U.S. 162, 197, 201 (1986) (Marshall, J., dissenting).

What We Talked About When We Talked About Ethics: A Critical View of the Model Rules, 46 Ohio St. L.J. 243 (1985).

The Quality of Mercy:  Constitutional Accuracy at the Selection Stage of Capital Sentencing, 18 U.C. Davis L. Rev. 1037 (1985).

Berger Redux, 92 Yale L.J. 731 (1983) (Review of Death Penalties by Raoul Berger).

Selective Incapacitation:  Does It Offer More or Less?, 38 The Record of the Assoc. Bar City of N.Y. 379 (1983).

Great Expectations:  Conceptions of Lawyers at the Angle of Entry, 33 J. Legal Ed. 662 (1983).

Perspectives on the Judicial Function in Criminal Justice (Monograph, Assoc. Bar City of N.Y., 1982).

Deciding Who Dies, 129 U. Pa. L. Rev. 1 (1980) (quoted and cited as "valuable" in Spaziano v. Florida, 468 U.S. 447, 487 n.33 (1984) (Stevens, J., dissenting); also cited in Zant v. Stephens, 462 U.S. 862, 878 n.17, 879 n.19 (1983); Lockhart v. McCree, 476 U.S. 162, 191 (1986) (Marshall, J., dissenting); Callins v. Collins, 114 S.Ct. 1127, 1134 n.4 (1994) (Blackmun, J., dissenting); and Harris v. Alabama, 115 S.Ct. 1031, 1038-39 (1995) (Stevens, J., dissenting).

Numerous articles in various publications, including The New York Times, The Nation, American Lawyer, The New York Law Journal, The National Law Journal, Newsday, and the ABA Journal.  See below for selected bibliography.

Stephen Gillers

| | |
|---|---|
| **AWARDS** | **2011 Recipient, Michael Franck Award.** Michael Franck Award from the ABA's Center for Professional Responsibility. The Award is given annually for "significant contributions to the work of the organized bar....noteworthy scholarly contributions made in academic settings, [and] creative judicial or legislative initiatives undertaken to advance the professionalism of lawyers…are also given consideration." |
| **VIDEOTAPES** | "Adventures in Legal Ethics and Further Adventures in Legal Ethics": videotape of thirteen dramatic vignettes professionally produced and directed and raising issues of legal ethics.  Author, Producer.  (1994) |
| | "Dinner at Sharswood's Café," a videotape raising legal ethics issues. Author,  Producer. (1996) |
| | "Amanda Kumar's Case," a 38-minute story raising more than two dozen legal ethics issues.  Author. (1998) |
| **TRIBUTES** | To Honorable Gus J. Solomon, printed at 749 Federal Supplement LXXXI and XCII (1991). |
| | Truth, Justice, and White Paper, 27 Harv. Civ. R. Civ. Lib. L. Rev. 315 (1992) (to Norman Dorsen). |
| | Irving Younger: Scenes from the Public Life, 73 Minn. L. Rev. 797 (1989). |
| **OTHER TEACHING** | Visiting Professor of Law, Harvard Law School, Winter 1988 Semester; |
| | Adjunct Professor of Law, Yeshiva University, Cardozo Law School, Spring 1986, Spring 1987, and Fall 1988 Semesters. Course:  The Legal Profession. |
| | Adjunct Associate Professor of Law, Brooklyn Law School, 1976-78. |

6

# A-5859

Stephen Gillers

**PRIOR EMPLOYMENT**

1973 - 1978
Private practice of law
Warner and Gillers, P.C. (1975-78)

1974 - 1978
Executive Director
Society of American Law Teachers, Inc.

1971 - 1973
Executive Director, Committee for
Public Justice

1969 - 1971
Associate, Paul, Weiss, Rifkind,
Wharton & Garrison

1968 - 1969
Judicial Clerk to Chief Judge
Gus J. Solomon, Federal District Court
for the District of Oregon, Portland, Oregon

**SELECTED TESTIMONY**

Testimony on "Nomination of Sandra Day O'Connor to the
Supreme Court of the United States", Hearings, before the Senate
Committee on the Judiciary, 97th Congress, 1st Sess., Sept. 11, 1981.

Testimony on S. 2216, "Habeas Corpus Reform Act of 1982",
Hearings, before the Senate Committee on the Judiciary,  97th
Congress, 2d Sess.,  April 1, 1982.

Testimony on H.R. 5679, "Criminal Code Revision Act of 1981",
Hearings, before the House of Representatives, Committee on the
Judiciary, 97th Congress, 2d Sess., April 22, 1982.

Testimony on S. 653, "Habeas Corpus Procedures Amendment Act of
1981", Hearings, before the Senate Committee on the Judiciary, 97th
Congress, 1st Sess., November 13, 1981.

Testimony on S. 8875 and A. 11279, "A Proposed Code of Evidence
for the State of New York", before Senate and Assembly Codes and
Judiciary Committees, February 25, 1983.

Testimony before A.B.A. Commission on Women in the Profession,
Philadelphia, February 6, 1988.

7

Stephen Gillers

| | |
|---|---|
| **SELECTED TESTIMONY** (continued) | Testimony on the nomination of William Lucas to be Assistant Attorney General for Civil Rights, before the Senate Committee on the Judiciary, 101st Congress, 1st Sess., July 20, 1989. |
| | Testimony on the nomination of Vaughn Walker to be United States District Judge for the Northern District of California, before the Senate Committee on the Judiciary, 101st Congress, 1st Sess., November 9, 1989. |
| **PUBLIC LECTURES** (partial list) | Tabor Lecture, Valparaiso University School of Law, April 12, 2007. This event consisted of two lectures. A public lecture was entitled "Here's the Gun: A Lawyer's Responsibility for Real Evidence." The Bench and Bar lecture, which will be published in the school's law review, is entitled "Virtual Clients: An Idea in Search of a Theory (With Limits)." |
| | Paul M. Van Arsdell, Jr., Memorial Lecture, University of Illinois, College of Law, March 7, 2005: "Do Lawyers Share Moral Responsibility for Torture at Guantanamo and Abu Ghraib?" |
| | Howard Lichtenstein Distinguished Professorship of Legal Ethics Lecture Series, "In Praise of Confidentiality (and Its Exceptions)," delivered at Hofstra University School of Law, November 12, 2003. |
| | Henry J. Miller Distinguished Lecture, Georgia State University College of Law, May 11, 1988. "Protecting Lawyers Who Just Say No." |
| | First Annual South Carolina Bar Foundation Lecture, April 9, 1992, University of South Carolina Law School, Columbia, South Carolina. "Is the Legal Profession Dead?  Yearning to Be Special in an Ordinary Age." |
| | Philip B. Blank Memorial Forum on Attorney Ethics, Pace University School of Law, April 8, 1992. "The Owl and the Fox: The Transformation of Legal Work in a Commodity Culture." |
| | Speaker on Judicial Ethics, ABA Appellate Judges' Seminar and Flaschner Judicial Institute, September 29, 1993, Boston, Massachusetts. |
| | Baker-McKenzie Ethics Lecture, Loyola University Chicago School of Law, October 13, 1993, Chicago, Illinois ("Bias Issues in Legal Ethics:  Two Unfinished Dramas"). |
| | The Sibley Lecture, University of Georgia School of Law, Athens, Georgia, November 10, 1993 ("Telling Stories in School: The Pedagogy of Legal Ethics"). |

# A-5861

Stephen Gillers

**PUBLIC LECTURES**
(continued)

Participant, "Ethics in America" series (to be) broadcast on PBS 2007, produced by Columbia University Seminars on Media and Society.

Participant, "Ethics in America" series, broadcast on PBS February and March 1989, produced by Columbia University Seminars on Media and Society.

Participant, "The Constitution: That Delicate Balance, Part II" series, broadcast on PBS February and March 1992, produced by Columbia University Seminars on Media and Society.

Lecturer on legal ethics and allied subjects in the U.S. and abroad at hundreds of seminars, CLE events, and conferences organized by private law firms, corporate law departments, the District of Columbia, Second, Fourth, Sixth, Ninth and Federal Circuit Judicial Conferences; American Bar Association; Federal Bar Council; New York State Judiciary; New York City Corporation Counsel; American Museum of Natural History; Practicing Law Institute; Law Journal Seminars; state, local and specialty bar associations (including in Oregon, Nebraska, Illinois, New York, New Jersey, Pennsylvania, Rhode Island, Vermont, and Georgia); corporate law departments; law schools; and law firms.

**LEGAL AND PUBLIC SERVICE ACTIVITIES**

Member, ABA 20/20 Commission, 2009-_____ (appointed by the ABA President to study the future of lawyer regulation).

Chair, American Bar Association Center for Professional Responsibility, Policy Implementation Committee, 2004-2008 (Member 2002-2010).

Member, American Bar Association Commission on Multijurisdictional Practice, 2000-2002.

Consultant, Task Force on Lawyer Advertising of the New York State Bar Association (2005).

Retained by the New Jersey Supreme Court, in connection with the Court's review of the lawyer disciplinary system in New Jersey, to provide an "analysis of the strengths and weaknesses of California's 'centralized' disciplinary system" and to "report on the quality, efficiency, timeliness, and cost effectiveness of the California system...both on its own and compared with the system recommended for New Jersey by the Ethics Commission." Report filed December 1993. Oral presentation to the Court, March 1994.

9

Stephen Gillers

**LEGAL AND
PUBLIC SERVICE
ACTIVITIES**
(continued)

Reporter, Appellate Judges Conference, Commission on Judicial participation in the American Bar Association, (October 1990-August 1991).

Member, David Dinkins Mayoral Transition Search Committee (Legal and Law Enforcement, 1989).

Member, Committee on the Profession, Association of the Bar of the City of New York (1989-1992)

Member, Executive Committee of Professional Responsibility Section, Association of American Law Schools (1985-1991).

Chair, 1989-90 (organized and moderated Section presentation at 1990 AALS Convention on proposals to change the ABA Code of Judicial Conduct).

Counsel, New York State Blue Ribbon Commission to Review Legislative Practices in Relation to Political Campaign Activities of Legislative Employees (1987-88).

Administrator, Independent Democratic Judicial Screening Panel, New York State Supreme Court (1981).

Member, Departmental Disciplinary Committee, First Judicial Department  (1980 - 1983).

Member, Committee on Professional and Judicial Ethics, Association of the Bar of the City of New York (1979 - 1982).

**BAR MEMBERSHIPS**

STATE:

New York (1968)

FEDERAL:

United States Supreme Court (1972);
Second Circuit (1970);
Southern District of New York (1970);
Eastern District of New York (1970)

10

Stephen Gillers

| LEGAL EDUCATION | J.D. cum laude, NYU Law School, 1968 |
|---|---|
| | Order of the Coif (1968) |
| | Dean's List (1966-68) |
| | University Honors Scholar (1967-68) |

| PRELEGAL EDUCATION | B.A. June 1964, City University of New York (Brooklyn College) |
|---|---|

| DATE OF BIRTH | November 3, 1943 |
|---|---|

**OTHER ARTICLES**    (Selected Bibliography 1978-present)

1.  Carter and the Lawyers, The Nation, July 22-29, 1978.

2.  Standing Before the Bar, Bearing Gifts, New York Times, July 30, 1978.

3.  Judgeships on the Merits, The Nation, September 22, 1979.

4.  Entrapment, Where Is Thy Sting?, The Nation, February 23, 1980.

5.  Advice and Consent, New York Times, September 12, 1981.

6.  Lawyers' Silence: Wrong . . . , New York Times, February 14, 1983.

7.  The Warren Court - It Still Lives, The Nation, September 17, 1983.

8.  Burger's Warren Court, New York Times, September 25, 1983.

9.  "I Will Never Forget His Face!", New York Times, April 21, 1984.

10.  Warren Court's Landmarks Still Stand, Newsday, July 29, 1984.

11.  Von Bulow, And Other Soap Operas, New York Times, May 5, 1985.

12.  Statewide Study of Sanctions Needed for Lawyers' Misconduct, New York Law Journal, June 6, 1985.

13.  Preventing Unethical Behavior - Something New in Model Rules, New York Law Journal, August 30, 1985.

14.  Proposed Model Rules Superior to State's Code, New York Law Journal, October 21, 1985.

Stephen Gillers

15. Five Ways Proposed to Improve Lawyer Discipline in New York, New York Law Journal, January 8, 1986.

16. Poor Man, Poor Lawyer, New York Times, February 28, 1986.

17. Proposals To Repair Cracks in Ethical Legal Behavior, New York Law Journal, April 17, 1986.

18. Unethical Conduct: How to Deter It Through Education, Bar Leader (May/June 1986).

19. The New Negotiation Ethics - Or Did Herb's Lawyer Do Wrong? New York Law Journal, June 2, 1986.

20. The Real Stakes in Tort Reform, The Nation, July 19-26, 1986.

21. Bernhardt Goetz: Vigilante Or Victim?, Toronto Star, September 10, 1986.

22. The Message That the Goetz Trial Will Send, Newsday, August 31, 1986.

23. Amending the Ethics Code - Solicitation, Pre-Paid Plans, Fees, New York Law Journal, November 10, 1986.

24. Amending the Ethics Code - Conflicts of Interest, Screening, New York Law Journal, November 12, 1986.

25. Amending the Ethics Code - Confidentiality and Other Matters, New York Law Journal, November 13, 1986.

26. No-Risk Arbs Meet Risk Justice, New York Times, November 23, 1986.

27. The Meese Lie, The Nation, February 21, 1987.

28. Amending State Ethics Code - Conflicts of Interest Gone Awry, New York Law Journal, May 18, 1987.

29. "The Lawyers Said It Was Legal," New York Times, June 1, 1987.

