M38TMAX1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                        20 CR 330 (AJN)

5   GHISLAINE MAXWELL,

6              Defendant.

7   ------------------------------x
                                        New York, N.Y.
8                                       March 8, 2022
                                        10:15 a.m.
9
    Before:
10
                    HON. ALISON J. NATHAN,
11
                                        District Judge
12

13                      APPEARANCES

14  DAMIAN WILLIAMS
         United States Attorney for the
15       Southern District of New York
    ALISON MOE
16  MAURENE COMEY
    ANDREW ROHRBACH
17  LARA POMERANTZ
         Assistant United States Attorneys
18
    COHEN & GRESSER
19       Attorneys for Defendant
    CHRISTIAN EVERDELL
20
    BOBBI C. STERNHEIM
21       Attorney for Defendant

22  SPODEK LAW GROUP
         Attorneys for Juror 50
23  TODD A. SPODEK

24

25

M38TMAX1

|   |   |
|---|---|
| 1 | (Case called) |
| 2 | DEPUTY CLERK:  Counsel, please state your name for the |
| 3 | record, starting with the government. |
| 4 | MS. MOE:  Good morning, your Honor, Alison Moe, Lara |
| 5 | Pomerantz, Andrew Rohrbach and Maurene Comey for the |
| 6 | government. |
| 7 | THE COURT:  Good morning, counsel. |
| 8 | MS. STERNHEIM:  Bobbi C. Sternheim and Christian |
| 9 | Everdell for Ghislaine Maxwell, who is present at defense |
| 10 | table. |
| 11 | THE COURT:  Good morning. |
| 12 | And Mr. Spodek on behalf of Juror 50, please state |
| 13 | your appearance. |
| 14 | MR. SPODEK:  Good morning, your Honor, Todd Spodek on |
| 15 | behalf of Juror 50, who is present. |
| 16 | THE COURT:  Thank you.  We're here today for a hearing |
| 17 | on the defendant's motion for a new trial.  The government has |
| 18 | consented and to indeed requested this hearing as to Juror 50. |
| 19 | My opinion and order dated February 24, 2022 ordered |
| 20 | this hearing into Juror 50's responses to questions on the jury |
| 21 | selection questionnaire.  That opinion lays out the scope and |
| 22 | nature of today's hearing. |
| 23 | In addition to the motion for new trial briefing that |
| 24 | I received from of the parties, I also received proposed |
| 25 | questions from both sides which I have carefully considered in |

M38TMAX1

1    preparing for today's hearing.  In the submitted questions, the

2    defense renewed the request that counsel be permitted to

3    conduct the questioning.  I am denying that renewed request.  I

4    will conduct this proceeding in accord with my February 24

5    opinion.

6            Following my questioning, I will hear from counsel for

7    the parties at sidebar as to any proposed follow-up questions

8    that they wish be asked and I will consider those requests.

9            In a moment, I will address counsel for Juror 50.

10           Let me ask counsel for the parties if there are any

11   preliminary matters.

12           MS. MOE:  Not from the government, your Honor, thank

13   you.

14           MS. STERNHEIM:  No, thank you.

15           THE COURT:  All right.  Juror 50 is present and

16   represented by retained counsel, Mr. Spodek.

17           Mr. Spodek, just as a preliminary matter, does your

18   client wish that he be referred to here as Juror 50 rather than

19   using his full name?

20           MR. SPODEK:  Yes, your Honor.

21           THE COURT:  And I understand, but again confirm for me

22   that in post-verdict press interviews he did not reveal his

23   last name, is that correct?

24           MR. SPODEK:  That's correct.

25           THE COURT:  I do intend to continue to refer to him as

M38TMAX1

Juror 50.  In post-verdict press interviews he did not reveal

his last name.  Consistent with that and my juror anonymity

order during trial, I will permit that to continue.

I received a letter dated March 1st, 2022 from

Mr. Spodek.  In that letter, Mr. Spodek, you informed me that

Juror 50 would invoke his Fifth Amendment privilege against

self-incrimination at this hearing.  As you see from my

February 24 opinion, Mr. Spodek, I am going to ask Juror 50

questions today about responses that he gave during the jury

selection process in the case of *United States v. Maxwell*.

Does it remain your client's intention to assert his

Fifth Amendment privilege in response to those questions?

MR. SPODEK:  Yes, your Honor.

THE COURT:  I'm going to confirm on the record with

your client, Mr. Spodek:

Juror 50, is it your intention to assert your Fifth

Amendment privilege in response to the questions I'm going to

ask you today?

JUROR 50:  Yes, your Honor.

THE COURT:  All right.  I received a written

application from the government last night.

Ms. Moe, could you confirm that the government is

making the application?

MS. MOE:  Yes, your Honor.

THE COURT:  In accord with the application, I have

M38TMAX1

1    signed the proposed immunity order which will be docketed with

2    Juror 50's name redacted.

3              Juror 50, in view of your assertion of the Fifth

4    Amendment privilege, I have signed an order granting you

5    immunity.  It is use immunity with respect to your testimony in

6    this proceeding.  That means that no testimony given by you or

7    any information, directly or indirectly, derived from your

8    testimony may be used against you in a federal criminal case,

9    except if you testify falsely today you could be prosecuted for

10   perjury.  In light of this immunity, you will be required to

11   answer questions today.

12             So in other words, you need to answer my questions

13   today.  You need to answer truthfully.  If you don't answer

14   truthfully, you could be prosecuted for perjury.  But you will

15   not be prosecuted in federal court based on any truthful

16   testimony that you give here today, even if that testimony

17   indicated that you committed a crime.

18             Juror 50, do you understand that?

19             JUROR 50:  Yes, your Honor.

20             THE COURT:  All right.  I am going to have Juror 50

21   come forward to the witness stand, please.

22             (Continued on next page)

23

24

25

M38TMAX1

1                     █████████,

2              having been duly sworn, testified as follows:

3      EXAMINATION

4      BY THE COURT:

5              THE COURT:  I'm going to approach with the court

6      reporter and ask Juror 50 at the sidebar to state and spell his

7      name for the record.  His name will be redacted from the public

8      transcript.

9              (At sidebar)

10             THE COURT:  Please state your name for the record.

11             THE WITNESS:  ██████████.

12             (In open court)

13     BY THE COURT:

14     Q.  With that, Juror 50, you are under oath.

15             I will begin with some general instructions to you.

16     If at any point you don't understand something that I'm asking,

17     please ask for clarification.  Don't speculate as to the

18     meaning of my question, ask for clarification.

19             In responding to questions, I do instruct you not to

20     tell me about the jury deliberations or your thought process

21     during deliberations.  I'm not asking questions about those and

22     you should not provide that information in response to my

23     questions.  So listen to my specific questions, let me know if

24     there's something you don't understand, do not respond with

25     information about the jury's deliberations, and tell the truth.

