UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/1/22

United States of America,

—v—

Ghislaine Maxwell,

Defendant.

20-CR-330 (AJN)

OPINION & ORDER

ALISON J. NATHAN, Circuit Judge, sitting by designation:

Central to our system of justice is a defendant's right to have guilt adjudged by a lay jury of one's peers. Citizens give their time and attention to this critical role in the administration of justice, a role which is enshrined in our Constitution. Judicial officers are charged with the implementation of this constitutional right. In all cases, whether of high profile or low, trial courts must ensure that only jurors who can fairly and impartially assess the evidence are seated on the jury. And once seated, the jury must be permitted to deliberate fully and frankly in an effort to reach a unanimous verdict. Trials entail significant investments of public and private resources. *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 555 (1984). For all of these reasons, a verdict may be set aside only in the most extraordinary of circumstances.

Before the Court is the Defendant's motion for a new trial pursuant to Federal Rule of Criminal Procedure 33 on the basis that a juror provided inaccurate information during jury selection. Maxwell contends the juror's presence on the jury violated her Sixth Amendment right to an impartial jury. Bearing these principles in mind, the Court conducted an uncommon post-trial hearing. Although uncommon, the hearing was necessary because of incontrovertible evidence that Juror 50 failed to respond accurately during the jury selection process to a question on a written questionnaire about his history of sexual abuse. At the hearing, the Court

questioned the juror under oath and under the penalty of perjury.  The Court inquired about whether his answers were false, his explanation for giving those answers, and how he would have responded to follow-up questions if accurate answers had been provided at the time of jury selection.  This inquiry was limited by Federal Rule of Evidence 606, which prohibits a juror from testifying about the content of deliberations or his mental processes in evaluating the evidence at trial.  The rule embodies long-accepted federal law and is an important safeguard of the integrity of the jury trial system.  The hearing was further limited by Supreme Court and Second Circuit law that permits inquiry only if there is clear and incontrovertible evidence of potential misconduct by the juror.

Based on the hearing record, the questions before the Court are whether Juror 50 failed to answer honestly a material question during jury selection, and whether, if he had provided a correct response, the Court would have struck him "for cause" because he was biased. Controlling law is clear that the question is not whether the Defendant would have chosen to exercise one of her discretionary peremptory strikes against this juror had he accurately disclosed his prior sexual abuse.  It is only whether the Court would have struck him for cause due to actual, implied, or inferred bias.  *See McDonough Power Equip., Inc.*, 464 U.S. at 555–56.  The limits on the nature of the post-trial inquiry serve the important interest in the finality of judgments.

The Court concludes that the Defendant has failed to satisfy the demanding requirements of the controlling Supreme Court decision, *McDonough v. Greenwood*.  The Court finds Juror 50 testified credibly at the hearing.  There are many reasons for that finding.   He appeared to testify frankly and honestly, even when the answers he gave were the cause of personal embarrassment and regret.  His incentive at the hearing was to testify truthfully or face criminal perjury charges.

His tone, demeanor, and responsiveness gave no indication of false testimony.  The Court thus credits his testimony that he was distracted as he filled out the questionnaire and "skimmed way too fast," leading him to misunderstand some of the questions.  Assuming mistakenly that he would not be one of the twelve jurors selected from the hundreds of prospective jurors who had been summoned, he rushed through the questionnaire.  This led to inaccurate answers.  Juror 50's lack of attention and care in responding accurately to every question on the questionnaire is regrettable, but the Court is confident that the failure to disclose was not deliberate.

The Court further finds that Juror 50 was not biased and would not have been stricken for cause even if he had answered each question on the questionnaire accurately.  At the hearing, the Court asked Juror 50 the same set of questions that it asked of all prospective jurors who had indicated prior experience with sexual abuse on the questionnaire.  These questions are typical of how trial court judges seek to assess potential bias and determine—based on the juror's responses—whether the juror should be struck for cause.  This is so because the key question is not simply whether an individual has had experiences similar to the issues that will be explored at trial, but whether the individual can serve fairly and impartially.

This Court has presided over a murder trial in which a juror who had a family member murdered was not struck for cause.  So too victims of fraud serve faithfully in fraud trials and individuals who have been discriminated against serve fairly in discrimination cases.  And survivors of rape have and can serve impartially in trials charging the crime of rape.  In this case, Juror 50's responses at the hearing to the questions regarding his ability to be a fair and impartial juror, even in light of his past experience of sexual abuse, established that he too could serve fairly and impartially.  Thus, this Court would not have struck Juror 50 for cause if he had provided accurate responses to the questionnaire.

The Defendant's motion for a new trial pursuant to Rule 33 is therefore DENIED.

## I.   BACKGROUND

### A.  Jury Selection Process

The jury selection process in this case was designed to screen a sufficient number of prospective jurors for the high-profile trial while also complying with the Southern District of New York's COVID-19 protocols and protecting the health and safety of prospective jurors, court staff, and case participants during the unprecedented pandemic. Selection proceeded in three stages: a written pre-screen questionnaire, one-on-one oral *voir dire*, and, finally, the exercise of peremptory strikes.  The Court developed the questionnaire and *voir dire* with input from the parties.  *See* Dkt. No. 367; *see also* Oct. 21, 2021 Tr., Dkt. No. 459.  The questionnaire was designed to pre-screen for "the major for-cause strike issues in the case"—that is, "the trial's length and schedule, a juror's personal knowledge of the parties, [the] extent of a juror's awareness of publicity about the case and the defendant, and any bias due to publicity or as a result of the nature of the charges."  Oct. 21, 2021 Tr. at 5.  In-person *voir dire* would then focus on appropriate follow-up questions based on questionnaire responses, additional questions more appropriately asked orally, and background information to aid the parties' exercise of informed peremptory challenges.  *Id.* at 7.

When prospective jurors arrived to complete the questionnaire, and when they returned for *voir dire*, they watched videotaped instructions from this Court.  The Court prepared those instructions with the parties' input.  Dkt. Nos. 366, 404, 427.  These instructions briefly explained the jury selection process, explained the nature of the charges (using the same language that the parties proposed for the jury questionnaire), and instructed jurors not to discuss the case or consume any media about the case.

The final questionnaire contained 51 questions, although multiple questions required follow-up responses for certain answers.  Dkt. No. 462.  Questions 25, 48, and 49 asked about a prospective juror's experience with crime and sexual abuse, harassment, and assault.

Question 25 asked: "Have you, or any of your relatives or close friends, ever been a victim of a crime?," and provided three answer options in the following order: "Yes (self)," "Yes (friend or family member)," and "No."  *Id.* at 13.  Question 25a then asked: "If yes, is there anything about that experience that would prevent you from acting as a fair and impartial juror in this case?," and provided two answer options: "Yes" and "No."  Finally, Question 25b asked: "If yes to 25a, please explain."  Several lines were then provided for the prospective juror to explain their answer.  *Id*.

Question 48 asked:

Have you or a friend or family member ever been the victim of sexual harassment, sexual abuse, or sexual assault?  (This includes actual or attempted sexual assault or other unwanted sexual advance, including by a stranger, acquaintance, supervisor, teacher, or family member).

*Id.* at 24.  Like Question 25, there were three answer options in the following order: "Yes (self)," "Yes (friend or family member)," and "No."  Question 48a next asked: "If yes, <u>without listing names</u>, please explain."  Space was provided to write an answer.  Question 48b asked: "If your answer to 48 was yes, do you believe that this would affect your ability to serve fairly and impartially as a juror in this case?"  There were two answer choices: "Yes" and "No."  Finally, Question 48c asked: "If yes to 48b, please explain."  Like Question 48a, several lines of space were provided to answer the question.  *Id.*

Finally, Question 49 asked:

Have you or a friend or family member ever been accused of sexual harassment, sexual abuse, or sexual assault?  (This includes both formal accusations in a court of law or informal accusations in a social or work setting of actual or attempted sexual assault or

other unwanted sexual advance, including by a stranger, acquaintance, supervisor, teacher, or family member.).

*Id.* at 25.  Like Questions 25 and 48, there were three answer options in the following order: "Yes (self)," "Yes (friend or family member)," and "No."  The follow-up questions to Question 49 followed the same structure as the follow-up questions to Question 48.  Question 49a asked: "If yes, <u>without listing names</u>, please explain."  Question 49b asked: "If your answer to 49 was yes, do you believe that this would affect your ability to serve fairly and impartially as a juror in this case?" and had checkboxes for "Yes" and "No."  Finally, Question 49c asked: "If yes to 49b, please explain."  *Id.*  The Court developed Questions 48 and 49 in response to requests from both sides that the Court inquire into a prospective juror's experience with sexual abuse and assault. *See* Dkt. No. 367 at 21, 24.  The Defendant also sought questions about experience with sexual harassment.  *See id.* at 22.  Rather than ask several separate questions, the Court adopted a compromise of two sufficiently broad questions so as not to unduly lengthen the questionnaire.

