UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- x
                                                         :
UNITED STATES OF AMERICA                                 :
                                                         :          S2 20 Cr. 330 (AJN)
                v.                                        :
                                                         :
GHISLAINE MAXWELL,                                       :
                                                         :
                        Defendant.                       :
                                                         :
                                                         :
-------------------------------------------------------- x


**MEMORANDUM OF GHISLAINE MAXWELL IN SUPPORT OF
HER OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT**

Christian R. Everdell
COHEN & GRESSER LLP
800 Third Avenue
New York, NY 10022
Phone: 212-957-7600


Bobbi C. Sternheim
Law Offices of Bobbi C. Sternheim
33 West 19th Street - 4th Floor
New York, NY 10011
Phone: 212-243-1100


Jeffrey S. Pagliuca
Laura A. Menninger
HADDON, MORGAN & FOREMAN P.C.
950 17th Street, Suite 1000
Denver, CO 80202
Phone: 303-831-7364


*Attorneys for Ghislaine Maxwell*

## <u>TABLE OF CONTENTS</u>

**Page**

I.    The 2003 Guidelines Apply to the Offense Conduct.......................................................... 1

    A.    A Jury Must Determine the End Date of Criminal Conduct that Dictates Which Guidelines Book Applies Consistent with the *Ex Post Facto* Clause. ........ 3

    B.    The Trial Record Is Insufficient to Support a Finding that the Offense Conduct Continued Past November 1, 2004........................................................... 4

    C.    The Goals of Sentencing Are Not Served by Applying the More Onerous 2004 Guidelines Based Solely on Epstein's Conduct.............................................. 8

II.   The Five-Point Adjustment Under USSG § 4B1.5 Does Not Apply................................ 10

    A.    Ms. Maxwell Does Not Present a Continuing Danger to the Public. ................... 11

    B.    Applying § 4B1.5 Would Lead to Absurd Results. ............................................... 14

III.  Ms. Maxwell Does Not Qualify for an Aggravating Role Adjustment Under USSG § 3B1.1................................................................................................................................ 16

    A.    Ms. Maxwell Did Not Supervise Another Criminal Participant.......................... 16

    B.    The Criminal Activity Was Not "Otherwise Extensive" ...................................... 19

IV.   The Two-Point "Undue Influence" Enhancement Under USSG § 2G1.3(b)(2)(B) Does Not Apply. ........................................................................................................... 20

V.    The Correct Sentencing Range is 51-63 Months Under the 2003 Guidelines................. 22

CONCLUSION................................................................................................................................ 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apprendi v. New Jersey*,
  530 U.S. 466 (2000)........................................................................................4

*Blakely v. Washington*,
  542 U.S. 296 (2004)........................................................................................4

*Kimbrough v. United States*,
  552 U.S. 85 (2007)........................................................................................15

*Peugh v. United States*,
  569 U.S. 530 (2013)......................................................................................1, 4

*Stinson v. United States*,
  508 U.S. 36 (1993)........................................................................................14

*United States v. Bennett*,
  37 F.3d 687 (1st Cir. 1994)..............................................................................8

*United States v. Booker*,
  543 U.S. 220 (2005)........................................................................................4

*United States v. Broxmeyer*,
  699 F.3d 265 (2d Cir. 2012)......................................................................12, 13

*United States v. Cavera*,
  550 F.3d 180 (2d Cir. 2008)...........................................................................15

*United States v. Cordoba-Murgas*,
  233 F.3d 704 (2d Cir. 2000).............................................................................7

*United States v. Dorvee*,
  616 F.3d 174 (2d Cir. 2010)...........................................................................15

*United States v. Gigante*,
  94 F.3d 53 (2d Cir. 1996).................................................................................7

*United States v. Harris*,
  79 F.3d 223 (2d Cir. 1996)...............................................................................3

*United States v. Julian*,
  427 F.3d 471 (7th Cir. 2005) .........................................................................3, 4

*United States v. McGrain*,
  No. 6:20-cr-06113 (EAW), 2022 WL 287350 (W.D.N.Y. Feb. 1, 2022)................................13

*United States v. Patterson*,
  576 F.3d 431 (7th Cir. 2009) ..................................................................................................21

*United States v. Pope*,
  554 F.3d 240 (2d Cir. 2009).....................................................................................................14

*United States v. Reuter*,
  463 F.3d 792 (7th Cir. 2006) ................................................................................................9, 10

*United States v. Sanchez*,
  30 F.4th 1063 (11th Cir. 2022) .................................................................................................13

*United States v. Santos*,
  No. 21-10381, 2022 WL 1196761 (5th Cir. Apr. 22, 2022)....................................................13

*United States v. Skys*,
  637 F.3d 146 (2d Cir. 2011).....................................................................................................16

*United States v. Suarez*,
  No. 21-1721, 2022 WL 1449174 (3d Cir. May 9, 2022) ..........................................................13

*United States v. Torres*,
  901 F.2d 205 (2d Cir. 1990).......................................................................................................3

*United States v. Tykarsky*,
  446 F.3d 458 (3d Cir. 2006).......................................................................................................3

*United States v. Watkins*,
  667 F.3d 254 (2d Cir. 2012).....................................................................................................20

**Statutes**

Child Protection and Sexual Predator Punishment Act of 1998 ....................................................12

Protection of Children from Sexual Predators Act of 1998...............................................11, 12, 14

**Other Authorities**

*Meriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-
  webster.com/dictionary/coerce (accessed June 15, 2022) ......................................................20

United States Sentencing Guidelines (2003) ....................................................................... *passim*

United States Sentencing Guidelines (2004) ....................................................................... *passim*

Ghislaine Maxwell respectfully submits this memorandum in support of her objections to the Presentence Investigation Report ("PSR") and her claim that the correct sentencing range under the United States Sentencing Guidelines ("USSG" or the "Guidelines") is **51-63 months**, not the 292-365 month range calculated by the U.S. Probation Office ("Probation") in the PSR. As set forth more fully below, the lower range is correctly calculated because (1) the 2003 Guidelines apply to Ms. Maxwell's offense conduct, not the 2004 Guidelines; and (2) the enhancements under § 4B1.5 (repeat and dangerous sex offender against minors), § 3B1.1 (aggravating role), and § 2G1.3(b)(2)(B) (use of undue influence) do not apply.[1]

## ARGUMENT

### I.  The 2003 Guidelines Apply to the Offense Conduct

Before determining the applicable sentencing range, the Court must first resolve the threshold issue of whether the 2003 Guidelines or the 2004 Guidelines applies to the criminal conduct in this case.  It is well-settled that it is a violation of the *Ex Post Facto* Clause for a sentencing court to apply a version of the Guidelines that did not come into effect until after the criminal conduct was complete if it provides for a higher sentencing range.  *See Peugh v. United States*, 569 U.S. 530, 532-33 (2013) ("[T]here is an *ex post facto* violation when a defendant is sentenced under Guidelines promulgated after he committed his criminal acts and the new version provides a higher applicable Guidelines sentencing range than the version in place at the time of the offense.").

