UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

United States of America,

–v–

Ghislaine Maxwell,

Defendant.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 11/19/21

20-CR-330 (AJN)

MEMORANDUM
OPINION & ORDER

ALISON J. NATHAN, District Judge:

Before the Court is the Defendant's fourth motion *in limine* to "exclude evidence related

to Accuser-3," to whom the Court refers as Witness-3, on the grounds that the testimony is not

direct evidence of the charged conspiracies and is inadmissible under Federal Rules of Evidence

404(b) and 403.  Dkt. Nos. 387, 444.  The Court has twice heard argument related to this motion,

including argument at the November 10, 2021 in camera hearing that was sealed pursuant to

Federal Rule of Evidence 412.  *See generally* Nov. 1, 2021 Transcript; Nov. 10, 2021 Transcript.

At the November 1, 2021 hearing, the Court provided a brief explanation of its current position

based on the information then before it, but the Court ultimately reserved ruling pending

additional briefing.  The Court is now in receipt of the parties' additional briefing and

accordingly is prepared to resolve the motion.[1]

The Government now proffers that the anticipated testimony of Witness-3 will describe

how she met the Defendant and her relationship with the Defendant and Mr. Epstein.  In

particular, Witness-3 is anticipated to testify how Defendant introduced her to Mr. Epstein, how

---

[1] This Memorandum Opinion & Order is filed temporarily under seal to permit the parties the opportunity to propose
sealing or limited redactions pursuant to *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110 (2d Cir. 2006), and
Federal Rule of Evidence 412(c)(2).

massages progressed to involve sexual activity, and Ms. Maxwell's role in facilitating those massages. Based on all of the information now before the Court, including a substantially more detailed proffer by the Government as to the anticipated testimony, *see* Gov. Supp. Ltr. at 2-3 (Nov. 5, 2021); *see also* Dkt. No. 452 at 42-43, the Court concludes that some of the anticipated testimony may serve as direct evidence of the Mann Act counts.

The Government rightly acknowledged at the November 1 pretrial conference that Ms. Maxwell cannot be found guilty on this witness's testimony alone for any of the crimes charged in the Indictment. Nov. 1, 2021 Tr. at 67:12-25, 68:13-19, 69:4-9, 70:23-71:2, 72:22-25. As the Government acknowledged, with respect to the jury's determination in this case, this witness is not a victim of any of the crimes charged in the Indictment. *See id.* at 69:4-9; Nov. 10, 2021 Tr. at 164:19-165:3.[2] However, evidence of legal conduct can of course be relevant evidence of illegality. And conduct that cannot itself form the basis of a conviction can serve as direct evidence of the crimes charged. *See, e.g.*, *United States v. Robinson*, 702 F.3d 22, 37 (2d Cir. 2012) (affirming admission of defendant pimp's relationship with and control over women who worked as prostitutes as direct evidence of 18 U.S.C. § 1591(a) charge). Thus some of the anticipated testimony described above can serve as direct evidence, notwithstanding the fact that the alleged conduct as to Witness-3 was not illegal for the purpose of the charges in this case.

Portions of the anticipated testimony may also serve permissible purposes under Rule 404(b), namely proving motive, intent, and knowledge. *See* Fed. R. Evid. 404(b)(2). The witness is expected to testify about certain statements by Ms. Maxwell. For example, the

---

[2] At the November 1 conference, the Court denied the Defendant's motion to preclude the Government from referring to alleged victims as "victims" and "minor victims." Nov. 1, 2021 Tr. at 4. In contrast to the other alleged victim witnesses, it is not (nor could it be) the Government's litigating position that this witness is a victim of the crimes charged in the Indictment. Given this, the Government may not refer to this witness as a "victim" or a "minor victim" in front of the jury. Doing so would constitute prejudicial error for the reasons explained in this Memorandum Opinion & Order.

