**EXHIBIT H**

IN THE SUPERIOR COURT OF THE VIRGIN ISLANDS
Division of St. Thomas/St. John
_____o_____

In the Matter of the Estate of: )
) PROBATE CASE
)
) NO. ST-19-PB-0080
JEFFREY E. EPSTEIN, )
) ACTION FOR TESTATE
Deceased. ) ADMINISTRATION
_____)

Official Transcript
FEBRUARY 4, 2020

BEFORE: THE HONORABLE CAROLYN P. H. PERCELL
Magistrate Judge Presiding

APPEARANCES: ARIEL SMITH, ESQ.,
PAMELA TEPPER, ESQ.,
Assistant Attorneys General
Department of Justice
GERS Building, Second Floor
St. Thomas, Virgin Islands
{ On Behalf of the Government}



William Blum, Esq.
Christopher Kroblin, Esq.
Marjorie Whalen, Esq.
Shari D'Andrade, Esq.
Andrew Tomback, Esq.
Daniel Weiner, Esq.
{On Behalf of the Co-Executors }

Probate ST-19-PB-0080                                2

APPEARANCES (Cont'd)   Douglas Chanco, Esq.
                       {On Behalf of Jennifer Araos}

                       Kevin D'Amour, Esq.,
                       {On Behalf of Maria Farmer,
                       Teresa Helm, Juliette Bryant,
                       Jane Doe 1,000 and Jane Doe }

                       Richard Bourne-Vanneck, Esq.
                       {On behalf of Tela Davis}

                       John Benham, Esq.,
                       {On Behalf of Jane Doe}

                       Melody Westfall, Esq.,
                       {On Behalf of Claimants
                        Jane Doe 1-12}

                       Sean Foster, Esq.,
                       {On Behalf of Anonymous Claimants

I-N-D-E-X

Motion Re: Appointment of Appraisers.................12

Motion Re: Appointment of Master.....................22

Motion Re: Fee Applications .........................36

Motion Re: Quarterly Accountings.....................49

Motion Re: Claims Resolution Program/
Criminal Activity Lien Notice........................63

| WITNESSES | DIRECT |
|---|---|
| Jordana Harris Feldman | 103 |
| Kenneth Feinberg | 158 |

1  was approved and signed by Justice Cabret
2  January 30th at 2020. And we have your oath
3  that was attested by the Clerk of the Court,
4  Attorney Handy February 3rd at 2020. So you
5  are properly before the Court. We will now
6  swear the witness.
7           Thereupon, JORDANA HARRIS
8  FELDMAN, first having been duly sworn, was
9  examined and testified as follows:
10          DIRECT EXAMINATION
11 By Attorney Tomback:
12     Q.   Please state your name?
13     A.   Jordana Harris Feldman.
14     Q.   Where do you live?
15     A.   New York City.
16     Q.   Did you come down in St. Thomas
17 specifically to testify in this proceeding?
18     A.   Yes.
19     Q.   And are you familiar with our
20 filing indicating on January 9th in our brief
21 that you would be here to answer questions
22 that the Court may have?
23     A.   Yes.
24     Q.   And where were you most recently
25 employed?

```
 1          Q.  Is it a confidential program as
 2   well?
 3          A.  It's confidential to the extent
 4   that we, as the program administrators and my
 5   staff and contractors, would be protecting the
 6   privacy of the victims. We wouldn't be sharing
 7   any information with the estate or publicly.
 8   But the confidential requirement is
 9   unilateral. It's  only imposed on us and
10   there's no requirement whatsoever that
11   claimants limit their-- what information they
12   want to share with whomever they wish -- you
13   know, investigators, the public.  This is an
14   alternative to civil litigation and so we have
15   no intention to interfere with any sort of
16   criminal proceeding .
17          Q.  Are you familiar with the civil
18   lawsuit that the Attorney General of the
19   United States Virgin Islands filed in the
20   other court?
21          A.  Yes.
22          Q.  And have you read the Complaint?
23          A.  I have.
24          Q.  And direct your attention--you
25   probably don't remember this, but I'll tell
```

1  not agents of the estate. We're not here to do
2  their bidding. We make decisions on the design
3  and I will make designs on the administration
4  of the program, how it operates, and how
5  claims are determined based on our own
6  judgment and experience and the estate has
7  agreed to be removed from any part of that
8  process.
9       Q.  And so just to focus in on an
10 individual claimant's claim and the amount of
11 compensation that the program, and you as the
12 administrator, arrive at, the statement
13 provides that quote, the estate will have no
14 authority to reject or modify the
15 administrator's determination on any basis or
16 as to any claims, close quote. Why is that
17 important to the program and the claimants?
18      A.  It's important because to allow
19 the estate a say in these decisions
20 compromises the key-guiding principle of the
21 program. It compromises our independence; it
22 compromises our claims and confidentiality; it
23 compromises the non-adversarial nature of the
24 program.
25      Q.  And with respect to the program it

