M6SQmax1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     UNITED STATES OF AMERICA,
 3
                  v.                        20 CR 330 (AJN)
 4                                          Sentencing
     GHISLAINE MAXWELL,
 5
                  Defendant.
 6   ------------------------------x
                                        New York, N.Y.
 7                                      June 28, 2022
                                        11:00 a.m.
 8
     Before:
 9              HON. ALISON J. NATHAN,

10                                  United States Circuit Judge
                                    Sitting by Designation
11

12                          APPEARANCES

13

     DAMIAN WILLIAMS
14        United States Attorney for the
          Southern District of New York
15   BY:  MAURENE COMEY
          ALISON MOE
16        LARA POMERANTZ
          ANDREW ROHRBACH
17        Assistant United States Attorneys

18   HADDON MORGAN AND FOREMAN
          Attorneys for Defendant
19   BY:  CHRISTIAN R. EVERDELL
              -and-
20   BOBBI C. STERNHEIM

21   Also Present:  Amanda Young, FBI
                    Paul Byrne, NYPD
22                  Sunny Drescher,
                     Paralegal, U.S. Attorney's Office
23

24

25
```

M6SQmax1

1              (In open court; case called)

2              DEPUTY CLERK:  Counsel, please state your name for the

3    record starting with the government.

4              MS. MOE:  Good morning, your Honor.  Alison Moe, Lara

5    Pomerantz, Maurene Comey and Andrew Rohrbach for the

6    government.  We're joined at counsel table by paralegal

7    specialist Sunny Drescher.  Also as a member of our team in the

8    gallery are our case agents, Special Agent Amanda Young and

9    Detective and Paul Byrne.

10             THE COURT:  Good morning to you all.

11             MS. STERNHEIM:  Good morning.  Bobbi C. Sternheim and

12   Christian R. Everdell for Ghislaine Maxwell, who is present at

13   counsel table.

14             THE COURT:  Good morning, Counsel.

15             Good morning, Ms. Maxwell.

16             Please, be seated everyone.

17             We are here today for sentencing in United States v.

18   Ghislaine Maxwell 20 CR 330.

19             In preparation for today's proceeding, I have reviewed

20   the probation report, which is dated June 9, 2022 by revision

21   date.

22             I have also received and reviewed the following

23   additional submissions:  I have the defense memorandum in

24   support of PSR objections, which is dated June 15, 2022.  I

25   have the defendant's primary sentencing submission, which is

M6SQmax1

1    dated June 15, 2022.  There are exhibits attached to that

2    sentencing submission, Exhibits A through J.  A through H --

3    I'm sorry -- A through I were a series of letters from friends

4    and family members of Ms. Maxwell.  J is a forensic psychiatric

5    evaluation.  And then I received by a later transmission date

6    of June 26, 2022 a letter from an inmate at MDC related to

7    Ms. Maxwell's assistance of other inmates with tutoring.

8         I have the government's sentencing submission, which

9    is dated June 22, 2022.

10        With respect to victim impact statements, I have dated

11   June 22, 2022 a victim impact statement from Annie Farmer.  I

12   have a victim impact statement from the witness who went by the

13   name of Kate under my pseudonym order during trial.  That I

14   believe is undated.  I have a statement dated June 22, 2022

15   from Virginia Roberts, or Giuffre.  I have same date from

16   Juliette Bryant, same date from Maria Farmer, same date from

17   Teresa Helm.  I also have undated statements from Sarah

18   Ransome -- I apologize if I'm saying your name wrong -- and

19   Elizabeth Stein.

20        Counsel, is there anything else I should have in front

21   of me for purposes of sentencing?

22        MS. MOE:  No, your Honor.  Thank you.

23        THE COURT:  Ms. Sternheim.

24        MS. STERNHEIM:  Other than the submissions that we

25   made in connection with the CVRA, that is a complete record of

M6SQmax1

```
 1    what we have received and reviewed.

 2            THE COURT:  Yes.  Thank you.  And that is part of the

 3    record including there was an ethics letter and other materials

 4    submitted in connection with your objection to that.

 5            MS. STERNHEIM:  Thank you very much.

 6            THE COURT:  Thank you.

 7            All right.  Counsel, would you just please confirm

 8    that you've received each other's submissions?

 9            MS. MOE:  Yes, your Honor.

10            MS. STERNHEIM:  Yes.

11            THE COURT:  Let's also confirm all submissions are

12    filed on ECF.

13            MS. MOE:  That's correct, your Honor.

14            MS. STERNHEIM:  Yes.

15            THE COURT:  Thank you.

16            Ms. Moe, I did have the government indicate this in a

17    letter, but if you would confirm and articulate what the

18    government has done to notify any crime victims of their rights

19    under the Justice For All Act?

20            MS. MOE:  Yes, your Honor.

21            With respect to the six individuals who were proved at

22    trial to be directly impacted by the offense conduct, the

23    government has notified those individuals through their counsel

24    about the sentencing and about their right to be heard.

25            In addition to that notification, the government has
```

M6SQmax1

1    used the victim notification page on the U.S. Attorney's Office

2    website regarding this case about the upcoming sentencing.

3              THE COURT:  And you posted the Court's order there

4    regarding a process for submission of statements.

5              MS. MOE:  Yes, your Honor.

6              THE COURT:  Thank you.

7              We'll turn to the presentence report.

8              Ms. Sternheim, I know that you have because you've

9    objected to a lot which we will talk about, but for the record,

10   have you read the presentence report and discussed it with your

11   client?

12             MS. STERNHEIM:  Yes, your Honor.

13             And, if I may, Mr. Everdell will handle the objections

14   portion of our presentation.

15             THE COURT:  Okay.  We'll get to that in just a moment.

16   Thank you.

17             Ms. Maxwell, can you please confirm that you've read

18   the presentence report and had a full opportunity to discuss it

19   with your counsel?

20             THE DEFENDANT:  I did have an opportunity to read it.

21             THE COURT:  And an opportunity to discuss it with your

22   counsel?

23             THE DEFENDANT:  I did.

24             THE COURT:  Okay.

25             Ms. Moe, for the record, have you reviewed the

M6SQmax1

1    presence report?

2            MS. MOE:  Yes, your Honor.

3            THE COURT:  Thank you.

4            So we will turn first -- we'll set aside first the

5    guideline calculation.  We'll turn to the factual accuracy of

6    the report.  And I did receive substantial factual objections

7    to factual assertions in the report.  I am prepared to go

8    through those with respect to any continuing factual objections

9    by the defense.

10           Let me confirm, Ms. Moe, does the government have any

11   objections to the report regarding factual accuracy?

12           MS. MOE:  None, aside from those which are already

13   noted in the PSR.

14           THE COURT:  No continuing objections.

15           MS. MOE:  That's correct, your Honor.

16           THE COURT:  Mr. Everdell, I know that you do have

17   continuing objections.  Tell me where you'd like to begin.

18           MR. EVERDELL:  Well, your Honor, I don't know if the

19   Court is planning on resolving each and every factual

20   discrepancy or dispute or whether there are certain ones that

21   the court will find are relevant to sentencing or whether we

22   should go through each in detail.

23           THE COURT:  I am prepared to -- what I typically do is

24   go through each one so that if there is a correction to the

25   report that is being requested to be made, whether it's

M6SQmax1

1    material to sentencing or not, I am prepared to address it.

2              So I believe the first -- what I see as your first

3    continued objection is to paragraph 22.

4              MR. EVERDELL:  I'm just getting my submissions.

5              Yes, that's correct, your Honor.

6              THE COURT:  I overrule the objection.  I do credit

7    Juan Alessi's testimony that the defendant identified and

8    targeted Virginia after seeing her in the Mar-a-Lago parking

9    lot.  The defendant also worked with Epstein to identify and

10   target Jane.

11             Paragraph three I see three objections to this

12   paragraph.  Is that a continuing objection, Mr. Everdell?

13             MR. EVERDELL:  Paragraph three, your Honor?

14             THE COURT:  23.  I apologize.

15             MR. EVERDELL:  Yes, your Honor.

16             THE COURT:  I overrule the objection.  The first

17   objection is regarding the conclusion that Ms. Maxwell was the

18   author of the essay in the paragraph.  I overrule the objection

19   because a reasonable inference supported by the trial evidence

20   is that the defendant authored the essay.  Metadata indicated

21   that the computer was registered to "GMax" and the document was

22   saved under the user name "Ghislaine."

23             The second objection is to the assertion that Epstein

24   transferred Ms. Maxwell approximately $23 million during the

25   conspiracy.  I overrule that objection.  Bank statements

1   admitted at trial showed that accounts under Epstein's name

2   wired approximately $23 million over two occasions during the

3   conspiracy to accounts of "Ghislaine Maxwell."  The defendant's

4   assertion that Epstein's accountant may have had access to and

5   control over these accounts does not undermine the reasonable

6   inference that the defendant controlled the funds in accounts

7   bearing her name, so that is established by a preponderance.

8           As to the third objection that there's no evidence in

9   the record that Epstein bought the defendant her New York City

10  townhouse, I overrule that objection because I credit Kate's

11  testimony that the defendant told her that Epstein bought the

12  defendant her New York townhouse.

13          Paragraph 25 is an objection to the characterization

14  of the Palm Beach residence being operated through a culture of

15  silence.

16          You'll let me know if you're not maintaining an

17  objection.

18          MR. EVERDELL:  Yes.  I think that the default is we

19  are, your Honor.

20          THE COURT:  Understood.

21          I overrule this objection.  Evidence at trial

22  indicates that this was the case.  For example, the household

23  manual instructed employees to "see nothing, hear nothing, say

24  nothing."  I credit Mr. Alessi's testimony that he understood

25  this instruction to be a kind of warning that he was supposed

M6SQmax1

1    to be blind, deaf and dumb, and to say nothing of Epstein's and

2    Ms. Maxwell's lives.

3           Paragraph 26, there's an objection to the

4    characterization concerning the defendant's identification and

5    isolation of minor girls as inconsistent with the trial

6    evidence.  I overrule this objection for the same reasons as

7    articulated with respect to paragraph 22.  In addition, the

8    trial evidence established that the defendant and Epstein

9    isolated girls by spending time with them alone away from their

10   families.  For example, Annie's testimony regarding the trip to

11   New Mexico.  Jane's testimony that she would spend time at the

12   Palm Beach residence alone with Epstein and the defendant.

13          Paragraphs 27 and 28 the defendant makes two

14   objections:  First, to the assertion that the defendant and

15   Epstein developed a scheme that created a "constant stream of

16   girls who recruited each other."  And, second, she objects to

17   the assertion that she encouraged minor girls to bring other

18   minor girls to provide Epstein with sexualized massages.

19          Again, based on the trial testimony and evidence, I

20   overrule the objection.  It supported the information in these

21   paragraphs.  The evidence indicated the scheme started with the

22   defendant's recruitment of Virginia.  Virginia then enlisted

23   Carolyn in addition to at least two other girls.  Carolyn in

24   turn recruited at least three friends, and those friends then

25   brought more girls.

M6SQmax1

