LBTVMAX1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
    UNITED STATES OF AMERICA,
3
                v.                        20 CR 330 (AJN)
4
    GHISLAINE MAXWELL,
5
                Defendant.                Jury Trial
6   ------------------------------x
                                          New York, N.Y.
7                                         November 29, 2021
                                          8:40 a.m.
8
    Before:
9                   HON. ALISON J. NATHAN,

10                                        District Judge

11                        APPEARANCES

12  DAMIAN WILLIAMS
         United States Attorney for the
13       Southern District of New York
    BY:  MAURENE COMEY
14       ALISON MOE
         LARA POMERANTZ
15       ANDREW ROHRBACH
         Assistant United States Attorneys
16
    HADDON MORGAN AND FOREMAN
17       Attorneys for Defendant
    BY:  JEFFREY S. PAGLIUCA
18       CHRISTIAN R. EVERDELL
         LAURA A. MENNINGER
19          -and-
    BOBBI C. STERNHEIM
20          -and-
    RENATO STABILE
21
    Also Present:  Amanda Young, FBI
22                 Paul Byrne, NYPD
                   Sunny Drescher,
23                  Paralegal, U.S. Attorney's Office
                   Ann Lundberg,
24                  Paralegal, Haddon Morgan and Foreman

25

LBTVMAX1

1              (Jury not present)

2              THE DEPUTY CLERK:  United States v. Ghislaine Maxwell

3    20 CR 330.

4              Counsel, please state your name for the record,

5    starting with the government.

6              MS. COMEY:  Good morning, your Honor.

7              Maurene Comey, Laura Pomerantz, Alison Moe, and Andrew

8    Rohrbach for the government.  Also joining us today is

9    Paralegal Specialist Sunny Drescher, Special Agent Amanda Young

10   of the FBI, and Detective Paul Byrne of the NYPD.

11             THE COURT:  Good morning, everyone.

12             MS. STERNHEIM:  Good morning.

13             Bobbi C. Sternheim, with Christian Everdell, Laura

14   Menninger, Jeffrey Pagliuca; joining us also is Renato Stabile,

15   for Ghislaine Maxwell, who is present at counsel table.

16             THE COURT:  Good morning, everyone.  Thank you.

17             Please be seated.

18             Ms. Comey, is the government prepared to proceed to

19   trial today?

20             MS. COMEY:  Yes, your Honor.

21             THE COURT:  Ms. Sternheim?

22             MS. STERNHEIM:  Yes.

23             THE COURT:  Thank you.

24             All right.  So just first to go over the final stage

25   of jury selection, I think everybody is aware, but make sure

LBTVMAX1

we're all on the same page.  We're waiting for our 58 remaining

jurors to arrive and go to the two courtrooms where they're

being held.  Once we have everyone -- hopefully we'll have

everyone, but once we everyone, the live feed into those two

rooms will come on, I'll say good morning to everyone, I'll ask

the two questions that we've discussed, whether they've read or

heard anything, and whether there's any reason they can't be

fair and impartial, and that they should raise their hands if

the answer to either of those questions is yes.  I believe both

teams will have someone in each of the courtrooms; and, of

course, we'll have courthouse staff in the courtrooms.  And

we'll get indication if there are any hands raised.  If there

are, we'll bring them in one at a time.  I'll have them in the

witness box and inquire as to what the basis for the yes

response is, and we'll deal with that as we would any other

jury selection issues.

        Once we've resolved that, any of those issues with

respect to the first 40 people in ascending order, my plan is

to have all of those 40 in the same holding courtroom.  And

then counsel will exercise their peremptories.  I have the

board with the numbers of the jurors which will be finalized.

We'll come to sidebar and alternate strikes for your

peremptories.  We'll do first with respect to Jurors 1 through

28, the primary juror, ten and six alternating, and then three

each with respect to 29 through 40 for the alternates, three

LBTVMAX1

1    each alternating.

2            Once we have our jury selected, my intention is to go

3    back to the live feed to that courtroom, read the numbers of

4    the selected jurors, and then have Ms. Williams escort those

5    jurors to the jury room to put down their things and gather

6    their contact information and the like, rest room and the like.

7            At that point I'll ask counsel if there's any reason

8    why the remaining jurors cannot be dismissed, take any issues,

9    dismiss the jurors who are not selected.  And then we'll bring

10   in the jury, and we'll swear them in.  Then we'll commence with

11   preliminary instructions that everybody has seen, and opening

12   statements.

13           We will seat the jurors taking account of any

14   unvaccinated jurors, because the district has different

15   distancing rules for unvaccinated jurors -- unvaccinated

16   individuals, if we do have any on the jury.  What we'll do is

17   once they're seated, we'll produce a list by where they're

18   seated so that you know which juror is seated where.

19           And that is what I have.

20           Any questions or requests or otherwise?

21           MS. COMEY:  Not from the government, your Honor.

22           Thank you.

23           MS. STERNHEIM:  I just have one sort of a protocol

24   question.  During the prior proceedings, the Court permitted

25   only one counsel to approach for sidebar.  Is that going to be

LBTVMAX1

1    the routine during trial or may we all participate?

2             THE COURT:  I think it's just a distancing question to

3    make sure that we have sufficient space.  So maybe what we can

4    do is have kind of a first layer of lawyers -- a first layer of

5    lawyers and then --

6             MS. STERNHEIM:  A backup team.

7             THE COURT:  -- a backup team behind them so that we're

8    keeping everyone distances, as is required.

9             MS. STERNHEIM:  Thank you.

10            I think Mr. Everdell has an issue.

11            MR. EVERDELL:  Yes.  Thank you, your Honor.

12            Just a matter of choreography.  Assuming we do get to

13   witnesses today, pursuant to the Court's instructions, we have

14   a binder of materials for the witness.  Once cross begins,

15   we'll need to take just a brief break to deliver the binder to

16   the witness box.  And I believe for the first witness we may

17   have some manila folders to hand out to the jurors which we

18   would instruct them not to look at until they are instructed to

19   do.

20            THE COURT:  Okay.  And does this overlap with the

21   request put in yesterday regarding using video for cross?

22            MR. EVERDELL:  It does, your Honor.  We have prepared

23   as if we need binders.  We still would like that request to be

24   considered so that we can use electronic, but we have prepared

25   the first couple witnesses with binders.

LBTVMAX1

1              THE COURT:  What I was going to say to that request is

2       essentially what you've done, which is that I'm happy to try

3       with the electronic.  So, of course, the concern is that where

4       I've -- in particular, where I have -- I suppose there's two

5       concerns.  One, where I've allowed a witness to testify under

6       pseudonym, it's possible that the material that you're using

7       would identify the witness.  And so because of the way the room

8       is structured with counsel table screens viewable to the

9       gallery, we have to be cautious of that.

10             And your suggestion was to not put it on counsel's

11      screens, but to put it on my screen, the witness screen, my

12      deputy's screen.  And what I was going to say to that is I'm

13      happy to try that, so long as it's completely clear to the

14      government what it is that the witness is looking at and what

15      you're directing the witness to so that there's no discrepancy

16      between what the government is aware that you're showing the

17      witness and what you're showing the witness.

18             So I'm happy to try that so long as you've got paper

19      to enable if that were to fail or if, in any event, so that the

20      government can have precisely what you're showing the witness,

21      and that you're fully describing on the record any aspect of

22      the document that you're identifying for the witness.

23             MR. EVERDELL:  Totally clear, your Honor.  Absolutely.

24             And the government has informed us that they have

25      copies of the 3500 material, of course, and they have copies of

LBTVMAX1

1   their own exhibits; so they won't require us to give them paper

2   copies of that.  And I believe the Court does as well.  So it's

3   only if we are using to refresh or impeach materials that are

4   not 3500 or the government exhibits, at that point we have

5   paper that we can give to the government and to the Court and

6   the Court's deputy.  We're just trying to minimize the amount

7   of paper we have to use.

8          THE COURT:  Ms. Comey?  Ms. Moe?

9          MS. MOE:  Thank you, your Honor.

10          Just two small points on that.

11          I think Mr. Everdell was mentioning handing out

12   binders to the witness and to the jurors for some of those

13   materials.  We just want to note that the government has not

14   yet had an opportunity to review those binders, and so we'd ask

15   for an opportunity to review those before they are handed to

16   the jurors or to the witness.

17          With respect to the second issue of --

18          THE COURT:  Well, I guess let's just take the first

19   one.

20          So certainly before anything is shown to the witness

21   or the jurors, the government and I will see the document.  I

22   guess the question is to the extent that there's a binder that

23   they may call the jury and the witness's attention to a

24   document at a time, you're requesting to see the full binder in

25   advance?

LBTVMAX1

1      MS. MOE:  That's correct, your Honor.  Just to be able

2  to see the binder before it's passed out to jurors, because

3  they'll have a binder full of paper and be flipping through it

4  to turn to exhibits.  We just want to have chance to lay eyes

5  on that binder in an abundance of caution.  I've note that we

6  have done the same; we've provided defense counsel with a copy

7  of the binders that we plan to hand out.

8      THE COURT:  Can you come closer to the mic please.

9      MS. MOE:  Yes, your Honor.

10      I would just note that we've done the same; we've

11  provided defense counsel with a copy of the binders that we

12  intend to pass out to the jurors so they can examine it.

13      MR. EVERDELL:  Your Honor, what we would like to do is

14  follow the practice of this Court that it's been doing forever,

15  as far as I know, which is that before we show anything to the

16  witness, we will show it to the government and we will show it

17  to the Court and the Court's deputy so that they can see what

18  we are showing to the witness.  But we do not want to give them

19  a whole binder of cross materials before the cross begins.

20      THE COURT:  All right.  That's fine.  But in that

21  case, we won't place the binder with the jury --

22      MR. EVERDELL:  That's fine.

23      THE COURT:  -- in advance.

24      MR. EVERDELL:  That's fine.

25      THE COURT:  Okay.

LBTVMAX1

1          MS. MOE:  Thank you, your Honor.

2          The second issue is with respect to the issue of

3     having a screen that the witness sees, but which the government

4     can't see, I think the Court noted there is an issue with the

5     government not being able to follow what the witness is being

6     shown.

7          Our concern in particular is that in a letter defense

8     counsel filed, I think they previewed that they plan to sort of

9     highlight some portions of the documents or flag certain

10     portions on the screen.  That is very difficult for us to

11     follow without a mirrored screen.  And so because we cannot

12     mirror the screens because they are open to the gallery, that

13     is why we proposed using paper for exhibits like that, and so

14     we ask to proceed that way.

15          THE COURT:  Here's my thinking:  Let's say they show

16     the paper and then they say, Okay, paragraph 2, read the first

17     sentence.  If they want to highlight or make larger that first

18     sentence to ease the reading of it for the witness, if they've

19     described fully what they're doing on the screen, and I'm

20     watching it, I think that's okay and it is not that different

21     than doing it orally and with paper.  And I would, of course,

22     allow the same for the government, to the extent that there are

23     documents that you may have a witness look at that can't -- if

24     they can't be projected on the counsel table because it might

25     be identifying, I would permit that as well.

LBTVMAX1

1          MS. MOE:  Okay.  We're happy to give that a shot, your

2     Honor.  We just did want to raise that concern about being able

3     to follow along.  We also wanted to ask --

4          THE COURT:  And I fully agree with you.

5          And that's why I said we'll give it a shot.  They have

6     to be extremely mindful that anything that they're doing or

7     showing the witness has to be fully described on the record and

8     so the government can follow.  And if that doesn't work for

9     some reason or I think it's not particularly aiding the review

10    of the evidence, then we'll just do it the old-fashioned way

11    with paper.

12         MS. MOE:  Thank you, your Honor.

13         And finally, we just wanted to know where -- where the

14    screen would be located that those items would be projected to

15    the witness from.  So, for example, our paralegal is sitting in

16    the gallery and has a screen there; so we're being careful

17    about what's on her screen to avoid the public seeing that.  We

18    just wanted to know where the screen would be in the courtroom

19    that that's being projected from so we can be mindful of that

20    concern.

21         THE COURT:  Good question.

22         MS. STERNHEIM:  May I have a moment?

23         Ms. Lundberg will be sitting over there where

24    Ms. Menninger is.  The screen will not be viewable to the

25    public.

LBTVMAX1

```
1              MS. MOE:  Thank you, your Honor.  I appreciate that.

2              THE COURT:  Thank you.

3              All right.  Let me check where we are.

4              (Pause)

5              THE COURT:  We still have a few more jurors coming in

6    through the security line.  So I'll wait to get an update.

7    We're getting close, but we're not there yet.

8              Counsel, matters to take up?

9              MS. COMEY:  Nothing from the government, your Honor.

10             MS. STERNHEIM:  Your Honor, could you just confirm

11   which rooms are the overflow rooms?  Is it the fifth floor up

12   here and the first floor down there?

13             THE COURT:  For the jurors you mean?

14             MS. STERNHEIM:  Yes.

15             THE COURT:  Yes, it's the fifth floor and the first

16   floor.

17             MS. STERNHEIM:  Thank you very much.

18             THE COURT:  That's correct.

19             I believe the information I'm getting is that all the

20   jurors are here, but still some going through the security

21   check, which is good.

22             MS. STERNHEIM:  Judge, I do have one other thing.

23             THE COURT:  Just one moment.

24             MS. STERNHEIM:  Sorry.

25             THE COURT:  That's okay.  Go ahead, Ms. Sternheim.
```

LBTVMAX1

1              MS. STERNHEIM:  Thank you.

2              I just wanted to confirm that in doing alternating

3    strikes, we would start or the government would start.  I'm not

4    sure.

5              THE COURT:  I think since the defense has ten, the

6    defense should start.

7              MS. STERNHEIM:  So two/one, one/two, two/one, and till

8    we get to the one and one and one.

9              THE COURT:  That's fine with me.  Ms. Comey?

10             MS. COMEY:  That's fine with the government, your

11   Honor.

12             THE COURT:  Okay.  So the defense will do two;

13   government is one; defense, two; government, one.

14             MS. STERNHEIM:  Usually it's one and then two.

15             THE COURT:  That's fine.

16             MS. STERNHEIM:  Alternating.

17             THE COURT:  That's fine.  Or you can -- as you know, I

18   don't do alternating strikes.

19             MS. STERNHEIM:  I know.  And I appreciate that --

20             THE COURT:  I've given into the requests of both sides

21   to do it this way.  You can just alternate one, one, and the

22   defense goes, or you could do what you proposed.

23             MS. STERNHEIM:  I think we're fine with the typical

24   way.

25             MS. COMEY:  Yes, your Honor.  The typical way is fine.

LBTVMAX1

1          THE COURT:  Okay.

2          MS. STERNHEIM:  Thank you.

3          THE COURT:  Actually, I'm reminded, if we have jurors

4    for me to inquire of, we're going to have them sit in the first

5    seat of the jury box and use a handheld mic.

6          There is one issue that the parties briefed over the

7    weekend that you requested to be filed under seal to protect

8    the privacy of the witness who I've permitted to testify under

9    pseudonym.  I think I have a few questions just to see where

10   exactly we are on that, and I think we should do that at

11   sidebar to protect the privacy interests of the witness who I

12   have allowed to testify under pseudonym.

