LBUCmax1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     UNITED STATES OF AMERICA,
 3
                v.                        20 CR 330 (AJN)
 4
     GHISLAINE MAXWELL,
 5
                     Defendant.           Jury Trial
 6   ------------------------------x
                                          New York, N.Y.
 7                                        November 30, 2021
                                          8:50 a.m.
 8
     Before:
 9                    HON. ALISON J. NATHAN,

10                                        District Judge

11                        APPEARANCES

12   DAMIAN WILLIAMS
          United States Attorney for the
13        Southern District of New York
     BY:  MAURENE COMEY
14        ALISON MOE
          LARA POMERANTZ
15        ANDREW ROHRBACH
          Assistant United States Attorneys
16
     HADDON MORGAN AND FOREMAN
17        Attorneys for Defendant
     BY:  JEFFREY S. PAGLIUCA
18        CHRISTIAN R. EVERDELL
          LAURA A. MENNINGER
19          -and-
     BOBBI C. STERNHEIM
20          -and-
     RENATO STABILE
21
     Also Present:  Amanda Young, FBI
22                  Paul Byrne, NYPD
                    Sunny Drescher,
23                   Paralegal, U.S. Attorney's Office
                    Ann Lundberg,
24                   Paralegal, Haddon Morgan and Foreman

25
```

LBUCmax1

1            (Jury not present)

2            THE COURT:  Looks like we have everybody.  Matters to

3    take up, counsel.

4            MS. COMEY:  Nothing from the government, your Honor.

5            MR. EVERDELL:  Nothing, your Honor, but note we have

6    put the folders under the chairs as we agreed yesterday.

7            THE COURT:  And the government has seen -- well, I

8    guess you didn't see them, but you are aware of them?

9            MS. COMEY:  We have seen the outside of the folders,

10   your Honor.

11           THE COURT:  Mr. Everdell, there are two folders.

12           MR. EVERDELL:  There is one folder with two documents.

13           THE COURT:  One folder with two documents.  And then,

14   as we discussed, he'll direct us as necessary to make sure

15   everybody can follow along.

16           I think the only thing I wanted to raise is that,

17   assuming the timing works out, I would like to speak with the

18   juror who had the trip planned, with the court reporter

19   present, of course, to see if there is additional information

20   about the ability to change that plan to make sure it's not

21   weighing on my mind.  Without objection to that?

22           MS. COMEY:  No objection, your Honor.

23           MR. EVERDELL:  No objection, your Honor.

24           THE COURT:  So if they're here a little on the early

25   side, I'll do that before, otherwise I'll do it at the break.

LBUCmax1

1        MS. STERNHEIM:  Judge, I have an issue I would prefer

2   to raise at sidebar very quickly.

3        THE COURT:  Okay.

4        (Continued on next page)

5        (Pages 123 to 125 SEALED)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LBUCmax1

```
 1              (In open court)

 2              THE COURT:  I'll note I received a report from the

 3   district executive office that, once again, today, everyone

 4   who's appearing to watch the trial is being accommodated,

 5   either in this court or in the overflow courtrooms.  There are

 6   empty seats available for everybody who wishes to observe the

 7   public trial.

 8              With that, anything else before we wait for the

 9   jurors?

10              MS. COMEY:  No, thank you, your Honor.

11              MR. EVERDELL:  No, your Honor.

12              THE COURT:  Thank you so much.

13              (Continued on next page)

14              (Pages 127 to 129 SEALED)

15

16

17

18

19

20

21

22

23

24

25
```

LBUCmax1

```
 1              (In open court)

 2              THE COURT:  I spoke to the juror with the travel plans

 3    and the information is that dates can't be changed and they

 4    can't cancel and it would be of some significant hardship.  The

 5    juror is, I think, more concerned about the spouse's reaction.

 6    At one point, they did say, "If I have to proceed, I can.  I

 7    understand."  On the other hand, they mentioned some level of

 8    distraction and concern.

 9              So, I'll hear your suggestion.

10              MR. PAGLIUCA:  Your Honor, I understood that the Court

11    was going to -- there were two options the Court was

12    considering.  One was seeing if the juror could change plans,

13    and if that didn't work, the Court was considering breaking for

14    the juror's anticipated vacation.  That's what I understood the

15    Court to say.

16              If the juror can't change the plans, our preference

17    would be, not frankly that we want to delay the trial, but my

18    preference would be to keep the juror and accommodate the

19    juror's travel plans, your Honor.

20              MS. COMEY:  Your Honor, the government's preference

21    would be to keep the trial moving, keep the trial days as

22    scheduled, and excuse the juror if those days become necessary

23    for this case.

24              THE COURT:  Just to be clear about what we're talking

25    about.  So given the holiday, we're not going to sit the 23rd
```

LBUCmax1

1   or the 24th, and it's the weekend, Christmas weekend, 25th,

2   26th.  The juror would be gone the 27th, 28th, would not make

3   sense to return for one day of that week.  So, really, it would

4   be a 10-day break in the trial.  I don't think that makes

5   sense, Mr. Pagliuca.  I know I mentioned that, but I'm not sure

6   I had that fully in mind at the time, and that's practically

7   what we would be talking about.

8          MR. PAGLIUCA:  I appreciate that, your Honor.  Again,

9   I frankly don't want to delay this trial.  The intention here

10  is, first, I don't know which juror this is, and that would

11  make a difference in my analysis here, frankly.

12         THE COURT:  I mean, to be candid, that's why I'm not

13  telling you, because -- I'm not telling either side because I

14  think under the veil of ignorance is a better place for

15  everybody to be.

16         MR. PAGLIUCA:  Let me be more specific, your Honor.

17  I'm not asking to know the specific juror, but what would make

18  a large difference to me is whether this person is in the

19  alternate pool versus the main pool of jurors.  I would have

20  less of a problem excusing the juror if the juror was in the

21  alternate pool as opposed to the main pool.  And the reason I

22  say that is we carefully exercised peremptory challenges in

23  this case, both to the main pool and the alternate pool.  Had

24  we understood that if this juror's plans couldn't be changed,

25  we would have made a different choice while the entire venire

LBUCmax1

1    was still available and we would have gone with the choice of

2    seating the one juror, the number I don't remember off the top

3    of my head, but the one juror who had dropped off of the

4    alternate pool as opposed to doing something else.  That would

5    have been the choice we would have made at that point.

6            THE COURT:  But you actually had that option with this

7    information available to you yesterday.  The government

8    supported that move of having seven alternates and you declined

9    that option.  So even with the information that we might face

10   this issue, you chose not to go that route.

11           MR. PAGLIUCA:  But, your Honor, my view, that's

12   because we understood that the Court was not going to excuse

13   the juror.  That was my clear understanding.  The transcript

14   says whatever it says.

15           THE COURT:  Fair enough.  It was not with a 10-day

16   pause in the trial in mind, and I suppose the new information

17   is the juror telling me that there is some level of distraction

18   as a result of this concern, which was not what was indicated

19   yesterday when the discussion was that they would make every

20   effort to try to move it.  Having apparently now made that

21   effort, they can't move it.

22           MR. PAGLIUCA:  I understand, your Honor.  I think my

23   position is clear and the Court will do as the Court sees fit.

24           THE COURT:  I don't want to do a 10-day break in the

25   middle of the trial.  That doesn't make sense.  I think,

LBUCmax1

1    really, the option is just to encourage them to take a last

2    shot at any effort to move it, but I think we're going to end

3    up in the same place.  I'm wishing we had kept that additional

4    juror.  I think I have to excuse the juror.

5         I'll have a discussion in which I just say one more

6    time, is there anything else to explore regarding cancellation

7    or moving it, and if the answer to that is no, I think I will

8    excuse the juror.  I'll step down.

9              (Continued on next page)

10             (Pages 134 to 136 SEALED)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LBUCmax1

```
 1              (In open court)

 2              THE COURT:  I had an additional conversation with the

 3    juror.  He was confident there was no way to move it.  He said

 4    he could cancel it, they would lose money, it was a burden, he

 5    was distracted by it, so I had to excuse juror number 58.

 6              All our other jurors are here.  They're just finishing

 7    up settling in.  So we can proceed as soon as Ms. Williams

 8    brings them out.

 9              Anything to take up?

10              MS. COMEY:  No, thank you, your Honor.

11              MR. EVERDELL:  No, your Honor.

12              THE COURT:  I think they'll be ready momentarily.  So

13    I'll sit.

14              MS. COMEY:  Your Honor, would you like the witness in

15    the witness box?

16              THE COURT:  That would be great.  Thank you.

17              (Witness present)

18              We need about two more minutes.

19              (Continued on next page)

20

21

22

23

24

25
```

LBUCmax1                        Visoski - direct

 1              (Jury present)

 2              THE COURT:  Thank you, members of the jury.  I hope

 3  you had a pleasant evening.  Thank you so much for being here

 4  ready to go on time.  I greatly appreciate it.  We will resume

 5  with the direct examination of Mr. Visoski.

 6              Mr. Visoski, I remind you are under oath.

 7              THE WITNESS:  Thank you, your Honor.

 8              THE COURT:  Ms. Comey, you may proceed.

 9              MS. COMEY:  Thank you, your Honor.

10   LAWRENCE VISOSKI, resumed.

11  DIRECT EXAMINATION CONTINUED

12  BY MS. COMEY:

13  Q.  Good morning, Mr. Visoski.

14  A.  Good morning, Ms. Comey.

15  Q.  I'd like to pick up where we left off yesterday talking

16  about Mr. Epstein's employees and his office.

17              THE COURT:  Ms. Comey, could you adjust the microphone

18  a little bit higher.

19              MS. COMEY:  Yes.  Thank you, your Honor.  Is this

20  better?

21              THE COURT:  Yes, that's better.

22              MS. COMEY:  Thank you, your Honor.

23  Q.  Mr. Visoski, I'd like to pick up where we left off

24  yesterday talking about Mr. Epstein's office and his employees.

25  A.  Yes.

```
 1   Q.  Based on your interactions with and observations of
 2   Mr. Epstein's employees, where in the hierarchy did Ms. Maxwell
 3   fall?
 4   A.  Ms. Maxwell was number 2.  It was definitely Mr. Epstein
 5   was a big number 1.
 6   Q.  What makes you say that Ms. Maxwell was the number 2 in
 7   your experience?
 8   A.  She was the one that pretty much handled most of the
 9   finance, my expenses, spending in the office.
10   Q.  What, if any, assistants did Mr. Epstein have, other than
11   Ms. Maxwell?
12   A.  As far as secretaries or personal assistants, is that what
13   you mean?
14   Q.  Personal assistants.
15   A.  He had an array of personal assistants, almost like
16   professional shoppers, because there was a lot of items that
17   needed to be purchased for all of the properties that were
18   being acquired.  So there were several people that were
19   personal assistants.
20   Q.  How about Ms. Maxwell, did she have personal assistants?
21   A.  Yes, I would consider Ms. Maxwell a personal assistant.
22   Q.  My question was, did Ms. Maxwell have her own personal
23   assistants.
24   A.  Oh, I see.  Yes, she had assistants, as well.
25   Q.  What were the names of some of the personal assistants you
```

LBUCmax1                          Visoski - direct

1   remember?

2   A.   Throughout the entire -- or we're talking 1994 to '04?

3   Q.   Yes.

4   A.   The first one that comes to mind would be Sarah Kellen.

5   Then there was another woman named Kimberly, the last name

6   escapes me.  Those are the two that are coming to mind right

7   away.

8   Q.   About when did you meet Sarah Kellen?

9   A.   It had to have been the late '90s to my recollection.

10  Q.   What did Sarah Kellen look like between when you first met

11  her and the mid 2000s?

12  A.   She looked the same except for different hair lengths and

13  maybe a little different hair color.

14        MS. COMEY:  Ms. Drescher, I would like to please pull

15  up for the witness, the parties, and the Court Government

16  Exhibits 327 and 310, please.

17  Q.   Mr. Visoski, do you recognize these?

18  A.   Yes, I do.

19  Q.   What are they?

20  A.   The photo on the left is Ms. Sarah Kellen with the green

21  dress.  And then to the right in the photo, it's actually a

22  photo of myself at the front of the aircraft.  Then there is

23  Mr. Epstein.  And that's also Sarah Kellen in the photo.

24        MS. COMEY:  Your Honor, the government offers these

25  two exhibits in evidence.

1            MR. EVERDELL:  No objection.

2            THE COURT:  Government Exhibit 327 and 310 are

3    admitted.  You may publish.

4            (Government's Exhibits 327, 310 received in evidence)

5            MS. COMEY:  Thank you, your Honor.

6    BY MS. COMEY:

7    Q.   While Ms. Drescher puts these up on the screen for the

8    jury, Mr. Visoski, could you tell us, for Government Exhibit

9    310, the photo on the right, could you tell us what we see in

10   that photo?

11   A.   In that photo, that's the one with the aircraft in it?

12   Q.   Yes.

13   A.   That appears to be a photo of -- it was probably the late

14   '90s, mid to late '90s, Mr. Epstein purchased that twin engine

15   Cessna 421, and he had a runway at the ranch.  So that photo

16   appears to be taken at the ranch at one of the ends of the

17   runway, judging by the square, you know, the asphalt bottom

18   with the square on top there, because it was a dirt runway and

19   at the end of the runway, there was an asphalt base to turn the

20   aircraft around.

21           But in the photo, obviously, it's a picture of me with

22   the luggage and Mr. Epstein and Ms. Kellen.

23           MS. COMEY:  Thank you.  We can take that down,

24   Ms. Drescher.

25           I would like to now pull up for the witness, the

LBUCmax1                    Visoski - direct

1   Court, and the parties Government Exhibits 334 and 335, please.

2   Q.  Do you recognize these, Mr. Visoski?

3   A.  Yes, I do.

4   Q.  Who do we see starting in Government Exhibit 334, the one

5   on the left?

6   A.  The one on the left is a picture of Ms. Maxwell and to the

7   right of her is a photo of Ms. Kellen.

8   Q.  How about Government Exhibit 335, who do we see in that

9   exhibit?

10  A.  The same, Ms. Maxwell on the left and Ms. Kellen on the

11  right.

12          MS. COMEY:  Your Honor, the government offers these in

13  evidence.

14          MR. EVERDELL:  No objection.

15          THE COURT:  Government 334 and 335 are admitted and

16  you may publish.

17          (Government's Exhibits 334, 335 received in evidence)

18          MS. COMEY:  Thank you, your Honor.

19          Ms. Drescher, could we please put those up for the

20  jury.  We can take those down.  Thank you.

21  Q.  Mr. Visoski, about when do you recall first visiting

22  Mr. Epstein's ranch in New Mexico?

23  A.  I believe the ranch -- his ranch was purchased in

24  approximately 1994.  I'd call it the mid '90s.

25  Q.  About how often did you visit that ranch during your

1    employment with Mr. Epstein?

2    A.  I visited that ranch every visit that Mr. Epstein had to

3    the ranch.

4    Q.  And about how often did Mr. Epstein go to the ranch?

5    A.  It wasn't that often.  Certainly not enough.  It was

6    probably, maybe five, six times a year.

7    Q.  What was that ranch called?

8    A.  It was called Zorro Ranch.

9            MS. COMEY:  Ms. Drescher, would you please pull up

10   Government Exhibit 328 for the witness, the Court, and the

11   parties.

12   Q.  Do you recognize this?

13   A.  Yes, I do.

14   Q.  What is it?

15   A.  That is a photo of the entrance driveway to Mr. Epstein's

16   main property on Zorro Ranch.

17   Q.  Is this a fair and accurate depiction of a portion of

18   Mr. Epstein's property in New Mexico?

19   A.  Yes, it is.

20           MS. COMEY:  Your Honor, the government offers this in

21   evidence.

22           MR. EVERDELL:  No objection.

23           THE COURT:  Government 328 is admitted and you may

24   publish.

25           (Government's Exhibit 328 received in evidence)

1          MS. COMEY:  Thank you, your Honor.

2          Ms. Drescher, could we please show this to the jurors.

3     BY MS. COMEY:

4     Q.   While that's up, Mr. Visoski, would you please describe the

5     ranch property that Mr. Epstein owned in New Mexico.

6     A.   The property in general, the whole --

7     Q.   Yes, please, the whole property.

8     A.   The whole property.  You started entering the ranch off of

9     Highway 41 in Stanley, New Mexico.  So you drove down a dirt

10    road approximately a half mile and you would enter an area

11    which the ranch called the Ranch Central, and that housed many

12    buildings.

13         Just to the left, there were two homes, and that was

14    mainly for the ranch staff that lived on the ranch for support.

15    So there were two homes to the left.  To the right, there was a

16    small office for the ranch.  And then you continued, you're

17    still in the Ranch Central area.  And then you went still

18    further into the ranch, probably a hundred feet.

19         And then on the right side, there was a building that

20    had rooms, there was approximately five bedrooms with a western

21    motif on the outside.  And that would be for whether it be,

22    the -- any of the guests that would have came on the aircraft

23    to stay, the chef, the pilots all still stayed there.  And then

24    it was a motel style building.

25         And then across the street from that, there was a

firehouse with a fire engine, and that also had several garages
for all the maintenance for the ranch.  And then to the right
of that, there was a greenhouse for growing vegetables, et
cetera.

           And then across the street from the greenhouse, there
was a stable with a stable area that housed -- it had to have
been 10 to 15 horses.  That was the ranch central area.

           And then you continued through Ranch Central and
continued up a dirt road approximately, I don't know, it had to
have been two or three miles and you got to a Y in the road
where if you went to the left -- I'll take you to the left
first.  Once you got to the Y in the road, you took a left and
actually you're going to pass by, during that drive, a runway
we had on the property, which, as you saw, the twin-engine
Cessna was parked on.  So we had a runway and a hangar to house
the aircraft.  So you pass the runway and you continued up the
road to -- it was called the lodge.  It was actually the first
home site that was selected to build the main house, and that
was a triple-wide trailer that also had a western faux facade
built around it.  Once you went past the triple-wide lodge, you
went about, you know, maybe a thousand yards and there was a
log cabin that was built up on the cliff, because both the
lodge and the log cabin were on cliffs that overlooked the
ravine to the north.

           And we go back to the Y in the road that brought you

LBUCmax1                          Visoski – direct

1    past the runway.  You continued up that road where you saw the

2    photo with the Z on the entrance.  That was the main entrance

3    to the main house.  And then the main house was built

4    eventually on that cliff overlooking the ravine.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    BY MS. COMEY:
 2    Q.  In total approximately how many acres was Mr. Epstein's
 3    ranch?
 4    A.  It was approximately 10,000 acres.  I know there was some
 5    state land included in it, but everybody said it was around
 6    10,000 acres.
 7    Q.  And all of the structures you just described, were they all
 8    located on that property owned by Mr. Epstein?
 9    A.  Yes.
10    Q.  Have you been inside the main house on the ranch property?
11    A.  Yes, I have.
12    Q.  For what purpose?
13    A.  Several purposes.  A lot of the times -- it was on occasion
14    I would meet with Mr. Epstein and discuss future aircraft
15    maintenance or purchases for the aircraft.  And then other
16    times would be to pick up and drop off luggage.  And that was
17    another residence that I installed a lot of the home theater
18    and audio equipment.  He was an audiophile, so he liked very
19    high-quality music; so I installed a home theater, like I had
20    done at the other properties as well.
21            MS. COMEY:  Ms. Drescher, can we please pull up
22    Government Exhibits 323 and 706 for the witness, the Court, and
23    the parties.
24    Q.  Mr. Visoski, do you recognize these?
25    A.  Yes.
```

LBUVMAX2                        Visoski - direct

1    Q.  What are they?

2    A.  Those are exterior photos of the main house at Zorro Ranch.

3    Q.  Are these fair and accurate depictions of the exterior of

4    the main house on Mr. Epstein's Zorro Ranch?

5    A.  Yes, they are.

6              MS. COMEY:  Your Honor, the government offers these in

7    evidence.

8              MR. EVERDELL:  No objection.

9              THE COURT:  Government 323 and 706 are admitted and

10   you may publish.

11             (Government's Exhibits 323, 706 received in evidence)

12             MS. COMEY:  Thank you, your Honor.

13   Q.  While Ms. Drescher shows those to the jury, I'd like to ask

14   you, Mr. Visoski, to please describe the interior of this main

15   residence.

16   A.  Okay.  As you come into the entrance, I'll take you to the

17   front door, since it's a quite large property.  You entered in

18   the front door, and I'll take it starting to the left.  If you

19   enter the main door at the front of the house, you made a left,

20   and the house was actually a square house with an open

21   courtyard in the middle that had access to the sun.  So it was

22   a -- virtually a square house that circled the courtyard in the

23   middle.

24             So we make a left, and that brought you down a

25   hallway.  And the first room you came to was the main living

1    room, which was tremendous in size; it had to have been 200

2    feet by 50 feet, and it had an extremely large picture window

3    that overlooked the ravine or the house -- where the house was,

4    you know, to take advantage of the view.  Inside that room we

5    had a tremendous stereo system that I installed.  And then you

6    came out of that living room and you continued down the

7    hallway.  At the corner of that hallway there was Mr. Epstein's

8    library with a desk in it where he spent most of his time, and

9    also housed an impressive audio system.

10        You came out of that room and that led you -- now

11   you're on the -- you're still walking down circling the house.

12   That brought you into what was the dining room for the house.

13   And he didn't use it as a dining room actually; we made that

14   into a movie theater room with a projector that came down.  So

15   that was actually the home theater of the house.  And you

16   continued through that room.  That brought you into a butler's

17   pantry.  And then from the butler's pantry, you went into the

18   main kitchen, which also had a dining room table.  Once you

19   went through the kitchen, that brought you to another room,

20   which was kind of a morning room, just a small little family

21   room off to the kitchen.

22        As you continue around, there was a staircase that

23   would -- I'll take you downstairs first.  You went downstairs.

24   And that brought you to a gym and an indoor swimming pool that

25   also led to the outside patio.  Once you came -- I'll bring you

1    back up the stairs.  We're on the main level.  And then there

2    was another staircase that brought you upstairs that housed the

3    master bedroom, as well as approximately three -- three or four

4    guest bedrooms upstairs.

5    Q.  When you first visited this ranch, was the main house you

6    just described completed?

7    A.  No, it was not.

8    Q.  About when was construction on this main house completed?

9    A.  It was under construction for a while, that's why he had

10   the triple-wide trailer to stay during the construction.  But I

11   would estimate probably late '90s, maybe 2000 is when the house

12   got finished.

13   Q.  And so in the mid to late '90s, when you visited the ranch,

14   where did Mr. Epstein stay?

15   A.  He would stay up at the lodge or the triple-wide mobile

16   home I described.

17   Q.  Could you describe what the interior of that triple-wide

18   lodge looked like.

19   A.  Sure.  As I mentioned, it was a triple-wide trailer that

20   had a wood western facade built around it to make it a little

21   more attractive than just a mobile home.  Once you went in the

22   front door, there was a large wooden deck in the front of the

23   house like you would see in a western movie.  And you went in

24   the front door, you walked into the living room which had a

25   fireplace to the left.

1          And then if you continued past the living room and

2     made your left turn to the left side of the home, that was the

3     master bedroom.  And then you came back into the living room

4     you continued straight ahead from the entrance door, that

5     brought you into a kitchen that led to a large outside deck

6     that overlooked the ravine.  And then you came back into the

7     kitchen, and to the right side of the house there were -- there

8     was a small -- or a family room to the right side and also

9     there was two guest bedrooms there.

10    Q.   Did the inside of this structure look like a trailer?

11    A.   Not the way it was decorated.  It was very high-end.

12    Q.   What airport did you fly to when Mr. Epstein was staying on

13    this ranch?

14    A.   Typically, depending upon what aircraft he selected, if we

15    were flying the Gulfstream, which is a smaller, lighter

16    aircraft, we would use Santa Fe, New Mexico Airport.  And if we

17    were flying the Boeing, which is a large airliner, we would fly

18    into Albuquerque due to weight restrictions.

19    Q.   I'd like to turn now to Mr. Epstein's Paris property.

20         About when do you remember first visiting

21    Mr. Epstein's apartment in Paris?

22    A.   It had to have been maybe the late '90s, Ms. Comey.  I

23    couldn't really narrow it down, but it had to have been in the

24    '90s, I would -- yes.

25    Q.   About how many times did you visit that apartment while

1    working for Mr. Epstein?

2    A.   Not as much as the other properties.  On occasion I would

3    go to pick up luggage and drop off luggage at that place.  But

4    I would almost say every trip, but we didn't go to Paris that

5    often, so I'll even go as far as saying most every trip.

6    Q.   Other than to pick up luggage, did you go to that apartment

7    for any other reason?

8    A.   Yeah.  I also did some audio work on the home theater that

9    he had in the Paris apartment as well.

10            MS. COMEY:  Ms. Drescher, could we please pull up

11   Government Exhibit 705 for the witness, the Court, and the

12   parties.

13   Q.   Mr. Visoski, do you recognize this?

14   A.   Yes.

15   Q.   What is it?

16   A.   That is the exterior of the Paris apartment.

17   Q.   Is this a fair and accurate depiction of the exterior of

18   the building in which Mr. Epstein's apartment was located?

19   A.   That is correct, yes, it is.

20            MS. COMEY:  Your Honor, the government offers this in

21   evidence.

22            MR. EVERDELL:  No objection.

23            THE COURT:  GX-705 is admitted and you may publish.

24            (Government's Exhibit 705 received in evidence)

25            MS. COMEY:  Thank you, your Honor.

1              Ms. Drescher, would you please show that to the jury.

2      Q.  And while that's up, Mr. Visoski, would you please describe

3      what the inside of this apartment looked like.

4      A.  I believe it was on the second or third floor, we're going

5      back a little ways.  But it was -- once you went in the front

6      door, it was a little on the unique side.  It was a very long

7      type of apartment.  Once you went in the front door, there was

8      an entrance foyer.  And if you continued straight through that

9      foyer, it would take you into the kitchen.  And then to the

10     left of the kitchen, I think, led down to a hallway with some

11     guest bedrooms.

12             Once you came back to the kitchen, to the right there

13     was a dining room.  And then to the right of the dining room

14     there was Mr. Epstein's office where he had a home theater set

15     up in his office as well.  And then once you came out back into

16     the foyer, I believe if you went to the right, it took you to

17     either more guest bedrooms, and definitely the master bedroom

18     was down the hallway.

19     Q.  When Mr. Epstein stayed at this apartment, what airport did

20     you fly out of?

21     A.  We flew into Paris-LeBourget.

22     Q.  Turning now to Mr. Epstein's island, about when did you

23     first visit that island?

24     A.  It was approximately mid to late -- late '90s.

25     Q.  And what was that island called?

LBUVMAX2                          Visoski - direct

1    A.   Little St. James.

2    Q.   About how often did you visit Little St. James during your

3    employment for Mr. Epstein?

4    A.   Every time we went to the St. Thomas U.S. Virgin Islands,

5    where the island was located.

6    Q.   About how often did you fly Mr. Epstein to the U.S. Virgin

7    Islands?

8    A.   Had been every week, every ten days, if we weren't

9    elsewhere in the world, but it was a regular destination.

10   Q.   And why did you go to the island each time Mr. Epstein went

11   to the Virgin Islands?

12   A.   I also flew the helicopter.  So when Mr. Epstein would

13   arrive at St. Thomas main airport, I would go get the

14   helicopter and then pick him up and the passengers and fly them

15   to Little St. James Island, as well as, you know, taking

16   luggage and also picking up luggage at the island.  And also a

17   very large home theater was installed at that residence as

18   well.

19   Q.   Did you install large home theaters in all of Mr. Epstein's

20   residences?

21   A.   Yes, I did.

22   Q.   Other than helicopter, how else could you get to Little St.

23   James?

24   A.   The other option would be boat.

25            MS. COMEY:  Ms. Drescher, can we please pull up

1    Government Exhibit 346 for the witness, the Court, and the

2    parties.

3    Q.  Mr. Visoski, do you recognize that?

4    A.  Yes.

5    Q.  What is it?

6    A.  That is an aerial view of Little St. James Island.

7    Q.  And does that fairly and accurately depict Little St. James

8    Island?

9    A.  Yes, it does.

10            MS. COMEY:  Your Honor, the government offers this in

11   evidence.

12            MR. EVERDELL:  No objection.

13            THE COURT:  Government 346 is admitted.

14            You may publish.

15            (Government's Exhibit 346 received in evidence)

16            MS. COMEY:  Thank you, your Honor.

17            We can take that down.  Thank you, Ms. Drescher.

18            I'd like to go now to Government Exhibit 308 for the

19   witness, the Court, and the parties please.

20   Q.  Mr. Visoski, do you recognize this?

21   A.  Yes, I do.

22   Q.  What is it?

23   A.  That is an aerial view of the main property on Little St.

24   James Island.

25   Q.  Is this a fair and accurate depiction of a portion of

1    Mr. Epstein's private island?

2    A.  Yes, it is.

3           MS. COMEY:  Your Honor, the government offers this in

4    evidence.

5           MR. EVERDELL:  No objection.

6           THE COURT:  Government 308 is admitted.

7           You may publish.

8           (Government's Exhibit 308 received in evidence)

9           MS. COMEY:  Thank you, your Honor.

10   Q.  And while Ms. Drescher puts that up for the jury,

11   Mr. Visoski, could you tell us what we see in this photograph

12   please?

13   A.  That is the main house which appears to be -- and it's

14   located on the north side of the island.  But it's a photo of

15   the main house structure on the island.

16          MS. COMEY:  I'd like now, please, to go to Government

17   Exhibit 326 for the witness, the Court, and the parties.

18   Q.  Mr. Visoski, do you recognize this?

19   A.  Yes, I do.

20   Q.  What is it?

21   A.  That is also an aerial view of Little St. James Island's

22   main property home site.

23   Q.  And is this a fair and accurate depiction of a portion of

24   Jeffrey Epstein's private island?

25   A.  Yes, it is.

1            MS. COMEY:  Your Honor, the government offers this in

2    evidence.

3            MR. EVERDELL:  No objection.

4            THE COURT:  GX-326 is admitted.  You may publish.

5            (Government's Exhibit 326 received in evidence)

6            MS. COMEY:  Thank you, your Honor.

7    Q.  And while Ms. Drescher puts this up for the jury,

8    Mr. Visoski, would you please tell us what we see in this

9    photograph.

10   A.  As far as describing the home or the property?

11   Q.  Yes.  Could you tell us what we see in the top right-hand

12   corner first and then tell us what we're seeing on the

13   property.

14   A.  Oh, gotcha.

15           The top right-hand corner was the boat dock, if you

16   were to arrive by boat.  So that was the entrance for guests to

17   arrive by boat.  And then if you continued down the highway

18   there, you can't see the helipad, the helipad is still south of

19   that structure.  Once you were there, you could take -- you

20   would walk up to the main house up on the top of the hill.

21   Q.  Thank you.

22           MS. COMEY:  We can take that down.

23           And now, Ms. Drescher, can you please pull up

24   Government Exhibit 703 for the witness, the Court, and the

25   parties.

LBUVMAX2                          Visoski – direct

1   Q.  Mr. Visoski, do you recognize this?

2   A.  Yes, I do.

3   Q.  What is it?

4   A.  That is a photo of Little St. James Island.

5   Q.  Is this a fair and accurate depiction of an aerial view of

6   the entirety of Little St. James Island?

7   A.  Yes, it is.

8           MS. COMEY:  Your Honor, the government offers this in

9   evidence.

10          MR. EVERDELL:  No objection.

11          THE COURT:  Government's 703 is admitted.

12          You may publish.

13          (Government's Exhibit 703 received in evidence)

14          MS. COMEY:  Thank you, your Honor.

15  Q.  While Ms. Drescher puts this up for the jury, Mr. Visoski,

16  I want to ask you, did Mr. Epstein own this entire island that

17  we see here?

18  A.  To my knowledge, yes.

19  Q.  And could you walk us through in a little more detail a

20  description of the island and the property on it.

21  A.  Okay.  I guess I'll start at the top of the photo.  There

22  was a building there that was a library.  It used to have a

23  gold dome on it, but that was actually a library inside that

24  building.  And then we come down to the right side of the

25  photo, you could see a small pool on the right side of the

LBUVMAX2                          Visoski - direct

1    photo which was -- which they call the flag -- or the flagpole

2    pool, which was a tremendous-size pool which also had a cabana

3    built.  And that was another office that Mr. Epstein spent a

4    lot of his time working on the phone and computers.

5            And then we're coming down through the beach area.

6    Right dead center of the island you'll see a little blue roof,

7    that was the gym.  And inside the gym had a tremendous audio

8    system for working out.  There was a large gym inside there.

9    And then you come down further from -- further down -- or

10   you're heading down back to the main house structure, to the

11   left you see a wide open grass area, that was the helipad that

12   if we -- if you arrived by helicopter.

13           Coming further down from that, there are several

14   buildings to the left, you see a blue one, a white one.  That

15   housed all of the construction equipment, tractors, dump trucks

16   and such, support equipment for the island.  And then we're

17   going to come down further from that to the right.  We'll come

18   all the way down to the main house structure which also has a

19   large swimming pool.

20           The house was quite unique.  It was pretty much a home

21   that was exploded out, that each building was a room of a

22   house; that guest bedrooms were their own bunaglows.  So the

23   kitchen was its own building, the living room was its own

24   building, the master bedroom was its own building.  So in order

25   to walk from one to another, you actually walked outside.  So

1   it was kind of what I considered like an exploded house.

