LC1VMAX1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     UNITED STATES OF AMERICA,
 3
                 v.                        20 CR 330 (AJN)
 4
     GHISLAINE MAXWELL,
 5
                     Defendant.           Jury Trial
 6   ------------------------------x
                                          New York, N.Y.
 7                                        December 1, 2021
                                          8:55 a.m.
 8
     Before:
 9                    HON. ALISON J. NATHAN,

10                                          District Judge

11                            APPEARANCES

12   DAMIAN WILLIAMS
          United States Attorney for the
13        Southern District of New York
     BY:  MAURENE COMEY
14        ALISON MOE
          LARA POMERANTZ
15        ANDREW ROHRBACH
          Assistant United States Attorneys
16
     HADDON MORGAN AND FOREMAN
17        Attorneys for Defendant
     BY:  JEFFREY S. PAGLIUCA
18        CHRISTIAN R. EVERDELL
          LAURA A. MENNINGER
19            -and-
     BOBBI C. STERNHEIM
20            -and-
     RENATO STABILE
21
     Also Present:  Amanda Young, FBI
22                  Paul Byrne, NYPD
                    Sunny Drescher,
23                   Paralegal, U.S. Attorney's Office
                    Ann Lundberg,
24                   Paralegal, Haddon Morgan and Foreman

25
```

LC1VMAX1

1              (Trial resumed; jury not present)

2              THE COURT:  All right.  Matters to take up, counsel,

3      includes the Rule 16/608, as I see it, issue.  And then I want

4      to see where you are in terms of working out anticipated

5      personal identifying information of witnesses who I've given

6      permission to testify under pseudonyms to protect their

7      privacy.

8              So let's begin.

9              Ms. Menninger, did you want to begin with the Rule 16

10     issue?

11             MS. MENNINGER:  I think Mr. Everdell was going to

12     handle that piece.

13             THE COURT:  Okay.

14             Ms. Comey, are you taking this?

15             MR. ROHRBACH:  I'm taking this one, your Honor.

16             THE COURT:  You all swapped off.

17             So I think the defense is clearly right that if we are

18     talking by impeachment by contradiction, that is to say,

19     impeachment, direct contradiction of something testified to on

20     the stand, it's not required to be disclosed as case-in-chief

21     material under Rule 16; and depending on what it is, it's

22     likely not 608 because it's impeachment by contradiction, not

23     impeachment to show -- extrinsic evidence to show a character

24     for dishonesty and the like.

25             So the question is whether it's impeachment or not.

LC1VMAX1

1    And I still don't fully understand the photograph of the street

2    that the witness read the line from saying, That's the address

3    where we lived, how that's impeachment.  That remains an open

4    question in my mind.

5            But otherwise, Mr. Rohrbach, do you disagree with

6    anything I've just said as to the state of the law?

7            MR. ROHRBACH:  No, I think that that's a correct

8    statement of the law, your Honor.

9            The issue with the photograph is it wasn't established

10   that that satisfied any of the theories of impeachment; and so

11   if the defense is offering it for some other purpose, that

12   purpose would be part of the defense's case-in-chief and,

13   therefore, subject to Rule 16 or an attack on the witness's

14   character for truthfulness, which would be barred by 608.

15           THE COURT:  Right.

16           But the, I'll charitably call it, theory offered

17   yesterday that anything that's not part of the case-in-chief

18   somehow then falls under 608 as extrinsic, you've walked away

19   from that.

20           MR. ROHRBACH:  Yes -- the theory really is that it has

21   to satisfy some proper basis of impeachment for extrinsic

22   evidence.  So it's true that there are more than two paths,

23   yes, your Honor.

24           THE COURT:  All right.  So just to get to the

25   photograph, as I see it, the witness's testimony -- and tell

LC1VMAX1

1    me -- I don't know if this is Mr. Everdell or Ms. Menninger.

2              MR. EVERDELL:  It's me, your Honor.

3              THE COURT:  Okay.

4              The witness testified, I believe, that at the time

5    that she met Epstein and Ms. Maxwell, that she was living with

6    her family in a pool house and she described that as homeless;

7    correct?

8              MR. EVERDELL:  And she said that she lived in one

9    place, I believe, continuously for her childhood.  The

10   testimony, what you just said, is accurate.

11             THE COURT:  Right.  So then you've got the FBI 302 in

12   which she said that she lived at a certain address at the time

13   that she met them; correct?

14             MR. EVERDELL:  That's right.

15             THE COURT:  I think there's a question of whether that

16   statement comes in as a prior inconsistent statement.  I don't

17   know that that was moved.  But she said, in any event, she

18   looked at it and it was a typo; so she addressed the apparent

19   discrepancy, as I heard it.  I'm not sure if you wanted to move

20   the statement in as a prior inconsistent statement and let the

21   jury resolve that dispute.

22             But we moved on then to a current photograph of a

23   street that had writing on it, an address and a date, and she

24   said that's the street I lived in -- that's the street I lived

25   on, which it just -- I think it suffered from a lot of

LC1VMAX1

1    problems, but certainly wasn't directly impeaching of her

2    testimony.

3         MR. EVERDELL:  Your Honor, I'm sorry.  I just -- see

4    if we could back up.

5         Have we moved beyond the Rule 16 issue at this point

6    and we're just talking about --

7         THE COURT:  Well, if it's impeaching, then there's not

8    a Rule 16 issue.  As I sit here, I don't know -- I don't see

9    that it's impeaching; so that if it's not impeaching, I'm not

10   sure what you're doing with it and it may be a Rule 16 issue.

11        MR. EVERDELL:  If I can address that, your Honor,

12   because I think we disagree with what the state of the law is.

13   I think there's some disagreement on the courts about whether

14   or not if the defense is going to introduce something or talk

15   about something on cross-examination, whether that is

16   considered a Rule 16 document.

17        So what I understand the case law to be, your Honor,

18   is that they are trying to deal with the issue of where the

19   defense is trying to introduce affirmative proof in its own

20   case through the government's own witnesses.

21        THE COURT:  For sure.  Which is, let's face it,

22   usually what happens.  There's often not a defense case.  Both

23   cross-examination and impeachment testimony, as well as

24   affirmative evidence, comes in through cross-examination.

25        So I think the cases that say there's not a clear

LC1VMAX1

1    temporal time split, that is to say, you don't have to put on

2    your first witness, is not the question; it's a functional

3    question, are you putting on evidence in your case-in-chief as

4    opposed to impeachment testimony.

5              MR. EVERDELL:  I think that's right, your Honor.

6              Let's give an example, because I think it's helpful to

7    use examples.  I'll use one from this very case.

8              It's my understanding that the government wants to

9    introduce certain FedEx records through a FedEx document

10   custodian.  The defense also would like to introduce other

11   FedEx records, coincidentally, through the same document

12   custodian.  So if that happens, you'd have a witness called by

13   the government, the defense would want to introduce affirmative

14   proof in its case through that same witness.  That would be

15   defense case-in-chief material which, by the way, we disclosed

16   in our Rule 16 letter to the government.  That's an example, I

17   think, where the courts are talking about where you disclose

18   things -- where you have a witness where you are trying to put

19   on affirmative proof in the defense case through the

20   government's witness.  That is an example where we don't

21   dispute.

22             I'll give another example.  This is a hypothetical

23   one.  Larry Visoski just testified.  He was shown a number of

24   pictures of Little St. James Island where there were

25   structures, houses on the island.  And he testified to those,

LC1VMAX1

1    and those were introduced.

2          If we hypothetically had photos of that same island

3    before those houses were built, we don't, but if we did and we

4    wanted to introduce those through Larry Visoski, again, that

5    would be affirmative defense in the defense case-in-chief

6    introduced through the government's witness.  That would be

7    Rule 16 which we'd have to disclose ahead of time.

8          THE COURT:  Right.

9          MR. EVERDELL:  Now, what we are talking about here is

10   what Witness 1, what Jane, remembers about the childhood, about

11   these events; it's about her recollection of everything, and

12   that is critical to the case.  So misremembering details,

13   misremembering where she lived, not being able to recognize a

14   house, that all goes to her credibility as a witness, her

15   believability, any contradiction.

16         This is central to the case.  Her memory of every

17   single detail of her childhood is central to the case, and that

18   is not case-in-chief material.  That is, if she testifies to

19   something and we think we have something that contradicts what

20   she just said, like a photograph of her -- of a place where she

21   lived as a child, but she didn't seem to remember, that's

22   impeachment material.  And we don't know if we're going to use

23   that until she says on the stand what she says on the stand.

24   We have it ready to go in case she says that, and she did in

25   this case, and so that's why we were able to use it or try to

LC1VMAX1

1    use it, to show that she doesn't have an accurate recollection.

2    That is pure impeachment material.

3            THE COURT:  Up to the point where you said it

4    contradicted what she said on the stand, you and I were in

5    vigorous agreement.

6            MR. EVERDELL:  Okay.

7            THE COURT:  Okay.

8            MR. EVERDELL:  All right.

9            Well, what I would say is that we can't -- no, this is

10   not -- it's not as if we were going to introduce the photograph

11   of her house in our case-in-chief.  We are doing this -- we had

12   it ready to be able to use it in case she said something that

13   we believe was contradictory and contradicted by the

14   photograph.  So that's why we did not disclose it ahead of

15   time, because we believed it to be impeachment material.

16           By the way, Judge, I'll just note for the record that

17   when we sent our Rule 16 discovery several weeks ago to the

18   government, we included a cover letter, which I'm happy to

19   share with the Court --

20           THE COURT:  I can imagine it reserved all your rights.

21   And you can keep talking, but we remain in agreement.

22           MR. EVERDELL:  Okay.  And it cited all the cases that

23   we cited, and it said we do not consider impeachment material

24   or refreshing material case-in-chief material.

25           THE COURT:  It is true.  I think, Mr. Rohrbach agrees.

LC1VMAX1

1  The only question in any specific instance is is it impeaching,

2  and is it a prior inconsistent statement.  We have to deal with

3  the rules around a prior inconsistent statement.  It wasn't

4  like you had deposition testimony.  You had an FBI agent's

5  write-up of notes which the witness was confronted with and

6  said it was a mistake.  Again, that wasn't moved in, but we can

7  deal with that as it comes.

8          There could be -- not here, but there could be 608

9  issues if you're trying to use extrinsic evidence.  If what we

10  have is impeaching by contradiction, impeachment of what the

11  witness testified to on the stand, then it's not going to be a

12  608 issue.

13          MR. EVERDELL:  If we're impeaching the witness, yes,

14  that's right.  And I just want to address the issue of

15  impeaching with extrinsic evidence, which I know the government

16  has raised.  That rule is -- and the cases they cite --

17          THE COURT:  I know you cited Rule 613.  I hadn't

18  understood their argument to be about 613.

19          MR. EVERDELL:  They raised in their papers the notion

20  that you can't impeach -- or you can't use extrinsic evidence

21  to impeach.  But the rule there and the cases they've cited

22  stand for the unremarkable proposition that you can't

23  impeach -- or you can't use extrinsic evidence on a collateral

24  matter.

25          THE COURT:  Correct.

LC1VMAX1

```
1          MR. EVERDELL:  Her memory about anything to do with
2    this time period is not a collateral matter; she is a central
3    witness to this case.
4          THE COURT:  Well, again, I don't adopt that broad
5    statement.  But to the extent you are attempting to impeach --
6    so you have something that contradicts what she testified to on
7    the stand, then it's not a Rule 16 issue, I doubt it's a 613 --
8    a 608 issue.  We may have to deal with 613 questions and what
9    it is that we're looking at.
10         MR. EVERDELL:  Again, it's also not a 608 issue, I'd
11   say, your Honor, because that rule deals with conduct.
12         THE COURT:  I said it's not a 608 issue.
13         MR. EVERDELL:  Yes.  Okay.  I agree with you.
14         MR. ROHRBACH:  I'm a little confused, your Honor.
15         I think we're agreeing that, as your Honor said, if
16   it's offered for impeachment with a proper basis for
17   impeachment and it's not about a collateral matter, then they
18   didn't have to disclose it in Rule 16.  If it's to advance the
19   defense case, whether in the government's case or in the
20   defense case, then it should have been disclosed in Rule 16.
21         There are things that the defense might expect to
22   offer for impeachment, but that might be impeachment about a
23   collateral matter or might be impeachment, but is not, in fact,
24   based on a contradiction or some other proper theory of
25   impeachment, in which case it is not an admissible exhibit.
```

LC1VMAX1

1            The government also doesn't agree with the defense's

2      broad statement that anything that goes to this witness's

3      memory is a noncollateral matter.  It's hard for us to know now

4      exactly what they plan to do.  The government thinks we should

5      take that as it comes.  But I think there's sort of broad

6      agreement about the general principles here, your Honor.

7            MR. EVERDELL:  If there's broad agreement, your Honor,

8      then there shouldn't be objections.  If we have an issue with

9      the witness's memory that we believe we have a document or some

10     other information that contradicts what she's saying, then we

11     are allowed to cross on it.

12            THE COURT:  Okay.  We'll take it as it comes, but we

13     agree on the principles.  I think the only question is -- I

14     sustained the objection to admission of the photograph, because

15     it's not clear to me that it's impeaching.  As I said, if it's

16     not impeaching, then it might be a Rule 16 issue; I wasn't

17     entirely sure what you were trying to do with it.

18            You're welcome to -- if there's some basis to show a

19     photograph, to impeach something she suggested in her

20     testimony, then you can do that.

21            MR. EVERDELL:  Yes.

22            THE COURT:  Okay.

23            MR. EVERDELL:  Understood.

24            MR. ROHRBACH:  The government agrees, your Honor.  The

25     issue with that particular photograph, setting aside the fact

LC1VMAX1

1    that the witness couldn't recognize it, and there are other

2    questions about admissibility than just whether it's relevant

3    or impeaching, is that it wasn't a direct contradiction of

4    anything the witness said on the stand; so it wasn't a proper

5    basis for impeachment.  And if it advanced the defense case in

6    some other way, it would have been a Rule 16 --

7              THE COURT:  What is the government's understanding of

8    when the witness lived at the address that's referenced in the

9    302?

10             MR. ROHRBACH:  If I may ask Ms. Moe, who's taking the

11   rest to answer that question.

12             THE COURT:  Sure.

13             MS. MOE:  Yes, your Honor.

14             I don't recall the particular date, but I think the

15   witness was beginning to clarify on cross-examination yesterday

16   that at some point while she was a teenager living in Palm

17   Beach, she moved to the second address.  I don't recall the

18   specific date --

19             THE COURT:  And you say the second address, what do

20   you mean?

21             MS. MOE:  Yes, your Honor.

22             THE COURT:  I guess what do you mean by the first

23   address, do you mean the pool house?

24             MS. MOE:  Yes, your Honor.  I believe the witness

25   would explain that at the time that all of this --

LC1VMAX1

 1              THE COURT:  Could you pull up the microphone.

 2              MS. MOE:  Yes, your Honor.  I apologize.

 3              THE COURT:  Even though we're three days in, I still

 4    can't hear you without the mic.

 5              MS. MOE:  I'm sorry.

 6              THE COURT:  That's okay.

 7              MS. MOE:  I believe the witness would explain that

 8    when all of this began when she was 14, she was living in a

 9    pool house because of her family's financial circumstances.

10    But at some point during the years that followed, her family

11    moved to a second house.

12              THE COURT:  And that's the address listed in the 302,

13    as you understand it?

14              MS. MOE:  I don't recall offhand whether that's the

15    particular address.  I'd want to review the 3500.  But I

16    believe the witness was clarifying that she lived at a second

17    house.

18              THE COURT:  Okay.  All right.

19              MR. EVERDELL:  Your Honor, I'm sorry.

20              I believe -- and I'm checking this right now, but I

21    believe the address she put on her 1994 Interlochen application

22    was the address we were showing her the photograph of.  And

23    she's saying she's in a pool house or homeless.  So I think

24    this is impeaching.  I think this goes directly --

25              THE COURT:  Again, she said she lived -- they move in

LC1VMAX1

1    the application.  All she said about the photograph was, That's

2    the address that I lived in.  And so we just don't have a --

3    she looked at your photograph, she looked at the address

4    written on it; she said that's the address where I lived.

5    That's not yet in contradiction to her statement, because

6    there's a timeline issue.  But you can try, again, to see if

7    there's a basis for impeachment.

8            MR. EVERDELL:  All right.  I'll leave it to

9    Ms. Menninger, who's going to be doing the cross.

10           THE COURT:  Okay.

11           Any questions about that, Ms. Menninger?

12           MS. MENNINGER:  No, your Honor.  I think I can ask her

13   questions today that explain when she lived where --

14           THE COURT:  Great.

15           MS. MENNINGER:  -- what was on her applications.  What

16   she said in her 302, which was already discussed on the record,

17   is that she lived in the same place from the time she met

18   Epstein until she moved to New York.  That was her statement.

19   She continued on --

20           THE COURT:  You mean that's the statement recorded in

21   the 302.

22           MS. MENNINGER:  That is one of the statements recorded

23   in the 302 verbatim.

24           THE COURT:  Right.  Sorry, verbatim.  She said it was

25   a typo.  It's a type-up of agents' notes, is it not?

LC1VMAX1

1          MS. MENNINGER:  It's a type-up of the agent's notes.

2     We also have the agent's handwritten notes.

3          The next sentence -- then I'll explain what I think we

4     may get to.  The next sentence, she says, That home was a

5     three-bedroom home in a gated community called Bear Lake,

6     something like that.  Those were the two statements that were

7     typed up in the agent's 302.

8          THE COURT:  Okay.

9          MS. MENNINGER:  And in the handwritten notes.

10          She's had a chance to explain it; in her mind, it's a

11     typo.  We have those agents on call to be witnesses, and they

12     can talk about whether it was a typo or not a typo.  I mean, I

13     think that's the state of play in terms of contradicting a

14     witness with a prior inconsistent statement.

15          THE COURT:  Okay.  Anything else on that?

16          MR. ROHRBACH:  Nothing from the government.

17          MR. EVERDELL:  No, your Honor.  Thank you.

18          THE COURT:  Do we have issues to take up around

19     specific identifying information?

20          MS. MOE:  Yes, your Honor.

21          Just to provide the Court with an update on the status

22     of our conferral with defense counsel, defense counsel provided

23     the government with a list of certain topics this morning,

24     which we appreciated; and we had a productive conversation this

25     morning about a number of those topics, and I think I've

LC1VMAX1

1    narrowed the scope of any disagreement.

2            There are two remaining topics.  And I think we've

3    agreed that before those topics are raised at a break or before

4    the jury comes out, we're going to confer with the witness's

5    counsel just to confirm what issues might be identifying as to

6    those two particular issues.  I'm hopeful that we'll be able to

7    resolve any disagreement there, but we want to just work that

8    out before that comes out before the jury.  And I think there

9    are one or two issues that we've agreed that won't be raised

10   without a sidebar in advance to discuss them.

11           THE COURT:  Okay.  Is there no way to do that now

12   while we're waiting for our jurors or --

13           MS. MOE:  Your Honor, I think defense counsel's

14   preference was to do that at a sidebar.

15           THE COURT:  It's here.

16           MS. MOE:  Yes, your Honor.

17           THE COURT:  I just meant I'm happy to do it at the

18   sidebar, to the extent we're referencing the specific

19   identifying information.  I just meant as a time saver can we

20   do it now.

21           MS. MENNINGER:  I think there are two of the three

22   that we can do now; but the third one depends on what the

23   witness says, your Honor.

24           THE COURT:  Okay.

25           Let me just get a check on our juror numbers.

LC1VMAX1

1          MS. MOE:  Yes, your Honor.

2          Just to be clear, I think two of those topics were

3     ones that we wanted to just confer with the witness's attorney

4     about, because there may not be any disagreement; we just

5     wanted to confer with him to ensure we have that right.

6          I think there was one remaining topic that defense

7     counsel preferred to raise as it arises during the course of

8     cross-examination.  That's what I meant by at sidebar.

9          Apologies.

10          THE COURT:  Okay.  So is there anything we can discuss

11     now at the sidebar or no?

12          MS. MENNINGER:  There's two of the three we can

13     discuss at sidebar.  I'm happy -- if the witness's counsel

14     wants to join us at the sidebar and weigh in on what counsel

15     thinks is identifying or not as we discuss it.

16          THE COURT:  My preference would be for you to confer

17     first and then let me know.

18          MS. MOE:  Yes, your Honor, that's what we would

19     propose.

20          THE COURT:  Okay.

21          MS. MOE:  Thank you.

22          THE COURT:  All right.

23          Anything else we can take up now?

24          MS. MENNINGER:  Yes, your Honor.

25          I conferred with the government.  We have prepared,

LC1VMAX1

1    similar to the government and similar to what Mr. Everdell did

2    yesterday, 18 binders that have potentially admissible sealed

3    exhibits in them we would like to place under the jurors'

4    chairs, consistent with the practice on prior witnesses, to

5    only have them directed to a particular tab when and if the

6    Court admits a particular document that has identifying

7    information contained in it, if that's okay with your Honor.

8              THE COURT:  Ms. Moe, is that fine with you?

9              MS. MOE:  Your Honor, may I have just one moment?

10             (Counsel conferred)

11             MS. MOE:  No, your Honor.  Thank you.

12             THE COURT:  Fine.  Okay.  So you can place the

13   binders.  Anything else we can take up now, Ms. Menninger?

14             MS. MENNINGER:  No, your Honor.  I'm just going to

15   approach the witness stand at some point and re-place the

16   binder on the witness stand.

17             THE COURT:  You may do that.

18             Ms. Moe, anything we can take up now?

19             MS. MOE:  No, your Honor.

20             THE COURT:  All right.  I will step down.

21             I appreciate counsel conferring on the anonymity

22   issues and working through as much as you could.  I greatly

23   appreciate that.  I will see you in a few minutes.

24             (Recess)

25             THE COURT:  All right.  We have our jury.

LC1VMAX1

1           Anything to take up?

2           MS. MOE:  Yes, your Honor.

3           I just wanted to report to the Court, we had a chance

4    to confer about those two issues.  We've narrowed the scope of

5    disagreement to just one issue after conferring with the

6    witness's counsel, which we'd like to raise at sidebar.  I

7    don't know how soon that will come up, so I defer to defense

8    counsel whether to do that now or whether it would be more

9    efficient to bring the jury out and deal with that at a break.

10          There's a second issue to flag, but let me just pause

11   there on that to see.

12          THE COURT:  Sure.

13          Is it anytime soon, Ms. Menninger?

14          MS. MENNINGER:  I don't think so, but I don't have it

15   all memorized.

16          THE COURT:  Understand.  Let's hope we get to the

17   break and then we'll take it.

18          What else?

19          MS. MOE:  Yes, your Honor.

20          Defense counsel provided the government with a number

21   of exhibits, and we appreciated the chance to review those in

22   order to raise issues in advance.  We just wanted to flag that

23   for two of those we anticipate there being a Rule 408

24   objection.  Again, I don't know how quickly that will arise, so

25   I just wanted to alert that to the Court.  We can take that up

LC1VMAX1

1    as it arises, but wanted to bring that to the Court's

2    attention.

3            In addition, defense counsel has notified the

4    government that they've provided binders of defense materials

5    for the jurors.  It appears that -- we have not had a chance to

6    review those materials, but based on a sampling that defense

7    counsel has provided to the government, it appears a large

8    number of them are things like printouts from the internet and

9    otherwise.  So we have concerns about jurors flipping through a

10   binder that would appear to contain a wide array of materials

11   that would not be admissible.  And because we haven't examined

12   that binder, we have concerns about that.

13           I don't want to delay bringing the jury out, and so I

14   would just ask for an opportunity to be heard about that before

15   the jurors bring out any binders and begin flipping through

16   them.

17           MS. MENNINGER:  I'm going to be asking them to look at

18   the binders at the outset at the beginning exhibits.  I think

19   we've all come to believe --

20           THE COURT:  We're going to keep doing what we've been

21   doing, which is before the jury turns to it, the defense will

22   tell us what it is.  If you have an objection before they turn

23   to it, you'll raise it and we'll deal with it.

24           MS. MOE:  Yes, your Honor.  Thank you.

25           THE COURT:  Is there any general set of objections in

LC1VMAX1

1    that regard that we can --

2              MS. MOE:  Yes, your Honor.

3              I think materials like printouts from the internet,

4    things like tabloid articles, Wikipedia pages, we don't think

5    are appropriate as exhibits before the jury, and so we would

6    object to exhibits of that nature.

7              In addition, the samples that we've been provided

8    include --

9              THE COURT:  Doesn't it depend what it's being used --

10   you have an internet objection, is that the -- what's the

11   grounds for a blanket objection to internet material?

12             MS. MOE:  Yes, your Honor.

13             I agree that we'll have to take these as they come.

14   Thinking ahead, we can't conceive of a basis for offering

15   things like Wikipedia articles with this witness or tabloid

16   articles with this witness, but we recognize the Court will

17   have to address that as it comes because we're not quite sure

18   what the defense argument would be.  We mostly just wanted to

19   give the Court a preview of those issues that we anticipate

20   arising.

21             THE COURT:  Okay.

22             MS. MENNINGER:  Your Honor, I feel like I'm trying to

23   give them stuff in advance so they can be prepared and we can

24   move this proceeding more quickly, but it will only come up

25   when and if it comes up.

LC1VMAX1

```
 1              THE COURT:  All right.  Then we'll take it -- I'm
 2      going to try to minimize sidebars, so we have to keep moving.
 3              My request always is if there are things that you
 4      think are likely to require a discussion to address
 5      admissibility, that you do raise them in advance.  Confer.  If
 6      you disagree, raise them.
 7              I think at this point we'll bring out the jury.  I'll
 8      ask you to keep trying to do that as we go, so we use our time
 9      efficiently.  But it makes no sense to have the jury sitting
10      idly now.
11              MS. MOE:  Thank you, your Honor.
12              THE COURT:  We'll bring in the jury.
13              Can we bring in the witness.
14              (Witness present)
15              (Jury present)
16              THE COURT:  Good morning, ladies and gentlemen of the
17      jury.  Nice to see you.  Thank you so much for your punctuality
18      and attention and diligence.  I greatly appreciate it.  I hope
19      you had a good evening.
20              We will continue with Ms. Menninger's
21      cross-examination of the witness who's testifying under the
22      pseudonym "Jane."
23              I remind Jane that you are under oath.
24              I do remind the sketch artists that pursuant to my
25      order, please don't sketch exact likeness of the witness who is
```

LC1VMAX1                         Jane - cross

1   testifying under a pseudonym.

2              With that, Ms. Menninger, you may continue.

3              MS. MENNINGER:  Thank you, your Honor.

4    JANE,

5        called as a witness by the Government,

6        having been previously duly sworn, testified as follows:

7   CROSS-EXAMINATION (continued)

8   BY MS. MENNINGER:

9   Q.  Good morning, Jane.

10  A.  Good morning.

11  Q.  I'd like to pick up again with your Interlochen

12  applications, all right?  You don't need to open the binder

13  until we let you know.  Thank you.

14             You are aware that Interlochen awards financial aid;

15  correct?

16  A.  Yes.

17  Q.  You are aware that Interlochen awards scholarships;

18  correct?

19  A.  Correct.

20  Q.  You went there for three years in the summers?

21  A.  Yes.

22  Q.  Ages 13 to 17 -- 16?

23  A.  16, yes.

24  Q.  No, 17; I think you turned 17 in your final summer.

25             THE COURT:  Is that a question?

LC1VMAX1                              Jane - cross

1              MS. MENNINGER:  Yes.

2              THE COURT:  Did you turn 17 in your final summer?

3              THE WITNESS:  Sorry, I'm doing the math.  14, 15 --

4    no, 16.

5    Q.  Your brothers went there as well?

6    A.  Yes.

7              MS. MENNINGER:  If we could turn to J-3, which has

8    already been admitted.  And there is a little green flag for

9    you to get to the J exhibits more quickly.

10             And your Honor, because J-3 has been admitted, I would

11   ask at this time that the jurors be permitted to access the

12   smaller binder under their chairs which has J-3 in it.

13             THE COURT:  Just one moment.

14             Without objection?

15             MS. MOE:  No objection, your Honor.

16             THE COURT:  Okay.  Jurors, you may pick up the smaller

17   binder please and turn to J-3.  Thank you.

18   BY MS. MENNINGER:

19   Q.  Have you found J-3?

20   A.  Yes.

21   Q.  I think as we discussed yesterday, that's your name on this

22   application; correct?

23   A.  Yes, ma'am.

24   Q.  And at the top line above your name, the question was

25   asked:  Are you applying for scholarship/financial aid;

LC1VMAX1                         Jane - cross

1    correct?

2    A.  Correct.

3    Q.  And you checked off no; correct?

4    A.  Correct.

5    Q.  I want to ask you to turn to the second page of that

6    exhibit.  And on the second page, you described what kind of

7    classes you wanted to apply for; correct?

8    A.  Correct.

9    Q.  You wrote that:  When asked about something difficult,

10   nothing has been difficult for me; correct?

11   A.  I guess I did.

12   Q.  You were involved in the school of the arts as we

13   discussed, right?

14   A.  Yes.

15   Q.  Costuming, acting, improvisation, right?

16   A.  Yes.

17   Q.  Plays, performances, movies, right?

18   A.  Correct.

19   Q.  This was at the age of 13, right?

20   A.  Yes.

21   Q.  And then just below that, it has the names of some

22   individuals who offered letters of recommendation for you,

23   right?

24   A.  Right.

25   Q.  When you were 13; correct?

LC1VMAX1                          Jane - cross

1   A.  Correct.

2   Q.  And then your signature is on that page, right?

3   A.  Yes.

4   Q.  And then the next page in this exhibit are some photographs

5   of yourself, right --

6   A.  Yes.

7   Q.  -- that you submitted?

8   A.  Yes.

9   Q.  These were all taken before you had turned 14, right?

10  A.  Yes.

11  Q.  All of them on the page?

12  A.  Yes.

13  Q.  All right.  If we could turn to page -- well, actually,

14  yes, the next page, 4.  That also has your address at the time;

15  correct?

16  A.  Yes.

17  Q.  And one more page, page 6.  That is one of the letters of

18  recommendation for you; correct?

19          THE COURT:  Ms. Menninger, could I have a binder?  I

20  don't think I have it.  That's the government exhibits.

21          MS. MENNINGER:  Your Honor --

22          THE COURT:  If you don't, that's okay.

23          MS. MENNINGER:  No, no.  I believe for this one we

24  gave you one yesterday, but I could be wrong about that.  If I

25  could just check with Ms. Lundberg.

1          THE COURT:  I thought you did, too.  I have just the

2    government exhibits.

3          MS. MENNINGER:  Can she put it on the screen, your

4    Honor?

5          THE COURT:  That would be fine.  That is, I think,

6    what we were doing in part yesterday.

7          MS. MENNINGER:  My apologies.

8          J-3, and we're on page 6.

9          THE COURT:  Go ahead, Ms. Menninger.

10   BY MS. MENNINGER:

11   Q.  On page 6, we have a letter of recommendation for you.  Do

12   you see that?

13   A.  Yes.

14   Q.  Glowing letter of recommendation, right?

15   A.  Yes, it looks like it.

16   Q.  And the person that is referred to who performed or wrote

17   that letter of recommendation gave her qualifications, right?

18   A.  Yes.

19   Q.  Her credentials, right?

20   A.  Yes.

21   Q.  She was then on the board of the Palm Beach School of the

22   Arts, right?

23   A.  I didn't know that till I just saw it.

24   Q.  Well, it's in your application, right?  You solicited this

25   letter of recommendation from her; correct?

LC1VMAX1                          Jane - cross

1    A.   Yes.

2    Q.   And she was presently on the -- formerly, I'm sorry, a

3    director of the Professional Children's School; correct?

4    A.   Correct.

5    Q.   And that's the school that you ultimately went to in New

6    York for senior year, right?

7    A.   Yeah.

8    Q.   And she was glowing in her support of your application to

9    go to Interlochen when you were 13 years old; correct?

10   A.   Correct.

11   Q.   I want to direct your attention to the last page in that

12   exhibit, page 11.  If I could have you read the third full

13   paragraph; but, of course, omit your family name from that

14   reading.  If you could read it out loud.

15   A.   The third paragraph?

16   Q.   Yes, that begins with "Each."

17   A.   Each child has their own individual personality and talent,

18   but all three reflect the qualities of a strong, loving family

19   background.  The arts have always been a common interest with

20   music as a binding love.  The family organized and underwrote

21   an annual charity performance for our school.  After attending

22   their Feastival of Lights, our school community has always felt

23   we had witnessed the rebirth of the von Trapp family.

24   Q.   The von Trapp family, is that right?

25   A.   Yes.

LC1VMAX1                          Jane - cross

1   Q.  And this was a reference to you and your two brothers,

2   right?

3   A.  Yes.

4   Q.  I also believe, just in case it wasn't audible, it said

5   that you and your two brothers came from a strong and loving

6   family background; is that right?

7   A.  That's what it says.

8   Q.  I want to turn to -- and we could show for the Court --

9   what's been marked for identification as J-4.  But you're

10  certainly welcome, Jane, to turn to that in paper form.

11          THE COURT:  Not the jurors.

12          MS. MENNINGER:  Not the jurors.

13          THE COURT:  Please wait till I direct you.  Please

14  wait till I direct you.  You can close your binders.

15          Thank you.

16          MS. MENNINGER:  It's going to come out again, I hope

17  soon.

18  BY MS. MENNINGER:

19  Q.  Do you recognize this document?

20  A.  I do not recognize the document per se.

21  Q.  J-4?

22  A.  But I recognize my signature.

23  Q.  Okay.  Do you believe that this is your application?

24  A.  Yes.

25  Q.  And to the same Interlochen Arts Camp?

LC1VMAX1                          Jane - cross

```
1    A.  Yes.

2    Q.  And do you see the date on the upper right-hand corner?

3    A.  Yes.

4    Q.  And that would have been an application for the next year,

5    for the next summer, is that fair?

6    A.  Yes.

7    Q.  All right.

8              MS. MENNINGER:  Your Honor, at this time I'm moving

9    for the admission of J-4, which I previously discussed with the

10   government.

11             MS. MOE:  No objection, your Honor.  We would just ask

12   that it be under seal and that any identifying information not

13   be read into the record.

14             THE COURT:  Okay.  J-4 is admitted.  It's admitted

15   under seal consistent with my ruling that this witness may

16   testify under pseudonym.  And if any reference -- if any

17   reading of the document occurs, everyone is admonished not to

18   use the identifying information.

19             (Defendant's Exhibit J-4 received in evidence)

20   BY MS. MENNINGER:

21   Q.  So if you need to turn on the second page, I think it has

22   your signature, just for reference sake.  Do you see that?

