LC2Qmax1

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x
      UNITED STATES OF AMERICA,
 3
               v.                              20 CR 330 (AJN)
 4
      GHISLAINE MAXWELL,
 5
                    Defendant.                 Jury Trial
 6    ------------------------------x
                                               New York, N.Y.
 7                                             December 2, 2021
                                               8:45 a.m.
 8
      Before:
 9                     HON. ALISON J. NATHAN,

10                                             District Judge

11                           APPEARANCES

12    DAMIAN WILLIAMS
           United States Attorney for the
13         Southern District of New York
      BY:  MAURENE COMEY
14         ALISON MOE
           LARA POMERANTZ
15         ANDREW ROHRBACH
           Assistant United States Attorneys
16
      HADDON MORGAN AND FOREMAN
17         Attorneys for Defendant
      BY:  JEFFREY S. PAGLIUCA
18         CHRISTIAN R. EVERDELL
           LAURA A. MENNINGER
19             -and-
      BOBBI C. STERNHEIM
20             -and-
      RENATO STABILE
21
      Also Present:  Amanda Young, FBI
22                    Paul Byrne, NYPD
                      Sunny Drescher,
23                     Paralegal, U.S. Attorney's Office
                      Ann Lundberg,
24                     Paralegal, Haddon Morgan and Foreman

25
```

LC2Qmax1

1                    (In open court; jury not present)

2              THE COURT:  Good morning.  Matters to take up,

3       counsel?

4              MR. ROHRBACH:  Your Honor, from the government, we

5       just wanted to make sure the Court and defense counsel saw our

6       letter of last night about Government Exhibits 52 and 606.

7              THE COURT:  I did see it.

8              MR. PAGLIUCA:  Yes, your Honor.  I received it roughly

9       1:00 a.m., give or take, something like that.

10             THE COURT:  So you were just waking up.

11             MR. PAGLIUCA:  I had never gone to sleep.

12             THE COURT:  I mean, I've had prior briefing.  This is

13      additional briefing.  My view remains.  We will see what comes

14      in on the testimony, and then I'll make a ruling.

15             I guess one question for defense is whether they do

16      intend to -- and maybe you don't know yet, but to seek to voir

17      dire before I rule on admission?

18             MR. PAGLIUCA:  Yes, I think so, your Honor.  Well, I'm

19      assuming that we're changing the witness that we're trying to

20      introduce this through, which will happen later today, is my

21      understanding of the briefing.  So I don't think it changes the

22      landscape of needing to do some voir dire on the exhibit prior

23      to the Court's ruling.

24             THE COURT:  Okay.

25             MR. PAGLIUCA:  I guess just -- I think -- there's an

LC2Qmax1

1   additional issue that I think would relate to this issue.  This

2   witness is -- I'd say it's more of a 803(6) issue with this

3   witness likely than a 901 issue, your Honor.  And I think we're

4   implicating 803(6) subsections (C), I think (D) and (E) likely

5   with this particular witness.

6            THE COURT:  Okay.  Just give me a minute.  Understood.

7            MR. ROHRBACH:  Your Honor, I would just point out that

8   neither of these documents are being offered for the truth of

9   the matter.  The household manual is being offered as a set of

10  instructions, it's a document of instructions which have no

11  truth value themselves, and the contact book is not being

12  offered to show that any of the entries are in fact the contact

13  information of any of the people listed therein.

14           It's being offered to show that the defendant was in

15  possession of a book which contained -- which purported to

16  contain this information.  So, in either sense, 803(6) -- the

17  government does not expect 803(6) to be implicated by the

18  testimony when it offers the exhibits.

19           THE COURT:  Do you want to respond to that,

20  Mr. Pagliuca?

21           MR. PAGLIUCA:  I think then this implicates some

22  relevance issues, your Honor.

23           THE COURT:  I'm sorry, it implicates?

24           MR. PAGLIUCA:  Relevance issues.  I mean, I dispute

25  the characterization that the defendant is in possession of a

LC2Qmax1

```
 1    book or even that particular book.

 2              THE COURT:  That's the factual dispute that goes to

 3    authenticity, and then if it comes in, whether the jury

 4    believes the testimony regarding that.

 5              MR. PAGLIUCA:  Yes, but, you know, I think --

 6              THE COURT:  I gather the point here is there's nothing

 7    from these exhibits that the government would argue at closing

 8    the jury should conclude factually based on the statements

 9    contained in either document.

10

11              MR. PAGLIUCA:  See, I don't think that's true, your

12    Honor, and I think that's my next point because I think it's a

13    little fast and loose to say that it's not being offered for

14    the truth.  I mean, that's convenient to get around of the

15    hearsay objection.

16              THE COURT:  Sometimes it works.

17              MR. PAGLIUCA:  Right.

18              THE COURT:  Sometimes it doesn't.

19              MR. PAGLIUCA:  But it is being offered for the truth

20    in my view:  The truth that these people's names are in there;

21    the truth that these people had some sort of contact.  This is

22    all part and parcel of the government's theory that this list

23    has something to do with, you know, underage females and their

24    names are on the list, etc., etc.  So, I don't think you can

25    say this is being offered to show what, notice?  It doesn't
```

LC2Qmax1

1    make any sense to me.

2              MR. ROHRBACH:  Your Honor, I think it's helpful to --

3    I think Mr. Pagliuca is talking about the contact book and not

4    the household manual.

5              THE COURT:  Would you pull up the microphone?

6              MR. ROHRBACH:  I think Mr. Pagliuca is talking about

7    the contact book and not the household manual, which are

8    different documents, but specifically with regard to the

9    contact book, the government expects the evidence will show

10   either that it was the defendant's contact book, or through the

11   witness we talk about in our letter, the defendant and

12   Epstein's contact book, in which case would also be a statement

13   of the defendant or her co-conspirator.  Again, if this were

14   offered for the truth, it could come out without the

15   requirement apply 803(6).

16             THE COURT:  I was surprised that argument hadn't been

17   made earlier.  I think that was the first time the government

18   articulated that, although may we haven't been focused on the

19   hearsay objection that much, although it was raised.  But I

20   don't see why that's wrong.  I mean, they have an alternate

21   theory:  Either it's not being offered for the truth or if it

22   is being offered for the truth, the evidence they anticipate

23   that will come in is that it is statements of the defendant or

24   Mr. Epstein in furtherance of the conspiracy.

25             MR. PAGLIUCA:  I don't know whether we're talking

LC2Qmax1

1  about Exhibit 52.

2           THE COURT:  52.

3           MR. PAGLIUCA:  Okay.  I think we can address that

4  differently.  I don't see how one can say that a purported

5  address book created sometime after the end of the alleged

6  conspiracy is a statement in furtherance of the conspiracy.  We

7  don't know, frankly, who created the book.

8           THE COURT:  Right.  That's an authentication point,

9  not a hearsay point.

10           MR. PAGLIUCA:  I understand, but I'm addressing the

11  801(b)(2)(E) issue as opposed to the 803(6) hearsay issue at

12  this point.  Anyway, I guess we'll see what the witness says,

13  and then we can take it from there.

14           THE COURT:  Thank you.  What else can I take up now?

15           MR. EVERDELL:  Your Honor, I think this could be

16  addressed later in the day if the Court prefers.  There are two

17  law enforcement witnesses who will be testifying after the

18  first three witnesses, so it's possible we will get to them

19  today.  We've had a conferral with the government.  There are a

20  number of issues we have been able to agree on.  I think there

21  are a few that we don't.  We can take that up now or we can do

22  that later in the day.

23           MS. COMEY:  Your Honor, I would propose taking it up

24  at the lunch break.  I don't think we'll get anywhere near

25  these witnesses before lunch, and I think there's more

LC2Qmax1

```
1    conferral to be had.

2              THE COURT:  That's fine.  We may have some time now,

3    so I can step off and you can confer because we don't have all

4    our jurors yet, although we're getting there.

5              What else?  Anything else I can take up, counsel?  No?

6              MR. ROHRBACH:  Nothing from the government, your

7    Honor.

8              MR. PAGLIUCA:  No, your Honor.  Thank you.

9              THE COURT:  Thank you, I'll leave you to your

10   conferral, and if it would be helpful if we don't have all our

11   jurors and you have remaining issues, please let Ms. Williams

12   know.  Thank you.

13             (Recess)

14             (Jury present)

15             THE COURT:  Good morning, everyone.  You may take your

16   seats as you come in.  Everyone may be seated.

17             Good morning members of the jury.  Thank you again for

18   your punctuality.  We can get started right away.

19             Ms. Comey, the government can call its next witness

20             MR. ROHRBACK:  The government calls Paul Kane.

21             THE COURT:  Paul Kane may come forward.  Thank you.

22    PAUL KANE,

23        called as a witness by the Government,

24        having been duly sworn, testified as follows:

25
```

1    DIRECT EXAMINATION

2    BY MR. ROHRBACH:

3            THE COURT:  Please and spell your name for the record.

4            THE WITNESS:  Hello.  My name is Paul Kane.  P-A-U-L;

5    K-A-N-E.

6            THE COURT:  Thank you, Mr. Kane.

7            Mr. Rohrbach, you may proceed.

8    BY MR. ROHRBACH:

9    Q.  Good morning, Mr. Kane.

10   A.  Good morning.

11   Q.  Mr. Kane, where do you work?

12   A.  I work at the Professional Children's School.

13   Q.  What is the Professional Children's School?

14   A.  Yes.  The Professional Children's School is an independent

15   school here in New York City that educates students between the

16   grades 6 through 12.  The school was founded in 1910, primarily

17   to educate students who worked in professional fields, whether

18   that be dance, theater, later on movie and television industry,

19   athletics and modeling, other professions.  So it allows the

20   students who are working to have a place where they can have an

21   academic environment to learn.

22   Q.  What is your title at the Professional Children's School?

23   A.  I am the director of finance.

24   Q.  In that capacity, are you familiar with the normal business

25   practices of the school?

LC2Qmax1                        Kane - Direct

1    A.  Yes, I am.

2    Q.  Are you familiar with the school's practices regarding

3    students' permanent files?

4    A.  Yes, I am.

5    Q.  What are student permanent files?

6    A.  So, students when they apply, we begin a file for them.

7    When they apply to the school the admissions department will

8    keep their application, and then if they apply for financial

9    aid, that will go into that file.

10            From there, their transcripts, their grades will go

11   into the file, and eventually their application to college and

12   any recommendations from the school.

13   Q.  And those records you just mentioned, are they put into the

14   file at the time they're created?

15   A.  Yes, they are.

16   Q.  Does the Professional Children's School regularly maintain

17   those student files?

18   A.  Yes, we do.

19   Q.  How are those records maintained?

20   A.  They are maintained electronically now so that they're in

21   an archive of which I oversee, and they are filed according to

22   the student's name and the year of graduation or the year that

23   they retired or left the school.

24   Q.  How did the maintenance of those records work in the 1990s?

25   A.  So they were kept in a hard file until about ten years ago,

LC2Qmax1                    Kane - Direct

1   so the admissions person would have begun the file, eventually

2   would have added to that file.  Some things would have been

3   removed from the file at some point because we have as the

4   archives -- they clean out things that aren't necessarily

5   needed, but eventually the files were kept in the school, and

6   then were, as I said, digitized about ten years ago.

7   Q.  How long are student records kept?

8   A.  Well, in the permanent file, meaning that we must keep

9   forever, would include student's transcript and any

10  recommendation letters that were made to colleges.  Other items

11  are generally removed after six to seven years, depending on

12  best practices.

13  Q.  Are those records kept in the ordinary course of business?

14  A.  Yes.

15  Q.  You mentioned that some records are kept permanently and

16  some are not.  What happens at the end of the period of time

17  for the records that are not kept permanently?

18  A.  I'm sorry, ask the question again.

19  Q.  You mentioned that some records are not kept permanently.

20  What happens for the records that are not kept permanently?

21  A.  Yes.  So, what should happen is someone would go through

22  the file, pull those things that do not need to be kept

23  permanently, and they would have been shredded.

24  Q.  Are they always purged from the file at that time?

25  A.  No.  There are older files in which it's a complete file

LC2Qmax1                          Kane - Direct

1    that was kept and digitized.

2    Q.  Will you turn in the binder next to you to what's been

3    marked for identification as Government Exhibit 761?

4    A.  Yes.

5    Q.  Do you recognize this document?

6    A.  Yes, I do.

7    Q.  Without saying any names, what is it?

8    A.  This is an enrollment application for a student at the

9    Professional Children's School.

10   Q.  Have you reviewed it prior to today?

11   A.  Yes, I have.

12   Q.  Did you compare it with the records from the Professional

13   Children's School's database?

14   A.  Yes, I have.

15   Q.  Is it a true and accurate copy of the document at the

16   Professional Children's School?

17   A.  Yes, it is.

18            MR. ROHRBACH:  Your Honor, the government offers

19   Government Exhibit 761.

20            MS. MENNINGER:  Objection.  Hearsay.

21            MR. ROHRBACK:  Your Honor, it's business record.

22            THE COURT:  Overruled.

23            MS. MENNINGER:  Your Honor, may I make a record or

24   voir dire?

25            THE COURT:  You may voir dire.

LC2Qmax1                         Kane – Direct

1   VOIR DIRE EXAMINATION

2   BY MS. MENNINGER:

3   Q.   Good morning, Mr. Kane.

4   A.   Good morning.

5   Q.   The Professional Children's School prepares a form that

6   looks like this form, correct?

7   A.   I'm not sure I understand the question.

8   Q.   The typed information on Government Exhibit 761 is the

9   portion that the Professional Children's School actually

10  creates, correct?

11  A.   Yes, that is correct.

12  Q.   The handwriting on the form is from a third-party outside

13  of the Professional Children's School, correct?

14  A.   Correct.

15  Q.   You don't know whose handwriting that is, correct?

16  A.   I do not.

17  Q.   You do not know whether the person whose handwriting it is

18  had accurate or complete information, correct?

19  A.   I do not.

20  Q.   The Professional Children's School doesn't verify the

21  accuracy of the handwritten information on this form, correct?

22  A.   Well, the admissions director would be in contact with this

23  family once this application came in.  So that person would

24  have, in my knowledge, and still does, would confirm this

25  information on this form.

LC2Qmax1                          Kane - Direct

1    Q.  Every piece of information on this form?

2    A.  That I do not know.

3    Q.  What you told the government when you interviewed with them

4    is that your school traditionally may verify things like the

5    contact information or the student's name, correct?

6    A.  That is correct.

7    Q.  You don't know whether other information contained on the

8    form is accurate, correct?

9    A.  I do not.

10   Q.  And no one at your school knows whether or not, for

11   example, the person who is represented to refer the student to

12   the school was an accurate representation of the referral,

13   correct?

14   A.  I do not have that knowledge.

15   Q.  You do not know whether the financial responsibility

16   information the person listed there is accurate, correct?

17   A.  I do not have that knowledge.

18   Q.  The school doesn't maintain records as of today about who

19   actually paid for the student to go to the school, correct?

20   A.  No, we do not.

21   Q.  So you don't even have a way to verify some of the

22   information contained in this form as you sit here today,

23   correct?

24   A.  That is correct.

25              MS. MENNINGER:  Your Honor, with that record, the

LC2Qmax1                       Kane - Direct

1    information contained in handwritten form --

2              MR. ROHRBACH:  May I?

3              THE COURT:  You may.

4              MR. ROHRBACH:  Thank you.

5    BY MR. ROHRBACH:

6    Q.  Mr. Kane, when an application is received by a Professional

7    Children's School, what happens?

8    A.  As I mentioned, the admissions director would review the

9    information, contact the family, would bring them into the

10   school if it looks to be a good fit for the school and would

11   begin to interview them.  So the family is first contacted by

12   phone, and then the family would be brought in to tour the

13   school and to have a conversation with the admissions director.

14   Q.  Does the Professional Children's School rely on the

15   information in these records when it makes its admissions

16   decision?

17   A.  Yes, they do.

18   Q.  Does the Professional Children's School make admission

19   decisions in the ordinary course of its business?

20   A.  Yes.

21   Q.  And after the Professional Children's School makes

22   admission decisions, does it retain the applications?

23   A.  Yes.

24             MR. ROHRBACH:  Your Honor, based on that record, the

25   government offers again this exhibit.

LC2Qmax1                          Kane - Direct

1              MS. MENNINGER:  Your Honor --

2              THE COURT:  And you object.

3              MS. MENNINGER:  Yes, your Honor, with respect to

4     803(6).

5              THE COURT:  If you want to make an argument, we'll do

6     it at sidebar, but I understand your objection.  Do you want to

7     make a record beyond that?

8              MS. MENNINGER:  I do, your Honor, but may I approach?

9         (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LC2VMAX2                          Kane - Direct

1              (At sidebar)

2              THE COURT:  State your objection.

3              MS. MENNINGER:  Your Honor, this is very similar to a

4    police report in which a third party is transmitting

5    information to a business.  Yes, they rely on certain pieces of

6    information contained in that report to do their job; but as

7    the case law holds, that doesn't make the entire police report

8    admissible under the business records exception.

9              When information is reported by a third party, the

10   information has to have its own sources of reliability in order

11   for it to be useful to the business.  While they may make a

12   decision, for example, to file charges, there may be inaccurate

13   information, and that's why police records are traditionally

14   excluded because they are reflections of third-party

15   information that only portions may be reliable.

16             In this case, certainly I understand the school did

17   contact her and follow up with her and she became admitted.

18   But there are other pieces of information that are being

19   offered for the truth of the matter asserted therein.  In

20   particular, I imagine that Mr. Epstein ultimately became

21   financially responsible because that's what's listed in the

22   form.  However, what this record would tend to show is that

23   someone -- we don't even know if it was the Jane or her

24   mother -- filled out the form, had an expectation or wrote that

25   name down on the form at the time without any subsequent

LC2VMAX2                        Kane – Direct

1   follow-up.

2          Yesterday we heard from Jane.  She disputed the

3   accuracy of some of the applications that came in in terms of

4   the summer camp.  She said that I recognize my mother's

5   handwriting, and she talked about her mother not being reliable

6   about other things.  The government could have put on this

7   document through her if this information was reliable.  They

8   chose not to.  I don't think that there's a sufficient record

9   to put this on through 803(6).

10          MR. ROHRBACH:  Your Honor, I'm quite surprised defense

11   counsel is making this argument.  There are several admissions

12   applications that are already in the record, including ones

13   offered by defense counsel.  This particular document was used

14   in cross-examination of Jane yesterday and portions were read

15   into the record; so the rest of the document is something

16   that's fair game to come into the record.

17          Specifically about the business records exception,

18   police reports are accepted from the police records doctrine.

19   And this document otherwise needs to go in for comments of the

20   business record, both in the traditional classical sense of a

21   business record, but also, as the additional voir dire showed,

22   it's been integrated into the files of the school; the school

23   had relied on it in its business practices, which, at a

24   minimum, makes it an adoptive business record of the school.

25          THE COURT:  Overruled.

LC2VMAX2                        Kane - Direct

1             (In open court)

2             THE COURT:  Government Exhibit 761 is admitted.

3             MR. ROHRBACH:  Your Honor, the government offers this

4    exhibit under seal pursuant to the Court's order, protecting

5    the identity of witnesses.

6             THE COURT:  Admitted under seal, consistent with my

7    ruling allowing the individual name to testify under a

8    pseudonym.

9             (Government's Exhibit 761 received in evidence)

10            MR. ROHRBACH:  With the Court's permission, I would

11   ask that the jurors pull out their larger binder and turn to

12   Government Exhibit 761.

13            THE COURT:  Without objection?

14            MS. MENNINGER:  Yes, your Honor.

15            THE COURT:  Okay.  You may pull the larger binder,

16   please, and open to GX-761.

17   BY MR. ROHRBACH:

18   Q.  Mr. Kane, directing your attention to page 1 of the

19   exhibit.  Without saying the student's name, what grade is the

20   student applying for?

21   A.  The student is applying for 12th grade.

22   Q.  And turning your attention to section B, what did the

23   student list as her present school?

24   A.  Her present school was the Alexander W. Dreyfoos School of

25   the Arts.

LC2VMAX2                          Kane - Cross

1    Q.  What reason did the student give for leaving that school?

2    A.  Moved to New York.

3    Q.  And turning to page 2 of this document, section E, who did

4    the student list as the person with financial responsibility

5    for her attendance at the school?

6    A.  Mr. Jeffrey Epstein.

7              MR. ROHRBACH:  Thank you, your Honor.

8              No further questions.

9              THE COURT:  All right.  Ms. Menninger?

10   CROSS-EXAMINATION

11   BY MS. MENNINGER:

12   Q.  You are the director of finance?

13   A.  That's correct, yes.

14   Q.  And you have no idea whether Mr. Epstein actually paid for

15   the student's attendance at the school; correct?

16   A.  I do not.

17   Q.  You looked for those records?

18   A.  Yes, I did.

19   Q.  You found none?

20   A.  That is correct.

21   Q.  You don't have personal knowledge about where this student

22   lived?

23   A.  I do not, no.

24   Q.  I would ask you to turn to the second page.  That indicates

25   a name for the student's mother; correct?

LC2VMAX2                        Kane - Cross

```
 1   A.  Yes.
 2   Q.  Does it say unemployed?
 3   A.  It says self-employed.
 4   Q.  Does it give an occupation?
 5   A.  Yes, interior decorator.
 6   Q.  Okay.  On the last page it indicates that the student was
 7   represented by an agent; is that correct?
 8   A.  That is correct, yes.
 9   Q.  What's the name of that agent?
10          MR. ROHRBACH:  Objection, your Honor.
11          THE COURT:  Just a moment.  Where are you directing?
12          MS. MENNINGER:  The top of page 4, your Honor.
13          THE COURT:  Thank you.
14          MS. MENNINGER:  And the middle of the page as well.
15          MR. ROHRBACH:  Your Honor, we object to reading this
16   name out loud.  There's no particular relevance for it.
17          THE COURT:  Okay.  If you want to just focus the jury
18   so they can look at it themselves, Ms. Menninger.
19          MS. MENNINGER:  Certainly, your Honor.
20          THE COURT:  Thank you.
21   BY MS. MENNINGER:
22   Q.  So in the middle of the page, the upper right-hand corner
23   of the page, a name of an agent is represented; correct?  You
24   don't have to read the name into the record, but do you see the
25   name of the agent?
```

LC2VMAX2                        Kane - Cross

1    A.   I see the name of an instructor, and then --

2    Q.   Okay.

3    A.   Is that what you're referencing?

4    Q.   Well, maybe the clearer place is the middle of the page

5    where it says name of agent, manager, or agency.

6    A.   Correct.  That's the same name.

7    Q.   Okay.

8             And also it gives in there a number of other

9    professional instructors and schools; correct?

10   A.   Yes.

11   Q.   There's a name of a voice teacher, for example?

12   A.   That is correct.

13   Q.   And so at least the form indicates that that voice teacher

14   had helped this student in the year prior to the application?

15   A.   Yes, that's understood, yes.

16   Q.   All right.

17             MS. MENNINGER:  No further questions.

18             Thank you, your Honor.

19             THE COURT:  Thank you.

20             MR. ROHRBACH:  Just one question, your Honor.

21             THE COURT:  Go ahead.

22             MS. MENNINGER:  I apologize.  Can I ask one more

23   question?

24             THE COURT:  You may.

25   BY MS. MENNINGER:

LC2VMAX2                          Kane - Redirect

