LBUCmax1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     UNITED STATES OF AMERICA,
 3
              v.                          20 CR 330 (AJN)
 4
     GHISLAINE MAXWELL,
 5
              Defendant.                  Jury Trial
 6   ------------------------------x
                                          New York, N.Y.
 7                                        December 3, 2021
                                          8:48 a.m.
 8
     Before:
 9              HON. ALISON J. NATHAN,

10                                        District Judge

11                          APPEARANCES

12   DAMIAN WILLIAMS
          United States Attorney for the
13        Southern District of New York
     BY:  MAURENE COMEY
14        ALISON MOE
          LARA POMERANTZ
15        ANDREW ROHRBACH
          Assistant United States Attorneys
16
     HADDON MORGAN AND FOREMAN
17        Attorneys for Defendant
     BY:  JEFFREY S. PAGLIUCA
18        CHRISTIAN R. EVERDELL
          LAURA A. MENNINGER
19           -and-
     BOBBI C. STERNHEIM
20           -and-
     RENATO STABILE
21
     Also Present:  Amanda Young, FBI
22                  Paul Byrne, NYPD
                    Sunny Drescher,
23                   Paralegal, U.S. Attorney's Office
                    Ann Lundberg,
24                   Paralegal, Haddon Morgan and Foreman

25
```

LBUCmax1

1        THE COURT:  Matters to take up?

2        MR. EVERDELL:  Your Honor, from the defense, I think

3   after Mr. Alessi, there is going to be a series of law

4   enforcement agents to talk about items that were recovered

5   during various searches, and I have some objections to the

6   exhibits that I want to raise now, which we've conferred with

7   the government, we've reached agreement on some things, but

8   there are others to raise.

9        THE COURT:  Okay.

10        MR. EVERDELL:  The first witness -- and this relates

11   to the Florida -- the search of the Palm Beach residence.  I

12   believe Mr. Parkinson, who I believe is going to testify after

13   Mr. Alessi, is the agent who went through during the search, of

14   October 20th of 2005, of that residence.  He did the video

15   walk-through of the residence.  So there is video and he was

16   present.  I believe he's going to say he was present when

17   photographs were taken of various rooms and things in the

18   house.  Those are going to be offered through him.

19        So there are three things to talk about here with

20   Mr. Parkinson.  There is the exhibits — the photographs — the

21   video, and the certain testimony.

22        We'll start with the exhibits, the photographs.

23        We already moved in limine to exclude one of the

24   photographs, that was Government Exhibit 288.  That was a

25   photograph, if you recall, your Honor, of a younger girl sort

LBUCmax1

1    of pulling down her underwear exposing her buttocks.  That was

2    excluded by your Honor on motions in limine.  There is a

3    similar photo, it's the same photo.  The one we excluded was

4    that photograph which was hanging on the wall, it was on the

5    floor, but Government Exhibit 270 was the same photograph on

6    the wall.  There is consent to that one.  Yes, we agreed that

7    that would not be offered.  So 270 is not going to be offered.

8         There was one that we didn't reach agreement on, which

9    is Government Exhibit 250.  In the motions in limine, your

10   Honor, you excluded Government Exhibit 251, which, if you

11   recall, was a photograph of a toddler, an infant walking

12   forward towards the camera with an adult in the back, naked,

13   and excluded it on 401 and 403 grounds.

14        There is another photo, which is Government Exhibit

15   250, which shows -- maybe we can pull that up if we can see it.

16   Is it on your screen, your Honor?

17        THE COURT:  Yes.

18        MR. EVERDELL:  That, as you can see, depicts Jeffrey

19   Epstein with a slightly older girl.  At this point, I believe

20   it is the same girl with her lying across his lap with her

21   bottom -- although with underwear on, but he's got his head

22   down close to the bottom.

23        I think, for similar reasons, this is not relevant and

24   is prejudicial.  It shows him with a prepubescent girl.  There

25   is no allegations that he or Ms. Maxwell, for that matter, were

LBUCmax1

involved in anything with prepubescent females.  This is, I
believe, the same girl as the toddler photo.  It's his
goddaughter.  But if the jury sees a photo like this, they may
draw some inappropriate assumptions about his proclivities, and
we think this should be excluded on relevance and 403 ground
prejudice.

MS. COMEY:  Your Honor, I think it would make sense to
take this up with another exhibit from the same witness because
our arguments are the same as to both.

With respect to Government Exhibit 296, which is the
walk-through video, it's about a 40-minute video, I don't
expect to play all of it for the jury, but in the walk-through,
you can see that when walking from the top of the staircase on
the second floor through the anteroom into the master bedroom,
that prominently displayed is the photograph displayed in
Government Exhibit 270, which your Honor excluded.  It is
briefly shown on the screen, but in context, it's clear that it
is the primary decoration right outside of the master bedroom
that the defendant shared with Mr. Epstein.  So, I would like
to take that exhibit up at the same time because I think the
arguments are the same.

MR. EVERDELL:  That's fine, your Honor.  I can address
that.

THE COURT:  Okay.

MR. EVERDELL:  So as Ms. Comey said, when we do the

LBUCmax1

video walk-through, the agents or Mr. Parkinson is going to

describe — and you'll see on the video — they're going up the

circular staircase to the second floor, they turn right, and

they head down the hallway towards the master bedroom suite.

We saw that on the floor plans yesterday.

In that hallway on the wall is where that picture of

the girl who's exposing her bottom is hanging on the wall.  So

obviously it's before they took the picture down and before

they logged that piece of evidence because it's in the initial

walk-through.  So you see the photo quite prominently on the

wall as the video goes through the hallway towards the master

bedroom.

Given that your Honor has excluded that piece of

evidence, the photograph of that photograph, which is

Government Exhibit 288 and also 270, which we're still talking

about, that we think that portion of the video --

THE COURT:  Sorry.  Which ones?  288?

MR. EVERDELL:  So the photograph of that photograph.

288, you already excluded.  That's a photo of that photo on the

floor.  270 is the one we consent to, which is a photo of that

photo still on the wall.  And then 296 is the video

walk-through where, when he does it, you will see the photo on

the wall as the video goes through that hallway.  And given

that your Honor has excluded this at least once and we now

consent to excluding it twice, we think that that portion of

LBUCmax1

1    the video should be redacted so that the jurors can't see the

2    picture your Honor already excluded on the video.

3          MS. COMEY:   Your Honor, we consent to the exclusion of

4    the other photograph because we understand your Honor's ruling

5    about the prejudice, especially when taken out of context, but

6    here the probative value is extraordinary when it is taken in

7    context, especially after Mr. Alessi's testimony about the fact

8    that the defendant spent the majority of her nights in this

9    bedroom with Mr. Epstein and the testimony that this is where

10   many of the massages took place that are the subject of the

11   charges here.  It is extremely probative of the defendant's

12   knowledge that, in order to walk into that room, you have to go

13   by a sexually suggestive photograph of a young girl.

14         We have no intention of arguing that Mr. Epstein or

15   that the defendant is alleged to have had had any sort of

16   sexual involvement with prepubescent minors, and we would

17   consent to an instruction to that effect if that's what the

18   defense would like, but I think the fact that there is a

19   sexualized photograph of a clearly underage female in the

20   entryway to that room is highly probative.

21         It also directly responds to the argument that the

22   defense made in its opening and has been making through cross

23   examination, that Mr. Epstein was some upstanding citizen who

24   was surrounded by presidents and all sorts of important

25   prominent people, and so he never could have possibly been

LBUCmax1

```
 1   associated with something so disgusting as sexual abuse of
 2   minors.  This photograph, right outside the bedroom that the
 3   defendant shared with him, directly contradicts that argument.
 4               THE COURT:  I want to make sure I understand the last
 5   point.  The last point is that it contradicts the argument
 6   because why?
 7               MS. COMEY:  Because it is, in defense's own words and
 8   in the Court's finding, a very disturbing photograph, a
 9   photograph that suggests a prurient interest in underage
10   females.  So the fact that Mr. Epstein would choose to
11   prominently display such a photograph right outside his master
12   bedroom contradicts a suggestion that there was some sort of
13   halo effect around him for the defendant, because I believe the
14   defense is setting up an argument that the defendant couldn't
15   have possibly known that Mr. Epstein was attracted to underage
16   females because he was surrounded with, by, and spent so much
17   time with such important and prominent people, and that
18   somebody who spent so much time with such important prominent
19   people couldn't possibly have such a vile attraction to
20   underage girls.  This photograph is directly contradicting that
21   argument.
22               THE COURT:  So you do think it's evidence of
23   attraction to prepubescent girls?
24               MS. COMEY:  No, your Honor.  I think it's evidence
25   that Jeffrey Epstein's lifestyle and that the way that he
```

1    decorated his home and his private spaces contradicted the

2    public persona that has been presented through the defense

3    arguments and cross examination.  And the point here is that

4    the defendant knew not only the public persona, but the private

5    persona, and the private persona included prominently

6    displaying art that sexualized an underage girl.

7            THE COURT:  All right.  Anything further?

8            MR. EVERDELL:  Your Honor, I don't think that this is

9    connected in one way at all.  I think if you asked any parent

10   about, do they have like a photograph of their child as a

11   toddler or their goddaughter as a toddler, like in the swimming

12   pool or something where they're not wearing any clothe, they

13   probably have one of those things.  Now, whether they display

14   that on their walls, that's another question, but these are not

15   photographs that are indicative of his lifestyle.

16          The problem is in this case, because of the nature of

17   the subject matter, if a juror sees that, they're probably

18   going to leap that to that assumption, that it's not just --

19   the allegations in this case are women -- are girls that are

20   under the age, but just under the age of consent, 15, 16, 17,

21   not girls that are 5, 6, 7, prepubescent females.  If they see

22   that, then they're going to drew an inappropriate conclusion,

23   which I don't think the government is even arguing, and that is

24   a really big 403 prejudice problem.  And that's the issue we're

25   trying to avoid, which is why we moved in limine and why we

LBUCmax1

1   made those arguments before.  If the Court already excluded

2   that very photograph for those reasons, then it's got to be the

3   case that we exclude it in the video for those same reasons.  I

4   don't see that the placement and the argument the government is

5   making, it is still those 403 problems and the relevance

6   problems, too, that mean that this should not be seen by the

7   jury, regardless where it's placed or what arguments the

8   defense has made.

9        MS. COMEY:  Your Honor, I think the prejudice will be

10  very restricted here.  I do not intend to linger over the

11  photograph or pause while playing it.  It will just show the

12  context of the full decorations of the area around the master

13  bedroom that the defendant shared with Jeffrey Epstein.  I

14  think that probative value is not substantially outweighed by

15  unfair prejudice, particularly when it is in the context of the

16  video showing the entire decorations.

17       THE COURT:  I'm overruling the objection.  I think the

18  context is different than the photo in isolation.  You'll

19  propose a limiting instruction along the line of what you've

20  indicated.

21       MS. COMEY:  Yes, your Honor.

22       THE COURT:  It is consistent with testimony regarding

23  photographs of naked people in the house, it's corroborative of

24  that.  It strikes me as different in light of the evidence

25  that's come in and the context in which it is.  So I will

LBUCmax1

1    overrule the objection with a limiting instruction.

2            MR. EVERDELL:  Your Honor, I understand the Court's

3    ruling.  If I can make one other point, which is the fact that

4    Juan Alessi has sort of testified about this, but he left in

5    2002 according to his own testimony.  This walk-through and

6    these photographs were taken in 2005, which are three years

7    later.  So the government is -- he didn't say that that photo

8    was there.

9            So I mean the government is making the argument that

10   these important people may have seen these photographs or the

11   fact the photograph was there contradicts the defense argument

12   that the people in Epstein's orbit would have known about this,

13   including Ms. Maxwell, but we actually don't have any testimony

14   that the photo was on the wall at the time that's relevant to

15   this case.

16           THE COURT:  We have testimony of Jane regarding art

17   and photographs.

18           MR. EVERDELL:  Not this photo, your Honor.  They

19   didn't go through with Jane specific photographs, do you recall

20   this one, do you recall that one, was that on the wall, was

21   this on the wall.  She gave very, very general descriptions of

22   her recollection of certain residences, not particular

23   artworks, not particular photographs.

24           So I don't think it's fair, on the record we have, to

25   say that this photograph being on the wall in 2005 — mind you,

LBUCmax1

1    a year after the last year of the conspiracy charged in this

2    case — is probative of anything about Epstein's circle and what

3    they might have known about him or not known about him because

4    we simply don't know whether this photograph was even on the

5    wall.

6            THE COURT:  You made your record, I overruled the

7    objection with a limiting instruction as discussed.

8            MR. EVERDELL:  All right, your Honor.  So that is the

9    issue with the video.

10           THE COURT:  Go back then to the 250.

11           MS. COMEY:  Yes, your Honor.  That photograph is

12   displayed on the bookshelves behind Jeffrey Epstein's desk in

13   the lake room that Mr. Alessi testified about.  On those

14   bookshelves, there are a number of photographs on different

15   shelves.  One of those photographs is a photograph of Jeffrey

16   Epstein with a young girl across his lap and he appears to be

17   pulling down her underwear and indicating like he's going to

18   bite on her backside.  That appears to be what it looks like.

19   He prominently displayed that by his desk, the desk in the

20   house that the defendant ran, where she was the lady of the

21   house.  We think that that is equally probative and it will be

22   in context of Mr. Epstein displaying that right by his desk.

23           MR. EVERDELL:  Your Honor, I think this is just an

24   attempt to backdoor evidence, your Honor.  I mean, you haven't

25   ruled on this one, but a similar photograph for prejudicial

1    reasons that your Honor excluded.  If it's displayed behind his

2    desk, yes, that may be the case, but the fact remains, we have

3    issues with this jury seeing photographs like this and making

4    assumptions about what people were doing or not doing.

5           There are no allegations in this case that Jeffrey

6    Epstein was attracted to prepubescent girls, and they will

7    potentially draw the wrong conclusion about a photograph of

8    somebody with his goddaughter in some sort of playful moment,

9    it would appear — maybe not everybody does this with their

10   goddaughters, but it's certainly nothing illegal — and they

11   will look at this and assume that his predilections strayed not

12   just to young girls, but to prepubescent girls.  It's similar,

13   not just in context, this photograph is a closeup photograph of

14   that photograph, the same way that Government Exhibit 288,

15   which your Honor already excluded about the girl with the

16   underwear exposing her bottom was not in context enough to

17   respond to this argument, it is the same issue.  You're looking

18   at a photograph of the photograph by itself without context

19   showing what it shows, and the jury is going to draw an

20   improper conclusion.

21          MS. COMEY:  Your Honor, the jury will see the

22   photograph after seeing a series of photographs of the

23   bookshelves around Jeffrey Epstein's desk.  I'm not sure I

24   understand what argument the defense is making.  Is this an

25   innocent photograph that's just normal behavior between a

LBUCmax1

1  godfather and his goddaughter or is it deeply disturbing,

2  overly sexualizing a young girl?

3        We would consent to another limiting instruction

4  similar to the one that I proposed with respect to the master

5  bedroom photograph, but this one if that addresses the concern

6  about an improper inference the jury might draw.

7        THE COURT:  So the time has elapsed between 288 and

8  250 in terms of the age of the girl?

9        MS. COMEY:  I would need to look, your Honor, to

10  refresh my own recollection of how old she appears.

11        THE COURT:  I thought you said that one when we first

12  brought it up, but I'm not certain.

13        MS. COMEY:  I don't know that to be true, so I don't

14  know if I did say that.  I apologize.  I don't know that to be

15  true.  I would want to check and look at the photograph myself.

16        MR. EVERDELL:  Your Honor, we are displaying, if you

17  want to see it, 288, which your Honor already excluded, side by

18  side with the photo we're talking about now, 250, which we're

19  seeking to exclude.  We believe that's the same girl.  To us --

20        MS. COMEY:  Can I see what you're showing?

21        MR. EVERDELL:  Yes.

22        Your Honor, looking side by side, I believe we are

23  talking about the exact same type of photo taken in the exact

24  same scale with the exact same closeness of the exact same

25  girl, is my belief.  So I think it's the same ruling that your

LBUCmax1

<table>
<tr><td>1</td><td>Honor already made, that this is overly prejudicial and the</td></tr>
<tr><td>2</td><td>jury will draw the wrong conclusion from it, so we need to</td></tr>
<tr><td>3</td><td>exclude it.  I don't see the difference.</td></tr>
</table>

1   Honor already made, that this is overly prejudicial and the

2   jury will draw the wrong conclusion from it, so we need to

3   exclude it.  I don't see the difference.

4              MS. COMEY:  Your Honor, I think the difference here is

5   that, in Mr. Everdell's -- in the photograph that your Honor

6   excluded, the photograph was on the floor.  It was unclear

7   where it had been positioned originally.  It was unclear where

8   it had been positioned when the search was conducted.

9              Here, this is a photograph I expect the witness will

10  testify to, showing the exact placement, and the reason we need

11  that closeup is because the photograph of the zoomed-out

12  bookshelf, you cannot actually see the image.  You can see the

13  frame and you can tell that it's the same circular frame, but

14  you cannot see the image without a closeup, so we will show the

15  two in succession.

16             MR. EVERDELL:  Your Honor, that's the point.  If you

17  zoom out, you will see this photograph in the context of other

18  photographs that are nonsexual.  This I don't think is sexual,

19  but that are not with underage girls, that are with other

20  photos, including people with adults.  It's shown in context in

21  a series of photos along a bookshelf where people tend to keep

22  photos, lots of different photos, and it will show a panoply of

23  photos that is not one photo of a clearly minor child with him

24  looking like he's about to bite her backside.  At least there

25  you have a full context of other photos and it is not a zoom-in

LBUCmax1

1   on the one photo showing details of what's going on there,

2   where the jury, again, will draw an improper conclusion from.

3           MS. COMEY:  Your Honor, I'm not sure I understand

4   Mr. Everdell's point about context, because those photos in the

5   bookshelf include a photo of Jane, they include photos of nude

6   and partially nude females.  I don't understand the argument

7   about the context.  The context had sexualized images of

8   females around his desk.

9           MR. EVERDELL:  Jane testified she was 19 when those

10  headshots were taken.  So that's the point, your Honor.

11          MS. COMEY:  Your Honor, I don't think that's the

12  testimony.  I believe she testified she was 15.

13          THE COURT:  I'm going to overrule the objection.

14  Context, again, matters and distinguishes from the pretrial

15  rulings.  You'll craft a limiting instruction and run it by the

16  defense.

17          MR. EVERDELL:  Understood, your Honor.  There is one

18  last issue with this witness, which is his testimony --

19          THE COURT:  This is Mr. Parkinson?

20          MR. EVERDELL:  Mr. Parkinson.  So everything we've

21  been discussing so far, I believe, is going to be introduced

22  through Mr. Parkinson.  We have the video, the photos, and now

23  his testimony.

24          I understand from the government and from the

25  materials we've been given that Mr. Parkinson is going to

LBUCmax1

testify that he found or he saw at least a green massage table
when they did the video sweep and that he was able to look at
that table when he was there in the house, and then he saw what
appeared to him to be semen on the table.

I don't think that that testimony is appropriate
because, for example, on both 401 and 403 grounds, this table
was found a full year after the last year of the conspiracy
charged here, so that's 2004.  The search was October 20th,
2005, a full year later.

Him seeing something that appeared to be semen, first,
they never tested it, it's in a room with lotions for massage.
How he knows this appears to be semen, I don't know, but
regardless of that fact, it's done a year after the fact.  Any
number of ways that could have been on there, if it is, in
fact, semen, I don't see how it's probative of a conspiracy
that ends in 2004, unless they can show that the semen was on
the table during the time period of the conspiracy.

Given that, if we have an agent talking about semen in
front of the jury, that's just going to be a salacious detail
that is going to be prejudicial of the client.  So we object on
401, 403.

MS. COMEY:  Your Honor, I expect this testimony would
be very brief and very clinical.  He would describe seeing a
white stain that he saw and thought was consistent with the
appearance of semen, and I think that is entirely --

LBUCmax1

1          THE COURT:  It wasn't tested?

2          MS. COMEY:  It was not tested.

3          THE COURT:  Or preserved in any way?

4          MS. COMEY:  It was not, your Honor.  It was

5    corroborative of the testimony already received and testimony I

6    expect will come later in this trial.

7          THE COURT:  What about the timeframe issue?

8          MS. COMEY:  Your Honor, I think it's still

9    corroborative that these massages were sexual.  The fact that

10   Jeffrey Epstein's massages were sexual, even if it was just a

11   year after the end of the conspiracy, is still probative of

12   whether or not these massages were just massages, as I expect

13   the defense will argue the defendant believed, or were, in

14   fact, sexual.  We think it is highly probative.

15         THE COURT:  I would permit lab tests that indicated it

16   was semen, but in light of the essentially lay description in

17   combination with the timeframe issue, I'll sustain this

18   objection.

19         MS. COMEY:  Understood, your Honor.

20         MR. EVERDELL:  Thank you, your Honor.  I think that's

21   everything we have for Parkinson.

22         MS. COMEY:  There was one logistical issue, which is

23   we will be offering this video under seal because it contains

24   images of witnesses who your Honor has permitted to testify

25   under pseudonym and nude images of third parties.  We will need

LBUCmax1

```
 1    to play it on the jurors' screens, and I think that because the
 2    video moves pretty quickly through any images, we don't have
 3    concerns about the public being able to just glimpse something
 4    from a juror's screen, it moves pretty quickly from the house,
 5    but what we would ask is that the public television be turned
 6    off before the video is played so there is not a big screen
 7    showing it.
 8                THE COURT:  If it's under seal, I guess maybe we can't
 9    do both, just the jurors' screens, including nude images of a
10    prepubescent third party, that privacy should be protected.
11    You'll work with the tech folks to make sure and maybe consider
12    positioning the jurors' screens.  Any objection to that?
13                MR. EVERDELL:  No, just in terms of obscuring the
14    video --
15                THE COURT:  The material coming in under seal to
16    protect privacy interests.
17                MR. EVERDELL:  No, Judge.
18                THE COURT:  What else?
19                MR. EVERDELL:  We're done with Parkinson?
20                MS. COMEY:  That's right.
21                MR. EVERDELL:  There is another witness after
22    Parkinson, and that's Mr. Dawson, and there is a witness after
23    that is Kelly Maguire; is that right?
24                MS. COMEY:  That's correct, your Honor.
25                MR. EVERDELL:  I have issues --
```

LBUCmax1

1          THE COURT:  It's a different order than what you gave

2     me.

3          MS. COMEY:  Yes, your Honor.  We alerted the defense

4     but neglected to alert the Court.  We let the defense know

5     yesterday that due to some travel issues with the pace of

6     trial, we need to reorder the witnesses.  So we will be doing

7     Parkinson, then Dawson, then Maguire, then Meder, then Flatley,

8     and I think that will take us through the end of the day, but

9     if we need to, there are some additional witnesses who we can

10    get to come to the courthouse.

11         THE COURT:  Shelling is not today?

12         MR. EVERDELL:  We stipped to --

13         MS. COMEY:  We stipulated to Shelling.

14         THE COURT:  So Parkinson, Dawson, Maguire.

15         MS. COMEY:  Correct, your Honor.

16         THE COURT:  Meder or Flatley?

17         MS. COMEY:  Meder, then Flatley.

18         MR. EVERDELL:  Your Honor, if you want, we can take up

19    the issue of Maguire later if you prefer because I don't think

20    she'll go on until after lunch, most likely.

21         MS. COMEY:  I think that's very likely.

22         THE COURT:  Let me just see if we have a note that we

23    have all our jurors.  Until we have all our jurors, I'll take

24    it up.

25         MR. EVERDELL:  My understanding, your Honor, Kelly

LBUCmax1

Maguire is an FBI agent who assisted with the search of

Mr. Epstein's Manhattan townhouse in July of 2019.  So that's

after his arrest, they executed several search warrants at his

Manhattan townhouse, collected a number of items of evidence,

and took photographs of the exterior and the interior of the

townhouse.

          My understanding is that the government plans to

introduce a number of the photographs of the exterior and

interior through Ms. Maguire, who was present during the

search, and also certain physical items like they're not --

well, there were hard drives that were found and CDs that were

found.  Those I don't believe are going to be admitted, but

she's going to discuss them, and there is also some physical

items like costumes and a massage table there.

          I think we should start with the physical items,

because I did with confer with the government and we reached

some agreement or understanding about the hard drives and the

disc because they purportedly contain information that relates

back to the time period of the conspiracy, we don't have an

issue with, and my understanding is they're not going to

introduce the hard drives or the discs themselves, or even

photographs of the hard drives or the disc.  So that I don't

think is an issue if I'm correct, Ms. Moe?

          MS. MOE:  Yes, your Honor.

          THE COURT:  So other physical items that might come in

LBUCmax1

1    through this witness, there is the massage table itself and the

2    costumes.  I think we agreed or the government represented that

3    they do not intend to introduce the massage table itself, just

4    photographs of the massage room where the table was present; is

5    that right?

6              MS. MOE:  That's correct, your Honor.  We'll be

7    offering photographs of the massage room, we're not offering

8    the physical massage table itself.

9              THE COURT:  But the photograph contains an image of

10   the massage table?

11             MS. MOE:  Yes, your Honor.  There are a number of

12   photographs of the massage room, those photos depict the

13   massage table.  We're not offering the table itself in

14   evidence.

15             MR. EVERDELL:  I'll get to the photographs in a

16   second, your Honor.

17             The last physical item is the costumes themselves, I

18   believe it's a box of five costumes, cosplay costumes that were

19   found in the residence.  Obviously, your Honor, this search

20   took place in 2019, that's 15 years after the last year of the

21   conspiracy charged in this case.  We don't have any testimony

22   up to this point about anybody involved in costume play,

23   cosplay, dressing up.  There may be some later, I don't know,

24   your Honor, but the fact that these costumes are found 15 years

25   later in the residence does not seem to be relevant or

LBUCmax1

probative of anything going on in this conspiracy charged in

the indictment.  It's far too attenuated and at the very least,

at this point, we don't have any testimony about any costume

play.  So, again, I don't see the relevance at this point of

introducing those costumes.

And there is a 403 issue because — setting aside how

relevant it is because we don't believe it's relevant at all —

we start talking about costumes and that again raises things

that no witness has testified to at this point and is going to

potentially make the jurors make a moral judgment about

Mr. Epstein, about conduct that could be legal.  I mean, we

have this discussion in the motions in limine because the one

witness who may talk about this is witness 3, but she was above

the age of consent at all relevant times during the conduct

that's charged.  So I don't see the relevance of these, and I

think there is a 403 issue, as well.

THE COURT:  Ms. Moe.

MS. MOE:  Your Honor, throughout this case from

opening statements, defense counsel has repeatedly suggested to

the jury that all of the victims in this case were overage,

that nothing improper happened, and suggested to the jury that

no one had an interest in underage girls.

The fact that Jeffrey Epstein had a collection of

schoolgirl outfits alongside the same floor as his massage

room, in the same room where he kept the massager devices that

LBUCmax1

are consistent with the way the witnesses have described,
certainly rebuts that argument.  It's not illegal to own
schoolgirl costumes, but it directly speaks to a sexual
preference for underage girls and its relevance is readily
apparent in connection with the testimony in this case.

        MR. EVERDELL:  Your Honor, the fact that Jeffrey
Epstein may have had schoolgirl costumes in 2019, 15 years
after the conspiracy, is not probative of anything in this
case.  There is no link whatsoever to anything in this
residence so far with Ms. Maxwell.  We had testimony that she
never lived in this residence.

        So I don't see how anything this attenuated that
doesn't have a link to our client that is potentially
prejudicial and there is no testimony establishing its
relevance at all to begin with should be admitted before the
jury.

        MS. MOE:  Your Honor, with respect to the timing
issue, if defense counsel wants to argue to the jury that
Jeffrey Epstein somehow developed his interest in underage
girls after the timeframe of the charged conspiracy and in
2019, they're welcome to try to advance that argument, but
otherwise I don't think the timing issue here is relevant.
It's clear throughout the testimony of the witnesses and up to
date that he maintain an interest in schoolgirls and that's why
there were schoolgirl outfits in the residence.  It's clearly

LBUCmax1

1   probative of his sexual interest in underage girls, which the

2   defense hat put at issue squarely in this case.  This evidence

3   is probative of that question.  In particular, the fact that

4   schoolgirl costumes, small ones, were found in the same floor

5   of the house as a massage room where an underage girl was

6   sexually abused is certainly probative.

7           THE COURT:  It seems to me that that evidence, as you

8   alluded, Mr. Everdell, so I have my denial of the exclusion of

9   witness 3.  There are 412 issues in that, so that is sealed,

10  I'm going to be cautious, but I think it's consistent with what

11  I indicated would be permitted as testimony with regard to that

12  witness.  So, I think the arguments that are being made go as

13  to timeframe, go to weight and not admissibility, and I will

14  overrule the objection.

15          MR. EVERDELL:  Your Honor, if I could just make one

16  request, which is if we're going to let that exhibit be

17  admitted, that it be admitted subject to connection and not

18  shown to the jurors until we have testimony that relates back

19  to a particular victim in this case.

20          MS. MOE:  Your Honor, if the Court would prefer to

21  either admit that evidence subject to connection or reserve on

22  that issue, unless and until that witness testifies, we'd have

23  no objection.  Our argument remains the same that it is

24  probative of his interest in underage girls, separate and apart

25  from it being corroborative of any witness testimony that may

1     occur at this trial.

2              So our view is that it should be admitted now,

3     regardless of future witness testimony based on the record to

4     date and the arguments from the defense about what was going

5     on, the age of the victims, and whether anyone was interested

6     in underage girls.

7              So we would ask the Court to admit this evidence now,

8     but if the Court's ruling is dependent upon the prospective

9     testimony of a witness, we would have no objection to offering

10    it subject to connection or the Court reserving on that issue.

11             THE COURT:  So for the reasons that I permitted

12    testimony similar, I concluded it was relevant and not

13    outweighed by prejudice.  That's my point, is consistency.  I

14    think for the timeframe issue, I'll reserve subject to

15    connection.

16             MS. MOE:  Yes, your Honor.  Just so I understand how

17    to navigate that issue with this witness, would the Court's

18    preference be -- I'm just thinking about the mechanics of this

19    in terms of what's coming out before the jury to lay the

20    foundation for this before the Court reserves, being mindful

21    that the Court is reserving on this issue.

22             THE COURT:  This is coming in through photographs, I

23    presume?

24             MS. MOE:  Yes, your Honor.  There are photographs of

25    those costumes.  Because they are folded, we are also offering

LBUCmax1

```
 1   a bag containing the costumes themselves and would anticipate

 2   otherwise asking Special Agent Maguire to publish them to the

 3   jury so that they can see both what they look like and also how

 4   small they are.

 5           So I'm just thinking about the mechanics of this.

 6           One option would be to offer the photographs and the

 7   bag without eliciting out loud what they are and just

 8   confirming without describing them that these are items that

 9   were recovered from the residence and where they were recovered

10   without publishing the photographs or opening the bag.

11           Would that be the Court's preference?  I'd be happy to

12   do it another way.

