LC6Cmax1

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
     UNITED STATES OF AMERICA,
3
                v.                        20 CR 330 (AJN)
4
     GHISLAINE MAXWELL,
5
                     Defendant.           Jury Trial
6    ------------------------------x
                                          New York, N.Y.
7                                         December 6, 2021
                                          8:52 a.m.
8
     Before:
9                    HON. ALISON J. NATHAN,

10                                        District Judge

11                          APPEARANCES

12   DAMIAN WILLIAMS
          United States Attorney for the
13        Southern District of New York
     BY:  MAURENE COMEY
14        ALISON MOE
          LARA POMERANTZ
15        ANDREW ROHRBACH
          Assistant United States Attorneys
16
     HADDON MORGAN AND FOREMAN
17        Attorneys for Defendant
     BY:  JEFFREY S. PAGLIUCA
18        LAURA A. MENNINGER
             -and-
19   BOBBI C. STERNHEIM
             -and-
20   COHEN & GRESSER
     BY:  CHRISTIAN R. EVERDELL
21
     Also Present:  Amanda Young, FBI
22                  Paul Byrne, NYPD
                    Sunny Drescher,
23                   Paralegal, U.S. Attorney's Office
                    Ann Lundberg,
24                   Paralegal, Haddon Morgan and Foreman

25
```

LC6Cmax1

1          THE COURT:  Good morning.  I received a letter

2     briefing over the weekend regarding the government's request

3     for a limiting instruction with respect to the next anticipated

4     witness.  The witness will testify under the pseudonym Kate.

5          As the government has indicated, because Kate was over

6     the age of consent in all relevant jurisdictions at the time

7     that she alleges sexual conduct with Epstein took place, she's

8     not a victim of the crimes charged in the indictment.  On this

9     basis the defense moved pretrial to exclude her testimony as

10    irrelevant and prejudicial.  I denied that request.  I

11    concluded based on the government's proffer that she has

12    relevant testimony that is direct evidence of the Mann Act

13    counts and evidence that is otherwise admissible under 404(b).

14         To avoid jury confusion and prejudice, however, I

15    concluded that her testimony should be limited in the

16    description of details of the sexual conduct that does not form

17    a basis of the charged counts and that a limiting instruction

18    was required.

19         Over the weekend, the government asked for me to

20    include in the limiting instruction a statement that I

21    instructed the parties not to ask about details of the sexual

22    conduct that the witness will testify occurred with

23    Mr. Epstein.  In part, the government justifies this request

24    based on the defense's opening statement that calls into

25    question the credibility of witnesses based on their inability

LC6Cmax1

1    to recall details.  Defense opposed this request.  I have

2    considered the letters by both sides which were filed under

3    seal pursuant to Federal Rule of Evidence 412.

4              I accept the government's suggestion to include the

5    language in the limiting instruction.  The statement is

6    accurate.  It ensures a balanced limiting instruction, and it

7    is fair to both sides.  It is also appropriate in light of the

8    defense's opening.

9              One question, counsel, the draft language suggests

10   that I direct, quote, the parties to not ask Kate details about

11   the sexual conduct she says occurred with Epstein.  I think it

12   would be more accurate to say that I've directed the government

13   not to so ask.  I have indicated that if the defense were to do

14   so, it would open the door for the government.

15             So I'll hear from you as to whether your request is to

16   indicate the parties or the government.  Mr. Rohrbach.

17             MR. ROHRBACH:  That's fine, your Honor.  The

18   government just tried to offer a more neutral instruction, but

19   I agree that your -- that that edit is more consistent with the

20   Court's ruling.

21             THE COURT:  Mr. Everdell.

22             MR. EVERDELL:  I don't think we have an objection if

23   it's the government was directed or however --

24             THE COURT:  Thank you.  The instruction, in total,

25   would read -- my next question after this is the parties'

LC6Cmax1

1   request as to timing of giving the instruction.

2           So the instruction is, you'll hear testimony from the

3   next witness about interactions that she says she had with the

4   defendant and Mr. Epstein.  I instruct you that because the

5   witness -- I instruct you that because -- sorry.  Let me start

6   over.

7           You'll hear testimony from the next witness about

8   interactions that she said she had with the defendant and

9   Mr. Epstein.  I instruct you that because the witness was over

10  the relevant age of consent at the relevant time period, any

11  sexual conduct she says occurred with Mr. Epstein was not,

12  quote, illegal sexual activity, end quote, as the government

13  has charged in the indictment.  For that reason, I have

14  directed the government not to ask this witness the details of

15  any sexual conduct she says occurred with Mr. Epstein.

16          I instruct you that this witness is not a victim of

17  the crimes charged in the indictment.  To the extent you

18  conclude that her testimony is relevant to the issues before

19  you, you may consider it.  However, you may not convict the

20  defendant on the basis of the testimony regarding the sexual

21  conduct between this witness and Mr. Epstein, nor may you

22  consider this testimony as any kind of reflection on

23  Mr. Epstein's or Ms. Maxwell character or propensity to commit

24  any of the crimes charged in the indictment.

25          Mr. Rohrbach.

LC6Cmax1

```
 1              MR. ROHRBACH:  That's fine, your Honor.  Thank you.

 2              THE COURT:  Mr. Everdell.

 3              MR. EVERDELL:  That's fine.

 4              THE COURT:  Timing as to when to give the instruction?

 5              MR. ROHRBACH:  The government's proffer is to give the

 6     instruction before the witness testifies.

 7              THE COURT:  So straightaway, she's sworn and I give

 8     the instruction?

 9              MR. ROHRBACH:  Your Honor, the government's preference

10     is it would occur before she takes the stand.  It can be after

11     the government calls for her testimony, but that way the

12     witness herself is not present while the instruction is given.

13              THE COURT:  Mr. Everdell.

14              MR. EVERDELL:  Your Honor, defense prefers that the

15     witness is on the stand when the instruction is given to the

16     jury.  We agree that it should be given before she testifies,

17     but she should be on the stand so that the jurors can see who

18     we're talking about and understands who it pertains to.

19              MR. ROHRBACH:  The witness will enter the room as soon

20     as the instruction is complete, your Honor.  I think the jury

21     will fully understand that it is in reference to that witness.

22              MR. EVERDELL:  Your Honor, the government is trying to

23     divorce this instruction as much as they can from this witness.

24     It's very evident that that's the purpose of doing it while

25     she's not on the stand.
```

LC6Cmax1

1           THE COURT:  I think what makes sense is she comes in,

2     she's sworn before any questions on direct, I give the

3     instruction, and then the direct testimony begins.

4           Next issue is the 900 series.  The government seeks to

5     admit photographs of the interior of Jeffrey Epstein's New York

6     apartment taken in 2019.  The government claims that the photos

7     are probative of how Epstein's apartment appeared when Jane,

8     who previously testified, saw it as early as 1994 and therefore

9     corroborates her testimony.  Trial transcript at 1075 to 76.

10    The defense objected to the photos' admission.  I sustained the

11    objection based on the current record.  Trial transcript at

12    1077.

13          I noted that while, quote, older photographs of

14    immoveable objects and structures may be relevant, end quote,

15    photos of, quote, very moveable objects, end quote, are not

16    relevant unless, quote, there is a witness, end quote, that

17    confirms the photos are similar to how the objects appeared

18    years earlier.  Trial transcript at 1076 to 77.

19          With the leave of Court, the government filed a letter

20    on December 4th, 2021, requesting admission of at least a

21    subset of the photographs.  The defense filed a response on

22    December 5th.

23          I must determine the probative value of the photos and

24    then determine if that relevance is substantially outweighed by

25    unfair prejudice.  A photograph of the scene may be relevant

LC6Cmax1

even if taken months or years after the time period in question
if there is reason to believe the photo is probative of how the
scene appeared at the earlier time.  See, for example, *United
States v. Causey*, 748 F.3d 310, which is a Seventh Circuit
decision from 2014.

Typically, this inquiry turns on whether the photo
depicts, quote, relatively enduring or fixed structures whose
locations and arrangement in location to one another would not
likely have changed, end quote, in the intervening time period.
I'm quoting here from *United States v. Smith*, 2020WL5663433,
which is a District of New Mexico 2020 decision.

For example, the Seventh Circuit in the *Causey* case
affirmed the admission of photographs of houses taken three and
six years after the conspiracy ended, stating that, despite the
significant passage of time, the photos were relevant because
they presented the jury with the layout, size, location, and
composition of the houses.  748 F.3d at 316.

Similarly, a Court in this circuit admitted crime
scene photos of the interior of a restaurant taken nine months
later where there was no argument that the photographs at issue
did not fairly and accurately depict the interior of the
restaurant.  *Walker v. Conway*, 2007WL9225072, Western District
of New York, June 25, 2007.

The defense argues that admission of the photos is not
merely a matter of relevance and prejudice under 401 and 403,

LC6Cmax1

but also of authentication under Rule 901, a proposition for

which the defense cites a Ninth Circuit case from 1977, *United*

*States v. Sterns*, 550 F.2d 1167, which is Ninth Circuit 1977.

I disagree.  Rule 901 requires that the proponent must

produce evidence sufficient to support a finding that the item

is what the proponent claims it is.  Here, the government

claims that the photographs are of Epstein's apartment in 2019,

a claim that I understand will be provided via testimony and

that the defense does not dispute.  Whether those photos taken

in 2019 are probative of how the apartment appeared in 1994 is

a question of relevance under Rule 401 to be balanced with 403,

not of authentication.  See *United States v. Certified*

*Environmental Services Inc.*, 753 F.3d 72 at 90, which is a

Second Circuit decision from 2014 I'll quote here.  Quote, with

respect to temporal relevance, we have held that a suggestion

that an item of evidence relates to a period that is too remote

goes to both the item's relevance and its weight.  That case

quotes itself from another Second Circuit case, *Fitzgerald v.*

*Henderson*, 251 F.3d 345 at 365, Second Circuit 2001.  Though,

to be clear, the government, as I said, will still need to

authenticate that the photos are of Epstein's apartment in

2019.

In any event, even if analyzed under Rule 91, as I'll

discuss below in a moment, Jane's testimony about the

distinctive characteristics of Epstein's apartment captured in

LC6Cmax1

1   the photos that the Court will admit are a sufficient basis

2   under 901(b)(4) which permits authentication based on the

3   appearance, contents, substance, internal patterns or other

4   distinctive characteristics of the item taken together with all

5   of the circumstances.  *United States v. Al Farekh*, 810 F.Appx

6   2144, Second Circuit 2020.

7           Based on this case law, the Court will address the

8   government's requested photographs specifically.

9           First, the government seeks to admit six photos,

10  Exhibits 909 through 911, and 913, 915, and 933 that depict

11  structural features of Epstein's apartment.  These photos

12  corroborate Jane's testimony that the apartment was massive and

13  contained lots of stone and old wood.  Trial transcript 317 to

14  18 and 320.  These are structural features likely to have

15  remained relatively unchanged, even years later.  Indeed, the

16  defense expressly does not object to these photos.  I admit

17  these six photos.

18          Second, I will admit the photos of Epstein's massage

19  room, photos 902 through 904, 917 and 928, but only if the

20  pictures on the wall are redacted.  The exhibits could

21  corroborate several aspects of Jane's testimony, including that

22  the room was the size of a giant walk-in closet, but space for

23  a giant massage table in the middle of it.  Trial transcript at

24  320.

25          She also described it as very dark and with a red mood

LC6Cmax1

1     and testified that there was a built-in bookcase on the

2     right-hand side.  These are structural features of the massage

3     room, not moveable objects that are unlikely to have changed

4     during the interveining period.  See *United States v. Diecidue*,

5     603 F.2d 535 at 560, Fifth Circuit 1997, which stated that,

6     quote, the floors and walls of the house are relatively

7     permanent fixtures, fixtures that would not likely be subject

8     to removal.

9             The massage table in the photo demonstrates the room's

10    size, layout, and purpose as Jane testified to them, not to

11    prove that it's the same massage table that Jane saw.  But the

12    pictures on the wall must be redacted from these photos.

13            First, the pictures on the wall are not structural or

14    unmoveable, they don't go to the room's size, layout, or

15    purpose.  Unless a witness testified that the pictures in the

16    2019 photos are the same as those in the room years earlier,

17    the photos are not probative as to the presence of those

18    pictures.  Indeed, the government admits that it would not

19    argue the particular pictures in the photos were presented

20    while Jane testified she was abused.

21            Second, the government indicates that Jane agrees that

22    Jane did not testify to any art in the massage room.  Rather,

23    she testified that she did not look at the walls in the room.

24    The presence of the pictures, therefore, cannot corroborate

25    Jane's testimony and the pictures on the wall risk prejudice

LC6Cmax1

1   because they're likely to distract or confuse jurors.

2            With those photos redacted from the photos, I do

3   conclude the probative value of the photos of the massage room

4   is not substantially outweighed by unfair prejudice.  As

5   indicated, the photos corroborate Jane's description of the

6   massage room and would assist the jury in understanding the,

7   quote, layout, size, location, and composition, end quote, of

8   the space.  *Causey* 748 F.3d at 316.

9            I see little risk of prejudice.  The exhibits show

10  features of the massage room to which Jane has testified and

11  the jury has heard because the jury will know the length of

12  time that's passed between Jane's experience as she testified

13  to and the photos.  It can determine the photos' probative

14  weight.  See *Certified Environmental Services*, 753 F.3d at 90.

15           The third set of photos that the government seeks to

16  admit, photos 918 and 921, depict several back massagers and a

17  bathroom drawer.  The government argues that these photos

18  corroborate Jane's testimony that Epstein used vibrators and

19  back massagers of different sizes in abusing her.  The Court

20  will exclude these photos.

21           First, these items are highly moveable, such that a

22  photo taken decades later is not probative of the items that

23  Epstein owned at the time that Jane testified she was abused.

24           Second, the government has not presented any testimony

25  that the massagers in the photos match or are similar to the

LC6Cmax1

massagers to which Jane testified.  In short, these photos have

little, if any, relevance and they're likely prejudicial

because they are likely to confuse the jury.

     The four sets of photos that the government seeks to

admit, photos 936 and 938, depict a room with a stuffed tiger

and a stuffed dog.  The government argues that these photos

corroborate Jane's testimony that Epstein's apartment

contained, quote, creepy-looking animals and animal heads and

strange things.  Trial transcript at 305 to 318.

     I will exclude these photos, first, both the dog and

tiger are moveable items such that the photos taken in 2019

are, without additional testimony, not probative of what Jane

would have seen years earlier.  Second, though Jane described

artwork of animals, she did not describe a stuffed dog or

tiger.  The photos therefore have little corroborative value,

even if, as the government argues, the dog and tiger are highly

idiosyncratic.  And the photos are unfairly prejudicial because

they're likely to confuse the jury by suggesting that these

same items were in Epstein's apartment at the time that Jane

was there.  Further, the idiosyncratic nature of the items is

likely to distract the jury, it could delay trial as the

connection to Jane's testimony is tenuous at best.

     I'll note that, as I've said, the schoolgirl outfits

found in the New York apartment in 2019 that the government

intends to introduce, as I said on Friday, I anticipate these

LC6Cmax1

1    would be admissible if the witness connects these outfits to

2    the applicable timeframe by testifying that they're similar to

3    the outfits she was allegedly instructed to wear.

4         Last, the government references photos taken in

5    Epstein's apartment that depict photos of celebrities.  I think

6    the government here represents that it doesn't intend to admit

7    these photos but will elicit the testimony of law enforcement

8    officers that they saw celebrity pictures.  Government's brief

9    at 12.  Defense notes it would oppose admission of the photos.

10   I'll reserve judgment until I have a better sense of what the

11   government is seeking to do with those photos.

12        MR. ROHRBACH:  Your Honor, can I ask a clarification

13   question on the last point.  I expect the government will ask

14   that witness about the decor of Epstein's house and that the

15   witness will say something like there were many photos of

16   celebrities and nude photos of women, but the government would

17   not offer any exhibits that demonstrate that fact.  So the

18   government just wants to make sure that that question would be

19   a proper question.  I understand the Court is reserving until

20   it hears the answer.

21        THE COURT:  I'm reserving on the admission of the

22   exhibits, which it sounds like you're not moving?

23        MR. ROHRBACH:  We're not planning.

24        THE COURT:  I don't see anything wrong with that

25   question.

LC6Cmax1

1          MR. ROHRBACH:  Thank you, your Honor.

2          THE COURT:  I note that, with my thanks to the

3     government, the redacted photos of the 200 series were part of

4     what the Court received in the supplemental production this

5     morning, Ms. Comey.

6          MS. COMEY:  Yes, your Honor.  I think we would propose

7     just to offer those formally at the beginning of the trial day

8     when the jury comes in and then it can be released to the

9     public.

10          THE COURT:  Okay.  Any objection to this that process,

11     Mr. Everdell?

12          MR. EVERDELL:  Your Honor, we got them pretty late, we

13     haven't a chance to review the redactions.  I'm assuming

14     they're fine, we don't have objection to process, we would just

15     like a chance to look at them.

16          THE COURT:  Of course.  Let us know when you've had a

17     chance and they can be moved in front of the jury.

18          I will ask, so going forward, any items that had been

19     admitted in redaction form to the extent the witness or the

20     jury is looking at the unredacted version, the government

21     should show the public the redacted version.

22          MS. COMEY:  Yes, your Honor.

23          THE COURT:  And going forward, on new exhibits, I

24     think it should be, it's what I had imagined, but we're a

25     little behind, that as the witness and the jury are looking at

LC6Cmax1

1    an unredacted version, the government should move at the same

2    time the redacted version so that, simultaneous to the

3    testimony, the public can see the redacted.

4            MS. COMEY:  Yes, your Honor.

5            THE COURT:  Okay.  Mr. Everdell.

6            MR. EVERDELL:  I understand the Court's instructions

7    on that --

8            THE COURT:  Microphone, please.

9            MR. EVERDELL:  I understand the Court's instructions

10   on that, so we will do our best to try to get those redacted

11   versions cued up.  It may take some time, we'll try to catch

12   up, but we'll do our best.

13            I understand the Court's rulings on the 900 series,

14   but I just didn't get the full list of the massage room photos

15   that you said could be admitted in redacted form.

16            THE COURT:  909, 910, 911, 913, 915, 933.  That's

17   wrong.  Those are the one you consented to.  902, 903, 904,

18   917, 928 with redactions.

19            MR. EVERDELL:  Thank you, your Honor.  I do have one

20   other matter to take up, if that's appropriate.

21            THE COURT:  Okay.

22            MR. EVERDELL:  As you may recall, your Honor, the last

23   witness on Friday was Sergeant Michael Dawson.  The government

24   and the defense have agreed to a testimonial stipulation, which

25   we will execute I think shortly -- right now.  We would like if

LC6Cmax1

1    the defense could read that stipulation before the calling of

2    the next witness.

3              MR. ROHRBACH:  No objection.

4              THE COURT:  And just by background, I imagine you had

5    just one or two questions left and the government said rather

6    than having him come back, would you stipulate to testimony,

7    you agreed, and that's the stipulation?

8              MR. EVERDELL:  Actually, we offered, Judge, because we

9    didn't want him to have to travel back from Florida, but yes,

10   that's how it worked.

11             THE COURT:  I appreciate both sides doing that.  As

12   you see, when I tell the jury we'll end at 5:00, we end at

13   5:00, but sometimes that produces issues.  Obviously let me

14   know if we're one or two questions away, but I appreciate the

15   parties working together to aid that.

16             So the suggestion is the jury comes out, I tell them

17   that -- what would you like me to tell them, Mr. Everdell?

18             MR. EVERDELL:  The government can weigh in, but I

19   would simply tell them that the parties have reached a

20   stipulation about some additional testimony that the last

21   witness you heard from, Sergeant Michael Dawson, would have

22   given on the stand.  For matters of convenience, we didn't want

23   to call him back.  So the parties have agreed to read in a

24   stipulation about his additional testimony.

25             THE COURT:  And then the defense could read the stip?

LC6Cmax1

1          MR. EVERDELL:  Yes.

2          MS. COMEY:  That's fine, your Honor.  And we thank the

3     defense for their courtesy to Sergeant Dawson.

4          THE COURT:  All right.  That all sounds good.  What

5     else can I take up?

6          MR. ROHRBACH:  There is one matter from the

7     government, your Honor.  Over the weekend, the parties had a

8     productive conversation about topics of cross examination for

9     Kate, the next witness.  There is one matter the government

10    wanted to raise with the Court, which is that we expect from

11    our conversations with the defense that the defense is likely

12    to elicit from this witness -- your Honor, may we do this at

13    sidebar?

14         THE COURT:  Yes.

15         (At the sidebar)

16         MR. ROHRBACH:  So the government understands that the

17    defense is likely to elicit from this witness the name of her

18    counsel and possibly do a courtroom identification of the

19    witness's counsel.  The government objects on the grounds that

20    there is no relevance to either of those --

21         MS. STERNHEIM:  Judge, my feeling is when a witness

22    elects to have her counsel in the courtroom for support or for

23    whatever other reason, it is fair game to ask if her counsel is

24    here.  That's a choice that the government has elected to make,

25    it is a choice that some attorneys elect.  I can say in my 35

LC6Cmax1

1  years in practice, I have never been in the courtroom when my

2  client testifies for this very reason.

3       MR. ROHRBACH:  The government wouldn't object to the

4  question, is your attorney in the courtroom today.  It's the

5  additional, what is the name of your attorney, can you point

6  out your attorney to the jury, those questions the government

7  thinks has no relevance.

8       THE COURT:  I agree.  Are you represented, is your

9  attorney here, I've certainly seen witnesses testify with their

10  attorney in the room.  So beyond that, what's the relevance of

11  the attorney --

12       MS. STERNHEIM:  The relevance is that this is an

13  attorney who sat through the proffer sessions with her, this is

14  the attorney who was instrumental in starting the Epstein Fund,

15  this is an attorney who has written about her while this case

16  is pending in his own book.  There is a tremendous amount of

17  handling that is going on and I think the jury is entitled to

18  know that.

19       THE COURT:  How is that information going to --

20       MS. STERNHEIM:  I'm going to ask her questions about,

21  the book is public, she's in the book.  I think that she has

22  agreed to have her story put in a book, not in her own name,

23  and I'm not going to make reference to her name, but I think

24  all of these things are fair game.  There are many other topics

25  that I will be raising prior to my cross examination.  This is

LC6Cmax1

1    one that the government chose to flag at this time.

2              MR. ROHRBACH:  Your Honor, all of those -- those may

3    or may not be lines of cross depending on exactly how the

4    question is phrased, but the government is not objecting to

5    them in advance now.  The government's objection is to the

6    specific identification of the particular counsel, which we

7    don't think is relevant.

8              And I'd note that I think this counsel's name was used

9    in cross examination of other witnesses already, so the

10   government is trying to, in part, prevent a suggestion that

11   this lawyer is involved in some kind of broader conspiracy for

12   which there is no evidence.  So that's a level of prejudice.

13             THE COURT:  You can ask if she's represented, you can

14   ask what her counsel's name is, I don't see a relevance, you

15   can ask if your attorney is in the courtroom, a spectacle of

16   pointing him out.

17             MS. STERNHEIM:  I don't need to do that, Judge.  I'm

18   not trying to make a spectacle of this.  I'm just trying to

19   have the record covered.

20             THE COURT:  I'll allow that.  Counsel, any reason for

21   sealing this?

22             MS. STERNHEIM:  I don't think so.

23             MR. ROHRBACH:  I don't think that's necessary.  We

24   didn't use any names.

25             THE COURT:  Okay.  Not sealed.

LC6Cmax1

1            (In open court)

2            THE COURT:  Anything else to take up?

3            MR. EVERDELL:  Nothing from the defense, your Honor.

4            MS. MOE:  Your Honor, one last issue with respect to

5     three exhibits.  We had a chance to review the transcript from

6     last week from the cross examination of Jane, we noticed that

7     there were three defense exhibits that were offered which were

8     not offered under seal but which contained identifying

9     information for Jane, so we wanted to address that.  We

10    conferred with defense about that.

11           Taking those exhibits in order, the first is

12    Defendant's Exhibit J15.  So this exhibit contains some

13    redactions, but there is additional identifying information as

14    to Jane.  I flagged that for defense counsel.  What we would

15    propose is that we work together to mark a further redacted

16    version which would become J15R, and that J15 itself would

17    remain as it is and under seal as it is offered during her

18    testimony.  So we'll work with the defense to propose

19    additional redactions, mark that, and make sure that that's in

20    the record, but I just wanted to flag that because, as it

21    stands, the underlying exhibit is not yet received under seal

22    and because that contains identifying information, we'd ask

23    that that exhibit be sealed at this juncture.

24           MS. MENNINGER:  I don't believe that J15 does have

25    other additional identifying information, but I'm happy to

LC6Cmax1

speak with Ms. Moe and we can try to come to an agreement about

any further redactions.  It was a civil case that was filed

under a pseudonym, and I don't know if we'll be able to reach

agreement, but we'll certainly try as far as a further -- I

don't have an objection to having a conversation about

potential further redaction.

             THE COURT:  Okay.  So J15 is sealed pending

conversation that you'll discuss about redactions and just

would like to button that up by the end of the day.

             MS. MOE:  Thank you, your Honor.  We'll do that.

             THE COURT:  Thank you, counsel.

             MS. MOE:  There are two additional exhibits, those are

Defendant's Exhibit J8 and J9.  Those are both state court

documents.  There are some redactions on them in their current

form, but because the unredacted versions are public, anyone in

possession of these redacted versions would be able to compare

them against court records that have the full information which

would be identifying as to Jane.  For that reason, our view is

that these documents should be under seal in their current

form.  If the defense wants to unredact more from the sealed

versions, the jury has a complete unredacted version, we

certainly would have no objection to that.  But because these

are court documents that can be compared up against public

records that would easily identify Jane if a redacted version

were released to the public, and for that reason, these

LC6Cmax1

1    exhibits should be under seal.

2              THE COURT:  I thought I did admit that under seal, but

3    maybe I misremembered.

4              MS. MENNINGER:  Your Honor, we ended up admitting the

5    one complete document.  It is now marked J8 and 9 because it's

6    the one that contains the seal.  I think to narrowly tailor

7    redactions so that it can't be matched up, it may include the

8    case number, for example, certainly the plaintiffs' names, but

9    otherwise I think there is a way to redact this so that the

10   public has access to the bulk of the exhibit, but just not the

11   personally identifying information.

12             Again, I'm happy to speak with Ms. Moe about what she

13   believes are the things that would lead to be a personally

14   identifying piece of information, but portions of it, including

15   the defendants' names and other pieces were testified about

16   publicly on the record, not under seal.

17             So, I think to keep the entire exhibit under seal does

18   not comport with Lugash and the other precedent that requires

19   us to sort of take a pen to the parts that are concerning.

20             THE COURT:  So let's do this, same process.  If I

21   didn't already, J8 and J9 are temporarily sealed and you'll

22   confer on redactions.

23             MS. MOE:  Yes, your Honor.  We'd be happy to confer.

24   I do want to flag, because these documents are entirely public

25   in full, it is very easy for a member of the public to compare

LC6Cmax1

1   them against other public records, which are unredacted and

2   have Jane's identifiers.  So the redactions we would propose

3   would be substantial and perhaps beyond recognition in order to

4   avoid that problem.

5          For example, in a civil case in this district, if you

6   were print out from ECF the full docket entry and it were a

7   public document that had identifiers for the person who filed

8   that civil suit, in order to redact it to make sure someone

9   couldn't troll around PACER and find the public version, you

10  would have to redact essentially everything, and that's the

11  problem here.  The same is true for the copy --

12         THE COURT:  Please just take a look, see if there is

13  an agreement that you'll propose to me, taking into account

14  also what is already public regarding the document in the trial

15  transcript.

16         So, one of the lessons, too, is that simply you can't

17  just look in isolation.  So if information is already public,

18  then redacting it -- but you'll look and see if there is some

19  appropriate middle ground that would ensure the continued

20  privacy of the witness consistent with the law.

21         MS. MOE:  Yes, your Honor.  Thank you.

22         THE COURT:  Thank you.  And we have all of our jurors.

23  Everybody ready?  Okay.  We'll bring them in.

24         MR. ROHRBACH:  Your Honor, we need just a minute or

25  two to print and sign the stipulation.

LC6Cmax1

1        THE COURT:  Okay.  We'll take a minute.

2        (Pause)

3        Counsel, are you ready?

4        MR. ROHRBACH:  Yes, your Honor, we're ready.

5        THE COURT:  Okay.  We'll bring in the jury.

6        (Continued on next page)

LC6Cmax1

1          (Jury present)

2          THE COURT:  Good morning, members of the jury.  Nice

3     to see you.  I hope you had a good weekend.  Thank you again

4     for your diligence and punctuality.  It's much appreciated.

5     You may recall that the last witness testified before we broke

6     on Friday was Sergeant Dawson.  That testimony was almost

7     finished, so as a matter of convenience so as not to call

8     Sergeant Dawson back, the parties agreed to stipulate to some

9     remaining testimony.

10          Mr. Everdell, I'll ask you to please read the

11     stipulation that the parties agreed to.

12          MR. EVERDELL:  Yes, your Honor.

13          THE COURT:  Thank you.

14          MR. EVERDELL:  It is hereby stipulated and agreed by

15     and among the United States of America, by Damian Williams,

16     United States Attorney for the Southern District of New York,

17     and Maureen Comey, Alison Moe, Lara Pomerantz, and Andrew

18     Rohrbach, Assistant United States Attorneys of counsel, and

19     defendant, Ghislaine Maxwell, by and with the consent of her

20     attorneys, Christian Everdell, Laura Menninger, Jeffrey

21     Pagliuca, and Bobbi Sternheim that:

22          One, Sergeant Michael Dawson, who previously testified

23     in this case, would have given the following additional

24     testimony on cross examination:  The cardboard box shown in

25     Government Exhibit 294, which was recovered during the search

LC6Cmax1

1  of Jeffrey Epstein's Palm Beach residence on October 20th,

2  2005, was found in the closet of one of the guest bedrooms on

3  the second floor of the residence.  The two items inside the

4  cardboard box, which are visible in Government Exhibit 294,

5  were still in their original boxes unopened.

6          It is further stipulated and agreed that this

7  stipulation, marked as Defendant's Trial Exhibit B, may be

8  received in evidence at trial.  And it's dated today's date

9  December 6th, 2021, and signed by the parties.

10          THE COURT:  And you move for admission.

11          MR. EVERDELL:  We move for the admission of

12  Defendant's Tribal Exhibit B.

13          MS. COMEY:  No objection.

14          THE COURT:  Without objection and on stipulation,

15  Defendant's Trial Exhibit B is admitted.  Thank you, counsel.

16          (Defendant's Exhibit B received in evidence)

17          Mr. Rohrbach, you may call your next witness

18  Ms. Comey.

19          MS. COMEY:  Your Honor, at this time, the government

20  would move certain redacted exhibits into evidence.  In

21  particular, the government would move Government Exhibit 223R,

22  224R, 225R, 234R, 241R, 243R, 244R, 246R, 247R, 248R, 249 R,

23  250R, 252R, 253R, 254R, 255R, 281R, 282R, 285R, 286R, and 287R

24  in evidence as redacted versions of exhibits that the Court

25  already received under seal.

LC6Cmax1

1          THE COURT:  Mr. Everdell.

2          MR. EVERDELL:  No objection, your Honor.

3          THE COURT:  Thank you.  The redacted R series exhibits

4    that Ms. Comey just read are admitted as redacted versions of

5    previously admitted exhibits.  Thank you.

6          (Government's Exhibits 223R, 224R, 225R, 234R, 241R,

7    243R, 244R, 246R, 247R, 248R, 249 R, 250R, 252R, 253R, 254R,

8    255R, 281R, 282R, 285R, 286R, 287R  received in evidence)

9          MS. COMEY:  Thank you, your Honor.

10          THE COURT:  Government may call its next witness.

11          MS. POMERANTZ:  Thank you, your Honor.  The government

12    calls Kate.

13          THE COURT:  The witness testifying under the pseudonym

14    Kate may come forward.

15     KATE,

16        called as a witness by the Government,

17        having been duly sworn, testified as follows:

18          THE COURT:  You may be seated.  We'll refer to you as

19    Kate.  You may remove your mask.

20          Members of the jury, before we begin the direct, I

21    have a limiting instruction.  You will hear testimony from the

22    next witness about interactions that she says she had with the

23    defendant and Mr. Epstein.  I instruct you that because the

24    witness was over the relevant age of consent at the relevant

25    time period, any sexual conduct she says occurred with

LC6Cmax1

1    Mr. Epstein was not, quote, illegal sexual activity, end quote,

2    as the government has charged in the indictment.  For that

3    reason, I have directed the government not to ask this witness

4    about the details of any sexual conduct she says occurred with

5    Mr. Epstein.

6            I instruct you that this witness is not a victim of

7    the crimes charged in the indictment.  To the extent you

8    conclude her testimony is relevant to the issues before you,

9    you may consider it.  However, you may not convict the

10   defendant on the basis of the testimony regarding the sexual

11   conduct between this witness and Mr. Epstein, nor may you

12   consider this testimony as any kind of reflection on

13   Mr. Epstein's nor Ms. Maxwell's character or propensity to

14   commit any crimes charged in the indictment.

15           Ms. Pomerantz, you may proceed with your direct

16   examination.

17           MS. POMERANTZ:  Thank you, your Honor.  Your Honor, in

18   light of the Court's order regarding sketch artists, I just

19   wanted to --

20           THE COURT:  Thank you, Ms. Pomerantz.  I remind the

21   sketch artists that witnesses who I've permitted to testify

22   under a pseudonym shall not have their exact likenesses drawn

23   to protect their anonymity.  Thank you, Ms. Pomerantz.  You may

24   proceed.

25           MS. POMERANTZ:  Thank you, your Honor.

LC6Cmax1                    Kate - direct

1   DIRECT EXAMINATION

2   BY MS. POMERANTZ:

3   Q.  Good morning.  If you could pull up to the microphone so we

4   can hear you.

5   A.  That's fine?

6   Q.  Yes.  Thank you.  To be clear, are you testifying under the

7   name Kate today?

8   A.  Yes.

9   Q.  Is Kate your real name?

10  A.  No.

11  Q.  Leading up to this trial, did you ask to testify under a

12  pseudonym to protect your privacy?

13  A.  I did.

14  Q.  Kate, can you take a look, there should be a binder next to

15  you.

16          MS. POMERANTZ:  Your Honor, at this time, I would

17  request that the jurors be permitted to take out their binders

18  and turn to Government Exhibit 16, which is in evidence under

19  seal.

20          THE COURT:  It is in evidence already.  Let me just

21  confirm.

22          MS. POMERANTZ:  Thank you, your Honor.

23          THE COURT:  Without objection, Ms. Sternheim?

24          MS. STERNHEIM:  Without objection.

25          THE COURT:  Members of the jury, you may pick up your

LC6Cmax1                    Kate - direct

1    binders, please, the large binders, and turn to GX16, which is

2    in evidence.

3    Q.  Kate, you can pull the microphone closer to you.  Thank

4    you.

5           Kate, can you please let me know when you're at

6    Government Exhibit 16?

7    A.  Yes, I am.

8    Q.  Do you recognize that?

9    A.  Yes, I do.

10   Q.  What is that?

11   A.  It's my birth certificate.

12   Q.  Is that the name that you were born with?

13   A.  Yes.

14          MS. POMERANTZ:  Your Honor, at this time, I would ask

15   just the witness, not the jurors, to turn to what has been

16   marked for identification as Government Exhibit 18.

17          THE COURT:  Members of the jury, please don't -- why

18   don't you close your binders for the moment.  Thank you.

19          The witness may turn, please, to GX18.

20          Again, members of the jury, please don't go there yet

21   until the document has been admitted.

22   BY MS. POMERANTZ:

23   Q.  Kate, do you recognize that?

24   A.  Yes.

25   Q.  What is that?

LC6Cmax1                          Kate - direct

1   A.  It's my driver's license.

2   Q.  Is that your current legal name?

3   A.  Yes.

4          MS. POMERANTZ:  Your Honor, the government offers

5   Government Exhibit 18 under seal.

6          MS. STERNHEIM:  No objection.

7          THE COURT:  GX18 is admitted under seal consistent

8   with my ruling to protect this witness's anonymity.

9          (Government's Exhibit 18 received in evidence)

10          Ms. Pomerantz, do you wish to publish to the jury?

11          MS. POMERANTZ:  Yes, your Honor, if we can now publish

12   to the jury, please.

13          THE COURT:  Members of the jury, you may open your

14   binder and look at GX18, please.

15   BY MS. POMERANTZ:

16   Q.  Kate, how far did you go in school?

17          THE COURT:  I'll ask the members of the jury to put

18   their binders away, please.

19          MS. POMERANTZ:  Thank you, your Honor.

20   Q.  Kate, how far did you go in school?

21   A.  I finished some high school.

22   Q.  What kind of work do you do now?

23   A.  I work with mainly women who suffer with trauma and

24   substance use disorder.

25   Q.  What kind of work did you do before that?

1   A.  I was a working musician, singer, and songwriter.

2   Q.  When you were approximately 17 years old, where were you

3   living?

4   A.  I was living in England, London.

5   Q.  What neighborhood in London did you live?

6   A.  Belgravia.

7   Q.  Who did you live with at the time?

8   A.  My mother.

9   Q.  What was your life like at home with your mother at that

10  time?

11  A.  Well, my mother was having a difficult time and she had

12  been quite ill.  So it was a bit stressful and I was alone

13  quite a lot.

14  Q.  Did there come a time when you met Ghislaine Maxwell?

15  A.  Yes.

16  Q.  How did you meet Maxwell?

17  A.  I had been dating a man and we took a trip to Paris, and he

18  introduced me to Ghislaine Maxwell in Paris.

19  Q.  Approximately how old were you at the time you met Maxwell

20  in Paris?

21  A.  Approximately 17.

22  Q.  And approximately what year were you 17 years old?

23  A.  God, I can't do the math.  So that was '94.

24  Q.  Is that 1994?

25  A.  Yes.

LC6Cmax1                        Kate - direct

1    Q.  And you mentioned that you met her through a friend.  About

2    how old was the friend?

3    A.  He was about 35.

4    Q.  And what was the nature of your relationship with the

5    friend?

6    A.  We were dating.

7    Q.  Did you speak with Maxwell the night you met her?

8    A.  Yes.

9    Q.  What, if anything, did you and Maxwell speak about?

10   A.  We spoke about -- we spoke about the evening and where we

11   were, you know, we were headed to -- out for the evening.  And

12   we spoke about where I lived, we spoke about the man that I was

13   dating.  She was asking me things about myself.

14   Q.  What did Maxwell look like when you met her?

15   A.  She was very sophisticated and very elegant.  And she had

16   short -- quite short dark brown hair.  She just -- she was very

17   impressive.

18   Q.  About how old did she seem?

19   A.  In her 30s.

20          MS. POMERANTZ:  Ms. Drescher, can we please pull up

21   what's in evidence as Government Exhibit 115.

22   Q.  Do you recognize the person in this photograph?

23   A.  Yes.

24   Q.  Who is it?

25   A.  It's Ghislaine Maxwell.

1          MS. POMERANTZ:  We can take that down, Ms. Drescher.

2          Your Honor, at this time, I'd like to ask the witness

3   to look at what's been marked for identification as Government

4   Exhibit 109 in her binder.

5          THE COURT:  Okay.  The witness may look at GX109,

6   please.

7   Q.  Kate, are you at Government Exhibit 109?

8   A.  Yes.

9   Q.  Do you recognize this?

10  A.  Yes.

11  Q.  What is it?

12  A.  It's a picture of me.

13  Q.  Is this a fair and accurate depiction of your physical

14  appearance around the time you met Maxwell?

15  A.  Yes.

16          MS. POMERANTZ:  Your Honor, the government offers

17  Government Exhibit 109 under seal.

18          MS. STERNHEIM:  No objection.

19          THE COURT:  Thank you.  GX109 is admitted under seal

20  consistent with my ruling regarding pseudonyms.

21          (Government's Exhibit 109 received in evidence)

22          MS. POMERANTZ:  I request the jurors be permitted to

23  open their binders and turn to Government Exhibit 109, your

24  Honor.

25          THE COURT:  Jurors, you may look at your binders

LC6Cmax1                      Kate - direct

1    please and look at GX109.

2    BY MS. POMERANTZ:

3    Q.   About how old were you at the time this photograph was

4    taken?

5    A.   About 17.

6    Q.   And where was this photograph taken?

7    A.   It was in the backyard of our home where I lived with my

8    mother.

9          MS. POMERANTZ:   Your Honor, I believe that the jurors

10   can put the binder down now.

11         THE COURT:   Jurors, you may return your binders to the

12   floor, please.   Thank you.

13   Q.   When you and Maxwell were in Paris, did you and Maxwell

14   stay in touch?

15   A.   Yes.

16   Q.   How did you stay in touch?

17   A.   Well, I gave her my phone number on a piece of paper and

18   she called me.

19   Q.   Where did you give her your phone number?

20   A.   In Paris.

21   Q.   When was the next time you saw Maxwell?

22   A.   A few weeks later.

23   Q.   How did that meeting come about?

24   A.   She called me and invited me to go to tea at her house.

25   Q.   Did you go to Maxwell's house for tea?

1    A.  Yes.

2    Q.  Why did you go to Maxwell's house for tea?

3    A.  Well, I was quite excited to be friends with her and she

4    was friends with the man that I had been dating and she seemed

5    very exciting and she seemed to be everything that I wanted to

6    be.  And she seemed to -- she seemed to like me, so I was

7    excited to go.

8    Q.  Can you please describe for the jury Maxwell's house.

9    A.  Yes.  Her house was like a townhouse with a white front and

10   a red door.

11            You want me to describe the inside?

12   Q.  Why don't we pause there.

13            MS. POMERANTZ:  Ms. Drescher, would you pull up for

14   just the witness, the parties, and the Court what has been

15   marked for identification as Government Exhibit 702.

16   Q.  Kate, do you recognize this?

17   A.  Yes.

18   Q.  What is it?

19   A.  It's Ghislaine Maxwell's house.

20   Q.  Is this a fair and accurate depiction of the outside of

21   Maxwell's house?

22   A.  Yes.

23            MS. POMERANTZ:  Your Honor, the government offers

24   Government Exhibit 702.

25            MS. STERNHEIM:  No objection.

LC6Cmax1                    Kate - direct

1        THE COURT:  Thank you.  GX702 is admitted.  You may

2   publish.

3        (Government's Exhibit 702 received in evidence)

4        MS. POMERANTZ:  Thank you, your Honor.

5   Q.  Kate, in what neighborhood was this townhouse?

6   A.  In the same neighborhood I lived in, in Belgravia.

7        MS. POMERANTZ:  Ms. Drescher, we can pull that down.

8   Thank you.

9   Q.  What, if any, photographs did you see inside Maxwell's

10  house?

11  A.  There were -- there were lots of photographs and many of

12  them were of Ghislaine Maxwell with an older man with slightly

13  peppered hair, graying hair.  And in lots of the photographs,

14  he was looking at the camera and she was looking at him.

15  Q.  Did there come a time when you learned who the man in the

16  photographs was?

17  A.  Yes.

18  Q.  And who was the man in the photographs?

19  A.  Jeffrey Epstein.

20  Q.  Can you describe the rest of the townhouse for the jury,

21  please.

22  A.  Yes.  When I walked in, it was carpeted in pale carpet.  It

23  was very nicely decorated, the constable and nice beautiful

24  chairs.  There was a lot of silver-framed pictures that were

25  out.  And in that visit, I was just in the living room, which

LC6Cmax1                    Kate - direct

1   is the first room which I was in, and there was a staircase
2   going up.
3   Q.  So focusing on the first time that you went to Maxwell's
4   townhouse, can you describe for the jury what happened when you
5   went to her townhouse.
6   A.  Yes.  I had a really lovely time and I felt really special.
7   And I felt -- I felt that I had found a new connection that
8   could be really meaningful to me.  I had just moved back from
9   France to England and left the school that I was -- that I was
10  at and all my friends.  And I was really happy that we had
11  connected and that she seemed as excited as I was to have a new
12  friend.  And it was just -- I left that feeling exhilarated,
13  like somebody wanted me, like somebody wanted to be my friend.
14  Q.  What, if any, conversations do you remember having with
15  Maxwell about your family?
16  A.  I told her that things were quite difficult at my house and
17  that I lived alone with my mother and that she had been unwell
18  and struggling and that she would get very bad migraines, and I
19  would often try and take care of her and give her massages and
20  bring her cups of tea.
21  Q.  What, if any, conversations do you recall having with
22  Maxwell about what you wanted to do with your life?
23  A.  Well, I had been offered a place at Oxford University to
24  study law, and she shared that she had been to that university.
25  And that I shared with her that I also was really interested in

1  music and I loved music and I was interested in pursuing that,

2  but I was worried to tell my parents because they really wanted

3  me to go to law school, as most parents would.  And I was quite

4  athletic, although I was very thin, and I told her that I was

5  interested in martial arts, as well.

6  Q.  What, if any, conversations do you remember having with

7  Maxwell during tea about her personal life and relationships?

8  A.  She told me lots of amazing things about her boyfriend and

9  she said that he was a philanthropist and that he liked to help

10  young people, and that, at some point, it would be really

11  wonderful for me to get to meet him and that we shared so many

12  things in common and that -- yeah, just that it would be great

13  for me to get to meet him at some point.

14  Q.  What, if anything, did Maxwell say about how Epstein would

15  respond to you?

16  A.  Oh, she said that he was going to love me and that I was

17  exactly the kind of person he would like to help.  She seemed

18  very genuinely excited about it, and I was excited, too.

19  Q.  What was your reaction to the attention that Maxwell was

20  paying you?

21  A.  I mean, I was 17 and I liked to have attention.  And I

22  was -- I was lonely and I had not found a group of friends yet.

23  So I was really glad to have found somebody who was also older

24  than me who I felt could maybe guide me as she seemed to have a

25  lot of connections and opportunities to guide me and be very

1   willing to do so.

2   Q.  Did there come a time when you met Epstein?

3   A.  Yes.

4   Q.  About how long after you had tea at Maxwell's townhouse did

5   you meet Jeffrey Epstein?

6   A.  A few weeks later.

7   Q.  Where did you meet Epstein?

8   A.  At Ghislaine Maxwell's house.

9   Q.  When you first met Epstein, approximately how old was he?

10  A.  He seemed to be in his 40s.

11  Q.  How did you come to meet Epstein at Maxwell's townhouse?

12  A.  Ghislaine called me and she was -- called me to tell me

13  that he was in town and she would really love if I could come

14  over to meet him and that it was -- there was a sense of

15  urgency, that it was like very important that I take this

16  opportunity.

17  Q.  What was Maxwell's demeanor like during that conversation

18  on the phone?

19  A.  I would say she was very activated, very excited, and there

20  was a sense of urgency.

21  Q.  Now focusing on the time when you met Epstein at Maxwell's

22  house, who was at the house when you arrived?

23  A.  Ghislaine Maxwell and Jeffrey Epstein.

24  Q.  When you arrived, what was Jeffrey Epstein wearing?

25  A.  He was wearing sweatpants and a hoodie.

1    Q.   And what was Epstein doing when you arrived?

2    A.   He was sitting in a chair and he was on the phone talking

3    quite loudly.

4    Q.   Did Epstein stay on the phone the entire time you were at

5    Maxwell's townhouse?

6    A.   No.

7    Q.   Did there come a time when Epstein got off the phone?

8    A.   Yes.

9    Q.   What, if anything, did Maxwell say to Epstein about you

10   during that visit?

11   A.   She said this is the girl that I told you about and she

12   listed some of my accolades and said, you know, about me going

13   to -- possibly going to Oxford, but that I was also a really

14   talented singer, that I was really athletic, and that I was

15   strangely strong for my size.

16   Q.   You mentioned your size.  What was your size at the time?

17   A.   I was about 95 pounds.

18   Q.   What happened next?

19   A.   Next, after she said that I was very strong, she said why

20   don't you give his feet a little squeeze to show him how strong

21   you are.

22   Q.   Did you give his feet a little squeeze?

23   A.   Yes.

24   Q.   When you say that you gave his feet a little squeeze, what

25   does that mean?

1    A.  I massaged them.

2    Q.  And what happened next?

3    A.  And then he seemed to be very approving and he said, oh,

4    you can go ahead and do my shoulders.

5    Q.  Did you massage Epstein's shoulder?

6    A.  Yes.

7    Q.  What happened next?

8    A.  He said that I was very strong and he said that he likes

9    that I was very -- seemed to be -- know what I wanted.  And

10   they talked about something that I couldn't quite hear what

11   they were saying about like a music producer.  And then his

12   phone rang again.

13   Q.  After his phone rang, did you stay at Maxwell's house?

14   A.  No.

15   Q.  How did you end up leaving?

16   A.  He didn't say anything.  He just answered the phone and

17   started talking on the phone and then Ghislaine sort of ushered

18   me out.

19   Q.  And did you leave Maxwell's house?

20   A.  Yes.

21   Q.  After you left Maxwell's house, did you hear from her

22   again?

23   A.  Yes.

24   Q.  Approximately how long after you met Epstein at Maxwell's

25   house did you hear from Maxwell?

LC6Cmax1                          Kate - direct

