LC7VMAX1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
     UNITED STATES OF AMERICA,
3
               v.                            20 CR 330 (AJN)
4
     GHISLAINE MAXWELL,
5
                    Defendant.               Jury Trial
6    ------------------------------x
                                             New York, N.Y.
7                                            December 7, 2021
                                             9:05 a.m.
8
     Before:
9                     HON. ALISON J. NATHAN,

10                                           District Judge

11                          APPEARANCES

12   DAMIAN WILLIAMS
          United States Attorney for the
13        Southern District of New York
     BY:  MAURENE COMEY
14        ALISON MOE
          LARA POMERANTZ
15        ANDREW ROHRBACH
          Assistant United States Attorneys
16
     HADDON MORGAN AND FOREMAN
17        Attorneys for Defendant
     BY:  JEFFREY S. PAGLIUCA
18        LAURA A. MENNINGER
               -and-
19   BOBBI C. STERNHEIM
               -and-
20   COHEN & GRESSER
     BY:  CHRISTIAN R. EVERDELL
21
     Also Present:  Amanda Young, FBI
22                  Paul Byrne, NYPD
                    Sunny Drescher,
23                   Paralegal, U.S. Attorney's Office
                    Ann Lundberg,
24                   Paralegal, Haddon Morgan and Foreman

25

LC7VMAX1

1                    (Trial resumed; jury not present)

2               THE COURT:  Matters to take up.

3               MS. MENNINGER:  Yes, your Honor.

4               THE COURT:  Go ahead, Ms. Menninger.

5               MS. MENNINGER:  We learned early this morning through

6        a disclosure by the government that they have spoken with

7        witness Brian.

8               THE COURT:  I'm sorry, could you pull up the mic

9        closer please.  Thank you.

10              MS. MENNINGER:  That they had spoken with witness

11       Brian, who was anticipated to testify today.  Brian is the

12       brother of witness Jane.

13              THE COURT:  Correct.

14              MS. MENNINGER:  You may recall, your Honor, we had

15       litigation around prior consistent statements; and that Brian

16       is being offered in part to report supposedly prior consistent

17       statements with Jane.  We had discussions about whether Jane

18       would be subject to recall in order to be questioned about

19       those particular prior consistent statements, should they be

20       admitted.

21              What we learned from the government early this morning

22       is that after her testimony, Jane called Brian and discussed

23       with Brian her testimony in court, in violation of the Court's

24       sequestration order.  She disclosed to him a document that she

25       was shown on the stand during cross-examination; she gave her

LC7VMAX1

1    characterization of the defense attorney who cross-examined

2    her, using an expletive that rhymes with "front."  And that was

3    told to this witness, who is anticipated to be testifying

4    today, who is obviously also subject to the Court's

5    sequestration order.

6          I am very troubled and disturbed that witnesses who

7    are still subject to recall are calling other witnesses that

8    they know will be called to testify; that will be called to

9    testify about their memories of events that happened years ago;

10   and that they are disclosing to witnesses -- this witness --

11   what they experienced on the witness stand, including a

12   document that they were shown, your Honor.

13         I am asking the Court to forbid the witness Brian from

14   being called, given this violation.  At a minimum, your Honor,

15   I would ask that there is a hearing outside the presence of the

16   jury in which Brian is subject to examination by the Court as

17   to exactly what happened during this phone call.  Those are the

18   two pieces of information that he reported to the government

19   and was reported to us via some handwritten notes at about 2

20   this morning.  That's my request, your Honor.

21         THE COURT:  Okay.

22         MS. MOE:  Your Honor, there are only two legal

23   principles at play here.  The first is Rule 615 about excluding

24   witnesses from a courtroom.  Neither Brian nor Jane has been in

25   the courtroom while other witnesses have testified.  That rule

LC7VMAX1

1    has been fully complied with.

2            The other legal principle is that the government

3    cannot have substantive communications with Jane because she is

4    subject to recross about prior consistent statements.  We have

5    not violated that legal principle either.

6            With respect to communications between Jane and Brian,

7    we have disclosed our awareness of that and defense counsel is

8    free to cross-examine Brian about those communications; that's

9    all the law requires.  There is no sequestration order that

10   prevents family members from talking to one another; of course,

11   it's not best practice.

12           THE COURT:  Did the government give any guidance?

13           Just on the first point, witnesses sequestered, so not

14   in the courtroom, could they be provided by another witness or

15   an attorney the transcript of the trial testimony?

16           MS. MOE:  I have no awareness of whether that's

17   occurred, your Honor.

18           THE COURT:  No, it's just to test the boundaries of

19   what you suggested in the first point, which is the only

20   question is whether they observed trial or not.  And I don't

21   think -- I think that strikes me, I haven't looked at the law

22   on this, as an overstatement.

23           For example, I don't think a witness could be

24   provided, consistent with a sequestration order, the transcript

25   of trial testimony; and I wondered if the government agreed

LC7VMAX1

1    with that proposition.

2           MS. MOE:  Your Honor, I haven't looked at the law on

3    that particular issue.  That would strike me as sort of

4    consistent with being in a courtroom to see the testimony.  And

5    I'm not aware of that occurring in this case; we certainly

6    haven't been providing trial witnesses with transcripts of

7    testimony.  I'm not aware of any attorney doing that either.

8           I think what we're talking about is a conversation

9    between two siblings in which one sibling shared that her

10   experience in court was unpleasant.

11          THE COURT:  Pull up the mic please.

12          MS. MOE:  Apologies, your Honor.

13          I think what we're talking about here, your Honor, is

14   a conversation between two siblings in which one sibling said

15   she had an unpleasant experience in court; and that she was

16   shown a document on the stand that was -- I don't know all the

17   details of this conversation, just what's been relayed to me.

18          THE COURT:  Can I back up and ask if the government

19   gave any direction in advance about not discussing trial

20   testimony with other witnesses, which I think probably would

21   constitute best practices.

22          MS. MOE:  Yes, your Honor.

23          Following Jane's testimony, I spoke with her attorney.

24   I don't want to make a representation that's not accurate.  My

25   memory of that conversation is that I told him and reminded him

LC7VMAX1

1    that she was potentially subject to recall and recross.  And so

2    my understanding is that he understood the rules about that;

3    and that we couldn't speak with her; and that she was still a

4    trial witness subject to recall.  I don't remember whether I

5    repeated, sort of, the ground rules about trial witnesses.

6    That's all I remember from that conversation, your Honor.

7              THE COURT:  And did the government prior to trial

8    give -- was there any direction given on this issue -- since

9    this witness is being provided for prior consistent statements,

10   did the government give any direction either to the witnesses

11   or to their counsel that they ought not to confer in light of

12   the reason that the witness is being offered?

13             MS. MOE:  Yes, your Honor.

14             Off the top of my head, I can't point to a particular

15   date or a particular conversation; but it's our practice -- and

16   what we did in this case -- is to tell every witness that their

17   memory should be their memories and they shouldn't be talking

18   to other witnesses before the trial.  So I'm confident we did

19   that in this case; I just can't remember a particular date of a

20   particular conversation, but we've been having those

21   conversations with all of our witnesses.

22             THE COURT:  And how did the government learn about

23   this conversation?

24             MS. MOE:  Last night we had a meeting with Brian.  And

25   he, unprompted, mentioned that he had heard from Jane that she

LC7VMAX1

1    had called him after her testimony and relayed that her

2    experience wasn't pleasant.

3           THE COURT:  It sounds like maybe more than that it

4    wasn't pleasant; sounds like part of what was relayed -- that's

5    not the part that concerns me.  Needless to say, the point

6    that's concerning is whether she coached him on her responses

7    so that his testimony regarding prior consistent statements

8    would show consistency.  That's, I think, the only --

9           MS. MOE:  Yes, your Honor.

10          THE COURT:  I'm not sure there's any relevance --

11   although it's concerning, I'm not sure there's any relevance to

12   a description of the process is unpleasant or that they did or

13   didn't like the lawyers and how they were treated.

14          MS. MOE:  Yes, your Honor.

15          On the subject of the prior consistent statement, I

16   would note -- and the 3500 material reflects this -- that Brian

17   had relayed the substance of his testimony to the government

18   and it's memorialized in 3500 long before this conversation

19   happened.  He has been on our witness list for some time; he's

20   met with the government long before this trial began.

21          And so to the extent there is any suggestion that his

22   testimony is prompted by a recent conversation with Jane during

23   the trial, that's belied by the record here, which is that he

24   has relayed to us those prior consistent statements

25   substantially in advance of the trial.

LC7VMAX1

1           With respect to his communications with Jane, we
2    memorialized what Brian told us about that in our notes and
3    provided them to defense; and so we've been transparent about
4    that.
5           I don't think those notes or that conversation in any
6    way suggests that witnesses are doing something improper or
7    that anyone is coaching anyone to say something in particular.
8    And again, this witness has been on the record with the
9    government about this issue long before the trial.
10          THE COURT:  Well, obviously if I allow the testimony,
11   it's fair grounds for cross, needless to say.
12          MS. MOE:  Of course, your Honor.
13          THE COURT:  And where is he in the order of things
14   today?
15          MS. MOE:  He would be the next witness after the
16   witness who's currently on the stand.
17          THE COURT:  Ms. Menninger, so given the timing of
18   where we are, do you have any authority to support the
19   proposition that -- other than obviously it being fair grounds
20   for cross, that this is a violation of order or law that would
21   suggest a quite substantial remedy of excluding testimony?
22          MS. MENNINGER:  Your Honor, I have not had time to
23   research this.  I think that the disclosure came in around 3
24   o'clock in the morning.  And without revealing what time I got
25   up, I have not had time to research that question between when

LC7VMAX1

1    I got up and when I came to court this morning.  I have checked

2    the Westlaw headnotes and there certainly are cases where

3    witnesses are excluded for far more minor infractions than

4    this.

5              THE COURT:  But infractions of what?

6              MS. MENNINGER:  A sequestration order like walked into

7    a courtroom briefly, you know, or an agent was in the room and

8    heard some of the confidential informant's testimony.  That's

9    what I've briefly learned from looking at headnotes, your

10   Honor.

11             Part of my concern is that what you've just heard from

12   the government is those are the two things that Brian

13   volunteered to them.  They said they don't know exactly what

14   happened in this conversation.  And for all we know, there's

15   more to the conversation than what Brian volunteered, because

16   they may have said, Oh, whoa, don't tell us anymore about that.

17             So that's one of the reasons why my request is to find

18   out exactly what was communicated to him by Jane before he gets

19   on the stand; and that, I would submit, is something that the

20   Court could ask him about under oath outside the presence of

21   the jury to determine exactly the scope of the violation here.

22   Because we only know of one document that she told him she had

23   been shown on the stand.  I don't know if she told --

24             THE COURT:  Do we know what document?

25             MS. MENNINGER:  Yes, your Honor.

LC7VMAX1

```
 1          He volunteered that it was the Interlochen application

 2     that she was shown and was asked, as you know, questions about

 3     on the stand.  So whether there were other disclosures in that

 4     conversation, they weren't written down in the notes.  And I

 5     suggest that maybe it is important to learn that information

 6     before the Court makes a determination about exactly the

 7     magnitude of the violation here, your Honor.

 8          MS. MOE:  Your Honor, I would direct the Court's

 9     attention to our note on this, which is marked 3510-020.

10          THE COURT:  Can I have it?

11          While Ms. Drescher is getting that, go ahead, Ms. Moe.

12          MS. MOE:  Thank you, your Honor.

13          The note reflects --

14          MS. MENNINGER:  Your Honor, I have a paper copy, if

15     you'd like.

16          THE COURT:  Okay.  Thank you.

17          Go ahead, Ms. Moe.

18          MS. MOE:  Thank you, your Honor.

19          The note reflects in the middle of the page that Brian

20     told the government, after Jane testified, she called Brian.

21     Jane did not discuss her testimony.  She just told Brian that

22     he should know that the defense attorney is a expletive; and he

23     should know that's what this will be like.  Jane mentioned she

24     was shown an Interlochen application.

25          And on that score, your Honor, I would note that the
```

LC7VMAX1

1    Interlochen application is not the basis of any prior

2    consistent statement.  I don't anticipate asking him on direct

3    about his Interlochen application at all.

4           MS. MENNINGER:  The point is we don't know if that's

5    the only thing she told him; that's just what he volunteered to

6    the government.

7           THE COURT:  All right.  Let's do this.  We'll have

8    Brian not testify till after lunch.  I think the first task is

9    the government to fully inquire what Brian learned from Jane or

10   anyone else about testimony that's taken place.

11          MS. MOE:  Yes, your Honor.

12          We'd be happy to have that conversation.

13          With respect to scheduling issues, just in terms of

14   the sequencing today, I would note that we anticipate

15   calling -- your Honor, if I could have just one moment.

16          THE COURT:  Sure.

17          (Counsel conferred)

18          MS. MOE:  Thank you, your Honor.

19          I just wanted to think through a scheduling issue

20   because we have a witness who will be testifying beginning

21   probably later this morning, and that testimony may be fairly

22   long.  And for scheduling reasons, Brian had planned to fly

23   home tomorrow; and so it may be, just depending on the

24   sequencing of this issue, that we might request to call him out

25   of order to accommodate that.  But we can see how the timing

LC7VMAX1

1    goes today and flag that later on.

2              THE COURT:  Well, we're not going to speed up Brian

3    because he's planning to fly home today.  The question is when

4    we have sufficient time to inquire whether there's been an

5    effective violation of the sequestration order and, if so, what

6    the appropriate remedy for that is.  So that's going to require

7    a factual investigation by the government, and then legal

8    analysis from both sides as to what an appropriate remedy is in

9    light of what we learn factually.

10             MS. MOE:  Of course, your Honor.  I just wanted to

11   flag a scheduling concern.  I certainly don't mean to expedite

12   the issue.  We'll thoroughly examine it.

13             THE COURT:  Okay.  Ms. Menninger, is that --

14             MS. MENNINGER:  Yes, your Honor.

15             THE COURT:  -- sufficient in light of where we are at

16   the moment?

17             MS. MENNINGER:  Yes, your Honor.

18             THE COURT:  Okay.  Other issues?

19             MS. MENNINGER:  Yes, your Honor.

20             I also conferred with the government this morning in

21   light of the briefing last night on Mr. Flatley's testimony.

22   Because the letter that we received from the government is

23   different from what I was told during a conferral on Friday on

24   this topic.  So I've tried to narrow the issues as I understand

25   them to be.

LC7VMAX1

1        Your Honor, with respect to any testimony that was in

2   the November 26 disclosure, which I believe is not what was

3   disclosed earlier in September, but most of it is what I would

4   agree is factual testimony.  If a document has metadata, any

5   old person can right-click on it, look at the properties, and

6   read what those properties are.

7        There's only one portion of the November 26 disclosure

8   that I believe treads into opinion expert land, and that is on

9   the second page of the November 26 disclosure where Mr. Flatley

10  will testify that he verified the accuracy of metadata by

11  running a particular program.  He will explain what metadata

12  is, such as the file name and when the file was created, and

13  where it can be stored in a computer system.

14       Your Honor, if those are the only things that

15  Mr. Flatley intends to testify about, then I think we're fine.

16  It's the things that came in the disclosures on November --

17  there were more on November 26 that were not in this letter and

18  there were things on December 3rd that were disclosed.  If he

19  is limited to those things that were put in the September 26

20  disclosure, I'm fine with that, your Honor.

21       He also was not ever disclosed as a fact or expert

22  witness with regard to CDs.  The original notice and the

23  supplemental notice all refer to his review of devices.  So I

24  believe that the government does not intend to put on evidence

25  about CDs through him, but those are the two areas that I think

LC7VMAX1

1    we're down to, your Honor.

2              THE COURT:  Okay.

3              MR. ROHRBACH:  Your Honor, as I think our letter

4    indicated, we're quite surprised to receive the defendant's --

5              THE COURT:  Mr. Rohrbach, let's just get to the issue.

6    It sounds like it's narrowed to two things.  Every letter I

7    get, it starts with, We're so surprised or this has already

8    been litigated.  Let's just get to the issue.

9              MR. ROHRBACH:  So, your Honor, I think we're in a

10   pretty good place then.  Mr. Flatley is not going to go into

11   very much -- we obviously don't know exactly what Mr. Flatley

12   will say on the stand, but the questions and what we expect to

13   elicit should track the government's November 26 letter.  And

14   so it sounds like if defense counsel doesn't have a problem

15   with what's in this letter, then there is no issue here for the

16   Court.

17             I'm not exactly sure what Ms. Menninger is referencing

18   with regard to CDs, but I think that we expect Mr. Flatley to

19   give purely fact testimony regarding CDs, and there's no expert

20   opinion at all involved there.  To the extent that it's a late

21   disclosure of anything, it's just a factual view of Mr. Flatley

22   that is in the 3500 material that he may testify to.

23             MS. MENNINGER:  Your Honor, on the CDs, apparently

24   Mr. Flatley intends to testify that a created date is the same

25   thing as a modified date.  And also about once a file is burned

LC7VMAX1

1    onto a CD, it can't be unburned.  Those are, I think, what the

2    government represented in their letter of last night he

3    intended to talk about, which have never been disclosed to us

4    as his intended testimony.

5              MR. ROHRBACH:  Your Honor, as we said in our letter

6    last night, we don't intend to elicit those things on direct;

7    but also those are factual pieces of knowledge that you can

8    understand without having any specialized training or

9    experience if you just have used a CD burner before.

10             MS. MENNINGER:  If it's not coming out on direct, your

11   Honor, then I don't think it matters.

12             THE COURT:  Okay.

13             MS. MENNINGER:  But as to the other ones, I will just

14   make an objection if there's something that's not in the

15   November 26 letter.  I think the government knows what their

16   witness is going to say because they are going to ask him

17   questions.  And if it's a question that calls for things that

18   weren't disclosed, then I'll bring it to the Court's attention.

19             THE COURT:  Okay.

20             MR. ROHRBACH:  That's fine, your Honor.

21             THE COURT:  I do want to press a little bit on the CD

22   bit; because I want to know what in the government's mind would

23   happen on cross that would lead the government to redirect with

24   respect to the created date is the same as the modified date or

25   once burned on CD, can't be unburned.  I don't want to have the

LC7VMAX1

1    government being too cute here and saying we're not going to do

2    it on direct, but you know full well you're going to do it on

3    redirect.

4              MR. ROHRBACH:  Understood, your Honor.

5              If I could confer with Ms. Pomerantz, she's putting it

6    on; but I suspect it really is unlikely to come out on redirect

7    at all.

8              THE COURT:  Okay.

9              (Counsel conferred)

10             MR. ROHRBACH:  Your Honor, the government is not

11   planning to talk with Mr. Flatley on direct about CDs.  So it's

12   hard to imagine what exactly would happen on cross that would

13   make this an issue; but, of course, the government doesn't want

14   to limit itself by promising under no circumstances will it

15   elicit this information.

16             THE COURT:  Okay.

17             So if you're not going to ask about CDs on direct, if

18   he's not crossed on CDs, that's the end of the matter.

19             MR. ROHRBACH:  Yes, your Honor.

20             THE COURT:  Ms. Menninger, does that get us where we

21   need?

22             MS. MENNINGER:  That's fine, your Honor.  Thank you.

23             THE COURT:  Okay.  Great.  Thank you both.

24             All right.  Well, it sounds like all that work we did

25   on Flatley last night will just go in the can for future use.

LC7VMAX1

1          I think the only outstanding issue from yesterday is

2      the objection to Exhibit 309.  I'm sustaining that objection on

3      401/403 grounds.

4          What else do we need?

5          MS. MENNINGER:  Nothing else from the defense, your

6      Honor.

7          MS. MOE:  Your Honor, may we briefly be heard at

8      sidebar about an issue relating to potential cross-examination

9      of Brian that implicates a privacy interest?

10          THE COURT:  Okay.  So this will be sealed; correct?

11          MS. MOE:  Yes, your Honor.

12          THE COURT:  I do have a request for lengthy sealed

13      proceedings that we do them in the robing room because of the

14      physical taxing on the court reporter.  So if you think it will

15      be short, we can do it here; if it will be more than five

16      minutes, we should do it in the robing room.

17          MS. MOE:  Yes, your Honor.

18          I believe this will be brief.

19          THE COURT:  Okay.  All right.

20          (Pages 1440 to 1443 SEALED)

21          (Continued on next page)

22

23

24

25

LC7VMAX1                          Meder - direct

1          (In open court)

2          THE COURT:  All right.  Just waiting to hear from

3    Ms. Williams, if we have all our jurors.

4          Bring in the jury.

5          Can we have the witness back on the stand.

6          MS. POMERANTZ:  Yes, your Honor.

7          THE COURT:  Thank you.

8          (Jury present)

9          THE COURT:  Good morning, members of the jury.  Nice

10   to see you.  Thank you again for being here right on time so we

11   can get started.  I appreciate it.

12         Ms. Meder, you may remove your mask.  And I remind you

13   you are under oath.

14         Ms. Comey, you may continue with your direct

15   examination.

16         MS. COMEY:  Thank you, your Honor.

17    KIMBERLY MEDER,

18       called as a witness by the Government,

19       having been previously duly sworn, testified as follows:

20   DIRECT EXAMINATION (continued)

21   BY MS. COMEY:

22   Q.  Good morning.

23   A.  Good morning.

24   Q.  I'd like to pick up where we left off yesterday.

25         I think you had Government Exhibit 1101 in front of

1    you to use as an aid.  Do you have that in front of you now?

2    A.  Yes.

3    Q.  And then we were talking about what was marked for

4    identification as Government Exhibit 304.

5         MS. COMEY:  Ms. Drescher, will you please pull that up

6    for the witness, the parties, and the Court.

7    Q.  Ms. Meder, do you recognize this?

8    A.  Yes.

9    Q.  What is it?

10   A.  It's a photo from a CD I reviewed from the Epstein and

11   Maxwell investigation.

12   Q.  And what was the 1B number that that CD was contained

13   under?

14        THE COURT:  I'm sorry, could you pull the microphone a

15   little bit closer.  Thank you.  Go ahead.

16   A.  1B26.

17   Q.  And have you familiarized yourself with the physical

18   appearance of Ghislaine Maxwell and Jeffrey Epstein during this

19   investigation?

20   A.  Yes.

21   Q.  Who do we see in this photograph?

22   A.  Ghislaine Maxwell and Jeffrey Epstein.

23        MS. COMEY:  Your Honor, the government offers Exhibit

24   304.

25        MS. MENNINGER:  Subject to the prior objections, your

LC7VMAX1                         Meder - direct

1    Honor, no further objection.

2              THE COURT:  Okay.  Thank you.

3              GX-304 is admitted.  You may publish.

4              (Government's Exhibit 304 received in evidence)

5              MS. COMEY:  Thank you, your Honor.

6    Q.  And while this is published for the jury, could you please

7    tell us who's on the left and who's on the right?

8    A.  On the left, Ghislaine Maxwell; on the right, Jeffrey

9    Epstein.

10             MS. COMEY:  We can take that down.

11             Thank you, Ms. Drescher.

12             Can we now please pull up for the witness, the

13   parties, and the Court Government Exhibit 306.

14   Q.  Do you recognize this?

15   A.  Yes.

16   Q.  What is it?

17   A.  It's a photo from a CD I reviewed from the Epstein and

18   Maxwell investigation.

19   Q.  And under what 1B number was that CD logged?

20   A.  1B26.

21   Q.  Who's in this photograph?

22   A.  Ghislaine Maxwell.

23             MS. COMEY:  Your Honor, the government offers this in

24   evidence.

25             MS. MENNINGER:  No further objection.

LC7VMAX1                         Meder - direct

1                    THE COURT:  Thank you.

2                    GX-306 is admitted.  You may publish.

3                    (Government's Exhibit 306 received in evidence)

4                    MS. MENNINGER:  And your Honor I will have the same

5       for the rest of these just to save everyone's time.

6                    THE COURT:  Understand.

7                    And your objections are preserved.

8                    MS. COMEY:  May we publish, your Honor?

9                    THE COURT:  You may.

10                   MS. COMEY:  Thank you.

11                   We can take that down.  Thank you, Ms. Drescher.

12                   Let's go now please to what's been marked for

13      identification as Government Exhibit 307.  Ms. Drescher, will

14      you please pull that up for the witness, the Court, and the

15      parties.

16      Q.  Do you recognize this?

17      A.  Yes.

18      Q.  What is it?

19      A.  It's a photo from a CD I reviewed from the Epstein and

20      Maxwell investigation.

21      Q.  What 1B number was that CD logged under?

22      A.  1B26.

23      Q.  And who do we see in this photograph?

24      A.  Jeffrey Epstein and Ghislaine Maxwell.

25                   MS. COMEY:  The government offers this in evidence.

LC7VMAX1                          Meder - direct

 1            THE COURT:  GX-307 is admitted.

 2            (Government's Exhibit 307 received in evidence)

 3            MS. COMEY:  May we publish?

 4            THE COURT:  You may.

 5            MS. COMEY:  Thank you, your Honor.

 6  Q.  Who do we see on the left and the right?

 7  A.  On the left, Jeffrey Epstein; on the right, Ghislaine

 8  Maxwell.

 9            MS. COMEY:  Ms. Drescher, would you now please pull up

10  what's been marked for identification as Government Exhibit 320

11  just for the Court, the parties, and the witness.

12  Q.  Do you recognize this?

13  A.  Yes.

14  Q.  What is it?

15  A.  It's a photo from a CD I reviewed from the Epstein and

16  Maxwell investigation.

17  Q.  And under what 1B number was that CD?

18  A.  1B75.

19  Q.  Who's in this photograph?

20  A.  Jeffrey Epstein and Ghislaine Maxwell.

21            MS. COMEY:  Your Honor, the government offers this in

22  evidence.

23            THE COURT:  Without further objection, GX-320 is

24  admitted.

25            (Government's Exhibit 320 received in evidence)

LC7VMAX1                        Meder – direct

1       MS. COMEY:  May we publish?

2       THE COURT:  You may.

3       MS. COMEY:  Thank you, your Honor.

4   Q.  Who do we see on the left and the right in this photograph?

5   A.  On the left, Jeffrey Epstein; on the right, Ghislaine

6   Maxwell.

7       MS. COMEY:  We can take that down.  Thank you.

8       Let's go now, please, to Government Exhibit 321.

9       Ms. Drescher, would you please pull that up for the

10  witness, the parties, and the Court.

11  Q.  Do you recognize this?

12  A.  Yes.

13  Q.  What is it?

14  A.  It's a photo from a CD I reviewed from the Epstein and

15  Maxwell investigation.

16  Q.  What 1B number was that CD logged under?

17  A.  1B75.

18  Q.  Who's in this photograph?

19  A.  Ghislaine Maxwell and Jeffrey Epstein.

20      MS. COMEY:  The government offers this in evidence,

21  your Honor.

22      THE COURT:  Consistent with the Court's rulings,

23  GX-321 is admitted.

24      (Government's Exhibit 321 received in evidence)

25      MS. COMEY:  May we publish please, your Honor.

LC7VMAX1                        Meder - direct

1          THE COURT:  You may.

2          MS. COMEY:  Thank you.

3     Q.  Who do we see on the left and who do we see on the right?

4     A.  On the left, Ghislaine Maxwell; on the right, Jeffrey

5     Epstein.

6          MS. COMEY:  Ms. Drescher, let's go now, please, to

7     Government Exhibit 322 for the witness, the parties, and the

8     Court.

9     Q.  Do you recognize this?

10    A.  Yes.

11    Q.  What is it?

12    A.  It's a photo from a CD I reviewed from the Epstein and

13    Maxwell investigation.

14    Q.  What 1B number was that CD logged under?

15    A.  1B78.

16    Q.  Who's in this photograph?

17    A.  Jeffrey Epstein and Ghislaine Maxwell.

18         MS. COMEY:  Your Honor, the government offers this in

19    evidence.

20         THE COURT:  Okay.  And I've ruled.  GX-322 may be

21    admitted.

22         (Government's Exhibit 322 received in evidence)

23         THE COURT:  And you may publish.

24         MS. COMEY:  Thank you, your Honor.

25    Q.  Who's on the left and who is on the right?

1  A.  On the left, Jeffrey Epstein; on the right, Ghislaine

2  Maxwell.

3       MS. COMEY:  Ms. Drescher, let's go now please to

4  Government Exhibit 324 just for the witness, the parties, and

5  the Court.

6  Q.  Do you recognize this?

7  A.  Yes.

8  Q.  What is it?

9  A.  It's a photo from a CD I reviewed from the Epstein and

10 Maxwell investigation.

11 Q.  Under what 1B number was that CD logged?

12 A.  1B19.

13 Q.  Who's in this photograph?

14 A.  Jeffrey Epstein and Ghislaine Maxwell.

15      MS. COMEY:  Your Honor, the government offers this in

16 evidence.

17      THE COURT:  Consistent with my ruling, GX-324 is

18 admitted.  You may publish.

19      (Government's Exhibit 324 received in evidence)

20      MS. COMEY:  Thank you, your Honor.

21 Q.  Who's on the left and who's on the right?

22 A.  On the left, Jeffrey Epstein; on the right, Ghislaine

23 Maxwell.

24      MS. COMEY:  Ms. Drescher, let's go now to Government

25 Exhibit 325, please, for the Court, the parties, and the

LC7VMAX1                          Meder - direct

1   witness.

2   Q.  Do you recognize this?

3   A.  Yes.

4   Q.  What is it?

5   A.  It's a photo from a CD I reviewed from the Epstein and

6   Maxwell investigation.

7   Q.  Under what 1B number was that CD logged?

8   A.  1B75.

9   Q.  Who's in this photograph?

10  A.  Ghislaine Maxwell and Jeffrey Epstein.

11          MS. COMEY:  Your Honor, the government offers this in

12  evidence.

13          THE COURT:  GX-325 is admitted.  You may publish.

14          (Government's Exhibit 325 received in evidence)

15          MS. COMEY:  Thank you, your Honor.

16  Q.  Who is on the left and who is on the right?

17  A.  On the left, Ghislaine Maxwell; on the right, Jeffrey

18  Epstein.

19          MS. COMEY:  Ms. Drescher, we can now pull up what's

20  been marked for identification as Government Exhibit 333,

21  please, for the parties, the Court, and the witness.

22  Q.  Do you recognize this?

23  A.  Yes.

24  Q.  What is it?

25  A.  It's a photo from a CD I reviewed from the Epstein and

LC7VMAX1                        Meder – direct

1    Maxwell investigation.

2    Q.  Under what 1B number was the CD logged?

3    A.  1B78.

4    Q.  Who is in this photograph?

5    A.  Jeffrey Epstein and Ghislaine Maxwell.

6            MS. COMEY:  Your Honor, the government offers this in

7    evidence.

8            THE COURT:  And again, consistent with my rulings,

9    GX-333 is admitted.  You may publish.

10           (Government's Exhibit 333 received in evidence)

11           MS. COMEY:  Thank you, your Honor.

12   Q.  Who is on the left and who is on the right?

13   A.  On the left, Jeffrey Epstein; on the right, Ghislaine

14   Maxwell.

15           MS. COMEY:  Ms. Drescher, let's now pull up, please,

16   Government Exhibit 337 for the Court, the witness, and the

17   parties.

18   Q.  Do you recognize this?

19   A.  Yes.

20   Q.  What is it?

21   A.  It's a photo from a CD I reviewed from the Epstein and

22   Maxwell investigation.

23   Q.  Under what 1B number was this CD logged?

24   A.  1B63.

25   Q.  Who's in this photograph?

LC7VMAX1                          Meder - direct

1    A.   Ghislaine Maxwell.

2              MS. COMEY:  Your Honor, the government offers this in

3    evidence.

4              THE COURT:  And again, GX-337 is admitted consistent

5    with my rulings.  You may publish.

6              (Government's Exhibit 337 received in evidence)

7              MS. COMEY:  Thank you, your Honor.

8              Ms. Drescher, let's go now, please, to Government

9    Exhibit 340 for the witness, the parties, and the Court.

10   Q.   Do you recognize this?

11   A.   Yes.

12   Q.   What is it?

13   A.   It's a photo from a CD I reviewed from the Epstein and

14   Maxwell investigation.

15   Q.   Under what 1B number was that CD logged?

16   A.   1B63.

17   Q.   Who is in this photograph?

18   A.   Ghislaine Maxwell.

19             MS. COMEY:  Your Honor, the government offers this in

20   evidence.

21             THE COURT:  Consistent with my rulings, GX-340 is

22   admitted.  You may publish.

23             (Government's Exhibit 340 received in evidence)

24             MS. COMEY:  Thank you, your Honor.

25             Ms. Drescher, let's go now, please, to Government

LC7VMAX1                        Meder - direct

1    Exhibit 341 for the witness, the Court, and the parties.

2    Q.  Do you recognize this?

3    A.  Yes.

4    Q.  What is it?

5    A.  It's a photo from a CD I reviewed from the Epstein and

6    Maxwell investigation.

7    Q.  Under what 1B number was that CD logged?

8    A.  1B63.

9    Q.  And who are the people we see on the left and in the center

10   in this photograph?

11   A.  On the left, Ghislaine Maxwell; in the center, Jeffrey

12   Epstein.

13          MS. COMEY:  Your Honor, the government offers this in

14   evidence.

15          THE COURT:  Consistent with my rulings, GX-341 is

16   admitted.

17          (Government's Exhibit 341 received in evidence)

18          MS. COMEY:  May we publish, your Honor?

19          THE COURT:  You may.

20   Q.  And will you tell us one more time who's on the left?

21   A.  Ghislaine Maxwell.

22   Q.  And who's in the center?

23   A.  Jeffrey Epstein.

24          MS. COMEY:  Let's go now, please, Ms. Drescher, to

25   Government Exhibit 342 for the witness, the parties, and the

LC7VMAX1                           Meder - direct

1    Court.

2    Q.  Do you recognize this?

3    A.  Yes.

4    Q.  What is it?

5    A.  It's a photo from a CD I reviewed from the Epstein and

6    Maxwell investigation.

7    Q.  Under what 1B number was that CD logged?

8    A.  1B63.

9    Q.  Who is in this photograph?

10   A.  Ghislaine Maxwell and Jeffrey Epstein.

11          MS. COMEY:  Your Honor, the government offers this in

12   evidence.

13          THE COURT:  I don't think we discussed this one

14   yesterday, so if you want to --

15          MS. MENNINGER:  Subject to the same objection, your

16   Honor.

17          THE COURT:  Understood.  GX-342 is admitted.

18          (Plaintiff's Exhibit 342 received in evidence)

19          THE COURT:  You may publish.

20   Q.  Who is on the left?

21   A.  Ghislaine Maxwell.

22   Q.  Who is on the right?

23   A.  Jeffrey Epstein.

24          MS. COMEY:  Ms. Drescher, let's go now, please, to

25   Government Exhibit 343 for the witness, the Court, and the

1   parties.

2   Q.  Do you recognize this?

3   A.  Yes.

4   Q.  What is it?

5   A.  It's a photo from a CD I reviewed from the Epstein and

6   Maxwell investigation.

7   Q.  Under what 1B number was that CD logged?

8   A.  1B63.

9   Q.  Who is in this photograph?

10  A.  Ghislaine Maxwell and Jeffrey Epstein.

11            MS. COMEY:  Your Honor, the government offers this in

12  evidence.

13            MS. MENNINGER:  Same objection and cumulative, your

14  Honor.

15            THE COURT:  Understood.  GX-343 is admitted.

16            (Government's Exhibit 343 received in evidence)

17            THE COURT:  Let me just ask, Ms. Comey, are there

18  other ones I didn't see yesterday?

19            MS. COMEY:  I don't believe so, your Honor.  I didn't

20  realize we had not discussed these yesterday.

21            THE COURT:  My presumption is that there won't be, and

22  so we'll move on.

23            MS. COMEY:  May we publish, your Honor?

24            THE COURT:  Yes, you may.

25            MS. COMEY:  Thank you.

LC7VMAX1                       Meder - direct

1   BY MS. COMEY:

2   Q.  Who is on the left and who is on the right?

3   A.  On the left, Ghislaine Maxwell; on the right, Jeffrey

4   Epstein.

5           MS. COMEY:  Let's go now to what's been marked for

6   identification as Government Exhibit 347, please.

7   Q.  Do you recognize this?

8   A.  Yes.

9   Q.  What is it?

10  A.  It's a photo from a CD I reviewed from the Epstein and

11  Maxwell investigation.

12  Q.  Under what 1B number was this CD logged?

13  A.  1B19.

14  Q.  Who is in this photograph?

15  A.  Jeffrey Epstein and Ghislaine Maxwell.

16          MS. COMEY:  Your Honor, the government offers this in

17  evidence.

18          THE COURT:  Consistent with my ruling, GX-347 is

19  admitted.  You may publish.

20          (Government's Exhibit 347 received in evidence)

21          MS. COMEY:  Thank you, your Honor.

22  Q.  Who is on the left and who is on the right?

23  A.  On the left, Jeffrey Epstein; on the right, Ghislaine

24  Maxwell.

25          MS. COMEY:  Let's go now, please, to what's been

LC7VMAX1                          Meder – direct

1   marked for identification as Government Exhibit 348.

