```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     UNITED STATES OF AMERICA,
 3
              v.                          20 CR 330 (AJN)
 4
     GHISLAINE MAXWELL,
 5
                  Defendant.              Jury Trial
 6   ------------------------------x
                                          New York, N.Y.
 7                                        December 8, 2021
                                          8:52 a.m.
 8
     Before:
 9                     HON. ALISON J. NATHAN,

10                                        District Judge

11                          APPEARANCES

12   DAMIAN WILLIAMS
          United States Attorney for the
13        Southern District of New York
     BY:  MAURENE COMEY
14        ALISON MOE
          LARA POMERANTZ
15        ANDREW ROHRBACH
          Assistant United States Attorneys
16
     HADDON MORGAN AND FOREMAN
17        Attorneys for Defendant
     BY:  JEFFREY S. PAGLIUCA
18        LAURA A. MENNINGER
               -and-
19   BOBBI C. STERNHEIM
               -and-
20   COHEN & GRESSER
     BY:  CHRISTIAN R. EVERDELL
21
     Also Present:  Amanda Young, FBI
22                  Paul Byrne, NYPD
                    Sunny Drescher,
23                   Paralegal, U.S. Attorney's Office
                    Ann Lundberg,
24                   Paralegal, Haddon Morgan and Foreman

25
```

LC8Cmax1

 1          THE COURT:  Good morning, everyone.  Matters to take
 2    up, counsel?
 3          MR. ROHRBACH:  A couple matters from the government,
 4    your Honor.
 5          THE COURT:  Yes.
 6          MR. ROHRBACH:  First, we just wanted to confirm, as
 7    per our discussion at the end of the day yesterday, that
 8    whether or not the defense is planning to recall Jane and
 9    whether they are releasing Brian from subpoena.
10          MS. MENNINGER:  Your Honor, I had understood that
11    there was going to be a conversation with Jane about the
12    conversations she had with her brother, and that would be
13    disclosed to us.  I didn't receive that last night.  I think we
14    need to know whether there is not truth telling going on in the
15    recounting of this event.
16          THE COURT:  And that's with respect to recalling Jane,
17    not with respect to subpoenaing Brian; correct?
18          MS. MENNINGER:  It could be with respect to either
19    one.  We already have Brian under subpoena, your Honor.  With
20    respect to the calling of Jane, I would like to know that
21    before we make a decision.
22          THE COURT:  I did ask yesterday if you had prevailed
23    on your motion not to exclude Brian, would you subpoena him and
24    you said no.  I realize you didn't prevail nor did you -- not
25    prevail, the government withdrew him, but is your position now

LC8Cmax1

1    that, even though the government is not calling him, you may

2    still seek to subpoena him?

3          MS. MENNINGER:  We may, your Honor.  As I mentioned,

4    we have the other brother under subpoena and some of this

5    depends on what comes out between now and our case in chief.

6    I'm not 100 percent sure I can give you ballparks of

7    likelihoods, but I think we would need to see -- I would like

8    full disclosure before we make a decision about that.

9          MR. ROHRBACH:  I don't see any basis for that, your

10   Honor.  The government is not calling Brian as a witness at

11   this time, so there is no basis for us to inquire more about

12   Brian's statements.  The other brother is not a government

13   witness and is also not -- there is no suggestion that that

14   brother has been in conversation with Jane about anything of

15   substance in any event.  That's a defense witness.  Jane has

16   already testified.  So there is no basis for us to inquire

17   further about that.

18         If she's subject to recall, she's subject to recall

19   for confrontation about the prior consistent statements that

20   have been introduced and not just general additional questions

21   by the defense.

22         MS. MENNINGER:  We don't know if she's spoken to the

23   other brother, your Honor.  We are not in contact with him.  We

24   have him under subpoena based on his interviews with the

25   government and the things he told the government during his FBI

LC8Cmax1

1    interview, not because we had some other contact with him.

2           THE COURT:  So you have a choice to make whether to

3    subpoena him or not.  I'm just trying to understand what the

4    decision point is.  The government has indicated they're not

5    calling Brian.

6           MS. MENNINGER:  He has a lot of prior inconsistent

7    statements with his sister, your Honor.  That's the decision

8    point.  He said a lot of things that are inconsistent in her

9    prior statements.  We understand if we call him that your Honor

10   is likely to allow them to then bring in the prior consistent

11   statements that they would have elicited had they called him

12   yesterday.  So that's a decision point.

13          THE COURT:  Okay.  You have a decision point whether

14   to call him?

15          MS. MENNINGER:  Right.

16          THE COURT:  Is there an application with respect to

17   it?

18          MS. MENNINGER:  No, your Honor.  We have him under

19   subpoena.

20          THE COURT:  Mr. Rohrbach.

21          MR. ROHRBACH:  I suppose we just flag that Brian has

22   left the district since he's no longer a government witness.

23   If the defense ends up deciding to call him, I suppose that's

24   their choice to make.

25          It sounds like the defense has not yet made a decision

LC8Cmax1

1    about whether they're going to recall Jane.  I just want to

2    make sure I'm understanding --

3              THE COURT:  Sounds like that.

4              MS. MENNINGER:  That's correct.

5              MR. ROHRBACH:  -- defense's position.

6         So I guess we would just repeat, your Honor, that the

7    only issue for which Jane is subject to recall is the issue of

8    the prior consistent statement and not the broader question of

9    her contacts --

10             MS. MENNINGER:  If she's had contact with her younger

11   brother, who is under our subpoena, that might be fair game,

12   your Honor.  In my mind, she's violated the sequestration

13   order.

14             THE COURT:  As I indicated yesterday, before the

15   government withdraw Brian, I thought that was unlikely to be my

16   conclusion.  I don't have any different basis for coming to a

17   different conclusion, unless we learn something substantial,

18   but, again, there was no order in place, I don't think.  I

19   didn't enter one directing witnesses not to speak to each

20   other.  It is certainly not a good practice for reasons that

21   have become apparent.  And he didn't come into the courtroom,

22   which is what the text of 6/15 indicates.  I hypothesized

23   whether someone giving him a transcript of the proceeding would

24   be, if not a violation of the letter, a violation of the

25   spirit.  There is no contention as to that.

LC8Cmax1

1          In any event, I'm still unclear what the decision

2     point is.  You have decisions to make as to who to call, but

3     you're not seeking anything --

4          MS. MENNINGER:  No, your Honor.  And if I were to call

5     her and ask her something outside of the prior consistent

6     statements, we would brief that to your Honor or bring that up

7     in advance, we would not just do that.  It's just that, as your

8     Honor has seen, they shaved a substantial amount of their case

9     off and are not calling a number of witnesses that they

10     intended to call, and we are assessing who we need to call in

11     getting those people here and so forth.

12          So I just, in asking you right this second, what

13     decision we've made about our case in chief, I can't give your

14     Honor an answer.

15          THE COURT:  I understand that.  I don't think I was

16     seeking that.

17          Mr. Rohrbach, you just began by asking whether they

18     intended to recall Jane.  They don't know.

19          MR. ROHRBACH:  Right.

20          THE COURT:  And whether they intend to call Brian,

21     they don't know.

22          MR. ROHRBACH:  Thank you, your Honor.

23          The other issue the government wanted to just flag for

24     the Court is there is a possibility that we'd get to victim 2

25     by the end of the day today, and I know the Court has --

LC8Cmax1

1           THE COURT:  Yes, that's on my to-do list today, this

2    morning, which is to give you my view of the limiting

3    instruction, which I can do now.

4           So we last talked about this at the November 23rd

5    conference, and I think the defense agreed with the limiting

6    instruction.  The government had suggested changes, which I

7    rejected, but I understood the government's position that it

8    wasn't fully accurate as stated, and that's because of

9    complications around New Mexico law, potentially.

10          If we need to go into further issues that implicate

11   412, we can do sidebar, but I think for purposes of the

12   limiting instruction, here's my thinking, and I may not need

13   you to react immediately to it unless you want to, but you can

14   consider it and think about it.

15          I think an appropriate limiting instruction would be:

16   "I anticipate that you'll hear testimony from the next witness

17   about sexual conduct that she said she had with Mr. Epstein in

18   New Mexico.  I instruct you that the sexual conduct she says

19   occurred with Mr. Epstein in New Mexico was not, quote, illegal

20   sexual activity, end quote, as the government has charged in

21   the indictment.

22          "I'll give you more instructions on the legal term,

23   illegal sexual activity, at the end of the case.  However, to

24   the extent you conclude that her testimony is relevant to the

25   issues before you, you may consider it, but you may not

LC8Cmax1

1    consider this testimony as any kind of reflection on

2    Mr. Epstein's nor Ms. Maxwell's character or propensity to

3    commit any of the crimes charged in the indictment."

4         So I think that it's obviously a very different

5    instruction with respect to Kate, because this is an alleged

6    victim of the crimes charged in the indictment.  This

7    instruction avoids issues that were complicated regarding New

8    Mexico law that I don't think is necessary to get into because

9    it's not illegal sexual activity, as the government has charged

10   in the indictment, which the government has indicated -- you

11   agree with that, right Mr. Rohrbach?

12        MR. ROHRBACH:  Yes, your Honor.

13        THE COURT:  So that's my view.  You can react to it

14   now or think about it.

15        MR. ROHRBACH:  I would like to give it some thought,

16   your Honor.  We thank the Court for its thoughtfulness.

17        MS. MENNINGER:  Same, your Honor.  Thank you.

18        THE COURT:  Thank you.

19        MS. STERNHEIM:  Your Honor, the government, I expect,

20   will be calling, perhaps as its next witness, an individual

21   named Janine Gill.  My understanding is she is employed by some

22   property company, either under the auspices or related to the

23   Trump organization.  She became an employee in 2007.  The

24   government is seeking to introduce two documents, they are

25   Government Exhibit 824 and 823.  I believe they will seek to

LC8Cmax1

1    introduce it in a redacted form.

2              823 is a personal action notice that indicates --

3              THE COURT:  Can I see them while we're talking about

4    them?

5              MS. STERNHEIM:  Sure.  May I hand it up to you?

6              THE COURT:  Sure.

7              MS. STERNHEIM:  I think I've given you one redacted

8    and one not, but I can give you a whole --

9              THE COURT:  Okay.

10             MS. STERNHEIM:  So this document concerns the start

11   date of employment of an individual named Sky Roberts.  It was

12   not prepared by this individual and she has no personal

13   knowledge as to how it was prepared.

14             THE COURT:  When you say it wasn't prepared by this

15   individual, you mean by --

16             MS. STERNHEIM:  Ms. Gill.

17             THE COURT:  By Janine Gill?

18             MS. STERNHEIM:  Yes.  She started her employment in

19   2007.  This document concerns 2000.

20             There is nothing in the record concerning an

21   individual named Sky Roberts.  The second document, 824, is a

22   document concerning insurance for Sky Roberts that indicates

23   his dependents, his wife, his son, and the daughter by the name

24   of Virginia Roberts.

25             That is not a proper business record.  It has nothing

LC8Cmax1

1   to do with the operation of the Trump company or Mar-a-Lago.

2   The relevance is extraordinarily remote as there is nothing to

3   tie in the relationship or to suggest that Virginia Roberts was

4   at Mar-a-Lago during the period of time that Juan Alessi claims

5   to have seen her.  There are no employment records for her and

6   there is nothing in the record to suggest anything concerning

7   her father.

8        THE COURT:  So is it a relevance objection?

9        MS. STERNHEIM:  It's relevance as well as foundation

10  as a business record.

11       THE COURT:  Okay.

12       MR. ROHRBACH:  I suppose beginning with the relevance

13  objection, your Honor.  The relevance for these documents

14  arises in three respects.  First of all — and this is an

15  initial matter — Sky Roberts, the evidence already in the case

16  shows that there is a Virginia Roberts with a father named Sky

17  Roberts, as shown on her birth certificate.  So these documents

18  are relevant to connect the Virginia Roberts in the birth

19  certificate to a Virginia Roberts who was present in the area

20  of Mar-a-Lago in the year 2000 which allows the jury to draw

21  the inference that that is the Virginia Roberts who has been

22  the subject of testimony by Carolyn and Juan Alessi and others.

23       So these records both corroborate the fact that there

24  was a Virginia Roberts with an association of Mar-a-Lago at the

25  relevant time and corroborate and provide corroboration that

LC8Cmax1

1     that Virginia Roberts is the Virginia Roberts in the birth

2     certificate, which relative to her age, to which is therefore

3     relevant to the sex trafficking counts.

4              I'd also note that the phone number for Sky Roberts in

5     these documents is the phone number for an entry in Government

6     Exhibit 52 for -- that's listed as Virginia parents.  So in the

7     event that Government Exhibit 52 comes in, this is relevant to

8     show that that entry, in fact, is the phone number for Virginia

9     Roberts's parents.

10             So those are the various three theories of relevance.

11             In terms of admissibility under the business record

12    exception, Ms. Gill, the witness, is a records custodian for

13    Mar-a-Lago.  So she will say that personal action notices are

14    created in the ordinary course of business by managers at

15    Mar-a-Lago at the time an employee is hired and that once an

16    employee is eligible for benefits at Mar-a-Lago, those

17    employees fill out the benefit application form in Government

18    Exhibit 824 and submit them to Mar-a-Lago, which processes

19    them, sends them out to insurance companies and retains them

20    for Mar-a-Lago's own business purposes.

21             THE COURT:  And these were records that were

22    maintained at Mar-a-Lago?

23             MR. ROHRBACH:  Yes, your Honor.  I expect Ms. Gill to

24    say that she has looked at these records in Mar-a-Lago's

25    personnel file and confirms that they are true and accurate

LC8Cmax1

1    copies.

2              MS. STERNHEIM:  Judge, the fact that somebody fills

3    out a request for insurance does not deem it a business record.

4    It is not related to the course of business of the Mar-a-Lago

5    property, and the government is trying, through a backdoor

6    method, to draw an inference that because a person named

7    Virginia Roberts was insured by a man named Sky Roberts, that

8    she was, one, employed by Mar-a-Lago or, two, was at

9    Mar-a-Lago.  Insurance does not support that.

10             THE COURT:  Nothing in these records appears support

11   that she was employed at Mar-a-Lago.

12             MR. ROHRBACH:  The government agrees, your Honor,

13   these records don't give rise to that.

14             THE COURT:  But you're trying to show that?

15             MR. ROHRBACH:  That she was the dependent of a

16   Mar-a-Lago employee.

17             On the insurance point, I would note that Sky Roberts

18   was not an outsider to Mar-a-Lago at the time he filled out the

19   employee benefits forms.  He was an employee of Mar-a-Lago, and

20   one of the things Mar-a-Lago does is provide benefits to its

21   employees.

22             THE COURT:  And then on the business records, your

23   argument, Ms. Sternheim, is that because it's a form filled out

24   by Mar-a-Lago employees for the purposes of insurance that's

25   provided by another entity, that they're not a Mar-a-Lago

LC8Cmax1

1  business record?

2           MS. STERNHEIM:  That is correct, Judge.

3           THE COURT:  Mr. Rohrbach.

4           MR. ROHRBACH:  I wasn't planning to ask Ms. Gill this,

5  but I think she would say that Mar-a-Lago retains these records

6  in case there is some kind of dispute involving the insurance

7  company and its employees.  But Mar-a-Lago does retain these

8  records because, in order to hire, retain, and protect its

9  employees, they presumably make sure they're offered insurance.

10          And I'll just note, your Honor, that the exhibit and

11 Government Exhibit 824 are not just the benefit application

12 forms, but fax transmittal cover sheets from Mar-a-Lago which

13 indicates that Mar-a-Lago is doing the work of processing and

14 sending out these applications.

15          MS. STERNHEIM:  But it still contains hearsay

16 information, the source of which we do not know.  It is not

17 part of the business of Mar-a-Lago, even though it does have

18 employees and may offer it insurance, the fact that it is kept

19 in their files does not deem it a business record.

20          THE COURT:  I think I'll have to hear the testimony,

21 the foundation for the business record to determine whether

22 it's sufficient under the rule.

23          Do you have any authority, Ms. Sternheim?

24          I would say, just intuitively, I would think that

25 employers who provide insurance to employees who have a set of

LC8Cmax1

1    forms that they maintain in the normal course of business that

2    captures information for purposes of the employer providing the

3    insurance through another entity and maintains those records

4    and the like, my intuitive reaction is those probably fit

5    within the business records exception depending on some of the

6    specifics of the testimony, but I'll look at the question and

7    if anybody has any authority for the proposition either way,

8    and my team will look at it in the meantime.

9              MR. ROHRBACH:  Thank you, your Honor.

10             THE COURT:  Anything else?

11             MR. EVERDELL:  Your Honor, there is an issue, we

12   haven't had the chance to confer with government --

13             THE COURT:  I don't think your mic is on.

14             MR. EVERDELL:  There is a small issue with the fourth

15   witness, I think that's Mr. Rogers, but we haven't had the

16   chance to confer yet.  I think we can do it fairly quickly.  We

17   can probably do it at the break since it's probably going to be

18   the fourth witness; is that right?  We'll do it then.

19             THE COURT:  Anything else to take up in the immediate?

20             MR. ROHRBACH:  Nothing from the government.

21             THE COURT:  Anything else from the defense?

22             MR. EVERDELL:  No, your Honor.

23             THE COURT:  We'll break until we have our jury.  Thank

24   you.

25             Ms. Sternheim do you need these back, 823 and 824?

LC8Cmax1

1      MS. STERNHEIM:  I believe the government is putting

2  those in evidence; is that correct?  Are you going to be moving

3  those into evidence?

4      THE COURT:  823 and 824.

5      MR. ROHRBACH:  Yes, I am.

6      MS. STERNHEIM:  You can hold onto them if you would

7  like.  I imagine they'll be putting them on the screen.

8      THE COURT:  I'll keep them for now then.  Thank you.

9      (Recess)

10      THE COURT:  We have one juror who had a substantial

11  train issue and had to back up and revert, who called worried

12  that they were late and we said just get here safely.  So we're

13  not quite ready with all the jurors yet.

14      Mr. Rohrbach, you know that case, *United States v.*

15  *Lieberman*?

16      MR. ROHRBACH:  I am not familiar with that case, your

17  Honor.

18      THE COURT:  It's pretty much directly on point, I

19  think, for Ms. Sternheim's argument regarding the content of

20  823 and 824.  Let me give you the cite.  It is *United States v.*

21  *Lieberman*, 637 F.2d 95 (2d Cir. 1980).

22      Do you have any reason to think that the witness would

23  testify that the employer does anything to verify the

24  information filled out by the employee on the insurance cards?

25      MR. ROHRBACH:  First of all, for 823, your Honor,

LC8Cmax1

1    that's a document created by managers at Mar-a-Lago and not the

2    employee.

3             THE COURT:  I think, probably, 823 comes in, depending

4    on the business record foundation, which essentially

5    provides -- right.  So this is a personnel form of Mar-a-Lago

6    that your witness will testify they maintained in their records

7    of employees?

8             MR. ROHRBACH:  Yes, your Honor.

9             THE COURT:  So that, I think, you're right.

10            Ms. Sternheim, do you have an objection to 823?

11            MS. STERNHEIM:  No.

12            THE COURT:  824, I think that Ms. Sternheim is right,

13   that the information filled out by the employee, which you're

14   seeking to assert for the truth, essentially that Virginia

15   Roberts was his daughter, as I understand it.

16            MR. ROHRBACH:  Yes, your Honor.

17            THE COURT:  It would be hearsay unless there is

18   testimony -- under the Lieberman case, unless there is

19   testimony that the employer does something to verify the

20   information.

21            MR. ROHRBACH:  I've never asked that question of

22   Ms. Gill, your Honor.  I'm happy to do so while we're waiting

23   for the remaining juror.  I would imagine she would say that

24   Mar-a-Lago provides benefits to the daughter as a dependent of

25   Mr. Roberts.  So in the sense that they are, in fact, providing

LC8Cmax1

1    insurance benefits to her, they have verified that information.

2              THE COURT:  Well, it's a bit circular.  I think the

3    question is, did they do anything to verify the information on

4    the form.  The fact that they provided -- that they sent this

5    form and then insurance was provided based on the employee's

6    information, that's the out-of-court statement.  It's

7    Mr. Roberts' statement on this form that you're seeking to

8    offer for the truth.  So unless there is -- you'll look at the

9    *Lieberman* case.  I think it's directly on point, as I said.

10             MR. ROHRBACH:  I'm happy to look at the case and also

11   ask Ms. Gill, your Honor.

12             My point is, I think it's more than just sending the

13   form and then obtaining insurance for someone because their

14   name is on the form, but it's the course of conduct of paying

15   bills for someone who then receives medical treatment because

16   that person is insured through Mar-a-Lago.

17             THE COURT:  Well, if she's got information on this

18   employee with respect to that or records, I suppose that's

19   another story.

20             MR. ROHRBACH:  I think those records do exist, but

21   I'll just go have a conversation with Ms. Gill about this.

22             THE COURT:  Ms. Sternheim.

23             MS. STERNHEIM:  Judge, the government would be asking

24   this witness about a practice that preceded the time period in

25   which she was there.  And the fact of the matter is, requesting

LC8Cmax1

1    insurance or accepting the offer of insurance in and of itself

2    may be a perk of the business, but putting on the form who you

3    wish to be insured as your family is hearsay.

4              THE COURT:  Agreed.

5              MS. STERNHEIM:  So the form itself is one thing, the

6    content is something else.

7              THE COURT:  I agree.

8              MS. STERNHEIM:  Thank you.

9              THE COURT:  I think the only potential for -- and

10   you'll look at the *Lieberman* case, too, is if there is

11   testimony that the employer did something to verify the

12   information on the form.

13             So, for example, if the form says this is my address

14   and the testimony is that when an employee fills out this form,

15   we look at their driver's license to verify that the address is

16   the same, then, as a business, I think, under *Lieberman*, that

17   comes in.  It would have to be something comparable for

18   verification of children -- I think it's children and spouse?

19             MS. STERNHEIM:  Correct.

20             THE COURT:  In order for this to fit for the content

21   of the form.  It's content versus the form itself.  It's

22   precisely the line that the circuit draws in *Lieberman*.

23             MS. STERNHEIM:  But in addition, Judge, this witness

24   does not have any personal knowledge as to what the procedures

25   were seven years prior to her becoming employed.

LC8Cmax1

```
 1              THE COURT:  That may or may not be true depending on
 2   the testimony.
 3              MS. STERNHEIM:  Well, it would be hearsay as to her
 4   knowledge, having gained it from somebody remotely in the
 5   company providing that to her.
 6              THE COURT:  So if her testimony is, this is the
 7   practice and this was the longstanding practice, I learned it
 8   from predecessors or the like, she might have -- just as her
 9   understanding of the practice of maintaining records is what
10   she learned in the course of her employment, it may be -- I'm
11   doubtful that we'll get this testimony.  We'll see what the
12   testimony is.
13              My current thinking is 823 comes in.  That gives -- I
14   mean, what I understand the relevance to be -- and there is no
15   objection to 823.  824, absent the content, I'm not sure gets
16   you anything beyond what 823 gets you.
17              MR. ROHRBACH:  I think that's right, your Honor.  If
18   824 could not come in with the content, we probably would not
19   offer 824.
20              I would like to just have this conversation with
21   Ms. Gill, as she's been the head of HR for Mar-a-Lago for quite
22   a long time.  She's reviewed this particular employment file,
23   which is much larger than this set of records.  So I think she
24   may have a great well more to say about these issues and we
25   would like to be able to talk with her.
```

LC8Cmax1

1          THE COURT:  I think we're on the same page in terms of

2     the law and in terms of what is the factual record with respect

3     to the employer's practice at the time of their filing any

4     information provided by employees.

5          MS. STERNHEIM:  Thank you.

6          MS. MENNINGER:  Your Honor, may I briefly address

7     something?

8          THE COURT:  Sure.

9          MS. MENNINGER:  Government Exhibit 761 was offered, it

10    was a Professional Children's School application for Jane.  I

11    elicited testimony from the offer award that he did not verify

12    the information pertaining, for example, to the financial

13    guarantor, and I objected to the admission of that for the same

14    reasons your Honor is articulating for *Lieberman*.

15         THE COURT:  So I overruled that objection because,

16    what seemed to me, the relevance was that the witness or her

17    family was indicating that Mr. Epstein was providing financial

18    assistance at the time, whether or not he was providing

19    financial assistance at the time.

20         MR. ROHRBACH:  I would also note, your Honor, that in

21    addition to the verification line of business records cases,

22    there is another line of cases of adoptive business records

23    which say that if a company receives a record created by an

24    outsider and integrates it into their files and relies on it,

25    it becomes a record of that business.  I haven't so far

LC8Cmax1

articulated a theory like that with regard to this record, but

the testimony for Government Exhibit 761 was that the school

received the record, integrated it into its files, and relied

on it for its admissions decisions, which are a regular

function and practice of the school.  So it would come in as a

business record under that line of cases.

          MS. MENNINGER:  Your Honor, they didn't rely on the

financial guarantor piece of it, which is what the government

is offering for the truth of the matter asserted therein, and

that's the piece that we object to.  If they want to redact

that piece, I would renew my objection to the admission of that

and take out the piece that they're offering that was not

verified by the school --

          THE COURT:  I'm telling you my rationale at the time

for ruling on the objection was that -- the relevance was that

the family at the time was indicating that -- whether it's true

or not, but that Mr. Epstein was providing financial

assistance.

          MS. MENNINGER:  If it was admitted for a limited

purpose then, your Honor, I would ask that there be some type

of instruction given -- we can take up at the charging

conference about the purposes for which that document can be

considered by the jury.

          MS. STERNHEIM:  Judge, I just want to make sure that

the Court is aware, whereas I don't object to the admission as

LC8Cmax1

1    a business record, I still maintain my objection to 823 on

2    relevance grounds.

3            THE COURT:  So on that, I think I'm prepared to

4    overrule because we have in evidence -- so there is testimony

5    that Ms. Maxwell met Ms. Roberts at Mar-a-Lago in this

6    timeframe.  We have a birth certificate of Ms. Roberts that

7    shows her father's name is Sky Roberts.  So the relevance, as I

8    understand it, is that the employment of Mr. Roberts at

9    Mar-a-Lago at the timeframe is relevant, is probative of the

10   family's connection to Mar-a-Lago at the timeframe testified to

11   by Mr. Alessi.

12           Do I have the theory of relevance?

13           MR. ROHRBACH:  That's right, your Honor, as well as

14   the conditional relevance theory that the phone number in

15   Government Exhibit 823 appears in Government Exhibit 52 as

16   Virginia's parents.  If that exhibit were to come in, this

17   record would become relevant for that additional reason.

18           THE COURT:  What case do you have in mind for the

19   adaptive business record?

20           MR. ROHRBACH:  We'd be happy to provide the case name

21   and cite after the break.  I don't want to butcher the name of

22   the case and leave the Court astray.  We'll be happy to provide

23   it to the Court's law clerk, as well.  I do have a particular

24   case in mind.

25           THE COURT:  You have a case in mind, but you're not

LC8Cmax1

1    sure?

2             MR. ROHRBACH:  It's in the matter of -- it starts with

3    an L.  I can't give the cite off the top of my head.  I wasn't

4    expecting this particular argument today.

5             THE COURT:  If that theory applies for the content of

6    824, I'll consider it, so you'll let me know.

7             MR. ROHRBACH:  Yes, your Honor.  I just haven't asked

8    Ms. Gill about their reliance on this record, which is similar

9    to the questions the Court has been asking for, so I couldn't

10   articulate that theory of a business record for 824 right now.

11            THE COURT:  Right.  Sounds like a similar --

12            MS. STERNHEIM:  Just to close the loop, with regard to

13   the Court's statement that it was a relevant time period, it's

14   my recollection that Mr. Alessi testified to 2001, and the fact

15   that someone may be employed is not a basis for an inference

16   that a child of that employee was at a certain location at a

17   certain time, which is why the government is seeking to

18   introduce that.

19            THE COURT:  We'll leave the fact finding to the jury.

20            MS. STERNHEIM:  Okay.

21            THE COURT:  Thank you.

22            MR. ROHRBACH:  Thank you, your Honor.

23            THE COURT:  Anything else?  We'll still have to wait

24   for our juror who had substantial train issues.  So we will

25   wait.  I'll step down.  Thank you.

LC8Cmax1

1           I had a question.  You indicated, Mr. Rohrbach,

2   something regarding Exhibit 52.  Is there another witness who's

3   going to testify about Exhibit 52?

4           MS. COMEY:  No.

5           MR. ROHRBACH:  No, your Honor.  We plan to submit a

6   letter tonight in articulating our theory why the Court should

7   admit that exhibit based on the current evidence.

8           THE COURT:  You'll confer with defense counsel.

9   Obviously, I reserved based on the representation there would

10  be additional testimony.

11          MR. ROHRBACH:  Yes, your Honor.

12          THE COURT:  Thank you.

13          (Recess)

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

LC8VMAX2

1              THE COURT:  Okay.  Mr. Rohrbach.

2              MR. ROHRBACH:  Your Honor, I have interviewed

3    Ms. Gill.  I think she would likely say that the Mar-a-Lago

4    does not make independent efforts to verify information on

5    these forms.

6              I've also been reading *United States v. Lieberman*.  I

7    do think this case is distinguishable.  The case is about an

8    outsider to the hotel filling out a form or -- the case said it

9    wouldn't matter if the employee filled it out themselves.

10             Verification is important there because they are just

11   taking the information of the outsider at their word.  Here,

12   Mr. Roberts was an employee of Mar-a-Lago; so he had a business

13   duty not to lie to his own employer.  So he's not an outsider

14   in the traditional sense the way that *United States v.*

15   *Lieberman* and cases like it are talking about.  It would have

16   been a violation of his duty, a fireable offense, presumably,

17   by Mar-a-Lago if he had lied to them about the names of his

18   dependents and obtained for them insurance coverage.

19             THE COURT:  I'm not persuaded that that distinguishes

20   a binding precedent.  It's a point of distinction, but it

21   doesn't show verification.

22             Do you have authority for beyond verification, some

23   obligation to fill it out truthfully or the like?  In fact,

24   there's no -- I'm not aware of any obligation of employees to

25   fill it out truthfully other than the fact that they could get

LC8VMAX2

1    fired if they don't.

2          MR. ROHRBACH:  I think that would be the source of the

3    obligation is that they would be a fireable offense against the

4    company to be fraudulently obtaining insurance benefits for

5    someone.  But if the Court is not persuaded --

6          THE COURT:  I don't always find a case on point.

7    You're right, there's a basis to distinguish, but it's pretty

8    directly on point; so I think it shows it would be hearsay in

9    the absence of some verification or some nontruth basis for

10   which you're offering.

11         MR. ROHRBACH:  Then I think the government will just

12   offer the other exhibit, your Honor.

13         THE COURT:  Okay.  823.

14         MR. ROHRBACH:  823.

15         THE COURT:  To the extent there was a relevance

16   objection, I'll overrule the relevance objection.

17         MS. STERNHEIM:  Your Honor, may I state it for the

18   record even though I know you're ruling?

19         THE COURT:  I'm sorry?

20         MS. STERNHEIM:  I would like to state it for the -- in

21   front of the jury.

22         THE COURT:  Oh, yes, you can object and I'll overrule.

23         MS. STERNHEIM:  Okay.

24         THE COURT:  That's fine.

25         MR. ROHRBACH:  Your Honor, the case I mentioned

LC8VMAX2                    Gill Velez - direct

1    earlier is *Matter of Ollag Construction Equipment*, 665 F.2d 43,

2    which is a case and its progeny that stand for the proposition

3    that when records are integrated and relied on by a company,

4    that that makes it a business record.  We're not going to

5    assert that with regard to the object here, at issue here; but

6    for the purposes of 761, that's the case I had in mind.

7              (Jury present)

8              THE COURT:  Good morning.  Please be seated.

9              Good morning, everyone.  Thank you so much.

10             I know there was some train issues this morning.  Not

11   a problem.  Gave us some time to talk through issues as well.

12   So thank you so much, everyone, for your diligence.  I

13   appreciate it.

14             Mr. Rohrbach, the government may call its next

15   witness.

16             MR. ROHRBACH:  The government calls Janine Gill.

17             THE COURT:  Janine Gill may come forward.

18    JANINE GILL VELEZ,

19        called as a witness by the Government,

20        having been duly sworn, testified as follows:

21             THE COURT:  Thank you.  Mr. Rohrbach, you may inquire.

22   DIRECT EXAMINATION

23   BY MR. ROHRBACH:

24   Q.  Good morning, Ms. Gill.

25   A.  Hello.

LC8VMAX2                         Gill Velez - direct

1    Q.   Where do you work?

2    A.   Florida Properties Management.

3    Q.   What is Florida Properties Management?

4    A.   Florida Properties Management is the management company for

5    the Mar-a-Lago Club.

6    Q.   What's your position there?

7    A.   Human resources director.

8    Q.   And what are your duties and responsibilities as the human

9    resources director?

10   A.   I am in charge of all the employment processes.

11   Q.   What are those employment processes?

12   A.   It would be recruiting, retention, hiring, benefits,

13   compensation, policies, procedures; anything to do with the

14   employees.

15   Q.   How long have you worked at Mar-a-Lago?

16   A.   Almost 15 years.

17   Q.   And in that capacity, are you familiar with the normal

18   business practices of Mar-a-Lago?

19   A.   Yes.

20   Q.   Are you familiar with the business practices regarding

21   employee records?

22   A.   Yes.

23   Q.   How are those records stored?

24   A.   Normally it's a paper file, in an individual folder.

25   Q.   When an employee joins Mar-a-Lago, is any sort of record

1  generated?

2  A.   New-hire paperwork.

3  Q.   What sorts of new-hire paperwork?

4  A.   It would be application, policies and procedures handbook,

5  personnel action notices.

6  Q.   You mentioned a personnel action notice.  What is a

7  personnel action notice?

8  A.   That would be the document that the manager would complete

9  to bring the person onboard.  It would state their position and

10 pay rate.

11 Q.   And what happens after the personnel action notice is

12 created?

13 A.   It's submitted to human resources and payroll for

14 processing.

15 Q.   Who, if anyone else, reviews the personnel action notice?

16 A.   It would be the manager, human resources, payroll, and the

17 managing director.

18 Q.   What sort of information is contained in a personnel action

19 notice?

20 A.   It would be the employee's name, date of birth, Social

21 Security number, address, they'll put the position, and rate of

22 pay.

23 Q.   Is making a personnel action notice a regular practice of

24 Mar-a-Lago?

25 A.   Yes.

LC8VMAX2                         Gill Velez - direct

1    Q.  Are personnel action notices kept in the ordinary course of

2    business?

3    A.  Yes.

4    Q.  Ms. Gill, would you turn in the binder next to you to

5    what's been marked for identification as Government Exhibit

6    823.  Do you recognize it?

7    A.  Yes.

8    Q.  Have you reviewed this before today?

9    A.  Yes.

10   Q.  What is it?

11   A.  This is a personnel action notice for Sky Roberts, when, it

12   looks like, he was originally hired.

13   Q.  Is this a fair and accurate copy of the version in

14   Mar-a-Lago's records?

15   A.  Yes.

16           MR. ROHRBACH:  Your Honor, the government offers

17   Government Exhibit 823.

18           MS. STERNHEIM:  Objection.

19           THE COURT:  For the reasons indicated, overruled.

20           And GX-823 is admitted.

21           (Government's Exhibit 823 received in evidence)

22           MR. ROHRBACH:  Your Honor, may I publish it to the

23   jury?

24           THE COURT:  You may.

25           MR. ROHRBACH:  I apologize, your Honor.  We offer

LC8VMAX2                    Gill Velez - direct

1    Government 823 in redacted form to the public and in sealed

2    form for the jury in order to protect the personal information

3    of third parties.

4              THE COURT:  All right.

5              823-R is admitted in its redacted form.

6              (Government's Exhibit 823-R received in evidence)

7              MR. ROHRBACH:  Thank you, your Honor.

8              Ms. Drescher, if you would pull up 823-R for the

9    public.  And members of the jury, if you would turn to

10   Government Exhibit 823 in your binder.  I believe there are two

11   binders, and this is in the larger binder.  Again, it's the

12   larger binder of the two binders.

13             THE COURT:  Larger binder, GX-823.  And we have 823-R

14   published.

