LCACmax1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
    UNITED STATES OF AMERICA,
3
                v.                          20 CR 330 (AJN)
4
    GHISLAINE MAXWELL,
5
                    Defendant.              Jury Trial
6   ------------------------------x
                                            New York, N.Y.
7                                           December 10, 2021
                                            8:55 a.m.
8
    Before:
9                   HON. ALISON J. NATHAN,

10                                          District Judge

11                          APPEARANCES

12  DAMIAN WILLIAMS
         United States Attorney for the
13       Southern District of New York
    BY:  MAURENE COMEY
14       ALISON MOE
         LARA POMERANTZ
15       ANDREW ROHRBACH
         Assistant United States Attorneys
16
    HADDON MORGAN AND FOREMAN
17       Attorneys for Defendant
    BY:  JEFFREY S. PAGLIUCA
18       LAURA A. MENNINGER
             -and-
19  BOBBI C. STERNHEIM
             -and-
20  COHEN & GRESSER
    BY:  CHRISTIAN R. EVERDELL
21
    Also Present:  Amanda Young, FBI
22                 Paul Byrne, NYPD
                   Sunny Drescher,
23                  Paralegal, U.S. Attorney's Office
                   Ann Lundberg,
24                  Paralegal, Haddon Morgan and Foreman

25

LCACmax1

1          THE COURT:  Good morning, everyone.  Good to see

2     everyone.  Matters to take up, counsel?

3          MS. MOE:  Yes, your Honor.  Thank you.  Just a

4     housekeeping matter with respect to Government Exhibit 52.  We

5     just wanted to clarify, before we offered the excerpts, that we

6     would be offering Government Exhibit 52 and its subparts

7     pursuant to a stipulation that they are true and accurate

8     photocopies.  I just wanted to make sure we clarified that

9     before we offered it at the beginning of the court day.

10          MR. PAGLIUCA:  I'm not sure if we're saying the same

11     thing.  I understood that 52 was being offered foundationally,

12     which is the entire document, and that then there are the

13     excerpts that were being offered into evidence for the jury.

14     That was my understanding of the process that we were doing.

15          THE COURT:  Ms. Moe, it's your exhibit.

16          MS. MOE:  Thank you, your Honor.  I think the way in

17     which we're proposing handling this would be similar in the way

18     we handled the message pads, which is part of the

19     authentication, involves the message pads themselves.  So those

20     exhibits were offered and also the subparts as marked

21     exhibit --

22          THE COURT:  I think you are then saying the same

23     thing.

24          MR. PAGLIUCA:  Okay.  So you'll move 52 in its

25     entirety.  There is a stipulation as to the accuracy of the

LCACmax1

1    copies on the subset of exhibits by letter, and you'll move

2    those, as well.

3            MS. MOE:  Yes, your Honor.

4            MR. PAGLIUCA:  I guess my question, your Honor, is

5    what's going --

6            THE COURT:  Hang on a second.

7            MR. PAGLIUCA:  -- to the jury is really the question.

8    My belief, when we address this with the witness, was the

9    government was not offering the entirety of 52, the government

10   was offering the photocopies of the various pages, and that was

11   the exhibit that was being admitted to the jury, and that's, I

12   think, a significant distinction here.

13           THE COURT:  So you're opposing movement of the --

14   obviously, you've objected.  To any event, I've overruled, but

15   even after that, you have an objection to moving the whole

16   thing to the jury or you just think it's inconsistent with how

17   it's been discussed or I suppose inconsistent with how it was

18   discussed at the time it was moved?

19           MR. PAGLIUCA:  Yes.  We had this colloquy.  The

20   government simply moved to admit the -- I think it's five

21   pages.  That was the extent of the admission.  My suggestion,

22   because we were dealing with the foundation issues, was that we

23   would have that exhibit, we would agree to the copies being

24   admitted per the government's request, but I wanted the actual

25   exhibit as part of the record for any necessary appellate

LCACmax1

1   issues.  And that's how I understood this was being addressed.

2              THE COURT:  Well, you want all of 52 as an exhibit for

3   the appellate record, but you don't want the jury to get all of

4   52?

5              MR. PAGLIUCA:  I think there are a couple of problems.

6   Certainly, we didn't cross examine on the entirety of 52,

7   because I understood that 52, in its entirety, was not being

8   admitted.  So I think that's problem number 1.

9              There are also problems, I think, simply with

10  relevance related to the rest of the exhibit, and there were

11  discrete portions that the government said the government was

12  contending were relevant and not the other portions.  So the

13  book is however many pages it is, but I think it's outside of

14  what was appropriate for cross examination at the time.

15             THE COURT:  My clerk is sending me the portion of the

16  transcript.

17             I can't tell if you're in disagreement yet or not,

18  Ms. Moe.

19             MS. MOE:  Yes, your Honor.  I think the issue is more

20  that because the weight and authenticity of this exhibit has

21  now been put in dispute, I don't know how the jurors would

22  evaluate the testimony about its contents, the format, in order

23  to evaluate its authenticity or weight without the object

24  itself.  That's what we wanted to clarify about whether that

25  would be part of the record.

LCACmax1

1            THE COURT:  You say now it's been put in dispute.  It

2      was certainly in dispute at the time you moved.  So we'll see

3      what was moved and go from there.

4            MS. MOE:  Yes, your Honor.  Thank you.

5            THE COURT:  I have the parties proposed limiting

6      instruction, which looks just right to me.  So thank you.

7            MS. MOE:  Thank you, your Honor.  And aside from this

8      matter, there are no additional matters this morning.

9            MS. MENNINGER:  I was going to propose that your Honor

10      handle the limiting instruction for Ms. Farmer's testimony in

11      the same way that we handled it for Kate in that she would be

12      brought into the witness stand and the Court would read that

13      limiting instruction so the jury can identify the person about

14      who the limiting instruction is being given.

15            THE COURT:  I think we indicated yesterday before the

16      break that we would do it the same way.

17            MS. MOE:  Yes, your Honor.

18            MR. PAGLIUCA:  There is another issue, your Honor, to

19      a newly disclosed witness as of last night or yesterday

20      evening.  The witness's name is William Brown, as I understand

21      it.  He is a, I would say, record custodian for DMV related to

22      the identity of an individual that has the same name.

23            THE COURT:  Same first name?

24            MR. PAGLIUCA:  Correct.

25            THE COURT:  As Jane?

LCACmax1

1          MR. PAGLIUCA:  Yes.  So we are objecting to the late

2    endorsement and the calling of the witness, first on simply

3    disclosure issues, but second, I'm unclear of the relevance,

4    given the lack of any, I'll call it, tying to any actual

5    testimony.

6          We're going to get a DMV record, as I understand it,

7    from this witness that no one else who has testified has ever

8    done any comparator between whatever is in the DMV record and

9    either photographs or other information about the witness that

10   Mr. Rodgers talked about.  So I don't think there has been a

11   linkup for relevance purposes.

12         So we object on the basis of relevance to this witness

13   being called, as well.

14         THE COURT:  Who will handle this one?

15         MS. MOE:  Yes, your Honor.  This exhibit and this

16   evidence is directly responsive to an issue raised by the

17   defense in their cross examination of both pilots in this case.

18         As the Court may recall, defense counsel suggested

19   that the Jane in the records in the 1990s could potentially be

20   the person with the first name Jane from the 2000s.  We have

21   produced in discovery, and is nontestifying witness materials,

22   ample material that makes it clear that could not possibly --

23   and in response to the suggestion that it might be this

24   different person, we now need to clarify the record on that.

25         As defense counsel knows, the second Jane from the

LCACmax1

```
1     2000s wasn't even in the United States in the 1990s.  In fact,

2     her date of birth and age makes clear that she could not be an

3     adult in the 1990s on that flight --

4               THE COURT:  It's a rebuttal witness.

5               MS. MOE:  Yes, your Honor.

6               THE COURT:  On the disclosure front, I suppose if they

7     want to make you wait and do it in rebuttal -- why you want to

8     do that, I'm not sure, but on the disclosure front, it's

9     clearly a rebuttal witness.  I don't think someone that they

10    could have anticipated needing but for the arguments put

11    forward by the defense, you tell me if I'm wrong, but I'd

12    certainly let -- on the disclosure front, I'd let the

13    government call the person as a rebuttal witness.  Whether we

14    do that now or in rebuttal, I suppose, is -- I'll hear from

15    both sides on that question.

16              And then relevance, I think you've indicated the

17    rebuttal relevance of the evidence you're seeking to get in?

18              MS. MOE:  Yes, your Honor.  On the disclosure front, I

19    want to make clear we produced this exhibit the same day we

20    received it.  We were on equal footing with the defense here.

21    In terms of the content of the testimony in the exhibit, it's

22    just a picture and date of birth, which is information the

23    defense has had or for a very long time now.  It's a person

24    that the defendant herself knows.

25              So I don't think there is any surprise or mystery
```

LCACmax1

about a photograph of this defendant -- of this person which is

the same as the photograph the defense has already offered and

connecting that up with her date of birth, which is information

that is not a mystery to the defense, they've been in

possession of that information for a long time now through

discovery.  So we're both on equal footing.  We promptly

complied with our discovery obligations.  There is no surprise

in the substance of this testimony or the exhibit.

So we would like to correct the record before the jury

now because there is no basis to suggest to this jury that the

person in the 1990s flights is Jane.  That is misleading and we

would like to clarify that today.

MR. PAGLIUCA:  Your Honor, if the Court is going to

allow it on rebuttal, it makes sense to do it now.  I don't see

why we would need to delay the witness.  So if the Court is

going to allow it, I would just --

THE COURT:  I'll allow it.  It is rebuttal.  The

relevance is that the defense has suggested that, with both

pilot witnesses, that the person they either remember to have

the first name -- same first name as Jane or listed on

Mr. Rodgers' log as having the same first name as Jane wasn't,

in fact, Jane.

I understand the government's proffer to be that they

have evidence that shows this other person who has the same

first name as Jane would not have been -- whose age and also

LCACmax1

1    presence in the U.S. -- is that part of it or just the age?

2              MS. MOE:  Just the age.  What we're offering is not a

3    travel record.  I think the photograph that was offered by

4    defense counsel is of an adult.  The testimony with that person

5    was a person -- so her date of birth makes clear that she

6    couldn't have been a personal assistant as an underage girl

7    given her date of birth and given the timing.  This would have

8    been in the 2000s.

9              THE COURT:  Rebuttal relevance, I think, is apparent.

10   So I will allow it and we can do it now.

11             MS. MOE:  Thank you, your Honor.

12             THE COURT:  What else can I take up?

13             MS. MOE:  Nothing from the government, your Honor.

14             THE COURT:  Okay.  Ms. Williams will check on the

15   juror members.

16             While we're gathering that, I would like to speak to

17   the parties at sidebar just as to how to address the jury about

18   the followup from the break yesterday.

19             (Continued on next page)

20             (Page 2037 SEALED)

21

22

23

24

25

LCACmax1

1              (In open court)

2              THE COURT:  I've looked at the transcript, and the

3    government expressly said it wasn't moving 52 in its entirety.

4    So that's what's in issue and that's what I reserved on.  So

5    it's the subletters.  Then 52, what's been marked for

6    identification as 52 should be part of the record for purposes

7    of the 901 issue.  Okay?

8              MS. MOE:  Yes, your Honor.  Thank you.

9              THE COURT:  But what's been moved are the sub-sheet

10   copies.

11             If nothing else, I'll step down until we have our

12   jury.

13             MS. MOE:  Thank you, your Honor.

14             THE COURT:  Thank you.

15             (Recess)

16             THE COURT:  We have our jury.  Any reason not to bring

17   them in, counsel?

18             MS. MOE:  No, your Honor.  Thank you.

19             MS. MENNINGER:  No, your Honor.  Thank you.

20             THE COURT:  Please bring in the jury.

21             (Continued on next page)

22

23

24

25

LCACmax1

1              (Jury present)

2              THE COURT:  Thank you so much, members of the jury.

3      Appreciate your patience yesterday.  I'm very pleased to report

4      all the attorneys are here.  Everyone is doing well.  So we can

5      continue.

6              Ms. Moe, the government may call its next witness.

7              MS. MOE:  Thank you, your Honor.  At this time, we

8      would like to read a stipulation between the parties.

9              THE COURT:  Go ahead.

10             MS. MOE:  Thank you, your Honor.

11             For the record, your Honor, the stipulation is marked

12     Government Exhibit 1009.  The stipulation is regarding

13     Government Exhibit 52.

14             THE COURT:  Just, without objection?

15             MR. PAGLIUCA:  Without objection, your Honor.

16             THE COURT:  Go ahead.

17             MS. MOE:  It is hereby stipulated and agreed by and

18     among the United States of America, by Damien Williams, United

19     States Attorney for the Southern District of New York, and

20     Maureen Comey, Alison Moe, Lara Pomerantz, and Andrew Rohrbach,

21     Assistant United States Attorneys of counsel, and defendant,

22     Ghislaine Maxwell, by and with the consent of her attorneys,

23     Christian Everdell, Laura Menninger, Jeffrey Pagliuca, and

24     Bobbi Sternheim, that Government Exhibits 52A, 52D, 52E, 52F,

25     52G, and 52H are true and correct photo copies of six pages of

LCACmax1

1   Government Exhibit 52.

2           Your Honor, pursuant to this stipulation, the

3   government offers the following exhibits under seal:

4   Government Exhibits 52A, 52D, 52E, 52F, 52G, and 52H.

5           MR. PAGLIUCA:  Subject to our previous record, your

6   Honor.

7           THE COURT:  Okay.  Thank you.  I am admitting the

8   exhibits just indicated with a limiting instruction.

9           (Government's Exhibits 52A, 52D, 52E, 52F, 52G, and

10  52H received in evidence)

11          MS. MOE:  Yes, your Honor.

12          THE COURT:  Members of the jury, the exhibit is being

13  offered for a limited purpose.  They were not being offered for

14  the truth of the matters asserted therein, and you may not

15  consider it for that purpose.  Rather, you may consider them

16  only to the extent you believe it is relevant to show a link,

17  if any, between Ms. Maxwell and the names and phone numbers

18  listed and how, if at all, the information was organized.

19          MS. MOE:  Thank you, your Honor.  And may these

20  exhibits be received under seal to protect the identities of

21  witnesses testifying under pseudonyms and the privacy of third

22  parties?

23          THE COURT:  No objection to the sealing?

24          MR. PAGLIUCA:  No objection.

25          THE COURT:  For the reasons indicated, they are

LCACmax1

1    admitted under seal.

2            MS. MOE:  May the jurors turn to what's now in

3    evidence under seal as Government Exhibits 52G, which is in

4    their binders.

5            THE COURT:  Without objection?

6            MR. PAGLIUCA:  No objection.

7            THE COURT:  Large binders, GX52G, please.

8            MS. MOE:  Thank you, your Honor.  May the jurors have

9    a moment to read this exhibit.  In particular, we would direct

10   the jurors' attention to the entries under massage, Florida,

11   for --

12           MR. PAGLIUCA:  Your Honor, I object to the direction

13   here.

14           THE COURT:  Sustained.  They can review the document.

15           MS. MOE:  Thank you, your Honor.  May we give the

16   jurors a few minutes to read the document in full?

17           THE COURT:  Just G?

18           MS. MOE:  52G, your Honor, yes.

19           THE COURT:  They can take a moment for 52G, yes.

20           (Pause)

21           Okay.

22           MS. MOE:  Thank you, your Honor.  Finally, we would

23   offer Government Exhibit 1009.  This stipulation is a public

24   exhibit.

25           THE COURT:  Without objection and on stipulation, 1009

LCACmax1                        Brown – direct

1   is admitted.

2           MR. PAGLIUCA:  Yes, your Honor.

3           THE COURT:  Thank you.

4           MS. MOE:  Thank you, your Honor.

5           THE COURT:  Jurors may put the binders down and the

6   government may call its next witness.

7           MR. ROHRBACH:  The government calls William Brown.

8           THE COURT:  William Brown may come forward.

9    WILLIAM BROWN,

10       called as a witness by the Government,

11       having been duly sworn, testified as follows:

12          THE COURT:  Thank you, Mr. Brown.  You may be seated

13   and you may remove your mask and please state and spell your

14   name for the record.

15          THE WITNESS:  Thank you.  My name is William Brown,

16   W-i-l-l-i-a-m  B-r-o-w-n.

17          THE COURT:  Mr. Rohrbach, you may inquire.

18   DIRECT EXAMINATION

19   BY MR. ROHRBACH:

20   Q.  Good morning.

21   A.  Good morning.

22   Q.  Mr. Brown, where do you work?

23   A.  I work for the New York State Department of Motor Vehicles,

24   Division of Field Investigations.

25   Q.  What is your position there?

LCACmax1                          Brown - direct

1   A.  My position is a supervisor/investigator.

2   Q.  As part of your job, are you familiar with the process by

3   which people obtain identification cards?

4   A.  Yes, I am.

5   Q.  Are you familiar with the Department of Motor Vehicles'

6   business practices around the issuing of identification card?

7   A.  Yes, I am.

8   Q.  How does someone get an identification card?

9   A.  A person would have to go to a DMV office, fill out an

10  application, take a picture, then provide original

11  documentation to their identification to the motor vehicle

12  representative.

13  Q.  What sort of information do they provide to the Department

14  of Motor Vehicles?

15  A.  They provide name, date of birth, social security number.

16  Q.  And what, if anything, does the Department of Motor

17  Vehicles do to verify that information?

18  A.  We verify the original documents' security features.

19  Q.  What original documents do you look at?

20  A.  Social security cards, possible U.S. passport, birth

21  certificate.

22  Q.  Does that happen at or near the time the information is

23  provided?

24  A.  Yes, it does.

25  Q.  You mentioned that a photograph is taken.  Who takes that

LCACmax1                        Brown - direct

1   photograph?

2   A.   A motor vehicle representative will take that photograph at

3   the counter.

4   Q.   Is making identification cards a regular practice of the

5   Department of Motor Vehicles?

6   A.   Yes, it is.

7   Q.   I'd like you to pick up the folder next to you.  Would you

8   please look at what's been marked for identification as

9   Government Exhibit 21.

10  A.   Okay.

11  Q.   Do you recognize this?

12  A.   Yes, I do.

13  Q.   Have you reviewed it before today?

14  A.   Yes, I have.

15  Q.   Without saying any names, what is it?

16  A.   It is a database -- New York State DMV compass database.

17  Q.   What is the compass database or what records are stored?

18  A.   ID cards, driver's licenses.

19  Q.   Is this a fair and accurate report from the compass

20  database?

21  A.   Yes, it is.

22  Q.   Is the data stored in the compass database kept in the

23  ordinary course of business?

24  A.   Yes, it is.

25          MR. ROHRBACH:   The government offers Government

LCACmax1                        Brown – direct

1    Exhibit 21 as a sealed exhibit to protect the identities of

2    witnesses testifying under pseudonyms.

3              MR. PAGLIUCA:  Subject to the previous record, your

4    Honor.

5              THE COURT:  GX21 is admitted for the reasons I

6    previously indicated under seal to protect the identity of the

7    witnesses.

8    BY MR. ROHRBACH:

9    Q.  Supervisory Investigator Brown, would you please turn to

10   what's been marked for identification in your folder as

11   Government Exhibit 22.

12   A.  Okay.

13   Q.  Do you recognize this?

14   A.  Yes, I do.

15   Q.  Have you reviewed it before today?

16   A.  Yes, I have.

17   Q.  What is it?

18   A.  This is an image capture that was taken of the person who

19   received an ID card.

20   Q.  Is it the same person as the person in Government Exhibit

21   21 that we were just looking at?

22   A.  Yes, it is.

23   Q.  How is this record stored at the DMV?

24   A.  This record is stored in a photosystem database.

25   Q.  Is it kept in the regular courts of business?

LCACmax1                      Brown - direct

```
 1  A.  Yes, it is.

 2  Q.  Is that document a fair and accurate copy of the image from

 3  the DMV's database?

 4  A.  Yes, it is.

 5          MR. ROHRBACH:  Your Honor, the government offers

 6  Government Exhibit 22 under seal for the pseudonym reason.

 7          MR. PAGLIUCA:  Subject to the previous record, your

 8  Honor.

 9          THE COURT:  Okay.  For the reasons indicated, I will

10  admit Government Exhibit 22.  It's admitted under seal to

11  protect the identity of the testifying witness.

12          MR. ROHRBACH:  Your Honor, with the Court's

13  permission, I would ask the jurors first turn in their binders

14  what's already in evidence under seal as Defense Exhibit LV3A.

15          THE COURT:  Without objection, Mr. Pagliuca?  Without

16  objection to directing the jurors to turn to LV3A?

17          MR. PAGLIUCA:  That's fine, your Honor.

18          THE COURT:  It's in the binder or the folder?

19          MR. ROHRBACH:  Front of the binder.

20          THE COURT:  Front of the binder, LV3A.

21          MR. ROHRBACH:  Your Honor, now with the Court's

22  permission, I direct the jurors and the witness to turn to

23  what's in evidence under seal as Government Exhibit 22.

24          THE COURT:  Just admitted GX22, so you may turn to

25  that.
```

LCACmax1                      Brown - direct

1  Q.  Supervisory Investigator Brown, what is the date that this

2  photo was taken?

3  A.  This photo was taken on April 28th of 2004.

4          MR. ROHRBACH:  Now, your Honor, I would ask that the

5  witness and the jury turn to Government Exhibit 21.

6          THE COURT:  I just admitted GX21, so you may turn to

7  that, members of the jury.

8  Q.  Directing your attention to the middle of the page, what is

9  the box titled nondriver ID history?

10  A.  This box states the date that the nondriver ID was issued

11  and the date that it expires.

12  Q.  What is the date that this nondriver ID was issued?

13  A.  It was issued on April 28th of 2004.

14  Q.  And is that the same date as the date on the photograph we

15  just looked at?

16  A.  Yes, it is.

17  Q.  Directing your attention to the top of the page, again,

18  without saying any names, do you see where it says DOB?

19  A.  Yes.

20  Q.  What does that stand for?

21  A.  Date of birth.

22  Q.  What is the year of this date of birth?

23  A.  The year of this date of birth is 1985.

24  Q.  How old was someone born in 1985 in 1996?

25  A.  Someone born in 1985 in 1996 would be 11 years old.

LCACmax1                          Brown - direct

1          MR. ROHRBACH:  No further questions, your Honor.

2          MR. PAGLIUCA:  I have no questions of this witness,

3    your Honor.

4          THE COURT:  Thank you, Mr. Brown.  You may step down.

5          THE WITNESS:  Thank you.

6          (Witness excused)

7          THE COURT:  Government may call its next witness.

8          MS. POMERANTZ:  The government calls Annie Farmer.

9          THE COURT:  Annie Farmer may come forward.  Good

10   morning, Ms. Farmer.

11    ANNIE FARMER,

12        called as a witness by the Government,

13        having been duly sworn, testified as follows:

14         THE COURT:  You may be seated.  You can remove your

15   mask and please state and spell your name for the record.

16         THE WITNESS:  My name is Annie Farmer, A-n-n-i-e

17   F-a-r-m-e-r.

18         THE COURT:  Members of the jury, I have a limiting

19   instruction.

20          I anticipate that you'll hear testimony from the next

21   witness about physical contact that she says she had with

22   Mr. Epstein and Ms. Maxwell in New Mexico.  I instruct you that

23   the alleged physical contact she says occurred with Mr. Epstein

24   and Ms. Maxwell in New Mexico was not, quote, illegal sexual

25   activity, end quote, as the government has charged in the

LCACmax1                          A. Farmer - direct

1    indictment.  I'll give you more instructions on the legal term,

2    quote, illegal sexual activity, end quote, at the end of the

3    case.  However, to the extent you conclude that her testimony

4    is relevant to the issues before you, you may consider it, but

5    you may not consider this testimony as any kind of reflection

6    on Mr. Epstein's nor Ms. Maxwell's character or propensity to

7    commit any of the crimes charged in the document.

8              Ms. Pomerantz, you may inquire.

9              MS. POMERANTZ:  Thank you, your Honor.

10   DIRECT EXAMINATION

11   BY MS. POMERANTZ:

12   Q.  Good morning.

13   A.  Good morning.

14   Q.  How old are you?

15   A.  I'm 42 years old.

16             MS. POMERANTZ:  Your Honor, at this time, I would ask

17   that the jurors be permitted to take out their binders and turn

18   to Government Exhibit 13, which is in evidence under seal, and

19   I would ask that the witness also look at Government Exhibit

20   13.

21             THE COURT:  Ms. Menninger, without objection?

22             MS. MENNINGER:  Sorry, your Honor.  One moment.

23             THE COURT:  That's okay.

24             MS. MENNINGER:  No objection, your Honor.

25             THE COURT:  Members of the jury, you could open your

LCACmax1                        A. Farmer - direct

1    binder to GX13 and direct the witness to open to GX13.

2    Q.  What is Government Exhibit 13?

3    A.  It's a copy of my birth certificate.

4    Q.  Directing your attention on the first line towards the top

5    right, is that the date of your birth?

6    A.  Yes, that's correct.

7               MS. POMERANTZ:  Your Honor, we can put that away now.

8               THE COURT:  You can put down your binders.  Thank you.

9    Q.  In what state were you born?

10   A.  Missouri.

11   Q.  Where did you grow up?

12   A.  I moved around a bit when I was young, but when I was 8

13   years old, I moved to Arizona and lived there until I graduated

14   from high school.

15   Q.  How far did you go in school?

16   A.  I completed my Ph.D.

17   Q.  Where did you go to college?

18   A.  I went to the University of Pennsylvania for my

19   undergraduate.

20   Q.  Where did you get your Ph.D.?

21   A.  University of Texas at Austin.

22   Q.  What is your Ph.D. in?

23   A.  Educational psychology.

24   Q.  What kind of work do you do now?

25   A.  I'm a psychologist and I work primarily as a therapist.

LCACmax1                          A. Farmer - direct

1  Q.  Now, Annie, could you please look around the courtroom and

2  let us know, you do you see anyone in this courtroom who has

3  ever given you a massage?

4  A.  Yes, I do.

5  Q.  Could you please describe where the person you recognize is

6  sitting and describe an item of clothing the person is wearing.

7  A.  She's wearing a brown sweater.  She's seated to my right at

8  the end of the table next to you.

9       MS. POMERANTZ:  Let the record reflect that the

10  witness has identified the defendant.

11       THE COURT:  Record may so reflect.

12  Q.  How old were you when Maxwell gave you a massage?

13  A.  I was 16 years old.

14  Q.  We'll talk about that more later, but I want to switch

15  gears and take a step back.

16  A.  Okay.

17  Q.  Where did you go to high school?

18  A.  I went to high school in Phoenix, Arizona.

19  Q.  And when you were about 16 years old, in what state were

20  you living?

21  A.  In Arizona.

22  Q.  When you were 16 years old, who did you live with at home?

23  A.  I lived with my mom and my little sister, Ashley, and our

24  dog.

25  Q.  Did your dad live with you?

LCACmax1                        A. Farmer - direct

1    A.  No.  My parents are divorced.

2    Q.  Was your mother employed?

3    A.  She was.

4    Q.  What kind of work did she do?

5    A.  She was a sales rep for Owen Company, and she worked for

6    herself -- worked with a couple of different companies.

7    Q.  What was your understanding of your family's financial

8    circumstances when you were 16 years old?

9    A.  Money was tight.  It had often been a stressor since my

10   parents were divorced and my mom was supporting my sisters and

11   I pretty much on her own without much help at all from my

12   father.  So I was in high school and looking forward to college

13   and worried about money and how that would work out.

14   Q.  You mentioned that you lived with your mom and your younger

15   sister.  Do you have any other siblings?

16   A.  Yes, I have an older sister.

17   Q.  What is your older sister's name?

18   A.  Maria Farmer.

19   Q.  About how much older than you is your sister?

20   A.  She is a little more than nine years older than me.

21   Q.  When you were 16 years old, where did Maria live?

22   A.  She lived in Manhattan.

23   Q.  What did Maria do for a living?

24   A.  She had just completed her graduate school in painting and

25   she was working as a painter, but her employment was with

LCACmax1                          A. Farmer - direct

1   Jeffrey Epstein.

2   Q.  Did you talk to Maria while she was working for Jeffrey

3   Epstein?

4   A.  I did.

5   Q.  How did you speak with Maria?

6   A.  We would talk on the phone.

7   Q.  Did there come a time when you visited Maria in New York?

8   A.  Yes.

9   Q.  Approximately when did you visit Maria in New York?

10  A.  It was December 1995.

11  Q.  Had you visited Maria in New York before December 1995?

12  A.  I had not.

13  Q.  Why not?

14  A.  Money was, as I said, tight for us.  So she had graduated,

15  but we had not been able to attend that.  And just affording a

16  plane ticket was a big deal.  So I had not gone to visit her.

17  Q.  How was it that you were able to afford this trip in

18  December 1995 to New York?

19  A.  Jeffrey Epstein purchased a ticket for me.

20  Q.  What were you hoping to do on this trip to New York?

21  A.  I was hoping, one, to see my sister.  I was very excited to

22  see her.  It had been some time.  I was also hoping to be

23  acquainted with Jeffrey Epstein.  He had said that he was

24  interested in helping --

25          MS. MENNINGER:  Objection.  Hearsay, your Honor.  It

LCACmax1                         A. Farmer - direct

1    wasn't directly to her.

2              THE COURT:  Just a moment.  Sustained.

3    Q.  Annie, did there come a time when your sister spoke to you

4    about a trip to New York?

5    A.  Yes.

6    Q.  And what did she tell you about this trip to New York?

7              MS. MENNINGER:  Objection.  Hearsay, your Honor.

8              MS. POMERANTZ:  Your Honor, effect on the listener.

9              THE COURT:  Just a moment.  Is this the issue we've

10   discussed?

11             MS. POMERANTZ:  I believe so, yes.

12             THE COURT:  Okay.  Overruled.

13             MS. MENNINGER:  If that's the question --

14             THE COURT:  I'll listen to the testimony and if it's

15   beyond that, I'll hear the objection.

16             MS. MENNINGER:  Thank you, your Honor.

17             THE COURT:  Go ahead.  Do you need the question

18   repeated?

19             THE WITNESS:  Yes.  Could you repeat that.

20   BY MS. POMERANTZ:

21   Q.  What had your sister, Maria, told you about the trip to New

22   York?

23   A.  She had said that Epstein was interested in possibly

24   helping me with my education, and this was one of the reasons

25   that he was purchasing my ticket.

LCACmax1                        A. Farmer - direct

| | |
|---|---|
| 1 | MS. MENNINGER:  I renew my objection, your Honor. |
| 2 | THE COURT:  So I'll overrule the objection, but I will |
| 3 | tell the jury that the testimony that Ms. Farmer just provided |
| 4 | about what was told to her is not being offered for the truth, |
| 5 | but for the limited purpose of the effect on the listener, |
| 6 | Ms. Farmer. |
| 7 | Go ahead. |
| 8 | BY MS. POMERANTZ: |
| 9 | Q.  How did you travel to New York? |
| 10 | A.  I flew, commercially. |
| 11 | Q.  Who, if anyone, did you travel with to New York? |
| 12 | A.  No one.  I flew by myself. |
| 13 | Q.  Who paid for your flight to New York? |
| 14 | MS. MENNINGER:  Objection.  Foundation, your Honor. |
| 15 | THE COURT:  All right.  Sustained. |
| 16 | Q.  Did you pay for your flight to New York? |
| 17 | A.  I did not. |
| 18 | Q.  When you were in New York, who, if anyone, did you think |
| 19 | bought you the ticket? |
| 20 | A.  When I met Epstein -- |
| 21 | MS. MENNINGER:  Objection, your Honor.  Hearsay.  It's |
| 22 | being offered for that purpose. |
| 23 | THE COURT:  Additional foundation questions are |
| 24 | required. |
| 25 | MS. POMERANTZ:  Your Honor, I'll move on for now. |

LCACmax1                            A. Farmer – direct

1    Thank you.

2    BY MS. POMERANTZ:

3    Q.  Where did you stay in New York?

4    A.  I stayed with my sister in her apartment.

5    Q.  Approximately how long were you in New York?

6    A.  I believe it was about a week.

7    Q.  When did you go to New York?

8    A.  After Christmas in 1995.

9    Q.  Did there come a time when you met Jeffrey Epstein during

10   that trip?

11   A.  Yes.

12   Q.  Did you meet Maxwell during this trip to New York?

13   A.  I did not.

14   Q.  How many times did you see Jeffrey Epstein during this trip

15   in New York?

16   A.  There were two different occasions that I recall.

17            MS. POMERANTZ:  Ms. Drescher, would you please pull up

18   for just the witness, the parties, and the Court, what has been

19   marked for identification as Government Exhibit 101.

20   Q.  Annie, do you recognize this?

21   A.  Yes.

22   Q.  What is it?

23   A.  It's my high school photo from my junior year in high

24   school.

25   Q.  Is this a fair and accurate depiction of your physical

LCACmax1                        A. Farmer – direct

1   appearance around the time you met Jeffrey Epstein?

2   A.  It is.

3            MS. POMERANTZ:  Your Honor, the government offers

4   Government Exhibit 101 in evidence.

5            MS. MENNINGER:  No objection, your Honor.

6            THE COURT:  Thank you.  GX101 is admitted.  You may

7   publish.

8            MS. POMERANTZ:  Thank you, your Honor.

9   BY MS. POMERANTZ:

10  Q.  How old were you at the time this photograph was taken?

11  A.  I was 16 years old.

12  Q.  How old were you on the trip to New York?

13  A.  I was 16 years old.

14           MS. POMERANTZ:  Ms. Drescher, can you please pull up

15  what's already in evidence as Government Exhibit 112.

16  Q.  Annie, do you recognize the person in this photograph?

17  A.  Yes.

18  Q.  Who is it?

19  A.  It's Jeffrey Epstein.

20           MS. POMERANTZ:  Ms. Drescher, we can take that down.

21  Thanks very much.

22  Q.  Can you please describe for the jury what happened the

23  first time you met Jeffrey Epstein.

24  A.  Yes.  My sister and I went to his home.  He had purchased

25  tickets for us to attend the Phantom of the Opera.  So we met

LCACmax1                          A. Farmer - direct

1   with him at his home.  He was very -- he seemed very friendly

2   and kind of down to earth, he was dressed casually.  We were

3   dressed up because we were going to the theater and this was a

4   big deal because I had been very excited about seeing this

5   production, and he invited us into his home and we talked and

6   served us champaign.  And then, later on, his driver took us to

7   the play.

8   Q.  Just to unpack that a little bit.  Where did you meet

9   Epstein?

10  A.  At his home.

11  Q.  Can you describe for the jury what the home looked like.

12  A.  Yeah, it was a very grand home.  I was staying with my

13  sister in her apartment, which is about, I think, 500 square

14  feet.  So I had never been in a private residence that was so

15  large in the city before.  It was full of very nice things.  I

16  remember sitting across a desk from him, like, you know, a

17  beautiful large wooden desk in this kind of library room.  And,

18  yeah, it was just a very, you know, a very fancy home.

19          THE COURT:  Ms. Farmer, could I ask you to move the

20  microphone a little bit closer to you if you speak directly

21  into it.

22          THE WITNESS:  Yes.  Sorry.

23          THE COURT:  Thank you.

24  Q.  What, if anything, did Epstein ask you about?

25  A.  Well, one thing he asked me about was my plans for after

LCACmax1                          A. Farmer – direct

1   high school, and we talked a bit about colleges and he asked me

2   where I was considering.  I remember he suggested that I should

3   look at UCLA, that that was a place that he liked or had some

4   connection.  And then, yeah, just made, you know, made small

5   talk.

6   Q.  What, if anything, did Epstein talk to you about in terms

7   of your summer?

8   A.  We'd talked about the idea of me going on a trip that

9   summer, something that would help sort of boost my application

10  for college, that would look good.  So a lot of people at that

11  time were doing international trips and he said that was

12  something he thought would be a good idea for me to do and he

13  would be willing to help me with that.

14  Q.  How did you feel when you first met Epstein?

15  A.  I was excited.  He was, again, very friendly with me, he

16  seemed down to earth.  I had been sort of intimidated by what I

17  heard of him, but he seemed, you know, very nice when I met

18  him.  What he said about wanting to help me was, of course,

19  exciting, reassuring.

20              (Continued on next page)

21

22

23

24

25

LCAVMAX2                          A. Farmer - direct

1    BY MS. POMERANTZ:

2    Q.  After you met Epstein in his home, where did you go?

3    A.  His driver took my sister and I to see *The Phantom of the*

4    *Opera*.