30. Feminists vs. Civil Libertarians, New York Times, November 8, 1987.

31. Lessons for the Next Round in Picking a Justice, Newsday, November 11, 1987.

32. We've Winked For Too Long, National Law Journal, December 21, 1987 (judicial membership in exclusionary clubs).

33. No More Meeses, New York Times, May 1, 1988.

34. In Search of Roy Cohn, ABA Journal, June 1, 1988 (book review).

Stephen Gillers

35.   Do Brawley Lawyers Risk Serious Discipline?, New York Law Journal, June 22, 1988.

36.   Have the Brawley Lawyers Broken the Law?, New York Times, July 2, 1988.

37.   Report Demonstrates Why Meese is Unfit to Be Attorney General, Atlanta Journal and Constitution, July 24, 1988.

38.   Ethical Questions for Prosecutors in Corporate-Crime Investigations, New York Law Journal, September 6, 1988.

39.   Restoring Faith at Justice, National Law Journal, November 21, 1988.

40.   Is Bush Repeating Rockefeller's Folly?, New York Times, September 11, 1989.

41.   Standards Time, The Nation, January 29, 1990 (on the subject of legislative ethics).

42.   Abused Children vs. The Bill of Rights, New York Times, August 3, 1990.

43.   Words Into Deeds: Counselor, Can You Spare a Buck?, ABA Journal, November 1990.

44.   Bad Apples, ABA Journal at 96 (March 1991) (book review).

45.   The Gotti Lawyers and the Sixth Amendment, New York Law Journal, August 12, 1991.

46.   Justice or Just Us?  The Door to Dan Quayle's Courthouse Only Swings One Way, ABA Journal (June 1992) at 109.

47.   Fighting Words (What was once comical is now costly), ABA Journal (August 1992) at 102.

48.   Sensitivity Training: A New Way to Sharpen Your Skills At Spotting Ethics Conflicts, ABA Journal (October 1992) at 107.

49.   Under Color of Law:  Second Circuit Expands Section 1983 Liability for Government Lawyers, ABA Journal (December 1992) at 121.

50.   Cleaning Up the S&L Mess: Courts Are Taking the Duty to Investigate Seriously, ABA Journal (February 1993) at 93.

51.   All Non-Refundable Fee Agreements Are Not Created Equal, New York Law Journal (February 3, 1993) at 1.  (Analyzing appellate decision prohibiting non-refundable fees.)

52.   The Packwood Case: The Senate Is Also on Trial, The Nation (March 29, 1993) at 404.

53.   Conflict of Laws: Real-World Rules for Interstate Regulation of Practice, ABA Journal (April 1993) at 111.

Stephen Gillers

54.    Packwood II, The Nation (May 10, 1993) at 617.

55.    Generation Gap, ABA Journal (June 1993) at 101.  (On the use of a boycott in response to the Colorado anti-gay initiative.)

56.    Future Shocks, ABA Journal (August 1993) at 104.  (Looking back on the practice of law in the 21st century from the year 2103.)

57.    A Rule Without a Reason, ABA Journal (October 1993) at 118.  (Criticism of the prohibition in Rule 5.6(b) against a lawyer agreeing not to restrict future practice in connection with a settlement.)

58.    Too Old to Judge?, ABA Journal (December 1993) at 94.  (Supreme Court justices have life tenure.  Maybe they should not.)

59.    Truth or Consequences, ABA Journal (February 1994) at 103.  (Discovery obligations.)

60.    "Ethical Cannons," in Symposium - Twenty Years of Change, Litigation (Fall 1993).

61.    Stretched Beyond the Limit, Legal Times (March 21, 1994) at 37.  (Analysis of the office of Counsel to the President in light of Bernard Nussbaum's resignation.)  [Same article was reprinted in the Connecticut Law Tribune, the Fulton County (Atlanta) Daily Report, and the Recorder (San Francisco).]

62.    Putting Clients First, ABA Journal (April 1994) at 111. (Discussing cases on lawyers' fiduciary duty.)

63.    Grisham's Law, The Nation (April 18, 1994) at 509.  (The effect of popular culture on Whitewater reporting.)

64.    The Elsinore Appeal: "People v. Hamlet", New York Law Journal (October 11, 1994) at 3.  (Brief for Appellee, State of Denmark).  (This was a mock appeal from Hamlet's conviction for the murder of Claudius, Polonius, Ophelia, Laertes, Rosencrantz & Gildenstern, held at the Association of the Bar of the City of New York on October 11, 1994.)

65.    Billing for Costs and Disbursements: What Law Firms Can Charge and Clients Can Expect, monograph published 1995 by Pitney Bowes Management Services.

66.    Clinton Has A Right To Privacy, N.Y. Times, 12/21/95, at _____.

67.    "'Filegate' Was Bad Enough.  Now This?," N.Y. Times, 7/5/96, at A23. (Article criticizing proposal to privatize certain security investigations of government personnel.)

68.    "Whitewater: How to Build a Case Using a Tainted Witness,"  Los Angeles Times, 2/16/97, at M1.

69.    "Hillary Clinton Loses Her Rights," New York Times, 5/4/97, at E15.

14

70.    "Shakespeare on Trials," IV Federal Bar Council News 16 (June 1997).

71.    "Florida Backs Out On a Deal," New York Times, 10/10/97, at A23.

72.    "The Perjury Loophole," New York Times, 2/18/98, at A21 (discussion of perjury in connection with Kenneth Starr's investigation of President Clinton).

73.    "Any Method to Ginsburg's Madness?" Los Angeles Times, 3/15/98, at M1 (discussion of William Ginsburg's public defense of Monica Lewinsky).

74.    "Whitewater Made Easy," The Nation, 6/1/98, at 8.

75.    "A Highly Strategic Legal Chess Game," Los Angeles Times, June 7, 1998,  at M1 (Starr-Clinton legal maneuvers).

76.    "To Sleep . . . Perchance, to Dream," New York Law Journal, July 8, 1998, at 2.  (Humorous article about bored jurors.)

77.    "Clinton Is No Ordinary Witness," New York Times, 7/28/98, at A15.

78.    "The High Cost of an Ethical Bar," The American Lawyer, July/August 1998, at 87.

79.    "Clinton's Choice: Tell Truth or Dare to Gamble," Los Angeles Times, August 2, 1998, at M1.

80.     "Accurate Lies: The Legal World of Oxymorons," Los Angeles Times, August 30, 1998, at M1.

81.    "A Fool For a Client?" The American Lawyer, October 1998, at 74.  (President Clinton's legal representation in the Lewinsky representation.)

82.    "The Presidency: Out to End Clinton's Mess and Be Happy," Los Angeles Times, October 4, 1998, at M1.

83.    "Protecting Their Own," The American Lawyer, November 1998, at 118.

84.    "Can't We All Just Practice Together: Taking Down 'Trade Barriers' on Lawyers Here and Abroad," Legal Times, November 9, 1998, at 32.

85.    "Beyond the Impeachment Spectacle," Los Angeles Times, November 22, 1998, at M1.

86.    "The Perjury Precedent," New York Times, December 28, 1998, at A27.

87.    "From the Same Set of Facts: A Tale of Two Stories," Los Angeles Times, January 17, 1999, at M1 (about the Clinton impeachment trial).

Stephen Gillers

88. "The Decline and Fall of Kenneth Starr," Los Angeles Times, February 7, 1999, at M1.

89. "The Truth About Impeachment," The American Lawyer, March 1999, p. 131.

90. "The Double Standard," New York Times Book Review, March 21, 1999, at 13 (review of *No Equal Justice* by David Cole).

91. "Four Officers, One Likely Strategy," New York Times, Saturday, April 3, 1999, at A15.

92. "The Man in the Middle: Did George Ventura Step Over the Ethical Line?" The American Lawyer, May 1999, p. 80 (discussion of lawyer whistleblowing in light of *State v. George Ventura*). (Reprinted as "Whistleblower, Esq." in New York Law Journal, May 26, 1999 at page 2.)

93. "Your Client Is A Corporation – Are Its Affiliates Clients Too?" The New York Professional Responsibility Report, May 1999 , at 1.

94. "Job Talk (Scenes from the Academic Life)," The American Lawyer, July 1999, at 161. (Satire about law school hiring.)

95. "The Other Y2K Crisis," The Nation, July 26/August 2, 1999, at 4 (editorial about the year 2000 electoral races).

96. "Walking the Confidentiality Tightrope," ACCA Docket 20 (September/October 1999) (remarks at ACCA's national conference in 1998).

97. "Things Old & New – The Code Amendments," New York Professional Responsibility Report (September 1999), at 1.

98. "Clinton's Chance to Play the King," New York Times, Sept. 20, 1999 at A17.

99. "Overprivileged," American Lawyer, October 1999 at 37. (Discussion of First Amendment protection for journalists.)

100. "Controlling Conflicts Between Old and New Clients," New York Professional Responsibility Report, January 2000 at 3.

101. "How To Spank Bad Lawyers," American Lawyer, February 2000 at 41.

102. "A Weak Case, But a Brave Prosecution," New York Times, Wednesday, March 1, 2000 at A23 (the Diallo case).

103. "Conflicts of Interest in Malpractice Cases," New York Professional Responsibility Report, March 2000 at 1.

104. "The Court's Picayune Power," New York Times, Thursday, April 20, 2000 at A29.

16

Stephen Gillers

105.    "Some Misrepresentations Among Corporate Lawyers," New York Professional Responsibility Report, June 2000 at 1.

106.    "Was Hubbell Case About Getting Justice or Getting Even?" Los Angeles Times, June 18, 2000 at M2 (comment on the U.S. Supreme Court's decision in *United States v. Hubbell*, decided June 5, 2000).

107.    "Who Owns the Privilege After a Merger?" New York Professional Responsibility Report, July 2000 at 1.

108.    "Fighting the Future," The American Lawyer, July 2000 at 55.

109.    "Campus Visits Deconstructed," Newsweek: How To Get Into College, 2001 Edition at 46.

110.    "The Court Should Boldly Take Charge," New York Times, Tuesday, November 21, 2000 at A25 (Florida's presidential election recount).

111.    "Who Says the Election Has a Dec. 12 Deadline?"  New York Times, Saturday, December 2, 2000 at A19.

112.    "Motive Is Everything in the Marc Rich Pardon," New York Times, Saturday, February 17, 2001.

113.    "For Justice To Be Blind, Must Judges Be Mute?"  New York Times, Sunday, March 4, 2001 at Section 4, page 3.

114.    "Should Supreme Court Justices Have Life Tenure?"  Reprinted in *The Supreme Court and Its Justices* (Choper J., ed.) (ABA 2001).

115.    Professionalism Symposium, 52 South Carolina L. Rev. 55 (2001) (closing remarks).

116.    "No Lawyers To Call," New York Times, Monday, December 3, 2001 at A19 (ethical and constitutional obligations that will prevent lawyers from participating in military tribunals).

117.    "Let Judicial Candidates Speak," New York Times, Thursday, March 28, 2002 at A31.

118.    "The Flaw in the Andersen Verdict," New York Times, Tuesday, June 18, 2002 at A23.

119.    "Why Judges Should Make Court Documents Public," New York Times, Saturday, November 30, 2002 at A17.

120.    "It's an MJP World," ABA Journal, December 2002 at 51.

121.    "Upholding the Law as Pretrial Publicity Goes Global," New York Times, Sunday, April 27, 2003,  Sec. 4 at 14.

**A-5870**

Stephen Gillers

122.   "Court-Sanctioned Secrets Can Kill," Los Angeles Times, Wednesday, May 14, 2003 (reprinted May 15, 2003 in Newsday).

123.   "Make a List," New York Times, June 11, 2003 at 31 (advocating changes in the methods of judicial selection).

124.   "Conflicted About Martha?" American Lawyer (September 2003) (analysis of Martha Stewart indictment).

125.   "The Prudent Jurist," Legal Affairs, January/February 2004.

126.   "On Knowing the Basic Rules of Advocacy," New York Times, February 8, 2004, Sec. 4 at 2 (cross-examination in the Martha Stewart trial).

127.   "The Prudent Jurist," Legal Affairs, March/April 2004.

128.   "Scalia's Flawed Judgment," The Nation, April 19, 2004 at 21.

129.   "Scholars, Hucksters, Copycats, Frauds," Washington Post, April 25, 2004 at B3  (Outlook) (discussion of ethics of academics who put their names on newspaper opinion pieces written by industry).

130.   "The Prudent Jurist," Legal Affairs, May/June 2004 at 17.

131.   "Multijurisdictional Practice of Law:  Merging Theory With Practice," 73 The Bar Examiner 28 (May 2004).

132.   "Tortured Reasoning," American Lawyer (July 2004) (analysis of government lawyer memos addressing the application of various treaties and laws to the treatment of Afghan prisoners).

133.   "Paying the Price of a Good Defense," New York Times, August 13, 2004.

134.   "Improper Advances:  Talking Dream Jobs with the Judge Out of Court," Slate.com, August17, 2005 (with D. Luban and S. Lubet).

135.   "Roberts' Bad Decision," Los Angeles Times, September. 13, 2005 (with D. Luban and S. Lubet).

136.   "No Privilege for Miers," The Nation, November 7, 2005

137.   "Senators, Don't Rubber-Stamp," USA Today, January 5, 2006 at 13A (discussing the Senate's advise and consent responsibility in connection with Alito nomination).

138.   Ethics Column, American Lawyer, page 61 (January 2006) (with Deborah Rhode).

139.   Ethics Column, American Lawyer, page 63 (April 2006) (with Deborah Rhode).

Stephen Gillers

140. "Bush Postpones 2008 Election," The Nation, August 14/21, 2006 (satire).

141.  "Free the Ulysses Two: Joyce's First U.S. Publishers Were Convicted of Obscenity. It's Time to Clear Them." The Nation, February 19, 2007.

142. "Twenty Years of Legal Ethics: Past, Present, and Future," 20 Georgetown J. Legal Ethics 321 (2007) (symposium celebrating the 20th anniversary of the journal).

143. "The Torture Memos," The Nation, April 28, 2008.

144. "Bar None," American Lawyer (October 2008) (globalization of law practice and how it will effect regulation of the bar).

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, §<br>§<br>v.   §<br>§<br>PAUL M. DAUGERDAS, §<br>DONNA GUERIN, §<br>DENIS FIELD, and §<br>DAVID PARSE, §<br>§<br>Defendants. § | **ECF CASE**<br><br>Case No. S3 09 Cr. 581 (WHP)<br><br>**AFFIDAVIT OF DAVID PARSE** |

STATE OF NEW YORK   )
                                              ss.:
COUNTY OF NEW YORK   )

DAVID PARSE, being duly sworn, deposes and says:

1.       My name is David Parse, and I am a defendant in the above-captioned case.

2.       During jury selection (or shortly thereafter), I heard one of the lawyers at the Brune firm (I believe it was Theresa Trzaskoma) say that there was a prospective juror (or a juror) who had the same name as a suspended attorney but that it was not the same person.  I cannot recall if the lawyer was speaking to me or if I overheard her speaking to someone else.