M38TMAX1

```
 1            If there is a response that is too difficult or
 2    embarrassing for you to share in open court, you may request to
 3    speak at sidebar with me and counsel.  However, if you have
 4    already shared the information publicly, including in media
 5    interviews, then I will not allow the sidebar.
 6            There's a binder in front of you.  I have marked the
 7    document in there as Court Exhibit 1, so it's Court Exhibit 1
 8    to the record for this hearing proceeding and you may open
 9    that.
10            That is a copy of the questionnaire that you filled
11    out on November 4, 2021.  Please take a moment and look through
12    it so that you're familiar with it and can identify it.
13    A.  Yes.
14    Q.  Do you recognize that as the questionnaire that you filled
15    out on November 4, 2021, as part of the jury selection process
16    in this case?
17    A.  Yes, your Honor.
18    Q.  I will ask you to turn to page 24 and look at question 48.
19            That question reads:  Have you or a friend or family
20    member ever been the victim of sexual harassment, sexual abuse
21    or sexual assault, and then in parenthesis, this includes
22    actual or attempted assault or other unwanted sexual advance,
23    including by a stranger, acquaintance, supervisor, teacher or
24    family member.  Do you see that question 48?
25    A.  Yes, your Honor.
```

M38TMAX1

1   Q.  On your questionnaire you indicated no as your answer.  You

2   checked the box for no.  Is no an accurate answer to that

3   question?

4   A.  No, it is not.

5   Q.  What is an accurate answer to that question?

6   A.  Yes for self.

7   Q.  Okay.  If you look at question 48A, that question says:  If

8   yes, without listing names, please explain.

9        And when you filled out the questionnaire on

10  November 4, 2021, you left that blank.  What is an accurate

11  answer to question 48A?

12  A.  I would have put I was abused as a child.

13  Q.  Without listing names, what happened?

14  A.  It was a family member, who is no longer a part of the

15  family, and one of their friends when I was nine and ten years

16  old.

17  Q.  Did this happen on one occasion or multiple occasions?

18  A.  Multiple occasions.

19  Q.  And did you tell anyone?

20  A.  I did not for several years until I was in high school.

21  Q.  And when you told someone in high school, did you tell

22  authorities or adults or friends?

23       Who did you tell?

24  A.  I told my mom and she called the police station and gave a

25  report of the account and but never received any paperwork.  So

M38TMAX1

```
 1   I don't know if anything was actually filed or anything done.
 2   There were no charges brought.
 3   Q.  You said a family member, no longer a family member.
 4   Again, without listing names, what was the nature of the
 5   familial relationship?
 6   A.  A stepbrother.
 7   Q.  You said stepbrother?
 8   A.  Yes.
 9   Q.  I'm going to ask you to look at question 48B.  Question 48B
10   reads:  If your answer to 48 was yes, do you believe this would
11   affect your ability to serve fairly and impartially as a juror
12   in this case?
13          When you filled this out on November 4, you left that
14   blank.  What is an accurate answer to 48B?
15   A.  It would have been no, because it did not affect my ability
16   to be fair and impartial at all.
17   Q.  I'm going to ask you to turn to page 13 of the
18   questionnaire.  Question 25 reads:  Have you or any of your
19   relatives or close friends ever been a victim of a crime?
20          And you checked no when you filled this out on
21   November 4.  Is no an accurate answer?
22   A.  Looking back at it now, no, it's an incorrect answer.
23   Q.  Who would have an accurate answer have been?
24   A.  It would have been yes.
25   Q.  Yes self, yes friend or family?
```

M38TMAX1

1   A.  Yes self.

2   Q.  And when you say "yes self," what are you referring to?

3   A.  I'm referring to the sexual abuse.

4        What I was thinking when I was completing that

5   questionnaire was like if I was robbed or mugged or some sort

6   of crime like that.  I wasn't thinking of my sexual abuse as

7   being a victim of a crime because I no longer associate being a

8   victim.  It's part of my healing process and it's how I dealt

9   with the abuse.

10  Q.  Have you ever been robbed?

11  A.  Never.

12  Q.  Ever been mugged?

13  A.  Never.

14  Q.  Family or friends ever been robbed?

15  A.  No.

16  Q.  Or mugged?

17  A.  I don't know anybody that has ever been robbed or mugged.

18  Q.  Question 25A, asked:  If yes, is there anything about the

19  experience that would prevent you from acting as a fair and

20  impartial juror in this case?

21       You left that blank when you filled it out on

22  November 4.  What is an accurate answer to 25A?

23  A.  It would have been no.  I was definitely able to set aside

24  everything and be fair and impartial.

25  Q.  Okay.  In light of the answer that you gave to 48A, I am

1   going to ask you to turn to question 49.  It's on page 25.

2               Question 49 reads:  Have you or a friend or family

3   member ever been accused of sexual harassment, sexual abuse or

4   sexual assault, and then in parenthesis:  This includes both

5   formal accusations in a court or law or informal accusations in

6   a social or work setting of actual or attempted sexual assault

7   or other unwanted sexual advance, including by a stranger,

8   acquaintance, supervisor, teacher or family member.

9               When you filled this out on November 4, you checked

10  no.  Is that an accurate answer?

11  A.  Yes, your Honor.

12  Q.  So the incident that you described in response to 48 in

13  which, as I understand it, you informed your mother when you

14  were in high school that when you were nine or ten a family

15  member had engaged in sexual abuse with you, is that correct?

16  A.  Yes.

17  Q.  So why is that not responsive to question 49?

18  A.  Because I don't consider them part of my family.  I never

19  considered them part of my family even when they lived with us

20  for a few years.

21  Q.  And when you filled out the questionnaire, when you got to

22  this question were you thinking about what happened to you but

23  you didn't respond yes because you didn't consider them a

24  family member, or you didn't consider it?

25  A.  I didn't even consider it at all.

1    Q.   Why is that?

2    A.   I flew through this questionnaire.  I never thought that

3    I -- I honestly never thought I would be chosen to sit on this

4    jury.  We had to be at the courthouse super early, and I got

5    here early and it took 45 minutes just to get through the

6    security line.  And we get ushered into a room --

7    Q.   I will come back and ask you some questions about the

8    process for filling it out.

9    A.   Got it.

10   Q.   Just for the moment, just with respect to this question,

11   tell me your thought process.

12   A.   At this point I was super distracted because I was sat

13   right in front of the table, literally within four feet of that

14   table where everybody was dropping off their questionnaires.

15   People were asking questions, there was papers being ripped off

16   the questionnaire packets, and there's a lot of talking going

17   on, and it's super distracting.  I'm like:  I want to finish.

18   So I just start going through and marking the questions as I'm

19   like:  Okay, okay.  I didn't spend a whole lot of time thinking

20   about it.

21   Q.   As you sit here now, what's the answer to question 49?

22   A.   It would have been -- it would have been yes, that a

23   stepbrother was accused -- a stepbrother and his friend was

24   accused of sexual abuse.

25   Q.   Okay.  So a moment ago you said the answer would have been

M38TMAX1

1   no because you didn't consider them family.

2   A.  Family, yeah.

3   Q.  But now you say yes because it would have been a

4   stepbrother.  Explain.

5   A.  Because by law, by marriage, that person was my

6   stepbrother.  So when you read the question that way and it

7   says has a friend or family member ever been accused, then the

8   correct answer would have been yes, a friend or family member.

9   Q.  Okay.  And so the same response then for 48A is what you

10  would have given for 49B?

11  A.  Yes, your Honor.

12  Q.  And 49B, if your answer to 49 was yes, do you believe this

13  would affect your ability to serve fairly and impartially as a

14  juror in this case?