During five sessions held over three days on November 4, 5, and 12, 2021, 694 prospective jurors completed the questionnaire.  *See* Nov. 15, 2021 Tr. at 2, Dkt. No. 529. Counsel reviewed the completed questionnaires and jointly submitted four lists to the Court: (1) prospective jurors that both sides agreed should proceed to *voir dire*; (2) prospective jurors that both sides agreed should be excused or struck for cause; (3) prospective jurors that the Defendant but not the Government believed should be excused; and (4) prospective jurors that the Government but not the Defendant believed should be excused.  *Id.* at 2–3.  Because the parties agreed on a sufficient number of prospective jurors to proceed to *voir dire*, the Court did not resolve any disputes from lists 3 and 4, and those prospective jurors were excused by consent. *Id.* at 2–5.

As a result of this process, 231 prospective jurors were selected to return for in-person questioning for *voir dire*. *Id*. at 4. At this second stage of selection, the Court questioned prospective jurors one-on-one due to "Covid-related space limitations, to streamline the process in light of a likelihood of a high number of sidebars which would otherwise be required, and to ensure that the comments of one juror [did] not infect the pool." *Id*. at 8. If a prospective juror was not struck for cause, the Court instructed the now-qualified juror to return on the morning of November 29, 2021, for the parties' exercise of peremptory strikes.

### B. *Juror 50's jury selection process*

Juror 50 completed the questionnaire on the morning of November 4, 2021—the first questionnaire session. Mar. 8, 2022 Hearing Tr. at 7. In his questionnaire, Juror 50 checked "No" for Question 25. Hearing Exhibit 1 at 13, Dkt. No. 638 (hereinafter "Questionnaire"). He left Questions 25a and 25b blank. For Question 48, he checked the box "No." *Id*. at 24. He left Questions 48a, 48b, and 48c blank. Finally, Juror 50 checked "No" for Question 49. *Id*. at 25. He left Questions 49a, 49b, and 49c blank.

Juror 50 was among the prospective jurors the parties agreed should proceed to *voir dire*. He returned for in-person questioning on November 16, 2021. Consistent with other prospective jurors who had answered "No" to Questions 25, 48, and 49, the Court did not ask Juror 50 any follow-up questions on these issues. However, the Court did ask Juror 50 about his background, whether he would follow the Court's instructions, and his prior knowledge of the Defendant and Jeffrey Epstein, among other questions. Juror 50 explained that he had seen a news article on *CNN*, but he could "absolutely" decide the case "based on the facts and evidence, or lack of evidence, here presented in court." Nov. 16, 2021 Voir Dire Tr. at 130; *see also id.* at 131 (indicating that he had "no doubt" as to his ability to put his prior knowledge aside). In closing,

the Court asked if Juror 50 had any doubt about his ability to be fair to both sides.  Juror 50

replied, "No" and affirmed that he did not have "any reason to think that [he] can't be fair and

impartial here."  *Id*. at 134.

On November 29, the parties exercised their peremptory strikes.  The Defendant used all

of her strikes.  *See* Nov. 29, 2021 Trial Tr. at 731–32.  Juror 50 was one of fifty-eight qualified

prospective jurors, and he was ultimately one of the twelve deliberating jurors.  *Id*. at 733.

### C.  Juror 50's post-verdict interviews and party response

Following the thirteen-day trial, the jury began deliberations on December 20, 2021.  The

jury returned a unanimous verdict on December 29, 2021, finding the Defendant guilty of five of

the six counts.  Dkt. No. 593 at 29–30.

A week after the jury announced its verdict, on January 5, 2022, the Government

informed the Court that a juror had given at least three post-verdict interviews to press outlets

about his jury service and requested a hearing be held on the matter.  Dkt. No. 568.  The letter

noted that in the interviews, which were both in print and on video, the juror "described being a

victim of sexual abuse" and asserted that he "flew through" the jury questionnaire and did not

recall being asked whether he had been a victim of sexual abuse.  *Id*. at 1.  The Government

indicated that it believed the juror to be Juror 50, and a review of his questionnaire showed that

he had provided a negative response to a question that asked whether a prospective juror had

been a victim of sexual abuse.  *Id*. at 2 n.2; *see also* Feb. 25, 2022 Op. & Order, at 3 & n.1, Dkt.

No. 620.  A letter from the Defendant followed shortly thereafter also informing the Court about

the juror's interviews.  Dkt. No. 569.  The Defendant filed a second letter that same day

opposing the Government's request for a hearing "because based on undisputed, publicly

available information, the Court can and should order a new trial without any evidentiary hearing."  Dkt. No. 570.[1]

On January 19, 2022, the Defendant filed a motion for a new trial pursuant to Federal Rule of Criminal Procedure 33, on the basis of Juror 50's statements.  Dkt. Nos. 613, 642.  In an Opinion & Order dated February 25, 2022, the Court denied the Defendant's motion for a new trial on the current record and determined that a hearing was necessary to resolve the motion. The Court ordered an evidentiary hearing limited to instances supported by clear, strong, and incontrovertible evidence that a specific, nonspeculative impropriety had occurred—namely, a false statement during jury selection.  The hearing was also limited by Federal Rule of Evidence 606, which bars the Court from receiving evidence of a juror's statements regarding what occurred during jury deliberations.  Fed. R. Evid. 606(b)(1).  Accordingly, the evidentiary hearing was limited to "whether Juror 50 provided false answers on the questionnaire, the explanation for those answers, and how Juror 50 would have responded to follow-up questions if accurate answers had been provided" during the jury selection process.  Feb. 25, 2022 Op. & Order, at 7.

### D.  Evidentiary Hearing

The hearing took place on March 8, 2022.  Juror 50 appeared with retained counsel and testified pursuant to a grant of immunity.  Hearing Tr. at 3–5.  Juror 50 confirmed he understood that if he provided false answers he could be prosecuted for perjury.  *Id.* at 5.  The Court conducted the questioning with input from counsel; both parties submitted proposed questions in advance for the Court's consideration.  Dkt. Nos. 635, 636.  The Court's inquiry went beyond the

---

[1] As noted in the Court's prior Opinion, also on January 5, 2022, the Jury Department of the Southern District of New York received a call from Juror 50 asking for guidance because of statements he had given to certain media outlets that were being widely reported on in the press, inquiring whether he needed an attorney, and asking if he could receive a copy of his completed questionnaire.  February 25, 2022 Op. & Order, at 3 n.2.

limited approach proposed by the Government.  The Court also rejected many of the Defendant's proposed lines of questions.  The parties were also permitted to propose follow-up questions at the hearing in light of the Court's questioning and Juror 50's responses.  The Court accepted some of these proposals and rejected others.

Juror 50 testified that his answers to Questions 25, 48, and 49 were not accurate.  He explained that when he was nine and ten years old, he was abused on multiple occasions by a stepbrother, who he no longer considered part of the family, and one of the stepbrother's friends. Hearing Tr. at 8.  He disclosed the abuse to his mother when he was in high school.  His mother called the police and gave a report, but no charges were brought.  *Id*. at 8–9.  Although he first testified that "no" was correct for Question 49 because he did not consider the stepbrother part of his family, upon further questioning from the Court, he acknowledged that the correct answer would have been "yes."  *Id*. at 11–13.  He similarly acknowledged that "yes (self)" would have been correct to Question 25; although at the time of the questionnaire, he understood the question to be asking about being "robbed or mugged or some sort of crime like that."  *Id*. at 9–10.

Juror 50 testified that these incorrect answers were an inadvertent mistake and that he had not intentionally failed to disclose his personal history of sexual abuse.  *Id*. at 14–16, 22–23.  He explained that he was distracted as he filled out the questionnaire and "completely skimmed way too fast," leading him to misunderstand the questions.  *Id*. at 14–15.  It took several hours to start the questionnaire after a long security line and technical issues with the Court's instructional video.  His mind was preoccupied with a recent romantic breakup and the commotion at the nearby check-out table.  He saw other prospective jurors completing their questionnaires and rushed to finish.  He explained that he was unconcerned with diligently completing the questionnaire; he assumed due to the sheer "volume" of prospective jurors being screened that it

was impossible he would be selected as a final juror.  *Id.* at 11–13, 18.  He testified that his

personal history of sexual abuse was not something he typically thought about and that it had not

crossed his mind as he filled out the questionnaire.

The Court asked follow-up questions consistent with those asked of prospective jurors

during *voir dire* who responded affirmatively to Questions 25, 48, and 49 on their questionnaires,

including those questions proposed by Defense counsel at that stage during trial.  Further, the

Court asked Juror 50 about several potential inconsistencies in his testimony.  The Court did not

permit questions that were inconsistent with the process as it played out in *voir dire* or otherwise

irrelevant or redundant.  Ultimately, Juror 50 testified that his experience would not affect his

ability to be a fair and impartial juror.  He affirmed that he did not harbor any bias against the

Defendant nor in favor of the Government.  He asserted that he would be able to assess the

credibility of witnesses alleging sexual abuse.  And he affirmed that the subject matter of the

case would not upset him in such a way that would distract him from his duty as a juror, nor

would he be thinking about his experience in a way that would prevent him from being fair or

impartial.