There is no dispute that the 2004 Guidelines, which took effect on November 1, 2004, call for a much harsher sentence than the 2003 Guidelines.  If the Court applied all of the same

---

[1] This memorandum sets forth arguments concerning the proper Guidelines calculation.  Ms. Maxwell's arguments for why the Court should grant a substantial downward variance from the advisory Guidelines range are addressed in a separate submission entitled Sentencing Memorandum on Behalf of Ghislaine Maxwell.

enhancements that were applied in the PSR, the recommended sentencing range under the 2003 Guidelines would be roughly 75% *less* than the recommended sentencing range under the 2004 Guidelines: **168-210 months** based on a Combined Adjusted Offense Level of 35 under the 2003 Guidelines versus **292-365 months** based on a Combined Adjusted Offense Level of 40 under the 2004 Guidelines.[2]  The parties dispute, however, whether the offense conduct ended before or after November 1, 2004, and whether a court or a jury must make that finding.  *See* USSG § 1B1.11, cmt. n.2 (the "last date of the offense of conviction" is the "controlling date for *ex post facto* purposes").

Probation and the government assert that the 2004 Guidelines apply because the second superseding indictment (the "S2 Indictment") generally alleges that the criminal conduct ended "in or about 2004" and the Court should find based on the trial testimony and other evidence that the offense conduct continued "through the end of 2004."  *See* PSR at 58.  That is legally and factually incorrect.  For the reasons set forth more fully below, the Court must apply the 2003 Guidelines in this case because (1) the jury, not the Court, must determine the end date of the criminal conduct when that fact dictates which Guidelines book applies consistent with the *Ex Post Facto* Clause; (2) even if the Court may make that determination, the trial record is insufficient to find that the offense conduct continued past November 1, 2004, the effective date of the 2004 Guidelines; and (3) it would not serve the goals of sentencing to apply the harsher 2004 Guidelines in this case when the record is clear that Ms. Maxwell was no longer actively participating in the offense conduct by 2002 or 2003 at the latest.

---

[2] The five-point difference in the total offense level is driven by the base offense level.  Under the 2003 Guidelines, the applicable base offense level is 19.  *See* USSG § 2G1.1(a)(1) (2003).  Under the 2004 Guidelines, the applicable base offense level is 24.  *See* USSG § 2G1.3(a) (2004).  Ms. Maxwell disputes the application of many of the enhancements as discussed in Sections II-IV, *infra*.

A. **A Jury Must Determine the End Date of Criminal Conduct that Dictates Which Guidelines Book Applies Consistent with the *Ex Post Facto* Clause.**

As set forth above, it would be a violation of the *Ex Post Facto* Clause for the Court to sentence Ms. Maxwell under the 2004 Guidelines absent a finding that the offense conduct continued past November 1, 2004. That finding must be made by a jury, not the sentencing court. Because the jury never made such a finding here, the Court cannot apply the 2004 Guidelines and must instead apply the 2003 Guidelines.

Several appellate courts, including the Second Circuit, have held that if the end date of the offense conduct dictates whether, consistent with the *Ex Post Facto* Clause, a harsher penalty may apply to the defendant, then that fact must be resolved by a jury. *See United States v. Julian*, 427 F.3d 471, 480-482 (7th Cir. 2005) ("As it is the lifespan of the conspiracy that determines whether, consistent with the *Ex Post Facto* Clause, the defendant may be subject to the enhanced penalty [of 18 U.S.C. § 2423], the question whether the alleged conspiracy continued beyond the effective date of the new penalty is one that must be submitted to the jury."); *United States v. Tykarsky*, 446 F.3d 458, 478-480 (3d Cir. 2006) ("[B]ecause the communications spanned two different versions of the statute [18 U.S.C. § 2422] with different minimum penalties, the question of whether the violation extended beyond the effective date of the amended version was one that had to be resolved by the jury."); *United States v. Harris*, 79 F.3d 223 (2d Cir. 1996) (noting that when the offense conduct for a continuing criminal offense is alleged to straddle the date when the applicable penalty increased, the jury must determine whether the criminal conduct continued past the date of the change for purposes of the *Ex Post Facto* Clause); *United States v. Torres*, 901 F.2d 205, 226-27 (2d Cir. 1990) (same), *overruled on other grounds as recognized by United States v. Marcus*, 628 F.3d 36 (2d Cir. 2010).

In each of these cases, the *ex post facto* violation resulted from an increase in the applicable statutory penalty, as opposed to the applicable sentencing range under the Guidelines. However, the Supreme Court has clearly held that it is also a violation of the *Ex Post Facto* Clause to apply a later version of the Guidelines that increases the recommended sentencing range if the criminal conduct was complete before the later version took effect.  *See Peugh*, 569 U.S. at 532-33 ("[T]here is an *ex post facto* violation when a defendant is sentenced under Guidelines promulgated after he committed his criminal acts and the new version provides a higher applicable Guidelines sentencing range than the version in place at the time of the offense.").  An *ex post facto* violation is an *ex post facto* violation regardless of whether the increased penalty resulted from a change in the statute or a change in the Guidelines.  Hence, if the end date of the offense conduct dictates whether it is permissible to apply a later Guidelines book consistent with the *Ex Post Facto* Clause, the jury must find that fact.