Government expects the witness to testify: █████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

Gov. Supp. Ltr, at 2-3 (Nov. 5, 2021).  These statements are relevant because the jury may

conclude that they tend to establish that the Defendant knew the alleged massages were

sexualized and the Defendant's motive for facilitating the encounters.  ████████████████

█████████████████████████████████████████

█████  *Id.* at 3, 9.  This testimony is relevant because the jury may conclude that it tends to

establish the Defendant's intent to recruit girls for sexualized massages.  ████████████████

█████████████████████████████████████████████

█████████████████████████  *Id.* at 3.  Although it is not the only

available interpretation of this evidence, the jury could conclude that ████████████████

████████████████████████████████████████████████

█████████████████████████████████████████

████████████████████  Such knowledge and intent are of course proper purposes under Rule

404(b).[3]

---

[3] Defendant argues that this witness's testimony is impermissible propensity evidence as to Mr. Epstein under Rule 404(b).  Def. Supp. Resp. at 5-7 (Nov. 11, 2021).  The Court is unpersuaded.  The testimony is not offered to show that Mr. Epstein acted in accordance with a certain character trait on a particular occasion.  Rather, it is probative of whether Ms. Maxwell knew of or at least believed he had a sexual interest in ████████, which a jury may find tends to establish the Defendant's intent and motive as to the charged crimes.  *See Roe v. Howard*, 917 F.3d 229, 245-46 (4th Cir. 2019) (rejecting argument that husband's assault of a non-party housekeeper was improper character evidence under Rule 404(b) in a Trafficking Victims Protection Act action against the wife for facilitating husband's assaults of live-in housekeeper).

The probative value of the anticipated testimony must of course be balanced with any potential prejudice under Rule 403. As the Court noted at the November 1 conference, there is a risk that the jury may confuse the issues and think that the sexual conduct this witness is describing itself constitutes the illegality charged in the Indictment due to the closeness in age of this witness to the age of consent. Nov. 1, 2021 Tr. at 89-90. There is also the risk that the jury may convict Ms. Maxwell due to feelings of immorality or sympathy for the witness despite the lack of illegality with regard to the crimes charged in the Indictment. However, the Court concludes that this risk of prejudice can be sufficiently minimized through two avenues. First, the testimony must be carefully limited. Second, there must be a clear limiting instruction.

As to the first, the witness is limited to stating that sexual activity occurred but is precluded from providing detailed descriptions of the sexual activity. There is little to no probative value of a witness describing sexual activity when that witness's testimony regarding the sexual activity cannot form the basis for the conviction of the crimes charged. For example, any prejudice from ███████████████████ described above is substantially diminished by limiting the proffered testimony to the Defendant's interaction with the witness and testimony indicating that sexual activity allegedly took place without describing the details of that sexual activity. Unlike the details of the sexual conduct itself, this anticipated testimony would not be unduly prejudicial. In contrast, the minimal probative value of the details of sexual conduct would be substantially outweighed by the risk of the jury convicting Ms. Maxwell on an improper basis. The same is true of the witness's subjective experience of the sexual conduct and any emotional or other impact the sexual conduct had on the witness because such testimony cannot form the basis of a conviction in this case. Accordingly, the witness is limited, as the Government phrased it, to describing her "factual experience" as to the lines of testimony

described above.  *See* Gov. Supp. Ltr. at 12 (Nov. 5, 2021).  For example, in a recent murder trial, the Court permitted the nephew of the victim to describe his uncle's wounds because the nephew, who had served as a caretaker, had some information that was not cumulative of the medical records.  The Court expressly cautioned the Government that it would not permit emotional testimony, or the probative value would be outweighed by the prejudice:

> [I]t's clearly a 403 line here. You have cumulativeness with the medical testimony, you have graphic descriptions from a relative who cared for the victim which could very well produce sympathies and prejudice that would interfere with and overcome the medical facts that you need for purposes of proving causation. . . . I am certainly going to cut off the line at any graphic descriptions.  To the extent that walking this person through questions regarding the medical condition is emotional testimony, I think we are – it will have to be stopped.