1  whether you can say we can back out this
2  amount, whatever is going on in the civil
3  court should not be affected; we believe the
4  estate, if the Attorney General, the
5  Government of the Virgin Islands was to
6  prevail, this will be the amount that they
7  would recover and so we can safely expend
8  these monies on this program, but remember the
9  question was because we don't have the
10 quarterly accountings, we don't have the full
11 evaluation. We don't know what the estate
12 consist of.
13            ATTORNEY TOMBACK: Your Honor, I
14 understand. Can we start with Mr. Feinberg
15 just to address the subsequent concerns that
16 the Attorney General have with the program, if
17 I can call him?
18            THE COURT: Just call him quickly.
19 Thank you, Ms. Feldman. We have all exhibits
20 admitted?
21            Thereupon, KENNETH R. FEINBERG,
22 first having been duly sworn, was examined and
23 testified as follows:
24            DIRECT EXAMINATION
25 By Attorney Tomback:

```
 1          Q.  Mr. Feinberg, before you were
 2   sworn in, I think you have all the exhibits in
 3   front of you so it would go much quicker.
 4          THE COURT: He's already sworn
 5   in.
 6          ATTORNEY TOMBACK: He already
 7   sworn in?
 8          THE COURT: Yes, we were good on
 9   this one.
10   By Attorney Tomback:
11          Q.  Where do you live, Mr. Feinberg?
12          A.  Washington, DC.
13          Q.  Did you come down here just to
14   testify in this proceeding?
15          A.  I did.
16          Q.  Where are you employed?
17          A.  I'm the Law Office of Kenneth R.
18   Feinberg, PC.
19          Q.  What do that firm do?
20          A.  We specialize in alternative
21   dispute resolutions, mediations, arbitrations
22   and claim programs like the one proposed.
23          Q.  Would you just describe briefly to
24   Your Honor your experience in this matter?
25          A.  I started in 1984 with the Agent
```

1        Q.  I mean, that's a very fine point I
2   asked. It's not really clear to me whether the
3   Attorney General is concerned about finding
4   too many people eligible or finding too many
5   people ineligible.
6              I mean the goal of the program,
7   right, is to figure out the people who are
8   truly eligible and to accurately figure out
9   what is just compensation?
10       A.  Correct.
11       Q.  That's the whole game, right?
12       A.  Correct.
13       Q.  Okay. We covered the concern about
14  being forced to come to New York or not being
15  heard.  If need be, could you envision coming
16  down here, I guess you or Ms. Feldman coming
17  down here if there's enough people here and
18  meeting with claimants?
19       A.  Absolutely.  Don't forget, what
20  these people often want as much as
21  compensation, if not more, is validation, is
22  acknowledgment, the opportunity to be heard
23  and this is something that is a very important
24  voluntary aspect of the program.
25       Q.  Ms. George complains that the

1  program, quote, contains no assurances that
2  the information submitted by a claimant cannot
3  be later used against her if she thereafter
4  decides to file suit against the estate or any
5  other co-defendant.
6              Is that criticism grounded in
7  the way you see the program?
8         A.   No.  No. The protocol expressly
9  secures the confidentiality of anything
10 provided by the claimant. The claimant, and
11 the claimant alone, decides the extent of
12 transparency or disclosure - not the program,
13 not the administrator, or the estate.
14        Q.   A few more, on Page 6, there's a
15 concern that notes, quote, the program
16 provides no protection to claimants who
17 voluntarily provide information that may later
18 be used to defend the estate from claims or
19 provides evidence against other victims. Does
20 the program work that way?
21        A.   No. The program seals all the
22 information and various common law and
23 statutorial privileges apply. We've seen that
24 in these other programs - attorney-client,
25 etcetera; settlement discussions, etcetera.

1  litigate or pursue other remedies.
2          Q.   Is the estate vulnerable to third
3  party claims and how does that work if, in
4  fact, the estate does not receive a general
5  release from a compensated claimant?
6          A.   That's a very interesting
7  provocative question raised by the Attorney
8  General and others.  And as Ms. Feldman stated
9  earlier, the scope of the release has not yet
10 been finalized. The estate has to make a
11 decision. Does it want total peace?
12              Ms. Feldman, you will pay what
13 ever is necessary to secure a comprehensive
14 release so we won't be cross-claimed by a
15 claimant or alternatively now, if a claimant
16 wants to release the estate but litigate
17 against X or Y, that is up to the claimant.
18              So that is a critical issue and
19 you can argue both ways and I think that the
20 estate and the administrator and the
21 plaintiffs' lawyers are discussing that at
22 this time.
23         Q.   Page 8, Ms. George complains that
24 the program, quote, does not specify whether
25 the administrator is permitted or required to

1  share evidence with law enforcement, thus
2  positioning the program as a potential means
3  to conceal criminal activity, close quote. I
4  take it that wasn't an accusation that you're
5  trying to conceal anything, but in any event,
6  what's your view on that?
7         A.    In the forty years that I've
8  designed and administered these programs, law
9  enforcement has never sought to secure any
10 civil confidential information.
11              In the church cases, the
12 Attorney General of various states have come
13 to us and said, you know, you have a lot of
14 information about wrongdoings by Clergy and we
15 refused to--we work out with the Attorney
16 General, go see the diocese or the Church.
17 Don't come to a program where claimants,
18 individual victims have participated in a
19 program on the absolute guarantee of the
20 administrator that information that have been
21 submitted will not be disclosed to anybody.
22 And that is a very important part of this.
23 Claimants do not want information disclosed.
24        Q.    The program, would it respect that
25 wish of claimants?

```
 1        A.   It's expressly spelled out in the
 2   protocol, yes.
 3        Q.   And they can still go to law
 4   enforcement. Period.  Full stop. It's up to
 5   them?
 6        A.   It's up to them and they can go
 7   public. That's up to them.  The estate cannot.
 8   The administrator cannot.
 9        Q.   On Page 8, Ms. George says that
10   the program, quote, presents an unavoidable
11   conflicts of interest, close quote, between
12   the executors and the program. She said, the
13   Co-Executors have, quote, an inescapable
14   conflict of interest in recommending a program
15   that proposes to compensate any individual or
16   entity making such allegations requiring in
17   return overly broad releases. Do you have a
18   view on this?
19        A.   You have to ask the estate on
20   that. I can tell you that before we agreed to
21   take on this assignment, Ms. Feldman and
22   myself and Ms. Biros, we have received
23   absolute assurances from the estate that they
24   will play no role in the day-to-day
25   administration of this program.
```