```
1          Carolyn credibly testified that she was paid twice as
2    much when she brought friends to the massages.  Based on the
3    defendant's control of household and Carolyn's testimony that
4    the defendant on occasion paid her directly, I find it more
5    probable than not by a preponderance of the evidence that
6    Virginia was also paid more as encouragement to recruit
7    additional girls.
8          Paragraph 9, there's an objection to the inclusion of
9    Kate in this paragraph.  It argues that her name should be
10   deleted because Kate is not a victim of the crimes charged in
11   the indictment.
12         MR. EVERDELL:  Your Honor, I'm sorry to interrupt.  I
13   think you said paragraph 9.
14         THE COURT:  I did.  I'm sorry.  I'm skipping the first
15   number for some reason.  29.  Thank you, Mr. Everdell.
16         I overrule this objection because the paragraph
17   doesn't assert that Kate was a statutory victim as we've
18   discussed throughout trial and the government didn't contend
19   that Kate was a victim of the crimes charged in the indictment,
20   and that paragraph doesn't assert that she was.
21         Paragraphs 30 to 38, there's objection throughout
22   these to the characterization of the defendant having groomed
23   Jane.  I overrule these objections.  I think the government is
24   right here that the objection is conflating grooming with
25   enticement to travel for purposes of sexual contact.  Jane's
```

M6SQmax1

credible trial testimony established that the defendant took
steps to make Jane comfortable and encouraged her to engage in
illegal sex acts with Epstein.

Paragraphs 39 to 45 which describe specific conduct
involving Kate, I think the specific request here -- well,
first, was that it should be removed from the PSR because Kate
was not a victim of the crimes charged in the indictment, and
then, alternatively, that it be moved to a different paragraph
with a heading offense behavior not part of relevant conduct.
I don't see that this is necessary.  I overrule the objection.
Conduct involving Kate may be considered at sentencing her
testimony revealed additional details of the defendant's method
of identifying and introducing to Epstein young girls for
sexualized massages.  Her testimony also established the
defendant's knowledge of the sexualized nature of massages with
Epstein.

Paragraph 43, the defendant contends this paragraph
should include a sentence that Kate was above the age of
consent at all times.  I think the paragraph says that Kate was
age 17 or above at all relevant times, and I have no objection
to including that she was above the age of consent at all times
based on the trial evidence, so I will make that change to
paragraph 43 of the PSR.

Paragraph 54, the defendant objects that there's no
evidence that Epstein paid for Annie's trip to Thailand.  That

M6SQmax1

1    objection is overruled.  Annie testified to this fact at trial,

2    and I credit this testimony.

3          Paragraph 5 -- sorry -- did it again.  55, defendant

4    makes three objections to the paragraph.  I overrule the

5    objections.  The record supports that the defendant personally

6    recruited Virginia to provide Epstein with sexualized massages

7    when she was a minor.  Jane and Kate's testimony established

8    that the defendant was aware that the massages were sexualized.

9    I credit Mr. Alessi's testimony that the defendant approached

10   Virginia, and that Virginia visited the residence -- approached

11   Virginia for the first time, and that Virginia visited the

12   residence later that day.  Flight records and credible witness

13   testimony established that this meeting occurred before

14   Virginia was 18.  In addition, when Virginia brought Carolyn to

15   the residence, the defendant greeted them and instructed

16   Virginia to show Carolyn -- quoting from the trial record --

17   "what to do."  Carolyn then witnessed Virginia give Epstein a

18   sexualized massage involving sexual intercourse.  Finally, as I

19   explained in my resolution to paragraphs 27 and 28, I do

20   conclude that there is a sufficient basis to find by a

21   preponderance of the evidence that the defendant used monetary

22   incentives to encourage Virginia to recruit Carolyn.

23         Paragraph 58, the defendant objects to the assertion

24   that Carolyn was 14 years old when Virginia brought her to

25   Epstein's residence, claiming that Carolyn's recollection is

1    inconsistent and unreliable.  I overrule this objection.

2    Carolyn testified at trial that Virginia first brought her to

3    Epstein's residence when she was 14 years old.  I found Carolyn

4    to be credible and credit her testimony.  I'm not persuaded by

5    the arguments to the contrary.  Moreover, @Sean's credible

6    testimony corroborated Carolyn's recollection.

7            Paragraph 59, the defendant makes two objections.

8    Same objection to Carolyn being 14.  For the reasons I've

9    stated, that's overruled.  She objects to Carolyn's assertion

10   that she visited Epstein's residence more than a hundred times.

11   I overrule that objection.  Again, I credit Carolyn's

12   testimony.  She testified that she went to the house "over 100

13   times."  I reject the suggestion that this is improbable based

14   on Epstein's travel schedule.

15           Paragraphs 61 and 62 again object to Carolyn's age,

16   and I overrule for the same reasons.

17           Paragraph 64, three objections.  First, the defendant

18   objects to Carolyn's assertion that she visited the Palm Beach

19   residence over a hundred times and her assertion that she was

20   14.  For the reasons I've given, I overrule those objections.

21   She objects to the assertion that Carolyn stopped performing

22   sexualized massages in 2001 when she was 18 years old and

23   argues that the evidence indicates she was 17 years old.  We're

24   going to take up the issue of this timing question with respect

25   to the issue of which Guidelines Manual controls.  So I'll skip

M6SQmax1

1    that for now.

2              Paragraph 72, defendant objects to the assertion that

3    Epstein briefly penetrated Carolyn's vagina with his penis

4    because her trial testimony the defense claims is contradicted

5    by a 2009 deposition testimony.  I overrule this objection.

6    Again, I credit Carolyn's testimony.  Carolyn plainly testified

7    to this at trial.

8              Paragraph 74, the defendant again objects to the

9    assertion as to the age and timing.  Again, we'll pick up on

10   that issue when we discuss the appropriate guideline manual.

11             Paragraphs 75 and 76 the defendant objects to the

12   inclusion of these paragraphs in the presentence report because

13   the perjury counts have not been presented to a jury, and so

14   she contends have no bearing on the sentence in this case.  I

15   do overrule this objection.  A sentencing court's discretion is

16   largely unlimited as to the kind of information it may

17   consider.  It's free to consider evidence of uncharged crimes,

18   dropped counts of an indictment, criminal activity resulting in

19   acquittal in determining sentence.  *United States v. Bennett*,

20   839 F.3d 153 (2d Cir. 2016).  I may consider the information as

21   long as the information is reliable and accurate.  For the

22   following reasons, I do conclude the information underlying the

23   severed perjury charges is reliable.  The defendant testified

24   under oath in 2016 that she was not aware of Epstein's scheme

25   to recruit underage girls for sexual massages and other than

M6SQmax1

Virginia, was unaware if she had interacted with anyone under

the age of 18 at Epstein's properties.  She never gave Annie

Farmer a massage.  She was unaware whether Epstein possessed

sex toys.  She was unaware that he was engaging in sexual

activity with anyone other than her in the 1990s and 2000s.

She never gave Epstein a massage.  The credible testimony and

evidence admitted at trial disproves these assertions which

were made under oath.

Paragraph 79, the defendant objects to the

characterization of the offense conduct as contrary to the

trial record.  Here, defense hasn't provided any reason

specifying this, and I don't see one.  So based on the written

objection, it's overruled.

Paragraph 81, the defendant objects to the assertion

that Ms. Maxwell had direct responsibility for any sexualized

massages that several women or any other people that Carolyn

may have brought to Epstein's residence may have performed, and

she contends there's no record that she interfaced with these

individuals.  I am prepared to overrule that objection.

The paragraph makes clear that these individuals did

not interact directly with Ms. Maxwell.  Nevertheless, for the

reasons explained a little while ago in overruling the

objections to paragraphs 27 and 28, I do conclude that the

evidence at trial established that the defendant's recruitment

of Virginia set the recruitment scheme in motion that resulted

M6SQmax1

1    in the abuse of these individuals.

2              Paragraph 82, the objection is to the assertion that

3    the records recovered from the Palm Beach residence during the

4    2005 search reveal that additional minors provided Epstein with

5    sexualized massages between 2001 and 2004.  Again, I overrule

6    the objection.  The trial record including message pads, phone

7    book entries, and testimony of witnesses establishes by a

8    preponderance that the information contained in this paragraph

9    is accurate.

10             Paragraph 83, so there was a revision here.  I'm not

11   sure if there is a continuing objection, Mr. Everdell.  The

12   previous objection was to the assertion that the defendant is

13   responsible for the victimization of untold number of other

14   victims.  The probation department adopted the government's

15   suggestion, revised the paragraph to assert that the defendant

16   is responsible for the victimization of additional minor

17   victims.  To the extent there is a continuing objection, I

18   overrule it for the reasons stated regarding paragraphs 27 and

19   28.

20             Paragraph 85 is an objection to the inclusion of

21   Kate's victim impact statement and her status under the CVRA.

22   We have litigated the question of Kate's ability to make a

23   statement here.  I believe that defense's ultimate position was

24   that with the requested redactions, there were no objections to

25   her making a statement.  Do I have that right?

M6SQmax1

1          MR. EVERDELL:  That's correct, your Honor.

2          THE COURT:  So I did reject the request for redactions

3     for the reasons explained in my order.  And as I explained in

4     overruling the objection to paragraphs 39 to 45, Kate's

5     testimony and her statement are relevant to sentencing which

6     I've indicated she may give.  And with that, there's objections

7     pertaining to fine and assets and the like.  I think we can

8     turn to those when we get to the fine.  Mr. Everdell, okay with

9     that?

10         MR. EVERDELL:  Yes, your Honor.  So we'll delay the

11    offense level calculation objections and the ones related to

12    the financial penalties for now?

13         THE COURT:  Yes, precisely, and we'll pick those up.

14    I think otherwise that's it for what I understand to be

15    continuing objections after probation responded to your

16    requests and assertions.  Agree with that, Mr. Everdell?

17         MR. EVERDELL:  Your Honor, the only one that I would

18    highlight is there was an objection, I believe it's framed

19    according to paragraph 173, which deals with the financial

20    penalties.  The government made in their response some

21    representations that we take issue with, but if you're planning

22    on covering that later, we can reserve that till later because

23    it does deal with the financial penalties.

24         THE COURT:  Yes, I have objections to 172, 178, 192

25    and 193.

M6SQmax1

1          MR. EVERDELL:  I guess in the final version, it

2     probably pertains to 172.

3          THE COURT:  Thank you.

4          And with that, no further factual objections that need

5     resolution, Mr. Everdell?

6          MR. EVERDELL:  Other than the ones we've just

7     discussed, no, your Honor.

8          THE COURT:  Ms. Moe?

9          MS. MOE:  No, your Honor.  Thank you.

10          THE COURT:  So, with those rulings, hearing no further

11     objections, with those rulings, I otherwise adopt the factual

12     recitations set forth in the PSR.  As in all cases, the PSR is

13     sealed and made a part of the record in this matter.  If an

14     appeal is taken, counsel on appeal may have access to the PSR

15     without further application to this court.

16          We'll turn now to the guideline calculation.  As

17     counsel is aware, I am no longer required to follow the United

18     States Sentencing Guidelines, but I am still required to

19     consider the applicable guidelines in imposing sentence and

20     must therefore accurately calculate the Sentencing Guideline

21     range.  The parties dispute multiple aspects of the guideline

22     calculation.

23          Just to outline the relevant overall calculations, the

24     defense contends that the correct guideline calculation is 51

25     to 63 months' imprisonment.  The government contends that the

M6SQmax1

correct calculation is 360 to 660 months' imprisonment and

argues that a guideline sentence is warranted.

        The probation department has calculated the range at

292 to 365 months' imprisonment, but recommends a downward

variance to a term of 240 months' imprisonment.

        Counsel, I have reviewed your written arguments

carefully.  I have a few questions I want to ask, but I don't

need to hear repetition of your written arguments, but I would

be happy to give you an opportunity to add anything beyond your

submission if you'd like to make any additional arguments.

        I'll hear from you now, Mr. Everdell.

        MR. EVERDELL:  Thank you, your Honor.

        I will largely rely on my written submissions.  I just

would like to amplify one or two things.

        Your Honor, our initial argument, of course, is that

the Court must resolve who is to make the determination about

which book like -- when the offense conduct ended, which

determines guidelines book applies: the 2003 or 2004

guidelines.  We argue that that is a jury determination because

the issue implicates the *Ex Post Facto* Clause.  So the 2003

guidelines must apply because the jury was never asked to make

that factual determination.

        I know your Honor is familiar with the arguments we

raised.  I would just point out that the government in their

response really did not engage with our arguments about the

M6SQmax1

issue of the *Ex Post Facto Clause* being implicated.  They want
to cast this as purely a Sixth Amendment issue and cited cases
along the *Apprendi* lines.  But this is an ex post facto issue
properly framed.  This decision of when the offense conduct
ended implicates whether or not an ex post facto violation will
occur if the later guidelines is applied.

Under the cases that we've cited, your Honor, we think
that that is an issue for the jury to decide, and it is not
really in the *Apprendi* line of cases.  It is focused on
ex post facto law.  I just, for example, highlight for your
Honor the *Tykarsky* opinion that we cited for the Court.  That
is not an *Apprendi* decision.  That is not a Sixth Amendment
decision.  In that case, there was an increase in the mandatory
minimum that took effect potentially after the offense conduct
ended.  It's interesting that at the time the law was that you
could do that, a judge could make a finding and increase it as
long as it didn't increase beyond the statutory maximum, so
there was no *Apprendi* issue there.  That decision later got
overruled by the Supreme Court, but at the time of *Tykarsky*, it
clearly wasn't a Sixth Amendment *Apprendi* issue.  They resolved
that issue on an ex post facto basis.  This decision about
whether or not the offense conduct ended at a certain time, if
it triggers an increase that implicates the ex post facto
clause is a decision for the jury to make.  The government has
not responded to that argument, and we think that that is a

M6SQmax1

1    persuasive -- along with the other sources and opinions we've

2    cited, it's persuasive authority for the fact this is a jury

3    decision, not a Court determination.

4              THE COURT:  Are you leaving that argument?

5              MR. EVERDELL:  Yes, your Honor.

6              THE COURT:  We'll do a little back-and-forth so I have

7    everybody's arguments in mind.  Thank you.

8              Go ahead, Ms. Moe.

9              MS. MOE:  Thank you, your Honor.

10             The government is confident the 2004 Manual applies in

11   this case.  I believe we did engage with the ex post facto

12   issue thoroughly in our brief.  The question is whether the

13   factual record at trial establishes that the offense continued

14   throughout the duration of 2004, which it emphatically did.

15   The testimony of a crime victim who testified at this trial

16   establishes that the offense conduct went past November 1,

17   2004.

18             THE COURT:  So I think the framing of the question

19   here is very important and its technical -- this whole

20   discussion is very technical.  It seems to me the question is

21   can the government point to a preponderance of the evidence

22   that conspiratorial conduct took place in this very small time

23   window, basically November and December 2004.  That is what's

24   in issue, and the question is what the trial record establishes

25   with respect to that two-month window.

M6SQmax1

1        To some extent, the government points, I think, to

2   post conspiracy conduct, and that concerns me.  And so I would

3   like to ask you to draw my attention to what in the trial

4   record specifically speaks to November and December of 2004.

5        MS. MOE:  Yes, your Honor.

6        As a threshold matter, the government's understanding

7   that the case law is that the question is what is the end date

8   of the conspiracy.  In other words, if the conspirators are

9   taking actions periodically over time, the question is what is

10  the last date of the conspiracy?  What does the trial evidence

11  establish about the final date?  And here the trial evidence

12  was that the conspiracy was ongoing through all of 2004 and

13  into 2005.

14        THE COURT:  But to make that point, I think you're

15  relying on post conspiracy evidence.

16        MS. MOE:  No, your Honor.  We're relying on evidence

17  that exceeds the date in the indictment, but it --

18        THE COURT:  It exceeds also the date of Carolyn's 18th

19  birthday.  And so it's not just what the indictment charges --

20        MS. MOE:  Yes, your Honor.

21        THE COURT:  -- but by a conspiracy that is dependent

22  here on Carolyn being under 18 for its continuation.  And so

23  that's why I see what you're pointing to as post conspiracy,

24  not only because it goes past what the indictment charged, but

25  because I think legally you're pointing to non-conspiracy

M6SQmax1

1     evidence.

2              MS. MOE:  No, your Honor.  I think our point is that

3     the conspiracy was still live at the end of 2004, and we know

4     that because in fact the conspiracy was still ongoing beyond

5     that, and I don't mean to be --

6              THE COURT:  But, see, just in that sentence, the

7     conspiracy was going on beyond that, what you point to, I

8     think -- and tell me if I should look at something else, but

9     what you point to to make that argument is definitionally

10    non-conspiracy conduct.

11             MS. MOE:  No, your Honor, in part because -- well, to

12    step back and discuss the framing of the issue.  The question

13    is whether a conspiracy was still ongoing throughout 2004.  And

14    the key thought tells us it's the defendant's burden to show

15    that she withdraw from the conspiracy if it was ongoing.  The

16    question is in framing it, when did this conspiracy end.  We

17    know that it was still live as of the end of 2004, in fact,

18    because, among other reasons, Carolyn testified that she was

19    continually going to Epstein's house through age 17 and through

20    age 18, which would have been throughout the duration of 2004

21    and 2005.

22             The government is not required to show that any

23    conspirator took an action in between those specific dates

24    because the question is when did the conspiracy terminate?  Was

25    it still live at the end of 2004?  And the evidence here shows

SOUTHERN DISTRICT REPORTERS, P.C.•
•
•
•
(212) 805-0300

M6SQmax1

1   that it certainly was.  The message pads show that Carolyn was

2   still going to the house.  Her testimony establishes that she

3   was still going to the house throughout that time period.  We

4   do not agree that we're required to show that any conspirator

5   took a specific act in that exact window but just that the

6   conspiracy was still live, and the fact that there were

7   additional acts ratifying membership of the conspiracy

8   throughout 2004 and into 2005 satisfies that burden.