13          So we will do that now.

14          (Continued on next page)

15          (Pages 14 to 17 SEALED)

16

17

18

19

20

21

22

23

24

25

LBTVMAX1

```
 1              (In open court)

 2              MS. STERNHEIM:  Judge?

 3              THE COURT:  Just a moment.

 4              Yes, Ms. Sternheim.

 5              MS. STERNHEIM:  I'm just inquiring if that format was

 6     satisfactory to the Court.

 7              THE COURT:  I think so.

 8              MS. STERNHEIM:  Thank you.

 9              THE COURT:  I think the information I'm getting is

10     that we're missing three jurors who are not yet accounted for

11     on the security line.

12              (Pause)

13              THE COURT:  Current status is we're missing one juror

14     from the fifth floor, and two from the first floor.  I think

15     we'll give it five more minutes and then I'll move one juror

16     from the first floor to the fifth floor, unless counsel has

17     concerns with that.  And I'm not going to tell you who the

18     juror is yet.

19              MS. COMEY:  Your Honor, we would just ask whether the

20     Court has attempted to call the missing jurors.

21              THE COURT:  That's happening now.

22              MS. COMEY:  Thank you, your Honor.

23              (Pause)

24              (Continued on next page)

25
```

LBTVMAX1

1          (Jury present)

2          THE COURT:  Jurors, you may take your seats as

3   Ms. Williams directs you.  Feel free to be seated as you come

4   in.  Everyone may be seated.

5          This will not be your permanent seats; we'll get that

6   squared away during the lunch break.

7          But first, let me say good afternoon to you.  It's

8   nice to see you all.  Thank you very much for your patience.  I

9   appreciate you hanging in there with a little bit of delay, but

10  we're now prepared to get started.

11          I will ask Ms. Williams to swear you in as our jurors.

12          (A jury of 12 and six alternates was impaneled and

13  sworn)

14          THE COURT:  Thank you so much.  You may be seated.

15          Members of the jury, now that you've been sworn, I'm

16  going to give you some instructions about your duties as

17  jurors.  At the end of the trial, I'll give you more detailed

18  instructions, and those instructions will control your

19  deliberations in this case.  But for now, let me explain how

20  the trial will proceed.

21          The first step in the trial will be opening

22  statements.  The government will make an opening statement.

23  After that, I expect the lawyers for the defendant to make an

24  opening statement as well.  Those statements are not evidence.

25  They serve no purpose other than to give you an idea in advance

LBTVMAX1

of the evidence that the lawyers expect you to hear from the
witnesses.  Those statements permit the lawyers to tell you a
little bit of what the case is all about, but the only evidence
comes from the witnesses and the exhibits.

After opening statements, the government will present
its evidence.  The government's evidence will consist of the
testimony of witnesses, as well as documents and exhibits.  The
government will examine the witnesses and then the defendant's
lawyers may cross-examine them.

Following the government's case, the defendant may
present a case, if she wishes.  Again, because of the
presumption of innocence, the defendant is not required to
offer any proof.  If the defendant does present a defense case,
the defense witnesses will testify and the government will have
the opportunity to cross-examine them.

After the presentation of evidence is completed, the
parties will deliver their closing arguments to summarize and
interpret the evidence.  Just as the parties' opening
statements are not evidence, their closing arguments are not
evidence either.

Following closing arguments, I'll instruct you on the
law.  Then you will retire to deliberate on your verdict, which
must be unanimous; it must be based on the evidence or lack of
evidence presented at trial.

Your deliberations are secret.  You'll never have to

LBTVMAX1

1 explain your verdict to anyone.  As I told you, under the law,

2 a defendant in a criminal case is presumed innocent and cannot

3 be found guilty of the crimes charged unless a jury, after

4 hearing all of the evidence in the case, unanimously decides

5 that the evidence proves the defendant guilty beyond a

6 reasonable doubt.

7    In a criminal case, the burden of proof remains with

8 the prosecution, the government.  For the jury to return a

9 verdict of guilty as to the defendant, the government must

10 prove that the defendant is guilty beyond a reasonable doubt.

11 A person charged with a crime has absolutely no burden to prove

12 that she's not guilty.  And if the defendant chooses not to

13 present any proof, that decision cannot be held against her and

14 may not enter into your deliberations at all.  I will, however,

15 instruct you fully on the burden of proof after all of the

16 evidence has been received.

17    Now, let me explain the jobs that you and I are to

18 perform during the trial.

19    I will decide which rules of law to apply to this

20 case.  I'll decide that by making legal rulings during the

21 presentation of the evidence and also, as I told you, in giving

22 the final instructions to you after the evidence and arguments

23 are completed.  In order to do my job, I may have to interrupt

24 the proceedings from time to time to confer with the parties

25 about the rules of law that should apply here.  Sometimes we'll

LBTVMAX1

1    talk here at the bench outside of your hearing, but some of
2    those conferences may take some more time than others; so as a
3    convenience to you, I may excuse you from the courtroom.  I'll
4    try to avoid such interruptions as much as possible, but please
5    be patient and understand that these conferences are necessary
6    to ensure the fairness of the trial and often make the trial go
7    faster.

8           While I decide the law that applies to this case, you,
9    ladies and gentlemen of the jury, are the triers of fact.
10   You'll weigh the evidence presented and decide whether the
11   government has proved beyond a reasonable doubt that the
12   defendant is guilty of the charges in the indictment.  You must
13   pay close attention to all of the evidence presented, and you
14   must base your decision only on the evidence in the case and my
15   instructions about the law.

16          What then is evidence?

17          Evidence consists only of the testimony of witnesses,
18   documents, and other things admitted as evidence or
19   stipulations agreed to by the parties.  Some of you have
20   probably heard the term "circumstantial evidence, direct
21   evidence."  Do not be concerned with these terms.  You are to
22   consider all of the evidence given in this trial.  Certain
23   things are not evidence and must not be considered by you.  The
24   following is a list of what is not evidence:

25          First, arguments, statements, and questions by the

LBTVMAX1

1     lawyers are not evidence, nor are statements I make or

2     questions I ask of a witness.

3            Second, objections to questions are not evidence.  The

4     lawyers have an obligation to make an objection when they

5     believe evidence being offered is improper under the rules of

6     evidence.  You should not be influenced by the objection or by

7     my rulings on them.  If the objection is sustained, ignore the

8     question and any answer that may have been given.  If it's

9     overruled, treat the answer like any other.  If you're

10    instructed that some item of evidence is received for a limited

11    purpose only, you must follow that instruction.

12           Third, the testimony that I've excluded or told you to

13    disregard is not evidence and must not be considered.

14           Fourth, anything you may have seen or heard outside

15    the courtroom is not evidence and must be disregarded.  You are

16    to decide this case solely on the evidence presented here in

17    the courtroom.

18           There is no formula to evaluate testimony or exhibits.

19    For now, suffice it to say that you bring with you into this

20    courtroom all of the experience and background of your lives.

21    Do not leave your common sense outside the courtroom.  The same

22    types of tests that you use in your everyday dealings are the

23    tests that you should apply in deciding how much weight, if

24    any, to give to the evidence in this case.

25           The law does not require you to accept all of the

LBTVMAX1

evidence admitted at trial.  In determining what evidence you
accept, you must make your own evaluation from the testimony of
each of the witnesses and the exhibits that are received in
evidence.  It is essential, however, that you keep an open mind
until you've heard all of the evidence in the case.  A case can
be presented only step by step, witness by witness, before all
evidence is before you.

As you know from your experience, you can hear one
person give his or her version of an event and think it sounds
very impressive or even compelling; and yet, upon hearing
another person's version of the same event or even the same
person cross-examined with respect to the event, things may
seem very different.  In other words, there may be another side
to any witness's story.

You should use your common sense and good judgment to
evaluate each witness's testimony based on all of the
circumstances.  Again, I can't emphasize too strongly that you
must keep an open mind until the trial is over.  You should not
reach any conclusion until you have all of the evidence before
you.

As I mentioned during jury selection, this case has
received and will continue to receive significant attention in
the media.  To protect their privacy, I have permitted
witnesses, if they choose, to be referred to in open court by
either their first name or a pseudonym.  The full names of the

witnesses are known to the government, the defendant, to the

Court, and were shown to you during jury selection.  This

process should not bear in any way on your evaluation of the

evidence in this case.

          Finally, let me caution you about certain rules and

principles governing your conduct as jurors in this case.

          First, you must not talk to each other about this case

or about anyone who has anything to do with this case until the

end of the case, when you go to the jury room and decide your

verdict.  And the reason for this requirement is that you must

not reach any conclusion on the charges until all of the

evidence is in.  As I've said, keep an open mind until you

start your deliberations at the end of the case.

          Second, do not communicate with anyone else about the

case or about anyone having anything to do with it until the

trial has ended and you've been discharged as jurors.  "Anyone

else" includes members of your family and your friends.  And

"no communicating about the case" means no communicating on

your cell phone, iPhone, BlackBerry, text messaging, websites,

internet chat rooms, email, social media websites or

applications, including Facebook, Instagram, Twitter, LinkedIn,

You Tube, Reddit, etc., or by any other means.  I know in this

day and age there's a temptation to look at these devices or

means of communication; but with your oath, you are making a

commitment to resist that temptation.  Of course, you may tell

LBTVMAX1

1    your family and friends that you're a juror in a criminal case,

2    but you may not tell them anything else about it until you've

3    been discharged by me.

4          Third, do not let anyone talk to you about the case or

5    about anyone who has anything to do with it.  If any person

6    should attempt to communicate with you about this case at any

7    time throughout the trial, either in or out of the courthouse,

8    you must immediately report that to my deputy, Ms. Williams,

9    and to no one else.  Ms. Williams will report it to me.  And

10   when I say report that communication to no one else, I mean you

11   should not tell anyone, including your fellow jurors.  To

12   minimize the probability of any such improper communication, it

13   is important that you go straight to the jury room when you

14   come in in the morning, and that you remain in the jury room

15   for the duration of the trial day.  You should not linger in

16   the public areas of the courthouse on this floor or elsewhere

17   on your way in and out.

18         Fourth, do not do any research or any investigation

19   about the case or about anyone who has anything to do with the

20   case on your own.  Don't go visit any place described in the

21   trial, don't read or listen to or watch any news reports about

22   the case, don't go on the internet or use whatever digital or

23   communications device it is you use to see what you can learn

24   to inform yourself about this matter.  Again, I know that in

25   this day and age there is a temptation, but as I've made clear

LBTVMAX1

throughout this process, this rule is very, very important.
That's because your decision in this case must be made solely
on the evidence or lack of evidence presented at this trial.
In other words, all that you need to know will be presented
here in open court by the parties.  This is critically
important to ensuring a fair trial, which I know that all of
you would want if you were a party in this court, and I have no
doubt it's what you want for the parties who are here today.  I
expect you to inform me immediately through Ms. Williams if you
become aware of another juror's violation of these
instructions.

            Finally, each of you either has or will be given a
notebook and pen; and that's because I do permit jurors to take
notes.  But you don't have to take notes.  Notes are just an
aid to your own recollection.  The court reporters in this case
record everything that's said in the courtroom, and any portion
of the testimony can be read back to you during your
deliberations.  If you do take notes, be aware that note-taking
may distract you from something important that's happening on
the witness stand.  Whether or not you take notes, rely on your
own recollections and don't be influenced by the fact that
another juror has taken notes.  If you do take notes, all notes
must be left each day in the jury room.  Ms. Williams will make
sure that they are secure.

            From this point until the time when you retire to

LBTVMAX1

deliberate, it is your duty not to discuss this case with

anyone and not to remain in the presence of other persons who

may be discussing this case.  And this includes discussions

even with members of your own family and your friends.  In this

regard, please understand that the parties and the counsel in

this case have been instructed by me to have no contact with

any of you, not even to offer a friendly greeting.  So if you

happen to see any of them outside this courtroom and they don't

acknowledge you, say hello, or make small talk, please do not

take offense.  They are not being rude; they are following my

instructions.

That concludes my preliminary instructions to you.

We will begin after lunch with the initial stage of

the case, which, as I said to you, is opening statements, and

we'll begin when you return from lunch with the government.

Let me just note, as I've said in the beginning of

jury selection, we are in an outfitted courtroom for COVID

times.  The witness will testify -- witnesses will testify in

this Plexiglas box that has a HEPA filter, and they will remove

their mask to testify when we have witnesses testify.  The

lawyer who will be questioning them and the lawyer during

opening statements, for example, will be in that Plexiglas box

which also has a HEPA filter, and they'll be permitted to

remove their mask while they provide opening statements as

well.

LBTVMAX1

1          So we are going to break for lunch which Ms. Williams

2     has arranged.  Please bear all of my instructions in mind.

3     We'll break for 45 minutes for you to enjoy your lunch and for

4     everyone else to take a lunch break.  We will return in 45

5     minutes with opening statements.  And we will stop at 5 p.m.

6     today.  Thank you for your attention.

7          (Jury not present)

8          THE COURT:  All right.  Matters to take up, counsel?

9          MS. COMEY:  No, your Honor.

10         MS. STERNHEIM:  No, thank you.

11         THE COURT:  All right.  We'll see you in 45.

12         We're breaking for lunch.  Thank you.

13         (Luncheon recess)

14         (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

LBTCMAX2

1                         AFTERNOON SESSION

2                 (In open court)

3                 (Jury not present)

4                 THE COURT:  Any matters to take up?

5                 MS. POMERANTZ:  Not from the government.  Thank you,

6       your Honor.

7                 MS. STERNHEIM:  No, thank you.

8                 THE COURT:  Okay.  We can bring in the jury.

9                 Ms. Pomerantz, you're welcome to get situated in the

10      podium.

11                MS. POMERANTZ:  Thank you, your Honor.

12                THE COURT:  Just as a note while we're waiting,

13      learned from the DE we have many overflow courtrooms up and

14      running.  We've accommodated everyone who has sought to observe

15      trial in those overflow rooms, and apparently still have space

16      for others.  So my thanks to the district executive's office

17      and the clerk's office for facilitating that public access.

18

19

20

21

22

23

24

25

1           (Jury present)

2           THE COURT:  Thank you so much, members of the jury.  I

3    hope you had a pleasant lunch.  I understand it's cold in the

4    jury room and that the facilities department is working on

5    that.  I apologize about that.  Please do let Ms. Williams know

6    if there are any issues like that and we'll address them as

7    soon as we can.

8           We turn now to opening statements beginning with

9    opening statements of the government.  I ask you to please give

10   your full attention to Ms. Pomerantz who will be making the

11   opening statement for the government.

12          MS. POMERANTZ:  I want to tell you about a young girl

13   named Jane.  It was 1994 and Jane was spending her summer at a

14   camp for talented young kids.  Jane turned 14 years old that

15   summer.  She was sitting at a picnic table with friends when a

16   man and a woman walked by.  The man introduced himself as a

17   donor who gave scholarships to students at this camp.  The man

18   and the woman spoke with Jane and, after discovering they all

19   lived in Palm Beach, Florida, they asked Jane for her phone

20   number.

21          What Jane didn't know then was that this meeting at

22   summer camp was the beginning of a nightmare that would last

23   for years, that this meeting would pull Jane into a

24   relationship with the man and the woman who were each more than

25   double her age.  What she didn't know then was that this man

1   and woman were predators.  What Jane didn't understand then or

2   what you will learn at this trial was that this meeting was the

3   beginning of that man and woman targeting Jane for sexual abuse

4   that would last for years.

5            Jane was not their only victim.  There were other

6   young girls, teenagers who the man and woman targeted for

7   sexual abuse.  Who was that woman targeting young girls for

8   sexual abuse?  It was the defendant, Ghislaine Maxwell.