2   Q.  When Mr. Epstein was staying on this island, what airport

3   did you fly into and out of?

4   A.  We flew into the main airport in St. Thomas, U.S. Virgin

5   Islands.  I believe it's called Charlotte Amalie.

6           MS. COMEY:  We can take that down.

7           Thank you, Ms. Drescher.

8   Q.  Mr. Visoski, what, if any, of Ms. Maxwell's residences did

9   you visit during your employment?

10  A.  I think I've been to all of her residence.

11  Q.  Could you walk us through each of them chronologically,

12  starting with the first, please.

13  A.  Yes.  The first time I met Ms. Maxwell, she was in a

14  smaller apartment.  We're going back 30 years, so I don't

15  really remember the streets.

16          But then the second apartment I remember a little

17  more, a little more -- obviously better, which I believe was on

18  84th Street, which was a nice three-bedroom apartment.  And she

19  was there for several years.  I did set up a home theater in

20  that apartment as well.

21          And then eventually she purchased a brownstone

22  townhouse, I believe, which was on 65th Street.

23  Q.  About when do you remember Ms. Maxwell moving from the

24  smaller apartment to the apartment around 84th Street?

25  A.  Had to have been the mid '90s.  I don't really have a good,

1   accurate estimation on that.

2   Q.  And about when do you remember her moving into the

3   brownstone townhouse you mentioned?

4   A.  I'd only be guessing if I said the 2000s, but I don't have

5   an exact era.  It had to have been in the 2000s, I believe.

6   Q.  In what borough were all three of those residences?

7   A.  They were in Manhattan.

8   Q.  Why did you go to those residences?

9   A.  It was -- it was still luggage; we would actually go there

10  to pick up luggage for the flights.  I would actually go there

11  sometimes to get an expense report signed.  And then also at

12  the brownstone I did -- she had the sixth floor up there that

13  had a home theater that I installed with a flat screen TV, so I

14  would occasionally go there and support, you know, help tune

15  and adjust that.

16  Q.  Would you please describe the interior of Ms. Maxwell's

17  brownstone townhouse.

18  A.  I believe it was a five or six-story building or home.  You

19  entered the front door, it brought you into a courtyard or I

20  should say an entrance foyer.  And then once you started -- you

21  walk up the first stairs to the first -- to the first level you

22  got to, that was kind of the living room and also had the

23  kitchen.  So in the front of the house of the brownstone was

24  the living room, then there was a dining room, and then further

25  back of that was the kitchen.  And then you went to the next

1    level, the second and third floors, I believe were the guest

2    bedrooms and the master bedroom.  And then once you got to the

3    top, which, if memory serves me correctly, might have been the

4    fifth floor where we installed a home theater for her.

5    Q.  Switching gears.  Between 1991 and 2004, what planes did

6    you fly for Mr. Epstein?

7    A.  From '91 to 2004?

8    Q.  Yes.

9    A.  The first aircraft was a Hawker Siddeley, what's called an

10   HS125.  Mr. Epstein purchased that.  He had that aircraft from

11   '91 till 1994.  And then in 1994, he sold that aircraft and he

12   purchased a Gulfstream, which is called the G2B.  And he had

13   the Gulfstream from 1994 up until 2000, when he added another

14   aircraft, is when he bought the Boeing 727.  And he continued

15   to keep both of those aircraft.  So we flew both aircraft, the

16   Boeing and the Gulfstream, up until 2004, to the date you

17   mentioned.

18         MS. COMEY:  Ms. Drescher, would you please pull up

19   Government Exhibits 311 and 312 for the witness, the Court, and

20   the parties.

21   Q.  Mr. Visoski, do you recognize these?

22   A.  Yes.

23   Q.  What are they?

24   A.  That is the first aircraft Mr. Epstein purchased, which is

25   the Hawker Siddeley 125.

```
 1   Q.  Are these both fair and accurate depictions of that
 2   aircraft?
 3   A.  Yes, they are.
 4            MS. COMEY:  Your Honor, the government offers both of
 5   these exhibits in evidence.
 6            MR. EVERDELL:  No objection.
 7            THE COURT:  Without objection, Government 311, 312 are
 8   admitted, and you may accomplish.
 9            (Government's Exhibits 311, 312 received in evidence)
10            MS. COMEY:  Thank you, your Honor.
11            You can take those down.  Thank you, Ms. Drescher.
12   Q.  Mr. Visoski, about how many helicopters do you remember
13   Mr. Epstein owning between 1994 and 2004?
14   A.  During that time frame, up until 2004, it was probably the
15   first helicopter he purchased, one helicopter.
16   Q.  And when did Mr. Epstein purchase that helicopter?
17   A.  Give or take a year, probably the year 2000, '99 to 2000.
18            MS. COMEY:  Ms. Drescher, would you please pull up
19   Government Exhibits 344 and 345 for the witness, the Court, and
20   the parties.
21   Q.  Mr. Visoski, do you recognize these?
22   A.  Yes, I do.
23   Q.  What are they?
24   A.  That is a photo of Mr. Epstein's first helicopter he
25   purchased.
```

1   Q.  Do both of these exhibits fairly and accurately depict that

2   helicopter?

3   A.  Yes, they do.

4            MS. COMEY:  Your Honor, the government offers these in

5   evidence.

6            MR. EVERDELL:  No objection.

7            THE COURT:  344 and 345 government exhibits are

8   admitted.  You may publish.

9            (Government's Exhibits 344, 345 received in evidence)

10           MS. COMEY:  Thank you, your Honor.

11  Q.  And while Ms. Drescher puts those up, I'll ask you,

12  Mr. Visoski, what did Mr. Epstein use these -- this helicopter

13  for?

14  A.  It was mainly to get from St. Thomas to Little St. James,

15  rather than taking the boat ride.

16  Q.  Who do you remember flying this helicopter?

17  A.  Myself, Ms. Maxwell flew the helicopter with me, and I also

18  had some contract pilots that were based in St. Thomas that

19  assisted flying the helicopter as well.

20  Q.  About how many times do you remember Ms. Maxwell flying

21  this helicopter?

22  A.  Many times.  It would be hard to put a number on it.  Any

23  time -- several -- many times.  It's hard to put a number on

24  it.

25           MS. COMEY:  We can take those down.  Thank you.

1    Q.   Between approximately 1994 and 2000, what plane did you fly

2    most frequently for Mr. Epstein?

3    A.   From 1994 to 2000, that would be -- it would have been --

4    all been the Gulfstream G2B.

5          MS. COMEY:  Ms. Drescher, would you please pull up

6    Government Exhibits 336 and 315 for the witness, the Court, and

7    the parties.

8    Q.   Mr. Visoski, do you recognize these?

9    A.   Yes, I do.

10   Q.   What are they?

11   A.   The photo on the left is a photo of the Gulfstream G2B that

12   has the white stripe on it, the black aircraft.  The white

13   aircraft in the photo is -- I don't -- nothing to do with

14   Mr. Epstein.  And then the photo on the right is another photo

15   of the Gulfstream G2B with Mr. Epstein standing in front of it.

16         MS. COMEY:  Your Honor, the government offers these in

17   evidence.

18         MR. EVERDELL:  No objection.

19         THE COURT:  336 and 315 are admitted and you may

20   publish.

21         (Government's Exhibits 315, 336 received in evidence)

22   Q.   While Ms. Drescher puts these up for the jury, would you

23   please describe what the interior of the G2B looked like,

24   please.

25   A.   As you walk up the entrance stairs to the aircraft,

1  obviously if you make a left turn, that would bring you into

2  the cockpit.  You made a right turn, brought you into the

3  passenger compartment.  And as soon as you got into the

4  passenger compartment, there were four large captain's chairs.

5  They were baseball glove leather in color.  This aircraft had a

6  burgundy carpet.  Once you get past the four chairs, you're

7  continuing walking to the rear of the aircraft.  There was a

8  conference table to the right that had two chairs as well.

9         And then further aft, as you continue walking to the

10  back of the aircraft, there was a couch or a divan inside

11  there.  And then once you went past the couch divan, there was

12  a galley or what you would call kitchen inside the aircraft.

13  And as you went further past that was the bathroom for the

14  aircraft.  And then further back than that is the luggage

15  compartment.

16  Q.  What, if any, barrier was there on this aircraft between

17  the pilots and the passengers?

18  A.  Between the pilots and the passengers there was a door that

19  could be shut.

20  Q.  And when you flew this plane for Mr. Epstein, was that door

21  open or shut during flight?

22  A.  We always had the door closed.  It's much quieter with the

23  door closed as well.

24  Q.  So were you able to observe what the passengers were doing

25  when you flew this plane?

LBUVMAX2                    Visoski - direct

1  A.  No, I could not.

2  Q.  Between approximately 2001 and 2004, which of Mr. Epstein's

3  planes did you fly most frequently?

4  A.  Between 2001 and 2004, it was a combination of both the

5  Boeing 727 and the G2B, depending upon his choice of what

6  aircraft he wanted to fly.  But mostly during that time frame

7  we were flying the Boeing 727.

8          MS. COMEY:  Ms. Drescher, would you please pull up

9  Government Exhibits 302 and 301 for the witness, the Court, and

10  the parties.

11  Q.  Mr. Visoski, do you recognize these?

12  A.  Yes, I do.

13  Q.  What are they?

14  A.  Those are two photos of the Boeing 727 that Mr. Epstein

15  owned.

16          MS. COMEY:  Your Honor, the government offers these in

17  evidence.

18          MR. EVERDELL:  No objection.

19          THE COURT:  302 and 301, government exhibits, are

20  admitted.  You may publish.

21          (Government's Exhibits 301, 302 received in evidence)

22          MS. COMEY:  Ms. Drescher, after you've shown both of

23  these, I'd ask just to put up Government Exhibit 301 for the

24  jury, please.

25  Q.  While she's doing that, Mr. Visoski, would you please

1   describe what the inside of this plane looked like.

2   A.   Sure.   The best way to describe it, it was kind of like a

3   recreational vehicle inside; it wasn't like a typical airliner

4   would look.

5           You went in the front entrance door which is located

6   at the forward part of the aircraft.  You walked upstairs.  And

7   if you continued straight ahead, it went into the first

8   bathroom, which we considered the crew bathroom; so there was a

9   lavatory up in front.  And then if you made a left turn,

10  brought you into the cockpit.

11          Now we're still at the entrance and now we're going to

12  walk to the back of the airplane.  You went through -- as soon

13  as you got to the first compartment, there was like a large

14  living room that had one, two, three -- it had three couches or

15  divans.  And then it had several captain chairs inside there.

16          Once you went from that first compartment, you're

17  continuing walking to the back of the aircraft, in the middle

18  there was a galley or kitchen like you would find in a home.

19  It was a full decked-out kitchen.

20          And then once you went further past the kitchen, there

21  was what we call the round room.  There was a couch or a divan

22  in the middle of the aircraft that was actually round or

23  circular.  And once you went past that, there was what we

24  called the red room, which had Mr. Epstein's office that also

25  had a red couch or divan and his office desk.

1          And then once you continue further walking to the back

2     of the aircraft, there was the master bedroom that had a

3     queen-size bed and two captain's chairs inside there.  And then

4     you're still walking to the back of the aircraft, there was the

5     master -- the master lavatory or the bathroom in the rear of

6     the aircraft.

7          MS. COMEY:  Ms. Drescher, would you please pull up

8     Government Exhibit 303 for the witness, the Court, and the

9     parties.

10    Q.  Mr. Visoski, do you recognize this?

11    A.  Yes.

12    Q.  What is it?

13    A.  That is actually the round room I described with the round

14    couch or divan inside it.  And then further in the photo you

15    could see the red couch which was his office.  And further

16    after that led into the bedroom.

17    Q.  Is this a fair and accurate depiction of a portion of the

18    interior of Jeffrey Epstein's Boeing 727?

19    A.  Yes, it is.

20         MS. COMEY:  Your Honor, the government offers this in

21    evidence.

22         MR. EVERDELL:  No objection.

23         THE COURT:  Government 303 is admitted.

24         You may publish.

25         (Government's Exhibit 303 received in evidence)

Q.   While Ms. Drescher puts that up, will you please describe

once again what we see in this photograph, Mr. Visoski.

A.   That's the middle of the aircraft or where actually the

emergency exits are located.  When you say describe it --

Q.   What we're seeing in the foreground and the background, the

jurors weren't able to see the photograph when you were

describing it.

A.   Oh, I'm sorry.  Gotcha.  I thought I just explained it.

I'm going to repeat myself.

          So this is the round couch, round divan that was in

the middle of the aircraft.  And then as you see in the photo,

the red couch or divan, which was Mr. Epstein's office and

which -- to the right side of that, which is not in the photo,

there was a large desk.  And then in the foreground, way in the

back are the two captain's chairs that are actually across from

the master bed in the back of the aircraft.

          MS. COMEY:  We can take that down.

          Thank you, Ms. Drescher.

Q.   What, if any, barrier was there between the pilots and the

passengers on the Boeing 727?

A.   On the Boeing, each compartment had its own doors, so you

can seclude each compartment or even the cockpit from the

passengers.

Q.   During flight in the Boeing 727, was the cockpit door

opened or closed?

1   A.   It was always closed.

2   Q.   So were you able to observe the passengers on the flights

3   you piloted on that plane?

4   A.   No.

5   Q.   What records did you keep as a pilot for Mr. Epstein?

6   A.   We kept two documents, one was a flight log and the other

7   was a passenger manifest.

8   Q.   And when you say "we," who do you mean?

9   A.   I meant myself and the other pilot.

10  Q.   And who was that?

11  A.   David Rogers.

12  Q.   You mentioned a flight log and a passenger manifest.  Did

13  you complete one for each flight you piloted for Mr. Epstein?

14  A.   Yes, I did.

15  Q.   What is contained in a flight log?

16  A.   A flight log is a document that is pretty much married to

17  the aircraft; it's the history of how many hours the aircraft

18  has on it, how many times the aircraft has landed, each engine

19  has its own total time that's recorded, as well as how many

20  times it was cycled, meaning turned on or off.

21  Q.   Will that flight log have any information about the

22  passengers onboard for a particular flight?

23  A.   No, it will not.

24  Q.   How about the passenger manifest, what information goes

25  into a passenger manifest?

LBUVMAX2                         Visoski - direct

A.  A passenger manifest is a document that we recorded what

time we actually took off and landed.  It had the date of the

flight, it had the exact time of departure and arrival, and it

also had a column for the name of the passengers that were on

the aircraft.

Q.  Who completed the passenger manifest for each flight that

was piloted for Mr. Epstein?

A.  Whoever was captain on the aircraft that day would complete

that form.

Q.  What does it mean to be captain?

A.  To be captain would be to fly in the left seat and be in

total control of the aircraft.

Q.  How long after each flight did the captain complete the

passenger manifest?

A.  It was done immediately after the aircraft, within an hour.

Q.  Between approximately 1994 and 2004, what did you do with

the passenger manifests that you personally completed?

A.  They would acquire them.  After about 30 days, I would take

them to the main office in New York and then drop them off.

Q.  Did you keep a copy for yourself?

A.  No, I did not.

Q.  If you did not know the name of a particular passenger on a

flight, how will you indicate the presence of that passenger in

a passenger manifest?

A.  I tried to be as accurate as I could.  If I didn't know a

1    passenger name, I wanted to put whether they were male or

2    female, the passenger -- as a pilot's standpoint, it's more

3    important how many people and how much they weigh compared to a

4    person's name.  We tried to be as accurate as we could.  So if

5    I didn't know a name, I put whether they were male or female.

6    Q.  And remind us why you wouldn't necessarily know the name of

7    everyone on your plane?

8    A.  It wasn't my first priority.  Most of the time Mr. Epstein

9    would, you know, indicate or introduce us to the passengers,

10   but it just wasn't -- it wasn't the first thing, you know, on

11   anybody's mind.  Occasionally he would introduce and sometimes

12   he wouldn't.  We would try to gather their name if we asked

13   them, if we had the time to ask them.  But we tried to do the

14   best we could is to get everybody's name.

15   Q.  During your employment with Mr. Epstein, did you ever fly

16   to the airport in Traverse City, Michigan?

17   A.  Yes, I did.

18   Q.  About what years do you remember making those trips to

19   Michigan?

20   A.  Definitely in the '90s is the best I could come up with.

21   It was in the '90s.

22   Q.  During what season do you remember taking those trips to

23   Michigan?

24   A.  I don't remember it being cold, because I know it gets

25   pretty cold up there.  It had to have been summer or, you know,

1    maybe close to fall when cherry season was happening because I

2    think that's the cherry capital.

3    Q.   When traveling to Traverse City, Michigan, where, if

4    anywhere, do you remember picking up Mr. Epstein's luggage?

5    A.   I can only recall one time that Mr. Epstein had called or

6    somebody notified me to pick up the luggage in the lobby of the

7    Interlochen School of Music.

8    Q.   About when was that?

9    A.   I don't have an accurate date.  I could only say the '90s.

10   Q.   And what is Interlochen?

11   A.   I believe it's a school for gifted children that are

12   talented musicians, singers, etc., world-renowned type of

13   school.

14   Q.   How many, if any, female passengers who flew on

15   Mr. Epstein's plane do you remember who were singers?

16   A.   I can recall one.

17          MS. COMEY:  At this time, your Honor, I'd like to read

18   a stipulation into the record, if I may.

19          THE COURT:  What is the identification number?

20          MS. COMEY:  It's Government Exhibit 1004.

21          THE COURT:  Mr. Everdell, without objection?

22          Go ahead.

23          MR. EVERDELL:  No objection, your Honor.

24          THE COURT:  Okay.  You may read Government Exhibit

25   1004, the stipulation.

1          MS. COMEY:  Thank you, your Honor.

2          It is hereby stipulated and agreed that Government

3    Exhibit 11 is a true and correct certified copy of a birth

4    certificate reported to the New York Department of State.

5    Government Exhibit 11 accurately reflects the date of birth of

6    the person named on the certificate.

7          Government Exhibit 12 is a true and correct copy of a

8    birth certificate reported to the Rhode Island Department of

9    Health.  Government Exhibit 12 accurately reflects the date of

10   birth of the person named on the certificate.

11         Government Exhibit 13 is a true and correct certified

12   copy of a birth certificate reported to the Missouri Department

13   of Health and Senior Services.  Government Exhibit 13

14   accurately reflects the date of birth of the person named on

15   the certificate.

16         Government Exhibit 14 is a true and correct certified

17   copy of a birth certificate reported to Sacramento County,

18   California.  Government Exhibit 14 accurately reflects the date

19   of birth of the person named on the certificate.

20         Government Exhibit 15 is a true and correct certified

21   copy of a birth certificate reported to the Massachusetts

22   Department of Public Health.  Government Exhibit 15 accurately

23   reflects the date of birth of the person named on the

24   certificate.

25         Government Exhibit 16 is a true and correct copy of a

1    birth certificate reported to the general registrar -- register

2    office of England and Wales.  Government Exhibit 16 accurately

3    reflects the date of birth of the person named on the

4    certificate.

5           It is further stipulated and agreed that this

6    stipulation, marked as Government Exhibit 1004, and Government

7    Exhibits 11, 12, 13, 14, 15, and 16 may be received in evidence

8    at trial.

9           At this time, your Honor, the government offers all of

10   the exhibits I just named.

11          THE COURT:  Mr. Everdell.

12          MR. EVERDELL:  No objection.

13          THE COURT:  Without objection and on stipulation,

14   Government Exhibit 1004 is admitted, as are Government Exhibit

15   11, 12, 13, 14, 15, and 16.

16          (Government's Exhibits 11, 12, 13, 14, 15, 16, 1004

17   received in evidence)

18          MS. COMEY:  Your Honor, I would note that the parties

19   have agreed that Government Exhibits 11 through 16 would be

20   submitted under seal.  And I would ask for authorization to

21   have the jurors pick up their binders of sealed exhibits so

22   that we may look at one of those in a moment.

23          THE COURT:  Okay.  And the sealing is consistent with

24   my ruling that some of the witnesses are able to testify under

25   pseudonyms.

1          MS. COMEY:  Yes, your Honor.

2          THE COURT:  Okay.  And the specific direction to the

3     jury is to pick up the binder now or not yet?

4          MS. COMEY:  Pick up the binder now, but don't turn

5     anywhere in the binder yet.

6          THE COURT:  Okay.  Mr. Everdell, without objection?

7          MR. EVERDELL:  That's fine, your Honor.

8          THE COURT:  Members of the jury, there's a binder

9     under your seat.  Please just pick it up, but don't open it

10    until specifically directed.  Thank you.

11         MR. EVERDELL:  Your Honor, also they shouldn't pick up

12    the folder.

13         THE COURT:  They should not.  There's a folder there

14    as well, and you should not pick up the folder yet, just the

15    binder.  Surprises under your seats.

16         MS. COMEY:  Your Honor, I would also ask the witness

17    to please pick up the binder in front of him.

18         THE COURT:  Okay.  Please do, Mr. Visoski.

19         MS. COMEY:  At this time I'd like to ask for the jury

20    and the witness to just turn silently to Government Exhibit 12

21    and take a look at that.

22         THE COURT:  We're not going to put these on the

23    screens.

24         MS. COMEY:  That's correct, your Honor.  All paper

25    copies.

1          THE COURT:  Thank you.

2          MS. COMEY:  And your Honor, we have a hard copy for

3     the Court, if that would be useful.

4          THE COURT:  That would help.  Thank you.

5          MS. COMEY:  May Ms. Drescher approach?

6          THE COURT:  Please.

7          And you've asked, Ms. Comey, to turn to again?

8          MS. COMEY:  Government Exhibit 12, your Honor.

9          THE COURT:  Okay.

10         So please just turn to Government Exhibit 12.

11         Everybody there?  Not yet.

12         MS. COMEY:  I see a hand from a juror.

13         THE COURT:  You need glasses.  We're going to get

14    them.  Hang on a second.  Ms. Williams will ask you where she

15    can find them for you.  Just a moment.

16         Members of the jury, please don't turn to other

17    exhibits until expressly instructed, but you may look at

18    Government Exhibit 12 in the binder.

19         (Pause)

20         THE COURT:  Thank you, Ms. Williams.  GX-12.

21         MS. COMEY:  Yes.  Thank you, your Honor.

22    BY MS. COMEY:

23    Q.  Now, Mr. Visoski, without saying the name out loud, would

24    you please look at the first and last name on this exhibit.

25    A.  Yes.

1   Q.  Is the first and last name on that document the name of the

2   female singer you remember being a passenger on Mr. Epstein's

3   plane?

4           MR. EVERDELL:  Objection.  Leading.

5           THE COURT:  I'll allow it.  Go ahead.

6   Q.  You can answer or I'm happy to ask the question again if

7   you need me to.

8   A.  Yes.

9   Q.  To be clear, is that the first and last name of the female

10  singer you remember being a passenger on Mr. Epstein's plane?

11  A.  Yes, it is.

12          MS. COMEY:  We can set that aside.  Thank you.

13          And your Honor, we don't need those binders for the

14  jurors anymore for this witness.

15          THE COURT:  All right.  Members of the jury, you can

16  close the binder and put it back under your chair, please,

17  until given further instruction.  Thank you so much.

18  Q.  Mr. Visoski, I'm going to refer to that person whose name

19  we just looked at as Jane, and I would ask you to do the same,

20  please.

21  A.  Okay.

22  Q.  Do you remember meeting Jane?

23  A.  Approximately mid to late '90s.

24  Q.  Do you remember the exact year as you sit here today?

25  A.  No, I do not.

1   Q.  Did anyone ever tell you how old Jane was?

2   A.  No.

3   Q.  Do you know how old Jane was when you met her?

4   A.  No, I didn't.

5   Q.  How did you meet Jane?

6   A.  Mr. Epstein brought her to the cockpit and introduced her

7   to me.

8   Q.  What, if anything, stands out in your mind about Jane's

9   demeanor when you met her that day?

10  A.  Just a mature woman with some piercing powder blue eyes.

11  Q.  About how many times do you recall seeing Jane on

12  Mr. Epstein's plane?

13  A.  At least one, the time that Mr. Epstein introduced.

14  Q.  Do you remember where you were going that day?

15  A.  I do not.

16  Q.  Do you remember where you were coming from?

17  A.  Yes.

18  Q.  Do you remember where you were coming from that day?

19  A.  Yes, we were departing West Palm Beach Airport.

20  Q.  What, if any, passenger with the first name Virginia do you

21  remember flying on Mr. Epstein's plane?

22  A.  I do remember at least one person named Virginia.

23  Q.  And what was that person's full name?

24  A.  It was Virginia Roberts.

25  Q.  About when did you meet Virginia Roberts?

1   A.  Had to have been mid to late '90s.

2   Q.  Do you remember the exact year?

3   A.  I do not.

4   Q.  What did Virginia look like?

5   A.  A shorter woman with dirty blond hair.

6   Q.  Did anyone ever tell you how old Virginia was when you met

7   her?

8   A.  No.

9   Q.  Do you know how old she was when you met her?

10  A.  No, I did not.

11  Q.  About how many times do you remember seeing Virginia

12  Roberts as a passenger on Mr. Epstein's private planes?

13  A.  She was on the airplane a couple times.  I couldn't guess

14  the quantity, but definitely more than once.

15          MS. COMEY:  May I have a moment, your Honor?

16          THE COURT:  You may.

17          (Counsel conferred)

18          MS. COMEY:  Nothing further, your Honor.

19          THE COURT:  Okay.  Mr. Everdell, you may proceed with

20  the cross-examination.

21          MR. EVERDELL:  Thank you, your Honor.

22          At this point, with the Court's permission, I would

23  put a binder up in the witness box.

24          THE COURT:  Okay.

25          MS. COMEY:  Your Honor, to be clear, I have not seen

LBUVMAX2                        Visoski – cross

1   what's inside this binder.

2                MR. EVERDELL:  This is in case we need to refer the

3   witness to something.

4                THE COURT:  So you may bring it forward.  Before the

5   witness is directed to look at any document, you'll show it to

6   the government.

7                MR. EVERDELL:  Yes.  If we're going to refer to

8   anything, we will refer what it is to the government so they

9   can see it before we have the witness open the binder.

10               THE COURT:  Okay.

11               MS. COMEY:  Thank you, your Honor.

12               THE COURT:  Thank you.

13               MR. EVERDELL:  May I approach, your Honor?

14               THE COURT:  You may.

15               MR. EVERDELL:  May I remove my mask, your Honor?

16               THE COURT:  You may, Mr. Everdell.

17  CROSS-EXAMINATION

18  BY MR. EVERDELL:

19  Q.  Good morning Mr. Visoski.

20  A.  Good morning, Mr. Everdell.

21  Q.  I'm going to ask you a few questions about what you just

22  testified to on direct.

23  A.  Okay.

24  Q.  Now, you testified that you started working as a pilot for

25  Jeffrey Epstein in about 1991; is that right?

1   A.  That is correct.

2   Q.  And you were hired, along with your friend David Rogers; is

3   that right?

4   A.  That's correct.

5   Q.  Now, when you started in 1991, Dave Rogers was the chief

6   pilot and you were the co-captain?

7   A.  That is correct.

8   Q.  But that changed, I think, in about 2000; is that right?

9   A.  That is correct, approximately.

10  Q.  At that point you became the chief pilot and Dave Rogers

11  became the co-captain?

12  A.  That's correct.

13  Q.  And you continued to work for Epstein as his chief pilot

14  until about 2019?

15  A.  Correct.

16  Q.  So you were a pilot for Jeffrey Epstein for almost 30 years

17  from 1991 to 2019; is that right?

18  A.  That is correct.

19  Q.  And in that time, I think you testified that you flew

20  several different planes for him; is that right?

21  A.  That is correct.

22          MR. EVERDELL:  If we could call up what is already in

23  evidence as Government's Exhibit 311.

24          THE COURT:  311 you said?

25          MR. EVERDELL:  311, your Honor.

1          THE COURT:  Okay.  You may.

2          MR. EVERDELL:  And we can display that for the jurors.

3          THE COURT:  You may.

4    Q.  Do you see that, Mr. Visoski?

5    A.  Yes, I do.

6    Q.  We saw that before.  That's the Hawker Siddeley jet, right?

7    A.  Correct.

8    Q.  And that was used from about '91 -- 1991 to 1994; is that

9    right?

10   A.  That's correct.

11         MR. EVERDELL:  Okay.  We can take that down.

12   Q.  So you no longer flew the Hawker after about '94?

13   A.  No, the aircraft was sold after '94.

14   Q.  And there was another aircraft you mentioned, the

15   Gulfstream, the G2B, right?

16   A.  Correct.

17         MR. EVERDELL:  If we can pull up what's already in

18   evidence as Government's Exhibit 315.

19         THE COURT:  You may.

20         MR. EVERDELL:  Display that for the jurors as well.

21   Q.  Do you see that, Mr. Visoski?

22   A.  Yes.

23   Q.  We saw that before, right, that is the Gulfstream jet with

24   Mr. Epstein in front of it; is that right?

25   A.  Correct.

1    Q.  Okay.  And he got that, your recollection is, sometime

2    around 1994?

3    A.  Correct.

4         MR. EVERDELL:  All right.  We can take that down.

5    Q.  And you've also mentioned that he eventually got the Boeing

6    727?

7    A.  Correct, in 2000.

8    Q.  That was roughly around 2000?

9    A.  Correct.

10         MR. EVERDELL:  If we can display what's already in

11    evidence as Government's Exhibit 301.

12         THE COURT:  You may.

13         MR. EVERDELL:  And show that to the jurors as well.

14    Q.  That was -- that is the Boeing 727; correct?

15    A.  That is correct.

16         MR. EVERDELL:  Okay.  You can take that down.

17    Q.  You occasionally flew other planes for him as well?

18    A.  Yes.

19    Q.  I think we saw in one of the photos, I won't call it up,

20    but there was a small Cessna?

21    A.  Yes.

22    Q.  But from about 1994, after Mr. Epstein sold the Hawker,

23    till about 2001 or 2000, I think is your recollection, when he

24    bought the Boeing, you flew primarily the Gulfstream?

25    A.  That is correct.

1    Q.  And from 2000 onwards or till 2004 or five, you were flying

2    both the Gulfstream and the Boeing?

3    A.  That's correct.

4    Q.  Now, in the period from 1991, when you were first hired, to

5    2005, you flew numerous flights for Epstein?

6    A.  Correct.

7    Q.  Would it be accurate to say that you flew over 1,000

8    flights during that time period?

9    A.  I'd have to look at my records, but it was probably close

10   to that, yes.

11   Q.  Give or take?

12   A.  Give or take, yes.

13   Q.  That's a lot of flights.

14   A.  We consider it more in hours than flights, but --

15   Q.  Understood.

16          And Epstein would frequently have other passengers on

17   these flights, right?

18   A.  Yes.

19   Q.  And many of these passengers were female; correct?

20   A.  Correct.

21   Q.  And sometimes you saw the passengers, right?

22   A.  Yes.

23   Q.  There were times when you, I think, stood at the entrance

24   of the plane near the cockpit when the passengers arrived and

25   you might have greeted them?

1    A.   Sometimes.

2    Q.   There were times when Epstein or Ghislaine introduced you

3    to passengers?

4    A.   Correct.

5    Q.   There were times when the plane and the passengers had to

6    clear customs, right, and the pilots and the passengers would

7    have to get out of the plane and clear customs to do that?

8    A.   Yes, that's correct.

9    Q.   And you'd see the passengers then too?

10   A.   Sure.

11   Q.   Okay.  And there were times when the passengers came up to

12   the cockpit before takeoff and you might have met some of them

13   then?

14   A.   Occasionally that would happen, sure.

15   Q.   Okay.  Now, you testified that the cockpit doors for the

16   Gulfstream and the Boeing were always closed during the flights

17   while you were in the air; is that right?

18   A.   Yes.

19   Q.   But you left the door open to the cockpit as you were

20   getting the plane ready for takeoff before you took off, right?

21   A.   Yes.

22   Q.   As you were in the cockpit, if you were looking back

23   through the cockpit door, you could see the passengers in the

24   entranceway if you wanted to, right?

25   A.   Most of them, yes.  It wasn't a clear view to every seat in

1   the aircraft, but, yeah, I could see the passengers.

2   Q.  There were several ways that you could have observed and

3   did observe the passengers that came onto his planes?

4   A.  Yeah, if I looked over my shoulder; correct, yes.

5   Q.  Or those other ways we discussed?

6   A.  At the entrance, yes.

7   Q.  Now, of the female passengers on these planes that you

8   observed, you occasionally saw young girls who were traveling

9   with their family members, isn't that right?

10  A.  There was some time when adults would bring their children

11  onboard, sure.

12  Q.  But you never saw a female you thought was under the age of

13  18 who was not with her family, right?

14  A.  Correct.  No.

15  Q.  And apart from those times when you saw young girls

16  traveling with their family members, you never saw any female

17  on the plane who looked to you to be under the age of 20, isn't

18  that right?

19  A.  Well, that's correct, yeah, I didn't notice anybody of a

20  younger nature without an adult or, you know, a parent.

21  Q.  So in the roughly thousand or so, give or take, flights

22  that you flew for Epstein from 1994 -- or 1991, I should say,

23  to 2005, you never once saw a female on any of the planes who

24  looked under the age of 20, apart from the ones who were

25  traveling with their family members?

LBUVMAX2                          Visoski – cross

1  A.  Correct.  I didn't know anybody's, you know, exact age or

2  age at all really.