23   A.  Yes.

24   Q.  Do you believe this is your application?

25   A.  Yes.
```

LC1VMAX1                          Jane – cross

1   Q.  That was submitted in October of 1994?

2   A.  Yes.

3   Q.  And that would be for the summer of 1995?

4   A.  Yes.

5   Q.  Up again on the top line above your name there is a

6   question:  Are you applying for financial aid?

7          MS. MENNINGER:  Oh, the jurors can look at J-4 now, if

8   that's okay.

9          THE COURT:  Without objection?

10         MS. MOE:  No objection, your Honor.

11         THE COURT:  You may open your binder to J-4, please.

12         Thank you.

13  Q.  So we see your name in the top portion of the application,

14  right?

15  A.  Yes.

16  Q.  And then above that, are you applying for financial aid,

17  and you checked no; correct?

18  A.  Correct.

19  Q.  If you want to turn to page 2 of that exhibit, up on the

20  top line there are some references and one is your father's

21  name; is that right?

22  A.  Yes.

23  Q.  And then next to that was your teacher from Palm Beach

24  School of the Arts, right?

25  A.  Yes.

LC1VMAX1                         Jane - cross

1   Q.  And then below that, again, it gave a little summary of

2   where you were in your career in October of '94; correct?  It

3   talked about you had done commercials, right?

4   A.  A couple.

5   Q.  Many performances singing, right?

6   A.  Yes.

7   Q.  Plays, skits, etc., right?

8   A.  Yes.

9   Q.  You had been in the New York Broadway production of *Joseph*

10  *and the Amazing Technicolor Dreamcoat*; correct?

11  A.  I was not in the New York production.

12  Q.  It was a local production?

13  A.  It was -- it was the touring company in Florida.

14  Q.  Okay.

15          MS. MOE:  Your Honor, may I have just a moment to

16  confer with defense counsel?

17          THE COURT:  You may.

18          (Counsel conferred)

19          MS. MOE:  Thank you, your Honor.

20  Q.  And again, you said:  Nothing has been very difficult for

21  me.  Correct?

22  A.  I guess I did.

23  Q.  On the next page you had submitted a letter asking to take

24  extra classes the next summer, right?

25  A.  Yeah.

LC1VMAX1                        Jane - cross

1    Q.  And your address on this application for the summer of '95

2    is the same address as the one that was on your application for

3    the summer of '94; correct?

4    A.  Correct.

5              MS. MENNINGER:  All right.  And then if we could --

6    not the jurors, if the jurors could wait a minute, could we

7    have the witness identify what's been marked as J-5, which is

8    the next exhibit?

9              THE COURT:  Jurors, close your binders please.  And

10   keep them on your laps, but close them.  Thank you.

11   Q.  Do you see the exhibit at J-5?

12   A.  Yes.

13   Q.  And that has your signature as well, correct?

14   A.  Correct.

15   Q.  And there's a date on the upper left-hand corner, do you

16   see that date?

17   A.  Yes.

18   Q.  And do you believe this to be your application for the

19   summer of 1996?

20   A.  Yes.

21   Q.  All right.

22             MS. MENNINGER:  At this time I would move for the

23   admission of J-6.

24             MS. MOE:  No objection, your Honor.  We'd ask that

25   this exhibit be received under seal for the same reasons.

LC1VMAX1                        Jane - cross

1          THE COURT:  Okay.  J-6 is admitted.  It's admitted

2   under seal, consistent with my ruling --

3          MS. MENNINGER:  I'm sorry, J-5 for 1996.

4          THE COURT:  Oh, I apologize, J-5.  J-5 is admitted

5   under seal consistent with my ruling that this witness may

6   testify under a pseudonym, and without objection from the

7   government.

8          (Defendant's Exhibit J-5 received in evidence)

9          THE COURT:  I'll direct, Ms. Moe, the jury to look at

10  the binder, J-5.

11         MS. MOE:  Yes, your Honor.

12         THE COURT:  All right.

13         Jurors, you may look at J-5 please.

14  BY MS. MENNINGER:

15  Q.  So on J-5 we have your signature there again; correct?

16  A.  Correct.

17  Q.  And you were applying for the high school level, right?

18  A.  Yes.

19  Q.  And you had a new address for this application for the

20  summer of 1996; correct?

21  A.  Yes.

22  Q.  That address is the one we talked about yesterday that was

23  in the Bear Lake Estates gated community, right?

24  A.  Yes.

25  Q.  I want to show you, at the bottom of that page, it's the

1    same teacher who had supported you from the prior year's

2    application; correct?

3    A.  Correct.

4    Q.  And then if we could turn the page to the next page, on

5    page 2 of J-5, in the second box down from the top, there's a

6    label "Financial Information."  Do you see that box?

7    A.  Yes.

8    Q.  And in that box it asks:  Are you applying for financial

9    aid?  And you said no.  Correct?

10   A.  Correct.

11   Q.  And then the next line says:  Does the student applying

12   expect to be the recipient of any funds, scholarship, grant,

13   award, or prize from any country, state, organization, or

14   individual specifically for attendance at the Interlochen Arts

15   Camp.  And you checked no.  Correct?

16   A.  Correct.

17   Q.  And then on that same page there is a little newspaper

18   clip; correct?

19   A.  Correct.

20   Q.  And I won't say the names of any performances, but it's

21   talking about some performances that you and your brothers had

22   performed in the area, right?

23   A.  Yes.

24          MS. MENNINGER:  And if I may have one second, your

25   Honor?

LC1VMAX1                          Jane - cross

1              THE COURT:  You may.

2              (Counsel conferred)

3    Q.  And that you and your brothers had performed the last week

4    for a School of the Arts performance locally; correct?

5    A.  Correct.

6    Q.  And then you were going to be performing in another city in

7    Florida in the upcoming days; is that right?

8    A.  That's right.

9    Q.  And then it said in April that you would be traveling to

10   Italy for a vocal competition; correct?

11   A.  Correct, with my school.

12   Q.  And so this was in -- this was dated in 1996, right?

13   A.  Yes, ma'am.

14   Q.  All right.  And then if we could go to the last -- I'm

15   sorry, page 5 of that exhibit we touched on briefly yesterday.

16   On page 5 of that exhibit, it gives the camp fee structure for

17   Interlochen for you for that summer, right?

18   A.  It looks like it, yeah.

19   Q.  And it's $4,025 for the summer; correct?

20   A.  Correct.

21   Q.  And you signed under that as well as your mother, right?

22   A.  Yes.

23   Q.  And on none of these three applications is there any

24   mention of Jeffrey Epstein; correct?

25   A.  Correct.

LC1VMAX1                          Jane - cross

1    Q.  And there's no mention of Ghislaine Maxwell; correct?

2    A.  Correct.

3              MS. MENNINGER:  All right.  At this point, if we could

4    ask the jurors to close the binders, your Honor.

5              THE COURT:  Please do.  Thank you.

6    Q.  I want to talk about the first time that you say you met

7    Mr. Epstein and Ms. Maxwell, okay?

8    A.  Okay.

9    Q.  And you claim that was in 1994 when you were 14, right?

10   A.  Yes.

11   Q.  You testified yesterday on direct examination that you were

12   sitting with friends at a picnic table, and a tall, thin woman

13   approached you with a dog.  And you chitchatted with her, and

14   then a man came and joined her, right?

15   A.  Right.

16   Q.  You recalled a lot of details about that incident in 1994,

17   right?

18   A.  Yes.

19   Q.  You remember that the man had a newspaper under his arm

20   which he put down on the table, right?

21   A.  Right.

22   Q.  You remember that you were on a break from classes, right?

23   A.  Right.

24   Q.  You were eating an ice cream cone and the man said, I think

25   I know your mom.  That's what you testified to yesterday;

LC1VMAX1                          Jane - cross

1    correct?

2    A.  Yes.

3    Q.  All right.  You gave some statements about that meeting to

4    several people over the course of the last 20 years, right?

5    A.  Yes.

6    Q.  You spoke to your brother, your older brother Brian within

7    a few days of that meeting, right?

8    A.  I'm sorry, can you -- a few days of the meeting back in

9    1994?

10   Q.  Right.

11   A.  I don't recall.

12   Q.  Well, isn't it true that you told your brother Brian that

13   you had been approached by Epstein?

14   A.  I don't recall.

15   Q.  Isn't it true that you told your brother Brian that Epstein

16   said he knew your dad and admired him?

17   A.  I don't recall.

18   Q.  Isn't it true you told Brian nothing about Ghislaine

19   Maxwell being there at all; correct?

20   A.  I don't recall.

21   Q.  Do you remember talking to your younger brother about it

22   over the last 20 years?

23   A.  Over the last 20 years?

24   Q.  Yes.

25   A.  Yes.

LC1VMAX1                          Jane - cross

1   Q.  And when you spoke to your younger brother about this

2   initial meeting, you also told him that you only met Epstein;

3   correct?

4   A.  I don't recall.

5   Q.  You didn't tell him anything about meeting a woman;

6   correct?

7   A.  I don't recall.

8   Q.  And you also gave an interview to a news source about this

9   initial meeting; correct?

10  A.  Correct.

11  Q.  And when you spoke to that news source, you told the news

12  person, journalist, that you were approached by Epstein;

13  correct?

14  A.  Correct.

15  Q.  You said nothing about Ghislaine being there?

16  A.  I don't remember what I said.

17  Q.  All right.  Could I have you -- and only you and not the

18  jurors -- take a look at J-13.

19          MS. MENNINGER:  And for the Court and the witness we

20  could put it on the screen.

21          If I could direct the witness's attention to page 2 of

22  that document.

23  Q.  Are you at page 2?

24  A.  Yes.

25  Q.  And on the fourth paragraph, you told the reporter that

LC1VMAX1                          Jane – cross

1    Epstein approached you; correct?

2    A.  Correct.

3    Q.  You didn't say anything to the reporter about Ghislaine

4    being there; correct?

5    A.  Correct.

6    Q.  You spoke to the government for the first time, as we

7    discussed yesterday, in September of 2019; correct?

8    A.  I don't recall the exact date.

9    Q.  Well, you were there in California with your lawyers and

10   Ms. Moe and some others; correct?

11   A.  Correct.

12   Q.  And what happened when you spoke to them then is you were

13   asked about the first time that you met Ghislaine, right?

14   A.  Right.

15   Q.  And what you told the government on that day with your

16   attorneys there is that Ghislaine walked by with her dog;

17   correct?

18   A.  I don't recall my exact vernacular.

19                    (Continued on next page)

20

21

22

23

24

25

LC1Qmax2                         Jane - Cross

1    BY MS. MENNINGER:  (Continued)

2    Q.  And you told the government that only Epstein came up to

3    meet you, correct?

4             MS. MOE:  Objection, your Honor.

5             MS. MENNINGER:  3509-002, page 1.

6             THE COURT:  Can I have it on the screen?

7             MS. MENNINGER:  Yes, your Honor.  3509-002.

8    Q.  What you told the government on September 19 of 2019 is

9    that Ghislaine walked by with her dog and Jeffrey Epstein came

10   up to meet you, correct?

11   A.  I wouldn't have said that.

12   Q.  So, the (inaudible) again.

13                              (Reporter inquired)

14            MS. MOE:  Objection, your Honor.

15            THE COURT:  You cut out.  I think I heard the

16   question, but can you repeat the question?

17   Q.  So the FBI got it wrong again?

18            MS. MOE:  Objection, your Honor.

19            THE COURT:  Overruled.  You may answer.

20   A.  Maybe they typed it up wrong.

21   Q.  What you told the government is that -- well, what you

22   testified to yesterday is that both Ghislaine and Jeffrey told

23   you that they give scholarships, correct?

24   A.  I don't remember which -- I know Jeffrey said it.

25   Ghislaine was standing there.

LC1Qmax2                    Jane - Cross

1    Q.  And that's right.  Ghislaine didn't walk by?

2    A.  No, she was right there.

3    Q.  And Jeffrey said, can I give scholarships?

4    A.  I cannot remember his exact verbiage this many years later.

5    Q.  And Jeffrey said, can I have your mom's phone number?

6    A.  Yes.

7    Q.  Not Ghislaine asking for your mom's phone number?

8    A.  No.

9    Q.  You testified yesterday that you were sitting on a park

10   bench with your friends, right?

11   A.  Yes.

12   Q.  And when you filed your civil lawsuit in January of 2020

13   you said you were sitting alone on a bench between classes,

14   correct?

15   A.  I don't recall what was written.

16   Q.  I want to talk about the second meeting that you had with

17   Mr. Epstein.  You went back home after camp that summer?

18   A.  Yes.

19   Q.  And you started school for the school year, right?

20   A.  Yes.

21   Q.  You testified yesterday that a few days after you got back

22   to school, someone from Epstein's office called your mom,

23   right?

24   A.  Yes.

25   Q.  That someone from Epstein's office was not Ghislaine

1   Maxwell, correct?

2   A.  I don't know.

3   Q.  Well, did the person invite you to Maxwell's house?

4   A.  No.

5   Q.  Invited you to Epstein's house, correct?

6   A.  Correct.

7   Q.  With your mother, right?

8   A.  Yes.

9   Q.  And when you got to Epstein's house with your mother, it

10  was 15 or 20 minutes away from your house, right?

11  A.  Yes.

12  Q.  It was in -- your house was in West Palm Beach, right?

13  A.  No, not at this time.  It was in Palm Beach.

14  Q.  You didn't cross any state lines, did you?

15  A.  No.

16  Q.  When you got to Epstein's house for tea, you and your

17  mother sat by the pool?

18  A.  Yes.

19  Q.  You were the only people there?

20  A.  Yes.

21  Q.  Ghislaine was not there?

22  A.  I don't recall.

23  Q.  Well, you spoke to the government in October of 2021, so

24  two months ago.  Do you recall speaking with them two months

25  ago?

LC1Qmax2                          Jane - Cross

1   A.   Yes.  So I was sitting -- it was only the three of us

2   having tea, yes.  I don't recall if Ghislaine was in the house.

3   Q.   Well, what you said to the government in October of 2021 at

4   3509-28 in the handwritten notes is, it was just Epstein, mom

5   and you present, correct?

6             MS. MOE:  Again, your Honor, I think we've been over

7   reading documents that are not in evidence.

8             THE COURT:  That statement is not inconsistent, so

9   I'll sustain the objection with respect to that statement.

10  Q.   At the first tea, the only people there were you and your

11  mom and Epstein, correct?

12  A.   Yes.

13  Q.   You never reported to the government that Ms. Maxwell was

14  present for the tea, correct?

15  A.   That's right.

16  Q.   During the conversation, Epstein told you he gives

17  scholarships and mentors people, right?

18  A.   Yes.

19  Q.   He said he does that; not we do that, correct?

20  A.   Correct.

21  Q.   And he did not refer to Ms. Maxwell at all during your

22  initial meeting with him, correct?

23  A.   Correct.

24  Q.   Wasn't a part of the conversation?

25  A.   No.

LC1Qmax2                      Jane - Cross

```
1    Q.  After this tea with your mother, you went back to Epstein's
2    house, correct?
3    A.  Correct.
4    Q.  Yesterday you testified that for the first few months when
5    you spent time with Epstein in Palm Beach, you were there by
6    yourself.  Do you remember that testimony?
7    A.  I'm sorry, can you repeat that?
8    Q.  Yesterday you testified that for the first few months when
9    you spent time with Jeffrey Epstein in Palm Beach, you were
10   there by yourself?
11   A.  By myself as in without my mother.
12   Q.  Right.  You said --
13   A.  Yes.
14   Q.  You were --
15   A.  Yes, yes, without my mother.
16   Q.  And then you clarified that your mother did not go back to
17   his house with you for meetings because she was "not invited."
18   That was your testimony yesterday, correct?
19   A.  Correct.
20   Q.  That is not what you told the government when you met with
21   them in September of 2019, is it?
22   A.  I don't know.
23   Q.  What you told the government in September of 2019,
24   including Ms. Moe, is "In the beginning, I would be with my
25   mother and brother"?
```

LC1Qmax2                          Jane - Cross

1           MS. MOE:  I object to just reading documents.

2           THE COURT:  Let me see it.  Let me see it before you

3    read, I'll see it, okay?  And then you can make your objection,

4    Ms. Moe, and I'll rule.

5           MS. MOE:  Thank you, your Honor.

6           THE COURT:  Let me have the passage first.

7           MS. MENNINGER:  It's going to be in 3509-001 on the

8    second page, in the fourth paragraph beginning in the middle of

9    the paragraph.

10          THE COURT:  Ms. Moe?

11          MS. MOE:  Your Honor, if the question is whether she

12   made that statement, we have no objection.

13          THE COURT:  Go ahead.

14          MS. MENNINGER:  Thank you.

15   Q.  What you said to Ms. Moe and the agents was, "In the

16   beginning, I would be with my mother and brothers at Epstein's

17   house," correct?

18   A.  I don't recall that.

19   Q.  You told the government nothing about your mother wasn't

20   invited back to Epstein's house, correct?

21   A.  I don't recall.

22   Q.  And you talked thereafter about being driven repeatedly to

23   Epstein's house by a chauffeur who was a sweet Latin American

24   man, correct?

25   A.  Correct.

LC1Qmax2                        Jane - Cross

1   Q.  And you said that that sweet Latin American man picked you

2   up every week or two while you were 14, 15 and 16 years old?

3   A.  Correct.

4   Q.  So approximately a hundred times he picked you up over

5   three years every week or two.  That's your testimony, correct?

6   A.  I'm not good at math, but I wouldn't recall how many times.

7   Q.  Well, you testified under oath yesterday --

8   A.  Okay.

9   Q.  -- that it was every week or two for three years, right?

10  A.  Yes.

11  Q.  All right.  You were asked yesterday by the government how

12  these meetings at Epstein's house were typically arranged.  Do

13  you remember that question?

14  A.  Yes.

15  Q.  And you said yesterday it was Ghislaine calling the house

16  or Jeffrey's office calling the house like an assistant or

17  something.  Do you remember that testimony?

18  A.  Yes.

19  Q.  That's not what you told the government in November of 2019

20  when you met with them then.  And if we could turn to 3509-003

21  at page 1, fourth paragraph?

22          MS. MOE:  I'm sorry, I didn't hear the number.

23  Q.  3509-003, first page, fourth paragraph.

24          MS. MOE:  Thank you.

25  Q.  What you told the government on that occasion is you were

1    not sure if Maxwell ever called you to make appointments,

2    correct?

3    A.  I don't recall.  I don't know.

4    Q.  And then on the next page in the same interview in the

5    first paragraph, same document, next page, you said, "When in

6    Florida, Epstein or his office would call your house," right?

7    A.  I guess so.

8    Q.  You didn't say Maxwell would call your house, right?

9    A.  I guess -- I don't know.  I guess so.

10   Q.  And so two years later, now you remember that Ghislaine

11   called your home to make appointments, right?

12   A.  Right.

13   Q.  That memory has come back to you in the last two years?

14   A.  Well, memory is not linear.

15   Q.  Do you remember that Mr. Epstein came to your house for

16   dinner?

17   A.  Yes.

18   Q.  In Bear Lakes Estate?

19   A.  Yes.

20   Q.  Right?  And he came to your house with your mother and your

21   brothers there, correct?

22   A.  Yes.

23   Q.  Ghislaine was not there?

24   A.  No.

25   Q.  You recall that that did not happen right at the beginning

LC1Qmax2                         Jane - Cross

1   of your meeting with Mr. Epstein, right?

2   A.  Right.

3   Q.  And it was a year or two after meeting Epstein that he came

4   to your house for dinner, correct?

5   A.  I don't know the timeline, but it was at the new house.

6   Q.  Well, in February of 2020, you told the government -- this

7   is at 3509-008, page 12.

8           THE COURT:  What paragraph?

9   Q.  The fourth full paragraph beginning with the word "this."

10  At the end of that paragraph -- I'm sorry -- the middle of that

11  paragraph is that you said to the government, "They visited you

12  one to two times at your house in Florida.  This was about a

13  year or two after meeting him," correct?

14  A.  Correct, I guess.

15  Q.  So then you remembered it was a year or two, but you don't

16  remember it today.  Is that right?

17  A.  Well, I'm trying to be very accurate, so I don't know.  I

18  just know it's at the new house.

19  Q.  And the dinner that you had at your house was prior to any

20  abuse?

21  A.  That's not true.

22  Q.  Well, in the same interview in February of 2020, at page

23  11 --

24          MS. MOE:  Your Honor, I'd object to counsel testifying

25  about --

LC1Qmax2                          Jane - Cross

        THE COURT:  We're going to keep doing -- point to the

passage.  You'll read it, Ms. Moe.  You'll let me know if

there's an objection, okay?

        MS. MOE:  Yes, your Honor.

        THE COURT:  So where are we reading?

Q.  On page 11 of that same document in the last full

paragraph, second sentence.

        THE COURT:  Okay.  No objection.  You may proceed,

Ms. Menninger.

Q.  What you told the government on that occasion is that at

some point Maxwell and Epstein came to your house prior to the

abuse, correct?

A.  Correct.

Q.  You mentioned on direct examination that you felt Ghislaine

had kind of become your big sister, right?

A.  Right.

Q.  And you have two older sisters as we discussed yesterday,

correct?

A.  Correct.

Q.  One is approximately ten years older than you, right?

A.  Right.

Q.  One is approximately 15 years older than you, correct?

A.  Yes.

Q.  During the time you were in high school, you traveled to

see your sisters?

LC1Qmax2                          Jane - Cross

1  A.  Yes.

2  Q.  You traveled to Los Angeles to visit and stay with one of

3  them there, correct?

4  A.  I don't recall what year, but, yes, at some point.

5  Q.  You remember staying with her in Los Angeles, correct?

6  A.  Yes.

7  Q.  Before you lived in Los Angeles?

8  A.  Yes.

9  Q.  So it was while you were still in high school, right?

10  A.  Yes.

11  Q.  And you traveled to Boston to visit the other sister,

12  correct?

13  A.  No, that's the same sister.

14  Q.  Same sister, a different time?

15  A.  Yes.

16  Q.  In high school, right?

17  A.  Middle school -- no, middle school and then, okay, once in

18  high school.

19  Q.  And your own sisters took you shopping on occasion,

20  correct?

21  A.  Correct.

22  Q.  They took you to the movies, correct?

23  A.  Correct.

24  Q.  Over the years, they've talked to you about your

25  boyfriends, correct?

LC1Qmax2                         Jane - Cross

1    A.  No.

2    Q.  You have not talked to your sisters about your boyfriends?

3    A.  I never had any boyfriends.

4    Q.  You've never had a boyfriend?

5    A.  Not in high school, I didn't.

6    Q.  Sorry.  My question was had you ever over the years spoken

7    to your sisters about boyfriends?

8    A.  Over the years, yes.

9    Q.  Because yesterday you suggested that you hadn't had normal

10   relationships, right?

11   A.  Right.

12   Q.  But you have had boyfriends for multiple years at a time,

13   correct?

14   A.  Yes.

15   Q.  You talked a little bit about Ghislaine and Epstein taking

16   you to see the movies; you said that's something that you guys

17   did together, right?

18   A.  Yes.

19   Q.  You went to a movie theater in the area of Epstein's house

20   in Florida, correct?

21   A.  Correct.

22   Q.  Which is a nice area, right?

23   A.  Right.

24   Q.  They were normal movie theaters?

25   A.  Yes.

LC1Qmax2                         Jane - Cross

1  Q.  Sometimes other girls went with you, right?

2  A.  Yes.

3  Q.  And Epstein would direct who was supposed to sit where in

4  the movie theater, correct?

5  A.  Correct.

6  Q.  And he did not sit next to you in the movie theater,

7  correct?

8  A.  I don't remember.

9  Q.  Well, let's turn -- well, not you, but we'll look at

10  February 27 of 2020 when you spoke with the government,

11  3509-008 on page 3.

12        MS. MOE:  Your Honor, could we have just a very brief

13  sidebar about this issue?

14        THE COURT:  Can you tell me what paragraph I'm

15  reading?  And then yes.

16        MS. MENNINGER:  It's going to be on page 4 at the end

17  of the paragraph that began on the page 3, the last sentence.

18        (Continued on next page)

19

20

21

22

23

24

25

LC1Qmax2                     Jane - Cross

1        (At the sidebar)

2        MS. MOE:  Thank you, your Honor.  And I apologize for

3    asking for a sidebar, but I'm hoping this will streamline

4    things.  The issue is at a number of times the witness has

5    testified that she doesn't recall, and instead of showing the

6    witness the document and asking if that refreshes her

7    recollection, which is the only thing that would be proper at

8    that juncture, I believe counsel is now just reading reports

9    into the record, which is not proper.

10        THE COURT:  Well, the question was yesterday you

11    testified --

12        (Pause)

13        THE COURT:  So, yes, she said she didn't remember if

14    Epstein directed where they sat.

15        MS. MENNINGER:  Your Honor, under 613, I'm not

16    obligated to show the witness a prior statement before I ask

17    her about it.  I have to give her an opportunity --

18        THE COURT:  She said she didn't remember.  What's the

19    inconsistency?

20        MS. MENNINGER:  Well, your Honor, her not remembering

21    I don't have to refresh her recollection.  Her memory is at

22    issue in this case.  If she can't remember what she said a

23    month ago or two months ago or a year ago, that's relevant to

24    the jury's determination.  Then we can put on evidence through

25    other witnesses that that is in fact what she said to the

LC1Qmax2                         Jane - Cross

1    government on that date.

2              THE COURT:  Your theory is everything that she -- when

3    you ask her, "What did you say on this date to the government,"

4    she says, "I don't remember."

5              MS. MENNINGER:  Her story has changed like a hundred

6    thousand times, and that is exactly what the problem is here,

7    your Honor.

8              THE COURT:  Well, here's the problem:  There is a way

9    you can get in her story has changed, but what you're doing and

10   what -- I don't know what the limits to this would be.  You're

11   asking her very specific questions about multiple instances of

12   reporting, and when she said "I don't remember what I said in

13   that moment," you're then introducing the statements of what

14   she said.

15             MS. MENNINGER:  I can say, isn't it true that you said

16   this?  That's the other way to phrase it.

17             THE COURT:  You could say "do you recall saying this

18   to the government"?  If she says no, then you move on.

19             MS. MENNINGER:  Right.  That's all I've been doing.

20             THE COURT:  Is that right?

21             MS. MOE:  Yes, your Honor.  I think we're talking

22   about two different scenarios.  The first is, for example, if

23   Ms. Menninger asked the witness, "Did this meeting happen on a

24   particular date" or you know "were you living in the blue

25   house" for example.  If the witness says, "I don't remember,"

LC1Qmax2                         Jane - Cross

1    then we're talking about refreshing her recollection with a

2    document.  If the witness says something that Ms. Menninger

3    believes to be inconsistent with a prior statement, the

4    question then is instead, not a document, but do you recall --

5    like isn't it true that you told the government X?  And if the

6    witness says, "I don't remember that," then that's the record.

7    If the witness says, "Yes, I said that," then that's the

8    impeachment.

9            The documents themselves are impeachment by collateral

10   material.  The proper way to do this is to ask the witness

11   whether she said something or not.  If she denies it, then the

12   way to do that is through the witnesses to that meeting, and

13   not by asking the witness to read a document that she didn't

14   prepare into the record, which is what's happening.

15           THE COURT:  Well, what I understand you to be saying

16   is you want first her to show it to her and see if it refreshes

17   her recollection.

18           MS. MOE:  Yes, your Honor, if she says she doesn't

19   recall.  If she denies the fact and the point is to impeach her

20   with a fact of a prior inconsistent statement --

21           THE COURT:  Well, I think the window of disagreement

22   is not just an inconsistent statement but that she doesn't

23   recall -- no, I think you're right.  So if she doesn't recall

24   what she said in a meeting, you can refresh her recollection as

25   to what she said.  If she says, "I didn't say that" or "I don't

LC1Qmax2                         Jane - Cross

recall," you can say, "Didn't you say the following to the FBI

agent," and then --

             MS. MENNINGER:  So I believe that I do not have to

refresh for impeachment, but I can ask her --

             THE COURT:  You're claiming that because she doesn't

recall what she said, it's an inconsistent statement.  There's

not an inconsistency there.

             MS. MENNINGER:  So, I can ask her, "Did you say this?"

She can say, "I don't recall."  And then I can say, "Isn't it

true you said it on this date?"  And she can say, "No, I

didn't" or "I still don't recall."

             THE COURT:  Every trial I've been to with these

materials I've presided over -- and there's been a lot in ten

years -- this precise thing happens.  You testified X.  Didn't

you tell the agent some variation of x or Y.

             I don't remember way said to the agent.

             You show them the 302.  Does that refresh your

recollection, or didn't you -- and didn't you say if it doesn't

refresh your recollection and then you get to do precisely what

you're doing.

             MS. MENNINGER:  Your Honor, may I get the statute book

because it says right in 613.

             THE COURT:  Sure.

             MS. MENNINGER:  Yesterday I tried to show the witness

an exhibit and I was directing her to when the exhibit was made

LC1Qmax2                         Jane - Cross

1    and what the date of the interview was, and nobody liked that.

2    So today I tried --

3         THE COURT:  I don't think I sustained an objection to

4    that.

5         MS. MENNINGER:  Well, I said here's the date and then

6    there was an objection at the time.  But in Rule 613(a), it

7    says:  When showing or disposing the statement during

8    examination.  When examining a witness about the witness' prior

9    statement, a party need not show it or disclose its contents to

10   the witness.  But the party must on request show it or disclose

11   its contents to an adversary party's attorney.

12        And so because I don't believe I have to show it to

13   her.  If I want to prove it later with extrinsic evidence, she

14   has to be given an opportunity to explain or deny the statement

15   and the adversary party is given an opportunity to examine the

16   witness about it.  That's the way I read that rule.

17        THE COURT:  So the extrinsic evidence of a witness'

18   prior inconsistent statement.  My point is if she says she

19   doesn't remember, it's not an inconsistent statement.  You have

20   to get to a point of inconsistency.

21        MS. MENNINGER:  Here is the inconsistency.

22        THE COURT:  When you're doing it based on what she

23   testified to yesterday, if there's a difference, yes.

24        MS. MENNINGER:  That's what I've been trying to do.

25        THE COURT:  Here you're saying on this date you said

LC1Qmax2                     Jane - Cross

1   Epstein told you where to sit.  She says, "I don't remember."

2   It's not an inconsistent statement.  That's the difference.

3   Then you can refresh her on what she said.  But if what you're

4   doing is -- right?  What's inconsistent about you saying, "You

5   said X to the agent," and she says, "I don't remember."  Is

6   that an inconsistency?

7          MS. MENNINGER:  The statement that she gave yesterday

8   versus what her statement to the agent that's what I'm trying.

9          THE COURT:  I let you do that.  I let you do that.

10  Just now the example that drew the objection you said Epstein

11  didn't -- you told the agent you didn't sit next to Epstein and

12  she said "I don't remember."

13         MS. MENNINGER:  Okay.  So I will show her for that

14  type of example --

15         THE COURT:  But I agree with you if you have a prior

16  statement that is inconsistent with testimony, that's when

17  we're there.

18         MS. MOE:  Yes, your Honor and in that scenario, it's a

19  question:  Did you say that to the agent on this date?  If not,

20  showing the witness the document and asking her to read it into

21  the record.  The question is, did you make that statement?

22         MS. MENNINGER:  I just asked.

23         THE COURT:  I agree.  I think you did it right up

24  until this moment when we didn't have and inconsistent

25  statement?  We're in vigorous disagreement.

LC1Qmax2                          Jane - Cross

1              MS. STERNHEIM:  Vigorously.

2                 (In open court)

3            (Continued on next page)

1            THE COURT:  Ms. Menninger, you can take off your mask.

2            I want to pause.  Counsel, one of the exhibits

3    referenced was not in one of the jurors' binders, so I want to

4    just correct that.

5            Ms. Williams, can you let counsel know what exhibit it

6    was?

7            MS. MENNINGER:  My apologies, your Honor.  We'll get

8    that fixed.

9            THE COURT:  Thank you.  And thank you to the juror for

10   alerting us.

11           MS. MENNINGER:  If there is anyone else that has a

12   problem.

13           Thank you, your Honor.

14           THE COURT:  I apologize for that.  I'm grateful to the

15   jurors.  If anything like that happens, feel free to kind of

16   raise your hand in the moment and we'll have Ms. Williams as

17   she always does, make things right.

18           (Pause)

19           THE COURT:  I think we're not in the binders at the

20   moment, so while Mr. Everdell is working on that, you'll

21   proceed.

22           MS. MENNINGER:  Thank you, your Honor.

23   BY MS. MENNINGER:

24   Q.  I believe we were talking about you going to the movies

25   with Epstein and Ghislaine.  Do you remember that?

LC1Qmax2                      Jane - Cross

1    A.  Yes.

2    Q.  And isn't it true that you told the government that you did

3    not sit next to Epstein in the movie theaters?

4    A.  I don't recall.

5    Q.  Okay.  If I could have you look at 3509-008, page 4, in the

6    binder sorry.  Just you.

7    A.  Sorry, 35 what?

8    Q.  It's in the first set.

9    A.  Okay.

10   Q.  She'll show it to you, I apologize.

11          THE COURT:  It's on the screen.

12   Q.  004 -- I'm sorry, page 4 of 008, and the top paragraph and

13   the last line of that top paragraph.

14   A.  Okay.

15   Q.  You told the agents that Epstein would decide where

16   everyone sat?

17   A.  Yes.

18   Q.  Correct?

19          MS. MOE:  Objection, your Honor.  Same issue.  The

20   question is whether that refreshes her recollection.

21          THE COURT:  Go ahead.

22   Q.  Does it refresh your recollection what you told the

23   government?

24   A.  Yes.

25   Q.  And what you told the government is that Epstein would

1   decide where everyone sat, correct?

2   A.  Correct.

3   Q.  And you told them that you did not sit next to Epstein,

4   right?

5   A.  Right.

6   Q.  But when you were in the movie theater, nothing sexual was

7   happening; you weren't sitting next to him, right?

8   A.  Right.

9   Q.  Yesterday you spoke about the first time that you saw

10   Ghislaine without her clothes on, correct?

11   A.  Yes.

12   Q.  You said that happened shortly after the first incident in

13   the pool house, correct?

14   A.  Correct.

15   Q.  And you described that you were just hanging out and all of

16   a sudden Epstein demanded that you follow him upstairs, right?

17   A.  I'm sorry, can you clarify which --

18   Q.  The first time that you saw Ghislaine without her clothes

19   on is what you claimed.  Do you remember that?

20   A.  The first time I saw her without a top on was by the pool.

21   Q.  Yesterday Ms. Moe asked you about the first time you saw

22   Ghislaine without her clothes on.  Do you recall that?

23   A.  I -- I don't recall which question you were referring to or

24   I don't recall, sorry.

25   Q.  You don't recall the first time you saw Ghislaine without

LC1Qmax2                    Jane - Cross

1    her clothes on?

2    A.  Yes, I do recall, but to be specific, topless or completely

3    naked?

4    Q.  The question from Ms. Moe was the first time you saw

5    Ghislaine with her clothes off, and you didn't have any

6    question about what she meant.

7            MS. MOE:  Objection to form.

8            THE COURT:  Sustained.

9    Q.  Yesterday you were asked:

10   "Q.  Did there ever come a time when you saw Ghislaine Maxwell

11   without her clothes on?"

12           Do you recall that question?

13   A.  Yes.

14   Q.  And you said yes?

15   A.  Yes.

16   Q.  You didn't say her top or not her top?

17           MS. MOE:  Objection to form.

18           THE COURT:  Overruled.

19   Q.  Right?

20   A.  Right.

21   Q.  And you described a whole scenario where you claim you and

22   Epstein and Ghislaine went upstairs and there was fondling in a

23   room.  Do you recall relating that to this jury yesterday?

24   A.  Yes.

25   Q.  When you spoke with the government in December of 2019, you

1    told them that you do not have a specific memory of the first

2    time with Ghislaine?

3              MS. MOE:  Objection to form.

4              THE COURT:  Sustained.

5    Q.  Yesterday did you give a specific memory of the first time

6    that you recall being in a massage scenario with Ghislaine?

7    A.  Yes.

8    Q.  All right.  And when you spoke with the government in

9    December of 2019, you told them you do not have a specific

10   memory of the first time with Ghislaine.

11             MS. MOE:  Objection to form.

12             THE COURT:  That's not a question.

13   Q.  Isn't it true that you told the government in December of

14   2019 that you do not have a specific memory of the first time

15   with Ghislaine?

16             MS. MOE:  Objection to form.

17             THE COURT:  Overruled.

18   A.  I don't recall.

19   Q.  You did not tell the government in December of 2019 about a

20   scenario of you following Ghislaine and Jeffrey upstairs and

21   the three of you were alone, correct?

22   A.  I don't recall.

23   Q.  In fact, there was a period of time that you claim that it

24   was just you and Jeffrey alone, and you had not been present

25   with Ghislaine?

1          MS. MOE:  Objection to form.

2          THE COURT:  Sustained.  I don't understand the time

3    frame of that question.

4    Q.  Yesterday you testified that it was shortly after the pool

5    house that you had this incident with Epstein and Ghislaine,

6    right?

7    A.  Right.

8    Q.  When you spoke with the government before, you said that

9    some period of time, months went by before you ever had an

10   incident with Ghislaine, correct?

11         MS. MOE:  Objection to form.

12         THE COURT:  I will sustain it.  You've drawn on

13   different meetings with the government.  You have to specify

14   which one you're talking about so that the witness can answer

15   whether she recalls or not.

16   Q.  Previously you told the government you do not have a

17   specific memory of your first time with Ghislaine.

18         MS. MOE:  Objection to form.

19         MS. MENNINGER:  This is just foundational to the next

20   question.

21         THE COURT:  But give a -- give what you are asking

22   about, give the date that you're asking about.

23   Q.  In December of 2019, you told the government you do not

24   have a specific memory of your first time with Ghislaine.

25         Moving on from that, because you do not have a

LC1Qmax2                        Jane - Cross

1    specific --

2              MS. MOE:  Objection to form.

3              MS. MENNINGER:  That was just admitted.  I'm just

4    laying the foundation for the next question.  That was the last

5    thing.

6              MS. MOE:  Your Honor, I'm not sure what the question

7    is.

8              THE COURT:  You don't have a question yet.  Go ahead.

9    BY MS. MENNINGER:

10   Q.  Because you have no specific memory of your first time with

11   Ghislaine in December of 2019, you have come up with that

12   memory in the last two years, the one you gave yesterday,

13   correct?

14             MS. MOE:  Objection to form.

15             THE COURT:  Overruled.

16   A.  I come up with -- I don't believe I've come up with a

17   memory, no.

18   Q.  Well, you gave a memory to the jury yesterday that you

19   didn't have in December of 2019, right?

20   A.  I don't recall.

21   Q.  You then later met with the government in February of 2020,

22   right?

23   A.  Right.

24   Q.  And what you told the government in February of 2020 is

25   that the first time you were involved with Ghislaine, there

LC1Qmax2                         Jane - Cross

1    were two other girls there as well, correct?

2    A.  I don't recall.

3    Q.  At 3509-008, page 4, first full paragraph, beginning in the

4    middle of the paragraph.

5            MS. MOE:  And, your Honor, is the question whether

6    that refreshes the witness' recollection?

7            THE COURT:  That will be the question.  Go ahead.

8    Q.  Does it refresh your recollection to read the sentence

9    beginning with the first time?  Yes or no.

10   A.  Yes.

11   Q.  It refreshes your recollection, it's true that you told the

12   government that the first time with Maxwell, there were two

13   other girls there as well, correct?

14   A.  Correct, but the wording that was typed up on this isn't

15   correct, so I don't know how to --

16   Q.  Another typo by the government?

17           MS. MOE:  Objection, your Honor.

18           THE COURT:  Overruled.

19   Q.  It's another typo?

20   A.  Yes.

21   Q.  So, yesterday you gave a story that is different from

22   December 2019 when you had no specific memory and is different

23   from February 2020 when there were two other girls there as

24   well, correct?

25           MS. MOE:  Objection.  Compound.

LC1Qmax2                    Jane – Cross

1              THE COURT:  Sustained.

2      Q.  Yesterday you testified that there were times when

3      Ghislaine was in the room with you and Epstein, correct?

4      A.  Correct.

5      Q.  And you remember those times, right?

6      A.  Not all, but yes.

7      Q.  When you spoke with the government at the February 2020

8      meeting, they asked you if there were times where it was just

9      you, Epstein and Ghislaine in the room, and you said you were

10     not sure, correct?

11     A.  I don't recall.

12     Q.  You said you were not sure that ever happened, correct?

13     A.  I don't recall.

14     Q.  You were not sure where it happened, correct?

15     A.  I don't recall.

16     Q.  You only remembered being solely with Epstein and going

17     back to the group setting, correct?

18     A.  I don't recall.

19     Q.  It is true that you do not recall Ghislaine ever touching

20     you?

21     A.  That's not true.

22     Q.  When you spoke to the government in December of 2019 with

23     your lawyers there, and you told the government at that time

24     you are not sure whether Maxwell ever touched you during these

25     encounters, correct?

LC1Qmax2                         Jane - Cross