```
 1  Q.  On the first page there is the name of a counsellor or
 2  principal for the student's prior high school.  Do you see that
 3  name?
 4  A.  Yes, I do.
 5  Q.  And while you don't need to read it out, do you have any
 6  reason to doubt that that was, in fact, the student's prior
 7  principal?
 8  A.  I have no reason to doubt.
 9  Q.  All right.  Thank you.
10  REDIRECT EXAMINATION
11  BY MR. ROHRBACH:
12  Q.  Mr. Kane, on cross-examination you were asked about payment
13  records for the student in this application.  Did you find any
14  payment records reflecting who paid for that student's
15  education?
16  A.  No.  Financial records are kept separately from the student
17  file.
18  Q.  Thank you.  No further questions.
19          MS. MENNINGER:  No, thank you, your Honor.
20          THE COURT:  All right.  Thank you, Mr. Kane.
21          You may step down.  You are excused.  Thank you.
22          (Witness excused)
23          THE COURT:  The government may call its next witness.
24          MS. POMERANTZ:  Your Honor, the government calls Dr.
25  Lisa Rocchio.
```

LC2VMAX2                      Rocchio - Direct

1              THE COURT:  Dr. Rocchio may come forward.

2     LISA ROCCHIO,

3          called as a witness by the Government,

4          having been duly sworn, testified as follows:

5              THE COURT:  Thank you.  You may proceed.

6              MS. POMERANTZ:  Thank you, your Honor.

7     DIRECT EXAMINATION

8     BY MS. POMERANTZ:

9     Q.  Good morning, Dr. Rocchio.

10    A.  Good morning.

11    Q.  What is your profession?

12    A.  I'm a clinical and forensic psychologist.

13    Q.  What is clinical psychology?

14    A.  It's the study of human behavior and thought, both abnormal

15    and normal.

16    Q.  And what is forensic psychology?

17    A.  Forensic psychology is the application of the science of

18    psychology to a particular legal matter or question.

19    Q.  Dr. Rocchio, can you please describe your educational

20    background.

21    A.  I have a bachelor's degree from Emory University, and I

22    have a master's and a Ph.D. from the University of Rhode Island

23    in clinical psychology.

24    Q.  Can you describe for the jury your course work and training

25    in connection with your master's and Ph.D. degrees.

1  A.  So a doctoral program in clinical psychology, the one I

2  attended, is what's called a scientist practitioner model.  So

3  I'm trained in both research methods and the practice of

4  psychology.

5          So through the course of my graduate training, I took

6  courses in assessment methods, ethics, cognition, perception,

7  forensic psychology assessment and treatment.  And I also took

8  courses in the specific methods to practice psychotherapy, so

9  individual psychotherapy, marital therapy, for example.

10  Q.  During the course of your graduate studies, what, if any,

11  topics did you focus on?

12  A.  I focused on the general practice of clinical psychology,

13  but in particular traumatic stress, forensic psychology, and

14  eating disorders.

15  Q.  What is traumatic stress?

16  A.  Traumatic stress refers to any event that overwhelms an

17  individual's ability to cope.  At the more severe end, as

18  described in the DSM, which is a manual we use for diagnosis,

19  it's defined as exposure to actual or threatened death, serious

20  bodily injury, or sexual violence.

21  Q.  Dr. Rocchio, during the course of your graduate studies,

22  did you focus on the topic of interpersonal violence?

23  A.  I did.

24  Q.  And what is interpersonal violence?

25  A.  Violence is violence that occurs between one person and

1   another.  It doesn't -- it refers to things such as rape,

2   sexual assault, battering, intimate partner violence, childhood

3   sexual abuse, sexual harassment.  It doesn't have to involve

4   actual physical violence, but it's the umbrella term that's

5   used to refer to assault and violence between two people or

6   between individuals.

7   Q.  What do you mean when you use the term "childhood sexual

8   abuse"?

9   A.  Childhood sexual abuse is a term that refers to either

10  attempted or actual engagement with a child, someone under the

11  age of 18, in a sexual manner.  So it can involve both physical

12  contact, but it can also involve noncontact, such as exposure

13  to sexual material, for example.

14  Q.  And just to be clear, in your field, when you say "child,"

15  what are you referring to?

16  A.  Someone under the age of 18.

17  Q.  In connection with your master's and Ph.D. degrees, did you

18  perform clinical work with patients?

19  A.  I did.

20  Q.  Approximately how many patients did you work with during

21  your graduate studies?

22  A.  During my graduate studies, I complete -- worked

23  approximately 4,000 hours of supervised clinical hours with

24  hundreds upon hundreds of patients.

25  Q.  In the course of earning your graduate degrees, did you do

LC2VMAX2                         Rocchio - Direct

1    a predoctoral fellowship?

2    A.  I did.

3    Q.  Where did you do your predoctoral fellowship?

4    A.  At the Yale University School of Medicine.

5    Q.  During the course of your predoctoral fellowship at Yale,

6    what kind of work did you do?

7    A.  So I worked for six months at Yale New Haven Hospital in a

8    partial hospital program with adults.  Partial hospital is a

9    program where individuals come in for a higher level of

10   psychiatric care; and they stay during the day, but they go

11   home at night.  And I worked there for six months.

12            And then I worked for six months at Yale Psychiatric

13   Institute in both an inpatient program and a partial program

14   with adolescents.

15   Q.  After you received your Ph.D., what did you do next in your

16   career?

17   A.  I did a postdoctoral fellowship where I worked again under

18   clinical supervision in a private practice setting.  I also

19   worked in a partial hospital program and taught classes at the

20   college level.

21   Q.  What issues did you focus on during your postdoctoral

22   fellowship?

23   A.  Primarily I was working with individuals who -- women in

24   particular who were chronically suicidal and self-injurious,

25   had multiple problems in life, and the vast majority of whom

LC2VMAX2                    Rocchio - Direct

1    had quite severe histories of childhood abuse, trauma, and

2    neglect.

3    Q.  And did that childhood abuse and neglect include childhood

4    sexual abuse?

5    A.  Yes, it did.

6    Q.  After your fellowship, what did you do next in your career?

7    A.  I founded an independent practice.

8    Q.  What kind of independent practice?

9    A.  So it's an independent group practice that focuses on

10   providing assessment and psychotherapy services to adults,

11   individuals, and children, where I employ other therapists who

12   work for me, and I also maintain an independent forensic

13   psychology practice.

14   Q.  What is your role in the practice?

15   A.  I'm the owner and the founder, as well as the clinical

16   director.

17   Q.  What do you do in that role?

18   A.  I'm responsible for hiring all of the clinicians in the

19   practice, for hiring and supervising the administrative and

20   clinical staff, for providing clinical oversight, as well as

21   consultation around clients.  I see a full caseload of clients

22   where I provide psychotherapy.  And then I also conduct

23   forensic work.

24   Q.  Approximately when did you start that group practice?

25   A.  I believe it was around January of 1998.

LC2VMAX2                          Rocchio - Direct

Q.  And can you briefly describe the work you do in connection
with your private practice.
A.  So I provide treatment to patients, the vast majority of
whom have experienced some form of traumatic stress.  A large
number have experienced sexual abuse during childhood.

        I also work with a number of individuals who have been
in abusive relationships in adulthood or who've experienced
rape and sexual assaults either in childhood or adulthood.  And
I work with other types of traumatic stress as well; traumatic
grief, for example, parents who've lost a child, or people
who've been involved in motor vehicle accidents.  I've done
work with first responders.

        So primarily traumatic stress, but also individuals
coping with problems in living, someone's going through a
divorce, someone is going through a life transition, anxiety,
depression, that sort of thing.
Q.  Do you have a forensic practice?
A.  I do.
Q.  In your forensic practice, what sort of work do you do?
A.  So I work in both civil cases and criminal cases.  And I
provide expert witness testimony around issues in my area of
expertise, as I'm doing today.  Sometimes I also conduct
psychological evaluations to answer a particular question
that's relevant to the legal issue at hand.
        THE COURT:  Dr. Rocchio, could I ask you to move a

1    little closer to the mic.

2                 THE WITNESS:  Sure.

3                 THE COURT:  If possible.  Thank you.

4            Thank you so much.

5    BY MS. POMERANTZ:

6    Q.  Dr. Rocchio, can you explain for the jury at a high level

7    what a forensic practice is.

8    A.  So an attorney will hire me and they will ask me -- they'll

9    explain the issue that they need help with.  It may be could I

10   come in and talk about a subject that is within my area of

11   expertise.  It might be, for example, if somebody has claimed

12   that they've been harmed, say, through childhood sexual abuse,

13   they'll ask me to do an evaluation to determine whether or not

14   the individual has any problems or mental health issues; and if

15   they do, whether those problems and mental health issues are

16   attributable either in whole or part to the abuse that they've

17   alleged.

18               In a criminal case I might be asked to determine what,

19   if any, role an individual's mental health may have had or

20   their traumatic experiences may have had on the crime that they

21   are accused of.  Or in sentencing issues I might be asked to do

22   a psychological evaluation and provide information that might

23   be relevant for purposes of sentencing.

24   Q.  Approximately how many forensic evaluations have you

25   conducted?

LC2VMAX2                    Rocchio - Direct

1    A.  I would say maybe around 100.

2    Q.  And I think you touched on this, but just to be clear, who

3    hires you for forensic work?

4    A.  The vast majority of the time I'm hired by an attorney.  At

5    other times I might be hired by the state.  For example, at one

6    point in my career the state of Rhode Island hired me to

7    perform forensic evaluations on children and adolescents who

8    had become involved with the juvenile justice department.  But

9    at this point the vast majority of individuals who hire me are

10   attorneys.

11   Q.  And are those attorneys on just the plaintiff's side or can

12   you explain that for the jury.

13   A.  Sure.  So when I'm working in a criminal arena, I might be

14   hired by the prosecution or I might be hired by the defense.

15   And if I'm working in a civil case, again, I might be hired by

16   the person who's working on behalf of the plaintiff or the

17   person who's working on behalf of the defense.

18         As a forensic psychologist, I'm coming in and

19   providing an independent evaluation.  So I'll work for all

20   sides of -- all parties of a case.

21   Q.  Dr. Rocchio, what licenses do you hold?

22   A.  I hold a psychology license in the states of Rhode Island,

23   Massachusetts, and New York.

24   Q.  In your career, for approximately how many years have you

25   treated and assessed patients?

LC2VMAX2                     Rocchio - Direct

1    A.  About 30 years now.

2    Q.  As a clinical psychologist, what issues or areas do you

3    specialize in?

4    A.  I specialize primarily in the areas of traumatic stress and

5    interpersonal violence.

6    Q.  For how long have you focused on traumatic stress and

7    interpersonal violence?

8    A.  The same, about 30 years.

9    Q.  In the course of your career, have you treated and

10   evaluated individuals who have experienced or reported

11   experiencing childhood sexual abuse?

12   A.  Yes.

13   Q.  Approximately how many victims of childhood sexual abuse

14   have you evaluated and treated in the course of your career?

15   A.  Hundreds upon hundreds.

16   Q.  For how many years have you treated victims of childhood

17   sexual abuse?

18   A.  For the duration of my career; so since starting doing

19   clinical work and graduate work, again, about 30 years ago.

20   Q.  During the course of your career, how old are the patients

21   that you have treated and evaluated who've experienced

22   childhood sexual abuse?

23   A.  So I worked beginning in my graduate training with

24   teenagers, adolescents ages 12 and up, as well as adults.  And

25   then in my private practice setting, I also worked with

1  teenagers and their families.  I conducted forensic work with

2  teenagers and their families, as well as with adults and

3  couples.  And at this point in my career, I'm working almost

4  exclusively with individuals who are over the age of 18 in both

5  my forensic and clinical practices.

6  Q.  In addition to running a group practice, do you work

7  anywhere else?

8  A.  I do.

9  Q.  Where do you work?

10  A.  I'm on the faculty, the clinical faculty at Brown

11  University School of Medicine.

12  Q.  Do you work in a particular department within Brown

13  University School of Medicine?

14  A.  Within the department of psychiatry.

15  Q.  What is your title?

16  A.  Clinical assistant professor.

17  Q.  How long have you taught at Brown University's medical

18  school?

19  A.  Since June of 2020.

20  Q.  And what are your current responsibilities in your job at

21  Brown?

22  A.  I supervise psychiatrists in training, so psychiatric

23  fellows who are learning how to do adult psychotherapy.  I also

24  conduct seminars around issues pertaining to trauma and

25  traumatic stress.

1    Q.  Have you published articles on traumatic stress and

2    interpersonal violence?

3    A.  I have.

4    Q.  Do you have any other involvement in professional

5    publications?

6    A.  I do.  I'm on the editorial advisory board for the primary

7    journal for the division of trauma psychology within the

8    American Psychological Association.  And I also serve as a peer

9    reviewer for a number of other journals when topics come up

10   that pertain to my areas of expertise.

11   Q.  What does it mean to serve as a peer reviewer?

12   A.  So when someone wants to have an article published, they

13   will submit the article to the journal.  And then the editors

14   will send that article out to experts in the field to review

15   the article and provide feedback as to whether the article

16   should be accepted, whether significant or minor revisions are

17   in order, or whether the article should be rejected for

18   publication.

19   Q.  Have you given presentations in the area of traumatic

20   stress and interpersonal violence?

21   A.  Yes, many.

22   Q.  How did you come to give those presentations?

23   A.  So there are really two ways that I've given presentations.

24   One is through professional conferences, where you go through a

25   very similar peer review process for professional organizations

1  that are in the field of psychology or national and

2  international traumatic stress organizations.  And then I've

3  also given a number of invited addresses where I've been asked

4  to come and provide a lecture or a talk on a topic within my

5  area of expertise.

6  Q.  Do you belong to any professional organizations, Dr.

7  Rocchio?

8  A.  I do.

9  Q.  Do you hold any leadership positions for those

10 organizations?

11 A.  Yes, I do.

12 Q.  Can you explain briefly.

13 A.  Sure.  I'm currently the president-elect for the division

14 of trauma psychology within the American Psychological

15 Association.  I serve on the ethics committee for the American

16 Psychological Association.  Within my state psychological

17 association, I've served in various capacities.  I've been

18 president; and I'm currently serving there as their

19 representative, their council representative to the national

20 organization of the American Psychological Association.

21 Q.  Are you a fellow of any professional organizations?

22 A.  Yes.

23 Q.  Can you explain briefly.

24 A.  I'm a fellow of the American Psychological Association

25 within two divisions, the division of trauma psychology and the

1   division of independent practice.  And to be awarded fellow

2   status means that I have been recognized as having made unique

3   and significant, unusual contributions to the field of

4   psychology.

5   Q.  Dr. Rocchio, how do you keep up to date on the subjects in

6   which you specialize?

7   A.  Through a variety of ways.  Through regular peer

8   consultation, talking with other colleagues who are experts in

9   the field, reading the literature.  Certainly I learn a

10  tremendous amount from the clients with whom I work, attending

11  continuing education programming, and getting consultation from

12  peers on an as-needed basis.

13  Q.  Do you receive any additional education and training to

14  keep up to date?

15  A.  So as part of my licensure requirements and then also

16  because it's a way to keep up to date, I regularly attend

17  continuing education seminars, yes.

18          MS. POMERANTZ:  Your Honor, at this time the

19  government moves to qualify Dr. Rocchio as an expert in

20  psychology with a specialized expertise in traumatic stress and

21  interpersonal violence.

22          MR. PAGLIUCA:  No objection, your Honor.

23          THE COURT:  Consistent with my pretrial ruling, I do

24  deem Dr. Rocchio so qualified.

25          MS. POMERANTZ:  Thank you, your Honor.

1    BY MS. POMERANTZ:

2    Q.  Dr. Rocchio, have you interviewed any witnesses in this

3    case?

4    A.  No, I have not.

5    Q.  Do you know who the witnesses in this case are?

6    A.  I do not.

7    Q.  Has the government provided you with any specific details

8    about this case?

9    A.  No.

10   Q.  Are you aware of press and news reporting relating to the

11   allegations of this case?

12   A.  I'm aware of it, yes.

13   Q.  Do you have any personal knowledge of the facts of this

14   case?

15   A.  I do not.

16   Q.  To be clear, when you are describing aspects of childhood

17   sexual abuse today, will your testimony be based on information

18   from this specific case?

19   A.  No, it will not.

20   Q.  Dr. Rocchio, what, if any, compensation are you receiving

21   for testifying today?

22   A.  I'm being compensated for the time spent preparing to

23   testify and the time spent testifying.

24   Q.  What kind of basis is that done?

25   A.  I'm being paid hourly for my time.

1    Q.   Does the amount that you get paid depend in any way on the

2    outcome of the trial?

3    A.   No, it depends solely on the time spent.

4    Q.   Dr. Rocchio, I want to switch gears a little.

5             Based on your experience, research, and training, how

6    are most instances of childhood sexual abuse committed?

7    A.   When children are sexually abused, most often it's not done

8    through the use of physical force, but rather through grooming

9    and coercion in the context of a relationship with the child.

10   Q.   Are most instances of childhood sexual abuse committed by

11   strangers or people known to the children?

12   A.   Usually by people known to the child.

13   Q.   Based on your experience, research, and training, are you

14   familiar with the term "grooming"?

15   A.   I am.

16   Q.   What is grooming?

17   A.   Grooming is -- refers to a series of deceptive tactics,

18   strategies, *modus operandi* that are used by perpetrators for

19   the purpose of engaging a child in sexual abuse.

20   Q.   How long has the concept of grooming been recognized among

21   the psychological community?

22   A.   So childhood sexual abuse is a process.  And so the -- it

23   doesn't refer to a single event.  So understanding in reference

24   to these processes that offenders use to -- in order to

25   facilitate their sexual abuse has been part of the childhood

LC2VMAX2                          Rocchio - Direct

1    sexual abuse literature since we've been talking about sexual
2    abuse, so the early 1900s -- 1970s, I mean, sorry.  Grooming
3    itself, probably since about the 1980s.
4    Q.  Dr. Rocchio can I just ask you to move a little bit closer
5    to the microphone; I just want to make sure everyone can hear
6    you.
7    A.  Okay.  Sorry.
8    Q.  Thank you.
9             Is there one definition of grooming?
10   A.  No, there's not.  There's generally consensus around what
11   the process entails and the types -- and the stages that it
12   generally involves, but not one specific agreed-upon
13   definition.
14   Q.  Can you describe what grooming typically entails at a high
15   level.
16   A.  So it's usually thought to include behaviors that fall into
17   five general stages:
18            The first having to do with selection and
19   identification of a victim; then obtaining access and -- to the
20   victim and isolating that victim for the purpose of sexual
21   abuse; then engaging in lies and deception and manipulation in
22   order to build a relationship of trust and attachment with the
23   child; then a process of desensitizing the child to both
24   physical touch, sexual content, and sexual touch; and then
25   finally, a process of maintaining control in order to coerce

1  the child into continued sexual abuse and to reduce the

2  likelihood of disclosure.

3  Q.  Dr. Rocchio, I'd like to walk through those stages of

4  grooming in a little more detail.

5        Can you please explain the first stage for the jury.

6  A.  So we know from the literature -- literature both with

7  victims and with offenders -- that offenders typically seek to

8  target someone who they believe they're likely to be able to

9  successfully abuse.  They target vulnerable children,

10  vulnerable populations.  We also know this because there are

11  certain vulnerable populations that are at much higher risk for

12  being sexually abused.

13  Q.  Dr. Rocchio, can you explain the second stage of grooming

14  for the jury.

15  A.  So the second stage involves perpetrators putting

16  themselves in situations where they are likely to have access

17  to children, but also where they're being around children is

18  not likely to be questioned.  We often find perpetrators of

19  childhood sexual abuse in positions where there's lots of kids

20  around.  It may be as a coach or a teacher, working at a gym,

21  certainly boy scout leader, they put themselves in situations

22  where their involvement and relationship and access to children

23  are not going to be questioned.  And then they will begin to

24  isolate that child, the one that they've selected for

25  victimization, in order to have time alone with the child.

1   Q.  Can you please describe the next stage of grooming.  I

2   believe we're up to the third stage.

3   A.  Okay.  So once the perpetrator has access to the child, the

4   next thing that they typically do is engage in a series of

5   deceptive and coercive manipulative behaviors in order to build

6   a relationship of trust, attachment, and dependency.  So they

7   will exploit whatever vulnerabilities they've identified in the

8   child, and then put themselves in a position to meet those

9   unmet needs.

10       And that can involve anything from spending time with

11  the child; giving the child special attention; letting the

12  child know that they're unique or special in some way; creating

13  a false sense of family, you know, I'm somebody you can trust,

14  I'm somebody you can rely on; gift giving, sometimes using

15  money or exposing them to things that they wouldn't otherwise

16  have access to.  And that generally both increases the

17  likelihood that the child is going to become attached and

18  connected with the perpetrator, but also it increases the

19  perpetrator's power and control over the victim.

20  Q.  Dr. Rocchio, you mentioned gift-giving.  Based on your

21  experience, research, and training, what role can gift-giving

22  play in building a relationship between a child and a

23  perpetrator?

24  A.  Gift-giving can certainly be a very powerful inducement and

25  lure in the context of a relationship.  Again, especially to

1   the extent that you're working with -- that a perpetrator is

2   attempting to manipulate someone who perhaps has limited access

3   to resources and you start giving them things that -- you know,

4   that they need or that they like.

5           I've, for example, seen examples where a boy scout

6   leader might, you know, give camping equipment or someone else

7   might buy a really special car, if they know that the child is

8   really into cars, or fancy dresses or clothing or jewelry.

9   Anything that might persuade the child, again, that they are

10  special, that they are liked, that they are wanted, that they

11  are important to the perpetrator.

12  Q.  Based on your experience, research, and training, do

13  victims of childhood sexual abuse hold on to gifts given to

14  them by perpetrators?

15  A.  I think it can really depend.  It can depend on what the

16  gift is, what the meaning of the gift is to the individual.  So

17  certainly it wouldn't be unusual, particularly, again, if we're

18  talking about somebody who wouldn't otherwise have access to

19  that item, whatever it may be.  They may hold on to it because

20  it's a valuable item, it's something they like, it's something

21  they enjoy.

22          But also victims of childhood sexual abuse are often

23  very, very confused.  They're being harmed in the relationship

24  by the sexual abuse, but they also have developed this trust

25  and attachment.  So sometimes the gifts can symbolize the

1    positive parts of the relationship and serve to remind the

2    child that it wasn't all bad.

3    Q.  Dr. Rocchio, can you explain for the jury the next stage of

4    grooming.

5    A.  So once this relationship of trust and attachment has been

6    established, then the next stage involves a process of

7    desensitization, which means slowly and gradually moving the

8    line, and the perpetrator begins to define what is and is not

9    normal.

10          So with physical contact, for example, they may

11   initially start by normalizing touch.  Maybe, you know,

12   touching on the arm, touching on the shoulder, giving hugs.

13   That may escalate to, you know, sitting very close, touching a

14   leg, giving a massage; normalizing the idea that in a

15   relationship, you know, physical contact is happening.  And at

16   the same time, they're normalizing sexual material.

17          So they may begin slowly by talking about sex,

18   introducing the topic, telling sexual jokes.  That may escalate

19   to maybe showing risque movies, which might escalate to

20   pornography.  And then all of that will then escalate over time

21   to combining the sexual activity to sexual touch in the form of

22   sexual abuse.

23   Q.  Can you explain the fifth stage of grooming.

24   A.  So the fifth stage really is about maintaining the

25   relationship.  At this point now there's a dynamic of what's

1  referred to in the literature as entrapment and a dynamic of

2  coercive control whereby the perpetrator wants to maintain the

3  relationship, maintain the power they have over the victim of

4  childhood sexual abuse so that the abuse can continue, but also

5  to the extent that the child remains isolated and under the

6  control of the perpetrator, the victim is far less likely to

7  disclose.

8  Q.  Dr. Rocchio, based on your experience, research, and

9  training, how, if at all, common is it for a child to be

10  sexually abused multiple times by the same perpetrator?

11  A.  Unfortunately, it's very common.  Again, because it's

12  occurring in a relationship, oftentimes the perpetrator has

13  continued access and the abuse continues.

14  Q.  How long does it typically take to move through the stages

15  of grooming that you've described for the jury?

16  A.  It can really depend.  I mean, we call them stages, but

17  sometimes they occur simultaneously, sometimes they occur, you

18  know, more gradually.  So we can be talking about a process of

19  weeks, we can be talking about something that's happening over

20  the course of months or abuse that can continue over the course

21  of many years.

22  Q.  Based on your experience, research, and training, are you

23  familiar with the term "grooming the environment"?

24  A.  I am.

25  Q.  What is grooming the environment?

A.  Grooming the environment refers to -- it's most relevant to

the stages two and three in terms of gaining access and then

building trust.  It means that the perpetrator is known to

often not only develop a relationship of trust with the

intended victim, but also with individuals in the victim's

lives.

         So they may, for example, hold themselves out to

parents, say, as somebody who's going to be there as a support

to the parent, to fill some need that maybe the parent would

like to provide for the child, but for some reason is unable

to.  But, again, it's a series of lies and deceptive

manipulations that the perpetrator engages in so that when they

spend a lot of time alone with a child, it doesn't raise any

sort of suspicion and it increases access.  It also increases

the child's trust in the perpetrator because now you have other

adults perhaps that the child trusts who are kind of conveying

that this is -- this is a trustworthy and an okay person to be

spending time with.

Q.  Based on your experience, research, and training, do the

techniques used by perpetrators to build a relationship with a

child vary depending on the age of the child?

A.  Yes.  Perpetrators are really quite skillful.  And when

they are interviewed, they'll tell you that they can really --

they work hard to pinpoint exactly what it is they need to do

in order to win over the trust of a particular individual.

1            So if you're talking about a younger child, maybe it

2    will be camping gear, maybe it will be taking them out for ice

3    cream.  If you're talking about an adolescent, it might be

4    fancy clothes, it might be drugs and alcohol.  It can really

5    vary.

6    Q.  You talked about gift-giving.  How can you tell if that

7    gift-giving is grooming or innocent behavior?

8    A.  So gift-giving in and of itself is not grooming.  What

9    we're talking about is it's part of an entire process.  So you

10   have to look at the context in which the gift is giving -- is

11   given, I'm sorry.

12           Obviously we know anyone can give a gift to someone

13   else for perfectly reasonable reasons.  But if the gift is

14   being given along with all of these other behaviors where, you

15   know, there's inordinate access, there's deceptive techniques

16   being used to build a relationship of trust, there's isolation

17   of the child, and then desensitization to touch and sexual --

18   sexual abuse, then the gift-giving is occurring within the

19   context of the grooming process for the purposes of sexual

20   abuse.

21   Q.  Is grooming a concept used to predict whether an adult is

22   going to sexually abuse a child?

23   A.  No.  In the social sciences in psychology, we're actually

24   not very good at predicting behavior ahead of time.  So, no, we

25   haven't really been able yet to identify grooming as a

1   predictor.

2   Q.  Can you tell retrospectively whether someone who was abused

3   was also groomed?

4   A.  Sure.  Yeah.  On the individual level, for example, when

5   I'm providing treatment and I'm talking with someone who's been

6   abused, we'll be talking about how that abuse came to be.  And

7   often they'll be talking about the development of the

8   relationship and how they felt about this person and how it

9   unfolded over time.

10          And then we've also done scientific research that's

11   been done to also identify retrospectively the grooming

12   process.

13   Q.  Can you explain what you mean by the scientific research.

14   A.  Sure.  So there's a lot of research that's been done, for

15   example, with victims, talking with them about what their

16   experiences have been in terms of the childhood sexual abuse

17   that they've experienced.  And that's with both people who are

18   talking about the abuse as children or people who are talking

19   about it when they are adults.  So there's what -- that would

20   be called kind of the victim literature.

21          But then there are also a number of professionals who

22   do research and work with the offenders.  And they do research

23   talking with offenders about what sorts of behaviors they

24   engage in in order to lure and recruit and entrap children in

25   these sexually abusive circumstances.

1          And then finally, you have interviews and research
2     that's done with professionals in the field who work with both
3     victims and perpetrators.  So to the extent that you look at
4     the research and you see that what victims tell us has been
5     done to them, and you look at the research at what offenders
6     say that they do, and professionals who say that they see, to
7     the extent that all of those things are very, very similar,
8     that gives us some scientific support for the idea that this
9     is, in fact, a common occurrence.
10    Q.  And just to be clear, what is the consistency across those
11    various groups of literature that you were just describing?
12    A.  Very high level of consistency with what victims report has
13    been done to them and what offenders say that they do.
14    Q.  Dr. Rocchio, approximately how many patients have you
15    treated and evaluated who have reported behaviors consistent
16    with grooming?
17    A.  Hundreds upon hundreds.
18    Q.  Based on your experience, research, and training, how
19    useful, if at all, is the concept of grooming in treating and
20    assessing patients who report having been subjected to
21    childhood sexual abuse?
22    A.  It's very important.
23    Q.  Can you explain why.
24    A.  So in the course of treatment for one who's been abused as
25    a child, often the fact that the abuse occurred in the context

LC2VMAX2                      Rocchio - Direct

1    of a relationship with someone they had come to trust and

2    depend upon is a significant part of what they're struggling

3    with in therapy.  They are trying to understand how they could

4    have been fooled.  They are trying to look back at the

5    relationship and figure out what parts were real, what parts

6    weren't.

7             Often the fact that there were --

8             MR. PAGLIUCA:  Your Honor, may we approach?

9             THE COURT:  Yes, you may.

10            (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At sidebar)

2          MR. PAGLIUCA:  Your Honor, I'm going to object to this

3    as being outside what's been endorsed for this witness's

4    opinions in terms of the disclosure that was given to us.  This

5    is now a narrative into basically treatment of people as

6    opposed to identifying what is or is not grooming.  And that's

7    never been disclosed and we didn't do any *Daubert* on this.  I

8    think it's outside of the opinion.

9          MS. POMERANTZ:  Your Honor, this is part of her basis

10   of her grooming opinion and delayed disclosure.  This is

11   something that was extensively covered at the *Daubert* hearing

12   and in the briefing.

13         MR. PAGLIUCA:  Her clinical treatment of people and

14   identifying what is or is not grooming was discussed.  But now

15   she's getting into anecdotal discussions of treatment of her

16   own patients, I believe, which is inappropriate, A, and B, not

17   disclosed.  And I don't think that this can be the subject of

18   expert opinion.  This is simple anecdotal testimony about her

19   experience as a clinician.

20         MS. POMERANTZ:  Your Honor, she's explaining to the

21   jury the basis of her opinions.  This is something that we've

22   litigated already.

23         THE COURT:  It's a little different than what was

24   presented in the *Daubert*.  Just in this moment, that is to say,

25   it's appropriate to describe generally the nature of her

LC2VMAX2                          Rocchio – Direct

1    clinical experience.  But she turned in this last question a

2    little bit toward specific anecdotal discussion of her

3    treatment, and that's beyond the scope and it's different.

4            So I'll sustain with respect to this line and move to

5    the next.

6            MR. PAGLIUCA:  Thank you, your Honor.

7            (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LC2VMAX2                    Rocchio - Direct

1              (In open court)

2              THE COURT:  You may proceed.

3              No, I'm sorry.  I sustain the objection.

4              Next question.

5    BY MS. POMERANTZ:

6    Q.  Dr. Rocchio, based on your experience, research, and

7    training, is the person doing the grooming always the recipient

8    of the sexual gratification?

9    A.  No.  We know that --

10             MR. PAGLIUCA:  Your Honor, I object to this.

11             THE COURT:  Sustained.

12   Q.  Dr. Rocchio, based on -- without getting into your own

13   particular examples within your own clinical --

14             THE COURT:  Counsel, it's a different objection.  It's

15   based on my ruling.

16             MS. POMERANTZ:  Your Honor, may we be heard at

17   sidebar?

18             THE COURT:  You may.

19             (Continued on next page)

20

21

22

23

24

25

1          (At sidebar)

2          THE COURT:  This is grooming by third-party

3    involvement.  They called it grooming by proxy.  It is a

4    specific area that I precluded in my opinion.  That was the

5    only -- in the *Daubert*, the only questions that were asked

6    about whether there might be someone else who receives the

7    sexual gratification was in the context of that precise issue.

8    We talked about it in the context of testimony in the

9    pimp-prostitute context, and it was litigated entirely on that

10   question, and that's where I precluded it.

11         MS. POMERANTZ:  Your Honor, I just wanted to note we

12   weren't asking about the presence of a third party facilitating

13   a sexual abuse, which is what I understood your Honor's opinion

14   to be --

15         THE COURT:  Well, you're toying with that boundary in

16   a way that was not discussed in the *Daubert* hearing.  You

17   didn't ask that question that you just asked, and we only

18   discussed it.

19         So, for example, it sounds like she's giving an

20   opinion similar to the pimp-prostitute context, that we talked

21   about those cases precisely on this issue.  So you're toying

22   with the boundary of what I've precluded in a way that was not

23   brought out during *Daubert*.

24         MS. POMERANTZ:  Your Honor, I just note that I had

25   actually ran this question by defense counsel to avoid this

1    issue yesterday.  I'll move on.  That's fine.

2              MR. PAGLIUCA:  Let me make a record.

3         I raised this issue two days ago, and exactly this

4    issue, and was assured that the government was not going to go

5    to this issue.  And that question exactly was the question that

6    I raised about not going into that question.  And because --

7    well, I don't need to get into reasons, but because of

8    disclosures, I raised this issue, your Honor.

9         So I object to any further discussion about this,