13           THE COURT:  Mr. Everdell.

14           MR. EVERDELL:  Your Honor, I do have an issue with

15   these being displayed or shown in any way, shape, or form until

16   witness 3 testifies.  I actually have some concerns and I hope

17   they're not unfounded.  They pushed her testimony off, she was

18   originally supposed to testify today, I don't know if it maybe

19   had to do with a travel issue or not, but I don't know is she

20   going to testify or not, when is she going to testify, if she

21   doesn't testify for whatever reason, then these items and the

22   photographs of those items should not be seen by the jury at

23   all.  And so that is my concern.  I don't want this to be in

24   their heads, in their minds at all unless we have a witness on

25   the stand who can connect their relevance to this case, and
```

LBUCmax1

1    that has to be, from what I understand, witness 3.

2              And so I don't think these should be admitted.  I

3    don't think they should be shown.  If the government wants to

4    introduce pictures of them, which I know is Government Exhibits

5    919 and 920, are photographs of the costumes outside of the box

6    I believe, and the costumes themselves are Government Exhibit

7    53, the government wants to get the agent to describe certain

8    items they found without exactly describing what they were, but

9    have those items somewhat generally described and the

10   photographs, you can describe taking a photograph of certain

11   items, but not described in a way that the jury is going to

12   know what they are.  They can't be described as schoolgirl

13   outfits.

14             THE COURT:  Right.  I think it's consistent with what

15   Ms. Moe said, which is basically some version of showing the

16   items to the witness but not the jury, and just simply asking,

17   without describing what they are, did you find these items

18   during the search.

19             MR. EVERDELL:  As long as there is no description of

20   the items and no showing them to the jury, I don't I think I

21   have a problem.

22             MS. MOE:  Yes, your Honor, that's what I was trying to

23   flag, a way of laying the foundation without putting before the

24   jury prematurely what they are.  If I'm permitted to lead the

25   witness and direct her not to describe them, I'll just lay that

LBUCmax1

1    foundation and have her identify the bag, which is opaque, that

2    contains those items.  I think that's all we need to do.  At

3    that point, I would just ask for permission to lead to make

4    sure that we're just laying a foundation without describing

5    those items or otherwise displaying them to the jury.

6              THE COURT:  And you could say clearly, without

7    describing the items or showing them, just look and did you

8    find these items.

9              MS. MOE:  Exactly, your Honor.  I'll have a

10   conversation with Special Agent Maguire before she testifies to

11   make sure we're on the same page.

12             MR. EVERDELL:  One last issue and then I'll sit down,

13   I promise, your Honor.

14             Special Agent Maguire is also going to testify, as I

15   mentioned, a series of photographs of the exterior and the

16   interior of the residence that were taken during the search.

17             The exterior photographs, I don't think there are that

18   many, I don't think we have an issue with because the exterior

19   of that building did not change from the time period of the

20   conspiracy — which I mentioned several times — ends in 2004 and

21   the time of the search, which is 15 years later in 2019.

22             However, the photographs of the interior — and there

23   are lots of them, photographs of rooms, decorations, artwork,

24   paintings on the walls, photographs on the walls — those are

25   all taken from a time in 2019, which is far removed temporally

LBUCmax1

       1   from the relevant time period in this case.  We've already had

       2   a lot of testimony about how there were frequent renovations to

       3   these places, we had testimony from Juan Alessi about that, and

       4   so there is no reason to believe that the interior of this

       5   townhouse looked the way it did in 2019, whether it looked the

       6   same way in 1994 to 2004, which is the time period of the

       7   conspiracy.  In fact, quite the opposite.  We have every reason

       8   to believe that there were significant changes based on the

       9   testimony.

      10           So my objection is, your Honor, I don't think, unless

      11   they have a witness who can say that these photographs taken in

      12   2019 look like those rooms that I saw back in '94, '95, or 2002

      13   or some time period that's actually in the conspiracy, and I

      14   don't think they do, then these are irrelevant and they

      15   shouldn't be admitted to the jury because there is no basis to

      16   believe that this is what the place looked like on the inside

      17   back 15 years before.  I believe the only witness they have

      18   testified so far, and maybe the only one they can offer, is

      19   Jane, who testified very, very generally and very briefly about

      20   how the New York townhouse looked on the inside.  She said

      21   something to the effect of, there was old wood, it was dark,

      22   there were creepy animal pictures on the wall.  That's all we

      23   had.  I think she said she may have slept on the eighth floor

      24   in the guest room, but there certainly wasn't a room-by-room

      25   description of what this place looked like.  And my

LBUCmax1

1    understanding is there is going to be several photographs, room

2    by room, of what that this place looked like.  So I don't think

3    they've established a foundation for these photos, your Honor,

4    and I don't think they will be able to because I don't think

5    they have another witness who can do it, and I don't think they

6    should be admitted.

7         THE COURT:  What are the exhibits numbers?

8         MR. EVERDELL:  It's everything in the 900 series, your

9    Honor, minus the ones that are of the exterior, and I don't

10   have those in my mind, but anything in the 900 series that is

11   an image of the interior.  And that also would include, your

12   Honor, the massage rooms.  I understand they want to introduce

13   photographs of the massage room, interior.

14        And case in point, your Honor, there are photographs

15   on those walls in the massage room of nude females that we

16   don't believe actually were there in the relevant time period.

17   So this is the problem with introducing photographs from 2019

18   when it's 15 years after the fact.

19        MS. MOE:  Your Honor, as a threshold matter, I think

20   Mr. Everdell was referring to testimony from Mr. Alessi about

21   renovations.  My understanding is that that testimony was about

22   renovations in the Florida house and not the New York house.

23        With respect to the point about a witness identifying

24   the interior of the house as being consistent during the

25   timeframe of the charged conspiracy, that witness is Jane.  I

LBUCmax1

1    would respectfully direct the Court to pages 318 through 320 of

2    the transcript, which is Jane's testimony.  She described, in

3    fact, in striking detail what was it was like to be inside the

4    house and what the artwork was like.  I'd be happy to read that

5    into the record.

6              THE COURT:  I'll take a look at it.  We do have all of

7    our jurors.  I think I have your argument on this one.  We're

8    not going to get to this witness before lunch.  I'll take a

9    look at Jane's testimony and the 900 series of exhibits and

10   I'll hear from you further at the break if I need to.

11             MS. MOE:  Yes, your Honor.  Thank you.

12             MR. EVERDELL:  Thank you, your Honor.

13             MS. COMEY:  Your Honor, one logistical issue that

14   Ms. Drescher reminded me of.  Is there a way to confirm that

15   when we play the video on the jurors' screens that it will not

16   appear in the overflow rooms?  My understanding from my

17   conversation is when you play anything on the juror's screens,

18   it automatically shows up on the public screen.  I was going to

19   turn off the public screen, but that won't work.

20             THE COURT:  We would have to have staffing to turn off

21   all of the screens in the overflow rooms.  Is this in the

22   immediate?  No, we have Mr. Alessi's cross.

23             MS. COMEY:  It's the next witness after Mr. Alessi.

24             THE COURT:  So Ms. Williams will check with the AV

25   folks in the interim to see if there is any way to just show --

LBUCmax1

```
 1    I think there may be, but we'll work on it.  So the point is,
 2    is there a way to just show video on the jurors' screens?  We
 3    also don't want them on counsel's table; right?
 4              MS. COMEY:  I think we can turn off the screens on
 5    counsel's table to the extent they face --
 6              THE COURT:  So you have counsel table screens, we've
 7    got the screen here in the courtroom that shows admitted
 8    evidence, and we've got the overflow rooms that shows admitted
 9    evidence.  So we'll check into that.
10              Another option is maybe there is a way to position two
11    screens so that it's just showed to the jurors that way.  I'm
12    not sure, but we will inquire.  We don't think this will happen
13    before the morning break, do we?
14              MS. COMEY:  I think it depends on how long the cross
15    of Mr. Alessi will be.
16              THE COURT:  Mr. Pagliuca?
17              MR. PAGLIUCA:  If we're taking the morning break at
18    10:30, timeframe issue, I think we're safe that it won't happen
19    with the morning break, your Honor.
20              THE COURT:  We'll shoot for that.  I think basically
21    what we're going to need is someone on your team to talk to the
22    AV folks to explain what and when you want to do it and
23    Ms. Williams will have someone come for you to do that with.
24    But she can convey in the meantime that the basic proposition
25    is, is there a way to show video on the jurors' screens without
```

LBUCmax1

1    it being on any other screens in the courtroom, including the

2    overflow rooms.

3              MS. COMEY:  Thank you, your Honor.

4              THE COURT:  I think we can bring in the jury,

5    Ms. Williams.

6              Good morning, Mr. Alessi.  You may take your seat.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (Jury present)

2           THE COURT:  Good morning, members of the jury.  Right

3    on time, as always.  Thank you very much.  We will begin with

4    the cross examination of Mr. Alessi.

5           Mr. Alessi, I remind you that you are under oath.

6           Mr. Pagliuca, you may proceed.

7           MR. PAGLIUCA:  Thank you, your Honor.

8     JUAN PATRICIO ALESSI,

9    CROSS-EXAMINATION

10   BY MR. PAGLIUCA:

11   Q.  Mr. Alessi, let me start with, on direct examination, you

12   testified that although your name is Juan, Mr. Epstein and

13   Ms. Maxwell called you John; correct?

14   A.  Yes, sir.

15   Q.  Now, isn't it true that during that time period, everyone

16   called you John; right?

17   A.  Yeah, basically.  Yes.

18   Q.  And you preferred to be called John; right?

19   A.  Yes.

20   Q.  Okay.  And, in fact, during that time when people would say

21   to you, you're Juan, you would say, no, I'm not called Juan,

22   I'm called John; right?

23   A.  If they call me Juan, yes, I answered to Juan.

24   Q.  And John?

25   A.  And John.

1    Q.  So there was no disrespect by anyone calling you John;

2    correct?

3    A.  No.  John is the translation for Juan.

4    Q.  And Ms. Maxwell also speaks Spanish and would converse with

5    you in Spanish, as well; correct?

6    A.  Yes, she does.

7    Q.  So if she's speaking with you in Spanish, she would call

8    you Juan; if she's speaking with you in English, she would call

9    you John; correct?

10   A.  Correct.

11   Q.  And absolutely no disrespect intended to you by calling you

12   John or Juan; right?

13   A.  No.

14   Q.  And you didn't take it as a sign of disrespect; correct?

15   A.  Absolutely not.

16   Q.  Mr. Alessi, yesterday at the end of your testimony, you

17   told the jury that after you quit working for Mr. Epstein in

18   2002, you were having money problems.

19          Do you remember that?

20   A.  Yes, sir.

21   Q.  And you said that you made the biggest mistake of your

22   life, that you went into Jeffrey Epstein's house one time and

23   took a bundle of $100 bills that amounted to $6,300.

24          Do you remember that testimony?

25   A.  Yes, sir.

LC3Cmax1                    Alessi - cross

1  Q.  And then you looked at the jury and you said, I will tell

2  the truth.

3          Do you remember that, telling the jury that yesterday?

4  A.  Yes.

5  Q.  But you didn't tell the jury the truth yesterday, did you,

6  Mr. Alessi?

7  A.  I did tell the truth.

8  Q.  Well, isn't it true, isn't it true that you went into

9  Mr. Epstein's house two times in 2003 and stole money twice

10  from Mr. Epstein?

11  A.  No, it was one time.

12  Q.  Isn't it true that the first time was in August or

13  September of 2003 and you went in to steal a gun, but you

14  couldn't find a gun?

15  A.  That's not true.

16  Q.  Isn't it true that the second time that you went into

17  Mr. Epstein's house -- well, when you couldn't find the gun,

18  isn't it true that you looked around and took $1,900 in $100

19  bills from a white envelope, isn't that true?

20  A.  That's not true.

21  Q.  Didn't you go back on October 5th, 2003 and steal $5,600

22  from Mr. Epstein?

23  A.  No, that's not true.

24  Q.  And isn't it true that you stole the money to pay for your

25  girlfriend's immigration papers?

1    A.  It was not my girlfriend, sir.

2    Q.  Mr. Alessi, I'd like you to take a look -- if we can

3    display for Mr. Alessi, please, 3504-6 -- 3501-080-001, page

4    11.

5          MS. COMEY:  Your Honor, Ms. Drescher has explained the

6    issue to me.  3501 is the series for nontestifying witnesses,

7    so we did not print out copies of those.  If I may ask the

8    defense for a copy of this, please.

9          MR. PAGLIUCA:  Certainly, your Honor.

10         MS. COMEY:  Thank you.

11   Q.  Mr. Alessi, do you have that exhibit in front of you?

12   A.  Yes, sir.

13   Q.  I'd like you to go to page 11 of that exhibit.

14   A.  I have only page 11 in front of me.

15   Q.  Do you recall that you were contacted by Officer Michael

16   Dawson on October 15th, 2003?

17   A.  I was not contacted by Michael Dawson.  I went to the

18   police on my own.

19   Q.  Do you remember when you went to the police, Mr. Dawson

20   asked you questions about going into Mr. Epstein's house and

21   you answered those questions?

22   A.  I don't think he asked me questions.  I did a statement to

23   him of what I remembered.

24   Q.  And what you told him in 2003, first, was that you went in

25   to steal a gun; correct?

LC3Cmax1                    Alessi - cross

1    A.  I don't recall that.

2    Q.  You don't recall or you didn't say that?

3    A.  I didn't recall.

4    Q.  So you might have said it, but now you just don't recall.

5    Is that what you're saying?

6    A.  Yes.

7    Q.  And do you remember telling him that you couldn't find the

8    gun?

9    A.  No.

10   Q.  Do you remember telling him that you went into

11   Mr. Epstein's house twice, and the first time when you couldn't

12   find the gun, you went into Mr. Epstein's briefcase and you

13   stole $1,900 in $100 bills in a white envelope?

14           Do you remember telling him that?

15   A.  No, that's not true.

16   Q.  Do you remember telling him that or not?

17   A.  No.

18   Q.  Do you remember telling him that you went back on October

19   5th, 2003 at 5:00 a.m. in order to once again steal money?

20   A.  I recall making a statement to him in request from

21   Mr. Epstein that I should go to the police department and make

22   that statement of what happened and why the reasons that I did.

23   And I am trying to tell you that I did one time and that's what

24   I think I told the police what happened.

25   Q.  My question simply, sir, is do you remember telling him

1    that when you went back to the house on October 5th, 2003 at

2    5:00 a.m., that you went through the sliding glass door, opened

3    Mr. Epstein's briefcase, and stole $5,600 in $100 bills?

4            Do you remember telling him that?

5    A.  I don't remember.

6    Q.  Do you remember telling him that you stole the money to pay

7    for the girlfriend's immigration papers?

8    A.  First of all, it was not my girlfriend.  She was a friend.

9    She came to live with me in my apartment, but we were not

10   involved, and I was trying to help her with that.

11   Q.  So is it true that you stole the money for the immigration

12   papers?

13   A.  It's true that I stole $6,300 that I paid Mr. Epstein back.

14   Q.  That wasn't my question, sir.  Is it true that you stole

15   the money to pay for the immigration papers?  Yes or no.

16   A.  Yes.

17   Q.  Now, you also testified under oath about stealing the money

18   from Mr. Epstein.  Do you recall that?  Not before today, do

19   you recall testifying previously about stealing the money from

20   Mr. Epstein?

21   A.  Yes.

22   Q.  And do you recall testifying under oath, on September 8th,

23   2009, that you went to the house and got some money?  Do you

24   remember testifying to that under oath?

25   A.  No, I don't remember that.

1              MR. PAGLIUCA:  If we can show the witness, please,

2      3504-022.  On this particular document, it's page 14.  We're

3      going to be looking at deposition transcript pages 133 through

4      135.

5              THE WITNESS:  I cannot read this page.

6              MR. PAGLIUCA:  It will come up for you on the screen,

7      Mr. Alessi.

8              THE WITNESS:  Is that my screen, because --

9              THE COURT:  They'll make it bigger, Mr. Alessi.

10             MR. PAGLIUCA:  If we can go in this document, which is

11     going to be page 14 of the document, and the page number I'd

12     like to start with, the deposition page number is 133.  If we

13     can blow that up for the witness, please.

14     BY MR. PAGLIUCA:

15     Q.  At line 12, Mr. Alessi, do you recall giving the following

16     testimony --

17             THE COURT:  I can't hear you.

18             MR. PAGLIUCA:  I'm sorry, your Honor.

19     Q.  Do you recall giving the following testimony, Mr. Alessi:

20     "A.  That incident is, I went to the house and I got some

21     money.

22     "Q.  What time of day did you go to the house?

23     "A.  Night.

24     "Q.  Was anybody home?

25     "A.  No.

1   "Q.  Where did you get the money?

2   "A.  Out of his bag.

3   "Q.  Out of his --

4   "A.  Bag.

5   "Q.  Bag, briefcase, bag?

6   "A.  Briefcase.

7   "Q.  Briefcase?

8   "A.  Yeah."

9        Did you give that testimony, Mr. Alessi?

10  A.  I think I did.

11  Q.  Then at the bottom of page 134 on the same page, 14, line

12  25.

13  "Q.  Now, is that the only time that you took money out?"

14        And we go to page 135, top of the page.

15  "A.  No."

16        Do you see that, Mr. Alessi?

17  A.  Yes.

18  Q.  That was your testimony under oath on September 8th, 2009,

19  that you went back more than once to steal money from

20  Mr. Epstein; correct?

21  A.  I guess it was.

22  "Q.  Out of his briefcase?

23  "A.  It was twice."

24  Q.  Do you see that testimony, Mr. Alessi?

25  A.  Yes, I see it.

LC3Cmax1                         Alessi - cross

1   Q.  That's what you testified to under oath, September 8th,

2   2009; correct?

3   A.  I guess I did.

4   "Q.  When was the other time?

5   "A.  Couple weeks before.

6   "Q.  What time of day was that?

7   "A.  At night.

8   "Q.  How much did you take out the first time?

9   "A.  It was a total of $6,300.

10  "Q.  That's for both times?

11  "A.  Yeah.

12  "Q.  Can you break them down?

13  "A.  I think one time was $1,500.  Another time was the rest."

14  Q.  That was your testimony under oath, correct, Mr. Alessi?

15  A.  Guess so.

16        MR. PAGLIUCA:  Your Honor, I move for the admission of

17  this testimony under Rule 801.

18        MS. COMEY:  It's been read in already.

19        THE COURT:  It's read in the record and admitted.

20        MR. PAGLIUCA:  Thank you.

21  Q.  Now, Mr. Alessi, yesterday you told the jury that you stole

22  the money because you were having --

23        THE COURT:  Pull up the microphone, please.

24  Q.  -- you stole the money because you were having financial

25  problems.

LC3Cmax1                    Alessi - cross

1          Do you remember that testimony?

2   A.  Yes.

3   Q.  Isn't it true that in 2003 when you stole the money, you

4   owned a number of rental properties in Florida?

5   A.  Yes.

6   Q.  You owned 1515, number 1902 West Palm Beach.  Do you recall

7   that?

8   A.  Yes.

9   Q.  And that was a rental property that you purchased in 2001

10  for $105,000 for which Mr. Epstein gave you $20,000 for the

11  down payment; correct?

12  A.  That's correct.

13  Q.  You also owned the apartment next door, 1515 South Flagler

14  Drive, number 1901, which is another property; correct?

15  A.  That's correct.

16  Q.  And you bought that in 2003 for $159,000; correct?

17  A.  That's correct.

18  Q.  You also owned a multifamily residential property at

19  Yarmouth Drive in Wellington, Florida that you bought in 2001

20  for a total of $310,000; correct?

21  A.  That's correct.

22  Q.  And when you left Mr. Epstein's employment in 2002, you

23  were given a severance package of $50,000 for you and your

24  wife; correct?

25  A.  That's correct.

LC3Cmax1                    Alessi - cross

1    Q.  So when you went into Mr. Epstein's house twice in 2003 and

2    stole at least $6,300, you owned properties valued at over a

3    million dollars; correct?

4    A.  I don't think it's correct.

5    Q.  Well --

6    A.  Because I sold the properties at Tower 1515 in order to buy

7    the property for the multifamily.

8    Q.  Let's look the 3504-022, going to be deposition page 145.

9    Let's start at line 19.

10         Do you have that in front of you, Mr. Alessi?

11   A.  I cannot read.

12   Q.  3500, page 17.

13   A.  I cannot read it.

14         THE COURT:  They'll make it bigger in a moment.

15         I'm sorry.  Can you give me the cite again?

16         MR. PAGLIUCA:  It's 3504-022, page 17 of 35,

17   deposition page 145, line 19.

18   Q.  Do you have that, Mr. Alessi?

19   A.  Yes.

20   Q.  You were asked the question:

21   "Q.  Now, do you recall in December of 1997, you and your wife

22   bought an apartment at 1902 115 South Flagler Drive; right?"

23   A.  Yes.

24   "Q.  Purchase price was $105,000?"

25         You answered:

LC3Cmax1                        Alessi - cross

1   "A.  Yes, sir."

2            Do you see that?

3   A.  Yes, sir.

4   Q.  Then on the next page, 146, you were asked:

5   "Q.  Now, do you recall that in November, you and your wife

6   bought apartment 1901?"

7            Do you see that?

8   A.  Yes.

9   "Q.  For a purchase price of $159,000?"

10  Q.  Do you see that?

11  A.  Yes.

12  Q.  And if we go down to line 18, after buying the lot, yes, we

13  bought the lot years, years back.  Then it says:

14  "Q.  Now in October 2001, do you remember buying a multifamily

15  residential property at Yarmouth Drive in Wellington?"

16            Answer at line 23:

17  "A.  I still have it."

18            Do you see that?

19  A.  Yes.

20  Q.  Then the next question, line 24:

21  "Q.  Do you remember the purchase price being $310,000?"

22            Do you see that?

23  A.  Yes.

24  Q.  And then if we go down --

25            THE COURT:  Mr. Alessi, could you reposition the mic

LC3Cmax1                    Alessi - cross

1    as you're looking.  Thank you.

2    Q.  We go down to page 147, which is in the left side there, if

3    we go to line 9.

4    "Q.  Now, do you recall that in September of 2002 --

5    Q.  This is right at the same time that you were breaking into

6    Mr. -- shortly, a year, a year before you broke into

7    Mr. Epstein's house, September of 2002, you and your wife

8    purchased a multifamily residential property at Sequoia Drive

9    in West Palm Beach, that's correct, and the purchase price was

10   $590,000.

11           Do you remember that?

12   A.  Yes.

13           MS. COMEY:  Your Honor, I'm going to object to this

14   because I don't think any of this is inconsistent.

15           THE COURT:  Sustained.  The answer earlier was that he

16   had sold one of these properties before you add up to the

17   amount you said, so it's not inconsistent.  So I'm sustaining

18   the objection.

19           MR. PAGLIUCA:  I'm getting there, your Honor, because

20   I don't think there was a sale of the property.

21           THE COURT:  You can get to that, but otherwise, so

22   far, it's consistent.

23   BY MR. PAGLIUCA:

24   Q.  Mr. Alessi, you owned all of these properties in 2003;

25   correct?

1    A.  No.

2    Q.  With you one didn't you own?

3    A.  I owned the house that I built in Royal Palm Beach and I

4    sold the apartments at Tower 1515.  And in all my life, I work

5    very hard and save a lot of money, including the time that I

6    work for Mr. Epstein.  I did a lot of savings, sir.

7    Q.  The point is, Mr. Alessi, and you agree with me that you

8    weren't poor when you went into Mr. Epstein's house in 2003 and

9    stole the money; correct?

10   A.  I was not poor, but it was -- the money was sequestered

11   because I was going through a divorce and I had no access to

12   the money.

13   Q.  Okay.

14   A.  Or to sell the properties.

15   Q.  Now, Mr. Alessi, I'm going to turn to some testimony that

16   you gave yesterday about Jane.

17           Do you recall that?

18   A.  Yes, sir.

19   Q.  Isn't it true -- well, yesterday you testified that you met

20   Jane in 1994.

21           Do you recall that testimony?

22   A.  I recall the testimony, but I'm not sure if it was '94,

23   '95, '93, '96.  I cannot recall exactly the same date.

24   Q.  Isn't it true that you met Jane in 1998 or 2000?

25   A.  Can you repeat the question.

LC3Cmax1                        Alessi – cross

1   Q.  Isn't it true that you met Jane in 1998 or 2000?

2   A.  No, that's not true.

3            MR. PAGLIUCA:  If we can show the witness 3504-030,

4   page 20, deposition page 79, line 18.

5            THE COURT:  Just caution about not stating the real

6   name of Jane.

7            MR. PAGLIUCA:  I understand, your Honor.  I completely

8   blacked it out on all of my copies.

9            (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              THE COURT:  For the witness, too.

2              MR. PAGLIUCA:  Understood.

3              THE COURT:  Thank you.  What line am I looking at?

4              MR. PAGLIUCA:  That's a good question, your Honor.

5    I'm having trouble seeing it here.  We're at page 19 and 20 of

6    3504-030.

7              THE COURT:  That's page 79 of the deposition?

8              MR. PAGLIUCA:  Yes, your Honor, that's correct.

9              THE COURT:  That's the single page on the screen.

10   BY MR. PAGLIUCA:

11   Q.  If we go down to line 20, do you remember this question,

12   Mr. Alessi:  Do you know the year Nadia met --

13   A.  You mentioned the name, sir.

14             MR. PAGLIUCA:  I'm sorry.

15             MS. MOE:  Your Honor, I do have a concern about this.

16             MR. PAGLIUCA:  I move to strike that, your Honor.  I

17   withdraw it.

18             THE COURT:  It will be struck.  You are admonished to

19   carefully abide by my ruling.

20             MS. COMEY:  Your Honor, may we approach?

21             THE COURT:  You may.

22             (Continued on next page)

23

24

25

1          (At the sidebar)

2          MR. PAGLIUCA:  I apologize, your Honor.  It was

3    completely unintentional.  I apologize.

4          MS. COMEY:  Your Honor, given that Mr. Pagliuca

5    represented that he had prepared to cross-examine this witness

6    on this testimony, I think we need to have a plan going forward

7    for how to make sure this does not happen again because,

8    clearly, Mr. Pagliuca had not prepared enough.

9          THE COURT:  The witness herself did the same thing.

10   It happens.  My perception was that it was an accident.

11         MR. PAGLIUCA:  Completely.

12         THE COURT:  I agree, we need a plan, but --

13         MS. COMEY:  Your Honor, I would propose that to the

14   extent Mr. Pagliuca intends to use some sort of prior

15   inconsistent statement, that he can discuss it with me before

16   reading it into the record, and we can confer about how he

17   should read it.

18         MR. PAGLIUCA:  I understand how to read, your Honor.

19   It won't happen again.

20         THE COURT:  All right.  It won't happen again.

21         MR. PAGLIUCA:  It will not.

22         THE COURT:  If it happens again, we're going to need a

23   different approach.

24         MR. PAGLIUCA:  I understand.  It will not happen

25   again.

1           (In open court)

2               MR. PAGLIUCA:  May I resume, your Honor?

3               THE COURT:  Just a moment.

4           (Pause)

5               THE COURT:  You may.

6               MR. PAGLIUCA:  Thank you.

7       BY MR. PAGLIUCA:

8       Q.  You were asked the question:

9       "Q.  Do you know what year Jane met Jeffrey Epstein and Glen

10      Maxwell?"

11              And your answer was:  "I would say we left it in 2002.

12      I would say '99 or 2000 maybe."

13              Do you recall that question and answer?

14      A.  I don't recall the question, but I imagine I made the

15      mistake between the two girls that I met, Jane and I made -- I

16      confuse the first girl with the second girl.  The first girl

17      that I met, underage, was Jane.  And I think it was 1994, sir.

18      The other girl that I met, it was 2002 or 2001, I'm not sure.

19      Q.  Okay.  Well, let's continue, Mr. Alessi, because the

20      questioner was Mr. Edwards.

21              Do you recall Mr. Edwards being the person who

22      questioned you?

23      A.  It was one of the lawyers.

24              THE COURT:  Microphone.

25      Q.  The person who was questioning you in this deposition was

LC3KMAX2                          Alessi - Cross

1    Virginia Roberts' lawyer, Brad Edwards.

2              Do you recall that?

3    A.  I don't recall him, but it was one of the lawyers, he asked

4    me questions.

5    Q.  And you were in Fort Lauderdale at an office when you were

6    answering these questions?

7    A.  Yes, sir.

8    Q.  Okay.

9              And Mr. Edwards then says to you at line 22 --

10             THE COURT:  And I will caution --

11             MR. PAGLIUCA:  Right.

12   Q.  -- "If Jane believes that the year was 1994 or 1995" -- and

13   then you say, no.

14             Do you see that?

15   A.  Again, I think in this testimony, I mistake the two, I

16   confused the two girls.

17   Q.  I understand that's what you're saying today, Mr. Alessi --

18   A.  Yes.

19   Q.  -- but in 2016, when you testified, you were specifically

20   directed to the name Jane and what Jane, according to this

21   lawyer, believed, and you answered no.

22             Do you see that?

23   A.  Could have been.

24   Q.  Okay.

25             And then the question from Mr. Edwards is:  You don't

1    remember that way?

2          And then you say, at the next page, page 80, lines 1

3    and 2, you say:  That is not true.  I don't think it was that

4    early.

5          Do you remember giving that testimony under oath?

6    A.  I don't remember, but I could have been confused again.

7    Q.  And then the question is:  Okay, but you remember going and

8    picking her up from the school?

9          And the answer is:  Yes.

10         Correct?

11   A.  Yes.

12   Q.  And then you're asked another question, and then you say:

13   I would -- I would say it's 1999, '98 maybe.

14         Correct?

15   A.  Yes, sir.

16   Q.  And then you're asked some specific questions about Jane

17   and whether Jane is driving or not?

18   A.  Yes, sir.

19   Q.  And then you say:  I never saw Jane driving a car.

20         Right?

21   A.  Yes, sir.

22   Q.  And those were all questions and answers about Jane,

23   correct?

24   A.  I'm not sure those are all the questions about Jane.

25   Q.  Yesterday you also testified that Jane would go to see

1    Epstein without her mother.

2              Do you recall that?

3    A.  Yes, sir.

4              MR. PAGLIUCA:  If we can go to 3304-22, which is a

5    different exhibit.  3504-22.

6              Your Honor, I neglected to move for the admission of

7    that prior inconsistent testimony.  I will do so now.

8              THE COURT:  It was read into the record and admitted.

9              MR. PAGLIUCA:  Thank you.

10             THE COURT:  If it's read into the record, it's

11   admitted.

12             MR. PAGLIUCA:  No need to move for admission?

13             THE COURT:  Correct.

14             MR. PAGLIUCA:  Thank you.

15   BY MR. PAGLIUCA:

16   Q.  Mr. Alessi, we're at 3504-22.  Do you see that?

17   A.  Yes.  Not legible.

18             THE COURT:  Needs to be bigger, please.

19             MR. PAGLIUCA:  Can we enlarge, please.

20   Q.  At page 26 of this exhibit, deposition page 183, lines 9

21   through 13 -- are you there, Mr. Alessi?

22   A.  Yes, sir.

23             MS. COMEY:  Your Honor, before Mr. Pagliuca reads this

24   into the record, I don't believe it's inconsistent with any

25   testimony that's been given.

1          THE COURT:  I need to see earlier portions of the

2     transcript.

3          MR. PAGLIUCA:  Your Honor, are you talking about

4     yesterday's testimony?

5          THE COURT:  Well, I think it's two things.  It's

6     yesterday's testimony -- and give me the line.  And then I need

7     to have context for who is being spoken about in the depo.

8          MR. PAGLIUCA:  Sure.

9          Yesterday's testimony, we're talking about page 835,

10    836, 837, which was where this was referenced.  And for

11    purposes of this transcript, I think if the Court starts at

12    line 6, you will get the context of the question.

13         If you go to the page before, 182, you start at line

14    15, that will give you the complete context.

15         If we can blow up for the Court and the witness 182,

16    beginning at line 15.

17         THE COURT:  Just a minute.

18         (Pause)

19         THE COURT:  Transcript 835, line 19?

20         MR. PAGLIUCA:  19 through 20; 836, lines 1 and 2; and

21    836, I think, line 5.

22         THE COURT:  Can you go back to the line in the

23    deposition, please?  Now I have 182.

24         MR. PAGLIUCA:  Yes, your Honor.

25         MS. COMEY:  Your Honor, I just want to make sure that

1   your Honor has also reviewed page 835 --

2            THE COURT:  Yes, I have the testimony in mind.

3            Now I need to see what you're contending is

4   inconsistent.

5            MR. PAGLIUCA:  Right.  I'm at lines 10 through 12,

6   your Honor.

7            THE COURT:  Of what page?  I have page 182.

8            MR. PAGLIUCA:  It's 183, lines 9 through 12.  182 is

9   for context.

10           (Pause)

11           THE COURT:  Sustained.

12   BY MR. PAGLIUCA:

13   Q.  Mr. Alessi, do you recall that the lawyer for Jane, a

14   lawyer for Jane, contacted you in July of 2020, two thousand

15   twenty?

16   A.  No.

17   Q.  Do you recall that in July of 2020, you authored a

18   declaration, which is a sworn statement, under oath,

19   declaration of Juan P. Alessi?

20   A.  I don't know.  I don't know what you talking about.  At

21   2020?

22   Q.  Yes.

23           MR. PAGLIUCA:  Can we show the witness Defendant's

24   Exhibit JA-1, please.

25           MS. COMEY:  Your Honor, I do not have a copy of this.

LC3KMAX2                    Alessi - Cross

1            THE COURT:  You will be provided one before we show

2      the witness.

3            MS. COMEY:  Thank you, your Honor.

4            MR. PAGLIUCA:  Does the witness have JA-1?

5            THE COURT:  Not yet.

6            Ms. Comey, are you ready?

7            MS. COMEY:  Yes, thank you, your Honor.

8            THE COURT:  Go ahead.

9      BY MR. PAGLIUCA:

10     Q.  Do you see JA-1, Mr. Alessi?

11           THE COURT:  Mr. Alessi, could you reposition the mic,

12     please.  Thank you.

13     A.  Yes, I am reading.

14           I can't remember where this was done.  Where?

15     Q.  Mr. Alessi, I'm just going to ask you a couple of

16     questions.

17           First, is that your signature?

18     A.  Yes, it is.

19     Q.  It's dated July 9, 2020; is that correct?

20     A.  That's correct.

21           MS. COMEY:  Your Honor, before this is read, I would

22     make the same objection.  I don't believe this is inconsistent.

23           THE COURT:  Which paragraph are you focused on?

24           MR. PAGLIUCA:  Your Honor, I was going to move for the

25     introduction of the entire exhibit.

LC3KMAX2                          Alessi – Cross

1          THE COURT:  So paragraph 1, sustained.

2          Paragraph 2, sustained.

3          You want to focus me?

4          MR. PAGLIUCA:  Paragraphs 3 and 4, your Honor, are the

5    inconsistencies.

6          THE COURT:  Okay.  Just a moment.

7          (Pause)

8          THE COURT:  Sustained.

9          MR. PAGLIUCA:  May we be heard on this, your Honor?

10         THE COURT:  Yes.

11         (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (At the sidebar)

2              THE COURT:  Let's just set the stage.  The testimony

3     yesterday said "multiple occasions with her mother, some

4     occasions without the mother; in those instances, he would pick

5     her up and drive her."

6              MR. PAGLIUCA:  Okay.

7              THE COURT:  You agree that is the testimony?

8              MR. PAGLIUCA:  Generally, yes.

9              On line 9, we have:  "I personally observed Jane along

10    with her mother on three occasions, not multiple occasions."

11             THE COURT:  "Three" is not "multiple"?

12             MR. PAGLIUCA:  Not in my view, your Honor.  It is

13    inconsistent with "multiple."

14             At Mr. Epstein's --

15             THE COURT:  I don't understand --

16             MR. PAGLIUCA:  It is more than one.

17             THE COURT:  So is "multiple."

18             MR. PAGLIUCA:  Yes, I understand.

19             THE COURT:  I mean, unless we're speaking a different

20    language.

21             MR. PAGLIUCA:  We may be, but this is quantifying the

22    number.  It's not multiple, it's three.

23             "At Mr. Epstein's home in Palm Beach.  I don't recall

24    the year," which is also inconsistent with his testimony

25    yesterday.

1          THE COURT:  Well, he said he doesn't recall exactly

2     the year, and you impeached on the earlier one.

3          MR. PAGLIUCA:  Yesterday, he said it was 1994, and

4     this is impeaching that testimony as well.

5          MS. COMEY:  Your Honor, if I may on that point, I

6     believe the testimony was 1994 or 1995 yesterday, and then

7     today on cross-examination I think he expanded it to between

8     1993 and 1996.  I think it's clear in the record that he's not

9     sure exactly what year it was.

10          THE COURT:  Yes, I agree with that.

11          MR. PAGLIUCA:  Respectfully, I disagree, your Honor.

12          "During those occasions, I observed Mr. Epstein and

13     Ms. Maxwell and her mother talking."

14          We're limiting it to those occasions, and it's not

15     expanding on any of those occasions.  Yesterday he testified to

16     multiple occasions, more than three, many more than three.

17          Paragraph 4:  "In addition to seeing Jane at

18     Mr. Epstein's home, I was also instructed on one occasion by

19     Mr. Epstein to pick Ms. Jane up from what I presume was her

20     home address in West Palm Beach."

21          He discussed yesterday more than one occasion being

22     instructed to pick her up at West Palm Beach.

23          THE COURT:  You can ask him if he recalls saying one

24     occasion.

25          MS. COMEY:  Your Honor, if I may, the fact that he

LC3KMAX2                         Alessi - Cross

 1   remembers one occasion does not preclude that there were other

 2   occasions.  He's just saying in the declaration --

 3              THE COURT:  I agree, and I presume that will be the

 4   testimony.

 5              MS. COMEY:  But then, your Honor, it's not

 6   inconsistent.  I just don't see the basis to put this in front

 7   of the jury if it's not inconsistent on its face.  There's just

 8   not a basis.

 9              THE COURT:  Well, on this one, I think he said

10   multiple occasions, this says one.  He can explain the

11   difference, and the jury will decide.

12              So I'll permit you to ask about that one.

13              MR. PAGLIUCA:  Thank you.

14              (Continued on next page)

1           (In open court)

2           MR. PAGLIUCA:  Thank you, your Honor.

3           THE COURT:  Okay.

4   BY MR. PAGLIUCA:

5   Q.  Mr. Alessi, do you recall in 2020, in this declaration,

6   saying, I was also instructed on one occasion by Mr. Epstein to

7   pick Ms. Jane up from what I presumed was her home address in

8   West Palm Beach, Florida and drive her to Mr. Epstein's home?

9   Do you recall that statement in your under-oath declaration?

10  A.  First of all, I would like to know where this declaration

11  was taken place.  I think this -- if I remember correctly, this

12  was sent to me by mail.  By somebody.  I don't recall making

13  this declaration with anybody.

14  Q.  Well, Mr. Alessi, we've established that that's your

15  signature on July 9 --

16  A.  Yeah, it is my signature, but I don't recall being in a

17  place and declare this.

18  Q.  Okay.  Are you denying making the declaration?

19          MS. COMEY:  Your Honor, I think there may be some

20  confusion about terminology here.

21          THE COURT:  Yes.

22          I think the question is not, were you deposed, but,

23  did you sign this statement?

24          THE WITNESS:  Yes.  It definitely is my signature.

25  Q.  And is that what you said, you were instructed by

1   Mr. Epstein on one occasion to pick Ms. Jane up from what I

2   presume was her home address in West Palm Beach, Florida and

3   drive her to Mr. Epstein's house, is that correct?

4   A.  That's correct.  It might have been more than one occasion,

5   too.

6   Q.  That's not what you said in this declaration, correct?

7   A.  No, in this declaration it says once.

8   Q.  Right.

9           Mr. Alessi, I want to talk a little bit now about the

10  renovations to the Palm Beach house, okay?

11  A.  Yes.

12          MR. PAGLIUCA:  If we can show the witness what's been

13  admitted as Government Exhibit 297, please.

14          MS. COMEY:  Your Honor, could this be published to the

15  parties and the public as well?

16          THE COURT:  It's admitted, so GX 297 may be published.

17          MR. PAGLIUCA:  Thank you, your Honor.

18  BY MR. PAGLIUCA:

19  Q.  Mr. Alessi, you talked about this exhibit yesterday.

20          Do you recall that?

21  A.  Yes, sir.

22          MR. PAGLIUCA:  First, I would like to zoom in on the

23  lower right corner of the exhibit, and highlight that, please.

24  Q.  Do you see the date here 4/4/94, Mr. Alessi?

25  A.  Yes, sir.

LC3KMAX2                        Alessi - Cross