```
 1   A.  Few weeks, couple of weeks.

 2   Q.  How did you communicate with Maxwell?

 3   A.  She called me.

 4   Q.  What, if anything, did Maxwell say when she called you?

 5   A.  She said that the -- Jeffrey was going to get a massage,

 6   but the massage therapist had canceled and could I please do

 7   her a favor and help her by coming over because I had such

 8   strong hands.

 9   Q.  Were you a massage therapist at the time?

10   A.  No.

11   Q.  Have you ever been a massage therapist?

12   A.  No.

13   Q.  Did you go to Maxwell's house?

14   A.  Yes.

15   Q.  Who was at Maxwell's house when you arrived?

16   A.  Ghislaine and Jeffrey.

17   Q.  What, if anything, did Maxwell say when you arrived at her

18   house?

19   A.  She said thank you so much for coming and I'm really

20   excited that you're here.

21   Q.  Did she comment about how often Epstein needed massages?

22              MS. STERNHEIM:  Objection to leading.

23              THE COURT:  Sustained.

24   Q.  What, if anything, did Maxwell say about Epstein and his

25   need for massages?
```

LC6Cmax1                        Kate – direct

1          MS. STERNHEIM:  Objection.  Leading.

2          THE COURT:  I'll allow it.  You may answer.

3     A.  Could you repeat the question, please.

4     Q.  What, if anything, did Maxwell say about Epstein's need for

5     massages?

6     A.  She said that he needed massages all the time and it was

7     very difficult to keep up.

8     Q.  Where did you and Maxwell go after that conversation?

9     A.  She led me up the stairs and opened the door to a room that

10    had a massage table in it.

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LC6VMAX2                        Kate - direct

 1    BY MS. POMERANTZ:

 2    Q.  Can you describe the room for the jury.

 3    A.  Yes.  It was dimly lit.  It was a small room.  There was a

 4    massage table, some towels, and Jeffrey was in the room.

 5    Q.  What was Epstein wearing?

 6    A.  He was wearing a robe.

 7    Q.  What, if anything, did he do with the robe?

 8    A.  He took off the robe.

 9    Q.  What, if anything, was Epstein wearing under the robe?

10    A.  He was naked.

11    Q.  Where was he when he removed the robe?

12    A.  Standing facing the door.

13    Q.  Where was Maxwell when Epstein removed the robe?

14    A.  In the doorway facing him.

15    Q.  What, if anything, did Maxwell give you?

16    A.  She gave me some massage oil.

17    Q.  Did you enter the room?

18    A.  Yes.

19    Q.  Did someone close the door?

20    A.  Yes.

21    Q.  Who closed the door?

22    A.  Ghislaine Maxwell closed the door.

23    Q.  After the door was closed, did you give Epstein a massage?

24    A.  Yes.

25    Q.  Without telling the jury the details, during the massage,

LC6VMAX2                        Kate - direct

1    did Epstein initiate sexual contact with you?

2    A.   Yes.

3    Q.   Did Epstein engage in a sex act with you during the

4    massage?

5    A.   Yes.

6    Q.   I'd like to move forward to the end of the massage.  After

7    it ended, where did you go?

8    A.   I left the room and started walking down the stairs.

9    Q.   And who, if anyone, did you see?

10   A.   I saw Ghislaine Maxwell.

11   Q.   What, if anything, did Maxwell say?

12   A.   She said -- she said, How did it go?  Did you have fun?

13   Was it good?

14   Q.   Can you describe Maxwell's tone when she made those

15   statements.

16   A.   She seemed very excited and happy.  She thanked me again.

17   Q.   Did you leave Maxwell's house?

18   A.   Yes.

19   Q.   Did there come a time when you saw Epstein again in London?

20   A.   Yes.

21   Q.   About how long after the massage you just testified about

22   did you see Epstein again?

23   A.   A few days later.

24   Q.   Where did you see Epstein again?

25   A.   In Ghislaine Maxwell's house.

1    Q.  Who invited you to her house?

2    A.  Ghislaine.

3    Q.  How did she invite you to her house?

4    A.  She called me.

5    Q.  When you arrived, what, if anything, did Maxwell say?

6    A.  She said, I'm so glad you're here.  You did such a good job

7    last time.  He wanted you to come back.

8    Q.  Where did you and Maxwell go?

9    A.  We went upstairs to the same room.

10   Q.  And when you went upstairs, was the door to the room open

11   or closed?

12   A.  Closed.

13   Q.  Who opened the door?

14   A.  Ghislaine.

15   Q.  Who, if anyone, did you see when Maxwell opened the door to

16   the room?

17   A.  Jeffrey.

18   Q.  What was Epstein wearing?

19   A.  He was naked.

20   Q.  Where was Epstein standing?

21   A.  Next to the massage table facing the door.

22   Q.  Where was Maxwell when you saw Epstein naked?

23   A.  In the doorway facing him.

24   Q.  What, if anything, did Maxwell say?

25   A.  She said, Have a good time.

LC6VMAX2                    Kate - direct

1    Q.  Did Maxwell leave the room?

2    A.  Yes.

3    Q.  Was the door closed?

4    A.  Yes.

5    Q.  Who closed the door?

6    A.  Ghislaine Maxwell.

7    Q.  Did you give Epstein a massage in the room?

8    A.  Yes.

9    Q.  And without telling the jury the details, during the

10   massage, did Epstein initiate sexual contact with you?

11   A.  Yes.

12   Q.  Did Epstein engage in a sex act with you during the

13   massage?

14   A.  Yes.

15   Q.  I want to move forward to the end of the massage.

16         After it ended, where did you go?

17   A.  I went downstairs again.

18   Q.  And who, if anyone, did you see?

19   A.  I saw Ghislaine Maxwell.

20   Q.  What, if anything, did Maxwell say to you after the

21   massage?

22   A.  She said, Did you have fun?  You're such a good girl.  And

23   I'm so happy you were able to come.  This is really great.  And

24   he obviously likes you a lot.

25   Q.  Can you describe Maxwell's tone when she made those

LC6VMAX2                    Kate - direct

1   statements.

2   A.  She sounded really pleased.  And I was really pleased that

3   she was pleased.

4   Q.  Did you leave Maxwell's house?

5   A.  Yes.

6   Q.  Other than the three times that you saw Epstein at

7   Maxwell's townhouse in London, did you see anyone else at her

8   house?

9   A.  Can you repeat it?

10  Q.  Other than the three times you saw Epstein at Maxwell's

11  townhouse in London, did you see anyone else at her house?

12  A.  Yes.

13  Q.  Who did you see?

14  A.  I saw a girl.

15  Q.  What did the girl look like?

16  A.  She was blond and slim and around my age.

17  Q.  Approximately how old were you when you saw the girl?

18  A.  Seventeen.

19  Q.  And what did you see the girl doing at Maxwell's townhouse?

20  A.  She was having tea with Ghislaine and telling -- telling

21  Ghislaine about the things that she was interested in.

22  Q.  What, if anything, did Maxwell say to you about what she

23  thought Epstein would think of the girl?

24  A.  Can you repeat it please.

25  Q.  What, if anything, did Maxwell say to you about what she

LC6VMAX2                    Kate - direct

1    thought Epstein would think of the girl?

2    A.  She said, I think she would be a good fit for him.

3    Q.  After Epstein engaged in sex acts with you during massages

4    in Maxwell's house in London, did you ever see Epstein and

5    Maxwell again?

6    A.  Yes.

7    Q.  Over the next few years, how frequently did you see them?

8    A.  I saw them -- do you mean how many individual occasions or

9    how many -- can you be specific?

10   Q.  Sure.  Over the next few years, about how many times a year

11   did you see them?

12   A.  How many times per year?  It was sporadic.  The first

13   couple of years, more; probably five times the first couple of

14   years.

15   Q.  And on the times that you would see them, would you see

16   them just one time or would you see them multiple times?

17   A.  Multiple times.

18   Q.  Do you remember the exact details and dates of every single

19   time you saw Epstein and Maxwell?

20   A.  No.

21   Q.  Do some details and events stand out more in your mind than

22   others?

23   A.  Yes.

24   Q.  I want to talk to you about the time period from when you

25   were 17 years old to your early twenties.

1          Were you in contact with Maxwell during that time

2     period?

3     A.   Yes.

4     Q.   How did you typically communicate with Maxwell during that

5     period?

6     A.   By phone.

7     Q.   When you spoke with Maxwell on the phone, what topics did

8     Maxwell talk to you about?

9     A.   She asked me what I was up to, if things were going well,

10    if I was dating anybody, if I wanted to visit, and if anything

11    exciting was happening.

12    Q.   When you spoke with Maxwell on the phone, what, if

13    anything, did Maxwell ask you to do for Epstein?

14    A.   She asked me to come and visit them.

15    Q.   What, if any, sexual topics did Maxwell bring up on the

16    phone?

17    A.   She didn't bring up sexual topics on the phone.

18    Q.   When you saw Maxwell in person, did there come a time when

19    she brought sexual topics up with you?

20    A.   Yes.

21    Q.   What, if any, sexual topics did Maxwell bring up?

22    A.   She would talk a lot about the nature of -- she would say

23    boys, and boys and their willies, which was a euphemism for

24    penis.  How demanding Jeffrey was.  And she would ask me if I

25    knew anybody who could come and give Jeffrey a blow job because

LC6VMAX2                      Kate - direct

1    it was -- it was a lot for her to do.

2    Q.  What, if anything, did Maxwell tell you about the girls for

3    Epstein?

4              MS. STERNHEIM:  Objection.  Leading.

5              THE COURT:  Just a moment.

6              I'll allow it.  You may answer.

7              THE WITNESS:  Thank you.

8    A.  She said, You know what he likes, cute, young, pretty, like

9    you.

10   Q.  About how long after you met Maxwell do you remember having

11   conversations about those topics?

12   A.  Within a few weeks.

13   Q.  Approximately how many times did that -- did those sexual

14   topics come up?

15   A.  All the time.

16   Q.  Did you tell Maxwell about any other girls for Epstein?

17   A.  No.

18   Q.  Did you connect Maxwell with any girls for Epstein?

19   A.  No.

20   Q.  What, if anything, did Maxwell say about how often Epstein

21   needed to have sex?

22   A.  She said that he needed to have sex about three times a

23   day.

24   Q.  Approximately when did she make those statements?

25   A.  In the first couple of months.

LC6VMAX2                        Kate - direct

1    Q.  What was Maxwell's demeanor like when she would talk to you

2    about sexual topics?

3    A.  Her demeanor was very -- I would say that it was almost

4    like a schoolgirl.  And I almost felt like she was younger --

5    like, talking like she was younger than me, like -- which was

6    odd.  And everything was fun and everything was silly and

7    everything was just very exciting.  And just everything seemed

8    to be like a fun, silly joke.

9    Q.  Within the first few months of meeting Maxwell, what, if

10   anything, did Maxwell ask you about your sex life?

11   A.  She asked me if I liked sex.  She asked me, you know, if I

12   was dating somebody or --

13   Q.  You testified earlier that when you went to tea at

14   Maxwell's house in London, you told her about your family.  Did

15   you continue to tell Maxwell about your family?

16   A.  Yes.

17   Q.  What, if anything, did you tell her about your family?

18   A.  I just continued to tell her that, you know, my mother was

19   struggling, and that it was difficult; and that I was -- I was

20   alone a lot.

21   Q.  When you first met Maxwell and Epstein, what was your

22   understanding of their relationship?

23   A.  I understood that Jeffrey was her boyfriend.

24   Q.  In the first few years you knew Maxwell, what did you

25   understand to be Maxwell's job?

LC6VMAX2                         Kate - direct

1   A.   I understood that her job was to take care of Jeffrey's

2   needs.

3   Q.   What, if any, involvement did Maxwell have in managing

4   properties?

5   A.   She seemed to be pretty involved in managing properties and

6   making sure that everything was the way that Jeffrey liked it

7   to be.  And there seemed to be a lot of rules around that.

8   Q.   Did Maxwell ever tell you what, if any, properties she

9   owned?

10  A.   Yes.

11  Q.   What did she tell you?

12  A.   She told me that she owned her house in London; and that at

13  a later time she told me that she owned her house in New York

14  City, and that Jeffrey had got it for her.

15  Q.   Did you ever have any conversations with Maxwell about her

16  social circle?

17  A.   Yes.

18  Q.   What do you recall her telling you about her social circle?

19  A.   Well, she seemed to know everybody.  And she told me that

20  she was friends with Prince Andrew, friends with Donald Trump,

21  friends with lots of famous people.  And sometimes their names

22  would just come up in conversations or she might be talking on

23  the phone about them with me present.

24  Q.   I want to switch gears just for a moment.

25            You mentioned Oxford earlier.  Did you end up going to

1    Oxford?

2    A.   No.

3    Q.   During your late teens and early twenties, what did you do

4    for a living?

5    A.   In my late teens and early twenties I -- I became a

6    musician and a model.

7    Q.   You testified earlier that Epstein initiated sexual

8    activity with you when you were 17 years old.  Approximately

9    when did he stop initiating sexual activity with you?

10   A.   Approximately in my early thirties.

11   Q.   When you spent time with Epstein in that time period, about

12   how often did he initiate sexual activity with you?

13   A.   Sorry.  Can you repeat that?

14   Q.   When you spent time with Epstein, how often did he initiate

15   sexual activity with you?

16   A.   Every time.

17   Q.   When Epstein initiated sexual activity with you, was that

18   always in the context of massage?

19   A.   No.

20   Q.   When you spent time with Epstein, did you provide him with

21   sexualized massages?

22   A.   Yes.

23   Q.   In what locations did these sexualized massages with

24   Epstein take place?

25   A.   In London, in Palm Beach, and on his island.

LC6VMAX2                        Kate - direct

1    Q.  We'll talk about those places in a bit.

2              Apart from the first massage in London where you

3    rubbed Epstein's feet and shoulders, were there ever any

4    massages you provided Epstein in which nothing sexual happened?

5    A.  No.

6    Q.  Was anyone in the room with you and Epstein while you were

7    giving him the massages?

8    A.  No.

9    Q.  You mentioned that after the first two massages you gave

10   Epstein when you were 17, you saw Maxwell right after.  Did

11   anything like that happen with any other sexualized massages

12   you gave Epstein?

13   A.  Yes.

14   Q.  What do you remember about those interactions?

15   A.  Mostly she would ask me if -- if it went well, if I had

16   fun.

17   Q.  What, if any, gifts did you receive from Maxwell?

18   A.  I received a small black Prada handbag.

19   Q.  Where did you receive that gift?

20   A.  In London.

21   Q.  And how did you know that was a gift from Maxwell?

22   A.  There was a note that said "from Ghislaine and Jeffrey."

23   Q.  And what was that a gift for?

24   A.  For my birthday.

25   Q.  What birthday?

LC6VMAX2                    Kate - direct

1   A.   I believe my 18th.

2   Q.   Did you receive this gift before or after the two times

3   Epstein engaged in sex acts with you during massages at

4   Maxwell's house?

5   A.   After.

6   Q.   What, if any, conversations do you remember having with

7   Maxwell about travel?

8   A.   I remember that she was always very accommodating and told

9   me that whenever I wanted to come and visit, that she would

10  take care of everything; that they would take care of

11  everything.

12  Q.   Did those conversations about travel happen before or after

13  she gave you the handbag?

14  A.   Before.

15  Q.   Did there come a time when you traveled to meet Epstein and

16  Maxwell?

17  A.   Yes.

18  Q.   Approximately how many times did you travel to meet them?

19  A.   To meet both of them?

20  Q.   Yes.

21  A.   Four or five times.

22  Q.   Do you remember approximately how old you were when you

23  first traveled to meet Maxwell and Epstein?

24  A.   Approximately 18.

25  Q.   And do you remember approximately how old you were when you

LC6VMAX2                      Kate - direct

1  last traveled to meet both Maxwell and Epstein?

2  A.  Approximately 24.

3  Q.  During that time period, where did you travel to meet

4  Maxwell and Epstein?

5  A.  I traveled to Palm Beach, to New York, and to the island.

6  Q.  When you traveled to meet Maxwell and Epstein, how did you

7  travel?

8  A.  I traveled on commercial planes.

9  Q.  Who booked your travel?

10  A.  I'm not always sure who booked it, but usually Ghislaine

11  informed me about it.  Sometimes one of the assistants would

12  book it, maybe Lesley Groff.

13  Q.  Generally speaking, where did you stay when you visited

14  Epstein and Maxwell?

15  A.  I generally stayed with them.

16  Q.  And when you say you stayed with them, where did you stay?

17  A.  At their house.

18  Q.  Who owned the properties?

19  A.  Jeffrey, I think.

20  Q.  How did Maxwell talk about the properties that Epstein

21  owned?

22  A.  She talked -- she talked about them as -- as their homes.

23  Q.  Who worked at Epstein's homes?

24  A.  I would see staff sometimes, but I didn't know their names

25  and I didn't have much interaction with them.

LC6VMAX2                          Kate - direct

1    Q.  What, if anything, did you observe about Maxwell and her

2    interactions with the staff?

3    A.  I noticed that she was the one who mainly communicated with

4    the staff.  She seemed to be telling them -- giving them a lot

5    of direction around doing things the way that Jeffrey wanted

6    them done, detailed instructions around food and -- and just

7    quite aggressive communication with them.

8    Q.  You testified earlier about travel to Palm Beach.  I want

9    to talk about that for a minute.

10           Who did you travel to see in Palm Beach?

11   A.  Ghislaine and Jeffrey.

12   Q.  How many times did you visit Maxwell and Epstein in Palm

13   Beach?

14   A.  One time.

15   Q.  Do you remember exactly when you went to Palm Beach?

16   A.  No.

17   Q.  Approximately how old were you when you went to Palm Beach?

18   A.  Approximately 18.

19   Q.  Is it possible that you were older when you went to Palm

20   Beach?

21   A.  Possible.

22   Q.  Where did you stay when you visited Epstein and Maxwell in

23   Palm Beach?

24   A.  I stayed in the house with them.

25   Q.  Can you describe for the jury the Palm Beach house.

LC6VMAX2                    Kate - direct

1   A.  Yes.  The house had a beautiful swimming pool.  And there

2   were doors that opened up from the house onto the swimming

3   pool.  And Jeffrey had a desk that would face out onto outside

4   so he could see out.  And there was a kitchen downstairs, a

5   small dining area, and there were bedrooms upstairs.

6   Q.  What, if any, photographs did you see in Epstein's house in

7   Palm Beach?

8   A.  There were lots of photographs of young girls.

9   Q.  What do you remember about those photographs?

10  A.  I remember that they were shocking.

11  Q.  Were the young girls clothed or unclothed in the

12  photographs?

13  A.  Unclothed.

14  Q.  Where did you see those photographs in Epstein's house in

15  Palm Beach?

16  A.  They were in almost every room.

17  Q.  Did there come a time that you were given clothing to wear

18  when you were staying at Epstein's Palm Beach house?

19  A.  Yes.

20  Q.  What were you given to wear?

21  A.  I was given a schoolgirl outfit.

22  Q.  Can you please describe the schoolgirl outfit for the jury.

23  A.  It was a short -- a short pleated skirt, white socks, white

24  panties, and a shirt.

25  Q.  Where did you find the schoolgirl outfit?

LC6VMAX2                      Kate - direct

1    A.   On my bed.

2    Q.   What did you do after finding the schoolgirl outfit?

3    A.   I went downstairs to find Ghislaine.

4    Q.   What, if anything, did Ghislaine say?

5    A.   I asked her what -- what was happening with the -- there

6    were clothes in my room.  And she said, I thought it would be

7    fun for you to take Jeffrey his tea in this outfit.

8    Q.   Did you put on the schoolgirl outfit?

9    A.   Yes.

10   Q.   Why did you put on the schoolgirl outfit?

11   A.   I didn't know -- I didn't know how to say no to that.  I

12   was -- I didn't know anybody in Florida.  I'd never been to

13   Palm Beach or Florida before.  I had no idea even where the

14   house was or how -- and I wasn't sure if I said no, if -- if I

15   would have to leave or what kind of consequence there might be

16   for not doing it.

17   Q.   What did you do after you put on the schoolgirl outfit?

18   A.   Ghislaine gave me a tray and told me to go and walk to

19   where Jeffrey was and bring -- bring him the tray.

20   Q.   Did you go and find Epstein?

21   A.   Yes.

22   Q.   Where did you find him?

23   A.   He was next to the pool house and he was working out.

24   Q.   Was Epstein alone?

25   A.   No.

1    Q.  Who was he with?

2    A.  He was with -- there was some kind of trainer with him.

3    Q.  Did the trainer stay with him?

4    A.  No.

5    Q.  After the trainer left, without getting into the details,

6    did Epstein initiate sexual contact with you?

7    A.  Yes.

8    Q.  Did Epstein engage in a sex act with you?

9    A.  Yes.

10   Q.  What if later --

11          MS. POMERANTZ:  Withdrawn, your Honor.

12   Q.  What, if anything, did Maxwell say to you later that day?

13   A.  She asked me if I had fun, and told me that I was such a

14   good girl, and that I was one of his favorites.  And that's it.

15   Q.  Did Epstein engage in sexual activity with you again during

16   that trip?

17   A.  Yes.

18   Q.  One time or multiple times?

19   A.  Multiple times.

20   Q.  You testified earlier that you went to the island.  What is

21   the island?

22   A.  The island was an island that Jeffrey owned.

23   Q.  What was the name of the island?

24   A.  Well, he called it Little St. Jeff.

25   Q.  When you went to the island, who invited you there?

LC6VMAX2                        Kate - direct

1    A.   Ghislaine.

2    Q.   Approximately when did you go to the island?

3    A.   When I was approximately 23 or 24.

4    Q.   When Maxwell invited you to the island, what, if anything,

5    did she ask you to do?

6    A.   She asked me to massage Jeffrey.

7    Q.   Did sexualized massages with Epstein take place on the

8    island?

9    A.   Yes.

10   Q.   Do you recall seeing anyone other than Epstein and Maxwell

11   when you visited the island?

12   A.   Yes.

13   Q.   Who do you remember seeing?

14   A.   I remember seeing a blond, slim girl who seemed far younger

15   than me, very young.

16            MS. POMERANTZ:  Your Honor, may I have just a moment?

17            THE COURT:  You may.

18            MS. POMERANTZ:  Thank you.

19            (Counsel conferred)

20   Q.   Kate, at the beginning, why did you start spending time

21   with Maxwell and Epstein?

22   A.   At the beginning, it was a combination.  In the beginning,

23   I wanted to maintain a relationship with Ghislaine.  And I

24   thought that they were going to be -- I thought she was going

25   to be my friend.

LC6VMAX2                    Kate - direct

1   Q.  Did that change over time?

2   A.  Yes.

3   Q.  Through your twenties and early thirties, did you continue

4   to communicate with Epstein?

5   A.  Yes.

6   Q.  Without using any words from the communications, what was

7   the tone of your communications with Epstein generally?

8   A.  My tone was friendly.

9            MS. STERNHEIM:  I'm sorry, I couldn't hear.

10           THE COURT:  Friendly.

11           THE WITNESS:  Friendly.

12  Q.  Why did you keep communicating with Epstein through your

13  twenties and early thirties?

14  A.  I was -- I did not want to admit what had happened to me.

15  And I felt that by ceasing communication, I would have to

16  acknowledge the events that had taken place and I would have to

17  say something.  I was also fearful of disengaging because I had

18  witnessed how connected they both were and I was fearful.

19  Q.  Did there come a time when you stopped communicating with

20  Epstein?

21  A.  Yes.

22  Q.  Approximately when?

23  A.  In my early thirties.

24  Q.  And approximately when did you stop spending time with

25  Epstein?

LC6VMAX2                      Kate - direct

1  A.  Also in my thirties.

2  Q.  Approximately when did you stop spending time with Maxwell?

3  A.  My late twenties -- sorry, spending time or communicating?

4  Q.  Spending time.

5  A.  Oh, around 24.

6  Q.  I want to switch gears.

7        When you were a teenager and in your twenties, were

8  you addicted to any substances?

9  A.  Yes.

10  Q.  What were you addicted to?

11  A.  I was addicted to alcohol, cocaine, and sleeping pills.

12  Q.  How often did you use cocaine, alcohol, and sleeping pills?

13  A.  Sporadically, but mostly weekly.

14  Q.  When was the last time you used those substances that you

15  just mentioned?

16  A.  May 1st, 2003.

17  Q.  Why did you stop using those substances then?

18  A.  When I first started using substances, they helped me to

19  cope with the way that I was feeling.  And then the substance

20  use got out of control and started to destroy my relationships

21  and my health and my peace of mind.  And I felt that I was

22  going to die if I continued.

23  Q.  Has your prior drug and alcohol use affected the memories

24  you have?

25  A.  No.

LC6VMAX2                     Kate - direct