2   Q.  Do you recognize this?

3   A.  Yes.

4   Q.  What is it?

5   A.  It's a photo from a CD I reviewed from the Epstein and

6   Maxwell investigation.

7   Q.  Under what 1B number was that CD logged?

8   A.  1B19.

9   Q.  Who is in this photograph?

10  A.  Ghislaine Maxwell and Jeffrey Epstein.

11          MS. COMEY:  Your Honor, the government offers this in

12  evidence.

13          THE COURT:  Consistent with my ruling, GX-348 is

14  admitted.  You may publish.

15          (Government's Exhibit 348 received in evidence)

16  BY MS. COMEY:

17  Q.  Who is on the left and who is on the right?

18  A.  On the left, Ghislaine Maxwell; on the right, Jeffrey

19  Epstein.

20          MS. COMEY:  Let's go now please to Government Exhibit

21  314 for the witness, the Court, and the parties, Ms. Drescher.

22  Q.  Do you recognize this?

23  A.  Yes.

24  Q.  What is it?

25  A.  It's a photo from a CD I reviewed from the Epstein and

LC7VMAX1                           Meder - direct

1    Maxwell investigation.

2    Q.  Under what 1B number was the CD logged?

3    A.  1B75.

4    Q.  Who is in this photograph?

5    A.  Ghislaine Maxwell and Jeffrey Epstein.

6              MS. COMEY:  The government offers this in evidence,

7    your Honor.

8              THE COURT:  Consistent with my ruling, GX-314 is

9    admitted.  You may publish.

10             (Government's Exhibit 314 received in evidence)

11   Q.  Who is on the left, who's on the right?

12   A.  On the left, Ghislaine Maxwell; on the right, Jeffrey

13   Epstein.

14             MS. COMEY:  Let's go now, please, Ms. Drescher, to

15   Government Exhibit 317 for the witness, the Court, and the

16   parties.

17   Q.  Do you recognize this?

18   A.  Yes.

19   Q.  What is it?

20   A.  It's a photo from a CD I reviewed from the Epstein and

21   Maxwell investigation.

22   Q.  Under what 1B number was the CD logged?

23   A.  1B75.

24   Q.  Who is in this photograph?

25   A.  Ghislaine Maxwell and Jeffrey Epstein.

LC7VMAX1                          Meder - direct

1          MS. COMEY:  The government offers this in evidence,

2     your Honor.

3          THE COURT:  Consistent with my ruling, GX-317 is

4     admitted.  You may publish.

5          (Government's Exhibit 317 received in evidence)

6     Q.  Who is on the left and who is on the right?

7     A.  On the left, Ghislaine Maxwell; on the right, Jeffrey

8     Epstein.

9          MS. COMEY:  Let's go now, please, Ms. Drescher, to

10    Government Exhibit 318.

11    Q.  Do you recognize this?

12    A.  Yes.

13    Q.  What is it?

14    A.  It's a photo from a CD I reviewed from the Epstein and

15    Maxwell investigation.

16    Q.  Under what 1B number was that CD logged?

17    A.  1B75.

18    Q.  Who is in this photograph?

19    A.  Ghislaine Maxwell and Jeffrey Epstein.

20         MS. COMEY:  Your Honor, the government offers this in

21    evidence.

22         THE COURT:  Consistent with my ruling, GX-318 is

23    admitted.  You may publish.

24         (Government's Exhibit 318 received in evidence)

25         MS. COMEY:  Thank you, your Honor.

LC7VMAX1                      Meder - direct

1    Q.  Once that's published, would you please tell us who's on
2    the left and who's on the right.
3    A.  On the left, Ghislaine Maxwell; on the right, Jeffrey
4    Epstein.
5         MS. COMEY:  Thank you, Ms. Drescher.  We can take that
6    down.
7    Q.  The last two exhibits I want to talk about are in the
8    binder up by you at the podium, Ms. Meder.  I want to start
9    with what's been marked for identification as Government
10   Exhibit 313.  Would you please turn to that in your binder.
11   A.  Yes.
12   Q.  Do you recognize that?
13   A.  Yes.
14   Q.  What is it?
15   A.  It's a photo from a CD I reviewed from the Epstein and
16   Maxwell investigation.
17   Q.  Under what 1B number was the CD logged?
18   A.  1B75.
19   Q.  And who is in this photograph?
20   A.  Ghislaine Maxwell and Jeffrey Epstein.
21        MS. COMEY:  Your Honor, the government offers this
22   exhibit under seal to protect the privacy of a party.
23        THE COURT:  No objection?
24        MS. MENNINGER:  No further objection.
25        THE COURT:  No further objection.

LC7VMAX1                          Meder - direct

```
 1              No objection to sealing, I presume.

 2              MS. MENNINGER:  Correct.

 3              THE COURT:  Okay.  GX-313 is admitted under seal to

 4    protect the privacy of a party.

 5              (Government's Exhibit 313 received in evidence)

 6              MS. COMEY:  And, your Honor, I think I'll proceed to

 7    one more exhibit we'll propose under seal and then ask the

 8    jurors to take a look in their binders, if that's all right

 9    with your Honor.

10              THE COURT:  That's okay with me.

11              MS. COMEY:  Would you please now turn in your binder

12    to what's been marked for identification as Government Exhibit

13    332.

14    Q.  Do you recognize this?

15    A.  Yes.

16    Q.  What is it?

17    A.  It's a photo from a CD I reviewed from the Epstein and

18    Maxwell investigation.

19    Q.  Under what 1B number was that CD logged?

20    A.  1B26.

21    Q.  During the course of this investigation, have you

22    familiarized yourself with the physical appearance of Virginia

23    Roberts?

24    A.  Yes.

25    Q.  Who is in this photograph?
```

LC7VMAX1                          Meder - cross

1   A.  Virginia Roberts.

2                MS. COMEY:  Your Honor, the government offers this

3   exhibit under seal to protect the privacy of a third party.

4                MS. MENNINGER:  No further objection, your Honor.

5                THE COURT:  Okay.  332 is admitted, and it's admitted

6   under seal to protect the privacy of the third party.

7                (Government's Exhibit 332 received in evidence)

8                MS. COMEY:  Your Honor, at this time I would ask that

9   the jurors be permitted to look in their binders at what's now

10  been admitted under seal as Government Exhibit 313 and 332.

11               THE COURT:  Okay.  Jurors, you may look at GX-313 and

12  GX-332.  And after you've viewed them, please place your

13  binders back on the ground.

14               MS. COMEY:  And, your Honor, once the jurors have

15  reviewed those exhibits, I have no further questions.

16               THE COURT:  Okay.

17               All right.  Ms. Menninger, you may set up for cross.

18               All right.  Thank you.

19  CROSS-EXAMINATION

20  BY MS. MENNINGER:

21  Q.  Good morning, Ms. Meder.  Is that how you pronounce it?

22  A.  Yes.

23  Q.  You were testifying about some photographs that you copied

24  from CDs onto a computer; correct?

25  A.  Correct.

LC7VMAX1                        Meder – cross

1   Q.  And then you reviewed those photographs; correct?

2   A.  Correct.

3   Q.  And some of those photographs were shown to the jury today;

4   correct?

5   A.  Yes.

6   Q.  Those CDs that you copied photographs from onto a computer,

7   those CDs were found all around the Epstein home; correct?

8           MS. COMEY:  Objection.  Foundation.

9           THE COURT:  Sustained.

10  Q.  Did you prepare for the government a location report for

11  the exhibits that were just shown to the jury?

12  A.  I prepared a report showing the evidence item number of

13  where it came from.

14  Q.  Within Mr. Epstein's house; correct?

15  A.  Yes.

16  Q.  So you found which CDs were found in which room of

17  Mr. Epstein's house; correct?

18  A.  Yes, according to the evidence item numbers.

19  Q.  Right.  So you weren't at the house when the CDs were

20  seized, right?

21  A.  I was on both searches.

22  Q.  You were on both searches?

23  A.  I was.

24  Q.  Okay.  And so you personally compared the numbers of these

25  CDs to where they were located in Mr. Epstein's house, right?

LC7VMAX1                         Meder - cross

1    A.  I confirmed the CD with the 1B numbers.

2    Q.  And the 1B number was tied to a room in the house?

3    A.  Yes.

4    Q.  Okay.  You did that work for the government, right?

5    A.  I confirmed it.

6    Q.  And you gave that work product to the government?

7    A.  Correct.

8    Q.  And so you know from the work that you did and gave to the

9    government that some of these CDs were found in a closet on the

10   third floor, for example?

11   A.  I don't recall exact locations.  I know the 1B numbers as

12   corresponding to the testimony today.  And I do not recall

13   exact locations in the house.

14   Q.  Do you know whether CDs were found in the third floor

15   closet?

16   A.  I know they were found in the house.  Again, I don't

17   remember the exact locations.

18   Q.  Okay.  So just from memory, you're not remembering where a

19   particular CD was found?

20   A.  Correct.

21   Q.  Okay.  And you do know that CDs were found around the

22   house?

23   A.  Yes.

24   Q.  And you know that the CDs were found in different floors

25   and in different places, different rooms?

LC7VMAX1                         Meder - cross

1    A.   Yes.

2    Q.   None of the photos that you've been talking about, to your

3    knowledge, were displayed in the house, right?

4    A.   I don't recall.

5    Q.   They just came off of a CD?

6    A.   I don't recall.

7    Q.   Well, you've just testified about these CDs and taking the

8    photos off the CDs, right?

9    A.   Correct.

10   Q.   Okay.  You didn't testify about any photos that were taken

11   off of a wall?

12   A.   Correct.

13              (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

LC7Cmax2                         Meder - cross

1    BY MS. MENNINGER:

2    Q.  And all of the CDs, to your knowledge, were seized during

3    the two searches that you were part of; correct?

4    A.  Yes.

5    Q.  And that was in July of 2019; right?

6    A.  Yes.

7    Q.  As a part of this project, you reviewed a substantial

8    number of CDs; right?

9    A.  Yes.

10   Q.  Do you know approximately how many CDs you reviewed?

11   A.  I do not.

12   Q.  A hundred?

13   A.  There were probably hundreds, yes.

14   Q.  And on those hundreds of CDs, there were thousands of

15   photographs; right?

16   A.  Collectively, yes.

17   Q.  There were more than 10,000 photographs; correct?

18   A.  I don't know specific numbers.

19            MS. MENNINGER:  Your Honor, may I approach the

20   witness?  Actually, if we can just show the witness and the

21   Court, and I'll alert counsel to the number, 3531-12.

22            MS. COMEY:  We don't have it yet.

23            MS. MENNINGER:  I have a hard copy.

24            THE COURT:  Okay.

25            MS. MENNINGER:  May I approach, your Honor?

LC7Cmax2                          Meder - cross

```
 1              THE COURT:  You may.
 2    BY MS. MENNINGER:
 3    Q.  Ms. Meder, do you recognize the handwriting on 3531-12?
 4    A.  Yes.
 5    Q.  Is that your handwriting?
 6    A.  It is.
 7    Q.  Are these some of your notes that you took when you were
 8    doing this photograph review?
 9    A.  Yes.
10    Q.  And if you could just look at a couple of the pages and
11    tell me whether it refreshes your recollection about the number
12    of photographs that you reviewed.
13    A.  Yes.
14    Q.  Can you tell the jury now about how many photographs you
15    think you reviewed?
16    A.  Several thousand.
17    Q.  In one set, there was more than 20,000, is that right, on
18    page 2?
19    A.  I'm not seeing the 20,000.
20    Q.  In the box in the middle of the page on page 2, it's on the
21    backside.
22    A.  Yes.
23    Q.  On another set, there was somewhere between four and
24    ten thousand; is that right?
25    A.  Yes.
```

LC7Cmax2                          Meder - cross

1   Q.  And in another set, there was about 18,000, on page 4?

2   A.  That might have been the total.

3   Q.  Okay.  So not the four to ten, but the eighteen?

4   A.  Correct.

5   Q.  So eighteen and twenty thousand in a couple different sets

6   that you have reflected in these notes; right?

7   A.  Yes.

8   Q.  And you remember it took a substantial period of time for

9   you to go through all those photographs; right?

10  A.  Yes.

11  Q.  Your job was to copy the photos from the CDs to the

12  computer and then to review them; right?

13  A.  Yes.

14  Q.  You don't have any personal knowledge of how the photos got

15  onto the CDs, for example?

16  A.  No.

17  Q.  You don't have any personal knowledge of who took the

18  photos that you've been talking about; right?

19  A.  Well, in some of the black binders, there are initials

20  written on the bottom of pages.

21  Q.  But you don't know what those initials mean from personal

22  knowledge; correct?

23  A.  You can infer based on how they were labeled on the disc.

24  Q.  You don't have personal knowledge, do you?

25  A.  No.

LC7Cmax2                         Meder - cross

```
1    Q.  You don't have personal knowledge about when these photos
2    were taken; correct?
3    A.  On the disc, there are dates labeled.
4    Q.  But you don't know if those dates are accurate from
5    personal knowledge, do you?
6    A.  I'm not a computer expert, so I wouldn't be able to confirm
7    it, but they are written on the CDs.
8    Q.  There are notes on the CDs and you don't know if they're
9    accurate; correct?
10   A.  Correct.
11   Q.  You don't know whether the photos were altered by anyone
12   before they went onto the CD?
13   A.  Correct.
14   Q.  You don't know whether those photos on the CD were simply
15   sent to Epstein or someone else and then captured on a CD;
16   correct?
17   A.  Correct.
18   Q.  You don't know whether any of those photos are a correct
19   and accurate representation of any particular fact; correct?
20   A.  Correct.
21           MS. MENNINGER:  No further questions.  Thank you.
22           THE COURT:  Ms. Comey.
23           MS. COMEY:  Briefly, your Honor.  Thank you.  May I
24   inquire?
25           THE COURT:  You may.
```

LC7Cmax2                          Meder - redirect

1    REDIRECT EXAMINATION

2    BY MS. COMEY:

3    Q.  Ms. Meder, you were mentioning some initials that you saw

4    on the black binders.  Could you tell us what you saw?

5              MS. MENNINGER:  Objection.  It's hearsay, your Honor.

6    The labels on the binders are hearsay.

7              MS. COMEY:  I'm just asking her about the initials

8    that were elicited during cross examination.

9              MS. MENNINGER:  I did not elicit the hearsay, your

10   Honor.  I elicited that there were initials and not what they

11   were, because she just testified she does not know whether

12   those initials are accurate.

13             THE COURT:  Sustained.

14   BY MS. COMEY:

15   Q.  You also mentioned that you saw dates on CDs.  Could you

16   tell us what dates you remember seeing on the CDs you reviewed?

17             MS. MENNINGER:  Same objection, your Honor.

18             THE COURT:  Sustained.

19             MS. COMEY:  No further questions.

20             THE COURT:  Thank you.  Nothing further, correct,

21   Ms. Menninger?

22             MS. MENNINGER:  Not for this witness.  Thank you.

23             THE COURT:  Ms. Meder, you may step down.  You are

24   excused.

25             (Witness excused)

LC7Cmax2                        Flatley – direct

1              Ms. Comey, the government may call its next witness.

2              MS. COMEY:  Your Honor, may I retrieve our exhibit?

3              THE COURT:  Yes.

4              MS. POMERANTZ:  The government calls Stephen Flatley.

5              THE COURT:  Stephen Flatley may come forward.

6    STEPHEN FLATLEY,

7         called as a witness by the Government,

8         having been duly sworn, testified as follows:

9              THE COURT:  You may be seated.  Please remove your

10   mask and state and spell your name for the record.

11             THE WITNESS:  Sure.  It's Stephen, S-t-e-p-h-e-n,

12   Flatley, F-l-a-t-l-e-y.

13             THE COURT:  Ms. Pomerantz, you may inquire.

14             MS. POMERANTZ:  Thank you, your Honor.

15   DIRECT EXAMINATION

16   BY MS. POMERANTZ:

17   Q.  Good morning.

18   A.  Good morning.

19   Q.  Where do you work?

20   A.  I work for the Federal Bureau of Investigation, New York

21   division.

22   Q.  Is that also known as the FBI?

23   A.  Yes, it is.

24   Q.  Do you work any particular unit at the FBI?

25   A.  Yes.  I work in the Computer Analysis Response Team, or

LC7Cmax2                          Flatley - direct

1    CART.

2    Q.  And what is CART?

3    A.  CART is responsible for collecting and processing digital

4    evidence.

5    Q.  What is your title in the CART team?

6    A.  I am the CART coordinator.

7    Q.  And what does that mean?

8    A.  That means I mentor other people and handle the day-to-day

9    activities.

10   Q.  Do you have any other roles on the CART team?

11   A.  I am a senior examiner.  I am also a field instructor from

12   Quantico.

13   Q.  You mentioned that you're an examiner.  What kind of

14   examiner are you?

15   A.  I am a forensic -- digital forensic examiner.

16   Q.  How long have you been a forensic digital examiner for the

17   FBI on the CART team?

18   A.  16 and a half years.

19   Q.  What did you do prior to joining the FBI?

20   A.  I was a computer consultant and programmer.

21           MS. MENNINGER:  Your Honor, I think since we're just

22   doing fact testimony that any more than this would be

23   inappropriate under 702.

24           THE COURT:  Okay.  You can move on.  Thank you.

25           MS. POMERANTZ:  Thank you, your Honor.

LC7Cmax2                    Flatley - direct

1    BY MS. POMERANTZ:

2    Q.   You mentioned digital evidence.   What do you mean by

3    digital evidence?

4    A.   Things like computers, thumb drives, CDs, anything that

5    stores information in a digital format.

6    Q.   Taking a step back, what does it mean to forensically

7    examine an electronic device?

8    A.   Basically we just categorize and organize the data so it's

9    easier to look through.

10   Q.   Mr. Flatley, what is considered a computer?

11   A.   To be considered a computer, a device has to have four

12   characteristics.   It has to take input, it has to give output,

13   it has to have some kind of processor, and have some kind of

14   storage.

15   Q.   Where is information stored on a computer?

16   A.   On your average computer, it's stored on the hard drive.

17   Q.   What is a hard drive?

18   A.   It's an electromechanical device for storing digital data.

19   Q.   When you analyze digital evidence, what, if anything, do

20   you know about the case?

21   A.   Usually nothing.

22   Q.   Mr. Flatley, did there come a time when you examined

23   digital evidence in this case?

24   A.   Yes, there did.

25   Q.   In approximately what year or years?

LC7Cmax2                         Flatley - direct

1   A.  It began in 2019.

2            MS. POMERANTZ:  Your Honor, I would like to show the

3   witness what's been marked for identification as Government

4   Exhibit 54.

5            THE COURT:  Okay.

6            MS. POMERANTZ:  Thank you, your Honor.  I'm going to

7   show it to defense counsel.

8            THE COURT:  Thank you.

9   BY MS. POMERANTZ:

10  Q.  Mr. Flatley, do you recognize this?

11  A.  Yes, I do.

12  Q.  What is it?

13  A.  It's one of the hard drives I examined in this case.

14  Q.  What is the NYC number?

15  A.  The NYC number here, NYC024350.  It's a unique identifier

16  that I place on different pieces of evidence.  Every piece of

17  evidence gets its own NYC number.

18  Q.  How do you recognize Government Exhibit 54 as a device you

19  examined?

20  A.  It has my initials on it and it has the case number and the

21  date.

22  Q.  What was the first step you took in examining Government

23  Exhibit 54?

24  A.  When I received government's 54, I plugged it into a write

25  blocker --

LC7Cmax2                    Flatley - direct

Q.  I'm sorry, Mr. Flatley.  Just to take a step back, when you

first get it, do you mark it in some way?

A.  Yes.  I'm sorry.  The first thing I do is put the NYC

number on it and the sticker with my initials.

Q.  After marking it, do you create an image of the drive?

A.  Yes.  In this case, I had to inspect it to see what kind of

data was on it, to see if it was already an image or if it was

a clone so that if it was a clone, I would have to image it.

If it was an image, I would just have to copy it.

Q.  Did you end up making an image of this device?

A.  Yes, I did.

Q.  What does it mean to make an image of a device?

          MS. MENNINGER:  Your Honor, this is outside the 702

disclosure.

          THE COURT:  Overruled.

A.  So an image is a bit-for-bit copy of the media from the

very beginning to the very end.  We take those -- that copy and

we write it into several different files and then that way it

containerizes the data inside it so we don't accidentally mess

it up.

Q.  Did you image the drive that's been marked for

identification that's been marked as Government Exhibit 54?

A.  Yes, I did.

Q.  Can you explain to the jury how you made or what tools you

used to make a forensic image of the hard drive?

LC7Cmax2                        Flatley - direct

1    A.   Sure.   There is a possibility of three different tools that
2    we can use.   One is a physical piece of equipment called a TX1
3    disc duplicator --
4    Q.   Mr. Flatley, sorry to interrupt.   In this case, what did
5    you use here?
6    A.   I used the TX1 disc duplicator.
7    Q.   Why not just examine the drive itself in this case,
8    Government Exhibit 54?
9    A.   Hard drives are a little fragile, especially this one, it's
10   pretty old.   The fact that we spin it up, that may be the last
11   time it ever spins.   So we always make a copy and we work off
12   the copy so that we have our data.   We can make arguably
13   infinite copies of that data and prove that it's the same data.
14   So that's what we do.
15   Q.   What, if anything, do you do to determine that the image
16   you made from Government Exhibit 54 matched the data on
17   Government Exhibit 54?
18   A.   We run a hash algorithm, which is basically a math problem
19   against the data that we copied and the data from the original,
20   and if the hashes match, then the data is identical, and the
21   data was in this case.
22   Q.   After you made an image of Government Exhibit 54, what do
23   you do next?
24   A.   After the 54 was imaged, I then placed it through our
25   software, AccessData's lab to categorize and organize the data.

1    Q.   What is AccessData's lab?

2    A.   It's a piece of forensic software.

3    Q.   Did there come a time when you were asked to review the

4    image you made of Government Exhibit 54?

5    A.   Yes, there did.

6             MS. POMERANTZ:   Ms. Drescher, could we please pull up

7    for the witness, the Court, and the parties what's been marked

8    for identification as Government Exhibit 419.

9    Q.   Mr. Flatley, do you recognize this?

10   A.   Yes, I do.

11   Q.   What is it?

12   A.   It is a piece of the software registry information for

13   government's 54.

14   Q.   And what is registry software information?

15   A.   So the registry is a database, a hierarchical database that

16   Windows uses to store all its settings.

17   Q.   Does Government Exhibit 419 fairly and accurately reflect

18   the registry software information for Government Exhibit 54?

19   A.   Yes, it does.

20            MS. POMERANTZ:   Your Honor, the government offers

21   Government Exhibit 419.

22            MS. MENNINGER:   No objection, your Honor.

23            THE COURT:   Thank you.  GX419 is admitted.  You may

24   publish.

25            (Government's Exhibit 419 received in evidence)

LC7Cmax2                          Flatley - direct

1    Q.  Mr. Flatley, let's walk through the information listed in

2    Government Exhibit 419.  What is listed as the install date for

3    Government Exhibit 54?

4    A.  It's February 22nd, 2001.

5    Q.  What is listed as the product name here?

6    A.  Microsoft Windows 2000.

7    Q.  Do you see where it says registered organization?

8    A.  Yes, I do.

9    Q.  What is registered organization mean?

10   A.  It's a standard user inputtable field that Windows displays

11   to you when you first set up the computer and it asks for

12   basically the company name that owns the computer.

13   Q.  You just mentioned user inputtable.  Just briefly, what

14   does that mean?

15   A.  That means when you first start the computer, it asks who

16   is the organization, who owns this, and you answer, you type in

17   on a keyboard.

18   Q.  What is listed as the registered organization?

19   A.  Gmax.

20   Q.  And what is registered owner?

21   A.  It's the same kind of field as registered organization.

22   It's user inputtable field that's put in when you first start

23   the computer.

24   Q.  What is listed as the registered owner here?

25   A.  Gmax.

1          MS. POMERANTZ:  Ms. Drescher, now we can bring that

2     down.

3          Can we pull up for the witness, the Court, and the

4     parties what's been marked for identification as Government

5     Exhibit 424.

6     Q.  Mr. Flatley, do you see that?

7     A.  Yes, I do.

8     Q.  Do you recognize Government Exhibit 424?

9     A.  Yes, I do.  It's an email that was printed from

10    Government's 54.

11    Q.  And how do you recognize this?

12    A.  I reviewed it prior to court today.

13    Q.  Is Government Exhibit 424 a true and accurate copy of an

14    email on Government Exhibit 54?

15    A.  Yes, it is.

16         MS. POMERANTZ:  Your Honor, the government offers

17    Government Exhibit 424.

18         MS. MENNINGER:  No objection, your Honor.

19         THE COURT:  Thank you.  GX424 is admitted.  You may

20    publish.

21         (Government's Exhibit 424 received in evidence)

22         MS. POMERANTZ:  Thank you, your Honor.

23         Ms. Drescher, if we can publish.

24    BY MS. POMERANTZ:

25    Q.  I'd like to turn to the first email in the chain on page 2.

LC7Cmax2                     Flatley - direct

1   Mr. Flatley, what is the date and time of the email?

2   A.  The email was sent on Friday, May 25th, 2001, at 12:05 p.m.

3   Q.  Who is the email from?

4   A.  It's from gmax1@mindspring.com.

5   Q.  Who is the recipient of the email?

6   A.  Sally Markham.

7         MS. POMERANTZ:  I'd like to ask, Ms. Drescher, if you

8   could, highlight the language starting with "I need to know"

9   and we can go through the end of number 6.

10  Q.  Mr. Flatley, can I ask you to read the highlighted

11  language, please?

12  A.  "I need to know what if any list John is using and he needs

13  to understand that he is doing a truly awful job.

14         1.  There was no drinking water in the black Merc.

15         2.  There were no pens in the black Merc.

16         3.  The bulb on JE desk was burnt out when we arrived.

17         4.  The pool deck was so filthy, JE had to ask him to

18  pressure wash it.  Is this not the gardener's job?  And if so,

19  why does John not have it done?

20         5.  Even though John said that he changed the color

21  card in the computer, having done it would it could not -- he

22  could not see that it was exactly the same as before, i.e., no

23  different, and that obviously JE would not be happy with it.

24         6.  The massage creams, et cetera, in JE's bathroom

25  were a mess.  No one had it tidied up and arranged them so it

LC7Cmax2                    Flatley - direct

```
 1   was neat."
 2                MS. POMERANTZ:  And if we could highlight the last two
 3   lines of this.  Sorry, Ms. Drescher.  Starting with "How are we
 4   doing."  Thanks very much.
 5   Q.  Mr. Flatley, can you read that highlighted language,
 6   please.
 7   A.  Sure.  "How are we doing with the PB manual — where do we
 8   stand with it?  G."
 9                MS. POMERANTZ:  We can move out of that and let's move
10   up to page 1 of this exhibit and take a look at the email
11   response to the prior email that we just looked at.
12   Q.  Mr. Flatley, what is the date and time of the email?
13   A.  It's 6:46 p.m. on May 25th, 2001.
14   Q.  And who is the email addressed to?
15   A.  It's addressed to Ms. Maxwell.
16   Q.  And if we could just scroll down to the bottom of the
17   email.  And who is it signed by?
18   A.  Signed by Sally.
19                MS. POMERANTZ:  Ms. Drescher, let's pull back up to
20   the first page.  Thank you very much.
21                THE COURT:  Ms. Pomerantz, could I get you a little
22   bit louder, please.
23                MS. POMERANTZ:  Of course, your Honor.  Thank you.
24                Ms. Drescher, can you highlight the paragraph starting
25   with "John and I specifically talked."
```

LC7Cmax2                    Flatley - direct

1    Q.  Mr. Flatley, can you read that paragraph, please.

2    A.  Sure.  "John and I specifically talked last week about how

3    important these details are.  About two weeks ago, I faxed your

4    checkoff lists to John in preparation for the manual.  These

5    are the lists you made and I'd say they are at least 3/4

6    complete.  (This is the third time I've reviewed these lists

7    with him since I've started.)  He stated the lists are

8    complete, although I definitely want to add to them and edit

9    them as your needs change."

10         MS. POMERANTZ:  If we can pull out of that, we can

11   drop that call out, and if we can zoom in on the paragraph

12   starting with "Our household manual draft."  Thanks very much.

13   Q.  Mr. Flatley, can you please read that.

14   A.  Sure.  "Our household manual draft does indicate where to

15   purchase "Cleaning supplies" (Publix and Sam's Club-PB Gardens)

16   and states "Use only Tide with bleach, Downy softeners (switch

17   fragrance every 2-3 months) Bounce dryer sheets.  We did edit

18   and reviewed this information last week.  However, we have not

19   completed an inventory list/check off list of supplies yet."

20   Q.  Thank you, Mr. Flatley.  And directing your attention to

21   the top of page 1, who is this email from?

22   A.  It is from gmax, gmax1@mindspring.com.

23   Q.  And who is this email to?

24   A.  MarkhamCPM@earthlink.net.

25         MS. POMERANTZ:  Ms. Drescher, we can pull that down.

LC7Cmax2                      Flatley - direct

1    Thanks very much.

2              Ms. Drescher, can we pull up for the witness, the

3    Court, and the parties what's been marked for identification as

4    Government Exhibit 418 and 418R.  If we can pull them up side

5    by side.

6    BY MS. POMERANTZ:

7    Q.  Mr. Flatley, do you recognize this exhibit?

8    A.  Yes, I do.

9    Q.  What is it?

10   A.  That's a document that was printed from Government 54.

11   Q.  And are you referring Government Exhibit 418 or 418R?

12   A.  Both of them.  One was -- one is just redacted.

13   Q.  And just to be clear for the record, which is the redacted

14   one?

15   A.  Redacted is 418R.

16   Q.  And Government Exhibit 418, how do you recognize this

17   exhibit?

18   A.  I reviewed it prior to court today.

19   Q.  Where did you locate this exhibit?

20   A.  It was on Government's 54.

21   Q.  Is this a true and accurate copy of a document on

22   Government Exhibit 54?

23   A.  Yes, it is.

24              MS. POMERANTZ:  Your Honor, the government would offer

25   Government Exhibit 418 under seal and 418R publicly.

1            MS. MENNINGER:  No objection to that, your Honor.

2            I would note that the unredacted one is visible on

3    counsel's table.  So I'm not sure if the --

4            THE COURT:  We'll take those down from counsel's

5    table.

6            MS. POMERANTZ:  We can take down Government Exhibit

7    418.  Thank you.

8            THE COURT:  So 418 is admitted under seal because it

9    has third-party telephone numbers.  And 418R is admitted with

10   some of those phone numbers redacted.

11           (Government's Exhibits 418, 418R received in evidence)

12           MS. POMERANTZ:  Thank you, your Honor.

13           Ms. Drescher, could we pull up for the witness, the

14   Court, and the parties what has been marked for identification

15   as Government Exhibit 418B.

16   Q.  Mr. Flatley, do you recognize this?

17   A.  Yes, I do.

18   Q.  What is it?

19   A.  It is the properties of the document you just showed me,

20   418.

21   Q.  And does Government Exhibit 418B fairly and accurately

22   reflect the properties for Government Exhibit 418?

23   A.  Yes, it does.

24   Q.  How do you know that?

25   A.  I reviewed it prior to court today.

LC7Cmax2                          Flatley - direct

1   Q.   What did you do to review?

2   A.   I'm sorry?

3   Q.   What did you do to review?

4   A.   I looked at it in my forensic software.

5           MS. POMERANTZ:   The government offers Government

6   Exhibit 418B.

7           MS. MENNINGER:   No objection, your Honor.

8           THE COURT:   Thank you.   GX418B is admitted.   You may

9   publish.

10          (Government's Exhibit 418B received in evidence)

11          MS. POMERANTZ:   Thanks, your Honor.   If I may, I'm

12  going to go through a couple more exhibits to enter them and

13  then I'll publish them for the jury.

14          THE COURT:   That's fine.   Thank you.

15          MS. POMERANTZ:   Thank you, your Honor.

16          Ms. Drescher, could we pull up for the witness, the

17  Court, and the parties what's been marked for identification as

18  Government Exhibit 420 and 421.

19  BY MS. POMERANTZ:

20  Q.   Mr. Flatley, please let me know when you've reviewed those

21  exhibits.

22  A.   I have.

23  Q.   Thank you.

24          MS. POMERANTZ:   Ms. Drescher, if we could pull up

25  Government Exhibit 422 for just the witness, the Court, and the

1   parties.

2   Q.  Mr. Flatley, let me know when you've reviewed that, please.

3   A.  I have.

4   Q.  Do you recognize Government Exhibits 420, 421, and 422?

5   A.  Yes, I do.

6   Q.  What are they?

7   A.  They're documents that were printed off of Government

8   Exhibit 54.

9   Q.  What kind of documents are they?

10  A.  They are Word documents.

11  Q.  And how do you recognize these exhibits?

12  A.  I reviewed them prior to court today.

13  Q.  Are they true and accurate copies of Word documents on

14  Government Exhibit 54?

15  A.  Yes, they are.

16          MS. POMERANTZ:  Your Honor, the government offers

17  Government Exhibit 420, 421, and 422.

18          MS. MENNINGER:  No objection, your Honor.

19          THE COURT:  Thank you.  420, 421, and 422 are

20  admitted.

21          (Government's Exhibits 420, 421, 422 received in

22  evidence)

23          MS. POMERANTZ:  Ms. Drescher, we can pull that down.

24  If we can pull up for the witness, the Court, and the parties

25  what's been marked for identification as Government Exhibit

1    420B and 421B.

2    Q.  Mr. Flatley, please let me know when you've reviewed this.

3    A.  I have.

4           MS. POMERANTZ:  Ms. Drescher, if we can pull up 422B,

5    please.

6    Q.  Mr. Flatley, let me know when you've reviewed that.

7    A.  I have.

8    Q.  Do you recognize Government Exhibits 420B, 421B, and 422B?

9    A.  Yes, I do.

10   Q.  What are they?

11   A.  They are the properties of the documents that are

12   associated with.

13   Q.  Do these exhibits fairly and accurately reflect the

14   properties for the corresponding exhibits?

15   A.  Yes, they do.

16   Q.  How do you know that?

17   A.  I reviewed it prior to court today.

18          MS. POMERANTZ:  The government offers Government

19   Exhibits 420B, 421B, and 422B.

20          MS. MENNINGER:  No objection, your Honor.

21          THE COURT:  420B, 421B, 422B are admitted.

22          (Government's Exhibits 420B, 421B, 422B received in

23   evidence)

24          MS. POMERANTZ:  Thank you, your Honor.

25   Q.  Mr. Flatley, where were Government Exhibits 418, 420, 421,

LC7Cmax2                         Flatley - direct

1   and 422 saved?

2   A.   They were on Government Exhibit 54.

3   Q.   Were they saved under any user account?

4   A.   Just give me one second.  Yes, they were saved under -- in

5   the documents folder for a user, Ghislaine.

6   Q.   When you say they were saved under a user account, what

7   does that mean?

8            MS. MENNINGER:  Objection, your Honor.  The user

9   account was outside the scope.

10            THE COURT:  Overruled.

11   A.   So when you have a computer, a Windows computer, when you

12   have a sign-in, a log-in ID username and password, it creates a

13   folder structure under that name to organize the different data

14   on it in case there is other users that are also on the

15   machine.  So, these particular documents were saved under the

16   documents folder under the user Ghislaine.

17   Q.   What kind of files are Government Exhibits 418, 420, 421,

18   and 422?

19   A.   They're Microsoft Word documents.

20   Q.   Where are properties stored in a Word document?

21   A.   So Word documents are actually not just one file, there are

22   several files that are kind of cobbled together and one of

23   those files maintains the properties of the document.

24   Q.   Just put simply, how can someone determine the properties

25   in a Word document?

LC7Cmax2                    Flatley - direct

1  A.  So there are two ways you can do it.  If the document is

2  open in Word and you go up to File and go down to Properties,

3  it will tell you that.  Or, if the document is closed, you can

4  just right-click on the document and select Properties and it

5  will tell you the same information.

6  Q.  When a Word document is created, is there metadata that is

7  generated that reflects the creation date of that file?

8  A.  Yes, there is.

9  Q.  Do Word documents have metadata regarding dates of

10  modification?

11  A.  Yes, they do.

12  Q.  And what is that referred to as?

13  A.  The date modified.

14  Q.  What does that metadata reflect?

15  A.  The last time somebody saved it.

16      MS. POMERANTZ:  Ms. Drescher, could you please publish

17  Government Exhibit 420 and 420B, which are now in evidence,

18  side by side.

19  Q.  Let's just take a look at 420B, Mr. Flatley.  What is

20  listed as authors?