15   BY MR. ROHRBACH:

16   Q.  Ms. Gill, whose personnel action notice is this?

17   A.  This is for Sky Roberts.

18   Q.  And what does it reflect about Sky Roberts?  Or what -- let

19   me turn your attention, I guess, to the top left corner of

20   this.

21   A.  Okay.

22   Q.  Would you read for the jury the date of hire.

23   A.  Date of hire was April 11th of 2000.

24   Q.  Thank you.

25             MR. ROHRBACH:  And, your Honor, if I may just ask the

LC8VMAX2                           Gill Velez - cross

1    jurors to turn to Government Exhibit 14, which is already in

2    evidence.

3              THE COURT:  Ms. Sternheim, any objection?

4              MS. STERNHEIM:  No objection.

5              THE COURT:  You may look at GX-14 please.

6              MR. ROHRBACH:  With your permission, your Honor, I

7    would just direct the jurors' attention to the line of this

8    exhibit labeled "father of child."

9              THE COURT:  I'm sorry.  Mr. Rohrbach, say that again.

10             MR. ROHRBACH:  With the Court's permission, I would

11   direct the jurors' exhibit to the line of this exhibit that

12   says "father of child."

13             THE COURT:  You may look there.

14             MR. ROHRBACH:  No further questions, your Honor.

15             THE COURT:  All right.  Ms. Sternheim.

16             MS. STERNHEIM:  Thank you.

17             THE COURT:  Jurors, you may put your binders down.

18             Thank you.

19   CROSS-EXAMINATION

20   BY MS. STERNHEIM:

21   Q.  Good morning.

22   A.  Hello.

23   Q.  Is it Ms. Gill Velez or just Gill?

24   A.  Gill is fine.

25   Q.  Okay.  Thank you.

LC8VMAX2                           Gill Velez - cross

1           Ms. Gill, you indicated that you've worked for the

2    property management company for approximately 15 years;

3    correct?

4    A.   Correct.

5    Q.   Which means you started in approximately 2007?

6    A.   Correct.

7    Q.   And the document that was introduced in connection with

8    your testimony concerns the date of 2000; correct?

9    A.   Correct.

10   Q.   You have no personal knowledge of how this document was

11   completed; correct?

12   A.   No.

13   Q.   You have no personal knowledge of any of the information on

14   this document; correct?

15   A.   The information I know is what was written in it.

16   Q.   Right.  But you had nothing to do with putting it on this?

17   A.   No.

18   Q.   And you had nothing to do with how records were kept prior

19   to you joining the management property company in 2007;

20   correct?

21   A.   Correct.

22           MS. STERNHEIM:  No further questions.  Thank you.

23           THE COURT:  Thank you, Ms. Sternheim.

24           Mr. Rohrbach.

25           MR. ROHRBACH:  No redirect, your Honor.

1           THE COURT:  All right.  Ms. Gill, thank you.  You're

2   excused.  You may step down.

3           (Witness excused)

4           THE COURT:  The government may call its next witness.

5           MS. COMEY:  The government calls Shawn.

6           THE COURT:  The witness testifying under the name

7   "Shawn" may come forward.

8    SHAWN,

9        called as a witness by the Government,

10       having been duly sworn, testified as follows:

11          THE COURT:  You may be seated.  Please remove your

12  mask.  This witness will be testifying under the name Shawn to

13  protect the anonymity of a prior witness who I permitted to

14  testify by her first name.

15          I do remind the sketch artists that the exact likeness

16  of Shawn not be drawn, please, in order to protect the

17  anonymity of the other witness.

18          Ms. Comey, you may inquire.

19          MS. COMEY:  Thank you, your Honor.

20          May the witness remove his mask?

21          THE COURT:  Oh, I'm sorry.  Yes.

22          Shawn, please remove your mask.

23  DIRECT EXAMINATION

24  BY MS. COMEY:

25  Q.  Good morning.

LC8VMAX2                        Shawn - direct

1    A.   Good morning.

2    Q.   Would you please make sure the microphone is close to your

3    mouth so that everyone can hear you.

4    A.   Can you hear me clearly?

5    Q.   Yes.   Thank you.

6    A.   All right.

7    Q.   Would you please state and spell your first name for us.

8    A.   Yeah.   Shawn, S-H-A-W-N.

9    Q.   Shawn, I'd like to ask you to turn in the binder that is in

10   front of you to what's been already admitted in evidence as

11   Government Exhibit 20.

12           MS. COMEY:   And, your Honor, I'd ask for permission

13   for the jurors to do the same in their binders.

14           THE COURT:   Okay.   Ms. Sternheim, without objection?

15           MS. STERNHEIM:   No objection.

16           THE COURT:   GX-20, please, members of the jury.

17           That's in the large binder; correct?

18           MS. COMEY:   Yes, your Honor.

19   BY MS. COMEY:

20   Q.   Shawn, what is Government Exhibit 20?

21   A.   A copy of my ID.

22   Q.   And is your full name on this exhibit?

23   A.   It is.

24   Q.   We can set that aside.   Thank you very much.

25           Shawn, how old are you?

LC8VMAX2                         Shawn – direct

1   A.  Thirty-eight.

2   Q.  In what state were you born?

3   A.  Akron, Ohio.

4   Q.  Where did you grow up?

5   A.  West Palm Beach, Florida.

6   Q.  How far did you go in school?

7   A.  Some college.

8   Q.  And what kind of work do you do now?

9   A.  I'm a salesman.

10  Q.  What schools did you attend for high school?

11  A.  Wellington High School and Survivors Charter School.

12  Q.  In what town are those schools?

13  A.  West Palm Beach, Florida.

14       THE COURT:  Shawn, could you move a little bit closer

15  to the mic and keep your voice up please.  Thank you.

16       THE WITNESS:  Yes, ma'am.

17       THE COURT:  Go ahead.

18  BY MS. COMEY:

19  Q.  Will you tell us again what schools you attended?

20  A.  Wellington High School and Survivors Charter School.

21  Q.  And in what town are those schools?

22  A.  West Palm Beach, Florida.

23  Q.  When you attended Survivors Charter School, what was the

24  first name of your girlfriend?

25  A.  Carolyn.

LC8VMAX2                           Shawn - direct

1    Q.  Would you please take a look in the binder next to you at

2    what is in evidence as Government Exhibit 11.

3           Let me know when you're there please.

4    A.  Yes.

5    Q.  Please take a look at the name at the top of that exhibit.

6           Is that Carolyn's full name?

7    A.  Yes, ma'am.

8    Q.  Okay.  You can set that aside.  Thank you.

9           About how old was Carolyn when you first started

10   dating her?

11   A.  She was 14.

12   Q.  About how old were you when you first started dating

13   Carolyn?

14   A.  Seventeen.

15   Q.  For about how long did you and Carolyn date when she was a

16   teenager?

17   A.  Four years, five years.

18   Q.  While you were dating Carolyn, how, if at all, did she make

19   money?

20   A.  She only had two jobs ever that I know.  One was worked at

21   Arby's; and the other, she worked for Jeffrey.

22   Q.  Do you know Jeffrey's full name?

23   A.  Yes, ma'am.

24   Q.  What is it?

25   A.  Jeffrey Epstein.

LC8VMAX2                         Shawn - direct

1    Q.  Do you know how she first met Jeffrey Epstein?

2    A.  Through a schoolmate of mine at Survivors Charter School.

3    Q.  What was that schoolmate's name?

4    A.  Virginia.

5    Q.  Do you know her last name?

6    A.  Roberts.

7              MS. COMEY:  Ms. Drescher, would you please pull up

8    what's in evidence as Government Exhibit 113.

9    Q.  Do you recognize the person in that photograph?

10   A.  Yes, ma'am.

11   Q.  Who is that?

12   A.  That's Virginia.

13             MS. COMEY:  We can take that down.

14             Thank you, Ms. Drescher.

15   Q.  About when do you remember meeting Virginia Roberts?

16   A.  It was my senior year of school, so 2001.

17   Q.  And when you would spend time with Virginia, who else, if

18   anyone, was around?

19   A.  Her boyfriend, Tony.

20   Q.  Do you know his last name?

21   A.  Figueroa.

22   Q.  What, if anything, would you, Carolyn, Tony, and Virginia

23   do when you hung out together?

24   A.  Drive around, smoke pot.

25   Q.  Did Carolyn meet Virginia and Tony around the same time you

LC8VMAX2                          Shawn - direct

1   did?

2   A.  Yes.

3   Q.  How did Jeffrey Epstein come up in that group of people?

4   A.  Virginia said that she worked for a guy out on Palm Beach.

5   And Carolyn could make money if she wanted to come do massages.

6   Q.  Were you present when Virginia said that to Carolyn?

7   A.  Yes.

8   Q.  About how long after you met Virginia did she bring up this

9   topic of massages in Palm Beach?

10  A.  Two to three weeks.  Very soon.

11  Q.  What do you remember Virginia saying to Carolyn about that?

12  A.  That she could come out and give a guy a massage, and she

13  would leave with a couple hundred dollars.

14  Q.  What was the name of the guy?

15  A.  Jeffrey.

16  Q.  How did Carolyn respond?

17  A.  She was excited to make money.

18  Q.  After that conversation, do you know if Carolyn went to

19  Jeffrey Epstein's house?

20  A.  She did.

21  Q.  How do you know that?

22  A.  Because I went with her.

23  Q.  Who else went?

24  A.  Tony and Virginia.

25  Q.  How did you all get to Jeffrey Epstein's house?

LC8VMAX2                        Shawn – direct

1   A.  Tony drove.

2   Q.  Where was Jeffrey Epstein's house?

3   A.  El Brillo Way on Palm Beach Island.

4   Q.  At that time where were you and Carolyn living, in what

5   town?

6   A.  West Palm Beach.

7   Q.  What's the difference between Palm Beach and West Palm

8   Beach?

9   A.  Money is no object out there.  Money doesn't --

10  everybody --

11          MR. PAGLIUCA:  Your Honor, I'm going to object to this

12  as lacking foundation.  602.

13          THE COURT:  Sustained.

14          Could I ask you to move closer to the mic when you

15  talk, but wait for the next question.

16          THE WITNESS:  Yes, ma'am.

17  BY MS. COMEY:

18  Q.  How long did you live in the West Palm Beach area?

19  A.  Pretty much all my life.

20  Q.  And how often did you go to Palm Beach when you lived in

21  West Palm Beach?

22  A.  Very rarely.

23  Q.  Why did you go there very rarely?

24  A.  I didn't have enough money to buy anything at the gas

25  station.

LC8VMAX2                          Shawn - direct

1    Q.  In Palm Beach?

2    A.  Correct.

3    Q.  Did you ever go inside Jeffrey Epstein's home?

4    A.  No, ma'am.

5    Q.  Did you see the outside?

6    A.  Yes, I did.

7    Q.  When you first went to Jeffrey Epstein's house, do you

8    remember what it looked like on the outside?

9    A.  It was pink.

10   Q.  Did you go there multiple times after that first time?

11   A.  Yes.

12   Q.  Did the color later change?

13   A.  It did.

14   Q.  To what?

15   A.  White.

16   Q.  That first time you went to Jeffrey Epstein's house, who,

17   if anyone, went inside the house?

18   A.  Virginia and Carolyn.

19   Q.  About how long were they inside?

20   A.  An hour, hour and five minutes.

21   Q.  After Carolyn and Virginia came back outside, what, if

22   anything, did they have with them?

23   A.  Money.

24   Q.  In what denomination?

25   A.  Hundred dollar bills.

LC8VMAX2                        Shawn – direct

1   Q.   After that first time, did you go with Carolyn to Jeffrey

2   Epstein's house again?

3   A.   I did.

4   Q.   About how often did you go with Carolyn to Jeffrey

5   Epstein's house?

6   A.   About every two weeks.

7   Q.   To the best of your knowledge, about when did Carolyn stop

8   going over to Jeffrey Epstein's house in Palm Beach?

9   A.   When we left and went to Georgia.

10  Q.   Do you remember about how old Carolyn was when you went to

11  Georgia?

12  A.   Sixteen.

13  Q.   Are you and Carolyn still together now?

14  A.   No, ma'am.

15  Q.   About when did you break up?

16  A.   2005.

17  Q.   During the period when Carolyn was going to Jeffrey

18  Epstein's house with you, do you know how she would schedule

19  times to go there?

20  A.   Somebody would call my phone.

21  Q.   How many people do you remember calling your phone?

22  A.   Three.

23  Q.   Were they male or female?

24  A.   Female.

25  Q.   Do you know any of their names?

LC8VMAX2                        Shawn - direct

1    A.   Sarah was one.

2    Q.   Other than Sarah, do you know the names of any others?

3            MR. PAGLIUCA:  Your Honor, I'm going to object to this

4    under 602 and 801.

5            THE COURT:  Just a moment.

6            MS. COMEY:  I'm happy to rephrase the question, your

7    Honor.

8            THE COURT:  Okay.

9    BY MS. COMEY:

10   Q.   The other two callers, did they tell you their names when

11   calling you?

12   A.   No, ma'am.

13   Q.   Do you remember anything about the voices of the other two

14   callers?

15   A.   They were foreign.

16   Q.   Can you tell --

17   A.   To me.  They were foreign to me.

18   Q.   Can you tell us about their voices?

19   A.   One was English and one sounded almost French.  English

20   being proper English.

21   Q.   When these three women called, what did they say to you

22   about Carolyn?

23   A.   That Jeffrey was requesting her to work.

24   Q.   And how did you respond each time you received one of these

25   calls?

LC8VMAX2                          Shawn - direct

1    A.  I would tell Carolyn and set the appointment for her.

2    Q.  Do you remember what your phone number was at the time?

3    A.  No.

4    Q.  Other than calling you, did you observe anyone else

5    receiving calls to schedule Carolyn to see Jeffrey Epstein?

6    A.  Her mother.

7    Q.  And when her mother received those calls, what did you see

8    her do?

9    A.  She would agree and tell them that she would let Carolyn

10   know.

11   Q.  When you went with Carolyn, how did you two get to Jeffrey

12   Epstein's house?

13   A.  At first it was cabs.

14   Q.  At some point did that change?

15   A.  Yeah.  We got a car from her mother.

16   Q.  And then who would drive?

17   A.  I would.

18   Q.  Why couldn't Carolyn drive herself?

19   A.  She was too young.

20   Q.  You mentioned cabs.  Where would the cabs pick you up,

21   without giving a specific address?

22   A.  West Gate, West Palm Beach.

23   Q.  At whose house?

24   A.  Carolyn's.

25   Q.  Each time you went with Carolyn to Jeffrey Epstein's house,

LC8VMAX2                          Shawn - direct

1    who would go inside?

2    A.   Carolyn.

3    Q.   And what would you do?

4    A.   I would wait outside.

5    Q.   For about how long would you wait for Carolyn?

6    A.   A little over an hour.

7    Q.   And when she came out each time, what did she have with

8    her?

9    A.   Hundred dollar bills.

10   Q.   Why do you remember the denomination?

11   A.   Because we used to cash those in at that one gas station on

12   Palm Beach.  It was the only place that would accept hundred

13   dollar bills.  In West Palm they don't accept hundred dollar

14   bills.

15   Q.   Over the multiple times you went with Carolyn to Jeffrey

16   Epstein's house, who, if anyone, did you meet at the house?

17   A.   Jeffrey.

18   Q.   How many times did you meet Jeffrey?

19   A.   Just once.

20   Q.   Where was that?

21   A.   In his driveway.

22   Q.   What do you remember from that interaction?

23   A.   He was late.  And he came pulling up in a car, stopped and

24   got out, and introduced himself, and showed off his car a

25   little bit.

LC8VMAX2                          Shawn - direct

1    Q.   Other than Jeffrey, did you meet anyone at his house?

2    A.   No, ma'am.

3              MS. COMEY:  Can we pull up what's in evidence as

4    Government Exhibit 112, please, Ms. Drescher.

5    Q.   Do you recognize the person in this photograph?

6    A.   Yes, ma'am.

7    Q.   Who is that?

8    A.   Jeffrey Epstein.

9              MS. COMEY:  We can take that down.

10             Thank you, Ms. Drescher.

11   Q.   Other than Jeffrey and Sarah, did Carolyn mention

12   interacting with anyone else at Jeffrey Epstein's house?

13             MR. PAGLIUCA:  Objection, your Honor.  Hearsay.  801.

14             THE COURT:  Just a moment.

15             MS. COMEY:  Prior consistent statement, your Honor.

16             THE COURT:  Sustained.

17             You may answer.

18             MS. COMEY:  Your Honor, I think you said "sustained."

19             THE COURT:  I did.  I meant overruled.  Safe.

20             I meant overruled.  Overruled.  You may answer.

21   A.   Can you ask me the question again please?

22   Q.   Sure.  Other than Jeffrey and Sarah, did Carolyn mention

23   interacting with anyone else at Jeffrey Epstein's Palm Beach

24   house?

25   A.   There was a woman.

1   Q.   Did Carolyn tell you that woman's name?

2   A.   Maxwell.

3   Q.   Did Carolyn say anything about that woman's first name?

4   A.   She couldn't pronounce it.

5   Q.   Why?

6   A.   She wasn't able -- she didn't have the reading ability or

7   she couldn't -- it was foreign to her; she didn't know it.

8   Q.   Do you know how far Carolyn went in school?

9   A.   She dropped out before I met her, so probably middle

10  school.   Sixth grade, seventh grade.

11  Q.   When Carolyn was 14 years old and going to Jeffrey

12  Epstein's house, could you describe her level of intelligence

13  and education?

14  A.   She was a child.   Yes, ma'am.

15              THE COURT:   Shawn, could you move the mic a little

16  more directly in front of you, please.   Thank you.

17              THE WITNESS:   Sorry.   I mumble.

18              THE COURT:   Just speak up.   Go ahead.

19  BY MS. COMEY:

20  Q.   Did you and Carolyn ever talk about Maxwell?

21  A.   No.

22  Q.   Did you ever meet Maxwell?

23  A.   No.

24  Q.   Other than money, what, if any, gifts do you remember

25  seeing Carolyn receive around the time she was going to Jeffrey

LC8VMAX2                         Shawn - direct

1    Epstein's house?

2    A.  She received a package.

3    Q.  What kind of package?

4    A.  It was -- what was in it?

5    Q.  No.  Do you know what the carrier was?

6    A.  FedEx possibly.

7    Q.  Where did she receive the package?

8    A.  At her mom's.

9    Q.  In West Palm Beach?

10   A.  Yes, ma'am.

11   Q.  Did you see what was in the package?

12   A.  Yes.

13   Q.  What was in the package?

14   A.  Lingerie and a movie.

15   Q.  Do you remember what the return address on that package

16   was?

17   A.  New York.

18   Q.  Any reason that stands out to you?

19   A.  She was from New York, Carolyn was; and she was excited to

20   see something from New York.

21   Q.  Other than Carolyn, Virginia, and Tony, did you ever go

22   with anyone else to Jeffrey Epstein's Palm Beach house?

23   A.  Yes.

24   Q.  About how many people did you go with?

25   A.  Two.

LC8VMAX2                          Shawn - direct

1   Q.  What were those two people's first names?

2   A.  Melissa and Amanda.

3   Q.  What was Amanda's last name?

4   A.  Lazlo.

5   Q.  I'd like now to ask you to turn in your binder to what is

6   in evidence as Government Exhibit 15, please.

7           MS. COMEY:  And, your Honor, I would ask that the

8   jurors do the same in their binders, please.

9           THE COURT:  Mr. Pagliuca?  Okay?  GX-15?

10          MR. PAGLIUCA:  Yes.

11          THE COURT:  Okay.  You may look at, in the large

12  binder, GX-15, please.

13  Q.  Shawn, looking at the entry that says "child name," without

14  saying it out loud, is that Melissa's full name?

15  A.  It is.

16          MS. COMEY:  We can set that aside.  Thank you.

17  Q.  How did you know Amanda and Melissa?

18  A.  They were girlfriends of mine.

19  Q.  Were you dating them at the same time you were dating

20  Carolyn?

21  A.  I was.

22  Q.  About how old was Amanda the first time you saw her go to

23  Jeffrey Epstein's house?

24  A.  Fifteen or 16.

25  Q.  About how old was Melissa the first --

LC8VMAX2                        Shawn - direct

1          MR. PAGLIUCA:  Your Honor, I'm going to object to the

2     first question under Rule 404(b) and answer.

3          THE COURT:  Just a moment.

4          MS. COMEY:  Direct evidence, your Honor.

5          THE COURT:  I need to hear it from you.

6          (Continued on next page)

LC8VMAX2                        Shawn - direct

1              (At sidebar)

2              MR. PAGLIUCA:  Your Honor, this Amanda person was not

3      noticed under 404(b).  We had two that were noticed.  As I

4      recall, that's the Melissa and Virginia, and that's it.

5              MS. MENNINGER:  Not just 404(b).

6              Your Honor ordered that the government produce to us

7      the names of any victims that they intended to discuss at

8      trial.  They gave the names of six individuals; the four that

9      we normally have been talking about, Ms. Roberts, and this last

10     one.  But Amanda was not one of the names that they gave.  So

11     if they intended to refer to her as a victim in this trial, the

12     deadline to do that was, I think, in September.

13             MS. COMEY:  Your Honor, yesterday during her

14     testimony, Carolyn said that Amanda Lazlo was someone who she

15     brought with her.  I asked how old Amanda was, and she said how

16     old she was.  There was no objection.

17             MS. MENNINGER:  She said 18.

18             MS. COMEY:  This is corroborative -- I don't believe

19     she said 18.  This is corroborative testimony.  And I would

20     note --

21             THE COURT:  Well, the age distinction is an important

22     question.  It's entirely not corroborative in identifying a new

23     victim if the testimony yesterday was 18.

24             MS. COMEY:  And, your Honor, I would want to check the

25     transcript for this.

LC8VMAX2                        Shawn - direct

1          MS. MOE:  Your Honor, with respect to the disclosure

2     question, I just wanted to note, the issue for disclosure was

3     who the government would be arguing at trial were the victims

4     here.  We don't intend to argue at closing that there's an

5     additional victim Amanda.  This is being offered as direct

6     evidence as corroborative testimony of the account of the

7     victims here.

8          THE COURT:  Well, direct evidence only if you're

9     suggesting she's a victim of the conspiracy.  So that would

10    violate that order.  And it's corroborative only if the age

11    matches up.

12         MS. MOE:  Your Honor, our view is that it's direct

13    evidence because it corroborates her account of who she was

14    bringing.

15         THE COURT:  Then what's the purpose of the -- sorry.

16    What's the purpose of the age?

17         The testimony yesterday was she believes she was 17.

18         Sustained.

19         (Continued on next page)

20

21

22

23

24

25

LC8VMAX2                          Shawn – direct

1                  (In open court)

2                  THE COURT:  Next question.

3       BY MS. COMEY:

4       Q.  Did Amanda go alone to Jeffrey Epstein's house or with

5       someone else?

6                  MR. PAGLIUCA:  Your Honor, objection.

7                  This was just ruled on at the bench.

8                  MS. COMEY:  Your Honor, I've moved on from the

9       question that was objected to.

10                 THE COURT:  Sustained.

11      Q.  Let's talk about Melissa, Shawn.

12                 About how old was Melissa when she was going over to

13      Jeffrey Epstein's house?

14      A.  Sixteen.

15      Q.  The first time you saw Melissa go to Jeffrey Epstein's

16      house, was she going alone or with someone else?

17      A.  The first time it was her and Carolyn.

18      Q.  Did they go in together?

19      A.  Yes.

20      Q.  For about how long were they inside?

21      A.  An hour.

22      Q.  When they came back out, what, if anything, did they have

23      with them?

24      A.  Money.

25      Q.  In what denomination?

LC8VMAX2                          Shawn - direct

1   A.  Hundred dollar bills.

2   Q.  I'd like you to please turn in your binder to what's been

3   marked for identification as Government Exhibit 105.

4            Let me know when you're there.

5   A.  I'm here.

6   Q.  Do you recognize that?

7   A.  Yes, ma'am.

8   Q.  What is it?

9   A.  That's a picture from Melissa's 16th birthday.

10  Q.  How do you know it's a picture from Melissa's 16th

11  birthday?

12  A.  Because I was there.

13  Q.  Who do we see in this photograph?

14  A.  Carolyn, Melissa, Candace, and another cousin.

15           MS. COMEY:  Your Honor, the government offers this in

16  evidence under seal to protect the privacy of witnesses and

17  third parties.

18           MR. PAGLIUCA:  No objection.

19           THE COURT:  GX-105 is admitted under seal for the

20  reasons indicated.

21           (Government's Exhibit 105 received in evidence)

22           MS. COMEY:  Your Honor, I would ask that the jurors

23  please turn in their binders to Government Exhibit 105.

24           THE COURT:  All right.

25           GX-105 in the large binders, please.

LC8VMAX2                          Shawn – direct

1    BY MS. COMEY:

2    Q.  Shawn, can you tell us who we see from right to left in

3    this photograph, please.

4    A.  On the right is Carolyn.

5           THE COURT:  Sorry.  I need you at the microphone,

6    please.

7    A.  On the right is Carolyn, then Melissa, then Candace, and

8    then a cousin.

9    Q.  And how do you remember this picture?

10   A.  I was there.

11   Q.  Where were you?

12   A.  On the boat right over there to the side.

13   Q.  And what day was this?

14   A.  Melissa's 16th birthday.

15          MS. COMEY:  We can set that aside.  Thank you.

16   Q.  Did you go to Jeffrey Epstein's house with Melissa one time

17   or multiple times?

18   A.  Multiple.

19   Q.  About how many times did you go with her when she was with

20   Carolyn?

21   A.  Her and Carolyn went one time together.

22   Q.  For the rest of the time, who did Melissa go inside with?

23   A.  It was her or Amanda.  She took Amanda there.

24          MR. PAGLIUCA:  Your Honor, objection.

25          THE COURT:  Sustained.

LC8VMAX2                        Shawn – direct

1            The jury will disregard the last response.

2   Q.   Did she go in by herself?

3   A.   Yes.

4   Q.   Did she go in by herself multiple times?

5   A.   Yes.

6   Q.   When she went in by herself, how long would she be inside?

7            MR. PAGLIUCA:  Your Honor, I'm going to object on 602

8   grounds.

9            THE COURT:  Overruled.

10  Q.   How long did you wait for her?

11  A.   An hour.

12  Q.   And each time she came out after being in alone, what did

13  she have with her?

14  A.   Money.

15  Q.   In what denomination?

16  A.   Hundred dollar bills.

17  Q.   Remind us about when did you stop going with Carolyn to

18  Jeffrey Epstein's Palm Beach house?

19  A.   She was 16, I was 18.

20           MS. COMEY:  May I have a moment, your Honor?

21           THE COURT:  You may.

22           (Counsel conferred)

23  Q.   Shawn, were you and Carolyn using drugs around the time

24  when she was going to Jeffrey Epstein's house?

25  A.   Yes.

LC8VMAX2                         Shawn - direct

1   Q.  Have you been arrested before?

2   A.  Yes.

3   Q.  Were you arrested in Louisiana in 2015?

4   A.  Yes.

5   Q.  What were you arrested for?

6   A.  Possession of methamphetamine.

7   Q.  Did you plead guilty to a felony based on your possession

8   of methamphetamine?

9   A.  Yes, ma'am.

10  Q.  Were you arrested in Florida in 2017?

11  A.  I was.

12  Q.  What were you arrested for?

13  A.  Convicted felon with a firearm.

14  Q.  What happened?

15  A.  I did three years in prison.

16  Q.  Did you plead guilty to having a gun after being convicted

17  of a felony?

18  A.  Yes, ma'am.

19  Q.  When were you released from prison?

20  A.  August 2020.

21  Q.  Have you been arrested since then?

22  A.  No, ma'am.

23  Q.  What type of work do you do now?

24  A.  I'm a salesman.

25  Q.  How often do you communicate with Carolyn now?

LC8VMAX2                        Shawn - cross

1   A.  Very rarely.

2   Q.  When you do speak, what do you speak about?

3   A.  My son.

4   Q.  Do you two share a child?

5   A.  We do.

6   Q.  Since you broke up with Carolyn, have you had any

7   conversations with her about what happened with Jeffrey

8   Epstein?

9   A.  No, ma'am.

10  Q.  Have you had any conversations with Carolyn about your

11  testimony here today?

12  A.  No, ma'am.

13        MS. COMEY:  No further questions, your Honor.

14        THE COURT:  All right.  Mr. Pagliuca.

15        MR. PAGLIUCA:  Yes, your Honor.  Briefly.

16  CROSS-EXAMINATION

17  BY MR. PAGLIUCA:

18  Q.  Shawn, you recall going --

19        THE COURT:  Take off your mask.

20        MR. PAGLIUCA:  Thank you, your Honor.

21        THE COURT:  Thank you.

22  Q.  Shawn, you recall going to the house in Palm Beach in 2002;

23  correct?

24  A.  Yes.

25  Q.  And you testified that you and Carolyn shared a phone; is

LC8VMAX2                        Shawn - cross

1   that correct?

2   A.  Yes.

3   Q.  And you would occasionally answer the phone and it would

4   either be Epstein or Sarah Kellen calling; correct?

5   A.  Yes.

6           MS. COMEY:  Objection.

7           THE COURT:  Just a moment.

8           Overruled.

9   Q.  And you knew the name Sarah because Sarah told you that she

10  was calling on behalf of Epstein; correct?

11  A.  Yes.

12  Q.  You recall Sarah being professional in demeanor; correct?

13  A.  Yes.

14  Q.  And then you also recall someone with what you thought was

15  a French accent calling you; correct?

16  A.  Correct.

17  Q.  The first time you met with the government in connection

18  with this case was in a parking lot in Florida around January

19  4th, 2021, do you recall that?

20  A.  Yes.

21  Q.  And you didn't have any communication with the FBI at that

22  point.  And then you scheduled a phone meeting with the

23  government or video meeting with the government January 13th,

24  2021; correct?

25  A.  I believe so.

LC8VMAX2                        Shawn - cross

```
 1   Q.  And in that meeting, the phone meeting, you identified two
 2   people that called you, Sarah and then another European woman
 3   with an accent that wasn't British that you couldn't identify;
 4   correct?
 5   A.  Correct.
 6   Q.  And those were the only two people that you discussed with
 7   the government in that June 13th, 2021 meeting; correct?
 8   A.  That first meeting, yes.
 9   Q.  And then in the meeting on June 7th, 2021 with the
10   government, that's the third meeting.  You recalled again
11   getting calls from Sarah and another woman that you said had a
12   proper foreign accent; correct?
13   A.  Correct.
14           THE COURT:  Mr. Pagliuca, could I get you to shift the
15   mic a little when you're reading.
16           MR. PAGLIUCA:  Yes, your Honor.
17           THE COURT:  Thank you.
18   Q.  Then you had a fifth meeting with the government, July
19   12th, 2021.  You again indicated to the government that you
20   couldn't identify the specific origin of this accent of this
21   woman.  Do you recall that?
22   A.  Yes.
23   Q.  And you again said it was European and not French, do you
24   recall that?
25   A.  It's different, it's foreign to me.
```

LC8VMAX2                          Shawn - cross

1    Q.  Okay.  And then it wasn't until very close to this trial in

2    November that you first said Maxwell was one of these people

3    calling you; correct?

4    A.  I'm not sure about that.

5    Q.  Okay.  Now, you went to some of these meetings with

6    Epstein; correct?

7    A.  Yes.

8    Q.  And at one point I think you thought that you saw Sarah in

9    the driveway; is that correct?

10   A.  I did.

11   Q.  You never saw, talked to, met, Ms. Maxwell; correct?

12   A.  No.

13   Q.  And you were getting money, as I understand it, from

14   Carolyn; is that correct?

15   A.  I would take money for gas, yes.

16   Q.  And you would use the money from Carolyn to buy drugs;

17   correct?

18   A.  Correct.

19   Q.  And you and Carolyn were using marijuana, cocaine, ecstasy,

20   and other pills during that time period; correct?

21   A.  Correct.

22   Q.  You left the state of Florida in 2003 to go to Georgia;

23   correct?

24   A.  Yes.

25   Q.  And you were in Georgia for a period of time while Carolyn

LC8VMAX2                          Shawn - cross

1   was pregnant with your child; correct?

2   A.   I believe he was conceived in Georgia.

3   Q.   Right.  And then you were there until 2000 -- late 2003,

4   early 4, when your son was born in Florida; correct?

5   A.   Correct.  In March.

6               MR. PAGLIUCA:  If I could have a moment, your Honor.

7               THE COURT:  Yes.

8               MR. PAGLIUCA:  Those are all the questions I have,

9   your Honor.

10              THE COURT:  Okay.  Ms. Comey.

11              MS. COMEY:  No redirect, your Honor.

12              THE COURT:  All right.

13              Shawn, you may step down.  You are excused.

14              THE WITNESS:  Thank you, ma'am.

15              THE COURT:  Thank you.

16              (Witness excused)

17              THE COURT:  The government may call its next witness.

18              MS. MOE:  Thank you, your Honor.

19              The government calls Nicole Hesse.

20              THE COURT:  One more time.

21              MS. MOE:  Nicole Hesse, H-E-S-S-E.

22              Thank you, your Honor.

23              THE COURT:  Thank you.

24              Nicole Hesse, you may come forward.

25              (Continued on next page)

LC8Cmax3                         Hesse - direct

1            THE COURT:  Good morning, Ms. Hesse.

2       NICOLE HESSE,

3            called as a witness by the Government,

4            having been duly sworn, testified as follows:

5            THE COURT:  Thank you.  Please be seated.  You may

6       remove your maverick.  Please state and spell your full name

7       for the record.

8            THE WITNESS:  My name is Nicole Hesse, N-i-c-o-l-e

9       H-e-s-s-e.

10           THE COURT:  Ms. Hesse, if you would please pull the

11      microphone toward you, if you speak directly into it and please

12      keep your voice up.

13           Ms. Moe, you may inquire.

14           MS. MOE:  Thank you, your Honor.

15      DIRECT EXAMINATION

16      BY MS. MOE:

17      Q.  Good morning.

18      A.  Good morning.

19      Q.  Do you prefer to be addressed as Ms. Hesse or Mrs. Hesse?

20      A.  Mrs. Hesse, please.

21      Q.  Thank you, Mrs. Hesse.

22           Can you tell the jury where were you born?

23      A.  I was born in West Palm Beach, Florida.

24      Q.  Where did you grow up?

25      A.  North Palm Beach.

LC8Cmax3                        Hesse - direct

1   Q.   What kind of work do you do now?

2   A.   I am a CNA.  I work with the elderly.  I'm also a teacher

3   and work with young children.

4   Q.   Where did you work in approximately 2003?

5   A.   I worked at the Epstein home.

6   Q.   At what home are you referring to?

7   A.   Jeffrey Epstein and Ghislaine Maxwell's house.

8   Q.   Where was that house located?

9   A.   On Palm Beach, El Brillo Way.

10  Q.   What were your job responsibilities when you worked at the

11  Epstein and Maxwell home?

12  A.   To take care of the home when they weren't there, any

13  maintenance.  Things like that.

14  Q.   So, to be clear, were they home when you were working in

15  the house?

16  A.   No.

17  Q.   Who hired you?

18  A.   Ghislaine Maxwell.

19  Q.   What did Maxwell look like when you first met her?

20  A.   Short brown hair, defined cheeks, well put together,

21  pretty.

22           MS. MOE:  Your Honor, may we publish what's in

23  evidence as Government Exhibit 115 as a public exhibit?

24           THE COURT:  You may.

25           MS. MOE:  Thank you, your Honor.

LC8Cmax3                          Hesse – direct

1   Q.  Mrs. Hesse, do you recognize Government Exhibit 115?

2   A.  Yes, I do.

3   Q.  What is it?

4   A.  It's a picture of Ghislaine Maxwell.

5           MS. MOE:  Thank you, Ms. Drescher.  We can take that

6   down.

7   Q.  Mrs. Hesse, can you tell us, what do you remember about

8   what the house in Palm Beach looked like?

9   A.  It's a big home and I believe it to be white.  The hedges

10  are all manicured.  And large kitchen with an island.  It's a

11  two-story home.  I remember the stairwell going up.  It was on

12  the water.  It was like a pool and a patio area.  And a guest

13  home off to the left.

14  Q.  When you worked there, who gave you directions about what

15  to do at the house?

16  A.  Ghislaine Maxwell.

17  Q.  What were your job responsibilities?

18  A.  Basically, if anything was broken in the house, like if the

19  air conditioner didn't work, I would call the AC guy and things

20  like that, just any maintenance.  And I was there when the

21  housekeeper was there, I would open the door for her and let

22  her in and stuff.