5    Q.  And who -- just to be clear, who went to the theater?

6    A.  My sister Maria and I.

7    Q.  Did you see Jeffrey Epstein again during this trip to New

8    York?

9    A.  Yes.

10   Q.  Where did you see him again?

11   A.  We met him one evening to go see a movie.

12   Q.  Who went to the movies?

13   A.  My sister, myself, and Jeffrey Epstein.

14   Q.  What movie did you see?

15   A.  The movie *Five Monkeys*.

16   Q.  Who did you sit next to at the movie theater?

17   A.  I sat next to Epstein.

18   Q.  And where was Maria seated?

19   A.  She was seated on his other side.

20   Q.  What happened during the movie?

21   A.  Initially, when the lights went down, watching the movie.

22   And then at some point he reaches over and puts his hand on the

23   armrest in between our seats and starts to reach for my hand.

24   And then, you know, caressed my hand; and then, you know,

25   interlocked his hand with mine, holding my hand.  And then also

LCAVMAX2                          A. Farmer - direct

1   was rubbing my -- I think I had my, you know, legs crossed, so

2   he was rubbing the bottom of my shoe and then rubbing my foot

3   and my leg.

4   Q.  When he was doing that, what was your reaction?

5   A.  I was very surprised.  I was very nervous and anxious.  I

6   felt sick to my stomach.  It was not something that I was at

7   all expecting.  And I noticed that when he would interact in

8   some way with my sister, that he would stop doing that.  And

9   then when he -- when the interaction was over, we were

10  watching -- he was looking forward again, he would return to

11  touching me.

12  Q.  What happened after the movie ended?

13  A.  When the movie ended, we got up, left the theater.  And he

14  said good-bye and walked -- my sister and I walked back.

15  Q.  Did you tell your sister about what had happened in the

16  movie theater?

17  A.  I did not.

18  Q.  Why not?

19  A.  I was, number one, very confused about what had happened.

20  And I knew that she was very protective.  And if I told her

21  that he had done something that aimed to touch me and make me

22  so uncomfortable, that she would be upset.  And that was her

23  employer.  And I thought that would -- you know, she could

24  possibly lose her job.  It would be bad for her.  And so I

25  just -- I decided not to say anything.

LCAVMAX2                          A. Farmer - direct

1   Q.  When you left the movie theater, did you see Epstein again

2   while you were in New York?

3   A.  No, I did not.

4   Q.  At the time you were visiting Epstein when you were 16

5   years old, what were you hoping to do the following summer?

6   A.  I was hoping to go on a trip, to go on an international

7   trip to help me with maybe getting into a good school.

8   Q.  During this time period, did you write in a journal?

9   A.  I did.

10  Q.  Can you describe your journaling practice at this time.

11  A.  I was -- I was not a consistent journaler, but I would just

12  from time to time write about things happening in my life,

13  write about my thoughts and feelings about different things,

14  yeah.

15        MS. POMERANTZ:  Ms. Drescher, would you please pull up

16  for just the witness, the parties, and the Court what's been

17  marked for identification as Government Exhibit 601.

18  Q.  Annie, do you recognize this?

19  A.  Yes, this is a notebook I used as a journal at that time in

20  my life.

21  Q.  Is that the cover of the journal?

22  A.  That's the cover, yes.

23  Q.  Is that a fair and accurate depiction of the cover of your

24  journal?

25  A.  It is.

LCAVMAX2                          A. Farmer – direct

1              MS. POMERANTZ:  Your Honor, the government offers

2      Government Exhibit 601 in evidence.

3              MS. MENNINGER:  Your Honor, subject to our request

4      under Rule 106, we have no objection.

5              THE COURT:  Okay.  601 is admitted.

6              (Government's Exhibit 601 received in evidence)

7              MS. POMERANTZ:  Thank you, your Honor.

8              I would ask if that could be published, please.

9              THE COURT:  You may.

10             MS. POMERANTZ:  Ms. Drescher, would you please pull up

11     for just the witness, the parties, and the Court what has been

12     marked for identification as Government Exhibit 603.

13     Q.  Annie, do you recognize this?

14     A.  Yes.

15             MS. POMERANTZ:  We could scroll to -- I believe there

16     are two pages.  If we could just scroll to the second page.

17     Thank you.

18     Q.  What is this?

19     A.  It is an entry from that journal.

20     Q.  Is this a fair and accurate depiction of an entry from your

21     journal?

22     A.  It is.

23             MS. POMERANTZ:  Your Honor, the government offers

24     Government Exhibit 603.

25             MS. MENNINGER:  Same objection under Rule 106.

LCAVMAX2                        A. Farmer - direct

1               THE COURT:  GX-603 is admitted.

2               (Government's Exhibit 603 received in evidence)

3               MS. POMERANTZ:  Your Honor, I would ask that we

4     publish it at this time.

5               THE COURT:  You may.

6     BY MS. POMERANTZ:

7     Q.  Annie, what is the date of this entry?

8     A.  January 7th, 1996.

9     Q.  Can you please read the entry for the jury.

10    A.  Yes.

11              I got back from my trip to New York today.  I had such

12    a great time.  It is really depressing to be back home.  I feel

13    like it was a trip that changed my whole outlook on life.  I

14    guess I always feel that way a little bit when I get back

15    home -- when I get back from trips.  But it is overwhelming

16    this time.

17              Continue reading?

18              I am so ready to be out of high school and in college.

19    Everything seems so silly, going out, etc.  It did a little

20    before anyway.  I even feel a little isolated from my friends.

21    Before I left, I was on a high of how great my friends were.  I

22    still realize how wonderful they are, but I feel more

23    independent, like they aren't necessary.

24    Q.  You can keep reading.

25    A.  Okay.  I felt like this when I got back from Mexico, and it

LCAVMAX2                          A. Farmer - direct

1    faded quickly, but I have a feeling it is different this time.

2    New York is such an amazing city.  I felt really comfortable

3    there, like I know that I belong there and would live there at

4    some point, hopefully soon.  I miss Maria so much already.  It

5    seems unfair that I can't see her more often.  I feel like I'm

6    missing so much.

7            There is so much to tell about the trip, but I don't

8    know where to begin.  The best night was when Maria and I saw

9    *Phantom of the Opera*.  We went to Jeff Epstein's house and had

10   champagne with him.  I found him down-to-earth and easy to talk

11   to.  I thanked him so much for the trip, etc.

12           We then took his car.  His driver actually took us to

13   *Phantom*.  I didn't know any play could be so moving.  I had

14   seen it before, but still couldn't believe it.  I bawled.  It

15   was fantastic.  After the play, we walked around the plaza and

16   went home.  It was so much fun.

17           MS. POMERANTZ:  Ms. Drescher, would you please pull up

18   for just the witness, the parties, and the Court what has been

19   marked for identification as Government Exhibit 604.  You can

20   scroll to the second page.  Thank you.  And we can go back up

21   to the top.  Thank you, Ms. Drescher.

22   Q.  Annie, do you recognize this?

23   A.  Yes.  It's another entry from the same journal.

24   Q.  Is this a fair and accurate depiction of an entry from your

25   journal?

LCAVMAX2                        A. Farmer - direct

 1 || A.  It is.

 2 ||         MS. POMERANTZ:  Your Honor, the government offers

 3 || Government Exhibit 604.

 4 ||         MS. MENNINGER:  Same 106 objection, your Honor.

 5 ||         THE COURT:  Okay.  Overruled.

 6 ||         GX-604 is admitted.

 7 ||         (Government's Exhibit 604 received in evidence)

 8 || Q.  What is the date of this entry?

 9 ||         MS. POMERANTZ:  Oh, your Honor, I'm sorry.  Can we

10 || please publish it?

11 ||         THE COURT:  You may.

12 ||         MS. POMERANTZ:  Thank you.

13 || Q.  Annie, what is the date of this entry?

14 || A.  January 25th, 1996.

15 || Q.  Can you please read the entry for the jury.

16 || A.  It has been a couple of weeks since I got back, and I have

17 || gotten back into the swing of things.  A couple of quick

18 || details about New York I didn't mention earlier.  Went to see

19 || *The Dutchess*, a decent play, and *Blue Man Group* tubes Off

20 || Broadway.  A really cool production.

21 ||         Went to the flea market, where I got some cool stuff.

22 || Went to Jeffrey Epstein's mansion.  Went to The Met, a pretty

23 || fun New Year's Eve party.  Went to thrift stores where I got an

24 || amazing dress for prom.  It's from the '50s, laced with pink

25 || flowers with rhinetones in the middle all over it.  It is my

LCAVMAX2                        A. Farmer - direct

1    dream dress.

2              One night we went to the movies with Jeffrey Epstein.

3    It was -- it was a little weird; one of those things that is

4    hard to explain.  We were sitting next to each other, and he

5    put out his hand for me to hold, and we were holding hands.

6    Not weird.  Normal.  Fine.  Then he kind of caressed, rubbed my

7    arm and shoe, foot.  It was one of those things that just gave

8    me a weird feeling, but wasn't that weird and probably normal.

9              The one thing that kind of weirded me out about it was

10   he let go of my hand when he was talking to Maria.  Oh, well, I

11   decided it was no big deal.  It just made me mad because he's

12   being so amazing, paying for a summer program for me and

13   helping me with college.  He's so nice and so generous with

14   everyone.  I just didn't want to have any weird feelings about

15   it.  I didn't/couldn't say anything to Maria about it because

16   she worships him and it would just create problems.  I couldn't

17   tell anyone else because it is not a big deal and I didn't want

18   to portray him in a bad light.  I really don't think it is a

19   big deal.  I think he is just a relaxed guy and likes to flirt

20   or was being fatherly or something.  I know this sounds like me

21   trying to justify him doing something weird, but it isn't.

22             Continue reading?

23   Q.  Let me just pause you right there.

24             Can you explain how you were feeling about Epstein at

25   the time you were writing about him in your journal.

LCAVMAX2                      A. Farmer – direct

```
 1   A.   Yeah.  I think that I was obviously very conflicted because
 2   I knew what had happened in the movie theater was not normal or
 3   right.  And but it had made me feel very uncomfortable.  But I
 4   was trying to come up with excuses or justifications in my mind
 5   to make it seem okay, because of what I saw as, you know, him
 6   being such a generous, nice person.  And so, you know, I'm
 7   trying to -- I'm trying to make sense of it and I'm having a
 8   hard time.
 9   Q.   I'll ask you to continue reading from where it says "Right
10   now."
11   A.   Right now my big concern is what I am going to do this
12   summer.  There are so many cools things to do and amazing
13   places to go.  Right now I'm really thinking about doing
14   something in Africa.  It would be incredible.  So different, so
15   beautiful, all the different people.  I would love it.  I think
16   I will really be happy doing almost anything.
17             MS. POMERANTZ:  Ms. Drescher, we can take that down.
18             Your Honor, may I have just one moment please?
19             THE COURT:  You may.
20             (Counsel conferred)
21   BY MS. POMERANTZ:
22   Q.   Annie, after meeting Epstein in New York, did you and
23   Epstein stay in touch?
24   A.   Yes.
25   Q.   How did you and Epstein communicate?
```

LCAVMAX2                        A. Farmer - direct

1    A.  We spoke on the phone.

2    Q.  Approximately how many times did you speak with Epstein by

3    phone after your trip to New York?

4    A.  Approximately two or three times.

5    Q.  Did there come a time when you saw Jeffrey Epstein in

6    person again?

7    A.  Yes.

8    Q.  Approximately when did you see him?

9    A.  In April of 1996, the spring of 1996, I think it was April.

10   Q.  Where did you see Epstein?

11   A.  In New Mexico.

12            MS. POMERANTZ:  Ms. Drescher, would you please pull up

13   for just the parties, the witness, and the Court what has been

14   marked for identification as Government Exhibit 102.

15   Q.  Annie, do you recognize this?

16   A.  Yes.

17   Q.  What is this?

18   A.  It's a photo of me getting ready for prom.

19   Q.  Is this a fair and accurate depiction of your physical

20   appearance during the spring of 1996?

21   A.  Yes.

22            MS. POMERANTZ:  Your Honor, the government offers

23   Government Exhibit 102.

24            MS. MENNINGER:  No objection, your Honor.

25            THE COURT:  Thank you.  GX-102 is admitted.

LCAVMAX2                              A. Farmer – direct

1              (Government's Exhibit 102 received in evidence)

2              MS. POMERANTZ:  Your Honor, may we publish at this

3      time?

4              THE COURT:  You may.

5      Q.  Annie, how old were you at the time this photograph was

6      taken?

7      A.  I was 16 years old.

8      Q.  Where was the photograph taken?

9      A.  In my apartment.

10     Q.  Who invited you on this trip to New Mexico?

11     A.  Epstein invited me.

12     Q.  How did you learn you were going to be allowed to go on

13     this trip to New Mexico?

14     A.  My best recollection is from my mom, that we had talked

15     about it.

16     Q.  Who, if anyone, did you understand you would be seeing in

17     New Mexico?

18             MS. MENNINGER:  Objection.

19             Foundation, your Honor, hearsay or not.

20             THE COURT:  Sustained.

21     Q.  In the spring of 1996, did there come a time when you

22     learned that you would be going to New Mexico?

23     A.  Yes.

24     Q.  I think you mentioned you learned about that from your

25     mother; is that right?

LCAVMAX2                              A. Farmer – direct

1    A.  That's correct.

2    Q.  Based on your conversations with your mother, who did you

3    understand you would be seeing in New Mexico?

4              MS. MENNINGER:  Objection.

5              Hearsay, your Honor.

6              THE COURT:  Sustained.

7              MS. POMERANTZ:  Your Honor, this is not being offered

8    for the truth.

9              THE COURT:  Sustained.

10             MS. POMERANTZ:  May I have one moment?

11             THE COURT:  You may.

12             (Counsel conferred)

13             MS. POMERANTZ:  Your Honor, may we approach?

14             THE COURT:  You may.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

LCAVMAX2                          A. Farmer - direct

1           (At sidebar)

2           MS. POMERANTZ:  Thank you, your Honor.

3           This information is being asked not for the truth of

4    the matter being asserted, but for her state of mind for what

5    was in her mind at the time that she was going to New Mexico,

6    why she felt comfortable, why she felt more comfortable going

7    to this trip.  It's not being offered for the truth of the

8    matter; it's being offered for what her state of mind was when

9    she was going on this trip to New Mexico.

10          MS. MENNINGER:  Your Honor, this is backdoor hearsay.

11          THE COURT:  It is backdoor hearsay.

12          You can ask her about going on the trip, why she went

13   and why she was comfortable.  But to the extent you're

14   eliciting -- which you clearly are -- hearsay as to what her

15   mother told her about who would be there, objection sustained.

16          MS. POMERANTZ:  Okay.

17          MS. MENNINGER:  Her mother is testifying; so if

18   there's a conversation between Epstein and her mother, I

19   understand that that would perhaps come in through the mother.

20          THE COURT:  Right.

21          MS. POMERANTZ:  Okay.  Thank you, your Honor.

22          THE COURT:  Counsel, the other thing you can say is

23   after you had your conversation with your mother, did you then

24   go to New Mexico.  And again, you can ask her about her own

25   experience, but not elicit the hearsay of what her mother told

LCAVMAX2                        A. Farmer - direct

1    her.

2              MS. MENNINGER:  Your Honor, just to the extent it's

3    why she went, it's, I understand after the conversation with

4    the mother, I went to New Mexico.  But if it's the content from

5    the mother to her, that's where it gets into the hearsay piece.

6              MS. COMEY:  Your Honor, just to clarify, the jury just

7    heard this witness say she felt uncomfortable around Jeffrey

8    Epstein; and that she knew something was wrong.  The point of

9    this is not to give the truth of what the mother said, but to

10   explain why she was willing to go back to see Jeffrey Epstein

11   again.  That is all we're trying to elicit.

12             THE COURT:  You're trying to elicit that her mother

13   told her that Maxwell would be there, which is for the truth

14   and hearsay.  In any event, because it is central to the

15   question coming in as hearsay, there's a 403 issue.  I think

16   you can get this -- you can get who was there, etc., but not

17   what her mother told her for the truth, which is, I think,

18   plainly what you're trying to do.

19             MS. MOE:  Your Honor, I can be more precise.

20             I think the questions would be, Did you feel

21   comfortable going to New Mexico?  Why did you feel comfortable

22   going to New Mexico?  And then we wouldn't object to a limiting

23   instruction.  It's not offered for the truth, it's to explain

24   the progress of events and why she would feel comfortable doing

25   something like that.

LCAVMAX2                          A. Farmer – direct

1            THE COURT:  Counsel, there's a limit, and hearsay is

2      the limit, and this is a central question.  You have the

3      witness, you have Maria Farmer coming to testify.  I presume,

4      although I don't know, that she can testify Ms. Farmer was

5      there in New Mexico; correct?

6            MS. MOE:  Yes, your Honor.

7            THE COURT:  And then you can ask her how she felt

8      about that.  But you can't do it through hearsay.

9            Sustained.

10            (Continued on next page)

LCAVMAX2                         A. Farmer - direct

1                (In open court)

2    BY MS. POMERANTZ:

3    Q.  Annie, did you travel to New Mexico?

4    A.  I did.

5    Q.  How did you travel to New Mexico?

6    A.  I flew commercially.

7    Q.  Did you pay for your ticket to New Mexico?

8    A.  I did not.

9    Q.  Did you thank anyone for paying for your ticket to New

10   Mexico?

11              MS. MENNINGER:  Objection, your Honor.

12              Foundation.  Hearsay.

13              THE COURT:  Foundation, overruled.  Overruled.

14   A.  I thanked Epstein when I got to New Mexico.

15   Q.  Who, if anyone, did you travel with to New Mexico?

16   A.  I traveled alone.

17   Q.  Approximately when did you go to New Mexico?

18   A.  The spring of 1996; I believe it was April.

19   Q.  And approximately how long were you in New Mexico?

20   A.  It was a weekend trip.

21   Q.  When you landed in New Mexico, what happened next?

22   A.  There was a man at the airport that had a sign with my name

23   on it, and so I went with him.  He was a driver.  And he drove

24   me out to the ranch.

25   Q.  You mentioned the ranch.  Can you describe the ranch for

LCAVMAX2                          A. Farmer - direct

1     the jury.

2     A.   Yeah.  It was a large -- a large piece of property in New

3     Mexico, so kind of a desert landscape.  And there were

4     different sections.  And there was one that had like an old

5     movie set, like a western movie set on it.  And then there was

6     a portion where we were staying where there's a small

7     residence.

8              THE COURT:  I'd ask you again, Ms. Farmer, if you can

9     maybe shift it a little bit closer to you.

10             Thank you.  Perfect.  Thank you.

11    Q.   Who, if anyone, did you meet at the ranch?

12    A.   When I arrived, I had met -- I mean, I saw Epstein, and

13    then I met Ghislaine Maxwell.

14    Q.   What did Maxwell look like?

15    A.   She was trim, attractive woman, well-dressed, dark hair.

16    Q.   About how old did Maxwell seem?

17    A.   I believe she was in her thirties, so at the time she was

18    an adult.

19             MS. POMERANTZ:  Ms. Drescher, can we please pull up

20    what's in evidence as Government Exhibit 115.

21    Q.   Annie, do you recognize the person in this photograph?

22    A.   I do.

23    Q.   Who is it?

24    A.   Ghislaine Maxwell.

25             MS. POMERANTZ:  Ms. Drescher, we can pull that down.

LCAVMAX2                           A. Farmer - direct

1              Thank you.

2    Q.   What did Maxwell sound like?

3    A.   She had a British accent and she was well-spoken and

4    articulate.  And she was enthusiastic in greeting me and

5    speaking with me.

6    Q.   Annie, had you wanted to go to New Mexico at the time?

7    A.   No, I was not eager to go to New Mexico.

8    Q.   What, if anything, made you feel more comfortable about

9    going to New Mexico?

10             MS. MENNINGER:  Objection.  Hearsay, your Honor.

11             THE COURT:  I'm going to overrule here and I'll adopt

12   a limiting instruction.

13             MS. POMERANTZ:  Thank you, your Honor.

14   A.   I had been told that Maxwell would be in New Mexico with

15   Epstein; and so that made me feel more comfortable.  Basically,

16   after what had happened in the movie theater in New York, I did

17   not want to be alone with him.  But I thought that Ghislaine

18   was his romantic partner, and I didn't think he would do

19   anything like that while they were together.

20             MS. MENNINGER:  Your Honor, I think we need to say who

21   told her that.

22             THE COURT:  Okay.  You may ask and then I'll give the

23   instruction.

24   Q.   Who told you that?

25   A.   I was told by my mother.

LCAVMAX2                          A. Farmer - direct

1            THE COURT:  Members of the jury, the testimony the

2    witness provided about what her mother told her is not being

3    offered for the truth, but for the limited purposes of the

4    effect on the listener.

5            Go ahead.

6            MS. POMERANTZ:  Thank you, your Honor.

7    BY MS. POMERANTZ:

8    Q.  Based on your observations that weekend, what was your

9    understanding at the time of the relationship between Epstein

10   and Maxwell?

11   A.  I believed that they were romantic partners.  They were

12   very intimate with each other in terms of touching each other

13   and the way that they spoke with each other and interacted; it

14   was what I had seen from couples.

15   Q.  What happened after you got to the ranch?

16   A.  When I first arrived, I remember we did a little bit of a

17   tour, where I saw this portion I mentioned where there was this

18   western movie set and, I believe, some horses.  And, you know,

19   I was, I guess, oriented a little bit to the property.

20   Q.  Where did you stay at the ranch?

21   A.  In a small residence.

22   Q.  Who else stayed in that residence?

23   A.  Epstein and Maxwell.

24   Q.  Was anyone else staying in that area of the ranch?

25   A.  No.

LCAVMAX2                        A. Farmer - direct

1    Q.   Did you see staff at the ranch that weekend?

2    A.   Yes, I did see like a couple of men that I believe were

3    ranch hands or caretakers for the property; and the driver, you

4    know, I mentioned who took me to the airport.

5    Q.   Apart from staff and Epstein and Maxwell, was anyone else

6    staying at the residence?

7    A.   No.

8    Q.   What was your reaction at the time about being at the ranch

9    with only Epstein and Maxwell?

10   A.   I think it was -- you know, it seemed unusual in a way,

11   being that I was a teenager, to be spending this time with

12   them.  But I also -- there is a way in which it sort of made me

13   feel special that they would want to spend this time with me.

14   So I think it was a mixed bag.

15   Q.   Based on your initial conversations with Maxwell, did you

16   have the impression that she was surprised to see you or did

17   she seem to expect you?

18   A.   She did not seem surprised to see me at all.  She -- yeah,

19   she seemed to know who I was and be excited to be meeting me.

20   Q.   What was your impression of Maxwell?

21   A.   She was very outgoing and talked a bit of engaging with me,

22   so I enjoyed meeting with her and talking with her.

23   Q.   What, if anything, did you and Maxwell talk about?

24   A.   She was just, you know, making conversation with me about

25   my life, asking me -- I remember we talked a bit about my

1   school, and I was writing a paper about some British authors.

2   And I remember bringing this up to her and talking to her about

3   that.  And I think just, you know, kind of general life things,

4   what I was doing.

5   Q.  You mentioned that Epstein and Maxwell gave you a tour of

6   the ranch.  Did you leave the ranch that weekend?

7   A.  We did.

8   Q.  Where did you go?

9   A.  We went into town, and I remember we did a little bit of

10   shopping.  We went to a natural food store of some sort.  And

11   Ghislaine offered to buy me some product.  I remember she

12   bought me this henna hair lightening cream of some kind.  And

13   then on that same outing, we went to a western wear store where

14   they had me try on cowboy boots and purchased a pair of cowboy

15   boots for me.

16   Q.  When you said "we went shopping," who went shopping?

17   A.  Epstein, Maxwell, and myself.

18   Q.  What did the cowboy boots look like?

19   A.  They were black leather pointy standard cowboy boots.

20   Q.  Who bought the boots for you?

21   A.  Epstein.

22   Q.  And who was present at the time of the boots being

23   purchased?

24   A.  Maxwell as well.

25   Q.  Did you keep the cowboy boots?

LCAVMAX2                          A. Farmer - direct

1   A.   I -- yes, I did.

2   Q.   What was your reaction at the time that the cowboy boots

3   were purchased for you?

4   A.   It was -- I remember it seemed -- because they cost over

5   $100, it seemed they were very expensive to me.  And so, you

6   know, I was very grateful; although I didn't really have any

7   reason to be wearing cowboy boots, so it wasn't something I had

8   been seeking out or wanting.  But the -- you know, I was

9   gracious about it.

10  Q.   Did there come a time when you left the ranch again?

11  A.   Yes.

12  Q.   Where did you go?

13  A.   We went to the movies.

14  Q.   Who went to the movies?

15  A.   Sorry.  Maxwell, Epstein, and I.

16  Q.   Did you want to go to the movies?

17  A.   No.  I think because of what had happened in the movie

18  theater in New York, I was -- that was not something I was

19  eager to do.  But I imagined it would be different this time

20  because Maxwell was there.

21  Q.   What, if anything, happened before you went in to watch the

22  movie?

23  A.   Oh, so the movie theater is in sort of a mall area, and

24  we -- there was a ticket counter and they purchased tickets and

25  we were waiting to go in.  And Epstein and Maxwell were being

LCAVMAX2                        A. Farmer - direct

1   very, like, playful with each other and kind of grabbing each

2   other.  And Maxwell went to, like, pull Epstein's pants down a

3   little bit and, you know, sort of like depantsing someone,

4   which seemed very odd to me at the time because they were

5   adults and this is the kind of thing, you know, I would expect

6   more from younger people.  And so I was kind of, you know, just

7   caught off guard by it and thought it seemed odd.

8   Q.  What movie did you see?

9   A.  We saw Primal Fear.

10  Q.  How were you, Epstein, and Maxwell seated during the movie?

11  A.  I was seated next to Epstein, and I believe Maxwell was on

12  his other side.

13  Q.  What, if anything, happened during the movie?

14  A.  It was very similar to the first time that I went to the

15  movies with Epstein in that he right away began to hold my hand

16  and caress it and, you know -- and rub on my -- on my foot and

17  on my arm.

18  Q.  For approximately how much of the movie did Epstein touch

19  you in the way you just described?

20  A.  Throughout the majority of the movie.  And he also had

21  popcorn, I think, and was, you know, eating.  But it was -- he

22  did not -- unlike in New York, he didn't seem to be concerned

23  about hiding those behaviors.  He was very blatant in doing it

24  throughout the film.

25  Q.  How did what Epstein do in the movie theater in New Mexico

LCAVMAX2                        A. Farmer - direct

1    compare with what he did in the movie theater in New York?

2                MS. MENNINGER:  Objection.

3                Asked and answered, your Honor.

4                THE COURT:  Overruled.

5    A.   Yeah.  I'd say it was very similar, except for more

6    blatant -- like not -- he wasn't -- he wasn't stopping.  It was

7    just this is what he was doing.

8    Q.   What else do you recall happening in New Mexico?

9    A.   So we were at the movies.

10               Another experience after we were back at the residence

11   was that it was decided that I would learn how to give Epstein

12   a foot massage.  Maxwell wanted to show me how to rub his feet;

13   and so that was something I should learn how to do.  And so she

14   sat and held one of his feet, and then instructed me to hold

15   his other foot and showed me how to rub it.

16   Q.   Where were you when this took place?

17   A.   In the same little area.  There was a couch.  I think it

18   was kind of like a den type room.  And yeah.

19   Q.   Was this back at the ranch?

20   A.   Back at the ranch, yeah.  Sorry.

21   Q.   Did you know how to give foot massages at that point?

22   A.   No, I'd never been shown how to do that.

23   Q.   What, if anything, did Epstein have on his feet during the

24   massage?

25   A.   He was not wearing any socks or anything; it was just

LCAVMAX2                       A. Farmer - direct

1    his -- his bare feet.

2    Q.  How did you know how to give him a massage?

3    A.  I just -- you know, I watched what she was doing.  And she

4    instructed me, you know, you pull back his big toe, rub this

5    part of his foot, you know.  And so I did what she told me.

6    Q.  What did Epstein do while you were rubbing his feet?

7    A.  He seemed, you know, to be enjoying it.  He sort of made

8    like groaning noises like he was -- it felt good to him.

9    Q.  How did you feel while you were rubbing his feet?

10   A.  I felt very uncomfortable.  I did not want to be touching

11   his feet.  And also just the whole situation made -- I wanted

12   to stop and I was hoping it would be over quickly.

13   Q.  What, if anything, did Maxwell ask you about your

14   experience with massages during this trip?

15   A.  She asked me if I'd ever had a professional massage and,

16   you know, talked about what a lovely experience it was and how

17   enjoyable it was to get a massage.

18   Q.  What, if anything, did Maxwell do next?

19   A.  She said that, you know, she wanted me to have that

20   experience, and she would be happy to give me a massage.  And

21   so encouraged me to say that, yes, okay, I would get a massage

22   from her.

23   Q.  Did Maxwell give you a massage?

24   A.  She did.

25   Q.  Where in the house did Maxwell give you a massage?

LCAVMAX2                          A. Farmer - direct

1    A.  My best recollection is that she set up a table in the room

2    where I was staying.

3    Q.  You said she set up a table.  Can you describe the table.

4    A.  It was, I think, a standard kind of massage table that's

5    portable that has the legs that, you know, can be extended and

6    has padding on top.

7    Q.  What were you wearing during the massage?

8    A.  Nothing.

9    Q.  Why did you -- why were you wearing nothing during the

10   massage?

11   A.  She told me to get undressed.

12   Q.  When you say "she," who are you referring to?

13   A.  I'm sorry.  Maxwell.

14   Q.  What happened during the massage?

15   A.  She, you know, said to get undressed and lay under the

16   sheet on the massage table.  And I did.  And then she, you

17   know, started rubbing my body and rubbing my back and my legs.

18   And while she's doing this, she's just making -- you know,

19   making small talk.  And then at some point in the massage she

20   had me roll over so I was laying on my back.

21   Q.  And what happened once you were laying on your back?

22   A.  She pulled the sheet down and exposed my breasts and

23   started rubbing on my chest and on my -- on my upper breasts.

24   Q.  When she touched your breasts, what was your reaction?

25   A.  I mean, once she pulled down the sheet, I felt like kind of

LCAVMAX2                         A. Farmer - direct

1    frozen; because I knew that that was very -- just, it didn't

2    make sense to me that that would happen, and I was surprised.

3    And, you know, I just wanted to -- badly to get off of the

4    table and have this massage be done.

5    Q.  Who was present during the massage?

6    A.  It was Maxwell and I.  But the door to the room was open.

7    And I was fearful, especially at that moment, that Epstein -- I

8    just had the sense that he could see me.  But I don't have a

9    memory of him standing nearby or of seeing his face, but I

10   just -- I had this sense that he might be able to.

11   Q.  What else, if anything, happened during your weekend in New

12   Mexico?

13   A.  I guess the other memory that stands out the most is being

14   in bed in the morning, and suddenly Epstein kind of opening my

15   door and sort of bounding into the room in this sort of playful

16   way and saying that he wanted to cuddle.  And so he climbed

17   into bed with me and kind of laid behind me and reached his

18   arms around me and he pressed his body into me.

19   Q.  Did you want to cuddle with Epstein?

20   A.  No.

21   Q.  Did you tell him you did not want to cuddle with him?

22   A.  No.

23   Q.  Why not?

24   A.  I was very aware at that time that I was, you know, very

25   isolated; that, you know, I was on this ranch with these two

LCAVMAX2                    A. Farmer - direct

1    people and, you know, no one's safe for a great distance.  And
2    so I just had thought, like, I just need to get through this
3    and then it will be fine.  And so I just -- you know, I didn't
4    say anything.
5    Q.  Did Epstein cuddle you?
6    A.  Yeah.
7    Q.  Can you explain what happened.
8    A.  Yeah.  He just -- you know, as I said, he kind of had his
9    arms around me and I felt, again, kind of frozen.  And then I
10   thought I have to have an excuse to get out of this.  And so I
11   just said I needed to go to the bathroom.  And it was in my
12   bedroom area and there was a bathroom near.  And so I just made
13   the excuse and got out of bed and went into the bathroom and
14   shut the door.
15   Q.  What did you do while you were in the bathroom?
16   A.  I just, you know, waited.  And I don't remember how long I
17   was in there, you know, I just remember thinking, like, I
18   wanted to be in there long enough that this hopefully situation
19   would be over.
20   Q.  What was your reaction to the series of events in New
21   Mexico that you've just testified about culminating with
22   Epstein getting into bed with you?
23   A.  My reaction at that time?
24   Q.  At that time.
25   A.  Yeah, I just wanted -- I wanted the weekend to be over.  I

LCAVMAX2                      A. Farmer - direct

1  felt very -- like, I thought I had been brought there because

2  of, you know, one set of reasons; like, I thought that he was

3  interested and they were both interested in me as, like, a

4  student; that they may want to help in an academic way.  So I

5  was trying to be sort of impressive in that way and talk about

6  things that they wanted to hear about.  And all these

7  experiences made me feel that they had a very different

8  interest in me.  And so it was extremely kind of disorienting

9  and I just was wanted to be done with it.

10 Q.  What, if anything, did you discuss with Maxwell during your

11 last day on the ranch in New Mexico?

12 A.  What I remember about that, just this final conversation

13 was that I was sort of trying to reengage with her around,

14 like, this academic stuff.  And I had brought, like, three by

15 five note cards for this paper that I was writing where I had

16 little, like, facts on them.  And we were sitting outside on

17 what seemed like kind of a deck area.  And I was going through

18 them and I was trying to get her to talk to me about them, I

19 think, in a way, like, to make myself feel better, like, maybe

20 they did care about that.  And she just seemed like very

21 disinterested and kind of like, you know, she didn't care.

22 Q.  Did you say good-bye to Epstein and Maxwell before you left

23 New Mexico?

24 A.  Yes.

25 Q.  Where did you go when you left New Mexico?

LCAVMAX2                         A. Farmer - direct

1    A.  I flew home to Phoenix.

2    Q.  How did you get to the airport?

3    A.  I think it was the same driver, but a driver drove me back

4    to the airport.

5    Q.  How did you fly home to Arizona?

6    A.  Commercially by myself.

7    Q.  Who picked you up from the airport?

8    A.  My mom.

9    Q.  You testified earlier about your journal.  Did you write in

10   your journal about your trip to New Mexico?

11   A.  No.

12   Q.  Why not?

13   A.  I think I just really didn't want to think about it; and,

14   you know, writing would be a way of, like, me having to think

15   more about what had happened.  And I just wanted to put it out

16   of my mind.

17   Q.  You testified earlier about boots that Maxwell and Epstein

18   purchased for you during a shopping trip in New Mexico.  You

19   said that you had kept the boots; is that right?

20   A.  Yes.  Yeah.

21   Q.  Why did you keep the boots?

22   A.  I think initially I just sort of got home and shoved them

23   to the back of my closet.  And then when I graduated from high

24   school, my mom moved.  And everything in my closet I just

25   packed into boxes.  And they were in her storage for a number

LCAVMAX2                          A. Farmer - direct

1    of years.

2            And then when I interviewed with agents about this in,

3    I think, late 2006/early 2007, they asked me if I still had

4    those, and I didn't know.  So at some point I found them next

5    time I visited my mom.  And I held onto them for some time,

6    hoping maybe, you know, they would want them.  And then when

7    that didn't seem to come to pass, I just thought, I live in

8    Texas, now I have these boots, and I'm going to kind of reclaim

9    them and use these boots.

10   Q.  Did you start wearing those boots?

11   A.  I did wear those boots.

12   Q.  I want to change topics.

13           Where, if anywhere, did you go during the summer of

14   1996?

15   A.  I went on a trip to Thailand and Vietnam.

16   Q.  How long were you in Thailand and Vietnam?

17   A.  For six weeks.

18   Q.  What were you doing in Thailand and Vietnam?

19   A.  It was like a cultural emerging trip/service trip.  So we

20   built like a community building, and we did some teaching in

21   schools, and then just did some hiking and kind of fun things.

22           MS. POMERANTZ:  Ms. Drescher, would you please pull up

23   for just the witness, the parties, and the Court what has been

24   marked for identification as Government Exhibit 103.

25   Q.  Annie, do you recognize this?

LCAVMAX2                           A. Farmer - direct

1   A.  Yes, it's a photo of me on that trip to Thailand.

2   Q.  Is this a fair and accurate depiction of your physical

3   appearance during the summer of 1996?

4   A.  It is.

5           MS. POMERANTZ:  Your Honor, the government offers

6   Government Exhibit 103 in evidence.

7           MS. MENNINGER:  No objection.

8           THE COURT:  GX-103 is admitted.  You may publish.

9           (Government's Exhibit 103 received in evidence)

10          MS. POMERANTZ:  Thank you, your Honor.

11  Q.  Annie, how old were you at the time this photograph was

12  taken?