3.       A week after the verdict, I met with the Brune lawyers to discuss possible post-trial motions and appellate issues.  The possibility of a juror misconduct issue was not raised.

4.       It was not until after the Brune firm filed its motion for a new trial that I learned that prior to jury deliberations the issue of Conrad being a suspended lawyer had resurfaced. More precisely, to the best of my memory, it was after the July 15, 2011 conference call that I learned (i) that on May 12, 2011, Ms. Trzaskoma had considered the possibility that Juror No. 1

3689133.1

# A-5873

was the suspended lawyer, (ii) that a paralegal had generated a Westlaw report, and (iii) that the

Brune lawyers had concluded that Conrad was not the suspended attorney and determined that

there was no need to inform the Court.

David Parse

Sworn to before me this
3,2 day of August, 2012

Notary Public

OFFICIAL SEAL
WILLIAM B KAVANAUGH
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:12/14/12

2

3689133.1

**[PAGES A-5874 TO A-5902 INTENTIONALLY LEFT BLANK]**

CAC3PARC                                                          1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                        09 CR 581 (WHP)

DAVID K. PARSE,

                Defendant.

------------------------------x

                                      New York, N.Y.
                                      October 12, 2012
                                      3:00 p.m.

Before:

                HON. WILLIAM H. PAULEY III,

                                      District Judge

                      APPEARANCES

PREET BHARARA
     United States Attorney for the
     Southern District of New York
STANLEY J. OKULA
NANETTE DAVIS
     Assistant United States Attorneys

ZUCKERMAN SPAEDER
     Attorneys for Defendant
PAUL SHECHTMAN

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

CAC3PARC

2

```
 1              (In open court)
 2              THE DEPUTY CLERK:  Case of United States of America v.
 3   David Parse.  Appearances for the government?
 4              MS. DAVIS:  Good afternoon, your Honor.  Nanette Davis
 5   and Stanley J. Okula, Jr. for the government.
 6              THE COURT:  Good afternoon, Ms. Davis.
 7              MR. SHECHTMAN:  Paul Shechtman for Mr. Parse.  Ali
 8   Feingold who is a paralegal who has worked on this matter is
 9   with me, and obviously Mr. Parse is here.
10              THE COURT:  Good afternoon, Mr. Shechtman.  And I note
11   the presence of Mr. Parse at counsel table.
12              This is oral argument on the defendant Parse's motion
13   for a new trial.  Do you wish to be heard, Mr. Shechtman?
14              MR. SHECHTMAN:  I do, your Honor.  As your Honor now
15   knows and from the papers, there is only one issue here which
16   is a question of ineffective assistance of counsel.
17              THE COURT:  If you can just pull the mike a little
18   closer.  It has been a long week.
19              MR. SHECHTMAN:  I understand.  I think for all of us.
20              Justice O'Connor once said that Strickland was the
21   most cited case that she ever wrote, and I say that because I
22   assume the Court is quite familiar with it and the legal
23   standard.  And obviously the standard is two part.
24              I would like to think though, I may be proven wrong,
25   that if we get to prejudice, we should prevail.  But we can
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

CAC3PARC                                                          3

1    have that discussion.
2            The first question obviously is was the performance
3    deficient here.  And that I think turns on the question of did
4    the Brune firm make a strategic judgment on that fateful
5    May 12, 2011 day, maybe even earlier during the voir dire
6    itself.  And I'm not sure there is a great definition of
7    strategic judgment, but there is very good language in Justice
8    Stevens' dissent, but I don't think the majority disagreed with
9    it, that talks about a conscious choice between two
10   alternatives borne of deliberation not happenstance,
11   inattention or neglect.
12           The Second Circuit has told us that it is not a
13   strategic judgment when what is going on is oversight or
14   carelessness or ineptitude.
15           I like to think about this as strategic judgments are
16   situations where lawyers say, one of two courses could have
17   answered my client's interests.  I choose A after some thought.
18   It may be that B is the wiser course.  But we'd retry a lot of
19   cases if we second guess lawyers in that situation and
20   obviously the Supreme Court says we shouldn't.
21           I say in our papers that if what went on here was one
22   of two things.  If the Brune firm in that plaza conversation
23   said the equivalent of let's sandbag the Court, let's go
24   forward.  We know this information and we get a free bite at
25   the apple.  It's hard to think that's not a strategic decision,

CAC3PARC

1    and that of course is very similar to the Chappee case in the
2    First Circuit.  Justice Stevens talks about it being a
3    legitimate decision, but even an unethical one like sandbagging
4    I think is going to turn out to bind the client.
5           The other way this could be a strategic decision, if
6    what they said to themselves, let's sandbag, but more, look,
7    she is a pro-defense juror given what we know about this
8    checkered history, let's keep her on because we're likely to
9    get an acquittal now.  That's the government's view here.
10   That's what they've advanced in their papers.  And I think
11   that's not at all what happened in this case.
12          I think the testimony, and the Court referred to the
13   testimony and said the facts were largely undisputed.  That
14   doesn't mean the inferences from them were ones that all sides
15   were ready to adopt.  But I don't think the core facts were
16   much in dispute at the hearing.  And what happened here,
17   particularly on that day of May the 12th, is that Ms. I will
18   say Theresa because I have trouble with her last name, I
19   apologize, had real second thoughts when she thought about that
20   juror note and the legal words in it.  She then sent paralegals
21   to work -- as your Honor knows, the one thing about the Brune
22   firm is they had an army of them.  And she got information
23   back, and her e-mail said something like, Jesus, I think it's
24   her.  And whether that is characterized as fleeting or a belief
25   held longer than that, there is no doubt that she thought it.

CAC3PARC

1           What's always been odd to me is when she gets to the
2   plaza, how quickly she abandons it.  And whether it is because
3   she's exhausted at the end of a long trial, whether it's
4   because, as she said, she looked more at this report and she
5   thought it was more complicated, whether it was because her
6   seniors cowed her.  But, as your Honor says, the discussion
7   there was superficial and never addressed the information that
8   she had accumulated over the last 12 hours.  And she simply
9   goes along.  And she goes along with her two seniors who don't
10  know of the Westlaw report, but say to themselves it can't be
11  her.  There is no need to tell the judge.  Let's go home, it's
12  been a long day, a long trial.
13          Now, we differed back at the time as to whether that
14  was a waiver or not.  But there is no doubt that that is not a
15  judgment that a lawyer should have made in that situation.
16  Your Honor referred to it as a tragic misjudgment, and it was.
17          One of two things should have happened.  There should
18  have been an investigation, or there should have been someone
19  saying, why me investigate?  Let's just tell the Court and
20  we'll go from there.  And neither of those things happened.
21  Instead, people went home, they spoke to their colleagues a day
22  or two later, and said, geez, she has the same name, but it
23  can't be her.  And nobody said, well, let's do the easy thing
24  and let's tell the Court.  As your Honor says, a few days
25  later, we substituted a new juror and nobody thinks to

6

CAC3PARC

1  themselves we could just tell the judge.
2        Strickland talks about counsel has a duty to make
3  reasonable investigations or make a reasonable decision that
4  makes particular investigation unnecessary.  And if ever there
5  was a reason either to investigate more, to unleash the
6  Nardello firm, or, I say this respectfully, unleash the Court.
7  Because as crazy as this woman was, I've always thought if your
8  Honor brought her out and said are you the same person, I'm not
9  sure her lying would have gone that far.  You may disagree with
10  me on that, but I think she would have had trouble there.
11        But nobody does it.  And nobody does it not because
12  they were playing a strategic game that they were out to
13  sandbag a court or they were out to get an acquittal.  They
14  didn't do it because, to use the Second Circuit's word, it was
15  an oversight, it was careless, it was inept.  And if I'm right
16  about that, then I think one has met the first prong here, and
17  then the question becomes prejudice.
18        And I can talk more, your Honor, the government
19  doesn't argue sandbagging.  I can talk more about why I think
20  this wasn't -- look, I've read the Court's opinion, I think
21  only seven times.  And I know that the Court at the end of it
22  talks about gambling.  But, I don't think the Court is making
23  findings in that opinion that there was a great strategy going
24  on in that court.  I think your Honor's findings are that these
25  people really dropped the ball, and they failed to do what they

CAC3PARC

1   should have done as lawyers.  And then after that, I've always
2   thought, partly because they dropped the ball, they were less
3   than candid in what they said to the Court going forward.
4           THE COURT:  That last point is really another part of
5   the analysis, isn't it, that, why shouldn't this Court view
6   Brune & Richard's lack of candor with the Court in making their
7   motion as circumstantial evidence that they were in fact trying
8   to conceal from the Court a strategic decision they made?
9           MR. SHECHTMAN:  Look, I think, and the Court does in
10  its opinion consider it as circumstantial evidence and it's not
11  a pretty picture.  But the question to me has always been what
12  is it circumstantial evidence of?  And I think it is
13  circumstantial evidence of a realization that they had a
14  responsibility to tell the Court, and they walked away that
15  night and really left the Court in an untenable position such
16  that at least two, and I hope three, defendants may be on trial
17  again in the spring.
18          So, I don't have any doubt that you can take that
19  conduct and look back.  The question is, do you look back and
20  say to yourself, these are people who knew they dropped the
21  ball and were careless and inattentive and didn't fulfill their
22  obligations to the Court?  Or do you go back and say these are
23  people who made a strategic decision to game the system at an
24  earlier time.  I don't think there is any evidence to support
25  that.  As I've said before, there is nothing in that plaza

CAC3PARC
1    conversation --
2        THE COURT:  I'm really thinking about beyond the plaza
3    conversation, at the time a month and a half later when they
4    filed their motion, they failed to disclose to the Court what
5    they knew and when they knew it.  And a series of proceedings
6    then occur, essentially initiated by both the Court and the
7    government to find out what they knew and when they knew it.
8    And their statements in their memorandum to the Court on their
9    motion that they knew were wrong or misleading at the time that
10   they made them to me.
11       MR. SHECHTMAN:  You're not going to get much argument
12   from me on the point.  The Court has a sort of lovely phrase in
13   the opinion about disclosure by iteration or something like
14   that.  There is no doubt when you go from the telephone
15   conversation to the document itself, and then to and not
16   wanting further discovery, wanting your Honor to somehow
17   address a preliminary issue and issues of privilege.  Your
18   Honor knows I got in this case late and the first thing I did
19   was to say, what are we kidding ourself?  We are going to turn
20   over those documents to the Court because worse comes to worst,
21   the Court is going to look at them in camera.  And if it is
22   going to look at them in camera, it is going to look at them, I
23   don't know you can say out of camera, but it's going to look at
24   them.  This is not a game.
25       I think what happened, though, is lawyers said to
                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

**A-5911**

CAC3PARC

1   themselves we failed the Court.  I have said to myself a
2   hundred times, it is so easy the next morning or even that
3   afternoon to walk back in and say to the judge, Judge, we
4   think -- we don't really believe this, for a variety of
5   reasons, but you should know the following.  That she has the
6   same name, there is other information here, and whatever your
7   Honor wants to do with it, we don't think it's her, but we
8   would be foolish if we didn't bring this to your attention.
9             I think what happened to the Brune firm was after this
10  revelation, they said to themselves oh God, we really did drop
11  the ball.  But dropping the ball is ineffectiveness.  Dropping
12  the ball to me is not strategy.
13            Look, if your Honor looks at that conduct, and I know,
14  and I say this respectfully, I know how much that conduct eats
15  at the Court because it's wrong, and the result of it is a very
16  long trial in this courtroom has to be done again.  But, I also
17  don't think that one looks at it and says ah-ha, there was a
18  strategy going on.
19            I think the lawyers thought to themselves that the
20  Court is going to be very disappointed in us if it realizes
21  that we didn't come forward.  Right.  If it realizes we took
22  for an answer it can't be her, when investigation or telling
23  the Court was the better course.
24            If the Court concludes that that conduct is so
25  egregious that circumstantially it proves strategy, I'm not

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

CAC3PARC