15  A.  In no case.  It would not affect me.

16  Q.  In responding a moment ago you said you never thought you

17  would be chosen as a juror in this case.  Why is that?

18  A.  Only because the sheer volume of people that were there.

19  It was insane, the amount of people.  So I just never

20  thought -- number one, I didn't know what it was when I went

21  into it, and then when they played the video of you, I just

22  thought that the likelihood of being chosen, surely they will

23  be interviewing thousands of people.  And they ultimately

24  choose twelve people to sit on a jury, and I never thought I

25  would be one of those twelve.

M38TMAX1

1  Q.  Did you hope that you would be?

2  A.  I did not hope to be on this jury.  But again, like if

3  you're going to serve jury duty, it might as well as be

4  something that's interesting, but I did not set out in order to

5  get on this jury.

6  Q.  Let me ask you to return to question 48A, page 24.  You

7  spoke to this a little bit but I want to make sure I understand

8  the answer.  You indicated that when you checked no, that was

9  an inaccurate answer.  Why did you check no?

10 A.  I didn't see the part where it says self, I just -- I

11 completely skimmed way too fast.  I was distracted by all the

12 noise going on around me.  And again, like I said, I just

13 wanted to get done with this.  It had been a long process, I

14 had been sitting for hours, there were audiovisual problems

15 getting your video to play, so we literally sat there for three

16 hours.  I didn't have a phone, I didn't have a book, I was

17 sitting there twiddling my thumbs thinking about the break up

18 that just happened a few weeks prior and sitting in my feelings

19 and not very focused.

20 Q.  So tell me what you understood the question to be asking.

21 A.  I thought it was asking about family or a friend.

22 Q.  And the box that says yes for self?

23 A.  Right, I just missed it.  Inadvertent mistake.  This was

24 one of the biggest mistakes I have ever made in my life, and if

25 I could go back and change everything and have slowed down and

M38TMAX1

1    actually taken the time to read this appropriately, I would in

2    a heartbeat.

3    Q.   There are other questions on the questionnaire that are

4    structured with similar yes self, yes friend or family, or no.

5    Do you recall seeing those questions?

6    A.   Only after I have reread this do I recall that.

7    Q.   So on none of the questions that included yes, parenthesis

8    self, yes friend or family member, or no --

9    A.   I did not pick up on that when I was filling this out.

10    Q.   Okay.  When did you first learn that an answer to the

11    questionnaire was inaccurate?

12    A.   When an article had come out about the article that I had

13    given to Lucia through The Independent.

14    Q.   So you learned of an inaccurate answer in an article about

15    an interview?

16    A.   Yes.

17    Q.   And what about during the interview?

18    A.   During the interview, no.

19    Q.   When did you first learn that the questionnaire may contain

20    a question that asked about sexual abuse history?

21    A.   That was during my Daily Mail interview with the reporter

22    Laura Collins.

23    Q.   So we're talking about your response to 48 which you have

24    indicated was inaccurate.  Did you in any way intentionally

25    provide an inaccurate answer to this question?

M38TMAX1

1   A.  Absolutely not.

2   Q.  In responding to this question, did you answer no so as to

3   make it more likely that you would be selected for the jury?

4   A.  Absolutely not, your Honor.

5   Q.  Did your history of sexual abuse motivate you in any way to

6   try to tailor your answers to make it more likely that you

7   would be selected for this jury?

8   A.  Not at all, your Honor.

9   Q.  At the time you filled out the questionnaire on November 4,

10  did it occur to you that you might personally benefit in any

11  way from being on the jury in this case?

12  A.  Not at all, your Honor.

13  Q.  I'm going to return to question 25 again, which you have

14  indicated was inaccurately responded to, and again you've

15  discussed this, but I want to just hear directly in response to

16  this question, why did you check no?

17  A.  Well, again, I wasn't thinking about abuse.  I don't really

18  think about my abuse really much anymore because it doesn't

19  define me, it doesn't make me who I am today.  It's something

20  that happened, it's an experience that I lived through, and I

21  have become the person I am today because of my goals and

22  ambitions.  And I do not feel that I am a victim of a crime,

23  even though looking back on this abuse, that does make me a

24  victim of a crime, which is why I should have marked yes for

25  self.

M38TMAX1

1   Q.  In any way did you intentionally provide an inaccurate

2   answer to this question?

3   A.  Absolutely not, your Honor.

4   Q.  In responding to the question, did you answer no so as to

5   make it more likely that you would be selected for the jury?

6   A.  No, your Honor.

7   Q.  Did your history of sexual abuse motivate you, again, to

8   try to tailor this answer to make it more likely that you would

9   be selected for the jury?

10  A.  No, your Honor, I wasn't even thinking about that.

11  Q.  I am going to return to the topic of the process for

12  filling out the questionnaire, and you have spoken to that some

13  and I will give you as much space as you want to respond.  Just

14  by background, you were summoned to appear for jury duty on the

15  morning of November 4, is that correct?

16  A.  Yes, your Honor.

17  Q.  And when did you learn you would be filling out a

18  questionnaire?

19  A.  When we got to the courtroom.

20  Q.  When did you learn the case for which you were being

21  considered as a juror?

22  A.  Three hours after sitting in that chair.

23  Q.  And how long did it take you to fill out the questionnaire?

24  A.  It's a great question.  I don't recall how long it took,

25  but I want to say we were done by around noon or a little after

M38TMAX1

1    noon.

2    Q.   Were you rushed in any way?

3    A.   I felt rushed only because of all the commotion going on in

4    front of me and everybody else just going by on both sides.

5    Q.   And how did that make you feel rushed?

6    A.   It made me -- growing up in school I never wanted to be the

7    last one finished.  You want to finish your test and go hang

8    out with your friends.  So it's kinds of that same policy, I

9    just wanted -- everyone else is finishing and I'm like:  Why am

10   I still reading this?  I'm like:  I'm never going to get

11   chosen, let's get this done with.

12   Q.   Would you say you approached the filling out of the

13   questionnaire with diligence?

14   A.   Looking back on it now, no, your Honor.

15   Q.   Were you concerned with following my instructions?

16   A.   Absolutely not.

17   Q.   You were not concerned with following my instructions?

18   A.   No, I really -- this is a terrible excuse, but I didn't

19   really think I would be chosen.

20   Q.   Some of the questions required follow up depending on

21   whether a yes or no answer was provided.  Do you recall that?

22   A.   Yes, your Honor.

23   Q.   And we'll take a quick look at two examples, question 9 on

24   page 8, question 9 and 9A and question 10 and 10A.

25              Question 9 asked whether your beliefs would make you

M38TMAX1

1    unable to render a verdict.  You checked no.  9A said:  If yes,

2    please explain.  You left that blank.  So that question, if a

3    yes response called for explanation, you didn't provide an

4    explanation because you checked no.

5           The next question 10 asked about principles of law and

6    whether you would accept them if selected to serve on the jury,

7    and you said yes.  10A said:  If no, please explain.  And you

8    followed that instruction and didn't provide an explanation

9    because you had said yes.

10          You recall there were a number of questions that

11   sometimes called for explanation and sometimes didn't?