At the conclusion of the hearing, the Court ordered the parties to submit supplemental

briefing on Juror 50's testimony, which the parties simultaneously submitted on March 15, 2022.

Dkt. Nos. 648, 649.[2]

## II.   LEGAL STANDARD

The Sixth Amendment guarantees criminal defendants "the right to a speedy and public

trial[] by an impartial jury."  U.S. Const. amend. VI.  An impartial jury is one "capable and

---

[2] On April 1, 2022, the Defendant requested the Court stay its ruling pending the release of a documentary in which
Juror 50 is expected to appear.  Dkt. No. 651.  That request is denied.  The Defendant provides no basis to conclude
that the interview would affect the Court's analysis or conclusion having held an evidentiary hearing.

willing to decide the case solely on the evidence before it."  *Smith v. Phillips*, 455 U.S. 209, 217 (1982).  One important means of ensuring an impartial jury is *voir dire* examination, which "expos[es] possible biases, both known and unknown, on the part of potential jurors," by eliciting information under oath.  *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554 (1984).

Once a jury has returned a verdict, a motion to set aside that verdict is "disfavored" and the moving party must overcome an "exacting hurdle" of proof.  *United States v. Ventura*, No. 09-CR-1015 (JGK), 2014 WL 259655, at *3 (S.D.N.Y. Jan. 21, 2014); *see United States v. Ianniello*, 866 F.2d 540, 543 (2d Cir. 1989).  And while Federal Rule of Criminal Procedure 33 permits a court to "vacate any judgment and grant a new trial if the interest of justice so requires," Fed. R. Crim. P. 33(a), the Second Circuit has cautioned district courts that "such action must be done 'sparingly' and in 'the most extraordinary circumstances.'"  *United States v. Archer*, 977 F.3d 181, 187 (2d Cir. 2020) (quoting *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001)).

The parties agree that a defendant's Rule 33 motion premised on a juror's alleged nondisclosure during *voir dire* is governed by *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548 (1984).  Maxwell Br. at 22–28, Dkt. No. 642; Gov. Br. at 11, Dkt. No. 643.  In *McDonough*, the Supreme Court held that to obtain a new trial on the basis of juror nondisclosure during *voir dire*, "a party must first demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause."  *McDonough*, 464 U.S. at 556; *see also United States v. Shaoul*, 41 F.3d 811, 815–16 (2d Cir. 1994).

The parties dispute whether the first prong of *McDonough* requires "deliberate juror misconduct"—that is, whether the juror must have deliberately provided a false answer in *voir dire*.  The Government, relying on Second Circuit precedent such as *United States v. Shaoul*, argues that a deliberate falsehood is required.  Gov. Br. at 13 (citing *Shaoul*, 41 F.3d at 815–16).  In contrast, the Defendant contends that *McDonough* does not require deliberateness and that an inadvertent false statement satisfies the first prong.  Maxwell Br. at 23–28; Maxwell Reply at 9–14, Dkt. No. 644.[3]  The Court does not resolve this legal dispute because, as explained in the analysis section below, regardless of which approach is the correct one, the Court finds that the false answers were not deliberate *and* that the second prong of *McDonough* is not satisfied.

Under the second prong of *McDonough*, the Court "must determine if it would have granted the hypothetical challenge" for cause if the juror had responded accurately.  *United States v. Greer*, 285 F.3d 158, 171 (2d Cir. 2002); *United States v. Stewart*, 433 F.3d 273, 304 (2d Cir. 2006).  "Challenges for cause are generally based on actual bias, implied bias, or inferable bias."  *Greer*, 285 F.3d at 171.  These categories do not always elucidate the analysis and there is overlap (and sometimes confusion) in how they are discussed in some of the cases.  Nevertheless, it is important to attempt to delineate.  Actual bias is "bias in fact," due either to the juror admitting partiality or a judge finding actual partiality based on the juror's *voir dire* answers.  *United States v. Torres*, 128 F.3d 38, 43 (2d Cir. 1997).  Implied bias is "bias presumed as a matter of law" due to a juror's relationship to the parties or connection to the actual crime itself.  *Greer*, 285 F.3d at 171–72.  Finally, a judge may infer bias when actual or implied bias does not apply.  "Bias may be inferred when a juror discloses a fact that bespeaks a risk of partiality sufficiently significant to warrant granting the trial judge discretion to excuse

---

[3] In an amicus curiae brief, the National Association of Criminal Defense Lawyers also argues that deliberateness is not required under *McDonough*.  *See* Dkt. No. 614.

the juror for cause, but not so great as to make mandatory a presumption of bias." *Id*. at 171

(quoting *Torres*, 128 F.3d at 47). The ensuing determination of whether the juror was biased or

prejudiced against the defendant may be "affected both by whether the nondisclosure was

deliberate and, if it was, by the juror's motivation to conceal the truth." *United States v. McCoy*,

995 F.3d 32, 51 (2d Cir. 2021); *see also Greer*, 285 F.3d at 172–73. It is important to consider

whether a juror's answer was dishonest in the second part of the test "because it can show 'a

personal interest in this particular case that was so powerful as to cause the juror to commit a

serious crime [by lying during *voir dire*].'" *United States v. Nix*, 275 F. Supp. 3d 420, 438

(W.D.N.Y. 2017), *aff'd sub nom. United States v. McCoy*, 995 F.3d 32 (2d Cir. 2021) (alteration

in original) (quoting *United States v. Colombo*, 869 F.2d 149, 151 (2d Cir. 1989)).

> The *McDonough* inquiry is restricted by Federal Rule of Evidence 606, which states:
>
> During an inquiry into the validity of a verdict or indictment, a juror may not testify
> about any statement made or incident that occurred during the jury's deliberations; the
> effect of anything on that juror's or another juror's vote; or any juror's mental processes
> concerning the verdict or indictment. The court may not receive a juror's affidavit or
> evidence of a juror's statement on these matters.

Fed. R. Evid. 606(b)(1). As explained in this Court's prior opinion, the rule is subject to certain

exceptions inapplicable here. *See* Feb. 25, 2022 Op. & Order, at 12. The rule, which embodies

"long-accepted Federal law," is an important safeguard on the integrity of the jury trial system.

*Tanner v. United States*, 483 U.S. 107, 120–21 (1987) (rejecting a constitutional challenge to the

rule). It enables "full and frank discussion in the jury room" and secures "jurors' willingness to

return an unpopular verdict." *Id*. Without the rule, the finality of verdicts, upon which the

system relies, would be seriously disrupted. *See id.* at 120–21, 124–25; *see also Warger v.

Shauers*, 574 U.S. 40, 45, 49–50 (2014). And though not at issue in this case, the rule plays a

14

critical role in those extreme cases where dissatisfied litigants may be tempted to harass or tamper with jurors in an attempt to impeach the verdict. *See Tanner*, 483 U.S. at 120–21.

Finally, what is not at issue in resolving this motion is whether the Defendant would have exercised a peremptory strike against this juror had he accurately disclosed his prior sexual abuse. Although the Defendant argues in her pre-hearing briefing that she is also entitled to a new trial because Juror 50's failure to disclose his history denied her the opportunity to exercise her peremptory challenges, that is not the law in federal court. Indeed, in making this argument she cites only decisions that relied on New Jersey state law. Maxwell Br. at 46–47. But the rule in New Jersey state courts is different than the rule that binds this Court. *See State v. Scher*, 650 A.2d 1012, 1019–20 (N.J. App. Div. 1994) (explaining that New Jersey's "rule differs from its federal counterpart" of *McDonough*). Under *McDonough*, a defendant seeking a new trial must show that "a correct response would have provided a valid basis for a challenge *for cause*." 464 U.S. at 555–56 (emphasis added). A desire to "wipe the slate clean simply to recreate the peremptory challenge process" is not enough. *Id.*; *see also Shaoul*, 41 F.3d at 816 (concluding that a defendant failed to satisfy the second prong of *McDonough* where the defendant "may certainly exclude such jurors by the use of peremptory challenges, but he has no basis for arguing that a district court is required to sustain such a challenge for cause"). That difference arises in part from the fact that "[u]nlike challenges for cause, peremptory strikes are not constitutionally required." *Torres*, 128 F.3d at 43 n.4.

## III.    ANALYSIS

### A.  *McDonough* Prong One

The Court begins with what Juror 50's testimony at the evidentiary hearing makes plain: Juror 50 provided inaccurate answers to Questions 25, 48, and 49 of the questionnaire. For each

of these questions, Juror 50 answered "No" on the questionnaire, but testified that the correct

answer would have been "Yes (self)" for Questions 25 and 48 and "Yes (friend or family

member)" for Question 49.  Hearing Tr. at 7–12.  Those three inaccurate answers all stem from

Juror 50's failure to disclose that he was sexually abused as a child.  Under the Defendant's

interpretation of *McDonough*, that would be sufficient to satisfy the first prong.  But the

Government's interpretation requires that the Court make a further finding that the inaccurate

answers were made deliberately.