Here, the S2 Indictment alleges only that the criminal conduct ended "in or about 2004" and does not specify whether the conduct continued into November and December 2004.  Nor was the jury asked to make a specific finding as to the end date of the offense conduct.  Because the jury did not make the necessary factual finding, the Court cannot apply the 2004 Guidelines and must instead apply the 2003 Guidelines.[3]

### B.     The Trial Record Is Insufficient to Support a Finding that the Offense Conduct Continued Past November 1, 2004.

Even if the Court can determine the end date of the offense conduct for Guidelines purposes, the record does not support a finding that the conduct extended past November 1,

---

[3] Although the issue is properly framed as an *ex post facto* issue, it would also violate Ms. Maxwell's Sixth Amendment rights for the Court, and not the jury, to determine when the offense conduct ended.  *See Apprendi v. New Jersey*, 530 U.S. 466 (2000); *Blakely v. Washington*, 542 U.S. 296 (2004); *United States v. Booker*, 543 U.S. 220 (2005); *see also Julian*, 427 F.3d at 482 (failure to have the jury determine the end date of the conspiracy for *ex post facto* purposes was a violation of the defendant's Sixth Amendment rights).

2004, as the government asserts.  The government's claim is based solely on (1) Carolyn's vague recollection that she stopped performing sexualized massages for Epstein in 2005 when she was 18 years old (Tr. 1525, 1549), and (2) two message pad slips that were never admitted in evidence.  (GX 4-B, GX 4-F).  Such meager and unreliable evidence is insufficient to support a finding that the offense conduct continued into the last two months of 2004, especially when that determination has such a significant effect on the recommended sentencing range.  Instead, the credible evidence in the trial record established, at most, that Epstein was receiving sexualized massages in his Palm Beach residence through the summer of 2004, *before* the 2004 Guidelines took effect.

Carolyn's recollection that she was 18 when she stopped seeing Epstein cannot be credited.  (Tr. 1525, 1549).  Carolyn's memory of the timeline of events—in particular, her age at the time of the relevant events—was demonstrably inconsistent and unreliable.  For example, Carolyn initially testified that she was 14 years old when Virginia Roberts first took her to Epstein's Palm Beach residence, which would have been in 2001.  (Tr. 1518-19, 1525; GX-11).  However, when Carolyn was confronted on cross-examination with her prior deposition testimony in 2009, she agreed that Virginia first took her to Epstein's house in May or June 2002 when she was 15 years old, as she stated in her deposition.  (Tr. 1570-73).  Then on redirect Carolyn changed her testimony yet again and testified that she first went to Epstein's house when she was 13 years old, which would have been in 2000.  (Tr. 1693).  Carolyn also testified that she was "15, going to be 16" when she recruited her friend Tatum to give Epstein massages, which would have been towards the end of 2002 or early 2003.  (Tr. 1544).  However, according to the message pad slips that were admitted in evidence, the earliest of which dates to January 2003, Tatum did not begin calling the Palm Beach residence until April 2004 when Carolyn was

17.  (GX-3-B).  Carolyn further testified that she had trouble remembering details of the events in question and affirmed that she "[doesn't] remember the times and dates" of her visits to Epstein's Palm Beach residence.  (Tr. 1525, 1559).

The government asserts that Carolyn's recollection can be credited because even if she cannot recall the year that an event took place, she has been consistent about how old she was when the event took place.  (PSR at 53).  As set forth above, this claim is flatly contradicted by the record.  If Carolyn could not accurately remember how old she was when she first met Epstein, the Court should not credit her recollection of how old she was when she last saw him.

Carolyn's memory of when she stopped seeing Epstein was not only unreliable, but also contradicted by the other evidence in the record.  Carolyn herself testified that her last interactions with Epstein were when she returned from Georgia after giving birth to her son on March 14, 2004.  (Tr. 1548-49).  Carolyn stated that she went back to Epstein "four or five times" because she needed money to buy things for her son, but eventually gave up when it became clear that she was too old for Epstein.  (Tr. 1549).[4]  The message pads that were admitted in evidence corroborate that these interactions occurred from approximately late spring through summer 2004, when Carolyn was 17 years old.  (*See* GX-3-E (undated message from "Carolyn Andriano"; surrounded by messages dated April 29 and May 2 and included in a book of messages from 2004); GX-3-I (July 6 message from "Caroline Ambriano"; included in a book of messages from 2004); GX-1-B (July 30 message from "Carolyn Andriano"; next to a message dated August 12, 2004 and included in a book of messages from 2004).  Accordingly, the trial

---

[4] Carolyn's memory of her interactions with Epstein around the time of the Georgia interlude was also inconsistent and contradictory.  On the one hand, Carolyn testified that she left Florida in 2003 "to escape the traumatic events" that had happened in Palm Beach and traveled to Georgia where she became pregnant with her child.  (Tr. 1548-49, 1617, 1668).  On the other hand, Carolyn testified that she continued to visit Epstein in Palm Beach while she was pregnant.  (Tr. 1549).

evidence indicates that Carolyn stopped performing sexualized massages for Epstein at the latest in the summer of 2004, not in 2005.[5]

The two message pad slips cited by the government (GX 4-B, GX 4-F) do not support a finding that the offense conduct lasted beyond November 1, 2004.  Although these two messages were labeled as government exhibits along with the rest of the message slips in the same book (GX 4-A-K), these messages were never admitted in evidence.  The Court admitted the message slips from three other message books (GX 1-3) because Juan Alessi and Nicole Hesse recognized their signatures and/or handwriting in those books and could establish a business records foundation for their admission.  (Tr. 877-889, 1772-1790).  The government presumably did not have anyone who could do the same for GX 4 or it would certainly have admitted the message slips from that book as well.  The Court should not rely on two isolated, unauthenticated documents in determining when the offense conduct ended, especially when they would almost single-handedly increase the recommended sentencing range by over 10 years.  *Cf. United States v. Cordoba-Murgas*, 233 F.3d 704, 708 (2d Cir. 2000) (acknowledging that enhancements based on relevant conduct may result in sentences that are "excessive, inappropriate, and unintended under Sentencing Guidelines" when imposed "without regard to the weight of the evidence proving the relevant conduct"); *United States v. Gigante*, 94 F.3d 53, 56 (2d Cir. 1996) (holding that, for sentencing purposes, "the preponderance standard is no more than a *threshold* basis for adjustments and departures, and the weight of the evidence, at some point along a continuum of sentence severity, should be considered") (emphasis in original).