*United States v. Berry*, No. 20 Cr. 84 (AJN), Dkt. No. 138 at 13; *see also id.* at 15.  In that case, the Government agreed that the line had to be carefully guarded.  *Id.* at 13-14.  The transcript of that ruling is attached for counsel's reference.  *See* Exhibit A.  The Court cautions the Government to proceed carefully because the Court will not allow testimony that steps over this 403 line.  The Court will allow some leading questions for this portion of the testimony to help ensure that it does not.

Finally, the Court concludes that this witness's anticipated testimony as to the sex trafficking counts is inadmissible.  Although the Government's letter points to some relevant direct evidence that this witness could provide regarding these counts, *see* Gov. Supp. Ltr. at 6-7, any minimal probative value of this evidence is diminished by its remoteness in time to the charged sex trafficking conspiracy, which is alleged to have run from 2001 to 2004.  This evidence does not face the same problem as it relates to the Mann Act conspiracies, which are alleged to have begun in 1994 (and when the Defendant allegedly began her relationship with this witness.).  Because the risk of unfair prejudice substantially outweighs the probative value of

this evidence as to the sex trafficking counts, the witness is precluded from testifying that ███

███████████████████████████████████████

The Court thus draws the line described above for limiting Witness-3's testimony. Permitting the entirety of the proffered testimony carries a risk that the jury may convict Ms. Maxwell due to conduct that cannot form the basis of a conviction for the charged crimes. But by limiting the testimony to the few categories of relevant testimony outlined above, the prejudice is substantially minimized.

Moreover, whether as direct evidence of the Mann Act counts or offered for a proper purpose under 404(b), this testimony must be paired with a proper limiting instruction to guard against potential juror confusion. The Defense has submitted proposed limiting instructions, and the Government agrees that some sort of instruction is appropriate, although it disagrees with the basis for the instruction. Dkt. No. 452 at 50 n.12; Gov. Supp. Ltr. at 12 (Nov. 5, 2021). In accordance with this ruling, the Court proposes the following instruction before this anticipated witness testifies:

> You will hear testimony from the next witness about interactions that she says she had with the Defendant and Mr. Epstein. I instruct you that because the witness was over the relevant age of consent at the relevant time period, any sexual conduct she says occurred with Mr. Epstein was not "illegal sexual activity" as the Government has charged in the Indictment. I instruct you that this witness is not a victim of the crimes charged in the Indictment. To the extent you conclude that her testimony is relevant to the issues before you, you may consider it. However, you may not convict the Defendant on the basis of the testimony regarding the sexual conduct between this witness and Mr. Epstein. Nor may you consider this testimony as any kind of reflection on Mr. Epstein's nor Ms. Maxwell's character or propensity to commit any of the crimes charged in the Indictment.

The Court also proposes the following instruction before any testimony by other witnesses regarding sexual activity that occurred after the relevant age of consent:

> I anticipate that you will hear testimony from the next witness about sexual conduct that she says she had with Mr. Epstein in [insert relevant jurisdiction, e.g. New Mexico]. I instruct you that because the witness was over the age of consent in [insert relevant

jurisdiction, e.g. New Mexico] at the relevant time period, the sexual conduct she says occurred with Mr. Epstein was not "illegal sexual activity" as the Government has charged in the Indictment. However, to the extent you conclude that her testimony is relevant to the issues before you, you may consider it. However, you may not consider this testimony as any kind of reflection on Mr. Epstein's nor Ms. Maxwell's character or propensity to commit any of the crimes charged in the Indictment.

The parties may submit any requested edits to the proposed limiting instructions that are consistent with the Court's ruling or indicate that they have none on or before November 21, 2021.

This resolves Dkt. Nos. 387, 444.

SO ORDERED.


Dated: November 19, 2021
      New York, New York

_____
ALISON J. NATHAN
United States District Judge

L9L5ber1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,                    New York, N.Y.

            v.                               20 Cr. 84 (AJN)

RALPH BERRY,

                Defendant.

------------------------------x

                                             September 21, 2021
                                             9:45 a.m.