9              THE COURT:  Again, just to make sure I'm not missing

10  anything you want to point to, the into 2005 is pointing to

11  post conspiracy conduct.

12             MS. MOE:  Post indictment conduct, your Honor.

13             THE COURT:  Post indictment.  Is it in some way not

14  post conspiracy?

15             MS. MOE:  Well, your Honor, again, the question before

16  the Court, according to the application is when the did offense

17  end.

18             THE COURT:  Ms. Moe, I do understand you're framing

19  that question.  I'm asking record evidence question.  Is there

20  something you're pointing to for your statement, the post 2005

21  which consists of conspiratorial conduct?

22             MS. MOE:  I think separate from the 2005 evidence, we

23  would point to in the fall of 2004, a message from Carolyn in

24  November of 2004 showing that she was contacting the house to

25  make a scheduled appointment.

M6SQmax1

1          THE COURT:  It's not dated November 2004; am I right?

2     It's on a page that has dates surrounding it of December,

3     November.

4          MS. MOE:  Yes, your Honor, all of the dates

5     surrounding the message would be after November 1, 2004.  The

6     neighboring dates are November 13.  There's a date in December.

7     And I think looking at the message pads as a whole, it tells us

8     they're dated essentially sequentially.

9          THE COURT:  Is there any way to tell -- again, this is

10    very technical -- if it's October and November?

11         MS. MOE:  Your Honor, I'd be happy to take a look at

12    physical book.  I just have the sheet in front of me to see the

13    page before and after, if the Court would like to examine it.

14    Our view is the combination of the message itself and the

15    neighboring dates tell us it's November of 2004.  In addition,

16    as we noted in our brief, the defendant was still traveling

17    with Epstein during this exact same time period.  Again, it's

18    the defendant's burden to establish withdrawal from an ongoing

19    conspiracy, which they've not attempted to do, nor could they.

20    We think that the message pads, the flight records, the fact

21    that the testimony of a crime victim Carolyn was that the

22    conspiracy was ongoing more than meets this burden.

23         THE COURT:  Okay.

24         MR. EVERDELL:  Your Honor, if I could just respond to

25    that.  I do pick up on what the Court is saying, and we agree

M6SQmax1

1    with the point, which is we're focusing on the record evidence.

2    The conspiracy as charged requires there be to be a minor

3    involved.  Carolyn is not a minor in 2005.  Her birthday is

4    January -- I don't know if I can say that, I'm sorry, but you

5    understand it's at the beginning.

6            THE COURT:  It's early.

7            MR. EVERDELL:  It's early.  So as of 2005, she is not

8    a minor any more.  So if we're looking to the end date of the

9    conspiracy that's charged in the indictment, that does not

10   exist in 2005, and Carolyn is not a minor in 2005, that

11   evidence can't be used to support the end date of the

12   conspiracy that is charged.

13           So what we're really talking about is one message pad

14   that is undated, unverified, and not even in evidence.  It's

15   not even properly authenticated.  I would also point out --

16   it's not reliable, your Honor.  But I would also point out that

17   I think we did have testimony that there were multiple message

18   pads going on at any one time.  The surrounding message pads

19   are not a perfect indicator of when that message would have

20   been taken if it's undated.  It could have been weeks, months

21   afterwards that someone decided to use that message pad to take

22   that message instead of another of message pad that was ongoing

23   at the same time.  So there is no reliable credible evidence

24   that's the date of that message pad.

25           And so, your Honor, we cited a number of cases in our

1    submission about the Court has to consider the weight and

2    reliability of the evidence when determining a factor -- a

3    sentencing factor that is going to increase the guidelines,

4    especially by the amount that this is going to increase it by.

5    And this one uncorroborated, unadmitted, unreliable message pad

6    is not sufficient for that purpose.  So if we're relying on a

7    factual record argument, there is not enough of evidence in the

8    record to support that the conspiracy ended in November or

9    December of 2004.  Therefore, the 2003 guidelines must apply.

10            THE COURT:  Okay.  I have a question about the

11    leadership enhancement, as I said, but anything else you want

12    to raise that you didn't have the opportunity to raise in your

13    papers, Mr. Everdell?

14            MR. EVERDELL:  Your Honor, just one point about that

15    same book issue.  I think there was a section of the

16    government's brief where they were trying to show -- this was

17    the point about the Court's discretion.  We argued the Court

18    has discretion to sentence as if it were the 2003 guidelines.

19    I realize that might not be where the Court is headed, but I

20    would point out --

21            THE COURT:  You mean as a variance argument.

22            MR. EVERDELL:  Exactly.  In that section, the

23    government made reference to an argument that the defendant was

24    receiving money into the 2007 time period.  I believe they

25    pointed to $7 million.  I think that is an extreme stretch,

M6SQmax1

1    your Honor.  If the Court remembers the record evidence, there
2    was some evidence of money moving, but it was to buy a
3    helicopter that was not for her.  We heard testimony from Larry
4    Visoski that he often kept assets of cars in his name for
5    Mr. Epstein.  That doesn't make Larry Visoski a participant in
6    the criminal endeavors.  I think it's a stretch for the
7    government to point to that as some sort of evidence of
8    continued involvement or continued profit after the end date of
9    the conspiracy.  I just wanted to make that one point, your
10   Honor.

11              THE COURT:  Anything on that, Ms. Moe?

12              MS. MOE:  Your Honor, with respect to the financial
13   transaction, we offered that along with other evidence to
14   refute the claim that the defendant had moved on, which, as we
15   noted, is an expression that has no legal meaning.  And so
16   contrary to the assertion that the defendant had moved on and
17   was no longer associated with Epstein, the trial evidence
18   established that she remained a close associate for many years,
19   and that is the purpose for which we offered that evidence.

20              THE COURT:  Understood.  Thank you.

21              I do want to address -- do you have other -- I want to
22   ask about 3(b)(1).

23              MR. EVERDELL:  Yes, your Honor.

24              THE COURT:  I think it's for the government.  So as I
25   see the question here, the guidelines require me to find that

M6SQmax1

1      the defendant was an organizer or leader, and that the criminal

2      activity either involved five or more participants or was

3      otherwise extensive.  The guidelines defines a participant as a

4      person who is criminally responsible for the commission of the

5      offense but need not have been convicted.

6             So I think my question for the government is, you're

7      asking the Court to look to as a criminally responsible -- a

8      person who is criminally responsible for the commission of the

9      offense over whom Ms. Maxwell exercised supervisory or

10     leadership role.

11            MS. MOE:  Yes, your Honor.  As we noted in our

12     briefing, our view is that the trial evidence establishes that

13     the defendant had a supervisory role over Sarah Kellen.  Here,

14     we're not required to establish that there were five or more

15     participants; that is, people who were criminally responsible

16     for the charged conduct, but rather that it was extensive, and

17     that the defendant supervised at least one other person.

18     That's the text of the commentary, although as we noted, the

19     Second Circuit in applying this factor hasn't really engaged

20     with that from what we can tell, but on the factual question of

21     the trial record and whether it establishes the defendant

22     supervised another participant, it absolutely does.

23            THE COURT:  And the government is pointing to Sarah

24     Kellen for that conclusion, which you agree, there has to be

25     one criminally responsible participant who we can point to.

M6SQmax1

1          MS. MOE:  Yes, your Honor.  Looking at the text of the

2     application note -- again, it's unclear from some case law on

3     this, but under the text of the application note, if we're

4     looking to one criminal participant, we would direct the

5     Court's attention to Sarah Kellen.

6          THE COURT:  And the leadership over her as opposed to

7     Epstein being the leader over her or them being -- Kellen sort

8     of replacing the defendant's role, could you focus my mind on

9     what specifically you point to to show supervision and

10    leadership by Ms. Maxwell over Ms. Kellen.

11         MS. MOE:  Yes, your Honor.

12         The trial evidence was that Sarah Kellen became an

13    assistant, and that she worked for both Maxwell and Epstein.

14    Essentially, when you look at defendant's role in earlier

15    years, she was doing things like calling victims and arranging

16    for massage appointments.  As the scheme shifted, they brought

17    in another member of the scheme beneath them in the structure

18    and hierarchy of the scheme.  The defendant remained a close

19    associate.  She was often traveling with them, often traveling

20    with Kellen together.  So as Kellen took on some of the tasks

21    that were then delegated to a lower member of the conspiracy,

22    the defendant was higher up in the leadership structure.

23         There wasn't direct evidence about, you know, the

24    defendant directly instructing Kellen to make a certain phone

25    call, and we acknowledge that, but we think the inference is

M6SQmax1

1    very clear that when you have two knowing conspirators, Maxwell

2    and Epstein, and they bring in a much younger woman as an

3    assistant and have her take on some of those roles while the

4    defendant remains a lady of the house in the hierarchy of the

5    structure to whom a person like Sarah Kellen would report, that

6    she has leadership of that person; that she is directing that

7    person; that she has control.  Even the simple task of

8    directing her to take on some of those responsibilities, which,

9    of course, to transition parts of that role she would have to

10   do would qualify for leadership.

11              THE COURT:  And there's clear time overlap in the

12   role?

13              MS. MOE:  Yes, your Honor.  As we noted in our brief,

14   the flight records reflect that the defendant continued flying

15   on Epstein's private jet at the same time that Sarah Kellen was

16   also traveling, and that there was an overlap in the years of

17   the time period where they were all close associates of Jeffrey

18   Epstein and the scheme was ongoing.

19              THE COURT:  Go ahead.

20              MR. EVERDELL:  Yes.  Your Honor, before I address the

21   Sarah Kellen point, I would just make the point that the

22   government seems to argue that there is some case law that is

23   not clear that you don't have to necessarily show that they're

24   supervising another criminal participant.  That's just wrong.

25   All those cases that the government cites, the issue has

M6SQmax1

1    already been decided or conceded by the defendant.  The court

2    found they were leader or the defendant didn't contest that, so

3    the issue was only about whether the criminal activity was

4    otherwise extensive.  So that is not -- that is clear under

5    Second Circuit law, that they have to supervise another

6    criminal participant, and it's clear from the guidelines too,

7    as the government concedes.

8             Let's just talk a bit about Sarah Kellen.  I don't

9    think it is a fair inference to say from the trial record that

10   Ms. Maxwell was supervising Sarah Kellen.  In fact, the

11   inference is exactly the opposite.  And you can rely on

12   Carolyn's testimony alone for that; that she herself testified

13   that there was a clear break between when she says that

14   Ms. Maxwell was calling her to schedule for massage

15   appointments versus when Sarah Kellen took over and scheduled

16   for massage appointments.  They did not overlap.  There was a

17   break.  That is corroborated by Juan Alessi no less, who said

18   the same thing.  He said Sarah Kellen came at the end of my

19   employment, to his recollection, and as soon as she got there,

20   she took over the responsibility of scheduling the massage

21   appointments.  Again, a clear break.

22            What the record shows is that there was a replacement.

23   Sarah Kellen replaced Ms. Maxwell, at least according to the

24   trial testimony; not that there was some sort of ongoing

25   supervision by Ms. Maxwell over Sarah Kellen.  It couldn't be

M6SQmax1

1    clearer, your Honor, this notion that she was somehow -- Sarah

2    Kellen was an assistant of both Epstein and Maxwell is again

3    belied by the trial record.

4            If you look at Larry Visoski's testimony, which I

5    believe is what the government is relying on there, he

6    originally testified, oh, I think she was an assistant for

7    both.  But on cross-examination, he conceded that he really

8    didn't know what her role was, and his best recollection was

9    that she was an assistant for Epstein.

10           And again, just look again at Cimberly Espinosa's

11   testimony who was the actual assistant for Ms. Maxwell, and she

12   says unequivocally, "I was her assistant.  Kellen was Epstein's

13   assistant."  So there is no fair inference that Ms. Maxwell was

14   supervising Sarah Kellen.  The inference is exactly the

15   opposite, and it can't provide a basis for that leadership

16   enhancement.

17           THE COURT:  All right.  Anything further on the

18   enhancements for the government's objection?

19           MS. MOE:  Your Honor, just very briefly with respect

20   to the leadership question, I just want to direct the Court's

21   attention, we noted this on page 27 of our brief, but the

22   testimony at trial was that Carolyn recalled that even after

23   Sarah Kellen took over calling to schedule massages, Maxwell

24   was still present inside the Palm Beach residence when Carolyn

25   arrived for massage appointments.

M6SQmax1

1          With respect to the testimony of the pilots who

2     testified, whether they -- whether an employee was paid by

3     Maxwell or Epstein or technically reported to one, according to

4     their job descriptions, is not the question here.  The fact

5     that pilots based on their observation thought at one point

6     that Kellen reported to Maxwell proves the point that she had

7     supervisory authority over Kellen and exercised it, whether in

8     the chain of command or on their formal employment paperwork,

9     she was just an employee for one or the other, it makes no

10    difference.  There was an overlap here.  They had different

11    roles in the conspiracy, and the defendant had a supervisory

12    roll over Kellen.

13         MR. EVERDELL:  Your Honor, just to that point.  Being

14    present does not mean that you're a supervisor.  That's way too

15    far a stretch.  So the fact that there was testimony she was

16    present still in the house while Kellen was making the calls

17    and scheduling the massage appointments means nothing in terms

18    of supervisory authority.

19         THE COURT:  Thank you.  Other enhancements before the

20    government's objection is to be addressed.

21         MS. MOE:  No, your Honor.  Thank you.

22         MR. EVERDELL:  Your Honor, I assume you don't want to

23    hear or have any questions about the five-point enhancement for

24    repeated and dangerous sex offenders.

25         THE COURT:  I believe I have what I need, but as I

M6SQmax1

1   said, I don't need repetition of the arguments in the papers,

2   but if there is any additional points you want to make, you're

3   welcome to.

4           MR. EVERDELL:  Your Honor, just one point.  I will be

5   brief.  The government in its papers makes the argument that

6   the background commentary can't be relied upon as authoritative

7   because it is not explanatory or interpretative of what the

8   guideline is.  I think that is incorrect.

9           It is not simply a recitation of what Congress was

10  considering.  That first sentence or two which talks about how

11  this guideline can only be applied to offenders who represent a

12  continuing danger to the community is interpretative of what

13  the guideline is.  The title of the guideline is repeat and

14  dangerous sex offenders.  That explanatory commentary explains

15  how to interpret what dangerous means.  It means someone who is

16  continuously dangerous to the community, not someone who's

17  never been accused of a crime in the 18 plus years since the

18  crime in this case, and has never been accused of re-offending.

19  So I don't agree with that point.  This is authoritative

20  guidance from the Sentencing Commission, and the Court should

21  consider it as such.  Thank you.

22          THE COURT:  Ms. Moe, do you want to respond?

23          MS. MOE:  No, your Honor.  We rest on our briefing on

24  this issue, but thank you.

25          THE COURT:  Thank you.  Anything else?

M6SQmax1

1           MR. EVERDELL:  No, your Honor.  We rest on the papers.

2           THE COURT:  I thank you counsel for your thorough

3     briefing.  I am prepared to rule.

4           The defendant raises four objections to the

5     calculation of the guideline range contained in the PSR.  As we

6     discussed, first, she argues I must apply the 2003 guidelines

7     rather than the 2004 guidelines.  Beyond that, she objects to

8     the application of three sentencing enhancements.  The

9     government's sole objection to the calculation of the

10    guidelines is that Virginia Roberts and Melissa should be

11    considered victims.  So I will address the defense objections

12    and then the government's objections.

13          I begin by determining which of the Guideline manuals

14    apply.  Generally, a sentencing court applies the version of

15    the guidelines in effect on the date that the defendant is

16    sentenced.  18 U.S.C. Section 3553(a)(4)(A)(ii).  But the

17    *Ex Post Facto* Clause is violated if a defendant is sentenced

18    under Guidelines issued after she's committed her offense and

19    the new Guidelines provide a higher sentencing range than the

20    version in place at the time of the offense.  That's the

21    principle of a case called *Peugh v. United States*, 569 U.S. 530

22    (2013).  In that case, a sentencing court must -- in the case

23    of a higher range at the time of sentencing than in place at

24    the time of the offense, in that case the sentencing court must

25    apply the guidelines in effect when the offense was committed.

M6SQmax1

*United States v. Guerrero*, 910 F.3d 72 (2d Cir. 2018).  Here,

the parties and the probation department agree that applying

the current Guidelines would result in a significantly longer

sentence than the application of the guidelines in place when

the defendant committed her offense, whether that is the 2003

or 2004 guidelines.

The controlling date for ex post facto purposes is the

last date of the offense of conviction.  The 2004 Guidelines

became effective on November 1, 2004.  So I must determine if

the last date of the offense was after November 1, 2004.

Because it seeks an increased punishment, the

government bears the burden of persuasion.  The government

charged a decade-long conspiracy of sexual abuse that the

indictment alleged ended in 2004.  It's proof at trial that the

conspiracy continued in 2004 related to Carolyn.  And the

charged conspiracy had to end no later than very early 2005

because that's when Carolyn turned 18 and can no longer be

deemed a victim of the federal sex-trafficking offense charged

which proscribes conduct with respect to individuals under the

age of 18.  So the government purports to carry its burden on

this issue based on portions of Carolyn's testimony and some

message pads regarding what occurred in 2004 and 2005.

Let me state clearly, I found, as I said repeatedly in

my factual conclusions on the PSR objections, I found Carolyn

to be a credible witness, as did the jury.  The question before

M6SQmax1

me is specific and highly technical.  Does the preponderance of
the evidence demonstrate that the offense to sex traffic
Carolyn continued after November 1, 2004 before she turned 18
in early 2005?  In other words, does a preponderance of the
evidence establish that acts in furtherance of the conspiracy
to traffic Carolyn occurred in either November or
December 2004?  Although Carolyn testified regarding contact