9            The defendant took these girls on shopping trips,

10  asked them about their lives, their schools, their families.

11  She won their trust.  She discussed sexual topics with them.

12  She helped normalize abusive sexual conduct.  She put them at

13  ease and made them feel safe all so that they could be molested

14  by a middle-aged man.

15           She knew what was going to happen to those girls.  The

16  defendant walked the girls into a room where she knew that man

17  would molest them, and there were times when she was in the

18  room when it happened, making it all feel normal and casual.

19           That is why we are here today, because between 1994

20  and 2004, the defendant sexually exploited young girls.  She

21  preyed on vulnerable young girls, manipulated them, and served

22  them up to be sexually abused.  The defendant was trafficking

23  kids for sex.  That is what this trial is all about.

24           Ladies and gentlemen, this opening statement is the

25  government's opportunity to give you a roadmap of the evidence

LBTCMAX2                    Opening - Ms. Pomerantz

1    that you're going to see in this case, and I'm going to do that

2    in two parts.  First, I will tell you what I expect the

3    evidence is going to show.  Second, I'm going to talk about the

4    different types of evidence that will prove that Ghislaine

5    Maxwell is guilty beyond a reasonable doubt.

6                So what will the evidence show?

7                You're going to learn that the man and woman I just

8    mentioned were Jeffrey Epstein and Ghislaine Maxwell.  Maxwell

9    was Epstein's best friend and right hand.  Epstein was a

10   multimillionaire connected to famous and powerful people.  He

11   lived a life of extraordinary luxury.  He owned many

12   properties, including a villa in Palm Beach, Florida, a mansion

13   in Manhattan, a ranch in New Mexico, and an apartment in Paris.

14   He even owned an entire private island in the United States

15   Virgin Islands.  And he had staff who worked for him in his

16   various homes.

17               Epstein also owned private planes.  He had pilots who

18   worked for him full-time, flying him to his properties and

19   other locations in the United States and internationally.  The

20   defendant got to enjoy that luxury right along with Epstein.

21               Starting in the early 1990s, the defendant was in a

22   personal intimate relationship with Epstein, they were a couple

23   for many years, and when their relationship ended, they

24   remained, in the defendant's own words, the best of friends.

25               The defendant was Epstein's closest associate and

1    second in command.  She was involved in every detail of

2    Epstein's life.  During the ten years the defendant and Epstein

3    committed these crimes together, the defendant was the lady of

4    the house.  She ran Epstein's various properties, hiring and

5    firing employees.  She imposed rules, instructing employees to

6    not speak directly with Epstein or talking with other people

7    visiting Epstein's homes.  When she took charge of those homes,

8    the rules for staff were strict.  Employees were to see

9    nothing, hear nothing, say nothing.  There was a culture of

10   silence.  That was by design, the defendant's design, because

11   behind closed doors, the defendant and Epstein were committing

12   heinous crimes.  They were sexually abusing teenage girls.

13        The defendant and Epstein were partners in crime.

14   They had a playbook.  First, they got access to young girls,

15   then they gained their trust.  They learned about each girl's

16   hopes and dreams.  They learned about each girl's families,

17   often targeting the daughters of single mothers.  The defendant

18   and Epstein promised these girls the world.  Some of the girls

19   had difficult home lives and came from families that were

20   struggling to make ends meet.  The defendant and Epstein were

21   wealthy, powerful, and well connected, and they flaunted it.

22   They made sure everybody knew.  The defendant and Epstein made

23   young girls believe that their dreams could come true.  They

24   figured out what the girls dreamed of becoming when they grew

25   up and they promised to help, promised to help pay for school,

1    become actresses, models, professional musicians.  They made

2    these girls feel seen, they made them feel special, but that

3    was a cover, a cover that enabled the defendant and Epstein to

4    operate in plain sight.  They were wealthy and influential

5    people who used that cover to make the girls and their parents

6    feel comfortable and safe.

7          But what came next was anything but safe.  The next

8    stage involved getting the girls comfortable with sexual

9    contact involving Epstein.  To do this, the defendant discussed

10   sexual topics with the girls and then she used the same excuse

11   over and over to get the girls to touch Epstein — massage.  You

12   will learn that the cover of massage was the primary way the

13   defendant and Epstein lured girls into sexual abuse.  The

14   defendant massaged Epstein in front of the girls, then she

15   encouraged the girls to massage Epstein.

16         You see, Epstein's Palm Beach villa and his Manhattan

17   mansion each had a room used for massage, massage rooms filled

18   with photographs of naked females.  Epstein brought girls into

19   his massage room every single day.  But what was happening

20   inside those massage rooms was not a massage — it was sexual

21   abuse.  Calling it a massage was a rouse, a rouse designed to

22   get young girls to touch Epstein, an excuse for Epstein to

23   touch the girls.

24         And before I describe those so called massages for

25   you, let me just say, I know this is hard to hear, but these

LBTCMAX2                         Opening - Ms. Pomerantz

1    are the facts of the case.  This is what happened to these

2    children.  These are the crimes the defendant and Epstein

3    committed.

4            The sexual abuse started with Epstein lying facedown

5    for so called massages, but escalated as he turned over and

6    touched the girls.  And they escalated beyond that.  Epstein

7    touched the teenage girls' vaginas with a massager device or a

8    vibrator.  He directed girls to massage him while he

9    masturbated.  He sometimes touched the girls' breasts or

10   vaginas.  He sometimes received oral sex, and he sometimes

11   penetrated the girls' vaginas with his penis.  The defendant

12   helped Epstein find those girls.  She helped him recruit girls

13   for so called massages.  She manipulated the girls, groomed

14   them for abuse, helped the girls feel comfortable as

15   friendliness escalated to abuse.  Sometimes she was even in the

16   room for the massages herself, and sometimes she touched the

17   girls' bodies.

18           And even when she was not in the room, make no

19   mistake, she knew exactly what Epstein was going to do to those

20   children when she sent them to him inside the massage rooms,

21   massage rooms inside the houses the defendant ran for over a

22   decade.  When the defendant sent a 14-year-old girl into a

23   massage room with an adult man, she knew exactly what was going

24   to happen.

25           The defendant was essential to this scheme.  As an

adult woman, she was able to provide a cover of respectability

to Epstein that lulled these girls and their families into a

false sense of security.  She was in on it from the start.  The

defendant and Epstein lured their victims with the promise of a

brighter future only to sexually exploit them and forever

change their lives.  And while this horrific abuse was going on

behind closed doors, the defendant was jet setting in private

planes and living a life of extraordinary luxury.  These girls

were just a means to support her lifestyle, a way for the

defendant to make sure that Epstein — who demanded constant

sexual gratification from young girls — remained satisfied so

that the defendant could stay in the lifestyle to which she was

accustomed.

So what happened to Jane, the 14-year-old who met the

defendant and Epstein at her summer camp in 1994?  You will

hear from Jane about the day she met these predators.  You'll

hear that after Jane returned to Florida from camp, someone

from Epstein's office reached out to Jane and invited her to

Epstein's house in Palm Beach for tea.  Jane went to Epstein's

house with her mother.  Epstein explained that he liked to

mentor young talented people, that he gave scholarships and

that he wanted to help Jane.

Jane started spending time with the defendant and

Epstein at Epstein's house in Palm Beach.  Jane was 14 years

old.  She was a kid.  Epstein was in his early 40s, the

1   defendant was in her early 30s — they were adults.  They were

2   each more than double her age.  Yet, they were befriending a

3   child.  They pretended to be Jane's friend.  They took her to

4   the movies and on shopping trips.  Jane spent time with the

5   defendant and Epstein at Epstein's house in Palm Beach, often

6   by the pool.

7           During those visits, Epstein regularly gave Jane

8   hundreds of dollars, knowing that her family needed the money.

9   He also paid for voice lessons for Jane.  During those visits,

10  the defendant asked Jane about her life, but that wasn't all

11  that happened during those visits.

12          Within that first year, while Jane was just 14 years

13  old, Epstein started sexually abusing Jane.  He did not abuse

14  her alone.  There were times when the defendant was in the

15  room.  She was in the room for the abuse, making it feel

16  normal, making it feel okay that a man in his 40s was naked and

17  touching Jane's body.  There were times when the defendant

18  undressed in front of Jane, times when the defendant was in the

19  room when Jane undressed in front of Epstein, and she was

20  sometimes in the room when Epstein engaged in sex acts with

21  Jane.  The sexual abuse, these horrifying massages occurred

22  frequently.  It continued for years when Jane was 14, when Jane

23  was 15, when Jane was 16, it went on for years.

24          And the abuse was not limited to Palm Beach, Florida.

25  Both the defendant and Epstein encouraged Jane to travel with

1    them, and she did.  She traveled with the defendant and Epstein

2    to New York where she stayed at Epstein's Manhattan mansion.

3    During those trips, Epstein sexually abused her just like he

4    did in Florida.

5        Ladies and gentlemen, Jane was not the only one.

6    During the course of this trial, you will learn about multiple

7    girls who were targeted by the defendant and Epstein for sexual

8    abuse.  You will learn about other girls who the defendant

9    encouraged to massage Epstein, knowing that Epstein planned to

10   engage in sex acts during those massages.

11       For example, you will learn about a 16-year-old girl

12   who traveled to Epstein's ranch in New Mexico and found herself

13   alone with the defendant and Epstein.  Once the girl was

14   isolated, the defendant took steps to normalize sexual contact

15   under the rouse of massage, preparing her to be sexually abused

16   by Epstein.  The defendant told the girl she was going to give

17   her a massage, and once she got the girl on the massage table,

18   the defendant started touching the girl's breasts.  The girl

19   was 16 years old.

20       You will also learn about a 17-year-old girl the

21   defendant spotted in a parking lot and recruited out of the

22   blue.  You'll hear that the defendant made her driver pull over

23   so that she could approach that 17-year-old girl to recruit her

24   to give Epstein massages.

25       And you will learn about the way the defendant and

LBTCMAX2                    Opening - Ms. Pomerantz

1   Epstein's sexual abuse evolved over the course of a decade.

2   You will learn that in the 1990s, they used the cover of

3   mentoring young girls, of promising them scholarships and

4   opportunity, to introduce massage, inviting them on trips and

5   transporting them across state lines, and that you will learn

6   that they used these so called massages as a way to sexually

7   abuse the victims.

8           During that earlier phase, the defendant and Epstein

9   had to find each girl individually themselves, but by the early

10  2000s, the defendant and Epstein found an easier way to

11  maintain a continuous flow of girls to abuse.  They were no

12  longer finding girls through the cover of scholarships and

13  opportunity.  Instead, they devised a pyramid scheme of abuse,

14  a scheme that no longer required the defendant to personally

15  find young girls for Epstein.

16          So what did the defendant and Epstein do?  They

17  encouraged girls to bring other girls.  They asked the girls if

18  they had any young friends to bring over.  And when a girl

19  brought someone new, she was rewarded with cash, extra cash on

20  top of the hundreds of dollars she got for giving Epstein a

21  sexualized massage.  The defendant and Epstein handed hundred

22  dollar bills to poor teenage girls in exchange for them giving

23  Epstein so called massages.  To be clear, those girls were not

24  professional masseuses — they were kids being sexually

25  exploited and abused.

1          Under this pyramid scheme of abuse, the defendant

2     could just call girls to schedule massage appointments and hand

3     them cash afterwards, overseeing the operation and normalizing

4     the abuse by showing these young girls that she, an older,

5     purportedly respectable woman, had no problem with the paid sex

6     acts that were taking place during these so called massages.

7     For a decade, the defendant played an essential role in this

8     scheme.  She knew exactly what she was doing.  She was

9     dangerous.  She was setting young girls up to be molested by a

10    predator.

11         That's what we expect the evidence will show, that the

12    defendant enticed and groomed multiple young girls to engage in

13    sex acts with Jeffrey Epstein, that the defendant and Epstein

14    enticed some of those girls to travel to Epstein's homes in

15    different states, which the defendant knew would result in

16    sexual abuse.

17         As a result of these actions, the defendant is charged

18    in six counts.  Four of the counts charge her with working with

19    Epstein to transport girls under the age of 17 across state

20    lines to be sexually abused.  Two of the counts charge her with

21    crimes for sex trafficking of minors.  Sex trafficking of

22    minors, as I expect Judge Nathan will instruct you, means

23    recruiting or enticing a girl under the age of 18 for sex acts

24    in exchange for money.

25         Now, how will we prove to you that the defendant is

LBTCMAX2                    Opening - Ms. Pomerantz

1  guilty of these crimes?  We're going to prove it to you in

2  several different ways.  I want to highlight just a few of

3  those ways for you now.

4          First, you will hear from the victims, including Jane

5  herself.  They will take that stand and describe the sexual

6  abuse they suffered at the hands of the defendant and Epstein.

7  They will tell you about the defendant's significant role in

8  that sexual abuse, how the defendant helped put them at ease,

9  how she talked about sexual topics with them, how the defendant

10  was sometimes in the room for the sexual abuse, how the

11  defendant sometimes touched their bodies, how the defendant

12  encouraged some of them to travel with Epstein to his homes.

13  These witnesses will be testifying about some of the most

14  painful and private experiences of their childhood, experiences

15  they couldn't talk about for years, experiences that forever

16  changed their lives, experiences that scarred them.

17          You will also hear that a fund to compensate girls who

18  Epstein abused awarded some of these witnesses millions of

19  dollars, but it will be obvious to you at this trial that these

20  witnesses would have paid anything for this not to have

21  happened to them.  They would pay anything to have never met

22  the defendant and Epstein.

23          You'll also hear from people who knew some of the

24  victims, who knew them not as the adults that you will see

25  during the course of this trial, but as the kids they were when

LBTCMAX2                    Opening - Ms. Pomerantz

1    the abuse happened.  You'll hear from relatives from some of

2    the victims.  They will tell you about the victims spending

3    time with the defendant and Epstein, traveling to meet the

4    defendant and Epstein, and receiving phone calls from the

5    defendant, all when those victims were between the ages of 14

6    and 17.

7              You'll also hear from some of Epstein's staff.  You'll

8    hear from the pilots who flew Epstein and the defendant and

9    some of the victims in Epstein's private planes.  You'll also

10   hear from some of the employees who worked at Epstein's Palm

11   Beach residence.  They will tell you what it was like to work

12   for Epstein and the defendant.  The rules the defendant imposed

13   on staff, rules designed by the defendant to ensure a culture

14   of silence.

15             You'll also hear from law enforcement witnesses.

16   You'll hear from law enforcement witnesses who participated in

17   a search of Epstein's Palm Beach home in 2005 and a search of

18   Epstein's New York mansion in 2019.  You'll see photographs

19   from those searches.  You will see that Epstein lived in

20   mansions filled with photographs of naked females, and you will

21   learn that he had a massage room in each of those houses that

22   was decorated with more nude photographs.

23             You'll also see evidence recovered from the searches

24   of Epstein's Palm Beach and New York residences, backing up the

25   victims' accounts, like massage tables, a school girl outfit,

LBTCMAX2                    Opening - Ms. Pomerantz

1   and nude photographs.

2              Finally, you'll also see a variety of other types of

3   records that further back up the victims' testimony.  To name

4   just three examples, you'll see flight logs of Epstein's

5   private planes, logs that include the names of some of the

6   defendant and Epstein's victims, confirming that the defendant

7   and Epstein flew on his planes with minor girls.  You'll see

8   FedEx records confirming that Epstein sent a gift to one victim

9   when she was just 15 years old.  And you'll see records

10  confirming that the defendant and Epstein were at the arts camp

11  the same summer as Jane when she was just 14 years old.