3  Q.  But none of them appeared to you to be under 20?

4  A.  Correct.

5  Q.  Was that –– I didn't hear.

6  A.  Yes, that's correct, yes.

7  Q.  Now, that includes the woman that we have been referring to

8  as Jane; correct?

9  A.  Correct.  I didn't know her age.

10  Q.  And she did not appear to you to be under the age of 20?

11  A.  I didn't know her exact –– I didn't know her age at all.

12  But to my –– she looked like a woman.

13  Q.  She looked like a mature woman, I believe was your

14  testimony before; is that right?

15  A.  Sure.  Yes.

16  Q.  Okay.  And it also includes the woman you referred to as

17  Virginia?

18  A.  Yes.

19  Q.  She also did not look below the age of 20 to you?

20  A.  I didn't know her age, but she didn't –– she didn't look

21  young.  I mean, wherever you decipher is the definition of

22  "young," but she –– she was a woman in my category.

23            (Continued on next page)

24

25

1  BY MR. EVERDELL:

2  Q.  She was a woman?

3  A.  Yes.

4  Q.  Mr. Visoski, in all these flights that you flew, the

5  several hundred to a thousand flights that you piloted for

6  Mr. Epstein in this time period, you also never saw any kind of

7  sexual activity occur on the planes; isn't that right?

8  A.  I never saw any sexual activity, no.

9  Q.  And you certainly never saw anyone engaging in sex acts

10  with underage girls on the plane?

11  A.  Absolutely not.

12  Q.  In fact, you never saw anyone engaging in sex acts with any

13  of the women on the flights period; right?

14  A.  That is correct.

15  Q.  Now, you testified, I think we already established this,

16  that when you were flying, in flight, the cockpit doors were

17  closed?

18  A.  That is correct.

19  Q.  So if the cockpit doors were closed, you couldn't

20  necessarily see what was going on in the cabin during the

21  flights; right?

22  A.  Not at all, no.

23  Q.  But you were never instructed by Epstein or anyone else

24  that you were not allowed to leave the cockpits during the

25  flights; is that correct?

1   A.  That's correct.  Mr. Epstein invited us, that if we had to

2   go to the bathroom, that we were welcome to walk to the back of

3   the aircraft.

4   Q.  So he invited you to come anywhere you wanted to, even

5   including in the back of the aircraft to use the restroom if

6   you wanted to?

7   A.  Exactly.  Yes, because there are times that if you have to

8   use the restroom, like now.

9   Q.  We can take a break.

10  A.  I was hoping for a break in between.  Am I the only one?

11          THE COURT:  Jury, I think it's time for our midmorning

12  break.  Why don't you finish the question and then we'll take a

13  break.

14          MR. EVERDELL:  Yes, your Honor.

15  Q.  I'll just ask the question.  He invited you to use the

16  restroom at the back of the plane whenever you needed to?

17  A.  Yes, he offered, if we needed to use the restroom, to feel

18  free to come into the back of the aircraft to use the restroom.

19  Q.  One last question before we break.  To do that, you had to

20  walk through the cabin to the back of the plane and go through

21  the rooms of the plane to get to the restroom; isn't that

22  right?

23  A.  If we were in the Gulf Stream, yes.  In the Boeing, we had

24  our own lavatory up front.  But in the Gulf Stream, like,

25  you're talking about from '94 to 2000, we would walk down the

LBUCmax3                          Visoski – cross

1    middle of the aircraft because the bathroom was at the absolute

2    rear, correct.

3                THE COURT:  Members of the jury, we'll take our

4    midmorning break.  See you in about 10 minutes.  Thank you.

5                (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    (Jury not present)

2                    Everyone may be seated, the witness may step down for

3       the break.

4                    (Witness not present)

5                    Are there matters to take up before the break?

6                    MS. COMEY:  No, your Honor.

7                    MR. EVERDELL:  No, your Honor.

8                    MS. STERNHEIM:  Judge, may I just ask, it's very cold

9       in here, can the temperature be risen just a little?

10                   THE COURT:  I'm sweating.

11                   MS. STERNHEIM:  Sorry.

12                   THE COURT:  We'll get it raised.  This is my light

13      weather robe.  We'll get it raised.

14                   MS. STERNHEIM:  Thank you.

15                   THE COURT:  I apologize.  We'll see you in about 10.

16                   (Recess)

17                   THE COURT:  Matters to take up, counsel?

18                   MS. COMEY:  No, your Honor.

19                   MR. EVERDELL:  No, your Honor.

20                   THE COURT:  We can bring the witness back into the

21      box.

22                   Mr. Everdell, do you have a time estimate?  I won't

23      hold you to it.

24                   MR. EVERDELL:  Do you have an estimate for how long

25      I've been going so far?  I could probably --

LBUCmax3                        Visoski – cross

1              THE COURT:  20 minutes.

2              MR. EVERDELL:  I'd say maybe another hour or so.

3              THE COURT:  Okay.  Ms. Sternheim, I have asked for

4     them to raise the temperature.

5              MS. STERNHEIM:  Thank you, Judge.  Feels better

6     already.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (Jury present)

2           THE COURT:  Please be seated.  I hope you had a

3    pleasant and timely break, members of the jury.  Thank you for

4    your continued attention and diligence.

5           Mr. Everdell, you may continue with your cross

6    examination of Mr. Visoski.  And Mr. Visoski, I remind you that

7    you are under oath.  You may proceed.

8           MR. EVERDELL:  Thank you, your Honor.

9    BY MR. EVERDELL:

10   Q.  Welcome back, Mr. Visoski.

11   A.  Thank you.

12   Q.  Trust you're feeling more comfortable?

13   A.  Oh, much better.

14   Q.  Very good.  Do you recall when we left off, we were talking

15   about going to the restroom on the airplanes?

16   A.  Yes.

17   Q.  And I think you said that you were allowed, you were

18   permitted and even invited to walk through the Gulf Stream to

19   the back of the plane to use the restroom there if you needed

20   to?

21   A.  That's correct.

22   Q.  So Mr. Epstein never told you, for example, you have to

23   stay in the cockpit during the flight?

24   A.  Absolutely not.

25   Q.  Now if he were engaging in sex acts with underage girls in

LBUCmax3                         Visoski – cross

1    the plane and he didn't want you to see that, he probably would

2    have said something to you about that, wouldn't he?

3              MS. COMEY:  Objection, your Honor.

4              THE COURT:  Overruled.  You may answer.

5    A.  Can you repeat the question.

6    Q.  Sure.  If Mr. Epstein were engaging in sex acts with

7    underage girls on his planes and he didn't want you to see it,

8    he probably would have told you that you couldn't leave the

9    cockpit during the flight; isn't that right?

10   A.  That's correct.

11   Q.  And he never told you that you could never mingle with the

12   passengers; right?

13   A.  No, not at all.

14   Q.  In fact, you recounted how you did interact with the

15   passengers on occasion; right?

16   A.  Absolutely on occasion, sure.

17   Q.  In fact, you were never given any rules about how you could

18   or could not interact with the passengers; right?

19   A.  No, I was never told what to do with the passengers or what

20   not to do.

21   Q.  And you were never given any rules about how you could

22   interact with the other members of his staff or his assistants;

23   isn't that right?

24   A.  That is correct, never.

25   Q.  Now, you did say that every once in a while you would leave

1    the cockpit to use the restroom?

2    A.   Correct.

3    Q.   And you did that both on the Gulf Stream and on the Boeing;

4    is that correct?

5    A.   Yes.

6    Q.   The Gulf Stream bathroom, you said, was in the back of the

7    plane; right?

8    A.   Yes.

9    Q.   And the Boeing bathroom was near the cockpit but outside

10   the cockpit; is that right?

11   A.   Exactly, yes.

12   Q.   So if you went to the bathroom in the Boeing, you could

13   still see the cabin where the passengers were, at least the

14   first cabin?

15   A.   If the door was open.  Each section of the aircraft had a

16   door and typically the doors were open.

17   Q.   Well, in any of those trips to the restroom, you never saw

18   any sexual activity on the plane?

19   A.   No, I never did.

20   Q.   And you had also, I think, occasion go to get coffee in the

21   galley kitchen; is that right?

22   A.   In the Boeing, yes.  I would go to the middle of the

23   aircraft to get a cup of coffee on occasion, sure.

24   Q.   And as you said in the Boeing, the galley kitchens is in

25   the middle of the aircraft; is that right?

LBUCmax3                           Visoski – cross

```
 1   A.  That's correct.

 2   Q.  So you would have to walk through at least that first cabin

 3   of passengers?

 4   A.  That's correct.

 5   Q.  And on those trips you took to get coffee in the galley

 6   kitchen, you never saw any sexual activity going on then, did

 7   you?

 8   A.  No, never.

 9   Q.  Now, after the flight landed, I believe it was part of the

10   pilot's job to help clean up the cabin and straighten up a bit;

11   isn't that right?

12   A.  Yes, it is.

13   Q.  And when you did that, you never saw anything like clothes

14   strewn about the cabin; is that right?

15   A.  No, never.

16   Q.  You never saw any sex toys left in the cabin?

17   A.  Never.

18   Q.  You never saw anything like used condoms?

19   A.  Absolutely not.

20   Q.  You never saw anything that gave you the impression that

21   any kind of sexual activity was taking place on the plane with

22   anyone; is that right?

23   A.  That is correct, I never, no.

24   Q.  So sitting here today, based on what you observed, you have

25   no reason to believe that Epstein or anyone else was engaging
```

LBUCmax3                    Visoski - cross

1   in sexual activity with underage girls on the flights you

2   piloted; isn't that right?

3   A.   Correct.

4   Q.   Mr. Visoski, I want to ask you some questions about how the

5   flights were scheduled and set up.  Okay?

6   A.   Sure.

7   Q.   Now, before a flight was scheduled, you and Dave Rogers

8   needed to be alerted ahead of time that Epstein needed to fly

9   somewhere; isn't that right?

10  A.   Yes.

11  Q.   I think you said typically you get about a day's notice;

12  isn't that right?

13  A.   That's correct.

14  Q.   And several different people would call you to schedule

15  these flights; is that right?

16  A.   Yes.

17  Q.   And in the 1990s, focusing on that time period, you would

18  occasionally get calls from Epstein himself to schedule

19  flights?

20  A.   He would call on occasion, yes.

21  Q.   And every once in a while, you'd get a call from Ghislaine,

22  as well?

23  A.   Sure.

24  Q.   But during that time period, it was usually Epstein's

25  secretary or one of his other assistants in New York who would

LBUCmax3                    Visoski – cross

1    call you to schedule the flights; isn't that right?

2    A.  It would be a variety.  Whoever got the message would pass

3    it along to us, correct.

4    Q.  Right.  And I think you said that in the 1990s, you didn't

5    have cellphones; right?

6    A.  Correct.  It was a beeper, pager.

7    Q.  Beeper.  This was over 20 years ago at this point; right?

8    A.  Coming in on 30, but yes, correct.

9    Q.  Coming in on 30.  That's before everybody owned a

10   cellphone; correct?

11   A.  Yes.

12   Q.  But you did have the beepers?

13   A.  Yes.

14   Q.  And you and Dave Rogers would get a message on your beeper;

15   right?

16   A.  Yes.

17   Q.  And you would call back Epstein's office, usually; right?

18   A.  Yes.

19   Q.  Because that's usually where the call came from, isn't it?

20   A.  That's correct.  That was the number that would appear for

21   departure.

22   Q.  And you would talk to Epstein's secretary or assistant or

23   whoever was going to schedule that flight?

24   A.  Correct.

25   Q.  Now, occasionally, you said you talked to Ghislaine about

LBUCmax3                         Visoski – cross

1   this, about scheduling?

2   A.   Occasionally Ghislaine would reach out.  Several people

3   would reach out.  Whoever Jeffrey told, hey, get the plane

4   ready, that's the person that contacted me.

5   Q.   It was usually the case, if you spoke to Ghislaine about a

6   flight, she was going to be traveling on that flight?

7   A.   Most of the time, sure.

8   Q.   And in the 2000s now, fast forwarding to a later time

9   period, you spoke to different people about scheduling flights;

10  isn't that right?

11  A.   Yeah, whoever would get the message, correct.  It would be

12  different people.

13  Q.   Well, one person you spoke to in the 2000s was Lesley

14  Groff; isn't that right?

15  A.   That's correct.

16  Q.   And Lesley Groff was Epstein's secretary?

17  A.   That's correct.

18  Q.   And she worked in Epstein's New York office?

19  A.   That is correct.

20  Q.   Do you recall what number you used to call her on?

21  A.   Yes, the main office number.

22  Q.   Do you remember what that number was?

23  A.   Yes, I do.

24  Q.   What was it?

25  A.   212-750-9895.

LBUCmax3                       Visoski - cross

1    Q.  But the person I think you spoke most often to about

2    scheduling flights in the 2000s was not Lesley Groff, it was

3    Sarah Kellen; isn't that right?

4    A.  She would also schedule flights, yes.

5    Q.  You met Sarah Kellen, you said?

6    A.  Yes, I have.

7              MR. EVERDELL:  If we can pull up for the members of

8    the jury and everyone else Government Exhibit 327, which is

9    already admitted.

10   Q.  That's Sarah Kellen, isn't it?

11   A.  That is Sarah Kellen, yes.

12   Q.  Now, you say you think you met her sometime in the early

13   2000s; is that right?

14   A.  It could have been late '90s.  Again, we're 20, 21 years

15   ago, but yeah, it was late '90.  It could have been 2000.  I

16   remember Ms. Kellen obviously flying on the Boeing, which would

17   have been 2000 and later.  Yeah, it was late '90s.  It's the

18   best I could do as far as recollection.

19   Q.  Well, isn't it true that she first flew on one of Epstein's

20   planes in September of 2001?

21   A.  I believe she -- well, she probably did because she was

22   around in '01 when the Boeing was there.  I haven't gotten

23   any -- I don't have any documentation or -- but yes.

24             MR. EVERDELL:  Let me see if there is something that

25   might refresh your recollection.  I would like to pull up just

LBUCmax3                       Visoski - cross

1    for the Court, the deputy, and for the witness 3527-07 at page

2    86.  I'll repeat for clarity that's 3527-007 at page 86.

3              THE COURT:  Let me know when you're ready, Ms. Comey.

4              MS. COMEY:  I'm there.  Thank you, your Honor.

5              THE COURT:  Thank you.

6    BY MR. EVERDELL:

7    Q.  Mr. Visoski, if I could direct your attention to the sixth

8    entry down on that list you're looking at.  If you could just

9    take a look at that.  Just see if that refreshes your

10   recollection about the first time Sarah Kellen flew.

11   A.  Is that the September 3rd date you're looking?

12   Q.  I'm asking, does that refresh your recollection?

13   A.  Well, it's a document of a regularly scheduled route.

14   Obviously it's not my logbook.  It was normal -- there was a

15   typical routing that we would fly.  It's the best I could say,

16   but it would appear to be the -- it doesn't refresh of any, you

17   know, certainty, but sure, that would be a date that we would

18   do a trip like that.

19   Q.  Okay.  So I'll just rephrase.  Sarah Kellen, to the best of

20   your recollection, was flying on Epstein's planes in the early

21   2000s?

22   A.  Yes.  Correct.

23             MR. EVERDELL:  You can take that down.

24   Q.  Now, that is around the time when Epstein -- excuse me.

25   When Sarah Kellen became Epstein's personal assistant; isn't

1   that right?

2   A.   I didn't know what her exact job detail was.  I mean, I

3   considered her position or her title, you know, throughout the

4   same as far as to being Mr. Jeffrey's assistant or

5   Ms. Maxwell's assistant, just that she was there as an

6   employee.

7   Q.   Your recollection is that she was an employee who worked

8   with Epstein; is that fair to say?

9   A.   Yeah.  Exactly, yes.

10  Q.   But you're a little unclear exactly what her role was?

11  A.   Correct.

12  Q.   But she certainly did some work for Epstein in the time she

13  worked in his office?

14  A.   Exactly, yes.

15  Q.   Do you recall, she was married to a racecar driver; right?

16  A.   Later in life, I believe she got married to a racecar

17  driver.

18  Q.   So you said that Sarah Kellen would call you to arrange the

19  flight departures?

20  A.   Sometimes, sure, yes.

21  Q.   And by that point in the 2000s or the early 2000s, you had

22  cellphones; right?

23  A.   Correct.

24  Q.   So Sarah Kellen, when she did call you, would call your

25  cellphone to arrange a flight; is that right?

1   A.   That is correct.

2   Q.   In fact, you spoke to Sarah Kellen so often at that point

3   that you had her number on speed dial in your phone; isn't that

4   right?

5   A.   Most likely, yes.

6   Q.   Do you recall what Sarah Kellen's phone number was?

7   A.   I do not.

8          MR. EVERDELL:   Let me show you something, see if it

9   refreshes your recollection.   I want to call up 3527-001, we'll

10  go to the third page.   That is just for the Court, the deputy,

11  and the witness, please.

12         MR. EVERDELL:   May I proceed, your Honor?

13         THE COURT:   Yes.

14         MS. COMEY:   Thank you.

15  Q.   Mr. Visoski, do you have that document in front of you?

16  A.   Yes, I do.

17  Q.   Do you see just sort of maybe a third of the way down from

18  the top of the page, there is an entry there.   Does that

19  refresh your recollection on what Sarah Kellen's phone number

20  was?

21  A.   Her number wasn't embranded in my mind as a memory, but the

22  number does come back to me as being Sarah Kellen's cellphone

23  number.

24  Q.   So the number, was it 917-855-3363?

25  A.   That's correct, yes.

1           MR. EVERDELL:  Thank you.  You can take that down.

2   Q.  So in the 2000s, that's the number you would speak to Sarah

3   Kellen on about arranging flights?

4   A.  Correct.

5   Q.  Now, regardless of who you spoke to about scheduling

6   flights, when you were told that Epstein needed to fly

7   somewhere, you would need to be given certain information about

8   the flight; correct?

9   A.  Sure.

10  Q.  Like, for example, you would need to be given the date of

11  when Epstein wanted to fly?

12  A.  Correct.

13  Q.  You would need to be given roughly the time of departure?

14  A.  Yes.

15  Q.  And you would need to be given the destination where you're

16  going to fly; right?

17  A.  Yes.  That would be helpful, yes.

18  Q.  You might want to follow a flight plan or something like

19  that?

20  A.  Yes.

21  Q.  But you wouldn't necessarily be told who was going to be

22  going on the flight; right?

23  A.  Not at all.

24  Q.  If you had someone who was particularly important that was

25  going to be on the flight, you might be told ahead of time?

LBUCmax3                         Visoski - cross

1   A.  Exactly.

2   Q.  So, for example, I believe former president Bill Clinton

3   flew on Epstein's planes a few times in the 2000s; isn't that

4   right?

5   A.  Yes, he did.

6   Q.  So if he were going to be on the flight, you might be told

7   that information in advance?

8   A.  Yes.

9   Q.  Because you might want to make sure the plane looked nice?

10  A.  Exactly.

11  Q.  You might want to invite some special caterer?

12  A.  Sure.

13  Q.  But otherwise, you might not know who would be traveling on

14  the flight at all; is that right?

15  A.  Correct.

16  Q.  And even when the passengers arrived at the airport, even

17  then, you wouldn't necessarily meet all the passengers; right?

18  A.  No, not at all.

19  Q.  A lot of the time you didn't meet them?

20  A.  Correct.

21  Q.  Sometimes you were just given their names?

22  A.  Yes.

23  Q.  And you wouldn't always be given all of their names; right?

24  A.  Correct.

25  Q.  Sometimes you would just be given a first name?

1  A.  Sure.

2  Q.  But even if you weren't told all the names or you didn't

3  have all the names, you did try to keep track of how many

4  people were on the plane; right?

5  A.  That's correct.

6  Q.  Because as you mentioned before in testimony, pilots need

7  to fill out a passenger manifest for each flight; right?

8  A.  They don't have to on general aviation.  It was more for

9  weight and balance.  It was my understanding we kept passenger

10  information more for tax reasons on who flew on the aircraft in

11  the early days.  Might not be the case at this point, but we

12  still tried to keep as accurate records, if we could, even if

13  it wasn't necessary.

14  Q.  Fair enough.  So but you did try to keep passenger

15  manifests for flights on Epstein's planes?

16  A.  Absolutely, yes.

17  Q.  And a manifest, I think you described, among other things,

18  contains the list of the passenger names if you have them; is

19  that right?

20  A.  That's correct.

21  Q.  And if you didn't know their names, you might put in

22  something like one female or one male or one passenger to note

23  a named passenger?

24  A.  Exactly.  We tried to at least identify the sex rather than

25  just put one passenger.  So that's why we had put male or

LBUCmax3                    Visoski - cross

1   female if we didn't catch a name.

2   Q.  Obviously, if you did know the name or it was a person you

3   recognized from before, you would put their name on the

4   manifest?

5   A.  Absolutely.

6   Q.  And you said that it was important to keep track of the

7   head count, which is why you wanted to know how many people

8   were on the plane; right?

9   A.  That is correct.

10  Q.  Now, you said weight was also a consideration; is that

11  right?

12  A.  It's a consideration on some aircraft, not the kind that

13  we're flying, but it's something that should take into account

14  or as far as how heavy luggage is.  But it is a consideration

15  as a pilot to know how much something weighs as far as luggage

16  and/or passenger.

17  Q.  And that's if you're flying a small plane, for example, you

18  need to know the weight of the passengers?

19  A.  Exactly, yes.

20  Q.  But for the planes you were flying for Epstein,

21  particularly the Gulf Stream and the Boeing, you didn't need to

22  know the weight for those planes; right?

23  A.  It was not necessary, no.  It's, like I said, more of a

24  head count, but yeah, it's not a factor in these type of

25  aircraft.

LBUCmax3                    Visoski – cross

1   Q.  Right, because the Boeing, as we saw it, it's huge; right?

2   A.  Correct.

3   Q.  And the Gulf Stream is not a little prop plane, it has a

4   jet engine; right?

5   A.  Correct.  It's not power challenged, correct.

6   Q.  So it wasn't your practice to ask passengers their weight

7   before they boarded?

8   A.  No, absolutely not.

9   Q.  Now, it was sometimes the case, wasn't it, that if one of

10  Epstein's friends or acquaintances or family members needed to

11  go to the same place he was flying, he would take them on his

12  plane; right?

13  A.  I'm sure on occasion.  I don't know for a fact, but sure,

14  if we were going to the same place, he may extend an invitation

15  for somebody to come along.

16  Q.  He did have friends and family members and other people

17  traveling on his plane?

18  A.  That is correct, yes.  I see what you're saying.

19  Q.  It's like offering a lift in your car, except it's a jet?

20  A.  Correct, yes.

21  Q.  You call these people tagalongs; right?

22  A.  Yeah, there is several names, sure, but tagalongs or extra

23  guest.

24  Q.  Now, in those cases, if the person or the tagalong was not

25  a regular traveler, you might not know their name?

LBUCmax3                          Visoski - cross

```
 1   A.  That's correct.

 2   Q.  Or you might just be given their first name?

 3   A.  Correct.

 4   Q.  Not be given a name at all?

 5   A.  Correct.

 6   Q.  So that's an example of where you might put one female, one

 7   male?

 8   A.  That is correct, yes.

 9   Q.  Now, the manifest, you testified that you kept the

10   manifest; right?

11   A.  Yes.

12   Q.  And then eventually you gave them to the New York office?

13   A.  Correct.

14   Q.  I think you sent them, if I recall, to someone named Lauren

15   in New York; is that right?

16   A.  Yes.

17   Q.  You did not send them to Ghislaine, though; isn't that

18   right?

19   A.  No, they went to the main office, whether it be Lauren --

20   haven't heard that name in a long time.  That was a memory

21   refreshed.  Thank you.

22   Q.  My pleasure.  So you have no reason to believe that

23   Ghislaine was reviewing these manifests; right?

24   A.  No, Ms. Maxwell had nothing to do with the passenger

25   manifests.
```

1   Q.  So from your perspective, you had no reason to believe that

2   Ghislaine would have known which passengers were on the flights

3   that she didn't fly on herself?

4   A.  Correct.

5   Q.  I want to talk to you about a few specific flights.  I

6   think you mentioned in your testimony a place called

7   Interlochen; is that right?

8   A.  Yes.

9   Q.  Interlochen is, I think you recall, an arts center; is that

10  right?

11  A.  Yes, correct.

12  Q.  It hosts an arts camp in the summer for musicians and

13  singers and actors and other types of artists; is that right?

14  A.  That's correct.

15  Q.  And generally, in this summer camp, these artists,

16  musicians, and singers are in high school; is that right?

17  A.  I didn't know where they -- I knew it was just an upcoming

18  school for talented, I guess, children, because I would take it

19  they're more on the younger side than older.

20  Q.  Understood.  Are you aware that Epstein himself attended

21  the Interlochen Summer Arts Camp when he was a young man?

22  A.  I did not.

23  Q.  Interlochen is located in Michigan?

24  A.  Correct.

25  Q.  And to get to Interlochen, you said you had to fly into

LBUCmax3                         Visoski - cross

 1  Traverse City, Michigan?

 2  A.  That's correct.

 3  Q.  That's the closest airport?

 4  A.  That is closest.

 5  Q.  And in the 1990s, you flew into Traverse City at least once

 6  a year or maybe twice a year in the summer months, you recall;

 7  right?

 8  A.  That's correct.

 9  Q.  Do you recall any of the passengers on those flights?

10  A.  I do not.

11  Q.  Isn't it true that Itzhak Perlman flew on some of those

12  flights?

13  A.  As you said, it just dawned on me, yes, Itzhak Perlman did

14  fly on some of those flights, correct.

15  Q.  Itzhak Perlman is a world famous violinist?

16  A.  Yes.

17  Q.  It's fair to say that Epstein went to Interlochen almost

18  every summer in the 1990s; isn't that right?

19  A.  He went there often in the '90s, but like you, said we are

20  going back a ways.  Yes, correct.

21  Q.  You recall this being in the summer months?

22  A.  Summer months, yes.

23  Q.  These flights typically took place in August, didn't they?

24  A.  I don't know the exact month, but it was warm.

25  Q.  Let me see if I can show you something to refresh your

1    recollection again.  If we could pull up 3527-007 at page 2

2    just for the Court, the deputy, and the witness, please.  We'll

3    direct your attention, Mr. Visoski, from the bottom if you

4    count up six or seven lines, if you look at those entries right

5    there.

6    A.  Yes.

7    Q.  Okay.  And you can look to the left-hand side, as well, in

8    terms of the date.

9    A.  Yes.

10   Q.  Does that refresh your recollection about flying in the

11   month of August to Interlochen?

12   A.  Sure it does, yeah.  This certainly would be a trip that we

13   would do.  I recognize the identifiers.  So it would be in the

14   trip that we would do during that timeframe, yes.

15   Q.  So, you recall, I believe, right, that Epstein eventually

16   had a cabin at Interlochen; isn't that right?

17   A.  That is correct.

18   Q.  So he would be going there at the end of the summers to

19   stay in his cabin and see the performances at the end of the

20   Interlochen Summer Camp; isn't that right?

21   A.   It was my understanding, which it could have been hearsay

22   information, that I thought the cabin was bought or built for

23   Itzhak Perlman, but that was just a rumor I heard, but I don't

24   know whether or not Mr. Epstein actually stayed in the cabin or

25   he donated it to the Interlochen School.  I don't know a whole

1   lot of facts on it, just sheer of what I know, what I remember.

2   Q.  But on those trips, Ghislaine wasn't with him every time he

3   went, was she?

4   A.  I don't remember whether she was or not.  I know

5   Mr. Epstein was because he always traveled on the aircraft.

6   Q.  Let's take a look at that same document again to see if I

7   can refresh your recollection.  One moment.

8   A.  Sure.

9   Q.  I'll call up that same page if I could, 3527-007 at page 2,

10  just for the Court, the deputy, and the witness.  We'll look at

11  the same entries as you did before, Mr. Visoski.

12  A.  Okay.

13          THE COURT:  Describe those, please.

14          MR. EVERDELL:  Sorry.  It's the sixth and seventh

15  entries up from the bottom.

16  Q.  These are the ones we were looking at before; isn't that

17  right, Mr. Visoski?

18  A.  That's correct.

19  Q.  And if you look there, there is some indications of the

20  passengers?

21  A.  Yes, I see that.

22  Q.  And does that refresh your recollection about whether or

23  not there were flights to Interlochen that Ms. Maxwell did not

24  fly on?

25  A.  I mean, it appears that way.  Obviously this isn't my

1   document, but I don't see Ms. Maxwell's name on there.  It's

2   just --

3            MS. COMEY:  Your Honor, objection.

4            THE COURT:  Sustained.  I'll have the jury disregarded

5   observations of the document that are not in evidence other

6   than to refresh his recollection, which we've moved beyond.

7            MR. EVERDELL:  Understood, your Honor.  That's fine.

8   Thank you, Mr. Visoski.  We can take that down.

9   BY MR. EVERDELL:

10  Q.  Mr. Visoski, I think you also flew Mr. Epstein a number of

11  times to Columbus, Ohio; isn't that right?

12  A.  That's correct.

13  Q.  Columbus, Ohio is where Les Wexner lives?

14  A.  That's correct.

15  Q.  Les Wexner is the billionaire owner of the Limited?

16  A.  That's correct.

17  Q.  That's the clothing company?

18  A.  Yes.

19  Q.  It owns Victoria's Secret and Abercrombie & Fitch, among

20  other companies?

21  A.  That's correct, yes.

22  Q.  And Les Wexner was a friend of Jeffrey Epstein's?

23  A.  I believe they were friends.

24  Q.  He was one of Epstein's clients, wasn't he?

25  A.  To my knowledge, Mr. Epstein would call him a client, yes.

1   Q.  And Epstein had a home and an office in Columbus, Ohio

2   where Les Wexner's home was; isn't that right?

3   A.  That is correct.

4   Q.  So he had a few reasons to go to Columbus, Ohio?

5   A.  That's correct.

6   Q.  Now, you were asked a few questions by the government about

7   a woman we are referring to as Jane?

8   A.  Yes.

9   Q.  Do you recall that?

10  A.  Yes.

11  Q.  Just to be clear, Jane is not her real name; right?

12  A.  Correct.

13  Q.  But you do know what her real name is?

14  A.  Yes.

15  Q.  It's been shown to you?

16  A.  That's correct.

17  Q.  Now, you recall seeing Jane on Epstein's plane on one

18  occasion; is that right?

19  A.  One occasion for sure at the time that I had met her.

20  Q.  That's the only time you actually have a recollection?

21  A.  That I have a recollection of, correct.

22  Q.  And you recall this I think being in the 1990s; right?

23  A.  Yes.

24  Q.  Now you said, I believe, that you remember meeting her; is

25  that right?

LBUCmax3                          Visoski – cross

1   A.  Yes.

2   Q.  And that she was a singer; right?

3   A.  Yes.  That's the way Mr. Epstein introduced her as.

4   Q.  And you said that I think she had striking blue eyes; is

5   that right?

6   A.  Correct.

7   Q.  You'll forgive the question, Mr. Visoski, but I think you

8   also remembered that at the time you saw her, you remembered

9   she had large breasts; isn't that right?

10  A.  She was a mature woman, in my opinion.

11  Q.  Well, she looked to you like she was in her 20s, as we said

12  before?

13  A.  Sure, yes.

14  Q.  Now, you remember that this meeting took place I think you

15  said in Palm Beach?

16  A.  It was on the ramp in West Palm Beach, correct.

17  Q.  Now, it was sometimes the case that Epstein would invite

18  people onto the plane before takeoff to show them the plane;

19  isn't that right?

20  A.  Correct.

21  Q.  And sometimes Epstein brought them into the cockpit to meet

22  the pilots?

23  A.  That's correct, yes.

24  Q.  And these people didn't always fly on the planes; isn't

25  that right?

1    A.   That's correct.  He would bring passengers on just to show

2    them the interior and the cockpit, correct.

3    Q.   Sometimes he would show them around, they would look

4    around, maybe meet the pilots, and then leave before takeoff?

5    A.   That's correct, yes.

6    Q.   Sitting here today, you don't know whether the woman you

7    met, Jane, actually flew on that flight that you recall meeting

8    her in the plane?

9    A.   I wouldn't be able to swear that she actually flew on it.

10   I know I met her in the cockpit.

11   Q.   And you don't remember where that flight was going?

12   A.   No, I don't.

13   Q.   And you don't remember anybody else who was on that flight?

14   A.   I do not.

15   Q.   And again, you don't recall seeing Jane specifically,

16   seeing Jane on the plane or any plane at any other time except

17   that one time in Palm Beach that you recall?

18   A.   I can't visualize her sitting in the passenger compartment

19   like I would, say, president Clinton.  It was so long ago, but

20   to answer your question, I can't visually see her sitting in

21   the -- I see her standing in between the two pilot seats.

22   That's my recollection of her.

23   Q.   On that one occasion?

24   A.   On that one occasion, yes, sir.

25   Q.   Now, you met, I believe, with the government on several

LBUCmax3                        Visoski - cross

```
 1   times before coming here to testify today; isn't that right?
 2   A.  Yes.
 3   Q.  And at one of those meetings, they showed you the same
 4   document that I've been showing you just today to refresh your
 5   recollection; isn't that right?
 6   A.  Was that reference to the logbook looking --
 7   Q.  Yes.
 8   A.  Okay.  I don't remember if I did see any from the
 9   government on that.  I'm drawing a blank.  I'm going to go with
10   yes.
11   Q.  Well, do you recall them pointing out certain flights to
12   you?
13   A.  Yes.
14   Q.  To see if you recall them?
15   A.  Yes.
16   Q.  You do remember that?
17   A.  Yes, I do.  Yes.
18   Q.  And in particular, they pointed out certain flights to you
19   where a female passenger was listed with just her first name.
20   Do you remember that?
21   A.  Yes.
22   Q.  And that first name was the same as Jane's true first name;
23   is that right?
24   A.  Correct.
25   Q.  And that did not list the passenger's last name, right,
```

1   just her true first name?