```
 1   A.  I don't recall.
 2   Q.  You told the government that you're not sure that Maxwell
 3   ever kissed you, correct?
 4   A.  I don't recall.
 5   Q.  You told the government that Ghislaine never used sex toys
 6   or vibrators on you, correct?
 7   A.  That's correct.
 8   Q.  You told the government that you don't recall Ghislaine
 9   ever giving you a talk about how to massage Epstein, correct?
10   A.  I don't recall.
11   Q.  You told the government that Ghislaine never saw you
12   perform oral sex on Epstein, correct?
13   A.  That's correct.
14   Q.  You told the government that Ghislaine never saw you
15   perform hand jobs on Epstein, to use your words, correct?
16   A.  I don't recall.
17   Q.  You told the government that Ghislaine never saw you
18   involved in any masturbation with Epstein, correct?
19   A.  I don't -- know or I don't recall.
20   Q.  You told the government that Ghislaine never saw you
21   engaged in sexual intercourse with Epstein, correct?
22   A.  Correct.
23   Q.  You told the government you have no memory of Ghislaine
24   being present when you claim Epstein engaged in any sexual
25   contact with you, correct?
```

LC1Qmax2                    Jane - Cross

1   A.  I'm sorry, can you repeat that?

2   Q.  You told the government you have no memory of Ghislaine

3   being present when you claim Epstein engaged in any sexual

4   contact with you, correct?

5   A.  I don't recall.

6   Q.  You told the government that Ghislaine never discussed any

7   sexual abuse with you, right?

8   A.  Whether she discussed abuse with me?

9   Q.  Right.

10  A.  Right.

11  Q.  It was very compartmentalized.  It was never discussed.

12  A.  Yes.

13  Q.  No one gave you any feedback afterwards.  It was never

14  mentioned, right?

15  A.  Right.

16  Q.  No one asked you if Epstein had fun, right?

17  A.  I don't recall.

18          MS. MENNINGER:  Can I have one moment, your Honor?

19          THE COURT:  You may.

20                      (Pause)

21  Q.  So if we could go back to your conversations with the

22  government in February of 2020, and if I could direct your

23  attention to 3509-008 at page 5, in the second paragraph, I'm

24  going to ask you if this refreshes your recollection?

25          MS. MOE:  Your Honor, about what?

1        THE COURT:  Yes.

2        MS. MENNINGER:  Something that she earlier said she

3   doesn't recall.

4        THE COURT:  Well, you will have to ask it again.

5        MS. MENNINGER:  I will.

6        THE COURT:  You will ask the question again.

7   Q.  Before she does it, okay.

8        You said you don't recall whether or not you ever told

9   the government that you and Ghislaine and Jeffrey were alone

10  together in the room.  You were not sure that ever happened.

11  Do you recall that testimony?

12  A.  I don't recall that, no.

13  Q.  If I could have you look at 3509-008, page five, the last

14  paragraph, the first sentence in that paragraph, if you could

15  read that to yourself, tell me whether that refreshes your

16  recollection?

17  A.  It doesn't, but I read it, yeah.

18  Q.  So, what you told the government on February 27, 2020 --

19       MS. MOE:  Objection, your Honor.

20       THE COURT:  Overruled.

21  Q.  -- is that when asked if there were times when it was only

22  you, Epstein and Ghislaine in the room, you said you were not

23  sure, correct?

24  A.  That's what it says.

25  Q.  You were not sure that ever happened in February of 2020,

LC1Qmax2                           Jane - Cross

1    right?

2                 MS. MOE:  Your Honor, objection.  Is the question

3    whether she made the statement, whether she remembers it,

4    whether she's reading it from a document it's very unclear.

5                 THE COURT:  You will rephrase, please.

6    Q.  As you sit here today, you're not sure whether you were

7    ever in the room alone with Ghislaine and Epstein, correct?

8    A.  No.

9    Q.  I asked you if you recall telling the government that

10   Ghislaine never touched you?

11   A.  I don't recall that.

12   Q.  If I could have you take a look at 3509-005.  That's going

13   to be difficult.

14                 On page 3 of 3509-005, in the second full paragraph in

15   the middle of the paragraph there's a sentence that begins with

16   your name, and I would like you to read that and tell me if

17   that refreshes your recollection that you said that to the

18   government in December of 2019?

19   A.  Which paragraph?

20   Q.  The second full paragraph in the middle of the paragraph

21   beginning with your name.

22   A.  Yes.

23                 (Continued on next page)

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

LC1VMAX3                         Jane - cross

1   BY MS. MENNINGER:

2   Q.  Does that refresh your recollection that you told the

3   government you do not have a recollection and are not sure if

4   Ghislaine touched you during these encounters; correct?

5   A.  I don't recall.

6   Q.  Isn't it true that's what you told the government on that

7   date?

8   A.  I don't remember, but it's written here.

9   Q.  I want to turn back to your statement that you don't recall

10  whether you ever told the government that Ghislaine did not see

11  you performing oral sex on Epstein.  Is that what you told the

12  government?

13  A.  I don't remember.

14  Q.  If I could have you look at 3509-008 at page 10.  And I ask

15  you to look at the first full paragraph and the last sentence

16  of that paragraph.  Does that refresh your recollection of

17  whether Ghislaine was ever present for instances of oral sex

18  between you and Epstein?

19  A.  Correct.

20  Q.  It's true that you don't know whether Ghislaine was ever

21  present for you having oral sex in any way with Epstein;

22  correct?

23  A.  I don't remember.

24  Q.  That's what you told the government, didn't you?

25  A.  I don't remember.

LC1VMAX3                      Jane - cross

1           MS. MENNINGER:  Your Honor, is now an appropriate time

2    for a break?  I was about to start another area.

3           THE COURT:  All right.  We can take our morning break.

4           Members of the jury, we'll take about a ten-minute

5    break.  Thank you.

6           (Jury not present)

7           THE COURT:  Matters to take up, counsel?

8           Just a moment.  You may step out, Jane.  Thank you.

9           Everyone may be seated.

10          MS. MOE:  Thank you, your Honor.

11          Just two --

12          THE COURT:  Just a moment.  Go ahead.

13          MS. MOE:  Thank you, your Honor.

14          Two issues to raise.

15          The first is the issue that we raised earlier this

16   morning about the remaining anonymity issue.  Happy to raise

17   that at this time, if it's appropriate.  I don't know if it's

18   coming up soon in cross-examination.

19          THE COURT:  Okay.

20          MS. MOE:  But we would prefer to raise that at sidebar

21   because it relates to anonymity.

22          The second issue is the Rule 408 issue I flagged this

23   morning relating to documents we received a few minutes before

24   the beginning of the court day.  Happy to front that issue now

25   while we have a break if the Court would like to hear that

LC1VMAX3                        Jane - cross

 1   issue.

 2              THE COURT:  Okay.  Go ahead.

 3              MS. MOE:  So with respect to the Rule 408 issue,

 4   defense counsel has provided the government this morning just

 5   before the Court day with a few documents they've marked as

 6   exhibits.

 7              THE COURT:  One moment.  Go ahead.

 8              MS. MOE:  Those two documents are correspondence

 9   between Jane's attorney and the victim compensation fund, as

10   well as correspondence from Jane's attorney and Ms. Menninger's

11   law firm.

12              To the extent defense counsel intends to offer these

13   as exhibits, there's a Rule 408 issue here.

14              MS. MENNINGER:  I don't, your Honor.

15              THE COURT:  Okay.

16              MS. MOE:  I just want to ensure any questions about

17   this are framed as Jane's knowledge about the litigation and

18   not asking for her to testify about documents that aren't in

19   evidence, that she may not have seen, that are prepared by

20   attorneys.  In order to avoid confusion, we want to make sure

21   that any questions about civil litigation are about what she

22   knows or doesn't know.  I want to avoid a scenario in which a

23   lay witness is shown legal documents and asked to read them

24   into the record or testify to them beyond the scope of her

25   knowledge.

1          THE COURT:  So that's not a 408 issue, it's a scope of

2    knowledge issue.

3          MS. MOE:  Yes, your Honor.

4          It's a 408 issue to the extent the questions are about

5    negotiations related to settlements which would only be

6    admissible in order to show bias under the second prong of the

7    rule.  And that's where the scope of knowledge issue comes into

8    play, because facts along those lines would only be relevant

9    under Rule 408 if this witness were aware of them.  So we just

10   wanted to make sure any examination was cabined along those

11   lines.

12         THE COURT:  Ms. Menninger?

13         MS. MENNINGER:  Your Honor, in those two documents,

14   the attorney in a civil matter for this witness demanded sums

15   of money.  And there was one in the civil case.  He was acting

16   in his capacity, and she was a party in that case, and he was

17   her lawyer.  So his statements are adoptive admissions by the

18   party from that case that she was demanding the money that's

19   claimed in that letter.  That's the first one.

20         THE COURT:  And so what do you expect to do?  You

21   expect to ask what?

22         MS. MENNINGER:  You were demanding $25 million to

23   settle your civil law claim while Ms. Maxwell was pending in

24   this criminal case, I might add.  That's the first one.

25         THE COURT:  Okay.  So the question is, Were you

LC1VMAX3                      Jane - cross

1    demanding $25 million in civil litigation while this criminal

2    case was pending?

3              MS. MENNINGER:  Yes, your Honor.

4              THE COURT:  Okay.

5              MS. MOE:  Yes, your Honor.

6              As long as it's framed in terms of her knowledge; we

7    have no objection to what she knows about or was involved in.

8              What we want to avoid is a scenario where following a

9    question like that, a legal document exchanged between

10   attorneys was then shown to the witness to refresh her

11   recollection, and this witness was asked to read into the

12   record comments her attorney made, which would not be

13   admissible under Rule 408 if she doesn't know about them

14   because they can't speak to her bias if she is not aware of

15   those communications.

16             THE COURT:  So just to spin out the question, Were you

17   demanding $25 million during -- in a civil lawsuit while this

18   criminal investigation was pending?

19             I suppose one response would be I don't know, one

20   response is yes, and one response is no.

21             So if the response is yes, you move on?

22             MS. MENNINGER:  Yes.

23             THE COURT:  If the response is I don't know, what do

24   you do?

25             MS. MENNINGER:  Refresh her recollection with her own

LC1VMAX3                     Jane - cross

  1   attorney's letter to my law firm in which he's demanding that

  2   and the date of the letter.  If she wants to say she doesn't

  3   know what her civil attorney is doing acting on her behalf, I

  4   guess she could say that.

  5       THE COURT:  Okay.  So if it doesn't refresh her

  6   recollection, we move on.  And then if the answer is no, what

  7   then?

  8       MS. MENNINGER:  Well, your Honor, that leads to a

  9   potential scenario with her attorney being a witness.  But I

 10   think we would cross that bridge on another day.

 11       MS. MOE:  Yes, your Honor.

 12       The question remains about her knowledge.  And again,

 13   if we're refreshing this witness's recollection with a document

 14   she hasn't seen, I just want to make sure that the question is

 15   very precisely framed.  Because there have been a number of

 16   times already this morning where the witness has been asked to

 17   just read the document and has given answers like, I don't

 18   know, but I guess that's what this says, which is beyond the

 19   scope of refreshing a recollection.  So I just want to ensure

 20   we're not asking this witness to read into the record hearsay

 21   statements of her attorney which she doesn't have knowledge.

 22       THE COURT:  If she says, I don't know, you can try to

 23   refresh her recollection.  The question is, Does this refresh

 24   your recollection?  If the answer is no, we move on.  And then

 25   you do --

LC1VMAX3                         Jane - cross

1              MS. MENNINGER:  We cross bridges that --

2              THE COURT:  Right.

3              And if the answer is -- so she says no.  And you show

4      it to her and ask if that refreshes her recollection.  And if

5      the answer is no, we move on.

6              MS. MENNINGER:  The second one, your Honor, is in the

7      victims' compensation program.  As your Honor may have seen,

8      she was offered an award.  And after that award was offered,

9      her lawyer -- the same lawyer in that proceeding -- wrote

10     basically a motion for reconsideration and said that the award

11     was not appropriate; that it should at least be an eight-figure

12     award.  So that delayed the whole -- you know, her decision to

13     join in the -- or to accept the award.  And I believe that is,

14     again, an adoptive admission or a statement because he was

15     acting in her capacity as her lawyer in a civil case while this

16     criminal case was pending.

17             THE COURT:  So what's the question you'll ask.

18             MS. MENNINGER:  They are the same, your Honor.  It's

19     essentially, Didn't you get offered an award of $5 million and

20     felt that that was not sufficient?  And your attorney, on your

21     behalf, went back to the claims program and asked for an

22     eight-figure settlement instead.

23             MS. MOE:  Yes, your Honor.

24             Again, the substance of that testimony would only be

25     relevant under Rule 408.  If this witness knows about it and,

1    thus, it's offered about her particular bias --

2              THE COURT:  Well, you heard the question.

3              MS. MOE:  Yes, your Honor.

4              THE COURT:  Do you object to the question?

5              MS. MOE:  We do object to the question.  If the

6    question is, Did you seek an increased amount in the settlement

7    award, I have no objection to that.  If the question is, Isn't

8    it true your attorney made the following statement, that

9    question is objectionable.

10             THE COURT:  Under 408.

11             MS. MOE:  Yes, your Honor.

12             MS. MENNINGER:  Your Honor, it goes to bias, her

13   motive to testify in this case, and her bias against my client.

14             THE COURT:  Let's start with a more basic issue which

15   no one has briefed, but *Manko v. United States*, are you

16   familiar?

17             MS. MOE:  I'm not, your Honor.

18             THE COURT:  87 F.3d 50 (2d Cir. 1996).

19             I'll quote:  "the policy that underlies Rule 408 does

20   not apply to criminal prosecutions.  The policy favoring the

21   encouragement of civil settlements sufficient to bar their

22   admission in civil actions is insufficient, in our view, to

23   outweigh the need for accurate determinations in criminal cases

24   where the stakes are higher."

25             Is that good law?

LC1VMAX3                    Jane - cross

1           MS. MOE:  Your Honor, I'm not -- I take the Court at

2     its word.  I'm not familiar --

3           THE COURT:  I mean, that's what it says.  I'll admit

4     there may be some complications, but I'd like to know the

5     government's position on that.

6           MS. MOE:  Yes, your Honor.  We'd be happy to take a

7     quick look into it.

8           THE COURT:  It will probably take more than a quick

9     look.  It's complicated.  That case is in the context of the

10    defense seeking to introduce civil litigation settlement.  Is

11    defense aware of this case?  Anybody have knowledge?  No.

12          Who reads Second Circuit cases?

13          In the context of the defense seeking to introduce,

14    the rule was subsequently amended, there's been no intervening

15    Second Circuit interpretation.  The rule is amended because the

16    government wanted some ability to introduce in some context

17    civil settlement matters.  So the rule has been changed now, by

18    its terms, at least, not in the case of motive and bias, it

19    does appear to apply in criminal settings.  But I don't think

20    that the amendment, which was not -- I don't think that

21    amendment is sufficiently overruling of the Second Circuit

22    decision for me not to be bound by that Second Circuit

23    decision.  But you'll, I'm sure, take a look at that issue.

24          MS. MOE:  Yes, your Honor.

25          And just to widen the aperture of the issue, what

LC1VMAX3                          Jane - cross

1    we're talking about is impeachment.  And so a statement or an

2    issue of bias that's being offered for impeachment, whether

3    we're talking about a Rule 408 issue or otherwise, is only

4    relevant and permissible if this witness knows about it.

5              THE COURT:  I agree there are personal knowledge

6    questions in issue.  I did ask you specifically if it was a 408

7    issue, and you said yes.  You're on your feet, of course, now,

8    and have to respond to me quoting a Second Circuit decision at

9    you.  And, of course, district courts are required to follow

10   Second Circuit precedent even if its intention was subsequent

11   changes in the law, unless and until the case is reconsidered

12   by the Second Circuit sitting *en banc* or its equivalent or is

13   rejected by a later Supreme Court decision.

14             So I do think there may be a question of the change in

15   the rule and what the scope of that was and whether it

16   overturns the Second Circuit decision such that I'm not bound

17   by it.  I doubt it.  Separate and apart from that is the

18   question of whether she has personal knowledge of what her

19   attorneys did, right.

20             MS. MOE:  Yes, your Honor.

21             THE COURT:  It's not a 408 issue, it's a foundation

22   question, personal knowledge question.

23             Ms. Menninger made an argument that in the civil

24   litigation context, she could be assumed to have adopted the

25   position of her attorneys.  I think we do get to that bridge,

1    if we need to cross it, so let's see if there's a memory -- if

2    there's an awareness or not.  And if she doesn't know and the

3    answer is no, I think we'll move on until I hear from you as to

4    how it might come in.

5              MS. MOE:  Thank you, your Honor.

6              And we'll look into the Rule 408 issue.  If we have

7    that wrong, we'll certainly withdraw that objection.  And I

8    appreciate the Court flagging that.

9              THE COURT:  I assume that's why you hadn't raised 408

10   in your motion to quash.  In any event, one of the parties

11   raised 408, so we looked at it and that was as far as we got.

12             Anything else?

13             MS. MOE:  Yes, your Honor.

14             There was just that brief anonymity.

15             THE COURT:  Oh, yes.  Let's do that at sidebar.

16             MS. MOE:  Thank you, your Honor.

17             (Pages 491 to 495 SEALED)

18             (Continued on next page)

19

20

21

22

23

24

25

 1              (In open court)

 2              THE COURT:  Five minutes.

 3              (Recess)

 4              THE COURT:  Matters to take up?

 5              MS. MOE:  Not from the government, your Honor.

 6              MS. MENNINGER:  No.  Thank you, your Honor.

 7              THE COURT:  We can bring the witness.

 8              And Ms. Williams can bring in the jury.

 9              Mr. Everdell, did you get the binders squared away for

10    the jurors?

11              MR. EVERDELL:  Your Honor, I did look, and the one

12    juror referenced the letter of recommendation.  And those, I

13    think, would have been with the Interlochen applications.  And

14    I looked at all of those in both binders, and they look to be

15    complete.  I just think that he or she may have missed the

16    page.

17              THE COURT:  Okay.  All right.

18              So maybe we'll take -- really make sure we're taking

19    time to direct them --

20              (Jury present)

21              THE COURT:  All right.  We will resume, Ms. Menninger,

22    with your cross-examination of witness Jane.

23              And Jane, I remind you, you are under oath.

24              Go ahead, Ms. Menninger.

25              MS. MENNINGER:  Thank you, your Honor.

LC1VMAX3                        Jane - cross

1  BY MS. MENNINGER:

2  Q.  Yesterday you testified about the first time you were

3  abused, you claim, by Epstein.  Do you recall that testimony?

4  A.  Yes.

5  Q.  You said that it occurred in a pool house in Florida;

6  correct?

7  A.  Correct.

8  Q.  His Palm Beach home; correct?

9  A.  Correct.

10  Q.  The Palm Beach home that you went to, you say, for all

11  three years; correct?  Fourteen through 16.

12  A.  Correct.

13  Q.  And the very first time that you were abused would be a

14  very important part of your story, you would agree; correct?

15  A.  Correct.

16  Q.  But when you talked to the government in December of 2019,

17  isn't it true that you told them that the first time you were

18  abused was in New York?

19  A.  That is not correct.

20  Q.  Isn't it true that you said you were in New York and you

21  were abused when you went up there to take headshots?

22  A.  I don't recall.

23  Q.  If I could direct your attention to 3509-005 on the second

24  page.  It's going to be the second paragraph up from the

25  bottom.

LC1VMAX3                          Jane - cross

1   A.  Yes.  And with all due respect, I didn't write any of this

2   and I've never read this document because this is incorrect.

3   Q.  So you're denying that you made the statement your first

4   experience of abuse was when you were 14 years old in New York,

5   you met Epstein to take headshots, and that is when he

6   masturbated?

7   A.  Yeah, this is incorrect.

8   Q.  When you first talked to the government in December of 2019

9   about traveling to New York, you told them that on your first

10  trip nothing inappropriate happened; correct?

11  A.  I don't recall.

12  Q.  You told the government that your first trip was to just go

13  and have fun; correct?

14  A.  I don't recall.

15  Q.  If I could direct your attention to your statement from

16  September of 2019, which is 001, at the second page.

17          MS. MOE:  And I'd object to characterizing it as her

18  statement.

19          THE COURT:  Sustained.

20          MS. MENNINGER:  I'm sorry, what?  I didn't hear it.

21          MS. MOE:  I'd object to characterizing this as her

22  statement.  I think the witness has been very clear these are

23  not her statements.

24          MS. MENNINGER:  I didn't hear it.  I apologize, your

25  Honor.

LC1VMAX3                         Jane - cross

1          THE COURT:  I sustain.

2     Q.  You spoke with the government in September of 2019;

3     correct?

4     A.  Correct.

5          MS. MENNINGER:  I apologize.  I may be on the wrong

6     page.  I'll find that in a minute.  And I apologize.

7     Q.  If I can direct your attention to a discussion you had with

8     the government in February of 2020, where you told them that

9     the first trip to New York was just to go and have fun.  Is

10    that true?

11    A.  I don't recall.

12    Q.  Okay.  If I could have you take a look at 008 on page 8.

13    And it's going to be in the fourth full paragraph.

14         Does that refresh your recollection about what you

15    told the government in February 2020 about your first trip to

16    New York?

17    A.  Like I said, with all due respect, I didn't write any of

18    this.  I've never read this before.  And I was never recorded.

19    This was just somebody jotting down notes, and so a lot of this

20    is out of sequence and incorrect.

21    Q.  Does that refresh your recollection about what you told the

22    government about your first trip to New York?

23    A.  No.

24         MS. MOE:  Asked and answered, your Honor.

25         THE COURT:  The answer is no.

LC1VMAX3                    Jane - cross

1          You may proceed.

2    Q.  Isn't it true you told the government on that occasion that

3    your first trip to New York was just to go and have fun?

4          MS. MOE:  Asked and answered, your Honor.

5          THE COURT:  Sustained.

6    A.  No.

7          THE COURT:  I sustained.  If I sustain, pause.  And

8    then if I overrule, you can answer.

9          Go ahead, Ms. Menninger.

10   BY MS. MENNINGER:

11   Q.  And it was later when you were talking to the government in

12   April of 2020 that you said you only specifically recalled one

13   incident in New York where Ghislaine was present; correct?

14   A.  I don't recall.

15   Q.  If I could have you take a look at 3509-004.  Okay.  I'm

16   sorry, 3509-003.  Excuse me.  And it's on the second page in

17   the second full paragraph.  If you could look at that second

18   sentence in the second paragraph regarding how many incidents

19   in New York.

20         MS. MOE:  And, your Honor, is the question whether

21   that refreshes her recollection or --

22         MS. MENNINGER:  Right.  I'm having her take a look at

23   it.

24   Q.  And does that refresh your recollection?

25   A.  What page is this?

LC1VMAX3                           Jane - cross

1    Q.   On page 2.  3509-03, page 2.

2    A.   What is the question?

3    Q.   Do you recall -- does this refresh your recollection about

4    how many incidents in New York you recall with Ghislaine

5    present?

6    A.   I don't think I have the correct page.

7              THE COURT:  You're directing to the second full

8    paragraph, second sentence?

9              MS. MENNINGER:  Yes, your Honor, the second full

10   paragraph on page 2.  The paragraph begins with "Maxwell."  The

11   second sentence of that paragraph.

12             MS. MOE:  I also object as mischaracterizing.

13             THE COURT:  Sustained.

14   Q.   Did you tell the government that you recall one incident in

15   New York where Maxwell was present?

16             MS. MOE:  Same objection, your Honor.

17             THE COURT:  Sustained.

18   A.   Well, this one says --

19             THE COURT:  Just a second.  Go ahead.

20   Q.   Did you tell the government you recalled at least one

21   incident in New York where Maxwell was present?

22   A.   Yes.

23   Q.   And that's what you relayed to them on that day; correct?

24             MS. MOE:  Your Honor, again, I'd object to

25   mischaracterizing these documents.  It's very confusing for the

LC1VMAX3                        Jane – cross

1    witness.

2            THE COURT:  You've asked already do you recall having

3    made that statement and the answer, I think, is yes?

4            THE WITNESS:  Yeah, for at least --

5            THE COURT:  Okay.

6    Q.  You recall at least one incident in New York?

7            THE COURT:  Are you asking that as a question of her

8    memory now or are you asking her if she remembers relaying that

9    to the FBI?

10   Q.  Yes, do you remember that now?

11   A.  Yes.

12   Q.  Okay.

13           MS. MOE:  Your Honor, which was that about, her memory

14   or whether it happened?

15           THE COURT:  It was rephrased as about her memory now.

16           Next question, Ms. Menninger.

17   Q.  That was a conversation you had in November of 2019 with

18   the government; correct?

19   A.  Correct.

20   Q.  And then by April of 2020, you reported to the government

21   that you were abused 90 percent of the time you traveled with

22   Epstein and Maxwell; correct?

23           MS. MOE:  Objection, your Honor.

24           THE COURT:  Overruled.

25   A.  Correct.

LC1VMAX3                        Jane - cross

1   Q.  So you went from nothing inappropriate happened to being

2   abused 90 percent of the time; correct?

3          MS. MOE:  Objection, your Honor.  Mischaracterizes --

4          THE COURT:  Sustained.

5   Q.  Has your story changed about how many times you remember

6   abuse over the course of your discussions with the government?

7   A.  No, and I didn't understand exactly the question.

8   Q.  In September of 2019, when you first met with the

9   government, you told them that you flew with Ghislaine and

10  Epstein to New York to see *The Lion King*; correct?

11  A.  Correct.

12  Q.  You told them that you flew to New York for the first time

13  with them to see *The Lion King*; correct?

14  A.  I said that, but I was incorrect in my timeline.

15  Q.  You said that happened when you were 14, right?

16  A.  Yes.

17  Q.  And that's the trip where you said nothing inappropriate

18  happened; correct?

19  A.  I don't recall.

20  Q.  And you were, as we've seen, a student of theater and the

21  arts at the time; correct?

22  A.  Correct.

23          MS. MOE:  Objection to form.

24          THE COURT:  Overruled.  You may answer.

25  A.  Correct.

LC1VMAX3                          Jane - cross

1   Q.  A student of the arts would be pretty excited about their

2   first trip to see a Broadway show; correct?

3   A.  Correct.

4   Q.  Especially *The Lion King* when it came out; correct?

5   A.  Correct.

6   Q.  And it would also be memorable to a young person to have

7   their first trip on a private jet; correct?

8   A.  Correct.  But, once again, my timeline was wrong.

9   Q.  Well, you told them that in September of 2019, right, when

10  you first met with them?

11  A.  I did say that, yes.

12  Q.  You repeated that same story in December of 2019; correct?

13  A.  I don't recall.

14  Q.  You repeated that story in February of 2020; correct?

15  A.  I don't recall.

16  Q.  All right.  I'll have you take a look at 3509-005 at 6 to

17  7.  I apologize.  001 at page 2.

18          THE COURT:  What paragraph?

19          MS. MENNINGER:  I'm having a little trouble with my

20  glasses.  Just a moment, your Honor.  I apologize.

21          THE COURT:  Okay.

22          MS. MENNINGER:  Third paragraph, your Honor.  Sorry.

23          THE COURT:  Third full paragraph?

24          MS. MENNINGER:  Yes, your Honor.

25          THE COURT:  Okay.

LC1VMAX3                          Jane - cross

1                MS. MOE:  Your Honor, I apologize.  I'm confused.

2           I think the question was about a number of different

3      meetings, but we're now looking at the same notes.  I think

4      there's a confusing suggestion that we're talking about --

5                THE COURT:  Okay.

6      BY MS. MENNINGER:

7      Q.   The first time that you met with the government, you told

8      them that you were flown to New York by Epstein and Maxwell to

9      see *The Lion King*, right?

10               MS. MOE:  Objection.  Asked and answered.

11               THE COURT:  Just a moment.

12               Do you need a break?

13               THE DEPUTY CLERK:  Yes.

14               THE COURT:  Go ahead.

15               (Jury not present)

16               THE COURT:  You can be seated.

17               Let me find out what's happening.

18               (Recess)

19               THE COURT:  Just to be clear, it looked like a witness

20     was having a coughing issue or sickness or something.  That a

21     juror, apologize.

22               (Pause)

23               THE COURT:  Happy to report she's fine.  She felt like

24     something was stuck in her throat.  She's getting some water

25     and a cough drop and we'll resume.  The juror, to be clear.

LC1VMAX3                       Jane - cross