10   which is prejudicial, it's outside of the scope of the -- well,

11   it's clearly, in my view, a violation of the Court's ruling.

12             MS. POMERANTZ:  Your Honor, I just want to be clear

13   for the record.  We had viewed this question as not coming

14   close to the line.  We understand the Court's opinion with

15   respect to the presence of a third party.  I was not intending

16   to ask that.  This is a distinct question.

17             THE COURT:  Did you ask this question at the *Daubert*?

18             MS. POMERANTZ:  I think we can check the transcript,

19   your Honor.

20             THE COURT:  Outside of the context of -- in any event,

21   I'm sustaining for the reasons I've indicated.  I have no idea

22   what happened in a discussion that you raised this and

23   understood them to say they wouldn't do it.  It's baffling to

24   me.

25             MS. POMERANTZ:  Your Honor, just to be clear, I ran

LC2VMAX2                        Rocchio - Direct

1    the exact question by Mr. Pagliuca.

2              THE COURT:  He's saying he ran the exact question by

3    you, you said you wouldn't do it.  Look, that's why we have a

4    court reporter now.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            (In open court)

2            THE COURT:  I sustain the objection.

3            I will direct the jury to disregard the last response

4    from the witness.  That testimony is struck.

5            Go ahead.

6    BY MS. POMERANTZ:

7    Q.  Dr. Rocchio, based on your experience, research, and

8    training, what factors, if any, place a child at increased risk

9    of being sexually abused?

10   A.  The research in particular has looked at what types of

11   vulnerability factors place children at higher risk.  And they

12   generally fall into factors pertaining to either the child's

13   characteristics, personal characteristics, issues pertaining to

14   the parents and the parental characteristics, and issues

15   pertaining to the family.

16   Q.  Can you explain the personal factors.

17   A.  So we know that children who have experienced victimization

18   of any kind, whether it's prior child sexual abuse or physical

19   and emotional abuse or neglect are at much higher risk, for

20   example, of being revictimized later.  We know that children

21   who have certain kinds of psychological or chronic health

22   difficulties can be certainly at much higher risk for child

23   sexual abuse.  We know that children who come from

24   disadvantaged circumstances can be at higher risk, children

25   with cognitive and intellectual disabilities, for example;

1    children who come from -- who are members of minority gender or

2    sexual groups are also at higher risk.

3    Q.  You also mentioned parental factors.  Can you explain that

4    for the jury please.

5    A.  To the extent that there's conflict and particularly, to

6    the extent that there's violence between the parents in the

7    home, certainly to the extent that there are financial

8    difficulties within the home, so children, families, parents

9    who have less -- fewer resources, are at higher risk.

10          To the extent that the parents themselves have

11   experienced any form of abuse in their own backgrounds, that

12   also places the child at higher risk.  To the extent that the

13   parents are abusive to the child, that puts the child at risk

14   for being abused by others.  And there's also research to show

15   that the presence of a stepfather in the home or oftentimes a

16   single parent can, under certain circumstances, put a child at

17   higher risk.

18   Q.  You also mentioned family factors.  Can you explain those

19   please.

20   A.  Those factors refer to the family functioning in general.

21   So children who have poor attachment, poor connection with

22   other family members are at higher risk.  Families where there

23   are other children in the home who are being abused or have

24   been abused are at higher risk.  Families who are isolated, for

25   example, those families that have moved six or more times in

1    the course of a child's lifetime, that single factor can place

2    a child at higher risk.  So these are vulnerabilities that have

3    been found to be specific to child sexual abuse risk.

4    Q.  Based on your experience, research, and training, Dr.

5    Rocchio, are you familiar with the term "attachment"?

6    A.  I am.

7    Q.  What is attachment?

8    A.  Attachment really refers to the relationship and connection

9    between two people.  The research was initially done looking at

10   the caregiver attachment, so typically the relationship that it

11   develops between a mother and an infant.  But it's since

12   expanded to look at relationships between other caregivers and

13   children, as well as adults.

14   Q.  Can you please explain the relationship, if any, between

15   attachment and grooming.

16   A.  So in the context of building a relationship of trust and

17   using coercion and deception and lies in order to manipulate

18   the child, one of the things that offenders are doing is trying

19   to create increased dependency, trust, and attachment.  They

20   hold themselves out as somebody who is special to the child,

21   and the child feels often very special, and that there's

22   something unique and important and valuable about their

23   relationship with the perpetrator.

24   Q.  Dr. Rocchio, based on your experience, research, and

25   training, are you familiar with the term "coercive control"?

1   A.  I am.

2   Q.  What is coercive control?

3   A.  Coercive control refers to a strategic pattern of

4   domination for purposes of controlling another individual and

5   getting that individual to either do or not do things that you

6   want them to do or not do.

7   Q.  What is the relationship between grooming and coercive

8   control?

9   A.  So the whole pattern of the grooming process is designed to

10  create an environment of coercive control, whereby the negative

11  aspects of the relationship, the abuse itself or intimidation

12  or threats, are interspersed with these positive or neutral

13  events which causes the attachment to keep going.  It kind of

14  keeps the hope alive that there are positive aspects to the

15  relationship.  It causes confusion and difficulty identifying

16  the abuse as wrong on the part of the victim.  And it keeps the

17  victim in a state of what's referred to as entrapment and under

18  the power and control of the perpetrator.

19  Q.  Based on your experience, research, and training, how do

20  the grooming process and the concept of attachment impact the

21  way in which a victim of childhood sexual abuse understands the

22  abuse?

23  A.  So what we know, from both my training, research, and the

24  scientific literature, as well as my experience, is that the

25  grooming and attachment and the degree to which the child is

1  close to the perpetrator is very closely tied to adverse

2  outcomes and really can interfere with their ability to

3  identify that what's happening -- even realizing that what's

4  happening to them is abusive or is wrong.

5  Q.  Dr. Rocchio, does the relationship of trust and attachment

6  between a victim and a perpetrator affect whether a victim

7  tells someone about the abuse?

8  A.  Yes.

9  Q.  Can you explain how?

10  A.  One of the things that we know when we look at when do

11  victims of childhood sexual abuse tell and who do they tell is

12  we know that they are less likely to tell and more likely to

13  have a delay in telling the closer the relationship to the

14  perpetrator.

15  Q.  Based on your experience, research, and training, are you

16  familiar with a concept called "delayed disclosure"?

17  A.  I am.

18  Q.  Can you explain for the jury what delayed disclosure is.

19  A.  Delayed disclosure really just refers to when does someone

20  tell.  So in the case of delayed disclosure in terms of child

21  sexual abuse, we would call disclosure telling delayed when it

22  happens at some point after the abuse has occurred.

23  Q.  Does disclosure of childhood sexual abuse depend on the

24  victim's age?

25  A.  Yes.

LC2VMAX2                         Rocchio - Direct

1   Q.   How so?

2   A.   We know that younger -- the younger someone is, the more

3   likely they are to delay disclosure; in other words, the less

4   likely they are to tell someone right away about what's

5   happening to them.

6   Q.   And when you say "the younger," how does that compare in

7   terms of children?

8   A.   So when we're talking about children, they are much less

9   likely to disclose.  And most children, in fact, we know don't

10  tell anyone about the abuse that they've experienced until

11  adulthood.

12  Q.   Is it common for children to disclose sexual abuse at or

13  near the time of the abuse?

14  A.   Not at all, no.

15  Q.   Why is it not common?

16  A.   There are a number of factors.

17         Delayed disclosure is such a common -- commonly

18  recognized phenomenon within the literature that now we are

19  doing research to try to identify what are the barriers to

20  disclosure because, of course, we would like children to be

21  able to tell their experiences sooner so that they can get

22  access to help and so that the abuse can be stopped.  So there

23  have been identified both internal barriers and external

24  barriers to disclosure.

25  Q.   When you say "external barriers," what are you referring

1    to?

2    A.   So the external barriers are things that are outside the

3    child.  So, for example, fear of getting into trouble for an

4    adolescent; in particular, fear that if they tell someone,

5    their freedom is going to be constricted; fear that others are

6    going to judge or blame them; fear often that the perpetrator

7    is going to get into trouble.  Again, remembering that they

8    have a close relationship with this person often, and even

9    though the person has been sexually abusing them, there's this

10   sense of loyalty.

11          So those would be examples of the external factors in

12   contrast to the internal factors.

13   Q.   What are the internal factors, Dr. Rocchio?

14   A.   So the internal factors have much more to do with the

15   feelings of shame, feelings of guilt, the feelings of

16   self-blame, the feelings of confusion, perhaps not

17   acknowledging to oneself that what's happening is abusive.  So

18   those are the kind of emotions that go along with the impact of

19   being sexually abused during childhood.

20   Q.   Is the concept of delayed disclosure established in

21   scientific literature?

22   A.   It is.

23   Q.   Can you explain.

24   A.   So sexual abuse, in particular, of all kinds is thought to

25   be one of the most underreported crimes.  But we certainly know

1    that when we talk -- there are a lot of studies that are done,

2    national studies, interviewing, say, adults, asking about a

3    whole range of experiences that they've had during the course

4    of their lifetime.  And that research has repeatedly

5    demonstrated that when people -- when you ask people if they

6    acknowledge that they've been abused, particularly sexually

7    abused, during childhood, and then you ask them if they ever

8    told anyone, a significant number will say no, not until this

9    interview.  And then others will say yes, and then they are

10   asked when they've told.  And we know from the research that

11   often they don't tell until adulthood.

12   Q.  In your clinical and forensic practices, have you treated

13   and evaluated patients who did not disclose sexual abuse they

14   experienced as children, but disclosed such abuse later?

15   A.  Yes.

16   Q.  Without getting into any particular anecdotes of your

17   practices, can you explain.

18   A.  I'm sorry, can you repeat the question.

19   Q.  Yes.  Can you just explain -- let me ask it this way:  In

20   your own clinical practice, how common, if at all, is it for

21   you to be the first person your patients have told they were

22   abused?

23            MR. PAGLIUCA:  Your Honor, I'm going to object to this

24   as not being relevant.

25            THE COURT:  Overruled.  Thank you.

1  A.  It's very common in both my clinical and forensic work for

2  individuals to tell me that either they had a significant delay

3  in disclosure, and at times in my clinical work sometimes I am

4  the very first person they've ever spoken about the abuse with.

5  Q.  To be clear, how common is delayed disclosure in the

6  patients you treat and evaluate in connection with your

7  clinical and forensic practices?

8  A.  Very common.

9  Q.  Based on your experience, research, and training, if an

10  individual was sexually abused as a child, who, if anyone, is

11  that individual most likely to disclose the sexual abuse to?

12  A.  If and when they choose to disclose, most often they're

13  going to tell a trusted friend.  If we're talking about

14  adolescents, they're going to talk to a peer.  If we are

15  talking about adults, a trusted friend.  Sometimes, as I

16  alluded to when I said that I'm the first person they tell,

17  sometimes it may be in the context of a therapy setting.

18  Q.  Based on your experience, research, and training, is an

19  individual who was sexually abused as a child likely to report

20  the abuse to law enforcement?

21  A.  No.  Unfortunately, we know that rape, sexual assault,

22  childhood sexual abuse, again, they are the most underreported

23  crimes.  And law enforcement agencies are actually the least

24  likely group to which an initial report or disclosure is made.

25  Q.  Dr. Rocchio, based on your experience, research, and

1    training, how do people who have experienced childhood sexual

2    abuse talk about or disclose the abuse?

3    A.   It's important when --

4              MR. PAGLIUCA:  Your Honor, I'm going to object to this

5    foundation for this question.

6              THE COURT:  Just a moment.

7              Foundation and what else?

8              MR. PAGLIUCA:  The question is very vague, your Honor.

9              THE COURT:  Okay.  So a form objection?

10             MR. PAGLIUCA:  Yes.

11             THE COURT:  I'll sustain.

12             Can you rephrase, Ms. Pomerantz.  Is the question in

13   the context of clinical therapy?

14             MS. POMERANTZ:  I asked based on the experience,

15   research, and training.  I'm happy to be more specific, your

16   Honor.

17             THE COURT:  Go ahead.  Thank you.

18             MS. POMERANTZ:  Thank you.

19   BY MS. POMERANTZ:

20   Q.   Dr. Rocchio, in your clinical practice, how do people who

21   have experienced childhood sexual abuse talk about or disclose

22   the abuse?

23   A.   Disclosure is a process that unfolds over time.  So

24   individuals will typically begin the disclosure maybe by

25   alluding to what's happened in a general sense or the gist of

what's happened.  And then it's only over time that they will

begin to talk more specifically about what has happened.  And

even in therapy, oftentimes disclosure of the most intimate or

difficult details is something that's very hard and individuals

are very reluctant to do.

Q.  Dr. Rocchio, in your clinical experience, what factors --

withdrawn, your Honor.

          Dr. Rocchio, in your clinical and forensic experience,

what factors contribute to if and when a person discloses the

childhood sexual abuse they experienced?

A.  It has to do with the degree to which they feel safe, the

degree to which they feel that they are going to be believed.

Again, as it's a process that unfolds over time, they may begin

to talk about it.  And then to the extent that they are getting

messages that they are being judged or that they are being

blamed or shamed, they may shut down.  To the extent that they

feel supported and believed, then they may be more likely to

continue with that disclosure, again, over time.

Q.  Dr. Rocchio, what, if any, long-term impact does childhood

sexual abuse have on victims?

A.  We know that although all adverse events that occur during

childhood can place children at higher risk for adverse

outcomes, we know that among those, child sexual abuse in

particular increases risk for a very, very high number of

various health problems and mental health problems and also

1   increases risk for the severity of those problems.

2   Q.  Dr. Rocchio, what is the relationship between grooming and

3   attachment and the impact of childhood sexual abuse?

4   A.  So the closer the relationship between the child and the

5   perpetrator, and the longer the abuse has gone on, the more

6   likely --

7          MR. PAGLIUCA:  Your Honor, I'm going to object to this

8   as being asked and answered.  I think we're recovering ground

9   here.

10         THE COURT:  I understand that.  It's asked and

11  answered.  Thank you.  Sustained.

12         MS. POMERANTZ:  Your Honor, may I have a moment

13  please?

14         THE COURT:  You may.

15         (Counsel conferred)

16  BY MS. POMERANTZ:

17  Q.  Dr. Rocchio, when you treat victims of childhood sexual

18  abuse for trauma, how does the concept of trust factor into the

19  treatment?

20         MR. PAGLIUCA:  I object to this being outside of the

21  scope, your Honor and, I think, asked and answered as well.

22         THE COURT:  Those are kind of conflicting objections,

23  but overruled.  I'll allow it.  You may answer.

24  A.  Trust is central often in the treatment of someone who's

25  been sexually abused, because it's often the part that is most

1   confusing and also causes the most -- the most harm.  We know

2   that the more they trusted the individual, then, of course, the

3   more they feel betrayed, the more betrayal there's been.  And

4   to the extent that there's betrayal in the relationship, then

5   the individuals are really struggling to a much, much greater

6   degree, often trying to understand what happened, how it

7   happened and why, and what its effect is certainly.

8           MS. POMERANTZ:  Nothing further, your Honor.

9           THE COURT:  All right.  Thank you.

10          We'll take our mid-morning break, members of the jury,

11  about a 15-minute break.  Thank you so much.

12          (Jury not present)

13          THE COURT:  You may be seated.

14          Matters to take up?

15          MS. POMERANTZ:  Your Honor, I just wanted to note, the

16  government understood that the Court's opinion excluded Dr.

17  Rocchio's opinion regarding the presence of a third party.

18          We did check the transcript, your Honor.  And on page

19  73, I had asked a question about whether there was anything

20  about what you're testifying about here that says that grooming

21  can only be done for the benefit of the person doing the

22  grooming, to which Dr. Rocchio responded, No, there's not.  And

23  then your Honor had asked a series of questions relating to the

24  presence of a third party, what the defense has been referring

25  to as grooming by proxy, which is a different subject matter.

LC2VMAX2                         Rocchio - Direct

1    And then I believe I had returned to questions about that

2    topic.

3              So I just wanted to note that for your Honor that

4    we -- when I asked that question, I believe that it was

5    different from the question -- the opinion that your Honor had

6    excluded.

7              Your Honor, there is a distinction between the

8    presence of a third party and whose sexual gratification the

9    grooming is for; that that is part and parcel of the larger

10   topic of grooming and attachment.

11             I'm not trying to relitigate it, your Honor --

12             THE COURT:  Oh, you're not?

13             MS. POMERANTZ:  Well, if your Honor would permit me --

14             THE COURT:  Looking at the transcript, I think it's

15   consistent with my ruling.  I understand you're saying you

16   didn't intentionally -- the point you're making is you didn't

17   intentionally violate my ruling.

18             MS. POMERANTZ:  Yes, your Honor.

19             THE COURT:  Okay.  And I see the portion of the

20   transcript.  I continue to think the testimony regarding

21   whether strategies that she's testifying about can be utilized

22   for the sexual gratification of the person doing the grooming

23   we explored in the *Daubert* context specifically with me asking

24   whether she talked about -- whether there was literature

25   comparable to the pimp-prostitute context in which grooming

LC2VMAX2                          Rocchio - Direct

1    happens for the gratification of a third person.

2            And I said, Is there anything like that in the child

3    sexual abuse context beyond the, sort of, institutional

4    authority positions that you've discussed?

5            And she said no, which was the basis for my exclusion

6    of that small window of her testimony.

7            So I still think that even if there are slightly

8    distinct points to be made as to whether grooming always

9    happens for the sexual gratification of the person who's doing

10   the grooming, and whether grooming by a third person

11   facilitates child sexual abuse for another person, for me, the

12   context in the *Daubert* overlapped and related to the same

13   issue, which is the narrow issue that I excluded on.

14           So I take your point that there's a slight analytical

15   distinction and, therefore, I don't believe you intentionally

16   violated my ruling.  I do think sustaining the objection is

17   consistent with that ruling.  I don't understand how it could

18   be that in conferring, both counsel completely misunderstood

19   each other.  Mr. Pagliuca says he asked specifically about the

20   question that you asked, and understood you to say that you

21   wouldn't ask it.  And you said you asked specifically about

22   this question and you understood him to say he didn't have an

23   objection.  Wow.  I can't explain that.  It seems to me that

24   you had this discussion on this issue precisely because it

25   comes up to the question of the boundaries of the opinion and

1    there we are.

2              Anything further?

3              MR. PAGLIUCA:  Not from me, your Honor.

4              MS. POMERANTZ:  Your Honor, nothing further.

5              I just wanted to note that in the transcript for your

6    Honor.  Our understanding is that the question that had been

7    posed to Dr. Rocchio was about the presence of third parties,

8    and just wanted to make that clear for your Honor when she had

9    said no, that was our understanding as to what she was saying

10   no about, in terms of the support in the literature, your

11   Honor.

12             But I take your Honor's point.  We can move on, your

13   Honor.  I just wanted to explain that to the Court, where the

14   question was coming from, your Honor.

15             THE COURT:  The question you asked that was objected

16   to here was, Based on your experience, research, and training,

17   is the person doing the grooming always the recipient of the

18   sexual gratification?

19             For the reasons I've indicated, that is precluded by

20   the narrow basis on which I did preclude what they call

21   grooming by proxy.  Again, I see there's a slight analytical

22   distinction between the question you asked and that theory, but

23   the question, I think -- and I see that she says no, that

24   wasn't how she understood it.  But still for me, that testimony

25   was in aid of the next piece, which I excluded.

1        So again, I don't -- I don't think you intentionally

2   violated the line of the order.

3        MS. POMERANTZ:  Thank you, your Honor.

4        THE COURT:  I still don't understand the

5   miscommunication.

6        Anything else to take up?

7        I don't understand the miscommunication between

8   counsel, that is.

9        MS. POMERANTZ:  Thank you, your Honor.

10        THE COURT:  Anything else?

11        MS. POMERANTZ:  Not from the government.

12        MR. PAGLIUCA:  No, your Honor.

13        THE COURT:  All right.

14        We will resume in ten.  Thank you.

15        (Recess)

16        THE COURT:  Matters to take up?

17        MS. POMERANTZ:  Yes, your Honor.  Apologies.

18        Thank you, your Honor.

19        We had an opportunity to confer with the defense just

20   now in terms of topics for cross-examination.  And we

21   understand that Mr. Pagliuca intends to cross-examine Dr.

22   Rocchio about certain topics that were not the subject of her

23   direct testimony and of topics about which he has not proffered

24   an expert opinion, such as things like the halo effect or

25   suggestive memory and the like.  And so I wanted to flag that

1  for the Court because we think that such questions would be

2  inappropriate on cross-examination.

3          THE COURT:  So beyond the scope.

4          MS. POMERANTZ:  Yes, your Honor.

5          MR. PAGLIUCA:  Would you like me to respond, your

6  Honor?

7          THE COURT:  Please.

8          MR. PAGLIUCA:  So I guess first with regard to the

9  memory issue, Dr. Rocchio talked about delayed disclosure and

10 memory impacts delayed disclosure.  And it's not as simple to

11 say that there are only a couple of reasons why disclosure is

12 delayed.  I mean they can say, Well, there are these factors

13 that result --

14         THE COURT:  So is the cross -- Dr. Rocchio, you talked

15 about delayed disclosure.  Are there other reasons?

16         MR. PAGLIUCA:  Exactly.

17         THE COURT:  And then what?

18         MR. PAGLIUCA:  Well, like memory and things like

19 confabulation and the process of storing memories and

20 retrieving memories, the effect of alcohol on memories.  Those

21 are the kinds of things that would impact memory and,

22 therefore, delayed disclosure, which I think are fair game on

23 cross-examination; psychological conditions that may impact

24 delayed disclosure is fair game on cross-examination.

25         So those are some of the topics.

1          THE COURT:  So the basic point is to the extent she

2     talked about the literature regarding delayed disclosure in the

3     context of sexual abuse, you want to ask if there are other

4     reasons for delayed disclosure.

5          MR. PAGLIUCA:  Yes.

6          THE COURT:  And explore her expertise on those other

7     reasons?

8          MR. PAGLIUCA:  Well, she's being proffered as an

9     expert in psychology, to begin with, and trauma.  And the

10    interplay between trauma, psychology, and delayed disclosure is

11    simply not you're close to somebody and, therefore, you don't

12    disclose or you feel embarrassed about something and you don't

13    disclose.  There are other things, and they relate to other

14    facts in this case.  And I think that we're entitled to bring

15    those things out on this expert who is testifying as a blind

16    expert.  It's just fair game for cross-examination.

17         THE COURT:  I think there's two questions.  There's

18    scope of direct and, I agree, to the extent that she's

19    testified for a reason about delayed disclosure, you can cross

20    her as to whether she's aware of other reasons for delayed

21    disclosure.

22         I think the question is whether there is a version of

23    that which is then seeking to solicit, sort of, not just I'm

24    aware of other reasons.  Are you aware of this kind of

25    literature?  Are you aware of that kind -- but to actually have

LC2VMAX2                          Rocchio - Direct

1    her explain, as an expert, opinions, undisclosed opinions,

2    regarding some of those issues.  And I can't tell yet from your

3    proffer whether you're trying to do the former or the latter

4    or --

5              MR. PAGLIUCA:  I'm not going to ask her for any

6    opinions, your Honor.  I'm going to be using leading questions

7    throughout all of this.  So there will be no --

8              THE COURT:  Well --

9              MR. PAGLIUCA:  -- opportunity for her to give an

10   opinion other than yes or no.

11             THE COURT:  Well, we'll see about that.

12             MR. PAGLIUCA:  I understand.  Of course.  611 allows

13   you to control the examination 100 percent, your Honor, and I

14   get that.  But I don't intend to, I guess that's the answer to

15   the Court's question.

16             THE COURT:  Ms. Pomerantz?

17             MS. POMERANTZ:  Your Honor --

18             THE COURT:  So in terms of -- let's just start with

19   scope, if we could.

20             So to the extent she's testified around her opinions

21   regarding delayed disclosure in this context, is it fair

22   cross-examination and within the scope of that to suggest that

23   there are other reasons for delayed disclosure?

24             MS. POMERANTZ:  Your Honor, may I just have one

25   moment?

1          (Counsel conferred)

2          MS. POMERANTZ:  Your Honor, I think the issue or the

3     concern from the government is that --

4          THE COURT:  Can we start with the answer to my

5     question, and then tell me what the issue is.

6          MS. POMERANTZ:  Your Honor, unfortunately, I think the

7     question -- the answer is a little complicated because --

8          THE COURT:  I can handle it.

9          MS. POMERANTZ:  In the sense that I don't -- your

10    Honor, I have no doubt in that.  I meant that it's not a yes or

11    no answer; because I'm a little unclear on what Mr. Pagliuca is

12    intending to do.

13         THE COURT:  We're going to see and there might be a

14    line, but that's why I want to just start with the first

15    question, right.

16         So the first question is you made a scope objection.

17    The witness testified about delayed disclosure in the context

18    of sexual abuse.  Is it fair cross to ask if there are other

19    reasons for delayed disclosure?

20         MS. POMERANTZ:  I believe so, your Honor.

21         THE COURT:  Okay.  So then tell me where you think the

22    line turns from that fair cross into soliciting opinions.

23         MS. POMERANTZ:  Your Honor, I think the concern is

24    where Mr. Pagliuca intends to ask questions about, you know,

25    You're aware there's theory about X, certain topics.  But she

1    is not an expert on those topics and has not been proffered --

2    has not been offered as an expert on those topics.  That is

3    crossing the line.  And it seems that this more proper; this

4    would be an area where they are trying to explain, I think, why

5    it's relevant to offer their own expert, as opposed to why they

6    should be able to cross Dr. Rocchio on those opinions.

7         THE COURT:  I'm having trouble in the abstract

8    understanding the objection.  Frequently, cross of experts is

9    essentially versions of, Well, haven't you heard the theories

10   of my expert, who's going to come testify, to suggest that

11   they're providing too narrow of a view or to introduce

12   criticisms through the cross-examination.  I suspect you'll

13   cross-examine their witness in similar ways, won't you?

14        MS. POMERANTZ:  Your Honor, I think we would.  But I

15   think we wouldn't be going into areas in which their expert

16   wasn't necessarily, you know, qualified as an expert.

17        THE COURT:  I've qualified her as an expert to provide

18   opinions on delayed disclosure in the context of sexual abuse.

19   We've established that it's fair cross to ask if there are

20   other bases for delayed disclosure.  We'll see what she's aware

21   of and what she's not and that will determine.  I won't -- and,

22   you know, I won't allow a long -- what I imagine might be

23   problematic is you attempting to assert some other expert's

24   opinion, undisclosed expert opinion, and then say, Are you

25   familiar with that?  So that you're effectively putting in

1    expert testimony through your cross-examination.

2              MR. PAGLIUCA:  I do not intend to do that, your Honor.

3    I would say that absent a few other questions, much of my

4    cross-examination -- and not, frankly, on the topic of the

5    literature that was discussed during the *Daubert* hearing, but

6    much of my cross-examination is similar to that which was --

7    that occurred that your Honor pointed out during the hearing

8    was -- may be appropriate in front of a jury.  That was a

9    comment that the Court made.

10             THE COURT:  I did say that.

11             MR. PAGLIUCA:  That was not helpful to you during the

12   *Daubert* hearing, but it might be helpful in front of a jury.

13             So that is some of the cross-examination.

14             THE COURT:  I think I particularly said that when you

15   were spending a fair amount of time on hourly fees.

16             MR. PAGLIUCA:  I understand, your Honor.

17             THE COURT:  Has very little effect on me.

18             MR. PAGLIUCA:  I understand.

19             THE COURT:  I understand the concern, at least with

20   respect to suggestive memory.  We've established there's some

21   fair grounds to cross to make sure she's considered other

22   bases.  That's kind of classic cross of an expert.  I won't

23   allow insertion of undisclosed expert testimony via

24   cross-examination questions, and you won't do that.  And you'll

25   object, Ms. Pomerantz, if so.

LC2VMAX2                         Rocchio - Direct

1              Halo effect.

2              MR. PAGLIUCA:  So I'm not going to call -- well, I

3    don't think I'm going to call it that, your Honor.  But on

4    direct examination, the government elicited testimony

5    specifically about -- and let me get to my notes here so I can

6    be accurate -- grooming the environment was the --

7              THE COURT:  Grooming the environment.

8              MR. PAGLIUCA:  Yes, "grooming the environment" was the

9    catchphrase, which Dr. Rocchio said was a commonly recognized

10   phenomena used by perpetrators in the service of getting the

11   accusers to victims and building that relationship with trust.

12             This is based on one of the articles that Dr. Rocchio

13   provided to the government and was referenced during the

14   *Daubert* hearing and relied on by Dr. Rocchio as part of her

15   testimony here today in terms of the five -- you may recall the

16   five stages of grooming that we went through with Dr. Rocchio

17   about an hour ago.  That article is called *Stages of Sexual*

18   *Grooming, Recognizing Potentially Predatory Behaviors of Child*

19   *Molesters,* and is disclosed at 3500 material, 3502-018,

20   disclosed to me by the government through Dr. Rocchio.  And in

21   that article, there is a discussion at page 9, and they call it

22   the hindsight bias phenomena.  And so I am intending to ask

23   her --

24             THE COURT:  So you have a theory that everything in

25   any article disclosed is within the scope of the direct?

LC2VMAX2                          Rocchio - Direct

1          MR. PAGLIUCA:  No, your Honor.

2          THE COURT:  Okay.  So let's go back to that question.

3          So you started by saying grooming the environment.

4          MR. PAGLIUCA:  Right.

5          THE COURT:  What does this have to do with it?

6          MR. PAGLIUCA:  Well, because what that -- what the

7     testimony from Dr. Rocchio was and is, is that the perpetrator

8     is deceiving people around the perpetrator.  She talked about

9     the boy scout business and all of that.  And that is part of

10    this hindsight -- bias hindsight effect which is referred to in

11    the literature.  And I think it's appropriate to bring that out

12    as part of this testimony.

13          (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

LC2Qmax3

1          THE COURT:  What's the question?

2          MR. PAGLIUCA:  The question will be: Isn't it true

3    that hindsight bias phenomena could lead to blame of the

4    victim's family or community from not preventing the abuse,

5    which is a direct quote out of article that she is basing her

6    testimony on.

7          THE COURT:  I'm sorry.  I don't have LiveNote.  Can

8    you give that to me again?

9          MR. PAGLIUCA:  The quote?

10         THE COURT:  No, your question.

11         MR. PAGLIUCA:  The question is:  Isn't it true that

12   the hindsight bias phenomena can lead to blame to the victim's

13   family or community for not preventing the abuse?

14         THE COURT:  That sounds beyond the scope to me.

15         MR. PAGLIUCA:  Beyond the scope of an article --

16         THE COURT:  I just started with the proposition is it

17   your theory that everything in an article disclosed suddenly is

18   within the scope of the direct, and you said no, rightly.  So

19   that's why I asked for the question.

20         The question you asked is beyond the scope of the

21   direct, unless you want to point me to testimony suggesting

22   otherwise, other than the fact that it's in an article

23   disclosed.

24         If I would make everybody answer my first question,

25   it's the first question that gets me where I need to go.

LC2Qmax3

1          MR. PAGLIUCA:  Ms. Menninger points out that she also
2     said --
3          THE COURT:  Is that in the testimony?
4          MR. PAGLIUCA:  Yes.  Two things.  This is in my notes
5     as well.
6          Grooming not always easily detected, and these factors
7     are not used to predict grooming.  That's what she testified
8     to.
9          And the next-question is along the lines of, you know,
10    you are deceiving those around you, and people don't
11    necessarily know that they are being groomed along with the
12    other individuals being groomed.
13          So I do not have to call it hindsight bias.
14          THE COURT:  I don't see yet how that links up to the
15    question that you gave me.
16          MR. PAGLIUCA:  It's a different --
17          THE COURT:  It sounds beyond the scope to me.
18          MR. PAGLIUCA:  It's a different question.
19          THE COURT:  What's the question?
20          MR. PAGLIUCA:  The question is the people who are
21    grooming the environment are grooming the people around them
22    and it is often difficult for the people that are -- that are
23    in the environment being groomed to recognize that this
24    grooming behavior is occurring.
25          THE COURT:  I would permit that question.

1            MR. PAGLIUCA:  Okay.  Ms. Pomerantz.

2            MS. POMERANTZ:  That question seems fine, your Honor.

3            I think the government agrees with your Honor that the

4    other questions were beyond the scope.

5            MR. PAGLIUCA:  May I?  As long as we're on this topic,

6    your Honor, I would like to preview another area from this

7    article that I think is within this, but I want to make sure

8    that the Court agrees with me before I go down this road.

9            THE COURT:  Go ahead.

10           MR. PAGLIUCA:  The article that we're talking about

11   which is at 3502-018, the government's disclosure, the study

12   that was done in this particular article, and which I believe

13   this is the basis for her testimony about this grooming the

14   environment, and so the study that she is referring to

15   factually, there were 395 undergraduate students at John Jay

16   College here who were given the five vignettes, I will call

17   them, of this grooming behavior and asked in a sixth vignette

18   which was non-grooming behavior, and they were asked to predict

19   prospectively whether or not that was grooming behavior, and

20   they couldn't.  And the conclusion of the study was the five

21   factors that she was talking about cannot be used to

22   prospectively predict grooming behavior.  And I would like to

23   bring out those facts on cross-examination.

24           THE COURT:  Sure.  I mean, that's consistent with her

25   testimony.

LC2Qmax3