```
 1              MR. PAGLIUCA:  We can zoom out.
 2   Q.  These are architectural drawings of the El Brillo Way
 3   house, correct?
 4   A.  Yes.
 5              MR. PAGLIUCA:  If we can go to Government Exhibit 298,
 6   and also zoom in on the lower right corner.
 7   Q.  The date is a little hard to read here, but do you see that
 8   there's a 24, and then a 94 is there as well, Mr. Alessi?
 9   A.  Yes.
10              MR. PAGLIUCA:  If we can go to Government Exhibit 299,
11   and zoom in on the same section.
12   Q.  We have a date 3/23/94.
13              Do you see that, Mr. Alessi?
14   A.  Yes, sir.
15              MR. PAGLIUCA:  We can zoom out.
16              Let's go back to 297, please.  We can zoom in, please,
17   on the writing, the small writing, that you can't read, through
18   the lower right quarter of this document.
19              Right there.  Go ahead, zoom in there.
20   Q.  These are instructions for the contractor as part of the
21   renovation.  Do you see that, Mr. Alessi?
22   A.  Yes, sir.
23   Q.  We're installing new doors and frames, in this note.
24              Do you see that?
25   A.  Yes.
```

1    Q.  And then we're giving instructions to the subcontractor

2    here as well.

3            Do you see that?  In item 6.

4    A.  AC subcontractor shall...

5            Yes, sir, I see it.

6            MR. PAGLIUCA:  We can take that down and go back to

7    the notes to the left of that, please, and blow those up.

8    Q.  Do you see that the bathrooms are being redone with marble

9    tile, the floors are being done, countertops are being done,

10   the baths are being done, we're installing new molding in the

11   guestrooms?  Do you see those general notes, Mr. Alessi?

12   A.  Yes.

13           MR. PAGLIUCA:  If we can take that down and go back to

14   the notes to the left of those notes.

15   Q.  We're removing windows, we're cutting masonry down to floor

16   level, installing new doors, modifying, replacing windows.

17           Do you see that, Mr. Alessi?

18   A.  Yes, sir.

19   Q.  So this was a major renovation, correct, Mr. Alessi?

20   A.  Yes, sir.

21   Q.  And the architects, if we can go to page 297, on the upper

22   right, look at who the architects were, you remember these

23   folks from New York, Mr. Alessi?

24   A.  Yes, sir.

25   Q.  And they would fly down to Palm Beach and supervise the

LC3KMAX2                         Alessi - Cross

1   major construction, correct?

2   A.   Yes, sir.

3   Q.   And you were in the construction business years ago,

4   Mr. Alessi, right?

5   A.   Yes.

6   Q.   And you know that you need these kind of construction

7   drawings before you can begin construction, correct?

8   A.   Of course.

9   Q.   So the architects finish these construction drawings in

10  1994, and the construction begins sometime after they finish

11  these drawings, right?

12  A.   I think so yes.

13  Q.   So in 1994, when the construction starts, nobody's living

14  in this residence, correct?

15  A.   No, sir.  It was a large part -- during the construction,

16  Mr. Epstein and Ms. Maxwell live at the residence.

17  Q.   You had, during your time on El Brillo Way, had regular

18  access to the house, meaning complete access, you could go

19  anywhere --

20  A.   I live at the house.

21  Q.   -- you want, correct?

22  A.   Yes.

23  Q.   And --

24         THE COURT:  Could you pull up the microphone,

25  Mr. Alessi.  Thank you.

1       THE WITNESS:  Keep forgetting.  I'm sorry.

2   BY MR. PAGLIUCA:

3   Q.  There was no part of the house that you were denied access

4   to, correct?

5   A.  There was no part, no.

6   Q.  So you could go wherever you wanted, whenever you wanted,

7   in the house, correct?

8   A.  Yes.

9   Q.  And there was a difference between when Mr. Epstein was

10  going to be in the house and when he wasn't there, correct?

11  A.  Can you repeat the question and also --

12  Q.  Sure.

13  A.  Difference?  What you mean, difference?

14  Q.  When Mr. Epstein was going to be in the residence --

15  A.  Yes.

16  Q.  -- he wanted you and your wife there, correct?

17  A.  Only us.  He didn't want -- no contractors at the house.

18  Q.  Right.  And so when he was there, you had to be there

19  pretty much 24 hours a day, correct?

20  A.  Yes.  It was slavery.

21  Q.  And you needed to be there at 5:00 a.m. and work all day

22  and go to bed whenever you were able to; is that right?

23  A.  That's correct.

24  Q.  When Mr. Epstein wasn't there, you had the apartment on the

25  other side of the bridge that you and your wife would go to,

LC3KMAX2                     Alessi - Cross

1   correct?

2   A.  To sleep, yes.

3   Q.  To sleep.

4           And then you would come back during the day and work

5   during the day when Mr. Epstein wasn't there, right?

6   A.  Yes.

7   Q.  And there were lots of other workers who came to the house

8   on a regular basis; is that right?

9   A.  When Mr. Epstein was not at the residence, they will come

10  and I will be there.

11  Q.  Right.  And you would have different kinds of workers?  You

12  would have -- the pest control people would come, correct, the

13  people that took care of bugs and things, they would come?

14  A.  Yeah, there were all kinds of contractors, subcontractors.

15  Q.  Landscaper kind of people, right?

16  A.  Excuse me?

17  Q.  Landscapers?

18  A.  Yes.  They were outside, not inside the house.

19  Q.  And there were people inside as well, right?  There were

20  people that dealt with air conditioning and heating and furnace

21  and cleaning, right?

22  A.  Of course.

23  Q.  And those people came and went under your supervision at

24  the time, correct?

25  A.  Yes, sir.

1   Q.  I think you testified that there were many properties that

2   Mr. Epstein owned, right?

3   A.  Yes.

4   Q.  And you had been to those properties, correct?

5   A.  Briefly, yes.

6   Q.  And all of those properties required substantial daily

7   maintenance and care, correct?

8   A.  I imagine so.

9   Q.  Okay, just like the Palm Beach property required, correct?

10  A.  Of course.

11  Q.  Okay.

12       So that was why there was a plan to do regular

13  scheduled checklists for maintenance and things, correct?

14  A.  I guess so.

15  Q.  Mr. Epstein was your boss, correct?

16  A.  That's correct.

17  Q.  When Mr. Epstein was in Palm Beach, you would go to

18  Mr. Epstein for direction, correct?

19  A.  No.  I will go directly to Ms. Maxwell.  She was my

20  immediate superior.  I will go to her first.

21  Q.  Do you recall that -- let's talk about Mr. Epstein for a

22  little bit.

23       Mr. Epstein wanted his properties to be run like

24  five-star hotels, correct?

25  A.  That's correct.

1  Q.  And Mr. Epstein liked having guests, right?

2  A.  That's correct.

3  Q.  Mr. Epstein liked having people that he thought were

4  important in the house, correct?

5          MS. COMEY:  Foundation.

6          THE COURT:  Overruled.

7  A.  I guess so.

8  Q.  Well, he had pictures of famous people in the house that he

9  was meeting with, right?

10 A.  Yes.

11 Q.  And he brought famous people to the house, and you saw them

12 there, right?

13 A.  Yes.

14 Q.  And Mr. Epstein would have lots of meetings with lots of

15 famous people there, right?

16 A.  Yes.

17 Q.  And he liked to show off the properties, correct?

18 A.  I don't know if he likes it or not, I don't know.

19 Q.  But he did it, right?

20 A.  To show off the properties?

21 Q.  Yes.  He had all the people there, and they were at the

22 pool, and they would --

23 A.  Sir, I don't know anything about the other properties.

24 Q.  No, your property, the Palm Beach property.

25 A.  Yeah, they were there sometimes, they were a guest and they

LC3KMAX2                      Alessi - Cross

1    stay there.  So I don't know if he liked to show off that

2    property or not.

3    Q.  Okay.  He also liked to be in control of things, didn't he,

4    Mr. Epstein?

5    A.  He had a very little contact with me in the later years.

6    Q.  Well, isn't it true, Mr. Alessi, that if Mr. Epstein was at

7    the house, you would never go to Ms. Maxwell and you would go

8    directly to him, or he would come to you?  Isn't that true?

9    A.  That is not true.

10          MR. PAGLIUCA:  If we can show the witness 3504-030.

11   At that transcript, page 6, deposition page 23.

12   Q.  Do you have that, Mr. Alessi?

13   A.  Page 23, yes, sir.

14          MS. COMEY:  Your Honor, may I have a moment to review

15   this?

16          THE COURT:  Yes.  Can you give me the lines?

17          MR. PAGLIUCA:  Yes, your Honor.  Page 23, line 6

18   through 8.

19          MS. COMEY:  Your Honor, I would object.  This is not

20   inconsistent.

21          MR. PAGLIUCA:  Excuse me?

22          THE COURT:  Overruled.

23          You may read it.

24   BY MR. PAGLIUCA:

25   Q.  The question was:  Who was in charge of the Palm Beach

 1   house?

 2           Your answer was:  I was.

 3           And then the next question is:  All right.  Who was

 4   your direct supervisor?

 5           You said:  Mr. Epstein.  He would deal with me

 6   directly or, if he was not available, Ms. Maxwell.

 7           Do you see that?

 8   A.  Yes.

 9   Q.  Those were the questions and answers under oath that you

10   gave, correct?

11   A.  Could have been, yes.

12   Q.  Are you denying it, Mr. Alessi?

13   A.  I am not denying it.

14   Q.  Okay.

15           And then at line 18 of the same transcript --

16           THE COURT:  Just a moment.

17           (Pause)

18           THE COURT:  Okay.

19   BY MR. PAGLIUCA:

20   Q.  You answered:  But if Mr. Epstein was at the house, I would

21   never go to Ms. Maxwell, I would go to him directly or he would

22   come to me.

23           Do you see that, Mr. Alessi?

24   A.  Yes, sir.

25   Q.  And that was your testimony under oath about who the boss

1    was, correct?

2    A.  Well, the boss of what I understand was Mr. Epstein he was

3    the owner.

4    Q.  Mr. Alessi, the question I asked you was:  That's what you

5    testified about who the boss was?  Isn't that what I asked you?

6            THE COURT:  I direct the witness:  Can you give the

7    answer and then you can explain.  Go ahead.

8    A.  I could have said this statement at that time.

9    Q.  Okay.  Thank you, Mr. Alessi.

10           It's also true, isn't it, Mr. Alessi, that you

11   understood that whatever Ms. Maxwell was telling you, it was

12   coming from Mr. Epstein, correct?

13   A.  I don't know the answer.  I don't know if it was from him

14   or from herself.

15   Q.  You're aware that this book that we talked about, the

16   household manual -- we talked about that yesterday, correct?

17   A.  Yes, sir.

18   Q.  Now, that was -- Mr. Epstein hired a countess.

19           Do you recall that?

20   A.  Yes.

21   Q.  And the countess put together the manual, correct?

22   A.  I don't know if she got it or not.  I don't know if she was

23   the author of the manual.

24           MR. PAGLIUCA:  If we can go to 3504-030 page 6, line

25   24.  3504-030, 6, deposition page 23, lines -- page 24, lines 9

LC3KMAX2                        Alessi - Cross

1    through 16.

2            MS. COMEY:  Your Honor, I object.  I don't believe

3    it's inconsistent.

4            THE COURT:  Sustained.

5    BY MR. PAGLIUCA:

6    Q.  You didn't agree with the manual, correct, Mr. Alessi?

7    A.  Yes, I did not.

8    Q.  And you didn't follow it?

9    A.  I did not -- I did my chores, I did my work.  I did not

10   follow the manual.  I don't think I never did the checkmarks on

11   the manual.

12   Q.  Okay.

13           But you knew that they hired the countess to write the

14   book and write the ideas of how the house should be, correct?

15   A.  I don't know that, sir.

16           MR. PAGLIUCA:  We can go to 3504-022.

17           Page 25 of that exhibit.

18           MS. COMEY:  I'm sorry, I didn't hear you.

19           MR. PAGLIUCA:  3504-022, page 25.

20           MS. COMEY:  Thank you.

21           THE COURT:  Page and line?

22           MR. PAGLIUCA:  Yes, I'm getting there, your Honor.

23           Page 179, lines 25 through 18 --

24           MS. COMEY:  Your Honor, which lines is Mr. Pagliuca

25   proposing to read?

LC3KMAX2                        Alessi - Cross

1              THE COURT:  I think he said 25 through -- something.

2              MS. COMEY:  I would ask the whole answer be read, the

3     whole question and the whole answer, if Mr. Pagliuca wants to

4     introduce this.

5              THE COURT:  Okay.

6              Go ahead.

7              MS. COMEY:  Just for the record, I believe the

8     question would begin on line 17 at page 179, and the answer

9     would end on line 6 of page 180.  I think that's the full

10    question and answer.

11             THE COURT:  Okay.  Go ahead.

12             MR. PAGLIUCA:  I'm sorry, your Honor, I'm on the wrong

13    page.  I will come back to this.

14    BY MR. PAGLIUCA:

15    Q.  Mr. Alessi, I want to now talk a little bit about --

16             MR. PAGLIUCA:  Well, would this be a good time for a

17    break, your Honor?

18             THE COURT:  Let me just check.

19             (Pause)

20             THE COURT:  Okay, yes, we can break.  We'll take our

21    mid-morning break.

22             About 15 minutes, members of the jury.  Thank you.

23             (Continued on next page)

24

25

LC3KMAX2                        Alessi - Cross

1              (Jury not present)

2              THE COURT:  Mr. Alessi, you may step down for the

3     break.

4              Everyone may be seated.

5              While we're waiting, I'll just note that Ms. Williams

6     has asked someone from A/V to come talk to the government

7     during the break, so hopefully we can figure that out.

8              MS. COMEY:  Thank you, your Honor.

9              THE COURT:  Matters to take up?

10             MS. COMEY:  Not from the government, your Honor.

11             MR. PAGLIUCA:  No, your Honor.

12             THE COURT:  We'll meet again in ten.  You'll let me

13     know if there are any issues.  Thank you.

14             (Recess)

15

16

17

18

19

20

21

22

23

24

25

LC3Cmax3                          Alessi – cross

1               THE COURT:  Matters to take up?

2               MS. COMEY:  Not from the government, your Honor.

3               THE COURT:  Mr. Pagliuca, anything?

4               MR. PAGLIUCA:  No, your Honor.

5               THE COURT:  We can bring the witness back to the stand

6       and Ms. Williams will bring in the jury.

7               (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LC3Cmax3                        Alessi - cross

1                (Jury present)

2                THE COURT:  Thank you, everyone.  Thank you, members

3      of the jury.

4                Mr. Pagliuca, you may continue with your cross

5      examination of Mr. Alessi.

6                Mr. Alessi, I remind you, you are under oath.

7                MR. PAGLIUCA:  Thank you, your Honor.

8      BY MR. PAGLIUCA:

9      Q.  Mr. Alessi I want to talk now about you meeting Virginia

10     Roberts.  Okay?

11     A.  Okay, sir.

12     Q.  Do you recall that you met Ms. Roberts for the first time

13     at Mar-a-Lago; correct?

14     A.  Yes.

15     Q.  And you went, Ms. Maxwell, Ghislaine went into Mar-a-Lago

16     for a treatment.

17                Do you recall that?

18     A.  I don't know if she was going to get a treatment, but if

19     that's why she went inside, yes.

20     Q.  Let me just ask the question.  Do you recall that she went

21     into Mar-a-Lago for some form of treatment?

22                Do you recall that?

23     A.  I don't recall that.

24                MR. PAGLIUCA:  If we can show the witness 3504-030,

25     page 48, deposition transcript page 190, lines 13 through 25,

1    and page 191, lines 2 through 6.

2    Q.  Have you had the opportunity to review that, Mr. Alessi?

3    A.  Can you repeat the number.

4    Q.  Sure.  Page 190 beginning at line 15.

5    A.  Okay.  Sir, I cannot see the number of the page.  Okay, now

6    I do.  Yes, sir.

7    Q.  Does that refresh your memory, Mr. Alessi, that, as you

8    understood it, Ms. Maxwell went into Mar-a-Lago for some form

9    of treatment?

10   A.  No, I think she was looking for -- because we -- I don't

11   know if she went in for a treatment or not.

12   Q.  Isn't it true that you testified, as I understand it,

13   Ms. Maxwell went into Mar-a-Lago for some form of treatment,

14   correct, and you said yes.  Do you see that?

15   A.  Yes, sir.

16   Q.  And that was your testimony under oath; correct?

17   A.  Yes.

18   Q.  And then the question was:

19   "Q.  So you were waiting outside for about an hour?"

20        Do you see that, line 22?

21   A.  Yes.

22   Q.  And you said, "Right."

23        Do you see that?

24   A.  Yes.

25   Q.  And that was your testimony under oath; correct?

1    A.  I guess so.

2    Q.  And then the question was:

3    "Q.  And then Ms. Maxwell came out after she had her

4    treatment?"

5            Do you see that?

6    A.  Okay.

7    Q.  And you said, "Right."

8            Do you see that?

9    A.  Uh-huh.

10   Q.  Is that a yes?

11   A.  Yes.

12   Q.  Okay.  And that's when you saw her talking to a person who

13   you later came to find out was Virginia Roberts?

14           MS. COMEY:  Objection, your Honor.  It was misread.

15           THE COURT:  I'm sorry?

16           MS. COMEY:  I believe that counsel just inserted two

17   extra words in what he's reading from the deposition.

18           MR. PAGLIUCA:  I will reread it, your Honor.

19           THE COURT:  Okay.

20   "Q.  You saw her talking to a person who you later came to find

21   out was Virginia Roberts?"

22           MR. PAGLIUCA:  Did I read that correctly?

23           MS. COMEY:  I believe you did.  Thank you.

24   A.  Yes, sir.

25   Q.  And you said, "That's right."

1          Do you see that?

2    A.  Yeah.

3    Q.  And do you recall that it was very hot out, do you recall

4    that?

5    A.  I recall that very much.

6    Q.  And you met -- well, this event occurred in 2002.  Do you

7    recall that, Mr. Alessi?

8    A.  Excuse me?  Can you repeat the question.

9    Q.  What we're talking about here, going to Mar-a-Lago and

10   meeting Ms. Roberts occurred in 2002.  Do you recall that?

11   A.  I'm not sure if it was 2002 or 2001.

12   Q.  Okay.  If I could direct the witness's attention to

13   3504-030, page 24, let's just see if we can refresh your

14   memory, Mr. Alessi.  Will you look at page 95, lines 17 through

15   21.

16          MS. COMEY:  Your Honor, I would object to reading that

17   in isolation.  I would ask that the whole series of questions

18   and answers before that be read.

19          THE COURT:  Okay.

20          MR. PAGLIUCA:  I'm happy to read it all, your Honor.

21          MS. COMEY:  Your Honor, I would ask that it begin on

22   page 94 at line 19 is where I believe the exchange begins.

23          MR. PAGLIUCA:  Your Honor, I think, appropriately, if

24   Ms. Comey wants to redirect this witness's attention on --

25          THE COURT:  Well, then I'll sustain the objection or

LC3Cmax3                        Alessi - cross

1   you could read the whole thing.

2           MR. PAGLIUCA:  I guess it will save time if we read

3   the whole thing.

4           THE COURT:  Okay.

5   BY MR. PAGLIUCA:

6   Q.  So let's start at page 94 and I will read.  You're being

7   asked a series of questions again by Mr. Edwards who is

8   Virginia Roberts' lawyer.  Do you recall that?

9   A.  I don't recall him, but I imagine so.

10  Q.  Do you recall saying, beginning at line 21 on page 94 --

11          MS. COMEY:  Your Honor, I ask that it begin on line 19

12  of page 94 with the question.

13          THE COURT:  Okay.  Go ahead.

14          MR. PAGLIUCA:  Okay.  19, okay.

15  "Q.  What year do you believe that you went to Mar-a-Lago to

16  pick Virginia up?

17  "A.  I think it was 2000 and I think it was the summer of

18  2002."

19          Do you see that?

20  A.  Yes, sir.

21          MS. COMEY:  Your Honor, I believe that the

22  understanding was that the remainder of that exchange would

23  then be read.

24          MR. PAGLIUCA:  I'm going to keep reading it.  I'm just

25  asking questions along the way, your Honor.

LC3Cmax3                    Alessi - cross

1  BY MR. PAGLIUCA:

2  Q.  And you say, "Okay."  Is that right, on line 23?

3  A.  Yes, sir.

4  Q.  And then the next question -- well, after that, it's okay,

5  and then you say summer, because I remember that day that I was

6  sweating like hell in the car waiting for Ms. Maxwell to come

7  out of the massage; right?  Do you see that?

8  A.  Yes, sir.

9  "Q.  Okay.  So what month of summer do you remember it being?

10  "A.  I think it was June, July, maybe 2001.

11  "Q.  2000 and what?

12  "A.  2001.

13  "Q.  June, July 2001, that's when you believe that it was?

14  "A.  Yes.

15  "Q.  Okay.  And do you remember the month?

16  "A.  No, sorry.  Sorry.  Not 2001.  We left in December 31st.

17  It was 2000, the year that I was working for Jeffrey when I met

18  Virginia.

19  "Q.  Your recollection as you sit here today?

20  "A.  It was 2002."

21  Q.  Did I read that correctly?

22  A.  You were reading correctly.

23  Q.  And that was your answer; right?

24  A.  Yes, sir.

25  Q.  And then the next question is:

1    "Q.  Is that it was June or July 2002?

2    "A.  2002.

3    "Q.  When you met Virginia Roberts at Mar-a-Lago?

4    "A.  My recollection."

5    Q.  Correct?

6    A.  Yes.

7    Q.  And you thought that Virginia Roberts was a massage

8    therapist; correct?

9    A.  I have -- I have no idea what she was.

10   Q.  When you saw her for the first time, she had a white

11   uniform on.  Do you remember that?

12   A.  Yes.

13   Q.  And she was at the spa; right?

14   A.  No, she was coming from the front gate of Mar-a-Lago down

15   the ramp, and I was -- we were driving the car up the ramp with

16   Ms. Maxwell in the car and she says to me, stop.  I stopped the

17   car, Ms. Maxwell walk across where she was coming to, she

18   talked to this girl that I didn't know her name or what she was

19   doing there, she talked to her and they went back to the spa.

20   Q.  And that's when Ms. Maxwell had her treatment; right?

21   A.  I don't know what she had.  I don't -- I never see the

22   treatments.

23   Q.  So if we can take a look at 3504-22, page 30, deposition

24   page 199.

25          THE COURT:  What line?

LC3Cmax3                          Alessi - cross

1          MR. PAGLIUCA:  Line 22 through 25.

2          THE COURT:  Okay.

3     Q.  There was a question:

4     "Q.  And did you consider her, at least from your viewpoint,

5     that she was one of the individuals that came to give massages?

6     "A.  She was supposed to be a massage therapist."

7          Do you remember giving that testimony under oath?

8     A.  I do not remember.

9     Q.  Did you give that testimony under oath?

10    A.  I think it was under oath, yes.

11    Q.  Part of what -- one of the things that Mr. Epstein asked

12    you to do was to go to clubs and spas to hire licensed massage

13    therapists; is that correct?

14    A.  That is incorrect.

15         MR. PAGLIUCA:  If we can go to 3504-22, page 34,

16    deposition page 213, lines 7 through 19.

17         MS. COMEY:  Your Honor, I would just ask that the full

18    question preceding this answer and the entire answer be read.

19         THE COURT:  Okay.  Go ahead.

20         MR. PAGLIUCA:  I will, your Honor.  I'm trying to

21    figure out exactly what Ms. Comey is requesting here.

22         MS. COMEY:  From page 213, line 5, through page 213,

23    line 22, please.  I think that is the full exchange.

24         MR. PAGLIUCA:  Okay.  That's fine.  Line 2.

25    "Q.  And one of those things that you had to do with her was

1    take her to different spas?

2    "A.   Yes.

3    "Q.   And there she would recruit young women to come to

4    massage?

5    "A.   Because she was English and she didn't know the area too

6    much as well as I know.  So she says, John, make a list of all

7    the massage, the spas in the area from Jupiter to Boca Raton,

8    and we went to all this main spas.  And then we went to the

9    schools for massage therapists and all the massage parlors and

10   massages, the small massage.  So I make a list from the

11   telephone book and we would go from one to the other one.  I

12   would wait in the car and she goes in.  And sometimes it took a

13   couple of minutes and walk out with cards, business cards, and

14   that she did the recruiting."

15          Do you see these questions and answers?

16   A.  Yes, sir.

17          MS. COMEY:  Your Honor, I would ask that the remainder

18   of the answer be read, please.

19          THE COURT:  Go ahead.

20   "A.  From then she would pick up the girls and that was the end

21   of it.  I never did any recruiting and I never really saw him

22   doing that.  Him, right?"

23   A.  Hold on.  Can you repeat the question.

24   Q.  There is no question.  I was just reading your answer,

25   Mr. Alessi.

LC3Cmax3                    Alessi - cross

1    A.  Yes.  Sometimes she took a couple minutes and walk out with

2    business cards and that she did, I imagine that she was doing

3    the recruiting.

4                THE COURT:  Okay.  He read it.  Thank you.  Next

5    question.

6    Q.  And the business cards are from places like The Breakers;

7    right?

8    A.  I don't know, sir.  I never saw the business cards.  They

9    were -- she come out with in her hands.  I didn't ask it to

10   give it to me.  I was never -- they were never given to me.

11   But we went to from the most exclusive spas and country clubs

12   from -- in the country of Palm Beach and I was the driver.

13   Q.  Well, you kept a Rolodex, Mr. Alessi; correct?

14   A.  True.

15   Q.  And the Rolodex you had kept cards in it from the spas;

16   right?

17   A.  No.  It had cards from the names of the repeat woman who

18   came to the house and massage therapists.

19                MR. PAGLIUCA:  If we can show the witness 3504-030,

20   page 8, deposition page 30, lines 5 through 7.

21                MS. COMEY:  Your Honor, I don't believe this is

22   inconsistent.

23                THE COURT:  Sustained.

24   Q.  Do you recall, Mr. Alessi, that you got referrals from

25   other people for massage therapists?

LC3Cmax3                    Alessi - cross