```
 1   Q.  Can you explain?
 2   A.  The memories I have of significant events in my life have
 3   never changed.  My memory -- there are things that I have
 4   missed that happened that sometimes I later recall.  The
 5   memories I have are the memories I have.
 6   Q.  Directing your attention to August 2019, did there come a
 7   time when you were interviewed by the government?
 8   A.  Yes.
 9   Q.  Was FBI present for the interview?
10   A.  Yes.
11   Q.  Before that day, had you ever talked to law enforcement
12   about your experiences with Maxwell and Epstein?
13   A.  No.
14   Q.  That same day did you speak publicly about some of the
15   experiences that you testified about here today?
16   A.  Did I speak publicly?  Yes.
17   Q.  And when you did that, did you talk about all of the
18   details that you shared with the government?
19   A.  No.
20   Q.  Why not?
21   A.  I have a huge amount of humiliation and shame and -- around
22   the events that took place.  I was not ready to share that in
23   detail on a public level.
24   Q.  If you have spoken publicly before, why did you ask to
25   testify under a pseudonym here today?
```

LC6VMAX2                          Kate - direct

```
1   A.  I asked to testify under a pseudonym because I have a
2   child.  And I do not wish for her to be associated with or
3   exposed to any negative connotation that this might bring.
4   Q.  You testified earlier that you first spoke with the
5   government in August 2019.  About how many meetings have you
6   had with the government since that time?
7   A.  About ten meetings.
8   Q.  What is your immigration status?
9   A.  I am in status in this country on an O-1 visa.
10  Q.  And what is that?
11  A.  It's a visa of extraordinary ability.
12  Q.  What does that mean?
13  A.  It can be extraordinary ability in many different areas.
14  Initially, I was a singer/songwriter, but it extends to any
15  artist.
16  Q.  Did there come a time when you asked the government to
17  sponsor you for a visa?
18  A.  Yes.
19  Q.  At the time you made the request, approximately how many
20  meetings had you had with the government?
21  A.  Approximately seven.
22  Q.  Approximately how long had you been meeting with the
23  government at the time you raised your immigration status?
24  A.  About a year and a half.
25  Q.  Has the government made any promises to you about your
```

LC6VMAX2                         Kate - direct

1    immigration visa?

2    A.   No.

3    Q.   I'm going to switch gears.

4          Have you participated in a compensation fund called

5    the Epstein's Victims' Compensation Program?

6    A.   Yes.

7    Q.   What did you do as part of that fund?

8    A.   I had an interview with a forensic psychologist and I

9    submitted a claim form.

10   Q.   How much money did the fund pay you?

11   A.   $3.25 million.

12   Q.   Did that money come from the Estate of Jeffrey Epstein?

13   A.   Yes.

14   Q.   Has that money been wired to you already?

15   A.   Not that total amount.

16   Q.   But a portion of that has been?

17   A.   Yes.

18   Q.   As part of receiving that money, did you have to sign a

19   waiver agreeing not to sue any of Epstein's employees?

20   A.   Yes.

21   Q.   You mentioned that you didn't -- you weren't wired the

22   total amount.  What happened to the rest of it?

23   A.   The rest went to my attorneys.

24   Q.   Have you ever sued Maxwell?

25   A.   No.

LC6VMAX2                          Kate - direct

1  Q.  Do you plan to sue Maxwell?

2  A.  No.

3  Q.  Are you hoping or expecting to get any more money for what

4  happened to you with Epstein and Maxwell?

5  A.  No.

6  Q.  Based on your understanding, will the jury's verdict in

7  this case affect the award that you received from the fund?

8  A.  No.

9  Q.  Just to be clear, do you have any financial stake in the

10  outcome of this trial?

11  A.  I do not.

12          MS. POMERANTZ:  Your Honor, may I have just one

13  moment?

14          THE COURT:  You may.

15          (Counsel conferred)

16          MS. POMERANTZ:  No further questions, your Honor.

17          THE COURT:  All right.  Thank you.

18          We'll take our morning break.

19          Members of the jury, we'll break for about 10 to 15

20  minutes.  See you soon.  Thank you.

21          (Jury not present)

22          THE COURT:  The witness may step down and out for the

23  break.  Thank you.

24          Everyone may be seated.

25          (Witness not present)

LC6VMAX2                          Kate - direct

1          THE COURT:  Counsel, are there matters to take up?

2          MS. STERNHEIM:  Yes.

3          THE COURT:  Okay.  Just a moment.

4          Ms. Sternheim.

5          MS. STERNHEIM:  Judge, in light of this witness's

6     anonymity status, I think it's appropriate to do it at a

7     sidebar.  If the Court feels otherwise, then we can come into

8     open court.

9          THE COURT:  Okay.

10          (Pages 1211 to 1231 SEALED)

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LC6Cmax3

1           (Recess)

2           (Jury not present)

3           THE COURT:  Counsel, let me just finish up where I am

4    before we get going.

5           (At the sidebar)

6           THE COURT:  On the sexual harassment claim, I'm not

7    going to allow it if there were a pattern of repeated

8    allegations of the same kind, even if you didn't have a proffer

9    as to falsity, then it would be a closer call, but in the

10   absence of any proffer as to falsity and in light of the one

11   instance of sexual harassment, I won't allow it.

12          I think our other open on is the tabloid; correct?

13   I'm going to allow that because there is a notion of exception

14   of a friend which goes to the credibility and is impeachment.

15          I think that resolves all of our open issues.

16          MS. POMERANTZ:  Your Honor, I wanted to note one thing

17   that I had the chance to go back and look at some of the 3500

18   material, and I know that there was planning to ask the witness

19   about an unsigned declaration involving I think the witness's

20   exhusband; is that right?

21          MS. STERNHEIM:  No, it has nothing to do with her

22   exhusband.  I was going to ask if she asked a friend or former

23   person in her life if he had -- she had asked him to plant the

24   drugs on the father of her child.

25          MS. POMERANTZ:  So I wanted to flag this because I had

LC6Cmax3

1     a chance to go back and look at the 3500 material and she has

2     explained that she was a victim of domestic violence by the --

3     by her daughter's father, and I'm happy to provide the page

4     number, that she's filed restraining orders against him and

5     that there were -- there was issues with that.  And so, to the

6     extent that Ms. Sternheim intends to ask that, I do think that

7     it would permit me to, on redirect, ask questions about the

8     circumstances around that.

9                THE COURT:  I agree.  But you'd ask questions around

10    the circumstances of that, but I'll permit that question.

11               Anything else?  All right, thank you.

12               (In open court)

13               THE COURT:  Can we have the witness come back, please.

14               MS. STERNHEIM:  Judge, may I hand you a binder?  I'm

15    not sure we're going to need to use it, but I do have one for

16    Kate, as well.  May I?

17               THE COURT:  Yes.  Bring in the jury.

18               (Continued on next page)

19

20

21

22

23

24

25

LC6Cmax3                          Kate – cross

1            (Jury present)

2            THE COURT:  Thank you so much, members of the jury.

3    Sorry for the slightly -- we took the extended break that

4    allowed me to work through some things with the lawyers to

5    facilitate overall the efficiency of the process.  So thank you

6    for your patience.

7            Ms. Sternheim, you may begin your cross examination of

8    the witness testifying under the name of Kate.

9            Kate, I remind you, you are under oath.

10           Go ahead, Ms. Sternheim.

11           MS. STERNHEIM:  Thank you.

12   CROSS-EXAMINATION

13   BY MS. STERNHEIM:

14   Q.  Good morning, Kate.  I have some questions to ask you.

15           During your direct examination, you had stated that

16   Ghislaine was everything you wanted to be; correct?

17   A.  She appeared to be.

18   Q.  Now, you had a very beautiful mother, didn't you?

19   A.  Yes.

20   Q.  She was a debutante; correct?

21   A.  I'm not sure.

22   Q.  She was married to a wealthy -- well, your stepfather is a

23   wealthy man; correct?

24   A.  He was.

25   Q.  He had his own plane; correct?

LC6Cmax3                     Kate - cross

1   A.  Yes.

2   Q.  Your mother and your stepfather, and in turn, you and your

3   brother lived a comfortable life at some point, didn't you?

4   A.  Yes.

5   Q.  You lived in the Belgravia section of London.  That's a

6   very tony area of London, isn't it?

7   A.  Yes.

8   Q.  And you lived quite close to Kinnerton Street, which is

9   where Ghislaine lived; correct?

10  A.  Yes.

11  Q.  In fact, Ghislaine lived on the street that also is the

12  street of the Nags Head Pub; correct?

13  A.  Yes.

14  Q.  And that pub is a rather famous pub in London, isn't it?

15  A.  I don't know.

16  Q.  But it was right across the street, nonetheless, from

17  Ghislaine's home at 44 Kinnerton, wasn't it?

18  A.  Yes.

19  Q.  Now, going back to your mother for a moment, you would

20  watch and see the attention that your mother got because of her

21  beauty, didn't you?

22  A.  I thought she was beautiful.

23  Q.  And didn't you say that you wanted to garner that same kind

24  of attention because you liked the way people looked at her?

25          MS. POMERANTZ:  Objection, your Honor.

1    THE COURT:  Overruled.  You may answer.

2  A.  To clarify, didn't I say when?

3  Q.  Well, you've spoken to a number of tabloids and magazines

4  throughout the year, haven't you?

5  A.  Yes.

6  Q.  You have been featured in a number of magazines and news

7  articles, haven't you?

8  A.  Yes.

9  Q.  You have spoken about your life on a number of occasions,

10  haven't you?

11  A.  Yes.

12  Q.  And your picture has been in a number of magazines, as

13  well; correct?

14  A.  Yes.

15  Q.  During the period of time that you testified meeting

16  Ghislaine and Epstein, you were an international model?

17  A.  I was a model.

18  Q.  You met Ghislaine in Paris when you had traveled there with

19  the older prominent gentleman with whom you had been dating at

20  the time; correct?

21  A.  Yes.

22  Q.  And you learned that that individual was an Oxford

23  classmate of Ghislaine; correct?

24  A.  Yes.

25  Q.  Now, through the relationship that you had with that older

LC6Cmax3                         Kate - cross

1    gentleman, you met a variety of people in the fashion industry,

2    didn't you?

3    A.  Yes.

4    Q.  And through those connections, you met fashion journalists;

5    correct?

6    A.  I'm not sure if it was through those connections or not.

7    Q.  Well, didn't you once say that you were in the right place

8    at the right time and your career in modeling was launched?

9    A.  Possibly.

10   Q.  And didn't you also say that even without those

11   connections, you believed that you would have made it anyway in

12   modeling?

13   A.  I'm not sure.  I don't recollect that.

14   Q.  You have also considered yourself to be fiercely ambitious;

15   correct?

16   A.  At times.

17   Q.  In fact, back in around 2004 when you were interviewed, you

18   said that for as long as you could remember, you were

19   ambitious.  Do you remember that?

20   A.  Yes.

21   Q.  And you also said that you spent 90 percent of your time

22   thinking about the next move; correct?

23   A.  Yes.

24   Q.  But the other 10 percent was that you were thinking about

25   your dog, wasn't it?

LC6Cmax3                    Kate - cross

1    A.  Could have been.

2    Q.  And at that time, you had a very large Great Dane; correct?

3    A.  At which time?

4    Q.  At the time you made that statement when you said the other

5    10 percent was thinking about your dog?

6    A.  I don't remember which dog it was at that time, but it's

7    possible.

8    Q.  In around 2004, you did have a Great Dane, didn't you?

9    A.  I don't remember the date, but I did have a Great Dane,

10   that I did used to have a Great Dane.

11   Q.  But there was a period in time in which you became very

12   well known as a model; correct?

13   A.  I was not very well known.

14   Q.  Well, you were on billboards, weren't you?

15   A.  I was on a billboard once.

16   Q.  And you were a model for a U.K. version of Victoria's

17   Secret, weren't you?

18   A.  No.

19   Q.  You never were a model for an organization that sold

20   lingerie?

21   A.  I was a model for a lingerie company that failed almost as

22   soon as it began.

23   Q.  But it was a lingerie company?

24   A.  Yes.

25   Q.  And you also were a model for clothing, weren't you?

LC6Cmax3                       Kate – cross

1    A.   Yes.

2    Q.   And Milinery & Hanbex (ph.); correct?

3    A.   Possibly.  I don't recall.

4    Q.   But suffice it to say, you had photo shoots in various

5    parts of Europe.  Milan?

6    A.   Once in Milan.

7    Q.   Paris?

8    A.   Yes.

9    Q.   And London?

10   A.   Yes.

11   Q.   Did you also model in the United States?

12   A.   No.

13   Q.   There came a time when you did come to the United States,

14   though; correct?

15   A.   Yes.

16   Q.   You moved to the United States at some point in your

17   career; correct?

18   A.   Yes.

19   Q.   And you came here on the visa you described which, in your

20   situation, was an entertainment or talent visa, wasn't it?

21   A.   Well, they call it extraordinary ability, so that covers a

22   lot of fields.

23   Q.   But your extraordinary ability at that time was to go to

24   Hollywood, wasn't it?

25   A.   I don't know if going to Hollywood is an extraordinary

1    ability, but I was a musician.

2    Q.  Okay.  Fair enough.  You were a musician; correct?

3    A.  Yes.

4    Q.  You were a singer; correct?

5    A.  Yes.

6    Q.  In fact, when you were younger, 16 or 17, you were living

7    in the South of France; correct?

8    A.  Yes.

9    Q.  And you were at a -- I guess a piano bar where you were

10   discovered by the musician Seal, weren't you?

11   A.  No.

12   Q.  Never?

13   A.  No.

14   Q.  You never told that to the press at all?

15   A.  No.

16   Q.  You produced your own album or CD; correct?

17   A.  Yes.

18   Q.  And you launched it on your own; correct?

19   A.  In part.

20   Q.  And fair to say that was the only album or CD you ever

21   launched?

22   A.  Yes.

23   Q.  You also were an actress, weren't you?

24   A.  That was not my trade.

25   Q.  Well, whether it was your trade or not, it is fair to say

LC6Cmax3                          Kate - cross

1    that you acted in movies; correct?

2    A.  I did not have speaking roles, so I was kind of an extra a

3    couple of times.

4    Q.  And you were in a movie with a very well-known British

5    actor; correct?

6    A.  Yes.

7    Q.  And you were in a couple of other movies, as well, over the

8    years, weren't you?

9    A.  I'm not sure which ones you're talking about.

10   Q.  Well, I'm going to ask you to look at a list that should be

11   in your folder --

12          THE COURT:  Please direct the government and me before

13   the witness.

14          MS. STERNHEIM:  I will.  I just want to get the

15   number, Judge.  I apologize.

16          THE COURT:  Thank you.

17          MS. STERNHEIM:  I apologize, Judge.  I gave my copy.

18   Q.  I'm going to ask you what's been marked as defense K7, it

19   should be tabbed in your binder.

20          THE COURT:  Tab 7, counsel?

21          MS. STERNHEIM:  K7.

22   A.  Okay, K7.

23          THE COURT:  My binder does not have K7.

24          THE WITNESS:  I don't have K7.

25          MS. STERNHEIM:  I apologize about that.  Your Honor, I

LC6Cmax3                    Kate - cross

1    do have paper copies.  May I hand them up?

2              THE COURT:  You may.

3              MS. STERNHEIM:  I apologize about that.

4    Q.  I'm just going to ask you to take a look at that list and

5    I'm going to ask you to look at number 21.

6    A.  Yes.

7    Q.  Is that a movie that you were in?

8    A.  No.

9    Q.  No?  Number 3, is that a movie that you were in?

10   A.  Yes.

11   Q.  And number 29, is that a movie that you were in?

12   A.  No, I don't know what that movie is.

13   Q.  Are you familiar with the IMBD system?

14   A.  IMDB?

15   Q.  Yes.  I apologize.

16   A.  Yes.

17   Q.  And if those were listed in your IMDB, would those indicate

18   that you were involved with those productions?

19             MS. POMERANTZ:  Objection, your Honor.

20             THE COURT:  Grounds?

21             MS. POMERANTZ:  Foundation.

22             THE COURT:  Sustained.

23   Q.  Do you look at your listings to see whether they are

24   accurate or not?

25   A.  No.

LC6Cmax3                    Kate - cross

1    Q.  You also starred in a reality show, didn't you?

2    A.  Yes.

3    Q.  And that reality show had to do with individuals who wanted

4    to make it in Hollywood; correct?

5    A.  Yes.

6    Q.  And what period of time were you involved in that?

7    A.  I don't recall exactly, but I believe it was probably about

8    19 years ago.

9    Q.  19 years ago?

10   A.  Probably around then.

11   Q.  And in light of the visa that you had, you were committed

12   to work in that industry; correct?

13   A.  I didn't have a visa at that time.  I had not moved to the

14   United States yet.

15   Q.  So it was after you did the reality show that you then

16   moved to the United States?

17   A.  At some point later.

18   Q.  And when you moved to the United States, it was at that

19   time that you were in the music business?

20   A.  Yes.

21   Q.  And the purpose of your visa at that time was to permit you

22   to move to the United States to work in the music industry;

23   correct?

24   A.  Yes.

25   Q.  You no longer are in the music industry; correct?

1    A.  I'm actually a music therapist.

2    Q.  A music therapist?

3    A.  Yes.

4    Q.  And are you licensed as a music therapist?

5    A.  No, I'm not licensed in anything.

6    Q.  But you hold yourself out to be a music therapist; correct?

7    I couldn't hear you, I'm sorry.

8    A.  Yes.

9    Q.  At some point, did you begin a foundation?

10   A.  Yes.

11   Q.  Without using the name, that was a foundation that was for

12   women with substance abuse; correct?

13   A.  It was actually a foundation for women who have trauma and

14   substance use disorder.

15   Q.  And it is a residential environment for women to live in;

16   correct?

17   A.  It's actually no longer a foundation, it was dissolved, but

18   it was a residential facility, yes.

19   Q.  And you launched that in approximately 2019; correct?

20   A.  Approximately.

21   Q.  And there are videos about it, aren't there?

22   A.  Most likely, yes.

23   Q.  And you and a partner or another woman with whom you worked

24   had produced some videos for that foundation; correct?

25   A.  Yes.

LC6Cmax3                         Kate - cross

```
1    Q.  And it was launched in 2019 and it no longer exists;
2    correct?
3    A.  I think it was in 2019, but I don't know the exact date,
4    but you are correct, it no longer exists.
5    Q.  And after you received your settlement money in connection
6    with the Epstein victim compensation fund, you no longer were
7    involved in that foundation; correct?
8    A.  I was still -- the foundation shut down first.
9    Q.  But it shut down around the time that you began cooperating
10   with the government; correct?
11   A.  It shut down before the -- I had received any kind of
12   settlement.
13   Q.  You received your settlement a year ago this week; correct?
14   A.  If you say so.  I would say that's probably about accurate.
15   Q.  Earlier, the government had asked you about having made a
16   public statement at some point in 2019 concerning Mr. Epstein.
17   Do you remember that?
18   A.  Sorry.  Could you repeat that.
19   Q.  On direct examination, you were asked about having made a
20   public statement in connection with Jeffrey Epstein?
21   A.  Yes.
22   Q.  And you made a public statement in this very courthouse;
23   correct?
24   A.  Yes.
25   Q.  And you made that public statement using your true name;
```

LC6Cmax3                     Kate - cross

1   correct?

2   A.  Yes.

3   Q.  And you testified earlier that the reason why you're not

4   using your true name is to protect your child; correct?

5   A.  Yes.

6   Q.  You had a child at that point, didn't you?

7   A.  Yes.

8   Q.  And your lawyer also introduced you using your true name at

9   that public hearing; correct?

10  A.  Yes.

11  Q.  And you were represented by a lawyer named Brad Edwards;

12  correct?

13  A.  Yes.

14  Q.  And Mr. Edwards has represented you in connection with the

15  claim that you made against the Epstein Victim Compensation

16  Fund; correct?

17  A.  Yes.

18  Q.  In fact, Mr. Edwards was instrumental in setting up that

19  fund, wasn't he?

20  A.  I'm not sure.

21  Q.  Is he here with you today?

22  A.  Yes, he's here.

23  Q.  He's in the courtroom; correct?

24  A.  Um --

25  Q.  And you have consulted with him concerning your appearance

LC6Cmax3                         Kate - cross

1      here?

2                  MS. POMERANTZ:  Objection, your Honor.

3                  THE COURT:  Sustained.

4      Q.  That statement that you made in this courthouse was after

5      Epstein died; correct?

6      A.  Yes.

7      Q.  And you and a number of other people accusing Epstein of

8      abuse were invited by a judge in this courthouse, named Judge

9      Berman, to speak publicly; correct?

10     A.  Yes.

11     Q.  And you took that opportunity to speak publicly?

12     A.  Yes.

13     Q.  And you spoke publicly with regard to Jeffrey Epstein;

14     correct?

15     A.  Yes.

16     Q.  You did not speak with regard to Ghislaine Maxwell?

17     A.  I did not.

18     Q.  And right after that very day that you made that statement

19     was the first time that you sat down with the government in

20     connection with things that you were testifying to today;

21     correct?

22     A.  Yes.

23     Q.  And right after you sat down with the government, which was

24     right after you had spoken publicly, you appeared on television

25     with regard to your allegations; correct?

LC6Cmax3                           Kate - cross

1    A.  Yes.

2    Q.  And you appeared on television with other women who had

3    been present during that public court appearance; correct?

4    A.  Yes.

5    Q.  And there were about six of you who were featured on a

6    television show; correct?

7    A.  Yes.

8    Q.  Talking about your allegations against Jeffrey Epstein;

9    correct?

10   A.  Yes.

11   Q.  And you all appeared as a sisterhood of accusers against

12   Jeffrey Epstein?

13   A.  Sorry, is it a question?

14   Q.  Yes.

15   A.  Did we appear as a sisterhood?

16   Q.  Yes.

17   A.  I don't know how it came across to other people.

18   Q.  Well, you were somewhat affectionate to one another on the

19   show, weren't you?

20   A.  I suppose so.

21   Q.  You were supportive of one another on the show; correct?

22   A.  Yeah.  I had just met them, so --

23   Q.  Well, you had met them for the very first time that day?

24   A.  I think it may have been at the court appearance which may

25   have been the day before.

LC6Cmax3                      Kate - cross

1    Q.  And you continued maintaining contact with some of them;

2    correct?

3    A.  Yes.

4    Q.  You would be on chat groups with them for a period of time?

5    A.  I actually was only on the chat group for a very small

6    amount of time.  I left the chat group.

7    Q.  But nonetheless, for at least a small period of time, you

8    were involved in the chat group with other individuals, other

9    women who claimed they had been abused by Jeffrey Epstein;

10   correct?

11   A.  Yes.

12   Q.  And you had also maintained contact with an individual

13   named Virginia Roberts; correct?

14   A.  Yes.

15   Q.  And you and Virginia Roberts are represented by the same

16   attorney, Bradley Edwards?

17   A.  I don't -- I don't know who represents Virginia.

18   Q.  You never have spoken to her about that at all?

19            MS. POMERANTZ:  Objection, your Honor.

20            THE COURT:  Grounds?

21            MS. POMERANTZ:  Hearsay.

22            THE COURT:  Sustained.

23   Q.  You're aware that your attorney wrote a book about your

24   case and the case of others while he has been representing you;

25   correct?

LC6Cmax3                      Kate - cross

1    A.   Yes.

2    Q.   And you read that book, didn't you?

3    A.   I have not read the book.

4    Q.   But you knew that you were going to be included in that

5    book; correct?

6    A.   To my knowledge, those only -- I think there was only one

7    sentence about me.  I don't think there's anything about any

8    details of anything .

9    Q.   Did you give permission to your attorney to be referenced

10   or written about in that book?

11   A.   Yes.

12   Q.   So before it was published, you knew that some of your

13   story was going to be in that book; correct?

14   A.   I don't believe any of my story is in the book.

15   Q.   Do you have a private practice where you are a music

16   therapist?

17   A.   Sorry.  Could you repeat.

18   Q.   Do you have a private practice in which you are a music

19   therapist?

20   A.   I see people on an hourly basis.

21   Q.   And you do that in California?

22   A.   I do.

23   Q.   And are you required to be licensed to hold yourself out as

24   a music therapist?

25   A.   No.

LC6Cmax3                          Kate - cross

1   Q.   Do you collect monies from insurance by your clients?

2   A.   No.

3   Q.   It is all cash or check?

4   A.   Yes.

5   Q.   Now, you've testified that there was a period of time, I

6   think upwards of ten years, that you used drugs; correct?

7   A.   Yes.

8   Q.   You used cocaine; correct?

9   A.   Yes.

10  Q.   You used sleeping pills; correct?

11  A.   Yes.

12  Q.   And you also used alcohol; correct?

13  A.   Yes.

14  Q.   And it is your testimony that you abused those substances;

15  correct?

16  A.   Yes.

17  Q.   To the point where, after approximately ten years of use,

18  you decided you no longer wanted to engage in that; correct?

19  A.   Yes.

20  Q.   And you have lived a sober life since then; correct?

21  A.   Yes, I have.

22  Q.   And that, in part, is what you were promoting with your

23  foundation, weren't you?

24  A.   I would say it's what we're attracting, not what we're

25  promoting.

LC6Cmax3                    Kate - cross

1    Q.   I apologize.   I don't mean promoting.   I mean promoting

2    sobriety and support for women who had also had addictions?

3    A.   I think it's what we offer or what we offered when the

4    foundation was still going.

5    Q.   Understood.

6    A.   Yes.

7    Q.   Fair to say that using and abusing those substances over a

8    ten-year period has had an impact on memory; correct?

9    A.   It has not had an impact on the memories that I have always

10   had.

11   Q.   The memories that you have always had are your personal

12   memories; correct?

13   A.   Yes.

14   Q.   And memories based upon your perception of experiences;

15   correct?

16   A.   Well, they're just based on my experience.

17   Q.   But you have testified today about experiences during a

18   period of time where you were abusing drugs; correct?

19   A.   The memories that I testified to were at periods when I was

20   always sober because I was always required to not take drugs

21   and not be drunk around Ghislaine and Jeffrey.

22   Q.   Because you knew that they did not tolerate drug use;

23   correct?

24   A.   That was what was required.

25   Q.   You knew that they did not tolerate drug use; correct?

LC6Cmax3                    Kate - cross

1   A.  That's just what they asked of me.  I didn't know what

2   their tolerance was outside of that.

3   Q.  So during the period of time that you were with them, you

4   weren't snorting cocaine?

5   A.  No.

6   Q.  You just were able to go cold turkey during those periods

7   of time; correct?

8   A.  Yes.

9   Q.  And afterwards, you went right back to your habit of using

10  cocaine, using alcohol, using sleeping pills?

11  A.  I was a periodic drug abuser.

12  Q.  But nonetheless, your periodic drug use had a negative

13  impact on your life, didn't it?

14  A.  Yes.

15  Q.  Enough to the point where you wanted to end that type of

16  behavior so that you could go forward as a sober person?

17  A.  Yes.

18  Q.  Now you've testified that you met Ghislaine at her home on

19  Kinnerton Street when you were 17 years old; correct?

20  A.  I testified that I thought I was around that age, yes.

21  Q.  And I think you said, when asked to do the math, that it

22  was approximately 1994; correct?

23  A.  Yes.

24  Q.  And it was during that period of time, 1994 around the age

25  of 17, that you went to Ghislaine's home with the red door

LC6Cmax3                        Kate - cross

1  across from Nags Pub on Kinnerton Street; correct?

2  A.  Yes.

3  Q.  And that is where you met Epstein; correct?

4  A.  Yes.

5  Q.  Now, there came a point where -- well, during this period

6  of time, were you still involved with that prominent older

7  gentleman who had introduced you to Ghislaine?

8  A.  No, we had become friends.

9  Q.  You've had an on-and-off friendship or dating situation

10 with him for a period of time?

11 A.  We were really just friends.

12 Q.  Friends that took you to Paris; correct?

13 A.  No, when I was dating him, he took me to Paris.

14 Q.  He also hosted you at his weekend home; correct?

15 A.  Yes.

16 Q.  And you've also dated other men; correct?

17 A.  Yes, I have dated other men.

18 Q.  In fact, you even married one of the men that you dated;

19 correct?

20 A.  Are you asking me if I've been married?

21 Q.  Well, I'll start.  Have you been married?

22 A.  Yes.

23 Q.  Did you marry a prominent restauranteur?

24 A.  I married a man who owned two restaurants.

25 Q.  And you were married during the period of time that you say

LC6Cmax3                      Kate - cross

1    you were with Ghislaine and Epstein; correct?

2    A.  Can you explain, when you say I was with them, what do you

3    mean?

4    Q.  Well, you testified about spending time with them at the

5    Kinnerton residence in Belgravia; correct?

6    A.  Yes.

7    Q.  You also testified that there came a point where you also

8    spent time with them in the United States; correct?

9    A.  Yes.

10   Q.  When did you get married?

11   A.  I got married -- I think I was 23 when I got married.

12   Q.  You were 23?

13   A.  I think so.

14   Q.  You've also told the government at various times that you

15   were married at 18 or 19?

16   A.  I don't recall that.

17   Q.  That you were married at 20 or 21?

18   A.  I don't recall that.

19   Q.  That you were married during the time of the World Trade

20   Center disaster?

21   A.  I do recall that.

22   Q.  In fact, there came a time where were you in the United

23   States and didn't make it back to London while your husband was

24   waiting for you at the airport; isn't that correct?

25   A.  When you say didn't make it, what do you mean?

LC6Cmax3                      Kate – cross

1   Q.  Didn't you have a situation where you told the government

2   that you missed your flight?

3   A.  I did not get on my flight.

4   Q.  You did not get on your flight.  You met a man named Kevin

5   and you went home with him?

6   A.  Yes.

7          MS. POMERANTZ:  Objection, your Honor.

8          THE COURT:  Sustained.

9   Q.  Did you meet a man named Kevin?

10          MS. POMERANTZ:  Objection.

11          THE COURT:  Grounds, Ms. Pomerantz.

12          MS. POMERANTZ:  Relevance, your Honor.

13          THE COURT:  We'll see.  I'll allow it, but if we need

14   to have a discussion, let me know.  I'll allow it.

15   Q.  Did there come a time that you were flying back to London

16   from the United States when you missed your flight?

17   A.  Yes.

18   Q.  And did there come a time that you were assisted by a man

19   that you had met after you had missed your flight?

20   A.  Yes.

21   Q.  And did you have occasion to go to that man's home?

22   A.  Yes.

23   Q.  And did you have occasion --

24          MS. POMERANTZ:  Objection, your Honor.

25          THE COURT:  I think we need to have a sidebar.

LC6Cmax3                          Kate - cross

1              (At the sidebar)

2              THE COURT:  Where are we going, Ms. Sternheim?

3              MS. STERNHEIM:  We're going to the fact that this

4    woman was married at the time, she left her husband to travel

5    to spend time with Ghislaine and Jeffrey Epstein, and then, at

6    some point, something happened to her on her way home.

7              THE COURT:  What is the relevance?

8              MS. STERNHEIM:  It all goes to what her state of mind

9    was when she is testifying about what happened during this

10   period of time.

11             THE COURT:  State of mind?

12             MS. STERNHEIM:  Yes.

13             MS. POMERANTZ:  Your Honor, the defense is asking

14   questions that are very suggestive of something --

15             MS. STERNHEIM:  I'm sorry.  I didn't hear you.

16             MS. POMERANTZ:  The defense is asking questions that

17   are very suggestive of something, but I have not yet heard a

18   proffer about that and it seems like where they're going with

19   this is an issue that should have been raised as a 412 issue.

20             THE COURT:  Are you suggesting she had an affair?

21             MS. STERNHEIM:  No, she said she was associative as if

22   she was using drugs.  I'll move on.

23             THE COURT:  Okay.  Move on.

24             (Continued on next page)

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

LC6Cmax3                        Kate - cross

1              (In open court)

2      BY MS. STERNHEIM:

3      Q.  Kate, did there come a time that you divorced your husband,

4      the restauranteur?

5      A.  He divorced me.

6      Q.  And how long were you married at that point?

7      A.  I think it was just under a year.

8      Q.  And prior to marrying him, had you been engaged to other

9      people?

10     A.  Yes.

11             MS. POMERANTZ:  Objection.

12             THE COURT:  I'll allow it.

13     Q.  Did you ever marry again?

14     A.  No.

15     Q.  But you dated other people throughout the years; correct?

16     A.  Yes.

17     Q.  And you also have a child; correct?

18     A.  I do.

19     Q.  With someone with whom --

20             MS. POMERANTZ:  Objection, your Honor.

21             THE COURT:  Overruled.

22             MS. POMERANTZ:  Your Honor, may we be heard at

23     sidebar, please.

24             (Continued on next page)

25

LC6Cmax3                    Kate - cross

1           (At the sidebar)

2           MS. POMERANTZ:  The government is concerned about this

3    line of questioning.  She's asking a series of questions about

4    her romantic history.  It seems unduly invasive.

5           THE COURT:  Just a moment.  We had an earlier sidebar.

6    I permitted her to ask questions based on the declaration

7    regarding someone who said she planted drugs on the person that

8    she's now asking a question about.  So, how is the objection

9    consistent with that ruling?

10          MS. POMERANTZ:  I understand that ruling, your

11   Honor -- my understanding is I frankly didn't know that's where

12   it was going, but it's also my concern is that it's been a

13   series of questions that have just been basically a litany of

14   questions --

15          THE COURT:  Counsel, when you have an objection, I

16   rule on it.  A series of questions objections doesn't fly.

17   Please bear in mind my rulings, that that is why we do it at

18   the sidebar, that's why the jury had a 45-minute break.  I

19   don't need a sidebar every time a question that I've approved

20   is asked.

21          (Continued on next page)

22

23

24

25

```
 1              (In open court)

 2    BY MS. STERNHEIM:

 3    Q.  Kate, were you involved in a custody dispute with the

 4    father of your child?