21  A.  The author is listed as gmax.

22  Q.  What is listed as last saved by?

23  A.  That is also gmax.

24  Q.  And what is listed as the content created date for this

25  document?

LC7Cmax2                      Flatley - direct

1   A.  Created on September 7th, 2002.

2   Q.  And what is listed as the date last saved?

3   A.  September 13th, 2002.

4   Q.  What is listed here for last printed?

5   A.  September 7th, 2002.

6   Q.  And what is listed as the total editing time?

7   A.  30 minutes.

8   Q.  Mr. Flatley, just focusing on --

9           THE COURT:  I'm sorry, Ms. Pomerantz.  I can't hear

10  you.

11          MS. POMERANTZ:  I'm sorry, your Honor.  My apologies.

12  Q.  Looking at Government Exhibit 420, what is the date in the

13  top-right corner?

14  A.  September 7th, 2002.

15  Q.  And if you could read the title of the document, please.

16  A.  Sure.  It's PB New Shampoo and Massage Products.

17          MS. POMERANTZ:  Ms. Drescher, we can take that down.

18  Thanks very much.

19          Ms. Drescher, could you now publish Government Exhibit

20  418R and 418B.  They're already in evidence, so we can publish

21  them side by side, please.

22  Q.  Let's start with 418R, Mr. Flatley.  On the first page, can

23  you read the top of the document, which I'm going to ask

24  Ms. Drescher to highlight for you.

25  A.  It says, Palm Beach House Workers.

LC7Cmax2                      Flatley - direct

1              MS. POMERANTZ:  We can pull that down.

2    Q.  If you can read the names under full-time workers and just

3    the first entry would be fine.  Thank you.

4    A.  John and Mary Alessi.

5    Q.  If we can turn to page 2 of this document, can you read the

6    top of the page 2 of this document.

7    A.  Palm Beach House Maintenance.

8    Q.  And I want to direct your attention to where it says FedEx.

9    Can you read that, please.

10   A.  Sure.  It says, FedEx an 800 number, 800-463-3339.  The

11   account number is 114420816.  Nearest dropoff — box next to

12   P.B. National Bank on Worth Avenue.

13             MS. POMERANTZ:  Ms. Drescher, we can take that down.

14   Q.  Let's take a look at 418B.  Who is the author?

15   A.  The author is gmax.

16   Q.  Who is the document last saved by?

17   A.  Last saved by gmax.

18   Q.  What is the revision number listed here?

19   A.  2.

20   Q.  And what is the last printed date here?

21   A.  The last printed date is January 29th, 2002, 6:01 p.m.

22   Q.  And what is the content created date?

23   A.  It's January 29th, 2002, 6:05 p.m.

24             MS. POMERANTZ:  Ms. Drescher, we can pull those down

25   now.  Thank you.

1          If we could pull up Government Exhibit 421 and 421B,

2    which are already in evidence.

3    Q.  Mr. Flatley, can you read Government Exhibit 421.

4    A.  Sure.  It says:  "Help wanted.  Are you a massage

5    therapist?  Work in Palm Beach home.  Excellent pay.  Mostly

6    weekends.  Please call 351-1000.  Leave message."

7    Q.  Mr. Flatley, focusing on 421B, who is listed as authors?

8    A.  The author is gmax.

9    Q.  Who is listed as last saved by?

10   A.  Last saved by gmax.

11   Q.  On what date was the content created?

12   A.  Created on September 17th, 2001.

13   Q.  What's listed as the date last saved?

14   A.  September 17th, 2001.

15          MS. POMERANTZ:  Ms. Drescher, we can pull that down.

16          If we could publish 422 and 422B.

17   Q.  Mr. Flatley, I want to focus your attention to Government

18   Exhibit 422B.

19   A.  Okay.

20   Q.  On what date was the document created?

21   A.  The document was created on October 14th, 2002.

22   Q.  And what's listed as the late last saved?

23   A.  October 14th, 2002.

24   Q.  What's listed as the last printed date?

25   A.  October 13th, 2002.

1  Q.  What is the total editing time?

2  A.  20 minutes.

3  Q.  And I want to direct your attention to Government Exhibit

4  422.

5      MS. POMERANTZ:  Ms. Drescher, can you please zoom in

6  on the first paragraph.

7  Q.  Mr. Flatley, can you please read the first photograph gmax

8  wrote?

9  A.  Sure.  "Jeffrey and Ghislaine have been together, a couple

10  for the last 11 years.  They are, contrary to what many people

11  think, rarely apart — I almost always see them together."

12      MS. POMERANTZ:  We can pull that down.

13      Let's zoom in on the second paragraph.

14  Q.  Mr. Flatley, can you please read the second paragraph gmax

15  wrote.

16  A.  Sure.  "Ghislaine is highly intelligent, and great company

17  with a ready smile and an infectious laugh who always puts one

18  at one's ease, and always makes one feel welcome."

19      MS. POMERANTZ:  And let's pull up the next paragraph.

20  A.  "Jeffrey and Ghislaine share many mutual interests and they

21  have a lot of fun together.  They both have keen searching and

22  inquisitive minds.  She grew up amongst scientists and in an

23  academic and business environment."

24      MS. POMERANTZ:  We can pull that down, Ms. Drescher.

25  Thank you.

LC7Cmax2                          Flatley - cross

1              Can we zoom in on the last paragraph, please.

2     Q.  Mr. Flatley, can you please read this last paragraph.

3     Thank you.

4     A.  "Jeffrey and Ghislaine complement each other really well

5     and I cannot imagine one without the other.  On top of being

6     great partners, they are also the best of friends."

7              MS. POMERANTZ:  Your Honor, may I have one moment,

8     please?

9              THE COURT:  You may.

10             MS. POMERANTZ:  No further questions, your Honor.

11             THE COURT:  Thank you.  Ms. Menninger.

12    CROSS-EXAMINATION

13    BY MS. MENNINGER:

14    Q.  Good morning, Mr. Flatley.

15    A.  Good morning.

16    Q.  How are you?

17    A.  I'm fine.

18    Q.  Good.  The exhibit that represents the hard drive, do you

19    have that in front of you?

20    A.  Yes, ma'am.

21    Q.  That's GX54; correct?

22    A.  Yes, ma'am.

23    Q.  And it's your understanding that that hard drive was found

24    within Mr. Epstein's home in New York; correct?

25    A.  Yes, ma'am.

LC7Cmax2                    Flatley - cross

1   Q.  And what you actually saw were three copies of that hard

2   drive; right?

3   A.  That is correct.

4   Q.  And there was no information about why there were three

5   copies of that same hard drive; correct?

6   A.  No, ma'am.

7   Q.  And, in fact, the three hard drives were in a box; correct?

8   A.  Yes, ma'am.  That's how I received them.

9   Q.  And when they were in the box, the front of the box had a

10  xerox copy of another hard drive on the front; correct?

11  A.  Yes, ma'am.

12  Q.  You have no idea why there was a different hard drive

13  xeroxed on the front of the box; right?

14  A.  I have my thoughts of why that would be.

15  Q.  But you don't know?

16  A.  But no one told me or conveyed to me why it was like that,

17  no.

18  Q.  And there was evidence tape on the box; right?

19  A.  Yes, ma'am.

20  Q.  And you didn't break that evidence tape; correct?

21  A.  Not for that one, no, ma'am.

22  Q.  It was already broken when you received the box?

23  A.  That is correct.

24  Q.  And there was some indication that the drive had been

25  seized in July of 2007; correct?

LC7Cmax2                        Flatley - cross

1            MS. POMERANTZ:  Objection, your Honor.

2            THE COURT:  Grounds?

3            MS. POMERANTZ:  Foundation.  Relevance.

4            THE COURT:  Foundation, sustained.

5    BY MS. MENNINGER:

6    Q.  Did you write a report in which you talked about the fact

7    that these devices show they were seized in July of 2007?

8    A.  No, ma'am.

9    Q.  And they had a name D. Klyman on them?

10            MS. POMERANTZ:  Objection, your Honor.  Hearsay.

11            THE COURT:  Sustained.

12            MS. MENNINGER:  Your Honor, I'm asking if he can

13    identify Government Exhibit 54 as something he previously

14    referred to with a different indication.  It goes to the --

15            THE COURT:  You can ask him that question.  Sustained

16    on the current question.

17            MS. MENNINGER:  Okay.

18    BY MS. MENNINGER:

19    Q.  Do you recall whether the drive that you examined had a

20    representation on it that it was from D. Klyman?

21    A.  Not on the drive, no, ma'am.

22    Q.  On the box in which the drive was located; correct?

23    A.  No, ma'am.

24    Q.  On the bag in which the box in which the drive was located?

25    A.  I do recall a D. Klyman on a bag for one of these hard

LC7Cmax2                      Flatley - cross

1   drives, but I couldn't tell you if it was that one.

2   Q.  And you don't know who he is or what that means; correct?

3   A.  No, ma'am.

4   Q.  When you examined that hard drive, you don't have the

5   device, the computer that that hard drive was in; correct?

6   A.  That is correct.

7   Q.  You don't know if it was from a desktop computer; right?

8   A.  I can make -- actually, yes, I can say it was from a

9   desktop computer.

10  Q.  So not a laptop computer?

11  A.  Correct.

12  Q.  In a stationary place; right?

13  A.  Correct.

14  Q.  People don't usually take their desktops with them on

15  airplanes, for example; right?

16          MS. POMERANTZ:  Objection.

17          THE COURT:  Sustained.

18  Q.  A desktop is more difficult to transport than a laptop; is

19  that fair to say?

20  A.  Yes, ma'am.

21  Q.  So when you examined this hard drive, you actually learned

22  that the hard drive itself was a clone of some other hard

23  drive; right?

24  A.  That is correct.

25  Q.  So you made a clone of a clone?

LC7Cmax2                    Flatley - cross

A.  I did not.  I made an image of a clone.

Q.  Thank you for the clarification.  You made an image of a

clone; right?

A.  Yes, ma'am.

Q.  But you were not able to match the clone with whatever it

had cloned; right?

A.  I don't understand the question.

Q.  Well, on direct examination, you talked about how an image

was a bit-for-bit copy of the clone; right?

A.  Yes, ma'am.

Q.  And that means you were able to then confirm that the image

you made was identical to the clone from which you made it;

right?

A.  That is correct.

Q.  And then you believe that the thing you were imaging was a

clone of something else?

A.  Yes, ma'am.

Q.  And you don't have that something else to make sure that

you did an identical copy, that the clone was an identical

copy; correct?

A.  Correct, I do not know what happened or who made that clone

or where it came from.

Q.  Right.  You just don't know?

A.  Correct.

Q.  So you don't know whether anything was changed in the

1    course of that copying; correct?

2    A.  That is correct.

3    Q.  You just don't have something to compare it to; right?

4    A.  Correct.

5    Q.  If you had the other one, you could run the same program;

6    right?

7            MS. POMERANTZ:  Objection, your Honor.

8            THE COURT:  Overruled.

9    Q.  If you had the other one, you could run the same program

10   and make sure that they were identical; right?

11   A.  That's correct.

12   Q.  So, because you don't have that other thing to compare it

13   to — what you think is a desktop; right?

14   A.  Correct.

15   Q.  — you don't know where that desktop was living when any of

16   these exhibits were created; correct?

17           MS. POMERANTZ:  Objection, your Honor.

18           THE COURT:  Overruled.

19   A.  No, I don't.

20   Q.  Right.  You don't have a location, a geo location for any

21   of these particular documents you've been testifying about;

22   correct?

23   A.  That's correct.

24   Q.  So the desktop could have been in Florida or in New York or

25   somewhere else; right?

LC7Cmax2                    Flatley - cross

1   A.  Yes, that's correct.

2   Q.  And so, when you examined these particular documents, you

3   were able to tell, and I think you told the jury about the user

4   that was associated with the computer, you testified was the

5   author; correct?

6   A.  Correct.

7   Q.  Because that's the piece of information that's contained in

8   the properties, author; right?

9   A.  That's correct.

10  Q.  An author is just drawn from the person who set up the

11  computer in the first place; right?

12  A.  No.  In that particular instance, the author is another

13  user inputtable field from Microsoft Word when you start using

14  it and it's saved to your account.  So, where the account name

15  was Ghislaine, the author name was gmax.

16  Q.  So when you first set up Word, you put in your name because

17  you're the person who's installing the Word; right?

18  A.  Correct.

19  Q.  And then when you create documents from that Word program,

20  it auto populates the name of the author from the person who

21  set it up; right?

22  A.  That's correct.

23  Q.  It doesn't actually mean a particular person is sitting in

24  front of Word on a particular time when they say new document;

25  right?

LC7Cmax2                    Flatley - cross

1   A.  That's correct.

2   Q.  It just auto populates it from Word; right?

3   A.  Yes, that is correct.

4   Q.  And it auto populates the created date or the modified date

5   and the other dates you talked about; right?

6   A.  Yes, ma'am.

7   Q.  That's not a person inputting a created date, it just comes

8   from the program; right?

9   A.  Yes, it gets it from the system, from the clock in the

10  computer.

11  Q.  So you didn't specify whether this particular computer was

12  password protected; right?

13  A.  That's correct.

14  Q.  You don't have any information that this computer was

15  password protected; right?

16  A.  In the registry, it said that it was.

17  Q.  You were able to get into the computer no problem; right?

18  A.  We don't actually get into the computer.  We don't go

19  through the operating system.  We just take the information

20  that's on the drive and categorize it.  The password and user

21  name and all that only protects the computer when you're

22  accessing it through its operating system.

23  Q.  And you were accessing it through a hard drive copied

24  cloned image?

25  A.  All through our forensic software.

LC7Cmax2                          Flatley - cross

1    Q.  Which was running off of the image of the clone of

2    something; right?

3    A.  Yes, ma'am.

4    Q.  And so, you don't know whether it was an easy-to-remember

5    password or whether the computer actually just had the password

6    on a Post-it next to it; right?

7    A.  I have no idea.

8    Q.  So when you were looking at these documents, these Word

9    documents, you talked about the created date; right?

10   A.  Yes, ma'am.

11   Q.  And that, as we just discussed, was something that was

12   populated by the computer system; right?

13   A.  Correct.

14   Q.  And you didn't then go out and look at that created date to

15   see where any particular person was at that point in time;

16   correct?

17   A.  No, ma'am.

18   Q.  So if, for example, Government Exhibit 418 had some

19   metadata associated with it in 418B -- could we pull that up,

20   418B.  You see that; correct?

21   A.  Yes, ma'am.

22   Q.  And that tells you that the document was created on January

23   29th, 2002; right?

24   A.  Yes, ma'am.

25   Q.  And it was only edited and so forth on that day, no other

LC7Cmax2                        Flatley - cross

1   day; right?

2   A.  It says that it was created on the 29th and it was last

3   saved on the 29th.

4   Q.  And last printed on that date; right?

5   A.  Yes, ma'am.

6   Q.  So, for example, if you were to go get a flight log and

7   tell where gmax was on January 29th, 2002, it might tell you

8   that gmax was in the same place as the computer or a different

9   place; right?

10          MS. POMERANTZ:  Objection, your Honor.

11          THE COURT:  Sustained.

12  Q.  You don't know who was actually sitting down creating this

13  document; right?

14  A.  That's correct.

15  Q.  You don't even know where the computer was; correct?

16  A.  That is correct.

17  Q.  And if you were to ascertain that gmax was in several

18  different places when different of these documents were

19  created, it might lead one to believe that she's not the one

20  who created all these documents; right?

21          MS. POMERANTZ:  Objection.

22          THE COURT:  Sustained.

23  Q.  Other people had access to this computer, potentially;

24  right?

25          MS. POMERANTZ:  Objection.

LC7Cmax2                           Flatley - cross

1          THE COURT:  Overruled.

2     A.  I have no idea.

3     Q.  You don't know whether the computer was sitting in the

4     middle of a kitchen that other people could access it; right?

5     A.  I don't know where the computer was.

6     Q.  You don't know who was around the computer at any

7     particular point in time; correct?

8     A.  The only thing I know is that there were three user

9     accounts on the computer — two were created by default when the

10    computer was made and the only other user account was

11    Ghislaine.

12    Q.  So anyone who used that computer was using that Ghislaine

13    Maxwell user account; right?

14    A.  That's correct.

15    Q.  No other user account was used; correct?

16    A.  That's correct.

17    Q.  So if Ghislaine was not present with the computer when a

18    document was made, that would suggest other people had access

19    to the computer; correct?

20    A.  I don't know who had access to the computer.

21          MS. MENNINGER:  May I have one moment, your Honor?

22          THE COURT:  You may.

23          MS. MENNINGER:  No further questions of this witness.

24    Thank you.

25          THE COURT:  Ms. Pomerantz?

1                MS. POMERANTZ:  Just briefly, your Honor.

2    REDIRECT EXAMINATION

3    BY MS. POMERANTZ:

4    Q.  Mr. Flatley, during the course of your review of Government

5    Exhibit 54, did you review emails?

6    A.  Yes, I did.

7    Q.  And as to the emails you reviewed on Government Exhibit 54,

8    how many emails did not include gmax1@mindspring.com on the

9    email chains?

10   A.  They were all from that account.

11               MS. POMERANTZ:  No further questions, your Honor.

12               MS. MENNINGER:  Your Honor, on that point.

13               THE COURT:  Okay.

14   RECROSS EXAMINATION

15   BY MS. MENNINGER:

16   Q.  You know about email clients; right?

17   A.  Yes, ma'am.

18   Q.  An email client is something like Outlook or Mail; correct?

19   A.  Correct.

20   Q.  And when an email client like Outlook or Mail is installed

21   on a computer, it often goes up to the server and refreshes

22   itself from the server whenever that computer is connected to

23   the internet; correct?

24   A.  That is correct.

25   Q.  Just like my cellphone may be constantly drawing down

LC7Cmax2                    Flatley - recross

1    emails or sent emails, even though I'm not using it at the

2    moment; correct?

3    A.  That is correct.

4    Q.  So anytime the computer was connected to the internet, it

5    may have been populating emails through an email client on it;

6    correct?

7    A.  That's correct.

8            MS. POMERANTZ:  No further questions.  Thank you.

9            THE COURT:  Thank you.  Mr. Flatley, you're excused.

10   You may step down.

11           Members of the jury, we'll take our mid morning break.

12   See you in about 15 minutes.  Thank you.

13           (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

LC7Cmax2                        Flatley - recross

1                (Jury not present)

2                THE COURT:  Mr. Flatley may step down and out.

3                (Witness excused)

4                Counsel, do we need to speak before the break?

5                MS. POMERANTZ:  Nothing from the government, your

6     Honor.

7                THE COURT:  I'll be back in 10 if anybody needs to see

8     me before the break ends.  Thank you.

9                (Recess)

10               (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LC7VMAX3

1           THE COURT:  All right.  Where are we?  Ms. Comey.

2           MS. COMEY:  I don't believe we have matters to take

3      up, your Honor.

4           THE COURT:  Oh, okay.

5           MS. COMEY:  I think that the next witness will likely

6      go past the lunch break, so we can deal with the issue with

7      Brian hopefully during the lunch break.

8           THE COURT:  I hadn't totally understood Ms. Moe's

9      point about the potential need to take a witness out of order

10     given the length.  And it's fine with me if that's what makes

11     sense and there's no objection from the defense.

12          MS. COMEY:  Thank you, your Honor.  We'll see how long

13     this next witness takes and then go from there.

14          THE COURT:  Okay.

15          MR. PAGLIUCA:  Your Honor, might I hand up potential

16     cross-examination exhibits?

17          THE COURT:  Will we get there before lunch?

18          MR. PAGLIUCA:  I doubt it.

19          MS. COMEY:  We might, but unlikely, your Honor.

20          THE COURT:  Sure.  Thank you, Mr. Pagliuca.

21          All right.  We can bring in the jury please,

22     Ms. Williams.  Thank you.

23          MS. MOE:  I'm very sorry for the delay, your Honor.

24          THE COURT:  Just one second please.  We're about to

25     start with the jury.  I'm sorry, Ms. Moe, I didn't realize we

LC7VMAX3

1   were waiting for you.

2          MS. MOE:  No, your Honor.  I just apologize.  I got a

3   message saying that folks were waiting for me, so I apologize

4   for being late.

5          THE COURT:  Oh, no, no.  That's fine.  Everybody has a

6   lot going on.  I understand.

7          (Jury present)

8          THE COURT:  Thank you, members of the jury.

9          Ms. Comey, the government may call its next witness.

10          MS. COMEY:  The government calls Carolyn.

11          THE COURT:  The witness testifying under the name

12   Carolyn may come forward.

13    CAROLYN,

14       called as a witness by the Government,

15       having been duly sworn, testified as follows:

16          THE COURT:  Once seated, please remove your mask.

17          This witness will be testifying under the pseudonym

18   Carolyn.  I remind the sketch artists that my order is in place

19   requiring no exact likenesses of the witnesses testifying under

20   pseudonym.

21          MS. COMEY:  Your Honor, just to be clear, this witness

22   is testifying just under her first name, not a pseudonym.  But

23   we would ask the same order be in place.

24          THE COURT:  Thank you, Ms. Comey.

25          The witness is testifying under her first name, and

LC7VMAX3                          Carolyn - direct

1   the anonymity order with respect to exact likenesses applies.

2                   Go ahead, Ms. Comey.

3                   MS. COMEY:  Thank you, your Honor.

4                   May I inquire?

5                   THE COURT:  You may.

6   DIRECT EXAMINATION

7   BY MS. COMEY:

8   Q.  Good morning.

9   A.  Good morning.

10  Q.  What's your first name?

11  A.  Carolyn.

12  Q.  Could you spell that for us please.

13  A.  C-A-R-O-L-Y-N.

14  Q.  Leading up to this trial, Carolyn, did you ask to testify

15  under just your first name to protect your privacy?

16  A.  Yes, ma'am.

17  Q.  I'd like to ask you to please take a look at the binder in

18  front of you.  Could you please turn to Government Exhibit 11.

19  Let us know when you're there.

20  A.  I'm here.

21  Q.  Do you recognize that?

22  A.  Yes.

23  Q.  What is that?

24  A.  My birth certificate.

25                  THE COURT:  Sorry, Carolyn.  If you could come closer

1    to the microphone, please.

2    A.  My birth certificate.

3           MS. COMEY:  Your Honor, I would ask that the jury be

4    permitted to turn to Government Exhibit 11 in their binders,

5    please.

6           THE COURT:  Which is admitted?

7           MS. COMEY:  Which is admitted, yes, your Honor.

8           THE COURT:  All right.  Without objection?

9           MR. PAGLIUCA:  No objection.

10           THE COURT:  Thank you.

11           Jury, please turn to GX-11.

12    BY MS. COMEY:

13    Q.  Carolyn, at the top of the page here, without saying it out

14    loud, do you see the name at the very top?

15    A.  Yes.

16    Q.  Is that your full name?

17    A.  Yes.

18    Q.  And is the date of birth in the top right-hand corner your

19    date of birth?

20    A.  Yes.

21    Q.  Thank you.  You can set that aside.

22           And your Honor, I'd ask that the jurors be permitted

23    to put their binders back under their chairs.

24           THE COURT:  Yes.  Thank you.

25           Please do so, jury.  Thank you.

LC7VMAX3                        Carolyn - direct

1    Q.   Carolyn, where did you grow up?

2    A.   In New York.

3    Q.   And then did you move somewhere from New York?

4    A.   Yes, I moved down here to Florida.

5    Q.   And in what year did you move to Florida?

6    A.   In 1999.

7    Q.   I'm going to ask you to speak into the microphone.

8    A.   1999.

9    Q.   Thank you.

10           Carolyn, what is the last kind of school you attended?

11   A.   Middle school.

12   Q.   What is the last grade you attended before dropping out in

13   middle school?

14   A.   Seventh.

15   Q.   After you dropped out in seventh grade, did you ever go

16   back to school?

17   A.   No.

18   Q.   Carolyn, have you used drugs in your life?

19   A.   Yes.

20   Q.   Have you been addicted to drugs in your life?

21   A.   Yes.

22   Q.   What drugs have you been addicted to?

23   A.   Pain pills and cocaine.

24   Q.   I want to talk a little bit about when you were in middle

25   school.  Where did you go to middle school?

LC7VMAX3                    Carolyn - direct

1   A.  At H. L. Watkins.

2   Q.  In what town is H. L. Watkins?

3   A.  Palm Beach Gardens.

4   Q.  Is that in Florida?

5   A.  Yes.

6   Q.  When you were 14 years old, who lived at home with you?

7   A.  My mom and my brothers.

8   Q.  Are your brothers older or younger than you?

9   A.  Younger.

10  Q.  What was your life like at home when you were 14 years old?

11  A.  I was allowed to do whatever I wanted.

12  Q.  Why is that?

13  A.  Because my mom was an alcoholic and a drug addict.

14  Q.  When you were between the ages of 14 and 16, how did you

15  make money?

16  A.  I went to Mr. Epstein's house and got money that way.

17  Q.  How did you first meet -- and when you say "Mr. Epstein,"

18  do you know his full name?

19  A.  Yes.

20  Q.  What's his full name?

21  A.  Jeffrey Epstein.

22  Q.  How did you first meet Jeffrey Epstein?

23  A.  Through the guy I was dating.

24  Q.  What's the first name of the guy you were dating when you

25  were 14?

1   A.   Shawn.

2   Q.   Can you spell that for us?

3   A.   S-H-A-W-N.

4   Q.   How did you meet Shawn?

5   A.   He lives across the street from me.

6   Q.   In West Palm Beach?

7   A.   Yes.

8   Q.   About how old were you when you first started dating Shawn?

9   A.   Thirteen.

10  Q.   About how old was Shawn when you first started dating him?

11  A.   Seventeen.

12  Q.   I'd like you to please turn back to the binder and pull out

13  what's been marked for identification has Government Exhibit

14  20.  Let us know when you're there.

15  A.   I'm sorry, which exhibit?

16  Q.   Two zero, 20.

17  A.   I'm here.

18  Q.   Is the name on that exhibit, without saying it out loud,

19  Shawn's full name?

20  A.   Yes.

21          MS. COMEY:  Your Honor, the government offers this

22  exhibit under seal.

23          MR. PAGLIUCA:  No objection.

24          THE COURT:  Thank you.

25          GX-20 is admitted under seal to protect the identity

LC7VMAX3                          Carolyn - direct

1    of the third party and the witness.

2                (Government's Exhibit 20 received in evidence)

3                MS. COMEY:  Your Honor, may we have the jurors please

4    turn to this exhibit in their binders.

5                THE COURT:  They may.

6                Please take out your binders.  GX-20.

7                MS. COMEY:  Thank you, your Honor.

8                I think the jurors can put the binders back down.

9                THE COURT:  Okay.  Please do so, jury.

10   BY MS. COMEY:

11   Q.  Carolyn, when you first met Shawn, how old did you tell him

12   you were?

13   A.  Seventeen.

14   Q.  How, if at all, to your knowledge, did Shawn learn how old

15   you actually were?

16   A.  I was going -- I had a birthday and I was going to be 14.

17   Q.  Did he come to your 14th birthday party?

18   A.  Yeah.

19   Q.  And is that how he learned your actual age?

20   A.  Yeah.

21               THE COURT:  I just ask again, Carolyn, please speak

22   directly into the mic so everyone can hear you.  Thank you.

23   Q.  How did Shawn lead you to meeting Jeffrey Epstein?

24   A.  Through friends of his, Virginia Roberts and Tony Figueroa.

25   Q.  How did you meet Virginia?

LC7VMAX3                         Carolyn - direct

1   A.   Through Shawn.

2   Q.   About how old were you when you met Virginia?

3   A.   Fourteen.

4           MS. COMEY:  Ms. Drescher, would you please pull up

5   what's in evidence as Government Exhibit 113.

6   Q.   Carolyn, do you recognize the person on the screen in front

7   of you?

8   A.   Yes.

9   Q.   Who is that?

10  A.   That's Virginia.

11  Q.   Is that the same Virginia we were just talking about?

12  A.   Yes, ma'am.

13          MS. COMEY:  We can take that down.  Thank you.

14  Q.   Who was Tony in relation to Virginia?

15  A.   Her boyfriend.

16  Q.   What would you, Shawn, Tony, and Virginia do together when

17  you were 14 years old?

18  A.   We would smoke pot.

19  Q.   How do you remember Jeffrey Epstein first coming up with

20  that group?

21  A.   Virginia asked me if I wanted to go make money.

22  Q.   Did she tell you what you would need to do to make that

23  money?

24  A.   Not right away.

25  Q.   Before you ultimately went, did she tell you?

1    A.   No.

2    Q.   What did she tell you?

3    A.   That we were going to go to her friend's house who lived on

4    Palm Beach Island, and I was going to meet one of her wealthy

5    friends.

6    Q.   And do what?

7    A.   Give him a massage.

8    Q.   How did you respond?

9    A.   Okay.  I said okay.

10   Q.   Why did you say okay?

11   A.   Because I was going to make a lot of money.

12   Q.   About how old were you the first time you went to Jeffrey

13   Epstein's house?

14   A.   Fourteen.

15   Q.   Do you remember about what time of year it was the year you

16   were 14?

17   A.   Yes.  It is around spring, like going into summer.

18   Q.   How did you get to Jeffrey Epstein's house that first time?

19   A.   Virginia drove me.

20   Q.   When you got to Jeffrey Epstein's house -- withdrawn.

21            Where was Jeffrey Epstein's house?

22   A.   On Palm Beach Island.

23   Q.   What did the outside of the house look like that first day

24   you went there?

25   A.   I could tell it was a mansion and it was pink.

LC7VMAX3                          Carolyn - direct

1   Q.  Did you go there multiple times after that?

2   A.  Yes.

3   Q.  Did the color of the house change at some point?

4   A.  Yes.

5   Q.  To what?

6   A.  White.

7   Q.  That first day when you got to Jeffrey Epstein's house, who

8   went inside?

9   A.  Me and Virginia.

10  Q.  What room did you walk into?

11  A.  The kitchen.

12  Q.  When you walked into the kitchen, what happened?

13  A.  We were greeted by Ms. Maxwell.

14  Q.  What did Ms. Maxwell look like?

15  A.  An older lady.

16  Q.  Can you describe her.

17  A.  She had an accent and she had like shoulder-length black

18  hair.

19  Q.  How did you learn her name?

20  A.  She introduced herself.

21  Q.  Did she say just her last name or both her first and her

22  last name?

23  A.  Her first and her last name.

24  Q.  What did you call her?

25  A.  Maxwell.

LC7VMAX3                      Carolyn - direct

1    Q.  Why did you call her Maxwell instead of using her first
2    name?
3    A.  Because I couldn't exactly pronounce her first name
4    correctly.
5    Q.  When Maxwell greeted you in the kitchen, what, if anything,
6    did Virginia say to Maxwell?
7    A.  That I was her friend.
8    Q.  Did she say your name?
9    A.  Yes.
10   Q.  What did she say?
11   A.  She said, This is my friend Carolyn.
12   Q.  And what did Maxwell say?
13   A.  You can bring her upstairs and show her what to do.
14   Q.  What happened next?
15   A.  We walked up the stairs that were in the kitchen, and we
16   passed a bunch of bedrooms and entered into Mr. Epstein's
17   bedroom, into his bathroom area.
18   Q.  Can you describe the bathroom that you went into off of
19   Mr. Epstein's bedroom.
20   A.  Yes.  When you walk in, there is a sink to your right,
21   there is a dresser to the left, there is a closet area, there
22   is a toilet area, there is a steam room, and then there's a
23   shower.
24   Q.  What, if any, seating do you remember?
25   A.  There is an ugly polka-dotted couch.

LC7VMAX3                        Carolyn - direct

1  Q.  After you went into that room with Virginia, what did

2  Virginia show you?

3  A.  Where the massage table was.

4  Q.  Then what happened?

5  A.  We walked into the little closet area and she was pulling

6  out the massage table.  And I was looking at all the photos

7  that were on the wall.

8  Q.  What else did Virginia show you, if anything?

9  A.  Where all the massage oils and lotions were kept.

10  Q.  And where was that?

11  A.  In the bottom drawer of the dresser that is on your

12  left-hand side.

13  Q.  After the massage table was set up, what did you and

14  Virginia do next?

15  A.  Virginia had taken off her clothes and she asked me if I

16  would be comfortable taking off mine.  And I told her I would

17  like to keep my bra and underwear on.

18  Q.  So at that point what was Virginia wearing?

19  A.  Nothing.

20  Q.  And what were you wearing?

21  A.  My bra and underwear.

22  Q.  What happened next?

23  A.  Mr. Epstein came into the room.

24  Q.  Then what happened?

25  A.  He brushed his teeth and then laid face down on the massage

LC7VMAX3                          Carolyn - direct

1     table.

2     Q.  While Mr. Epstein was face down on the massage table, what

3     did you and Virginia do?

4     A.  We massaged the backs of his legs up to his buttocks.

5     Q.  Then what happened?

6     A.  After 45 minutes, he had turned over.

7     Q.  What happened when Mr. Epstein turned over?

8     A.  Virginia got on top of him.

9     Q.  And what did you see Virginia and Mr. Epstein doing?

10    A.  Having sex.

11    Q.  Where were you while Virginia and Mr. Epstein were having

12    sex on the massage table?

13    A.  I was sitting on the couch right in front of them.

14    Q.  Did Mr. Epstein touch you during this first massage?

15    A.  No.

16    Q.  After that ended, what happened next?

17    A.  I was paid.

18    Q.  Where did the money come from?

19    A.  It was on top of the sink.

20    Q.  In that same bathroom?

21    A.  Yes.

22    Q.  Who got money?

23    A.  Me and Virginia.

24    Q.  How much money did you get?

25    A.  $300.

LC7VMAX3                       Carolyn - direct

1    Q.  How much money did Virginia get?

2    A.  I'm not exactly sure.

3    Q.  What denominations were the bills?

4    A.  Hundred dollar bills.

5    Q.  After that first time, did you go back to Jeffrey Epstein's

6    house with Virginia again?

7    A.  No.

8    Q.  Why not?

9    A.  Because I didn't have to.

10   Q.  Why not?

11   A.  Because when we were leaving, Maxwell had asked me for my

12   telephone number.

13   Q.  And did you give her your telephone number?

14   A.  Yes.

15          MS. COMEY:  Ms. Drescher, would you please pull up

16   what's in evidence as Government Exhibit 115.

17   Q.  Carolyn, do you recognize the person in this photograph?

18   A.  Yes.

19   Q.  Who is that?

20          THE COURT:  I'm sorry, I need the witness to speak

21   into the microphone.

22   A.  That's Mrs. Maxwell.

23          THE COURT:  Thank you.

24          MS. COMEY:  Now, can we please go to Government

25   Exhibit 112, Ms. Drescher.

LC7VMAX3                        Carolyn - direct

1    Q.  Do you recognize the person in this photograph?

2    A.  Yes.

3    Q.  Who is that?

4    A.  That's Mr. Epstein.

5           MS. COMEY:  Let's take that down please, Ms. Drescher.

6    Q.  Carolyn, in total, approximately how many times did you go

7    over to Mr. Epstein's house to give him massages?

8    A.  Over 100.

9    Q.  About how often did you go over to his house to provide

10   those massages?

11   A.  Two to three times a week.

12   Q.  About how old were you the first time you went over to his

13   house?

14   A.  Fourteen.

15   Q.  And about how old were you the last time you went over to

16   his house?

17   A.  Eighteen.

18   Q.  Do you remember the exact details of every encounter you

19   had at that house?

20   A.  A lot of them run together.

21   Q.  Do some of those details and events stand out more in your

22   mind though?

23   A.  Yes.

24   Q.  Carolyn, I'd like to ask you -- go ahead and get a drink.

25          Would you please pick up the binder again and turn to

LC7VMAX3                          Carolyn - direct

1   what's been marked for identification as Government Exhibit

2   104.

3   A.  One 0 what?

4   Q.  104.

5       Do you recognize that?

6   A.  Yes, I do.

7   Q.  What is it?

8   A.  A picture of me when I was 14.

9   Q.  Does this fairly and accurately depict what you looked like

10  when you went to Jeffrey Epstein's house when you were 14 years

11  old?

12  A.  Yes.

13      MS. COMEY:  Your Honor, the government offers this

14  exhibit under seal.

15      MR. PAGLIUCA:  No objection.

16      THE COURT:  Thank you.  GX-104 is admitted under seal

17  to protect the anonymity of the witness who I've permitted to

18  testify under her first name.

19      (Government's Exhibit 104 received in evidence)

20      MS. COMEY:  Your Honor, may we please ask the jurors

21  to pull out their binders and look at Government Exhibit 104.

22      THE COURT:  Yes.  Please, jurors, take your binders.

23  GX-104.

24      MS. COMEY:  Thank you, your Honor.

25      The jurors can set their binders aside.

1      THE COURT:  All right.  Please do.  Thank you.

2  BY MS. COMEY:

3  Q.  Carolyn, how would you schedule times to go to Jeffrey

4  Epstein's house for massages?

5  A.  Maxwell would call and set up appointment times.

6  Q.  Would anyone else ever call?

7  A.  I sometimes called and there over time was Sarah Kellen

8  that would call.