23  Q.  When you worked for Epstein and Maxwell in Palm Beach, did

24  you receive any instructions about what to do if someone called

25  the house?

LC8Cmax3                     Hesse - direct

1   A.  Yes.  If someone called, there was a message pad right by

2   the phone and I would write it in that.

3   Q.  Who gave you the instructions about what to do if someone

4   called the house when Epstein and Maxwell were away?

5   A.  Initially, when I met with Ghislaine the first time, she

6   told me, if anyone calls to please write it in that book.

7   Q.  What did the message book look like?

8   A.  It was, like, blue and it had a spiral -- it was more like

9   a notebook.  It had the time and the date and there were, like,

10  two copies, you know, on each --

11  Q.  Where was the message book kept?

12  A.  In the kitchen near the phone, there was like a little

13  counter-desk area.

14          MS. MOE:  Your Honor, may I have just one moment?

15          THE COURT:  You may.

16          MS. MOE:  Your Honor, may I approach the witness with

17  what's marked for identification as Government Exhibits 1, 2,

18  and 3?

19          THE COURT:  You may.

20          MS. MOE:  Thank you.

21  BY MS. MOE:

22  Q.  Mrs. Hesse, I've handed you what's been marked for

23  identification as Government Exhibits 1, 2, and 3.  Do you see

24  those?

25  A.  Yes, I do.

1   Q.  I want to ask you a few questions about those exhibits.

2            Have you reviewed Government Exhibits 1, 2, and 3 in

3   preparation for trial?

4   A.  Yes, I have.

5   Q.  Do you recognize them?

6   A.  Yes, I do.

7   Q.  What are Government Exhibits 1, 2, and 3?

8   A.  They're message pads.

9   Q.  Do you recognize these particular message pads?

10  A.  Yes.

11  Q.  Can you tell us about that.

12  A.  This is where, when I was working at the Epstein home, I

13  would put messages if someone called.

14  Q.  Have you reviewed the contents of these message books in

15  preparation for trial?

16  A.  Yes, I have.

17  Q.  Do you recognize their contents?

18  A.  Yes, I do.

19  Q.  Do you recognize your signature in Government Exhibits 1,

20  2, and 3?

21  A.  Yes.

22  Q.  Is your signature in all three of those books?

23  A.  Yes, it is.

24  Q.  Do you recognize messages that you took in all three of

25  those books?

LC8Cmax3                    Hesse - direct

1    A.   Yes.

2    Q.   The messages that you took in those books, were they made

3    at or near the time of the phone calls that were the source of

4    the messages?

5    A.   When the person called, I would look at my watch and write

6    down the time and the date and everything.  So immediately,

7    yeah.

8    Q.   Were these messages kept in the course of regularly

9    conducted activity within the Epstein and Maxwell residence?

10   A.   Yes.

11   Q.   Was taking messages like this a regular practice of your

12   job function?

13   A.   Yes.  If the phone rang, I would answer it and write down

14   who called and the time.

15   Q.   Thank you, Mrs. Hesse.

16           MS. MOE:  Your Honor, at this time, the government

17   would offer a series of excerpts from Government Exhibit 1.  In

18   particular, your Honor, the government offers Government

19   Exhibit 1A as a public exhibit and the following exhibits under

20   seal:  Government Exhibits 1B, 1C, 1J, 1K, 1M, 1O, and 1P.

21           With respect to Government Exhibit 2, excerpts from

22   that item have already been offered and received in evidence.

23           With respect to Government Exhibit 3, your Honor, the

24   government offers Government Exhibit 3A as a public exhibit,

25   and the following exhibits under seal:  Government Exhibit 3B,

LC8Cmax3                         Hesse - direct

3C, 3D, 3E, 3F, 3G, 3H, 3I, 3J, 3K, 3L, 3M, 3N, 3O, 3P, 3Q, 3R,

3S, 3T, 3U, 3V, 3W, 3X, 3Y, 3Z, 3AA, 3BB, 3CC, 3DD, 3EE, 3FF,

3GG, 3HH, 3II, 3JJ, and 3KK.

            MR. PAGLIUCA:  Your Honor, I don't object to the

records that this witness has --

            THE COURT:  Microphone.

            MR. PAGLIUCA:  -- personal knowledge of it in terms of

the signature that she took.  The remainder, I object on

hearsay grounds.

            THE COURT:  Can you identify, do you know which?

            MR. PAGLIUCA:  We went through a very quick list

there, your Honor.

            MS. MOE:  Your Honor, may we be heard?

            THE COURT:  Why don't I give the jury their morning

break and I'll take this up.

            Members of the jury, we'll see you in about 15

minutes.

            The witness may step down for the break.  Thank you.

            (Continued on next page)

LC8Cmax3                         Hesse - direct

1              (Jury not present)

2              (Witness excused)

3              THE COURT:  You may be seated.  Okay.

4              MS. MOE:  Thank you, your Honor.  These three exhibits

5     are spiral bound message books.  As their appearance makes

6     clear, no one could tear an object out or put it in there, and

7     so they are a continuous record.

8              Your Honor, this witness has authenticated these

9     message books in the same manner that a previous witness has

10    also authenticated other message books, and they were admitted

11    exactly the same way earlier in a trial.

12             With respect to rule 901 --

13             THE COURT:  I didn't hear an authentication objection.

14    It was hearsay.

15             MS. MOE:  With respect to hearsay, these are

16    admissible for the same reasons the other message pads are

17    admissible and received.  They are phone messages that record

18    the date and time of a person calling.

19             With respect to particular victims that are in those

20    messages, that would be a prior consistent statement to the

21    extent the witness testified.

22             Your Honor, there are already message pads that are

23    already in evidence that were not objected to on hearsay

24    grounds.  So they are in the record.  These are of a similar

25    nature.  We are simply offering an additional set in the same

LC8Cmax3                          Hesse - direct

1    way we offered similar messages through a previous witness.

2            THE COURT:  So you have to take the objection when it

3    comes.  I don't think there is a waiver theory as to future

4    objections.

5            Are you seeking to offer the names and phone numbers

6    for their truth?

7            MS. MOE:  Yes, your Honor.  And here, this witness has

8    testified that they would receive these calls, memorialize it

9    at the same time the person was recording it.  And here, we're

10   not offering this for the truth of the particular phone number,

11   but that a person identifying themselves that way had called

12   and left a message on that date.  That is consistent with the

13   testimony of victims who described calling the house and the

14   name of a victim who testified yesterday is in these messages.

15   The names are also consistent with the names of other

16   individuals who witnesses have testified about contacting the

17   house and being involved in scheduling massage appointments.

18           So with respect to the business records issue, here,

19   this witness has testified --

20           THE COURT:  So the contention is that it's a business

21   record?

22           MS. MOE:  Yes, your Honor.  In addition, it's

23   memorializing the statement of the person calling at the time

24   they made it.  So it's confirming that a person identifying

25   themself that way contacted the house at that time.

LC8Cmax3                        Hesse - direct

1          In particular, your Honor, many of these messages have

2    the first and last name of a victim who testified yesterday

3    under the name Carolyn.  And so it confirms that a person with

4    that name was contacting the house during the relevant

5    timeframe of the charged conspiracy.

6          THE COURT:  Just so I understand the government's

7    argument, you are offering for the truth, but it's the hearsay

8    exception that proffering is the business record exception?

9          MS. MOE:  Yes, your Honor.  If I could just have one

10   moment.

11         THE COURT:  Yes.

12         MS. MOE:  Yes, your Honor.  Just to be more precise.

13   I've been using the shorthand business records, but here the

14   issue is about whether it's record of a regularly conducted

15   activity within an organization.

16         THE COURT:  Mr. Pagliuca.

17         MR. PAGLIUCA:  Yes, your Honor.  Just so that the

18   record is clear, there are four, I will call them message slips

19   per page.  Many of these message slips don't have dates, don't

20   have signatures, and have very sort of cryptic explanations

21   about what is or isn't being purported to be recorded here.

22         This witness, I think, maybe has the ability to

23   authenticate four or five of these separate slips, but has no

24   knowledge about the other slips.

25         THE COURT:  I'm sorry.  So is that a 901 objection?

LC8Cmax3                      Hesse - direct

1           MR. PAGLIUCA:  No, it is not.  I think she can say

2    this is the message pad.  So it's not an authentication

3    objection.  It is, though, as to these individual slips, she

4    has no knowledge about what's contained in them, and it goes to

5    a business record foundation as in when it was made, when it

6    was recorded, how it was stored, all of those sorts of things

7    that a normal business record custodian would talk about.

8           She, this particular witness, is not under any

9    particular business duty to record these other messages and

10   doesn't have any information about how these other messages may

11   or may not have been recorded, by whom, when, where, how, all

12   of those kinds of things.

13          So, I don't think you can just say that we're going to

14   take all these messages with all this different information in

15   it and then say it's all business record, it all comes in for

16   the truth of the matter asserted.

17          That's my objection under 801, your Honor, and I

18   suppose 803.6, which is the particular subsection under which

19   it is being offered.

20          MS. MOE:  Taking those in turn, it appears defense

21   counsel is not disputing the authenticity of these messages

22   within the entire book because this witness has identified the

23   book.  It's a spiral bound book.  It sounds like there is no

24   dispute that these are authentic.

25          So the only thing we're talking about here is a

LC8Cmax3                        Hesse - direct

1    hearsay objection.  Here, this witness --

2                THE COURT:  Just to be specific, there is not an

3    objection to the ones that she personally took.  Can you

4    identify those, of the numbers.

5                MS. MOE:  Yes, your Honor.  I just want to doublecheck

6    the exhibits.  I want to doublecheck them in the binder.  I

7    think they are 1B, 2C, 3P, and 3X.  I just want to doublecheck

8    that I have that right.

9                THE COURT:  The 2 series is already in?

10               MS. MOE:  Yes, your Honor.

11               THE COURT:  So of the ones that you're offering?

12               MS. MOE:  1B, 3P, and 3X.

13               Just so I understand the issue, because it seems to

14   now be overlapping, I'm not sure why there would be a business

15   records objection to records other than those that this

16   employee took.  I'm not sure if that's an authentication

17   question --

18               THE COURT:  No.  I think, as I understand it, we need

19   a custodian who indicates the foundation for the exception.

20   The record was made at or near the time by or from information

21   transmitted by someone with knowledge.  The record was kept in

22   the course of a regularly conducted activity of a business,

23   organization, occupation, or calling, whether or not for

24   profit.  Making your record was a regular practice of that

25   activity.

1           So I think, with respect to the objection, we start

2     with the record was made at or near the time that the call came

3     in.  So I think she's testified what she was instructed to do.

4           MS. MOE:  Yes, your Honor.

5           THE COURT:  Which included indicating a date and time

6     of the call and the like?

7           MS. MOE:  Yes, your Honor.  In our view, that meets

8     that prong of the business records exception.

9           On that score, I would note, your Honor, this is now

10    the second employee to testify that the instructions at the

11    household were to take contemporaneous messages as they came

12    in, in a message pad exactly like this.  So there is now a

13    foundation in the record to show that this was the practice of

14    the household, these were the instructions the employees were

15    given.

16          Again, it's a spiral bound book, so we have a series

17    of messages in sequential order with dates and times

18    memorializing messages made.  And the testimony has now been

19    twice that that was the practice of the household and

20    particular restrictions given by the defendant.

21          MR. PAGLIUCA:  Your Honor, on that point, factually,

22    if you look at these messages, it belies the statement just

23    made, because Ms. Hesse's messages, for example, are pretty

24    well maintained, but when you go through these messages, there

25    are many multiples that are unsigned, undated, and don't fall

LC8Cmax3                          Hesse - direct

1   within the practice that Ms. Hesse practiced -- Mrs. Hesse.  So

2   I don't think that anyone can actually say that there is a

3   practice or methodology associated with these exhibits.

4          MS. MOE:  Your Honor, on that subject, because the

5   messages are ordered sequentially, the rule only requires that

6   the record is made at or near the time of the offense recorded,

7   and because the dates and times are sequential, even when a

8   message doesn't have a date or time, it's situated between

9   sequentially ordered messages, which is how the record itself

10  shows that these are sequentially kept messages that are kept

11  at or near the time of those events.  They are in chronological

12  order and that's all that the rule requires.

13         MR. PAGLIUCA:  I disagree with that, as well, your

14  Honor, because when I'm going through these, again, there are

15  some that have dates on them and then there are some that have

16  dates out of order on them, and then there are a bunch that

17  don't have dates on them.  There is no one that can establish a

18  particular practice of using the same book at the same time.

19  It is common knowledge, I think, for people who were using

20  these books when they were used, you can take any six different

21  books and start writing in them at any point in time to take a

22  message.

23         MS. MOE:  Your Honor, the point here is that employees

24  were instructed to take messages from phone calls as they came

25  in.  Mr. Pagliuca's point is to weight and not authenticity or

LC8Cmax3                          Hesse - direct

1    to the business records exception.  They're free to argue about

2    the timeframes and what could be construed from them, but the

3    question is whether this is a business record, and based on the

4    testimony from now two witnesses and the organization of the

5    book itself, which shows that this is a sequentially numbered

6    book that's bound, that was used as part of this employee's job

7    functions.  That's all that the business records exception

8    requires.

9         Again, on the timing, the issue is whether these

10   records were made at or near.  I'm not aware of any authority

11   that requires a foundation that a witness testify that they

12   personally made that record at the exact moment a phone call

13   came in.  That's not what the business records exception

14   requires.  It's whether it's at or near, whether it's part of

15   the general practice.  If the requirement were that witnesses

16   come in and talk about the exact moment they recorded something

17   every time, business records would never be admitted in court.

18   That's not what the rule requires.

19        THE COURT:  I'm going to poke around at the law.  If

20   anybody has a case, you may have noticed, I like cases.

21        MS. MOE:  Yes, your Honor.

22        THE COURT:  I'll take a look during the remainder of

23   the break.

24        Can I keep these to look at them?

25        MS. MOE:  Yes, your Honor, of course.

LC8Cmax3                        Hesse - direct

1           THE COURT:  Do you have sheets of the ones in

2     question?

3           MS. MOE:  Yes, your Honor.

4           THE COURT:  I guess what I need to do is consider

5     Mr. Pagliuca's point that they're out of order and the like.

6     I'll take the whole book back and we'll look at the law.

7           MS. MOE:  Yes, your Honor.  Very briefly on that very

8     last point, I would note that for I think essentially every

9     exhibit -- I'll doublecheck at the break, but I think for every

10    exhibit we've offered, there may not be a date on every single

11    message, but there are four messages per page and there are

12    dates on -- at least somewhere on the page.

13          THE COURT:  Okay.

14          MS. MOE:  Thank you, your Honor.

15          THE COURT:  Thank you.  See you in a few.

16          (Recess)

17          THE COURT:  Anything further to offer on this?

18          MS. MOE:  Yes, your Honor.  Thank you.

19          We wanted to point out with respect to Government

20    Exhibit 606, which is the household manual, turning to page 7,

21    there are instructions to employees about taking phone

22    messages.  Those instructions are:  "Complete a phone message

23    slip with the following information:  Name, spelt correctly;

24    date and time of call; telephone number, including the area

25    code."

LC8Cmax3                        Hesse - direct

1          That is consistent with the testimony of Juan Alessi

2     who testified at pages 879 and 880 of the transcript.

3     "Q.  And what was the practice when you worked for Mr. Epstein

4     of how you would take messages?

5     "A.  I will answer the phone, I will listen who is calling.

6     And if the message was for Mr. Epstein, and if he wants to take

7     the call, he usually answer his calls, he has his number.  And

8     if he was there, he will answer his calls.  If he was not

9     there, I will take a message.  Who's calling?  I will ask for

10    the telephone number, the name, and I will write it down in

11    the -- in the -- in the message book.

12    "Q.  And when would you write it in the message book?

13    "A.  Soon while I was talking on the phone.

14    "Q.  As you're talking on the phone receiving the information,

15    you were writing down that information into the book?

16    "A.  Yes."

17         That's also consistent with his testimony at pages 878

18    through 880 where he describes that not only would he take

19    messages, but his wife would take messages and that another

20    personal assistant would take messages.

21         Finally, your Honor, with respect to the question of

22    case law, the Second Circuit has made clear that the

23    requirement is not that the custodian have personal knowledge

24    of all of the records.  In particular, in *United States v.*

25    *Algamal*, (ph.) 831 F.appx 539 (2d Cir. 2020).  The Second

LC8Cmax3                          Hesse - direct

1    Circuit made clear, quote, the term custodian or other

2    qualified witness in Rule 803.6 is generally given a very broad

3    interpretation.  A witness need not be a custodian or have

4    personal knowledge of the actual creation of the document to be

5    qualified within the meaning of Rule 803.6.  And that's exactly

6    the foundation here under the business rules exception and for

7    that reason, your Honor, we offer these exhibits.

8             MR. PAGLIUCA:  Your Honor, factually, Mr. Alessi left

9    in 2002.  It's clear from looking at these records that

10   whatever the practice was, was not followed going forward.

11   Assuming for a moment that this house --

12            THE COURT:  Not followed in every instance.

13            MR. PAGLIUCA:  In most, in my review of these records.

14   We don't have -- I didn't do a percentages here, but there is a

15   substantial number of items in that book that don't follow what

16   either Mr. Alessi or Ms. Hesse said.  And so, I don't think,

17   factually, you can say that these records were regularly --

18   well -- so this goes to --

19            I think there are two issues.  First, is there a

20   business practice in effect during the time that these

21   particular exhibits are collected.  That's the first question.

22   Then the second question is sort of a Lieberman-related issue,

23   and that is the content of what's in these messages, the actual

24   words themselves, all the Western Union money transfer records

25   for the truth of the content of what was written in the money

LC8Cmax3                        Hesse - direct

1    transfer.  Although there were certain pieces of information

2    that could be admitted, for example, someone saying a lengthy

3    dialogue that's recorded in one of these messages shouldn't be

4    admitted for the truth of the matter asserted because, first of

5    all, there is no business trustworthiness foundation for it.

6    Typically, when you're recording hearsay, in order for it to be

7    admissible, there needs to be some sort of business duty to

8    record and trustworthiness of the information.

9            This issue is similar.  Issues that come up with

10   hospital records, for example, or police records, for example.

11   Just because a police officer, in the ordinary course of a

12   police officer's business being a police officer, takes a

13   statement from someone doesn't make the statement itself

14   admissible for the truth of the matter in the statement because

15   there is no verification of the accuracy and it just becomes

16   part of a record that, down the road, no one should be able to

17   say, here, I'm introducing this entire statement about what

18   happened for the truth of the matter asserted.

19           So, it is similar to that and I think it is --

20           THE COURT:  I think in those cases, at the least, it

21   comes in for the limited purpose that a statement was taken

22   from so-and-so on a particular date and time.

23           MR. PAGLIUCA:  Sure.  And so that's a limiting factor

24   on the truth of the matter asserted in the statement.  In my

25   experience, typically, the hearsay portions of those kinds of

LC8Cmax3                    Hesse - direct

1    records, which I think these are those kinds of records, are

2    redacted and you get -- there is a very limited range of

3    information on the record.

4              THE COURT:  You were handed a note.  Do you have

5    another point?

6              MR. PAGLIUCA:  Yes, and Ms. Menninger makes a good

7    point.  Police officers, for example, or hospital folks

8    typically get identification when they're recording this

9    information, so they actually know who's speaking to them, and

10   that is some circumstantial trustworthiness at least of ID or

11   something like that.  Here, we don't have many instances,

12   anything other than JE Natasha — this is the 2D that I'm

13   looking at — and then a phone number with no date and no

14   signature on it.

15             So there are many of these throughout that simply

16   don't have any indicia of reliability or satisfy even the

17   minimum requirements for the business record exception.

18             MS. MOE:  Your Honor, I think the Court has it exactly

19   right, that the issue here is whether they can be offered to

20   show who was calling the house, the dates and times of those

21   calls.  That's the purpose for which these are being offered.

22             With respect to other indicators of trustworthiness,

23   now two witnesses have testified that a person with a first and

24   last name appearing in these records, in fact, called the house

25   and was there during this time period.  It would be exceedingly

LC8Cmax3                    Hesse - direct

1    strange to suggest that her full name would appear in this

2    message book for no reason.  There are all kinds of indicia of

3    trustworthiness here.

4         Again, given the purpose for which these are being

5    offered and the substantial foundation for both authentication

6    and admissibility as a business record, we believe these should

7    be admitted.

8         THE COURT:  On the purpose point, the name given by

9    the caller, date and time of call, are you also seeking the

10   phone numbers?

11        MS. MOE:  Yes, your Honor, that that person was

12   reporting a certain callback number.

13        Again, the purpose of the messages was to report to

14   the defendant and Mr. Epstein who was calling.  So here, that

15   information is relevant in terms of knowledge and otherwise,

16   the fact that a caller provided that information on a certain

17   date and a time, that's the purpose for which they're being

18   offered.

19        THE COURT:  I will overrule the objection.  I do think

20   between the two witnesses, Alessi and the current witness, is

21   sufficient foundation for application of 803.6 has been made.

22   These are not the kind of miscellaneous jottings that are

23   excluded from calendars or the like.  There is a record of a

24   sufficiently regular practice having reviewed the full books in

25   their entirety, and based on the testimony of the two

LC8Cmax3                         Hesse - direct

1    witnesses, there is a sufficiently regular practice to permit

2    admissibility under 803.6 for the purpose of showing that

3    someone reporting to be a given name and calling from a

4    particular number called on the dates indicated, and there are

5    a number of other indicia of trustworthinesses described by

6    Ms. Moe.  So I'll overrule the objection and I'll admit the --

7    well, you're seeking admission of the full message books with

8    the ones you indicated or just the ones you indicated?

9               MS. MOE:  We're just offering the subsets of the

10   marked exhibits that I read into the record.  If defense

11   counsel would prefer that the books themselves be admitted

12   along with it, we certainly would have no objection about that.

13   We just tried to be more narrow.

14               THE COURT:  I would say part of my analysis depends on

15   having reviewed the full set of books.

16               MS. MOE:  Yes, your Honor.  I have no objection to

17   offering Government Exhibits 1, 2, and 3, and I can do that

18   when the jury returns.

19               THE COURT:  Okay.  Anything else to bring up before

20   the jury comes back?

21               MS. MOE:  Nothing from the government, your Honor.

22               THE COURT:  We can bring the witness back.

23               Mrs. Hesse, you may take your seat.  Thank you.

24               (Continued on next page)

25

LC8Cmax3                          Hesse - direct

1                   (Jury present)

2                   THE COURT:  Thank you, members of the jury.  Ms. Moe,

3        you can continue with your direct examination of Mrs. Hesse.

4                   MS. MOE:  Thank you, your Honor.

5                   Just so the record is clear, for the subset of exhibit

6        numbers that I just read out, have those now been received in

7        evidence?

8                   THE COURT:  Yes.  Objection overruled.  They are

9        admitted.

10                  MS. MOE:  Your Honor, in addition, the government

11       would offer Government Exhibits 1, 2, and 3.

12                  THE COURT:  Mr. Pagliuca, same objection, overruled.

13       1, 2, and 3 are admitted.

14                  (Government's Exhibits 1, 2, 3 received in evidence)

15                  MS. MOE:  Thank you, your Honor.  We would request

16       that Government Exhibits 1, 2, and 3 be received under seal for

17       the same reasons.

18                  THE COURT:  Yes.  GX1, 2, and 3 are admitted under

19       seal for the privacy of witnesses and parties.

20                  MS. MOE:  Thank you, your Honor.

21       BY MS. MOE:

22       Q.  Mrs. Hesse, I just want to ask you about three of those

23       messages in particular.

24       A.  Okay.

25       Q.  If you could please turn to the binder in front of you and

LC8Cmax3                         Hesse - direct

1    look for tab 1B.

2              MS. MOE:  Your Honor, I would respectfully request

3    that the jury be permitted to turn to Government Exhibit 1B in

4    their binders.

5              THE COURT:  Okay.  Mr. Pagliuca, 1B?

6              MR. PAGLIUCA:  No objection, your Honor.

7              THE COURT:  You may turn to 1B in the large binder,

8    please.

9              MS. MOE:  Just to clarify, it's the smaller of the two

10   binders.  Apologies for all the binders.

11             THE COURT:  Sorry.

12             MS. MOE:  That's my mistake, your Honor.

13             THE COURT:  I think we're missing --

14             MS. MOE:  Thank you.

15   BY MS. MOE:

16   Q.  Mrs. Hesse, are you now looking at what's in evidence as

17   Government Exhibit 1B?

18   A.  I can't find the B.

19             MS. MOE:  May I have just one moment to help?

20             THE COURT:  Yes.

21             MS. MOE:  Thank you.

22   A.  Yes, I have it now.

23   Q.  Mrs. Hesse, I want to ask you some questions about

24   Government Exhibit 1B, but I want to be very careful not to

25   read out any names out loud.

LC8Cmax3                      Hesse - direct

1    A.   Okay.

2    Q.   I'm going to direct your attention to the top-left corner

3    of Government Exhibit 1B.

4    A.   Okay.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LC8VMAX4                        Hesse - direct

1    BY MS. MOE:

2    Q.  What's the date of that message?

3    A.  8/12/04.

4    Q.  And looking at the signature line at the bottom of that

5    message in the upper left-hand corner, do you recognize that?

6    A.  Yes, that's my signature.

7    Q.  Now, I want to turn to the message on the upper right, the

8    one to the right of the message that has your signature.

9    A.  Okay.

10   Q.  Again, without reading any names, I just want to ask you,

11   yes or no, is the person who left this message Carolyn?

12   A.  I don't know.  I see a K.

13   Q.  Focusing on the upper right-hand corner of Government

14   Exhibit 1B, do you see the message that starts "for

15   Mr. Epstein"?

16   A.  Yes, I do.  Oh, wait.  Yeah.

17   Q.  And again, without reading the name, just want to follow

18   along very closely.  The top line, it says "for Mr. Epstein";

19   is that right?

20   A.  That's correct.

21   Q.  And is the date beneath that 7/30?

22   A.  That's correct.

23   Q.  And again, without reading the name, just yes or no, the M

24   line, is that the person who left the message, again, without

25   saying the name?

LC8VMAX4                         Hesse – direct

1    A.  I believe so.

2    Q.  And is the first name Carolyn, C-A-R-O-L-Y-N?

3    A.  That's correct.

4    Q.  All right.  So I want to turn now and ask you about another

5    exhibit, Mrs. Hesse.  Could you please turn to tab 2T please.

6              MS. MOE:  And, your Honor, may the jurors turn to

7    Government Exhibit 2T, which is in evidence?

8              THE COURT:  Yes.  Mr. Pagliuca, 2T is already in?

9              MR. PAGLIUCA:  That's correct.

10             THE COURT:  All right.  Jurors, turn to 2T.

11             MS. MOE:  Thank you, your Honor.

12   BY MS. MOE:

13   Q.  All right.  Now that we're looking at Government Exhibit

14   2T, I just want to ask you a few questions about this

15   particular exhibit.

16             So focusing on the message on the upper right-hand

17   corner, do you see the line that says "for" and it says

18   "Mr. Epstein"?

19   A.  Yeah.  I just want to confirm that I'm in the right spot.

20   Is it GX and then 2T?

21   Q.  Yes.

22   A.  Okay.

23   Q.  Thank you, Mrs. Hesse.

24             All right.  So looking at the upper right-hand corner

25   of Government Exhibit 2T, do you see the message that says "for

LC8VMAX4                        Hesse – direct

1   Mr. Epstein"?

2   A.  Yes, I do.

3   Q.  And is the date on this message March 11th, 2003?

4   A.  Yes, 3/11/2003.

5   Q.  And the line M underneath that listing, the person who left

6   the message, is that Carolyn, C-A-R-O-L-Y-N?

7   A.  Yes, that's what I see.

8   Q.  I want to ask you about just one last message.  Could you

9   please turn to the tab marked Government Exhibit 4B.

10              MS. MOE:  And, your Honor, may the jurors do the same?

11              THE COURT:  I'm sorry, what was the number?

12              MS. MOE:  Government Exhibit 4B.

13              THE COURT:  4B is in?

14              MR. PAGLIUCA:  Let me --

15              MS. MOE:  Apologies, your Honor, I misspoke.

16              THE COURT:  Just a moment please, members of the jury.

17   BY MS. MOE:

18   Q.  Mrs. Hesse, could you please turn to Government Exhibit 3E,

19   which is in evidence?

20              THE COURT:  Are you saying "E," like elephant?

21              MS. MOE:  Yes, your Honor.

22              And may the jurors do the same?

23              THE COURT:  Let me just confirm, Mr. Pagliuca.  I just

24   admitted 3E so --

25              MR. PAGLIUCA:  Correct.

LC8VMAX4                      Hesse - direct

1           THE COURT:  Thank you.  You may turn to 3E.

2     Q.  Thank you, Mrs. Hesse.  Do you have 3E?

3     A.  Yes, I do.

4     Q.  Thank you.

5           So my only question about this exhibit is, is the

6     first name of the person who left this message Carolyn,

7     C-A-R-O-L-Y-N?

8           THE COURT:  Are you directing to a particular message?

9           MS. MOE:  Yes.

10    Q.  Do you see a message on there that has the name Carolyn on

11    it, Mrs. Hesse?

12    A.  Yes, I do.  It's in the bottom corner on the right.

13    Q.  And is that spelled C-A-R-O-L-Y-N?

14    A.  Yes.

15    Q.  Thank you, Mrs. Hesse.

16          On the days that you worked at the Palm Beach house --

17          THE COURT:  Jurors can put the binders down.

18          Thank you.

19          MS. MOE:  Thank you, your Honor.

20    Q.  Mrs. Hesse, on the days that you worked at the Palm Beach

21    house, were Maxwell and Epstein home?

22    A.  No.

23    Q.  Was your job to work there while they were away?

24    A.  That's correct.

25    Q.  Did you work full-time?

LC8VMAX4                         Hesse - cross

1    A.  No, part-time.

2    Q.  Approximately when did you stop working for Maxwell and

3    Epstein?

4    A.  Around 2004, a little bit after that.

5            MS. MOE:  Your Honor, may I have just one moment?

6            THE COURT:  You may.

7            (Counsel conferred)

8            MS. MOE:  Nothing further, your Honor.

9            Thank you, Mrs. Hesse.

10           THE COURT:  All right.  Mr. Pagliuca?

11           MR. PAGLIUCA:  Thank you, your Honor.

12   CROSS-EXAMINATION

13   BY MR. PAGLIUCA:

14   Q.  Good afternoon, Ms. Hesse.

15   A.  Good afternoon.

16   Q.  Just a few questions.

17           THE COURT:  You could take off your mask,

18   Mr. Pagliuca.

19           MR. PAGLIUCA:  Thank you for reminding me, your Honor.

20   Q.  Ms. Hesse, you were hired after an interview by

21   Ms. Maxwell, hired by Mr. Epstein; correct?

22   A.  That's correct.

23   Q.  And is it my understanding that you started working in

24   roughly September of '03; is that correct?

25   A.  I'm not exactly sure, but, yes, I was working in September

LC8VMAX4                     Hesse - cross

1    of '03.

2    Q.  Okay.  And I think you just testified that it was a

3    part-time job at that point in time; correct?

4    A.  That's correct.

5    Q.  And I believe you had children and you were -- had other

6    obligations as well; correct?

7    A.  Yes, my two-year old came with me.

8    Q.  Right.  And so the practice was for you to -- when

9    Mr. Epstein wasn't in residence, you would go to the Palm Beach

10   house and take care of various maintenance issues, monitor what

11   was going on, those types of things; correct?

12   A.  That's correct.

13   Q.  And when Mr. Epstein was in residence, your services were

14   not needed there; correct?

15   A.  That's correct.

16   Q.  So I think it would be fair to say you functioned as what I

17   would call sort of a part-time caretaker of the property?

18   A.  Manager, yeah.

19   Q.  And you would go for however much time was needed, and then

20   you would leave and go back home, right?

21   A.  That's correct.

22   Q.  Okay.  Now, when you were doing this job, sometimes

23   Ms. Maxwell would be there and sometimes Ms. Maxwell wouldn't

24   be there; correct?

25   A.  That's correct.

LC8VMAX4                        Hesse - cross

1  Q.  And you actually didn't interact with her very much at the

2  house in Palm Beach; correct?

3  A.  That's correct.

4  Q.  And there were times that you were aware of where

5  Mr. Epstein would go to the Palm Beach property and bring

6  another woman with him other than Ms. Maxwell; correct?

7  A.  I don't really know that.

8          MR. PAGLIUCA:  If we can show the witness

9  electronically 3517-002, page 2.

10         MS. MOE:  Your Honor, I believe the witness testified

11 she doesn't know, not that she doesn't remember.

12         MR. PAGLIUCA:  I'm referring the witness to a

13 statement, your Honor.

14         THE COURT:  You may proceed.

15         MR. PAGLIUCA:  Thank you.

16         THE COURT:  It's not up yet, so I need to look at it.

17         MR. PAGLIUCA:  I understand.  I'm waiting for it to be

18 up, your Honor.  3517-002, page 2, second paragraph up from the

19 bottom.

20         THE COURT:  That's not it.

21         MR. PAGLIUCA:  Excuse me?

22         THE COURT:  What was just shown --

23         MR. PAGLIUCA:  3517-02.

24         THE WITNESS:  I see what you're showing me.

25         THE COURT:  You mean the third paragraph?

LC8VMAX4                         Hesse - cross

1          MR. PAGLIUCA:  Yes, your Honor.

2          THE COURT:  Just a moment.  Okay.

3     BY MR. PAGLIUCA:

4     Q.  Ms. Hesse, do you recall that you knew Epstein liked women,

5     and that women would visit the residence even when Maxwell was

6     not there?

7     A.  Yes, that there were women that came to massage, because

8     I've taken messages for them.

9     Q.  When Maxwell was not there, right?

10    A.  Right.  But I wasn't there to see it, but I've taken a

11    message in reference to massage.

12    Q.  Okay.  So you also understood that Ms. Maxwell had another

13    residence in Miami at the time; correct?

14    A.  No, I never knew about a Miami residence, only New York.

15    Q.  And you did know that she had a home in New York, right?

16    A.  That's correct.

17    Q.  Okay.  I want to take a look at some of what you've looked

18    at in Government Exhibit -- let's start with 1B, which was the

19    first message pad that you looked at.

20         MS. MOE:  Your Honor, if I could just have a moment to

21    confer with counsel.

22         THE COURT:  Yes.

23         (Counsel conferred)

24    Q.  I just want to use this page as a general example moving

25    forward, Ms. Hesse.

LC8VMAX4                         Hesse - cross

1    So the left message is a message that you took, the

2    top left quarter?

3    A.  That's correct.  That's my signature.

4        MR. PAGLIUCA:  And perhaps, your Honor, if the jurors

5    could be referred to their binders and follow along.

6        THE COURT:  Jurors may turn to GX-1B, please.

7        Is that the small binder or large binder?

8        MS. MOE:  The small binder, your Honor.

9        THE COURT:  Small binder.  Thank you.

10       Just caution about saying the last name.

11       MR. PAGLIUCA:  Understood, your Honor.

12       THE COURT:  1B.  Thank you.  GX-1B.

13   BY MR. PAGLIUCA:

14   Q.  And so, Ms. Hesse, just looking at the left quarter there,

15   that's a message that you took; correct?

16   A.  That's correct.

17   Q.  And the top line is the "for" line on all of these

18   messages?

19   A.  Yes.

20   Q.  And on this page, for example, the top two are for

21   Mr. Epstein; the one in the left quarter lower is JE, and then

22   the right is Sarah.  Do you see that?

23   A.  Oh, the JE is down below.  Correct.

24   Q.  Yes.  And I'm assuming you did not take the three yellow

25   messages that are referenced here; correct?

LC8VMAX4                         Hesse - cross

1    A.  That's correct.

2    Q.  It appears to me that you were pretty precise when you were

3    taking messages, is that a fair statement?

4    A.  That's fair.

5    Q.  And then the other three on this page lack some of the

6    precision of your message-taking; correct?

7    A.  That's true.

8    Q.  Going forward, let's take a look at 1C.

9           MR. PAGLIUCA:  And if the jurors could just follow

10   along, if that's all right, your Honor.