13  A.  I was 17.

14  Q.  Had you turned 17 over the summer?

15  A.  Yes.

16  Q.  And where was this photograph taken?

17  A.  It was in Thailand.

18          MS. POMERANTZ:  We can take that down, Ms. Drescher.

19          Thank you.

20  Q.  Who paid for your trip to Thailand and Vietnam?

21  A.  Epstein.

22  Q.  When you left Thailand and Vietnam, where did you go?

23  A.  I went back to Phoenix.

24  Q.  And when you got back, did you want to see Maxwell and

25  Epstein again?

LCAVMAX2                        A. Farmer - direct

1    A.  No.

2    Q.  At that point, how were you feeling about Maxwell and

3    Epstein?

4    A.  I think, you know, again, I felt conflicted because I had

5    had -- I had been on this trip, which is something I never

6    could have done without, you know, Epstein's support.  But I --

7    so I felt I should be grateful for that.

8            But the experience that I had with Maxwell and Epstein

9    in New Mexico was so uncomfortable that I didn't -- you know, I

10   was very much hoping I would never have to be around them

11   again.  Then I felt sort of guilty about that because of -- you

12   know, again, because they had paid for this trip.

13   Q.  From that point on, did you have any contact with Maxwell

14   and Epstein?

15   A.  I did not.

16   Q.  Did there come a time when you told someone about your

17   experiences with Maxwell and Epstein?

18   A.  Yes.

19   Q.  Who did you first tell?

20   A.  I had a brief conversation with my mom just acknowledging

21   that something uncomfortable had happened, but I didn't go into

22   any details with her about that.

23   Q.  What did you tell your mom?

24            MS. MENNINGER:  Objection, your Honor.  Hearsay.

25            THE COURT:  I'll hear from you, counsel.

LCAVMAX2                          A. Farmer - direct

1              (At sidebar)

2              THE COURT:  Is this not a prior consistent statement

3    that was litigated or discussed?

4              MS. POMERANTZ:  This is a prior consistent statement,

5    your Honor.

6              MS. MENNINGER:  Your Honor, I don't believe that we

7    have impeached her yet or called her story into question in

8    opening about this issue.  So I'm a little -- I understand that

9    eventually it may be, if I do impeach her.

10             THE COURT:  The opening questioned the veracity of all

11   of the accusers.

12             MS. MENNINGER:  Not on every point, your Honor.  I

13   mean --

14             THE COURT:  Okay.

15             MS. MENNINGER:  Not that she was there, for example,

16   or anything like that.  So I don't believe that it's been

17   opened, and I think it's just bolstering.

18             THE COURT:  Well, is the statement just that she's

19   going to be there or what's -- what is the anticipated

20   statement?

21             MS. MENNINGER:  Actually, my reading of the discovery

22   is that she told her mom, I wasn't raped.  And so if that's

23   what is planned to be elicited, that's going to be a problem

24   for a lot of other reasons that have been litigated.

25             THE COURT:  Is that what she's going to say?

LCAVMAX2                          A. Farmer - direct

1           MS. POMERANTZ:  My understanding, your Honor, of what

2     she's going to say is that she didn't want to talk about it;

3     that something had happened.  There are times where she has

4     used that word.  In our several last meetings she has not used

5     that word.  But she has said, I didn't want to get into details

6     with my mom.  I told her something had happened.

7           MS. MENNINGER:  The quote in discovery is, I told her

8     I wasn't raped, and I don't want this to ruin my life.

9           So I'm a little worried about the "rape" word being

10    used by the witness in this context, especially because we've

11    litigated extensively that consent and --

12          MS. POMERANTZ:  Your Honor, the defense has put the

13    memory of the witnesses, of the victims, at issue from the

14    start at their opening, and they are incentives.

15          THE COURT:  I'm overruling.

16          It's an anticipated prior consistent statement based

17    on the clear attack on the credibility of the allegations of

18    all of the alleged victims.  We'll see what comes.  A statement

19    that she wasn't raped is not suggesting that she was raped;

20    that's suggesting the opposite.

21          MS. STERNHEIM:  Judge, if I might add, it's the use of

22    the word and knowing how inflammatory it is and the

23    restrictions put on it to now allow them to even suggest, that

24    is extremely loaded and extraordinarily prejudicial.

25          This has nothing to do with the opening with regard to

LCAVMAX2                          A. Farmer - direct

1   this witness at all, and it's extremely far afield.

2             MS. MENNINGER:  I can tell your Honor we're not

3   challenging the statements that she had a foot massage, a body

4   massage, and so forth.  So there may be some of the details of

5   her memory that are off, but we did not put in to challenge

6   that she had those contacts.  That's why we worded the limiting

7   instruction "the physical contact."  And to use the word

8   "rape," when she's above the age of consent --

9             THE COURT:  She's saying not raped.  It's the opposite

10  of raped.  It's not raped.

11            MS. MENNINGER:  Well, your Honor --

12            THE COURT:  I'll allow the question as a prior -- I'm

13  overruling the objection because it's an anticipated prior

14  consistent statement in which the credibility of all of the

15  witnesses as to what occurred has been attacked.

16            I don't think this needs to be sealed.

17            MS. POMERANTZ:  No.

18            THE COURT:  Okay.  Not sealed.

19            (Continued on next page)

20

21

22

23

24

25

LCAVMAX2                              A. Farmer – direct

1              (In open court)

2     BY MS. POMERANTZ:

3     Q.  Annie, what did you tell your mom?

4     A.  I had told my mom that I was not raped and I didn't want to

5     talk about it.

6     Q.  When did this conversation happen?

7     A.  This was shortly after I returned from the trip from

8     Thailand and Vietnam, so late summer of 1996.

9     Q.  If I could just ask you to speak into the microphone.

10    A.  Yeah.  Sorry.  Late summer of 1996.

11    Q.  Thank you.

12             Who else, if anyone, did you tell what had happened to

13    you with Maxwell and Epstein?

14    A.  Later in that fall, I started dating someone named Dave

15    Mulligan.  And I talked to him at some point a little bit about

16    what had happened at the ranch.

17    Q.  When did you meet Dave?

18    A.  I met him at prom, actually, my junior year; so earlier in

19    the spring of 1996.

20    Q.  And when did you start dating him?

21    A.  In that fall, I think maybe September/October.

22    Q.  And did you tell Dave about what had happened with Maxwell

23    and Epstein?

24    A.  I did.

25    Q.  Did there come a time when you spoke with members of the

LCAVMAX2                            A. Farmer - direct

1   media about your experiences with Epstein and Maxwell?

2   A.  Yes.

3   Q.  Did you speak with the media once or more than once?

4   A.  More than one time.

5   Q.  Approximately when was the first time you spoke with the

6   media?

7   A.  In 2002.

8   Q.  Did there come a time when you were interviewed by law

9   enforcement agents about your experiences with Maxwell and

10  Epstein?

11  A.  Yes.

12  Q.  And approximately when was this?

13  A.  In 2006 -- or late 2006/early 2007.

14  Q.  During that interview, did you tell the FBI about your

15  experiences with Maxwell and Epstein?

16  A.  Yes.

17  Q.  Did you tell the FBI that Maxwell had given you a massage?

18  A.  Yes.

19  Q.  Did you tell the FBI that Epstein got into bed with you?

20  A.  Yes.

21  Q.  You said earlier that you wanted to reclaim the cowboy

22  boots.

23  A.  Yeah.

24  Q.  What do you mean by "reclaim"?

25  A.  I think it was just, you know, obviously something I -- it

LCAVMAX2                          A. Farmer - direct

```
 1   was a dark memory, and I felt so taken advantage of by them
 2   both.  And I think I was just a little older, and I just saw
 3   them as a symbol of, you know, this hard thing that happened to
 4   me; but that I could -- you know, by using them, it was some --
 5   by using the boots, I mean, it was somehow like changing that,
 6   reclaiming it in some way.
 7   Q.  In the years after you spoke with FBI in late 2006 or early
 8   2007, have you spoken with the media about your experiences
 9   with Maxwell and Epstein?
10   A.  I have.
11   Q.  Were you interviewed on television?
12   A.  I was.
13   Q.  Did you participate in other interviews?
14   A.  Yes.
15   Q.  Approximately when?
16   A.  I believe -- well, I first spoke with another reporter, I
17   think, in maybe 2016 off the record.  And then later on the
18   record in the summer of 2019.  And I think then in the -- yeah,
19   and then later into the fall.
20   Q.  Were you paid for those interviews?
21   A.  I was not.
22   Q.  Did you struggle with the decision to talk publicly about
23   your experiences with Maxwell and Epstein?
24            MS. MENNINGER:  Objection.  Relevance, your Honor.
25            THE COURT:  Overruled.
```

LCAVMAX2                          A. Farmer - direct

1   A.  Yes.

2   Q.  Can you explain.

3   A.  Yeah.  I think most people probably can understand that

4   it's not the kind of thing that you would want -- I mean, it

5   sort of feels like a shameful memory and is not the kind of

6   thing you want a lot of attention on.  But at a certain point,

7   I felt compelled because I, you know --

8              MS. MENNINGER:  Objection.  Narrative, your Honor.

9              THE COURT:  Overruled.

10  A.  I wanted to -- if I could help there be any accountability

11  or these people being stopped in some way, it felt like it was

12  worth it, even if it was uncomfortable.

13  Q.  Did there come a time when you were interviewed by law

14  enforcement in New York?

15  A.  Yes.

16  Q.  Approximately when was that?

17  A.  That was in 2019, I believe, in the late summer/early fall.

18  Q.  Since that time, have you been interviewed by the

19  government?

20  A.  Yes.

21  Q.  Approximately how many times have you met with the

22  government?

23  A.  I'd say approximately five or six times.

24  Q.  Did there come a time when you sued Maxwell and Epstein?

25  A.  Yes.

LCAVMAX2                           A. Farmer - direct

1    Q.   Approximately when did you sue them?

2    A.   That was, I believe, the fall of 2019.

3    Q.   Was that before or after you had met with law enforcement

4    in New York?

5    A.   After.

6    Q.   After you filed that lawsuit, did you participate in a

7    victim compensation fund for victims of Jeffrey Epstein?

8    A.   I did.

9    Q.   Do you remember what year that fund started accepting

10   applications?

11   A.   I believe that was in early 2020.

12   Q.   What did you do as part of that fund?

13   A.   I, with my attorneys, there was an application process.

14   They interviewed me and they put together some materials about,

15   you know, my story.

16   Q.   How much money did the fund award you?

17   A.   $1.5 million.

18   Q.   Did that money come from the Estate of Jeffrey Epstein?

19   A.   It came, yeah, from the victims' compensation fund.

20   Q.   Did your attorneys receive any portion of that award?

21   A.   They did not.

22   Q.   Why not?

23   A.   They agreed to work with me *pro bono*.

24   Q.   Has that money been wired to you already?

25   A.   Yes.

LCAVMAX2                          A. Farmer - direct

1    Q.  And just to back up, when you said *"pro bono*," what do you

2    mean by that?

3    A.  I mean they have not received any of that money.

4    Q.  As part of the settlement that you received from the fund,

5    were you required to dismiss your lawsuit against Maxwell and

6    Epstein?

7    A.  I was.

8    Q.  To be clear, is your civil case over?

9    A.  It is.

10   Q.  Are you hoping or expecting to get any more money for what

11   happened to you with Maxwell and Epstein?

12   A.  No.

13   Q.  Based on your understanding, will the jury's verdict in

14   this case affect the award that you received from the fund?

15   A.  No.

16   Q.  Just to be clear, do you have any financial stake in the

17   outcome of this trial?

18   A.  I do not.

19            MS. POMERANTZ:  Your Honor, may I have one moment?

20            THE COURT:  You may.

21            (Counsel conferred)

22            MS. POMERANTZ:  No further questions.

23            THE COURT:  Okay.  Ms. Menninger.

24            MS. MENNINGER:  Would your Honor like to take the

25   morning break now or -- I'm happy to start.

LCAVMAX2                        A. Farmer - cross

1              THE COURT:  I think 15 minutes and then break.

2              MS. MENNINGER:  Okay.  Sure.

3   CROSS-EXAMINATION

4   BY MS. MENNINGER:

5   Q.  Good morning, Ms. Farmer.

6              Sorry.  Let me get the microphone.

7   A.  Good morning.

8   Q.  When you were a junior in high school, you traveled to New

9   York?

10  A.  That's correct.

11  Q.  You were 16 years old?

12  A.  Yes.

13  Q.  Your older sister lived in New York?

14  A.  Yes, she did.

15              (Continued on next page)

16

17

18

19

20

21

22

23

24

25

LCACmax3                         A. Farmer - cross

1   BY MS. MENNINGER:

2   Q.  She's about 10 years older than you?

3   A.  Yeah, nine and a half.

4   Q.  She was 25 at the time?

5   A.  I believe that's correct.

6   Q.  You stayed with her while you were in New York?

7   A.  I did.  I stayed at her apartment.

8   Q.  She lived there?

9   A.  Yes.

10  Q.  Your sister is the one who communicated with you about your

11  travel to New York?

12  A.  Yes, I believe that is correct.

13  Q.  You flew out by yourself?

14  A.  I did.

15  Q.  That was not abnormal for you to travel out by yourself?

16  A.  Well, I would travel sometimes with my younger sister to

17  see my dad or my grandparents, not usually by myself.

18  Q.  When you spoke with law enforcement in September of 2019,

19  you told them that you flew alone, which was not abnormal for

20  you; correct?

21  A.  I don't recall saying that.  But, as I mentioned, I did

22  have to fly to see my dad because he lived across the country.

23  So that's probably what I was referring to.  Usually, though,

24  my sister would be with me, my little sister.

25  Q.  But what you said was, you flew alone, which was not

LCACmax3                          A. Farmer - cross

1   abnormal for you; correct?

2              MS. POMERANTZ:  Objection.  Asked and answered.

3              THE COURT:  Sustained.

4   Q.  If I could show you what's been marked as 3514-006, page 2

5   in the overflow photograph.

6              MS. MENNINGER:  I think we can put that on the screen

7   for counsel and the Court and the witness.  The overflow

8   paragraph at the top, if we could call that out.  My screen

9   went blank.

10             THE COURT:  I hit something.

11             MS. MENNINGER:  Happens to all of us.

12             THE COURT:  Ms. Williams will make it right.

13             MS. MENNINGER:  Okay.  Mine is back.

14             THE COURT:  She made it better.  Go ahead.

15  BY MS. MENNINGER:

16  Q.  What you told the government on that occasion is you flew

17  alone which is not abnormal for you; correct?

18             MS. POMERANTZ:  Objection.  Asked and answered.

19             THE COURT:  You can ask if it refreshes.

20  Q.  Does looking at this report refresh your memory that you

21  told the government, in September much 2019, that you flew

22  alone which was not abnormal for you?

23  A.  I see, yeah, that's what they noted.  I'm assuming that was

24  based on exactly as I've explained, that I would fly to see my

25  family.

LCACmax3                     A. Farmer - cross

1    Q.  You didn't say anything about your little sister?

2    A.  I guess not, but at that -- but what would happen.

3    Q.  It was your understanding that Mr. Epstein purchased your

4    plane ticket for you to fly to New York?

5    A.  Yes.

6    Q.  You understood Mr. Epstein to be Maria's boss; correct?

7    A.  That's correct.

8    Q.  You understood that he had been connecting her to people in

9    the art world; correct?

10   A.  Yes.

11   Q.  And she was 25; correct?

12   A.  That's correct.

13   Q.  You understood that he was very wealthy?

14   A.  That's correct.

15   Q.  You understood or hoped that he might help get you into

16   college; correct?

17   A.  And pay for college, yes.

18   Q.  And you understood and hoped that he might help you pay for

19   college; correct?

20   A.  Yes.

21   Q.  He did not pay for your college?

22   A.  He did not.

23   Q.  You were planning to go away for the summer, correct, to an

24   international trip?

25   A.  I had hopes.  I didn't have any plans at that point.

LCACmax3                    A. Farmer - cross

1    Q.  And you hoped that he might help pay for that trip;

2    correct?

3    A.  That's correct.

4    Q.  Ghislaine Maxwell had no role in the logistics of your

5    travel to New York; correct?

6    A.  That's correct.

7    Q.  She did not fly you there?

8    A.  No.

9    Q.  She didn't buy you a ticket to go here?

10   A.  She did not.

11   Q.  She didn't arrange for your travel?

12   A.  No.

13   Q.  She didn't call your mother before you traveled to New

14   York?

15   A.  To New York, no.

16   Q.  She didn't encourage you to travel to New York?

17   A.  She did not.

18   Q.  She did not transport you to New York?

19   A.  That's correct.

20   Q.  You had never seen her before you came to New York?

21   A.  That's correct.

22   Q.  You had never talked to her before you came to New York?

23   A.  Yes.

24   Q.  You didn't even know about her before you came to New York;

25   correct?

LCACmax3                    A. Farmer - cross

1   A.   I'm not -- I don't recall whether I heard -- I think I may

2   have, but I don't remember when I first learned about her.

3   Q.   The purpose of your trip was to visit your sister; correct?

4   A.   And to meet Epstein, correct.

5   Q.   Well, you believed that Mr. Epstein purchased you a ticket

6   for you to come see Maria in New York; right?

7   A.   Yes, that was part of the purpose.

8   Q.   You testified that you stayed with your sister at her

9   apartment in the Village; right?

10  A.   Yes.

11  Q.   You did not stay at Mr. Epstein's home?

12  A.   No, I did not.

13  Q.   You went to see several live performances while you were in

14  town; correct?

15  A.   Yes.

16  Q.   You went to see those with your sister?

17  A.   Yes, at least two of them, yeah.

18  Q.   Well, you went to see the Blue Man Group tubes; right?

19  A.   Yeah.

20  Q.   You went to see The Dutchess, a play; correct?

21  A.   Yeah, I think -- Blue Man Group, I don't think Maria was

22  there for that, but yeah.

23  Q.   You went to stay in a ski cabin while you were here;

24  correct?

25  A.   That's correct.

LCACmax3                         A. Farmer - cross

1    Q.  You stayed overnight there?

2    A.  I think that's correct.

3    Q.  With your sister?

4    A.  Yes.

5    Q.  And with your sister's boyfriend and his brother were at

6    that cabin; correct?

7    A.  That's correct.

8    Q.  You went shopping with your sister; right?

9    A.  I did.

10   Q.  You went to flea markets?

11   A.  Uh-huh.

12   Q.  Thrift stores?

13   A.  Yes.

14   Q.  You went to see some bands with your sister?

15   A.  Yes.

16   Q.  You did all of those things on this trip in New York with

17   your sister; right?

18   A.  I did.

19   Q.  She was with you, I think you said without the exception of

20   perhaps Blue Man Group, she was with you the entire time;

21   right?

22   A.  Yes.

23   Q.  Now, when you arrived in New York, Ghislaine Maxwell didn't

24   pick you up at the airport?

25   A.  No.

LCACmax3                          A. Farmer - cross

1    Q.  She didn't drive you anywhere while you were in New York?

2    A.  No, I didn't see her during that trip.

3    Q.  She didn't take you to any of these live performances?

4    A.  No.

5    Q.  She didn't take you to see The Lion King, for example?

6    A.  No.

7    Q.  She didn't take you shopping or to a ski cabin; right?

8    A.  No.

9    Q.  She didn't take you to the movies?

10   A.  No.

11   Q.  She didn't engage you in any conversation about your

12   interests; right?

13   A.  No.

14   Q.  She didn't offer to pay for your college or a trip in the

15   summer; right?

16   A.  She did not.

17   Q.  Didn't invite you to her home?

18   A.  No.

19   Q.  Didn't give you champaign?

20   A.  No.

21   Q.  She didn't buy you any clothing while you were in New York?

22   A.  No.

23   Q.  No preppy clothes or underwear; right?

24   A.  No.

25   Q.  She simply was not here the entire time you were in New

LCACmax3                        A. Farmer - cross

1   York; right?

2   A.  That's correct.

3   Q.  When you went to Epstein's house, you were there the whole

4   time with your sister; correct?

5   A.  Yes.

6   Q.  And it was there that Mr. Epstein spoke with you about

7   college applications?

8   A.  Yes.

9   Q.  And discussed the college application process; right?

10  A.  That's right.

11  Q.  He urged you to consider UCLA, I think it was?

12  A.  Yes.

13  Q.  He talked to you about traveling abroad for the summer?

14  A.  Yes.

15  Q.  And how that might help your college applications?

16  A.  Yes.

17  Q.  You did ultimately go to an ivy league school; right?

18  A.  Yes.

19  Q.  And he surprised you with tickets to the Phantom of the

20  Opera; right?

21  A.  Yes.

22  Q.  You said you were really excited about seeing the Phantom

23  of the Opera; right?

24  A.  I was.

25  Q.  It wasn't the first time you had seen it?

LCACmax3                        A. Farmer – cross

1   A.  No.

2   Q.  You had seen it before?

3   A.  Yeah, a friend invited me in Phoenix.

4   Q.  And it was better this time in New York?

5   A.  Yes.

6   Q.  And, again, Ghislaine Maxwell wasn't a part of this

7   conversation at Epstein's home; right?

8   A.  She was not.

9   Q.  He didn't even mention her during this trip to his home;

10  correct?

11  A.  That, I don't remember.

12  Q.  Well, you've spoken to the government a number of times;

13  correct?

14  A.  Yes.

15  Q.  You filed a civil lawsuit against Ms. Maxwell; right?

16  A.  Yes.

17  Q.  You submitted a claim to the Victims Compensation Fund;

18  right?

19  A.  Yes.

20  Q.  And on none of those occasions have you said that

21  Mr. Epstein's conversation with you at his home involved

22  Ghislaine Maxwell; right?

23  A.  It did not center on her.  I don't remember if she was

24  mentioned.  I was trying to be accurate, yeah.

25  Q.  And if you didn't remember it, you didn't tell someone

LCACmax3                        A. Farmer - cross

1   about it; right?

2   A.  I did not, right.

3   Q.  You said, I believe, that you had visited with Mr. Epstein

4   in the office of his home; correct?

5   A.  I remember there being a desk there.  That's why I was

6   assuming it was an office, but --

7            MS. MENNINGER:  Just one moment.

8            THE COURT:  Okay.

9   Q.  You were sitting at a desk; right?

10  A.  Yes.

11  Q.  You don't know whether his home was under renovation at the

12  time you were there; correct?

13  A.  I believe it was.

14  Q.  And you believe this was at the beginning of 1996; correct?

15  A.  As I said, late 1995, early 1996.

16  Q.  Well, your journal entry is dated January 7th; right?

17  A.  Right.

18  Q.  And you had just gotten back that day; right?

19  A.  I don't know if it says that day.  I know I recently

20  returned.

21  Q.  And you thought you were there about a week; right?

22  A.  I know I left after Christmas.  So in that time.

23           MS. MENNINGER:  If we could --

24           THE COURT:  We're at about a quarter after,

25  Ms. Menninger.  Should we break here?

LCACmax3                          A. Farmer - cross

1              MS. MENNINGER:  Sure.

2              THE COURT:  Ladies and gentlemen, we'll take our

3      morning break.  See you in about 15 minutes.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LCACmax3                          A. Farmer - cross

 1              (Jury not present)

 2              THE COURT:  The witness can step down while we break.

 3              (Witness not present)

 4              Counsel, are there matters to take up before we break?

 5              MS. POMERANTZ:  Not from the government, your Honor.

 6              MS. MENNINGER:  Not from me, your Honor.

 7              THE COURT:  See you in about ten minutes.  Let me know

 8  if there is anything you need.  Thank you.

 9              (Recess)

10              Matters to take up?

11              MS. MENNINGER:  No, your Honor.

12              MS. POMERANTZ:  Not from the government.  Thank you,

13  your Honor.

14              THE COURT:  We'll bring back the witness and bring in

15  the jury.

16              (Witness present)

17              You can take your seat, Ms. Farmer.  Thank you.  You

18  may remove your mask.

19              (Continued on next page)

20

21

22

23

24

25

LCACmax3                        A. Farmer – cross

1              (Jury present)

2              Thank you so much, members of the jury.

3              Ms. Menninger, you may continue with your cross

4    examination.

5              MS. MENNINGER:  Thank you, your Honor.

6    BY MS. MENNINGER:

7    Q.   I think when we left off, I was asking you about the dates

8    of your trip.

9              MS. MENNINGER:  If I could pull up Government Exhibit

10   603.  As this is in evidence, your Honor, if I could also

11   publish it to the jury.

12             THE COURT:  You may.

13   Q.   So this is your journal; right?

14   A.   It is, yes.  I see what you're referring to.

15   Q.   In your journal, you gave a date of January 7th, 1996;

16   correct?

17   A.   Yes.

18   Q.   And what you wrote is, I got back from my trip to New York

19   today?

20   A.   Yes, I was right on top of that journal entry, yes.

21   Q.   So it's now your memory that you got back on January 7th;

22   right?

23   A.   Correct.

24   Q.   And you had been there for about a week; correct?

25   A.   Yes.

LCACmax3                      A. Farmer - cross

1   Q.   And you had been there for a New Year's eve party, I think

2   you said?

3   A.   Yes.  So it may be that the trip was a little longer than a

4   week, because I'm seeing that date, yeah.

5   Q.   You know it was after Christmas of '95; right?

6   A.   Yeah.

7            MS. MENNINGER:  We can take that down now, thank you.

8   Q.   Back in your time at Mr. Epstein's home, you believe it was

9   under renovation while you were there; correct?

10  A.   It may have been.  I don't know.  I have heard, but I don't

11  remember from that time.  I don't have a memory of it being

12  under renovation, but I have heard that that's possible.

13  Q.   And I won't ask you where you heard that.  I'm not asking

14  you where you heard that.

15  A.   Okay.

16  Q.   You do know that there was no sexual activity that occurred

17  while you were in Mr. Epstein's home; correct?

18  A.   That's correct.

19  Q.   No one physically touched you there?

20           MS. POMERANTZ:  Objection, your Honor.  Just to

21  clarify which home we're talking about.

22           MS. MENNINGER:  The New York home.  Sorry.  I thought

23  that was the general topic here.

24  Q.   I'm talking about your time in the New York home that was

25  possibly under renovation in early of 1996; right?

LCACmax3                          A. Farmer - cross

1    A.   Sorry.  What was the question about that?

2    Q.   I'm just orienting you to make sure you and I are talking

3    about the same thing.

4    A.   Yes.

5    Q.   And I understand us to be talking about a time in early

6    January 1996 when you were in Mr. Epstein's --

7    A.   We're on the same page, yes.

8    Q.   -- New York home; right?

9    A.   Yes.

10   Q.   No physical contact happened with you in that home?

11   A.   That's correct.

12   Q.   No one showed you any vibrators or massagers or anything

13   like that in that home?

14   A.   No.

15   Q.   And regardless, Ghislaine Maxwell was not present in

16   Mr. Epstein's home while you were there; right?

17   A.   Correct.

18   Q.   You just talked about later going to the movie theater with

19   Epstein and your sister during the same trip in New York in

20   early 1996?

21   A.   Yes.

22   Q.   And Ghislaine Maxwell was not at the movie theater; right?

23   A.   That's right.

24   Q.   And you talked about how he held your hand and rubbed your

25   arm during that time in the movie theater; right?

LCACmax3                      A. Farmer - cross

1    A.   That's right.

2    Q.   You told this to the FBI when you first met with them in

3    relation to this case, in September of 2019; correct?

4    A.   Yes.

5    Q.   And before you met with the FBI in September of 2019 and

6    talked about the movie theater incident, you actually refreshed

7    your memory by looking at your journal; right?

8    A.   I had seen my journal, yes.

9    Q.   And you told them that you knew about this experience in

10   the movie theater because you had looked at your journal and

11   refreshed your memory; correct?

12   A.   I knew about the experience apart from that, but I had

13   looked in my journal, yes.

14   Q.   What you told the prosecutors and the FBI in 2019, after

15   telling them about the movie theater incident, is that you

16   recalled your memory was refreshed of the incident by looking

17   at your journal; right?

18   A.   Yes.

19   Q.   You had looked at the journal before you had the meeting

20   with them in September of 2019?

21   A.   Yes.

22   Q.   And you also refreshed your memory about the age you were

23   when you took the trip by looking at your journal in 2019?

24   A.   The age when I took the trip to New Mexico --

25   Q.   New York.  New York.  I'm sorry.  I'm just talking about

1    New York.  I apologize if it wasn't clear.

2    A.   Okay.

3    Q.   You refreshed your memory about the age you were when you

4    took the trip to New York by looking at your journal?

5    A.   I don't remember saying that, but that's possible, yes.  I

6    mean, I knew it was in my junior year, so I don't think it

7    would have been that hard for me to determine my age, but --

8           MS. MENNINGER:  If I could have the witness and

9    counsel look at 3514-006, page 1, third full paragraph about

10   five lines down.

11   Q.   If you could just read that bottom half of that paragraph

12   to yourself and tell me if that refreshes your memory about

13   what you told the government in 2019.

14          MS. POMERANTZ:  Objection, your Honor.

15          THE COURT:  She can look at it.

16   A.   I'm sorry.  Just read it but to myself, is that what you

17   said?

18   Q.   Yes.  And do you now recall that, in September of 2019, you

19   had looked at your journal and refreshed your memory about the

20   age you were when you took the trip before you met with the

21   government then?

22   A.   I think it -- the sentence is a summary.  I don't know if

23   that's what it -- that's not my interpretation of it.  I see

24   that they wrote a note about that.  I think I knew I was 16,

25   but I do know that I refreshed my memory about the experience

LCACmax3                        A. Farmer - cross

1   by reading the journal.

2              MS. MENNINGER:  Okay, clear.  So we can take that

3   down.

4   Q.  So we know that you refreshed your memory with the journal

5   before you met with the government in September of 2019?

6   A.  Yes.

7   Q.  And we do that sometimes in this courtroom, too.  I ask you

8   to take a look at a document to refresh your memory because it

9   helps people remember things that they wrote down a long time

10  ago?

11  A.  Of course.

12  Q.  And that's kind of what you had done before you met with

13  the government in September of 2019; right?

14  A.  I had had that journal with me, and so I had looked at it

15  over the years, yes.

16  Q.  And it helped you remember things from a long time ago?

17  A.  Yes.

18  Q.  Because you had written it down at the time; right?

19  A.  Yeah.

20  Q.  The government introduced some pages from that journal — I

21  think it was 603 and 604, if memory serves — and they asked you

22  a little bit about the journal on direct.  I want to ask you a

23  few more questions about the journal.

24  A.  Oh, sure.

25  Q.  The cover of the journal —

LCACmax3                    A. Farmer – cross

1              MS. MENNINGER:  Is that 603?  Sorry.  601.  If we
2    could show that to counsel and the witness.
3    Q.  This is the cover of one of your journals from high school;
4    correct?
5    A.  Yes.
6    Q.  It's the one that contains the pages that we've been
7    looking at; right?
8    A.  Yes.
9    Q.  Now, you had several journals during high school; right?
10   A.  Yes, I did have other journals in high school.
11   Q.  You kept a journal throughout high school?
12   A.  I know, like, I journaled when I went to Thailand in a
13   separate journal on that trip.  And I've had journals starting
14   in elementary school, off and on, but again, I'm not very
15   consistent, so I don't know that I journaled throughout high
16   school.  I think there were chunks of time that I would do it
17   and then I would put it aside for a while.
18   Q.  And when you spoke to the government in September of 2019,
19   you said throughout high school, you maintained a journal;
20   right?
21   A.  Yeah.  I'm trying to elaborate on that, yeah.
22   Q.  So you had this journal from around the time you went to
23   New York?
24   A.  Right.
25   Q.  And then you had another journal from the time you went to

LCACmax3                        A. Farmer - cross

1    Thailand in the summer?

2    A.  Yeah.  That was only about that trip.  Yes.

3    Q.  And then you had other journals thereafter; right?

4    A.  I don't recall if I journaled again in my senior year, but

5    I know I journaled again in college and other times.

6    Q.  And this particular journal that we've been looking at and

7    the government had you read from, you actually read from it

8    during some of your media appearances; right?

9    A.  I did.

10   Q.  On a documentary or a 2020 special or something; right?

11   A.  I did.

12           MS. MENNINGER:  And if I could ask to turn to page 2

13   of 603, I believe it is.  I'm sorry.  It's not.

14           Let me back up.  I would like to introduce Defendant's

15   Exhibit AF1, which I think there was a page omitted from the

16   government's exhibit.  If I could confer with counsel.

17           THE COURT:  You want to indicate the identification

18   mark and then pull it up for me, please.

19           MS. MENNINGER:  Yes, your Honor.  And I apologize,

20   your Honor, if I may approach, I do have a paper binder I could

21   give to the Court and the witness because it's multiple pages.

22   There is just a different page than the government's exhibit.

23           THE COURT:  Okay.  When you get back, the tab number

24   and then, again, just the mark for identification.

25           MS. MENNINGER:  AF1, your Honor.

LCACmax3                       A. Farmer - cross

1          THE COURT:  And that's behind tab 1?

2          MS. MENNINGER:  I think we have the 3500 material

3     first, your Honor.  So it's about halfway through the binder is

4     when the AF exhibits start.

5          THE COURT:  I see.  Thank you.

6          MS. MENNINGER:  Your Honor, I've marked for

7     identification AF1.  What I would like to do is to draw the

8     witness's attention --

9          THE COURT:  You want to direct the witness to a page?

10         MS. MENNINGER:  Page 2, exactly, of that entry.

11         THE COURT:  Of AF1?

12         MS. MENNINGER:  Yes.

13    BY MS. MENNINGER:

14    Q.  Do you see that entry?

15    A.  Yes.

16    Q.  Do you recognize this was another entry in the same

17    journal?

18    A.  Yes.

19         MS. MENNINGER:  And I don't believe it was in the

20    government's exhibit, and that's why I'm asking to introduce

21    this page, and I can work out with the government later if

22    there is any redactions.  I don't think any are appropriate,

23    but --

24         MS. POMERANTZ:  No objection, your Honor.

25         THE COURT:  AF1 is admitted temporarily under seal so

LCACmax3                          A. Farmer - cross

1    the government can propose any redactions.

2              (Defendant's Exhibit AF1 received in evidence)

3    BY MS. MENNINGER:

4    Q.   Thank you.  This page 2 is actually is an entry that you

5    made before you went to New York; right?

6    A.   Right.

7    Q.   And it doesn't have a date on it?

8    A.   Right.

9    Q.   But you're describing your excitement at going to see your

10   sister in New York; right?

11   A.   Yeah.

12   Q.   And you're describing your excitement about meeting

13   Epstein; correct?

14   A.   Right.  Maria, I'm excited about getting this ticket that

15   he bought me, yeah.

16   Q.   And you refer to him --

17             MS. MENNINGER:  Could we publish to the jury that

18   page.  Is that a problem?

19             MS. POMERANTZ:  No, not at all.

20             MS. MENNINGER:  If we could publish to the jury that

21   page, your Honor?

22             THE COURT:  Do you have it on paper?

23             MS. MENNINGER:  I don't think that the government

24   thinks that there is any proposed redactions to this page.

25             THE COURT:  Let's just give them a minute.

LCACmax3                          A. Farmer - cross

1              MS. MENNINGER:  Of course.

2              THE COURT:  And if not, we can unseal it.

3              MS. POMERANTZ:  Your Honor, as long as we're referring

4    to just page 2, then the government does not believe any

5    redactions are necessary.  So it can be published.

6              THE COURT:  Why don't we do that.  Why don't we make

7    page 2 AF1.

8              MS. MENNINGER:  That's fine.

9              THE COURT:  Page 2 of what I'm looking at will be now

10   marked as AF1 and, without objection, I'll admit AF1, which is

11   only page 2.

12             Let me just give the Bates that's at the bottom.  You

13   want to just give that --

14             MS. MENNINGER:  Yes, your Honor.  It's Bates labeled

15   AFarmer10472.

16             THE COURT:  That is the single page that I'm admitting

17   as AF1.  And no objection to it being published?

18             MS. POMERANTZ:  No objection, your Honor.

19             THE COURT:  You may publish.

20             MS. MENNINGER:  Thank you, your Honor.

21   BY MS. MENNINGER:

22   Q.  So this is, I think as we just said, an entry that you made

23   in the same journal before you went to New York?

24   A.  Correct.

25   Q.  So it's your handwriting, et cetera?

LCACmax3                        A. Farmer - cross

1    A.  Correct.

2    Q.  You referred to Epstein as Maria's boss; right?

3    A.  Yes.

4    Q.  You didn't use his name at that point in time?

5    A.  Right.

6    Q.  And you described that you were hoping that he might help

7    pay for your college; right?

8    A.  Yes.

9    Q.  And you were hoping that he might help you get into

10   college; right?

11   A.  Yes.

12   Q.  And you didn't want to get your hopes up because you might

13   be disappointed?

14   A.  Yes.

15   Q.  And that's sort of what you had written down before you

16   went to New York?