```
1   going to win.  We're going to have a sentencing in January and
2   not a trial in the spring.  But I don't think you can read that
3   much into it, and I don't think that in fairness to Mr. Parse
4   the record supports that.  But I understand your Honor's views
5   of the matter.  I can't say more.
6           THE COURT:  Other than the alleged deficiencies by the
7   Brune firm regarding Juror No. 1, was Parse's counsel otherwise
8   constitutionally effective?
9           MR. SHECHTMAN:  Look, I've never read a trial record
10  where I didn't say I wish they would have preserved that issue,
11  I wish they would have made that argument, I think that
12  cross-examination could have been stronger.  I came away from
13  that trial thinking, boy, that Barry Berke is a great
14  cross-examiner.
15          If you asked me was it constitutionally adequate, you
16  bet.  It was very solid defense by a group of very good
17  lawyers.  So, that one's easy for me.
18          THE COURT:  Can you think of any circumstance where a
19  Court could find both a waiver to an impartial jury and
20  effective assistance of counsel?
21          MR. SHECHTMAN:  Yes.  I think.  The simplest one is if
22  it really was a strategic decision, take the most blatant case,
23  the lawyer said to themselves free bite at the apple, don't
24  tell the judge.  If we get an acquittal the great thing about
25  the double jeopardy clause is it's over.  That is a waiver
```

CAC3PARC

1    under any definition.
2         It's also under Chappee in the First Circuit, and I
3    would bet it is also effective assistance.  Or it's not
4    ineffective assistance, even though one can say that's back
5    alley -- I can't remember the words in Chappee, but they are
6    not very flattering.  Even though you can say those things,
7    it's got to be effective assistance because you're not going to
8    let people get away with that game.  There is a perfect
9    example.
10        You can have, I've done this as a grid, and you can
11   have, if you put waiver and ineffective assistance, you can
12   fill out most of the four boxes.  There is a case in the Second
13   Circuit that I stumbled across which is Flores.  It is old
14   enough there is a Judge Van Graafeiland dissent.  Flores is one
15   where there is a waiver.  The trial lawyer I think says after
16   trial, look, I've come across this 3500 material, this Rosario
17   material, but it wouldn't have helped me very much.  And he
18   says it at a time when it is per se reversible not to have
19   turned over that 3500 material.  There is no harmless error
20   standard, that's how crazy New York law was.  And the First
21   Department in New York Court of Appeals says waiver.  You say
22   right on the record you're not pressing the issue.  The Second
23   Circuit said ineffective assistance, right.  How can a lawyer
24   possibly having been handed a piece of paper which is a new
25   trial card, how can you not play it.  So there is a situation

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

CAC3PARC
1   where you can have waiver, but ineffective assistance.  And I
2   think it is that that Judge Easterbrook had in mind when he
3   said you have to think about each of these doctrines separately
4   and you can probably have every combination of them.
5           THE COURT:  All right.
6           MR. SHECHTMAN:  Look, on the prejudice prong, I would
7   just say this.  There were acquittals on all but two of these
8   counts.  Mr. Parse is not situated that much differently than
9   Mr. Brubaker, and the proof as it came in didn't come in much
10  differently.  There is a sort of lovely irony here that the
11  government cooperator who the Jenkins lawyer dealt with him was
12  actually a witness, and so, the Kramer Levin firm got to
13  cross-examine him.  And in a sense having him as a cooperator
14  was helpful to their side because they established that their
15  client, like the taxpayers and everyone else, was told
16  repeatedly this is lawful.  What distinguishes these two men is
17  the, quote, backdate.
18          And what I've tried to say in my papers is I think the
19  government was very good at trial in turning this into a
20  backdating case.  I don't think that's what the Deutsche Bank
21  records show.  They are doing these in February and March and
22  putting them on February and March statements and they're
23  putting "as of."  They're then going out to what are very
24  accomplished tax preparers who were getting February, March
25  statements.  And know there was a mistake and are then filing
            SOUTHERN DISTRICT REPORTERS, P.C.
                 (212) 805-0300

13

CAC3PARC

1   tax returns.
2          At the end of the day, the government's brief takes
3   you at great pains through each of those three backdating
4   transactions.  And I should say, quote, backdating
5   transactions.  What you learn is what is undisputed is that's
6   what happened.  Mistakes in the craziness of this law firm
7   where you were churning these things out every December and
8   taking a portion of the losses into income, the tax loss, in
9   the craziness of that and mistakes were made.  And trades were
10  done to try to correct the mistakes.  You can't dispute that.
11         The only question at the end of the day, as I say in
12  the papers, is mens rea.  And the mens rea when you read the
13  government's evidence, the bottom line is he must have known.
14  And he must have known because he was an accountant.
15         And what we know on that is I think for two years, in
16  the '80s, he was a junior accountant at 20 some thousand
17  dollars a year.  There is not a shred of evidence that he ever
18  took a class that taught, quote, the annual accounting rule,
19  and I think the Court knows the Second Circuit precedent that
20  says "must have known" is an argument, but it's not of great
21  weight.
22         And I'll stop with this.  I have to say, I wasn't in
23  the must've known category.  This wasn't something that I was
24  taught in tax law.  Maybe I forgot it and maybe the answer is
25  it's so obvious you didn't have to teach it.  But I said to

CAC3PARC
1    myself the other night, if somebody had said to me, and again I
2    apologize for the example, I won't try to belabor it.  But
3    December 28 in year one if I gave 10,000 shares of IBM to a
4    charity and 10,000 shares to my daughter, right, and I said to
5    my broker just move them into those -- 10,000 to charity,
6    10,000 to my daughter.  And the broker made a mistake.  And
7    here's what makes it so tricky.  The shares to the charity were
8    IBM; the shares to my daughter were Philip Morris.  They
9    reversed it.  The charity calls January 2nd and says we can't
10   take tobacco stock.  We can't accept your gift.  I call the
11   broker, I say what about this.  He says we'll just reverse it.
12   It was our mistake.  We'll send the Philip Morris to your
13   daughter and we'll send the IBM to the charity.  And they
14   reverse it and they put as of December 28 because they reverse
15   it and do it at December 28 prices and it all shows up on the
16   January statement.
17           If I said to Mr. Parse, if I said to me -- the Court
18   may be situated differently, the Court's been educated by this
19   trial.  If I said can I put that tax deduction on my year one
20   return, in that situation, even though it was mistake, it never
21   got accepted, I'd say I don't know, you should ask a tax
22   lawyer.  And that's what Mr. Parse said.  He made the
23   transactions, he made the change, not a single document at
24   Deutsche Bank reflected that this happened other than the as of
25   which was a reflection of what the pricing was.
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

CAC3PARC

1    I'm sitting here with a tolling agreement from the
2    Southern District in a case of mine which says as of
3    January 14. Which is faxed on January 16. But everybody
4    wanted it to be effective two days before because that was the
5    agreement, as happens in the Southern District. It happens
6    everywhere. And it doesn't mean backdating. In this case it
7    means this is the price.
8    But all that is a long way of saying there is no proof
9    that he knew this rule. There is no proof it was discussed
10   with him. There is no proof he thought he knew these
11   transactions were wrong. And at the end of the day, when one's
12   argument is he must've known, that's a weak reed, particularly
13   when this prejudice notion is harmless error like. After all,
14   you have Justice Marshall's dissent in Strickland that says it
15   should have been harmless error, it should have been under the
16   government's burden. When you do harmless error analysis, you
17   say two things: What is the nature of the error, and what's
18   the proof. The nature of the error here is that a government
19   partisan out to get him in particular was on the jury. That's
20   a pretty serious error. The proof, far from overwhelming.
21   As I say, I think if I can get you to the prejudice
22   prong, we ought to see you in April and not in January and I
23   hope that's the case.
24   THE COURT: Thank you, Mr. Shechtman.
25   Ms. Davis, does the government want to be heard?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

CAC3PARC

1          MS. DAVIS:  Yes, please, your Honor.
2          Good afternoon, your Honor.  I'm glad to see that
3   Mr. Shechtman has conceded that other than this particular
4   area, Mr. Parse did in fact receive what can only be described
5   as a platinum plated defense with a defense team that most
6   defendants can only dream of.
7          MR. SHECHTMAN:  I don't think I quite went that far,
8   your Honor.
9          MS. DAVIS:  I do think, though, that had Mr. Shechtman
10  been here at trial and seen the forces that were mustered in
11  Mr. Parse's favor, he would have to admit that it is a rare
12  scene in such a courtroom for an individual defendant.
13         Your Honor, the crux of it is that defendant Parse is
14  seeking to be rewarded now for the strategic choices of his
15  attorney regarding Catherine Conrad and their knowledge of her.
16  Choices for which he has already benefited in the form of
17  acquittals on the conspiracy and the tax evasion counts.  We
18  submit, as we said in our papers, that we believe that
19  Mr. Shechtman has met neither prong of the Strickland standard
20  in that he cannot show ineffective assistance of counsel and he
21  cannot show prejudice.
22         This Court in its ruling on the motion for new trial
23  regarding Catherine Conrad has already found that the Brune &
24  Richard law firm knew that Catherine Conrad and Juror No. 1
25  were the same person and chose to gamble with the jury that

Case 1:20-cr-00330-AJN   Document 640-20   Filed 03/24/22   Page 76 of 117

CAC3PARC

1    they had.  Your Honor, that in our view ends the inquiry
2    completely.  That finding alone is sufficient to defeat a
3    finding of ineffective assistance of counsel.
4             The Second Circuit has made very clear, as have other
5    circuits, that you cannot as a defense counsel basically engage
6    in a heads-we-win-tails-you-lose strategy when it comes to your
7    trial conduct.  We know that based on the documentary evidence
8    and the evidence that was adduced at the hearing as well as the
9    evidence that was put forth in the affidavit of Susan Brune,
10   that the Brune & Richard law firm had the suspension opinion
11   prior to voir dire, and chose not bring it to this Court's
12   attention.  As we all know engaged in subsequent investigation
13   regarding Juror No. 1, when Theresa Trzskoma started to have
14   certain doubts about her after the receipt of Juror No. 1's
15   note.
16            It's quite clear that this is not a case where the
17   defense counsel had been given a piece of information and did
18   nothing.  That's quite, quite not what happened here.  In fact,
19   we know that prior to voir dire, they discussed the suspension
20   opinion, they chose not to bring it to the Court's attention.
21   Instead relying simply on the voir dire answers, even though as
22   this Court pointed out, far more trivial issues were aired by
23   all of the parties, by the government and indeed by the Court,
24   in terms of trying to figure out who would be good jurors.
25   They chose not to bring that to the Court's attention then

18
CAC3PARC

1  which I think is very significant.  And it is significant in
2  part because I think if we can say anything, that we all know
3  based on the Brune & Richard's defense of Mr. Parse, that if
4  they had any actual and real concern about a suspended attorney
5  being on this jury, if they really thought that that was not in
6  their client's interest, you know, we all know that they would
7  have brought it to the Court's attention during voir dire.  And
8  if not at voir dire, then after the results of the Theresa
9  Trzskoma investigation.
10         This is absolutely a situation where the Brune &
11 Richard lawyers, on May 12, after the investigation that they
12 had, they looked at all the alternatives.  We know because
13 Laurie Edelstein testified at the hearing, they considered the
14 three possible alternatives.  They considered whether or not
15 they should do more investigation, and Susan Brune said no.
16 They considered whether or not they should bring it to the
17 Court's attention, and they said no.  So they decided to do
18 nothing.  And it is that conscious and deliberate choice that
19 we believe means that they made a strategic choice that cannot
20 form the basis of ineffective assistance of counsel.
21         How do we know in the government's view that this
22 indeed was a tactical choice?  As this Court just pointed out
23 with regard to the questioning of Mr. Shechtman, they did not
24 bring that knowledge to the attention of the Court either in
25 the brief, where they made it appear as if they first learned

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

CAC3PARC
1   of this after the receipt of the jury -- of Ms. Conrad's letter
2   to the government in May after the verdict.  And worse, even in
3   the conference calls with the Court, they continued to make it
4   appear and resist the Court and the government learning that
5   knowledge.
6            Mr. Shechtman seems to want to characterize this as
7   them wanting to hide their mistakes.  But it's quite clear, and
8   Susan Brune and Laurie Edelstein testified, we would not have
9   told this Court but for the Court pressing.  That to me speaks
10  of a decision made early on and continuing through the briefing
11  that they wanted the juror on the panel, but they wanted the
12  Court not to know exactly what they knew because they
13  understood, and, as was acknowledged at the hearing, that that
14  was damaging to their client.
15           THE COURT:  Would you address the prejudice prong.
16           MS. DAVIS:  Yes, your Honor.  Your Honor, we believe
17  that there is more than adequate evidence, indeed overwhelming
18  evidence, of defendant Parse's criminal involvement in the
19  corrupt endeavor to obstruct the IRS and in the mail fraud
20  count.  The defense conceded in its papers that Mr. Parse was
21  involved in the backdated transactions.  We think backdated
22  transactions is a perfectly adequate description of them.
23           We also submit, your Honor, that Mr. Parse's
24  background as a CPA, even a non-practicing CPA, is under case
25  law relevant to his intent and circumstantial evidence of his
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

CAC3PARC

1   incident.  We know he was instrumental and indeed Carrie Yackee
2   cited to more than a dozen instances during her testimony where
3   she made clear that she was acting at the instructions of and
4   with the knowledge of David Parse in implementing all of these