12   A.  Yes, your Honor.

13   Q.  So how did you know whether to include follow-up answers?

14   A.  So these questions are in the beginning where I had more

15   focus than I did at the end and less distractions, so it was

16   easier to follow along, like these are the first few questions.

17   It is a pretty thick packet, there's a binder of questions, so

18   at this point I was still, I guess, in focus and in the zone

19   and knew how to respond to these questions I guess accurately

20   at this part.

21   Q.  Actually throughout the questionnaire you appeared to have

22   followed the instructions with respect to follow-up questions.

23   A.  Right.

24   Q.  I reviewed a lot of questionnaires.  Some people would

25   provide follow-up when it wasn't called for or not provide

M38TMAX1

follow-up when it was called for.  Your questionnaire seems to
follow the instructions throughout.  It appears generally that
you read and followed the instructions within each question.
So how do you reconcile that with what you just testified to
that you were distracted, raced through?

A.   Pretty simply, because you see your answer, you mark a no,
then the next question says "if yes."  Well, I marked no, so
skip, go to the next question.  So that's what I'm talking
about when I flew through, I skimmed, I didn't read everything.
So if I had just marked no and it says "if yes," immediately
move on.

Q.   Just to return to 48 now, sorry to go back, first you told
me it was a good question, how long it took you to fill it out,
and then you said you couldn't remember.  I want to go back.  I
think you said you were finished by noon.  Do you remember what
time you started the questionnaire?

A.   It had to be around 11-something.  Again, I don't know,
I --

Q.   I'm not sure that clock works.

A.   Yeah, I don't remember seeing -- obviously that clock is in
the back and I was facing the front of the courtroom that we
were in, so I wouldn't have even seen that clock.  But I feel
like the room we were in was much larger than this one, and I
don't know what time I started.  It definitely felt like we
were there for hours before even seeing your video and then

M38TMAX1

1   given the questionnaire.

2   Q.  You say, if you had to estimate, an hour to fill out the

3   questionnaire?

4   A.  Maybe.  I think that would be accurate.

5   Q.  And to return to 48, so you just said it was pretty easy

6   to, if yes, explain, if no, explain, so you skimmed through

7   that.  Looking again at 48, which has sort of a lot of white

8   space for the answer there, do you see that?

9   A.  Yes, your Honor.

10  Q.  And again, this is how many of the questions were

11  structured:  Check box yes self, yes friend or family, or no.

12          Tell me again your thought process and how you

13  understood the yes self, and yes friend or family.

14  A.  I just read the friend or family, again, like distracted,

15  so I missed that "have you," and then "yes self" while reading

16  this question.

17  Q.  At the time you were filling this out, were you surprised

18  the questionnaire asked about friend and family but not about

19  you?

20  A.  I didn't honestly think about it.

21  Q.  At the time you filled out the questionnaire, did you think

22  that your history of sexual abuse would be something that the

23  parties and I would want to know in order to determine if you

24  could be fair and impartial?

25  A.  Looking back thinking now, yes, that's a question that

M38TMAX1

1    would have been asked, but I honestly didn't think about it.  I

2    really don't think about my sexual abuse, period.  I don't tell

3    very many people.

4    Q.  After the trial you gave interviews in which you did tell

5    people about your history of sexual abuse.

6    A.  Yes.

7    Q.  How do you reconcile what you just said with that?

8    A.  So I didn't -- this is going back to a deliberation thing,

9    so I have to think about how to say this.

10   Q.  Well, I don't want you to talk about deliberations.

11   A.  Right.

12   Q.  If you can, you just said you don't talk about it, but --

13   A.  I didn't talk about my abuse, I only said that -- I only

14   used it in order to talk to a reporter about jury

15   deliberations, I didn't use it in order to insert anything.  I

16   just gave that as to why I believe a certain way based on all

17   the evidence that was provided during the trial.

18   Q.  I suppose that the question is:  You were prepared for the

19   public and you knew the public paid a lot of attention to this

20   case, you were giving national and international media

21   interviews, you were prepared for your history of sexual abuse

22   to be widely known.

23   A.  Right, but not something -- I didn't think this would

24   happen, like I didn't lie in order to get on this jury and then

25   go to the press and tell them about my abuse.  It just -- it's

M38TMAX1

1    a little illogical thinking about it, like if I lied

2    deliberately I wouldn't have told a soul.  I certainly wouldn't

3    have put myself in a position to where I could -- this position

4    that I'm in now, potentially any sort of criminal charges, I

5    just wouldn't have done it.  It was an honest mistake and one

6    of the biggest mistakes, and again, I apologize for wasting a

7    lot of people's time and money, and this is never anything that

8    I intended or did on purpose.

9    Q.  I understand your point, I still want to just make sure I

10   understand as someone who is filling out the questionnaire and

11   sort of walking through life and doesn't think about the

12   history of sexual abuse and talk about it, at the same time you

13   were prepared for the world to know about it.  Tell me how to

14   make sense of that.

15   A.  It was only how I view things and how I can recall

16   memories, that's it.  I didn't talk about my abuse, I just said

17   I can remember things and recall things, like the color of the

18   wall or --

19   Q.  Did you think about the fact that many people would learn

20   from your interview that you had this history of sexual abuse?

21   A.  No, I did not.

22   Q.  You didn't think about that?

23   A.  No, I did not think that anybody -- certainly my family or

24   friends would find this out.

25   Q.  Friends weren't following the news of the case after you

M38TMAX1

1    indicated you had been a juror on it?

2    A.  I don't know if they were following the news of the case,

3    but I have had some conversations about it with my friends

4    afterward, but most people don't even know.  It's not like -- I

5    didn't know much about it either.  Sexual abuse isn't a topic

6    that I really want to research or learn about or watch about

7    frequently.

8    Q.  You did understand from your interviews that the fact that

9    you were abused would be a known fact in the world.

10   A.  Yes, your Honor.

11   Q.  And did you make a conscious decision that you were okay

12   with that?

13   A.  Yes, your Honor.  After sitting on this trial for several

14   weeks and seeing the victims be brave enough to give their

15   story, I felt like if they can do it, then so can I.  I didn't

16   have to divulge any of the details that happened to me, I

17   focused on the memory aspect.

18   Q.  Okay.  What I'm going to do now is I'm going to take us

19   back in time to not November 4 but November 16, 2021.  That's

20   when I questioned you individually in that process that I

21   suspect now you know is called voir dire.  You recall that

22   process?

23   A.  Yes, your Honor.

24   Q.  At that time I asked you some follow-up questions based on

25   your responses to the questionnaire and some additional

1   questions.  Do you recall that?

2   A.  Yes, your Honor.

3   Q.  So if you had filled out your questionnaire accurately as

4   to 48 and 25 and 49, I would have asked additional questions

5   that day.  So what I'm going to do is ask you those questions

6   now.

7   A.  Okay.

8   Q.  And I need you to answer honestly as to how you would have

9   answered on November 16 if you had answered the questions 25,

10  48 and 49 accurately.  Do you understand that?

11  A.  Yes, your Honor.

12  Q.  And again, I'm not asking for your thought process during

13  deliberations or anything about jury deliberations, I'm asking

14  you to go back to that time and if you had answered these

15  questions accurately, how would you have responded to my follow

16  ups.  Okay?