After close consideration of the record, including Juror 50's testimony under oath, the

Court concludes that Juror 50's answers to the questionnaire, while incorrect, were not

deliberately inaccurate.  Rather, for the reasons that follow, the Court credits Juror 50's

explanation that he "flew through" the questionnaire, misread the relevant questions, and

provided inadvertently inaccurate responses.  *Id*. at 12.

As a preliminary matter, Juror 50 testified under oath pursuant to a grant of immunity.

*Id*. at 5.  He faces the possibility of perjury charges if he testified falsely at the hearing.  Juror 50

therefore had a strong incentive to testify truthfully.

Moreover, the Court credits Juror 50's testimony in light of his demeanor in testifying

under oath.  At the hearing, the Court was able to closely observe Juror 50 as he testified and to

assess his reaction to questions, including those he appeared not to expect, as well as to the

overall tone of his answers.  Juror 50 answered the Court's questions in a calm and

straightforward manner.  He was apologetic for his carelessness.  His tone, demeanor, and

responsiveness gave no indication of false testimony.

Further, Juror 50's answers to the Court's questions were logical explanations and

generally internally consistent.  He testified that his attention to the questionnaire was distracted

16

by several factors, among them the several hours that he had to wait in the courthouse's security line, to wait in the room to hear the Court's instructional video, and then to begin answering questions. And while he waited, he says, he was distracted by his thoughts on the recent end of a romantic relationship. *Id*. at 14 ("I didn't have a phone, I didn't have a book, I was sitting there twiddling my thumbs thinking about the break up that just happened a few weeks prior and sitting in my feelings and not very focused."). That explanation is not only consistent with his other hearing testimony, but also with his sworn statements months earlier at oral *voir dire*. *See* Nov. 16, 2021 Voir Dire Tr. at 133 (stating that he "just got out of a relationship and I didn't want to see anything regarding them").

Distractions continued, and increased, as he neared the end of the questionnaire. Juror 50 testified that he was seated near the table where prospective jurors dropped off their completed questionnaires. As more potential jurors completed their questionnaires, the noise and bustle at that table increased. And as more potential jurors completed their questionnaires, he "felt rushed" to finish so that he would not be the last to turn in a questionnaire. Hearing Tr. at 18. Moreover, the Court credits Juror 50's candid admission that he was not concerned with following the Court's instructions, and did not proceed with "diligence," because he had concluded that he would not be selected as a juror given the "sheer volume of people that were there." *Id*. at 13, 18; *see also id*. at 40.

This explanation coheres with Juror 50's testimony that his sexual abuse history was not a salient or front-of-mind consideration as he completed the questionnaire. He repeatedly testified that he does not often think about his sexual abuse. *See, e.g.*, *id*. at 16, 22. The summary of the charges, which do not use the terms "abuse" or "assault" but explained that the Defendant had been charged with a total of six counts that involved "travel to engage in criminal

sexual activity" and "sex trafficking of a minor," did not cause him to think of his own sexual

abuse.  Hearing Tr. at 47; Questionnaire at 4.  The Court finds that explanation to be reasonable.

Last, the Court finds Juror 50's explanation that his answers were made inadvertently to

be the most logical explanation of his overall behavior.  Shortly after trial, Juror 50 readily

disclosed the fact of his sexual abuse in several media interviews in which he used his real first

name and pictures of himself.  Finding that Juror 50 intentionally provided false answers on the

questionnaire requires concluding that he willingly disclosed his deliberate and unlawful

deception in public interviews.  The more likely explanation for Juror 50's behavior is the one to

which he credibly testified: Juror 50's inaccurate answers were provided inadvertently, and he

was made aware of his mistake only after he completed his media interviews.  That explanation

is corroborated by a video recording of Juror 50's interview with the *Daily Mail*, which the

Defendant entered into the record and previously cited in support of her claim for a new trial.

*See* Maxwell Br. at 39–40.  In that video, Juror 50 states that he was asked only about the sexual

abuse history of his friends and family but not his own.  When the interviewer asks Juror 50

about Question 48 in particular, he appears genuinely and completely surprised to learn that the

questionnaire included this question.  That moment of surprise is consistent with Juror 50's

hearing testimony that this was the moment at which he realized he may have made a serious, but

honest, mistake.  *See* Hearing Tr. at 15 (stating that he first learned that the questionnaire may

ask about his own sexual abuse history "during [his] Daily Mail interview with the reporter

Laura Collins").

The Defendant raises several arguments for why the Court should instead find that Juror

50 committed perjury at the hearing and that his answers on the questionnaire were intentionally

inaccurate.  The Court is not persuaded.  *First*, the Defendant characterizes much of Juror 50's

testimony as "self-serving" and "rehearsed."  Maxwell Post-Hearing Br. at 7, 10, Dkt. No. 649.

Juror 50 certainly appeared prepared to answer the Court's questions, but that is consistent with

what any good counsel would have recommended he do.  It is unremarkable that Juror 50 would

have reflected on his experience in anticipation of testifying under oath and was prepared for

anticipated questions.  The Court did not detect in Juror 50's responses any fabrication or

improper rehearsal of a false narrative.  *Cf. Singh v. Barr*, 823 F. App'x 10, 12 (2d Cir. 2020)

(summary order) (declining to discount a witness's testimony as "rehearsed" where that witness

did "what any reasonable person . . . would do: namely, prepare for questioning at a potentially

life-altering hearing").  As for being "self-serving," as noted above, Juror 50's personal interests

were served by testifying truthfully at the hearing so as not to face criminal perjury charges.

*Second*, the Defendant argues that it is not credible that Juror 50 "did not see the word

'you' and the answer 'Yes (self)'" for Question 48.  Maxwell Post-Hearing Br. at 8.  She notes

that he answered fifty-two prior questions and follow-up questions with the word "you" and that

it is not plausible that Question 48 would ask only about friends and family.  Yet the Court, in

several lines of questioning, tested exactly this component of Juror 50's testimony and is

satisfied by his answers.  The Court first observed to Juror 50 that throughout the questionnaire,

he "appeared to have followed the instructions."  Hearing Tr. at 19.  When asked how he

correctly followed the instructions elsewhere, Juror 50 explained, as he had previously in his

testimony, that for questions appearing earlier in the questionnaire, he "was still . . . in focus"

and so more able to respond accurately.  *Id*.  That focus waned, he explained, in reading later

questions, including Question 48.

Additionally, the Court observed that many questions were structured like Question 48,

asking jurors both about their personal experience and providing options to check for "yes self,

yes friend or family, or no." *Id*. at 15, 21.  Consistent with his explanation that he skimmed the

questionnaire, he testified that he "did not pick up on" that pattern when filling out the

questionnaire, *id*. at 15, and read only "the friend or family" and "missed that 'have you,' and

then 'yes self' while reading," Question 48, *id*. at 21.  And when asked a follow-up question,

Juror 50 said he was not "surprised" at the time, but only surprised "thinking now" that the

questionnaire had asked about the sexual abuse history of friends and family but not about a

juror's own sexual abuse history.  *Id*. at 21–22.  The Court finds that Juror 50's answers to each

of these lines of questioning were reasonable and credible.

  *Third*, the Defendant argues that, as to Question 49, Juror 50 was inconsistent in first

stating that he was sexually abused by "a family member, who is no longer part of the family,"

but then stating that he "never considered [the stepbrother] part of [his] family even when they

lived with us for a few years."  Maxwell Post-Hearing Br. at 9–10 (quoting Hearing Tr. at 8, 11).

The Court acknowledges the tension between these two statements, but does not agree that

tension suggests Juror 50 deliberately concealed his stepbrother's abuse.  Juror 50's explanation

of his answer to Question 49 proceeded in three stages.  He clarified, first, that on November 4,

he "didn't even consider . . . at all" whether his stepbrother's conduct was responsive to Question

49 as he "flew through" the questionnaire.  Hearing Tr. at 11–12.  At the hearing, he initially

stated that "No" was an accurate answer because, as the Defendant notes, he "never considered"

the stepbrother to be a member of his family.  *Id*.  And finally, when asked whether, "[a]s [he]

sit[s] here now," what his answer to Question 49 would be, Juror 50 said "it would have been

yes" because "by law, by marriage, that person was [his] stepbrother."  *Id*. at 12–13.  In short, it

was only after Juror 50 was made to reflect on the question and its answer that he reached an

accurate response.  Yet Juror 50 did not read closely Question 49 or consider carefully his answer to it on November 4.

These evolving answers do not reflect Juror 50 changing his story so much as an explanation of a complex and fraught set of events and relationships from decades before.  The Court is cognizant that jurors may well assign their own emotional connotations to terms like "family" rather than interpret it in the technical or legal manner as would an attorney or judge. *Cf. United States v. Stewart*, 317 F. Supp. 2d 432, 438 (S.D.N.Y. 2004) ("Would a reasonable juror necessarily consider an ex-girlfriend to be 'someone close to him?'").