---

[5] In her 2007 interview with the FBI, which the government cites in its own objections to the PSR, Carolyn stated that she went to Epstein's residence "over 100 times for approximately three years beginning when she was 14 years old."  *See* PSR at 54.  According to that timeline, Carolyn last visited Epstein when she was 17.

Furthermore, it would be improper for the Court to rely on Carolyn's recollection and the message slips to find that the offense conduct lasted until 2005 because the government alleged in the S2 Indictment that the offense conduct ended "in or about 2004," not "in or about 2005." The initial indictment charged Ms. Maxwell with offenses that lasted "up to and including in or about 1997." (Ind. ¶¶ 9, 13, 15, 19). The S2 Indictment, which the government filed after it had located and interviewed Carolyn, charged offense conduct that lasted "up to and including in or about 2004." (S2 Ind. ¶¶ 11, 17, 23, 27). The expanded end date of the S2 Indictment was based solely on Carolyn's anticipated testimony and corroborating evidence. Yet the government alleged that the offense conduct ended in 2004, even though the government knew Carolyn's recollection of when she last visited Epstein and was aware of the two message slips when it filed the S2 Indictment. The Court should hold the government to its allegations and not allow it to expand the end date of the offense conduct for purposes of sentencing. *See United States v. Bennett*, 37 F.3d 687, 700 (1st Cir. 1994) ("In determining 'the last date of the offense of conviction' for *ex post facto* purposes and … Application Note [2 of § 1B1.11], it is only reasonable to hold the Government to its own alleged dates.").

For these reasons, the record is insufficient for the Court to find that the offense conduct continued past November 1, 2004, the effective date of the 2004 Guidelines. The Court must therefore apply the 2003 Guidelines to avoid an *ex post facto* violation.

### C.     The Goals of Sentencing Are Not Served by Applying the More Onerous 2004 Guidelines Based Solely on Epstein's Conduct.

If the Court finds that the offense conduct continued past November 1, 2004, it should nevertheless vary downwardly and sentence Ms. Maxwell as if the 2003 Guidelines apply. The variance would account for the fact that Ms. Maxwell had stopped actively participating in the offense conduct by 2003 at the latest, when the earlier Guidelines were in effect. Such a

variance would provide just punishment for the offense and promote respect for the law because it would punish Ms. Maxwell only for the conduct for which she was directly responsible, rather than artificially inflating her sentence based on two months' worth of Epstein's criminal conduct in which she was not involved.

There is no evidence in the record that Ms. Maxwell did anything in furtherance of the conspiracy in November or December 2004.  In fact, the evidence clearly showed that by that time, Ms. Maxwell was in a committed relationship with another man and Sarah Kellen had taken over responsibility for scheduling the massage appointments at the Palm Beach residence. Ms. Maxwell's assistant, Cimberly Espinosa, testified that by 2002 Ms. Maxwell had "moved on" from Epstein, had stopped coming to the office, and had begun a long-term relationship with Ted Waitt.  (Tr. 2370-71, 2374, 2378-80).  Juan Alessi testified that Sarah Kellen, whom he recalled seeing for the first time towards the end of his employment in 2002, "immediately took over" responsibility for answering the phones and scheduling the massage appointments at the Palm Beach residence as soon as she was hired.  (Tr. 832-33).  Carolyn testified that Ms. Maxwell called her to schedule massage appointments only in "the first year or two" and that Sarah Kellen called her thereafter.  (Tr. 1527).  In sum, the record is clear that by 2002 or 2003 at the latest Ms. Maxwell had stopped actively participating in the offense conduct and had been replaced by Kellen.

Applying the 2004 Guidelines would significantly increase Ms. Maxwell's sentencing range based on a finding by a mere preponderance that her co-conspirator Epstein engaged in offense conduct in the final two months of 2004 that Ms. Maxwell had nothing to do with and was not personally responsible for.  That result would be fundamentally unjust and contrary to the purposes of sentencing.  *See United States v. Reuter*, 463 F.3d 792, 793 (7th Cir. 2006)

(Posner, J.) ("A judge might reasonably conclude that a sentence based almost entirely on evidence that satisfied only the normal civil standard of proof would be unlikely to promote respect for the law or provide just punishment for the offense of conviction.").  Accordingly, the Court should exercise its discretion to vary from the 2004 Guidelines and sentence Ms. Maxwell under the 2003 Guidelines.  *See id*. (the § 3553(a) sentencing factors "are broad enough and loose enough to allow the judge to dip below the guidelines range if he is justifiably reluctant to impose a sentence most of which rests entirely on a finding of fact supported by a mere preponderance of the evidence").

**II.**    **The Five-Point Adjustment Under USSG § 4B1.5 Does Not Apply.**

Probation and the government seek to substantially increase Ms. Maxwell's Guidelines range by adding a five-point adjustment under USSG § 4B1.5 applicable to a "Repeat and Dangerous Sex Offender Against Minors."  That one adjustment increases Ms. Maxwell's advisory sentencing range from 168-210 months to 292-365 months – a roughly 75% increase. But § 4B1.5 was intended to apply only to habitual sexual offenders who present a high risk of recidivism and pose "a continuing danger to the public."  USSG § 4B1.5, cmt. background.  The facts of this case fall far outside the scenarios that Congress and the Sentencing Commission were trying to address with § 4B1.5.  Here, the government concedes that the defendant is *not* a danger to the public, there is no evidence that the defendant herself is sexually attracted to minors, the conduct that gives rise to the adjustment ended almost 20 years ago, and there is no evidence that the defendant has re-offended and no concern that she will ever re-offend. Moreover, the application of § 4B1.5 to Ms. Maxwell would lead to absurd results that the Sentencing Commission did not contemplate.  Section 4B1.5 therefore does not apply.