Before:

                    HON. ALISON J. NATHAN,

                                             U.S. District Judge
                                                And A Jury

                            APPEARANCES

AUDREY STRAUSS
      United States Attorney for the
      Southern District of New York
BY:   JACOB R. FIDDELMAN
      DOMINIC A. GENTILE
      ADAM HOBSON
      Assistant United States Attorneys

LAW OFFICE OF MARK S. DEMARCO
      Attorneys for Defendant
BY:   MARK DeMARCO
      -AND-
LAW OFFICES OF EZRA SPILKE, PLLC
BY:   EZRA SPILKE

L9L5ber1

1           (Case called)

2           THE DEPUTY CLERK:  Counsel, please state your name for

3     the record, starting with the government.

4           MR. HOBSON:  Good morning, your Honor.  Adam Hobson,

5     Jacob Fiddelman, and Dominic Gentile for the government.

6           THE COURT:  Good morning.

7           For the defendant?

8           MR. DeMARCO:  Good morning.  For Mr. Berry, Mark

9     DeMarco and Ezra Spilke, Ms. Mayerlin Ulerio, and of course

10    Mr. Berry.

11          THE COURT:  Good morning, counsel.

12          Good morning, Mr. Berry.

13          THE DEFENDANT:  Good morning.

14          THE COURT:  I had hoped to start at 9:00 but Mr. Berry

15    wasn't brought until now.  Hopefully that won't repeat going

16    forward.  We will make sure that things are in place to prevent

17    that so we can timely get started each day.

18          I thank everyone for being here on time.  Let me ask,

19    as a matter of procedure, we will wait for the jury department

20    to let us know when the panel is checked in and assembled and

21    in their seats, and then can head over to 500 Pearl to commence

22    jury selection.  My purpose for today is to confirm the receipt

23    of the voir dire questionnaire that I sent yesterday with the

24    noted change, make sure everybody got that.  The second is to

25    confirm that there have been no additional plea offers.  And

L9L5ber1

1    lastly, I made the note, make sure there are no questions

2    regarding jury selection now that you have been to the

3    walk-through in the jury selection room where selection will

4    take place.

5              So, let me ask, everybody received the voir dire with

6    the noted changes?

7              MR. HOBSON:  Yes, your Honor.  We did.

8              THE COURT:  Nothing additional, Mr. Hobson?

9              MR. HOBSON:  Nothing additional.

10             MR. DeMARCO:  Yes, your Honor; and nothing additional.

11             THE COURT:  Thank you.

12             Any additional plea offers that I need to allocute on?

13             MR. HOBSON:  No additional plea offers have been

14    extended, your Honor.

15             THE COURT:  OK.  And then let me confirm if anybody

16    has any questions about jury selections.  To repeat the basic

17    process, I will qualify 33 potential jurors that represents 12

18    jurors and three alternates, 10 peremptories as to the main

19    panel for the defense, six peremptories for the government, one

20    peremptory per side with respect to the alternates.  And the

21    way that we are operating under the COVID protocols, the jury

22    department will, after the jury panel members are checked in,

23    they'll be randomly assigned a number consistent with a list

24    that the jury department generates, they will be seated in that

25    numerical order in the jury selection room.  I understand 1

L9L5ber1

1    through 42 will be in the main jury selection room and then 43

2    through, I believe 82 -- we will get the final number once we

3    see what the return on the summons is -- will be seated in

4    courtroom 9C also at 500 Pearl, with a live feed to 9C of

5    everything taking place in the jury assembly room.

6           I will make preliminary instructions which you have

7    seen after you and I enter the courtroom.  The panel members

8    will be seated at that point.  I will make my preliminary

9    remarks, the written questionnaire that the jurors can read

10   along with will be handed out at that point, both in the jury

11   assembly room and in 9C simultaneously through court staff.  I

12   will instruct the jurors not to write anything on the

13   questionnaire with the exception of circling a number if they

14   have a "yes" response to that question as I read through the

15   questionnaire.