earlier in 2004 and after she turned 18 in 2005, there is no
evidence, either in the form of testimony or documentary
evidence, including the message pads, that demonstrates by a
preponderance of the evidence conspiratorial conduct during
those last two months of 2004 before Carolyn turned 18 in 2005.

          In those portions of Carolyn's testimony cited by the
government, Carolyn stated that she was 18 years old the last
time she went to Epstein's house, which would have been in
2005.  As Carolyn further explained, she returned more than
four or five times to Epstein after she gave birth to her son
in March of 2004, and that testimony is supported by message
pads entered at trial that show Carolyn called Epstein several
times in the summer of 2004:  Once in late April or early May
again on July 6, and again on July 30.  When she did return to
Epstein, Carolyn testified Epstein asked if she had younger
friends, and she explained during her testimony that at 18
years old, she was too old for him.  Carolyn wasn't asked, and
her testimony doesn't specifically address, whether she went to

M6SQmax1

Epstein's house after November 2004 before she turned 18.
Message pads entered at trial show contact only before
November 1.

          The government's reliance on two additional pads that
were not entered into evidence doesn't change my analysis.  The
first message GX-4B, it's undated, and the context does not
give sufficient confidence that it came after November 1.  The
other message pad is dated March 1, 2005, which falls outside
the scope of the conspiracy alleged in the indictment, and
after Carolyn turned 18.  Because I cannot on this record find
by a preponderance of the evidence that the offense continued
during that two-month window after November 1, 2004, and before
early 2005, I must apply the 2003 guidelines.  Because I find
that the date of the offense was not after November 1, 2004, I
do not address the defendant's alternative argument that a jury
must decide if the 2004 Guidelines apply.

          Within the Guidelines themselves, the defendant
objects to the application of three enhancements in the PSR.
She takes issue first with 4B1.5(b).  The enhancement
statements that the offense level is increased by five if:
One, the offense of conviction is a covered sex crime; two,
4B1.5(a) for prior convictions does not apply; three, the
defendant engaged in a pattern of activity involving prohibited
sexual conduct.  All three requirements are met:  The defendant
was convicted of a covered sex crime; she was not previously

convicted of a sex crime; and I readily find she engaged in a

pattern of activity involving prohibited sexual conduct.

Specifically, the Guidelines define a pattern of such activity

as the defendant engaging in prohibited sexual conduct with a

minor on at least two separate occasions.

         The defendant doesn't contest any of these enumerated

requirements.  Rather, she argues that I may apply this

enhancement only if I further find that the defendant poses a

continuing danger to the public.  Here, the defense draws this

requirement from background commentary by the Sentencing

Commission and a few statements made by members of the Congress

who of emphasized high recidivism rates in enhancing sentences

for sex offenders.

         I overrule this objection because it lacks any basis

in the Guidelines.  As with all interpretive matters, I start

with the text of the Guidelines.  If the text is unambiguous, I

apply it as written and do not resort to background commentary.

*United States v. Sash*, 396 F.3d 515 (2d Cir. 2005).  Commentary

cited by the defendant simply provides policy rationale for a

particular enhancement.  It does not purport to interpret the

Guidelines and so is not binding.  Nor can scattered

legislative history override the clear text of the Guidelines,

especially when that history amounts to only a few short floor

statements which are "among the least illuminating forms of

legislative history."  *NLRB v. SW General, Inc.* 137, S. Ct. 929

M6SQmax1

1      (2017).

2              Moreover, the defendant fails to prove that 4B1.5(b)

3      was enacted only to prevent future danger to the public.

4      Background commentary explains that aside from recidivism,

5      Congress "directed the Commission to ensure lengthy

6      incarceration for offenders who engage in a pattern of activity

7      involving the sexual abuse or exploitation of minors."  That's

8      4B1.5 comment background.

9              Further, the legislative history quoted by the

10     defendant says that Congress increased Guidelines sentences for

11     sexual abuse of minors "to address the egregiousness of these

12     crimes."  And, in fact, the defendant's brief cites that I

13     believe at 12.  Thus, I find no basis for a requirement that I

14     must first find the defendant to be a public danger before

15     applying the enhancement.  The defendant's remaining argument

16     that applying this enhancement would result in an excessive

17     sentence is appropriately considered as part of the defendant's

18     request for a downward variance.

19             Next the defendant objects to the application

20     3B1.1(a), which we've discussed, which adds four offense levels

21     for her leadership role in a criminal activity.  "a court must

22     make two specific factual findings before it can properly

23     enhance a defendant's offense level under 3B1.1(a): (i) that

24     the defendant was an organizer or leader; and (ii) that the

25     criminal activity involved five or more participants or was

M6SQmax1

1   otherwise extensive." Quoting from *United States v. Patasnik*,

2   89 F.3d 63 (2d Cir. 1996).  The Guidelines define a participant

3   as a person who is criminally responsible for the commission of

4   the offense, but need not have been convicted.  That's Section

5   3B1.1, comment note 1.  And in assessing whether criminal

6   activity is extensive, all persons involved during the course

7   of the entire offense are to be considered, including persons

8   who provided services unknowingly.  Comment note 3.

9           The defendant argues that she did not lead another

10  criminal participant.  I overrule this objection because I do

11  conclude that the government has proved by a preponderance that

12  the defendant supervised Sarah Kellen, who was a knowing

13  participant in the criminal conspiracy.

14          Larry Visoski and David Rodgers both testified for

15  that at least part of the time period at issue Sarah Kellen

16  acted as a personal assistant to the defendant.  I credit that

17  testimony which is corroborated by further testimony that the

18  defendant was Epstein's number two and the lady of the house.

19  At some point, Kellen took over some of the defendants duties.

20  But even after that time, the defendant retained her leadership

21  position, as evidenced by Carolyn's testimony, by flight

22  records in evidence, and the household manual in evidence.  I

23  do conclude by a preponderance of the evidence that the

24  defendant led a criminally responsible participant.

25          I further find that the defendant's criminal activity

M6SQmax1

was extensive.  Whether criminal activity is extensive is based primarily on the number of people involved, criminally and noncriminally, rather than on other possible indicators of the extensiveness of the activity.  District courts must determine the number of knowing participants in the criminal activity, the number of unknowing participants whose activities were organized or led by the defendant with specific criminal intent, and the extent to which the services of the unknowing participants were peculiar and necessary to the criminal scheme.  For example, a taxi driver that drives a defendant to a crime scene would not count.  That is an example from a case called *Carrozzella*, 105 F.3d at 804.

At all relevant times, the conspiracy proved at trial included at least two knowing participants:  Epstein and the defendant.  Beginning in 2002, Sarah Kellen joined, and beginning in approximately 2001, additional minor victims were recruited through Virginia and Carolyn.  Additionally, trial evidence established that services were unknowingly provided by various Epstein employees.  For example, I credit Juan Alessi's testimony that following the defendant's instructions, he scheduled massage appointments, set up the massage table for appointments, cleaned up after sexualized massages, and on at least one occasion drove Virginia to an appointment.

Additionally, both Visoski and Rodgers were employed as Epstein's pilots over the same time period as the counts of

M6SQmax1

1    conviction.  Visoski testified that Maxwell partially owned the

2    jet, and both pilots testified that she would tell them when to

3    fly Epstein or schedule flights for herself.  The evidence at

4    trial demonstrates that Epstein and the defendant had the

5    pilots fly victims of the conspiracy.  Across the timeframe of

6    all counts of conviction, Alessi, Visoski and Rodgers provided

7    personalized services that were peculiarly tailored to the

8    defendant's offenses and were not fungible services generally

9    available to the public.  Again, I'm citing from the

10   *Carrozzella* case, 105 F.3d at 804.

11         In addition to these unknowing participants that

12   testified at trial, I find by a preponderance of the evidence

13   that there were other unknowing persons led by Maxwell.  As

14   Epstein's number one, Ms. Maxwell managed Epstein's numerous

15   households and interviewed, hired and oversaw the household

16   staff.  The defendant had her own personal assistants, like

17   Sarah Kellen and another individual.  From the record, I can't

18   determine the precise number of these other individuals that

19   unknowingly assisted Epstein and the defendant in their

20   criminal activity, but I find an adequate basis in the record

21   that the number is sufficient to make the activity extensive

22   within the meaning of 3B1.1(a) from 1994 to 2004.  See *United*

23   *States v. Archer*, 671 F.3d 149 (2d Cir. 2011).

24         Last, the defendant objects to enhancement

25   2G1.1(b)(4)(B).  That provision increases the offense level by

M6SQmax1

two if a participant unduly influenced a minor to engage in a

commercial sex act.  In defining the enhancement, the

Commission instructs courts to closely consider the facts of

the case to determine whether a participant's influence over

the minor compromised the voluntariness of the minor's

behavior.  2G1.1, comment note 7.  And if the participant is at

least ten years older than the minor, there is a rebuttable

presumption that the participant unduly influenced the minor to

engage in a commercial sex act.  I overrule the defendant's

objection.

          The defendant first says the undue influence

enhancement would punish her for the same harm already counted

in her base offense level.  Impermissible double counting

occurs when a guideline enhancement is applied to reflect the

kind of harm that's already fully accounted for elsewhere in

the Guidelines but does not occur if the enhancement aims at

differing harms emanating from the same conduct or reflects

different facets of the defendant's conduct.  *United States v.*

*Watkins*, 667 F.3d 254 (2d Cir. 2012).  There isn't double

counting here.  The 2G1.1(a) base offense level reflects the

aggregating factor that the victim of the defendant's sex

offense was a minor.  The enhancement, by contrast, reflects

the use of undue influence to engage in a commercial sex act.

I'll cite a few cases that stand for that proposition,

including *United States v. Kohlmeier*, 858 F. App'x, 444 (2d

M6SQmax1

1   Cir. 2021) (summary order).   Similar conclusion, *United States*

2   *v. Smith*, a Ninth Circuit case from 2013, 719 F.3d 1120.   That

3   case explains 2G1.3(a) base offense level and the undue

4   influence enhancement "serve unique purposes under the

5   Guidelines."

6          The defense argues that because the enhancement

7   applies only if undue influence was exerted with the aim of a

8   commercial sex act, it does not apply here.   But the jury in

9   Count Six did convict the defendant of sex trafficking Carolyn

10  to participate in commercial sex acts.   The Court finds that

11  Virginia Roberts, who brought Carolyn and Melissa who was

12  brought by Carolyn similarly were paid.   The remaining victims,

13  including Jane and Annie, also testified that they received

14  money and gifts during their abuse which satisfies the

15  enhancement.

16         The defendant argues Carolyn was not unduly influenced

17  to sexually massage Epstein.   I find this argument meritless.

18  The age gap between Carolyn and Epstein and the defendant far

19  exceeded ten years, and the defendant does not rebut the

20  resulting presumption of undue influence.   2G1.1, comment note

21  7.   Carolyn testified she was paid to give Epstein sexualized

22  massages, and she needed the money for her drug addiction.

23  Later, Carolyn returned to Epstein because she needed the money

24  for herself and her newborn son.   Plainly, taking advantage of

25  a victim's financial need is a form of undue influence.   I'll

M6SQmax1

1    cite some cases for that proposition.  *Watkins* 667 F.3d at 265;

2    *United States v. Streb*, 36 F.4th 782.  That's and Eighth

3    Circuit case from 2022.  Courts have repeatedly concluded that

4    a minor can be the victim of undue influence even if the minor

5    initiates a sexual meeting.  See, for example, *United States v.*

6    *Lay*, 583 F.3d 436 (6h Cir. 2009).  I therefore overrule the

7    defendant's objection.

8            I next turn to the government's only objection to the

9    PSR Guideline calculation.  I do find that Virginia Roberts and

10   Melissa were minor victims of sex offenses -- they were

11   trafficked and abused by the defendant and Epstein during the

12   charged period.  The Guidelines require that each minor victim

13   be considered a separate count of conviction.  2G1.1.(d)1.

14   Probation department excluded Virginia and Melissa from this

15   provision only because they were not named in the indictment.

16   This is an incorrect basis for excluding them from the

17   calculation.  Relying on commentary by the Commission, the

18   Second Circuit has instructed "that conduct against victims

19   other than those charged in the indictment may constitute

20   relevant conduct, and, if such conduct qualifies, should be

21   treated for sentencing purposes as though it occurred in a

22   separate count of conviction."  I United States V. Wernick,

23   691, F.3d 108 (2d Cir. 2012) (citing 2G1.1 comment note 4).  I

24   therefore consider Virginia and Melissa as two additional

25   groups of victims and assign each a unit under Section 3D1.4.

M6SQmax1

1        Having resolved the parties' objections, I will

2    calculate the Guideline range.  As explained, I will use the

3    2003 Guidelines manual.  Following Section 2G1.1(d)(1), each

4    victim is considered a separate count of conviction.  In

5    addition to the three victims for which an offense level was

6    calculated in the PSR -- Jane, Annie, and Carolyn -- I

7    calculate offense levels, for Virginia and Melissa, coming to a

8    total of 5 groups.

9        For all groups, the base offense level is 19.  That's

10   Sections 2G1.1(a) and 2X1.1(a).

11       For Jane and Carolyn, because they were older than 12

12   but were not yet 16 when abuse began, the offense level is

13   enhanced by 2.  2G1.1(b)(2)(B).

14       The offense level for Jane and Carolyn is further

15   enhanced by 2 because they were unduly influenced into a

16   commercial sex act.  2G1.1(b)(4)(B).

17       For Annie, Virginia, and Melissa, who were at least

18   16, the offense level is increased by 2 because they were

19   unduly influenced into a commercial act.  2G1.1.(b)(4)(B).

20       The offense level for all groups are also enhanced by

21   4 points because of the supervisory role in an extensive

22   criminal activity.  3B1.1(a).

23       This brings the total offense level for Jane's and

24   Carolyn's groups to 27.  And Annie's, Virginia's and Melissa's

25   groups each to 25.

M6SQmax1

1          Because there are multiple counts, all within at least
2     four offense levels of each other, I determine 5 units under
3     3D1.4(a).  And under 3D1.4, 5 units increases the total offense
4     level of the group with the highest total offense level by 5
5     from 27 to 32.
6          Last, because the defendant engaged in a pattern of
7     activity involving prohibited sexual conduct, the total offense
8     level is increased by 5 from 32 to 37.  4B1.5(b)(1).
9          In conclusion, I find the correct total offense level
10    under the 2003 Guidelines is 37.
11         No party disputes the defendant's Criminal History
12    Category of I.
13         Under the 2003 Guidelines, a Criminal History Category
14    of I and total offense level of 37, produces a guideline range
15    of 210 to 262 months' imprisonment.
16         The range for the fine, again, under the 2003 manual
17    is $20,000 to $200,000 for each count.  That's 5E1.2(c)(3).
18         The range for supervised release is three years to
19    life.  5D1.2(a)(1) and (c) and 18 U.S.C. 3583(k), although I
20    believe there is a -- yeah, I think that's supervised release.
21         I don't want to hear repeated objections, but any
22    objections based on anything I said that is new?
23         MS. MOE:  Yes, your Honor.  With respect to the unit
24    analysis, we wanted to note that under 3D1.4, a total of 5
25    units adds 4 levels, not 5 levels.  I think the next layer on

M6SQmax1

1  the table is more than 5, as 5 levels.  And, thus, the total

2  number would be 36.

3          THE COURT:  I presume you agree with that,

4  Mr. Everdell?

5          MR. EVERDELL:  Yes, your Honor.

6          THE COURT:  Under the 2003 manual -- I see.  The

7  highest total offense level, increase by 4 from 32 to 36.

8          MS. MOE:  Yes, your Honor.  Thank you.

9          THE COURT:  Thank you, Ms. Moe.  And that produces a

10  guideline range 188 to 235.

11          MS. MOE:  Yes, your Honor.

12          MR. EVERDELL:  We agree with that, your Honor.

13          THE COURT:  Thank you.  Same question to you,

14  Mr. Everdell.  Preserving your objections, of course, but

15  anything new based on what I said?

16          MR. EVERDELL:  Yes, your Honor.  I don't think because

17  the government's response was the one added their request to

18  add Virginia and Melissa as separate groups, so we do object to

19  that.  I know the Court has already ruled on that.  We don't

20  think the record is adequate to make them separate offense

21  groups.  I understand the Court has already ruled on that, but

22  we would like to preserve that objection.

23          THE COURT:  Understood.  Thank you.

24          Do you want to respond, Ms. Moe?

25          MS. MOE:  Your Honor, I think the Court's rulings

M6SQmax1

1    addressing the factual objections speak directly to this issue.

2    The record at trial amply established that Melissa and Virginia

3    were victims of this conspiracy, and that the defendant had

4    been involved with recruiting Virginia, who in turn recruited

5    Carolyn, who in turn recruited Melissa.

6            With respect to Melissa in particular, we would not

7    that, like Virginia, her name appears in the defendant's little

8    black book, noting that she's a friend of Carolyn's.  For all

9    those reasons, and the reasons in our brief, we think the trial

10   record amply establishes that they were both victims of the

11   conspiracy.

12           THE COURT:  I agree with that, and for the reasons

13   indicated, do -- I agree with the government's objection to the

14   probation calculation for that reason.

15           I think that means we don't need to resolve the

16   factual objections that pertain to Carolyn's age.  As I said, I

17   credit Carolyn's testimony.  The objections I would overrule

18   because I think she accurately testified regarding her age both

19   in 2004 and 2005, but it doesn't answer the question, as I see

20   it, the legal question as to establishment of acts

21   conspiratorial conduct in the relevant two-month period.

22           With respect to fines, Mr. Everdell, what is now

23   paragraph 172 of the revised report, the defendant objects to

24   the inclusion a $10 million bequest from Epstein being included

25   in her assets for purposes of determining her ability to pay a

M6SQmax1

1    fine.  I can't quite tell from the papers whether -- I know you

2    say the bequest is likely to be contested.  What is the current

3    status of the bequest?

4                MR. EVERDELL:  Your Honor, my understanding is that

5    the document says what it says, and the estate is undergoing

6    bankruptcy proceedings.  I don't believe there is any -- this

7    issue has been addressed because I think the estate is still

8    dealing with victims' claims and other claims against the

9    estate.  But because it's in bankruptcy, I assume that this

10   will be contested, and we don't know if there will be any money

11   left at the end of that proceeding to honor the bequest.  So

12   that's one of the many reasons why I think this is such a