12             Taken together, all of this evidence will prove to you

13  that the defendant conspired with Jeffrey Epstein to entice

14  young teenage girls to be sexually abused.  They were

15  exploiting kids.  They were trafficking kids for sex.

16             You're going to see a lot of evidence and hear from a

17  lot of witnesses in this case.  This evidence will come in

18  piece by piece, and it won't always come in perfect

19  chronological order, but by the end of this trial when you've

20  seen and heard all of the evidence, you will see how it fits

21  together.  You will see how it proves that the defendant and

22  Epstein were dangerous predators who sexually exploited and

23  abused young girls for a decade.

24             At the end of this trial, we will speak to you again

25  to summarize the evidence, but between now and then, we're

1   going to ask you to do three things:  First, please pay close

2   attention to the evidence; second, please follow Judge Nathan's

3   instructions on the law; and third, use your common sense, the

4   same common sense you use every day to make all sorts of

5   decisions in your own lives.  If you do those three things, you

6   will reach the only verdict that is consistent with the

7   evidence, the law, and your common sense, that Ghislaine

8   Maxwell is guilty.

9              THE COURT:  Thank you, Ms. Pomerantz.

10             Members of the jury, we'll now hear opening statements

11  on behalf of the defendant and we'll hear from Ms. Sternheim.

12             MS. STERNHEIM:  Ever since Eve was tempting Adam with

13  the apple, women have been blamed for the bad behavior of men,

14  and women are often villainized and punished more than the men

15  ever are.

16             The charges against Ghislaine Maxwell are for things

17  that Jeffrey Epstein did, but she is not Jeffrey Epstein, she

18  is not like Jeffrey Epstein, and she is not like any of the

19  other men, powerful men, moguls, media giants who abuse women.

20             Epstein is not on trial, but his name and his conduct,

21  as you have already heard, will be mentioned throughout this

22  trial.  He's the proverbial elephant in the room.  He is not

23  visible, but he is consuming this entire courtroom and the

24  overflow courtrooms that other members of the public are

25  viewing.  You will hear plenty of testimony, some of which the

LBTCMAX2                          Opening - Ms. Sternheim

government has already previewed, which revolves around

Epstein's conduct, not Ghislaine's.

         But you are not here to judge whether Epstein

committed the crimes, you are not here to judge whether the

government could prove beyond a reasonable doubt that Epstein

committed the crimes — you are here to determine whether the

government can prove beyond a reasonable doubt that Ghislaine

Maxwell has committed the crimes charged.  When all is said and

done, the evidence will show that the government cannot because

Ghislaine did not.

         Now, together with my colleagues — Christian Everdell,

Laura Menninger, and Jeffrey Pagliuca — I stand before you

proud to represent Ghislaine Maxwell.

         This case is about memory, manipulation, and money.

As you will see, the accusations that you will hear from the

mouths of four accusers — not like the hundreds that the

government suggested you would hear from — you will hear from

them and they will recount their memories, memories of a

quarter century ago, memories that have been corrupted by

things that have happened throughout the years, manipulated by

a narcissistic man and self-interested civil lawyers, and a

desire for a big jackpot of money.

         The government's proof, the government's story relies

on the claims of four accusers, four who will say that

Ghislaine prepared them or — to use a term that you will hear

1    in this trial through expert testimony — groomed them to engage

2    in acts with Epstein.

3           Now, we're talking about events that took place 15 to

4    over 25 years ago, and as we all know, memories fade over time,

5    and in this case, you will learn that not only have memories

6    faded, but they have been contaminated by outside information,

7    constant media reports and other influences.

8           Manipulation.  Yes, Jeffrey Epstein manipulated the

9    world around him and the people around him.  He

10   compartmentalized his life, showing only what he wanted to show

11   to the people around him, including Ghislaine.  You will hear

12   that the accusers themselves were manipulated by those around

13   them, especially civil attorneys who saw Epstein and Ghislaine

14   as easy targets for lawsuits and, of course, money.

15          As you heard, Epstein's estate set up a victim's

16   compensation fund to pay accusers who claimed to be of a

17   certain age and have had contact with Epstein.  But those

18   claims met the most minimal requirements, and certainly not

19   proof beyond a reasonable doubt.  The fund did not challenge

20   the accusers, did not check facts, didn't ask questions.  Each

21   accuser who applied to the fund — who will testify here —

22   received millions of dollars from Epstein's estate, and it made

23   it very easy for these women to include Ghislaine Maxwell when

24   it really always was about Epstein.

25          Now, Ghislaine Maxwell is on trial because of her

LBTCMAX2                         Opening - Ms. Sternheim

1    association with Jeffrey Epstein.  She is a scapegoat for a man

2    who behaved badly.

3              MS. POMERANTZ:  Objection.

4              THE COURT:  As stated, overruled.

5              MS. STERNHEIM:  She is a target, a bullseye of anger

6    for women who were or otherwise believed they were victimized

7    by Epstein.  Epstein's death left a gaping hole in the pursuit

8    of justice for many of these women.

9              MS. POMERANTZ:  Objection.

10             THE COURT:  Overruled as stated.

11             MS. STERNHEIM:  Ghislaine is on trial here, and you

12   heard about the conduct of Jeffrey Epstein.  She is filling

13   that hole and filling an empty chair.  She is a brand name, she

14   is a lightning rod, she is a convenient stand-in for the man

15   who --

16             MS. POMERANTZ:  Objection.

17             THE COURT:  Let me speak to counsel, please.

18             (Continued on next page)

19

20

21

22

23

24

25

1          (At the sidebar)

2          THE COURT:  This is not sealed.  It's out of the

3    earshot of the jury.

4          State your objection.

5          MS. COMEY:  Your Honor, this is in violation of

6    pretrial ruling made by the Court, including the defense, from

7    arguing that the government was targeting this defendant --

8          THE COURT:  And they may not do that.  What they can

9    do is argue that, for the witnesses, she's a scapegoat or a

10   stand-in, and I think that's where we are in the line.  I think

11   the last statement comes closest because you put it in context

12   of justice.  The other ones, that's why I said as stated, were

13   on the line about credibility of these witnesses and motives of

14   witnesses and that, I think you agree, is permissible.

15         MS. COMEY:  That is permissible, your Honor.  But the

16   reference to an empty chair is clearly a reference to this case

17   and the prosecution --

18         THE COURT:  I won't allow the line to be crossed into

19   where I ruled on, which is that you can't talk about

20   motivations of the prosecution.  The government is not on

21   trial.

22         To the extent that you want to argue motivation of the

23   witnesses to not tell the truth or credibility with respect to

24   them, you may do that, but don't play with the line.

25         MS. STERNHEIM:  I will not.  I will not play with the

1    line.  I will make clear that I'm talking about the witnesses.

2              THE COURT:  Okay?

3              MS. COMEY:  Thank you, your Honor.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          MS. STERNHEIM:  Four women will come into this

3    courtroom and they will point a finger at Ghislaine Maxwell,

4    but what they say and the evidence that you will see is not

5    going to support these charges beyond a reasonable doubt.

6          You've heard many negative things about Ghislaine

7    Maxwell, and the evidence is going to show many exceptional

8    things about Ghislaine Maxwell — well educated, well traveled,

9    a graduate of Oxford.  She socialized with extraordinary

10   people, she can pilot a helicopter, she speaks numerous

11   languages, and she has worked her entire adult life.  She is

12   being pegged as the rich girl, the socialite.  But privileged

13   background, comfortable lifestyle, status — they may be things

14   that easily check the wrong box, but they are not crimes and

15   nor should they factor negatively into your consideration of

16   the evidence because, as you may recall, during jury selection,

17   you all agreed and you all said that you would not be biased by

18   affluence or opulence, and your word is your bond.

19         Now, in the '90s, Ghislaine met Epstein.  As you will

20   hear, he was a successful financier, a philanthropist, a patron

21   of the arts and sciences, and a supporter of educational

22   pursuit and artistic talent.  He was a bright, fascinating man

23   with wide ranging interests, and he had many positive traits,

24   attractiveness, charisma, intelligence, status, charm.  He gave

25   generously and he shared his lifestyle with others.  He

LBTCMAX2                    Opening - Ms. Sternheim

1   radiated what's called a halo effect.  He attracted people

2   because of his charisma and his charm, but he also

3   compartmentalized what he would disclose to people about his

4   life.

5        Now, you heard that he had a relationship with

6   Ghislaine, they became friends, became companions, but she

7   became his employee.  She had the task, a time-consuming task

8   of developing and administering his real estate portfolio, the

9   multiple properties that each operated like small boutique

10  hotels.  They were luxurious, they were vacation spots, and

11  like many New Yorkers, Epstein wintered and spent weekends in

12  Palm Beach.  But unlike many New Yorkers, he did not summer in

13  the Hamptons he went to his ranch in Santa Fe, and he also went

14  to his home in the Virgin Islands.

15       You heard about his house having staff and house

16  managers because the houses required cleaning and maintenance,

17  housekeeping, gardening, all kinds of upkeep, purchase of

18  supplies, purchases of foods and sundries and meal preparation.

19       You will hear that Ghislaine visited those properties

20  with and without Epstein, and you will hear that Epstein spent

21  time with other women and traveled without Ghislaine.

22            (Continued on next page)

23

24

25

1           MS. STERNHEIM:  Now, you heard about the private jets.

2      Enviable as they are, in many ways they served like a Hampton

3      Jitney in the air.  They were used as commuter jets for Epstein

4      to travel with family and friends, guy friends, past, present,

5      and future girlfriends, and an array of other very, very

6      interesting people, academics, politicians, scientists,

7      musicians, celebrities, even a former astronaut who became a

8      senator.  And there were families on the flights and children

9      on the flights, high-style commuting.  But it was a way of

10     getting back and forth from his properties and taking others

11     along for the ride at times, for them to go to their own homes

12     or to other destinations that were on the way.

13          You'll also hear that Epstein worked out of his office

14     in New York, as well as out of his homes; and that Ghislaine

15     had worked out of his New York office, but then out of her own

16     office in her own residence.  There came a time where the

17     companionship part of their relationship ended, but she still

18     remained an employee.  She moved on with her life, but she

19     still worked for Epstein.

20          Now, I would love to be able to tell you a progressive

21     once-upon-a-time narration, but the evidence is not conducive

22     for that.  I would also like to be standing right in front of

23     you, but these times also are not conducive for that.

24          What you are going to see and what you are going to

25     hear basically center around four women.  They are going to

LBTVMAX3                    Opening - Ms. Sternheim

1   tell four different stories, they are four completely different

2   people, and they are going to recount things that they claim

3   happened to them decades and decades ago.  They are not going

4   to be able to pinpoint dates; they are going to tell stories

5   that have changed over time and grown over time, stories that

6   they have told for the first time after Epstein died.  And

7   Ghislaine has been inserted in those stories as they reframed

8   their stories for a payday.

9        Now, they will come in here and they will point their

10  finger at Ghislaine Maxwell.  There is nobody else to point the

11  finger at at this trial.  And I ask you to consider, when you

12  hear their testimony, those core themes that I mentioned

13  before:  Memory, manipulation, and money.

14       Now, the four women who will come here -- and, as you

15  heard, they are permitted to have pseudonyms or not have their

16  whole names used -- are Jane, Annie, Kate, and Carolyn.  They

17  don't have contemporaneous records, they don't have notes of

18  the things they are going to say.  Unlike you, as Judge Nathan

19  said, you could keep notes to aid your recollection.  They

20  don't have those notes.  Instead, they come before you and tell

21  their stories purely from memory.

22       Now, memory, as you will hear, changes.  It is not

23  like we take a picture and it is exactly the same as what

24  happened.  You are going to hear expert testimony about how

25  memories can be contaminated over time; how false memories can

1    be created through suggestive activities, information, and

2    influence; how people can testify seemingly convincingly about

3    false memories that they believe to be true, even when they are

4    not.  It may seem like their personal truth, but, in fact, it

5    is not the truth.

6            You are going to hear stories from women who have

7    absorbed many things, things they have heard and read, saw and

8    said to others.  And as the evidence will show and the expert

9    testimony will show, these things can lead to memories that are

10   untrustworthy, uncorroborated, and unreliable.

11           Now, keep in mind the amount of time that has elapsed,

12   the many versions of events that have been spun in the media,

13   through talk, etc., and the incentive of personal monetary

14   gain.  All of these impact so-called memories into a

15   retrospective interpretation that will be offered during this

16   trial.

17           Now, the four women that will testify were not

18   initially interviewed by investigators experienced in the

19   training of evaluating claims of sexual abuse.

20           MS. COMEY:  Objection.

21           THE COURT:  Sustained.

22           The jury will disregard the last comment of

23   Ms. Sternheim.

24           MS. STERNHEIM:  You are going to decide, when you hear

25   these witnesses, if you find them reliable, credible,

LBTVMAX3                          Opening - Ms. Sternheim

1    plausible.  You are going to see, based on the evidence and,

2    importantly, the lack of evidence, that they do not support the

3    charges in this indictment, certainly not beyond a reasonable

4    doubt.  There will be no eyewitnesses to their accounts, even

5    when they claim there were all these other people involved in

6    the activities that the government has alleged.  There will not

7    be documentation, even that which still exists some 25 years

8    later, that is going to corroborate their testimony.

9           Now, I said before that Epstein was a manipulator.  He

10   had the money and the means to create an exceptional world:

11   Beautiful homes, beautiful surroundings, beautiful people.  But

12   he also was a mysterious man without attachment.  He had no

13   wife, he had no children, he had no boss; yet he attracted all

14   these rich, powerful, famous people before and after his fall

15   from grace back in around 2008.  In many regards, he was like a

16   21st century James Bond.  His mystery has stirred interest and

17   his accusers have shaken the money tree and millions of dollars

18   have fallen their way.

19          But Epstein wasn't the only one who manipulated, even

20   though he was a man who, as I said, compartmentalized, had

21   eccentricities, very specific requirements about his diet, his

22   daily physical regime, he demanded perfection, he demanded

23   solitude and silence; but he also surrounded himself with

24   people and traveled at times with an entourage.  Yet as open as

25   that may seem, he kept parts of his life locked from others.

1            But he isn't the only source of manipulation in this

2     case.  Lawyers, media, money, have impacted the memories that

3     you will hear about.  You will learn that these four women are

4     all represented by civil lawyers who targeted clients, primed

5     their clients, cultivated their stories, honed their

6     accusations.

7            MS. COMEY:  Objection.

8            THE COURT:  Just a moment.  I need to hear the

9     grounds.

10           (At sidebar)

11           MS. MOE:  Thank you, your Honor.

12           Our objection is, as the Court may recall, we moved to

13    preclude any suggestion before this jury the credibility of

14    lawyers was at issue in this case.  In particular, as the Court

15    might recall, last week we raised the issue that defense

16    counsel had served subpoenas on the lawyers for these

17    witnesses.  In our view, we can't imagine how it can be proper

18    to bring this out before this jury or how this evidence that

19    defense counsel is proffering could possibly come in evidence

20    at this trial.

21           What Ms. Sternheim has just proffered is about a

22    conversation with lawyers and their clients, which can't

23    possibly come before this jury at this trial; it would be

24    inappropriate.  Certainly the victims themselves couldn't be

25    cross-examined about their contacts with their attorneys, and

LBTVMAX3                        Opening – Ms. Sternheim

1    certainly their attorneys couldn't be called as witnesses to

2    talk about that.  Beyond that, I can't imagine a good-faith

3    basis to proffer that evidence to come before this jury about

4    that.