2   A.   Correct.   Yes.

3   Q.   And there were three of those flights; is that right?

4   A.   As far as that same first name?

5   Q.   Yes.

6   A.   I'm sure, yeah, there is at least three.

7   Q.   There was one in '96, one in '97, and one in '98 they

8   showed you; is that right?

9   A.   I don't remember the dates, Mr. Everdell.

10   Q.   Do you remember those three flights they showed you?

11   A.   Yes.

12   Q.   Well, when you met with the government and they showed you

13   these three flights, you couldn't recall whether the woman we

14   are referring to as Jane actually flew on those flights or

15   whether it was somebody else with her same first name?

16   A.   Correct.   There was a -- the first names were the same, but

17   there were no last names.

18   Q.   Now, sitting here today, you still don't know whether the

19   women we're calling Jane flew on any of those flights; isn't

20   that right?

21   A.   Not to my knowledge.   I mean, it was just -- I couldn't

22   tell one from the other with no last name and 20 -- like you

23   said, 20, 22 years ago.

24   Q.   Sure.   But there were other people in Epstein's world who

25   had that same true first name; isn't that right?

LBUCmax3                    Visoski - cross

1   A.  That is correct, yes.

2   Q.  For example, Epstein had an assistant with that same first

3   name; isn't that right?

4   A.  That is correct.

5   Q.  And it was spelled the same way, wasn't it?

6   A.  Yes.

7   Q.  And you met that person, didn't you?

8   A.  Yes, I did.

9           MR. EVERDELL:  One moment, your Honor.

10          Your Honor, I apologize for the delay.  We have a

11  slight choreography issue that we're dealing with here.  I

12  wonder if it might be appropriate if we could take a brief

13  break to deal with it or I can try to do it without the issues

14  of the choreography.

15          MS. COMEY:  Your Honor, I think a brief break would

16  help with the choreography.  I apologize.

17          THE COURT:  You mean to send the jury back to the jury

18  room?

19          MS. COMEY:  I think that might be necessary, your

20  Honor.  There is an exhibit that needs to be submitted under

21  seal instead of on the screens.

22          THE COURT:  Okay.  Is it possible to move past this

23  moment and then return to it later?

24          MR. EVERDELL:  Your Honor, actually, we can do that.

25  If I'm permitted to fix the problem and then display it later,

LBUCmax3                        Visoski - cross

```
 1   we just have to return to this topic when we can figure this
 2   out.  As long as I'm able to return to this topic and display
 3   things to the jury, that's fine.
 4            MS. COMEY:  That's fine with me, your Honor.
 5            THE COURT:  I don't usually tell lawyers what
 6   topics -- you're not going to get an asked and answered
 7   objection, if that's --
 8            MR. EVERDELL:  Yes.  Understood, your Honor.
 9            THE COURT:  So we'll keep going for now.  I presume
10   we'll hit the lunch break time and then you can do the
11   choreography.
12            MR. EVERDELL:  That's fine, your Honor.  We'll do
13   that.  We're breaking for lunch when?
14            THE COURT:  We have jury lunches at 12:30.  If you're
15   otherwise done by then, we'll break early and do that.
16            MR. EVERDELL:  Let me see if I can also fix it in the
17   meantime.
18            THE COURT:  Mr. Everdell, my deputy reminds me, we
19   have a close room with bathrooms, we can just do a short break
20   for the jury.
21            MR. EVERDELL:  Thank you, your Honor.
22            THE COURT:  So we'll do a five-minute break, members
23   of the jury.  Ms. Williams will take you just to that first
24   room where the restrooms are.  Thank you.
25            (Recess)
```

LBUCmax3                          Visoski - cross

1                (Jury not present)

2                THE COURT:  Are you set, Mr. Everdell?

3                MR. EVERDELL:  Your Honor, I have the copies.  What I

4      need to do is insert them into the folders.

5                MS. COMEY:  No objection, your Honor.

6                THE COURT:  Go ahead, Mr. Everdell.

7                (Pause)

8                Are you ready, Mr. Everdell?

9                MR. EVERDELL:  Yes.

10               THE COURT:  The procedure will be you will direct the

11     jury to open the folder under the chair and turn to a

12     particular page?

13               MR. EVERDELL:  Yes.  This one will be done on paper,

14     your Honor.  We'll have it on the screen for the Court, the

15     deputy, and the witness, but the jurors will just have it in

16     paper, as will the government, and it will not be displayed to

17     the public.

18               THE COURT:  This is choreography to maintain the

19     anonymity of the witnesses who might be permitted to testify

20     under pseudonyms?

21               MS. COMEY:  That's exactly right, your Honor.  And for

22     that reason, we're going to ask that the two exhibits that the

23     defense is about to offer be offered under seal.

24               THE COURT:  I am grateful to both counsel for working

25     that through.  Thank you.

LBUCmax3                        Visoski – cross

1              MR. EVERDELL:  Yes, your Honor.

2              THE COURT:  We'll bring in the jury.

3              (Continued on next page)

LBUCmax3                          Visoski - cross

1            (Jury present)

2            THE COURT:  Members of the jury, I guess it ended up

3     being more a medium break, but you're getting your steps in.

4            So, we are ready to proceed, Mr. Everdell, whenever

5     you're ready.

6            MR. EVERDELL:  Thank you, your Honor.

7     BY MR. EVERDELL:

8     Q.  Hi again, Mr. Visoski.

9     A.  Hi.

10    Q.  So when we broke, we were talking about other people in

11    Epstein's world who had that same first name as we were talking

12    about as Jane; right?

13    A.  Yes.

14    Q.  And you said that Epstein had an assistant with that same

15    first name?

16    A.  Yes, there was another person with that same name.

17    Q.  And spelled the same way?

18    A.  Correct.

19    Q.  And you met that person?

20    A.  Yes.

21           MR. EVERDELL:  Now, just for the Court, the deputy,

22    and for the witness, if you could please display LV3A and LV3B,

23    if you can display them together.

24    Q.  Do you see those, Mr. Visoski?

25    A.  Yes, I do.

LBUCmax3                    Visoski – cross

```
 1   Q.   Those are two photographs; is that right?

 2   A.   That's two photographs.

 3   Q.   Do you recognize the person in those photographs?

 4   A.   Yes, I do.

 5   Q.   Is it the same person in both photographs?

 6   A.   Yes.

 7   Q.   And you know that person's name?

 8   A.   Yes.

 9   Q.   Without telling us the name, is that the person we've been

10   referring to just now that has the same first name as Jane's

11   true first name?

12   A.   That's correct, yes, it is.

13   Q.   And is that a fair and accurate depiction of that woman?

14   A.   Yes.

15           MR. EVERDELL:  The defense offers LV3A and LV3B.

16           MS. COMEY:  No objection so long as they are sealed,

17   your Honor.

18           MR. EVERDELL:  We offer them under seal, your Honor.

19           THE COURT:  LV3A and LV3B are admitted under seal

20   consistent with my ruling allowed certain witnesses to testify

21   under pseudonyms to protect their privacy.

22           (Defendant's Exhibits LV3A, LV3B received in evidence)

23           MR. EVERDELL:  Thank you, your Honor.  Now if I could,

24   with the Court's permission, members of the jury, you can take

25   out the manilla folders that are under your chairs, but please
```

LBUCmax3                          Visoski - cross

1   don't open them yet.

2           I would just, with the Court's permission, instruct,

3   especially the jurors who are here on the right side of the

4   jury box, as you look at the photos, because they are under

5   seal, please do it in such a way that you do not display what

6   you're looking at to the members of the gallery.  So keep that

7   manilla folder upright so no one could see, if you would.

8           Is that right all right, your Honor?

9           THE COURT:  Yes.

10          MR. EVERDELL:  Is it okay with the government?

11          MS. COMEY:  Yes, your Honor.

12          MR. EVERDELL:  If you would open the folders and

13  please look at what's been marked as LV3A and LV3B.  When

14  you've had a chance to look, you can return the folders under

15  your chair.  And you can take that down.

16  BY MR. EVERDELL:

17  Q.  Now, Mr. Visoski, you spoke to this person in the photos on

18  a number of occasions; is that right?

19  A.  That's correct.

20  Q.  In fact, you've spoke to her frequently enough that you

21  even had her phone number in your cellphone; right?

22  A.  That's correct.

23  Q.  And she traveled frequently with Mr. Epstein on his planes;

24  isn't that right?

25  A.  Yes.

1    Q.  But that woman is not Jane, is she?

2    A.  Correct.

3    Q.  And you testified earlier that you often didn't meet the

4    passengers on the flights, you were just given their names

5    sometimes before takeoff; right?

6    A.  Correct.

7    Q.  So, for all you know, there may have been many other people

8    with that same first name as Jane's first name who traveled on

9    Epstein's planes?

10   A.  True.

11   Q.  But the bottom line is, you don't know whether Jane was on

12   any of those three flights where there is a passenger listed

13   with Jane's true first name?

14   A.  Not the three flights you made reference to.  Without the

15   last name, I didn't know which one you were referring to or who

16   it was.

17   Q.  Thank you.  I want to ask you just about a few more

18   flights.

19   A.  Sure.

20   Q.  Are you familiar with Prince Andrew, the Duke of York?

21   A.  Yes, I am.

22   Q.  He is the son of Queen Elizabeth II of England, is he not?

23   A.  Yes.

24   Q.  Did he ever fly on Epstein's planes?

25   A.  Yes, he did.

LBUCmax3                        Visoski - cross

1   Q.  Do you recall the first time when he flew on the plane?

2   A.  I do not.

3   Q.  Do you recall someone named Emmy Tayler?

4   A.  Yes.

5   Q.  She was one of Ghislaine's assistants, wasn't she?

6   A.  Yes, she was.

7   Q.  She started working for Ghislaine in around 1997 or so;

8   isn't that right?

9   A.  I don't know the exact date and I actually didn't remember

10   the name until you brought it up, but that's correct, that's a

11   name from the past.

12   Q.  Well, did Emmy Tayler fly on Epstein's planes?

13   A.  Yes, she did.

14   Q.  Do you recall the first time she flew?

15   A.  I do not.

16   Q.  Are you familiar with the name Andy Farmer?

17   A.  Yes.

18   Q.  Do you recall meeting or seeing anyone named Andy Farmer on

19   any flights?

20   A.  I don't remember.  I know the name, but I think we're going

21   back a long way.

22   Q.  Well, to your knowledge, is there any record of anyone

23   named Andy Farmer ever flying on --

24   A.  I don't know of any record.

25          MR. EVERDELL:  Just one moment, your Honor.

1    I'll ask we put up for the Court, the deputy, and

2    Mr. Visoski LV4 and LV5.

3    Q.  Mr. Visoski, do you see those documents in front of you?

4    A.  Yes, I do.

5    Q.  Each of those documents has a name on it; isn't that right?

6    A.  Yes.

7         MR. EVERDELL:  Without objection, I believe we will

8    offer these under seal as LV4 and LV5.

9         MS. COMEY:  No objection, as long as they're under

10   seal, your Honor.

11        THE COURT:  LV4 and LV5 are admitted to the extent of

12   my rulings that certain witnesses may testify pursuant to

13   pseudonyms in order to protect them.

14        (Defendant's Exhibits LV4, LV5 received in evidence)

15        MR. EVERDELL:  At this point, I will ask the members

16   of the jury if the government is okay to pick up their folders

17   one more time.

18        MS. COMEY:  No objection, your Honor.

19        THE COURT:  Go ahead.

20        MR. EVERDELL:  It's the same procedure as before.  I'm

21   going to ask you to look at the documents that are underneath

22   the two photographs you've already looked at.  Please do not

23   show any of them to the members of the gallery.

24   BY MR. EVERDELL:

25   Q.  Mr. Visoski, I'm going to start with what's now in evidence

1   as LV4; all right?

2   A.   Yes.

3   Q.   I'm going to refer to the person there as Kate, okay?

4   A.   Okay.

5   Q.   Now, LV4 has a true name on that exhibit; is that right?

6   A.   Correct.

7   Q.   Do you recognize Kate's true name, the one that's on the

8   paper of LV4?

9   A.   Not really.

10  Q.   Do you recall meeting or seeing anyone with Kate's true

11  name on any of the flights?

12  A.   Not to my knowledge.  It's not jumping out at me at all.

13  Q.   To your knowledge, there is no record with Kate's true name

14  ever flying on any of Epstein's flights?

15  A.   I don't recall any of them.

16  Q.   Now please look at LV5.  That has a full name on it, too,

17  doesn't it?

18  A.   Yes.

19  Q.   And that person's first name is Carolyn; correct?

20  A.   Correct.

21  Q.   I'm going to refer to that person by her first name,

22  Carolyn, okay?

23  A.   Okay.

24  Q.   Do you recognize Carolyn's full name that's on the paper,

25  LV5?

LBUCmax3                          Visoski – cross

1   A.  I do not.

2   Q.  Do you recall meeting or seeing anyone with Carolyn's full

3   name on any flights?

4   A.  I do not.

5   Q.  And to your knowledge, there is no record of anyone with

6   Carolyn's full name flying on any of Epstein's flights?

7   A.  Not to my knowledge.  I don't have any memory at all.

8   Q.  Mr. Visoski, during your testimony so far, you've mentioned

9   the names of some pretty important people; isn't that fair to

10  say?

11  A.  Yes.

12  Q.  You already said that former president Bill Clinton flew on

13  some of the flights?

14  A.  Yes, he did.

15  Q.  And Prince Andrew on some of the flights?

16  A.  Yes.

17  Q.  Itzhak Perlman, the famous violinist, on some of the

18  flights?

19  A.  Yes.

20  Q.  Donald Trump, before he was president, also flew on

21  Epstein's flights; isn't that right?

22  A.  Yes, he did.

23  Q.  He flew on them a number of times; right?

24  A.  There was more than once I believe, yes.

25  Q.  Sometimes he flew with his family members, too; right?

1    A.  I don't know -- I don't remember that.  I certainly

2    remember President Trump, but not nearly the other people

3    associated with him.  Like I said, if it was something special

4    that would get embranded in my head, I certainly remember the

5    president.

6    Q.  Did Robert Kennedy Jr. also fly on his plane?

7    A.  I don't remember.  I'm not remembering that one.

8    Q.  What about Senator John Glenn, the former astronaut?

9    A.  I do remember Senator Glenn, yes.

10   Q.  Former Senator George Mitchell also flew on his plane?

11   A.  I do remember.

12   Q.  The actors Kevin Spacey and Chris Tucker also flew on his

13   plane?

14   A.  I remember them, as well.

15   Q.  It's fair to say that these are all pretty high profile

16   people; is that right?

17   A.  Correct.

18   Q.  And these are people who the public at large would be

19   interested in?

20   A.  Sure.

21   Q.  And these are all people who are subject to a great deal of

22   media attention and scrutiny; is that right?

23   A.  I would assume so, yes.

24   Q.  And these are all people who might have legitimate privacy

25   concerns about their goings on?

1   A.  Correct.  Yes.

2   Q.  Mr. Visoski, I think you were asked as part of your

3   employment to sign a nondisclosure agreement?

4   A.  That is correct.

5   Q.  Now, when you were asked to sign a nondisclosure agreement,

6   you didn't think it was unusual, did you?

7   A.  Not at all.

8   Q.  And you certainly didn't take it to mean that you needed to

9   sign it so you wouldn't disclose some kind of illegal activity

10  that was happening on the plane, did you?

11  A.  No, of course not.

12  Q.  You never saw anything that came close to that; right?

13  A.  Correct.

14  Q.  You just took it to mean you couldn't write a book about

15  the stuff and the people you were interacting with; right?

16  A.  That's correct.  Several of my colleagues have signed the

17  same or similar documents in my profession.  It's a fairly

18  normal request.

19  Q.  So for people who fly private jets, this is a fairly common

20  occurrence?

21  A.  That is correct, sure.

22  Q.  You have a lot of people, high profile people we just

23  mentioned, who don't want necessarily all their business

24  written about in a book; right?

25  A.  Exactly.

1   Q.  I want to ask you a little bit about where you stayed when

2   you flew to Epstein's residences.  All right?

3   A.  Okay.

4   Q.  Now, I believe your home is near Palm Beach; is that right?

5   A.  Yes, it was.

6   Q.  So when you flew to Palm Beach, you stayed in your home;

7   right?

8   A.  Correct.

9   Q.  That's where you're based?

10  A.  Correct.

11  Q.  When you flew to New York, where did you stay?

12  A.  The first part of my employment with Mr. Epstein, I stayed

13  in a hotel, but then later on, I was offered to stay at a

14  building he owned, an apartment building on East 62nd or 66th

15  Street.  So I had my own apartment.

16  Q.  Was that 301 East 66th Street?

17  A.  That is correct.

18  Q.  Is that where your partner, copilot Dave Rogers also

19  stayed?

20  A.  That's correct.

21  Q.  And that's an apartment building?

22  A.  That is correct.

23  Q.  These are basically corporate apartments?

24  A.  Correct.

25  Q.  Do you know if Epstein owns that building or rents those

1   apartments?

2   A.  I don't know the actual business of it.  It was to my

3   knowledge that he owned the building.

4   Q.  But it's safe to say that you and Dave Rogers stayed there

5   on your trips to New York?

6   A.  That is correct.

7   Q.  Do you know if any other Epstein employees stayed there?

8   A.  Yes.

9   Q.  So you saw some other employees in the building when you

10  were there; right?

11  A.  Correct.

12  Q.  For example, you saw Sarah Kellen in the 66th Street

13  building; is that right?

14  A.  That's correct.

15  Q.  Do you remember any others you saw there?

16  A.  The other person was the one we can't say the name.

17  Q.  Okay.  So you saw the person whose photographs we just

18  looked at, LV3A and LV3B; right?

19  A.  That is correct, yes.

20  Q.  You saw that woman in that apartment building?

21  A.  That is correct, yes.

22  Q.  But you never saw the woman we're referring to as Jane

23  there, did you?

24  A.  No, not -- no.

25  Q.  All right.  Now, for the ranch in New Mexico, your

1  recollection is that Epstein bought the ranch I think sometime

2  in the mid 1990s; is that right?

3  A.  That's correct.

4  Q.  And when he first bought the property, that large main

5  house that we saw pictures of hadn't been built yet right?

6  A.  That's correct.

7  Q.  That house was under construction for several years; right?

8  A.  That's correct.

9  Q.  I think you said it was finished towards the end of the

10  '90s, 2000?

11  A.  Correct.

12  Q.  So you stayed when you went to the ranch in the mid to late

13  '90s -- well, where did you stay?

14  A.  In the early part of the mid '90s, I stayed at the Ranch

15  Central in the bunkhouse rooms, and then later on I built a

16  home on the ranch.

17  Q.  I'll ask you about that home in a bit.  But for the first

18  part, you stayed in Ranch Central; right?

19  A.  Ranch Central, correct.

20  Q.  And the ranch hands and the property manager stayed there,

21  as well?

22  A.  They stayed in the other buildings associated with Ranch

23  Central, but mostly the Ranch Central lodge or bedrooms were

24  for guests that were on the aircraft.  But everybody stayed,

25  really, at Ranch Central, like you said, employees or workers

1   on the ranch that lived there.

2   Q.  And you said that Epstein, before the main house was built,

3   stayed in that triple-wide trailer you called the lodge; is

4   that right?

5   A.  That's correct.

6   Q.  Okay.  And you've described it already, I think from the

7   outside, it had a deck; is that right?

8   A.  That's correct.

9   Q.  And it sort of looks nicer than a trailer does from the

10  outside, it was outfitted that way?

11  A.  Correct, yes.

12  Q.  About how big was it?

13  A.  It was probably around two 2,000 square feet.

14  Q.  You went inside it?

15  A.  Yes.

16  Q.  How many times were you inside that triple-wide trailer?

17  A.  Many times.

18  Q.  And you described the interior before, but you mentioned a

19  number of bedrooms.  Can you just describe a little bit when

20  you walk in the front door where things are situated from the

21  front door entrance, the different rooms?

22  A.  Sure.  When you walked in the front door, there was --

23  immediately to your left, there was a fireplace on the wall.

24  Across from the fireplace, there was a couch that faced the

25  fireplace.  You went further in, you're in the middle of the

1   living room, which was you made a left turn that brought you

2   into the master bedroom, and if you made a right turn, it took

3   you to the two guest bedrooms on the right side of the trailer.

4   Q.   Were the guest bedrooms next to each other or how were they

5   set up?

6   A.   There was a bedroom with a bathroom in between.   They

7   weren't a Jack and Jill bathroom, but it was still a bedroom, a

8   bathroom in between, and then the other bedroom, but they were

9   on the right side of the trailer.   The left side of the trailer

10  was the master bedroom.   So it was a split floor plan.

11  Q.   But you didn't sleep there; right?

12  A.   On occasion I have slept there.

13  Q.   Where did you sleep, in one of the guestrooms?

14  A.   In one of the guestrooms, but this was a vacation where

15  Mr. Epstein was on the ranch.   It was before I built my home,

16  so I was able to spend the time at the lodge.   We're going

17  really back far.

18  Q.   But eventually, and I think maybe it was in the 2000s or

19  so, Epstein gave you some land; is that right?

20  A.   That's correct.

21  Q.   Epstein gave you about 40 acres of land from his ranch so

22  that you could build a house; isn't that right?

23  A.   That's correct.

24  Q.   And he didn't charge you for that land?

25  A.   No, he did not.

LBUCmax3                    Visoski - cross

1    Q.  And you built a house there?

2    A.  I built the house there, yes.

3    Q.  So from about 2000 onwards when you flew to the ranch,

4    you'd stay at your home?

5    A.  That is correct.

6    Q.  Let me ask you briefly about the trips to Epstein's island

7    in the Virgin Islands.  You said that's Little St. James

8    Island?

9    A.  That's correct.

10   Q.  When you flew to the Virgin Islands, you didn't fly

11   directly into little St. James, you said; right?

12   A.  No.

13   Q.  It doesn't have an airstrip?

14   A.  That's correct.

15   Q.  You flew to St. Thomas, which is the bigger island right

16   by?

17   A.  That's correct.

18   Q.  You flew Epstein and his guests to Little St. James in a

19   helicopter?

20   A.  Correct.

21   Q.  Because you're a trained helicopter pilot?

22   A.  That is correct.

23   Q.  Where did you stay when you went on the trips to the Virgin

24   Islands?

25   A.  Typical hotel, Marriott Resorts that were there.

LBUCmax3                        Visoski - cross

1    Q.  So you wouldn't stay in the island residence, you'd stay at

2    St. Thomas?

3    A.  I would bring the helicopter back and the crew would stay

4    on St. Thomas in a regular hotel.

5    Q.  Now, we saw a number of photographs of Little St. James

6    Island when you were on your direct testimony.

7         Do you remember those?

8    A.  Yes.

9    Q.  I'm not going to call them up, there were a number of them.

10   But you recall that they had structures on the property in

11   those photographs; right?

12   A.  Yes.

13   Q.  They had the fully built houses on those photographs;

14   right?

15   A.  Yes.

16   Q.  Well, when Epstein first bought the property, those houses

17   weren't there; right?

18   A.  Some of the buildings were not there.  He added buildings,

19   yes.

20   Q.  So there was a fair amount of construction to make the

21   island look the way it was in those photographs; right?

22   A.  That is correct.

23   Q.  And was it about -- was it roughly '97 when he purchased

24   the property?

25   A.  It was the late '90s, correct.  I don't know the exact

1   year, but you're correct that it was late '90s.

2   Q.  And that construction was going on for several years,

3   wasn't it?

4   A.  Yes.

5   Q.  Including the helipad that was there?

6   A.  The helipad moved a couple times, but yeah, it was -- it's

7   kind of easy to do a helipad compared to a building, but yes,

8   the helipad moved around.

9   Q.  And Ghislaine supervised all that construction?

10  A.  She was involved, absolutely.

11  Q.  Separate question, Mr. Visoski.  You are, I believe,

12  somewhat of a car guy; is that right?

13  A.  That's correct.

14  Q.  You like cars?

15  A.  Yes, I do.

16  Q.  You enjoy looking at the latest models?

17  A.  I like the classics.

18  Q.  You like the classics.  Okay.  Well, Epstein shared that

19  interest with you; is that right?

20  A.  That is correct.

21  Q.  He also liked cars?

22  A.  Yes.

23  Q.  And you and he would discuss cars from time to time; isn't

24  that right?

25  A.  Yes.

LBUCmax3                    Visoski - cross

 1   Q.   So he knew about your shared interest, you talked about

 2   this a lot?

 3   A.   That is correct.

 4   Q.   Now he, I believe, bought some cars that he registered in

 5   your name; isn't that right?

 6   A.   Yes.

 7   Q.   There was a 2008 Land Rover?

 8   A.   Yes.

 9   Q.   There was a 2005 Mercedes Benz CLK?

10   A.   Yes.

11   Q.   There was a 2005 Jaguar X-Type?

12   A.   Yes.

13   Q.   These were all kept at his residence in Palm Beach?

14   A.   That's correct.

15   Q.   And you could use the cars if you wanted to; right?

16   A.   If I wanted to, sure.

17   Q.   But you didn't consider them your cars?

18   A.   No.

19   Q.   They were Epstein's cars; right?

20   A.   I'm sorry?

21   Q.   They were Epstein's cars; right?

22   A.   That's correct.

23   Q.   And other people at the Palm Beach residence could use

24   them, as well?

25   A.   That is correct.

LBUCmax3                        Visoski - cross

1    Q.   I believe Epstein also bought a 34-foot JVC powerboat;

2    right?

3    A.   Yes.

4    Q.   That was registered to you, as well?

5    A.   Yes, it was.

6    Q.   And you could use it if you wanted to; right?

7    A.   That's correct.

8    Q.   But it wasn't -- you didn't consider it yours?

9    A.   No.

10   Q.   Are you also aware of a green Cobra sports car that Epstein

11   had?

12   A.   Yes.

13   Q.   That one was not registered in your name; right?

14   A.   No.

15   Q.   Do you know where Epstein got that from?

16   A.   Yes.

17   Q.   Where did he get it from?

18   A.   That came from Mr. Wexler in Columbus, Ohio.

19   Q.   Do you know approximately when he got that car?

20   A.   It had to been -- I know the car was built in '94,

21   Mr. Wexner held it for — I'm only guessing now — a year or two.

22   So I would think Mr. Epstein got it '96, '97.

23   Q.   Do you know when he got rid of it?

24   A.   When he got rid of the Cobra?

25   Q.   Yeah.

1    A.   Yes.

2    Q.   When was that?

3    A.   That was probably -- it was in my possession for 20 years.

4    Probably around 2000.

5    Q.   Thank you.  Now, Mr. Visoski, in your testimony a little

6    while ago, you said that Epstein gave you 40 acres of land on

7    his ranch in New Mexico so you could build a house; right?

8    A.   Yes.

9    Q.   I think you would agree that was a pretty generous act on

10   his part; yes?

11   A.   Yes.

12   Q.   Now, over the years, Epstein also gave you other gifts, as

13   well; isn't that right?

14   A.   He gave other -- yes, he gave gifts to me as well as other

15   employees, but yes.

16   Q.   Isn't it true that he paid for your children's tuition?

17   A.   Yes.

18   Q.   You have two daughters; is that right?

19   A.   Correct.

20   Q.   And he paid for both of their tuitions?

21   A.   Correct.

22   Q.   So were these private school tuitions when they were in

23   high school?

24   A.   Yes.

25   Q.   Did he also pay for their college tuitions, as well?

1    A.  Yes.

2    Q.  Did you ever mention this to Ghislaine that Epstein was

3    paying for your daughters' tuitions?

4    A.  Yes.

5    Q.  So she was aware of this fact, too?

6    A.  Absolutely.

7    Q.  Did you ask Epstein to pay for your daughters' tuitions?

8    A.  He offered it when I first got hired.  He said that he

9    would take care of all employees' children's education.  So we

10   knew it was pretty much a given.

11   Q.  So he offered to do this for all of the employees that

12   you're aware of?

13   A.  Yes, correct.

14   Q.  You didn't have to ask him for it?

15   A.  No.

16   Q.  So fair to say that Epstein took an interest in seeing your

17   young daughter succeed; isn't that right?

18   A.  That's correct.  He believed in higher education.

19   Q.  And this was when they were high school aged and college

20   aged; isn't that right?

21   A.  Yes, and even younger, grade school.

22   Q.  You didn't think there was anything inappropriate about

23   that; right?

24   A.  No.

25   Q.  It was just a generous act on his part, wasn't it?

LBUCmax3                          Visoski - cross

1   A.  Absolutely.

2   Q.  And you certainly didn't think that Epstein had any

3   ulterior motive for being generous to your daughters, did you?

4   A.  No.

5   Q.  And he never asked you for anything in return, did he?

6   A.  No.

7   Q.  Mr. Visoski, are you aware that Epstein had back problems?

8   A.  He complained about back problems, yes.

9   Q.  Are you aware he often used a heating pad on his back?

10  A.  Yes.

11  Q.  And are you aware that he often got massages on a regular

12  basis for the same reason?

13  A.  Yes, he did.  Yes.

14  Q.  Now, for example, when you flew to the ranch in New Mexico,

15  the ranch manager would sometimes arrange massages for Epstein;

16  isn't that right?

17  A.  It's what I heard from the ranch manager, yes.

18  Q.  When the masseuses showed up, they were from a professional

19  saloon in Santa Fe?

20  A.  To my knowledge, yes.

21  Q.  That was called the Ten Thousand Waves; is that right?

22  A.  I know that salon existed and it was famous for massage

23  service, yes.

24  Q.  And he received massages from both male and female

25  masseuses; isn't that right?

A.  I didn't know their sexes, to be honest with you.

Q.  But to your knowledge, these were all adult professional

masseuses?

A.  Oh, absolutely.

Q.  Now, Mr. Visoski, I want to ask you some questions about

where Epstein lived in New York and where Ghislaine lived in

New York in the 1990s and the 2000s.

A.  Okay.

Q.  Epstein, I think you testified, had two different

residences in New York from 1991 two 2005?

A.  Correct.

Q.  You visited both of these?

A.  Yes.

Q.  One of the reasons you would have gone to his residence was

to pick up his luggage or drop it off before or after a flight;

right?

A.  That was typically the main reason, correct.

Q.  Another reason you said you might have gone there was you

had a hobby of installing home video and audio equipment and

home theaters; is that right?

A.  It was home theater.  I had been using the word "video

equipment," but it was in the '90s when home theaters, the

Dolby came out, so everybody was on installing that.  So he

got -- he was an audio/video person, too, as one on high

fidelity.  So we were doing home theaters in all the

1   residences.

2   Q.   This is something you know how to do well?

3   A.   Yeah, I had a knack for that, as well.

4   Q.   So your mechanics background helps with that?

5   A.   Yes, it did.

6   Q.   And he liked having sort of the latest audio/video

7   equipment or home theater equipment in his homes?

8   A.   Absolutely.

9   Q.   So you would occasionally go to all of his homes and

10  install this for him?

11  A.   Absolutely, yes.

12  Q.   Did this in all his residences, not just New York?

13  A.   All of them.

14  Q.   Palm Beach, Zorro Ranch, the island?

15  A.   That's correct.

16  Q.   I want to focus on his residences in New York.  Your

17  recollection is that when you first began working for him in

18  '91, he lived on a residence on 69th Street; isn't that right?

19  A.   Yes, that was of the first residences I remember.  I think

20  I only maybe went there one time.  It was very early on

21  obviously, in '91.

22  Q.   Was that 34 East 69th Street?

23  A.   I know it was 69th Street.  I don't remember the number.

24  But you are correct when you say 69th Street.

25  Q.   And then sometime after that, maybe in the mid '90s, he

LBUCmax3                          Visoski - cross

1   moved to a townhouse on 71st Street; right?

2   A.  That's correct.

3   Q.  That's the one we saw photographs of?

4   A.  Correct, that's the 9 East 71st Street.

5   Q.  That's right off Fifth Avenue and Central Park?

6   A.  Correct.

7   Q.  And these are the only two New York residences you recall

8   for Epstein; isn't that right?

9   A.  That's correct.

10  Q.  That's where you go to pick up his luggage and install

11  video equipment?

12  A.  Yes.

13  Q.  Now, you also went to Ghislaine's residences during the

14  same period, didn't you?

15  A.  Yes.

16  Q.  And you went for the same purposes; isn't that right?

17  A.  Yes, it was exactly -- yes, for luggage and such.

18  Q.  You'd go pick up her luggage from the residence, drop it

19  off there?

20  A.  Yes.

21  Q.  I think you also did the home theater work for her

22  residences, as well?

23  A.  Exactly, yes.

24  Q.  Now, Ghislaine had several different residences in New York

25  from 1991 to 2005; isn't that right?

1   A.  Yes.

2   Q.  And I believe you said you think you went to all of them?

3   A.  Yes.

4   Q.  So when you first started working for Epstein in '91, she

5   lived in an apartment on -- you said a small apartment on the

6   east side of Manhattan; is that right?