```
 1              MS. MENNINGER:  I've been provided a light by
 2    Ms. Sternheim to see.
 3              THE COURT:  Oh, great.  These courtrooms are dark.
 4              (Jury present)
 5              THE COURT:  All right.  Everyone please be seated.
 6              Okay.  Everybody is okay.  I know it's always alarming
 7    to know you have to travel in a group always, but do let us
 8    know if you need anything.  Thank you, everyone.
 9              Ms. Menninger, you may continue with your cross.
10              MS. MENNINGER:  Thank you, your Honor.
11    BY MS. MENNINGER:
12    Q.  So I think we were talking about in September of 2019 you
13    agreed that you had told the government about flying to New
14    York with Maxwell and Epstein to see The Lion King; correct?
15    A.  I did not say that.  Incorrect.
16    Q.  Okay.  If I can show you 3509-001, page 2, third paragraph.
17    A.  Yes, I see that.  And it's incorrect.  This is not a
18    transcript of mine.  Nobody ever recorded me saying any of my
19    statements.  And I'm reading it right now and a lot of these
20    are not correct.
21    Q.  So you did not tell the government in September of 2019
22    that when you were 14 years old, you flew with Epstein and
23    Maxwell to New York City to see The Lion King?
24    A.  I flew with them to New York City and I had mistaken that
25    we were going to see The Lion King, but that was a different
```

LC1VMAX3                          Jane – cross

1    trip.

2    Q.  But you did say it, but you learned later you were wrong;

3    correct?

4    A.  Yes.

5    Q.  All right.  So let's turn to when you learned that you were

6    wrong.  Your attorney -- you repeated it a few times though, I

7    guess that's my point?

8              MS. MOE:  Objection, your Honor.

9    Q.  That was the only time you told the government that you

10   flew to New York to see *The Lion King* with Epstein and Maxwell?

11             MS. MOE:  Objection, your Honor, to form.  It's an

12   argument, not a question.

13             THE COURT:  Overruled.

14   A.  No, it's not the only time.

15   Q.  You told it to them a couple times before you found out you

16   were wrong, right?

17   A.  No.

18   Q.  Okay.  Well, let's go to your conversation in February of

19   2020, 008, page 8.  And at that time you told the government

20   your first trip to New York was to just go and have fun.  It

21   may have been the trip that you went to see *The Lion King*,

22   right?

23             MS. MOE:  Objection, your Honor.  It's not

24   inconsistent and, again, this is misleading.

25             THE COURT:  You can --

LC1VMAX3                        Jane - cross

1              MS. MENNINGER:  Refresh?

2              THE COURT:  Yes, you can ask if it refreshes.

3    Q.  Does reading the second sentence of the fourth paragraph

4    refresh your recollection about what you told the government in

5    February of 2020?

6    A.  No.

7    Q.  You don't remember saying it then?

8    A.  No.

9    Q.  Isn't it true what you said to the government in February

10   2020 is that your first trip to New York was to just go and

11   have fun, this may have been the trip to see *The Lion King*?

12             MS. MOE:  Objection.  Asked and answered.

13             THE COURT:  Sustained.

14   Q.  After this meeting in February 2020, your email -- your

15   lawyer was Mr. Glassman at the time; correct?

16   A.  Correct.

17   Q.  Mr. Glassman got an email from a prosecutor,

18   Mr. Rossmiller; correct?

19             MS. MOE:  Objection to foundation, your Honor.

20             MS. MENNINGER:  I'm not asking the contents.

21             THE COURT:  Do you know?

22             THE WITNESS:  I don't know.

23             THE COURT:  Okay.

24   Q.  At some point did your attorney, Mr. Glassman, come to you

25   with a question?

LC1VMAX3                          Jane - cross

1              MS. MOE:  Objection.  Privileged.

2              THE COURT:  Sustained.

3              MS. MENNINGER:  Your Honor, it was communicated to the

4    government, so the privilege had been waived.

5              MS. MOE:  Your Honor --

6              THE COURT:  He didn't ask -- I sustained.

7              MS. MOE:  Thank you, your Honor.

8              THE COURT:  The question as phrased, sustained.

9    Q.  Do you know whether your attorney ever communicated to the

10   government an answer regarding *The Lion King* and Broadway?

11             MS. MOE:  No objection, your Honor.

12             THE COURT:  Good.

13             MS. MENNINGER:  I know Ms. Moe would like to come do

14   this for me, but --

15             MS. MOE:  I do object to that, your Honor.

16             THE COURT:  All right.  Everybody calm down.  The

17   question is not objected to nor objectionable.  You may state

18   it again, Ms. Menninger.

19   BY MS. MENNINGER:

20   Q.  Do you know whether your attorney communicated to the

21   government -- communicated with the government about your

22   experience with *The Lion King* and going to New York?

23   A.  No, I don't know.

24   Q.  Could looking at 3509-10 refresh your recollection?

25             MS. MOE:  Your Honor, I object.

LC1VMAX3                           Jane - cross

1           The witness testified that she doesn't know, not that
2      she doesn't remember.
3           THE COURT:  Overruled.
4           You can ask if this refreshes.  This is precisely what
5      we talked through.  You can ask if it refreshes her
6      recollection.
7      A.  What is the question?  Sorry.
8      Q.  Does this refresh your recollection about your attorney
9      communicating with the government about The Lion King and
10     Broadway?
11     A.  Yes, but it doesn't reference the timeline, if that was the
12     original question.  I'm sorry.  I'm confused.
13     Q.  Is it true that your lawyer communicated to the government
14     your recollection that, in fact, you had seen The Lion King
15     Broadway show and not the movie?
16     A.  Oh, yes, I -- we did see the show.
17     Q.  And you recalled seeing the Broadway show; correct?
18     A.  Correct.
19     Q.  And you recalled sitting in the mezzanine seats; correct?
20     A.  Correct.
21     Q.  And you recalled that Epstein bragged about getting those
22     seats because he knew the director; correct?
23     A.  Correct.
24     Q.  And your attorney communicated all of that to the
25     government; correct?

LC1VMAX3                         Jane - cross

1   A.  That's correct.

2   Q.  And that was in response to a question from the government

3   to you through your attorney; correct?

4   A.  Correct.

5   Q.  That's because the government communicated to you through

6   your attorney that *The Lion King* didn't come out until 1997;

7   correct?

8   A.  Correct.

9   Q.  So although you had told the government twice previously

10  that you flew to New York with Maxwell and Epstein when you

11  were 14, you learned that the Broadway show didn't come out

12  until you were 17; correct?

13  A.  That's right.  But that wasn't the first time that we'd

14  flown.

15  Q.  The government suggested to you that perhaps you meant to

16  say *The Lion King* movie through your attorney to you; correct?

17          MS. MOE:  Objection, your Honor.

18          THE COURT:  Sustained.

19  Q.  Did Mr. Glassman share with you the email that he got from

20  the government?

21          MS. MOE:  Objection.

22          THE COURT:  Sustained.

23  Q.  You knew at the time you communicated the information to

24  Mr. Glassman that he intended to share it with the government;

25  correct?

LC1VMAX3                          Jane - cross

1        MS. MOE:  Objection, your Honor.

2        THE COURT:  Sustained.

3        MS. MENNINGER:  Your Honor, that's how we establish a

4    waiver of the privilege.

5        MS. MOE:  Objection, your Honor.

6        THE COURT:  Sustained.

7    Q.  When you first talked to the government about traveling to

8    New Mexico, you told them that you were ignored on that trip;

9    correct?

10   A.  I don't recall.

11   Q.  You recall telling the government that the first time you

12   went on a private plane to New Mexico, you were not doing much

13   and just sitting around; correct?

14   A.  I don't recall.

15   Q.  Okay.  Look at 3509-008 at page 6, and the second full

16   paragraph, in the middle of the paragraph.  Do you recall

17   telling the government that the first time you went to New

18   Mexico on Epstein's plane you were somewhat ignored?

19   A.  No, I don't recall.

20   Q.  Do you recall that you were told to go hiking?

21   A.  I don't recall.

22   Q.  Do you recall saying you were not impressed?

23       THE COURT:  I need you to clarify.  You're again

24   switching between asking if it's a memory now or whether she

25   remembers having said that to the government.

1  Q.  As you sit here today, do you remember not being impressed

2  when you went to New Mexico for the first time on the private

3  plane?

4  A.  I don't recall saying that.

5  Q.  No.  Do you recall as you sit here today that you were not

6  impressed when you first went to New Mexico on a private plane?

7  A.  No.

8  Q.  You do not recall any abuse happening when you first went

9  to New Mexico; correct?

10 A.  That's not correct, no.

11 Q.  That's what you told the government in February of 2020;

12 correct?

13 A.  No, that's not correct.  Like I said, this is not a

14 transcript of mine.  This is the first time I'm reading it and

15 it's not correct.

16 Q.  All right.  I'm going to direct your attention to 3509-008,

17 page 7, the last full paragraph.  Does that refresh your

18 recollection about what you told the government about your

19 first trip to New Mexico?

20 A.  No, it doesn't.

21 Q.  And isn't it true you told the government in February of

22 2020 that on your first trip to New Mexico, you recalled going

23 hiking, remembered not doing too much, just sitting around

24 mostly, and did not recall specific abuse that may have

25 occurred?

LC1VMAX3                        Jane - cross

1    A.  I don't recall this.

2    Q.  Then I would like to direct your attention to the last

3    sentence on that same page, where you were asked again if you

4    recalled any specific abuse that occurred in New Mexico, and

5    then turning to the next page, you stated you were not sure.

6            THE COURT:  Do you have a question?

7    Q.  Does that refresh your recollection now that you've seen

8    that on the page?

9    A.  No, it does not.

10   Q.  Isn't it true that's what you said to the government?

11   A.  I don't recall saying this.

12   Q.  And you also told the government that your memory of the

13   details of that location were not good; correct?

14   A.  I don't recall saying that.

15   Q.  Okay.  If you could look at the top of the second page --

16   I'm sorry, of page 8.  Does that refresh your recollection?

17   A.  No.

18   Q.  Isn't it true you told the government regarding New Mexico

19   the place was dark and you do not recall many of the details of

20   this location?  If there was abuse that occurred there, it

21   wouldn't have been a group thing, but she cannot recall -- you

22   cannot recall anything specific?

23           MS. MOE:  Objection, your Honor.

24           THE COURT:  What's the question?

25           MS. MENNINGER:  Well, I asked her if it refreshed her

1    recollection, she said it did not.  Now I'm asking her if she

2    made the statement, and we haven't heard her answer yet.

3           THE COURT:  So the question is did you make the

4    statement?

5           MS. MENNINGER:  Yes.

6           THE COURT:  Okay.  You may answer that.

7    A.  No, I don't recall making these statements.

8    Q.  Then you were asked the same question by the government in

9    the same interview a third time; correct?

10   A.  I don't know.

11   Q.  I'm going to ask you to take a look at page 11, the top

12   paragraph, the first sentence.  Does that refresh your

13   recollection about you being asked a third time in the same

14   interview about abuse occurring in New Mexico?

15   A.  No, it does not.

16   Q.  Isn't it true what you told the government a third time was

17   that you were asked about the New Mexico trips you took and if

18   you recalled any specific abuse that occurred there, to which

19   you answered you did not remember; correct?

20          MS. MOE:  Objection.

21          THE COURT:  Sustained.

22   Q.  It didn't refresh your recollection --

23          THE COURT:  You said isn't it true that you told the

24   government a third time that you were asked about the New

25   Mexico trips.  I think you lost the thread.

LC1VMAX3                        Jane - cross

1            MS. MENNINGER:  Okay.

2   Q.  Isn't it true you told the government you do not remember

3   any specific abuse that occurred in New Mexico on the trips

4   that you took there?

5   A.  I don't recall.

6   Q.  And yesterday you testified about an incident in New Mexico

7   that you now specifically remember two years later.

8   A.  That's right.

9   Q.  Today you remember it; in 2020 you did not.

10  A.  I don't recall saying any of what's written here.

11  Q.  I'm going to ask you about the homes that you testified you

12  visited for Epstein in the mid 1990s, okay, between the ages of

13  14 and 16.

14          You recall in Palm Beach that you went to a pool

15  house; correct?

16  A.  That's correct.

17  Q.  And you only went to one house for Epstein in Palm Beach

18  ever; correct?

19  A.  Yes.

20  Q.  You remember the whole house in Florida was light-colored

21  and beachy; correct?

22  A.  I think so; correct.

23  Q.  You remember a winding staircase with pictures on the wall;

24  correct?

25  A.  Correct.

1   Q.  You recall a massage room that was attached to the

2   bathroom; correct?

3   A.  That's my memory, yes.

4   Q.  And that's the description that you gave the government;

5   correct?

6   A.  Yes.

7   Q.  In New York, you described an eight-story mansion on the

8   Upper East Side; correct?

9   A.  Yes.

10  Q.  You started staying there when you were 14; correct?

11  A.  Correct.

12  Q.  That's the only home in New York that you visited of

13  Epstein's; correct?

14  A.  No.

15  Q.  You stayed in some apartments where he did not live;

16  correct?

17  A.  Correct.

18  Q.  And you stayed in this eight-story mansion beginning at the

19  age of 14; correct?

20  A.  Correct.

21  Q.  And you stayed on the eighth floor of this mansion, right?

22  A.  I believe so.

23  Q.  And Ghislaine didn't live in that mansion, right?

24  A.  I don't know.

25  Q.  You didn't see her living there; correct?

LC1VMAX3                         Jane - cross

1   A.  I don't know.

2   Q.  And you started staying there at the age of 14, right?

3   A.  Yes.

4   Q.  You recall a massage table being black in that home;

5   correct?

6   A.  Correct.

7   Q.  And then you remember going to New Mexico where there was a

8   giant ranch; correct?

9   A.  Correct.

10  Q.  An impressive, huge house, right?

11  A.  Like all of them.

12  Q.  What's that?

13  A.  I said like all of the homes, yes.

14  Q.  Right.  And there were other guests around in New Mexico;

15  correct?

16  A.  No.

17  Q.  Do you remember telling the government that Jeffrey's

18  brother Mark Epstein went with you on a trip to New Mexico?

19  A.  I don't recall saying that.

20  Q.  Do you remember telling the government that Chef Adam Perry

21  Ling went on a trip to New Mexico with you?

22  A.  I don't recall.

23  Q.  And you don't remember a massage room in the New Mexico

24  home; correct?

25  A.  I don't recall.

LC1VMAX3                          Jane - cross

1    Q.  In your time with Epstein, you never saw any other underage

2    girls around him; correct?

3    A.  I wouldn't know that, if they were.

4    Q.  Well, you told the government in 2019 that you thought you

5    were the only one; correct?

6    A.  Correct.

7    Q.  And you only learned otherwise, you said, when you saw the

8    news about Mr. Epstein's arrest in 2007 or 8; correct?

9    A.  Correct.

10   Q.  So none of the other participants in these orgies, I think

11   you called them, were underage; correct?

12   A.  I wouldn't know that.

13   Q.  That you thought you were the only one, right?

14   A.  Yes.

15   Q.  And you were never asked to go recruit other girls for

16   Epstein; correct?

17   A.  Correct.

18   Q.  You were not asked to have sexual contact with any of

19   Epstein's friends?

20   A.  No.

21   Q.  Epstein did introduce you to a number of people associated

22   with the arts, right?

23   A.  Not really, no.

24   Q.  He introduced you to the dean of Interlochen at a cocktail

25   party, right?

LC1VMAX3                         Jane - cross

1   A.  I don't remember.  Maybe.

2   Q.  Well, in December of 2019, you told the government that he

3   had introduced you to the dean of Interlochen at a cocktail

4   party.

5          THE COURT:  Having a hard time hearing you,

6   Ms. Menninger.

7          MS. MENNINGER:  I'm sorry.

8   Q.  In 2019 December, you told the government that you had been

9   introduced to the dean of Interlochen by Epstein at a cocktail

10  party.

11  A.  I don't recall.

12  Q.  If I could have you look at 3509-005, page 5, the second

13  full paragraph.  Does that refresh your recollection?

14  A.  I remember the dean of admissions for Julliard.  I don't

15  remember saying the first sentence.

16  Q.  Isn't it true you told the government that on one occasion

17  the dean of Interlochen was there for a cocktail party, you met

18  him through Epstein?

19  A.  I don't remember.

20  Q.  You don't remember if you did meet the dean of Interlochen

21  through Epstein?

22  A.  No.

23  Q.  And you do remember meeting the dean of admissions for

24  Julliard; correct?

25  A.  Yes.

LC1VMAX3                          Jane - cross

1    Q.  Through Epstein, right?

2    A.  Yes.

3    Q.  And you applied to Julliard; correct?

4    A.  No, I did not.

5    Q.  You were referred to the Professional Children's School by

6    the dean of Julliard -- or, excuse me, the dean of admissions

7    for Julliard; correct?

8    A.  I don't remember who referred.

9    Q.  Mr. Epstein introduced you to Donald Trump; correct?

10   A.  Correct.

11   Q.  He took you to Mar-a-Lago, right?

12   A.  Right.

13   Q.  When you were 14, you claim?

14   A.  Yes.

15   Q.  He took you in a dark green car?

16   A.  Yes.

17   Q.  And you met Donald Trump there; correct?

18   A.  Correct.

19   Q.  That was before the pool house incident; correct?

20   A.  I don't remember that.

21            (Continued on next page)

22

23

24

25

LC1Qmax4                        Jane - Cross