```
 1              MR. PAGLIUCA:  Thank you.

 2              THE COURT:  Right?

 3              MS. POMERANTZ:  I believe so, your Honor, yes.

 4              THE COURT:  Not a problem.

 5              MS. POMERANTZ:  I think that's right.

 6              THE COURT:  But thank you for raising it.

 7              MR. PAGLIUCA:  That's it.  I think we're good.

 8              THE COURT:  Get the jury.  Binder for the witness?

 9              MR. PAGLIUCA:  That is the binder for the witness.

10              THE COURT:  Ms. Pomerantz, you are familiar with the

11     binder?

12              MR. PAGLIUCA:  It's simply her testimony from the

13     Daubert hearing, which is the 3500 material and the article we

14     discussed.

15              MS. POMERANTZ:  Your Honor, may I please look at it

16     first, if possible?

17              MR. PAGLIUCA:  I promise, I didn't sneak in anything

18     else.

19              (Jury present)

20              THE COURT:  Mr. Pagliuco, you may begin your

21     cross-examination of Dr. Rocchio.

22              Dr. Rocchio, I remind you, you are under oath.

23              MR. PAGLIUCA:  Thank you, your Honor.

24

25
```

1   CROSS-EXAMINATION

2   BY MR. ROHRBACH:

3   Q.   Good morning, Dr. Rocchio.

4   A.   Good morning.

5   Q.   Dr. Rocchio, you talked a bit about your review of

6   literature in connection with the topics that you talked about

7   today.  Do you recall that testimony this morning?

8   A.   I do.

9   Q.   You yourself have not published anything specifically about

10  the topic of grooming, correct?

11  A.   No.

12  Q.   And you yourself have not conducted any metadata studies to

13  collect and analyze literature about grooming, correct?

14  A.   Correct.

15  Q.   And a metadata study is a somewhat comprehensive review of

16  the literature on the topic, analyzing that literature, and

17  then having a publication that deals with the metadata

18  analysis.  Is that a fair summary of what that would be?

19  A.   A statistical analysis, yes.

20  Q.   So the studies that you were discussing with the jury are

21  studies that are done by other people, correct?

22  A.   Yes, experts in the field.

23  Q.   You are aware that there is some disagreement in the

24  scientific literature about the topic of grooming, correct?

25  A.   About certain aspects of the topic, yes.

1    Q.  Yeah.  And there are other respected professionals who

2    disagree with some of your opinions about this topic, correct?

3    A.  I -- I couldn't answer that.  I'm not sure.

4    Q.  Well, for example, Dr. Dietz, correct?

5    A.  Which aspect of my opinion are you suggesting?  Could you

6    be more specific?

7    Q.  Well, you are aware from your review of the literature, for

8    example, that Dr. O'Donohue has a disagreement with your

9    opinion on the topic of grooming, correct?

10   A.  I think that there are -- we're actually largely consistent

11   in terms of the literature, both publications by Bennett and

12   O'Donohue and by Dietz.

13   Q.  Okay.  Some of the things that -- well, your testifying

14   here is what's commonly referred to as a blind expert, correct?

15   A.  Correct.

16   Q.  And that basically means that you don't have any factual

17   information about the case, correct?

18   A.  It typically means I haven't evaluated any of the parties

19   in the case, and I'm testifying about specific subject matter

20   expertise.

21   Q.  Right.  So, for example, you don't know any of the

22   individuals who are making allegations in this case, right?

23   A.  No, I do not.

24   Q.  And you haven't talked to any of the prosecution witnesses

25   in this case, correct?

LC2Qmax3                          Rocchio - Cross

1   A.  Correct.

2   Q.  And you have not reviewed any of the witness statements in

3   connection with this case, correct?

4   A.  Correct.

5   Q.  You haven't performed any psychological evaluation on

6   anyone in connection with this case, correct?

7   A.  Correct.

8   Q.  You are testifying having met with the government some

9   approximately 15 times in connection with this case or

10  talked --

11  A.  I don't believe it's that many, but a number of times, yes.

12  Q.  Okay.  And the only information that you have really has

13  come from the government lawyers about this case, correct?

14  A.  They haven't provided me with any details about the case at

15  all.

16  Q.  And you have a contract with the government for $45,000 in

17  connection with this case, correct?

18  A.  Up to $45,000, yes.

19  Q.  Now, you're not offering any opinions about what did or did

20  not happen in this case, correct?

21  A.  Correct.

22  Q.  And you're not offering any opinions about any witness

23  credibility in connection with this case, correct?

24  A.  Correct.

25  Q.  You're not a neuropsychologist, correct?

LC2Qmax3                    Rocchio - Cross

1    A.   Correct.

2    Q.   And neuropsychology is the study of the human behavior as

3    it relates to normal and abnormal functions of the central

4    nervous system, correct?

5    A.   Sure.

6    Q.   And that involves the brain, which is a significant part of

7    the central nervous system, right?

8    A.   Yes.

9    Q.   You're not a toxicologist, which involves a specialized

10   study of the effects of alcohol and drugs on the human body,

11   correct?

12   A.   Correct.

13   Q.   You did talk a little bit about disclosure and memory.  Do

14   you recall that testimony?

15   A.   I believe I spoke about disclosure.

16   Q.   Right.  And delays in disclosure, right?

17   A.   Correct.

18   Q.   And memory is a factor that contributes to a potential of

19   delay in disclosure, correct?

20   A.   It can.

21   Q.   And there are two components to whether people can

22   accurately remember things as part of disclosure.  One would be

23   the physical ability for someone to store or retrieve a memory?

24   A.   Is that a question?

25   Q.   Yes.  Is that correct?

1    A.  Could you clarify?  I'm not really sure what you're asking.

2    Q.  Sure.  For example if somebody has a traumatic brain

3    injury, it may be difficult for someone as a matter of

4    physiology to retrieve a memory?

5              MS. POMERANTZ:  Objection, your Honor.

6              THE COURT:  Sustained.

7    Q.  There are other factors that relate to the ability of

8    someone to accurately disclose a piece of information about any

9    alleged abuse, correct?

10             MS. POMERANTZ:  Objection, your Honor.

11             THE COURT:  Sustained.

12   Q.  Would you agree with me, Dr. Rocchio, that, for example,

13   alcohol consumption can impact the disclosure of an event?

14   A.  I guess it would depend on the context.  That question is

15   so broad, I'm not really sure how to answer it.

16   Q.  If someone is consuming alcohol or controlled substances,

17   they may not have a very good recall of a particular event,

18   correct?

19             MS. POMERANTZ:  Objection, your Honor.

20             THE COURT:  Sustained.

21   Q.  Are you familiar with the concept of confabulation,

22   Dr. Rocchio?

23             MS. POMERANTZ:  Objection.

24             THE COURT:  Overruled.

25   A.  I am.

1   Q.   Confabulation is the brain under certain circumstances

2   filling in gaps to make a whole picture of something, correct?

3   A.   Yes.

4   Q.   And a filling in of these gaps may or may not be accurate,

5   but the person actually may believe what's been filled in?

6            MS. POMERANTZ:   Objection, your Honor.

7            THE COURT:   Sustained.

8   Q.   When you're talking about delayed disclosure, Dr. Rocchio,

9   you didn't talk about two concepts that can impact delayed

10  closure and memory:   One of those would be secondary gain.   Are

11  you familiar with that concept?

12  A.   I am.

13  Q.   That's a diagnostical and statistical manual definition --

14           MS. POMERANTZ:   Objection, your Honor.

15           THE COURT:   Sustained.

16  Q.   Are you familiar with the concept of malingering,

17  Dr. Rocchio?

18  A.   I am.

19           MS. POMERANTZ:   Objection, your Honor.

20           THE COURT:   Overruled.

21  Q.   Malingering is the fabrication of symptoms for financial

22  gain, correct?

23           MS. POMERANTZ:   Objection.

24           THE COURT:   Sustained.

25  Q.   You talked about delays in disclosure about people being

1   close.  Do you recall that?

2   A.  Disclose in disclosure when there is a close attachment

3   between the perpetrator and the victim of child sexual abuse,

4   yes.

5   Q.  Right.  And when you say perpetrator, we're talking about

6   an allegation.  So you're making an assumption that someone is

7   a perpetrator --

8           MS. POMERANTZ:  Objection, your Honor.

9           THE COURT:  Overruled.

10  Q.  -- in that context, correct?

11  A.  No, I'm talking about the literature that's been done on

12  child sexual abuse, so a significant amount of that literature

13  is conducted by --

14  Q.  That's fine, Dr. Rocchio.

15          THE COURT:  You may finish.  You may finish.  Go

16  ahead.

17  A.  A significant amount of that literature has been conducted

18  on known and corroborated or admitted --

19          MR. PAGLIUCA:  Your Honor, I'm going to object to this

20  as being --

21          THE COURT:  You asked the question and then you

22  interrupted halfway through.

23          MR. PAGLIUCA:  This is beyond the scope of my

24  question.

25          THE COURT:  No, it's not.  That's why I allowed the

1     question.

2               Overruled.  You may finish.

3     A.  No, it's not an assumption, because a lot of the research

4     that I'm talking about and much of my experience in both

5     clinical and forensic settings has been conducted when the

6     abuse is actually known or have been found in a court of law to

7     have occurred or the event offender has admitted to the

8     behavior.

9     Q.  You offered some opinions about grooming, Dr. Rocchio.  I

10    think you referred to grooming as a series of tactics and

11    strategies that are commonly experienced by victims and

12    utilized by offenders in the course of deceiving the child

13    building a relationship of trust and then eventually sexually

14    abusing the child.  Is that correct?

15    A.  Yeah, that's a summary of what I said.  Sure, yes.

16    Q.  And these behaviors that you're referring to as grooming

17    behaviors can also be non-grooming behaviors as well, correct?

18    A.  Some of them can, yes.

19    Q.  And so there are many things that we do that in hindsight

20    one might say is grooming, but prospectively you can't tell

21    whether or not it's grooming, right?

22    A.  It would be important though to -- grooming is not a

23    specific behavior.  It's a series and a pattern of behavior

24    that's taking into account the entire pattern.  So it wouldn't

25    be just a specific individual behavior.

LC2Qmax3                         Rocchio - Cross

Q.  Well, let's talk about specific individual behaviors, for
example.  My grandfather used to take me to the Bronx Zoo, and
I liked going there.  Is that a grooming behavior or not a
grooming behavior?
A.  Given that in your hypothetical I'm assuming he wasn't
taking you there for the purposes of sexual abuse, it would not
be.
Q.  So the importance there is whether or not someone is doing
something for an improper purpose.  Is that correct?
A.  So, the intent around sexual exploitation and abuse is
built into the definition of grooming when it's being used in
the discussions of child sexual abuse, yes.
Q.  Right.  So there are many things that parents do, for
example, that are normal behaviors that would not be considered
grooming behaviors, true?
A.  True.
Q.  Such as buying presents for their children, correct?
A.  Yeah.
Q.  Taking their children to special places, correct?
A.  Yes.
Q.  Treating the child specially, correct?
A.  Yes.
Q.  Paying attention to the child, correct?
A.  Again, in the context of a healthy normal relationship, no,
that would not be considered grooming.

1    Q.  Being nice to someone is not considered grooming, correct?

2    A.  In the context of a healthy normal relationship, no.

3    Q.  You also talked about grooming the environment.  Do you

4    recall that testimony?

5    A.  I do.

6    Q.  And that is an alleged perpetrator manipulating the

7    environment around the perpetrator and children to achieve an

8    improper purpose, correct?

9    A.  An alleged or found perpetrator manipulating often the

10   individuals in the child's environment.

11   Q.  Well, and that could include manipulating people around the

12   perpetrator as well, correct?

13   A.  Yes.

14   Q.  Right.  So if the perpetrator is in a business, for

15   example.  Let's say the perpetrator is a boy scout leader, to

16   use your example, right?

17   A.  Okay.

18   Q.  The perpetrator could deceive co-employees or their bosses

19   so that the behavior that the perpetrator is engaging in looks

20   normal to the people around the perpetrator, correct?

21   A.  Yes.  Perpetrators are quite good at hiding their

22   manipulative behaviors.

23   Q.  And deceiving those people around them, correct?

24   A.  They can, yes.

25   Q.  And those folks can become sort of pillars in the community

LC2Qmax3                    Rocchio - Cross

1   with an air of respectability around them and use that to

2   deceive people around them, correct?

3   A.  Perpetrators, you mean?

4   Q.  Yes.

5   A.  Yes, they can.

6   Q.  You discussed in your direct examination testimony, I think

7   you referred to them as five stages of grooming.  Do you recall

8   that testimony?

9   A.  I do.

10  Q.  And those five stages were discussed in the article by

11  Winters and Jeglic, that was published in 2016.  Do you recall

12  that?

13  A.  That's one of the places that the stages of the grooming

14  process is referred to, but it's referred to in multiple other

15  literature.

16  Q.  Well, let's stick with that one for a moment, okay?

17  A.  Okay.

18  Q.  And that's a paper that you actually provided to the

19  government in connection with your testimony.  Do you recall

20  that?

21  A.  Yes.

22  Q.  And so you're familiar with that publication, correct?

23  A.  I am.

24  Q.  And in that -- and that's a peer reviewed article, correct?

25  A.  Correct.

1    Q.   And it was done by folks who are at John Jay College here

2    in New York.  Do you recall that?

3    A.   I don't recall where the authors reside, no.

4    Q.   Do you recall that part of the study involved using what

5    they call six vignettes and providing those to 393

6    undergraduate students?

7    A.   I do.

8    Q.   And the six vignettes were -- a vignette is like a story,

9    right?

10   A.   Yes.

11   Q.   And so what the authors were doing were taking these six

12   vignettes, five of them involving what you discussed, the five

13   stages of grooming, and then a sixth vignette which was a

14   non-grooming vignette.  Do you recall that?

15   A.   I don't recall the exact number of vignettes as I sit here

16   today, but I do recall that they were using vignettes in that

17   study, yes.

18   Q.   And they would need a controlled vignette for the purpose

19   of this study which was the sixth vignette.  Do you recall

20   that?

21   A.   Not specifically as we speak here, but I'm happy to review

22   it if you'd like.

23   Q.   Sure.  I think you have a binder there that has this at a

24   tab.

25               THE COURT:  Dr. Rocchio, could you come little closer

1   to the mic when you're answering?

2          THE WITNESS:  Sorry.

3   Q.  I think it's tab 18.  Do you have a tab 18?

4   A.  Yes, I do.

5   Q.  And that's the study that we're talking about?

6   A.  It's one of them, yes.

7   Q.  That's the study you and I are talking about right now,

8   correct?

9   A.  Yes.

10         THE COURT:  May I have it?

11         MR. PAGLIUCA:  Yes, your Honor.

12  Q.  Tell me when you've had enough time to review that.

13  A.  So, if your question is:  Was one of the vignettes used a

14  non-grooming condition, yes.

15  Q.  Yes, okay.  And those vignettes were given to these 393

16  undergraduate students to review, correct?

17  A.  Yes.

18  Q.  And they were asked questions about whether or not they

19  could identify what you've called grooming behavior as grooming

20  behavior, correct?

21  A.  So this was one of the predictive studies, yes.

22  Q.  Right.  And so that's the question they were asked:  Can

23  you predict this as being grooming behavior, correct?

24  A.  Correct.

25  Q.  And these 390-some-odd college students who reviewed these

LC2Qmax3                          Rocchio - Cross

1   vignettes weren't able to prospectively predict this behavior

2   as grooming behavior, correct?

3   A.  Correct.

4   Q.  And so one of the conclusions of the study is that the

5   participants are not able to identify potential predatory

6   behaviors that may be employed, correct?

7   A.  Correct.

8   Q.  And the certainty of these behaviors, what you're calling

9   grooming behaviors' predictability, is very low according to

10  this study, correct?

11  A.  The certainty of the behavior?

12  Q.  Predictability of the behavior?

13  A.  We're not able to reliably predict grooming behavior ahead

14  of time, that is correct.

15  Q.  Prospectively?

16  A.  Yes.

17  Q.  Meaning, looking at something while it's going on and

18  saying that is or is not grooming behavior?

19  A.  For a number of reasons, yes.

20  Q.  Right.

21          MR. PAGLIUCA:  Those are all the questions I have,

22  your Honor.

23          MS. POMERANTZ:  Your Honor, may I just have a moment?

24          THE COURT:  You may.

25          (Pause)

LC2Qmax3                          Rocchio - Redirect

1    REDIRECT EXAMINATION

2    BY MS. POMERANTZ:

3    Q.  Dr. Rocchio, you were asked about grooming the environment

4    and about whether perpetrators deceive other adults around

5    them.  Dr. Rocchio, based on your experience, research, and

6    training, if a perpetrator abused a child in front of another

7    adult, is that grooming the environment?

8              MR. PAGLIUCA:  Your Honor, I object to this as being

9    beyond the scope of my examination.

10             THE COURT:  I'm --

11   A.  No --

12             THE COURT:  I'm sorry, just a second.

13             I'll sustain.  The jury will disregard that response.

14             MS. POMERANTZ:  Your Honor, may I have one moment?

15             THE COURT:  You may.

16             (Pause)

17             MS. POMERANTZ:  Your Honor, no further questions.

18             THE COURT:  Thank you, Dr. Rocchio.

19             THE WITNESS:  Thank you.

20             THE COURT:  You may step down.

21             (Witness excused)

22             THE COURT:  The government may call its next witness.

23             MS. COMEY:  The government calls Juan Alessi.

24             THE COURT:  Juan Alessi may come forward.

25

LC2Qmax3                        Alessi - Direct

1    JUAN PATRICIO ALESSI,

2         called as a witness by the Government,

3         having been duly sworn, testified as follows:

4              THE WITNESS:  My name is Juan Patricio Alessi.

5    J-U-A-N.  Patricio, P-A-T-R-I-C-I-O.  Alessi, A-L-E-S-S-I.

6              THE COURT:  Thank you.  You may proceed, Ms. Comey.

7              MS. COMEY:  Thank you, your Honor.

8    DIRECT EXAMINATION

9    BY MS. COMEY:

10   Q.  Good afternoon, Mr. Alessi.

11   A.  Good afternoon.

12   Q.  How old are you?

13   A.  I gonna be 72 couple weeks.

14   Q.  Where were you born?

15   A.  I was born in Quito, Ecuador.

16   Q.  Where did you grow up?

17   A.  I grew up to 19 in Quito, Ecuador.

18   Q.  Where did you go after you turned 19?

19   A.  I came to the United States.

20   Q.  How far did you go in school?

21   A.  I have one year of premed student.

22   Q.  What kind of work did you do after coming to the United

23   States?

24   A.  I only had three jobs before -- when I came to the United

25   States.  One was in a bottling company, perfume company, and

LC2Qmax3                    Alessi - Direct

1  another one was the largest dairy in New Jersey.

2  Q.  Mr. Alessi, I'm going to ask you to get closer to the

3  microphone please and make sure it points towards your mouth.

4  I want to make sure everyone can hear you.

5  A.  Okay.  This better now?

6  Q.  Thank you.

7         After you worked in New Jersey, where did you go next

8  A.  We moved to Florida.

9  Q.  What kind of work do you do now?

10  A.  Now?  I am retire.

11  Q.  About when did you move to Florida?

12  A.  We move early 1994.

13  Q.  What type of work did you do after moving to Florida?

14  A.  I work for a very wealthy family in the city of Palm Beach.

15  They have a multiple properties, and I was a maintenance guy

16  for those properties.

17  Q.  What did you do after that?

18  A.  After that I start to work at -- for myself doing the same

19  work, the same repairman service for different families in Palm

20  Beach.

21  Q.  For about how long were you self-employed working for

22  different families in Palm Beach?

23  A.  About a year and a half.

24  Q.  What did you do after that?

25  A.  After that I was a -- I work for Mr. Jeffrey Epstein.

LC2Qmax3                        Alessi - Direct

1    Q.  About when did you meet Jeffrey Epstein?

2    A.  I meet Mr. Epstein in early 1990.

3    Q.  How did you meet Jeffrey Epstein?

4    A.  He -- he contact me because I was referred to him by one of

5    his friends, Mr. Meister, and I went to -- also, I was working

6    at Mr. Wexner's mother's house, and I was contacted by

7    Mr. Epstein.

8    Q.  Ms. Drescher, would you please pull up what's in evidence

9    as Government Exhibit 112.

10          Looking at the screen in front of you, Mr. Alessi, do

11   you recognize the person in this Exhibit?

12   A.  Yes, that's Mr. Jeffrey Epstein.

13   Q.  Thank you.  We can take that down, Ms. Drescher.

14          What was your job title when you first started working

15   for Mr. Epstein?

16   A.  I was just a self-contractor to do the dismantling of the

17   house.  He just purchase a house.

18   Q.  What house was that?

19   A.  At 358 El Brillo Way.

20   Q.  Was that in Palm Beach, Florida?

21   A.  Palm Beach, Florida.

22   Q.  For about how long were you involved in renovating

23   Mr. Epstein's house?

24   A.  I was working as a self-contractor for about a year.

25   Q.  Just to get the timeline, about what year did you first

1  start working for Mr. Epstein?

2  A.   I start working for him around 1990.

3  Q.   And about when did you stop working for him?

4  A.   I start -- I stop working for Mr. Epstein December -- at

5  the end of December 2002.

6  Q.   At first, during the first couple years you worked for

7  Mr. Epstein, what were your job responsibilities?

8  A.   When I start working for him, my responsibility was doing

9  repairs in the house, the dismantling of many rooms in the

10  house.  That's it.

11  Q.   About how long did those renovations on the house take?

12  A.   It took it about a year.

13  Q.   And during that time, was Mr. Epstein able to stay in the

14  house?

15  A.   Yes.

16  Q.   About when were the renovations completed?

17  A.   I would think, I will say it's 1991.

18  Q.   After that, were there any other renovations on

19  Mr. Epstein's Palm Beach house?

20  A.   Yes, it was done by a big company.  They did huge

21  extension -- extensive -- expensive and extensive renovation.

22  Q.   About when were those renovations completed?

23  A.   They were completed around 1994.

24  Q.   Over the time that you worked for Mr. Epstein how, if at

25  all, did your job responsibilities change?

1   A.   My job responsibilities change when Mr. Epstein asked me to

2   work full time only for him and leave all my clients that I had

3   in Palm Beach and to work full time for him only.

4   Q.   About when was that?

5   A.   1991.

6   Q.   And then what were your job responsibilities?

7   A.   My job responsibilities changed gradually during the years.

8   From being a contractor outside, I went to work inside the

9   house for Mr. Epstein.

10  Q.   What was your job title?

11  A.   I was in charge of the running of the house.

12  Q.   And what does that mean to be in charge of the running of

13  the house?

14  A.   I was responsible for overseeing the -- the cleanliness,

15  the maintenance, the shopping for the house, the taking care of

16  the people who work outside the house:  The gardeners, the pool

17  man.

18  Q.   When you were responsible for the house and Mr. Epstein was

19  staying in Palm Beach, what hours did you work?

20  A.   Too many hours.

21  Q.   Can you approximate for us?

22  A.   My job starts between 5:00 in the morning, and we finish

23  around 9:00, 10:00 at night.

24  Q.   Why did you have to work such long hours?

25  A.   It was required by my position.

1    Q.  When Mr. Epstein was in Palm Beach, where did you sleep?

2    A.  Most of the time I sleep in the staff quarters.  I had a

3    room at the house.

4    Q.  Who else worked in the house with you during your

5    employment with Mr. Epstein?

6    A.  After three years working for him, I bring my wife to help

7    me.  She would stay with me, and also there was other girls

8    that was constantly flying with them -- with Mr. Epstein and

9    Ms. Maxwell to the house.

10   Q.  Focusing on your wife, about when did she start working for

11   Mr. Epstein?

12   A.  I think it was 1995.

13   Q.  And until when did she work for Mr. Epstein?

14   A.  She left at the same time I did.

15   Q.  In December 2002?

16   A.  Yes.

17   Q.  When Mr. Epstein was not in Palm Beach, where would you

18   stay?

19   A.  Most of the times I stayed -- we had an apartment across

20   the bridge in West Palm Beach.

21   Q.  Would you please describe what Mr. Epstein's Palm Beach

22   house looked like during the time you worked for him?

23   A.  Yes.  It was very large residence.  It had, I think, was

24   ten bathrooms, around six bedrooms, a very large property.  It

25   had a pool house we used to call the cabana.  When I start

1    working for him, that's it.

2    Q.   How many structures were on Mr. Epstein's Palm Beach

3    property?

4    A.   In the beginning, it was just the main house and the pool

5    house.  At the end -- almost at the end of my staying there,

6    they constructed a staff quarters.  There was a house separate

7    from the main residence, and it was in there there were three

8    bathrooms, three bedrooms, a small living room, dining room,

9    and it was a very large laundry room, the staff house.

10   Q.   That third structure, that staff house, about when was it

11   built?

12   A.   I have to say 1999, 2000.

13   Q.   Do you remember the cabana being on the property the entire

14   time you worked for Mr. Epstein?

15   A.   Yes, I do.

16   Q.   What color was the main house when you first started

17   working for Mr. Epstein?

18   A.   The main house was white, and I painted, and it was pink

19   after I painted.

20   Q.   Was it still pink when you left in 2002?

21   A.   Yes, it was still pink.

22   Q.   Other than Mr. Epstein, who else, if anyone, gave you

23   instructions about your job responsibilities during your

24   employment?

25   A.   Ms. Maxwell.

LC2Qmax3                         Alessi - Direct

1    Q.  About when did you first meet Ms. Maxwell?

2    A.  I met Ms. Maxwell around 1991.

3    Q.  Do you know her full name?

4    A.  Ms. Ghislaine Maxwell.

5    Q.  When you first met Ms. Maxwell, what did she look like?

6    A.  She was a pretty girl, tall, brunette.

7    Q.  For how long did you know Ms. Maxwell?

8    A.  Since I -- since she came to the house until I left.

9    Q.  In 2002?

10   A.  Yes.

11   Q.  Do you think you would recognize her if you saw her in

12   person again?

13   A.  Yes.

14   Q.  Do you see her in the courtroom today?

15   A.  Yes, I think she is with a black sweater.

16   Q.  Would you please point her out?

17   A.  (Indicating)  At the corner.

18          MS. COMEY:  Would the record please reflect that the

19   witness has identified the defendant?

20          THE COURT:  The record so reflects.

21   Q.  Mr. Alessi, about how often did you interact with

22   Ms. Maxwell while you were working for Mr. Epstein?

23   A.  On a daily basis.

24   Q.  Why did you interact with her on a daily basis?

25   A.  Because I had all the orders from Mr. Epstein where I

1    suppose it was passed to Ms. Maxwell, and she would interact

2    with me directly.

3    Q.  So did you primarily receive your instructions from

4    Ms. Maxwell?

5    A.  Yes, I did.

6    Q.  What, if any -- what kinds of instructions do you remember

7    Ms. Maxwell giving you over the time that you worked for

8    Mr. Epstein?

9    A.  Many, many instructions.  From cleaning the house to the

10   way we should serve, the way the kitchen should be handled, the

11   way the shopping list should be done and the cleanliness of the

12   house.

13   Q.  By what name did Ms. Maxwell call you?

14   A.  She call me John.

15   Q.  Is that your name?

16   A.  Well, my name is -- she call me John, and Mr. Epstein

17   called me John, but my name is Juan.

18   Q.  Do you know where she call you John instead of Juan?

19   A.  John is translation for Juan.

20   Q.  Over your years of employment, based on your observations

21   of Ms. Maxwell and Mr. Epstein, what was your understanding of

22   the nature of their relationship?

23   A.  They were -- Ms. Maxwell was the girlfriend of Mr. Epstein.

24   I understand she was the lady of the house.

25   Q.  What, if anything, did Ms. Maxwell tell you about her role

1   in Mr. Epstein's life?

2   A.  From the day she came to the house, she -- she right away

3   took over, and she mentioned to me that she was going to be the

4   lady of the house, and also she was in charge of other homes,

5   other properties.

6   Q.  Whose other properties was she in charge of according to

7   her?

8   A.  Of Mr. Epstein.

9   Q.  What was your relationship with Mr. Epstein like before you

10  met Ms. Maxwell?

11  A.  It was cordial.

12  Q.  How, if at all, did that change after you met Ms. Maxwell?

13  A.  It changed gradually from being cordial to be more --

14  more -- just professional, in a professional manner.  Our

15  conversation with him were less and less and less.

16  Q.  What, if anything, did Ms. Maxwell tell you about whether

17  you could speak directly to Mr. Epstein?

18  A.  Well, only I was supposed to speak to Mr. Epstein when he

19  asked me questions.

20  Q.  What, if anything, did Ms. Maxwell tell you about eye

21  contact?

22  A.  At the end of my stay, it was a time when she says Jeffrey

23  doesn't like to be looked at his eyes.  You should never look

24  at his eyes.  Just look at another part of the room and answer

25  to him.

1   Q.  During your time working for Mr. Epstein, how often was

2   Mr. Epstein at the Palm Beach residence?

3   A.  It was almost every weekend of the year.  All the holidays

4   he'd spend it in Palm Beach.  Usually he left Palm Beach either

5   on a Monday or a Tuesday, and he was back in Palm Beach either

6   Thursday or Friday.  The whole weekend we have to be there.

7   Q.  Was there a set schedule for when Mr. Epstein would be in

8   Palm Beach?

9   A.  No.

10  Q.  How much notice would you typically receive before he came

11  to Palm Beach?

12  A.  Sometimes one day, sometimes couple hours before.

13  Q.  When you heard Mr. Epstein was coming to Palm Beach, what

14  were you required to do?

15  A.  It was extensive preparations.  It was very hectic, very --

16  a lot of work, a lot of work.

17  Q.  What kind of work?

18  A.  From cleanliness of the house, to make the -- change the

19  sheets in his room, to change the sheets in all the guest

20  rooms, prepare the guest rooms, prepare food, do the shopping,

21  and the cars, taking care of the cars.  Make sure the cars were

22  clean.  Make sure the cars have money -- hundred dollar bills

23  in the car in every car.  The cars they have to be immaculate.

24  The house needs to be -- he run the house like a five-star

25  hotel.

1  Q.  About how often was Ms. Maxwell at the Palm Beach residence

2  during the time you worked there?

3  A.  Can you repeat the question?

4  Q.  About how often was Ms. Maxwell at the Palm Beach residence

5  during the time you worked there?

6  A.  I would say she was with Mr. Epstein 95 percent of the

7  times.

8  Q.  Ms. Drescher, could we please pull up what's been marked

9  for identification as Government Exhibit 298.

10         Mr. Alessi, I think that's a binder up next to you.

11  You're welcome, with the Court's permission, to look at a paper

12  copy of 298 if that's easier than the screen.

13  A.  No, I think I prefer the screen.

14  Q.  Do you recognize this exhibit?

15  A.  Yes, this is a --

16         THE COURT:  Sir, I need you to speak to the

17  microphone.  Thank you.

18  A.  Yes, this is the main floor of the house, the first floor

19  of the house.

20  Q.  Is this a fair and accurate depiction of the layout of the

21  first floor of Mr. Epstein's Palm Beach residence?

22  A.  Yes, very accurate.

23         MS. COMEY:  Your Honor, I offer this in evidence.

24         MR. PAGLIUCA:  No objection.

25         THE COURT:  PX-298 is admitted.