```
 1   A.  No, sir.
 2              MR. PAGLIUCA:  If we can look at 3504-030, page 47.
 3              THE COURT:  Page and line.
 4              MR. PAGLIUCA:  Yes.  Let's start with page 187, line
 5   10.
 6              MS. COMEY:  Your Honor, I'm not sure this is
 7   inconsistent.  It appears to refer to a different part of the
 8   testimony.
 9              THE COURT:  Can I see the earlier testimony.
10              MR. PAGLIUCA:  I'm referring to his testimony right
11   now, your Honor.
12              THE COURT:  But what you want to read refers in the
13   line to earlier testimony.  I need to see that.
14              MR. PAGLIUCA:  I think we're talking about page 47 of
15   this document, at 88, lines 4 through 6.
16              THE COURT:  Do you know what page number of the
17   transcript?
18              MR. PAGLIUCA:  188, lines 4 through 6.
19              MS. COMEY:  Your Honor, that's after the portion.
20              THE COURT:  Agreed.  If you don't have it, move on and
21   come back to it.
22              MR. PAGLIUCA:  Okay.
23   BY MR. PAGLIUCA:
24   Q.  Mr. Alessi, you would call The Breakers or Mar-a-Lago or
25   Boca Raton resort and find someone to give Jeffrey Epstein a
```

LC3Cmax3                    Alessi - cross

1  massage; correct?

2  A.  Can you repeat the question, sir.

3  Q.  Yes.  You would call The Breakers or Mar-a-Lago or Boca

4  Raton resort and find someone to give Jeffrey Epstein a

5  massage?

6  A.  Never.

7            MR. PAGLIUCA:  If we can go to page 47 of the

8  transcript, deposition page 187.

9            May I inquire, your Honor?

10            THE COURT:  I don't see it yet.

11            MS. COMEY:  Can we get clarification on which lines,

12  please.

13            MR. PAGLIUCA:  Starting 187, line 21 for context, and

14  going into the next page.

15            MS. COMEY:  Your Honor, I don't believe this is

16  inconsistent.

17            THE COURT:  Let me read it.

18            MR. PAGLIUCA:  Through page 188, line 15, your Honor.

19            THE COURT:  I have to admit, the difficulty is I don't

20  understand the grammar of the question you asked.

21            MR. PAGLIUCA:  My question to Mr. Alessi is that he

22  would get phone numbers and call people for Mr. Epstein and he

23  said no.

24            THE COURT:  That was the question?

25            MR. PAGLIUCA:  Yes.  Well, that is the question.

1          THE COURT:  You can ask that question, because the

2     question you asked was, you would call The Breakers, et cetera,

3     and find someone to give Epstein a massage.

4          MR. PAGLIUCA:  Okay, your Honor.

5          THE COURT:  So you can ask that question, your

6     question.  Go ahead.

7          MR. PAGLIUCA:  Thank you, your Honor.

8     BY MR. PAGLIUCA:

9     Q.  Mr. Alessi, you got numbers for massage therapists to call

10    for Mr. Epstein; isn't that correct?

11    A.  Yes, I had a list of massage therapists, repeat massage

12    therapists, and I never call anybody with that -- they told me

13    who to call.  I never made a call suggesting to get a massage

14    therapist to come to the house, never.

15         MR. PAGLIUCA:  May I, your Honor, from line 24 --

16         MS. COMEY:  Your Honor, I don't believe any of the

17    testimony --

18         THE COURT:  Just say objection.

19         MS. COMEY:  Objection, your Honor.

20         THE COURT:  I'll allow it.

21         MR. PAGLIUCA:  Thank you.

22         MS. COMEY:  Your Honor, may I just ask which lines

23    Mr. Pagliuca is going to read, because I just want to make sure

24    we have the full context.

25         THE COURT:  Okay.

LC3Cmax3                    Alessi - cross

1          MR. PAGLIUCA:  I'm going to read from line 24, your

2     Honor.

3          THE COURT:  Through?

4          MR. PAGLIUCA:  188, line 24.

5          THE COURT:  Okay.

6          MR. PAGLIUCA:  Thank you.

7     BY MR. PAGLIUCA:

8     Q.  The question under oath, again, Mr. Alessi, was:

9     "Q.  But, for example, one of Mr. Epstein's friends would say,

10    'I got a good massage from this person, I recommend her to

11    you.'"

12         And then you said:

13    "A.  Yes, he would give me the number."

14         Do you see that at page 188, line 3?

15    A.  Who you talking about?

16    Q.  I'm reading your answer, Mr. Alessi, to the question.  In

17    answer to the question:

18    "Q.  One of Mr. Epstein's friends would say to you, 'I got a

19    good massage from this person.  I recommend her to you.'"

20         And your answer was:

21    "A.  Yes, he would give me the number."

22         Correct?

23    A.  Can I answer the question?

24    Q.  Did you say that, Mr. Alessi, did you answer that question

25    under oath in 2016 in that fashion?

1  A.  I might have answered and I didn't understand the question.

2  I had never had the authority to call, myself, or to look for a

3  massage therapist.  I always complaint with the questions from

4  Mr. Epstein and Ms. Maxwell or the office secretaries to get.

5  And they would call me, they says, John, get an appointment at

6  10 o'clock tonight for Jeffrey or get an appointment -- or

7  Ms. Maxwell come to me and says, get Jodi or whatever name to

8  come.  That was my job, sir.  I went to the phone, called that

9  person.  I never call anybody for them.

10           MR. PAGLIUCA:  May I continue, your Honor?

11           THE COURT:  Yes, and I permitted it, so you just read.

12  We don't need to continue with the back and forth.

13           MR. PAGLIUCA:  Yes, your Honor.

14  Q.  Beginning again at line 4, Mr. Alessi:

15  "Q.  And most of the people, I take it, were from these spas or

16  clubs, is that right, most of the massage people?"

17           Do you see that question, Mr. Alessi?

18  A.  Yes.

19  Q.  And your answer was, "Yes."

20           Correct?

21  A.  Yes.  And it's yes today.

22  "Q.  Okay.  And do you know, did they have what I'll call

23  regular day jobs at the spas and then they would come into

24  Mr. Epstein's after?"

25           And then your answer was:

LC3Cmax3                          Alessi - cross

1   "A.  I think so."

2            Right?

3   A.  I think so, too.

4   Q.  And then the next question was:

5   "Q.  Okay.  And why do you think so?

6   "A.  Because they were working at The Breakers, and sometimes I

7   have to get in touch with these people.  I used to call -- have

8   to call The Breakers or Mar-a-Lago, all the clubs.  There be

9   clubs, even in Boca Raton, and Boca Raton Resort and Hotel,

10  they have a great spa.  I had to call these people, can you

11  come in at 10:00 tonight.

12  "Q.  You would know they were working there because you would

13  talk to them there?"

14  "A.  Yes.  Correct."

15  A.  It might be correct, but I never did contact these people

16  like you says, I contact the person who I was told to call.

17  Q.  Mr. Alessi, you answered those questions in 2016 under oath

18  the way I read them; correct?

19  A.  I can't recall.

20  Q.  Okay.  Mr. Alessi, do you recall that there were times that

21  Mr. Epstein would come to the Palm Beach house without

22  Ms. Maxwell?

23  A.  Yes, he did.

24  Q.  And there were times that he would bring other women to the

25  house, to the Palm Beach house; correct?

LC3Cmax3                     Alessi - cross

1   A.  Yes, he did.

2   Q.  And he would tell you before he got there to remove any of

3   the pictures of Ms. Maxwell in the house; correct?

4   A.  Yes, he did sometimes.

5   Q.  And you understood the reason for that, for removing the

6   pictures was Mr. Epstein was interested in the other women;

7   correct?

8   A.  I have no idea about that answer, sir.  I don't know if it

9   was interested, in love with her, or just going to be with

10  them.  I have no idea or presentations.

11  Q.  But you would remove the pictures; correct?

12  A.  I did what he told me to do all the time.

13  Q.  Which was remove the pictures; is that right?

14  A.  Yes, sir.

15  Q.  And that happened regularly, didn't it, Mr. Alessi?

16  A.  No, sir.  It might have happened maybe -- in the time I

17  worked for Mr. Epstein, probably three, four times.

18  Q.  And you never told Ms. Maxwell about removing the pictures

19  for the other women to show up with Mr. Epstein; correct?

20  A.  It was not necessary, sir.

21  Q.  Well, Mr. Epstein told you not to tell her; correct?

22  A.  No, sir.

23  Q.  Well, you knew it was a secret between you and Mr. Epstein

24  you were taking pictures down?

25  A.  It was not a secret, sir.  It was a mandate.

1    Q.  A mandate from Mr. Epstein?

2    A.  Absolutely.

3    Q.  And a secret between you and Mr. Epstein about the other

4    women coming; correct?

5    A.  A secret from me and Mr. Epstein?  He have no secrets with

6    me, sir.  He never share anything of his personal life with me.

7    Q.  It was a secret between you and Mr. Epstein that was kept

8    from Ms. Maxwell; correct?

9    A.  Sir, he never told me, this is a secret, don't tell

10   Ghislaine about this.  He never suggest it, imply, or told me

11   about that.

12   Q.  Why did you think you were taking her pictures down,

13   Mr. Alessi?

14   A.  I have no idea, sir.

15   Q.  Towards the end of your stay with Mr. Epstein, working for

16   Mr. Epstein, that was about the same time that you met Virginia

17   Roberts; correct?

18   A.  I'm not clear about these dates.  I have difficult to

19   remember exactly what years or what you're talking about, what

20   years or what timeframe.  I left at the end of the year at

21   2002, sir.

22   Q.  And that's the same time that you -- around the same time

23   that you recall meeting Ms. Roberts; is that right?

24   A.  Probably was 2002, probably was 2001.  I'm not sure.

25   Q.  Okay.  And that's around the same time that there were more

LC3Cmax3                    Alessi - cross

1  massages happening, right around when you were leaving;

2  correct?

3  A.  It gradually went from one massage to around three massages

4  a day.

5  Q.  Now, when you were working for Mr. Epstein between let's

6  say 1994 and 2002, there were a number of other foreign people

7  who came to Mr. Epstein's house; correct?

8  A.  Another -- what is it?

9  Q.  Foreign people.

10  A.  Foreign.  Yes.  Yes.

11  Q.  And there were many people that worked for Mr. Epstein that

12  had accents, do you recall that, different accents?

13  A.  Yes, sir, there were Butler -- I mean chefs, friends with

14  English accents, French accents, Italian accents.

15  Q.  Lots of different accents?

16  A.  Lots of different accents.

17  Q.  Okay.  And do you remember, for example, any tailor who

18  worked for Mr. Epstein who had a British accent; correct?

19  A.  Yes, I remember her very clearly, sir.

20  Q.  And she would answer the phone in around 2002 timeframe

21  when you were there at the house; correct?

22  A.  I not sure if she came at 2002, sir.  I think it was a

23  little later.  I'm not sure.  I'm not sure if it was 2002.

24  Q.  You're not sure, but you know that she came and you know

25  that she would answer the phones at the house; correct?

LC3Cmax3                    Alessi - cross

1    A.  Yes, sir.

2    Q.  And she had a British accent; right?

3    A.  Yes, she was English.

4    Q.  Do you recall meeting Shelly Lewis?

5    A.  I recall the name, sir.  I don't recall the person.

6    Q.  Do you recall Ms. Lewis was also a citizen of the United

7    Kingdom?

8    A.  Could have been.

9    Q.  And she had a British accent, as well; right?

10   A.  I don't recall her, sir.

11   Q.  Do you remember meeting Frances Hardinge?

12   A.  Yes.

13   Q.  And she was from --

14   A.  South Africa.

15   Q.  South Africa, and had a South African accent; correct?

16   A.  Yes.  She came a couple times.

17   Q.  And that accent, to some people, can sound like a British

18   accent, as well; right?

19   A.  It is, but it's different.

20   Q.  A little bit.

21   A.  A little bit.

22   Q.  Do you remember Mandy Ellison from South Africa, also?

23   A.  Yes, she was a lawyer for Mr. Epstein.

24   Q.  And she had a South African accent?

25   A.  Yes, sir.

1  Q.  Do you remember Eva Andersson?

2  A.  Yes, I do.

3  Q.  And she was Mr. Epstein's girlfriend; right?

4  A.  Yes, sir.

5  Q.  And she stayed friends with Mr. Epstein for many years?

6  A.  For many years, sir.

7  Q.  And she came to the house regularly; correct?

8  A.  Very regular with the husband and the kids.

9  Q.  Right, Mr. Dubin and the children?

10 A.  Yes, sir.

11 Q.  And she had -- she was from Sweden.  Do you recall that?

12 A.  Yes, sir.

13 Q.  And she had a Swedish accent; right?

14 A.  Yes, sir.

15 Q.  Do you remember a woman named Grace who had a British

16 accent?

17 A.  Grace?

18 Q.  Grace.

19 A.  No, I don't remember Grace, sir.

20 Q.  Do you remember a woman from Norway, Selena?

21 A.  Yes, sir.

22 Q.  And she had an accent, northern European accent; correct?

23 A.  Yes, sir.

24 Q.  And those people would be at the house and when they were

25 there, they would talk to people, guests, other people;

LC3Cmax3                    Alessi - cross

1   correct?

2   A.   They were guests, sir.

3   Q.   Right.  And you observed them talking to people; right?

4   A.   I would say yes, I observe them, but not in the same room,

5   sir.  I was not allowed to be in the same room where

6   Mr. Epstein and their guests were conversating.

7   Q.   Mr. Alessi, on behalf of Mr. Epstein, you went looking for

8   people to give massages; correct?

9   A.   Never, sir.

10  Q.   You drove the car to Mar-a-Lago, to The Breakers?

11  A.   I drove Ms. Maxwell to a different massage places.

12  Q.   Okay.  But you were there; correct?

13  A.   I was the driver, sir.

14  Q.   And you knew what was happening, that people were looking

15  for professional masseuses; correct?

16  A.   They were people looking for professional -- I don't

17  understand your question, sir.

18  Q.   Right.  The point of being at The Breakers was to find a

19  professional masseuse for Mr. Epstein; correct?

20  A.   I imagine so.

21  Q.   Okay.  Now, that doesn't make you guilty of sex

22  trafficking, does it, Mr. Alessi?

23            MS. COMEY:  Objection.

24            THE COURT:  Sustained.

25  Q.   At Mr. Epstein's direction, you called people and scheduled

LC3Cmax3                     Alessi - cross

1    massages; correct?

2    A.  Yes, sir.

3    Q.  And at Mr. Epstein's direction, you answered phones at the

4    house; correct?

5    A.  It was one of my duties.  If he didn't pick up the phone or

6    Ms. Maxwell didn't pick up the phone, it was one of my duties

7    if I was at the house at the moment.

8    Q.  Right.  So you answered the phones at the house at

9    Mr. Epstein's direction; correct?

10   A.  Not all of it.

11   Q.  And you would speak to females who you knew were going to

12   give Mr. Epstein massages; right?

13   A.  When I would call these girls or these women to ask for a

14   massage at the time they was requested by Mr. Epstein or

15   Ms. Maxwell.

16   Q.  Okay.  And you would do that?

17   A.  Of course.

18   Q.  Okay.  And you would sometimes arrange for transportation

19   for people to come to the house; correct?

20   A.  I did not arrange.  They arrange.

21   Q.  Well, you would call cabs; right?

22   A.  If they asked me to call a cab, I will call a cab.

23   Q.  And you would set up the room for a massage; right?

24   A.  If they told me in which room they want a massage or which

25   place they want a massage, I will set up the massage table.

LC3Cmax3                    Alessi - cross

```
 1   Q.  You would pay the masseuses when they were done; correct?
 2   A.  Some of them, yes, sir.
 3   Q.  And the process that you went through for paying the
 4   masseuses was, generally, you would pay them by check; is that
 5   right?
 6   A.  Most of the times I would pay them by check.  If they
 7   request cash, I will go to my petty cash box and find if I had
 8   enough.  If I had $100 or $200, I will pay in cash, otherwise
 9   it was a process of making them sign a piece of paper and make
10   a receipt, make the check, send a copy of the check back to the
11   office in New York, and that's how they kept the records.
12   Q.  Okay.  So the process would be someone would give a massage
13   and sometimes they would come down and say to you, okay, I was
14   there for an hour and you would pay them a check for $100;
15   right?
16   A.  Yes.  The massage, when I was working with Mr. Epstein, it
17   was $100 flat.  I didn't have to tip or no tips.  It was $100.
18   And it was on repeat girls that came to the house and they will
19   have -- they didn't want to get paid that night and they -- I
20   just kept -- they kept a record on it for the amount of times
21   they were there.  So if it was five massage, it was $500 check,
22   $600 check, $200 checks.
23   Q.  Let's just break it down so we're clear.  You would either
24   pay them when they were leaving or they could run a tab; right?
25   A.  Yes, sir.
```

LC3Cmax3                    Alessi - cross

1   Q.  And so they would come to you and say, I did five massages

2   last week, so I need $500; right?

3   A.  Yes, sir.

4   Q.  And then you would write a check for $500?

5   A.  Exactly.

6   Q.  And that was the process that you went through through 2002

7   when you worked for Mr. Epstein; is that right?

8   A.  Yes, sir.

9   Q.  And to your knowledge, you never observed -- first of all,

10  no one forced anyone to come to the house; correct?

11  A.  No, they were not forced to come to the house.

12  Q.  People came to the house because they wanted to come to the

13  house to give a massage; right?

14          MS. COMEY:  Objection.

15          THE COURT:  Sustained.

16  Q.  No one complained to you about having to come to the house;

17  correct?

18  A.  No, sir.

19  Q.  And no one came into the house, that you observed, looked

20  afraid or hurt or screaming or anything that would show you

21  that they were in any kind of distress; correct?

22  A.  No, sir, never.

23  Q.  And during the entire time you were there, people would

24  come, they would give their massage, and then they would get

25  paid and leave, and no one complained to you about anything;

LC3Cmax3                        Alessi - cross

1  correct?

2  A.  That's correct.

3  Q.  And the entire time that you were there, after people came,

4  gave massages, got paid and left, sometimes you would go clean

5  the room; correct?

6  A.  Yes, sir.

7  Q.  You never saw any signs that anyone was hurt or injured

8  during any of these massages; correct?

9  A.  No, sir.

10  Q.  And no one complained to you that they had ever been forced

11  to do anything against their will; correct?

12  A.  No, they never did, but I wish they would have done because

13  I would have done something to stop it.

14  Q.  But no one did; correct?

15  A.  No one did.

16  Q.  And you were asked some questions about photographs and

17  Ms. Maxwell taking photographs.  Do you recall that?

18  A.  Yes, Ms. Maxwell.

19  Q.  Ms. Maxwell took a lot of photographs of many different

20  things; is that correct?

21  A.  That's correct.

22  Q.  And she was very artistic about the kinds of photographs

23  that she took; correct?

24  A.  She was a good photographer and she had a fantastic setup

25  for cameras and lenses.  I don't know anything about

LC3Cmax3                    Alessi - cross

1    photography.

2    Q.   But she would take pictures of her dog, for example?

3    A.   She took pictures of everything.

4    Q.   Everything.  And that was a hobby of hers; correct?

5    A.   I would say so.

6    Q.   It's also true, Mr. Alessi, that during the time you were

7    there, it was your view that, other than Jane, you had no

8    knowledge of anyone at the house being under the age of

9    probably 20; correct?

10   A.   I will answer that question, did I find out about those two

11   individuals being underage, Jane and Virginia, after they were

12   in the house for couple days.  I don't recall anybody else.  I

13   was not -- I was not asked for their age to any individuals

14   that came to the house.

15   Q.   Let's break it down a little bit here, Mr. Alessi.  There

16   are a number of women that were there that have been described

17   as European women.  Do you recall that?

18   A.   Yes.

19   Q.   And in your view, they were over 20 years old --

20   A.   In my view, yes.

21   Q.   And you, during your time there, saw maybe between 50 and

22   100 people.  So over the 10 years or the 11 years that you were

23   there, there were maybe 50 or 100 people that were hired to

24   give massages.  Do you recall that?

25   A.   Not all those people were massage therapists.

LC3Cmax3                    Alessi - cross