 5    A.  Yes.

 6    Q.  And Kate, did you ask a friend to plant drugs on the father

 7    of your child to advance your custody case?

 8    A.  Absolutely not.

 9    Q.  And are you familiar with a man named Tim Powers?

10    A.  Yes.

11    Q.  And as you sit here, you did not ask Mr. Powers to help you

12    with your custody dispute?

13    A.  No.

14    Q.  You had been involved in a situation in the late '90s

15    involving a man who is connected to the Royal Family.  Do you

16    know who I'm talking about?

17    A.  Yes.

18    Q.  And that was someone who you had a friendship with;

19    correct?

20    A.  An acquaintanceship.

21    Q.  But a friendly acquaintanceship, it was someone that you

22    had spoken to at times; correct?

23    A.  A couple of times.

24    Q.  And the two of you had an interaction while you were at the

25    Cannes Film Festival in France; correct?
```

LC6Cmax3                    Kate - cross

```
 1    A.  Yes.
 2    Q.  And you had been approached by a tabloid to engage that
 3    gentleman in a situation; correct?
 4    A.  Not exactly.
 5    Q.  You were not asked to encourage that man to get you
 6    cocaine?
 7    A.  No.
 8    Q.  You were never approached by a tabloid to have that man
 9    recorded?
10    A.  I was never approached by a tabloid to have him recorded.
11    Q.  But, in fact, he was recorded, wasn't he?
12    A.  Yes.
13    Q.  And he was recorded in conversation with you when you tried
14    to get him to get you drugs; correct?
15    A.  Yes.
16    Q.  And that became a big tabloid spectacular, wasn't it?
17    A.  Yes.
18    Q.  And that was because of his standing in connection to the
19    Royal Family; correct?
20    A.  Yes.
21    Q.  And it was quite embarrassing for him and his family;
22    correct?
23    A.  I can't speak to his experience of it.
24    Q.  You can't even imagine that that would have been
25    embarrassing for him?
```

LC6Cmax3                          Kate - cross

1          MS. POMERANTZ:  Objection.

2          THE COURT:  Sustained.

3    Q.  Well, you were embroiled in that, as well.  Your name got

4    in the paper about it, didn't it?

5          MS. POMERANTZ:  Objection.

6          THE COURT:  Sustained.

7    Q.  Was that an embarrassing experience for you?

8    A.  Yes.

9    Q.  And you were paid approximately £40,000 for your

10   involvement in that, weren't you?

11   A.  I wasn't paid anything.

12   Q.  You just did it for free?

13   A.  Did what?

14   Q.  Embroiled that acquaintance in a drug scandal?

15         MS. POMERANTZ:  Objection to form.

16         THE COURT:  Sustained.

17   Q.  Did you have a conversation with him asking him to get you

18   drugs?

19   A.  Yes.

20   Q.  Was that conversation recorded?

21   A.  I believe so.

22   Q.  And was that conversation and the circumstances surrounding

23   that publicized in a British tabloid?

24   A.  Yes.

25   Q.  And as you said, it was embarrassing for you; correct?

LC6Cmax3                    Kate - cross

1    A.  Yes.

2    Q.  Now, I want to speak to you for a few minutes about your

3    interactions with Epstein; okay?

4    A.  Yes.  Okay.

5    Q.  You were aware that sometime toward the late 2000s, Epstein

6    was incarcerated; correct?

7    A.  Yes.

8    Q.  And you sent him pictures while he was in jail, didn't you?

9    A.  I didn't recall that.

10   Q.  Do you recall having emailed correspondence with him?

11   A.  Yes.

12   Q.  Do you recall that he asked for pictures and you agreed to

13   send him pictures?

14   A.  I don't recall that.

15   Q.  During the course of your preparation with the government,

16   were you shown any of the emails that you had with Jeffrey

17   Epstein?

18   A.  Sorry.  Is the question, was I shown by the government my

19   emails?

20   Q.  Yes.

21   A.  No.

22   Q.  Did you talk to the government about emails?

23   A.  Yes.

24   Q.  And did you talk about having sent pictures to Jeffrey

25   Epstein while he was in jail?

LC6Cmax3                    Kate - cross

1    A.  No.

2    Q.  Well, let me show you -- I'm going to ask you to look at

3    your tab.

4              THE COURT:  Tell the government and me the tab first.

5              MS. STERNHEIM:  I'm getting to it, Judge.  Just a

6    moment.  I'm going to refer the government, the Court, and Kate

7    to the tab 3513-019, and it may be at 019.

8              THE COURT:  I don't have tabs by 3500.

9              MS. STERNHEIM:  May we put it on the screen for the

10   witness and the Court?

11             THE COURT:  Sure.  But you have to direct the

12   government.  Do you have it, Ms. Pomerantz?

13             MS. STERNHEIM:  I will show them.

14             MS. POMERANTZ:  Yes, your Honor, I have it.  Thank

15   you.

16             THE COURT:  Thank you.

17             MS. STERNHEIM:  This one.

18             MS. POMERANTZ:  Yes.  Thank you.

19   BY MS. STERNHEIM:

20   Q.  Kate, do you see what is marked as 3513-019?

21   A.  Yes.

22   Q.  Do you recognize that?

23   A.  Yes.

24   Q.  Do you recognize that to be email correspondence that you

25   had with Jeffrey Epstein?

LC6Cmax3                          Kate - cross

1    A.   Yes.

2    Q.   And does that have to do with correspondence that you had

3    with him when he was in jail?

4    A.   Yes.

5    Q.   And that correspondence has to do with sending pictures to

6    him; correct?

7    A.   Yes.

8              MS. STERNHEIM:  Your Honor, I would move this into

9    evidence as 3513-019.

10             THE COURT:  Can you give it an identification trial

11   exhibit, please.

12             MS. STERNHEIM:  Defendant's K8.

13             THE COURT:  Ms. Pomerantz.

14             MS. POMERANTZ:  Your Honor, the government objects.

15   Hearsay.

16             THE COURT:  Sustained.

17   BY MS. STERNHEIM:

18   Q.   Did you send pictures to Jeffrey Epstein while he was in

19   jail?

20   A.   No.

21   Q.   Did you tell him you would send him pictures?

22   A.   Yes.

23   Q.   And did you sign your correspondence to Jeffrey Epstein,

24   "Best love always, Kate"?

25   A.   Yes.

LC6Cmax3                        Kate - cross

```
 1    Q.  Now, you maintained email correspondence with Epstein even
 2    after he was in jail, didn't you?
 3    A.  I don't recall.
 4    Q.  I'm going to ask you to look at what's been marked as
 5    3513-014.
 6            THE COURT:  I don't have a tab number.
 7            MS. STERNHEIM:  I'll put it on the screen, Judge.
 8            THE COURT:  Ms. Pomerantz, do you have that?
 9            MS. POMERANTZ:  I do.  Thank you, your Honor.
10            THE COURT:  Okay.  You can put it on the screen.
11    BY MS. STERNHEIM:
12    Q.  Just going back for a moment, the correspondence that you
13    had with Epstein concerning pictures which you claim you didn't
14    send him was in 2008; correct?
15    A.  If that's what it said, then that would be accurate.
16    Q.  Okay.  And you don't deny that you had email correspondence
17    with him?
18    A.  I do not deny that.
19    Q.  Okay.  Now, looking at this next exhibit, 3513-014, do you
20    see that?
21    A.  Yes.
22    Q.  Do you recognize that to be email correspondence that you
23    had with Jeffrey Epstein?
24    A.  Yes.
25    Q.  Correspondence that you had with him in 2011?
```

LC6Cmax3                        Kate - cross

1    A.  Yes.

2    Q.  And do you recall telling Jeffrey that you were --

3                MS. POMERANTZ:  Objection, your Honor.

4                THE COURT:  Sustained.

5    Q.  Did you, at any point, attempt to visit Epstein in New

6    York?

7    A.  Yes.

8    Q.  Did you contact him for the purpose of arranging to visit

9    him in New York?

10   A.  I felt compelled to contact him.

11   Q.  I did not ask you that.  I asked you, did you contact him?

12   A.  Yes, I did.

13   Q.  You initiated email contact with him; correct?

14   A.  Yes.

15   Q.  You initiated contact because you wanted to meet with him

16   in New York?

17   A.  Yes.

18   Q.  And you also asked if you could stay at his place in New

19   York; correct?

20   A.  Yes.

21   Q.  And then you learned that he was not in New York; correct?

22               MS. POMERANTZ:  Your Honor, objection.

23               THE COURT:  To the question, you learned he was not in

24   New York?

25               MS. POMERANTZ:  Your Honor, to the series of questions

LC6Cmax3                          Kate – cross

1    about -- this goes to hearsay.

2              MS. STERNHEIM:  Judge, may we approach?

3              THE COURT:  Overruled.

4    Q.  You initiated contact with Jeffrey Epstein in 2011;

5    correct?

6    A.  Yes.

7    Q.  You asked to visit with him in New York; correct?

8    A.  Yes.

9    Q.  You asked if you could stay with him in New York; correct?

10   A.  Yes.

11   Q.  He was not in New York; correct?

12   A.  Apparently.

13   Q.  You learned that he was in Paris; correct?

14   A.  Yes.

15   Q.  Throughout the years, you maintained contact with Jeffrey

16   Epstein; correct?

17   A.  Yes.

18   Q.  You had emails that support the contact you had with

19   Epstein; correct?

20   A.  Yes.

21   Q.  You don't have any email correspondence with Ghislaine, do

22   you?

23   A.  No.

24   Q.  When was the last time you had communication with Epstein?

25   A.  Probably in my early 30s.

LC6Cmax3                    Kate - cross

1   Q.  Give me a date, please.

2   A.  I don't have a date.

3   Q.  When were you in your early 30s?

4   A.  I'm not sure I understand.

5   Q.  Well, you just said when you were in your early 30s, I

6   asked for a date, you said you don't have one.  Please tell me

7   the years in your early 30s.

8   A.  Okay.  Well, I'm 44 now, so it's 2021, probably within ten

9   years ago and before that.

10  Q.  So fair to say through 2012, you were in contact with him?

11  A.  Quite possibly so.

12  Q.  Or maybe even later?

13  A.  No.

14  Q.  You just stopped at some point?

15  A.  Yes.

16  Q.  And you stopped at the point that you became a mother;

17  correct?

18  A.  Yes.

19  Q.  And what was your employment while you became a mother?

20  A.  I had a facility for women recovering from substance use

21  disorder and trauma.

22  Q.  Was that the same foundation we were talking about?

23  A.  No.

24  Q.  Something different?

25  A.  Yes.

LC6Cmax3                        Kate - cross

1    Q.  And that was your employment during that period of time

2    that you became a mother?

3    A.  Which period of time specifically?

4    Q.  Well, I don't want to go into the details, but there came a

5    point where you delivered a baby; correct?

6    A.  Yes.

7    Q.  And you were employed at that time?

8    A.  Yes.

9    Q.  And you also sought support from the government during that

10   period of time so you could stay home with your child?

11   A.  Yes.

12   Q.  And even though you are employed, you sought benefits from

13   the government so you could stay home?

14   A.  What do you mean even though I was employed?

15   Q.  Well, I asked you if you were employed at that period of

16   time.  You said you were working for a residence; correct?

17   A.  No.  No, I wasn't working for that then.  I lived there.  I

18   was working for another company.

19   Q.  What company?  You don't have to tell me the name of it,

20   just tell me what type of company it was.

21   A.  It was a financial company.

22   Q.  So you were working for a financial company at the time you

23   gave birth, yet you requested public assistance so you could

24   stay home with your child?

25   A.  Yes.

LC6Cmax3                        Kate - cross

Q.   Now, in connection with the claim that you made beginning

after you testified in this courthouse following Jeffrey

Epstein's death, you sought compensation for therapeutic

services; correct?

A.   Yes.

Q.   And in connection with your assistance with the government,

the FBI victim services awarded you money so that you could

seek therapy; correct?

A.   I'm not sure what it was in connection with.

Q.   Well, do you doubt that you received money for therapy?

A.   No, I did.  Well, I didn't receive the money, the therapist

received the money.

Q.   Okay.  But your therapy was paid for by the government;

correct?

A.   Yes.

Q.   And you had been in email contact with one of the FBI

victim services liaison, both in New York and California;

correct?

A.   Possibly, yes.

Q.   In fact, they sent you a victim's form to fill out;

correct?

A.   Yes.

Q.   And you commented on issues concerning the form that they

were somewhat complicated.  Do you remember that?

A.   Yes.

LC6Cmax3                              Kate - cross

1    Q.  But nonetheless, you completed the form; correct?

2    A.  Yes.

3    Q.  And they also alerted you to resources in the area where

4    you were living?

5    A.  Yes.

6    Q.  Even though, as a therapist, you knew about the resources

7    in the area where you were living; correct?

8    A.  No.

9    Q.  You were not aware of that?

10   A.  No.

11   Q.  And in connection with the work that you do in your

12   foundation and the other residence, you were not familiar with

13   therapeutic services for women claiming to have been abused?

14   A.  Not many of them.

15   Q.  Nonetheless, they put you in the direction of services that

16   you could avail yourself of; correct?

17   A.  Yes.

18   Q.  Some of which they paid for; correct?

19   A.  Yes.

20   Q.  And they also alerted you to facilities or situations where

21   you could get free therapy; correct?

22   A.  I don't recall that, but possibly, quite possibly, yes.

23   Q.  And in connection with the three and a quarter million

24   dollars that you received from the compensation fund, you paid

25   back some of that money; correct?

LC6Cmax3                         Kate - cross

1   A.  You mean the money for the therapy?

2   Q.  Yes.

3   A.  I think I paid back all of it.

4   Q.  And that was $1,200?

5   A.  I don't recall, but if you say so.

6   Q.  You don't dispute that?

7          MS. POMERANTZ:  Objection, your Honor.

8          MS. STERNHEIM:  I'll move on.

9          THE COURT:  Okay.

10  Q.  You're familiar with a man named Ray?

11  A.  I know several people called Ray.

12  Q.  Are you familiar with --

13         MS. STERNHEIM:  May I have just a moment, Judge?

14         THE COURT:  Yes.

15  Q.  Are you familiar with a man — and I'm going to use a name,

16  it's going to sound like a Broadway play — Alexander Hamilton?

17  A.  No.

18  Q.  Are you familiar with a man that goes by the name Ray

19  Hamilton?

20  A.  Yes.

21  Q.  Ray Hamilton was a friend of yours; correct?

22  A.  He was an acquaintance.  He was a friend of a friend.

23  Q.  He's someone that you knew both in the states as well as in

24  London; correct?

25  A.  No.

LC6Cmax3                          Kate - cross

1    Q.   You did not know him?

2    A.   Know him in the states, I don't really know what you mean.

3    Did I see him here?

4    Q.   Yes.

5    A.   No.

6    Q.   Do you recall being on a flight where you ran into him

7    traveling to Los Angeles or from Los Angeles?

8    A.   I don't recall that.

9    Q.   You have no recollection of running into the acquaintance

10   you've known as Ray on a plane?

11   A.   On a plane, yes, but not to Los Angeles.

12   Q.   But on a plane.  I apologize if I got the destination

13   wrong.

14          Do you recall telling him that the Epstein matter had

15   fallen into your lap?

16   A.   No.

17   Q.   And do you recall having called him, fairly recently,

18   giving him updates about how the case was going?

19   A.   No.

20   Q.   That you were going to be writing a book?

21   A.   No.

22   Q.   That you were hoping that a movie would be made?

23   A.   No.

24   Q.   That it is your goal to get the money and move to Italy

25   with your child?

LC6Cmax3                          Kate - cross

1  A.  No.

2             MS. POMERANTZ:  Objection, your Honor.

3             THE COURT:  All right.  We'll move on?

4             MS. STERNHEIM:  Yes, we can move on.

5  Q.  So you knew that assisting the government, as you have,

6  helped your claim against the Epstein Fund; correct?

7  A.  No.

8  Q.  You did not know that?

9  A.  I did not know that.

10  Q.  You're testifying here not as a victim; correct?

11             MS. POMERANTZ:  Objection, your Honor.

12             THE COURT:  Sustained.

13  Q.  You applied to the Epstein Fund; correct?

14  A.  Yes.

15  Q.  And that was based upon your claim that, when you were 17

16  years old, you had contact with Jeffrey Epstein; correct?

17  A.  Yes.

18  Q.  And you now that age was a particular factor in connection

19  with the claim to the fund?

20  A.  I did not know that.

21  Q.  You testified earlier that you were awarded three and a

22  quarter million dollars; correct?

23  A.  Yes.

24  Q.  And, obviously, your attorney, Mr. Edwards, got a fee out

25  of that; correct?

1    A.  Yes.

2    Q.  But the rest was yours, tax free; correct?

3    A.  Yes.

4    Q.  You have requested assistance by the government to obtain

5    what's called a U visa?

6    A.  Yes.

7    Q.  That's a special visa for people who claim to have been

8    victims who assist the government; correct?

9    A.  That is my understanding.

10   Q.  And you have begun the process of filling out the

11   application; correct?

12   A.  No.

13   Q.  You've never filled out an application?

14   A.  I don't think I've begun that process, no.

15   Q.  So if there is an application with your name on it, you

16   don't know who filled that out?

17   A.  I made an inquiry about it.  I'm not sure that I filled out

18   an application.

19   Q.  But it is your goal to try to get the U visa; correct?

20   A.  No, it is not.

21   Q.  You do not want the U visa?

22   A.  I do not want the U visa.

23           MS. STERNHEIM:  May I have a moment, Judge?

24           THE COURT:  You may.

25           MS. STERNHEIM:  Judge, I'm handing up a copy of an

LC6Cmax3                    Kate - cross

1    exhibit that I'd like to show the government.

2               THE COURT:  Can you give it a trial mark for

3    identification, please.

4               MS. STERNHEIM:  It would be Defendant's K9, please.

5               May I give one to the witness, Kate, please?

6               THE COURT:  You may.

7    BY MS. STERNHEIM:

8    Q.  Kate, I'm going to ask you to take a look at the exhibit I

9    gave you, which we are marking as K9.  Do you recognize that?

10   A.  No.

11   Q.  Do you recognize your true name on it?

12   A.  Sorry.  On which page?

13   Q.  On page 2, which is in the flip side of page 1.  I would

14   direct you to the left-hand column.

15   A.  I've got, I think -- I've got pages 1 of 6, 3 of 6, and 5

16   of 6.

17   Q.  If you turn 1 of 6 over?

18   A.  The other side.  Thank you.

19   Q.  Do you see it now?

20   A.  Yes.

21   Q.  I'm going to ask you to look at the left-hand column.

22   A.  Yes.

23   Q.  Near what may be 2A?

24   A.  Yes.  Yes.

25   Q.  Is that your true name?

LC6Cmax3                          Kate – cross

1    A.  Yes, it is.

2    Q.  I'm going to ask you to review other parts of this.  It

3    indicates that certain questions have been answered.

4              MS. POMERANTZ:  Objection, your Honor.

5              THE COURT:  Sustained.

6    Q.  Did you at any point participate in the completion of a

7    U visa application?

8    A.  Could you repeat that question.

9    Q.  Did you at any point participate in an application for a

10   U visa?

11   A.  I'm not sure.

12   Q.  The document that is before you, K9, bears your true name;

13   correct?

14             MS. POMERANTZ:  Objection, your Honor.

15             THE COURT:  Sustained.

16   Q.  Do you have any idea who would have put your name on this

17   application?

18             MS. POMERANTZ:  Objection, your Honor.

19             THE COURT:  Sustained.

20             MS. STERNHEIM:  Your Honor, I would ask that this be

21   entered into evidence.

22             MS. POMERANTZ:  Objection, your Honor.

23             THE COURT:  Sustained.

24             MS. STERNHEIM:  Can I have a moment, please?

25             THE COURT:  You may.

LC6Cmax3                    Kate - cross

1    BY MS. STERNHEIM:

2    Q.  I think you testified earlier you had approximately 10

3    meetings with the government in preparation for your testimony

4    here; correct?

5    A.  Yes.

6    Q.  And toward the end of those meetings, meaning not the end

7    of each meeting, but meaning the meetings closest to today, the

8    issue of your immigration status was raised, wasn't it?

9    A.  Yes.

10   Q.  And a request was made that the government look into

11   helping you with a U visa?

12   A.  I asked that an inquiry be made.

13   Q.  And at some point, if not today, but at least prior to

14   today, it was your interest in getting a U visa; correct?

15   A.  Yes.

16   Q.  Because at some point, your other visa will no longer

17   survive; correct?

18   A.  No.

19   Q.  So the U visa would permit you to stay here; correct?

20   A.  No, I'm saying no to what you said.  So that's not the

21   case.

22   Q.  The exceptional visa just lasts forever?

23   A.  No, but it's renewable and I have existed and I have stayed

24   here in status on those visas for the period of time that I've

25   been here.  It's not problematic to renew them.

LC6Cmax3                     Kate - cross

```
1    Q.  And what is the exceptional circumstance that you use to
2    renew your visa?
3    A.  It's actually an -- it's an extraordinary ability.
4    Q.  And what is your extraordinary ability that you put forth
5    in support of your visa?
6    A.  The last one?
7    Q.  Yes.
8    A.  The last one was related to music, but not actually
9    songwriting or anything.  It was coaching.
10   Q.  So anyone --
11   A.  Singing, coaching.
12   Q.  So anyone who can claim to be an unlicensed music coach
13   would be eligible for that type of visa?
14           MS. POMERANTZ:  Objection, your Honor.
15           THE COURT:  Sustained.
16   Q.  Prior to using music, what else did you use to indicate
17   that you are exceptional?
18   A.  I don't -- I'm not clear on what you're asking, what did I
19   use to indicate that I was exceptional.
20   Q.  What did you state was the basis of you being exceptional?
21   A.  My -- the basis has always been music-related and it's
22   evolved over time as my work has evolved.
23   Q.  But other than you being an unlicensed music coach, you are
24   not in the music business?
25   A.  I don't -- I don't understand.  You're saying other than --
```

LC6Cmax3                          Kate - cross

1   Q.  Being a music coach or a music therapist, are you employed

2   in the music industry?

3   A.  I mean, that is the music industry.

4   Q.  So you are employed in that capacity?

5   A.  I'm employed -- I mean I work in that capacity and I get

6   paid in that capacity.

7   Q.  And you are selfemployed; correct?

8   A.  Yes.

9   Q.  But a U visa would permit you to be in other areas than

10  music; correct?

11  A.  I don't know.

12  Q.  And a U visa is not something that you can buy; correct?

13  A.  I don't know.

14  Q.  It's something that you need the government to attest to

15  the fact that you claim to be a victim; correct?

16  A.  I'm not sure of the requirements.

17  Q.  You have no idea?

18  A.  I don't know what the requirements are, no.

19            MS. STERNHEIM:  Just a moment.

20            Nothing further.  Thank you.

21            THE COURT:  Ms. Pomerantz.

22            MS. POMERANTZ:  Your Honor, would this be a good time

23  for a break?

24            THE COURT:  I guess it depends on how long you

25  anticipate.

LC6Cmax3                       Kate – cross

1          MS. POMERANTZ:  I think we would go into the lunch

2     break, your Honor, so I would request that we start after the

3     lunch break.

4          THE COURT:  Okay.

5          MS. POMERANTZ:  Thank you.

6          THE COURT:  Members of the jury, we'll take our lunch

7     break.  It's 12:45.  We're going to shoot for 45 minutes to an

8     hour.  Thank you.  Enjoy your break.

9          (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LC6Cmax3                      Kate – cross

1           (Jury not present)

2           THE COURT:  The witness may step down for the lunch

3    break.

4           THE WITNESS:  Thank you, your Honor.

5           (Witness excused)

6           THE COURT:  Everyone may be seated.  Matters to take

7    up, counsel?

8           MS. POMERANTZ:  Not from the government.  Thank you,

9    your Honor.

10          MS. STERNHEIM:  Not at this time.

11          THE COURT:  We'll resume in 45 minutes.  Let me know

12   if there is anything we need to address, please.  Thank you.

13          (Recess)

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

LC6VMAX4

```
 1                      A F T E R N O O N   S E S S I O N

 2                               1:35 P.M.

 3              THE COURT:  Matters to take up?

 4              MS. MOE:  Thank you, your Honor.

 5         I'm not sure if my microphone is on.

 6              THE COURT:  It's not.  I'm not sure why.

 7              MS. MOE:  Thank you, your Honor.

 8              Regarding the 900 series, I just wanted to flag in

 9    advance for the Court I've conferred with Mr. Everdell.  We had

10    earlier discussed the range of exhibits that the Court had

11    ruled on.  There were some additional exhibits from the 900

12    series that weren't in dispute.  And so I just want to flag for

13    the Court that when I offer them, there will be additional

14    numbers.  I've conferred about the list with Mr. Everdell; I

15    think we're in agreement on the scope of that, and that that's

16    consistent with the Court's ruling.  But I just wanted to flag

17    that in advance.

18              THE COURT:  Thank you.

19              MR. EVERDELL:  That's correct, your Honor.

20              THE COURT:  Great.  Thank you.

21              MS. STERNHEIM:  Judge, I have a couple of matters, if

22    I might.

23              THE COURT:  Okay.

24              MS. STERNHEIM:  I have requested and I would ask the

25    Court to direct the government to disclose the origin of the U
```

LC6VMAX4

1    visa application that bears Kate's name.  It was provided to us

2    some time in the wee hours.  I do not know its origin, but it

3    certainly contains specific information regarding this witness.

4    It may require us to call a witness, so I need to know from

5    where it came.

6           The other has to do with the emails.  I'm not sure

7    what the Court's preclusion of the introduction of the emails

8    which actually constitute past recollection recorded of this

9    witness to Mr. Epstein.

10          THE COURT:  Let's start with the -- what got marked --

11   remind me what the --

12          MS. STERNHEIM:  I think it was K-9.

13          THE COURT:  3513-062, pages 1 through 6, which got

14   marked for identification as Defendant's K-9.  The request is

15   for the government to indicate the origin.

16          MS. POMERANTZ:  Your Honor, on 3513-045, the notes

17   say, at the end of the meeting, the witness's counsel provided

18   a form and asked to discuss her visa status, and that is the

19   form.  And the index also indicates that that was the form

20   provided on that date.

21          THE COURT:  Okay.  That resolves that.

22          And then the emails which were marked -- I'm sorry,

23   remind me what they were marked as.

24          MS. STERNHEIM:  I think they were marked as K-7.

25          THE COURT:  Defendant's K-7.

LC6VMAX4

1        MS. STERNHEIM:  Excuse me.  I'm getting another --
2   K-8.  I apologize.
3        THE COURT:  Okay.  Defendant's K-8.
4        So just get my head back in it.
5        Okay.  Ms. Pomerantz?
6        MS. POMERANTZ:  Your Honor, may I just have a moment.
7        THE COURT:  Okay.
8        (Counsel conferred)
9        MS. POMERANTZ:  If I could have just the 3500 number
10  so that way -- because I don't believe I have the exhibit.
11       MS. STERNHEIM:  3513-019.
12       THE COURT:  I don't think I ever got a copy of it.  It
13  was on the screen.
14       MS. POMERANTZ:  Yes.
15       THE COURT:  If it's not in the binder, maybe you could
16  hand up a copy, please.
17       MS. STERNHEIM:  I can, Judge.
18       THE COURT:  Thank you.
19       MS. STERNHEIM:  I'm just showing the government.
20       THE COURT:  Yes.
21       MS. POMERANTZ:  Your Honor, the recorded recollection
22  rule provides an exception to the rule against hearsay.  And
23  the first prong refers to:  On a matter that the witness once
24  knew about, but now cannot recall well enough to testify fully
25  and accurately.

LC6VMAX4

         But the witness was able to testify fully about the
issue, and she testified fully about the matter; and there was
no, you know, inconsistency or prior inconsistent statement.
It should not be admitted into evidence.

         THE COURT:  My read on it at the time was that the
only discrepancy was -- the implied discrepancy was whether
pictures were actually sent, but the email doesn't go to that;
so it seems to me that her testimony was what was reflected in
the email.  What am I missing?

         MS. STERNHEIM:  May I have just a moment?

         THE COURT:  You may.

         And I suppose, to put a fine point on the question, as
Ms. Pomerantz says, what is it that the witness could not
recall well enough to testify fully and accurately?

         MS. STERNHEIM:  Your Honor, it's my understanding --

         THE COURT:  I'm sorry, at the mic please.

         MS. STERNHEIM:  I apologize.

         THE COURT:  That's okay.

         MS. STERNHEIM:  Past recollection recorded does not
have to be inconsistent.

         THE COURT:  Okay.  That's not the question.

         So just a record that sub A is on a matter the witness
once knew about, but now cannot recall well enough to testify
fully and accurately.

         So what couldn't the witness testify fully and

LC6VMAX4

1   accurately about?

2           MS. STERNHEIM:  Well, at first she wasn't sure.  And

3   then when she saw it, she didn't deny it.  But I think that it

4   is a recording of her own email.  There is no issue as to

5   authenticity.

6           THE COURT:  It's not an authenticity objection; it's a

7   hearsay objection.

8           Again, I think her testimony would be described as she

9   recalled it well enough to testify fully and accurately because

10  it doesn't conflict with what's in here.  So it's not the same

11  analysis as prior inconsistent statement, but I think the

12  initial question is what did she not testify to fully and

13  accurately.

14          MS. STERNHEIM:  I just think it is corroborative of

15  her testimony and more reliable than just coming from the stand

16  when it is her own written statement to the co-conspirator in

17  this case.

18          MS. POMERANTZ:  Your Honor, that's not responsive to

19  the question.  And also, as the Court has noted, it just

20  doesn't meet the standard that's articulated under 5A in terms

21  of the question is whether it's on a matter that the witness

22  once knew about, but now cannot recall well enough to testify

23  fully and accurately.  And that's just not the case here, your

24  Honor.

25          THE COURT:  Okay.

LC6VMAX4

1          MS. STERNHEIM:  Judge, I would just say that it is not

2     being offered for the truth; it's offered for the fact that she

3     maintained contact with him at a time later than the matters in

4     issue and, therefore, it has relevance.

5          THE COURT:  That's the truth, what you just said.

6     It's being offered for the truth that she had contact.

7          MS. STERNHEIM:  Well, that part is not hearsay.  The

8     content is hearsay.  The fact of the contact itself is

9     something else.  That's my understanding of it.

10          THE COURT:  Well, okay.  She said she emailed with

11     him.  If you want to redact the content and show that there

12     were emails, I suppose that's another question.  But if you're

13     not -- you want the content, which is consistent with what she

14     testified to.

15          MS. STERNHEIM:  Judge, I want the dates.

16          THE COURT:  Okay.

17          MS. STERNHEIM:  And that is not hearsay.

18          THE COURT:  All right.  So the dates then I would

19     permit -- I'll hear the government's response to this, but with

20     the content redacted.

21          MS. POMERANTZ:  Your Honor, I'd like to check the

22     transcript, because I thought she had agreed to the dates.  And

23     so --

24          THE COURT:  She did.

25          MS. POMERANTZ:  So this seems cumulative, your Honor.

LC6VMAX4

1          THE COURT:  Well, I would permit it as cumulative if

2     all we're doing is showing the jury that emails happened on

3     these dates.

4          MS. POMERANTZ:  I just want to make sure I understand,

5     your Honor.  Would all of the substance of the emails be

6     redacted?

7          THE COURT:  That's the proposition.

8          MS. POMERANTZ:  And what about the subject lines?

9          MS. STERNHEIM:  The subject lines would not be --

10    well, the sender and recipient would not be hearsay.  The date

11    would not be hearsay.

12         THE COURT:  Right.  But the subject line would be.

13         Okay.  So with the content and the subject matter

14    redacted, I'll let the dates in.  And who's emailing it would

15    have to be sealed because it identifies the witness by her true

16    identity.

17         MS. POMERANTZ:  Okay, your Honor.  Thank you.

18         THE COURT:  Okay.  So, Ms. Sternheim, your team will

19    prepare a redacted -- I'm sorry, I lost the number, K -- what

20    was the defendant's mark?

21         MS. STERNHEIM:  K-8.

22         And if I may just supplement the record for a moment.

23         THE COURT:  Sure.

24         MS. STERNHEIM:  If it is not being offered for the

25    truth, why can't it come in with a limiting instruction?  Other

LC6VMAX4

```
 1   things have been admitted during this trial with limiting
 2   instructions.  I think that there is relevance to this.
 3           THE COURT:  Yes.
 4           MS. STERNHEIM:  And it comports with testimony;
 5   therefore, there is relevance to it.  And an instruction would
 6   cure the concerns of the government.
 7           THE COURT:  I'm going to continue with my ruling.
 8           Now I'm leaning towards cumulativeness, but I'll
 9   permit the dates and the emails for the reasons indicated with
10   redaction of the content on 403 grounds.
11           If you can prep a redacted version or, counsel, you
12   could stipulate to the dates the emails were sent or the like,
13   but you need to do this quickly because the jury is going to
14   come back in.  What else do we need to take up?
15           MS. STERNHEIM:  That's all.
16           MS. POMERANTZ:  Nothing from the government.
17           THE COURT:  Okay.  Can you sort out how you're going
18   to get it in?  Well, I suppose -- I mean, she's off of cross at
19   this point.  Figure it out and you can do it on recross, I
20   suppose.  I'll step down for two minutes.
21           (Recess)
22           THE COURT:  Counsel, ready to proceed?
23           MS. POMERANTZ:  Yes.
24           MR. ROHRBACH:  One matter --
25           THE COURT:  I can't hear you, Mr. Rohrbach.
```

LC6VMAX4

1      MR. ROHRBACH:  One matter to take up, your Honor,

2  before the jury comes in.

3      After conferring with the defense we just wanted to

4  make sure we fully understood the Court's ruling this morning

5  about one piece of the testimony related to the New York

6  search.

7      The government's understanding of the Court's ruling

8  is that the government is not going to offer exhibits that

9  depict either images of celebrities or images of nude or

10  semi-nude people inside the house; but it is going to elicit

11  testimony from the witness that she observed those two

12  categories of images.  We just want to make sure that both of

13  those were consistent with -- both of those pieces of testimony

14  would be consistent with the Court's ruling.

15      THE COURT:  You can ask the witness testimony about

16  what she saw at the relevant time period.

17      On the celebrity piece, I understood you to say you

18  weren't moving in that exhibit; that is a desk with photos of

19  Epstein with celebrities.  Was that a misunderstanding?

20      MR. ROHRBACH:  No, that is correct, your Honor.

21      THE COURT:  I didn't rule on that, but your question

22  is may you ask the witness about photos she saw?

23      MR. ROHRBACH:  Yes.  So my understanding is we're

24  going to just ask at a relatively high level of generality, but

25  both photos she saw and the nude artwork she observed.

LC6VMAX4