9  Q.  Let me ask you some questions about that.

10      During about what time period do you remember Maxwell

11  being the person who would call to schedule massage

12  appointments with Jeffrey Epstein?

13  A.  For like the first year or two.

14  Q.  And then after that, who would call you to schedule your

15  appointments?

16  A.  Sarah or I would call.

17  Q.  Now, after Sarah started being the person to call you, did

18  you still see Maxwell at Epstein's house?

19  A.  Yes.

20  Q.  Where would she be?

21  A.  In an office area off the kitchen.

22  Q.  And you said that sometimes you would call to make

23  appointments?

24  A.  Yes.

25  Q.  Why would you call?

LC7VMAX3                          Carolyn - direct

```
 1    A.  Because I was young and $300 was a lot of money to me.

 2    Q.  What phone numbers would Maxwell and Sarah call you on in

 3    order to make massage appointments?

 4    A.  Either my cell phone, my mom's cell phone, or Shawn's home

 5    phone.

 6    Q.  How did they get all of those numbers?

 7    A.  I give -- I had given them to Maxwell.

 8    Q.  Why did you give extra numbers to Maxwell?

 9    A.  In case she couldn't get a hold of me on one.

10    Q.  Was that your idea?

11    A.  Yeah.

12    Q.  Do you remember any of those phone numbers?

13    A.  No, I can't.

14    Q.  Do you remember your mom's cell phone number?

15    A.  That I do.

16    Q.  Okay.  But you don't remember your own phone number or

17    Shawn's number?

18    A.  I -- I've blocked it out.  It's been a very long time.

19    Q.  This morning, Carolyn, did I ask you to write your mom's

20    cell phone number down on a piece of paper?

21    A.  Yes.

22    Q.  Could you please turn now to what's been marked for

23    identification as Government Exhibit 608 in your binder.

24            Are you there?

25    A.  Yes.
```

1    Q.  Do you recognize that?

2    A.  Yes.

3    Q.  What is that?

4    A.  My mother's cell phone number.

5    Q.  Is that the phone number you wrote down on a piece of paper

6    this morning?

7    A.  Yes.

8            MS. COMEY:  Your Honor, the government offers this in

9    evidence under seal.

10           MR. PAGLIUCA:  No objection.

11           THE COURT:  GX-608 is admitted under seal to protect

12   the anonymity of this witness.

13           (Government's Exhibit 608 received in evidence)

14           MS. COMEY:  Thank you.  You can set that aside,

15   Carolyn.

16   Q.  Carolyn, what is your mother's first name?

17   A.  Dorothy.

18   Q.  Carolyn, when Maxwell called you to schedule appointments,

19   what did she say to you?

20   A.  She would ask if I would be available at this time,

21   sometimes because they would be out of town and be flying in.

22   Q.  During those times when Maxwell mentioned that they were

23   flying in, who's the "they" she referred to?

24   A.  Her and Mr. Epstein and I don't know who else.

25   Q.  And what did Maxwell say about where she and Mr. Epstein

LC7VMAX3                    Carolyn - direct

1   were during those conversations?

2   A.  Sometimes they said New York.

3   Q.  How would that come up?

4   A.  Well, they -- she said that they would be flying in from

5   New York, could I be available at this time.

6   Q.  And when Sarah would call you to schedule an appointment,

7   what would she say?

8   A.  She'd ask me if I would be available at this time.

9   Q.  Were you ever present when your mom received a phone call

10  that you later learned was from Maxwell?

11  A.  Sometimes, yeah, she would hand me the phone.

12  Q.  What do you remember happening on those occasions?

13  A.  Just my mom saying, Here, you have a phone call.

14  Q.  And then what would happen?

15  A.  It would be to schedule an appointment.

16  Q.  Were you ever present when Shawn received a phone call on

17  his phone --

18  A.  Yes.

19  Q.  -- from Maxwell?

20          What happened?

21  A.  Shawn would tell me that I have a phone call and to say yes

22  to the appointment.

23  Q.  About how many times do you remember Maxwell saying she was

24  calling from New York?

25  A.  Only a couple.

LC7VMAX3                    Carolyn - direct

1    Q.  Now, you mentioned that sometimes you would reach out to

2    schedule appointments yourself; is that right?

3    A.  Yes.

4    Q.  And you mentioned that Shawn would tell you to go to these

5    appointments, right?

6    A.  Yes.

7    Q.  Why were you reaching out to go to these appointments?

8    A.  For the money.

9    Q.  What were you doing with the money?

10   A.  I was buying drugs.

11   Q.  What drugs were you using?

12   A.  Marijuana, cocaine, alcohol, anything that could block out

13   for me to go to the appointment.

14   Q.  Did you become addicted to drugs at some point while you

15   were going over to Mr. Epstein's house?

16   A.  Yes, unfortunately.

17   Q.  What drugs did you become addicted to?

18   A.  Cocaine and pain pills.

19   Q.  How did you get to Jeffrey Epstein's house for appointments

20   in your home in West Palm Beach to Palm Beach?

21   A.  Sometimes it would be by a driver would be sent, or I would

22   take a cab, or Shawn would use my mom's car and drop me off,

23   and my mom has also dropped me off there.

24   Q.  Why couldn't you drive yourself?

25   A.  Because I wasn't of age.

LC7VMAX3                    Carolyn – direct

1    Q.  When you got a cab or a car was sent for you, how did you

2    know that those cars were on the way?

3    A.  I was told.

4    Q.  By who?

5    A.  Either Maxwell or Sarah, whoever called to schedule the

6    appointment.

7    Q.  What would they say?

8    A.  That we would be sending a cab or a Town Car.

9    Q.  Did Shawn ever go inside Jeffrey Epstein's house when he

10   drove you there?

11   A.  No.

12   Q.  Who, if anyone, did Shawn meet outside of Jeffrey Epstein's

13   house when he went with you there?

14          MR. PAGLIUCA:  Objection.

15          Lack of foundation, your Honor, under 602.

16          THE COURT:  Sustained.

17   Q.  When you and Shawn were together at Jeffrey Epstein's

18   house, did you ever see someone else?

19   A.  When we were together at Mr. Epstein's house, yes.

20   Q.  Who did you see?

21   A.  I mean, he didn't go inside.

22   Q.  But when you were outside, did you ever see anyone?

23   A.  Yes, Mr. Epstein.

24   Q.  How many times did you see Mr. Epstein when Shawn was with

25   you?

1    A.  Once.

2    Q.  What happened that one time?

3    A.  They were talking about the Shelby Cobra that he owned.

4    Q.  That who owned?

5    A.  Mr. Epstein.

6    Q.  Where did that conversation happen?

7    A.  In the driveway.

8    Q.  Carolyn, did you ever drive yourself to Jeffrey Epstein's

9    house even though you didn't have a license?

10   A.  Yes.

11   Q.  About how many times?

12   A.  A few.

13   Q.  When you went over to Jeffrey Epstein's house for massage

14   appointments, where did you enter the house each time?

15   A.  Through the kitchen.

16   Q.  During the first few months when you were going over to

17   that house for massages, who did you see when you first entered

18   the kitchen?

19   A.  Maxwell.

20   Q.  What, if any, conversations do you remember having with

21   Maxwell when you would meet her in the kitchen?

22   A.  She would just let me know that Mr. Epstein would be back,

23   he was on a jog or he was -- he'd be back any moment; I could

24   go upstairs and set up.

25   Q.  When you interacted with Maxwell, what, if any,

1   conversations did you have with her about your family?

2   A.  About my upbringing and things that were going on at the

3   time.

4   Q.  What did you tell Maxwell?

5   A.  That my mom was an alcoholic, and I had been molested, and

6   just random personal things.

7   Q.  What, if any, conversations do you remember having with

8   Maxwell about sexual abuse that you have had experienced in the

9   past?

10  A.  I'm sorry, can you repeat that?

11  Q.  What conversations do you remember having with her about

12  sexual abuse that you'd experienced?

13  A.  I remember telling her that I had been raped and molested

14  by my grandfather starting at the age of four.

15  Q.  What, if any, conversations did you have with Maxwell about

16  travel?

17  A.  I couldn't travel because I couldn't get a passport because

18  I was too young.  And my mom, no matter how messed up she was,

19  there was no way I would be able to leave the country.

20  Q.  How did that topic come up?

21  A.  I was invited to go to an island.

22  Q.  Who invited you?

23  A.  Mr. Epstein and Maxwell.

24  Q.  And did they invite you together in one conversation or in

25  separate conversations?

LC7VMAX3                          Carolyn - direct

1    A.  Separate.

2    Q.  When you were speaking with Maxwell about that, what did

3    she say?

4    A.  She had asked if I ever traveled.  And I told her I've been

5    to New York, I used to live there, and just places I've been in

6    the United States.

7    Q.  And then where did she invite you to?

8    A.  To the island.

9    Q.  And how did you respond when Maxwell invited you to the

10   island?

11   A.  I told her that I was too young, and there is no way in

12   hell my mom was going to let me leave the country.

13   Q.  Did you tell her how old you were?

14   A.  Yes.

15   Q.  What did you say?

16   A.  I told her I was 14.

17   Q.  After you told Maxwell you were 14, did she continue to

18   call you to schedule massage appointments with Jeffrey Epstein?

19   A.  Yes.

20   Q.  What, if any, conversations do you remember having with

21   Maxwell about school?

22   A.  She had asked me if I had ever -- like, what I wanted to

23   do.  And I told her I wanted to become a massage therapist.

24   Q.  What, if any, conversations did you have with Maxwell about

25   sex toys?

LC7VMAX3                       Carolyn - direct

```
 1   A.  She asked me if I'd ever used them, and I told her no.
 2   Q.  What, if any, conversations do you remember having with
 3   Maxwell about your bra and hip size?
 4   A.  I was upstairs setting up the massage table.  And at that
 5   point I was kind of comfortable because I had been there so
 6   many times, that at that point I was getting fully nude.  And
 7   she came in and felt my boobs and my hips and my buttocks and
 8   said that -- that Mr. Epstein would -- that I had a great body
 9   for Mr. Epstein and his friends.
10   Q.  How did that relate to your breast and hip size?
11   A.  She just said that I had a good body type.
12   Q.  And just so we're clear about who she is?
13   A.  Maxwell.
14   Q.  You said she felt your boobs.  Did she touch you?
15   A.  Yes.
16   Q.  Where?
17   A.  On my breasts.
18   Q.  And where did that happen?
19   A.  In the massage room or the bathroom.
20   Q.  After that, did she leave the massage room?
21        You have to say the answer.
22   A.  Yes.
23   Q.  And then who came in?
24   A.  Mr. Epstein.
25   Q.  During each massage appointment at Jeffrey Epstein's house,
```

LC7VMAX3                    Carolyn - direct

1    after you went into the kitchen, where would you go from there?

2    A.   Upstairs to set up the massage table.

3    Q.   In what room did you set up the massage table?

4    A.   In his bathroom.

5    Q.   In whose bathroom?

6    A.   Mr. Epstein's.

7    Q.   Is that the same bathroom you described for us earlier?

8    A.   Yes.

9    Q.   When you first went into the massage room, what did you do

10   first?

11   A.   I would -- well, sometimes the massage table was already

12   set up, and all I would have to do is put the towel on it.  And

13   sometimes I would have to open the closet door and pull it out

14   and set it up.

15   Q.   After you set up the massage table, what would you do with

16   your clothing?

17   A.   I would take them off.

18   Q.   At first when you were first going over to that house, what

19   would you wear during the massages?

20   A.   I would keep my underwear on.

21   Q.   Did that change at some point?

22   A.   Yes.

23   Q.   What did it change to?

24   A.   To me being fully nude.

25   Q.   After -- withdrawn.

1          Other than Jeffrey Epstein, who else saw you fully

2    naked in the massage room?

3    A.  Maxwell, two of Mr. Epstein's friends, and two girls that I

4    don't know who they were.

5    Q.  We'll talk about them in a minute.

6          How many times approximately did Maxwell see you fully

7    naked in the massage room?

8    A.  Probably about three.

9    Q.  Was one of those the time when she touched your breasts?

10   A.  Yes.

11   Q.  Did she touch you the other two times that you can

12   remember?

13   A.  No.

14   Q.  After Maxwell saw you naked in the massage room, did she

15   continue calling you to schedule massage appointments with

16   Jeffrey Epstein?

17   A.  Yes.

18   Q.  About how old were you when Maxwell saw you naked in the

19   massage room and touched your breasts?

20   A.  I was going to be 15.

21   Q.  So were you 14, almost 15?

22   A.  Yeah.

23   Q.  Did anyone ever photograph you while you were at Jeffrey

24   Epstein's house?

25   A.  Yes.

LC7VMAX3                        Carolyn - direct

1   Q.  Who photographed you?

2   A.  Sarah.

3   Q.  How did Sarah come to photograph you?

4   A.  She had called me and asked -- well, she had said Mr.  --

5   she called and said she was calling in regards to Mr. Epstein;

6   and that I would get paid five to $600 if she could take

7   pictures of me.

8   Q.  How did you respond?

9   A.  I said okay.

10  Q.  Where were those pictures taken?

11  A.  In the Palm Beach house.

12  Q.  What were you wearing in those pictures?

13  A.  Nothing.

14  Q.  Who took those pictures?

15  A.  Sarah Kellen.

16  Q.  Do you remember anyone else being around at that time?

17  A.  No.  It was just me and her that I was aware of.

18  Q.  During the massage appointments, after you set up the

19  massage table and got undressed, who would come inside the

20  room?

21  A.  Mr. Epstein.

22  Q.  After Mr. Epstein came in the room, for the first

23  approximately 45 minutes in the room, what would you do?

24  A.  Massage him.

25  Q.  How would he be lying down?

LC7VMAX3                         Carolyn - direct

1   A.  Face down.

2   Q.  While you were massaging Mr. Epstein, what, if any,

3   conversations did you have?

4   A.  About my life, my upbringing.

5   Q.  What did you tell him about your family, if anything?

6   A.  That it was kind of screwed up; that my mom was an

7   alcoholic and an addict.

8   Q.  And what did you tell him about sexual abuse you had

9   experienced in the past?

10  A.  I had told him that I had been molested and raped.

11  Q.  And what, if any, conversations did you have with him about

12  travel?

13  A.  He had also asked me a couple of times if I can travel.

14  And I told him there is no way that my mom's going to let me

15  because I was too young.

16  Q.  In those conversations, did you tell Jeffrey Epstein how

17  old you were?

18  A.  Yes.

19  Q.  What did you say?

20  A.  I told him that I was only 15 and I couldn't leave.

21  Q.  After each massage, what were you paid?

22  A.  Three to $400.

23  Q.  Usually where would the money be after each massage?

24  A.  On the sink.

25  Q.  Did anyone ever hand you money?

LC7VMAX3                          Carolyn - direct

1    A.  Once or twice Ms. Maxwell did.

2    Q.  About how much money do you remember Ms. Maxwell handing

3    you after you engaged in a sexualized massage with Jeffrey

4    Epstein?

5    A.  $300.

6    Q.  What denominations were the bills?

7    A.  Hundreds.

8    Q.  Other than money, what gifts, if any, did you receive from

9    Jeffrey Epstein?

10   A.  I received lingerie.

11   Q.  How did you get that lingerie?

12   A.  Through FedEx.

13   Q.  Where did you receive a FedEx package?

14   A.  At my home.

15   Q.  In what town was your home?

16   A.  West Palm Beach.

17   Q.  Is that the home where you lived with your mom and your

18   younger brothers?

19   A.  Yes.

20   Q.  Did you notice the return address from those packages?

21   A.  Yes.

22   Q.  What was it?

23   A.  Manhattan, New York.

24   Q.  Any reason that stands out in your mind?

25   A.  Yeah.  Because I was born in New York, so -- and also I

LC7VMAX3                        Carolyn - direct

```
 1    knew that he had a home here in New York.
 2    Q.   What was inside those packages?
 3    A.   Lingerie from Victoria's Secrets.
 4    Q.   How did Mr. Epstein get your address as far as you know?
 5    A.   I had given --
 6              MR. PAGLIUCA:  Objection, your Honor.
 7              Lack of foundation.
 8              THE COURT:  Sustained.
 9    Q.   Did you give your address to anyone?
10    A.   Yes.
11    Q.   Who?
12    A.   Maxwell.
13    Q.   Why did you give your address to Maxwell?
14    A.   Because Jeffrey Epstein wanted to send me some items.  I
15    wasn't sure what the items were going to be.
16    Q.   And so did she ask for your address?
17    A.   Yes.
18    Q.   And did you give her your address?
19    A.   Yes.
20    Q.   Other than the lingerie, did you receive any other gifts?
21    A.   Yes.  A massage book for dummies, because I wanted to be a
22    massage therapist; and concert tickets to Incubus.
23    Q.   Other than Virginia, were there ever any other females in
24    the room with you when you were massaging Jeffrey Epstein?
25    A.   Yes.
```

1  Q.  How did those other females end up in the room?

2  A.  They came in the room.

3  Q.  With who?

4  A.  Themselves.

5  Q.  Did you ever bring friends to Jeffrey's house?

6          You have to say the answer.

7  A.  Yes.

8  Q.  About how many friends did you bring to Jeffrey Epstein's

9  house?

10  A.  Two or three.

11  Q.  What are the names of some of the friends you remember

12  bringing?  First names.

13  A.  Amanda Lazlo, Tatum, and Julie Morgan.

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

LC7Cmax4                    Carolyn - direct

1   BY MS. COMEY:

2   Q.  About how old were they when you brought them over?

3   A.  Amanda was one year older than me, Tatum was the same age

4   as me, and so was Julie.

5   Q.  How old were you when you brought Amanda?

6   A.  I believe I was 15 or 16.

7   Q.  And so how old was Amanda?

8   A.  She was a year older than me.  So I believe she was going

9   to be 17.

10  Q.  And how old were you when you brought Tatum?

11  A.  When we were 15, going to be 16.

12  Q.  And how old were you when you brought Julie?

13  A.  16.

14  Q.  Why did you bring friends to Jeffrey Epstein's house?

15  A.  He asked me if I had any friends that were my age or

16  younger, and I told him I didn't hang out with younger people,

17  but I do have some friends I can ask.

18  Q.  Do you remember anyone else asking you to bring friends?

19  A.  No.

20  Q.  When you brought your friends over to Jeffrey's house,

21  where did you enter the house with them?

22  A.  Through the kitchen area.

23  Q.  Where did you go next?

24  A.  Up the stairs into the massage room.

25  Q.  And after the massage ended, what were you and the friend

LC7Cmax4                           Carolyn - direct

1   paid?

2   A.  I was paid $600 and my friend was paid $300.

3   Q.  In what denominations?

4   A.  Hundreds.

5   Q.  Why did you get extra?

6   A.  Because I brought her, a friend with me.

7   Q.  About how long did each massage with Jeffrey Epstein last?

8   A.  45 minutes.

9   Q.  After that first 45 minutes, what happened each time?

10  A.  He would turn over and start masturbating until he

11  ejaculated.

12  Q.  During how many of the massages you gave Jeffrey Epstein

13  did he masturbate?

14  A.  Every single time.

15  Q.  During how many of the massages you gave Jeffrey Epstein

16  did he touch your breasts?

17  A.  Every time.

18  Q.  During how many of the massages you gave Jeffrey Epstein

19  did he touch your buttocks?

20  A.  Every time.

21  Q.  Where else, if anywhere, did Jeffrey Epstein touch you

22  during these massages?

23  A.  He tried one time to use like a vibrating thing on me, and

24  I immediately told him I'm not comfortable with that.

25  Q.  And did he stop?

LC7Cmax4                    Carolyn - direct

1   A.  Yes.

2   Q.  Can you describe the vibrating thing that he tried to put

3   on your vagina?

4   A.  It looked like what now I know -- it looked like --

5   Q.  Like a penis?

6   A.  Yes.  Sorry.

7   Q.  Did he actually touch that vibrator onto your vagina?

8   A.  Yes.

9   Q.  How did every massage you ever gave Jeffrey Epstein end?

10  A.  With him masturbating until he ejaculated.

11  Q.  Were there ever massages you provided Jeffrey Epstein where

12  nothing sexual happened?

13  A.  No.  Something sexual happened every single time.

14  Q.  During the massages when you brought friends, did sex acts

15  happen?

16  A.  The same thing, he would turn over and masturbate.

17  Q.  And where, if anywhere, did Jeffrey Epstein touch you and

18  your friends during those massages?

19  A.  On our breasts and butt.

20  Q.  Did Jeffrey ever bring anyone into the room?

21  A.  Yes.

22  Q.  Who did he bring into the room?

23  A.  On two separate occasions, he had pushed the button on the

24  phone and a girl came in that was already fully nude.

25  Q.  How many times did that happen?

LC7Cmax4                          Carolyn - direct

1    A.  Twice.

2    Q.  I want to talk about those times.

3             Had you ever met them before?

4    A.  No.

5    Q.  Do you know their names?

6    A.  I have no idea.

7    Q.  Let's talk about the first one.  What did she look like?

8    A.  She was slender and she had blond -- long blond hair and

9    she had a really strong accent.

10   Q.  What happened when this first female came into the massage

11   room with you and Jeffrey Epstein?

12   A.  Jeffrey was having sex with her while she performed oral

13   sex on me.

14   Q.  And turning to the second female, what did she look like?

15   A.  She had darker brown hair.

16   Q.  And what happened when she came into the room with you and

17   Jeffrey Epstein?

18   A.  She came in nude and Jeffrey penetrated me a couple times

19   and I told him I wasn't comfortable.  So he had sex with the

20   model and she performed oral sex on me.

21   Q.  Just to be clear, did Jeffrey Epstein penetrate your vagina

22   with his penis?

23   A.  Yes.

24   Q.  And then when you said you weren't comfortable, did he

25   stop?

1    A.  Yes.

2    Q.  What were you doing with the money that you made going to

3    Jeffrey Epstein's house?

4    A.  Buying drugs.

5    Q.  Was there ever a time, Carolyn, when you took a break from

6    going over to Jeffrey Epstein's house?

7    A.  Yes.

8    Q.  About when was that?

9    A.  When me and Sean ran away from Florida, we stole my mom's

10   car and went to Georgia.

11   Q.  Do you remember how old you were when you and Sean went to

12   Georgia?

13   A.  I was 16.  I was 16, going to be 17.

14   Q.  While you took that break from going over to Jeffrey

15   Epstein's house, what major life event, if any, happened?

16   A.  I got pregnant.

17   Q.  Did you have a baby?

18   A.  I did.

19   Q.  What month and year did you have a baby?

20   A.  March 12th, 2004.

21   Q.  What is the father of your son's first name, just his first

22   name?

23   A.  Sean.

24   Q.  After you had your son, your baby, did you ever go back to

25   Jeffrey Epstein's house?

LC7Cmax4                          Carolyn - direct

1   A.  Yes, I did.

2   Q.  About how many times?

3   A.  Well, I had gone there while I was pregnant --

4   Q.  I'm asking about after you had the baby.

5   A.  Okay.  I had gone back there more than, like, four or five

6   times, and he asked me if I had any younger friends and I said

7   no.  And that's when I realized I was too old.

8   Q.  Why did you go back after you had your baby?

9   A.  Because I needed the money because I was so young when I

10  had my son and I needed the money to buy stuff for him.

11  Q.  Why did you stop going to Jeffrey Epstein's house?

12  A.  Because I became too old.

13  Q.  How old were you?

14  A.  18.

15          MS. COMEY:  May I have a moment, your Honor?

16          THE COURT:  Yes.

17  Q.  Carolyn?

18  A.  Yes.

19  Q.  After you stopped seeing Jeffrey Epstein, did you continue

20  using drugs?

21  A.  Yes.

22  Q.  What drugs did you use?

23  A.  Cocaine and pain pills.

24  Q.  Were you addicted to both of those drugs?

25  A.  Yes.

LC7Cmax4                          Carolyn – direct

1    Q.  Have you ever been arrested as a result of your drug use?

2    A.  Yes.

3    Q.  In 2011, were you arrested for possessing cocaine?

4    A.  Yes.

5    Q.  What happened that led to you getting arrested?

6    A.  I handed the officer the drugs.

7    Q.  Why did you do that?

8    A.  Because I'm an idiot.  I handed him the drugs because I was

9    hoping I wouldn't get arrested.

10   Q.  Had you been pulled over in a car?

11   A.  Yes.

12   Q.  Did you ultimately plead guilty to felony possession of

13   cocaine as a result?

14   A.  Yes.

15   Q.  What was your sentence?

16   A.  I was on SOR.

17   Q.  What's that?

18   A.  Supervised own recognizance.

19   Q.  In 2013, were you arrested for possessing stolen property?

20   A.  Yes.

21   Q.  What happened that led to that arrest?

22   A.  Sean told me it was our son's Xbox.

23           MR. PAGLIUCA:  Objection.  Hearsay.

24           THE COURT:  Sustained.

25   Q.  Did you pawn an Xbox?

LC7Cmax4                          Carolyn - direct

1    A.  Yes, I did.

2    Q.  Was it your Xbox?

3    A.  No.

4    Q.  Did you tell the pawnbroker it was your Xbox?

5    A.  Yes.

6    Q.  Did you ultimately plead guilty to felony possession of

7    stolen property as a result?

8    A.  Yes.

9    Q.  And did you plead guilty to felony false verification of

10   ownership to a pawnbroker?

11   A.  Yes.

12   Q.  What was your sentence?

13   A.  I spent 52 days in jail.

14   Q.  After serving that sentence, did you go to drug treatment?

15   A.  Yes.

16   Q.  And after serving that sentence, did you go to therapy?

17   A.  Yes.

18   Q.  What medications do you currently take?

19   A.  I take methadone and Xanax and doxepine and Vyvanse.

20   Q.  What is methadone for?

21   A.  It's an opioid blocker so I can't take any pain pills

22   without being really sick.

23   Q.  So is that to help you with your opioid addiction?

24   A.  Yes.

25   Q.  What's the Xanax for?

LC7Cmax4                    Carolyn - direct

1    A.   For all the anxiety I have of thinking my daughters are

2    going to be trafficked or stolen or kidnapped from me.

3    Q.   And you mentioned two other types of medication.  What were

4    those for?

5    A.   My Vyvanse is to stay focused and my doxepine is for the

6    schizophrenia so I don't freak out if I -- because I am scared

7    that my kids are going to get kidnapped.

8    Q.   But you mentioned schizophrenia.  Do you have particular

9    symptoms?

10   A.   Yes.

11   Q.   What symptoms?

12   A.   I feel like people are out to get my children and traffic

13   them.

14   Q.   And do you hear voices telling you that someone's going to

15   take your children away?

16   A.   Sometimes.

17   Q.   Can you tell the difference between those voices and

18   reality?

19   A.   Absolutely.

20   Q.   How is that?

21   A.   Because I know that they're right there with me and I would

22   never let that happen.

23   Q.   Do any of those medications affect your ability to remember

24   what has happened to you?

25   A.   No.

LC7Cmax4                        Carolyn - direct

1  Q.  Do any of them affect your ability to tell the difference

2  between the truth and a lie?

3  A.  No.

4  Q.  About how often do you speak to Sean now?

5  A.  Never.

6  Q.  When did you break up?

7  A.  After the pawnshop thing.

8  Q.  Since breaking up with Sean, have you had any conversations

9  with him about what happened with Jeffrey Epstein?

10 A.  Nope.

11 Q.  Have you had any conversations with Sean about your

12 testimony here today?

13 A.  Absolutely not.

14 Q.  In 2007, were you interviewed by the FBI about Jeffrey

15 Epstein?

16 A.  Yes.

17 Q.  During that interview, did you tell the FBI that you

18 noticed an older lady with short black hair and an accent at

19 Epstein's residence the first time you went there with

20 Virginia?

21 A.  Yes.

22 Q.  Who was that?

23 A.  Maxwell.

24 Q.  During your interview with the FBI in 2007, did you mention

25 the other details of your interactions with Maxwell?

LC7Cmax4                    Carolyn - direct

1    A.  No.

2    Q.  Why not?

3    A.  I wasn't asked about Maxwell.

4    Q.  Who was the focus of that interview?

5    A.  Jeffrey Epstein.

6           MR. PAGLIUCA:  Objection, your Honor.  Speculation.

7           THE COURT:  Sustained.

8    Q.  Who did the FBI ask you questions about in 2007?

9    A.  Jeffrey Epstein.

10   Q.  After you stopped seeing Jeffrey Epstein when you were

11   about 18 years old, how did you make money?

12   A.  I worked for an escort service and was a stripper.

13   Q.  When you worked for the escort service, did you have sex

14   with men for money?

15   A.  Sometimes.

16   Q.  In or about 2009, did you bring a lawsuit against Jeffrey

17   Epstein and Sarah Kellen?

18   A.  Yes.

19   Q.  Why did you sue Jeffrey Epstein?

20   A.  Because of all the damage, emotional damage he did to me.

21   Q.  Why did you sue Sarah?

22   A.  Because she knew what was going on and she was -- she was

23   older than me, so she was an adult.  She knew what was

24   happening.

25   Q.  And what else did she do?

LC7Cmax4                    Carolyn - direct

1    A.   Took pictures of me while I was nude.

2    Q.   Without getting into the substance of any conversations,

3    who made the decision about who to sue in that lawsuit?

4            MR. PAGLIUCA:   Objection, your Honor.   602 without any

5    further foundation.

6            THE COURT:   Sustained.

7    Q.   Carolyn, did you hire a lawyer in order to bring this

8    lawsuit?

9    A.   Yes.

10   Q.   Without telling me the substance, did you have

11   conversations with that lawyer about who to sue?

12   A.   Yes.

13   Q.   And ultimately, after those conversations, based on your

14   understanding, who decided who would be sued in this lawsuit?

15           MR. PAGLIUCA:   Objection, your Honor.   Lack of

16   foundation.

17           THE COURT:   Sustained.

18           THE WITNESS:   Am I --

19           THE COURT:   I sustained.   It means don't answer.   Jury

20   will disregard.

21   Q.   In 2009, were you deposed as a part of that lawsuit?

22   A.   Yes.

23   Q.   During that deposition, were you asked about your time

24   working for the escort service?

25   A.   No.

LC7Cmax4                          Carolyn - direct

1   Q.  Did you lie during your deposition, Carolyn?

2   A.  Yeah.

3   Q.  What did you lie about?

4   A.  Being an escort and a stripper.

5   Q.  What did you say during the deposition?

6   A.  I didn't say anything about that.

7   Q.  Did you say that you worked for the escort service but

8   didn't sleep with anyone?

9   A.  Yes.

10  Q.  Was that true?

11  A.  No.

12  Q.  Why did you lie about that?

13  A.  I was embarrassed.

14          MS. COMEY:  May I have a moment, your Honor?

15          THE COURT:  Yes.

16          MS. COMEY:  Thank you, your Honor.

17          Ms. Drescher, could we please pull up, just for the

18  Court and the witness, 3505-403 at page 1.

19  BY MS. COMEY:

20  Q.  Carolyn, what was the date of your deposition in the

21  lawsuit?

22  A.  December 4th, 2009.

23          MS. COMEY:  Can we now please turn in this document,

24  Ms. Drescher, to page 36.  I want to go to deposition page 137,

25  lines 3 through 6.

LC7Cmax4                         Carolyn - direct

1              Your Honor, I would like to offer this and read it

2       into the record pursuant to 801(d)(1)(B).

3              MR. PAGLIUCA:  Lines 3 through 6?

4              MS. COMEY:  Yes, your Honor.

5              MR. PAGLIUCA:  I don't understand what this is being

6       offered for, your Honor.

7              THE COURT:  You'll confer.

8              MS. COMEY:  We've conferred, your Honor.

9              THE COURT:  Okay.  Mr. Pagliuca, do you have an

10      objection?

11             MR. PAGLIUCA:  Well, your Honor --

12             THE COURT:  Just objection or no.

13             MR. PAGLIUCA:  Yes.  Can we approach?

14             THE COURT:  Okay.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

LC7Cmax4                          Carolyn - direct

1           (At the sidebar)

2           MR. PAGLIUCA:  This is apparently being offered as

3    purported prior consistent statement?

4           THE COURT:  Right.

5           MR. PAGLIUCA:  The problem is, when read in context,

6    which really starts at line 20 on the page above and goes

7    through probably line 16 on the next page, we're simply just

8    parsing out two lines.

9           THE COURT:  She can read the whole thing.

10          MS. COMEY:  That's fine, your Honor.

11          THE COURT:  Okay?

12          MR. PAGLIUCA:  Okay.

13          MS. COMEY:  Starting at which line?

14          MR. PAGLIUCA:  I'd say 136, line 23.

15          MS. COMEY:  That's an answer.

16          MR. PAGLIUCA:  So the question is going to be line 20.

17          MS. COMEY:  Line 20 through line 6.

18          MR. PAGLIUCA:  Yes.

19          (Continued on next page)

20

21

22

23

24

25

1           (In open court)

2           THE COURT:  Okay, Ms. Comey.

3           MS. COMEY:  Ms. Drescher, I would like to pull up the

4    page just a little earlier, page 136, line 20, and we're going

5    to go through page 137, line 6.

6    BY MS. COMEY:

7    Q.  Carolyn, do you see that in front of you?

8    A.  Yes.

9    Q.  My question is, were you asked the following questions and

10   did you give the following answers.  I'm going to read this

11   aloud.  Just listen and read along with me.

12   "Q.  You would agree with me that you cannot recall the

13   specifics of each visit that you had at Mr. Epstein's home?

14   "A.  I don't remember the times and dates, but I can tell you

15   everything that happened while I was there.

16   "Q.  In your complaint in each count, you allege that you went

17   to Mr. Epstein's at his request?

18   "A.  Uh-huh.

19   "Q.  In fact, Mr. Epstein himself did not contact you on each

20   occasion and request you to come, did he?

21   "A.  No, he would have Sarah or Maxwell call me."

22           Did you give that testimony in December 2009, Carolyn?

23   A.  Yes.

24           MS. COMEY:  I'd like to go now, please, to page 33 of

25   the same document.

LC7Cmax4                          Carolyn - direct

1                    THE COURT:  Page and line numbers, please.

2                    MS. COMEY:  We'll be doing deposition page 124, lines

3        8 through 20.

4                    THE COURT:  Just a moment.  Mr. Pagliuca.

5                    MR. PAGLIUCA:  That's fine, your Honor.

6                    THE COURT:  All right.  Go ahead.

7                    MS. COMEY:  Thank you, your Honor.

8        BY MS. COMEY:

9        Q.  Starting with line 8 on page 124:

10       "Q.  And for what reason were you placing calls to try to get

11       Mr. Epstein?

12       "A.  To go over there to see him.

13       "Q.  Were you seeking the opportunity to go over and massage

14       him and get paid?

15       "A.  Yes.

16       "Q.  And on these occasions that you called to see if you could

17       go over there and give him a massage, did you talk to him or

18       did you talk to others at his house?

19       "A.  I talked to Sarah or Maxwell.  I have also talked to -- I

20       don't know if it's the cook or somebody else that was there

21       that took phone messages."

22                    Carolyn, did you give that testimony in December 2009?

23       A.  Yes.

24       Q.  Other than those two exchanges we just talked about, were

25       you asked any other questions about Maxwell during your 2009

1    deposition?

2    A.  No.

3    Q.  How did your lawsuit against Jeffrey and Sarah end in 2009?

4    A.  I received money.

5    Q.  Did you settle the case?

6    A.  Yes.

7    Q.  Do you remember how much money you received?

8    A.  No.

9    Q.  Can you approximate for us?

10   A.  Like $250,000.

11   Q.  Have you participated in a victim compensation fund for

12   victims of Jeffrey Epstein?

13   A.  Yes.

14   Q.  What did you do to submit a claim to that fund for the

15   fund?

16   A.  I -- I don't understand the question.

17   Q.  Did you put in an application to the fund?

18   A.  My attorneys did.

19   Q.  Did you receive an award from the fund?

20   A.  Yes.

21   Q.  Do you know exactly how much the fund awarded you?

22   A.  No.

23   Q.  About how much do you remember it being?

24   A.  Somewhere between $1 million and $3 million.

25   Q.  Did that money come from the estate of Jeffrey Epstein?

LC7Cmax4                    Carolyn – cross

1   A.  Yes.

2   Q.  Has that money already been wired to you?

3   A.  Yes.

4   Q.  Are you waiting on any other money from the fund?

5   A.  No.

6   Q.  As part of receiving that money, did you have to sign a

7   waiver agreeing not to sue any of Jeffrey Epstein's employees?

8   A.  Yes.

9   Q.  To your understanding, can you sue Maxwell?

10  A.  No.

11  Q.  To your understanding, will the jury's verdict in this case

12  affect the award you received from that fund?

13  A.  No.

14  Q.  Do you have any financial stake in the outcome of this

15  case?