11          THE COURT:  Yes.  You may look at 1C, please, jurors.

12   Q.  And again, 1C doesn't appear to have been taken at all by

13   you; correct?

14   A.  I don't have anything on 1C; it's all blank.

15   Q.  Okay.  I have some messages on mine on 1C.

16          THE COURT:  Mrs. Hesse is referring to the message on

17   the lower left-hand corner of 1C.  The whole page is --

18          THE WITNESS:  Oh, the whole page is 1C, but the left

19   corner is blank.  Okay.

20   Q.  Yes.  And just to orient us, this is not taken by you;

21   correct?

22   A.  That is correct.

23   Q.  And again, the top line, there is one in the top left for

24   Mr. Epstein, and then on the top right we've got Sarah, and

25   then I can't tell who the bottom right is.

LC8VMAX4                          Hesse - cross

1   A.  I can't either.

2   Q.  Okay.  And if we could then look at 1J.

3            MR. PAGLIUCA:  And if the jurors could also turn to

4   1J, your Honor.

5            THE COURT:  They may.  Please turn to 1J.

6   Q.  All four of these messages are for Mr. JE, do you see that,

7   Ms. Hesse?

8   A.  Yes.

9   Q.  Okay.  And if we go to 1K --

10           THE COURT:  Jurors may go to 1K.

11           MR. PAGLIUCA:  Thank you, your Honor.

12  Q.  Just starting at the top left of these messages, we've got

13  for Sarah, Jeffrey, Sarah, Mr. JE.  Do you see that?

14  A.  I do.

15  Q.  Okay.  If we can go to 1M.

16           THE COURT:  Jurors may go to 1M.

17  Q.  1M, we've got --

18           THE COURT:  I'm sorry, is it "M," like Mary?

19           MR. PAGLIUCA:  Yes, "M," like Mary, your Honor.

20  Q.  The messages are for Jeffrey, Jeffrey, Jeffrey, Jeffrey;

21  correct?

22  A.  Yes, that's what I see.

23  Q.  Have you reviewed these message pads before today,

24  Mrs. Hesse?

25  A.  Yes.

LC8VMAX4                         Hesse - cross

1    Q.  It's a fair statement that the vast majority of the

2    messages in these exhibits are for Mr. Epstein; correct?

3    A.  Yes.

4    Q.  And at the time that -- well, let me back up.

5            Many of these messages do not have dates or times on

6    them; correct?

7    A.  I see a lot that do.  On this page it does, yeah.

8    Q.  And then there's a number that don't, right?

9    A.  Yes.

10   Q.  And again, you don't have any personal knowledge about the

11   accuracy of any of these messages, just that somebody wrote

12   down a message to Mr. Epstein generally in these message pads;

13   correct?

14   A.  The ones I wrote are accurate.

15   Q.  I understand.  I'm not questioning your recording accuracy,

16   Mrs. Hesse.  But all I'm talking about is the ones that you

17   didn't write.

18   A.  Mm-hmm.

19   Q.  OK?

20           And to my understanding, the only time you would be

21   taking messages would be when you were at the residence when

22   Mr. Epstein wasn't there?

23   A.  That's correct.

24   Q.  Okay.

25           MR. PAGLIUCA:  If I could have a moment, your Honor.

LC8VMAX4                      Rodgers - direct

1          THE COURT:  You may.

2          (Counsel conferred)

3          MR. PAGLIUCA:  I have no other questions, your Honor.

4          THE COURT:  All right.  Thank you.

5          Ms. Moe?

6          MS. MOE:  No redirect, your Honor.  Thank you.

7          THE COURT:  Mrs. Hesse, you may step down.

8          You are excused.  Thank you.

9          THE WITNESS:  Okay.

10         (Witness excused)

11         THE COURT:  The government may call its next witness.

12         MS. COMEY:  The government calls David Rodgers.

13         THE COURT:  David Rodgers may come forward.

14         Good afternoon, Mr. Rodgers.

15    DAVID RODGERS,

16        called as a witness by the Government,

17        having been duly sworn, testified as follows:

18         THE COURT:  Ms. Comey, you may inquire.

19         MS. COMEY:  Thank you, your Honor.

20   DIRECT EXAMINATION

21   BY MS. COMEY:

22   Q.  Good afternoon, Mr. Rodgers.

23   A.  Good afternoon.

24   Q.  What kind of work do you do?

25   A.  I'm a pilot.

LC8VMAX4                         Rodgers - direct

1    Q.  I'd like to direct your attention to the period between

2    1991 and 2019.  Who did you work for during that time?

3    A.  Jeffrey Epstein.

4    Q.  What was your job for Jeffrey Epstein?

5    A.  I was chief pilot for about 13 years, and then captain and

6    first officer and flight engineer.

7    Q.  About when were you first hired?

8    A.  I was first hired in July of 1991.

9    Q.  Who hired you?

10   A.  Jeffrey Epstein.

11   Q.  Where were you hired?

12   A.  Columbus, Ohio.

13   Q.  How did you come to be hired?

14   A.  I had been flying a Hawker for a real estate developer in

15   Columbus, Ohio for several years.  And we had just sold our

16   airplane.  So the aviation manager for the limited flight

17   department asked me if I would be interested in flying for

18   Jeffrey Epstein, who was about to purchase the same type of

19   airplane I'd been flying.  And I told him yes.

20           And so the next day I had an interview with Jeffrey.

21   And he hired me and said, You can hire anybody you want to work

22   with you.

23   Q.  And did you then hire someone else?

24   A.  Yes.

25   Q.  Who was that?

LC8VMAX4                          Rodgers - direct

1   A.   Larry Visoski.

2   Q.   What was his job?

3   A.   Larry was a co-captain and director of maintenance.

4   Q.   And for how long did Larry work with you for Mr. Epstein?

5   A.   For Mr. Epstein we were 28 years with Mr. Epstein alive, a

6   little longer after that.

7            MS. COMEY:  Ms. Drescher, would you please pull up

8   what's in evidence as Government Exhibit 112.

9   Q.   Mr. Rodgers, do you recognize the person in that

10  photograph?

11  A.   Yes, that's Jeffrey Epstein.

12           MS. COMEY:  We can take that down.

13           Thank you, Ms. Drescher.

14  Q.   About how old was Jeffrey Epstein when he hired you in

15  1991?

16  A.   Thirty-eight.

17  Q.   What were your responsibilities as chief pilot for your

18  first 13 years of employment with Mr. Epstein?

19  A.   As chief pilot, there are a lot of responsibilities.  But

20  probably the one that would be at the top would be safety,

21  making sure that the airplane is always operated in a safe

22  manner; making sure that you're following FAA regulations and

23  rules; making sure that your pilots are retrained every year,

24  recurrent training.  And also, more importantly is following

25  maintenance procedures for the aircraft to make sure it stays

LC8VMAX4                         Rodgers - direct

1    in proper operating condition.

2              And there's a lot of other duties, too:  Budgeting,

3    scheduling.  Quite a few things.  But that pretty much

4    summarizes it.

5    Q.  Did you also fly the planes?

6    A.  Yes, I did.

7    Q.  And then you switched to captain and flight engineer.  What

8    were the responsibilities of those positions?

9    A.  As captain, you would get the weather for the flight, file

10   the flight plan, fuel the airplane, you would reserve hotel

11   rooms, cars, catering, stuff like that.

12   Q.  Between 1994 and 2004, about how often did you fly Jeffrey

13   Epstein's private planes?

14   A.  On average, we flew every four days.

15   Q.  Was there a particular set schedule?

16   A.  No.

17   Q.  Was there any sort of routine or frequent stops?

18   A.  Primarily most of the time we were going to one of his

19   houses.

20   Q.  Where was that?

21   A.  At that time it was Palm Beach, Florida; New York;

22   Columbus, Ohio at that time.  And then later on there were the

23   ranch near Santa Fe, New Mexico, and then an island down at --

24   near St. Thomas.

25   Q.  About when do you remember starting to fly out to New

1    Mexico?

2    A.   That would have been 1993.

3    Q.   And about when do you remember starting to fly to St.

4    Thomas?

5    A.   Probably around 1998.

6    Q.   I'd like to focus again on the period between 1994 and

7    2004.  During that period, how did you learn about an upcoming

8    flight for one of Mr. Epstein's planes?

9    A.   It would be one of several ways.  It could be Jeffrey

10   Epstein himself could tell us before we left the plane that

11   we're leaving in two days or two hours or whatever we're doing.

12   It could also be from his secretary.  There were times that

13   Ghislaine Maxwell might tell us about when the flight was.

14   Q.   Who was Ghislaine Maxwell?

15   A.   She worked for Jeffrey Epstein.

16   Q.   Based on your observations and time working with her, what

17   were her job responsibilities?

18   A.   She had a lot of responsibilities.  She was a property

19   manager pretty much for all of his homes that he had, an office

20   manager.  She would hire -- or she would interview prospective

21   employees and she would hire employees.  She would be -- she

22   would do a lot of purchases for the homes, for the apartments,

23   for the airplanes also, soft goods that you would need in those

24   places.

25   Q.   Among Mr. Epstein's employees, where in the hierarchy did

1    Ms. Maxwell fall?

2    A.   She would be number two.

3    Q.   Below whom?

4    A.   Jeffrey Epstein.

5    Q.   About when did you first meet Ms. Maxwell?

6    A.   July of 1991.

7    Q.   What did Ms. Maxwell look like when you first met her?

8    A.   She was 29 years old, shoulder-length black hair, probably

9    around five seven, slim build, very energetic, great

10   personality.

11   Q.   What, if any, accent did she have?

12   A.   British accent.

13   Q.   How, if at all, did Ms. Maxwell's hair change between when

14   you met her in 1991 and 2004?

15   A.   It got shorter over the years.

16   Q.   Would you recognize Ms. Maxwell if you saw her again today?

17   A.   Yes.

18   Q.   Looking around the courtroom, do you see her?

19   A.   Yes, I do.

20   Q.   Would you please point her out and identify an article of

21   clothing she's wearing?

22   A.   She has a maroon top on at the table.

23              MS. COMEY:   Would the record please reflect that the

24   witness has identified the defendant.

25              THE COURT:   The record shall so reflect.

LC8VMAX4                      Rodgers - direct

1   Q.  Other than on one of Mr. Epstein's planes, how else would

2   you interact with Ms. Maxwell between 1994 and 2004?

3   A.  Early on it would be by beeper, if she needed something;

4   and then later on we had cell phones.  And, you know,

5   occasionally I would see her at the office, and obviously on

6   the airplane.

7   Q.  Other than on the airplane and at the office, did you ever

8   see Ms. Maxwell anywhere else in person?

9   A.  Yes, I would see her at her house.

10  Q.  Why would you go to her house?

11  A.  She had first aid kits that we also had maintained on our

12  airplane; and so we provided her with those first aid kits.

13  And so they had to be refurbished once a year.  So I would go

14  there to pick it up, and then return it after it got

15  refurbished.

16  Q.  Between 1991, when you first met her, and 2004, what

17  residences of Ms. Maxwell's did you personally visit?

18  A.  The first one would have been on 59th Street near Columbus

19  Circle.  The second one would have been a studio apartment, not

20  sure of the location, probably Upper East Side of Manhattan.

21  And then she had an apartment, large apartment, on 84th Street.

22  And then she had a townhouse on 65th Street.

23  Q.  I want to walk through each of those, please.

24          When did you go to the 59th Street apartment?

25  A.  In the fall of 1991.  I don't recall exactly when.

LC8VMAX4                        Rodgers - direct

1    Q.  Could you describe that residence.

2    A.  It was a very large residence.  It was, you know -- I don't

3    recall what floor, an upper floor, but it was a very large

4    residence, very large apartment.

5    Q.  Was it in Manhattan?

6    A.  Yes.

7    Q.  Where was it situated?

8    A.  59th Street near Columbus Circle.

9    Q.  And then about when, to your understanding, did she move to

10   the studio apartment?

11   A.  I would say that was at the end of 1991, possibly early

12   1992.

13   Q.  And were you aware from your conversations with Ms. Maxwell

14   about something that happened in between that move?

15             MR. EVERDELL:  Objection.  Relevance.

16             THE COURT:  Just a moment.

17             MS. COMEY:  Goes to motive, your Honor.

18             MR. EVERDELL:  Your Honor, may I be heard?

19             THE COURT:  You may.

20             (Continued on next page)

21

22

23

24

25

1              (At sidebar)

2              THE COURT:  I don't know what the question is

3    eliciting.

4              MR. EVERDELL:  It seems evident to me that what the

5    government wants to get into is the fact of Ms. Maxwell's

6    father's death around that time.  Because I think what they're

7    going to try to do is argue that his death was somehow a motive

8    for her because of their wealth or something connected to her

9    father, and she had to move to a smaller apartment.

10             Now, this is something that is outside of the scope of

11   the conspiracy and wasn't even -- our understanding, it wasn't

12   even her apartment on 59th; she shared a room with somebody.

13   This is really getting totally outside the scope.  It is three

14   years before the conspiracy allegedly began and it is totally

15   out of bounds here because they are trying to link it up to

16   something that has no relevance to this case.

17             MS. COMEY:  Your Honor, I think that what the witness

18   will say is that -- I think the witness will say that her

19   father died in between those two, that's all I plan to elicit.

20   And then she moved to a much smaller apartment.  She then moved

21   to a series of larger apartments, ending in a large townhouse.

22   There's evidence that Jeffrey Epstein bought that townhouse for

23   her.  This goes to Ms. Maxwell's motive to participate in these

24   crimes with Mr. Epstein in terms of the finances that she

25   received and the fact that she was not a particularly wealthy

LC8VMAX4                        Rodgers - direct

1    person when she first met Mr. Epstein.

2              MR. PAGLIUCA:  There's no foundation for that either.

3    The fact that somebody moves into a smaller apartment means

4    that they don't have any money?  I mean --

5              THE COURT:  Overruled.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LC8VMAX4                      Rodgers - direct

1                (In open court)

2                THE COURT:  Go ahead, Ms. Comey.

3    BY MS. COMEY:

4    Q.  Are you aware from your conversations with Ms. Maxwell

5    about an event that took place in her life between when she was

6    in the larger apartment and then moved to the studio apartment?

7    A.  Her father had passed away in November, early November of

8    1991.

9    Q.  Do you know about when she moved from the studio apartment

10   to the 84th Street apartment?

11   A.  I don't.  I would guess -- if I guessed, it would be --

12   Q.  I'm not asking you to guess.  Can you estimate based on

13   your best recollection?

14   A.  I would estimate maybe one to two years.

15   Q.  And then do you recall approximately when she moved to the

16   townhouse?

17                MR. EVERDELL:  Objection.  Foundation.

18                THE COURT:  Sustained.

19   Q.  Based on your conversations with Ms. Maxwell, what is your

20   understanding of when approximately she moved to the townhouse?

21                MR. EVERDELL:  Objection.  Hearsay.

22                MS. COMEY:  Statement of the defendant, your Honor.

23                MR. EVERDELL:  It's not in furtherance, your Honor.

24                THE COURT:  Overruled.

25   Q.  Based on your conversations with Ms. Maxwell, what is your

LC8VMAX4                      Rodgers - direct

1   understanding of when she moved to the townhouse approximately?

2   A.   In the -- probably the late '90s, possibly 2000.

3   Q.   Could you describe that townhouse for us please.

4   A.   I believe it was a brown, five stories tall.  It had a

5   courtyard in the back of it.  It was -- it was a pretty big

6   place, probably, I'm guessing -- well, I'm not guessing.

7   Approximately 6,500 square feet, maybe seven.

8   Q.   All of these homes you've described, in what borough were

9   they located?

10  A.   Manhattan.

11  Q.   Based on your observations of and interactions with

12  Ms. Maxwell and Mr. Epstein, what was your understanding of the

13  nature of their relationship between 1991 and 2004?

14  A.   Early on they were romantically involved.  And somewhere in

15  between that time period they weren't romantically involved.

16  Q.   When Ms. Maxwell was the person to let you know about an

17  upcoming flight on one of Mr. Epstein's planes, how would she

18  contact you to convey that information?

19  A.   It could have been by beeper.  And then after we got rid of

20  the beepers, it would have been by cell phone.

21  Q.   About how far ahead of time did you typically receive

22  notice of an upcoming flight for one of Mr. Epstein's planes?

23  A.   It would vary.  Usually 24 hours.  And it could be even two

24  or three days.

25  Q.   To your knowledge, did Mr. Epstein fly exclusively by

LC8VMAX4                        Rodgers - direct

1   private plane between 1994 and 2004?

2   A.  Almost.  But occasionally he would ride on an airline.  I

3   mean I can recall dropping him off to take the Concorde to

4   Europe.

5   Q.  Were there ever times when Mr. Epstein's private plane was

6   unavailable?

7   A.  Yes.

8   Q.  Why was that?

9   A.  We would have to go down for maintenance every year,

10  usually typically two to three weeks at that time.

11  Q.  To your knowledge, did Ms. Maxwell only fly by private

12  plane between 1994 and 2004?

13  A.  I'm not --

14          MR. EVERDELL:  Objection.  Foundation.

15          THE COURT:  Sustained.

16  Q.  Based on your conversations with Ms. Maxwell, do you have

17  an understanding of whether she only flew by private plane?

18  A.  She -- she had a travel air -- a Raytheon Travel Air card

19  that allowed her to use like a charter type of private jet.

20  Q.  When you were piloting a flight for Mr. Epstein, typically,

21  what interactions would you have with the passengers?

22  A.  When they would get on, you know, you would speak to

23  them -- or you might speak to them, you say hi.  But that would

24  be just about it.

25  Q.  Between 1991 and 2004, what aircrafts did Jeffrey Epstein

LC8VMAX4                         Rodgers - direct

1    own?

2    A.  From '91, the first one was a Hawker Siddeley 125 aircraft.

3    The next aircraft was a Gulfstream G2B.  After that we had a

4    smaller aircraft, a twin engine, light twin Cessna 421.  Then

5    we purchased the Boeing 727.

6    Q.  Is that it for that period, '91 to 2004?

7    A.  Yes, that's it for that period.

8    Q.  On the Gulfstream G2B, what, if any, divider was there

9    between the pilot and the passengers?

10   A.  As you walked up the airstairs and made a right to go back

11   to the passenger cabin, you passed through a door that

12   contained a passenger cabin.  So that door was always closed

13   from the cockpit or from the flight deck.

14   Q.  But during the flights that you piloted on that plane, were

15   you able to observe what the passengers were doing?

16   A.  No.

17   Q.  And how about on the Boeing, what divider, if any, was

18   there between the pilots and the passengers during flight?

19   A.  We had two there.  As you walked up the airstairs, if you

20   looked left to the flight deck, the door was closed -- there

21   was a door there that was always closed.  And then as you made

22   a right to go back to the forward lounge area, there was

23   another door that you would pass through.  So there were

24   literally two doors on that one.

25   Q.  Were you able to observe what the passengers were doing on

LC8VMAX4                          Rodgers - direct

1    the Boeing during the flights you piloted?

2    A.  No.

3    Q.  During your time working as a pilot for Mr. Epstein, what,

4    if any, records did you keep about the flights that you

5    piloted?

6    A.  We kept a passenger manifest which we filled out after

7    every flight.  And then at the end of the day, we had an

8    aircraft log that we put down flight times that we flew on that

9    particular day.  And then I also kept a personal logbook.

10   Q.  Walking through each of those, starting with the flight log

11   for the plane, what information went into that log?

12   A.  Okay.  On the passenger manifest you'd have the date, you

13   would have the trip number, you would have the departure, the

14   destination.  We had who the passengers were on there, the

15   flight time, I think we also had the amount of fuel we would

16   purchase on there.  And then on the aircraft log, it was really

17   for maintenance procedures.  It had about engine times,

18   aircraft landings, APU times, stuff like that.

19   Q.  What happened to the passenger manifests that you filled

20   out for Jeffrey Epstein's planes?

21   A.  Those -- I had those and turned those over to an attorney

22   of Jeffrey's.

23   Q.  One of Jeffrey Epstein's attorneys?

24   A.  Yes.

25   Q.  Did you keep a copy?

LC8VMAX4                      Rodgers - direct

1    A.  No.

2    Q.  Now, you also mentioned a set of records that you kept

3    separately.  What was that?

4    A.  My logbook.

5    Q.  What's a logbook?

6    A.  It just shows you the day you flew, the destination you

7    went to, the flight time that you flew on that.

8    Q.  What other information about each flight you piloted did

9    you keep in your logbook?

10   A.  I kept passenger names also.

11   Q.  Now, did that logbook include every flight that each of

12   Mr. Epstein's planes took or only the flights where you were a

13   crew member?

14   A.  It was only the flights that I was a crew member.

15   Q.  Over the course of your employment for Mr. Epstein, how

16   often were you away from work?

17   A.  On average, about five weeks a year, between vacation and

18   training.

19   Q.  I'd now like to ask you to please pull out the binder in

20   front of you and take a look at what's been marked for

21   identification as Government Exhibit 662.

22   A.  Okay.  I have it.

23   Q.  Do you recognize that?

24   A.  Yes.

25   Q.  What is it?

LC8VMAX4                          Rodgers - direct

1    A.  That's a copy of my logbook.

2    Q.  Did you review this before coming to testify here today to

3    make sure that this exhibit is an accurate copy of your

4    logbook?

5    A.  Yes, I did.

6    Q.  Was each entry in this logbook made at or near the time of

7    the flight reflected in each row?

8    A.  Yes, it would have been made at the time that flight was

9    over, probably within 30 minutes of the passengers leaving.

10   Q.  Did you keep these records in the course of your regularly

11   conducted activity as a pilot?

12   A.  Yes.

13   Q.  And was maintaining this logbook a regular practice of that

14   activity?

15   A.  Yes.

16            MS. COMEY:  Your Honor, the government offers Exhibit

17   662 under seal; and a redacted version, 662-R, for the public.

18   The sealing is for witness and third-party reasons.

19            MR. EVERDELL:  No objection.

20            THE COURT:  All right.  662 is admitted under seal for

21   the reasons indicated.  662-R is admitted, which is a redacted

22   version.

23            (Government's Exhibits 662, 662-R received in

24   evidence)

25            MS. COMEY:  Thank you, your Honor.

LC8VMAX4                        Rodgers - direct

1           Ms. Drescher, I'll ask you to please pull up page 1 of

2       662-R.

3           And, your Honor, I would ask that at the same time the

4       jurors be permitted to turn in their binders to the first page

5       of 622.

6           THE COURT:  Okay.  Jurors, you may -- is it the small

7       binder or the large binder?

8           MS. COMEY:  Large binder.

9           THE COURT:  Large binder.  GX-662, please.

10          MS. COMEY:  Before we get to 662, Mr. Rodgers, would

11      you please also look at Government Exhibit 661.

12          THE COURT:  But not the jurors yet, please.  Just 662

13      for the jurors.

14          MS. COMEY:  Withdrawn.  662 is the right exhibit.

15          THE COURT:  Okay.  So we are staying on 662?

16          MS. COMEY:  We are staying on 662, your Honor.

17          THE WITNESS:  I'm at 661.

18      BY MS. COMEY:

19      Q.  Would you go to 662 for me, Mr. Rodgers.  I apologize for

20      that.

21      A.  All right.  I'm there.

22      Q.  Could you please walk us through the columns in this

23      logbook, starting with the far left-hand column that says

24      "date."

25      A.  Okay.  So the first column says "date."  The second column

LC8VMAX4                      Rodgers - direct

1    says --

2    Q.  Before you move on, what information did you put for each

3    row under the "date" heading?

4    A.  I would have the year next to where you see 19.  Under

5    that, I would have the month.  And if the month changed, if you

6    look further down, I would write the new month.  And then the

7    day of the month, which is one number.

8    Q.  And could you walk us through the next two column headings,

9    please.

10   A.  Okay.  The next one is the aircraft make and model.  And

11   the next one is the aircraft identification mark, which is the

12   registration number for the aircraft.

13   Q.  And do those just tell you what plane you were on?

14   A.  Yes, that would tell us what -- which airplane we were on.

15   Q.  And then how about the next two columns, what information

16   was contained in those?

17   A.  These are the points of departure and arrival.  So this is

18   where we're leaving from and where we're going to.

19   Q.  And then what is the next column?

20   A.  The next column has miles flown.  And on this particular

21   one it says "duty time."  That pretty much can be ignored.

22   It's not relevant to what we're doing.  But the next one is --

23   which is our flight number.

24   Q.  What's a flight number?

25   A.  That's -- like number one is the very first flight that we

1    took for Jeffrey Epstein.

2    Q.  And is that for a particular aircraft?

3    A.  Yes.  This one would be for the Hawker HS125.

4    Q.  And then the next column, "remarks, procedures, maneuvers,

5    endorsements," what did you put in that column?

6    A.  I put in that column passenger names.

7    Q.  And then the remaining columns on this page, can you just

8    generally tell us what those are.

9    A.  Yeah.  One of them, it says number of landings; how many

10   landings you did that day.  And then the aircraft categories,

11   whether you were flying a single engine or whatever you might

12   be flying.  And then there are totals down at the bottom of the

13   page.

14   Q.  I want to walk through a couple entries on this page,

15   please.  Let's go to the row that has flight number one down at

16   the bottom; four from the bottom, I believe.

17   A.  Okay.

18   Q.  That row, can you walk us through the date of this flight.

19   A.  Yes.  This is July 26, 1991.

20   Q.  And you're getting July from what part of this page?

21   A.  If you look up one, two, three, four, five rows up, you'll

22   see J-U-L there.

23   Q.  And you're getting 1991 from what part of this page?

24   A.  From the very top of this page.

25   Q.  Going back to flight one, can you tell us what aircraft you

LC8VMAX4                        Rodgers - direct

1   were on, going to the next two columns?

2   A.  Yes.  This is the HS125-700.  And at the time the

3   registration number was N404CB.

4   Q.  Now, in this row there are just two marks.

5   A.  Yes.  That's just a copy -- it's a ditto of what's above

6   it.  And what's above it, you'll see where it turns into

7   HS125-700 and N404CB.

8   Q.  Now, let's go to the "from" and "to" columns.  Can you walk

9   us through those, please, for flight number one?

10  A.  Yes, flight number one, we departed Wilmington, Delaware.

11  And our destination was Teterboro, New Jersey.

12  Q.  So what does "TEB" stand for?

13  A.  Teterboro, New Jersey.

14  Q.  How far is Teterboro, New Jersey from Manhattan?

15  A.  It's about 16 miles.

16  Q.  And when you flew into Teterboro, New Jersey, what was your

17  understanding of where Jeffrey Epstein was staying?

18  A.  When we first started working for him, he lived in an

19  apartment in Manhattan.

20  Q.  And now let's move over to the remarks procedures,

21  maneuvers, and endorsements part of this row.  Can you tell us

22  what this means.

23  A.  Yes.  Like, for instance, on flight number one, I think it

24  just says repositioning to Teterboro after closing on the

25  airplane.  This is the first flight that we actually own that

LC8VMAX4                          Rodgers - direct

1    aircraft.

2    Q.  Let's go down, please, to flight number two.  Can you walk

3    us through the date of this flight where you're flying from and

4    where you're flying to?

5    A.  It's July 26, 1991.  We're flying from Teterboro, New

6    Jersey to Palm Beach, Florida.

7    Q.  What does "PBI" stand for?

8    A.  Palm Beach International.

9    Q.  When you were flying to Palm Beach International Airport

10   for Jeffrey Epstein, what was your understanding of where he

11   was staying?

12   A.  He had a home located on Palm Beach Island.

13   Q.  And then let's go to the passenger column.  Was Jeffrey

14   Epstein a passenger on this flight?

15   A.  Yes.

16   Q.  And was Ghislaine Maxwell a passenger on this flight?

17   A.  Yes.

18   Q.  And were there two other passengers as well?

19   A.  Yes.

20   Q.  Stepping back for a second from these records, we'll turn

21   right back to them in a moment, how did you learn the names of

22   the passengers on each flight you piloted?

23   A.  It would vary.  Sometimes we would be told if the secretary

24   said, You're leaving two days from now and these are your

25   passengers.  That didn't always happen, as far as knowing who

LC8VMAX4                      Rodgers - direct

1   the passengers were.  So sometimes we might get introduced to

2   the passenger by Jeffrey once they got onboard.

3   Q.  Did you always know the name of every passenger onboard?

4   A.  No.

5   Q.  Why not?

6   A.  Nobody told us who they were.

7   Q.  If there was a passenger onboard and you didn't know that

8   person's name, how did you indicate the presence of that person

9   in your logbook?

10  A.  With the industry standard of "PAX," which is abbreviation

11  for passenger.  And then later on we further change it from

12  that to either -- the gender, either male or female.

13  Q.  I want to go now actually backing up.

14          So is the first time a person's name appears in this

15  logbook necessarily the first time that person was a passenger

16  on one of Mr. Epstein's planes?

17  A.  It might not be, because they could have been a PAX on the

18  previous flight because we didn't know their name, and then

19  maybe the next flight we find out who they are.

20  Q.  So you wouldn't go back and add in their name?

21  A.  No.

22  Q.  I'd like to turn now, please, to page 29 of Government

23  Exhibit 662.  And there are numbers on the bottom.

24  A.  Okay.

25  Q.  I want to look at flight number 573, please.  Can you

LC8VMAX4                     Rodgers - direct

1    please tell us the date of this flight, where you're flying

2    from, and where you're flying to.

3    A.   This is August the 18th, 1994.  And we're traveling from --

4    departing Aspen, Colorado to Traverse City, Michigan.

5    Q.   What plane were you on?

6    A.   This is the Gulfstream 2B.  And the way you tell that is

7    looking -- just go to the upper part of the column there and

8    you'll see G1159B, which is the technical name, but it's

9    primarily known as a G2B.

10   Q.   And for the date here, how do you know that this is August

11   18th, 1994?

12   A.   Because in the first column it says 18.  And if we move up

13   through probably six or seven rows, you'll see August, A-U-G.

14   And if we move to the very top of the page, you'll see 1994.

15   Q.   What does "TVC" stand for?

16   A.   Traverse City, Michigan.

17   Q.   About how many times do you remember flying Jeffrey Epstein

18   to Traverse City, Michigan during your time as a pilot for him?

19   A.   I was -- flew there seven times between 1991 and 1998.  The

20   year that we didn't go, I think, was 1995.

21   Q.   During about what time of year do you remember all of those

22   flights being?

23   A.   They were all August, with one exception.  We arrived one

24   time on the 31st of July.  But they were typically within the

25   first couple of weeks of August.

LC8VMAX4                         Rodgers - direct

Q.  And when you were at Traverse City, Michigan, do you

remember ever going anywhere in particular?

A.  Yes, went to the Interlochen Center for the Arts.

Q.  I want to go back to flight number 573.

        Is Jeffrey Epstein a passenger on that flight?

A.  Yes.

Q.  And were there two other passengers as well on that flight?

A.  Yes.

Q.  Let's go now to the very next flight, flight 574.  What was

the date of that flight?

A.  This is July the 20th, 1994.

Q.  I'm sorry, you said July the 20th?

A.  I'm sorry.  I'm sorry.  August the 20th.  My mistake.

Q.  Of what year?

A.  Of 1994.

Q.  Where are you flying from and where are you flying to?

A.  From Traverse City, Michigan to Teterboro, New Jersey.

Q.  Was Jeffrey Epstein a passenger on this flight?

A.  Yes.

Q.  And was Ghislaine Maxwell a passenger on this flight?

A.  Yes.

Q.  Was there also a third passenger?

A.  Yes.

Q.  Just to be clear, how do you know that Jeffrey Epstein was

a passenger on this flight?  What in the logbook tells you

LC8VMAX4                        Rodgers - direct

1    that?

2    A.  I have his initials in there, "JE."

3    Q.  And how about for Ghislaine Maxwell, what in the logbook

4    tells us that?

5    A.  I have her initials, "GM."

6    Q.  I'd like to --

7              THE COURT:  Actually, we'll break for lunch here,

8    Ms. Comey, unless you're on the cusp of finishing.

9              MS. COMEY:  No.  This is a good stopping point, your

10   Honor.  Thank you.

11             THE COURT:  All right.  Members of the jury, we'll

12   break for lunch.  We'll see you in about an hour.

13             (Jury not present)

14             THE COURT:  Mr. Rodgers, you may step down for the

15   break.  Everyone may be seated.

16             You may head out.  Thank you.

17             (Witness not present)

18             THE COURT:  Okay.  Matters to take up?

19             MS. COMEY:  Not from the government, your Honor.

20             MR. EVERDELL:  Your Honor, just a procedural point for

21   this witness on cross-examination, and I just noticed it now in

22   the direct.

23             Counsel for the government was referring to certain

24   flights and noting that Epstein and/or Maxwell were on the

25   flights, and then would say "and others," without naming those

1    individuals.  I plan on cross-examining to name individuals

2    that are not going to link up to anybody who needs to be

3    anonymized.  The examples we just looked at are perfect

4    examples.  I don't see why that's not permissible.

5           THE COURT:  I was going to say, this struck me as

6    overly redacted in any number of ways, including from the fact

7    that you read from parts that are redacted.  So I recognize

8    it's labor, but this needs to be more narrowly tailored.  I

9    don't know why it wouldn't be permissible.

10           MR. EVERDELL:  That's my understanding too, your

11    Honor.

12           MS. COMEY:  Your Honor, there was no particular reason

13    why I wasn't referencing the names of those other people other

14    than I didn't think that they were relevant to the question I

15    was asking.

16           So I have no objection to Mr. Everdell saying the

17    names of other individuals, except for obviously those who have

18    been granted anonymity by the Court.

19           I also understand the Court's view on narrowly

20    tailoring these redactions.  That will be very time-intensive,

21    your Honor.  I would ask for permission to do that over the

22    long weekend break that we have coming up.

23           THE COURT:  Okay.  That's fine.  Let's do that.

24           Relatedly, the message pads, I think you only have one

25    or two unredacted exemplars, but most of those -- other than

1    the -- for example -- sometimes, for example, it said just

2    Carolyn, so that doesn't need to be redacted at all.  In other

3    instances, the last name would need to be redacted.

4              MS. COMEY:  So, your Honor, the thinking was that

5    there's phone numbers for not only Carolyn, but also a number

6    of third parties.

7              THE COURT:  We could do redactions of the last four,

8    for example.  Again, I understand it's labor, but do it now or

9    do it later and, it seems to me, better to do it now.

10             MS. COMEY:  Yes, your Honor.

11             May we have the long weekend coming up as well to

12   complete those redactions please?

13             THE COURT:  Yes.

14             MS. COMEY:  Thank you, your Honor.

15             MR. EVERDELL:  One other choreography point just for

16   purposes of cross, we do have folders for the jury.  I could

17   put it under their chairs now, as long as they are instructed

18   not to look at them.

19             MS. COMEY:  No objection.

20             THE COURT:  Okay.

21             Have you looked at the *in limine* instruction?

22             MR. ROHRBACH:  Yes, the government has no objection.

23             MR. EVERDELL:  Your Honor, actually if we could take

24   that up when we return from the lunch break.

25             THE COURT:  Okay.  That's fine.

LC8VMAX4                          Rodgers - direct

1          And then I don't know if you've conferred on 52.  I'll

2    obviously consider any argument; but, among other things, if

3    it's premised on Mr. Alessi's testimony, the defense had no

4    opportunity to cross-examine him, so even -- am I

5    misunderstanding?

6          MS. COMEY:  Your Honor, I don't --

7          THE COURT:  I had understood Mr. Rohrbach to indicate

8    that there was going to be a briefing tonight on Government

9    Exhibit 52.

10          MS. COMEY:  Yes, your Honor.  I just didn't understand

11   the point that the defense didn't have the opportunity to

12   cross-examine Mr. Alessi.  I think there was extensive

13   examination of Mr. Alessi and voir dire on Government Exhibit

14   52, as I recall.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

LC8Cmax5                          Rodgers - direct

1          THE COURT:  I'll consider it after you confer, but you

2     know where it was.  And that's all I have.

3          MR. PAGLIUCA:  Your Honor, on that point, I'm assuming

4     what the Court means is if there is a new issue raised that

5     wasn't raised during the examination is the problem.  Is that

6     what the Court is alluding to?

7          THE COURT:  Having not admitted it pending what all

8     along had been the government's proffer as to the anticipated

9     testimony of an anticipated witness, I didn't admit it

10     following Mr. Alessi's testimony.  It's true that there was

11     voir dire on it, but I don't know what new argument will be

12     asserted, and it strikes me that the fact that it -- whatever

13     argument is being made in the absence of the witness could be

14     an issue.