17   A.  Yes.

18   Q.  Nothing in there about Ghislaine Maxwell?

19   A.  Correct.

20           MS. MENNINGER:  And now we'll use the Government

21   Exhibit 603, which picks up, I believe, on the next entry that

22   we have.

23           THE COURT:  And that's a public exhibit?

24           MS. MENNINGER:  Right.

25           MS. POMERANTZ:  That's correct, your Honor.

LCACmax3                        A. Farmer – cross

1   BY MS. MENNINGER:

2   Q.  And I think we looked at this just a moment ago?

3   A.  Yes.

4   Q.  And you can look at it on your screen now.

5   A.  It's a little easier to read.

6   Q.  You can put that down.  Thank you.

7          And as we discussed, this is the first entry that you

8   made when you got back from New York; right?

9   A.  Right.

10  Q.  And this is the entry in which you talked about going to

11  Phantom of the Opera?

12  A.  Yes.

13  Q.  And going to Mr. Epstein's home; right?

14  A.  Yes.

15  Q.  You called the Phantom of the Opera the best night of your

16  trip; correct?

17  A.  Yes.

18  Q.  You talked about meeting Maria's boyfriend and so forth in

19  this same entry; correct?

20  A.  Yes.

21  Q.  You talked about going cross country skiing at some point

22  during the trip?

23  A.  Yes.

24          MS. MENNINGER:  On the next page, if we could.

25          MS. POMERANTZ:  Your Honor, can we take this down for

LCACmax3                          A. Farmer - cross

1    just a moment, please.

2              If I can just have a moment to confer with defense

3    counsel?

4              THE COURT:  Yes.

5              (Pause)

6              MS. MENNINGER:  Your Honor, there is a bit of a

7    disagreement about the redactions, but I don't want to hold up

8    the presentation for the jury.  So we can take that up later.

9              THE COURT:  Sure.

10             MS. MENNINGER:  But I do want to ask the witness a

11   couple of questions.  So if I could direct her attention to

12   what we have marked as AF1, and it's going to be page 4 of that

13   exhibit.

14             THE COURT:  We have a terminological issue, because

15   that was originally AF1, but we just admitted the one page as

16   AF1.

17             How about this, we'll go back, I'll admit under seal,

18   again, temporarily, AF1 as a seven-page document.

19             MS. MENNINGER:  Thank you.

20             THE COURT:  Recognizing there is overlap between some

21   of the pages of the AF1 and Government Exhibit 603.

22             MS. MENNINGER:  Thank you, your Honor.  We can work

23   that out.

24             THE COURT:  Ms. Pomerantz.

25             MS. POMERANTZ:  That's fine, your Honor.

LCACmax3                         A. Farmer – cross

1          THE COURT:  Let me just talk to the record for a

2    moment.

3          I retract that I'm only admitting the single page of

4    AF1 as AF1.  Instead, I am temporarily admitting under seal a

5    seven-page document marked as AF1.  Counsel will work out

6    limited redactions.  We'll turn that into a public document

7    with limited redactions.

8          Go ahead.

9          MS. MENNINGER:  Thank you, your Honor.

10   BY MS. MENNINGER:

11   Q.  So I just wanted to ask you, in this journal entry, you

12   wrote about going to a ski cabin and going cross country

13   skiing; right?

14   A.  Yeah.  I'm sorry.  I think I got lost.  Are we back in the

15   binder now?

16   Q.  You can testify from memory right now.  If you need to look

17   at it, we can show it to you again.

18   A.  Okay.

19   Q.  But you, I believe, would recall that you wrote about going

20   to a cross country skiing cabin?

21   A.  Yes.

22   Q.  And you also wrote about going to see a movie or watching a

23   movie while you were in that cabin, and the name of the movie

24   was Sleuth?

25   A.  Okay.  Yes.

LCACmax3                          A. Farmer - cross

1    Q.   And you talked about going to see bands and going to a bar

2    and other things that you did during your trip?

3    A.   Okay.  Yes.

4    Q.   Is that right?

5    A.   Yes.

6    Q.   You recall that's in your journal entry?

7    A.   Yes.

8    Q.   You've reviewed that journal entry a few times; right?

9    A.   Yes.

10   Q.   And significantly, in this journal entry, you really talked

11   about your emotions that you were feeling after you returned

12   from your trip to New York; right?

13   A.   Yes.

14   Q.   You talked about how you had such a great time, it was

15   really depressing to be home; right?

16   A.   I did.

17   Q.   The trip changed your whole outlook on life; right?

18   A.   Yeah.

19   Q.   You say you always feel that way when I get back from

20   trips; right?

21   A.   Yes.

22   Q.   You had been on other trips?

23   A.   Correct.

24   Q.   I think you mentioned that you felt similarly when you got

25   back from Mexico?

LCACmax3                        A. Farmer - cross

1    A.  Correct.

2    Q.  You've been to Mexico?

3    A.  Yes.

4    Q.  It was really overwhelming this time because you felt more

5    independent and things along those lines; right?

6    A.  That's right.

7    Q.  You also talked about how you felt really comfortable here

8    in New York?

9    A.  Yes.

10   Q.  And you felt like you belonged here?

11   A.  Yes.

12   Q.  You hoped to live here some day?

13   A.  Yes.

14   Q.  And this was after your entire trip was over; right?

15   A.  That's right.

16   Q.  You wrote this after you got back home; right?

17   A.  That's right.

18   Q.  After the movie theater incident?

19   A.  That's right.

20   Q.  You also had your impressions of Epstein recorded in this

21   journal entry; right?

22   A.  That's correct.

23   Q.  You found him down to earth and easy to talk to; right?

24   A.  Yes.

25   Q.  In this journal entry, after you got back from New York,

LCACmax3                        A. Farmer – cross

1   again, there is no mention of Ghislaine Maxwell; correct?

2   A.  That's right.

3   Q.  And this, what we've been looking at, is only a portion of

4   your January 7th journal entry; right?

5   A.  Right.

6   Q.  But you have no reason to believe Ghislaine Maxwell is

7   mentioned in the rest of the entry that we don't have?

8   A.  No.

9   Q.  I want to talk about the next journal entry, which I

10  believe is Government Exhibit 604.

11          MS. MENNINGER:  And we may have the same issue, but

12  I'll try to be sensitive to it, your Honor.

13          THE COURT:  Okay.  Thank you.

14  Q.  This one is dated January 25th of 1996; right?

15  A.  Right.

16  Q.  And that's about three weeks after the last one; right?

17  A.  Yeah.

18  Q.  And were there any entries between January 6th and January

19  25th?

20  A.  I don't believe so.

21  Q.  And when you wrote this entry a few weeks later, you wanted

22  to go back and fill in some details that you hadn't mentioned

23  the first time; right?

24  A.  Right.

25  Q.  And that's when you wrote about go going to see a play

LCACmax3                        A. Farmer - cross

1    called the Dutchess?

2    A.   Yes.

3    Q.   The Blue Man Group and the flea market and that kind of

4    thing?

5    A.   Yes.

6    Q.   You went to the Met; right?

7    A.   Yes.

8    Q.   And a pretty fun New Year's Eve party and the thrift

9    stores?

10   A.   Yes.

11   Q.   And it was after your discussion about all of those things

12   that you wrote about your experience in the movie theater;

13   right?

14   A.   Yes.

15   Q.   During your entire trip in New York, you didn't write about

16   Ghislaine Maxwell in your journal; right?

17   A.   Right.

18   Q.   And you would agree with me that having been able to

19   refresh your memory with these journal entries has brought back

20   some of the details that you may not have remembered if you

21   didn't have a journal entry; right?

22   A.   Yes.

23   Q.   You may not have remembered the Dutchess or --

24   A.   Right.

25   Q.   What your emotions were; right?

LCACmax3                           A. Farmer - cross

1    A.   Right.

2    Q.   But having written them down in this journal, it's easy for

3    you to now recall them?

4    A.   Yeah, it helps with the frame of mind -- remind myself --

5    of the frame of mind.

6    Q.   In your journal entry related to the movie theater

7    incident — and I think you talked about this on direct — you

8    made a number of statements like, it wasn't weird, it wasn't

9    that weird, probably normal, it's a little back and forth; is

10   that fair?

11   A.   Oh, yeah.

12   Q.   You even said to yourself, it sounds like I'm justifying

13   it, but I'm not justifying it; right?

14   A.   Yes.

15              (Continued on next page)

16

17

18

19

20

21

22

23

24

25

LCAVMAX4                          A. Farmer – cross

 1   BY MS. MENNINGER:
 2   Q.  And as you sit here today, you now find Epstein's behavior
 3   in that movie theater weird?
 4   A.  I think I found it weird then too, which is why I used that
 5   word so many times.  But I do now, yes.
 6   Q.  You said it was not weird, it was normal and fine, in your
 7   journal entry, right?
 8   A.  Yeah.  I also said it weirded me out.
 9   Q.  And then you said, It's not a big deal.  Right?
10   A.  I did say that.
11   Q.  And "I really don't think it is a big deal."  Right?
12   A.  Correct.
13   Q.  So you used both versions:  It's weird, it's not weird.
14   Right?
15   A.  Yes.
16   Q.  As you sit here today, you find it weird, right?
17   A.  I still find it weird.
18   Q.  And at points in this journal entry, you did not find it
19   weird, but at other points you did, right?
20   A.  That's what I wrote.
21   Q.  And that's based on your today looking back on it in
22   hindsight; correct?  You're looking back on your emotions on
23   January 25th, 1996; correct?
24   A.  I am reflecting on that.
25   Q.  You have your memories today, and you have the emotions you

LCAVMAX4                        A. Farmer - cross

1   wrote down in January of 1996, right?

2   A.  Correct.

3   Q.  And your memories today are colored by hindsight; correct?

4   A.  Of course.

5   Q.  And you are colored in your memories of hindsight by what

6   happened to you in New Mexico, for example?

7           MS. POMERANTZ:  Objection, your Honor.

8           THE COURT:  Overruled.

9   Q.  Right?

10  A.  Does that affect how I perceive what happened to me in New

11  York?

12  Q.  Yes.

13  A.  Yes, I'm sure it does in some ways.

14  Q.  Right.  Because what may not have seemed weird in one

15  moment, if it happened again with him, may become weirder,

16  right?

17  A.  Yes.

18  Q.  In your journal entry, after describing the movie theater

19  incident, you continue on to talk about mundane teen

20  activities, right?

21  A.  Right.

22  Q.  And we don't need to talk about your friends' names, but

23  you started talking about, excuse me, who you were friends with

24  or --

25  A.  Very high school stuff, yes.

LCAVMAX4                         A. Farmer - cross

1    Q.   Okay.  And you even said you were in a pretty happy place

2    at the time you wrote this entry; correct?

3    A.   I did say that.

4    Q.   And you were excited for the future, right?

5    A.   Yes.

6    Q.   And for the avoidance of all doubt, there is no entry in

7    any of your journals that relate to Ghislaine Maxwell?

8    A.   That's correct.

9    Q.   And that is true with respect to a journal you wrote in

10   Thailand after you claimed the New Mexico event happened;

11   correct?

12   A.   That's correct.

13   Q.   And that's true if you had other journals from your senior

14   year; no mention of Ghislaine Maxwell, right?

15   A.   Correct.

16   Q.   604 that we looked at with the government is the last

17   journal entry that you gave to the government for this case;

18   correct?

19   A.   Sorry.  Should I pull up the binder?

20            MS. MENNINGER:  Actually, if Ms. Drescher could pull

21   up 604.  I just don't have that version in our computer.

22            THE COURT:  Okay.  It is admitted, so you may publish,

23   please, Ms. Drescher.  Thank you.

24            MS. MENNINGER:  If we could go to the next page.

25   Thank you, Ms. Drescher.  And then is the back cover admitted?

1        Sorry, your Honor.

2   BY MS. MENNINGER:

3   Q.  Is this page that you see here in front of you from 604 the

4   last page of your journal that you gave to the government in

5   connection with this case?

6   A.  I don't recall, but if it's entered that way, then yes, I'm

7   assuming it is.

8   Q.  Okay.

9        MS. MENNINGER:  We could pull up AF-1, page 7, just

10  for counsel and the witness.

11       THE COURT:  That's fine.

12       MS. MENNINGER:  I believe it's noncontroversial.  And

13  the government has a copy of it now.

14       MS. POMERANTZ:  Yes, your Honor, we have a copy.

15  Q.  So this is the back of the journal, right?

16  A.  Correct.

17  Q.  And you gave a copy of this picture of the back of this

18  journal to the government?

19  A.  Right.

20  Q.  And so that's what we have.

21  A.  Oh, yeah.  Okay.

22  Q.  We've covered everything that you gave to the government in

23  relationship to this journal?

24  A.  Okay.  Yes.

25  Q.  Correct?

LCAVMAX4                      A. Farmer - cross

1    A.  Correct.

2    Q.  So we have photocopied pages from within the journal?

3    A.  Yes.

4    Q.  We have a picture of the front of the journal, right?

5    A.  Yes.

6    Q.  And a picture of the back of the journal?

7    A.  Yes.

8    Q.  Just to be clear, the government has never received a

9    physical copy of the journal; correct?

10   A.  Correct.

11   Q.  You have never given that to them?

12   A.  Correct.

13   Q.  So since you -- these are all the pages we have; you do not

14   have a journal entry that reflects your trip to New Mexico?

15   A.  That's correct.

16   Q.  We don't have "I'm excited about going to New Mexico,"

17   right?

18   A.  Correct.

19   Q.  We don't have "I'm excited to go to New Mexico to see

20   Maria's boss" or something like that?

21   A.  Right.

22   Q.  We don't have how we felt when you got home from New

23   Mexico?

24   A.  There's no journal entries about New Mexico.

25   Q.  And where is the physical journal right now?

LCAVMAX4                        A. Farmer – cross

1    A.  It's in the City of New York.

2    Q.  Without a journal entry from the New Mexico trip, we can't

3    confirm with a piece of paper who invited you there, right?

4    A.  With a piece of paper?  No.

5    Q.  Or why you were going, right?

6    A.  Yes, there's no journal and record of any of that.

7    Q.  There's no piece of paper that you know of, right?

8    A.  Correct.

9    Q.  Journal or otherwise, right?

10   A.  Correct.

11   Q.  We don't have a document that tells us when you went,

12   right?

13   A.  Correct.

14   Q.  And because we don't have an entry from after the trip to

15   New Mexico, we can't tell with a piece of paper what happened

16   to you while you were there; correct?

17   A.  Correct.

18   Q.  Or who was there, right?

19   A.  Correct.

20   Q.  Or what you talked about while you were there?

21   A.  That's right.

22   Q.  How you felt about the trip?

23   A.  Right.

24   Q.  Right?

25            And because we don't have a piece of paper or a

LCAVMAX4                        A. Farmer – cross

1    journal entry, it is harder for you to remember the events in

2    the New Mexico trip versus the New York trip?

3                MS. POMERANTZ:  Objection, your Honor.

4                THE COURT:  Overruled.

5    A.  Yes.

6    Q.  You've told the government it was harder for you to

7    disaggregate discussions about those two trips?

8    A.  I'm sorry, to disaggregate discussions with who?

9    Q.  You had discussions about going to New York with certain

10   people, your sister, I think you said?

11   A.  Right.

12   Q.  You had discussions about going to New Mexico with people,

13   I think you said, before you went?

14   A.  Before I went.

15   Q.  Yes.

16   A.  Yes.

17   Q.  You said you spoke with Mr. Epstein on the phone; correct?

18   A.  About going to Thailand.  I don't remember about going to

19   New Mexico.

20   Q.  You spoke to him between the time you went to New York and

21   the time you went to New Mexico.

22   A.  Correct.

23   Q.  You spoke with him on the phone?

24   A.  Yes.

25   Q.  You did not ever speak with Ghislaine Maxwell on the phone?

1   A.   I did not.

2   Q.   And you spoke to your mother about going to New Mexico?

3   A.   That's correct.

4   Q.   And when you were talking to the government about all these

5   various conversations, you told them it was harder for you to

6   disaggregate the discussions about those two different trips,

7   right?

8   A.   I don't recall saying that, but I -- I understand what

9   you're saying.

10  Q.   Okay.  And you have very little memory of how the New

11  Mexico trip was planned; correct?

12  A.   That's correct.

13  Q.   And you have very little memory because you have no journal

14  entries from that time period, right?

15          MS. POMERANTZ:  Objection.

16          THE COURT:  Overruled.

17  A.   I have not had a journal to help me refresh my memories of

18  how that was planned.

19  Q.   Thank you.

20          Now, you testified on direct that you believe you went

21  in the -- to New Mexico in the spring of '96, right?

22  A.   That's correct.

23  Q.   And you also said you believe it was April of '96?

24  A.   That's right.

25  Q.   And you're going off of your memory for that?

LCAVMAX4                          A. Farmer - cross

1    A.   Yes.

2    Q.   Because we don't have a journal entry, right?

3    A.   That's correct.

4    Q.   And actually it's a bit of a reconstructed memory, right?

5    A.   About the timeline?

6    Q.   Of when you went to New Mexico.

7    A.   Certain things stand out that help me to remember what the

8    timeline would have been, yes.

9    Q.   Okay.  You remember certain things about the trip, like

10   going to see *Primal Fear*, right?

11   A.   Yes.

12   Q.   And what you did is you got on the internet and researched

13   when *Primal Fear* was released, right?

14   A.   I remember going to see *Primal Fear*.  And I did at some

15   point check to make sure that that was -- when that came out.

16   And that confirmed that, yes, that was the correct time that I

17   had remembered.

18   Q.   You confirmed the time *Primal Fear* was released and then

19   placed your memory of the trip relative to that date; correct?

20   A.   I don't think I would say it that way.

21   Q.   Okay.

22            MS. MENNINGER:  I'd like to show the witness what

23   we've marked for identification as AF-8.

24            THE COURT:  Okay.

25            MS. POMERANTZ:  Your Honor, this is the first time

LCAVMAX4                         A. Farmer - cross

1    we're seeing this, so I'd ask for just a moment to review.

2              THE COURT:  You may.

3              MS. POMERANTZ:  Thank you, your Honor.

4              THE COURT:  Go ahead.

5              MS. MENNINGER:  May I show AF-8 to the witness, your

6    Honor?

7              THE COURT:  You may.

8              MS. MENNINGER:  Can you please put it on counsel's

9    screen.

10   BY MS. MENNINGER:

11   Q.  Ms. Farmer, you recall having email communications with a

12   journalist?

13   A.  Yes.

14   Q.  And that journalist's name is Mike Baker?

15   A.  Correct.

16   Q.  He works for *The New York Times*?

17   A.  That's correct.

18   Q.  You gave an interview with Mr. Baker relative to your

19   experiences; correct?

20   A.  I did.

21   Q.  And before you did that, Mr. Baker had some emails where he

22   was confirming certain dates with you?

23   A.  That's right.

24   Q.  And one of the communications Mr. Baker asked about is the

25   timing of your trip to New Mexico?

LCAVMAX4                           A. Farmer - cross

1    A.  That's right.

2    Q.  And he cited your recollection that it was in the spring?

3    A.  Sorry.  I just read the first part.  I'm looking at the

4    bottom.

5    Q.  If you look at the bottom full paragraph --

6    A.  Oh, yeah.

7    Q.  -- does that refresh your memory --

8    A.  Yeah.

9    Q.  -- he's asking you?

10   A.  Yes.

11   Q.  And he said he understood it was in the spring, maybe

12   April, right?

13   A.  Yes.

14   Q.  And you wrote him back and told him that you had looked up

15   the release date of *Primal Fear*?

16   A.  Yes.

17   Q.  Right?

18          And you told him it wasn't out until April 3rd, right?

19   A.  Right.

20   Q.  And you told him that you also had talked to some of your

21   friends, right?

22   A.  Yes.

23   Q.  About when prom was?

24   A.  Yeah.

25   Q.  And that was in late April, right?

LCAVMAX4                        A. Farmer - cross

1    A.  That's correct.

2    Q.  And so after looking up *Primal Fear* and talking to your

3    friends, you told him you're feeling pretty confident that it

4    was April?

5    A.  Yes.

6    Q.  So you took some memory fragments that you had, *Primal Fear*

7    and prom, right?

8    A.  Yes.

9    Q.  And you looked up things on the internet, right?

10   A.  Yeah, I wanted to be accurate.  I had just said the spring,

11   and so I wanted to, you know, provide more detail.

12   Q.  And so you compared it to the release date of *Primal Fear*,

13   right?

14   A.  Right.

15   Q.  You compared it to your friends' memories of when prom was,

16   right?

17   A.  Right.

18   Q.  And that led you to be pretty confident that the trip

19   occurred in April of '96, right?

20   A.  Right.

21   Q.  And that's how you reconstructed your memory that it was

22   April of 1996?

23           MS. POMERANTZ:  Objection, your Honor.

24           THE COURT:  What are the grounds?  One-word grounds.

25           MS. POMERANTZ:  Just mischaracterization.

LCAVMAX4                          A. Farmer - cross

1              THE COURT:  Overruled.

2    Q.  Right?

3    A.  Right.

4    Q.  You wanted to be accurate?

5    A.  Yes.

6    Q.  So you checked it against dates and you checked it against

7    other people's memories, right?

8    A.  Right.

9    Q.  That's how you make sure it's accurate?

10             MS. POMERANTZ:  Objection, your Honor.

11             THE COURT:  Overruled.

12   Q.  Right?

13   A.  That's how I make sure --

14   Q.  Your memory is accurate.

15   A.  In general?

16   Q.  In this case.

17   A.  In this case that's what I did, yes.  I said that, yes.

18   Q.  Talking about things that happened 25 years ago, right?

19   A.  Right.

20   Q.  You also were trying to figure out or you were telling him

21   about the dates of your trip to Thailand, Mr. Baker?

22   A.  That's right.

23   Q.  And you were able to tell Mr. Baker the dates of your trip

24   to Thailand because you always remember you went on your

25   birthday?

LCAVMAX4                          A. Farmer - cross

1    A.   Right.

2    Q.   And you have pegged your memory of going to Thailand with

3    your birthday, which was in early July?

4    A.   Right.

5    Q.   And so you were able to remember the dates of your trip to

6    Thailand by reference to your birthday?

7    A.   Right.

8    Q.   And you're sure that you went to Thailand in the summer of

9    1996, right?

10   A.   Right.

11        MS. MENNINGER:   And we can take that down now.

12   Q.   There would be records of you going to Thailand in the

13   summer of 1996 presumably; correct?

14   A.   What kind of -- I mean --

15   Q.   You traveled abroad.

16   A.   I'm sure they are somewhere.   This was before digital

17   records, but --

18   Q.   You had a passport?

19   A.   Yes, yes, for sure.

20   Q.   You crossed borders?

21   A.   Yeah, those records, yeah.   I don't have those, but yeah.

22   Q.   You went with a school organization?

23   A.   Global Roots, yeah; it was a nonprofit.

24   Q.   So presumably there are records somewhere that substantiate

25   the date of your trip.

LCAVMAX4                          A. Farmer - cross

1    A.  Right.

2              MS. MENNINGER:  Can I have one moment, your Honor?

3              THE COURT:  You may.

4              (Counsel conferred)

5    BY MS. MENNINGER:

6    Q.  You talked on direct about the fact that you -- let me make

7    sure I've got my quote accurate.  You talked generally about

8    once you got to New Mexico, that Ghislaine did not seem

9    surprised to see you there.

10   A.  Right.

11   Q.  And that you felt more comfortable because she was there.

12   A.  Yes.

13   Q.  Originally, your sister Maria was going to accompany you on

14   this trip to New Mexico; correct?

15   A.  I don't remember that.

16   Q.  Well, do you remember meeting with the FBI in 2006?

17   A.  I do remember that meeting.

18   Q.  Okay.  And just as a side note, you, I think, testified on

19   direct that you believed the meeting with the FBI was in either

20   2006 or 2007?

21   A.  Yeah.  I had holiday decorations up, so I remember it was

22   that late in the year.

23   Q.  Well, earlier you have said that you remembered it was 2007

24   because you remembered it being hot out.  Do you remember that

25   statement?

LCAVMAX4                              A. Farmer - cross

 1              MS. POMERANTZ:  Objection, your Honor.

 2              THE COURT:  Time frame.

 3              You're talking about her testimony on direct?

 4              MS. MENNINGER:  Well, no, your Honor, I apologize.

 5              THE COURT:  Sustained.

 6              MS. MENNINGER:  Let me be more clear.

 7    BY MS. MENNINGER:

 8    Q.  In past interviews, you were trying to reconstruct the date

 9    of your interview with the FBI, do you remember that?  You were

10    asked to talk about when that meeting was?

11    A.  Do you remember what interview -- what --

12    Q.  Let me come back to it just to make sure I'm accurate.

13    But, in any event, you spoke to them in 2006 or 2007 is your

14    memory now?

15    A.  Right.

16              MS. MENNINGER:  And so if I could have the witness

17    look at 3514-001.

18    Q.  And if you look at this document, does that refresh your

19    memory about when your first meeting with the FBI was?

20    A.  Yes.

21    Q.  And that was in November of 2006?

22    A.  Yes.

23    Q.  And the actual interview was on November 15th, 2006 at the

24    bottom of the page; correct?

25              THE COURT:  Can you make it larger please?

LCAVMAX4                          A. Farmer - cross

1                MS. MENNINGER:  Yes.

2     Q.   The interview was on November 15th of 2006 at your home in

3     Austin, Texas; correct?

4     A.   That's correct.

5     Q.   And then the date of the report was a couple of weeks

6     later.  If we could look at the top of the page.  November

7     28th.

8     A.   Yes.

9     Q.   And so on page 2 of that document, in the second full

10    paragraph, the last sentence of that paragraph, what you told

11    the FBI in November of 2006 is that originally Maria was going

12    to accompany Annie to New Mexico; correct?

13    A.   I see it says that.

14    Q.   And that's what you told the FBI in November of 2006;

15    correct?

16    A.   I don't recall that, but I see that that's written here.

17               MS. POMERANTZ:  Your Honor, I would ask that the next

18    sentence be read.  It's for completeness of the record.

19               MS. MENNINGER:  Your Honor, that's what redirect is

20    for.

21               THE COURT:  You can ask your next question.

22    BY MS. MENNINGER:

23    Q.   You don't recall telling the FBI in November of 2006 that

24    originally Maria was going to accompany you to New Mexico;

25    correct?

LCAVMAX4                         A. Farmer - cross

1    A.  That's correct.

2            MS. MENNINGER:  We can take it down.

3    Q.  You did meet with agents at your home in November of 2006;

4    correct?

5    A.  Correct.

6    Q.  Agent Kuyrkendall and Slater?

7    A.  That's correct.

8    Q.  And they sat down and talked to you for some time; correct?

9    A.  They did.

10   Q.  They were taking notes when they talked to you?

11   A.  They were.

12   Q.  And they are FBI agents; correct?

13   A.  Yes.

14   Q.  They represented themselves to be?

15   A.  They did.

16   Q.  And they apparently wrote a report about the interview,

17   right?

18   A.  Right.

19   Q.  And they wrote in their report that originally Maria was

20   going to accompany you, right?

21   A.  They wrote that, yes.

22           THE COURT:  We're going to break for lunch shortly, if

23   this is a breaking point.

24           MS. MENNINGER:  It's fine, your Honor.

25           THE COURT:  Members of the jury, we'll break for about

LCAVMAX4                          A. Farmer - cross

1    an hour.  See you then.  Enjoy your lunch.

2              (Jury not present)

3              THE COURT:  Are there matters to take up before the

4    break?

5              MS. POMERANTZ:  Not from the government.

6              MS. MENNINGER:  Not from us, your Honor.  Thank you.

7              THE COURT:  Okay.  We'll reconvene in 45.  And you'll

8    let me know if there's anything to take up.

9              Thank you.  Have a good lunch.

10             MS. POMERANTZ:  Thank you.

11             (Luncheon recess)

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

LCACmax5                              A. Farmer - cross

                              AFTERNOON SESSION

                                   1:30 p.m.

1          THE COURT:  All right.  Matters to take up, counsel?

2          MS. POMERANTZ:  Your Honor, just briefly from the

3    government, my not amazing math skills, but I note that I think

4    that the witness who's been on cross examination now for about

5    the same amount of time that she was on direct examination, it

6    would be helpful for scheduling purposes to know when we can

7    expect to have the next witness ready.

8          MS. MENNINGER:  I don't know, your Honor.  An hour.

9          MS. POMERANTZ:  Thank you, your Honor.

10         And the other question, I just -- rather not a

11    question, just one thing I wanted to flag.  I believe that, on

12    cross examination, the witness was asked some questions about

13    hindsight bias, which I expect to be a subject of expert

14    testimony, and this witness, as she testified earlier on direct

15    examination, is a psychologist.  I'm not saying that there is

16    anything to take up at this moment, but before she had taken

17    the stand and the parties had conferred, we were asked that she

18    wasn't going to be -- we were asked by Ms. Menninger to make

19    sure that she wasn't going to be testifying about things in

20    that area.

21         So I just wanted to flag that she is testifying as a

22    lay witness and that she shouldn't be asked questions on cross

23    examination that would be the subject of expert testimony.

LCACmax5                           A. Farmer - cross

1          Again, I'm happy to take it up as it comes, but I just

2     wanted to flag that for the Court.

3          MS. MENNINGER:  Your Honor, I most definitely did not

4     ask her about hindsight bias.  I asked her about her

5     impressions of situations factually in hindsight.  Even when we

6     litigated expert issues around hindsight bias, there was a

7     clear distinction made between what is obvious to a lay juror

8     as seeing things in hindsight versus currently.  I did not use

9     any of the expert language associated with hindsight bias.  So

10    I disagree with any characterization that that was somehow

11    related to an opinion under 702.

12         THE COURT:  All right.  Are there further questions in

13    that regard?

14         MS. MENNINGER:  There are not.

15         THE COURT:  Okay.  Ms. Pomerantz.

16         MS. POMERANTZ:  That's fine.  Thank you, your Honor.

17         THE COURT:  Anything else to take up?

18         MS. POMERANTZ:  Not from the government.  Thank you.

19         MS. MENNINGER:  Not from the defense.  Thank you.

20         THE COURT:  We can bring the witness back, please.

21         (Witness present)

22         You may take your seat and you're welcome to remove

23    your mask, please.  Thank you.

24         We can bring the jury back in.

25         (Continued on next page)

LCACmax5                        A. Farmer – cross

 1              (Jury present)

 2              THE COURT:  Good afternoon, members of the jury.  Hope

 3     you had a good lunch.  Appreciate your continued attention,

 4     diligence, and patience.

 5              Ms. Menninger, you may continue with your cross

 6     examination.

 7              Ms. Farmer, I remind you, you are under oath.

 8              You may inquire.

 9              MS. MENNINGER:  Thank you, your Honor.

10     BY MS. MENNINGER:

11     Q.  Before you traveled from Arizona to New Mexico, I believe

12     you testified you did not talk to Jeffrey Epstein about the

13     trip to New Mexico; correct?

14     A.  That's right.

15     Q.  So, because you did not talk to him about the trip,

16     Mr. Epstein did not tell you that Ms. Maxwell would be in New

17     Mexico; correct?

18     A.  Mr. Epstein did not.

19     Q.  Mr. Epstein.  I apologize.  Thank you.  Did not tell you

20     Ms. Maxwell would be there?

21     A.  Correct.

22     Q.  And you did not talk to Ms. Maxwell ever before you arrived

23     in New Mexico; correct?

24     A.  Correct.

25     Q.  The information about the New Mexico trip came from your

LCACmax5                        A. Farmer - cross

1    mother?

2    A.  Correct.

3    Q.  As far as planning for the trip to New Mexico, you don't

4    know how you got the ticket or things like that, the logistics?

5    A.  How the ticket was delivered, no, I don't know.

6    Q.  When you arrived in New Mexico, you do not recall Ghislaine

7    ever saying to you she knew you would be there; correct?

8    A.  I don't have a memory of her saying those words.

9    Q.  And you don't remember her saying anything to you about the

10   travel or the trip; right?

11   A.  About the actual, like, logistical travel?

12   Q.  Right.

13   A.  I don't have a memory of that.

14   Q.  And that's consistent with her perhaps thinking that your

15   sister was going to be coming with you; correct?

16           MS. POMERANTZ:  Objection.

17           THE COURT:  Sustained.

18   Q.  You have no personal knowledge that Ghislaine made any of

19   your travel plans; correct?

20   A.  I do not.

21   Q.  And you have no personal knowledge that she encouraged you

22   to travel to New Mexico; right?

23   A.  I do not.

24   Q.  Or enticed you to travel to New Mexico?

25           MS. POMERANTZ:  Objection.

LCACmax5                         A. Farmer - cross

1          THE COURT:  Sustained.

2     Q.   Transported you to New Mexico?

3               MS. POMERANTZ:  Objection.

4               THE COURT:  I'll allow it.

5     A.   Do I have personal knowledge that Maxwell -- sorry.

6     Q.   Ghislaine transported you to New Mexico.

7     A.   No.

8     Q.   You have no knowledge that she did; correct?

9     A.   Correct.

10    Q.   The trip that you took to New Mexico was from a Friday to a

11    Sunday; right?

12    A.   Yes.

13    Q.   That was over a weekend?

14    A.   Right.

15    Q.   It wasn't in the middle of the week?

16    A.   Correct.

17    Q.   It wasn't Wednesday to Friday, for example?

18    A.   That's right.

19    Q.   And you and your mother have discussed this and you both

20    recall that it was over a weekend; right?

21    A.   That's correct.

22    Q.   And you told the government that you had talked with your

23    mother about that topic?

24    A.   That's right.

25    Q.   And you and your mother have the same memory of it being

LCACmax5                         A. Farmer - cross

1    over the weekend?

2    A.  Yes.

3    Q.  You have seen flight logs that are held in connection with

4    this case; correct?

5    A.  I do not recall seeing flight logs about this.  Flight logs

6    about me going to New Mexico?

7    Q.  I want to be very clear.  You're not on any flight logs, to

8    your knowledge; right?

9    A.  I don't know of being on any flight logs.

10   Q.  You never told anyone that you traveled on Epstein's

11   private plane?

12   A.  No.  Sorry.  I was confused.

13   Q.  Right?

14   A.  That's correct.

15   Q.  You and I have to be careful not to speak over one another.

16   I will try.

17          You have no reason to believe you were on a flight log

18   related to Mr. Epstein's private plane; right?

19   A.  Right.

20   Q.  Because you never traveled on Mr. Epstein's private plane;

21   correct?

22   A.  Correct.

23   Q.  Have you ever reviewed the flight logs related to

24   Mr. Epstein's private plane in connection with anything?

25   A.  No.

LCACmax5                           A. Farmer - cross

1    Q.  So you don't know whether there is a flight log entry

2    showing either Ghislaine Maxwell or Jeffrey Epstein traveling

3    to New Mexico over a weekend in April of 1996; right?

4    A.  I do not.

5    Q.  While you were at the ranch, there were other people there,

6    I believe you testified?

7    A.  Yes.

8    Q.  There was a driver that took you to and from the airport?

9    A.  Yes.

10   Q.  There were other ranch hands working there?

11   A.  There were.

12   Q.  There was actually, I think you did not mention on direct a

13   chef who was present; correct?

14   A.  I -- I don't have a lot of memories of that.

15   Q.  You don't recall a chef who made meals for you while you

16   were at the ranch?

17   A.  I don't recall a person doing that, but that makes sense to

18   me, that there was a chef there.

19   Q.  If I could refresh your memory by having you look at

20   3514-001, and this is the same 2006 document we looked at

21   earlier, page 3.

22   A.  Is this in the binder?

23   Q.  We're going to show it to you on the screen because it will

24   be easier than you flipping to it.  But if you want to see the

25   whole document, let us know.

LCACmax5                                      A. Farmer - cross

1           So if we can look at the second full paragraph, in

2     other words the last paragraph on that page and call that out.

3     If you could take a look just at this paragraph, Ms. Farmer,

4     and see if this refreshes your memory about a chef.

5     A.  Yes.

6     Q.  And this is --

7     A.  Sorry.

8     Q.  And this is from your conversation with the FBI in 2006?

9     A.  Right.  I still don't have, like, an image in my mind of

10    the chef, but I see that that is a part of the notes from that

11    interview, yes.

12    Q.  And so, understanding all of this is taking place a long

13    time ago, is it your belief that, in 2006, you had a memory of

14    a chef preparing dinner for all three of you?

15    A.  Yes.

16           MS. POMERANTZ:  Objection.

17           THE COURT:  Just a minute.  Overruled.

18    Q.  You may answer.  Do you want me to rephrase it?

19    A.  I think I got it.

20           Yes.

21    Q.  As you sit here now, you believe that, in 2006, you had a

22    memory of a chef who prepared a meal for all three of you?