5   complex and varied transactions that had to be effectuated in
6   order to change the results of the three sets of transactions.
7   It's actually four because Coleman and Blair were two separate
8   taxpayers.  She understood that this was being done for tax
9   purposes.  This is Carrie Yackee the sales assistant.  Nice
10  woman, but not nearly as sophisticated as Mr. Parse.  To
11  suggest that the jury could not find or infer that he knew
12  exactly why these transactions were being effectuated, not for
13  any real investment reason, not because they had figured out
14  that in February and March, the year after the transactions had
15  been done, that somehow it would have been a better investment
16  to have not invested in Cisco stock, but instead to have
17  invested in foreign currency.  To suggest that the jury could
18  not have found that Mr. Parse knew that the reason that these
19  were being done was to effectuate tax losses for the prior year
20  is simply ludicrous.
21          Your Honor, the defendant was faxed information
22  relating to the tax returns themselves.  This wasn't just a
23  one-way street between David Parse's office and Jenkins &
24  Gilchrist, but it was at least a two-way street between
25  Deutsche Bank and Jenkins & Gilchrist and also the accountants.

CAC3PARC

1    So it's quite clear the jury was entitled to infer that he knew
2    that this was being done to change the results of the tax
3    losses.  He also knew, and there is more than a plethora of
4    evidence on this, that each of these tax shelter transactions
5    had to be completed by year end.  And that's why, as Mr. Bair
6    testified and others testified, it was a real effort.
7              Sandra Burnside, you might recall, Mr. Daugerdas'
8    secretary, testified about the avalanche of work that went on
9    in December at the end of the tax years in order to finalize
10   these transactions.  Well, that avalanche of work hit the
11   offices of Mr. Parse's desk.  And as Carrie Yackee testified,
12   Carrie Yackee's desk as well.
13             So to suggest that he was not aware this was being
14   done in order to defraud the IRS as the true results of the
15   transaction we submit is unsupportable.
16             There was a suggestion in Mr. Shechtman's brief, I
17   don't think he touched on it today, but the suggestion was that
18   these transactions, these as of transactions were approved by
19   Deutsche Bank.
20             Well, first of all, Carrie Yackee's testimony here
21   that she was going to Mr. Parse for approval on these
22   transactions.  There is also no evidence to suggest that anyone
23   other than Mr. Parse and Carrie Yackee at Deutsche Bank knew
24   the full picture of what went on, which was that these
25   transactions for these particular taxpayers were tax shelter

CAC3PARC

1    transactions that had to be done by the end of the year, that
2    had been done by the end of the year, pursuant to instructions
3    that had been given by Jenkins & Gilchrist to Deutsche Bank,
4    had been implemented properly by Mr. Parse in the first
5    instance, and now were being requested to redo them to achieve
6    a different result.
7              This I think is a distinction that makes
8    Mr. Shechtman's example of the broker's mistake an apple to our
9    orange or an orange to our apple, which is that this is not an
10   instance where Mr. Parse takes an instruction from a client and
11   screws it up.  Implements it wrong.  Rather, they did
12   everything that they were supposed to do the way it was
13   supposed to be done, and there are results to show for that.
14   It's only because the tax loss that they wanted to get from
15   these results was not correct that it required anything to be
16   done after the end of the year.
17             We suggest that the evidence was overwhelming to
18   support Mr. Parse's knowing and criminal involvement in both
19   the corrupt endeavor to obstruct and impede the IRS and in mail
20   fraud.
21             THE COURT:  Anything further?
22             MS. DAVIS:  Your Honor, there are other pieces of
23   evidence which we've detailed in our briefing but which I will
24   not go through again here.
25             I did want to just note though that the Second Circuit
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

23

CAC3PARC

1    has stated that you can find that where there has been a split
2    verdict, as is the case with Mr. Parse, that is evidence of a
3    lack of prejudice.  We had argued in the original motion for
4    new trial and we renew that as well.
5            Finally, your Honor, with regard to the letter of
6    Catherine Conrad to the government which was referenced in the
7    defendant's briefing, she talked about their discussions and
8    deliberations with regard to David Parse.  And interestingly
9    what she also said, which was not mentioned by Mr. Shechtman in
10   his brief, was that that struggle ended when they asked the
11   Court to reread the definitions of wilfully and knowingly.
12   Different states for different counts.
13           MR. SHECHTMAN:  Well, I'll wait.  I apologize to the
14   Court.
15           MS. DAVIS:  And interestingly, their verdict exactly
16   tracked that difference between wilfully, this was required in
17   the conspiracy count and for the tax evasion counts, and
18   knowingly which was really the mens rea relating to other ones.
19   So you might say that they had a struggle.
20           To the extent we can even be considering that letter
21   at all because of Rule 606(b), but I think it's quite clear
22   that they made a deliberate and informed decision about making
23   a distinction drawn on the evidence as apply to the law.  Thank
24   you.
25           THE COURT:  Thank you, Ms. Davis.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

CAC3PARC

1        Mr. Shechtman, do you want to be heard further?

2        MR. SHECHTMAN:  I will and I will try to be brief,

3  Judge.  I think really four points.  The government has

4  repeated at the argument here what it said in its brief.  Which

5  was that Mr. Parse benefited from the strategic choice that his

6  clients made and I'll hold the strategic choice point for

7  second.  But I take that to mean that he got acquitted here

8  because she was on the jury.  And that, my father used to say

9  arguments were nonsense on stilts, and that is nonsense on

10  stilts.  I mean, your Honor knows exactly what happened here.

11  There was a partisan in the jury room, a woman who couldn't

12  follow instructions and the like.  Your opinion couldn't be

13  stronger on the point.  And she was fighting the good fight to

14  convict him on 100 percent.

15        So to say we got the benefit of having her on there

16  because we were acquitted isn't worthy, respectfully, of the

17  government.

18        And the related point this was a split verdict, it is

19  a split verdict because she couldn't carry the ball as far as

20  she wanted to, but not because Mr. Parse benefited by her

21  presence.

22        The second thing I'd say is this.  I take it there are

23  two competing visions of what happened here, and at the end of

24  the day, your Honor is going to have to decide.  One is that

25  what happened in that court, your Honor, in the plaza, is that

25

CAC3PARC

1    what was said was, look, don't be stupid, it can't be her, to
2    do any more would be a waste of the court's time.  That's what
3    I think happened.  That's what I think the record shows.
4            The other is, let's be smart.  She'll be a great juror
5    because she is a suspended lawyer.  Or, let's be smart.  If we
6    leave her on, we get two bites at the apple.  The latter two I
7    think are strategic, but be careful in the following sense.
8    The first one is a choice.  It is a choice to do nothing.  You
9    cannot have a case in which there is not in a sense a choice if
10   it's coming up in an ineffective assistance claim.  I can cite
11   you to Breakiron and Johnson v. Armontrout.  In our brief
12   lawyers are making choices.  In those cases the question is are
13   they informed choices, are they reasonable choices, are they
14   competent choices, are they strategic choices.  And if the
15   choice is don't be stupid, it can't be her, that is not a
16   strategic choice, that is a tragic misjudgment.  Implicit in
17   the word "misjudgment" is that someone's making a choice.  But
18   if it is a tragic misjudgment, I think it's ineffective
19   assistance.
20           The next thing I'd say is this.  We're told that there
21   can't be any doubt that these transactions were effectuated so
22   that there would be tax lawyers and tax losses in the prior
23   year and it's ludicrous to think otherwise.  Of course that's
24   why the transactions were being done.  There is no doubt that's
25   why these transactions were being done in February or March.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

26
CAC3PARC

1   But the real question is, did Mr. Parse know that that was
2   defrauding the government.  Right.
3           Look, the avalanche of work here was in December.  But
4   the question is, if you made a mistake, like in my example, can
5   you undo it.  And you have to appreciate what the government
6   has said to you today.  It has essentially said if it is a
7   broker's mistake, like in my hypothetical, then maybe a
8   reasonable broker could think you could undo it.  But if it is
9   a lawyer's mistake, you can't.  And that's a very different
10  version of the annual accounting rule than I've ever heard
11  before.  Right.  And if my hypothetical is one in which a
12  reasonable broker could think leave it up to the tax lawyers, I
13  am not sure what happened in this case isn't in that same
14  category.
15          We ended up with an argument about the contents of the
16  note and how your Honor should interpret them to show whether
17  there was prejudice here.  All of this began with the
18  government saying to us be careful, Rule 606(b) has its limits.
19  The one thing I know, and the Third Circuit case in Breakiron
20  is quite good on talking about whether one looks at this
21  subjectively or objectively, you can't draw inferences from
22  that juror's note in deciding whether there was prejudice here
23  for two reasons.  One, 606(b) precludes it, and two, that note
24  was written by Catherine Conrad and I still don't think the
25  United States wants to be standing up in a court and saying

27

CAC3PARC
1  rely on what Catherine Conrad said.
2        THE COURT:  All right.  Counsel, thank you for your
3  arguments on the motion.  Decision reserved.  Have a good
4  afternoon.
5        MS. DAVIS:  Thank you.
6                        o0o
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



ZUCKERMAN SPAEDER LLP

1185 AVENUE OF THE AMERICAS   31ST FLOOR
NEW YORK, NY 10036-2603
212.704.9600   212.704.4256 fax   www.zuckerman.com

PAUL SHECHTMAN
Partner
212-704-9600
Pshechtman@zuckerman.com

BY HAND

March 7, 2013

The Honorable William H. Pauley, III
United States District Judge
Southern District of New York
500 Pearl Street, Room 2210
New York, NY  10007

Re:    United States v. David Parse, et al., 09 Cr. 581 (WHP)

Dear Judge Pauley:

This letter is respectfully submitted on behalf of David Parse, who is scheduled to

be sentenced for tax-related crimes on March 22, 2013.  For the reasons discussed below, we

believe that a non-incarcerative sentence would be a fair and parsimonious one.  See United

States v. Dorvee, 616 F.3d 174, 182 (2d Cir. 2010)("it is the sentencing court's duty to impose a

sentence sufficient, but not greater than necessary to comply with the specific purposes set forth

at 18 U.S.C. § 3553(a)(2)").

A.     Background

David Parse was born in Detroit, Michigan, on December 7, 1961.  He was the

youngest of five children of Sylvia and Henry Parse.  A World War II veteran, David's father

worked two jobs for most of his life.  He was a mailman by day, and a factory worker at night.

David's mother worked part-time as a laundress in a local restaurant.  The two parents instilled

WASHINGTON, DC              NEW YORK              TAMPA              BALTIMORE

◢◣ **ZUCKERMAN SPAEDER** ᴸᴸᴾ

The Honorable William H. Pauley, III
March 7, 2013
Page 2

in their children the importance of work, education, family and respect for others. See letter of

Bridget Rodgers ("Dave comes from a blue-collar background; his dad was a mailman and his

mom was a saint").[1]

David attended local Catholic schools, where he excelled in academics and sports.

See letter of Scott Mordell ("David was an academic, sports and social leader among our [high

school] class"). He started on the varsity basketball team as a freshman and was among the top

players in the state his senior year. Although recruited by several colleges, he chose to attend the

University of Michigan, a state school, and gave up playing organized sports.

What he did not give up was his work ethic. David got his first job at age 11,

delivering the Detroit News to his neighbors. Every day after school and on weekends, he rode

his bicycle on his route. In eighth grade, he began working part-time in a local restaurant as a

busboy (the same restaurant where his mother cleaned linens). He worked there on weekends

during the school year and 30 to 40 hours a week in the summer. The job enabled him to

purchase a used car for $600. With a car, he could drive across town to work at a famous

seafood restaurant; beginning his senior year in high school, it became his regular employer.

David graduated from Michigan in 1984 with a bachelor's degree in Business

Administration. He put himself through college, commuting from Ann Arbor to Detroit to work

as a waiter in the seafood restaurant. Although most of his time went to studies and work, David

---

[1]    Letters from David's family and supporters are attached as an appendix to this
submission.

**ZUCKERMAN SPAEDER** LLP

The Honorable William H. Pauley, III
March 7, 2013
Page 3

enjoyed his college years immensely, and many of his closest friends are Michigan classmates.
To this day, he "tailgates" with friends before Michigan football games and donates generously
to the school.  See letter of Kenneth Norwick (our "tailgate [group] . . . has become like an
extended family . . . focused on the children"); letter of Bridget Rodgers ("[e]ven though he has
never mentioned it, I know [David] has been a generous donor to the University").

B.   Business Degree and Brokerage Industry Employment

        After graduating from Michigan, David worked two years at Touche Ross as an
accountant, doing audits for local businesses and not-for-profit institutions.  In August 1986, he
left the firm and reenrolled in Michigan to get an MBA degree.  Again, he paid his own way.  He
lived at home, commuted to school, and went back to waiting tables.  He graduated in 1988 with
a major in Finance and Economics and obtained employment at Goldman Sachs in Detroit as a
broker.

        From 1988 to his indictment in 2009, David enjoyed considerable success as an
investment consultant for institutions and high net worth individuals.  When Goldman left
Detroit, David moved to Kidder Peabody in Troy, Michigan, and then to Credit Suisse First
Boston in Chicago.  In 1995, he was recruited to join Alex Brown & Sons, which was
subsequently acquired by Bankers Trust and then Deutsche Bank.  The name on the front door
changed, but David's responsibilities did not.

 **ZUCKERMAN SPAEDER** LLP

The Honorable William H. Pauley, III
March 7, 2013
Page 4

    As a broker, David had 30 to 40 long-term customers, and his goal was to assist

them to invest their money wisely.  A former business associate writes this about him:

> [A]t the Chicago offices of Credit Suisse First Boston . . . I
> interacted with David on a constant basis during our tenure at the