17          So at the time I asked you questions on November 16,

18  and if you had answered the questions accurately, did you

19  believe there was anything about your prior experience with

20  sexual abuse that would affect your ability to be a fair and

21  impartial juror?

22  A.  No, it would not affect me in any way.

23  Q.  At the time I asked you the questions, if you had answered

24  the questions accurately, did you believe there was anything

25  about your experience with sexual abuse that would have

M38TMAX1

1    affected your ability to render a verdict based solely on the

2    evidence presented at trial and my instructions as to the law?

3    A.  Yeah.  No, your Honor, I would be able to review the

4    evidence based solely on the evidence.

5    Q.  Okay.  At the time I asked you questions, and if you

6    answered accurately, did you believe there's anything about

7    your experience with prior sexual abuse that would interfere

8    with your ability to assess the credibility of witnesses

9    alleging sexual abuse?

10   A.  Absolutely in no way.

11   Q.  So at the time did you believe that you would be able to

12   conclude that a witness alleging sexual abuse was not

13   testifying truthfully if that was what the evidence suggested?

14   A.  Correct, your Honor, yes, I did.

15   Q.  At the time I asked you questions on November 16, did you

16   harbor any bias against Ms. Maxwell?

17   A.  Not at all.

18   Q.  At the time I asked you questions on November 16, were with

19   you biased in favor of the government or the prosecution?

20   A.  Not at all, your Honor.

21   Q.  Did you want to put your thumb on the scale in any

22   direction?

23   A.  No.

24   Q.  At the time I asked you questions, and in light of your

25   experience with sexual abuse, did you believe that the subject

M38TMAX1

1    matter of the case would upset you in such a way that would

2    distract you from your duty as a juror?

3    A.  No, your Honor.

4    Q.  Would you be thinking about your own experience in a way

5    that would prevent you from being fair or impartial?

6    A.  No, your Honor.

7    Q.  At the time I asked you questions on November 16, and in

8    light of your experience with sexual abuse, did you believe

9    that issues of reporting or not reporting sexual abuse that

10   might be discussed at trial would interfere with your ability

11   to be fair or impartial as a juror in the case?

12   A.  No, your Honor.

13   Q.  At the time I asked you questions on November 16, and if

14   you had answered accurately and based on your experience with

15   sexual abuse, did you have any doubt as to your ability to be

16   fair to both sides?

17   A.  No, your Honor, no doubt.

18          THE COURT:  All right.  I will meet with counsel at

19   sidebar.

20          (At sidebar)

21          THE COURT:  I will give you an opportunity to propose

22   follow-up questions in light of his responses to questions of

23   counsel.

24          MS. MOE:  Yes, your Honor, just one proposal.  I

25   believe the Court asked Juror 50 about the way in which he

M38TMAX1

1   approached the questionnaire process, whether he took the

2   Court's instructions seriously.  We would just propose asking

3   parallel questions about the questions he was asked in person,

4   in particular because the juror was asked during voir dire

5   similar questions about questions of bias for or against the

6   government, impartiality.  And so to clarify the record,

7   whether he took answering those questions in person seriously

8   and answered truthfully.

9             MS. STERNHEIM:  Could we have a moment?

10            THE COURT:  You may.

11            (Pause)

12            MR. EVERDELL:  Your Honor, I think there was several

13   areas of follow-up here that are warranted.

14            First, the juror made some reference to his healing

15   process.  I couldn't quite understand what he said at the time,

16   something about how he views himself as a victim or not as a

17   victim of a crime.  I think we need to understand his healing

18   process and what he has gone through, because that affects his

19   ability to be an impartial juror in a case involving sexual

20   abuse.  Is this something that he still is seeking treatment

21   for?  Is this something he is still thinking?  How he deals

22   with the healing process and how he thinks about himself as a

23   victim affects how he views the victim witnesses in this case,

24   and I think there ought to be more questions about that.

25            THE COURT:  What's the proposed question?

1          MR. EVERDELL:  What was -- we gave a number of those

2     in our submissions, but:  You talked publicly about the fact

3     that you were in therapy, what was the nature of the therapy?

4     Does it deal with your experiences as victim of sexual abuse?

5     What was the healing process that you talked about?  Describe

6     this healing process for me.  Does it involve addressing this

7     issue of prior child sexual abuse?  Were you in therapy during

8     the trial?  Is this an issue that you are still dealing with?

9          THE COURT:  I did review those questions proposed and

10    I considered them.  The defense did not propose any comparable

11    questions for jurors during the voir dire process who indicated

12    yes to this question and indicated a history of sexual abuse,

13    so those requests are denied.

14          Any other follow-up requests?

15          MR. EVERDELL:  Your Honor, I think we need to talk

16    further about the nature of abuse.  We talked about the fact

17    this was repeated, happened multiple times.  This happened with

18    more than one person, a stepbrother and a friend.  I think we

19    need to understand because -- I'm not trying to pry, your

20    Honor, I'm not trying to get into these gory details, but it is

21    relevant, the extent of the similarities of this juror's abuse

22    and whether that lines up with the testimony we heard from the

23    victims is relevant in an inquiry to bias.

24          And I think we need to understand a little more about

25    similar questions that we asked -- we proposed to the Court in

M38TMAX1

1     our follow up:  How long did this go on?  When did it stop?

2     Were you home when this happened?  What was the interaction

3     between you and the abusers and family members?  These are all

4     things that go to the similarity.

5            THE COURT:  I have the same response.  I considered

6     those questions.  We had, I think it was Juror 21 who had

7     talked about familial abuse.  The defense didn't propose any

8     comparable follow-up questions.  The questions went to the core

9     questions of impartiality and fairness.  The defense didn't

10    request those questions and they didn't move to strike for

11    cause.  Here, there's dissimilarity of age; for example,

12    younger than some of the proposed jurors, some of the

13    inquired-into jurors who indicated yes, the defense didn't

14    request follow up as to the specific similarities and the like,

15    and I don't think I would have asked them because the bottom

16    line questions are what is in issue.  So that request is

17    denied.

18            Any other proposed follow up?

19            MR. EVERDELL:  Yes, I have a few more.

20            MS. STERNHEIM:  Judge, you have asked certain things

21    about the questionnaire, but I do not believe that you asked

22    about the summary of the case which specifically says what this

23    case is about, it is about sexual abuse of a minor, and did he

24    just fly through that as well?

25            It is clear that this juror has supplemented --

M38TMAX1

 1          THE COURT:  Make your arguments in briefing

 2     afterwards, if you're doing that.  I want specific proposed

 3     questions in light of responses.

 4          MS. STERNHEIM:  I know your Honor did not want to get

 5     into what happened in the jury room, but a couple of --

 6          THE COURT:  I'm not permitted to get into that.

 7          MS. STERNHEIM:  You are permitted to discuss what he

 8     stated publicly, and publicly he said that he --

 9          THE COURT:  You misunderstand the law, or I do, but I

10     have written an analysis of that issue in my opinion.  That he

11     revealed what happened in jury deliberations does not allow me

12     to accept, as part of this hearing, evidence of what he said in

13     jury deliberations.  You may disagree with that legal analysis.