*Fourth*, the Defendant argues that Juror 50's proclaimed reluctance to disclose his sexual abuse is inconsistent with his post-trial conduct.  Maxwell Post-Hearing Br. at 5–6, 10–11.  In particular, Juror 50 testified that he "[doesn't] tell very many people" about his abuse.  Hearing Tr. at 22.  Yet he conducted several interviews with international media outlets in which he revealed his sexual abuse history.  Further, Juror 50 posted a comment on social media to Annie Farmer, a witness in this case, in which he "thanked her for sharing [her] story."  *Id*. at 43. These prominent disclosures of his sexual abuse, the Defendant argues, contradict Juror 50's statement that he rarely disclosed that abuse.

The Court confronted Juror 50 at length about each of these purported contradictions.  As to his interviews, the Court asked Juror 50 how he "reconcile[d] what [he] just said" about nondisclosure with his high-profile disclosure in media interviews.  *Id*. at 22.  Juror 50 primarily provided two overlapping explanations.  He first testified that he "didn't think this would happen."  *Id*.  That is, he explained, he "did not think that anybody— certainly [his] family or friends would find this out," despite the significant media attention that the case had received. *Id*. at 23.  When the Court returned to this issue later in the hearing, Juror 50 added that in the

interviews he "wasn't using [his] full name," which Juror 50 apparently understood reduced the chance that people that knew him would draw the connection. *Id*. at 42. And, further, he explained that several friends that contacted him after the trial were unaware of the trial occurring, so he assumed his post-trial media interviews would not attract substantial attention.

Second, Juror 50 simultaneously acknowledged that because of his interviews, the fact that he was abused "would be a known fact in the world." *Id*. at 24. He explained that he had made a conscious decision in favor of disclosure because, "[a]fter sitting on this trial for several weeks and seeing the victims be brave enough to give their stories, [he] felt" that he could too. *Id*.; *see also id*. at 42 ("I'm also not ashamed about it. It's something that happened, and it's something that is relatively common that happened to multiple people throughout the world.").

In short, Juror 50's willingness to disclose his sexual abuse changed to some extent between November 4, 2021, and January 2022. He made a conscious decision to share the fact of his sexual abuse with a wider circle of people than he had prior to the time that he completed the questionnaire. At the same time, he presumed—in hindsight, mistakenly—that his interviews, given without his last name and predominantly to international media outlets, would not be seen by his friends or family in his life who, he believed, had not followed the trial up to that point. That explanation of partial public disclosure is further consistent with the fact that in his interviews he related only the fact that he had been abused, not any details of what had occurred. Juror 50's wishful thinking—or as the Government suggests, naivety—with respect to his post-trial interviews does not suggest that when he completed his questionnaire, he intended to deceive. *See* Government Post-Hearing Br. at 10 n.4, Dkt. No. 648.

The Court also asked Juror 50 about his social media interaction with Annie Farmer. On Twitter, Farmer shared an article that contained an interview with Juror 50 and she said that

Juror 50 "was brave enough to come forward," to which Juror 50 responded by "thank[ing] her for sharing her[] [story] as well."  Hearing Tr. at 43.  He explained that he had "randomly seen" Farmer's post and "felt like [he] wanted to comment." *Id*.  That comment was unlikely to be seen by Juror 50's friends and family, he speculated, because at the time he had only "two followers," which "were random things," and he did not "normally use" Twitter. *Id*.  The Court concludes that Juror 50's comment to Annie Farmer on Twitter, made in January 2022, does not provide a basis to question his testimony that as of November 4, 2021, he did not tell many people about his sexual abuse.

At bottom, based on Juror 50's demeanor and consistent responses while testifying under oath pursuant to a grant of immunity, the Court finds Juror 50 credible.  His failure to attend with diligence and care to the questions on the jury selection questionnaire is frustrating and regrettable, but it was not motivated by intentional deception.  In light of his testimony, the Court finds that Juror 50's answers to Questions 25, 48, and 49 were not deliberately incorrect.

### B. *McDonough* Prong Two

Assuming without deciding that Juror 50's inadvertently inaccurate responses satisfy the first prong of *McDonough*, the Defendant has, in any event, not established that the Court would have excused Juror 50 for cause if he had answered the questions during jury selection accurately. *See McCoy*, 995 F.3d at 46.  At the hearing, the Court asked Juror 50 the same set of questions that was asked of all prospective jurors during *voir dire* who indicated prior personal experience with sexual abuse.  Juror 50's credible responses to those questions under oath at the hearing established that he would not have been struck for cause if he had provided accurate responses to the questionnaire.

### 1. Actual Bias

"Actual bias is 'bias in fact'—the existence of a state of mind that leads to an inference that the person will not act with entire impartiality." *Torres*, 128 F.3d at 43. A court may find a juror to be partial because the juror admits as much, or based on the juror's other *voir dire* answers. *Id.* (citing *United States v. Haynes*, 398 F.2d 980, 984 (2d Cir. 1968)). This finding is "based upon determinations of demeanor and credibility." *Id.* at 44 (quoting *Wainwright v. Witt*, 469 U.S. 412, 428 (1985)).

The record does not support a finding that Juror 50 was actually biased. As explained above, the Court finds Juror 50's sworn testimony to be credible overall. He was responsive and forthright, and his demeanor evinced that he answered the Court's questions truthfully. He repeatedly and credibly affirmed that his personal history of sexual abuse would not affect his ability to serve as a fair and impartial juror "in any way." Hearing Tr. at 25; *see also id.* at 9, 10, 13. He testified that there was "absolutely in no way" anything about his experience that would interfere with his "ability to assess the credibility of witnesses alleging sexual abuse," and that he would be able to conclude such a witness was not testifying truthfully if that was what the evidence suggested. *Id.* at 26. He testified that he did not harbor any bias against the Defendant nor any bias in favor of the Government. Indeed, he did not want to put his "thumb on the scale in any direction." *Id.* He declared that he had "no doubt" as to his ability to be fair to both sides. *Id.* at 27. As noted above, the Defendant dismisses these responses as "self-serving." Maxwell Post-Hearing Br. at 7. The Court disagrees; it finds each of these responses to be credible.

Moreover, Juror 50's hearing testimony is corroborated by his answers during *voir dire*. Without hesitation, he declared that he would follow the Court's instructions on the law, he "absolutely" could decide the case based on the evidence or lack of evidence presented in court,

he had no doubt about his ability to be fair to both sides, and he had no reason to think otherwise. Voir Dire Tr. at 128, 130, 134.

The Court is unpersuaded by the Defendant's arguments to the contrary. The Defendant argues that Juror 50 was actually biased because his post-trial statements reveal that at the time of *voir dire* he regarded himself as a non-neutral advocate for the victims. Maxwell Post-Hearing Br. at 6.[4] In particular, she relies on Juror 50's post-trial interviews, in which he "proclaim[ed]" that the guilty verdict was for "for all the victims." *Id.* But these *post-trial* statements do not establish that Juror 50 was actually biased against the Defendant. The evidence at trial established that there was more than one victim of the Defendant's crimes, making Juror 50's post-trial statement reasonable. And, more importantly, Juror 50's view of the Defendant after the thirteen-day trial, during which he heard evidence that swayed him and eleven other jurors to convict the Defendant on five counts, does not shed light on any bias he allegedly harbored "*before* he heard the evidence presented." *Stewart*, 317 F. Supp. 2d at 439–40 & n.4 (emphasis in original) (rejecting argument that juror's post-trial statements that the verdict was "a victory for the little guy who loses money in the markets" and that the defendant "thought she was above everything" revealed bias).

### 2. Implied and Inferred Bias

The Defendant's central argument is that the Court should imply—based on Juror 50's personal history of sexual abuse, post-trial actions, and hearing testimony—that Juror 50 was biased against the Defendant. She similarly argues that the Court should infer Juror 50's bias

---

[4] In her pre-hearing briefing, the Defendant reserved arguing that Juror 50 was actually biased in the event the Court held an evidentiary hearing. Maxwell Br. at 39. The Defendant does not expressly argue that Juror 50 was actually biased in her post-hearing briefing, but the Court understands this argument to raise an actual bias issue. *See* Maxwell Post-Hearing Br. at 2–3.

based on the purported similarities between his personal history and the issues at trial.  Because these arguments overlap, the Court addresses implied and inferred bias together.[5]

"Implied bias" is "a concept that is reserved for 'extreme situations,' warranting a conclusive presumption of bias as a matter of law." *McCoy*, 995 F.3d at 48 (internal quotations omitted) (quoting *Greer*, 285 F.3d at 172).  Such bias is "attributed to a prospective juror regardless of actual partiality" because the law presumes that "an average person in the position of the juror in controversy would be prejudiced." *Torres*, 128 F.3d at 45 (citing *United States v. Wood,* 299 U.S. 123, 133 (1936)); *see also Haynes*, 398 F.2d at 984.  The category applies to "certain highly limited situations where a juror discloses a fact that creates such a high risk of partiality that the law requires the judge to excuse the juror for cause." *Torres*, 128 F.3d at 41.  Namely, "jurors who are related to the parties or who were victims" or otherwise involved in the alleged crime itself are impliedly biased. *Id.* at 45; *see also Greer*, 285 F.3d at 172.