### A.      Ms. Maxwell Does Not Present a Continuing Danger to the Public.

It is clear from the Guidelines commentary and the Congressional intent underlying the creation of § 4B1.5 that the adjustment does not apply to Ms. Maxwell.  The Sentencing Commission created § 4B1.5 after the passage of the Protection of Children from Sexual Predators Act of 1998 (the "Act").  *See* Pub. Law 105-314 (Oct. 30, 1998).  As part of the Act, Congress directed the Sentencing Commission to review and amend the Sentencing Guidelines applicable to several offenses involving child sexual abuse and exploitation, including the enticement and transportation offenses charged in the S2 Indictment, to ensure they were "appropriately severe."  *Id*., Section 502.  Congress also specifically directed the Sentencing Commission to review the guidelines applicable to these and other sexual abuse offenses and promulgate amendments "to increase penalties applicable to the[se] offenses … in any case in which the defendant engaged in a pattern of activity involving the sexual abuse or exploitation of a minor."  *Id*., Section 505.  In response, the Sentencing Commission created § 4B1.5, which was added to the Sentencing Guidelines on November 1, 2001.  *See* USSG, App'x C, amend. 615.

The legislative history of the Act makes clear that the purpose of the law, and § 4B1.5 specifically, was to protect children from habitual sexual predators and to inflict severe punishments on repeat (and often violent) offenders who present a significant risk of recidivism. Congress was particularly concerned about the danger these defendants pose to the community because they are typically far more likely to re-offend than other criminal defendants – a fact which numerous members of Congress cited as a primary justification for the passage of the Act.

- "Constituents deserve to be protected from society's worst offender-- the repeat sexual predator…. [T]he recidivism rates of sex offenders are astonishingly high – released rapists are 10 times more likely to repeat their crime than other criminals.  The Congress has a responsibility to address the issue by passing a bill that would put an end to this cycle of violence repeated by a single perpetrator."  Child Protection and Sexual Predator Punishment Act of 1998, Hearing Before the House Judiciary Committee, Subcommittee on Crime, 105th

Cong. (Apr. 30, 1998) (testimony of Rep. Louise Slaughter (D-NY)), *available at* 1998 WL 210930.

- "These strong sentencing provisions are important because the recidivism rates for sex offenders and pedophiles are 10 times higher than that of other criminals. Frankly, chances are that these predators will strike again." Child Protection and Sexual Predator Punishment Act of 1998, Proceedings and Debates Before the House of Representatives, 105th Cong., 2nd Session (Jun. 11, 1998) (comments of Rep. Deborah Pryce of (R-OH)), *available at* 144 Cong. Rec. H4491-03, 1998 WL 306835.

- "Sentences for child abuse and exploitation offenses will be made tougher. In addition to increasing the maximum penalties available for many crimes against children and mandating tough sentences for repeat offenders, the bill will also recommend that the Sentencing Commission reevaluate the guidelines applicable to these offenses and increase them where appropriate to address the egregiousness of these crimes." Protection of Children from Sexual Predators Act of 1998, Proceedings and Debates Before the Senate, 105th Cong., 2nd Session (Sept. 17, 1998) (statement of Sen. Orrin Hatch of (R-UT)), *available at* 144 Cong. Rec. S10518-02, 1998 WL 636904.

The Congressional intent underlying the Act was clear: the criminal statutes and the Sentencing Guidelines needed to be amended to impose harsher sentences on these sorts of dangerous, repeat sexual offenders to make sure that they do not "strike again."

The Sentencing Commission adopted this rationale in promulgating § 4B1.5. The commentary to the guideline explains that the adjustment should only apply to defendants who present a continuing danger to the community because there is a significant risk that they will re-offend if they are released from prison. *See* USSG § 4B1.5, cmt. background ("This guideline is intended to provide lengthy incarceration for offenders who commit sex offenses against minors and who present *a continuing danger to the public*." (emphasis added); *see also United States v. Broxmeyer*, 699 F.3d 265, 285 (2d Cir. 2012) ("We further note that this guideline [§4B1.5] is intended to identify 'repeat sex offenders,' who pose 'a continuing danger to the public.'" (citing USSG § 4B1.5 cmt. background)). The title of the enhancement itself reflects that it should only be applied to "Repeat and Dangerous" sex offenders. USSG § 4B1.5.

The case law bears this out.  The adjustment is typically applied to defendants (virtually all of whom are male) who repeatedly and often violently sexually abuse or exploit children for their own sexual gratification and who are caught soon after or while still engaging in that behavior.  *See, e.g., Broxmeyer*, 699 F.3d at 284-88; *United States v. Suarez*, No. 21-1721, 2022 WL 1449174, at *1-*2 (3d Cir. May 9, 2022); *United States v. Santos*, No. 21-10381, 2022 WL 1196761, at *1-*3 (5th Cir. Apr. 22, 2022); *United States v. Sanchez*, 30 F.4th 1063, 1067-76 (11th Cir. 2022); *United States v. McGrain*, No. 6:20-cr-06113 (EAW), 2022 WL 287350, at *1-*6 (W.D.N.Y. Feb. 1, 2022).

In sharp contrast, Ms. Maxwell has never been accused of any sex offenses—or any crimes, for that matter—in the almost 20-year period since the conduct at issue in this case ended.  There is absolutely no evidence that Ms. Maxwell is attracted to minors or has the sort of uncontrollable impulses that would compel her to re-offend.  According to the trial record, it was Epstein who had such proclivities, whereas Ms. Maxwell's role was to facilitate Epstein's sexual abuse.  Indeed, after she moved on from Epstein in the early 2000s, Ms. Maxwell was involved in two long-term relationships with men who had young children and was actively involved in their lives without even the slightest hint of impropriety.  Most importantly, the government *concedes* that Ms. Maxwell is not a danger to the community.  The government never made that assertion in connection with Ms. Maxwell's numerous bail applications and there is no evidence whatsoever to support such a claim.  Put simply, Ms. Maxwell is not "dangerous" and there is no risk that Ms. Maxwell will ever "repeat" the offense.  Accordingly, there is no basis to apply § 4B1.5, which is meant to apply only to "Repeat and Dangerous" sex offenders.

The government asserts that § 4B1.5 should apply as long as the offense conduct fits within the text of the guideline, to which it claims to be faithfully adhering.  *See* PSR at 60.  It is

not.  The government ignores the background commentary to § 4B1.5, which explicitly states that the adjustment only applies to sex offenders "who present *a continuing danger to the public*."  USSG § 4B1.5, cmt. background (emphasis added).  In doing so, the government rejects an authoritative statement from the Sentencing Commission about the proper interpretation and application of § 4B1.5.  *See Stinson v. United States*, 508 U.S. 36, 38 (1993) ("[C]ommentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline.").  The government is not at liberty to reject the Sentencing Commission's instructions, and neither is the Court.