16          So, at that point I will turn to panel member juror

17   no. 1 and go through and read the questionnaire getting "yes"

18   or "no" response to each question.  If the answer is "yes"

19   following up as appropriate.  To the extent that the matters

20   touched upon could influence other jurors or are of a sensitive

21   nature, we will bring that juror over to the plexiglass area to

22   my right in the jury assembly room, there is markings on the

23   floor where folks stand and the noise machine will be on so

24   that others cannot hear, and I will inquire with the juror as

25   to any necessary follow-up.

L9L5ber1

1      Once we get through, assuming we get through juror

2  no. 1 without any for-cause issues, I will turn to juror no. 2

3  and say do you have any "yes" responses?  And then we will take

4  those in order as they come.

5      If any juror needs to be dismissed for cause, let's

6  say juror no. 2 needs to be dismissed for cause, then we will

7  proceed with the same process with juror no. 3.  Any "yes"

8  questions, taking those one at a time, continuing until we have

9  33 qualified jurors.

10      Once we have 33 qualified jurors you will exercise

11  your peremptory strikes by list and simultaneously, that is,

12  each side will produce a list with the government's six strikes

13  as to the main panel and one strike as to the alternate panel,

14  and the defense will write its list with 10 strikes as to the

15  main panel and one strike as to the alternate panel.

16  Obviously, before anyone is dismissed, I will hear from counsel

17  if any applications or issues need to be raised if you are

18  satisfied with our jury.  Once we get there we will read the

19  names of the selected jurors, dismiss to the jury department

20  the unused jurors, and then proceed over back across the street

21  over here.  I believe what we will do is have Ms. Williams take

22  the jurors to the jury room, which is an outfitted courtroom so

23  they can put their belongings down, she can give them notebook

24  and pen, bring them back in.  At that point she will swear the

25  jury and I will give preliminary instructions and opening

L9L5ber1

| | |
|---|---|
| 1 | statements.  Whether that happens today or tomorrow we will |
| 2 | see.  Hopefully today. |
| 3 | Any questions or issues to raise with the process I |
| 4 | have described?  Mr. Hobson? |
| 5 | MR. HOBSON:  Your Honor, no.  One small thing on the |
| 6 | voir dire.  We submitted a list of names for the Court to read. |
| 7 | One thing I wanted to flag for the Court is one of the |
| 8 | witnesses' names we asked you to include is Jesus Ortiz, and |
| 9 | that's how he pronounces his name, with a hard J.  I want to |
| 10 | flag that for the Court so that his name is read accurately to |
| 11 | the jury. |
| 12 | THE COURT:  Let me see if there are any other |
| 13 | pronunciation issues. |
| 14 | Mr. DeMarco, while I am pulling that up, any other |
| 15 | questions or issues with respect to the process? |
| 16 | MR. DeMARCO:  No, your Honor. |
| 17 | THE COURT:  And, Mr. DeMarco, you are going to keep |
| 18 | your mask on so I don't have to keep coming at you about it? |
| 19 | MR. DeMARCO:  I will do my best. |
| 20 | THE COURT:  OK.  Don't take it off to talk. |
| 21 | MR. DeMARCO:  Sorry? |
| 22 | THE COURT:  Don't take it off to talk. |
| 23 | MR. DeMARCO:  OK.  I took it off to listen the last |
| 24 | time. |
| 25 | THE COURT:  That's an anatomical anomaly. |

L9L5ber1

1          I should say, of course, once we are in the courtroom

2     then counsel in the plexiglass box with the HEPA filter will be

3     able to remove their mask for questioning, and to the extent

4     outside of the jury we have argument or the like, we can do

5     that in there to aid that that process.

6          It's Ms. Ulerio, Mayerlin, am I saying that correctly?

7          MS. ULERIO:  Yes.

8          THE COURT:  And you have another paralegal Dylan

9     Schneider who may be here?

10          MR. DeMARCO:  Yes, your Honor, but he won't be with us

11     in court.

12          THE COURT:  And what about Jeremy Schneider?

13     Mr. Schneider.

14          MR. DeMARCO:  He is unable to be with us.

15          THE COURT:  He won't be at trial at any point?

16          MR. DeMARCO:  No.  I don't expect him to be here.

17          THE COURT:  Should I include him in the voir dire just

18     in case.