13   tenuous asset that it shouldn't be considered for purposes of

14   fines.

15               THE COURT:  It's listed as an asset in the financial

16   affidavit, is it not?

17               MR. EVERDELL:  It is, your Honor, because we felt we

18   wanted to fully disclose everything we know about, and we do

19   know about simply because we were produced that document.  We

20   didn't know about it before.  We knew about it because we got

21   it in discovery, and we saw it was there, so we felt in good

22   faith, we had to list it or at least disclose it, but I don't

23   think it should be considered for purposes of fine.

24               THE COURT:  Ms. Moe, do you want to respond to that?

25               MS. MOE:  Your Honor, I don't have additional

M6SQmax1

1    information about the status of the estate.  With respect to

2    whether this information should be in the PSR, I think the

3    Court is exactly right.  This is listed on an asset on her

4    balance sheet.  Whether she ultimately recovers that amount or

5    not, it's listed in the same way that liabilities are listed

6    even though it may be uncertain as to how those are resolved.

7    So I don't think the objection is founded.

8                THE COURT:  Yes, I'm going to overrule this objection

9    to the PSR paragraph.  It is included as an asset in

10   Ms. Maxwell's financial aid affidavit.  The uncertain assertion

11   that she may lose the asset is not a basis to exclude it from a

12   considered asset for purposes of determining a fine.

13               Paragraph 178, the assertion here is that she is

14   unable to pay a fine.

15               Do I have that right, Mr. Everdell?

16               MR. EVERDELL:  Yes, your Honor.

17               THE COURT:  I overrule the objection.  Section

18   5E1.2(a) of the Guidelines requires the Court to impose a fine

19   in all cases except where the defendant establishes that she is

20   unable to pay and is not likely to become able to pay any fine.

21   The defendant has failed to establish this.  As I just noted,

22   there is a $10 million bequest from Epstein this is in addition

23   to other assets noted in the PSR.

24               I will say the assets and finances have been a moving

25   target.  In July 2020, Ms. Maxwell reported $3.8 million in

M6SQmax1

1    assets, and then reported $22 million in assets in support of

2    the December 2020 bail application.  The claim now of an

3    inability to pay the fine, as I understand it, at the same time

4    in which the defense has not provided documentation of her

5    marriage or the purported pending divorce settlement.  So I am

6    unpersuaded based on the balance of facts that the defendant is

7    indigent, and I do intend to impose a fine.

8           I will address restitution at the end.  I understand

9    the government is not seeking restitution.  So we will pick

10   that up at the end.

11          All right.  With that, I'm going to take a break, and

12   then I will come back and hear from -- just fill a few

13   formalities.  Neither of the papers make an argument for formal

14   downward departures, as I understood them.  In any event, I've

15   considered whether there's an appropriate basis for departure

16   from the advisory range within the Guideline system and do not

17   find any grounds warranting departure under the Guidelines.

18          When we return with the Guideline calculation

19   complete, I will hear from the parties as to what they contend

20   a reasonable sentence is for Ms. Maxwell, taking into account

21   the 3553(a) factors.

22          It's 12:30, which is a shocking fact to me.  I suppose

23   we should take a 30-minute break so that everyone can get

24   lunch, as I imagine we still have a fair amount of matters to

25   discuss and time to get through.  So we'll take a 30-minute

M6SQmax1

1   break.

2           Ms. Moe

3           MS. MOE:  With respect to the sequence of events, just

4   so victims are aware, would the Court prefer to hear from

5   victims before the Court hears from the parties or after?  We

6   defer to the Court, but it would be helpful to know for the

7   victims.

8           THE COURT:  I was anticipating government, victim

9   statements, defense counsel and then Ms. Maxwell if she wishes

10  to make a statement.  My staff did provide counsel for the

11  victims making statements an order in which they're speaking.

12          MS. MOE:  Thank you, your Honor.

13          THE COURT:  Any objection to that ordering, Ms. Moe?

14          MS. MOE:  No, your Honor.  Thank you.

15          THE COURT:  Ms. Sternheim?

16          MS. STERNHEIM:  I'm on now.  No.  Thank you.

17          THE COURT:  I'll see you at 1:00.  Thank you.

18          (Luncheon recess taken)

19          (Continued on next page)

20

21

22

23

24

25

M6SQmaxS1

                        AFTERNOON SESSION

                           1:10 p.m.

1           THE COURT:  As I indicated, I'll hear first from the

2   government as to what a reasonable sentence is under the

3   3553(a) factors.

4           Ms. Moe, when you're ready.

5           MS. MOE:  Thank you, your Honor.  May I take the

6   podium?

7           THE COURT:  You may.  Thank you.

8           MS. MOE:  Your Honor, Ghislaine first met Jane at

9   summer camp in August of 1994.  Jane was 14 years old.  What

10  Maxwell did in the years that followed to Jane and Kate and

11  Annie and Virginia and Carolyn and Melissa, was almost

12  unspeakable, but the truth came out in this case; and while

13  many years have past, their pain is palpable, it's real, and it

14  matters.

15          Today we ask the Court to impose an above-guideline

16  sentence of multiple decades in prison, a sentence that holds

17  Maxwell accountable for the essential role she played in an

18  extensive and disturbing child exploitation scheme.

19          Maxwell trapped young girls in a horrifying nightmare.

20  Her victims were vulnerable kids who found themselves alone in

21  giant mansions where they were sexually exploited by adults

22  they thought would help them.  These girls were just kids.

23  They were just finding their way in the world, trying to figure

M6SQmaxS1

1    out who they were and who they might be some day when they grew

2    up.  These kids had hopes and dreams for their future and the

3    defendant used those dreams as her tool to abuse them.

4          We ask the Court to take an unflinching look at the

5    defendant's actions and consider what that tells you about who

6    she really is.  What kind of person persuades young girls to

7    massage the feet of a middle-aged man?  What kind of person

8    gets a 16-year-old girl all alone at a ranch in the middle of

9    nowhere and tells her to take off her clothes and get on a

10   massage table so that she can grope that girl's chest?  What

11   kind of person teaches a 14-year-old girl how a middle-aged man

12   likes his penis to be touched?  What kind of person sees a

13   17-year-old girl on the street and pulls over so that she can

14   persuade that girl to come to a house of horrors where that

15   young girl will be trafficked for sex?  What kind of person

16   flies around on a plane with underage girls so that when her

17   boyfriend travels, he always has a young girl to touch?  What

18   kind of person would use their privilege, their power in this

19   world to intentionally prey on the vulnerable, young girls from

20   struggling families:  Girls without fathers, girls who needed

21   help.  These are the actions of a person who was indifferent to

22   the suffering of other human beings.

23         The defendant's actions were not a one-time mistake;

24   not at all.  Maxwell was an adult woman, and she made the

25   choice, week in, week out for years to commit crimes with

M6SQmaxS1

1    Jeffrey Epstein, to be his right hand, to make his crimes

2    possible.  Those choices were hers, and they have to have

3    serious consequences.

4          What's more, her actions portrayed a disturbing view

5    of the world we live in.  To Maxwell there were two kinds of

6    people in this world:  The people who really mattered and the

7    people who were disposable.  Maxwell wanted to make sure that

8    she stayed among the people who she thought mattered.  She

9    wanted to live a luxurious lifestyle jet-setting around the

10   world.  She took millions of dollars from Epstein over the

11   years and that's because they were predators together, they

12   were partners in crime together, and they molested kids

13   together.

14         The defendant's actions had serious consequences for

15   her victims.  These girls, now women, are strong.  They have

16   shown the world what true bravery really is.  But when the

17   defendant preyed on them, they were just kids, and they'll

18   carry with them for their entire lives the trauma of what

19   they've experienced.  What is truly remarkable about this case,

20   your Honor, is that we don't have to speculate about the

21   lasting irreparable harm that the defendant's actions have had.

22   You have seen for yourself the devastating effects of the

23   defendant's crimes and how much her actions have affected her

24   victims even years later.

25         The defendant has shown absolutely no remorse for her

M6SQmaxS1

crimes.  She has not owned up to the truth.  She has lied

repeatedly.  She has been dishonest with the Court, and she has

made misrepresentations when it suits her.  Your Honor, we

recognize that the Court has calculated the guidelines to be

188 to 235 months.  That is far below the sentence that the

government believes is appropriate in this case.  We recognize

that there are a small number of cases where the Court imposes

an above-guideline sentence.  This is that case, your Honor.

          In the almost 20 years since the 2003 manual was

enacted, our Sentencing Commission, our Congress, and our

country have all recognized just how serious sex crimes against

children are.  Our country now recognizes how woefully

inadequate the 2003 guidelines were, and the Supreme Court has

expressly held that sentencing courts can vary upwards for

exactly that reason.  Again, this is that case.  This is

exactly that case.  This is the time to impose an

above-guideline sentence.  A guideline sentence in this case

would create unwarranted sentencing disparities with

individuals being sentenced today for sex-trafficking offenses.

This case calls out for an above-guideline sentence because of

the breathtaking scope of the defendant's conduct, the length

of her crimes, the number of victims, the vulnerability of her

victims, the sophistication of the defendant's predatory

conduct and the degree to which she psychologically manipulated

her victims.  Her conduct was shockingly predatory, and it

M6SQmaxS1

1   calls out for an above-guideline sentence.

2           We ask the Court to impose an above-guideline

3   sentence, a sentence that sends a message that those who would

4   conspire with sexual predators would be held responsible for

5   their significant role in these crimes.  We ask the Court to

6   send a message that nobody is above the law, and nobody is too

7   rich or powerful to be held accountable.  We ask the Court to

8   send a message that it is never too late for justice.

9           Your Honor, you should not hesitate to hold the

10  defendant accountable for the full measure of her crimes.  She

11  deserves to spend decades in prison for her crimes.  Thank you.

12          THE COURT:  Thank you, Ms. Moe.

13          And I will ask that the individuals who are making

14  statements come to the podium.

15          Ms. Farmer is first.  You're welcome to remove the

16  mask when you get there, Ms. Farmer, if you'd like.

17          MS. FARMER:  Judge Nathan:  For a long time I wanted

18  to erase from my mind the crimes that Ghislaine Maxwell and

19  Jeffrey Epstein committed against me and pretend they hadn't

20  happened.  It was the type of dark memory that feels safest to

21  keep locked away.  But I've had to acknowledge the long-lasting

22  effects.  One of the most painful and ongoing impacts of

23  Maxwell's and Epstein's abuse was a loss of trust in myself, my

24  perceptions and my instincts.  When predators groom and then

25  abuse or exploit you, they are in a sense training you to

distrust yourself.  When a boundary is crossed or an

expectation violated, you tell yourself, "Someone who cares

about me to do all these nice things surely wouldn't also be

trying to harm me."  This pattern of thinking is insidious, so

these seeds of self-doubt took root even as I learned my sister

had also been harmed by them and came to find out years later

that many others had been exploited.

            THE COURT:  Just a request to slow down.

            MS. FARMER:  For years these memories triggered

significant self-recrimination, minimization and guilt.  I

blame myself for believing these predators actually wanted to

help me.  I felt tremendous survivor guilt when I heard about

what other girls and young women had experienced at hands of

Maxwell and Epstein.  I saw about how my sister's concern about

me weighed on her and felt guilty about this as well.

            This toxic combination of being sexually exposed and

exploited, feeling confused and naïve and blaming myself all

resulted in significant shame; that sickening feeling that

makes you want to disappear.  It was not constant but would

come in waves, similar to the waves that anxiety would also

show up.  When I think back, I see a slide-show of moments when

these feelings would surface and overwhelm me.  There are too

many of these moments to name and though I have come a long way

in my path of healing, I know that these feelings will continue

to be triggered at times.

1              The ripple effects of trauma are undeniable.  When one

2      person is abused, many others are also harmed.  In addition to

3      the way I was impacted as an individual, there was the pain I

4      experienced as a sister due to how Maria was abused by Maxwell

5      and Epstein and the harm caused to the rest of my family due to

6      these events.  My sister Maria's abuse, the sexual assault,

7      Maxwell's threats that stole her sense of safety and her

8      career, the way they used her to get to me had devastating

9      effects on her.  As my family watched her grow more isolated

10     and more physically ill from the stress of all of it, we all

11     felt powerless.  It was heartbreaking and infuriating, and we

12     later learned how often this pattern was repeated.  A young

13     person on the path of pursuing her dreams was pulled in by

14     Maxwell, was abused and exploited, and then had to try and

15     piece together a life in the aftermath of this trauma that left

16     them feeling distrustful and fearful.  Most of these

17     individuals had families who also were negatively impacted as

18     they witnessed and felt the systemic effects of their loved

19     one's losses and struggles.  The number of people harmed is

20     impossible to measure.  Maxwell had many opportunities to come

21     clean but instead continued to make choices that caused more

22     harm.

23             When my sister and I first spoke out to the media

24     about what happened to us, Maxwell lied about us and threatened

25     Maria, thus helping shut down investigations into their

M6SQmaxS1

1  behavior so they could together continue to harm children and

2  young women.  After this attempt to alert people to Epstein and

3  Maxwell's abusive behavior, I avoided being public about it for

4  two decades.  My shame told me I should hide this fact because

5  it was embarrassing.  Later as I pursued my profession as a

6  psychologist, I feared it could potentially ruin my career.  I

7  worried clients would not want to work with me if I was

8  associated with this story, wrongly labeled as one of child

9  prostitution.  I feared being on Epstein's and Maxwell's radar

10  as a problem because of their previous lies and threats.

11          Once arrested, Maxwell faced another choice.  She

12  could admit her participation in this scheme, acknowledge the

13  harm caused or even provide information that could have helped

14  hold others accountable.  Instead, she chose again to lie about

15  her behavior, causing additional harm to all of those she

16  victimized.

17          Judge Nathan, I hope when you consider the appropriate

18  prison sentence for the role Maxwell played in this

19  sex-trafficking operation, you take into account the ongoing

20  suffering of the many women whom she abused and exploited as we

21  will continue to live with the memories of the way she harmed

22  us.  I hope you weigh the systemic effects of the crimes she

23  perpetrated, the ways that our family members, romantic

24  partners and friends have been hurt through our suffering.  I

25  ask you to bear in mind how Maxwell's unwillingness to

M6SQmaxS1

acknowledge her crimes, her lack of remorse and her repeated

lies about her victims created the need for many of us to

engage in a long fight for justice that has felt like a black

hole sucking in our precious time, energy and well-being for

much too long now, things that cannot be replaced.  Thank you.

THE COURT:  Thank you, Ms. Farmer.

Kate may make a statement now.

MS. MOE:  Your Honor, before Kate speaks, I just

wanted to confirm that the Court's anonymity order, in

particular with respect to sketch artists, is in effect.

THE COURT:  Yes.  Consistent with the Court's prior

anonymity and pseudonym order, we will refer to this witness as

Kate only, and the sketch artists shall not draw an exact image

of Kate so that she can remain anonymous.

Thank you, Ms. Moe.

Kate, you may proceed.

KATE:  Good afternoon, your Honor.  Thank you for

hearing me.  I believe you've already seen my victim impact

statement, so I have something else to say.

At a time when women's rights have so callously been

discarded, as the mother a young daughter, I fear for the

safety and freedom of my child.  Today offers hope that change

is possible.  Our voices may not have been heard before, but we

united to bring justice to a common enemy.  If we cannot stop

women who have been raped from being forced to bear the

M6SQmaxS1

children of their rapists, then we must take a stand on zero
tolerance to those who abuse their power to groom and traffic
and rape the vulnerable.

How you do anything is how you do everything.  Every
single person should have equal value.  Every single person
should have an equal right to be protected.  Every single child
must have their innocence defended.  No person should be
shielded from the consequences of their actions no matter their
status or class.  Ghislaine's lack of remorse and her blatant
refusal to take responsibility for her crimes towards us is the
final insult.

Having a difficult childhood is irrelevant to the
choices she made to traffic and supply women/children to
Jeffrey Epstein and other powerful men.  Despite the atrocities
perpetrated on me, I have never recruited a child or any person
to be sexually abused.  Someone being a hard worker does not
excuse sex trafficking of minors.  Someone starting a
non-profit does not excuse sex trafficking of minors.  Someone
who had it difficult or even an abusive father does not excuse
sex trafficking of minors.  Losing money and prestige does not
excuse sex trafficking of minors.  The lack of remorse or
responsibility taken by Ghislaine for how she ruined the lives
of countless women and children is exactly how we can tell that
she doesn't think what she did is wrong.  She is not sorry, and
she would do it again.

M6SQmaxS1

1          I have known Ghislaine for many years now, and I have

2     seen her be kind and generous to me and many others until she

3     doesn't get what she wants from that person, and then I have

4     seen her stop at nothing to enforce her will -- a manipulative

5     cruel and merciless person who only uses kindness to manipulate

6     and generosity to seek recognition.

7          Today for the first time I stand with my sisters,

8     bonded by a trauma that I wish on no one, to draw a line and to

9     set a precedent to say enough is enough; to say no with a

10    chorus of voices that you cannot ignore.  May that chorus ring

11    through the ears of people still being victimized and give them

12    strength.  May it echo in the ears of perpetrators to remind

13    them that there are those of us who will never stop until we

14    stop them.

15         Today is not a happy day.  I take no pleasure in being

16    part of a world where this is necessary, but I am proud to

17    stand shoulder to shoulder with these brave women and do what

18    is necessary to stop Ghislaine, to hold her accountable, and

19    for the first time in my life not to feel afraid.  I could not

20    have done this alone, and I thank those who walked alongside me

21    and those who carried me.  Today I can look at Ghislaine and

22    tell her that I became what I am today in spite of her and her

23    efforts to make me feel powerless and insignificant, and I will

24    pass that empowerment on to my daughter that she may never

25    consider being silent when faced with injustice because she

M6SQmaxS1