5              MS. STERNHEIM:  Judge, the government well knows that

6    the lawyers for these people sat in their offices through

7    proffer sessions.  If nothing else, they are witnesses to what

8    went on in that room.  They also separately were in

9    communication with the government providing information to the

10   government; and the government, in turn, was helping them build

11   their cases, their civil cases, and their cases for settlement.

12   So there is a good-faith basis to raise these things.

13             THE COURT:  I had said clearly, since it's unclear,

14   how you can call lawyers for witnesses in this case as

15   witnesses themselves; that you wouldn't do so unless you

16   briefed it specifically.  You have not done that.  So you may

17   not refer to that testimony that you somehow anticipate getting

18   in, although I don't know how you will in your opening.  You

19   may not.  I was very clear that before that would happen, you

20   would have to brief it.  I haven't seen any briefing, so you

21   may not reference it.

22             MS. STERNHEIM:  But, Judge, may I just say there's no

23   dispute that if a witness to a proffer has information that may

24   be a conflict with the testimony here, there is no privilege to

25   that.

1          THE COURT:  So tell me what you're going to do.

2     You're going to call -- so a witness will testify, and then

3     you're going to call that witness's attorney.  What is it that

4     you're going to do?  What evidence are you going to --

5          MR. PAGLIUCA:  The lawyers are in proffers, your

6     Honor, and the witness is in the proffer.  The witness can talk

7     about what the lawyer said to the government in the proffer.

8     The lawyers have emails to the government lawyers about what

9     their clients will or won't say.  There's an email from

10    Mr. Scarola to the government in which Mr. Scarola suggests ten

11    topics for the interview with Carolyn.  Those are not

12    privileged conversations.

13         THE COURT:  Sorry.  Just to clarify, you're saying

14    this is not what you just said, the cultivating of the stories

15    by these lawyers; you do not intend to get that by calling any

16    of these lawyers as witnesses.

17         MR. PAGLIUCA:  Not unless we brief it and you give us

18    permission to do that.

19         THE COURT:  But instead, it's based on communications

20    between the lawyers and the government?

21         MR. PAGLIUCA:  Correct.

22         THE COURT:  And email.

23         MR. PAGLIUCA:  And in proffers.

24         THE COURT:  And in proffers in which the government

25    was present.

1          MR. PAGLIUCA:  Correct.

2          MS. MOE:  Your Honor, what Ms. Sternheim said in the

3    opening was that the jury would learn that these women had been

4    manipulated by their attorneys which cultivated their stories.

5    The factual proffer about the basis for that is the lawyers

6    were sitting in the room while they interviewed them.  There is

7    no connection between what's been proffered to this jury and

8    what we are hearing now from defense counsel.  The fact that

9    there is an email between a lawyer and a prosecutor suggesting

10   topics about an interview is a separate matter, but certainly

11   wouldn't support the argument that they themselves had

12   manipulated their clients and cultivated the stories.  That is

13   an entirely separate matter, your Honor.

14         THE COURT:  I think the inference is available from --

15   cultivating, so I'm going to allow that.  It's unclear to me

16   what evidence will go to it, but the proffer now is that it's

17   not based on anticipated testimony to be elicited from the

18   attorneys, but it's based on nonprivileged communications

19   between the attorneys and the government.  And so beyond that,

20   I'm going to let the argument be made, unless the government's

21   position is there is no evidence available from which the

22   inference of manipulation by the attorneys could be made.

23         MS. MOE:  Yes, your Honor.

24         The only evidence that defense counsel has proffered

25   is an email between an attorney and a prosecutor suggesting

1   topics to ask the client about.  That certainly couldn't be a

2   good-faith basis to suggest to this jury that there will be

3   evidence before them at this trial; that these were more

4   manipulated by their attorneys who cultivated their specific

5   stories told to the government.  We think that's inappropriate,

6   your Honor.

7           THE COURT:  I'm going to overrule it at the opening

8   stage.  I did not preclude the line of argumentation; I wasn't

9   asked to preclude the line of argumentation.  You raised the

10  prospect -- you did certainly and I appreciate it, raise the

11  prospect related to a subpoena of a witness's attorney, which I

12  agree with the government is entirely unclear to me how that

13  would be able -- but if the proffers that it's based on

14  existing nonprivileged information from which the jury could

15  infer that these attorneys structured in some way the questions

16  that were asked, I think the line is I don't think you have any

17  basis to say that the attorneys told the witnesses what to say.

18          What evidence are you going to put in that shows the

19  attorneys told the witnesses what to say?

20          MR. PAGLIUCA:  Well, so we back up a little bit, your

21  Honor.  We have in 2008 -- I'll use Carolyn as the example --

22  answers to interrogatories that are detailed that do not

23  include Ms. Maxwell; deposition testimony that is detailed but

24  does not include Ms. Maxwell; a 91-page complaint detailed, but

25  does not include Ms. Maxwell.

LBTVMAX3                        Opening – Ms. Sternheim

1          It is only after years and after the fund is open that

2     we then have this witness coming forward in conjunction with

3     this email that I'm talking about that we've referenced in

4     papers to the Court.  So, for example, Mr. Scarola, who is the

5     lawyer on this topic, wrote all the answers to interrogatories

6     and were signed by the client.  Then we fast forward, and we

7     have all this information that's being provided in 2020 which

8     is not present in 2008.

9          First of all, all the answers to interrogatories are

10    not privileged.  The communications in the complaint are not

11    privileged.  The lack of information about our client in that

12    complaint can be inferred that after that is when all this

13    comes up, because we are seeking money from the victim

14    compensation fund and we are using the government as part and

15    parcel of that to buttress our claim to the fund.

16         MS. COMEY:  Your Honor, as an initial matter, it's not

17    factually accurate that the deposition is --

18         THE COURT:  Okay.  So these are arguments you're going

19    to make to the jury.  It's not -- the contention is that the

20    story has changed and what happened in between was the

21    involvement of civil lawyers.  I have no idea what the evidence

22    exactly will show with that, and it sounds like there are going

23    to be arguments to be made on both sides, but that's not based

24    on privileged testimony.  And I have a proffer that the story

25    has changed over time and what intervened between civil

1    lawyers.  They are allowed to make that inference argument to

2    the jury.  Thank you.

3              (In open court)

4              THE COURT:  Ms. Sternheim, you may continue.

5              MS. STERNHEIM:  Thank you.

6              In bringing this case against Ms. Maxwell, the

7    government has reached back almost a quarter of a century and

8    they are looking through a rearview mirror with 20/20 vision,

9    which you will hear is hindsight bias.  And there will be

10   experts who will explain that to you, what that means, how you

11   look at something later and it has a different meaning.

12             What we have here is lawful conduct that is going to

13   be labeled grooming; it has been labeled grooming by the

14   government, asking someone what they like to do, whether they

15   like a movie, whether they like going shopping.  The government

16   wants you to put a sinister subjective motive in Ghislaine

17   where the evidence will show none existed.

18             Now, you heard about the fund, and that's where money

19   comes in.  Now, for individuals to collect under the Epstein

20   Victim Compensation Fund, they have to submit a claim.  And

21   their claim is enhanced if they cooperate with the government.

22   And the witnesses here have, by speaking with the government,

23   testifying for the government, they have enhanced their claims.

24   And each of the witnesses who will testify here have gotten

25   money, a lot of money, from the Epstein fund.  And part of the

1   fund is making a claim against Epstein or others of his

2   employees.

3           Now, the fund, administered by some of the same folks

4   that administered the September 11th compensation fund, is

5   different in this regard:  9/11, there was hard proof of what

6   happened to victims.  Here, it is based on the memories which

7   we think the evidence will show is unreliable and suspect,

8   memories that will be the subject of this trial.  But the

9   claims that were made to the fund, as I said before, were not

10  contested and they were not put before you, a jury, to decide

11  whether they are credible.

12          Let's talk about those four accusers.  As I said

13  before, it's Jane, Annie, Kate, and Carolyn.

14          Here's what we expect the evidence is going to show

15  about Jane:  Yes, she was and is a talented musician and a

16  singer from a musical family.  And Epstein, a patron of the

17  arts and a supporter of young talent, sponsored musicians and

18  artists and actresses and others, and he offered to become her

19  benefactor.  He paid for her school, he paid for her vocal

20  lessons, he paid or at least cosigned for a Wall Street

21  apartment that Jane lived in with her mother and her brothers

22  while she went to a prestigious professional school in New York

23  City.

24          Jane and two of her brothers, the ones closest in

25  age -- she has three older siblings from her mother's first

LBTVMAX3                          Opening - Ms. Sternheim

1    marriage -- she and the two brothers that she shares both a

2    mother and a father, attended professional high schools and

3    performed in Florida, like a von Trapp trio.  And in the

4    summers, they all attended the prestigious Interlochen summer

5    program where Jeffrey Epstein was a sponsor.  He sponsored the

6    building of a handicap-accessible lodge, he sponsored

7    scholarships for talented youth, he sponsored many people who

8    went through that program, as well as people who went to other

9    programs and other schools.

10        Now, you will learn that Jane was in a beauty pageant,

11   singing competitions, including in Italy, she modeled, she

12   performed in commercials, she sang, she was on Broadway shows

13   that were in the local touring productions, she traveled

14   nationally and internationally from a young age.  She attended

15   auditions, performances, and she even had an agent in New York.

16        Now, you heard that she and her mother -- and you will

17   hear her brothers as well -- went to Epstein's home in Palm

18   Beach a few times.  They talked about music and the arts.

19   Nothing amiss happened.  That's it.

20        Now, Jane did take some flights on Epstein's dime, and

21   she went to New York and some other places as well.  You will

22   also learn that a month before Epstein's arrest in 2019, Jane

23   did not want to be involved in any criminal case regarding

24   Epstein.

25        But after Epstein died, she changed her mind.  When

LBTVMAX3                    Opening - Ms. Sternheim

money was on the line, she changed her mind.  She hired a
lawyer, she became a client, they got in touch with the
government, and said she changed her mind.  Why?  Because
assisting the government would help a claim with the Epstein
fund.

          Now, suddenly, after Epstein dies and she has a lawyer
by her side, she now remembers all this horror that happened to
her and places Ghislaine at the center of it all.  Hundreds of
things that happened to her that no one knew about, not her
mother, not her brothers, not her teachers, not staff at the
house, not her coaches, all of this that the government claims
happened and she didn't skip a beat, nobody ever noticed
anything amiss.

          Now, you will learn today she is a very successful
actress in a soap opera.  She's been on numerous sitcoms,
reality shows, movies, podcasts, drama series.  She is a
consummate actress.  She is a pro at playing roles.  And as her
scripts and characters change, so has her story that you will
hear in this courtroom.  I ask you to examine her testimony,
and you will find internal inconsistencies.  When money was on
the line, she tagged Ghislaine.  She got her application before
the fund, and she received $5 million.  Examine critically what
she is going to say on the stand.

          Now, here's what we expect will show about Annie.
Now, Annie's sister was an artist who was being promoted and

LBTVMAX3                          Opening - Ms. Sternheim

1    commissioned by Epstein, painted.  She painted her young

2    siblings.  She worked in Epstein's New York home while it was

3    under renovation.  And she was eager and excited for Annie to

4    meet Epstein.  She hoped that Epstein could help promote her

5    ambitions.  So she came to New York when she was 16 and she met

6    Epstein.  Epstein alone.  Ghislaine was not there; she was not

7    in the country.  It was just Annie, her sister, and Epstein.

8    She found New York thrilling.  She even wrote about it in a

9    diary.  And she was planning a school enhancement trip to

10   Thailand.  And her sister encouraged her to meet Epstein for

11   his support.

12           Now, some time later, with her mother's permission,

13   Annie at 16 went to Santa Fe.  That was the first and only time

14   she ever met Ghislaine, and nothing criminal happened there.

15   And you will learn that she was above the age of consent in New

16   Mexico.

17           MS. COMEY:  Objection.

18           THE COURT:  I need to hear from you.

19           (Pages 68 to 76 SEALED)

20           (Continued on next page)

21

22

23

24

25

1              (In open court)

2              THE COURT:  Thank you for your patience.

3              Ms. Sternheim, you may proceed.

4              MS. STERNHEIM:  Thank you.

5              Let's go back to Annie for just a couple of minutes.

6              Whatever you hear Annie claim happened there, Annie

7       did not believe that she was a victim until later.  People

8       convinced her otherwise.  And interestingly, she will tell you

9       that she stopped writing in her diary before the events she

10      will testify to concerning New Mexico.

11             Now, Annie is a 41-year-old psychotherapist who met

12      Ghislaine once in Santa Fe.  Never saw her again.  Never saw

13      Epstein after that.  Never traveled to New York after that.

14      She now promotes herself as a victim and speaks publicly.

15             Now, you should wonder why she is even a part of this

16      case.  Because from our perspective, what happened in New

17      Mexico is not illegal conduct under the terms of this

18      indictment.  She will claim that she's scarred by what happened

19      there.  Yet ask yourself, if it was so traumatic, why has she

20      kept for 25 years the boots she claims Epstein purchased for

21      her to wear in the snake-filled brush of Santa Fe, boots that

22      have been well-worn over more than two decades.  Now, Annie's

23      lawyers helped to set up the fund, and she was awarded $1.5

24      million for whatever she claims and didn't believe was

25      victimizing in Santa Fe.

1            Now, here's what we expect Kate to talk about:

2            Now, Kate has admitted that she's ambitious.  She led

3    a jet-setter lifestyle.  Before meeting Ghislaine and Epstein,

4    she was in a relationship with a man twice her age, a former

5    Oxford classmate of Ghislaine, a friend of Ghislaine, a

6    prominent older British gentleman.  Kate was above the age of

7    consent in Britain.  And when she came to the United States,

8    she was above the age of consent in New York and in Florida and

9    anywhere else she claims she had been.

10           Now, she will tell you that she used drugs during the

11   period of time that she will testify about, and that it fogged

12   her memory.  And you will learn that she eagerly spent time

13   with Epstein and, at times, with Ghislaine.  But what is really

14   telling is the emails that she sent to Jeffrey Epstein,

15   continuing a relationship with him for over a decade.  She

16   maintained contact with Epstein when he was in jail; she

17   eagerly sent him pictures of herself.  When his sentence was

18   over, she contacted him, eager to visit with him and stay with

19   him.

20           Now, Kate is a 44-year-old former actress, model, and

21   socialite from the United Kingdom.  She has lived in the States

22   for years, coming here on an entertainment visa.  She is no

23   longer in the entertainment business.

24           When Epstein died, she pointed the finger at

25   Ghislaine.  And you should wonder why she's here.  She is not

1   alleged to be a victim in this case.  Nonetheless, she settled

2   her claim with the fund for three and-a-quarter million

3   dollars.  She assisted the government and she will be here.

4   And in turn, that assisted her claim.  But she's also seeking

5   assistance from the government to help her to get a visa, a

6   special visa for government witnesses.

7           Now, three and a quarter million dollars is a lot of

8   money, but it cannot buy you a visa.  And maybe her testimony

9   will.  You will evaluate that.