7   A.  Yes.

8   Q.  Do you recall if that was 20 East 66th Street?

9   A.  I don't remember the -- I definitely don't remember the

10  66th Street because I would have remembered that was the

11  apartment building where we stayed, but I don't remember the

12  address of her very first place.

13  Q.  And then at some point in the mid '90s, she moved to a

14  different apartment on the east side on 84th Street?

15  A.  I do remember 84th Street, yes.

16  Q.  I think you described that before in your testimony?

17  A.  Yes.

18  Q.  Was that 114 East 84th Street?

19  A.  Yes, it was.

20  Q.  Do you recall her living for a few years in the late '90s

21  and early 2000s at an apartment on East 81st Street?

22  A.  I don't remember 81st Street.  I just remember 84th Street.

23  Q.  But you do recall that, at some point, maybe in the early

24  2000s, she moved to a townhouse on East 65th Street?

25  A.  I do remember 65th Street, yes.

LBUCmax3                    Visoski – cross

1    Q.  And that was 301 East 65th Street; right?

2    A.  No, 301 -- well, 301 was the apartment.  66th Street, that

3    address on 65th, which I want to say it was 116 or 114 East

4    65th Street --

5              MR. EVERDELL:  One moment, your Honor.

6    Q.  Sorry.  I'm going to correct myself.  It was 116 East 65th

7    Street?

8    A.  There you go.  That's correct.

9    Q.  These are all the New York residences that you recall for

10   Ghislaine; correct?

11   A.  Yes, it is.

12   Q.  These are all different residences than the residences that

13   Epstein had as we discussed; isn't that right?

14   A.  That's correct.

15   Q.  And that's where you'd pick up Ghislaine's luggage from;

16   right?

17   A.  Yes.

18   Q.  You wouldn't pick it up from one of Epstein's residences;

19   right?

20   A.  No, not unless I was picking up Jeffrey's luggage, I went

21   to Mr. Epstein's residence.

22   Q.  So at all times from 1991 to the 2000s, Ghislaine

23   maintained a separate residence in New York from Mr. Epstein's;

24   is that right?

25   A.  Correct.

LBUCmax3                          Visoski – cross

1    Q.  Mr. Visoski, I have one related question about the home

2    theater equipment you installed.  You testified that you

3    installed this type of equipment in virtually all of Epstein's

4    residences; right?

5    A.  Yes.

6    Q.  And you installed it in his residence in Palm Beach, you

7    said; right?

8    A.  Yes.

9    Q.  So that Palm Beach residence was 358 El Brillo Way in Palm

10   Beach?

11   A.  That's correct.

12   Q.  Do you recall a time when the El Brillo Way residence was

13   being renovated and Epstein had to move to a rental residence

14   in Palm Beach?

15   A.  I do remember that time.

16   Q.  And did you install the sort of home theater or any audio

17   equipment in the rental residence?

18   A.  I don't recall installing in the rental residence, no.

19   Q.  Do you recall where the rental residence was located in

20   Palm Beach?

21   A.  I don't know the address.  I know approximately where it

22   was, but I don't remember the address.

23   Q.  Do you recall when the renovation took place?

24   A.  I do not.  I'd only be guessing if I said the mid 1990s,

25   but I can't give you an accurate date.  Nothing sticks out in

LBUCmax3                    Visoski – cross

1    my head on that.

2    Q.  Best guess is sometime in the mid '90s?

3    A.  Mid '90s, yes.

4    Q.  Do you recall how long the renovation lasted?

5    A.  It was a pretty serious renovation.  I'd only be guessing

6    if I said six to eight months.

7    Q.  Thank you.

8         MR. EVERDELL:  Your Honor should I continue?

9         THE COURT:  How much longer do you have?

10        MR. EVERDELL:  I'm going to have probably about 20

11   more minutes.

12        THE COURT:  Keep going for now.  I'll let you know.

13   Keep going for now.

14        MR. EVERDELL:  Understood.

15   Q.  Mr. Visoski, I want to ask you some questions about your

16   sense of the relationship between Epstein and Ghislaine.  Okay?

17   A.  Okay.

18   Q.  Now, you said you flew on numerous flights both of them;

19   right?

20   A.  Yes.

21   Q.  And you interacted with them on a regular basis for several

22   years from the 1990s and the 2000s; right?

23   A.  Yes.

24   Q.  So I think you got a sense of what Ghislaine did for

25   Mr. Epstein; right?

LBUCmax3                          Visoski – cross

1    A.  Yes.

2    Q.  And you testified that she was one of the assistants he had

3    in his office; right?

4    A.  Yes.

5    Q.  He had lots of assistants; isn't that right?

6    A.  That's correct.

7    Q.  Now, in the mid '90s through the end of the 1990s,

8    Ghislaine was the assistant who took care of Epstein's

9    properties; isn't that right?

10   A.  That's correct.

11   Q.  She would make sure the cleaning people came; right?

12   A.  Yes.

13   Q.  Or the -- well, there were -- I should clarify.  There were

14   staff at each one of these residences; right?

15   A.  Yes, she took -- yes.

16   Q.  And there were house managers at each one of these

17   residences?

18   A.  That's correct.

19   Q.  So they would take care of, sort of, the day-to-day of each

20   of these residences?

21   A.  Exactly.  She was in charge of the house managers, making

22   sure that --

23   Q.  Right.

24   A.  -- it got taken care of.

25   Q.  She supervised the house managers who did the day-to-day?

LBUCmax3                          Visoski - cross

1  A.  Correct.

2  Q.  If there was something wrong, ultimately it was her

3  responsibility if there was a problem?

4  A.  It probably would have been the first phone call to

5  Ms. Maxwell to say we got a problem.

6  Q.  If there was a problem with a pool guy not coming and the

7  house manager wasn't dealing with it, Ghislaine would deal with

8  it?

9  A.  She would jump on it.

10  Q.  Same thing, cleaning people didn't come on time and it

11  wasn't being addressed correctly, Ghislaine had to deal with

12  that?

13  A.  Yes.

14  Q.  She would manage the household staff as a supervisory over

15  the household manager?

16  A.  Correct.

17  Q.  She would also oversee repairs and renovations and

18  decorating?

19  A.  Yes.

20  Q.  Things like that?

21  A.  Yes.

22  Q.  She was a shopper for Epstein; right?

23  A.  She liked to shop.

24  Q.  She bought furniture and things like that for the

25  residences?

LBUCmax3                          Visoski - cross

1   A.   That is correct.

2   Q.   She bought household items?

3   A.   Yes.

4   Q.   She decorated the planes, too; right?

5   A.   She had a lot put into the airplanes, stocking the airplane

6   on what we carry as far as beverages.

7   Q.   We saw photographs of the plane, right, this isn't a matter

8   of hanging a few curtains; right?

9   A.   No.

10  Q.   This is a pretty big job to outfit one of these planes

11  correctly for their flight?

12  A.   Sure.

13  Q.   And we also saw these properties; right?  They were --

14  let's talk about the ranch in particular.  That was a large

15  piece of property; right?

16  A.   A lot of square footage, yes.

17  Q.   You said 10,000 acres, roughly?

18  A.   Yes.

19  Q.   It's a pretty big job to manage those properties; right?

20  A.   Yes.

21  Q.   In particular, just to call out the ranch for a moment,

22  there were animals on that property; right?

23  A.   Yes.

24  Q.   There were horses in the stables?

25  A.   She loved her horses.

LBUCmax3                          Visoski – cross

1    Q.  She took care of the horses; right?

2    A.  Yes, she did.

3    Q.  She took care of the other animals on the property?

4    A.  Yes.

5    Q.  This took a lot of Ghislaine's time and energy to do this

6    job, didn't it?

7    A.  Yes.

8    Q.  And she had to travel to the properties from time to time

9    to do this work; right?

10   A.  That's correct.

11   Q.  Now, I think in your testimony, you called her Epstein's

12   number 2; right?

13   A.  Yes.

14   Q.  But from your perspective, she was dealing with the

15   aircraft and the properties; right?

16   A.  Yes.

17   Q.  She wasn't dealing with Epstein's finances; right?

18   A.  No, not the business side.  It was Jeffrey household

19   personal.

20   Q.  The reason why you call her number 2 is because she was

21   generally overseeing the running of the households; right?

22   A.  Correct.

23   Q.  But as we said, she wasn't on site at each of these

24   properties every single day running the day-to-day of these

25   households?

1   A.  No.

2   Q.  There were house managers that did that on a day-to-day

3   basis?

4   A.  That's correct.

5   Q.  Now, your recollection is that Ghislaine generally worked

6   out of Epstein's offices in New York; isn't that right?

7   A.  Yes.

8   Q.  And you testified there was a room in Epstein's offices

9   that had about five desks in it that was sort of off to the

10  right of his office?

11  A.  That's correct.

12  Q.  And that's what you called the personal assistants' room;

13  right?

14  A.  There was no official name for it, but it was my best

15  description of who was in that room.

16  Q.  And Ghislaine was one of the personal assistants who had a

17  desk in that room?

18  A.  That's correct.

19  Q.  Now, when you first met Ghislaine in 1991, she seemed to

20  you to be just an employee of Epstein; isn't that right?

21  A.  It might in the first introduction.

22  Q.  So at that point early on, I'm talking '91, '92 when you

23  first started working, it didn't seem to you like she had a

24  personal relationship with Epstein; right?

25  A.  No.  I believe when Mr. Epstein introduced her, that he

1    needed help because he was expanding, getting bigger, you know,

2    first time he had his own private jet, that he needed help to

3    handle everything else in his life so that he could focus on

4    his business.  And when you start buying homes and properties,

5    he --

6    Q.  I'm sorry to interrupt.

7    A.  He knew he was going to get busy.  So Ghislaine was his

8    go-to person to handle everything else that was not

9    business-related with his company.

10   Q.  So I think you said at some point, though, in the mid '90s,

11   it may have appeared to you that Ghislaine was involved in a

12   personal relationship with Epstein; isn't that right?

13   A.  Yeah, I thought they were a couple in the mid '90s.  It's

14   just my own take on it.

15   Q.  And that was based on your observations of them together at

16   the time and how they interacted with each other?

17   A.  Sure.  Yes.

18   Q.  They made travel plans together, they talked to each other,

19   things like that?

20   A.  Yes.

21   Q.  But I think you testified that it wasn't totally clear to

22   you that Epstein and Ghislaine had a romantic relationship;

23   right?

24   A.  Yeah, I don't know what the definition of a romantic

25   relationship is as opposed to just relationship.  To me,

LBUCmax3                       Visoski - cross

1    romantic would mean a more involved relationship.  I wasn't

2    aware of anything more than a couple.

3    Q.  You never saw them kiss you said; right?

4    A.  No.

5    Q.  You never saw them hold hands?

6    A.  No.

7    Q.  Now, it's fair to say, isn't it, that a lot of women were

8    flying on the plane with Epstein in the mid '90s; isn't that

9    right?

10   A.  That's correct.

11   Q.  It's fair to say that there were plenty of times that

12   Epstein was flying on the plane with these women without

13   Ghislaine?

14   A.  There has been times, sure.

15   Q.  It appeared to you that these women were adult women?

16   A.  Oh, yes.

17   Q.  So from your vantage point, whether Ghislaine or any one of

18   these other women was somebody romantically involved or

19   something else, is a little blurry; right?

20   A.  Yes.

21   Q.  In fact, I think the only person you really considered to

22   be a girlfriend of Epstein was Eva Dubin; is that right?

23   A.  That's the way she was introduced, as one of Mr. Epstein's

24   original first girlfriends, correct.

25   Q.  By the time you started, she was an ex-girlfriend; right?

LBUCmax3                              Visoski — cross

1    A.  Exactly.

2    Q.  She was with him in the 1980s?

3    A.  Yes, before my time.

4    Q.  Now, Eva Dubin, before she was married, went by Eva

5    Anderson?

6    A.  That's correct.

7    Q.  She was a former Ms. Sweden?

8    A.  That's what I heard.

9    Q.  She later married Glenn Dubin; is that right?

10   A.  That's correct.

11   Q.  Glenn Dubin is a billionaire hedge fund manager; is that

12   right?

13   A.  From my understanding, yes.

14   Q.  He was one of Epstein's clients; isn't that right?

15   A.  I don't know if he was a client.  I know he was a friend.

16   Q.  But during the period when Ghislaine and Epstein appeared

17   to you to have some sort of a personal relationship, she

18   continued to work for him as an employee; isn't that right?

19   A.  Who's that, Ms. Maxwell?

20   Q.  Ms. Maxwell, yes.

21   A.  Yes.

22   Q.  Ghislaine.  I'm talking Ghislaine still took care of the

23   houses?

24   A.  Yes.  Yes.

25   Q.  She still shopped for him?

LBUCmax3                              Visoski - cross

1   A.  Yes.

2   Q.  And you talked to her about the work she did for Epstein,

3   didn't you?

4   A.  Yes.

5   Q.  She would talk about all the work she was doing on these

6   houses, wouldn't she?

7   A.  Yeah, she would tell what's going on and the troubles of

8   decorating and house managers, et cetera, yes.

9   Q.  She'd talk about how demanding the job was; right?

10  A.  Yes.

11  Q.  Now, at some point, it appeared to you that whatever the

12  personal relationship was between Epstein and Ghislaine sort of

13  fizzled out; is that right?

14  A.  Yes.

15  Q.  And I think that was in about 2000, right, the best of your

16  recollection?

17  A.  It was the early 2000s, correct.

18  Q.  Now, Ghislaine was still traveling with Epstein in the

19  early 2000s; right?

20  A.  Yes.

21  Q.  She was still his friend?

22  A.  Yes.

23  Q.  But by that time, her role in Epstein's life was

24  decreasing, wasn't it?

25  A.  I don't know how the decreasing point did, but it just

1    wasn't as personal, it was obviously more business, because in

2    early 2000s is when we went around the world in the Boeing.  It

3    was just decreasing.

4    Q.  It was all business; right?

5    A.  It was all business.

6    Q.  And Epstein, at that time, brought in other people to help

7    run his day-to-day business, didn't he?

8    A.  Yes.

9    Q.  You testified already that Sarah Kellen appeared around

10   that time in the early 2000s; isn't that right?

11   A.  That's correct.

12   Q.  She was another one of Epstein's personal assistants?

13   A.  Yes.

14   Q.  And she became the person or one of the people you spoke to

15   about arranging flights; right?

16   A.  That's correct.

17   Q.  And do you recall the name Adriana Mucinska?

18   A.  Yes, I remember that name.

19   Q.  She also became one of Epstein's assistants around that

20   same point in the 2000s; isn't that right?

21   A.  Yes.

22   Q.  And you interacted with her?

23   A.  Yeah, not as much, but yeah, I did.  It's not like I would

24   with Ms. Kellen, but yes.

25   Q.  And there were, in fact, many other assistants who appeared

LBUCmax3                        Visoski – cross

1    over the years in the 2000s, as well, weren't there?

2    A.   There was many, yes.

3    Q.   Now, you testified that by 2004 or so, to the best of your

4    recollection, Ghislaine was traveling much less frequently on

5    Epstein's planes; isn't that right?

6    A.   Yes.

7    Q.   She was moving on from Epstein, was she not?

8    A.   That's correct.

9    Q.   Isn't it true that by 2004, Ghislaine was in a committed

10   relationship with another man?

11   A.   Yes.

12   Q.   You're familiar with Ted Waitt?

13   A.   Yes, I am.

14   Q.   He's the cofounder of Gateway Incorporated, the computer

15   company, isn't he?

16   A.   That's correct.

17   Q.   And Ghislaine was in a relationship with Ted Waitt by 2004,

18   wasn't she?

19   A.   I don't know if it was a relationship, but I know she was

20   spending a lot of time with Mr. Waitt, and I think he was

21   completing a boat that she was involved in decorating and

22   building a helipad on it.  So it was a different transfer to

23   Mr. Weight.

24   Q.   And, in fact, I think Ghislaine introduced you to Waitt's

25   pilots, you guys became friends?

LBUCmax3                     Visoski – cross

1    A.   Yes.

2              MR. EVERDELL:  Your Honor, this is a convenient

3    stopping point.

4              THE COURT:  We'll break here for lunch.  Members of

5    the jury, we'll take about a 45-minute lunch break.  Enjoy your

6    lunch.  Thank you for your continued attention.  Witness may

7    step down for the lunch break.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LBUCmax3                          Visoski – cross

1                    (Jury not present)

2                    (Witness not present)

3                    Matters to take up before the break.

4                    MS. COMEY:  No, your Honor.

5                    MR. EVERDELL:  Nothing, your Honor.

6                    (Recess)

7                    (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          A F T E R N O O N   S E S S I O N

2                        1:35 P.M.

3               THE COURT:  Matters to take up, counsel?

4               MS. COMEY:  Very briefly, your Honor.

5               Some of the courtroom sketch artists have indicated

6     confusion about the order about who they are allowed to draw

7     and not.  And so I think we would propose that before we call a

8     witness who cannot be sketched, that that be put on the record.

9               THE COURT:  Okay.  The only restriction is with

10    respect to the witnesses who I've permitted to testify

11    anonymously.

12              MS. COMEY:  That's correct, your Honor.  And any

13    sealed exhibits, if someone were to somehow glimpse a sealed

14    exhibit, though I think that's unlikely given the precautions

15    we're taking.

16              THE COURT:  Okay.  So let's just talk through the

17    protocol, also what the witness will be called using the

18    pseudonym.

19              MS. COMEY:  Yes, your Honor.

20              THE COURT:  And then I'll swear them in.  I would

21    typically say, State your name for the record.  I'll just say,

22    I've granted you permission to testify under the pseudonym,

23    fill in the blank.  And then turn the witness over for

24    questioning.

25              MS. COMEY:  Thank you, your Honor.

1          THE COURT:  And when I do that, I'll ask the sketch

2     artist not to draw exact likeness of that witness, consistent

3     with my ruling.

4          MS. COMEY:  Thank you, your Honor.

5          THE COURT:  Okay.  Thank you.

6          MS. COMEY:  Nothing further.

7          THE COURT:  Mr. Everdell?

8          MR. EVERDELL:  Nothing from the defense, your Honor.

9          THE COURT:  Okay.  We can bring the witness back.

10         And Ms. Williams, please bring in the jury.

11         (Jury present)

12         THE COURT:  Members of the jury, I hope you had a

13    pleasant lunch.  Thank you.

14         THE LAW CLERK:  Judge, one second.

15         THE COURT:  All right.  Thank you.

16         Everyone, I hope you had a good lunch.  Thank you for

17    your continued attention and diligence.

18         Mr. Everdell, you may continue with your

19    cross-examination of Mr. Visoski.

20         Mr. Visoski, I remind you you are under oath.

21         THE WITNESS:  Yes, ma'am.

22         THE COURT:  Go ahead.

23         MR. EVERDELL:  Thank you, your Honor.

24    LAWRENCE VISOSKI, resumed.

25    BY MR. EVERDELL:

1   Q.  Good afternoon, Mr. Visoski.

2   A.  Good afternoon, Mr. Everdell.

3   Q.  I just want to begin with a quick question about the ranch,

4   all right?

5   A.  Yes.

6   Q.  You testified before that it had a lot of acreage?

7   A.  Yes.

8   Q.  I think you said roughly 10,000 acres or so?

9   A.  10,000, yes.

10  Q.  And there was a lot of open space on that ranch, right?

11  A.  That's correct.

12  Q.  And one of the things that guests, I think, typically like

13  to do when they were there was to go hiking, right?

14  A.  Correct.  Yes.

15  Q.  Lots of places they could go hiking on the ranch?

16  A.  Sure they could, yes.

17  Q.  But it's true, isn't it, that the property had a lot of

18  rattlesnakes on it, isn't it?

19  A.  Yes, there are several rattlesnakes, yes.

20  Q.  Okay.  And it was wild country out there.

21  A.  Yes.

22  Q.  Okay.  And so if you were going to hike on this property,

23  you needed proper footwear to go hiking, right?

24  A.  Yes.

25  Q.  All right.  So people would typically wear boots to go

1    hiking?

2    A.   That would be a first choice, yes.

3    Q.   And that would be recommended for any guest who wanted to

4    go hiking, right?

5    A.   Yes.  Correct.

6    Q.   Okay.  Thank you.

7            And I'll just say, I was reminded by the court

8    reporter that we shouldn't talk over each other, so I'll try

9    not to do it and we'll do the same, okay?

10   A.   Yes.

11   Q.   Thank you.

12           All right.  I want to talk to you a bit about your

13   enter actions with Ghislaine.

14   A.   Okay.

15   Q.   You testified that you first met Ghislaine in about 1991,

16   when you started to work for Mr. Epstein, right?

17   A.   That's correct.

18   Q.   And Ghislaine would have been about 29 or 30 years or so

19   when you first met her?

20   A.   Yes.

21   Q.   And Epstein would have been about 37 or 38 at the time; is

22   that right?

23   A.   That is right.

24   Q.   And you said that Ghislaine flew on numerous flights with

25   you in the 1990s and 2000s, right?

1    A.  That is correct.

2    Q.  And so you knew her and you interacted with her for, it

3    would be, about 15 years, from the early 1990s to the mid

4    2000s; is that right?

5    A.  That is correct.

6    Q.  Now, in that whole time period, Ghislaine never appeared to

7    you to be pregnant, did she?

8    A.  No, not at all.

9    Q.  No one ever told you she was pregnant?

10   A.  No, never said that.

11   Q.  And you never saw any pictures of her pregnant at any of

12   the residences?

13   A.  No, I did not.

14   Q.  Now, you had some regular interactions with Ghislaine about

15   your job, right?

16   A.  Correct.

17   Q.  For example, I believe Ghislaine reviewed your expense

18   reports?

19   A.  Yes, that was one detail, yes.

20   Q.  So you said you took your expense reports to the New York

21   office maybe about once a week?

22   A.  Yeah, whenever I was in New York; correct.

23   Q.  And it was Ghislaine's job to review them and approve them,

24   right?

25   A.  It was one of her duties, yes.

LBUVMAX4                          Visoski – cross

1   Q.  And you also talked to her about scheduling maintenance

2   visits for the planes, right?

3   A.  That's correct.

4   Q.  And you talked to her about scheduling your own vacations,

5   right?

6   A.  Yes.

7   Q.  So generally speaking, these were the main interactions you

8   had with Ghislaine regarding employment issues and your job?

9   A.  Yes, that was a good description of a lot of the

10  interaction that I had with Ms. Maxwell; correct.

11  Q.  But now when Ghislaine had time when she wasn't working,

12  she spent time on other pursuits, right?

13  A.  Yes.

14  Q.  She became a trained emergency medical technician, didn't

15  she?

16  A.  I know she had some medical training, yes.

17  Q.  EMT?

18  A.  EMT, yes.

19  Q.  And she also became a trained helicopter pilot, too?

20  A.  Yes, she did.

21  Q.  You, yourself, are a trained helicopter pilot, right?

22  A.  Yes, I am.

23  Q.  And you traveled with Ghislaine when she went to school to

24  become a trained helicopter pilot, right?

25  A.  Yes, we traveled frequently together.

1  Q.  Now, Epstein bought his first helicopter, your recollection

2  was, sometime around 1990, 2000; is that right?

3  A.  Yeah, '99 to 2000; correct.  Yes.

4  Q.  So sometime, I believe, in the early 2000s, Ghislaine went

5  to school to become a trained helicopter pilot; is that right?

6  A.  Yes, she did.

7  Q.  That school was in Pompano Beach, Florida?

8  A.  That's correct.

9  Q.  Pompano Beach is about an hour or so drive south of Palm

10  Beach, right?

11  A.  Yeah, give or take traffic.  It could be longer some days;

12  but, yes, it's approximately an hour from Palm Beach to

13  Pompano.

14  Q.  And the training sessions that she was taking were about

15  one to three times per week, right?

16  A.  That's correct.

17  Q.  Each training session lasted about three to four hours,

18  isn't that right?

19  A.  Yes, if not longer.  Because there's a lot of preparation

20  before you fly, and you're flying for an hour and a half, and

21  then you're still talking about it afterwards, you know, with

22  your instructor, and then your drive home.  So it could be a

23  long duration.

24  Q.  Right.  So each training session was basically a full-day

25  event, wasn't it?

1   A.  Sure, it was.

2   Q.  You had to drive, take the course, talk to the instructor,

3   drive back, all that took about a day, right?

4   A.  Yes.

5   Q.  So it's fair to say she was away from the Palm Beach

6   residence for the whole day when she was taking these courses,

7   right?

8   A.  Yes, good chance, yes.

9   Q.  And that helicopter course that she took took about eight

10  months to a year to complete, isn't that right?

11  A.  Yes.

12  Q.  That course took a fair amount of time, didn't it?

13  A.  Took a lot of time, yes.

14  Q.  And it goes without saying that at the time, the time that

15  Ghislaine spent at those training sessions in Pompano Beach,

16  she was not at Epstein's residence in Palm Beach, isn't that

17  right?

18  A.  That's a correct assumption.

19  Q.  Now, you also accompanied Ghislaine to a different

20  helicopter training school in Dallas, Texas; is that right?

21  A.  That's correct.

22  Q.  Do you remember when that was?

23  A.  It was definitely once a year, because we were required to

24  go back for recurrent training.  But I don't know the dates,

25  but it was definitely once a year we would go to Dallas for

1   training together.

2   Q.  And do you remember how long that training lasted on those

3   trips?

4   A.  That class, it was typically, I believe, four days; two

5   days of ground school, and two or three days of flight.  It

6   could be four to five days, if memory serves.

7   Q.  And those training sessions that you're referring to in

8   Dallas, you said, took place every year you recall, right?

9   A.  Every year is a requirement for us as pilots.

10  Q.  Do you remember when in the year those took place?

11  A.  I do not.  I remember it being warm, not extremely cold, so

12  I would have to do the summer months; but, you know, the dates

13  escape me without any documentation of when we took the

14  courses.

15  Q.  Okay.  You guys had fun on those trips, right?

16  A.  The training was hard, but we tried to make the best of it.

17  Q.  I mean, you occasionally went out to a steak dinner while

18  you were there together?

19  A.  Yes, we did.

20  Q.  Those were fun events, right?

21  A.  Yes.

22  Q.  Now, once Ghislaine had her pilot's license, her helicopter

23  pilot's license --

24  A.  Yes.

25  Q.  -- she flew Epstein's helicopter; is that right?

LBUVMAX4                    Visoski - cross

1    A.  Yes, she did fly the helicopter.

2    Q.  You accompanied her on those flights as the more

3    experienced pilot?

4    A.  Yeah, I was going to go in that direction, but yes, I

5    accompanied her as a safety pilot.  We flew together.

6    Q.  And to your knowledge, that was Epstein's helicopter, not

7    Ghislaine's helicopter, right?

8    A.  That's correct.

9    Q.  So Ghislaine couldn't call you up and say, I want to fly

10   the helicopter.  Have it ready for me.  Right?

11   A.  She might have; but, no, that wasn't the normal situation.

12   We always had a mission to go on, and it was probably

13   Mr. Epstein driven.  But to my knowledge, it was Mr. Epstein's

14   helicopter, yes.

15   Q.  To your knowledge, it was Mr. Epstein who controlled

16   whether or not the helicopter was flown or not?

17   A.  Correct.  Yes.

18   Q.  Okay.  Now, you said that when Ghislaine did fly the

19   helicopter, you would fly with her as the more experienced

20   pilot?

21   A.  Yes.

22   Q.  And you got to know her a little bit from that too, from

23   your shared enjoyment of piloting helicopters, right?

24   A.  Yes, we talked a lot about aviation.

25   Q.  And you remember her as a nice person, right?

1    A.  Yes.

2    Q.  And you felt comfortable around her?

3    A.  Yes, I did.

4    Q.  You never saw Ghislaine do anything or say anything that

5    would lead you to believe she was helping Epstein or anyone

6    else sexually abuse underage girls?

7    A.  No, not at all.

8    Q.  Now, Mr. Visoski, you testified before that you have two

9    girls of your own.

10   A.  That is correct.

11   Q.  When you started working for Epstein in 1991, how old were

12   your daughters?

13   A.  When I started working, well, one was one year old and one

14   was not born yet.

15   Q.  And in the mid 1990s, how old would they have been then?

16   A.  Mid 1990s.  So if you're going to use 1995, so one would be

17   five years old and one would be one year old.

18   Q.  Okay.  And by the time you get to the mid 2000s, let's call

19   it 2004, just to pick a date, how old would they have been

20   then?

21   A.  Okay.  It's a math quiz.  Let's see.

22   Q.  Sorry.

23   A.  We're '94.  So we're talking 14 -- 11 and 14.

24   Q.  So I said 2004; is that right?

25   A.  2004; correct.  So one would be 14.  One was born in '90,

1   and the other, '94. So, yeah, 14 and 11-ish.

2   Q.  So one was a teenager and one was a preteen?

3   A.  That's correct.

4   Q.  Now, your daughters occasionally spent time with Ghislaine

5   on the ranch in New Mexico, especially after you built your

6   house there; isn't that right?

7   A.  Yes.

8   Q.  They loved the animals, I believe, right?

9   A.  Yes.

10  Q.  Especially the horses?

11  A.  Yeah, they are horse lovers.

12  Q.  And sometimes Ghislaine would take them riding on the

13  horses at the ranch; isn't that right?

14  A.  Yes, my daughters did ride at the ranch on the horses, yes.

15  Q.  They did that a fair amount?

16  A.  Yes.

17  Q.  And you trusted Ghislaine enough that you felt comfortable

18  letting your two young daughters spent time with her; isn't

19  that right?

20  A.  That is correct.

21  Q.  If you had any inkling whatsoever that Ghislaine was

22  involved in helping Epstein sexually abuse young girls, you

23  wouldn't have let that happen, would you?

24  A.  Absolutely not.

25  Q.  And if you had any inkling whatsoever that Ghislaine or

1   Epstein were involved in inappropriate sexual activity with

2   underage girls, what would you have done?

3   A.  They would have never seen my daughters.

4   Q.  And you would have quit your job?

5   A.  Reported it, yes.

6   Q.  And you would have quit your job?

7   A.  I would have quit my job, that's correct.

8   Q.  But you didn't do that, did you?

9   A.  No, I didn't.

10  Q.  Because nothing you saw or heard in the roughly 30 years

11  you worked for Epstein ever gave you even the slightest hint

12  that anything like that was going on?

13  A.  This is absolutely correct.

14          MR. EVERDELL:  One moment, your Honor.

15          THE COURT:  Okay.

16          (Counsel conferred)

17          MR. EVERDELL:  Nothing further, your Honor.

18          THE COURT:  All right.  Thank you.

19          Ms. Comey.

20          MS. COMEY:  Thank you, your Honor.

21          THE COURT:  You may redirect.

22  REDIRECT EXAMINATION

23  BY MS. COMEY:

24  Q.  Good afternoon.

25  A.  Good afternoon, Ms. Comey.

LBUVMAX4                          Visoski - redirect

1   Q.  Do you recall being asked questions about your daughters on

2   cross-examination, Mr. Visoski?

3   A.  Yes, I do.

4   Q.  When your daughters were 14 years old, did you let them

5   give Mr. Epstein a massage?

6   A.  No, I didn't.

7   Q.  Do you recall being asked about Jane and another person who

8   has the same first name as Jane?

9   A.  Yes.

10  Q.  Who did you meet first, Jane or the person who is

11  identified in Defense Exhibits LV3A and LV3B?

12  A.  The only way to kind of refresh my memory, Ms. Comey, to

13  narrow down that, I could only -- like when I -- when I

14  explained that I first met Jane, it was in between the two

15  pilot seats.  So I know that was one of Mr. Epstein's smaller

16  aircraft; it wasn't the Boeing.

17          So visually, I can picture the second Jane.  You have

18  to help me out which one it was.  Not the one -- not the first

19  Jane, but the other Jane I could visualize in the Boeing which

20  would have been sometime 2000 and later.

21  Q.  So to the best of your recollection, did you meet the

22  person we're calling Jane in the 1990s?

23  A.  I would go with that one, yes, only because with that

24  document of the airplane with, you know, that time frame, I

25  remember the other Jane was in the Boeing, the bigger plane.

1    Q.  I just want to make this clear because I know we're dealing

2    with some pseudonym issues, so just listen to the question

3    please.

4    A.  Okay.

5    Q.  The person we're calling Jane --

6    A.  Yes.

7    Q.  -- did you meet her in the 1990s, to the best of your

8    recollection?

9    A.  Yes.

10   Q.  And the person who is depicted in Defense Exhibits LV3A and

11   LV3B, did you meet her in the 2000s, to the best of your

12   recollection?

13   A.  Yes.  To the best of my recollection, that's a perfect

14   example of how I could remember; so that is correct, yes,

15   Ms. Comey.

16   Q.  And do you have that memory because the person depicted in

17   Defense Exhibits LV3A and 3B you remember on the Boeing?

18   A.  That's correct.  That was my synopsis.

19            THE COURT:  Sorry.  Just a moment.

20            MR. EVERDELL:  Objection.  Leading.

21            THE COURT:  Overruled.

22            You may finish.  You may finish your answer.

23            THE WITNESS:  Oh, I'm sorry.

24   A.  That is correct, Ms. Comey.  It was a way of correlating a

25   name to a date or a person to a date.

LBUVMAX4                         Visoski - redirect

1   Q.  Do you remember being asked on cross-examination about how

2   old you thought Jane may have been?