```
 1   Q.  If I could direct your attention to your conversation to
 2   the statement 3509-001?
 3            MS. MOE:  I object to characterizing it as a
 4   statement, your Honor.
 5            THE COURT:  Sustained.
 6   Q.  Page 3 of 001, in the second full paragraph, does that
 7   refresh your recollection that you described a period in the
 8   beginning before the pool house incident?
 9   A.  I don't recall saying that.
10   Q.  Do you recall telling the government that Epstein took you
11   -- that Epstein told you that he had famous friends that he
12   would call and put on speaker phone?
13   A.  That's correct.
14   Q.  And you told them that he took you in a dark green car to.
15   Mar-a-Lago to meet Donald Trump, right?
16   A.  Right.
17   Q.  And that was in the beginning before the pool house
18   incident?
19            MS. MOE:  Objection.  Asked and answered and also
20   misleading.
21            THE COURT:  Overruled.  I'll allow it.
22   A.  I don't remember saying that and I don't remember the
23   timeline of that.
24   Q.  Yesterday you talked about group sexualized massages,
25   right?
```

LC1Qmax4                          Jane - Cross

1    A.  Yes.

2    Q.  I think you called them orgies, right?

3    A.  Yes.

4    Q.  You talked about how those would happen almost every visit

5    with him, which would have been every two weeks, correct?

6          MS. MOE:  Objection to mischaracterizing the

7    testimony.

8          THE COURT:  Overruled.  Overruled.

9    A.  Not correct.  No.

10   Q.  Your testimony yesterday --

11         THE COURT:  Where am I looking?

12         MS. MENNINGER:  Your Honor, the transcript from

13   yesterday's testimony began on page 314 and the specific

14   statement about frequency is at the top of 315.

15         MS. MOE:  Your Honor, may I have just a moment?

16         THE COURT:  Yes.  I need one too.

17         Can I get the page again, please.

18         MS. MENNINGER:  Sure.  Your Honor, it began -- the

19   description of the topic was on 314, and then the specific

20   question about frequency occurred at the top of 315.

21         THE COURT:  Okay.

22         MS. MOE:  I'm sorry, your Honor.  What's the question?

23         THE COURT:  What's the question?

24   BY MS. MENNINGER:

25   Q.  I asked, you testified yesterday that these group massages

LC1Qmax4                        Jane - Cross

1   would happen almost every visit with him which would have been

2   every two weeks.  That was your testimony yesterday?

3   A.  Yes, I guess, I -- yes, I said that.

4   Q.  In these group massages, there were other participants,

5   correct?

6   A.  Correct.

7   Q.  You distinctly remembered the names of some of these other

8   women participants, correct?

9   A.  Correct.

10  Q.  You told those names to the government, correct?

11  A.  Correct.

12  Q.  You recalled a woman named Sophie who participated in these

13  group sexualized massages, correct?

14  A.  Correct.

15  Q.  She was an actual massage therapist, right?

16  A.  That's what she said, yeah.

17  Q.  She had blond hair?

18  A.  Mmm-hmm.  Yes.

19  Q.  Tall and thin, right?

20  A.  Yes.

21  Q.  Nice legs?

22  A.  Yes.

23  Q.  Was pretty?

24  A.  Yes.

25  Q.  Had a tan?

LC1Qmax4                         Jane – Cross

1    A.  Yes.

2    Q.  Right?

3    A.  Yes.

4    Q.  Lived in Florida?

5    A.  Yes.

6    Q.  Married a racecar driver?

7    A.  Yes.

8    Q.  She joined in the sexual massages, correct?

9    A.  Correct.

10   Q.  You said she knew the routine, right?

11   A.  Right.

12   Q.  She would make out with other girls during these

13   encounters?

14   A.  Yes.

15   Q.  And you remember being on flights with Sophie?

16   A.  Yes.

17   Q.  Sophie would be someone who could corroborate your

18   recollection about these group massages, correct?

19           MS. MOE:  Objection.

20           THE COURT:  Overruled.

21   A.  Yes.

22   Q.  You told the government about a woman named Eva who joined

23   in, correct?

24   A.  Correct.

25   Q.  You said she joined in with Sophie, right?

LC1Qmax4                          Jane - Cross

1   A.  What's the exact question joined in with Sophie?

2   Q.  Those were your words.

3   A.  Yes.

4   Q.  You said she joined in with Sophie?

5   A.  Joined into the group scenario, yes.

6   Q.  She knew the routine?

7   A.  Yes.

8   Q.  So she could also confirm your story, right?

9   A.  Yes.

10  Q.  You talked about a third woman named Emmy, who was a

11  participant in the abuse, correct?

12  A.  Correct.

13  Q.  You said that Emmy was British?

14  A.  Yes.

15  Q.  And she was nice and cool, right?

16  A.  Yes.

17  Q.  And she was involved in the sexual contact, right?

18  A.  Yes.

19  Q.  And she was in these group sexualized massages with you,

20  correct?

21  A.  Yes.

22  Q.  There was a fourth woman you remembered named Michelle?

23  A.  Yes.

24  Q.  Michelle was short?

25  A.  Yes.

LC1Qmax4                    Jane - Cross

1  Q.  You hung out with her and Emmy?

2  A.  Yes.

3  Q.  And you sometimes went out with them, right?

4  A.  Yes.

5  Q.  And you claimed that Michelle was also involved in the

6  sexual contact, correct?

7  A.  Yes.

8  Q.  And the group massages?

9  A.  Yes.

10  Q.  And then another person you remembered was named Kelly,

11  right?

12  A.  Yes.

13  Q.  And you remembered her last name, right?

14  A.  Yes.

15  Q.  And you thought she was a model who was older than you,

16  right?

17  A.  Yes.

18  Q.  And you told the government she could back up what you were

19  talking about, right?

20  A.  Yes.

21  Q.  You also told the agents and the prosecutors you were

22  meeting with, you thought you could recognize these people if

23  you saw pictures, right?

24  A.  A few of them, yes.

25  Q.  And you said that at your very first meeting in September

LC1Qmax4                          Jane - Cross

1   of 2019, right?

2   A.   Yes.

3   Q.   And between September of 2019 and today, you've never been

4   shown pictures of Sophie, right?

5           MS. MOE:  Objection.

6           MS. MENNINGER:  Lack of evidence your Honor?

7           THE COURT:  What are the grounds?  One word grounds

8   for the objection.

9           MS. MOE:  Your Honor, may we approach?

10          THE COURT:  Okay.

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LC1Qmax4                          Jane – Cross

1            (At the sidebar)

2            THE COURT:  What are the grounds?

3            MS. MOE:  Your Honor, in connection with our motions

4     in limine, the Court granted a motion in limine from the

5     government about efforts to put at issue particular

6     investigative techniques of whether we're showing photographs

7     or steps that the government is taking.  That's the objection,

8     your Honor.

9            THE COURT:  Overruled.

10           MS. MENNINGER:  Your Honor, can I make a record about

11    the number of objections because it's --

12           THE COURT:  Well, the record is clear about the number

13    of objections.

14           (Continued on next page)

1              (In open court)

2              THE COURT:  Do you need the question repeated?  Repeat

3    the question.

4    Q.  Between September of 2019 and today, have you ever been

5    shown photographs of Sophie by the government?

6    A.  No.

7    Q.  Of Emmy?

8    A.  No.

9    Q.  Michelle?

10   A.  No.

11   Q.  Eva?

12   A.  No.

13   Q.  Kelly?

14   A.  No.

15   Q.  Any of the other model-types that you said you saw in these

16   group massages?

17   A.  No.

18   Q.  You remembered being on flights with a number of

19   individuals, correct?

20   A.  Correct.

21   Q.  You remember Prince Andrew being on a flight, right?

22   A.  Yes.

23   Q.  You remember Mark Epstein, Jeffrey's brother, being on a

24   flight?

25   A.  Yes.

LC1Qmax4                        Jane - Cross

1    Q.  You recall Adam Perry Lang being on a flight with you?

2    A.  Yes.

3    Q.  You remember Epstein's mom being on a flight with you?

4    A.  Yes.

5    Q.  You told the government you remembered all these people

6    being on flights with you?

7    A.  Yeah.

8    Q.  Were you aware of whether the flight logs reflect any

9    flights by you with those individuals?

10   A.  I have no idea, no.

11   Q.  You also had some recollections about flying on the private

12   plane with Epstein, right?  You recall being on the plane?

13   A.  Yes.

14   Q.  And you said that you were asked your weight when you were

15   boarding the plane, correct?

16   A.  Yes.

17   Q.  And you also remember this Latin American driver for

18   Mr. Epstein driving you up to the airport, correct?

19   A.  Correct.

20   Q.  So he could back up that story too, correct?

21   A.  Correct.

22   Q.  And you remember someone from Epstein's office named Lesley

23   who called to set up travel arrangements for you, right?

24   A.  Yes.

25   Q.  And you recall Lesley calling your home phone in Florida,

LC1Qmax4                        Jane - Cross

1   right?

2   A.   That's what I remember, yeah.

3   Q.   When you were 14, 15 and 16, right?

4   A.   I don't know if it was her every time.  I just remember a

5   Lesley.

6   Q.   When you were in Florida?

7   A.   Yes.

8   Q.   Between the ages of 14 to 16.  And you remember Emmy

9   calling your house when you were age 14, 15 and 16 to make

10  arrangements, right?

11  A.   No, Emmy wasn't around then.

12  Q.   Well, you told the government that you do recall Emmy

13  calling your home phone in Florida, right?

14  A.   No, I never said that.

15  Q.   Let's look at 3509-001 at page 2, in the second full

16  paragraph.

17  A.   Yeah, but that's not correct.

18  Q.   So it says that you recall Emmy calling your house phone,

19  correct?

20           MS. MOE:  Objection.

21           THE COURT:  Just a moment.  Just a moment.  Sustained.

22  Q.   Did you tell the -- you're saying that it says it, but it's

23  not correct.  Can you just tell us what's not correct?

24           MS. MOE:  Objection, your Honor.

25           THE COURT:  Overruled.  You may answer.

1   A.   This timeline is not correct.  I did not know Emmy or

2   Michelle while living in Florida.  I knew them in New York.

3   Q.   You did not live in a house in New York, correct?

4   A.   No.

5   Q.   You lived in an apartment, right?

6   A.   Yes.

7   Q.   So you didn't have a house phone in New York?

8   A.   I think we did have a house phone, actually.  Actually, we

9   did for sure.

10  Q.   There was staff present at Mr. Epstein's eight-story

11  mansion, right?

12  A.   Yes.

13  Q.   And the staff included a chef, right?

14  A.   Yes.

15  Q.   And a house manager?

16  A.   Yes.

17  Q.   And a driver?

18  A.   Yes.

19  Q.   And so all of those people saw you staying in this mansion

20  by yourself as a 14 year old, right?

21  A.   Yes.

22  Q.   You said that Epstein gave you money almost every time that

23  you saw him, right?

24  A.   Correct.

25  Q.   Hundreds of dollars at a time?

LC1Qmax4                          Jane – Cross

1   A.  Yes.

2   Q.  $2- or $300 at a time?

3   A.  Yes.

4   Q.  And that happened regardless of whether or not you were in

5   what you claim was a sexually abusive relationship at that

6   time, right?

7   A.  Yes.

8   Q.  And your brothers never mentioned anything weird about you

9   having hundreds of dollars of cash, correct?

10  A.  I never mentioned it to them.

11  Q.  And your mother as well didn't know you had hundreds of

12  dollars?

13  A.  No.  I gave it to my mother.

14  Q.  You gave the hundreds of dollars to your mother?

15  A.  Yes.

16  Q.  Every time?

17  A.  I showed it to her every time.

18  Q.  And Epstein only gave you gifts.  He didn't give any gifts

19  to your brothers?

20  A.  He may have.  I don't recall.

21  Q.  Nothing major?

22  A.  I think he gave him a computer once.

23  Q.  Anything else?

24  A.  Not that I remember.

25  Q.  You don't have any photographs of yourself with Epstein,

1   correct?

2   A.   Correct.

3   Q.   Or Ghislaine?

4   A.   Correct.

5   Q.   You don't have any photographs of you wearing the clothes

6   that you claim they bought you?

7   A.   No.

8   Q.   The plaid pants and the Ralph Lauren sweater, right?

9   A.   That's right.

10  Q.   You claimed that there was a photo of you that Epstein kept

11  on his desk, and you were wearing a bathing suit, right?

12  A.   Yes.

13  Q.   You don't know whether that photograph was ever found,

14  correct?

15  A.   Correct.

16  Q.   Do you have any records of when you went to the Lion King,

17  like a program?

18  A.   No, I don't have really anything from that time of my life.

19  Q.   You said that Epstein paid for your acting lessons, right?

20  A.   Yes.

21  Q.   At a particular studio?

22  A.   Yes.

23  Q.   And you said that he paid a particular voice coach for you?

24  A.   Yes.

25  Q.   Have you got records of any of those payments?

LC1Qmax4                          Jane - Cross

1   A.   No.

2   Q.   You've met with the government quite a few times in person,

3   correct?

4   A.   Correct.

5   Q.   You've had a number of trial preparation sessions?

6   A.   Not -- not -- what's a number?

7   Q.   What's that?

8   A.   What do you mean by preparations?

9   Q.   Trial prep sessions?

10  A.   Yes.

11  Q.   Where they were talking about your testifying here?

12  A.   Yes.

13  Q.   And there was a mock cross-exam that you engaged in with

14  the government, right?

15  A.   Yes.

16  Q.   Where you practiced answering questions like we are now?

17  A.   Not practicing, no.

18  Q.   Did you rehearse your direct testimony?

19  A.   No, I did not.

20  Q.   You continued to travel on Mr. Epstein's dime after you

21  escaped in 1999, correct?

22  A.   That is not true.

23  Q.   Well, you took flights on his private jet after 1999,

24  right?

25  A.   Only one.

LC1Qmax4                          Jane - Cross

1   Q.  Do you remember taking commercial flights that he paid for?

2   A.  No.

3   Q.  I will have you look at Exhibit J-37 and see if this

4   refreshes your recollection.  And the J numbers are behind the

5   green flag.

6           MS. MENNINGER:  Your Honor, I think it's going to make

7   more sense for me to come back to this.

8           THE COURT:  Okay.

9   Q.  You do recall sending a photograph of yourself to Epstein

10  after you moved to LA, right?

11  A.  Yes.

12  Q.  That was Government Exhibit 245, right?

13          Where you wrote "Thanks for rocking my world"?

14  A.  Yes.  Embarrassing.

15  Q.  And you wrote that when you were 19?

16  A.  19, yes.

17  Q.  You testified yesterday that your mom made you send that to

18  him, right?

19  A.  Yes.

20  Q.  So your mom could clearly corroborate that, right?

21  A.  Yes.

22  Q.  And there were no dates on those photographs, right?

23  A.  Correct.

24  Q.  So it's your recollection about the age you were in those

25  photographs, right?

1    A.  Right.

2    Q.  There's nothing on the photographs themselves?

3    A.  Right.

4    Q.  And you testified yesterday that Epstein just kept calling

5    you and calling you in the 2000s until you stopped answering

6    his phone calls, right?

7    A.  Yes.

8    Q.  So there would be phone records of all those calls, right?

9    A.  Yes.

10   Q.  It took you quite some time to report this to law

11   enforcement, right?  We talked about that at the beginning

12   yesterday?

13   A.  Yes.

14   Q.  In the meantime, you got a job on a soap opera, right?

15   A.  Right.

16   Q.  You received an income from that job?

17   A.  Yes.

18   Q.  You had an agent?

19   A.  Yes.

20   Q.  You had a number of family members that lived nearby in the

21   2000s, right?

22   A.  Yes.

23   Q.  And once you had established yourself as an actress with

24   income, you didn't call up the police to let them know what you

25   claimed had happened to you, right?

LC1Qmax4                         Jane - Cross

1   A.  Right.

2   Q.  In the late 2000s, 2007, 2008, you saw on the news that

3   Epstein had been arrested, right?

4   A.  Right.

5   Q.  And charged, right?

6   A.  Yeah.

7   Q.  And so you knew the authorities were investigating

8   Mr. Epstein in 2007, 2008, right?

9   A.  Right.

10  Q.  You didn't pick up the phone then and call the people that

11  you knew were investigating him then, correct?

12  A.  Correct.

13  Q.  You knew how do that, right?

14  A.  Right.

15  Q.  You knew how to get a lawyer?

16  A.  Right.

17  Q.  You chose not do that?

18  A.  Yes.

19  Q.  And you started to see some press that mentioned yourself?

20  A.  Yes.

21  Q.  And so you did hire a lawyer, right?

22  A.  Yes.

23  Q.  And a lot of the press that you saw mentioned about

24  yourself was false, correct?

25  A.  I don't remember what the exact press was.

LC1Qmax4                           Jane - Cross

1    Q.  Were there allegations that you were a Yugoslavian sex

2    slave that you saw on the internet?

3              MS. MOE:  Objection to relevance, your Honor.

4              MS. MENNINGER:  I'm asking if she saw the press?

5              THE COURT:  I'll allow it.

6    A.  I don't remember reading that.

7    Q.  You wanted to stop the press about you, right?

8    A.  Yes.

9    Q.  So you hired an attorney?

10   A.  Yes.

11   Q.  And that was around 2015?

12   A.  Yes, I think so.

13   Q.  You hired a litigator, a tough litigator, right?

14   A.  Yes.

15   Q.  You paid her a lot of money?

16   A.  Yes.

17   Q.  Quarter of a million dollars?

18   A.  No.

19   Q.  Do you recall speaking with the government in December of

20   2019?

21   A.  Yes.

22   Q.  I'm sorry, got that date wrong.  September 2 of 2021, so a

23   few months ago?

24   A.  Yes.

25   Q.  At that time, you said you gave this litigator a quarter of

LC1Qmax4                           Jane - Cross

1    a million dollars?

2    A.  No, that is incorrect.

3    Q.  Why?

4    A.  First of all, I don't have that much money to give away,

5    and it was $25,000.  So maybe it's a typo?

6    Q.  I'm going to have you look at 3509-023.

7    A.  Yeah, I see it.

8    Q.  In the last full paragraph in the middle of the paragraph.

9    A.  Yes.

10   Q.  Does that refresh your recollection that you told the

11   government you did not know you would need a $250,000 retainer?

12   A.  That's not correct because I never said that.  I would not

13   be able to afford to pay anybody that much money for anything.

14   Q.  Well, you paid her some amount of money?

15   A.  Yes.

16   Q.  $25,000?

17   A.  $25,000.

18   Q.  And you did that to help her stop the media about you?

19   A.  Stop people from harassing me and bullying me into trying

20   to give some sort of interview or statement.

21   Q.  Well, you were being approached by lawyers?

22   A.  Yes.

23   Q.  Lawyers for Virginia Roberts, for example?

24   A.  Yes.

25   Q.  You spoke to them?

LC1Qmax4                         Jane - Cross

1    A.   Yes.

2    Q.   You were being approached by the media, right?

3    A.   Yes.

4    Q.   The media was wanting you to give statements, right?

5    A.   Right.

6    Q.   And you could have directed your lawyer to call the

7    government and report this crime you're claiming now, right?

8    A.   I don't know.

9    Q.   You didn't hire her for that purpose, right?

10   A.   No.

11   Q.   You could have, right?

12   A.   I guess I could have, yeah.

13   Q.   In 2019, before Epstein was arrested, you were contacted by

14   Agent Amanda Young, right?

15   A.   Right.

16   Q.   She gave you a call?

17   A.   Yes.

18   Q.   She asked to speak with you, right?

19   A.   Yes.

20   Q.   And you said you were just not interested in getting

21   involved, right?

22   A.   That's right.

23   Q.   And then thereafter, you hired a different attorney, right?

24   A.   Yes.

25   Q.   You hired Mr. Glassman?

LC1Qmax4                       Jane - Cross

1    A.   Yes.

2    Q.   Mr. Glassman is a personal injury lawyer, right?

3    A.   Yes.

4    Q.   Mr. Glassman, touts the very large verdicts that he has

5    received on his web page, correct?

6             MS. MOE:   Objection.

7             THE COURT:   Grounds.

8             MS. MOE:   Hearsay.

9             THE COURT:   Sustained.

10   Q.   Are you aware of Mr. Glassman's advertising?

11   A.   No.

12   Q.   Did you ever look at his website?

13   A.   No.   He's a friend of a friend.

14   Q.   You hired him on September 3 of 2019, correct?

15   A.   I don't know the exact date, but --

16   Q.   Okay.   Let's take a look at J-14.   Do you recognize that

17   document?

18   A.   Yes.

19   Q.   And what is that document?

20   A.   Attorney-client contingent fee contract.

21   Q.   That's between you and Mr. Glassman, right?

22   A.   Yes.

23   Q.   If you could look at the last page, does that refresh your

24   recollection about when you hired Mr. Glassman?

25   A.   Yes.

LC1Qmax4                          Jane - Cross

1    Q.  When did you hire Mr. Glassman?

2    A.  September 3, 2019.

3    Q.  That was two weeks before you met with the government for

4    the first time, right?

5    A.  I don't know those dates.

6    Q.  I want to look back at 3509-001, at the date.  Does looking

7    at the left-hand corner of 001 refresh your recollection about

8    the date that you first met with the government?

9    A.  It doesn't, but if that's what it says, then --

10   Q.  September 19, 2019 seems about right, correct?

11   A.  Correct.

12   Q.  You hired Mr. Glassman before this meeting with the

13   government, right?

14   A.  Right.

15   Q.  Mr. Glassman was at the first meeting with the government,

16   right?

17   A.  Yes.

18   Q.  As well as Mr. Werksman, the second lawyer, right?

19   A.  Right.

20   Q.  And those were both personal injury lawyers that you had

21   selected?

22   A.  Yes.

23   Q.  You didn't hire a lawyer that specializes in victims'

24   rights, correct?

25   A.  I hired a lawyer based on advice from my husband's friend,

LC1Qmax4                      Jane - Cross

1    their friends.

2    Q.  He's not a specialist in criminal law, for example?

3    A.  I guess not.

4    Q.  And you had Mr. Glassman and Mr. Werksman in the first

5    meeting with the government, right?

6    A.  Right.

7              MS. MENNINGER:  May I have one moment, your Honor?

8              THE COURT:  You may.

9              (Pause)

10             MS. MENNINGER:  Your Honor, would this be a good

11   stopping point?

12             THE COURT:  We were having a little issue with the

13   jurors' lunch, so not quite yet.

14             MS. MENNINGER:  Okay.  I'm just trying to find

15   something I can do on a short notice -- a short section.

16             THE COURT:  You can just start another section and

17   we'll break, that's fine.

18             MS. MENNINGER:  I appreciate that.

19   BY MS. MENNINGER:

20   Q.  In the period of time between '99 and 2019, there has been

21   a lot of things that have happened, right?

22   A.  Right.

23   Q.  You have read the press, including stories about yourself,

24   correct?

25   A.  Correct.

LC1Qmax4                          Jane - Cross

Q.  You've read the press about Epstein?

A.  Correct.

Q.  You've talked about the press about Epstein with other

people?

A.  What's that question?

Q.  You've talked about the press about Epstein with other

people?

          MS. MOE:  Objection to form.

Q.  Well, you had discussions --

          MS. MENNINGER:  I'll rephrase, your Honor.  Maybe that

will help.

Q.  You've spoken with your ex-boyfriend you were calling Matt

about Epstein, right?

A.  Yes.

Q.  And you and he watched news reports together, correct?

A.  Yes.

Q.  And you pieced some things together, correct?

A.  I pieced things?  What's the question?  Sorry.

Q.  You and Matt pieced things together based on your review of

press about Epstein, correct?

          MS. MOE:  Objection to form.

          THE COURT:  Overruled.

A.  I don't understand what pieced together means.

Q.  You talked to Virginia Roberts' lawyer, Brad Edwards,

right?

1   A.  Yes.

2   Q.  You talked to Stan Pottinger?

3   A.  Yes.

4   Q.  You know they represent other Epstein accusers, right?

5   A.  Yes.

6   Q.  Your lawyer has spoken to other lawyers?

7         MS. MOE:  Objection.

8         THE COURT:  I suppose you can ask if she knows that.

9   Q.  Do you know whether your lawyer has spoken to other lawyers

10  who represent Epstein accusers?

11  A.  I wouldn't know that.

12  Q.  You've talked to your family members, right?

13  A.  Some of them.

14  Q.  You've talked to your ex-boyfriend, Matt, right?

15  A.  Yes.

16  Q.  And during that period of time, all of the pieces of

17  information and conversations that you've had are part of what

18  you now know about the Epstein case, correct?

19        MS. MOE:  Objection.

20        THE COURT:  Just a moment.

21        One word.  Grounds.

22        MS. MOE:  Form.  Vague and confusing.

23        THE COURT:  Overruled.  You can state the question

24  again.

25  Q.  All of the conversations that you've had and the press that

1    you've read and the people that you've talked to, all of those

2    pieces of information go into what you know about the Epstein

3    case as you sit here today, correct?

4    A.  I wouldn't say it like that, no.

5    Q.  You don't remember all of the things that you've talked

6    about, right?

7    A.  No, I don't remember all the things I talked about.

8    Q.  You don't remember all the things that you read, correct?

9    A.  No.

10   Q.  You don't know all of the websites that you've seen, right?

11   A.  No, I try to avoid those.

12   Q.  But you've read them enough to hire a lawyer to stop some,

13   right?

14   A.  No, that's based more on people calling me, harassing me,

15   calling my husband, harassing him, calling my work, calling my

16   friends.  And I wanted these people to stop calling me and go

17   away.  It's not based on tabloids.  I've been in enough online

18   tabloids.  Being an actor, you read all kinds of stuff about

19   yourself.

20   Q.  You're aware of the media out there about yourself, right?

21   A.  Some of it, yeah.

22   Q.  During your teenage years, you traveled quite frequently,

23   correct?

24   A.  I guess it's all relative, but yeah, I guess.

25   Q.  You traveled back and forth to a country in northern

LC1Qmax4                          Jane - Cross

1   Europe?

2   A.  Yes.

3   Q.  You did that over the holidays?

4   A.  Yes.

5   Q.  With your family?

6   A.  Yes.

7   Q.  You were 15 when you went on one of those trips?

8   A.  I don't remember, but --

9   Q.  I will have you take a look at J-6.  I assume you have not

10  seen this document before?

11  A.  No.

12  Q.  Do you recognize your name on it?

13  A.  Yes.

14  Q.  And do you see certain dates and --

15          MS. MOE:  I'm sorry, your Honor, I don't believe I

16  have J-6.

17          MS. MENNINGER:  I thought you did.  I'm really sorry.

18          MS. MOE:  I'm sorry, I do.  Apologies.

19  Q.  You recognize your name and date of birth on this document?

20  A.  Yes.

21  Q.  And does -- I realize that some of these dates are old, but

22  does looking at this, particularly page 2 towards the bottom,

23  refresh your recollection about trips that you may have taken

24  outside of the country?

25  A.  Do I remember these flights?  Is that the question?

LC1Qmax4                    Jane - Cross

1    Q.  Yes, do you remember taking these trips?

2    A.  I don't remember these in particular.  These are old.  I

3    don't know.

4    Q.  Let me direct your attention to the second from the bottom

5    one.

6    A.  Okay.

7    Q.  Do you recognize those airport codes or the dates of travel

8    indicated there?

9    A.  I don't know what those airport codes are.  If somebody

10   could translate them for me.

11   Q.  Let me ask you this:  In April of 1996, did you take a trip

12   abroad?

13   A.  I don't remember.

14   Q.  How old were you in April of 1996?

15   A.  15.

16   Q.  And do you remember going abroad when you were 15?

17   A.  I don't remember.

18   Q.  Did you ever attend a vocal competition in Italy?

19   A.  Oh, yes.

20   Q.  And that was in April of 1996?

21   A.  I guess it was.

22   Q.  Was it?  I'm asking you.

23   A.  I don't remember.  I was 15.

24   Q.  Okay.  And then there was another trip that you took, maybe

25   you'll recall, in June of 1997.  How old were you in June of

LC1Qmax4                     Jane - Cross

1    1997?

2    A.  16.

3    Q.  Do you remember a trip that you took in June of 1997?

4    A.  I think I may remember what trip this was for, something

5    having to do with a sibling.

6    Q.  None of these trips involved Ghislaine Maxwell, right?

7    A.  No.

8    Q.  You didn't travel abroad with her?

9    A.  No.

10   Q.  And Epstein as well, you didn't travel abroad with him?

11   A.  No.

12   Q.  So, you may have taken a trip related to a sibling in June

13   of 1997 --

14   A.  Yes.

15   Q.  -- when you were 16?

16   A.  Yes.

17   Q.  And then in January of 1998, how old were you?

18   A.  167.

19   Q.  And you took a trip perhaps abroad then.  Do you recall

20   that?

21   A.  January 199 -- maybe a family thing?  I don't remember.

22   I'm sorry.

23   Q.  And then the last one I'll ask about is April of 1998.  Do

24   you remember taking a trip then?

25   A.  No, I don't remember what the trip was.

LC1Qmax4                       Jane – Cross

1    Q.  And how old were you in April of 1998?

2    A.  17.

3    Q.  You continued to travel throughout the 2000s abroad.  Is

4    that right?

5    A.  That's right.

6    Q.  When you were in your -- in the mid-1990s, you participated

7    in a beauty pageant, correct?

8    A.  Embarrassingly enough, so, yes.

9    Q.  A Miss Teen pageant?

10   A.  Yes.

11   Q.  The big one, right?

12   A.  Mmm, fairly big.

13   Q.  And it was associated with Mr. Trump, right?

14   A.  Yes.

15   Q.  And that was in a state that you were in in that time

16   frame, right?

17   A.  Yes.

18   Q.  You were given $2,000 by Epstein for a dress?

19   A.  I don't recall that.

20   Q.  Do you recall being devastated that Epstein only gave you

21   $2,000 for a dress?

22   A.  No, I don't recall that.

23   Q.  Or crying because he only gave you $2,000 for a dress?

24   A.  No, that's ridiculous.  I wouldn't do that.

25   Q.  You performed on a reality show, correct?

LC1Qmax4                           Jane - Cross

1    A.  Yes.

2    Q.  In the 2000s?

3    A.  Yes.

4    Q.  With your ex-boyfriend, Matt?

5    A.  Yes.

6    Q.  And you had cameras in your home, right?

7    A.  Yes.

8    Q.  You had some conflict with your mother during that?

9    A.  Yes.

10   Q.  And you had other friends who were also on the show?

11   A.  Yes.

12   Q.  And the cameras followed you around, right?

13   A.  Yes.

14   Q.  In that show, you talked about roughing it for you would be

15   going to the Four Seasons, something like that?

16   A.  Well, reality shows aren't really reality, so most of it is

17   produced by producers.

18   Q.  And you were paid for that reality show, right?

19   A.  Yes.

20   Q.  In the last few decades, you have supported your family,

21   right?

22   A.  Not all of them, but a few of them, yes.

23   Q.  You have had some of your brothers that have had to live

24   with you?

25   A.  Yes.

LC1Qmax4                          Jane - Cross

1    Q.   Your sister?

2    A.   No.

3    Q.   Has never needed financial support from you?

4    A.   No.

5    Q.   You had your mother living with you, right?

6    A.   Yes.

7    Q.   And she had some financial difficulties, right?

8    A.   Yes.

9    Q.   And you needed to help her with her finances, right?

10   A.   Yes.

11   Q.   I think at one point you claim that you were putting a roof

12   over your family's head, right?

13   A.   I don't know if I used that -- those words, but they lived

14   in my house, yes.

15   Q.   You told that to Matt?

16   A.   Oh, well...

17   Q.   Right?

18   A.   I don't recall if those are the words I told him, but yes,

19   they were living in my house.

20   Q.   And once you hired Mr. Glassman in September of 2019, he

21   talked to you about your decision to cooperate in the criminal

22   case, correct?

23                MS. MOE:  Objection.

24                THE COURT:  Sustained.

25                MS. MENNINGER:  Your Honor, he shared this with the

LC1Qmax4                          Jane - Cross

 1   government.  May we have a sidebar?

 2           THE COURT:  No.  If you want to try to get around

 3   privilege, you'll raise it in advance, as I've made clear.

 4           Sustained.

 5   BY MS. MENNINGER:

 6   Q.  When you decided finally to file a civil lawsuit, that was

 7   in January of 2020, right?

 8   A.  I don't recall the exact date.

 9   Q.  And you filed that under a pseudonym?

10   A.  Yes.

11   Q.  Jane, right?

12   A.  Yes.

13   Q.  And you did that with the help of Mr. Glassman?

14   A.  Yes.

15   Q.  And you sued Ghislaine, right?

16   A.  Yes.

17   Q.  You sued Epstein's estate, correct?

18   A.  Yes.

19   Q.  You also made a claim in the Virgin Islands against

20   Epstein's estate, correct?

21   A.  I don't know.

22   Q.  At some point you made a demand for Ghislaine to pay you

23   money, correct?

24   A.  I don't know what a demand means.

25   Q.  Well, your lawyer sent a letter demanding that she pay you

LC1Qmax4                        Jane - Cross

1  money?

2            MS. MOE:  Objection to foundation.

3            THE COURT:  Sustained.

4  Q.  Do you know whether your lawyer sent Ghislaine a letter

5  demanding money?

6  A.  I don't know that.

7  Q.  You knew at the time you had that civil complaint going,

8  that Ghislaine was charged in this case, correct?

9  A.  Correct.

10  Q.  You also participated in the Epstein Victims' Compensation

11  Program, right?

12  A.  Yes.

13  Q.  And with your lawyer's assistance, you filled out the claim

14  form for that, right?

15            MS. MOE:  Objection.

16            THE COURT:  Sustained.

17  Q.  Did you fill out the claim form?

18  A.  Did I personally?  No.

19  Q.  Did you sign the claim form?

20  A.  Yes.

21  Q.  Did you notarize your signature for the claim form?

22  A.  I don't remember.

23  Q.  Did you attest that everything in the claim form that you

24  submitted was true and accurate?

25  A.  Yes.

LC1Qmax4                    Jane - Cross

1  Q.  In that claim form that you attested was accurate, you were

2  asked whether or not you were participating in the prosecution

3  of any case related to Epstein, right?

4  A.  I don't remember what's in the form.

5  Q.  If I could have you look at Exhibit J-18 on page 6.  And if

6  you need to look at the last page to see your signature, just

7  let us know.

8  A.  Okay.

9  Q.  Do you see question 11?

10  A.  Yes.

11  Q.  And it asks you:  Have you filed litigation against Epstein

12  or the Estate of Epstein, right?

13  A.  Yes.

14  Q.  Or any related entities or individuals, right?

15  A.  Right.

16  Q.  You said yes?

17  A.  Yes.

18  Q.  And you listed your civil case, correct?

19  A.  Correct.

20  Q.  But you also said "refer to the attachment"?

21  A.  Well, I didn't write this, but --

22  Q.  You signed it?

23  A.  I signed it, yeah.

24  Q.  And then the next question, question 12, you were asked

25  whether or not you'd ever been trafficked to and sexually

LC1Qmax4                          Jane - Cross

1    abused by any individuals other than Epstein, correct?

2              MS. MOE:  Your Honor, we're now reading a document

3    that is not in evidence.

4              THE COURT:  Sustained.

5    Q.  Do you recall answering or telling the claims program that

6    you were making a claim against Ms. Maxwell?

7    A.  Yes.

8    Q.  And you were ultimately made an offer by the claims

9    program, right?

10   A.  Yes.

11   Q.  And you were told what that offer was?

12   A.  Yes.

13   Q.  What was that initial offer?

14   A.  $5 million.

15   Q.  Do you know whether your attorney went back and asked for

16   more money?

17   A.  I don't know that.

18   Q.  This year you were wired the money, right, $5 million?

19   A.  Well, not the entirety, no.

20   Q.  I would like to ask you to take a look at Exhibit J-40.  Do

21   you recognize this document?

22   A.  Yes.

23   Q.  And do you recognize the date of the document?

24   A.  Yes.

25   Q.  Do you recognize your name on the document?

LC1Qmax4                          Jane - Cross

1    A.  Yes.

2    Q.  And on the last page, do you recognize your signature?

3    A.  Yes.

4           MS. MENNINGER:  Your Honor, at this time I would move

5    for the admission of this under seal because it has identifying

6    information as Exhibit J-40.

7           MS. MOE:  Your Honor, may we take up this issue during

8    the lunch break?  We object.

9           THE COURT:  Okay.  We'll break for lunch, members of

10   the jury.  We almost have all your lunches in hand.  I'm hoping

11   by the time you get back, everything will be set.  So we'll

12   break about 45 minutes for lunch.  Enjoy your lunch.  Thank

13   you.

14          (Jurors not present)

15          THE COURT:  Everyone may be seated.  Can I have J-40

16   back up so we can discuss?

17          Grounds.

18          MS. MOE:  Thank you, your Honor.

19          We have a 401 and 403 objection to this document.

20   This is a multipage document containing legal terms relating to

21   a civil settlement.

22          To the extent the defense intends to impeach this

23   witness about the fact that she settled a claim and received a

24   sum of money, that's already in the record.

25          This document contains additional and, frankly,

LC1Qmax4                         Jane - Cross

1   complicated legal terms about a settlement agreement between

2   this witness and an estate that's not a party to this case.  We

3   think this document is confusing to the jury and don't

4   understand any potential impeachment relevance of the

5   particular terms of the settlement.

6          MS. MENNINGER:  Your Honor, it's a representative --

7   it's a documentary representative of the amount of money that

8   she received in the settlement.  I don't know what's confusing

9   about that.  I am not going to spend a lot of time arguing some

10  legal clauses or anything like that, but I think our jury is

11  sophisticated enough to know what a settlement agreement looks

12  like and the amount of money that she received.  She's

13  contesting that that's the amount of money she received, but I

14  don't think that precluding us from putting in a document

15  because it has legal language in it is an appropriate --

16         THE COURT:  That's the 403 argument, that it's legal

17  language?

18         MS. MOE:  Yes, your Honor.

19         THE COURT:  The government puts in cooperation

20  agreements all the time.  Those are not the models of clarity.

21         MS. MOE:  Of course, your Honor, and that's certainly

22  true --

23         THE COURT:  This is comparable legal language, isn't

24  it?

25         MS. MOE:  No, your Honor.  I think the difference

1    here, and it's an important one is, as a proponent of the

2    evidence, the defense has the burden of establishing its

3    relevance.  At this point what they've articulated is that they

4    want the exact figure that was disbursed, which this witness

5    has already testified to and --

6              THE COURT:  It's just a document of that agreement.

7    I'm going to overrule this objection.

8              Anything else?

9              MS. MOE:  Your Honor, in our view, this sort of opens

10   the door to a lot of legal issues related to the settlement

11   funds that are not proper before the jury.  It's cumulative of

12   the testimony about this particular figure and would be

13   confusing about its particular terms.

14             THE COURT:  Yes, that's what I just overruled.

15             MS. MOE:  Understood, your Honor.

16             THE COURT:  Anything else to take up?  We'll break for

17   lunch for 45 minutes.  Thank you.

18             And, Ms. Menninger, if you have an argument that

19   you're going to pierce attorney-client privilege --

20             MS. MENNINGER:  Yes, your Honor.  Can we take that up

21   right after lunch in a sidebar?  I believe I have grounds.

22             THE COURT:  You have to speak into the microphone.  It

23   should have been briefed.  I think that would be clear, but,

24   yes, I'll meet with you in 40 minutes.  You'll confer in

25   advance.

LC1Qmax4                        Jane - Cross

1                MS. MENNINGER:  Yes.

2                THE COURT:  As to what the contention is, what the

3       proffer is, and then I'll hear from you.  40 minutes.

4                (Luncheon recess)

5                (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    A F T E R N O O N   S E S S I O N

2                              1:50 P.M.

3              THE COURT:  All right.  Matters to take up?

4              MS. MENNINGER:  Yes, your Honor.

5         May I approach?

6              THE COURT:  Microphone.

7              MS. MENNINGER:  I have one exhibit that relates to the

8    testimony I'd like to --

9              THE COURT:  Okay.

10             MS. MENNINGER:  Your Honor --

11             THE COURT:  Would you come to the --

12             MS. MENNINGER:  Oh, yes.

13             THE COURT:  Take your mask off, if you'd like.

14             MS. MENNINGER:  As with some of the evidence, your

15   Honor, I understand that, when questioned, the witness might

16   deny knowledge about this communication to the government by

17   her attorney, but I would like to ask her if she has knowledge

18   of this communication.

19             THE COURT:  What exact question would you ask?

20             MS. MENNINGER:  Your Honor, I would ask her did she

21   have a communication from her attorney about why she should

22   cooperate and testify at this criminal trial.

23             THE COURT:  Did she have a communication from her

24   attorney about why she should cooperate and testify at this

25   trial.

564

LC1VMAX5                       Jane - cross

1              MS. MENNINGER:  I mean, I could start with the
2    question of does she know whether her attorney shared that with
3    someone else, which is the waiver question, in my mind, anyway.
4    But the ultimate question I would like to get to is her
5    attorney told her that.
6              THE COURT:  Right.  So you want to get to a
7    communication between attorney and client.  It's privileged,
8    right?  And you're arguing that it's been waived or what are
9    you arguing?
10             MS. MENNINGER:  Yes, I'm arguing that it's been waived
11   because it was communicated to the government.
12             THE COURT:  Ms. Moe.
13             MS. MOE:  Thank you, your Honor.
14             I think that question is a few moves down the
15   chessboard.
16             THE COURT:  Could you pull up the microphone, please.
17             MS. MOE:  Yes, your Honor.
18             I think there would be no issue with a question about
19   this witness's understanding of whether the outcome of this
20   case would help in a civil case or whether at the time she
21   decided to cooperate with the government and be interviewed she
22   thought that would help her get money in a civil case.  That
23   would be just a question about whether she had bias and motive;
24   that wouldn't go to issues of attorney-client privilege about
25   her general understanding.  I think the question becomes, if

1    she says no, if a privileged communication with her attorney

2    would be a proper basis for impeachment.

3           On that score, if we get to that scenario, this

4    witness's counsel is in the courtroom.  I've conferred with him

5    about the privilege issue.  My understanding is his view is

6    this is privileged and he'd like to confer with his client

7    about that.  But I think he'd like to be heard on the question

8    of privilege and waiver.  It's not the government's privilege

9    to hold or waive or speak to; and so we'd ask for him to be

10   heard on that question.

11          THE COURT:  Well, I guess it still depends what we're

12   talking about.  What is the "this" in that sentence?

13          MS. MOE:  It sounds like, your Honor, if defense

14   counsel plans to impeach this witness about bias by offering a

15   statement of her attorney to the government, that that

16   implicates a privilege question.  If separately defense counsel

17   plans to ask this witness just generally --

18          THE COURT:  The statement from the attorney to the

19   government is not privileged.  This is not privileged.  The

20   question goes to her communication with her attorney, that's

21   where the privilege is.

22          MS. MOE:  Exactly, your Honor.

23          THE COURT:  I'm not yet seeing the connection between

24   what I -- I don't know what the basis of admissibility would be

25   with respect to this email that's been handed up, which is a

LC1VMAX5                        Jane - cross

1    nonprivileged communication, right, between the attorney and

2    the witness's attorney and the government.

3         MS. MOE:  Yes, your Honor.  That is my note to file

4    about a conversation with Mr. Glassman.  In our view, my notes

5    about a conversation with someone who's not this witness can't

6    be an exhibit at the trial.  There are separate questions about

7    her conversations with her attorneys that implicates other

8    privilege issues.

9         THE COURT:  You don't have any objection to

10   Ms. Menninger asking the witness if she has any awareness of

11   her participation in this criminal proceeding impacting -- what

12   is the underlying question?  Let me just get the underlying

13   question before we get -- Ms. Menninger.

14        MS. MENNINGER:  Your Honor, the underlying question is

15   she expected to get a higher payout in her civil case if she

16   testified in and cooperated in this criminal case.  That's the

17   ultimate underlying issue.

18        THE COURT:  Did she have any basis to believe that by

19   testifying in this criminal case, it would aid the payment she

20   would get in the -- with respect to the fund or the civil case?

21        MS. MENNINGER:  Well, they ultimately became as one.

22   But at the time her initial advice from Mr. Glassman came in,

23   there was not a victims' compensation fund.  That arose during

24   the course of her civil case.  And so --

25        THE COURT:  And the line you're interested in is that

LC1VMAX5                          Jane - cross

1     he mentioned he told her it would help her case?

2            MS. MENNINGER:  Yes, your Honor.  Because prior to

3     that line, he's disclosing that he discussed whether

4     cooperating with the case and then ultimately gets to the

5     question of testifying in the case, he says, were the morally

6     right thing to do.  And they had discussed how testifying at

7     trial was the right thing to do.  He also mentioned that he had

8     told her it would help her case.  It is slightly ambiguous.  I

9     don't know if it refers back to the entirety of the things said

10    before it, but that's what the email or the note says.

11           THE COURT:  Okay.  So you want to ask her if she had

12    any basis to conclude that her participation as a witness here

13    would help her civil litigation recovery prospects.

14           MS. MENNINGER:  Right, your Honor.  If it were a

15    cooperation agreement and a witness had cooperated and someone

16    had promised that they would get a lesser sentence if they

17    cooperated, I can see that also being admissible.  So maybe

18    just the --

19           THE COURT:  The attorney's advice to the client about

20    whether they should take a plea and what assistance that might

21    get them and all of that obviously is privileged.

22           MS. MENNINGER:  It is, until you disclose it to the

23    government.  I totally agree with that, your Honor.

24           THE COURT:  Okay.  So then the question is if she

25    answers yes to that question, I had some reason to believe that

1     it would -- it might have some impact -- my participating would

2     have some impact on the civil litigation, do you have

3     additional questions?

4             MS. MENNINGER:  May I confer, your Honor?

5             THE COURT:  Yes.

6             (Counsel conferred)

7             MS. MENNINGER:  Your Honor, I suppose that there might

8     be additional question -- you know that your lawyer told the

9     government that.

10            THE COURT:  So however she answers that, I suppose you

11    want to ask, Do you know that your lawyer told the government

12    that?

13            MS. MENNINGER:  Yes.

14            THE COURT:  Do you have an objection to the "Do you

15    know that your lawyer told the government that"?

16            MS. MOE:  I'm sorry, your Honor.  I'm trying to follow

17    the logic of trying to impeach a witness by her knowledge of an

18    attorney's statement to the government about a client's

19    intention.  I don't think that tracks the logic of impeachment

20    by bias or by a prior inconsistent statement.  I'm not sure how

21    that establishes impeachment under the rule.

22            THE COURT:  The fact that she knows her lawyer told

23    the government that.

24            MS. MOE:  Your Honor, that appears to be an end-run

25    around getting in her conversations with her attorney.  Because

LC1VMAX5                          Jane - cross

the question is, Are you aware that your attorney made a

statement to the government about his conversation with you

about your expected outcome in the case.

THE COURT:  Well, okay.  At the first step, you agree

they can ask if she had any basis to believe that her

participation as a witness here would have any impact on her

potential compensation in civil litigation.  You don't object

to that question?

MS. MOE:  No, your Honor, no objection.

THE COURT:  So then we have what if she says yes and

what if she says no.  So if she says yes, their follow-up

question is, Are you aware that your attorney told the

government that?

I think I agree with you.  I don't know what the

relevance of that is.  And it is an attorney-client

communication.

What's the relevance of whether she knows her attorney

told the government that?

MS. MENNINGER:  Your Honor, I think it gets into her

expectations that she -- that the government knows that she

knows.  And so at that point she's testifying with an

expectation that -- you know, if the government doesn't -- is

unaware of her attorney's advice, then it's just a secret

between her and her attorney.  But if the government who is

calling her to testify is aware of her plan, intent to get more

LC1VMAX5                        Jane - cross

1   money by testifying in the criminal case, that can affect, you

2   know, whether or not it's an appropriate -- you know, whether

3   the witness has an expectation that is somewhat colored by the

4   government's plan or putting them on the stand, you know,

5   knowing that.  It's an issue of whether the witness is coming

6   and testifying knowing that the person who's calling them to

7   the stand is aware of this whole plan to get more money from

8   the civil case by testifying here.

9         THE COURT:  What does that tell us at all about her

10  motivation?  The two pieces aren't linking up.  There's does

11  she have in her mind that testifying might help her in the

12  civil case.  The answer to that is yes.  I don't see -- it

13  seems to me it's potentially -- it's attorney-client privilege

14  issues because it's about what her attorney communicated to

15  her.  And it's hard to see any additional relevance that comes

16  from whether the fact -- whether the government knew -- whether

17  she knew that the government knew that she believed that -- or

18  testifying would help her civil case, because it doesn't link

19  up to the benefit part.

20        So I think the first question would be fine.  If the

21  answer is yes, my inclination is not to allow the second

22  question on both privilege, 401/403 grounds.  So then the

23  question is if the answer is no, then what do you propose?

24        MS. MENNINGER:  Your Honor, as with some of the other

25  issues in this case, if she says no, I think that there is

1    evidence that could be put on extrinsically, specifically, her

2    attorney's testimony.

3           THE COURT:  So you want to then call her attorney and

4    ask her attorney if he told her, advised her that if she

5    participated in this case, she would -- it would help her in

6    the civil case.

7           MS. MENNINGER:  Right.  Because that is the only

8    portion that was waived.  That's what he -- whatever he

9    communicated to the government is what was waived.  I don't

10   think he's waived -- I'm not arguing for subject matter waiver,

11   for example.

12          THE COURT:  So, first of all, as I've said before, you

13   have to brief that.  This is not enough.  I haven't looked at

14   any law on that question.  You've put none before me.  I made

15   very clear you'd have to brief it.  So we're not doing that

16   today.

17          MS. MENNINGER:  No, I understand, your Honor.

18          THE COURT:  Ms. Moe, what's your response to the

19   waiver question?

20          MS. MOE:  Your Honor, having not had an opportunity to

21   research it or consider it or confer with Mr. Glassman, who --

22   it's not my privilege to hold, so I can't speak to its waiver

23   without researching the issue and conferring with Mr. Glassman.

24          THE COURT:  The government not infrequently objects to

25   privilege grounds to questions during trial.  So the government

1    certainly has a position, I'm sure.

2                 MS. MOE:  Yes, your Honor.

3                 I would just want to make sure I was conferring with

4    her counsel about that issue and being mindful.

5                 Broadly speaking, your Honor, to the extent this

6    evidence is offered for the purpose of impeaching the

7    credibility of the prosecutors in this case, which is what I

8    think what Ms. Menninger was suggesting, I think that would be

9    entirely improper.

10                THE COURT:  I think that's, in part, like the

11   mysterious implication of the second question that I said I

12   wouldn't allow.

13                MS. MOE:  Yes, your Honor.

14                THE COURT:  Because it just doesn't match up to

15   anything in motivating her.

16                So we know where the branch of the tree ends.  If the

17   question is yes, that's the end of it.  If the question is no,

18   then it sounds like we're done with this witness with that

19   question.  And then you're going to brief calling her lawyer

20   only on the question of whether he told the government that her

21   participating -- testifying would help her civil case.

22                MS. MENNINGER:  He told her that.  No, he told Jane

23   that.

24                THE COURT:  Right.

25                MS. MENNINGER:  Yes.  And, your Honor, that would be

LC1VMAX5                          Jane - cross

1    something to -- I mean would be --

2              THE COURT:  It would be waiver argument.  You're going

3    to brief waiver as to that on the basis that he told that to

4    the government.

5              MS. MENNINGER:  Exactly.  The waiver was the telling

6    to the government.  The question for him on the stand would be

7    what he told his client.  But the briefing would be on the

8    waiver question.

9              THE COURT:  Well, right.  But whether he waived --

10   whether the privilege -- it's the client's to waive, I think.

11   That will be part of the briefing, I suppose.

12             Okay.  But if the answer is no, you don't have

13   anything further for this witness?

14             MS. MENNINGER:  I understand, your Honor.

15             THE COURT:  That was a question.

16             MS. MENNINGER:  Yes, that's right.  I understood your

17   Honor to say there is no other question, so I --

18             THE COURT:  Well, no, it was a question.  If she says

19   no, do you have other questions for her?

20             MS. MENNINGER:  On this topic, no.

21             On other topics, yes.

22             THE COURT:  Yes, of course.

23             MS. MENNINGER:  Okay.

24             THE COURT:  I think Ms. Moe had something.

25             MS. MOE:  Yes, your Honor.

LC1VMAX5                          Jane - cross

1          Just to facilitate clarity with respect to the

2     threshold question here about the witness, about her

3     understanding if the question is phrased as her understanding

4     about testifying at trial today and the effect of a civil case,

5     I think the answer to that question has to be no because there

6     is no civil case, there is no pending claim, it's all been

7     resolved.

8          And so I just wanted to clarify whether the question

9     is at the time she started meeting with the government was that

10    her understanding, while the case was active, or whether the

11    question will be about her testimony here at trial.

12         Jane has testified on direct that her understanding is

13    she has no financial stake in the outcome of this case.  The

14    civil matter is resolved and the verdict in this case won't

15    affect what she's received from those settlements.  And so I

16    just wanted to clarify in terms of how that question is phrased

17    and what we're getting at about the issue about testifying at

18    trial or her initial decision to cooperate with the government.

19         THE COURT:  Fair enough.

20         MS. MENNINGER:  That's fair.

21         In the paragraph itself it refers to cooperating with

22    the case and it refers to testifying.  So I think any reason to

23    believe either one of those --

24         THE COURT:  Can you just give us the specific

25    question.

LC1VMAX5                     Jane - cross

1        MS. MENNINGER:  Do you have any basis to believe --

2    any reason to believe that your cooperation would help with

3    this case, would help you with your civil case, that's one

4    question.

5        The other is do you have any reason --

6        THE COURT:  I'm sorry.  I don't think that

7    clarifies -- I think it's unclarifying on two points that

8    Ms. Moe has raised.

9        MS. MENNINGER:  Okay.

10        THE COURT:  One, cooperating in this case, meaning by

11    testifying or more broadly.  And two, since she no longer has a

12    pending civil case, I think she'd probably be left wondering

13    what you're referring to.

14        Can you clarify the question -- I think what you're

15    asking is at any point during your -- at any point in your

16    cooperation with the government -- "cooperation" is loaded

17    because it's not like there's a cooperation agreement or

18    something.  But for lack of a better term, cooperating with the

19    government with respect to this criminal case, did you ever

20    have an understanding that it might benefit you in what was

21    then a pending civil litigation?

22        Ms. Moe, is that getting at what you're suggesting?

23        MS. MOE:  Yes, your Honor.  I just wanted to make sure

24    it was clear for the witness.

25        THE COURT:  Okay.

LC1VMAX5                     Jane - cross

1          MS. MOE:  Thank you.

2          THE COURT:  Ms. Menninger, is that getting at what you

3   are suggesting?

4          MS. MENNINGER:  It is.  I believe that he also

5   communicated that testifying would benefit her in the criminal

6   case.

7          THE COURT:  Okay.

8          MS. MENNINGER:  And so I'm not privy to whether, you

9   know, at what point in time --

10         THE COURT:  How about did you ever have an

11  understanding that any cooperation with the government,

12  including testifying in this trial, would aid you in any way in

13  your efforts to recover in the then-pending civil litigation?

14  Does that get at it, Ms. Menninger?  I'm not disputing that you

15  should ask the question.  I agree with Ms. Moe there's points

16  for confusion, so let's just --

17         MS. MENNINGER:  I think it does, your Honor.

18         I would have to kind of -- I would like to just write

19  out the question so I understand.  But I do think, as I

20  mentioned a little bit earlier, because the civil litigation

21  morphed into the victims' comp fund, there may be a similar

22  question with respect to the comp fund.  But I think I can

23  draft this language and we could -- I can tell your Honor what

24  it is in just a minute.

25         THE COURT:  Okay.

1           (Pause)

2           THE COURT:  What else do we need to take up?

3           MS. MOE:  Your Honor, I'm not quite sure about the

4    timing for the length of cross, but I did want to just remind

5    the Court that the next witness raises the prior consistent

6    statements issues we discussed at the conclusion of the Court

7    day yesterday.

8           THE COURT:  I'm sorry, that what?

9           MS. MOE:  That the next witness we anticipate calling

10   would be the witness identified as Matt.  And so just wanted to

11   tee up any issues relating to prior consistent statements.

12          THE COURT:  I think where we left it was that, as

13   Ms. Sternheim said, we'll evaluate when you seek to introduce a

14   prior consistent statement whether, in fact, it's consistent

15   and whether they have attacked the veracity of that and, if

16   not, you won't object.

17          MS. STERNHEIM:  Right.

18          THE COURT:  And if they do object, I'll decide.

19          MS. MOE:  Yes, your Honor.

20          I just wanted to clear that in advance.

21          THE COURT:  Thank you.

22          Okay.  What do you have, Ms. Menninger?

23          MS. MENNINGER:  Under the authority of Rule 611(c), I

24   have redrafted it into a leading question, if that's

25   permissible, your Honor.  And what I would ask is --

LC1VMAX5                        Jane - cross

 1           THE COURT:  It's cross, so --

 2           MS. MENNINGER:  Right.  Why not?

 3           -- you knew that cooperating with the government,

 4   including testifying, would benefit you in your civil

 5   litigation against the Estate of Epstein and Ms. Maxwell?  And

 6   then the same question with respect to the victims'

 7   compensation fund.

 8           THE COURT:  I'll never win this argument with a

 9   lawyer, but I always think it's a better question just to ask

10   them did you know.  But you do you.

11           Okay.  Any objection to that question?

12           MS. MOE:  No, your Honor.

13           THE COURT:  And the same formed question with respect

14   to the victim compensation fund?

15           MS. MOE:  Yes, your Honor.

16           THE COURT:  Okay.  Good.

17           Anything else we can take up?  And if not --

18           MS. MOE:  Your Honor, if possible, it would be helpful

19   to have a sense of timing for the duration of cross for timing

20   of next witnesses.

21           THE COURT:  Okay.  Ms. Menninger?

22           You took your foot off the gas for about the last half

23   an hour there.  Was that because you were looking forward to

24   have some time during lunch or --

25           MS. MENNINGER:  No, your Honor.  I have low blood

LC1VMAX5                         Jane - cross

1    sugar.  Sorry.  I did revive myself with a Diet Coke.

2              Your Honor, I think I would estimate about 45 minutes.

3              THE COURT:  Okay.  And then, Ms. Moe, do you

4    anticipate substantial redirect?

5              MS. MOE:  I do anticipate redirect, but I don't

6    anticipate it being lengthy.

7              THE COURT:  Okay.  We have a plan.

8              I think we can get the jury.

9              And we can bring the witness back up please.

10             (Witness present)

11             (Jury present)

12             THE COURT:  Thank you for your patience, members of

13   the jury.  I hope you had a nice lunch.  And we will continue

14   with the cross-examination of Witness Jane.

15             Jane, I remind you you are under oath.

16             Ms. Menninger, you may continue.

17             MS. MENNINGER:  Thank you, your Honor.

18   JANE, resumed.

19   BY MS. MENNINGER:

20   Q.  I want to go back to something I needed to skip earlier.  I

21   was asking you about whether or not you had traveled on Jeffrey

22   Epstein's expense commercially after you moved to Los Angeles.

23   And I started to show you Exhibit J-37, so I'd like to do that

24   and go to page 13, about three-quarters of the way down.

25             See if you recognize your name.

LC1VMAX5                    Jane - cross

1    A.  Yes.

2    Q.  And the date associated with your name?

3    A.  4/17/2000.

4    Q.  And the amount?

5    A.  $343.

6    Q.  Does that refresh your recollection that you were -- a trip

7    was paid for you in April of 2000 for $343?

8    A.  No, it doesn't.

9    Q.  Do you think that looking at other pages of your travel

10   would refresh your recollection?

11            MS. MOE:  Objection.

12            MS. MENNINGER:  If the answer is no, I'm planning on

13   moving on, your Honor.  I can show other ones.

14            THE COURT:  Is there anything that would refresh your

15   recollection?

16            THE WITNESS:  No.

17   Q.  We were talking a little bit earlier about your decision to

18   testify in this case and cooperate with this case.  You met

19   with the government, I think we established, ten or more times

20   over the last couple of years.  Is that fair?

21   A.  Something like that.

22   Q.  And in each of those meetings, you had your attorney with

23   you or the vast majority of those meetings?

24   A.  Yes.

25   Q.  Your attorneys are Mr. Glassman and Mr. Werksman, right?

LC1VMAX5                        Jane – cross

1    A.  Mr. Glassman.

2    Q.  At any point during your cooperation with the government,

3    including testifying, you knew that your cooperation with the

4    government, including testifying, would benefit you in your

5    civil litigation against the Epstein estate and Ms. Maxwell;

6    correct?

7    A.  No, I don't know that.

8    Q.  You knew that cooperation with the government, including

9    testifying, would benefit you in your claim for the victims'

10   compensation fund; correct?

11   A.  No, I don't know that.

12   Q.  Yesterday, you testified a bit about your inability to

13   speak with your mother about what happened -- you say happened

14   between you and Epstein; correct?

15   A.  Correct.

16   Q.  You testified that you and your mother did not have that

17   kind of relationship, right?

18   A.  That's right.

19   Q.  You testified that you were raised in a household where you

20   would be in trouble if you said something, right?

21   A.  Said something about what?  Can you clarify?

22   Q.  Something personal.

23   A.  Something, yeah, that personal, yes.

24   Q.  And the effect on you is you felt you could not tell your

25   mother about Epstein, right?

LC1VMAX5                          Jane - cross

1    A.  Yes.

2    Q.  You told the jury about an incident with your guidance

3    counsellor, right?

4    A.  Yes.

5    Q.  Where you got in trouble --

6    A.  Yes.

7    Q.  -- for telling the guidance counsellor that your mother was

8    unavailable and unsupportive, right?

9    A.  Yes.

10   Q.  So when you were in high school and you were mine, you

11   didn't feel like your mother would get your back if you told

12   her about Epstein's misconduct, right?

13   A.  Yes.

14   Q.  And your mother would not want you to report that to

15   others, right?

16   A.  Right.

17   Q.  I want to ask you about another incident that happened when

18   you were at the Palm Beach School of the Arts.  Do you remember

19   a time when you claim a teacher pulled your hair?

20   A.  Yeah.

21   Q.  You recall telling your mother about the teacher pulling

22   your hair?

23   A.  Yes.

24   Q.  You recall your mother hiring a lawyer for you?

25   A.  I don't know that.

Q.   You recall you and your mother filing a lawsuit against

your teacher?

A.   I didn't know that.

Q.   I'd like to show you a couple of exhibits.  They've been

marked for identification purposes as J-7 and J-9.

          I'd like to show you what's been marked for

identification purposes, this J-7, second page.  Does that

refresh your recollection that you sued your teacher for

pulling your hair on one occasion?

A.   No, I had no idea my mother did this.

Q.   I'm going to show you Exhibit J-10 -- I apologize, J-9.

          MS. MENNINGER:  Your Honor, we have the original of

this document present in the courtroom.  This one is redacted

for the name, but, if it's necessary, may I approach the

witness?

          THE COURT:  Show it to the government.

          Ms. Menninger.

          MS. MENNINGER:  Your Honor, what we have is an

original of a document that was certified.  It's been marked --

those two pieces have been marked J-8 and J-9.  But they are

combined as originals from the Court; it is one document.

          THE COURT:  Okay.

          MS. MENNINGER:  So I wanted the record to be clear

what I would be showing the witness.

          THE COURT:  You're showing her a combination of J-8

LC1VMAX5                        Jane - cross

1   and J-9.

2           MS. MENNINGER:  Yes, your Honor, that are unredacted.

3           THE COURT:  Yes.  Without objection, Ms. Moe?

4           MS. MOE:  No objection, your Honor.

5           THE WITNESS:  Okay.

6   BY MS. MENNINGER:

7   Q.  Does looking at that document refresh your recollection

8   about a lawsuit that you and your mother filed against your

9   teacher?

10  A.  No, I literally had no idea she did this.

11  Q.  You recognize the name of the teacher --

12  A.  Yes.

13  Q.  -- as the same person who was on your Interlochen

14  application we looked at earlier; correct?

15  A.  Yes.

16          MS. MOE:  Objection, your Honor.  We're now testifying

17  about documents not in evidence.

18          THE COURT:  That's true.

19          I'll allow that question and then you're not going to

20  do more.  You asked if it refreshed her recollection.  The

21  answer is clearly -- is no.  She's answered the same way.

22          So let's go.

23          MS. MENNINGER:  I'm a little unclear, your Honor.  And

24  I don't know if we need a sidebar, because there are two other

25  names that -- without my saying them out loud to ask her if she

LC1VMAX5                          Jane - cross

1     remembers who those persons are.

2                    THE COURT:  Well, so you want to point her somewhere

3     in the document and say, Do you recognize a name?

4                    MS. MENNINGER:  If I could -- I'll try to do it

5     without naming the names because I don't know if that's a

6     problem.

7                    THE COURT:  Right.

8                    MS. MENNINGER:  But on J-7, on the second page, they

9     are in the first paragraph.  And I'm just going to direct the

10    witness to that line so that we can see the names.

11    BY MS. MENNINGER:

12    Q.  Do you recognize the names of the persons in that first

13    paragraph?

14    A.  I remember my teacher, I remember the principal.  I don't

15    remember the guidance counsellor.

16    Q.  And do you know whether you and your mother sued the

17    principal of your high school?

18    A.  No, I don't.  And we're friends on Facebook, so I had no

19    idea that we even had an issue.

20                    MS. MENNINGER:  Your Honor, at this time I would offer

21    into evidence the originals of the document that is a combined

22    document of Exhibits J-8 and J-9.  I think the Court can take

23    judicial notice.  They are certified copies.

24                    THE COURT:  You're moving J-8 and J-9?

25                    MS. MENNINGER:  Well, in the combined original exhibit

LC1VMAX5                          Jane – cross

1     would be the court exhibit, your Honor.

2               THE COURT:  Right.

3               MS. MOE:  I object, your Honor, both on relevance and

4     foundation grounds.

5               THE COURT:  I'll take a look at the document and then

6     we'll move on.

7               MS. MENNINGER:  Okay.

8               THE COURT:  Can I have the witness's copy?

9               Go ahead.

10              MS. MENNINGER:  Thank you, your Honor.

11    BY MS. MENNINGER:

12    Q.  You consider yourself an actor?

13    A.  Yes.

14    Q.  An actor plays the role of a fictional character --

15    A.  Yes.

16    Q.  -- for a living?

17    A.  Yes.

18    Q.  An actor endeavors to effectively communicate the character

19    they are playing to an audience?

20    A.  Yes.

21    Q.  Using their voice, body, actions, right?

22    A.  Yes.

23    Q.  An actor takes lines borrowed from a writer and uses those

24    lines to convincingly portray someone else in front of an

25    audience; correct?

LC1VMAX5                        Jane - cross

1    A.  Yes.

2    Q.  Been an actor for a very long time?

3    A.  Yes.

4    Q.  Since middle school?

5    A.  Yes.

6    Q.  You performed numerous times as a teenager?

7    A.  More singing than acting, but yes.

8    Q.  You traveled away from school to perform?

9    A.  Yes.

10   Q.  You performed around the state?

11   A.  Yes.

12   Q.  You competed internationally?

13   A.  This was all singing though, but yes.

14   Q.  What?

15   A.  This was all singing, but yes.

16   Q.  You performed at a number of different venues?

17   A.  Yes.

18   Q.  You received coverage in the local newspapers; correct?

19   A.  Yes.

20   Q.  Before you began your senior year of high school, you had a

21   professional agent?

22   A.  Somewhere in the senior year, yes.

23   Q.  Before your senior year.

24   A.  I don't recall if it was before or during.

25           MS. MENNINGER:  If we could show the witness

LC1VMAX5                          Jane - cross

1    Government Exhibit 761 at page 4.

2              THE COURT:  It's been admitted?

3              MS. MENNINGER:  Not yet, your Honor.  I was just going

4    to use it to refresh.  I believe there's a witness coming

5    today.

6    Q.  Do you recognize that document?

7    A.  Yes.

8    Q.  You do?

9    A.  Yes.

10   Q.  And what is it?

11   A.  Well, I actually don't -- can you go back to the first

12   page?  I recognize that I wrote this.  I don't know what the

13   document is.

14   Q.  Okay.

15   A.  Okay.  Yes.

16   Q.  And you see the date on there?

17   A.  Yes.

18   Q.  And that was before you were a senior?

19   A.  Yes.

20   Q.  And then if you go to page 4, you listed your agent;

21   correct?

22   A.  Actually, that was a manager, that's why it was -- I didn't

23   remember.  I had a manager, not an agent.

24   Q.  But you got an agent in your senior year?

25   A.  Yes.

LC1VMAX5                          Jane - cross

1    Q.  You got a manager and an agent by your senior year?

2    A.  Yes.

3    Q.  All right.  And you moved to New York for the purpose of

4    going to that high school here; correct?

5    A.  Not to go to that high school.  The high school wasn't a

6    performing arts school; it just was a private school.

7    Q.  Professional Children's School?

8    A.  Yes.  It was for kids who were seeking professions in --

9    entertainment professions.  And if they booked a job, then the

10   school would work with them of sending them homework, but we

11   didn't do any arts in that school.

12   Q.  I see.  Thank you for that clarification.

13        And you did have work in your senior year; correct?

14   A.  I did not, actually, not till after I graduated.

15   Q.  Okay.  You don't remember any school notes in which they

16   commented that you had been missing a lot of school because of

17   your work in your first quarter at that school?

18   A.  They might have written those notes that I was working, but

19   I was not working.

20   Q.  That you were working, but you weren't?

21   A.  No, I was skipping school.

22   Q.  Later in your -- after your senior year, you got this job

23   in Los Angeles, right?

24   A.  Yes.

25   Q.  And you moved to Los Angeles to work on the soap opera?

LC1VMAX5                          Jane - cross

1    A.   Yes.

2    Q.   And you recently commemorated 20 --

3    A.   -- something years, yes.

4    Q.   Twenty-something years on that show.

5              A soap opera is characterized by tangled interpersonal

6    situations, fair enough?

7    A.   It's a very eloquent way to put it, I guess.

8    Q.   And melodramatic are sentimental treatment of those

9    interpersonal situations, right?

10   A.   Hopefully, not melodramatic, just dramatic.

11   Q.   Your character has been involved in a number of different

12   plot lines over those 20-something years, fair?

13   A.   Naturally, yes.

14   Q.   You've played a protective mom?

15   A.   Yes.

16   Q.   You've been bullied?

17   A.   Yes.

18   Q.   You've battled cancer?

19   A.   Yes.

20   Q.   You've played a car crash victim?

21   A.   I forgot about that one, but yes.

22   Q.   Mental health issues?

23   A.   Yes.

24   Q.   You've been stalked by serial killers?

25   A.   Yes.

1  Q.  You played a prostitute?

2  A.  Not my favorite storyline.

3  Q.  You ran a restaurant?

4  A.  Yes.

5  Q.  You took down a Mexican drug cartel?

6  A.  Yes.

7  Q.  Essentially, there's no melodramatic role that you haven't

8  played?

9  A.  If you want to call it melodramatic.  I just say dramatic,

10 but yeah.

11 Q.  It involves a significant amount of drama; correct?

12 A.  Yes.

13 Q.  You're able to cry on command?

14 A.  No, not always.  It's not really how it works.

15 Q.  You express pain through your characters?

16 A.  Yeah, of course.

17 Q.  Vulnerability?

18 A.  Yes.

19 Q.  The job you've trained for for a long time, right?

20 A.  Yes.

21 Q.  You've been hired to work on other TV shows and series,

22 right?

23 A.  Yes.

24 Q.  A feature-length movie?

25 A.  Yes.

LC1VMAX5                    Jane - cross

1   Q.  Christmas specials, a wide range, right?

2   A.  No Christmas special yet, I don't think, but yeah.

3   Q.  You had a reality show we talked about a little while ago?

4   A.  Unfortunately, yes.

5   Q.  Which was not real?

6   A.  No, it's not real.

7   Q.  Your accusations in this case depend significantly on

8   you -- your memory that you were 14 when you met Epstein;

9   correct?

10  A.  Correct.

11  Q.  You repeated it a number of times on the stand, right?

12  A.  Right.

13  Q.  Well, actually, when you first met with the government, you

14  told them that you were 13 when you met Epstein, right?

15  A.  No, I said I might have been 13 going on 14; because my

16  birthday is in August, and I believe I met them earlier in the

17  summer.  So it was just a small technicality, I guess.

18  Q.  Well, in your civil complaint in the first paragraph, you

19  said it all started in 1994, when 13-year-old Jane met Epstein

20  and Maxwell; correct?

21  A.  Correct.  I was 13 in June and July.

22  Q.  You didn't say "13, going on 14."

23  A.  I don't know.  I don't know.

24  Q.  Okay.  Do you want to take a look at 3509-007, paragraph 1.

25  A.  Okay.

LC1VMAX5                    Jane - cross

1    Q.  And there you just said you were 13, right?

2    A.  It says there that I'm 13, yeah.

3    Q.  And that was what was filed by your attorney in court?

4    A.  Yes.

5    Q.  And you told the government 13, but later they refreshed

6    your memory that maybe you were 14, right?

7    A.  No, I always from the beginning said 13, but I turned 14

8    that summer.

9    Q.  Okay.  I'll have you take a look at 3509-008, page 11.  And

10   looking at that, do you recall the government asking you --

11              THE COURT:  Where?

12              MS. MENNINGER:  I apologize.  The second from the --

13   second full paragraph from the bottom up.

14   Q.  Does that refresh your recollection about a conversation

15   you had with the government?

16   A.  No, because I didn't write any of this.  The second half of

17   that makes sense, which is I was probably 13.  And it says here

18   that I turned 14 that summer.

19   Q.  So you were not asked if it was possible that you met

20   Epstein after you turned 14?

21   A.  I don't remember.

22   Q.  But I understand now you're saying you believe you were 14

23   because it was later in the summer, right?

24   A.  What was later in the summer?

25   Q.  When you met Epstein.

1    A.  No, I said it was earlier in the summer.

2    Q.  Okay.  So you thought you met him earlier in the summer?

3    A.  Yes.

4    Q.  And then we talked about *The Lion King*, where you thought

5    you were 14 when you saw the Broadway show, but then realized

6    you were not; correct?

7    A.  Correct.

8    Q.  It actually came out when you were 17; correct?

9    A.  Correct.

10   Q.  Now, you recall meeting Mike Wallace of *60 Minutes* fame in

11   New York, right?

12   A.  Yes.

13   Q.  And you believed that you were 15 when you met him?

14   A.  I don't remember.

15   Q.  You met him with Epstein, I should clarify, right?

16   A.  Yes.

17   Q.  And your first meeting with the government -- I'll have you

18   look at 3509-001 on page 5 in the middle of the page.

19   A.  I see it.

20   Q.  And you told the government about meeting Mike Wallace?

21   A.  Yes.

22   Q.  And that was Mike Wallace's 80th birthday party; correct?

23   A.  I think so.

24   Q.  And you came in and said happy birthday to Mr. Wallace;

25   correct?

LC1VMAX5                    Jane - cross

1   A.  I sang *Happy Birthday*, yes.

2   Q.  And that's when you were 15?

3   A.  I'm not sure.  That's why it says approximately.  I

4   couldn't remember, and I don't know how old Mike Wallace was

5   when --

6   Q.  Okay.

7   A.  -- is now or he's passed away.

8   Q.  He has passed away.

9   A.  Passed away.

10  Q.  You recall it being his 80th birthday party though;

11  correct?

12  A.  Yes.

13  Q.  Okay.  And you don't know what his birthday is, I think you

14  just said; correct?

15  A.  No, I don't know.

16  Q.  If I can have you take a look at J-33, on the right side.

17  Do you have any reason to believe that that birthday is

18  incorrect?

19          MS. MOE:  Objection.

20          THE COURT:  Sustained.

21  Q.  Does it refresh your recollection?

22          MS. MOE:  Objection.

23          THE COURT:  Sustained.  No basis for refreshing.

24  Q.  It's true that Mike Wallace's birthday party, 80th birthday

25  party, was in May of 1998; correct?