```
 1                 (Government's Exhibit 298 received in evidence)
 2                 MS. COMEY:  Ms. Drescher, can we please publish this?
 3                 THE COURT:  You may.
 4                 MS. COMEY:  Oh, excuse me.  Thank you, your Honor.
 5      BY MS. COMEY:
 6      Q.  Mr. Alessi, can you please walk us through the layout of
 7      this house using Government Exhibit 298?
 8      A.  Can I use my finger?
 9                 THE COURT:  I think you have to describe it with your
10      words.  Maybe start in the left-hand corner.
11                 MS. COMEY:  Your Honor, is the touch screen available
12      on the witness's screen?
13                 THE COURT:  I'm not sure.
14                 MS. COMEY:  May I ask Ms. Drescher to check, please?
15                 THE COURT:  Sure.
16                 MS. COMEY:  Thank you.
17      A.  Okay.  I gonna describe the front entrance going into the
18      main house, and I will describe the back entrance going from
19      the garage section of the --
20      Q.  Mr. Alessi, I'm going to stop you there.  I don't think the
21      touch screen is working, so I'm going to work with Ms. Drescher
22      to zoom in on the parts we're talking about.
23                 THE COURT:  Actually, we have our jurors' lunch, so we
24      can break if Ms. Williams is ready.  Let me just check.  We'll
25      break and then you can work on that during the break.
```

LC2Qmax3                         Alessi - Direct

1              Members of the jury, see you in about 45 minutes.

2       Thank you.  Enjoy your lunch.

3              (Jury not present)

4              THE COURT:  You may be seated.

5              Matters to take up, counsel?

6              MS. COMEY:  Not at this time, your Honor.

7              MR. PAGLIUCA:  No, your Honor.

8              THE COURT:  You can work on the touch screen, but do

9       be mindful that we need to describe it for the record as well.

10             MS. COMEY:  Yes, of course, your Honor.

11             THE COURT:  Let's resume in 45, please.  Thank you.

12             (Luncheon recess)

13             (Continued on next page)

1         A F T E R N O O N   S E S S I O N

2                          1:30 P.M.

3         THE COURT:  Matters to take up?

4         MS. COMEY:  No, your Honor.

5         MR. PAGLIUCA:  No, your Honor.

6         THE COURT:  All right.  We'll bring in the jury.

7         (Jury present)

8         THE COURT:  Just a moment while we wait for one more

9    juror.

10        All right.  Good afternoon, jurors.  I hope you had a

11   nice lunch.  Thank you for your continued diligence and

12   attention.

13        Ms. Comey, you may continue with your direct

14   examination of Mr. Alessi.

15        MS. COMEY:  Thank you, your Honor.

16   JUAN PATRICIO ALESSI, resumed.

17   BY MS. COMEY:

18   Q.  Good afternoon, Mr. Alessi.

19   A.  Good afternoon.

20   Q.  I'd like to pick back up with Government Exhibit 298.

21        MS. COMEY:  Ms. Drescher, would you please pull that

22   exhibit up.

23   Q.  Mr. Alessi, I'm going to try to use the touch screen to

24   draw your attention to particular parts of this exhibit.

25        So first, I'm going to circle the room labeled foyer.

LC2VMAX4                           Alessi - Direct

1    Can you see that?

2    A.  Yes.

3    Q.  And that's at the center of this page.

4          Can you describe this area of the house for us please.

5    A.  Yes, this is the front entrance.

6          THE COURT:  I'm sorry.  Mr. Alessi, could you pull up

7    the microphone, please.  Thank you.

8          THE WITNESS:  Put it closer?

9          THE COURT:  That's good.  Thank you.

10   A.  Okay.  This is the front entrance.  And it's a single door,

11   very tall.  At the left of the door was a stairway going to the

12   second floor.  Coming into the foyer, to the right is going

13   into the lake room or living room.

14         To your right you have Mr. Epstein desk --

15   Q.  I'm going to pause you right there, Mr. Alessi.

16   A.  Yup.

17   Q.  I'm going to clear the markings and circle now the room

18   labeled lake room.  Can you please continue describing that

19   room.

20   A.  Yes.  Coming into the lake room, to the right against the

21   wall, there was Mr. Epstein desk.  Behind the desk is where

22   stereo equipment and hundreds and hundreds of books of all the

23   way to the wall.  This are -- is sliding doors.  All the

24   sliding door is glass.

25   Q.  And for the record, are you indicating the far right wall

1   on this exhibit?

2   A.   Yes.

3   Q.   Please continue.

4   A.   In here was a large couch and different chairs and small

5   couches in the living room.

6   Q.   Thank you.  Let's move up now to the garden room which I've

7   just circled.  Would you please describe that for us.

8   A.   Yes.  The garden room was a long and kind of narrow room.

9   On the left-hand side was Ms. Maxwell's desk.  All this rear

10  wall was all the sliding doors.  It was a couch in here and

11  these are sliding doors.

12  Q.   Okay.  Thank you.

13       Now I'm going to circle the room labeled dining room.

14  A.   Yes.

15  Q.   Would you please describe that room for us.

16  A.   The dining room had access to the -- to the lake room, to

17  Ms. Maxwell's desk, to the left, and an entry to the pantry

18  room.

19  Q.   Let's move now to the left, the areas labeled kitchen and

20  pantry.  Would you please describe those for us.

21  A.   Yes.  Coming from the pantry, it was a stove.  This is the

22  pantry room, it has countertops, and it was a sink by this

23  window.  Coming into the kitchen at the right was a stove and

24  range oven.  Here was a refrigerator.  And they have an island

25  in the middle with a sink, a dishwasher.  This was a sliding

1   doors going to the kitchen patio.  Here was a AC unit.  And

2   here was the entrance to the -- to the back foyer.

3   Q.  Thank you.  I'm going to pause you there, clear the screen.

4        And I'm going to circle the area around the room

5   labeled staff.  Would you please describe this area of the

6   first floor for us.

7   A.  Yes.  Well, the staff quarter -- the staff where my office

8   was, was there.  It had a large window facing the front of

9   the -- to the street.  It had a small bathroom with a shower,

10  this here.  It had a closet for utilities and a door here.  The

11  elevator, this was the elevator going to the second floor.  And

12  this is the back stairway, the steps going to the second floor

13  that was used only for -- for the staff.

14  Q.  There were two staircases in the house?

15  A.  Yes, one in the front and the main staircase, and the back

16  staircase.  And also was one outside going to the rear balcony

17  to the second floor, a metal stair -- winding stairway.

18  Q.  And I've just circled the top right corner of this exhibit.

19  Is that where the metal circular stairway was?

20  A.  Yes, it was right here.

21  Q.  Which staircase were you supposed to use?

22  A.  We were supposed to use the -- the staff stairway.

23  Q.  Which one was that?

24  A.  Right here.

25  Q.  And you're indicating the stairway to the left of this --

1    A.   Yes.

2    Q.   -- exhibit?

3    A.   Mm-hmm.  Right here.

4              MS. COMEY:  Ms. Drescher, we can take that down.

5    Thank you.  I'd like to now pull up just for the witness, the

6    Court, and the parties, Government Exhibit 297.

7    Q.   Mr. Alessi, do you recognize this?

8    A.   Yes, this is the layout for the second floor.

9    Q.   Does this fairly and accurately depict the second floor of

10   Mr. Epstein's Palm Beach residence?

11   A.   Yes, it is.

12             MS. COMEY:  Your Honor, the government offers this in

13   evidence.

14             MR. PAGLIUCA:  No objection, your Honor.

15             THE COURT:  Thank you.  GX-297 is admitted.

16             (Government's Exhibit 297 received in evidence)

17             THE COURT:  You may publish.

18             MS. COMEY:  Thank you, your Honor.

19             Ms. Drescher, would you please publish this exhibit.

20   Q.   Mr. Alessi, I want to walk through this exhibit the same

21   way we just walked through Exhibit 298.  I'm going to circle

22   the spiral in or about the center of this page.

23             Can you tell us what that is?

24   A.   Yes, that's the main stairway going into the second floor.

25   Q.   And when you got up to the top of the stairs and you turned

1    right --

2    A.  Yes, this was --

3    Q.  -- what would be to your right?

4    A.  It was a hallway, all the way towards Mr. Epstein's

5    bedroom.  It was a two sets of double doors, one here and one

6    here.  And it also was his door.  I think his door, if I

7    remember correctly, was a single door going into his room.

8    Q.  Let me clear this.  I'm going to circle the rectangle

9    slightly to the right of the spiral.

10          Can you tell us what that area is?

11   A.  This is the hallway.  That is a hallway.  I think it was a

12   table with some lights.

13   Q.  And where does that hallway lead to?

14   A.  That hallway leads to Mr. Epstein's door, bedroom.

15   Q.  Is that hallway separated from the staircase by double

16   doors?

17   A.  Yes.

18   Q.  I'd like to move now to the master bedroom, which I've

19   circled on the right side of this exhibit.

20          Would you please describe the master bedroom for us.

21   A.  Yes, it was a very large master bedroom.  At the left of

22   the -- the bed was situated right here in the center.  To the

23   left of the room was the entrance with a door into his

24   bathroom.

25   Q.  Whose bathroom was that?

1    A.  Mr. Epstein's bathroom.

2    Q.  Thank you.

3         Would you please go back to the master bedroom to

4    describe that a bit more.

5    A.  Okay.  The master bedroom had a -- if I remember correctly,

6    it was a corner TV right there and also was a projection TV

7    that it came down from the ceiling in front of the bed.  These

8    doors were all sliding doors going into the balcony facing the

9    pool.

10   Q.  Thank you.

11        Now, Mr. Alessi, if you walked into the master bedroom

12   and instead of turning left you turned right, what would you

13   see?

14   A.  Yes.  If I coming into the master bedroom to the right, it

15   was the entrance with a door to Ms. Maxwell's bathroom.  Her

16   bathroom, it had a closet with double doors.

17   Q.  I'm going to pause you right there.  I'm going to circle

18   what is identified as bath number four on this exhibit.

19        Whose bathroom was this, first of all?

20   A.  This was Ms. Maxwell's bathroom.

21   Q.  And can you please describe Ms. Maxwell's bathroom for us.

22   A.  It was a very large, very nice room.  It had a double

23   room -- a double closet.  It had a vanity, it had a bathtub.

24   Her toilet was in this corner.  And here were several drawers,

25   and here was a door going to the front balcony of the

LC2VMAX4                          Alessi - Direct

1    residence.

2    Q.   Thank you.

3            I'd now like to circle what's indicated as bath number

4    five up above the room we were just talking about.

5            Whose bathroom was that?

6    A.   That was Mr. Epstein's bathroom.

7    Q.   And just to clarify, did both Ms. Maxwell's bathroom and

8    Mr. Epstein's bathroom attach to the master bedroom?

9    A.   Yeah, they were attached, but they were not -- not

10   separated by -- they were separated by two walls, this hallway

11   and this hallway.

12   Q.   But they were both -- they both came off of the master

13   bedroom?

14   A.   Yes, they did.

15   Q.   Thank you.

16           Can you please describe Mr. Epstein's bathroom.

17   A.   Mr. Epstein's bathroom was basically the same dimension as

18   Ms. Maxwell's bathroom.  It had a dresser.  Coming into the

19   left there was -- coming into the room from the left there was

20   a dressing room with four or five set of drawers.  On top was a

21   countertop.  That was for storage of oil, perfumes, for the

22   massages.  And in this wall it had a vanity.  And then it had a

23   door going -- the door so long ago --

24           THE COURT:  Mr. Alessi, could you pull up the

25   microphone again, please.  Thank you.

LC2VMAX4                        Alessi - Direct

1    Q.  I'm going to redraw the circle for you, Mr. Alessi.

2    A.  Yeah.

3    Q.  Go ahead.

4    A.  So the bathroom had a vanity.  And the garden side, it had

5    a -- his toilet was here.  This was his closet.  This was a

6    steam room, and this was a shower, a double shower.  And in

7    here they had a couch.

8    Q.  Do you remember what color the couch was?

9    A.  I think it was green, if I remember correctly.

10   Q.  Okay.  Thank you.  I'm going to clear that.

11            And now I'm going to circle at the bottom left-hand

12   corner the area labeled housekeeper bedroom.  What was that?

13   A.  Yes, that was my bedroom.

14   Q.  Could you describe where your bedroom was in relation to

15   the master bedroom, please.

16   A.  My bedroom was here, and the master bedroom was on the

17   opposite side of the house.

18   Q.  Thank you.

19            MS. COMEY:  We can take that down.  Thank you,

20   Ms. Drescher.

21            I'd like to now show the witness, the Court, the

22   parties what's been marked for identification as Government

23   Exhibit 299.

24   Q.  Mr. Alessi, do you recognize what's depicted in this

25   exhibit?

1   A.  Yes.  This was the structure of the main house.  The main

2   house was -- I'm going to --

3   Q.  Well, Mr. Alessi, before you start marking on it, I'm just

4   going to ask you, is this a fair and accurate depiction of the

5   layout of the structures on Mr. Epstein's Palm Beach property

6   before the third structure was constructed?

7   A.  Yes.

8            MS. COMEY:  Your Honor, the government offers this in

9   evidence.

10           MR. PAGLIUCA:  No objection.

11           THE COURT:  Thank you.  GX-299 is admitted.

12           (Government's Exhibit 299 received in evidence)

13           MS. COMEY:  May we publish, your Honor?

14           THE COURT:  You may.

15           MS. COMEY:  Thank you.

16           Ms. Drescher, would you please put this up for the

17  jury.

18  Q.  Mr. Alessi, I'm circling the rectangle at the top of the

19  page labeled cabana.  What was this?

20  A.  This was also called the pool house, the cabana.  It had --

21  was a pretty large structure.  It had his -- Mr. Epstein desk

22  was situated in here.  It had a couch here.  In here was a

23  sliding door.  And in the front were sliding doors.  It had the

24  stereo equipment right here.  This closet had a door to the

25  outside of the patio, and it was a closet for utilities for the

LC2VMAX4                    Alessi - Direct

1    pool tables, the pool cushions, etc.  And in here it was --

2    this section here was the yoga apparatus, they were hanging

3    from the ceiling.  And this was his bathroom, a vanity, and a

4    shower.

5    Q.  Thank you.  I'll clear the screen.

6              I'm circling the rectangle in the center of the page.

7    What was that?

8    A.  That is the pool.

9    Q.  And then the shape all the way to the left of this exhibit

10   that I just circled, what was that?

11   A.  That is the main house.  That is the main outside walls of

12   the house, of the main house.  This is the stairway -- the

13   entrance.

14   Q.  Thank you.

15             And then focusing on the line to the right of this

16   diagram, what was to the right of that?

17   A.  To the right of this diagram was the intercoastal lake way.

18   Q.  A waterway?

19   A.  Waterway.  And it was a dock for the boats and jet skis

20   right here.

21   Q.  Mr. Alessi, could you please indicate for us on this

22   exhibit where the third structure was built on Mr. Epstein's

23   property?

24   A.  Yes.  It was -- it was located at the right -- at the right

25   of the --

LC2VMAX4                    Alessi - Direct

1   Q.   Indicating the -- well, are you indicating the top left

2   right now?

3   A.   The helper's quarters.

4   Q.   And is that at the top left of this exhibit?

5   A.   Yes.

6   Q.   Okay.

7   A.   And also it was a wall that I used to call the Berlin Wall,

8   that it was all -- was constructed all the way to the fence and

9   the structure was here.

10  Q.   After that structure was built, where did you spend the

11  night when Mr. Epstein was in Palm Beach?

12  A.   After this structure was finished, I moved from my room in

13  the second floor to a room in the back of the structure.

14  Q.   And the wall you described, what view did it obstruct?

15  A.   It obstruct the whole view of the garden and the pool, so

16  it was no view from the staff quarters to the rest of the

17  house.

18  Q.   Thank you.  I'll clear that and we can take that down,

19  Ms. Drescher.

20       When Ms. Maxwell was in Palm Beach, where would she

21  sleep at night?

22  A.   99 percent --

23       MR. PAGLIUCA:  Your Honor, I'm going to object to the

24  foundation of this question.  We're lacking a date certain

25  here.

1          THE COURT:  Sure.

2          MS. COMEY:  Sure.

3   Q.  Between approximately when you first met Ms. Maxwell in

4   1991 and when you stopped working for Jeffrey Epstein in 2002,

5   where did you understand Ms. Maxwell to be sleeping when she

6   was in Palm Beach?

7   A.  She was sleeping at Mr. Epstein's bedroom.

8   Q.  And was that the master bedroom that we saw on the diagram

9   earlier?

10  A.  Yes.

11  Q.  How many desks did Mr. Epstein have in his home in Palm

12  Beach?

13  A.  In his home he had three desks.  One at the right-hand side

14  of his bedroom, one by the lake room in the first floor, and

15  one desk by the pool house, on the south part of the pool

16  house.

17  Q.  How many desks did Ms. Maxwell have at the Palm Beach

18  residence between 1991 and 2002?

19  A.  One.

20  Q.  Where was that?

21  A.  That was in the garden room, close to the pantry.

22  Q.  Over your years working for Mr. Epstein, what, if any,

23  females did you observe coming to his Palm Beach residence?

24  A.  Many, many, many females.

25  Q.  How old did most of them appear to be?

LC2VMAX4                    Alessi - Direct

1   A.   Most of them appear to be in the late twenties, twenties.

2   Q.   What did you see those females do when they came to

3   Mr. Epstein's home?

4   A.   They went into the --

5        MR. PAGLIUCA:   Your Honor, again, I need to object

6   because we were talking about a wide time frame here and we're

7   now lumping in many people over a very wide time frame.   I

8   think it needs to be more specific.

9        THE COURT:   Okay.   Ms. Comey?

10        MS. COMEY:   I'm happy to rephrase, your Honor.

11  BY MS. COMEY:

12  Q.   Over the years that you worked for Mr. Epstein, about how

13  many times do you remember seeing the female guests by the

14  pool?

15  A.   Oh, many, many times.   Over the 12 years that I work there,

16  hundreds of times.

17  Q.   And over those hundreds of times, about what percentage of

18  the time were those females topless?

19  A.   I would say 75, 80 percent probably.

20  Q.   Did you ever see any of those females fully naked?

21  A.   No.

22  Q.   Those females that you saw by the pool who were topless,

23  who did you see them spend time with?

24  A.   They spend time by the pool and they spend time inside the

25  house, inside the main house, and also by the -- in the pool

1    house.

2    Q.  And who did you see them interact with, if anyone?

3    A.  Mr. Epstein and Ms. Maxwell.

4    Q.  What, if any, trips did you personally take to any of

5    Mr. Epstein's other properties?

6    A.  Yes.  I took a trip to the ranch, Zorro Ranch in Santa Fe,

7    New Mexico.  There was supposed to be --

8    Q.  I'm going to stop you there.

9              About when did you go to New Mexico?

10   A.  I would say 1994, '95.

11   Q.  Who invited you to travel to Zorro Ranch?

12   A.  Ms. Maxwell and Mr. Epstein.

13   Q.  Did they tell you why they wanted you to come to the ranch?

14   A.  Yes, they did.

15   Q.  What did they say?

16   A.  They said it was going to be like a symposium.  And this

17   lady was going to teach all the personnel of the different

18   homes how to clean the houses.

19   Q.  How did you travel from Florida to New Mexico for that

20   symposium?

21   A.  I fly commercial from West Palm Beach to Albuquerque, New

22   Mexico.  And I was picked up by the house ranch manager at the

23   ranch.

24   Q.  What did the ranch look like when you visited it?

25   A.  Oh, it was a huge, huge property.  I don't remember how

```
 1    many, but it was thousands and thousands of acres.  And the

 2    entrance, it was a couple homes for the ranch people, it was an

 3    office, and it was the cowboy quarters.  And the guest rooms,

 4    they were in a structure at the right-hand side of the ranch.

 5    And it was a -- a big, long gravel and dirt road going up the

 6    mountain.  And on top of the mountain was -- they were

 7    construction -- they were still under the construction of the

 8    main house.  And also was a mobile home to the right.  And it

 9    was also a little cabana house at the end of the -- at the end

10    of this mountain.

11    Q.  Were you able to go inside the main house?

12    A.  Yes.  Very, very briefly they show us the house, and I saw

13    very little bit.  I know that it was a huge structure and it

14    had -- it was like a Spanish style construction with a patio in

15    the center and the rooms were all around.  I only saw

16    Mr. Epstein's -- I think it was his office or living room

17    office, and it was --

18    Q.  If the main house was still under construction, how were

19    you able to go inside of it?

20    A.  They were still -- they were in the finishing phases of the

21    construction.  And we were able to walk to the kitchen.  We saw

22    very few rooms.  I think it was only two rooms that we saw

23    inside.

24    Q.  And were people able to stay in that house overnight even

25    though it was still under construction?
```

LC2VMAX4                    Alessi - Direct

1   A.  I don't know.

2               MR. PAGLIUCA:  Objection.  Leading.

3               THE COURT:  All right.  Sustained.

4   A.  I don't know.

5               THE COURT:  Sorry.  Sustained.

6               The jury will disregard the answer.

7   Q.  What other homes did you understand Mr. Epstein owned

8   during the time you worked for him?

9   A.  During the time we work for him, he own Zorro Ranch.  He

10  own the private island in the Caribbean, Little St. James, that

11  we used to call Little St. Jeff, and right outside St. Thomas.

12  Also he had a home that I never visit in New York, a very large

13  home in New York.  And he had a home in Paris, France.  And I

14  think they have -- he had a home at Columbus, Ohio.

15  Q.  During the approximately ten years when you worked for

16  Mr. Epstein, do you know how he traveled to his different

17  homes?

18  A.  He traveled on his private planes.

19  Q.  How many times have you flown on Mr. Epstein's private

20  planes?

21  A.  None.  I'm sorry.  I flew with Ms. Maxwell in a small

22  plane, the first plane that he purchase, he had, it was a -- I

23  think it's called a Hawker, Hawker.  Small plane.  We flew with

24  Ms. Maxwell to an engagement in Miami and flew back.  That's

25  it.  That's the only time I flew with him.

LC2VMAX4                    Alessi - Direct

1    Q.   Other than the New Mexico property and the Palm Beach

2    property, have you visited any other of Mr. Epstein's

3    properties?

4    A.   The island.

5    Q.   About when did you visit the island?

6    A.   The island I visit for maybe two hours.

7    Q.   I'm sorry, about what year or approximately?

8    A.   I can't remember.

9    Q.   Was it during your employment with Mr. Epstein?

10   A.   Yes, of course.

11   Q.   For about how long were you on the island?

12   A.   Oh, for two hours.  We --

13   Q.   Mr. Alessi, could you speak into the microphone, please.

14   A.   We went to a vacation with my wife in a cruise line.  And

15   the cruise line was supposed -- it did stop in St. Thomas.  And

16   the people from the island pick us up and they show us the

17   island.  Very, very exclusive, beautiful island.

18   Q.   Could you describe the island.

19   A.   Yes.  The island had -- the main structures of the island

20   was not one house, but there were different pavilions,

21   different parts of the house.  And it had a -- I think it was

22   in the center, it had the pool, and the kitchen/dining room

23   area was the biggest structure that I saw when I went there.

24   It was the kitchen/dining room area.

25   Q.   What properties, if any, of Ms. Maxwell's did you visit

1  during your employment with Mr. Epstein?

2  A.  I visit Ms. Maxwell's townhome in London.

3  Q.  About when was that?

4  A.  I cannot tell you exactly what year, but it was also before

5  my departure.

6  Q.  Was it sometime when you were still working for

7  Mr. Epstein?

8  A.  Of course.  Yes.

9  Q.  How did you come to visit Ms. Maxwell's home in London?

10 A.  She invite us to see her house.

11 Q.  For about how long were you there?

12 A.  Five minutes.

13 Q.  Can you describe what you saw?

14 A.  I saw -- I think it was a townhome, two floors.  I think

15 the -- the front door was either red, a red front door, and we

16 saw just the living room.  And we went upstairs and it was a --

17 I think it was a bathroom.  And we saw her bedroom upstairs.

18 It was a pretty small place.  There was not a big structure.

19 Q.  What, if any, rules did Ms. Maxwell tell you to follow as

20 an employee of Mr. Epstein's?

21 A.  Oh, there were many, many, many rules.

22 Q.  What are some that you remember?

23 A.  From rules about presentation of the dishes, presentation

24 of the table; there were rules about the way we should be

25 dressed; there were rules about how we are to address

1    Mr. Epstein, address Ms. Maxwell; rules about cleanliness;

2    there was rules about what to shop, what the shopping list.

3    There were tremendous amount of instructions were given to me.

4    Q.  Were those oral rules or written rules?

5    A.  Most of it oral rules.

6    Q.  Were there ever any written rules?

7    A.  Yes.  At the end of my stay, I think it was at the last

8    year, 2001, maybe 2002, I receive from Ms. Maxwell this

9    booklet.  There were rules how to handle the houses.  It was

10   not only for the house in Palm Beach, it was also written for

11   the other properties.

12   Q.  Who gave you that booklet of rules?

13   A.  I think it was Ms. Maxwell.

14   Q.  And what did she tell you when she gave you that booklet?

15   A.  This is what we're going to do it, and this is what has to

16   be done from now on.

17   Q.  Did you read the entire booklet?

18   A.  Yes.

19   Q.  What do you remember being in the booklet?

20   A.  It was like 30 pages, probably more of checklist,

21   incredible amount of work, enough work for ten people, not for

22   one and a half.  It was -- it was -- I'm sorry to say, but it

23   was very degrading to me.  Most of the pages, they were just

24   unbelievable to me.  They were written for the employees.  And

25   it was -- I wasn't hire to do that type of work.

1          MR. PAGLIUCA:  Your Honor, I'm going to object to the

2     narrative at this point.

3          THE COURT:  Sustained.

4          MS. COMEY:  We'll move on.

5     Q.  Mr. Alessi, you mentioned checklists.

6     A.  Yes.

7     Q.  What do you mean by checklists?

8     A.  Well, I have the instructions and there was a checkmark,

9     check square under each instruction.  And different --

10    different items from -- from the cleanliness of the cars to the

11    shopping list.

12         MR. PAGLIUCA:  Again, your Honor, narrative.

13         THE COURT:  Sustained.

14    Q.  What are the different topics of checklists that you

15    remember seeing in this booklet?

16    A.  There were everything.  Cleanliness, the way we should

17    address Mr. Epstein, the way we should ask Mr. Epstein, the way

18    we should ask Ms. Maxwell, the way we should be presented

19    ourselves, the way we should not to --

20         MR. PAGLIUCA:  Again, your Honor, we're into a

21    narrative here.

22         MS. COMEY:  Your Honor, I think he's listing out the

23    checklist.  He said that this was at least 30 pages.

24         THE COURT:  All right.

25         MR. PAGLIUCA:  They are not checklists, your Honor.

1          THE COURT:  Well, not your turn to testify, counsel.

2          Overruled.

3    Q.  Are there any others you remember?

4    A.  There were, many, many, many pages that I cannot remember.

5    This is about 20 -- 23 years ago, so I cannot remember every --

6    every page.  I cannot remember.  But it was an incredible

7    amount of work used to checklist.

8    Q.  Thank you, Mr. Alessi.

9          What, if any, conversations do you remember having

10   with Ms. Maxwell about this booklet?

11   A.  I told her that I will not confirm, I will not -- I will

12   not do it.

13   Q.  And how did she respond?

14   A.  Well, she says -- I can't remember her response, but I was

15   not able to do this checklist and this amount of work with all

16   the work that I have to do and perform every day.

17          MR. PAGLIUCA:  Your Honor, narrative.

18          THE COURT:  Sustained.  Let's move on.

19          MS. COMEY:  Ms. Drescher, could we please pull up for

20   the witness, the Court, and the parties what's been marked for

21   identification as Government Exhibit 606.

22   Q.  And Mr. Alessi, I think there's a paper copy of this in the

23   binder in front of you, 606.  Please let us know when you have

24   it in paper copy, Mr. Alessi.

25          THE COURT:  Can I have a paper copy?

1          MS. COMEY:  Yes, your Honor.

2     A.   Where it says household -- household --

3     Q.   Hold on one second, Mr. Alessi.

4          MS. COMEY:  May I approach, your Honor?

5          THE COURT:  You may.  Thank you.

6          You may proceed.

7     Q.   Mr. Alessi, would you flip through this exhibit and tell us

8     about how many pages long it is.

9     A.   It's 58 pages.

10    Q.   And have you looked through this before coming here to

11    testify today?

12    A.   Yes, I did.

13    Q.   Do you recognize it?

14    A.   Yes.

15    Q.   What does it appear to be?

16    A.   Well, this is all the instructions that we're supposed

17    to -- that I was supposed to follow up to maintain the house.

18    Q.   And Mr. Alessi, does this appear to be a version of the

19    booklet that you were just testifying about?

20    A.   Yes.

21    Q.   Now, I want you to look at the date at the bottom left of

22    each page.

23    A.   Yes.

24    Q.   Is that date before or after you left Mr. Epstein's

25    employment?

LC2VMAX4                         Alessi - Direct

1   A.  This list -- this --

2   Q.  Mr. Epstein -- excuse me, Mr. Alessi, Mr. Alessi, was this

3   before or after --

4   A.  After I left.

5   Q.  You left employment?

6   A.  I left my employment.

7   Q.  But in reviewing this, did you recognize portions of it?

8          MR. PAGLIUCA:  Objection.  Leading.

9          THE COURT:  Sustained.

10  Q.  Mr. Alessi, I'd like to ask you to go through this page by

11  page and tell us what portions you recognize and what portions

12  you don't recognize.  And I'd like you to do it without reading

13  any of the portions aloud.

14          Let's start with page 1.

15  A.  I recognize them.

16  Q.  Everything on the page?

17  A.  Yes.

18  Q.  Let's go to page 2.  Do you recognize that?

19  A.  Yes.

20  Q.  Everything on the page?

21  A.  Yes.

22  Q.  Let's go to page 3.  Do you recognize that?

23  A.  Yes.

24  Q.  Everything on the page?

25  A.  Yes.

LC2VMAX4                          Alessi – Direct

1    Q.   How about page 4?

2    A.   Yes.

3    Q.   Everything on the page?

4    A.   Yes.

5    Q.   Page 5?

6    A.   Yes.

7    Q.   How about page 6?

8    A.   Yes.

9    Q.   Now, page 7?  And remember, I'd like you to look through

10   and let us know if there are any portions that you do not

11   remember from the version of the booklet you just testified

12   about.

13   A.   Page 7, I recognize the whole page.

14   Q.   I'm sorry?

15   A.   Yes, I do.

16   Q.   And page 8?

17   A.   I do.

18   Q.   What about page 9?

19   A.   Yes, page 9, I recognize it.

20   Q.   How about page 10?

21   A.   Yes.

22   Q.   Page 11?

23   A.   Yes.

24   Q.   Page 12?

25   A.   Yes, I do.

LC2VMAX4                          Alessi - Direct

1    Q.  Page 13?

2    A.  Yes.

3    Q.  Page 14?

4    A.  I don't remember this page with all the -- the different

5    brands of --

6    Q.  Without reading it, are there portions of this particular

7    page that you don't remember?

8    A.  Yes.

9    Q.  Okay.  Let's turn -- but do you recognize some portions of

10   this page?

11   A.  I do.

12   Q.  Let's go now to page 15.

13   A.  Yes.

14   Q.  How about page 16?

15   A.  I recognize most of it.  But some items on this list I did

16   never see it before.

17   Q.  Okay.  So there are some items on here that you don't

18   remember from the booklet that you received from Ms. Maxwell?

19   A.  Yes.

20   Q.  Let's turn now to page 17.

21   A.  Yes.

22   Q.  Page 18?

23   A.  Yes.

24   Q.  Page 19?

25   A.  And page 19, I don't remember some of the items that are

LC2VMAX4                         Alessi - Direct

1   listed in here.

2   Q.  But do you recognize -- so is it fair to say you recognize

3   some, but not all, of the items on 19?

4   A.  Yes.

5   Q.  How about page 20?

6   A.  Yes.

7   Q.  Page 21?

8   A.  Yes.

9   Q.  Page 22?

10   A.  Yes.

11   Q.  Page 23?

12   A.  Yes.

13   Q.  Page 24?

14   A.  Yes.

15   Q.  Page 25?

16   A.  Yes.

17   Q.  Page 26?

18   A.  Yes.

19   Q.  Page 27?

20   A.  Yes.

21   Q.  Page 28?

22   A.  Yes.

23   Q.  Page 29?

24   A.  Page 29, most of these items, that were -- I never remember

25   seeing in the list.

LC2VMAX4                    Alessi - Direct

1   Q.  Mr. Alessi, are you saying that the majority of the items

2   on page 29 were not in the booklet that Ms. Maxwell gave you?

3   A.  Yes.

4   Q.  Were some of the items on page 29 in the booklet that

5   Ms. Maxwell gave you?

6   A.  Yes, but I -- yes.

7   Q.  Let's go to page 30.

8   A.  The same thing in this page.  Some of the stuff I don't

9   remember purchasing or seeing it before.

10  Q.  But were some of them in the booklet that you remember

11  Ms. Maxwell giving you?

12  A.  Yes.

13  Q.  Let's go to page 31.

14  A.  Same thing.

15  Q.  Same thing?

16  A.  Same thing.  These items -- some of these items I -- I

17  never -- I was never given this list of shopping.

18  Q.  But are there some items on here that you remember from a

19  page --

20  A.  Yes.

21  Q.  -- in a booklet that Ms. Maxwell gave you?

22  A.  Absolutely.  Except for the liquor.

23  Q.  Please don't describe the content of the document.

24          Let's go to page 32.

25  A.  Yes.

LC2VMAX4                      Alessi - Direct

1    Q.  Page 33?

2    A.  This -- this page, I don't remember any of this page.

3    Q.  You don't remember anything on page 33?

4    A.  No.

5    Q.  Okay.  Page 34?

6    A.  Yes.

7    Q.  Page 35?

8    A.  Yes.

9    Q.  Page 36?

10   A.  Yes.

11   Q.  Page 37?

12   A.  Yes.

13   Q.  Page 38?

14   A.  Yes.

15   Q.  Page 39?

16   A.  Yes.

17   Q.  Page 40?

18   A.  Yes.

19   Q.  Page 41?

20   A.  Yes.

21   Q.  Page 42?

22   A.  I don't remember seeing this page.

23   Q.  Anything on the page you don't remember?

24   A.  No, because most of the stuff I -- it was -- I had to do it

25   anyway, so -- but I don't remember this page.

LC2VMAX4                          Alessi - Direct

1    Q.   Okay.  Let's go to page 43.

2    A.   Yes.

3    Q.   Page 44?  I'm sorry, page 44?  I think I --

4           THE COURT:  Just a moment.  My copy goes from page 42

5    to page 49.

6           THE WITNESS:  Yeah, so do mine.

7           THE COURT:  Actually, counsel, it's out of order.

8           MS. COMEY:  I apologize, your Honor.

9           THE WITNESS:  Oh, wait.

10          THE COURT:  Just a second please.  Wait till you're

11   asked a question.  Thank you.

12   Q.   So we stopped at page 42.

13          The next page in your copy, does it say page 49?

14   A.   Yes.

15   Q.   Okay.  Do you recognize that page?

16   A.   Yes, I do.

17   Q.   Does the next page say page 50?

18   A.   Yes.

19   Q.   Do you recognize that page?

20   A.   Yes.

21   Q.   Does the next page say page 51?

22   A.   Yes, I recognize it.

23   Q.   And does the next page say 43?

24   A.   That's correct.

25   Q.   Do you recognize that page?

1  A.  Yes.

2  Q.  And does the next page say 47?

3  A.  I recollect some of these items being in the list, but not

4  all of them.

5  Q.  And is this the page that has 47 at the bottom?

6  A.  Yes.

7  Q.  Let's go to the next page.

8       Does the next page in your copy say 44?

9  A.  That's correct.

10 Q.  Do you recognize that?

11 A.  Some of these items, I don't recollect it.

12 Q.  Let's go now to page -- the next page, does it say page 45?

13 A.  This page I don't recollect seeing in my booklet that was

14 given to me.

15 Q.  How about the page that says page 48?

16 A.  Yes, they were.

17 Q.  And does the next page say page 46?  Yes or no, Mr. Alessi,

18 does the next page say 46?

19 A.  Yes.

20 Q.  And do you recognize what's on this page as being in the

21 booklet Ms. Maxwell gave you?

22 A.  Yes.

23 Q.  Let's go to the next page.

24      Does your next page say 52?

25 A.  That's correct.

LC2VMAX4                        Alessi – Direct