```
1    Q.  That wasn't my question, Mr. Alessi.  You recall that
2    during your time there, there would be between about 50 and 100
3    people that were hired to give massages.  Do you recall that?
4    A.  Sir, I repeat it again, I don't know if they were called to
5    give massages.  They were at the house as guests.  That's all I
6    know.
7    Q.  Okay.  Between 50 and 100 people?
8    A.  Probably more.
9    Q.  And in your view, they all appeared to be over the age of
10   20; correct?
11   A.  Yes, sir.
12   Q.  In your view, they could have been 18, 19, 20, or 25;
13   right?
14   A.  Yes, sir.
15   Q.  Isn't it true that when you were working for Mr. Epstein,
16   you didn't have any doubt that the girls that provided him with
17   massages were not of the proper age; correct?
18   A.  Can you repeat the question.
19   Q.  When you were working for Mr. Epstein, you didn't have any
20   doubt that the girls who provided him with massages were not of
21   proper age; correct?
22           MS. COMEY:  Your Honor, I'm going to object to form.
23           THE COURT:  Sustained.  Can you clarify.
24           MR. PAGLIUCA:  I'm trying to be precise with this
25   question for impeachment purposes, your Honor.  So I will ask a
```

LC3Cmax3                          Alessi - cross

1   different question.

2            THE COURT:  Still has to be clear.

3            MR. PAGLIUCA:  Yes.  I will ask a different question.

4   BY MR. PAGLIUCA:

5   Q.  You believed, when you were working for Mr. Epstein, that

6   the people who provided Mr. Epstein with massages were of age;

7   correct?

8   A.  I believe -- I believe so, yes.

9            MR. PAGLIUCA:  If I could have a moment, your Honor.

10           THE COURT:  You may.

11  Q.  One final question, Mr. Alessi.  When you were there, you

12  don't recall meeting anyone named Carolyn; correct?

13  A.  Karen?

14  Q.  Carolyn.

15  A.  Carolyn.  Probably.

16  Q.  You do or you don't?

17  A.  Sir, I saw hundreds of guests at the house.  I don't recall

18  their name.

19           MR. PAGLIUCA:  Thank you.  No other questions, your

20  Honor.

21           MS. COMEY:  No redirect, your Honor.

22           THE COURT:  Okay.  Mr. Alessi, you may step down.  You

23  are excused.  Thank you.  You're finished, yes.

24           THE WITNESS:  Thank you.

25           THE COURT:  Government may call its next witness.

1          MS. COMEY:  Government calls Gregory Parkinson.

2          THE COURT:  Gregory Parkinson may come forward.

3   GREGORY PARKINSON,

4       called as a witness by the Government,

5       having been duly sworn, testified as follows:

6          THE COURT:  Mr. Parkinson, you may remove your mask

7   and please state and spell your name for the record.

8          THE WITNESS:  My name is Gregory Parkinson,

9   G-r-e-g-o-r-y P-a-r-k-i-n-s-o-n.

10          THE COURT:  Ms. Comey, you may proceed.

11          MS. COMEY:  Thank you, your Honor.

12   DIRECT EXAMINATION

13   BY MS. COMEY:

14   Q.  Good afternoon, Mr. Parkinson.

15   A.  Good afternoon, counselor.

16   Q.  What kind of work do you do right now?

17   A.  I am a retired police officer that devotes some of my time

18   to mentoring new people coming into the world of crime scene

19   investigation.

20          THE COURT:  Mr. Parkinson, can I ask you to shift the

21   microphone a little bit closer and speak directly into it if

22   you can.

23          THE WITNESS:  Yes, your Honor.

24   Q.  Mr. Parkinson, so would you briefly walk us through your

25   law enforcement career before you were retired.

1    A.   I joined the police force in 1966 as a police cadet, worked

2    two years, got my associate of arts degree.  I then, in 1968,

3    became a reserve officer, left the department and went to

4    Florida State University where I later received my

5    baccalaureate degree.  I then returned and became a full-time

6    police officer on July 1st of 1970.  I then worked until about

7    1974 or '75 when I was promoted to sergeant and then continued.

8    And then about 1982, I was promoted to lieutenant.  And I was

9    the lieutenant of the crime scene investigation unit, which

10   includes photographs, fingerprints, evidence handling,

11   preparation marking, and also trial presentation.  In 1989, I

12   was selected to be sent to the Federal Bureau of Investigation

13   in Quantico, Virginia, where I am a graduate of the national

14   academy, and I continued and was inspired by my time at the

15   academy to go back to college and continued with Nova South

16   Eastern University where I received my master's degree.

17          And then I continued to work in the crime scene unit

18   right up until I retired on July 1st of the year 2000.  I had

19   the weekend off and went to work for the state attorney's

20   office as an investigator and worked with them for just about

21   three years.  And then in 2003, I left the state attorney's

22   office, 15th Judicial Circuit, Palm Beach County, and I was --

23   again, I had a weekend off and then on February -- I believe it

24   was February 17th, I began full-time as the crime scene manager

25   for the Town of Palm Beach Police Department and continued to

LC3Cmax3                         Parkinson - direct

1    work there until I reached my retirement age on May 2nd,

2    1917 --

3                (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MS. COMEY:

2    Q.  You mean 2017?

3    A.  2017, yes.

4    Q.  In 2005, what was your title at the Palm Beach Police

5    Department?

6    A.  I was the crime scene manager and a sworn police officer.

7    Q.  Could you briefly explain what it is to be a crime scene

8    manager?

9    A.  The job that I had, the responsibilities, was to oversee

10   the operation of the fingerprint bureau, with a fingerprint

11   expert.  It was also to oversee the photography and video work

12   that was done, both in-car, in camera, and the still photos

13   that were taken on various crime scenes, not necessarily ones I

14   worked but ones that either patrol processed or people under me

15   processed.  And also I was in charge of the evidence unit, the

16   evidence department.  And we had regular inspections.  We were

17   an accredited agency and under CALEA.  And we did follow the

18   rules on that, and we were checked quite frequently on those

19   rules.

20   Q.  Thank you, Mr. Parkinson.

21           I'd like to direct your attention to October 20, 2005.

22           What, if any, search did you participate in that day?

23   A.  I participated in a search of a residence at 358 El Brillo

24   which is a street in the town of Palm Beach.

25           MS. COMEY:  Ms. Drescher, could we please pull up for

1    the witness, the Court and the parties Government Exhibit 721.

2    Q.  Mr. Parkinson, do you recognize this?

3    A.  I do.

4    Q.  What is it?

5    A.  This is a map --

6            THE COURT:  Sorry, Mr. Parkinson, I'm having a little

7    difficulty hearing you.  It's important to speak directly into

8    the mic, please.

9            THE WITNESS:  Yes, ma'am.

10           THE COURT:  Maybe point it a little more towards you.

11   Thank you.

12   A.  This is a map, an overview, or, as they say, an aerial

13   view, looking down, on the island of Palm Beach and also the

14   mainland of West Palm Beach.

15   Q.  Does this fairly and accurately depict the area surrounding

16   358 El Brillo Way in Palm Beach?

17   A.  Yes, it does.

18           MS. COMEY:  Your Honor, the government offers this in

19   evidence.

20           MR. EVERDELL:  No objection.

21           THE COURT:  GX 721 is admitted you may publish it.

22           (Government's Exhibit 721 received in evidence)

23           MS. COMEY:  Ms. Drescher, could you please publish

24   this for the jury.

25   Q.  Mr. Parkinson, what is signified by the red dot in about

LC3KMAX4                      Parkinson – Direct

1    the center right of the page?

2    A.   Based on my observation here, it would appear that that

3    would be the residence, 358 El Brillo.

4    Q.   Can you please just describe for us where Palm Beach is

5    situated relative to West Palm Beach, please?

6    A.   Palm Beach is east of West Palm Beach, and it is a long,

7    thin, what is known as a barrier island.

8    Q.   What is in between Palm Beach and West Palm Beach?

9    A.   The Intracoastal Waterway.

10          MS. COMEY:   We can take that down.   Thank you very

11   much, Ms. Drescher.

12   Q.   Mr. Parkinson, when you participated in a search of 358

13   El Brillo Way on October 20, 2005, was that the first time you

14   had been to that address, or had you been there before?

15   A.   I had been there one time before.

16   Q.   About what year was that?

17   A.   2003.

18   Q.   Can you briefly tell us why you were there?

19   A.   I was notified at the morning briefing that there had been

20   a report called in from that address of a theft of currency.

21   Q.   Thank you, Mr. Parkinson.

22          Did you go to 358 El Brillo Way after hearing that

23   report?

24   A.   Yes, I did.

25   Q.   Did you meet the owner of the residence?

1    A.  Yes, I did.

2    Q.  Who was that?

3    A.  Mr. Jeffrey Epstein.

4           MS. COMEY:  Ms. Drescher, would you please pull up

5    what's in evidence as Government Exhibit 112.

6    Q.  Mr. Parkinson, do you recognize the person in this

7    photograph?

8    A.  Yes, ma'am.

9    Q.  Who is that?

10   A.  Jeffrey Epstein.

11          MS. COMEY:  We can take that down.  Thank you,

12   Ms. Drescher.

13   Q.  Mr. Parkinson, what part of the residence at 358 El Brillo

14   Way did you personally observe when you were there in 2003?

15   A.  I met with the officer out on the street.  And we walked

16   back along the west side of the house, in between the house and

17   the pool, and we went to the southern edge of the house, and

18   turned left.  And there was a room called the garden room that

19   we walked through.  We felt that that may have been where the

20   entry point was made.  It was not a forced entry — apparently

21   the door was unlocked — and the perpetrator --

22   Q.  Mr. Parkinson, I'm going to ask you not to go into the

23   details of the investigation.  Just tell us the portions of the

24   residence that you personally observed, please.

25          THE COURT:  Could you state the date again?

1    MS. COMEY:  I believe the search was October 20, 2005,

2    and I believe what Mr. Parkinson is currently describing is in

3    the year 2003.

4    Q.  Do I have that right, Mr. Parkinson?

5    A.  Correct.

6    Q.  Okay.

7         So just to clarify the record, the incident we're

8    talking about now, when you first went to 358 El Brillo Way,

9    was that about two years before the execution of the search

10   warrant in 2005?

11   A.  Two years and 15 days.

12   Q.  Thank you, Mr. Parkinson.

13        Could you continue describing for us what part of the

14   residence you observed?  I think you were mentioning the garden

15   room.

16   A.  Yes.  There were three rooms that I went into.  The garden

17   room was where I entered — that was on the south side — passed

18   through the garden room into what was known as the lake room,

19   which was like an office and a library, and I also went into

20   the kitchen area.

21   Q.  Turning your attention back to October 20, 2005, what

22   authority did your team have to search 358 El Brillo Way that

23   day?

24   A.  We had a signed search warrant.

25   Q.  Based on your -- did you view, again, the garden room, the

1    lake room and the kitchen of 358 El Brillo Way during the

2    search on October 20, 2005?

3    A.  Yes, I did.

4    Q.  Based on your observations, did the furnishings and the

5    layout of those portions of the room appear unchanged?

6            Just the furnishings and the layout.

7    A.  The furnishings and the layout did appear to be the same,

8    to me.

9    Q.  What differences, if any, did you notice?

10   A.  It appeared as though there was about to be either

11   renovations or what perhaps new decorations, like wall --

12   carpet samples or --

13   Q.  Mr. Parkinson, you say it appeared there were about to be

14   those kinds of changes.

15           What did you observe that gave you that impression?

16   A.  Well, on one of the tables, a round table, there was

17   blueprints laid out on top of it, and also on the floor were

18   patches of cloth swatch that may have been either for curtains,

19   because there were a lot of windows in this case, or perhaps

20   flooring.

21   Q.  Stepping back, would you please describe how many

22   structures there were on the property of 358 El Brillo Way on

23   October 20, 2005?

24   A.  Insofar as concrete structures, there were three.  There

25   was also, like, a Ted's Shed, or metal shed, behind the cabana.

1    It's not really a structure; it's like a storage place.

2    Q.   Other than that storage place, could you describe what the

3    three structures were on the property, please?

4    A.   Yes.   The first one that I walked into was the main house

5    itself, two stories, facing north, the backyard was to the

6    south.

7            The second building that I went into, I really don't

8    have a name for it.   To me, it was a barracks.   It's where the

9    working staff stayed.   I think there were three rooms there.

10   It was a separate building disjoined from the main house.

11           And then there was a third building that went -- in

12   Florida, I don't know about up North, we call it a cabana, and

13   it was at the south end of a swimming pool, and it was a

14   gymnasium, basically.

15           MR. EVERDELL:   Your Honor, could we just clarify if

16   we're talking about 2003 or 2005 now, when he's describing the

17   property?

18           THE COURT:   Sure.

19   BY MS. COMEY:

20   Q.   That description you just gave, Mr. Parkinson, was that how

21   the property appeared on October 20, 2005?

22   A.   Yes.

23   Q.   Mr. Parkinson — I just want to be clear — all of the rest

24   of the questions I'm going to be asking you today will be about

25   October 20, 2005.   Okay?

1    A.  Yes.

2           MS. COMEY:  Ms. Drescher, I'd like to show the

3    witness, the parties, and the Court now Government Exhibits 201

4    through 222.  I'd like to flip through those on the screen

5    slowly for the witness.

6    Q.  Mr. Parkinson, as you look at those, my question is just:

7    Do you recognize them?

8    A.  I do recognize --

9    Q.  Mr. Parkinson, we're going to flip through 201 through 222,

10   just look at them, and then at the end I'll ask you my

11   question.

12          (Pause)

13   Q.  Mr. Parkinson, having now reviewed Government Exhibits 201

14   through 222, do you recognize them?

15   A.  Yes.

16   Q.  What are they?

17   A.  These are photos of the exterior of the residence, and

18   the --

19   Q.  Do these exhibits fairly and accurately depict different

20   portions of the exterior of the property at 358 El Brillo Way,

21   as it appeared on or about October 20, 2005?

22   A.  True.

23          MS. COMEY:  Your Honor, the government offers these in

24   evidence to the extent some of them aren't already.

25          MR. EVERDELL:  No objection.

1          THE COURT:  Thank you.  GX 201 through 222 are

2    admitted.  And you may publish.

3          (Government's Exhibits 201 through 222 received in

4    evidence)

5          MS. COMEY:  Thank you, your Honor.

6    BY MS. COMEY:

7    Q.  I want to walk through a subset of these.  Let's talk about

8    Government Exhibit 202.

9          Mr. Parkinson, can you tell us what we're looking at

10   here?

11   A.  Yes.  You are standing at the entrance to the driveway,

12   which is located on the east side of the property, and it shows

13   a garage, which is attached to the main house, and also to the

14   left is the barracks.

15         MS. COMEY:  Let's go now to Government Exhibit 206,

16   please, Ms. Drescher.

17   Q.  Mr. Parkinson, what do we see here?

18   A.  This is a patio, you're standing south looking north, and I

19   believe this leads into the kitchen.

20         MS. COMEY:  Let's go now to Government Exhibit 209,

21   please.

22   Q.  Can you tell us what we see here?

23   A.  Yes.  This is -- you're standing east and looking west.

24   The building on the right is actually the garden room, first

25   floor.  There's an edge of a building on the far left, which is

LC3KMAX4                        Parkinson - Direct

1    the cabana.

2             MS. COMEY:  Let's go now to Government Exhibit 212,

3    please.

4    A.  You're standing south, looking somewhat northwest, and this

5    is the pool area.  The cabana would be behind me to the left,

6    and the -- actually, part of the garden room and the lake room

7    is the partial structure to the right of the three palm trees

8    on the right.

9    Q.  What is the little bit of blue we see just above the pool,

10   through the trees?

11   A.  That is the Intracoastal Waterway.

12             MS. COMEY:  Let's go now to Government Exhibit 214,

13   please.

14   Q.  What do we see here?

15   A.  This shows the west side of the residence, both the lower

16   floor and upper floor.  The right, larger, windows, is the

17   garden room.  The left six sliding glass door windows is the

18   lake room.

19             MS. COMEY:  We can go to Government Exhibit 217,

20   please.

21   Q.  Mr. Parkinson, what do we see here?

22   A.  You're standing north, looking south across the pool, and

23   also at the cabana.

24             MS. COMEY:  Let's go to Government Exhibit 219,

25   please.

1    Q.   What do we see here?

2    A.   This is actually the very front of the house.  You're

3    standing to the northwest, looking to the southeast.

4         MS. COMEY:  We can take this down.  Thank you,

5    Ms. Drescher.

6    Q.   Mr. Parkinson, what was your role in the search on

7    October 20, 2005, at 358 El Brillo Way?

8    A.   On that morning, my role was to record the reading of the

9    search warrant, and also to do a very quick search of the

10   residence to see if there was any other persons in there, for

11   officer safety purposes, and then to supervise, if necessary,

12   and also participate in evidence collection, should that be

13   necessary.

14   Q.   Who else from the Palm Beach Police Department do you

15   remember participating in the October 20, 2005, search?

16   A.   There were a number of people.  The main one was Detective

17   Joseph Recarey, now deceased, Sergeant Mike Dawson was present.

18   Q.   Were there others whose names aren't coming to mind right

19   now?

20   A.   Detective Sandman was present.

21   Q.   And Mr. Parkinson, without going through the rest, were

22   there other members of the Palm Beach Police Department there?

23   A.   There were.

24   Q.   You mentioned doing a protective sweep of the house.

25        During that sweep, who, if anyone, did you see in the

LC3KMAX4                          Parkinson - Direct

1   house?

2   A.   Joseph Recarey, myself, and I believe Sergeant Dawson,

3   Captain Crowell.  We went through to check all the rooms, make

4   sure no one else was in there.

5   Q.   Was anyone else in the house?

6   A.   No.

7   Q.   Was there anyone at the house when your team arrived?

8   A.   Yes.

9   Q.   Who was that?

10  A.   The property manager, Mr. Janusz --

11  Q.   Do you remember his last name?

12  A.   I do.  Banasiak.

13  Q.   After you completed the protective sweep and the reading of

14  the search warrant, what did you do next?

15  A.   I made a videotape, walking through the house, showing it

16  as it was, in the condition it was, at the time prior to the

17  search.

18  Q.   After you finished making that video prior to the search,

19  what did your team do?

20        What did your evidence collection team do after the

21  video was finished?

22  A.   There was a series of still photographs that were taken,

23  and then the search took place, and then we had one of the team

24  members that was actually marking down the evidence itself and

25  where it was from -- or where it was found.

LC3KMAX4                         Parkinson - Direct

1   Q.  After all of the evidence was collected, did you do one

2   final video at the end of the search?

3   A.  True.

4   Q.  What was that?

5   A.  I walked through showing that the police department did not

6   damage anything, and that the house was left in substantially

7   the same condition.

8           MS. COMEY:  Your Honor, I think now might be an

9   appropriate time for a lunch break, if possible.  We need to

10  deal with some of the technical issues.

11          THE COURT:  We don't have it yet, so keep going.

12  Maybe skip to something else.

13          MS. COMEY:  Ms. Drescher, could we please pull up

14  what's been marked for identification as Government Exhibit --

15  before we do that:

16  Q.  Mr. Parkinson, at the end of the search on October 20,

17  2005, what did the Palm Beach Police Department team do with

18  all of the evidence that had been seized?

19  A.  We transported it back to headquarters.

20  Q.  Is that the Palm Beach Police Department's headquarters?

21  A.  It is.

22  Q.  To what other law enforcement agency, if any, was that

23  evidence later transferred?

24  A.  It was all transferred to the Federal Bureau of

25  Investigation.

1    Q.  About what year was that?

2    A.  I think around 2006.

3    Q.  Were you present for that evidence transfer?

4    A.  Yes, I was.

5    Q.  What happened that day?

6    A.  The FBI called and said they wanted to pick it up.  We said

7    we'd have it ready for them.  They sent a vehicle over.  And we

8    formed a human chain, my office personnel did, and we

9    transported each item of evidence to the agent that was on the

10   scene, and we packed it in their vehicle.  And they signed for

11   it, and it was gone.

12        MS. COMEY:  Ms. Drescher, I'd now like to pull up,

13   please, what's marked for identification as Government Exhibit

14   264 through 268.  Can we please flip through those just for the

15   witness, the Court, and the parties.

16   Q.  And, Mr. Parkinson, my question for you will be:  Do you

17   recognize these?

18   A.  I do.

19   Q.  One more.

20        Having now seen all of these, do you recognize them?

21   A.  Yes, I do.

22   Q.  What are they?

23   A.  These are areas of the kitchen.

24   Q.  Are these fair and accurate depictions of the kitchen

25   inside 358 El Brillo Way as it appeared on October 20, 2005?

1    A.   True.

2              MS. COMEY:  Your Honor, the government offers these

3    exhibits in evidence.

4              MR. EVERDELL:  No objection.

5              THE COURT:  GX 264 through 268 are admitted.

6              (Government's Exhibits 264 through 268 received in

7    evidence)

8              MS. COMEY:  Ms. Drescher, would you please -- excuse

9    me.  May I publish, your Honor?

10             THE COURT:  You may.

11             MS. COMEY:  Ms. Drescher, would you please publish

12   Government Exhibit 264.

13   Q.   Mr. Parkinson, what do we see here?

14   A.   You are standing in the northeast corner of the kitchen,

15   looking towards the southwest.  There's an island with books,

16   stove and other kitchen appliances on top.

17   Q.   Let's go now, please, to Government Exhibit 265.

18             Is this the same room from a different angle?

19   A.   It is.  You're more closely aligned with being at the east,

20   looking to the west.

21             MS. COMEY:  Let's go to 266, please.

22   Q.   What do we see here?

23   A.   This is part of the kitchen, as well, and you are aligned

24   standing to the southeast, looking to the northwest.

25             MS. COMEY:  Let's go to 267, please.

1    Q.  What do we see here?

2    A.  This is a work area for notes and, apparently, cookbooks,

3    and you are standing somewhat to the north, looking to the

4    south.

5            MS. COMEY:  Ms. Drescher, could you please zoom in on

6    the center right part of this photograph.

7    Q.  Would you please read aloud the words we see here,

8    Mr. Parkinson?

9    A.  "Jeffrey E. Epstein."

10           MS. COMEY:  We can take that down.  Thank you.

11   Q.  I'd like to now show you what's been marked for

12   identification as Government Exhibits 223 through 241.

13           THE COURT:  Actually, Ms. Comey, we do have the lunch

14   now, so we can break.

15           MS. COMEY:  That would be much appreciated, your

16   Honor.

17           THE COURT:  Okay.

18           Members of the jury, enjoy your lunch.  We'll see you

19   in about 45 minutes to an hour.  Thank you.

20           (Continued on next page)

21

22

23

24

25

1           (Jury not present)

2           THE COURT:  Mr. Parkinson, you may exit for the lunch

3     break.  Thank you.

4           THE WITNESS:  Thank you, your Honor.

5           (Witness temporarily excused)

6           THE COURT:  Everyone may be seated.

7           Are there matters to take up, counsel, before the

8     break?

9           MS. COMEY:  Not before the break, your Honor.  I think

10    we'll confer with defense counsel with the limiting

11    instruction, and we'll deal with the technical preparations

12    during the lunch break, and then raise any issues with your

13    Honor closer to the restart.

14          THE COURT:  Okay, yes, you'll confer on the limiting

15    instruction and when it will be given?

16          MS. COMEY:  Yes, your Honor.

17          THE COURT:  And let me know if you have disagreement

18    as to any of that.  And you will work out the tech.

19          Mr. Everdell?

20          MR. EVERDELL:  I think we can confer, your Honor.

21          THE COURT:  Okay.  Anything to take up?

22          MR. EVERDELL:  No.

23          THE COURT:  Thank you.

24          So we'll resume in 45.  Thank you.

25          MS. COMEY:  Thank you, your Honor.

LC3KMAX4                          Parkinson – Direct

1              (Luncheon recess)

2                            AFTERNOON SESSION

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

AFTERNOON SESSION

1:40 PM

(Trial resumed)

(In open court; jury not present)

THE COURT:  Matters to take up?

MR. EVERDELL:  Your Honor, we've conferred with the government on the matter of the limiting instruction, and, well, I think this is a case where the cure is worse than the disease.  So, although we maintain our objection, I think a limiting instruction wouldn't be productive, from our standpoint, as just highlighted, so we are going to withdraw our request for the limiting instruction.

THE COURT:  Okay.  For the record, what was the proposed limiting instruction?

MS. COMEY:  As to the video, we proposed:  "The video you are watching contains a depiction of a very young minor. You should not infer from this photo that Mr. Epstein had a sexual attraction to minors as young as the girl depicted in that photo.  You also may not consider this evidence as any kind of reflection on Ms. Maxwell's character or propensity to commit any of the crimes charged in the indictment.  However, to the extent you conclude that the evidence is relevant to the issues before you, you can consider it."

And the limiting instruction as to Government Exhibit 250, the photo, was as follows:  "You are about to see a photo

1   containing a depiction of a very young minor.  You should not

2   infer from this photo that Mr. Epstein had a sexual attraction

3   to minors as young as the girl depicted in this photo.  You

4   also may not consider this evidence as any kind of reflection

5   on Ms. Maxwell's character or propensity to commit any of the

6   crimes charged in the indictment.  However, to the extent you

7   conclude that the evidence is relevant to the issues before

8   you, you can consider it."

9            THE COURT:  Okay.  And the defense's request is not to

10  give it because you don't want to highlight the photo that

11  otherwise might be just in passing and so, rather, your request

12  is not to give the instruction?

13           MR. EVERDELL:  That's correct, your Honor.

14           THE COURT:  Okay.

15           What else?

16           MS. COMEY:  Your Honor, I just wanted to note that,

17  after conferring, the parties have agreed to offer a redacted

18  version of Government Exhibit 296, which is the video.  The

19  portion we've agreed to redact is a portion at the beginning

20  where Detective Recarey reads aloud the entire search warrant

21  for several minutes.  So we have redacted that from the version

22  that we will ask be accepted into evidence and that we will

23  actually play for the jury.

24           THE COURT:  Okay.

25           What else?

1    MS. MENNINGER:  Your Honor, there are two witnesses

2    that are slated to appear later this afternoon, if we get to

3    them.  Those would be Kimberly Meder and Stephen Flatley.

4    There are some issues related to 3500 material and opinions

5    that were disclosed after midnight last night to us.  I don't

6    think we need to raise them now because I'm not entirely clear

7    we will even reach those witnesses, but if we are moving

8    quickly this afternoon, I would ask for time before your Honor,

9    at the break perhaps, the mid-afternoon break, to address some

10   of those concerns we have.

11             THE COURT:  Okay.

12             MS. MENNINGER:  Thank you.

13             THE COURT:  Thank you.

14             So we'll get to Parkinson.  Will we get to Maguire

15   before the break?

16             MS. COMEY:  I doubt it, your Honor.

17             THE COURT:  Okay.  So we can take up the objected-to

18   900 series then?  Is that the right witness?

19             MS. MOE:  Yes, your Honor.  Thank you.

20             THE COURT:  Okay.

21             If there's nothing --

22             MS. COMEY:  Your Honor, I should note that with

23   respect to the video, we have turned the jurors' screens in the

24   jury box — and I thank the courthouse staff and your Honor's

25   deputy for their help in accomplishing this — but we will just

1    need to ask the members of the jury to move their chairs over

2    so that they can see the screens, the way that they are angled.

3             THE COURT:  Okay.

4             I'll note, as they come in, that we've adjusted the

5    screens so that the gallery can't see something we're going to

6    show them; they should adjust their seats so they can see.

7             I know there's a concern that someone walking in may

8    be able to see them.  I'm not going to lock the courtroom down

9    for half an hour.  So if you have a different proposal, I'm

10   happy to hear it.

11            MS. COMEY:  No, your Honor, that's not our request.

12            THE COURT:  Okay.

13            So you're comfortable with how we're proceeding?  It

14   protects the privacy of the individuals who are depicted in the

15   video?

16            MS. COMEY:  I am, your Honor.  And I thank your

17   Honor's courthouse staff and chambers' staff and defense

18   counsel for their assistance in preparing for this video to be

19   played.

20            THE COURT:  Okay.  Thank you.

21            We'll bring in the jury.

22            MR. EVERDELL:  Your Honor, just quickly, before cross,

23   we'll deliver the binder to the witness --

24            THE COURT:  Sorry.  You can line up the jury.

25            MR. EVERDELL:  Just a choreography question, your

1    Honor:  Similar to before, before cross begins, we will hand up

2    a binder to the witness on the stand?

3              THE COURT:  Okay, yes, that's fine.  And you will

4    direct the government -- do you have an extra copy of the

5    binder so I can have it?

6              MR. EVERDELL:  We've been relying on the screens for

7    your Honor, but if you like, we can -- well, I don't have one

8    right now but I can probably make one pretty quickly.

9              THE COURT:  We'll do the screens.  I prefer paper.

10             MR. EVERDELL:  There are not that many for this

11   witness, but why don't we give you a paper copy.

12             THE COURT:  Fine.

13             Ms. Comey, you confirmed with courthouse staff that

14   when you're showing the video, the screens in the overflow

15   courtrooms will also not show the video, correct?

16             MS. COMEY:  Yes, your Honor.  We checked and played

17   the video in here, in this courtroom, and checked to see that

18   it will not play in the overflow courtroom, and everything

19   seemed to be working the way we want it to.

20             THE COURT:  Okay.  Thank you.

21             I'll just make sure that, once the video is completed,

22   that the screens are returned so that members of the public can

23   see the published exhibits?

24             MS. COMEY:  Absolutely, your Honor.  I think that

25   there may be a couple minutes' pause while we turn things back

LC3KMAX4                        Parkinson – Direct

1    on and adjust the courtroom, but, yes, that is the plan.

2              THE COURT:  Thank you.

3              We should bring the witness back.

4              MS. COMEY:  Yes, your Honor.

5              THE COURT:  You may come forward, Mr. Parkinson.

6    Thank you.

7              THE WITNESS:  Thank you, your Honor.

8              THE COURT:  You may take your seat and remove your

9    mask while we wait for the jury.  Thank you.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  I hope everyone had a nice lunch.  Thank

3    you, members of the jury.

4          Ms. Comey, you may resume your direct examination of

5    Mr. Parkinson.

6          And I do remind you, Mr. Parkinson, that you are under

7    oath.

8          THE WITNESS:  Thank you, your Honor.

9          THE COURT:  Go ahead.

10         MS. COMEY:  Thank you, your Honor.

11         Before I resume, there was the matter of instructing

12   certain jurors to move --

13         THE COURT:  Oh, yes.

14         Members of the jury, there will be a video shown that

15   we are not showing to the gallery, so your screens were

16   adjusted a little.  You can keep your screens where they are

17   but adjust your chair.  So return your screens if you moved

18   them and adjust your chair so that you can see your screens, if

19   you would.

20         That's great.  That will count as our exercise for the

21   day.  Thank you.  Thank you, everyone.

22         Go ahead, Ms. Comey.

23         MS. COMEY:  Thank you, your Honor.

24         (Continued on next page)

25

1    GREGORY PARKINSON, resumed.

2    DIRECT EXAMINATION CONTINUED

3    BY MS. COMEY:

4    Q.  Good afternoon, Mr. Parkinson.

5    A.  Good afternoon, ma'am.

6    Q.  I believe in front of you is an item marked for

7    identification as Government Exhibit 296.

8             Do you see that?  In front of you to the left.

9    A.  Oh.  Yes.

10   Q.  Do you see that disk right there?

11   A.  I do.

12   Q.  Do you recognize that?

13   A.  I do.

14   Q.  What is it?

15   A.  It is a compact disk — I'm going to call it a CD — which

16   has Government Exhibit label of 296.

17   Q.  Did you review the contents of that CD before coming to

18   testify here today?

19   A.  Yes, I did.

20   Q.  What is on that CD?

21   A.  This is a CD of the reading of the search warrant, and then

22   the search of the building for other live persons, and then the

23   follow-up conclusion of the search process, showing there was

24   no damage to the residence.

25   Q.  In other words, does it contain your walk-through video of

1   the October 20, 2005, search of 358 El Brillo Way?

2   A.  True.

3   Q.  Does the video on that CD fairly and accurately depict the

4   interior and exterior of 358 El Brillo Way as it appeared on

5   October 20, 2005?

6   A.  True.

7           MS. COMEY:  Your Honor, the government offers a

8   redacted version of this exhibit in evidence, marked as 296R.

9           MR. EVERDELL:  With the agreed-upon redactions, your

10  Honor, no objection.

11          THE COURT:  Thank you GX 296R is admitted.

12          (Government's Exhibit 296R received in evidence)

13          MS. COMEY:  Your Honor, I would ask that this exhibit

14  be received under seal, both to protect witnesses who have been

15  permitted to testify under pseudonym and to protect the privacy

16  of third parties who are depicted in this exhibit.

17          THE COURT:  Without objection, Mr. Everdell?

18          MR. EVERDELL:  No objection.

19          THE COURT:  It is admitted under seal for the reasons

20  you've indicated.  Thank you.

21          MS. COMEY:  Thank you, your Honor.

22          May we publish just to the jury and the parties and

23  the Court?

24          THE COURT:  Yes.

25          MS. COMEY:  Ms. Drescher, I'm going to ask you to

1     please play Government Exhibit 296, and I'll ask you to play it

2     for 30 seconds and then pause.

3     Q.  Pausing at 30 seconds, Mr. Parkinson, what part of the

4     search are we seeing on this video?

5     A.  This is the -- our ground floor, coming from the south to

6     the north, and going through the central lobby area to where

7     the stairwell is leading to the second floor.

8     Q.  What was happening at this point in the video?

9     A.  This was the initial search for any other persons that may

10    have been in the residence, officer safety.

11    Q.  Thank you.

12          MR. EVERDELL:  We can play it for another about eight

13    seconds, Ms. Drescher.

14          Pause it here, please, Ms. Drescher, at 37 seconds.

15    Q.  What is being shown here, Mr. Parkinson?

16    A.  This is the first and formal reading of the contents of the

17    search warrant to the property manager.

18    Q.  Is that the property manager whose name you told us

19    earlier?

20    A.  Yes.  Mr. Janusz Banasiak.

21          MS. COMEY:  For the rest of this video, I think it

22    might be useful to refer to what is in evidence as Government

23    Exhibit 298, your Honor.  With your permission, I'd ask that

24    the jurors please be permitted to take out their binders and

25    look at Government Exhibit 298.

1    THE COURT:  Just a moment.

2    GX 298 has been admitted?

3    MS. COMEY:  Yes.

4    THE COURT:  Without objection, Mr. Everdell?

5    MR. EVERDELL:  Without objection.

6    THE COURT:  All right.

7    Jurors, you may pick up your binders and look at GX

8    298.

9    MS. COMEY:  Thank you, your Honor.

10   We can play it, please, Ms. Drescher.

11   (Pause)

12   Q.  Now, as this is playing, at 46 seconds and continuing,

13   Mr. Parkinson, what part of the search is this video depicting?

14   A.  This is on the east side of the residence, ground floor,

15   approaching from west to east.

16   Q.  Is this now the walk-through video that you talked about

17   earlier?

18   A.  Yes.

19   Q.  Now, at 1 minute and 15 seconds, what part of the property

20   are we entering?

21   A.  We are in the garage -- the three-car garage located on the

22   first floor, east side of the dwelling.

23   Q.  And now we're at one minute and 55 seconds.  Mr. Parkinson,

24   what part of the main residence are we in now?

25   A.  The ground floor, the south side, and it's relatively in

LC3KMAX4                    Parkinson – Direct

1   the middle of the dwelling.

2   Q.  Which room are we in?

3   A.  The kitchen.

4   Q.  That yellow room we see straight ahead, what room is that?

5   And this is at two minutes and 54 seconds.

6   A.  The formal dining room.

7   Q.  And now at three minutes and six seconds, what room are we

8   walking into?

9   A.  That is the dining room.  Front door.

10  Q.  Now, at three minutes and 44 seconds, what room are we

11  walking into?

12  A.  This is known as the garden room.

13  Q.  What are we looking at at four minutes and 33 seconds?

14  A.  You're looking west, standing east, looking at the pool and

15  the Intracoastal Waterway.

16  Q.  What do we see here at 5:05?

17  A.  That was a picture of Pope John Paul with Jeffrey Epstein.

18  Q.  What room are we walking into now?

19  A.  This room is known as the lake room because of its view to

20  the lake to the west.

21  Q.  What do we see in the top right at five minutes and 43

22  seconds?

23  A.  That is a picture of Fidel Castro with Jeffrey Epstein.

24          THE COURT:  Can you pause for a moment.

25          MS. COMEY:  Please pause, Ms. Drescher, at 6:20.

1           (Pause)

2           THE COURT:  Apparently, the video is visible on

3    Ms. Drescher's laptop, and I can see folks looking at it.

4           MS. COMEY:  The way I'll proceed, your Honor, is I

5    won't ask Ms. Drescher to pause, I'll ask my questions as the

6    video plays, and I will ask Ms. Drescher to please just close

7    down her laptop and press play.

8           All right.  We can resume.  Thank you.

9           May we pause again, Ms. Drescher, please, at six

10   minutes and 31 seconds.

11          MS. STERNHEIM:  Judge, would it be all right if I just

12   move so I can watch the screen?

13          THE COURT:  Of course.  I thought you weren't going to

14   pause.  You are --

15          MS. COMEY:  I apologize, your Honor.  I paused because

16   I saw Ms. Sternheim raising her hand to you, and I wanted her

17   to be able to speak.

18          MS. STERNHEIM:  Sorry.

19          THE COURT:  No, no, that's fine.  I want you to be

20   able to see.

21          MS. COMEY:  Ms. Drescher, can we please play it at six

22   minutes and 31 seconds.  Thank you.

23   Q.  Now, at seven minutes and eight seconds, what do we see

24   here?

25   A.  Architectural drawings.

1  Q.   Now, at seven minutes and 20 seconds, what are we seeing on

2  the floor?

3  A.   These are various swatches of material.

4  Q.   Those items we just discussed, are those the items that led

5  you to believe that there might be some renovations coming up

6  in this property?

7  A.   True.

8  Q.   Now, at seven minutes and 49 seconds --

9         MS. COMEY:   Excuse me, withdrawn.

10 Q.   At eight minutes and five seconds, what room are we in?

11 A.   This is the garden room.   You're standing west, looking

12 east.

13 Q.   Now, eight minutes and 17 seconds, what room are we in?

14 A.   This is the lake room.

15 Q.   Now, eight minutes and 25 seconds, what room are we

16 entering now?

17 A.   This is the foyer of the front door.

18 Q.   At nine minutes and 19 seconds, what room are we walking

19 into?

20 A.   This is the bathroom.

21        THE COURT:   I need you to pause again.

22        MS. COMEY:   Ms. Drescher, would you please pause.

23        THE COURT:   They want to adjust the monitor at your

24 lectern.

25        MS. COMEY:   Of course.   Thank you, your Honor.

LC3KMAX4                    Parkinson – Direct

1              (Pause)

2              MR. EVERDELL:  Your Honor, then I think I'm going to

3    shift over here.

4              THE COURT:  Of course.  Thank you, Mr. Everdell.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LC3Cmax5                          Parkinson - direct.

1              MS. COMEY:  May I resume?

2              THE COURT:  You may.

3              MS. COMEY:  Playing at 9:29, Ms. Drescher.

4    BY MS. COMEY:

5    Q.  At 9:52, what room are we walking into?

6    A.  This is on the north side, you're standing to the south,

7    and that is a computer room.  This is the wall with the keys

8    that is up against the east side of the building, which would

9    be the garage right behind it.

10   Q.  Mr. Parkinson, have you reviewed diagrams of this property?

11   A.  I have.

12   Q.  On that diagram, is this room we're in right now referred

13   to as the staff room?

14   A.  Yes, it is.

15   Q.  At 11:42, what are we seeing here?

16   A.  You are looking from east -- from west to east, and this is

17   an elevator.

18             MS. COMEY:  Your Honor, I won't pause it, but at this

19   point I think it would be useful for the jurors to turn one tab

20   over to what's already in evidence as Government Exhibit 297.

21             THE COURT:  Mr. Everdell, without objection?

22             MR. EVERDELL:  No objection.

23             THE COURT:  The jurors may look at GX297.

24   Q.  Mr. Parkinson, what floor of the house are we on now?

25   A.  This is the second floor.

LC3Cmax5                          Parkinson - direct.

1    Q.  What do we see here at 12:40?

2    A.  This is a stairwell that is on the east side of the house,

3    first floor to second, second floor to first.  It abuts the

4    elevator.

5    Q.  Now at 18:50, are we coming back out to the top of the

6    staircase in the second floor?

7    A.  True.

8    Q.  What are we facing here at 19:09?

9    A.  This is a room which is a bit like a hallway which leads to

10   the master bedroom.  You're standing east looking west.

11   Q.  What room are we walking into now at 19:50?

12   A.  The master bedroom.

13   Q.  What does that door lead to at 20:06?

14   A.  One of the two master baths.

15   Q.  What room are we walking into now at 20:29?

16   A.  The north side second floor master bath.

17   Q.  Now what room are we walking back into now at 21:10?

18   A.  Master bedroom walking east to west.

19   Q.  What room have we jumped back to now at 21:20?

20   A.  This is the north master bathroom.

21   Q.  At 21:35, what room are we in?

22   A.  The master bedroom.  We're turning to the southwest.

23   Q.  What do we see through that doorway at 22:06?

24   A.  This is the south-side second-floor master bedroom, master

25   shower.

1  Q.  Now at 24:15, what part of the property are we on now?

2  A.  This is the west side, southwest area, and this is the

3  cabana for the pool.

4  Q.  Now at 28:01, where are we looking?

5  A.  We're looking north from the south.  This is actually out

6  north and you're looking west-southwest here.

7  Q.  At 28:52, what part of the property are we looking at?

8  A.  This is the cabana.  It's on the west side.

9  Q.  At 29:08, what is that pink structure to the right?

10  A.  That is the storage building.

11  Q.  Now at 30:06, what part of the property are we on now?

12  A.  I believe this is the -- what we call the barracks.

13  Q.  Now at 39:14, are we walking back out of the barracks?

14  A.  True.

15  Q.  Is that the conclusion of your walk-through video?

16  A.  True.

17  Q.  At 19:31, this is the beginning of the exit video?

18  A.  True.

19        MS. COMEY:  We can stop there and take that down.

20  That will conclude our watching of this particular video.

21        THE COURT:  Okay.  We can resume the public access to

22  the evidence monitors?

23        MS. COMEY:  Yes.  Thank you, your Honor.

24        THE COURT:  Members of the jury, if you want to

25  readjust your monitors, make sure you can see, you're welcome

LC3Cmax5                        Parkinson - direct.

1   to do so.

2            MS. COMEY:  Your Honor, I would note, I am going to

3   ask for permission for the jurors to --

4            THE COURT:  Can't hear you.

5            MS. COMEY:  I am going to ask for the permission for

6   the jurors to look in their binders again during this next

7   piece of testimony.  So if they don't want to put them away,

8   they might want to keep them out.

9            THE COURT:  Their choice.  You can proceed, Ms. Comey.

10           MS. COMEY:  Thank you, your Honor.  I think we're just

11  checking to make sure the defense monitors are up and running.

12           Thank you, your Honor.

13  BY MS. COMEY:

14  Q.  Mr. Parkinson, I believe there is a binder at your podium.

15  Do you have that?

16  A.  True.

17  Q.  I'd like to talk about a few exhibits, please.  Starting

18  with Government Exhibits 223, 224, and 225, I'd ask that just

19  the witness turn to those.

20  A.  I'm on 223.

21  Q.  Then please flip to 224 and next to 225, and let me know

22  when you've done that, please.

23  A.  I have done it.

24  Q.  Do you recognize those?

25  A.  I do.

LC3Cmax5                          Parkinson - direct.

1    Q.  What are they?

2    A.  Photographs.

3    Q.  Are these fair and accurate depictions of a portion of the

4    garden room in 358 El Brillo Way as it appeared on October

5    20th, 2005?

6              MR. EVERDELL:  Objection.  Leading.

7              THE COURT:  Sustained.

8    A.  True.

9              THE COURT:  Sustained.  Jury will disregard the

10   answer.  Rephrase the question.

11   Q.  Mr. Parkinson, what are these three exhibits?

12   A.  These are photographs that were in the garden room.

13   Q.  Of what property?

14   A.  The 358 Brillo.

15   Q.  Are these fair and accurate depictions of that portion of

16   that property as they appeared on October 20th, 2005?

17   A.  True.

18             MS. COMEY:  Your Honor, the government offers these

19   exhibits in evidence under seal to protect the privacy of third

20   parties depicted therein.

21             MR. EVERDELL:  No objection.

22             THE COURT:  Can you give me the exhibit numbers again?

23             MS. COMEY:  223, 224, and 225, your Honor.

24             THE COURT:  GX223, 224, 225 are admitted under seal

25   for the reasons indicated.

LC3Cmax5                         Parkinson - direct.

1           (Government's Exhibits 223, 224, 225 received in

2    evidence)

3           MS. COMEY:  Thank you, your Honor.  I you would now

4    ask for permission to have the jurors turn to Government

5    Exhibit 223.

6           THE COURT:  Okay.  Mr. Everdell.

7           MR. EVERDELL:  No objection, your Honor.

8           THE COURT:  Turn to GX223 in your binder.

9           MS. COMEY:  I'm going to pause for a moment for the

10   jurors to view that.  Your Honor, I'd now ask for permission

11   for the jurors to turn to Government Exhibit 224.

12          THE COURT:  Okay.  Mr. Everdell?  Without objection,

13   you may look at 224.

14          MS. COMEY:  Now I would ask for permission for jurors

15   to turn to Exhibit 225, please.

16          THE COURT:  Mr. Everdell, without objection, jurors

17   may look at 225?

18          MR. EVERDELL:  No objection, your Honor.

19          THE COURT:  Please, jurors, GX225.  Okay.

20          MS. COMEY:  Thank you.  I will be referring back to

21   the binder, so I ask the jurors be permitted to keep them, if

22   they wish.

23   BY MS. COMEY:

24   Q.  Mr. Parkinson, I'm now going to show you exhibits marked

25   for identification as Government Exhibits 226 through 241 --

LC3Cmax5                        Parkinson - direct.

1      THE COURT:  Actually, for simplicity, let's have the

2 jurors put the binders under the chair until they're directed

3 to look at something in particular.

4      MS. COMEY:  Okay, your Honor.  Thank you.

5 Q.  Do you have exhibits 226 through 241 in the binder in front

6 of you, Mr. Parkinson?

7 A.  I do.

8 Q.  And have you reviewed those, 226 through 241?

9 A.  No, I was only taking inventory.

10 Q.  Would you please review all of those and then let us know

11 when you've finished.

12 A.  I'm ready.

13 Q.  Do you recognize those?

14 A.  I do.

15 Q.  What are they?

16 A.  These are photographs of the interior of the house, the

17 ground floor, mostly in the garden room and lake room,

18 partially in the hallway to the center part of the house

19 looking from east to west into the lake room.

20 Q.  Do these exhibits fairly and accurately depict portions of

21 the interior of the main house at 358 El Brillo Way as it

22 appeared on October 20th, 2005?

23 A.  They do.

24      MS. COMEY:  Your Honor, the government offers these

25 into evidence and ask that 234 be under seal both with your

LC3Cmax5                              Parkinson - direct.

1   Honor's order about witnesses testifying under pseudonym and to

2   protect the privacy of third parties.  And also as to

3   Government Exhibit 241, I'd ask that it be under seal to

4   protect the privacy of third parties.

5            THE COURT:  So give me the range again, please.

6            MS. COMEY:  I'm offering Government Exhibits 226

7   through 241, and I'm asking that 234 and 241 be accepted under

8   seal.

9            THE COURT:  Okay.

10           MR. EVERDELL:  No objection, your Honor.

11           THE COURT:  GX226 through 241 are admitted.  Exhibit

12  234 and 241 are admitted under seal consistent with my ruling

13  regarding witnesses testifying under pseudonym.

14           (Government's Exhibits 226 to 241 received in

15  evidence)

16           MS. COMEY:  Thank you, your Honor.  May we publish the

17  unsealed exhibits?

18           THE COURT:  Yes.

19           MS. COMEY:  Thank you.  Ms. Drescher, I'd ask to pull

20  up now Government Exhibit 226.

21  BY MS. COMEY:

22  Q.  Mr. Parkinson, can you tell us what this is?

23  A.  Yes, this is in the garden room.  You're standing north and

24  looking to the south.

25           MS. COMEY:  Can we go now, please, Ms. Drescher, to

LC3Cmax5                         Parkinson - direct.

1    227.

2    Q.  Mr. Parkinson, what do we see here?

3    A.  This, again, is in the lake room and you're standing on the

4    east side looking towards the west.

5          MS. COMEY:  I'd like to jump now please, Ms. Drescher,

6    to Government Exhibit 235.

7    Q.  What do we see here?

8    A.  You are standing in the entrance to the foyer, the front

9    door, which is partially opened, and the stairwell, and you're

10   looking east standing on the first floor.

11         MS. COMEY:  Ms. Drescher, could we please pull up

12   Government Exhibit 236.

13   Q.  What is this?

14   A.  I believe this is a view looking from the north to the

15   south.

16         MS. COMEY:  I'd like to now go, please, to Government

17   Exhibit 228, please.

18   Q.  What do we see here?

19   A.  This is a view from the garden room standing at the

20   northeast -- southeast, rather, looking towards the northwest.

21   The room that you're actually looking in is called the lake

22   room.

23         MS. COMEY:  Let's go now to Government Exhibit 231,

24   please.

25   Q.  What do we see here?

LC3Cmax5                              Parkinson - direct.

1   A.   This is standing on the first floor and looking to the --

2   or down a hallway, and I believe you're looking to the

3   northwest.

4             THE COURT:  I'm sorry.  I can't hear you,

5   Mr. Parkinson.

6   A.   Looking, I believe, to the northwest.

7             MS. COMEY:  Your Honor, I would now like to ask

8   permission, while we keep this up on the screen, to have the

9   jurors turn in their binders to Government Exhibit 255.

10            THE COURT:  Mr. Everdell, 255 is admitted already?

11            MR. EVERDELL:  It is not, I believe.

12            THE COURT:  Please close your binders.

13            MS. COMEY:  I apologize, your Honor.  I apologize,

14   your Honor.  I wanted to have the witness look at 255.

15            THE COURT:  Okay.  The witness may look at 255.

16   A.   I have examined it.

17   Q.   Do you recognize that?

18   A.   I do.

19   Q.   What is that?

20   A.   This is in the -- I believe it's the lake room looking

21   towards --

22            THE COURT:  Could you speak into the microphone,

23   please.

24   A.   I believe it's in the lake room and it's looking towards

25   the garden room with a series of photos.

LC3Cmax5                    Parkinson - direct.

1  Q.  Does this fairly and accurately depict a portion of the

2  interior of 358 El Brillo Way as it appeared on October 20th,

3  2005?

4  A.  True.

5       MS. COMEY:  Your Honor, the government offers this

6  under seal to protect the privacy of third parties.

7       MR. EVERDELL:  No objection.

8       THE COURT:  GX255 is admitted under seal for the

9  reasons stated.

10       (Government's Exhibit 255 received in evidence)

11       MS. COMEY:  Now, your Honor, I'd like to ask the

12  jurors to --

13       THE COURT:  Mr. Everdell, without objection?

14       MR. EVERDELL:  No objection.

15       THE COURT:  Jurors, please take out your binders and

16  take a look at GX255.

17       MS. COMEY:  Thank you, your Honor.  We can set those

18  binders aside and I'll now ask Ms. Drescher to pull up

19  Government Exhibit 229.

20  BY MS. COMEY:

21  Q.  What are we seeing here?

22  A.  This is a view on the first floor, the west side of the

23  house standing south looking to the north of the lake room.

24       MS. COMEY:  And I'd like to go now please to

25  Government Exhibit 230.

LC3Cmax5                              Parkinson - direct.

1    Q.   What do we see here?

2    A.   This is the same room and we are looking to the -- standing

3    to the south, looking to the north slightly northeast.

4    Q.   Mr. Parkinson, while this is up on the screen, I'd like you

5    to please look in your binder at what's been marked for

6    identification as Government Exhibit 243 through Government

7    Exhibit 250.

8    A.   Yes, I have reviewed them.

9    Q.   Do you recognize these?

10   A.   I do.

11   Q.   What are they?

12   A.   A series of photographs of photographs.

13   Q.   From where?

14   A.   This was in the lake room.

15   Q.   Of 358 El Brillo Way?

16   A.   True.

17   Q.   Do these photographs fairly and accurately depict a portion

18   of the interior of 358 El Brillo Way as it appeared on October

19   20th, 2005?

20   A.   True.

21          MS. COMEY:   Your Honor, the government offers these in

22   evidence under seal consistent with your Honor's ruling about

23   witnesses testifying under pseudonyms and to protect third

24   parties.

25          MR. EVERDELL:   No objection, your Honor.

LC3Cmax5                        Parkinson - direct.

1              THE COURT:  All right.  Give me the range again.

2              MS. COMEY:  243 through 250.

3              THE COURT:  Two-four-three through two-five-zero.

4              MS. COMEY:  Yes, your Honor.

5              THE COURT:  Are admitted under seal for the reasons

6       indicated.

7              (Government's Exhibits 243 to 250 received in

8       evidence)

9              MS. COMEY:  Thank you, your Honor.

10             May we please ask the jurors to turn in their binders

11      to Government Exhibit 243.

12             THE COURT:  Without objection, Mr. Everdell?

13             MR. EVERDELL:  No objection, your Honor.

14             THE COURT:  Jurors you may take out your binders,

15      GX243, please.

16             MS. COMEY:  I'd ask the jurors to please now turn to

17      Government Exhibit 244.

18             THE COURT:  Okay.  You may look at 244.

19             MS. COMEY:  I ask now that the jurors be permitted to

20      turn to Government Exhibit 245.

21             THE COURT:  Okay.  You may look at GX245.

22             MS. COMEY:  I'd ask now that the jurors be permitted

23      to turn to Government Exhibit 246.

24             THE COURT:  Okay.  You may look at 246.

25             MS. COMEY:  I'd ask now that the jurors be permitted

 1    to turn to Government Exhibit 247, please.

 2              THE COURT:  GX247, you may look at.

 3              MS. COMEY:  I'd ask now that the jurors be permitted

 4    to turn to Government Exhibit 248, please.

 5              THE COURT:  You may look at GX248.

 6              MS. COMEY:  I'd ask now that the jurors be permitted

 7    to turn to Government Exhibit 249.

 8              THE COURT:  You may look at GX249.

 9              MS. COMEY:  I ask now that the jurors be permitted to

10    turn to GX250.

11              THE COURT:  You may look at GX250.

12              MS. COMEY:  And I ask that those be set aside now,

13    please.

14              THE COURT:  Binders down, please.

15    BY MS. COMEY:

16    Q.  Mr. Parkinson, I'd like to ask you to turn to now what's

17    been marked for identification in your binder as Government

18    Exhibit 252, 253, and 254.  Please take a look at those and

19    tell us if you recognize them.

20              THE COURT:  Should 2:30 come down?  It's on the

21    screen.

22              MS. COMEY:  Your Honor, I'd like to keep that for

23    reference for now.  Thank you.

24    A.  Yes, I recognize them.

25    Q.  What are they?

LC3Cmax5                              Parkinson - direct.

1    A.  These are photographs in frames.

2    Q.  From where?

3    A.  They were in the first floor on the west side of the

4    building, either in the lake room or bordering on the garden

5    room.

6    Q.  Do these photographs fairly and accurately depict a portion

7    of the interior of the main house at 358 El Brillo Way as it

8    appeared on October 20th, 2005?

9    A.  True.

10             MS. COMEY:  Your Honor, the government offers these in

11   evidence.

12             MR. EVERDELL:  No objection, your Honor.

13             MS. COMEY:  I would ask that they be --

14             THE COURT:  Sorry.  You said no objection?

15             MR. EVERDELL:  No objection, your Honor.

16             THE COURT:  GX252, 253, and 254 are admitted.

17             (Government's Exhibits 252, 253, 254 received in

18   evidence)

19             MS. COMEY:  Your Honor, I would ask that these be

20   received under seal to protect the privacy of third parties.

21             MR. EVERDELL:  No objection.

22             THE COURT:  They are admitted under seal for the

23   reasons indicated.

24             MS. COMEY:  May we ask the jurors please to turn in

25   their binders to Government Exhibit 252.

LC3Cmax5                           Parkinson - direct.

1              THE COURT:  You may.  GX252.

2              MS. COMEY:  I'd ask now that the jurors be permitted

3    to turn to Government Exhibit 253, please.

4              THE COURT:  You may turn to GX253.

5              MS. COMEY:  And I ask now that the jurors be permitted

6    to turn to Government Exhibit 254, please.

7              THE COURT:  You may look at GX254.

8              MS. COMEY:  And I'd ask that the jurors be permitted

9    to set that aside, please.

10             THE COURT:  Put your binders down, please.

11   BY MS. COMEY:

12   Q.  Mr. Parkinson, would you please turn to what's in your

13   binder and marked for identification as Government Exhibit 241.

14             THE COURT:  241 is admitted under seal.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1           MS. COMEY:  Thank you, your Honor.

2    BY MS. COMEY:

3    Q.  Mr. Parkinson --

4    A.  I have it.

5           MS. COMEY:  Would you please, Ms. Drescher, pull up

6    just for the witness, the parties, and the Court what's been

7    marked for identification as Government Exhibits 238, 239 and

8    240.

9           I'm sorry, your Honor, have those exhibits been

10   admitted?

11          MR. PAGLIUCA:  Yes.

12          THE COURT:  Yes, we have those admitted.

13          MS. COMEY:  Then, Ms. Drescher, would you please

14   publish Government Exhibit 238.

15   BY MS. COMEY:

16   Q.  Mr. Parkinson, what do we see here?

17   A.  This is on the first floor and I believe the north side of

18   the building.

19          MS. COMEY:  Can we go now, please, to Government

20   Exhibit 239.

21   Q.  What do we see here?

22   A.  This is, I believe, on that north side of the building, as

23   well, first floor.

24          MS. COMEY:  Let's go now, please, to 240.

25   Q.  What do we see here?