```
 1              THE COURT:  Is there an objection?
 2              MR. EVERDELL:  Your Honor, I think --
 3              THE COURT:  Microphone please.
 4              MR. EVERDELL:  Sorry, your Honor.
 5          I think it does defeat the purpose a bit of not
 6     admitting the exhibits just to have the agent testify about
 7     those very same --
 8              THE COURT:  Are you talking about the agent?
 9              MR. ROHRBACH:  Yes, the agent who conducted the
10     search.
11              THE COURT:  Oh, I misunderstood.
12          No, you can't ask the agent unless -- for the same
13     reason.  Relevance has to be to the time period.
14              MR. ROHRBACH:  That's fine, your Honor.  We just
15     wanted to make sure we understood.
16              THE COURT:  Thank you for clarifying, Mr. Everdell.
17          I thought you meant the current witness.
18              MR. ROHRBACH:  No, not the current witness.
19              MR. EVERDELL:  Thank you, your Honor.
20              THE COURT:  Thank you.
21          Okay.  What else?  Anything?
22              MS. POMERANTZ:  Nothing from the government.
23          Thank you.
24              THE COURT:  All right.  Bring in the witness, please.
25     And we'll bring in the jury.
```

LC6VMAX4                      Kate - redirect

 1                (Witness present)

 2                THE COURT:  You may remove your mask.  We'll have the

 3     jury in in a moment.

 4                Ms. Pomerantz, if you want to go to the podium and set

 5     up, you may.

 6                MS. POMERANTZ:  Thank you, your Honor.

 7                THE COURT:  Thank you.

 8                Just while we're waiting, just to flag, counsel, if

 9     you look at 911 and 913, it looks like there's photos that

10     might need additional redaction.

11                (Jury present)

12                THE COURT:  Thank you, members of the jury.

13                I hope you had a pleasant lunch.

14                We're going to pick up with the redirect examination

15     of the witness identified as Kate.

16                Ms. Pomerantz, when you're ready.

17                And Kate, I remind you that you are under oath.

18                Go ahead.

19     REDIRECT EXAMINATION

20     BY MS. POMERANTZ:

21     Q.  Good afternoon, Kate.

22     A.  Good afternoon.

23     Q.  Can you just pull the microphone a little bit closer to you

24     please?

25     A.  Is that good?

LC6VMAX4                        Kate – redirect

1    Q.  Yes.  Thank you.

2              Do you remember being asked questions on

3    cross-examination about your immigration status?

4    A.  Yes.

5    Q.  Can you explain to the jury what you expect will happen

6    with your immigration status.

7    A.  Yes.  My plan is to file a renewal of my current existing

8    O-1 visa a couple of months before the existing one expires, as

9    I have done many previous times.

10   Q.  Has the government promised you anything with respect to

11   your immigration status?

12   A.  No, they have not.

13   Q.  Have you coordinated your testimony with any other

14   witnesses at this trial?

15   A.  No.

16   Q.  Has anyone told you what to say at this trial?

17   A.  No.

18   Q.  What are you here to do today?

19   A.  Aside from the events that took place a long time that I'm

20   referring to today, this is the hardest thing that I have ever

21   had to do.  And I am here because I don't think there is

22   anything more important, especially now that I'm a parent, than

23   demonstrating to her that I can stand up for myself and

24   demonstrating that the truth is important.

25   Q.  Kate, you were asked on cross-examination about public

LC6VMAX4                          Kate - redirect

1    statements that you made in your name.  Do you recall that?

2    A.  Can you repeat?

3    Q.  You were asked on cross-examination about public statements

4    you made in your name.

5    A.  Yes.

6    Q.  Do you recall that?

7    A.  Yes.

8    Q.  Was that hearing where you made those public statements

9    about Maxwell?

10   A.  Sorry.  I can't hear you.

11   Q.  Was that hearing where you made those public statements

12   about Maxwell?

13   A.  No, it was not.

14   Q.  Who was the hearing about?

15   A.  It was about Jeffrey Epstein.

16   Q.  At that hearing, did you talk about all of your

17   experiences?

18   A.  No.

19   Q.  Did you go into detail about your experiences with Epstein

20   during that hearing?

21   A.  No.

22   Q.  Why not?

23   A.  Because I did not want to disclose on a public level under

24   my own name the details of the incidents that took place

25   because I did not want my daughter to be exposed.

LC6VMAX4                        Kate - redirect

1   Q.  That same day did you meet with the government for the

2   first time?

3   A.  Yes.

4   Q.  Who did you tell the government about?

5   A.  I told the government about Ghislaine Maxwell.

6   Q.  Kate, do you remember the first time you saw Jeffrey

7   Epstein naked?

8   A.  Yes.

9   Q.  Do you remember who was standing next to you?

10  A.  Yes.

11  Q.  Who was standing next to you?

12  A.  Ghislaine Maxwell.

13  Q.  How old were you?

14  A.  Seventeen.

15  Q.  Can you explain to the jury why you remember that so

16  clearly?

17  A.  I remember it so clearly because I was terrified and

18  frozen.

19  Q.  You were asked on cross-examination questions about your

20  memories and your drug use, do you recall that?

21  A.  Yes.

22  Q.  Can you explain to the jury why you remember what happened

23  to you with Maxwell and Epstein when you were 17?

24  A.  I remember what happened when I was 17 with Ghislaine and

25  Jeffrey because those events come back to me all the time.  I

LC6VMAX4                         Kate - cross

1    have nightmares about them.

2              MS. STERNHEIM:  Objection.

3              THE COURT:  All right.  Sustained.

4              Next question.

5              MS. POMERANTZ:  Thank you, your Honor.

6    Q.  You were asked some questions on cross-examination about

7    the awards you received from the Epstein Victim Compensation

8    Fund.  Do you remember that?

9    A.  Yes.

10   Q.  Can you tell the jury what the money meant to you.

11   A.  Yes.  What the money meant to me was recognition of my

12   pain; what it meant to me was that my truth was important --

13             MS. STERNHEIM:  Objection.

14             THE COURT:  Overruled.  You may answer.

15   A.  It meant that I could continue to try to recover and to

16   continue to try and help other people recover from these kinds

17   of events.

18   Q.  Kate, do you have any financial stake in the outcome of

19   this trial?

20   A.  I do not.

21             MS. POMERANTZ:  No further questions, your Honor.

22             MS. STERNHEIM:  Briefly.

23             THE COURT:  Yes.

24   RECROSS EXAMINATION

25   BY MS. STERNHEIM:

LC6VMAX4                          Kate - cross

1    Q.  You've been asked questions about your memory; correct?

2              THE COURT:  Ms. Sternheim, your mask.

3              MS. STERNHEIM:  Oh, I forgot.  Thank you.

4              THE COURT:  Thank you.

5    Q.  Kate, you've been asked questions about your memory;

6    correct?

7    A.  Yes.

8    Q.  And you testified from your memory about an occasion where

9    you were asked to put on a uniform; correct?

10   A.  Yes.

11   Q.  And in connection with that interaction, you and Ghislaine

12   spoke about St. Trinian's, do you recall?

13   A.  I do not.

14             MS. POMERANTZ:  Objection, your Honor.

15             Beyond the scope.

16             THE COURT:  Sustained.

17             MS. STERNHEIM:  I don't understand the objection.

18             THE COURT:  Beyond the scope of the redirect.

19   Q.  Have you on other occasions wore costumes?

20             MS. POMERANTZ:  Objection, your Honor.

21             THE COURT:  Sustained.

22   Q.  You speak about the truth.  It's your truth as you believe

23   it to be; correct?

24   A.  It is my experience.

25   Q.  Your experience and your experience alone; correct?

LC6VMAX4                          Kate - cross

1   A.  Yes.

2   Q.  And experiences that you have discussed with other

3   individuals who claim to have been abused by Epstein; correct?

4   A.  I have not discussed these experiences with others.

5   Q.  Experiences that you have discussed with your lawyer who

6   represents other --

7           MS. POMERANTZ:  Objection.

8   Q.  -- victims?

9           THE COURT:  Sustained.

10  Q.  You were at a meeting with the government where your

11  immigration status was discussed, do you recall?

12  A.  Yes.

13  Q.  And during that meeting, a form that was shown to you

14  today, a U visa form, was handed to the government.

15          Do you remember that?

16  A.  I do not recall.

17  Q.  Do you remember that your lawyer, Mr. Edwards, was at that

18  meeting?

19  A.  I would imagine he would have been.

20  Q.  And do you recall that Mr. Edwards is the one who gave that

21  form to the government?

22  A.  I do not recall.

23  Q.  And do you recall that Mr. Edwards had consulted with you

24  during that meeting concerning your U visa?

25          MS. POMERANTZ:  Objection, your Honor.

1           THE COURT:  Sustained.

2    Q.  And do you recall that it was at that meeting that a

3    request was made for the government to look into your U visa?

4           MS. POMERANTZ:  Objection, your Honor.

5           Asked and answered.

6           THE COURT:  Sustained.

7    Q.  So as you sit here now, you're just going to renew your

8    visa based on exceptionalism and are not going forward with the

9    U visa?

10          MS. POMERANTZ:  Objection, your Honor.

11          Asked and answered.

12          THE COURT:  Sustained.

13          MS. STERNHEIM:  Your Honor, at this time I would move

14   into evidence, with proper redactions being made, Exhibit K-8

15   and K-10.  I have discussed this with the government.  They

16   will be appropriately redacted for later publication to the

17   jury.

18          THE COURT:  Without objection?

19          MS. POMERANTZ:  No objection, your Honor.

20          THE COURT:  Defendants's K-8 and K-10 with redactions

21   will be admitted.  I know K-8 is sealed.  Is K-10 also sealed?

22          MS. POMERANTZ:  Your Honor, they both should be under

23   sealed.

24          THE COURT:  Both are sealed even with redactions

25   because the unredacted material would identify the witness.

LC6VMAX4                        Kate - cross

1              (Defendant's Exhibits K-8, K-10 received in evidence)

2    BY MS. STERNHEIM:

3    Q.  Kate, in connection with your application to the fund, if

4    it is determined that anything you stated on that application

5    is not true, that could impact the money you received, isn't

6    that a fact?

7    A.  I'm not sure.

8    Q.  Didn't the application specifically state that applications

9    would be vetted for fraud?

10   A.  I don't remember that, but I would imagine that would be

11   true.

12           MS. STERNHEIM:  Thank you.

13           No further questions.

14           THE COURT:  Okay.  Thank you, Kate.

15           You may step down.  You are excused.  Thank you.

16           THE WITNESS:  Thank you.

17           (Witness excused)

18           THE COURT:  The government may call its next witness.

19           MS. MOE:  Thank you, your Honor.

20           The government calls Patrick McHugh.

21           THE COURT:  Patrick McHugh may come forward.

22    PATRICK McHUGH,

23        called as a witness by the Government,

24        having been duly sworn, testified as follows:

25           THE COURT:  You may inquire.

LC6VMAX4                          McHugh – direct

1              MS. MOE:  Thank you, your Honor.

2      DIRECT EXAMINATION

3      BY MS. MOE:

4      Q.  Good afternoon, Mr. McHugh.

5      A.  Good afternoon.

6      Q.  Can you just take a moment to move the microphone so that

7      it's closer to your mouth, that way you don't have to lean

8      forward.  Thank you.

9              THE COURT:  It's okay to lean forward, too.

10     Q.  Thanks very much.

11             All right.  Mr. McHugh, can you tell us, where do you

12     work?

13     A.  JPMorgan.

14     Q.  Is JPMorgan a bank?

15     A.  Yes.

16     Q.  Can you tell us how long have you worked for JPMorgan?

17     A.  Thirty years.

18     Q.  What is your current title at JPMorgan?

19     A.  Executive –– executive director.

20     Q.  What does it mean to be an executive director?

21     A.  I'm an officer of the firm.

22     Q.  Do you work in a particular department at JPMorgan?

23     A.  I work in the client service group.

24     Q.  What are your duties and responsibilities as an executive

25     director in the client services group at JPMorgan?

1          THE COURT:  I'm sorry, I'm having a little trouble

2    hearing you.

3          MS. MOE:  Thank you, your Honor.

4          THE COURT:  Thank you.  Can you repeat.

5          MS. MOE:  Thank you.

6    Q.  What are your duties and responsibilities as an executive

7    director in the client services group at JPMorgan?

8    A.  I'm currently responsible as the global business process

9    and control manager for our client service group.

10   Q.  In your role at JPMorgan, are you familiar with the normal

11   business practices of JPMorgan with respect to keeping records?

12   A.  Yes.

13   Q.  Are you familiar with the business practices regarding

14   account opening documents and account ownership documents?

15   A.  Yes.

16   Q.  Can you tell the jury, what are account opening documents?

17   A.  Account opening documents are applications that clients

18   complete to provide us information in order to open and operate

19   their accounts and any subsequent documents that tell us who's

20   authorized for the various transactions and entities.

21   Q.  Are you familiar with the business practices regarding

22   account statements?

23   A.  Yes.

24   Q.  What are account statements?

25   A.  Account statements are typically monthly records that we

LC6VMAX4                         McHugh – direct

1   produce in physical or digital form for our clients so they can

2   see the balances and activity in their accounts.  And they can

3   call and inquire or reconcile for their purposes.

4   Q.  Does JPMorgan maintain account statements and account

5   ownership documents in its files?

6   A.  Yes.

7   Q.  How are those records maintained?

8   A.  They are digitally imaged in our system of record.

9   Q.  If you could please take a look at the binder in front of

10  you on the witness stand.  I have placed in front of you

11  documents which are marked for identification as Government

12  Exhibits 501, 502, 504, 505, 506, and 509.  Can you just take a

13  moment to see that those exhibits are in that binder?

14  A.  Sure.  Documents are in there.

15  Q.  Thank you.

16       In preparation for trial, has the government asked you

17  to review those exhibits?

18  A.  Yes.

19  Q.  And how do you know that those are the same exhibits you

20  reviewed in preparation for trial?

21  A.  In order to authenticate those documents, I went into our

22  system of record in our imaging application, and I had those

23  documents pulled up so I could look across dual screens and

24  verify that those were the identical images that we had on

25  our -- in our records and files.

LC6VMAX4                         McHugh - direct

1    Q.   And how do you know that the exhibits in the binder are the

2    same ones that you pulled up in the system and compared

3    side-by-side to make sure they are accurate?

4    A.   Well, again, I went into the system and did the

5    side-by-side review and verified that they were identical.  And

6    I checked the attributes of those individual documents, the key

7    attributes of all of those individual documents, to make sure

8    that they matched.

9    Q.   Did you make any notations in the binder?

10   A.   Yes.

11   Q.   What notations did you make?

12   A.   I initialed the binder based on the tab and each exhibit.

13   Q.   Do you recognize these exhibits as records from JPMorgan?

14   A.   Yes, I recognize them.

15   Q.   Okay.  What kinds of records from JPMorgan are they?

16   A.   Those are account opening documents and account statements.

17   Q.   Are those true and accurate copies of JPMorgan records?

18   A.   Yes.

19   Q.   Are those records kept by JPMorgan in the normal course of

20   business?

21   A.   Yes.

22   Q.   Were the entries in those records made at or near the times

23   those events occurred?

24   A.   Yes.

25           MS. MOE:  Your Honor, the government offers Government

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    Exhibits 501, 502, 504, 505, 506, and 509 as public exhibits.

2              MR. EVERDELL:  No objection.

3              THE COURT:  Thank you.

4              The exhibits just indicated are admitted and you may

5    publish.

6              (Government's Exhibits 501, 502, 504, 505, 506, 509

7    received in evidence)

8              MS. MOE:  Thank you, your Honor.

9    BY MS. MOE:

10   Q.  Mr. McHugh, before I begin asking you about these records,

11   had the full account numbers been redacted from these exhibits

12   for bank security and privacy reasons?

13   A.  They've been partially redacted.

14   Q.  Thank you.  All right.

15             MS. MOE:  Ms. Drescher, could you please publish

16   what's now in evidence as Government Exhibit 509.

17   Q.  Mr. McHugh, what are we looking at here?

18   A.  Exhibit 509 is a Morgan account corporate partnership

19   information application page.

20   Q.  What is the name of this particular account?

21   A.  The name of this -- the title of this account is Financial

22   Trust Company, Inc.

23   Q.  Focusing on the field in section B that says contact person

24   and title, what is listed there?

25   A.  The contact person is Jeffrey Epstein, and the title is

LC6VMAX4                         McHugh - direct

1   president.

2              MS. MOE:  Ms. Drescher, if we could turn to the bottom

3   of page 3 of this exhibit.

4   Q.  Can you tell us, what is the date of this account

5   application?

6   A.  August 11th, 1999.

7   Q.  And who is listed here as the account holder?

8   A.  Jeffrey Epstein.

9              MS. MOE:  And Ms. Drescher, if we could please turn to

10  page 2.

11  Q.  Focusing on the upper right-hand corner of page 2, do you

12  see where it says "asset account number"?

13  A.  Yes.

14  Q.  What does that mean?

15  A.  Asset account number is the account number we assign when

16  we open up asset accounts for our clients.

17  Q.  What are the last four digits of that asset account number?

18  A.  5001.

19  Q.  Could you please explain for the jury what is an asset

20  account?

21  A.  An asset account is an account that our clients use to hold

22  securities and cash and purchase securities and effect

23  transactions.  It's an account that is controlled by the client

24  and all the transactions are directed by them.

25  Q.  I want to ask you a few more questions about this

1    particulate asset account.

2              MS. MOE:  Ms. Drescher, if you could leave this up and

3    publish alongside it what's now in evidence as Government

4    Exhibit 505.

5    Q.  What is Government Exhibit 505?

6    A.  Exhibit 505 is an asset account statement.

7    Q.  And what account is this an account statement for?

8    A.  For account number 5001 for the Financial Trust Company,

9    Inc.

10             MS. MOE:  And Ms. Drescher, if you could please

11   highlight on the left the account number in Government Exhibit

12   509.

13   Q.  Mr. McHugh, is this the same account we've been talking

14   about?

15   A.  Yes.

16   Q.  Okay.

17             MS. MOE:  Thank you, Ms. Drescher.

18             If you could please drop Government Exhibit 509; we'll

19   focus on Government Exhibit 505.

20   Q.  Just so we're on the same page, what's the month and year

21   of this asset account statement?

22   A.  October 1999.

23             MS. MOE:  All right.  If we could turn to page 6 of

24   Government Exhibit 505 please.  Ms. Drescher, if you could

25   please blow up the two entries that are dated October 19th,

1   1999.

2   Q.  Do you see those, Mr. McHugh?

3   A.  Yes.

4   Q.  Thank you.

5       All right.  So I'd like to direct your attention to

6   the first entry here that's dated October 19th, the one that's

7   marked "sale."

8       Could you please walk the jury through what the

9   annotation for this transaction means.

10  A.  Sure.  On October 19th, there is a sale of $18,300,000

11  worth of -- or shares of the prime JPMorgan institutional prime

12  money market fund that generated $18,300,000 in cash.

13  Q.  All right.  So just in layman's terms, what does it mean to

14  sell $18.3 million in shares?

15  A.  It means redeemed from a money market account, $18,300,000

16  worth of -- of shares for cash, to raise cash.

17  Q.  So at the time this account sold those shares, is that

18  amount now in cash?

19  A.  It's now in cash in the account and available.

20  Q.  Is that in the amount of $18.3 million?

21  A.  Yes, $18.3 million.

22  Q.  Turning to the next entry below that, what's the very next

23  thing that happened in this account on that day?

24  A.  On October 19th, there was a transfer by wire to Bear

25  Stearns for the account of Ghislaine Maxwell for $18,300,000.

LC6VMAX4                         McHugh - direct

1    Q.  Is that the same amount that had just been cashed out?

2    A.  Yes.

3    Q.  So I just want to make sure we all understand, can you

4    remind the jury, who owned this bank account?

5    A.  This account is the Financial Trust Company, Inc., and the

6    president was Jeffrey Epstein.

7    Q.  Does this entry reflect that on October 19th, 1999, this

8    account wired $18.3 million to Ghislaine Maxwell?

9              MR. EVERDELL:  Objection.  Leading.

10             THE COURT:  Sustained.

11   Q.  Just so we're clear, where did this fund wire $18.3

12   million?

13             MR. EVERDELL:  Objection.

14             Basis for knowledge.

15   Q.  Mr. McHugh, does the annotation in this bank statement

16   reflect who the recipient of the wire was?

17   A.  Yes.

18   Q.  And who was the recipient of this $18.3 million

19   transaction?

20   A.  Ghislaine Maxwell.

21   Q.  Thank you.

22             So I want to switch gears now and ask you about some

23   records from 2002.

24             MS. MOE:  Ms. Drescher, could you please publish what

25   is in evidence as Government Exhibit 504.

LC6VMAX4                          McHugh – direct

1   Q.  And can you tell the jury, what are we looking at here?

2   A.  This is an asset account statement.

3   Q.  What month is this an account statement for?

4   A.  September 2002.

5        MS. MOE:  Ms. Drescher, if you could please highlight

6   the upper left corner, as well as the lower middle.

7   Q.  What name was this account under?

8   A.  Jeffrey Epstein, care of Financial Trust Company.

9        (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   Q.   Thank you.  All right.  So, if we could turn to now page 8

2   of Government Exhibit 504, I'm going to ask you about some

3   transactions from this account statement.

4           Ms. Drescher if you could please highlight the bottom

5   two transactions on page 8 that are both dated September 18,

6   2002.

7           So, focusing on this first transaction on September

8   18th, marked sale, could you please walk the jury through what

9   we're looking at in this transaction.

10  A.   On September 18th, there was a sale of five million shares

11  of the JP Morgan tax free money market fund institutional share

12  class that raised $5 million in cash.

13  Q.   In layman's terms, what does that mean?

14  A.   It means that $5 million is now available in the account.

15  Q.   Turning to the entry right below that on September 18th,

16  marked disbursement, could you please walk the jury through

17  what that notation means.

18  A.   I'm sorry.  Could you repeat that.

19  Q.   Of course.  So focusing on the second entry here dated

20  September 18th, could you please walk the jury through this

21  particular transaction.

22  A.   On September 18th, there was a transfer by wire to Palm

23  Beach National Bank & Trust Co. for the account of Ghislaine

24  Maxwell for $5 million.

25  Q.   What does the abbreviation FAO stand for?

1    A.  For account of.

2    Q.  So does this account statement reflect that this account

3    wired $5 million to Ghislaine Maxwell on September 18th, 2002?

4              MR. EVERDELL:  Objection.  Leading.

5              THE COURT:  Sustained.

6    Q.  I want to turn now and ask you about some records from

7    2007.  Ms. Drescher, could you please publish what is now in

8    evidence as Government Exhibit 502.

9              What is Government Exhibit 502?

10   A.  Exhibit 502 is a premiere checking account banking

11   statement.

12   Q.  If we could highlight the address here, whose account is

13   this?

14   A.  The account is Ghislaine Maxwell, care of New York Strategy

15   Group, 457 Madison Avenue, 4th floor, New York, New York 10022.

16   Q.  What type of an account is this?

17   A.  This is a premiere checking account, a checking account

18   with interest.

19   Q.  Focusing on Government Exhibit 502, if we could turn to

20   page 2 of this account statement, please.  If we could

21   highlight the first entry here on June 15th.

22             Mr. McHugh, is this an entry dated June 15th, 2007?

23   A.  Yes.

24   Q.  Could you please walk the jury through the entry -- this

25   particular entry on the account statement.

1   A.  On June 15th -- actually.  Sorry.  Let me look at my book.

2   It's a little easier for me to follow.

3   Q.  I'm sorry.  Is that harder to read the font size --

4   A.  It blocks the --

5           MS. MOE:  I'm sorry, Ms. Drescher, could you drop out

6   so Mr. McHugh can see it.  And if now we could highlight the

7   entry on June 15th.

8   Q.  Do you see that, Mr. McHugh?

9   A.  Can you lower it, please.  It's all right.  Okay.  I see

10  it.

11  Q.  Thank you.

12  A.  Perfect.

13  Q.  Could you please walk the jury through this entry in the

14  account statement dated June 15th, 2007.

15  A.  Sure.  On June 15th, there was a wire received in this

16  account, Ghislaine Maxwell, ending in account numbers 6312.  A

17  wire received from Mellon Bank from beneficial owner, Jeffrey

18  Epstein, in St. Thomas Virgin Islands, and then it has

19  reference for Ghislaine Maxwell.

20  Q.  I believe you were describing what the entry here

21  indicates, these funds were from the beneficial owner, Jeffrey

22  Epstein.  Could you just explain for the jury what that means.

23  A.  When payments are received, the firm, the transmitting firm

24  that sends a wire in, sends the account -- the account

25  information, the account number, and the account address to

LC6Cmax5                         McHugh – direct

1    stay with it, and it posts to the account, so that's where the
2    money came from.
3    Q.  What was the amount of funds of income on this wire credit?
4    A.  $7,400,000.
5    Q.  If we could turn now to the next entry on this account
6    statement on June 18th.  Do you see that, Mr. McHugh?
7    A.  I do.
8    Q.  Could you please walk the jury through this entry on the
9    account statement.
10   A.  On June 18th, there was an internal transfer of funds from
11   DDA account, 6312, to DDA account 4324 as requested for
12   $7,400,000.
13   Q.  So just so I'm clear, is the amount of this transaction
14   $7.4 million?
15   A.  Yes.
16   Q.  And from this entry, where did that $7.4 million go?
17   A.  It went to account 4324.
18   Q.  I want to ask you a few questions about that account ending
19   in the number 4324.
20          Ms. Drescher, if you could please leave this exhibit
21   up and pull alongside it Government Exhibit 506.
22          What is Government Exhibit 506?
23   A.  Exhibit 506 is a Morgan account signature card.
24   Q.  And Ms. Drescher, focusing on the bottom left of Government
25   Exhibit 506, what are the last four digits of the account

LC6Cmax5                         McHugh - direct

1   number for this signature card?

2   A.  4324.

3   Q.  Is that the same account number we were just talking about

4   with the $7.4 million went into?

5   A.  Yes.

6   Q.  Thank you.  If we could drop Government Exhibit 502 and

7   focus on Government Exhibit 506, focusing on the top, the

8   signatories, who was listed here as president?

9   A.  Ghislaine Maxwell, president.

10  Q.  Thank you.  We can take Government Exhibit 506 down.  I'd

11  like to turn now to Government Exhibit 501.  What is Government

12  Exhibit 501?

13  A.  A business checking account.

14  Q.  And Ms. Drescher, if you could please highlight the account

15  you number at the top where it says primary account number,

16  what are the last four digits of that account number?

17  A.  4324.

18  Q.  Is that the same account we've just been talking about?

19  A.  Yes.

20  Q.  What is the title of this account?

21  A.  Air Ghislaine Inc.

22  Q.  What is the date of the account statement?

23  A.  June 1st, 2007, through June 29th, 2007.

24  Q.  I want to ask you now about some transactions in this

25  account statement.  If we could please turn to the second page

LC6Cmax5                         McHugh – direct

1    of this account statement.  I'd like to ask you about the two

2    entries that are dated June 18th, 2007.  Do you see those?

3    A.  I do.

4    Q.  Thank you.  All right.  So, focusing on the first entry

5    dated June 18th at the top, could you please just walk the jury

6    through what that entry reflects.

7    A.  On June 18th, there was an internal funds transfer from DDA

8    account 6312 to DDA account 4324 as requested for $7.4 million.

9    Q.  And in laymen's terms, what does that mean?

10   A.  It means there was an internal transfer between two

11   accounts within JP Morgan and one account transferred

12   $7.4 million to the 4324 account.

13   Q.  So to be clear, for this entry, is this account receiving

14   $7.4 million or sending $7.4 million out?

15   A.  It's a credit.  You can see on the column there, it's a

16   credit of $7.4 million.

17   Q.  All right.  So after this account received the

18   $7.4 million, if you could turn to the entry right beneath that

19   dated June 18th, what happened next in this account?

20   A.  So on June 18th, there was a transfer out of $7,352,825.  A

21   transfer to the account of Sikorsky Aircraft in Stratford,

22   Connecticut, and it references Air Ghislaine Inc. regarding

23   purchase of a green helicopter, Sikorsky S76C, and down payment

24   on executive finish.

25   Q.  You were explaining that this entry reflects that this wire

LC6Cmax5                        McHugh − cross

1   was regarding the purchase of a green helicopter.  Could you

2   just explain for the jury why those instructions are on this

3   particular entry.

4   A.   Typically, those instructions are provided by the client as