16  A.  No.

17          MS. COMEY:  May I have a moment, your Honor?

18          THE COURT:  You may.

19          MS. COMEY:  Nothing further.

20          THE COURT:  We have about 15 minutes before lunch.

21  Mr. Pagliuca, you may begin your cross.

22          MR. PAGLIUCA:  Thank you, your Honor.

23          THE COURT:  Thank you.

24  CROSS-EXAMINATION

25  BY MR. PAGLIUCA:

LC7Cmax4                        Carolyn - cross

1    Q.  Good afternoon, Carolyn.

2            Carolyn, you had an acquaintance named Virginia

3    Roberts that was a friend of yours in 2002, approximately;

4    correct?

5    A.  Yes.

6    Q.  And you met her through your then boyfriend, Sean; is that

7    correct?

8    A.  Yes.

9    Q.  Sean was a friend of the man that Virginia Roberts was

10   living with, a fellow named Tony; is that correct?

11   A.  Yes.

12   Q.  And Tony and your boyfriend, Sean, were older than you;

13   correct?

14   A.  Yes.

15   Q.  About four years older than you; is that right?

16   A.  Yes.

17   Q.  And Ms. Roberts and Tony had an apartment together; is that

18   right?

19   A.  Yes.

20   Q.  And you had been to their apartment; correct?

21   A.  Yes.

22   Q.  You and Sean and Virginia Roberts and Tony hung out at that

23   apartment and smoked marijuana, for example?

24   A.  Yeah.

25   Q.  Drank alcohol; correct?

LC7Cmax4                          Carolyn - cross

1    A.  We didn't drink any alcohol.

2    Q.  Did other drugs?

3    A.  No.

4    Q.  Now, as I understand it, you were at a party when Virginia

5    Roberts approached you first about making $300; is that

6    correct?

7    A.  Absolutely not.

8    Q.  Do you remember speaking to the FBI in 2007?

9    A.  Yes.

10   Q.  And that was the first time that you talked to any law

11   enforcement about Mr. Epstein; correct?

12   A.  Yes.

13   Q.  And I'll direct --

14           MR. PAGLIUCA:  May I approach the witness, your Honor?

15           THE COURT:  You may.

16   Q.  If you could turn to tab 5 in that binder that I just

17   handed you, the big one, which is 3505-005, page 1.

18   A.  Sorry.  In which binder?

19   Q.  The big binder that I just gave you.

20           THE COURT:  Ms. Comey, do you have it?

21           MS. COMEY:  I do.  Thank you, your Honor.

22   A.  What number?  I'm sorry.

23   Q.  It's the first tab, it's got a 5 on it.

24   A.  It's upside down.  Hold on.

25   Q.  The first page.

LC7Cmax4                    Carolyn - cross

1              MR. PAGLIUCA:  We can display this electronically if

2     it's easier, your Honor.

3     A.  Okay.

4     Q.  I want to direct your -- do you have the document?

5     A.  Yes.

6     Q.  Page 1, paragraph 2.

7     A.  Okay.

8     Q.  The fifth line down, do you see where it starts, "Virginia

9     approached Carolyn at a party and asked her if she would like

10    to make $300."  Do you see that?

11    A.  No, I don't.

12             MS. COMEY:  Your Honor, may we approach?  Actually,

13    may I confer with counsel?

14             THE COURT:  You may confer.

15    Q.  Carolyn, directing your attention to that paragraph, do you

16    see that?

17    A.  Yeah, I see the paragraph.

18    Q.  Where it says that, "Virginia approached Carolyn at a party

19    and asked her if she would like to make $300."  Do you see

20    that?

21    A.  Yes, I see that.

22    Q.  Is that what you told the FBI in 2007?

23    A.  No.

24    Q.  The FBI got it wrong?

25    A.  We weren't at a party.  We were at Virginia's house when

LC7Cmax4                        Carolyn - cross

1   she approached me.

2   Q.   Did Virginia explain to you that you could make $300 by

3   providing a man in Palm Beach with a massage?

4   A.   She told me that we were going to be meeting a friend of

5   hers in Palm Beach.

6   Q.   And the friend you were meeting was older; is that correct?

7   A.   Yes.

8   Q.   Now, when Roberts approached you about making this $500,

9   Ms. Maxwell, Ghislaine Maxwell was not there; correct?

10  A.   There was no $500.

11  Q.   $300.  Ms. Maxwell was not there; correct?

12  A.   No, it was me and Virginia.

13  Q.   And Ms. Maxwell was not involved in this conversation that

14  you had with Ms. Roberts about making this $300; correct?

15  A.   Correct.

16  Q.   During your conversation with Ms. Roberts, she told you

17  that you could make this $300 by massaging this older man; is

18  that right?

19  A.   No.  She said we were going to meet one of her friends

20  and -- I'm sorry.  Repeat the question.

21  Q.   She told you that you could make money by massaging an

22  older man; is that correct?

23          MS. COMEY:  Your Honor, can we just classify if

24  Mr. Pagliuca is asking her about a document or her memory as

25  she sits here today.

LC7Cmax4                          Carolyn – cross

 1             THE COURT:  Sure.  You're asking about her memory?

 2             MR. PAGLIUCA:  Yes.

 3             THE COURT:  Start with that question.

 4             THE WITNESS:  Why do I have the binder?

 5             THE COURT:  You can close the binder.

 6   BY MR. PAGLIUCA:

 7   Q.  Ms. Roberts told you that you could make money by massaging

 8   an older man; is that correct?

 9   A.  No.

10   Q.  If you could go back to that same exhibit, 005 at page 1,

11   paragraph 2.

12   A.  Go ahead.

13   Q.  The last line, isn't it true that you told the FBI,

14   "Virginia explained that Carolyn could make $300 by providing a

15   man in Palm Beach with a massage."  Isn't it true, you told

16   them at that time?

17   A.  What paragraph are you on?

18   Q.  Paragraph 2, the last sentence.

19   A.  She didn't tell me anything about a massage at that time.

20   Q.  So you're saying you didn't tell that to the FBI in 2007

21   when they interviewed you?

22   A.  She told me that when we got to Mr. Epstein's house.

23   Q.  Carolyn, I'm just asking you a very simple question, are

24   you denying telling the FBI, in August of 2007, that Virginia

25   explained that Carolyn could make $300 by providing a man in

LC7Cmax4                      Carolyn - cross

1    Palm Beach with a massage?

2    A.  Yes, she told me that.

3    Q.  And that's what you told the FBI?

4    A.  Yes, I told the FBI that.

5    Q.  It's also true that Ms. Roberts told you that you could

6    make a lot of money real fast; correct?

7               MS. COMEY:  Your Honor, are we talking about a

8    document or her memory?

9               THE COURT:  Can you clarify the timeframe of your

10   question, both as to whether you're asking about her current

11   memory, and if so, what time you're asking her to recall.

12              MR. PAGLIUCA:  I'm asking about current memory, unless

13   I refer the witness to the document, your Honor.

14              MS. COMEY:  Your Honor, it might be helpful to have

15   the witness set the document aside.

16              MR. PAGLIUCA:  That's fine.

17              THE COURT:  Close the binder, please.

18              MR. PAGLIUCA:  Might be easier if we use the screen.

19              THE COURT:  Do that.

20              MR. PAGLIUCA:  That's fine.

21   BY MR. PAGLIUCA:

22   Q.  Carolyn, Ms. Roberts told you, you recall, this first time

23   that you could make a lot of money real fast; isn't that true?

24   A.  No.

25   Q.  If we can show the witness 005, page 1, third paragraph,

LC7Cmax4                    Carolyn - cross

1  first sentence, please.

2  A.  Yes, I did say that.

3  Q.  It's also true, Carolyn, that Ms. Roberts instructed you to

4  dress sexy; is that correct?

5  A.  Ms. Roberts dressed me sexy to be able to go.

6  Q.  Isn't it also true that Ms. Roberts instructed you that if

7  you didn't like something, to let her know; correct?

8  A.  Yes.

9  Q.  She also told you, before you went over to Mr. Epstein's,

10  that you might have to remove your shirt and pants, but could

11  keep your underwear on; is that correct?

12          MR. PAGLIUCA:  We can take this down while we're

13  asking questions.

14  A.  She had -- she asked me if I wanted to go with her to meet

15  a friend of hers who lived on Palm Beach and I would have to

16  dress provocatively. so she dressed me and said that we could

17  make money.  So she drove me there and when we got there is

18  when she told me that she would massage Mr. Epstein with me so

19  I would not feel uncomfortable.

20  Q.  Okay.  My question is, before you went over there,

21  Ms. Roberts told you that you might have to remove your shirt

22  and pants, but you could keep your underwear on.  Is that true

23  or not?

24  A.  She told me that when we were in the massage room.

25  Q.  Before you went over there, isn't it also true that

LC7Cmax4                    Carolyn - cross

1   Ms. Roberts told you to say that you were 17 or 18?

2   A.   That is not true.

3   Q.   That's not true; is that your testimony?

4   A.   She said if somebody asked, I needed to say that.

5         MR. PAGLIUCA:   If we can show the witness the same

6   document at paragraph 4.

7   Q.   Do you see on the last two lines there, "Carolyn was

8   previously instructed by Virginia to tell Epstein she was 17."

9   Do you see that?

10  A.   Yeah.

11  Q.   Is that what you told the FBI in August of 2007?

12  A.   Yes, because I slipped up and told Mr. Epstein that I was

13  14.

14  Q.   I'm not asking you what you told Mr. Epstein, I'm asking

15  you first, that's what Ms. Roberts told you and, at first, you

16  said no, and now you're saying yes?

17  A.   She told me if anybody asked, I needed to say I was 17.

18        MR. PAGLIUCA:   We can take that down.

19  Q.   Do you remember Ms. Roberts saying that he, Epstein, was a

20  friend of hers, we can go there, you can give him a massage,

21  and he will pay.   Do you remember that?

22  A.   Yes.

23  Q.   Now, I want to talk about the timeframe that you've

24  testified about.   Isn't it true that the date you first went to

25  Epstein's house at the invitation of Roberts was in May or June

LC7Cmax4                     Carolyn - cross

1   of 2002?

2   A.  I don't recall.

3   Q.  Ms. Comey showed you your deposition testimony from

4   December 2009.  Do you recall that?

5   A.  Yes.

6   Q.  And that was in connection with your civil lawsuit against

7   Jeffrey Epstein and Sarah Kellen; correct?

8   A.  I don't remember.

9          MR. PAGLIUCA:  Let's show the witness 3505-043 at page

10  33 at deposition page 125, lines 23 through 24 through 126,

11  line 2.

12  Q.  Do you have that?  Isn't it true that, under oath in August

13  of 2009, you were asked the question:

14  "Q.  All right.  So for purposes --

15          THE COURT:  I'm sorry.  It's small again.

16          MR. PAGLIUCA:  Can we enlarge that, please.

17          THE COURT:  Can we get the page and line numbers that

18  you intend to read.

19          MR. PAGLIUCA:  Certainly, your Honor.  So we'll start

20  at the bottom, which is page 33, deposition page 125, lines 23

21  through 25 on that page, over to page 126, line 1, and we'll

22  continue down to line 10, your Honor.

23          THE COURT:  Okay.

24  BY MR. PAGLIUCA:

25  Q.  Isn't it true, Carolyn, that, under oath, you were asked

LC7Cmax4                          Carolyn - cross

1   the question:

2   "Q.  All right.  So for purposes of this case, the total period

3   of time that you had any interaction with Mr. Epstein was

4   between May of '02 and August of '03.

5   "A.  Uh-huh."

6   Q.  Do you see that?

7   A.  I see the ending of that, yes.

8   Q.  And then if we go to page 126, lines 1 through 10 is the

9   next page --

10         THE COURT:  Could you pull up the mic, Mr. Pagliuca.

11  A.  We're on page 126.

12  Q.  Okay.  And then there is another question:

13  "Q.  That is another way of saying it is the first time you

14  went, is May of '02, and the last time was August of '03?

15  "A.  Yeah."

16         Do you see that?

17  A.  Yes, I do.

18  Q.  And that was your testimony under oath?

19  A.  Yes.

20  Q.  In 2009; correct?

21  A.  Yes.

22  Q.  And then you were then asked the question:

23  "Q.  Didn't know Mr. Epstein at all prior to May of '02 and had

24  no contact with him after August of '03?

25  "A.  Correct."

LC7Cmax4                          Carolyn - cross

1            Is that right?

2    A.  Yes, that's right.

3    Q.  So that was your deposition testimony under oath in 2009;

4    is that right?

5    A.  Yes, that's right.

6            MR. PAGLIUCA:  We can take that down.

7    Q.  You recall that Virginia Roberts was 18 when you first met

8    her; is that correct?

9    A.  Yes.

10   Q.  And you don't recall the exact date, but sometime in May or

11   June of '02 after this conversation is when you went to

12   Mr. Epstein's house; correct?

13   A.  I'm sorry.  Can you repeat the question.

14   Q.  Yes.  You don't recall the exact date, but sometime after

15   you had this conversation with Virginia Roberts in May or June

16   of '02 is when you went to Mr. Epstein's house; correct?

17   A.  Yes.

18   Q.  And you had never been to the house before; correct?

19   A.  Correct.

20   Q.  You never met Mr. Epstein before; correct?

21   A.  Correct.

22   Q.  You didn't even know the name of the person that you were

23   going to meet; correct?

24   A.  She told me when we got there.

25   Q.  Before you got there, you didn't even know the name of the

LC7Cmax4                              Carolyn – cross

1   person that you were going to meet; correct?

2   A.  Correct.

3   Q.  And it is Roberts who arranged this meeting with

4   Mr. Epstein; correct?

5   A.  I suppose.

6   Q.  Well, it was just you and her that went; correct?

7   A.  Yes.

8   Q.  And she drove; correct?

9   A.  Correct.

10  Q.  And she had a white car.  Do you recall that?

11  A.  Yes.

12  Q.  She picked you up at your house; right?

13  A.  Nope.

14  Q.  How did you get there?

15  A.  We were at her house for the first time, not a party, and

16  it was only me, Sean, Tony, and Virginia, and she dressed me

17  provocatively and that's when we went to Mr. Epstein's home.

18  Q.  Okay.  She knew where to go; right?

19  A.  Yes, she did.

20  Q.  And she drove the two of you there; is that right?

21  A.  Yes.

22  Q.  And it took about 30 minutes or so to get there; is that

23  fair?

24  A.  I have no idea, sir.

25  Q.  She parked the car; right?

LC7Cmax4                     Carolyn - cross

1    A.  Obviously.

2    Q.  And then you and she walked to the front door; is that

3    correct?

4    A.  No, we walked to the kitchen door.

5    Q.  You walked to a door; right?

6    A.  That led into the kitchen.

7    Q.  Okay.  You went inside; right?

8    A.  Yes.

9    Q.  Now, this is approximately 19 years ago is what we're

10   talking about here today; correct?

11   A.  Give or take.

12   Q.  And you had never been inside this house before; correct?

13   A.  Didn't you already ask me that question?

14   Q.  I don't think I did.

15   A.  That was the first time I went, was with Virginia.

16   Q.  And that's the first time you were inside; correct?

17   A.  Correct.

18   Q.  You had never met anyone who worked there before; correct?

19   A.  Correct.

20   Q.  And you went inside and you were taken upstairs by Virginia

21   Roberts; correct?

22   A.  Correct.

23        THE COURT:  Mr. Pagliuca, we're going to break here

24   for lunch.

25        MR. PAGLIUCA:  Thank you, your Honor.

LC7Cmax4                        Carolyn - cross

1              THE COURT:  Members of the jury, you have your lunch.

2       We'll resume in about an hour.  Thank you so much.

3              (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LC7Cmax4                        Carolyn - cross

1           (Jury not present)

2           THE COURT:  The witness may step down and break for

3    lunch.

4           (Witness excused)

5           Everyone may be seated.  Okay, matters to take up

6    before the break?

7           MS. MOE:  Yes, your Honor.  During the morning break,

8    we had an opportunity to speak with the witness identified as

9    Brian.  I've provided a copy of the notes from that

10   conversation to defense counsel when we came back from the

11   break along with a text message that Brian provided us a copy

12   with.  I'm happy to -- we haven't had a chance to stamp them

13   yet with 3500 numbers, but I'm happy to provide a copy to the

14   Court.

15          THE COURT:  Okay.

16          MS. MOE:  Besides that, is there a particular time

17   when the Court would like to take up that particular issue and

18   the other issue that we addressed at sidebar?

19          THE COURT:  Let's discuss this now since that goes to

20   the defense's at least prior request was the exclusion of his

21   testimony.  So I'll hear from you on that, if you're prepared

22   to be heard from that now or we break and then I hear from you.

23          MS. MOE:  Your Honor, we'd be happy to take this up

24   after the break, perhaps in order to provide defense counsel an

25   opportunity to review those further and to confer on this

LC7Cmax4                         Carolyn - cross

1    issue.  I just wanted to alert the Court that we had run this

2    issue down and disclosed that matter and wanted to promptly

3    alert the Court about that.

4              THE COURT:  So Ms. Menninger, the suggestion is we all

5    look at the copy of the notes, I think we resume in about 30

6    minutes to address the issue.

7              MS. MENNINGER:  Yes, your Honor.  I received it right

8    as testimony was beginning, so I have not studied them.  If

9    your Honor would like to take an additional 10 minutes, I can

10   try to do some research, but if your Honor is just wanting to

11   address the content of the note --

12             THE COURT:  My suggestion is we all look at the

13   contents of the notes, do some research, and resume in 30

14   minutes.  How is that?

15             MS. MENNINGER:  I will do my best, your Honor.

16             THE COURT:  It's all we all can do.

17             Do you want to give a 3500 stamp or --

18             MS. MOE:  Your Honor, I would suggest that we hand up

19   the printed copy now and, during the break, we can stamp it and

20   send an email copy to chambers.

21             THE COURT:  That's fine.

22             MS. MOE:  Thank you, your Honor.

23             THE COURT:  So it's 12:55.  We'll resume in 30 minutes

24   to discuss this.  Assuming we're going forward with this

25   witness's testimony, we'll take up, at sidebar, the issue

LC7Cmax4                          Carolyn - cross

1    regarding a question that the defense is interested in that

2    implicates some privacy issues.  Correct?

3           MS. MOE:  Thank you, your Honor.  Yes.

4           MS. MENNINGER:  Yes, your Honor.

5           THE COURT:  We'll meet in 30.  Thank you.

6           (Recess)

7           (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LC7VMAX5                    Carolyn – cross

1                    A F T E R N O O N   S E S S I O N

2                              1:40 P.M.

3          THE COURT:  All right.  We'll take up the question of

4     the communication between the brother of Jane and Jane.

5          MR. ROHRBACH:  Yes, your Honor.

6          During the break, the government did find some cases.

7     But we also learned toward the end of the break that there are

8     a small number of additional text messages.

9          The government's view at this point is that it makes

10    sense for us to fully run down and make sure we have identified

11    the universe of text messages.  And we're willing to not call

12    Brian until tomorrow morning to give the parties an opportunity

13    to understand all the facts and provide an analysis of the law.

14         And so my understanding from talking to Ms. Menninger

15    is that the defense doesn't object to allowing us to brief this

16    issue tonight and call Brian and address it tomorrow morning.

17         THE COURT:  Okay.

18         MS. MENNINGER:  Yes, your Honor.  As long as the

19    factual record is still undeveloped, I don't think it makes

20    sense to start applying the law to those facts.  But I repeat

21    my request that there be an actual under-oath representation by

22    this witness about the communications rather than dribbling out

23    information.

24         THE COURT:  Well, I don't know if we'll need an under

25    oath prior to his testimony.  Certainly it can be fully

LC7VMAX5                    Carolyn - cross

1    explored in your cross-examination, which is under oath.  But I

2    do think in advance of that, we need a full understanding which

3    I think includes making sure you have every text and email

4    communication.  I would think you need to have an interview

5    with Jane, as well, to see if you're getting the same

6    information from her.  And I think you need to make sure that

7    there are no other conduits of information regarding Jane's

8    testimony to the brother.

9            MR. ROHRBACH:  Yes, your Honor.

10           THE COURT:  Okay.  And I've started to look at the law

11   too.  I think it's unlikely we're going to get to a breach of

12   the text of the rule.  I think my hypo about if somebody passed

13   the transcript would certainly go to a violation of the spirit

14   of the rule and not the text.  And there may be some further

15   version of full communication of her testimony, especially a

16   witness who's being put on solely to provide prior consistent

17   statements.

18           I don't think the government did anything wrong.  I'm

19   a little shocked that this wasn't fully drilled into these

20   witnesses just as a matter of best practice.  I understand from

21   the notes that it was communicated to the witnesses not to

22   speak to other witnesses, but somehow this witness didn't

23   understand that to mean his sister.  But here we are.

24           MR. ROHRBACH:  Your Honor, on that point, we would

25   just say that the notes from today reflect that the witness

LC7VMAX5                    Carolyn - cross

1    recalls having been instructed by the government not to discuss

2    his testimony with his sister.  Of course, it can be very

3    difficult not to talk about your life with your family.

4              THE COURT:  Right.  That would be the kind of thing, I

5    would think, best practices would say, Look, I know this is

6    difficult.  This is important.  I imagine that is a

7    conversation that many government lawyers have with witnesses.

8              MR. ROHRBACH:  Yes, your Honor.  And my understanding

9    is that we did have that conversation.

10             THE COURT:  Okay.

11             Then it may be a little hard to square that that

12   conversation was had with the statement that it was unclear

13   that this was a transgression.  There's some mismatch there.

14             So you need to run a full investigation.  We'll have

15   those facts produced to the defense by what time?

16             MR. ROHRBACH:  We'll be working on it through the

17   afternoon today.  We will do our best to have disclosed as much

18   as we know by the end of the court day.  Understanding the

19   breadth of the investigation the Court wants, it may take

20   longer to complete all of --

21             THE COURT:  Well, you should think about whether there

22   is anything else worth pursuing to make sure that the Court and

23   both sides have a full factual record.

24             MR. ROHRBACH:  We will certainly give that thought.

25             THE COURT:  And then, as I say, I think once we have

LC7VMAX5                    Carolyn - cross

1   that, my quick look at the case law is that I'm very unlikely

2   to exclude, unless there was some knowing and full violation of

3   the sequestration spirit, if details of -- significant details

4   of Jane's testimony.  But in the absence of that, I think what

5   we have is ripe grounds for cross-examination with an

6   opportunity for the defense to have at it.

7            MR. ROHRBACH:  Yes, your Honor.

8            MS. MENNINGER:  Your Honor I looked at some recent

9   case law, and I imagine your Honor has seen similar cases.  But

10  one was Judge Engelmayer's decision in *Teman*.  And there are

11  some significant reasons why this case is much different than

12  the decision he reached in that case, including the fact that

13  that was a conversation between the government and a witness

14  rather than -- he distinguished the other cases, which were a

15  witness speaking to another witness.

16           THE COURT:  There was no order in place for witnesses

17  not to speak.  It could have been requested, I suppose.  It

18  wasn't requested.  I didn't put one in place.  I never have.

19  And the reason is because if witnesses speak to each other,

20  that's going to come out on cross, and boy is that going to

21  look bad for the witnesses.

22           So I think that's probably where we are.  I have

23  looked at *Teman*.  I looked at the rule.  We'll keep looking at

24  cases once we have the full factual record.

25           But it seems to me we're likely to be at a point where

1    we have the factual record.  There's no additional record that

2    would lead to exclusion, and so we'll do what we need to do.  A

3    hearing, an order, only to prepare further for what's going to

4    happen is likely not necessarily.  I don't see any law that

5    supports that.  But we'll get the full factual record and

6    you'll brief it.

7            So I would like -- if this witness is going to testify

8    tomorrow, I think the government needs to provide the defense

9    the results of a full factual investigation by 6 p.m.  And

10   then, Ms. Menninger, when would you like to brief the issue?

11           MS. MENNINGER:  By 9 p.m., your Honor.

12           THE COURT:  Okay.  By 9 p.m.

13           And then let's say -- Mr. Rohrbach?

14           MR. ROHRBACH:  I apologize.  By 9 p.m.  By midnight.

15   I know that's late for the Court.  That would be three hours

16   for each side to write a brief.

17           THE COURT:  Okay.

18           MR. ROHRBACH:  Thank you, your Honor.

19           Just one other point on this witness, your Honor.

20           We understand that this witness is also a subject of a

21   defense subpoena.  And so the government would just like to

22   know whether, in light of the defense's motion to preclude his

23   testimony for this reason, he's still under defense subpoena.

24           THE COURT:  I suppose they might want to know the

25   result of that motion first.

LC7VMAX5                         Carolyn - cross

1          MS. MENNINGER:  Yes, your Honor.

2          THE COURT:  Right?

3          MR. ROHRBACH:  Yes.

4          THE COURT:  Okay.  In other words, let's put it this

5    way:  If I grant your motion, do you intend to call the

6    brother?

7          MS. MENNINGER:  It seems highly unlikely, your Honor.

8          THE COURT:  Okay.

9          MS. MENNINGER:  But, your Honor, two very quick

10   factual issues.  One is you may recall that when we began at

11   the final pretrial conference on November 23rd, we specifically

12   requested permission to share Dr. Rocchio's testimony with our

13   two experts because we believed that this issue precluded

14   otherwise witnesses listening in or finding out about the

15   testimony of other witnesses, one.

16         The second point is --

17         THE COURT:  And I said talk it out, confer, and then

18   brief me if you have disagreement.  I received no briefing.

19         MS. MENNINGER:  I think there was no objection to that

20   process, your Honor.

21         MR. ROHRBACH:  There was no objection.

22         MS. MENNINGER:  And then the second point is when Jane

23   was released from the stand and the government asked for

24   permission to speak with her about logistical matters, I said

25   at that time, So long as she's admonished that she's not to

LC7VMAX5                      Carolyn - cross

```
 1   speak to other witnesses; and they said, Of course.  That was a
 2   brief sidebar conversation that was had.
 3          So just to the extent your Honor has brought up the
 4   fact that there wasn't an order specifically saying witnesses
 5   aren't to speak to one another, I certainly thought it was
 6   implied in the course and conduct of what had occurred and the
 7   sequestration order generally.
 8          THE COURT:  Okay.  You'll brief it.
 9          MR. ROHRBACH:  Yes, we'll brief it, your Honor.
10          THE COURT:  All right.
11          So I suppose that we can deal then in the afternoon or
12   tomorrow with the related sub question of an area that the
13   defense seeks to cross the witness on.
14          MS. MENNINGER:  Yes, your Honor.
15          Ms. Moe and I spoke briefly.  We assumed, I think, as
16   your Honor said, that the question of gatekeeping would
17   logically come first before dealing with a side issue if he
18   does testify.  We didn't really have a chance over the break to
19   explore the facts of that further.
20          THE COURT:  Okay.  So you'll confer on that and we can
21   take it up.  I suppose we could take it up in the morning.
22   There's going to be a lot to do in the morning.  But I need to
23   hear from you on it before I resolve the question of whether
24   Brian will testify on the theory that I think it's likely that
25   he will testify.
```

LC7VMAX5                         Carolyn - cross

1          MS. MENNINGER:  Understood, your Honor.

2          THE COURT:  Okay.  Thank you.

3          Is there anything else we can address now?

4          MS. STERNHEIM:  I can raise this now or --

5          THE COURT:  Microphone please.

6          MS. STERNHEIM:  I apologize.

7          THE COURT:  That's okay.

8          MS. STERNHEIM:  I could raise this now or we could

9    hold off, but the government has indicated that they may call

10   some witnesses out of order.  That's not the issue.

11         But with regard to one of the witnesses that they may

12   call, I have some objection to the relevance of some of the

13   testimony.  And I did not know if you wish to hear it now or

14   wait until such time as they actually intend to call.

15         THE COURT:  Okay.  So, let's see.  We have the current

16   witness.  How long do you anticipate for your cross,

17   Mr. Pagliuca?

18         MR. PAGLIUCA:  I'm going to guess an hour, hour and a

19   half, your Honor, something like that.

20         THE COURT:  Okay.

21         MR. PAGLIUCA:  Some of that may depend on some issues

22   that I think the government has opened the door on.  And I

23   don't know if you want to talk about those now or later.

24         THE COURT:  Well, I don't want the jury to be sitting

25   idly.  So if it is going to happen in your cross, we should

LC7VMAX5                      Carolyn - cross

1    talk about it now.

2              MR. PAGLIUCA:  Sure.  I don't know if you want to deal

3    with Ms. Sternheim's issue first.

4              MS. STERNHEIM:  Mine should go to the back of the bus

5    on this.

6              THE COURT:  Okay.

7              MR. PAGLIUCA:  So there was direct examination

8    testimony, your Honor, concerning psychiatric issues, ongoing

9    psychiatric issues, with this witness.  I think there was some

10   minimization of the ongoing psychiatric issues.  And the

11   records that I have reflect much more extensive psychiatric

12   issues.

13             I believe that I should be allowed to inquire about

14   her extensive psychiatric history.  There were questions on

15   direct examination about her ongoing drug abuse, and I think

16   that opens -- and I think it was minimized.  And I think that

17   that opens the door to my being able to examine on the full

18   extent of her ongoing drug abuse.

19             There was also testimony raised sort of in the vein

20   of, I'm schizophrenic and I am schizophrenic about my children

21   because they're important to me, essentially, and that's why I

22   have this schizophrenia and hear voices around my children.

23             This witness has a significant history of having her

24   children taken away from her and these children living with her

25   mother or other relatives.  And I think that the way that the

LC7VMAX5                    Carolyn - cross

 1    government has framed this allows for inquiry about that.  And

 2    had the government not asked those questions, it was not my

 3    intent to get into any of the child issues.

 4          But I think the jury is left with the impression that

 5    because of what Epstein did to her, she's now schizophrenic and

 6    has all these schizophrenic concerns about her children, when,

 7    for the last 19 years, these children have been repeatedly put

 8    in different places as a result of her problems.

 9          MS. COMEY:  Your Honor, I think if Mr. Pagliuca is

10    going to go into detail, we should be having this at side bear

11    under seal, if we're going to be discussing the details of her

12    family.

13          THE COURT:  Yes.

14          MR. PAGLIUCA:  Okay.

15          THE COURT:  The court reporter requested, so she can

16    sit, that we do it in the robing room.

17          (Pages 1590 to 1601 SEALED)

18          (Continued on next page)

19

20

21

22

23

24

25

```
 1              (In open court)

 2              THE COURT:  We'll bring in the jury.

 3              Can we have the witness come back please.

 4              MS. POMERANTZ:  I believe Ms. Comey just went to do

 5    that, your Honor.

 6              THE COURT:  Thank you.  Bring in the jury.

 7              (Jury present)

 8              THE COURT:  Please take your seats.  We're just

 9    waiting for the witness to return.

10              Good afternoon, Carolyn.  You may remove your mask.

11    And I remind you, you are under oath.

12              And Mr. Pagliuca, you may resume with your

13    cross-examination.

14              MR. PAGLIUCA:  Thank you, your Honor.

15              THE WITNESS:  One second.  I walked upstairs.

16              THE COURT:  Sorry about that.  Take your time.

17              THE WITNESS:  Okay.

18    CAROLYN, resumed.

19    BY MR. PAGLIUCA:

20    Q.  Are you ready?

21    A.  Yup.

22    Q.  Okay.  Carolyn, when we broke for lunch --

23              THE COURT:  Could you pull the mic up, Mr. Pagliuca?

24              MR. PAGLIUCA:  Yes, your Honor.

25              THE COURT:  Thank you.
```

LC7VMAX5                      Carolyn - cross

1    Q.  -- we were talking about 2002, when you went to

2    Mr. Epstein's house with Virginia Roberts.  And I think where

3    we stopped was you were -- you went into the house and you were

4    taken upstairs by Ms. Roberts.  Do you recall that?

5    A.  Yes.

6    Q.  Now, the only person that you saw when you entered the

7    house, you identified as being an older lady with unknown hair

8    and an unknown accent.  Is that correct?

9    A.  No.  I said she had shoulder-length black hair with an

10   accent.

11   Q.  Do you recall again giving a statement to the FBI in August

12   of 2007?

13   A.  A what?  A testimony?

14   Q.  Do you recall being interviewed by the FBI in August of

15   2007, Special Agents Nesbitt and Kuyrkendall?

16   A.  Yes.

17   Q.  And they met with you at your house; is that right?

18   A.  Yes.

19   Q.  And they weren't there to be mean to you; they were trying

20   to ask you questions.  Correct?

21   A.  Yes.

22   Q.  And they introduced themselves to you, right?

23   A.  Yes.

24   Q.  And you certainly had no reason to lie to them; correct?

25   A.  Correct.

LC7VMAX5                    Carolyn - cross

```
 1    Q.  You told the FBI the truth at that meeting; correct?

 2    A.  Some of the things I didn't mention because I was

 3    embarrassed.

 4    Q.  So let's talk about that.

 5         Do you recall testifying at your deposition, this is

 6    at 3505-043, page 27.

 7         THE COURT:  And give us the line numbers while that's

 8    being brought up on the screen.

 9         MR. PAGLIUCA:  It's actually 3505-043, 9, at

10    deposition page 37, lines 21 through 23.

11         THE COURT:  I don't have anything on my screen yet.

12         MR. PAGLIUCA:  3505-043, page 9, page 27, deposition,

13    lines 21 through 23, continuing on to the next page, which is

14    28, lines 1 and 2.

15         May I, your Honor?

16         THE COURT:  Ms. Comey, any objection?

17         MS. COMEY:  No, your Honor.

18         THE COURT:  Go ahead.

19    BY MR. PAGLIUCA:

20    Q.  Isn't it true, Carolyn, that you testified under oath in

21    2009 to the following:

22    "Q.  Whether you were under oath or not, did you tell them the

23    truth at that meeting?

24    "A.  Yeah.

25    "Q.  Did you tell the FBI the truth when they came to your
```

1    house?

2    "A.  Yes.  I have absolute no -- absolutely no reason to lie

3    about this situation."

4            Do you recall that testimony under oath?

5    A.  I do not remember if I was under oath or not, but I do

6    remember the question.

7    Q.  Okay.  And you testified in your deposition that you told

8    the FBI the truth in 2007; correct?

9    A.  Yes.

10   Q.  Okay.  So let's go back to what you told the FBI.  And this

11   is at 3505-005, page 1, fourth paragraph, second sentence:

12           Carolyn noticed an older lady with short black hair

13   and an unknown accent at Epstein's residence.  Isn't that what

14   you told the FBI when you told them the truth in 2007?

15   A.  Yes.

16   Q.  And they didn't cut you off when you were talking to them;

17   correct?

18   A.  Well, that day was a bad day for me.  So it was like -- I

19   was not expecting the FBI to come to my home.

20   Q.  Okay.  They didn't cut you off though, they weren't rude to

21   you; correct?

22   A.  No, they weren't rude.

23   Q.  Okay.  And they gave you the opportunity to tell them

24   whatever you wanted to tell them; correct?

25   A.  Yes.

LC7VMAX5                    Carolyn - cross

1    Q.  Okay.  What you told them, the only thing you told them is

2    that you saw an older lady with short black hair and an unknown

3    accent; correct?

4    A.  Yes.

5    Q.  Now, at that point in your life, you knew what a British

6    accent was; correct?

7    A.  Yes.

8    Q.  And you didn't tell them a British accent, you said an

9    unknown accent; correct?

10   A.  I didn't say an unknown accent, I said with an accent.

11   Q.  Are you denying telling the FBI in 2007 that you said an

12   unknown accent?

13   A.  The day that you're talking about --

14          MR. PAGLIUCA:  Your Honor, I'd ask that the Court --

15   A.  -- talking about --

16          MR. PAGLIUCA:  I'd ask that the Court direct the

17   witness to answer the question please.

18          THE COURT:  I will direct the witness to answer the

19   specific question and then you can explain.

20          Would you like --

21          THE WITNESS:  Yeah, can I --

22          THE COURT:  Repeat the question.

23          MR. PAGLIUCA:  Yes.

24   BY MR. PAGLIUCA:

25   Q.  You told the FBI that it was an unknown accent; correct?

LC7VMAX5                         Carolyn - cross

1    A.  Yes.

2    Q.  Thank you.

3         Okay.  You didn't say anything else about the person

4    that you claim you saw at Epstein's house, correct, other than

5    what is right here?

6    A.  I guess, yeah.

7    Q.  Okay.

8    A.  I'm looking -- I don't know what I'm looking at and where

9    you're reading from.

10        THE COURT:  I think at this point you can close and

11   you can ask the question again just from her memory.  Go ahead.

12        MR. PAGLIUCA:  Thank you, your Honor.

13   Q.  What you told the FBI in 2007 was that you saw an older

14   lady with short black hair and an unknown accent, and that's

15   all you told them at the time; correct?

16   A.  Yes.

17   Q.  Thank you.

18        Now, you went in and Ms. Roberts led you upstairs;

19   correct?