15          MR. PAGLIUCA:  Right.  That's what I understand.  That

16     was my understanding.  I get it.

17          THE COURT:  I'm open to arguments.  Obviously, both

18     sides have reargued many issues and I keep an open mind.

19          Anything else?

20          MS. COMEY:  Not from the government, your Honor.

21          MR. PAGLIUCA:  Nothing from the defense, your Honor.

22          (Recess)

23

24

25

1                           AFTERNOON SESSION

2                              1:54 p.m.

3               (Jury not present)

4               (Witness not present)

5               THE COURT:  Matters to take up?

6               MS. COMEY:  Nothing from the government, your Honor.

7               MR. EVERDELL:  We've not had the chance to confer with

8     the government on this, but there is one proposed edit or two

9     proposed edits to the limiting instruction.  If you give us a

10    minute, we can try to confer briefly.

11              THE COURT:  Sure.  Go ahead.

12              MR. EVERDELL:  Your Honor, sorry about that.  We have

13    conferred and I think we have agreement on the language.

14              THE COURT:  Okay.

15              MR. EVERDELL:  There is just two edits to the

16    Court's -- proposed two edits to the Court's proposed

17    instruction.  I'll just read it from the beginning.  It says,

18    "Now, I anticipate that you will hear testimony from the next

19    witness about it..." and here's the first change, change from

20    "sexual conduct" to "physical contact."

21              THE COURT:  Okay.

22              MR. EVERDELL:  "That she says she had with Mr. Epstein

23    in New Mexico.  I instruct you that the..." and here's the

24    second change, "...alleged physical contact she says occurred

25    with Mr. Epstein in New Mexico was not, quote, illegal sexual

1    activity, unquote, as the government has charged in the

2    indictment.

3            I won't read the rest, your Honor.  The rest is as is.

4            MS. COMEY:  That's fine with us, your Honor.

5            THE COURT:  Great.  I accept that and will give

6    that -- and I propose that the timing would be the same as with

7    the prior witness with the limiting instruction?

8            MS. COMEY:  Yes, your Honor.

9            MR. EVERDELL:  Sorry.  One more moment, your Honor.

10           We have agreement again, your Honor.

11           THE COURT:  It's a magical moment.

12           MR. EVERDELL:  It is a magical moment.  I agree with

13    you.  Let's hold onto this.

14           So the changes I read remain, but I will read the

15    first sentence again.

16           "I anticipate that you will hear testimony from the

17    next witness about physical contact that she says she had with

18    Mr. Epstein and Ms. Maxwell in New Mexico.  I instruct you that

19    the alleged physical contact she says occurred with Mr. Epstein

20    and Ms. Maxwell in New Mexico was not illegal sexual activity."

21    The rest is the same.

22           MS. COMEY:  That's fine with us, your Honor.

23           THE COURT:  Great.  Thank you.  That makes good sense.

24           On this issue, and there is a 412 issue that we had

25    discussed -- let me talk to you at sidebar, that goes to

LC8Cmax5                          Rodgers - direct

1   whether there is a dispute as to the scope of what will be

2   explored.

3                  (Continued on next page)

4                  (Pages 1838-1843 SEALED)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LC8Cmax5                          Rodgers – direct

1          (In Open court)

2          THE COURT:  Any other matters to take up?

3          MS. COMEY:  No, your Honor.

4          MR. EVERDELL:  No, your Honor.

5          THE COURT:  Okay.  We can bring in the jury.

6          We can have the witness back.

7          Good afternoon, Mr. Rodgers.  You may take your seat

8   and you may remove your mask.

9          Bring in the jury.

10          (Continued on next page)

LC8Cmax5                          Rodgers - direct

1           (Jury present)

2           THE COURT:  Thank you, members of the jury.  Hope you

3    had a pleasant lunch.

4           We will continue, Ms. Comey, with your direct

5    examination of Mr. Rodgers.

6           Mr. Rodgers, I do remind you, you are under oath.

7           You may inquire.

8           MS. COMEY:  Thank you, your Honor.

9    BY MS. COMEY:

10   Q.  Good afternoon, Mr. Rodgers.

11   A.  Good afternoon.

12   Q.  How many female passengers on Mr. Epstein's planes, if any,

13   do you recall who you understood attended Interlochen?

14   A.  One.

15   Q.  Do you know that person's name, without saying it, do you

16   know that person's name?

17   A.  Yes.

18   Q.  I'd like you to please turn in the binder in front of you

19   to what's in evidence as Government Exhibit 12.  Without saying

20   the name out loud, would you please look at the first and last

21   name on that exhibit.

22   A.  Yes.

23   Q.  Is that the full name of the passenger on Mr. Epstein's

24   plane who you understood attended Interlochen?

25   A.  Yes, it is.

LC8Cmax5                      Rodgers - direct

1  Q.  I'm going to refer to her as Jane and I would ask that you

2  do the same.

3  A.  Okay.

4  Q.  You can set that aside for now.

5       Mr. Rodgers, about when do you remember first meeting

6  Jane?

7  A.  I believe that was November the 11th, 1996.

8  Q.  Backing up, what do you remember about meeting her?

9  A.  She was a passenger on our flight.

10 Q.  And who do you remember Jane flying with?

11 A.  She's flown with Jeffrey Epstein, Ghislaine Maxwell, and

12 other people, as well.

13 Q.  About how many times do you remember seeing Jane as a

14 passenger on one of Mr. Epstein's planes?

15 A.  Four times.

16 Q.  I'd like to turn back to Government Exhibit 662, please.

17      MS. COMEY:  Your Honor, I'd ask that the jurors also

18 turn in their binders to that exhibit.

19      THE COURT:  Jurors, you may look at GX662.  Large

20 binder?

21      MS. COMEY:  Yes.  Ms. Drescher, would you please pull

22 that up, as well.  We're going to go to page 44.

23      THE COURT:  You mean pull up 662R?

24      MS. COMEY:  Yes, your Honor.  Thank you.  662R.

25 Q.  Again, Mr. Rodgers, we're going to page 44 of this exhibit.

LC8Cmax5                      Rodgers - direct

1    A.   Okay.

2    Q.   I'll direct your attention to flight number 916.

3    A.   Okay.

4    Q.   Just want to make sure everyone has gotten there.

5              Mr. Rodgers, turning to flight number 916, can you

6    tell us the date of this flight, please.

7    A.   It's November the 11th, 1996.

8    Q.   And how do you know it's November, looking at this?

9    A.   If you look up above the 11, you'll see November, N-O-V.

10   And then at the very top of the page, you'll see 1996.

11   Q.   What plane were you flying?

12   A.   This is the Gulf Stream G2B.

13   Q.   Where were you flying from and where were you flying to?

14   A.   Flying from Palm Beach, Florida, to Teterboro, New Jersey.

15   Q.   Is Jeffrey Epstein a passenger on this flight?

16   A.   Yes.

17   Q.   Is Jane a passenger on this flight?

18   A.   Yes.

19   Q.   And do you see just her first name written in the column

20   where the passengers are?

21   A.   Yes.

22   Q.   And are there a number of other passengers on this flight?

23   A.   Yes.

24   Q.   I'd like to go to the very next flight.  What's the date of

25   the next flight?

LC8Cmax5                              Rodgers - direct

1   A.  Next flight is November the 15th, 1996.

2   Q.  Where were you flying from and where were you flying to?

3   A.  Teterboro, New Jersey, to Columbus, Ohio.

4   Q.  Is Jeffrey Epstein on this flight?

5   A.  Yes.

6   Q.  Is Ghislaine Maxwell on this flight?

7   A.  Yes.

8   Q.  Is Jane on this flight?

9   A.  No.

10  Q.  Are there some other passengers on this flight?

11  A.  Yes.

12  Q.  Before we turn to the next page, just a question about Palm

13  Beach International Airport.  When you were flying out of that

14  airport, what, if any, local employees of Mr. Epstein's do you

15  remember driving passengers to the plane?

16  A.  Juan Alessi.

17  Q.  Who was Juan Alessi?

18  A.  He was the house manager for Jeffrey's house in Palm Beach.

19  Q.  And for about how long did Juan Alessi work for Mr. Epstein

20  in Palm Beach?

21  A.  Approximately 12 years.

22  Q.  And was that in the 1990s and early 2000s?

23  A.  Yes.

24          MR. EVERDELL:  Objection.  Leading.

25          THE COURT:  I'll allow it, but --

1          MS. COMEY:  Understood, your Honor.

2     Q.  Where would you see Mr. Alessi when you were flying out of

3     Palm Beach?

4     A.  He would drive the car up to the airplane with passengers

5     to either drop them off or to pick them up.

6     Q.  I want to go now, please, to page 48 of this same exhibit.

7     I would like to direct your attention to flight 979.

8     A.  Okay.

9     Q.  Can you tell us, please, the date of this flight.

10    A.  This is May the 9th, 1997.

11    Q.  Where are you getting May and '97 from?

12    A.  May is at the top of the column and '97 is just above it.

13    Q.  Where were you flying from and where were you flying to?

14    A.  From Teterboro, New Jersey, to Santa Fe, New Mexico.

15    Q.  When you flew to Santa Fe, New Mexico, what's your

16    understanding of where Jeffrey Epstein was staying?

17    A.  He stayed at his Zorro Ranch.

18    Q.  Is Jeffrey Epstein a passenger on this flight?

19    A.  Yes.

20    Q.  Is Ghislaine Maxwell a passenger on this flight?

21    A.  Yes.

22    Q.  Is Jane a passenger on this flight?

23    A.  Yes.

24    Q.  Is there anyone else who was a passenger on this flight?

25    A.  No.

LC8Cmax5                         Rodgers - direct

1    Q.  I'd like to go to the very next flight, please.  Would you

2    please walk us through the date of that flight.

3    A.  So May the 12th, 1997.

4    Q.  Where were you flying from and to?

5    A.  Santa Fe, New Mexico, to Van Nuys, California.

6    Q.  Who was the only passenger?

7    A.  Jeffrey Epstein.

8    Q.  I'd like to turn now, please, to page 55.  Flight 1105 down

9    at the bottom of the page.

10   A.  Okay.

11   Q.  Can you tell us the date of this flight, please.

12   A.  This is May the 3rd, 1998.

13   Q.  Where are you flying from and where are you flying to?

14   A.  Palm Beach, Florida, to Teterboro, New Jersey.

15   Q.  Is Jeffrey Epstein a passenger on this flight?

16   A.  Yes.

17   Q.  Is Ghislaine Maxwell a passenger on this flight?

18   A.  Yes.

19   Q.  Is Jane a passenger on this flight?

20          MR. EVERDELL:  Objection.

21          THE COURT:  Overruled.

22   A.  Yes.

23   Q.  Is it just her first name indicated on this flight log for

24   this entry?

25   A.  Yes.

LC8Cmax5                          Rodgers - direct

1   Q.  Are there a number of other passengers on this flight?

2   A.  Yes.

3   Q.  I'd like to go to the very next flight, please, 1106.

4   Would you walk us through the date of that flight, please.

5   A.  It's May the 5th, 1998.

6   Q.  Where are you flying from and to?

7   A.  Teterboro, New Jersey, to Bedford, Massachusetts.

8   Q.  And is Jeffrey Epstein a passenger on this flight?

9   A.  Yes.

10  Q.  Is there one other passenger on this flight?

11  A.  Yes.

12  Q.  I'd like to go now, please, back to page 40.  I'd like to

13  direct your attention to flight number 818.  Can you tell us

14  the date of this flight.

15  A.  This is March the 29th, 1996.

16  Q.  Where are you flying from and to?

17  A.  Van Nuys, California, to Santa Fe, New Mexico.

18  Q.  And who is the only passenger on this flight?

19  A.  Jeffrey Epstein.

20  Q.  What is the number of the very next flight after 818?

21  A.  821.

22  Q.  Why the skip from 818 to 821?

23  A.  I'm not on that flight.

24  Q.  So for flights 819 and 820, were you piloting those next

25  two flights?

LC8Cmax5                         Rodgers - direct

1    A.  No.

2    Q.  Let's go now to flight 821.  What's the date of that

3    flight?

4    A.  This is April the 8th, 1996.

5    Q.  Where are you flying from and to?

6    A.  Palm Beach, Florida, to Teterboro, New Jersey.

7    Q.  Is Jeffrey Epstein a passenger on this flight?

8    A.  Yes.

9    Q.  Is Ghislaine Maxwell a passenger on this flight?

10   A.  Yes.

11   Q.  Are there multiple other passengers on this flight?

12   A.  Yes.

13   Q.  Now let's go, please, to page 41.  I'll direct you to

14   flight 844 close to the bottom of the page, please.

15   A.  Okay.

16   Q.  What's the date of this flight?

17   A.  This is May 22nd, 1996.

18   Q.  Where are you flying from and where are you flying to?

19   A.  Teterboro, New Jersey, to Santa Fe, New Mexico.

20   Q.  Who are the only two passengers on this flight?

21   A.  Jeffrey Epstein, Ghislaine Maxwell.

22   Q.  What is the very next flight that date?

23   A.  The 24th of May 1996.

24   Q.  Where are you flying from and where are you flying to?

25   A.  Santa Fe, New Mexico, to Palm Beach, Florida.

LC8Cmax5                              Rodgers - direct

1   Q.  Who are the only two passengers on that flight?

2   A.  Jeffrey Epstein and Ghislaine Maxwell.

3   Q.  I'd like to go now, please, to page 48.  I'll direct you to

4   flight 976 up close to the top.

5   A.  Okay.

6   Q.  What is the date of this flight?

7   A.  This is May 5th, 1997.

8   Q.  Where were you flying from and to?

9   A.  From Geneva, Switzerland, to Paris, France.

10  Q.  And who is the only passenger on this flight?

11  A.  Jeffrey Epstein.

12  Q.  What was your understanding of where Jeffrey Epstein was

13  staying when you flew into Paris, France?

14  A.  He had an apartment in Paris, France.

15  Q.  And would you walk us through the very next flight, please,

16  starting with the date.

17  A.  May 6th, 1997.

18  Q.  Where are you flying from and to?

19  A.  Paris, France, to Stephenville, Canada.

20  Q.  Are the only two passengers on this flight, Jeffrey Epstein

21  and Ghislaine Maxwell?

22  A.  Yes.

23  Q.  I'd like to go now, please, to page 85.  I'm going to

24  direct you near the center of the page to flight 1.

25  A.  Okay.

LC8Cmax5                        Rodgers - direct

1  Q.  Why have the numbers restarted at 1?

2  A.  This is our first trip in the Boeing 727.

3  Q.  How do you know you're flying the Boeing?

4  A.  Because under the aircraft make and model, it says B727-31.

5  Q.  So why did you restart the numbers?

6  A.  Because we wanted to keep the numbering going for the Gulf

7  Stream, and so we began all over with the Boeing starting at

8  number 1.

9  Q.  Did you continue flying the Gulf Stream, though?

10 A.  Yes.

11 Q.  How did you handle the numbering for the Gulf Stream?

12 A.  In sequential order.  It continued on.

13 Q.  Let's turn to page 87, then, to take a look.  Here we have

14 a flight 24, and then what's the very next flight after flight

15 24?

16 A.  After 24 is 1538.

17 Q.  Why the big jump?

18 A.  Because we were in the Boeing on flight 24, and on 1538,

19 we're in the Gulf Stream.

20 Q.  How can you tell that?

21 A.  Because under the aircraft make and model, it has G1159B.

22 Q.  I'd like to go now, please, to page 78.  We'll look at

23 flight 1433.  What is the date of this flight?

24 A.  1433 is December the 11th, 2000.

25 Q.  How can you tell it's December 11, 2000?

LC8Cmax5                         Rodgers - direct

1   A.  Well, the first column has 11, and if we go up a few rows

2   higher, you're going to see December, D-E-C, and then at the

3   top of the page, you'll see 2000.

4   Q.  Where were you flying from and where were you flying to?

5   A.  Palm Beach, Florida, to Teterboro, New Jersey.

6   Q.  Was Jeffrey Epstein a passenger on this flight?

7   A.  Yes.

8   Q.  Was Ghislaine Maxwell a passenger on this flight?

9   A.  Yes.

10  Q.  And then were two other passengers on this flight?

11  A.  Yes.

12  Q.  Was one of them named Virginia?

13  A.  Yes.

14  Q.  Is that the name included in this entry for this flight,

15  just the first name?

16  A.  Yes, just the first name.

17  Q.  Who is Virginia?

18  A.  That was Virginia Roberts.

19  Q.  About when do you remember meeting Virginia Roberts?

20  A.  On that day.

21  Q.  In 2000?

22  A.  In 2000.

23  Q.  About how many times do you remember Virginia Roberts

24  flying on Jeffrey Epstein's private planes?

25  A.  32 times.

LC8Cmax5                              Rodgers - direct

1              MS. COMEY:  Ms. Drescher, would you please pull up

2      what's in evidence as Government Exhibit 113.

3      Q.  Mr. Rodgers, do you recognize the person in that

4      photograph?

5      A.  Yes, that's Virginia Roberts.

6              MS. COMEY:  We can take that down.  Thank you,

7      Ms. Drescher.

8      Q.  I'd like to go now, staying on page 78, down to flight

9      1434.  What's the date of this flight?

10     A.  This is December the 14th, 2000.

11     Q.  And again, we're in Government Exhibit 662.  Where were you

12     flying from and where were you flying to?

13     A.  Teterboro, New Jersey, to St. Thomas, U.S. Virgin Islands.

14     Q.  What does TIST stand for?

15     A.  That's the airport identifier for the St. Thomas airport.

16     Q.  When you flew Jeffrey Epstein to that airport, what was

17     your understanding of where he was staying?

18     A.  He owned an island that was nearby.

19     Q.  Was Jeffrey Epstein a passenger on this flight?

20     A.  Yes.

21     Q.  Was Ghislaine Maxwell a passenger on this flight?

22     A.  Yes.

23     Q.  Was Virginia Roberts a passenger on this flight?

24     A.  Yes.

25     Q.  Was there also one other passenger?

LC8Cmax5                        Rodgers - direct

1    A.  Yes.

2    Q.  Let's go to the very next page, please, page 79.  Looking

3    at flight 1444, what was the date of this flight?

4    A.  January the 26th, 2001.

5    Q.  Where were you flying from and where were you flying to?

6    A.  Teterboro, New Jersey, to Palm Beach, Florida.

7    Q.  Was Jeffrey Epstein a passenger on this flight?

8    A.  Yes.

9    Q.  Was Ghislaine Maxwell a passenger on this flight?

10   A.  Yes.

11   Q.  Was Virginia Roberts a passenger on this flight?

12   A.  Yes.

13   Q.  Was there also one other passenger?

14   A.  Yes.

15   Q.  And does this entry for this flight have Virginia Roberts'

16   full name?

17   A.  Yes.

18            MS. COMEY:  May I have a moment, your Honor?

19            THE COURT:  You may.

20            MS. COMEY:  Thank you.

21   Q.  Let's stay on this page now and go down to flight 1445.

22   What's the date of this flight?

23   A.  This is January the 29th of 2001.

24   Q.  Where are you flying from and where are you flying to?

25   A.  Palm Beach, Florida, to St. Thomas, U.S. Virgin Islands.

1    Q.  Is Jeffrey Epstein a passenger on this flight?

2    A.  Yes.

3    Q.  Is Ghislaine Maxwell a passenger on this flight?

4    A.  Yes.

5    Q.  Is Virginia Roberts a passenger on this flight?

6    A.  Yes.

7    Q.  Is her full name in this entry?

8    A.  Yes.

9    Q.  And is there one other passenger?

10   A.  Yes.

11   Q.  Let's go to the very next flight, please, 1446.  What's the

12   date of that?

13   A.  This is January the 30th, 2001.

14   Q.  Where were you flying from and where were you flying to?

15   A.  St. Thomas, U.S. Virgin Islands, to Palm Beach, Florida.

16   Q.  Was Jeffrey Epstein a passenger on this flight?

17   A.  Yes.

18   Q.  Was Ghislaine Maxwell a passenger on this flight?

19   A.  Yes.

20   Q.  Was Virginia Roberts a passenger on this flight?

21   A.  Yes.

22   Q.  Is her full name in this entry?

23   A.  Yes.

24   Q.  And was there another passenger on this flight?

25   A.  Yes.

1   Q.  Let's turn to the next page, please, page 80.  I'll direct

2   you to flight number 1464.  What was the date of this flight?

3   A.  March the 5th, 2001.

4   Q.  Where were you flying from and where were you flying to?

5   A.  Palm Beach, Florida, to Stephenville, Canada.

6   Q.  Was Jeffrey Epstein a passenger on this flight?

7   A.  Yes.

8   Q.  Was Ghislaine Maxwell a passenger on this flight?

9   A.  Yes.

10  Q.  Was Virginia Roberts a passenger on this flight?

11  A.  Yes.

12  Q.  Is her full name in this entry?

13  A.  Yes.

14  Q.  And was there another passenger on this flight?

15  A.  Yes.

16  Q.  Let's go to the very next flight, please.  What was the

17  date of that?

18  A.  This is March the 6th, 2001.

19  Q.  Are where are you flying from and where are you flying to?

20  A.  Stephenville, Canada, to Paris, France.

21  Q.  Was Jeffrey Epstein on this flight?

22  A.  Yes.

23  Q.  Was Ghislaine Maxwell on this flight?

24  A.  Yes.

25  Q.  Was Virginia Roberts on this flight?

LC8Cmax5                          Rodgers - direct

```
 1    A.  Yes.
 2    Q.  How did you indicate that Virginia Roberts was on that
 3    flight in this entry?
 4    A.  With her initials.
 5    Q.  Which are?
 6    A.  VR.
 7    Q.  And was there another person on this flight?
 8    A.  Yes.
 9    Q.  I'd like to go to the very next flight, please.  Would you
10    please tell us the date.
11    A.  This is March the 8th, 2001.
12    Q.  Where were you flying from and to?
13    A.  From Paris, France, to Granada, Spain.
14    Q.  Is Jeffrey Epstein a passenger on this flight?
15    A.  Yes.
16    Q.  Is Ghislaine Maxwell a passenger on this flight?
17    A.  Yes.
18    Q.  Is Virginia Roberts a passenger on this flight?
19    A.  Yes.
20    Q.  And are there multiple other passengers on this flight?
21    A.  Yes.
22    Q.  I'd like to go to the very next flight, please.  What's the
23    date?
24    A.  March the 8th, 2001.
25    Q.  Where are you flying from and to?
```

LC8Cmax5                              Rodgers - direct

```
 1   A.   Flying from Granada, Spain, to Tangiers, Morocco.
 2   Q.   Is Jeffrey Epstein a passenger on it this flight?
 3   A.   Yes.
 4   Q.   Is Ghislaine Maxwell a passenger on it flight?
 5   A.   Yes.
 6   Q.   Is Virginia Roberts a passenger on this flight?
 7   A.   Yes.
 8   Q.   Are there multiple other passengers?
 9   A.   Yes.
10   Q.   Let's go to the next flight.  What's the date?
11   A.   This is March 9th, 2001.
12   Q.   Where are you flying from and to?
13   A.   Tangier, Morocco, to Luton, England.
14   Q.   Is Jeffrey Epstein a passenger on this flight?
15   A.   Yes.
16   Q.   Is Ghislaine Maxwell a passenger on this flight?
17   A.   Yes.
18   Q.   Is Virginia Roberts on this flight?
19   A.   Yes.
20   Q.   And is there one other passenger?
21   A.   Yes.
22   Q.   Let's go to the very next flight, what's the date of that
23   flight?
24   A.   March the 11th, 2001.
25   Q.   Where are you flying from and to?
```

LC8Cmax5                          Rodgers - direct

```
 1   A.  Luton, England, to Bangor, Maine.

 2   Q.  Is Jeffrey Epstein a passenger on this flight?

 3   A.  Yes.

 4   Q.  Is Ghislaine Maxwell a passenger on this flight?

 5   A.  Yes.

 6   Q.  Is Virginia Roberts a passenger on this flight?

 7   A.  Yes.

 8   Q.  And is there one other passenger?

 9   A.  Yes.

10   Q.  Let's go to the very next flight on this page, please.

11   A.  That's March the 11th, 2001.

12   Q.  Where are you flying from and to?

13   A.  Bangor, Maine, to Teterboro, New Jersey.

14   Q.  Is Jeffrey Epstein a passenger on this flight?

15   A.  Yes.

16   Q.  Is Ghislaine Maxwell a passenger on this flight?

17   A.  Yes.

18   Q.  Is Virginia Roberts a passenger on this flight?

19   A.  Yes.

20   Q.  And is there one other passenger on this flight?

21   A.  Yes.

22   Q.  Before we leave this page, up at entry 1466, the March 8th,

23   2001, is there an entry for one female?

24   A.  Yes.

25   Q.  What does that mean?
```

LC8Cmax5                        Rodgers - direct

1   A.  There was one female on board that we didn't know her name.

2   Q.  Let's go to the next page, please, page 81.  I'd like to go

3   to flight 1478.  What's the date of this flight?

4   A.  This is March the 27th, 2001.

5   Q.  Where were you flying from and to?

6   A.  Palm Beach, Florida, to Teterboro, New Jersey.

7   Q.  Is Jeffrey Epstein a passenger on this flight?

8   A.  Yes.

9   Q.  Is Ghislaine Maxwell a passenger on this flight?

10  A.  Yes.

11  Q.  Is Virginia Roberts a passenger on this flight?

12  A.  Yes.

13  Q.  And are there multiple other passengers on this flight?

14  A.  Yes.

15  Q.  There is an entry that says two females.  What does that

16  mean?

17  A.  There were two females on board that we didn't know their

18  names.

19  Q.  Let's go to the very next flight, please.  Would you tell

20  us the date?

21  A.  This is March the 29th, 2001.

22  Q.  Where are you flying from and to?

23  A.  Teterboro, New Jersey, to Santa Fe, New Mexico.

24  Q.  Is Jeffrey Epstein a passenger on this flight?

25  A.  Yes.

LC8Cmax5                          Rodgers - direct

1   Q.  Is Ghislaine Maxwell a passenger on this flight?

2   A.  Yes.

3   Q.  Is Virginia Roberts a passenger on this flight?

4   A.  Yes.

5   Q.  And are there other multiple passengers on this flight?

6   A.  Yes.

7   Q.  Let's go to the very next entry, please.  Would you tell us

8   the date?

9   A.  March 31st, 2001.

10  Q.  Where are you flying from and to?

11  A.  Santa Fe, New Mexico, to Palm Beach, Florida.

12  Q.  Is Jeffrey Epstein a passenger on this flight?

13  A.  Yes.

14  Q.  Is Ghislaine Maxwell a passenger on this flight?

15  A.  Yes.

16  Q.  Is Virginia Roberts a passenger on this flight?

17  A.  Yes.

18  Q.  Is Jane a passenger on this flight?

19  A.  Yes.

20  Q.  And is her full name included in this entry?

21  A.  Yes.

22  Q.  And are there other passengers on this flight?

23  A.  Yes.

24  Q.  Let's go now to page 82, please.  Up at the top or close to

25  the top, I'd like to do entry 1488, please.  Would you tell us

LC8Cmax5                         Rodgers - direct

1    the date of that flight?

2    A.  April the 9th, 2001.

3    Q.  Where are you flying from and to?

4    A.  Palm Beach, Florida, to Atlantic City, New Jersey.

5    Q.  Is Jeffrey Epstein a passenger on this flight?

6    A.  Yes.

7    Q.  And is Virginia Roberts a passenger on this flight?

8    A.  Yes.

9    Q.  Are there other passengers on this flight, as well?

10   A.  Yes.

11   Q.  Let's go to the next flight.  What's the date of that

12   flight?

13   A.  April 9th, 2001.

14   Q.  Where are you flying from and to?

15   A.  Atlantic City, New Jersey, to Teterboro, New Jersey.

16   Q.  Is Jeffrey Epstein a passenger on this flight?

17   A.  Yes.

18   Q.  Is Virginia Roberts a passenger on this flight?

19   A.  Yes.

20   Q.  And are there multiple other passengers?

21   A.  Yes.

22   Q.  Let's go to the very next flight, please.  What's the date?

23   A.  This is April the 11th, 2001.

24   Q.  Where are you flying from and to?

25   A.  Teterboro, New Jersey, to St. Thomas, U.S. Virgin Islands.

LC8Cmax5                          Rodgers – direct

1    Q.   Is Jeffrey Epstein a passenger on this flight?

2    A.   Yes.

3    Q.   Is Ghislaine Maxwell a passenger on this flight?

4    A.   Yes.

5    Q.   And is Virginia Roberts a passenger on this flight?

6    A.   Yes.

7    Q.   Are there multiple other passengers?

8    A.   Yes.

9    Q.   Let's go to the very next flight, please.  What's the date?

10   A.   It's April the 16th, 2001.

11   Q.   Where are you flying from and to?

12   A.   St. Thomas, U.S. Virgin Islands, to Palm Beach, Florida.

13   Q.   Is Jeffrey Epstein a passenger on this flight?

14   A.   Yes.

15   Q.   Is Ghislaine Maxwell a passenger on this flight?

16   A.   Yes.

17   Q.   Is Virginia Roberts a passenger on this flight?

18   A.   Yes.

19   Q.   And are there multiple other passengers on this flight?

20   A.   Yes.

21   Q.   I'd like to jump down on this page now, please, to flight

22   1501 near the bottom.  What's the date of that flight?

23   A.   This is May the 3rd, 2001.

24   Q.   Where are you flying from and to?

25   A.   From Addison, Texas, to San Antonio, Texas.

LC8Cmax5                           Rodgers - direct

1   Q.  Is Jeffrey Epstein a passenger on this flight?

2   A.  Yes.

3   Q.  Is Virginia Roberts a passenger on this flight?

4   A.  Yes.

5   Q.  Are there any other passengers on this flight?

6   A.  No.

7   Q.  Let's go to the very next flight, please.  What's the date?

8   A.  May the 5th, 2001.

9   Q.  Where are you flying from and to?

10  A.  San Antonio, Texas, to Palm Beach, Florida.

11  Q.  Who are the only two passengers on this flight?

12  A.  Jeffrey Epstein and Virginia Roberts.

13  Q.  Let's go to the next page, please, down to flight 1506 near

14  the middle of the page.  Would you tell us the date of this

15  flight, please?

16  A.  This is May the 14th, 2001.

17  Q.  Where are you flying from and to?

18  A.  St. Thomas, U.S. Virgin Islands, to Teterboro, New Jersey.

19  Q.  Is Jeffrey Epstein a passenger on this flight?

20  A.  Yes.

21  Q.  Is Ghislaine Maxwell a passenger on this flight?

22  A.  Yes.

23  Q.  Is Virginia Roberts a passenger on this flight?

24  A.  Yes.

25  Q.  Are there multiple other passengers?

LC8Cmax5                          Rodgers - direct

1    A.  Yes.

2    Q.  And is one of those entries one female?

3    A.  Yes.

4    Q.  What does that mean?

5    A.  There was a female on board that we don't know their name.

6    Q.  Let's turn to the next page, please, page 84.  I'd like to

7    look at flight 1510.  Would you please tell us the date of that

8    flight.

9    A.  This is June the 3rd, 2001.

10   Q.  Where are you flying from and to?

11   A.  Palm Beach, Florida, to St. Thomas U.S. Virgin Islands.

12   Q.  Is Jeffrey Epstein a passenger on this flight?

13   A.  Yes.

14   Q.  Is Virginia Roberts a passenger on this flight?

15   A.  Yes.

16   Q.  And is there another passenger on this flight?

17   A.  Yes.

18   Q.  Let's go now to the very next flight.  Would you tell us

19   the date.

20   A.  This is June the 5th, 2001.

21   Q.  Where are you flying from and to?

22   A.  St. Thomas, U.S. Virgin Islands, to Teterboro, New Jersey.

23   Q.  Is Jeffrey Epstein a passenger on this flight?

24   A.  Yes.

25   Q.  Is Virginia Roberts a passenger on this flight?

LC8Cmax5                        Rodgers - direct

1   A.  Yes.

2   Q.  And is there one other passenger on this flight?

3   A.  Yes.

4   Q.  Let's go down to flight 1525, please, down at the bottom of

5   this same page.  What is the date of this flight?

6   A.  This is July the 8th, 2001.

7   Q.  Where are you flying from and to?

8   A.  Palm Beach, Florida, to Teterboro, New Jersey.

9   Q.  Is Jeffrey Epstein a passenger on this flight?

10  A.  Yes.

11  Q.  Is Ghislaine Maxwell a passenger on this flight?

12  A.  Yes.

13  Q.  Is Virginia Roberts a passenger on this flight?

14  A.  Yes.

15  Q.  And are there multiple other passengers on this flight?

16  A.  Yes.

17  Q.  Let's go to the very next flight, please.  What's the date?

18  A.  It's July the 11th, 2001.

19  Q.  Where are you flying from and to?

20  A.  Teterboro, New Jersey, to Cahokia, Illinois.

21  Q.  Is Jeffrey Epstein a passenger on this flight?

22  A.  Yes.

23  Q.  Is Ghislaine Maxwell a passenger on this flight?

24  A.  Yes.

25  Q.  Is Virginia Roberts a passenger on this flight?

LC8Cmax5                         Rodgers - direct

1   A.  Yes.

2   Q.  And is there one other passenger on this flight?

3   A.  Yes.

4   Q.  I'd like to go to the next page, please.  Let's go to

5   flight 1528.  What's the date of that flight?

6   A.  This is July the 16th, 2001.

7   Q.  Where are you flying from and to?

8   A.  Santa Fe, New Mexico, to Teterboro, New Jersey.

9   Q.  Is Jeffrey Epstein a passenger on this flight?

10  A.  Yes.

11  Q.  Ghislaine Maxwell a passenger on this flight?

12  A.  Yes.

13  Q.  Is Virginia Roberts a passenger on this flight?

14  A.  Yes.

15  Q.  Is there one other passenger on this flight?

16  A.  Yes.

17  Q.  Finally, let's go, please, to flight 1531 on the same page.

18  What's the date?

19  A.  July the 28th, 2001.

20  Q.  Where are you flying from and to?

21  A.  St. Thomas, U.S. Virgin Islands, to Palm Beach, Florida.

22  Q.  Who are the only two passengers on this flight?

23  A.  Jeffrey Epstein, Virginia Roberts.

24          MS. COMEY:  May I have a moment, your Honor?

25          THE COURT:  You may.

LC8Cmax5                          Rodgers – direct

1              MS. COMEY:  Your Honor, at this time, I would ask that
2       the jurors please be directed to turn to Government Exhibit 14.
3              THE COURT:  Mr. Everdell, GX14.
4              MS. COMEY:  Which is in evidence.
5              MR. EVERDELL:  One moment, your Honor.
6              THE COURT:  Just a second, members of the jury.
7              MR. EVERDELL:  No objection.
8              THE COURT:  You may turn in the large binder to GX14,
9       please.
10             MS. COMEY:  I would just ask that the jurors direct
11      their attention to the child's name entry, and then the date of
12      birth entry.
13             THE COURT:  Okay.
14             MS. COMEY:  No further questions, your Honor.
15             THE COURT:  Thank you.  Mr. Everdell.
16             MR. EVERDELL:  Your Honor, I have a binder for the
17      witness and for the Court.
18             THE COURT:  Okay.
19             (Continued on next page)
20
21
22
23
24
25

1           MR. EVERDELL:  May I inquire, your Honor?

2           THE COURT:  You may, Mr. Everdell.

3    CROSS-EXAMINATION

4    BY MR. EVERDELL:

5    Q.  Good afternoon, Mr. Rodgers.

6    A.  Good afternoon.

7    Q.  Mr. Rodgers, you testified that you started working as a

8    pilot for Jeffrey Epstein about 1991; is that right?

9    A.  Yes.

10   Q.  And when you were hired, you then hired your friend who I

11   think you'd been working with, Larry Visoski?

12   A.  Yes.

13   Q.  Okay.  So you started together roughly?

14   A.  Yes.

15   Q.  And when you started in '91, you were the chief pilot and

16   Larry Visoski was the co-captain?

17   A.  Yes.

18   Q.  And you continued -- sorry, that changed, I think, in

19   about, what was it, 2004-ish?

20   A.  2004, end of 2004.

21   Q.  Okay.  And at that point, Larry Visoski became the chief

22   pilot and you became the co-captain, is that right?