23    A.  That's what I'm taking from reading this.

24    Q.  But you don't have that memory today?

25    A.  Right.

LCACmax5                        A. Farmer - cross

1                MS. MENNINGER:  We can take that down.  Thank you.

2    Q.  There were other people on the ranch that were working

3    there; right?

4    A.  Yes.

5    Q.  You don't have a memory of their names or things like that?

6    A.  I do not.

7    Q.  Their faces?

8    A.  Not really.  I mean, I have a little better image in my

9    mind of, like, the ranch hand I was talking about, but I

10   don't -- I couldn't identify him.

11   Q.  During your involvement with this case, the government has

12   never shown you photographs of people who worked on the ranch

13   to see if that refreshed your memory; correct?

14   A.  Not that I recall.

15   Q.  So you don't have a refreshed memory about the people that

16   worked on the ranch?

17   A.  Right.

18   Q.  You testified on direct that there was a small residence

19   that you were staying in at the ranch?

20   A.  Right.

21   Q.  The ranch is a large piece of land; correct?

22   A.  That's right.  Yes.

23   Q.  When you referred to the ranch, you're talking about the

24   large piece of land?

25   A.  Yes.

LCACmax5                              A. Farmer - cross

1    Q.  And on that large piece of land, I think you testified
2    there was a movie set that you visited, an old movie set?
3    A.  Right.
4    Q.  And there was a small residence and that's where you
5    stayed?
6    A.  Right.
7    Q.  You did not stay at the big, glorious Zorro Ranch that
8    Mr. Epstein owned later; correct?
9    A.  Correct.
10   Q.  You did not see the big, glorious Zorro Ranch while you
11   were there; right?
12   A.  No.
13   Q.  And you certainly didn't stay in the big, glorious Zorro
14   Ranch while you were there; right?
15   A.  I did not.
16   Q.  You've seen those photos on news accounts since then;
17   right?
18   A.  I've seen a couple photos of that, yes.
19   Q.  And so that big, huge mansion-like place is not what you
20   saw?
21   A.  Correct.
22   Q.  And it's not where you stayed?
23   A.  Correct.
24   Q.  So if another witness said that they saw a big, glorious
25   ranch in '94, '95, that's inconsistent with your memory of the

LCACmax5                          A. Farmer - cross

1  buildings on the ranch?

2           MS. POMERANTZ:  Objection.

3           THE COURT:  Sustained.

4  Q.  You have no memory of a big glorious mansion on the ranch?

5  A.  I know there were other buildings, as I said, but I don't

6  have much memory about what the others were because we weren't

7  spending time in them.

8  Q.  You took a tour of the whole ranch while you were there;

9  right?

10 A.  I took a tour out to the movie set.  It was more of an

11 outdoor -- as I said, we were seeing the horses and we were

12 seeing the movie set.

13 Q.  No one took you on a tour by a place under construction?

14 A.  I don't -- I have no memory of that.

15 Q.  You went on a shopping trip that you talked about on direct

16 examine; correct?

17 A.  That's correct.

18 Q.  You went to a natural grocery store?

19 A.  That's correct.

20 Q.  You went to a western wear store?

21 A.  Yes.

22 Q.  That's where Epstein bought you cowboy boots?

23 A.  That's correct.

24 Q.  I don't think you mentioned on direct, but you also went

25 horseback riding while you were on the ranch; correct?

LCACmax5                          A. Farmer - cross

1    A.   That does sound familiar, yes.  That did happen.

2    Q.   Well, you actually spent a significant amount of time

3    horseback riding while you were at the ranch?

4    A.   A significant amount of time?

5    Q.   Horseback riding while were you at the ranch.

6    A.   Is that a question?

7    Q.   Yes.  Did you spend a significant amount of time horseback

8    riding while were you at the ranch?

9    A.   I wouldn't say significant.  I don't remember going on more

10   than one occasion.

11             MS. MENNINGER:  If I could direct the witness's

12   attention to 3514-001, page 2, the last paragraph on that page.

13   This, again, is from the 2006 interview.

14   Q.   What you relayed to the FBI agents in 2006 is that you

15   spent a significant amount of time horseback riding on the

16   ranch; correct?

17   A.   That's this document, yes.

18   Q.   That the FBI took notes of in 2006?

19   A.   Yes.

20   Q.   And you told them that right after you told them about

21   buying cowboy boots?

22   A.   Right.

23   Q.   And you told them that right after you told them about

24   going shopping at the store for the natural food products;

25   right?

LCACmax5                          A. Farmer - cross

1   A.   Right.

2   Q.   So you went shopping at the store, you went and bought

3   cowboy boots, and then you went horseback riding?

4   A.   Right.

5   Q.   For a significant amount of time?

6   A.   That's what this says, yes.

7   Q.   And you needed the cowboy boots to go horseback riding --

8   A.   Horseback riding --

9   Q.   Right --

10  A.   I mean, you can go horseback riding without cowboy boots,

11  but I'm sure that was the purpose, yes.

12  Q.   I want to talk about the boots a little bit more.  You said

13  Epstein bought you those boots; correct?

14  A.   Correct.

15  Q.   And you kept the boots; right?

16  A.   Yes.

17  Q.   You kept them for 25 years?

18  A.   Yes.

19  Q.   Quarter of a century; right?

20  A.   Yes.

21  Q.   And you chose to wear the boots?

22  A.   Yes.

23  Q.   You wore them a lot?

24  A.   In more recent years, yes.

25  Q.   We'll talk about that.

LCACmax5                          A. Farmer - cross

1          At some point in the course of this case, you handed

2     those boots over to the government; correct?

3     A.   Correct.

4     Q.   That actually happened earlier this year?

5     A.   That's right.

6     Q.   The FBI agent came to your house and picked up the boots

7     from you there in Texas; right?

8     A.   That's right.

9     Q.   That was in or about June 29th?

10    A.   Yes.

11         MS. MENNINGER:  I would like to have the witness

12    identify what we would mark for identification as AF9.  I

13    believe an agent or detective has those boots.  If they could

14    be handed to the witness.

15         THE COURT:  Showing the witness what's been marked for

16    identification as AF9.

17         MS. MENNINGER:  May I approach the witness, your

18    Honor?

19         THE COURT:  You may.

20    BY MS. MENNINGER:

21    Q.   Ms. Farmer, do you know what's in the bag?

22    A.   I do.

23    Q.   What is it?

24    A.   Cowboy boots.

25    Q.   Are those the boots that Mr. Epstein bought you?

LCACmax5                        A. Farmer - cross

1    A.  Yes.

2    Q.  Could you remove them from the bag, please.

3              THE COURT:  Are you moving them?

4              MS. MENNINGER:  Yes, your Honor.  May I move for the

5    admission of AF9?

6              MS. POMERANTZ:  No objection.

7              THE COURT:  AF9 are admitted.

8              (Defendant's Exhibit AF9 received in evidence)

9    Q.  So those boots are in your size; right?

10   A.  I think they're a little smaller than my current size, but

11   yes.

12   Q.  And those are the same boots that you recall having been

13   purchased in 1996; right?

14   A.  Yes.

15   Q.  And fair to say that the heels are worn down on the boots?

16   A.  Yeah.

17   Q.  Fair to say that the toes of the boots are pretty well

18   scuffed; right?

19   A.  Yes.

20   Q.  And the leather looks like it's been worn a couple times;

21   right?

22   A.  Yeah.

23   Q.  Now, you testified on direct that you reclaimed the boots;

24   right?

25   A.  Yes.

LCACmax5                        A. Farmer - cross

1   Q.  And you said that you reclaimed them after the government
2   and you spoke in 2006?
3   A.  That's right.
4   Q.  So in 2006, you knew that the boots were evidence of your
5   interactions with Mr. Epstein; right?
6   A.  That's right.
7   Q.  And the government didn't ask you for them then?
8   A.  They asked if I had them.
9   Q.  And what did you tell them?
10  A.  I wasn't sure.
11  Q.  And you later found them?
12  A.  I did.
13  Q.  And you did not send them to the FBI when you found them;
14  right?
15  A.  No.  At the time I had them, it didn't seem there was
16  further -- the case did not seem to be developing.
17  Q.  So you did not --
18  A.  I did not send them to them.
19  Q.  And you chose to wear the evidence of your contact with
20  Mr. Epstein; right?
21  A.  I did.
22  Q.  And the first time you've told anyone about this reclaiming
23  of the boots is in court today; correct?
24  A.  No.
25  Q.  Well, you've met with the government, I think you said five

LCACmax5                        A. Farmer - cross

1   or six times; right?

2   A.  Yes.

3   Q.  And you've never told the government that you reclaimed the

4   boots by wearing them after 2006; right?

5   A.  I believe that we have spoken about that.  I mean -- I

6   don't know if I used the term "reclaim," but that I explained

7   why they were not used previously and then I did wear them.

8          MS. MENNINGER:  I'll raise this under Rule 16 later,

9   your Honor.

10  Q.  So you believe you've told that to the government?

11  A.  I believe that I -- that part that I just said, yes, that I

12  did not wear the boots and then I did wear the boots.

13  Q.  And you wore them a lot?

14  A.  I mean, because that's the general term.  I didn't wear

15  them to work or things, but I did wear them when I would go

16  two-stepping.

17  Q.  So you went dancing in the boots that Mr. Epstein bought

18  for you?

19  A.  That's correct.

20  Q.  To the point where the heels are worn down and the toes are

21  scuffed; right?

22  A.  Yes.

23  Q.  You can put that back in the bag.  If it's in your way, I

24  can come move it.  If it's okay up --

25  A.  No, it's --

LCACmax5                           A. Farmer − cross

1   Q.   Thank you.   We talked a little bit about this conversation

2   you had with the agents in 2006, and I believe you testified

3   that you recall having Christmas lights up?

4   A.   I said holiday decorations.   I was selling some holiday

5   products and I remember having them out when the agents came.

6            MS. MENNINGER:   Just one moment.   Your Honor, after

7   the government has had a chance to look at it, I would like to

8   show the witness what's been marked as AF10.

9            THE COURT:   Okay.

10           MS. MENNINGER:   Has the government had a chance?

11           MS. POMERANTZ:   Yes, your Honor, and we object to

12  this.

13           THE COURT:   I'll hear from you.

14           (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

LCACmax5                              A. Farmer - cross

1            (At the sidebar)

2            THE COURT:  I think what I'm looking at is an email

3    from August of 2019, in which she recounts to the New York

4    Times reporter that she thinks when they came — meaning the FBI

5    agents — it was in spring-summer of 2007.  Grounds.

6            MS. POMERANTZ:  Your Honor, this is a collateral

7    matter.  She's been testifying about the interview itself, but

8    there is no grounds to bring in extrinsic evidence on this

9    matter with the date of the interview itself.

10           MS. MENNINGER:  Your Honor, my point is simply that

11   she refreshed her memory about when the meeting was by talking

12   to her husband and thinking about other points, like it was hot

13   and sunny.  She did testify that it was --

14           THE COURT:  But what's in issue is her memory of when

15   she met with the FBI agents?  What does that matter?

16           MS. MENNINGER:  It's her memories now of things that

17   she -- yes, about things that happened a decade ago, which, by

18   inference, goes to the strength of her memory about things that

19   happened in '96.

20           THE COURT:  So the theory is anything testing her

21   memory from years ago is relevant.

22           MS. MENNINGER:  I wouldn't go that far, your Honor.

23           THE COURT:  This is two steps removed and I'll

24   sustain.

25           (Continued on next page)

LCACmax5                        A. Farmer - cross

1              (In open court)

2              THE COURT:  Sustained, 401 and 403.  Go ahead.

3    BY MS. MENNINGER:

4    Q.  I want to talk about the incident in the movie theater in

5    New Mexico.

6    A.  Okay.

7    Q.  You testified that Epstein held your hand in the movie

8    theater in New Mexico; right?

9    A.  That's correct.

10   Q.  And it was, in your words, more blatant than in New York?

11   A.  Right.

12   Q.  You don't actually know that Ghislaine Maxwell saw Epstein

13   holding your hand; correct?

14   A.  I don't.

15   Q.  You just said she was present on the other side of him?

16   A.  That's right.

17   Q.  And afterwards, she didn't say anything to you about it;

18   right?

19   A.  She did not.

20   Q.  She did not say, hey, were you holding his hand or anything

21   like that?

22   A.  No.

23   Q.  In the movie theater, there was no touching of your

24   breasts?

25   A.  No.

LCACmax5                          A. Farmer - cross

1    Q.   There was no touching of your genitalia or private parts?

2    A.   No.

3    Q.   I want to talk to you about the foot massage that you

4    described on direct.

5    A.   Yes.

6    Q.   You said that Ms. Maxwell -- Ghislaine was massaging one of

7    Jeffrey's feet; correct?

8    A.   Correct.

9    Q.   And she gave you instructions on how to massage the other

10   foot; right?

11   A.   That's right.

12   Q.   And at the time, you do not remember the specifics of what

13   Epstein was saying during the foot massage; right?

14   A.   No, I don't.

15   Q.   You don't remember it going beyond the massaging of his

16   foot; right?

17   A.   Correct.

18   Q.   And you do not remember the foot massage being sexualized;

19   right?

20   A.   I guess I would consider all of that sexualized.  I

21   don't -- it was not -- they were not touching my private body

22   parts and I was not touching his.

23            MS. MENNINGER:  If I could have the witness look at

24   3514-12.  I'll just show the first page to orient you in the

25   upper right-hand corner.  This is an interview in May --

LCACmax5                          A. Farmer - cross

1            MS. POMERANTZ:  Objection, your Honor.

2            MS. MENNINGER:  I don't know how to orient the witness

3    to the time, your Honor.

4            THE COURT:  I'll allow you to -- it's been expanded

5    now, so she can look at the document.

6    BY MS. MENNINGER:

7    Q.  You recall speaking to the government in May of 2020;

8    right?

9    A.  Right.  Yes.

10   Q.  May 9th of 2020; right?

11   A.  Yes.

12   Q.  And you were there with some prosecutors and FBI agents;

13   right?

14   A.  Don't remember if this was in person or over the phone, but

15   I remember having a communication, yes.

16   Q.  And your attorney, Ms. McCauley, was also there?

17   A.  Yes.

18   Q.  If I could direct your attention to the second page, there

19   is a section three-quarters of the way down, a paragraph.  If

20   we can call out that section that has a label.

21            If I can have you take a look at these notes.

22   A.  Yes.

23   Q.  What you told the government on that occasion is you do not

24   remember it, meaning the foot massage, being sexualized;

25   correct?

LCACmax5                          A. Farmer - cross

1    A.  I see that that is the note, that that's how it was

2    described.  I would say, just as what I said a minute ago, is

3    that, in my mind, all of this was sexualized to some degree,

4    but it did not go to touching my private body parts or me

5    touching his.

6    Q.  Ms. Farmer, what you told the government is you do not

7    remember the foot massage being sexualized.  Yes or no?

8              MS. POMERANTZ:  Objection.  Asked and answered.

9              THE COURT:  Sustained.

10             MS. MENNINGER:  I don't think I got an answer to the

11   yes or no.

12             THE COURT:  You did, and then the witness elaborated,

13   and that's permissible, and the question has been asked and

14   answered.  So, next question.

15   Q.  The notes say you do not remember --

16             MS. POMERANTZ:  Objection.

17             THE COURT:  Sustained.

18   Q.  You said a minute ago that the notes say you do not

19   remember it being sexualized?

20             THE COURT:  Sustained.

21   Q.  You also do not remember the specifics of what Mr. Epstein

22   was saying during the foot massage; correct?

23   A.  Correct.

24   Q.  And that was in May of 2020; right?

25   A.  Right.

LCACmax5                          A. Farmer – cross

1    Q.  I want to talk about the full body massage that you

2    described.

3    A.  Yes.

4    Q.  You testified on direct that you had nothing on during that

5    massage?

6    A.  Yes.

7    Q.  I want to direct your attention to what's been marked as

8    AF8.

9            THE COURT:  The government has it?

10           MS. MENNINGER:  Yes, we spoke about it earlier in this

11   cross examination, your Honor.

12           I gave it to you earlier in the cross examination.

13           (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

LCAVMAX6                           A. Farmer - cross

1   BY MS. MENNINGER:

2   Q.  If I could direct your attention to the paragraph that's

3   third from the bottom, begins with I.

4   A.  Yes.

5            MS. POMERANTZ:  Your Honor, objection.

6            This is not inconsistent.

7            MS. MENNINGER:  What?  I can't hear.

8            MS. POMERANTZ:  Objection.

9            THE COURT:  All right.  Just a minute.

10           Let me read it.

11           Sustained.

12           MS. MENNINGER:  I did not hear the basis for the

13  objection, your Honor.

14           THE COURT:  Not a prior inconsistent statement.  I've

15  ruled, Ms. Menninger.  Sustained.

16           MS. MENNINGER:  I'm not allowed to ask about this

17  document at all?

18           THE COURT:  You can ask the next question, but what

19  you just drew to I've sustained.

20  BY MS. MENNINGER:

21  Q.  I draw your attention to the second paragraph from the top.

22  A.  Yes.

23  Q.  And while you testified on direct that you had nothing on

24  during the massage, what you told Mr. Baker from *The New York*

25  *Times* --

LCAVMAX6                          A. Farmer - cross

1              MS. POMERANTZ:  Objection, your Honor.

2              THE COURT:  Just a moment.

3    Q.  -- is that --

4              THE COURT:  Just a moment, please.  There's an

5    objection.  You'll pause until I rule.  Did you not hear it?

6              MS. MENNINGER:  Your Honor --

7              THE COURT:  Did you not hear it?

8              MS. MENNINGER:  I did not hear the objection.  I'm

9    sorry, I can't hear from in here.

10             THE COURT:  I understand.  We'll make sure --

11   Ms. Pomerantz, you'll speak loudly into the mic because it is

12   difficult to hear in the box, all right?

13             MS. POMERANTZ:  Yes, your Honor.

14             THE COURT:  Thank you.

15             All right.  I will overrule.

16             You may ask your question.

17   BY MS. MENNINGER:

18   Q.  What you told Mr. Baker from *The New York Times* in August

19   2019 is that you were not wearing a bra during the massage,

20   that is clear in your memory; correct?

21   A.  Yes.

22   Q.  And what was not clear in your memory in August of 2019 is

23   whether you had your underwear on; correct?

24   A.  What I remember saying is that she asked me to undress

25   and --

LCAVMAX6                         A. Farmer - cross

1    Q.   I'm asking you about the 29th.

2              THE COURT:  You may answer.

3    A.   That's the conversation I remember having with Mike Baker,

4    is saying that Maxwell asked me to undress, and I did so.  And

5    I remember very clearly -- because the part of my body that was

6    exposed during the massage was my breast.  That was very clear

7    in my memory that that was exposed.

8    Q.   You were not clear in your memory whether you had your

9    underwear on; correct?

10   A.   I was not clear.  You're saying in 2019, when I spoke with

11   Mike Baker, I was not clear in my memory if I had my underwear

12   on.  I said that I remember her asking me to undress.  I don't

13   remember her saying whether or not I could leave my underwear

14   on.  And but I do remember for sure that my breasts were

15   exposed.

16   Q.   When you spoke to Mike Baker, you told him you were unsure

17   if you had your underwear on; correct?

18             MS. POMERANTZ:  Objection, your Honor.

19             THE COURT:  Just a moment.

20             Overruled.  I'll allow the question.  You may answer.

21   A.   Okay.  Sorry, can you say it one more time?

22   Q.   When you spoke with Mike Baker of *The New York Times*, you

23   said that you were unsure if you had your underwear on during

24   the massage; correct?

25   A.   Yes, I said that this -- I remember very clearly part of my

LCAVMAX6                          A. Farmer – cross

1    body being exposed.  And I don't remember 100 percent if my

2    underwear was on; that my best recollection is that I was

3    undressed.

4    Q.  And today you've testified that you had nothing on during

5    the massage.

6    A.  That's correct.

7    Q.  So between 2019 and today, you now have a memory that you

8    did not have your underwear on; correct?

9    A.  My best recollection, as I've said, is that I was

10   undressed.  When he asked me further, I tried to clarify to him

11   that it was a very clear memory of me not having my top on;

12   that the other part was not as clear because that part of my

13   body was not exposed.

14   Q.  And you were clear you didn't have a bra on, that was clear

15   in your memory?

16   A.  Yes.

17   Q.  That's what you told him?

18   A.  That is what I told him.

19   Q.  You've told this jury you didn't have your underwear on,

20   right?

21            MS. POMERANTZ:  Objection.

22            THE COURT:  Sustained.

23   Q.  You testified on direct that Ghislaine massaged your chest

24   and upper breast; correct?

25   A.  That's correct.

LCAVMAX6                          A. Farmer - cross

1    Q.  In the area of your pectoral muscles; correct?

2    A.  Yeah, I guess that's all part of the breast, right?

3    Q.  Ghislaine did not touch your nipples?

4    A.  She did not touch my nipples.

5    Q.  She did not touch your nipple area, right?

6    A.  Right.

7    Q.  She did not massage that part of your breast; correct?

8    A.  Yes, that's correct.

9    Q.  And the part that she massaged is the part that was

10   exposed; correct?

11   A.  My entire breast was exposed.

12   Q.  You don't have a journal entry about that; correct?

13            MS. POMERANTZ:  Objection.

14            THE COURT:  Sustained.

15   Q.  You have no written recollection of what happened in the

16   massage at all; correct?

17            MS. POMERANTZ:  Objection.

18            THE COURT:  Asked and answered.  Sustained.

19   Q.  When you think back on this massage, you do not believe it

20   was explicitly sexual; correct?

21   A.  That's not correct.

22            MS. MENNINGER:  I'd like to draw the witness's

23   attention to 3514-12, page 4.

24            THE COURT:  Okay.

25            MS. MENNINGER:  I'm sorry, page 3.

LCAVMAX6                          A. Farmer - cross

1                 THE COURT:  Where are we looking?

2                 MS. MENNINGER:  The bottom third of the page, I think.

3      If we could call that out and expand it for everyone's benefit.

4      Q.  You recall speaking with the government and the agents on

5      May 9th of 2020, right, Ms. Farmer?

6      A.  Yes.

7      Q.  And you described for them this massage that you're talking

8      about now, right?

9      A.  Yes.

10     Q.  And what you told the agents and the government in May of

11     2020 is that the body massage was awkward and uncomfortable,

12     but not explicitly sexual; correct?

13     A.  I don't believe those are my words; I think that's what's

14     noted here.  It says no touching of nipples, genitals, etc.,

15     and I did clarify that, but that did not happen.

16     Q.  "Not explicitly sexual" is what you said; correct?

17                MS. POMERANTZ:  Objection, your Honor.

18                THE COURT:  Sustained.

19     Q.  Is it your belief that the prosecutor wrote that down wrong

20     in May of --

21                MS. POMERANTZ:  Objection.

22                THE COURT:  Sustained.

23     Q.  You talked about during this massage you had a sense that

24     Epstein would be able to see you; correct?

25     A.  Correct.

LCAVMAX6                        A. Farmer - cross

1    Q.  That you have no memory of him seeing you, right?

2    A.  That's correct.

3    Q.  He was not in the room for this massage, right?

4    A.  That's right.

5    Q.  I want to talk to you about what you said happened in the

6    bed the next morning or something.  Is that the right time

7    frame, the next morning?

8    A.  Right.

9    Q.  You said that Epstein entered your room; correct?

10   A.  Yes.

11   Q.  Ghislaine Maxwell did not enter your room?

12   A.  She did not.

13   Q.  She was not in there the whole time this happened, right?

14   A.  She was not in there.

15   Q.  After it happened, you got up and went to the bathroom and

16   stayed in the bathroom awhile, right?

17   A.  Yes.

18   Q.  Before you went to the bathroom, Epstein laid on the bed

19   with you right?

20   A.  Yes.

21   Q.  You were not sure whether he was over the covers or under

22   the covers, right?

23   A.  Right.

24   Q.  He kind of had his arms around you, right?

25   A.  Yeah.

LCAVMAX6                               A. Farmer – cross

1   Q.  And you do not recall this being a sexual touch either;
2   correct?
3   A.  No, I would not characterize it that way.
4   Q.  Okay.
5   A.  Again, he did not touch specifically my sexual body parts
6   in that -- in that experience.
7   Q.  Okay.  On May 9th of 2020, you told the prosecutors and the
8   government regarding this incident in the bed that you do not
9   remember this being a sexual touch; correct?
10  A.  Am I just to be looking at -- oh, sorry.
11  Q.  Did you tell the government that on May 9th of 2020?
12  A.  I don't recall saying that.
13  Q.  You do recall telling them that he did not grab your
14  breasts?
15  A.  Yes.
16  Q.  And didn't touch your breasts?
17  A.  Yes.
18  Q.  Correct?
19          Did not grab or touch your genitals; correct?
20  A.  Correct.
21  Q.  You testified on direct that he pressed his body into you;
22  is that right?
23  A.  That's right.
24  Q.  You did not feel an erect penis in your back?
25  A.  I did not -- I do not -- I couldn't say whether he had an

LCAVMAX6                              A. Farmer - cross

1    erect penis; correct.

2    Q.  You do not recall him pressing an erect penis into your

3    back; correct?

4    A.  Yeah, I recall him pressing his body.  I do not recall an

5    erect penis.

6    Q.  And you told the government in May of 2020 that you do not

7    recall a penis being pushed into your back; correct?

8    A.  An erect penis, I don't recall those words.

9           MS. MENNINGER:  Okay.  If I could have the witness

10   look at 3514-012 at page 4.  And if we could highlight the

11   first, sort of, half of the page.

12   Q.  If I could have you take a look at this, Ms. Farmer.

13   A.  Yes.

14          MS. POMERANTZ:  Your Honor, objection.

15          This is not inconsistent.

16          THE COURT:  Sustained.

17   Q.  You told the government that you did not feel an erect

18   penis in your back; correct?

19          MS. POMERANTZ:  Objection, your Honor.

20          THE COURT:  Asked and answered.  Sustained.

21   Q.  After you returned from New Mexico, you told your mother

22   you were "not raped"; correct?

23   A.  When I returned from New Mexico?

24   Q.  Yes.

25   A.  When I returned from the trip to Thailand.  We didn't talk

LCAVMAX6                           A. Farmer - cross

1   about it when I returned from New Mexico.

2   Q.  When you got back from Thailand, you said you were not

3   raped?

4   A.  That's right.

5   Q.  You were not sexually abused?

6   A.  I said I was not raped.

7   Q.  And you meant you were not sexually abused; correct?

8           MS. POMERANTZ:  Objection, your Honor.

9           THE COURT:  Overruled.

10  A.  I think those are two different things.

11  Q.  You spoke to the government on May 9th of 2020, right?

12  A.  Yes.

13  Q.  And I want to jump ahead about a month from that.  In late

14  June of 2020, the Epstein Victims Compensation Fund opened,

15  right?

16  A.  I don't remember when it opened, but yes.

17          MS. MENNINGER:  Okay.  I'd like to have the witness

18  look at AF-12.

19          THE COURT:  The government has it?

20          MS. MENNINGER:  I will get them a copy, your Honor.  I

21  believe they do, but I'll give them a copy.

22          If I could have the witness take a look at the first

23  paragraph of text and just tell me if that refreshes your

24  memory about when the Epstein Victims Compensation Program

25  opened.

LCAVMAX6                          A. Farmer – cross

1   A.   It says June 25th.

2   Q.   June 25th of 2020?

3   A.   Yes.

4   Q.   So about a month after you spoke with the government,

5   right?

6   A.   That's right.

7   Q.   And you, yourself --

8           MS. MENNINGER:   We can take that down now,

9   Ms. Lundberg.

10  Q.   You, yourself submitted a claim to the Epstein Victims

11  Compensation Program?

12  A.   Yes, my attorneys submitted a claim for me.

13  Q.   And you submitted your claim on the very next day, June

14  26th of 2020; correct?

15  A.   Correct.

16  Q.   Your submission was substantial, 3,000 pages or so;

17  correct?

18  A.   I haven't seen the full submission.

19  Q.   Okay.

20          MS. MENNINGER:   If I could have the witness take a

21  look at AF-13.   And I will give a copy to the government.

22          I would like to draw the witness's attention to page

23  12 to 13 of this document.

24  Q.   Do you recognize it, I guess, as an initial matter?

25  A.   Oh, yes.

LCAVMAX6                              A. Farmer – cross

1    Q.  And what do you recognize it to be?

2    A.  This is a signature page, but just, I think, the

3    application for the program.

4    Q.  Your application to the program?

5    A.  Yes.

6    Q.  All right.  And on page 12, do you recognize this as the

7    document that you initialed?

8    A.  I do.

9    Q.  And then if we can look at page 13, there is a signature

10   from you, is that --

11   A.  That's my signature, yes.

12   Q.  Okay.  And that the date of this submission was June 26th

13   of 2020; correct?

14   A.  Correct.

15         MS. MENNINGER:  Your Honor, I would like to move for

16   the admission of pages 12 and 13 of this document.

17         MS. POMERANTZ:  Your Honor, no objection.  I do want

18   to have to review it to see if any redactions are necessary.

19         THE COURT:  Okay.  I'll admit -- so let's see, this is

20   AF-12 -- I'm sorry, AF-13, pages 12 and 13 will be temporarily

21   submitted -- admitted under seal with an opportunity to

22   consider whether any redactions are necessary to protect the

23   privacy interests of a third party.

24         Is that the -- Ms. Pomerantz?

25         MS. POMERANTZ:  Yes, your Honor.

LCAVMAX6                      A. Farmer - cross

1              MS. MENNINGER:  Your Honor, there's no one's name.

2              THE COURT:  Okay.

3              MS. MENNINGER:  I'd like to read from it because it's

4      now in evidence and there's no --

5              THE COURT:  All right.  Give the government a minute

6      to review.  Thank you.

7              MS. POMERANTZ:  I think it's fine, your Honor.

8              Thank you.

9              THE COURT:  All right.  Then not sealed, admitted,

10     AF-12, pages 12 and 13.  And you may publish if you like.

11             (Defendant's Exhibit AF-12 received in evidence)

12             MS. MENNINGER:  Thank you, your Honor.

13     BY MS. MENNINGER:

14     Q.  If I could start with page 12.  Do you remember this

15     document, that you signed it --

16     A.  Yes.

17     Q.  -- Ms. Farmer?

18             If I could draw your attention to the first italicized

19     paragraph, which is the second paragraph.  I would like, if you

20     could, to read that paragraph to the jury.

21     A.  I hereby certify that the information provided in this

22     claim form and any documents provided in support of this claim

23     are true and accurate to the best of my knowledge, and declare

24     under penalty of perjury that the foregoing is true and

25     correct.  I understand that false statements or claims made in

LCAVMAX6                          A. Farmer - cross

1    connection with this claim may result in fines, imprisonment,

2    and/or any other remedy available by law; and that claims that

3    appear to be potentially fraudulent or to contain information

4    known to me to be false when made will be forwarded to federal,

5    state, and local law enforcement authorities for possible

6    investigation and prosecution.

7    Q.  So you understood that you were signing this claim form

8    under penalties of perjury, right?

9    A.  Correct.

10   Q.  And if it was later determined that your claim was

11   potentially fraudulent, you could be referred for legal action,

12   right?

13   A.  That -- yes.

14   Q.  And if you testified as something differently today, then

15   your claim may be found potentially fraudulent; correct?

16            MS. POMERANTZ:  Objection, your Honor.

17            THE COURT:  Sustained.

18            MS. MENNINGER:  You can take this down for the moment.

19            Thank you.

20   Q.  In the claim form, you were asked where any sexual abuse

21   occurred in support of your claim.  Do you remember that

22   question?

23   A.  No.  Sorry.  There's a lot of questions.

24   Q.  That's all right.

25            MS. MENNINGER:  If we could have the witness take a

LCAVMAX6                          A. Farmer - cross

1    look at -- it's that same document on page 3., and it's

2    question 3.

3    A.   I see.

4    Q.   Okay.  So you were asked in question 3 where -- to the best

5    of your ability, to locate the places where sexual abuse

6    occurred, right?

7    A.   That's correct.

8    Q.   And you understood to be answering this sexual abuse by

9    Jeffrey Epstein, right?

10   A.   Right.

11   Q.   And Ghislaine Maxwell, right?

12   A.   Mm-hmm.

13   Q.   And you told the -- we can take it down -- the victims'

14   compensation program that you were sexually abused in a movie

15   theater in New York, right?

16   A.   The box for "New York" was checked.

17           MS. MENNINGER:  I'm sorry, can we bring it back up.

18   Q.   There is a box under question 3?

19   A.   Yeah, that's what I was saying, yes, it says New York City

20   and New Mexico.

21   Q.   And then there's a box below that.

22   A.   Oh, I'm sorry.  I didn't see that.

23   Q.   Okay.

24   A.   Yes, yes.

25           MS. MENNINGER:  So now you can take it down.

LCAVMAX6                         A. Farmer - cross

1   Q.  Unless you need to look at it further?

2   A.  No, no, no.  I just wanted to read the whole entire thing.

3   Q.  Okay.  So we can take it down.

4        So what you told the victims compensation fund is that

5   you were sexually abused in a movie theater in New York, right?

6   A.  Right.

7   Q.  And you were sexually abused in a movie theater in New

8   Mexico?

9   A.  Right.

10  Q.  And both of those were related to the hand-holding

11  incidents that happened in those two locations, right?

12  A.  Yeah, that was explained in the application.

13  Q.  Hand-holding was sexual abuse?

14        MS. POMERANTZ:  Objection, your Honor.

15        THE COURT:  Just a moment.

16        Overruled.  Go ahead.

17  A.  My experience was detailed in the application, which

18  included, yes, him holding and caressing my hands.  I did not

19  say anything else happened to me in the movie theater.

20  Q.  You told the victims compensation fund that you were

21  sexually abused in a movie theater in New York; correct?

22  A.  I think I answered that.  Those were the boxes that are

23  checked, yes.  And then that was a small field.  And then later

24  on you describe what happened to you, and that's what I did.

25  Q.  It wasn't just a box that was checked; you wrote in "movie

LCAVMAX6                              A. Farmer - cross

1    theater in New York," right?

2    A.   That was written in on the form.

3    Q.   And a movie theater in New Mexico, right?

4    A.   Yes.

5    Q.   And so those were both hand-holding incidents, right?

6    A.   They were the incidents that I've already described where

7    my leg and hand was caressed, yes.

8    Q.   Right.  You're not saying anyone touched your private

9    parts?

10   A.   No, I was very consistent with that.

11   Q.   And it's important to you that you be consistent, right?

12             MS. POMERANTZ:  Objection.

13             THE COURT:  Overruled.

14   A.   Of course.

15   Q.   So you did, as you said, submit a longer detailed version

16   of your claim to the fund, right?

17   A.   Yes.

18   Q.   It wasn't just checking boxes?

19   A.   Right, right, right.  There was a narrative portion.

20   Q.   Okay.  And when you were describing the foot massage in the

21   narrative program -- portion, excuse me, you told the victims

22   compensation fund that Mr. Epstein kept staring at you and

23   telling you how good the massage felt, right?

24   A.   I -- I think that -- I mean -- I -- yes, I guess that is

25   what I said.  I don't remember using those words.  I know I

LCAVMAX6                        A. Farmer - cross

1   communicated to my attorneys and they typed it for me.

2   Q.  Okay.  If you would take a look at AF-13, page 22, second

3   full paragraph.  And the second sentence from the bottom, does

4   that refresh your recollection about what you told the victims

5   compensation fund about the foot massage?

6   A.  Yes.

7   Q.  And what you told them is that Mr. Epstein kept staring at

8   you and telling you how good the massage felt, right?

9   A.  Yes.

10  Q.  And you also told them that Mr. Epstein was groaning a lot

11  during the foot massage, right?

12  A.  Yes.

13  Q.  And that's not what you had told the government in May of

14  2020, right?

15  A.  I don't know if they asked me questions about that in May

16  of 2020.

17  Q.  You told them you don't remember it being sexualized,

18  right?

19          MS. POMERANTZ:  Objection, your Honor.

20          THE COURT:  Sustained.

21  Q.  You also described for the victims compensation fund the

22  massage that you received in New Mexico; correct?  Right?

23  A.  Yes.

24  Q.  And you've told the jury that the -- your chest and upper

25  breast were massaged during the massage; correct?

LCAVMAX6                          A. Farmer - cross

1    A.   Correct.

2    Q.   What you told the victims compensation fund is that your

3    breasts were groped; correct?

4    A.   Yes.  I don't see that as significantly different, but --

5    Q.   Rubbed, groped, massaged.

6    A.   Yes.

7    Q.   Not your nipple area, any of that?

8    A.   No, she did not touch my nipples.

9    Q.   But you told them your breasts were groped, right?

10   A.   Yes.

11   Q.   And you told us in your direct testimony that it was your

12   chest and upper breast that were touched, right?