> firm. I literally could overhear his phone calls with clients . . . . In
> all of [our] interactions I found David to be diligent, intelligent,
> and most of all honest. David always put his client's interests first,
> and prided himself on his ability to protect [their] assets.  He took
> very seriously his fiduciary duty, and our entire group relied upon
> him as a sounding board when evaluating the appropriateness of
> investment vehicles. As an example of how much I trust David in
> business, years ago I asked him to consult on the endowment fund
> for an inner city high school that I oversee . . . . [As] you can
> imagine . . . I would only ask David to participate if I was
> completely convinced of his character.

Letter of Phil Allen.

    Others who have worked with David sound the same theme.  <u>See</u> letter of Jeffrey

DeYoung (he would "always put clients first and do the right thing; when the market was starting

to unravel . . . Dave was the first to pull his clients out in spite of his loss of revenue"); letter of

Susan Manske ("[i]n my opinion, Dave has always been a straight shooter, a conservative

investor protecting his clients from downside risk, [and] a staunch supporter of ethical

behavior"); letter of John and Kathryne McGuire ("David chose the securities business so that he

could help his clients protect their assets; he truly understood his fiduciary obligations and [put]

his client's interest first").  In all his years as a broker, David received <u>no</u> complaints from his

customers for his investment advice.[2]

---
[2]    David has been sued by several taxpayers whose tax shelters were disallowed.

 **ZUCKERMAN SPAEDER** LLP

The Honorable William H. Pauley, III
March 7, 2013
Page 5

In 1998, David was introduced to Paul Daugerdas; his relationship with

Daugerdas and the Jenkens & Gilchrist firm is discussed in Part D below.

C.     Family, Community and Friends

David met Theresa Austerberry in 1987, when they were at business school

together, and they have been married for 20 years.  They have supported each other's careers --

when Theresa found a better position at McKinsey's Chicago office, David left Kidder Peabody

to move with her -- and have devoted themselves to family and community.  They have three

boys -- ages 17, 15, and 12 -- whom they have raised conscientiously.  The letter of David's

brother-in-law, James Yetter, describes it best:

> [David's] three sons (my nephews) are wonderful young men with
> exceptional character traits that I know are a direct result of Dave's
> strong parenting  ....   [H]e treats them with a very good
> combination of love, caring and high expectations.  They all have
> chores to do and household responsibilities.  They are expected to
> have jobs in the summer.  They have a healthy regard and respect
> for others.  Study time is sacred.  Responsibilities are not to be
> taken lightly.  It's not "enforced," it's an expectation.

Letter of James W. Yetter.

Other letters confirm Mr. Yetter's observations.  See letter of Andrew Miller

("[h]is emphasis and influence on his children have also resulted in good, respectful, well-

rounded and academic kids"); letter of Phil Allen (David "teaches by example, and extolls the

values of hard work and mutual respect; everyone pitches in, whether it is preparing a family

 **ZUCKERMAN SPAEDER** LLP

The Honorable William H. Pauley, III
March 7, 2013
Page 6

meal or helping a younger sibling . . . do [his] homework"); letter of Thomas E. Carnaghi (David

"is truly a model father [who] sets the bar high for his boys").[3]

      For the past 15 years, David has devoted much of his free time to coaching youth

sports teams in his community.  In his letter to the Court, Phil Allen describes the depth of

David's commitment:

> In our town's Little League Baseball organization, David has held
> every volunteer position from an assistant coach to a team
> manager.  I have seen him do everything from raking baseball
> fields . . . to throwing batting practice . . . .  During basketball
> season, David has also been the coach or assistant coach for
> numerous grammar school teams.  If there is one example of the
> depth of David's commitment to coaching, it is the basketball
> training sessions he designed and managed for students outside of
> the organized teams he coached.  On his own initiative, David
> arranged for a gym to be available during the week for all children,
> even those who didn't make a team . . . .  There are not many of us
> . . . who would find the time to make such an impact on the lives of
> the children in their community.

Letter of Phil Allen; see also letter of John and Kathryne Maguire ("[c]oaching children is often

a difficult and thankless job in a small community; David has been a leader in Hinsdale in

volunteering his time and knowledge to help our community").

---

[3]    As the Presentence Report notes, Theresa has had serious health problems since 2008.  In
February 2008, Theresa began experiencing severe dizziness, and the episodes often lasted hours
and sometimes days.  Neck pain, heart palpitations and stomach pain followed.  See letter of
Theresa Parse.  A battery of tests has proven negative, and medication and a change of diet have
given her some relief.  But health issues, which may be stress-related, continue to plague her.

 **ZUCKERMAN SPAEDER** LLP

The Honorable William H. Pauley, III
March 7, 2013
Page 7

     As the letters reflect, coaching for David is about more than teaching a 12-year-old to turn a double play. "He wants the kids to develop their athletic . . . skills and [for them] to be as successful . . . as possible, but he clearly believes that there are things more important than winning games." Letter of Charles Austerberry; <u>see also</u> letter of Theresa Parse ("Dave understands how sports can teach children valuable life lessons"). David relates to each child individually and gives each a chance to play. When a boy with severe disabilities was on the basketball team, David "made sure every other boy . . . went out of [his] way to . . . help him make a basket before the end of the season." <u>Id.</u> As one observer notes, David's "measured, personal approach contrasts markedly with the loud cacophony typically employed by [those] . . . who attempt to coach [children's] sports teams." Letter of Charles Austerberry.[4]

     What may best reflect David's character is his commitment to his friends. In their letters to the Court, many of them recount stories of David's support in their times of need. <u>See e.g.</u>, letter of Bridget Rodgers (when I was pregnant and "told I had an infection that would cause

_____

[4]     One parent whose child is a gifted athlete writes this about David:

> The thing that has endeared me most to Dave is the way he coaches the boys in basketball. Over the years, he has coached . . . my son      . . . [Dave] is always calm, guiding, teaching and encouraging the boys in a way that is so helpful. Dave has gone out of his way to tell my wife Kimberly and me how special      is as an athlete and he encourages us to continue his development. The vast majority of coaches in our community are screamers and not teachers and are singularly focused on their [own] kids. Dave is different. I sincerely appreciate the many hours Dave has spent with my son.

Letter of Venanzio Arquilla.

Case 1:20-cr-00330-AJN Document 646-30 Filed 03/24/22 Page 94 of 117
**A-5937**
Case 1:09-cr-00581-WHP   Document 604   Filed 03/16/13   Page 8 of 14

◤ **ZUCKERMAN SPAEDER** LLP

The Honorable William H. Pauley, III
March 7, 2013
Page 8

horrific birth defects, Dave cried openly with us" and discussed the "moral, ethical and
emotional dilemmas this raised"); letter of James Yetter ("[w]hen our friend's daughter was on
her death bed, Dave . . . flew in from Chicago . . . to provide support"); letter of Andrew Miller
("when my son was diagnosed and hospitalized with a mental illness . . . , David was there to
. . . counsel and encourage me"); letter of Thomas Carnaghi (when "my then 12 year old
daughter had a brain aneurysm burst . . . [David] drove in from Chicago to spend time with me
and my family; he spoke with me every day during the three plus weeks of this ordeal"). As one
friend puts it, "Dave is a giver, not a taker; if you need some help, he is the friend you can call."
Letter of Kenneth Norwick.

Notably, David's good deeds have involved his time and effort and not his
money. Nor has he sought recognition for what he has done. Just the opposite is true: he has
been reluctant to ask others to write on his behalf because asking for something in return has
never been his way. See United States v. Cooper, 394 F.3d 172, 177 (3d Cir. 2005)(noting that
defendant's actions were not "detached acts of charity . . . [but were] in a very real way, hands-
on personal sacrifices, which have had a . . . positive impact on the lives of others").

D.     The Instant Offense

As noted above, David met Paul Daugerdas in 1998, but the relationship between
Deutsche Bank and Daugerdas began earlier. In the early 1990's, Jason Shih was one of a group
of brokers in Alex Brown's San Francisco office, who began executing bond shorts for
Daugerdas' clients. When Shih was transferred to Chicago to supervise the office, he continued

◤ **ZUCKERMAN SPAEDER** LLP

The Honorable William H. Pauley, III
March 7, 2013
Page 9

the relationship. Shih introduced David and his partner Rod McKay to Daugerdas, and they

began doing business.

As the Court knows, Deutsche Bank's participation in the tax shelters was

approved at the bank's highest levels.[5] That fact, coupled with the prominence of the Jenkins

firm and the knowledge that other law and accounting firms were marketing similar products,

gave David comfort that the tax shelters were lawful. Like many others, he believed that

Daugerdas and his partners had found a "loophole" that could be exploited until it was closed.

From 1998 to 2001, tax shelter trades became a part of David's business.

As we see it, the jury accepted the proposition that David was not a culpable

participant in the overall Jenkins tax shelter scheme. His acquittal on the tax conspiracy count

and the substantive tax evasion counts (and the complete acquittal of his co-defendant Craig

Brubaker) confirm the point. The jury, it seems, concluded that David did not know that a lack

of economic substance made the Jenkins shelters illegal. If that is correct, then David's

convictions for mail fraud and tax obstruction reflect his involvement in the three "backdating"

transactions. In each instance, trades effected in one year (e.g., 2002) were used to generate tax

---

[5]    See, e.g., Tr. 2965 (discussing letter from Irwin Mayer to Bob Price, Alex Brown's
general counsel); Tr. 5678-79 (confirming that approvals from legal, credit, tax and compliance
had been obtained for the Homer transaction).

A-5939

 **ZUCKERMAN SPAEDER LLP**

The Honorable William H. Pauley, III
March 7, 2013
Page 10

losses in the prior year (e.g., 2001).  The prosecution focused on those transactions in its summations, as did the jury in its deliberations.[6]

E.    Guidelines Calculation

        In its preliminary Report, the Probation Office calculates an offense level of 40 and a Guidelines range of 292 to 365 months.  It assumes a tax loss amount of $1.5 billion and adds "points" for sophisticated means (§ 2T1.1(b)(2)) and special skill (§ 3B1.3).  We have written to Probation and asked it to reconsider that calculation.  Under the Court's rules, its final Report is due after ours, and so we summarize here our argument that the Guidelines range should be far lower than where Probation has preliminarily put it.

---

[6]    Juror No. 1's letter to AUSA Okula goes far to show that David's conviction was only for the "backdating" transactions:

> [W]e did have qualms with Mr. David Parse.  <u>I solely held out for two days on the conspiracy charge for him</u> -- I wanted to convict 100%, (not only on that charge) -- but on Tuesday, May 24, 2011, we had asked for the Judge's clarification of "willfully" and "knowingly", I believe, and I had to throw in the towel.  I did fight the good fight, however, and I felt that Mr. Parse played his integral part and was a key element in the elaborate scheme/scam.  <u>The backdating was enough for the other charges.</u>

Letter of Catherine Conrad 5/25/11 (emphasis added).

**A-5940**

 **ZUCKERMAN SPAEDER** LLP

The Honorable William H. Pauley, III
March 7, 2013
Page 11

      Our lower Guidelines calculation begins from the premise that Mr. Parse was convicted only of the three "backdating" transactions.   If that is so, then the proper loss calculation is this:

| | |
|---|---|
| Coleman | $2,738,630 |
| Blair | $ 470,035 |
| Aronoff | $ 536,770 |
| Toporek | $   62,553 |
| | |
| TOTAL | $3,807,988 |

These numbers are based on the additional assessments calculated by the IRS, which are in evidence.

      Moreover, if the Guidelines calculation is based only upon the three "backdating" transactions, then the enhancement for "sophisticated means" should not apply.  While it is true that the tax shelters created fraudulent tax losses through a series of complex transactions, the "backdating" involved only correcting certain trades -- <u>e.g.</u>, canceling a transaction in stock and effecting one in foreign currency.  The new transactions were shown in Deutsche Bank's books in the month in which they occurred.  No records were altered.  Thus, this is not an instance of "hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts."  <u>See</u> Commentary § 2T1.1 Application Note 4.

      Likewise, an enhancement for "special skills" under § 3B1.3 is unwarranted.  The Report states that Mr. Parse "used his special skills as a former stock broker and CPA to materially facilitate his design and implementation of the highly-complex financial products that were involved in different tax shelters."  ¶ 64.  Mr. Parse, however, had no role in designing the

Case 1:20-cr-00330-AJN Document 646-30 Filed 03/24/22 Page 98 of 117
A-5941
Case 1:09-cr-00581-WHP Document 604 Filed 03/16/13 Page 12 of 14

**ZUCKERMAN SPAEDER** LLP

The Honorable William H. Pauley, III
March 7, 2013
Page 12

tax shelters and did not function as a CPA. He gave no investment advice, and the trades were
executed by his assistant. In short, his role as a broker in the three "backdating" transactions is
too thin a reed to support this enhancement.

If all of this is correct, then Mr. Parse should be at offense level 24, with a
Guidelines range of 51 to 63 months. Of course, we believe that even that calculation produces a
range that is still far too harsh. See, e.g., Smirlock v. United States, 2005 U.S. Dist. Lexis 7321
at *6 (noting that "the amount of loss that actually winds up resulting from a person's conduct
. . . can be arbitrary" and may not reflect culpability); Bowman, The Failure of the Federal
Sentencing Guidelines: A Structural Analysis, 105 Colum L. Rev. 1315, 1328 (2005)("[a]t or
near the root of virtually every serious criticism of the guidelines is the concern that they are too
harsh").

F.    Conclusion

In her sentencing submission, Donna Guerin catalogued the sentences that have
been imposed on those who designed and marketed illegal tax shelters. See Guerin's Am.
Sentencing Mem. 13-16, ECF No. 592. They have varied greatly in length. What makes this
case different is that David Parse did not design or market tax shelters; he was a broker executing
trades. Indeed, to our knowledge, of all of the brokers who performed that function for Jenkins
and other law firms, he and Craig Brubaker were the only two people who were prosecuted, and
he is the only one who stands convicted.

 **ZUCKERMAN SPAEDER** LLP

The Honorable William H. Pauley, III
March 7, 2013
Page 13