14     I have written extensively about it in my February 24 opinion.

15     I won't relitigate that now.

16          MS. STERNHEIM:  He did not tell very many people about

17     it, then he told the world.

18          THE COURT:  Right.  I pressed repeatedly on that

19     issue.  If you have a specific follow up that you would like me

20     to ask --

21          MR. EVERDELL:  I do have some follow up.  He said he

22     didn't tell many people, but he also said he didn't think

23     people would learn about his history of sexual abuse, despite

24     the fact that he was telling reporters about that.  We need to

25     ask him, I think, about his post to Annie Farmer where he says:

M38TMAX1

Thanks for telling my story.  So if he says:  I didn't expect
the world to hear about my sexual abuse, yet at the same time
he's telling Annie Farmer, one of the victims in this case,
post-trial, "Thanks for telling my story," that suggests to me
that he wanted to be known as the victim of sexual abuse, he
wanted to be seen as a champion of sexual abuse, and that this
explanation that he is giving is simply false.

            There's also the Facebook post that he made after the
fact --

            THE COURT:  Just a moment.  I will ask him to explain,
to reconcile that if he can, that he said he didn't think
people would know about it with the fact that he went on social
media and thanked one of the witnesses in the case.  I will ask
about that.

            MR. EVERDELL:  Your Honor, he said this is a verdict
for all of the victims, which I think includes himself.  How
does he reconcile that comment with the fact that he didn't
want to share with the world that he himself was a victim of
sexual abuse, meaning:  I'm doing this for the victims of
sexual abuse.  That's clear import of that comment.  I think
that's a conflict.

            There's also his Facebook posts after the fact where
he says:  I can now tell everybody that I was a juror on the
Ghislaine Maxwell trial.  What an incredible, surreal
experience.  Again, telling the world that I'm out here.

M38TMAX1

1          THE COURT:  I will ask the question how does he

2     reconcile the statement that he didn't think anyone would know

3     with the fact that he was posting on social media.

4          MR. EVERDELL:  I think we also need some follow-up

5     questions that we proposed in our letter about his belief about

6     victim memory, because I think that goes to his ability to

7     evaluate the evidence fairly and impartially.

8          THE COURT:  I will deny that.

9          MR. EVERDELL:  I believe also he said in his answers

10    that he didn't hope to be on the jury but if he is going to be

11    on a jury, it might as well be something interesting.  I'm

12    paraphrasing, but that's the import of his comment.  I think we

13    need some follow up about what he meant by that comment.  Why

14    was it that he found this interesting?  Was it some reflection

15    of the fact that it involved victims of sexual abuse, and

16    because he was the victim of sexual abuse himself that made it

17    interesting for him?

18         THE COURT:  I will ask him what he meant.

19         MS. STERNHEIM:  Judge, I may have an issue.  I thought

20    the last question about following your instructions, I think he

21    said no.  And insofar as saying no, how did he not follow your

22    instructions after he filled out the questionnaire?

23         THE COURT:  Okay.  I will ask that question and then I

24    will ask the government's question about whether he followed my

25    instructions during voir dire.

M38TMAX1

1          MS. MOE:  Thank you, your Honor.

2          THE COURT:  And then I will --

3          MR. EVERDELL:  Your Honor, I believe he mentioned

4    something about his interview with the journalist Lucia, first

5    name Lucia, and I was trying to follow his response, but he

6    said something about:  I didn't understand that this was an

7    issue in the questionnaire.  But I believe the reporting is

8    that they discussed this at length, the consequences of him

9    going public and the consequences of the fact that there was a

10   jury questionnaire at issue here and there were answers to

11   those questions that he would be talking about.  I can't

12   remember exactly what it is, but there was some discussion

13   about the consequences of him going forward.  And I believe

14   what he said was:  I didn't have any discussions or any lengthy

15   discussions with the journalists about me coming forward and

16   just answered their questions.  But I believe there was a

17   discussion with Lucia about the consequences, about whether he

18   wants to do this, about -- I don't remember now --

19         THE COURT:  I don't understand what you're referring

20   to.

21         MR. EVERDELL:  I think the issue is he was saying how

22   he didn't expect to be public, he didn't expect to be known

23   worldwide as a victim of sexual abuse, he didn't expect this

24   come out, even though he's talking to journalists.  My

25   understanding is he had a discussion with Lucia, the journalist

M38TMAX1

1    from The Independent, about the consequences of him coming

2    forward, which is:  This is a momentous decision you're making.

3         So I don't see how he squares his comments about I

4    never thought by talking to the press that I would come forward

5    and be known this way, when in fact I think there was a lengthy

6    discussion he had with a journalist about this very fact.

7         THE COURT:  He said that he recognized by talking to

8    the press about it that it would be known publicly.

9         MR. EVERDELL:  I think he may have said that, but I

10   think at the same time he's saying I didn't think this would be

11   known by my parents and my friends.  I don't know how you

12   square those responses.  To me -- and I know this was the

13   subject of argument that you don't want to hear at this point,

14   but his responses are simply not credible on this point because

15   he's talking out of both sides of his mouth:  I didn't think I

16   would be known, but yet I did know I would be known.  It makes

17   no sense to me.  I'm curious to hear more about what I perceive

18   as blatant conflict in answers about a discussion with a

19   journalist about the consequences of going forward.

20        THE COURT:  You want me to ask about what he discussed

21   with which journalist?

22        MR. EVERDELL:  Lucia, who I believe is The Independent

23   journalist.  So I would -- I'm sorry it's not coming out very

24   focused, I apologize, but:  You had discussed before in

25   responses to my questions about the fact that you didn't think

M38TMAX1

that talking to a reporter would necessarily make you known to

the world about -- your sexual abuse known to the world.  If

that wasn't something that truly entered your head, isn't it a

fact that you spoke to Lucia, the reporter from The Independent

that you spoke to, about the consequences that you might face

in revealing all this stuff -- we won't get into jury

deliberations -- about what you said to her about your sexual

abuse and other things, there would be well-known consequences

to what you were doing.  How do you square those two thoughts

in your head, which you didn't think it would be public, didn't

think you would be known for this, and the journalist is

telling you that very fact?

MS. MOE:  Your Honor, the government has no objection

to limited follow-up questions about his understanding about

whether it would become public.  I do have concerns about the

proposed question because it's confusing and a little cryptic.

I don't know what the word "consequences" might mean in

response to the question or what that's in particular driving

at.  I think, as the Court noted, he has already sort of

explained his understanding about speaking publicly to a

reporter and whether it would be publicly known that he was the

victim of sexual abuse.

There's also, I think, some tension between the

Court's focused question about whether he understood it would

become public that he was the victim of sexual abuse and

M38TMAX1

further questions about his understanding about sort of the

magnitude of press coverage arising from the issue that gives

rise to this hearing, which I believe he touched on as well.

THE COURT:  I think what I will do is go back and ask:

Did you understand at the time you talked to the press in the

way that you did, did you understand that it would be publicly

known that you were a victim of sexual abuse?  We'll see what

he says.

Did you think about the consequences of talking to the

press about that?  Did you talk to the press, the press

reporter about the consequences?