On the other hand, a finding of inferred bias is a determination within the trial court's discretion. *Greer*, 285 F.3d at 171; *see also McCoy*, 995 F.3d at 49.  "Bias may be inferred when a juror discloses a fact that bespeaks a risk of partiality sufficiently significant to warrant granting the trial judge discretion to excuse the juror for cause, but not so great as to make mandatory a presumption of bias." *Greer*, 285 F.3d at 171 (quoting *Torres*, 128 F.3d at 47)).  The inquiry is whether the juror's responses at *voir dire* "permit an inference that the juror in question would not be able to decide the matter objectively." *Torres*, 128 F.3d at 47.  If such facts are elicited, "then, just as in the situation of implied bias, the juror's statements as to his or her ability to be impartial become irrelevant." *Id.*  However, "a judge may—particularly when

---

[5] It is unsettled in the Second Circuit whether implied or inferred bias may serve as the basis for a post-trial allegation of juror partiality. *See Greer*, 285 F.3d at 172.  Because the Court determines that Juror 50 is neither impliedly nor inferably biased, it need not resolve this issue.

considering whether some marginal types of disclosed facts are enough to show inferable bias—ask about a juror's impartiality and might be persuaded by the force of the juror's assurance." *Id.* at 47 n.12.  For example, in *Torres*, the Second Circuit held that the trial court did not abuse its discretion when it concluded during *voir dire* that a juror was inferably biased because she had engaged in money-structuring activities that were highly similar to the conduct charged in the case.  But the Second Circuit made clear that the district court would not have erred if it had kept the juror.  *Id.* at 46–48.

The Court concludes that Juror 50 is neither impliedly nor inferably biased.  First, none of the "extreme situations" in which the Court must conclusively presume bias as a matter of law apply here.  *McCoy*, 995 F.3d at 48.  Juror 50 was not a victim of the charged crime itself, nor is he related to any of the attorneys, witnesses, victims, or other case participants.  *See Nix*, 275 F. Supp. 3d at 451.  Thus, the Court would not have granted a hypothetical challenge for cause based on implied bias even if Juror 50 had provided correct answers to the questionnaire.

Second, Juror 50's personal experience of sexual abuse does not evidence partiality sufficient to infer that Juror 50 was biased against the Defendant.  The Court need not imagine a wholly hypothetical universe for this conclusion.  That is because the *voir dire* provides highly relevant indications of how the parties and Court would have reacted had Juror 50 provided accurate answers during jury selection.  A review of the *voir dire* of jurors who responded "yes (self)" to Question 48 reveals that it is unlikely that the Defendant would have challenged Juror 50 for cause.  It also reveals that the Court would not have granted a for-cause challenge had one been raised.  *See McCoy*, 995 F.3d at 49.

Eight prospective jurors who answered "yes (self)" to Question 48 proceeded to *voir dire*. The Court asked every follow-up question requested by the Defendant with regard to a juror's

personal experience with sexual assault, abuse, or harassment; although, for a majority of these eight jurors, the Defendant did not propose any follow-up questions.  The Defendant did not challenge any of these prospective jurors for cause on the basis of the juror's answer to Question 48.

Some of these jurors disclosed experiences distinct from that disclosed by Juror 50—for example, sexual harassment on the subway.  Two jurors, however, disclosed experiences similar to that of Juror 50, neither of whom was challenged for cause.  Juror A reported that she was "sexually molested by an uncle when [she] was 12, 13."[6]  Although this juror was even closer in age to the victim-witnesses when they first were abused, and presumably abused by "someone familiar to [her] . . . who was part of [her] life," Maxwell Post-Hearing Br. at 4, the Defendant did not propose any follow-up questions or challenge the prospective juror for cause.  Like Juror A, Juror 50 credibly affirmed that his personal experience would not impact his ability to be fair or impartial nor would the subject matter "upset [him] in such a way that would distract [him] from [his] duty as a juror."  *See* Hearing Tr. at 26–27.  Next, Juror B explained that just two years before jury selection, she had reported that a friend was being coerced and sexually abused by a professor.  At the Defendant's request, the Court asked whether the experience might in any way interfere with her ability to be fair and impartial to the extent there may be issues in the case that arise around reporting or not reporting allegations related to sexual abuse.  She affirmed that it would not, and the Defendant did not challenge her for cause.  Like Juror B, Juror 50 credibly affirmed at the March 8 hearing that "issues of reporting or not reporting sexual abuse that might

---

[6] To further the important interest of protecting juror anonymity and privacy, the Court has redacted references to specific juror numbers.  *See Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110 (2d Cir. 2006); *Press-Enter. Co. v. Superior Ct. of Cal., Riverside Cnty.*, 464 U.S. 501, 511–12 (1984).  In this opinion, Juror A refers to Juror ▮  Juror B refers to Juror ▮ and Juror C refers to Juror ▮  The Court has provided an unredacted copy of the Opinion & Order to the parties and will file an unredacted copy under seal.

be discussed at trial would [not] interfere with [his] ability to be fair or impartial as a juror in the case." *See* Hearing Tr. at 27.[7]

Accordingly, even if Juror 50 had disclosed his abuse during jury selection, the Court would not have granted a hypothetical challenge for cause, as consistent with other prospective jurors who disclosed similar experiences. This is so because our system of trial by jury does not exclude individuals with experiences similar to the issues at trial when those individuals can serve fairly and impartially. This Court has presided over a murder trial in which a juror who had a family member murdered was not struck for cause. So too victims of fraud serve faithfully in fraud trials and individuals who have been discriminated against have served without bias in discrimination trials.

So the critical question, as for any juror, is whether the juror has the ability to decide the case based only on the evidence presented in court, not extraneous information, and without bias, prejudice, or sympathy. *See U.S. ex rel. Owen v. McMann*, 435 F.2d 813, 818 (2d Cir. 1970). Juror 50 repeatedly and unequivocally affirmed his ability to do just that. And for all the reasons articulated above, the Court found that testimony credible. To imply or infer that Juror 50 was biased—simply because he was himself a victim of sexual abuse in a trial related to sexual abuse and sex trafficking, and despite his own credible testimony under the penalty of perjury, establishing that he could be an even-handed and impartial juror—would be tantamount to concluding that an individual with a history of sexual abuse can never serve as a fair and

---

[7] In her pre-hearing briefing, the Defendant raises that out of 694 prospective jurors, the parties jointly agreed to excuse 67 of the 114 prospective jurors who answered "yes (self)" to Question 48, and the "Court granted" the Defendant's challenges to 23 and the Government's challenges to 2 additional prospective jurors who answered "yes (self)." Maxwell Br. at 9–10. But that is a mischaracterization. First, a significant number of those prospective jurors stated that they could not be fair and impartial for a variety of reasons. Second, and as noted above, all of those excusals "resulted from the parties' agreement, not from the court's analysis of each challenged juror's ability to be impartial." *Stewart*, 317 F. Supp. 2d at 439. "The question now is whether [Juror 50's] omission reveals a bias sufficient to support a for-cause challenge." *Id.* As explained above, it does not.

impartial juror in such a trial.  That is not the law, nor should it be.  *See Gonzales v. Thomas*, 99 F.3d 978, 989–90 (10th Cir. 1996) ("To hold that no rape victim could ever be an impartial juror in a rape trial would, we think, insult not only all rape victims but also our entire jury system."); *Buckner v. Davis*, 945 F.3d 906, 914–15 (5th Cir. 2019) (affirming conclusion that juror who failed to disclose childhood abuse was not impliedly biased in conviction for sexual assault of a child).  Thus, the Court finds no basis to infer that Juror 50 is biased.

The Defendant's arguments to the contrary do not disturb the Court's conclusion that Juror 50 was neither impliedly nor inferably biased.  *First*, the Defendant argues that Juror 50 was impliedly biased because of multiple "dishonest answers."  Maxwell Br. at 36; Maxwell Post-Hearing Br. at 11.[8]  But this is not a case involving a juror's extreme deceit due to a desire to be selected.  By contrast, in *United States v. Daugerdas*, on which the Defendant extensively relies, a juror "created a totally fictitious persona in her drive to get on the jury."  867 F. Supp. 2d 445, 473 (S.D.N.Y. 2012), *vacated and remanded on other grounds*, *United States v. Parse*, 789 F.3d 83 (2d Cir. 2015).  The court granted the defendant's motion for a new trial, emphasizing the "deliberate lies engineered to create a fictitious, 'marketable' juror" warranted "extraordinary relief."  *Id*. at 468.  Such is not the case here.  The Court credits Juror 50's explanation that his nondisclosure was an "inadvertent mistake," not intentional deception.  Hearing Tr. at 14–15.  Juror 50 explained how the circumstances surrounding his completion of the questionnaire—including his recent romantic breakup, that he had no expectation of being selected, the technical issues and ensuing long wait to begin the questionnaire, and the generally distracting environment—resulted in his "skimming" the questionnaire and missing the personal

---

[8] The Defendant argued that these repeated lies included Juror 50's use of social media in her pre-hearing briefing. Maxwell Br. at 36.  For the reasons stated in this Court's February 25 Opinion, that Juror 50 used social media accounts *after* the completion of trial does not establish that he lied about having been inactive on social media *before* trial.  Feb. 25, 2020 Op. & Order, at 9–10.

aspect of Questions 48 and 49.  As he repeatedly explained, he never expected or even hoped to be selected.  The Court finds Juror 50's testimony to be credible, forthright, and responsive and does not find as a factual matter that Juror 50 deliberately lied in order to be selected as a juror.