Applying § 4B1.5 to Ms. Maxwell would directly contradict the intent of Congress and the explicit instructions of the Sentencing Commission and would improperly add over 10 years to her sentencing range.  It was not meant to be applied in cases where the defendant is not a danger to the community and poses no risk of recidivism.  It should not be applied here.

### B.    Applying § 4B1.5 Would Lead to Absurd Results.

Applying § 4B1.5 would also yield a sentencing range for Ms. Maxwell that is significantly higher than the range for a proven recidivist sex offender – *i.e.*, the type of defendant that Congress and the Sentencing Commission were so clearly targeting with § 4B1.5. The Court should not interpret a guideline in such a way that it would lead to such obviously absurd results.  *See United States v. Pope*, 554 F.3d 240, 246 (2d Cir. 2009).

Section 4B1.5 contains two prongs – one that applies to defendants who have been convicted of at least one prior sex offense (USSG § 4B1.5(a)) and one that applies to defendants who have not been convicted of a prior sex offense (USSG § 4B1.5(b)).  As discussed above, the purpose of the Act and § 4B1.5 was to increase the sentences given to repeat sex offenders.  It follows that convicted sex offenders who re-offend after being released from prison should

14

receive more serious punishment than those defendants who have never been convicted of a sex offense. In this case, the reverse would happen. If we assume for the sake of argument that Ms. Maxwell had been convicted of a prior sex offense and that § 4B1.5(a) therefore applied, Ms. Maxwell's recommended sentencing range under the 2004 Guidelines would be 262-327 months based on a Combined Adjusted Offense Level of 35 and a criminal history category of V. *See* USSG §§ 4B1.5(a)(1)(A) & (a)(2)(B) (2004). By contrast, if we assume the facts—*i.e.*, that Ms. Maxwell has never been convicted of a prior sex offense and § 4B1.5(b) therefore applies—her recommended sentencing range under the 2004 Guidelines is 292-365 months based on a Combined Adjusted Offense Level of 40 and a criminal history category of I. *See* USSG §§ 4B1.5(b)(1) & (b)(2) (2004). Accordingly, Ms. Maxwell is subject to a substantially higher Guidelines range than a defendant who had been previously convicted of a sex offense. Such a result would be unjust and contrary to the express purpose of § 4B1.5.[6]

Furthermore, by applying § 4B1.5 Ms. Maxwell would face the same sentencing range that Jeffrey Epstein would face for the same offenses, even though he was indisputably the more culpable offender. It would be fundamentally unjust and contrary to the goals of sentencing for the Court to apply the Guidelines in a way that would create no meaningful distinction between the most serious offenders and those with lesser culpability. *See United States v. Dorvee*, 616 F.3d 174, 186-87 (2d Cir. 2010) ("[A]dherence to the Guidelines results in virtually no distinction between the sentences for [less culpable] defendants … and the sentences for the most dangerous offenders.… This result is fundamentally incompatible with § 3553(a)."); *see also United States v. Cavera*, 550 F.3d 180, 191 (2d Cir. 2008) (citing *Kimbrough v. United States*,

---

[6] A similar disparity would occur under the 2003 Guidelines, which should apply in this case for the reasons already discussed.

552 U.S. 85, 108-09 (2007) ("[A] district court may vary from the Guidelines range based solely on a policy disagreement with the Guidelines, even where that disagreement applies to a wide class of offenders or offenses.").  Section 4B1.5 should therefore not apply.

### III.   Ms. Maxwell Does Not Qualify for an Aggravating Role Adjustment Under USSG § 3B1.1.

#### A.   Ms. Maxwell Did Not Supervise Another Criminal Participant.

Under the plain language of USSG § 3B1.1 and its commentary, Ms. Maxwell does not qualify for an aggravating role enhancement.  The Guidelines are clear that for any of the three aggravating role enhancements to apply, the Court must first find that Ms. Maxwell supervised at least one other criminal participant in the offense.  USSG § 3B1.1, cmt. n.2 ("To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor *of one or more other participants*." (emphasis added)); *United States v. Skys*, 637 F.3d 146, 156 (2d Cir. 2011) (citing USSG § 3B1.1, cmt. n.2).  A "participant" is defined as "a person who is criminally responsible for the commission of the offense, but need not have been convicted."  USSG § 3B1.1 cmt. n.1; *Skys*, 637 F.3d at 156.

There is no evidence in the trial record that Ms. Maxwell supervised another criminal participant in the offenses against "Jane," Annie Farmer, or Carolyn, which form the basis for the three offense groups in the PSR.  *See* PSR ¶¶ 89-90.[7]  According to the trial testimony, the only criminal participants in the offenses involving "Jane" and Annie Farmer were Epstein and Ms. Maxwell.  There is certainly no support in the record that Ms. Maxwell supervised Epstein.  In fact, the record is clear that the opposite is true: Epstein directed and managed Ms. Maxwell,

---

[7] Because the Court ruled that "Kate" is not a victim of the offenses of conviction, Probation and the government agree that the conduct related to "Kate" cannot be treated as a separate offense group and is not subject to a Guidelines analysis.  *See* PSR at 58-59.  We therefore do not address the application of any enhancements or adjustments based on evidence related to "Kate."  Regardless, there is no evidence in the record that Ms. Maxwell supervised another criminal participant in her offense conduct.

who was his employee.  According to the record, there were several people employed by Epstein who interacted with "Jane" and Annie Farmer and whom Ms. Maxwell supervised in her role as manager of Epstein's properties in the mid-late 1990s – *e.g.*, Juan Alessi in Palm Beach and various unnamed employees at Zorro Ranch.  The record also reflects that Ms. Maxwell had some role in coordinating payroll and expenses for Epstein pilots, Larry Visoski and David Rodgers, who transported "Jane" on Epstein's private planes.  But these people had no knowledge of the criminal conduct and do not qualify as criminally responsible participants for the purposes of the aggravating role enhancement.