19          MR. DeMARCO:  I think you should, Judge, because his

20     name might come up and I just can't see how or where or under

21     what scenario.  But, just to be safe.

22          MR. HOBSON:  His name is on the stipulations, so maybe

23     to be safe.

24          THE COURT:  Just to note, when I do introduce counsel

25     for purposes of the voir dire, and Mr. Berry, and the

L9L5ber1

| | |
|---|---|
| 1 | paralegals, I will ask each of you to stand as I say your name |
| 2 | so that the jurors can see you, the panelists can see you.  So, |
| 3 | I will note Mr. Schneider is part of the team but not present |
| 4 | today and may not be present every day of the trial. |
| 5 | Appropriate, Mr. DeMarco? |
| 6 | MR. DeMARCO:  Yes, Judge. |
| 7 | THE COURT:  OK.  So Jesus Ortiz is the pronunciation. |
| 8 | How about, Mr. Hobson, how do I pronounce no. Q? |
| 9 | MR. HOBSON:  I believe, your Honor, it is Vyacheslav, |
| 10 | and the last name is Polosin. |
| 11 | THE COURT:  Vyacheslav Polosin.  OK. |
| 12 | Special Agent Stefano Braccini? |
| 13 | MR. HOBSON:  And he is in the courtroom. |
| 14 | THE COURT:  OK.  I think that's it.  Other issues to |
| 15 | take up? |
| 16 | MR. HOBSON:  I don't think so, your Honor. |
| 17 | THE COURT:  Mr. DeMarco? |
| 18 | MR. DeMARCO:  No, your Honor.  Not now. |
| 19 | Judge, how much time do we have before we walk over? |
| 20 | Maybe we could use this time efficiently, because I do have -- |
| 21 | I raised with the government an issue I was going to raise with |
| 22 | their first witness so you tell me. |
| 23 | THE COURT:  I was told around between 10:00 and 10:30 |
| 24 | but we won't know until they actually call over so I'm happy to |
| 25 | use the time and if we get the call, we will pause. |

L9L5ber1

1            MR. DeMARCO:  OK.

2            THE COURT:  Was it an issue you wanted to speak to the

3    government about first?

4            MR. DeMARCO:  I did consult with the government.  I

5    was unpersuasive.  I was hoping to be more successful with your

6    Honor.

7            THE COURT:  OK.  And the first witness is?

8            MR. DeMARCO:  Mr. Rasheen Vega.

9            THE COURT:  Go ahead.  And if you could speak into the

10   mic, please?

11           MR. DeMARCO:  It seems to me, your Honor, from my

12   reading of the 3500 material, that we can expect Mr. Vega to

13   testify to something like this:  That he was the nephew of

14   Mr. Jones, that he was 11 years old at the time that Mr. Jones

15   was shot in June of 2000, that he witnessed a portion of that

16   shooting or the aftermath of that shooting which I am OK with.

17   The problem that I have with his prospective testimony is this:

18   It also appears from reading the 3500 that the government will

19   seek to elicit from Mr. Vega testimony about the horrific,

20   horrific bedsores or compression sores that Mr. Jones was

21   suffering from at the time of his death.  I believe there is at

22   least notes that Mr. Vega observed the sores to be oozing,

23   observed Mr. Jones to be in terrible, terrible pain and

24   suffering at or near the time of his death, and my concern is

25   that, A, in light of the fact that two doctors are being called

L9L5ber1

by the government and, even apart from that, Mr. Vega is not

qualified to testify about the injuries that he observed; and

B, that this type of testimony serves no purpose but to elicit

or garner sympathy from the jury and will be unduly prejudicial

to Mr. Berry.

So, that's the basis of my objection to Mr. Vega,

should he be asked those types of questions.

THE COURT:  Understood.

Mr. Hobson?