```
1    will feel all of us standing behind her.  Thank you.
2              THE COURT:  Thank you.
3              I will hear the statement from counsel for Virginia
4    Roberts.
5              VIRGINIA ROBERTS COUNSEL:  Good afternoon, your Honor.
6              May it please the Court, this statement I am reading
7    on behalf of my client, Virginia Giuffre, is written to
8    Ghislaine Maxwell.
9              Ghislaine:  22 years ago in the summer of 2000, you
10   spotted me at Mar-a-Lago in Florida, and you made a choice:
11   You chose to follow me and procure me for Epstein.  Just hours
12   later, you and he abused me together for the first time.
13   Together you damaged me physically, mentally, sexually and
14   emotionally.  Together you did unthinkable things that still
15   have a corrosive impact on me to this day.
16             I want to be clear about one thing:  Without question,
17   Jeffrey Epstein was a terrible pedophile, but I never would
18   have met Jeffrey Epstein if not for you.  For me, and for so
19   many others, you opened the door to hell, and then, Ghislaine,
20   like a wolf in sheep's clothing, you used your femininity to
21   betray us and you led us all through it.  When you did that,
22   you changed the course of our lives forever.  You joked that
23   you were like a new mother to us.  As a woman, I think you
24   understood the damage that you were causing, the price you were
25   making us victims pay.  You could have put an end to the rapes,
```

M6SQmaxS1

the molestation, the sickening manipulation that you arranged,
witnessed and even took part in.  You could have called the
authorities, and reported that you were part of something
awful.

          I was young and naïve when we met, but you knew that.
In fact, you were counting on it.  My life as a young person
was just beginning.  You robbed me of that by exploiting my
hopes and ambitions.  Ghislaine, the pain you have caused me is
almost indescribable.  Because of your choices and the world
you brought me into, I don't sleep.  Nightmares wake me at all
hours.  In those dreams, I relive the awful things that you and
others did to me and the things that you forced me to do.
Those memories will never go away.

          I have trouble meeting new people without questioning
if somehow they're going to hurt me too.  There is not a day
that doesn't go by that I don't ask why.  Why did you enjoy
hurting us so much?  I worry every single day and night that
you will get away with it and evade being punished.  I will
worry about that until you're brought to justice.  And what
should that justice look like?  Ghislaine, you deserve to spend
the rest of your life in prison in a jail cell.  You deserve to
be trapped in a cage forever just like you trapped your
victims.  But I want you to know that while you tried to break
me, you did not succeed.  Despite you, I've grown into a woman
who tries to do good in the world; a woman who on her best days

M6SQmaxS1

1   feels like she's making a difference.

2          My promise to you is as follows:  As long as you and

3   perpetrators like you continue to prey on the vulnerable, I

4   will not stop standing up and speaking out.  Together with so

5   many others you abused, we will do all we can to keep predators

6   from stealing the innocence of children.  I will never give up.

7   I will never go away.  If you ever get out of prison, I will be

8   here watching you and making sure you never hurt anyone else

9   again.  Thank you.

10          THE COURT:  Thank you, counsel.

11          And I do have the written submissions submitted in

12   accordance with the Court's order from Ms. Bryant, Ms. Maria

13   Farmer and Ms. Helm, who I understand was not able to be

14   present.  And so I'll hear from Ms. Ransome.  Please tell me

15   how tell me how to say your name correctly.

16          MS. RANSOME:  Ransome.

17          THE COURT:  Thank you.

18          MS. RANSOME:  Your Honor, it's been a long journey to

19   bring Maxwell to justice.  Although I have physically escaped

20   the hideous trap set by Epstein, Maxwell and other

21   co-conspirators, I continue now, 17 years later, to suffer from

22   the horrific trauma it has caused.

23          I came to New York at the age of 22 hoping to attend

24   New York's FIT and work in the fashion industry.  Soon after

25   arriving, I made met an Epstein-Maxwell recruiter named Natalya

M6SQmaxS1

1   Malyshev.  She described him as a kind philanthropist who could
2   help me get into FIT and provide much needed support.

3           Over the next seven to eight months, I became against
4   my will nothing more than a sex toy for the entertainment of
5   Epstein, Maxwell and others.  I was subjected to sexual
6   predation multiple times per day, both in his New York mansion
7   and on his private island in the U.S. Virgin Islands.  On one
8   of the visits to the island, the sexual demands, degradation
9   and humiliation became so horrific that I tried to escape by
10  attempting to jump off a cliff into shark-infested waters.

11          Epstein and Maxwell were masters at finding young,
12  vulnerable girls and young women to exploit.  Upon targeting a
13  vulnerable girl/young woman, they would ingratiate themselves
14  to her, giving her compliments and small gifts, telling her how
15  special she was.  Soon after lulling me and others into a false
16  sense of security and comfort, they pounced, ensnaring us in
17  the upside-down, twisted world of rape, rape, rape.  Like Hotel
18  California, you can check into the Epstein-Maxwell dungeon of
19  sexual hell, but you could never leave.

20          The manipulation, intimidation and emotional abuse
21  used to control the victims took many forms.  In my case,
22  Epstein and Maxwell used my dysfunctional family history,
23  naivete, visa status, lack of education and desire to go to FIT
24  to manipulate, scare and ensnare me.  They told me that I was
25  exceptionally intelligent and that I had real potential to be

M6SQmaxS1

someone and something in life one day.

Epstein's and Maxwell's strong ties to FIT could make
this happen.  With their help, my admission was almost assured,
but there was always a but.  First I had to write my
application, which I did.  But Maxwell had to review it and
conveniently always found fault.  Then another but, I needed to
lose 30 pounds because I was a piglet.  Maxwell's numerous
degrading descriptions of me.  Epstein and Maxwell put me on a
strict Atkins diet while simultaneously sending me to a
psychiatrist who prescribed antidepressants that caused weight
gain.  It was a classic no-win situation, and they knew it:
Precisely what human traffickers seek.  I never lost the
weight, my application was never good enough, and it never got
submitted.

I thank the almighty God that in 2007, I managed to
escape the horror by fleeing to the U.K.  Since then, I have
been coping as best as I can and frequently experience
flashbacks and wake up in a cold sweat from nightmares from
reliving the awful experience.  I'm hypervigilant.  I do not
trust people easily.  I experience dramatic mood changes.  I
will sometimes start crying uncontrollably for reasons I cannot
always comprehend.  I worked hard with several mental health
professionals.  They have diagnosed me with extreme symptoms of
anxiety, depression, low self-esteem, PTSD and tendency to
self-harm.

M6SQmaxS1

1            Despite my earnest effort I have not realized life's

2    true potential professionally, nor entered any healthy personal

3    relationships.  I have never married, and I do not have

4    children, something I always wished for when I was a little

5    girl.  I shy away from meeting new people and have difficulty

6    making new friends because I fear they too could be associated

7    with Epstein and Maxwell and their enablers and

8    co-conspirators.

9            To this day I attend meetings to treat alcoholism, but

10   I have had numerous relapses, and I cannot always control that.

11   I know that only by the grace of God do I continue to live.  I

12   have attempted suicide twice since the abuse -- both near

13   fatal.

14           Last year, I traveled to New York to attend Maxwell's

15   trial.  It was therapeutic to hear the testimony of the four

16   brave victim-witnesses, whose experience paralleled my own, to

17   know that I was not alone, and that our story was finally being

18   told for the world to hear.

19           I am grateful the jury believed the victims and

20   returned a guilty verdict, but a question still tears at my

21   soul.  After all of this, how can this five-star general of

22   this enormous sex-trafficking conspiracy involving hundreds, if

23   not thousands, of vulnerable girls and young women over three

24   decades continue to maintain her innocence?  Reflecting on it,

25   I know the answer to my questions.

M6SQmaxS1

1          Maxwell is today the same woman I met almost 20 years

2   ago, incapable of compassion and human common decency.  Because

3   of her wealth, her social status and connections, she believes

4   herself beyond reproach and above the law.  Sentencing her to

5   the rest of her life in prison will not change her, but it will

6   give the other survivors and I a slight sense of justice and

7   help us as we continue to work to recover from the

8   sex-trafficking hell she perpetrated.

9          She will never ever hurt another young woman or child

10  again in this lifetime, and for that I am sure.

11         To Ghislaine, I say, you broke me in unfathomable

12  ways, but you did not break my spirit, nor did you dampen my

13  eternal flame that now burns brighter than ever before.

14         Thank you, your Honor.

15         THE COURT:  Thank you, Ms. Ransome.  I will hear the

16  statement from Ms. Stein.

17         MS. STEIN:  Good afternoon, your Honor.

18         THE COURT:  Good afternoon.

19         MS. STEIN:  I came to New York in 1991 at the age of

20  18 to attend FIT and immediately began to excel academically.

21  In my sophomore year, I accepted a Christmastime internship at

22  Henri Bendel New York.  I performed well and was asked to stay

23  on as a part-time employee.

24         In the fall semester of my senior year at FIT,

25  Ghislaine Maxwell came into the store where she was a frequent

M6SQmaxS1

1   customer.  Her usual salesperson wasn't there, so I helped her.

2   Ghislaine was electrifying.  We hit it off immediately.  In

3   this first meeting we spoke of our mutual love of fashion, of

4   difficult fathers and formal upbringing, of boyfriends and of

5   how we both saw New York as a chance to start over.  She told

6   me that her boss, who I later came to understand was Jeffrey

7   Epstein, was close friends with Lex Wexner, the CEO and founder

8   of The Limited, which owned Henri Bendel at the time.

9        When she completed her purchases, I offered to deliver

10  them to her so she didn't have to carry them around all day.

11  This was a courtesy I frequently extended to my high-end

12  clients.  Later that day, I called her office for delivery

13  instructions and was told to bring them to a hotel close by to

14  the store.  When I arrived, the hotel concierge told me

15  Ms. Maxwell was in the bar and wanted me to meet someone.  It

16  was Jeffrey Epstein.  That night in the hotel was the first of

17  many times they sexually assaulted me.

18       Afterwards I tried to pretend everything was normal.

19  I returned to my classes at FIT and continued to work at Henri

20  Bendel, but I started to crack.  I failed a course that was

21  necessary for my degree and had to retake it to get my diploma.

22  Shortly after my first meeting with Epstein and Maxwell, I was

23  offered a full-time position at Henri Bendel.  It was a newly

24  created position at the store, and it would have required me to

25  leave FIT a semester short of completing my degree.  I had

M6SQmaxS1

aspirations of going to law school, and I knew I could not do

so without my undergraduate degree, so I declined it.

When Ghislaine found out, she flew into a rage.  I

didn't understand why until she told me that she and Epstein

were responsible for giving me that opportunity and that in

turning it down I was being ungrateful.  I now know that this

was their standard operating procedure.  Give a gift or a favor

and then demand sex in return.  Nevertheless, I completed my

course work, got my degree from FIT, at which point I left

Henri Bendel and took a position at Bloomingdales.  I wanted to

leave Epstein and Maxwell and the abuse they perpetrated

against me behind as I started my professional life.  I never

wanted to or expected to see them again.

One day in the fall of 1995, Maxwell showed up at

Bloomingdales looking for me.  When I asked her how she knew

where I was, she said she asked my colleagues at Henri Bendel.

She immediately began befriending me once again, asking me to

go out socially.  I tried to resist but eventually she wore me

down, and I began spending time with them again.  They made me

feel like they were friends, contemporaries.

In one instance, they took me to Florida and insisted

that I stay longer than planned which caused me to miss work

and led to me being fired.  Seizing on this new vulnerability

they began trafficking me to their friends.  By that time I was

trapped.  I was assaulted, raped and trafficked countless times

in New York and Florida during a three-year period.  Things

happened that were so traumatizing that to this day I am unable

to speak about them.  I don't even have the vocabulary to

describe them.  In the most literal sense of the word, Epstein

and Maxwell terrified me.  They told me that if I told anyone,

no one would believe me; and if they did, they would kill me

and the people closest to me.  I believed them.

       I was once bright, fun, outgoing and kind.  I loved

life and people genuinely enjoyed being around me.  After

meeting Jeffrey Epstein and Ghislaine Maxwell, it felt like

someone shut off the lights to my soul.  My secrets became too

much for me to handle, and I began doing whatever I could to

try to get away from Maxwell and Epstein.  I changed jobs,

apartments, cities and even states to try to get away.

Everywhere I went, they found me.

       In 1997 I moved to Philadelphia with the hopes of

finally starting law school.  They found me again, and it was

more than I could take.  I was hospitalized with a nervous

breakdown.  It would be the first of over two dozen

hospitalizations in a decade following my involvement with

Epstein and Maxwell.

       In addition to my escalating mental health problems, I

began to experience physical symptoms that doctors could never

quite put their fingers on.  I could no longer even pretend to

be able to hold down a job or take care of myself in any

M6SQmaxS1

1    meaningful way, and I had to move back home once again.

2    Emotionally, I had cracked and nobody thought I would ever get

3    better, but I didn't give up.  I was determined to do whatever

4    I had to to prove everyone wrong.  I wasn't crazy.  I was hurt.

5         For over a decade and a half, I went to all kinds of

6    medical specialists and was in and out of medical and

7    psychiatric hospitals, having tests and procedures, even

8    submitting to clinical trials and an experimental implantable

9    medical device.  Nothing helped.

10        Just as I began to repair the emotional damage, I was

11   diagnosed with complex regional pain syndrome.  CRPS is a rare

12   neuro-inflammatory disorder characterized raised by intense

13   relentless physical pain.  Both CRPS and PTSD are

14   psychophysical states in which the sympathetic nervous system

15   is engaged and remains inappropriately hyperaroused.  There is

16   no cure.  The mind and body are interconnected.  Despite of

17   this, I immersed myself this trauma therapy and repaired my

18   emotional health.  I began physical therapy and regained my

19   physical mobility.  I started to rebuild my life.

20        The arrest of Epstein in 2019 and Maxwell in 2020

21   helped me immensely.  For the first time, I was finally able to

22   disclose their abuse to friends and medical providers.  25

23   years after meeting them my experience was validated.  I could

24   finally see the possibility of closure.  This past November and

25   December I commuted almost every day from my home in

M6SQmaxS1

1    Philadelphia to attend Ghislaine Maxwell's trial in Manhattan.

2    For weeks I sat in this courtroom anonymously, only revealing

3    my identity the day before the verdict.  I had to see justice

4    myself.

5          At the age of 48, I feel as if I'm just starting my

6    life.  All those things I assumed I would have in life, the

7    things that my siblings and my friends have achieved:  A

8    career, success, partner, family, a home, a legacy to be proud

9    of leaving behind were jeopardized for more than two and a half