10          Now, the last accuser is Carolyn.  And admittedly, she

11  had a troubled past, lived a dangerous lifestyle, was using

12  drugs during the period of time that she interacted with

13  Epstein.

14          Let me just stop for a second.

15          There's a different time period that we're in now.  We

16  are now in about 2002, whereas Jane, Annie, and Kate were in

17  the mid to late '90s.

18          Carolyn was introduced to Epstein not by Ghislaine, by

19  a woman named Virginia Roberts.  Roberts was paid by Epstein to

20  recruit females for him to get massages.  She offered the

21  opportunity to Carolyn to meet Epstein, and Carolyn readily

22  agreed.  The evidence that you will hear with regard to

23  Carolyn, which relate to the trafficking charges in Counts Five

24  and Six, counts that only relate to Carolyn, had nothing to do

25  with Ghislaine.

1      Now, like many of the other accusers, but even more

2  startling here, Carolyn's story changed dramatically.

3      Back in around 2007, she was interviewed by the FBI

4  about Epstein.  She did not have a lawyer at that time, but she

5  answered their questions.  And later, she hired an attorney and

6  sued Epstein and his assistant, Sarah Kellen.  She did not sue

7  Ghislaine.

8      She then brought another lawsuit in federal court in

9  Florida.  Again, she sued Epstein and Kellen.  She did not sue

10  Ghislaine.  Ghislaine had not come up during that interview in

11  2007.  Ghislaine was not identified as anyone who recruited

12  Carolyn or groomed Carolyn or otherwise interacted with Carolyn

13  in Palm Beach.  As I said, two suits by Carolyn, none involved

14  Ghislaine.  You will see the length of the complaint against

15  Epstein and Kellen.  It doesn't include Ghislaine.

16      Now, the evidence will also show that Carolyn actually

17  groomed and trafficked other people to Epstein.  And after

18  Epstein died and there was money to be had, her lawyer

19  contacted the government, and now her story included Ghislaine.

20  And assisting the government enhanced her application to the

21  fund, and she got three and a half million dollars, less the 40

22  or $50,000 that she had received in one of her lawsuits against

23  Epstein and Kellen.

24      Now, early on, the judge told you that the burden is

25  on the government to prove the case beyond a reasonable doubt.

1    I don't even, as part of the defense, have to make an opening

2    statement, but far be it for a lawyer not to want to talk.  And

3    you will hear that we will question witnesses, we will put in

4    evidence, we will make objections for the judge to rule on.

5    But I ask you to keep in mind that in asking questions of

6    witnesses that may make witnesses feel uncomfortable, there is

7    no interest in asking those questions to shame anyone.  The

8    purpose of our job is to see whether the government has proven

9    the charges beyond a reasonable doubt, and you do that through

10   questioning.

11          Now, the government went through the charges, and I'm

12   just going to quickly wrap them up.

13          Counts One and Three are conspiracy charges; One

14   having to do with enticing minors to cross state lines, and

15   Three having to do with transport of minors across state lines.

16   And those pertain to all four of the accusers.

17          Counts Two and Four, which are called substantive

18   crimes, allege actual enticement and actual transportation.

19   And those only pertain to Jane.

20          Now, with regard to Counts Five and Six, the

21   trafficking charge, charges conspiracy and the substantive

22   offense.  As I said before, that only pertains to Carolyn.  I

23   ask you to keep that in mind.

24          But with regard to any of the charges, the proof that

25   the government has indicated they will put forth the stories of

LBTVMAX3                    Opening - Ms. Sternheim

1     the witnesses on the stand will not establish beyond a

2     reasonable doubt any of those six charges.

3          Now, age of consent is an important factor that you

4     will focus on.  And you will learn that in New York, the age of

5     consent is 17 years old.  You will learn that there are

6     witnesses, the accusers, some that never traveled to New York

7     and some that did that were above the age of consent.  And you

8     need to listen to their testimony as to where they claim they

9     were and what age they were when they were there, because that

10    is critically important to the charges in this indictment.

11         And with regard to the trafficking charges, the age of

12    consent is 18.  But regardless of what Carolyn's age was at the

13    time of those charges, the evidence will not prove beyond a

14    reasonable doubt that those charges have been proven.

15         Now, the government has pinned its entire case on the

16    notion that Ghislaine enabled Epstein's bad behavior.  The

17    evidence will not support that.  There will be no eyewitnesses,

18    there may be some secondhand and thirdhand witnesses, there may

19    be witnesses who said she told me this, she told me that.  They

20    are not eyewitnesses.  They are only repeating what was told to

21    them, and you have to evaluate the credibility of who told them

22    what.

23         What you will hear are stories that are based on

24    words, and words alone.  There will not be the kind of

25    corroboration, if any corroboration, to support the charges.

1   There will not be substantive evidence that supports the

2   charges.  The exhibits that the government is going to claim

3   corroborates, will not and will not overcome their burden.

4   They will not overcome reasonable doubt.

5          And the stories of the individual accusers cannot be

6   used to corroborate other accusers' stories; they are personal

7   stories to them.  The government is trying to stitch together

8   stories of four different people, four different stories to

9   support a pattern.  The only pattern that you will see here is

10  the success of those four people getting big money rewards from

11  the Epstein fund.

12         Each accuser's story is thin; it lacks support.  It's

13  like taking paper cutouts and putting them together, cutouts

14  that can't stand on their own, even linked together cannot

15  substantiate and stand and will not support the charges here

16  beyond a reasonable doubt.

17         I ask you to scrutinize closely all of the evidence,

18  all of the exhibits, all of the documents, but pay particular

19  attention to those four accusers.  They have been impacted by

20  lawyers, by media, by things they have read and things they

21  have heard, and by money, big bucks.  And I ask you again, in

22  evaluating them and listening to them, focus on memory,

23  manipulation, and money.  Evaluate each of them for

24  credibility, plausibility, reliability.

25             (Continued on next page)

LBTCMAX4

1          MS. STERNHEIM:  Until now, even though they got money

2     from a fund, their words have been untested and unchallenged,

3     and for the first time, they are being put to the test, whether

4     they support the charges beyond a reasonable doubt.

5          You have heard about the presumption of innocence.

6     That is what every person charged with a crime is cloaked in.

7     No jury can remove that unless the government proves each and

8     every element of each count beyond a reasonable doubt and they

9     won't be able to do that, they won't be able to meet their

10    burden.

11         As I said before, Jeffrey Epstein is not here,

12    Ghislaine is here, but you have the power at the end of this

13    case after we've come back and present argument to show how the

14    government has not met its burden.  You have the power to

15    return a verdict of not guilty for Ghislaine Maxwell.

16         Thank you.

17         THE COURT:  Thank you, Ms. Sternheim.

18         Let's take a 10-minute break for the jury and we'll

19    have the government call its first witness.

20         Members of the jury, 10-minute break.  Thank you.

21         (Continued on next page)

22

23

24

25

LBTCMAX4

```
1              (Jury not present)
2              THE COURT:  You may be seated.  Matters to take up?
3              MS. COMEY:  No, your Honor.
4              THE COURT:  Ms. Sternheim?
5              MS. STERNHEIM:  No.
6              MR. EVERDELL:  Your Honor, just on choreography again,
7     we are going to put the binder up when cross begins as a backup
8     option.  When the time comes to hand the jury the folders --
9              THE COURT:  Are we going to get to cross?  How long is
10    the direct?
11             MS. COMEY:  It's at least an hour.
12             Your Honor, that does remind we, we have binders of
13    sealed exhibits for the jurors.  I do anticipate looking at one
14    sealed exhibit during the direct testimony.  May we pass those
15    binders out while the jurors are on a break or would you prefer
16    that we wait until that point in the testimony?
17             THE COURT:  So, it's a binder that has multiple
18    exhibits, but one that you anticipate and the defense has it?
19             MS. COMEY:  Yes, your Honor, the defense has seen this
20    binder.
21             THE COURT:  Any objection, Mr. Everdell?
22             MR. EVERDELL:  No, your Honor.
23             THE COURT:  So you want to put the binders under the
24    chairs?
25             MS. COMEY:  Yes, please, your Honor.
```

LBTCMAX4

1      MR. EVERDELL:  As long as the Court instructs the

2  jurors not to --

3      THE COURT:  I'll tell them that I may direct them to

4  open binders under the chairs and they should not do so until

5  directed.  Okay?

6      MS. COMEY:  Yes, your Honor.  Thank you.

7      THE COURT:  Other exhibits, nonsealed exhibits, those

8  will be shown on the screen?

9      MS. COMEY:  That's correct, your Honor.

10      THE COURT:  All right.  10-minute break.  Thank you.

11      (Recess)

12      THE COURT:  The jury inquired as to the holiday

13  schedule.  So, I did intend to tell them at the end of the day

14  that the plan is to sit the Monday, Tuesday, Wednesday before

15  Christmas and the Monday, Tuesday, Wednesday before New Year's

16  Eve and New Year's, and that I'll fill them in on any

17  adjustments to the schedule as we go and give them as much

18  notice as I can.

19      I also intend to tell them that I'd like them to get

20  here at 9:00 and the jury room will be open earlier than that

21  and breakfast and the like so that we can start promptly at

22  9:30.  And counsel, I'll meet with you tomorrow, let's say

23  8:45, to make sure we can cover issues before the jury arrives.

24  I do plan to address the scheduling issue at the end of the

25  day.

LBTCMAX4

1              Matters to take up, Ms. Comey?

2              MS. COMEY:  Not from the government, your Honor.

3              THE COURT:  Mr. Everdell?

4              MR. EVERDELL:  Nothing, your Honor.

5              THE COURT:  We'll bring in the jury.

6              Ms. Comey, this will be your witness?

7              MS. COMEY:  Yes, your Honor.

8              (Continued on next page)

LBTCMAX4                          Visoski – direct

 1              (Jury present)

 2              THE COURT:  Thank you, members of the jury.  The

 3     government, in a moment, will call its first witness.  As I

 4     said, we will stop promptly at 5 o'clock.

 5              Ms. Comey, you may call your first witness.

 6              MS. COMEY:  The government calls Lawrence Visoski.

 7      LAWRENCE VISOSKI,

 8          called as a witness by the Government,

 9          having been duly sworn, testified as follows:

10              THE COURT:  You may remove your mask in the Plexiglass

11     and please state and spell your name for the record.

12              THE WITNESS:  Sure.  My name is Lawrence Paul Visoski,

13     Jr.  L-a-w-r-e-n-c-e, Paul, P-a-u-l, Visoski, V-i-s-o-s-k-i

14     junior.

15              THE COURT:  Thank you.  Ms. Comey, you may proceed.

16     DIRECT EXAMINATION

17     BY MS. COMEY:

18     Q.  Good afternoon.

19     A.  Good afternoon, Ms. Comey.

20     Q.  Do you go by any nicknames?

21     A.  Yes.

22     Q.  What nicknames?

23     A.  Larry.

24     Q.  What kind of work do you do?

25     A.  I am an airline transport pilot and a commercial instrument

LBTCMAX4                          Visoski – direct

1  rated helicopter pilot.

2  Q.  I'd like to direct your attention to the period between

3  1991 and 2019.  Who did you work for then?

4  A.  I was employed by Mr. Jeffrey Epstein.

5  Q.  What was your job title?

6  A.  I was captain during the initial part and then I also

7  handled the aircraft maintenance scheduling.

8  Q.  In other words, were you a pilot?

9  A.  I was a pilot, yes.

10  Q.  And what kind of planes did you pilot?

11  A.  We had several aircraft, Hawker Siddeley, Gulf Stream,

12  Boeings.

13  Q.  Were those Mr. Epstein's private planes?

14  A.  Yes.

15  Q.  About when were you first hired?

16  A.  I believe I was hired July of 1991.

17  Q.  Where were you hired?

18  A.  In Columbus, Ohio.

19  Q.  Who hired you?

20  A.  Mr. Epstein.

21  Q.  How did you come to be hired by Mr. Epstein?

22  A.  Actually, my current employment, while in Columbus, Ohio,

23  they were selling the aircraft, and the flight department that

24  was based right next to me at Columbus Airport, their chief

25  pilot knew of an opportunity of Mr. Epstein purchasing

LBTCMAX4                          Visoski - direct

1   aircraft, so I interviewed with Mr. Epstein.

2   Q.  And after the interview, were you hired?

3   A.  Yes, I was.

4   Q.  Who else, if anyone, was hired at the same time you were?

5   A.  Another pilot, David Rogers.

6   Q.  How did you know him?

7   A.  We were actually working together in the previous job.  So

8   we actually transferred together as a team.

9   Q.  How long did Mr. Rogers work for Mr. Epstein?

10  A.  Same duration as myself.

11          MS. COMEY:  Ms. Drescher, could we please pull up

12  Government Exhibit 112 for the witness, the Court, and the

13  parties.

14  Q.  I'm sure showing you what's marked for identification as

15  Government Exhibit 112.  Do you recognize that?

16  A.  Yes, I do.

17  Q.  Who is depicted in that exhibit?

18  A.  That's Mr. Jeffrey Epstein.

19          MS. COMEY:  Your Honor, the government offers Exhibit

20  112 in evidence.

21          MR. EVERDELL:  No objection.

22          THE COURT:  Without objection, Government Exhibit 112

23  is received and may be published.

24          (Government's Exhibit 112 received in evidence)

25          MS. COMEY:  Thank you.  I'd ask we please publish it,

LBTCMAX4                        Visoski - direct

1    Ms. Drescher.

2    Q.  Mr. Visoski, about how old was Mr. Epstein when you first

3    met him in 1991?

4    A.  I believe he was 38 years old.

5            MS. COMEY:  We can take that down.  Thank you,

6    Ms. Drescher.

7    Q.  What were your job responsibilities when you were first

8    hired by Mr. Epstein?

9    A.  When I was first hired by Mr. Epstein, I was captain on the

10   aircraft, as well as -- I mentioned I took care of the aircraft

11   maintenance because I'm also a licensed aircraft mechanic.  So

12   I took care of the maintenance, as well, on the aircraft.

13   Q.  Did you also fly the planes?

14   A.  I also flew the planes as captain, yes, ma'am.

15   Q.  I'd like to focus on the period between 1994 and 2004.

16   During that 10-year period, about how often did you fly

17   Mr. Epstein's private planes?

18   A.  It was pretty much every four days we were on the road

19   flying somewhere.

20   Q.  Was there a set schedule during that period?

21   A.  No set schedule.

22   Q.  During that same period, where did you fly to most often

23   for Mr. Epstein?

24   A.  We mainly transported him between his homes.  He had

25   several locations.  So we were pretty much on a regular -- not

1    a regularly scheduled, but we flew Palm Beach, to New York, to

2    St. Thomas, to Santa Fe, New Mexico, as well as Paris, France.

3    Q.  Again, focusing on the period between 1994 and 2004, who,

4    if anyone, gave you notice of when Mr. Epstein's plane was

5    going to depart?

6    A.  It would have been several people.  Number one, Mr. Epstein

7    would call directly and notify, as well as Ms. Maxwell or any

8    other secretary or assistant in the office that had information

9    about an impending flight to give us heads up or give me heads

10   up about a flight.

11   Q.  Who was Ms. Maxwell?

12   A.  Ghislaine Maxwell was one of the assistants in the office

13   for Mr. Epstein.

14   Q.  About when did you first meet Ms. Maxwell?

15   A.  Probably was shortly after I got hired in July of '91.  So

16   it was later on in '91, to generalize it, we're going back a

17   little ways, but it was late in '91.

18   Q.  What did Ms. Maxwell look like when you first met her?

19   A.  She was approximately five-foot-eight, dark hair color, and

20   she has a British accent.