3   A.  I remember that question, yes.

4   Q.  Did you ever meet Jane at summer camp when she was a

5   camper?

6   A.  I did not, no.

7   Q.  Did you ever pick Jane up at high school?

8   A.  No, I did not, ma'am.

9   Q.  Did you ever talk with Jane about camp?

10  A.  No, I did not.

11  Q.  Did you ever talk with Jane about high school?

12  A.  No, ma'am.

13  Q.  Did you ever meet Jane's mother?

14  A.  No, I did not.

15  Q.  Did you meet Jane's other family members?

16  A.  I did not.

17  Q.  And finally, Mr. Visoski, do you recall being asked about a

18  Cobra vehicle?

19  A.  Yes, ma'am.

20  Q.  Do you remember exactly when Mr. Epstein gave you that

21  vehicle?

22  A.  Also to clarify, it's a replica Cobra.  Probably in the

23  2000s, 2000; it's been around 20 years since I've had it.  I

24  would say 2000, give or take.  I don't have an exact date.

25  Q.  As you sit here today, do you remember the exact date or is

1   that an approximation?

2   A.   It's just an approximation.   I do not know the exact date.

3             MS. COMEY:   May I have a moment, your Honor?

4             THE COURT:   You may.

5             (Counsel conferred)

6             MS. COMEY:   Nothing further.

7             THE COURT:   Okay.

8             MR. EVERDELL:   Nothing from the defense.

9             THE COURT:   All right.   Thank you, Mr. Visoski.

10            You may step down.   You are excused.

11            THE WITNESS:   Thank you very much, your Honor.

12            THE COURT:   Thank you.

13            (Witness excused)

14            THE COURT:   Do you have a matter to take up?

15            MR. EVERDELL:   Yes, your Honor.   You may want to

16   collect the binders and folders before the next witness or at

17   least the defense folders.

18            THE COURT:   Okay.   Or we leave them there?

19            MR. EVERDELL:   There may be another -- it's fine, your

20   Honor.

21            THE COURT:   Okay.   Jurors, you know this, but don't

22   look at anything unless I direct you to, please.   And there may

23   be instances in which I direct you to, but wait for that

24   direction.

25            Ms. Comey, the government may call its next witness.

LBUVMAX4                         Jane - direct

1              MS. MOE:  Thank you, your Honor.

2              The government calls Jane.

3              THE COURT:  The witness testifying under the pseudonym

4    Jane may come forward.

5     JANE,

6         called as a witness by the Government,

7         having been duly sworn, testified as follows:

8              THE COURT:  Please be seated.

9              This witness will be testifying under the pseudonym

10   Jane.

11             Ms. Moe, you may proceed.

12             MS. MOE:  Thank you, your Honor.

13             And with respect to the Court's order regarding sketch

14   artists, is that now in effect?

15             THE COURT:  It is in effect.  I've asked the sketch

16   artist not to sketch the exact likeness -- ordered the sketch

17   artist not to depict the exact likeness.

18             And I will ask the witness to please remove your mask.

19   You are in the Plexiglas box with the HEPA filter.  Thank you.

20             MS. MOE:  Thank you, your Honor.

21   DIRECT EXAMINATION

22   BY MS. MOE:

23   Q.  Good afternoon.

24   A.  Good afternoon.

25   Q.  Just to be clear, are you testifying under the name Jane

1    today?

2    A.  Yes.

3    Q.  Leading up to this trial, did you ask to testify under a

4    pseudonym to protect your privacy?

5    A.  Yes.

6    Q.  I'd ask you to please take a look in the binder in front of

7    you on the witness stand.  If you could please turn to what's

8    marked for identification as Government Exhibit 12.  Just let

9    me know when you are there please.

10   A.  Here.

11   Q.  Do you recognize that?

12   A.  Yes, I do.

13          THE COURT:  I just want to make sure that defense has

14   what they need.

15          MS. MENNINGER:  I do.  Thank you.

16          THE COURT:  Okay.  Thank you.  Go ahead.

17   Q.  What is Government Exhibit 12?

18   A.  My birth certificate.

19          MS. MOE:  At this time, your Honor, Government Exhibit

20   12 is in evidence under seal.  I'd ask the jurors be permitted

21   to remove their juror binders and turn to Tab 12.

22          THE COURT:  Without objection, Ms. Menninger?

23          MS. MENNINGER:  No objection.

24          THE COURT:  Okay.  Jurors, you may open the binder and

25   look at what's been admitted as GX-12, please.

1              MS. MOE:  Thank you, your Honor.

2     BY MS. MOE:

3     Q.  Directing your attention to the top left corner of

4     Government Exhibit 12, where it says "child's name."  Do you

5     see that?

6     A.  Yes.

7     Q.  Without saying that out loud, is that your true name?

8     A.  Yes.

9     Q.  Is that your date of birth?

10    A.  Yes, it is.

11    Q.  Thank you.  You can close the binder.

12              Now, Jane, I want to ask you, did there come a time in

13    your life when you met someone named Jeffrey Epstein?

14    A.  Yes.

15    Q.  What year was that?

16    A.  1994.

17    Q.  Did there come a time in your life when you had sexual

18    contact with Jeffrey Epstein?

19    A.  Yes.

20    Q.  How old were you when that first happened?

21    A.  Fourteen years old.

22    Q.  Did that happen once or more than once when you were 14

23    years old?

24    A.  More than once.

25    Q.  Was there ever anyone else in the room with you when you

LBUVMAX4                    Jane - direct

1   had sexual contact with Jeffrey Epstein when you were 14 years

2   old?

3   A.  Yes.

4   Q.  Who was most frequently in the room when you had sexual

5   contact with Jeffrey Epstein when you were 14 years old?

6   A.  Ghislaine Maxwell.

7   Q.  I'd like to ask you to take a moment to look around the

8   courtroom, and you can stand up if you need to if you can't

9   see.  Do you see Ghislaine Maxwell in the courtroom today?

10  A.  Yes.

11  Q.  Can you please point to where she's sitting and indicate an

12  article of clothing that she's wearing.

13  A.  Right there in the corner wearing a -- sort of a beige

14  turtleneck.

15          MS. MOE:  Your Honor, may the record reflect that the

16  witness has identified the defendant?

17          THE COURT:  It may so reflect.

18  Q.  Now, I want to ask you more about that in a few moments,

19  but first I want to take a step back.

20          Directing your attention to 1993, where were you

21  living that year?

22  A.  Palm Beach, Florida.

23  Q.  How old were you in 1993?

24  A.  Twelve, going on 13.

25  Q.  I'd ask you to take a look at the binder in front of you.

1    If you could please turn to what's been marked for

2    identification only as Government Exhibit 106.

3           Do you recognize that?

4    A.   Yes.

5    Q.   What is Government Exhibit 106?

6    A.   That is a picture of myself.

7    Q.   Approximately how old were you when that photograph was

8    taken?

9    A.   Thirteen years old.

10          MS. MOE:  Your Honor, the government offers Government

11   Exhibit 106 under seal.

12          MS. MENNINGER:  No objection.

13          THE COURT:  Government Exhibit 106 is admitted under

14   seal, consistent with my ruling, to protect the anonymity of

15   this testifying witness.

16          (Government's Exhibit 106 received in evidence)

17          MS. MOE:  Thank you, your Honor.

18          May the jurors turn to Government Exhibit 106, please.

19          THE COURT:  Jurors, you may pick up the binder and

20   please turn to GX-106.

21   BY MS. MOE:

22   Q.   Who was living with you in your household in 1993 when you

23   were approximately 13 years old?

24   A.   My mother and two of my brothers.

25   Q.   What type of work did your father do?

1    A.  He was a conductor and composer.

2    Q.  Directing your attention to the fall of 1993, what happened

3    in your family at that time?

4    A.  My father died of leukemia.

5    Q.  What was your home life like after your father passed away?

6    A.  It was not great.  My father's employer had canceled his

7    health insurance without him knowing, and ended up in the

8    hospital and died very suddenly.  And basically, my family went

9    into complete bankruptcy and lost everything, and we had to

10   move out of our home.

11   Q.  You testified that before he passed away, your father was a

12   composer.  Were you involved in the arts growing up?

13   A.  Yes.

14   Q.  Were your brothers involved in the arts?

15   A.  Yes.

16   Q.  Did you continue being involved in the arts after your

17   father passed away?

18   A.  Yes.

19   Q.  Directing your attention to the summer of 1994, what did

20   you do that summer?

21   A.  Me and my two brothers, we went to camp for the first time,

22   Interlochen Arts Camp.

23   Q.  What is Interlochen Arts Camp?

24   A.  It's a camp for children with all kinds of artistic

25   abilities:  Music, musical theater, theater, orchestra.

1     Basically, what we used to joke about being band camp.

2     Q.   And where is that located?

3     A.   In Interlochen, Michigan, which is northern Michigan.

4     Q.   Did anyone else go to camp with you that summer?

5     A.   My two brothers.

6     Q.   Given your family's financial circumstances at the time,

7     how were you and your brothers able to attend summer camp?

8     A.   That first summer, my oldest sister and her husband and her

9     husband's family all pitched in to send us to camp.

10    Q.   What grade in school had you just finished when you started

11    at summer camp that year?

12    A.   Seventh grade.

13    Q.   And when you arrived at camp that summer, how long had it

14    been since your father passed away?

15    A.   So the end of October '93, so what is that, nine months?

16    Q.   Did there come a time that summer at Interlochen Arts Camp

17    when you met a man and a woman?

18    A.   Yes.

19    Q.   Where were you when that happened?

20    A.   I was in the main campus area where all the students hung

21    out during a break and where all the little cafes were and sort

22    of the gift shop.  And I was on a park bench or a picnic bench

23    with my friends from camp.  And we were eating ice cream.

24    Q.   What do you remember happening next?

25    A.   Well, we were sitting around and socializing.  And we see

this tall thin woman approach us.  Well, she was walking with a
cute little Yorkie.  And the Yorkie came by us and we asked if
we could pet the dog.

Q.  What happened then?

A.  We started chitchatting, petted the dog.  And the rest of
my classmates had to go to class.  And probably about a minute
later, another man came and joined her.

Q.  Once the man joined her, what happened next?

A.  We continued chitchat, sort of talked to us.  And the rest
of my friends, my classmates, left, and I was there by myself.
And I sat on the bench still eating my ice cream, and the man
sat across from me.

Q.  Did you have a conversation with that man and that woman?

A.  Yes, I did.  He seemed very interested to know what I
thought about the camp, what my favorite classes were, what my
least favorite classes, teachers, whatnot, what the experience
was like.  And proceeded to say that they were big benefactors
of this camp; and that they went there every summer; and that
they gave different kids scholarships.  And so they wanted to
really know what a student attending the camp, what their
perspective was on it.

Q.  What, if anything, else did you discuss with them?

A.  Well, they asked me where I was from.  And I said I lived
in Palm Beach, Florida.  And the man said, What a coincidence,
we live there too.  What are your parents' names?

1          And I said, Well, my father just passed away.  But my

2     mother's name is.

3          And he said, I think we know your mom.  It's kind of a

4     smaller town.  We definitely know her.

5          And I said, You know, my parents were sort of out on

6     the scene, and my father was a musician, and so that would make

7     sense.

8          And he had a newspaper under his arm.  And then he put

9     the newspaper on the picnic table and said, Well, what's your

10    mom's name?

11         Gave my mom's name.

12         And he said, Well, what's her phone number?

13         And I just kind of went, Okay.  He's asking me for a

14    number, so I gave it to him.  And so I gave my mom's, which,

15    you know, at the time was just a landline.

16    Q.  How did that conversation end?

17    A.  It just sort of ended like, It was, you know, so nice to

18    meet you and I'm going to call your mom.  That was it.

19    Q.  That man and that woman that you had this conversation

20    with, who were they?

21    A.  Jeffrey Epstein and Ghislaine Maxwell.

22    Q.  What was your impression of them at that point?

23    A.  They seemed very friendly.  I thought they were a married

24    couple.  They seemed inquisitive.  And it made sense, I guess,

25    if they spent time there, that they wanted to know what the --

1    what the classes were like and what the campus was like.

2    Q.  Did you return home to Palm Beach when summer camp was

3    over?

4    A.  Yes.

5    Q.  Where were you living at that point?

6    A.  We were living in a pool house in one of my parents'

7    friend's backyards.

8    Q.  Why were you living in a pool house?

9              THE COURT:  I'm sorry, Ms. Moe, can you come a little

10   closer to the mic?

11             MS. MOE:  Thank you, your Honor.

12   Q.  Why were you living in a pool house at the time?

13   A.  Because we lost our house and we were homeless.

14   Q.  When you were staying there, did you have your own bedroom?

15   A.  No.

16   Q.  Where did you sleep?

17   A.  I slept in a bed with my mom.

18   Q.  After you returned home from summer camp in 1994, did you

19   ever hear from those two people that you met at camp?

20   A.  Yes.

21   Q.  When was the first time you heard from them?

22   A.  Well, it was a few days after I had started school again.

23   Q.  What grade were you in at that point?

24   A.  Eighth grade.

25   Q.  What school were you attending?

1   A.  Palm Beach County School of the Arts.

2   Q.  Is that a middle school or a high school?

3   A.  Middle school.

4   Q.  So what happened when you heard from them?  What do you

5   remember about that?

6   A.  I just remember coming home from school one day, and my mom

7   said, Someone you met at summer camp, someone from their office

8   called me.

9           And I said, Oh, well, I don't -- oh, that's right.

10  I -- I barely remember, because it seemed so long ago.  It was

11  maybe four or five or six weeks, but, you know, being that

12  young, it seemed like an eternity.  And I said, Yeah, I met --

13  and they said that they know you.

14          And my mom said, Well, we've been invited to his house

15  for some tea some afternoon.

16  Q.  Did you end up going to his house for tea?

17  A.  Yes.

18  Q.  What do you recall about going over to the house for tea?

19  A.  He sent somebody to come pick us up, like a chauffeur.  And

20  we were driven to his house.

21  Q.  What was your impression of the house when you first

22  arrived?

23  A.  Well, it was enormous.  It was not a pool house in the back

24  of someone's yard.  It was this giant, like, beach-looking

25  house with a big white fence around it.  And these giant gates

1   opened up, and the car pulled in.  And it was just this, you

2   know, big beautiful house.

3   Q.  Who, if anyone, went with you when you went over for this

4   tea?

5   A.  My mother.

6   Q.  What happened after you and your mother arrived at the

7   house?

8   A.  Well, somebody opened the door for us and let us in the

9   house and escorted us through the house and to Jeffrey's

10  office, which was sort of like an open space.

11  Q.  And after you got to the office, what happened next?

12  A.  He was on the phone.  He got off the phone, stood up, and

13  introduced himself to me and my mother, and then sort of let us

14  outside to the back patio, which had this great big dining

15  table.  And there was a big spread of, like, pastries and

16  sandwiches and tea.

17  Q.  What happened during the tea with you and your mother and

18  Jeffrey Epstein?

19  A.  Well, he was very inquisitive and asked me questions about

20  what I was doing in school, what my interests were, what I

21  wanted to do with my life, and was asking us about our family,

22  asking my mother.  It didn't last very long, I would say maybe

23  30 minutes in total.

24          But he proceeded to say, Well, I like to mentor young

25  students who are artists.  And I love music, and I love dance,

1   and I gave all kinds of scholarships.

2   Q.  How did that tea end?

3   A.  It ended with him saying, Well, I am -- I'm very impressed

4   with your daughter and, you know, would love to see her sing

5   next time.

6   Q.  After the day that you had this tea, did you ever see

7   Jeffrey Epstein again?

8   A.  Yes.

9   Q.  In the months after that tea, how frequently did you begin

10  seeing Jeffrey Epstein?

11  A.  On average, once or -- once every week or two.

12  Q.  We've been talking about a time period when you were 14 and

13  living in Palm Beach.  How old were you when you moved away

14  from Palm Beach?

15  A.  When I moved away?  17.

16  Q.  I want to focus now first on the first few months that you

17  spent time with Jeffrey Epstein when you were 14.  During those

18  first few months, when you spent time with Jeffrey Epstein in

19  Palm Beach, who was typically there with you?

20  A.  At Jeffrey's house?

21  Q.  Yes.

22  A.  I was there by myself.

23  Q.  And when you would spend time with Jeffrey Epstein at his

24  house in those first few months, who, if anyone, was there?

25  A.  Ghislaine Maxwell.

1   Q.  What was your understanding at the time of what the

2   relationship was between Ghislaine Maxwell and Jeffrey Epstein?

3   A.  I didn't really understand.  They never really shared that

4   information.  I just assumed that they were married.  And then

5   at a certain point I thought maybe they're best friends.  And

6   then I thought, Well, maybe she works for him because he would

7   ask her to do things, make phone calls and things for him.  So

8   I guess I was just confused.

9   Q.  When you would see Epstein or Maxwell, how were those

10  meetings typically arranged?

11  A.  It would be Ghislaine calling the house or Jeffrey's office

12  calling the house, like an assistant or something.

13  Q.  Now, you mentioned earlier that you would go to these

14  meetings alone.  Just to be clear, did your mother go with you

15  for these meetings?

16  A.  No.

17  Q.  Why not?

18  A.  She wasn't invited.

19  Q.  How would you typically get over to the house?

20  A.  Jeffrey would send his chauffeur for me.

21  Q.  Did you have your driver's license at the time?

22  A.  No.

23  Q.  Do you recall the driver who would pick you up?

24  A.  Yes.  I don't remember his name, but he was a sweet

25  Latin-American man.  And I know his wife worked at the house as

1   well.

2   Q.  When you began spending time with Maxwell and Epstein, what

3   was your impression at the time of how old they were?

4   A.  I thought approximately the same age as my parents, my mom.

5   Q.  And again, just to be very clear, how old were you when you

6   first started spending time with Maxwell and Epstein?

7   A.  14.

8   Q.  What kind of activities would you typically do when you

9   spent time with Maxwell and Epstein during those first few

10  months?

11  A.  We would spend time at the house and sort of chitchat

12  and -- or eat in the kitchen or hang out by the pool, sometimes

13  going to the movies.  Casual stuff.

14  Q.  What, if anything, do you remember about spending time at

15  the pool during those first few months?

16  A.  Well, I remember maybe the first time I went to the

17  poolside.  And I walked out there.  And there was at least four

18  women and Ghislaine all topless, and some of them were naked.

19  Q.  What was your reaction to that?

20  A.  Well, I was just shocked because I hadn't seen that before.

21  Q.  In those first few months when you spent time at the house

22  in Palm Beach, did you have conversations with Maxwell?

23  A.  Yes.

24  Q.  What kinds of things would she talk about with you?

25  A.  Well, we would chitchat, talk about school.  She would ask

1   me, you know, what I was up to, and ask me if I had any

2   boyfriend at school.

3   Q.  During those first few months, as you were getting to know

4   her, how did Maxwell come across to you?

5   A.  She seemed a little bit odd and quirky; but, you know, she

6   would kind of like tease me at times and -- but she was nice.

7   Q.  How would you describe your relationship with Maxwell those

8   first few months when you started spending time with her?

9   A.  In the first few months, I felt like I think she might have

10  said, I'm sort of like an older sister.  Because I at least

11  thought that she was the same age difference maybe as my oldest

12  sister, but I wasn't sure.

13  Q.  And at that time, approximately how old was your oldest

14  sister?

15  A.  Twenty-seven.  I'm not great at math.  Sorry.

16  Q.  Did there ever come a time when Epstein ever gave you any

17  gifts or money?

18  A.  Yes.

19  Q.  Approximately when did that first happen?

20  A.  It happened probably a few visits in.

21  Q.  What do you remember about the first time that that

22  happened?

23  A.  I just remember that he said good-bye to me and was going

24  to lead me to the front door.  And he put cash in my hand.  And

25  I was a polite kid who didn't want to look.  And I said, No,

1    it's okay.

2            And he said, No, no, no.  It's okay.  This is for your

3    mother.  I know she's having a hard time, so it's not a big

4    deal.

5    Q.  After that happened, did he ever give you any money again?

6    A.  Yes.

7    Q.  How often would that happen?

8    A.  Almost every visit.

9    Q.  Did there come a point where he began paying for things for

10   you?

11   A.  Yes.

12   Q.  What kinds of things did he help pay for?

13   A.  He helped pay for some voice lessons, he bought me some

14   clothes, things for school.

15   Q.  In your conversations with Maxwell, in that first few

16   months that you were spending time with her and with Epstein,

17   did you ever have any conversations with her about boyfriends?

18   A.  Yes.

19   Q.  What do you remember her telling you?

20   A.  I just remember her telling me at one point when I said,

21   No, I don't have a boyfriend, she said, Well, remember when you

22   do, that once you fuck them, you can always fuck them again

23   because they're grandfathered in.

24   Q.  What was your reaction to that when she told you that?

25   A.  Well, I giggled because I didn't understand what

LBUVMAX4                          Jane - direct

1   "grandfathered" meant, first and foremost.

2   Q.   Did there ever come a time when you went shopping with

3   Maxwell and Epstein?

4   A.   Yes.

5   Q.   Approximately when was that?

6   A.   Sometime at the end of 1994 or --

7   Q.   Did they buy you anything?

8   A.   Yes.

9   Q.   What did they buy you?

10   A.   They bought me some -- some pants and some shoes, like,

11   sort of loafers.  I remember some shirts, like, sort of a

12   preppy button-up shirt, like a cashmere sweater.

13   Q.   During that trip, did you go shopping for anything else

14   with them?

15   A.   Yes, we went to a Victoria's Secret and bought some

16   underwear.

17   Q.   What kind of underwear did they buy you?

18   A.   It was sort of those, like, white cotton briefs; like, the

19   very sort of, I would say, basic-looking ones that you would,

20   sort of, wear when you're -- when you're younger.

21   Q.   During this time in the first few months when you were

22   spending time with Maxwell and Epstein, did they ever tell you

23   anything about their social circle?

24   A.   Yes.  I mean, from the very beginning there was a lot of

25   bragging about how they were friends with essentially everyone,

1  and they knew everyone.  And they would sort of name-drop or

2  sometimes put people on speakerphone whose voices I didn't know

3  and then say, Oh, well, this was so-and-so and so-and-so; and

4  just, you know, say that they were very well-connected and

5  affluent.

6  Q.  How did that make you feel at the time?

7  A.  I mean, I guess it made me feel slightly intimidated, but

8  it was overwhelming.  And also I just -- I didn't know how I

9  was supposed to feel about it.

10 Q.  What names do you recall them mentioning to you when they

11 would tell you about their social circle?

12 A.  Donald Trump, Bill Clinton, Mike Wallace, people at some --

13 that I didn't know.

14 Q.  I want to ask you now about the house in Palm Beach where

15 you were spending time with Maxwell and Epstein.

16         Could you please describe for the jury how that house

17 in Palm Beach was decorated.

18 A.  It was -- I mean, it was a giant house, and so it had lots

19 of furniture, or at least in my opinion it was lots of

20 furniture, and lots of artwork and sculptures.  And there was a

21 lot of, like, memorabilia and pictures, and pictures with

22 famous people and presidents and things like that.

23 Q.  What do you remember about the pictures and artwork inside

24 the house in Palm Beach?

25 A.  Well, not knowing much about art, I thought some of it was

1   maybe a little bit odd.  You know, there were some paintings

2   of, like, naked women or half-naked women and, like, lots of

3   kind of -- or animals, like creepy looking animals.

4   Q.  How did you feel when you were spending time inside that

5   house?

6   A.  "Intimidated" I guess is the first word I think of.

7   Q.  You testified earlier that there came a time when you had

8   sexual contact with Jeffrey Epstein.  Again, approximately when

9   was that, the first time?

10  A.  In 1994.

11  Q.  And again, how old were you?

12  A.  Fourteen.

13  Q.  Where were you when that happened for the first time?

14  A.  In Jeffrey's Palm Beach house.

15  Q.  Can you describe for the jury what happened that day.

16  A.  Well, Jeffrey was asking me, you know, You really need to

17  focus on what you want to do; you can't be broad.  You know, do

18  you want to be an opera singer?  Do you want to do theater?  Do

19  you want to be an actress or model?

20          We just sort of discussed that.

21          He said, Well, you know, I know everybody.  I know all

22  the agents.  I know all the photographers.  I know, you know,

23  the owner of Victoria's Secret.  So I can make things happen,

24  but you just have to be ready for it.

25  Q.  After he said that, what's the next thing that happened?

1   A.  The conversation just sort of ended abruptly.  It was in

2   his office.  And he just took my hand and he said, Follow me.

3   Q.  Where did he take you?

4   A.  He took me outside in the backyard past the pool to the

5   pool house.

6   Q.  Could you please describe for the jury what happened when

7   he took you inside the pool house.

8   A.  He took me in the pool house.  And on the right-hand side

9   was this couch, futon-looking thing.  And he just proceeded to

10  pull me over.  And he sat in the corner and he didn't say a

11  word.  And he just pulled his pants down.  He was wearing

12  sweatpants.  And he pulled me on top of himself and he

13  proceeded to masturbate on me.  And then he just -- he got up

14  and he went into the bathroom and, like, cleaned himself up,

15  and then acted like nothing happened.

16  Q.  What was your reaction when he did that to you?

17  A.  Well, I was frozen in fear.  I'd never seen a penis before,

18  let alone not seen anything like this.

19  Q.  Did you tell anyone that day about what happened to you?

20  A.  No.

21  Q.  Why not?

22  A.  Because I was terrified and felt gross and I felt ashamed.

23  Q.  After the incident that you just described, did you

24  continue spending time with Maxwell and Epstein in Palm Beach?

25  A.  Yes.

1    Q.  After that day that you just described, did there ever come

2    a time when you saw Ghislaine Maxwell without her clothes on?

3    A.  Yes.

4    Q.  Approximately when was that?

5    A.  Shortly after the first incident.

6    Q.  Could you please describe for the jury what happened that

7    day.

8    A.  The three of us were just spending time together hanging

9    out and talking.  And then all of a sudden, in that same

10   manner, just abruptly said, you know, Follow me.  And we went

11   upstairs.  I followed them up this -- felt like a winding

12   staircase, up into Jeffrey's bedroom.

13   Q.  Once you got to the bedroom with Epstein and Maxwell that

14   day, could you please describe for the jury what happened next.

15   A.  They moved me over to the bed and took their clothes off

16   and started to like sort of, like, fondle each other and sort

17   of, like, kind of casually giggling about it.  And I was just

18   standing there.

19        And he asked me to take my top off.  And then, you

20   know, sort of just there were hands everywhere.  And Jeffrey

21   proceeded to masturbate again.  And Ghislaine was like rubbing

22   on him and kissing on him and, you know, fondling.  And then

23   that was it.

24   Q.  After the incident that you just described, did your visits

25   to Epstein's house in Palm Beach include sexual contact?

1    A.  Yes.

2    Q.  And I just want to be clear about this.  For the incident

3    that you just described when you were alone in a room with

4    Epstein and Maxwell, how old were you when that happened for

5    the first time?

6    A.  Fourteen.

7    Q.  After that day, did your visits to Epstein's house in Palm

8    Beach include sexual contact?

9    A.  Yes.

10   Q.  I'll ask you now about what happened during those

11   incidents.  Were there times when you were alone with Epstein

12   and Maxwell when you were 14?

13   A.  Yes.

14   Q.  What kinds of things would happen when you were alone with

15   Epstein and Maxwell when you were 14?

16   A.  I'm sorry, in what context?

17   Q.  When you were 14 years old and there were times where you

18   were alone with Maxwell and Epstein, what kinds of sexual

19   contact would occur during those incidents?

20   A.  It would be them leading me to a massage table and showing

21   me how Jeffrey likes to be massaged.

22   Q.  Who would tell you how Jeffrey likes to be massaged?

23   A.  Ghislaine and Jeffrey.

24   Q.  How did he like to be massaged?

25   A.  Like, he -- he liked -- like, very hard, like -- like,

1   rubbing his shoulders really hard, and like twisting his

2   nipples hard, and rubbing his feet hard and, like, his head.

3   Q.  Where in the house would incidents like this typically

4   happen?

5   A.  In a massage room that was off, like, the master bedroom.

6   Q.  Did anyone ever give you instructions during incidents like

7   this in the massage room?

8   A.  Yes.

9   Q.  Who would give you instructions?

10  A.  Ghislaine and Jeffrey.

11  Q.  What kind of instructions would they give you?

12  A.  Just showing me, you know, what he likes, what -- you know,

13  what men like, what women like, you know, sort of touching on

14  breasts and touching his penis.

15  Q.  What was Maxwell's demeanor like during these incidents?

16  A.  I would say that it seemed very casual, like it was -- like

17  it was very normal, like it was not a big deal.

18  Q.  And when she behaved like that, how did that make you feel?

19  A.  Well, it made me feel confused because that did not feel

20  normal to me; I'd never seen anything like this or felt any of

21  this, and it was very embarrassing.  You know, it's all these

22  mixed emotions.  When you're 14, you have no idea what's going

23  on.

24  Q.  During these incidents that we've been discussing, did

25  Epstein touch your body?

1   A.  Yes.

2   Q.  Where did Epstein touch your body?

3   A.  He would touch my breasts, he would touch my vagina.

4   Q.  During these incidents we've been discussing when you were

5   14, did you touch Epstein's body?

6   A.  Yes.

7   Q.  Where did you touch his body?

8   A.  Everywhere.

9   Q.  When you were alone with Maxwell and Epstein when you were

10   14, did anyone ever use a sex toy?

11   A.  Yes.

12   Q.  I'm sorry to ask you this, but could you please describe

13   for the jury what would happen during those incidents.

14   A.  He liked to, like, use, like, vibrators that were different

15   sizes; and even, like, those -- like -- like the back massagers

16   that were, like, really, you know, painful.

17   Q.  During those incidents, what did Epstein do with that back

18   massager?

19   A.  He would -- he would put it on my vagina even if I said

20   that it hurt.

21   Q.  During these incidents, did Maxwell ever touch your body?

22   A.  Yes.

23   Q.  Where would she touch you?

24   A.  I would say mainly my breast.

25   Q.  Earlier, I believe you said that during these incidents,

1  you touched Epstein everywhere.  Can you explain for the jury

2  what you meant by that.

3  A.  I meant he -- he wanted to be massaged really from head to

4  toe.  He liked his head rubbed, his shoulders, he liked his

5  nipples squeezed, his feet and his penis.

6  Q.  Approximately how often did incidents like this occur when

7  you were 14 years old?

8  A.  Approximately every visit to his house.

9  Q.  Were there ever sexual interactions with Maxwell and

10  Epstein when other people were present as well?

11  A.  Yes.

12  Q.  Approximately how old were you when that happened for the

13  first time?

14  A.  Fourteen or 15.

15  Q.  Where would those incidents typically take place?

16  A.  In one of Jeffrey's houses.

17  Q.  Were there times where you traveled to other houses that

18  Epstein owned?

19  A.  Yes.

20  Q.  I want to talk with you about that in a few minutes.  The

21  incidents you've been describing where other people were

22  present, how would they typically start?

23  A.  I'm sorry, can you --

24  Q.  Of course.

25          When there were incidents between you and Maxwell when

1   other people were present, how did incidents like that

2   typically start?

3   A.   It would be other people spending time at the house, sort

4   of hanging out, seemingly casually.  And then it was, once

5   again, sort of, it seemed just abruptly everything would stop.

6   And someone, Ghislaine or Jeffrey, would sort of summon

7   everyone to, you know, follow to a room.

8   Q.   Where would everyone go?

9   A.   To either Jeffrey's bedroom or mainly the massage room.

10  Q.   During these incidents where other people were present,

11  what would Maxwell typically do?

12  A.   Well, she, along with others, would just start taking their

13  clothes off.  And Jeffrey would get on the massage table, and

14  it would just, you know, sort of turn into this orgy.

15  Q.   What, if anything -- what, if any, clothing did you wear

16  during these sessions?

17  A.   My underwear.

18  Q.   During incidents like this where other people were present,

19  what kinds of sex acts would occur?

20  A.   Kissing, oral sex on each other, oral sex on Jeffrey,

21  full-on intercourse.

22  Q.   How often was Maxwell present in the first year that that

23  happened to you?

24  A.   I can't give an exact number.

25  Q.   Were there times where there were incidents like this where

1    she was not present?

2    A.   Yes.

3    Q.   Approximately how often would she be present during these

4    incidents?

5    A.   I'm sorry, can you explain that?

6    Q.   If there were times when she was present and times when she

7    wasn't present, approximately how often would she be present

8    for group sessions like this?

9    A.   I don't know.

10   Q.   During these incidents where other people were present,

11   were there ever sex toys that were used?

12   A.   Yes.

13   Q.   What do you remember about that?

14   A.   I mean, it was pretty much the same thing:  Using vibrators

15   on girls' vaginas.

16   Q.   The other people who were in the room during incidents like

17   this, what was their gender?

18   A.   Female.

19   Q.   Approximately how old were they?

20   A.   Older than myself, but I don't know.

21   Q.   During these incidents when other people were present, were

22   there any -- were there any particular acts that Epstein

23   particularly liked or requested?

24   A.   Sorry.  When other people were present?

25   Q.   Yes.

1    A.  I don't know if there's anything he particularly liked.  I

2    saw different acts, but --

3    Q.  Again, to be clear, where in the house would incidents like

4    this typically happen?