```
 1              MS. MOE:  Objection.

 2              THE COURT:  Overruled.

 3   A.  I don't remember.

 4   Q.  You might have been 15 or it might have been some other

 5   date, right?

 6   A.  Right.

 7   Q.  You moved to New York in or around 1998, right?

 8   A.  Yes.

 9   Q.  And you went to your senior year here from '98 to '99?

10   A.  Yes.

11   Q.  What you put in your civil complaint is that you moved to

12   New York in 1996 to go to school here; correct?

13   A.  I don't remember saying that.

14   Q.  Let's go back to 3509-007, paragraph 20.  And in your civil

15   complaint, you alleged that you moved to New York in 1996 when

16   you were 16; correct?

17   A.  No, I don't think I said that, because I didn't move to New

18   York then.

19   Q.  Do you want to look at the first page of this?

20   A.  No, I -- I know.  I know what it is.

21   Q.  You know your lawyer signed it?

22   A.  Yes.

23   Q.  The lawyer that you met with the government with multiple

24   times, right?

25   A.  Yes.
```

LC1VMAX5                          Jane - cross

1           MS. MENNINGER:  If I could have one moment, your

2    Honor.

3           THE COURT:  You may.

4           (Counsel conferred)

5    BY MS. MENNINGER:

6    Q.  In this civil case -- just a moment.

7           In your civil case, you were given something called

8    interrogatories.  Do you know what those are?

9    A.  No.

10   Q.  They are questions for you to answer under oath.  Does that

11   ring a bell?

12   A.  No.

13   Q.  Do you recall answering any questions under oath?

14   A.  No.

15   Q.  Do you know what your lawyer put down as your answers under

16   oath to any particular questions?

17   A.  No.

18   Q.  I'm going to show you a document that we have marked as

19   J-15.  I have one that's redacted, but if you would like to see

20   the entire document, just let us know.  We have that available.

21          Do you recognize the caption on this case?

22   A.  Yes.

23   Q.  Is this your lawsuit that you filed?

24   A.  Yes.

25   Q.  And this is signed by your attorney in June of 2020;

LC1VMAX5                          Jane - cross

1  correct?

2  A.  I don't see a date.

3  Q.  On the last page.  Sorry.  I forgot you didn't have --

4  A.  Yes.

5  Q.  And in June of 2020, you answered, through your attorney,

6  interrogatories, right?

7  A.  Right.

8  Q.  And interrogatory number nine, if I could have you turn to

9  that, on page 4, asked you to identify all persons other than

10 decedent, Mr. Epstein, who have ever committed or attempted to

11 commit sexual misconduct or offenses against or otherwise

12 concerning you, including, without limitation, any unwelcome

13 behavior of a sexual nature, sexual abuse, sexual assault,

14 threats or intimidation of a sexual nature or sexual

15 exploitation, regardless of whether the misconduct or offenses

16 involved physical touching, and you responded none.  Correct?

17         MS. MOE:  Objection.

18         THE COURT:  Are you moving this?

19         MS. MENNINGER:  Yes, your Honor, this interrogatory.

20         MS. MOE:  Your Honor, I think the record is that this

21 witness doesn't recognize it, doesn't know anything about it,

22 and so for that reason we'd object.

23         MS. MENNINGER:  Your Honor, it's a legally binding

24 document.

25         THE COURT:  Can I see the whole document?

LC1VMAX5                          Jane – cross

1              MS. MENNINGER:  Yes, your Honor.

2              THE COURT:  Are you making an authentication

3      objection?

4              MS. MOE:  Your Honor, it's about relevance and

5      personal knowledge.  She's being asked about --

6              THE COURT:  Yes, I understand.

7              MS. MOE:  Thank you.

8              THE COURT:  Overruled.

9              J-15 is admitted.

10             (Defendant's Exhibit J-15 received in evidence)

11             MS. MENNINGER:  Thank you.  No further questions.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

LC1Qmax6                          Jane - Redirect

1          THE COURT:  Let me just ask about J-8, the combined

2     J-8 and J-9.  I'll overrule the objection, and it's admitted.

3          MS. MENNINGER:  Thank you, your Honor.

4          (Defendant's Exhibits J-8 and J-9 received in

5     evidence)

6          THE COURT:  Redirect.

7          MS. MOE:  Thank you, your Honor.

8     REDIRECT EXAMINATION

9     BY MS. MOE:

10    Q.  Since we were just talking about Defendant's Exhibits J-15,

11    I just want to be clear, do you recognize this document?

12    A.  I don't have a document in front of me.  Which one, this

13    last one?

14    Q.  Yes.

15    A.  No.

16    Q.  Did you write this?

17    A.  No.

18         MS. MOE:  Your Honor, may I proceed?

19         THE COURT:  Yes.

20         MS. MOE:  Thank you.

21    Q.  Jane, you were asked questions on cross-examination about

22    your meetings with the government.  Do you remember being asked

23    about that?

24    A.  Yes.

25    Q.  And you were asked about your meetings with me.  Do you

1   remember being asked about that?

2   A.  Yes.

3   Q.  And you were asked about whether in your meetings with the

4   government you were asked about the questions that I was going

5   to ask you on direct examination.  Do you remember being asked

6   about that?

7   A.  Yeah.

8   Q.  Did I or any other prosecutor ever tell you what to say on

9   the witness stand at this trial?

10  A.  No.

11  Q.  What did we tell you to do?

12  A.  Just tell the truth.

13  Q.  Has anyone told you what to say at this trial?

14  A.  No.

15  Q.  You were asked some questions on cross-examination about

16  notes of meetings with the government.  Do you remember being

17  asked about that?

18  A.  Yes.

19  Q.  I want to ask you about your meetings with the government.

20  When you met with the FBI and the government, did you cover

21  every detail of your entire relationship with Maxwell and

22  Epstein in every meeting with the government, or did you talk

23  about different topics at different times at different

24  meetings?

25  A.  Different topics, different times, different meetings.

LC1Qmax6                         Jane - Redirect

1   Q.  Did you take any notes during the meetings?

2   A.  No.

3   Q.  Who took the notes?

4   A.  I don't know.

5   Q.  Did you have any opportunity to review any notes or reports

6   of any meetings for accuracy?

7   A.  No.

8   Q.  And before Ms. Menninger showed you some notes during your

9   cross-examination, had you ever seen any of that before?

10  A.  No.

11  Q.  In your conversations with prosecutors, were there times

12  when we asked you about additional details of your experiences

13  in followup meetings?

14  A.  Yes.

15  Q.  Did we discuss every topic at every meeting?

16  A.  No.

17  Q.  I want to back up and ask you about your first meetings

18  with the government.

19          Can you explain for the jury, was it difficult to talk

20  to the government in your first meetings?

21  A.  Yes, absolutely.

22  Q.  Why was that difficult?

23  A.  Because I was sitting in a room full of strangers and

24  telling them the most shameful, deepest secrets that I'd been

25  carrying around with me my whole life.

1    Q.  In those first meetings, were you able to share with the

2    government all of the details of what had happened to you?

3    A.  No.

4    Q.  Why was that?

5    A.  Because it was too difficult, too difficult emotionally,

6    too difficult on every level.

7    Q.  Over time, did you become more comfortable sharing the

8    details about what happened to you with the government?

9    A.  Yes.

10   Q.  Why was that?

11   A.  Because I guess I became more familiar with the people

12   sitting in front of me, and starting to feel like I could trust

13   them, and it didn't feel quite as embarrassing.

14   Q.  Did there come a point in your meetings with the government

15   where fewer people were in the room?

16   A.  Yes.

17   Q.  And did you have an understanding at the time about why in

18   your meetings with the government there started to be fewer

19   people in the room?

20   A.  I believe it was to make me more comfortable.

21   Q.  And how did you feel once you started having meetings with

22   the government with fewer people in the room?

23   A.  It started feeling easier.

24   Q.  I want to ask you about your last few meetings with the

25   government leading up to the trial.  During those meetings in

1   the last few months, was your attorney present?

2   A.  No.

3   Q.  In general, who was in the room?

4   A.  Just me and you guys.

5   Q.  You were asked some questions on cross-examination about

6   your living situation when you were in middle school and high

7   school living in Palm Beach.  Do you remember those questions?

8   A.  Yes.

9   Q.  So I just want to ask you about where you were living at

10  the time.  In the summer of 1994, when you first met Maxwell

11  and Epstein, where were you living?

12          MS. MENNINGER:  Objection.  Leading, your Honor.

13          THE COURT:  Overruled.  You may answer.

14  A.  That summer we were still living on Palma Way at my

15  mother's friend, Joan, in her pool house in her back yard, and

16  we -- when we came home from camp that summer, we were still

17  living in that place.

18  Q.  Did your family struggle financially during the years that

19  you were in high school?

20  A.  Yes.

21  Q.  Was there ever a time when you and your brothers had a hard

22  time paying for lunch at school?

23          MS. MENNINGER:  Objection, your Honor.  403.

24          THE COURT:  Overruled.  You may answer.

25  A.  Yes.

1    Q.  Can you tell the jury what you remember about that?

2    A.  I mean, I remember my mother never had any money.  She

3    didn't work, so she didn't have money to really pay for

4    anything.  We had food stamps that she refused to use because

5    her pride was too big, and she would sort of, you know,

6    scrounge for quarters, and sometimes I would give my brothers

7    my lunch money and pretend like I had some so that they could

8    eat.

9    Q.  Did your family's financial circumstances improve after you

10   met Maxwell and Epstein?

11   A.  But -- no.

12   Q.  Did Jeffrey Epstein help your family financially?

13   A.  In some ways, yes.

14   Q.  Can you describe for the jury the ways that Jeffrey Epstein

15   helped your family financially?

16   A.  Well, he -- he handed me cash.  He gave us a computer.  He

17   paid for some school stuff.  He -- he paid for Interlochen Arts

18   Camp for the next two summers.  He paid for my younger

19   brother's Interlochen Arts Academy his entire year at boarding

20   school.  Gave us gifts.  And, you know, so on and so forth.

21   Q.  Did there come a time when your family moved out of the

22   pool house?

23   A.  Yes.

24   Q.  And where did you move to?

25   A.  That's when we moved to that second house that was first

LC1Qmax6                    Jane - Redirect

1  discussed, that three-bedroom house.  My sister was the one who

2  rented it for us.

3  Q.  Approximately when did you move out of the pool house and

4  into the three-bedroom house?

5  A.  We moved out of the pool house in, I think, spring of '96.

6  Wait.  Sorry.  I'm tired.  The spring of '95.  Sorry.

7  Q.  Do you recall being asked some questions on

8  cross-examination about whether you traveled internationally

9  when you were in high school?

10  A.  Yes.

11  Q.  Just to be clear, did those trips have anything to do with

12  Maxwell and Epstein?

13  A.  No.

14  Q.  Without discussing any specifics about your family members,

15  do you have some family members who live abroad?

16  A.  Yes, that's -- the country that we would travel to, that's

17  where we were from, and any time those dates that were

18  discussed earlier, that would be a family trip home.

19  Q.  Do you recall being asked on cross-examination questions

20  about whether you had ever talked to a reporter?

21  A.  Yes.

22  Q.  And you were asked about whether you made a statement to a

23  tabloid about what had happened to you with Jeffrey Epstein.

24  Do you remember being asked about that?

25  A.  Yes.

LC1Qmax6                          Jane - Redirect

1   Q.  Can you please explain for the jury what were the

2   circumstances under which a reporter approached you?

3   A.  Well, it was a reporter who called me and said --

4            MS. MENNINGER:  Objection.  Hearsay, your Honor.

5   A.  Okay.  Sorry.

6            MS. MOE:  I'm happy to rephrase, your Honor.

7            THE COURT:  Go ahead.

8   Q.  When you had that conversation with the reporter, did you

9   want to have that conversation?

10  A.  No.

11  Q.  Why did you agree to speak to that reporter?

12  A.  Because he basically blackmailed me.

13           MS. MENNINGER:  Objection, your Honor.  Hearsay.

14           THE COURT:  Overruled.  Go ahead.

15  A.  He said that he -- that court documents with my name on it

16  were unredacted, and that the Epstein's little black book was

17  out, and my name was in it, and he was going to print --

18           MS. MENNINGER:  Objection, your Honor.  Hearsay.

19           THE COURT:  We'll limit what the witness has testified

20  to as not being offered for the truth of what was stated by

21  someone else but the effect on the listener.

22           And let's re-narrow the question.

23           MS. MOE:  Yes, your Honor.  May I ask a leading

24  question to navigate through this?

25           THE COURT:  Let me hear the question.

1   Q.  When you spoke with that reporter, did that reporter

2   threaten to reveal your identity publicly if you wouldn't speak

3   with him?

4   A.  Yes.

5   Q.  Is that why you spoke with the reporter?

6   A.  Yes.

7   Q.  Did you make an agreement with the reporter in order to

8   make sure your identity wasn't revealed?

9   A.  Yes.

10  Q.  And what was that agreement?

11  A.  The agreement was to briefly discuss only how I had met

12  Jeffrey Epstein.

13  Q.  And in exchange for doing that, what did the reporter agree

14  to do?

15  A.  He promised to keep my name anonymous.

16  Q.  Did the reporter keep your name anonymous?

17  A.  Yes.

18  Q.  Was that important to you at the time?

19  A.  Yes.

20  Q.  Why was that so important to you?

21  A.  It was important because I was -- I was scared.  I was

22  embarrassed, ashamed.  I didn't want anybody to know any of

23  this about me.  I wanted to stay out of it.  I -- I'm working

24  on a TV show, and I didn't want everybody to know that that was

25  me and associate me with any of this, and so I desperately did

LC1Qmax6                        Jane - Redirect

1   whatever I had to do to make sure that he didn't reveal my

2   name.

3   Q.  What were you scared of?

4              MS. MENNINGER:  Objection, your Honor.  Asked and

5   answered.

6              THE COURT:  Sustained.

7   Q.  Approximately how long was that conversation with the

8   reporter?

9   A.  I don't remember.

10  Q.  Was it in person?

11  A.  No.  It was in my car on the side of the road with my phone

12  plugged in.

13  Q.  Was that a phone conversation or an in-person conversation

14  in your car?

15  A.  Just a phone conversation.

16  Q.  Was it a detailed conversation?

17  A.  I tried to make it not so detailed.

18  Q.  You were asked some questions on cross-examination about

19  your attorney, Robert Glassman.  Do you remember those

20  questions?

21  A.  Yes.

22  Q.  Can you just explain for the jury without getting into any

23  privileged conversations, how did you find this attorney?

24  A.  He was a referral.  Actually, he's friends with my

25  husband's best friend, and I met with him, and I just liked

LC1Qmax6                    Jane - Redirect

1    him.

2    Q.  You were asked some questions on cross-examination about

3    your applications for admission to Interlochen.  Do you

4    remember those questions?

5    A.  Yes.

6    Q.  I'd like to just ask you a few questions about those

7    particular applications.

8    A.  Okay.

9           MS. MOE:  If I could just have a moment, I'm going to

10   grab a copy of them.

11          Your Honor, I'd ask for permission for the witness and

12   the jurors to view Defendant's Exhibit J-3 which I believ is in

13   evidence under seal.

14          THE COURT:  Let me just verify.  Yes.

15          MS. MOE:  Thank you, your Honor.  May the jurors turn

16   to that in their binders?

17          Ms. Menninger, without objection?

18          MS. MENNINGER:  Yes, your Honor.

19          THE COURT:  Jurors, you may pick up your binder and

20   turn to J-3, correct?

21   Q.  Jane, do you have that up in front of you?

22   A.  Yes.

23   Q.  Just to be clear, what we're talking about is Defendant's

24   Exhibit J-3, your application for admission to Interlochen for

25   the summer of 1994?

1   A.   Yes.

2   Q.   How old were you when you applied to go to Interlochen in

3   1994?

4   A.   13.

5   Q.   I want to ask you about a few things on this application.

6   But when I do, I just want to be careful we are not reading

7   anything into the record that's identifying about you.

8            If we could turn to the second page of that

9   application, and directing your attention to the second section

10  towards the bottom, do you remember Ms. Menninger asking you

11  questions about whether you told Interlochen you were having

12  any difficulties?

13  A.   I don't remember.

14  Q.   Let me just be clear about this portion of the application.

15  I want to direct your attention to the portion of the middle

16  section that says:  List two difficult works performed in

17  orchestra, band or ensemble within the past year.  Do you see

18  that question?

19  A.   Yes.

20  Q.   Is that the question you answered:  Nothing has been

21  difficult for me?

22  A.   I guess I did.

23  Q.   And what did you mean when you said that?

24  A.   I have no idea.

25  Q.   At the time, were you fairly talented?

LC1Qmax6                          Jane - Redirect

1   A.  Yes, and very cocky, apparently.

2   Q.  Just to be clear, nowhere in this application did you say

3   you weren't having any difficulties at home, right?

4   A.  No.

5   Q.  Were you having difficulties at home during this time?

6   A.  Absolutely, yes.

7   Q.  You were asked some questions about the recommendation

8   letters in your applications to Interlochen.  Do you remember

9   those questions?

10  A.  Yes.

11  Q.  And you were asked about whether your recommenders talked

12  about your family in a favorable light.  Do you remember those

13  questions?

14  A.  Yes.

15  Q.  The people who you asked to recommend you for Interlochen,

16  did they know what was going on in your house at home?

17  A.  No.

18  Q.  Why was that?

19  A.  Because we were very good at hiding what was going on at

20  home, and these recommendation letters are basically just from

21  our school teachers.

22  Q.  I want to ask you one last question about this application.

23  If you could turn back to the first page of Defendant's Exhibit

24  J-3.  And I want to focus your attention at the top section

25  with applicant information.  You see a few lines down, there's

1   a line that starts F, above sex, M or F?

2   A.  I'm sorry, I'm having a hard time finding it.  Where is it?

3   Q.  So, in the very -- I'm looking in the first page of

4   Defendant's Exhibit J-3 in the top header, the very first top

5   of the document under applicant information, do you see about

6   five lines down underneath the names of your siblings, the line

7   there?

8   A.  Yes.  Yes.  Sorry.

9   Q.  In your application, did you have to list your height and

10  weight?

11  A.  Yes.

12  Q.  And how tall were you when you were going to summer camp

13  that summer?

14  A.  Five-two.

15  Q.  How many pounds did you weigh?

16  A.  90.

17  Q.  What grade were you in?

18  A.  Seventh grade.

19  Q.  I want to ask you about the next year you went to

20  Interlochen.  If you could turn to --

21          MS. MOE:  I'd ask for permission for the jurors to

22  turn to Defendant's Exhibit J-4 which is in evidence under

23  seal.

24          THE COURT:  Without objection, you may.

25          MS. MENNINGER:  Yes, your Honor.

LC1Qmax6                        Jane - Redirect

  1                THE COURT:  You may.

  2                MS. MOE:  Thank you, your Honor.

  3                THE COURT:  J-4 for the jurors.

  4    BY MS. MOE:

  5    Q.  On this application, I want to ask you about that same

  6    section about the applicant information?

  7    A.  Mmm-hmm.

  8    Q.  Directing your attention to that same line, by the next

  9    year in 1995, how tall were you by then?

 10    A.  It says I was five-four.

 11                MS. MENNINGER:  Objection, your Honor.  It misstates

 12    the date on the document.  The date on the document is not what

 13    was just represented by counsel.

 14                THE COURT:  Ms. Moe, go ahead.

 15    BY MS. MOE:

 16    Q.  In your application for the next year at summer camp, how

 17    tall were you by then?

 18    A.  It says I was five-four.

 19    Q.  You'd grown two inches?

 20    A.  I don't know, I may have been fibbing.

 21    Q.  What grade were you in by then?

 22    A.  Eighth grade.

 23    Q.  Do you recall defense counsel asking you about Government

 24    Exhibit 761 and whether that was your application to the

 25    Professional Children's School?

LC1Qmax6                        Jane - Redirect

1   A.  I'm sorry, I don't know what that means.

2   Q.  Do you remember being shown a document on cross-examination

3   and being asked about whether that was your application to the

4   Professional Children's School?

5   A.  Yes.

6   Q.  And did you recognize that document as your application to

7   the Professional Children's School?

8   A.  No.

9   Q.  Do you recognize the handwriting on that document?

10  A.  Is it here?  Can I see it or --

11  Q.  That's all right.  I can move on.

12  A.  Okay.

13  Q.  You were asked some questions on cross-examination about

14  your career as an actor.  Do you remember being asked about

15  that?

16  A.  Yes.

17  Q.  Do you know the difference between acting on television and

18  testifying in court?

19  A.  Yes.

20  Q.  What's the difference?

21  A.  Acting on television is not real, and testifying in court

22  is real, is the truth.

23  Q.  Are you acting here today?

24  A.  No.

25  Q.  What are you here to do?