```
1    Q.  And do you recognize what's on this page as being in the
2    booklet that Ms. Maxwell gave you?
3    A.  Yes.
4    Q.  I think we're back in order.
5             Is the next page 53?  Mr. Alessi?
6    A.  Yes.
7    Q.  Is the next page 53?
8    A.  Yes.
9    Q.  Do you recognize it?
10   A.  Yes.
11   Q.  How about the next page, 54?
12   A.  Yes.
13   Q.  How about 55?
14   A.  Yes.
15   Q.  56?
16   A.  Yes.
17   Q.  57?
18   A.  Yes.
19   Q.  And 58?
20   A.  Yes.
21             MS. COMEY:  Your Honor, the government offers Exhibit
22   606 in evidence.
23             MR. PAGLIUCA:  May I inquire, your Honor?
24             THE COURT:  You may.
25
```

LC2VMAX4                          Alessi – Direct

1    VOIR DIRE EXAMINATION

2    BY MR. PAGLIUCA:

3    Q.  Good afternoon, Mr. Alessi.

4    A.  Good afternoon, sir.

5    Q.  You left Mr. Epstein's employment in 2001; correct?

6    A.  2002.

7    Q.  December of 2001; correct?

8    A.  No, December 2002.

9    Q.  Okay.  And when you left --

10             THE COURT:  You can take your mask off.

11             MR. PAGLIUCA:  Thank you, your Honor.

12             It's becoming a habit wearing it.

13   Q.  When you left in 2002, you didn't have in your possession

14   Government Exhibit 606, which is dated different dates, but

15   beginning in February of 2005; is that correct?

16   A.  No.  I -- I had it in my possession, a booklet with the

17   dates.  It didn't have dates when I was given to it.

18   Q.  Okay.  But you left, you say, in 2002?

19   A.  That's correct.

20   Q.  So if something was made after 2002, you would not have had

21   it; correct?

22   A.  Absolutely, no.

23   Q.  All right.  Okay.

24             And so whatever you had in 2002 was not Government

25   Exhibit 606, which was created, at least by the date on it,

1     after that date; correct?

2              MS. COMEY:  Objection.  Compound.

3              MR. PAGLIUCA:  I don't think that's a compound

4     question.

5              THE COURT:  Overruled.

6     Q.  You wouldn't have had 606 because assuming the date on 606

7     is even accurate, it's after you left; correct?

8     A.  Yes.

9     Q.  Okay.  And so you, Mr. Alessi, don't have any personal

10    knowledge about, first of all, how 606, this exhibit, came into

11    existence; correct?  Because this is not whatever it was that

12    you had?

13    A.  No, I did not have it.

14    Q.  Right.  Okay.

15              And you, Mr. Alessi, didn't have this Exhibit 606 with

16    you after you left.  You threw whatever was given to you away,

17    as I understand it; correct?

18    A.  Yes, I did.

19    Q.  Because you didn't agree with whatever was given to you?

20              MS. COMEY:  Objection, your Honor.  This is voir dire.

21              THE COURT:  Just a moment.

22              I'll sustain with respect to the last question.

23              MR. PAGLIUCA:  Okay.

24    Q.  But so we're clear, whatever you were given, you threw it

25    away and didn't keep it after you left in 2002?

1    A.   There was no reason to keep it.

2    Q.   I understand.  And so you don't have any personal knowledge

3    about how this document, assuming it's accurate, was maintained

4    after you left Mr. Epstein's employment in 2002; correct?

5    A.   I have no personal knowledge.

6    Q.   Okay.

7              MR. PAGLIUCA:  I object, your Honor.

8              Lack of foundation.

9              MS. COMEY:  Your Honor, I believe we've established a

10   foundation certainly as to the pages that Mr. Alessi

11   recognizes.  I think the rest of the document, based on its

12   context --

13             THE COURT:  Okay.  Ms. Comey, not the place for that.

14             I'm overruling the objection.  606 is admitted.

15             (Government's Exhibit 606 received in evidence)

16             MS. COMEY:  May we publish, your Honor?

17             THE COURT:  You may.

18   BY MS. COMEY:

19   Q.   Mr. Alessi, taking a look at the very first page of this,

20   do you recognize the address at the bottom -- going back, the

21   address at the bottom of the page?

22   A.   Yes.

23   Q.   What is that address?

24   A.   That is the address of Mr. Epstein's residence.

25   Q.   Let's turn now to the second page, please, the page that

1   has page 1 on it.  I'm circling a bullet point close to the

2   middle of the page.  Would you please read that aloud for us.

3   A.   Daily duties while Mr. Epstein, Ms. Maxwell, and guests are

4   on residence.

5   Q.   And what is listed below that?

6   A.   Morning preparation, pool area, the cabana, the kitchen,

7   downstairs areas, master bedroom, master bathroom,

8   Ms. Maxwell's bathroom, guest rooms, early evening, before you

9   leave at night.

10  Q.   What was your understanding of what you were supposed to do

11  with all of those places based on the instructions you received

12  from Ms. Maxwell?

13  A.   That I was supposed to do these duties, perform these

14  duties.

15  Q.   Let's turn to the next page please.  And now let's turn to

16  page -- the page marked page 3.  Would you please read this

17  aloud for us, Mr. Alessi.

18  A.   Yes.

19        This manual is designed to give you the proper

20  guidance and assistance to perform your duties to the best of

21  your ability, while ensuring a consistently high level of

22  service.  Gathering as much information as possible will help

23  you with the day-to-day running of the home.

24        By using your communications skills, listening and

25  observing, you will be able to anticipate the needs of

LC2VMAX4                         Alessi – Direct

1    Mr. Epstein, Ms. Maxwell, and their guests.

2              Checklists will assist you in making sure that all

3    tasks have been completed and that not even the smallest

4    details have been overlooked.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LC2Qmax5 - corrected        Alessi - Direct

1  BY MS. COMEY:   (Continued)

2  Q.   Thank you, let's please go to the page marked page 4.  I'd

3  like you to first please read the first bullet point on this

4  page?

5  A.   Try to anticipate the needs of Mr. Epstein, Ms. Maxwell,

6  and their guests.

7  Q.   Would you please now read the fourth bullet point on this

8  page?

9  A.   Do not discuss personal problems with guests.

10  Q.   What did you understand this instruction to mean when

11  Ms. Maxwell gave you this booklet?

12  A.   Well, this instruction told me that any personal problem I

13  have, I was not supposed to discuss with anybody.

14  Q.   Thank you.

15          I'd like to now go to the seventh bullet point on this

16  page.  Would you please read that allowed?

17  A.   Remember that you see nothing, hear nothing, say nothing,

18  except to answer a question directed to you.  Respect their

19  privacy.

20  Q.   Mr. Alessi, when Ms. Maxwell gave you this booklet, what

21  did you understand this rule to mean?

22  A.   It means a kind of warning that I was supposed to be blind,

23  deaf and dumb to say nothing of their lives.

24  Q.   Let's go now please to the page marked 8.  Thank you.

25          Would you please read the first bullet point on this

LC2Qmax5 – corrected        Alessi – Direct

1  page?

2  A.  Unless otherwise instructed, never disclose Mr. Epstein or

3  Ms. Maxwell's activity or whereabouts to anyone.  If the caller

4  is insistent, you simply ask to take a message, a time, a

5  number where the caller can be reached.  Do not -- do not be

6  bullied and do not show any reaction or impatience, simply be

7  firm.

8  Q.  Can we please go now to the page marked page 10.

9          Mr. Alessi, what are we looking at on this page?

10  A.  This is a list of things that have to be done before the

11  arrival of Mr. Epstein or Ms. Maxwell.

12  Q.  There's a reference on this page to JE and GM telephone

13  directories.

14  A.  Yes.

15  Q.  What were those?

16  A.  These were booklets with JE and GM.  I think they were in

17  the front or in the binding of the --

18          THE COURT:  Mr. Alessi, could you talk into the

19  microphone please.

20  Q.  Mr. Alessi, what were these directories, JE and GM

21  telephone directories to your understanding?

22  A.  This would mean Jeffrey Epstein and Ghislaine Maxwell.

23  Q.  What are the directories?

24  A.  The directories were books with hundreds and hundreds of

25  names and their telephone numbers and contacts, directions,

LC2Qmax5 - corrected          Alessi - Direct

1   addresses.

2   Q.  What did the books look like?

3   A.  The book -- the books, they were type of hard binding,

4   either blue or black.  I can't remember which one was blue,

5   which one was black, but they were thick, I would say two

6   inches thick, and the size of a large telephone.

7   Q.  What was inside?

8   A.  Inside was a list by alphabetical order of all the people,

9   friends and families and business with Mr. Epstein and

10  Ms. Maxwell.

11  Q.  I'd like to go now, please, to page 13.  What do we see on

12  this page?

13  A.  Same thing, instructions for Ms. Maxwell's bathroom.

14  Q.  Is this a list of things you were supposed to do for

15  Ms. Maxwell's bathroom?

16  A.  Yes.

17  Q.  When were you supposed to do these things?

18  A.  Before their arrival, and after that every day they were

19  in.

20  Q.  Every day who was in?

21  A.  Mr. Epstein and Ms. Maxwell.

22  Q.  Let's go now to page 14, please.  I'm sorry, I meant page

23  20, excuse me.  Let's go to page 20.

24          Could you read the bullet point that's the second from

25  the bottom on this page, please.  Could you read that aloud for

LC2Qmax5 - corrected          Alessi - Direct

1  us, please?

2  A.  Check the fence for holes where Max can get out.

3  Q.  Who is Max?

4  A.  Max was this little dog that Ms. Maxwell owned.  Her name

5  was Max.  It was a little Yorkie.

6  Q.  When do you remember first seeing Max?

7  A.  I remember seeing Max probably when she came the first

8  time, but I'm not sure.

9  Q.  When who came the first time?

10  A.  Ms. Maxwell came to Palm Beach.

11  Q.  Remind us about what year that was.

12  A.  '91.

13  Q.  1991?

14  A.  Yes.

15  Q.  Did Ms. Maxwell still have this dog Max when you left

16  Mr. Epstein's employment in 2002?

17  A.  Yes.

18  Q.  Do you know whether Max traveled with Ms. Maxwell or stayed

19  in Palm Beach?

20  A.  No, she traveled with Ms. Maxwell all the time.

21  Q.  How do you know that?

22  A.  Because I took Max, she had to have a bath before she

23  leave, and every time they -- there was wheels up, the poor dog

24  shake like crazy because she didn't like to be in the plane.

25  Q.  Let's turn now, please, to page 23.  I'd like to look at

LC2Qmax5 - corrected        Alessi - Direct

1  the center portion of this page, please.

2          This says Ms. Maxwell's desk.  What is that referring

3  to?

4  A.  The DSL computer --

5  Q.  What do you understand Ms. Maxwell's desk to refer to?

6  A.  The desk that she use all the time down on the first floor.

7  Q.  What room was that in?

8  A.  That was in the garden room.

9  Q.  And the fourth bullet point, would you please read that for

10 us?

11 A.  JE and GM telephone directories placed to the right of the

12 telephone.

13 Q.  Is that the same telephone directories that we were talking

14 about earlier?

15 A.  Yes.

16 Q.  Let's turn now, please, to page 24.  I want to look at the

17 section titled stationery.  Would you read this aloud for us,

18 please?

19 A.  The whole list?

20 Q.  Yes, please.

21 A.  Three sizes of Jeffrey Epstein notepads.  Two sizes of

22 Ghislaine Maxwell and Lady Ghislaine notepads.  Letterhead,

23 stationery and envelopes.  One pack from each of Mr. Epstein's

24 residences and businesses.  Mr. Epstein's personal stationery

25 (writing paper, notepads, envelopes, compliment slips).

LC2Qmax5 – corrected        Alessi – Direct

1   Jeffrey Epstein and Ghislaine Maxwell cards and envelopes.

2   Q.  What was your understanding of what you were supposed to do

3   with respect to stationery?

4   A.  With respect to stationery, there was different sizes of

5   pads for Mr. Epstein and Ms. Maxwell, and also there was

6   engraving on those pages with her name and his name on top of

7   it.

8   Q.  Let's turn now, please, to page 55.  Could you explain to

9   us what's on this page?

10  A.  This was instructions for serving breakfast for Mr. Epstein

11  and Ms. Maxwell, and breakfast for the guests.

12  Q.  Other than for Ms. Maxwell and Mr. Epstein, did you ever

13  have special instructions for how to prepare breakfast for

14  anyone else at the Palm Beach residence?

15  A.  No.

16  Q.  We can take that down.  Thank you, Ms. Drescher.

17          Mr. Alessi, during the time that you worked for

18  Mr. Epstein, who else, if anyone, worked for Mr. Epstein, to

19  your knowledge?

20  A.  Can you repeat the question, please?

21  Q.  Who were the other of Mr. Epstein's employees that

22  overlapped with you?

23  A.  It was Emmy Tayler.  She used to travel with them

24  constantly.

25  Q.  What was her job, to your understanding?

LC2Qmax5 - corrected        Alessi - Direct

1   A.  My understanding she was Ms. Maxwell's assistant.

2   Q.  Anyone else you remember?

3   A.  There were a couple chefs.  They were cam -- they came with

4   him, they travel with him and Ms. Maxwell.

5   Q.  Let me pause you there.

6           If there were chefs who traveled with Mr. Epstein and

7   Ms. Maxwell, why would you need to prepare breakfast?

8   A.  Sometimes I needed to prepare breakfast even when the chefs

9   were there because they were -- had the privilege to sleep

10  late, and I have to prepare breakfast at 5:00 in the morning

11  for Mr. Epstein.

12  Q.  Other than chefs and Emmy Tayler, any other employees you

13  remember?

14  A.  Well, my wife worked for me during that time.

15  Q.  Were there any other assistants you remember working for

16  Mr. Epstein or Ms. Maxwell?

17  A.  At the very end, I saw Sarah Kellen at the very end of my

18  stay there.

19  Q.  About how long before you left in December of 2002 do you

20  remember Sarah Kellen starting to work for Mr. Epstein?

21  A.  Couple weeks.  I have very little interaction with Sarah.

22  Q.  Can we pull up what's already in evidence as Government

23  Exhibit 327, Ms. Drescher?

24          Do you recognize the person in this photograph,

25  Mr. Alessi?

LC2Qmax5 - corrected          Alessi - Direct

1   A.   That was Sarah Kellen.

2   Q.   What were Sarah's responsibilities during the brief time

3   you overlapped?

4   A.   I don't know her job responsibility, but she immediately

5   took over the telephone, answering the phone, and I guess -- I

6   think she did the scheduling of the massages.

7   Q.   You can take that down.   Thank you.

8            Do you know who Mr. Epstein's pilots were?

9   A.   Yes, I do.

10  Q.   Who were they?

11  A.   It was Larry Visoski and David Rodgers.

12  Q.   Mr. Alessi, during the time that you worked for

13  Mr. Epstein, how many, if any, young females do you remember

14  seeing at Mr. Epstein's Palm Beach house?

15  A.   I don't know what young you refer to, but underage you're

16  talking?

17  Q.   Who appeared to be underage to you?

18  A.   Who appeared to be, there were just two females.

19  Q.   Who appeared to be underage to you?

20  A.   They appeared to be underage to me.

21  Q.   Without saying their names, do you know their names?

22  A.   Yes, I do.

23  Q.   I'd like to ask you to please turn in the binder next to

24  you to Government Exhibit 12.

25            MS. COMEY:   And, your Honor, I would ask that the jury

1    also be permitted to take out their binders and turn to

2    Government Exhibit 12.

3              THE COURT:  Just a moment, jury.

4              Any objection?

5              MR. PAGLIUCA:  No, your Honor.

6              THE COURT:  The small binder or large binder?

7              MS. COMEY:  I think it's the large binder.

8              THE COURT:  Large binder.  GX-12, please.

9    BY MS. COMEY:

10   Q.  Do you have Government Exhibit 12 in front of you?

11   A.  Yes, I do.

12   Q.  Without saying the name out loud, I'd like you to look at

13   the portion of this exhibit that says child's name.  Is that

14   the first and last name of one of the two underage females you

15   remember seeing at Mr. Epstein's Palm Beach residence?

16   A.  Yes, I do.

17   Q.  I'm going to refer to her as Jane, and I would ask that you

18   do the same, please.  Okay?

19   A.  Okay.

20   Q.  You can set that aside.  Thank you.  We won't need the

21   binders again for the jurors for this witness.

22              Mr. Alessi, other than Jane, what was the name of the

23   second young female you remember seeing at Mr. Epstein's Palm

24   Beach house?

25   A.  Her name was Virginia Roberts.

LC2Qmax5 - corrected        Alessi - Direct

1    Q.  Who did you meet first, Jane or Virginia?

2    A.  Jane.

3    Q.  How did you meet Jane?

4    A.  I met Jane the first time when she came to the house in

5    Palm Beach with her mother, and she was introduced her to

6    Ms. Maxwell, and they stay with her mother talking in the

7    living room.

8    Q.  When you first met Jane, about how old was she?

9    A.  I don't know exactly how old she was, but she appeared to

10   be young.

11   Q.  About how old did she appear to you?

12   A.  I would say 14, 15.

13   Q.  Could you describe what Jane looked like when you first met

14   her?

15   A.  She was strikingly beautiful girl.  Beautiful eyes.  Long

16   hair.  Long brunette hair.  Tall.  Very pleasant.

17   Q.  About how many times do you remember seeing Jane at

18   Mr. Epstein's Palm Beach house with her mother?

19   A.  I remember at least three times she was there with her

20   mother.

21   Q.  After those visits with her mother, do you remember seeing

22   Jane at Mr. Epstein's home without her mother?

23   A.  Yes, I do.

24   Q.  Do you remember exactly how many times you saw her at

25   Mr. Epstein's home without her mother?

LC2Qmax5 - corrected          Alessi - Direct

1    A.  I don't remember exactly how many times, but it was four,

2    five times after.

3    Q.  Who did you observe Jane spending time with when she came

4    without her mother to the house?

5    A.  Ms. Maxwell and Mr. Epstein.

6    Q.  To your knowledge, how did Jane get to Mr. Epstein's house

7    when she would visit without her mother?

8    A.  I was -- I was told to pick her up.  Either Ms. Maxwell or

9    Mr. Epstein instruct me to pick her up couple times.

10   Q.  I want to be clear here.  Did Mr. Epstein instruct you to

11   pick her up?

12   A.  Either him or Ms. Maxwell.

13   Q.  You remember Ms. Maxwell instructing you to pick her up?

14   A.  Yes, I do.

15   Q.  And do you also remember Mr. Epstein instructing you --

16   A.  Yes, I do.

17   Q.  -- to pick her up?

18   A.  Yes, I do.

19   Q.  Where do you remember picking Jane up?

20   A.  I remember picking Jane at the School of the Arts one time,

21   only one time in West Palm Beach.  That was the old Palm Beach

22   Lakes High School, and they turn it into a School of the Arts,

23   and I pick her up outside the school one time and brought her

24   to Palm Beach.

25   Q.  Other than school, where else did you pick up Jane?

LC2Qmax5 - corrected          Alessi - Direct

1    A.   I picked up Jane at her house that she live with her mother

2    and siblings.

3    Q.   Why couldn't Jane drive herself?

4    A.   I don't think she had the license.

5    Q.   Who else that you know of picked Jane up to bring her to

6    Mr. Epstein's house?

7    A.   My wife pick her up couple times.

8    Q.   When you picked Jane up, where in the car did she sit?

9    A.   It was a rule that sit in the back of the car.

10   Q.   Who told you that rule?

11   A.   The back seat.  It was by Ms. Maxwell.  Everybody should

12   sit in the back.

13   Q.   Other than Jane, did you drive other people for Ms. Maxwell

14   and Mr. Epstein?

15   A.   Can you repeat the question, please?

16   Q.   Did you drive other people other than Jane for Ms. Maxwell

17   and Mr. Epstein?

18   A.   Oh absolutely, yes.

19   Q.   How many?

20   A.   Dozens and dozens.

21   Q.   So do you have a clear memory of every single time you

22   picked up a passenger?

23   A.   Not a clear memory, no, but I remember driving to Miami to

24   airports and homes to pick people up.

25   Q.   Other than Mr. Epstein's house, where else, to your

LC2Qmax5 - corrected          Alessi - Direct