```
 1    A.  Ground floor, first floor, north side of the building.
 2    This is what was called a staff room, part of the bathroom.
 3               MS. COMEY:  May I have a moment, your Honor?
 4               THE COURT:  You may.
 5               (Pause)
 6               THE COURT:  We can take a standing stretching break,
 7    if you like.
 8               (Pause)
 9               THE COURT:  Okay.  You may be seated.
10               Ms. Comey.
11               MS. COMEY:  Thank you, your Honor.
12               Ms. Drescher, can we please pull up what's been marked
13    for identification as Government Exhibits 289 through 293.
14    We're going to start with 289 just for the witness, the Court
15    and the parties, please.
16    BY MS. COMEY:
17    Q.  Mr. Parkinson, take a look at these, please, and then I'll
18    ask you if you recognize them.
19    A.  I do recognize --
20    Q.  Hold on one moment.  I'm going to show you the rest.
21               Having seen those exhibits, do you recognize them?
22    A.  I do.
23    Q.  What are they?
24    A.  This is on the second floor.
25    Q.  Of what building?
```

1  A.  The main building, the residence.  And this is various

2  directions.

3  Q.  Do these exhibits fairly and accurately depict portions of

4  the second floor of the main house at 358 El Brillo Way as it

5  appeared on October 20, 2005?

6  A.  True.

7          MS. COMEY:  Your Honor, the government offers these in

8  evidence.

9          MR. EVERDELL:  No objection, your Honor.

10          THE COURT:  Okay.  The range again?

11          MS. COMEY:  289 through 293.

12          THE COURT:  289 through 293 are admitted.

13          (Government's Exhibits 289 through 293 received in

14  evidence)

15          MS. COMEY:  May we publish, your Honor?

16          THE COURT:  You may.

17          MS. COMEY:  Ms. Drescher, would you please just pull

18  up Government Exhibit 289.

19  BY MS. COMEY:

20  Q.  What do we see here?

21  A.  This is on the second floor of the main residence.  You are

22  just now coming up the spiral staircase, and you are now facing

23  south.

24          MS. COMEY:  Would you please turn now, Ms. Drescher,

25  to Government Exhibit 293.

1   Q.   What do we see here?

2   A.   This is the stairway, or stairwell, that is located

3   adjacent to and partially behind the elevator on the second

4   floor, looking down towards the first floor.

5        MS. COMEY:   Thank you.   We can take that down,

6   Ms. Drescher.

7        Ms. Drescher, can we please now pull up for the

8   witness Government Exhibits 269, 271, 272, 273, 276, and 277.

9   Q.   Mr. Parkinson, do you recognize those exhibits?

10  A.   I do.

11  Q.   What are they?

12  A.   These are pictures of generally the master bedroom area.

13  Q.   Do these exhibits fairly and accurately depict the master

14  bedroom area of 358 El Brillo Way as it appeared on October 20,

15  2005?

16  A.   True.

17       MS. COMEY:   Your Honor, the government offers Exhibits

18  269, 271, 272, 273, 276, and 277 in evidence.

19       MR. EVERDELL:   Your Honor, they flipped by before I

20  had a chance to see them.   Do you mind if I take two seconds?

21       THE COURT:   No, go ahead.   Of course.

22       (Pause)

23       MR. EVERDELL:   No objection, your Honor.

24       THE COURT:   Thank you.

25       GX 269, 271, 272, 273, 276, and 277 are admitted.

1          (Government's Exhibits 269, 271, 272, 273, 276, and

2    277  received in evidence)

3          MS. COMEY:  Your Honor, may we please publish?

4          THE COURT:  You may.

5          MS. COMEY:  Ms. Drescher, let's please pull up

6    Government Exhibit 269.

7    Q.  What do we see here?

8    A.  This is looking through the double doors.  It is a small

9    room, hallway, on the second floor.  You are standing to the

10   east, looking to the west.

11         MS. COMEY:  Let's go now, please, to 271.

12   Q.  What do we see here?

13   A.  This is the master bedroom.  This is the master bed.  And

14   you are standing to the south, looking to the north.

15         MS. COMEY:  Let's go to 272, please.

16   Q.  What do we see here?

17   A.  This is the master bed.  You're standing to the southeast,

18   looking towards the northwest.

19         MS. COMEY:  Let's go to 273, please.

20   Q.  What do we see here?

21   A.  This is the second floor master bedroom, and if I'm not

22   mistaken, you're looking to the -- I'm lost on my direction on

23   that.

24   Q.  But is this in the master bedroom?

25   A.  It is.

LC3KMAX6                          Parkinson - Direct

1              MS. COMEY:  Let's go now to 276.

2              What do we see here?

3      A.  This is the master bedroom, second floor, you're standing

4      to the west.

5              MS. COMEY:  Let's go now to 277.

6      A.  This is part of the master bedroom, and you're looking --

7      standing at the west, looking to the east.

8      Q.  Mr. Parkinson, I'd like you to turn in your binder to

9      what's been marked for identification as Government Exhibit

10     278.  Would you please take a look at that and tell us if you

11     recognize it.

12     A.  I do.

13     Q.  What is it?

14     A.  This is the master shower room, located on the second

15     floor.  It is due east of where the master bed is.

16     Q.  Does this fairly and accurately depict a portion of the

17     interior of 358 El Brillo Way as it appeared on October 20,

18     2005?

19     A.  True.

20             MS. COMEY:  Your Honor, the government offers this

21     under seal to protect the privacy of third parties.

22             MS. STERNHEIM:  Judge, may I approach, please?

23             THE COURT:  We'll break for mid-afternoon break for

24     the jury.  We'll resume in about 15 minutes, members of the

25     jury.  Thank you.

LC3KMAX6                        Parkinson - Direct

```
 1                (Jury not present)

 2                THE COURT:  Mr. Parkinson, you may step down for the

 3    break.  Thank you.

 4                THE WITNESS:  Thank you, your Honor.

 5                THE COURT:  You may step down and out for the break.

 6    Thank you.

 7                THE WITNESS:  Oh.

 8                THE COURT:  Everyone may be seated.

 9                (Witness temporarily excused)

10                THE COURT:  Does it need to be a sidebar?

11                MS. STERNHEIM:  No, Judge.

12                THE COURT:  Okay.  Just a moment.

13                (Pause)

14                THE COURT:  Okay.

15                MS. STERNHEIM:  Your Honor, going forward --

16                THE COURT:  At the mic, please, Ms. Sternheim.

17                MS. STERNHEIM:  I apologize.

18                I've just conferred with Ms. Comey, and I certainly

19    understand her position, but it just seems to me that it's

20    getting a bit out of hand with regard to the sealing of these

21    exhibits.

22                Now, if the onus was on us, then we'll deal with it

23    going forward, but we saw a 40-minute video, of which maybe 40

24    seconds --

25                THE COURT:  Well, I had a note to suggest there's no
```

1    reason most of that can't be a public document.  And what you

2    need to do, since narrow tailoring is required, is to make a

3    public version so you redacted it to exclude the reading of the

4    warrant.  I don't see why a public version can't be made that

5    simply redacts the few instances in which individuals whose

6    privacy must be protected is redacted.

7         MS. COMEY:  That's fine, your Honor.  We'll work on

8    that.

9         THE COURT:  Okay.

10         MS. STERNHEIM:  Thank you, Judge.

11         THE COURT:  Ms. Sternheim, I'm happy to hear if

12    there's additional -- I had that note to raise here for

13    purposes of the video.

14         Do you have that for other exhibits?

15         MS. STERNHEIM:  The individual exhibits are not as

16    glaring to me as the video was, and viewing it in the context

17    of the public not being aware of it, it sends an impression

18    that this was like a domicile of debauchery, and there were a

19    few pictures that maybe should not have been in the public

20    domain, but 39 minutes of it should have been.

21         THE COURT:  I completely agree.

22         MS. COMEY:  That's understood, your Honor.  We

23    approached it this way to avoid having to pause and then turn

24    to the side and then go back, but completely understood.  And

25    we will prepare a redacted version that can be released to the

1    public.

2              THE COURT:  Okay.

3              MR. PAGLIUCA:  Your Honor, on this point, I have a

4    related request, and that is, I think, from the defense

5    perspective, if Ms. Comey or the prosecutors simply want to

6    say, we move for this under seal, without then the rest of the

7    explanation over and over and over again, that's fine with us.

8    I just think, again, to Ms. Sternheim's point, it highlights

9    sort of why are we doing this.  It's fine for the record, I

10   think, and if then we need to make a further record down the

11   road, I don't think we need to expand the reasons for all of

12   this.

13             So I think we're fine with under seal.

14             MS. COMEY:  That's fine, your Honor.  I'm just trying

15   to set forth the basis, but whatever your Honor would like me

16   to do, I'm happy to just offer it under seal.

17             THE COURT:  I need to know what the basis is, that

18   it's being offered under seal for, and I need to find that

19   that's appropriate.  So sometimes that's obvious, but it's not

20   always obvious, so I want to take your suggestion,

21   Mr. Pagliuca, but I guess I'm concerned --

22             MR. PAGLIUCA:  Believe me, we've been through the

23   sealing issues up and down 35 times here --

24             THE COURT:  My job is to make sure that we're not

25   oversealing anything.

1           MR. PAGLIUCA:  I totally respect that, your Honor.

2    And I think we could say, "under seal, witness," or "under

3    seal, third-party," and I think that gets to the heart of the

4    matter.

5           THE COURT:  Okay.  I think that's fine.

6           So, either to protect the anonymity of someone who I

7    permitted to testify under a pseudonym, you'll say, "under

8    seal, witness"; and if it is privacy interests of a third party

9    — for example, the photograph of a prepubescent girl, you'll

10   say, "seal, third-party privacy."

11          MS. COMEY:  Yes, your Honor.

12          The one thing I will note that just came to mind about

13   the redacted version of the video is that the timestamps of the

14   redacted version just won't line up with the transcripts here.

15   I don't think there's really a way to fix that, but I just

16   wanted to note that.

17          THE COURT:  Well, that's fine.  The full video is

18   admitted into evidence, so for purposes of the record, those

19   timestamps will match up.  To the extent the public wants to

20   follow the timestamps on the redacted version, it will be

21   slightly off.

22          Is there a way to just show a blank screen or

23   something?

24          MS. COMEY:  I asked the same thing, your Honor.  My

25   understanding is that's not feasible with the technology that

1    we have available at our office.

2            THE COURT:  All right.

3            I think that's fine.  Given how little of that video

4    that I think requires redactions for privacy interests, I don't

5    think it will be much off but it will be a little off.

6            MS. COMEY:  Thank you, your Honor.

7            THE COURT:  Okay.

8            Anything else?

9            MR. EVERDELL:  Nothing from the defense, your Honor.

10           MS. COMEY:  Nothing from the government, your Honor.

11           THE COURT:  All right.

12           We'll break briefly.  Do we need to get to the 900

13   series question or is that going to be Monday?

14           MS. COMEY:  I think we may, your Honor.  I'm almost

15   done with Mr. Parkinson, and then the next witness is very

16   quick, so I do think we'll get to Agent Maguire.

17           THE COURT:  Let's take a comfort break.  As soon as

18   you're regathered after the break, I will come back and take

19   that up.  Thank you.

20           (Recess)

21           THE COURT:  Matters to take up?

22           MR. EVERDELL:  Your Honor, just if we do end up

23   getting to Agent Maguire, we've tried to quickly go through

24   some of the photos to dedesignate any as unsealed if we need

25   to, but we haven't completed the process just because we

1    haven't had enough time to do it.  So we may have to follow the

2    proceed where they're offered under seal and then unseal them

3    later.  We have not had the chance to confer on that fully yet.

4              THE COURT:  Okay.

5              Ms. Moe?

6              MS. MOE:  Yes, your Honor, I think we can confer on

7    that later on that.  We proposed some designations and we're

8    happy to confer with the defense if we'd like to dedesignate

9    it.

10             THE COURT:  You had raised this morning the question

11   of if there were objections, Mr. Everdell --

12             MR. EVERDELL:  Sorry, your Honor.

13             THE COURT:  -- or was it Ms. Menninger?  I can't

14   remember who made the objections to some of the 900 series.  Do

15   I need to rule on that?

16             MR. EVERDELL:  Once we get to Agent Maguire, that

17   becomes an issue because she's going to introduce the 900

18   series, yes, your Honor.

19             THE COURT:  Okay.

20             What numbers are objected to?

21             MR. EVERDELL:  Well, your Honor, it's the same issue

22   we've been talking about.  This is a search that took place in

23   2019 --

24             THE COURT:  Yes, I understand.  For the record, what

25   are the exhibits that are objected to?

LC3KMAX6                        Parkinson - Direct