5   part of the instructions for transfer and our service people

6   will record that in at their request.

7            MS. MOE:  Your Honor, if I could just have one moment.

8            THE COURT:  Okay.

9            MS. MOE:  Thank you.

10  Q.   Mr. McHugh, just to be clear, did you have any personal

11  involvement with the accounts or the transactions that we've

12  been discussing here today?

13  A.   No.

14  Q.   Have you, yourself, ever had any interactions with

15  Ghislaine Maxwell or Jeffrey Epstein before?

16  A.   No.

17           MS. MOE:  Nothing further, your Honor.

18           THE COURT:  Thank you.  Mr. Everdell.

19           MR. EVERDELL:  Yes.  Your Honor, I have binders for

20  the witness and for the Court if you would like those.

21           THE COURT:  Okay.

22           MR. EVERDELL:  May I inquire, your Honor?

23           THE COURT:  You may.

24  CROSS-EXAMINATION

25  BY MR. EVERDELL:

LC6Cmax5                          McHugh - cross

1    Q.  Good afternoon, Mr. McHugh.

2    A.  Good afternoon.

3    Q.  If you see, I've placed a folder of documents near you, but

4    please don't look at those until I direct you to.  All right?

5    A.  Okay.

6    Q.  Okay.  Mr. McHugh, you testified that you've been working

7    at JP Morgan bank for 30-odd years; is that right?

8    A.  Yes.

9    Q.  And you've been an executive director since 2017; is that

10   right?

11   A.  I was promoted to executive director a while ago.  I don't

12   remember the exact date.

13   Q.  Okay.  For several years?

14   A.  Several years.

15   Q.  Okay.  And your current responsibilities I think you said

16   are to work with -- you work with the service teams; is that

17   right?

18   A.  I support the service teams.

19   Q.  Okay.  And also the compliance teams?

20   A.  I work in partnership with compliance teams.  They're part

21   of the second line of defense.

22   Q.  I see.  So you mainly focus on supporting the client

23   service teams; is that right?

24   A.  That's right.

25   Q.  And before you became executive director, you, yourself,

LC6Cmax5                        McHugh - cross

1    also worked in account services; right?

2    A.   In -- so I worked in many roles.  Can you clarify account

3    services?

4    Q.   Well, perhaps you can clarify.  You were working in a

5    client service capacity for several years in your employment

6    with JP Morgan; is that right?

7    A.   That's correct.

8    Q.   What that means you're helping out clients at the bank with

9    their accounts; correct?

10   A.   I did.

11   Q.   And so you, in that role, you handled opening bank accounts

12   for customers; right?

13   A.   Yes.

14   Q.   Or you are familiar with how bank accounts are opened?

15   A.   Yes.

16   Q.   I don't think you were personally doing it, you were

17   probably a little bit more senior than that; is that right?

18   A.   I did more on the security side when I was working with

19   clients than I did on the cash side, yes.

20   Q.   But you're familiar with how bank accounts get opened; is

21   that right?

22   A.   Yes.

23   Q.   You and you're familiar with the paperwork that's used to

24   open those accounts?

25   A.   Yes.

LC6Cmax5                         McHugh - cross

1    Q.   And what needs to get filled out in order to open an

2    account; right?

3    A.   Yes.

4    Q.   And you're familiar with the general process about how

5    these different accounts get opened in addition to the

6    paperwork, the general process of how that happens; right?

7    A.   I have an understanding of that process, yes.

8    Q.   Now, Mr. McHugh, at any point in your 30 years with JP

9    Morgan, did you work with -- did you ever work with high net

10   worth individuals?

11   A.   Yes.

12   Q.   So you worked with people who have tens of millions or

13   hundreds of millions of dollars; right?

14   A.   Yes.

15   Q.   And so you are generally familiar with the banking

16   practices of JP Morgan's high net worth or ultra wealthy

17   clients; right?

18   A.   Yes.

19   Q.   You know generally how they structure and use bank accounts

20   and other types of accounts?

21   A.   Can you clarify that question.

22   Q.   Well, in your work with high net worth individuals, you

23   became familiar with, for example, how many bank accounts they

24   typically use or the types of bank accounts that they use?

25   A.   So, in a service role, you would get some familiarity with

LC6Cmax5                          McHugh – cross

1   the transactions on the relationship basis.

2   Q.  Well, let me ask it this way:  You, yourself, worked with

3   certain high net worth individuals and had relationships with

4   those high net worth individuals?

5   A.  Yes.

6   Q.  And you helped those high net worth individuals open bank

7   accounts or do whatever banking they needed with JP Morgan;

8   right?

9   A.  Yes.

10  Q.  Okay.  Now, we saw in the documents you just went through

11  documents showing tens of millions of dollars in a single

12  account; isn't that right?

13  A.  I don't know the exact balances, but there was one account

14  that had a very large balance.

15  Q.  Right.  I think you showed us a document where there was an

16  $18.3 million transfer in one shot; right?

17  A.  Yes, counsel did.

18  Q.  And you said you showed us documents of accounts that were

19  controlled by Jeffrey Epstein?

20  A.  I testified to documents that were presented.

21  Q.  Yes.  You testified about accounts that were in the name of

22  Jeffrey Epstein?

23  A.  Yes.

24  Q.  Is that fair to say?

25  A.  Yes.

LC6Cmax5                    McHugh - cross

1   Q.  And I think it's fair to say from the documents you

2   testified about that Jeffrey Epstein was a very wealthy

3   individual, wasn't he?

4           MS. MOE:  Objection.

5           THE COURT:  Sustained.

6   Q.  Well, you've dealt with very high net worth individuals in

7   the past; correct?

8   A.  Yes.

9   Q.  And those individuals have multimillions of dollars in

10  their bank accounts, typically; right?

11  A.  Many do.

12  Q.  And the documents we saw for the accounts that were in the

13  name of Jeffrey Epstein at JP Morgan that you just testified

14  about also had many millions of dollars in those accounts;

15  correct?

16  A.  Can we go through the specifics.

17  Q.  Sure.  I think if you want to look at Government Exhibit

18  504 to start with.  If we can put that on the screen.  That's

19  already in evidence.

20          So we're now looking at Government Exhibit 504, which

21  is in evidence.  This is a document you talked about before in

22  your testimony; correct?

23  A.  Yes.

24  Q.  And we saw this before and you were shown the upper

25  left-hand corner, this is an account under the name of Jeffrey

LC6Cmax5                        McHugh - cross

1   Epstein?

2   A.  Yes.

3   Q.  And if you go to I think it's page 8 of this document, I

4   think we looked at this page in your testimony; correct?

5   A.  Yes.

6   Q.  The date September 18th of 2002, there was a transfer of

7   $5 million in that account; right?

8   A.  Yes.

9   Q.  So this is one example of an account we looked at under the

10  name of Jeffrey Epstein where there were multimillion dollars

11  in the account; right?

12  A.  Yes.

13  Q.  Okay.  Great.  And I think we also looked at accounts that

14  was under the name of Financial Trust Company; right?

15  A.  Yes.

16  Q.  Why don't we just take a quick look at that, Government

17  Exhibit 505.  That's Government Exhibit 505 that you're looking

18  at, Mr. McHugh.  Do you recall testifying about that in your

19  direct; right?

20  A.  Yes.

21  Q.  And on the top left, that's an account that's under the

22  name of Financial Trust Company; right?

23  A.  Yes.

24  Q.  Okay.  And I think we saw a document that indicated that

25  this was controlled by Jeffrey Epstein?

LC6Cmax5                          McHugh - cross

1   A.  Yes.

2   Q.  And if you look at page 6 of this document, and you look at

3   the transactions on October 19th of 1999, which I think we

4   looked at in your testimony in direct; is that right?

5   A.  Yes.

6   Q.  That shows a sale of roughly $18.3 million and another

7   transfer of the same amount on the same day; right?

8   A.  Yes.

9   Q.  So here's another example, is it not an account with many,

10  many millions of dollars in an account that's controlled by

11  Jeffrey Epstein; right?

12  A.  Yes.

13  Q.  So I think it's fair to say he had a lot of money?

14          MS. MOE:  Objection, your Honor.

15          THE COURT:  Sustained.

16  Q.  Now, from your experience working with high net worth

17  individuals, it's usually the case, isn't it, that people who

18  have this much money don't have it all in one bank account;

19  isn't that right?

20          MS. MOE:  Objection, your Honor.

21          THE COURT:  Overruled.

22  A.  I don't know.  It depends.

23  Q.  Well, some may, some may not, I suppose; right?

24          MS. MOE:  Objection to form.

25          THE COURT:  Overruled.

1  Q.  Can you answer the question, I think, Mr. McHugh?

2  A.  Could you repeat the question, please.

3  Q.  You said it depends, and my question was some high net

4  worth individuals may have multiple accounts, I guess some may

5  not; is that fair to say?

6  A.  Yes.

7  Q.  Okay.  And if they have multiple accounts, they may have

8  money in traditional checking accounts, for example?

9  A.  Yes.

10 Q.  And they may have money in money market accounts, like some

11 of the ones we saw?

12 A.  They may have.

13 Q.  And they may have their money in brokerage accounts so they

14 can use it to buy and sell securities in stocks and bonds?

15 A.  They may.

16 Q.  And it's true that high net worth individuals like this

17 often have lots of assets; correct?

18 A.  Can you clarify, assets.

19 Q.  Sure.  They may have multiple homes?

20 A.  They could.

21 Q.  They may have planes?

22         MS. MOE:  Objection, your Honor.

23         THE COURT:  Sustained.

24 Q.  Well, fair to say that a high net worth individual like the

25 ones you dealt with in the past may have expensive assets that

LC6Cmax5                          McHugh - cross

1    they've purchased, right?

2              MS. MOE:  Objection your Honor.  Is Mr. Everdell

3    proffering him as an expert?

4              MR. EVERDELL:  Your Honor, he said he worked with high

5    net worth individuals in the past.  I think this now beyond the

6    kin of someone who worked with these individuals.

7              THE COURT:  I don't know exactly where you're going, a

8    little bit of room, but let's get to a question.

9    BY MR. EVERDELL:

10   Q.  Well, let's go to this, Mr. McHugh.  Are you familiar with

11   the term, family office?

12   A.  Yes.

13   Q.  A family office is typically a privately held company that

14   manages the money and the investments of a wealthy family;

15   isn't that right?

16   A.  It's a general description of one.

17   Q.  And in those cases, the family office will typically manage

18   the wealth of everyone in the family; isn't that right?

19             MS. MOE:  Objection, your Honor.

20             THE COURT:  Sustained.

21   Q.  Have you dealt with family offices in the past?

22   A.  Some.

23   Q.  And in the cases you've dealt with, do the family offices

24   manage the money of the people in that wealthy family?

25             MS. MOE:  Objection, your Honor.

LC6Cmax5                          McHugh - cross

1         THE COURT:  Sustained.

2    Q.  Well, you are familiar with what a family office is; right?

3              MS. MOE:  Objection, your Honor.  Asked and answered.

4              MR. EVERDELL:  I'm simply trying to reorient the

5    witness, your Honor.

6              THE COURT:  I'll allow it.

7    Q.  The family office takes care of the -- typically takes care

8    of the day-to-day transactions for that wealthy family; isn't

9    that right?

10             MS. MOE:  Objection, your Honor.

11             THE COURT:  Sustained.

12   Q.  Well, it's typically the case that if you are a very

13   wealthy person who uses a family office like the ones you've

14   dealt with in the past, that the wealthy person is not the one

15   signing the day-to-day checks out of those accounts, the person

16   who runs the family office that does that; isn't that right?

17             MS. MOE:  Objection, your Honor.

18             THE COURT:  Sustained.

19   Q.  In your experience with working with family offices in the

20   past, has it been part of your experience that people whose

21   accounts are run through the family offices are not necessarily

22   controlled by them personally?

23             MS. MOE:  Your Honor, I object.

24             THE COURT:  I'll allow it.  Overruled.

25   A.  Could you repeat the question.

LC6Cmax5                          McHugh - cross

1   Q.   Sure.   In your experience working with people who have

2   family offices, is it often or sometimes at least the case that

3   the people whose accounts are run by the family office, the

4   transactions through those accounts are handled by someone

5   other than the person whose account it is?

6              MS. MOE:   Objection.

7              THE COURT:   That was the same question.   And I

8   overruled.

9              MS. MOE:   Yes.   This one is an objection to form.

10             THE COURT:   Overruled.

11  A.   Sorry.   Could you repeat the question.

12  Q.   I'll do my best.   I'll try one more time.

13             In your experience working with family offices in the

14  past, is it the case -- is it typically the case that people

15  whose accounts are run through the family office don't

16  necessarily handle the day-to-day transactions through those

17  accounts, it is handled by someone other than the account

18  holder?

19  A.   It's too general.   There is a multitude of clients and

20  relationships.   I don't -- I can't say with certainty how

21  they're set up.

22  Q.   But you've seen that happen in the past, have you, what I

23  just described?

24  A.   Can you -- the question was whether a family office --

25  Q.   Yes.

LC6Cmax5                        McHugh - cross

1   A.  They would have to be authorized.

2   Q.  So someone running the family office would have to be

3   authorized to use those accounts; correct?

4              MS. MOE:  Objection.

5              THE COURT:  Overruled.

6   Q.  I'll ask the question again.

7              Someone who is running the family office would have to

8   be authorized to use the accounts that he or she was

9   controlling; right?

10  A.  In that instance, yes.

11  Q.  And so they could be authorized by being given signatory

12  authority over those accounts; right?

13  A.  Can you be more specific, what the operating document would

14  be.

15  Q.  Let's take one of the money market accounts, for example.

16  You could give somebody signing authority over that account

17  that's not yourself, and that person can sign checks or do

18  transactions on that account -- that person would have that

19  authority to do that without you approving it?

20             MS. MOE:  Objection.

21             THE COURT:  Sustained.

22  Q.  Let me try to rephrase that, and let's keep it simple with

23  the checking account, a simple checking account.

24             If I have a checking account and I write a check, I

25  can do that because I have signatory authority over that

LC6Cmax5                        McHugh – cross

1   account; right?

2   A.   Yes.

3   Q.   But I can also authorize someone else that's not me to have

4   signing authority over that same account; right?

5   A.   Yes.

6   Q.   And that person — if they're properly authorized by me, the

7   account holder — can then sign checks on that account under

8   their own authority because I've given that to them; isn't that

9   right?

10   A.   If authorized.

11   Q.   If there is a proper authorization in place; right?

12   A.   Yes.

13   Q.   And that is called signatory authority in that case; right?

14   A.   Yes.

15   Q.   And there are other types of authorities you can give

16   someone over accounts to besides signatory authority; correct?

17   A.   Uh --

18   Q.   I'll give you an example.

19   A.   Please.

20   Q.   Power of attorney?

21   A.   Yes.

22   Q.   You can give somebody power of attorney authority over an

23   account; correct?

24   A.   Yes.

25   Q.   And if you give that person power of attorney authority

LC6Cmax5                        McHugh - cross

1   over an account, they can use and control that account as if
2   they're the owner; correct?
3   A.   In a power of attorney, the powers are specified.
4   Q.   You're right.  You can specify certain powers, but let me
5   ask this:  One of the powers you can specify to the person
6   getting power of attorney is the power to write checks on an
7   account if there is checking involved; right?
8   A.   That would be in -- yes, in part of that signatory
9   authority.
10  Q.   And another authority you can give them is the power to add
11  other signatories to the account; right?
12  A.   I don't know.  I would ask my legal department and have to
13  look at those documents.  It's beyond my realm.
14  Q.   Understood.  Understood.  All right.  Well, let me ask you
15  a few other questions, then.
16          You saw some documents referencing a company called
17  Air Ghislaine; right?
18  A.   Yes.
19  Q.   We discussed -- you discussed those in your direct
20  testimony; right?
21  A.   Yes.
22  Q.   And I think you referenced some line items that appear to
23  show a helicopter purchase involving that company; correct?  We
24  can show it to you if you like?
25  A.   Can you show it.

1   Q.  Sure.  Why don't we go to Government Exhibit 502.  I'm

2   sorry.  Actually, let's go to 501.  You've got 501 in front of

3   you, Mr. McHugh?

4   A.  Yes.

5   Q.  And you see that that's a statement from June of 2007 for a

6   company called Air Ghislaine Inc.; right?

7   A.  Yes.

8   Q.  And if we go to page 2 of that document, these are the

9   transactions you spoke about in your direct testimony on June

10  18th; right?  There are two line items on that date; correct?

11  A.  Yes.

12  Q.  And the second line item was highlighted for you and it

13  appears to show the purchase of a green helicopter from

14  Sikorsky; right?

15  A.  It's what the transaction description reads.

16  Q.  Okay.  So now, again, I'm just going to ask you a bit about

17  this practice.

18         Now, is it your experience, having been in banking for

19  30 years, that people buy assets like planes, larger assets and

20  have them owned by companies?

21         MS. MOE:  Objection.

22         THE COURT:  Sustained.

23  Q.  Do you know anything about the practice of having larger

24  assets owned by companies or corporate entities?

25         MS. MOE:  Objection.

LC6Cmax5                          McHugh - cross

1         THE COURT:  Sustained.

2    Q.  Well, let's talk about that transaction that we were just

3    looking at, because I think you've reviewed those statements

4    and you did talk about those in your direct testimony.

5         Now, let's go to Government Exhibit 506, which I think

6    is in evidence.  We saw that page in 506; right?  You testified

7    about that in your direct?

8    A.  Yes.

9    Q.  I think you said that was a signature card; right?

10   A.  It is a signature card.

11   Q.  Yes.  And that is a signature card for the account ending

12   in 4324; correct?

13   A.  Yes.

14   Q.  And that's the account that's associated with Air Ghislaine

15   Inc.; right?

16   A.  I didn't memorize the numbers.

17   Q.  Understood.  That's fine.  Let's look at the third page of

18   this document, which we didn't see before.  Let's go back to

19   the page before, the second page so we can see the complete

20   document.

21        Are we at 506?  Is this Government Exhibit 506?  Okay.

22   I'm sorry, let's go to page 5.  My fault.  Go to page 5.

23        MS. MOE:  This is a three-page document, your Honor.

24        MR. EVERDELL:  Must have the wrong one.  May I have a

25   moment, your Honor?

LC6Cmax5                        McHugh - cross

1          THE COURT:  Sure.

2          MR. EVERDELL:  I'm going to move on to a different

3    topic and come back to this one.

4    Q.  Let's go to Government Exhibit 505.  You testified about

5    this document on your direct; right?

6    A.  Yes.

7    Q.  This is an October 1999 statement from Financial Trust

8    Company; right?

9    A.  Yes.

10   Q.  If we go to page 6 of the document and we look at the

11   transactions on October 19th.  Do you see those?

12   A.  I do.

13   Q.  So you testified before that that reflects the sale of

14   money market fund assets of $18.3 million as the first of those

15   two transactions; right?

16   A.  Yes.

17   Q.  And the second is a disbursement transferred by wire to

18   Bear Stearns for account of Ghislaine Maxwell; right?

19   A.  Yes.

20   Q.  But there is nothing on this document that shows what that

21   transfer was for, right, what the purpose of that money was?

22   A.  Correct.

23   Q.  And this document doesn't tell us which accounts at Bear

24   Stearns the money went into; right?

25   A.  No.

LC6Cmax5                         McHugh - cross

1   Q.  And it says for the account of Ghislaine Maxwell; right?

2   A.  Yes.

3   Q.  But you testified that there are ways to -- I believe there

4   are ways to set up accounts on other people's behalf if you

5   have the proper authority to do that; isn't that right?

6         MS. MOE:  I'd object, your Honor.  I think that

7   mischaracterizes the testimony.

8         THE COURT:  Sustained.

9   Q.  Are there ways to set up an account for someone on their

10  behalf as long as you have proper authorization to do that?

11  A.  I would -- I don't know.  I would refer that to the -- our

12  legal group and the power of attorney and the instructions that

13  were involved in that.

14  Q.  Understood.  But safe to say, we don't know from this

15  document here what this transaction was for; right?

16        MS. MOE:  Objection.  Asked and answered.

17        THE COURT:  Sustained.

18  Q.  Let's move on to the transaction you saw in September of

19  2002, which I believe is Government Exhibit 504.  You testified

20  about that document, as well, right, we saw that before?

21  A.  One moment.  I just want to doublecheck.  Yes.

22  Q.  Okay.  So if we look at that document, that is a statement

23  dated September of 2002; right?

24  A.  Yes.

25  Q.  And it's for an account held by Jeffrey Epstein?

LC6Cmax5                          McHugh – cross

1   A.  Yes.

2   Q.  All right.  And if you go to page 8, do you see the

3   transactions on September 18th; right?

4   A.  I do.

5   Q.  You testified about those, that reflects a sale again of

6   about $5 million of a money market fund to generate cash and

7   then a transfer of that $5 million in cash to another account;

8   right?

9   A.  A transfer by wire to another account outside JP Morgan.

10  Q.  Okay.  Correct.  Now, you see that the September 18th

11  entry, it says it's transferred by wire to a Palm Beach

12  NATLBKNTR Co.; right?

13  A.  Yes.

14  Q.  Is that Palm Beach National Bank & Trust Company?

15  A.  That's what it appears to be; right.

16  Q.  And that's for the account of Ghislaine Maxwell?

17  A.  Yes.

18  Q.  Again, from this document, we don't know what this

19  transaction was for; right?

20  A.  I don't know.

21  Q.  And we don't know what kind of an account that that money

22  went into; right?

23  A.  I don't know.

24  Q.  And I want to just focus on the word trust in the name of

25  that bank, Bank & Trust Co.  Are you familiar with what a trust

LC6Cmax5                        McHugh – cross

1   account is?

2   A.  Yes.

3   Q.  A trust account — I'm generally summarizing — it holds

4   money for a beneficiary of a trust, but that account is

5   actually controlled by a third party; right?

6           MS. MOE:  Objection, your Honor.

7           THE COURT:  Overruled.

8   A.  Can you repeat the question, please.

9   Q.  So in a trust account, the money is held in an account for

10  a beneficiary of the trust, but the account is actually

11  controlled by a third party; isn't that right?

12  A.  There are many types of trusts, but generally, a general

13  description.

14  Q.  What I just described is a type of trust account; is that

15  accurate?

16  A.  Yes.

17  Q.  And it is possible to set up a trust account for someone

18  without them even knowing; is that right?

19          MS. MOE:  Objection, your Honor.

20          THE COURT:  Sustained.

21          MR. EVERDELL:  Your Honor, may I have a moment to

22  confer with the government?

23          THE COURT:  Yes.  Members of the jury, if you would

24  like to take a standing break, you're welcome to.

25          All right, please be seated.

LC6Cmax5                          McHugh - cross

1    BY MR. EVERDELL:

2    Q.  Mr. McHugh, I want to ask you now about that 2007 purchase

3    of the helicopter we were looking at before.  All right?

4    A.  Okay.

5    Q.  All right.  So if we can pull up Government Exhibit 502.

6           Now, before we look at the exhibit, based on what we

7    saw before, it seemed like there was some money that went into

8    this account held by Ghislaine Maxwell that then went out of

9    that account to the account held by Air Ghislaine, and then a

10   similar amount of money going to Sikorsky to pay for the

11   helicopter.

12          Is that an accurate summary of these exhibits we

13   looked at?

14   A.  Quite honestly, I didn't map it, but I'm happy to walk

15   through it.

16   Q.  Why don't we take a look at Government Exhibit 2 at page 2.

17   502, sorry, at page 2.  We looked at those transactions on June

18   15th and June 18th in the middle of the page; right?

19   A.  15th and 18th, yes.

20   Q.  And you see that on the 15th, you said that there was

21   money, it appeared coming in from an account held by or

22   associated with Jeffrey Epstein, $7.4 million coming into this

23   account, which appears to be in the name of Ghislaine Maxwell;

24   correct?

25   A.  Yes.

1   Q.  And then you saw on June 18th, there was the same amount of

2   money going out from this account under the name of Ghislaine

3   Maxwell to the account of 4324?

4   A.  That's right.

5   Q.  And if you look at Government Exhibit 501, that is the 4324

6   account, right, where the money ended up?

7   A.  Yes.

8   Q.  And that is a account held by Air Ghislaine?

9   A.  Yes.

10  Q.  And if you look at page 2 of that document, you see on June

11  18th, $7.4 million coming into the account; right?

12  A.  Yes.

13  Q.  And on June 18th, same day, almost equivalent number,

14  slightly less going out to Sikorsky Aircraft Corporation;

15  right?

16  A.  Yes.

17  Q.  So fair to say it looks like money goes into the account

18  held by Ghislaine Maxwell or in the name of Ghislaine Maxwell

19  from Jeffrey Epstein, money goes out from that account to the

20  Air Ghislaine account and then goes from that account to

21  Sikorsky.

22        Is that a fair summary of what we just looked at?

23  A.  Yes.

24  Q.  So I want to take a look back at that account that's in the

25  name of Ghislaine Maxwell, that's Government Exhibit 502.

LC6Cmax5                        McHugh - cross

1            Now, this document -- and we can go to page 2 where

2      the transfers are.  This document doesn't tell you who

3      orchestrated these transactions, does it?

4            MS. MOE:  Objection to form.

5            THE COURT:  Could you rephrase?

6            MR. EVERDELL:  Sure.

7      Q.  This document doesn't tell you who was the person who

8      actually initiated these wire transfers that we looked at --

9      I'll be even more specific.

10           On the transaction on June 18th, the money that's

11     going out of this account to the 4324 account, which is the Air

12     Ghislaine account, this document doesn't tell us who approved

13     that transaction; right?

14     A.  Yes, does not.

15     Q.  It does not?

16     A.  Does not.

17     Q.  It just says that the transaction occurred on that date for

18     that much money, it doesn't say who approved it?

19     A.  Correct.

20     Q.  So it doesn't tell you whether, for example, Ghislaine

21     Maxwell approved that transaction herself; correct?

22     A.  The statement does not.

23     Q.  And, in fact, given our discussion before, anybody who had

24     proper authority over this account could have approved that

25     transaction; correct?

LC6Cmax5                        McHugh - cross

 1   A.  Correct.

 2   Q.  So even though the account is under the name of Ghislaine

 3   Maxwell, this statement can't tell us whether Ghislaine Maxwell

 4   actually approved or had anything to do with that transaction?

 5   A.  Yes.

 6   Q.  And now I want you to look at that same exhibit starting at

 7   page 5.

 8   A.  Same statement?

 9   Q.  The same statement, but I want you to now go to page 5,

10   which we didn't look at on direct examination.  Do you see that

11   page?

12   A.  I do.

13   Q.  That has a canceled check on it; right?

14   A.  Yes, a check date.

15   Q.  And let's go to the next page, page 6.  That also has a

16   series of paid checks on that page; right?

17   A.  Yes.

18   Q.  And that's typical with account statements, when they're

19   sent to the account holder, they include the checks that were

20   drawn on the account for that month; right?

21   A.  Especially at that time, yes.

22   Q.  So these reflect checks that were drawn on the account in

23   that month in the statement of June of 2007; right?

24   A.  Yes.

25   Q.  Now let's look at just the first three of those checks on

1    this page.  Do you see those three checks?

2    A.   The one check is very small, but I see three checks.

3    Q.   You do see three checks there; right?  Okay.  This may get

4    a little small for you to see, but I'm going to try to do it.

5    Let's leave this on the screen and put next to it Government

6    Exhibit 506, which is already in evidence.  I think we have

7    them both there now.  Do you see that, Mr. McHugh?

8    A.   I see --

9    Q.   Do you see the checks on the left-hand side, which are

10   Government Exhibit 502, and you see on the right-hand side,

11   Government Exhibit 506, which you said was the signature card;

12   right?

13   A.   Which is a signature card, yes.

14   Q.   I believe it's the signature card for a different account,

15   but a signature card?

16   A.   Different account.

17   Q.   But it is a signature card; right?

18   A.   It is a signature card.

19   Q.   And you see the signature there on the right-hand side for

20   Harry Beller (ph.), secretary?

21   A.   I do.

22   Q.   And if you look over to the left-hand side on the account

23   that is nominally in the name of Ghislaine Maxwell, do you see

24   all the signatures on those checks for that account?

25   A.   I do.

LC6Cmax5                        McHugh - cross