20   A.  Yes.

21   Q.  She knew where to go; correct?

22   A.  Yes.

23   Q.  She instructed you to rub Mr. Epstein's legs; correct?

24   A.  Yes.

25   Q.  And she rubbed his back; correct?

LC7VMAX5                      Carolyn - cross

 1  A.  Yes, but when we -- can you back up for a second?  Because

 2  when we first --

 3         THE COURT:  Could you talk into the mic.

 4  A.  When we first walked in is when Maxwell introduced herself

 5  to me.

 6  Q.  You didn't tell that to the FBI in 2007, did you?

 7  A.  No, I did not.

 8  Q.  Thank you.

 9         So you went upstairs and Ms. Roberts directed you to

10  rub Epstein's legs while she rubbed his back; correct?

11  A.  Yes.

12  Q.  Then Epstein told you to take off your shirt and your

13  pants; correct?

14  A.  Not at the first time, no.

15         MR. PAGLIUCA:  If we can show the witness again

16  3505-005, page 1, fourth paragraph -- no, fifth paragraph,

17  middle of the paragraph.

18         Isn't it true that you told the FBI, Epstein stated to

19  Carolyn, take off your shirt and take off your pants?

20  A.  Yes.

21  Q.  Okay.  And then you told the FBI, Virginia got naked and

22  Carolyn undressed to her bra and panties, right?

23  A.  Yes.

24  Q.  And it's after that that Virginia Roberts, who's 18 at this

25  time, has sex with Mr. Epstein in front of you; correct?

LC7VMAX5                         Carolyn - cross

1   A.  Yes.

2   Q.  Okay.  And that's while you sat on a couch; correct?

3   A.  Yes.

4   Q.  And they were looking at you while you were sitting on a

5   couch; correct?

6   A.  No, they were not looking at me.

7   Q.  Okay.  Epstein paid you $300 directly to you; correct?

8   A.  It was on the sink, but yes.

9   Q.  It was from Mr. Epstein to you; correct?

10  A.  I -- I don't know who it was from.  It was just laying

11  there.  Anybody could have put it there.

12          MR. PAGLIUCA:  Again, if we can show the witness

13  3505-005, page 2, paragraph 1.

14  Q.  The second to the last sentence:  Epstein paid Carolyn $300

15  at the end of the massage.  Do you see that?

16  A.  Yeah, I see that.

17          (Continued on next page)

18

19

20

21

22

23

24

25

LC7Cmax6                        Carolyn - cross

1   Q.  That's what you told the FBI in 2007; correct?

2   A.  Yes.

3   Q.  Okay.  You then left the house with Ms. Roberts after

4   Mr. Epstein paid you $300; is that correct?

5   A.  Yes, we left after.

6   Q.  And then after you left, isn't it true that you got

7   Mr. Epstein's phone number from the phonebook?

8   A.  No.

9           MR. PAGLIUCA:  We're going to show the witness,

10  please, 3505-005, page 2, third paragraph, first sentence.

11  Q.  Isn't it true that you told the FBI, in 2007, "Carolyn

12  obtained Epstein's phone number from a telephone book."  Do you

13  see that?

14  A.  Yeah, the telephone book that you're talking about was my

15  personal book.  It wasn't like a phonebook.

16  Q.  Well, what you told the FBI --

17  A.  It was a telephone book with my personal numbers of friends

18  and loved ones.

19  Q.  And you called to schedule a massage session by leaving a

20  message with Sarah.  Do you see that?

21  A.  Yes.

22  Q.  And then Epstein returned your call; correct?

23  A.  It was not Epstein who called me.

24  Q.  Well, isn't it true --

25  A.  It was someone in Epstein's house that called me.

LC7Cmax6                    Carolyn - cross

1   Q.  Isn't it true that, in 2007, you told the FBI that Epstein

2   returned Carolyn's call?

3   A.  I see that it says that, yes, but I don't -- at the time,

4   the way that it's worded is not that Jeffrey Epstein himself

5   called me.

6   Q.  Well, there is not a different name, is there?  It says

7   Epstein returned Carolyn's call?

8           MS. COMEY:  Objection, your Honor.

9   A.  No.  Yes, that's what it says, but it wasn't Epstein

10  himself.

11          THE COURT:  Sustained.

12  Q.  Then there was a second visit that you had shortly after

13  you returning Mr. Epstein's call to schedule this second visit;

14  correct?

15  A.  I'm sorry.  Can you repeat the question.

16  Q.  Yes.  You scheduled a second visit with Mr. Epstein after

17  he returned your call; correct?

18  A.  I made an appointment to meet with Mr. Epstein again after

19  I got a phone call.

20  Q.  And then your boyfriend, Sean, drove you; correct?

21  A.  Yes.

22  Q.  And Sean waited in the car; is that right?

23  A.  Yes.

24  Q.  And this second visit, first you sat in the kitchen and

25  talked to the chef; correct?

LC7Cmax6                          Carolyn - cross

1   A.  I don't recall if it was the second visit or a couple into

2   going there.

3              MR. PAGLIUCA:  We can show the witness 005, page 2,

4   paragraph 4, please.

5   Q.  Isn't it true that, in 2007 --

6              MS. COMEY:  Objection, your Honor.  Isn't this

7   refreshing recollection at this point?

8              THE COURT:  Yes.  If you want to point her to the

9   paragraph and make it larger, that's fine.

10             MR. PAGLIUCA:  Sure.  Fourth paragraph, please enlarge

11  that.

12  BY MR. PAGLIUCA:

13  Q.  Have you had a chance to look at the fourth paragraph?

14  A.  I'm reading it right now, sir.

15  Q.  Okay.

16  A.  Okay.

17  Q.  Does reading that paragraph refresh your recollection that

18  you told the FBI that you sat in the kitchen and the chef asked

19  if you were hungry?

20  A.  You might be wrong on the paragraph you had me read.  It

21  mentioned nothing about a chef.  It mentioned about me taking

22  off my panties to get $400.

23  Q.  We should be at 005, page 2, paragraph 4.

24             THE COURT:  You mean the fourth full paragraph?

25             MR. PAGLIUCA:  Correct.

LC7Cmax6                          Carolyn - cross

1           THE COURT:  That's not what was said.

2           MR. PAGLIUCA:  I'm sorry.  The fourth line down

3    beginning with "She."

4           THE COURT:  That's not there.

5           MR. PAGLIUCA:  3505-005, page 2.

6           THE WITNESS:  You're wrong.

7           MR. PAGLIUCA:  I'm looking at a paper copy.

8           THE COURT:  Why don't you look at your paralegal's

9    screen and make sure you're directing to the right paragraph,

10   please.

11          I think you mean the third full paragraph.  Is that

12   what you're looking for?

13          MR. PAGLIUCA:  Yes, the third full paragraph.

14          THE COURT:  All right.  We have that now.

15          Question?

16          MR. PAGLIUCA:  Yes, your Honor.  I was waiting for the

17   witness to finish.

18   BY MR. PAGLIUCA:

19   Q.  Carolyn, does that refresh your memory that that's what you

20   told the FBI in 2007, that you sat in the kitchen and the chef

21   asked if you were hungry?

22   A.  Yes.

23   Q.  Isn't it also true that on that second visit, Sarah was

24   there and led you upstairs?

25   A.  I wasn't led upstairs by anybody.

LC7Cmax6                        Carolyn - cross

1    Q.   Sarah was there to greet you?

2    A.   The second time I had gone to Epstein's residence, Maxwell

3    greeted me.

4              MR. PAGLIUCA:   If we can direct the witness back to

5    the third paragraph, starting with the word "Sarah" after the

6    word "Hungry."

7              THE WITNESS:   I see what you're saying.

8    Q.   Does this refresh your recollection that, in 2007, you told

9    the FBI that Sarah was there and led her — meaning you —

10   upstairs?

11   A.   A lot of it runs together because I had gone there so many

12   times.  So I'm a little confused on the timing, because the

13   second time I went to his residence, I did not see Sarah.

14   Q.   So isn't it true, though, that that's what you told the FBI

15   in 2007?

16   A.   Obviously, because it's here.

17   Q.   And you also told them, in 2007, that Sarah placed towels

18   on the massage table; correct?

19   A.   Yes, that's what it states.

20   Q.   And at this second time, there is no one else there that

21   you have told the FBI about, other than Sarah and Mr. Epstein;

22   correct?

23   A.   Yes.  Maxwell was not brought up.

24   Q.   It's also true that Sarah was the person who would call you

25   from New York to schedule massages; correct?

1    A.  It wasn't only Sarah, no.

2    Q.  If you can look at the next paragraph, 005, page 2, second

3    paragraph from the bottom.

4    A.  Question.

5    Q.  Does this refresh your memory that Sarah would call you

6    from New York to schedule a massage appointment for Epstein?

7    A.  On some occasions, yes.

8    Q.  Ms. Maxwell's name does not appear in that paragraph;

9    correct?

10   A.  We were not talking about Ms. Maxwell in 2007.

11   Q.  Okay.

12   A.  So this has nothing to do with --

13   Q.  Now, in this entire first discussion with the FBI in 2007,

14   it's true that you never said the name, Ghislaine Maxwell,

15   once; correct?

16   A.  Yes, because it's not who we were talking about.

17   Q.  So is it your testimony that the FBI limited your ability

18   to talk in some fashion?

19   A.  She was not the subject of the discussion.

20   Q.  You talked about Virginia Roberts, you talked about Sarah,

21   you talked about Sean, you talked about Epstein, you talked

22   about a cook, you talked about going there, and you never

23   mentioned Maxwell once; correct?

24   A.  Correct, because she was not topic of what they were asking

25   me.  It had nothing to do with her at the time.  But, yes,

LC7Cmax6                         Carolyn - cross

1    several occasions, she was there, but I was not asked about

2    her.

3    Q.  You gave other information to the FBI about Sarah.  Do you

4    recall that?

5    A.  What kind -- what's the information?

6    Q.  Do you recall telling the FBI that Sarah called you from

7    New York to tell you about the Incubus tickets?

8    A.  I believe it was Epstein who called me about the Incubus

9    tickets.

10            MR. PAGLIUCA:  If we can direct the witness to 005,

11   page 3, paragraph 5, the second to last sentence.

12            THE WITNESS:  What about it?

13   Q.  Does this refresh your memory that you told the FBI, in

14   2007, that Sarah called Carolyn to inform her that Epstein left

15   the concert tickets for her?

16   A.  Yes.

17   Q.  And it was Sarah who called you to tell you that Epstein

18   wanted to take photographs of you; correct?

19   A.  What does that have to do with what I'm reading?

20            MS. COMEY:  Your Honor, I think the document may still

21   be up for the witness.

22            THE COURT:  Okay.  Shut the document.

23            MS. COMEY:  Your Honor, I would ask that, at the end

24   of each question about a document, the document be brought

25   down.

LC7Cmax6                          Carolyn - cross

1            THE WITNESS:  I'm getting confused.

2            THE COURT:  Then do that.

3            MR. PAGLIUCA:  We'll do that, your Honor.

4            May I re-ask the question, your Honor?

5            THE COURT:  Yes.

6    BY MR. PAGLIUCA:

7    Q.  It was Sarah who called you to tell you --

8    A.  Yes.

9    Q.  -- that Epstein wanted to take photographs of you; correct?

10   A.  Yes.

11   Q.  And you left Florida in 2003 to go to Georgia; correct?

12   A.  Yes.

13   Q.  Now I want to talk about the lawsuit that you filed --

14   A.  What does that have to do with me going to Georgia?

15   Q.  I'm changing the question here.  Okay?

16            You filed a lawsuit against Epstein and Sarah Kellen

17   in 2008; correct?

18   A.  Yes.

19   Q.  You had lawyers.  One of your lawyers was a man named jack

20   Scarola; correct?

21   A.  Correct.

22   Q.  Mr. Scarola is still your lawyer; correct?

23   A.  I don't believe so.

24   Q.  Mr. Scarola represented you in your claim with the Epstein

25   Victim Compensation Fund; correct?

LC7Cmax6                    Carolyn - cross

1   A.  Yes.

2   Q.  And you also had a lawyer in 2008 named Richard Willits.

3   Do you remember Mr. Willits?

4   A.  Yes, I do.

5   Q.  The lawsuits that were filed in 2008 were after your first

6   discussion with the FBI in 2007; correct?

7   A.  I'm not sure.

8   Q.  Well, you met with the FBI in 2007 and then there was a

9   lawsuit in 2008; right?

10  A.  Correct.

11  Q.  And before the lawsuits were filed, you had lawyers; right?

12  A.  Correct.

13  Q.  And you had meetings with lawyers about the lawsuits?

14  A.  Yes.

15  Q.  And based on those meetings, you filed not one, but two

16  civil complaints.  Do you recall that?

17  A.  I -- yeah.

18  Q.  I want to talk about the second civil complaint first.

19           First, you read that complaint before it was filed.

20  Do you recall that?

21  A.  I don't recall.

22           MR. PAGLIUCA:  If we can direct the witness to

23  3505-043, page 41, deposition page 157, lines 18 through 25.

24  If we can blow that up for the witness and the Court, please.

25           THE COURT:  Okay.

LC7Cmax6                        Carolyn - cross

1                MR. PAGLIUCA:  Thank you, your Honor.

2    Q.  Do you recall testifying in your deposition, under oath?

3    A.  Yes.

4                THE COURT:  You can leave it up for reading the

5    question.

6                MR. PAGLIUCA:  Thank you, your Honor.

7                THE COURT:  Go ahead.

8    Q.  You were asked:

9    "Q.  Did you read the complaint before it was filed?

10   "A.  Yeah, I read the complaint.

11   "Q.  Did you -- when you read the complaint, did you notice

12   there was anything missing from it?

13   "A.  No, I trust my attorneys.  That's why they're my

14   attorneys."

15               Correct?

16   A.  Right.

17   Q.  And moving on to the next question on the same page:

18   "Q.  Did you tell anyone, your lawyers or anybody --

19               THE COURT:  Just a second.

20               MR. PAGLIUCA:  That question was objected to, your

21   Honor, so I'm not going to read it.

22               THE COURT:  Okay.

23   Q.  The complaint that you filed in federal court was not

24   against Ms. Maxwell; correct?

25   A.  Correct.

LC7Cmax6                    Carolyn - cross

1   Q.  I'm sorry.  I didn't hear the answer.

2   A.  Correct.

3   Q.  The complaint didn't mention Ms. Maxwell's name; correct?

4   A.  Correct.

5   Q.  The complaint was 91 pages with 209 paragraphs.  Do you

6   remember that?

7   A.  Yes.

8   Q.  And not one paragraph had the word "Maxwell" in it;

9   correct?

10  A.  Correct.

11          MR. PAGLIUCA:  I would like to show the witness and

12  the Court first Exhibit C4.  I provided the government a copy

13  of this exhibit.

14          THE WITNESS:  Is it in the binder?

15          MR. PAGLIUCA:  It's in the smaller binder.  We can put

16  it on the screen, if that's easier.

17          THE WITNESS:  What's the number?

18          MR. PAGLIUCA:  C4.

19          THE WITNESS:  Okay.

20          THE COURT:  Question.

21          MR. PAGLIUCA:  Yes, your Honor.

22  BY MR. PAGLIUCA:

23  Q.  This complaint was filed by Mr. Willits on your behalf in

24  state court.  Do you recall that?  If you look at page 3,

25  Mr. Willits' signature is there.

LC7Cmax6                    Carolyn - cross

1    A.  I might be in the wrong --

2              THE COURT:  Could you pull up to the microphone,

3    please, Carolyn.

4    A.  I might be in the wrong binder.  Is it this one?

5    Q.  It should have -- yes, I think that's the one, and it

6    should be at C --

7              THE COURT:  Well, there is no C.  I think you mean tab

8    4?

9              MR. PAGLIUCA:  Yes, tab 4, which is going to be

10   Exhibit C4.

11   A.  That has to do with me being arrested --

12             THE COURT:  Just a moment.  Just a moment.  It's not

13   what I have in my binder.

14             MR. PAGLIUCA:  Can we pull up C4 electronically,

15   please.

16   Q.  ██████████, if you put that one down and we have the

17   exhibit on the screen in front of you.

18   A.  Yes.  It's also in the binder on the next page.

19             MS. COMEY:  Your Honor, can we approach?

20             (Continued on next page)

21             (Pages 1622 to 1624 SEALED)

22

23

24

25

1                (In open court)

2                MR. PAGLIUCA:  May I resume your Honor?

3                THE COURT:  You may.

4     BY MR. PAGLIUCA:

5     Q.  Carolyn, we were talking about the exhibit that was up on

6     the screen which is the --

7                THE COURT:  It's not up there.  Go ahead.

8     Q.  The complaint filed by Mr. Willits in state court regarding

9     Jeffrey Epstein and Sarah Kellen.  Do you see that?

10    A.  Yes, I do.  Yes.

11    Q.  And this was the complaint that was filed originally in

12    2008 on your behalf against those two individuals; correct?

13    A.  Yes.

14               MR. PAGLIUCA:  Did the witness say yes, your Honor?

15               THE COURT:  Yes.

16               THE WITNESS:  Thank you.

17               MR. PAGLIUCA:  I'm going to move for the admission of

18    C4, your Honor.

19               MS. COMEY:  I'm going to object, your Honor.  Not

20    inconsistent.

21               MR. PAGLIUCA:  I didn't hear the objection.

22               MS. COMEY:  I would object, your Honor.  It's not

23    inconsistent.

24               THE COURT:  I'll sustain.

25               MR. PAGLIUCA:  Can we have a sidebar, your Honor?

LC7Cmax6                        Carolyn - cross

1          THE COURT:  We'll take it at the break.

2          MR. PAGLIUCA:  Okay.

3     BY MR. PAGLIUCA:

4     Q.  Carolyn, I'd like to ask you some questions about Exhibit

5     C5, if we can display that for the witness, please.

6     A.  Go ahead.

7     Q.  Thank you.  Carolyn, I want to direct your attention first

8     to paragraph 21 of exhibit -- 11 of Exhibit C5.

9     A.  Okay.

10    Q.  This was the complaint that you reviewed with your lawyers

11    and testified under oath that it was complete and accurate;

12    correct?

13    A.  It wasn't accurate.

14    Q.  That's what you testified to under oath; correct?

15    A.  Yes, but they had it wrong.

16    Q.  Paragraph 11 is a factual claim that you made against

17    Mr. Epstein in that complaint; correct?

18    A.  Yes.

19    Q.  Paragraph 11 does not contain the name "Maxwell," correct?

20    A.  Correct.

21         MR. PAGLIUCA:  Your Honor, I'm going to move for the

22    admission of paragraph 11.

23         MS. COMEY:  Your Honor, same objection.

24         MR. PAGLIUCA:  Your Honor, I can respond --

25         THE COURT:  No, on this one, on paragraph 11, I will

LC7Cmax6                    Carolyn - cross

1    overrule.

2            MR. PAGLIUCA:  Thank you.

3    BY MR. PAGLIUCA:

4    Q.  Paragraph 11 reads:  "The plaintiff, Carolyn, was first

5    brought to the defendant, Jeffrey Epstein's mansion..."

6            THE COURT:  You skipped a word.

7    Q.  "...was the first brought to the defendant, Jeffrey

8    Epstein's mansion in late May or early June 2002 when she was

9    15 years old and in middle school."

10   A.  Correct.  I see that it says that, yes.

11   Q.  Okay.

12   A.  But it's inaccurate.

13           MR. PAGLIUCA:  I'd like to show the witness paragraph

14   21 of Exhibit C5.

15           THE WITNESS:  Okay.  Go ahead.

16   Q.  Again, this is a factual statement made by your lawyers in

17   this complaint against Jeffrey Epstein and Sarah Kellen;

18   correct?

19   A.  Correct.

20           MR. PAGLIUCA:  I move for the admission of paragraph

21   21, your Honor.

22           THE COURT:  Without objection, you may read it.

23           MR. PAGLIUCA:  Thank you, your Honor.

24   Q.  This paragraph reads:  "In late May or early June of 2002,

25   Carolyn was first introduced to defendant, Jeffrey Epstein.

 1    Carolyn was brought to Jeffrey Epstein's residence by a female

 2    friend of hers.  Carolyn sat on the couch while the female

 3    friend took off her own clothes, mounted Jeffrey Epstein, who

 4    was wearing only a towel and lying on a table, and performed a

 5    sexual act upon Jeffrey Epstein in the presence of Carolyn in

 6    exchange for her participation as an observer of Jeffrey

 7    Epstein's lewd and insidious conduct.  Carolyn was paid $300 by

 8    Jeffrey Epstein."

 9            Correct?

10    A.   That's what it states.

11    Q.   Paragraph 27 is another factual paragraph filed by your

12    lawyers in federal court in this lawsuit; correct?

13    A.   Sorry?

14    Q.   Paragraph 27, could you look at that, please.

15    A.   Okay.  It's true.

16            MR. PAGLIUCA:  I move for the admission of paragraph

17    27, your Honor.

18            MS. COMEY:  No objection.

19            THE COURT:  Without objection, you may read 27.

20            MR. PAGLIUCA:  Thank you, your Honor.

21    Q.   Paragraph 27 says:  "Approximately one week after the first

22    incident, Carolyn received a telephone call from Jeffrey

23    Epstein requesting that she return to his residence.  On this

24    occasion, Jeffrey Epstein directed Carolyn to undress to her

25    brassier and underwear and to provide him with a massage.  At

LC7Cmax6                      Carolyn - cross

1    the conclusion of the massage, Jeffrey Epstein masturbated

2    himself in Carolyn's presence.  Jeffrey Epstein paid Carolyn

3    $300 for this encounter."

4              True?

5    A.   True.  But what does this have to do --

6              MR. PAGLIUCA:  I'd like to direct the witness's

7    attention to paragraph 33.  And this will be the last

8    exemplary, your Honor --

9              THE COURT:  Just ask the question.

10             MR. PAGLIUCA:  Yes.

11   BY MR. PAGLIUCA:

12   Q.   Do you see paragraph 33?

13   A.   Yes.

14   Q.   And that's another factual paragraph in the complaint

15   against Mr. Epstein, filed in federal court in 2009; correct?

16   A.   Yes.

17   Q.   And again, that's true?

18   A.   Yes.

19             MS. COMEY:  Your Honor, I would object.  It's not

20   inconsistent.

21             THE COURT:  Sustained.

22             MR. PAGLIUCA:  Your Honor, may I respond?

23             THE COURT:  I'm sustaining.  Move on.  We'll deal with

24   it at the break.

25             MR. PAGLIUCA:  Okay.  I'm going to move for the

LC7Cmax6                        Carolyn - cross

1    admission of paragraph 33, your Honor.

2              MS. COMEY:  Same objection.

3              THE COURT:  Sustained.  We'll take it up at the break.

4              MR. PAGLIUCA:  Okay.

5    BY MR. PAGLIUCA:

6    Q.  Carolyn, this complaint repeats these same paragraphs

7    against Mr. Epstein two times per month up to August 2003.  Do

8    you recall that?

9    A.  I do not recall.

10             MR. PAGLIUCA:  I'd like to show the witness paragraph

11   206.

12             THE WITNESS:  Okay.

13   Q.  Paragraph 206 is a factual complaint against Sarah Kellen.

14   Do you see that?

15   A.  Yes, I do.

16   Q.  And again, that was reviewed by you prior to it being filed

17   in federal court by your lawyers; correct?

18   A.  Um, what was the question, if it was correct?

19   Q.  You reviewed this prior to it being filed in federal court

20   by your lawyers, correct, and approved it?

21   A.  I did not.

22   Q.  Do you recall me asking you questions about your testimony

23   under oath earlier?

24   A.  I do.

25   Q.  And you agreed that you gave that testimony under oath in

LC7Cmax6                     Carolyn – cross

1    2009; correct?

2    A.  Yes.

3    Q.  Are you disagreeing with that now?

4    A.  Yes.

5             THE COURT:  I think the witness is looking at the

6    paragraph.  So clarify the question.

7             MR. PAGLIUCA:  Okay.

8    Q.  Isn't this paragraph 206 of the complaint that you agreed

9    you reviewed and agreed with; correct?

10   A.  Yes.

11   Q.  This paragraph does not contain the name Ghislaine Maxwell;

12   correct?

13   A.  Correct.

14            MR. PAGLIUCA:  I move for the admission of paragraph

15   206, your Honor.

16            MS. COMEY:  Same objection, your Honor.

17            THE COURT:  Sustained.

18   Q.  Paragraph 207, again, this paragraph deals with Sarah

19   Kellen; correct?

20   A.  I don't believe that it was to engage me in prostitution,

21   no.

22   Q.  My question is, is this a paragraph of the complaint that

23   was approved --

24   A.  Yes.

25            MR. PAGLIUCA:  Move for the admission of paragraph

LC7Cmax6                          Carolyn - cross

1    207, your Honor.

2            MS. COMEY:  Same objection, your Honor.

3            THE COURT:  I'll take it at the break.

4            MR. PAGLIUCA:  Your Honor, there are a number of these

5    that I will address with the Court at the break if that's all

6    right.

7            THE COURT:  Okay.

8    BY MR. PAGLIUCA:

9    Q.  Do you remember, Carolyn, talking to Dr. Hall in connection

10   with this lawsuit?

11   A.  Who?  I'm sorry.  Repeat the question.

12   Q.  Do you remember talking to --

13           THE COURT:  I'm sorry.  Stop.  You can close the

14   binder, Carolyn.  Thank you.

15           MR. PAGLIUCA:  May I, your Honor?

16           THE COURT:  You may.

17   Q.  Do you remember talking to Dr. Richard Hall for about six

18   and a half hours in connection with this lawsuit at your

19   lawyer's office on October 21st, 2009?

20   A.  I don't have any recollection of that.

21   Q.  You have no recollection of meeting with Dr. Hall for six

22   and a half hours on October 21st, 2009?

23   A.  No.

24   Q.  Do you recall telling Dr. Hall that you started seeing

25   Epstein in 2002?

1   A.  Yeah.

2   Q.  Yes, you do?

3   A.  Yes, I do.

4   Q.  There were also, in connection with this lawsuit, what are

5   called interrogatories that you answered under oath.  Do you

6   recall that?

7   A.  That what?

8   Q.  There were documents called interrogatories --

9   A.  I don't know what that -- what those are.

10  Q.  They were questions sent by lawyers --

11  A.  Okay.

12  Q.  -- to your lawyer for you to answer under oath.  Do you

13  recall that?

14  A.  I didn't -- I don't -- don't know anything about that.

15          MR. PAGLIUCA:  If we can show the witness 3505-043,

16  page 5, deposition page 12, lines 23 through 25.

17  Q.  Have you had an opportunity to review that, Carolyn?

18          THE COURT:  It just came up.

19  A.  Yeah.  Review -- which numbers am I?

20  Q.  Sure.

21  A.  The whole thing?

22  Q.  You should be looking at page 12, lines 19 through 25.

23          MS. COMEY:  Your Honor, is the question whether this

24  refreshes recollection?

25          THE COURT:  I think that is the question.

LC7Cmax6                    Carolyn - cross

1              THE WITNESS:  I am confused.

2              MR. PAGLIUCA:  It is.

3              THE WITNESS:  Very confused right now.

4    BY MR. PAGLIUCA:

5    Q.  Well, reviewing those questions and answers, does that

6    refresh your recollection --

7    A.  You want me to read from 8 and 9 to 20 and 20-what?

8    Q.  Deposition page 12, on that page.

9    A.  Okay.

10   Q.  Lines 18 through 25.

11   A.  18 through 25.  Like I said, I'm so confused.

12           Okay.  I read it.

13   Q.  Does that refresh your recollection that you were shown

14   your answers to interrogatories, Mr. Scarola directed you to

15   them, and that you said to Mr. Scarola, this is what me and you

16   did, right, then it should be correct, unless somebody messed

17   with it?

18           MS. COMEY:  Objection, your Honor.  I didn't think

19   that was what -- the witness said she didn't recall.

20           THE COURT:  Sustained.

21   Q.  Isn't it true that's what you said under oath in 2009?

22           MS. COMEY:  A same objection.

23           THE COURT:  Sustained.

24   Q.  I'd like to show you, Carolyn, the answers to

25   interrogatories that you authored and swore to under oath in

LC7Cmax6                    Carolyn - cross

1   connection with this lawsuit.  Okay?

2              MR. PAGLIUCA:  If we can show the witness C8, please.

3   It might be easier to look at C8 in the binder.

4              THE COURT:  Last time it wasn't the right exhibit.

5              MR. PAGLIUCA:  We can do it on the screen.

6              THE WITNESS:  Okay.  That's correct.

7              THE COURT:  Go ahead.

8   BY MR. PAGLIUCA:

9   Q.  Do you have C8?  And if you flip to the last page, 19 of 20

10  on C8.  Do you see that's the first part of your --

11  A.  I do.

12  Q.  And you signed that under oath; correct?

13  A.  Yes, I believe so.  That is -- that's my signature, my

14  first name, yes.

15             MR. PAGLIUCA:  Your Honor, I move for the admission of

16  C8.

17             MS. COMEY:  Same objection, your Honor.

18             THE COURT:  We'll take it up at the break.

19             MR. PAGLIUCA:  I'm going to have the same request,

20  your Honor, as to C9, which we'll take up at the break, I

21  assume?

22             THE COURT:  Yes.

23             MR. PAGLIUCA:  Would you like to take the break now?

24             THE COURT:  Do you have other matters?

25             MR. PAGLIUCA:  Yes, your Honor, I have further cross

LC7Cmax6                          Carolyn – cross

1    examination of this witness.

2              THE COURT:  We'll break.  Members of the jury, for the

3    afternoon break, we'll see you in about 15 minutes.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LC7Cmax6                        Carolyn - cross

1              (Jury not present)

2              MR. PAGLIUCA:  Your Honor, should I sit or stand?

3              THE COURT:  I don't mind.  I just want to hear you.

4              MR. PAGLIUCA:  C4 was the state complaint, your Honor.

5    And I'm not sure what the objection was.

6              MS. COMEY:  The objection was that it is not

7    inconsistent with the witness's testimony, your Honor.  I

8    believe your Honor sustained that objection.

9              THE COURT:  That's what I'm hearing you on now.

10             Mr. Pagliuca, you're seeking the admission of the

11   whole document?

12             MR. PAGLIUCA:  I am, your Honor.  Alternatively, the

13   factual paragraphs.  This does not have a lot of legalese in

14   it.  It didn't seem to be too complicated to me.

15             THE COURT:  Okay.  So let's pick up the first factual

16   paragraph.

17             So just by way of background, you inquired about this

18   document and asked if Ms. Maxwell is mentioned anywhere in the

19   complaint; correct?

20             MR. PAGLIUCA:  Yes.

21             THE COURT:  And the answer to that was no?

22             MR. PAGLIUCA:  Correct.

23             THE COURT:  So what I think we then need is to take

24   individual statements to determine if there is some

25   inconsistency with the testimony.  So point me to the first

LC7Cmax6                           Carolyn - cross

1    factual inconsistency.

2           MR. PAGLIUCA:  Well, your Honor, there are two

3    principals at play here.

4           The first is this is what is commonly referred to as

5    impeachment by omission, which is a subset of impeachment by

6    contradiction.  Impeachment by omission typically occurs where

7    there is a document or a statement where the witness would

8    likely include whatever is omitted, and this is such a

9    document, and I am seeking to impeach by omission through this

10   document.  This is a complaint against two people that this

11   witness claims sexually abused her.  It's not only against

12   Epstein, it's against one of Epstein's employees who is

13   highlighted in this complaint.  The entire testimony by the

14   government here through this witness has downplayed the role of

15   Sarah Kellen and up-played the role of Ghislaine Maxwell, and

16   it is an impeachment by omission that, in 2008, shortly after

17   being interviewed by the FBI about the same subject matter with

18   counsel, there is no mention of Maxwell in this entire

19   complaint.  I think that is significant under the facts of this

20   case.  So, I think it is admissible under that theory and there

21   is ample federal law, First Circuit, this circuit, that

22   supports that theory of impeachment by omission.  And these

23   factual paragraphs, I believe, are also impeaching of the

24   witness's testimony because it is inconsistent with the things

25   that she has claimed happened to her in addition to these

LC7Cmax6                         Carolyn - cross

1     things that are in the complaint.

2              THE COURT:  So that's a long way of getting to my --

3     responding to my first question.

4              MR. PAGLIUCA:  Yes.

5              THE COURT:  What paragraph is inconsistent?

6              MR. PAGLIUCA:  Well, the fact that Ms. Maxwell --

7              THE COURT:  Point me to a paragraph.

8              MR. PAGLIUCA:  All of the paragraphs, your Honor.

9              THE COURT:  On the same theory you just pronounced?

10             MR. PAGLIUCA:  Yes.

11             THE COURT:  So then on your second theory, can you

12    point to any inconsistency?

13             MR. PAGLIUCA:  Well, these are all omissions, your

14    Honor, factual.  So paragraph 8, for example, the witness has

15    testified now that she was the subject of penetration and

16    intercourse by Epstein.  Paragraph 8 does not include that.

17             Paragraph 9, I think, is an expansion.  We have only

18    Kellen, often calling -- excuse me.  11A is what I'm looking

19    at.

20             THE COURT:  So other than the omission theory, is

21    there an inconsistency you're pointing to?

22             MR. PAGLIUCA:  No.

23             THE COURT:  Is there any other?  I understand your

24    omission theory, I'll hear from Ms. Comey on that in a second,

25    I do have a question for you on it, and I need to read the

LC7Cmax6                    Carolyn - cross

whole thing.

          Let me just ask.  If there were, for example, a
paragraph that said these are some of the facts of what
occurred, but not all of them, would your omission theory work
to get everything in?

          MR. PAGLIUCA:  Yes.

          THE COURT:  If there is a few discrepancies?

          MR. PAGLIUCA:  Yes.

          THE COURT:  Do you have a case for that proposition?
I mean, it's really a factual question whether there is a
reasonable inference available from which the jury could
conclude that there is an inconsistency by testifying to one
thing to inclusion of facts now that were not included
previously.

          MR. PAGLIUCA:  I think that's true and it's under the
circumstances -- I mean the case law, I can -- I need to pull
up my computer to give you the cite here, your Honor, but I'll
do that now.

          THE COURT:  Okay.  Go ahead, Ms. Comey.

          MS. COMEY:  Thank you, your Honor.  I think the theory
of omission only works where one would expect that the specific
facts that are omitted would be included in the particular
statement.  This is a lawsuit brought against two defendants
and it is containing the core allegations against those two
defendants.  One would not expect that to include allegations

LC7Cmax6                        Carolyn - cross

1   against third parties.  I think that's borne out by the

2   substance of the document.  Count One only talks about Jeffrey

3   Epstein, the first defendant.  Count Two only talks about Sarah

4   Kellen, the second defendant.  I think that that makes sense

5   and it wouldn't be expected that Ghislaine Maxwell or anyone

6   else would be included in allegations in a complaint against

7   those two.

8          More broadly, I think defense counsel has already

9   gotten the point that he wants to make across to the jury.  He

10  has made very, very clear, repeatedly, that this witness sued

11  Jeffrey Epstein and Sarah Kellen and not Ghislaine Maxwell.

12  They have now heard that she has filed multiple court documents

13  that are lengthy in which the defendant's name is not

14  mentioned.  So he has everything he needs to make his

15  impeachment point.  At this point, it's cumulative and risks

16  403 prejudice and confusion of the issues, and a sideshow about

17  a 2009 lawsuit to put in the document itself.  He has

18  everything he needs.

19          THE COURT:  I think that he has everything he needs

20  goes to the relevance of the contention that the exclusion is

21  there.

22          MS. COMEY:  Your Honor, I think that the point is that

23  she wasn't included as a defendant.  I don't think that it

24  would be expected, especially in a document --

25          THE COURT:  I think it's a redirect point, frankly,

LC7Cmax6                        Carolyn - cross

1    counsel.  And on a 401, 403, it is already in, it's a document.

2    So it's really a cumulative argument.  The point that you want

3    to make, I presume you'll make on redirect.  Since the point

4    has already been made, I don't see that there is tremendous

5    prejudice in including the document itself.

6              MS. COMEY:  Your Honor, my concern would be that these

7    are crafted by lawyers in order to satisfy the elements of

8    particular causes of action.

9              THE COURT:  Right.

10             MS. COMEY:  It will confuse the issues and it's not

11   written in a narrative form and it wasn't offered by this

12   witness, and I think it would confuse the issues to start

13   putting these words in that her attorneys wrote.  She did not

14   write this.

15             THE COURT:  I think those are fine redirect points.

16   We've already established the 401 of the omission, I don't

17   think it causes substantial 403 prejudice, and you're going to

18   make those redirect points in any event.  So at least with

19   respect to this document C4, I'm going to overrule the

20   objection.