23   A.  Correct.

24   Q.  And you continued to work for Mr. Epstein as his co-captain

25   until 2019?

LC8VMAX6                        Rodgers - cross

1   A.  Correct.  Yes.

2   Q.  So you were a pilot for Jeffrey Epstein for almost 30

3   years, right?

4   A.  Twenty-eight for him.

5   Q.  Twenty-eight.

6   A.  Right.

7   Q.  And in that time, you flew a number of different planes for

8   him, right?

9   A.  Yes.

10  Q.  You mentioned the Hawker Siddeley, right?

11  A.  Correct.

12  Q.  And I think Mr. Epstein had that from roughly 1991 to '94;

13  is that right?

14  A.  That's correct.  End of '94.  December of '94 we got rid of

15  it.

16  Q.  He sold it in the end of '94?  He sold it in the end of

17  1994?

18  A.  Yes, December of '94 it was sold.

19  Q.  Okay.  And at that point he replaced the Hawker with a

20  Gulfstream 2B, is that right?

21  A.  That's correct.

22  Q.  So that was roughly December of '94 when he got the

23  Gulfstream?

24  A.  No, we purchased the Gulfstream on February 2nd, 1994.

25  Q.  Oh, I see.

LC8VMAX6                        Rodgers – cross

1            So there was a bit of an overlap between the Hawker
2       and the Gulfstream?
3       A.   Yes.  But we didn't start flying the Gulfstream until
4       August of that year, because we had it in for paint and
5       interior, so there was a lot of work to do to the aircraft.
6       Q.   Understood.
7            And you mentioned that he also at some point later
8       bought a Boeing 727, right?
9       A.   Yes.
10      Q.   That's a big aircraft, right?
11      A.   That's a big aircraft.
12      Q.   That's like a jetliner, right?
13      A.   It is.
14      Q.   And he bought that sometime around 2001; is that right?
15      A.   Yes, in January of 2001.
16      Q.   Okay.  And I think you mentioned there were some other
17      planes you flew as well.  There was a smaller Cessna, for
18      example?
19      A.   There was a smaller Cessna that we had.
20      Q.   Okay.  And was that mainly for flights to the ranch?
21      A.   We used it at the ranch, yes, a little bit, yes.
22      Q.   There was a landing --
23      A.   It wasn't the only mission, but it was in Palm Beach,
24      Florida a lot also.  It sort of varied between Palm Beach and
25      the ranch, and I think one time it may have gone to St. Thomas.

LC8VMAX6                          Rodgers - cross

1    Q.   Sure.  Okay.

2          But from about 1994, after he sold the Hawker, through

3    about 2001, when he bought the Boeing, you flew primarily the

4    Gulfstream 2B?

5    A.   That's correct.

6    Q.   Okay.  And then from 2001 up through the mid 2000s, let's

7    call it 2004 for convenience, you were flying primarily both

8    the Gulfstream and the Boeing?

9    A.   Yes.  We flew the Boeing more, but -- but we did fly both

10   of them.

11   Q.   Okay.  So during that same time period, from 1994 to 2004,

12   you flew numerous flights for Mr. Epstein?

13   A.   Yes.

14   Q.   We saw on your flight log that we just looked, at the

15   flights for even one aircraft numbered in the thousands, isn't

16   that right?

17   A.   Correct.

18   Q.   Fair to say you flew over 1,000 flights, well over 1,000

19   flights for Mr. Epstein?

20   A.   Yes.

21   Q.   And Mr. Epstein would frequently have other passengers on

22   these flights, right?

23   A.   Yes.

24   Q.   And many of these passengers were female; correct?

25   A.   Yes.

LC8VMAX6                     Rodgers - cross

1  Q.  Now, when the flights were getting ready to taxi and take

2  off, you were usually in the cockpit, right, getting the flight

3  ready?

4  A.  That's correct.

5  Q.  And you would be in the cockpit generally when the

6  passengers arrived in the plane, right?

7  A.  Say that again.

8  Q.  You would usually be up in the cockpit getting the plane

9  ready when the passengers arrived for their flights?

10  A.  One pilot would usually be in the cockpit, and one would be

11  in the baggage compartment loading luggage.

12  Q.  Okay.  Well, so if you were in the baggage compartment

13  loading luggage, you'd have the chance to see some of the

14  passengers, right?

15  A.  Yes.

16  Q.  You might not greet them or meet them, but you'd see them

17  with your eyes?

18  A.  Correct.

19  Q.  Okay.  And even if you were in the cockpit, if you were the

20  pilot that was in the cockpit, the door sometimes was open

21  during the pre-flight preparations?

22  A.  Yes, the door is going to be open until the pilot in the

23  back gets through loading the luggage, walks through the

24  compartment, and then the door would be closed.

25  Q.  And that's generally the time when the passengers are going

LC8VMAX6                        Rodgers - cross

1    to be entering the plane, right?

2    A.  No, the passengers are already on the plane.

3    Q.  Sorry.  Let me be clear.

4          Until the time when the luggage compartment is fully

5    loaded, I think you testified that the cockpit door is usually

6    open?

7    A.  Yeah, it's open.

8    Q.  So if you're in the cockpit at that time, you can look into

9    the passenger section?

10   A.  Yeah.

11   Q.  And you can see the passengers boarding the plane if you're

12   looking in that direction?

13   A.  You could.

14   Q.  Okay.  And you did that on occasion, right?

15   A.  It's possible, yeah.

16   Q.  I think there were also times when Mr. Epstein would

17   introduce some of the passengers to you?

18   A.  He would sometimes.

19   Q.  Okay.  Maybe if there was a special guest, he might come

20   introduce them to you in the cockpit so they could see the

21   cockpit?

22   A.  That's correct.

23   Q.  Okay.  And you might have some chitchat with them there,

24   right?

25   A.  Yes.

LC8VMAX6                         Rodgers - cross

1    Q.  All right.

2             And there were also times too when the plane and the

3    passengers had to clear customs, and the pilots and the

4    passengers had to exit the plane, right?

5    A.  That's correct.

6    Q.  That would happen on international flights, for example?

7    A.  Yes.

8    Q.  It would also happen when you're leaving St. Thomas too,

9    right?

10   A.  Yes, when we -- it would depend.  If we were pre-clearing

11   customs at St. Thomas, yes, we would taxi over to the customs

12   area, have to take everything off the airplane and clear

13   customs there.

14   Q.  Because even though that's the U.S. Virgin Islands, it's

15   part of the United States, there is a customs clearance you

16   have to do when departing St. Thomas, right?

17   A.  That's correct.  You could pre-clear.  And then if you

18   pre-clear there, we don't have to see customs wherever we're

19   going.  However, if we don't pre-clear there, then we have to

20   see customs when we land in the United States.

21   Q.  Fair enough.

22             But I guess my point is at any time when you're

23   clearing customs and you've exited the plane with the

24   passengers, you have the chance to see them there too?

25   A.  Oh, sure.

LC8VMAX6                      Rodgers - cross

1   Q.   Right?

2   A.   Sure.

3   Q.   Okay.  Now, so I think there were several ways you could

4   have seen some of the passengers on the flights?

5   A.   Yes.

6   Q.   And over the years, I think you said you saw a lot of

7   female passengers on Epstein's planes, right?

8   A.   Yes.

9   Q.   And you saw lots of women who were in their early twenties;

10  correct?

11  A.   Yes.

12  Q.   But you never saw a female passenger who you thought was

13  under the age of 18, did you?

14  A.   No.

15  Q.   In fact, you never saw any female on any of the planes who

16  looked younger to you than 19 or 20; is that right?

17  A.   Let me back up and say that there were -- there could have

18  been some females under 18, but they were with their parents.

19  Q.   Fair enough.

20        Occasionally, you'd have younger females traveling

21  with their parents, right?

22  A.   Yes.

23  Q.   Or maybe they were traveling with a nanny?

24  A.   Yes.

25  Q.   But apart from those instances where a younger female is

LC8VMAX6                        Rodgers - cross

1    traveling with their parents or a nanny, you didn't see any

2    females on the plane under the age of, say, 18 or 19?

3    A.  No.

4    Q.  So fair to say in the thousand-plus flights that you flew

5    for Epstein from '94 to 2004, you never once saw any female on

6    the plane who looked under the age of 18 or 19, right?

7    A.  No.

8    Q.  And, in fact, in the many flights you piloted after 2004,

9    you never once saw any female on the planes who looked under

10   the age of 18 or 19, apart from the ones traveling with their

11   family?

12           MS. COMEY:  Objection, your Honor.

13           THE COURT:  Just a moment.

14           Overruled.

15   A.  That's correct.

16   Q.  Okay.  And that includes, doesn't it, the woman that you

17   referred to or that we have been referring to as "Jane" in your

18   direct exam; correct?

19   A.  Correct.

20   Q.  And you do recall meeting Jane, right?

21   A.  Yes.

22   Q.  I think your recollection, isn't it, was that she appeared

23   to you to be at least 18 years old when you met her?

24   A.  It did.

25   Q.  And it also includes the woman we've been talking about,

LC8VMAX6                      Rodgers - cross

1    Virginia Roberts, right?

2    A.   Yes.

3    Q.   She was mentioned in your direct testimony?

4    A.   Correct.

5    Q.   And your recollection was that Virginia Roberts appeared to

6    be at least 18 or 19 when you saw her on the plane, right?

7    A.   Yes.

8    Q.   All right.  Now, I know you don't know exactly how old they

9    were, right, you weren't checking their IDs?

10   A.   Correct.

11   Q.   But when you saw those two people, Jane and Virginia

12   Roberts, you believed that they looked 18 or over when you met

13   them, right?

14   A.   I did.

15   Q.   So, Mr. Rodgers, related question or, I guess, a separate

16   question:  In those more than 1,000 flights that you flew for

17   Mr. Epstein during that time period of '94 to 2004, you also

18   never saw any kind of sexual activity occurring on the planes,

19   isn't that right?

20   A.   That is correct.

21   Q.   You never saw anyone engaging in sex acts with underage

22   girls, for example, did you?

23   A.   That's correct, I did not.

24   Q.   In fact, you never saw anyone engaging in sex acts with any

25   of the women on the flights, period, right?

LC8VMAX6                       Rodgers - cross

1    A.  No.

2    Q.  All right.  Now, you did testify that when you flew the

3    planes, both the Gulfstream and the Boeing, the cockpit doors

4    were closed?

5    A.  Correct.

6    Q.  And so if they are closed, you can't necessarily see what's

7    happening in the passenger section of the plane; is that right?

8    A.  That's right.

9    Q.  Okay.  But you were never instructed by Jeffrey Epstein or

10   anyone else, for that matter, that you were not allowed to ever

11   leave the cockpit during flight, were you?

12   A.  No.

13   Q.  He never told you, for example, You have to stay in the

14   cockpit; you cannot leave, David Rodgers?

15   A.  No, he never said that.

16   Q.  Okay.  And he never told you and nor did anybody else that

17   you could never mingle with the passengers on the flight, did

18   he?

19   A.  That he could never what?

20   Q.  That you could never mingle or meet the passengers on the

21   flight?

22   A.  No.

23           THE COURT:  If we could just make sure the question

24   finishes before the answers.

25           MR. EVERDELL:  I'm sorry.

1          THE COURT:  Thank you.

2          MR. EVERDELL:  Yes, I'll try to be clearer too when I

3   end my question.

4   Q.  You were never told you couldn't mingle with the other

5   passengers?

6   A.  No, never told that.

7   Q.  All right.  In fact, you weren't given any rules whatsoever

8   about what you could and couldn't do with the passengers,

9   right?

10  A.  That is correct.

11  Q.  And you were never given any rules whatsoever about how you

12  could interact with the other pilots and the other staff of

13  Mr. Epstein, isn't that right?

14  A.  That is correct.

15  Q.  Now, you did, every once in a while on some of these

16  flights, leave the cockpit to go to the rest room, right?

17  A.  Very few.

18  Q.  Very few.

19  A.  Usually they were Atlantic crossings going to Europe.

20  Q.  I see.

21          Well, if you did, then on the -- as I you understand

22  it, on the Gulfstream, the bathroom is all the way in the back

23  of the plane, right?

24  A.  That's correct.

25  Q.  So if you wanted to use the rest room, you'd have to leave

1  the cockpit and walk all the way through the plane to get to

2  the rest room in the back of the plane, right?

3  A.  Right.

4  Q.  And on the occasions when you did use the rest room on the

5  Gulfstream, you never saw anything of a sexual nature going on

6  in the passenger cabin, right?

7  A.  No, I did not.

8  Q.  Okay.  Did you ever leave the cabin -- or, sorry, the

9  cockpit to get coffee?

10 A.  No, we had our own coffee up in that area that we could

11 make.

12 Q.  That was on the Gulfstream, I think, right?

13 A.  Correct.

14 Q.  But on the Boeing, there was a galley kitchen in the middle

15 of the plane, right?

16 A.  There was.  But also we had our own coffeemaker up front in

17 the Boeing.  But, yes, there was one in the galley.

18 Q.  Did you ever go get coffee from the galley kitchen in the

19 middle of the plane?

20 A.  Not that I recall.

21 Q.  Okay.  All right.

22        Well, let me ask you this question:  After a flight

23 lands on either the Gulfstream or the Boeing, it's generally

24 the pilot's responsibility to help straighten up the cabin

25 after flight; is that right?

LC8VMAX6                        Rodgers - cross

1   A.   That is correct.

2   Q.   Okay.  And when you did that, you never saw anything in any

3   of these cabins like clothes all about the cabin, right?

4   A.   No.

5   Q.   You never saw any sex toys in the cabin; correct?

6   A.   No.

7   Q.   You never saw anything like used condoms?

8   A.   No.

9   Q.   So you never saw anything that gave you the impression that

10  any kind of sexual activity was occurring on the flights during

11  the in-flight portion of the flight where you couldn't see

12  anything?

13  A.   That is correct, I did not.

14  Q.   And sitting here today, based on what you observed, you

15  have no reason to believe that Epstein or anyone else was

16  engaging in sexual activity with underage girls or any women,

17  for that matter, on the flights you piloted, isn't that right?

18  A.   That's correct.

19  Q.   Okay.  Now, I want to ask you some questions about how the

20  flights were scheduled and set up.  Okay?

21  A.   Okay.

22  Q.   I think you were asked a few questions about this on your

23  direct exam, right?

24          So before a flight was scheduled, you and Larry

25  Visoski would need to be alerted ahead of time that Epstein

LC8VMAX6                    Rodgers - cross

1   needed to fly somewhere, right?

2   A.  Yes.

3   Q.  And you'd usually get about a few days' notice, maybe a

4   day's notice, if it's short notice; is that right?

5   A.  Correct.

6   Q.  And there were several different people who would speak to

7   you about scheduling flights, right?

8   A.  Yes.

9   Q.  I think you mentioned on your direct that you would

10  occasionally speak to Mr. Epstein himself to schedule flights

11  or he would let you know a flight was happening, right?

12  A.  Yes, he would let us know.

13  Q.  If he was leaving the plane on one particular time and he

14  knew he was going to go somewhere, say, in a day or two, he

15  would mention to you we're going to fly to so-and-so

16  destination two days from now?

17  A.  That is correct.

18  Q.  And you said you would occasionally speak to Ghislaine as

19  well about flights, right?

20  A.  Yes.

21  Q.  But during the time period of the 1990s, it was usually the

22  case that you were speaking to Epstein's secretary in New York

23  about scheduling flights, isn't that right?

24  A.  Yes, more often than not.

25  Q.  And in the '90s, I think you mentioned you didn't have a

LC8VMAX6                      Rodgers - cross

```
 1   cell phone, right?
 2   A.  Early '90s we did not.
 3   Q.  Before the days of cell phones.
 4   A.  Right.
 5   Q.  Because we're talking 20 years ago at this point, right?
 6   A.  Yeah, when we first were there, we had beepers.
 7   Q.  Okay.
 8   A.  And cell phones -- I'm guessing it was late '90s before we
 9   had cell phones.
10   Q.  Right.  So early '90s was before anybody really carried a
11   cell phone as a matter of course?
12   A.  Yeah.
13   Q.  So you did have beepers though?
14   A.  Yes.
15   Q.  If there was a flight needed to be scheduled, typically you
16   and Larry Visoski would get a page on your beeper, right?
17   A.  Correct.
18   Q.  You would call back Epstein's office usually, right?
19   A.  Yes.
20   Q.  Because more often than not, that's where the call was
21   coming from?
22   A.  Right.
23   Q.  And you would speak to Epstein's secretary or his assistant
24   about the flight, right?
25   A.  Correct.
```

1    Q.  Now, on the occasions that you did speak to Ghislaine about

2    scheduling a flight, that was because she was going to be

3    traveling on that flight; isn't that right?

4    A.  Yes.

5    Q.  Okay.  So if she wasn't traveling on the flight, you

6    typically would coordinate with someone else, right?

7    A.  That's correct.

8    Q.  One of Epstein's secretaries or something like that?

9    A.  Correct.

10   Q.  Okay.  So that was the 1990s I think we were just

11   discussing; correct?

12   A.  Correct.

13   Q.  I want to fast forward to the 2000s.  Okay.

14          In the 2000s, you spoke to some different people about

15   scheduling flights, isn't that right?

16   A.  Yes.  He had a different secretary.  Yes, it would be

17   different people, but the same position.

18   Q.  Right.  Same position, but different people started filling

19   these positions, right?

20   A.  Yes.

21   Q.  Do you recall a person named Lesley Groff?

22   A.  Say again?

23   Q.  Do you recall someone named Lesley Groff?

24   A.  Yes.

25   Q.  Okay.  She was Epstein's secretary in the 2000s, right?

LC8VMAX6                          Rodgers - cross

1    A.  Yes.

2    Q.  And do you recall speaking to her about scheduling flights

3    on occasion?

4    A.  Yes.

5    Q.  But I think the person you spoke to most often about

6    scheduling flights in the 2000s was Sarah Kellen, isn't that

7    right?

8    A.  For me, not that much.

9    Q.  Okay.  Well, did you speak to Sarah Kellen about scheduling

10   flights?

11   A.  I'm sure we have; but at that point in time, Larry -- she's

12   probably directing everything to Larry instead of me.

13   Q.  So let's make a distinction here.  It's because the call

14   would be handled by Larry at that point as chief pilot, not

15   yourself?

16   A.  That's correct.

17   Q.  I see.  Okay.

18          But you do recall meeting someone named Sarah Kellen

19   around the early 2000s, right?

20   A.  Yes.

21   Q.  And I think the first time you recall meeting Sarah Kellen

22   was sometime in late 2001; is that right?

23   A.  That's correct, September 2001.

24   Q.  Right.  I think September of 2001, if we looked at your

25   flight logs, is the first time she appears on one of your

LC8VMAX6                          Rodgers - cross

1   flights, right?

2   A.  Yes.

3   Q.  Okay.  Now, I think it's true that Sarah Kellen started

4   filling the role of one of Epstein's assistants at that time,

5   isn't that right?

6   A.  I feel like Sarah was more of Ghislaine's assistant, but

7   actually she was probably both.

8   Q.  Well, I think you said that she may have started as

9   Ghislaine's assistant, but at some point she became Epstein's

10  assistant?

11  A.  That's true.  That's true.

12  Q.  In fact, I think you actually said at one point that you

13  considered her to be Epstein's primary assistant as of late

14  2001, isn't that right?

15  A.  2001, that who was, Sarah?

16  Q.  Sarah is the question.  That you considered Sarah Kellen to

17  be Epstein's primary assistant as of late 2001?

18  A.  I am not sure if she was primary or not at that point.

19  Q.  Let me see if I can show you something that may refresh

20  your recollection.

21  A.  Okay.

22  Q.  I put a binder by your feet.  If you could pick that up,

23  sir.  And I want you to turn to tab number 4.  And this is

24  going to be document 3523-004 at page 2.

25              MR. EVERDELL:  And if we can maybe put that on the

LC8VMAX6                        Rodgers - cross

1   screen for just the Court, the deputy, and that's it.  I think

2   the government has their copy.

3           THE COURT:  I have it on paper.

4   Q.  So, Mr. Rodgers, if you just take a look at that.  I'm

5   going to direct your attention specifically to the second full

6   paragraph.  It's towards the end, but why don't you read that

7   whole paragraph.  It's right in the middle of the page.

8           THE COURT:  Read to himself.

9   Q.  Yes, read to yourself.  I'm sorry.

10  A.  Okay.

11  Q.  Mr. Rodgers, I'll ask you, does reading that refresh your

12  recollection that it was your impression that Sarah Kellen took

13  over as Epstein's primary assistant in the late 2000s -- sorry,

14  in late 2001?

15  A.  I didn't see Sarah's name mentioned in here.

16  Q.  Are you referring to 35 -- it's tab 4.

17          THE COURT:  I think -- it wasn't clear what page you

18  were directing to.

19  Q.  I'm sorry.  I direct you to page 2 of 3, if that wasn't

20  clear, sir.

21  A.  I didn't hear that.  Page 2?

22  Q.  I'm sorry, why don't we try this again.

23          If you could refer to page 2.

24  A.  Okay.

25  Q.  It's the second full paragraph.  Just read that paragraph.

LC8VMAX6                      Rodgers - cross

 1   A.  I see it.

 2         According to this, it's been a long time ago.

 3   Q.  Well, it is, sir, yes.

 4   A.  I stand corrected.

 5   Q.  Does that refresh your recollection that it was your

 6   impression that Sarah Kellen took over as Epstein's primary

 7   assistant in late 2001?

 8   A.  Yes.

 9   Q.  Okay.  Thank you.

10         You can put that away for now, Mr. Rodgers.

11   A.  Okay.

12   Q.  So, I'm sorry, I'll wait till you're ready.

13   A.  Yeah, sure.

14   Q.  Okay.  So then in the 2000s, starting in late 2001, I guess

15   Larry Visoski would often speak to Sarah Kellen about

16   scheduling flights; correct?

17   A.  Yes.

18   Q.  She was the one who would arrange the flight departures

19   generally?

20   A.  Sarah?

21   Q.  Sarah.

22   A.  Yes.

23   Q.  And she was the one who arranged the luggage transfers

24   back -- to and from the residences in your houses?

25   A.  Yes, most likely.

LC8VMAX6                        Rodgers - cross

1    Q.  And she was the one who arranged for a driver to pick you

2    up at the airport?

3    A.  No, we had our own.  We would take care of our own

4    transportation, for the pilots we did.

5    Q.  I see.  Okay.

6            And by that point in the 2000s, you and Mr. Visoski

7    had cell phones, right?  Had cell phones at that point, not

8    beepers?

9    A.  Yes.

10   Q.  So you were communicating about flights usually through

11   your cell phones, right?

12   A.  Yes.

13           THE COURT:  I'm going to ask again everybody, please,

14   you're talking on top of each other a little bit.  It's

15   challenging for the court reporter.  So question finishes, then

16   answer; answer finishes, then question.  Thank you.

17           MR. EVERDELL:  I will be mindful, your Honor.

18           Thank you.

19   Q.  So you recall that you had Sarah Kellen's cell phone number

20   in your own phone, right?

21   A.  Yes.

22   Q.  So you spoke to her often enough to have that programmed in

23   your phone, right?

24   A.  Yes.

25   Q.  Okay.  You don't happen to remember her phone number off

LC8VMAX6                    Rodgers - cross

1   the top of your head, do you?

2   A.  I do not.

3   Q.  Okay.  Let me just refresh -- see if something refreshes

4   your recollection.  If you can pick up your binder again and

5   again flip to the fourth tab and you turn to the third page.

6   A.  Okay.

7   Q.  And if you look in the -- sort of the middle of that page,

8   just take a look at that and see if that refreshes your

9   recollection about what Sarah Kellen's phone number was.

10  A.  It really does -- I mean I see the number, but I don't

11  recall that number.

12  Q.  Fair enough.  You can put that away.

13          All right.  Let's move on to a different topic,

14  Mr. Rodgers.

15          So regardless of who you were speaking to about

16  scheduling a flight, when you were told that Epstein needed to

17  fly somewhere, you would need to be given certain information

18  about -- to be able to plan the flight appropriately, right?

19  A.  Did you say something about meals?

20  Q.  Not meals.  You would need to be given some information

21  about the flight in order to plan it, like, for example, the

22  destination?

23  A.  Correct.  Yes.

24  Q.  And you'd need to be given the time of departure, right?

25  A.  Correct.

LC8VMAX6                         Rodgers - cross

1   Q.  And but you wouldn't necessarily be told who was going to

2   be on the flight, right?

3   A.  That's correct.

4   Q.  I think you mentioned that on your direct exam, right, the

5   names of the passengers wasn't one of these sort of critical

6   pieces of information for you to know, right?

7   A.  No.

8   Q.  Okay.  And, in fact, most of the time you didn't ever meet

9   the passengers, right?

10  A.  Other than we would know who they were.

11  Q.  Sure.  If you had passengers, for example, who flew often,

12  you would get to know those people, right?

13  A.  Right.

14  Q.  All right.  But a lot of times you were just at some point

15  given some names of the passengers, right?

16  A.  Correct.

17  Q.  And you wouldn't necessarily be given all of their names,

18  right?

19  A.  No.

20  Q.  Sometimes you'd be given some of the names and sometimes

21  you'd be given all, but it was a mix, right?

22  A.  That's correct.

23  Q.  And there's no requirement under airline regulations that

24  requires you to gather the names of the passengers, right?

25  A.  That is correct.

LC8VMAX6                        Rodgers - cross

1   Q.  I think you only really need the names if you're flying

2   internationally, right, and you have to clear customs and

3   immigration?

4   A.  That is correct.

5   Q.  Okay.  So even if you weren't told all the names of the

6   passengers, I think you mentioned on your direct exam that you

7   did try to keep track of how many people were on the plane,

8   right?

9   A.  Correct.

10  Q.  Because, among other things, the pilots need to fill out

11  passenger manifests for each flight, right?

12  A.  We're not required to fill out a -- you mean -- by FAA you

13  mean?

14  Q.  I don't mean -- I'll rephrase.

15           It was your practice to fill out passenger manifests

16  for each flight; correct?

17  A.  That is correct.

18  Q.  Okay.  And the manifest as you mentioned contains a list of

19  passenger names, among other things, right?

20  A.  Yes.

21  Q.  Okay.  Now, we looked at a lot of entries in what you

22  referred to as your pilot logbook; correct?

23  A.  Yes.

24  Q.  That was Government's Exhibit 662.  We looked at a lot of

25  entries on your logbook; is that right?

LC8VMAX6                        Rodgers - cross

```
1    A.  That's right.

2    Q.  That is not a passenger manifest, right?

3    A.  No, it is not.

4    Q.  You had a practice, I think you described this, of taking

5    the manifests and then taking the names of the passengers and

6    entering them in your own personal pilot logbook, right?

7    A.  Correct.

8    Q.  So that's why your logbook has those -- that information in

9    it, right?

10   A.  Yes.

11   Q.  But that's your particular practice; it's not what every

12   pilot does, right?

13   A.  Correct.

14   Q.  Okay.  Now, you said on direct that if you didn't get all

15   the names of the passengers, which happened from time to time,

16   you would still try to keep track of how many passengers there

17   were?

18   A.  Yes.

19   Q.  And if you didn't know their names, you might put in

20   something like "one passenger" or "one PAX" to indicate an

21   unnamed passenger?

22   A.  Correct.

23   Q.  And then later you might have put -- or around the same

24   time you might have put "one female" or "one male" to indicate

25   the gender, right?
```

LC8VMAX6                          Rodgers - cross

1   A.   That is correct.

2   Q.   But sitting here today, if your logbook entries reflect one

3   male or one female or one passenger, you don't know who that

4   person is who you indicated as that one male, one female, one

5   passenger, right?

6   A.   That is correct.

7   Q.   Okay.  So you would have no way of knowing today what the

8   actual name of that person was on those flights where those are

9   indicated?

10  A.   No.

11  Q.   Okay.  Now, in keeping your logbook and your manifests,

12  obviously if you knew who the person was and you recognized

13  them from before, you would put their names in the manifest,

14  right?

15  A.   Correct.

16  Q.   And your practice, I think, was if you knew the name of the

17  person because they flew a lot, you might just enter their

18  initials in your logbook because it saved space, right?

19  A.   That's correct.

20  Q.   Okay.  So if we see initials in your logbook, that reflects

21  that it's someone who flew several times on Epstein's planes

22  that you recognized, right?

23  A.   Correct.

24  Q.   Okay.  So, for example, there are numerous examples of the

25  initials SK in the logbook, right?

LC8VMAX6                    Rodgers - cross

```
 1   A.  Right.

 2   Q.  And do you know what those initials designate?

 3   A.  Sarah Kellen.

 4   Q.  So Sarah Kellen was a frequent passenger who you would

 5   abbreviate with her initials, right?

 6   A.  Yes.

 7   Q.  And those people -- sorry, I take it back.

 8          If someone was a new passenger or someone you hadn't

 9   met yet, you would put their full name, if it had been given to

10   you, right?

11   A.  Yes.

12   Q.  Or you would put a first name if that's all you had for

13   them, right?

14   A.  Yes.

15   Q.  Or you'd put down a placeholder like we spoke about, one

16   passenger, one male, one female?

17   A.  Correct.

18   Q.  Okay.  Now, it was sometimes the case, wasn't it,

19   Mr. Rodgers, that Epstein's friends or acquaintances or family

20   members would fly on the plane with him, right?

21   A.  Yes.

22   Q.  And he would take them on his plane if they were -- if he

23   was going the direction they were going, right?

24   A.  Yes.

25   Q.  Effectively giving them a lift on his plane, right?
```

LC8VMAX6                        Rodgers - cross

1    A.  Yes.

2    Q.  Now, in those cases, if it's not a regular traveler or,

3    say, a family member, you might not know their name, right?

4    A.  Say that again?

5    Q.  In those cases where it's someone who's kind of getting a

6    lift, who -- it might be an acquaintance or friend, you might

7    actually not know that person?

8    A.  That's correct.

9    Q.  Okay.  So that's an example, right, of somewhere where you

10   might put one male, one female, one passenger, right?

11   A.  Yes.

12   Q.  Okay.  One of these people getting a ride somewhere, right?

13   A.  Yes.

14   Q.  Okay.  Now, you and, I think, Larry Visoski had your

15   manifests, right, which were separate from the logbook that we

16   looked at, right?

17   A.  Correct.

18   Q.  And you sent those manifests periodically to Epstein's

19   office in New York; is that right?

20   A.  Yes.

21   Q.  About every month or so, give or take?

22   A.  Usually at the end of the month.

23   Q.  Okay.  You did not send those manifests to Ghislaine, did

24   you?

25   A.  No, I did not.

LC8VMAX6                    Rodgers - cross

Q.  And you didn't send your pilot logbook to Ghislaine either,
right?

A.  No.

Q.  That was your own personal logbook that you kept yourself,
right?

A.  Correct.

Q.  So you have no reason to believe that Ghislaine was
reviewing the manifests and the people who were flying on the
flights, right?

A.  No.

Q.  And from your perspective, you have no reason to believe
that Ghislaine would have known which passengers were on which
flights, if she didn't fly on the flight herself, right?

A.  That's correct.

Q.  Okay.  I want to move to a different topic, Mr. Rodgers.  I
want to ask you about the ownership of the planes, okay?

A.  Okay.

Q.  So from 1994 to 2004, you said Mr. Epstein had two primary
planes, the Gulfstream and eventually the Boeing, right?

A.  Yes.

Q.  Those planes were owned by limited liability companies or
LLCs, isn't that right?

A.  I don't think the first plane -- are we referring to the
Gulfstream or the --

Q.  I'm referring to the Gulfstream and the Boeing.

LC8VMAX6                         Rodgers – cross

1   A.  I think the Gulfstream was not an LLC; I think it was

2   incorporated.  And I think that the Boeing was an LLC.

3   Q.  I'm sorry.  Let me rephrase the question.

4           The two aircraft we're talking about, the Boeing and

5   the Gulfstream, were actually owned by companies?

6   A.  Correct.

7   Q.  I'll use that general term.  Is that correct?

8   A.  That's correct.

9   Q.  Okay.  So the companies that owned the planes were

10   controlled by Mr. Epstein, right?

11   A.  Yes.

12   Q.  But the actual owner on paper was a company; correct?

13   A.  That is correct.

14   Q.  Okay.  So I think you recall that the Boeing 727 was owned

15   by JEGE, Incorporated, right?

16   A.  Correct.

17   Q.  And the Gulfstream was owned by a company called Hyperion

18   Air, right?

19   A.  Correct.

20   Q.  And I think Epstein also owned a Bell helicopter at some

21   point, didn't he?

22   A.  Yes.

23   Q.  Do you know about when he bought the Bell helicopter?

24   A.  I believe it was 2002, maybe November 2002.

25   Q.  Okay.  That's a rough estimate?

LC8VMAX6                       Rodgers - cross

1    A.   That's a rough.  I'm not for sure about that.

2    Q.   Okay.  But that helicopter was also owned by a company,

3    wasn't it?

4    A.   Yes.

5    Q.   That was owned by Air Ghislaine, Inc., isn't that right?

6    A.   Correct.

7    Q.   And I think Mr. Epstein bought another helicopter sometime

8    later from Sikorsky; isn't that right?

9    A.   Yes.

10   Q.   And that aircraft or that helicopter was also owned by Air

11   Ghislaine, right?

12   A.   Yes.

13   Q.   All right.  Now, it's your understanding that all of these

14   companies that owned these aircraft were controlled by

15   Mr. Epstein, right?

16          MS. COMEY:  Objection, your Honor.

17   A.   Yes.

18          THE COURT:  Just a moment.  Just a moment.

19          MS. COMEY:  Foundation and calls for hearsay.

20          THE COURT:  I'll sustain on foundation.

21   Q.   Let me ask you this, Mr. Rodgers:  Before you were hired by

22   Jeffrey Epstein, you worked for a company that sold airplanes;

23   isn't that right?

24   A.   No.

25   Q.   No?  You didn't work for Glimcher?  Is that the name of the

LC8VMAX6                          Rodgers - cross

1    company?  G-L-I-M-C-H-E-R?

2    A.  Yes, I worked for that company, but it was a real estate

3    development.

4    Q.  Oh, I'm sorry.  I've got it.  Okay.

5         But you do have some awareness of how people buy

6    aircraft and how they own aircraft through companies; correct?

7    A.  Yes.

8    Q.  All right.  Now, it is fairly common if someone wants to

9    buy an airplane, to buy it using a company, a corporate entity;

10   isn't that right?

11        MS. COMEY:  Objection.

12   A.  Yes.

13   Q.  And if that person owns more than one aircraft, it is also

14   fairly common that they own each plane with a separate company,

15   right?

16   A.  That is correct.

17   Q.  And one of the main reasons you do that is because it

18   limits your liability, right?

19   A.  Correct.

20   Q.  So, in other words, it protects that person from being

21   sued, right?

22   A.  Correct.

23   Q.  So, for example, if I owned a plane and, God forbid, there

24   was an accident on the plane and some of the passengers were

25   seriously injured, some of those injured passengers might want

LC8VMAX6                        Rodgers - cross

```
 1   to sue me because it's my plane, right?
 2              MS. COMEY:  Objection, your Honor.
 3              THE COURT:  Sustained.
 4   Q.  Well, if I own the plane in my own name, I could be sued
 5   personally, right?
 6              MS. COMEY:  Objection, your Honor.
 7              THE COURT:  Sustained.
 8   Q.  All right.  Well, I'll ask one more question.
 9              In your experience working with aircraft, there's
10   nothing improper about owning an aircraft through a company, is
11   there?
12              MS. COMEY:  Objection, your Honor.
13              THE COURT:  Sustained.
14   Q.  All right.  Let's switch gears, Mr. Rodgers.  I want to
15   talk a little bit about a few specific flights, all right?
16   A.  Okay.
17   Q.  You testified on your direct about a place called
18   Interlochen, right?
19   A.  Yes.
20   Q.  And you're familiar with that place, right?
21   A.  Yes.
22   Q.  Interlochen hosts an arts camp in the summer; is that
23   right?
24   A.  Correct.
25   Q.  And that camp is for talented musicians and singers and
```

LC8VMAX6                          Rodgers - cross

1   actors and other types of artists, right?

2   A.  Correct.

3   Q.  And those people, those artists, are in high school for

4   this camp, right?

5   A.  Yes.

6   Q.  Okay.  And it's pretty well known in the arts community,

7   the Interlochen Arts Camp; isn't that right?