13              MS. POMERANTZ:  Objection, your Honor.

14              THE COURT:  I'll allow it.  Go ahead.

15   A.   Yes.

16   Q.   And you believed that that -- you told the victims

17   compensation fund that that was also sexual abuse; correct?

18   A.   Yes.

19   Q.   When you testified on direct about the incident in the bed,

20   you said that Mr. Epstein had his arms around you, right?

21   A.   Yes.

22   Q.   And you don't remember any penis being pressed against you,

23   right?

24   A.   No --

25              MS. POMERANTZ:  Objection, your Honor.

LCAVMAX6                          A. Farmer - cross

1    A.  You said erect penis.

2              THE COURT:  Just a moment.

3              Grounds, Ms. Menninger.

4              MS. MENNINGER:  For me, your Honor?

5              THE COURT:  I'm sorry, Ms. Pomerantz.

6              Grounds, Ms. Pomerantz?

7              MS. POMERANTZ:  Asked and answered, your Honor.

8              THE COURT:  Sustained.

9              MS. MENNINGER:  Your Honor, I am trying to draw her

10   attention to direct testimony, that's all, as a foundation of

11   further questioning.

12             THE COURT:  Sustained.

13   BY MS. MENNINGER:

14   Q.  Did you testify on direct that Mr. Epstein pressed his body

15   against you?

16   A.  I did.

17   Q.  And what you told the Epstein Victims Compensation Fund is

18   that he rubbed his genitals against you in the bed; correct?

19   A.  Yes.

20   Q.  Those are not consistent.

21             MS. POMERANTZ:  Objection, your Honor.

22             THE COURT:  Sustained.

23   Q.  You testified on direct that on your last day in New

24   Mexico, that Ghislaine seemed disinterested in your school

25   project, right?

LCAVMAX6                          A. Farmer - cross

1   A.  Yes.

2   Q.  That's not something you told the government in 2006 when

3   you met with them, right?

4   A.  I don't recall whether we talked about that.

5   Q.  You never had any communication with Ghislaine after New

6   Mexico, right?

7   A.  That's correct.

8   Q.  She never called you?

9   A.  No, she did not.

10  Q.  She didn't make any travel plans for you, right?

11  A.  She did not.

12  Q.  She didn't ask you to travel somewhere; correct?

13  A.  That's correct.

14  Q.  And you went to Thailand after this at some point, right?

15  A.  Yes, that summer.

16  Q.  And you accepted the money for the Thailand trip from

17  Mr. Epstein, right?

18  A.  I did.

19  Q.  I think you talked a little bit on direct about the fact

20  that you've made a number of public statements, right?

21  A.  Yes.

22  Q.  You've been on documentaries and podcasts, right?

23  A.  I have.

24  Q.  Under your real name?

25  A.  That's correct.

LCAVMAX6                          A. Farmer - cross

1   Q.  And you have touted yourself in those appearances as a
2   survivor of sexual abuse; correct?
3           MS. POMERANTZ:  Objection, your Honor.
4           THE COURT:  One-word grounds.
5           MS. POMERANTZ:  Form.
6           THE COURT:  Overruled.
7   Q.  Correct?
8   A.  Have I described myself as a survivor of this --
9   Q.  Survivor of sexual abuse.
10  A.  Yes.
11  Q.  And you've gone to court in relationship to Mr. Epstein's
12  legal proceedings, right?
13  A.  I did.
14  Q.  And you spoke publicly there?
15  A.  Yes.
16  Q.  And afterwards you met with a number of other Epstein
17  accusers; correct?
18  A.  Yes.
19  Q.  You were part of a press conference with your attorneys;
20  correct?
21  A.  Yes.  I mean, I was standing there.  I wasn't really doing
22  anything, but I was at the -- at the location.
23  Q.  And you have had attorneys representing you in connection
24  with this for quite some time; correct?
25  A.  Yes.

LCAVMAX6                           A. Farmer - cross

1   Q.  You originally hired attorneys in 2016?

2   A.  I don't believe I hired any attorneys at that time.  I

3   was -- I spoke with an attorney at that time.

4   Q.  And certainly you had hired attorneys before you first met

5   with the government in September of 2019; correct?

6   A.  Yes.

7   Q.  At your first meeting in September of 2019, your attorneys

8   were there?

9   A.  Yes, that's correct.

10  Q.  Someone from the Boies Schiller firm, right?

11  A.  That's right.

12  Q.  And so you had a civil attorney sometime before September

13  of 2019?

14  A.  Yes.

15  Q.  So the same civil attorneys that filed a lawsuit on your

16  behalf?

17  A.  They are.

18  Q.  They are the same attorneys who filed the Epstein Victims

19  Compensation Fund documents on your behalf; correct?

20  A.  Correct.

21  Q.  Your attorney, Ms. McCawley, is here in the courtroom

22  wearing white; correct?

23  A.  That's correct.

24  Q.  She has attended numerous meetings with the government with

25  you, right?

LCAVMAX6                          A. Farmer – cross

1   A.  Yes.

2   Q.  She has attended prior trial testimony in this case at this

3   courthouse; correct?

4   A.  Yes.

5   Q.  She has sat in the overflow room for that portion; correct?

6   A.  She did.

7   Q.  And she's listened to the testimony of other witnesses;

8   correct?

9   A.  Yes.

10          MS. POMERANTZ:  Objection, your Honor.

11          THE COURT:  Sustained.

12  Q.  You talked on direct about your lawyers representing you

13  *pro bono*; correct?

14  A.  That's right.

15  Q.  You do not know your lawyers' arrangements with other of

16  their clients; correct?

17          MS. POMERANTZ:  Objection.

18          THE COURT:  Sustained.

19  Q.  Do you know how much money your lawyers have made in

20  connection with Epstein claims?

21          MS. POMERANTZ:  Objection.

22          THE COURT:  Grounds.

23          MS. POMERANTZ:  Foundation.

24          Beyond the scope of her knowledge, your Honor.

25          THE COURT:  I'll sustain on foundation.

LCAVMAX6                          A. Farmer - cross

1    Q.  Have you read anywhere in the press how much money your

2    lawyers have made in connection with representing Epstein

3    accusers?

4              MS. POMERANTZ:  Objection.  Hearsay.

5              THE COURT:  Sustained.

6    Q.  You know that Virginia Roberts was also represented by your

7    attorneys; correct?

8              MS. POMERANTZ:  Objection.

9              MS. MENNINGER:  I can lay a foundation.

10             THE COURT:  You may inquire.

11             MS. POMERANTZ:  Relevance and hearsay.

12   Q.  You were preparing to testify in a civil case?

13             THE COURT:  Just a minute.

14             MS. MENNINGER:  Oh, I'm sorry.

15             THE COURT:  If there's an objection, you have to give

16   me a minute to rule.

17             MS. MENNINGER:  I thought you had, your Honor.

18             I apologize.

19             THE COURT:  I had on the prior ones.

20             Overruled.  You may inquire.

21   BY MS. MENNINGER:

22   Q.  You were preparing to testify in a civil case in or around

23   2016 or 2017; correct?

24   A.  Correct.

25   Q.  And the lawyers you were interacting with in that case, the

LCAVMAX6                          A. Farmer - cross

1    civil case, were the same lawyers from Boies Schiller; correct?

2    A.   In part.

3    Q.   And also Mr. Edwards; correct?

4    A.   Correct.

5    Q.   And you know that in connection with that civil case, your

6    lawyers, Ms. McCawley and Mr. Edwards, represent Virginia

7    Roberts; correct?

8              MS. POMERANTZ:  Objection, your Honor.

9              THE COURT:  Foundation objection?

10             MS. POMERANTZ:  Relevance.

11             THE COURT:  Ms. Pomerantz, you inquired as to *pro bono*

12   representation; correct?  Is that correct?

13             MS. POMERANTZ:  Yes, your Honor.

14             THE COURT:  All right.  I'll overrule.

15   A.   Can you repeat the question?

16   Q.   You know that Ms. McCawley and Mr. Edwards represent

17   Virginia Roberts?

18   A.   Yes.

19   Q.   Correct?

20   A.   Yes.

21   Q.   In connection with civil litigation?

22   A.   Yes.

23   Q.   And you were prepared to testify in that civil litigation;

24   correct?

25   A.   I was.

LCAVMAX6                              A. Farmer - cross

```
 1   Q.  And you know that Mr. Edwards is representing other people
 2   in this criminal case; correct?
 3             MS. POMERANTZ:  Objection, your Honor.
 4             THE COURT:  Just a moment.  Overruled.
 5   A.  I do know that.
 6   Q.  And you know that your attorney represents other
 7   individuals who have accused Epstein; correct?
 8             MS. POMERANTZ:  Objection.
 9             THE COURT:  Just a moment.  Overruled.
10   A.  Yes.
11   Q.  You've been in touch with a number of other Epstein
12   accusers in many different forms and fashion; correct?
13             MS. POMERANTZ:  Objection.  Vague.  Confusing.
14             THE COURT:  Okay.  You can specify please.
15   Q.  Okay.  Are you a part of a WhatsApp group of Epstein
16   accusers?
17   A.  Yes.
18   Q.  You communicated with other Epstein accusers on the
19   WhatsApp for those accusers?
20   A.  Correct.
21   Q.  You've emailed with other accusers; correct?
22   A.  I have.
23   Q.  You directly emailed with Virginia Roberts; correct?
24   A.  I have.
25   Q.  You have been with other Epstein accusers in connection
```

LCAVMAX6                    A. Farmer - cross

1   with your media appearances, right?

2   A.  You mean when they were at the courtroom and filming

3   everyone?

4   Q.  Right.

5   A.  Yes.

6   Q.  You know that your attorneys from Boies Schiller were a

7   part of setting up the Epstein Victims Compensation Fund;

8   correct?

9             MS. POMERANTZ:  Objection, your Honor.

10            THE COURT:  Just a moment.

11            One-word grounds.

12            MS. POMERANTZ:  Hearsay and privilege.

13            THE COURT:  You can inquire as to foundation.

14  Q.  I'm not trying to ask you about things that you've learned

15  in connection with your --

16            THE COURT:  Just ask.

17  Q.  -- communications --

18            THE COURT:  I'll deal with that, but just ask the

19  question.  I'll either sustain or overrule.

20  Q.  You are aware it's a matter of public record that your

21  attorneys --

22            MS. POMERANTZ:  Objection, your Honor.

23            THE COURT:  Foundation.  Ask the foundation question

24  first and then we'll see.

25            MS. MENNINGER:  Okay.

LCAVMAX6                         A. Farmer - cross

1    Q.  It's in the newspapers that your attorneys helped set up

2    the Epstein Victims Compensation Fund?

3              MS. POMERANTZ:  Objection, your Honor.

4              THE COURT:  Is the question is she aware of that?  Is

5    that the question?

6              MS. MENNINGER:  Yes, your Honor.

7              THE COURT:  Okay.

8    A.  Yes.

9    Q.  And so you are aware that it is a matter of public

10   knowledge that your attorneys helped set up the Epstein Victims

11   Compensation Program?

12             MS. POMERANTZ:  Your Honor, objection to this entire

13   line of questioning.

14             THE COURT:  Yes, I gather.

15             MS. POMERANTZ:  This calls for hearsay.

16             THE COURT:  I asked for foundation.  We got the

17   foundation.  And now on this question, one question at a time.

18             I sustain.

19   BY MS. MENNINGER:

20   Q.  You participated in that fund; correct?

21   A.  I did.

22   Q.  You accepted an offer from that fund?

23   A.  I did.

24   Q.  You were paid one and a half million dollars?

25   A.  I was.

LCAVMAX6                        A. Farmer - cross

1   Q.  And was based on the same things that you've testified in

2   this courtroom today; correct?

3   A.  That's correct.

4   Q.  The sexual abuse in a movie theater, right, is one of those

5   things?

6   A.  As one of the things, yes.

7   Q.  Right.

8           MS. MENNINGER:  Your Honor, at this time I would

9   offer -- I would ask to show, excuse me, the witness AF-14.

10  And I'll provide a copy to the government.

11          MS. POMERANTZ:  No objection, your Honor.

12          THE COURT:  Okay.

13          MS. MENNINGER:  If I could show the witness page 2 of

14  that document as well, and page 3, and the last page.

15  Q.  That's your signature, Ms. Farmer; correct?

16  A.  Yes.

17  Q.  That was in October of 2020?

18  A.  That's correct.

19  Q.  This form is the release form that you signed in connection

20  with accepting the offer from the victims compensation program,

21  right?

22  A.  That's right.

23  Q.  And it details the one and a half million dollars that you

24  received, right?

25  A.  That's right.

LCAVMAX6                          A. Farmer - cross

1              MS. MENNINGER:  I would move for the admission of

2       AF-14, your Honor.

3              MS. POMERANTZ:  No objection, your Honor.

4              THE COURT:  AF-14 is admitted.

5              (Defendant's Exhibit AF-14 received in evidence)

6              THE COURT:  No redaction requests here?

7              MS. POMERANTZ:  No, your Honor.

8              THE COURT:  14 is admitted.

9              MS. MENNINGER:  We can take it down now, Ms. Lundberg.

10      BY MS. MENNINGER:

11      Q.  In connection with some of your public appearances, you

12      have described the fact that you are a psychologist; correct?

13      A.  That's correct.

14      Q.  And you have described the fact that you work with victims

15      of sexual trauma; correct?

16      A.  Amongst other types of, yeah, clients, I do.

17      Q.  And you know that it gives you more credibility with future

18      clients --

19              MS. POMERANTZ:  Objection.

20      Q.  -- if you mention your profession in connection with your

21      media appearances, right?

22              THE COURT:  Just a moment.

23              There's an objection to that question?

24              MS. POMERANTZ:  That's fine, your Honor.  Withdrawn.

25              THE COURT:  Go ahead.

LCAVMAX6                          A. Farmer - cross

1    A.  The question is whether it gives me more credibility to be

2    a victim?

3    Q.  It gives you more credibility with future clients if you

4    mention your experience during your media appearances; correct?

5    A.  My personal experience or my professional experience?

6    Q.  Your personal experiences.

7    A.  I guess I would say that that is probably not -- people

8    have different opinions about that, about whether that would

9    give you credibility or not.

10   Q.  You certainly have not shied away from telling in your

11   public appearances the fact that you are, yourself, trained as

12   a psychologist, right?

13   A.  I have shared that.

14   Q.  We've talked previously about the fact that you spoke with

15   the FBI in 2006, right?

16   A.  Yes.

17   Q.  That was with Agent Nesbitt Kuyrkendall, right?

18   A.  Right.

19   Q.  You did not tell Agent Kuyrkendall in 2006 that you wanted

20   Mr. Epstein prosecuted; correct?

21            MS. POMERANTZ:  Objection, your Honor.

22            THE COURT:  Sustained.

23            I'll hear from you, if you'd like.

24            MS. MENNINGER:  Yes.  Please.  I'm not clear.

25            THE COURT:  Sure.

LCAVMAX6                         A. Farmer - cross

1          (At sidebar)

2          THE COURT:  State your ground.

3          MS. POMERANTZ:  Your Honor, I don't understand the

4     relevance of this question.  It seems just like a wholly

5     improper question, what she was asking, whether she asked the

6     FBI to prosecute Jeffrey Epstein at this time.  I just don't

7     even understand the question.

8          MS. MENNINGER:  Your Honor, Agent Kuyrkendall signed a

9     declaration in 2017 and she said that she spoke to a number of

10     victims between '06 and '08, and none of them expressed an

11     opinion that they wanted Epstein prosecuted.  Now, she clearly,

12     in 2019, did want Epstein prosecuted.

13          THE COURT:  She's the witness.

14          MS. MENNINGER:  What's that?

15          THE COURT:  She's the witness subpoenaed to testify.

16     Her motivation --

17          MS. MENNINGER:  I'm asking what she said to --

18          THE COURT:  Right, but --

19          MS. MENNINGER:  Okay.  You want me to ask the

20     motivation?  I see.

21          THE COURT:  Well, I don't understand -- well, I'll

22     sustain the objection to the question asked --

23          MS. MENNINGER:  Okay.

24          THE COURT:  -- about what she told an agent --

25          MS. MENNINGER:  Okay.

LCAVMAX6                       A. Farmer - cross

1            THE COURT:  -- in 2006.

2            What's the next question?

3            MS. MENNINGER:  It would just be, You did not want

4    Epstein prosecuted in 2006?

5            THE COURT:  You want to ask her if she wanted Epstein

6    prosecuted in 2006?

7            MS. MENNINGER:  Yes.

8            THE COURT:  What is the relevance of that?

9            MS. MENNINGER:  Because she's changed her mind about

10   wanting people prosecuted in connection with this case.  She

11   has a different bias today than she did in 2006; that she

12   brought up her lawsuit in connection with applying to the fund

13   and filing a civil lawsuit.  When she didn't have those

14   motivations in 2006, she didn't want to prosecute.  It's a

15   clear distinction in two different periods of time, 15 years

16   apart.  It goes to our money theme, your Honor, that we opened

17   on.

18           MS. POMERANTZ:  Your Honor, I just don't see the

19   relevance or basis for this line of questioning.

20           THE COURT:  You're going to ask her if she wanted

21   Epstein prosecuted in 2006.  And if she says yes, then what?

22           MS. MENNINGER:  Agent Kuyrkendall is under subpoena,

23   your Honor, and testified that none of the victims she talked

24   to in '06 to '08 wanted them prosecuted.

25           THE COURT:  You're not doing that.  I've ruled on

LCAVMAX6                        A. Farmer - cross

1    that.

2              MS. MENNINGER:  What she told the agent about

3    prosecution.

4              MS. MOE:  Your Honor, I think we're confusing two

5    issues:  Whether or not she told the FBI she wanted him

6    prosecuted and asked them to do that and whether she, in fact,

7    wanted that to happen.  I think what she's proposing is

8    impeaching her in the absence of a statement to the FBI.

9              THE COURT:  I think that's right.  You can ask her, I

10   suppose, if she wanted him prosecuted in 2006.  I'm not going

11   to allow --

12             MS. MENNINGER:  I know with this witness I'm not.  If

13   we get into --

14             THE COURT:  We'll get into that when we get into that.

15             MS. MENNINGER:  That's right.

16             THE COURT:  But not what you told.

17             MS. MENNINGER:  I understand.

18             MS. MOE:  We're now about an hour and 15 minutes.

19             THE COURT:  There have been a lot of objections.

20             (Continued on next page)

21

22

23

24

25

LCAVMAX6                          A. Farmer - redirect

 1              (In open court)

 2     BY MS. MENNINGER:

 3     Q.   Ms. Farmer, in 2006, you did not want Jeffrey Epstein

 4     prosecuted; correct?

 5     A.   I don't recall that being the case.

 6     Q.   You didn't want him prosecuted because no crime had been

 7     committed; correct?

 8              MS. POMERANTZ:  Objection.

 9              THE COURT:  Sustained.

10              MS. MENNINGER:  If I may have one moment to confer

11     with my client, your Honor?

12              THE COURT:  You may.

13              (Counsel conferred with defendant)

14              MS. MENNINGER:  No further questions at this time,

15     your Honor.

16              THE COURT:  Ms. Pomerantz?

17              MS. POMERANTZ:  Your Honor, may I just have one moment

18     please?

19     REDIRECT EXAMINATION

20     BY MS. POMERANTZ:

21     Q.   Good afternoon, Annie.

22     A.   Good afternoon.

23     Q.   How, if at all, have you struggled to process your

24     experiences with Maxwell and Epstein?

25     A.   I think it's been -- it was a very upsetting and confusing

LCAVMAX6                        A. Farmer - redirect

situation.  And I think for a long time I just really didn't

want to think about it.  And then, you know, of course, it has

come up again and again, and so with, you know -- I have

thought a lot more about it and it -- it's just -- it causes

discomfort, and yeah.  I don't know what to say.

Q.  You were asked questions on cross-examination about your

journal.  Do you remember that?

A.  Yes.

Q.  Did you give the government every entry from your journal

that has anything to do with this case?

A.  Yes.

Q.  What's the subject matter of the rest of your -- of that

journal from when you were 16 years old?

A.  Very high school kind of things.  There's a journal entry

about the day that --

Q.  I should say, without sharing any details, just generally,

what was the subject matter of the rest of your teenage

journal?

A.  A favorite musician died, and I wrote that I was very sad

about it.  Going -- like social things, friend things, things

like that.

Q.  Did you write about private matters?

A.  Yes.

Q.  Do you recall being asked about your first interview with

the FBI in 2006?

LCAVMAX6                     A. Farmer - redirect

1    A.  Yes.

2    Q.  When you spoke with the FBI in 2006, did you have a lawyer?

3    A.  I did not.

4    Q.  When you spoke with the FBI in 2006, did you tell the FBI

5    about Maxwell massaging your breasts?

6    A.  Yes.

7    Q.  When you spoke with the FBI in 2006, did you tell the FBI

8    about Epstein getting into bed with you?

9            MS. MENNINGER:  Objection.  Leading, your Honor.

10           THE COURT:  Sustained.

11   Q.  Do you recall Ms. Menninger asking you about a particular

12   statement you made in connection with the 2006 interview

13   conducted by the FBI?

14   A.  Yes.

15   Q.  I believe she showed you a particular document to refresh

16   your recollection.

17           MS. POMERANTZ:  Can we pull up 3514-001.

18   Q.  And I want to direct your attention to the second full

19   paragraph on page 2.

20   A.  Yes.

21   Q.  And directing your attention to the last sentence.  She

22   directed you to the first half of the sentence, but I would

23   like to direct you to the full sentence.

24   A.  Yes.

25   Q.  After you told the FBI that Maria was supposed to go on the

LCAVMAX6                          A. Farmer - redirect

1  trip to New Mexico, what's the very next thing you said to the

2  FBI?

3          MS. MENNINGER:  Objection.

4          Hearsay.  Foundation, your Honor.

5          THE COURT:  Overruled.

6          This was the sentence Ms. Pomerantz asked you to read

7  in context.  And I believe your words were, That's what

8  redirect is for.

9          MS. MENNINGER:  And for objections on redirect,

10 including foundation.

11         THE COURT:  Understood.  Overruled.

12 A.   That Epstein or Maxwell was the one that was responsible

13 for canceling Maria's trip at the last minute.

14 Q.   I want to direct your attention to a -- the last paragraph

15 on that same page.

16         MS. POMERANTZ:  Can we pull that up, Ms. Drescher.

17 Q.   And do you recall when you were asked questions on

18 cross-examination, Ms. Menninger read the sentences about

19 horseback riding in this paragraph to you?

20 A.   Yes.

21              (Continued on next page)

22

23

24

25

LCACmax7                          A. Farmer - redirect

1   BY MS. POMERANTZ:

2   Q.  Can you read the rest of the paragraph to yourself.

3   A.  Yes.

4   Q.  Does that refresh your recollection that you told the FBI

5   in 2006 that Maxwell --

6            MS. MENNINGER:  Objection.  Leading, your Honor.  And

7   there was no denial of a recollection to refresh.

8            THE COURT:  Sustained.

9            MS. POMERANTZ:  Prior consistent statements.

10           THE COURT:  You can ask the question.  Leading.

11  Sustained.

12  Q.  What do you recall telling the FBI --

13           MS. POMERANTZ:  Your Honor, may I have just one

14  moment?

15           THE COURT:  You may.

16  Q.  Annie, did you tell the FBI about a foot massage in 2006?

17  A.  I did.

18  Q.  What did you tell the FBI about a foot massage?

19  A.  That Maxwell showed me how to rub Epstein's feet and that,

20  eventually --

21           MS. MENNINGER:  Your Honor, I believe the witness is

22  reading from a document.

23           THE COURT:  We can take it down.

24  A.  -- that I began doing that on my own after she had shown me

25  how to do it.

LCACmax7                           A. Farmer - redirect

1            MS. POMERANTZ:  If we can bring up 3514-001 on page 3.

2       Blow up the top paragraph.

3            MS. MENNINGER:  Your Honor, I'm not sure what the

4       witness is being shown the document for.

5            THE COURT:  I'll allow it.  I will see, but I presume

6       prior consistent statements following impeachment of prior

7       inconsistent statements.

8            MS. MENNINGER:  Yes, your Honor.  But either the

9       witness recalls it from memory or needs to be refreshed, and

10      that's the part that's not a matter of record in this

11      procedure.

12           THE COURT:  Fair enough.  You'll ask the specific

13      question and then we can take it from there.

14           You can take it down.

15      BY MS. POMERANTZ:

16      Q.  Annie, do you recall what you told the FBI in 2006 about

17      the massage that Maxwell had given you?

18      A.  I recall the parts that I've described.

19      Q.  Can you explain?

20      A.  Yes.  Again, that she had me lay on the table, that she was

21      eager for me to experience the massage and asked me to, you

22      know, lay on the table, to undress, to lay under the sheets,

23      and then she began rubbing my body.  Eventually, she pulled

24      back the sheet --

25           MS. MENNINGER:  Objection.  Narrative, your Honor.

LCACmax7                          A. Farmer - redirect

1              THE COURT:  Overruled.

2    A.   -- and rubbed my breasts, as I described.

3    Q.   And you talked about your experience with Epstein and

4    Maxwell in New Mexico.  Did you include the details of your

5    experience with Epstein and Maxwell in your submission to the

6    Epstein Victim Compensation Fund?

7    A.   Yes.

8    Q.   Do you recall being asked questions on cross examination

9    about your time in New Mexico?

10   A.   Yes.

11   Q.   Do you recall being asked questions about the movie that

12   you saw in New Mexico?

13   A.   Yes.

14   Q.   What was that movie again?

15   A.   Primal Fear.

16   Q.   Why does that movie stand out in your memory?

17   A.   In the movie, there's a priest that's sexually abusing --

18   it's a theme around sexual abuse.  So there is sexual

19   misconduct on the screen with the actors.

20   Q.   You were asked questions on cross examination about public

21   interviews you gave.  Do you remember that?

22   A.   Yes.

23   Q.   About how many interviews have you given publicly?

24   A.   I think maybe four or five.

25   Q.   And are your public interviews consistent or inconsistent

LCACmax7                              A. Farmer - redirect

1   with what you have testified about here today?

2                MS. MENNINGER:  Objection, your Honor.

3                THE COURT:  Sustained.

4   Q.  When you spoke publicly in interviews, did you tell the

5   truth?

6   A.  Yes.

7   Q.  Was it important to tell the truth when you spoke publicly?

8                MS. MENNINGER:  Objection, your Honor.

9                THE COURT:  Sustained.

10  Q.  Annie, have you coordinated your testimony with any other

11  witnesses at this trial?

12  A.  I have not.

13  Q.  Has anyone ever told you what to say?

14  A.  No.

15  Q.  Have you conformed your testimony to anyone else?

16  A.  No.

17  Q.  What are you here to do today?

18  A.  I'm here to be a part of hoping that Ghislaine Maxwell's

19  held accountable for the harm that she's caused.

20  Q.  You were asked questions about your claim to the Epstein

21  Victim Compensation Fund.  Do you recall that?

22  A.  Yes.

23  Q.  And to be clear, approximately when and what year did you

24  submit your application to the Epstein Victim Compensation

25  Fund?

LCACmax7                    A. Farmer - redirect

1    A.  In 2020.

2    Q.  And just to take a step back, can you remind the jury, when

3    was the first time that you spoke with the FBI?

4    A.  2006.

5    Q.  And just to remind the jury, when you spoke with the FBI in

6    2006, did you have a lawyer?

7    A.  I did not.

8    Q.  You were asked questions about the award that you received

9    from the Epstein Victim Compensation Fund?

10   A.  Yes.

11   Q.  Can you tell the jury what the money means to you?

12           MS. MENNINGER:  Objection.  Relevance, your Honor.

13           THE COURT:  Overruled.

14   A.  It's a very significant chunk of money.  It's a security

15   for myself and my family, and it's already been helpful in

16   providing that.

17   Q.  To be clear, do you have a financial stake in the outcome

18   of this trial?

19   A.  I do not.

20           MS. MENNINGER:  Objection.  Asked and answered, your

21   Honor.

22           THE COURT:  Sustained.

23           MS. POMERANTZ:  Your Honor, may I have just one

24   moment, please?

25           THE COURT:  You may.

LCACmax7                          A. Farmer - redirect

1  BY MS. POMERANTZ:

2  Q.  Annie, do you recall being asked questions on cross

3  examination about your memory?

4  A.  Yes.

5  Q.  Do you remember Maxwell touching your breasts?

6  A.  Yes.

7  Q.  Do you need a journal entry or a piece of paper to remember

8  Maxwell touching your breasts?

9  A.  No.

10         MS. MENNINGER:  Objection.

11         THE COURT:  I'm sorry.  There is an objection.

12         MS. POMERANTZ:  Sorry, your Honor.

13         MS. MENNINGER:  Leading to the last question.

14         THE COURT:  I'll allow the question and then pause

15  after the next one.

16         MS. POMERANTZ:  Apologies, your Honor.  I'm sorry.  I

17  just want to know which question I should back up to.

18         THE COURT:  The question was, do you need a journal

19  entry or a piece of paper.

20  BY MS. POMERANTZ:

21  Q.  Annie, do you need a journal entry or a piece of paper to

22  remember Maxwell touching your breasts during a massage?

23  A.  No, I do not.

24  Q.  Why does that stand out?

25  A.  Because it was a very distressing event, and those are the

LCACmax7                      A. Farmer - redirect

1    things that we remember.

2    Q.  Can you explain to the jury --

3              MS. POMERANTZ:  Withdrawn.

4    Q.  Do you recall being asked about Jeffrey Epstein's penis

5    several times on cross examination?

6    A.  I do.

7    Q.  In your own words, can you explain what Epstein did when he

8    got into bed with you?

9              MS. MENNINGER:  Objection, your Honor.  Asked and

10   answered.  And I was not allowed to ask the question.

11             THE COURT:  I believe the objection I sustained with

12   you was the asked and answered question, wasn't it?

13             MS. MENNINGER:  No, your Honor.

14             THE COURT:  Give me a moment.  Overruled.

15   BY MS. POMERANTZ:

16   Q.  Annie, I believe the question I had asked was:  In your own

17   words, can you explain what Epstein did when he got into bed

18   with you?

19             MS. MENNINGER:  Objection.  Calls for a narrative,

20   your Honor.

21             THE COURT:  I'll give her some room to lead, if you'd

22   like.  I don't know what the answer will be, so how can you --

23   she can either lead or she can ask a non-leading question.  So

24   if it's --

25             MS. MENNINGER:  It's a broad question.  That's my

LCACmax7                          A. Farmer - redirect

1    complaint.

2              THE COURT:  Overruled.

3    A.  When he crawled into bed with me, he put his arms around me

4    and he pressed his body into mine and, you know, sort of -- he

5    had rubbing up against me with his arms around my front.

6    Q.  You testified about your experiences with Epstein and

7    Maxwell, about them being sexualized experiences.  Can you

8    explain in your own words what you mean by that?

9              MS. MENNINGER:  Objection, your Honor.

10             THE COURT:  Overruled.

11   A.  I think this was all a pattern of them working on confusing

12   my boundaries, making me question myself about what was right

13   and what was not right and with the ultimate goal of sexually

14   abusing me.

15             MS. MENNINGER:  Objection.  702, your Honor.

16             THE COURT:  Overruled.  Door opened.  Overruled.

17   Q.  Can you explain to the jury in your own words how you

18   experienced Maxwell touching your breasts during the massage in

19   New Mexico?

20             MS. MENNINGER:  Objection.  Misstates the witness's

21   testimony.

22             THE COURT:  Just a moment.  Overruled.

23   A.  I was very uncomfortable and fearful and wanted to get off

24   of the table, that massage table, and wanted it to be over

25   with.

LCACmax7                        A. Farmer – redirect

 1              MS. POMERANTZ:  Your Honor, may I have just one

 2     moment, please.

 3              THE COURT:  You may.

 4              MS. POMERANTZ:  No further questions, your Honor.

 5              THE COURT:  Ms. Menninger.

 6              MS. MENNINGER:  No further questions, your Honor.

 7     Thank you.

 8              THE COURT:  Thank you.  Ms. Farmer, you may step down.

 9     You are excused.

10              (Witness excused)

11              Government may call its next witness.

12              MS. POMERANTZ:  The government calls David Mulligan.

13              THE COURT:  David Mulligan may come forward.

14              MS. STERNHEIM:  Judge, may we come forward just one

15     moment?

16              THE COURT:  Have Mr. Mulligan wait one moment until we

17     come back.

18              (Continued on next page)

19

20

21

22

23

24

25

LCACmax7                        A. Farmer - redirect

1           (At the sidebar)

2           THE COURT:  Before I start, I want to make a record

3    because I said, door open.

4           The defense expressly attempted to suggest impeachment

5    of the witness, that she had indicated the handholding on the

6    victim's compensation form as sexual abuse.  So I allowed that

7    question.  In light of that door opening, I don't think she'd

8    tread it into expert testimony in any way, but it was directly

9    responsive to a series of questions that the defense put at

10   issue by her description of the earlier conduct as handholding.

11   So that's the record I'm making.

12          MS. MENNINGER:  Your Honor, may I make a very brief --

13          THE COURT:  You're welcome to make a record.  I wanted

14   to explain why I said, door opened.

15          MS. MENNINGER:  Thank you, your Honor.  I had asked

16   the witness a number of questions about her statements to law

17   enforcement where she said she does not remember it being

18   sexualized and I was not allowed to ask those questions about

19   those not being sexualized touches.

20          THE COURT:  The record is what it is.  That's not the

21   Court's memory.

22          MS. MENNINGER:  It's my memory, and I understand --

23          THE COURT:  -- asked repeatedly, that's true, and I

24   didn't allow it to be asked if it was not a prior inconsistent

25   statement, but I didn't preclude that area from being explored.

LCACmax7                          A. Farmer – redirect

1          MS. MENNINGER:  For that reason, having her explain

2     what sexualized means when I wasn't allowed to elicit to the

3     agents that it wasn't sexualized is what gives me concern.

4          THE COURT:  The record stands and you inquired.  I

5     didn't prohibit you from asking her, I didn't let her explain

6     what sexualized means either.  I've made my record and the

7     record stands as it is.  You can't go back in time.

8          MS. MENNINGER:  That's right.

9          THE COURT:  What is the issue?  Should I send the jury

10     for a break or?

11          MS. STERNHEIM:  If this would probably be a good time

12     for a break before they call him, but I can make it very

13     quickly.

14          THE COURT:  Go ahead.

15          MS. STERNHEIM:  It's my understanding that Dave

16     Mulligan is being called as a witness for prior inconsistent

17     statements.

18          THE COURT:  Right.

19          MS. STERNHEIM:  The 3500 material that has been

20     provided far exceeds the testimony of this witness, and I just

21     want to make sure that it is not going to exceed as far as

22     prior consistent what she's testified to.

23          MS. POMERANTZ:  I'm happy to consult with

24     Ms. Sternheim on a break.  My plan is to ask specific questions

25     that would be consistent with what she's testified about.

LCACmax7                          A. Farmer – redirect

1            THE COURT:  Let's get started.  My plan was to break

2       at 3:30.

3            MS. STERNHEIM:  Thank you.

4            THE COURT:  If I get an objection, then I'll send them

5       for a break.

6            (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LCACmax7                          A. Farmer – redirect

1              (In open court)

2              THE COURT:  I understand the members of the jury need

3     a restroom break, so we'll break for about 10 minutes.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LCACmax7                          A. Farmer - redirect

1          (Jury not present)

2          THE COURT:  I encourage counsel to confer.  I'll come

3    back in 10.  You let me know if there is dispute about the

4    scope of the --

5          MS. STERNHEIM:  Yes, Judge.  May I sit here rather

6    than move or would you prefer I move to that --

7          THE COURT:  I don't mind.  That's fine, Ms. Sternheim.

8          MS. STERNHEIM:  Thank you.

9          THE COURT:  10 minutes.  Thank you.

10         (Recess)

11         THE COURT:  Any matters to take up?

12         MS. POMERANTZ:  Not from the government, your Honor.

13         MS. MENNINGER:  No, your Honor.

14         MS. POMERANTZ:  Your Honor, should we get the witness?

15         THE COURT:  Yes, he can come in.  That's fine.  He's

16   been called.

17         Mr. Mulligan, you're welcome to come in, take your

18   mask off.  Once the jury comes in, I'll swear you in.