     As noted above, we believe that the jury convicted David for his involvement in three backdating transactions from which he barely profited. He has already suffered greatly for that conduct. Since 2004, when the criminal investigation commenced, this matter has hung over him. His once-thriving brokerage business has collapsed. His wife's health has suffered. See supra n.3. His children have felt the sting of comments from others who have learned of David's conviction. And the stigma of the conviction haunts David, especially because it is antithetical to the values with which he was raised. See letter of Theresa Parse ("our lives [have] essentially [been] placed on hold, as we try to raise our three sons in a safe and secure environment").

     More than 15 years ago, the United States Supreme Court reminded that the "uniform and constant . . . tradition for the sentencing judge [is] to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." Koon v. United States, 518 U.S. 81, 113 (1996). In this submission, we have tried to show that David Parse is a fundamentally decent man. He believes in family, hard work, helping others, and being actively involved in community. The conduct for which he was convicted, we believe, was at the periphery of the Jenkins scheme. On this record, we respectfully submit that a non-incarcerative sentence would be just. It would not diminish respect for the law. See United States v. Adelson, 441 F.Supp.2d 506, 513-14 (S.D.N.Y. 2006)("if ever a man is to receive credit for the good he

 **ZUCKERMAN SPAEDER** LLP

The Honorable William H. Pauley, III
March 7, 2013
Page 14

has done, and his immediate misconduct assessed in the context of his overall life hitherto, it

should be at the moment of his sentencing").[7]

Respectfully submitted,

Paul Shechtman

PS/wr

cc: AUSA Stanley J. Okula, Jr.
    AUSA Nanette Davis

---

[7]      In <u>Gall v. United States</u>, 552 U.S. 38 (2007), the Supreme Court emphasized that a non-incarcerative sentence does not mean "letting an offender off easily."  The Court wrote:

> We recognize that custodial sentences are qualitatively more
> severe than probationary sentences of equivalent terms.  Offenders
> on probation are nonetheless subject to several standard conditions
> that substantially restrict their liberty.  Probationers may not leave
> the judicial district, move, or change jobs without notifying, and in
> some cases receiving permission from, their probation officer or
> the court.  They must report regularly to their probation officer,
> permit unannounced visits to their homes, refrain from associating
> with any person convicted of a felony, and refrain from excessive
> drinking.  Most probationers are also subject to individual "special
> conditions" imposed by the court.

<u>Id.</u> at 59.

**[PAGES A-5944 TO A-6040 INTENTIONALLY LEFT BLANK]**

# EXHIBIT G

**A-6042**

## Jenkens and Gilchrist Clients
## Restitution Calculation

| Client | Transaction Type | Year | Tax Benefit Taken per Return | Tax Deficiency per RAR | Interest thru 12/31/2012 per RAR | Interest 12/31/2012 - 3/1/2013 | Total Interest | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Allenduff, Phillip | SOS | 1999 | 2,116,153 | 607,293 | 635,773 | 8,304 | 644,077 | 1,251,370 | |
| Augustine, William | SOS | 1999 | 5,443,789 | 2,220,413 | 2,324,546 | 30,358 | 2,354,904 | 4,575,317 | |
| Balistrieri, James | SOS | 1999 | 1,295,704 | 509,840 | 533,750 | 6,971 | 540,721 | 1,050,561 | |
| Balistrieri, Rosemarie | SOS | 1999 | 488,166 | 174,257 | 182,429 | 2,383 | 184,812 | 359,069 | |
| Basler, Wayne G | SOS | 1999 | 4,923,914 | 1,079,073 | 1,129,679 | 14,754 | 1,144,433 | 2,223,506 | |
| Batchelder, Abigail | SOS | 1999 | 427,884 | 154,580 | 161,829 | 2,114 | 163,943 | 318,523 | |
| Batchelder, Joseph H & Marcia | SOS | 1999 | 427,884 | 92,567 | 96,908 | 1,266 | 98,174 | 190,741 | |
| Batchelder, Joseph Henry III | SOS | 1999 | 927,082 | 325,231 | 340,484 | 4,446 | 344,930 | 670,161 | |
| Bernard, Stephen F. | SOS | 1999 | 3,951,064 | 804,309 | 842,029 | 10,997 | 853,026 | 1,657,335 | |
| Cairo, Louis | Short Sale | 1998 | 683,826 | 278,919 | 339,894 | 4,134 | 344,028 | 622,947 | |
| Calbert, Michael | SOS | 1999 | 5,445,579 | 2,010,877 | 2,105,183 | 27,493 | 2,132,676 | 4,143,553 | |
| Carlins, Joel M. | SOS | 1999 | 4,949,045 | 1,097,489 | 1,148,959 | 15,005 | 1,163,964 | 2,261,453 | |
| Carruth, Herman | SOS | 1999 | 5,142,787 | 1,169,583 | 1,224,434 | 15,991 | 1,240,425 | 2,410,008 | |
| Denning, Richard | SOS | 1999 | 742,987 | 155,473 | 162,764 | 2,126 | 164,890 | 320,363 | |
| Deveter, Dennis M. | SOS | 1999 | 8,093,882 | 2,259,810 | 2,365,790 | 30,897 | 2,396,687 | 4,656,497 | |
| Dotson, Kenneth | SOS | 1999 | 4,944,392 | 1,911,747 | 2,001,404 | 26,138 | 2,027,542 | 3,939,289 | |
| Eigel, C&C | SOS | 1999 | 1,500,024 | 604,289 | 632,629 | 8,262 | 640,891 | 1,245,180 | |
| Frigo, Arthur | Short Sale | 1998 | 47,490,958 | 18,568,165 | 22,627,401 | 275,165 | 22,902,566 | 41,470,731 | |
| Gecsey, William | Short Sale | 1999 | 1,849,245 | 754,270 | 789,644 | 10,312 | 799,956 | 1,554,226 | |
| Georgius, John R. | SOS | 1999 | 30,018,220 | 11,489,491 | 12,185,410 | 0 | 12,185,410 | 23,674,901 | ** |
| Goldberg, M | Short Sale | 1998 | 1,291,133 | 526,628 | 641,756 | 5,775 | 647,531 | 1,174,159 | |
| Goldstein, Robert | Short Sale | 1998 | 545,820 | 200,473 | 244,299 | 2,971 | 247,270 | 447,743 | |
| Gorman, Robert | SOS | 1999 | 7,326,125 | 2,971,595 | 3,110,956 | 40,629 | 3,151,585 | 6,123,180 | |
| Guy, Jerry | SOS | 1999 | 517,554 | 200,275 | 209,667 | 2,739 | 212,406 | 412,681 | |
| Harvanek, Steven | SOS | 1999 | 19,654,299 | 4,270,448 | 4,470,723 | 58,386 | 4,529,109 | 8,799,557 | |
| Jensen, Robert & Debra | SOS | 1999 | 5,148,261 | 1,604,155 | 1,701,319 | 0 | 1,701,319 | 3,305,474 | ** |
| Kelley, Phillip & Kathy | Short Sale | 1998 | 11,876,759 | 4,741,316 | 5,803,796 | 44,294 | 5,848,090 | 10,589,406 | |
| Koenig, Thomas | Short Sale | 1999 | 1,514,982 | 615,486 | 644,351 | 8,415 | 652,766 | 1,268,252 | |
| Lowenberg, James A. | SOS | 1999 | 2,475,423 | 704,214 | 737,240 | 9,628 | 746,868 | 1,451,082 | |
| Lusvardi, Laurence C. | SOS | 1999 | 11,476,629 | 2,201,073 | 2,334,392 | 0 | 2,334,392 | 4,535,465 | ** |
| Martell, James | SOS | 1999 | 1,657,646 | 340,556 | 356,527 | 4,657 | 361,184 | 701,740 | |

Page 1

**Jenkens and Gilchrist Clients**
**Restitution Calculation**

| Client | Transaction Type | Year | Tax Benefit Taken per Return | Tax Deficiency per RAR | Interest thru 12/31/2012 per RAR | Interest 12/31/2012-3/1/2013 | Total Interest | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Merchant, William | SOS | 1999 | 3,960,459 | 1,615,392 | 1,713,236 | 0 | 1,713,236 | 3,328,628 | ** |
| Owen, Dennis | SOS | 1999 | 8,851,963 | 1,770,393 | 1,853,421 | 24,205 | 1,877,626 | 3,648,019 | |
| Pape, Mark | SOS | 1999 | 3,711,793 | 1,472,661 | 1,541,726 | 20,134 | 1,561,860 | 3,034,521 | |
| Peterson, Ronald A. | SOS | 1999 | 2,971,727 | 512,416 | 536,447 | 7,006 | 543,453 | 1,055,869 | |
| Pollitt, Hunter | SOS | 1999 | 5,445,573 | 2,046,426 | 2,142,399 | 27,979 | 2,170,378 | 4,216,804 | |
| Poncher, Lyle | SOS | 1999 | 1,584,257 | 529,086 | 560,595 | 538 | 561,133 | 1,090,219 | ^^ |
| Postorivo, Jr., Eugenio | SOS | 1999 | 3,958,160 | 1,604,318 | 1,679,557 | 21,935 | 1,701,492 | 3,305,810 | |
| Purcel, Morris | SOS | 1999 | 10,517,045 | 4,284,575 | 4,485,512 | 58,580 | 4,544,092 | 8,828,667 | |
| Ragsdale, C&E | Short Sale | 1999 | 7,024,447 | 2,782,380 | 2,951,380 | (471) | 2,950,909 | 5,733,289 | >> |
| Ragsdale, H/V | Short Sale | 1999 | 517,475 | 188,809 | 200,277 | (32) | 200,245 | 389,054 | >> |
| Ragsdale, T&L | Short Sale | 1999 | 7,307,819 | 2,798,322 | 2,968,290 | (473) | 2,967,817 | 5,766,139 | >> |
| Ragsdale, TS IV | Short Sale | 1999 | 517,475 | 188,797 | 200,264 | (32) | 200,232 | 389,029 | >> |
| Schmidt, Ralph F. | Short Sale | 1998 | 786,621 | 320,848 | 390,989 | 4,755 | 395,744 | 716,592 | |
| Schuett Sr., William G. | SOS | 1999 | 8,162,118 | 1,677,490 | 1,756,161 | 22,935 | 1,779,096 | 3,456,586 | |
| Schuett, Jr., William G. | SOS | 1999 | 8,162,118 | 1,636,216 | 1,712,951 | 22,371 | 1,735,322 | 3,371,538 | |
| Small, Richard & Arlene | SOS | 1999 | 16,831,914 | 3,366,382 | 3,524,258 | 46,026 | 3,570,284 | 6,936,666 | |
| Spector, Donald | SOS | 1999 | 2,012,684 | 797,375 | 834,770 | 10,902 | 845,672 | 1,643,047 | |
| Stuart, Thomas | SOS | 2000 | 4,628,056 | 1,878,052 | 1,637,363 | 23,481 | 1,660,844 | 3,538,896 | |
| Tate, Joseph P. | SOS | 1999 | 39,573,266 | 11,048,595 | 11,566,751 | 151,058 | 11,717,809 | 22,766,404 | |
| Vanek, Greg | SOS | 1999 | 992,081 | 389,312 | 407,570 | 5,323 | 412,893 | 802,205 | |
| Walsh, Carol | SOS | 1999 | 7,675,366 | 3,054,180 | 3,197,415 | 41,757 | 3,239,172 | 6,293,352 | |
| Wiggins, Glenn | SOS | 1999 | 9,209,607 | 1,841,921 | 1,928,303 | 25,183 | 1,953,486 | 3,795,407 | |
| Yang, Julie | SOS | 1999 | 180,876 | 72,467 | 75,866 | 990 | 76,856 | 149,323 | |
| | | | | | | | | | |
| Total Clients - J&G | | | 348,930,116 | 110,520,308 | 119,951,466 | 1,188,760 | 121,140,226 | **231,660,534** | |

^^ Interest on RAR was calculated through 3/16/2012
** Interest on RAR was calculated through 3/22/2012
>> Interest on RAR was calculated through 3/23/2012

**[PAGES A-6044 TO A-6073 INTENTIONALLY LEFT BLANK]**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                       :

**UNITED STATES OF AMERICA,**        :

    - v. -                            :       **S3 09 Cr. 581 (WHP)**

**PAUL DAUGERDAS,**              :
**DONNA GUERIN,**
**DENIS FIELD, and**              :
**DAVID PARSE,**

                                      :

                   **Defendants.**

                                       :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**AMENDED SENTENCING MEMORANDUM OF THE**
**UNITED STATES REGARDING DEFENDANT DAVID PARSE**


                                           **PREET BHARARA**
                                           **United States Attorney for the Southern**
                                           **District of New York**


**STANLEY J. OKULA, JR.,**
**NANETTE L. DAVIS,**
**Assistant United States Attorneys**

         **- Of Counsel -**

**TABLE OF CONTENTS**

Preliminary Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.   Relevant Facts.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.   The Defendant's Educational Background and Work History. . . . . . . . . . . . . . . . . . . . 3

    B.   The Offense Conduct.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        1.   Parse' Participation in the Fraudulent Kasperzak/Calphalon Tax Shelter.. . . . . . . . . 3

        2.   Parse's Personal Tax Evasion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        3.   Parse's Participation in the Fraudulent Backdating of Transactions. . . . . . . . . . . . . 5

    C.   The Indictment, Trial, New Trial Rulings, and the PSR. . . . . . . . . . . . . . . . . . . . . . . . 8

    D.   The Objections to the PSR. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    E.   Restitution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

II.   Sentencing Guidelines Discussion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

III.   3553(a) Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

        1.   The Nature and Circumstances of the Offense. . . . . . . . . . . . . . . . . . . . . . . . . . . 24

        2.   History and Characteristics of the Defendant. . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

        3.   The Need To Afford Adequate Deterrence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

        4.   The Need To Avoid Unwarranted Sentence Disparities. . . . . . . . . . . . . . . . . . . . . 33

        5.   The Appropriate Sentence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                   :

UNITED STATES OF AMERICA,                          :

   - v. -                                          :        S3 09 Cr. 581 (WHP)

PAUL DAUGERDAS,                                    :
DONNA GUERIN,                                      :
DENIS FIELD, and                                   :
DAVID PARSE,                                       :
                                                   :
                Defendants.                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

AMENDED SENTENCING MEMORANDUM OF THE
UNITED STATES REGARDING DEFENDANT DAVID PARSE

         The United States respectfully submits this memorandum for the Court's consideration in

connection with the sentencing of defendant David Parse ("Parse" or "the defendant"), which is

scheduled for March 22, 2013 at 2:30 p.m.

**Preliminary Statement**

         Following an eleven-week trial that included over 1300 exhibits, 41 witnesses, eight days of

jury deliberations, and 46 jury notes, the jury on May 24, 2011 convicted David Parse on one count

of corruptly obstructing and impeding the due administration of the Internal Revenue Laws in

violation of 26 U.S.C. § 7212(a) (Count Twenty of the Redacted S3 Indictment), and one count of

mail fraud in violation of 18 U.S.C. §§ 1341 and 2 (Count Twenty-Five of the Redacted S3

Indictment).  The jury acquitted Parse of the conspiracy count and three counts of tax evasion.  Those

convictions stemmed from David Parse's integral role in one of the largest tax fraud schemes ever

charged, the details of which are spelled out in the indictment against him, S3 09 Cr. 581 (WHP),

and the trial record.  Incorporating the factual allegations in the conspiracy count, Count Twenty

charged Parse, Donna Guerin, Denis Field and Craig Brubaker with a wide-ranging corrupt endeavor to obstruct and impede the IRS in connection with the design, marketing, implementation, and defense of four tax shelters known as Short Sale, Short Option, SWAPS, and HOMER. Likewise incorporating the factual allegations of the conspiracy count, Count Twenty-Five charged Parse, along with Paul Daugerdas, Guerin, Field, and Brubaker, with mail fraud as to the overarching scheme to defraud the IRS through the design, marketing, implementation, and defense of the Jenkens & Gilchrist tax shelters.

The proof at trial demonstrated that Parse — an investment representative at Deutsche Bank Alex Brown and certified public accountant — participated as a key actor in the largest criminal tax fraud in history. That fraud, which featured Parse's five-year involvement in four fraudulent tax shelters, resulted in the creation of over $7 billion of fraudulent tax deductions or benefits, $1.6 billion in Guidelines tax loss, and well in excess of $230 million in actual loss to the United States Treasury. Parse's role in the fraud - as one of the principal Deutsche Bank employees who steered bank clients to the J&G tax shelters, established the evanescent brokerage accounts for those shelters, executed the crucial Treasury short sale and options "investments," executed the pivotal transfers between accounts, and who helped facilitate the fashioning of the options and other financial instruments used in the shelters - was indispensable to the shelters' success. Consequently, Parse earned substantial commission income from his role in the tax shelters — over $3 million.

For the reasons spelled out below and in the Probation Department Presentence Investigation Report ("PSR"), we submit that Parse's conduct, and the resulting harm, is deserving of a significant prison sentence.

I.    **RELEVANT FACTS**[1]

    A.    **Defendant's Educational Background and Work History**

Parse obtained his bachelor's degree in business administration from the University of Michigan in 1984 and his Master's degree in business administration from the same school in 1988. PSR ¶¶ 89-90.  Parse also was a licensed stockbroker and investment adviser, and passed various securities and investment adviser exams.  From 1988 to 1995, Parse acted as an investment adviser at Goldman Sachs, Kidder Peabody, and Credit Suisse First Boston.  From 1995 through April 2006, Parse was employed as an investment representative at Deutsche Bank Alex Brown in its Chicago office.  From April 2006 to the present, Parse has been self-employed at his company Union Capital LLC, a financial consulting firm, which is currently dormant.