It's difficult for me to see what it's going at, but I

will seek clarification on his answers, as I did multiple

times, on the reconciling and understanding his thinking about

coming out publicly as a victim of sexual abuse.  He has

explained some of the transformation process and the like.  You

can make your arguments about credibility.  But I will go back

and see if there's something to ask regarding talking to the

reporter about the consequences.  Which also there's a temporal

issue here, he didn't think about it until he talked to the

press, and in the course of that the press talked to him about

the consequences and that changed his understanding

potentially.

MS. MOE:  Yes, your Honor.  And I think yet a third

point, talking about consequences today, I think Juror 50

M38TMAX1

1      rightly understands that question to be referring to whether he

2      would understand he would be sitting in a courtroom like this.

3              THE COURT:  I will go back and try to get an

4      understanding of what he thought would happen when talking to

5      the press regarding his own sexual history regarding it being

6      publicly known that he was someone who suffered from sexual

7      abuse.

8              MS. STERNHEIM:  During the interview he mentioned

9      question 48, and he said:  I recall being asking about friend

10     and family, and she said "it also asked about you," he turned

11     beet red, and she said:  You're turning beet red.  He said:

12     The blood is rushing to my head.

13             THE COURT:  She actually said:  You're not on the

14     stand.  You misquoted it in the papers.

15             MR. EVERDELL:  Not in the sun.

16             THE COURT:  You're not in the sun, she said, you're

17     not on the stand, don't worry, but yes.

18             MS. STERNHEIM:  What was going through his mind when

19     she mentioned that the question included you?

20             THE COURT:  I will ask that.  He talked about the

21     first time he learned that the questionnaire had the question.

22             MS. STERNHEIM:  And last thing is:  What was his

23     motivation in speaking to the press and being interviewed?

24             THE COURT:  Those questions, what motivated him after

25     trial, is not relevant to what was going on during the filling

M38TMAX1

1    out of the questionnaire and responding to the voir dire.  I

2    would ask questions about that, and I have, but what motivated

3    him to talk to the press is not relevant to the inquiry.

4            All right.  Anything else?

5            MS. MOE:  Not from the government, your Honor, thank

6    you.

7            (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M38YMAX2

 1              (In open court)

 2              THE COURT:  All right.  I do have some additional

 3     questions, Juror 50.

 4     BY THE COURT:

 5     Q.  I asked you whether you approached filling out the

 6     questionnaire with diligence.

 7              Can you recall that?

 8     A.  Yes, your Honor.

 9     Q.  And you indicated no and you wish you had and that sort of

10     thing.  And I asked you whether you took my instructions

11     carefully in the questionnaire.

12              Do you remember that?

13     A.  Yes, your Honor.

14     Q.  And your answer is no?  Is that accurate?

15     A.  Yes, your Honor.

16     Q.  And to make sure I understand, why is that?  Why didn't you

17     take my instructions carefully?

18     A.  It was definitely inadvertent.  Again, like I said, I began

19     to float, fly through it, in order to get done.  I was super

20     distracted, and it just -- I don't know what happened.  I just

21     wanted to get done with it.

22     Q.  When you came back on November 16 for the follow-up

23     questions, there was another instruction video.

24              Do you recall that?

25     A.  Yes, your Honor.

M38YMAX2

1    Q.  And when I asked you questions, those one-on-one questions,

2    did you pay attention to the instructions at that time?

3    A.  Yes, your Honor.

4    Q.  Did you listen carefully to my questions?

5    A.  Yes, your Honor.

6    Q.  Do you have any doubt that you answered those questions

7    accurately?

8    A.  I answered every single one of those questions accurately.

9    Q.  Might you have failed to pay attention to the specifics of

10   the questions in any way?

11   A.  Not at all, your Honor.

12   Q.  And how do you know that, given how you approached the

13   questionnaire?

14   A.  Because it was a different situation.  I wasn't distracted.

15   There weren't things going on.  I wasn't sitting there for

16   hours.  It was multiple weeks later.  So, again, I wasn't -- at

17   that point, I wasn't thinking about my ex.

18   Q.  Would you say that you're distracted easily?

19   A.  I think I can become distracted, but it had no effect me

20   serving in the jury, on the jury, and listening to all the

21   evidence given during the trial.

22   Q.  And what was your approach to my instructions at various

23   points?

24   A.  It was to follow them.

25   Q.  When you were testifying earlier -- and I asked you some

M38YMAX2

1  questions about this -- you said that you didn't think that

2  your family or friends would learn that you were a victim of

3  sexual abuse, despite the press interviews.

4          Do I have that right?

5  A.  Yes, your Honor.

6  Q.  And why didn't you think that?

7  A.  Well, I wasn't using my full name.  I'm also not ashamed

8  about it.  It's something that happened, and it's something

9  that is relatively common that happened to multiple people

10  throughout the world.

11  Q.  And we talked about this, but you understood that there was

12  a high level of press and public attention to the case.

13  Correct?

14  A.  Yes, your Honor.

15  Q.  Help me reconcile that you didn't think friends and family

16  would learn about your sexual abuse with the fact that you were

17  speaking publicly about it.

18  A.  The one thing that I can point to is that when my friends

19  commented, texted me -- commented on my post, texted me about

20  it, they didn't even know that this trial was even happening.

21  So I figured a little article about a juror giving their

22  experience wouldn't be record-breaking or really in the news at

23  all.

24  Q.  So you couldn't see how they would find out about it?

25  A.  Yes, your Honor.  That wasn't something that I was

M38YMAX2

1    intentionally planning to hide; right?  So if somebody were to

2    ask me if I was abused, I would say yes.

3    Q.  And otherwise -- well, let me ask you:  You were posting on

4    social media about your role as a juror.

5    A.  After the trial, yes.

6    Q.  So wouldn't your friends and family find out in that

7    regard?

8    A.  It just -- I just said that I had served on the jury.  I

9    didn't say anything about it in it.

10   Q.  There was a communication with one of the witnesses in the

11   case, Annie Farmer, on social media?

12   A.  That's right.

13   Q.  And you thanked her for sharing your story.

14   A.  Yes.

15   Q.  What did you mean by that?

16   A.  She just shared the article, and then I commented on it;

17   that thank you for sharing my story because she said that I was

18   brave enough to come forward, and so I thanked her for sharing

19   hers as well.

20   Q.  So your friends who followed you there would see that.

21   A.  I don't have any followers.  I think I had like two

22   followers, and they were random things.  Twitter is not

23   something I normally use.  So I had just randomly seen that

24   she'd shared that.  So I felt like I wanted to comment.

25   Q.  You testified, when I asked whether you hoped you'd be on

M38YMAX2

1    the jury, and you had said that you didn't think you would.

2    And I asked you why, and I asked you if you hoped you would.

3            And you said, well, I thought it would be interesting.

4    If you were going to serve jury duty, this would be --

5            What did you mean you thought it would be interesting?

6    A.  So not everybody gets called for jury duty.  Some people

7    never get called in their entire lifetime.  I figured if --

8    what I mean by that is this is something interesting.  It's not

9    like -- I don't know.  Maybe a fraud case might be boring.  I

10   don't know.  I just felt like this might be something

11   interesting that keeps my attention.

12   Q.  I asked you when you first learned that the questionnaire

13   included a history-of-sexual-abuse question.