The Defendant's reliance on *Sampson v. United States*, 724 F.3d 150 (1st Cir. 2013), is similarly unavailing.  *See* Maxwell Post-Hearing Br. at 11.  There, a juror failed to disclose that her husband had previously threatened her with a shotgun during jury selection for a bank robbery case in which the defendants threatened the bank tellers at gunpoint.  However, the juror had told a "litany of lies" during *voir dire* bearing on a number of issues, including her daughter's incarceration and her own substance abuse issues.  *Id*. at 161–62, 168.  By contrast, Juror 50's inadvertent nondisclosure, while implicating multiple questions on the questionnaire, stems only from his experience of sexual abuse.

*Second*, the Defendant contends that Juror 50 was biased due to the "similarities between [his] personal experiences . . . and the issues being litigated."  Maxwell Br. at 30 (quoting *Daugerdas*, 867 F. Supp. 2d at 472).  She expressly disavows arguing "that *every* person who has been a victim of sexual assault or sexual abuse was subject to a 'mandatory' challenge for cause based on implied bias."  Maxwell Reply at 17.  Distancing from that position is necessary— again, it is not the law that an individual with a history of sexual abuse cannot serve as a fair and impartial juror.  Rather, the Defendant finesses the argument by saying that Juror 50's personal history is sufficiently similar to the issues at trial so as to warrant a mandatory finding of implied bias, or alternatively, a discretionary finding of inferred bias, and points to Juror 50's testimony and post-trial statements as evidence that these purported similarities made him biased.  Maxwell Br. at 31–32; Maxwell Post-Hearing Br. at 5–6.

The Court is unpersuaded.  First, the Second Circuit has not held that bias must be implied when a juror has a personal experience similar to the issues at trial.  The Defendant's only in-circuit decision is the district court opinion in *Daugerdas*.  *See* Maxwell Br. at 30–35; Maxwell Post-Hearing Br. at 5.  In passing, the *Daugerdas* court noted that "[c]ourts imply bias 'when there are similarities between the personal experiences of the juror and the issues being litigated.'"  867 F. Supp. 2d at 472 (quoting *United States v. Sampson*, 820 F. Supp. 2d 151, 164 (D. Mass. 2011)).  But the court resolved the motion on other grounds—it did not imply bias because that juror had similar experiences to those at issue in the trial, but instead (as discussed above) implied bias because of that juror's "brazen[]," "deliberate," and "repeated lies" and creation of "a totally fictitious persona in her drive to get on the jury."  *Id.* at 472–74.

The Second Circuit has made clear that implied bias is an intentionally narrow category.  The circuit has "consistently refused 'to create a set of unreasonably constricting presumptions that jurors be excused for cause due to certain occupational or other special relationships which might bear directly or indirectly on the circumstances of a given case, where . . . there is no showing of actual bias or prejudice.'"  *Torres*, 128 F.3d at 46 (quoting *United States v. Brown*, 644 F.2d 101, 104–05 (2d Cir. 1981)); *see also United States v. Garcia*, 936 F.2d 648, 652 (2d Cir. 1991).  As noted above, the *Torres* court held that it was not an abuse of discretion for the trial court to *infer* that a juror was biased when she engaged in money structuring activities that were similar to conduct charged in the case.  128 F.3d at 46–47.  But the circuit "decline[d] to hold as a general matter that, where a juror has engaged in conduct similar to that of the defendant at trial, the trial judge *must presume* bias."  *Id.* at 46 (emphasis added).  As the court explained, "[s]uch cases are unlikely to present the 'extreme situations' that call for mandatory

removal." *Id.* Accordingly, this Court refuses the Defendant's invitation to expand this "strictly limited" category of "truly 'exceptional'" circumstances absent binding authority. *Id.*

Second, even if a court must imply bias on the basis of a juror's similar experience, the *voir dire* in this case of comparable jurors evinces that Juror 50's personal experience is not so similar to the issues in this case as to constitute a "truly exceptional" situation. Nor is it sufficiently similar to warrant the Court's exercise of discretion to infer bias. In arguing that Juror 50's experience is sufficiently similar, the Defendant highlights that Juror 50 was sexually abused as a minor on multiple occasions by "two people who were friends"—his stepbrother, who was "someone familiar to him . . . who was part of his life," and the stepbrother's friend. Maxwell Post-Hearing Br. at 4. He also delayed reporting the abuse. *Id.* But the Defendant overlooks the important differences. Juror 50 was younger—ages 9 and 10—than the victims testified they were when they were abused by the Defendant and Epstein. He disclosed his abuse to his mother in high school, unlike the victims here. And unlike the period of two years of abuse that Juror 50 endured, some of the trial witnesses testified about several years of abuse. Like Juror A and Juror B, the Court would not have implied or inferred bias if Juror 50 had disclosed his experience during jury selection. The Court would have asked appropriate follow-up questions proffered by counsel and determined based on the juror's answers to those questions whether he could serve as a fair and impartial juror.

Juror 50 is also dissimilar to the cases from other federal circuits and state courts cited by the Defendant. For example, as noted above, the Defendant's prominent citation to *Sampson v. United States* is misplaced because the juror in that case told a "litany of lies" bearing on a variety of issues. 724 F.3d at 161. Thus, unlike here, a "combination of factors" led the First

Circuit to affirm the district court's order for a new penalty-phase hearing.  Maxwell Br. at 33

(citing *Sampson*, 724 F.3d at 168).

The Defendant next relies on a state court case, *State v. Afshar*, 196 A.3d 93 (N.H. 2018),

in which a court granted a new trial in a child sexual assault case when a juror failed to disclose

that a babysitter sexually assaulted him when he was five or six years old.  Maxwell Post-

Hearing Br. at 5; *see also* Maxwell Br. at 34.  But that juror had previously reported an inability

to be impartial in another case involving sexual assault of a minor, and the court concluded that

there was "little in the way of logical explanation for how he could have differentiated between

the two cases."  196 A.3d at 98.  Such is not the case here.

Finally, in *Burton v. Johnson*, the Tenth Circuit concluded that a juror was impliedly

biased when she suffered an abusive relationship with her husband that was highly similar to that

of the defendant.  948 F.2d 1150, 1158–59 (10th Cir. 1991).  However, not only had that juror

deliberately lied during *voir dire* about the experience, but she was also living in that abusive

situation during *voir dire*, the trial itself, and her post-verdict testimony to the court.  *Id.*

Conversely, Juror 50 credibly testified that his abuse "happened so long ago" that it is not

something that he "think[s] about," "it's not part of who [he is]."  Hearing Tr. at 47.  And again,

the Court has not found that Juror 50 deliberately lied about his personal history.

The Defendant's remaining arguments also fail to alter the Court's conclusion that Juror

50 is not biased.  The Defendant contends that Juror 50's post-trial conduct—in particular, his

posts on social media and his decision to give interviews using his picture and first name—is

"strong evidence" of his bias because he was "not looking to avoid notice," but rather to "soak

up his 15 minutes of fame."  Maxwell Post-Hearing Br. at 10–11.  The Court disagrees that this

conduct reveals bias.  Whether wise or foolish, the fact that a juror may give an interview

following a high-profile trial does not establish bias.  This common occurrence is not necessarily

nefarious.  *See Stewart*, 317 F. Supp. 2d at 440.  Even if Juror 50 were selfishly seeking his

fifteen minutes of fame, his interview "would have garnered the same amount of media attention

after a verdict of acquittal."  *Id*.

　　　The Defendant next argues that "the victims' testimony personally resonated with [Juror

50] in a way that jurors who had not been sexually abused as children would not have felt."

Maxwell Post-Hearing Br. at 5–6.  She argues this is evinced by his explanation that the victims'

testimony inspired him to give post-trial interviews and "tell his story" despite his apparently

normal reserve to discuss his sexual abuse pre-trial.  *Id*.  As noted above in this Court's finding

that Juror 50 is not actually biased, Juror 50's statements regarding his post-trial view of the

verdict and the Defendant do not illuminate pre-trial bias.  A juror's view of a case and defendant

would necessarily change after reviewing thirteen days of evidence that persuaded twelve jurors

of the Defendant's guilt.  *See Stewart*, 317 F. Supp. 2d at 439–40.  It is unsurprising that such an

experience might change the way a juror views his own life experiences.