Similarly, there is no evidence in the trial record that Ms. Maxwell supervised another criminal participant in the offenses against Carolyn.  Apart from Epstein, Sarah Kellen was the only other person identified in the trial record as a criminal participant in the offenses against Carolyn.  Among other things, Carolyn testified that Sarah Kellen scheduled massage appointments for her and took nude pictures of her at the Palm Beach residence on one occasion. (Tr. 1527-28; 1538-39).  The record is clear, however, that Ms. Maxwell did *not* supervise Sarah Kellen.  Rather, Kellen was hired by Epstein as his assistant to *replace* Ms. Maxwell and take over responsibility for scheduling massage appointments and other property management tasks at a time when Ms. Maxwell was moving on from Epstein and was no longer actively managing the day-to-day affairs of his residences.

For example, Cimberly Espinosa testified that Kellen was hired sometime between 2000-2002 to be *Epstein's* assistant and that she, and not Sarah Kellen, was Ms. Maxwell's assistant from when she was hired in 1996 up through the end of her employment in 2002.  (Tr. 2332-33, 2376-77).[8]  Espinosa further testified that in the last two years of her employment (2000-2002),

---

[8] Larry Visoski initially testified that he thought Sarah Kellen was Ms. Maxwell's assistant.  (Tr. 139-40).  But he later clarified on cross-examination that he "didn't know what her exact job" was and did not know whether Kellen

Epstein and Ms. Maxwell ended their romantic relationship and "went their separate ways": Ms.

Maxwell "moved on" from Epstein, stopped coming into the office, started dating other men, and

eventually entered a long-term, committed relationship with Ted Waitt.  (Tr. 2370-71, 2374,

2378-80).  Juan Alessi testified that Kellen "immediately took over" responsibility for answering

the phones and scheduling the massage appointments at the Palm Beach residence as soon as she

was hired.  (Tr. 833).  Carolyn herself testified that there was a clear break in time between when

Ms. Maxwell called her to schedule massage appointments and when Sarah Kellen called her.

(Tr. 1527) (Ms. Maxwell called her in roughly "the first year or two" of her visits to the Palm

Beach residence—2001-2002, according to Carolyn—and Kellen called her thereafter).  Carolyn

recalled seeing Ms. Maxwell in the kitchen office of the Palm Beach residence during the period

when Kellen scheduled her massage appointments.  (Tr. 1527).  But nothing in her testimony

indicates that Ms. Maxwell supervised or directed Kellen or that Ms. Maxwell had anything to

do with the massage appointments at that time.  (*Id*.).  Accordingly, there is no basis in the trial

record to conclude that Ms. Maxwell supervised Sarah Kellen in connection with the offense

conduct and therefore no basis to apply the aggravating role enhancement.

Both Probation and the government contend that the aggravating role enhancement

applies because Ms. Maxwell was the organizer or leader of criminal activity relevant to each

victim that was "otherwise extensive."  (PSR at 58-59).  But this position ignores the first step in

the analysis.  Regardless of whether the criminal activity was "otherwise extensive," no

aggravating role enhancement applies unless Ms. Maxwell supervised another criminal

participant in the offense.  USSG § 3B1.1, cmt. n.2.  The record does not contain any evidence

---

was Epstein's assistant or Ms. Maxwell's assistant.  (Tr. 204).  He further conceded that his best recollection was
that Kellen was "an employee who worked with Epstein."  (*Id*.).

that she did so in connection with the offense conduct related to "Jane," Annie Farmer, or Carolyn.  The aggravating role enhancement therefore does not apply to any of the three offense groups.

### B.      The Criminal Activity Was Not "Otherwise Extensive"

Even if the Court finds that Ms. Maxwell supervised another "participant," the record does not support a finding that the criminal activity related to "Jane," Annie Farmer, or Carolyn was "otherwise extensive," as the government contends.[9]  Under the Guidelines, the Court must treat each minor victim separately and consider whether the enhancement applies based solely on the criminal activity related to that minor victim.  *See* USSG § 2G1.3, cmt. n.6 ("[S]ubsection (d)(1) directs that if the relevant conduct of an offense of conviction includes travel or transportation to engage in a commercial sex act or prohibited sexual conduct in respect to more than one minor … each such minor shall be treated as if contained in a separate count of conviction.").  For example, the government cannot use conduct from the 2001-2004 time period related to Carolyn to justify applying the aggravating role enhancement to the criminal activity in 1994-1997 related to "Jane" or in 1996 related to Annie Farmer.

The government nevertheless attempts to justify the enhancement as to each of the three minor victims by making a broad assertion about the nature and scope of the conspiracy as a whole, rather than making an individualized determination that the criminal activity was "otherwise extensive" as to each.  (*See* PSR at 59)  Because that is insufficient to establish that the criminal activity was "otherwise extensive," Ms. Maxwell should, at most, be subject to a two-point enhancement under USSG § 3B1.1(c).

---

[9] The government does not argue that the aggravating role enhancement applies because the criminal activity involved "five or more participants," conceding that the trial record does not support the conclusion that five or more people criminally participated in the offense conduct.

## IV.  The Two-Point "Undue Influence" Enhancement Under USSG § 2G1.3(b)(2)(B) Does Not Apply.

Finally, it would be improper for the Court to apply a two-level enhancement on the grounds that a participant in the criminal activity "unduly influenced a minor to engage in prohibited sexual conduct."  USSG § 2G1.3(b)(2)(B).  First, it would constitute impermissible double-counting to apply § 2G1.3(b)(2)(B) to the offense conduct related to "Jane," Annie Farmer, and Carolyn because it would punish Ms. Maxwell for the same harm that was fully accounted for in the base offense level for Counts Three, Four, and Six.  "Impermissible double counting occurs when one part of the Guidelines is applied to increase the defendant's sentence to reflect the kind of harm that has already been fully accounted for by another part of the Guidelines."  *United States v. Watkins*, 667 F.3d 254, 261 (2d Cir. 2012).  Ms. Maxwell was convicted of conspiring to "entice" and "coerce" minors to travel to engage in prohibited sexual conduct and "enticing" minors to engage in commercial sex acts.  (S2 Ind. ¶¶ 12, 24, 27).[10] Webster's Dictionary defines the word "entice" to mean "to attract artfully or adroitly or by arousing hope or desire; tempt" and the further explains that the word "tempt" "implies the presenting of an attraction so strong that it overcomes the restraints of conscience or better judgment."[11]  Similarly, Webster's Dictionary defines the word "coerce" to mean "to compel to an act or choice" and further explains that the word "compel" "typically suggests overcoming of resistance or unwillingness by an irresistible force."[12]  Accordingly, the base offense level for

---

[10] Count Three charged a conspiracy to transport minors with intent to engage in criminal sexual activity.  S2 Ind. ¶¶ 16-19.  Although this offense does not contain an element of "enticement" or "coercion," the offense conduct for Counts One, Three, and Five (the three conspiracy counts) was consolidated under Count Three for the purposes of sentencing, pursuant to the Court's order.  *See* Dkt. 657.