MR. HOBSON:  Your Honor, there are two large topics

that Mr. Vega is anticipated to testify about.  I think it is

consistent with what Mr. DeMarco says is, one, he was a

percipient witness to the shooting itself; and two, he observed

the victim's injuries after the shooting and was involved in

the victim's care in the 10 years between the shooting and the

victim's death.  I take it it is the second category that the

defendant is objecting to.  But here, cause of death is

obviously a big issue in this case and it is something that it

is our burden to prove, that the injuries from the shooting

lead to his death.  And we expect the evidence to show that, as

a result of the shooting, the victim became paralyzed from the

waist down and that meant that he was confined to a

wheelchair -- whereas he was not in a wheelchair before -- and

developed serious complications as a result of that including

serious sores which later led to infection and the victim's

L9L5ber1

1     death.

2             We will not be eliciting expert medical testimony or

3     opinion from this witness, he will be simply testifying to what

4     he observed with respect to the victim's physical condition

5     during the 10 intervening years between the shooting and the

6     death and that's important evidence, it's evidence that will

7     then be consistent with things that medical experts to be

8     qualified as experts will be called to testify about, but those

9     experts did not observe these injuries during the 10

10    intervening years.  They also did not observe Mr. Jones prior

11    to the shooting.  For instance, they wouldn't be able to tell

12    you whether he was in a wheelchair before the shooting or after

13    the shooting.  They wouldn't be able to tell you if he

14    developed those bedsores before the shooting or after the

15    shooting.  It is Mr. Vega's observations that will allow the

16    jury to connect those dots.  Given how important causation is

17    in this case, we think it is important that the jury understand

18    those injuries.

19            THE COURT:  Will medical records, that will be

20    introduced, describe the bedsores?

21            MR. HOBSON:  They will describe the bedsores at the

22    time of the autopsy which was in November of 2010.

23            THE COURT:  What is the connection between bedsores

24    and cause of death?  Infection?

25            MR. HOBSON:  Your Honor, essentially what I expect the

L9L5ber1

testimony will be from the medical experts is that as a result
of the gunshot wound, that caused paralysis and paraplegia in
the victim.  Paraplegia commonly leads to things such as
bedsores or pressure sores from not being able to move one's
body; also other conditions such as a colostomy bag, a
collapsed rectum, a permanent catheter, all of which can lead
to infections and that in this particular case it was the
complications of the paraplegia that led into infections or
sepsis and that it was the sepsis that ultimately, in 2010,
killed Mr. Jones.

　　　　　　MR. DeMARCO:  Your Honor, if I may?

　　　　　　THE COURT:  Sure.

　　　　　　MR. DeMARCO:  In my reading of the 3500 notes that
were disclosed it's more than that.  He describes oozing-type
wounds, he describes a horrific odor, I think he described it
as the smell of death in Mr. Jones' apartment at or near the
time of his death.  It's facts like these that I am focusing
on.

　　　　　　THE COURT:  Yes.

　　　　　　MR. DeMARCO:  The paraplegia, the medical testimony
from the medical examiners will establish that Mr. Jones was a
paraplegic and he was in a wheelchair.  But, my concern is
about the graphic description of the bedsores, the compression
sores, and also the horrific odor witnessed by Mr. Vega.

　　　　　　MR. HOBSON:  Your Honor, we are certainly cognizant of

L9L5ber1

 1    not crossing the 403 line here.  We think it is important that

 2    the jury understand the nature of these injuries and how they

 3    could lead to his death and what the injuries were during the

 4    intervening time between the shooting and the autopsy.  We are

 5    not looking to be gratuitous or to pile on here.

 6              THE COURT:  Yes.  Well, it's clearly a 403 line here.

 7    You have cumulativeness with the medical testimony, you have

 8    graphic descriptions from a relative who cared for the victim

 9    which could very well produce sympathies and prejudice that

10    would interfere with and overcome the medical facts that you

11    need for purposes of proving causation.  So, because this

12    witness is testifying first it's difficult for me to know

13    exactly what additional facts you need to extract from the

14    witness but I am certainly going to cut off the line at any

15    graphic descriptions.  To the extent that walking this person

16    through questions regarding the medical condition is emotional

17    testimony, I think we are -- it will have to be stopped.