10   decades.  The only pronounced difference between my life

11   experience and theirs is that one day when I was doing my job,

12   I met Ghislaine Maxwell who fed me to Jeffrey Epstein.

13          (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

M6s2Max2

1          MS. STEIN:  In more ways than one, they almost killed

2     me, but I wasn't going to let them.  Overcoming what happened

3     to me became my decades-long, full-time career.  In that, I

4     have been successful.

5          For the past 25 years, Ghislaine Maxwell has been free

6     to live a life of wealth and privilege that is almost

7     incomprehensible.  Meanwhile, I have had virtually none of the

8     life experiences I might have had we never met.  For over two

9     and a half decades, I felt like I was in prison.  She has had

10    her life.  It's time to have mine.  She needs to be imprisoned

11    so all of her victims can finally be free.

12         Thank you, your Honor

13         THE COURT:  Thank you, Ms. Stein.

14         Ms. Sternheim?

15         MS. STERNHEIM:  Thank you, Judge.  Judge, I would like

16    to stand at the podium.

17         THE COURT:  Please.

18         Let me just note again that I did have the statements

19    of the victims in the record.  I thank them for making

20    statements today and thank their counsel for working with them

21    in conformity with my order.

22         MS. STERNHEIM:  Your Honor, I would like to address

23    the victims.  I am going to try to turn around if the Court

24    permits me.

25         THE COURT:  As long as I can hear you and the court

SOUTHERN DISTRICT REPORTERS, P.C.•
•
•
•
(212) 805-0300

1    reporters can hear you.

2              MS. STERNHEIM:  I am going to speak as best as I can.

3              I want to acknowledge the courage that all of you have

4    exhibited in coming forward at the trial and again today.  Your

5    statements are immensely powerful.  We feel the pain.  We can

6    only hope that the end of this case and the sentence to be

7    imposed will give you some solace and the sanctity that you

8    have the ability to move forward and beyond all of this.

9              Judge Nathan, can you hear me?  I didn't pull it out,

10   I hope.

11             THE COURT:  I can.

12             MS. STERNHEIM:  Okay.

13             You have heard all of the trial testimony and you are

14   fully familiar with the record.  We will refrain from pointing

15   out many statements that we disagree with by the government

16   that we believe stretches the elasticity of the record well

17   beyond what we believe is fair inference.  But the purpose of

18   today is not to take issue with the record; that will be

19   addressed to the Court of Appeals.

20             The government asks the Court to sentence Ms. Maxwell

21   above the more reasonable guideline range that the Court

22   determined is applicable in this case and seeks a sentence of

23   multiple decades in prison for a woman who is almost 61 years

24   old and for almost the last 20 years has not engaged in any

25   conduct similar to that which was the subject of the trial and

M6s2Max2

1    the conviction.

2              The government has asked for an immense sentence.  We

3    recognize that any sentence in this case is going to be

4    significant and is going to be immensely punishing.  The

5    probation department, based on the original guidelines in the

6    presentence report, recommended a downward variance to 20

7    years.  That recommendation is now higher than the guideline

8    range that is applicable in this case.  But we ask the Court to

9    consider the justification that probation articulated in the

10   presentence report in fashioning a sentence that takes into

11   consideration that a sentence lower than the guideline range is

12   appropriate in this case.

13             The government's sentence asks for the outer limits,

14   and although we still believe that even the recommendation is

15   too high, a sentence within the guideline range now may be more

16   reasonable, but it still does not take into consideration some

17   of the various factors that we have brought to the Court's

18   attention in our submission.  Simply stated, based upon the

19   conduct of conviction, the government's request is out of

20   proportion.  Jeffrey Epstein would have faced the same

21   sentence, and he is clearly far more culpable than Ghislaine

22   Maxwell.

23             THE COURT:  You mean he would have faced the same

24   guidelines.

25             MS. STERNHEIM:  Yes, that is correct, Judge.

M6s2Max2

1          The sentencing submissions, which I know the Court has

2     read——and I know the Court reads everything very critically and

3     carefully——outlines and details our position, and I am not

4     going to take the time to repeat those things unless the Court

5     requests me to answer certain questions.

6          But in fashioning the appropriate sentence for this

7     case and this defendant, the Court needs to take into

8     consideration the various 3553(a) factors that the Court must

9     take into consideration in every case regardless of what the

10    crime of conviction is.

11         I know that what we heard today does not beg sympathy

12    for Ms. Maxwell, but there are circumstances in her life that

13    bear attention by the Court in imposing a reasonable sentence

14    in this case.  She has lived the entirety of her life under

15    giant clouds that have cast very dark shadows.  The tragic

16    accident of her eldest brother within 72 hours of her birth on

17    Christmas Day left him in a coma for seven years, until he

18    died, an event that impacted her family to this day and

19    overshadowed infant Ghislaine's entry into the world and her

20    early childhood.  Her narcissistic, brutish, and punitive

21    father overwhelmed her adolescence and early adulthood.  And

22    the controlling, demanding, manipulative Jeffrey Epstein cast a

23    deceptive shadow over Ghislaine's adulthood, the repercussions

24    of which will plague her until her last breath.  And like the

25    past two years of intense presentence incarceration, which was

M6s2Max2

1    unusually harsh and punishing, she will remain in the shadow of

2    prison bars until she can return to the sunlight of liberty.

3            As I said before, she is over 60 years old.  She has

4    no history of violence.  She had no criminal history before or

5    after the crimes of conviction, which ended some 20 years ago,

6    and the Court needs to consider that there is an extensive

7    period that has elapsed from the end of the charged conduct.

8    She poses no danger to society or of recidivism.  Her personal

9    circumstances include many accomplishments and good deeds.

10           As I said, she has been subjected to extensive

11   punishing conditions of presentence incarceration in solitary

12   confinement.  When she was moved within the last two months to

13   general population, she began interacting with the inmates and

14   assisting them in many, many ways.  She began conducting

15   English classes and GED tutoring, programs that were no longer

16   being offered in the MDC and certainly had been suspended as a

17   result of the ongoing pandemic.  Her asset to the unit in

18   general population is recited in the unsolicited letter

19   submitted to the Court from one of her fellow unit inmates.

20   But I have also been contacted personally by counsel for other

21   inmates in Ms. Maxwell's unit, reporting to me that she is

22   providing needed educational assistance that has not been

23   ongoing for at least two years.

24           Ms. Maxwell is being sentenced for terrible conduct.

25   There is no denying that.  But she has the ability and the

M6s2Max2

1   desire to be law-abiding, which she has exhibited, and to do

2   good.  Before the charged offense and for the better part of

3   the past 20 years, she has demonstrated that she is not a

4   danger to anyone.  A sentence below the applicable guidelines

5   is sufficient, but not greater than necessary, punishment for

6   Ghislaine Maxwell.  The Court should not send her away for the

7   rest of her life.

8          Thank you.

9          THE COURT:  Thank you, Ms. Sternheim.

10          Ms. Maxwell, you have the right to make a statement.

11   You are not obligated to do so, but if you would like to, you

12   may do so now.

13          THE DEFENDANT:  I would, your Honor.

14          MS. STERNHEIM:  She would.  Where would you like her

15   to -- I'm sorry, Judge.  Where would you like her to address

16   the Court?

17          THE COURT:  Are the marshals comfortable with the

18   podium?

19          THE MARSHAL:  Yes, your Honor.

20          THE COURT:  You can go to the podium, Ms. Maxwell.

21          MS. STERNHEIM:  Thank you very much.

22          And she may remove her mask?

23          THE COURT:  Once you are at the podium, yes, you may

24   remove your mask.

25          THE DEFENDANT:  Thank you, your Honor.

M6s2Max2

1              Your Honor, it is hard for me to address the Court

2    after listening to the pain and anguish expressed in the

3    statements made here today.  The terrible impact on the lives

4    of so many women is difficult to hear and even more difficult

5    to absorb, both in its scale and in its extent.  I want to

6    acknowledge their suffering and empathize.  I empathize deeply

7    with all of the victims in this case.

8              I also acknowledge that I have been convicted of

9    helping Jeffrey Epstein commit these crimes.  And despite the

10   many helpful and positive things I have done in my life, and

11   will continue to do, to assist others during my sentence, I

12   know that my association with Epstein and this case will

13   forever and permanently stain me.

14             It is the greatest regret of my life that I ever met

15   Jeffrey Epstein.  I have had plenty of time to think, having

16   spent two years in solitary confinement.  I believe that

17   Jeffrey Epstein was a manipulative, cunning, and controlling

18   man who lived a profoundly compartmentalized life and fooled

19   all of those in his orbit.

20             Variously, his victims considered him as a godfather,

21   a mentor, benefactor, friend, lover.  It is absolutely

22   unfathomable today to think that that is how he was viewed

23   contemporaneously.

24             His impact on all those who were close to him has been

25   devastating, and today those who knew him even briefly, or

M6s2Max2

1    never met him but were associated with someone who did, have

2    lost relationships, have lost jobs, and have had their lives

3    completely derailed.

4            Jeffrey Epstein should have been here before all of

5    you.  He should have stood before you all those years ago.  He

6    should have stood before you in 2005, again in 2009, and again

7    in 2019, all of the many times he was accused, charged, and

8    prosecuted.

9            But today it is not about Epstein ultimately.  It is

10   for me to be sentenced and for the victims to address me, and

11   me alone, in this court.

12           To you, all the victims, those who came in court and

13   to those outside, I am sorry for the pain that you experienced.

14   I hope that my conviction, along with my harsh and unusual

15   incarceration, brings you closure.  I hope this brings the

16   women who have suffered some measure -- I hope that this brings

17   the women who have suffered some measure of peace and finality

18   to help you put the experiences of those many years ago in a

19   place that allows you to look forward and not back.

20           I also acknowledge the pain this case has brought to

21   those that I love, the many I held and still hold close, which

22   tortures me every single day, and the relationships that I have

23   lost and will never be able to regain.

24           It is my sincerest wish to all those in this courtroom

25   and to all those outside this courtroom that this day brings a

M6s2Max2

1    terrible chapter to the end, to an end.  And to those of you

2    who spoke here today and to those of you who did not, may this

3    day help you travel from darkness into the light.

4              Thank you, your Honor.

5              THE COURT:  Thank you, Ms. Maxwell.

6              Counsel, is there anything else -- I'm sorry, let

7    me -- I do want to ask defense counsel, before I get there, if

8    there are any objections to any of the conditions recommended

9    by the Probation Department with respect to supervised release.

10             MS. STERNHEIM:  No, Judge.

11             THE COURT:  Okay.  And I understand the government is

12   not -- I just want to talk about restitution before I get to

13   the statement of judgment.

14             Count Six is mandatory restitution, but the

15   government's position is that no restitution should be ordered

16   because all victims have been compensated.

17             MS. MOE:  That is correct, your Honor.

18             THE COURT:  Counsel, is there anything else I should

19   consider or any reason why sentence should not be imposed at

20   this time?

21             MS. MOE:  No, your Honor.  Thank you.

22             MS. STERNHEIM:  No.

23             THE COURT:  All right.  Let me gather my thoughts for

24   one moment.

25             (Pause)

M6s2Max2

1          THE COURT:  Thank you for your patience.

2          As I have stated, the guideline range applicable to

3     this case is 188 to 235 months' imprisonment.

4          Under the Supreme Court's decision in a case called

5     *Booker* and related cases, the guideline range is only one

6     factor that the Court must consider in deciding the appropriate

7     sentence.  I am also required to consider the other factors set

8     forth in a provision called 18 U.S.C. 3553(a).  These include

9     the nature and circumstances of the offense, and the history

10    and characteristics of the defendant; the need for the sentence

11    imposed to reflect the seriousness of the offense, to promote

12    respect for the law, to provide just punishment for the

13    offense, to afford adequate deterrence to criminal conduct, to

14    protect the public from further crimes of the defendant, to

15    provide needed educational, vocational training, medical care,

16    or other treatment.  I am to take into account the kinds of

17    sentences available, as I have said, the guideline range, any

18    pertinent policy statement, the need to avoid unwarranted

19    sentence disparities among defendants with similar records who

20    have been found guilty of similar conduct, the need to provide

21    restitution as appropriate under the law to any victims of the

22    offense.

23         I am required to impose a sentence sufficient, but no

24    greater than necessary, to comply with the purposes I have just

25    described.  I have given substantial thought and attention to

M6s2Max2

the appropriate sentence in this case in light of the 3553(a)

factors and the appropriate purposes of sentencing as reflected

in that statute.

        The crimes for which I sentence Ms. Maxwell today are

the crimes for which a jury convicted her of committing

following trial.  I do want to emphasize that today the

sentence is based entirely on those crimes and the harm done to

the victims of those charged and proved crimes.  The evidence

at trial established that Ms. Maxwell directly and repeatedly

and over the course of many years participated in a horrific

scheme to entice, transport, and traffic underage girls, some

as young as 14, for sexual abuse by and with Jeffrey Epstein.

        I will pause on those words for a moment, "by and with

Epstein."  It is important at the outset to emphasize that

although Epstein was, of course, central to this criminal

scheme, Ms. Maxwell is not being punished in place of Epstein

or as a proxy for Epstein.  Like every other participant in a

multi-defendant case, Ms. Maxwell is being punished for the

role that she played in the criminal conduct.  As to that role,

the trial evidence established that Ms. Maxwell was

instrumental in the abuse of several underage girls and that

she herself participated in some of the abuse, and it is her

conduct for which she has been convicted in the court under the

laws of this country and it is her conduct for which she must

be held accountable.

M6s2Max2

1          Turning to that conduct, the punishment here must

2     reflect the seriousness of the offense, promote respect for the

3     law, provide just punishment for the offense, and deter.

4          First, as to the seriousness, the defendant's conduct

5     was, as aptly described by the probation department, heinous

6     and predatory.  Ms. Maxwell worked with Epstein to select young