21   Q.  About how old was Ms. Maxwell when you met her in 1991?

22   A.  She was 30 years old.

23   Q.  About how often did you interact with Ms. Maxwell during

24   your time working for Mr. Epstein?

25   A.  We interacted quite often, interacted.  She was mostly on a

1    lot of the flights.  She would also assist with scheduling.  So

2    we'd interacted quite often.

3    Q.  At some point during your employment with Mr. Epstein, did

4    you notice that Ms. Maxwell was spending less time flying on

5    Mr. Epstein's planes?

6    A.  Yes.

7    Q.  About when was that?

8    A.  It was more in the mid 2000s, 2004-5ish.

9    Q.  Between the period when you met Ms. Maxwell in 1991 and

10   when she was less frequently on flights in about 2004 or 2005,

11   how, if at all, did Ms. Maxwell's hairstyle change?

12   A.  It changed frequently like most females.  It changed with

13   the hairstyle of the time.  So it was short and sometimes long.

14   Q.  Would you recognize Ms. Maxwell if you saw her again today?

15   A.  Yes.

16   Q.  Looking around the courtroom here today, do you see her?

17   A.  Yes, I do.

18   Q.  Would you please point her out and identify an article of

19   clothing she's wearing?

20   A.  Ms. Maxwell is over in the far corner with the white

21   sweater on and the dark hair.

22          MS. COMEY:  Would the record please reflect, your

23   Honor, that the witness has identified the defendant.

24          THE COURT:  Without objection, it so reflects.  Thank

25   you.

LBTCMAX4                          Visoski - direct

1              MS. COMEY:  Ms. Drescher, could we please pull up

2      Government Exhibit 115.

3      Q.  Would you please take a look at this exhibit, Mr. Visoski,

4      and tell us if you recognize it.

5      A.  Yes.

6      Q.  Who is depicted in this exhibit?

7      A.  That is Ghislaine Maxwell.

8              MS. COMEY:  Your Honor, the government offers this

9      exhibit in evidence.

10             MR. EVERDELL:  No objection.

11             THE COURT:  Without objection, Government Exhibit 115

12     is admitted and you may publish.

13             (Government's Exhibit 115 received in evidence)

14             MS. COMEY:  Thank you, your Honor.

15             Ms. Drescher I'd ask we please publish this exhibit.

16             And now I'd like to turn to Government Exhibit 111,

17     please, just for the witness, Ms. Drescher, and the parties and

18     the Court.

19     BY MS. COMEY:

20     Q.  Do you recognize the person in this exhibit?

21     A.  Yes, I do.

22     Q.  Who is that?

23     A.  That is also Ms. Ghislaine Maxwell.

24             MS. COMEY:  Your Honor, the government offers this

25     exhibit in evidence.

1            MR. EVERDELL:  No objection.

2            THE COURT:  Without objection, Government Exhibit 111

3     is admitted.  You may publish.

4            (Government's Exhibit 111 received in evidence)

5            MS. COMEY:  Thank you.  Ms. Drescher, I'd ask that we

6     please publish this.  And we can take that down.  Thank you,

7     Ms. Drescher.

8     BY MS. COMEY:

9     Q.  Mr. Visoski, you mentioned that Ms. Maxwell worked for

10    Mr. Epstein between approximately 1994 and 2004.  Based on your

11    observations of Ms. Maxwell, what was her role as an employee

12    for Mr. Epstein?

13    A.  She managed the households.  She was involved, to my

14    knowledge, in decorating, hiring household staff.  During that

15    time period, Mr. Epstein was quite -- was acquiring quite a lot

16    of residences and quite large residences.  So it took a lot to

17    undertake of managing and hiring and decorating, et cetera.

18    Q.  Focusing on the period between 1994 and 2004, how would

19    Ms. Maxwell, Mr. Epstein, or another assistant let you know

20    about an upcoming flight for one of Mr. Epstein's planes?

21    A.  Since you're going back so far in the '94s, I believe that

22    was before cellphones even.  So when I first got hired, we were

23    issued pagers, and at that point, the office would page us and

24    we would call in for the message.  Then I guess later on in the

25    '90s when cellphones came to be, we were issued cellphones or I

1   was issued a cellphone.

2   Q.  During that same period between 1994 and 2004, how much

3   notice would you typically receive before a flight on one of

4   Mr. Epstein's planes?

5   A.  It was typically short notice.  It could be a day notice.

6   Probably -- a day notice at least, sometimes shorter notice,

7   but it was -- it was short notice.

8   Q.  Again, focusing on that same period between 1994 and 2004,

9   based on your observations of Ms. Maxwell and Mr. Epstein, did

10  they appear to have a personal relationship?

11  A.  From what I could see, I thought it was more personal than

12  business, yes.

13  Q.  What did you observe, for example, that gave you that

14  impression?

15  A.  I guess it's the way you would talk to another person if

16  you were closer.  It was more of a smalltalk as far as thinking

17  that they were together as opposed to, you know, boss or not.

18  But it was just a conversation that I saw, really.

19  Q.  About how long did that romantic relationship last from

20  what you observed?

21  A.  It probably went to the 2000s.  Yeah, about the 2000s.  I

22  wouldn't even categorize romantic, but more couplish than

23  anything else.  I don't think I ever witnessed them kiss or

24  hold hands kind of thing.

25  Q.  To your knowledge, did Mr. Epstein only fly by private

1   plane between 1994 and 2004?

2   A.  Mostly private -- the private jet.  The only time that he

3   would take the airlines was when the Concorde was flying.  And

4   typically, he would take a Concorde from New York to Paris, but

5   otherwise anytime else, it was mostly private.

6   Q.  How about Ms. Maxwell, during that same period, to your

7   knowledge, did she only fly on Mr. Epstein's private planes?

8   A.  She flew on the private planes.  And if memory serves, she

9   did ride the airlines, as well.  And then, it was probably in

10  the late 1990s, she also had an option on a quarter share or a

11  private -- or a quarter ownership of a private jet, as well.

12  They call it a quarter share.

13  Q.  What did Ms. Maxwell tell you about that?

14  A.  That it was her jet, which, in fact, it was, because she

15  was partial owner of the jet and she had access to it with

16  notice.

17  Q.  Could you explain the difference between flying on a

18  private plane and flying commercially.

19  A.  Well, the best advantage is you leave when you want.

20  Otherwise, flying privately, security is much less.  You don't

21  have TSA, you don't have x-rays, you come and go as you please,

22  pretty much.  Some airports even let you drive your car

23  directly onto the ramp next to the aircraft and unload.  So

24  it's a lot more freedom flying private.

25  Q.  Typically, what, if any, interactions did you have with

1   passengers on Mr. Epstein's private planes?

2   A.   My interaction would be mostly when they either boarded or

3   exited the airplane.  I would assist with loading luggage.  So

4   my interaction was brief.  Most of my duties were obviously up

5   in the cockpit.

6   Q.   How, if at all, did you learn the names of passengers on a

7   particular flight on one of Mr. Epstein's planes?

8   A.   It was mainly not a priority to get a name, but we would

9   try to be as accurate as we could.  We would -- Mr. Epstein,

10  Ms. Maxwell, or even any of these secretaries at the office

11  would say, you know, so many people are going on the aircraft.

12  It wasn't as much important as a pilot knowing that how many

13  people were going as opposed to specifying the name if it was a

14  domestic flight.  If it was an international flight, I would

15  need their names, et cetera.

16  Q.   Did you learn the name of every single passenger who flew

17  on Mr. Epstein's planes?

18  A.   No.

19  Q.   Why not?

20  A.   Like I said, it wasn't a priority.  I tried to get their

21  names.  Typically, it was usually the same people that flew, so

22  I recognized their names with the first introduction.  But it

23  just -- it wasn't convenient to get it.  That wasn't my job to

24  jot down every person that flew on the aircraft.

25  Q.   What, if any, of Mr. Epstein's residences did you visit

LBTCMAX4                          Visoski - direct

1    during your employment with him?

2    A.  I'm sorry.  You said which residence?

3    Q.  Which residences did you visit, yes.

4    A.  All of them.

5    Q.  Would you please list the ones that you remember.

6    A.  I would start in New York.  He has a townhouse in New

7    York -- Manhattan, Palm Beach, Florida, and then a ranch in

8    Santa Fe, New -- or just south of Santa Fe, New Mexico.

9    Actually Stanley, New Mexico.  And actually an apartment in

10   Paris.  And then he also acquired an island in St. Thomas U.S.

11   Virgin Islands, and then later on purchased a second island

12   that adjoined, that's next door to the island in St. Thomas.

13           I think I covered them all.

14   Q.  I'd like to walk through each of those, please.  Starting

15   with Palm Beach, about when do you remember first visiting

16   Mr. Epstein's Palm Beach residence?

17   A.  That would have been actually on my first trip with

18   Mr. Epstein.  So that would have been 1991.

19   Q.  And in what state is Palm Beach located?

20   A.  That is Palm Beach, Florida.

21   Q.  About how often did you visit the Palm Beach residence

22   during your employment with Mr. Epstein?

23   A.  I would visit the residence -- it would seem almost on

24   every trip.  I would either -- there has been occasion where

25   I'd either go pick up luggage, drop off excess luggage.  And

LBTCMAX4                        Visoski - direct

1   there is other occasion that I've actually done some

2   audio/video work at the home.

3           MS. COMEY:  I'd like to pull up, Ms. Drescher, please,

4   what's been marked for identification as Government Exhibit

5   202.

6   Q.  Mr. Visoski, do you recognize this?

7   A.  Yes, I do.

8   Q.  What is it?

9   A.  That is the garage of the Palm Beach house that Mr. Epstein

10  owns.

11  Q.  Is this a fair and accurate depiction of a portion of the

12  exterior of Jeffrey Epstein's Palm Beach residence?

13  A.  Yes, it is.

14          MS. COMEY:  Your Honor, the government offers this

15  exhibit in evidence.

16          MR. EVERDELL:  No objection.

17          THE COURT:  Government Exhibit 202 is admitted.  You

18  may publish it.

19          (Government's Exhibit 202 received in evidence)

20          MS. COMEY:  Thank you.  Ms. Drescher, could we please

21  publish that.

22          I want to turn now please, Ms. Drescher, to Government

23  Exhibit 212.

24  BY MS. COMEY:

25  Q.  Mr. Visoski, do you recognize this?

1    A.  Yes, I do.

2    Q.  What is it?

3    A.  That is the pool area of Mr. Epstein's Palm Beach house.

4    Q.  Is this a fair and accurate depiction of another portion of

5    the exterior of Mr. Epstein's Palm Beach residence?

6    A.  Yes, it is.

7              MS. COMEY:  Your Honor, the government offers this in

8    evidence.

9              MR. EVERDELL:  No objection.

10             THE COURT:  Government Exhibit 212 is admitted is and

11   you may publish.

12             (Government's Exhibit 212 received in evidence)

13             MS. COMEY:  Thank you, your Honor.

14             Ms. Drescher, may you please publish this for the

15   jury.

16   Q.  Mr. Visoski, could you please describe the interior of

17   Mr. Epstein's Palm Beach residence.

18   A.  Yes.  If we start at the front door, you walk into the

19   front door, there is an entrance courtyard area.  Once you're

20   inside the house, there is just obviously a large waiting area.

21             I guess it's easy, the first day, if you just walk to

22   your left, there is a half of staircase or half a circle

23   staircase that leads you to the upstairs bedrooms.

24             Once you get upstairs, you walk straight down the

25   hallway, there is a master bedroom located at the end of that

LBTCMAX4                         Visoski - direct

1    hallway.

2            And then to the left, if you -- once you got up to the

3    top of the staircase, there is approximately three guest

4    bedrooms.

5            Now we're back downstairs at the entrance door.  If

6    you continue to walk straight ahead from the front entrance

7    door, it led you into a Florida room, which, in New York, you

8    would call a family room, but it was a Florida room.  Once you

9    came back from the Florida room from the entrance door and made

10   a left turn, that brought you into the kitchen that had a --

11   obviously a Butler's pantry, which is a large area to store

12   excess kitchenware.  And then the kitchen -- and then the

13   kitchen led out to the three-car garage, as you saw in the

14   photo.

15           Then we walk back into the entranceway by the main

16   door and you take the right turn.  That took you to the living

17   room, which also led out to the back patio pool area that you

18   saw in the photo.

19           Once you got to the pool area, then you made a left

20   turn, there was a pool cabana that had Mr. Epstein's gym and

21   his personal office inside there.

22   Q.  How many structures were on Mr. Epstein's Palm Beach

23   property?

24   A.  There was actually three structures.  If I went back to the

25   kitchen and walked out the garage, once you got out the garage,

1  later on, it was probably in the 2000s, so long ago that he

2  built a structure that would actually house the Butler and the

3  household staff that was actually separated.

4          So, to answer your question, there was three

5  structures on the property.

6  Q.  And those were the cabana, the main house, and the house

7  for the staff?

8  A.  That is correct.

9  Q.  When you picked up luggage for Mr. Epstein at the Palm

10  Beach residence, what airport did you then take it to?

11  A.  When we flew to Mr. Epstein's house in Palm Beach, we just

12  used the West Palm Beach International Airport.

13  Q.  Between 1994 and 2004 when you were flying out of the Palm

14  Beach International Airport, how did the passengers get to

15  Mr. Epstein's plane?

16  A.  At the West Palm Beach airport, passengers are allowed to

17  drive their vehicles right up to the aircraft and exit.  They

18  would pull up to the security gate and actually tell them the

19  aircraft number.  And then, at that time, the gate would open

20  and the driver would be able to drive the car directly to the

21  aircraft entrance front door.

22  Q.  As the pilot on the plane, were you able to see the car

23  with the passengers pull up to the plane before a flight?

24  A.  I could see the driver and perhaps maybe the passenger.

25  99 percent of cars in Florida have tinted windows, so I

1  probably couldn't see the passengers as well, but depending

2  upon how the car approached the aircraft, if I'm sitting in the

3  cockpit looking down, I would be able to see the driver of the

4  car.

5  Q.  During that same period between 1994 and 2004, who do you

6  remember that you saw driving passengers up to Mr. Epstein's

7  plane in Palm Beach?

8  A.  There were probably several.  Typically, it was the house

9  manager at the time that would drive Mr. Epstein to the

10 airplane.  One name comes to mind would be Juan Alessi, and

11 another would have been one of the house managers, Janusz.

12 There were probably a couple more that I'm just drawing a blank

13 on their names right now.

14 Q.  That's fine.  Now switching gears to New York, about when

15 do you remember first visiting Mr. Epstein's New York

16 residence?

17 A.  Well, he first had a home on 69th Street, so it was in 1991

18 that I went to his very first residence, and then it was

19 probably a year or maybe two years later on that he had

20 purchased a different townhouse or brownstone, they call it, I

21 guess, on 71st Street.  So it was immediately with my

22 employment I visited the home.

23 Q.  Thank you.  I'd like to go back to something you said

24 earlier about the Palm Beach airport.  You referenced a house

25 manager as a driver.  What is a house manager?

A.  A house manager would be in charge of all the mechanical at
the house.  Could go as far as grocery shopping.  It's anything
involved with the house.  Scheduling maintenance, lawn care.
If there was a water leak, he would call the plumber.  He was
in charge of the home.

Q.  And who were the two house managers you remember driving
passengers to Mr. Epstein's plane in Palm Beach between 1994
and 2004?