5    A.  The massage room.

6    Q.  Could you please describe that room for the jury.

7    A.  In which house?

8    Q.  In the Palm Beach house.

9    A.  Oh.

10   Q.  Sorry.

11   A.  It was -- it looked like maybe it was light, because it was

12   off the master bathroom, which was sort of -- it had like a

13   beachy feel.

14   Q.  What was in the room?

15   A.  I don't think I saw anything past the massage table.

16   Q.  Did anyone ever call the incidents that you've just

17   described a massage?

18   A.  Yes.

19   Q.  Who would call it that?

20   A.  Jeffrey.

21   Q.  Did incidents like this continue when you were 16?

22   A.  Yes.

23   Q.  How frequently did these incidents occur between when you

24   were 14 and when you were 16?

25   A.  The number or --

1   Q.  How often would it happen during those years?

2   A.  It would happen almost every visit with him, which would

3   have been every two weeks.

4           MS. MOE:  Your Honor, if I could just have one moment.

5           THE COURT:  Yes.

6           (Counsel conferred)

7           MS. MOE:  Thank you, your Honor.

8   BY MS. MOE:

9   Q.  Earlier, you were describing an incident when Maxwell was

10  in the room when you were 14.  Just to be clear, during the

11  incidents you've been describing to the jury when you were 14,

12  was Maxwell in the room?

13  A.  Yes.

14  Q.  And when these incidents would occur when you were 14, was

15  Maxwell in the room?

16  A.  At times.

17  Q.  And when you were 16, were there times when Maxwell was in

18  the room?

19  A.  Yes.

20  Q.  Did there ever come a time when you traveled with Jeffrey

21  Epstein or Ghislaine Maxwell?

22  A.  Yes.

23  Q.  Approximately when did you begin traveling with them?

24  A.  At 14 years old.

25  Q.  About when did you last travel with them?

1    A.   In March of 2001.

2    Q.   I want to focus now on the years when you were 14, 15, and

3    16.  About how many times did you travel with them during those

4    years?

5    A.   Maybe ten times.

6    Q.   Where did you travel with them when you were 14, 15, and

7    16?

8    A.   From Palm Beach to New York City, and also Santa Fe, New

9    Mexico.

10   Q.   When you traveled with them to those locations, how did you

11   get there?

12   A.   Mainly on Jeffrey's private plane.

13   Q.   Did you ever get there another way?

14   A.   Yes.

15   Q.   And how was that?

16   A.   Commercial flights.

17   Q.   When you flew in the private jet, did Maxwell ever go with

18   you?

19   A.   Yes.

20   Q.   How would these trips typically be arranged?

21   A.   They would be arranged by Jeffrey's office.

22   Q.   Where did you typically stay when you traveled with Maxwell

23   and Epstein?

24   A.   At Epstein's house.

25   Q.   Did Maxwell ever assist you in making travel arrangements?

1   A.  Yes.

2   Q.  I want to talk about some of the locations that you just

3   mentioned.  Did some of those trips include travel to New York?

4   A.  Yes.

5   Q.  Where did you stay when you traveled with Maxwell and

6   Epstein to New York?

7   A.  Epstein's house.

8   Q.  Where was that house located?

9   A.  New York City.

10  Q.  In what borough?

11  A.  Do you need the exact address?

12  Q.  No, it's okay.

13          Approximately where was it within the city?

14  A.  Upper East Side.

15  Q.  Thank you.

16          Could you please describe for the jury what the house

17  on the Upper East Side looked like.

18  A.  Well, it looked more like a building than a house.  It was

19  eight stories, his massive eight-story house building where you

20  walk through these giant doors and then there was, like,

21  another security door to go in.  And it had an elevator and it

22  was eight stories.

23  Q.  How was the house decorated on the inside?

24  A.  It was -- it was very dark, I felt.  You know, very,

25  very -- like an old building.  Lots of stone, you know, old

1   wood, and lots of, like, fabric wallpaper, like red curtains,

2   lots of artwork, statues, paintings.

3   Q.  When you spent time in the house, what, if anything, did

4   you notice about the artwork, the statues, and the paintings?

5   A.  I thought some of it was a little creepy personally.  There

6   was, you know, like, animals and giant, like, paintings that

7   looked kind of -- I don't know how you would -- how I would

8   describe it, but just felt uncomfortable.

9   Q.  What made you feel uncomfortable about the paintings and

10  the artwork in the house?

11  A.  It all sort of seemed like to have a dark theme, like it

12  was kind of, you know, intimidating and dark and, like, animal

13  heads and strange things.

14  Q.  Did any of the artwork inside the house in New York contain

15  nudity?

16  A.  Yeah.

17  Q.  What did you notice about that?

18  A.  Paintings of naked women and orgies and things like that.

19  It didn't seem very unusual at this point.

20  Q.  When you would spend time inside that house in New York,

21  how did you feel when you were inside the house?

22  A.  Intimidated.  It wasn't a very warm place; you didn't feel

23  very, maybe, safe.  I kind of felt like -- you always kind of

24  felt like someone is watching you.  You didn't feel free to

25  roam around exactly.

1   Q.   What rooms in the house did you spend time in when you

2   would stay in the house in New York?

3   A.   What rooms would I spend time in?  The room that I was

4   given, which was the guest room on the eighth floor, or

5   Jeffrey's bedroom, his bathroom, the massage room, or his

6   office or the kitchen.

7   Q.   Earlier, you described having sexual contact with Epstein

8   and Maxwell in Palm Beach.  Did that ever happen when you

9   traveled with them?

10  A.   Yes.

11  Q.   Can you describe for the jury what kinds of sexual acts

12  would happen when you traveled to New York when you were 14,

13  15, and 16?

14  A.   It was a lot of the same.  If it wasn't an orgy in the

15  massage room, it was in Jeffrey's bedroom, and that would be

16  mostly me alone with him.

17  Q.   What would happen when you were alone with him in the New

18  York house when you were 14, 15, and 16?

19  A.   Well, he would get naked and get on his bed.  And he would

20  pull me on top of him and ask me to take my clothes off.

21          Do you want me to describe in detail?

22  Q.   I'm sorry to ask, but if you could explain for the jury

23  what would happen during these incidents.

24  A.   So he would show me what he likes.  And basically, he

25  would -- he would use vibrators on me, he would put his fingers

1   in my vagina, he would start to masturbate, and he would ask me

2   to straddle his face.  He would ask me to, like, squeeze his

3   nipples really hard while he came.

4   Q.  Did all of the things that you just described happen on

5   trips to New York when you were 14, 15, and 16?

6   A.  Yes.

7   Q.  You testified that you were mostly alone with him when

8   these incidents occurred in the New York house when you were

9   14, 15, and 16.  Just to be clear, were there times when

10  Maxwell was present during those years?

11  A.  Yes.

12  Q.  Where would these incidents in New York typically happen

13  within the house?

14  A.  In the massage room.

15  Q.  Can you please describe for the jury what the massage room

16  in the New York house looked like.

17  A.  Well, it was off the master bathroom, and it looked like it

18  was maybe supposed to be a giant walk-in closet.  And it was

19  very dark.  There was a built-in bookcase on the right-hand

20  side, and there was a stereo system.  And there was, like,

21  music playing.  And I don't know if it was painted dark, but --

22  or maybe that was the lighting, but it sort of had this, like,

23  red mood.  And then there was just a giant black massage table

24  in the middle of it.

25  Q.  Was there anything along the walls in the massage room?

1   A.   My eyes didn't even look at the walls, mostly the floor, if

2   not what was going on.

3   Q.   Was there any other furniture inside the massage room aside

4   from the massage table?

5   A.   I don't know.

6   Q.   Earlier you testified that you recall traveling to New

7   Mexico; is that correct?

8   A.   Yes.

9   Q.   Approximately when did you travel to New Mexico?

10  A.   The year?

11  Q.   Approximately how old were you when you traveled to New

12  Mexico?

13  A.   Oh, 15 or 16.

14  Q.   Who went with you on that trip?

15  A.   Jeffrey and Ghislaine.

16  Q.   Where did you spend most of your time on the trip to New

17  Mexico with Maxwell and Epstein?

18  A.   At Epstein's house, which was a ranch.

19  Q.   What do you remember about the ranch that you visited on

20  that trip?

21  A.   I just remember that it was this giant ranch sort of in the

22  middle of nowhere.  And it seemed very empty on the interior,

23  meaning there wasn't really any other people around.

24  Q.   When you were at the ranch in New Mexico, where did you

25  spend most of your time?

LBUVMAX4                          Jane - direct

1    A.  In the guest bedroom that was assigned to me.

2    Q.  Were you by yourself in the bedroom?

3    A.  Yes.

4    Q.  And did you spend most of your time alone in that bedroom

5    when you were in New Mexico?

6    A.  Yes.

7                (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  Q.  On that trip in New Mexico, was there ever a time when

2  someone came into your room?

3  A.  Yes.

4  Q.  Can you describe to the jury what you remember about that?

5  A.  I just remember someone, at one point, just came into the

6  room and said Jeffrey wants to see you and then escorted me to

7  see him.

8  Q.  When that person came into your room and told you that he

9  wanted to see you, how did you feel?

10  A.  I just, as usual, felt, like, my heart sink into my

11  stomach, you know.

12  Q.  And why was your heart sinking into your stomach?

13  A.  Because I did not want to go see him.

14  Q.  What's the next thing you remember about that?

15  A.  I just remember being led to his bedroom and, you know, the

16  same thing would happen.

17  Q.  Who was the person who came into your room to tell you that

18  Epstein wanted to see you?

19  A.  I don't know.

20  Q.  During that trip to New Mexico, was your bedroom in the

21  same building as Epstein and Maxwell's bedrooms?

22  A.  Yes.

23  Q.  When you traveled with Epstein and Maxwell, was there ever

24  a time when you had trouble getting on a flight?

25  A.  Yes.

1   Q.  Can you describe to the jury what happened.

2   A.  Well, I had traveled with them and I had to fly back to

3   Palm Beach to go to school on a Monday, and I traveled with

4   them on a private jet.  Then, to get back, I was taking a

5   commercial flight, but I was only 15, so I didn't have a

6   driver's license or any ID, I didn't have a learner's permit

7   yet.  So I had no ID to get on the airplane.

8   Q.  What happened next after you couldn't get on the airplane?

9   A.  I remember calling and freaking out, saying how am I going

10  to get on this plane.  And Ghislaine made it happen for me.

11  She sort of called somebody and helped me get on that flight.

12  Q.  Approximately how old were you when that happened?

13  A.  I was 15.

14  Q.  Earlier, you testified that Maxwell assisted with your

15  travel arrangements on these trips when you were 14, 15, and

16  16.  Could you explain to the jury how Maxwell assisted with

17  your travel during these trips?

18  A.  Well, sometimes it would be -- Jeffrey would ask her, hey,

19  can you get -- not Jane, you know, tickets and the times and

20  whatnot and make the arrangements to be picked up.

21  Q.  You testified that this began when you were 14.  Can you

22  explain to the jury how old you were when you moved away from

23  Palm Beach?

24  A.  17.

25  Q.  Can you describe for the jury what you looked like when you

1   were ages 14, 15, 16, and 17.

2   A.   What I looked like?

3   Q.   Can you describe what your physical appearance was like.

4   A.   Oh, I was -- I was kind of short.  I was very thin.  I was

5   flat-chested until I was almost 16.

6   Q.   If you could please take a look at the binder in front of

7   you on the witness stand.  I'd ask you to just turn to what's

8   been marked for identification as Government Exhibit 107.

9            Do you recognize that?

10  A.   Yes.

11  Q.   What is Government Exhibit 107?

12  A.   That is a picture of myself at 15 years old when I thought

13  it was a really good idea to bleach my own hair at home, which

14  was not a good idea.

15           MS. MOE:  Your Honor, the government offers Government

16  Exhibit 107 under seal.

17           THE COURT:  Government Exhibit 107 is admitted under

18  seal consistent with my ruling allowing this witness to testify

19  under a pseudonym to protect her privacy.

20           (Government's Exhibit 107 received in evidence)

21           MS. MOE:  Thank you, your Honor.

22  Q.   Jane, if you could please take a look at the binder in

23  front of you and turn to what's been marked for identification

24  as Government Exhibit 108.

25           Do you recognize that?

1    A.   Yes.

2    Q.   What is Government Exhibit 108?

3    A.   That's a picture of me.

4    Q.   Approximately, how old were you when that picture was

5    taken?

6    A.   17.

7             MS. MOE:   Your Honor, the government offers Government

8    Exhibit 108 under seal.

9             MS. MENNINGER:   No objection.

10            THE COURT:   Thank you.   Government Exhibit 108 is

11   admitted under seal consistent with my ruling, allowing this

12   witness to testify using a pseudonym.

13            (Government's Exhibit 108 received in evidence)

14            MS. MOE:   Thank you, your Honor.   May the jurors turn

15   to Government Exhibits 107 and 108 in their binders.

16            THE COURT:   Yes, please.   Pick up your binders and

17   look at GX107 and GX108.

18            MS. MOE:   Thank you.   Just give the jurors a moment to

19   turn to that.

20   BY MS. MOE:

21   Q.   So again, just to be clear, now that we're all looking at

22   Government Exhibit 107, approximately how old were you when

23   that photograph was taken?

24   A.   15.

25   Q.   Turning to Government Exhibit 108, approximately how old

LBUCmax5                    Jane - direct

1    were you when that photograph was taken?

2    A.   17.

3    Q.   I want to step back and ask you a little bit about your

4    home life during the years we've been talking about.  When you

5    were 14 to 17 and living in Florida, can you describe for the

6    jury what your home life was like during those years?

7    A.   Well, it was -- it was not great.  My father had just

8    passed away, sort of suddenly, and we found ourselves losing

9    our home and moving into a pool house and not being allowed to

10   grieve the loss of my father and having a very depressed mom at

11   home.

12   Q.   I think you mentioned that you felt like you weren't

13   allowed to grieve your father.  Can you explain to the jury

14   what you meant by that?

15            MS. MENNINGER:  Objection, your Honor.  Relevance.

16            THE COURT:  Overruled.  You may answer.

17   A.   Well, I grew up with a mother who didn't allow us to talk

18   about our feelings because that was a sign of weakness.  So

19   grieving would be a part of that because she was very concerned

20   about appearance and what we would look like and that you

21   always sort of put a pretty face on.  So we really didn't

22   discuss those kinds of things at home and weren't allowed to

23   discuss it with anyone else.  So, being a kid and losing your

24   dad and not being allowed to talk about it, not having anyone

25   to talk to about it, it was really difficult.

1   Q.  During the years that we've been talking about, did your

2   mother know that you were spending time with Epstein and

3   Maxwell?

4   A.  Yes.

5   Q.  Would you ever talk with her about that?

6   A.  Not in detail, but, you know, my mom was so enamored with

7   the idea that these wealthy affluent people took an interest in

8   me.

9           MS. MENNINGER:  Objection.  Hearsay, your Honor.

10  We've strayed into hearsay.

11          THE COURT:  Just one moment, please.  Overruled with

12  respect to the answer that's been given, but is that the end of

13  the question line, Ms. Moe?

14          MS. MOE:  Your Honor, this testimony is offered for

15  the effect on the listener.  We ask that the witness be able to

16  explain what is going on during this time period and how that

17  affected her.

18          THE COURT:  You may ask that question.

19          MS. MOE:  Thank you, your Honor.

20  BY MS. MOE:

21  Q.  During the time period that we've been talking about when

22  you were 14, 15, and 16, did your mother ever talk to you about

23  Jeffrey Epstein and Ghislaine Maxwell?

24  A.  The most that she would talk to me about was saying that I

25  need to be --

LBUCmax5                          Jane - direct

 1              MS. MENNINGER:  Objection.  Hearsay, your Honor.  That

 2     was a different question.

 3              THE COURT:  I'll sustain.  If you reframe the question

 4     to elicit the information you indicated as opposed to asking

 5     what her mother said, you may proceed.

 6              MS. MOE:  Your Honor, if I could just have one moment?

 7              THE COURT:  You may.

 8              MS. MOE:  Your Honor, could we briefly approach?

 9              THE COURT:  Why don't we take our midafternoon break,

10     because the jurors' snacks are here and it's time for that.  So

11     we'll take an approximately 10-minute break, members of the

12     jury.  Thank you.  See you in about 10 minutes.

13              (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1                (Jury not present)

2                (Witness excused)

3           THE COURT:  Everyone may be seated.  Go ahead,

4      Ms. Moe.

5           MS. MOE:  Thank you, your Honor, I'd like to ask the

6      witness about her conversations with her mother during this

7      time period about Epstein and Maxwell.  As I think the witness

8      began explaining during this time period, her mother would tell

9      her about how great they were, how enamored she was with them,

10     and that I expect she would say that that had an effect on her.

11     None of that is offered for the truth, but for the effect on

12     the listener.

13          I think the defense has put at issue in this case why

14     the victims continued seeing the defendant and Epstein and why

15     they didn't tell about what happened to them later, and the

16     circumstances under which all of this was happening, including

17     her home life, the effect of her own mother and how her mother

18     would talk about Maxwell and Epstein are all part of that and

19     it's directly responsive to that issue.

20          THE COURT:  The initial questions that you're asking,

21     you expect the witness to say what exactly was communicated to

22     the witness by her mother?

23          MS. MOE:  Yes, your Honor.  I expect the witness to

24     testify that her mother encouraged the relationship and would

25     often talk about them favorably and tell them she should be

1    grateful for everything they were doing for her.

2            THE COURT:  And you're not seeking to offer that

3    information for the truth, but for the effect that it had on

4    the witness?

5            MS. MOE:  Yes, your Honor.

6            THE COURT:  So you'll accept a limiting instruction?

7            MS. MOE:  Of course, your Honor.

8            THE COURT:  Ms. Menninger.

9            MS. MENNINGER:  Your Honor, I think the simple way to

10   ask the question is, how did you feel, and if it was based on

11   something your mother said to you, without getting into the

12   content of what the mother had communicated to her.  I think

13   it's a real issue that may come up later with things that the

14   mother has said to any number of people, and I feel like this

15   opens the door to many other conversations that relate to the

16   mother.

17           So I'm not sure that just asking -- giving a bunch of

18   hearsay from the mom, saying we're asking it for the effect on

19   the listener and precluding cross examination about other

20   conversations with the mom would be appropriate.

21           THE COURT:  So I don't know what you have in mind

22   coming down the road.  I think it's proffered by the government

23   at this point anyway.  I think there might be a way to

24   streamline it.  Ms. Moe, maybe you could think about that.

25           But as proffered by the government, it's not being

1    offered for the truth, it's being offered for the effect on the

2    listener.  I would give the jury a limiting instruction that

3    the witness's testimony regarding what her mother said is not

4    being offered for the truth of those statements, but for the

5    impact or effect that it had on the witness.  We'll keep it

6    limited, Ms. Moe, as to eliciting statements for an

7    out-of-court witness, but with that caveat.

8             And then tell me, Ms. Menninger, what your concern

9    down the road was so I have it in my head.

10            MS. MENNINGER:  Your Honor, if you're admitting it

11   with that limiting instruction, I think we'll take up the

12   issues with other statements by the mom when they come up.

13            THE COURT:  Okay.

14            MS. MOE:  Thank you, your Honor.  Just to preview in

15   order to streamline things because we're on the subject, I

16   expect the next few questions to be about the issue of

17   disclosure.  In particular, I expect to ask the witness whether

18   there was ever a time when she talked to a guidance counselor

19   when she was a kid and whether she came to learn that her

20   mother had found out that she talked to the guidance counselor,

21   and I want to talk to her about how her mother reacted to that

22   and told her that she should never talk about what goes on in

23   their house.

24            We're offering that, again, not for the truth of

25   anything, it's certainly not our position that she shouldn't

LBUCmax5                        Jane - direct

1    have told someone that that is a true statement.  It's offered

2    to show the environment in which she was living and how that

3    affected her and affected her decision not to disclose what was

4    going on with her.

5              THE COURT:  But in particular, you want the witness to

6    testify that her mother told her not to report what happened,

7    not to tell anyone what happened.  Did I get that right?

8              MS. MOE:  Yes, your Honor.  I expect that she'll

9    testify that she spoke with a guidance counselor after her

10   father passed away, that her mother found out that she had

11   spoken with a guidance counselor and had a very strong negative

12   reaction to that, and told her that she shouldn't be talking

13   about personal family matters and shouldn't be talking about

14   what happens in their household.

15             THE COURT:  Ms. Menninger.

16             MS. MENNINGER:  I have no objection to that, your

17   Honor.

18             MS. MOE:  Thank you, your Honor.

19             THE COURT:  Thank you for previewing it.

20             Anything else to take up?

21             MS. MOE:  Not from the government, your Honor.

22             THE COURT:  Ms. Menninger?

23             MS. MENNINGER:  No, your Honor.  Not now.

24             THE COURT:  We'll take a short break.  Thank you.

25             (Recess)

LBUCmax5                              Jane - direct

1           THE COURT:  Nothing to take up; correct?

2           MS. MOE:  Correct, your Honor.

3           MS. MENNINGER:  Correct, your Honor.

4           THE COURT:  We'll bring in the jury.

5           (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  Thank you, everyone.  Ms. Moe, you may

3     continue with your direct examination of the witness.

4          MS. MOE:  Thank you, your Honor.

5     BY MS. MOE:

6     Q.  Before the break, we were talking about your interactions

7     with your mother during this time period when you were 14, 15,

8     and 16.  I want to ask you, during that time period, did you

9     ever talk with your mother about Jeffrey Epstein or Ghislaine

10    Maxwell?

11    A.  Yes.

12    Q.  What kinds of things would she say to you about Maxwell and

13    Epstein?

14          THE COURT:  I'm going to give the limiting instruction

15    now.

16          Members of the jury, the witness may provide some

17    testimony regarding things that her mother said to her.  I

18    instruct you that that testimony is not being offered for the

19    truth of the matter of what was said, but instead for the

20    purposes of its impact on the listener of this witness.

21          You may proceed.

22          MS. MOE:  Thank you, your Honor.

23    Q.  Would it be helpful if I ask the question again?

24    A.  Yes, please.

25    Q.  Sorry about that.  During this time period that we've been

1  talking about when you were 14 and 15 and 16, did you ever talk

2  with your mother about Jeffrey Epstein and Ghislaine Maxwell?

3  A.  Yes.

4  Q.  What kinds of things would she say to you about Epstein and

5  Maxwell during that time period.

6  A.  What would she say?  I'm sorry.  I'm not really

7  understanding your question.

8  Q.  Of course.  When would you talk to your mother during those

9  years about Maxwell and Epstein, what, if anything, would she

10  say to you about her impressions of them?

11  A.  My mother seemed very impressed and enamored with the sort

12  of the wealth, the affluence.  She thought they seemed very

13  generous and they must think I'm special and that I should be

14  grateful for the attention that I received.

15  Q.  During this time period, did you ever tell your mother

16  about the sexual abuse that you were experiencing when were you

17  at Epstein's house?

18  A.  No.

19  Q.  Why didn't you tell your mother during those years?

20  A.  Because I felt very ashamed, I felt very disgusted, I was

21  confused, I didn't know if it was my fault, and my mother and I

22  did not have that kind of a relationship.  We didn't talk about

23  our feelings.  We weren't allowed to.  I was raised in a

24  household where you were sort of spoken to, and you don't speak

25  unless you're spoken to, and I would be afraid that I would be

1    in trouble if I said something.

2    Q.   During those same years, did you tell your brothers or any

3    of your friends that you were being sexually abused by Maxwell

4    and Epstein?

5    A.   No.

6    Q.   And why not?

7    A.   Because how do you tell or describe any of this to any one

8    of your peers or your siblings when all you feel is shame and

9    disgust and confusion and you don't even know how you ended up

10   there.

11   Q.   Were there ever times when you were 14 or 15 and 16, while

12   all of this was happening, where you thought about hurting

13   yourself?

14   A.   Yeah.

15   Q.   Can you explain to the jury what that was like for you?

16   A.   Well, it was a multitude of things, of my father dying and

17   losing our home and then having a manic depressed mother who

18   didn't know how to cope and know how to take care of us and,

19   you know, just kind of feeling like it was hopeless, I guess.

20   It didn't seem like there was a lot of joy to look forward to

21   and it was just -- it was all -- it was very painful.  It was

22   all very difficult.

23   Q.   Did there come a time when you were a kid when you spoke to

24   a school guidance counselor?

25   A.   Yes.

1    Q.   Approximately when was that?

2    A.   In the 7th grade.

3    Q.   How did you go to see the guidance counselor when you were

4    in the 7th grade?

5    A.   Well, actually, she asked to speak to me.  She called me in

6    her office and said -- asked me what was going on at home, if

7    we had been or I had been in grief counseling and how my mother

8    was doing.  So I told her how I was feeling and how sad I was

9    and, you know, how unavailable my mother was and how

10   unsupportive and there was really no one for me to talk to.  So

11   I spoke to her and she was -- she was lovely and she would --

12   when she would see me.  She would say if you need a place to

13   go, just come to my office and sit there and we'll talk.

14   Q.   After you spoke with the guidance counselor, did there come

15   a time when you learned that your mother had become aware about

16   the conversations you were having with the guidance counselor?

17   A.   Yes.  I came home from school one day and my mother said

18   that the guidance counselor had called her and had said that

19   she wanted to see her because she was very worried about me.

20   My mother proceeded to berate me and scream at me and slap me

21   and tell me how dare I talk about myself and our family and

22   that it was an embarrassment, and that you don't tell other

23   people about your feelings or what's going on at home.

24   Q.   I want to pause here and ask a few questions about the

25   sexual abuse you described experiencing when you were 14 and

LBUCmax5                        Jane - direct

1    when you were 15 and when you were 16.

2              Just to be clear, were there times when that happened

3    when it was just you and Jeffrey Epstein?

4    A.  Yes.

5    Q.  Were there times when that happened when it was just you

6    and Epstein and Maxwell?

7    A.  Yes.

8    Q.  Were there times when that happened when it was you and

9    Epstein and Maxwell and other women?

10   A.  Yes.

11   Q.  All those three categories, what happened the most during

12   those years?

13   A.  Me and Jeffrey.

14   Q.  What was the next most frequent thing that happened?

15   A.  The group situations.

16   Q.  Approximately how many times during the years that you were

17   14 and 15 and 16 was Ghislaine Maxwell in the room while you

18   were being sexually abused by Jeffrey Epstein?

19   A.  I don't know.

20   Q.  Why is it hard to remember the specific number?

21   A.  It's hard to remember because I was abused pretty much

22   every time that I would go over to his house and it all started

23   to seem the same after a while, whether it was just him or

24   there were other women involved or me and Jeffrey and

25   Ghislaine, it all started to seem the same after a while and

 1    you just become numb to it.

 2    Q.  Is it fair to say that she was frequently in the room while

 3    you were being sexually abused by Jeffrey Epstein when you were

 4    14, 15, and 16?

 5            MS. MENNINGER:  Objection.

 6            THE COURT:  I'll sustain.  Please rephrase.

 7    Q.  Was Maxwell in the room just once while you were being

 8    sexually abused by Jeffrey Epstein?

 9    A.  No.

10    Q.  Was it just twice?

11    A.  No.

12    Q.  Approximately how many times?

13    A.  I don't know, but more than twice.

14            MS. MOE:  Your Honor, just one moment, please.

15            THE COURT:  Sure.

16    Q.  I want to ask you about that third category that I asked

17    you about the incidents where it was you and Maxwell and

18    Epstein and other people who were in the room.

19            What was typically happening before incidents like

20    that would start?

21    A.  It would typically be something very casual, like hanging

22    out by the pool or sitting around in a living room or in the

23    kitchen and just be, like, very seemingly casual hangouts.

24    Q.  When you would spend time at Epstein's house in Palm Beach,

25    were there other women present in the house?

LBUCmax5                          Jane - direct

```
 1    A.  Yes.
 2    Q.  Would those women sometimes be involved in these
 3    encounters?
 4    A.  Yes.
 5              MS. MOE:  Just one moment, your Honor.
 6              THE COURT:  Sure.
 7    Q.  How would you typically transition from hanging around the
 8    house or hanging around the pool to the incidents that you've
 9    described?
10    A.  We were summoned to follow Jeffrey up into his bedroom or
11    massage room.
12    Q.  Can I ask you to please look at the binder in front of you.
13    If you could please turn to what's been marked for
14    identification as Government Exhibit 245.  Thank you.
15              Do you recognize that?
16    A.  Yes.
17    Q.  What is Government Exhibit 245?
18    A.  It's two pictures of myself.
19              MS. MOE:  Your Honor, the government offers Government
20    Exhibit 245 under seal.
21              MS. MENNINGER:  No objection, your Honor.
22              THE COURT:  Thank you.  GX245 is admitted under seal
23    consistent with my ruling, allowing this witness to testify
24    using a pseudonym.
25              (Government's Exhibit 245 received in evidence)
```

1          MS. MOE:  Thank you, your Honor.  May the jurors turn

2    to Exhibit 245 in their binders?

3          THE COURT:  Yes, please.  You may pick up your binder

4    and turn to GX245.

5    BY MS. MOE:

6    Q.  Looking at Government Exhibit 245, do you recognize those

7    two photographs?

8    A.  Yes.

9    Q.  Can you please describe to the jury what those two

10   photographs are?

11   A.  Well, the large -- larger photograph in the back is a

12   modeling picture of me, approximately age 15.  The one in the

13   front is like my first head shot at about 19.

14   Q.  For the smaller picture in the corner, did you give a copy

15   of that photograph to Jeffrey Epstein?

16   A.  I did.

17   Q.  Did you write a note on that photograph?

18   A.  I did.

19   Q.  What did you write on the photograph?

20   A.  Well, cringey enough, I wrote, thanks for rocking my world.

21   Q.  Why did you write that?

22   A.  Well, my mother made me send him a picture after I had

23   gotten my first big job, and that's when I had taken this

24   picture and, in fairness, I used to write really bad captions

25   for people when I would write -- sign a headshot.  So that was

LBUCmax5                          Jane - direct

1   my attempt at being cool, I guess.

2   Q.  I want to ask you, Jane, how did you feel at the time about

3   the attention that Epstein and Maxwell were paying to you when

4   you were in middle school and high school?

5   A.  How did I feel about the attention?

6   Q.  Yes.

7   A.  Initially, I felt special.  You know, I didn't -- I didn't

8   really have much support or attention at home, so he was

9   someone who was seemingly looking out for me and caring for me

10  is how it felt.

11  Q.  Why was that important to you at the time, to feel cared

12  about?

13  A.  Because I didn't have any family that made me feel cared

14  about.

15  Q.  In your adult life, how has what happened to you with

16  Maxwell and Epstein affected your relationships?

17              MS. MENNINGER:  Objection, your Honor.  Relevance.

18              THE COURT:  Just a moment.

19              MS. MENNINGER:  May we have a sidebar if there is

20  any --

21              THE COURT:  Let's do that.

22              (Continued on next page)

23              (Pages 344 to 347 SEALED)

24

25

1           (In open court)

2                THE COURT:  You may proceed, Ms. Moe.

3                MS. MOE:  Thank you, your Honor.

4     BY MS. MOE:

5     Q.  Let me back up and ask you a few questions.  You testified

6     in the beginning Epstein and Maxwell made you feel special.

7     Can you explain to the jury what it is they did that made you

8     feel special when it first started?

9     A.  Well, they made me feel special by spending time with me,

10    talking to me, asking me about my family, my interests, what I

11    was doing, what I was doing in school, what I wanted to do with

12    my life.  They took me to the movies, they took me shopping,

13    and took me on field trips, I guess you could say.

14    Q.  And to be clear, during this time, did Maxwell talk with

15    you about your school and your family and what was going on

16    with you and your life?

17    A.  Yeah.

18    Q.  You testified that you felt this way in the beginning.  Did

19    there come a time when that changed?

20    A.  Yes.

21    Q.  Can you tell the jury about that.

22    A.  Well, it changed when the abuse started happening.

23    Q.  Can you explain for the jury how has what Maxwell and

24    Epstein did to you affected your relationships as an adult?

25    A.  That's a loaded question.  Sure you could ask a lot of

1   people their opinions on that.  How do you navigate a healthy

2   relationship with a broken compass?  I didn't even understand

3   what real love is supposed to look like.  It ruined my

4   self-esteem, my selfworth, I don't know how men were supposed

5   to treat me and how I was supposed to reciprocate any of that.

6   It led me to not trust people and probably make bad decisions

7   in future boyfriends.

8   Q.  Earlier, we were talking about the years that you lived in

9   Palm Beach and about the time when you moved away from Palm

10  Beach.  Can you tell the jury, approximately when did you move

11  away from Palm Beach?

12  A.  Approximately 17 years old.

13  Q.  Did you go to school when you moved to New York City?

14  A.  Yes.

15  Q.  Where did you go to school?

16  A.  Professional Children's School.

17  Q.  When you moved to New York City when you were 17 to go to

18  the Professional Children's School, who paid for your tuition?

19  A.  Jeffrey Epstein.

20  Q.  About how old were you when you started school in New York

21  City?

22  A.  I just turned 18.

23  Q.  What year of school were you starting?

24  A.  Senior year of high school.

25  Q.  During your senior year of high school, did you spend time

LBUCmax5                    Jane – direct

1    with Jeffrey Epstein?

2    A.  Yes.

3    Q.  Did you spend time with Ghislaine Maxwell that year?

4    A.  Yes.

5    Q.  During that year when you were a senior in high school, did

6    you continue engaging in sexualized massages with Jeffrey

7    Epstein?

8    A.  Yes.

9    Q.  To be clear, did you want to keep doing that?

10   A.  No.

11   Q.  Did you graduate from school that year?

12   A.  Yes.

13   Q.  Did there come a time after you graduated when you moved

14   away from New York?