```
 1    A.  I am here to hopefully finally find some sort of closure to

 2    all of this.  This is something that I have been running from

 3    my entire life up until now, and I'm just tired of it, and I

 4    was just hoping that I could help in any way to make that

 5    happen and to hopefully find some peace and healing some day.

 6    Q.  I want to ask you a few more questions about the summer of

 7    1994.  About how many weeks were you at summer camp that

 8    summer?

 9    A.  Eight weeks.

10    Q.  Were there weeks when you were at summer camp that summer

11    when you were 13?

12    A.  Yes.

13    Q.  Were there weeks when you were in summer camp that summer

14    when you were 14?

15    A.  Yes.

16    Q.  Is your birthday in the summer?

17    A.  Yes.

18    Q.  Do you remember which week of summer camp you met Ghislaine

19    Maxwell and Jeffrey Epstein?

20    A.  No.

21    Q.  How strong is your memory of meeting Ghislaine Maxwell and

22    Jeffrey Epstein at summer camp in 1994?

23    A.  Pretty strong.

24    Q.  Why is that memory pretty strong?

25    A.  Because it was the beginning of when my life would change
```

LC1Qmax6                              Jane – Redirect

1    forever.

2    Q.  You were asked on cross-examination about your memories of

3    being sexually abused.  Do you remember those questions?

4    A.  Yes.

5    Q.  How old were you when you first touched Jeffrey Epstein's

6    penis?

7    A.  14.

8    Q.  Can you describe for the jury how you touched his penis

9    when you were 14?

10             MS. MENNINGER:  Your Honor, this exceeds the scope of

11   cross.  I didn't ask this question.

12             MS. MOE:  Your Honor, I believe there were questions

13   on cross-examination about whether she remembers details how

14   strong those memories are.

15             THE COURT:  Overruled.

16             MS. MOE:  Thank you, your Honor.

17             THE COURT:  You may answer.

18   A.  I mean, how do you touch a penis, you put your hand around

19   it?

20   Q.  And what would you do when you touched his penis when you

21   were 14?

22   A.  Umm, masturbate him?

23   Q.  Who would give you instructions about what to do during

24   incidents when Jeffrey Epstein sexually abused you when you

25   were 14?

LC1Qmax6                          Jane - Redirect

1   A.  Well, the first time was Ghislaine.

2   Q.  Why does that stand out to you in your memory?

3   A.  Because it was just significant.  It's when that sort of

4   like fun, casual relationship I had with her just changed.

5   Q.  When you say the first time, when you talk about first

6   times, what do you mean by that?

7   A.  Meaning that the first time I was ever like unclothed with

8   just the both of them.

9   Q.  You were asked a lot of questions on cross-examination

10  about first and first times.  Do you remember those questions?

11  A.  I think so.

12  Q.  Fair to say there were a lot of firsts for you when you

13  were 14 and 15 and 16 with Maxwell and Epstein?

14          MS. MENNINGER:  Objection.  Leading, your Honor.

15          THE COURT:  Sustained.

16          MS. MOE:  Your Honor, if I could just have one moment.

17          THE COURT:  Okay.

18          (Pause)

19          MS. MOE:  Thank you very much.

20  BY MS. MOE:

21  Q.  I want to ask you about just one last topic.  You were

22  asked some questions on cross-examination about the award you

23  received from the Epstein Victims' Compensation Fund.  Do you

24  remember being asked on cross-examination about that?

25  A.  Yes.

1   Q.  To be clear, would you give that money back if it meant

2   that you weren't abused as a kid?

3           MS. MENNINGER:  Objection.  Leading, your Honor.

4           THE COURT:  Sustained.

5   Q.  Jane, in your own words, can you tell the jury what that

6   money meant to you?

7   A.  Sorry.

8   Q.  It's all right.  Take your time.

9   A.  I mean, it -- oh, I wish I would have never received that

10  money in the first place because of what happened.  You know,

11  when you're seeking some sort of closure, and I guess in, you

12  know, laws in this country, compensation is the only thing you

13  can get to try to move on with your life and for the, you know,

14  pain and abuse and suffering that I received, and all the

15  out-of-pocket money I paid to try to make this go away and to

16  try to fix myself.

17          MS. MENNINGER:  Objection.  Narrative, your Honor.

18          THE COURT:  Overruled.

19  A.  So, you know, hopefully this just puts it all to an end,

20  and I can move on with my life.

21  Q.  Do you have any financial stake in the outcome of this

22  trial?

23  A.  No.

24          MS. MOE:  Nothing further, your Honor.

25          THE COURT:  Okay.  Ms. Menninger.

LC1Qmax6                          Jane - Redirect

1           MS. MENNINGER:  No recross.  Thank you.

2           THE COURT:  Thank you, Jane.  You may step down.  You

3    are excused.

4                          (Witness excused)

5           THE COURT:  Members of the jury, we will take our

6    mid-afternoon break.  Your snacks are here.  We will break for

7    about 15 minutes.  Thank you.

8           (Jurors not present)

9           THE COURT:  You may be seated.

10          Matters to take up before the break?

11          MS. MOE:  Not from the government, your Honor.

12          MS. STERNHEIM:  I have a matter, Judge.  I believe the

13   next witness is Matt, whose issue was teed up yesterday.  In

14   advance of his testimony, just to make sure that it is

15   compliant with the Federal Rules of Evidence, I would request

16   that the government give a proffer of what he is going to say,

17   as there are things in his 3500 material that did not come out

18   on direct examination, and it would be improper for him to be

19   able to testify as to things that are not prior consistent

20   statements.

21          THE COURT:  There are things in his 3500 material that

22   the previous witness said to him --

23          MS. STERNHEIM:  Yes.

24          THE COURT:  -- that were not asked about of the

25   witness.

1                MS. STERNHEIM:  Right.

2                THE COURT:  Okay.  Can you confer?

3                MS. MOE:  Yes, your Honor.

4                THE COURT:  During the break?

5                MS. STERNHEIM:  Of course.

6                THE COURT:  Great.  I appreciate you raising it, and

7       let me know if there's disagreement.  Thank you.

8                MS. STERNHEIM:  Will do.

9                THE COURT:  We'll break for ten.

10               (Recess)

11               (Jurors not present)

12               THE COURT:  Matters to take up?

13               MS. MOE:  Not from the government your Honor.

14               MS. STERNHEIM:  Just very briefly, Judge.  I did have

15      an opportunity to confer with Ms. Moe.  I just want to state

16      for the record, with regard to the introduction of prior

17      consistent statements, it is my understanding that there needs

18      to be a similar exactitude as one would have with prior

19      inconsistent statements, and I understand that the government

20      is offering their next witness, Matt, to establish the fact

21      that there was some colloquy discussion between Matt and Jane

22      at an earlier time before this.  I have no problem with that.

23               The issue is that, at least in the 3500 material, the

24      statements that Matt made are not -- they don't dovetail

25      entirely with what went on on the direct examination.  One

1   example would be, his 3500 material is that she said that

2   Ms. Maxwell brought girls.  There was no testimony to that.

3        There was testimony that there were women, but not

4   that she brought them.  There was testimony of her presence,

5   but not necessarily that she told the group that everything

6   would be okay.

7        That's the kind of statements that are in the 3500

8   material.  And I have addressed this with Ms. Moe.  We're not

9   entirely sure how it will come out, but it isn't a prior

10  consistent statement.  There is a prior conversation or

11  discussion, but the statements themselves are not consistent.

12       THE COURT:  Ms. Moe.

13       MS. MOE:  Your Honor, I believe the Court's ruling on

14  this is that we would evaluate the statements as they come out

15  through the witness.  And as a preview, after conferring with

16  Ms. Sternheim on this issue, we did confer with Matt and asked

17  him about what he recalls, specifically about the woman he

18  recalls Jane telling him.  Again, it's always difficult to

19  predict the precise testimony of a lay witness, but my general

20  expectation is that he would explain that in conversations with

21  Jane, she explained that there was a woman at the house who

22  made her feel comfortable; that sometimes there was that woman

23  at the house, sometimes there were girls; and so that made her

24  feel comfortable in the house.

25       I don't expect that the testimony would go beyond

1    that, but again, we're talking about a number of conversations

2    during this time period.  That's my current expectation.  But I

3    think with respect to I think some of the granular issues, the

4    difference between woman and girls, I think, especially in this

5    context is not so different that it would not be a prior

6    consistent statement.  And beyond that, your Honor, we think

7    this tracks the rule.

8             MS. STERNHEIM:  Judge, I disagree.  The distinction

9    between a girl and a woman is precisely what this case is

10   about, and she was very clear that she felt like she was the

11   only one.  The other people were women.

12            THE COURT:  She said she didn't know what their ages

13   were.

14            MS. STERNHEIM:  She didn't know their ages, but she

15   did not refer to them as girls.

16            THE COURT:  But wasn't the recent testimony, I think

17   it was on cross, which was:  Were there underage girls.  And

18   she said, "I wouldn't know the ages."

19            MS. STERNHEIM:  That's fine, but to call them girls

20   connotes that they are minors, and that parlays right into the

21   government's theory of the case, and they're bringing it out

22   through a witness whose sole purpose is substantiated prior

23   consistent statement, and that is not consistent with the

24   testimony that we've heard.

25            If he wants to say there were prior women, I can't

1    make objection to that, but I do object to the term girls, and

2    I do object to other aspects of his 3500 material insofar as

3    there was no testimony, and this witness should not be used to

4    supplant what the primary witness did not testify about.

5            THE COURT:  I agree with you on that distinction.

6    This witness can't testify as a prior consistent statement that

7    Jane told him that there were -- I mean, there's ambiguity in

8    the term, but I think since the witness couldn't testify if

9    they were underage or not, I can't allow the witness to make

10   that as an implication since that implication wouldn't be

11   consistent with the testimony.

12           MS. MOE:  Yes, your Honor.  I think on this point, to

13   be clear, the government doesn't intend to argue in closing

14   that the jury must infer from the evidence that there were

15   underage girls in the room because of Matt's testimony.  I

16   think it is, unfortunately, common that often women above the

17   age of 18 are referred to as girls.  That's how he remembers

18   it.

19           I would be happy to lead him through that testimony,

20   if the Court would prefer, and use the term females.  It's not

21   our intention to elicit the testimony to suggest anything in

22   particular about the ages of those folks, but that's how he

23   remembers it, and that's the word he uses.

24           THE COURT:  Why don't you -- I'll let you lead, but

25   why don't you just say *other people*, or something like that.

1           MS. MOE:  If I ask him about that, I do expect he

2      would say, yes, other girls.  And so I think unless it's a

3      leading question, I just want to front that in order to avoid

4      creating an issue there.

5           THE COURT:  Yes.  Well, lead, and that way I don't

6      have to strike the testimony as not a prior consistent

7      statement.

8           MS. MOE:  Yes, your Honor.  If the Court authorizes us

9      to lead, I think we can navigate through this area.

10          THE COURT:  Ms. Sternheim, okay if she leads through

11     this portion?

12          MS. STERNHEIM:  I have no problem with that, Judge,

13     but if the witness on his own *sua sponte* says *girls*, I will be

14     objecting to that.  I cannot rely on what they are going to do

15     or not do in closing.

16          THE COURT:  I agree with that.  That's why I said --

17          MS. STERNHEIM:  That's fine.

18          THE COURT:  -- I will let Ms. Moe lead so I don't have

19     to strike that testimony.  I think we are in agreement that if

20     he were to testify that she told her that there were girls, the

21     implication would be underage; that implication wouldn't be a

22     prior consistent statement, and so I wouldn't allow that

23     implication to stay with the jury.

24          MS. STERNHEIM:  I understand, and I thank you for

25     that.  But the other part would be there was no testimony on

1    direct that Ms. Maxwell brought women.  There were women there

2    but not that she brought them, and I think that Ms. Menninger

3    cleared that up on cross-examination as well.

4              THE COURT:  Okay.

5              MS. MOE:  Your Honor, particularly, if I'm permitted

6    to ask leading questions, I wouldn't expect to ask that

7    particular question.

8              THE COURT:  Okay.  You won't ask it, it sounds like.

9              MS. MOE:  Yes, your Honor.

10             MS. STERNHEIM:  Thank you Judge.

11             THE COURT:  Okay.  Thank you.  Anything else?

12             MS. MOE:  Your Honor, very briefly, I just wanted to

13   clarify because I believe in briefing the subject of prior

14   consistent statements, defense counsel had raised the prospect

15   of recall of the witness.  So I just wanted to make sure in

16   terms of our contacts with Jane, we had clarity on that status.

17             THE COURT:  Yes.  And I didn't hear it from anyone on

18   the 615 issue on the timing that I said, so I assumed you

19   worked that out, correct?

20             MR. ROHRBACH:  Yes, your Honor.  Our understanding is

21   that none of the witnesses who are testifying as victims are

22   intending to observe any of the trial until at least both sides

23   have rested, which we've conveyed to the defense, and we

24   understand there would be no objection to that.

25             THE COURT:  So then the open question is might there

1    be recall that would prohibit the government from conferring

2    with a witness who's completed their testimony?

3            MS. MOE:  Yes, your Honor.  We just wanted to navigate

4    that, otherwise I think we would make arrangements for Jane to

5    travel home to her family today.  And so if we wanted to make

6    those arrangements, we will need to be in touch with her to

7    make those arrangements, otherwise not planning to have

8    substantive communications, but I wanted to be very transparent

9    and candid about those contacts and just the state-of-play on

10   this issue.

11           MS. MENNINGER:  Your Honor, my recollection is that

12   there was a second witness who was going to be offering prior

13   consistent statements for Jane.

14           MS. MOE:  That's correct, your Honor.  I think our

15   preference would be for Jane to be permitted to leave the

16   district, but if we can be in touch with her about the

17   possibility of a need for recall after today, if there are

18   additional prior consistent statements, we can navigate it that

19   way.  Otherwise, Jane would have to remain in the district for

20   I think potentially a long time.

21           MS. MENNINGER:  I have no objection to that, your

22   Honor.  I do have one clarifying question, which is, while not

23   observing the trial in the courtroom, there is certainly

24   substantial coverage of the trial including relaying witnesses'

25   testimony.  So I don't know whether that has been clarified

1    with the witness that not just sitting in the overflow room,

2    but we're not reading media about it either.

3              THE COURT:  I'm sure you all discussed this when I

4    raised the 615 issue weeks ago, right?  Maybe it surprised you

5    there's media coverage.

6              Why don't you talk -- I am going to bring in the jury,

7    so you'll talk about it and let me know if you disagree.

8              MS. MOE:  Thank you, your Honor.

9              THE COURT:  Okay.  Bring in the jury.

10             I'm sorry.  Two administrative matters before we bring

11   in the jury.  I admitted J-8 and 9.

12             MS. MENNINGER:  Yes, your Honor.

13             THE COURT:  And to be clear, that needs to be admitted

14   under seal because it has specific identifying information of a

15   witness whom I've permitted to testify under a pseudonym.

16             Tell me if that's true for J-15 as well.

17             MS. MENNINGER:  Your Honor, I believe that was a

18   pleading that was filed under a pseudonym.  I can check it

19   certainly to be sure and confer with the government.  We'll

20   check it one more time, your Honor --

21             THE COURT:  Okay.

22             MS. MENNINGER:  -- and confer.

23             And then as for 8 and 9, we were going to put 8 and 9

24   on the sticker, make copies to replace in the binder.

25             THE COURT:  Okay.  So confer and let me know if J-15

LC1Qmax6                         Jane - Redirect

1    needs to be admitted under seal.

2            MS. MOE:  Thank you, your Honor.  We'll review the

3    transcript from today and confer about exhibits and their

4    status under seal.

5            THE COURT:  And then, to be clear, the next witness

6    I'm permitting to testify under a pseudonym to protect the

7    identity of the prior witness.

8            MS. MOE:  Yes, your Honor.

9            THE COURT:  And so I guess consistent with that,

10   sketch artists should not draw an exact likeness of the next

11   witness who will also be testifying under a pseudonym.

12           MS. MOE:  Yes, your Honor.

13           THE COURT:  Now we can bring in the jury.

14           (Jury present)

15           THE COURT:  Please take your seats as you come in.

16   Everyone may be seated.  Thank you, members of the jury.

17           Ms. Moe the government may call its next witness.

18           MS. MOE:  Thank you, your Honor.  The government calls

19   a witness identified as Matt.

20           THE COURT:  The witness identified as Matt may come

21   forward.

22    MATT,

23        called as a witness by the Government,

24        having been duly sworn, testified as follows:

25           THE COURT:  Ms. Moe, you may begin your direct

LC1Qmax6                          Matt - Direct

1    examination of the witness testifying under the pseudonym Matt.

2              MS. MOE:  Thank you your Honor is the Court's order

3    with respect to sketch artists now in effect?

4              THE COURT:  It is.

5              MS. MOE:  Thank you.

6    DIRECT EXAMINATION

7    BY MS. MOE:

8    Q.  Good afternoon.

9    A.  Good afternoon.

10   Q.  Are you testifying under the name Matt today?

11   A.  Yes.

12   Q.  Are you using a pseudonym in order to protect the privacy

13   of the person you are going to be testifying about today?

14   A.  Yes.

15   Q.  I'd like you to just take a look at the witness stand.

16   There's a folder in front of you.  Would you mind just taking a

17   look at that document.  And that is what's marked for

18   identification as Government Exhibit 17?

19   A.  Yes.

20   Q.  Without saying what's on the document, do you recognize

21   that?

22   A.  Yes, I do.

23   Q.  What is that?

24   A.  It's my driver's license.

25   Q.  Is that your true name?

LC1Qmax6                     Matt - Direct

1    A.  Yes, it is.

2           MS. MOE:  Your Honor, the government offers Government

3    Exhibit 12 under seal.

4           MS. STERNHEIM:  No objection.

5           THE COURT:  Without objection, GX-12 is admitted under

6    seal to protect the identity of the witness who I permitted to

7    testify under a pseudonym.

8           MS. MOE:  Apologies, your Honor.  My colleagues just

9    alerted me it's Government Exhibit 17, not 12.  I misspoke.

10          THE COURT:  Or I did.  GX-17.  Thank you.

11          MS. MOE:  Thank you, your Honor.

12          (Government's Exhibit 17 received in evidence under

13   seal)

14          MS. MOE:  May the jurors now view that exhibit in

15   their binders?

16          THE COURT:  Without objection, Ms. Sternheim.

17          MS. STERNHEIM:  No objection, your Honor.

18          THE COURT:  Jurors may pick up your binders and look

19   at Exhibit GX-17, please.  Large binder, GX-17.  Thank you.

20   BY MS. MOE:

21   Q.  Now that the jurors are there, just to be clear, on

22   Government Exhibit 17, is that your true name?

23   A.  Yes, that is.

24   Q.  Is that your driver's license?

25   A.  Yes, that is.

1    Q.  For today's purposes --

2              THE COURT:  Ms. Moe, can you come closer to the mic?

3    Q.  For today's purposes, we'll be referring to you as Matt.

4    Is that okay?

5    A.  Yes, that's okay.

6    Q.  All right.  If the jurors could keep their binders for a

7    moment up, we'll turn to another exhibit in a moment.  Let me

8    pause here and just ask you, Matt, how far did you go in

9    school?

10   A.  High school.

11   Q.  What kind of work do you do now?

12   A.  I'm an actor.

13   Q.  Do you work on a television show?

14   A.  Yes, I do.

15   Q.  Are you employed full time as an actor in a television

16   show?

17   A.  Yes, I am.

18   Q.  For how many years have you been employed full time as an

19   actor?

20   A.  I'd say on and off for the last 15 years.

21   Q.  And if you could please take a look at the binder in front

22   of you, and take a look at Government Exhibit 12, which is in

23   evidence and under seal.  Do you have Government Exhibit 12 in

24   that folder?

25   A.  Yes, I do.

LC1Qmax6                          Matt - Direct

1    Q.  I would ask that the jurors please turn to Government

2    Exhibits 12 in their binder, which is in evidence and under

3    seal.

4              THE COURT:  Without objection, Ms. Sternheim?

5              MS. STERNHEIM:  No objection.

6              THE COURT:  You may look at GX-12, please.

7              MS. MOE:  Thank you, your Honor.

8    Q.  Focusing on Government Exhibit 12, I want to direct your

9    attention to the top left corner of that document.  Without

10   saying her name, do you recognize the person listed on that

11   birth certificate?

12   A.  Yes, I do.

13   Q.  For today's purposes, we're going to refer to that person

14   as Jane.  Will you do that?

15   A.  Yes.

16             MS. MOE:  Thank you, your Honor.  I think that's all

17   we need for the binders today?

18             THE COURT:  Okay.  Put the binders away.

19   Q.  Now that we know who we're talking about, I want to ask you

20   some questions about Jane.  How do you know Jane?

21   A.  She's my ex-girlfriend.

22   Q.  Approximately what year did you first meet Jane?

23   A.  First time was 2002 and the second time was 2006.

24             (Continued on next page)

25

LC1VMAX7                          Matt - direct

1   BY MS. MOE:

2   Q.  Did there come a time when you were in a romantic

3   relationship with Jane?

4   A.  Yes.

5   Q.  During approximately what years were you in a romantic

6   relationship with Jane?

7   A.  2006 till 2014, approximately.

8   Q.  During those years, did you live together?

9   A.  Yes.

10  Q.  What years did you live together?

11  A.  2007 till 2014.

12  Q.  Did you keep in touch with Jane after you broke up?

13  A.  Yes.

14  Q.  What's the nature of your current relationship with Jane?

15  A.  We're friends.

16  Q.  Have you had a professional relationship with Jane?

17  A.  Yes, I have.

18  Q.  What's the nature of your professional relationship with

19  Jane?

20  A.  Jane and I, we work on the same TV show.

21  Q.  During the years that you lived with Jane, did you get to

22  know some of her family members?

23  A.  Yes, I did.

24  Q.  Were there times when Jane would talk to you about what her

25  home life was like when she was growing up?

Matt - direct

1    A.  Yes.

2    Q.  Let me just take a step back and ask you some questions

3    about how that topic came up.  In general, how would the topic

4    of Jane's home life come up during the course of your

5    relationship?

6    A.  There's different aspects of the home life, but just most

7    likely, I would say, getting to know her family and getting to

8    know the relationships between her and her siblings and her

9    mother and the struggles that she went through.

10   Q.  During the years that you were dating Jane, did she tell

11   you about what her home life was like when she was a kid?

12   A.  Yes, she did.

13   Q.  What did she tell you about that?

14          MS. STERNHEIM:  Objection.

15          THE COURT:  Do you want a more specific question?

16          MS. STERNHEIM:  Well, that is hearsay.  That is not

17   the basis of this witness's testimony.

18          MS. MOE:  Your Honor, it's both the foundation for a

19   prior consistent statement and a prior consistent statement

20   itself.

21          THE COURT:  In light of cross, I think that's right,

22   but I'll hear you if --

23          MS. STERNHEIM:  If I may be heard briefly.

24          THE COURT:  Yes.

25          (Continued on next page)

LC1VMAX7                           Matt - direct

1              (At sidebar)

2              THE COURT:  We discussed this yesterday, didn't we?

3              MS. STERNHEIM:  Judge, the witness is going to talk

4      about home life.  It's not the subject matter of his testimony,

5      it's whether she revealed to him at a time earlier than meeting

6      with the government allegations concerning Ms. Maxwell.

7              THE COURT:  Well, but Ms. Menninger crossed on the

8      veracity of her poverty and financial situation growing up and

9      the relationship with her mother, and I assume that's where

10     we're going.

11             MS. STERNHEIM:  I think the government -- I don't

12     think that's the issue here.  The issue is whether she stated

13     at sometime earlier that she was abused.

14             THE COURT:  Well, that's true.  But you've put in

15     issue her credibility about everything.  Why did you cross her

16     on whether she grew up poor?

17             MS. STERNHEIM:  Because they raised it.  They raised

18     the fact that she lived in a pool house.  The witness testified

19     under oath that she lost her home after her father died.  I

20     don't think that's the issue --

21             THE COURT:  So you've attacked her credibility on

22     that.  You said her credibility on everything is an issue.  You

23     specifically attacked her credibility on that.  Why can't it

24     come in as a prior consistent -- you're saying this witness can

25     only testify about --

1          MS. STERNHEIM:  Judge, if that was the case, then

2     anytime a witness is on the stand who spoke about their home

3     life, you could bring a witness in?  I've never seen that

4     before.  I understand the subject matter with regard to the

5     allegations in this case.

6          THE COURT:  Right.  For sure.

7          MS. STERNHEIM:  But prior consistent, my father died,

8     I don't think that we're contesting that her father died.

9          THE COURT:  Right.  But you contested whether she grew

10    up poor, whether she had a relationship with her mother that

11    wouldn't allow her to -- you put all of those things at issue;

12    made a strong point that every inconsistency is an issue

13    because her credibility is central.  Good for the goose, good

14    for the gander.

15         MS. STERNHEIM:  No, that would mean they could pull

16    anyone she was involved with to support the fact that she had a

17    difficult --

18         THE COURT:  What is the nature of your objection?  So

19    that this witness -- I mean, either it's a prior consistent

20    statement or it's not.  I don't understand -- so under the Rule

21    801(b)(3), right, that's the evidentiary objection.  You

22    attacked her credibility on what she testified about her home

23    life.  What is the evidentiary objection?  Relevance?  403?

24    Tell me.

25         MS. STERNHEIM:  Judge, it seems like we're going to

LC1VMAX7                          Matt - direct

1    have a witness here who's just going to testify about

2    everything he knew about her because he was in a relationship

3    with her and --

4            THE COURT:  No, I won't allow everything that he knew

5    about her.  I will allow issues that you specifically spent

6    time on cross-examination.

7            MS. STERNHEIM:  Okay.

8            THE COURT:  Attacking her credibility.

9            (Continued on next page)

LC1VMAX7                        Matt - direct

1              (In open court)

2              THE COURT:  Ms. Moe, I'll ask you to rephrase, to

3       narrow the question.

4              MS. MOE:  Yes, your Honor.

5       BY MS. MOE:

6       Q.  Matt, were there times when Jane would talk to you about

7       her family's financial circumstances when she was growing up?

8       A.  Yes.

9       Q.  What did she tell you about that?

10      A.  She told me that when her father got sick, that her mother

11      spent basically all of the money that they had for his

12      treatments, and obviously hoping that he would survive.  And he

13      didn't.  And basically she -- that she was the one who left

14      them broke.

15      Q.  And did Jane tell you what her family's financial

16      circumstances were like after her father passed away?

17      A.  Yes.

18      Q.  What did she tell you about that?

19      A.  That they basically had no money.  The mother was working a

20      small job.  And I think she said at one point the three of

21      the -- that her and her two brothers were sleeping in the same

22      bed at one point because they were living in such a small

23      place, and the three of them had to sleep in the same bed.

24      Q.  Did there come a time when Jane told you how she was able

25      to pay for things when she was a kid?

1  A.  Yes, she did.

2  Q.  Approximately what year was it when this conversation came

3  up?

4  A.  It's probably 2006, 2007, when we -- when we first started

5  dating, just getting to know each other.

6  Q.  What did Jane tell you during that conversation about how

7  she was able to pay for things when she was a kid?

8  A.  She said her mom had a job that paid basically nothing; and

9  that she had it -- it was like a godfather, an uncle, a family

10  friend type person that basically helped her mom pay the bills.

11  Q.  Is this something Jane discussed with you once or more than

12  once during the course of your relationship?

13  A.  More than once.

14  Q.  During the conversations with Jane about this godfather

15  figure, did you come to learn the name of the uncle figure or

16  godfather figure?

17  A.  Yes, I did.

18  Q.  What did she tell you his name was?

19  A.  His name is Jeffrey Epstein.

20  Q.  In general, when Jane would talk with you about her

21  experiences with Jeffrey Epstein, how would that topic come up?

22  A.  First it was purely that he was -- you know, that he was a

23  godfather and, you know, he was looking out for her family.

24          And then the topic came up when she came to me when --

25  I think it was in two thousand -- like 2009, she was contacted,

LC1VMAX7                          Matt - direct

1     I think, by the FBI to see if she would tell her story, if she

2     had a story.

3             And she came to me and she said, I need to tell you

4     something.

5             And I said, Yeah.

6             And she said, You know the godfather that I told you

7     about, the person that was helping my family?

8             And I said, Yes, I do.

9             And she said, I need you to know that this is who it

10    is.

11            And it was public news.

12            And that's when I said, That guy is your godfather?

13    That's the guy that was helping you pay your bills and your

14    family's bills?

15            And she said, Yes.

16    Q.  Did Jane tell you when she met Jeffrey Epstein?

17    A.  Yes.

18    Q.  What did Jane tell you about when she met Jeffrey Epstein?

19    A.  She told me she met him shortly after --

20            THE COURT:  Just a minute.  Just a minute.

21            THE WITNESS:  Sorry.

22            THE COURT:  More specific question.

23            MS. MOE:  Your Honor, I can lay some additional

24    foundation for that and return to it later, if that's

25    acceptable.

 1          THE COURT:  Okay.  And then you'll ask it as a more

 2   specific question.

 3          MS. MOE:  Yes, your Honor.

 4          THE COURT:  Thank you.

 5   BY MS. MOE:

 6   Q.  Did there ever come a time when Jane explained to you why

 7   it was that she received financial help from Jeffrey Epstein?

 8   A.  Yes, she did.

 9   Q.  Approximately when did she tell you about that?

10   A.  When -- when the -- when she told me who it was, when she

11   told me the name of the person and --

12   Q.  What did Jane tell you about why it was that she received

13   this money from Jeffrey Epstein?

14   A.  Well, once -- once I learned who it was, I asked her if she

15   was one of the girls, and she said that she was.

16          MS. STERNHEIM:  Objection.

17          THE COURT:  I'll sustain the objection.

18          The jury will disregard the last statement of the

19   witness.  And you'll ask a specific question, Ms. Moe.

20   BY MS. MOE:

21   Q.  Did Jane tell you what happened between her and Jeffrey

22   Epstein during the years that she knew him?

23   A.  Not specifically.

24   Q.  Did there come a time when she told you why it was that

25   Jeffrey Epstein gave her money?

1   A.  Yes.

2   Q.  What did she tell you about that?

3   A.  Well, I was the one that asked her, based on after finding

4   out who it was, I asked her if she was doing that for the

5   money.

6   Q.  What did she tell you she was doing for the money?

7   A.  She said it wasn't --

8            THE COURT:  Just a minute.  Just a minute.

9            Sustained.

10  Q.  In your conversations with Jane about Jeffrey Epstein, did

11  there come a time when she told you that she had to do things

12  she didn't want to do?

13  A.  Yes.

14  Q.  What did she tell you about that?

15  A.  She never went into detail; she just said it wasn't free.

16  Q.  Did she ever use any particular words to describe the

17  things that she had to do with Jeffrey Epstein?

18  A.  Nothing specific.  No specific words.

19  Q.  In your conversations with her, did she ever use the word

20  "massage"?

21           MS. STERNHEIM:  Objection.  Leading.

22           THE COURT:  Overruled.

23           I'll allow it.  You may answer.

24  A.  Yes.

25  Q.  What did she tell you about that?

LC1VMAX7                         Matt - direct

1    A.   I think it was only because of the fact that it was public

2    knowledge, and that was as far as she would ever let me go into

3    the -- into the -- what happened, what she did.

4    Q.   Okay.  But focusing on her statements to you, what did she

5    tell you about massage?

6    A.   Just that was it, that -- basically, that was it.

7    Q.   Did Jane ever tell you how old she was when she had to do

8    things with Jeffrey Epstein?

9          MS. STERNHEIM:  Objection.

10   A.   Yes.

11         THE COURT:  Overruled.

12   Q.   And what did Jane tell you about how old she was when she

13   had to do things with Jeffrey Epstein?

14   A.   She said that it started at 14, when she met him.

15   Q.   Did she tell you where she met him?

16   A.   Yes.

17   Q.   What did she tell you about that?

18   A.   She said it was a camp.

19   Q.   In these conversations with Jane, did she ever tell you

20   that someone else was present during a massage?

21   A.   No.

22   Q.   In your conversations with Jane, did you ever have any

23   conversations with her about a woman?

24   A.   Yes.

25   Q.   In your conversations with Jane about Jeffrey Epstein, did

LC1VMAX7                        Matt - direct

1   she tell you that there was a woman present at his house?

2   A.  Yes.

3   Q.  Did she tell you that the woman in the house made her feel

4   comfortable?

5   A.  Yes.

6   Q.  Why did you ask her about the woman in the house?

7   A.  I asked her because I couldn't understand why her mother

8   would let her go with a man without anybody else present.  And

9   then she told me sometimes there were other girls present.

10             MS. STERNHEIM:  Objection.

11             THE COURT:  Sustained.

12             The jury will disregard the witness's last statement.

13             Ms. Moe, you'll lead.

14             MS. MOE:  Yes, your Honor.

15   Q.  In your conversations with Jane -- withdrawn.

16             Approximately what year was it that Jane told you

17   about this woman who made her feel comfortable?

18   A.  It was when I found out about Jeffrey, approximately 2009.

19   Q.  And in your conversations with Jane about her interactions

20   with Jeffrey Epstein, did she tell you that this woman would

21   tell her that it was okay?

22   A.  Not specifically that.  She didn't use those words.

23   Q.  Okay.  What words did she use?

24   A.  She just said that having a woman there made her feel --

25   made her feel more comfortable.

LC1VMAX7                        Matt - direct

1   Q.  At the time when you were having these conversations with

2   Jane about this woman, did she tell you what the woman's name

3   was?

4   A.  No, she didn't.

5   Q.  In general, when Jane would tell you about what had

6   happened with her and Jeffrey Epstein, what was her demeanor

7   like?

8            MS. STERNHEIM:  Objection.

9            THE COURT:  Grounds.

10           MS. STERNHEIM:  Relevance.

11           MS. MOE:  Your Honor, it's --

12           THE COURT:  Overruled.

13           Go ahead.  You may answer.

14   A.  What was the question again?

15   Q.  I'm happy to repeat it.

16           Matt, when you would have these conversations with

17   Jane about her interactions with Jeffrey Epstein, what was her

18   demeanor like when she would tell you about that?

19   A.  Ashamed, embarrassed, horrified.

20   Q.  Without telling me what she said, did you ask her about the

21   details about what had happened with her and Jeffrey Epstein?

22   A.  Yes, I did.

23   Q.  In those interactions, did she provide you with details

24   about those interactions?

25   A.  No, she didn't.

LC1VMAX7                     Matt - direct

1    Q.  What was her reaction when you asked her for details about

2    those interactions?

3    A.  She would just say to me, Matt, the money wasn't fucking

4    free.

5    Q.  Did she go beyond that?

6    A.  No, she didn't.

7    Q.  I believe you testified that you met Jane's family members

8    when you were dating; is that right?

9    A.  Yes.

10   Q.  Based on your observations during the years that you dated

11   Jane, what was her relationship like with her mother?

12   A.  It was rough.  It was brutal.

13   Q.  Did there ever come a time when you saw Jane confront her

14   mother about Jeffrey Epstein?

15   A.  Yes, I did.

16   Q.  Approximately when was that?

17   A.  I think it was approximately 2011.

18   Q.  Where were you when that happened?

19   A.  I was at a house.

20   Q.  Who was in the room when you had that conversation?

21   A.  It was just --

22           MS. STERNHEIM:  Objection.

23           Sidebar please.

24           THE COURT:  One word, grounds.

25           MS. STERNHEIM:  First time we are hearing this.

LC1VMAX7                          Matt - direct

1          THE COURT:  Okay.

2          (At sidebar)

3          THE COURT:  What do you expect the witness to say?

4          MS. MOE:  That he recalls being present when Jane and

5     her mother were in a room.  He recalls Jane saying to her

6     mother, How could you not know the money wasn't for free?  How

7     could you not know?

8          THE COURT:  Is that in 3500 material?

9          MS. MOE:  Yes, I'm happy to pull it up.

10          MS. STERNHEIM:  There's been no testimony by Jane

11     about confrontation with her mother at this time.  She

12     testified that her mother was irate regarding a guidance

13     counsellor, but she didn't go toe-to-toe with her mother about

14     Jeffrey Epstein.

15          THE COURT:  So it's in the 3500 material; it's not the

16     first time you're hearing it.

17          MS. STERNHEIM:  I don't recall if it's this witness or

18     her brother.

19          THE COURT:  Okay.

20          MS. STERNHEIM:  But even if it is in the 3500

21     material, if it is not on the direct of Jane, why can it be

22     offered as a prior consistent statement when it never was

23     offered at all?

24          MS. MOE:  This is a statement from Jane to her mother

25     essentially acknowledging she was abused, expressing

LC1VMAX7                        Matt - direct

 1    frustration about that.  That is entirely consistent with her

 2    testimony that she was, in fact, abused.

 3          MS. STERNHEIM:  But not with regard to her mother

 4    having a confrontation.

 5          THE COURT:  Well, it's a prior consistent statement

 6    that he heard related to the abuse which you've repeatedly

 7    called into question in your opening and your direct and in

 8    your cross-examination.

 9          MS. STERNHEIM:  Judge, I understand that.  But we're

10    talking about prior consistent statements.

11          THE COURT:  Right.  The prior consistent statement is

12    that she was abused by Jeffrey Epstein.

13          MS. STERNHEIM:  But they are bringing out a

14    conversation.  If she wants to say, Did you know or learn that

15    she was abused?  Yes.  But a conversation that she had with her

16    mother is hearsay.

17          MS. MOE:  Your Honor, it's not hearsay because it's a

18    prior consistent statement of Jane about her experiencing

19    sexual abuse.

20          THE COURT:  Yes.  Overruled.

21          (Continued on next page)

22

23

24

25

LC1VMAX7                      Matt - direct