```
 1   knowledge, would Jane go with Mr. Epstein and Ms. Maxwell?
 2               MR. PAGLIUCA:  Objection.  Lack of foundation, your
 3   Honor.
 4               THE COURT:  Sustained.
 5   Q.  Did you ever see Jane with luggage?
 6   A.  Yes, I did.
 7   Q.  After you -- where did you see Jane with luggage?
 8   A.  She came maybe twice with a small luggage, and they left
 9   with Mr. Epstein in their plane.
10   Q.  Let me break that down a little bit.  Where did you see
11   Jane with luggage on these approximately two occasions?
12   A.  I saw her at the house in Palm Beach bringing the luggage.
13   Q.  Mr. Epstein's house?
14   A.  Mr. Epstein's house.
15   Q.  Do you know how Jane got to the airport?
16   A.  Yes.  I was introduced to be -- I was the driver also.
17   Q.  So did you drive Jane to the airport?
18   A.  Jane with Mr. Epstein and Ms. Maxwell, Max, the little dog,
19   and other guests.
20   Q.  And when you drove them to the airport, did you drive all
21   the way up onto the tarmac?
22   A.  All the way up to the plane.
23   Q.  Were you able to see Jane get on the plane?
24   A.  Yes.
25   Q.  And who did she get onto the plane with?
```

LC2Qmax5 - corrected        Alessi - Direct

1   A.  Ms. Maxwell, Mr. Epstein.  I don't remember I think it was

2   Emmy Tayler, the chefs and Max.

3   Q.  Do you remember about what year you met Jane?

4   A.  I think it was 1994, '94.

5   Q.  When Jane came over to Mr. Epstein's house, do you know if

6   she ever went to the movies?

7   A.  Yes, they went to the movies.

8   Q.  Who went to the movies?

9   A.  Mr. Epstein, Ms. Maxwell, the guest and Emmy.  Basically

10  they went almost every night to the movies.

11  Q.  Did Jane sometimes go with them?

12  A.  Yes.

13  Q.  When Jane visited Mr. Epstein's house, were there ever

14  other females around?

15  A.  Yes.

16  Q.  Who are the fe -- let me back up.  Do you remember the name

17  of every single female who was at Mr. Epstein's Palm Beach

18  house when Jane came over?

19  A.  No.

20  Q.  Do you remember some of the names?

21  A.  Yes.

22  Q.  What are some of the names you remember?

23  A.  Emmy Tayler, Gwendolyn Beck.  I don't think I can recall

24  anybody else.

25  Q.  When Jane would first arrive at Mr. Epstein's house, where

LC2Qmax5 - corrected          Alessi - Direct

1   did you see her go?

2   A.   She went through the kitchen, I will introduce her to

3   Ms. Maxwell at her desk, and that's it.  That's as far as I saw

4   her going to.  She talked to Ms. Maxwell.  From then, I was --

5   that was not my job to see where they were.

6   Q.   During the time that you worked for Mr. Epstein, who, if

7   anyone, would tell you about Mr. Epstein's upcoming travel

8   plans?

9   A.   Either Ms. Maxwell, sometimes the secretaries from the

10  office.  If I remember correctly, was Fiona secretary, also

11  Kimberly, a secretary from New York, and sometimes the pilots

12  told me, "We're on our way and we have to rush."

13  Q.   Other than Jane, what was the name of the other female who

14  appeared to be underage that you remember seeing at

15  Mr. Epstein's house?

16  A.   The other young person that I saw there was Virginia

17  Roberts.

18  Q.   How did you first come to see Virginia Roberts?

19  A.   I saw Virginia Roberts at Mar-a-Lago one afternoon with

20  Ms. Maxwell --

21  Q.   Let me stop you there.  What were you doing at Mar-a-Lago

22  with Ms. Maxwell?

23  A.   She went to check the spa.  She went to see the spa at

24  Mar-a-Lago.

25  Q.   What had you and Ms. Maxwell been doing that day?

LC2Qmax5 - corrected          Alessi - Direct

1   A.   That day we went from all the main expensive -- luxury spas

2   and country clubs in Palm Beach County.

3   Q.   Did you go inside each those?

4   A.   No.

5   Q.   What were you doing?

6   A.   I wait in the car like a driver.

7   Q.   What happened when you got to Mar-a-Lago that day with

8   Ms. Maxwell?

9   A.   I dropped Ms. Maxwell, I park in the spaces where I was

10  supposed to park, wait in the car.  I remember it was a very

11  hot day, and we have a convertible.  And Ms. Maxwell come out,

12  got in the car and we were going up the ramp, small ramp going

13  out of Mar-a-Lago --

14  Q.   As you were driving up that ramp, what did Ms. Maxwell say

15  to you?

16  A.   She told me to stop, "John, stop."

17  Q.   And after she told you to stop the car, did you stop the

18  car?

19  A.   I stopped the car, and she opened the door and she went

20  towards this girl as she was coming down the ramp.

21  Q.   Let me break that down.  After Ms. Maxwell told you to

22  stop, what did you see Ms. Maxwell do?

23  A.   She went to talk to this girl.

24  Q.   And where was this girl?

25  A.   She was coming down the ramp from the main gate towards the

LC2Qmax5 - corrected          Alessi - Direct

1    spa.

2    Q.  What did this girl look like?

3    A.  She look -- she look young.  She have blond hair, and she

4    had a long white uniform, like a nurse's uniform.

5    Q.  What did you see Ms. Maxwell do after she got out of the

6    car?

7    A.  They talk briefly, and they went back to the spa.

8    Q.  Who talked?

9    A.  Ms. Maxwell and Ms. Roberts.

10   Q.  Is that the girl?

11   A.  Yes.

12   Q.  And then where did you see Ms. Maxwell and the girl go?

13   A.  They went inside the spa.  And couple minutes later

14   Ms. Maxwell come out, got in the car, and we left.

15   Q.  When was the next time you saw that girl from the

16   Mar-a-Lago parking lot?

17   A.  The next time I saw her was late that afternoon, around

18   5:00, 6:00 in the afternoon.

19   Q.  Where did you see her?

20   A.  At the house in Palm Beach.

21   Q.  And when she arrived, where did she go?

22   A.  She went -- I introduce her to Ms. Maxwell at her desk.

23   Q.  Did you learn her name?

24   A.  No.

25   Q.  At some point did you learn her name?

LC2Qmax5 - corrected          Alessi - Direct

1   A.  No.

2   Q.  The girl's name?

3   A.  I didn't know her name -- her name or her last name.

4   Q.  Did you eventually learn her name?  You told us her name.

5   Yes?

6   A.  Yes.  Oh, eventually I learned her name.

7   Q.  Okay.  What is her name?

8   A.  It was Virginia Roberts.

9   Q.  I'd like to pull up, please, what's been marked for

10  identification as Government Exhibits 113 and Government

11  Exhibit 114, just for the witness, the Court and the parties,

12  Ms. Drescher.

13          Mr. Alessi, do you recognize these exhibits?

14  A.  Yes, they are both pictures of Virginia.

15  Q.  Are these both fair and accurate depictions of Virginia

16  Roberts?

17  A.  Yes.

18          MS. COMEY:  Your Honor, the government offers these in

19  evidence.

20          MR. PAGLIUCA:  No objection.

21          THE COURT:  GX-113 and 114 are admitted.  And you may

22  publish.

23          MS. COMEY:  Thank you, your Honor.

24          (Government's Exhibits 113 and 114 received in

25  evidence)

LC2Qmax5 - corrected        Alessi - Direct

1   Q.  Ms. Drescher, I'd ask you to publish these for the jury.

2            After that first visit, about how often do you

3   remember seeing Virginia at Mr. Epstein's Palm Beach home?

4   A.  After the first time very often she came to the house while

5   Mr. Epstein and Ms. Maxwell were at the Palm Beach house.

6   Q.  What was your understanding of why Virginia was at Mr.

7   Epstein's house?

8            MR. PAGLIUCA:  Objection.  Lack of foundation.

9            THE COURT:  Sustained.

10  Q.  Did Ms. Maxwell ever tell you why Virginia was at the

11  house?

12  A.  No.

13  Q.  About how old was Virginia when you saw her coming over to

14  Mr. Epstein's Palm Beach home?

15           MR. PAGLIUCA:  Objection.  Lack of foundation.

16           THE COURT:  Sustained.

17  Q.  About how old did Virginia appear to you when you first met

18  her?

19  A.  Probably 14, 15.

20  Q.  Do you know how Virginia got to Mr. Epstein's Palm Beach

21  home when she would visit?

22  A.  When she visit the first time?

23  Q.  After the first time.

24  A.  After the first time.  She came with her boyfriend couple

25  times, and I was told to pick her up couple times from her

LC2Qmax5 - corrected          Alessi - Direct

1   house.  She live with her boyfriend in Royal Palm Beach.

2   Q.  Who instructed you to pick Virginia up?

3   A.  Either Mr. Epstein or Ms. Maxwell.

4   Q.  Let's break that down.  Did Ms. Maxwell ever instruct you

5   to pick up Virginia Roberts?

6   A.  Yes.

7   Q.  Did Mr. Epstein ever instruct you to pick up Virginia

8   Roberts?

9   A.  Yes, he did.

10  Q.  Who else, if anyone, did you see Virginia bring to Jeffrey

11  Epstein's Palm Beach home?

12  A.  On one occasion, she bring her boyfriend and he came to the

13  kitchen.  However, I was told by Ms. Maxwell to get him out of

14  the kitchen, and he has to wait in the car.

15  Q.  What, if any, females do you remember Virginia bringing to

16  Mr. Epstein's Palm Beach house?

17  A.  At the end of my stay there, I saw her bringing two other

18  girls.  I even never saw their faces.  They walk through the

19  kitchen right away, and they went directly to Ms. Maxwell's

20  desk.

21  Q.  When Virginia was at Mr. Epstein's Palm Beach home, who did

22  you see her interact with?

23  A.  Ms. Maxwell and Mr. Epstein.

24  Q.  Did you ever see Virginia at Mr. Epstein's Palm Beach house

25  with luggage?

LC2Qmax5 - corrected          Alessi - Direct

1   A.  Yes, I did.

2   Q.  About how many times?

3   A.  Two, three times.

4   Q.  And on those times, did you then drive Virginia somewhere?

5   A.  I drove from her house in Royal Palm Beach to the house in

6   Palm Beach.

7   Q.  How about on the times she had luggage, do you know where

8   she went from there with her luggage?

9   A.  They went with Mr. Epstein and Ms. Maxwell to the plane.

10  Q.  How do you know that?

11  A.  Because I brought them.  I was the driver.

12  Q.  Did you drive right onto the tarmac?

13  A.  Up to the tarmac.

14  Q.  Who did you see get on the plane?

15  A.  Mr. Epstein, Ms. Maxwell, the chefs, Ms. Tayler, little

16  Max, they went on the plane.

17  Q.  Did you also see Virginia go on the plane?

18  A.  Yes.

19  Q.  Do you remember approximately when you first met Virginia?

20  A.  Not exactly, but I would say it's 2001.

21  Q.  We can take these exhibits down.  Thank you, Ms. Drescher.

22        Mr. Alessi, about how often did Mr. Epstein receive

23  massages at the Palm Beach residence while you worked for him?

24  A.  In the beginning, he receive around one.  At the end of my

25  stay, he received up to three massages per day.

LC2Qmax5 - corrected        Alessi - Direct

1   Q.  Was it the same person massaging Epstein at each

2   appointment or a different person?

3   A.  They were different persons.

4   Q.  Who scheduled Mr. Epstein's massages?

5   A.  Ms. Maxwell, Mr. Epstein, or sometimes even the office

6   people in New York, they would call me and ask me to schedule

7   the massages.

8   Q.  When you scheduled the massages, what did you do?

9   A.  I went to my office, and I had a Rolodex with all the

10  massage therapists, and whoever they told me to call, I would

11  call that person, and I will ask if they're available for this

12  time.  It was a different times of the day.  And if they said

13  yes, I would confirm with Ms. Maxwell or Mr. Epstein that she

14  was coming.

15  Q.  And who do you remember telling you which person to call to

16  come give Mr. Epstein a massage?

17  A.  Either was Ms. Maxwell, Mr. Epstein, or the office.

18  Q.  Other than you, who else, if anyone, would call to schedule

19  massages?

20  A.  At the end, Ms. Kellen.

21  Q.  Now, you said that closer to the end, Mr. Epstein was

22  getting three massages a day?

23  A.  Yes.

24  Q.  What time of day typically were those massages?

25  A.  It was all different times of day.  It was a massage in the

LC2Qmax5 - corrected          Alessi - Direct

1    morning, a massage in the afternoon, and some of the massages

2    after dinner, after the movies.  They were scheduled to come

3    after the movies, 10:00, 11:00 at night.

4    Q.  You mentioned the phone books that we saw in Government

5    Exhibit 606.  Do you remember that?

6    A.  Yes.

7    Q.  Did that have contact information for people to massage

8    Mr. Epstein?

9    A.  Yes, there was a page with the massages -- massage

10   therapists for Palm Beach.

11   Q.  Was Jane's contact information in that book?

12   A.  Who?

13   Q.  Jane.

14   A.  No.  Oh, excuse me.  Can you repeat that?

15   Q.  The person we're referring to as Jane.

16   A.  Yes.  Yes, it was.  It was her on the contact information.

17   Q.  I want to make sure the record is clear here.  Do you

18   remember looking earlier at Government Exhibit 12 and telling

19   us that you recognized that name?

20   A.  Yes.

21   Q.  And we're calling that person Jane?

22   A.  Yes.

23   Q.  That person, do you remember seeing her true name in this

24   directory?

25   A.  Yes.

LC2Qmax5 - corrected        Alessi - Direct

1   Q.  About when do you remember first seeing this directory?

2   A.  Probably 1995, '96.

3   Q.  Were there different versions of this directory?

4   A.  Those directories were updated.

5   Q.  How often were they updated?

6   A.  I think it was once a year or maybe twice a year.

7   Q.  When they were updated, what did you do with the old ones?

8   A.  We just throw it away.

9   Q.  Did you look at different versions of the directory over

10  the years you worked for Mr. Epstein?

11  A.  Yes.

12  Q.  And when you got an updated version, were there new

13  contacts added?

14  A.  Yes.

15  Q.  Did you ever notice contacts being removed?

16  A.  I don't recall being removed.

17  Q.  Who did you see using these directories?

18  A.  Ms. Maxwell, Mr. Epstein.

19  Q.  Where were you supposed to keep copies of this directory?

20  A.  We were supposed to keep the copies, one in the kitchen

21  desk, it was a little tiny desk at the kitchen next to the

22  telephone, it was at Ms. Maxwell's desk, Mr. Epstein's three

23  desks he had in the house, Ms. Maxwell's each side of her night

24  table or Mr. Epstein's night table.

25          MS. COMEY:  Your Honor, may I approach the witness

LC2Qmax5 - corrected        Alessi - Direct

1    with a physical exhibit?

2             THE COURT:  I'm sorry?

3             MS. COMEY:  I have a physical exhibit that I would

4    like to approach and give to the witness.

5             THE COURT:  Please identify it for the record.

6             MS. COMEY:  Government Exhibit 52, which I will show

7    to defense counsel before I bring it up.

8             THE COURT:  Marked for identification GX-52?

9             MS. COMEY:  Yes.  Thank you, your Honor.

10            THE COURT:  Before the witness, may I see it?

11            MS. COMEY:  Yes, your Honor.

12            THE COURT:  Okay.

13            MS. COMEY:  Thank you, your Honor.  May I approach the

14   witness?

15            THE COURT:  You may.

16   BY MS. COMEY:

17   Q.  Mr. Alessi, I've just handed you what is marked for

18   identification as Government Exhibit 52.  Would you please take

19   a look at that, and then tell us if you recognize it?

20   A.  Yes, I recognize it.  The type of book, it was the same.

21   Q.  Hold on one second.  What does this appear to be to you?

22   A.  This appear to be the direct -- these were the directories

23   of Ms. Maxwell and Mr. Epstein.

24   Q.  Did you review this directory last night?

25   A.  Yes, I did.

LC2Qmax5 - corrected        Alessi - Direct

1   Q.  I want to ask you some questions about this directory.

2   Starting with the cover, what do you recognize about the cover?

3   A.  This was exactly the same cover of the directories that I

4   saw.

5   Q.  Is it the same binding?

6   A.  The same binding, binding.

7   Q.  Turning to the pages, what do you recognize about the

8   layout on the pages?

9   A.  It was exactly as the books that I recall.

10  Q.  Did you review every page of this exhibit last night?

11  A.  Yes.

12  Q.  When you reviewed this exhibit, did you see entries that

13  you recognized from the book you saw when you worked for

14  Mr. Epstein?

15  A.  Yes, I did.

16  Q.  Do you remember about how many?

17  A.  There were many, many, many, many names.

18  Q.  Were some of those entries for massage in Palm Beach?

19  A.  Yes.

20  Q.  Is there a difference in the size of the font in this

21  book--

22  A.  Yes.

23  Q.  -- from the one that you remember?

24  A.  Yes, these are much smaller font.  My books, the books when

25  I was there, they were a lot thicker, and the font was larger,

LC2Qmax5 – corrected          Alessi – Direct

1  but the format was the same.

2  Q.  Format was the same.  And are there some of the same

3  contacts that you remember from when you worked for

4  Mr. Epstein?

5  A.  Yes.

6  Q.  Based on your review of this book last night, do you think

7  this is the same book that you saw when you were employed, or a

8  later version from after you left working for Mr. Epstein?

9         MR. PAGLIUCA:  Objection, your Honor.  Lack of

10  foundation.

11         THE COURT:  Overruled.  You may answer.

12  A.  Yes, it was the same book.

13  Q.  Hold on.  Do you think this was a later version after you

14  left?

15  A.  This was a later version, yes, ma'am.

16         MR. PAGLIUCA:  Objection.

17         THE COURT:  Just a second.  I'm going to sustain.

18         The jury will disregard the last answer.

19         You may rephrase.

20  Q.  Mr. Alessi, based on your review of this book, do you

21  believe that this is the same book you saw when you worked for

22  Mr. Epstein or a later version from after you left?

23  A.  This was a later version of book after I –– that it was

24  printed probably after I left.

25  Q.  What makes you say that?

LC2Qmax5 - corrected        Alessi - Direct

1    A.  The books --

2                MR. PAGLIUCA:  Your Honor, lack of foundation.

3                THE COURT:  The question right now -- and I'll take

4    the objection after I hear the answer to this question.  Go

5    ahead.

6    Q.  What makes you say that?

7                MR. PAGLIUCA:  I'm objecting to this question, your

8    Honor.

9                THE COURT:  I am overruling that objection.  Thank

10   you.

11   Q.  What makes you say that this is a later version,

12   Mr. Alessi?

13   A.  It was a later version because the font is a lot smaller.

14   The book is a lot thinner.  Our books were about two inches

15   thick.

16   Q.  Mr. Alessi, is your name in this book?

17   A.  No, I didn't find it last night, and my name originally was

18   in the information for Palm Beach information of the house, the

19   house man in Palm Beach.

20               MS. COMEY:  May I have a moment, your Honor?

21               THE COURT:  You may.

22   Q.  Ms. Drescher, can we please pull up what's been marked for

23   identification as Government Exhibit 52A.  Thank you,

24   Ms. Drescher.  Ms. Drescher reminds me that this is a sealed

25   exhibit.

LC2Qmax5 - corrected       Alessi - Direct

1         So, Mr. Alessi, would you please, with the Court's

2    permission, look at the binder next to you and look at

3    Government Exhibit 52A for identification.  Do you recognize

4    this?

5    A.  Yes.

6    Q.  Did you compare this exhibit to a page in the book that's

7    marked for identification as Government Exhibit 52 earlier

8    today?

9    A.  Yes, I did.

10   Q.  And is Government Exhibit 52A a copy of that page from

11   Government Exhibit 52?

12         MR. PAGLIUCA:  Objection.  Lack of foundation.

13         THE COURT:  Mr. Alessi, will you look through each

14   page of the copy?

15         MS. COMEY:  Your Honor, it's a single page.

16         THE COURT:  I'm sorry.  What page?

17         MS. COMEY:  It's marked for identification as

18   Government Exhibit 52A.  Oh, you want us to look through

19   Government Exhibit 52?

20         THE COURT:  52A is one page of 52?

21         MS. COMEY:  Yes, your Honor.

22         THE COURT:  And what number page is it?

23         MS. COMEY:  The pages are not numbered, your Honor.

24         MR. PAGLIUCA:  Can we have a sidebar, your Honor?

25         THE COURT:  Actually, I'm going to break for the

LC2Qmax5 - corrected        Alessi - Direct

1    afternoon.  15-minute break.  Members of the jury, enjoy your

2    break.

3              (Jury not present)

4              THE COURT:  Ms. Comey, may I have the book and a copy

5    of 52A?

6              MS. COMEY:  Of course, your Honor.  Your Honor, if I

7    may clarify.

8              THE COURT:  I just want to make sure the witness is

9    clear.  Okay.  All right, go ahead.

10             MS. COMEY:  Thank you, your Honor.

11             I just wanted to clarify that last line of

12   questioning.  The witness this morning looked at Government

13   Exhibit 52A and compared it against Government Exhibit 52.  He

14   essentially did this homework before getting on the stand and

15   he did that for --

16             THE COURT:  Sometimes you have to show your work.

17             MS. COMEY:  Absolutely, your Honor.  I just wanted to

18   clarify that he could testify that he has just this morning

19   taken this exhibit and the other sub-marked exhibits that I

20   expect to introduce and compared them against Government

21   Exhibit 52 to confirm that they're copies.  But happy to go

22   through the process on the stand as well, your Honor.

23             MR. PAGLIUCA:  I think the problem from my

24   perspective, your Honor --

25             THE COURT:  Could you pull up the microphone?

LC2Qmax5 - corrected         Alessi - Direct

1              MR. PAGLIUCA:  Yes.

2              First of all, we're talking about copies.  All of this

3     is copies.  And this witness has no personal knowledge about

4     whether the copy he's being shown is a copy from this book or

5     from some other book, number one.

6              THE COURT:  Well, just on that, so if he could -- if

7     he's directed to a page in the book and then directed to the

8     exhibit, the A exhibit, he could look and compare and indicate

9     whether he sees any differences.

10             MR. PAGLIUCA:  Sure.  He could say this looks like a

11    copy from this book.  I agree with that.

12             THE COURT:  Right.  So, Ms. Comey, you will do that.

13             MS. COMEY:  Yes, your Honor.

14             THE COURT:  Do you have way to direct him to the

15    relevant page?

16             MS. COMEY:  Your Honor, during the break, I'm happy to

17    take the exhibit, and I will figure out a way to direct him to

18    the relevant page during our break.

19             THE COURT:  Okay.

20             MR. PAGLIUCA:  I guess, the other -- I'm not sure how

21    we're doing this, but it seems to me that foundationally there

22    should be a discussion about the admission of 52 before we're

23    doing these comparatives in front of the jury.

24             THE COURT:  I think that's fair enough.

25             Why not do it that way, Ms. Comey?

LC2Qmax5 - corrected       Alessi - Direct

1          MS. COMEY:  I'm sorry, your Honor, I didn't hear the

2     proposal.

3          THE COURT:  Why not do it that way?

4          MS. COMEY:  I didn't hear Mr. Pagliuca's proposal.

5          THE COURT:  Why not deal with the admission, the offer

6     of 52 -- I mean, we don't need testimony on the subpages --

7          MS. COMEY:  Your Honor, we're not offering the

8     entirety of 52.  As I believe we mentioned to your Honor in

9     briefing, we're trying to narrow what we're offering from this

10    exhibit, and so we picked five pages that are particularly

11    relevant to the facts that are at issue in this case, and we

12    would only propose to show the jury those five pages, which is

13    why we're going through this process.

14         MR. PAGLIUCA:  I don't have a problem with that, your

15    Honor, but I think what I would say is they would offer 52 and,

16    in essence, it's a redacted version of 52 that's going to the

17    jury.  So the record will be clear that 52, if the Court is

18    going to allow it, is authenticated and admitted, and that it's

19    a redacted version of 52 is what's going to the jury.

20         THE COURT:  That sounds exactly right.

21         MS. COMEY:  That's fine, your Honor.

22         THE COURT:  So it's 52A through what?

23         MS. COMEY:  It's 52A, D, E, F, G and H.

24         THE COURT:  So you will -- to the extent you have more

25    testimony to elicit for authentication, you're done, I presume

LC2Qmax5 - corrected          Alessi - Direct

1    you want to inquire, I'll allow that, and then I'll make my

2    ruling.

3          If 52 is admitted, I'll indicate that it's admitted in

4    redacted form, and for those purposes, Mr. Pagliuca, you'd like

5    the witness to compare each of the A, D, E, F, G, H pages to

6    those in the book.

7          MR. PAGLIUCA:  I think the answer to that question is

8    depending on whether the Court admits it or not, then we don't

9    need to make a copy.  If the Court is not going to admit it,

10   then we don't get to the 52.  If the Court does admit it, I do

11   not need an on-the-record comparison because we've dealt with,

12   I think, the issue.  I accept that the government is going to

13   say, and I agree, that they, they, the government, have copied

14   those pages.  That was not the problem of my objection.  It was

15   the rest of this format of how this was being done.

16         So I think if it's admitted, they say:  Here's 52.  Is

17   that a copy of a page out of the book?  Yes.  Okay, fine.  And

18   we move on.  Because the actual substance has been admitted, we

19   don't have to deal with -- copies are the same.

20         THE COURT:  How about this:  If I sustain the

21   objection, that's the end of it.  If I overrule the objection,

22   52 will be admitted in redacted form, and then you can

23   stipulate to the government's 52A, D, E, F, G and H being true

24   and correct photocopies of five pages from 52.  Is that

25   reasonable?

LC2Qmax5 - corrected        Alessi - Direct

1              MR. PAGLIUCA:  That's fine.

2              THE COURT:  So you don't -- we don't need the witness

3    to verify the copies.

4              MR. PAGLIUCA:  I agree.

5              MS. COMEY:  Thank you, your Honor.

6              THE COURT:  I will give you the book back, and we'll

7    take a short break.

8              MS. COMEY:  Thank you, your Honor.

9              (Recess)

10         (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  So I want to ask, there was an objection

2     to a question on foundation.  The question was, is this -- do

3     you know if this is the same book or a later book.  I wanted to

4     hear the answer to that.  But looking at it, I don't know what

5     his basis for knowledge is for saying that it's the later book.

6     So you can inquire into that or I'll -- yes?

7          MR. PAGLIUCA:  Well, I guess if he left in 2002 and

8     the book is after 2002, I don't think there can be a basis for

9     knowledge.

10         THE COURT:  Well, I'll allow the question to be asked.

11    And if there's not, then I will agree with you and I'll strike

12    the testimony.

13         MR. PAGLIUCA:  Okay.

14         MS. COMEY:  Understood, your Honor.

15         THE COURT:  So that's one.

16         And then two, I just want to make sure I understand,

17    because the letter indicated this witness, sort of a new person

18    to authenticate, as opposed to the original witness who you

19    indicated would authenticate; correct?

20         MS. COMEY:  Yes, your Honor.  That other witness we

21    believe could also authenticate it, but --

22         THE COURT:  Right.  So it seems to me when you're

23    finished here and after the voir dire, I can sustain the

24    objection, overrule the objection, or reserve until I hear

25    additional.  Any reason not to do it that way?

1          MS. COMEY:  No, your Honor.  I think our position is

2     clear that we think it should come in at this time, but

3     understood.

4          MR. PAGLIUCA:  I think that's entirely appropriate.  I

5     guess the question is are you conditionally admitting it or

6     not.

7          THE COURT:  The reason I ask, do you need -- is there

8     more to do with it now or can we simply reserve and move on

9     till the other witness?

10          MS. COMEY:  I think it's fine to reserve, your Honor.

11          THE COURT:  Okay.  So if that's what I do, I won't

12     conditionally admit and we'll take it from there.

13          MR. PAGLIUCA:  Okay.

14          THE COURT:  Anything to take up before we bring the

15     witness back?

16          MR. PAGLIUCA:  Not from me, your Honor.

17          MS. COMEY:  Your Honor, I apologize if I was not

18     clear, but we do want to admit this through this witness.  And

19     I do have questions for him about this exhibit, so we are

20     seeking to admit it.  I apologize.  My colleagues let me know

21     that I was not clear.

22          THE COURT:  It wasn't that you weren't clear.  That's

23     an opposite answer of the one you just gave.

24          MS. COMEY:  I apologize, your Honor.

25          I misunderstood the question.

1          THE COURT:  Well, I think -- you may move it.  And I

2     will tell you whether I'm -- presuming -- I'm going to hear the

3     voir dire.  You'll move it.  I'll either overrule -- there will

4     be an objection.  I'll either overrule the objection, sustain

5     the objection, or reserve.

6          MS. COMEY:  Understood.

7          THE COURT:  The other option I sort of reserve sub A

8     is conditionally admit it pending further testimony.  But I may

9     not do that.  I'm not sure.

10          MS. COMEY:  Understood, your Honor.  Thank you.

11          MR. PAGLIUCA:  To the extent it matters, I would be

12     opposed to conditionally admitting the exhibit, your Honor.

13          THE COURT:  I want to just get in my head the

14     question.  The question I have in mind that drew the foundation

15     objection was, Mr. Alessi, based on your review of this book,

16     do you believe this is the same book that you saw when you

17     worked for Mr. Epstein or a later version after you left?

18          And he said, This was a later version of the book

19     after I left, that it was printed probably after I left.

20          And then the objection came after that, lack of

21     foundation.

22          The question was, What makes you say this is a later

23     version, Mr. Alessi, which was what I thought would elicit --

24     be responsive to the foundation objection.

25          And he said, The book is a lot thinner.  Our books

 1   were about two inches thick.

 2             So you'll return to that.  I agree, based on that

 3   answer, which I had assumed would provide a foundation.

 4             MS. COMEY:  Yes, your Honor.

 5             THE COURT:  But it didn't.

 6             So unless there's further foundation, I'll sustain the

 7   lack of foundation objection and I'll tell the jury to

 8   disregard Mr. Alessi's testimony that it was a later version of

 9   the book.  Okay, Mr. Pagliuca?

10             MR. PAGLIUCA:  Yes, your Honor.  That's appropriate.

11             THE COURT:  Okay.  We'll bring in the witness.

12             The witness while we're getting the jury, please.

13             Thank you.

14             (Witness present)

15             (Jury present)

16             THE COURT:  You may be seated.

17             Thank you so much, members of the jury.

18             All right.  Ms. Comey, you may continue your direct of

19   Mr. Alessi.  Mr. Alessi, I remind you, you are under oath.

20             Go ahead.

21             MS. COMEY:  Thank you, your Honor.

22   BY MS. COMEY:

23   Q.  Good afternoon, Mr. Alessi.

24   A.  Good afternoon.

25   Q.  I want to return to talking about the booklet.  And in

LC2VMAX6                    Alessi - Direct

1  particular, I want to ask you some questions about the booklet

2  that you saw during your employment for Mr. Epstein.  So remind

3  us, between what years did you work for Mr. Epstein?

4  A.  Around 1990 to 2002.

5  Q.  During that time, how often were new booklets printed?  Or,

6  excuse me, directories, directories is what I wanted to talk

7  about.  How often were new directories --

8  A.  I think they were printed twice a year.

9  Q.  Did each directory have the names of current employees in

10 it?

11 A.  Yes.

12 Q.  So when an employee left, was that employee's name still in

13 the next version of the directory?

14 A.  No, because -- and the new directory you show me, my name

15 is not --

16 Q.  That's not my question, Mr. Alessi.  That's not my

17 question.  My question is just in your experience looking at

18 the different versions of directories that you saw, did the

19 directories remove the names of employees who had left?

20 A.  Yes.

21 Q.  Okay.  And did they add the names of any new employees who

22 had come?

23 A.  Yes.

24 Q.  I want to talk about Government Exhibit 52, the same

25 exhibit you reviewed last night.

1   A.   Okay.

2   Q.   Is your name in that book?

3   A.   No, my name is not in the book.

4   Q.   Is your wife's name in that book?

5   A.   No.

6   Q.   Is Sarah Kellen's name in that book?

7   A.   Excuse me?

8   Q.   Is Sarah Kellen, is her name in the book?

9   A.   No.

10  Q.   Do you want to go ahead and take a look at that book,

11  please, and tell me if you see Sarah Kellen's name in it?

12            THE COURT:  Just a moment.

13            He's looking at the binder.

14            MS. COMEY:  Oh, no.  May I approach, your Honor?

15            THE COURT:  You may.

16            MR. PAGLIUCA:  Your Honor, I'm going to object to this

17  process.  He answered no, and this is essentially a leading

18  question to change the answer.

19            THE COURT:  I'll sustain the leading objection.  But

20  otherwise, I'll allow it.  Well, I'll permit the question that

21  you asked.  So I'll allow the question, which is, is Sarah

22  Kellen's name in the book?

23            MS. COMEY:  I think I'm asking him to look in the

24  exhibit.

25            MR. PAGLIUCA:  And that's my objection, your Honor.

1              THE COURT:  I understand.

2              I'm going to overrule the objection.  Go ahead.

3    Q.  Would you please look through the exhibit and let us know

4    if you see Sarah Kellen's name in the exhibit?

5    A.  Can you repeat the name?

6    Q.  Sarah Kellen.

7              THE COURT:  Actually, do you know what?  I'll ask you

8    to pause, Mr. Alessi.  I'll sustain the objection.  I think

9    it's lost the thread on authentication at this point.  You'll

10   go to the question that I asked you to.

11             MS. COMEY:  Your Honor, I'm sorry.  Now I'm confused.

12             THE COURT:  The earlier foundation objection that I

13   asked you to return to.

14             MS. COMEY:  Yes, your Honor.

15             May I have a moment?

16             THE COURT:  You may.

17             (Counsel conferred)

18   BY MS. COMEY:

19   Q.  So Mr. Alessi --

20   A.  Yes.

21   Q.  -- how do you know that this Government Exhibit 52 is a

22   later version of the directory that you saw when you worked for

23   Mr. Epstein?

24   A.  I think this is a later version.  In the back page of the

25   front cover it says 2004-2005.

LC2VMAX6                        Alessi – Direct

1              MR. PAGLIUCA:  Your Honor, I object.

2          Now he's just reading from the book.

3              THE COURT:  Sustained.

4          The jury will disregard that answer.

5              MS. COMEY:  Your Honor, may I be heard on this issue?

6              THE COURT:  You may.

7          (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At sidebar)

2          THE COURT:  All you're doing at this point is asking

3    him to look at the exhibit and read from it.  It's not in

4    evidence.  He didn't seem to have a basis that he recalled, as

5    far as I can tell for why he thinks it's a different version.

6    So I'm not going to permit him to read from the document.

7          MS. COMEY:  Yes, your Honor.  All I was going to say

8    is his view of that is based on his observation of the exhibit.

9    I did not intend him to have him read the document not in

10   evidence.  My question is based on his observations of this

11   exhibit.  What makes him believe that it's a later version and

12   the contents of this exhibit is part of how he forms that

13   answer.

14         THE COURT:  The content, other than the date or

15   anything else?

16         MS. COMEY:  I think at this point it's the fact that

17   his name and his wife's name were not in the exhibit and that

18   there is the date on there.

19         THE COURT:  I think you can ask -- without -- putting

20   the document aside, he already answered that.  You think this

21   is a later version.  What is your basis for saying that?

22         MS. COMEY:  Your Honor, I think his basis would be --

23         THE COURT:  I know what you think his basis --

24         MS. COMEY:  I just don't want to -- I apologize, your

25   Honor.  I just don't want to elicit something that your Honor

1    does not want me to elicit.  I think what he will say is

2    something referring to the content of the exhibit.  I don't

3    want to elicit that if your Honor has ruled that I cannot.

4            THE COURT:  Fair enough.

5            I mean, it sounds like he gave two responses to the

6    question, right.  One is, I saw the date and it's a later date;

7    the other is my name has been removed, my name's not in it, my

8    wife's name is not in it.  He hasn't provided that testimony,

9    so I don't know -- it's a logical inference which you may be

10   making.  I don't know it's a logical inference that he would

11   make.

12           MS. COMEY:  Your Honor, at this point I'll rest on the

13   logical inference that I think the Court can make based on the

14   record before it.  I'll move on.

15           THE COURT:  So what I'm going to do is sustain the

16   foundation objection at this point.  I'll tell the jury to

17   disregard the testimony that he believes it to be a later

18   version of the book from his time.

19           I'll allow the voir dire, and we'll take it from

20   there.

21           MS. COMEY:  Yes, your Honor.

22           MR. PAGLIUCA:  Thank you, your Honor.

23           MS. COMEY:  Your Honor, I apologize.

24           (Counsel conferred)

25           MS. COMEY:  Your Honor, I think Ms. Moe would like to

1    be heard on this issue.  I apologize.

2              MS. MOE:  I'm sorry, your Honor.

3              Just to frame the issue, I recognize we've been

4    clarifying the record about time periods.  Our view on

5    authentication for this exhibit is this witness is not

6    authenticating it as a document from a particular time period.

7    I recognize we've been asking questions about that.

8              The question before the Court is whether this witness

9    can authenticate this exhibit as a document belonging to

10   Maxwell and Epstein or a document that he recognizes based on

11   his observations of the book.  So we just wanted to frame the

12   question in terms of our perspective.

13             THE COURT:  That's fine.  I didn't ask the question if

14   it was a later book.  Ms. Comey did.  There was an objection.

15   We thought we were on foundation.  That's where we are.

16             I'm now ruling, sustaining that objection, telling the

17   jury to disregard that testimony.  Then it's the defense's turn

18   to voir dire, you'll seek admission, I'll rule.  I may admit

19   it, I may not admit it, I may reserve until we hear the

20   testimony of employee one.

21             MS. MOE:  Yes, your Honor.  Thank you.

22             (Continued on next page)

23

24

25

1              (In open court)

2              THE COURT:  I am sustaining the earlier objection to

3     foundation.  I will instruct the jury to disregard prior

4     testimony that the witness indicated that this book is a later

5     version of the directory that he's familiar with.  Okay.

6              MS. COMEY:  Your Honor, the government offers Exhibit

7     52 in redacted form.

8              THE COURT:  You may inquire.

9              MR. PAGLIUCA:  Thank you, your Honor.

10    VOIR DIRE EXAMINATION

11    BY MR. PAGLIUCA:

12    Q.  Mr. Alessi, as I understand it, the first time you've

13    looked at Exhibit 52 is last night; is that correct?

14    A.  Yes, sir.

15    Q.  Okay.  So 19 years after you left Mr. Epstein's employment

16    is the first time you've seen Exhibit 52; correct?

17    A.  Correct.

18    Q.  Okay.  And as you sit here today, 19 years later, you have

19    no idea where Exhibit 52 has been for the last 19 -- well, has

20    been for however long that's been in existence; correct?

21    A.  Correct.

22    Q.  Okay.  The books that you remember from the 2000 time

23    frame, I think you testified, were approximately two inches

24    thick; is that correct?

25    A.  Yes.

LC2VMAX6                    Alessi - Direct

```
 1   Q.  Okay.  So two inches, I don't know if you can see this far,
 2   but that's about two inches; correct?
 3   A.  That's correct.
 4   Q.  And the Exhibit 52 is maybe a quarter of an inch, is that a
 5   fair statement?
 6   A.  It's fair.
 7   Q.  Okay.  The books that you were talking about, as I
 8   understand it, came from New York; is that right?
 9   A.  Yes.
10   Q.  Okay.  And you don't have any idea whether that book --
11   well, whether Exhibit 52 -- let's just call it Exhibit 52, came
12   from New York or not; correct?  You don't know whether Exhibit
13   52 came from New York, came from Palm Beach, came from
14   California, came from anywhere?  I mean, you have no personal
15   knowledge about where Exhibit 52 was created; correct?
16   A.  Excuse me.  This is Exhibit 52?
17   Q.  Yes, that's correct.
18   A.  Yeah, I have no idea.
19   Q.  Okay.  There are -- when you held that up, I can see a
20   bunch of different Post-It notes in Exhibit 52.  Do you see
21   that?
22   A.  Yes.
23   Q.  Okay.  You have no idea where those Post-It notes came
24   from; correct?
25   A.  Correct.
```

1  Q.  Okay.  Whenever you saw whatever books you saw in the

2  2000s, they didn't have Post-It notes on them; correct?

3  A.  Correct.

4  Q.  Okay.  When you looked through Exhibit 52 last night, 19

5  years after you left Mr. Epstein's employment, did you notice

6  that there was handwriting in Exhibit 52?

7  A.  Yes.

8  Q.  That's not your handwriting; correct?

9  A.  No.

10  Q.  And there were dates in Exhibit 52 that were handwritten

11  not by you; correct?

12  A.  Absolutely.

13  Q.  And you can't recognize the handwriting that's contained in

14  Exhibit 52; correct?

15  A.  Correct.

16  Q.  There were parts of Exhibit 52 that were circled or there

17  were boxes put around different things; correct?

18  A.  Correct.

19  Q.  You didn't put those boxes or circles around anything;

20  correct?

21  A.  Correct.

22  Q.  And you don't know who, if anybody, put those boxes or

23  circles around the things in Exhibit 52; correct?

24  A.  Correct.

25  Q.  Now, you testified that from your observation and memory,

1    the books that you saw in Palm Beach that came from New York,

2    the type was much larger; correct?

3    A.  Yes, sir.

4    Q.  And so that's different in what you're looking at in

5    Exhibit 52; correct?

6    A.  Yes.

7    Q.  And as you sit here today, you can't tell us, for example,

8    whether someone took a book from Mr. Epstein's house, took it

9    to Kinko's, had it printed much smaller and shrunk down, took

10   out pages, added pages, did whatever they did to it, and then

11   rebound it.  You can't -- you don't know whether that happened

12   or not; correct?

13   A.  Correct.

14   Q.  You were not charged with -- you were not tasked or

15   directed by anyone to maintain these books in Palm Beach?  Do

16   you understand my question, which may be a little complicated.

17           It wasn't your job to take the books, put them in a

18   folder, and put them in a drawer somewhere and keep them to

19   record them for history, right?

20   A.  Not that I remember.

21   Q.  Okay.  In fact, every time there was a new book that came

22   out, the old books were destroyed, as I understand it; is that

23   right?

24   A.  It was tossed in the garbage, yes.

25   Q.  Okay.  Tossed in the garbage.  And so there was no

LC2VMAX6                         Alessi - Direct

1   practice, as you understood it, to keep any of these books for
2   the future; correct?
3   A.  Correct.
4   Q.  Also in Exhibit 52 there are different -- there are arrows
5   that are pointed to some of the names.  You don't need to look
6   at them.  I'm asking you about your memory, okay?
7        When you looked at it last night, did you see some of
8   the entries had arrows pointing to them, right?
9   A.  Yes.
10  Q.  And you didn't put those in there, right?
11  A.  Absolutely, no.
12  Q.  And you don't know how they got there; correct?
13  A.  Correct.
14  Q.  The bottom line here, Mr. Alessi, you don't have any
15  personal knowledge about first how or when Exhibit 52 was
16  created; correct?
17  A.  Correct.  No knowledge.
18  Q.  You have no personal knowledge how or in what fashion
19  Exhibit 52 has been kept for the last 19 years; correct?
20  A.  Correct.
21  Q.  You have no personal knowledge about whether or not someone
22  took a book from Palm Beach, took out pages, photocopied it,
23  put it back together, put those sticky notes on it, and made
24  the markings on there; correct?
25       MS. COMEY:  Objection, your Honor.

1          THE COURT:  Sustained.

2          MR. PAGLIUCA:  I can break it down, your Honor.

3          THE COURT:  No, no, no.  I assume the objection is

4    asked and answered.

5          MS. COMEY:  Correct, your Honor.

6          MR. PAGLIUCA:  Without a grounds, I'm unaware of what

7    the --

8          THE COURT:  He said he didn't understand the grounds.

9          MR. PAGLIUCA:  That's all.

10          THE COURT:  Making a gesture as if we could read each

11    other's minds.

12          Fair enough.  I'm sustaining.  Asked and answered.

13    BY MR. PAGLIUCA:

14    Q.  Mr. Alessi, as you sit here today, you have no personal

15    knowledge about whether or not Exhibit 52 was ever touched by

16    Mr. Epstein; correct?

17    A.  Correct.

18    Q.  And you have no personal knowledge about whether Exhibit 52

19    was ever touched by Ms. Maxwell; correct?

20    A.  Correct.

21          MR. PAGLIUCA:  I think that's all, your Honor.

22          THE COURT:  Okay.  Counsel, I'm going to reserve, as

23    discussed, pending additional testimony.

24          MS. COMEY:  Thank you, your Honor.

25          May I resume direct?

1          THE COURT:  You may.

2     BY MS. COMEY:

3     Q.  Mr. Alessi, I want to talk some more about the massages

4     that Jeffrey Epstein received at his Palm Beach house.

5     A.  Okay.

6     Q.  Did you see the people who came to the house to give

7     Mr. Epstein massages during your employment?

8     A.  Yes.

9     Q.  About what percentage of those people were female?

10    A.  I would say 98 percent they were female.

11    Q.  And when those females would come to Mr. Epstein's Palm

12    Beach house to give him massages, which entry would they

13    take -- would they use to get into the house?

14    A.  If they were there for the first time, they will go through

15    the front entrance, front door.

16    Q.  Go ahead.

17    A.  And if they were repeat visits, they will come through the

18    kitchen always.

19    Q.  And when a female came through the kitchen and was there to

20    massage Jeffrey Epstein, where did they go from there based on

21    your observations?

22    A.  Based on my observation, they will stay in the kitchen, I

23    will let Mr. Epstein know, Ms. Maxwell, that this person is

24    here for a massage.  And they will tell me, Okay.  Set it up

25    upstairs in his bathroom, Mr. Epstein's bathroom, or by the