```
 1            MR. EVERDELL:  It's all of them, your Honor, because I
 2   wanted to be able to have the witness say at least this looks
 3   similar to what it looked like at the time of conspiracy, and I
 4   don't think we have a witness who says that.
 5            THE COURT:  Ms. Moe, what's the theory of relevance?
 6            MS. MOE:  Yes, your Honor.  As the Court may recall,
 7   Jane testified about being present in the New York house, and
 8   she described it and --
 9            THE COURT:  Present in the New York house?  In what
10   year?
11            MS. MOE:  Between 1994 and I think she testified that
12   she traveled through her early twenties.
13            THE COURT:  Pull up the mic.
14            MS. MOE:  Apologies, your Honor.
15            She described the interior of the house having nude
16   artwork, decorations with particular animals, she described the
17   massage room having a stereo and red on the walls, and a wooden
18   storage device on the side.  All of that is consistent with the
19   photographs that have been marked as government exhibits
20   showing the interior of the residence.
21            THE COURT:  The theory of relevance is that it looks
22   the same in those photographs as it looked to Jane when she was
23   present?
24            MS. MOE:  Yes, your Honor, it corroborates her
25   description and confirms she was at the residence, it
```

1    corroborates her testimony about the way the house appeared,

2    the way that made her feel when she was inside the house.

3    There are particular details throughout the residence that she

4    described that are corroborated by these photographs.

5         THE COURT:  But you didn't show her the photographs

6    and ask if it looks the same or what looks the same and what

7    looks different.

8         MS. MOE:  Of course, your Honor.  Part of the reason

9    that these photographs are corroborating is that she hasn't

10   been shown these photographs, she was able to describe the

11   interior of the residence not having seen the photographs that

12   had been taken.  In other words, she gave a blind description

13   of it that was corroborated by photographs of the interior.

14        THE COURT:  You could have, and you should have, shown

15   them to her after she provided the testimony.  The problem is,

16   it's 15 years since the end of the conspiracy, it's 20-some

17   years since her testimony.  I've looked at case law on this.

18   Older photographs of immovable objects and structure may be

19   relevant, and to the extent you have a witness testifying

20   saying it is similar to what I saw or specifically saying it's

21   similar in this way or dissimilar in that way, it would be

22   permitted.

23        In the absence of that, we're talking about very

24   movable items and a substantially long period of time.  If

25   there is a witness who could do that, that would be

 1   appropriate, but in the absence of that, I won't allow it in

 2   simply based on her description of what it looked like then.

 3          You have that description in, so I'll sustain the

 4   objection based on the current record.

 5          MS. MOE:  Your Honor, just so I understand the scope

 6   of the Court's ruling, is that to all photographs of the

 7   interior of the residence?  I guess my confusion is, in

 8   particular, with respect to the massage room, she described

 9   several objects that are depicted in these photographs and --

10          THE COURT:  Right, but over 20 years later.  So if you

11   wanted to ask her if it's the same objects, you should have, or

12   you could have, or you can, but in the absence of that, we're

13   talking about highly mobile items.  The law does not support

14   inclusion in this context without a witness testifying as to

15   the similarity of what -- you're trying to corroborate that

16   these photos show what it looked like then.  You have a witness

17   who can do that, but in the absence of that, I'm sustaining the

18   objection.  I don't see any basis to distinguish between 15-,

19   20-year-old, or more, distinction between her description and

20   the photographs.

21          MS. MOE:  Yes, your Honor.

22          Given that defense counsel raised this objection

23   today, we'd just ask for an opportunity to brief this issue

24   over the weekend.  We could potentially shift the order of our

25   witnesses in order to address that -- or maybe I should confer

1    with my colleagues with that, but we would like an opportunity

2    to brief that issue, your Honor.

3              I understand the Court's concern.

4              THE COURT:  To brief it?

5              MS. MOE:  Yes, your Honor, to examine the case law

6    that your Honor is referring to, consider it, and develop our

7    argument potentially further.

8              MS. COMEY:  Your Honor, the thinking here is that the

9    defense has had these exhibits for weeks, and we feel a bit

10   sandbagged here because they could have raised this objection

11   in their motions in limine and instead they did it after we had

12   finished our direct of the witness who could have looked at

13   these photographs.

14             MS. MOE:  In our view, part of the corroborating

15   impact is that we didn't show these photographs to the victim

16   and --

17             THE COURT:  I understand that.  And I suppose you

18   still can if you want to.  You're welcome to brief it; I have

19   no issue with that.  There is a factual disjointedness between

20   what you're seeking to enter and based on that testimony.

21             MR. EVERDELL:  Your Honor, if I could be heard on the

22   issue of sandbagging:  This was not sandbagging.  If we had

23   raised this at the motion in limine stage, the response would

24   have quite rightly been, we're going to have to see what

25   happens at trial, because it's their responsibility to lay a

1    proper foundation for these.

2              We assumed that there would be a witness who would do

3    this, and that Jane was the potential witness.  There may be

4    others, I don't know, but Jane didn't testify about these

5    photographs, and so that's when we raised it, when it looked

6    like it was a live issue, and it was only ripe when that

7    happened.

8              THE COURT:  I have to agree with that.  You're seeking

9    to move them now, and they're raising it now.  I don't disagree

10   with what Mr. Everdell said.

11             MS. MOE:  Your Honor, we'd just like an opportunity to

12   brief the issue.  I think had we know it was defense counsel's

13   position that in the absence of a victim identifying these

14   photographs --

15             THE COURT:  It doesn't have to be a victim.  It could

16   be anyone identifying -- again, you're asking to corroborate

17   what the witness testified she saw with photographs taken -- is

18   it 30 years?  Help me with the math.

19             MR. EVERDELL:  So the search is 2019, and Jane, I

20   think, claims she was there 1994 or 1995.  So that is already

21   almost 20 years --

22             THE COURT:  Twenty years.

23             MR. EVERDELL:  Sorry, 25.

24             THE COURT:  Twenty-five years.

25             -- of movable items, right, of various pieces of art,

1     of photographs hung, of items in drawers, and the like.

2              MS. MOE:  I understand the Court's concern, your

3     Honor.  We would appreciate an opportunity to brief this issue

4     over the weekend, if possible.

5              THE COURT:  Of course, yes, I'm happy to hear it.

6              MS. MOE:  Thank you, your Honor.

7              THE COURT:  Needless to say, if you have testimony

8     that would establish the relevance of these photographs because

9     they are what existed at the time that Jane testified to, or

10    otherwise, I'd be happy to consider it.

11             MS. MOE:  Thank you, your Honor.

12             MR. EVERDELL:  Thank you.

13             THE COURT:  All right.

14             What else can I take up?

15             MS. COMEY:  Nothing from the government, your Honor.

16             MR. EVERDELL:  Nothing from the defense other than we

17    have binders for the Court for the next few witnesses.  Do you

18    want me to deliver them up now?

19             THE COURT:  Sure.

20             Ms. Comey, we've elevated the mic because you're tall,

21    so do please speak into the mic, even when you're looking at an

22    item, to make sure that --

23             MS. COMEY:  Thank you, your Honor, for the reminder.

24             Your Honor, with respect to the issue we just

25    discussed, about the 900 series, there is other evidence that

LC3KMAX6                         Parkinson - Direct

1   Special Agent Maguire was going to offer that I don't believe

2   is being objected to.

3            Never mind, your Honor, I'm being told -- never mind.

4            THE COURT:  All right.

5            With respect to the items, either the physical items

6   or the photographs of the school costumes, as I indicated — and

7   I think the ruling I'm making now is fully consistent with that

8   — it has to be tied through a witness as to similarity of items

9   seen at the time.  And that was what I ruled before about

10  those, which is why you can lay the foundation through Maguire,

11  and if it's temporally tied back, I imagine I would admit it,

12  depending on that testimony; same theory here.

13           MR. EVERDELL:  Yes, your Honor.

14           MS. COMEY:  Understood, your Honor.  Thank you.

15           THE COURT:  All right.

16           Are these for me or for the witness?

17           MR. EVERDELL:  Those are for you, your Honor.

18           THE COURT:  Okay.  Thank you.

19           MR. EVERDELL:  It should be three, for the next three

20  witnesses.  Sorry I couldn't get one for your Honor's deputy.

21           THE COURT:  All right.  So we can bring the witness

22  back and we can get the jury.

23           THE WITNESS:  Good afternoon, your Honor.

24           THE COURT:  Good afternoon, Mr. Parkinson.  You may

25  take your seat.  Thank you.

1              (Jury present)

2              THE COURT:  Thank you, members of the jury.

3              Ms. Comey, you may continue with your direct

4    examination of Mr. Parkinson.

5              Mr. Parkinson, I remind you, you are under oath.

6              Go ahead, Ms. Comey.

7              MS. COMEY:  Thank you, your Honor.

8    BY MS. COMEY:

9    Q.  Mr. Parkinson, good afternoon.

10   A.  Good afternoon.

11             MS. COMEY:  Ms. Drescher, would you please pull up for

12   the witness, the parties, and the Court what's been marked for

13   identification as Government 278.

14   Q.  Mr. Parkinson, I think we were talking about this right

15   before the break.  Do you recognize this?

16   A.  Yes.

17   Q.  What is it?

18   A.  It's the shower room.

19   Q.  And is this a fair and accurate depiction of a portion of

20   the interior of 358 El Brillo Way as it appeared on October 20,

21   2005?

22   A.  True.

23             MS. COMEY:  Your Honor, the government offers this in

24   evidence.

25             MR. EVERDELL:  No objection, your Honor.

LC3KMAX6                      Parkinson - Direct

1       THE COURT:  GX 278 is admitted.

2       (Government's Exhibit 278 received in evidence)

3       MS. COMEY:  May we publish, your Honor?

4       THE COURT:  You may.

5       MS. COMEY:  Ms. Drescher, would you please publish

6  this.

7  Q.  And, Mr. Parkinson, what do we see in the bottom left-hand

8  corner of this photograph?

9  A.  There's a white hassock with an off-white color telephone

10 on it, and then there is a pink three-cushioned -- at least

11 three back cushions of what looks like a couch.

12 Q.  Thank you.  I'd like to leave that up while we discuss the

13 next few exhibits.

14      Would you please turn in your binder, Mr. Parkinson,

15 to what's been marked for identification as Government Exhibits

16 281, 282, 286, and 287.

17      (Pause)

18 A.  Yes.

19 Q.  Do you recognize these?

20 A.  I do.

21 Q.  What are they?

22 A.  It's a series of photos that were taken on the second floor

23 and most of which --

24      THE COURT:  Into the microphone, please,

25 Mr. Parkinson.

1   A.  They were photographs taken on the second floor, and they

2   were in the master -- one of the master baths.

3   Q.  Do these fairly and accurately depict a portion of the

4   interior of 358 El Brillo Way as it appeared on October 20,

5   2005?

6   A.  True.

7          MS. COMEY:  Your Honor, the government offers these

8   under seal, third-party.

9          MR. EVERDELL:  No objection.

10          THE COURT:  GX 281, 282, 286, and 287 are admitted

11   under seal for the reason indicated.

12          (Government's Exhibits 281, 282, 286, and 287 received

13   in evidence)

14          MS. COMEY:  Your Honor, may we at this point ask the

15   jurors to open up their binders to Government Exhibit 281,

16   please?

17          THE COURT:  Yes.  You may take out your binders,

18   please.  GX 281.

19   Q.  Mr. Parkinson, what is the green object --

20          THE COURT:  Ms. Comey, into the microphone, please.

21          MS. COMEY:  Thank you, your Honor.

22   Q.  Mr. Parkinson, what is the green object that we see in the

23   center of this photograph?

24   A.  That is a portable collapsable massage table.

25          MS. COMEY:  Your Honor, may we now ask the jurors to

LC3KMAX6                          Parkinson - Direct

1   turn to Exhibit 282 in their binders?

2           THE COURT:  Yes.  Please turn to 282.

3           MS. COMEY:  May we now ask the jurors to turn to

4   Government Exhibit 286 in their binders?

5           THE COURT:  Please turn to GX 286.

6           MS. COMEY:  And may we now ask the jurors to turn to

7   Government Exhibit 287 in their binders?

8           THE COURT:  Yes.  Please turn to GX 287.

9           MS. COMEY:  Thank you, your Honor.  I'm ready to move

10  on to another exhibit if the jurors want to put their binders

11  aside.

12          THE COURT:  Okay.  Please put your binders down.

13          MS. COMEY:  Ms. Drescher, would you please pull up,

14  for the witness, the parties and the Court, what's been marked

15  for identification as Government Exhibits 283 and 284.

16  Q.  Mr. Parkinson, are you able to see those side by side, or

17  do you need them one at a time?

18  A.  I can see them.

19  Q.  Do you recognize them?

20  A.  I do.

21  Q.  What are these?

22  A.  These are two photographs of the same room but from

23  different angles.

24  Q.  Which room?

25  A.  This would be the second floor, north side of the

LC3KMAX6                      Parkinson - Direct

1    residence.  It's adjoining the master bedroom, and this one has

2    the tub in it.

3    Q.  Is this a fair and accurate depiction of a portion of the

4    interior of 358 El Brillo Way as it appeared on October 20,

5    2005?

6              THE COURT:  Ms. Comey, you've got to speak up.

7    Q.  Is this a fair and accurate depiction of the interior of

8    358 El Brillo Way as it appeared on October 20, 2005?

9    A.  True.

10             MS. COMEY:  Your Honor, the government offers these in

11   evidence.

12             MR. EVERDELL:  No objection.

13             THE COURT:  Thank you.  283 and 284 are admitted.

14             (Government's Exhibits 283 and 284 received in

15   evidence)

16             MS. COMEY:  May we publish?

17             THE COURT:  You may.

18             MR. EVERDELL:  Ms. Drescher, I'd like to do these one

19   at a time, please.  283 first.

20             And now on to 284, please.

21   Q.  While that stays up there, Mr. Parkinson, would you please

22   turn in your binder to what's been marked for identification as

23   Government Exhibit 285.

24   A.  Yes, I have it.

25   Q.  Do you recognize this?

1    A.   I do.

2    Q.   What is it?

3    A.   This is a desktop.

4    Q.   From where?

5    A.   This is in the same bathroom but a little bit of an

6    anteroom.

7    Q.   Is this a fair and accurate depiction of a portion of the

8    interior of 358 El Brillo Way as it appeared on October 20,

9    2005?

10   A.   True.

11          MS. COMEY:  Your Honor, the government offers this

12   exhibit under seal to protect the interests of a party.

13          MR. EVERDELL:  No objection.

14          THE COURT:  285 is admitted for the reason indicated.

15          (Government's Exhibit 285 received in evidence)

16          MS. COMEY:  May we ask the jurors to turn in their

17   binder to Government Exhibit 285, please?

18          THE COURT:  Yes.

19   Q.   Mr. Parkinson, would you please read the writing in the

20   lower center of this picture?

21          THE COURT:  Sorry.  It's admitted under seal.

22          MS. COMEY:  Ah, then I apologize, your Honor.  May I

23   direct the jurors' attention to that writing?

24          THE COURT:  Sure.

25          MS. COMEY:  Thank you, your Honor.  I am done with the

1    binders for this witness.

2    BY MS. COMEY:

3    Q.  Mr. Parkinson, what, if any, evidence do you remember

4    personally physically carrying during the search of 358

5    El Brillo Way on October 20, 2005?

6    A.  I carried the green massage table.

7         MS. COMEY:  Your Honor, at this time I would ask for

8    permission to bring into the courtroom for Mr. Parkinson what's

9    been marked for identification as Government Exhibit 51, which

10   is a physical exhibit.

11        MR. EVERDELL:  No objection, your Honor.

12        THE COURT:  Okay.

13        MS. COMEY:  Your Honor, I would ask for permission for

14   Detective Byrne to bring the exhibit forward.

15        THE COURT:  Okay.

16        MS. COMEY:  Thank you.

17        Ms. Drescher, we can take down Government Exhibit 284.

18   Thank you.

19        Your Honor, I would ask for permission for the witness

20   to step down from the witness box to examine the exhibit that's

21   been marked for identification as Government Exhibit 51.

22        THE COURT:  He may.

23        Mask, please, Mr. Parkinson.  Thank you.

24   BY MS. COMEY:

25   Q.  Mr. Parkinson, would you please take a look at this exhibit

1   and tell us if you recognize it.

2   A.  I do.

3   Q.  Could you please return to the witness box.

4           THE COURT:  You can remove your mask, Mr. Parkinson.

5   Thank you.

6           THE WITNESS:  Thank you, your Honor.

7   Q.  Mr. Parkinson, do you recognize what's been marked for

8   identification as Government Exhibit 51?

9   A.  I do.

10  Q.  What is it?

11  A.  It is a massage table.

12  Q.  From where?

13  A.  It's from the second floor south bathroom, where the shower

14  was.

15  Q.  How do you recognize it?

16  A.  It has the evidence brown-stringed label that was attached

17  to it with a property number and a barcode number.

18  Q.  Is this the green massage table that you remember seizing

19  from 358 El Brillo Way on October 20, 2005?

20  A.  True.

21          MS. COMEY:  Your Honor, the government offers this

22  exhibit in evidence.

23          MR. EVERDELL:  No objection.

24          THE COURT:  I couldn't hear if that was "objection" or

25  "no objection."

LC3KMAX6                          Parkinson – Direct

1           MR. EVERDELL:  No objection, your Honor.  I'm sorry.

2           THE COURT:  Exhibit 51 is admitted.

3           MS. COMEY:  Your Honor, I would ask for permission to

4      have Detective Byrne come forward and publish the exhibit for

5      the jury by setting it up.

6           THE COURT:  Mr. Everdell?

7           MR. EVERDELL:  Without objection.

8           THE COURT:  Okay.

9           (Continued on next page)

LC3Cmax7                          Parkinson - direct

1              MS. COMEY:  While Detective Byrne is doing that,

2      Ms. Drescher, would you please pull up what's been marked for

3      identification as Government Exhibits 51A, B, and C, and show

4      them to the witness, the parties, and the Court.

5      BY MS. COMEY:

6      Q.  Mr. Parkinson, do you recognize those three exhibits?

7      A.  I do.

8      Q.  What are they?

9      A.  The table itself in an open position, the manufacturer's

10     label, and a second manufacturer's label.

11     Q.  Do these fairly and accurately depict portions of

12     Government Exhibit 51?

13     A.  True.

14             MS. COMEY:  Your Honor, the government offers these in

15     evidence.

16             MR. EVERDELL:  No objection.

17             THE COURT:  51A, B, and C are admitted.

18             (Government's Exhibits 51A, 51B, 51C received in

19     evidence)

20             MS. COMEY:  Thank you, your Honor.  May we publish?

21             THE COURT:  You may.

22             MS. COMEY:  Ms. Drescher, would you publish 51A, and

23     then 51B, and then 51C.

24     Q.  Mr. Parkinson, according to the manufacturer's labels,

25     where was this table manufactured?

LC3Cmax7                    Parkinson - cross

1    A.  Vista, California.

2              MS. COMEY:  Your Honor, I'd ask for permission for

3    Detective Byrne to take the exhibit back down and put it aside.

4              THE COURT:  Yes.  Thank you.

5    Q.  Mr. Parkinson, other than your participation in the search

6    of 358 El Brillo Way on October 20th, 2005, did you have any

7    other involvement in the investigation of this case?

8    A.  The final recording of the walk-through showing no damage.

9    Q.  Other than that, any other involvement in this case?

10   A.  No.

11             MS. COMEY:  No further questions, your Honor.

12             THE COURT:  Thank you.  Mr. Everdell, you may cross

13   examine Mr. Parkinson.

14             MR. EVERDELL:  Thank you, your Honor.  If I could

15   deliver a binder to the witness, may I approach?

16             THE COURT:  Yes.

17             MR. EVERDELL:  May I inquire, your Honor?

18             THE COURT:  You may.

19   CROSS-EXAMINATION

20   BY MR. EVERDELL:

21   Q.  Good afternoon, Mr. Parkinson.

22   A.  Good afternoon, sir.

23   Q.  Mr. Parkinson, you testified on direct examination about a

24   search warrant that you helped execute at Jeffrey Epstein's

25   Palm Beach residence on October 20th, 2005; is that right?

LC3Cmax7                        Parkinson - cross

A.   True.

Q.   I want to ask you about that search in a minute, but the search warrant that you executed in October 2005 was not the first time that you had been to Mr. Epstein's Palm Beach residence; isn't that right?

A.   True.

Q.   You had been there one time before?

A.   True.

Q.   The first time you went to Mr. Epstein's house was on October 5th of 2003; isn't that correct?

A.   True.

Q.   And that was almost exactly two years before the search; right?

A.   True.

Q.   I believe you said it was two years and 15 days to be precise?

A.   True.

Q.   And the reason you went to Mr. Epstein's house on October 5th, 2003 was to investigate a burglary; correct?

A.   True.

Q.   And October 5th, 2003 was a Sunday; correct?

A.   True.

Q.   That Sunday morning, you were alerted that a burglary had been reported at 358 El Brillo Way in Palm Beach; is that right?

LC3Cmax7                         Parkinson - cross

1    A.   True.

2    Q.   And that is the address of Mr. Epstein's Palm Beach

3    residence?

4    A.   True.

5    Q.   And you went to the house to respond to the report; right?

6    A.   True.

7    Q.   I believe you got there just past 9:30 a.m.?  Is there

8    something that would help refresh your recollection?

9    A.   I just did.  Thank you, sir.  And the answer is "true."

10   Q.   You mentioned there was something you saw.  If you're

11   looking at the binder, sir, I think you should put it down

12   unless I'm directing you to look at it.  So I apologize for not

13   making that clear.

14   A.   Done.

15   Q.   Since you've had your recollection refreshed.  Why don't we

16   just be clear about this, if you could please look at 3522-001

17   at the first page, it's under the binder, the first tab.

18   A.   I'm sorry.  What was that number?

19   Q.   It's the first tab, and I'm talking about the document that

20   is labeled 3522-001, and it's the first page.

21   A.   Yes, I'm with you.

22   Q.   If you take a look at that, sir, would that refresh your

23   recollection about what time you showed up in the morning at

24   Mr. Epstein's residence on October 5th, 2003?

25   A.   Yes.

LC3Cmax7                        Parkinson - cross

1   Q.  Was it around or just past 9:30 a.m.?

2   A.  Correct.

3   Q.  Thank you, sir.  You can put the binder down.

4           Now, when you went to his residence on that Sunday

5   morning, you met with Mr. Epstein; is that right?

6   A.  True.

7   Q.  And he showed you where he thought the burglar got into the

8   house; isn't that right?

9   A.  True.

10  Q.  And it was through the sliding glass window near the room

11  where his desk was; right?

12  A.  True.

13  Q.  And that was on the first floor of his house; correct?

14  A.  True.

15  Q.  And your recollection is that Mr. Epstein claimed that

16  several thousand dollars in cash had been stolen from a bag

17  near his desk; isn't that right?

18  A.  True.

19          MR. EVERDELL:  If I could pull up on the screen what's

20  already in evidence as Government Exhibit 230 and 234, and if I

21  could put them side by side, please.

22          THE COURT:  Okay.  Hang on.

23          MR. EVERDELL:  I don't think they're under seal, your

24  Honor.

25          THE COURT:  234 is under seal.

LC3Cmax7                         Parkinson - cross

1           MR. EVERDELL:  I apologize.  Let's just look at 230,

2      then.

3      Q.  Do you see that, Mr. Parkinson?

4      A.  I do, sir.

5      Q.  What we're looking at there, I think you identified as

6      Mr. Epstein's desk, isn't it?

7      A.  Yes.

8      Q.  And that was Epstein's main office in the house, right,

9      that area right there?

10          MS. COMEY:  Objection.  Foundation.

11          THE COURT:  Just a moment.  Sustained.

12     Q.  Well, you met with Mr. Epstein; correct?

13     A.  I'm sorry?

14     Q.  You met with Mr. Epstein that day; correct?

15     A.  Yes.

16     Q.  And he described for you what he thought might have

17     happened that day with respect to the burglary?

18     A.  True.

19     Q.  And he showed you this area of the house, didn't he?

20     A.  True.

21     Q.  Because he believed that this is where he thought the cash

22     had been taken from; is that right?

23     A.  Correct.

24     Q.  It was, according to him, it was taken from a bag near this

25     desk; correct?

1  A.   True.

2  Q.   And when you were speaking to him, you were mainly in this

3  area of the house; correct?

4  A.   True.

5  Q.   Now, we looked, I believe, at the floor plan of this house

6  on your direct testimony and you identified this room that

7  we're looking at here with the desk in it as the lake room; is

8  that right?

9  A.   True.

10  Q.   Now, when you got here on October 5th, 2003, you spoke to

11  Mr. Epstein; correct?

12  A.   True.

13  Q.   You examined the scene; is that right?

14  A.   I did.

15  Q.   You looked for fingerprints?

16  A.   I did.

17  Q.   You collected whatever evidence you found; right?

18  A.   I did.

19  Q.   And that was pretty much the sum total of what you did that

20  day; right?

21  A.   I believe it is, yes.

22  Q.   I think you said you went into a few other rooms in the

23  house?

24  A.   That's true.

25  Q.   You went into the garden room; right?

1    A.  I did.

2    Q.  And you went into the kitchen?

3    A.  I did, yes.

4    Q.  But generally, you stayed in the office or this room here,

5    the lake room to speak to Mr. Epstein; is that right?

6    A.  That is correct.

7    Q.  And about how long were you there, Mr. Parkinson?

8    A.  It was under four hours.

9    Q.  And in the roughly four hours or under four hours that you

10   were there, do you recall seeing anyone else in the residence

11   on that Sunday morning?

12   A.  There were people there.  I think one was a chef or a cook.

13   Q.  Do you know who Ghislaine Maxwell is?

14   A.  I do not.

15   Q.  So you don't recall seeing anybody by that name at the

16   residence on October 5th, 2003?

17   A.  No, sir.

18   Q.  Now, did you later learn who the burglar was in this case?

19   A.  We did.

20   Q.  And who was it?

21             MS. COMEY:  Objection, your Honor.

22             THE COURT:  Grounds.

23             MS. COMEY:  Relevance and hearsay.

24             THE COURT:  Sustained on hearsay.

25             MR. EVERDELL:  Your Honor, I think we've already had

LC3Cmax7                        Parkinson - cross

1    testimony about this, so I'm just connecting --

2              THE COURT:  True, but that doesn't (indiscernible

3    overlapping speech) under the rules of evidence.

4              MR. EVERDELL:  Fair enough.

5    BY MR. EVERDELL:

6    Q.  But you did learn who it was eventually; right?

7    A.  True.

8    Q.  One more question before we get to the search that we

9    talked about on your direct.

10             Before you met Mr. Epstein in connection with the

11   burglary investigation in October of 2003, I believe you had

12   seen him jogging around Palm Beach before then; is that right?

13   A.  No, I think that was after, because I didn't know who he

14   was.  I had only been on the force eight months, so I really

15   had no knowledge of him.  Never heard the name until the

16   burglary.  It's true, I saw him jogging, we'd wave to each

17   other, but really prior to the burglary, I had no idea who it

18   was.

19   Q.  Understood.  Let's go ahead and talk about the search; all

20   right?

21   A.  Yes.

22   Q.  So now I am fast forwarding two years and 15 days to

23   October 20th, 2005; correct?

24   A.  Correct.

25   Q.  And that's the day that you helped execute a search warrant

1     at Jeffrey Epstein's residence; is that right?

2     A.   True.

3     Q.   And that search warrant was part of an investigation that

4     the Palm Beach Police Department was conducting at that time;

5     is that right?

6     A.   True.

7     Q.   You were not the lead detective on that investigation;

8     right?

9     A.   No, I was not.

10    Q.   That was, I believe you mentioned detective Joseph Recarey;

11    is that right?

12    A.   True.

13    Q.   And he's since passed on?

14    A.   He has passed on.

15    Q.   So you were helping out that day on the search; right?

16    A.   Correct.

17    Q.   Your job was to organize the team, the evidence team that

18    would collect the evidence from the search, assuming you found

19    any; right?

20    A.   Correct.

21    Q.   And there was going to be one person who was going to

22    collect the evidence, right, put it in bags and catalog it?

23    A.   True.

24    Q.   That was someone named Annette Badger?

25    A.   True.

1   Q.  And there was also someone who was going to take

2   photographs of the house and the evidence that was collected;

3   right?

4   A.  True.

5   Q.  And that person was named Kim Paveolic (ph.); right?

6   A.  True.

7   Q.  And there was yourself?

8   A.  True.

9   Q.  And your role was to videotape the reading of the warrant,

10  the beginning of the search; right?

11  A.  True.

12  Q.  And also videotape the security sweep of the house when you

13  first entered?

14  A.  True.

15  Q.  And then to videotape the walk-through of the residence

16  after the security sweep had been performed?

17  A.  True.

18  Q.  And then do an exit video after the fact; right?

19  A.  True.

20  Q.  And you generally supervised the team; is that right?

21  A.  They -- we were operating independently.

22  Q.  So the search warrant that you executed we said was October

23  20th, 2005; right?

24  A.  True.

25  Q.  That is the day that you shot the video that we looked at

LC3Cmax7                          Parkinson – cross

1    in your direct examination?

2    A.   True.

3    Q.   And that is also the day that those photographs that we

4    looked at, that's the day that those were taken, too?

5    A.   True.

6    Q.   So that video and those photographs that we looked at show

7    what the house looked like on October 20th of 2005?

8    A.   True.

9    Q.   So it's like looking at a snapshot of what his residence in

10   Palm Beach looked like on that particular date; right?

11   A.   True.

12   Q.   That video and those photos do not show, for example, what

13   the house looked like in 1994; correct?

14   A.   I have no way of knowing that.

15   Q.   Right.  That was many, many years before?

16   A.   Yeah, I was still working at West Palm.

17   Q.   That was over a decade before you made that video?

18   A.   True.

19   Q.   And that was over a decade before the pictures that you saw

20   were taken?

21   A.   Say again, please.

22   Q.   And that was over a decade before the pictures that we saw

23   were taken?

24   A.   True.

25   Q.   And similarly, the videos and the photos do not show what

1  the house looked like in 1995, '96, or '97; correct?

2  A.  I have no way of knowing that.

3  Q.  I understand.  Exactly right.  It seems like an obvious

4  question.  I'm just simply saying that the video shows a

5  certain date, October 20th, 2005.  It wouldn't show what the

6  house looked like 10, 15 years, 20 years beforehand; correct?

7  A.  I'd only have to guess on that.  That was the only time I

8  was in the house up to that date in 2003 or 2005.  The second

9  time I was in it.  Other than that, it's hard to compare

10  because you're only in three rooms, one of which is a kitchen.

11  On the first working the case, that was in 2003 as opposed to

12  2005, which was totally new to me, except for the kitchen, the

13  office, and the garden room.

14  Q.  Correct.  I think we understand each other perfect.

15          Now, we saw in the video and in the photographs that

16  there were a number of framed photos around the house; is that

17  right?

18  A.  True.

19  Q.  But the video and the photographs of those photos don't

20  show how long any of those particular photos were in those

21  locations in the house; right?

22  A.  I don't know how we'd determine that.

23  Q.  Well, I think you'd agree with me that the video shows that

24  they were there on October 20th, 2005; right?

25  A.  I will agree with that.

LC3Cmax7                    Parkinson - cross

1    Q.  But there is no way for the videos or the photographs we

2    saw to show that they were there any day prior to October 20th,

3    2005; isn't that right?

4    A.  I just don't know how to answer that.

5    Q.  Okay.

6    A.  That's one of the best questions I've had in 55 years.  If

7    I do find out, I'll let you know.

8    Q.  Then I'll ask a few more hopefully smart questions.

9            The same thing with the artwork that we saw in the

10   videos and the photographs.  The videos and the photographs

11   show what artwork was in that house on October 20th of 2005;

12   yes?

13   A.  True.

14   Q.  But it would have no way of showing what artwork was there

15   on any day prior to October 20th, 2005?

16   A.  I don't see how that would be possible.

17   Q.  I'll just ask also about the items in the house apart from

18   the artwork and the photographs, same question.  There is no

19   way that the video or the photographs could show what items

20   were in the house prior to that day?

21   A.  No, sir, I don't believe science has gotten that far.

22   Q.  So bottom line is, we have no idea from what we looked at

23   in your testimony what the house looked like prior to October

24   20th of 2005?

25   A.  I certainly don't.

1  Q.  I'll move on.  Mr. Parkinson, we saw from the videos and

2  the pictures, you recall you testified it looked like the house

3  was undergoing renovations at the time you executed search; is

4  that right?

5  A.  True.

6  Q.  I believe we saw in the video and the photos that there

7  were fabric or carpet samples all over the floor and what you

8  determined the lake room; right?

9  A.  In addition to the floor plans and diagrams.

10 Q.  Right.  Yes.  So, in addition to the carpet samples, which

11 we saw pictures of, we also saw you said architectural drawings

12 on one of the tables; right?

13 A.  I'd say that's a reasonable conclusion.

14 Q.  So it appeared to you at the time of the search that the

15 house was in the process of being renovated?

16 A.  True.

17 Q.  Mr. Parkinson, I want to ask you just a few questions about

18 the floor plan we saw.  If we could call up what's already in

19 evidence as Government Exhibit 298.

20            THE COURT:  You may.

21            MR. EVERDELL:  Is that visible to the jurors, as well?

22 Great.

23 Q.  Mr. Parkinson, can you see Government Exhibit 298 in front

24 of you?

25 A.  I can, sir, yes.

LC3Cmax7                    Parkinson - cross

1    Q.  So that's the floor plan of the first floor of

2    Mr. Epstein's Palm Beach residence; isn't that right?

3    A.  It is, sir.

4    Q.  Do you see over on the left-hand side of the floor plan,

5    there is a room labeled "kitchen"?

6    A.  I do, sir.

7    Q.  If you would draw a line straight down to the bottom of the

8    floor plan from the kitchen, you hit a room that is labeled

9    "staff," is that right?

10   A.  True.

11           MR. EVERDELL:  I believe, if we can call up now maybe

12   next to this what's in evidence as Government Exhibit 238.  I

13   don't believe that's under seal.

14           MS. COMEY:  It's not under seal, your Honor.

15           THE COURT:  All right.  You can publish 238.

16           MR. EVERDELL:  Thank you, your Honor.

17   Q.  Mr. Parkinson, do you see 238 next to the floor plan, 298?

18   A.  I do, sir.

19   Q.  So is that what's depicted in Government Exhibit 238, is

20   that the staff room that is labeled in the floor plan as

21   "staff"?

22   A.  It is.

23   Q.  So it appears to be a little office; is that right?

24   A.  True.

25           MR. EVERDELL:  If we can take down 238 but keep up

1    298.

2    Q.  So if you look at where it says "staff," that room we just

3    looked at, if you go to the right, all the way to the right,

4    the room on the far right-hand side is called the lake room;

5    right?

6    A.  I'm sorry.  I'm still back in the staff room.

7            MR. EVERDELL:  If we can take down the call-out,

8    please, to see the full floor plan.

9    Q.  Are we looking at the full floor plan, Mr. Parkinson?

10   A.  True.

11   Q.  You see the room that's labeled "staff"?

12   A.  I do.

13   Q.  That's on the left side of the floor plan towards the

14   bottom; right?

15   A.  That would pretty much be the northeast corner.

16   Q.  Northeast corner?

17   A.  Yes.

18   Q.  And if you go to the right-hand side of the floor plan, the

19   northwest corner, that's the lake room; right?

20   A.  True.

21   Q.  And that is the room where we saw Mr. Epstein's desk in the

22   photos that we just talked about; right?

23   A.  Well, there were multiple desks.  Do you mean the one that

24   the money was taken from?

25   Q.  The one that the money was taken from, yes.

LC3Cmax7                      Parkinson - cross

1    A.  No, sir, that was in the lake room.

2    Q.  Yes.  I'm sorry.  I'm looking at the lake room on the far

3    right.

4    A.  All right.

5    Q.  You see the lake room is on the far right?

6    A.  Yes, it is.

7    Q.  And that's the room that had the desk where the money was

8    taken; is that right?

9    A.  True.

10   Q.  What I just want to point out is that the lake room is on

11   the opposite end of the house on the first floor from the staff

12   room; is that right?

13   A.  That is true.

14            MR. EVERDELL:  If we could pull in what's in evidence

15   as Government Exhibit 297, which is the second floor of the

16   house.

17   Q.  Do you see that, Mr. Parkinson?

18   A.  I do, sir.

19   Q.  We're looking there at the diagram of the second floor of

20   the house; yes?

21   A.  That is correct, sir.

22   Q.  Now, you see in sort of the middle of the diagram, there is

23   a semicircular -- it looks like a semicircular staircase; is

24   that right?

25   A.  True.

LC3Cmax7                    Parkinson - cross

1   Q.  And that goes up to the second floor landing; is that

2   right?

3   A.  It does, sir.

4   Q.  And if you go to the right, when you get to the top of the

5   landing, that is the hallway that heads to the master bedroom

6   suite; right?

7   A.  True.

8   Q.  And we saw some of the photos of those rooms in your

9   testimony; right?

10  A.  True.

11  Q.  But if you go to the left, there is another hallway that

12  leads to a series of what are labeled guest rooms?

13  A.  True.

14  Q.  It looks like one is called the red room, guest room 5 is

15  called the red room; is that right?

16  A.  That, I don't know.

17          MR. EVERDELL:  If we can call up just the left-hand

18  portion of that exhibit with the guest rooms to the landing on

19  the second floor.

20          THE COURT:  You're getting a little quiet there.

21          MR. EVERDELL:  I'm sorry.  If we can call up just the

22  left-hand portion of the diagram where the guest rooms are.

23  Q.  Is that easier to see?

24  A.  It is, sir.  Thank you so much.

25  Q.  You're welcome.  You see that one is labeled guest room 3,

LC3Cmax7                          Parkinson - cross

1  I should say, and that's the red room; right?

2  A.  True.

3  Q.  And there is one just next to it called guest room 1, and

4  that's labeled the blue room?

5  A.  True.

6  Q.  And there is one below that that's labeled guest room 2,

7  and that's labeled the back room?

8  A.  True.

9  Q.  We saw all that in the video walk-through; right?  We saw

10  those rooms, I believe?

11  A.  I believe so.

12  Q.  Those rooms are all on the other side of the second floor

13  than the master bedroom suite; right?

14  A.  They are on the east side, the master is on the west side.

15  Q.  And you can't tell from this floor plan who stayed in those

16  rooms; right?

17  A.  Correct.

18  Q.  And you can't tell that from your video or the photographs

19  either?

20  A.  No.

21  Q.  I want to talk to you about just a few other features of

22  the house; all right?

23  A.  Yes.

24  Q.  Let's look at 298 again, what's in evidence as Government

25  Exhibit 298.  We're back on the first floor there; right?

LC3Cmax7                     Parkinson - cross

1    A.  We are.

2    Q.  Do you see right at the bottom center where it says

3    "foyer"?

4    A.  I had a little help from my friend, but yes.  Yes, that's

5    much better.

6    Q.  I've got my reading glasses on, too.  So probably best we

7    just blow it up.  You see where it says "foyer"?

8    A.  I do.

9    Q.  That's the entranceway to the house?

10   A.  It is.

11   Q.  You see there is sort of a half of a semicircle right below

12   the word foyer to the left; right?  The staircase, the

13   semicircle staircase?

14   A.  True.

15   Q.  So that's where the staircase begins on the first floor;

16   right?

17   A.  True.

18   Q.  And that is the main staircase to the house; right?

19   A.  It is.

20   Q.  And that leads up to the second floor?

21   A.  True.

22          MR. EVERDELL:  If I could now call up -- we can take

23   down the diagram and call up Government Exhibits 235 and 292

24   side by side.  They are I don't believe sealed.

25          THE COURT:  Okay.

1   Q.  Mr. Parkinson, do you see those photographs in front of

2   you, Government Exhibit 235 and 292?

3   A.  I do.

4   Q.  Those depict the windy staircase that we just looked at on

5   the diagram; right?

6   A.  True.

7   Q.  And do you see, especially in 292, that shows the left-hand

8   side wall that goes up the windy staircase; right?

9   A.  It does.

10  Q.  You don't see any photographs or pictures on that wall, do

11  you?

12  A.  No, sir.

13  Q.  There are no pictures on the wall to the side of the windy

14  staircase?

15  A.  No.

16  Q.  Now, I'd like to take a look again at what's in evidence as

17  Government Exhibit 234.

18          MR. PAGLIUCA:  Sealed.

19          THE COURT:  That's sealed.

20          MR. EVERDELL:  That's sealed, okay.  So if I could

21  direct the witness's attention to Government Exhibit 234, if we

22  can place it on the screen for the witness, the Court, and the

23  Court's deputy.  I don't think I have a copy for the witness.

24  Can I borrow your binder.  May I approach, your Honor?

25          I'm getting confused choreography, your Honor.  I

1    believe the exhibit is on Mr. Parkinson's screen, so he can

2    look at it there and the government has their own copy.

3    Apologies.

4    BY MR. EVERDELL:

5    Q.  Mr. Parkinson, if you could look at what's already in

6    evidence under seal as Government Exhibit 234.

7    A.  Yes.

8    Q.  That is the area around Mr. Epstein's desk; isn't that

9    right?

10   A.  True.

11   Q.  And you see there are a number of photos on his desk?

12   A.  True.

13   Q.  And there are a number of photos that are on the bookcase

14   shelves behind the desk?

15   A.  True.

16          MR. EVERDELL:  Now, I also want to show just for the

17   witness, the Court, and the Court's deputy what is already in

18   evidence but under seal as Government Exhibit 245.

19          THE COURT:  Okay.  Would you like the jurors --

20          MR. EVERDELL:  I would like the jurors to look, too,

21   yes, your Honor.

22          THE COURT:  You can take out your binders and look at

23   Government Exhibit 245.

24          MR. EVERDELL:  We'll just wait a minute for the jurors

25   to open their binders.  I think the jurors have the binders

1    open.

2              Members of the jury, just please don't display

3    anything you're looking at to the gallery.

4    BY MR. EVERDELL:

5    Q.  Now, Mr. Parkinson, do you see the person that's depicted

6    in that picture?

7    A.  I do.

8    Q.  I don't want you to say any names, please, but if you could

9    just answer the question, do you see the person there?

10   A.  Yes.

11   Q.  You didn't find any other pictures of this woman in

12   Epstein's house when you did your search; correct?

13   A.  I didn't do a comparison of the photos.

14   Q.  To the best of your recollection, you didn't find another

15   picture of this woman?

16   A.  I have no idea.

17   Q.  Well, we didn't see any other pictures of this woman when

18   we did your direct testimony; correct?

19   A.  True.

20   Q.  The government didn't show you any other pictures of this

21   woman from the search for you to identify for the jury as

22   something that was found during the search?

23   A.  True.

24   Q.  And we didn't see any other photographs of this woman in

25   the video that you shot that was shown for the jury?

1  A.  Not that I recall.

2  Q.  And specifically, we didn't see here today on the video or

3  in the photos any pictures of this woman in a bathing suit on

4  Jeffrey Epstein's desk, did we?

5  A.  Not to my knowledge.

6  Q.  In fact, based on what we saw today, you never found a

7  photo of this woman in a bathing suit anywhere in the house;

8  isn't that right?

9  A.  Not to my knowledge.

10        MR. EVERDELL:  One moment.

11        THE COURT:  You can put your binders down.  Thank you.

12  Q.  I have just one final few questions for you, Mr. Parkinson.

13  A.  Yes, sir.

14  Q.  The search that you did on October 20th, 2005 in

15  Mr. Epstein's residence lasted from approximately 9:30 to

16  approximately 3 o'clock in the afternoon; is that right?

17  A.  Pretty much.  I think it was six hours.

18  Q.  So you were basically there all day; is that right?

19  A.  Yes.

20  Q.  You didn't see any other women in the house at that time

21  all day, did you?

22  A.  In all fairness, I did, but they were police personnel.  So

23  yes.

24  Q.  It's an appropriate clarification.  Other than the police

25  personnel who were helping you with the search, you didn't see

LC3Cmax7                        Dawson - direct

1    any women in the house that day?

2    A.   True.

3              MR. EVERDELL:  Nothing further, your Honor.

4              MS. COMEY:  No redirect, your Honor.

5              THE COURT:  Mr. Parkinson, you're excused.  You may

6    step down.

7              THE WITNESS:  I have a flight, may I take it?

8              THE COURT:  You may take your flight.

9              (Witness excused)

10             Ms. Comey, the government may call its next witness.

11             MS. COMEY:  Thank you, your Honor.  The government

12   calls Michael Dawson.

13             THE COURT:  Michael Dawson may come forward.

14    MICHAEL DAWSON,

15        called as a witness by the Government,

16        having been duly sworn, testified as follows:

17             THE COURT:  Please be seated.  If you would move up to

18   the microphone, please state and spell your name.

19             THE WITNESS:  My name is Michael Dawson, M-i-c-h-a-e-l

20   D-a-w-s-o-n.

21             THE COURT:  Thank you.  You may inquire, Ms. Comey.

22             MS. COMEY:  Thank you, your Honor.

23   DIRECT EXAMINATION

24   BY MS. COMEY:

25   Q.   Good afternoon, Sergeant Dawson.

LC3Cmax7                         Dawson - direct

1    A.   Good afternoon.

2    Q.   Where do you currently work?

3    A.   Town of Palm Beach Police Department.

4    Q.   What is your title?

5    A.   I'm a sergeant.

6    Q.   Would you please briefly walk us through your law

7    enforcement career.

8    A.   I started in law enforcement working for the State of

9    Florida, Probation Pool Department in Miami for approximately

10   four and a half years.  In the year 2000, I was hired by the

11   Town of Palm Beach Police Department and I've been there for a

12   little over 21 years now.

13   Q.   In 2005, what was your title at the Palm Beach Police

14   Department?

15   A.   I was a detective.

16   Q.   Generally, what were your duties and responsibilities?

17   A.   We investigated all crimes that came across our desk,

18   anywhere from general investigating unit, anywhere from

19   homicide, all the way down to petty theft.

20   Q.   I'd like to direct your attention to October 20th, 2005.

21   What, if any, search did you participate in that day?

22   A.   I participated to the search of Jeffrey Epstein's house at

23   358 El Brillo Way, Palm Beach, Florida.

24   Q.   What authority did you have to search that residence on

25   that day?

1    A.   Detective Recarey obtained a search warrant from the

2    courts.

3    Q.   What was your role in the search that day?

4    A.   I was assigned to assist in searching the house, the guest

5    quarters, and the cabana.

6    Q.   Who else do you remember participating in the search that

7    day?

8    A.   The majority of the criminal investigation unit, which was

9    Sergeant George Frick (ph.), Detective Joseph Recarey,

10   Detective Allen Dix (ph.), Detective Jennifer Sandman (ph.),

11   Detective Tom Mellenchuck (ph.), I believe Officer Michael

12   Bates was also present.

13   Q.   To your understanding, what types of evidence was your team

14   looking for during the search?

15   A.   We were looking for massage tables, massage oils, we were

16   looking for sex toys, we were looking for correspondence and

17   anything that held correspondence — computers, phones,

18   notebooks, phone message books, journals, calendars.

19   Q.   What do you remember happening when you first arrived at

20   Jeffrey Epstein's Palm Beach residence that day?

21   A.   I remember them knocking on the door, asking everybody to

22   come out of the house, at which time, three gentlemen came out

23   of the house.  I stood guard with the gentleman, had Detective

24   Recarey read the search warrant to one of the gentlemen there.

25   Q.   Do you know who those people were?

LC3Cmax7                          Dawson - direct

1    A.  I know one of them was the house manager who lived on the

2    property and the other two, I believe, were some type of

3    designers for Mr. Epstein.

4    Q.  After clearing the house and reading the search warrant,

5    what did your team do next?

6    A.  We began the search of the interior of the house.

7    Q.  What, if anything, stands out in your memory from your

8    observation of Jeffrey Epstein's Palm Beach house that day?

9    A.  I do recall being surprised that the computer -- there was

10   a desktop computer that didn't have the computer towers hooked

11   up to them, it was only the monitor and the keyboard.  Also,

12   there was numerous amount of photos throughout the house, the

13   cabana, and we found some in the closets, too, of nude females.

14   Q.  You mentioned the computers.  Can you describe for us in a

15   little more detail what you noticed about the computers inside

16   Jeffrey Epstein's house on October 20th, 2005?

17   A.  Yes.  The monitor and keyboard were normally where you

18   would see a monitor and a keyboard, and the wires came out the

19   back and went down underneath the desk and the hard drive was

20   not there.

21   Q.  What, if any, specific evidence do you remember seizing

22   during the search?

23   A.  Specifically, I remember seizing a phonebook next -- a

24   message phonebook next to the phone in the kitchen.  Also,

25   massage tables we found in one of the closets, two massage

LC3Cmax7                          Dawson - direct

1     tables.  There was also a photograph of a nude female in that

2     closest.  Upstairs, I seized -- it was a sex toy called the

3     Twin Torpedos in one of the closets or one of the bedrooms

4     upstairs.

5     Q.  I'd like to show you now what's been marked for

6     identification as Government Exhibit 294, please.  Ms. Drescher

7     if we could pull that up for the witness, the Court, and the

8     parties.

9             Do you recognize that, Sergeant Dawson?

10    A.  Yes, I do.

11    Q.  What is it?

12    A.  Those are the sex toys called the Twin Torpedos I located

13    in one of the closets.

14    Q.  Is this a fair and accurate depiction of an item that you

15    located at Jeffrey Epstein's Palm Beach residence on October

16    20, 2005?

17    A.  Yes, it is.

18            MS. COMEY:  Your Honor, the government offers this in

19    evidence.

20            MR. EVERDELL:  No objection.

21            THE COURT:  GX294 is admitted.

22            (Government's Exhibit 294 received in evidence)

23            MS. COMEY:  May we publish?

24            THE COURT:  You may.

25            MS. COMEY:  Thank you, your Honor.

1            Ms. Drescher, if you would please publish this to the

2    jury.

3            We can take that down.  Thank you, Ms. Drescher.

4            Ms. Drescher, would you please pull up for the witness

5    the following exhibits in order:  First 240, then 256, then

6    257, then 260, then 262, and then 263.

7    BY MS. COMEY:

8    Q.  Sergeant Dawson, do you recognize these?

9    A.  Yes.

10   Q.  What are they?

11   A.  Those are items we found during the search of the search

12   warrant.

13   Q.  When you say we, who located these items during the search?

14   A.  I located one, Detective Dix located a couple of the

15   message books, and the rest of the team, I assume, found some

16   of the others.

17           MR. EVERDELL:  Objection.

18           THE COURT:  Sustained.

19   Q.  Did you personally seize one of these message books?

20   A.  Yes, I did.

21   Q.  Did you witness Detective Dix seize some of these message

22   books?

23   A.  Yes, I did.

24   Q.  And the rest of them, did you see them in the house while

25   you were conducting the search?

LC3Cmax7                      Dawson - direct

1    A.  Yes, I did.

2              MS. COMEY:  Your Honor, the government offers these in

3    evidence.

4              MR. EVERDELL:  Your Honor, voir dire.

5              THE COURT:  You may.  For the photographs?

6              MS. COMEY:  Just the photographs.

7              MR. EVERDELL:  I'm sorry, no.  No objection to the

8    photographs, your Honor.

9              THE COURT:  GX240, 256, 257, 260, and 262 are

10   admitted.  Did I get that right?

11             MS. COMEY:  240, 256, 257, 260, 262, and 263.

12             THE COURT:  And 263 are admitted.  Thank you.

13             (Government's Exhibits 240, 256, 257, 260, 262, 263

14   received in evidence)

15             MS. COMEY:  Ms. Drescher, would you please publish

16   those and cycle through them.

17             You can go to the next one, please.

18             Thank you, Ms. Drescher.  We can take that down.

19   Q.  Sergeant Dawson, what did you do with all of the items of

20   evidence that you seized during this search?

21   A.  I notified the crime scene unit, at which time they took

22   photographs of the items and then placed them in evidence.

23   Q.  Who was the head of the crime scene unit at that search?

24   A.  Greg Parkinson.

25             MS. COMEY:  May I have a moment, your Honor?

LC3Cmax7                          Dawson - direct

1                    THE COURT:  You may.

2                    MS. COMEY:  Your Honor, I'd ask to approach the

3       witness with what's been marked for identification as

4       Government Exhibits 1, 3, and 4, and I'll show them to defense

5       counsel first.

6                    THE COURT:  Okay.

7                    MS. COMEY:  May I approach, your Honor?

8                    THE COURT:  You may.

9       BY MS. COMEY:

10      Q.  Sergeant Dawson, I've just handed you what's been marked

11      for identification as Government Exhibits 1, 3, and 4.  Do

12      those look familiar to you?

13      A.  Yes.

14      Q.  What do they look like?

15      A.  They look like the message books we found during the search

16      warrant.

17      Q.  Are you able to confirm that these are the same message --

18                   THE COURT:  I'm sorry, Sergeant Dawson.  Could you

19      remove your mask and could you pull up a little closer to the

20      mic, please.  Thank you.

21      Q.  Are you able to confirm that these are the same message

22      pads that you seized that day?

23      A.  They appear to be.  I can't confirm 100 percent.  I haven't

24      been in contact with them.

25      Q.  Is that because you are not familiar with the unique

1    characteristics of these exhibits?

2    A.   Correct.

3              MS. COMEY:   Your Honor, may I have a moment?

4              THE COURT:   You may.

5              MS. COMEY:   No further questions.

6              THE COURT:   Okay.   Cross, Mr. Everdell?

7              MR. EVERDELL:   Yes.   Thank you, your Honor.

8    CROSS-EXAMINATION

9    BY MR. EVERDELL:

10   Q.   Good afternoon, Sergeant Dawson.

11   A.   Good afternoon, sir.

12   Q.   You testified just now that you participated in the

13   execution of the search warrant at Jeffrey Epstein's house in

14   Palm Beach on October 20th, 2005; right?

15   A.   Yes.

16   Q.   And you were asked some questions on direct examination

17   about that?

18   A.   Yes.

19   Q.   I'm going to ask you some questions about the search, but

20   before I do that, I want to ask you about an earlier

21   investigation that involved Epstein's residence.   Okay?

22   A.   Yes.

23   Q.   Before that search warrant, the search warrant that you

24   discussed on direct took place, you were involved in the

25   investigation of a burglary that took place at Mr. Epstein's

 1    residence; isn't that right?

 2            MS. COMEY:  Objection, your Honor.  Beyond the scope.

 3            MR. EVERDELL:  Your Honor, I'm going to prove up an

 4    inconsistent statement of a prior witness through this witness.

 5            THE COURT:  You can confer and tell me if you need a

 6    sidebar.

 7            MR. EVERDELL:  Understood, your Honor.

 8            (Pause)

 9            Your Honor, I think we do need a brief sidebar on this

10    issue.

11            (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LC3Cmax7                        Dawson - cross

1           (At the sidebar)

2           MR. EVERDELL:  Your Honor, Sergeant Dawson was the

3  police officer who took Juan Alessi's confession after the

4  burglary.  He came into the precinct, Sergeant Dawson

5  Mirandized him and took his statement.  Juan Alessi denied

6  making some of the statements that we think are clearly

7  reflected in Sergeant Dawson's report.

8           Among other things, he denied going in twice to steal

9  the money.  It's as clearly in the reports that he went in

10  twice and stole money on two occasions.  The first occasion he

11  was going to try to steal the gun, he didn't find the gun, said

12  he took money.  He went back several weeks later and stole

13  more.  I think we're entitled to impeach or to point out and

14  elicit the prior inconsistent statement of Juan Alessi through

15  this witness.

16           MR. ROHRBACH:  This is an entirely collateral matter,

17  your Honor.  Whether Mr. Alessi went once or twice to steal

18  $6,300 only goes to his character for truthfulness or at beast,

19  also possibly impeachment by contradiction.  But in either

20  sense, it's totally collateral to any of the central issues of

21  this trial.  They would not be able to independently prove up

22  any of these facts but for Mr. Alessi having testified.

23           MR. EVERDELL:  It was a Mirandized statement, your

24  Honor.  Mr. Alessi put his credibility directly at issue about

25  these very statements when he said, I am going to tell the

LC3Cmax7                          Dawson - cross

1    truth --

2              THE COURT:  It's already at issue.  So you didn't

3    object to it being collateral before.  You can choose to do it

4    now or call him back.  So I'll allow it.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LC3Cmax7                         Dawson - cross

1           (In open court)

2     BY MR. EVERDELL:

3     Q.  So, Sergeant Dawson, where we left off, I had asked you if

4     you participated in the investigation of a burglary that took

5     place at Jeffrey Epstein's residence.  Did you?

6     A.  I don't recall.

7     Q.  Well, I could just show you, there is a --

8           MR. EVERDELL:  I'm sorry.  I think I need to give him

9     the binder, your Honor.  There is a witness binder for him

10    which I need to deliver.

11          THE COURT:  Doesn't he have it?

12    Q.  Do you have the binder in front of you?  You do.  Very

13    good.  I think that may be the government's binder.

14    A.  It has my name on it, witness copy.

15    Q.  I think you have the right one.  If I could show you -- if

16    you go behind tab 1, and there is a document there marked

17    3512-001.  The marking is at the bottom right hand of the page,

18    3512-001.  Do you see that document?  I think you may be

19    referring to the wrong binder.

20          THE COURT:  It is the wrong binder.  I have the one

21    marked Dawson, Judge binder.  I can give that to him.

22          MR. EVERDELL:  That's fine, your Honor.  Thank you

23    very much.  Thank you, your Honor.

24    BY MR. EVERDELL:

25    Q.  Sergeant Dawson, if you could turn to the document that's

1    behind tab 1 in that folder.

2    A.   Yes.

3    Q.   Why don't you take a moment to review it, and in

4    particular, the second page of that document, the end of the

5    first paragraph and the full second paragraph.  Take a minute

6    to read it all.

7    A.   I read the first two paragraphs of the back page.

8    Q.   Does that refresh your recollection about being involved in

9    a burglary investigation --

10   A.   Yes.

11   Q.   It does?

12   A.   Yes.

13   Q.   So it is true, then, that you were involved in a burglary

14   investigation at Mr. Epstein's Palm Beach residence at 358 El

15   Brillo Way in Palm Beach in October 2003; is that right?

16   A.   Yes.

17   Q.   And that was roughly two years before the search warrant

18   that you discussed on your direct testimony; right?

19   A.   Yes.

20   Q.   And, in fact, you interviewed the perpetrator in the

21   burglary case; isn't that right?

22   A.   Yes.

23   Q.   And his name was Juan Alessi; is that right?

24   A.   Yes.

25   Q.   And on October 15th of 2003, you and a fellow detective

1    went to Juan Alessi's house and tried to talk to him; isn't

2    that right?

3            I think if you refer to the same document on the first

4    page, you can refresh your recollection if you don't recall.

5    See if it refreshes your recollection.

6    A.  We did attempt to locate him.  Is that what you're going to

7    ask?

8    Q.  Do you remember attempting to locate him before you spoke

9    to him?

10   A.  Yes.

11   Q.  But you didn't find him at the address you had for him;

12   right?

13   A.  Correct.

14   Q.  You did find his wife there; is that right?

15   A.  Yes.

16   Q.  And her name was Maria Alessi; is that right?

17   A.  Yes.

18   Q.  And she gave you her husband's cellphone number to call

19   him; right?

20   A.  Yes.

21   Q.  And you called Juan Alessi; isn't that right?  He didn't

22   call you?

23   A.  Yes.

24   Q.  And he didn't just show up at the police station, he came

25   down there because you called him; right?

LC3Cmax7                          Dawson - cross

1    A.  Yes.

2    Q.  And he didn't voluntarily come on his own; is that right?

3    A.  Yes.

4    Q.  And he came to the station and he agreed to be interviewed;

5    isn't that right?

6    A.  Yes.

7    Q.  And he came to the police station a little bit later that

8    day, I believe; is that right?

9    A.  Yes.

10   Q.  And you put him in an interview room?

11   A.  Yes.

12   Q.  And you read him his Miranda rights?

13   A.  Yes.

14   Q.  And he acknowledged that he understood those rights, didn't

15   he?

16   A.  Yes.

17   Q.  Including his right to remain silent?

18   A.  Yes.

19   Q.  But he voluntarily agreed to waive those rights and talk to

20   you; isn't that right?

21   A.  Yes.

22   Q.  Now, isn't it true that in his statement to you on that

23   day, October 15th, 2003, Juan Alessi told you that

24   approximately six weeks before at about 5:00 a.m. or 0500 hours

25   on a Sunday morning, he decided to enter Mr. Epstein's house at

1    358 El Brillo Way in an attempt to steal his gun?

2    A.  Yes.

3    Q.  And isn't it also true that Juan Alessi told you that he

4    entered the house through an unlocked sliding glass door

5    located near Mr. Epstein's office?

6    A.  Yes.

7    Q.  And he told you that he entered the office and attempted to

8    locate the gun, didn't he?

9    A.  Yes.

10   Q.  And he said that he then went or he couldn't find the gun,

11   so he went to Epstein's briefcase and removed approximately

12   $1,900; is that correct?

13   A.  Yes.

14   Q.  And those were in $100 bills he said he removed them from a

15   white envelope; is that correct?

16   A.  Yes.

17   Q.  He said after taking the money, he immediately left the

18   house; is that right?

19   A.  Yes.

20   Q.  He also told you that a few weeks later on Sunday, October

21   5th, 2003, again at approximately 5:00 a.m., he decided to

22   return to Mr. Epstein's residence; isn't that right?

23   A.  Yes.

24   Q.  And he decided to return to the residence in order to steal

25   money once again from Mr. Epstein, that's what he told you,

LC3Cmax7                          Dawson - cross