```
1    Q.   That looks like the signature of Harry Beller, doesn't it?

2              MS. MOE:  Objection.

3              THE COURT:  Overruled.

4    A.   It appears to be.

5    Q.   It certainly doesn't look like the signature of Ghislaine

6    Maxwell that's on the signature card over there, does it?

7    A.   No.

8    Q.   So it would appear from these things we're looking at here

9    that Harry Beller had signatory authority over Ghislaine

10   Maxwell's bank account, doesn't it?

11   A.   I don't know.  I don't -- is there a -- this document on

12   the right is for a different account.

13   Q.   Well, I meant to show you the document on the right so you

14   can see the way the signature looks, but the document on the

15   left shows checks that were drawn on that account in the name

16   of Ghislaine Maxwell, doesn't it?

17   A.   From her account, yes.

18   Q.   From her account, under her name, at least that is the name

19   on the account, Ghislaine Maxwell?

20   A.   Yes.

21   Q.   But those checks appear to be signed by Harry Beller; isn't

22   that right?

23   A.   Yes, it appears so.

24   Q.   And you wouldn't be able to sign a check on an account

25   unless you had signatory authority on that account or some
```

LC6Cmax5                          McHugh - cross

1    other proper authority that gave you the authority to sign

2    checks?

3    A.   I don't know the account documents referencing this, but

4    you would need to be authorized or the -- I'm not a check

5    cashing expert.

6    Q.   Fair enough.  I just want to point out one other things.

7    We can take down 506 at this point.  If we could just go back

8    to the sixth page of 502 and look at those checks again, page

9    6.  If we could just quickly look at check numbers 1061 and

10   1062, I think those are the middle -- those two, the second and

11   third checks.

12            So just to look at a particular check, if you're

13   looking at 1061, that looks like it's a payment for $7 going to

14   someone with the title at the end, DDS; right?

15   A.   Yes.

16   Q.   That's a dentist.  Okay.  And looking at the next check,

17   it's about $400, that's check 1062, looks like it's going to

18   somebody with an M.D. after their name; right?

19   A.   Yes.

20   Q.   And that's apparently another doctor; right?

21   A.   Yes.

22   Q.   Okay.  And those are both signed apparently by Harry Beller

23   from this account?

24   A.   Yes.

25   Q.   And let's look at the last two checks on that page, 1063

LC6Cmax5                          McHugh - cross

1    and 1064.  Do you see those checks?

2    A.  I do.

3    Q.  If you're looking at 1063, do you see that check is made

4    out to the United States Treasury; correct?

5    A.  Yes.

6    Q.  And that says in the middle line, 2007 form 1040; correct?

7    A.  Yes.

8    Q.  So that's a check to pay for estimated taxes, isn't it?

9    A.  I assume.

10   Q.  So that check shows that Harry Beller is signing a check to

11   pay Ghislaine Maxwell's taxes for that year, doesn't it?

12   A.  I don't know, but that's what that appears to be.

13   Q.  And the check below, similar, goes to the New York State

14   Income Tax Authority; isn't that right?

15   A.  Yes.

16   Q.  So it would appear from that check that Harry Beller is

17   signing a check on an account held by Ghislaine Maxwell to pay

18   Ghislaine Maxwell state taxes that year; isn't that right?

19              MS. MOE:  Objection, your Honor.

20              THE COURT:  Sustained.  How much longer with this

21   witness, Mr. Everdell?

22              MR. EVERDELL:  Just one moment, your Honor, I'll be

23   able to tell you in a second.

24              THE COURT:  Okay.

25   BY MR. EVERDELL:

1    Q.  Just a few followup questions for you, Mr. McHugh.

2           We looked at a number of transactions in your direct

3    testimony and on cross examination from some of these accounts;

4    correct?

5    A.  Yes.

6    Q.  There is nothing on the face of these documents that

7    suggests in any way that any of these transactions was

8    improper; isn't that right?

9           MS. MOE:  Objection, your Honor.

10          THE COURT:  Overruled.

11   A.  I don't know the nature of the transactions.

12   Q.  But the statements themselves don't indicate anything on

13   their face of any kind of improper activity?

14   A.  No, I don't think so.

15          MR. EVERDELL:  No further questions, your Honor.

16          THE COURT:  Ms. Moe.

17          MS. MOE:  Very briefly, your Honor.  Thank you.

18   REDIRECT EXAMINATION

19   BY MS. MOE:

20   Q.  Mr. McHugh, you were asked some questions on cross

21   examination about account ownership documents.  Do you remember

22   being asked questions about that?

23   A.  Yes.

24   Q.  I'd just like to ask you to turn in the binder in front of

25   you to what's marked for identification as Government Exhibit

LC6Cmax5                          McHugh - redirect

1    507.

2    A.   507.

3    Q.   Do you recognize that?

4    A.   Yes, this is a Morgan account signature card.

5    Q.   In preparation for your trial, have you compared that

6    against the records for JP Morgan?

7    A.   I pulled up this document that the government had versus

8    our documents in our system of record and compared the two and

9    verified we had it on file.

10   Q.   Is that a true and accurate copy of a signature card on

11   file at JP Morgan?

12   A.   Yes.

13   Q.   Was that kept in the regular course of business at JP

14   Morgan?

15   A.   Yes.

16            MS. MOE:  Your Honor, the government offers Government

17   Exhibit 507.

18            MR. EVERDELL:  No objection.

19            THE COURT:  GX507 is admitted.

20            (Government's Exhibit 507 received in evidence)

21            MS. MOE:  Thank you, your Honor.  Nothing further.

22            THE COURT:  Thank you.

23            MR. EVERDELL:  Nothing further, your Honor.

24            THE COURT:  Thank you.  Mr. McHugh, you stay step

25   down, you're excused.

LC6Cmax5                         McHugh – redirect

1              (Witness excused)

2              We'll take our afternoon break, members of the jury.

3   See you in about 15 minutes.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Jury not present)

2              THE COURT:  Counsel, matters to take up before the

3    break?

4              MS. MOE:  Not from the government, your Honor.  Thank

5    you.

6              MR. EVERDELL:  Your Honor, defense has one matter.

7    The next witness I believe is Kelly Maguire, who is going to go

8    and introduce the exhibits, the 900 series exhibits among other

9    things that we've already discussed.  There are two photographs

10   in there, and we did discuss these, so I wasn't -- did not get

11   a chance to preview this for the government yet, but there are

12   two photographs, I believe it's 919 and 920, that show the

13   outfits, the schoolgirl outfits.

14             Now, the Court ruled before that those wouldn't be put

15   before the jury unless witness 3, or Kate, was able to link

16   them up.  She did talk about wearing a schoolgirl outfit.

17   However, she was not shown those photographs in her direct.  So

18   I think we have a similar problem to what we had with Kate --

19   sorry.  With Jane where she described a schoolgirl outfit, but

20   she didn't look at the actual photos that they want to

21   introduce and say those look like the schoolgirl outfits I was

22   wearing on the day I described.

23             So, at this point, because I don't think there is a

24   proper foundation for the same reasons as we had with Jane, I

25   would object to those photos being admitted.

LC6Cmax5                         McHugh – redirect

1          MS. MOE:  Thank you, your Honor.  Your Honor, as the

2     Court will recall, earlier today a witness identified as Kate

3     testified that the defendant asked her to wear a schoolgirl

4     costume.  Several schoolgirl outfits were recovered from

5     Jeffrey Epstein's residence in 2019.

6          Here, the fact that they were schoolgirl outfits is

7     obvious from looking at them.  They are relevant because they

8     confirm that Epstein's practice was, in fact, to prefer girls

9     dressed as schoolgirls and to have people wear schoolgirl

10    outfits.  So it is directly corroborative of Kate's testimony

11    on that score.

12          They're additionally relevant because they confirm an

13    issue, which defense has put it, in dispute in this case, that

14    Jeffrey Epstein did, in fact, have a sexual preference for

15    schoolgirls.  That point has been vigorously disputed at trial.

16    These exhibits confirm that that in fact was the case and

17    corroborates the testimony of Kate that she was in fact asked

18    to wear such an outfit.

19          Similarly to the Court's ruling with respect to Jane's

20    testimony and the descriptions of the massage room, here, it's

21    not necessary for a witness to talk about the particular

22    details of a schoolgirl costume.  The point is the same, one

23    witness was asked to wear a schoolgirl outfit and Epstein did

24    possess those schoolgirl outfits and had a preference for

25    people dressed that way and, in fact, forced schoolgirls.

LC6Cmax5                     McHugh - redirect

1   That's why these exhibits are relevant, your Honor.

2               THE COURT:  The photos are from 2019.

3               MS. MOE:  That's correct, your Honor.

4               THE COURT:  I'll look at the testimony during break,

5   but I'm not sure why, again, given the Court's earlier ruling,

6   they wouldn't have been linked up with the witness, but I'll

7   look at the testimony.

8               MR. EVERDELL:  Your Honor, I would just add that the

9   testimony I believe from Kate was that the schoolgirl outfit

10  was in Palm Beach.  These were found in New York 15 years

11  later.  So there is an issue there, as well.

12              MS. MOE:  Yes, your Honor.  I think regardless of

13  location, the issue is whether Jeffrey Epstein had a sexual

14  preference for schoolgirls, and this exhibit speaks --

15              THE COURT:  Not in 2019.

16              MS. MOE:  Yes, your Honor.

17              THE COURT:  That's the not question; right?

18              MS. MOE:  Yes, your Honor, but we would respectfully

19  submit if the defense wants to argue that he developed his

20  interest for schoolgirls after the timeframe of the charged

21  conspiracy --

22              THE COURT:  They don't have to argue anything until

23  you establish relevance.  So that's the primary question.

24  These are photos of the uniforms found in Palm Beach in 2019

25  and I just don't know, as I sit here, if these photos link up

LC6Cmax5                         McHugh – redirect

1    in any way to the specific testimony of Kate.

2             Again, you certainly could have shown and asked are

3    these similar to what you were asked to wear, which is, I

4    admit, what I thought would happen and I don't know why it

5    didn't.  That would have seemed to follow from the Court's

6    earlier ruling.

7             (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LC6VMAX6

1          MS. MOE:  Yes, your Honor.  And I'd be happy to speak

2     to why we've decided not to do that in this case, both for Jane

3     and Kate, since this has come up now twice.  I'd be happy to

4     explain why we've approached this this way.  Because we tried

5     to be sensitive in the way we've approached our interviews with

6     victims in this case.  We've done this for two reasons.  One,

7     the defense has put in issue the quality of the victims'

8     memories; and so it is important in terms of corroboration that

9     we have not shown the victims --

10         THE COURT:  I get that.  That is absolutely a

11    strategic decision and an understandable one.  It does not then

12    excuse a lack of foundation as to relevancy.  It just doesn't.

13    I certainly understand why you'd make that choice, and I can

14    imagine other reasons you'd make the choice.

15         I don't think -- tell me if I'm wrong -- that in any

16    way helps determine from the Court's perspective whether these

17    2019 pictures of highly movable objects, which may or may not

18    match up with the specific testimony of the witness, are

19    relevant to a conspiracy that ended 15 years earlier.

20         MS. MOE:  Yes, your Honor.

21         And I think our argument on that is that this is an

22    issue of weight and not relevance.  Because the argument before

23    the jury from this evidence is not that these are the

24    schoolgirl outfits or one of the schoolgirl outfits that Kate

25    was asked to wear.  The point is that Kate told the jury that

LC6VMAX6

1   she was asked to wear a schoolgirl outfit.  And the jury will

2   know that that's true because Epstein did, in fact, possess

3   such outfits; that it was his practice to maintain them, to ask

4   people to wear them; that what she told the jury was true; that

5   that is a very specific type of costume, and that was his

6   practice.  It corroborates her testimony.

7           The point is not to identify these as the particular

8   outfits, but to corroborate the fact that that was, in fact,

9   his practice and, thus, that her testimony on that score was

10   credible.  That's why we're offering this evidence, your Honor.

11           MR. EVERDELL:  Your Honor, the government is really

12   trying to bootstrap here.  This is the one witness who's going

13   to say anything about a schoolgirl outfit.  There's no

14   practice.  There's one person's experience.  And I would think

15   that they are also ignoring the 403 issue.  It's not just some

16   sort of weight issue; it goes to prejudice.  When an item is

17   found 15 years after the fact, I mean, it doesn't establish a

18   practice certainly.  And it's extraordinarily prejudicial to

19   show these items to the jury when they are not even linked up

20   to the witness who actually is the one person who has a story

21   about a schoolgirl outfit.

22           THE COURT:  I'm inclined to agree.

23           I'll look at the specific testimony, but I think, as I

24   sit here, 401/403 grounds -- well, first -- yes, 401/403

25   grounds, I think it's probably out.  I don't know whether -- I

LC6VMAX6

 1    mean, it's a low bar for relevance, but for the reasons I

 2    indicated in my earlier opinion, substantially far distance in

 3    time, highly movable objects that don't appear to be specific

 4    to what the witness described, may not meet the 401 standard.

 5    And if it does meet the 401 standard, I think for the reasons

 6    Mr. Everdell indicated, it would likely be outweighed by 403

 7    prejudice.

 8           You have the testimony from the witness as to her

 9    experience with the uniforms.  It's difficult to see on the

10    current record.  But, as I said, I'll look at the testimony and

11    I'll let you know.

12           MR. EVERDELL:  And, your Honor, just to be clear, this

13    objection would also apply to the physical outfits themselves.

14           THE COURT:  Right.  Same point.  Yes.  Okay.

15           MR. EVERDELL:  Thank you.

16           THE COURT:  Anything else?

17           MR. EVERDELL:  No, your Honor.

18           MS. MOE:  Not from the government, your Honor.

19           (Recess)

20           THE COURT:  All right.  I'm sustaining the objection

21    on 919 and 920 on 401/403 grounds, as well as the actual items.

22           Are there matters to take up?

23           MR. EVERDELL:  Not from the defense, your Honor.

24           MS. MOE:  Not from the government, your Honor.

25           THE COURT:  Okay.  Thank you.

LC6VMAX6

1          We'll bring in the jury.

2          Counsel, was I right, those other 900 exhibits needed

3     redaction of photos of individuals?

4          MS. MOE:  Your Honor, with respect to those exhibits,

5     just so I'm sure I understand --

6          THE COURT:  911, for example.  It looks like there's a

7     photo in the right corner.

8          MS. MOE:  I just wanted to make sure we'd redacted the

9     right thing.  I received a note about that issue.

10          We weren't sure whether the issue was the painting

11     over the mantel -- we've redacted that -- or whether there was

12     something else.

13          THE COURT:  No.  On the right-hand side there's a

14     table with a lamp.  There's a lamp marked D and there's a photo

15     of -- I can't quite tell, but I'm sure if somebody looked

16     closely, they could tell of an individual.

17          MS. MOE:  Oh, I see.  Sorry, your Honor, I had not

18     noticed that.  We will unredact the painting and re-mark it to

19     redact that photograph, if the Court requests.

20          THE COURT:  Well, you tell me.  Does it need to be

21     redacted to protect privacy interests?  I don't know -- for

22     example, I don't know if this is a witness.  I don't know.

23          MS. MOE:  Apologies, your Honor.  I'm not familiar

24     with the person in this photograph.  I can't tell from the

25     photograph.  We certainly have no objection to redacting it for

LC6VMAX6

1    privacy interests, if that's the defense's request.

2              MR. EVERDELL:  I think we'd request that, your Honor.

3              THE COURT:  Okay.  And then on 913, there are some

4    photos on the desk of -- it looks like some children and other

5    individuals.

6              MR. EVERDELL:  Yes.

7              MS. MOE:  Yes, your Honor.  We'd be happy to offer 913

8    under seal, and then prepare a 913-R.

9              Apologies, we already have a 913-R marked.

10             THE COURT:  Okay.

11             MR. EVERDELL:  It looks fine, your Honor.

12             THE COURT:  Just one second.

13             Okay.  You've looked at it.

14             Okay.  So you have a redacted version of 913?

15             MS. MOE:  Yes, your Honor.

16             THE COURT:  All right.

17             (Jury present)

18             THE COURT:  All right.  Ms. Moe, the government may

19   call its next witness.

20             MS. MOE:  Thank you, your Honor.

21             The government calls Special Agent Kelly Maguire.

22             THE COURT:  Kelly Maguire may come forward.

23    KELLY MAGUIRE,

24        called as a witness by the Government,

25        having been duly sworn, testified as follows:

LC6VMAX6                          Maguire – direct

1          THE COURT:  Thank you.  You may proceed.

2          MS. MOE:  Thank you, your Honor.

3   DIRECT EXAMINATION

4   BY MS. MOE:

5   Q.  Good afternoon, Special Agent Maguire.

6   A.  Good afternoon, ma'am.

7   Q.  Where do you work?

8   A.  The Federal Bureau of Investigation.

9   Q.  What is your title there?

10  A.  Special agent.

11  Q.  How long have you been a special agent with the FBI?

12  A.  Little over four years.

13  Q.  Are you assigned to a particular squad?

14  A.  Yes.

15  Q.  What squad are you assigned to?

16  A.  I'm assigned to C20, which is the child exploitation and

17  human trafficking task force.

18  Q.  What are your job responsibilities as a special agent in

19  the child exploitation and human trafficking task force?

20  A.  Generally, I am specifically focused on investigating

21  violations of human trafficking, whether that's sex

22  trafficking, labor trafficking, or domestic servitude.

23  Q.  Directing your attention to July 6 of 2019, did you assist

24  in an FBI operation on that date?

25  A.  Yes, I did.

LC6VMAX6                        Maguire - direct

1    Q.  What was the nature of that FBI operation?

2    A.  It was the execution of a search warrant at the residence

3    of Jeffrey Epstein.

4    Q.  What was the address of the location that you searched?

5    A.  It was No. 9 East 71st Street here in Manhattan.

6    Q.  What neighborhood in Manhattan is that address located at?

7    A.  It's the Upper East Side.

8    Q.  What was your role in that particular search operation?

9    A.  I was designated as the search team leader.

10   Q.  Can you explain to the jury what is a search team leader?

11   A.  In a general sense, I oversee the personnel that's on

12   scene.  I ensure that various documentation is filled out.  And

13   ultimately, I am the person who seizes pieces of evidence.

14   Q.  Special Agent Maguire, were you assigned to investigate

15   this case?

16   A.  No, I was not.

17   Q.  Do members of your squad provide operational support to

18   other agents' cases?

19   A.  Yes, we do.

20   Q.  And was that the capacity in which you served as the search

21   team leader for the operation at 9 East 71st Street?

22   A.  Yes, it was.

23   Q.  Focusing on July 6, 2019, what legal authority did your

24   team have to search 9 East 71st Street in Manhattan that day?

25   A.  We had a search warrant.

LC6VMAX6                    Maguire - direct

1  Q.  What type of building is located at that address?

2  A.  It's a large private residence.  I would describe it as a

3  multi-story townhouse.

4         MS. MOE:  Your Honor, may we publish what's in

5  evidence as Government Exhibit 932?

6         THE COURT:  Without objection?

7         MR. EVERDELL:  One moment, your Honor.

8         Without objection.

9         THE COURT:  932, which is in evidence, may be

10  published.

11         MS. MOE:  Your Honor, may I have just a moment?

12         THE COURT:  Yes.

13         MS. MOE:  Thank you, your Honor.

14  BY MS. MOE:

15  Q.  Special Agent Maguire, what are we looking at in Government

16  Exhibit 932?

17  A.  This is from the exterior of the residence.  If you were

18  standing on East 71st Street facing it, these would be the

19  upper floors of the residence.

20  Q.  How many floors were there in this particular residence?

21  A.  There were eight in total, six aboveground and two

22  sublevels.

23  Q.  Approximately how many square feet was this particular

24  residence on the interior?

25  A.  Approximately 19,000 square feet.

1    MS. MOE:  Your Honor, if we could show just the

2  witness, the Court, and counsel what's marked for

3  identification as Government Exhibit 909.

4    THE COURT:  909, you said?

5    MS. MOE:  Yes, your Honor.

6    THE COURT:  Okay.

7  Q.  Special Agent Maguire, do you recognize this?

8  A.  Yes, I do.

9  Q.  What is Government Exhibit 909?

10  A.  This is the front door to the residence at 9 East 71st

11  Street.

12  Q.  Is that a fair and accurate depiction of the exterior of

13  the location on the day of the search?

14  A.  Yes.

15    MS. MOE:  Your Honor, the government offers Government

16  Exhibit 909 as a public exhibit.

17    MR. EVERDELL:  No objection.

18    THE COURT:  GX-909 is admitted.  You may publish.

19    (Government's Exhibit 909 received in evidence)

20    MS. MOE:  Thank you, your Honor.

21  BY MS. MOE:

22  Q.  Focusing on Government Exhibit 909, what are we looking at

23  here?

24  A.  This is the front door of the residence.

25  Q.  What did the search team do when you first arrived at the

LC6VMAX6                              Maguire - direct

1   residence?

2   A.   When we first arrived, we knocked and announced our

3   presence for the execution of the search warrant.

4   Q.   What happened next?

5   A.   After we did not receive a response from any occupants

6   inside, we then forced entry into the residence.

7   Q.   After you made entry into the residence, what's the next

8   thing that happened in the search?

9   A.   My team conducted a protective sweep.

10  Q.   Can you explain for the jury what is a protective sweep.

11  A.   A protective sweep is when the team moves through the

12  residence to ensure that there are no additional threats to law

13  enforcement on scene, particularly from occupants.

14  Q.   Were there any issues during the protective sweep?

15  A.   No, there was not.

16  Q.   How did the search proceed from there?

17  A.   At that point we then label each room in the residence, and

18  then we began photographing the residence as it was.  We viewed

19  it before a search took place.

20  Q.   I think you mentioned just now that you labeled the

21  different rooms.  Can you explain for the jury what that means.

22  A.   So that we know where certain items are being found

23  throughout the residence, we then designate each room by a

24  letter of the alphabet.

25  Q.   Approximately how many rooms were inside the residence that

LC6VMAX6                          Maguire - direct

1   you encountered during the search?

2   A.   There were approximately 40.

3   Q.   After you had labeled the rooms within the residence, how

4   did the search proceed from there?

5   A.   We started taking photographs of the residence, and then

6   after that the search began.

7   Q.   Did there come a time when you obtained legal authority to

8   continue searching the house for other items?

9   A.   Yes, that's correct.

10  Q.   Was that during the course of the same search?

11  A.   Yes.

12  Q.   I want to talk with you now about the interior of the

13  residence.

14        MS. MOE:   Ms. Drescher, if you could please show just

15  the witness, the Court, and counsel, just cycling through them,

16  what's been marked for identification as Government Exhibits

17  933, 910, and 911.

18  Q.   Special Agent Maguire, do you recognize these?

19  A.   Yes, I do.

20        THE COURT:   It's really 911-R; correct?

21        MS. MOE:   Apologies, your Honor.   911-R.

22  Q.   Do you recognize these three exhibits?

23  A.   Yes, I do.

24  Q.   And what are Government Exhibits 933, 910, and 911-R?

25  A.   These are the first entryway and the main foyer near the

LC6VMAX6                          Maguire - direct

1    main staircase or grand staircase in the residence.

2    Q.  Are those photographs fair and accurate depictions of the

3    entrance and immediate interior into the residence you searched

4    that day?

5    A.  Yes, ma'am, it is.

6              MS. MOE:  Your Honor, the government offers Government

7    Exhibits 933, 910, and 911-R.

8              MR. EVERDELL:  No objection.

9              THE COURT:  All right.  Thank you.

10             933, 910, and 911-R are admitted.

11             (Government's Exhibits 910, 911-R, 933 received in

12   evidence)

13             MS. MOE:  Your Honor, may we publish Government

14   Exhibit 933?

15             THE COURT:  You may.

16   Q.  Special Agent Maguire, what are we looking at here?

17   A.  This is just after you pass through the large wooden doors

18   at the front of the residence.  In front of you is a large set

19   of double doors.  To the left and to the right of those doors

20   are individual offices.  And if you pass through those double

21   doors, that would lead you to the main foyer of the residence.

22             MS. MOE:  If we could turn now and take a look at what

23   is in evidence as Government Exhibit 910.

24             THE COURT:  You may.

25   Q.  Special Agent Maguire, what are we looking at here?

LC6VMAX6                      Maguire - direct

1    A.   This would be the grand staircase of the residence and the

2    main foyer.   If you look to the left-hand side of the

3    photograph, that would be the entryway through the double set

4    of doors in Exhibit 933 that you would have passed through.

5    Q.   I believe a moment ago you described this as the grand

6    staircase.   Were there other staircases within the residence?

7    A.   Yes, ma'am.

8    Q.   Could you please describe those for the jury.

9    A.   There was an additional staircase that was on the second

10   floor that went up to the third or fourth floor.   It was blue

11   in color and spiral.   There was also a utility stairwell that

12   mimicked a fire escape that went throughout the height of the

13   residence.

14   Q.   Aside from the staircases that you just described, were

15   there any other ways to get from floor to floor within the

16   residence?

17   A.   There was also an elevator present in the residence.

18          MS. MOE:   Your Honor, if we could please publish

19   what's now in evidence as Government Exhibit 911-R.

20          THE COURT:   You may.

21   Q.   Special Agent Maguire, what are we looking at here?

22   A.   This is just another angle of this main foyer area now in

23   this photograph, the entryway, where the large set of double

24   doors would be visible here, these staircases to the left-hand

25   side of the photograph.

LC6VMAX6                        Maguire - direct

1    Q.  So we're talking about different staircases within the

2    residence.  I'd like to ask you more about that.

3           MS. MOE:  Ms. Drescher, if you could please show for

4    just the witness, the Court, and counsel what's been marked for

5    identification as Government Exhibit 915 -- excuse me, 915-R.

6           THE COURT:  915-R.

7    Q.  Do you recognize that?

8    A.  Yes, I do.

9    Q.  What is Government Exhibit 915-R?

10   A.  This is a photograph of the blue in color spiral staircase

11   in the middle of the residence.

12   Q.  Is this a fair and accurate depiction of the staircase you

13   just described?

14   A.  Yes, it is.

15          MS. MOE:  Your Honor, the government offers Government

16   Exhibit 915-R.

17          MR. EVERDELL:  No objection.

18          THE COURT:  Thank you.

19          GX 915-R is admitted.  You may publish.

20          (Government's Exhibit 915-R received in evidence)

21          MS. MOE:  Thank you, your Honor.

22   Q.  Just to orient ourselves, could you describe for the jury

23   where the staircase was located within the residence.

24   A.  This was in the middle of the residence.  You would have a

25   wing to either the left side or the right side of the house.

LC6VMAX6                         Maguire - direct

1            So this particular staircase started on the second

2     floor and connected to the third and possibly the fourth floor.

3     Q.   Did there come a time when you and the search team went to

4     the third floor of the residence?

5     A.   Yes, we did.

6     Q.   I want to ask you some questions about the third floor of

7     the residence.

8            Did you come across a room within the residence that

9     you would describe as a massage room?

10    A.   Yes, I did.

11    Q.   I want to ask you about that room.

12           MS. MOE:   Ms. Drescher, if you could please show the

13    witness, the Court, and counsel what's been marked for

14    identification as Government Exhibit 902-R.   Thank you.

15    Q.   Special Agent Maguire, do you recognize Government Exhibit

16    902-R?

17    A.   Yes, I do.

18    Q.   And what is that exhibit?

19    A.   This is a photograph of the entryway into the massage room

20    on the third floor.

21    Q.   Is this a fair and accurate depiction of the entryway into

22    the massage room?

23    A.   Yes, it is.

24           MS. MOE:   Your Honor, the government offers Government

25    Exhibit 902-R.

1          MR. EVERDELL:  No objection.

2          THE COURT:  GX-902-R is admitted.  You may publish.

3          (Government's Exhibit 902-R received in evidence)

4          MS. MOE:  Thank you.

5     Q.  So now that we're publishing the exhibit, can you just

6     explain for the jury what we're looking at here.

7     A.  Again, this is the entryway into the massage room.  There

8     is a hallway where you would be standing to take this

9     photograph.  You just take a few steps into the entryway and

10    then the room opens up to your right.

11         MS. MOE:  Ms. Drescher, if you could take that down

12    and please show the witness, counsel, and the Court what's been

13    marked for identification as Government Exhibit 903-R.

14    Q.  Do you recognize this?

15    A.  Yes, I do.

16    Q.  What is Government Exhibit 903-R?

17    A.  This is a photograph inside the massage room for a

18    particular angle in the room.

19    Q.  Aside from redactions, is this a fair and accurate

20    depiction of the interior of the massage room?

21    A.  Yes, it is.

22         MS. MOE:  Your Honor, the government offers Government

23    Exhibit 903-R.

24         MR. EVERDELL:  No objection.

25         THE COURT:  903-R is admitted.  You may publish.

1    (Government's Exhibit 903-R received in evidence)

2    Q.  Focusing on Government Exhibit 903-R and focusing on the

3    foreground of the exhibit, do you see the item with the white

4    sheet?

5    A.  Yes, I do.

6    Q.  And what is that object?

7    A.  That particular object is a green in color massage table.

8    It was covered with a navy blue blanket; and then on top of

9    that, a white in color sheet.  You obviously see a blue in

10   color towel that's also placed on top of the table.

11   Q.  Were there curtains in this room?

12   A.  Yes, there were.  Those are the large pink curtains that

13   are visible in the photograph.

14        MS. MOE:  Ms. Drescher, if you could please take 903-R

15   down and show just the witness, counsel, and the Court what's

16   been marked for identification as Government Exhibit 904-R.

17   Q.  Do you recognize this?

18   A.  Yes, I do.

19   Q.  What is Government Exhibit 904-R?

20   A.  This is just another angle inside the massage room.

21   Q.  Is this a fair and accurate depiction of a separate angle

22   of the interior of the massage room?

23   A.  Yes, ma'am, that's correct.

24        MS. MOE:  Your Honor, the government offers Government

25   Exhibit 904-R.

1            MR. EVERDELL:  No objection.

2            THE COURT:  904-R is admitted.  You may publish.

3            (Government's Exhibit 904-R received in evidence)

4    BY MS. MOE:

5    Q.  Looking at Government Exhibit 904-R, and in the foreground,

6    is that the same massage table we were just discussing?

7    A.  Yes, ma'am, it is.

8    Q.  Directing your attention to the far left doorway we see

9    here in this photograph, where did that doorway lead?

10   A.  That doorway leads to an adjoining bathroom.

11           MS. MOE:  Ms. Drescher, if you could please take this

12   exhibit down and show just the witness, the Court, and counsel

13   what's been marked for identification as Government Exhibit

14   917-R.

15   Q.  What is this exhibit?

16   A.  This again is in this massage room.  This is also taken

17   from a different angle, with the focal point being the massage

18   table in the center of the photograph.

19   Q.  Is this a fair and accurate depiction of a separate angle

20   of the interior of the massage room?

21   A.  Yes, ma'am.

22           MS. MOE:  Your Honor, the government offers Government

23   Exhibit 917-R.

24           MR. EVERDELL:  No objection.

25           THE COURT:  917-R is admitted.  You may publish.

LC6VMAX6                          Maguire - direct

1           (Government's Exhibit 917-R received in evidence)

2    Q.  Looking at Government Exhibit 917-R, from this angle, what

3    are we looking at on the back wall in the upper left-hand

4    corner of this photograph?

5    A.  That is a wooden shelving unit that was located in the room

6    that had various objects on it.

7    Q.  I want to ask you a little bit more about those shelves.

8           MS. MOE:  If we could take down Government Exhibit

9    917-R.  And if we could please show just the witness, the

10   Court, and counsel what's been marked for identification as

11   Government Exhibit 928-R.

12   Q.  Special Agent Maguire, what is Government Exhibit 928-R?

13   A.  Again, this is another angle inside the room.  Now in this

14   photograph, to the right-hand side is a more visible view of

15   the wooden shelving unit that was located in the room.

16   Q.  Is this a fair and accurate depiction of the separate angle

17   of the massage room?

18   A.  Yes, ma'am.

19          MS. MOE:  Your Honor, the government offers Government

20   Exhibit 928-R.

21          MR. EVERDELL:  No objection.

22          THE COURT:  928-R is admitted.  You may publish.

23          (Government's Exhibit 928-R received in evidence)

24   Q.  Special Agent Maguire, you described a wooden shelving

25   unit.

1          MS. MOE:  Ms. Drescher, could you just highlight that

2     and blow that up.  Thank you.

3          If we could take that down, but then blow up --

4     apologies.  Would you mind just dropping the call out.

5     Q.  Special Agent Maguire, do you see a stereo system in this

6     photograph?

7     A.  Yes, I do.

8     Q.  Was there a stereo system in the massage room?

9     A.  Yes, ma'am, there was.

10          MS. MOE:  Ms. Drescher, could you please highlight

11     that for the jury.  Thank you.

12          We can take that down.

13     Q.  I want to turn now and ask you about some other areas of

14     the residence.

15          Did there come a time when you obtained legal

16     authority to search the residence for things like CDs?

17     A.  Yes, ma'am.

18     Q.  I want to ask you a little bit about that.

19          MS. MOE:  If we could please show the witness what's

20     been marked for identification as Government Exhibit 914; and

21     just to the witness, counsel, and the Court.

22     Q.  Special Agent Maguire, do you recognize this?

23     A.  Yes, ma'am, I do.

24     Q.  What are we looking at in Government Exhibit 914?

25     A.  This is a photograph that was taken in a closet located on

1    the fifth floor.  We're looking at the left-hand side of the

2    closet at numerous black binders that were found on a shelf

3    with homemade labels on the spine of the binders.

4    Q.  I'll just ask you a few more questions about that.

5            MS. MOE:  Could we just leave that up and pull up

6    alongside it Government Exhibit 925.  And again, just for the

7    witness, counsel, and the Court.

8    Q.  What is Government Exhibit 925?

9    A.  This is just another photograph of the same binders.  This

10   is just a closer photograph.

11   Q.  And do Government Exhibits 914 and 925 fairly and

12   accurately depict the binders as you found them on the day of

13   the search?

14   A.  Yes, ma'am.

15           MS. MOE:  Your Honor, the government offers Government

16   Exhibits 914, 925, and 925-R.

17           MR. EVERDELL:  Your Honor, just one moment.

18           THE COURT:  Yes.

19           (Counsel conferred)

20           MS. MOE:  Your Honor, after conferring with counsel,

21   we'd withdraw that application and we'd respectfully request

22   that Government Exhibits 925 and 925-R be admitted.

23           MR. EVERDELL:  No objection, your Honor.

24           THE COURT:  So not 914.

25           MS. MOE:  That's correct, your Honor.

LC6VMAX6                          Maguire - direct

```
 1              THE COURT:  Can I see 925-R.  So you're moving both?

 2              MS. MOE:  Yes, your Honor.  925-R as a public exhibit,

 3    and 925 under seal.

 4              THE COURT:  I see.  Okay.

 5              Mr. Everdell?

 6              MR. EVERDELL:  One moment, your Honor.

 7              THE COURT:  Yes.

 8              (Counsel conferred)

 9              MS. MOE:  Your Honor, if I might just ask one

10    follow-up question.

11              THE COURT:  Sure.

12    BY MS. MOE:

13    Q.  Special Agent Maguire, looking at Government Exhibit 925 --

14              MS. MOE:  Ms. Drescher, if you could please show the

15    witness.  Thank you.

16    Q.  Do you see white labels in this photograph?

17    A.  Yes, I do.

18    Q.  Were those labels applied by the FBI to those objects?

19    A.  No, they were not.

20    Q.  Were they on those objects when you found them?

21    A.  Yes, they were.

22    Q.  Do you see that there are some blue -- what appear to be

23    blue Post-Its on some of those objects?

24    A.  Yes.

25    Q.  Were those Post-Its on those objects when the FBI found
```

LC6VMAX6                        Maguire - direct

1  them?

2  A.  No, they were not.

3  Q.  How did those Post-Its get on the binders?

4  A.  That was by the FBI personnel labeling them.

5           MS. MOE:  Thank you, your Honor.

6           Your Honor, the government would offer Government

7  Exhibits 925 and 925-R.  925-R is a public exhibit, and

8  Government Exhibit 925 under seal.

9           MR. EVERDELL:  No objection.

10          THE COURT:  All right.  Thank you.

11          925 is admitted -- and what is the basis for seal?

12          MS. MOE:  Your Honor, with respect to the labels,

13  there is identifying information for third parties.

14          THE COURT:  Okay.  So 925 is admitted under seal.

15  925-R is a redacted version of 925, and that is admitted as a

16  public exhibit.

17          (Government's Exhibits 925, 925-R received in

18  evidence)

19          MS. MOE:  Thank you, your Honor.

20          Could we now publish Government Exhibit 925-R as a

21  public exhibit, and ask the jurors to turn in their binders to

22  what's in under seal as Government Exhibit 925.

23          THE COURT:  Right.  You may.

24          So you can publish 925-R, and the jurors may look --

25  I'm sorry, 925-R you may publish.  And the jurors may open

LC6VMAX6                          Maguire - direct

1    their binders to GX-925.

2              MS. MOE:  Thank you, your Honor.

3    BY MS. MOE:

4    Q.  All right.  Taking a look at Government Exhibit 925, just

5    to be clear, what are we looking at in this photograph?

6    A.  Again, this is a photograph of a closet that was located on

7    the fifth floor of the residence.  This is the left-hand side

8    of the closet, and these were several black in color binders

9    that were found on a shelf in that closet.

10   Q.  What was inside the binders?

11   A.  Inside the binders there were clear pages that contained a

12   sheet of paper that would have printed thumbnails of

13   photographs.  And then there was a corresponding CD attached to

14   those.

15   Q.  Were the CDs in those binders seized as evidence that day?

16   A.  Which day are you talking about?

17   Q.  Let me rephrase.

18             During the course of the search of this particular

19   residence, were the CDs contained in the binders that we're

20   looking at in Government Exhibit 925 seized in evidence?

21   A.  Yes, they were.

22   Q.  Were they marked with any particular identifiers as

23   evidence?

24   A.  Yes, they were labeled with evidence Item 1B-19.

25   Q.  Could you just explain for the jury how does the FBI apply

LC6VMAX6                         Maguire - direct