21             C5, I think might be in a different position.  I mean,

22   206 says, expressly, Kellen is one of defendant Epstein's

23   employees, assistants referenced in paragraph 12.  Epstein,

24   Kellen, and others reached an agreement between themselves for

25   the purposes of allowing defendant Epstein to commit the

1  illegal acts.  And then if you turn back to 12, 12 says,

2  Epstein's a wealthy financier with a lavish home, wealth, a

3  network of assistants and employees used his resource and

4  influence over a vulnerable minor child to engage in a

5  systematic pattern of sexually exploited behavior.

6          I mean, on its terms, it references additional people.

7  And so, on its face, it's not exclusive and I think that puts

8  it in a different position.

9          MR. PAGLIUCA:  Your Honor, with regard to this

10 exhibit, I was simply offering discrete factual paragraphs.

11         THE COURT:  Right.  But 206 -- so 206 was the one that

12 we began with.  I don't think that paragraph is factually

13 inconsistent with the testimony for precisely the reason I've

14 just indicated.

15         MR. PAGLIUCA:  I think we left off with 206.

16         THE COURT:  So what's the next paragraph?

17         MR. PAGLIUCA:  I mean, I can go through it and tell

18 you all the paragraphs that I'm intending to introduce or

19 ask --

20         THE COURT:  So 206 is not inconsistent.  Therefore,

21 the objection is sustained.

22         What's the next paragraph?

23         MR. PAGLIUCA:  Well, let me look at 206 and hopefully

24 respond to that.

25         THE COURT:  That's fine.

LC7Cmax6                          Carolyn - cross

1          MR. PAGLIUCA:  I'm fine with not admitting that, your

2     Honor.  I think that's right.

3          THE COURT:  They might want to get that one in.

4          MR. PAGLIUCA:  I agree with you.

5          THE COURT:  What's next?

6          MR. PAGLIUCA:  Well, I guess the question -- I'm not

7     sure where we left off, your Honor, because I think we got to

8     about 33, and then we were going to take it up at sidebar.

9          (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           THE COURT:  Okay.  Should I look at 33?

2           MR. PAGLIUCA:  Yes, 33.  The first inconsistency with

3      the direct testimony is the date, July of 2002.

4           THE COURT:  I don't know -- so again, return to --

5      what's the inconsistency?

6           MR. PAGLIUCA:  Well, the indictment says 2001.  In her

7      direct testimony she said 2001, and on the cross-examination,

8      she admitted to 2002.

9           THE COURT:  So you have to use a full sentence so I

10     can track you.  She said the first incident was in 2001.

11          MR. PAGLIUCA:  Yes.

12          THE COURT:  She then talked about 100 additional

13     incidents --

14          MR. PAGLIUCA:  Right.

15          THE COURT:  -- over the course of at least a couple of

16     years.  So what's inconsistent in July of 2002, she again

17     returned to?

18          MR. PAGLIUCA:  This is chronological through this

19     complaint.  This complaint goes from -- 2002 is the beginning

20     spot, and goes through 2003.  So the entirety of the allegation

21     is that these events occurred between 2002 and 2003, not 2001

22     and 2004.  And so this is impeachment on the time frame that is

23     alleged in the indictment and testified to by the witness on

24     direct examination.

25          THE COURT:  Is there a paragraph that talks about the

1   first couple of incidents, which I think would be, as you're

2   suggesting, time frame inconsistent.

3           MR. PAGLIUCA:  I think you admitted those already,

4   your Honor.

5           THE COURT:  See?  I'm consistent.

6           MR. PAGLIUCA:  You are.  Yes, you are.  Yes, you are.

7           The Court admitted paragraph 21, I think, as the -- 21

8   and 27.

9           THE COURT:  Okay.

10          MR. PAGLIUCA:  And where we started getting --

11          THE COURT:  21 and 27.  27 is called incident two.

12          MR. PAGLIUCA:  Right.

13          THE COURT:  And then 33, I'm not saying an

14   inconsistency.  I'll sustain there.

15          MR. PAGLIUCA:  39 --

16          THE COURT:  And to the extent it is, because it could

17   somehow be read as part of a time frame that's off, it's

18   consistent with her -- it falls within the time frame she

19   testified to; it's not specific as to which incident this is.

20   To the extent there's 401 relevance, it's cumulative of the

21   point that you've already gotten in, which is that this -- that

22   the first incident described in this complaint took place in

23   2002, and her testimony is that it took place in 2001.

24          Next.

25          MR. PAGLIUCA:  But also to that point, your Honor,

LC7VMAX7                        Carolyn - cross

```
 1    this is inconsistent because we're not -- we're not talking

 2    about 2001, we're talking about 2002.

 3              THE COURT:  Right.  But it doesn't specify -- she

 4    testified to incidents like these in 2002, and so it's just

 5    not -- tell me how it's inconsistent with that testimony.

 6              MR. PAGLIUCA:  Well, you know, for the second time in

 7    July of 2002 --

 8              THE COURT:  No, it doesn't say that.

 9              MR. PAGLIUCA:  Paragraph 39 is what I'm looking at.

10              THE COURT:  Oh, you told me 33.  I am a lot of things,

11    but I am not a mind reader.  I sustained on 33.

12              I will go to 39.  Go ahead.

13              MR. PAGLIUCA:  So for the second time in July of 2002.

14    This is --

15              THE COURT:  I mean, that reads like more than one

16    incident in July of 2002.

17              MR. PAGLIUCA:  The second, not a third, not a fourth.

18              THE COURT:  For the second time.  Okay.

19              MR. PAGLIUCA:  And when we get through all of this,

20    the other inconsistency that tracks all of these is there is no

21    allegation of sexual intrusion or penetration.  Every single

22    one of these allegations is fondling of breasts and buttocks,

23    every single one.  And so we have new testimony about the acts

24    that were allegedly performed.

25              THE COURT:  All right.  Ms. Comey, do you want to
```

LC7VMAX7                        Carolyn - cross

1    respond to that for paragraph 39?

2              MS. COMEY:  So for 39, your Honor, first with respect

3    to the time frame, I think the first clause is for the second

4    time in that month of that year.  That's not inconsistent with

5    what the witness testified to.  She testified she was going

6    frequently, certainly at least twice a month, through 2002.  So

7    that's not inconsistent.

8              With respect to the sex acts, I think here is part of

9    the issue with taking a legal document and trying to suggest

10   that the witness should have included every single detail in

11   it.  It is not necessarily the case that in order to make out

12   the legal claims in this complaint, that a lawyer would have

13   needed to include anything other than fondling and

14   masturbation.  So it is not to be expected that if she had told

15   her attorneys about the other sex acts, that they would have

16   included it.  And so I don't think the theory of omissions

17   works with respect to the sex acts.

18             MR. PAGLIUCA:  I disagree, your Honor.

19             THE COURT:  Yes, I imagine.

20             MR. PAGLIUCA:  I mean, Ms. Comey doesn't do civil

21   work, but it is significant.  And it is significant for many

22   reasons.  And in particular --

23             THE COURT:  This one, there are details included.  The

24   one detail that was testified to is a significant detail.  So

25   with respect to 39, I'll overrule.  Sorry, I'll sustain.

LC7VMAX7                        Carolyn - cross

1             MS. COMEY:  Your Honor, may I clarify on that?

2             I don't think the witness testified to a particular

3      time frame when the penetration actually took place.  And so I

4      don't know that we can say that any particular paragraph is

5      necessarily inconsistent, because I don't think she testified

6      to a time frame.  I don't know that she would remember a

7      particular time frame.  I think that this could be more readily

8      accomplished to the extent Mr. Pagliuca wants to point out that

9      this complaint does not contain a reference to that particular

10     sex act.  I think he can ask her the question.

11            MR. PAGLIUCA:  Your Honor, I think the document itself

12     has value --

13            THE COURT:  You're not moving the whole document.

14     We've established that.  So one paragraph at a time.

15            MR. PAGLIUCA:  Right.  The paragraphs have value --

16            THE COURT:  And you'll respond to Ms. Comey's point

17     that it's only inconsistent if the time frame matches up with

18     the time frame that she's testified as to penetration.

19            Do you have a response to that?

20            MR. PAGLIUCA:  Well, she testified here that it was

21     more frequent than what's alleged.  So that's one problem with

22     the argument from the government.  I think she testified here

23     that it was up to four times a week that she was going.  And

24     this complaint goes month by month, two times a month.  That's

25     what it talks about.  That's what this is.  So that's another

LC7VMAX7                    Carolyn - cross

inconsistency.  I'm not sure where the disconnect is here on
the factual inconsistency where there is specific claim of
fondling breasts and buttocks.  At the conclusion of the
massage, Jeffrey Epstein masturbated himself in C presence,
paid C in excess of $200 for this encounter, which is also
inconsistent with the testimony, which she's claiming 300, up
to 600 an encounter.  So it's inconsistent.

          THE COURT:  All right.  I'm going to overrule on 39
and I think Ms. Comey's points are fully available for cross --
sorry, for redirect on this one.

          The time frame pace is a little difficult to match up
exactly given that there is some -- a little bit of a shift --
well, it's hard to know what time frame this is referring to,
but I think in light of the witness's testimony, there's an
inference available that paragraph 39 falls within the time
frame that she talked about, penetrative acts, and that's not
included.  So I'll allow 39.

          Next.

          MR. PAGLIUCA:  The same argument for 45, your Honor.

          MS. COMEY:  Your Honor, I would just like to clarify
that the witness only described one penetrative act on one
occasion once.  So it cannot be that she's inconsistent if she
doesn't mention it in 50 different allegations on 50 different
dates.

          THE COURT:  Was that the testimony, that there was

LC7VMAX7                         Carolyn - cross

1    only a penetrative act once?

2              MS. COMEY:  Yes, your Honor.  It was the second

3    incident where Jeffrey Epstein brought another female into the

4    room.  She testified that he briefly penetrated her twice

5    during that incident.  So he inserted his penis into her two

6    times during that one incident and that was it.  So it's one

7    incident.

8              THE COURT:  Okay.  I'm re-persuaded.  I'm going to

9    sustain on 39.  But you can ask the question about are there

10   any allegations in the complaint regarding penetrative sex,

11   which is as she testified to.

12             Next paragraph.

13             MR. PAGLIUCA:  51.  And this is the same -- the same

14   issue.

15             MS. COMEY:  And the same objection, your Honor.

16             THE COURT:  All right.  So I'll sustain on 51.

17             Next.

18             MR. PAGLIUCA:  57.

19             THE COURT:  And again, you can ask the question, but

20   it's not, on its face, inconsistent.  And I don't think there's

21   an inference available.  And to the extent there is, it would

22   be cumulative of the question that you're asking.

23             57.

24             MS. COMEY:  Same objection, your Honor.

25             THE COURT:  All right.

1          I'll sustain on 57 for the same reason.

2          Next.

3          MR. PAGLIUCA:  I think I can -- I can just tell you

4     all of them, your Honor, which are going to be the same.

5          THE COURT:  If they are all on that same theory, then

6     you can make the record.  If there's any different theory of

7     inconsistency, either as to the specific time frame and

8     testimony or to some different inference available, I'll hear

9     it.  But otherwise just make the record with respect to the

10    numbered paragraphs.

11         MR. PAGLIUCA:  Sure.  And when I get to the place

12    where it's different, I'll stop and we'll address that.

13         THE COURT:  Okay.

14         MR. PAGLIUCA:  Is that fair?

15         THE COURT:  Fair.

16         MR. PAGLIUCA:  63.

17         THE COURT:  Okay.  Sustained.

18         MR. PAGLIUCA:  69, 75.

19         THE COURT:  Sustained on 69.  And sustained on 75.

20         MR. PAGLIUCA:  81.

21         THE COURT:  Sustained.

22         MR. PAGLIUCA:  87.

23         THE COURT:  Sustained.

24         MR. PAGLIUCA:  93.

25         THE COURT:  Sustained.

LC7VMAX7                    Carolyn – cross

1             MR. PAGLIUCA:  99.

2             THE COURT:  Sustained.

3             MR. PAGLIUCA:  105.

4             THE COURT:  Sustained.

5             MR. PAGLIUCA:  111.

6             THE COURT:  Sustained.

7             MR. PAGLIUCA:  117.

8             THE COURT:  Sustained.

9             MR. PAGLIUCA:  123.

10            THE COURT:  Sustained.

11            MR. PAGLIUCA:  129.

12            THE COURT:  Sustained.

13            MR. PAGLIUCA:  135.

14            THE COURT:  Sustained.

15            MR. PAGLIUCA:  141.

16            THE COURT:  Sustained.

17            MR. PAGLIUCA:  147.

18            THE COURT:  Sustained.

19            MR. PAGLIUCA:  153.

20            THE COURT:  Sustained.

21            MR. PAGLIUCA:  159.

22            THE COURT:  Sustained.

23            MR. PAGLIUCA:  165.

24            THE COURT:  Sustained.

25            MR. PAGLIUCA:  171.

1           THE COURT:  Sustained.

2           MR. PAGLIUCA:  177.

3           THE COURT:  Sustained.

4           MR. PAGLIUCA:  183.

5           THE COURT:  Sustained.

6           MR. PAGLIUCA:  There's a slightly different argument

7    on 189.

8           THE COURT:  Okay.

9           MR. PAGLIUCA:  And 195.

10          These are the end dates of the allegations, which

11   brackets it before 2004, which is inconsistent with the

12   testimony.  And so these are the last two dates alleged in this

13   complaint which does not go farther than August of 2003.

14          MS. COMEY:  Your Honor, I think the paragraphs

15   themselves are still consistent.  I think Mr. Pagliuca can make

16   the point by asking the question of the witness about whether

17   there were any allegations contained after August 2003 in the

18   complaint.

19          THE COURT:  Is there a line that says it's the final

20   contact?

21          MR. PAGLIUCA:  Well, it just says August 2003,

22   incident one and incident two.

23          THE COURT:  Right.

24          MR. PAGLIUCA:  And there are no further allegations in

25   the complaint.

1          THE COURT:  Okay.  Sustained.

2          I think if it said the last incident, then fine.  But

3    otherwise you can ask the question.  The paragraph itself is

4    not inconsistent.

5          What else?

6          MR. PAGLIUCA:  Well, I'm offering 207 and 208 with

7    regard to Sarah Kellen.

8          THE COURT:  207.

9          MR. PAGLIUCA:  207 and 208.

10          THE COURT:  What's the inconsistency in 207?

11          MR. PAGLIUCA:  Again, these are -- well, as to all of

12    these, I'll just make this argument as to all of the paragraphs

13    that the Court sustained.  I view these as impeachment by

14    omission because Ms. Maxwell's name does not appear in any of

15    these paragraphs.

16          THE COURT:  Right.  So this is why this one is

17    different than the last document, which is because of paragraph

18    206 and paragraph 12, which expressly reference other unnamed

19    individual employees and assistants.  So on that ground I'll

20    sustain on 207.

21          Is there something different in 208?

22          MR. PAGLIUCA:  No.

23          THE COURT:  Okay.  So sustained on that ground, too.

24          What else?

25          MR. PAGLIUCA:  The interrogatory responses, your

LC7VMAX7                        Carolyn - cross

```
 1   Honor.
 2              THE COURT:  Which one is that tab?
 3              MR. PAGLIUCA:  Those are going to be C-8, I believe,
 4   starting at --
 5              THE COURT:  Okay.
 6              MR. PAGLIUCA:  -- tab 8.
 7              THE COURT:  Okay.  Is there a specific inconsistency
 8   or is it the omission theory?
 9              MR. PAGLIUCA:  Yes.  It's both.
10              THE COURT:  Objection.  Compound.  Sustained.
11              Go ahead.
12              MR. PAGLIUCA:  It's both.
13              This document, we need to read the question with the
14   answer.  And so question 16:  State in detail how you came to
15   be at Mr. Epstein's home on each occasion, i.e., did someone
16   bring you or ask you if you would or wanted to go.  If so,
17   state the name and address of that individual and what he/she
18   told you and the purpose of your visit.
19              THE COURT:  Okay.  It's an open-ended question.
20              MR. PAGLIUCA:  Right.  The answer is limited.
21              THE COURT:  Okay.  So I will allow -- Ms. Comey,
22   unless you want to be heard, my inclination is to allow the
23   question and answer in 16 in.
24              MR. PAGLIUCA:  The same is -- 17, your Honor, we have
25   the question:  The amount of monies or anything of value you
```

LC7VMAX7                    Carolyn - cross

1    claim you were given or paid to you by Mr. Epstein or someone,

2    yaddah, yaddah.  And we have an expansive time frame here.  And

3    the question, 2000 to 2006.  And then the answer again is she's

4    only paid for May or June of 2002 to August of 2003.  So we've

5    excluded two whole years by this answer in terms of the time

6    frame the witness testified to.

7              THE COURT:  Okay.  On the time frame inconsistency,

8    I'll allow 17, question and answer.

9              What's next?

10             MR. PAGLIUCA:  19 is all males who had any sexual

11   contact with her.  It says sexual assault or battery since age

12   10.  And the answer is none.  And she's testified that there

13   were two males, I believe, that had sexual contact with her.

14             MS. COMEY:  Your Honor, I believe the testimony was

15   that they saw her naked in the massage room.  I don't believe

16   there was testimony about sexual contact.  I would want to

17   check the transcript, your Honor, but that is my recollection

18   of the testimony.

19             THE COURT:  It's mine as well, but you'll check the

20   transcript.  In the absence of that, I don't see any

21   inconsistency.

22             MR. PAGLIUCA:  Well, then 20 covers lewd or lascivious

23   conduct, which would be naked people in a massage looking at a

24   naked underage --

25             MS. COMEY:  Again, your Honor, the testimony was just

1    that they saw her naked.  There was no other color on it.

2    There was no suggestion that they were engaged in sex acts or

3    that they were naked.  I have the same objection.

4           THE COURT:  I'm going to overrule on that one, 20.

5    There's the inference available of inconsistency, so I'll allow

6    20.

7           Next.

8           MR. PAGLIUCA:  21 is a description --

9           THE COURT:  Just to spell that out, on the theory that

10   other males present in the room during conduct described could

11   be deemed lewd and lascivious conduct.

12          MS. COMEY:  I just want to be clear, your Honor, that

13   the description was that they saw her naked in the massage

14   room, not that they saw her during any of the conduct.  I think

15   there was testimony that she would be naked for a period before

16   Jeffrey Epstein would come in; and so it would just be them

17   seeing her nude in the room is what the testimony was, not lewd

18   and lascivious conduct.

19          THE COURT:  Well, I'm going to overrule on 20.

20          Go ahead.

21          MR. PAGLIUCA:  21 is simply asking a description of

22   the lewd and lascivious exhibition, the date, and whether you

23   received money or other consideration.  Answer, none.

24          THE COURT:  Okay.  Exhibition we did not get testimony

25   on, so I'll sustain.  There's no inconsistency on 21.  No

LC7VMAX7                         Carolyn - cross

1    inference available.

2                MR. PAGLIUCA:  Okay.

3                THE COURT:  Anything else?

4                MR. PAGLIUCA:  Yes.  C-9, question 16.  This is an

5    amendment to the prior question 16 by the witness.  And the

6    witness added in this amendment:  I was also transported via

7    private car provided by Jeffrey Epstein.

8                It's significant, your Honor, in that the witness had

9    the opportunity to think about, reflect, add information here,

10   and did not.  And it is important in the context of this case

11   where there's this changed memory over time.

12               THE COURT:  Okay.  I see the inconsistency.

13               MR. PAGLIUCA:  Thank you.

14               THE COURT:  16 I'll allow.

15               What else?

16               MR. PAGLIUCA:  I think that's it -- well, then

17   there's -- well, I think that's it.

18               THE COURT:  Okay.  We really need to get the jury

19   back.

20               MS. STERNHEIM:  Can we just have five minutes, Judge?

21               THE COURT:  You can take five.

22               MS. COMEY:  And, your Honor, can I ask how long we

23   have left on cross-examination?  I think it's been longer than

24   the direct at this point.

25               THE COURT:  I'm stepping down.  You can ask the

LC7VMAX7                        Carolyn - cross

1   question.

2            (Recess)

3            THE COURT:  We'll bring in the jury.

4            Ms. Comey is coming?

5            MS. POMERANTZ:  Yes, your Honor.

6            THE COURT:  Let's get the witness.

7            Mr. Pagliuca, if you can go to the podium.

8            MS. COMEY:  I apologize, your Honor.  The witness is

9   on her way.  I was looking for her.

10           THE COURT:  Okay.

11           Bring in the jury.

12           (Jury present)

13           THE COURT:  Everyone may be seated.  And we're getting

14   the witness, so it will just be a second.

15           Members of the jury, sorry for the extended break.  We

16   were working through issues to minimize the sidebars, so thank

17   you for your patience.

18           While we have a second, I'll use the time to remind

19   you of scheduling issues this week.  Same as it's been.

20           Next week, you'll recall, Monday, Tuesday, Wednesday

21   we won't sit.  That's because I have a scheduling conflict.  So

22   we'll be back Thursday, Friday.

23           And then the following week, Monday, Tuesday,

24   Wednesday, then we're off for the Christmas break.

25           And the following week, Monday, Tuesday, Wednesday,

LC7VMAX7                          Carolyn - cross

1    and then we're off for the New Year's break.

2                And I'll keep you updated beyond that as soon as I

3    have it.

4                Good afternoon, Carolyn.  You can take your seat.

5                And please remove your mask.  Thank you.

6                I remind Carolyn she's under oath.

7                Mr. Pagliuca, you may continue with your

8    cross-examination.

9                MR. PAGLIUCA:  Thank you, your Honor.

10               I'd like to direct the witness to 3505-43, page 10,

11   deposition page 31, lines 21 through 25.

12               THE COURT:  Can we get them called up please.

13               THE WITNESS:  I'm at page 10.

14               MR. PAGLIUCA:  It will come up on the screen.

15               THE COURT:  Page and lines?

16               MR. PAGLIUCA:  Excuse me?  Page and line, your Honor,

17   we're going to start --

18               MS. COMEY:  Your Honor, I would object to this.

19               MR. PAGLIUCA:  Start at page 32, line -- 31, line 18.

20   I'll have the witness to see if it refreshes --

21               THE COURT:  What are the lines?

22               MR. PAGLIUCA:  3505-043, page 10, deposition page --

23               THE COURT:  I can't hear you, Mr. Pagliuca.

24               MR. PAGLIUCA:  I'm trying to bend down, talk, and read

25   at the same time.

LC7VMAX7                    Carolyn - cross

1              THE COURT:  Right.

2              MR. PAGLIUCA:  3505-043, page 10, deposition page 31,

3    line 19.

4              THE WITNESS:  Is it in this binder?

5              MR. PAGLIUCA:  No, it will come up on your screen

6    there.

7              THE WITNESS:  Oh, okay.

8              THE COURT:  Sustained.

9              MR. PAGLIUCA:  Your Honor, I'd like the opportunity to

10   make a record on this after.

11             THE WITNESS:  There is nothing on my screen.

12             THE COURT:  It's okay.  Next question.

13             MR. PAGLIUCA:  Yes, your Honor.

14   BY MR. PAGLIUCA:

15   Q.  Carolyn, in the 2002 to 2003 time frame, you were abusing

16   multiple substances; correct?

17   A.  No.

18   Q.  Do you recall abusing alcohol and drugs at approximately

19   the age of 13?

20   A.  If you call smoking pot drugs, then I suppose so.

21             MR. PAGLIUCA:  If we can direct the witness to

22   3505-035.

23             THE WITNESS:  I was also on --

24             MR. PAGLIUCA:  47.

25             THE COURT:  Pause.  Go ahead.

LC7VMAX7                    Carolyn - cross

1          THE WITNESS:  I was also on my Xanax for anxiety.

2          MR. PAGLIUCA:  3505-035, 47.

3          THE COURT:  Lines please?

4          MR. PAGLIUCA:  Yes, your Honor.

5          THE COURT:  Thank you.

6          MR. PAGLIUCA:  23 through 24.

7          MS. COMEY:  No objection, your Honor.

8          THE COURT:  All right.  Go ahead.

9   BY MR. PAGLIUCA:

10  Q.  You indicated that you began drinking at the age 13, do you

11  see that?

12  A.  I don't.

13          THE COURT:  Carolyn, could you please move into the

14  mic.

15  A.  I do not see that on the page that's in front of me at all.

16          MR. PAGLIUCA:  Okay.  I will move on, your Honor.

17  Q.  You agree you were smoking marijuana at the age of 13;

18  correct?

19  A.  Yeah.

20          MR. PAGLIUCA:  I'd like to direct the witness to

21  3505-039, page 4, the lower right box.

22          THE WITNESS:  Yeah.

23  Q.  Do you recall that during the time frame 2002 through 2003,

24  you were using benzodiazepines three to six times a week;

25  correct?

LC7VMAX7                          Carolyn - cross

```
 1   A.  Sir, this document that you're showing me was taken on
 2   9/16/2005.  So what does that have to do with the time frame
 3   you're asking me?
 4   Q.  This was an intake interview, do you recall that?
 5   A.  In 2005.
 6   Q.  Right.  And if you turn to --
 7           MR. PAGLIUCA:  The witness can be shown 039, page 6.
 8   Q.  That's your signature in October of 2005; correct?
 9   A.  Yes, but what does that have to do with the year 2002 and
10   2003?
11   Q.  You were telling the intake person about your drug use;
12   correct?
13   A.  In 2005.
14   Q.  And you were telling them about your history of drug use
15   prior to 2005 in this intake; correct?
16   A.  No.
17   Q.  No?  If we look at the intake form, the paragraph that I
18   showed you, do you recall telling --
19           THE COURT:  Can you turn to it and enlarge it.
20           MR. PAGLIUCA:  Yes, your Honor.
21           Page 4 of the exhibit.
22           THE COURT:  It's too small to read.
23   A.  Okay.  What's your question?
24   Q.  Do you recall telling the intake interviewer that you were
25   using benzodiazepines?
```

LC7VMAX7                    Carolyn - cross

1   A.  That's Xanax.

2   Q.  I understand.  Three to six times per week, right?

3   A.  Right.  At the age of 13.

4   Q.  Right.

5   A.  That was my anxiety medication.

6   Q.  You were using alcohol three to six times per week;

7   correct?

8   A.  And I used it in 2005.

9   Q.  Do you see that it says alcohol, three to six times a week,

10  beginning --

11          MS. COMEY:  Objection.  Reading from a document --

12          THE COURT:  Just a moment.  Just a moment.

13          You could direct her to it and ask if that refreshes.

14  Q.  Yes.  I'm looking at where it says alcohol.

15  A.  I see that.

16  Q.  Okay.  And you told them -- well, does this refresh your

17  memory that you told them that you were using alcohol three to

18  six times per week beginning in 2000?  Do you see that?

19  A.  Yes, I do see that.  But that's incorrect.

20  Q.  Okay.  So this interviewer -- well, you signed this form,

21  didn't you?

22  A.  I did.

23  Q.  It's also true that you were doing cocaine in 2002 and

24  2003; correct?

25  A.  Absolutely not.  I haven't done that.  I didn't use crack

LC7VMAX7                        Carolyn - cross

1   until I was 18 years old.

2               MR. PAGLIUCA:  We can direct the witness to --

3   A.  And it dates in 2005.

4               MR. PAGLIUCA:  We can take down that document, your

5   Honor.

6               THE COURT:  It's down.

7               MR. PAGLIUCA:  If I can direct the witness to

8   3505-043, page 28, deposition page 105, lines 7 through 11.

9               THE COURT:  Just a moment.

10  A.  I'm sorry, what lines?

11  Q.  It will be enlarged for you.

12  A.  No, I see that.  I'm asking what lines of the paper you

13  would like me to look at.

14  Q.  Sure.  We're looking at lines 7 through 11.

15  A.  Yes, I see that.

16  Q.  Again, this is testimony under oath in 2009; correct?

17  A.  Right.

18              MS. COMEY:  Objection, your Honor.

19              THE COURT:  Sustained.

20              MR. PAGLIUCA:  The basis of the objection, your Honor?

21              THE COURT:  Not inconsistent.

22  Q.  You also ingested something called angel trumpets when you

23  were going to Mr. Epstein's house, do you recall that?

24  A.  That's a flower.  I don't think you should ingest those at

25  all.

LC7VMAX7                    Carolyn - cross

1          MR. PAGLIUCA:  If we can direct the witness to

2    3505-035, page 139.  That's the deposition page, I believe.

3          THE COURT:  I will direct the witness to answer,

4    because I don't think we got a direct answer to the question.

5          THE WITNESS:  I have never taken a hallucinogenic.

6          THE COURT:  Okay.  Go ahead.

7          MR. PAGLIUCA:  3505-035, page 139, line 10.

8          THE COURT:  All right.  Go ahead.

9          MS. COMEY:  Your Honor, may I confer with counsel --

10          THE COURT:  You may.

11          MS. COMEY:  -- please?

12          (Counsel conferred)

13          THE WITNESS:  I have never seen this document in my

14    life.

15          THE COURT:  Just one second, Carolyn.

16          MS. COMEY:  Thank you, your Honor.

17          MR. PAGLIUCA:  Thank you, your Honor.

18          THE COURT:  Can you orient the witness as to what

19    we're looking at.

20          MR. PAGLIUCA:  Page 138.

21          THE COURT:  But just the date that this is from.

22          MR. PAGLIUCA:  This is from 2009, your Honor.

23          THE COURT:  Okay.  Can you just show the first page,

24    because she said she didn't know what it was.

25          MR. PAGLIUCA:  Sure.  October 21st, 2009.

LC7VMAX7                          Carolyn - cross

1           THE COURT:  Okay.  And then --

2           THE WITNESS:  Rough draft.  Who's it from?

3    BY MR. PAGLIUCA:

4    Q.   The question is did you make that statement?

5    A.   What statement?

6    Q.   That you used angel trumpets --

7    A.   No, I don't even see that as a question.  It was asking

8    about hallucinogenics.

9    Q.   You know what an angel trumpet is; correct?

10   A.   I do not.  I don't suggest anybody eats them.

11   Q.   Your drug use continued in the 2001 through 2003 time

12   frame; correct?

13   A.   No.

14   Q.   Isn't it true that you left the state of Florida in part

15   because you were abusing cocaine, and you and your boyfriend

16   wanted to go to Georgia so that you could detox?

17   A.   That is not true.  I went to Georgia to escape the

18   traumatic events that were happening in my life.

19   Q.   Well, and you went to Georgia and you were pregnant, right?

20   A.   I got pregnant in Georgia.

21   Q.   And you stayed there through 2003; correct?

22   A.   Yes.

23   Q.   I want to ask you some questions about your testimony

24   related to your claims about having sex with Mr. Epstein.

25           Do you remember testifying about that on direct

LC7VMAX7                        Carolyn - cross

1     examination?

2     A.   When, earlier?

3     Q.   Yes.

4     A.   Yes.

5     Q.   And let me back up.

6     A.   Yeah.

7     Q.   Isn't it true that you used cocaine while you were at

8     Mr. Epstein's house?

9     A.   No.

10              MR. PAGLIUCA:  If I could direct the witness's

11    attention --

12    A.   I saw the paper.

13              THE COURT:  I will ask you to call it up.

14              MR. PAGLIUCA:  I am, your Honor.  I'm going to direct

15    the witness's attention to page 3505-043, 28, at page 105.

16    Let's start at page 103.

17              Does the witness have page 103?

18              THE COURT:  Yes.

19              MR. PAGLIUCA:  Let's go to line 10, start at line 11.

20              MS. COMEY:  Objection, your Honor.

21              THE WITNESS:  What does Mr. Epstein telling me not to

22    take drugs have to do with the question?

23              THE COURT:  Just a second.  When there's an objection,

24    you have to wait till I rule, please.

25              THE WITNESS:  Oh.

LC7VMAX7                         Carolyn - cross

1           MR. PAGLIUCA:  It's foundational for the next

2     question.

3           THE COURT:  Well, then let's direct counsel and the

4     Court to the lines, and then you can expand for foundation, if

5     necessary.

6           MR. PAGLIUCA:  Sure.  Line 14:

7           Question:  And how did Mr. Epstein --

8           THE COURT:  No, no, no.  You need to tell the

9     government and me what lines to read.  The government can

10    indicate objection or no objection, and then I'll rule, and

11    then you can proceed or not proceed.

12          MR. PAGLIUCA:  Sure.  Page 103, line 14 through 25,

13    continuing on to 104, through page -- line 25, continuing on

14    through 105, page -- line 25.

15          THE COURT:  I'm still on 103 here.

16          MR. PAGLIUCA:  Excuse me?

17          THE COURT:  It was just on 103 so far.

18          MR. PAGLIUCA:  Okay.

19          THE COURT:  You need to communicate with each other

20    because it's just not working.

21          THE WITNESS:  I don't understand what this has to

22    do --

23          THE COURT:  Just a minute, please.

24          Can you repeat, I guess, the line.  Okay.

25          MR. PAGLIUCA:  And we do have paper copies, your

1    Honor, if that's easier.

2                THE COURT:  Okay.

3                So what exact lines do you propose reading?

4                MR. PAGLIUCA:  Well, I think we need to start at 14

5    and continue through that page, the next page, the next page,

6    and the next page.

7                THE COURT:  Ms. Comey.

8                MS. COMEY:  Your Honor, I think the only potentially

9    admissible portion of this might be on pages 105 through 106.

10               THE COURT:  Thank you.  Let's go there.

11               That seems to get what you're getting at.

12               MR. PAGLIUCA:  Sure.  I was just trying to give the

13   context, your Honor.  So that's fine.  I'll go there.

14   BY MR. PAGLIUCA:

15   Q.   Looking at line 7 on page 105, does it refresh your memory

16   that you answered the question:  Yes, but I have done cocaine

17   at Mr. Epstein's house also?

18               MS. COMEY:  Your Honor, I think we need the question

19   and then its answer, and then it needs to continue through to

20   page 106.

21               THE WITNESS:  I need to know what line --

22               THE COURT:  So at this point you may read on that page

23   those indicated lines.  Go ahead.

24               MR. PAGLIUCA:  Fine, your Honor.

25               Starting at line 4, is that fine, Ms. Comey?

LC7VMAX7                        Carolyn - cross

1            MS. COMEY:  Yes.  But I would ask that counsel be

2       cautioned not to say a last name.

3            MR. PAGLIUCA:  Absolutely.

4            MS. COMEY:  And then continuing into page 106, line 9.

5            MR. PAGLIUCA:  That will be fine.

6            Does it refresh your recollection --

7            THE COURT:  You can just read.  Just read it all the

8       way through and then move on.

9            MR. PAGLIUCA:  Okay.

10            THE WITNESS:  Thank you.

11            MR. PAGLIUCA:  (Reading)

12       "Q.  And you were and he doing cocaine away from Mr. Epstein,

13       that is what you did when you weren't at Mr. Epstein's house?

14       "A.  Yes.  But I have done cocaine at Mr. Epstein's house also.

15       "Q.  When did you do cocaine at Mr. Epstein's house?

16       "A.  On some occasions when I was there.

17       "Q.  What occasions were those?

18       "A.  I don't recall the dates and times.

19       "Q.  What, where at his house were you doing cocaine?

20       "A.  I would excuse myself and go to the bathroom.

21       "Q.  And who was in the bathroom when you were doing cocaine?

22       "A.  Myself.

23       "Q.  And what form of cocaine were you doing?

24       "A.  Powder.

25       "Q.  And did you tell anyone you were taking cocaine?

LC7VMAX7                    Carolyn - cross

```
 1    "A.  Mr. Epstein knew I was high.

 2    "Q.  Did you tell Mr. Epstein that you had gone in the bathroom

 3    in his house and snorted cocaine?

 4    "A.  Not per se in that form.

 5    "Q.  Did you tell him that you were using drugs in his house?

 6    "A.  No.

 7    "Q.  So -- no.  He never told you to do drugs in his house, did

 8    he?

 9    "A.  No, he never told me to."

10    A.  He says he never told you to use drugs.  You missed a word.

11    Q.  Okay.  And then the answer was:

12    "A.  No, he never told me to."

13          Correct?

14    A.  That's what it says.

15    Q.  And those are the answers that you gave under oath in 2009;

16    correct?

17    A.  Yes.

18    Q.  Now, I want to ask you some questions about your testimony

19    here today about your claim that you had intercourse with

20    Mr. Epstein.

21          MR. PAGLIUCA:  Directing the witness's attention to

22    the same page, 106, line 13.

23          THE COURT:  Not up yet.

24          MS. COMEY:  Your Honor, I would just ask that the

25    witness be asked to explain what she defines as "sexual
```

LC7VMAX7                    Carolyn - cross

1    intercourse."

2              MR. PAGLIUCA:  I think that's --

3              THE COURT:  That's not an objection.  Let me look at

4    what we're talking about.  Let's do this the same way every

5    time, okay?

6              MS. COMEY:  Yes, your Honor.

7              THE COURT:  Page and line?

8              MR. PAGLIUCA:  106, 13, your Honor.

9              THE COURT:  All right.  Go ahead.

10   BY MR. PAGLIUCA:

11   Q.  (Reading)

12   "Q.  Did you ever have sexual intercourse with Mr. Epstein?

13   "A.  No."