8   A.  Correct.

9   Q.  Now, you testified, I believe, that from 1991, when you

10  first started working for Mr. Epstein, to 1998, you flew to

11  Interlochen once a year roughly, right?

12  A.  Yes.

13  Q.  And you did that typically in the month of August, right?

14  A.  Yes.

15  Q.  I think you mentioned there may have been one year where

16  you went July 31st, right at the end of July; but other than

17  that, it was August, right?

18  A.  Correct.

19  Q.  And Mr. Epstein, I think you're aware that he had a cabin

20  at Interlochen, right?

21  A.  Yes.  I believe it was referred to as a lodge.

22  Q.  A lodge?

23  A.  Yes.

24  Q.  But he had the ability to stay in that lodge if he wanted

25  to, right?

LC8VMAX6                          Rodgers – cross

1    A.   Yes.

2    Q.   And he would stay in that lodge typically in the days in

3    August when he went to see the end-of-the-year performances at

4    Interlochen, right?

5    A.   I'm not really sure where he stayed once we took him there.

6    I can't be for certain.  Somebody else could have been staying

7    there in his lodge.

8    Q.   Understood.

9         Setting apart where he stayed, he would typically go

10   in August to see the end-of-the-year performances by the

11   campers, right?

12   A.   Yes.

13   Q.   Now, Interlochen is located in Michigan, right?

14   A.   Correct.

15   Q.   And to get to Interlochen, you have to fly to Traverse

16   City, Michigan, right?

17   A.   That is correct.

18   Q.   That's the closest airport?

19   A.   Yes.

20   Q.   Okay.  Now, I want to take a look at some of these flights

21   in a second.  But you recall being asked on direct by the

22   government about the flights to Interlochen, right?

23   A.   Yes.

24   Q.   And I think you were able to say confidently that you took

25   seven flights to Interlochen between 1991 to 1997; is that

LC8VMAX6                          Rodgers - cross

1   right?

2   A.   That is correct.

3   Q.   And you remember they were in August, except for that one

4   time in July, right?

5   A.   Correct.

6   Q.   Now, you don't have any independent recollection of these

7   flights, right?

8   A.   No.

9   Q.   Okay.  So the way you were able to be so confident in the

10  number of flights and the timing of the flights is because you

11  were able to review your flight records, your flight logbook,

12  right?

13  A.   That is correct.

14  Q.   So you had your memory refreshed by looking at your flight

15  logbook, and that's why you were able to say confidently what

16  you said about the flights for Interlochen, right?

17  A.   That is correct.

18  Q.   So it's not as if you have a separate memory for each of

19  those flights; correct?

20  A.   No, I do not.

21  Q.   And that's true of really all the flights we're talking

22  about here; you don't have an independent recollection of each

23  and every one of these flights, right?

24  A.   That's correct, I do not.

25  Q.   So we're working off your refreshed recollection from your

LC8VMAX6                    Rodgers - cross

1    logbook which you've reviewed prior to testifying today?

2    A.   Correct.

3    Q.   So let's look first at --

4              THE COURT:  Actually, Mr. Everdell, we'll break here.

5    It's our mid-afternoon break time.

6              MR. EVERDELL:  Yes, your Honor.

7              THE COURT:  All right.  Members of the jury, about a

8    15-minute break.  Thank you.

9              (Jury not present)

10             THE COURT:  Mr. Rodgers, you may step down for the

11   break.  Thank you.

12             (Witness not present)

13             THE COURT:  Everyone may be seated.

14             Are there matters to take up before the break?

15             MS. COMEY:  Not from the government, your Honor.

16             MR. EVERDELL:  Not from the defense, your Honor.

17             THE COURT:  Okay.  Let's meet in ten minutes so that

18   you can raise anything if we need to.  Thank you.

19             (Recess)

20             THE COURT:  Matters to take up?

21             MS. MOE:  Not from the government, your Honor.

22             MR. EVERDELL:  Nothing for the defense.

23             THE COURT:  What's your time prediction, Mr. Everdell?

24             MR. EVERDELL:  I still got a little ways to go, your

25   Honor.  I'm not quite halfway done.

LC8VMAX6                          Rodgers - cross

1          THE COURT:  Okay.  Ms. Comey is looking at me like --

2          MS. COMEY:  I have no problem with that, your Honor.

3          THE COURT:  Okay.  All right.

4          We'll bring in the jury and bring back the witness

5 please.

6          (Witness present)

7          (Continued on next page)

1          (Jury present)

2          THE COURT:  Everyone may be seated.  Thank you,

3   members of the jury.

4          Mr. Everdell, you may continue with your cross

5   examination.

6          Mr. Rodgers, I remind you, you are under oath.

7          You may inquire.

8          MR. EVERDELL:  Thank you, your Honor.

9   BY MR. EVERDELL:

10  Q.  Welcome back, Mr. Rodgers.

11  A.  Thank you.

12  Q.  You were asked a lot of questions by the government on

13  direct examination about a woman that we are referring to as

14  Jane.  Do you recall that?

15  A.  Yes.

16  Q.  To be clear, Jane is not her real name, her real first

17  name; correct?

18  A.  Correct.

19  Q.  But you do know what her name is, her real name?

20         THE COURT:  Without saying it.

21  Q.  Without saying it?

22  A.  Yes.

23  Q.  Now, you say you recall seeing Jane on Epstein's plane;

24  right?

25  A.  Yes.

LC8Cmax7                          Rodgers - cross

1    Q.  I don't think you recall having much interaction with her,

2    though; right?

3    A.  Correct.

4    Q.  I think it was your testimony that you recalled seeing Jane

5    for the first time on Epstein's plane on November 11th of 1996;

6    right?

7    A.  That's correct.

8    Q.  Now, that is a date -- you don't have an independent

9    recollection of that date in your mind of meeting Jane;

10   correct?

11   A.  No.

12   Q.  That date is in your head because you referred to the

13   flight logs; correct?

14   A.  Correct.

15   Q.  And as we saw, there is an entry on that date on November

16   11th, 1996; correct?

17   A.  Correct.

18   Q.  And that entry shows that there is a first name there, but

19   only a first name; correct?

20   A.  Correct.

21   Q.  And that first name is the same first name as Jane's true

22   first name; correct?

23   A.  Yes.

24   Q.  And that is why you place Jane -- your meeting with Jane on

25   November 11th of 1996; correct?

LC8Cmax7                      Rodgers - cross

1   A.  Correct.

2   Q.  Because you saw it in your flight log; right?

3   A.  Correct.

4   Q.  But that entry only has the first name that is the same as

5   Jane's true first name; correct?

6   A.  Correct.

7   Q.  It doesn't say Jane's first and last name; right?

8   A.  That's correct.

9   Q.  Now, you were actually interviewed by the FBI several times

10  about the flights you flew for Epstein; right?

11  A.  Once, that I recall.

12  Q.  Well, isn't it true that you were interviewed the first

13  time by the FBI way back in August of 2006; isn't that correct?

14  A.  Yes, I recall that.

15  Q.  That, you were not asked about Jane at that interview?

16  A.  No.

17  Q.  Now, the next time you were interviewed, it was by the

18  government, right, meaning the prosecutors were there, as well?

19  A.  Yes.

20          THE COURT:  Please wait until the question is finished

21  and then answer.  Go ahead.

22  Q.  So that interview with the prosecutors was almost 15 years

23  later on February 7th, 2020; isn't that right?

24  A.  Repeat the question.

25  Q.  The first time you were interviewed by the prosecutors in

LC8Cmax7                        Rodgers - cross

1    this case was roughly almost 15 years after you were

2    interviewed by the FBI; correct?

3    A.   That's very close.

4    Q.   And that first interview with the prosecutors took place on

5    February 7th of 2020; is that right?

6    A.   Correct.

7    Q.   And some of the prosecutors that are here were at that

8    meeting; right?

9    A.   Yes.

10   Q.   And you were there with your attorney?

11   A.   Yes.

12   Q.   Now the government did ask you about Jane at that

13   interview; right?

14   A.   Yes.

15   Q.   And the government asked you when it was that you first

16   recall meeting Jane; right?

17   A.   Yes.

18   Q.   And you told them at that interview that you first recall

19   meeting Jane in around 2000, plus or minus a few years; isn't

20   that right?

21   A.   I don't recall.

22   Q.   Well, if you can pick up your binder that we looked at

23   before, please, if you could go to tab 18, which is 3523-018,

24   and I'm going to refer you to page 8 of that document.  If you

25   just read it to yourself.  There is a paragraph -- below the

LC8Cmax7                        Rodgers - cross

1   bullet point list on that page, there is a paragraph -- where I

2   want you to focus is the last few sentences, but you can read

3   the full paragraph.  Let me know when you've read it.

4   A.  Yes, that's correct, I did say that.  But at that time, I

5   hadn't done a lot of research in my logbook.

6   Q.  Exactly.  So, at that time, you were responding from your

7   memory?

8   A.  Correct.

9   Q.  As best you could about when you recalled first meeting

10  Jane; correct?

11  A.  Correct.

12  Q.  And you told the government that you best recalled first

13  meeting Jane around the year 2000, give or take a year or two;

14  right?

15  A.  Yes.  I was a couple of years off.

16  Q.  Well, that was before you were shown the flight logs;

17  right?  You gave that response before you were shown the flight

18  logs; right?

19  A.  Yes.

20  Q.  And as we saw, the flight logs for the flights in '96, '97,

21  and '98 where there is an indication where someone with Jane's

22  first name appears in the passenger list, those flight logs

23  just show just that, someone with Jane's first name flying on

24  those flights; right?

25  A.  Correct.

LC8Cmax7                        Rodgers - cross

1    Q.  It doesn't say her first and last name?

2    A.  That is correct.

3    Q.  So your basis for placing your first meeting with Jane on

4    November 11th, 1996, is not based on your memory, it's based on

5    what the flight logs say; right?

6    A.  That is correct.

7    Q.  And the flight logs only refer to someone with the same

8    first name as Jane?

9    A.  Correct.

10   Q.  Now, it is true, isn't it, that there are other people in

11   Epstein's world with that same first name as Jane?

12   A.  Correct.

13   Q.  In fact, you've met people with that same first name who

14   were in Epstein's world; right?

15   A.  Yes.

16   Q.  I believe he had an assistant with that same first name.  I

17   tell you what, I'll withdraw the question, I'm going to show

18   you something that I think will help you.

19          In your binder, there is a tab, LV3.  These are

20   admitted.  This is LV3A and LV3B, which are admitted under

21   seal.

22          Members of the jury, there are folders under your

23   chairs --

24          THE COURT:  Just a second.  I'll direct the jury.

25          MR. EVERDELL:  Understood, your Honor.

LC8Cmax7                        Rodgers - cross

1              THE COURT:  So first tell me --

2              MS. COMEY:  No objection, your Honor.

3              THE COURT:  So you want the jury to look at LV --

4              MR. EVERDELL:  I would like the witness and the jury

5    to look at LV3A and LV3B, which are already in evidence under

6    seal.

7              THE COURT:  Okay.  You may do so, members of the jury,

8    please.  It's which binder?

9              MR. EVERDELL:  It's the folder.

10             THE COURT:  In the folder, LV3A, LV3B.

11             MR. EVERDELL:  Jurors, I think it's underneath tab 3

12   for you.  So just go to tab 3.

13             THE COURT:  You may go to tab 3.

14             MR. EVERDELL:  I'm sorry, your Honor.  I'll stop.

15             THE COURT:  You were trying to be helpful.

16             MR. EVERDELL:  Yes.

17   BY MR. EVERDELL:

18   Q.  Mr. Rodgers, do you see that tab?

19   A.  Yes.

20   Q.  And do you see the person in those photos?  Yes or no.

21   A.  Yes.

22   Q.  I don't want you to tell me that person's name.

23   Understand?

24   A.  Yes.

25   Q.  But you do know that person's name; correct?

LC8Cmax7                    Rodgers - cross

1    A.  Yes.

2    Q.  Without telling us the name, is that Epstein's assistant

3    that had the same first name as Jane's true first name?

4    A.  Yes.

5    Q.  And that person you're looking at in the photographs who

6    had the same name, she traveled frequently with Epstein on the

7    planes; isn't that right?

8    A.  Yes.

9    Q.  Do you know if they had a romantic relationship together?

10   A.  Yes.

11   Q.  And she had a foreign accent, didn't she?

12   A.  I'm not sure about that.  Pretty good English.

13   Q.  Her first name is actually spelled the same exact way as

14   Jane's first name; right?

15   A.  Yes.

16   Q.  But she is not Jane; correct?

17   A.  No.

18            MR. EVERDELL:  You can put that way.

19            THE COURT:  Jurors, you can put the folders away.

20   Q.  I do want to look at some of those flights with Jane that

21   you looked at before.  So if we could bring up Government

22   Exhibit 662R, which is redacted, and I'll ask Ms. Drescher to

23   help me, because I think she has the redacted copy.  If we can

24   display page 44.

25            So do you see that in front of you, Mr. Rodgers?

LC8Cmax7                        Rodgers - cross

1    A.  Yes.

2    Q.  If you look at the flight that's for November 11th of 1996,

3    do you see that flight down at the bottom?

4    A.  Yes.

5    Q.  It's flight number 916?

6    A.  Yes.

7    Q.  And it's from Palm Beach to Teterboro; right?

8    A.  Yes.

9    Q.  And the passengers were -- it says in the notes JE, Sophie

10   and friend, Jeff Shantz (ph.) and family, four, Eva, child and

11   nanny.  Then it says Jane's true first name; correct?

12   A.  Correct.

13   Q.  And it says Russ --

14   A.  Yes.

15   Q.  So JE, we said, was Epstein; right?

16   A.  Yes.

17   Q.  Sophie is Sophie Biddle (ph.), is it not?

18   A.  Yes.

19   Q.  She was one of Epstein's professional masseuses; isn't that

20   right?

21   A.  Correct.

22   Q.  She traveled with him from time to time on the planes?

23   A.  Yes.

24   Q.  And she was in her late 20s or early 30s at the time,

25   wasn't she?

LC8Cmax7                        Rodgers - cross

1    A.  Yes.

2    Q.  Jeff Shantz was Epstein's attorney; isn't that right?

3    A.  Yes.

4    Q.  And Eva is Eva Dubin; correct?

5    A.  Yes.

6    Q.  She was Epstein's former girlfriend, wasn't she?

7    A.  Yes.

8    Q.  And before she was Eva Dubin, she was Eva Anderson?

9    A.  Yes.

10   Q.  Eva Anderson later married Glenn Dubin and became Eva

11   Dubin; right?

12   A.  Yes.

13   Q.  Are you aware that Glenn Dubin is a billionaire hedge fund

14   manager?

15   A.  Yes.

16   Q.  And he was one of Epstein's clients; right?

17   A.  I'm not sure about that.

18   Q.  Okay.  Just to round it out, Russ Kippus (ph.), he was

19   another pilot; right?

20   A.  Yes.

21   Q.  He would sometimes fill in when one of the other pilots

22   couldn't do it?

23   A.  Yes.

24   Q.  Now, again, we'll look back at the name, which is Jane's

25   true first name; correct?

LC8Cmax7                    Rodgers - cross

1   A.  Yes.

2   Q.  Just to be clear, that's just her first name, not her last

3   name; right?

4   A.  Correct.

5   Q.  So, bottom line is, you don't know, sitting here today,

6   whether Jane was actually on that flight; right?

7   A.  I've only flown two persons with that name, and the second

8   person I saw a picture of I met in September of 2003.  So it

9   couldn't have been her.

10  Q.  All right.  But there were potentially lots of people in

11  Epstein's world who had that same first name that you never

12  met; correct?

13  A.  Well, there could be.

14  Q.  You could have been given the name of Jane's true first

15  name as a passenger and never met that person; correct?

16  A.  Say that again.

17  Q.  Well, when you're filling out the manifest, you could have

18  been given the names of some of the passengers; right?

19  A.  Yes.

20  Q.  And you may have been given that first name, that's Jane's

21  true first name; correct?

22  A.  Yes.

23  Q.  And you might not have met the person on the flight who was

24  actually going by Jane's true first name; correct?

25  A.  Possibly.

LC8Cmax7                    Rodgers - cross

1    Q.  So it's possible that there are other people who go by that

2    same first name who you never met who could have flown on

3    Epstein's plane; correct?

4    A.  Yes.

5    Q.  So sitting here today, we can't say that the one you know

6    of as Jane was actually on this flight; right?

7    A.  Just have the first name.  That's it.

8    Q.  So now, let's go to page 48.  I'm going to look at the

9    flight that's on May 9th, which is flight 979.  Do you see that

10   flight?

11   A.  Yes.

12   Q.  That's a flight from Teterboro to Santa Fe, you said;

13   right?

14   A.  Correct.

15   Q.  And the passengers there are JE, GM, and Jane's true first

16   name?

17   A.  Yes.

18   Q.  So we should say JE is Jeffrey Epstein; correct?

19   A.  Yes.

20   Q.  GM, you said, was Ghislaine Maxwell; right?

21   A.  Correct.

22   Q.  And this flight only lists Jane's true first name, not her

23   last name; right?

24   A.  Correct.

25   Q.  Let's go to page 55.  Let's look at the flight that is the

LC8Cmax7                        Rodgers - cross

1    flight on May 3rd, 1998.  It's down at the bottom of the page,

2    flight 1105.  Do you see that?

3    A.   Yes.

4    Q.   That is a flight from Palm Beach to Teterboro; right?

5    A.   Correct.

6    Q.   And the passengers that are listed there are JE, GM, ET,

7    then Jane's true first name, then Glenn, Eva, Selena, Jordan,

8    nanny, Gwendolyn, and Beck; is that right?

9    A.   Correct.

10   Q.   So we know who JE and GM are; right?

11   A.   Yes.

12   Q.   ET is Emmy Taylor, that was Ghislaine's assistant?

13   A.   Yes.

14   Q.   Skipping over the name that's Jane's name, Glenn and Eva

15   are Glenn and Eva Dubin; is that right?

16   A.   Correct.

17   Q.   Selena and Jordan are their children; isn't that right?

18   A.   Yes.

19   Q.   Do you know who Gwendolyn Beck is?

20   A.   Yes.

21   Q.   Who is she?

22   A.   She was a friend of Jeffrey's.

23   Q.   Now, going back to the name we skipped, Jane's true first

24   name, again, that is just her first name, not her last name;

25   right?

LC8Cmax7                    Rodgers - cross

1    A.  Correct.

2    Q.  So those three flights we just looked at are the only

3    flights in the 1990s where a passenger with Jane's true first

4    name is listed on your flight log; isn't that correct?

5    A.  Correct.

6    Q.  And we'll look at one last flight, which is at page 81.

7    We'll look at the flight number 1480 on March 31st of 2001.  Do

8    you see that flight?

9    A.  Yes.

10   Q.  That is a flight from Santa Fe to Palm Beach; yes?

11   A.  Correct.

12   Q.  And the passengers listed there are JE, GM, AP, Virginia

13   Roberts, and then Jane's true first and last name this time;

14   correct?

15   A.  Yes.

16   Q.  And then Henry Drecky (ph.) and Marvin Minsky; correct?

17   A.  Yes.

18   Q.  We won't go over JE and GM.  AP is Adam Perry Lang; isn't

19   that right?

20   A.  Yes.

21   Q.  He was one of Epstein's chefs?

22   A.  Correct.

23   Q.  He was a chef at the time?

24   A.  Yes.

25   Q.  And Virginia Roberts, we discussed, is someone you recall

LC8Cmax7                     Rodgers - cross

1  flying on the flights; right?

2  A.  Yes.

3  Q.  Your recollection is, at the time, she was at least 18 or

4  19 when she was flying; right?

5  A.  Yes.

6  Q.  And you're not sure what her role was with Epstein; isn't

7  that right?

8  A.  Correct.

9  Q.  Do you know who Henry Drecky and Marvin Minsky are?

10  A.  I know they were friends of Jeffrey.

11  Q.  You're aware Henry Drecky taught at Yale Medical School?

12  A.  No.

13  Q.  You're aware that Marvin Minsky taught at MIT?

14  A.  No.

15  Q.  Well, jumping back to the name that's Jane's true first

16  name -- I'm sorry.  One other thing I want to say about AP.

17        There was somebody else who had the initials AP that

18  was in Jeffrey's world; isn't that right?  Was there a

19  decorator named Alberto Pinto?

20  A.  Yes.

21  Q.  So he also could go by the initials -- or the initials AP

22  on your logs; right?

23  A.  Yes.

24  Q.  And one other question about Emmy Taylor, who you saw as

25  ET, she was from England; isn't that right?

LC8Cmax7                          Rodgers - cross

1    A.   Yes.

2    Q.   So she had a British accent; isn't that right?

3    A.   Yes.

4    Q.   Now, looking at that entry at the name of Jane's true first

5    and last name, that is the only time in your flight logs where

6    Jane's true first and last name appears on your flight logs;

7    isn't that right?

8    A.   That's correct.

9    Q.   But you don't specifically recall this flight; right?

10   A.   No.

11   Q.   It's just what we see on the flight log; right?

12   A.   Correct.

13   Q.   A few other questions about Jane.  There are no flights

14   that you're aware of on your flight log where anyone with

15   Jane's full name or just her first name and Mark Epstein are on

16   the flights together; right?

17   A.   Say that again.

18   Q.   Well, we looked at the four flights where we think either

19   Jane's first name appears or her first and last name appear;

20   right?

21   A.   Okay.

22   Q.   In the 1990s, there were four of them; correct?

23   A.   Yes.

24   Q.   And none of those flights had Mark Epstein, Jeffrey

25   Epstein's brother, on the flights; correct?

1    A.  I don't know.

2    Q.  Well, we just looked at the passenger list for those four

3    flights and we didn't see Mark Epstein's names on those

4    flights; correct?

5    A.  Correct.

6    Q.  You're not aware of any other flight where someone with

7    Jane's first name or first and last name ever flew with Mark

8    Epstein; right?

9    A.  Correct.

10   Q.  And there are no flights with Jane in 1994, for example?

11   A.  Correct.

12   Q.  The first one we saw was '96?

13   A.  Correct.

14   Q.  And there are no flights with Jane in '95 either?

15   A.  Correct.

16   Q.  Now, you mentioned that, occasionally, you write one female

17   for someone you don't know who happens to be a female

18   passenger; right?

19   A.  Yes.

20   Q.  But sitting here today, you can't say that any one of those

21   instances where you wrote "one female" was actually Jane flying

22   on that flight; right?

23   A.  It could have been.

24   Q.  Could have been, but you don't know one way or the other;

25   right?

LC8Cmax7                          Rodgers - cross

1    A.  It's a possibility.

2    Q.  Could have been any number of people, though; correct?

3    Okay.

4          Now, you also were shown I think an instance in your

5    flight logs where the flight number jumped from flight 818 to

6    flight 821.  Do you remember that?

7    A.  Yes.

8    Q.  And you had said, well, sometimes you weren't flying and

9    since this was your personal logbook, you wouldn't have

10   recorded the other flights that were missing; right?

11   A.  That's correct.

12   Q.  But we have no information then about who may have been on

13   those flights or where those flights went; right?

14   A.  That's correct.

15   Q.  So sitting here today, you can't say one way or the other

16   whether, for example, Jane was on any of those missing flights;

17   right?

18   A.  I cannot.

19   Q.  There is just no information one way or the other; correct?

20   A.  Correct.

21   Q.  Let's look at just a few different flights.  I want to talk

22   to you just a little bit about the Interlochen flights.  Okay?

23   A.  Okay.

24   Q.  Let's look first at the same exhibit, but let's look at

25   page 2.

LC8Cmax7                         Rodgers - cross

1    A.   Okay.

2    Q.   And you see the flight there on August 13th, which is

3    flight 16, I believe; right?

4    A.   Yes.

5    Q.   That is -- sorry.  We'll go back to the flight before that.

6    That's the flight 15 from Teterboro to Columbus; right?

7    A.   Okay, Teterboro to Columbus, yes.

8    Q.   And the passengers on that flight are Jeffrey and one PAX;

9    right?

10   A.   Correct.

11   Q.   So that's an unknown passenger?

12   A.   Correct.

13   Q.   And Columbus, Ohio is where Les Wexner lives?

14   A.   Yes.

15   Q.   And he's the billionaire owner of The Limited; right?

16   A.   Yes.

17   Q.   It's a clothing company?

18   A.   Yes.

19   Q.   Was he one of Jeffrey Epstein's clients?

20   A.   Yes.

21   Q.   And Epstein had a home in Columbus, Ohio, near Mr. Wexner,

22   didn't he?

23   A.   Yes.

24   Q.   So, generally, trips to Columbus, Ohio is for when

25   Mr. Epstein is visiting Mr. Wexner or to visit?

LC8Cmax7                           Rodgers - cross

1    A.  Yes.

2    Q.  You see the next flight below that is from Columbus to TBC;

3    right?

4    A.  Correct.

5    Q.  And that's Traverse City, Michigan, where Interlochen is;

6    right?

7    A.  Yes.

8    Q.  So the passengers on that flight is Jeffrey plus 2 PAX;

9    right?

10   A.  Correct.

11   Q.  So there were two unidentified passengers on that flight?

12   A.  Correct.

13   Q.  And then you see the next two flights are from Traverse

14   City to CPS, and CPS back to Traverse City.  What's going on

15   there?

16   A.  So we departed -- we left Traverse City to go to Cahokia,

17   Illinois to have some work done on the airplane.  If I recall,

18   I think we were either putting carpet in -- I believe it was

19   carpet.  I couldn't be certain about that.

20   Q.  You flew back to Traverse City; right?

21   A.  Yes.  So we had no passengers.  In fact, it says there

22   relocate for the N number change.  That's what we want for, was

23   for the N number change.

24   Q.  Got it.

25   A.  And you'll notice there, from there on down, we have a

LC8Cmax7                        Rodgers - cross

different N number, registration number, on the same aircraft.

Q.  You got a different tail number at that point?

A.  Tail number.

Q.  So when you got back to Traverse City, there is a flight
back to Teterboro on August 18th; right?

A.  Yes.

Q.  And the passengers there are Jeffrey plus two PAX; right?

A.  Yes.

Q.  Ghislaine is not listed on any of those flights; right?

A.  No.

Q.  Just two unnamed people, besides Mr. Epstein?

A.  Correct.

Q.  Let's look at one more on page 11.  Let's look at the
flights on July 31st, which is flight number 178.  Do you see
that one?

A.  Yes.

Q.  That's a flight from Teterboro to Traverse City; right?

A.  Correct.

Q.  And the people on those flights, the Teterboro to Traverse
City and the next one back, Traverse City to POU, there is a
number of people there.  One of them is James Murphy.  Do you
see that name?

A.  Yes.

Q.  He was Epstein's traveling yoga instructor, wasn't he?

A.  Yes.

LC8Cmax7                      Rodgers – cross

1    Q.   And he was male; right?

2    A.   He was what?

3    Q.   Male.

4    A.   Yes.

5    Q.   Okay.  Itzhak Perlman is on some of those flights?

6    A.   Yes.

7    Q.   He's a famous violinist; correct?

8    A.   Correct.

9    Q.   Let's jump to 29.  And I want to look at the flights on

10   August 14th through August 20th.  So we're going to start with

11   the one on that's flight 569.  Do you see that?

12   A.   Yes.

13   Q.   So, let's pull that up.  So you see the first flight is

14   from PBI to MDW; right?

15   A.   Yes.

16   Q.   That's Palm Beach to Chicago Midway Airport?

17   A.   Correct.

18   Q.   The passengers are Jeffrey Epstein and Ghislaine Maxwell?

19   A.   Correct.

20   Q.   The next flight on the same day is from Midway, Chicago to

21   Columbus, Ohio?

22   A.   Yes.

23   Q.   That is also Epstein and Maxwell; right?

24   A.   Correct.

25   Q.   Then two days later, there is a flight from Columbus back

LC8Cmax7                        Rodgers - cross

1   to Midway; right?

2   A.   Yes.

3   Q.   And that is Jeffrey Epstein and Sophie Biddle, who we spoke

4   about before?

5   A.   Correct.

6   Q.   And then the same day, there is a flight from Midway to

7   ASE, that's Aspen Airport; right?

8   A.   Correct.

9   Q.   And that is Jeffrey Epstein, Sophie Biddle, and someone

10  named Frances Jardine (ph.); right?

11  A.   Correct.

12  Q.   Do you remember who Frances Jardine was?

13  A.   I do not.

14  Q.   Do you remember her as a girlfriend of Epstein's?

15  A.   I don't.

16  Q.   Safe to say that Ghislaine is not on that flight; correct?

17  A.   Correct, she's not.

18  Q.   So two days after that on the 18th, the flight goes back

19  from Aspen to Traverse City?

20  A.   Yes.

21  Q.   That is Epstein, Biddle, and Jardine?

22  A.   Correct.

23  Q.   Aspen is where Wexner has a house?

24  A.   It is.

25  Q.   Would Epstein use that house from time to time?

LC8Cmax7                        Rodgers – cross

1   A.  I know he would visit it.  I don't know if he would use it.

2   Q.  And he would bring guests occasionally with him?

3   A.  Yes.

4   Q.  So on the flight on the 18th going from Aspen to Traverse

5   City, Maxwell is not on that flight?

6   A.  Correct.

7   Q.  And Traverse City is where Interlochen is; correct?

8   A.  Yes.

9   Q.  Then on the 20th, there is a flight from Traverse City to

10  Teterboro in New Jersey; right?

11  A.  Yes.

12  Q.  That's two days later after the flight from Aspen to

13  Traverse City?

14  A.  Yes.

15  Q.  And on that flight on the 20th, the passengers are Jeffrey

16  Epstein, Ghislaine Maxwell, and someone named Dawn DeVitto;

17  right?

18  A.  Yes.

19  Q.  Frances Jardine is not on that flight; right?

20  A.  Correct.

21  Q.  And that is the first flight that we see Ghislaine Maxwell

22  appear after she dropped off on the flight on the 14th of

23  August; correct?

24  A.  Yes.

25  Q.  And just to round it out, dawn DeVitto, that's another

LC8Cmax7                        Rodgers - cross

1   traveling masseuse; correct?

2   A.  I don't think she was a masseuse.  I believe -- I thought

3   she was yoga.

4   Q.  I'm sorry.  She was a yoga instructor; right?

5   A.  I think so.

6   Q.  She was in her late 20s, early 30s, as well?

7   A.  Oh, yes.

8   Q.  And she was a professional?

9   A.  Correct.

10  Q.  Some questions about the flights to Palm Beach.  I'm not

11  going to ask you, I think, about particular ones, but you were

12  based in Palm Beach; right?

13  A.  Yes.

14  Q.  That was your home?

15  A.  Yes.  Well, I moved -- not the whole time.  I moved there

16  in 1994.

17  Q.  As part of your employment, you moved there; right?

18  A.  Well, no.  When I first met Jeffrey, I lived in Columbus or

19  near Columbus, Ohio, and I lived there for a couple of years,

20  and then I moved to Manhattan for a year, and then I moved to

21  West Palm Beach in 1994.

22  Q.  Well, safe to say that Epstein was not based in Palm Beach;

23  correct?  I mean, he had a residence in New York; is that

24  right?

25  A.  Yes, he had a residence in both places.

LC8Cmax7                          Rodgers - cross

1   Q.   But the Palm Beach residence was mainly for weekend travel
2   and that sort of thing?
3   A.   We primarily went there on the weekend.
4   Q.   So you took a lot of flights to Teterboro to Palm Beach and
5   back again; right?
6   A.   Yes.
7   Q.   Typically, if you're going to do weekend travel, you're
8   leaving on a Thursday or Friday and you come back on, say, a
9   Sunday; right?
10  A.   Yes.
11  Q.   And Ghislaine Maxwell wasn't always with Mr. Epstein when
12  you went to Palm Beach; isn't that right?
13  A.   Correct.
14  Q.   Let's take a look at one flight.  If we can pull back up
15  Government Exhibit 662R at page 92.  I want you to take a look
16  at the flight on May 4th, 2002.  That is down at the bottom,
17  flight 92.  Do you see that?
18  A.   What's the flight number?
19  Q.   Flight 92.
20  A.   Yes, I see that.
21  Q.   That is a flight from JFK to Palm Beach?
22  A.   Correct.
23  Q.   The passengers on that flight were Jeffrey Epstein and a
24  woman named Shelly Lewis?
25  A.   Correct.

LC8Cmax7                         Rodgers - cross

Q.  Shelly Lewis was someone Epstein was romantically involved
with in 2002; is that right?

A.  Yes.

Q.  And she had a British accent, didn't she?

A.  Yes.

Q.  In fact, Epstein flew around with a lot of women who had
foreign accents, didn't he?

A.  Yes.

Q.  All right.  Now, one quick question, you mentioned on your
direct that Ghislaine had a share, I think, in a charter plane
that she could use; is that right?

A.  Yes.

Q.  That's like sharing a plane, you can't use it anytime you
want; right?

A.  You have to request it.  It's not there at your beckon
call.

Q.  Because other people use that same plane; right?

A.  Yes.

Q.  But isn't it true that Ghislaine only had that share in the
1990s; right?

A.  I'm not sure how many years she had it.  She didn't have it
forever, that's for sure.

Q.  So, for example, in the 2000s, if she wanted to fly not on
Jeffrey Epstein's plane, she'd have to fly commercial, not on
that share of a jet?

LC8Cmax7                        Rodgers - cross

1    A.  I'm not sure when that terminated.

2    Q.  Let me ask you about a few other people we mentioned.  We

3    talked about Sophie Biddle.  I won't ask you about her again.

4    We did talk about Eva Dubin, remember?

5    A.  Yes.

6    Q.  She was married to Glenn Dubin; right?

7    A.  Yes.

8    Q.  Saw her on a few of the flights?

9    A.  Yes.

10   Q.  You recall we saw one flight where her children were with

11   her; right?

12   A.  Yes.

13   Q.  There was Selena and Jordan; isn't that right?

14   A.  Correct.

15   Q.  Now, do you know that Epstein was Selena Dubin's godfather,

16   wasn't he?

17   A.  I believe so.

18   Q.  Now, I want to show you a photo that's been admitted under

19   seal as Government Exhibit 250, with the Court's permission.

20           THE COURT:  Show the witness GX --

21           MR. EVERDELL:  The witness, the Court, and the deputy.

22           MS. COMEY:  Your Honor, can I have a moment to check

23   and see if that's in evidence.

24           (Pause)

25           Thank you, your Honor.  No objection.

1           THE COURT:  The witness may look at GX250.

2           THE WITNESS:  Where is 250?

3           THE COURT:  It's on your screen.

4           MR. EVERDELL:  It should be on your screen, sir.

5           THE WITNESS:  Oh, okay.

6           MR. EVERDELL:  Do you see that?

7           THE WITNESS:  Yes.

8    BY MR. EVERDELL:

9    Q.  Have you ever seen that photo before?

10   A.  No, I have not.

11          MR. EVERDELL:  One moment, your Honor.

12   Q.  Mr. Rodgers, I want to show you what is in your binder as

13   C10.  There should be a tab, C10.

14   A.  Is this your binder?

15   Q.  The binder I gave to you, yeah.  Is there a tab, C10,

16   there?

17   A.  Yes, I have C10.

18          MR. EVERDELL:  We can put it on the screen for the

19   Court, the deputy, and the witness if he wants.

20   Q.  Mr. Rodgers, have you ever seen this picture?

21   A.  No.

22   Q.  Do you recognize the person in that picture?

23   A.  I'm not sure positively, but it could be Eva.

24   Q.  Eva Dubin?

25   A.  Yes.

LC8Cmax7                         Rodgers - cross

1   Q.  And do you notice anything in particular about Eva Dubin in

2   that photograph?

3   A.  Is she pregnant?

4   Q.  Does she appear pregnant to you?

5   A.  Looks like it.

6   Q.  Is that a fair and accurate depiction of how Eva Dubin

7   looked to you at the time that she was pregnant?

8   A.  I never saw her like that.

9   Q.  Oh, okay.  Then I think you can put that away.

10          Let's look at Government Exhibit 662 at page 43,

11  please.  662R, I should say.

12          THE COURT:  Which is in?

13          MR. EVERDELL:  This is in.  This is the flight logs

14  again, your Honor.

15          THE COURT:  Yes.

16  Q.  Do you see the flight on August 18th at the top of the page

17  from Teterboro to Palm Beach?  It's the second one.