19         THE WITNESS:  Okay.

20         (Continued on next page)

21

22

23

24

25

```
 1                (Jury present)
 2                THE COURT:  Government has called David Mulligan.
 3    DAVID JAMES MULLIGAN,
 4         called as a witness by the Government,
 5         having been duly sworn, testified as follows:
 6                THE COURT:  Thank you.  Please be seated.  Once
 7    seated, please state and spell your name for the record.
 8                THE WITNESS:  My name is David James Mulligan,
 9    D-a-v-i-d J-a-m-e-s M-u-l-l-i-g-a-n.
10                THE COURT:  Thank you.  You may inquire,
11    Ms. Pomerantz.
12                MS. POMERANTZ:  Thank you, your Honor.
13    DIRECT EXAMINATION
14    BY MS. POMERANTZ:
15    Q.  Good afternoon, Mr. Mulligan.
16    A.  Good afternoon.
17    Q.  How old are you?
18    A.  I'm 42.
19    Q.  In what state were you born?
20    A.  In Arizona.
21    Q.  In what state did you grow up?
22    A.  Arizona.
23    Q.  How far did you go in school?
24    A.  As far as completing a master's degree.
25    Q.  What is your master's degree in?
```

LCACmax7                          Mulligan - direct

1    A.  In special education.

2    Q.  What kind of work do you do now?

3    A.  Now I'm a baker.

4    Q.  Did you go to high school?

5    A.  Yes.

6    Q.  In what state did you go to high school?

7    A.  Arizona.

8    Q.  When you were in high school, who, if anyone, was your

9    girlfriend?

10   A.  Annie Farmer.

11   Q.  Approximately when did you meet Annie Farmer?

12   A.  I met her in the spring of 1996.

13   Q.  Where did you meet Annie?

14   A.  I met her at a prom party.

15   Q.  What grade were you in when you met Annie?

16   A.  I was a junior in high school.

17   Q.  What grade was Annie in when you met her?

18   A.  She was also a junior.

19   Q.  When did you and Annie start dating?

20   A.  We started dating in the fall of 1996.

21   Q.  How old were you when you started dating Annie?

22   A.  I was 17 years old.

23   Q.  And about how old was Annie when you started dating?

24   A.  She was also 17.

25          MS. POMERANTZ:  Ms. Drescher, can we pull up what is

1   already in evidence as Government Exhibit 101.

2   Q.  Mr. Mulligan, do you recognize the person in this

3   photograph?

4   A.  Yes.

5   Q.  Who is it?

6   A.  Annie Farmer.

7   Q.  Is this a fair and accurate photograph of Annie Farmer as

8   she appeared when you met her in high school?

9   A.  Yes.

10  Q.  Did Annie tell you where she went in the summer of 1996?

11  A.  Yes.

12  Q.  Did there come a time when Annie told you how the trip --

13  let me back up.  Excuse me.

14          Where did Annie tell you she went?

15  A.  To Thailand.

16  Q.  Did there come a time when Annie told you how the trip to

17  Thailand was paid for?

18  A.  Yes.

19  Q.  What did she tell you?

20  A.  She told me it was paid for by Jeffrey Epstein.

21  Q.  Approximately when did she tell you that?

22  A.  Sometime after we began dating.  So in the fall or winter

23  of 1996.

24  Q.  For about how long were you and Annie romantically

25  involved?

LCACmax7                          Mulligan - direct

```
1    A.  We dated on and off through the end of 2003.

2    Q.  Did you keep in touch with Annie after you and Annie broke

3    up?

4    A.  Yes.

5    Q.  What is the nature of your current relationship with Annie?

6    A.  We're still friends.

7    Q.  About how often do you and Annie communicate?

8    A.  On average, probably about once a month.

9    Q.  What, if any, conversations have you had with Annie about

10   the substance of your testimony here today?

11   A.  None.

12   Q.  Did you go to Annie's house while you were dating in high

13   school?

14   A.  Yes.

15   Q.  During the time you dated Annie in high school, who did

16   Annie live with?

17   A.  She lived with her mom and her sister, Ashley.

18   Q.  Based on your observations, what did you understand to be

19   Annie's family's financial circumstances?

20   A.  Her mom was a single mom and always working.  So I would

21   say she was struggling to make ends meet.

22   Q.  Did there come a time when Annie spoke with you about a

23   trip Annie took to New York?

24   A.  Yes.

25   Q.  When did Annie first tell you about her trip to New York?
```

LCACmax7                    Mulligan - direct

1    A.  Sometime soon after we began dating.

2    Q.  Who did Annie tell you she went to see in New York?

3    A.  She went to visit her sister, Maria.

4    Q.  Who, if anyone, did Annie tell you she met in New York?

5    A.  She met Jeffrey Epstein on that trip.

6    Q.  What, if anything, did Annie tell you she did with Jeffrey

7    Epstein in New York?

8    A.  She told me that she went out to a show with Maria and

9    Jeffrey Epstein.

10   Q.  What, if anything, did Annie tell you happened during the

11   show?

12   A.  I remember her telling me that Jeffrey was seated between

13   the two sisters and that he reached out and touched her leg

14   during the show.

15   Q.  Did Annie tell you at that time how she felt about that?

16   A.  Yes.  She said she felt awkward and confused about it.

17   Q.  Did she tell you why she felt awkward and confused about

18   it?

19   A.  Because Jeffrey Epstein had provided a lot of opportunities

20   for her artistic career, and Annie felt that she couldn't

21   really speak up or say anything, and she really didn't

22   understand, I think, why it was happening in the moment.

23   Q.  When you say her artistic career, whose artistic career are

24   you referring to?

25   A.  Her sister, Maria's.

1    Q.  Did there come a time when Annie spoke with you about a

2    trip she took to New Mexico?

3    A.  Yes.

4    Q.  Approximately when did she first talk to you about the trip

5    to New Mexico?

6    A.  Soon after we began dating.  So I would say in the fall or

7    winter of 1996.

8    Q.  Is Annie's experience in New Mexico something that you and

9    Annie discussed once or more than once during the time you were

10   dating in high school?

11   A.  More than once.

12   Q.  Did Annie tell you all the details at once or did she tell

13   you more over time while you were in high school?

14   A.  She told me more over time.

15   Q.  How did Annie's trip to New Mexico first come up in

16   conversation between you and Annie?

17   A.  It first came up when we were beginning to be physically

18   affectionate with each other.

19   Q.  Can you describe for the jury Annie's demeanor?

20        MS. STERNHEIM:  Objection.

21        THE COURT:  Sustained.

22   Q.  You said this came up more than once in high school.  In

23   general, when you were in high school, when did Annie talk to

24   you about these experiences?

25   A.  At times, when we were being physically affectionate with

LCACmax7                    Mulligan - direct

1   each other.

2   Q.   While you and Annie were in high school, did Annie tell you

3   when she went to New Mexico?

4   A.   Yes.

5   Q.   What did she tell you about when she went?

6   A.   She said that she went just before we had met.

7   Q.   What, if anything, did Annie tell you about where she

8   stayed in New Mexico?

9   A.   She told me she stayed at Jeffrey Epstein's ranch.

10  Q.   Did she tell you where on the ranch she stayed?

11  A.   Yes.  I remember that she had her own bedroom at the ranch.

12  Q.   What did Annie tell you about who she spent time with in

13  New Mexico?

14  A.   The two people I remember her saying she spent time with

15  were Ghislaine Maxwell and Jeffrey Epstein.

16  Q.   Did Annie tell you if anyone else was in New Mexico?

17  A.   No, there was no one else with her in New Mexico that I

18  remember.

19  Q.   What did she tell you about that?

20  A.   She told me that she had expected to find other girls of

21  her age and in similar situations to her as part of -- I guess

22  what you could describe as an enrichment weekend of sorts, but

23  she told me that when she arrived, she realized that she was

24  the only girl there.

25  Q.   What, if anything, did Annie tell you about Maxwell?

1   A.  She said that Maxwell was very charming, very pretty.  She

2   greeted her when she arrived.  And I remember that they had a

3   day around town where Maxwell took her shopping.

4   Q.  Did Annie tell you if Maxwell bought her anything?

5   A.  Yes.

6   Q.  What did she tell you?

7   A.  I remember she told me that Maxwell bought her a pair of

8   cowboy boots.

9   Q.  Did Annie tell you about her conversations with Maxwell in

10  New Mexico in this time when you were dating in high school?

11  A.  Yes.

12  Q.  What did Annie tell you about her conversations with

13  Maxwell?

14  A.  I remember that Maxwell asked Annie if she had ever

15  received a massage before, which Annie had not.

16  Q.  Do you remember what Annie told you what happened next in

17  the context of massage in terms of what Maxwell said to her?

18  A.  Yes.  She said that Maxwell basically told her that she was

19  going to have the opportunity to have a massage and was telling

20  her how enjoyable that it would be for Annie.

21  Q.  While you and Annie were in high school, did Annie tell you

22  about receiving a massage in New Mexico?

23  A.  Yes.

24  Q.  Do you remember all the details Annie told you about the

25  massage today?

1   A.  I remember some of the details, but not all.

2   Q.  Did Annie tell you if anyone touched her during the

3   massage?

4   A.  Yes.

5   Q.  Who did Annie tell you touched her during the massage?

6   A.  Maxwell.

7   Q.  What, if anything, did Annie tell you about where Annie was

8   touched by Maxwell?

9   A.  She told me that she was touched on the breasts.

10  Q.  Did Annie tell you who touched her breasts?

11  A.  Yes.

12  Q.  Who was that?

13  A.  Ghislaine Maxwell.

14  Q.  While you and Annie were in high school, did Annie tell you

15  how she felt while Maxwell was touching her breasts and giving

16  her the massage?

17  A.  Yes.  She told me that she felt fearful and awkward and

18  helpless.

19  Q.  Did Annie tell you if she said anything --

20          MS. MENNINGER:  Objection.  Leading.

21          THE COURT:  Sustained.

22  Q.  What, if anything, did Annie tell you about whether she

23  said anything to anyone after the massage?

24          MS. MENNINGER:  Objection.

25          THE COURT:  Overruled.

A.  She told me that she didn't have the courage to speak up

and say anything because she was afraid of jeopardizing any of

her sister Maria's opportunities with Jeffrey Epstein.

Q.  While you and Annie were in high school, did Annie tell you

about any other experiences with Jeffrey Epstein in New Mexico?

A.  She also told me that, during the massage --

          MS. POMERANTZ:  Your Honor, if I may, with

counsel's -- this is what we had conferred on.  I just want to

ask a more leading question, if I may?

          MS. MENNINGER:  That's fine.

Q.  While you and Annie were in high school, did Annie tell you

about any other experiences with Jeffrey Epstein in her bedroom

in New Mexico?

A.  Yes.

Q.  What did she tell you?

A.  She said that, after the massage, that Jeffrey Epstein

followed her.  He had been present during the massage --

          MS. MENNINGER:  Objection.

          THE COURT:  Sustained.  I'll stop the response.  Next

question.

Q.  After you said that Annie told you that he followed her,

where did Annie tell you that he followed her?

A.  Into her bedroom.

Q.  And what did Annie tell you happened in the bedroom?

A.  That Jeffrey Epstein climbed into bed with her and

LCACmax7                    Mulligan - direct

```
1   attempted to snuggle.
2   Q.  And what did she tell you happened after he was trying to
3   snuggle with her?
4   A.  She told me that she got out of bed and locked herself in
5   the bathroom.
6   Q.  Did Annie talk to you about what happened in New Mexico
7   after high school?
8   A.  Yes.
9   Q.  When did she talk to you about what happened in New Mexico?
10  A.  I remember her talking to me about it in early 2003.
11  Q.  What was Annie's demeanor when you spoke with her when she
12  talked to you about what happened in New Mexico in 2003?
13          MS. MENNINGER:  Objection.
14          THE COURT:  Sustained.
15  Q.  In 2003 when Annie talked to you about her experiences with
16  Maxwell and Epstein in New Mexico, without going into the
17  details, when did this come up?
18  A.  This came up at a time where we were being physically
19  affectionate with each other.
20          MS. POMERANTZ:  Your Honor, may I have one moment,
21  please?
22          THE COURT:  You may.
23          MS. POMERANTZ:  Nothing further, Judge.
24          THE COURT:  Ms. Sternheim.
25          MS. STERNHEIM:  Briefly, Judge.
```

LCACmax7                        Mulligan - cross

1   CROSS-EXAMINATION

2   BY MS. STERNHEIM:

3   Q.  Good afternoon, Mr. Mulligan.

4   A.  Hello.

5   Q.  You're telling this jury things you remember from over 25

6   years ago; correct?

7   A.  That's correct.

8   Q.  You remember individuals' names?

9   A.  Yes.

10  Q.  And you've retained that over 25 years?

11  A.  Yes.

12  Q.  And you've talked with Ms. Farmer about this?

13  A.  Over time, yes.

14  Q.  And you've also seen things in the media about it?

15  A.  Some things, yes.

16  Q.  Well, you must have been curious if there were things in

17  the media about your close friend, Ms. Farmer; correct?

18  A.  Yes, but I'm not much of a news watcher, so --

19  Q.  Well, put news aside.  There were documentaries involved in

20  this case; correct?

21  A.  Yes.

22  Q.  And you're aware of those documentaries; correct?

23  A.  Yes.

24  Q.  And Annie told you she was in certain documentaries, didn't

25  she?

LCACmax7                    Mulligan - cross

1   A.  Yes.

2   Q.  And she told you that she was on certain podcasts, didn't

3   she?

4   A.  I don't recall telling me that she was on any podcasts.

5   Q.  Well, she told you that she was in the media; correct?

6   A.  Yes.

7   Q.  She told you she had been interviewed by the media;

8   correct?

9   A.  Correct.

10  Q.  She told you she had been in touch with other people who

11  claimed to have been abused by Jeffrey Epstein?

12          MS. POMERANTZ:  Objection.

13          THE COURT:  Overruled.

14          MS. POMERANTZ:  Hearsay, your Honor.  Just to state

15  the --

16          THE COURT:  Overruled.

17  A.  Can you repeat the question, please.

18  Q.  She told you that she had been in touch with other

19  individuals who claim to have been abused by Jeffrey Epstein?

20  A.  I don't recall Annie telling me about any contact with

21  other victims, no.

22  Q.  She told you that, at a certain point, she could make a lot

23  of money off of this case?

24          MS. POMERANTZ:  Objection.  Hearsay.

25          Your Honor, withdrawn.

1              THE COURT:  I'll provide a limiting instruction if you

2      want, but go ahead.

3      A.  No, Annie never talked to me about any money that she could

4      receive from this case.

5      Q.  You don't know that Annie received one and a half million

6      dollars for what she claimed happened in New Mexico in the

7      movie theater?

8      A.  No, I've never been told that.

9      Q.  You've never read about that?

10     A.  I've never read about that.

11     Q.  You don't follow anything about this case?

12     A.  I don't follow anything in the news about this case.

13     Q.  And when was the last time you spoke to Annie about this

14     case?

15     A.  About this case, I would estimate probably about a year

16     ago.

17     Q.  And you knew that she was going to be a witness in this

18     case; correct?

19     A.  Yes, I did.

20     Q.  And you knew when you were contacted by the government that

21     they wanted you to be a witness because Annie was going to be a

22     witness?

23     A.  That's correct.

24     Q.  And that's why you're here today; correct?

25     A.  Yes.

LCACmax7                       Mulligan - redirect

1                   MS. STERNHEIM:  May I have a moment?

2                   THE COURT:  You may.

3    Q.  You've spoken to the media about this case, haven't you?

4    A.  No, I haven't about this case.

5    Q.  You weren't contacted by the New York Times?

6    A.  I was asked by the New York Times to corroborate a story,

7    yes.

8    Q.  And you spoke to them; correct?

9    A.  Yes.

10   Q.  So you spoke to the media about this case; correct?

11   A.  That's correct.

12   Q.  And you recently got married, didn't you?

13   A.  Yes.

14   Q.  And Annie Farmer was at your wedding; correct?

15   A.  That's correct.

16                  MS. STERNHEIM:  No further questions.

17                  THE COURT:  Ms. Pomerantz.

18                  MS. POMERANTZ:  Yes, your Honor.  Just briefly.

19                  THE COURT:  Okay.

20                  MS. POMERANTZ:  May I inquire your Honor?

21                  THE COURT:  You may.

22   REDIRECT EXAMINATION

23   BY MS. POMERANTZ:

24   Q.  Mr. Mulligan, defense counsel asked you about your memory

25   of conversations with Annie.  Do you recall that?

LCACmax7                    Mulligan - redirect

1    A.  Yes.

2    Q.  Why does what Annie told you about New Mexico stand out in

3    your memory?

4    A.  I would say they were very memorable moments and formative

5    moments in our relationship.  They led to very emotional

6    conversations that I remember well to this day.

7    Q.  Did anyone tell you what to say here today?

8    A.  No.

9    Q.  What are you here to do today?

10   A.  To tell the truth.

11            MS. POMERANTZ:  No further questions.

12            THE COURT:  Ms. Sternheim.

13            MS. STERNHEIM:  No.  Thank you.

14            THE COURT:  Mr. Mulligan.  Thank you, you're excused.

15   You may step down.

16            THE WITNESS:  Thank you.

17            (Witness excused)

18            THE COURT:  Government may call its next witness.

19            MS. POMERANTZ:  Your Honor, the government calls

20   Janice Swain.

21            THE COURT:  Janice Swain may come forward.  Good

22   afternoon, Ms. Swain.

23    JANICE SWAIN,

24        called as a witness by the Government,

25        having been duly sworn, testified as follows:

LCACmax7                          Swain - direct

 1              THE COURT:  Please be seated.  If you remove your mask

 2       and please state and spell your name for the record.

 3              THE WITNESS:  Janice Swain, J-a-n-i-c-e S-w-a-i-n.

 4              THE COURT:  Ms. Swain, I'll ask you to please pull the

 5       microphone up to you and you need to speak directly into it.

 6       Please keep your voice up.  Thank you so much.

 7              THE WITNESS:  Okay.

 8              THE COURT:  Go ahead, Ms. Pomerantz, you may inquire.

 9              MS. POMERANTZ:  Thank you, your Honor.

10       DIRECT EXAMINATION

11       BY MS. POMERANTZ:

12       Q.  Good afternoon, Ms. Swain.

13       A.  Good afternoon.

14       Q.  If I can ask you to speak directly into the microphone, I

15       want to make sure everyone can hear you.

16       A.  Okay.

17       Q.  Thank you.  Ms. Swain, how old are you?

18       A.  I'm 71.

19       Q.  How far did you go in school?

20       A.  High school.

21       Q.  What kind of work do you do now?

22       A.  I'm a sales representative.

23       Q.  How many children do you have?

24       A.  I have three.

25       Q.  What is the name of your oldest child?

LCACmax7                      Swain - direct

1    A.   Maria Farmer.

2    Q.   In what year was Maria born?

3    A.   In 1969.

4    Q.   What is the name of your middle child?

5    A.   Annie Farmer.

6            MS. POMERANTZ:  Your Honor, at this time, I would

7    request that the jurors be permitted to take out their binders

8    and turn to Government Exhibit 13, which is in evidence under

9    seal, and I would ask that the witness turn to Government

10   Exhibit 13.

11           MS. MENNINGER:  No objection, your Honor.

12           THE COURT:  Please open your binder to GX13.  The

13   witness is also directed -- is it a binder?

14           MS. POMERANTZ:  I think it's a folder, your Honor.

15           THE COURT:  You have a folder there, Ms. Swain?

16           THE WITNESS:  Yes, I do.

17           THE COURT:  Document marked GX13.

18   BY MS. POMERANTZ:

19   Q.   Ms. Swain, do you have Government Exhibit 13?

20   A.   I do.

21   Q.   What is that?

22   A.   Annie's birth certificate.

23   Q.   And without stating it, is Annie's date of birth reflected

24   on that birth certificate?

25   A.   It is.

LCACmax7                      Swain - direct

1          MS. POMERANTZ:  We can put that away.

2     Q.  In what state was Annie born?

3     A.  Missouri.

4     Q.  In what states did Annie grow up?

5     A.  In Missouri, Florida, and -- I mean Arizona.

6     Q.  In what state did Annie go to high school?

7     A.  Arizona.

8     Q.  Approximately when did you move to Arizona?

9     A.  In 1986 or 7.

10    Q.  I want focus on 1995.  In 1995, what did you do for work?

11    A.  I was a sales representative.

12    Q.  Who did you live with in 1995?

13    A.  I lived with Annie and my younger daughter.

14    Q.  Did you live with your children's father in 1995?

15    A.  No.

16    Q.  What was your marital status in 1995?

17    A.  I was divorced.

18    Q.  Did you receive financial support from your children's

19    father?

20    A.  No.

21    Q.  What were your financial circumstances in 1995?

22    A.  I was a single mom, had very limited income.

23    Q.  In 1995, was Annie in school?

24    A.  Yes.

25    Q.  What grade was she in?

1   A.  She was a junior in high school.

2           MS. POMERANTZ:  Ms. Drescher, can we please pull up

3   what's already in evidence as Government Exhibit 101.

4   Q.  Ms. Swain, who's the person in this photograph?

5   A.  Annie.

6   Q.  Is this a fair and accurate photograph of Annie when she

7   was in high school?

8   A.  Yes.

9           MS. POMERANTZ:  Ms. Drescher, we can take that down.

10  Thank you very much.

11  Q.  At that time, did you have conversations with Annie about

12  preparing for college?

13  A.  Yes, we talked about college.

14  Q.  What was your plan for paying for college for Annie?

15  A.  Student loans.

16  Q.  In 1995, where was Maria living?

17  A.  In New York.

18  Q.  What did Maria do for work in New York?

19  A.  She was an artist.

20  Q.  Who did Maria work for in New York?

21          MS. MENNINGER:  Objection.  Hearsay.

22          THE COURT:  Sustained.

23  Q.  Did there come a time when you spoke with Jeffrey Epstein

24  on the phone?

25  A.  Yes.

LCACmax7                         Swain - direct

1  Q.   Have you ever met Jeffrey Epstein in person?

2  A.   No, I haven't.

3  Q.   About when was the first time you spoke with Epstein on the

4  phone?

5  A.   In 1995.

6  Q.   And how did that come about?

7  A.   He called to tell me that he was inviting Maria to go on

8  his plane to Florida for a work trip.

9  Q.   Did you speak to Epstein once on the phone or more than

10 once on the phone?

11 A.   More than once.

12 Q.   And during these first few calls, what did Epstein talk to

13 you about?

14         MS. MENNINGER:  Objection.  Hearsay.

15         THE COURT:  Overruled.  I'm sorry.  Can I get a

16 timeframe?

17         MS. POMERANTZ:  Your Honor, I believe that she had

18 testified about 1995.

19         THE COURT:  Okay.  Overruled.

20 BY MS. POMERANTZ:

21 Q.   Ms. Swain, after Epstein called you in 1995, what did

22 Epstein talk to you about during the first few calls that he

23 made to you?

24 A.   About Maria's art career and her talent.

25 Q.   At the time you spoke with him, what was your understanding

LCACmax7                    Swain - direct

1    of who Epstein was?

2    A.   That he was Maria's boss.

3    Q.   About how many calls in total did you have with Epstein?

4    A.   At least six.

5    Q.   What, if anything, did Epstein call you about, other than

6    Maria?

7    A.   He called me before the Christmas holiday to ask if I would

8    allow Annie to come to New York to visit Maria as a gift to

9    Maria for Christmas.

10   Q.   Did you have one call or multiple calls with Jeffrey

11   Epstein about Annie?

12   A.   Multiple.

13   Q.   When you had calls with Epstein, what, if anything, did he

14   discuss with you about Annie's education?

15   A.   He just said that he had -- he could probably help guide

16   her in selecting a college and that he would like to introduce

17   her to some other people who could help with that.

18   Q.   Approximately when did Epstein first call you about Annie?

19   A.   In December of '95.

20   Q.   Based on the call, what was Epstein offering to do?

21   A.   The first call, to offer her a flight to New York to visit

22   Maria.

23   Q.   Did you give Annie permission to go to New York?

24   A.   I did.

25   Q.   How come?

LCACmax7                        Swain - direct

1    A.   I thought it would be a good opportunity for the sisters to

2    be together.

3    Q.   Did Annie go to New York?

4    A.   Yes.

5    Q.   Approximately when did Annie go to New York?

6    A.   Over the Christmas holiday.

7    Q.   Was Annie in school at the time she went to New York?

8    A.   Yes.

9    Q.   In what grade was she in?

10   A.   She was a junior.

11   Q.   Was school in session?

12   A.   Yes -- no.   It was Christmas break.

13   Q.   When Annie returned from New York, did Annie tell you about

14   the trip to New York?

15   A.   She didn't talk too much about it.   She told me a few

16   places they visited and she did say that Epstein took her and

17   Maria to the movies to see a movie.

18   Q.   Did Annie travel again during her junior year after the

19   trip to New York?

20   A.   Yes.

21   Q.   Where did Annie go?

22   A.   She went to Epstein's ranch in New Mexico.

23   Q.   How did it come about that Annie went to New Mexico?

24   A.   He called and told me that he was planning a get-together,

25   a retreat of sorts for a group of 20 to 25 students that were

LCACmax7                        Swain - direct

1   academically gifted and he thought they could discuss their

2   college plans and possibly going abroad to work on their

3   résumés for college.

4   Q.   When you said he called me, who are you referring to?

5   A.   Jeffrey Epstein.

6   Q.   What, if anything, did you ask Epstein on the call?

7   A.   I asked if him, first of all, if he had enough space to

8   accommodate that many students and he said yes, they had cabins

9   that would accommodate 20 to 25 students.  And then I asked if

10  it would be boys and girls and he said yes, and so I asked who

11  would be chaperoning the girls.

12  Q.   And what did Epstein say in response?

13  A.   He said his wife, Ghislaine, would be.

14  Q.   What did Epstein tell you that Annie would be --

15          MS. POMERANTZ:  Withdrawn, your Honor.

16  Q.   What, if anything, made you feel comfortable letting Annie

17  go to New Mexico?

18  A.   I felt like it was a good opportunity for her to be around

19  other students who were planning trips.  And he told me that he

20  was funding the trips for all the students.  So it seemed like

21  a generous offer and, at that point, I trusted that it would be

22  okay.

23          (Continued on next page)

24

25

LCAVMAX8                         Swain - direct

1    BY MS. POMERANTZ:

2    Q.   Did you pay for Annie's trip to New Mexico?

3    A.   No.

4    Q.   Who paid for the trip?

5    A.   Epstein.

6    Q.   Did you talk to Maxwell on the phone about the trip to New

7    Mexico?

8    A.   No.

9    Q.   Have you ever spoken with Maxwell?

10   A.   I have not.

11   Q.   Have you ever met Maxwell in person?

12   A.   No, I haven't.

13   Q.   Did Annie go to New Mexico?

14   A.   Yes.

15   Q.   Approximately when did Annie go to New Mexico?

16   A.   It was in the spring of '96.

17   Q.   Approximately how long after your call with Epstein did

18   Annie go to New Mexico?

19   A.   I'm not sure if I talked to him one or two times about --

20   before her trip, but probably the last time I spoke with them

21   was about maybe a few days to a week before her trip.

22   Q.   For approximately how long was Annie in New Mexico?

23   A.   For a weekend, Friday night to Sunday night.

24   Q.   How did Annie get to the airport to fly to New Mexico?

25   A.   I took her.

LCAVMAX8                         Swain - direct

1   Q.  How did Annie get home from the airport when she returned

2   to Arizona from New Mexico?

3   A.  I picked her up.

4   Q.  Did you speak to Annie while she was in New Mexico?

5   A.  No, I didn't.

6   Q.  What, if anything, did Annie have when she returned from

7   the trip to New Mexico?

8   A.  She had a new pair of black boots.

9   Q.  Did Annie tell you who bought the boots for her?

10  A.  Yes, she said Ghislaine took her shopping and bought the

11  boots.

12  Q.  Based on your observations, how would you describe Annie's

13  demeanor when you picked her up from the airport?

14  A.  She was very quiet and withdrawn.  She didn't want to talk

15  and she seemed very tired.

16  Q.  What did Annie do in the summer of 1996?

17  A.  She went on a trip that -- one of the trips that had been

18  discussed to Thailand and Vietnam.

19  Q.  What was Annie doing in Thailand and Vietnam?

20  A.  I think they worked on like an orphanage and a school.

21  Q.  Did you pay for Annie's trip to Thailand and Vietnam?

22  A.  No, I didn't.

23  Q.  Who paid for her trip to Thailand and Vietnam?

24            MS. MENNINGER:  Objection.

25            Foundation, your Honor.

1            THE COURT:  All right.  Sustained.

2    Q.  Did Annie tell you who paid for her trip to Thailand and

3    Vietnam?

4            MS. MENNINGER:  Objection.  Hearsay, your Honor.

5            THE COURT:  I'll allow the question.

6    A.  She raised --

7            THE COURT:  Sorry.  Just a yes or no to the question.

8            THE WITNESS:  Oh, I'm sorry.

9    Q.  The question --

10            MS. POMERANTZ:  I'll repeat it, if I may, your Honor?

11            THE COURT:  Sure.

12   Q.  Did Annie tell you who paid for her trip to Thailand and

13   Vietnam?

14   A.  Yes.

15   Q.  Who did she tell you paid for the trip?

16            MS. MENNINGER:  Objection.  Foundation for that.

17            THE COURT:  Foundation is the objection?

18            MS. MENNINGER:  It's hearsay foundation.

19            MS. POMERANTZ:  Prior consistent statement, your

20   Honor.

21            MS. MENNINGER:  It's not, your Honor.

22            THE COURT:  Hearsay -- sustained.

23   BY MS. POMERANTZ:

24   Q.  You said earlier that Annie seemed tired and withdrawn

25   after the New Mexico trip.

LCAVMAX8                          Swain - direct

```
 1    A.  Yes.

 2    Q.  Did there come a time when you asked her about the trip

 3    again?

 4    A.  Other than the night I brought her home?  I tried to talk

 5    to her that night, and she said she was too tired to talk.

 6    Q.  Did you ask her about the trip once or more than once?

 7    A.  More than once.

 8    Q.  Did there come a time when you spoke with her about the

 9    trip to New Mexico after she returned from Thailand and Vietnam

10    in the summer of 1996?

11    A.  Yes.

12    Q.  What did you ask her?

13    A.  I asked her what happened when she was in New Mexico.

14    Q.  What did Annie say in response?

15    A.  She said, I don't want to talk about it.  And I'm just not

16    going to let it ruin my life.

17    Q.  Based on your observations, how would you describe Annie's

18    demeanor when you tried to talk to her about New Mexico?

19    A.  She's just always very evasive and she didn't -- she just

20    didn't want to discuss it.  And she would always say the same

21    thing:  I'm not going to let it ruin my life.

22              MS. POMERANTZ:  Your Honor, may I have just one

23    moment?

24              THE COURT:  You may.

25              (Counsel conferred)
```

LCAVMAX8                          Swain - cross

1            MS. POMERANTZ:  No further questions, your Honor.

2            THE COURT:  All right.  Ms. Menninger.

3            MS. MENNINGER:  Briefly, your Honor.

4            THE COURT:  Go ahead.

5    CROSS-EXAMINATION

6    BY MS. MENNINGER:

7    Q.  I just want to confirm, Ghislaine Maxwell never called you

8    in relationship to anything, right?

9    A.  No.

10   Q.  You've never spoken to her, right?

11   A.  I have not.

12   Q.  You've never met her?

13   A.  I have not.

14   Q.  The reference that you gave earlier about "your wife being

15   there," that came from Jeffrey Epstein, right?

16   A.  Yes.

17   Q.  On a phone call you had with Jeffrey Epstein?

18   A.  That's correct.

19   Q.  Did Jeffrey Epstein tell you that he kept secrets from

20   Ghislaine?

21   A.  No, I didn't ever hear that.

22   Q.  Did Jeffrey Epstein tell you that he was dating other women

23   behind Ghislaine's back?

24            MS. POMERANTZ:  Objection, your Honor.

25            MS. MENNINGER:  806, your Honor.

LCAVMAX8                         Swain - cross

 1                THE COURT:  Just a moment.  I need to hear you.  I'm
 2        not tracking.
 3                MS. MENNINGER:  Okay.
 4                (At sidebar)
 5                THE COURT:  Where are we going?
 6                MS. MENNINGER:  Your Honor, once the government
 7        elicits co-conspirator statements under 801(d)(2)(E), under
 8        806, I'm allowed to impeach the declarant as though they were
 9        testifying.  So I'm asking questions about Jeffrey Epstein
10        through this witness, who is the one from whom they elicited
11        the 801(d)(2)(E) statements.  That's what I believe 806
12        provides.
13                THE COURT:  You have a series of questions about
14        things that Epstein didn't tell her?
15                MS. MENNINGER:  Correct.
16                MS. MOE:  Your Honor, this is all a line of argument,
17        they are not questions.  This witness doesn't know anything
18        about it.  I'm not sure what the basis is for trying to impeach
19        Jeffrey Epstein's credibility through this particular witness.
20        It's all argument.
21                THE COURT:  We're not going to do ten --
22                MS. MENNINGER:  No.
23                THE COURT:  We're going to do --
24                MS. MENNINGER:  A handful; three.
25                THE COURT:  Three questions and then move on.

1              (In open court)

2      BY MS. MENNINGER:

3      Q.   Did Jeffrey Epstein tell you on the phone calls with you

4      that he was dating other women behind Ghislaine Maxwell's back?

5      A.   We didn't discuss her in those calls.

6      Q.   Did Mr. Epstein tell you that he manipulated people around

7      him for his own personal gain?

8      A.   No.

9      Q.   When Mr. Epstein talked to you about this trip to New

10     Mexico, it's true that he originally told you that Maria was

11     going to be going on the trip; correct?

12     A.   Would you repeat that?

13     Q.   When Mr. Epstein talked to you about Annie's trip to New

14     Mexico, he originally told you that Maria was going to go on

15     the trip; correct?

16     A.   No.

17     Q.   Because you never talked to Ghislaine Maxwell, you don't

18     know what she knew about this trip; correct?

19              MS. POMERANTZ:  Objection, your Honor.

20              I think it's a bit confusing.

21              THE COURT:  Sustained.

22     Q.   You've never talked to Ms. Maxwell about the New Mexico

23     trip before or after; correct?

24     A.   I have never spoken with her.

25     Q.   But you don't know whether she was aware that Annie was

LCAVMAX8                          Swain - cross

1   coming on this trip; correct?

2   A.   She picked her up at the airport.

3   Q.   I'm sorry, what?

4   A.   I think she picked her up at the airport.

5   Q.   Is that what Annie told you?

6   A.   I thought that's what happened.

7   Q.   Not a driver?

8   A.   I really don't know.  It was just my -- that's what I

9   thought.

10  Q.   Okay.  So you don't know what Ghislaine Maxwell knew about

11  Annie coming or going, right?

12  A.   I don't.

13  Q.   Regarding the trip to Thailand, you personally observed

14  Annie working to earn money for that trip; correct?

15  A.   Yes.

16  Q.   And Annie had been on trips before; correct?

17  A.   Yes.

18  Q.   She had been to Mexico?

19  A.   Yes.

20  Q.   You, yourself, were on a trip to Europe when she was in

21  Thailand; correct?

22  A.   Correct.

23  Q.   Annie did, in fact, go to an Ivy League college, right?

24  A.   She did.

25  Q.   And Mr. Epstein didn't pay for that college; correct?

LCAVMAX8

```
 1   A.  No.

 2           MS. MENNINGER:  If I could have one moment, your

 3   Honor.

 4           THE COURT:  You may.

 5           (Counsel conferred)

 6   BY MS. MENNINGER:

 7   Q.  In that summer when Annie was in Thailand, you were in

 8   Germany; correct?

 9   A.  Yes, I was.

10           MS. MENNINGER:  No further questions.

11           Thank you, your Honor.

12           THE COURT:  Ms. Pomerantz?

13           MS. POMERANTZ:  No redirect.

14           THE COURT:  All right.  Ms. Swain, thank you.

15           You are excused.  You may step down.

16           (Witness excused)

17           Ms. Pomerantz?  Ms. Moe?

18           MS. MOE:  Yes, your Honor.  The government rests.

19           THE COURT:  Okay.  Thank you.

20           Let me briefly speak to counsel.

21           (Continued on next page)

22

23

24

25
```

LCAVMAX8

1              (At sidebar)

2              THE COURT:  I should have clarified this before, but I

3      will excuse the jury.  I will excuse the jury with

4      instructions; correct?

5              MS. MOE:  Yes.  Thank you, your Honor.

6              THE COURT:  You still anticipate a defense case?

7              MR. EVERDELL:  Yes.

8              THE COURT:  So I will say I want to give them -- I'm

9      going to go over my instructions.  I'm going to say no

10     discussions, keep an open mind.  The government has rested.

11     The defense case will be next.  Okay with that?

12             MS. STERNHEIM:  Perfect.

13             MS. MOE:  Thank you.

14             MR. EVERDELL:  Thank you, your Honor.

15             THE COURT:  And then I'll hear the Rule 29 motion.

16             MS. STERNHEIM:  Yes.

17             MR. EVERDELL:  Yes.

18             (Continued on next page)

19

20

21

22

23

24

25

LCAVMAX8

1        (In open court)

2        THE COURT:  Members of the jury, as you've heard, the

3   government has rested.  We're going to break a little bit early

4   today and resume, as I said, on Thursday at our normal time,

5   with the next phase of the case, which is the defense case.