    B.    **The Offense Conduct**

The facts concerning Parse's offense conduct will not be repeated herein at length, as those facts are comprehensively set forth in the trial record and the PSR.  Accordingly, we are confident that, as a result of the foregoing and the submissions made by the parties, the Court is thoroughly familiar with the scope and nature of the defendant's criminal conduct.

Several aspects of that offense conduct bear additional discussion.

    1.    **Parse's Participation in the Fraudulent Kasperzak/Calphalon Tax Shelter**

Parse assisted in advising the shareholders of the Calphalon cookware company (primarily members of the Kasperzak family, owners of the company, and several key employees) on the orderly disposition of their shares of Newell stock acquired in a stock swap as a result of the sale of

---

[1]   The facts described in this section are based on the Probation Department's Presentence Report ("PSR"), the trial record, documents that the Government has produced to the defendant in discovery, and Government interviews of various witnesses.

the Calphalon company to Newell.  Parse was introduced to Peter Barnhart, Calphalon's Executive Vice-President, Sara Jane Kasperzak, Dean Kasperzak, and other members of the Kasperzak family in 1998.  As a result of the work that Parse was doing in helping the Calphalon stockholders dispose of their Newell shares, Parse became aware of the large taxable gains that the stockholders would receive.  In a meeting at Parse's office, Parse introduced Peter Barnhart to Paul Daugerdas (then an Altheimer & Gray partner) for the purpose of having Daugerdas pitch a J&G tax shelter to the Calphalon shareholders.  Parse subsequently attended a meeting with Daugerdas, the Calphalon shareholders, and several attorneys from the law firm of Shumaker Loop & Kendrick.  In that meeting and in Parse's presence, as Dean Kasperzak testified at trial, Daugerdas opened with the red-flag statement that the information that he was about to provide was completely confidential and that the shareholders could not even share it with the shareholders' own investment advisors or accountants.  (Tr. 6243).  Daugerdas then described the tax shelter which he said would result in the shareholders' paying virtually no taxes on the gains. Kasperzak further testified, "We were told that the profit potential was very low and that going forward, should we choose to go forward, if we were questioned about the matter, that our intent was in fact to make a profit, but in order for this tax shelter to work, there had to be, in effect, a loss to balance off the gains from the stock sale."[2]  (Tr. 6244).  The urging by Daugerdas for the shareholders to make false statements about their intent is wholly inconsistent with good faith – all of which Parse witnessed.

---

[2]  The testimony of Erwin Mayer and other trial witnesses made clear that the expected short-term duration of the Treasury note transactions, combined with the lack of volatility of the specific Treasury notes chosen for the transactions, meant that the short sale was virtually certain to produce only a small loss or gain on this purported "investment."

4

Case 1:20-cr-00330-AJN Document 646-32 Filed 03/24/22 Page 112 of 117
**A-6080**
Case 1:09-cr-00581-WHP   Document 605   Filed 03/18/13   Page 7 of 41

### 2.     **Parse's Personal Tax Evasion**

Parse executed his own fraudulent SOS tax shelter transaction to eliminate the gains he earned in 2000, and received a free fraudulent opinion letter from J&G.  The losses Parse created — $3,000,000 — were larger than Parse needed for the 2000 year, suggesting that he intended to eliminate taxes in more than one year.   On his 2000 tax return, Parse claimed a $1,278,706 fraudulent loss, evading $517,542 in taxes on over $2.1 million in income.  See GX 1001-132 (Parse 2000 Tax Return); GX 1000-52 (IRS Certificate of Assessment and Payments for Parse's 2000 Taxes); GX 54-1 (J&G Opinion Letter for Parse).  Parse's receipt of a free opinion letter, which would have otherwise cost him no less than $90,000 (and likely more)[3] had he paid the going rate for a J&G opinion letter, violated Deutsche Bank's gift prohibition policy and almost certainly violated the law, in that it constituted his receipt of an unlawful commission or gift by a bank official.  See l8 U.S.C. § 215 (unlawful for any bank employee to accept anything of value intended to be rewarded in connection with business of bank).

### 3.     **Parse's Participation in the Fraudulent Backdating of Transactions**

As detailed in paragraphs 44-52 of the PSR, Parse's conduct involved not only assisting in the design, marketing, and implementation of the fraudulent J&G tax shelters, but also the implementation of fraudulently backdated when Donna Guerin and others at J&G realized that the shelters had been implemented incorrectly, or not consistent with the clients' wishes with respect to

---

[3]  Parse executed a $3,000,000 short options deal through J&G.  Using a conservative 3% fee results in a $90,000 opinion letter value.  Parse only deducted just over $1.2 million of the $3,000,000 in losses on his 2000 return, and thus had available just under $1.8 million in losses to use on future tax returns.  Although Parse ultimately did not utilize those additional losses (because he reversed his own transaction when the IRS began investigating), the proper view of Parse's own fraudulent transaction should take into account the full amount of fraudulent benefit he produced.

5

the amount or nature of the tax loss.

The facts concerning all of the backdating will not be repeated at length herein.  It is useful to note, however, the following facts as they relate to Parse: (i) Parse was the key to the  success of the backdated transactions — without his agreement and participation, the J&G attorneys were powerless to correct the mistakes; (ii) the corrections needed for the Aronoff transactions are reflected in David Parse's own handwriting on GX 401-99 (reflecting the original transaction) and GX 401-100 (reflecting the revised transaction), showing that he fully understood the nature of the backdating; (iii) the correction of the transactions required a complex series of steps, including reversals of transfers of assets between accounts, reversals of already-completed stock and foreign currency transactions, and execution of new "as of" foreign currency and stock trades; and (iv) the backdating occurred with not just one client, but several and occurred in two different tax years — tax year 2000 for the Aronoff family members, and tax year 2001 for Michael Toporek, Greg Blair, and Matthew Coleman.

In his sentencing memorandum, Parse attempts to excuse the backdating by claiming, "He gave no investment advice, and the trades were executed by his assistant." (Parse Sent. Mem. at 12). This statement is not only a shameless attempt by Parse to throw his subordinate under the bus, but also a testament as to just how perverted these tax shelters were that the investment broker, who otherwise touts his treatment of his long-time clients, (id. at 4 "As a broker, David had 30 to 40 long-term customers, and his goal was to assist them to invest their money wisely."), now attempts to make much of the fact that he was not giving investment advice to the backdating clients (or, as the evidence showed, to any of the other tax shelter clients).  As to Parse's suggestion that the backdating transactions were done not by Parse, but by Carrie Yackee, his sales assistant (Parse

6

Sentencing Mem. at 12), the evidence showed and Yackee testified persistently, consistently, and credibly that she acted at all times at the instruction of David Parse. Given the foregoing, Parse's attempt to blame her for his criminal conduct is inconsistent with the facts; it is also, in a larger sense, inexcusable.

To the extent that Parse trial and current counsel have suggested and continue to suggest that the backdating transactions were approved by Deutsche Bank, the only approvals were from Parse himself, and on some of the trade tickets, the signature of the branch manager appears.[4]  Moreover, there is no evidence that the branch manager knew of the purpose and animus for the backdated transactions.  To the extent that a branch manager actually knew what was occurring, that fact would only render the branch manager a co-conspirator, and not excuse Parse's criminal conduct.

However complex the tax shelters, the fraudulent backdating was nothing more than garden-variety fraud committed to achieve impermissible tax results.  Basic principles of tax reporting — such as the annual accounting rule — prohibit the changing of tax results through transactions carried out after the close of the tax year.  Carrie Yackee testified that she understood, based on her

---

[4]  Yackee made clear that the "Deutsche Bank approvals" on the backdated transaction were actually instructions from David Parse:

> Q. You also testified about acting in accordance with Deutsche Bank policy, correct?
> A. Correct.
> Q. Are you aware what Deutsche Bank's policy is for the use of  as of dates on trades?
> A. I don't know of the specific policy.
> Q. How do you know you acted in accordance with the policy?
> A. I was directed what to do by my boss.
> Q. So when you say you acted in accordance with policy, you mean you followed your boss's orders?
> A. And I presumed that he would follow policy. So . . .

(Tr. 5699).

7

Case 1:20-cr-00330-AJN   Document 646-32   Filed 03/24/22   Page 115 of 117
A-6083
Case 1:09-cr-00581-WHP   Document 605   Filed 03/18/13   Page 10 of 41

conversations with David Parse, that the steps of the transactions had to be completed by the end of the year to achieve the tax benefits. Given this clear legal imperative, Parse's willingness to participate in such conduct can only be viewed as brazen misconduct.

### C.   The Indictment, Trial, New Trial Rulings, and the PSR

On March 4, 2010, the grand jury returned a third superseding Indictment charging Parse, Guerin, Daugerdas, Mayer, and Brubaker in thirty-one counts. Parse in particular was charged with a conspiracy to the defraud the IRS, to commit tax evasion, and to commit mail and wire fraud (Count One), as well as three counts of tax evasion relating to the tax shelter transactions of three separate tax shelter clients (Counts Seventeen, Eighteen, and Nineteen). Parse was also charged in Counts Twenty and Twenty-Five with engaging in a corrupt endeavor to obstruct and impede the IRS and mail fraud, respectively, essentially through the same conduct underlying the Count One conspiracy charge.

On February 28, 2011, trial commenced against Parse and his co-defendants. On May 24, 2011, the jury found Parse guilty on Counts Twenty and Twenty-Five, and not guilty on Count One and Counts Seventeen through Nineteen. Subsequently, the Court denied Parse motions for new trial based on juror misconduct and ineffective assistance of counsel. As a result of Parse's convictions, he faces a maximum of 23 years in prison.

In connection with Parse's sentencing, the Probation Office has prepared a Presentence Investigation Report (the "PSR"), which calculates the defendant's Sentencing Guidelines offense levels. As calculated by Probation, the final offense level is 40, calling for a Sentencing Guidelines sentence at the statutory maximum, 23 years' imprisonment. PSR ¶ 103. The breakdown of Parse's Guidelines calculation is as follows:

8

**A-6084**

- A base offense level of 36 pursuant to §§ 2T1.9, 2T1.1, and 2T4.1(tax table).  PSR ¶ 62.

- An increase of 2 levels pursuant to U.S.S.G. § 2T1.1(b)(2) because the offense involved sophisticated means.  PSR ¶ 63.

- An increase of 2 levels pursuant to U.S.S.G. § 3B1.3 because the defendant used his skills as a broker and CPA to materially facilitate his design and implementation of the highly-complex financial products that were involved in the different tax shelters. PSR ¶ 64.

Parse has no criminal history points.  Thus, with a final offense level of 40, Parse's Guidelines analysis, according to the PSR, yields a final advisory Guidelines range of 292-365 months.  However, due to the combined statutory maxima of Counts Twenty and Twenty-Five, the Guidelines term of imprisonment is limited to 276 months.  PSR ¶ 103.

### D.     The Objections to the PSR

Parse has leveled three objections to the calculation of the Guidelines: specifically, to (i) the loss calculations for Guidelines purposes; (ii) the application of the sophisticated means enhancement, and (iii) the application of the use of a special skill.  Parse objects to being held responsible, for Guidelines loss calculations purposes, for the full amount of loss generated by the corrupt endeavor and scheme to defraud the Internal Revenue Service.  Parse argues that "a fair reading of the jury's verdict is that Parse was convicted only for his role in what the [Presentence] Report describes as three instances of fraudulent 'backdating.'"

Defendant Parse's position is contrary to law and has no basis in reliable fact.  First, Parse's contention that he is being held responsible for acquitted conduct ignores the fact that he was convicted on the broad corrupt endeavor and scheme to defraud. Indeed, the Second Circuit Court of Appeals has held as follows:

Under § 1B1.3(a), the court, in calculating a defendant's offense level, was to take

9

Case 1:20-cr-00330-AJN Document 646-32 Filed 03/26/22 Page 117 of 117
**A-6085**
Case 1:09-cr-00581-WHP Document 605 Filed 03/18/13 Page 12 of 41

> into account, inter alia, the defendant's own acts and omissions, see id. §
> 1B1.3(a)(1)(A), as well as "all reasonably foreseeable acts and omissions of others
> in furtherance of the jointly undertaken criminal activity," id. § 1B1.3(a)(1)(B), and
> "all harm that resulted from the acts and omissions specified in subsection[ ] (a) (1)
> . . . above, and all harm that was the object of such acts and omissions," id. §
> 1B1.3(a)(3) (emphasis added).

United States v. Reifler, 446 F.3d 65, 108 (2d Cir. 2006) (alterations in original). See also United

States v. Nash, 338 Fed. Appx. 96, 98, 2009 WL 2901565, at *1 (2d Cir. 2009) (summary order)

(rejecting defendant's claim that he be held liable only for the fraudulent transactions in which he

was directly involved; loss should be based on foreseeable loss from fraudulent scheme); United

States v. Singh, 390 F.3d 168, 192 (2d Cir. 2004) (court upheld finding of full loss for sentencing

guidelines purposes, despite some acquittals: "It matters not that various phases of the execution of

the scheme were rejected by the jury for reason or reasons unknown. Singh's opinions regarding the

legality of his billing practices were rejected by the jury, which clearly found the existence of an

overall fraudulent scheme."); United States v. Zichittello, 208 F.3d 72 (2d Cir. 2000) (upholding loss

computations in RICO case: "As to the campaign finance scheme, Hartman is liable as a

co-conspirator for 'all reasonably foreseeable acts and omissions' in furtherance of the conspiracy.

U.S.S.G. § 1B1.3(a)(1)(B). Because there was evidence that Hartman was well aware of the larger

scheme, the district court did not err in finding that Hartman was liable for the entire loss suffered

by the NYCCFB."); United States v. Senninger, 429 Fed. Appx. 762, 767, 2011 WL 2688988, at *4

(10th Cir. 2011) (summary order) (court upheld attributing full loss from mail fraud scheme to

defraud the IRS and Colorado Department of Revenue; "[T]he court looked at the totality of

Senninger's involvement in that scheme, concluding her actions did not involve 'simply filling in

blanks on amended returns.' The district court found Senninger 'len[t] credibility to the entire

operation. She lent her credibility as having been an IRS auditor to this operation, and she knew she