14           Do you remember that?

15   A.  Yes, your Honor.

16   Q.  And you told me during a videoed interview.

17   A.  Yes, your Honor.

18   Q.  Correct.

19           What was your reaction when you learned that the

20   questionnaire contained that question?

21   A.  Well, she asked me.  And I was, like, they don't ask about

22   your own personal abuse because it's what I believed.  It's

23   what I thought.  It's what I read.  I didn't know I had made a

24   huge mistake like that, and that's why I responded that way.

25   Q.  And how did you feel?

M38YMAX2

A.  Well, number one, I was, like, did I just mess something up
entirely?  And I was embarrassed and sort of like shocked and
didn't know that that was the full question.

Q.  I think at one point you said that you sort of didn't
realize the extent to which your interviewing would kind of
reverberate.  I don't mean this process.

     But in terms of the public knowing that you had a
history of sexual abuse, with any of the reporters you spoke
to, did you talk through the consequences?

A.  No, your Honor.

Q.  And, again, I don't mean about this kind of process.  But I
just mean to speak about your history of sexual abuse.

A.  Correct.  No, your Honor.

          THE COURT:  I'll briefly meet with counsel.

          (At the sidebar)

          THE COURT:  I want to make sure that I've accurately
captured the follow-up questions that were requested and give
you a final opportunity if you have any additional questions
for followup.

          MS. POMERANTZ:  Nothing further, your Honor.  Thank
you.

          MS. STERNHEIM:  Judge, I had asked before if the Court
could inquire about the summary of the case.  He said he paid
attention early on.  He specifically said that the case was
about sexual abuse.

M38YMAX2

1            THE COURT:  I don't understand what the question is.

2            MS. STERNHEIM:  Well, you had read that.  So you knew

3    what this case about, and that was in your mind when you were

4    answering the questionnaire.  For him to say that --

5            THE COURT:  I don't want argument.

6            What question do you want me to ask?

7            MS. STERNHEIM:  Did you read the summary of the case

8    and understand that the subject matter of this case --

9            THE COURT:  Well, I won't summarize it.  I'll read the

10   whole thing and ask:  "Did you understand that that was the

11   subject matter of the case?"

12           MS. STERNHEIM:  Yes.

13           MS. POMERANTZ:  No objection, your Honor.  Thank you.

14           (In open court)

15   BY THE COURT:

16   Q.  Returning to the questionnaire, it says, page 4.  It's

17   actually the second page of the questionnaire.  There were

18   documents that you took off when you filled it out.

19           I provided a summary of the case.

20           Do you recall that?

21   A.  Yes, your Honor.

22   Q.  The third paragraph down in that summary reads:  "The

23   charges of the indictment stem from allegations that from at

24   least 1994 through 2004, the defendant conspired with and aided

25   and abetted Jeffrey Epstein to entice minors to travel to

M38YMAX2

1   engage in criminal sexual activity, to transport minors to

2   engage in criminal sexual activity, and to engage in sex

3   trafficking of a minor."

4           And then the next paragraph lays out of the specific

5   counts.

6           Do you recall if you read that summary of the case?

7   A.  Yes, your Honor.  I did.

8   Q.  So what did you understand the case to be about?

9   A.  Just that, just what was written there.

10  Q.  And in reading that, did that cause you to think about your

11  history of sexual abuse?

12  A.  It did not.  Again, it's something that I don't think

13  about.  It happened so long ago.  Again, it's not part of who I

14  am.

15          THE COURT:  All right.  You may step down.

16          (Witness excused)

17          THE COURT:  Counsel, let me ask your proposals as to

18  some briefing, if necessary, post-trial briefing.

19          Government?

20          MS. MOE:  Your Honor, the government would

21  respectfully propose that the parties submit letter briefing

22  promptly following the hearing within the next few days.

23          If I could just have a moment to confer with my

24  colleagues about a specific date.  Our general proposal would

25  be to have a short and tight briefing schedule to resolve the

M38YMAX2

1    issues from the hearing, but if I could just have one moment

2    about a specific date.

3            THE COURT:  Okay.

4            (Government counsel confer off the record)

5            MS. MOE:  Your Honor, the government would propose

6    that we submit our letter briefing by Friday.

7            MS. STERNHEIM:  May I, Judge?

8            THE COURT:  Yes.  I think your response on the other

9    briefing is due on Friday.

10           MS. STERNHEIM:  And I am starting a trial, not that

11   that is going to necessarily prolong our request.  But I would

12   ask for two weeks for us to submit our written submission.

13           MS. MOE:  Your Honor, the government respectfully

14   submits that this issue has been prolonged in litigation.  It

15   has been briefed exhaustively.  The only remaining issues are

16   about Juror 50's testimony today and the inferences to be

17   drawn, which is a very narrow and confined issue which can be

18   resolved quickly and briefed quickly.

19           MS. STERNHEIM:  Your Honor, this is an incredibly

20   important issue.  We are not asking for --

21           THE COURT:  I know it's incredibly important,

22   Ms. Sternheim.  That doesn't alter the fact of what there is to

23   do.  But let me look at the calendar.

24           What date does your trial start, Ms. Sternheim?

25           MS. STERNHEIM:  The 16th.

M38YMAX2

1      THE COURT:  All right.  I think simultaneous briefing

2  is appropriate.  For one, I have responsive briefing on the

3  legal issues, and so really what we're talking about is

4  argument following based on today's record.

5      One week from today, the 15th.  Simultaneous briefing,

6  I don't care if you call it letter briefing or otherwise.  As

7  you know, all I care is that it's double-spaced so I can read

8  it on my iPad.  Fifteen pages max per side.

9      Anything else from the government?

10      MS. POMERANTZ:  No, your Honor.  Thank you.

11      MS. STERNHEIM:  Your Honor, I would just request that

12  our submission of questions which was sent to chambers be made

13  a part of this record.

14      THE COURT:  Yes.  As I've said, I will docket

15  everything.  There's identifying information of Juror 50 in

16  your submitted questions.  So that needs to be redacted.

17      But other than Juror 50 identifying information, the

18  redactions for all materials, I believe, for all materials

19  based on the post-trial briefing and the submitted questions

20  can be publicly docketed.

21      Is that correct?  As well as my opinion had two lines

22  of redactions.  So I'll docket my opinion without redactions.

23  I'll ask the parties to -- actually, I think we can handle the

24  submitted questions, the redactions for identifying

25  information.

M38YMAX2

1          The parties' briefing, I'll ask you to submit the

2    briefs with redactions only for protecting juror privacy and

3    juror identity.

4          Any reason not to do that by tomorrow?

5          MS. MOE:  Yes, your Honor.

6          THE COURT:  By tomorrow?

7          MS. STERNHEIM:  Yes.

8          THE COURT:  Thank you.

9          So that will put everything on the record.  As for

10   today's hearing, the only thing that's redacted is Juror 50's

11   name.  And that's redacted on the immunity materials, as well

12   as Mr. Spodek's letter just indicated "Juror 50."

13         Anything further, Ms. Sternheim?

14         MS. STERNHEIM:  Not at this time.

15         THE COURT:  Ms. Moe?

16         MS. MOE:  No, your Honor.  Thank you.

17         THE COURT:  All right.  We're adjourned.

18         (Adjourned)

19

20

21

22

23

24

25