　　　The Defendant also argues that Juror 50 is biased because "his own experience of sexual

abuse shaped his beliefs about how victims' memories of traumatic events work."  Maxwell

Post-Hearing Br. at 6.  The Defendant relies on Juror 50's statements in post-trial interviews and

his hearing testimony regarding his view of the evidence at trial.  For example, Juror 50 noted at

the hearing that he referenced his abuse in interviews "in order to talk to a reporter about jury

deliberations" and to explain why he "believe[d] a certain way based on all the evidence that was

provided during the trial."  Hearing Tr. at 22.  The Court does not agree, as an initial matter, that

these statements demonstrate bias.  A foundational principle is that jurors rely on their common

sense and life experiences to adjudge guilt.  All jurors have no doubt experienced the recall of

personal memories, some from decades earlier and some involving sensitive or tragic events. So long as jurors can be fair and impartial and decide the case based solely on the evidence and the law as instructed, then it is those "very human elements that constitute one of the strengths of our jury system, and we cannot and should not excommunicate them from jury deliberations." *U.S. ex rel. Owen*, 435 F.2d at 818. In any event, Rule 606(b) bars the Court from relying on these statements because they pertain to Juror 50's "mental processes concerning the verdict or indictment." Fed. R. Evid. 606(b)(1). "[P]arsing how jurors considered the evidence or their mental states while hearing testimony is exactly what *Tanner* and the plain text of Rule 606(b) seek to prevent." *United States v. Leung*, 796 F.3d 1032, 1036 (9th Cir. 2015) (cited favorably by *United States v. Baker*, 899 F.3d 123, 132 (2d Cir. 2018)); *see also United States v. Abcasis*, 811 F. Supp. 828, 834 (E.D.N.Y. 1992) (Rule 606 does not permit inquiry into jurors' discussions or "reactions to the evidence as it developed" (cleaned up)).

Finally, the Defendant argues that Juror 50's statements about his "healing process" and his hearing testimony as to Question 25 "reveal just how deeply the trauma affected him and continues to affect him." Maxwell Post-Hearing Br. at 9. The Court is unpersuaded. First, at the March 8 hearing, the Court rejected the Defendant's proposed follow-up questions on Juror 50's "healing process" because the Defendant had not proposed comparable questions during the *voir dire* process for other prospective jurors who indicated a personal history of sexual abuse on their questionnaires. Hearing Tr. at 28–29. Moreover, that an individual has undergone a "healing process" at some point in his life does not evince that the experience interferes with his ability to be fair and impartial. Juror 50 credibly testified that his sexual abuse is not usually on his mind, that the subject matter would not upset him in a way that would distract him from his duty, and that he would not think about his own experience in a way that

would prevent him from being fair or impartial.  As discussed above, the minor discrepancies raised by the Defendant do not alter this assessment.[9]

Nor was Juror 50's inaccurate answer to Question 25 unreasonable.  He testified that he understood the question to ask whether he "was robbed or mugged or some sort of crime like that," and that he did not think of his history of "sexual abuse as being a victim of a crime." Hearing Tr. at 10.  Because neither he nor a friend or family member had been robbed or mugged or been the victim of a similar type of crime, he testified, he answered "No" to Question 25. That interpretation of what it means to be a victim of a crime, while technically incorrect, does not evince intentional deception or partiality.  *Cf. United States v. Fell*, No. 2:01-CR-12, 2014 WL 3697810, at *7, *13 (D. Vt. July 24, 2014) (crediting the explanation of a juror that was sexually abused as a child that she "ha[d] not considered [herself] a victim of a crime in all these years" in part because the abuser was "not convicted of any crime"); *McDonough*, 464 U.S at 555 ("[J]urors are not necessarily experts in English usage.  Called as they are from all walks of life, many may be uncertain as to the meaning of terms which are relatively easily understood by lawyers and judges.").  Evidently, other prospective jurors similarly interpreted Question 25 to not refer to uncharged incidents of sexual abuse.  For example, Juror C disclosed being "███████ ████████████████████████████," in response to Question 48, but in response to Question 25, reported only that a family member was mugged.  *See* Juror C Questionnaire.

In sum, the Court concludes that Juror 50 is not impliedly or inferably biased.

---

[9] The Defendant also notes that Juror 50 apparently posted on social media about attending therapy to help "deal[] with the stress of the [Maxwell] case."  Maxwell Post-Hearing Br. at 9; *see also* Maxwell Br. at 20.  It is perfectly reasonable for a juror to go to therapy and use of such services does not disqualify a citizen from service.  In fact, courts in this district routinely make counseling services available to jurors following the completion of a trial.

### 3.  The Court rejects the Defendant's additional post-hearing argument that Juror 50 was biased because he failed to follow instructions.

In her post-hearing briefing, the Defendant argues that Juror 50's testimony that he was "absolutely not" concerned with following the Court's instructions when filling out the questionnaire is an additional ground for concluding that Juror 50 was unable to serve as an unbiased juror.  Maxwell Post-Hearing Br. at 11–12 (quoting Hearing Tr. at 18).  The Court disagrees.

Juror 50's testimony established that his lack of diligence was limited to the questionnaire session.  Juror 50 showed up for trial on time every day and appeared to the Court that he was attentive throughout trial.  There is no indication that Juror 50 failed to follow this Court's instructions during *voir dire*, trial, or deliberations.  Juror 50 explained that he was unconcerned with following the Court's instructions while completing the questionnaire because he was "super distracted" and believed that there was no possibility that he would be selected for the jury.  Hearing Tr. at 40.  *Voir dire*, he testified, was a "different situation."  *Id.* at 41.  When he answered the Court's questions in person at *voir dire*, he had not been "sitting there for hours . . . thinking about [his] ex."  *Id.*  He felt confident that he accurately answered all of the Court's questions.  This included affirming that he was able to follow the Court's instructions as to the presumption of innocence and the law generally, the prohibition on consuming media on the case or any other extraneous information, and his ability to put any prior knowledge to the side and decide the case based on the evidence, or lack of evidence, presented at trial.  Voir Dire Tr. at 128–31.  Under oath, he testified that although he "can become distracted," that "had no effect" on him serving and "listening to all the evidence given during the trial."  Hearing Tr. at 41.  The Court confirmed that Juror 50 "carefully" followed the Court's instructions during *voir dire* and trial.  *Id.*

Even if confined to the questionnaire session, the Defendant argues that Juror 50's "willingness to disregard the Court's instructions" during the questionnaire "shows an inability to serve as an unbiased juror."  Maxwell Post-Hearing Br. at 11.  She relies on *Dyer v. Calderon*, 151 F.3d 970 (9th Cir. 1998) (en banc), as her sole support.  But *Dyer* stands for the distinct proposition that a juror who deliberately lies, and thus commits perjury, cannot be trusted to "stand in judgment of other people's veracity."  *Id.* at 983.  It does not support that an uncareful and inattentive prospective juror who mistakenly provides an inaccurate response during jury selection is biased.  As explained above, the Court does not conclude that Juror 50 committed perjury and lied in an effort to be on the jury.  Accordingly, the Court rejects granting the Defendant's motion on this basis.

* * *

In sum, the Court concludes that the evidence in the record does not support finding that Juror 50 was biased.  Juror 50's sworn testimony did not reveal actual partiality.  And Juror 50 was not impliedly or inferably biased.  He was neither a victim nor otherwise involved in the actual crimes.  Nor does he have any sort of relationship with any of the parties or case participants.  And as consistent with other jurors who answered "yes (self)" to Question 48, the Court would not have granted a for-cause challenge on the basis of Juror 50's personal history of sexual abuse.  That Juror 50 was distracted during the questionnaire does not reveal that he was biased or failed to follow the Court's instructions during *voir dire* and the trial.  Prong two of the demanding *McDonough* inquiry is not satisfied.

## IV.   CONCLUSION

For the reasons stated above, the Court concludes that Juror 50 testified credibly and truthfully at the post-trial hearing.  His failure to disclose his prior sexual abuse during the jury

selection process was highly unfortunate, but not deliberate.  The Court further concludes that Juror 50 harbored no bias toward the Defendant and could serve as a fair and impartial juror. The requirements for a new trial under *McDonough* are not satisfied.  The Defendant's motion for a new trial pursuant to Rule 33 is therefore DENIED.

The Court orders the preparation of the presentence investigation report.

With respect to Counts 7 and 8, the Court hereby excludes time under the Speedy Trial Act, 18 U.S.C. § 3161(h)(7)(A), from today's date through April 22, 2022.  The Court finds that the ends of justice served by granting this exclusion from speedy trial computations outweigh the interests of the public and the Defendant in a speedy trial on these counts because the pending post-trial motions affect the scheduling considerations set forth in the Government's January 10, 2022 letter.  *See* Dkt. No. 574.  The Defendant consents to this exclusion.  Dkt. No. 650.

The Court will rule on the Defendant's remaining post-verdict motions in due course. Sentencing remains scheduled for June 28, 2022.  This resolves docket numbers 613, 614, 642, 650, and 651.

SO ORDERED.


Dated: April 1, 2022
      New York, New York

_____
ALISON J. NATHAN
United States Circuit Judge
Sitting by Designation