[11] *Available at Meriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/coerce (accessed June 15, 2022).

[12] *Available at Meriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/compel (accessed June 15, 2022).

Counts Three, Four, and Six already includes the concept of "unduly influenc[ing] a minor to engage in prohibited sexual conduct." The enhancement therefore should not be applied to any of the three offense groups.

Second, under the 2003 Guidelines, which should apply in this case, the analogous two-point enhancement only applies if "a participant otherwise unduly influenced a minor to engage in *a commercial sex act*." USSG § 2G1.1(b)(4)(B) (2003) (emphasis added). There is no evidence that "Jane" or Annie Farmer engaged in a commercial sex act. Accordingly, the enhancement should not apply to their two offense groups (Groups 1 and 2).

Third, the evidence does not support that Carolyn was "unduly influenced" to provide sexualized massages to Epstein. The "undue influence" enhancement applies when "a participant's influence over the minor compromised the voluntariness of the minor's behavior." USSG § 2G1.3(b)(2)(B), Appl. Note 3(B). "[T]he defining characteristic of undue influence is that it involves a situation where the influencer has succeeded in altering the behavior of the target*." United States v. Patterson*, 576 F.3d 431, 443 (7th Cir. 2009) (internal quotation marks omitted). Apart from Virginia Roberts initially offering Carolyn the opportunity to massage Epstein, the record indicates that Carolyn sought out additional massage appointments herself and recruited other minors to perform sexualized massages to make more money. (Tr. 1527-28, 1543-46). Carolyn further testified that after she became pregnant, she returned to Epstein without being contacted to earn additional money. (Tr. 1548-49). In addition, Carolyn was not so influenced by Epstein or Ms. Maxwell that she did whatever they asked of her. Carolyn testified that she refused their offers to have her travel with them to Epstein's island. (Tr. 1534-35). In sum, the record does not support the conclusion that Ms. Maxwell or anyone else

compromised the voluntariness of Carolyn's behavior.  Accordingly, the enhancement should not apply to Carolyn's offense group (Group 3).

## V.   <u>The Correct Sentencing Range is 51-63 Months Under the 2003 Guidelines.</u>

By applying the 2003 Guidelines and eliminating the enhancements under §§ 4B1.5, 3B1.1, and 2G1.3(b)(2)(B), the correct sentencing range is **51-63 months**, based on a total offense level of 24 and criminal history category I, calculated as follows:

**<u>Group 1</u>:  Offense Conduct Related to "Jane"**

**Base Offense Level**:  Because the offense involved a minor, the base offense level is 19.  USSG § 2G.1.1(a)(1).                                                   **<u>19</u>**

**Specific Offense Characteristics**:  Because the offense involved a victim who had attained the age of 12 years but not attained the age of 16 years, a two-level enhancement is warranted, pursuant to USSG § 2G.1.1(b)(2).          **<u>+2</u>**

**Adjusted Offense Level (Subtotal)**:                                             **<u>21</u>**


**<u>Group 2</u>:  Offense Conduct Related to Annie Farmer**

**Base Offense Level**:  Because the offense involved a minor, the base offense level is 19.  USSG § 2G.1.1(a)(1).                                                   **<u>19</u>**

**Adjusted Offense Level (Subtotal)**:                                             **<u>19</u>**


**<u>Group 3</u>:  Offense Conduct Related to Carolyn**

**Base Offense Level**:  Because the offense involved a minor, the base offense level is 19.  USSG § 2G.1.1(a)(1).                                                   **<u>19</u>**

**Specific Offense Characteristics**:  Because the offense involved a victim who had attained the age of 12 years but not attained the age of 16 years, a two-level enhancement is warranted, pursuant to USSG § 2G.1.1(b)(2).          **<u>+2</u>**

**Adjusted Offense Level (Subtotal)**:                                             **<u>21</u>**

**Multiple Count Adjustment**

| Group/Count | Adjusted Offense Level | Units |
|---|---|---|
| Group 1 | 21 | 1.0 |
| Group 2 | 19 | 1.0 |
| Group 3 | 21 | 1.0 |

**Total Number of Units**:                                          3.0

**Greater of the Adjusted Offense Levels Above:**                **21**

**Increase in Offense Level:**                                        **+3**

**Combined Adjusted Offense Level:**                            **24**

**Total Offense Level:**                                            **24**

## CONCLUSION

For the foregoing reasons, the Court should apply the 2003 Guidelines, which yield a properly calculated sentencing range of **51-63 months**. Should the Court apply the 2004 Guidelines, it should not apply the enhancements under §§ 4B1.5, 3B1.1, and 2G1.3(b)(2)(B).

Dated: June 15, 2022
       New York, New York

Respectfully submitted,

*/s/ Christian R. Everdell*
Christian R. Everdell
COHEN & GRESSER LLP
800 Third Avenue
New York, NY 10022
Phone: 212-957-7600

Bobbi C. Sternheim
Law Offices of Bobbi C. Sternheim
33 West 19th Street - 4th Floor
New York, NY 10011
Phone: 212-243-1100

Jeffrey S. Pagliuca
Laura A. Menninger
HADDON, MORGAN & FOREMAN P.C.
950 17th Street, Suite 1000
Denver, CO 80202
Phone: 303-831-7364

*Attorneys for Ghislaine Maxwell*

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 15, 2022, I served by ECF the within memorandum upon the following:

Maurene Comey, Esq.
Maurene.Comey@usdoj.gov

Alison Moe, Esq.
Alison.Moe@usdoj.gov

Lara Pomerantz, Esq.
Lara.Pomerantz@usdoj.gov

Andrew Rohrbach, Esq.
Andrew.Rohrbach@usdoj.gov

*/s/ Christian R. Everdell*
Christian R. Everdell