18              So, I think what you need to think about is what --

19    and I'm going to allow a little bit of leading to ask the

20    specific factual questions you believe that you need and that

21    are not cumulative with the medical testimony, but I'm going to

22    guard this line very carefully, and you should too.

23              MR. HOBSON:  Your Honor, I understand that.  I will

24    say that in meeting with this witness we have tried to follow

25    that line and I am -- with the ability to maybe construct some

L9L5ber1

1    of my questions in a leading way, I will hope to enforce that

2    line.  It is, again, certainly not our intention to be

3    gratuitous but to simply get in the nature of the injuries and

4    their relationship.

5             THE COURT:  You don't have pre-autopsy medical records

6    that you are putting in that describes these injuries?

7             MR. HOBSON:  No, your Honor.

8             MR. DeMARCO:  I'm sorry.  What was that?  Pre?

9             THE COURT:  No.  I asked if there were --

10            MR. DeMARCO:  I misunderstood your question, Judge.

11   I'm sorry.

12            THE COURT:  I asked if there were pre-autopsy medical

13   records that describes these infections and injuries and the

14   answer is no.

15            MR. DeMARCO:  The government has disclosed, pursuant

16   to Rule 16, some of these records that your Honor references,

17   so.

18            MR. HOBSON:  Your Honor's question was I think if we

19   are introducing them.  There are voluminous medical records

20   that are almost incomprehensive to a layperson.  We are not

21   introducing those records.

22            THE COURT:  But you have a medical expert.

23            MR. HOBSON:  We do have a medical expert.

24            MR. DeMARCO:  Your Honor, if I just might add another

25   fact to this?  Based on the exhibit list and the exhibits

L9L5ber1

1    provided to us by the government, the government intends to

2    introduce, through the medical examiner, photographs of these

3    bedsores.  So, I think that expert testimony, by itself,

4    sufficiently will describe the bedsores that Mr. Jones was

5    suffering at the time of his death.

6              MR. HOBSON:  To be clear of what photographs we are

7    introducing, we are not introducing the most graphic pictures

8    of the bedsores.  In fact, we were concerned in introducing

9    some of the pictures that they wouldn't fully show how serious

10   the bedsores were but we are not going to be putting in the

11   most graphic pictures.

12             THE COURT:  What I am going to allow is you will have

13   some permission to lead with respect to the description of the

14   injuries and sores.  It's going to be brief and extraction of

15   facts that you need that is not cumulative with medical

16   testimony and evidence that's coming in.  We will see how it

17   goes but I am -- I intend to be extremely cautious given that

18   this is non-expert medical testimony coming from a relative.

19   So, the prospect of prejudice and emotion and sympathy is real

20   and I'm not going to let it happen.

21             MR. HOBSON:  Yes, your Honor.  We understand.

22             THE COURT:  Anything else?

23             MR. DeMARCO:  No thank you, your Honor.

24             THE COURT:  OK.  Any word, Ms. Williams?

25             (Discussion off record)

L9L5ber1

```
 1              THE COURT:  They said 15 to 20 minutes so I imagine
 2     the marshals need time to get Mr. Berry across the street.  So,
 3     unless anyone has anything further, we will break and
 4     re-assemble across the street at 500 Pearl.  Thank you.
 5              So, one question.  Mr. Hobson, is the government ready
 6     to commence trial?
 7              MR. HOBSON:  Yes, your Honor.
 8              THE COURT:  Mr. DeMarco?
 9              MR. DeMARCO:  Yes, Judge.
10              THE COURT:  Thank you.
11              MR. DeMARCO:  Your Honor, we are going to meet over at
12     the jury room?
13              THE COURT:  We will meet in the alcove outside the
14     jury assembly room.  There will be jury department staff there
15     to assist.
16              Thank you.
17              (Jury selection contained under separate cover)
18
19
20
21
22
23
24
25
```