7     victims who were vulnerable.  Once selected, Ms. Maxwell played

8     a pivotal role in facilitating the abuse of the underaged girls

9     through a series of deceptive tactics.  A sophisticated adult

10    woman, she provided an initial venire of responsibility and

11    even safety.  She befriended and developed relationships of

12    trust.  She then manipulated the victims and normalized sexual

13    abuse through her involvement, encouragement, and instruction.

14         To give one example from trial, Jane testified that

15    Ms. Maxwell cultivated a friendship with her, took her to

16    movies and shopping.  In an initial sexual interaction, while

17    Jane was 14 years old, the defendant engaged in sexual conduct

18    with Epstein while Jane was present.  After that, the defendant

19    instructed Jane, again, while she was only 14 years old, on how

20    to massage Epstein, including instructions on how to touch his

21    penis during massages.  The abuse later escalated to Epstein

22    using vibrators on Jane, penetrating her with his fingers.

23    During some of the sexual abuse, the defendant would herself

24    touch Jane's breasts.

25         Carolyn, the victim of the sex trafficking charge,

M6s2Max2

provides another example.  She testified that she confided in the defendant that her mother was an alcohol and that she had been raped and molested by her grandfather starting at a very young age.  The defendant, aware of this knowledge, used it to subject Carolyn to a continuing cycle of sexual abuse.  The defendant wasn't an impassive observer, but herself touched Carolyn's breasts, again, at the time Carolyn was 14.  For years, Carolyn was paid for the sexualized massages, including personally paid by the defendant.

Similar patterns of conduct were described by other witnesses.  Indeed, the criminal conduct established at trial was extensive and it was far-reaching.  Ms. Maxwell and Epstein victimized multiple underaged girls using this pattern, this playbook, over the span of many years and in a variety of locations.  And the damage done to these young girls was incalculable.  They did bravely testify at trial about what happened to them despite the extraordinary difficulty that entailed.  They withstood cross-examination from zealous defense counsel and testified credibly at trial about the trauma that they had endured and the painful, horrific, and lasting impact of that trauma.  They did so, they told me in their statements, in order to help ensure justice for themselves and others and to do what they could to try to prevent other girls from suffering in the future as they had suffered.

M6s2Max2

1          The sentence I impose must reflect the gravity of

2     Ms. Maxwell's conduct, of Ms. Maxwell's offense, the pivotal

3     role she played in facilitating the offense, and the

4     significant and lasting harm it inflicted.  So, too, must the

5     sentence promote respect for the law, provide just punishment,

6     and afford adequate deterrence.

7          As I have described, this scheme was long-lasting, it

8     was far-reaching, it was horribly damaging to the victims.

9     Just punishment and promotion of respect for the law, it

10     demands a substantial sentence that meets the scope of the

11     conduct and the scope of the harm.

12          Moreover, general deterrence is critically important

13     to the sentence I will impose.  A substantial sentence will

14     send an unmistakable message that those who engage in and

15     facilitate the sexual abuse and trafficking of underaged

16     victims will be held accountable by the law.

17          As the probation department stated, a significant

18     sentence should promote general deterrence against the

19     exploitation and degradation of humans made possible by this

20     offense, and I fully agree.  But let me be clear that

21     Ms. Maxwell is wealthy or that this case is high profile is not

22     a basis for increasing punishment in any regard, but the rule

23     of law demands, and this Court must ensure that, whether you

24     are rich or poor, powerful or entirely unknown, nobody is above

25     the law.  That message serves the important interest in

M6s2Max2

deterrence and just punishment as well.  All of these factors

suggest that a very serious, a very significant sentence is

necessary to achieve the purposes of punishment that I have

just described.

Of course I must, and I do, take into account the

history and characteristics of the defendant.  Ms. Maxwell is

over 60 years old.  This is her first conviction.  Neither in

arguing for pretrial detention nor with respect to sentencing

has the government contended that Ms. Maxwell represents a

continuing danger to the public.  As I explained, I do not need

to find she is a continuing danger to apply 4B1.5(b), as her

decade-long pattern of predatory activity amply justifies that

enhancement and a substantial sentence, but her present lack of

dangerousness is a factor in my consideration of a proper

sentence.

Her sentencing submission letters and psychological

report discuss the impacts of an overbearing and demanding

father and the tragic death of her brother at the beginning of

her life.  The record indicates that she has engaged in some

charitable works, including environmental conservation and

health-related charitable organizing and giving.  The set of

letters I received from her family members and friends describe

her as attentive and loving to her family and a loyal and

generous friend.  A letter from an inmate describes her

tutoring of other inmates while incarcerated and Ms. Sternheim

M6s2Max2

1   represents that she has heard similarly from other defense

2   counsel.  I take all of these factors into account consistent

3   with the 3553(a) statutory provision when deciding what

4   sentence to impose.

5       Beyond these factors, much of the defense written

6   submission, not the oral statement today, but much of the

7   written submission focused on a series of complaints about

8   Ms. Maxwell's pretrial detention.  As I have said in many

9   sentencing proceedings since the pandemic began, the conditions

10  in the MDC have been extremely difficult for all inmates as a

11  result.  There have been extended periods of lockdown, health

12  risks, and the lack of access to legal and social visits and

13  programming and the like.  Conditions at the MDC are, to put it

14  mildly, not what they should be, and serving time during the

15  pandemic has been more difficult than serving time before it.

16  As I have in other sentencings, I take into account this in

17  imposing an appropriate sentence.  I also take into account

18  that, as a high-profile defendant charged and convict of sex

19  offenses against minors, Ms. Maxwell faces security risks and

20  has endured additional isolation and surveillance beyond the

21  typical pretrial detainee.

22      That said, I largely reject the defense's primary

23  written contention that Ms. Maxwell has been singled out for

24  uniquely harsh and punishing treatment.  To the contrary, I

25  agree with the government that many of the complaints have been

M6s2Max2

unfounded and exaggerated and that Ms. Maxwell's treatment at

MDC was overall as good as or better than that of the typical

pretrial detainee at the MDC during the pandemic.

I also reject the repeated allegations that

Ms. Maxwell, who was provided extensive access to computers and

legal materials, as well as to highly involved counsel, was in

any way not able to prepare for trial or sentencing.  I will

say that I think a lack of full candor regarding treatment is

consistent with a lack of candor to Pretrial Services and to

the Court regarding finances, as well as the dishonesty that I

have concluded occurred during the civil deposition that makes

up the perjury counts.  Overall, the behavior appears

consistent with a pattern of deflection of blame.

I will note that I was -- I would emphasize that the

sentencing submission talks about these complaints and blames

others but did not express remorse or acceptance of

responsibility.  Ms. Sternheim and Ms. Maxwell today

acknowledge the courage of the victims who testified and who

spoke, talked about the pain and anguish that they have

expressed, to some extent acknowledged the impact on them and

their suffering, and I think that is important for the victims

to hear.  What there wasn't expressed was acceptance of

responsibility.  Now let me be clear.  Ms. Maxwell is fully

entitled to exercise her constitutional -- was fully entitled

and is fully entitled to exercise her constitutional right to

M6s2Max2

1    go to trial.  She has every right to appeal that verdict.  But

2    it is appropriate for this Court, in the face of genuine

3    expressions of remorse and acceptance of responsibility, to

4    decrease punishment because that's part of the message that's

5    being sent by the law.  It's appropriate to note and to take

6    into account a lack of acceptance of responsibility, a lack of

7    expression of remorse as to her own conduct.  Today's sentence

8    will attempt to acknowledge the harm that Ms. Maxwell caused

9    and it will strongly and unequivocally condemn her criminal

10   conduct.

11          I do conclude, consistent with the Probation

12   Department recommendation, that a sentence of 240 months, which

13   is slightly above the guideline range that I found, is both

14   sufficient and necessary -- and no greater than necessary to

15   meet the purposes of punishment that I have described.

16          I will now formally state the sentence I intend to

17   impose.  I will ask Ms. Maxwell and her counsel to please rise.

18          Ms. Maxwell, it is the judgment of this Court that you

19   be sentenced to a period of 240 months, 20 years, to be

20   followed by a period of five years' supervised release.

21          You may be seated.

22          To be precise, I am sentencing Ms. Maxwell to 60

23   months on Count Three, 120 months on Count Four, and 240 months

24   on Count Six, all to run concurrently, for a total of 240

25   months' imprisonment.  I am sentencing her to three years of

M6s2Max2

1    supervised release on Counts Three and Four and five years on

2    Count Six, all to run concurrently, for a total of five years

3    of supervised release.

4        Defense counsel indicated no objection to the

5    conditions of supervised release indicated in the presentence

6    report, and so I impose them precisely as stated in the

7    presentence report, including the standard conditions, special

8    conditions, and mandatory conditions of supervised release.

9    Again, I am imposing them precisely as stated in the PSR.

10       I order Ms. Maxwell to pay a fine in the amount of

11   $750,000.  The maximum amount per count is $250,000, so that is

12   $750,000 total.  As I have indicated, I reject the contention

13   that the defendant is unable to pay a fine.  Ms. Maxwell has

14   received a $10 million bequest from Epstein.  This is in

15   addition to her other assets.  And the defendant, I conclude,

16   is able to afford a substantial fine, and I conclude that the

17   maximum amount per count is reasonable under all relevant

18   circumstances in light of the counts of conviction.

19       The government has indicated that it is not seeking

20   restitution nor forfeiture.

21       I am imposing a mandatory special assessment, as I

22   must, of $100 per count, which is due immediately.

23       Does either counsel know of any legal reason, other

24   than those already argued, why the sentence shall not be

25   imposed as stated?

M6s2Max2

1          MS. MOE:  No, your Honor.

2          MS. STERNHEIM:  Your Honor, I would just like to make

3     one statement, if I may.  With regard to the fine, the Court

4     indicated the bequest in the will.  I just want the record to

5     reflect that that is an unactualized bequest, as Ms. Maxwell

6     has received nothing, and it is the expectation that she will

7     receive nothing.

8          THE COURT:  I understand.  And to be clear, I am not

9     finding and accept that she hasn't received anything, but there

10    have only been nonspecific claims that she won't receive

11    anything and there are additional assets that lead me to the

12    conclusion that she is able to pay the fine.

13         MS. STERNHEIM:  Thank you, Judge.

14         THE COURT:  Thank you.

15         And just to confirm, Ms. Sternheim, any legal reason

16    why the sentence should not be imposed as stated other than

17    what already was argued?

18         MS. STERNHEIM:  No, your Honor, but I do have requests

19    for recommendation.

20         THE COURT:  I will get there.  Thank you.

21         The sentence as stated is imposed.  I do find the

22    sentence is sufficient but not greater than necessary to

23    satisfy the sentencing purposes that I described earlier.

24         Ms. Maxwell, when you are released and on supervised

25    release, you will have the guidance and support of the

M6s2Max2

1    probation department.  I must caution you to comply strictly

2    with all of your conditions of supervised release.  If you are

3    brought back before me for a violation of those conditions, I

4    may sentence you to another term of imprisonment.

5              With that, Ms. Sternheim, requests regarding

6    designation?

7              MS. STERNHEIM:  Thank you, Judge.

8              We request that Ms. Maxwell be designated, based on a

9    recommendation by the Court, to the BOP facility, the women's

10   facility in Danbury, and also a recommendation that she be

11   enrolled in the FIT program, which is the Female Integrated

12   Treatment program, to address past familial and other trauma.

13             THE COURT:  Okay.

14             MS. STERNHEIM:  Thank you.

15             THE COURT:  I recommend to the Bureau of Prisons

16   consideration of placement in Danbury and consideration of

17   eligibility for enrollment in the FIT program.

18             Ms. Moe, remaining counts and underlying indictments

19   that need to be dismissed at this time?

20             MS. MOE:  Yes, your Honor.  The government moves to

21   dismiss Counts Seven and Eight and any underlying indictments.

22             THE COURT:  The motion is granted.  Counts Seven and

23   Eight are dismissed and any underlying indictments are

24   dismissed.

25             Ms. Maxwell, I am required to inform you of your

M6s2Max2

1    appellate rights.  You have the right to appeal your conviction

2    and your sentence.  The notice of appeal must be filed within

3    14 days of the judgment of conviction.

4              Other matters to take up counsel?

5              MS. MOE:  Not from the government, your Honor.  Thank

6    you.

7              MS. STERNHEIM:  No.  Thank you.

8              THE COURT:  Let me note, I will issue a housekeeping

9    order posttrial to ensure complete docketing of all -- any

10   outstanding materials and complete records, so please look for

11   that.  I will issue the judgment -- I should just say, Ms. Moe,

12   the Court intends to indicate the end of the conspiracy date as

13   the last date in the record, which I believe is in July of

14   2004, of acts in furtherance of the criminal conduct, and

15   obviously the government took a different position with respect

16   to that.  But in light of the Court's finding, any objection to

17   that?

18             MS. MOE:  No, your Honor.  We will review the

19   exhibits.  If that date is different from the sentencing

20   transcript, we will submit a letter to the Court, but otherwise

21   no objection, your Honor.

22             MS. STERNHEIM:  No objection.

23             THE COURT:  All right.

24             MS. MOE:  With apologies, your Honor, with respect to

25   the judgment, in light of the Court's decision to impose an

M6s2Max2

1    above-guidelines sentence and an above-guidelines fine, we

2    would respectfully request that the Court address both the

3    sentence and the fine in the Court's statement of reasons.

4              THE COURT:  Yeah, I actually -- guideline range, let

5    me just check.  I meant to talk about that.  I'm not sure it is

6    an above-guidelines, but it may be since, as we know, I read

7    over five to mean five.  So maybe I got that wrong.  Let me

8    just check.

9              Oh, you are right.  It is 20 to 200,000 for each

10   count.  Do I have that right?

11             MS. MOE:  Yes, your Honor.  Thank you.

12             THE COURT:  All right.  Thank you.

13             I want to thank counsel.  As I indicated, I do thank

14   the victims who made statements in writing or orally and their

15   counsel who supported them in that endeavor.  I thank counsel

16   for Ms. Maxwell and counsel for the government.

17             We are adjourned.

18                              oOo

19

20

21

22

23

24

25