A.  The first one that comes to mind is Juan Alessi.  And then
I know there was Janusz, also worked at the house, but I don't
remember the timeframe that Janusz was there.

Q.  Thank you.  Going back to New York, I'd like to focus on
the second residence you mentioned.  What borough was that
residence in?

A.  That was Manhattan.

Q.  And what was the address of that residence?

A.  It was 9 East 71st Street.

Q.  About how often did you visit that 9 East 71st Street
residence during your employment with Mr. Epstein?

A.  It was pretty much every trip that we had to Manhattan or
New York.

Q.  For what purpose did you go to that residence?

A.  Typically, it was to drop off or pick up luggage before a
flight.  It certainly saves time for the passengers.  So that
was the whole idea of picking up luggage early.  And then I

LBTCMAX4                           Visoski - direct

1    also set up audio/video equipment at that residence.

2              MS. COMEY:  Ms. Drescher, could we please pull up

3    Government Exhibit 932 and then Government Exhibit 704 and show

4    both of those to the witness.

5    Q.  Mr. Visoski, do you recognize these exhibits?

6    A.  Yes, I do.

7    Q.  What is depicted in both of these?

8    A.  That is Mr. Epstein's brownstone at 9 East 71st Street.

9    Q.  Are these both fair and accurate depictions of the exterior

10   of Mr. Epstein's New York residence?

11   A.  Yes, they are.

12             MS. COMEY:  Your Honor, the government offers these

13   exhibits in evidence.

14             MR. EVERDELL:  No objection, your Honor.

15             THE COURT:  GX 932 and 704 are admitted and you may

16   publish.

17             (Government's Exhibits 932, 704 received in evidence)

18             MS. COMEY:  Thank you, your Honor.

19             Ms. Drescher, if we can please publish.

20   Q.  While these are up, Mr. Visoski, would you please describe

21   the interior of this residence.

22   A.  Yes.  As you --

23             THE WITNESS:  Does the jury see the photo, also?

24             THE COURT:  They do.

25   A.  As you can see the large front door with the light there,

1   as soon as you enter that -- it probably has to be a 15-foot

2   door.  As soon as you walk in that entrance door, there is some

3   steps that you walk up.

4           Once you get up to the top of the foyer, if you made a

5   left turn, there is a room which is actually round, what they

6   call a rotunda.  There is a round room that housed -- it would

7   be like a secretary's desk inside there in a type of library,

8   small library.

9           And then, when you went back into the middle of the

10  hall and went, continued across to the right, there was a

11  security room in there which housed all the TV monitors that

12  monitored all the outside activity of the house.

13          Then, once you went back into the foyer and continued

14  straight ahead and to the main lobby of the home, there was a

15  spiral staircase that wrapped around, which was probably a

16  four-story -- because that home was approximately seven

17  stories, I believe.

18          Then once you're in the foyer, the spiral staircase

19  spiraled around and brought you up to the different levels.  So

20  we're still staying on the first floor.  Once you continued

21  straight ahead, that brought you into a large living room on

22  the first floor.  And then to the right side of that living

23  room, there were a there was a smaller, normalize-size kitchen.

24  Then there was a dumbwaiter that actually went down to the

25  basement to a chef's professional kitchen so food could be

1    prepared in the basement and shipped upstairs.

2              Then you continued back to the center and we go up the

3    stairs, the second floor was pretty much a living room, to my

4    knowledge, if I remember correctly.  There was really the

5    main -- the floor was a living room.

6              And then once you went to the second and third floor,

7    you got into the master bedroom, guest bedrooms, as well.  And

8    then it wasn't until you got to the -- I believe the sixth

9    floor -- which was where the home theater was that I set up.

10   So he had a home theater on the sixth floor, and I believe that

11   also had the residence -- it was either -- it could have been

12   the sixth floor, as far as the butler's residence, as well, for

13   them to stay.

14   Q.  When Mr. Epstein was staying at this New York residence,

15   what airport did you typically fly into?

16   A.  It depended upon what aircraft we were flying.  At the

17   time, in general, between the timeframe you're talking -- was

18   this between '94 and --

19   Q.  Yes.  Thank you for clarifying.  Between 1994 and 2004.

20   A.  If it was between '94 and 2000, we would operate out of

21   Teterboro Airport.  But if it was 2000 to 2004, Mr. Epstein had

22   purchased a Boeing 727, which is a large airliner, and we

23   weren't allowed to fly that aircraft due to weight into

24   Teterboro, so we would operate out of Newark or JFK Airport

25   with that plane.

LBTCMAX4                     Visoski - direct

1    Q.  What, if any, office did Mr. Epstein have in New York City

2    that you visited between 1994 and 2004?

3    A.  He had an office on Madison Avenue and 51st Street.

4    Q.  And what borough is that located?

5    A.  That is also Manhattan.

6    Q.  About how often did you go to that office between 1994 and

7    2004?

8    A.  Probably once a week or -- I shouldn't say once a week.

9    Once a New York visit at least.

10   Q.  How often approximately were you in New York during that

11   decade?

12   A.  Probably once a week.

13   Q.  Why did you go to that office?

14   A.  Mainly when I turned in my expense report.  I also would

15   speak with other employees about upcoming trips and trying to

16   gather information about our future travel.  But it was mainly

17   to get my expense check.

18   Q.  Would you describe that office, please.

19   A.  It was located on the 4th floor of an office -- not even an

20   office building.  It was the 4th floor.  Once you got out of

21   the elevator, it was a receptionist desk.  It was a smaller

22   office.  It was a narrow, narrow entranceway.  So the

23   receptionist had a desk right there.

24           Then, if you continued straight ahead from the

25   elevator, there was a room that had approximately one, two --

1    four or five desks that had pretty much the accounting

2    department and some of other Mr. Epstein's investment personnel

3    that watched investments and such.  It was no divisions, it was

4    just an open room with desks.

5            Then you came out of that room, went past the

6    receptionist, then there was another room in the middle of the

7    hallway which had two desks in it, I believe, or maybe one

8    large desk, and that was pretty much Mr. Epstein's attorney's

9    office.

10           Then, once we came out of that and we continued down

11   the same hallway where the reception was to the end, right at

12   the end of that was Mr. Epstein's main secretary's desk.  Then

13   once you're at the end of that hallway to the left of her desk

14   was Mr. Epstein's main office, which was quite a large office.

15   Once we left Mr. Epstein's office, you're back at the

16   secretary's desk and you continued to the other side of the

17   room.  There was another large room that had one, two, three --

18   another five -- five desks.  That is -- that was more of the

19   personal assistant's room where they had a place to sit and

20   work.

21   Q.  Who do you remember having a desk in that personal

22   assistant room?

23   A.  There were several people that had desks that I remember

24   there.  I know Ms. Maxwell had a desk there.  Sarah Kellen had

25   a desk there.  There was another personal assistant, I believe,

LBTCMAX4                        Visoski – direct

1    Kimberly.  I don't quite remember her last name.  But there

2    were several personal assistants that housed –– that kind of

3    had base of operation in that room.

4            THE COURT:  Ms. Comey, it's 4:59, so I'm going to stop

5    you here for the evening.

6            Members of the jury, we're going to break for the

7    evening.  A few things to go over.

8            I know you asked Ms. Williams about the schedule.  As

9    I indicated during the jury selection process, we do anticipate

10   sitting each day.  We're going to start promptly with you at

11   9:30 in the morning, so I ask you to arrive between 9:00 and

12   9:15.  Earlier will be fine.  Ms. Williams will have the jury

13   room open for you, we'll have some breakfast items and snacks.

14   Please come by 9:00 to 9:15 or earlier so we can start promptly

15   at 9:30 and we'll sit to 5:00 again and that's our standard

16   schedule.

17           I know you asked about the holiday schedule.  The

18   current plan, as I indicated during jury selection, is that the

19   week of Christmas, we'll sit Monday, Tuesday, Wednesday.  So

20   that's the 20th, 21st, and 22nd of December, and the week of

21   New Year's we'll sit Monday, Tuesday, Wednesday, the 27th,

22   28th, and 29th of December.  That's the schedule.  If I'm aware

23   of any adjustments to the schedule, I'll let you know as soon

24   as I know.

25           I'm going to send you home asking you to please bear

LBTCMAX4                        Visoski - direct

1  in mind all of my instructions to you.  They're critically

2  important.  I appreciate your time and your patience and your

3  attention and your diligence, and I look forward to seeing you

4  tomorrow morning, and Ms. Williams will show you out.  Thank

5  you so much.

6          (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LBTCMAX4                          Visoski – direct

1              (Jury not present)

2              (In open court)

3              THE COURT:  Mr. Visoski, you may step down.  We are

4    through with you for the evening.  We will see you in the

5    morning.  Everyone may be seated.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LBTVMAX5

1           THE COURT:  All right.  Matters to take up, counsel?

2           MS. COMEY:  Not from the government, your Honor.

3           MR. EVERDELL:  No, your Honor, unless you want to talk

4   about the cross choreography.

5           THE COURT:  Sure.  That's a good idea.

6           So you will have binders --

7           MR. EVERDELL:  Yes.

8           THE COURT:  -- that will be placed under the jurors'

9   chairs.

10          MR. EVERDELL:  Let me be clear, your Honor.  We will

11  have a binder for the witness; although we are going to try to

12  use the electronics, but we'll have a binder just in case for

13  the witness.

14          THE COURT:  Right.

15          MR. EVERDELL:  And we have manila folders this big,

16  which is two documents in them, each one page, for each of the

17  jurors.  And there will come a point where I will ask the

18  jurors to look at these; but I think, similar to what we did

19  with the government binders, if we can leave them there and

20  instruct the jurors not to look at them.  And then when I use

21  them, I will show copies to the government before they open

22  them up to make sure everything is okay.  And then we can have

23  them open it up if and when the Court approves that.

24          THE COURT:  Okay.

25          And so you'll show the paper copies to the government.

LBTVMAX5

1          MR. EVERDELL:  Yes.

2          THE COURT:  I'll see and Ms. Williams will see the

3     electronic version.

4          MR. EVERDELL:  And the witness will too, yes.

5          THE COURT:  And the witness.  Right.

6          And then if permitted to display what you're showing,

7     you'll use the electronic version with a careful description of

8     exactly what page you're showing.  And to the extent you're

9     highlighting or pointing to any passage, you'll make that clear

10    so that the government can follow along.  And obviously if it

11    is something that you've moved into evidence, it will be

12    published to everyone, unless there's a redaction issue around

13    identity.

14         MR. EVERDELL:  I am going to ask to move it into

15    evidence; but they are full names of real people, so they will

16    have to be fully redacted.  The exhibit itself is just the name

17    of a person who is testifying either under a pseudonym or a

18    first name.  It's the full name.

19         THE COURT:  Okay.  So that is a sealed item entirely.

20    So that won't be shown to the public.

21         MR. EVERDELL:  Yes.

22         THE COURT:  And therefore, can't be on the screens.

23    But the government will have the paper and the rest -- and I'll

24    see and the witness will see the electronic version.

25         MR. EVERDELL:  Correct.  And we will even just have

LBTVMAX5

1    the jurors look at them in paper, because I know these jurors

2    over here, their screens may face the gallery.  So they can

3    just look at them with the folder so nothing is facing the

4    gallery.

5           THE COURT:  Okay.  So the plan is not to put it on the

6    juror screens at all.

7           MR. EVERDELL:  I'm sorry, your Honor, I think I just

8    thought of that, because of the way those jurors are facing.

9    So I think the better way to do this, at least for publishing

10    it to the jury, is to use the folders so that the documents

11    cannot be seen by anybody in the gallery.

12           THE COURT:  Okay.  And the reason we're not just doing

13    it on paper is because -- for at least for this witness is why?

14           MR. EVERDELL:  It is actually, for the large portion

15    of things we want to show, like 3500 material or other things,

16    a lot easier to show it electronically, a lot faster, I think,

17    than having a witness tab through a large binder.  We can go

18    right to the page.

19          If the witness needs other pages, we can cue those up

20    at request.  So I think it will actually promote efficiency to

21    use the electronics with these particular exhibits.  Because

22    there are names of anonymized witnesses, we have to go through

23    this extra bit of choreography.  That's it, your Honor.

24           THE COURT:  Okay.  Ms. Comey?

25           MS. COMEY:  I'll just note, your Honor, that we will

LBTVMAX5

1    have papers, so we will have to tab through the binder

2    ourselves; so there may be delays on our end.  But that process

3    is fine with us, if that's how the defense would like to

4    proceed.

5              THE COURT:  All right.  Look, if it's just a single

6    piece of paper, for example, with a name, let's just use the

7    paper.

8              MR. EVERDELL:  Yes.

9              THE COURT:  And otherwise, as I said, we'll try it

10   this way.  It sounds like there may be efficiencies, there may

11   not be, but we'll try it just with the caution that I have

12   granted anonymity.  And so given the layout of the room, I

13   don't want the -- although the names of the witnesses will be

14   known to the jurors, they should not be published to the

15   courtroom.

16             MR. EVERDELL:  We'll try and be very mindful of this,

17   your Honor.  That's why we are trying to think through this

18   carefully.  Before the cross starts, I'll put the paper binder

19   in the witness box for the witness in case paper has to be

20   used, even though that's a backup option.  And I will put the

21   manila folders under the jurors' chairs and they will be

22   instructed not to look at them until the time is appropriate.

23             THE COURT:  Okay.  And so the government has

24   binders -- are you going to collect those binders for the

25   evening?

LBTVMAX5

1              MS. COMEY:  Yes, your Honor.

2              THE COURT:  And then you'll put them back there in the

3      morning.

4              MS. COMEY:  Yes, your Honor.

5              THE COURT:  And I'm not sure if we'll get -- if we'll

6      do a break -- so it sounds like the defense should put the

7      folders underneath in the morning as well, in case we get to

8      cross before the break.  Is that okay with everyone?

9              MS. COMEY:  That's fine, your Honor.

10             MR. EVERDELL:  That's fine, your Honor.

11             THE COURT:  Okay.  Great.

12             Other matters to take up in the immediate --

13             MS. COMEY:  No, your Honor.

14             MR. EVERDELL:  Not from the defense.

15             THE COURT:  Okay.  We'll meet at 8:45 just to discuss

16     issues as we need to.  Please think through issues that may

17     come up that require discussion out of the presence of the

18     jury.  It was disappointing to have multiple sidebars during

19     openings today.  And I encourage all of us to do what we can to

20     avoid that by thinking through and raising issues in advance,

21     okay?

22             MR. EVERDELL:  Yes, your Honor.

23             THE COURT:  Good.  All right.  Thank you.  Have a good

24     evening, everyone.  I'll see you in the morning.

25             (Adjourned to November 30, 2021 at 8:45 a.m.)

```
 1                          INDEX OF EXAMINATION

 2     Examination of:                              Page

 3      LAWRENCE VISOSKI

 4     Direct By Ms. Comey  . . . . . . . . . . . . .88

 5                          GOVERNMENT EXHIBITS

 6     Exhibit No.                               Received

 7      112   . . . . . . . . . . . . . . . . . . .90

 8      115   . . . . . . . . . . . . . . . . . . .94

 9      111   . . . . . . . . . . . . . . . . . . .95

10      202   . . . . . . . . . . . . . . . . . . 100

11      212   . . . . . . . . . . . . . . . . . . 101

12      932, 704  . . . . . . . . . . . . . . . . 106

13

14

15

16

17

18

19

20

21

22

23

24

25
```