15   A.  Yes.

16   Q.  Approximately when was that?

17   A.  October of 1999.

18            (Continued on next page)

19

20

21

22

23

24

25

1    BY MS. MOE:

2    Q.  Where did you go when you moved away from New York City in

3    October of '99?

4    A.  Los Angeles, California.

5    Q.  Why did you move to Los Angeles?

6    A.  Because I got a job on a TV show.

7    Q.  Jane, can you tell the jury what kind of work do you do

8    now?

9    A.  I am grateful to still be a working actor.

10   Q.  For how many years have you been employed as an actor?

11   A.  Twenty-two years.

12   Q.  After you moved to California, did you stay in touch with

13   Epstein and Maxwell?

14   A.  Yes.

15   Q.  For about how many years?

16   A.  Until approximately the end of 2002.

17   Q.  Approximately how old were you during that year?

18   A.  Twenty-two.

19   Q.  During the year that you were -- withdrawn.

20          After you moved away, did you continue to travel with

21   Maxwell and Epstein?

22   A.  With Epstein for sure.

23   Q.  When you traveled with Epstein in your early twenties, did

24   you travel in his private jet?

25   A.  Yes.

1   Q.   Did there come a time when you stopped being in touch with

2   Jeffrey Epstein?

3   A.   Yes.

4   Q.   Approximately when was that?

5   A.   The end of 2002.

6   Q.   And why did you stop seeing him at the end of 2002?

7   A.   Because I fell madly in love with someone, and we got very

8   quickly engaged.  And Jeffrey would call me.  And my new fiancé

9   would ask, Who is this person who calls you and that you sort

10  of have to drop everything for to take that call?

11          And I said, Oh, it's -- that's my godfather.

12          And he just kind of said, Well, what do you mean your

13  godfather?  You just tell him you'll call him back.

14          I said, No, it doesn't work that way.

15          And he had a pretty abrasive personality himself, this

16  guy.  And he said, Well, don't call him back.

17          And that was sort of -- well, that wasn't the end of

18  it.  I didn't call him back.  And then he tried contacting me

19  again and leaving me voicemails that became increasingly

20  agitated in saying that I need to call him back, he was coming

21  into town to visit, and he wanted to see me, and that I need to

22  be grateful and remember what he's done for me.  Because my

23  mother had still been living in an apartment in New York after

24  I moved away that he was paying for.  And then I didn't return

25  his call.

1              And do you want me to continue?

2       Q.   That's all right.

3              Was that the last contact you had with him?

4       A.   Yes.

5       Q.   I think you mentioned that the person you were dating at

6       that time you were engaged to.  Did you end up marrying him?

7       A.   No.

8       Q.   Did there come a time in the late 2000s when you were in a

9       romantic relationship with someone else?

10      A.   In the late 2000s?  Yes.

11      Q.   Approximately what years were you dating that man?

12      A.   2007 through 2013.

13      Q.   For today's purposes, I'm going to refer to that man as

14      Matt.  Will you do that?

15      A.   Yes.

16      Q.   While you were together, did you ever tell Matt that you'd

17      been sexually abused by Maxwell and Epstein?

18      A.   Yes.

19      Q.   Why did you tell him?

20      A.   I told him because that was around the time that you

21      started seeing on the news that Epstein had been arrested and,

22      you know, you sort of would see his face everywhere and it

23      would make me very emotional.  And my boyfriend at the time

24      would notice that and kind of wonder.  And you know -- and then

25      there would be moments of vulnerability that I sort of started

1    to share, like, some of the things that had happened to me, not

2    in detail, but, you know, it took a long time to really share

3    any of that stuff with him.

4    Q.   Directing your attention to September of 2019, were you

5    interviewed by the FBI that month?

6    A.   Yes.

7    Q.   Before that time, had you ever spoken with law enforcement

8    about Jeffrey Epstein or Ghislaine Maxwell?

9    A.   What was the month you mentioned?

10   Q.   Before you were interviewed by the FBI in September of

11   2019, had you ever spoken with law enforcement about what had

12   happened to you with Maxwell and Epstein?

13   A.   I think that month is incorrect.  I think it's --

14   Q.   Approximately what month do you remember being interviewed

15   by the FBI?

16   A.   May.

17   Q.   Of what year?

18   A.   Of 2019.

19   Q.   Before that first interview, had you ever spoken with law

20   enforcement about what happened to you with Maxwell and

21   Epstein?

22   A.   No.

23   Q.   Did there come a time when you sued Ghislaine Maxwell?

24   A.   Yes.

25   Q.   Approximately when did you file that lawsuit?

LBUVMAX6                          Jane - direct

```
 1    A.  Early 2020.

 2    Q.  To be clear, was that after you had told the government

 3    what had happened to you?

 4    A.  Yes.

 5    Q.  At the time that you sued Ghislaine Maxwell, did you also

 6    sue the Estate of Jeffrey Epstein at that same time?

 7    A.  Yes.

 8    Q.  Did you bring that lawsuit under a pseudonym to protect

 9    your identity?

10    A.  Yes.

11    Q.  After you filed that lawsuit, did you participate in a

12    victim compensation fund for victims of Jeffrey Epstein?

13    A.  Yes.

14    Q.  What did you do as part of submitting a claim to that fund?

15    A.  Well, I had to submit documents and speak to the people who

16    ran the fund.

17    Q.  Did the fund award you money?

18    A.  Yes.

19    Q.  How much money did the fund award you?

20    A.  $5 million.

21    Q.  Did that money come from the Estate of Jeffrey Epstein?

22    A.  Yes.

23    Q.  Did you receive all of that money?

24    A.  No.

25    Q.  And why not?
```

LBUVMAX6                         Jane - direct

1    A.  Because some of it has to go to counsel and litigation and

2    filing documents and such.

3    Q.  How much did you ultimately receive?

4    A.  Approximately 2.9 million.

5    Q.  Has that money been wired to you already?

6    A.  Yes.

7    Q.  As part of the settlement that you received from the fund,

8    were you required to dismiss your lawsuit against Maxwell and

9    the Estate of Jeffrey Epstein?

10   A.  Yes.

11   Q.  And did you dismiss the lawsuit against Maxwell after you

12   received an award from the fund?

13   A.  Yes.

14   Q.  Based on your understanding, will the jury's verdict in

15   this case affect the award that you received from the victim

16   compensation fund?

17            MS. MENNINGER:  Objection, your Honor.

18            THE COURT:  Just a moment.

19            I have to hear you.

20            (Continued on next page)

21

22

23

24

25

1          (At sidebar)

2          THE COURT:  The question is whether the jury's verdict

3    will affect what she receives from the victim compensation

4    fund?

5          MS. MENNINGER:  Right.  I think she has a lack of

6    personal knowledge about that, your Honor.  It's a legal

7    conclusion, a legal question.  She's not the right witness to

8    talk about that.

9          THE COURT:  You want the jury -- you want to put in

10   front of the jury that the involvement in this case affects

11   payout from the legal compensation fund.

12         MS. MENNINGER:  Well, your Honor, this is something

13   that we litigated, which is, any suggestion that the victim's

14   compensation fund was based on some kind of finding of validity

15   of her claims.

16         THE COURT:  I agree with that.  I don't see what that

17   has to do with this question.

18         MS. MENNINGER:  I think she has told this story to the

19   victim compensation fund, they have given her money, and now if

20   she is found -- if our client was found not guilty, for

21   example, I don't know what the ramifications would be for a

22   fund who has determined --

23         THE COURT:  Well, the question to be phrased is what

24   her understanding is.  I mean, you have well put in issue the

25   question of whether this fund impacts her motivation to tell

1   the truth or not, which is precisely why I granted the Rule 17

2   subpoena and, I suspect, in the opening raised this issue

3   precisely.  So whether it's true or not, the question is what

4   is her understanding.  So if the question is phrased that way,

5   I will overrule the objection.

6           MS. MOE:  Yes, your Honor.  In fact, that is exactly

7   how I phrased that question for that reason.

8           MS. MENNINGER:  I still think it's a legal conclusion,

9   your Honor, asking someone, you know, what is the effect of a

10  contract or what is -- how can a contract be dissolved.  It's

11  just not within the ken of a person who is not --

12          THE COURT:  I can give a limiting instruction that

13  testimony is not being offered for -- as a legal instruction,

14  but for the witness's understanding.

15          MS. MENNINGER:  Sure.  That would be better --

16          THE COURT:  Any objection?

17          MS. MOE:  No, your Honor.

18          I think this is very commonplace, it happens all the

19  time.  For example, when cooperators testify about their

20  understanding of whether, for example, a verdict in a case

21  affects their cooperation agreement with the government, I

22  don't think there's a limiting instruction; because, again, the

23  question is about this person's understanding.  I can make that

24  very clear when I ask the question.  It's directly responsive

25  to defense arguments about whether this witness has a motive to

1    lie.

2            MS. MENNINGER:  In cooperating situations, your Honor,

3    the sentence happens after the testimony.

4            THE COURT:  Well, they are not the same, but I think

5    the point is the same.

6            I'll give a limiting instruction that -- after she

7    testifies, that the jury should understand she's not providing

8    legal instruction, but testifying as to her understanding in

9    response to the question.  And so with that -- and you'll say

10   the question again, make sure it's phrased from her

11   understanding.  With that, I'll overrule.

12           I don't see any reason this should be sealed.

13           MS. MOE:  No, your Honor.

14           MS. MENNINGER:  No, your Honor.

15           MS. MOE:  Just to avoid a second sidebar, I just

16   wanted to flag, after asking this question, I expect the next

17   question I would ask would be just simply, Do you have a

18   financial stake in the outcome of this case?  Again, that's

19   about her understanding, whether she believes she has a

20   financial -- which is exactly what the defense suggested in

21   their opening.

22           THE COURT:  Oh, there's no doubt.

23           MS. MOE:  I just want to flag that.

24           THE COURT:  You have an objection to that question?

25           MS. MENNINGER:  No, your Honor.  But I think she does

LBUVMAX6                          Jane - direct

1    have a financial stake --

2              THE COURT:  That's what you argue to the jury.

3              MS. MENNINGER:  Your Honor, one other thing.  If she

4    did, in fact, give a statement to law enforcement in May of

5    2019, it hasn't been disclosed to us.

6              MS. MOE:  Yes, your Honor.  My understanding, I was at

7    that very first meeting.  I can double-check my notes, which we

8    produced to the defense, it is September 2019.

9              THE COURT:  Do you want to refresh her recollection on

10   the date or you don't have any notes from May 2099?

11             MS. MOE:  I do not.

12             THE COURT:  You're certainly welcome to inquire.

13             MS. MENNINGER:  Certainly, your Honor.  On her dates.

14             MS. MOE:  I'm sorry.  My colleague is -- again, I

15   don't remember this off the top of my head, but --

16             MS. COMEY:  Your Honor, I believe what is possibly

17   happening in the witness's answer about May 2019 is that I

18   believe before the September 2019 interview, FBI agents

19   approached this witness and asked her if she was willing to be

20   interviewed.  She declined.  And I believe that may have

21   happened around May of 2019.  So she may be confusing that as

22   the first time she ever spoke with the FBI.  But she was not

23   substantively interviewed and did not give substantive

24   statements until September of 2019.

25             THE COURT:  All right.  Not sealed.

1           (In open court)

2           THE COURT:  You may proceed, Ms. Moe.

3           MS. MOE:  Thank you, your Honor.

4      BY MS. MOE:

5      Q.  Jane, based on your understanding, will the jury's verdict

6      in this case affect the award that you received from the fund?

7      A.  No.

8           THE COURT:  I'll just instruct the jury the witness is

9      not providing legal instruction, but responding to the question

10     of her understanding.

11          MS. MOE:  Thank you, your Honor.

12     Q.  And just to be clear, do you have any financial stake in

13     the outcome of this trial?

14     A.  No.

15     Q.  Before this trial, have you ever publicly revealed your

16     identity as a victim of Jeffrey Epstein and Ghislaine Maxwell?

17     A.  No.

18     Q.  Do you want the public to know your true identity?

19     A.  No.

20     Q.  Why is it important to you to remain anonymous?

21     A.  Because I've always just wanted to put this past me.  I

22     moved on with my life.  I am proud that I have my own career,

23     my own husband, my own children, and I work in the

24     entertainment industry.  And victim shaming is still very

25     present to this day.  And I was also afraid that it was going

LBUVMAX6                        Jane – direct

```
 1   to affect my career if somebody looks at me and that's all they

 2   see and that they won't hire me based on that.  So I didn't

 3   really want any part of it; I just wanted it to go away.

 4              MS. MOE:  Your Honor, if I could just have one moment.

 5              THE COURT:  You may.

 6              (Counsel conferred)

 7              MS. MOE:  Nothing further, your Honor.

 8              THE COURT:  All right.  Thank you.

 9              Ms. Menninger, you may begin your cross-examination.

10              MS. MENNINGER:  Your Honor, consistent with past

11   practice, I have a binder to provide to the witness in case

12   electronics don't work.

13              THE COURT:  Okay.  Ms. Moe?

14              MS. MOE:  Yes, your Honor.  So long as we are provided

15   a copy with the item before they are reviewed, we have no

16   objection.

17              THE COURT:  Consistent with how we've been proceeding,

18   you will be.  Thank you.  You may approach.

19              MS. MENNINGER:  May I take off my mask, your Honor?

20              THE COURT:  Yes, you may.

21              (Pages 363 to 389 SEALED)

22              (Continued on next page)

23

24

25
```

LBUVMAX6                        Jane - direct

```
 1              THE COURT:  It's 5 o'clock.  So we'll break for the
 2      evening.
 3              Members of the jury, thank you for your attention and
 4      diligence.  I remind you to please bear in mind all of my
 5      instructions and rules as you break for the evening.  And we'll
 6      start up again at the same time.
 7              Please arrive in time to grab some breakfast and get
 8      ready to go.  We'll bring you out at 9:30.
 9              Thank you so much.  Have a great evening.
10              (Jury not present)
11              THE COURT:  The witness may step down for the evening.
12              See you in the morning.
13              I remind the witness and the government, since the
14      witness is under cross-examination, other than logistical
15      information, there won't be any communication on substance.
16              MS. MOE:  Yes, your Honor.
17              THE COURT:  Thank you.
18              Everyone may be seated.
19              (Continued on next page)
20
21
22
23
24
25
```

1          (Jury not present)

2          THE COURT:  We have some matters to take up?

3          MS. COMEY:  Yes, your Honor.  With respect to the Rule

4     16 issue, defendants Exhibit J36, what's never produced to the

5     government in Rule 16, the Court set a Rule 16 production

6     deadline of November 8th of this year.  It appears that this

7     may have been taken November 17th of this year, but just

8     because it came into existence after that deadline does not

9     excuse the defense from producing anything that they plan to

10    offer in evidence in this trial.  So this is a violation of

11    Rule 16.

12          THE COURT:  Okay.  Ms. Menninger.

13          MS. MENNINGER:  Your Honor, that rule applies to any

14    documents that we're offering in our case in chief, not as

15    impeachment.  In the government's presentation of evidence with

16    this witness, they talked about a particular home and the

17    characteristics of that home.  I am impeaching the witness with

18    an exhibit that presents a contrary home.  The rule does not

19    apply to impeachment material, it applies to things we intend

20    to offer in our case in chief as per the rule.

21          MS. COMEY:  Your Honor, then this is extrinsic

22    evidence that is inadmissible under the rules of evidence to

23    impeach.

24          THE COURT:  So it's one page of J36; correct?

25          MS. MENNINGER:  Correct, your Honor.  I offered page

LBUCmax7

1    3, your Honor.

2              THE COURT:  How did page 3 impeach?

3              MS. MENNINGER:  Because it shows the house and the

4    street that she lives on which is very different from what she

5    described as her childhood home.  She said we were homeless.

6              MS. COMEY:  Your Honor, A, that's not accurate, and B,

7    I think it is a clear violation of Rule 408(b).  They're trying

8    to offer extrinsic evidence.  It's not a prior inconsistent

9    statement.  It's not something that falls under the criminal

10   convictions contemplated by Rule 609.  This is clearly

11   precluded by the rules of evidence.

12             THE COURT:  I'll sustain.  What's next?

13             MS. MENNINGER:  On what grounds, your Honor?  On a

14   Rule 16 violation?

15             THE COURT:  Rule 16.  She recognized the street.  The

16   document is a current photograph.  She seemed to me that she

17   recognized the street because the document indicated the street

18   on it.  She was reading the document.  So also not impeaching.

19             MS. MENNINGER:  We'll find another way to introduce

20   it, your Honor.

21             THE COURT:  I'm sorry, can you --

22             MS. MENNINGER:  We will try to find another way to

23   introduce it.

24             THE COURT:  Okay.

25             MS. COMEY:  Your Honor, to the extent it's going to be

LBUCmax7

1    introduced, it's in violation of Rule 16.  I think to the

2    extent there are other exhibits that the defense intends to

3    offer that have not already been produced to us, we would ask

4    that the Court order that they make those productions

5    forthwith.

6            MS. MENNINGER:  Your Honor, we have a very different

7    view of Rule 16.  If it is an impeachment document, it is not

8    covered by the rule.  We will brief this tonight if your Honor

9    would like.  I have a very different view, apparently, than

10   Ms. Comey.

11           MS. COMEY:  Your Honor, we do not believe that any

12   prior inconsistent statements that would be admissible --

13           THE COURT:  It's not a prior inconsistent statement.

14           MS. COMEY:  Exactly, your Honor.  Nothing else is

15   admissible as impeachment by my reading of the rules of

16   evidence.

17           MS. MENNINGER:  Your Honor, anything that goes to the

18   witness's memory, bias, motive, all of those are impeachment

19   materials.  Impeachment is not limited to prior inconsistent

20   statements.  That's just not the state of the law.

21           THE COURT:  You can brief it.  So if the witness

22   testifies I live in a blue house and you go out tonight and

23   take a photograph of the house and it's a red house --

24           MS. MENNINGER:  Yes, your Honor.

25           THE COURT:  -- and you want to introduce a photograph

LBUCmax7

1    of the red house to impeach the testimony that she lives in a

2    blue house, you show it to the government before or no?

3            MS. MENNINGER:  I did just show it to the government.

4            THE COURT:  Before the beginning of the day?

5            MS. MENNINGER:  Your Honor, I believe it's impeachment

6    and it comes in when it comes in.  I did not believe that your

7    Honor ordered us to produce impeachment materials prior to

8    trial.

9            MS. COMEY:  Your Honor, I think we may need to brief

10   this tonight.

11           THE COURT:  You'll brief it.  You'll brief it.  A

12   specific example would be helpful.  I suppose you can use this

13   one complicated by the fact that my understanding of the

14   testimony was that she was -- she said that's the street I

15   lived on, reading a document that she had never seen before,

16   from a photograph taken in 2021.

17           So I suppose the question is, perhaps you could pick

18   another example, or you could imagine that photograph without

19   the information --

20           MS. MENNINGER:  Your Honor, if I had a photograph from

21   that time period, I certainly would have used it.  That's the

22   only thing available to me.

23           I would say, your Honor, that the government has just

24   introduced, today, photographs that were taken in the last year

25   of Epstein home when we're talking about events that happened

LBUCmax7

1    in '94, '95, and '96.  So I'm not really sure.

2           THE COURT:  There was a witness who testified as to it

3    being an accurate reflection of what the home looked like;

4    right?

5           MS. MENNINGER:  Without saying when, yes.  A witness

6    who continued to work for Mr. Epstein up until 2019.

7           THE COURT:  I mean, I suppose you're welcome to object

8    to foundation, but there wasn't an objection to foundation.

9           In any event, you'll brief whether the defense is

10   obligated under Rule 16 to produce in advance to the government

11   documents that clearly -- and we're not talking about

12   statements.

13          MS. COMEY:  That's correct, your Honor.  We're talking

14   about an exhibit like a photograph, something like this very

15   exhibit seems like classical 16.  So we'll brief it, your

16   Honor.

17          THE COURT:  Okay.  Certainly, there is at least two

18   situations.  There is the situation in which the witness said

19   something and you couldn't have anticipated what they said and

20   you have something that you want to impeach with it, you

21   couldn't have produced that in advance.  So the question is not

22   that, but obviously when you anticipate particular testimony

23   and you have material that you think impeaches that you intend

24   to introduce as evidence through cross examination.  Whether

25   you're obligated under Rule 16 to turn that over in advance,

LBUCmax7

 1   that's the question.

 2          So government's objection, so when would you like to

 3   brief?

 4          MS. COMEY:  Your Honor, may we have by 9:00 p.m.

 5   tonight?

 6          THE COURT:  And Ms. Menninger?  Or you could put in

 7   first.  You tell me your preference.

 8          MS. MENNINGER:  If I could confer, your Honor.

 9          THE COURT:  Okay.

10          MS. COMEY:  Your Honor, is it all right if

11   Ms. Drescher begins collecting the juror binders while we

12   continue?

13          THE COURT:  Sure.

14          MS. MENNINGER:  Your Honor, we would prefer to put in

15   our support why this is not covered by Rule 16 by 9:00 p.m.

16          THE COURT:  You can do that.  When would the

17   government like to respond?

18          You can simultaneously put in letters.  Why don't we

19   do that.  You'll both put in letters at 9:00.

20          MS. COMEY:  That's fine, your Honor.

21          THE COURT:  Thank you.  We need to deal with the

22   witness identifying information.  How are we going to handle

23   this, Ms. Moe?

24          MS. MOE:  Yes, your Honor.  We appreciate an

25   opportunity to confer with the defense about the subject matter

LBUCmax7

```
 1   at a high level of cross and what might be identified so we can

 2   troubleshoot these issues in advance in order to work on a

 3   solution that avoids wasting the jury's time and, most

 4   importantly, jeopardizing the privacy of a crime victim.  We

 5   have previously reached out to defense to ask to confer about

 6   some of these issues.  We would like to do that this evening.

 7   I am concerned that there may be topics that are identifying as

 8   to this victim and we would be happy to talk it through with

 9   defense counsel and work out a solution about anonymizing names

10   or other issues as we continued all along in this case.

11           So we ask the Court to direct the parties to meet and

12   confer on that issue given the steaks of that issue in this

13   case.

14           THE COURT:  Ms. Menninger, the witness is on cross, so

15   they can't confer with the witness.  Any reason not to do that?

16           MS. MENNINGER:  Your Honor, I see no reason not to

17   confer with the government about a way that we can accommodate

18   this.

19           THE COURT:  You can do that.  If you have different

20   views, you'll raise them with me by letter tonight if you come

21   to a point of disagreement.  Okay?

22           MS. MOE:  Thank you, your Honor.

23           MS. MENNINGER:  Thank you.

24           THE COURT:  Anything else?

25           MS. MENNINGER:  Not from us, your Honor.  Thank you.
```

LBUCmax7

```
 1          THE COURT:  And just so -- I sealed the sidebar where
 2   we discussed identifying information about the witness and
 3   because I sealed a portion of the testimony so that the
 4   government can propose redactions.
 5          MS. MOE:  Yes, your Honor.  Thank you.
 6          THE COURT:  When will you do that by?
 7          MS. MOE:  Proposed redactions, your Honor?  Your
 8   Honor, I'm not quite sure at what time this evening we'll
 9   receive the court transcript, but we'd be happy to do that
10   perhaps by midday tomorrow.
11          THE COURT:  That's fine.  I would just like to set a
12   time for if I'm going to hear from you on disagreement as to
13   how to proceed on cross so as to avoid public identifying
14   information.
15          What's a reasonable time for you to confer and put in
16   a letter if there is disagreement?
17          MS. MOE:  Your Honor, we'd be happy to confer
18   following the court day today.  With respect to any
19   disagreements, we can file simultaneous letters at perhaps
20   10 o'clock this evening.
21          THE COURT:  Okay.  Ms. Menninger.
22          MS. MENNINGER:  That's fine, your Honor.
23          THE COURT:  Okay.  What else do we need to address?
24          MS. MOE:  Your Honor, we had just one issue to raise
25   regarding the next witness.  We just wanted to let the Court
```

LBUCmax7

1    know, as the Court may recall, Jane testified earlier today

2    about having disclosed having been abused to a person who we

3    are identifying in this proceeding as Matt.  We anticipate that

4    Matt would be the next witness in this case who would be

5    testifying about a prior consistent statement by Jane.  We are

6    offering that testimony under both prongs of Rule 801(d)(1),

7    and I'd be happy to walk that through with the Court.

8            With respect to the first prong of the rule --

9            THE COURT:  Is there an objection?

10           MS. STERNHEIM:  I'd like to hear their bases.

11           THE COURT:  You have clarity on what the statement is?

12           MS. STERNHEIM:  Well --

13           THE COURT:  I don't, so I don't know if you do or not.

14           MS. STERNHEIM:  I think I would have to parse what the

15   next witness is going to say with the testimony here because it

16   doesn't dovetail as the government is suggesting.

17           THE COURT:  Okay.  Can you be specific?

18           MS. MOE:  Of course, your Honor.  I'd be happy to

19   provide a proffer.  I'd anticipate that Matt would testify that

20   he was in a relationship with Jane in 2007, '08, and '09, and

21   years thereafter.  And during those years, he recalls having

22   conversations with Jane in which Jane told him that when she

23   was growing up as a kid, her family struggled financially and

24   he asked her how they were able to pay for things when she was

25   growing up, and she told him that there was this uncle or

LBUCmax7

```
 1    godfather-like figure when she was growing up who helped the
 2    family.  I anticipate that Matt will testify that Jane told him
 3    during these conversations that the money was not for free,
 4    that she had to do things that she didn't want to do, that that
 5    included massages.  I also anticipate that Matt would testify
 6    that there was a woman in the room and he recalls Jane
 7    describing that a woman was present while this happened who
 8    would make her and other girls who were in the room feel
 9    comfortable while it happened.
10              THE COURT:  Ms. Sternheim.
11              MS. STERNHEIM:  Your Honor, I think it's somewhat
12    premature since the cross examination has not been concluded
13    yet.  I am mindful of the purpose why they're calling this
14    witness, but I think we have to wait to see what happens in
15    cross examination.  I don't understand what they're asking for
16    right now.
17              MS. MOE:  Your Honor, defense counsel put this issue
18    in their opening statement by challenging Jane's credibility
19    and her memory in particular.  So the foundation is in the
20    record for a prior consistent statement to be admitted under
21    both prongs of the rule.
22              With respect to the first prong of 801(d)(1)(B), it is
23    offered to rebut an express or implied charge the declarant
24    recently fabricated it or acted from a recent improper
25    influence or motive in so testifying.
```

1          Here defense counsel, in opening statements, suggested

2     to the jury that a recent motive to fabricate in this case was

3     civil litigation in a particular Jeffrey Epstein victim

4     compensation fund.  So this statement is offered expressly to

5     rebut that because, in fact, Jane had told someone about this a

6     decade before that or more.

7          With respect to the second prong of the rule, the

8     statement is proper to rehabilitate the declarant's credibility

9     as a witness when attacked on another ground.  The advisory

10    committee notes the rule expressly explained that one of the

11    grounds for rehabilitation is when that witness's memory has

12    been challenged, and here given this witness had made that

13    statement much earlier in time closer to the events, this

14    statement would be appropriate under the second prong of the

15    rule, as well.

16          MS. STERNHEIM:  My response is still I think we need

17    to wait until her cross examination is over.  I understand what

18    they are intending to do.  It has to be evaluated whether the

19    statement that they allege she made to Matt is really a prior

20    consistent statement on her.

21          MS. MOE:  Your Honor, in our view --

22          THE COURT:  Isn't the question whether it's a prior

23    consistent statement with what she testified on direct?

24          MS. STERNHEIM:  It's not entirely clear because her

25    statement to him is extraordinarily vague and he did research

LBUCmax7

1    and put it together by himself.

2                THE COURT:  You can cross him on that.

3                MS. STERNHEIM:  I understand that.  I'm not

4    challenging.  I'm just saying that I think the full issue

5    should be addressed at the conclusion of this witness's

6    testimony.

7                THE COURT:  All right.  We'll address it at the

8    conclusion of the witness's testimony.  I understand the

9    government's point to be that the prongs of the rule are both

10   put in issue by the defense's opening, attacking, I suppose,

11   all of the witness's credibility on memory, on recent

12   fabrication, and monetary incentive.  So I suppose the

13   government's position, if I understand it, is that in light of

14   that opening, any prior consistent statement of any of the

15   witnesses comes in.  Is that the contention?

16               MS. MOE:  Yes, your Honor.  Defense counsel has kicked

17   the door wide open.  So under both prongs of the rule, all

18   prior consistent statements of the witnesses in this case are

19   admissible.

20               THE COURT:  Do you anticipate beyond the next witness

21   the same issue occurring?

22               MS. MOE:  Yes, your Honor, with respect to other

23   victims in this case.

24               THE COURT:  Ms. Sternheim, your view is that the

25   opening hasn't sufficiently put the specific credibility of

LBUCmax7

1    each of the witnesses in issue such that the rule would allow

2    prior consistent statements?  I suppose the question is whether

3    a particular statement being offered is consistent with the

4    testimony, but I don't know that it has to be with respect to

5    cross.  It seems to me it has to be with respect to direct,

6    because you asked the jury essentially to evaluate all of the

7    witnesses' testimony as being motivated by memory issues,

8    manipulation, and monetary motivations.

9              So I think that's the issue.  I'll certainly think

10   about that question and then consider the -- I think this is a

11   useful example.  I'm happy to hear -- I mean, it strikes me

12   that's right, but I'm happy to hear why that wouldn't be right.

13             MS. STERNHEIM:  I'm not suggesting, I'm just asking

14   for an opportunity to dovetail her testimony with the statement

15   that is the support for the next witness's testimony.  I'm not

16   seeking to preclude, I'm just asking for an opportunity on the

17   issue of prior consistency.

18             THE COURT:  We can pick this up in the morning, but

19   the government made a specific proffer of anticipated testimony

20   based on direct testimony, which is to say -- I mean, when the

21   witness is testifying, you could say that's not consistent with

22   the prior testimony.  Is that what you want to do?

23             MS. STERNHEIM:  I'm just asking for an opportunity to

24   compare it.  I am not standing here saying I'm opposing it.

25             THE COURT:  I got it.  So it's not about the cross of

LBUCmax7

```
 1   this witness, it's about the direct of the next witness; fair
 2   to say?
 3            MS. STERNHEIM:  Yes.  And there could be redirect that
 4   might, in some way, have bearing on this, but I will review it
 5   in connection with the direct examination of this witness.
 6            THE COURT:  Okay.
 7            MS. MOE:  Thank you, your Honor.
 8            THE COURT:  Thank you for previewing it.  We'll take
 9   it as it comes.  I understand the government's position, I
10   understand Ms. Sternheim's request to evaluate it.  It's the
11   specific testimony that comes in on direct of the next witness
12   in light of what happens yet on cross.
13            Anything else?
14            MS. MOE:  Not from the government, your Honor.  Thank
15   you.
16            THE COURT:  We'll meet again at 8:45.  As soon as we
17   have the jury, we'll take up issues, I'll see a briefing, and
18   hopefully we can get resolution and we'll start with the jury
19   as soon as there here.  We're adjourned.
20            (Adjourned to December 1, 2021 at 8:45 a.m.)
21                             * * *
22
23
24
25
```

INDEX OF EXAMINATION

Examination of:                                    Page

 LAWRENCE VISOSKI

Direct By Ms. Comey . . . . . . . . . . . . . 138

Cross By Mr. Everdell . . . . . . . . . . . 182

Redirect By Ms. Comey . . . . . . . . . . . 281

 JANE

Direct By Ms. Moe . . . . . . . . . . . . . 286

Cross By Ms. Menninger . . . . . . . . . . . 363

                   GOVERNMENT EXHIBITS

Exhibit No.                                    Received

327, 310 . . . . . . . . . . . . . . . . . 141

334, 335 . . . . . . . . . . . . . . . . . 142

328 . . . . . . . . . . . . . . . . . . . . 143

323, 706 . . . . . . . . . . . . . . . . . 148

705 . . . . . . . . . . . . . . . . . . . . 152

346 . . . . . . . . . . . . . . . . . . . . 155

308 . . . . . . . . . . . . . . . . . . . . 156

326 . . . . . . . . . . . . . . . . . . . . 157

703 . . . . . . . . . . . . . . . . . . . . 158

311, 312 . . . . . . . . . . . . . . . . . 163

344, 345 . . . . . . . . . . . . . . . . . 164

315, 336 . . . . . . . . . . . . . . . . . 165

301, 302 . . . . . . . . . . . . . . . . . 167

303 . . . . . . . . . . . . . . . . . . . . 169

11, 12, 13, 14, 15, 16, 1004 . . . . . . . . 176

106  . . . . . . . . . . . . . . . . . . . 290

107  . . . . . . . . . . . . . . . . . . . 325

108  . . . . . . . . . . . . . . . . . . . 326

245  . . . . . . . . . . . . . . . . . . . 341

                    DEFENDANT EXHIBITS

Exhibit No.                              Received

 LV3A, LV3B . . . . . . . . . . . . . . . 227

 LV4, LV5 . . . . . . . . . . . . . . . . 231

                    JOINT EXHIBITS

J-3 . . . . . . . . . . . . . . . . . . . .389