```
 1                (In open court)
 2                THE COURT:  Go ahead.
 3    BY MS. MOE:
 4    Q.  Did there ever come a time when you saw Jane confront her
 5    mother about Jeffrey Epstein?
 6    A.  Yes.
 7    Q.  Approximately when was that conversation?
 8    A.  2011.
 9    Q.  Who was present for that conversation?
10    A.  It was just me, her, and her mom.
11    Q.  What do you remember Jane saying to her mother during that
12    conversation?
13    A.  She told her mother that the money was not free, and
14    confronted her mother about it.  And her mother said, crying --
15                THE COURT:  Just a minute.
16    Q.  Just focusing on just what Jane said and not what her
17    mother said, can you explain to the jury what did Jane say to
18    her mother?
19    A.  How do you think I got the money, mom?
20    Q.  Did she ask her mother whether her mother knew?
21    A.  She told her mother that she knew.  She accused her of it.
22    Q.  What do you remember about the exact words that she used?
23    A.  That Jane used, right?
24    Q.  Yes.  Can you just explain for the jury, what did Jane say
25    to her mother?
```

LC1VMAX7                        Matt - direct

1    A.   Jane told her mother that -- that she -- that the money was

2    not free, and that there's no way that she couldn't have known

3    that it wasn't free.

4    Q.   Did there come a time when you learned that a woman named

5    Ghislaine Maxwell was arrested?

6    A.   Yes.

7    Q.   Was that in 2020?

8    A.   Yes.

9    Q.   Without getting into details, how did you learn that

10   Ghislaine Maxwell was arrested?

11   A.   I saw it on the news.

12   Q.   When you learned that Maxwell had been arrested, did you

13   contact Jane?

14   A.   Yes.

15   Q.   What did you ask her?

16   A.   I just said, Is this the woman that you were referring to

17   when you told me?  And she said yes.

18   Q.   Just to be clear, during your relationship with Jane, did

19   she tell you that there was a woman at Jeffrey Epstein's house

20   who made her feel comfortable?

21   A.   Yes.

22             MS. STERNHEIM:  Asked and answered.

23             THE COURT:  Sustained.

24             MS. MOE:  Just a moment, your Honor.

25             THE COURT:  Okay.

LC1VMAX7                         Matt - direct

1                    (Counsel conferred)

2                    MS. MOE:  Nothing further, your Honor.

3                    THE COURT:  All right.  Thank you.

4                    Ms. Sternheim.

5                    MS. STERNHEIM:  No, thank you.

6                    THE COURT:  All right.

7                    No cross.

8                    Witness Matt, you may step down.

9                    You are excused.

10                    (Witness excused)

11                    THE COURT:  Government may call its next witness.

12                    MR. ROHRBACH:  The government calls Daniel Besselsen.

13                    THE COURT:  You may come forward.

14                    Mr. Besselsen, come forward.

15                    Somebody is getting him, Mr. Rohrbach?

16                    MR. ROHRBACH:  Yes, your Honor.

17                    We apologize for the delay.

18                    THE COURT:  You can take a standing stretching break,

19      if you'd like.

20                    You may be seated.

21       DANIEL ALAN BESSELSEN,

22           called as a witness by the Government,

23           having been duly sworn, testified as follows:

24                    THE COURT:  Go ahead.

25                    MR. ROHRBACH:  Thank you, your Honor.

1   DIRECT EXAMINATION

2   BY MR. ROHRBACH:

3   Q.  Good afternoon, Mr. Besselsen.

4   A.  Good afternoon.

5   Q.  Mr. Besselsen, where do you work?

6   A.  I work at Interlochen Center for the Arts.

7   Q.  What is Interlochen Center for the Arts?

8   A.  Interlochen is a nonprofit organization focused on arts

9   education.  We have our two largest programs, a arts camp in

10  the summer, and a boarding high school during September through

11  May.  And we're focused on arts education, as I mentioned.  So

12  we have visual arts, music, creative writing, dance, theater,

13  creative writing types of programming.

14  Q.  Where is Interlochen located?

15  A.  We're located in Interlochen, Michigan.

16  Q.  Where is Interlochen, Michigan?

17  A.  It's northern Michigan; it's about 20 minutes southwest of

18  Traverse City, Michigan, which is the largest town in northern

19  Michigan.

20  Q.  How long have you worked there?

21  A.  I've worked there 16 years.

22  Q.  What's your title?

23  A.  My title is assistant vice president of finance.

24  Q.  And what are your responsibilities as an assistant vice

25  president of finance?

LC1VMAX7                      Besselsen – direct

1    A.  I oversee the finance department, including accounts

2    payable, accounts receivable, our purchasing, payroll.  I'm

3    involved in overseeing director of campus safety and security,

4    as well as the director of dining services.  And I'm involved

5    with the auditors, the banks, the investment companies, as well

6    as external audits.

7    Q.  And in that capacity, are you familiar with the normal

8    business practices of Interlochen?

9    A.  Yes.

10   Q.  In particular, are you familiar with the business practices

11   regarding communications with donors?

12   A.  Yes.

13   Q.  Does Interlochen maintain records of its communications

14   with donors?

15   A.  Yes.

16   Q.  What sorts of records?

17   A.  For our major donors or prospects, we keep all

18   correspondence with donors, whether it might be a letter, email

19   correspondence, records of phone conversations, notes from

20   visits with donors, things like that.

21   Q.  Let's talk about letters in particular.  How are letters

22   that are written to donors created?

23   A.  The letters are created by an individual in our advancement

24   department who's charged with managing that particular donor

25   relationship.  And so they would be the ones that would write a

LC1VMAX7                        Besselsen – direct

1    letter to a donor or to a foundation.

2    Q.  Is there any relationship between the level of donation

3    given and the person writing the letter to the donor?

4    A.  Yes.  Yup.  For example, our vice president of advancement

5    or even our president would handle a higher-end donor that

6    might be capable of donating half a million dollars or more,

7    for example.  And we would have major gift officers that would

8    be below that vice president of advancement that would handle

9    folks with capacity to give $100,000, $200,000, something like

10   that.

11   Q.  When these letters are written to donors, does Interlochen

12   put them in any sort of file?

13   A.  Yes, yup.  We keep track of all correspondence with donors.

14   Nowadays, it's all electronic within Salesforce, which is the

15   software we use to track fundraising and donations.

16   Historically, we have hard copy letters, for example.  Prior to

17   using Salesforce, we've got manila folders or files that we

18   kept for each donor that includes all of the correspondence

19   over time with that donor.

20   Q.  How long are those records kept?

21   A.  They are kept forever.

22   Q.  And are they kept by Interlochen in the ordinary course of

23   business?

24   A.  Yes.

25            MR. ROHRBACH:  Ms. Drescher, would you please display

1   for the witness, Court, and counsel what's been marked for

2   identification as Government Exhibit 741.

3   Q.   Do you recognize this, Mr. Besselsen?

4   A.   Yes.

5   Q.   What is it?

6   A.   This is a letter from Interlochen's vice president of

7   advancement to Mr. Epstein providing some information to him on

8   the concept of building a scholarship lodge on Interlochen's

9   campus and the level of donation that would be required to

10  build a lodge.

11  Q.   Mr. Besselsen, will you pick up the binder next to you.   It

12  has another copy of Government Exhibit 741.

13          Have you reviewed this exhibit before today?

14  A.   Yes.

15  Q.   And what is this exhibit?

16  A.   This exhibit are all of the letters or a portion of the

17  letters that were included in Mr. Epstein's file that we've

18  stored away in the filing cabinet in the basement of the

19  McWhorter dorm locked away.

20  Q.   How do you know these letters come from the Epstein file at

21  Interlochen?

22  A.   I myself went in and pulled it recently and saw these.

23  Q.   Thank you.

24          MR. ROHRBACH:   The government offers Government

25  Exhibit 741.

LC1VMAX7                          Besselsen – direct

 1                  THE COURT:  741 is how many pages?

 2                  MR. ROHRBACH:  It is -- I believe it's eight pages,

 3       your Honor.

 4                  THE COURT:  Okay.

 5                  MR. ROHRBACH:  Yes, it's eight pages.

 6                  MS. STERNHEIM:  May I confer with the government for a

 7       moment?

 8                  THE COURT:  You may.

 9                  (Counsel conferred)

10                  MS. STERNHEIM:  Thank you, Judge.

11                  THE COURT:  So it's eight pages.

12                  MR. ROHRBACH:  Yes, your Honor.

13                  THE COURT:  All right.  Without objection, GX-741 is

14       admitted.

15                  (Government's Exhibit 741 received in evidence)

16       BY MR. ROHRBACH:

17       Q.  Mr. Besselsen, are you familiar with Interlochen's business

18       practices regarding student records?

19       A.  Yes.

20       Q.  Does Interlochen keep a file on each student?

21       A.  Yes.

22       Q.  And how is that file maintained?

23       A.  The file is maintained in a locked room in the lower level

24       of the Maddy Administration Building.  Once again, it's manila

25       files or folders for each student, and includes information

1   from the student, on a student.

2   Q.  And what sort of information is contained in student

3   records, in student files?

4   A.  So the files include comments from faculty that were

5   involved with that student's time on a camp -- academy

6   programming or camp programming, as well as cabin life,

7   comments from the counsellors during the camp programming, as

8   well as applications, paper applications, if you go back in

9   time, if we're talking about a camper or academy student.

10  Q.  And are those records regularly put into the student file?

11  A.  Yes.

12  Q.  And does Interlochen regularly maintain those records?

13  A.  Yes.

14  Q.  How long are student records kept?

15  A.  Records are kept for 99 years per Interlochen's record

16  retention policy.

17  Q.  In your binder, would you turn to what's been marked for

18  identification as Government Exhibit 743.

19          Without saying any names, do you recognize this?

20  A.  Yes.

21  Q.  What is it?

22  A.  This is an application for admission to our summer camp in

23  1994.

24  Q.  Did you review this prior to today?

25  A.  I did.

LC1VMAX7                          Besselsen – direct

1    Q.  And turning to page 3 of that exhibit, is that photo part

2    of the application?

3    A.  Yes.

4    Q.  How do you know?

5    A.  Once again, this is something that I went in and tracked

6    down and pulled this particular camper's file myself.  And this

7    was –– and these documents were in it, and this was attached to

8    this particular application.

9            MR. ROHRBACH:  The government offers Government

10   Exhibit 743 under seal.

11           MS. STERNHEIM:  No objection.

12           THE COURT:  GX-743 is admitted under seal, consistent

13   with my ruling allowing the individual listed to testify under

14   a pseudonym.

15           (Government's Exhibit 743 received in evidence)

16   Q.  Mr. Besselsen, does Interlochen keep records that a student

17   completes a program?

18   A.  Yes.

19   Q.  Who makes those records?

20   A.  Those records would be made or input by our admissions

21   office.

22   Q.  And how are those records maintained?

23   A.  When a student is accepted and enrolls in a program, that

24   is when those records are created in our software.

25   Q.  And to be clear, are those records kept in the ordinary

1    course of business?

2    A.  Yes.

3    Q.  In your binder, would you turn to what's been marked for

4    identification as Government Exhibit 744.

5              Do you recognize this?

6    A.  Yes.

7    Q.  Without saying any names, what is it?

8    A.  This is a report out of Salesforce, which is our software

9    that we use not only for fundraising, but also for student

10   records, that I generated.  And it's a report on education

11   records, specifically pulling the completion year, first name,

12   last name, and education type, with a filter on the last name.

13   Q.  And just so the record is clear, you personally generated

14   this spreadsheet?

15   A.  I did, yes.

16             MR. ROHRBACH:  The government offers Government

17   Exhibit 744 under seal.

18             MS. STERNHEIM:  No objection.

19             THE COURT:  GX-744 is admitted under seal consistent

20   with my ruling allowing the individual listed to testify under

21   a pseudonym.

22             (Government's Exhibit 744 received in evidence)

23   Q.  Mr. Besselsen, I'd like to walk briefly through some of the

24   exhibits we were just looking at.

25             MR. ROHRBACH:  Ms. Drescher, would you please publish

1   Government Exhibit 741 for the Court, counsel, the witness, and

2   the jury.

3   Q.  Mr. Besselsen, what is this document?

4   A.  This is a letter from Interlochen's vice president of

5   advancement to Mr. Epstein providing him with additional

6   information on the scholarship lodge, building a scholarship

7   lodge on Interlochen's campus, and what it would take to -- in

8   regards to donating for that project.

9   Q.  You mentioned a scholarship lodge.  What is a scholarship

10   lodge?

11   A.  A scholarship lodge is a rental lodge, a small home on our

12   campus where parents of campers or academy students can come

13   stay on campus, be close to the performance venues and things

14   like that.  So parents or guests of Interlochen or even the

15   general public who come stay in this rental lodge and pay a --

16   like a fee, like a hotel room to stay in.

17            MR. ROHRBACH:  Ms. Drescher, would you turn to page 2

18   of this document.

19   Q.  What is this document?  What are we looking at,

20   Mr. Besselsen?

21   A.  This is a letter, again, from Interlochen's vice president

22   of advancement to Mr. Epstein thanking him for his donation of

23   $200,000 for a new scholarship lodge on our campus, and the

24   different updates provided in the letter about construction

25   timelines and things like that.

1   Q.  Mr. Besselsen, what is the date of this letter?

2   A.  February 9, 1994.

3          MR. ROHRBACH:  And turning now to the next page,

4   Ms. Drescher.

5   Q.  Who is this letter from, Mr. Besselsen?

6   A.  The letter is from Tim Ambrose, vice president of

7   advancement.

8          MR. ROHRBACH:  Ms. Drescher, turn to page 5 of this

9   document.

10  Q.  Mr. Besselsen, what is this document?

11  A.  This is a letter from Interlochen's vice president of

12  advancement to Ms. Maxwell enclosing an envelope that was found

13  when Interlochen's custodial staff was cleaning the Epstein

14  scholarship lodge, returning the lost envelope to Ms. Maxwell,

15  as well as the next page of this provides a listing of items.

16  Q.  Mr. Besselsen, we'll get to the next page in a moment, but

17  would you read this letter for us?

18  A.  Yes.

19         Dear Ghislaine, enclosed is the envelope we recently

20  found in cleaning the Epstein Lodge.  Apparently it lodged

21  between the wall and the dresser.  It was not discovered until

22  the unit was moved for cleaning.

23         As we discussed, the final week of camp is August 14

24  through the 20th.  I've reserved the lodge for Jeffrey's use.

25  In addition, he has one more week that he can reserve for

 1    himself or guests.  He may wish to have use it.

 2             Attached is a list of the dry goods that are in

 3    storage as part of Jeffrey's personal inventory.  Please advise

 4    if we are missing any items you are aware of being sent here.

 5    Please convey to Jeffrey how pleased we are to have such a

 6    facility on our campus.  In fact, the president-elect will be

 7    staying in the lodge until his family's furniture arrives.  It

 8    is a remarkable place.  We are grateful.

 9             Best wishes for a wonderful holiday season.

10    Q.  Thank you, Mr. Besselsen.

11             MR. ROHRBACH:  Ms. Drescher, will you turn to the next

12    page.

13    Q.  A moment ago you mentioned an attached list.  Is this the

14    attached list?

15    A.  Yes.

16    Q.  And what sorts of items are on this list, Mr. Besselsen?

17    A.  Different types of linens, pillows, blankets, towels,

18    sheets, shams.

19    Q.  Mr. Besselsen, while you've been at Interlochen have you

20    been familiar with the Epstein Scholarship Lodge?

21    A.  Yes.

22    Q.  Does it have any other names?

23    A.  Yes, it does.

24    Q.  What are the names?

25    A.  The name is Green Lake Lodge.

1    Q.  And what is this lodge, the Green Lake Lodge?

2    A.  It's a two-bedroom home, formerly known as the Jeffrey

3    Epstein Scholarship Lodge.

4          MR. ROHRBACH:  Ms. Drescher, would you display for the

5    witness, the Court, and counsel what's been marked for

6    identification as Government Exhibit 745.

7    Q.  Mr. Besselsen, what is this?

8    A.  This is the Green Lake Lodge, formerly known as the Jeffrey

9    E. Epstein Scholarship Lodge.

10   Q.  Is this a fair and accurate photo of the lodge?

11   A.  Yes.

12         MR. ROHRBACH:  The government offers 745.

13         MS. STERNHEIM:  No objection.

14         THE COURT:  GX-745 is admitted.

15         (Government's Exhibit 745 received in evidence)

16         MR. ROHRBACH:  Ms. Drescher, will you publish this,

17   with the Court's permission.

18         THE COURT:  You may.

19         MR. ROHRBACH:  Ms. Drescher, you can take it down.

20         I'd now like to turn to Government Exhibit 744, which

21   I believe is in the heavier of the juror binders.  So if I

22   could ask the Court to permit the jury to take out the binder?

23         THE COURT:  It's already admitted?

24         MR. ROHRBACH:  Yes, your Honor.

25         THE COURT:  All right.  Without objection,

1    Ms. Sternheim?

2           MS. STERNHEIM:  No objection.

3           THE COURT:  And you said 744?

4           MR. ROHRBACH:  744.

5           THE COURT:  You may look at in the large binder,

6    GX-744, please.

7    BY MR. ROHRBACH:

8    Q.  Mr. Besselsen, you testified earlier that you generated

9    this record from Interlochen's database?

10   A.  Yes.

11   Q.  How did you do that?

12   A.  I logged into Salesforce and went to the reports section in

13   Salesforce and modified the filters.  This is a report that --

14   the title of the report is MJS Report.  Went to that report and

15   created these filters that you see at the top, the last name.

16   Q.  Just to be clear, without saying the last name, is that the

17   filter you ran to generate this report?

18   A.  Yes.

19   Q.  Thank you, Mr. Besselsen.

20          What does this report show about people with this last

21   name's attendance at Interlochen?

22   A.  It shows which -- which years that they came to either the

23   arts camp, which is the education type, the far right column.

24   And that would be the summer then, if it relates to arts camp.

25   So the summer of '94, '95, and '96.  And then the arts academy

1    would be -- the completion would be the May of that year, so

2    May of 1999 and May of 2000.

3            MR. ROHRBACH:  With the Court's permission, I'd like

4    to turn the jury's attention to Government Exhibit 743, which

5    is also in evidence.

6            THE COURT:  Ms. Sternheim?

7            MS. STERNHEIM:  No objection.

8            THE COURT:  The jury may turn to 743 in the same

9    binder.

10   Q.  So, Mr. Besselsen, again, without saying any names or other

11   information, I would just ask you to take note of the address

12   in the third section on the first page.  Do you see this

13   address?

14   A.  Yup.

15   Q.  All right.

16           MR. ROHRBACH:  Then with the Court's permission, I'd

17   ask the jury to turn to Defense Exhibit J-4 in the defense

18   binder which is in evidence.

19           And Mr. Besselsen, that is in the binder next to you.

20           THE COURT:  Ms. Sternheim, without objection?

21           MS. STERNHEIM:  No objection to whatever is admitted.

22           THE COURT:  All right.  And that's -- the jury is

23   looking at J-4; correct?

24           MR. ROHRBACH:  Yes, your Honor.

25           THE COURT:  In the smaller binder.  J-4 in the smaller

LC1VMAX7                          Besselsen – direct

1    binder.

2    BY MR. ROHRBACH:

3    Q.  Mr. Besselsen, do you note the address on page 1 of that

4    document?

5    A.  Yes.

6    Q.  Is it the same address as the address on the prior

7    document?

8    A.  Yes, it is.

9    Q.  And just to be clear, what is the document we're looking at

10   right now?

11   A.  This is an application for admission to our summer arts

12   camp, which would be the summer of 1995.

13   Q.  And the document we just looked at, Government Exhibit 743,

14   what is that document?  Again, without saying any names.

15   A.  That's an application for admission to our arts camp,

16   summer of 1994, previous summer.

17   Q.  And then, Mr. Besselsen, and with the Court's permission,

18   the jury, I would ask you to turn to Defense Exhibit J-5, which

19   is also in evidence.

20            THE COURT:  Ms. Sternheim.

21            MS. STERNHEIM:  No objection.

22            THE COURT:  You may turn to J-5 in the same small

23   binder, please.

24   Q.  Mr. Besselsen, do you recognize this document?

25   A.  Yes.

LC1VMAX7                         Besselsen - cross

1    Q.   What is it, without saying any names?

2    A.   This is an application for admission to our arts camp in

3    the summer of 1996.

4    Q.   Do you see the -- without saying any identifying

5    information, do you see the address in the third section of

6    this document?

7    A.   I do.

8    Q.   Is that the same address or a different address than the

9    other address that you're looking at?

10   A.   I believe it's a different address.

11   Q.   Just to be clear, you think it's a different address?

12   A.   Yes, it's a different address.

13   Q.   Thank you.

14           MR. ROHRBACH:  No further questions, your Honor.

15           THE COURT:  Okay.  Thank you.

16           Ms. Sternheim?

17           MS. STERNHEIM:  May I have a moment please?

18           THE COURT:  You may.

19           (Counsel conferred)

20           MS. STERNHEIM:  Thank you, Judge.

21           THE COURT:  Do you anticipate more than five minutes?

22           MS. STERNHEIM:  Maybe less.

23           THE COURT:  Go ahead.

24   CROSS-EXAMINATION

25   BY MS. STERNHEIM:

LC1VMAX7                          Besselsen – cross

1    Q.  Mr. Besselsen, just a few questions for you.

2    A.  Yes.

3    Q.  With regard to the --

4              THE COURT:  Take off your mask.

5              MS. STERNHEIM:  Thank you.

6    Q.  With regard to the applications that have been put in

7    evidence, did you produce to the government who paid for that

8    student?

9    A.  I did not provide that to the government; so no, I'm not

10   aware that we did provide that.

11   Q.  Because you do not have those records; correct?

12   A.  I believe that's correct, going back that far.

13   Q.  And you don't have records for the siblings of that

14   individual either; correct?

15   A.  I believe so.

16   Q.  And that would be for the years of attendance of those

17   three siblings, 1994, 1995, and 1996; correct?

18   A.  Correct.

19   Q.  Now, with regard to Mr. Epstein's invitation to come to the

20   lodge, it was for the end of August; correct?

21   A.  I believe the letter mentioned from Interlochen's vice

22   president of advancement that we were having the final concert

23   for our arts camp, I think it was August 7 or the week of

24   August 7, I believe.

25   Q.  And is it fair to say that in Interlochen, which some

1   people call band camp, that the end is like the equivalent of

2   color war for athletic camps?

3   A.   I'm sorry, I don't have any experience with color war.

4   Q.   Okay.

5   A.   I don't know what that term means.

6   Q.   It's when the performances are; it's the culmination of the

7   summer experience.  Correct?

8   A.   That's true, yeah.

9   Q.   And it is then that performances are going on as opposed to

10  classes going on; correct?

11  A.   The final day there are performances.  I'm not sure if the

12  entire week is like that or not, but --

13  Q.   But nonetheless, the donors, especially the major donors,

14  come for the performances; correct?

15  A.   Yes.  Some major donors do come to campus for performances.

16  Q.   And Mr. Epstein certainly was a major donor; correct?

17  A.   Correct.

18  Q.   And the invitation for him to have the lodge was for the

19  period of time which is the culmination of the summer program;

20  correct?

21  A.   That would be correct, I would imagine, yes.

22           MS. STERNHEIM:  May I have one moment, Judge?

23           THE COURT:  Okay.

24           (Counsel conferred)

25           MS. STERNHEIM:  You're finished.  Thank you.

LC1VMAX7

```
 1              THE WITNESS:  Oh, thank you.

 2              THE COURT:  All right.  Mr. Rohrbach?

 3              MR. ROHRBACH:  No redirect.  Thank you.

 4              THE COURT:  All right.

 5              Mr. Besselsen, you may step down.  You are excused.

 6              (Witness excused)

 7              THE COURT:  And that gets us at 5:02, jury.  I

 8    apologize for keeping you a little bit late.

 9              I will remind you of all of my instructions, of

10    course.  Please keep them in mind.  Same schedule for tomorrow.

11    Thank you for your continued attention and diligence.  Have a

12    great night.  See you tomorrow morning.

13              (Jury not present)

14              THE COURT:  You may be seated.

15              Matters to take up, Mr. Rohrbach?

16              MR. ROHRBACH:  Nothing from the government, your

17    Honor.

18              THE COURT:  Ms. Sternheim?

19              MS. COMEY:  I apologize, your Honor.  We do have an

20    issue.  We will need to take it up at sidebar because it

21    relates to a pseudonym issue.

22              THE COURT:  Okay.  Sidebar pseudonym issue.

23              MS. COMEY:  It will be brief, your Honor.

24              (Pages 672 SEALED)

25              (Continued on next page)
```

LC1VMAX7

1          (At sidebar – not sealed)

2          THE COURT:  Okay.  See you 8:45.

3          The only thing I wanted to -- this isn't sealed.  But

4    timing, if you're going to brief piercing the privilege.

5          MR. PAGLIUCA:  When would you like it, your Honor?

6          THE COURT:  A month ago.

7          MS. STERNHEIM:  We can turn back the hands of time.

8          THE COURT:  I wish we could.

9          MS. STERNHEIM:  I don't think you would.

10         We might, but not you.

11         MR. PAGLIUCA:  I think it's a little more complicated

12   than -- I think there are different issues related to different

13   potential witnesses, I guess is the issue.

14         I'm happy to have it briefed as best we can under the

15   facts that we know right now, assuming that the Court wants

16   briefed is the issue we discussed today.  Okay.  Because then

17   we may have issues related to lawyer witnesses that are under

18   subpoena, but will not be called under any circumstances unless

19   it's briefed and the Court gives permission for the calling of

20   those witnesses.

21         THE COURT:  Let's start with the limited issue that

22   was raised today, which is that you would call -- you're

23   seeking to call Glassman.

24         MR. PAGLIUCA:  Glassman.

25         THE COURT:  You're seeking to call Glassman on the

LC1VMAX7

1    narrow question of whether under theory of waiver he told Jane

2    that it would -- testifying would help her in her case.

3             When would you like to do that?

4             MR. PAGLIUCA:  How about Friday, your Honor?

5             THE COURT:  This would be a witness you would call in

6    your case-in-chief?

7             MR. PAGLIUCA:  Exactly.  So it's at least a week from

8    now, I would imagine.  I'm assuming the government has about a

9    week more of testimony, by my review of the witness list.

10            MS. COMEY:  Your Honor, I think that's right.  We're

11   unlikely to rest in less than a week from now.

12            THE COURT:  So is Friday okay?

13            MR. ROHRBACH:  We can respond on Monday, if that's all

14   right.

15            THE COURT:  Sure.  Great.

16            It will provide some general background on piercing

17   privilege and waiver to the extent that will inform issues

18   beyond the specific.

19            MR. PAGLIUCA:  To the extent we can preview the

20   additional issues, we'll get that underway as well so that you

21   have a sense of what may or may not be coming down the road

22   here.

23            THE COURT:  Okay.  Can I ask, thinking about timing,

24   now that we're where we are, what is your estimate for the

25   trial?

LC1VMAX7

1          MS. COMEY:  Your Honor, I think it depends on the

2     length of cross-examination for some of the more substantial

3     witnesses.  If we can expect about the same length as we have

4     with Jane today, I expect we'll be able to rest the third week

5     of trial.  So not next week, but the week after, early that

6     week is my best estimate.

7          THE COURT:  And what's the defense's best estimate?

8          MS. STERNHEIM:  We'll let you know.

9          MR. PAGLIUCA:  I'm going to suspect the length of

10    cross-examination will be less for the remaining witnesses.

11         THE COURT:  We worked out some --

12         MR. PAGLIUCA:  Kinks, yes.

13         But I just think substantively it's likely to be less,

14    and there's likely -- well, with the exception of one, there's

15    less 3500 impeachment material that needs to be gone through

16    potentially, so I think that will shorten the length of

17    cross-examination.  And we will have whatever we need to have

18    ready to go, understanding the format we're doing this in now.

19         THE COURT:  All right.  See you in the morning.

20         (Adjourned to December 2, 2021 at 8:45 a.m.)

21

22

23

24

25

```
 1                        INDEX OF EXAMINATION

 2    Examination of:                          Page

 3     JANE

 4    Cross By Ms. Menninger . . . . . . . . . . . 429

 5    Redirect By Ms. Moe  . . . . . . . . . . . . 600

 6     MATT

 7    Direct By Ms. Moe  . . . . . . . . . . . . . 630

 8     DANIEL ALAN BESSELSEN

 9    Direct By Mr. Rohrbach . . . . . . . . . . . 653

10    Cross By Ms. Sternheim . . . . . . . . . . . 668

11                       DEFENDANT EXHIBITS

12    Exhibit No.                             Received

13     J-4   . . . . . . . . . . . . . . . . . . . 436

14     J-5   . . . . . . . . . . . . . . . . . . . 440

15     J-15   . . . . . . . . . . . . . . . . . . . 599

16     J-8 and J-9   . . . . . . . . . . . . . . . 600

17                       GOVERNMENT EXHIBITS

18    Exhibit No.                             Received

19     17   . . . . . . . . . . . . . . . . . . . 631

20     741   . . . . . . . . . . . . . . . . . . . 657

21     743   . . . . . . . . . . . . . . . . . . . 659

22     744   . . . . . . . . . . . . . . . . . . . 660

23     745   . . . . . . . . . . . . . . . . . . . 664

24

25
```