```
 1   pool, in different locations of the house.
 2   Q.  Where did Mr. Epstein receive the majority of his massages?
 3   A.  His bathroom.
 4   Q.  And is that the bathroom attached to the master bedroom
 5   that we were talking about earlier?
 6   A.  Yes.
 7   Q.  What, if any, massage tables were in Jeffrey Epstein's Palm
 8   Beach house when you worked for him?
 9   A.  We have a massage table in every guest room, and
10   Mr. Epstein room.
11   Q.  Where in Mr. Epstein's room was the massage table?
12   A.  It was on his bathroom.
13   Q.  The same bathroom where you said he received the majority
14   of his massages?
15   A.  Yes.
16   Q.  While you worked for Mr. Epstein, when someone called
17   Mr. Epstein's Palm Beach house, how would employees keep track
18   of any messages left for Mr. Epstein?
19   A.  Most of the times I will answer the phone.  And I will ask
20   who the -- they want to talk to, and they will tell me, Is
21   Mr. Epstein at the house?  I will say, Yes.  He's busy.  You
22   want to leave a message?  And I will write it down in a -- in a
23   message sheet.  It was this booklet.  I think they have three
24   or four messages in each booklet, and they have a carbon copy.
25   Q.  Let me ask you some questions about that.
```

1      Where would you write phone messages down for

2  Mr. Epstein when you worked for him?

3  A.  Usually at the kitchen desk.

4  Q.  And into what type of book?  You mentioned a book.

5  A.  It was a book with three or four pull-out pages.  And it

6  had a copy, carbon copy on each page.

7  Q.  So after you wrote down a message for Mr. Epstein, what did

8  you do?

9  A.  If it was a message for Mr. Epstein and if he was in the

10  house, I will leave it in the -- his desk or in the kitchen

11  table.

12  Q.  And once you --

13          THE COURT:  I'm sorry, can I just ask, can we collect

14  52?

15          MS. COMEY:  Oh, yes, your Honor.  May I approach?

16          THE COURT:  You may.  Thank you.

17  Q.  Once you removed the message you had written for

18  Mr. Epstein, what would be left in the book?

19  A.  The carbon copy of the -- of the message.

20  Q.  Would it be an exact copy of the message you had written

21  down?

22  A.  Yes.

23  Q.  And what was the practice when you worked for Mr. Epstein

24  of how you would take messages?

25  A.  I will answer the phone, I will listen who is calling.  And

1   if the message was for Mr. Epstein, and if he wants to take the

2   call, he usually answer his calls, he has his number.  And if

3   he was there, he will answer his calls.  If he was not there, I

4   will take a message.  Who's calling?  I will ask for the

5   telephone number, the name, and I will write it down in the --

6   in the -- in the message book.

7   Q.  And when would you write it in the message book?

8   A.  Soon while I was talking on the phone.

9   Q.  As you're talking on the phone receiving the information,

10  you were writing down that information into the book?

11  A.  Yes.

12  Q.  Other than you, who else took messages in message books for

13  Mr. Epstein?

14  A.  Occasionally, my wife and occasionally he will preliminary

15  injunction Taylor.

16  Q.  When a message book was full, what would happen to it?

17  A.  We have a closet, utility closet in my office, in my little

18  office.  And it was a bunch of books, new books, and the old

19  ones were kept there.

20  Q.  Were the old books kept off of the staff room that we were

21  talking about earlier?

22  A.  Yes.

23          MS. COMEY:  Your Honor, I'd ask permission now to

24  approach the witness with what's been marked for identification

25  as Government Exhibit 2.

1            THE COURT:  Okay.

2            MS. COMEY:  And I'll show it to counsel first.

3            THE COURT:  Thank you.

4   Q.  Mr. Alessi, I've just handed you what is marked for

5   identification as Government Exhibit 2.  Would you take a look

6   at that and tell us if you recognize it?

7   A.  Yes, I do.

8   Q.  What do you recognize it to be?

9   A.  This was the booklet that it was -- that would take

10  messages on it.  These are the carbon copies.

11  Q.  Okay.  Do you recognize any of the handwriting in those

12  books?

13  A.  Yes.

14  Q.  Could you just -- without reading the content of any

15  messages, just tell us whose handwriting you recognize?

16  A.  The first one, the second one, the fourth one in the first

17  page are mine.

18  Q.  On the first page, three of the messages are in your

19  handwriting?

20  A.  Yes.

21  Q.  Let's go to the second page please.

22  A.  The second page, I recognize the first one as being my

23  wife.  The second one is mine, the third one is mine, the four

24  one is mine.

25            In the -- in the next page, for some reason this

LC2VMAX6                     Alessi - Direct

1   messages were not taken or put --

2   Q.  My question for you, Mr. Alessi, is just whether you

3   recognize the handwriting, okay?

4   A.  Yes.  Okay.  The first one is my wife.  The second one, I

5   don't know, this is not my writing.  The third one is my

6   writing.  The four one is not my writing.  And the last one is

7   my writing.

8   Q.  And what about the next page?

9   A.  Next page is my writing, my writing, my writing, my

10  writing.

11  Q.  And the next page?

12  A.  This is my wife's writing, the next one is my writing, my

13  wife's writing, and my writing.

14  Q.  How about the next page?

15  A.  This is my wife's writing, my, my wife's writing, and my

16  writing.

17  Q.  And the next page?

18  A.  Mine, mine, this one I don't recognize it, and this one is

19  blank.

20  Q.  The next page?

21  A.  This one is mine.  This one is -- I don't recognize this.

22  This -- I don't recognize this, this, and the last one I don't

23  recognize.

24  Q.  And how about the next page?

25  A.  The first one, I don't recognize it.  The second one is

1   blank.  The third I don't recognize it.  The four one I don't

2   recognize it.

3   Q.  And can you just flip through the rest of the pages and

4   tell us if you recognize any of the handwriting in the rest.

5   Just look at them silently and tell me, yes or no, whether you

6   recognize any of the handwriting in the rest of the book?

7   A.  No.

8   Q.  Now, the portions of handwriting that you do recognize,

9   Mr. Alessi --

10  A.  Yes.

11  Q.  -- are those messages that you took using the same process

12  you just described for us?

13  A.  Yes, I did.

14  Q.  So at the same time that you were taking information from a

15  phone call for Mr. Epstein --

16  A.  Yes.

17  Q.  -- you were writing it down simultaneously?

18  A.  Right.

19  Q.  And was that part of your job for Mr. Epstein?

20  A.  Yes, it was.

21  Q.  Was that a part of the practice of running Mr. Epstein's

22  Palm Beach residence?

23  A.  Yes, it was.

24  Q.  Okay.  You can set that aside and I'll come retrieve it.

25  Thank you, Mr. Alessi.

1           MS. COMEY:  One moment.  I'm sorry.  If I may have a

2     moment, your Honor.

3           THE COURT:  You may.

4           (Counsel conferred)

5           MS. COMEY:  May I come get the exhibit, your Honor?

6           THE COURT:  Yes.  Thank you.

7           MS. COMEY:  Your Honor, at this time the government

8     would offer certain excerpts from Government Exhibit 2, which

9     are marked for identification as Government Exhibits 2A through

10    2W.  And we'd ask that other than 2A, they be received under

11    seal.

12          MR. PAGLIUCA:  Well, your Honor, can I ask a few

13    questions about this exhibit with the witness?

14          THE COURT:  Yes.

15          MR. PAGLIUCA:  Thank you.

16    VOIR DIRE EXAMINATION

17    BY MR. PAGLIUCA:

18    Q.  Mr. Alessi, again, you left in -- at the end of 2002; is

19    that right?

20    A.  Yes.

21    Q.  And if I'm looking at this exhibit correctly, the dated --

22    the date range goes beyond 2002.  And you would have -- you

23    would not have taken any message after 2002; correct?

24    A.  Yes.

25    Q.  And you would not have any personal knowledge about any of

1    the information conveyed to whoever is operating anything down

2    in this book after 2002; correct?

3    A.   That's correct.

4    Q.   And I don't believe you've identified any handwriting other

5    than yours and your wife's handwriting in the beginning of this

6    book; is that correct?

7    A.   That's correct.

8    Q.   And there are a number of pages in this book that don't

9    have dates reflected in the message pad.  Do you know that or

10   not?

11   A.   Probably.

12   Q.   Okay.  I'm actually old enough to have used message pad

13   books in the past.  And as I recall -- and you tell me if this

14   is any different -- oftentimes there are five, six different

15   message pads being used at any particular point in time.  And

16   someone may write a message in one pad, and then may go to

17   another pad.  And so there can be conflicting dates in

18   different message pads at the same time.  Was that the practice

19   or not at Mr. Epstein's house?

20                MS. COMEY:  Objection, your Honor.

21                THE COURT:  Grounds.

22                MS. COMEY:  Form, your Honor.

23                THE COURT:  Overruled.  You may answer.

24   Q.   Did you understand my question?

25   A.   Yes, I did.  No, it was only one pad, and it was usually

1   situated at the kitchen -- kitchen desk.

2   Q.  And that would have been your desk; is that correct?

3   A.  No, that was the kitchen -- the desk -- that was the desk

4   for anybody to use.

5   Q.  I see.  So one message pad at the kitchen desk, and anybody

6   could answer the phone and write down a message; is that

7   correct?

8   A.  Yes.

9   Q.  Okay.  And then at some point, this message book was put

10  into a closet, would that have been the practice?

11  A.  Yes.

12  Q.  And then you don't know what happened to it after that?

13  A.  No.

14          MR. PAGLIUCA:  Your Honor, I have no objection to the

15  messages that were identified by Mr. Alessi as to his

16  handwriting or his wife's handwriting.  I think those have been

17  authenticated.  I object to the remainder as being hearsay.

18          THE COURT:  Can you specify as to 2A through 2W?

19          MR. PAGLIUCA:  Yes.  I'll have to go back to that

20  exhibit, your Honor.

21          THE COURT:  Okay.  Maybe Ms. Comey can --

22          MR. PAGLIUCA:  Sure.  So 2A, your Honor, I don't

23  object to.  That's a cover page.

24          THE COURT:  Okay.

25          MR. PAGLIUCA:  I think 2 -- I don't have a 2B in my

LC2VMAX6                    Alessi - Direct

1    book.

2            MS. COMEY:  I apologize, your Honor.  I don't think

3    we're offering 2B, so we'll just do 2C through 2W.

4            MR. PAGLIUCA:  Okay.  So 2C, your Honor, I object to.

5            (Counsel conferred)

6            MR. PAGLIUCA:  Ms. Moe has helped speed up the

7    process.  Ms. Moe.  I'm sorry, Ms. Comey has helped speed up

8    the process here, your Honor.  As I understand it, none of

9    these exhibits being offered were written by Mr. Alessi or his

10   wife and have not been authenticated, and so I object to all of

11   those exhibits.

12           THE COURT:  Ms. Comey, can I see the book?

13           MS. COMEY:  Yes, your Honor.

14           May I approach?

15           THE COURT:  Yes.

16           Do you have anything further, Ms. Comey?

17           MS. COMEY:  I'm sorry, your Honor?

18           THE COURT:  Do you have anything further?

19           MS. COMEY:  I'm happy to argue at sidebar, if your

20   Honor would like to hear argument.

21           THE COURT:  I was wondering if you had anything

22   further with the witness.

23           MS. COMEY:  No, your Honor.

24           THE COURT:  I'm overruling the objection to -- so

25   you're not seeking 2A, just 2C --

1          MS. COMEY:  I am seeking 2A, I'm not seeking 2B.  Just

2     C through W.

3          THE COURT:  All right.  2A on consent is admitted.

4     And I am overruling the objection as to 2C through 2W based on

5     the testimony of the witness.

6          MS. COMEY:  Thank you, your Honor.  These are sealed

7     exhibits.  I would ask that we please go through them with the

8     jurors in their binders.

9          THE COURT:  So are they all sealed?

10         MS. COMEY:  Yes, your Honor, I apologize.  We are

11    offering all of these under seal, consistent with prior

12    applications.

13         THE COURT:  I presume 2A is not under seal.

14         MS. COMEY:  No, 2A is not under seal.

15         Thank you for clarifying, your Honor.

16         THE COURT:  2C through 2W.

17         MS. COMEY:  We are moving under seal.

18         THE COURT:  Under seal.

19         MS. COMEY:  And it's both to protect witnesses who

20    you've authorized to testify under pseudonym, and to protect

21    personal information of third parties who have names, phone

22    numbers, and contact information in the other exhibits.

23         THE COURT:  Do you have any objection to the sealing

24    request?

25         MR. PAGLIUCA:  No, the sealing I have no objection to,

1   your Honor.

2           THE COURT:  All right.  So 2A is admitted.  And then

3   2C through 2W is admitted under seal for the reasons indicated

4   by Ms. Comey.

5           (Government's Exhibits 2A, 2C through 2W received in

6   evidence)

7           MS. COMEY:  Thank you, your Honor.

8           Ms. Drescher, would you please pull up 2A and publish

9   it for the jury.  Thank you.

10           I'm told that the remaining exhibits are in a

11   different set of binders that are not with the jury right now.

12   So we'll publish the remaining exhibits at a later time and

13   I'll move on to another topic.  So we can take this down.

14           THE COURT:  Okay.

15   BY MS. COMEY:

16   Q.  Mr. Alessi, what, if any, supplies were you instructed to

17   buy for Mr. Epstein to use during his massages?

18   A.  I don't recall buying any oils or perfumes or whatever for

19   the massages because they were purchased by Ms. Maxwell.

20           MR. PAGLIUCA:  Your Honor, I'm going to object to the

21   narrative.  I'm going to object to foundation.

22           THE COURT:  Okay.

23   Q.  If you didn't buy them, where did they come from?

24           MR. PAGLIUCA:  Objection.  Foundation, your Honor.

25           THE COURT:  Sustained.

LC2VMAX6                          Alessi - Direct

1    Q.  Did Ms. Maxwell ever give you supplies for Mr. Epstein's

2    massages?

3    A.  Yes.

4    Q.  What did she give you?

5    A.  All types of exotic oils, most of where they were from

6    other countries.

7    Q.  Where did you put them after Ms. Maxwell gave them to you?

8    A.  They were put in the dress -- on top of the dresser of

9    Mr. Epstein's bathroom.

10   Q.  Were you ever present in the massage room when Mr. Epstein

11   received his massages?

12   A.  Never.

13   Q.  Was the door ever open when Mr. Epstein received a massage

14   in his master bedroom and bathroom?

15   A.  Never.

16   Q.  Did you ever go into the massage room after Mr. Epstein's

17   massage appointments?

18   A.  Yes, usually I will go up --

19   Q.  Let me ask you a follow-up question.

20           Why?  Why did you go into Mr. Epstein's --

21   A.  To clean up and retrieve the -- the massage table.

22   Q.  Where was the massage table kept?

23   A.  In Mr. Epstein's closet.

24   Q.  Where was that closet?

25   A.  In Mr. Epstein's bathroom.

LC2VMAX6                          Alessi - Direct

1   Q.  What do you remember finding after -- when cleaning up

2   after Mr. Epstein's massages in that room?

3            MR. PAGLIUCA:  Object to the time frame, your Honor.

4            THE COURT:  Okay.

5   Q.  Between the periods of 1994 and 2002, what are some of the

6   things you remember finding after Mr. Epstein's massages?

7            MR. PAGLIUCA:  Your Honor, I still object to this time

8   frame.  It's too broad as framed.

9            THE COURT:  All right.  Ms. Comey, you can ask if

10  there's continuity or you can go through the dates.

11  BY MS. COMEY:

12  Q.  Mr. Alessi, are there some things that you remember seeing

13  after just about every one of Mr. Epstein's massages?

14  A.  Not after every one.

15  Q.  After the massages, would you clean up towels?

16  A.  Yes.

17  Q.  And would you clean up towels after all of his massages?

18  A.  Not all of his massages.  Not all of his massages, no.

19  Q.  About how many?

20  A.  Depends who the massage therapist was.

21  Q.  Can you explain?

22  A.  If the massage therapist was a repeat massage and they

23  usually were people who always come back to the house, they

24  will bring the towels for me to the laundry room.

25  Q.  And how about if it was a new person?

LC2VMAX6                    Alessi - Direct

1   A.  I will have to go out and bring the towels down.

2   Q.  What else did you do after the majority of Mr. Epstein's

3   massages?

4   A.  I will put the table away, I will put the -- take all the

5   towels out, and I will clean the table, and I will put the oils

6   away, higher up.

7   Q.  Are there any incidents that stand out in your mind where

8   you found something unexpected when cleaning up after a

9   massage?

10  A.  Yes.

11  Q.  Can you tell us about that?

12          MR. PAGLIUCA:  Objection, your Honor.  I think we need

13  to be specific as to time frame here.

14          THE COURT:  Why don't you start with the first

15  incident.

16  Q.  About when was the first time?

17  A.  Excuse me?

18  Q.  Did there ever come a time where you found something other

19  than towels and oils in Mr. Epstein's massage room?

20  A.  Yes.

21  Q.  About when was that?

22  A.  1995, '96, '97, '98.

23  Q.  What do you remember finding?

24  A.  I remember finding a large dildo.

25  Q.  What did it look like?

1  A.  It looked like a huge man's penis with two heads.

2  Q.  What did you do with the dildo?

3  A.  The dildo, I use to put my gloves on, put them in the sink,

4  run it under water, and put the dildo in Ms. Maxwell's closet

5  in a basket.

6  Q.  I want to be clear here.  Where did you find the dildo

7  after the massage?

8  A.  Usually at the table, at the massage table or at his bed.

9  Q.  And the massage table, where was that?

10  A.  The massage table was -- it was left there in the room.  It

11  was in his -- in Mr. Epstein's bathroom.

12  Q.  If that's where you found it, why would you put it in

13  Ms. Maxwell's bathroom?

14  A.  That's the place what I was told -- it was kept all the

15  time.

16  Q.  How do you know that?

17  A.  Because I knew everything that happen in that house.

18  Q.  Can you describe the basket in Ms. Maxwell's bathroom where

19  you put the dildo after Mr. Epstein's massages?

20  A.  Yes.  It was like a wicker basket, the size of a garbage

21  can, pretty large, and it had a cover on it.

22  Q.  What else do you remember seeing in that basket?

23  A.  I saw pornographic tapes, tapes, and I saw a custom, a

24  black vinyl or leather black, I remember it was black, custom.

25  Q.  Do you mean costume?

LC2VMAX6                          Alessi - Direct

1   A.  Costume, sorry.

2   Q.  About how many times do you remember seeing that dildo

3   after one of Mr. Epstein's massages?

4   A.  At least four, five times.

5   Q.  Are there any other items that stand out in your mind that

6   you saw after one of Mr. Epstein's massages?

7   A.  Yes, it was also a massage, a large massager that you put

8   them under your neck and it vibrates.  And it also was a very

9   large massager and it would vibrate the head.  I think it was

10  for the back.

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LC2Qmax7 – corrected        Alessi – Direct

1   BY MS. COMEY:

2   Q.  I want to break that down.  Were there two different kinds

3   of massagers?

4   A.  Yes.

5   Q.  What did the first one look like?

6   A.  The first one looked like a pillow, the form of a pillow,

7   and the other one looked like an arm with -- at the end of the

8   arm, there was this rubber vibrator ball.

9   Q.  So the second one with the ball at the end of the long arm,

10  did it vibrate?

11  A.  Yes.

12  Q.  About how often do you remember finding these massagers in

13  Mr. Epstein's room after one of Mr. Epstein's massages?

14  A.  Not too often.

15  Q.  About how many times?

16  A.  Probably three, four times.

17  Q.  What did you do with the massagers after you found them?

18  A.  Those massagers were kept at the top of his dresser with

19  the rest of the oils and fragrances for the massage.

20  Q.  At the top of whose dresser?

21  A.  Mr. Epstein's dresser.

22  Q.  In whose room?

23  A.  Mr. Epstein's bathroom.

24  Q.  Attached to the master bedroom?

25  A.  Yes, Mr. Epstein's bathroom.

1   Q.  Forgive me.  I don't think I asked.  Where do you remember

2   finding these massagers after Mr. Epstein's massages?

3   A.  I would find by the sink or in the couch -- there was a

4   couch in the bathroom -- or on top of the table or at his bed.

5   Q.  When you say the table, what do you mean?

6   A.  The massage table.

7   Q.  What, if any, photographs do you remember seeing in

8   Mr. Epstein's Palm Beach house while you worked for him?

9   A.  It was a lot of photographs with important people from --

10  or Ms. Maxwell with Mr. Epstein.  I remember seeing many

11  important people photographed with them.

12  Q.  Who are some of the important people you remember seeing in

13  photographs with Ms. Maximum and Mr. Epstein in the Palm Beach

14  residence?

15  A.  I think there was a photograph with Mr. Trump.  Photographs

16  with -- if I remember, I think there was a photograph with the

17  Pope.  I think there was a photograph with Fidel Castro.

18  Q.  What, if any, photographs do you remember seeing that

19  contained females who were topless?

20  A.  There were many photographs with females topless.  Usually

21  they were kept at Ms. Maxwell's desk.

22  Q.  Remind us where that desk was.

23  A.  The desk was at the garden room behind the pantry.

24  Q.  Based on your observations of those photographs, where do

25  they appear to have been taken?

LC2Qmax7 - corrected        Alessi - Direct

1    A.  They appear to have been taken --

2    Q.  Could you say that again, please?  Where did they appear to

3    have been taken?

4    A.  By the pool side.

5    Q.  In the Palm Beach residence?

6    A.  Yes.

7    Q.  Last question on the photos, Mr. Alessi.

8              Who, if anyone, do you remember using a camera to take

9    pictures around Mr. Epstein's Palm Beach house during the years

10   you worked for him?

11   A.  I don't remember seeing anybody else but Ms. Maxwell.

12   Q.  The only person you remember seeing was who?

13   A.  Ms. Maxwell.

14   Q.  I want to circle back to something I asked you at the

15   beginning of your testimony.  Could you clarify for us what

16   year did you move from New Jersey to Florida?

17   A.  I moved from New Jersey to Florida in October 1984.

18   Q.  1984?

19   A.  '84.

20   Q.  Thank you.  About when did you stop working for

21   Mr. Epstein?

22   A.  I stopped working for him December, at the end of December

23   of 2002.

24   Q.  Why did you stop working for Mr. Epstein then?

25   A.  I was sick.  I was ill.  I had a lot of pain.  I come up

1    with a disease that I was bleeding profusely.

2    Q.  Mr. Alessi, you don't need to go into the details, but

3    suffice it to say --

4    A.  I was sick and I was also very, very tired of the job.

5    Q.  What, if any, agreement were you required to sign when

6    leaving Mr. Epstein's employment?

7    A.  I sign an agreement of separation agreement with

8    Mr. Epstein.

9    Q.  What was your understanding of what you were required do

10   under that agreement?

11   A.  I was required not to talk to anybody about his life or

12   Ms. Maxwell.  It was a stipulated for the two of them to be

13   completely private from --

14   Q.  After you stopped working for Mr. Epstein, did you see

15   Ms. Maxwell in person again between then and today?

16   A.  No.

17   Q.  After you stopped working for Mr. Epstein, how many times,

18   if any, did you go back to Mr. Epstein's house?

19   A.  I went back one time.

20   Q.  About when was that?

21   A.  I think it was 2004.

22   Q.  Why did you go back to Mr. Epstein's house?

23   A.  I was -- I was -- I will tell the truth.  I was having a

24   tremendous pressure in my marriage.  I move out of my house,

25   but somehow I got involved with another woman, not romantically

LC2Qmax7 - corrected        Alessi - Direct

1   but involved, and she -- and we have -- I was having a lot of

2   financial problems without a job.  And I move out of my house,

3   out of my -- my family, and I commit the greatest mistake I

4   ever done in my life.

5   Q.  What did you do, Mr. Alessi?

6   A.  I went back to the house, and I took some money out.

7   Q.  How did you get into the house?

8   A.  Through a sliding door.

9   Q.  How could you get in?

10  A.  Through the sliding door.  It was open.  It was easily

11  opened.

12  Q.  Once you got into the house, where did you go?

13  A.  I went to this -- I went directly to where this luggage bag

14  was situated.

15  Q.  Where was that?

16  A.  By Mr. Epstein's desk.

17  Q.  Which desk?

18  A.  The lake room.

19  Q.  What did you do when you went to Mr. Epstein's desk in the

20  lake room?

21  A.  I took a band of a hundred dollar bills.

22  Q.  About how much money did you take?

23  A.  I took -- it was $6,300.

24  Q.  After you broke into Mr. Epstein's home and stole that

25  money, who, if anyone, contacted you?

LC2Qmax7 - corrected        Alessi - Direct

1   A.  Only Mr. Epstein.

2   Q.  What happened after he contacted you?

3   A.  He says, "We need to talk."  And should I elaborate on

4   that?  And he --

5   Q.  After he said, "We need to talk," did you meet with

6   Mr. Epstein?

7   A.  Yes, I met with Mr. Epstein.

8   Q.  And then what happened?

9   A.  We talk for about a half hour about family, talk about his

10  mother.  And he says --

11          MR. PAGLIUCA:  Your Honor, I'm going to object to this

12  as being hearsay.  This is outside of the --

13          THE COURT:  Sustained.

14          MS. COMEY:  Your Honor, I'm not offering this for the

15  truth.

16          THE COURT:  Then just ask about what happened next.

17  Q.  Mr. Alessi, did Mr. Epstein confront you about stealing the

18  money?

19  A.  Yes, he did.

20  Q.  How did he do that?

21  A.  He show me a picture.

22  Q.  What was the picture?

23  A.  It was a very small picture, it was showing my face.

24  Q.  Where did it appear?

25  A.  Inside the house.

LC2Qmax7 - corrected        Alessi - Direct

1    Q.  After he showed you the picture, what happened next?

2    A.  We discuss it for an hour -- for awhile, and he -- he says

3    to me, "John" --

4              MR. PAGLIUCA:  Objection, your Honor.  Hearsay.

5              THE COURT:  Sustained.

6    Q.  Did you come to an agreement with Mr. Epstein?

7    A.  Yes, I did.

8    Q.  What was the agreement?

9    A.  The agreement was that it was going to be considered as a

10   loan from Mr. Epstein to me; that he will not press charges

11   because of the kind of employee I had been, and the amount of

12   care that was given --

13   Q.  Mr. Alessi, what did you have to do under the agreement?

14   Under the agreement with Mr. Epstein, what did you have to do?

15   A.  I have to pay it back.

16   Q.  Did you pay him the money back?

17   A.  Absolutely.

18   Q.  How much money did you pay him back?

19   A.  I pay it with a money order, and I have the receipt.

20   Q.  Was it the full amount?

21   A.  $6,300.

22   Q.  Were you interviewed by the police about this incident?

23   A.  Yes, by his request --

24   Q.  Just yes or no.  Were you interviewed by the police?

25   A.  Yes.

LC2Qmax7 – corrected        Alessi – Direct

1    Q.  Were you arrested or charged with a crime?

2    A.  No.

3    Q.  After that incident, did you ever see Mr. Epstein in person

4    again?

5    A.  Never.

6            MS. COMEY:  May I have a moment, your Honor?

7            THE COURT:  You may.

8            (Pause)

9            MS. COMEY:  Nothing further, your Honor.

10           THE COURT:  I'll leave it to you, Mr. Pagliuca.  Do

11   you want to start or do you want --

12           MR. PAGLIUCA:  I think it would be better if we start

13   tomorrow.

14           THE COURT:  That's fine.  We only have ten minutes.

15           Members of the jury, we'll send you home for the

16   evening.  Same schedule tomorrow.  We'll start promptly at

17   9:30.  Thank you for your diligence.  We'll see you in the

18   morning.

19           (Jury not present)

20           THE COURT:  Mr. Alessi, you may step down.

21           MR. PAGLIUCA:  Your Honor, I don't recall whether the

22   Court's practice is to admonish the witness when he's on

23   cross-examination or not.

24           MS. COMEY:  We have no intention of having any

25   substantive communications with the witness other than

LC2Qmax7 – corrected          Alessi – Direct

1    logistics to get him to where he's staying.

2              THE COURT:  I usually just make sure everybody is on

3    the same page, and we are.  Thank you.  Everyone may be seated.

4              (Witness not present)

5              THE COURT:  Are there matters to take up?

6              MR. PAGLIUCA:  Not from the defense, your Honor.

7              MS. COMEY:  None from the government, your Honor.

8              THE COURT:  So we will meet at 8:45.  Please confer on

9    any anticipated issues so that we can address them before we

10   have the jury.  And I'll see you in the morning.  Thank you.

11             (Adjourned to December 3, 2021 at 8:45 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                          INDEX OF EXAMINATION

 2    Examination of:                              Page

 3     PAUL KANE

 4    Direct By Mr. Rohrbach . . . . .684

 5    Cross By Ms. Menninger . . . . .695

 6    Redirect By Mr. Rohrbach . . . .698

 7     LISA ROCCHIO

 8    Direct By Ms. Pomerantz  . . . .699

 9    Cross By Mr. Rohrbach  . . . . .760

10    Redirect By Ms. Pomerantz  . . .774

11     JUAN PATRICIO ALESSI

12    Direct By Ms. Comey  . . . . . .775

13                          GOVERNMENT EXHIBITS

14    Exhibit No.                               Received

15     761   . . . . . . . . . . . . . . . . 694

16     298   . . . . . . . . . . . . . . . . 787

17     297   . . . . . . . . . . . . . . . . 793

18     299   . . . . . . . . . . . . . . . . 798

19     606   . . . . . . . . . . . . . . . . 823

20     113 and 114  . . . . . . . . . . . . 843

21     2A, 2C through 2W  . . . . . . . . . 889

22

23

24

25
```