```
 1    isn't it?
 2    A.  Yes.
 3    Q.  And he also told you that he opened the briefcase again
 4    when he got inside, and this time he removed $5,600 in $100
 5    bills from a white envelope, isn't that what he told you?
 6    A.  Yes.
 7    Q.  Again he told you that he left through the glass door and
 8    drove away, he told you that, didn't he?
 9    A.  Yes.
10    Q.  And finally, Juan Alessi told you that he needed the money
11    in order to pay for his girlfriend's immigration papers, isn't
12    that what he told you?
13    A.  Yes.
14    Q.  Thank you.  You can put that down now, Sergeant Dawson.
15              THE COURT:  We're done for the night.
16              MR. EVERDELL:  This is a good stopping place.
17              THE COURT:  Members of the jury -- everybody be
18    seated.  I want to take a minute.
19              It's been one week, so this is our first weekend
20    apart.  So I really want to just really emphasize, all of my
21    instructions and rules continue to apply and apply in full
22    force for the weekend.  So no looking at, reading, or any kind
23    of consumption of any media involved in the case, any kind of
24    communication involving the case or the like, of course.  And
25    keep an open mind and all my other instructions.  So please
```

LC3KMAX8

1    bear those in mind.

2          I want to just briefly make a couple points about the

3    schedule to keep you updated.  Next week will be just like this

4    week, Monday through Friday, same timing.  Please arrive by

5    9:15 so we can start at 9:30 and we'll stop at 5:00.  Your

6    arriving every day on time has really helped us keeping things

7    moving along at a good pace, so I'm grateful for that.

8          The week after next, we're not going to sit Monday,

9    Tuesday, or Wednesday.  So we will not sit December 13th, 14th,

10   or 15th.  So that week it will be just be December 16th and

11   17th.  I'll remind you of this next week, too.  Next week,

12   regular.  Week after that, we won't sit.  Week after that,

13   which is the week before Christmas, we will sit Monday,

14   Tuesday, Wednesday.  So that's December 20th, 21st, and 22nd,

15   but we won't sit December 23rd or 24th.  And the week after

16   that, which is the week before New Year's, we'll sit Monday,

17   Tuesday, Wednesday.  So that's December 27th, 28th, and 29th.

18   Will not sit December 30th or 31st.  So just wanted to keep you

19   up to date on the current schedule.  I'm so grateful for your

20   attention and diligence.  I wish you a very good weekend, and

21   have a good night.

22          (Continued on next page)

23

24

25

LC3KMAX8

1          (Jury not present)

2          THE COURT:  Mr. Dawson, you may step down for the

3     weekend.

4          I remind counsel and Mr. Dawson, he's on cross, so

5     only logistical coordination with the government.

6          Thank you, everyone.  May be seated.

7          MS. COMEY:  Thank you, your Honor.  On that note, we

8     will need to discuss a number of logistics we will need to

9     discuss a number of logistics over the weekend with Sergeant

10    Dawson just for his travel, and I'm just noting that.

11         THE COURT:  That's why I said, only logistics.

12         MS. COMEY:  Thank you.

13         MR. EVERDELL:  That's fine, your Honor.

14         THE COURT:  Okay.  A couple of things:

15         We talked about a briefing schedule on the 900 series

16    for, I think Maguire is the witness.  When would you like to

17    put that in?

18         MS. MOE:  Your Honor, can we please file that on

19    Sunday, your Honor?

20         THE COURT:  I think it's got to be Saturday, so they

21    can reply on Sunday and I can review it before this witness

22    testifies on Monday.

23         MS. MOE:  Yes, your Honor.  Can I have just one

24    moment, please?

25         THE COURT:  Sure.

LC3KMAX8

1          MS. MOE:  Your Honor, would the end of the day of

2     midnight on Saturday be acceptable to the Court on timing?

3          THE COURT:  Let's do 8:00 o'clock on Saturday for the

4     government, 8:00 o'clock on Sunday for the defense, I'll take

5     between 8:00 p.m. and Monday morning to read your papers and

6     resolve it.

7          MS. MOE:  Thank you, your Honor.

8          THE COURT:  Okay, Mr. Everdell?

9          MR. EVERDELL:  That's fine for the defense.

10          THE COURT:  I received the first round of briefing on

11     the attorney-client privilege issue from the defense.

12          So the government's is due when?

13          MR. ROHRBACH:  Our brief is due on Monday right now,

14     your Honor.

15          THE COURT:  On Monday?  I wanted to indicate, I know

16     you raised that the witness' attorney might want to weigh in.

17     So if they do, you can convey that they could put in a letter

18     at that same timing.

19          MR. ROHRBACH:  We will.  Thank you, your Honor.

20          THE COURT:  Okay.

21          Redaction issues:  As I indicated, I do want the video

22     reviewed and a public version.

23          I want to encourage also, I think a lot of the photos

24     that came in, a lot of the exhibits that came in, could have

25     redacted versions so that just the images of the witnesses who

LC3KMAX8

```
 1    I'm allowing to testify under pseudonyms and third parties

 2    whose privacy interests are an issue could be redacted.

 3              I'll let you tell me a timing for that, but we've got

 4    to be narrowly tailored, so --

 5              MS. COMEY:  Yes, your Honor.  For the photographs, we

 6    could do that more quickly.  The video will require assistance

 7    from our IT staff who have left for the weekend.

 8              THE COURT:  Lucky them.

 9              MS. COMEY:  Indeed.

10              So I would ask for by the end of the day on Tuesday

11    for the videos so that they have time.

12              And then for the photographs, we should be able to do

13    that by the end of the weekend, so on Sunday.

14              THE COURT:  Okay.

15              MS. COMEY:  Thank you, your Honor.

16              THE COURT:  I appreciate that.

17              And you'll confer also; I know some came in that may

18    not need to be redacted.  You'll just confer and --

19              MS. COMEY:  Yes, your Honor.

20              THE COURT:  -- get as much to the public as you can.

21              MR. EVERDELL:  We will, your Honor.

22              THE COURT:  Thank you.

23              Other matters to take up?  Let me just check if I'm

24    forgetting anything.

25              I don't think so.  Anything?
```

LC3KMAX8

1          MR. EVERDELL:  Just if the government has a witness

2     list for next week, we'd appreciate it.

3          THE COURT:  Yes, if you could do an updated witness

4     list.

5          MS. COMEY:  Yes, your Honor.  May we do that by the

6     end of the day on Saturday?

7          THE COURT:  Okay.

8          MS. COMEY:  Thank you.

9          MR. EVERDELL:  Thank you, your Honor.

10          THE COURT:  To the defense and to the Court?

11          MS. COMEY:  Yes, your Honor.

12          THE COURT:  Anything else.

13          MR. EVERDELL:  Not from the defense, your Honor.

14          MS. COMEY:  Not from the government, your Honor.

15          THE COURT:  All right.  Everyone, have a nice weekend.

16     We are adjourned.

17          (Adjourned to December 6, 2021 at 8:45 a.m.)

18                              * * *

19

20

21

22

23

24

25

```
 1                        INDEX OF EXAMINATION

 2   Examination of:                            Page

 3    JUAN PATRICIO ALESSI

 4   Cross By Mr. Pagliuca  . . . . . . . . . . . 938

 5    GREGORY PARKINSON

 6   Direct By Ms. Comey  . . . . . . . . . . . .1011

 7   Cross By Mr. Everdell  . . . . . . . . . . .1092

 8    MICHAEL DAWSON

 9   Direct By Ms. Comey  . . . . . . . . . . . .1116

10   Cross By Mr. Everdell  . . . . . . . . . . .1124

11                       GOVERNMENT EXHIBITS

12   Exhibit No.                            Received

13    721   . . . . . . . . . . . . . . . . . . .1015

14    201 through 222   . . . . . . . . . . . . .1022

15    264 through 268   . . . . . . . . . . . . .1028

16    296R   . . . . . . . . . . . . . . . . . . .1040

17    223, 224, 225   . . . . . . . . . . . . . .1052

18    226 to 241  . . . . . . . . . . . . . . . .1054

19    255   . . . . . . . . . . . . . . . . . . .1057

20    243 to 250  . . . . . . . . . . . . . . . .1059

21    252, 253, 254   . . . . . . . . . . . . . .1061

22    289 through 293   . . . . . . . . . . . . .1065

23    269, 271, 272, 273, 276, and 277   . . . . .1067

24    278   . . . . . . . . . . . . . . . . . . .1083

25    281, 282, 286, and 287  . . . . . . . . . .1084
```

283 and 284   . . . . . . . . . . . . . . . .1086

285   . . . . . . . . . . . . . . . . . . .1087

51A, 51B, 51C   . . . . . . . . . . . . . .1091

294   . . . . . . . . . . . . . . . . . . .1120

240, 256, 257, 260, 262, 263   . . . . . . .1122