```
1    evidence numbers to items that are seized during the course of
2    the search warrant?
3    A.  After we seize items of evidence at a location, we then
4    enter them into a collected item log.  At that point each item
5    is serialized with a number that's called a 1B number that's
6    for evidence tracking purposes with our evidence control unit.
7    Q.  And just to be clear, I believe you testified that the CDs
8    contained in these binders were assigned evidence numbers
9    1B-19, is that right?
10   A.  That's correct.
11   Q.  I'd like to turn now to show you --
12            MS. MOE:  Ms. Drescher, if you could please just show
13   just the witness, the Court, and counsel what's been marked for
14   identification as Government Exhibit 926.
15   Q.  Do you recognize this?
16   A.  Yes, ma'am, I do.
17   Q.  What is Government Exhibit 926?
18   A.  This is a photograph taken in the same room where the
19   previous black binders were located.  In the center of this
20   closet room there was a drawer organizer located right there in
21   the center.  This is one of the bottom drawers where several
22   CDs were located.
23   Q.  Is this a fair and accurate depiction of the drawer with
24   CDs that you just described?
25   A.  Yes, ma'am.
```

1          MS. MOE:  Your Honor, the government offers Government

2    Exhibit 926 as a public exhibit.

3          MR. EVERDELL:  No objection.

4          THE COURT:  GX-926 is admitted.  You may publish.

5          (Government's Exhibit 926 received in evidence)

6    Q.  Taking a look at Government Exhibit 926, now that the jury

7    can see it, can you please describe what we are looking at here

8    in this photograph?

9    A.  Again, this was a closet located on the fifth floor.  This

10   is the same room where the previously discussed black binders

11   were located.  In the center of the room was a drawer

12   organizer.  This is the bottom drawer pulled out with various

13   CDs inside.

14   Q.  Were the CDs contained in the drawer that we're looking at

15   in this photograph seized by the FBI during the course of the

16   search?

17   A.  Yes, ma'am, they were.

18   Q.  Were they marked with any particular identifiers as

19   evidence?

20   A.  They were marked as evidence Item 1B-63.

21         MS. MOE:  Ms. Drescher, if you could please take down

22   Government Exhibit 926.  And if you could please show just the

23   witness, the Court, and counsel what's been marked for

24   identification as Government Exhibit 929.

25   Q.  Special Agent Maguire, do you recognize this?

LC6VMAX6                          Maguire - direct

1    A.  Yes, ma'am, I do.

2    Q.  What is Government Exhibit 929?

3    A.  This was a photograph of a room on the third floor that

4    could be described as a dressing room.  In this particular

5    photograph, you are viewing a safe that we located in a closet

6    in that room pulled out to the center.  And the items on top of

7    it and aside it are items that were taken from inside the safe.

8    Q.  Is Government Exhibit 929 a fair and accurate depiction of

9    how that dressing room appeared during part of the search --

10   A.  Yes, ma'am.

11   Q.  -- of the residence?

12             MS. MOE:  Your Honor, the government offers Government

13   Exhibit 929 as a public exhibit.

14             MR. EVERDELL:  No objection.

15             THE COURT:  GX-929 is admitted.  You may publish.

16             (Government's Exhibit 929 received in evidence)

17   Q.  All right.  Special Agent Maguire, what floor was this room

18   located?

19   A.  This was located on the third floor.

20   Q.  Is that the same floor as the massage room?

21   A.  Yes, ma'am, it is.

22   Q.  All right.  Now that we're all looking at it, could you

23   please walk the jury through what we're looking at in this

24   photograph?

25   A.  This is a dressing room located on the third floor.  In the

 1    center of the photograph, the large dark box is a safe that we
 2    pulled from a closet in this room.  And the items on top of the
 3    safe and the dark boxes down on the floor are all items that
 4    were taken out of the safe once we opened it.
 5    Q.  How was the FBI able to open the safe?
 6    A.  The day of the search we brought a saw with us.
 7    Q.  I believe you testified that the items we're looking at in
 8    this photograph were inside the safe.  Were there any CDs
 9    inside this safe?
10    A.  Yes, there were binders that contained CDs.
11              MS. MOE:  Ms. Drescher, could you please highlight the
12    top of the safe so the jury can see it.
13    Q.  Now, at the time you observed these CDs on the safe, did
14    you have legal authority to seize all of the CDs that day?
15    A.  No, not all of them.
16    Q.  Did there come a time when you obtained legal authority to
17    return to the residence?
18    A.  Yes, that would have been on July 11th.
19    Q.  And at that point, did you have legal authority to seize
20    CDs?
21    A.  Yes, we had a search warrant.
22    Q.  When you returned to the residence on that date, did you
23    return to the room we're looking at in this room with the safe?
24    A.  Yes, I did.
25    Q.  What did you observe?

1    A.  I observed that all of the items that are in this

2    photograph that I had previously seen were missing.

3    Q.  Without describing the substance of any conversations, what

4    did you do next?

5    A.  I next spoke with the house manager, Merwin de la Cruz, who

6    was on scene at the time that we were there.

7    Q.  And again, without telling me the substance of that

8    conversation, what's the next thing that happened?

9    A.  The next thing that happened is I was on a three-way

10   telephone conversation with an associate of Mr. Epstein named

11   Richard Kahn and his legal counsel named Andrew Tomback.

12   Q.  During the course of that phone call, did you tell those

13   attorneys that you had a search warrant for these items?

14            MR. EVERDELL:  Objection.

15   A.  Yes, I did.

16            THE COURT:  Just a moment.

17            MR. EVERDELL:  Objection.  Leading.

18            THE COURT:  I'll allow it.

19   Q.  And again, without getting into the substance of the

20   conversation, after you communicated that you had a search

21   warrant for these items, what's the next thing that happened?

22   A.  Approximately 20 to 30 minutes after that telephone

23   conversation, Richard Kahn came to the residence of Jeffrey

24   Epstein at seven east -- or No. 9 East 71st Street and brought

25   all of those items back to me in two suitcases.

LC6VMAX6                        Maguire - direct

1    Q.  Did you examine the contents of the suitcases?

2    A.  Yes, I did.

3    Q.  Did you recognize them?

4    A.  Yes, I did.

5    Q.  What were they?

6    A.  It appeared to be all of the items that had been previously

7    located in the safe.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LC6Cmax7                    Maguire - direct

1    BY MS. MOE:

2    Q.  What were those items?

3    A.  The items included binders that contained CDs.  There were

4    various items of jewelry.  There were external hard drives

5    there were loose diamonds, large amounts of U.S. currency and

6    passports, as well.

7    Q.  Did you seize the CDs that were obtained from this safe?

8    A.  Yes, I did.

9    Q.  And the CDs from the suitcase?

10   A.  Yes.

11   Q.  Were those CDs marked with any particular identifiers as

12   evidence?

13   A.  Yes, they were.  They were labeled as evidence items 1B26,

14   1B75, and 1B78.

15   Q.  We've been talking about CDs that you seized from several

16   areas of the house.  What did you do with all the CDs that

17   you've just testified about?

18   A.  I seized them and transported them back to our office and

19   then later, chain of custody was then transferred to the case

20   agents.

21   Q.  Did you come across any electronic devices as you were

22   going through the house?

23   A.  Yes, I did.

24           MS. MOE:  Ms. Drescher, if you could please show the

25   witness, counsel, and the Court what's been marked for

LC6Cmax7                      Maguire - direct

1    identification as Government Exhibit 935.

2    Q.   What is Government Exhibit 935?

3    A.   This is a photograph that's taken in an office near the

4    front of the residence.  This was a wooden bookcase and

5    cabinets that were located in that office.  This particular

6    photograph depicts the bottom cabinet open where my team

7    located several plastic bins that contained boxes of hard

8    drives.  The boxes in this photograph also had evidence tape

9    that were on the exterior of the boxes.

10           MS. MOE:  Ms. Drescher, if you could please up pull up

11   for the witness, counsel, and the Court, Government Exhibit

12   935R.

13   Q.   Is that the same photograph just redacted?

14   A.   Yes, ma'am, it is.

15           MS. MOE:  Your Honor, the government offers Government

16   Exhibit 935R as a public exhibit.

17           MR. EVERDELL:  No objection.

18           THE COURT:  935R is admitted.  You may publish.

19           (Government's Exhibit 935R received in evidence)

20           MS. MOE:  Thank you, your Honor.

21   Q.   Now that we're taking a look at Government Exhibit 935R, I

22   believe you were describing the items in this cabinet.

23           Let me just take a step back and ask, the room that

24   we're looking at in this photograph, where was that within the

25   house?

LC6Cmax7                          Maguire - direct

1   A.   This was on the first floor of the residence.   It was an

2   office that was located pretty close to the front door.

3   Q.   Focusing on the bottom half of the photograph, what was

4   inside the cabinet?

5   A.   These were large plastic bins that contained various boxes

6   that had hard drives in them.

7   Q.   How were they packaged?

8   A.   They were packaged within the box for the hard drive.   They

9   also had evidence tape on the exterior of the box.

10  Q.   Did the boxes containing hard drives have evidence tape on

11  them when the FBI found them?

12  A.   Yes, they did.

13  Q.   In other words, did the FBI find them with evidence tape or

14  did you apply evidence tape to the boxes?

15  A.   We found them with evidence tape.   We did not place that

16  there.

17  Q.   As you sit here today, do you have personal knowledge of

18  why there was evidence tape on these boxes?

19  A.   No, I don't.

20  Q.   Were these drives seized during the course of the search?

21  A.   Yes, they were.

22            MS. MOE:   Your Honor, if I could just have one moment.

23            THE COURT:   You may.

24            MS. MOE:   Thank you.   Thanks very much.   Your Honor,

25  may I approach the witness with Government Exhibit 54?

LC6Cmax7                        Maguire - direct

1          THE COURT:  You may.

2          MS. MOE:  I'll show it to counsel first.

3   Q.  All right, so I've just handed you what's been marked for

4   identification as Government Exhibit 54.  Special Agent

5   Maguire, do you recognize this?

6   A.  Yes, ma'am, I do.

7   Q.  What is Government Exhibit 54?

8   A.  This is a hard drive that was located in the previous

9   exhibit, 935R.  This was in one of the boxes that was located

10  in the plastic bins in that office.

11  Q.  And have you examined Government Exhibit 54 in preparation

12  for your testimony today?

13  A.  Yes, I have.

14  Q.  And how do you know that Government Exhibit 54 is one of

15  the hard drives contained in the box that we're looking at here

16  in Government Exhibit 935R?

17  A.  I examined this hard drive.  I also recognized the New York

18  CART lab bar code that's located on it.

19  Q.  So you just mentioned a New York CART bar code.  Can you

20  please explain to the jury what that is?

21  A.  Typically, when we seize digital evidence items, we then

22  turn them over to a unit in the FBI called CART.  It's the

23  Computer Analysis Response Team.  They're just more technically

24  trained to extract and review the digital evidence.  When they

25  receive an evidence item, they put their own bar code on it.

LC6Cmax7                        Maguire - cross

1    It's typically designated with NYC and then has a series of

2    numeric digits after that.

3    Q.  What is the NYC number for Government Exhibit 54?

4    A.  This particular one is NYC024350.

5           MS. MOE:  Your Honor, if I could have one moment,

6    please.

7           THE COURT:  Okay.

8           MS. MOE:  I have nothing further, your Honor.

9           THE COURT:  Thank you.  Mr. Everdell.

10          MR. EVERDELL:  Thank you, your Honor.  May I inquire?

11          THE COURT:  You may.

12   CROSS-EXAMINATION

13   BY MR. EVERDELL:

14   Q.  Good afternoon, Special Agent Maguire.

15   A.  Good afternoon, sir.

16   Q.  You testified on direct about a search warrant that you

17   helped execute at Jeffrey Epstein's New York residence on July

18   6th and 7th of 2019; is that right?

19   A.  Yes, sir, that's correct.

20   Q.  And the search warrant you were executing was part of an

21   investigation that the New York FBI was conducting at the time;

22   right?

23   A.  Yes, sir.

24   Q.  You were not the lead detective on that investigation;

25   right?

LC6Cmax7                          Maguire – cross

1    A.   No, I was not.

2    Q.   I believe the co-case agents for that investigation were

3    Special Agent Amanda Young and Task Force Officer Paul Byrne;

4    is that right?

5    A.   Yes, sir.

6    Q.   They were in charge of the investigation?

7    A.   Yes.

8    Q.   And your job was to help out on the day that the search was

9    executed; right?

10   A.   Yes, sir.

11   Q.   You were leading the Evidence Collection Team?

12   A.   That's correct.

13   Q.   So your job was to go through the various rooms in the

14   house, take photographs, and then search and seize any evidence

15   that you might find; right?

16   A.   Yes, sir.

17   Q.   Now that you did more than one search warrant on those two

18   days, July 6th and 7th; isn't that right?

19   A.   Yes, sir.

20   Q.   That's because when you first went into the residence and

21   you did a protective sweep of the area, you saw certain items

22   that weren't covered by the first warrant, so you went and got

23   a broader warrant; right?

24   A.   Yes, sir.

25   Q.   And I think you said there was yet even another warrant

1    that you executed a few days later on July 11th, that allowed

2    you to go back and collect CDs; right?

3    A.  Yes, sir.

4    Q.  So getting back to the day of the first execution of the

5    first warrant, that would be July 6th of 2019; is that correct?

6    A.  Yes, sir, it is.

7    Q.  And I believe the search started roughly around 5:30, 5:40

8    in the evening; is that right?

9    A.  Yes, sir.  I believe we approached the residence shortly

10   after 5:30 and then actually entered the residence

11   approximately 5:45, did the protective sweep, and I believe the

12   search started at 6:15 p.m., approximately.

13   Q.  In the evening?

14   A.  Yes, sir.

15   Q.  And I think you were there executing that and the second

16   warrant you got on July 7th all the way through the night;

17   isn't that right?

18   A.  Yes, sir, that's correct.

19   Q.  And I think the search ended early in the morning, around

20   6:30 a.m., is that right?

21   A.  Yes, sir, it is.

22   Q.  But it's safe to say for those first two warrants, I'm not

23   talking about the one when you came back with the CDs, but for

24   the times -- the warrants you executed where you took the

25   photographs were on July 6th, 2019, July 7th, 2019; right?

LC6Cmax7                     Maguire - cross

1    A.  Yes, sir.

2    Q.  So that's the day that the photos that we looked at were

3    taken?

4    A.  Yes, sir.

5    Q.  So those photos show what the house looked like on July

6    6th, 2019, and July 7th, 2019; isn't that right?

7    A.  Yes, sir.

8    Q.  Those photographs don't show, for example, what the house

9    looked like in 1994?

10   A.  No, sir, they don't.  Not to my knowledge.

11   Q.  Not to your knowledge, right, because you weren't in the

12   house in 1994; right?

13   A.  I would hope not, no, sir.

14   Q.  That was the first time you had ever been there?

15   A.  It was.

16   Q.  Those photographs wouldn't show what the house looked like

17   at any time prior to 2019 when you went inside the house;

18   right?

19            MS. MOE:  Objection, your Honor.

20            THE COURT:  Overruled.

21   A.  I have no way of knowing what the residence looked like, so

22   I don't know if they were representative of what they looked

23   like at that time period in the '90s.

24   Q.  The specific year I asked about was 1994, that would be 25

25   years before the day that you executed the search warrant;

1    right?

2    A.  Yes, sir.

3    Q.  That's a quarter of a century; right?

4    A.  Yes, sir.

5    Q.  And, in addition to what the house generally looked like in

6    that earlier time period of the 1990s, say, those photographs

7    we looked at don't show what items were in the house at that

8    time period, necessarily, do they?

9    A.  Again, I would not have any personal knowledge of that.

10   Q.  Those photographs wouldn't necessarily show what

11   furnishings were in the house in the 1990s and the 2000s;

12   right?

13   A.  Again, I don't know if it's representative or not.

14   Q.  And those photographs wouldn't necessarily show what

15   artwork was on the walls in that time period that I'm talking

16   about; right?

17   A.  Again, I don't know if it represents that or not.

18   Q.  Bottom line is that these photographs really show what it

19   looked like at the time of the search in 2019?

20   A.  That's the day that I was there, yes.

21   Q.  So you also mentioned that the search began around -- I

22   guess you said 6:30 is when the search began --

23   A.  Actually 6:15.

24   Q.  6:15?

25   A.  Yes, sir.

LC6Cmax7                         Maguire - cross

1   Q.  Great.  So you didn't take the photographs until after the

2   search began at 6:15 p.m.; right?

3   A.  We take, yes, the entry photographs and then we proceed

4   with the search after that.  So at 6:15, that would be the

5   labeling of the room, the photographs taken upon initial entry

6   and walk-through, and then we would start the search after

7   that.

8   Q.  So fair to say that the photographs you took that were

9   taken and that we saw were taken at night; right?

10  A.  I believe it was summertime, so they might have been taken

11  around dusk and then proceeding on through the nighttime hours.

12  Q.  And the search did last all the way through the night;

13  right?

14  A.  Yes, it did.

15  Q.  So, I think many of these photographs we saw were taken

16  with a flash; right?

17  A.  Yes, sir.

18  Q.  And so that wasn't natural lighting conditions, that's what

19  they looked like with a flash photo taken?

20  A.  I believe a flash was used in some circumstances in dimly

21  lit areas and I believe other times it was not because the room

22  was sufficiently lit.

23  Q.  I want to ask you about a few specific items that you

24  recovered from the residence.

25          You testified about certain items that were in the

LC6Cmax7                      Maguire – cross

1    safe, we just heard you talk about that; right?

2    A.   Yes, sir.

3    Q.   And some of the items found in the safe were CDs; correct?

4    A.   Yes, sir.

5    Q.   And you assigned the CDs the evidence numberses 1B26, 1B75,

6    and 1B78?

7    A.   Yes, sir.

8    Q.   And those were found in the safe; correct?

9    A.   Yes.   The 1B26 would have been located in the safe during

10   the search on the 6th and 7th, and then 1B75 and 1B78 would

11   have been with the suitcases with CDs were brought back to me

12   on July 11th.

13   Q.   Right.   But your understanding what was brought back to you

14   in the suitcases were originally what was inside the safe

15   before you opened it?

16   A.   Yes, sir, that's correct.

17   Q.   So all of those items that you mentioned, those 1B numbers

18   I just mentioned were items that were found inside the safe?

19   A.   Yes, sir.

20   Q.   So you didn't -- and that safe was on the third floor of

21   the house; right?

22   A.   Yes, sir.

23   Q.   And at the time of the search, you didn't look at what was

24   on any of these CDs; right?

25   A.   No, sir.

LC6Cmax7                          Maguire - cross

1    Q.  So, any images or photographs or anything else that came

2    off those CDs, those were taken off later; correct?

3    A.  Correct.

4    Q.  Now you also testified about CDs that were found in a room

5    on the fifth floor; right?

6    A.  Yes, sir.

7    Q.  So the safe is on the third floor and there was another

8    room on the fifth floor where you found CDs?

9    A.  That's correct.

10   Q.  And some of those CDs were also in binders on a shelf in

11   that room, we saw that; right?

12   A.  Yes.  Correct.

13   Q.  And there were other CDs that were found in the drawer of a

14   cabinet in that same room; right?

15   A.  Correct.

16   Q.  And we saw photographs of both of those; right?

17   A.  Yes.

18   Q.  And those CDs that we're talking about in the binders and

19   in the drawer were found in the same room on the fifth floor of

20   the residence; correct?

21   A.  Correct.

22   Q.  And again, at the time of the search, you, yourself, did

23   not look at what was on those CDs; right?

24   A.  The CDs in the binder, I was able to see thumbnails of the

25   corresponding CDs.  So I presumed that those were identical to

1  what should be on the CDs.  But, no, I did not view any other

2  CDs on the day of the search.

3  Q.  So you didn't compare the thumbnails with what was actually

4  on the CDs that day; right?

5  A.  No.  I did view several CDs the next day, though.

6  Q.  I'm just talking about on the day of the search.

7  A.  Correct.  Yes, sir.

8  Q.  So any images of photos that were on those CDs were taken

9  off later; right?

10  A.  Yes, sir.

11  Q.  Now you mentioned about how -- getting back to the safe,

12  there were certain items that you found on the day of the

13  search, but when you went back, they weren't there, but they

14  were returned later; is that right?

15  A.  That's correct.

16  Q.  So it was Mr. Khan, the attorney who brought suitcases that

17  had the items that were missing from before; right?

18  A.  That's correct.

19  Q.  And fair to say that you didn't see anything missing in

20  that inventory that was returned that day on the 11th?

21  A.  No, sir, I did not.

22  Q.  So you got back everything you thought should be there

23  based on what you had seen on the day of the search; right?

24  A.  Yes, sir.

25  Q.  Nothing missing?

LC6Cmax7                        Maguire – cross

1  A.  Not to my knowledge, no.

2  Q.  Special Agent Maguire, you went through I think every room

3  in the house during the search; is that correct?

4  A.  Yes.

5  Q.  So you were on every floor of the house at some point

6  during the search?

7  A.  Yes, sir.

8  Q.  And I think you said that there were eight total floors in

9  the house; right?

10  A.  That's correct.  Six aboveground and two sublevels.

11  Q.  So six aboveground and two cellar levels, call it; right?

12  A.  Yes.

13  Q.  There were no bedrooms in the cellar levels of the house;

14  right?

15  A.  Not that I recall, no, sir.

16  Q.  So of the six floors that were aboveground, there were some

17  bedrooms in those floors; right?

18  A.  Yes, sir.

19  Q.  But needless to say, if there were six floors aboveground,

20  there was no seventh floor aboveground; right?

21  A.  No, sir.

22  Q.  And there was no eighth floor above the ground with any

23  bedrooms; right?

24  A.  No, sir.

25          MR. EVERDELL:  One moment.  I have nothing further,

LC6Cmax7                         Maguire - cross

1   your Honor.

2           THE COURT:  Ms. Moe.

3           MS. MOE:  No redirect, your Honor.

4           THE COURT:  Thank you, Agent Maguire.  You may step

5   down.  You are excused.

6           Is it a short witness or better to start tomorrow?

7           MS. COMEY:  Relatively short, your Honor.  I don't

8   know that we would get through it in 12 minutes, but we could

9   try if your Honor would like.

10          THE COURT:  Let's give it a start, sure.

11          MS. COMEY:  Sure, your Honor.  The government calls

12  Kimberly Meder.

13          THE COURT:  Kimberly Meder may come forward.

14          MS. MENNINGER:  Your Honor, rather than us switching

15  with the lateness of the day, I'm going to be handling this

16  witness from here, if that's all right with the Court.

17          THE COURT:  That's fine.  Thank you, Ms. Menninger.

18   KIMBERLY MEDER,

19      called as a witness by the Government,

20      having been duly sworn, testified as follows:

21          THE COURT:  Thank you.  Please be seated.  Please

22  remove your mask and state and spell your name for the record.

23          THE WITNESS:  Kimberly Meder, K-i-m-b-e-r-l-y

24  M-e-d-e-r.

25          THE COURT:  Thank you.  You may inquire.

LC6Cmax7                          Meder - direct

1              MS. COMEY:  Thank you, your Honor.

2    DIRECT EXAMINATION

3    BY MS. COMEY:

4    Q.  Good afternoon.

5    A.  Good afternoon.

6    Q.  Where do you work?

7    A.  The FBI.

8    Q.  What is your title?

9    A.  Staff operations specialist.

10   Q.  How long have you worked at the FBI?

11   A.  10 years.

12   Q.  What is your current assignment?

13   A.  I'm an analyst on child exploitation and human trafficking

14   squad.

15   Q.  Generally what are your duties and responsibilities as an

16   analyst at the FBI?

17   A.  I conduct analysis and research, which includes helping

18   review evidence, that also includes looking for relevant

19   information related to that case.

20   Q.  Have you ever testified in court before?

21   A.  I have not.

22   Q.  I'd like to talk about how the cases you work on organize

23   evidence.  Could you explain, starting with case file numbers,

24   does each FBI investigation have its own unique case file

25   number?

LC6Cmax7                          Meder - direct

1    A.  Yes.

2    Q.  And within that case file number, how does the FBI

3    categorize evidence within a single file?

4    A.  We categorize them into 1B numbers.

5    Q.  What is a 1B number?

6    A.  A way to categorize pieces of evidence.  Multiple pieces

7    can be put into one 1B number.

8    Q.  I'd like to direct your attention to the summer of 2020.

9    Were you involved in reviewing particular CDs that summer?

10   A.  Yes.

11   Q.  For what case?

12   A.  The Epstein and Maxwell investigation.

13   Q.  Were those CDs logged under 1B numbers within that case's

14   FBI file?

15   A.  Yes.

16   Q.  Who else, if anyone, reviewed those CDs with you?

17   A.  Special Agent Amanda Young.

18   Q.  What did you and Special Agent Amanda Young do with those

19   CDs?

20   A.  We copied and saved each disc onto the computer in our

21   computer lab.

22   Q.  What types of files did you find on those CDs?

23   A.  Photos.

24   Q.  Could you explain to the jury how you processed each file

25   on those CDs?  So, for example, if you had a CD labeled A, B, C

1    on the physical CD, what did you do with it?

2    A.  If a CD was titled A, B, C, we created a folder titled A,

3    B, C, we then placed that CD into that computer and copied

4    everything on that disc into that folder.

5    Q.  After all of the photos from all of these CDs were copied

6    onto the FBI computer, what review did you conduct?

7    A.  I reviewed all of the images for case relevancy.

8    Q.  In preparation for your testimony here today, did you

9    review some of the image files that you copied from those CDs?

10   A.  Yes.

11   Q.  I'd like you to take a look, please, at the binder that

12   should be in front of you at what's been marked for

13   identification as Government Exhibit 1101.  Do you recognize

14   that?

15   A.  Yes.

16   Q.  What is that?

17   A.  It's a chart showing the exhibit numbers with the 1B

18   numbers and the name of the CDs.

19   Q.  Did you assist in the preparation of this exhibit?

20   A.  Yes.

21   Q.  Did you confirm that all of the information in it is

22   accurate?

23   A.  Yes.

24   Q.  How did you do that?

25   A.  I reviewed every picture in our computer lab and I

LC6Cmax7                    Meder - direct

1    corresponded it with the correct evidence item in the 1B

2    number, as well as confirming the name of the CD.

3    Q.  And when we say the name of the CD, is that a label that

4    was physically affixed to the CD?

5    A.  Yes, it was written on the disc.

6    Q.  Will this exhibit assist you in your testimony here today?

7    A.  Yes.

8         MS. COMEY:  Your Honor, I would ask permission for the

9    witness to refer to this exhibit as an aid during her

10   testimony.

11        MS. MENNINGER:  Your Honor, no objection to that,

12   although there is certainly hearsay contained in the far right

13   column, so I assume that won't be part of the testimony.

14        MS. COMEY:  Your Honor, I think we can take each

15   objection as it comes.

16        THE COURT:  You're not moving for the admission?

17        MS. COMEY:  That's correct, your Honor.

18        THE COURT:  For now, we'll allow it to be an aid for

19   memory and mindful of potential objections.

20        MS. COMEY:  Thank you, your Honor.

21        Ms. Drescher, would you please pull up what's been

22   marked for identification as Government Exhibit 304.

23   BY MS. COMEY:

24   Q.  Do you recognize this?

25   A.  Yes.

LC6Cmax7                         Meder - direct

1    Q.   What is it?

2    A.   It's a CD from 1B26 that I reviewed from the Epstein and

3    Maxwell investigation.

4    Q.   Now, is this the CD itself or an image from the CD?

5    A.   An image.

6    Q.   Before conducting your review that we've been talking about

7    here today, did you familiarize yourself with the physical

8    appearance of certain individuals?

9    A.   Yes.

10   Q.   So did you become familiar with the physical appearance of

11   Ghislaine Maxwell and Jeffrey Epstein?

12   A.   Yes.

13   Q.   Who are the individuals in Government Exhibit 304?

14   A.   Ghislaine Maxwell and Jeffrey Epstein.

15            MS. COMEY:   Your Honor, the government offers this

16   exhibit in evidence.

17            MS. MENNINGER:   Your Honor, may we have a sidebar,

18   please.

19            THE COURT:   We'll stop for the night, given that.

20            Members of the jury, thank you so much.   Same schedule

21   tomorrow.   Appreciate your diligence and patience.   We'll see

22   you in the morning.   Have a goodnight.

23            (Continued on next page)

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

LC6Cmax7                              Meder - direct

1              (Jury not present)

2              THE COURT:  The witness may step down and out.  Thank

3    you.

4              (Witness excused)

5              Everyone may be seated.

6              Okay, Ms. Menninger, GX304.

7              MS. MENNINGER:  Yes, your Honor.  I have an extra set

8    of the exhibits that I believe that the government intends to

9    offer through this witness, if I may approach for the Court's

10   benefit.

11             THE COURT:  Sure.  Okay.

12             MS. MENNINGER:  Your Honor, there are obviously

13   several categories of different types of photographs that are

14   contained in the exhibits that I believe the government intends

15   to offer.  Some of them obviously are pictures of Ms. Maxwell

16   and Mr. Epstein at various places, times, et cetera.  There is

17   no witness that I'm aware of that's going to talk about when

18   these photographs were taken, where they were taken, what they

19   accurately represent, et cetera.

20             I think the more problematic ones, though, are of

21   individuals, including just one of, for example, my client

22   laying on a boat at some unknown point in time in some unknown

23   location.  There are others that are people who have testified,

24   in fact recently in this case.

25             I would direct the Court's attention to 309, which is

LC6Cmax7                        Meder - direct

1    a recent witness, likewise 332 is a witness, and those

2    witnesses were not asked to identify these photographs to say

3    when they were taken, the circumstances under which they were

4    taken.

5         Likewise, your Honor, those two individual witness

6    photographs are, I believe, what's known as PSD files.  In

7    other words, they are from a photo shop program when you go and

8    look at the metadata behind those particular photos.  So, it is

9    particularly questionable whether or not they are what they

10   purport to be or there have been any alterations to the

11   photographs.

12        So, without the witness who can establish that these

13   photographs are what they purport to be at some particular time

14   or under certain circumstances or dates, I don't think that

15   just simply having possession of photographs on a CD in a home

16   gets you through those many different problems, including

17   hearsay problems, your Honor.  That's without the issue that

18   pertains to metadata, though I think --

19        THE COURT:  I'm sorry.  What statements are being

20   offered for the truth?

21        MS. MENNINGER:  Your Honor, there are, embedded in

22   these, and I think it's 332B is a screenshot of purported

23   metadata that has a title that was affixed to this photograph

24   by a person and it is labeled not by a computer-generated

25   photograph.  For example, if your Honor were to take a

1    photograph with your iPhone, your phone might save it as IMG

2    and then give it a number.  That's the kind of

3    machine-generated data that would pertain to a photo on your

4    iPhone.  In this case, this is information that was affixed by

5    a human being.

6             MS. COMEY:  Your Honor, I think I can save us time.  I

7    think I told Ms. Menninger the other day we're not planning to

8    offer 332B, at least with respect to that issue, we don't need

9    to resolve that.

10            THE COURT:  So let's take them one at a time.  304,

11   which is the one that's been offered.  What's the objection?

12            MS. MENNINGER:  Your Honor, with respect to this

13   photograph, there is no witness that will testify when this was

14   taken, if it was prior to the time of the conspiracy, some

15   other time, under what circumstances, and that it hasn't been

16   altered in some way since then.  So it is simply a document

17   without a witness to say what it is.

18            MS. MOE:  Thank you, your Honor.  I believe the

19   testimony here is that CDs were seized from Jeffrey Epstein's

20   residence, that they were reviewed by the FBI.  So with respect

21   to authentication, in terms of offering that these are what we

22   say they are, they are photographs seized from Jeffrey

23   Epstein's residence on CDs.

24            Their relevance is selfapparent, given the contents of

25   the photographs.  The relationship between Maxwell and Epstein

LC6Cmax7                        Meder - direct

 1    is central to this case.  There has been witness testimony

 2    about the timeframe of that relationship, that it began in the

 3    early '90s.  I think the defense has argued that that

 4    terminated during certain time periods.  But, in short, I think

 5    all of Ms. Menninger's arguments are arguments that they are

 6    free to make to the jury but have nothing to do with the

 7    question of relevance.

 8             These items have been thoroughly authenticated and to

 9    the extent the defense wants to offer witnesses about their

10    metadata and make arguments to the jury about what that means

11    or what it doesn't mean, that's for the defense to put before

12    the jury.  It has nothing to do with the question of

13    authentication or relevance, which are both low bars that are

14    easily cleared here.

15             THE COURT:  So the authentication is these items --

16    these represent the items that were found in the home during

17    the 2019 search and the relevance is that they show the

18    relationship between Mr. Epstein and Ms. Maxwell.

19             MS. MOE:  Yes, your Honor.  Throughout the course of

20    these photographs.

21             I would note, your Honor, with respect to the concern

22    about metadata, it happens often in criminal trials that

23    electronic evidence is seized, authenticated as such, and

24    offered before the jury.  If it were the case that evidence

25    could only be admitted in court if the people who wrote the

LC6Cmax7                         Meder - direct

1    emails or took the photographs or were in the photographs could

2    testify and identify themselves, no such evidence would ever be

3    offered in court.  But of course that's not what happens.  All

4    we do is we offer law enforcement agents who seized these items

5    and can authenticate them, and if defense wants to make

6    arguments to their relevance or otherwise, that goes to their

7    weight and not their admissibility, and those arguments are for

8    the jury.

9              MS. MENNINGER:  Your Honor, in many criminal cases,

10   there are lots of context over what photographs are admissible

11   and for what purpose.  For example, if it was a photograph that

12   was taken inside of a store when there was a robbery that

13   purported to take place in the store, there would be a witness

14   to say that this photograph was taken in or near the events and

15   that we have reason to believe that nothing inside the store

16   has changed.  Just showing photographs that are undated, they

17   may be from 1975 for all I know, and showed the two of them

18   together and there is no one to say that it hasn't been altered

19   in the meantime, even the low bar of showing that the

20   photograph is a photograph and without a witness to say it is

21   what it purported to be, I don't think that that is true with

22   respect to what is admissible for a photograph.  It's a low

23   bar, but there is not even a single person that can say that

24   this photograph or the ones behind it are what they purport to

25   be.

LC6Cmax7                              Meder - direct

1            THE COURT:  They are what were found in the Epstein

2       home.

3            MS. MENNINGER:  They could be altered documents found

4       within his home, but they're being offered for the truth of the

5       matter in the photograph, that is that there was a close

6       relationship between the two of them, as the government just

7       argued.

8            THE COURT:  Overruled.

9            MS. MENNINGER:  Your Honor, with respect to the next

10      document, it doesn't show any relationship.  It's a single

11      person.

12           THE COURT:  Overruled.  It's found in the home of

13      Mr. Epstein.

14           MS. MENNINGER:  Your Honor, with respect to other

15      individuals who haven't testified about the dates on which

16      these photographs were taken or the ages at which they were

17      taken, I don't think that there has been any foundation lead to

18      show that those individuals -- that the photographs are what

19      they purport to be.  As I said, they came from a photo shop

20      document file, which means they are, in fact, in a program that

21      is meant to alter photographs.

22           THE COURT:  Overruled.

23           MS. MENNINGER:  And with respect to the totality of

24      them, your Honor, there is a cumulativeness problem.  You don't

25      need 20 photographs to say what two might just as well say.

LC6Cmax7                          Meder - direct

1          MS. MOE:  On that score, your Honor, throughout this

2     trial, the defense has repeatedly tried to distance Ms. Maxwell

3     from Mr. Epstein and his affairs and argue that things were

4     compartmentalized.  I believe in the cross examination of some

5     witnesses, they repeatedly suggested that she was only a

6     personal assistant.

7          These photographs show their close relationship

8     throughout time and are directly relevant.  There is nothing

9     cumulative about that.  In fact, it speaks directly to one of

10    the issues at the heart of this case, and for that reason,

11    these photographs are certainly relevant.

12         MS. MENNINGER:  I'm not sure how they show time, your

13    Honor.  There are no date stamps on the photographs.

14         MS. MOE:  Your Honor, given the change in hairstyles,

15    the people in the photographs are clearly aging throughout

16    time, I think that relationship and its duration throughout

17    time is evident from the photographs themselves.

18         THE COURT:  Overruled.  Anything else?

19         MS. MENNINGER:  As to all, your Honor, including the

20    testifying witnesses?

21         THE COURT:  I'm sorry.

22         MS. MENNINGER:  Including as to the testifying

23    witnesses --

24         THE COURT:  What exhibit number?

25         MS. MENNINGER:  The first one, your Honor, I referred

LC6Cmax7                        Meder - direct

1    to is 309, and the second is someone who will -- the government

2    will contend is a victim in this case, though not testifying,

3    number 332.

4                THE COURT:  309.

5                MS. MOE:  Yes, your Honor.  309 depicts the witness

6    who testified earlier today as Kate.  The jury has met her.

7    This is a photograph of that same person.

8                Again, to the extent the defense has the native file,

9    which we produced in discovery, to the extent they wish to make

10   any arguments about timeframes or metadata, they're free to do

11   so, but a photograph of this person is certainly relevant given

12   the context.

13               With respect to Government Exhibit 332, your Honor, if

14   I could just have one moment.

15               THE COURT:  Okay.

16               MS. MOE:  Thank you, your Honor.  I just wanted to

17   confirm.  With respect to Government Exhibit 332, a cropped

18   version of that photograph which shows only that individual's

19   face has already been offered in evidence and identified by

20   another witness as that individual.

21               THE COURT:  So what's the relevance of a duplicate

22   photo?

23               MS. MOE:  Your Honor, it's not a duplicate photograph.

24   The photograph that we used for identification purposes was a

25   cropped photograph of just the face.  The full photograph is a

1   topless photograph of this victim.  We anticipate that the

2   testimony at this trial would be that that person recruited

3   another victim in this case, and I believe we, in advance of

4   trial, that our view that the person in this photograph is a

5   victim of the charged conspiracy.

6            In particular, other exhibits which we will offer at

7   trial will show flight logs that will show that this person,

8   the same person with her first and last name, traveled on

9   flights with Maxwell and Epstein when she was 17 years old.  As

10  the Court will recall, Mr. Alessi testified that he recalled

11  witnessing the defendant meet the same person and asked her to

12  come to the house and give massages.

13           So the fact that Mr. Epstein had a photograph of this

14  person topless is corroborative of that witness testimony and

15  consistent with the evidence at trial that this person, as a

16  minor, was a victim of the charged conspiracy.

17           MS. MENNINGER:  Your Honor, the fact that this lawyer

18  is just now representing to this Court that this is minor is

19  contrary, one, to the metadata on the photo that shows she was

20  not a minor when this photograph was taken, and two, the

21  testimony of Mr. Alessi that he met her in 2001 or 2002, also

22  when she was not a minor.  So to put in evidence a photo that

23  they know is not her of a minor, when there is no charged crime

24  with respect to photography in this case, your Honor, is

25  directly contrary to the evidence as the government knows it

LC6Cmax7                        Meder - direct

1    exists.

2           And I also would like to say with respect to 309, we

3    litigated whether or not we could put in evidence photographs

4    of this witness, and the government called us, I think it was

5    slut shaming when I tried to argue that there were other

6    photographs of this individual that were much like this that

7    she had put out in newspapers, and now they want to put on a

8    photo of her after she's gotten off the stand and not afforded

9    us the opportunity to cross examine her about similar

10   photographs that she has put out.

11          MS. MOE:  Your Honor, I'm surprised by all three of

12   those arguments.

13          THE COURT:  Let's start with 332.  Is the government's

14   representation that the individual depicted in this photo is a

15   minor at the time of the photo?

16          MS. MOE:  Your Honor, we made no representations about

17   the metadata of the file of this photo.  To be short, in

18   direct, I don't know.  There will be testimony at this trial

19   and there has been testimony at this trial that this person was

20   victimized as a minor.

21          In terms of the particular date of this photograph,

22   we're limited by the information we have in the metadata.  I

23   believe it's for this reason that the defense had noticed

24   perhaps a metadata expert and the defense will be free to

25   explore that issue.

LC6Cmax7                        Meder - direct

```
 1              There are of course limitations on metadata and
 2      whether it can tell whether a file was saved on a certain date
 3      or whether a photograph was taken on a certain date or
 4      otherwise.  And to the extent the defense wants to put that at
 5      issue, they're certainly welcome to do so.
 6              In terms of its relevance, it shows that the nature of
 7      the relationship between the defendant, Epstein, and this
 8      victim was of a sexual nature.  For example, when Mr. Alessi
 9      testified about this victim, I believe the cross examination
10      about that was that she was a professional, that she was at
11      Mar-a-Lago, the defendant was only there for a treatment, and I
12      believe there was a lot of -- there were a lot of questions on
13      cross examination designed to suggest that she was a
14      professional masseuse.  And if the defense intends to argue
15      that this person was a professional masseuse, it is certainly
16      relevant in response to that argument that, in fact, Epstein
17      had a topless photograph of her in a location that appears to
18      be a tropical island which would be consistent with flight
19      records along those lines.  Again, it goes to the relationship
20      between the defendant, Epstein, and this victim, that it was of
21      a sexualized nature, which is consistent with witness
22      testimony.
23              With respect to the particular date of the photograph,
24      that is an issue that the defense is certainly free to explore
25      and put before the jury.  I can't make a representation about
```

LC6Cmax7                         Meder - direct

1    the exact date because there are limitations on digital

2    forensics.

3            MS. MENNINGER:  Your Honor, the representation was

4    just made that this person was a minor victim, and that

5    representation has been made to this Court on previous

6    indications.

7            THE COURT:  Based on the testimony, I don't think the

8    representation was that the picture represented her as a minor.

9            MS. MOE:  --

10            MS. MENNINGER:  -- nature of the relationship.  I

11    think the quote just was between my client and her and

12    Mr. Epstein.  There is nothing about this photograph that

13    establishes any relationship having to do anything with my

14    client.  It's something that was in the possession of Jeffrey

15    Epstein in 2019, and it was taken by any available data in 2002

16    when she was above the age of consent.

17            I think the 403 problem looms large in this case where

18    we're going to put in a photograph of someone who there is not

19    going to be -- she's not going to testify, your Honor.  They

20    don't want her to testify because she has a lot of credibility

21    problems.  So they want to put in evidence that she was a

22    victim but without having her get on the stand and testify.  So

23    now they want to get in evidence that she had a topless photo

24    and no one's going to say when that photograph was taken.  The

25    available evidence on the photo is that it was taken when she

LC6Cmax7                          Meder - direct

1   was above the age of maturity, which is not a crime, not

2   something my client is charged with, and is not a part of the

3   conspiracy in this case.  And I think putting on a photograph

4   like that without any supporting testimony about when it was

5   taken, the circumstances under which it was taken is highly,

6   unduly prejudicial.

7            MS. MOE:  Your Honor, defense counsel is grasping at

8   straws here.  This exhibit is plainly relevant.  It's

9   consistent with other trial exhibits and I do take issue with

10  the suggestion that I made any misrepresentation with the

11  Court.  I certainly have not done that and would not do that,

12  your Honor.

13           THE COURT:  332, the objection is overruled.

14           309.

15           MS. MOE:  Sorry.  With respect to 309, that person is

16  the person who testified this morning as Kate.  I unfortunately

17  haven't reviewed the final information recently, so I don't

18  want to make a representation to the Court and it becomes an

19  issue.  We're happy to examine it and report to the Court this

20  evening.  My memory is the file name for this is her first

21  name.

22           MS. MENNINGER:  And the date was 2002 when she was 25.

23  And she didn't get on the stand and talk about photographs

24  being taken of her.  I mean, she didn't mention it.  So now

25  we're going to put in a photograph after she's left the stand.

LC6Cmax7                         Meder - direct

1    And by the way, we were precluded from cross examination about

2    her publicly available photographs of a similar type.

3            THE COURT:  I don't understand the parallel.  The

4    relevance of this photo is that it was in possession of

5    Epstein, which is different than the relevance that you were

6    offering.  I have to compare apples and apples.

7            MS. MENNINGER:  Your Honor, had she testified about

8    the circumstances under which that was made, it may have made

9    it very relevant.  We're just not going to have testimony about

10   the photograph having been made when it was made, how old she

11   was, et cetera, and then once she's off the stand, introduce a

12   photo of her that could have been authenticated through her,

13   but was not.

14           MS. STERNHEIM:  May I have a moment, Judge?

15           THE COURT:  You may.

16           MS. STERNHEIM:  Judge, if I may, on the issue of this

17   picture and the issue of nudity, I was essentially precluded

18   from raising issues concerning nudity, and a witness who was

19   brought up in the South of France, who was quoted as saying she

20   is comfortable with being nude was an area ripe for cross

21   examination if the government had not strategically decided not

22   to use this photograph when the witness was on the stand.

23           Now, if they will permit the witness to be brought

24   back, that's a whole different issue, but this idea that they

25   can just put in evidence after a witness is off the stand and

1  claim that there is some strategic reason why it's okay, it has

2  deprived us of cross examination, which is already compromised

3  by the rulings repeatedly concerning the victims or accusers

4  having certain rights, and they are coming into tension with

5  the rights of our client to have an aggressive defense put

6  forth.

7          MS. MOE:  Your Honor, the defense has not been

8  compromised in any way.  I want to unpack the facts here --

9          THE COURT:  Just to be clear, we're talking about

10  exhibit 309.

11          MS. STERNHEIM:  I know that.

12          THE COURT:  I take each objection as it comes.  You

13  make your record.  It doesn't help analyze it to just talk

14  about larger issues, which I don't know what you're talking

15  about.

16          So each objection as it comes.  I'm looking at 309.

17  Your objection is that by not putting it in when the witness is

18  on the stand, you can't cross examine the witness about the

19  context of the photo.  Do I have it right?

20          MS. STERNHEIM:  That is correct.

21          MS. MOE:  Yes, your Honor.  So, as defense counsel

22  knows, we showed this photograph to Kate during an interview in

23  September of this year.  She identified that as herself and

24  remembered it.  Defense counsel has had that note.  If they

25  wanted to ask her about this exhibit, that exhibit has been

1    marked in evidence for eight weeks now.  This is not a surprise

2    in any way.  It's not our practice, frankly, your Honor, to

3    humiliate women with naked photographs of themselves when

4    they're in a courtroom, and there is no need for it either,

5    given its obvious relevance.

6              THE COURT:  I'll consider 309.  Anything else?

7              MS. MENNINGER:  Not on these photos, your Honor.

8              THE COURT:  Any other matters to take up?

9              MS. MOE:  Not from the government, your Honor.  Thank

10   you.

11             THE COURT:  Thank you.  I will see you at 8:45.

12             (Adjourned to December 7, 2021 at 8:45 a.m.)

13                              * * *

14

15

16

17

18

19

20

21

22

23

24

25

<pre>
 1                          INDEX OF EXAMINATION

 2   Examination of:                               Page

 3    KATE

 4   Direct By Ms. Pomerantz  . . . . . . . . . .1169

 5   Cross By Ms. Sternheim . . . . . . . . . . .1234

 6   Redirect By Ms. Pomerantz  . . . . . . . . .1294

 7   Recross By Ms. Sternheim . . . . . . . . . .1298

 8    PATRICK McHUGH

 9   Direct By Ms. Moe  . . . . . . . . . . . . .1303

10   Cross By Mr. Everdell  . . . . . . . . . . .1319

11   Redirect By Ms. Moe  . . . . . . . . . . . .1348

12    KELLY MAGUIRE

13   Direct By Ms. Moe  . . . . . . . . . . . . .1360

14   Cross By Mr. Everdell  . . . . . . . . . . .1389

15    KIMBERLY MEDER

16   Direct By Ms. Comey  . . . . . . . . . . . .1400

17                         GOVERNMENT EXHIBITS

18   Exhibit No.                            Received

19    223R, 224R, 225R, 234R, 241R, 243R, . . . .1167

20             244R, 246R, 247R, 248R, 249 R,

21             250R, 252R, 253R, 254R, 255R,

22             281R, 282R, 285R, 286R, 287R

23    18   . . . . . . . . . . . . . . . . . . .1171

24    109  . . . . . . . . . . . . . . . . . . .1174

25    702  . . . . . . . . . . . . . . . . . . .1177
</pre>

501, 502, 504, 505, 506, 509 . . . . . . . .1307

507 . . . . . . . . . . . . . . . . . . . .1349

909 . . . . . . . . . . . . . . . . . . . .1363

910, 911–R, 933 . . . . . . . . . . . . . .1366

915–R . . . . . . . . . . . . . . . . . . .1368

902–R . . . . . . . . . . . . . . . . . . .1370

903–R . . . . . . . . . . . . . . . . . . .1371

904–R . . . . . . . . . . . . . . . . . . .1372

917–R . . . . . . . . . . . . . . . . . . .1373

928–R . . . . . . . . . . . . . . . . . . .1373

925, 925–R . . . . . . . . . . . . . . . . .1377

926 . . . . . . . . . . . . . . . . . . . .1380

929 . . . . . . . . . . . . . . . . . . . .1381

935R . . . . . . . . . . . . . . . . . . . .1386

                    DEFENDANT EXHIBITS

Exhibit No.                             Received

B . . . . . . . . . . . . . . . . . . . . .1166

K-8, K-10 . . . . . . . . . . . . . . . . .1302