14             Do you see that question and answer?

15   A.  Yeah, I do.

16             MR. PAGLIUCA:  Then, your Honor, I'm going to

17   continue, with the Court's permission, to the next series of

18   questions and answers.

19             THE WITNESS:  Can I finish my answer?

20             THE COURT:  You may.

21             THE WITNESS:  You asked me the question, did you ever

22   have sexual intercourse with Mr. Epstein.  And the answer says

23   that I replied no.  I replied no because I was not a willing

24   participant.  He had intercourse with me and I stopped it.  I

25   didn't ask to have sex with him.

LC7VMAX7                        Carolyn - cross

1          MR. PAGLIUCA:  And, your Honor, may I continue

2    reading?

3          THE COURT:  What lines?

4          MR. PAGLIUCA:  Sixteen through 107, 14.

5          THE COURT:  Need to see 107.

6          Through what line?

7          MR. PAGLIUCA:  Five, your Honor.

8          THE COURT:  Okay.  Go ahead.

9          MS. COMEY:  I would object, your Honor.

10         THE COURT:  I'm sorry?

11         MS. COMEY:  Same objection, your Honor.

12         THE COURT:  Go ahead.

13   BY MR. PAGLIUCA:

14   Q.  (Reading)

15   "Q.  Do you know what I mean by sexual intercourse or do I need

16   to go through the various acts?

17   "A.  Oh, I am pretty sure I know what sexual intercourse is

18   being I have two children.

19   "Q.  Well, I just want to make sure we're clear about some

20   things.  Did Mr. Epstein ever insert his penis into any part of

21   your body at all?

22   "A.  I just said that I've never had any sexual intercourse

23   with Mr. Epstein, and that I knew what -- "

24         THE COURT:  You misread.

25   BY MR. PAGLIUCA:

LC7VMAX7                    Carolyn - cross

1    Q.   (Reading)

2    A.   "I just said that I've never had sexual intercourse with

3    Mr. Epstein, and that I knew what sexual intercourse was and I

4    said no.  So for you to explain to me what it was, unnecessary.

5    "Q.   Okay.  Do you just want to answer my question now, ma'am?

6    "A.   I did four times.  I said no."

7             Continuing on, your Honor, to --

8             THE WITNESS:  For a spelling of that answer should

9    have been he did four times, I said no.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LC7Cmax8                         Carolyn - cross

1            MR. PAGLIUCA:  Continuing on, your Honor, to page 106,

2       please.

3            THE COURT:  Lines?

4            MR. PAGLIUCA:  24, 25 -- excuse me.  108, 24, 25, 109,

5       16.

6            THE COURT:  Ms. Comey?

7            MS. COMEY:  Same objection.

8            MR. PAGLIUCA:  I need a basis.  I'm going to respond.

9            THE COURT:  I'm going to overrule.

10      BY MR. PAGLIUCA:

11      "Q.  Did you ever masturbate Mr. Epstein?

12      "A.  No.

13      "Q.  Did you ever touch Mr. Epstein's penis?

14      "A.  No.

15      "Q.  In any way?

16      "A.  No.  No.

17      "Q.  Did you ever penetrate with any part of your body, any

18      part of Mr. Epstein's body?

19      "A.  Besides touching his nipples, no.

20      "Q.  Did you ever do anything physically to Mr. Epstein, other

21      than give him a nipple massage?

22      "A.  Squeezed his nipples.

23            THE WITNESS:  That says, "Simple massage."

24      "Q.  Simple massage?

25      "A.  Squeezed his nipples."

LC7Cmax8                          Carolyn - cross

1              Correct?

2     A.   Correct.

3     "Q.   Was that part of the massage?

4     "A.   No.

5     "Q.   Okay.  So other than squeeze his nipples and give him a

6     massage, did you do anything else physically to Mr. Epstein?

7     "A.   No."

8              Correct?

9     A.   Yes.  But what does this have to do with what I'm here for

10    today?

11             THE COURT:  Mr. Pagliuca, next question.

12             MR. PAGLIUCA:  Yes, your Honor.

13    Q.   When you spoke to the agents in 2007, you did not say

14    anything about Ghislaine Maxwell; correct?

15    A.   Ms. Maxwell was not the topic of discussion at that time.

16    Q.   Is the answer to my question yes?

17    A.   The only thing Ms. Maxwell was involved in was fondling and

18    touching my breasts and my buttocks, and for that, my soul is

19    broken and so is my heart.

20             THE COURT:  Counsel.

21             MR. PAGLIUCA:  Your Honor, I move to strike the answer

22    and ask the Court to direct the witness to answer the question

23    asked.

24             THE COURT:  Carolyn, you have to follow my rules here,

25    you have to.

LC7Cmax8                        Carolyn - cross

1              Jury will disregard.  I do direct the witness to

2     respond to the questions.  I'll give you an opportunity to

3     explain and Ms. Comey will have an opportunity to redirect.

4              Go ahead.

5     BY MR. PAGLIUCA:

6     Q.   The question was, in 2007, you never said anything to the

7     FBI agents about Ms. Maxwell; correct?

8     A.   Correct.

9     Q.   Your two lawsuits involving Jeffrey Epstein and Sarah

10    Kellen say nothing about Ms. Maxwell; correct?

11    A.   Correct.

12    Q.   Your deposition testimony in 2009 says nothing about

13    Ms. Maxwell, other than the two words that Ms. Comey read;

14    correct?

15    A.   Correct.

16    Q.   Now, you also met with Ms.Villaflana (ph.) in Florida in

17    2007 with the government.  Do you recall meeting with her?

18    A.   I'm sorry, who?

19    Q.   Ms. Villaflana?

20    A.   I'm not -- I don't recall the name.

21    Q.   Do you recall that there was a second meeting with the

22    government in 2007 in Florida which Ms.Villaflana attended?  Do

23    you remember that?

24    A.   I'm not sure exactly who that is.

25    Q.   You never said anything to Ms.Villaflana or anyone else in

LC7Cmax8                         Carolyn - cross

1  the second meeting about Ms. Maxwell; correct?

2  A.  I don't recall.

3  Q.  Between 2002 and 2003, you were in mental health

4  counseling.  Do you recall that?

5  A.  No.

6  Q.  Do you remember Dr. Susan Pope?

7  A.  That was my therapist.

8  Q.  All right.

9  A.  I wasn't in a mental facility.

10 Q.  I said counseling.  So I will use your word, your

11 therapist.  Do you recall being in therapy with Dr. Pope?

12 A.  Yes.

13 Q.  You never mentioned Ms. Maxwell in therapy with Dr. Pope;

14 correct?

15 A.  Correct.

16 Q.  Now, you also met with Dr. Serge Thys?

17 A.  Dr. Thys.

18 Q.  Never mentioned Ms. Maxwell to him either; correct?

19 A.  Correct.

20 Q.  It's true, isn't it, Carolyn, that your story has changed

21 significantly since 2007, 2008, and 2009; correct?

22 A.  No.

23 Q.  And isn't it true -- well, first of all, you had no contact

24 with the government between 2007 and 2019; correct?

25 A.  I'm not sure.  I don't remember the dates.

LC7Cmax8                           Carolyn - cross

Q.  Do you recall that after you met with the agents in 2007,
the next time you spoke with anyone from the FBI was March
19th, 2019?  Do you recall that?

A.  Yes.

Q.  And the agents contacted you and you told them that you
wanted to talk to your lawyers before talking to them; correct?

A.  Yes.

Q.  And you got a hold of Mr. Scarola, who was your lawyer from
before; correct?

A.  Yes.

Q.  And you spoke with Mr. Scarola?  The government continued
to try to contact you in 2019; correct?

A.  Correct.

Q.  And you didn't get back to them at all in 2019, did you?

A.  I don't recall.

Q.  Well, do you recall that Mr. Scarola forwarded a number of
emails from the government to you in 2019 and you never
responded to them?

A.  I -- I don't recall any of that.

Q.  You don't recall getting any emails from your lawyer --

A.  I'm not sure.  My phone number has been changed numerous
times.

Q.  My question is, do you recall getting any forwarded emails
from the government from your lawyer?

A.  Yes.

LC7Cmax8                         Carolyn - cross

1    Q.   And you didn't respond to those in 2019; correct?

2    A.   Correct.

3    Q.   Mr. Scarola also left you multiple --

4             THE COURT:  Just a second.  Go ahead.

5    A.   I'm not sure -- the dates and everything have been run

6    together right now.

7    Q.   Mr. Scarola also left multiple voice messages for you with

8    regard to the government, correct, in 2020?

9             MS. COMEY:  Objection, your Honor.

10            THE COURT:  Sustained.

11            MR. PAGLIUCA:  If I can direct the witness to 3505 --

12            THE COURT:  No, question.  What's your question?

13            MR. PAGLIUCA:  I understand.

14   BY MR. PAGLIUCA:

15   Q.   The question is, you were aware that Mr. Scarola was

16   leaving messages for you about contacting the government?

17   A.   I -- to Mr. Scarola --

18            THE COURT:  Just a minute.

19            MS. COMEY:  Objection.

20            THE COURT:  I sustained the objection.  That's why I

21   said go to the next question.

22            MR. PAGLIUCA:  I don't understand the basis for the

23   objection, your Honor.

24            MS. COMEY:  Privilege, your Honor.

25            THE COURT:  Sustained.  Sustained.  Next question.

LC7Cmax8                    Carolyn - cross

1    BY MR. PAGLIUCA:

2    Q.  You never responded to the government in 2020, based on any

3    messages that were left on your phone; correct?

4    A.  I did speak with Mr. Scarola in 2020.

5              MS. COMEY:  Your Honor --

6              THE COURT:  I'll allow that answer and now you'll move

7    on.

8              MR. PAGLIUCA:  I am, your Honor.

9    Q.  You first responded to the government in July of 2020

10   through Mr. Danchuk; correct?

11   A.  That was my attorney.

12   Q.  Right.  You first responded to them through Mr. Danchuk;

13   correct?

14   A.  Yes.

15   Q.  And July 1, 2020, is one month after applications to the

16   Epstein Victim Compensation Fund were opened; correct?

17             MS. COMEY:  Objection.  Foundation.

18             THE COURT:  Sustained.

19   Q.  You knew that in June, one month earlier, applications were

20   opened to the Epstein Victim Compensation Fund; correct?

21   A.  No.

22   Q.  In July 2020, your lawyer, Mr. Scarola, sent an email with

23   a number of bullet points for the government to interview

24   about; correct?

25             MS. COMEY:  Objection.  Foundation.

LC7Cmax8                      Carolyn - cross

1           THE COURT:  Just a moment.  Overruled.

2           The question is, in July 2020, did Mr. Scarola send an

3    email with a number of bullet points for the government to

4    interview about.

5    A.   Anytime I talked to the government, he was present with me.

6    Q.   I understand that.  And those interviews with the

7    government were a followup to the email that Mr. Scarola sent

8    on your behalf as your agent on July 16th, 2020; correct?

9           MS. COMEY:  Objection, your Honor.

10          THE COURT:  Sustained on foundation.

11   Q.   You were aware that Mr. Scarola sent the email with the

12   bullet points to the government in advance of you meeting with

13   the government; correct?

14   A.   Correct.

15   Q.   And there are materials shown to you in advance of your

16   meeting with the government; correct?

17          MS. COMEY:  Objection, your Honor.  We're veering into

18   privileged territory.

19          THE COURT:  You need to clarify the question so I can

20   respond to that objection.

21          MR. PAGLIUCA:  I'm not asking for any communications,

22   your Honor.  I'm just talking about materials shown to her --

23          THE COURT:  By her attorney, you're asking her what

24   materials her attorney showed her?

25          MR. PAGLIUCA:  In advance of meeting with the

1    government, yes.

2               THE COURT:  Sustained.

3    A.  I have no --

4               THE COURT:  I sustained it.

5    BY MR. PAGLIUCA:

6    Q.  You were present with Mr. Scarola and other lawyers on

7    multiple occasions meeting with the government; correct?

8    A.  Yes.

9    Q.  And this was at the same time that you were submitting your

10   Epstein Victim Compensation Fund request; correct?

11   A.  No, it's not correct.

12   Q.  Well, do you recall meeting with the government in July of

13   2020?

14              THE COURT:  Do you recall meeting with the government

15   in July 2020.

16   A.  No.  I'm not sure.  I can't recall.

17              THE COURT:  Okay.  You can say you can't recall if you

18   can't recall.

19   A.  I can't recall.

20   Q.  Do you recall meeting with the government -- let me ask the

21   question.  How many times do you recall meeting with the

22   government in 2020?

23   A.  I'm not sure.

24   Q.  Multiple times; correct?

25   A.  I don't recall.

LC7Cmax8                         Carolyn - cross

1  Q.  And do you recall submitting your application to the

2  Epstein Victim Compensation Fund in October of 2020?

3  A.  I'm not sure when it was admitted.

4           MR. PAGLIUCA:  Can we show the witness Exhibit C6,

5  electronically, please, and let's go to the last page of the

6  exhibit.

7           THE WITNESS:  Yes, that's my signature.

8  Q.  And there is a date on there, which is October 14th, 2020.

9  Does that refresh your recollection as to when you submitted

10 it?

11 A.  Yes, that's when it was submitted.

12 Q.  And that's during the time that you were meeting with the

13 government; correct?

14          THE COURT:  You could put the exhibit down?

15          MR. PAGLIUCA:  Yes, please.

16 A.  Yes.

17 Q.  And your Epstein Victim Compensation Fund submission is

18 different from your two lawsuits against Epstein and Kellen;

19 correct?

20 A.  Yes.

21 Q.  Your Epstein Victim Compensation Fund has the date, May

22 1st, 2020, as the start date, not -- I'm sorry.  2001 as the

23 start date; correct?

24 A.  I do not recall.

25          MR. PAGLIUCA:  If we can show the witness that --

LC7Cmax8                          Carolyn - cross

1    A.  Can you repeat the question.

2                MR. PAGLIUCA:  Sure.  If we can show the witness page

3    3 of C6, please.

4                THE WITNESS:  What is your question now?

5    Q.  I'm looking in the middle of the page, would that refresh

6    your memory as to what the date was you were claiming the

7    beginning date in the Epstein Victim Compensation Fund to get

8    compensation?

9    A.  Yes.

10   Q.  And that's May 1st, 2001; correct?

11   A.  Wait.  Can you ask me the question again, because --

12   Q.  In your Epstein victim fund compensation submission, you

13   were claiming Epstein abused you beginning May 1, 2001;

14   correct?

15   A.  Yes.

16   Q.  And that's different from the two lawsuits that you

17   filed --

18   A.  Yes.  I've already answered that question for you.

19   Q.  Okay.  This Epstein Victim Compensation Fund submission is

20   also different because you added claims of vaginal penetration

21   with fingers, sex toys, oral sex, and forged intercourse?

22   A.  Absolutely not.  That's a lie.

23                MR. PAGLIUCA:  If we can show the witness page 4 of 11

24   in that same exhibit.

25   Q.  Does that refresh your recollection that, with the Epstein

LC7Cmax8                          Carolyn - cross

1    Victim Compensation Fund, you added claims of vaginal

2    penetration with fingers and sex toys, oral sex, forged

3    intercourse; true?

4    A.  I suppose.  That's what it states.

5    Q.  And that's different from your lawsuits against Epstein --

6    A.  Yes.

7    Q.  Kellen --

8            THE COURT:  Carolyn.  Carolyn.  You have to wait for

9    the question to finish and then you may give your answer.  Go

10   ahead.

11   Q.  That's different from your lawsuits filed against Epstein

12   and Kellen in 2008 and 2009; correct?  Correct?

13   A.  I already answered.  Yes.

14   Q.  The other difference between your 2008 and 2009 lawsuits

15   and your Epstein Victim Compensation Fund request is that you

16   included Ms. Maxwell in this Epstein victim fund request;

17   correct?

18   A.  No, that's not correct.  I did not add her.

19   Q.  As part of the Epstein Victim Fund request, you were

20   awarded $3.25 million; correct?

21   A.  I'm not exactly sure.

22           MR. PAGLIUCA:  If we can show the witness C7, and the

23   bottom of the page, the number there.

24   Q.  Does that refresh your recollection --

25   A.  That does not say $3.9 million.  It's $2,804,000.

1             MR. PAGLIUCA:  Thank you.  We can take the exhibit

2      down.

3      Q.  You received $2,804,000; correct?

4      A.  Yes.  But what does that have to do with anything?

5      Q.  They subtracted $446,000 which had been previously paid for

6      your claims against Mr. Epstein and Ms. Kellen; correct?

7      A.  Yes, but no money will ever fix what's happened to me.  So

8      why is that --

9             MR. PAGLIUCA:  Move to strike the answer, your Honor.

10            THE COURT:  Carolyn, you have to wait for my ruling

11     when there is an objection.

12            THE WITNESS:  Oh, okay.

13            THE COURT:  Objection sustained.  Jury will disregard.

14     I will direct the witness to answer the questions of

15     Mr. Pagliuca.

16            Ms. Comey will have an opportunity to come back and

17     ask you additional questions.

18            Go ahead.

19            MR. PAGLIUCA:  Thank you, your Honor.

20     BY MR. PAGLIUCA:

21     Q.  As part of this compensation fund, you know that if any of

22     the information you've submitted is false, you can lose the

23     money; correct?

24     A.  Yes.

25     Q.  And you know if any of the information you've submitted is

LC7Cmax8                     Carolyn - cross

1   false, you can be in criminal trouble; correct?

2   A.  Yes.

3   Q.  So there is an incentive for you to stick to your story;

4   correct?

5            MS. COMEY:  Objection, your Honor.

6            THE COURT:  Sustained.

7   Q.  Ms. Comey asked you some questions about your schizophrenia

8   and issues related to your children.  Do you recall that?

9   A.  Yes, I do.

10  Q.  Isn't it true that you're worried about your children being

11  taken away from you because you've lost custody in the past

12  because of substance abuse issues?

13  A.  No, that is not what I said.  You are wrong.

14  Q.  Isn't it true -- I'm not asking what you said --

15  A.  It is not true, no.

16           THE COURT:  Hang on a second.  I'll direct the witness

17  to answer the question and then Ms. Comey will have an

18  opportunity to redirect.  You may ask the question.

19  Q.  Isn't it true that you're worried about your kids being

20  taken away because you lost custody of the children --

21  A.  No.

22  Q.  -- in the past --

23           THE COURT:  You have to wait for the question.

24  Q.  -- because of substance abuse issues?

25  A.  No.

LC7Cmax8                         Carolyn - cross

1          THE COURT:  Okay.  Next question.

2          MR. PAGLIUCA:  No further questions, your Honor.

3          THE COURT:  Ms. Comey.

4          MS. COMEY:  Briefly, your Honor.  Thank you.

5          MR. PAGLIUCA:  I need to confer, your Honor.

6          THE WITNESS:  I didn't lose my kids.

7          THE COURT:  Let's go, counsel, because it's close to

8    the end of the day.

9          MS. COMEY:  Your Honor, I'm going to be very brief.

10         THE COURT:  Okay.  Mr. Pagliuca, now is your time?

11         MR. PAGLIUCA:  Yes, your Honor.  Got it.  Your Honor,

12   as I understand it, the prior testimony that's been read into

13   the record is admitted; is that correct?

14         MS. COMEY:  Your Honor, it's been read into the

15   transcript.

16         THE COURT:  Correct.

17   BY MR. PAGLIUCA:

18   Q.  When you were talking to the government, you recall seeing

19   a photograph of Ms. Maxwell pregnant; is that correct?

20   A.  Excuse me?

21   Q.  One of your memories about Ms. Maxwell is you claim that

22   you saw a photograph of her in Epstein's house, pregnant;

23   correct?

24   A.  Nude and pregnant laying on the --

25   Q.  And pregnant.

LC7Cmax8                     Carolyn - redirect

1   A.   -- yes.  There was multiple pictures, nude photos.

2              MR. PAGLIUCA:  May I approach the witness, your Honor?

3              THE COURT:  Yes, but Mr. Pagliuca, you got to --

4              MR. PAGLIUCA:  Yes, your Honor.

5              Your Honor, I've handed the witness Defendant's

6   Exhibit C10.  The government has a copy.

7              THE WITNESS:  That is not the photo.

8              MR. PAGLIUCA:  Your Honor, I think I understand the

9   Court's ruling that the interrogatories that we discussed are

10  admitted; is that correct?

11             THE COURT:  Yes.

12             MR. PAGLIUCA:  No further questions.

13             MS. COMEY:  Three minutes, your Honor.

14             THE COURT:  Okay.

15             MS. COMEY:  May I inquire?

16             THE COURT:  You may.

17  REDIRECT EXAMINATION

18  BY MS. COMEY:

19  Q.   Carolyn, did you write your civil complaint?

20  A.   No.

21  Q.   Did you write your application to the Epstein Victim

22  Compensation Fund yourself?

23  A.   No.

24  Q.   Carolyn, when you were shown a report of an FBI interview,

25  had you ever seen that report before today?

LC7Cmax8                    Carolyn - redirect

1   A.  No.

2   Q.  Did you write it yourself?

3   A.  No.

4   Q.  Did anyone ever ask you if it was accurate?

5   A.  No.

6   Q.  Do you know how old you were when you first saw Ghislaine

7   Maxwell?

8   A.  I was 13.

9   Q.  Do you know how old you were when you first went to Jeffrey

10  Epstein's house?

11  A.  I was 13.

12  Q.  Do you know what year it was?

13  A.  Not off the top of my head right now.

14  Q.  Do you know what year it was when you were 14 years old,

15  Carolyn?

16  A.  I can't remember right now.

17  Q.  Are you able to tell us what year it was when you were 15

18  years old?

19  A.  No.

20  Q.  Can you tell us what year it was when you were 13?

21  A.  If I do the math, yes.

22  Q.  Did anyone tell you what to say here today on the stand?

23  A.  No.

24  Q.  Carolyn, are you trying to get money out of testifying here

25  today?

LC7Cmax8                    Carolyn - redirect

1    A.  No.  Money will not ever fix what that woman has done to

2    me.

3    Q.  Carolyn, why are you here today?

4    A.  Because what she did was wrong and she takes vulnerable

5    young girls and --

6              MR. PAGLIUCA:  Your Honor, I object.

7    A.  I'm so petrified that my daughters are --

8              THE COURT:  Carolyn, just a second.  Just a second.  I

9    have to rule on an objection.  Grounds.

10             MR. PAGLIUCA:  Your Honor, it's a narrative and

11   it's --

12             MS. COMEY:  Your Honor, an answer he doesn't like is

13   not a narrative.

14             THE COURT:  Counsel, both of you need to behave.

15             MR. PAGLIUCA:  I'm behaving, your Honor.  It's a

16   narrative --

17             THE COURT:  I understand.  Just one word objection.

18             MR. PAGLIUCA:  404(b).

19             THE COURT:  All right.  I'll let the answer in as it

20   is.  Next question.

21   BY MS. COMEY:

22   Q.  Carolyn, what have you been told by the government to do

23   here today?

24   A.  Just tell the truth.

25             MS. COMEY:  No further questions.

LC7Cmax8

|    |                                                                    |
|----|--------------------------------------------------------------------|
| 1  | THE COURT:  Mr. Pagliuca.                                          |
| 2  | RECROSS EXAMINATION                                                |
| 3  | BY MR. PAGLIUCA:                                                   |
| 4  | Q.  The $446,000 that you received in 2009, that was gone by       |
| 5  | 2012; correct?                                                     |
| 6  | A.  I don't know, sir.  I have children that I take care of.       |
| 7  | Q.  The $446,000 was gone by 2012; correct?                        |
| 8  |      MS. COMEY:  Beyond the scope, your Honor.                     |
| 9  |      THE COURT:  Overruled.                                        |
| 10 | A.  I do not recall the dates.                                     |
| 11 | Q.  You don't recall when you ran out of $446,000?                 |
| 12 | A.  I bought a house, a car, food.  I don't recall.               |
| 13 | Q.  And you lost all of it; correct?                               |
| 14 | A.  Absolutely not.                                                |
| 15 |      MR. PAGLIUCA:  No further questions, your Honor.              |
| 16 |      MS. COMEY:  Nothing, your Honor.                              |
| 17 |      THE COURT:  All right.  Carolyn, you may step down,          |
| 18 | you are excused.  Thank you.                                       |
| 19 |      THE WITNESS:  Thank you.                                      |
| 20 |      (Witness excused)                                             |
| 21 |      THE COURT:  Members of the jury, we're about two             |
| 22 | minutes over.  Thank you for your attention and diligence.        |
| 23 | We'll resume same time tomorrow.  Thank you so much.              |
| 24 |      (Continued on next page)                                      |
| 25 |                                                                    |

LC7Cmax8

1          (Jury not present)

2          THE COURT:  You my be seated.  Matters to take up.

3          MR. ROHRBACH:  Your Honor, the government has an

4    update on its factual development with regard to the witness,

5    Brian.  The government is not going to be able to complete a

6    factual investigation by 6 o'clock.  Specifically, Jane's

7    counsel is not available, so the government won't be able to

8    talk with Jane as part of this.  The government will just elect

9    not to call Brian as a witness.  We'll of course produce the

10   materials we have gathered to the defense tonight.

11         And I would just like to make a record that the

12   government does not believe that any rule or order of the Court

13   has been violated and the government's decision should not be

14   understood in that light.

15         THE COURT:  Anything, Ms. Menninger?

16         MS. MENNINGER:  No, your Honor.

17         THE COURT:  Any other matters to take up?

18         MR. EVERDELL:  Your Honor, just if we could get a bit

19   of the preview of the witness order since I think things have

20   shuffled a bit in light of developments today.

21         THE COURT:  Can you give defense counsel a new witness

22   list?

23         MS. MOE:  Yes, your Honor, we can that this evening.

24         THE COURT:  I'll note, the Court did receive a request

25   for a docketing of the witness list.  The government submitted

LC7Cmax8

1     that with a request to file it under seal on the theory that

2     it's not a judicial document, as I'm not doing anything with

3     it, and even if it is a judicial document, it contains the

4     names, it's identifying as to individuals who are testifying

5     under pseudonym and individuals who haven't testified yet.  For

6     that reason, I'll permit it to be maintained under seal if you

7     do share it with the Court.

8               MS. MOE:  Thank you, your Honor.

9               With respect to scheduling -- I'm sorry, may I have

10    just one moment?

11              THE COURT:  Yes.

12              MS. MOE:  Your Honor, with respect to scheduling, we

13    did want to update the Court and counsel that we do anticipate

14    that, given the current pace of scheduling, we will rest this

15    week.  So we want to let the Court know that, for scheduling

16    purposes, giving the timing of the trial, that's our current

17    update and estimate.

18              THE COURT:  That's helpful.  I wanted to talk about

19    the timing of the charging conference.

20              MS. MOE:  Yes, your Honor.

21              THE COURT:  Let me just pull up my calendar.

22              Let me ask defense counsel, in light of that and in

23    light of the fact that I'm, due to a scheduling conflict, not

24    sitting 13th, 14th, 15th -- let me run this as an option.  I

25    have inquired whether we can hold the charging conference on

LC7Cmax8

Saturday the 18th.  It is possible to have Ms. Maxwell present
and to make public access available on that weekend date.  So
you can consider if you'd like to do that or not, given where
we are in the schedule.  I'll leave it to counsel to consider
it and confer.  Alternatively, I suppose we could talk about
the charging conference on the 16th after we finish with the
jury.  Any thoughts?

            MS. MOE:  Your Honor, the government has no preference
between those two dates and would be available for a December
18th conference.  I think the timing would just depend on the
length and pace of the defense case.  For example, if the
defense case were to begin on Friday, depending on how long
that defense case were to last, it may be that we might need to
have that conference earlier, but we don't have a sense of the
length of the defense case, and so it's hard for us to gauge
the timing.

            MR. EVERDELL:  May we confer, your Honor?

            THE COURT:  You may.  Let me ask, does the government
anticipate -- I know it's a little hard to predict, but do you
predict resting potentially by Thursday such that --

            MS. MOE:  Yes, your Honor.  It just depends on the
length of cross of the remaining witnesses, but I think it is
possible we will be resting on Thursday.

            THE COURT:  Okay.

            MS. MOE:  Thursday of this week.

LC7Cmax8

1        MS. MENNINGER:  Your Honor, we do have witnesses, so

2   we're going to have to sort through some logistics ourselves.

3        THE COURT:  I understand that.

4        MR. EVERDELL:  Your Honor, I think maybe if we have

5   the opportunity to confer with the government, we can report

6   tomorrow on the options.

7        THE COURT:  That's fine.  I wanted to make that

8   available so that we're not -- so we have time for it that

9   isn't intruding into the time of the jury next week.  So I

10  think in light of what you're indicating, my thinking would be

11  either the evening of the 16th or 17th, or Saturday the 18th.

12        Again, I have inquired and there is no issue,

13  Ms. Maxwell can be here and we can have public access both in

14  the courtroom and overflow room.  So you'll confer and let me

15  know your thinking as to timing.

16        MS. MOE:  Thank you, your Honor.

17        THE COURT:  Other matters to take up?

18        MS. MENNINGER:  Your Honor, on that point, I would

19  like to point out that we do have a younger sibling of Jane

20  under our subpoena and I would ask, because we don't have

21  communications with that witness, that when there are

22  communications with Jane and her attorney, that she be directed

23  not to communicate about her testimony with that witness in

24  light of issues that I think are apparent that I can certainly

25  make a record if need be.

LC7Cmax8

1          MS. MOE:  Your Honor, I have no issue with reaching

2     out to Jane's attorney to remind him, again, about that issue.

3     Happy to do that this evening.

4          With respect to outstanding defense subpoenas, since

5     we're talking about this issue, my understanding at this

6     juncture is, because the witness identified as Matt has now

7     testified, the witness identified as Brian is no longer

8     testifying, that there will be no additional prior consistent

9     statements with respect to Jane.  We want to confirm that the

10    defense is not seeking to recall Jane regarding any prior

11    consistent statements so that she can be released for recall.

12         MS. MENNINGER:  Your Honor, we would like to just

13    think about it tonight and can certainly let the Court know

14    tomorrow.

15         THE COURT:  Okay.

16         MS. MOE:  Thank you, your Honor.

17         THE COURT:  I'll ask you to confer and if it's an

18    issue, raise it in the morning.  Thank you for raising it,

19    Ms. Moe.

20         MS. MOE:  Thank you.

21         THE COURT:  Any other matters?

22         MS. MOE:  Not from the government, your Honor.  Thank

23    you.

24         MR. PAGLIUCA:  I just needed to make a record on the

25    objections.  I can do that tomorrow if the Court wants me to,

LC7Cmax8

1     if the Court wants to leave.  It's very brief.

2               THE COURT:  Go ahead.

3               MR. PAGLIUCA:  So this is on the privilege objection,

4     your Honor.  The statement did not call for a communication.

5     This was a request about materials shown to the witness in

6     anticipation meeting with the government.  Those are not

7     privileged communications given that, whatever it is, is

8     intended to be communicated to a third party, number 1, and

9     number 2 --

10              THE COURT:  Well, I don't think you've made a record

11    that any -- you asked generally about any materials shown to

12    her.  I don't think you've made a record that any materials

13    shown to her were in anticipation of being -- how did you

14    phrase it?  Discussed with the government in the meeting?

15              MR. PAGLIUCA:  Well, the Court sustained the objection

16    and ordered me to move on, your Honor.

17              THE COURT:  I understand.  I'm just --

18              MR. PAGLIUCA:  There was no opportunity to further

19    that.

20              THE COURT:  Right.  To be clear, I think the question

21    was whether she was shown materials by her attorney, privilege

22    objection sustained.  There may have been other questions, I

23    suppose that would have been different than that, but I

24    sustained with respect to that question.

25              MR. PAGLIUCA:  So, I'm not arguing with your Honor.

LC7Cmax8

1    I'm just completing out the record here, which is the question

2    does not call for a privilege communication.  It's a yes-or-no

3    answer.  Yes, I was shown materials.  I don't believe that

4    that's privileged because there is no communication required,

5    number 1.

6           Number 2, in the event those materials are shown to

7    the government in a meeting, they lose any putative privilege

8    that they may have.

9           Number 3, to the extent that they're intended to be

10   communicated to a third party, they are not privileged to begin

11   with, even if they're not shown to the third party.  I believe

12   that's the status of the law and that's my record.  Thank you.

13          THE COURT:  Again, you might have been able to get

14   there, but the question that you asked, I sustained on

15   privilege.

16          Next, anything?

17          MS. MOE:  Not from the government, your Honor.  Thank

18   you.

19          MR. EVERDELL:  No, your Honor.

20          THE COURT:  Was there another issue you wanted to make

21   a record on, Mr. Pagliuca?

22          MR. PAGLIUCA:  I don't think --

23          THE COURT:  If it occurs to you, you can make it in

24   the morning.

25          MR. PAGLIUCA:  Thank you, your Honor.

LC7Cmax8

1          THE COURT:  I do just want to, in an admonishment,

2    because this has gotten a little out of hand.  Objection,

3    one-word grounds.  Cite a rule of evidence if a rule of

4    evidence is available.  If it's not, then you probably don't

5    have a basis for your objection.  But if a rule number can't be

6    used, one-word basis for grounds.  No more communicating to the

7    witnesses or the jury via objections.  Understood?

8          MS. COMEY:  Yes, your Honor.

9          MR. PAGLIUCA:  Yes, your Honor.

10          THE COURT:  Thank you.  Have a goodnight, everyone.

11   I'll see you -- sorry.  Sorry.

12          So we don't need any of the briefing related to the

13   witness.  So I think I'm not expecting anything tonight; is

14   that true?  It's like saying, oh, look, no traffic, but --

15          MS. MOE:  Nothing anticipated from the government,

16   your Honor.

17          THE COURT:  Okay.

18          MS. MENNINGER:  Nor from us.

19          THE COURT:  I thank everyone.  Goodnight.

20          (Adjourned to December 8, 2021 at 8:45 a.m.)

21                              *  *  *

22

23

24

25

1                    INDEX OF EXAMINATION

2 Examination of:                       Page

3  KIMBERLY MEDER

4 Direct By Ms. Comey . . . . . . . . . . . .1444

5 Cross By Ms. Menninger . . . . . . . . . . .1464

6 Redirect By Ms. Comey . . . . . . . . . . .1472

7  STEPHEN FLATLEY

8 Direct By Ms. Pomerantz . . . . . . . . . .1473

9 Cross By Ms. Menninger . . . . . . . . . . .1496

10 Redirect By Ms. Pomerantz . . . . . . . . .1507

11 Recross By Ms. Menninger . . . . . . . . . .1507

12  CAROLYN

13 Direct By Ms. Comey . . . . . . . . . . . .1512

14 Cross By Mr. Pagliuca . . . . . . . . . . .1562

15 Redirect By Ms. Comey . . . . . . . . . . .1692

16 Recross By Mr. Pagliuca . . . . . . . . . .1695

17                 GOVERNMENT EXHIBITS

18 Exhibit No.                 Received

19  304 . . . . . . . . . . . . . . . . . . .1446

20  306 . . . . . . . . . . . . . . . . . . .1447

21  307 . . . . . . . . . . . . . . . . . . .1448

22  320 . . . . . . . . . . . . . . . . . . .1448

23  321 . . . . . . . . . . . . . . . . . . .1449

24  322 . . . . . . . . . . . . . . . . . . .1450

25  324 . . . . . . . . . . . . . . . . . . .1451

1    325    . . . . . . . . . . . . . . . . . . .1452

2    333    . . . . . . . . . . . . . . . . . . .1453

3    337    . . . . . . . . . . . . . . . . . . .1454

4    340    . . . . . . . . . . . . . . . . . . .1454

5    341    . . . . . . . . . . . . . . . . . . .1455

6    343    . . . . . . . . . . . . . . . . . . .1457

7    347    . . . . . . . . . . . . . . . . . . .1458

8    348    . . . . . . . . . . . . . . . . . . .1459

9    314    . . . . . . . . . . . . . . . . . . .1460

10   317    . . . . . . . . . . . . . . . . . . .1461

11   318    . . . . . . . . . . . . . . . . . . .1461

12   313    . . . . . . . . . . . . . . . . . . .1463

13   332    . . . . . . . . . . . . . . . . . . .1464

14   419    . . . . . . . . . . . . . . . . . . .1479

15   424    . . . . . . . . . . . . . . . . . . .1481

16   418, 418R   . . . . . . . . . . . . . . . .1486

17   418B    . . . . . . . . . . . . . . . . . .1487

18   420, 421, 422   . . . . . . . . . . . . . .1488

19   420B, 421B, 422B   . . . . . . . . . . . . .1489

20   20    . . . . . . . . . . . . . . . . . . .1517

21   104    . . . . . . . . . . . . . . . . . . .1526

22   608    . . . . . . . . . . . . . . . . . . .1529

23                      PLAINTIFF EXHIBITS

24   Exhibit No.                            Received

25   342    . . . . . . . . . . . . . . . . . . .1456