18  A.  Give me a second.

19  Q.  Sure.

20  A.  It's page 43 and what number?

21  Q.  It's page 43 and it's flight number 878.

22  A.  Yes.

23  Q.  That flight on August 18th of 1996?

24  A.  Yes.

25  Q.  And that's a flight from Teterboro to Palm Beach; right?

LC8Cmax7                    Rodgers - cross

1   A.  Correct.

2   Q.  And the passengers on that flight are Epstein and Selena --

3   A.  That's right.

4   Q.  Ghislaine Maxwell is not on that flight?

5   A.  Correct.

6   Q.  Further down that same page, there is a flight on September

7   12th of 1996 from Teterboro to Palm Beach; right?  That's

8   flight 891?

9   A.  Yes.

10  Q.  The passengers on that, again, are Epstein and Selena --

11  A.  Yes.

12  Q.  Ghislaine Maxwell is not on that flight?

13  A.  No, she is not.

14  Q.  Selena was somebody that Epstein was in a romantic

15  relationship with at that time?

16  A.  Yes.

17  Q.  And she was in her 20s or 30s at that time; right?

18  A.  Yes.

19  Q.  Do you recall when -- I want to ask you about Emmy Taylor

20  who we talked about before.  Do you recall the first time that

21  Emmy Taylor flew on your planes?

22  A.  Probably 1997.

23  Q.  All right.  We'll take a look at the same exhibit, 662R at

24  51, page 51.  We'll look at the flight on October 17th, which

25  is right at the top from Teterboro to Palm Beach, flight 1039.

LC8Cmax7                    Rodgers - cross

1    Do you see that?

2    A.   Yes.

3    Q.   And do you see that Emmy is listed as a passenger on that

4    flight?

5    A.   Yes.

6    Q.   To your knowledge, is this roughly around the first time

7    you would -- that she would have flown on Epstein's planes?

8    A.   I believe so.

9    Q.   Now I want to ask you about some different names.  Are you

10   familiar with the name Annie Farmer?

11   A.   What is it.

12   Q.   Annie Farmer?

13   A.   Oh, Annie Farmer, I've heard the name.

14   Q.   Do you recall ever seeing Annie Farmer on any of the

15   flights?

16   A.   I do not.

17   Q.   And according to your flight log, there is no record of

18   anyone named Annie Farmer flying on Epstein's planes; right?

19   A.   Correct.

20   Q.   Now I want to show you documents that are in your binder

21   that are admitted as LV4 and LV5.  They're admitted under seal.

22            MS. COMEY:  No objection.

23            THE COURT:  Okay.

24            MR. EVERDELL:  With the Court's permission, I'll have

25   the members of the jury pull it up in their folders.

1           THE COURT:  Ms. Comey.

2           MS. COMEY:  No objection.

3           THE COURT:  So in the folder, members of the jury, you

4  may take out and look at LV4 and LV5.

5           THE WITNESS:  I don't have anything under LV5.

6  Q.  Sorry, sir, did you --

7  A.  LV5 is empty.  There is nothing here.

8  Q.  Do you have -- well, let me give you mine.

9           MR. EVERDELL:  May I approach, your Honor?

10          THE COURT:  You may.

11 Q.  Mr. Rodgers, I want you to take a look at those documents,

12 LV4 and LV5, which are admitted under seal.  If the jurors have

13 those, as well.  Each one of those documents has a name on it;

14 correct?  Just yes or no.

15 A.  Yes.

16 Q.  I don't want you to tell me the names on those documents.

17 But for LV4, do you see that name?

18 A.  Yes.

19 Q.  I'm going to refer to that person as Kate; okay?

20 A.  Okay.

21 Q.  Do you see Kate's true first name on the paper I gave you,

22 LV4; correct?

23 A.  Correct.

24 Q.  Do you recall meeting anyone with Kate's true name on any

25 flights?

LC8Cmax7                    Rodgers - cross

1    A.  I don't recall.  I'd have to check the logbook.

2    Q.  Well, sitting here today, to your knowledge, there isn't

3    anyone in your flight log with Kate's true first name

4    reflecting that she flew on one of Epstein's planes?

5    A.  Not that I'm aware of, but I'd have to check my flight logs

6    to see.

7    Q.  Understood.  I'll go with what you recall at this point.

8    If you could look at LV5.

9    A.  Yes.

10   Q.  Also has a name on it; right?

11   A.  Yes.

12   Q.  I'm going to use that person's first name and refer to her

13   as Carolyn; okay?

14   A.  Okay.

15   Q.  Do you see Carolyn's full name on the paper in front of

16   you?

17   A.  Yes.

18   Q.  Do you recall meeting anyone or seeing anyone with

19   Carolyn's full name on any flights?

20   A.  I do not.

21   Q.  To your knowledge, there is no record of anybody with that

22   name flying on any of Epstein's planes?

23   A.  Not that I'm aware, but I'd have to check my logbook to see

24   for sure.

25   Q.  Understood.

1    THE COURT:  Put those away?

2    MR. EVERDELL:  Yes, put those away, please.

3    THE COURT:  Thank you.

4    MR. EVERDELL:  Shall I continue, your Honor?

5    THE COURT:  As opposed to what?

6    MR. EVERDELL:  Good question.  I thought it was later

7    than it actually was.

8    THE COURT:  Just feels like it.  You can keep going.

9    MR. EVERDELL:  That hurt, your Honor.

10   THE COURT:  No, just the time of the day.

11   MR. EVERDELL:  I understand.

12   BY MR. EVERDELL:

13   Q.  Let's move on, Mr. Rodgers.  Let me ask about where you --

14   some of the residences.  You said that Epstein's residence in

15   Palm Beach -- well, I don't think you said this.  It was

16   located at 358 El Brillo Way; isn't that right?

17   A.  That's correct.

18   Q.  Do you remember a time when the El Brillo Way residence was

19   being renovated and Epstein had to temporarily move to a rental

20   residence in Palm Beach?

21   A.  Yes, I do.

22   Q.  Do you recall where the rental residence was located?

23   A.  It was south of where he lived at El Brillo, and it was,

24   from what I remember, right across the street from the ocean.

25   Q.  And do you recall when that renovation took place?

LC8Cmax7                    Rodgers - cross

1   A.  I would say -- I really don't recall, but I do recall being

2   there to talk about -- I believe it was the G2B that we were

3   getting.  So that would have been sometime in 1994, I think.

4   Q.  Okay.  So your recollection is that there was a move to a

5   rental residence sometime in 1994; correct?

6   A.  I think so, yes.

7   Q.  So that would not have been 358 El Brillo Way when he was

8   residing there?

9   A.  No.

10  Q.  It's another address in Palm Beach?

11  A.  It's another address.

12  Q.  Do you recall how long Mr. Epstein was living in the rental

13  address while the renovations were going on at El Brillo Way?

14  A.  I don't remember, but it was certainly months.  I don't

15  know if it was years, but I think it was certainly months.

16  Q.  Could it have been as much as a year?

17  A.  It's possible, it could have been a year.

18  Q.  So if it's '94, that could have been 1994 into 1995 that he

19  was in this rental residence?

20  A.  That's possible.

21  Q.  Now, just to move to the residence in New Mexico, your

22  recollection was that he bought that rental residence -- I'm

23  sorry.  That residence in New Mexico in I think the mid 1990s;

24  is that right?

25  A.  Yes.  I want to say the closing, if I remember correctly,

LC8Cmax7                          Rodgers – cross

1   was in January of 1993.

2   Q.  When he first bought the property, the large main house on

3   the property wasn't built yet?

4   A.  Correct.

5   Q.  That was under construction for several years?

6   A.  Yes.

7   Q.  And that wasn't even ready to be inhabited until the late

8   1990s; right?

9   A.  Correct.

10  Q.  And Mr. Epstein stayed in a trailer of sorts until the

11  property was ready to be lived in; right?

12  A.  Yes.

13  Q.  And where did you stay?

14  A.  I stayed at the bunkhouse.

15  Q.  That was in Ranch Central?

16  A.  Ranch Central.

17  Q.  That was separate from where the trailer was?

18  A.  Yes.

19  Q.  Let me ask you a few questions about where Mr. Epstein

20  lived and where Ghislaine lived in New York in this time

21  period.

22  A.  This is 1990 --

23  Q.  We'll start in the 1990s.

24  A.  1990.

25  Q.  I'm going to start with Mr. Epstein.

LC8Cmax7                    Rodgers - cross

1    A.  All right.

2    Q.  He had two different residences in New York from 1991 to

3    2005, let's call it; right?

4    A.  Three that I remember.

5    Q.  Did you visit all three of these?

6    A.  Two I visited.

7    Q.  Well, the first one you visited was on 69th Street; is that

8    right?

9    A.  That's correct.

10   Q.  So that's where he was living when you first had the job

11   when you first got hired in 1991; right?

12   A.  I think day 1, I thought that he lived in an apartment, but

13   I could be mistaken, but it was very soon after that that he

14   was at 69th Street.

15   Q.  So almost -- very shortly after you were hired by him, he

16   moved into 69th Street; right?

17   A.  I think so.

18   Q.  He may have lived somewhere else before that?

19   A.  Yes.

20   Q.  But at some point in the mid '90s, he moved to a townhouse

21   on 71st Street; right?

22   A.  Yes.

23   Q.  That was in 1996 that he did that; isn't that right?

24   A.  That's correct.

25   Q.  And that was 9 East 71st Street?

LC8Cmax7                     Rodgers - cross

1    A.  Correct.

2    Q.  Let's talk about Ghislaine's residences in the same period.

3         You recall a few residences that you visited for her;

4    right?

5    A.  Yes.

6    Q.  You recall that -- you think the first one you recall her

7    living in was on 59th Street; right?

8    A.  Yes.

9    Q.  Now, you don't know yourself whether or not she owned that

10   residence; right?

11   A.  I do not.

12   Q.  You don't know whether, for example, she may have been just

13   renting a room in that residence?

14   A.  I do not.

15   Q.  Are you aware of the fact that she was simply renting a

16   room from a friend in that residence and didn't actually own

17   that residence?

18   A.  I have no idea.

19   Q.  But at some point after that, she moved to a small

20   apartment that she did own; right?

21   A.  I don't know if she owned it or not.

22   Q.  But she moved to the apartment on the Upper East Side;

23   right?

24   A.  Yes.

25   Q.  At some point after that, she moved to a different

LC8Cmax7                          Rodgers - cross

1   apartment which was bigger?

2   A.  Yes.

3   Q.  That was on 84th Street?

4   A.  Correct.

5   Q.  At some point, she moves to 65th Street to a townhouse; is

6   that right?

7   A.  Yes.

8   Q.  So it's fair to say that all of those residences that I

9   just described where Ms. Maxwell lived were different from the

10  residences where Mr. Epstein lived; right?

11  A.  Yes.

12  Q.  So at all times from '91 into the 2000s, Ms. Maxwell --

13  Ghislaine retained a separate residence from Mr. Epstein?

14  A.  Correct.

15  Q.  Mr. Rodgers, I want to ask you about your sense of a

16  relationship between Mr. Epstein and Ghislaine.  Okay?

17  A.  Okay.

18  Q.  You flew with them on numerous flights; right?

19  A.  Yes.

20  Q.  And you interacted with them on a regular basis in the '90s

21  and the 2000s; correct?

22  A.  Yes.

23  Q.  Now, from your perspective, Ghislaine always had an

24  employment role with Mr. Epstein; right?

25  A.  Yes.

LC8Cmax7                    Rodgers - cross

1    Q.  And to you, she appeared to be someone who took care of his

2    properties; right?

3    A.  Yes.

4    Q.  She managed the various properties?

5    A.  Yes.

6    Q.  She managed the property managers who were on site at the

7    properties?

8    A.  Correct.

9    Q.  She hired staff for these residences?

10   A.  Yes.

11   Q.  She would oversee the repairs and renovations for these

12   residences, things like that?

13   A.  Yes.

14   Q.  And she was also responsible for purchases, you said;

15   right?

16   A.  Yes.

17   Q.  So she would purchase items for the house, like furniture

18   items, things like that?

19   A.  Yes.

20   Q.  She would do the same for the planes, too; right?

21   A.  Yes.

22   Q.  She decorated the residences and the planes?

23   A.  Yes.

24   Q.  This was a pretty big job; right?

25   A.  Very big.

LC8Cmax7                         Rodgers - cross

1   Q.  And these were huge properties with lots of staff; right?

2   A.  Yes.

3   Q.  And there were lots of these properties?

4   A.  Yes.

5   Q.  And they demanded constant upkeep and supervision; right?

6   A.  Correct.

7   Q.  And there were numerous renovation and building projects

8   going on at any given time at this time period at these

9   properties?

10  A.  Right.  Yes.

11  Q.  And she dealt with the pilots like yourself; right?

12  A.  Yes.

13  Q.  One of her responsibilities was, for example, approving

14  your expenses?

15  A.  Yes.

16  Q.  And she approved your vacation time?

17  A.  Yes.

18  Q.  So if there was a problem with the planes in any way,

19  shape, or form, she was the point of contact for that kind of

20  an issue; right?

21  A.  Yes.

22  Q.  And she performed those roles for Epstein throughout the

23  1990s; right?

24  A.  Yes.

25  Q.  Now, you characterized her as Epstein's number 2, I think

LC8Cmax7                     Rodgers - cross

1    is what you said; right?

2    A.  Yes.

3    Q.  Well, your daily interaction with her happened to be about

4    things related to the planes; isn't that right?

5    A.  Yes.

6    Q.  And that was one of her responsibilities for Mr. Epstein?

7    A.  Correct.

8    Q.  But Mr. Epstein had lots of people helping him run his

9    affairs day-to-day; isn't that right?

10   A.  Correct.

11   Q.  He had an office with lots of different assistants doing

12   lots of different things for him; isn't that right?

13   A.  Yes.

14   Q.  But you interacted mostly with Ghislaine because she was in

15   charge of the planes; right?

16   A.  Correct.

17   Q.  But she wasn't, for example -- although she managed the

18   properties, she wasn't on site at the properties all the time?

19   A.  No.

20   Q.  There were property managers who ran the day-to-day things

21   for the properties; right?

22   A.  Yes.

23   Q.  She was just supervising those people?

24   A.  Correct.

25   Q.  Now, setting aside Ghislaine's employment relationship with

LC8Cmax7                      Rodgers - cross

1   Epstein, let's focus a bit on her personal relationship with

2   Mr. Epstein; okay?

3   A.   Okay.

4   Q.   You met her soon after you started working for Epstein in

5   1991; right?

6   A.   Yes, she was on the first --

7   Q.   When you first started, I think it appeared to you that

8   they were friends?

9   A.   Yes.

10  Q.   At that point in the early '90s, it didn't seem to you that

11  she had a romantic relationship with Epstein in those first few

12  years; is that right?

13  A.   No, I kind of feel like there was a -- well, maybe some

14  relationship building, you know, from '91, '92.

15  Q.   Hard to say though?

16  A.   Yeah, it's hard for me to say.

17  Q.   But I guess at some point it seemed to you that they were

18  involved romantically in some way; right?

19  A.   Yes.

20  Q.   But it wasn't really clear to you whether they were sort of

21  boyfriend-girlfriend, that sort of relationship; right?

22  A.   Well, I'm not sure exactly when that happened.

23  Q.   But at some point, they did have some sort of a romantic

24  relationship?  Let's characterize it that way.

25  A.   Yes.

LC8Cmax7                     Rodgers - cross

1   Q.  Now, it never appeared to you that Ghislaine was pregnant
2   at any time; right?
3   A.  No.
4   Q.  You never saw any pictures of her pregnant at any of the
5   residences; right?
6   A.  No.
7   Q.  Now, whatever the personal relationship between them might
8   have been, at some point in the 1990s, that stopped; right?
9   A.  Correct.
10  Q.  From your perspective; right?
11  A.  Yes.
12  Q.  She still worked for Epstein; right?
13  A.  Yes.
14  Q.  She still took care of the residences?
15  A.  Correct.
16  Q.  And she was still his friend; right?
17  A.  Yes.
18  Q.  But it seemed to you that she no longer had a romantic
19  relationship with him; right?
20  A.  Correct.
21  Q.  And in the 2000s, it seemed like Ghislaine's role in his
22  life was lessening; isn't that right?
23  A.  Yes.
24  Q.  Epstein brought in other people to help him run his
25  day-to-day business at that point; right?

1   A.  Correct.

2   Q.  You testified that Sarah Kellen appeared around 2000 --

3   sorry.  2001; right?

4   A.  Yeah, September 2001.

5   Q.  And she was one of these new assistants at that time

6   period; right?

7   A.  Yes.

8   Q.  And you started speaking to her or Larry Visoski started

9   speaking to her?

10  A.  Correct.

11  Q.  There were many other assistants that appeared over the

12  years in the 2000s, weren't there?

13  A.  Yes.

14  Q.  And it's your recollection, wasn't it, that in 2003 or

15  2004, Ghislaine wasn't flying nearly as much with Mr. Epstein

16  anymore at that point; isn't that right?

17  A.  That is correct.

18  Q.  Isn't it true that by 2004 or thereabouts, Ghislaine was in

19  a committed relationship with another man?

20  A.  Yes.

21  Q.  You're familiar with Ted Waitt?

22  A.  Yes.

23  Q.  He is the cofounder of Gateway computers?

24  A.  Yes.

25  Q.  Ghislaine was in a relationship with Ted Waitt by 2004,

LC8Cmax7                         Rodgers - cross

1   wasn't she?

2   A.   Yes.

3   Q.   And she was separating from Epstein?

4   A.   Yes.

5          MR. EVERDELL:   Just a moment, your Honor.

6          THE COURT:   Okay.

7          MR. EVERDELL:   I just have a few topics, your Honor.

8   Okay?

9          THE COURT:   Okay.

10  Q.   Mr. Rodgers, slightly different question.  You, I believe,

11  received subpoenas for your flight logs as part of civil

12  litigation in the past; right?

13  A.   Yes.

14  Q.   And you had to turn over your flight logs to the people who

15  requested the flight logs; right?

16  A.   Yes, I -- the flight logs were turned over to the FBI.

17  Q.   Well, the flight logs were turned over to the FBI, but

18  weren't they also turned over to plaintiffs' lawyers as part of

19  a civil litigation?

20         MS. COMEY:   Objection.  Foundation.

21         THE COURT:   Overruled.  You may answer.

22  A.   Yes, that is correct.  I personally didn't, but my attorney

23  forwarded, yes.

24  Q.   I see.  Your attorney produced those to the other side's

25  attorneys who had requested them; right?

LC8Cmax7                     Rodgers - cross

1    A.   Yes.

2    Q.   And these were in connection of lawsuits of people who were

3    suing Jeffrey Epstein; right?

4                MS. COMEY:  Objection.  Foundation.

5                THE COURT:  Sustained.

6    Q.   You did turn over your flight logs to these plaintiffs'

7    lawyers in connection with the civil litigation; right?

8                MS. COMEY:  Objection.  Misstates the testimony.

9    Q.   Your attorney, on your behalf, turned over your flight logs

10   to the plaintiffs' lawyers in the civil litigation; right?

11   A.   Yes, that's correct.

12   Q.   And that occurred, I think, back in the late 2000s, 2009 or

13   so, 8 or 9; is that about right?

14   A.   That's about right.

15   Q.   So your flight logs had been given to other people, besides

16   yourself, all the way back in 2008 or 9; isn't that right?

17   A.   Correct.

18   Q.   And they were now in the hands of the lawyers representing

19   people who were suing Jeffrey Epstein; right?

20               MS. COMEY:  Objection.  Foundation.

21               THE COURT:  Overruled.

22   A.   Repeat the question.

23   Q.   Your flight logs, after your lawyer produced them on your

24   behalf, were in the hands of plaintiffs' lawyers who were suing

25   Jeffrey Epstein?

LC8Cmax7                         Rodgers - cross

```
 1    A.  Yes.
 2    Q.  Let me ask you a few final questions, Mr. Rodgers.
 3           Did Mr. Epstein give you any gifts while you were
 4    employed with him?
 5    A.  Like, Christmas bonuses.
 6    Q.  Well, let me ask you a specific question.  You have
 7    children, Mr. Rodgers?
 8    A.  Yes.
 9    Q.  How many children do you have?
10    A.  One.
11    Q.  And a son or a daughter?
12    A.  Daughter.
13    Q.  Did Mr. Epstein pay for your daughter's tuition?
14    A.  Yes.
15    Q.  Did he pay for both high school and college?
16    A.  Yes.
17    Q.  These were -- so it was a private high school and then
18    college, as well?
19    A.  Correct.
20    Q.  And this was something that he did for several of his
21    employees; isn't that right?
22    A.  All of them, I think.
23    Q.  And did you ever mention this to Ghislaine that Jeffrey
24    Epstein was paying for your daughter's tuition?
25    A.  I don't recall.  I assume she probably knew.
```

LC8Cmax7                          Rodgers - cross

1    Q.  From your perspective, she was aware of the fact that

2    Jeffrey was paying --

3    A.  I think she was, yeah.

4    Q.  And did you ever ask Jeffrey Epstein to pay for your

5    daughter's tuition or did he do it of his own accord?

6    A.  He was very big on education and he just let us know early

7    on that he would do that.

8    Q.  And so he took an interest in seeing your daughter succeed?

9    A.  Yes.

10   Q.  And he didn't ask anything of you in return?

11   A.  Correct.

12   Q.  Now, you knew Ghislaine for at least 15 years or so before

13   she was no longer with Mr. Epstein; isn't that right?

14   A.  Yes.

15   Q.  And you interacted with her a fair amount; right?

16   A.  Yes.

17   Q.  I think you said on your testimony that she had a great

18   personality; right?

19   A.  She did.

20   Q.  You don't have any ill will toward Ghislaine Maxwell?

21   A.  No.

22   Q.  And you felt comfortable around her?

23   A.  Sure.

24   Q.  You, as father of a daughter, felt comfortable having your

25   daughter around her, too; isn't that right?

LC8Cmax7                          Rodgers - cross

1    A.   Yes.

2    Q.   And your daughter was how old in 1994, let's say?

3    A.   1994, she would have been 7.

4    Q.   And in 2004, she would have been what, 17?

5    A.   17.

6    Q.   Or thereabout.  So you were comfortable having your teenage

7    daughter spend time with Ghislaine and around Ghislaine; right?

8    A.   Yes.

9    Q.   You never saw Ghislaine do anything or say anything that

10   would lead you to believe she was helping Mr. Epstein or anyone

11   else sexually abuse underage girls, did you?

12   A.   No.

13   Q.   Because if you had seen something like that, as the father

14   of a daughter, you would have done something, wouldn't you?

15   A.   Yes.

16   Q.   And nothing you saw or heard in the roughly 30 years you

17   worked for Epstein ever gave you even the slightest hint that

18   anything like that was going on; isn't that right?

19   A.   That's correct.

20           MR. EVERDELL:  One moment, your Honor.

21           THE COURT:  Okay.

22           MR. EVERDELL:  Nothing further.

23           THE COURT:  Ms. Comey.

24           MS. COMEY:  Briefly, your Honor.

25           THE COURT:  Okay.

1          MS. COMEY:  May I inquire?

2          THE COURT:  You may.

3   REDIRECT EXAMINATION

4   BY MS. COMEY:

5   Q.  Good afternoon, Mr. Rodgers.

6   A.  Good afternoon.

7   Q.  Did you let your daughter massage Jeffrey Epstein?

8   A.  No.

9   Q.  Did Mr. Epstein ever give you $18.3 million?

10  A.  No.

11  Q.  Do you recall being asked on cross examination about

12  Mr. Epstein's New York residence on 71st Street?

13  A.  Yes.

14  Q.  Do you know the exact year when Mr. Epstein acquired that

15  residence?

16  A.  Not precisely.  Probably 1996.

17  Q.  Are you certain about that or are you estimating?

18  A.  No, I'm estimating.

19  Q.  Do you recall being asked questions about the Florida

20  residence of Mr. Epstein's?

21  A.  Yes.

22  Q.  You were asked about renovations on cross examination; is

23  that right?

24  A.  Yes.

25  Q.  Now, you said you recalled a particular conversation with

LC8Cmax7                          Rodgers - redirect

1    Mr. Epstein during those renovations; is that right?

2    A.   Yes.

3    Q.   What was that conversation about?

4    A.   At the time we were getting -- I believe it was the G2B and

5    it was -- we were trying to layout about what we wanted to do

6    for the interior and I recall being there at that house to talk

7    about that.

8    Q.   And was that around the time you got the G2B?

9    A.   Yes, that would have been -- I believe that would have

10   been -- in the year 1994 or sometime.  I don't know what month.

11   Q.   When did you buy the G2B?

12   A.   We bought the G2B in October -- I'm sorry.  February 2nd of

13   1994.

14   Q.   So that was about six months or more before you traveled to

15   Traverse City, Michigan, in 1994?

16   A.   Yeah, it was eight -- eight months before.  I'm sorry.

17   You're right.  Six months.  You're right.

18   Q.   And did you work at the Palm Beach house?

19   A.   No.

20   Q.   Who worked at the Palm Beach house that you know of in the

21   1990s?

22   A.   That would have been Juan Alessi and his wife and I can't

23   think of anyone else.

24   Q.   Do you recall being asked about a person we're referring to

25   as Jane on cross examination?

LC8Cmax7                        Rodgers – redirect

1  A.  Yes.

2  Q.  And do you recall being shown defense LV3A and defense

3  LV3B, two photographs?

4  A.  I recall that, but can I look at the photographs?

5          MS. COMEY:  With the Judge's permission, I have no

6  problem with that.

7          THE COURT:  Yes.

8  A.  Oh, I think I know what it is.  Yes, I recall.

9  Q.  And the person in that photograph has the same first name

10  as Jane's true first name; is that right?

11  A.  Correct.

12  Q.  Who did you meet first, Jane or the person in those

13  photographs?

14  A.  Jane.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

LC8VMAX8                     Rodgers – redirect

1   BY MS. COMEY:

2   Q.  When did you meet the person in those photographs?

3   A.  September of 2003.

4   Q.  And about when do you remember meeting Jane?

5   A.  November of 1996.

6   Q.  And what makes you feel so confident?

7   A.  Based upon my logbook.

8   Q.  Do you remember ever meeting anyone else on Jeffrey

9   Epstein's planes who had that same first name other than those

10  two people?

11  A.  I do not.

12          MS. COMEY:  One moment, your Honor.

13          THE COURT:  Okay.

14          (Counsel conferred)

15          MS. COMEY:  Nothing further.

16          MR. EVERDELL:  Nothing, your Honor.

17          THE COURT:  All right.

18          Mr. Rodgers, you may step down.  You are excused.

19          THE WITNESS:  Thank you.

20          (Witness excused)

21          THE COURT:  And, members of the jury, we'll break for

22  the -- I assume you don't have a six-minute witness.

23          MS. COMEY:  No, your Honor.

24          THE COURT:  Okay.  We'll break for the evening.

25          Same schedule tomorrow.  And thank you so much.

LC8VMAX8

1          Have a great evening.  We'll see you tomorrow.

2          (Jury not present)

3          THE COURT:  Everyone may be seated.

4          Okay.  Matters to take up?

5          MS. MOE:  Your Honor, we just wanted to provide the

6     Court with an update on timing.  We anticipate that we may rest

7     tomorrow or, if things run long, on Friday morning.

8          THE COURT:  Okay.  Does the defense anticipate moving

9     to a defense case after the close of the government's case?

10         MR. EVERDELL:  Your Honor, we do have witnesses.  I

11    think we haven't had the chance to confer with the government

12    yet, but I think it might make sense, especially if we finish

13    on Thursday potentially, to have the charge conference on

14    Friday so we can have time to fully address it.

15         THE COURT:  I'll need you to pull up the mic.

16         MR. EVERDELL:  We will likely have an application at

17    the end of the government's case, as is typical for the

18    defense.  And we'd want the chance to be heard on that as well.

19         THE COURT:  So my thinking had been the charge

20    conference either the evening of the 16th or, if the parties

21    were interested in taking me up on Saturday the 18th.  So I

22    suppose it depends if you're saying there is -- you won't be --

23    well, I would prefer, given just timing of when I'm going to be

24    able to get you the charge, to not do it Friday, unless you

25    don't have a case to put on on Friday.

LC8VMAX8

1          MR. EVERDELL:  Your Honor, to be frank, we do -- the

2    government has shaved a considerable amount of its case off in

3    the last day.  And we have witness issues.  People are

4    traveling.  We had been budgeting that we would start our case

5    the following week after the three-day break, simply because we

6    thought, given the number of witnesses that were left, that we

7    would be maybe even going into the following week before the

8    defense case started.

9          So given that they have now trimmed their case

10   significantly in the last day, we are trying to hustle

11   witnesses.  It's not that easy.  So our strong preference, your

12   Honor, would be that if we can start the defense case the

13   following -- I'm sorry, Thursday of the following week.  So we

14   would fill up Friday with the charge conference, if the Court

15   isn't -- if we want to do it at a later time, we can also do

16   that.  But we prefer not to start the defense case until --

17          THE COURT:  Right.  I think we've come around to the

18   request, which is given the expedition of the government's

19   case, your request is to start the defense case, whatever it

20   looks like, on Thursday when we return.

21          MR. EVERDELL:  That is the request, your Honor.

22          THE COURT:  And so if we can use this Friday for the

23   charging conference, we could do that or we could do the

24   charging conference on the evening of the 16th.

25          MR. EVERDELL:  Yes.

LC8VMAX8

1          THE COURT:  Or if you think your case will last

2     through Friday, if the parties are interested in the Saturday

3     offer.

4          MR. EVERDELL:  Yes, your Honor.

5          THE COURT:  Okay.

6          MS. MOE:  Yes, your Honor.

7          We defer to the Court with respect to timing.  And it

8     may perhaps just depend on the sequencing and timing of how

9     things pan out tomorrow or Friday morning.

10          We would just note with respect to sequencing, the

11     Court has ordered the defense to produce Rule 26.2 disclosures

12     at the conclusions -- at the conclusion of the government's

13     case.  And so we would respectfully request those materials

14     again at the conclusion of our case, irrespective of the timing

15     of the beginning of the defense case.

16          THE COURT:  Yes.  So that will either be tomorrow or

17     Friday, it sounds like.

18          MS. MOE:  Yes, your Honor.

19          MR. EVERDELL:  Understood, your Honor.  Understood.

20          THE COURT:  All right.  Okay.  That's helpful.

21          I'm comfortable with the defense request in light of

22     the speed with which we've moved and my scheduling conflict,

23     to -- since that takes us through till Thursday, to let the

24     defense begin its case on Thursday, assuming the government is

25     finished, of course.  And I'll think about whether this Friday

LC8VMAX8

1    for the charging conference makes sense and is feasible.  And

2    in any event, I'll hear your motion at the close of the case.

3            It may mean -- so the result may be that the jury has

4    Friday in addition to Monday, Tuesday, Wednesday, if

5    everybody's comfortable with that.  Yes.  Okay.

6            MR. EVERDELL:  Yes, your Honor.

7            THE COURT:  All right.  That's helpful.

8            I'll let you know.  Obviously if the charging

9    conference is Friday, I'll have to get you the charge before

10   Friday, which is possible.  It may not be a lot before Friday.

11           MR. EVERDELL:  Your Honor, we're happy to accommodate

12   the Court's schedule on the charge.  If you'd prefer to do it

13   Saturday, I just --

14           THE COURT:  I don't have a preference.  I just wanted

15   to make that available to the parties because it can be

16   difficult, I know, to review the charge as trial is proceeding.

17   So I'm not sure I have a preference.  Go ahead.

18           MR. EVERDELL:  Your Honor, we're simply trying not to

19   waste the Friday.  But, to be honest, the charge is obviously

20   very important and is going to require some careful review.  So

21   we'll defer to the Court on what makes the most sense.  But we

22   could do it on Friday if the Court wants to take advantage of

23   the day, but I think it would probably make more sense to do it

24   at a later day and we'll make ourselves available.

25           THE COURT:  Okay.

LC8VMAX8

```
 1                 Does the government have a preference?

 2                 MS. MOE:  No, your Honor.  The government defers to

 3      the Court on the timing.

 4                 THE COURT:  I think from my perspective, I would like

 5      to use the jury's time on Friday, if we could.  But if we

 6      can't, then I suspect they won't mind the extra time off.

 7                 I'll let you know tomorrow if I can get you the charge

 8      in time to do a charging conference on Friday.  But I hear you

 9      that, all things being equal, more time with the charge when

10      you're not trying the case is helpful, I presume, for both

11      sides.

12                 MR. EVERDELL:  Yes.

13                 THE COURT:  I do sometimes push for speed, you may

14      have heard.  But given where we are in the schedule, I think

15      taking time to be careful and getting your full input,

16      considered input, is appropriate.  Okay.

17                 MR. EVERDELL:  Thank you, your Honor.

18                 MS. STERNHEIM:   Thank you.

19                 THE COURT:  Am I going to get briefing on 52?  Because

20      if so, I want to schedule for it.

21                 MR. ROHRBACH:  The parties haven't conferred, your

22      Honor; but I suspect there will be briefing tonight.  The

23      government will file its brief by 8 p.m. or we can confer

24      immediately after this, right now, your Honor, and get a

25      timeline.
```

LC8VMAX8

1          THE COURT:  I guess the question is so you presumably

2    need resolution before the close of the government's case.

3          MR. ROHRBACH:  Yes, your Honor.

4          THE COURT:  That could be -- it could be tomorrow, but

5    I suppose -- well, if you want resolution tomorrow, following

6    briefing by both sides, then you'll be mindful of the Court's

7    schedule.

8          MR. ROHRBACH:  Yes, your Honor.

9          THE COURT:  And I would need briefing completed, I

10   think, by 10 p.m. tonight.

11         Now, if I have till Friday to resolve it, if I have

12   till Friday to resolve it, then you can have till midnight, I

13   suppose.  But I gather we don't know whether we'll have the

14   jury here on Friday or not.

15         MR. ROHRBACH:  Since we don't know, the government

16   would prefer to brief it tonight.  We could propose doing

17   simultaneous briefing at 10 p.m.

18         THE COURT:  No, no, no.  I don't think that makes

19   sense, because I don't know what new argument the government is

20   going to make and neither does the defense.

21         MR. ROHRBACH:  That makes sense.

22         THE COURT:  So I'll say 7 for the government, 10 for

23   the defense.

24         MR. PAGLIUCA:  That's fine, your Honor.

25         And it may be quick on our side, since it seems to me

LC8VMAX8

1    that this horse has been beaten thoroughly during the briefing
2    already in this case.
3            THE COURT:  You'll confer, obviously, if there's
4    something to confer about.  But otherwise let's do that for the
5    briefing schedule and then I'll get you resolution.  I don't
6    know if it will be in the morning or by the time the government
7    rests.
8            MR. ROHRBACH:  Understood, your Honor.
9            THE COURT:  Okay.  Anything else, folks?
10           MR. EVERDELL:  No, your Honor.
11           THE COURT:  Okay.  Thank you.  Have a good night.
12           See you at 8:45.
13           (Adjourned to December 9, 2021 at 8:45 a.m.)
14
15
16
17
18
19
20
21
22
23
24
25

```
 1                     INDEX OF EXAMINATION

 2   Examination of:                          Page

 3    JANINE GILL VELEZ

 4   Direct By Mr. Rohrbach . . . . . . . . . . .1732

 5   Cross By Ms. Sternheim . . . . . . . . . . .1737

 6    SHAWN

 7   Direct By Ms. Comey  . . . . . . . . . . . .1739

 8   Cross By Mr. Pagliuca  . . . . . . . . . . .1763

 9    NICOLE HESSE

10   Direct By Ms. Moe  . . . . . . . . . . . . .1768

11   Cross By Mr. Pagliuca  . . . . . . . . . . .1797

12    DAVID RODGERS

13   Direct By Ms. Comey  . . . . . . . . . . . .1805

14   Cross By Mr. Everdell  . . . . . . . . . . .1872

15   Redirect By Ms. Comey  . . . . . . . . . . .1962

16                   GOVERNMENT EXHIBITS

17   Exhibit No.                           Received

18    823   . . . . . . . . . . . . . . . . . .1735

19    823-R  . . . . . . . . . . . . . . . . . .1736

20    105   . . . . . . . . . . . . . . . . . .1759

21    1, 2, 3  . . . . . . . . . . . . . . . . .1790

22    662, 662-R . . . . . . . . . . . . . . . .1821

23

24

25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300