6        Because we're going to be apart for five days, I'm

7   going to just take a minute to carefully remind you of all my

8   instructions.  And I know that you know this, but it's

9   important, since we're moving to the next phase of the case.

10        No consumption of any kind of media or information

11   through any means about the case.  No discussions with each

12   other or anyone else about the case or anyone involved in the

13   case.  No communications with anyone through any means about

14   the case.  And although the government has rested, it's

15   important to keep an open mind, as I've said, until we get to

16   the next stage of the case and through to the later stages

17   until you begin your deliberations.

18        With that, I bid you a happy Friday and a good

19   weekend, a long weekend for us.  I will see you Thursday.

20   We'll start promptly at 9:30 on Thursday morning.

21        Thank you so much.

22        (Jury excused)

23        THE COURT:  Matters to take up.

24        MR. EVERDELL:  Your Honor, the defense has an

25   application.

LCAVMAX8

1              THE COURT:  Go ahead, Mr. Everdell.

2              Do you want to come to the podium?

3              MR. EVERDELL:  Yes, please.

4              Your Honor, the defense moves at this time for a

5    judgment of acquittal under Rule 29(a) on the grounds that the

6    evidence elicited by the government in its case-in-chief is

7    insufficient to establish each element of the offenses charged

8    in the S2 indictment beyond a reasonable doubt.

9              THE COURT:  Move as to all counts?

10             MR. EVERDELL:  Move as to all counts, your Honor.

11             THE COURT:  Go ahead.

12             MR. EVERDELL:  Your Honor, we do make this application

13   with respect to every count in the S2 indictment; but for

14   purposes of today, I'm going to confine my comments to address

15   specifically Counts One and Two.

16             THE COURT:  Okay.

17             MR. EVERDELL:  Which are the enticement counts,

18   conspiracy, and the substantive enticement counts.

19             Your Honor, as the Court is aware, those counts depend

20   on the testimony of Jane.

21             To convict Ms. Maxwell, the government must show that

22   Ms. Maxwell persuaded or enticed Jane to travel to New York to

23   engage in sex acts that would violate New York law and the

24   specific law that's cited in the indictment.  There is no

25   evidence in the record that Ms. Maxwell or anyone else who

LCAVMAX8

allegedly participated in this conspiracy persuaded, induced, or enticed Jane to travel to New York to engage in illegal sexual activity.

Your Honor, these words "persuade, induce, entice," these are words of causation.  And I am now quoting from *U.S. v. Broxmeyer*, 616 F.3d 120 (2d Cir. 2010), and that's at page 125.  This is a decision that addresses 2251, not 2242, but that statute has the same words "persuade, induce, entice," and it's interpreting in the same way.

And *Broxmeyer* says that these are words of causation, which means they have to bring about an effect.  There has to be something done by the defendant to bring about an effect.  And in discussing the dictionary definitions, these words are usually given their dictionary definitions, but they do discuss in this opinion what those typically are.  And they quote from the Random House Dictionary.

"Induce" means, according to the dictionary, to bring about, produce, or cause.  "Entice" means to draw on by exciting hope or desire or allure.  And "persuade" means to prevail on a person to do something as by advising, urging, etc., to induce to believe or convince.

So, again, these are words of causation.

Now, the only testimony that we have in the record that relates in any way to Ms. Maxwell taking part in Jane's travel to New York is that Jane testified as to the following

LCAVMAX8

1    three points.  And I will refer the Court to the record.  I'm

2    looking at pages 316, line 2, to page 317, line 1; pages 324

3    line 14, to 324, line 20; and pages 323, line 23, to page 324,

4    line 11.

5         In those transcript paragraphs, this is Jane's

6    testimony, she says that three things occur with respect to

7    Ms. Maxwell and her travel:

8         First, she says that she, Jane, traveled with

9    Mr. Epstein and Ms. Maxwell to various locations, including New

10   York.

11        Second, she says that Ms. Maxwell sometimes assisted

12   in making the travel arrangements.  There's really like a one

13   line mention of that.

14        And third, she recounts an anecdote that on one

15   occasion when she was already in New York, she called

16   someone -- it's unclear who -- and she was said, quote/unquote,

17   freaking out because she couldn't get on her plane going back

18   to Palm Beach because she was only 15 at the time and didn't

19   have any identification.  And she says that at some point

20   "Ghislaine made it happen for me," meaning that she helped her

21   get on that flight.

22        That's the only testimony we have and only evidence we

23   have in the record that talks about Ms. Maxwell's involvement

24   in enticement or encouraging travel to New York.  So with

25   respect to each three, your Honor, they are insufficient.

LCAVMAX8

1          First, we can dispense with the incident where
2    allegedly Ms. Maxwell got on the phone and somehow arranged for
3    Jane to get back to Palm Beach, because that is a flight going
4    back to Palm Beach; that is not enticing someone to fly to New
5    York for the purposes of breaking New York law and engaging in
6    illegal sex acts.  There's no enticement as would be illegal
7    under the statute there because this is a return trip.

8          As to the first, simply traveling with someone is not
9    enticing; that's just being present on the plane, that's not
10   causing an effect, that's being present.  That does not
11   qualify.  So simply being on the plane traveling does not
12   establish persuasion, inducement, or enticement.

13         And as to the last, occasionally arranging travel, if
14   that is to be believed, is not enticement either.  Jane's
15   testimony, if you look at those transcript cites, your Honor,
16   is that her travel arrangements were typically made by Jeffrey
17   Epstein's office, and that Ghislaine Maxwell occasionally
18   helped out.

19         There is no testimony whatsoever that Ghislaine
20   Maxwell encouraged her to travel.  There is no testimony that
21   she tried to convince her to travel anywhere, much less New
22   York, or advised her to travel.  We don't even have testimony
23   that Ghislaine Maxwell offered to arrange the travel.

24         All it says is that she occasionally arranged.  And
25   maybe it's the office that called -- or that arranged with

LCAVMAX8

Ghislaine to have Ghislaine arrange the travel.  But she didn't

even offer it herself.  It seems like the best we have on this

record is that she performed a ministerial function of

arranging the travel.  But that is not doing something, a

cause, that produces an effect; that is simply doing paperwork.

That is not what the statute was designed to criminalize.

There has to be some effort to entice or persuade or induce

somebody to travel, which we do not have on this record.

        And one case I would direct your Honor to is *United*

*States v. Joseph*, 542 F.3d 13 (2d Cir. 2008).  In that case,

the Second Circuit reversed the conviction for enticement under

this same statute, 2422, because the jury was instructed that

they could convict if they found the defendant made the

possibility of a sex act "more appealing," as if that was

enough to entice, if they made it more appealing.

        The court held that that was not enough to establish

persuasion, inducement, enticement under the statute.  And here

we don't even have that.  We just have her performing what a

travel agent would do, which is arranging travel plans.  And

that is not enough, under the wording of the statute, to prove

enticement.  And there is nothing also from any member of the

conspiracy on that same count, your Honor, doing anything to

arrange or induce the travel.

        So I would argue, your Honor, that on the record we

have before us, there is insufficient evidence to establish

LCAVMAX8

1    Counts One and Two, the enticement conspiracy and substantive

2    counts.

3              THE COURT:  All right.  Thank you.

4              Mr. Rohrbach.

5              MR. ROHRBACH:  If I may take the podium, your Honor.

6              Your Honor, the Court should deny the defendant's

7    motion as to Counts One and Two.

8              Jane was not in New York by accident.  In fact,

9    there's no nonsexualized purpose that's been articulated at

10   this point for Jane to travel to New York.

11             Mr. Everdell takes a very narrow view on the nexus

12   that's required between enticement, inducement, and the other

13   verbs that are in the enticement statute and the travel itself.

14   The jury could readily conclude, as the government has argued,

15   that all of Jane's travel to New York was in the context of the

16   relationship that the defendant and Epstein built with Jane.

17   That meets each of the verbs in the statute.

18             Jane's testimony is that the defendant played on her

19   hopes and dreams to make her feel special, seen, and cared for.

20   "Enticement" is defined as using hope and desire.  So the

21   defendant was playing on Jane's hopes and desires in order to

22   get her into this relationship over a multi-year period in

23   which she was traveling with the defendant.

24             Similarly, persuasion, the defendant testified that --

25   sorry, Jane testified that the defendant developed a friendship

LCAVMAX8

1    with her, talked about sex with her, bought her gifts, took her

2    on field trips.  The defendant -- Jane's testimony, in

3    combination with Dr. Rocchio's testimony, would lead the jury

4    to concludes that the defendant was in a relationship of

5    coercive control with Jane, which would have allowed her to

6    exercise control to get Jane to continue to travel to New York

7    where, Jane's testimony is, the defendant personally engaged in

8    sexual abuse of Jane.  So those are plenty of reasons why the

9    enticement statute is met as to Jane herself, in light of the

10   course of conduct the defendant engaged in with Jane over many

11   years.

12           But even if the Court didn't readily conclude that

13   that statute was met, the defendant is also charged under an

14   aiding and abetting theory.  And there can be no serious

15   argument that Jeffrey Epstein didn't entice, persuade, induce,

16   and coerce Jane to travel to New York.  And given that fact,

17   it's quite obvious that the defendant was aware of that plan,

18   given that she was on the plane and in the room in New York

19   when the abuse was happening.  And she took steps over multiple

20   years to knowingly associate herself with it and to facilitate

21   it.  So that, again, is a separate theory by which the statute

22   is met.

23           And finally, here, I would just remind your Honor, as

24   I'm sure your Honor is already aware, the standard here is

25   remarkably low.  All that is required is that taking all

LCAVMAX8

 1    inferences in the government's favor, the jury could

 2    conclude -- they could find a conviction on Counts One and Two.

 3    That bar is surmounted very easily by just the testimony of

 4    Jane alone, and I have not even discussed other corroborating

 5    testimony that would support that conclusion.

 6            THE COURT:  All right.  Thank you.

 7            Any final points, Mr. Everdell?

 8            MR. EVERDELL:  Just two, your Honor.

 9            THE COURT:  Microphone, please.

10            MR. EVERDELL:  I can do it from here.

11            THE COURT:  That's fine.

12            MR. EVERDELL:  The point about Mr. Epstein's actions I

13    won't leave alone; but, of course, only applies to the

14    conspiracy count.  Obviously Count Two is the substantive

15    count.

16            THE COURT:  You'll address aiding and abetting?

17            MR. EVERDELL:  Well, yes, aiding and abetting.  So I

18    don't see any testimony of Ghislaine Maxwell aiding and

19    abetting Jeffrey Epstein, enticing her to travel to New York.

20    There's remarkably little testimony about that action, and that

21    is what the subject of the substantive count is, right.  You

22    have to show that Ms. Maxwell enticed Jane to travel to New

23    York with the intent knowing that when she got there, that

24    statute, that New York statute that's cited in the indictment,

25    would be violated.

LCAVMAX8

1          And if it's going to be on an aiding and abetting

2     theory, then she has to have aided Jeffrey Epstein or some

3     other person to have done the same thing.  And I don't see any

4     evidence in the record about Jeffrey Epstein enticing her to

5     travel to New York.  All we heard of was travel to New York.

6     And there could be any number of reasons why she traveled to

7     New York.  But there is no hard evidence that there was

8     enticement to travel, convincing her to travel for that

9     purpose.  So I don't think either on an aiding and abetting

10    theory, it also doesn't work.

11         The only other point I would make, your Honor, is that

12    I want to be clear on the record that we are making this

13    application as to all counts, although my comments are reserved

14    for the first two counts.

15         THE COURT:  Understood.  All right.  Thank you.

16         The motions are denied.

17         What do we need to discuss before Thursday?

18         MS. MOE:  Your Honor, we just wanted to confirm on the

19    record that we would be receiving defense exhibits and Rule 26

20    material today.

21         THE COURT:  Counsel?

22         MR. PAGLIUCA:  We should have those materials today,

23    your Honor.  There's a little bit of fluidity in terms of the

24    witnesses, and perhaps even if there are Rule 26 materials,

25    frankly, which I don't suspect that there are.

LCAVMAX8

1          THE COURT:  Okay.

2          MR. PAGLIUCA:  But the problem is, you know, we have a

3     larger list that we've needed to winnow down, given the fact

4     that the government has rested early and has not called a

5     significant number of witnesses.

6          We also have the problem of travel for this period of

7     time with some of our witnesses.  And we're confirming who's

8     available.  And we have been confirming who's available and

9     who's not available and when.  And there may be the need to

10    substitute a different witness on the same topic.

11         But what I expect to be able to do tonight is to send

12    the government what we believe our good-faith list is.  And

13    there will be some, I expect, adjustment to that as we move

14    along.  But that's our anticipated goal here, your Honor.

15         MS. MOE:  Your Honor, the government warned the

16    defense multiple times this week that we would rest.  The Court

17    ordered the defense to produce these materials at the

18    conclusion of the government's case, long before the trial.

19    And we submit the defense should do just that.

20         With respect to Rule 26 materials, especially given

21    that there are experts in this case, there should be Rule 26

22    materials, including communications with experts, things like

23    contracts and payment materials.  And if there were going to be

24    defense witnesses, any notes of interviews with those witnesses

25    are governed by Rule 26 and are subject to disclosure today.

LCAVMAX8

1          So we would ask the defense to comply with the Court's

2     order, produce those materials today, along with exhibits, a

3     list of witnesses, and an order of the first witnesses.

4          THE COURT:  Yes.  You'll do that.

5          MR. PAGLIUCA:  I think I said we were going to do

6     that, your Honor.

7          THE COURT:  Right.  To the extent you think one

8     witness might be substituted for a different witness, you need

9     to alert the government in your list today who the other

10    witness might be and make disclosures accordingly.

11         MR. PAGLIUCA:  We will do what we are supposed to do;

12    and we will do our best at it, your Honor.

13         THE COURT:  Okay.  You have time, since we're not

14    sitting again till Thursday, to arrange travel.  We've known

15    for some time the government would -- at least a few days, the

16    government would rest this week; and we've known about my

17    scheduling issues for Monday, Tuesday, Wednesday.  So we're not

18    at a moment of surprise at this point.  I get that they've

19    shaved witnesses and that might require -- it's not me.

20         MS. MOE:  It's not me, your Honor.

21         MR. PAGLIUCA:  It's not me, your Honor.

22         THE COURT:  Whoa.  That's weird.  Khalilah?

23         It's the ghost of Friday, I guess.

24         So I think you're in a position to do your full

25    disclosures.  To the extent there may be a substitute witness,

LCAVMAX8

1    you're in a position at this point to make those disclosures as

2    if it is that person, so I did expect a full disclosure.

3            What is the defense's anticipation as to length of

4    case?

5            MR. PAGLIUCA:  I would say -- I'm going to guess no

6    more than four days, more likely two to three, your Honor.

7            THE COURT:  Okay.  All right.

8            So I think then -- and then we should talk about the

9    timing of the charge conference.  Have you discussed that

10   further?  You kept promising to discuss it.

11           MS. MOE:  Yes, your Honor.

12           We haven't conferred with the defense about that.  We

13   continue to just defer to the Court's preference on timing.

14           I think if the defense case is two to three days, then

15   a charge conference at the conclusion of that would fit with

16   the Court's timing.  We're also happy to do that earlier.  We

17   don't have a preference as to the sequencing there.

18           THE COURT:  Let me just look at the calendar.

19           Go ahead, Ms. Sternheim.

20           MS. STERNHEIM:  I was just going to suggest that we

21   utilize the Saturday that the Court said would be available.

22   Even if we had more of a case, I think we could accomplish

23   that, if the Court is still amenable.

24           THE COURT:  Okay.  That's fine with me.

25           MS. MOE:  No objection to that, your Honor.

LCAVMAX8

| | |
|---|---|
| 1 | THE COURT:  All right.  So why don't we schedule the |
| 2 | charging conference for Saturday the 18th.  I will confirm with |
| 3 | the relevant court administrative staff and the marshal that we |
| 4 | can do that and ensure public access and the like, of course, |
| 5 | Ms. Maxwell's presence.  But, as I said, my assumption is we |
| 6 | can do that.  So I will get you the charge sometime in advance |
| 7 | of the 18th. |
| 8 | MR. EVERDELL:  Your Honor, one other matter to take |
| 9 | up. |
| 10 | Looking ahead to the defense case -- and we have been |
| 11 | in contact with a number of our potential witnesses, and we are |
| 12 | already getting requests, and I think these are valid |
| 13 | requests -- that at least some of them testify anonymously -- |
| 14 | THE COURT:  I think your mic went out. |
| 15 | MR. EVERDELL:  Maybe it's my mic that's the problem, |
| 16 | your Honor.  It's making noise. |
| 17 | MS. STERNHEIM:  Try this one. |
| 18 | MR. EVERDELL:  Is that better? |
| 19 | THE COURT:  It is. |
| 20 | MR. EVERDELL:  Okay.  So, your Honor, as I was saying, |
| 21 | we've been in contact with some of our witnesses, and we are |
| 22 | already getting what I think are valid requests that these |
| 23 | witnesses testify anonymously or under some sort of protection, |
| 24 | name protection, whether that's a pseudonym or a first name, we |
| 25 | have to work that out. |

LCAVMAX8

1          I think given the protections that the government has

2     sought for their witnesses and that they've received for their

3     witnesses, we all know that this case has gotten a lot of

4     attention and that people who are testifying here might get a

5     lot of unwanted attention, especially if they are testifying on

6     behalf of Ms. Maxwell.  And they would like to be able to do

7     this, at least some of them, with some sort of anonymous

8     protection.

9          And, your Honor, there's, I think, one in particular

10    that maybe we can be heard at sidebar on, but --

11         THE COURT:  Here's what I want to say:  You should

12    confer.  Identify specifically who you're talking about and the

13    asserted reasons.  You'll let me know if you come to agreement

14    or disagree and, in either case, you'll put -- certainly if you

15    disagree, you'll put forward your disagreement.  To the extent

16    you agree, you'll put forward the rationale and authoritative

17    support for the proposition.

18         MR. EVERDELL:  Absolutely, your Honor.

19         THE COURT:  So timing on that?

20         MS. MOE:  Your Honor, this is the first we're hearing

21    of this.  So I'm not aware of how many their witnesses are or

22    what the issues are, but we'd be happy to confer with defense

23    about that and submit briefing on it during the break over the

24    next few days.  I think the amount of time we'll need to

25    examine and brief the issue depends on how many folks we're

LCAVMAX8

 1   talking about.

 2          MR. EVERDELL:  Your Honor, if I can make a suggestion,

 3   I think it makes the most sense to do this after we have

 4   disclosed the witness list and then we can confer.

 5          THE COURT:  Right.  So do that.  And then confer and

 6   then you tell me, Mr. Everdell, when would you like to put

 7   in --

 8          MR. EVERDELL:  One moment, your Honor.

 9          I think if we can do it by Monday, that would be fine

10   for the defense, if that works for the government.

11          THE COURT:  So Monday.  If you're in agreement, you'll

12   put in a submission.  If you're in disagreement, the defense

13   will move on Monday and I'll hear from the government on --

14          MS. MOE:  Wednesday, your Honor?

15          THE COURT:  So I suppose we might be looking at this

16   application with respect to witnesses on Thursday.

17          MS. MOE:  Yes, your Honor.

18          If I could just have one moment to confer on timing.

19          THE COURT:  Yes.

20          MS. MOE:  Your Honor, would Wednesday at noon be

21   acceptable?  If the Court would like additional time --

22          THE COURT:  That's fine.

23          MR. EVERDELL:  Your Honor, I'm sorry to do this, but I

24   think the concern is high enough among some of these witnesses

25   that -- you know, that they need an answer on this issue sooner

LCAVMAX8

1    rather than later.

2           THE COURT:  Well, then it should have been raised

3    sooner rather than later.  You're asking for Monday; they can

4    have to noon on Wednesday.  I'll then have the papers briefed

5    by noon on Wednesday.

6           MR. EVERDELL:  Okay.  We can also back up the

7    schedule, your Honor.  We can have it done by -- we'll do it

8    Sunday.  And then if that backs it up for a day, that will make

9    a difference for the defense, your Honor, if we have our papers

10   Sunday.

11          THE COURT:  Okay.  Sunday to Tuesday?

12          MS. MOE:  Yes, your Honor.

13          MS. STERNHEIM:  Thank you.

14          THE COURT:  To be clear, I don't imagine you'll get

15   resolution from me until --

16          MR. EVERDELL:  I understand.

17          THE COURT:  -- Wednesday.

18          MR. EVERDELL:  Yes, I understand, your Honor.

19          THE COURT:  And I can't guarantee what time that will

20   be.

21          MR. EVERDELL:  Yes.  I understand.

22          THE COURT:  And again, if this is a significant issue,

23   it should have been raised earlier if you wanted earlier

24   resolution.  You're looking at Wednesday evening, at the

25   earliest, resolution.

LCAVMAX8

1          MR. EVERDELL:  Yes, your Honor.  I think the conferral
2     should work out.  I'm confident we can reach some agreement on
3     this.
4          THE COURT:  That's fine.  And authority and support.
5     Obviously I was not -- I broke no ground in permitting
6     anonymity with respect to the witnesses who have testified.  As
7     I said, that that ruling, that's well-tread territory.  Even if
8     there's agreement, I would look for authority to make sure that
9     it's permissible.
10          MR. EVERDELL:  Understood, your Honor.
11          MS. MOE:  Yes, your Honor.  We'll look into the issue.
12     I don't know who the witnesses are, what the basis would be,
13     but we'll thoroughly examine it and make sure to apprise the
14     Court whether there's a basis or not.  We'll certainly address
15     that in our briefing.
16          With respect to those defense witnesses or, I should
17     say, all of the defense witnesses, we just want to confirm that
18     they will also be subject to Rule 615, your Honor.
19          MR. EVERDELL:  None of them have any plans to stay in
20     the courtroom, your Honor, as far as we know.  They are going
21     to be in and out.
22          THE COURT:  Okay.
23          MS. MOE:  Thank you, your Honor.
24          THE COURT:  Okay.  Yes.
25          MS. MENNINGER:  Very briefly, your Honor.  This is

LCAVMAX8

1    something I've conferred with the government about a few times,

2    including as of the last three days, I think once a day.

3              With respect to defense Exhibits J-8/9 and Defense

4    Exhibit J-15 --

5              THE COURT:  Oddly, I remember them.

6              MS. MENNINGER:  We all do.  And I've been asking

7    for -- I submitted it with redactions that I thought were

8    appropriate.  The government has said several times that they

9    thought they might have one or two more redactions.  I've been

10   asking for those.  I believe those were admitted in evidence a

11   week ago Wednesday, so nine days ago.

12             I think that they should be made publicly available.

13   The government has said, Well, let's do it next week, when

14   we're doing videos and things like that.

15             Frankly, I think the time for giving more redactions

16   has come and gone.  And if they have any more, I'd ask that

17   they submit them to the Court by this evening so the Court can

18   rule on those additional redactions.  Because I submitted them

19   with redactions in the first place, and I think I've been

20   getting requests from the media for those exhibits.  I

21   obviously don't respond to the press, but I think it's an

22   indicia that they are interested in making whatever is going to

23   be publicly available happen sooner rather than later.

24             MS. MOE:  Your Honor, I spoke with Ms. Sternheim this

25   morning about all the pending redaction issues.  There are a

LCAVMAX8

```
 1    number of exhibits, both defense exhibits and government

 2    exhibits, that need additional redactions.  And we agreed over

 3    the break we would work diligently to resolve the full slate of

 4    pending redactions issues.  We don't understand the particular

 5    urgency with respect to these exhibits.

 6             Ms. Menninger is right, that she did email the

 7    government last night in the evening while, as the Court is

 8    aware, we were tending to other matters.  I don't understand

 9    the particular urgency with respect to these exhibits.  And

10    again, we conferred with the defense this morning to confirm

11    they would resolve all the pending redaction issues over the

12    weekend.  That seems entirely reasonable, given how many

13    redaction issues we'll be resolving.

14             We're still waiting to hear from the defense on a

15    number of redactions and we'll work together on that issue.  I

16    don't see the need for a fire drill redaction resolution this

17    evening; and so I think the proposal we discussed this morning

18    is reasonable.  We're going to get those issued resolved in

19    full.

20             THE COURT:  We'll get all of that done this weekend.

21    Thank you.

22             MS. MOE:  Thank you, your Honor.

23             THE COURT:  The attorney-client privilege issue.

24             MS. MENNINGER:  Your Honor, I think we very well may

25    be able to reach some type of stipulation, as your Honor
```

LCAVMAX8

1    suggested.  I think in the press of business over the last 24

2    hours, that has not yet been discussed between the two sides.

3              MS. MOE:  That's correct, your Honor.

4              We haven't had a chance to confer about that issue.

5    We have begun discussing that internally and are thinking

6    through that carefully.  We're not in a position to make a

7    representation about our position at this juncture, but that's

8    very much top of mind and we'll be working diligently on that

9    issue over the break.

10             THE COURT:  Okay.

11             MS. MENNINGER:  And just as a preview, your Honor,

12   there may be some others like that.  As your Honor is aware,

13   things came up during the course of testimony, and we will

14   confer with the government about that with respect to other

15   attorneys as well.

16             MS. MOE:  I'm sorry, your Honor.  I'm not sure I'm

17   following that.

18             MS. MENNINGER:  There are other matters that may give

19   rise to the need for attorney testimony or probably more likely

20   a stipulation about similar issues.  And we would like to

21   confer with the government first before briefing them.  But I

22   wouldn't -- our witness list may have other attorneys' names on

23   them that have an asterisk by it saying subject to briefing and

24   approval by the Court.  I don't want anyone to believe we

25   haven't understood the Court's prior statements on this topic.

LCAVMAX8

```
 1              It would be something we speak with the government
 2      about and brief if we believe that the testimony elicited
 3      during the government's case would give rise to such testimony
 4      from any other attorney.
 5              MS. MOE:  Yes, your Honor.
 6              We'd be happy to confer with the defense about any of
 7      these issues.
 8              Our view remains the same as it has been throughout
 9      this case, which is that there's no basis for calling
10      plaintiffs' attorneys as defense witnesses.  There's no basis
11      for waiving attorney-client privilege.  And the Court has been
12      very clear that that issue should be briefed in full before any
13      witnesses along those lines should be called.  But, again,
14      we're happy to confer with the defense about that.
15              THE COURT:  Okay.  You'll confer.
16              The one that's been teed up is where there's an
17      email --
18              MS. MOE:  Yes, your Honor.
19              THE COURT:  -- between you all and which it appears,
20      at least on the face of the email, that counsel made a
21      disclosure.
22              MS. MENNINGER:  That's similar to other issues, your
23      Honor.
24              THE COURT:  It's in that context that I've encouraged
25      a stipulation as to what was relayed to the government.
```

LCAVMAX8

```
1    Because I think -- as I said, I think that doesn't -- there's a

2    basis for it in the email; it doesn't require wading into

3    attorney-client privilege issues; and I think it gives the

4    defense what it's looking for, as would an inquiry, which would

5    be limited, into what the attorney said to the client.  I

6    haven't come to rest on how that's resolved, but I've indicated

7    I think it's a close call in light of the email I've seen.

8              MS. MENNINGER:  Yes, your Honor.

9              THE COURT:  So you'll confer.

10             MS. MENNINGER:  Yes, your Honor.

11             MS. MOE:  Thank you, your Honor.

12             THE COURT:  I have briefing currently on that issue.

13   So if you don't reach resolution, then I'll either -- I'll

14   resolve or tell you what additional steps I need in order to

15   resolve.  If there are other issues that are similar, we should

16   probably talk about timing for briefing --

17             MS. MOE:  Yes, your Honor.

18             THE COURT:  -- following conferral.

19             MS. MOE:  Yes, your Honor.

20             Is there a particular date upon which the Court would

21   like to receive briefing from the parties about any additional

22   privilege-related issues?

23             THE COURT:  I'm fine for it to be discussed and then

24   fully briefed again sometime on Wednesday, if that works.

25             MS. MOE:  Yes, your Honor.
```

LCAVMAX8

1              THE COURT:  Okay.

2              MS. MENNINGER:  I think so, your Honor.

3              THE COURT:  All right.  I'm just looking at the

4    calendar.  The defense case begins on the 16th.  We have the

5    16th, the 17th.  We'll do the charging conference on the 18th,

6    if the defense case continues into the next week.

7              But let me just encourage -- given this break that

8    we're going on and -- here's just the one thing I want to say.

9    I'll hear from you, but I want -- if the defense were to rest

10   on the 17th, for example, then I will expect closings, absent a

11   rebuttal case, on the 20th.  Everybody agree with that?

12             MS. STERNHEIM:  Yes, Judge.

13             But I think it's highly unlikely that we will complete

14   it on Friday, and I would ask the Court to take that into

15   consideration.

16             THE COURT:  Okay.  So let's say you rest on the 20th,

17   Ms. Sternheim.

18             MS. STERNHEIM:  That is our anticipation.

19             THE COURT:  Okay.  So then we would anticipate

20   closings on the 21st; correct?

21             MS. STERNHEIM:  Judge, we would like to at least

22   discuss our concerns about a jury deliberating one day prior to

23   a Christmas holiday.  I think that given that, as was

24   Thanksgiving, Christmas this year is particularly celebratory

25   since people were not able to do that last year.

LCAVMAX8

```
1              Our concern is that the jury might feel we don't want
2       to come back and would rush to judgment in a case that we know
3       they were prepared to be here until the middle of January.  And
4       they are already getting some time off.  They may be
5       disinclined to want to come back.  And that could inure to the
6       disadvantage of both parties, I understand.
7              But I think we would not want to be in a position
8       where the jury basically had one day prior to Christmas
9       holiday, and I would ask the Court to be mindful of that, as I
10      am sure you are.  And that was one of the reasons why early on
11      when we were hopeful that we could begin this case earlier
12      because of our concern that it was going to bump up, now
13      clearly we are way ahead of what the schedule is.  But I would
14      ask the Court to take into consideration that concern that we
15      have.
16             THE COURT:  Okay.  Ms. Moe?
17             MS. MOE:  Your Honor, with respect to the timing of
18      deliberations, I think the request on the timing of
19      deliberations is, I think, at best, premature because we don't
20      know how long the defense case will be; and so I don't think
21      the Court needs to reach that now.
22             But as a preview, if we end up in a situation in which
23      the defense rests during the week of the 20th, I think we
24      should be respectful of the jury's time.  There's no reason for
25      the jury not to be permitted to deliberate.  I think it would
```

LCAVMAX8

1    be a hardship to keep them indefinitely and have them come back

2    and wait a week to deliberate on a case that's ready to be

3    adjudicated.

4            So, again, I don't think the Court needs to reach this

5    issue given the timing; but if the jury was prepared to sit

6    this entire week and hear evidence, there's no reason they

7    couldn't also be here and be deliberating.  I think we should

8    be respectful of the jury's time.  And dismissing them for yet

9    another extremely lengthy break, I think, runs contrary to the

10   efficient way the Court has run this trial.  And if this case

11   can be resolved --

12           THE COURT:  Well, thank you.  That's not what they

13   usually call it.

14           MS. MOE:  And I think, you know, the best way to be

15   respectful of the jurors' time is to let them have the case.

16           THE COURT:  Okay.  It's premature.  We'll see where we

17   are.  My thinking was -- I think we'll see where we are.

18           I suppose my point was since we're doing the charging

19   conference on the 18th, I do want counsel to be prepared to

20   turn to closings the day following the completion of the

21   evidence.  We'll see where that is and the like.  But I don't

22   want to keep starting and stopping.  So we'll use our time, but

23   I'm mindful of your concern, Ms. Sternheim, and we'll see where

24   we are.

25           MS. STERNHEIM:  I would just like to add that we

LCAVMAX8

1     anticipate that our case will run into the Monday.  The

2     government has already noticed a rebuttal case.  That means

3     that the closings would not be until Tuesday, and the charge

4     may very well not be until Wednesday.  Then we go into two days

5     off.  To put the jury in a posture where they have basically

6     four hours to deliberate before the holiday season begins is

7     very dangerous and that's why I'm asking the Court to consider

8     that.

9                 THE COURT:  I do understand the concern.  And we'll

10    see where we are.

11                My admonishment is to -- what I don't want to hear is

12    if the evidence closes on Monday, that you don't want to do

13    your closings until the 27th.  That's definitely not going to

14    happen.

15                MS. STERNHEIM:  I am not saying that, Judge.  I think

16    we all understand what the concerns are.  And we will be very

17    judicious in our attempt to complete this timely.  But that

18    being said, there is still logistical things that, in our

19    estimation, will push this beyond Tuesday, and then we have the

20    situation of holiday.  But we've raised it with the Court.

21    I think the parties are mindful and we're not doing anything to

22    delay.  We just are concerned about this jury having ample

23    time, without any external pressures, to deliberate.

24                MS. MOE:  Yes, your Honor.

25                Just to provide the Court with some additional

LCAVMAX8

1  information about the rebuttal case, we have noticed -- we have

2  noticed a potential rebuttal expert.  Whether or not we end up

3  calling the expert we can't determine without seeing the

4  defense case first.  But that's the full scope of what we've

5  noticed at this juncture.  And I'm not sure whether or not we

6  would call that expert.  It would depend entirely on the

7  defense case.  So that's the scope of what we're discussing.

8       Again, with respect to timing, we'll take it as it

9  comes.  And I think the Court has noted that this issue is

10  premature, but we just wanted to assure the Court the

11  government will be prepared to close the day after the

12  conclusion of the defense case and would very much like to move

13  forward.

14       With respect to closings, we did want to just preview

15  that -- and we plan to work with the defense on this issue.

16  But we wanted to start thinking ahead the mechanics of how

17  closings would work, given the fact that there are sealed

18  exhibits and some public exhibits.

19       And so we've started thinking through that, but wanted

20  to just flag that that's a mechanical issue that we'll want to

21  work through with the defense so that everyone has an

22  opportunity to present what they need to without any hiccups,

23  and also so that the jury can see exhibits without them being

24  shown publicly.  And so we'll work with the defense on that

25  choreography to make sure that that runs smoothly.  And we'll

LCAVMAX8

1    raise with the Court when we return from the break, I think,

2    any issues that we need to flag about those mechanics so that

3    it goes smoothly, if that's all right, your Honor.

4              THE COURT:  Yes, of course.

5              And to the extent the AV folks can be helpful if

6    there's something you want to propose, I'm sure that they'll

7    make themselves available for that.

8              MS. MOE:  Thank you, your Honor.

9              THE COURT:  Anything else?

10             MS. MOE:  Not from the government, your Honor.

11             THE COURT:  Anything else?

12             MR. EVERDELL:  Nothing from the defense, your Honor.

13             THE COURT:  Okay.

14             So I will see everyone Thursday at 8:45 a.m.

15             MS. MOE:  Thank you, your Honor.

16             (Adjourned to December 16, 2021 at 8:45 a.m.)

17

18

19

20

21

22

23

24

25

1                        INDEX OF EXAMINATION

2    Examination of:                              Page

3     WILLIAM BROWN

4    Direct By Mr. Rohrbach . . . . . . . . . . .2042

5     ANNIE FARMER

6    Direct By Ms. Pomerantz . . . . . . . . . .2049

7    Cross By Ms. Menninger . . . . . . . . . . .2102

8    Redirect By Ms. Pomerantz . . . . . . . . .2213

9     DAVID JAMES MULLIGAN

10   Direct By Ms. Pomerantz . . . . . . . . . .2231

11   Cross By Ms. Sternheim . . . . . . . . . . .2242

12   Redirect By Ms. Pomerantz . . . . . . . . .2245

13    JANICE SWAIN

14   Direct By Ms. Pomerantz . . . . . . . . . .2247

15   Cross By Ms. Menninger . . . . . . . . . . .2259

16

17

18

19

20

21

22

23

24

25

```
 1                    GOVERNMENT EXHIBITS

 2   Exhibit No.                              Received

 3   52A, 52D, 52E, 52F, 52G, and 52H  . . . . . .2040

 4   601   . . . . . . . . . . . . . . . . .2063

 5   603   . . . . . . . . . . . . . . . . .2064

 6   604   . . . . . . . . . . . . . . . . .2066

 7   102   . . . . . . . . . . . . . . . . .2070

 8   103   . . . . . . . . . . . . . . . . .2091

 9                    DEFENDANT EXHIBITS

10   Exhibit No.                              Received

11   AF1   . . . . . . . . . . . . . . . . .2124

12   AF9   . . . . . . . . . . . . . . . . .2168

13   AF-12   . . . . . . . . . . . . . . . .2190

14   AF-14   . . . . . . . . . . . . . . . .2208

15

16

17

18

19

20

21

22

23

24

25
```