LCGVMAX1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
    UNITED STATES OF AMERICA,
3
              v.                          20 CR 330 (AJN)
4
    GHISLAINE MAXWELL,
5
                    Defendant.            Jury Trial
6   ------------------------------x
                                          New York, N.Y.
7                                         December 16, 2021
                                          8:55 a.m.
8
    Before:
9                     HON. ALISON J. NATHAN,

10                                         District Judge

11                          APPEARANCES

12  DAMIAN WILLIAMS
         United States Attorney for the
13       Southern District of New York
    BY:  MAURENE COMEY
14       ALISON MOE
         LARA POMERANTZ
15       ANDREW ROHRBACH
         Assistant United States Attorneys
16
    HADDON MORGAN AND FOREMAN
17       Attorneys for Defendant
    BY:  JEFFREY S. PAGLIUCA
18       LAURA A. MENNINGER
              -and-
19  BOBBI C. STERNHEIM
              -and-
20  COHEN & GRESSER
    BY:  CHRISTIAN R. EVERDELL
21
    Also Present:  Amanda Young, FBI
22                 Paul Byrne, NYPD
                   Sunny Drescher,
23                  Paralegal, U.S. Attorney's Office
                   Ann Lundberg,
24                  Paralegal, Haddon Morgan and Foreman

25

1                    (Trial resumed; jury not present)

2              THE COURT:  All right.  We have a number of issues to

3    take up.  I've gotten letter briefing on several issues over

4    the past few days, including some new issues that came in last

5    night.  I did address the issue of defense witness anonymity by

6    order last night, which will be docketed this morning when

7    docketing puts it up, denying the defense request for anonymity

8    for the reasons indicated.

9              As to the remaining issues, so there's the prior

10   inconsistent statements issue.  I received the letter with the

11   government objections close to 11 p.m. last night.  I haven't

12   had the ability to yet go through all of them, and I haven't

13   heard any responses from the defense.

14             What's the timing of anticipated witnesses here?

15             MR. EVERDELL:  Your Honor, for the witness order?

16             THE COURT:  Well, when might we get to a witness who

17   implicates the prior inconsistent statements?  And I gather

18   there's been some effort to work through stipulation and

19   narrowing.

20             MR. EVERDELL:  Yes, your Honor.

21             There have been some efforts, and I think there's

22   going to be continued efforts there.  I don't think we have a

23   witness until after lunch that is going to implicate the prior

24   inconsistent statements.

25             THE COURT:  Okay.  That may be what we're doing during

LCGVMAX1

1      lunch then.

2                  MR. EVERDELL:  Yes, your Honor.

3                  THE COURT:  I think this is an area ripe for narrowing

4      and stipulation when feasible.

5                  Okay.  Next is the attorney witness issue.  I am

6      prepared to give guidance on that.

7                  Okay.  So I have the defense's letter to call

8      attorneys Jack Scarola, Brad Edwards, and Robert Glassman to

9      testify during the defense case-in-chief.  And I've looked

10     quite carefully at these arguments and proffers.  Obviously

11     I've had the one related to Mr. Glassman the longest.

12                 The defense argues that the testimony of the attorneys

13     is relevant to show how and why the alleged victims cooperated

14     with the prosecution in this case, which it argues is relevant

15     to motive to testify and bias.  I think the government concedes

16     that, with the exception of Mr. Glassman's requested testimony

17     as to whether he told Jane that cooperating would "help her

18     case," other than that, I think the government agrees that the

19     proffered testimony is not -- at least as framed --

20     attorney-client privilege.

21                 I still have to exercise caution in considering the

22     ability of defense to call these witnesses, since they are

23     attorneys for witnesses who testified, and the boundary to

24     privileged communications can be easily crossed.  I do think as

25     a general matter, to the extent the defense has established

LCGVMAX1

that any of these witnesses will testify to relevant

nonprivileged information that is not outweighed by prejudice,

it's possible to get such testimony.

　　　　After careful consideration, with one exception, the

information the defense seeks to elicit from the three

attorneys, I conclude, is either not relevant under Rule 401,

is duplicative of information elicited on cross-examination

and, therefore, outweighed by prejudice, or is only potentially

marginally relevant to the limited inference of impeachment so

as to be outweighed by 403 prejudice.

　　　　The one question I intend to permit is the one I

suggested the parties stipulate to testimony from Mr. Glassman.

I will permit Mr. Glassman to be asked the following:  Did you

tell the government that you told Jane that cooperating with

the government and testifying in this case would help her civil

case against Epstein's estate and Ms. Maxwell and/or her claim

to the victims' compensation fund?

　　　　The question does not elicit privileged information

directly because it seeks only to know what Mr. Glassman told

the government.  Unlike the other proffers, this testimony is

relevant because Mr. Glassman's testimony, if the answer is

yes, could contradict Jane's testimony and allow an inference

to the jury that at least at one point she may have been under

the impression that testifying would help her civil case

against Ms. Maxwell and her claim to the fund.  With this

LCGVMAX1

| | |
|---|---|
| 1 | inference, the jury could find that Mr. Glassman's testimony |
| 2 | tends to impeach Jane either as to motive to testify or |
| 3 | impeachment by contradiction or both.  So that is my guidance |
| 4 | on the issue of the attorney -- the witness attorney testimony. |
| 5 | Any questions? |
| 6 | MR. ROHRBACH:  None from the government, your Honor. |
| 7 | MR. PAGLIUCA:  I just want to be clear, your Honor. |
| 8 | You're precluding testimony from Mr. Scarola and |
| 9 | Mr. Edwards. |
| 10 | THE COURT:  Yes. |
| 11 | MR. PAGLIUCA:  The only reason I'm asking that |
| 12 | question is we can release them and not have them appear. |
| 13 | THE COURT:  Yes, on the 401/403 grounds. |
| 14 | MR. PAGLIUCA:  Understood. |
| 15 | And that may speed things up a little bit here, since |
| 16 | we're releasing a couple of witnesses. |
| 17 | THE COURT:  Okay.  Thank you. |
| 18 | All right.  Making progress. |
| 19 | There's a government objection to preclude, pursuant |
| 20 | to Rule 16, an exhibit that I gather purports to be a sale |
| 21 | agreement for the defendant's home in -- house in London at 44 |
| 22 | Kinnerton Street dated 1996.  Does that have a trial mark for |
| 23 | identification, that exhibit? |
| 24 | MR. EVERDELL:  It does now, I believe, your Honor. |
| 25 | THE COURT:  Okay.  Just in time. |

LCGVMAX1

1          MR. EVERDELL:  Yes.  This is going to be MG -- one of

2     the MG exhibits, the agreement for sale.  We're just checking

3     which one it is, your Honor.  It's marked as MG-2 now, your

4     Honor.  We're going to have to hand up, I think, to the Court

5     some of these things.  I'm sorry, we have them in Trial

6     Director now, so we'll be able to --

7          THE COURT:  You have them what?

8          MR. EVERDELL:  We have these marked exhibits in Trial

9     Director; we'll be able to put them on the screen.

10          THE COURT:  I don't have a -- do you have a paper

11     copy?

12          MR. EVERDELL:  Of that particular exhibit?

13          THE COURT:  Yes.

14          MR. EVERDELL:  We can bring it for the Court.

15          THE COURT:  Okay.  Do you have a copy in front of you,

16     Mr. Everdell?

17          MR. EVERDELL:  I don't, because that's a witness

18     that's coming later.  But let me see if I can find one.

19          THE COURT:  Okay.  Well, maybe we can see what else we

20     can get to.

21          MR. ROHRBACH:  Your Honor, I have a paper copy.

22          THE COURT:  Okay.

23          MR. EVERDELL:  Put it on the screen.

24          THE COURT:  That's fine.

25          MR. EVERDELL:  Put MG-2 on the screen, please, for the

LCGVMAX1

1    Court, for the judge, and the deputy.

2              THE COURT:  I'm sorry, give me again the trial mark.

3              MR. EVERDELL:  MG-2, your Honor.

4              THE COURT:  Okay.  There it is.  Okay.

5              Is this you, Mr. Everdell?

6              MR. EVERDELL:  No, this is going to be Ms. Sternheim.

7              THE COURT:  Okay.

8              MS. STERNHEIM:  Judge, I do have a copy if you'd like

9    to see it.

10             THE COURT:  Okay.  Great.  Thank you.

11             All right.  And we're marking this MG-2.

12             I'm sorry, I meant the cover letter.

13             MR. EVERDELL:  The cover letter that's dated 2010?

14             THE COURT:  Yes.

15             MR. EVERDELL:  Okay.  We removed that from the marked

16   exhibit; it's just the agreement of sale that's underneath

17   that.

18             THE COURT:  Oh, you're just seeking to move the --

19             MR. EVERDELL:  Your Honor, there are a number of

20   documents that we're going to try to introduce through -- it's

21   actually slightly more complicated now.  So Mr. Grumbridge, who

22   is going to be --

23             THE COURT:  What has been simple?

24             MR. EVERDELL:  Nothing's been simple.

25             Mr. Grumbridge is unable to come because of

LCGVMAX1

1    professional reasons.  He would be available Tuesday.  But

2    we're going to try to do this a different way.

3          We have a notary named Keith Rooney who we plan to

4    call today who has gone to the land registry and has obtained

5    certified copies of the land registry entries for this property

6    showing when the title transferred to Ms. Maxwell.  And I have

7    copies of those documents, if you'd like to see those.

8          THE COURT:  Not yet, but maybe.

9          MR. EVERDELL:  Okay.  He's also gone to the consulate,

10   I believe, and got it apostilled to make it a foreign public

11   document, certified as a foreign public record that could be

12   admitted, self-authenticating by itself.  But we'd like to call

13   him to explain the process that he went through to get these

14   documents and admit them that way.

15         He is also going to -- we were going to seek to admit

16   Mr. Grumbridge's records through them as well, because he's

17   gone to Mr. Grumbridge's office in London, checked his files,

18   seen the copies of the agreement for sale and the other

19   documents we were going to admit through Mr. Grumbridge in his

20   files, has certified that they exist in his files, and can

21   authenticate those documents and introduce those as well.

22         THE COURT:  All of this is in an effort to prove that

23   Ms. Maxwell did not live at this address before 1996?

24         MR. EVERDELL:  That's correct.

25         THE COURT:  So let's go back to the letter, if we

LCGVMAX1

1    could, the cover letter.  Do we know why it's dated 2010?

2             MR. EVERDELL:  Your Honor, I think that's a separate

3    record.  Because I think that record reflects that there was an

4    opportunity to purchase the leasehold outright in 2010.  It's a

5    little bit of a complicated title.  It's actually a leasehold.

6    She does own the lease; it's effectively owning it, b.ut this

7    land, I think, has been in the possession of the Duke of

8    Westminster since, you know, 1500.  It's a very complicated

9    chain of title in the UK.

10            But the way it works is you pass the leasehold from

11   one person to another.  And that is effectively ownership under

12   the land registry records.  And that leasehold passed in -- the

13   contracts were exchanged in '96, and the deal closed in '97, in

14   January '97; and it was registered in a land registry as a

15   transfer of that title in March of '97.

16            THE COURT:  And again, my question is not that it's to

17   prove when Ms. Maxwell purchased the home, but the defense's

18   proffer from counsel is that it is to prove that she did not

19   live there before 1996?

20            MR. EVERDELL:  That's right.  We have a witness, Kate,

21   who says -- she didn't live there before 1997, because that's

22   when she actually took possession of the property, right.

23            We have a witness, Kate, who has testified to events

24   that allegedly took place in the Kinnerton Street property in

25   '94 and '95.  And these records show that she didn't own that

LCGVMAX1

1     place; that she wasn't living in that place --

2                THE COURT:  Well, they show she didn't own it, I

3     suppose.

4                MR. EVERDELL:  Correct.

5                THE COURT:  It sounds like there are different stages

6     in the purchase process.

7                MR. EVERDELL:  Well, yes.

8                But the records also reflect in the land registry that

9     the ownership existed with this couple whose last time is

10    O'Neill.  They owned it under the land registry records as of

11    1992.  That title passes then to Ms. Maxwell in 1997.  These

12    are both land registry entries which I have here, if the Court

13    would like to see them.

14               And what Mr. Grumbridge's records -- the agreement for

15    sale, for example, just shows the process of that contracting,

16    right.  So in December of '96, the parties exchange contracts;

17    Mr. and Mrs. O'Neill and Ms. Maxwell entered into contract for

18    sale for this property.  And that deal closed as of January

19    1997.  That's reflected in the agreement for sale.  And then

20    the notice is given to the land registry to make it an official

21    land record by March of '97.  So there's a record on file in

22    the land registry recording that the title has passed from the

23    O'Neills to Ms. Maxwell as of March of '97.

24               So there's a couple of documents that we think are

25    relevant that we think Mr. Rooney could enter into evidence.

LCGVMAX1

1          The first is the actual land registry records, which

2      are here, which show -- and I can pass them up if the Court

3      would like, which show the first ownership, which belongs to

4      the O'Neills as of '92; and then title passing to Ms. Maxwell

5      as of '97.  That's here.  There's also a land registry record

6      which shows the actual transfer of title which describes all of

7      this as well.

8          And then there are the records that are found in

9      Mr. Grumbridge's files, because he was the attorney who

10     represented Ms. Maxwell in this transaction, which include that

11     agreement for sale, because that's a private document, but it

12     exists in his files, it's still there.  And Mr. Rooney has seen

13     it in his files in London.  And he's prepared to testify to

14     that because he's here today.  And a few other documents that

15     were in his files that relate to this sale of the property and

16     the transfer of title at that time.

17          THE COURT:  Okay.  Mr. Rohrbach.

18          MR. ROHRBACH:  I think that the point Mr. Everdell

19     just made about how this is confusing and complicated

20     reinforces two of the government's arguments.

21          First of all, putting this confusing set of land

22     transfers and leaseholds that speaks to when the defendant took

23     ownership of the property would confuse the jury into having to

24     understand British real estate law and actually says nothing

25     about when she, in fact, occupied the property for the reasons

1     the government explained in its letter, including the

2     deposition --

3                 THE COURT:  So the government indicates that Ms.

4     Maxwell's 2019 deposition indicates that she lived in the home

5     beginning in '92 or '93?

6                 MR. ROHRBACH:  Yes, your Honor.

7                 THE COURT:  Would the government seek to introduce

8     that testimony if I let in the legal documents?

9                 MR. ROHRBACH:  Yes, we would, your Honor.

10                THE COURT:  Okay.  So we're going to have a trial

11    on -- we're going to have a little mini trial on whether -- on

12    whether Ms. Maxwell lived -- not owned, but lived in that house

13    prior to 1997?

14                MR. EVERDELL:  Your Honor, this is, I think, hardly a

15    mini trial.  This is extremely probative --

16                THE COURT:  What about the testimony, deposition

17    testimony, in which she said she lived there beginning in '92

18    or '93; it comes in, doesn't it?

19                MR. EVERDELL:  We can argue that, I suppose, your

20    Honor.  But even if it does come in, they can argue that that

21    shows that she's --

22                THE COURT:  Well, that goes directly to when she lived

23    there.  Your evidence goes to when she owned it.  Right?

24                MR. EVERDELL:  That's right.  But --

25                THE COURT:  So when she -- I see the relevance for

LCGVMAX1

1    impeachment as to when she lived there.  What is the relevance

2    to when she owned it?

3            MR. EVERDELL:  Your Honor, the records show that the

4    O'Neills owned that property until 1997, some family of the

5    O'Neills, not Ms. Maxwell.

6            THE COURT:  They don't rent places in London?

7            MR. EVERDELL:  That's something that the government,

8    I'm sure, could argue to the jury.  But this is extremely

9    relevant.  We're equally able to argue to the jury that this

10   shows that she owned it, and what Kate is testifying to

11   couldn't have happened because --

12           THE COURT:  Well, again, it shows ownership.  I get

13   that.  The relevant question is residence.  The government has

14   testimony from Ms. Maxwell that she lived there beginning in

15   1992.  What evidence do you have as to whether or not she lived

16   there prior to ownership?

17           MR. EVERDELL:  Your Honor, if I may have a moment.

18           THE COURT:  You may.

19           (Counsel conferred with defendant)

20           MR. EVERDELL:  Your Honor, I think the solution to

21   this problem -- and this would not be a mini trial -- is for us

22   to be able to admit the records showing the ownership records.

23   And if the government wants to admit the testimony to be able

24   to argue the opposite point, then okay.  But that's hardly a

25   mini trial.  And then each side gets to argue their point.

LCGVMAX1

1          THE COURT:  I was sort of leaning that way when I

2     thought the attorney was going to come testify who could be

3     crossed on this precise question.  But you want it to just come

4     in -- you want a fact not in issue, which is the ownership

5     question, you want an inference from ownership -- ownership is

6     confusing; but the inference from the timing of ownership as to

7     when she lived there, which is contradicted by deposition

8     testimony that would come in from Ms. Maxwell.

9          MR. EVERDELL:  Your Honor, I think we have records

10    which we'd have to find and anticipate this being the issue.

11    But Ms. Maxwell had another place in London at a street called

12    Stanhope Mews, I think it was 69 Stanhope Mews.  And we may be

13    able to find the title records that she sold it, because she

14    had that prior to the Kinnerton Street residence.  And I think

15    if you have -- we'd have to look for those.  I think we

16    probably can find them.  But they would show that she had

17    another place until she bought this new place.

18         So I think that is a fair inference to say that if

19    somebody owned another place and didn't buy another place until

20    later, that they are not living at that new place if they owned

21    the other place.  That's just common sense.

22         THE COURT:  And why can't the attorney who you had

23    proffered as the witness for this testify?

24         MR. EVERDELL:  Your Honor, if we need the attorney, we

25    can try to get him here, but we just couldn't get him here

LCGVMAX1

1    Thursday or Friday.  So if you give me a moment on that, I can

2    check on the status of that.

3              THE COURT:  Okay.

4              (Counsel conferred)

5              MR. EVERDELL:  Your Honor, I'm told he has a court

6    appearance on Monday, and he's only going to be able to get on

7    a plane Monday night and would only be available to testify

8    Tuesday.  We can consider a stipulation to his testimony too,

9    but I think these are all relevant and we should be able to

10   admit these to the jury to argue the inference.

11             THE COURT:  I think the point of cross is whether he

12   has knowledge of whether -- of who lived at the residence

13   prior.

14             Mr. Rohrbach, the complication of ownership aside,

15   what is the government's view as to the relevance of facts

16   regarding who lived in the home prior to 1997?

17             MR. ROHRBACH:  So who lived in the home might have

18   marginal impeachment value, but the government's view is that

19   it's only marginal.  The proffer we have from the defense now

20   is that, at most, the defendant lived in a home nearby before

21   she moved to the 44 Kinnerton Street home.  So to the extent

22   that that's true -- and again, it's contradicted by the

23   defendant's under-oath deposition testimony -- it would have

24   only marginal impeachment value.  It would mean that, if true,

25   it would mean that Kate identified a nearby, but incorrect,

LCGVMAX1

1    address for the first time she went to the defendant's house,

2    at most.  That's minimal impeachment value.

3            THE COURT:  I think what makes sense here to talk

4    about is a stipulation as to the timing of ownership of the

5    Kinnerton -- 44 Kinnerton, the timing of ownership.  And then

6    that can come in with the government's deposition -- with the

7    deposition of Ms. Maxwell saying she lived there beginning in

8    '92 or '93.  Then both sides can argue to the jury what they

9    want.

10           MR. ROHRBACH:  Yes, your Honor.

11           The government would -- I'd like to confer with the

12   team, but I think the government would probably agree to a

13   stipulation that included both the ownership fact and the

14   deposition testimony, so they'll both come in.

15           MR. EVERDELL:  We'll have to confer on this, Judge,

16   but I understand what the Court's position is.

17           THE COURT:  Okay.  It sounds like that gives you what

18   you want, which was the fact of ownership timing from which you

19   can argue to the jury that because she didn't own it until a

20   certain date, she couldn't have lived there before that date.

21   And you can then argue, therefore, Kate wasn't accurate or

22   testified falsely or however you want to phrase it, that she

23   was in that -- she believed Ms. Maxwell lived there prior to

24   '97.

25           MR. EVERDELL:  Just to preview for the Court, I think

LCGVMAX1

1   we would also like to include, which is information that

2   Mr. Grumbridge would have about the Stanhope Mews ownership

3   prior to this, because he was the lawyer and solicitor involved

4   in that transaction as well, from my understanding.  So I think

5   it's —- to make the same point.  But if we're going to lose his

6   testimony, because I think it's relevant testimony, I would

7   like to get in all parts of his testimony that I think are

8   relevant to this issue of ownership.

9            MR. ROHRBACH:  We're happy to confer with defense

10   counsel and try to work something out.  I would just note that

11   defense counsel has not produced any records to the government

12   showing this prior ownership of Stanhope Mews.

13            THE COURT:  All right.

14            MR. ROHRBACH:  We'll confer with the defense and try

15   to work out a stipulation.

16            THE COURT:  Great.  Thank you.

17            Okay.  All right.  Moving on to the Dr. Loftus

18   testimony.  So I got the letter dated December 15th in which

19   the government seeks to exclude two aspects of Dr. Loftus's

20   anticipated expert testimony on suggestive activities:  Her

21   testimony on the use of leading questions by government

22   investigators, and her anticipated testimony on the therapist

23   technique of response pressure to provide more detail about a

24   patient's experience.

25            In an order dated November 21st, 2021, I ruled that

LCGVMAX1

Dr. Loftus's opinions on suggestive activities are generally
admissible.  The government argues that the above two opinions,
however, lack a foundation in the record.  I'm going to deny
the government's motion to preclude here, but with guidance.

First, as we've discussed and I've made clear, Dr.
Loftus is testifying, I understand, as a blind expert, meaning
that she'll provide relevant expert opinion, but not apply it
to the facts of the case.  And just as Dr. Rocchio offered
testimony that included examples of grooming, variety of
grooming examples or factors that might make a child vulnerable
to sexual abuse, it seems comparable to me that Dr. Loftus can
offer examples of suggestive activity, including the two
examples the government seeks to exclude.  So long as her
testimony does not state that those activities occurred in this
case or go into any specifics of the case, that would be beyond
the bounds of a blind expert.

Second, I think there is -- the defense has provided
an adequate foundation for expert opinion on suggestive
questioning by the government by cross-examining witnesses
about the questions they were asked.  For example, the defense
on cross-examination of Jane asked about the government asking
her the same question three times in the same interview, trial
transcript at 515.  And Jane testified that the government,
quote, communicated to her through her attorney that *The Lion
King* didn't come out until 1997, which the defense also

LCGVMAX1

1  believes to be an example of suggestion.  This testimony

2  provides a sufficient basis for the jury to consider the

3  relevance of Dr. Loftus's opinions on suggestive questioning

4  techniques.  So that's my basis for that ruling.

5         There was argument regarding Agent Young testimony

6  that -- I don't know the government's general views on Agent

7  Young's testimony and I don't need to reach a conclusion on

8  that for purposes of this ruling.  So I don't have further

9  guidance on that now.

10         All right.  Questions on that?

11         MR. ROHRBACH:  Nothing from the government, your

12  Honor.

13         MS. STERNHEIM:  Nothing at this time.

14         THE COURT:  Okay.  Thank you.

15         All right.  Motion to preclude Alexander Hamilton

16  testimony.

17         MS. STERNHEIM:  We'd like to get Broadway tickets for

18  everyone.  That's the best we can do.

19         THE COURT:  It really is -- yes.  It was Hamilton in

20  Federal '78 that said, We just have judgment, not will nor

21  force, just judgment.  So I guess this calls for judgment.

22         So I have the defense response with respect to this

23  witness that came in at 12:31 a.m. this morning.  I haven't had

24  a chance to work through the issue yet.

25         What's the timing on this witness?

LCGVMAX1

1          MS. STERNHEIM:  The timing on this witness is that the

2     witness has COVID.  So the witness will not be here unless the

3     Court permits his testimony to be versus via WebEx.  And I have

4     cited another case in this district where I, in fact, was sent

5     to London when a government witness was too ill to come to the

6     district.  And certainly given what the courts have been

7     utilizing through COVID, there certainly is a legitimate basis

8     for that request.

9          He cannot travel.  He is quarantined.  Provided he is

10    not incapacitated -- and I understand he would be able to give

11    testimony from his home -- that would be the request, if the

12    government was not willing to work out a stipulation based upon

13    the declaration that had been disclosed orally and had been

14    provided in written form.

15         MR. ROHRBACH:  Your Honor, assuming the Court lets in

16    the testimony at all, the government is not going to agree to a

17    stipulation.  We think this witness needs to be subject to

18    cross-examination.  It may be possible -- I know the Court has

19    done before a procedure by which a witness can testify by

20    WebEx, but the Court would have to make certain findings first.

21    As part of that, we think that the witness would have to

22    produce the positive COVID test to demonstrate to the Court --

23         THE COURT:  I thought the letter said that you've got

24    that.

25         MS. STERNHEIM:  I do, but I didn't think it was

LCGVMAX1

1    necessary to make it part of a public record.

2            THE COURT:  All right.

3            Why don't you work out -- Mr. Rohrbach, you think a

4    finding other than Ms. Sternheim's -- you think a record beyond

5    Ms. Sternheim's proffer that she has a positive COVID test,

6    would the government -- you said the court has done this

7    before; you mean a colleague has done it.  I haven't done it.

8            MR. ROHRBACH:  My understanding is that before the

9    COVID era, the Court may have done -- taken -- permitted a

10   witness to testify remotely or at least considered the issue

11   before.  Maybe not permitted actually, your Honor.

12           My understanding is in general that the courts follow

13   the factors in Rule 15 for depositions in order to make this

14   determination; and so the Court would have to find that witness

15   is unavailable, that it's in the interest of justice before

16   permitting it.

17           THE COURT:  Okay.  And the government wants -- well,

18   it seems to me if there's a positive COVID test --

19           MR. ROHRBACH:  We would not resist that the witness is

20   unavailable if there's a positive COVID test, your Honor.

21           THE COURT:  Okay.

22           MR. ROHRBACH:  To be clear, I don't think the

23   government is resisting on any of those factors.  Under Rule 15

24   we would -- and we could come back at a break and elaborate on

25   exactly what the stretches are.  We just would ask the Court to

LCGVMAX1

1    make the full record of the reasons for permitting the witness

2    to testify through WebEx.

3              THE COURT:  Okay.

4              You don't disagree with that, do you?

5              MS. STERNHEIM:  No.  But I would just note that in the

6    case that I've cited, *United States v. Al-Fawwaz*, there was

7    less of a showing in that case as to the unavailability of the

8    witness who was available to come to the site where he was

9    deposed by myself and government counsel.

10             Here, we do have a definitive positive test for COVID,

11   and I think that speaks for itself.  He certainly would not

12   even be able to get on a plane, let alone enter the United

13   States.

14             THE COURT:  I think the unavailability on the

15   defense's proffer is established.  So why don't you work out

16   the -- if a further record is required and logistics.  I don't

17   think I let a witness testify remotely.  I let a juror

18   deliberate remotely.

19             MR. ROHRBACH:  I think the Court is right.  I think

20   the Court considered and applied the Rule 15 factors, but did

21   not allow the witness to testify remotely is my recollection,

22   your Honor.

23             THE COURT:  I'll look at it.  But I anticipate this

24   witness will be permitted to testify by WebEx.  So you'll work

25   out what we need to do to effectuate that.

LCGVMAX1

1          MS. STERNHEIM:  Thank you.

2          THE COURT:  Okay.  What other open issues do we have

3     that we can deal with now, counsel?

4          MR. EVERDELL:  Your Honor, I think there are some

5     issues with this first witness that I just want to raise with

6     the Court first.

7          THE COURT:  That I have briefing on?

8          MR. EVERDELL:  These are things that we've tried to

9     talk with the government about.  I don't think it's going to be

10    a major dispute.

11         THE COURT:  Okay.  I just wanted to make sure I hadn't

12    missed it.

13         MR. EVERDELL:  You did not miss anything.

14         THE COURT:  Okay.  Go ahead.

15         MR. EVERDELL:  The first witness is Ms. Espinosa.

16         THE COURT:  Right.

17         MR. EVERDELL:  So the first issue, which I think the

18    government and the defense agree on, is that there's a line of

19    cross that we ask the government if they plan to get into, and

20    they have agreed that they won't.  And that's related to the

21    following, which is that Ms. Galindo was a defendant in a civil

22    lawsuit by one of the Epstein -- not one of the accusers in

23    this case, but a different person.  And so I've asked the

24    government that they not get into that; they've agreed that

25    they won't cross Ms. Espinosa about that.

1           THE COURT:  Okay.

2           MR. EVERDELL:  I don't think there's any dispute about

3    that.

4           THE COURT:  Agreement on that?

5           MS. POMERANTZ:  Yes, your Honor.

6           THE COURT:  Thank you, Ms. Pomerantz.

7           MR. EVERDELL:  And the second issue is we were just

8    given by Ms. Espinosa some photographs that we would like to

9    admit into evidence.  She brought them with her today, so we

10   just obtained them.  I've shown them to the government.

11          I can describe them for the Court.

12          It's a series of photographs from the soap opera of

13   Jane's -- that Jane was on, because Ms. Galindo -- sorry,

14   Ms. Espinosa was a fan of the soap opera.  And after Jane went

15   and became a soap opera star, Jane sent her these photographs.

16   And one is of her and there's some of other cast members as

17   well.  And she has the envelope as well.  And we would like to

18   admit those photographs and the envelope as exhibits in her

19   testimony.

20          I've shown them to the government.  They were deciding

21   whether or not they had an objection to this, but I was going

22   to flag that for the Court.

23          MS. POMERANTZ:  Your Honor, the government remains of

24   the view it doesn't understand the relevance of these

25   particular proffered exhibits; and would also note that this

LCGVMAX1

1   isn't impeaching her -- wouldn't be impeaching her testimony in

2   any way.  We just don't understand the relevance of these

3   exhibits.

4           MR. EVERDELL:  Your Honor, it's evidence that she

5   maintained a relationship with the people in her abuser's --

6   alleged abuser's office.  I mean, if she claims that she left

7   New York and she fled this life with Epstein and didn't want

8   anything more to do with it, this is evidence that she was

9   keeping contact with people in his orbit.  Ms. Espinosa worked

10  in his office and was there with him in the office every day.

11          So it goes to show that there was a continuing

12  relationship.  She voluntarily sent these photographs to her

13  showing that she maintained that relationship voluntarily,

14  which I think is the opposite of what you would do if what you

15  wanted to do was put all this behind you and not be a part of

16  this world anymore.

17          MS. POMERANTZ:  Your Honor, my recollection of Jane's

18  testimony was that she herself acknowledged that she had

19  maintained a relationship with some of the individuals and

20  their orbit on direct examination and in the course of her

21  testimony.  So, again, I don't understand the relevance of

22  these photographs.

23          THE COURT:  So just to be clear, you're saying that

24  evidence came in already that she maintained a relationship;

25  correct?

LCGVMAX1

1          MS. POMERANTZ:  Your Honor, yes.  There's no dispute

2     about that.  This wouldn't impeach her.

3          THE COURT:  I understand it wouldn't impeach, but

4     first we start with the relevance question.  That's already in.

5          MS. POMERANTZ:  Yes, your Honor.

6          THE COURT:  Okay.

7          MR. EVERDELL:  Your Honor, we don't simply have to

8     take the witness's testimony.  We are allowed to show that same

9     point through other evidence.  And these photographs show that

10     the relationship continued.  And we are entitled to argue not

11     just from the witness's testimony, but from these photographs,

12     that there was a continuing relationship and what that means in

13     the defense's estimation, how we view -- how we can argue to

14     the jury what that means in terms of her state of mind.

15          THE COURT:  All right.  That the point is already in

16     establishes relevance.  I don't think it's 403 prejudice to

17     have duplicative evidence of the nature of the relationship.  I

18     don't hear an argument for prejudice otherwise.  So obviously

19     mindful of the need to continue to protect the anonymity of the

20     witness, I would allow it.

21          MR. EVERDELL:  Yes, your Honor.

22          And I've met with the witness and I've impressed upon

23     her that she should only use the name Jane.  And if she's

24     referring to Jane's family members, say the mother or the

25     brothers, she will say it that way, Jane's mother, Jane's

LCGVMAX1

1    brothers.  And she will only refer to the soap opera, not the

2    particular name of the soap opera.

3            THE COURT:  All right.  What else?

4            MR. EVERDELL:  I don't think anything from the defense

5    at the moment, your Honor.

6            MR. ROHRBACH:  Nothing from the government, your

7    Honor.

8            THE COURT:  We have one more juror we're waiting on.

9            Oh, while we have a moment, so I did work out

10   logistics for the charging conference.  We can do Saturday at 9

11   a.m. in this courtroom.  And as I said, the DE and other

12   courthouse staff will ensure significant public access.  We'll

13   have room in the courtroom and in overflow courtrooms for the

14   charging conference.

15           Anything else?

16           MR. EVERDELL:  Sorry, I did forget one thing.

17           With respect to those photos, your Honor, if they do

18   get admitted, there's only one copy of each.  So my plan on

19   publishing them to the jury would be to just walk down the jury

20   row with the photos so they can see them, because we don't have

21   physical -- we just got them this morning; we don't have copies

22   of the photos.

23           THE COURT:  You can't run off some copies?

24           MR. EVERDELL:  We can try in the meantime.

25           THE COURT:  Okay.

LCGVMAX1

<pre>
 1              MR. EVERDELL:  But --

 2              THE COURT:  I just think we have a standard for how

 3    we're doing this; and the need to make some photocopies isn't a

 4    sufficient burden to --

 5              MR. EVERDELL:  Well, we don't really have the

 6    resources --

 7              MS. COMEY:  Your Honor, the government is happy to

 8    make the copies.

 9              THE COURT:  We'll do the copying.

10              MR. EVERDELL:  All right.  That's fine.

11              I wish we did have a copier in our room, but we don't.

12              MS. STERNHEIM:  Judge, may we have a two-minute break?

13              THE COURT:  Yes.

14              MS. STERNHEIM:  Thank you.

15              THE COURT:  We'll adjourn until we have our jury.

16              Thank you.

17              (Recess)

18              THE COURT:  All right.  We have our jury.

19              Anything to take up before I bring them in?

20              MS. STERNHEIM:  Just very quickly, Judge.

21              THE COURT:  Sure.  Please be seated.

22              MS. STERNHEIM:  This has to do with a witness that may

23    be coming in.  It may be Dr. Loftus.  We would like to be able

24    to use the screen which you can draw on.  And the technical

25    people have assisted us in doing it.  The only thing is this
</pre>

LCGVMAX1

1    equipment does not save anything.  So I would ask permission

2    that we would be able to take a picture of it for the record.

3    It's a demonstrative; it's not being put into evidence.  But if

4    the Court wished it to be part of the record, the only way to

5    preserve it would be by a copy of it.

6         THE COURT:  What's an example?  Usually you just use

7    words to describe for the record what's being indicated.

8         MS. STERNHEIM:  There's an opportunity for her to do a

9    demonstrative for the jury.  If we weren't in COVID, she would

10   get up, she would stand before the jury with a whiteboard.  We

11   cannot do that under these circumstances.  And the equipment is

12   for that very purpose.  It's been done in other cases; it's

13   just that this equipment --

14        THE COURT:  So it would be like a whiteboard.

15        MS. STERNHEIM:  Yes.

16        THE COURT:  Whiteboard doesn't come into evidence.

17        MS. STERNHEIM:  I'm not saying it's coming into

18   evidence.

19        THE COURT:  She can draw on it, but I don't see a need

20   to take a picture.

21        MS. STERNHEIM:  I'm only saying if the Court wished

22   there to be a -- part of the record.  But if the Court does

23   not, that's fine.

24        THE COURT:  I'm sorry, I misunderstood.  I thought you

25   were asking for it to be part of the record.

LCGVMAX1

1          MS. STERNHEIM:  No.  I'm just saying that there's --
2     she will be describing it and we will make sure it gets in the
3     record.  But I did not know if the Court wished there to be it
4     as sort of a marked exhibit for identification just for the
5     record, not in the record.
6          THE COURT:  I've never done that.
7          MS. STERNHEIM:  Then that's fine.  I'm just --
8          THE COURT:  If somebody requests it, I'm happy to hear
9     the request, but it's not something I've ever --
10         MS. STERNHEIM:  Then it's not necessary.  I did not
11    know if the Court would prefer that.
12         THE COURT:  All right.
13         MR. EVERDELL:  Your Honor, if the Court would like, I
14    have just 3500 material for the witness in paper copy.
15         THE COURT:  Okay.  Thank you.
16         MR. EVERDELL:  I also have a copy for the witness
17    which I can put in the box.
18         THE COURT:  Yes.  Okay.
19         Can we get our jury.  Yes.  Thank you, Ms. Williams.
20         Who will call the witness, just so I can designate the
21    right person to call the first witness?
22         MR. EVERDELL:  I will be calling the first witness.
23         THE COURT:  All right.  Thank you, Mr. Everdell.
24         MR. EVERDELL:  Your Honor, I'll check if the witness
25    is there.

LCGVMAX1

```
1              THE MARSHAL:  Are you ready for her?  She's outside.

2              MR. PAGLIUCA:  Your Honor, we'll check --

3              THE COURT:  Of course.  Thank you.

4         Not yet.  Thank you.

5         Bring in the jury.

6              (Continued on next page)
```

LCGCmax2                          Espinosa - direct

1              (Jury present)

2              THE COURT:  Thank you, everyone.  Please be seated.

3   Good morning, members of the jury.  Nice to see you.  All

4   right.  I hope everyone is well.  We will proceed with the next

5   phase of the case.

6              Mr. Everdell, the defense may call its first witness.

7              MR. EVERDELL:  Thank you, your Honor.  The defense

8   calls Kimberly Espinoza.

9              THE COURT:  Cimberly Espinosa may come forward.

10   CIMBERLY ESPINOSA,

11        called as a witness by the Defendant,

12        having been duly sworn, testified as follows:

13              THE COURT:  Come forward into the box, you can take

14   your seat, you may remove your mask, and please state and spell

15   your name for the record.

16              THE WITNESS:  My name is Cimberly Espinosa, and it's

17   spelled C-i-m-b-e-r-l-y E-s-p-i-n-o-s-a.

18              THE COURT:  Thank you.  I will ask you, if you can,

19   pull up as close to the mic as you can and please speak

20   directly into the microphone.  Thank you.

21              Mr. Everdell, you may inquire.

22              MR. EVERDELL:  Thank you, your Honor.

23   DIRECT EXAMINATION

24   BY MR. EVERDELL:

25   Q.  Good morning, Ms. Espinosa.

LCGCmax2                          Espinosa – direct

1    A.  Good morning.

2    Q.  Ms. Espinosa, how old are you?

3    A.  55.

4    Q.  And where do you live?

5    A.  I live in California.

6    Q.  How far did you go in school?

7    A.  About a year and a half of college.

8    Q.  Are you married?

9    A.  Yes.

10   Q.  And do you work currently?

11   A.  Yes.

12   Q.  What is your current job?

13   A.  I'm an executive assistant to the CEO of a global company.

14   Q.  Is that in California?

15   A.  Yes.

16   Q.  And how long have you been doing that job?

17   A.  It will be 10 years.

18   Q.  I want to direct your attention now to October of 1996.

19   A.  Okay.

20   Q.  About how old were you in October 1996?

21   A.  28.

22   Q.  And where were you living around that time?

23   A.  I was living in Midtown.

24          THE COURT:  Pausing for technical issues.  Thank you

25   very much.  Go ahead, Mr. Everdell.

LCGCmax2                          Espinosa - direct

```
 1              MR. EVERDELL:  Thank you, your Honor.
 2   Q.  Ms. Espinosa, I actually want to jump back for a second.
 3   You mentioned your current job is an executive assistant for a
 4   CEO; is that right?
 5   A.  Correct.
 6   Q.  Can you describe generally what you do in that position.
 7   A.  I am basically the gatekeeper for the CEO.  All
 8   appointments are scheduled through me, I book a lot of travel,
 9   book a lot of meetings.  I'm also, I guess, the senior
10   executive assistant supervising about six other executive
11   assistants for the company.
12   Q.  Now I will direct your attention back to October of 1996.
13              Say again where you were living around that time.
14   A.  Well, I moved from California to New York, and when I first
15   moved to New York, I lived on the Upper East Side.  I
16   previously said Midtown, but that's because I moved from the
17   Upper East Side to Midtown during my employment.
18   Q.  But you started out on the Upper East Side.  Okay.
19              Did you get a job when you came to New York?
20   A.  Yes.
21   Q.  And what job did you get at that time?
22   A.  I was hired by J. Epstein & Co. for the legal team, legal
23   counsel being Jeff Schantz and Darren Indyke.  I was hired as
24   the legal assistant, the legal admin.
25   Q.  And J Epstein & Co. was whose company?
```

1    A.  Jeffrey Epstein's company.

2    Q.  And had you held any jobs as of this type of assistant

3    before working for Mr. Epstein?

4    A.  Yes.  I was previously -- before I came here, I was an

5    executive assistant to the CEO of a small startup technology

6    company for about two years before I moved here.

7    Q.  And how did you find the job with Jeffrey Epstein's

8    company?

9    A.  One of the papers, either the New York Times or the Daily

10   News, I'm not sure, but it was an ad that I answered or

11   responded to by calling a job agency, and I interviewed with

12   the job agency who sent me to two or three places to interview

13   in a day and one of them was J. Epstein & Co.

14   Q.  Did you have to interview with anybody at the J. Epstein

15   company to get the job?

16   A.  Yes.

17   Q.  Who did you interview with?

18   A.  I interviewed with four people.  First it was Jeff and

19   Darren themselves --

20   Q.  Let me pause you there.  Can you say their full names?

21   A.  Jeff Schantz and Darren Indyke.

22   Q.  Who were they?

23   A.  They were the legal counsel representing Jeffrey Epstein.

24   Q.  And who else, who were the other two?

25   A.  And then I passed the cut, I guess, from Darren and Jeff,

1    and was asked to interview with Ghislaine Maxwell.

2    Q.  And can you describe that interview.

3    A.  Yeah.  It was rather unique.  She had been running around

4    doing errands and wasn't able to make it up to the office where

5    I had been interviewed with Jeff and Darren, and so she had

6    asked if -- the receptionist asked me if it would be okay if I

7    can come down and have the interview in the back of the sedan

8    that was driven by a chauffeur.  So our interview took place

9    driving around Manhattan in the back of a limousine.

10   Q.  And how did that interview go?

11   A.  It went well.  It was a different interview than I had

12   experienced before, so I liked it, it was fun and I liked

13   meeting Ghislaine.

14   Q.  Did you meet with anybody else or interview with anybody

15   else after your interview with Ghislaine?

16   A.  Yes.  After I passed that test, I was allowed to meet with

17   Jeffrey Epstein, who would make the final decision on whether I

18   would be hired or not.

19   Q.  And how did that interview go?

20   A.  And I interviewed back at the office with Jeffrey Epstein

21   after waiting for a few hours for him.  And when he came, we

22   had a normal interview, if will you, and I left.  And I found

23   out the next day that I was given a job offer.

24   Q.  Now you mentioned that you were -- did you take the job?

25   Okay.

1          THE COURT:  I'm sorry.  Could you state the answer.

2    A.  Yes, I did take the job.

3    Q.  Be sure to state the answer as we can't do nodding.

4    A.  Okay.

5    Q.  You mentioned before that the job you got was with the

6    legal counsel with Jeffrey Epstein?

7    A.  Yes.

8    Q.  Did your job change at any point?

9    A.  It did.

10   Q.  How did it change?

11   A.  One day, Ghislaine's assistant had called in sick or was on

12   vacation a day or -- a day or a week or something and I was

13   filling in for Ghislaine.  After my fill-in, she decided that

14   she would like me to support her.  So I switched after getting

15   conversations with Jeff and Darren to make sure they were okay

16   that I go and work for Ghislaine instead.

17   Q.  And so your position changed at that point?

18   A.  Yes.

19   Q.  And what was the new position?

20   A.  It would be the executive assistant to Ghislaine.

21   Q.  And how long did you work as Ghislaine's executive

22   assistant?

23   A.  I would say approximately six years.

24   Q.  So from roughly when to when in years?

25   A.  Probably November of 1996 to the end of the summer of 2002.

1  Something like that.  Summer to fall.

2  Q.  In the roughly six or so years that you worked with

3  Ghislaine, about how much time did you spend with her and work

4  with her?

5  A.  I spent a lot of time with her in the office.  So she would

6  come into the office almost every day.  I was in the office

7  every day.  We worked together just about every day.

8  Q.  And you mentioned the office.  Where was the office?

9  A.  The office on 457 Madison Avenue.

10  Q.  In the time that you worked with her, did you get to know

11  her during that time?

12  A.  Yes.

13  Q.  What was your impression of Ghislaine?

14  A.  I highly respected Ghislaine.  I kind of -- no, not kind

15  of.  I looked up to her very much.  And I actually learned a

16  lot from her as far as administrative and being able to handle

17  a lot of calls, a lot of duties.  It was a very high-volume

18  work -- lots of work to do as far as arrangements to be made.

19  I attribute my career right now as an executive assistant to

20  what I learned at supporting Ghislaine.

21  Q.  And how did she treat you as an employee?

22  A.  She treated me fair and nice and it was fun.

23  Q.  What did you think of your experience working for

24  Ghislaine?

25  A.  Well, she was demanding, in a way, where, you know, every

LCGCmax2                         Espinosa - direct

1   task that was given needed to be done as soon as possible, if

2   not yesterday, and I enjoyed that challenge.  But I was able to

3   do my job and do everything that was needed to be done in a

4   day.  So it worked well.

5   Q.  Did you have any contact with Ghislaine after you stopped

6   working as her assistant?

7   A.  Yes, I did.

8   Q.  What sort of contact did you have?

9   A.  Kind of milestone contacts, birthday wishes, Christmas

10  wishes.  I asked for a couple of letter of references, personal

11  references for future jobs after I left Epstein & Co.

12  Q.  You mentioned birthday wishes.  Do you remember when

13  Ghislaine's birthday was?

14  A.  Absolutely.

15  Q.  When was it?

16  A.  Christmas day, 12/25.

17  Q.  Do you remember what year that was?

18  A.  She's about five years older than me, so '61.

19  Q.  Would you recognize Ghislaine today?

20  A.  Of course.

21  Q.  Would you look around the courtroom, please, Ms. Espinosa,

22  and do you see Ghislaine Maxwell in the courtroom today?

23  A.  I do.

24  Q.  Will you please point her out and identify an article of

25  clothing she's wearing.

1    A.   She is right across from me right there in what appears to

2    be a purple-hue turtleneck.

3           MR. EVERDELL:   Let the record reflect that the witness

4    has identified Ghislaine Maxwell.

5           THE COURT:   It may so reflect.   Thank you.

6    Q.   Ms. Espinosa, when you were working for Jeffrey Epstein's

7    company, where, physically, did you work?

8    A.   In the office, 457 Madison.

9    Q.   That's in Manhattan?

10   A.   Yes.

11   Q.   Did you work there the whole time that you were working for

12   Mr. Epstein?

13   A.   Yes.

14   Q.   Did you work anywhere else?

15   A.   Maybe just a handful of times I would work at Ghislaine's

16   residence, but that was towards the end of my career there.

17   Q.   And about how much time did you actually spend in

18   Ghislaine's residence, all tolled, roughly?

19   A.   Maybe a week or two, max.   Not straight.   It was just a day

20   here, a day there.

21   Q.   Over the course of your whole six years?

22   A.   Yup.

23   Q.   Did you ever work out of Jeffrey Epstein's residence in

24   Manhattan?

25   A.   No.

1   Q.   What were your typical working hours in the office?

2   A.   Typical working hours for me were about 9:30 to 6:30.

3   Q.   Now, I want to focus your attention on the time period when

4   you started your job, so the mid to late '90s, '96, '97, '98.

5   Who were the people who worked in the office in that time

6   period?

7   A.   We had Jeff Schantz and Darren Indyke, the legal team.

8   There was another attorney, Amanda Milroy.  There was an

9   accounting team, Harry Beller, Eric Gany, a woman by the name

10  of Bella, I don't remember her last name.  Also another woman

11  named Gee, I don't remember her last name.  We had a

12  receptionist, Michelle.  Jeffrey Epstein had his executive

13  assistant, at the time was a woman named Maureen when I first

14  started.  We had -- did I say the receptionist?

15  Q.   You mentioned, I think, Michelle was a receptionist.  Do

16  you remember Michelle's last name?

17  A.   Healy.

18  Q.   Were there any other receptionists you recall?

19  A.   Yes, there was a Helen Kim that came after Michelle left.

20  Q.   And you mentioned, I think, Mr. Epstein's executive

21  assistants; is that right?

22  A.   Yes.

23  Q.   Is that separate or the same as the receptionists?

24  A.   Separate.

25  Q.   And you mentioned a Maureen.  Were there any other

LCGCmax2                         Espinosa - direct

1  executive assistants that were there during your time in the
2  office?
3  A.  Yes, Leslie Roth and Suann Pisap.
4  Q.  Who came before who, Suann or Leslie?
5  A.  Suann was before Leslie.
6  Q.  Was Leslie there when you left?
7  A.  Yes.
8  Q.  Were there any other people in the office that you recall
9  working there in any of the offices there?
10 A.  On a daily basis, I can't remember if there was anybody
11 else there working on a daily basis.  We did have other
12 personal assistants come through and hang out, not necessarily
13 all day, but kind of like pit stops.  That would be Emmy Taylor
14 and Sarah Kellen.
15 Q.  So with respect to Emmy Taylor, I'm focusing your attention
16 on the 1996, '97, '98.  Do you recall seeing Emmy Taylor during
17 that time period?
18 A.  I don't recall when I first saw her.  I don't know.  I
19 would say it was the middle of my time there, in the middle of
20 that time.
21 Q.  You also mentioned a Sarah Kellen.  Do you remember when
22 you started seeing Sarah Kellen?
23 A.  That was more towards the end.
24 Q.  So in the time period, '96, '97, '98, do you recall seeing
25 Sarah Kellen?

LCGCmax2                          Espinosa - direct

1   A.  Hard to say, but I don't think so.

2   Q.  We'll talk about those folks in a minute.

3          Can you describe the layout of the office space at

4   Madison Avenue from when you get off the elevator.

5   A.  Sure.  So you get off the elevator and immediately to your

6   left were the restrooms.  Immediately in front of you was the

7   accounting team office, then the reception desk would just be

8   kind of pitched to the right.  Behind the reception desk was a

9   hallway where the offices were.  The legal team sat on the

10  left-side office, and that was followed by Jeffrey's office,

11  which was a corner.  Directly next to Jeffrey's office and

12  directly behind the receptionist at the end of the hall would

13  have been Jeffrey Epstein's assistant, and then I sat to the

14  left of Jeffrey Epstein's assistant.  So we were, like, in a

15  row.  If all doors were open, I could see Jeffrey in the

16  corner, his assistant, myself.  And then in my office, which

17  was Ghislaine's office, there were three desks — one was

18  Ghislaine's, one was mine, and one was the legal assistant's.

19  Q.  Do you remember the legal assistant's name when you were

20  there?

21  A.  Lauren Quitner (ph.).

22  Q.  Lauren Quitner?

23  A.  Yes.

24  Q.  So in the office where you sat and where Ghislaine sat, how

25  many people actually sat in that office?

LCGCmax2                              Espinosa - direct

1   A.   Three.

2   Q.   Were there cubicles or was it a shared space?

3   A.   Shared space.   Shared open space.

4   Q.   In your time there, do you recall Ghislaine having her own

5   private office, ever?

6   A.   No.

7   Q.   When you started the job, did you have to sign any legal

8   documents or agreements?

9   A.   Yes.

10  Q.   What did you have to sign?

11  A.   A nondisclosure agreement.

12  Q.   Did you have any particular reaction -- withdrawn.

13       What did the nondisclosure agreement mean to you?

14  A.   Just not to repeat any of my work.   My work was my work not

15  to be shared with the privacy and out of respect and privacy

16  for Jeffrey Epstein, you know, not to share who his clients are

17  or anything that I might be privy to.

18  Q.   In your work as an executive assistant for other CEOs, did

19  you ever have to sign a nondisclosure agreement for them?

20  A.   Yes.

21  Q.   That's happened in the past?

22  A.   Yes.

23  Q.   Did you have any particular reaction to signing these NDAs?

24  A.   No.

25  Q.   Were you ever given any instructions about how you could or

1   could not interact with other employees in the office?

2   A.  No.

3   Q.  Were you ever given any instructions about how you could or

4   could not interact with Jeffrey Epstein?

5   A.  No.

6   Q.  I want to talk to you in a little bit more detail about

7   your duties and responsibilities at the office.  We'll start

8   first with the job you briefly had as the admin to the lawyers.

9          What were your responsibilities there?

10  A.  A lot of photocopying, filing.  That was the gist of it.

11  And taking messages for them if they weren't available for a

12  phone call.

13  Q.  And do you know what sort of functions the lawyers

14  performed for Mr. Epstein, from your observations?

15  A.  I don't know exactly what they performed, but I know that

16  they were pretty important to Jeffrey Epstein.

17  Q.  And about how soon after you started your job did you

18  transition to becoming Ghislaine's executive assistant?

19  A.  I would say it was within a month.  It was kind of quick.

20  Q.  What were your responsibilities as Ghislaine's executive

21  assistant?

22  A.  Making arrangements.  We had kind of a routine where she

23  would come in, I'd sit at her desk, she'd give me a laundry

24  list of tasks to do for the day, people she needed to talk to,

25  things I needed to have shipped, things I needed to have

LCGCmax2                          Espinosa - direct

1    purchased, reservations to be made.  It could have been a list

2    of anywhere from 25 to 50 things in a day.

3    Q.  And what was Ghislaine's employment role in the office,

4    what jobs did she perform?

5    A.  She was the estate manager, in my mind.  She ran the

6    properties for Jeffrey Epstein.

7    Q.  And did you assist her with those jobs?

8    A.  I did.

9    Q.  And I'll get to the estates in a second, but as compared to

10   the other people in the office, where, in your mind, did

11   Ghislaine would fall in terms of importance?

12   A.  Ghislaine was very important to me.  She was obviously

13   important to Jeffrey Epstein because of his personal

14   residences.  I can't really say in Jeffrey Epstein's eyes what

15   her importance was, but, again, to me, she was quite important.

16   Q.  Well, if Ghislaine managed Jeffrey's properties, were there

17   other people in the office who handled other aspects of his

18   life?

19   A.  Absolutely.

20   Q.  Like who?

21   A.  Like his finance people handling the money and his

22   attorneys handling his business affairs.

23   Q.  To your knowledge, did Ghislaine have any role in managing

24   those aspects of Jeffrey Epstein's life?

25   A.  Not to my knowledge.

LCGCmax2                          Espinosa - direct

1    Q.   Now you mentioned the properties, right.  How many

2    properties did Jeffrey Epstein own when you started working in

3    the office?

4    A.   When I started working, he had already owned Zorro Ranch, 9

5    East 71st Street, and El Brillo, I believe.

6    Q.   You mentioned Zorro Ranch, where was that?

7    A.   That was in New Mexico.

8    Q.   9 East 71st Street was where?

9    A.   New York.

10   Q.   And El Brillo was where?

11   A.   Florida.

12   Q.   Did there come a time when he acquired any additional

13   properties while you were there?

14   A.   Yes.  I believe he acquired a Paris apartment, and he also

15   purchased the island, St. Thomas.

16   Q.   Do you remember the name of the island?

17   A.   It was Little Saint James, but the name was changed to

18   Little Saint Jeffs.

19   Q.   Was that purchased, the island, at the time you were there?

20   A.   Yes.  I would say probably the middle of my time there, it

21   was purchased, and it was a humongous project.

22   Q.   Please describe, if you could, just that particular project

23   of getting the island ready, what was involved in that and what

24   roles did you and Ghislaine perform?

25             MS. POMERANTZ:  Objection.  Foundation.

1      THE COURT:  All right.  You may inquire.  Why don't

2   you start with the latter part of the question.

3   Q.  Did you assist Ms. Maxwell in any way with the project.

4   Island?

5   A.  Yes.

6   Q.  And what sort of things did you assist with?

7   A.  There was new construction being done on the island, there

8   were, I think, new swimming pools.  But the majority of what I

9   did was furnish the house, furnish the resort style.  There

10  was, you know, every house good that you could think of —

11  silverware, glasses, towels, beach towels, linens.  We had to

12  ship all of that over, all of the furniture, all of the

13  artwork.  We even shipped in sand and palm trees and all kinds

14  of things to get the island to what he wanted it to be.

15  Q.  To be clear, you shipped in sand to a tropical island, why

16  was that?

17  A.  He wanted more sand on the beach.

18  Q.  Palm trees, too?

19  A.  Uh-huh.

20  Q.  When you started when the island was acquired, was there

21  anything, to your knowledge, on the island or was there nothing

22  on the island?

23  A.  I think there may have been one building or something.  It

24  was a lot of construction going on.  We even had a fire

25  department on the island, a firehouse with a proper firetruck

LCGCmax2                          Espinosa - direct

1  and firemen and all of that.

2  Q.  Was it part of your job to help Ghislaine do all this?

3  A.  It was part of my job to, yes.  Ghislaine would tell me who

4  she needed to talk to in a day, whether it be landscapers,

5  designers, interior decorators.

6  Q.  So just focusing on that particular project with the

7  island, how big a job was that to get the island up and

8  running?

9  A.  It was more than full-time, in my eyes.

10 Q.  And how long did that project last?

11 A.  Months.  I don't even know that it ever finished, to be

12 honest.

13 Q.  So just broadly speaking, how big a job, from your

14 observation, how big a job was it for Ghislaine to manage all

15 of these properties for Mr. Epstein?

16 A.  It was a huge job.

17 Q.  Did she work hard?

18 A.  Yes.

19 Q.  And in connection with her responsibilities, did she ever

20 have to travel to the properties to manage them?

21 A.  Sure.

22 Q.  And how often did she travel to do that?

23 A.  Well, she traveled on a weekly basis for the most part.  I

24 can't say, you know, when she went to each house for what

25 purpose.

LCGCmax2                          Espinosa - direct

1   Q.  When she did travel, would she always travel with Jeffrey

2   Epstein or would she sometimes travel herself?

3   A.  She sometimes traveled herself.

4   Q.  Did you ever travel with her?

5   A.  No.

6   Q.  If Mr. Epstein wanted to travel to one of his properties to

7   visit, what preparation would need to occur before he traveled?

8   A.  Well, Jeffrey had -- we always had the houses prepared, all

9   of the houses prepared for wherever he decided he wanted to go.

10  So what needed to happen was there was bread flown in, his

11  favorite bread that he liked.  I think we did butter, as well.

12  Make sure that the houses were stocked.  There were certain

13  things from New York that he wanted specifically in all of the

14  residences, and it needed to be fresh for his arrival.  So on

15  occasion, it wouldn't be odd to ship out this food to each of

16  the residences so that it would be there for whenever he

17  decided to show up or go.

18  Q.  And whose job was it to supervise all of these logistics?

19  A.  It would be Ghislaine's.

20  Q.  And did you assist her with those?

21  A.  Absolutely.

22  "Q.  Do you recall someone named, I think you mentioned before,

23  Emmy Taylor?

24  A.  Yes.

25  Q.  Who was Emmy Taylor?

LCGCmax2                          Espinosa - direct

1   A.  Emmy Taylor was an assistant to Ghislaine.  I kind of

2   looked at it more like a personal assistant as opposed to what

3   I did sitting in the office as an executive assistant.

4   Q.  Can you describe a little bit about the difference between

5   your job versus what her job was.

6   A.  Sure.  She would look after the dog, you know, take the

7   dogs for a walk, take it out if it needed, because Ghislaine

8   would bring the dog to the office.  She would carry her handbag

9   and her coat and run out and get her coffee or pasta or

10  whatever.  So that's what I saw in the office that she did for

11  Ghislaine.

12  Q.  Did Emmy work in the office or did she work elsewhere?

13  A.  She worked elsewhere.  She was sometimes in the office, but

14  not too often.

15  Q.  Were you friendly with Emmy Taylor?

16  A.  Yes.

17  Q.  Ms. Espinosa, how did Mr. Epstein typically travel to his

18  different properties?

19  A.  On one of his planes, private planes that he owned.

20  Q.  Do you know how many planes he owned around the time you

21  were working for him?

22  A.  I think three, three or four maybe.

23  Q.  Did you ever fly on his private planes?

24  A.  No.

25  Q.  Did you ever have any dealings with the pilots about

LCGCmax2                          Espinosa - direct

1   flights that were going to take place on the private planes?

2   A.  Sure.  On occasion I would have to tell them what time

3   wheels up was.  Jeffrey might call in and I'd pick up the phone

4   and he'd say, tell Larry wheels up at 8 o'clock to wherever he

5   was going.

6   Q.  And who was Larry?

7   A.  Larry, one of Jeffrey's pilots.

8   Q.  Did Ghislaine ever make a similar call when you were in the

9   office to let Larry know when wheels up was?

10  A.  It was directed by Jeffrey Epstein, what time wheels were

11  up.  And on occasion, I'm sure Ghislaine also told Larry what

12  time that would be.

13  Q.  Who in the office would most typically interact with the

14  pilots about wheels up times and make arrangements for flights?

15  A.  It could be any of the assistants, me, Jeffrey's assistant,

16  or Ghislaine herself.

17  Q.  And when you arranged the flights or when you had

18  conversations with the pilots, what information did you give

19  the pilots, typically?

20  A.  That was it.  The time -- they always, you know, the planes

21  were at Teterboro airport, so there was never a question of

22  where they needed to be.  It was just what time was wheels up

23  and where were they going.

24  Q.  Did you typically have information about the names of the

25  passengers that would be on the flights?

LCGCmax2                      Espinosa - direct

1   A.  No.

2   Q.  Do you know if Mr. Epstein ever traveled with guests on his

3   plane?

4   A.  Sure.  Yes.

5   Q.  Did you typically know the names of the guests that were

6   flying?

7   A.  No, not really.  Sometimes some of his friends would call

8   and ask for a lift to Florida, something like that, but I don't

9   recall the names or I wouldn't really know what guests were

10  flying at any given time.

11  Q.  Did Epstein ever travel on commercial flights?

12  A.  Not to my knowledge.

13  Q.  Would Ghislaine ever travel on commercial flights?

14  A.  Yes.

15  Q.  And when would she do that?

16  A.  There were times where she would either fly to see family

17  in London or she would fly to Miami a couple times.  Couple

18  times she came out to California.  Just different -- just when

19  she wasn't with Jeffrey, she would be somewhere else.

20  Q.  Did you help arrange those commercial flights?

21  A.  Yes.

22  Q.  Did you arrange commercial flights for anyone else in the

23  office?

24  A.  No, not really that I can recall.  Maybe, maybe I did, but

25  I don't remember exactly.

LCGCmax2                         Espinosa - direct

1   Q.  When you arranged these commercial flights, did you call

2   the airlines directly or did you use a travel service?

3   A.  We used a travel agency.

4   Q.  And what was the name of that travel agency?

5   A.  Shoppers Travel.

6   Q.  Do you know where that was located?

7   A.  It was in New York, but I don't know where.  I never was

8   there in person, just on the phone.

9   Q.  As part of your responsibilities as Ghislaine's executive

10  assistant, did you ever book massages for Ms. Maxwell?

11  A.  Yes.

12  Q.  And where did you book those massages?

13  A.  She had her places in SoHo.  She liked Bliss Spa, she liked

14  the Red Door, Elizabeth Arden, places like that.

15  Q.  Were these professional massage places?

16  A.  Yes.

17  Q.  Did you ever schedule a massage for Jeffrey Epstein?

18  A.  Yes.

19  Q.  Do you remember how many times, roughly, you did that?

20  A.  Maybe ten my entire time I was there.  I don't -- five to

21  ten.  A handful of times.

22  Q.  Do you remember any of the masseuses he used?

23  A.  I do remember a few names.  What comes to mind is there was

24  a Lydia, a Monica.  I don't really remember.  It's hard for me

25  to recall off the top of my head, but if I hear them that's

LCGCmax2                          Espinosa - direct

1    when I'm like, oh, I remember that name.

2    Q.  Were these people professional masseuses?

3    A.  Yeah.

4    Q.  Did you ever get a massage yourself?

5    A.  I did.

6    Q.  Do you remember who gave you that massage?

7    A.  Yes, that was Sophie Biddle.

8    Q.  Was that a masseuse that Mr. Epstein used?

9    A.  Yes.

10   Q.  Were you ever inside of Mr. Epstein's residence in New

11   York?

12   A.  I did get a tour when I first started.  I think I did meet

13   Ghislaine there on occasion once or twice to either drop off

14   something or retrieve something and take it back to the office.

15   Q.  And where was the residence?

16   A.  9 East 71st Street.

17   Q.  Is that on the Upper East Side?

18   A.  I don't know if that's considered the Upper East Side, but,

19   yes, it was right off the park, Central Park.

20   Q.  Were you ever in Ghislaine's residence?

21   A.  Yes.

22   Q.  Did she live in the same residence when you worked for her

23   or more than one residence?

24   A.  She had more than one residence or she had moved.  She was

25   first on the Upper East Side and then she moved to 65th Street.

LCGCmax2                      Espinosa - direct

1   Q.  Do you remember roughly where on the Upper East Side she

2   was living when you started the job?

3   A.  I want to say it was 84th Street.  I lived on 88th Street,

4   so I remember kind of feeling like we were in the same

5   neighborhood.

6   Q.  And do you remember roughly when she moved to 65th Street?

7   A.  I would say that would be during the middle of my time

8   there, maybe 2000, late '90s, early 2000.

9   Q.  And the 81st Street residence, what kind of residence was

10  that?

11  A.  What kind of residence?

12  Q.  Was it a townhouse or an apartment?

13  A.  It was a townhouse with many levels.

14  Q.  Was that the 84th Street one or the 65th Street one?

15  A.  No, I'm sorry.  I was thinking that we were talking about

16  Jeffrey Epstein's on 71st Street.  So now we went back to

17  Ghislaine?

18  Q.  Yes.  Let me be clear.  I'm asking you about Ghislaine's

19  different residences, you mentioned two, one on 84th Street,

20  one on 64th Street?

21  A.  Correct.

22  Q.  So let me first ask you about the 84th Street residence.

23  What kind of a residence was that?

24  A.  That was a townhouse-type thing.  Maybe it was an

25  apartment.  It was so long ago, I can't really recall that, but

LCGCmax2                              Espinosa - direct

1    I do recall her residence on 65th Street.

2    Q.  Okay.  What do you recall about the residence on 65th

3    Street?

4    A.  That was a townhouse with, I think, three levels.

5    Q.  And to your knowledge, did Ghislaine always retain her own

6    residence in New York while you were at your job?

7    A.  Yes.

8    Q.  To your knowledge, did she ever reside with Jeffrey

9    Epstein?

10   A.  No.

11   Q.  Are you familiar with a residence at 44 Kinnerton Street?

12   A.  Yes.

13   Q.  Whose residence was that?

14   A.  Ghislaine's.

15   Q.  And what city was that in?

16   A.  London.

17          MS. POMERANTZ:  Objection.  Foundation, your Honor.

18          THE COURT:  Sustained.

19   Q.  Have you ever been to that residence?

20   A.  Yes.

21   Q.  When were you in that residence?

22   A.  Three years ago.

23   Q.  So do you know who owned that residence at the time you

24   were there?

25          MS. POMERANTZ:  Objection.  Foundation.

1          THE COURT:  I'll take yes or no to this question and

2     then sustain.

3          MS. POMERANTZ:  I should also just say hearsay, your

4     Honor.

5          THE COURT:  I'll take yes or no to the question, do

6     you know who owned the residence at the time that you were

7     there.

8     A.  I --

9          THE COURT:  Just yes or no.

10    A.  No.

11    Q.  How was it that you were at that residence three years ago?

12    A.  It was my first trip to Europe and I reached out to

13    Ghislaine to ask her if I could stay there.

14    Q.  And so you were inside while you were there?

15    A.  Yes.

16    Q.  Was there a massage room in that residence when you were

17    there?

18    A.  No.

19    Q.  I want to jump back to your work in the office a bit.

20         From your work in the office, do you know whether

21    Epstein gave to charity?

22    A.  He did give to charity.

23         MS. POMERANTZ:  Objection, your Honor.

24         THE COURT:  I'll allow it.  What's the next question?

25         MR. EVERDELL:  What organizations did he give to.

LCGCmax2                    Espinosa - direct

1             THE COURT:  I'll sustain with respect to that.

2    Q.  Did he engage in any other types of giving?

3    A.  Yes.

4    Q.  What did you observe him -- what types of giving did you

5    observe him doing?

6    A.  I know that he paid for some of the employees' kids'

7    education.  He was -- I believe that he also paid for other

8    people's educations.  He was a giver.  He was generous and I

9    always knew him to be donating to charities and just being a

10   kind person.

11   Q.  Did Epstein ever give you any gifts?

12   A.  He did give me the massage a couple times.  And, also, he

13   had paid for a personal trainer for me to have.  I guess that

14   was a gift.  I kind of thought of it more as an employee perk.

15   I don't really think he gave me any gifts, other than when I

16   left.  My departure, I was given a watch.

17   Q.  Were there any special events he treated you to?

18   A.  Yes.  That was going to The Lion King.

19   Q.  And was this the Broadway show or was this the movie?

20   A.  The Broadway show.

21   Q.  And about when did that happen?

22   A.  I believe that's when the show first came out, it was a hot

23   ticket, and I recall him being friendly with the producer of

24   the show.  And during a time of a month or two, he was sending

25   a lot of people to The Lion King.

LCGCmax2                          Espinosa - direct

1    Q.  And that included yourself?

2    A.  Uh-huh.

3    Q.  And about how soon after the show opened, in your

4    recollection, was he handing out these tickets?

5    A.  That I can't say.  I'm not sure.

6    Q.  But you recall it being a hot ticket?

7    A.  Oh, yeah.  It was new.  It was a new show.

8    Q.  Do you recall anybody else that he gave Lion King tickets

9    to?

10   A.  I feel like he gave them to almost all of the employees if

11   they wanted.  It was just something that he was giving out at

12   that time.  I don't really recall who else.

13   Q.  I'm going to ask you a little bit more about the office.

14           Did Epstein ever receive visitors in the office?

15   A.  Yes.

16   Q.  Were any of these visitors female?

17   A.  Yes.

18   Q.  I want to show you on the screen, this is an exhibit that's

19   already admitted, Government Exhibit 12, but I believe it's

20   admitted under seal.  So if we can just display it --

21           MR. EVERDELL:  May I confer, your Honor?

22           THE COURT:  You may.

23           MR. EVERDELL:  All right.  So if we can just display

24   Government Exhibit 12 for the Court, the deputy, and the

25   witness only.  This is already admitted under seal.

LCGCmax2                          Espinosa - direct

1   Q.  Do you see that document in front of you?

2   A.  Yes, I do.

3   Q.  Now, without saying the name of that person out loud, do

4   you recognize the name of the person on that document?

5   A.  Yes, I do.

6   Q.  I'm going to refer to that person as Jane and you should,

7   too.  Okay?

8   A.  Okay.

9           MR. EVERDELL:  You can take that down now.

10  Q.  Ms. Espinosa, do you ever recall seeing Jane in the office?

11  A.  Yes.

12  Q.  How old did she appear to you to be when you first saw her?

13  A.  Probably 18.

14  Q.  And about when do you recall first seeing Jane in the

15  office?

16  A.  I remember seeing Jane in the office with her mother.

17  Q.  And about when do you recall that happening for the first

18  time?

19  A.  Probably the beginning to middle of my time there.

20  Q.  And about how many times did Jane visit the office, to your

21  recollection?

22  A.  There was a few times.  I can't really say how many times,

23  but I would say maybe five.

24  Q.  And you mentioned Jane's mother.  Do you recall how many

25  times Jane's mother came with her to the office?

LCGCmax2                         Espinosa – direct

1    A.   I don't recall, but I know that Jane's mother called the

2    office a lot because I spoke to her a lot on the phone.

3    Q.   About how often was Jane's mother calling the office?

4    A.   Hard to say, but I want to say there was, you know, a

5    couple months where it was a lot.

6    Q.   And who was she asking to speak to when Jane's mother

7    called the office?

8    A.   Jeffrey Epstein.

9    Q.   What, generally, do you recall about Jane and Jane's mother

10   and their interactions with Mr. Epstein in the office?

11   A.   Well, Jane's mother had mentioned that her daughter --

12            MS. POMERANTZ:  Objection, your Honor.  Hearsay.

13            MR. EVERDELL:  It's not offered for the truth, your

14   Honor.

15            THE COURT:  Just a moment.  I'll need a proffer.

16            (Continued on next page)

17

18

19

20

21

22

23

24

25

LCGCmax2                        Espinosa - direct

1                (At the sidebar)

2                MR. EVERDELL:  Your Honor, I anticipate the witness is

3      going to say that Jane's mother referred to Jane as Epstein's

4      goddaughter and that that actually caused a reaction, that

5      people in the office treated her a certain way because that's

6      how she represented Jane to be.  I'm not offering it for the

7      truth, it's simply the effect on this listener and how she

8      responded to Jane's mother when she was in the office.

9                MS. POMERANTZ:  No objection.

10               THE COURT:  Do you want a limiting?

11               MS. POMERANTZ:  It's fine, your Honor.

12               THE COURT:  Do you want a limiting?

13               MR. EVERDELL:  I don't think so your Honor.

14               (Continued on next page)

LCGCmax2                        Espinosa - direct

1              (In open court)

2              MS. POMERANTZ:  Objection withdrawn, your Honor.

3    BY MR. EVERDELL:

4    Q.  Let me ask you this, Ms. Espinosa, how did Jane's mother

5    refer to Jane among the people in the office?

6    A.  Jane's mother said --

7              THE COURT:  Could you pull up to the mic, please.

8    A.  Jane's mother said that Jane was Jeffrey's goddaughter.

9    Q.  And how did that, if at all, affect the interactions of the

10   people in the office with Jane and Jane's mother?

11   A.  Well, I know from myself and the girls that worked in the

12   office, you know, she was treated with the utmost respect, kind

13   of considered her family of Jeffrey's.  So, you know, we always

14   treated everyone that came in with courtesy and professionalism

15   and respect, but given that we thought Jane was the

16   goddaughter, she was just a little extra special.

17   Q.  Did Jane have any siblings?

18   A.  Yes.

19   Q.  Were they brothers, sisters, do you remember?

20   A.  Two brothers.

21   Q.  Again without saying their names, did they ever visit the

22   office?

23   A.  I don't recall.

24   Q.  About how much contact would Jane's mother have with

25   Epstein during the time period when they were in contact?

LCGCmax2                          Espinosa - direct

1              MS. POMERANTZ:  Objection, your Honor.  Foundation.

2              THE COURT:  Sustained.

3    Q.  You said you received calls from Jane's mother; right?

4    A.  Uh-huh.

5    Q.  And you said that she sometimes visited the office; is that

6    right?

7    A.  Correct.

8    Q.  Do you recall over what span of time this occurred?

9    A.  No.

10   Q.  Do you know if Jane ever traveled on Mr. Epstein's planes?

11   A.  I don't know.

12   Q.  What was your impression of the relationship between Jane

13   and Epstein?

14             MS. POMERANTZ:  Objection.

15             THE COURT:  One word, grounds.

16             MS. POMERANTZ:  Foundation.

17             THE COURT:  You can ask a foundation question.

18   Q.  Did you ever see Jane interact with Epstein in the office?

19   A.  Yes.

20   Q.  And how often did you see that interaction, how many times?

21   A.  Maybe three or four.

22   Q.  Based on those three or four interactions, what was your

23   impression of the relationship between Jane and Epstein?

24   A.  I felt it was a loving relationship.

25   Q.  Did there come a time when Jane stopped visiting the

1   office?

2   A.  Yes.

3   Q.  Do you know why that was?

4   A.  I think it was because she went to go work in California

5   for a soap opera.

6   Q.  And how do you know that she ended up working for a soap

7   opera?

8   A.  She told me and I also saw it myself, because it's one of

9   my soap operas I watched my entire life.

10  Q.  Are you a fan of this particular soap opera?

11  A.  Big time.

12  Q.  And did you see Jane on the soap opera?

13  A.  Yes.

14  Q.  After she moved to LA and was on the soap opera, did you

15  have any continuing contact with Jane?

16  A.  Only when she would call the office.

17  Q.  Any other type of contact with Jane after she stopped

18  coming to the office and was in LA?

19  A.  Yes.  She sent me a little envelope with headshots, signed

20  headshots of the cast from the soap opera, a few single

21  headshots and then the whole cast all signed.

22  Q.  Is that something that you asked for or did she send that

23  to you as a gift?

24  A.  I think it was a gift.

25  Q.  Do you remember roughly when she sent you those headshots?

LCGCmax2                        Espinosa - direct

1    A.  I don't recall.  I don't know.  I've held onto them for

2    very many years.

3             MR. EVERDELL:  One moment, your Honor.

4             Your Honor, I would like to approach the witness and

5    show her some exhibits marked for identification.  I have a

6    copy for the Court, as well.

7             THE COURT:  Okay.  Marked for identification as?

8             MR. EVERDELL:  Marked for identification as

9    defendant's CE3, CE4, CE5, CE6, CE7, and CE8.

10            May I approach, your Honor?

11            THE COURT:  You may.

12   BY MR. EVERDELL:

13   Q.  Ms. Espinosa, if you could take the documents I just handed

14   you and look at them, the documents that are marked for

15   identification as CE3 through CE8.

16            Have you had the chance to look at them?

17   A.  Yes.

18   Q.  Do you recognize what those are?

19   A.  Yes.

20   Q.  Sorry.  I couldn't hear you.

21   A.  Yes.

22   Q.  And what are they?

23   A.  They are the headshots of three of the cast members and

24   then a group cast member shot.

25   Q.  And is the envelope also there, too?

LCGCmax2                              Espinosa - direct

```
 1   A.  The envelope is here, yes.

 2   Q.  Are they the headshots that were sent to you and is that

 3   the envelope that they were sent in?

 4   A.  Yes.

 5   Q.  And how do you recognize these?

 6   A.  They're mine.  I've had them forever.

 7   Q.  Have you had them in your possession since you received

 8   them?

 9   A.  Yes.

10   Q.  And are they in the same or substantially the same

11   condition as when you first received them?

12   A.  Yes.

13           MR. EVERDELL:  Your Honor, at this time, the defense

14   moves to admit CE3 through CE8, temporarily under seal so we

15   can apply appropriate redactions to protect the privacy

16   interests of witnesses.

17           MS. POMERANTZ:  No objection, your Honor.

18           THE COURT:  CE3 through 8 are admitted temporarily

19   under seal for the purpose of protecting the anonymity of a

20   witness who I've permitted to testify under pseudonym.

21           (Defendant's Exhibits CE3 through CE8 received in

22   evidence)

23           MR. EVERDELL:  Correct, your Honor.  Your Honor, at

24   this time, I do have copies for the jurors if the Court will

25   permit me to hand them out.
```

1           THE COURT:  Thank you.

2    Q.  Ms. Espinosa, let's first take a look --

3           THE COURT:  I think they're waiting for me.  Would you

4    like the jurors to look?

5           MR. EVERDELL:  Yes.  May I publish this to the jurors,

6    your Honor?

7           THE COURT:  So the jurors may look at the exhibits in

8    the folder.  Go ahead.

9    BY MR. EVERDELL:

10   Q.  Look first at CE3.  Do you see what that is?  Actually, can

11   you hold that up?  What is CE3?

12   A.  CE3 is a manilla envelope addressed to Ms. Cimberly, care

13   of Epstein & Co., 457 Madison Avenue, from Jane.

14   Q.  Is there a date on the envelope?

15   A.  You can't read what the postage machine -- you can't see

16   it.

17          THE COURT:  Just my copy of the envelope doesn't have

18   a mark.

19          MR. EVERDELL:  Understood.  The physical copy of the

20   exhibit is what has the sticker on it.  I don't know if we were

21   able to copy the entire thing because it's a large envelope.

22          THE COURT:  Do you want to direct the jurors to look

23   at a photocopy of an envelope and that is what you're

24   indicating is CE3?

25          MR. EVERDELL:  Well, your Honor, I'm actually having

LCGCmax2                         Espinosa - direct

```
 1   the witness hold up the envelope itself, which is CE3.  The
 2   photocopies are just copies of the envelope.
 3              THE WITNESS:  It says CE3.
 4              THE COURT:  Got it.
 5   Q.  Just hold up the envelope so the jurors can see it.  Is
 6   that the envelope that the headshots came in?
 7   A.  Yes.
 8   Q.  And can you tell from the envelope what the postmark date
 9   is or is it too hard to tell at this point?
10   A.  Can't tell.
11   Q.  You can set that down.
12              Let's look at CE4, and I don't want you to hold that
13   up, but you have the original photograph there; correct?
14   A.  Yes.
15   Q.  And the jurors have photocopies.
16              First of all, who is in that photograph, using only
17   the names we've agreed upon?
18   A.  Jane.
19   Q.  And is there an inscription on the front of that
20   photograph?
21   A.  There is.
22   Q.  Without reading the name --
23              MR. EVERDELL:  One moment, your Honor.
24   Q.  Without reading the name on the inscription, can you just
25   read out the inscription on the front of the photograph?
```

1    A.  To Cimberly, with love, Jane.

2    Q.  Is there anything written on the back of the photograph

3    that is CE4?

4    A.  Yes.

5    Q.  Again, substituting the name we've agreed upon, can you

6    read out that inscription?

7    A.  Dearest Cimberly, thank you for always being so sweet and

8    such a great help.  Take care.  Jane.

9    Q.  And just looking quickly at the others in succession, which

10   is CE5, CE6, CE7, and CE8, what are those?

11   A.  They are photos, a group shot of the cast of the soap opera

12   and three separate headshots of three of the actors.

13   Q.  And those actors are not Jane; right?

14   A.  Correct.

15   Q.  And just looking briefly at CE5, do you see Jane in that

16   group shot?

17   A.  Yes.

18   Q.  And where do you see her?

19   A.  Middle row, all the way to the right.

20   Q.  So are these photographs in the envelope we just looked at

21   what Jane sent you after she started working at the soap opera?

22   A.  Yes.

23   Q.  Thank you.  You can put those away now.

24          MR. EVERDELL:  With the Court's permission, I'll have

25   the jurors put those down.

LCGCmax2                    Espinosa - direct

1          THE COURT:  Yes, please.  You can put those under your

2      seats.  Thank you so much.

3          MR. EVERDELL:  Your Honor, shall I continue?  Okay.

4      BY MR. EVERDELL:

5      Q.  Ms. Espinosa, are you familiar with the address 301 East

6      66th Street?

7      A.  Yes.

8      Q.  And what is at that address?

9      A.  That is an apartment building.

10     Q.  Did you have any job responsibilities with respect to that

11     apartment building?

12     A.  Yes.

13     Q.  Can you describe what those were?

14     A.  Sure.  First it was managing the scheduling of the

15     apartments, like a calendar, if you will.  There was

16     approximately a dozen apartments that Jeffrey Epstein owned,

17     and there were employees that stayed there, family, friends,

18     guests.

19     Q.  And when you say you managed the calendar, what do you mean

20     by that?

21     A.  Well, that we had a notebook that told us who was staying

22     in what apartment on any day, that way we would know what

23     apartment was available to give to someone else.

24     Q.  And was your responsibility to manage that calendar?

25     A.  Yes.

LCGCmax2                         Espinosa - direct

1   Q.  Do you remember any of the names of the people who had

2   regular apartments in that building, who regularly stayed

3   there?

4   A.  Yes.

5   Q.  Who were some of those people?

6   A.  Jeffrey Epstein's pilots had apartments there.  Jane stayed

7   there, Jane's mother, Jane's brothers.  We had -- let's see.

8   There were some other executives that Jeffrey knew.  Can't

9   really recall other names.  Shelly Lewis had an apartment there

10  for a while.

11  Q.  Who was Shelly Lewis?

12  A.  Shelly was one of Jeffrey's friends, I guess.

13  Q.  Okay.  Do you know if Emmy Taylor ever had an apartment

14  there?

15  A.  Emmy Taylor had an apartment there.

16              (Continued on next page)

1  BY MR. EVERDELL:

2  Q.  Now, you mentioned that Jane and Jane's mother and Jane's

3  brothers used the apartments; is that right?

4  A.  Yes.

5  Q.  Were they regular users of the apartments or did they use

6  it every -- how many times did they use it?

7  A.  They were regular for a duration of time, and then it was

8  come and go, specifically for the brothers and the mother.

9  Q.  About when do you recall Jane and Jane's mother and

10 brothers using the apartments in New York?

11 A.  It was right around when I had met her.  Again, I don't

12 recall the date, but I know that it was towards the beginning

13 of my -- beginning to middle of my term there.

14 Q.  All right.  So if the beginning of your term was the end of

15 1996 --

16 A.  Right.

17 Q.  -- what, roughly, years are we talking about here, if you

18 can estimate?

19 A.  Maybe late '90s, early 2000.

20 Q.  Okay.  The best of your recollection?

21 A.  Yeah.

22 Q.  All right.  Let's discuss your observations of the

23 relationship between Epstein and Ghislaine.

24        As part of working in the office with Ghislaine, were

25 you able to observe Jeffrey Epstein and Ghislaine interacting

1    with each other?

2    A.  Sure.

3    Q.  And when you first started in your job in 1996, what was

4    your impression of the relationship between Epstein and

5    Ghislaine?

6    A.  I thought they were a couple.

7    Q.  And what gave you that impression?

8    A.  Just their interaction together.  They were a little

9    flirty; and I just knew they were a couple, behaved like a

10   couple.

11   Q.  Did their romantic relationship change at all during the

12   time you worked for Epstein?

13   A.  Yes.

14   Q.  How so?

15   A.  They just kind of went their separate ways.  Seems like

16   Ghislaine moved on.  I know that she started dating --

17              MS. POMERANTZ:  Objection.  Foundation.

18              THE COURT:  Sustained.

19   Q.  What, if anything, did you observe at the time that

20   indicated to you that the romantic relationship was changing?

21   A.  Ghislaine started dating.

22   Q.  Dating other men?

23   A.  Yes, other men.

24   Q.  Okay.  Anything else?

25   A.  Well, they would not show up at the office around the same

LCGVMAX3                          Espinosa - direct

1   time or leave together, things like that.

2   Q.  Okay.  And roughly when do you recall noticing that

3   Ghislaine was dating other men and not coming to the office as

4   much?

5   A.  That would be probably the last two years of my employment.

6   Q.  Now, you mentioned that Epstein had visitors come to his

7   office, right?

8   A.  Mm-hmm.

9   Q.  And I think you said some of these were female.

10  A.  Mm-hmm.

11  Q.  We've talked about Jane.  But apart from Jane, how old were

12  these females who were visiting Jeffrey Epstein in the office

13  during your time there?

14  A.  I don't know how old they were.

15  Q.  Roughly, how old do they appear to you to be?

16  A.  Eighteen and over.  Young women.

17  Q.  And what contact did you see them -- withdrawn.

18         Do you remember some of the names of these women who

19  came and visited Epstein in the office?

20  A.  Yes.

21  Q.  Sorry?

22  A.  I do remember.

23  Q.  What names do you recall?

24  A.  Celina Midelfart; Shelly Lewis; Jane, of course; Gwendolyn

25  Beck.

1    Q.  Well --

2    A.  There were others.  There were others, I just can't

3    remember.

4    Q.  And what kind of contact did they have with Jeffrey Epstein

5    that you observed when they came into the office?

6    A.  I didn't really observe the guests and him together too

7    often, because most of the time it was them being escorted to

8    his office.  And the door would shut and they would visit in

9    his office, and I wouldn't see that.

10   Q.  Okay.  Now, you mentioned Celina Midelfart before.

11   A.  Yes.

12   Q.  Were you ever asked to do anything for Celina Midelfart?

13   A.  Yes.

14   Q.  What was that?

15   A.  Send her flowers.

16   Q.  And what kind of flowers were these?

17   A.  I recall an orchid at one time.  There might have been

18   another bouquet another time.

19   Q.  Based on your -- the tasks you were given for her and your

20   observations of her, did you ever get the impression that there

21   was a romantic relationship?

22            MS. POMERANTZ:  Objection, your Honor.

23            THE COURT:  One-word grounds.

24            MS. POMERANTZ:  Calls for speculation.

25            THE COURT:  Overruled.

LCGVMAX3                    Espinosa - direct

```
 1   Q.  Ms. Espinosa, based on the tasks you were given for
 2   Ms. Midelfart and your observations of her with Epstein, what,
 3   if any, sense did you have of their relationship with each
 4   other, put it that way?
 5   A.  I felt like Jeffrey liked her very much; I felt like they
 6   were a couple.  They were -- yeah, they were together, a
 7   couple.
 8   Q.  And did this happen either during or after the time when it
 9   appeared to you that Ghislaine was in a romantic relationship
10   with Epstein?
11   A.  I feel like it was at the very beginning of my employment,
12   so I -- you know, being new, it could have been concurrent for
13   a little bit of time.
14   Q.  Do you know whether or not Ghislaine knew about, for
15   example, you buying the flowers for Celina Midelfart?
16   A.  No, she didn't know.
17              MS. POMERANTZ:  Objection.
18              THE COURT:  Just a moment.
19              I'll allow it.
20   Q.  Do you know whether or not Ghislaine Maxwell knew about you
21   buying flowers for Celina Midelfart on behalf of Jeffrey
22   Epstein?
23   A.  She did not know.
24   Q.  You also mentioned Shelly Lewis before.
25   A.  Yes.
```

LCGVMAX3                        Espinosa - direct

1  Q.  Do you remember what nationality she was?

2  A.  English.

3  Q.  Did she speak in a British accent?

4  A.  Yes.

5  Q.  All right.  I want to direct your attention now to the

6  final years of your employment, okay, so roughly 2000 to 2002,

7  all right?

8       Were Epstein and Ghislaine still involved in a

9  romantic relationship or was that over by this time?

10 A.  I think it was over by that time.

11 Q.  Was Ghislaine still working for Epstein at that time?

12 A.  Yes.

13 Q.  Did her employment role for Epstein stay the same at this

14 time or did it change at this time?

15 A.  Stayed the same.

16 Q.  Okay.  Did she have as much involvement in his affairs or

17 were other people working for Epstein as well?

18 A.  Well, there were other people working for Epstein.  I don't

19 know.

20 Q.  Let me ask this:  How often was Ghislaine coming into the

21 office in the latter two years of your employment?

22 A.  Not often.  It started -- you know, at first it was almost

23 every day; then it became a few times a week; and then it

24 was -- towards the end it was full-time she wasn't coming into

25 the office.

LCGVMAX3                        Espinosa - direct

1    Q.  Okay.  Was there anyone else who was in the office who, for

2    example, was sitting in the office where Ghislaine used to sit?

3    A.  That would have been Sarah Kellen.

4    Q.  Sarah who?

5    A.  Kellen.

6    Q.  Okay.  I want to show you what's already in evidence as

7    Government's Exhibit 327.

8             MR. EVERDELL:  If we can put that on the screen.

9             THE COURT:  You may.

10            MR. EVERDELL:  Thank you, your Honor.

11            For the Court, deputy, the witness, and the jurors,

12   with the Court's permission.

13            THE COURT:  It's a public document; correct?

14            MR. EVERDELL:  It's not under seal, your Honor, as far

15   as I know.

16            THE COURT:  Correct?

17            MS. POMERANTZ:  I believe that's correct, your Honor.

18            MR. EVERDELL:  We'll just confer with the government.

19            MS. POMERANTZ:  Just take a quick look, your Honor.

20            It's fine, your Honor.  Thank you.

21            THE COURT:  Okay.  So you can publish.

22            MR. EVERDELL:  Thank you, your Honor.

23            So we'll also put it on the jurors' screens, if we

24   could.

25   BY MR. EVERDELL:

```
1    Q.  Ms. Espinosa, do you see the person in that photograph,
2    Government's Exhibit 327?
3    A.  Yes.
4    Q.  Do you recognize who that is?
5    A.  Yes.
6    Q.  Who is that?
7    A.  That's Sarah Kellen.
8    Q.  Do you remember --
9            MR. EVERDELL:  We can put that down now, with the
10   Court's permission.
11           THE COURT:  Yes.  Thank you.
12   Q.  Do you remember when Sarah Kellen was hired, when she first
13   arrived?
14   A.  I don't remember the date.
15   Q.  Was it towards the beginning or towards the end of your
16   employment, if you know?
17   A.  Towards the end.
18   Q.  Was it in the time period we're discussing now, 2000 to
19   2002?
20   A.  Yes.
21   Q.  What was her job for Epstein?
22   A.  I'm not sure what her job was, but she did accompany
23   Jeffrey around to the properties and was basically where he
24   was.  I didn't really work with her much in the office, so I
25   don't know what her -- her job was.
```

1    Q.  From your perspective, did she assist Epstein?

2    A.  Yes.

3    Q.  Okay.  Now, was she, in your mind, Epstein's assistant or

4    was she Ghislaine's assistant?

5    A.  Epstein's assistant.

6    Q.  Okay.  Who was Ghislaine's assistant?

7    A.  I was still there.  I was Ghislaine's assistant.

8    Q.  Okay.  Now, in the 2000s, did Ghislaine still travel with

9    Epstein to the properties?

10   A.  I believe so.

11   Q.  Okay.  Do you know, did she travel to Palm Beach

12   occasionally?

13   A.  Sure.

14   Q.  Did you help her arrange her travel when she traveled to

15   Florida?

16   A.  Sometimes.

17   Q.  And when she traveled to Florida at this time, did she

18   always go to Palm Beach or did she go to other locations?

19   A.  She visited other locations.

20   Q.  Where did she --

21   A.  Miami.

22   Q.  I'm sorry?

23   A.  Miami, Florida.  Miami.

24   Q.  And how do you know that she was going to Miami?

25   A.  Because she asked me to book a flight for her to Miami.

1  Q.  Did you help her arrange where she stayed in Miami too?

2  A.  I sort of recall, but I -- I -- it was a hotel.  I don't

3  remember the name.

4  Q.  Okay.  But your recollection is you booked hotels for her

5  to stay in in Miami when she was traveling to Florida?

6  A.  Yes.  I also think she had a friend there that she may have

7  stayed in -- in the condo or whatever it was.

8  Q.  So when she was traveling to Florida around this time, was

9  she always staying at Epstein's residence or did she stay at

10 hotels?

11          MS. POMERANTZ:  Objection.  Foundation.

12          THE COURT:  Sustained.

13 Q.  Fair to say you booked hotels in Miami for her travel to

14 Florida around this time, right?

15 A.  Correct.

16 Q.  Now, you mentioned that Ghislaine was dating other men in

17 the 2000s, right?

18 A.  Mm-hmm.

19 Q.  Are you familiar with a man named Ted Waitt?

20 A.  Yes.

21 Q.  Who is Ted Waitt?

22 A.  Ted Waitt is somebody that she dated and eventually became

23 a couple with.

24 Q.  All right.

25          And do you know who Ted Waitt was, what his job was?

1    A.  I didn't know what his job was or who he was until I met

2    him personally after I had already left Epstein and Company.

3    Q.  When did you meet Ted Waitt personally?

4    A.  Boy.  2009, '8, something like that.  I don't recall the

5    year.

6    Q.  And was Ghislaine still with Ted Waitt as a couple at that

7    time?

8    A.  Yes.

9    Q.  Okay.  And that was how many years after you left your

10   employment with Epstein, roughly?

11   A.  Maybe three years, something like that.

12   Q.  I think you said you left in 2002; is that right?

13   A.  Correct.

14   Q.  And when do you think you met Ted Waitt?

15   A.  Before 2010.  That's all I can really say.

16   Q.  And why was it that you were meeting Ted Waitt at that

17   time?

18   A.  For a job interview.

19   Q.  Okay.  Did Ghislaine help to arrange that job interview?

20   A.  Yes.

21   Q.  Okay.  And what was the job?

22   A.  It was like an estate manager.

23   Q.  Did you end up getting the job?

24   A.  No.

25   Q.  Okay.  Do you know if Ted Waitt had any children at the

LCGVMAX3                        Espinosa - direct

1   time you met with him?

2   A.  I don't --

3          MS. POMERANTZ:  Objection.

4   A.  I don't know.

5          THE COURT:  The response was "I don't know."

6          I'll allow that.  Move on.

7   Q.  And just jumping back, do you recall roughly when it was

8   that Ghislaine started seeing Ted Waitt as a couple?

9   A.  Well, it was before I left in 2002.  Maybe --

10         THE COURT:  Could you speak into the mic?

11  A.  It was before I left in 2002, so probably 2001 or so.

12  Q.  The best guess from your recollection?

13  A.  Best guess.

14         THE COURT:  Mr. Everdell, we'll break here for the

15  morning, unless --

16         MR. EVERDELL:  Actually, if I could just have one

17  moment, your Honor.

18         THE COURT:  Sure.

19         (Counsel conferred with defendant)

20         MR. EVERDELL:  I think it's a good time to take a

21  break, your Honor, if we could.

22         THE COURT:  How much longer do you anticipate?

23         MR. EVERDELL:  I don't think I have very much, but I

24  just wanted the chance to confer.

25         THE COURT:  All right.  So we'll break for 15 minutes,

LCGVMAX3                          Espinosa - direct

 1    members of the jury.  See you shortly.  Thank you.

 2                (Jury not present)

 3                THE COURT:  Ms. Espinosa, you may step down and out

 4    for the break.  Thank you.

 5                (Witness not present)

 6                THE COURT:  Counsel, matters to take up before the

 7    break?

 8                MS. POMERANTZ:  Not from the government.

 9                MR. EVERDELL:  Nothing from the defense.

10                THE COURT:  I'll see you in ten in case there's

11    anything to discuss before we resume.

12                (Recess)

13                THE COURT:  Anything to take up?

14                MR. EVERDELL:  Not from the defense, your Honor.

15                MS. POMERANTZ:  Not from the government.  Thank you.

16                THE COURT:  All right.  We can bring the witness back

17    and we can get the jury.

18                (Witness present)

19                (Jury present)

20                THE COURT:  All right.

21                Thank you, members of the jury.

22                Mr. Everdell, you may continue with your direct

23    examination of Ms. Espinosa.

24                Ms. Espinosa, I remind you, you are under oath.

25                Go ahead, Mr. Everdell.

1    MR. EVERDELL:  Thank you, your Honor.

2    BY MR. EVERDELL:

3    Q.  Ms. Espinosa, directing your attention again to the end of

4    your employment term, okay, in the 2000s, when -- the time

5    period when you said Ghislaine was moving on, right, did you

6    ever assist her during that time in hiring any other personnel

7    at the office?

8    A.  I don't remember.

9    Q.  Who was taking care of the properties, Epstein's

10   properties, on a day-to-day basis at the properties?

11   A.  Sarah Kellen.

12   Q.  Did you ever assist in hiring any other people to help

13   assist with properties at that time?

14   A.  Not that I recall.

15   Q.  Okay.  But your recollection is that Sarah Kellen was

16   managing the properties at that time?

17   A.  Mm-hmm.

18   Q.  Speaking of Sarah Kellen, do you know if she ever got

19   married?

20   A.  I heard that she got married.

21        MS. POMERANTZ:  Objection, your Honor.

22        THE COURT:  Sustained.

23        The jury will disregard.

24   Q.  Ms. Espinosa, were you ever contacted by the government in

25   this case, by the prosecutors?

 1    A.  Yes.

 2    Q.  And did you sit down for an interview with those

 3    prosecutors in the case?

 4    A.  Yes.

 5    Q.  Do you recall when that was?

 6    A.  I think it was during the summer of this year.

 7    Q.  Do you remember the first time you sat down with them?  Or

 8    this may have been a videoconference?

 9    A.  It was a videoconference.

10    Q.  Do you remember when that videoconference occurred?

11    A.  No.

12    Q.  I want to show you something that may refresh your

13    recollection.  Do you see the folder that's below you on the

14    floor next to the chair?

15              MR. EVERDELL:  With the Court's permission, I'll have

16    her turn to 3501.063-002, which should be behind tab 2 of your

17    materials.

18              THE COURT:  Ms. Pomerantz, are you there?

19              MS. POMERANTZ:  Yes, your Honor.

20              THE COURT:  Okay.  Go ahead.

21    Q.  Do you have that document in front of you?

22    A.  Yes.

23    Q.  And if you could just look down at the bottom of the page

24    where there is some information on the left-hand side.  Does

25    that refresh your recollection of when you had the

 1   videoconference with the government?

 2   A.  Last year, I think.  So repeat your question please.

 3   Q.  Does that refresh your recollection of when you had this

 4   videoconference for the first time with the government?

 5   A.  Yes, well, there's a date on here.

 6   Q.  And does that generally refresh your recollection about

 7   when this would have happened?

 8   A.  Yes.

 9   Q.  Okay.  And when did that happen?

10   A.  November 2020.

11   Q.  Okay.  All right.

12           Was that the only time you spoke to the government in

13   this case?

14   A.  Yes.

15   Q.  Okay.  Question about Ghislaine.  In the time that you

16   worked for Ghislaine Maxwell from 1996 to 2002, did you ever

17   see Ms. Maxwell pregnant?

18   A.  No.

19   Q.  Ever were told that Ms. Maxwell was pregnant?

20   A.  No.

21           MS. POMERANTZ:  Objection, your Honor.

22           THE COURT:  Overruled.

23   Q.  Ms. Espinosa, you said you left the job in roughly 2002; is

24   that right?

25   A.  Correct.

LCGVMAX3                        Espinosa - direct

1    Q.   Why did you decide to leave at that time?

2    A.   After 9/11, I had decided that it was time for me to move

3    back to my roots; wanted to be with my family.  My brother had

4    his first child, and I just wanted to go back to where I came

5    from.

6    Q.   And where was that?

7    A.   California.

8    Q.   Okay.  When you left, did you continue to stay in touch

9    with Ghislaine after you left?

10   A.   Yes.

11   Q.   Looking back on your experience working with Ghislaine,

12   what are your impressions about the job and about Ghislaine?

13   A.   I feel like Ghislaine was a very good resource for my own

14   career as far as experience and what I learned from her as far

15   as how to handle multiple projects at one time at a fast pace.

16   I think it helped me to get to where I am today in my job.

17   Q.   And what, if any, are your personal feelings and

18   reflections about your job?

19              MS. POMERANTZ:  Objection, your Honor.

20              THE COURT:  Sustained.

21   Q.   Besides your career path, are there any other reflections

22   you have on your experience with Ms. Maxwell?

23              MS. POMERANTZ:  Objection.

24              THE COURT:  Sustained.

25   Q.   In the time -- Ms. Espinosa, you are aware of the crimes

LCGVMAX3                          Espinosa - cross

1   that Ghislaine is accused of committing in this case?

2   A.  Yes.

3   Q.  In the time that you worked for Ghislaine, did you ever see

4   her engage in any kind of inappropriate activity with underage

5   girls?

6   A.  Never.

7   Q.  Did you ever see Jeffrey Epstein engage in inappropriate

8   activity with underage girls?

9   A.  Never.

10  Q.  Did you ever see anything at all in the six years that you

11  worked for Ghislaine that gave you the impression that anything

12  like that was going on?

13  A.  Never.  No.

14          MR. EVERDELL:  One moment, your Honor.

15          THE COURT:  Okay.

16          (Counsel conferred)

17          MR. EVERDELL:  I have no further questions, your

18  Honor.

19          THE COURT:  All right.  Ms. Pomerantz.

20          MS. POMERANTZ:  Yes.  Briefly, your Honor.

21          THE COURT:  Go ahead.

22  CROSS-EXAMINATION

23  BY MS. POMERANTZ:

24  Q.  Good afternoon, Ms. Espinosa.

25  A.  Hi.

LCGVMAX3                         Espinosa - cross

1    Q.  You worked out of Jeffrey Epstein's Madison Avenue office

2    in Manhattan, right?

3    A.  Correct.

4    Q.  You did not work out of any of Jeffrey Epstein's homes,

5    right?

6    A.  Correct.

7    Q.  You never went to Jeffrey Epstein's Palm Beach house,

8    right?

9    A.  Correct.

10             MS. POMERANTZ:  No further questions, your Honor.

11             THE COURT:  Okay.  Anything?

12             MR. EVERDELL:  No redirect, your Honor.

13             THE COURT:  All right.  Thank you, Ms. Espinosa.  You

14   may step down.  You are excused.  Thank you.

15             (Witness excused)

16             THE COURT:  Mr. Everdell, the defense may call its

17   next witness.

18             MR. EVERDELL:  Yes, your Honor.

19             The defense calls Mr. Raghu Sud.  That's R-A-G-H-U,

20   S-U-D.

21             THE COURT:  Okay.  Mr. Sud may come forward.

22    RAGHU SUD,

23         called as a witness by the Defendant,

24         having been duly sworn, testified as follows:

25             THE COURT:  Thank you.  Mr. Everdell, you may inquire.

LCGVMAX3                          Sud – direct

 1           MR. EVERDELL:  Thank you, your Honor.

 2   DIRECT EXAMINATION

 3   BY MR. EVERDELL:

 4   Q.  Good morning, Mr. Sud.

 5           Just be sure to speak into the microphone so we can

 6   hear your responses.

 7   A.  Good morning.

 8   Q.  Thank you.

 9           Where do you live, Mr. Sud?

10   A.  East Windsor, New Jersey.

11   Q.  How long have you lived there?

12   A.  Since 2002.

13   Q.  Where do you work?

14   A.  Shoppers Travel.

15   Q.  What is Shoppers Travel?

16   A.  It's a full-service travel agency providing airline

17   tickets, car rentals, hotels, and vacations to customers.

18   Q.  How long has Shoppers Travel been a company?

19   A.  Since 1988.

20   Q.  And when did you start working for Shoppers Travel?

21   A.  Since 1988.

22   Q.  You were there when it started?

23   A.  Yeah.

24   Q.  What is your current position at Shoppers Travel?

25   A.  Vice president.

LCGVMAX3                        Sud - direct

1   Q.  What are your duties and responsibilities in that position?

2   A.  Overseeing day-to-day operation and interacting with

3   customers, making travel bookings for them.  Whatever is

4   required to do.

5   Q.  Are you familiar with how Shoppers Travel bills or invoices

6   its customers?

7   A.  Yes.

8   Q.  And how does that work?

9   A.  When a customer calls, they ask for what they need.  We

10  make up an itinerary or issue tickets according to their needs

11  and then charge their credit cards for that; or if they are

12  sending check, then take a check from them.

13  Q.  And do you generate invoices as part of that process?

14  A.  Yes, we do.

15  Q.  And what do you do with the invoices?

16  A.  Invoices are sent to the customers.  And we keep them and

17  put them -- enter in our accounting system, which is called

18  QuickBooks.

19  Q.  Is it QuickBooks?

20  A.  Yeah.

21  Q.  Okay.  And are you familiar with how Shoppers Travel uses

22  QuickBooks to keep its billing records?

23  A.  Yes, I am.

24  Q.  Okay.  And is that kept electronically?

25  A.  Yes.

LCGVMAX3                          Sud - direct

Q.   And do the QuickBooks records include information about the

invoices that were sent to the customers?

A.   Yes.

Q.   How is the information from the invoices or any other

billing records input into the QuickBooks system?

A.   According to each customer.  It's different if it's repeat

customer.  We make up a profile for them and enter everything

under that name, even though they are different passengers, but

it's coming from one place.  A request is made, then it's

entered accordingly, or it's individually entered with the

invoice numbers and the date.

Q.   Okay.  And when is that information entered into the

QuickBooks system?

A.   Either same day or next day.

Q.   Same day or next day as what?

A.   Of the transaction.

Q.   Okay.  And are you able to search your QuickBooks database

for invoices and other billing records related to customers?

A.   Yes, we can.

Q.   Okay.  And how would you do that?

A.   It all depends if we are doing it for a company which we

have made a profile, or a group we have made a profile for.

Then we put the profile name and run a report on it.

Q.   Okay.  Great.

          And does the QuickBooks system generate a report for

LCGVMAX3                          Sud - direct

```
 1   that profile customer?
 2   A.  Yes, they do.
 3   Q.  Okay.  Do you ever have a profile for someone named Jeffrey
 4   Epstein?
 5   A.  Yes, we do.
 6   Q.  Okay.  Was he a customer of Shoppers Travel?
 7   A.  His office was a customer, yes.
 8   Q.  Okay.  And did you have interactions with his office about
 9   booking flights and other travel arrangements?
10   A.  Yes, we did.
11   Q.  Did there come a time when you were asked to verify certain
12   records related to Epstein's office that you had at Shoppers
13   Travel?
14   A.  To verify, not as of yet.
15   Q.  Okay.  Did there come a time when you were asked to
16   generate a report from your QuickBooks system?
17   A.  Yes.
18   Q.  And when were you asked to do that?
19   A.  In 2016.
20   Q.  Okay.  And did there come a time when you were asked to
21   review that same report later on?
22   A.  As of now, no.
23   Q.  How about this:  I want to show you what's been marked for
24   identification as RS-1.  And we'll put that on the screen for
25   the Court and the deputy and the witness for now.
```

LCGVMAX3                          Sud - direct

1   A.  Yes, these are --

2   Q.  Before you say anything, let's make sure --

3         MR. EVERDELL:  Your Honor, may I inquire?

4         THE COURT:  You may inquire.

5   Q.  Sorry to interrupt you, Mr. Sud.

6         Do you see what's marked in front of you as Defense

7   Exhibit RS-1?

8   A.  Yes.  It was a report run through us on -- like I said, in

9   2016.

10  Q.  Okay.  So do you recognize that report?

11  A.  Yes.

12  Q.  And what is that report?

13  A.  It shows the invoice.  It says the date of the invoice

14  issued, invoice number, name of the passenger, and the amount.

15  Q.  And what customer is this report related to?

16  A.  This was for file name Epstein.

17  Q.  And how do you recognize this document?

18  A.  Because I was the one who ran it at that time.

19  Q.  And what years does this report cover?

20  A.  Well, if you have all of it, this page which I'm looking at

21  it, has 2005, 2006.

22  Q.  Maybe if we could look now at the last page of the

23  document, which I believe is page 19.

24         Do you see page 19, Mr. Sud?

25  A.  I do see.  This is from '99.

LCGVMAX3                          Sud - direct

1    Q.   Okay.  So roughly the records between January 1999 and

2    December 2006?

3    A.   Yes, sir.

4    Q.   Okay.  And are these -- is this a fair and accurate copy of

5    the report of invoice information that's related to Epstein

6    from -- during those dates that I mentioned?

7    A.   Yes, sir.

8    Q.   Now, was this report generated -- does this report contain

9    information that was added to the database at or near the time

10   that the invoices that are listed there?

11   A.   I'm sorry, I didn't get the question.

12   Q.   Does the report -- does the information in the report about

13   the invoices, was it added to the database at or near the time

14   that the invoices reflect?

15   A.   Like I said, it's always entered on the same day or the

16   next day.

17   Q.   Okay.  And was the invoice information in this report added

18   to the database with someone who had knowledge of the

19   information on the invoices?

20   A.   Yes, sir.

21   Q.   And was -- is it the regular practice of Shoppers Travel to

22   keep this information in its database?

23   A.   Yes, sir.

24   Q.   And does this report summarize the invoice information

25   that's kept in the regular course of business at Shoppers

1    Travel?

2    A.  Yes, sir.

3           MR. EVERDELL:  Your Honor, at this time the defense

4    offers what's been marked as RS-1 for identification.

5           MS. MOE:  Your Honor, no objection, provided it's

6    received under seal.

7           MR. EVERDELL:  Yes, I should say that there are

8    personally identifying information of third parties, so we ask

9    for it to be received temporarily under seal so we can apply

10   appropriate redactions.

11          THE COURT:  All right.  RS-1 is admitted temporarily

12   under seal.  And you can propose narrowed redactions as

13   necessary.

14          (Defendant's Exhibit RS-1 received in evidence)

15          MR. EVERDELL:  Thank you, your Honor.

16          With the Court's permission, I will hand out copies to

17   the jury.

18          THE COURT:  Okay.

19          MR. EVERDELL:  Thank you.

20          With the Court's permission, I'll publish this to the

21   jury.

22          THE COURT:  Ms. Moe?

23          MS. MOE:  No objection, your Honor.

24          THE COURT:  Okay.  The jury may open the folder and

25   take a look.  It's RS-1, which has been admitted.

LCGVMAX3                         Sud - direct

1    Q.  All right.

2            Mr. Sud, do you still have RS-1 in front of you?

3    A.  Yes.

4    Q.  I'll just ask you a few questions about this document.

5            This is what comes from your QuickBooks system;

6    correct?

7    A.  Yes, sir.

8    Q.  And you said this is for -- related to the customer Jeffrey

9    Epstein?

10   A.  Yes, sir.

11   Q.  If we just look at the first page, you see the column that

12   says "type"?

13   A.  Yeah.

14   Q.  What does that refer to?

15   A.  It's an invoice.

16   Q.  Okay.  And the date refers to what?

17   A.  The date, when it was issued.

18   Q.  When the invoice was issued?

19   A.  Yeah.

20           THE COURT:  Mr. Sud, could I ask you to pull the

21   microphone a little closer to you.  Thank you so much.

22           THE WITNESS:  Okay.  Sorry about that.

23           THE COURT:  That's okay.

24   Q.  So the date is the date the invoice was issued?

25   A.  Yeah.

LCGVMAX3                          Sud - direct

1    Q.  And then number or num, what does that refer to?

2    A.  The number of the invoice.

3    Q.  And do you see where it says "name"?

4    A.  That's the name of the passenger.

5    Q.  Okay.  I don't want you to say any of the names, but that

6    reflects the name of the passenger who the ticket was purchased

7    for?

8    A.  Yes.

9    Q.  Okay.  "Amount," what does that refer to?

10   A.  That was the amount of that particular invoice.

11   Q.  Okay.  And then balance, what does that refer to?

12   A.  That's just a carry forward same number.  If you keep

13   saying -- balance keeps adding up.

14   Q.  Okay.  And again, these are records for Epstein from

15   January 1999 on the last page to December of 2006 on the first

16   page, right?

17   A.  Yes, sir.

18            MR. EVERDELL:  One moment, your Honor.

19            THE COURT:  You may.

20            (Counsel conferred)

21            MR. EVERDELL:  I have no further questions, your

22   Honor.

23            THE COURT:  Ms. Moe.

24            MS. MOE:  Very briefly, your Honor.

25            THE COURT:  Go ahead.

LCGVMAX3                       Sud - cross

1    CROSS-EXAMINATION

2    BY MS. MOE:

3    Q.  Good morning, Mr. Sud.

4    A.  Good morning.

5    Q.  Just to be clear, you began booking travel for

6    Mr. Epstein's office in 1999; is that right?

7    A.  Yes, ma'am.

8    Q.  Okay.  So you didn't book any travel for Mr. Epstein's

9    office before 1999?

10   A.  Ma'am, if we did, I do not have any records for that.

11   Q.  Okay.  So the records that we're looking at in RS-1, those

12   begin in 1999 and run through 2006; is that correct?

13   A.  Yes, ma'am.

14            MS. MOE:  Thank you very much.

15            Nothing further, your Honor.

16            MR. EVERDELL:  No redirect, your Honor.

17            THE COURT:  All right.  Thank you.

18            Mr. Sud, you may step down.  You are excused.

19            THE WITNESS:  Thank you.

20            (Witness excused)

21            THE COURT:  Mr. Everdell, the defense -- sorry,

22   jurors.  Thank you.  You may put your folders down.

23            Thank you so much.

24            And Mr. Everdell, the defense may call its next

25   witness.

LCGVMAX3                         Loftus - direct

1              MR. EVERDELL:  Turn it over to my colleague, your

2        Honor.

3              THE COURT:  Ms. Sternheim.

4              MS. STERNHEIM:  Thank you, Judge.

5              The defense calls Elizabeth Loftus.

6              THE COURT:  Okay.  Elizabeth Loftus may come forward.

7              MS. STERNHEIM:  Judge, I have an exhibit.  May I hand

8        it to the government and the Court and put it on the witness

9        stand?

10             THE COURT:  Yes.  Good morning.

11        ELIZABETH LOFTUS,

12            called as a witness by the Defendant,

13            having been duly sworn, testified as follows:

14             THE COURT:  Thank you.

15             MS. STERNHEIM:  Judge, if I may.

16             THE COURT:  Yes.  Please just set that aside until

17        directed.  Thank you.

18             Ms. Sternheim, you may inquire.

19             MS. STERNHEIM:  Thank you very much.

20        DIRECT EXAMINATION

21        BY MS. STERNHEIM:

22        Q.  Good afternoon, Professor Loftus.

23        A.  Good afternoon.

24        Q.  Please tell the jury why you are here today.

25        A.  I am here as a professor and a scientist who studies human

memory to talk about the nature of memory, the workings of

memory, how people can develop memories for things that didn't

happen or remember things differently from the way they

actually were, to talk about the work that I and other

scientists have done on false memories.

Q.   Thank you, Professor Loftus.

Please tell the jury what your present occupation is.

A.   I'm currently a professor at the University of

California-Irvine, the Irvine campus.  My title is

distinguished professor.  And I have appointments in a

department called psychological science, that's a psychology

department; I have an appointment in criminology, law, and

society, that's kind of a criminology department; and I'm also

a faculty member in the law school.

Q.   How long have you been at UC-Irvine?

A.   I joined the faculty in 2002, so it's coming on 20 years.

Q.   And prior to joining the faculty at Irvine, had you been on

the faculty of any other university?

A.   Yes.  Prior to UC-Irvine, I was a professor at the

University of Washington in Seattle for something like 29

years.  Prior to that, I spent a few years on the faculty at

the graduate faculty at the New School for Social Research here

in the city.  And prior to that I was in graduate school.

Q.   Focusing on graduate school, please tell the members of the

jury what degrees you have academically.

1   A.   Well, starting with college, I went to UCLA as an

2   undergraduate.  I majored in mathematics and psychology and

3   received my bachelor's degree in 1966.

4            After UCLA, I went to Stanford for graduate school and

5   received a master's degree in psychology, followed by a Ph.D.

6   in psychology in 1970.

7   Q.   Dr. Loftus, are you familiar with the term "curriculum

8   vitae"?

9   A.   Yes.

10  Q.   And is the abbreviation for that a CV?

11  A.   Yes.

12  Q.   And please tell the members of the jury what a curriculum

13  vitae is.

14  A.   Well, typically, it's a document that expresses your

15  educational background, career, publications, awards, honors,

16  your professional life.

17  Q.   And Dr. Loftus, do you, in fact, have a CV?

18  A.   I do, yes.

19  Q.   And for what period of time does your CV cover?

20  A.   Well, I think I have mentioned in there where I went to

21  college, so it goes back to the 1960s.  And then just about

22  everything that's happened professionally since that time.

23  Q.   Professor Loftus, I'm going to ask you questions about your

24  background, research, education, etc.  Would you benefit from

25  being able to look at your CV?

LCGVMAX3                    Loftus - direct

1    A.  That would be helpful, yes.

2           MS. STERNHEIM:  With the Court's permission, I would

3    ask that Dr. Loftus be permitted to look at her CV, which is

4    Defendant's Exhibit EL-1, a copy of which has been provided to

5    the government and the Court.

6           THE COURT:  Marked for identification?

7           MS. STERNHEIM:  Yes.

8           MS. POMERANTZ:  No objection, your Honor.

9           THE COURT:  She may.

10          MS. STERNHEIM:  Thank you.

11   BY MS. STERNHEIM:

12   Q.  In addition to the degrees that you've just discussed, have

13   you ever received any honorary degrees?

14   A.  I have received a number of honorary doctorates from

15   universities other than the ones I officially attended.

16   Q.  Of those universities, are they all in the United States or

17   elsewhere as well?

18   A.  Some of them are in the United States, like John Jay

19   College of Criminal Justice, which is one of the honorary

20   doctorates.  But I also have an honorary doctorate from a

21   British university, from -- actually, I think a couple of

22   British universities, from the University of Oslo, from Haifa

23   University in Israel.  And I was supposed to be awarded an

24   honorary doctorate by an Australian university, Australian

25   National University, where I was supposed to go to the

LCGVMAX3                        Loftus - direct

1    commencement and receive it, but because of COVID, that hasn't

2    yet happened.

3    Q.  Let's talk for a moment about any honors that you may have

4    received in connection with your professional capacities.

5            Could you please summarize them for the jury or

6    highlight those that you think are most significant.

7    A.  Well, I don't know.  That's kind of hard.  It's like

8    which --

9    Q.  Well --

10   A.  -- which baby is more important.

11   Q.  Let me stop you for a second.

12   A.  Okay.

13   Q.  You are referring to your CV?

14   A.  Yes.

15   Q.  Approximately how many pages is your CV?

16   A.  Well, the CV is 47 pages single-spaced.

17   Q.  Single-spaced.  So it's rather dense; correct?

18   A.  Yes.

19   Q.  Well, I'm just going to ask you to highlight some of the

20   awards that you are most proud of for the jury.

21   A.  Okay.  Well, that would be page 2 or 3.  Probably the most

22   prestigious of those awards is election to the National Academy

23   of Sciences.  I was elected to the United States National

24   Academy of Sciences approximately 2004.  And that is one of the

25   most prestigious things that can happen to an American

LCGVMAX3                    Loftus - direct

1   scientist in a field that doesn't have a Nobel Prize.

2   Q.  What are some of the other honors that you are especially

3   proud of?

4   A.  I've received the two highest honors from the Association

5   for Psychological Science, an organization of primarily

6   academic scientific psychologists.  I've received some lifetime

7   awards even from the American Psychological Association, which

8   is an organization that has many clinical psychologists as

9   members.  Those are some of them.

10  Q.  Is it fair to say you've received numerous awards, in

11  excess of dozens of awards?

12  A.  Yes.

13  Q.  And honors as well, correct?

14  A.  I sort of lump them together, yes, sometimes.

15  Q.  Okay.  With regard to your academic experience, do you

16  perform research?

17  A.  Yes.

18  Q.  And what kind of research do you perform?

19  A.  Over the course of my career, I've done many hundreds of

20  experiments.  And when I say "experiments," these are

21  experiments that are conducted in my laboratory with my

22  graduate students or post-docs or sometimes undergraduate

23  research assistants, or they might be experiments that are done

24  outside in the field.  And primarily these are studies of the

25  human memory; what happens after people have had some

LCGVMAX3                          Loftus - direct

experience, maybe recorded a little bit of information about

the experience into their memory, and are then exposed to some

new information that can potentially contaminate or distort

that memory.

Q.  In addition to the support that you received from the

universities of which you have been on the faculty and

supporting your research, have you received any fellowships or

grants that support your research?

A.  Over the years, yes.  My laboratory scientific experiments

have been supported by the National Science Foundation or the

National Institute of Mental Health or sometimes other

organizations or foundations that have provided the funds to,

excuse me, support that research.

Q.  In addition to research that you've conducted, have you had

occasion to consult with any government agencies?

A.  I've consulted with many government agencies, yes.

Q.  Could you please share with the jury some of those agencies

that you've consulted with?

A.  Well, I've consulted with the Department of Justice, the

Secret Service, the Central Intelligence Agency, the Federal

Bureau of Investigation, the Internal Revenue Service at

different points in my career.

Q.  With regard to the research that you conduct, are the

findings or your analysis of the experiments put into a report

generally?

LCGVMAX3                        Loftus - direct

A.   Generally, when we do an experiment or a set of

experiments, we will write up a scientific publication, submit

it hopefully to a peer-reviewed journal where it will undergo

peer review and then be published and be part of the scientific

literature so that it's available for other people to have

access to.

Q.   Please, in a very simple fashion, describe to the jury what

the peer review process is.

A.   Journals that are peer-reviewed journals generally have an

editorial board.  Members of the scientific community that will

review a manuscript that has been submitted for publication,

will review that manuscript and will make recommendations to

the editor about whether this manuscript is worthy of being

published.  Is it scientifically sound, is it sufficiently

interesting, is it appropriate for the journal, helping the

editor to make that -- or should it be rejected, because it's

none of those things.

Q.   In addition to your submission of your own reports to

peer-reviewed journals, have you had the occasion to serve on

the editorial boards of any peer-reviewed journals?

A.   Well, over these years I've served on the editorial board

of many journals.  And even today I am still on the editorial

board of a few journals.  But over the years, many of the major

journals in the field of psychology.

Q.   In the course of your career, have you been a member of any

LCGVMAX3                         Loftus - direct

1    professional organizations?

2    A.  Yes.

3    Q.  And give the jury just a sampling of what kind of

4    organizations those are.

5    A.  Well, one of my primary organizations with which I

6    affiliate is the Association for Psychological Science.  This

7    is an organization primarily of academic university research

8    psychologists, although there are many clinical researchers who

9    also belong to the organization.  I was president of that

10   organization in 1998-ish.

11          I'm a member of the Western Psychological Association.

12   This is the organization in psychology that covers the western

13   region of the United States; so it's California, Oregon,

14   Washington, maybe Hawaii, and possibly some other states on the

15   west coast.  And I was twice president of the Western

16   Psychological Association.

17          So those are just a couple of the organizations that I

18   affiliate with.

19          I've been president of a couple of the divisions of

20   the American Psychological Association in the past, like the

21   American Psychology Law Society, and have served in other roles

22   for other organizations, not president.

23   Q.  Moving on to publications.  During the course of your

24   career, have you published articles and journals?

25   A.  Yes.

1   Q.  Can you approximate over the span of your career -- and let

2   me stop you for a minute.  How many years would you say you

3   have been a psychologist in the field of memory science?

4   A.  Well, at least since I got my Ph.D. in 1970.  But I

5   actually published a few articles while I was still a graduate

6   student with my professors as coauthors.

7   Q.  Well, let's begin at 1970.  From 1970 to this year, 2021,

8   approximately how many articles, if you could estimate, have

9   you published?

10  A.  Well, I've published over 20 books and probably over 600

11  scientific articles and chapters.

12  Q.  And are all of them in your CV?

13  A.  I believe just about everything I've published is listed in

14  the CV, and that's why it takes so many pages.

15  Q.  In addition to the publications that you have discussed in

16  the books that you have written, have you also coauthored in

17  other people's books, such as chapters and textbooks and

18  otherwise?

19  A.  Yes, I've coauthored a number of chapters, but that would

20  have been included in the 600 estimate that I've given you

21  already.

22  Q.  Okay.  Now, I'd like to speak to you briefly about the

23  research that you've conducted.

24          Is it possible for you to approximate how many

25  research experiments you've conducted at least from 1970 to the

LCGVMAX3                        Loftus - direct

1   present?

2   A.  I would just estimate hundreds of experiments involving

3   maybe 50,000 participants or more, but it's just a -- it's just

4   kind of an estimate.

5   Q.  Well, let's just focus on a few of those, if we might.

6          What stands out in your mind with regard to

7   experiments that you have done that have impacted the science

8   of memory?

9   A.  I would say that one of the major contributions is the work

10  that I and my collaborators have done on the misinformation

11  effect on showing that after people see, say, a simulated crime

12  or a simulated accident, and they are exposed to some

13  misinformation about the accident or the crime that they saw,

14  that many people will incorporate that misinformation into

15  their memory and it causes an impairment in memory.  False

16  swayed of the misinformation.  It becomes their memory and

17  their memory becomes inaccurate.

18         One -- I guess you could call it a classic study,

19  because it's in many of the textbooks in psychology today is

20  one in which we show people a simulated accident, maybe a car

21  goes through a stop sign that's controlling the intersection.

22  And later on we expose our witnesses to misinformation that it

23  was a yield sign.  Many people will now claim that they saw a

24  yield sign instead of a stop sign.  So they have succumbed to

25  the misinformation in that new information that was presented

LCGVMAX3                         Loftus - direct

to them and adopted it as their own memory.  And that study was

published in 1978.

Q.  Have you conducted any studies that have to do with

language and how language might affect memory?

A.  Yes.  An example of that would be -- again, this is also a

fairly widely cited study.

      We showed people a simulated accident.  Afterwards, we

asked people about the speed of the vehicles involved in the

accident.  But different witnesses are questioned in different

ways.  So some witnesses are asked a question like, How fast

were the cars going when they smashed into each other?  And

others are asked, How fast were the cars going when they hit

each other?

      And we found that people estimated the speed as

greater if you used the word "smashed" than if you used the

word "hit."  Also we had found that if we use the smash word,

this leading kind of biased word, it affected what other things

that people remembered.  Our witnesses were more likely to

remember, for example, broken glass that didn't exist if we had

used that word smashed in questioning them.

      So that's an example of what you're asking about, the

connection between language and memory.

Q.  In the course of your research and experience, are you

aware of any experiments that have actually measured emotion

and its impact on memory?

LCGVMAX3                    Loftus - direct

A.   Yes, there is -- well, one study that's coming to mind

is -- this is a study that we published somewhat later in the

2000s, maybe around 2008 or so, along with my former Ph.D.

student who is now professor of psychology, Dr. Laney.  This

was a study where we -- we didn't just change memory for

turning a stop sign into a yield sign, but we planted entire

events into the minds of research witnesses, events that did

not happen.  And then we measured people's emotional reactions

to these false memories.

        So we planted false memories, for example, that you

witnessed your parents having a physically violent fight when

you were a kid or that you accidentally caught your parents,

you know, having sex when you were a kid.  And once we

succeeded in planting these false memories and measured

people's emotional reactions, they were just as emotional about

these created memories as other individuals were who truly had

had those experiences.  So the bottom line there was that

emotion is no guarantee that you're dealing with an authentic

memory.

Q.   Professor Loftus, in devising a research project, do you

need to gain approval from any organization or from your

university to permit you to engage in that experiment?

A.   Yes, we do.  Colleges and universities have human subjects,

review committees.  And when we want to propose to do a study

with humans, there are separate groups that review studies with

LCGVMAX3                    Loftus - direct

```
1    animals, but I am proposing studies with humans.  It goes

2    through a process of review on the campus.  And sometimes they

3    ask you to make modifications in your procedure; other times

4    they just outright give you the blessing to go ahead and do the

5    study.

6    Q.  Is there a standard requirement that the experiment that

7    you're engaging in cause no harm to the participant?

8    A.  Well, we certainly -- we certainly hope for -- yes, that

9    the -- when we're experimenting with human beings, that we are

10   not going to create any -- any harm in those participants.

11   Q.  And does that requirement in and of itself limit the types

12   of experiments that you might otherwise choose to engage in?

13   A.  Yes, it does.  It does.  So it might dictate what kind --

14   in the case of my work on false memories, what kind of false

15   memory I would propose to plant in the minds of a research

16   participant.  So I might want to plant a false memory that

17   something horrible happened that would have been traumatic if

18   it actually had happened, like you were, you know, attacked by

19   a vicious animal.  And the human subjects review committee,

20   well, has been known to approve that kind of proposal.

21          But other kinds of studies that might be a little bit

22   more sensitive, the human subjects committee might feel a

23   little uncomfortable about approving, like a deliberate attempt

24   to -- to plant a memory, for example, that your father, you

25   know, forced you to sacrifice animals or breed babies and kill
```

LCGVMAX3                    Loftus – direct

1   those babies, something that you see in these claims of satanic

2   rituals, for example.

3   Q.  Dr. Loftus, this is not your first time testifying, is it?

4   A.  No, it's not.

5   Q.  Approximately how many times have you testified in a court

6   of law over the time that you have been a research scientist?

7   A.  I've testified in approximately 300 trials since June 3rd,

8   1975.

9   Q.  And in addition to giving testimony at trial, have you also

10  provided testimony at depositions?

11  A.  Yes.

12  Q.  Have you testified in civil cases?

13  A.  Yes.

14  Q.  Have you testified for both the plaintiff and the defense?

15  A.  Many times, yes.

16  Q.  In connection with criminal cases, is it fair to say that

17  the majority, if not most, of your testimony is for the

18  defense; correct?

19  A.  Well, I've only been asked to consult with the prosecution

20  maybe five or six times.  But of those five or six times I've

21  consulted, only one time did the prosecution actually request

22  my testimony at trial; and I did testify for the prosecution in

23  that one case in Wisconsin.

24  Q.  I apologize.

25          Do you have any knowledge of why you have not

1    testified more often for the prosecution?

2    A.   The prosecution is frequently the one that has -- is

3    putting on memory testimony and maybe wants to bolster that

4    testimony.  And the testimony about memory distortion or the

5    potential for false memories is not something that typically

6    fits in their agenda.

7    Q.   With regard to the many hundreds of times that you've

8    testified, have you been declared as an expert in the science

9    of memory?

10   A.   The vast majority of those 300 cases are testimony about

11   memory.  Every now and then I have testified as an expert

12   witness on a slightly different issue, usually having to do

13   with human comprehension, but not necessarily memory, like how

14   people would understand warning labels, for example.

15   Q.   And is part of your expertise related to the impact of

16   memory on the brain?

17   A.   I talk about memory and the processes of memory.  It's the

18   neuroscientist who might be the ones who want to tell you about

19   the hippocampus and the amygdala and how it connects to the

20   parts of the brain.  I know a little bit about that and I've

21   included material in some of my introductory psychology

22   textbooks about that; but I would defer to a different expert,

23   if you're talking about matters of neuroscience.

24   Q.   Well, with regard to memory though, have you testified

25   about these stages of memory as known in your field?

LCGVMAX3                    Loftus – direct

1   A.   Oh, yes.  Yes.

2   Q.   Have you testified with regard to the impact of post-event

3   information on memory?

4   A.   Many times, yes.

5            (Continued on next page)

LCGCmax4                    Loftus - direct

BY MS. STERNHEIM:

Q.  And have you testified with regard to the construction or
reconstruction of memory?

A.  Yes.

        MS. STERNHEIM:  Judge, at this time, I would proffer
Professor Elizabeth Loftus as an expert in the field of memory
science, the nature of memory reconstruction, and the impact of
events upon memory.

        MS. POMERANTZ:  Subject to our earlier objections,
your Honor.

        THE COURT:  Consistent with my prior ruling, I
indicate Professor Loftus as an expert in the fields you've
indicated.  Go ahead.

        MS. STERNHEIM:  Thank you very much.

BY MS. STERNHEIM:

Q.  Professor Loftus, I just mentioned stages of memory.  Can
you please explain to the jury what those stages are in the
study of memory science.

A.  Yes.  One of the things we know about memory is it doesn't
work like a recording device.  You don't just record the event
and play it back later.  The process is much more complex.  And
we study the processes of memory, tend to divide that process
into three major stages.

        THE WITNESS:  And, your Honor, I don't know if it's
possible in this enclosure for me to illustrate this for the

LCGCmax4                          Loftus - direct

1   jury, but it might help if I could use the equipment to

2   identify the three stages and --

3          MS. STERNHEIM:  Judge, the monitors have the capacity

4   to be used as a whiteboard and I would request that, for

5   demonstrative purposes, Professor Loftus be permitted to

6   demonstrate what she is discussing concerning the stages of

7   memory.

8          THE COURT:  Ms. Pomerantz.

9          MS. POMERANTZ:  No objection, your Honor.

10          THE COURT:  All right.  If you can do it

11   technologically, go ahead.

12          MS. STERNHEIM:  May I just go over and show professor

13   Loftus what we need to do to turn it on.  I think we have our

14   able tech person to help us.  Thank you.

15          Your Honor, I would ask the screen be visible for the

16   jury, the parties, and the public.

17          THE COURT:  You may.

18   BY MS. STERNHEIM:

19   Q.  Professor Loftus, you may use the screen if it aids in your

20   testimony concerning the stages of memory.

21   A.  So, typically, we start with the first stage, which is

22   called the acquisition stage.  This is kind of -- and this is a

23   period where some event or events occur.  That's the first

24   stage of the process.

25          But after that event or those events are over, now

1    time is passing and we enter the second stage, and this is

2    called the retention stage.  After some time has passed, a

3    person might be asked to remember the event or the events, to

4    answer questions, to subject himself to an interview, to

5    testify.  These are acts of retrieval where somebody is trying

6    to retrieve information about the event.

7            And so now we enter that third stage, which is the

8    retrieval stage.  So our job as researches in this field is to

9    identify the psychological factors that come into play at each

10   of these three stages that can affect the accuracy of what

11   somebody is telling you.

12   Q.  Let me stop you for a second.  When you were referring to

13   the acquisition stage, you mentioned an event.  In the category

14   of event, is it just something that one sees or can it be that

15   something that one actually personally experiences or hears?

16   A.  Well, first of all, it could be just -- it could be what

17   somebody sees and hears.  It can be a robbery, for example,

18   which somebody is seeing something and maybe hearing some

19   conversation, but it might just be memory from a conversation

20   or memory for some other experience that ends up being critical

21   where you would like to know what happened.

22   Q.  So one could actually be an observer or an actual

23   participant or a hearer, someone who hears something in that

24   acquisition stage?

25   A.  Yes.  Sometimes people, for example, are crime victims and

LCGCmax4                          Loftus - direct

1   sometimes they're witnesses, and they're not the victim
2   themselves, but --
3   Q.   Now, after the acquisition stage, is anything that happens
4   after the event, whichever constitutes the event occurs,
5   considered retention stage?
6   A.   Typically, yes.  It's after the event is over, so we say,
7   well, that's the retention stage.  I don't mean to complicate
8   things too much, but I think you can appreciate that actually
9   there can be many acts of retrieval.  So there can be a long
10  retention interval peppered with different acts of retrieval.
11  But I used a simple diagram here to illustrate the three major
12  stages.
13  Q.   Can you simply identify what separate acts of retrieval
14  would be.
15  A.   So after some event, say, you know, a robbery, sometimes
16  people might have a conversation with each other about what
17  they saw and then sometimes the police might come to the scene
18  and start asking questions about what did you see or what did
19  you hear, and then the person might go to a police station and
20  maybe try to make an identification of somebody who might have
21  been seen at the event, and then somebody may be interviewed
22  many more times, may then testify at trial.  That would be a
23  standard situation in a legally relevant event.
24  Q.   Now, in each of those retrieval examples you just gave,
25  that is coming from an external source; correct?

LCGCmax4                         Loftus - direct

A.   Yes.

Q.   Is there the possibility of retrieval from an internal source, meaning within the individual who is trying to recreate the memory?

A.   Well, in the example that I gave earlier with the stop sign and the yield sign, we do suggest the misinformation externally, we supply them with the misinformation.  But sometimes what happens with individuals is they draw inferences about what might have happened or what could have happened or what possibly happened and they can suggest things to themselves.  That's called autosuggestion where there is not somebody deliberately suggesting something to you, not deliberately trying to tell you, you know, I saw the thief and he was wearing a brown jacket instead of a green jacket, but you, the witness, are drawing inferences that then start to feel as if they're memories.

Q.   Going back to the acquisition stage, what would affect the quality of one's acquisition of an event?

A.   At the time of acquisition, the event itself, well, some obvious thing, how good is the lighting, how far away are you, how distracted are you, are you preoccupied thinking about something else.  Sometimes, if you're under the influence of certain drugs.  Marijuana is one that has been studied a lot, for example, and we've studied it in a recent paper.  That could affect the formation of the memory in the first place.

LCGCmax4                           Loftus - direct

1    Q.  So in connection with the acquisition stage, there could be

2    external factors that can affect acquisition?

3    A.  Yes.

4    Q.  And there could also be personal or internal factors that

5    could affect one's acquisition of information?

6    A.  Yes.

7    Q.  Now, going to the retrieval stage --

8    A.  Retention.

9    Q.  Well, retention would be --

10   A.  What would be next.

11   Q.  What you hold from the experience; correct?

12   A.  Well -- so, time is passing.  I mean, the event is getting

13   older and older, and some other things are important in this

14   retention stage, and one of those things is whether or not a

15   person is exposed to post-event suggestion.  If there is

16   post-event suggestion, maybe a little misinformation, it can

17   enter a witness's memory and cause a contamination, an

18   alteration, a distortion, or even a supplementation of memory,

19   and the longer that retention interval, the older -- the older

20   the event is, the more susceptible people are to having

21   post-event suggestion potentially contaminate their memory.

22   Q.  It's fair to say that one does not need any degree

23   whatsoever to know that memory can fade over time; correct?

24   A.  Correct -- I think, yeah, that's kind of a matter of common

25   sense.  But what's less a matter of common sense is that, as

1   it's faded and weakened, it becomes more vulnerable to

2   contamination.

3   Q.   Now, you spoke about post-event suggestion.  Stepping back

4   for a moment and just using the term post-event information,

5   please tell the jury what that would be and what could

6   constitute such information.

7   A.   Post-event information can happen when two people are

8   having a conversation with each other about the past and they

9   can influence each other.  Post-event information can be

10  supplied when somebody is being interrogated, particularly, if

11  they're being interrogated with somebody who's got an agenda or

12  a hypothesis about what might have happened and communicates

13  that to the person they're interviewing, even inadvertently.

14       The media is a source of post-event suggestion that

15  we've actually studied where people are sometimes interviewed

16  on the media or media personalities will supply some suggestive

17  information that can contaminate memory.

18       Those are just examples of out there in the real

19  world, what are the opportunities for post-event suggestion to

20  become available to a person and potentially contaminate a

21  memory.

22  Q.   Have you conducted any studies or given any workshops with

23  regards to interviewing techniques and the effect on memory?

24  A.   Well, that is typically what -- when I would be consulting,

25  for example, with the FBI or the Secret Service or even the

LCGCmax4                          Loftus - direct

1   CIA, I would be talking about interviewing techniques and other

2   sources of potential post-event information that can

3   contaminate memory.  That's part of what those lectures and

4   consulting is about.

5   Q.  And in connection with an interviewing process, would there

6   be a difference between asking what would be an open-ended

7   question where the person being questioned provides the

8   information as opposed to, as we all know, what a leading

9   question is where the information may be provided and the

10  recipient of the question just answers yes or no?

11  A.  Well, it's certainly open-ended questions give you, in some

12  sense, more accurate information.  It might not be fully

13  complete, so you might need to follow it up with some specific,

14  more specific information or the closed-ended questions, and

15  you would like to have them be as neutral as possible so that

16  you don't contaminate the witness.  But to get a little bit

17  more complete a version of what you're looking for -- but when

18  you ask leading questions like how fast were the cars going

19  when they smashed into each other, that's probably not a good

20  way to follow up an open-ended question.

21  Q.  Now, with regard to the process of questioning someone,

22  have you conducted any studies that show the impact of stress

23  in the interviewing environment?

24  A.  I have -- no.  Usually, when you talk about stress, it's

25  usually at the time of the event itself.  It can be a very --

1    you've seen a horrible traffic accident or something

2    particularly stressful happens to you.  In terms of the stress

3    at the time of retrieval when you're answering questions, I'm

4    not sure, you know, to what extent that has been manipulated.

5    I'd have to think about that a little to see if I can think of

6    a study that might help you out there, but --

7    Q.  Well, in addition to questioning someone, are there other

8    situations in which there can be the exchange of information

9    that can be suggestive to an individual?

10   A.  Yes.

11   Q.  Can you please give us some examples of that.

12   A.  Sometimes when people are trying to retrieve information,

13   there is pressure to provide more, more details, more details

14   about some particular subject.  I've seen that not only in law

15   enforcement interviews, but more often even in certain kinds of

16   psychotherapy.

17   Q.  Now, talking about psychotherapy for a moment, you told the

18   jury that you have a doctorate in psychology, but are you a

19   practicing therapist?

20   A.  No.  No.

21   Q.  Do you consult with patients in a therapeutic environment?

22   A.  I don't do therapy, but I sometimes study patients.  I

23   don't do therapy, though.

24   Q.  So you're not a psychologist who has a therapeutic

25   practice?

LCGCmax4                            Loftus - direct

1   A.   Correct.

2   Q.   You just mentioned the suggestiveness at times of

3   psychotherapy.  Could you please explain to the jury what you

4   mean with regard to that.

5   A.   Well, there are certain -- of course therapy can be

6   wonderful for many people, but there are some practices in some

7   psychotherapy where the therapist tells the patient that the

8   current problems are due to some buried memories of childhood

9   trauma and that they need to be recovered or retrieved in order

10   to heal the patient.  Some of these patients -- some of these

11   psychotherapists have engaged in practices that have led their

12   patients to have false memories.

13   Q.   But that certainly is not in every therapeutic environment?

14   A.   No, absolutely not.

15   Q.   Now, with regard to suggestiveness, are you familiar with a

16   concept called labeling?

17   A.   Yes.

18   Q.   Could you please explain to the jury what that means with

19   regard to memory.

20   A.   There is a lot of classic work on labeling, which is if

21   you -- if a person sees something ambiguous and, later on, it

22   gets labeled with a particular label, that the individuals will

23   start to remember this ambiguous stimulus as something a little

24   closer to that label.

25        In one of the old classic studies, people saw a --

LCGCmax4                      Loftus - direct

something that could vaguely look like it might be eyeglasses
or whatever, very ambiguous.  If it got labeled as eyeglasses,
people remembered it as more like eyeglasses.  If it got
labeled as dumbbells, people later remembered it as looking
more like dumbbells.  That's just an example of how you can
label something ambiguous and it will affect people's memory
for what they saw.

Q.  So if two people, let's say, are having a conversation
concerning an event, and one of the individuals characterizes
it in some colorful fashion that the other one may not have
considered, would that be a situation where the memory might
become labeled?

A.  Yes, absolutely.  In one of our older studies, we found
that labeling something as an incident, which is really fairly
neutral, has a different affect than when you label the thing
that happened as a fight.  People are more likely to construct
an image of a fight, probably because of that label.

Q.  Are you familiar with the term memory traces?

A.  Memory traces?

Q.  Yes.  Or memory fragments?

A.  Well, I suppose that every now and then somebody might talk
about memory fragments.  Just, you would have a bit or a piece
of information in your memory.

Q.  And are you familiar with situations where someone might
take that bit of a memory and enhance it in some way?

LCGCmax4                    Loftus - direct

1            MS. POMERANTZ:  Objection, your Honor.

2            THE COURT:  Grounds.

3            MS. POMERANTZ:  Leading.

4            THE COURT:  Sustained.

5            MS. STERNHEIM:  Okay.  I'll move on.

6    BY MS. STERNHEIM:

7    Q.  Are you familiar with the term forgetting curve?

8    A.  Yes.

9    Q.  Could you please explain to the jury what that means.

10   A.  Yes.  I hope in talking about the forgetting curve I'm not

11   violating any judge's order, but I will --

12           THE COURT:  Jury will disregard the witness's last

13   comment.  The witness will just direct her answers to the

14   questions posed.  Thank you.

15           THE WITNESS:  Okay.  Sorry, your Honor.

16   Q.  So the forgetting --

17   A.  So the forgetting curve.  If I were to plot how good is

18   memory as a function of how much time has passed --

19           MS. POMERANTZ:  Objection, your Honor.

20           THE COURT:  Sustained.

21           MS. STERNHEIM:  We'll move on.

22   Q.  Going back again to the concept of post-event information,

23   you spoke before about post-event suggestion.  What would that

24   be?

25   A.  Well, post-event information is sort of an umbrella term.

LCGCmax4                          Loftus - direct

1   Post-event -- somebody could supply post-event information that

2   is accurate and that might cause somebody to supplement their

3   memory with accurate information.  Post-event suggestion

4   typically refers to a situation where you're supplying people

5   with new information that is not particularly accurate.

6   Q.  Memory has been termed a constructive process; correct?

7   A.  Yes.

8   Q.  Could you explain what that means to the jury.

9   A.  What we mean by that is, as I testified earlier, we don't

10  just record events and play it back later like a recording

11  device would work, like a video machine, but rather, we are

12  actually constructing our memories when we retrieve memories.

13  We often take bits and pieces of experience sometimes that

14  occurred at different times and places, bring it together, and

15  construct what feels like a recollection.

16  Q.  With regard to the experiments that you have conducted, by

17  virtue of the experiment itself, you have proof of what would

18  form the basis of a memory; correct?

19              MS. POMERANTZ:  Objection.

20              THE COURT:  Just a moment.  Grounds.

21              MS. POMERANTZ:  Leading.

22              THE COURT:  Sustained.

23  BY MS. STERNHEIM:

24  Q.  When you do memory research, is there a process in your

25  experiment that sets up a basis for a memory?

1    A.  In some of the experiments, yes.  So, for example, in the

2    study that I've testified about already, we show people a

3    simulated accident, so we know exactly what the event was, we

4    know what they saw and that way we can see how the post-event

5    information changes what they remember.

6    Q.  And in contrasting that, which you just said you could see,

7    that would be different than somebody who just reports a memory

8    with no visual proof or documentation of it; correct?

9    A.  Yes, then you don't have a record of what actually

10   happened.

11   Q.  And somebody who might report a memory may give very vivid

12   detail; correct?

13   A.  Yes.

14   Q.  And does the fact that someone reports a memory with vivid

15   detail mean that the memory is accurate?

16   A.  No, because of false memories.  Once they're constructed in

17   somebody's mind, either by external suggestion or by

18   autosuggestion, could be very vivid, detailed.  People can be

19   confident about them, people can be emotional about them, even

20   though they're false.

21   Q.  So if somebody believes that they had an experience and

22   describes that experience, there is no way of proving that that

23   actually occurred?

24           MS. POMERANTZ:  Objection.

25           THE COURT:  Sustained.

1    Q.  Outside of the laboratory, is there any way of proving that

2    someone has an actual memory?

3              MS. POMERANTZ:  Objection.

4              THE COURT:  Sustained.

5    Q.  Does an experience that may contain some trauma make a

6    memory more reliable than one that does not?

7    A.  Traumatic experiences compared to maybe more neutral ones

8    might be associated with certainly remembering, you know, the

9    core of what happened.  You know that what you saw was a plane

10   crash and not a warehouse fire and maybe some core details, but

11   even traumatic experiences can be subjected to post-event

12   suggestion that can exaggerate or distort or change the memory.

13   Q.  In the course of your research and experience, have you

14   done any experiments that have studied the confidence of

15   memory?

16   A.  Yes.

17   Q.  Can you please explain that to the jury.

18   A.  Oftentimes, at retrieval, when somebody is answering a

19   question or reporting on what they remember from an event, they

20   might be asked to express the level of confidence, you know,

21   I'm pretty sure it happened, I'm very sure or what have you.

22   And one of the things we know is if the conditions are very

23   pristine, not a lot of -- not a lot of suggestion, not a long

24   period of time, they're a fair test, people are more accurate

25   when they're confident than when they're not confident.  But

LCGCmax4                       Loftus - direct

1   the problem is when you have post-event suggestion or

2   intervention, people get very confident about their wrong

3   answers, and you can see that even wrong answers or false

4   information, false memories can be expressed with a high degree

5   of confidence.

6   Q.   In connection with your experience and research, have you

7   ever come across the term, rich false memories?

8   A.   Yes.

9   Q.   Could you please explain to the jury what that means.

10  A.   So going back, actually, to the typical eyewitness study,

11  witnesses see an accident, they really saw the car go through a

12  stop sign.  Later on, you suggest it was a yield sign and many

13  people will succumb to the suggestion.  You have changed a

14  detail in memory for an event that actually happened.

15          But somewhere around the 1990s, researchers from

16  around the world started to look at, could you plant an entire

17  event into the minds of people for something that didn't

18  happen, could you use enough suggestion that you would get

19  people to construct whole events, and we and others have

20  accomplished that, meaning other scientific laboratories,

21  planting false memories that -- well, as I mentioned, you

22  witnessed your parents have a physically violent fight or you

23  were attacked by a vicious animal, or you had a serious indoor

24  or outdoor accident, or you nearly drowned and had to be

25  rescued by a lifeguard, or you committed a crime as a teenager

LCGCmax4                        Loftus – direct

1    and it was serious enough that the police came to investigate —

2    all of these rich false memories have been planted in the minds

3    of otherwise healthy individuals.

4              THE COURT:  Ms. Sternheim, we're going to break for

5    the lunch hour.

6              MS. STERNHEIM:  That's great.  Thank you.

7              THE COURT:  Members of the jury, you'll have about an

8    hour for lunch.  Thank you so much.  Enjoy your lunch.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LCGCmax4                          Loftus - direct

 1              (Jury not present)

 2              THE COURT:  The witness may step down and out for the

 3     break.  Thank you.

 4              Everyone may be seated.  Are there matters to take up

 5     before the break or just after the break?

 6              MS. POMERANTZ:  Not from the government.

 7              MS. STERNHEIM:  Not at this time, Judge.

 8              THE COURT:  Okay.  You could step out, thank you.

 9              THE WITNESS:  Okay.

10              (Witness excused)

11              THE COURT:  I just want to make sure we have clarity

12     on what needs to be resolved following the break.

13              On the prior inconsistent statements, I'm going to

14     spend my lunch looking through them, but I'm hoping there will

15     be consultation and stipulation in narrowing so that we can

16     really get down to where there is genuine disagreement after

17     you've had some discussion.

18              Is that everybody's understanding?

19              MR. ROHRBACH:  That's fine with the government, your

20     Honor.

21              MR. EVERDELL:  We will try to confer, see if we can

22     narrow the issues.

23              THE COURT:  Okay.  I don't know when you need

24     resolution of the un-narrowed issue, but my understanding is we

25     might hit that point today.

1           MR. EVERDELL:  Your Honor, yes.  This does create a

2     bit of a timing problem because it's possible we would get to

3     the witnesses where these issues would come up, so --

4           THE COURT:  All the more reason to work it out.

5           MR. EVERDELL:  Very true.  And if -- well, I guess

6     we'll address if we can't work it out with the Court when we

7     come back.

8           THE COURT:  Okay.  Were you going to offer something

9     there, Ms. Pomerantz?

10          MS. POMERANTZ:  No, your Honor.  I saw something pop

11    up on the screen.

12          THE COURT:  All right.  We'll come back.  We're going

13    to need to come back early I think to get to some resolution if

14    we need to.

15          And Mr. Hamilton, you're going to confer on that so

16    that we can have that testimony ready when it's time?

17          MR. ROHRBACH:  We'll confer on the details about how

18    to make that testimony happen.  My understanding is the Court

19    hasn't resolved the pending motion to preclude the testimony in

20    full.

21          THE COURT:  Right.  I wanted to know what timing we

22    were talking about for that so that I can look at the papers.

23          MR. ROHRBACH:  We'll confer with defense counsel about

24    that.

25          THE COURT:  My quick skim of the papers this morning

LCGCmax4                          Loftus - direct

```
 1   was that there had been some narrowing there, as well; right?

 2              MR. ROHRBACH:  That's the government's understanding

 3   of the defense response, yes, is that it's narrowed to a few

 4   paragraphs of the affidavit.

 5              THE COURT:  A few paragraphs of the affidavit.  Okay.

 6   So I will focus my attention on those few paragraphs of the

 7   affidavit and try to come back with resolution after lunch if I

 8   can.  If not, end of the day -- is it fair to assume we're not

 9   going to get to that today?

10              MS. STERNHEIM:  That is correct, Judge.  If we were to

11   get there, we would have to do all the logistics about the

12   Webex and I also would need to see if Mr. Hamilton is up to it,

13   physically.

14              THE COURT:  Well, you should make that call --

15              MS. STERNHEIM:  I am doing that --

16              THE COURT:  Because it will either be today or

17   tomorrow; right?

18              MS. STERNHEIM:  Yes.

19              THE COURT:  Okay.  And then what else do I need to

20   consider?  Anything else?

21              MS. POMERANTZ:  Not from the government.

22              THE COURT:  About how much longer on Professor Loftus?

23              MS. STERNHEIM:  With the lunch break, much shorter.  I

24   don't expect to be very long and I would like to trim it so

25   that we can move on.
```

LCGCmax4                         Loftus – direct

1           THE COURT:  And then who's next?

2           MS. STERNHEIM:  I think we need to have a conferral

3   about that.

4           MR. EVERDELL:  It will either be Richard Barnett or

5   Michael Aznaran from Customs and Border Protection.

6           THE COURT:  Okay.  It's 1:03, we'll meet in 45

7   minutes, so that's 1:50.  See you then.

8           (Recess)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LCGCmax4                              Loftus – direct

1                         AFTERNOON SESSION

2                             2:05 p.m.

3               THE COURT:  Okay, where are we?

4               MS. MENNINGER:  Your Honor, the government and I spoke

5      over the break.  We appreciate how lengthy two of the witness's

6      prior inconsistent statement contentions are.  We were unable,

7      in this amount of time, to try to reach agreement on all of

8      them.  The witnesses that pertain to those two would be

9      testifying tomorrow.  The one that pertains to Carolyn is here

10     from out of state and would be testifying this afternoon.  So

11     our joint proposal, I think, would be to address right now the

12     Carolyn prior inconsistent statement so that witness could

13     testify or be released this afternoon and then, at the close of

14     court this afternoon, for us to sit down with the testimony and

15     try to reach agreement on the two related to Jane and Annie.

16              MS. COMEY:  That's correct, your Honor.  I believe

17     there are only three statements at this point in dispute

18     regarding Carolyn, so I think we can resolve that pretty

19     quickly.  Mr. Pagliuca, I believe, has the list of the three

20     that I believe are in dispute.

21              MR. PAGLIUCA:  Yes, your Honor.  The two that are

22     agreed to are at transcript 3610, 9 through 15 -- I'm sorry.

23     Not 36.  I have 35 numbers in my head.  1610, lines 9 through

24     15; 1611, lines 1 through 5.  Those correspond to the following

25     statements in the 302.

1          THE COURT:  I have them.  And have you agreed on how

2     they come in?

3          MS. COMEY:  Your Honor, we've offered to stipulate to

4     what the 302 says.  My understanding is that the defense

5     prefers a live witness, but we have offered to stipulate to

6     exactly what the witness would testify to if they wish.

7          MR. PAGLIUCA:  The witness is here, your Honor.  It

8     will be quicker just to put on the testimony than to draft up a

9     stipulation and read it into the record.  So I think that's

10    what makes sense to me.

11         THE COURT:  I mean, I can't force a stip.  I can

12    strongly encourage when it makes sense.  All right.

13         And then what's next?

14         MR. PAGLIUCA:  The ones that are in contention, your

15    Honor, are transcript trial testimony 1564, lines 4 through 7,

16    and page 1565, 18 through 23.

17         THE COURT:  Let me just get my eyes on it.  Okay.  Go

18    ahead.

19         MR. PAGLIUCA:  That corresponds to 3505, 005, page 1,

20    second paragraph, the inconsistent statement is, "Virginia

21    approached Carolyn at a party and asked her if she would like

22    to make $300."

23         THE COURT:  So what's in dispute is whether it was at

24    a party or at the Virginia house?

25         MR. PAGLIUCA:  Correct.

LCGCmax4                          Loftus – direct

1          MS. COMEY:  Your Honor, we believe that's collateral,

2     and extrinsic evidence isn't appropriate on a collateral

3     matter.

4          THE COURT:  And also, the quote was read in court,

5     wasn't it?

6          MS. COMEY:  Yes, your Honor.

7          THE COURT:  I'll sustain the objection to that one.

8          MR. PAGLIUCA:  The next is 1567, lines 7 through 19.

9          THE COURT:  Okay.  Just give me one moment.

10          MR. PAGLIUCA:  Sure.

11          THE COURT:  Okay.

12          MR. PAGLIUCA:  And the prior inconsistent statement is

13     at 3505, 005, page 1, second paragraph.  Virginia explained

14     Carolyn could make $300 by providing a man in Palm Beach with a

15     massage.

16          MS. COMEY:  Your Honor, our view is that the relevant

17     portion was read into the record and then, at lines 23 of 1567

18     through 2 of 1568, she was asked specifically whether she made

19     that statement to the FBI and she responded, yes, she told me

20     that.  So I don't see how extrinsic evidence would be

21     appropriate.

22          MR. PAGLIUCA:  I think it's inconsistent, your Honor.

23     There is a denial and then there is a yes, she told me that,

24     and I think with that inconsistency, we should be allowed to

25     impeach it.

1          THE COURT:  Yes, she told me that, and that's what you

2     told the FBI, yes, I told you that.  Sustained.

3          MR. PAGLIUCA:  The next one that's on the chart, your

4     Honor, is not at issue.

5          THE COURT:  Okay.

6          MR. PAGLIUCA:  So I think that resolves it with the

7     Court's rulings.  We're down to the two that have been agreed

8     to.

9          THE COURT:  Okay.  So that gets us what we need for

10    now and you'll keep working with respect to the other two

11    witnesses; correct?

12         MS. COMEY:  Yes, your Honor.

13         THE COURT:  Great.  What else?

14         MR. PAGLIUCA:  I don't know if the Court -- well, the

15    Court does not need to address this, but I conferred briefly

16    with the government about the government's proposed rebuttal

17    expert.  I'm prepared to file something related to that, but

18    they may not be calling the rebuttal expert, so we'll deal with

19    that later.

20         THE COURT:  Let's do what we need to do in the

21    immediate and then it sounds like we could do that by written

22    submission if we need to.

23         So the Hamilton issue, I'm trying to get my head

24    around.  So let me just ask, make sure I understand.  I'm

25    looking at the affidavit of Mr. Hamilton.  This is you,

1    Mr. Everdell?

2            MR. EVERDELL:  I have an update on his availability.

3    I think the substance is Ms. Sternheim.

4            THE COURT:  Okay.

5            MR. EVERDELL:  But as to his availability, we were

6    able to make contact with him and he can do a Webex today or

7    tomorrow, we just have to let him know when.  I don't think

8    we'll be able to get the technology set up today, but he is

9    available tomorrow.

10           MS. STERNHEIM:  Judge, I would just say that because

11   of his condition, I have not been able to speak with him and I

12   would like an opportunity to at least talk to him before we put

13   him on.  So my preference would be to make him the first

14   witness tomorrow morning because of the time difference.

15           THE COURT:  Okay.  I think that's fine.  Now let's

16   figure out if we're going to hear from him.

17           So I'm looking at the declaration.  And you've

18   narrowed to paragraphs -- tell me, Ms. Sternheim.  I think it's

19   17.

20           MS. STERNHEIM:  Let me just confirm with my

21   colleagues.

22           Judge, I need to access the letter that was filed

23   earlier this morning.

24           THE COURT:  I guess since perhaps we take this at the

25   end of the day.  I don't want to have the jury --

1          MS. STERNHEIM:  I'd appreciate that so that I can have

2     all of the documents in front of me.

3          THE COURT:  Okay.

4          MS. STERNHEIM:  Thank you very much.

5          THE COURT:  Just so I can marinate on it.  So the

6     basic idea is that you want this witness to testify about one

7     or two conversations that he had with this witness, who we're

8     calling Kate, the one or two conversations that he had with

9     Kate in which -- and his proffered testimony is that, at one

10    point, Kate said, regarding the subject of Jeffrey Epstein,

11    that it, quote, fell right into my lap.

12         MS. STERNHEIM:  That's correct.

13         THE COURT:  Let's start with that one.  What is the

14    purpose for which it is being offered?

15         MS. STERNHEIM:  It certainly shows motive and bias on

16    the part of Kate.  There is a monetary issue here.  That is not

17    the statement of someone who feels that they are a victim as

18    much as they feel -- it suggests that it's an opportunity that

19    is anything but placing her in the category of victim.  It

20    sounds more like someone who is interested in a windfall.

21         THE COURT:  So broadly stated, the purpose for which

22    it's being offered?

23         MS. STERNHEIM:  Is her bias and motive.

24         THE COURT:  And the government's objection?

25         MR. ROHRBACH:  The government's objection is that this

LCGCmax4                          Loftus - direct

1   is a collateral matter.  It doesn't go to bias or impeachment.

2   That --

3          THE COURT:  Is that a 401 objection?

4          MR. ROHRBACH:  Well, it's not a form of impeachment of

5   Kate's testimony.  So I guess it's 401 or it's not within the

6   common law motion to show bias or motive.  It is not probative

7   on the question of any monetary incentive by Kate whatsoever.

8   There is no mention of money, no suggestion of her motive for

9   doing anything in that sentence.  It's very difficult to parse,

10  without the witness's speculation, about what he thought Kate

11  might be referring to, which is it's certainly objectionable

12  and irrelevant testimony.

13         THE COURT:  I wouldn't permit that.  I guess the

14  question is just the recounting of what he said, she said, it

15  fell into my lap.

16         MR. ROHRBACH:  Right.

17         THE COURT:  So I think you mean that's -- I think it's

18  a 401 objection.

19         MR. ROHRBACH:  It's a 401 objection, your Honor, and

20  we think it's extrinsic evidence on a collateral matter because

21  it's not impeachment about any of the core subjects.  She was

22  asked about that on cross, she denied the statement.  Her

23  denial can't be impeached with extrinsic evidence.

24         MS. STERNHEIM:  Judge, it's my understanding that

25  motive and bias can be attacked in this manner.  The witness

1    said no and we have a witness who says otherwise.  To let it

2    just stand is only her statement, which we have the ability to

3    contest.

4           MR. ROHRBACH:  That would only be true if it went to

5    bias and motive, which it doesn't for the reasons I've

6    explained.  As the Court is aware, I think we had this

7    conversation at a sidebar during Kate's testimony when

8    Ms. Sternheim had this declaration and we all agreed this is a

9    collateral matter at that time.

10          MS. STERNHEIM:  Judge, collateral during the testimony

11   of that witness.  Having another witness to counter what that

12   witness says elevates it to another category.

13          MR. ROHRBACH:  It's impeachment with extrinsic

14   evidence, whether that extrinsic evidence is a declaration or

15   live testimony by a witness.

16          THE COURT:  It's not just the impeachment, it's not

17   just the question of did she say it or not.  Although, there is

18   that impeachment embedded in it.  But there is just the

19   testimony itself and the question is whether that's relevant

20   evidence of bias or motive; right?  Isn't that the analysis?

21          MR. ROHRBACH:  I didn't understand the defense to be

22   offering this as affirmative evidence of bias or motive, just

23   as impeachment for those reasons.  The defense has never turned

24   this over in Rule 16 discovery, for example, which they would

25   do if it was part of their case in chief because they were

LCGCmax4                    Loftus - direct

1    making an argument about witness bias, which is just, you know,

2    we're not raising a Rule 16 objection, it's just to show the

3    purpose for which this testimony is being used is extrinsic

4    evidence to impeach Kate's testimony.

5         MS. STERNHEIM:  The papers that we filed last night

6    specifically state the basis upon which we are seeking to

7    introduce this.  I made this available at the time of the

8    testimony.  It is dated at a time that occurred during the

9    course of the trial related to the testimony of their witness.

10   I don't see why it is a Rule 16 violation --

11        THE COURT:  Well, I think they're not actually arguing

12   that.

13        So, Mr. Rohrbach, for the proposition that the denial

14   can't be impeached by extrinsic evidence, cited Second Circuit

15   case, *United States v. Harvey*, 547 F.2d 720, "...that a cross

16   examiner is not required to, quote, take the answer, end quote,

17   of a witness concerning possible bias, but may proffer

18   extrinsic evidence, including the testimony of other witnesses

19   to prove the facts showing a bias in favor of or against a

20   party.

21        You agree that's the law, you're just saying that

22   there is not an available inference to the jury of bias from

23   the "it fell into my lap."

24        MR. ROHRBACH:  That's right, your Honor.  That

25   inference only becomes available when that statement is

1    surrounded by the speculative mental impressions of the

2    witness, which are not admissible evidence.  And the statement

3    on its own says almost nothing is an out of context statement

4    from which, on its face, doesn't say anything about Kate's

5    motives or financial interests in anything.

6             MS. STERNHEIM:  Judge, can the government really, with

7    a straight face, say that a victim would say, "It fell into my

8    lap."  I think it goes to the weight that the jury wants to

9    give to it and I think that it is appropriate affirmative

10   testimony to be put on in a defense case.  They can make

11   whatever arguments they want, they can cross examine

12   Mr. Hamilton, but to exclude it on that basis I think is just

13   wrong.

14            THE COURT:  I mean, I think we've settled on the

15   analytical framework, which is we agree, following Harvey, if

16   it is extrinsic evidence, to show bias in favor of or against a

17   party, it's permissible; right?

18            MR. ROHRBACH:  Yes, we agree.

19            THE COURT:  So it's really a 401 question.  Is there

20   an available inference to the jury, if they believe

21   Mr. Hamilton, that the witness said that Kate said, "It fell

22   into my lap," if that goes to bias.  I think there is an

23   available inference to the jury.  I won't let Mr. Hamilton go

24   beyond and speculate as to meaning.

25            MS. STERNHEIM:  Understood.

1          THE COURT:  So what else beyond that?

2          MS. STERNHEIM:  There is the statement that Kate told

3     him that the case against Ms. Maxwell was getting stronger

4     because the women were strengthening their stories.

5          THE COURT:  Okay.  Mr. Rohrbach.

6          MR. ROHRBACH:  So a few concerns about this one, your

7     Honor.  This one sort of doesn't attempt to be a quotation from

8     Kate, so we don't know the sense in which it's going to be

9     viewed with mental impressions from.  Mr. Hamilton is not a

10    statement that Kate was asked about on cross examination.

11         THE COURT:  Pause on that point.  Tell me the legal

12    basis for the pertinence of that.

13         MR. ROHRBACH:  Well, to the extent that they are -- I

14    guess if they're offering it solely to show bias or motive,

15    then that wouldn't be necessary.  If they're offering it as an

16    inconsistent statement with her other statements that she did

17    give on direct, that would not be available since they didn't

18    challenge her with a statement.

19         THE COURT:  This is why I keep asking what's the

20    framework, because --

21         MR. ROHRBACH:  If this is the bias framework again, it

22    wouldn't matter --

23         THE COURT:  Is that the same contention?

24         MS. STERNHEIM:  Yes, Judge.

25         THE COURT:  So then we have the 401 question.

1            MR. ROHRBACH:  It's the same 401 question, although

2    this one is even more attenuated from any notion of bias or

3    motive since it says nothing about her incentives or why she is

4    testifying.  She could be testifying for literally or

5    cooperating with the government for literally any reason and

6    make the same statement.  It sheds no light on her motives or

7    biases.

8            MS. STERNHEIM:  It sheds light on her knowledge that

9    she knows what the other accusers are doing.

10           MR. ROHRBACH:  That is not a motive or bias objection.

11           THE COURT:  I think that's right.  I'm inclined to

12   sustain on that one on the 401 ground.  Okay.

13           So I think we're limited to the first question.  So

14   you'll work out --

15           MR. ROHRBACH:  We've been conferring and will work out

16   a way for Mr. Hamilton to testify on that point.

17           THE COURT:  All right.  We can bring in the jury?

18           MR. ROHRBACH:  Nothing else from the government.

19           THE COURT:  Ms. Sternheim.

20           MS. STERNHEIM:  Ready to proceed.

21           THE COURT:  We'll get the witness and Ms. Williams

22   will get the jury.

23           (Witness present)

24           You may take off your mask.  Thank you.

25           (Jury present)

|    |                                                                          |
|----|--------------------------------------------------------------------------|
| 1  | THE COURT:  Thank you, everyone.  I hope you had a                        |
| 2  | pleasant lunch.  We're going to continue with the direct                  |
| 3  | examination of professor Loftus.                                          |
| 4  | Professor Loftus, I remind you, you are under oath.                       |
| 5  | Ms. Sternheim you may inquire.                                            |
| 6  | MS. STERNHEIM:  Thank you.                                                |
| 7  | BY MS. STERNHEIM:                                                         |
| 8  | Q.  Professor Loftus, before we broke for lunch, I was asking             |
| 9  | you, had you been involved in any research that dealt with the            |
| 10 | correlation between the certainty of confidence that one has              |
| 11 | and whether the memory itself is accurate.  Do you recall that?           |
| 12 | A.  Yes, I believe I answered the question.  Yes.                         |
| 13 | Q.  And are you familiar with the concept that confidence is              |
| 14 | malleable?                                                                |
| 15 | A.  Yes.                                                                  |
| 16 | Q.  Can you please explain what that means to the jury.                   |
| 17 | A.  People can express a level of confidence and if they then             |
| 18 | get some new information, for example, confirming information,            |
| 19 | something that confirms their recollection, it can increase --            |
| 20 | sort of artificially increase their confidence in what they're            |
| 21 | saying.                                                                   |
| 22 | So, for example, in some research, primarily research            |
| 23 | done by one of the most prominent people in this field,                   |
| 24 | Professor Wells from Iowa State, individuals would make an                |
| 25 | identification at a lineup and then be told -- and express some           |

LCGCmax4                        Loftus – direct

confidence like, I am pretty sure that's the guy.  They get

some new information, that's our suspect, or some other

confirming information and it increases their confidence in

their recollection.  And that's confidence malleability.

Q.  Are you familiar with the concept of prestige enhancing

memory distortion?

A.  Yes, I am.

Q.  Could you please explain to the jury what that means.

A.  So one of the things that memory scientists have discovered

about memory distortion is that we humans frequently remember

ourselves in a better light than perhaps is accurate.  So there

are studies showing that people remember their grades were

better than they really were, that they voted in elections they

didn't vote in, that they gave more to cater than they really

gave, that their kids walked and talked at an earlier age than

they really did.  These are prestige enhancing memory

distortions that people routinely make when they're not

deliberately lying, but maybe it makes them feel a little

better about themselves.

                (Continued on next page)

LCGVMAX5                       Loftus - direct

1    BY MS. STERNHEIM:

2    Q.  Earlier today I asked you various questions concerning the

3    context of your curriculum vitae, you remember that?

4    A.  Yes.

5    Q.  Fair to say that we didn't go into great detail about it;

6    correct?

7    A.  Well, no, not great detail.

8    Q.  And there was much more that you could have told the jury

9    about it, but it would be time-consuming, wouldn't it?

10   A.  It would, yes.

11           MS. STERNHEIM:  Judge, at this time I would move into

12   evidence Judge Loftus's CV, which is EF-1.

13           MS. POMERANTZ:  Objection, your Honor.

14           THE COURT:  I'm sorry?

15           MS. POMERANTZ:  The government objects.

16           THE COURT:  Overruled.  EF-1 is admitted.

17           MS. STERNHEIM:  Thank you.

18           (Defendant's Exhibit EF-1 received in evidence)

19   BY MS. STERNHEIM:

20   Q.  Professor Loftus, just to be clear, you are being

21   compensated for your time; correct?

22   A.  I am, or I hope so, yes.

23   Q.  I hope so, too.

24           You don't have any stake in the outcome of this trial,

25   do you?

1    A.   No, I don't.

2    Q.   The testimony that you give on memory science would be the

3    same regardless of what party called you; correct?

4    A.   That's correct.  It would depend on the facts of the case

5    and where it was appropriate; but whatever party wouldn't

6    matter.

7    Q.   And what is the hourly rate that you're charging for your

8    time?

9    A.   Well, I'm currently charging in this case $600 an hour for

10   my time, which was the rate that I quoted when I was retained

11   back in January.

12   Q.   Thank you.  Just a few more questions.

13           You testified earlier this afternoon about media being

14   a post-event information source; correct?

15   A.   Yes.

16   Q.   Now, media isn't just limited to the printed page; correct?

17   A.   No.  It's television, social media, newspapers, podcasts.

18   Q.   And dramatic portrayals would be a source of post-event

19   information, would it not?

20   A.   Books and movies, yes.

21   Q.   Okay.  Thank you.

22           Now, we've talked earlier about suggestion.  And

23   you've talked about studies in which memories have been

24   implanted in your subjects.  The implanting of information

25   either in your laboratory or outside of your laboratory in the

1    form of post-event information can be intentional or

2    inadvertent; correct?

3    A.   Correct.   Of course, in my studies or the studies of other

4    scientists, we do it deliberately in order to study what

5    happens, what changes it leads to.   But out there in the real

6    world, it doesn't necessarily happen deliberately that people

7    are deliberately trying to mislead other people.   It can happen

8    inadvertently.

9    Q.   Have you conducted any research or are you aware of any

10   research that has indicated that secondary gain or motive may

11   impact the retelling of an event?

12   A.   Well, there is some work on motivated false memories.

13   People do seem to be more willing to accept suggestions when

14   it's going to fit with their -- with their prior beliefs or fit

15   with some motives.   I'm not sure I know any specific study that

16   sort of shows if people are offered money for a particular

17   memory, that they are more likely to give it to you, but it

18   certainly seems plausible.

19   Q.   In any of the studies that you've conducted, has there been

20   an analysis of who provides the post-event information, meaning

21   someone who you trust as opposed to someone you don't trust?

22   A.   Yes.   There are several studies that are in the literature

23   on the source of the post-event information.   And just in

24   brief, what people find is -- what researchers find is that

25   people are more likely to accept suggestive post-event

LCGVMAX5                        Loftus - direct

1    information if it comes from somebody they trust or if it comes

2    from somebody who seems knowledgeable rather than somebody who

3    seems like they're trying to bias you for nefarious reasons.

4    So the source of the post-event information does matter.

5           There's even one study with children that shows that

6    young children are more likely to accept suggestions from

7    adults than from other children.

8    Q.  And in looking at memory, is there any way for you to tell,

9    based upon your training, experience, and research, whether a

10   memory is real or the product of post-event information?

11          MS. POMERANTZ:  Objection.

12          THE COURT:  Sustained.

13   Q.  Just going back for a moment, you spoke about post-event

14   information and post-event suggestion.  What is post-event

15   contamination?

16   A.  Post-event contamination would be a situation where there

17   was suggestive information that maybe led to a contamination.

18   You could have post-event suggestion and have people resist the

19   suggestion.  But I think if I were going to use the term

20   "post-event contamination," it would mean that somebody was

21   exposed to the suggestive information and it actually

22   contaminated them.

23          MS. STERNHEIM:  May I have a moment, Judge?

24          THE COURT:  You may.

25          (Counsel conferred)

LCGVMAX5                          Loftus - cross

1         MS. STERNHEIM:  Thank you, Professor Loftus.

2         THE COURT:  All right.  Thank you, Ms. Sternheim.

3         Ms. Pomerantz.

4         MS. POMERANTZ:  Thank you, your Honor.

5   CROSS-EXAMINATION

6   BY MS. POMERANTZ:

7   Q.  Good afternoon.

8   A.  Good afternoon.

9   Q.  I believe you testified that in addition to being a

10  researcher, you often serve as a consultant, right?

11  A.  Yes.

12  Q.  And that entails consulting with lawyers about cases,

13  right?

14  A.  Yes.

15  Q.  And sometimes it involves testifying at trials?

16  A.  Correct.

17  Q.  So let's first talk about consulting.

18         You consult with attorneys in criminal cases, right?

19  A.  Yes.

20  Q.  And you've consulted with attorneys hundreds and hundreds

21  of times, right?

22  A.  Yes.

23  Q.  You've consulted with defense attorneys in criminal cases

24  hundreds of times, right?

25  A.  Probably, yes.

LCGVMAX5                    Loftus - cross

1    Q.  About 1,000 times?

2    A.  Well, I don't know about 1,000, but hundreds of times.

3    Q.  Okay.  And of those hundreds of times, you've consulted

4    with the prosecution about five or six times, right?

5    A.  That's approximately the number of times I've been called

6    by prosecutors to consult, yes.

7    Q.  I want to talk about your trial testimony.

8          You testified earlier that you have testified in about

9    300 trials, right?

10   A.  Approximately, yes.

11   Q.  About half of those trials are criminal trials, right?

12   A.  It's an estimate, but let's say roughly half, yes.

13   Q.  Okay.  So you've testified in about 150 criminal trials,

14   right?

15   A.  Approximately, yes.

16   Q.  And of the 150 times that you've testified at trial, you've

17   testified for the defense every single time but once, right?

18   A.  Correct.

19   Q.  And that one time that you didn't testify for the defense

20   was in the 1990s, right?

21   A.  It was a case in Wisconsin is what I remember.  I think it

22   might have been the '90s, yes.

23   Q.  So it's fair to say that you've made a career out of being

24   a witness for the defense, right?

25   A.  In criminal cases it's predominantly been testimony for the

1    defense, yes.

2    Q.  You wrote a book about some of your experiences testifying

3    at trial, right?

4    A.  Yes, I did, 1991.

5    Q.  You wrote a book called *Witness for the Defense*, right?

6    A.  Correct.

7    Q.  You haven't written a book called *Impartial Witness*, right?

8             MS. STERNHEIM:  Objection.

9             THE COURT:  Overruled.

10   A.  I don't have a book by that title, no.

11   Q.  I'm holding up what's been marked for identification,

12   Professor Loftus.  Can you see that?

13   A.  I had eye surgery about six weeks ago and I can sort of see

14   it.

15            THE COURT:  You may approach.

16            MS. POMERANTZ:  Thank you, your Honor.

17            THE COURT:  After showing it to the defense.

18            MS. STERNHEIM:  No need to see it.

19            THE COURT:  When you return to the podium,

20   Ms. Pomerantz, you'll give an identification mark please.

21            MS. POMERANTZ:  Yes, your Honor.

22            It's been marked for identification as Government

23   Exhibit 1500.

24            THE COURT:  Okay.

25   Q.  That is your book, *Witness for the Defense*, right?

LCGVMAX5                    Loftus – cross

1    A.  Yes.

2    Q.  That's a photo of you on the cover, right?

3    A.  Very old photo, yes.

4    Q.  Okay.  And in your book, *Witness for the Defense*, isn't it

5    true that you wrote:  Should psychologists in a court of law

6    act as an advocate for the defense or an impartial educator?

7    My answer to that question, if I am completely honest, is both.

8    A.  Could you refer me to the page number?

9    Q.  Sure.  It's on page 238, I believe it's Government Exhibit

10   1518.

11        MS. POMERANTZ:  Your Honor, I have a binder with

12   materials that I'm happy to provide at this time if that would

13   be helpful.

14        THE COURT:  Okay.

15   A.  I've turned to page 238.

16        THE COURT:  Do you have for the defense?

17        MS. POMERANTZ:  Yes.

18        THE COURT:  Okay.

19   Q.  Dr. Loftus, I believe there is a binder now that you have.

20   The book works as well, but it is marked as Government Exhibit

21   1518.  And the question I had asked was in your book *Witness*

22   *for the Defense*, isn't it true that you wrote:  Should

23   psychologists in a court of law act as an advocate for the

24   defense or an impartial educator?  My answer to that question,

25   if I'm completely honest, is both.

1          It's just a yes or no, is that what you wrote?

2    A.   That is a quote, but it leaves out the context of -- in

3    which that quote is quoted.

4    Q.   Professor Loftus, when you testify at a trial, you don't

5    sit in the courtroom when you're not testifying, right?

6    A.   I don't usually.  Occasionally I do.

7    Q.   You were not present for any of the testimony in this case,

8    right?

9    A.   Well, I was not in the courtroom.

10   Q.   Right.  You were not present in the courtroom for any of

11   the testimony in this case, right?

12   A.   I was not present in the courtroom; correct.

13   Q.   Okay.  I want to talk about your compensation.

14          You are being paid or you will be paid for your work

15   in this case, right?

16   A.   I'm being compensated for my time, yes.

17   Q.   And as you sit here, you're billing for your services,

18   right?

19   A.   I'm sorry, could you repeat that?

20   Q.   Sure.  As you sit here, you're billing for your services,

21   right?

22   A.   Yes.

23   Q.   And you're charging the defendant $600 an hour, right?

24   A.   Correct.

25   Q.   And you said earlier that you've testified at over 300

1    trials, right?

2    A.  In 50 years, yes.

3    Q.  The first one was in about 1975, I believe you said?

4    A.  June 3rd, yes.

5    Q.  And you've also consulted on hundreds and hundreds of

6    cases, right?

7    A.  I have, yes.

8    Q.  And in most of those cases or many of those cases, you were

9    compensated for your work, right?

10   A.  In many of them, yes.

11   Q.  You've served as a paid expert for the defense many times,

12   right?

13   A.  I have, yes.

14   Q.  You served as a paid expert for some high-profile or famous

15   defendants, right?

16   A.  I have.

17   Q.  It's fair to say that over the years, criminal defendants

18   have paid you millions of dollars for your services, right?

19   A.  I don't know if it's millions of dollars, no.

20   Q.  When you started testifying as an expert witness back in

21   1975, you didn't charge $600 an hour, right?

22   A.  I started by charging nothing because I wanted to learn.

23   Q.  Right.  You charged much less than that, if anything at

24   all?

25   A.  Correct.

1    Q.  Right.  And over time, your hourly rate has increased,

2    right?

3    A.  Correct.

4    Q.  And in the years since 1975, you've testified in some

5    high-profile trials, right?

6    A.  Correct.

7    Q.  In some instances your testimony has drawn media attention,

8    right?

9    A.  Sometimes, yes.

10   Q.  There's been news articles about you and the testimony that

11   you've given, right?

12   A.  Sometimes, yes.

13   Q.  And that's helped raise your public profile, right?

14           MS. STERNHEIM:  I would object, your Honor.

15           THE COURT:  Just a moment.

16           The pending question is has this helped raise your

17   public profile.

18           Overruled.  You may answer.

19   A.  Overruled.  Open my mouth and speak.  Okay.

20           I wouldn't put it that way.  I think my profile is --

21   I'm not sure what it means, my public profile.  What do you

22   mean by that?

23   Q.  Well, your testimony has helped you get hired by other

24   defense attorneys, right?

25   A.  It's certainly possible that somebody has heard of my

LCGVMAX5                    Loftus - cross

1    testimony in one case and thought that maybe they would hire me
2    in their case, yes.  I would think that might be true.
3    Q.  Your testimony -- you've used your testimony from
4    high-profile cases to market yourself, right?
5             MS. STERNHEIM:  Objection.
6             THE COURT:  One-word grounds.
7             MS. STERNHEIM:  Relevance.
8             THE COURT:  Overruled.
9    A.  I don't market myself at all.
10   Q.  Well, you've used your testimony from high-profile cases to
11   attempt to earn more money, isn't that right?
12   A.  That's false.
13   Q.  Okay.  So you have provided defense attorneys with the
14   names of cases at which you've testified, right?
15   A.  Well, I have provided the names of cases when -- to show
16   that the testimony has been admitted in those cases.
17   Q.  But you've provided the list of the names of cases at which
18   you've testified for defense attorneys, right?
19   A.  When asked to do that, I've done that, yes.  Only when
20   asked.
21   Q.  You've testified on behalf of many famous and high-profile
22   defendants, right?
23   A.  A few, yes.
24   Q.  People who can afford to pay your hourly rate, right?
25   A.  And many who -- who -- in the past who couldn't.

LCGVMAX5                        Loftus - cross

1    Q.   You testified for Harvey Weinstein in his criminal trial,

2    right?

3                 MS. STERNHEIM:  Objection.

4    A.   I testified --

5                 THE COURT:  Just a moment.

6                 I'll hear from you.

7                 (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1              (At sidebar)

 2              THE COURT:  Is her testimony on her CV?

 3              MS. STERNHEIM:  Judge --

 4              THE COURT:  Is her testimony on her CV?

 5              MS. STERNHEIM:  No.

 6              THE COURT:  I just wanted to know that.

 7              MS. STERNHEIM:  I don't believe it has testimony.

 8    It's a CV of her academic pursuits, her awards, her

 9    publications.

10              THE COURT:  Not the cases she's testified.

11              MS. STERNHEIM:  No.

12              THE COURT:  Okay.  Go ahead.

13              MS. STERNHEIM:  Your Honor, I certainly understand the

14    desire on the part of the government to do some character

15    assassination.  But the fact of the matter, testifying in a

16    high-profile case is being used in a way that is very insidious

17    here.  I don't understand what the purpose is.  Are they

18    getting into her testimony in that case?

19              MS. POMERANTZ:  Your Honor, I'm happy to respond.

20              So the witness has financial incentive to testify on

21    behalf of the defense.  It's not a question of just getting

22    paid by the defendant in this case.  Over her career she has

23    used her testimony as a defense -- as an expert for the defense

24    to testify at trials.

25              In her book she has a chapter, the book that she has

1    right up there, there's a chapter in that book -- multiple

2    chapters dedicated to high-profile cases in which she's

3    testified.

4                THE COURT:  Wait.  So I allowed it because it goes to

5    motive, an ironic objection, but it goes -- if she has a motive

6    to testify in high-profile cases, that's monetary.  I suppose

7    the inference is available as to her motive and credibility, so

8    that's why I allowed it.

9                Why are we going into specific cases in which she

10   testified?

11               MS. POMERANTZ:  Your Honor, it's not an accident.

12   She's testifying here on the heels of her testimony at the

13   Harvey Weinstein trial.  I would note that in multiple

14   instances, for instance, when Jane was testifying, the defense

15   insisted on a need to name a particular name of a pageant.  It

16   wasn't enough to just say national pageant.  Here we are, it's

17   the same issue that's coming up, your Honor, is that the

18   relevance of this detail.  It is relevant, your Honor, that

19   this is after she did that.  She testified in the Harvey

20   Weinstein trial.  There is a *New Yorker Magazine* article that's

21   published on her in which she participates in the interview and

22   she --

23               THE COURT:  You're just trying to associate her with

24   other people who have bad reputations.  And frankly,

25   Ms. Pomerantz, to suggest otherwise is to show a lack of

LCGVMAX5                        Loftus - cross

1    respect for the Court.  You could, Ask after a trial, did you

2    have a profile done about you?  It's obvious what you're trying

3    to do.  It's impermissible on 403 grounds, 401/403 grounds.

4    There's lots of ways of asking it without trying to just draw

5    associations in the jurors' minds with other defendants for

6    whom she's testified.

7             So you won't do that.  Sustained.

8             You can ask general questions that go to incentive to

9    testify in high-profile, I'll allow it.  But don't do what

10   you're doing.

11            MS. POMERANTZ:  Yes, your Honor.

12            (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (In open court)

2     BY MS. POMERANTZ:

3     Q.  After your testimony at certain high-profile trials, you've

4     had articles written about you; isn't that right?

5     A.  I've had articles written about me or my work for decades.

6     Q.  The question was -- and let me ask it a little differently.

7           After your testimony at certain trials, you've

8     participated in interviews with the press about your testimony

9     as a defense witness; isn't that right?

10    A.  I have.  If somebody asks me questions about it, yes.

11          THE COURT:  Could you pull up a little closer to the

12    microphone, please.  Thank you.

13          THE WITNESS:  Sorry, your Honor.

14          THE COURT:  That's okay.  Thank you.

15    Q.  And in your book, *Witness for the Defense*, you have -- you

16    devote multiple chapters to different individuals on whose

17    behalf you testified as a defense witness; isn't that right?

18    A.  Yes.

19    Q.  And each time you've done -- you've testified on behalf of

20    famous high-profile defendants, it's brought you more business,

21    right?

22    A.  I don't know if -- maybe.

23    Q.  Your work focuses on research and experiments, right?

24    A.  The scientific work, yes, primarily.

25    Q.  You're not a clinician, right?

LCGVMAX5                          Loftus - cross

1    A.  Correct.

2    Q.  You're not licensed as a psychologist, right?

3    A.  No, we don't get licensed as experimental psychologists.

4    Q.  You don't see patients, right?

5    A.  Correct.

6    Q.  You've never treated a single patient, right?

7    A.  Correct.

8    Q.  You've never seen a patient or client for therapy, right?

9    A.  No, not for therapy, no.

10   Q.  You do not treat victims of traumatic events, right?

11   A.  I don't officially treat anyone.

12   Q.  Now, the opinions that you've given today about memory are

13   based in significant part on your research and experiments,

14   right?

15   A.  Not only my work, the work of many other scientists who

16   work in this field.

17   Q.  They are based in part on your -- based in significant part

18   on your research and experiments, right?

19   A.  Well, many of the experiments on -- particularly on

20   misinformation are my experiments, yes.

21   Q.  You've conducted many experiments over the years, right?

22   A.  Yes.

23   Q.  I want to talk about some of those experiments now.

24           One of your experiments involves Bugs Bunny, right?

25   A.  A bunny.

LCGVMAX5                        Loftus - cross

1    Q.  Bugs Bunny?

2    A.  Bugs Bunny, yes.

3    Q.  And in that experiment, you tried to get people to think

4    that they met Bugs Bunny at Disneyland, right?

5    A.  Correct.

6    Q.  That experiment involved an advertisement for Disneyland

7    that includes a picture of Bugs Bunny, right?

8    A.  That was involved in that study, yes.

9    Q.  And that would be impossible because Bugs Bunny is Warner

10   Brothers, right?

11   A.  That's exactly why we did the study, yes.

12   Q.  Okay.  So that experiment involved the use of fake

13   photographs, right?

14   A.  Fake drawings, yes.

15   Q.  And then you ask people in this experiment whether they had

16   met Bugs Bunny at Disney, right?

17   A.  On a childhood trip to Disney, yes.

18   Q.  And in that experiment, about 16 percent of people went

19   along with the suggestion, right?

20   A.  Well, I don't -- it's been a while since I've looked at the

21   actual data.  I don't remember the exact number, but some

22   percentage claim that they met Bugs Bunny at a Disney resort.

23   Q.  We can pull up that study if that would be helpful for you

24   to see the percentage.  It's Government Exhibit 1511.

25           MS. STERNHEIM:  Judge, I'm going to object.  And I

LCGVMAX5                          Loftus – cross

1    will give my reasons at sidebar, if you like.

2              THE COURT:  Let me look at 1511.

3              Can we get the background erased, Ms. Williams.

4              You can come up.  Thank you.

5              (Continued on next page)

LCGVMAX5                        Loftus - cross

1          (At sidebar)

2          MR. PAGLIUCA:  Your Honor, the objection is that this

3    is far afield from her expert testimony.  We're picking one

4    study out of hundreds and then going into it.

5          When I attempted to cross-examine Dr. Rocchio on a

6    study that she relied on, I was precluded from doing that and I

7    think the objection was similar.  And the Court sustained the

8    objection saying, you know, we're not going to go into all of

9    the studies that she may or may not have relied on in support

10   of her testimony.

11         This is similar to that.  Dr. Loftus is testifying

12   about a broad range of studies; and to single one out is, you

13   know, overly prejudicial, not very helpful to the jury, doesn't

14   go to any of the opinions that she's offered in this case.

15         THE COURT:  I'm sorry, can you remind me of the

16   parallel objection.

17         MR. PAGLIUCA:  Yes.  There was a study that was given

18   to the prosecution by Dr. Rocchio on hindsight bias and --

19   basically hindsight bias and what went into hindsight bias.

20         THE COURT:  You were trying to introduce affirmative

21   evidence through that study and not using it to impeach her

22   reliance on it; correct?

23         MR. PAGLIUCA:  I disagree.  I was trying to impeach

24   her and using some of the words from that study to impeach her

25   on what her opinions were during trial.  That was the purpose

LCGVMAX5                         Loftus – cross

1    of doing it.  And I think this is analogous to that, if not

2    exactly the same.

3            MS. POMERANTZ:  Your Honor, this witness has testified

4    about her extensive findings on memory that are based on

5    multiple experiments.  This is one of the experiments, so they

6    asked her about certain experiments on direct examination.

7    This is one of the studies that she herself conducted, and so I

8    don't see how this is a parallel question.  It's presented for

9    the Court.  This is part of the experiments that she used and

10   that she conducted that forms the basis of her opinions.

11           MR. PAGLIUCA:  I think part of the analysis -- I'm

12   sorry, I didn't mean to cut you off, if you were finished.

13           MS. POMERANTZ:  It's quite distinct from Dr. Rocchio,

14   who wasn't testifying.  That was something, as your Honor

15   pointed out, that the defense is trying to introduce for

16   cross-examination, and it wasn't an article that she had

17   written.  It's quite distinct.

18           THE COURT:  Overruled.

19           (Continued on next page)

20

21

22

23

24

25

1              (In open court)

2     BY MS. POMERANTZ:

3     Q.  I'm going to direct you on Government Exhibit 1511 to page

4     17.

5              MS. POMERANTZ:  If we can pull that up.

6     A.  How do you pull it up?

7              MS. POMERANTZ:  Is that not on the witness's screen?

8     A.  Oh, okay.  Yes.

9              MS. POMERANTZ:  Okay.  Great.  The lines are now

10    removed.  Thank you very much.

11    Q.  And I want to just direct your attention to the first

12    paragraph under "Discussion."  You see it says:  For example,

13    16 percent of people claim that they shook hands with Bugs

14    after receiving the false Bugs ad.  Do you see that?

15    A.  Yes.

16             MS. POMERANTZ:  Okay.  We can pull that down.

17    Q.  So in this experiment, about 16 percent of people went

18    along with the suggestion that they had met Bugs Bunny at

19    Disney, right?

20    A.  You'll have to put that back up because --

21             MS. POMERANTZ:  We can pull that back up.

22             THE COURT:  Is it in her binder as well, the full

23    study, Ms. Pomerantz?  Is it in the binder?

24             MS. POMERANTZ:  Yes.

25             Your Honor, I'm happy to move on from this.

LCGVMAX5                    Loftus - cross

1          THE COURT:  Okay.

2     Q.  The thing that the subjects got wrong was that they saw

3     Bugs Bunny at Disneyland, right?

4          THE COURT:  You said you were going to move on.  But I

5     just want to direct her.  She wants to look at the study to

6     refresh, if you're going to ask her questions about it, if it's

7     in the binder.

8          MS. POMERANTZ:  Your Honor, I meant, sorry, I was

9     going to move on from the percentage.

10         THE COURT:  Oh, okay.  Let me look at the question.

11         All right.  Go ahead.  You may ask.

12    BY MS. POMERANTZ:

13    Q.  The thing that the subjects got wrong was that they saw

14    Bugs Bunny at Disneyland, right?

15    A.  The study is 20 years old.  But according to what you just

16    showed me, 16 percent claim that they shook his hand.  Others

17    claim they touched his tail or touched his ear or heard him say

18    What's up, Doc?  And Bugs Bunny would not be at a Disney resort

19    because it's a Warner Brothers character.  And that was the

20    whole point of this study.

21    Q.  All right.  I'm going to turn to a different experiment.

22         You testified on direct about an experiment involving

23    a simulated car accident, right?

24    A.  Yes.

25    Q.  And the misinformation was that the car accident involved a

LCGVMAX5                         Loftus - cross

1    yield sign, not a stop sign, right?

2    A.  It was the critical item, yes.

3    Q.  Okay.  But to be clear, the research subjects still

4    remembered the simulated accident, right?

5    A.  Presumably, yes.

6    Q.  Okay.  In that experiment, did any of the experiment

7    subjects face the possibility of getting charged with a crime

8    if they lied to you?

9    A.  No.

10   Q.  Now, in that experiment, you changed one fact, that's the

11   yield sign stop sign, right?

12   A.  Or vice-versa.

13   Q.  You've done other experiments where you've changed more

14   than one fact, right?

15   A.  Yes.

16   Q.  There is, I think, a science museum experiment?

17   A.  Yes.

18   Q.  And in that study you tried to change two facts, right?

19   A.  Correct.

20   Q.  People went to a museum and they watched a short video,

21   right?

22   A.  Yes.

23   Q.  And in that video, a blue car rushed towards a person for

24   eight seconds, right?

25   A.  I don't -- the car was blue, the offending car, yes.

LCGVMAX5                      Loftus - cross

1    Q.   Okay.  And then folks, after watching the video, they

2    walked through the museum and then they are asked some

3    questions, right?

4    A.   Correct.

5    Q.   And during that questioning, certain details were

6    distorted, right?

7    A.   I believe that we had deliberately tried to change the

8    color of the car in their memory.

9    Q.   The color of the car was changed in the questions from blue

10   to white, right?

11   A.   Something like that, yes.

12   Q.   And there was a color of a jacket that was changed in

13   questions from, I believe, blue to black, right?

14   A.   Well, I mostly remember the blue car, so --

15   Q.   And in that study, some of the research subjects were

16   fooled by one changed fact about the color of the car, right?

17   A.   Yes.

18   Q.   But the research subjects were not fooled by the attempt to

19   change the second fact, right?

20   A.   I believe that's what happened in that study, yes.

21   Q.   Okay.  You've also conducted an experiment about planting a

22   false memory of someone being lost in a mall, right?

23   A.   That's a study that we did in the mid '90s, yes.

24   Q.   And that study involved about 24 participants, right?

25   A.   Yes.

1    Q.   And the participants were between the ages of 18 to 53,

2    right?

3    A.   Yes.

4    Q.   And you tried to implant a false memory, right?

5    A.   We tried to suggest to them that they, as a child, have

6    been lost in a shopping mall for an extended period of time and

7    then rescued by an elderly person and reunited with their

8    family.

9    Q.   So research subjects were -- they were shown one-paragraph

10   stories describing four events, right?

11   A.   Well, again, that was a 1995 paper; but the fine details of

12   the method, that sounds close, yes, but --

13   Q.   So but there were three true stories and one false one,

14   right?

15   A.   Yes.

16   Q.   Okay.  And you told the subjects that you talked to their

17   parents, right?

18   A.   Yeah, or an older sibling.

19   Q.   So a parent or older sibling, right?

20   A.   Yes.

21   Q.   And you found out from the parents experiences that had

22   happened to the subjects when they were children, right?

23   A.   Yes, some true experiences.

24   Q.   Right.  For the three true ones, right?

25   A.   Yes.

LCGVMAX5                         Loftus - cross

 1    Q.  Okay.  And then you presented the subjects with the three

 2    true memories that their parents had told you about, right?

 3    A.  Yes.

 4    Q.  And then you presented the subjects with the false memory

 5    that the subject was lost in the mall when the subject was five

 6    or six years old, right?

 7    A.  With more specifics, yes, but that's basically correct.

 8    Q.  And the subject was told that the false memory of being

 9    lost in the mall was something that their family members said

10    had happened, right?

11    A.  That was strongly suggested in the study, yes.

12    Q.  And sometime later, you conducted an interview of the 24

13    participants in that study, right?

14    A.  Yeah, we tested them, I guess, a few times.

15    Q.  And 25 percent -- about 25 percent remembered some of the

16    false event, which means 75 percent did not, right?

17    A.  Correct.

18    Q.  Okay.  Isn't it true that studies have shown that in the

19    extreme case where participants are given blatantly

20    contradictory suggestions, they are sometimes not susceptible

21    to suggestion or misinformation at all?

22    A.  We did a study where we tried to give a blatantly false

23    suggestion and people resisted it, yes.

24    Q.  You, yourself, you published a paper called *Reactions to*

25    *Blatantly Contradictory Information*, right?

LCGVMAX5                          Loftus - cross

1    A.  Correct.

2    Q.  In other words, if something contradicts the true events so

3    blatantly, the memory is not as susceptible to suggestion,

4    right?

5    A.  In that particular study, yes, that was -- that was a

6    wallet-snatching crime.  And we were not able to mislead people

7    about the color of the wallet, which was a very obvious,

8    obvious, strong detail.

9    Q.  You're familiar with a study conducted by Kathy Pezdek in

10   which Pezdek presented 20 subjects with one true memory and two

11   false memories, right?

12   A.  Well, I know about that study, yes.

13   Q.  And one of the false memories was being lost in the mall,

14   right?

15   A.  Yes.

16   Q.  And the other false memory was receiving something called a

17   rectal enema, right?

18   A.  Correct.

19   Q.  And I'm not going to ask you to describe a rectal enema,

20   but it's fair to say that that's an intrusive bodily procedure,

21   right?

22   A.  Yes.

23   Q.  Three of the 20 subjects remembered having been lost in the

24   mall, right?

25   A.  Something like that in her study, yes.

LCGVMAX5                      Loftus - cross

Q.  And none of the 20 subjects remembered the rectal enema,
right?

A.  None of the 20 remembered the scenario that they were
presented with involving a rectal enema.  But they weren't told
they even saw it.

Q.  Pezdek tried to instill a false memory of subjects of
having a rectal enema, but she did not succeed in doing that,
right?

A.  She did not; correct.

Q.  You testified on direct examination about post-event
contamination, right?

A.  Yes.

Q.  Young children are more susceptible to post-event
contamination than adults, right?

A.  Typically, very young children, yes.

Q.  And we're talking about children under the age of six,
right?

A.  Correct.

Q.  Not all memory is retained equally, right?

A.  Right.

Q.  Not all memory is retrieved equally, right?

A.  Correct.

Q.  If there was an event like the birth of your first child,
it would be very rare to forget that over time, right?

A.  I would think that would be hard to forget.

LCGVMAX5                        Loftus - cross

1    Q.   I want to talk about memories of trauma.

2              The core memory of trauma is stronger than other types

3    of memory, right?

4    A.   There are studies that show typically people can remember a

5    core event and some core details, support for that proposition,

6    yes.

7    Q.   People tend to remember the core or essence of trauma

8    events, right?

9    A.   They can, yes.

10   Q.   People may forget some of the peripheral details of a

11   trauma event, right?

12   A.   That can happen, yes.

13   Q.   But the core memories of a trauma event remain stronger,

14   right?

15   A.   I probably agree with that.

16   Q.   And people who are involved in the trauma event tend to

17   remember the core or gist of the event better than those who

18   are nonparticipants, right?

19   A.   There are at least one or two studies that show that if you

20   participate, your memory is somewhat better than if you're just

21   observing.

22   Q.   And if a person is involved in repetitive traumatic

23   experiences, they are more likely to remember it, right?

24   A.   Generally, the more times something happens to you, the

25   better your memory; or the more times you're exposed to

1    something, the better your memory.

2    Q.   That's a fundamental principle of human memory, right?

3    A.   Yes, frequency, yes.

4    Q.   Now, we've talked today about some of the experiments you

5    have done.  And you talked about experiments you've done that

6    involved videos of car crashes, people being lost in the malls,

7    things like that, right?

8    A.   Among other things, yes.

9    Q.   Now, obviously you've never done a study where you arranged

10   for teenage girls to be sexually abused, right?

11   A.   Correct.

12   Q.   You've never done a study of how well those girls remember

13   that sexual abuse years later, right?

14   A.   Well, I've done studies where we interview people who were

15   sexually abused about what they remember.

16   Q.   The question I'm asking you is have you conducted a study

17   where you arranged for girls to be sexually abused?

18   A.   No, absolutely not.

19   Q.   You haven't conducted a study where you saw girls being

20   sexually abused, right?

21   A.   Correct.

22   Q.   You've never conducted a study in which you attempted to

23   implant a false memory of childhood sexual abuse?

24   A.   We have not.

25            MS. POMERANTZ:  May I have one moment, your Honor?

LCGVMAX5                        Loftus - redirect

1              THE COURT:  Okay.

2              (Counsel conferred)

3              MS. POMERANTZ:  Nothing further, your Honor.

4              THE COURT:  All right.

5              MS. STERNHEIM:  Briefly.

6              THE COURT:  Yes.

7    REDIRECT EXAMINATION

8    BY MS. STERNHEIM:

9    Q.  Professor Loftus, you've been conducting experimental

10   psychology research for over 50 years; correct?

11   A.  Correct.

12   Q.  You have received numerous awards for lifetime achievement

13   for the work that you have done?

14             MS. POMERANTZ:  Objection.

15             THE COURT:  Sustained.

16   Q.  You were asked a number of questions about studies here;

17   correct?

18   A.  Correct.

19   Q.  Some that you actually conducted and some that were

20   conducted by others; correct?

21   A.  Yes.

22   Q.  You were asked questions about studies that would involve

23   sexual abuse; correct?

24   A.  Yes.

25   Q.  And earlier I had asked you whether there were certain

LCGVMAX5                          Loftus - redirect

1   restrictions placed upon the type of experiments that a

2   psychologist is allowed to perform?

3            MS. POMERANTZ:  Objection.

4            THE COURT:  Overruled.

5   A.  Yes, you did.

6   Q.  And please explain to the jury why that is.

7            MS. POMERANTZ:  Objection.

8            Asked and answered, your Honor.

9            THE COURT:  I'll allow it.

10  A.  The human subjects review committees at universities and

11  colleges are in place to try to protect human beings from being

12  involved in experiments that might be harmful to them.  And so

13  that is why these committees will review your proposal for a

14  piece of research and either allow you to go forward with your

15  proposal or not allow you to go forward or suggest

16  modifications that would allow you to go forward.

17           But their interest is in making sure -- or trying to

18  ensure that you're not doing something to harm the research --

19  that might harm the research participants.  That's why we

20  would, as I thought I indicated earlier in my testimony, would

21  not be probably, you know, allowed to deliberately plant

22  memories of sexual abuse.

23  Q.  On cross-examination, the government had suggested that you

24  are a profiteer when you testify for the defense.  Do you

25  remember that?

LCGVMAX5                      Loftus - redirect

1              MS. POMERANTZ:  Objection.

2   A.  Yes, I do.

3              THE COURT:  I'm going to sustain.

4   Q.  They took issue with the fact that you have testified in

5   criminal cases predominantly for the defense?

6              MS. POMERANTZ:  Objection.

7              THE COURT:  Grounds.

8              MS. POMERANTZ:  Mischaracterization, your Honor.

9              THE COURT:  Overruled.

10  Q.  You have worked as a consultant for the federal government,

11  have you not?

12  A.  Yes.

13  Q.  For the Secret Service; correct?

14  A.  Yes.

15  Q.  For the Department of Justice; correct?

16  A.  Yes.

17  Q.  For the FBI; correct?

18  A.  Yes.

19  Q.  For the Internal Revenue Service; correct?

20  A.  Yes.

21  Q.  And those entities were aware that you have provided

22  testimony for defendants in criminal matters; correct?

23             MS. POMERANTZ:  Objection.

24             THE COURT:  Grounds.

25             MS. POMERANTZ:  Foundation.

1              THE COURT:  Sustained.

2    Q.  The testimony that you gave here today, would it have been

3    any different if you had been called to the stand by the

4    government?

5    A.  I don't think -- I don't see how it would have been any

6    different.  I think in the case where I did testify for the

7    prosecution, it was similar testimony.

8    Q.  And if the prosecution had called you, you would have been

9    available to be a witness for them, wouldn't you?

10   A.  I might have been.

11             MS. STERNHEIM:  No further questions.  Thank you.

12             THE COURT:  Ms. Pomerantz?

13             MS. POMERANTZ:  No, nothing further from the

14   government.  Thank you, your Honor.

15             THE COURT:  Thank you.  All right.

16             Professor Loftus, you may step down.  You are excused.

17             (Witness excused)

18             THE COURT:  Defense may call their next witness.

19             MS. STERNHEIM:  I'm just going to move please.

20             THE COURT:  Sure.

21             Mr. Everdell?

22             MR. EVERDELL:  Yes, your Honor.

23             The defense calls Michael Aznaran.

24             THE COURT:  Okay.

25             He may come forward.

LCGVMAX5                          Aznaran - direct

1    MICHAEL WILLIAM AZNARAN,

2          called as a witness by the Defendant,

3          having been duly sworn, testified as follows:

4                THE COURT:  You may inquire, Mr. Everdell.

5                MR. EVERDELL:  Yes, your Honor.  I believe the

6    government may have an objection to the exhibit we plan to

7    admit through this witness, so we may need to be heard at

8    sidebar before we begin the examination.

9                THE COURT:  Can we start and then we can take it at

10   the break?

11               MR. EVERDELL:  There's some questioning before we get

12   to the exhibit, your Honor, so yes.

13               THE COURT:  Okay.

14               MR. EVERDELL:  Thank you.

15               THE COURT:  Is that okay, Ms. Pomerantz?

16               MS. POMERANTZ:  Yes.  Thank you, your Honor.

17               THE COURT:  All right.  Thank you.

18               You may inquire.

19               MR. EVERDELL:  Thank you, your Honor.

20   DIRECT EXAMINATION

21   BY MR. EVERDELL:

22   Q.  Good afternoon, Mr. Aznaran.

23   A.  Good afternoon.

24   Q.  How old are you, sir?

25   A.  Thirty-seven.

LCGVMAX5                        Aznaran - direct

1    Q.  Where do you work?

2    A.  I currently work for U.S. Customs and Border Protection

3    here in Manhattan at the New York/New Jersey HIDTA task force.

4    Q.  What is Customs and Border Protection?

5    A.  It's a federal law enforcement agency that mainly works out

6    of the land border seaports and airports around the United

7    States.

8    Q.  And generally, what functions do they serve at the borders?

9    A.  Basically, checking incoming either passengers or land

10   border travelers entering the United States.

11   Q.  Did Customs and Border Protection used to be known as

12   something else in the past?

13   A.  It did, yes.

14   Q.  What was that?

15   A.  It's actually made up of two legacy agencies.  One was the

16   INS, Immigration and Naturalization Service; the other one was

17   USCS, U.S. Customs service.

18   Q.  Okay.  And those are both now combined in CBP or Customs

19   and Border Protection?

20   A.  Yes.

21   Q.  Okay.  How long have you worked at Customs and Border

22   Protection?

23   A.  Since July of 2008.

24   Q.  And can you just describe the different positions you've

25   held at CBP and your duties and responsibilities in those

1   positions.

2   A.   Sure.  July of 2008, I entered the service.  I went to the

3   academy for about four months.  When I got back from the

4   academy, I was assigned to John F. Kennedy International

5   Airport, passenger operations.

6   Q.   Can you explain what passenger operations is?

7   A.   Yes.  It's considered what we call the core process.  So

8   any travelers that are coming into the United States at JFK,

9   when they get off the plane from a foreign country, they have

10  to go down to what's called an FIS, a federal inspection site.

11          At that site, we have officers, uniformed officers, in

12  booths that basically check the -- check each and every

13  traveler, swipe their passports, and either admit them or deny

14  them entry into the United States.

15  Q.   So are those the folks that are in the booths or the kiosks

16  you show your passport to when you're traveling internationally

17  when you arrive?

18  A.   Yes.

19  Q.   Okay.  So how long did you do that job for?

20  A.   I did that for approximately three and a half years.

21  Q.   Okay.  And did you say which airport you were in?

22  A.   JFK, John F. Kennedy.

23  Q.   What did you do after that?

24  A.   At that point I was selected to go up to what's -- what

25  used to be called PAU, passenger analysis unit.  And more

LCGVMAX5                        Aznaran - direct

1   specifically, I was assigned to what's called RCLG, regional

2   carrier liaison group.

3   Q.  Can you explain for the jury what the passenger analysis

4   unit is and what the RCLG is?

5   A.  Sure.  PAU used to be mainly an intel center made up of

6   several different functions such as narcotics, terrorism, and

7   RCLG.  RCLG, we were more or less liaisons that would

8   communicate with airline and airport employees in foreign

9   countries.  And we would make recommendations to those airline

10  employees if we basically found or noticed a particular

11  passenger that would be on one of their flights coming into the

12  United States that might have some kind of an issue being

13  admitted into the United States.

14          We would then, if we did find a passenger such as

15  this, we would recommend to that airline to do what we call an

16  offload.  So it's just a recommendation to that airline saying,

17  If this passenger does travel on your airline into the United

18  States, there is either a high probability or a certainty that

19  they will not be admitted, be able to be admitted into the

20  United States.  We recommend they go to the closest embassy and

21  get their issue figured out there.

22  Q.  How long did you do that work for at CBP?

23  A.  Roughly four and a half years.

24  Q.  And did you have a position after that?

25  A.  I did.  In 2015, I was promoted to first line supervisor,

1   at which point I was then placed back into passenger

2   operations.

3   Q.  And that's what we discussed before?

4   A.  Yes.

5   Q.  This time you were a supervisor?

6   A.  Yes.

7   Q.  I see.

8           And what airport were you working there?

9   A.  Same airport, John F. Kennedy International.

10  Q.  And is that your current position?

11  A.  It is not.

12  Q.  What position did you hold after that?

13  A.  So in April of 2018, still as a supervisor, I was selected

14  to be a task force officer with the New York/New Jersey HIDTA

15  task force.

16  Q.  What's HIDTA?

17  A.  HIDTA is H-I-D-T-A, high intensity drug trafficking area.

18  Q.  What does that mean?  What did you do for HIDTA?  What's

19  the mission?

20  A.  So I'm still currently assigned to HIDTA.

21          My function is basically to act as a liaison between

22  my agency, Customs and Border Protection, and the roughly 30 to

23  35 other law enforcement agencies that also have

24  representatives at HIDTA.

25  Q.  And how long have you held that post?

1    A.  Since April of 2018, so almost four years now.

2    Q.  And that's your current position?

3    A.  Correct.

4    Q.  All right.  Mr. Aznaran, does Customs and Border Protection

5    keep records on people that are entering or exiting the United

6    States?

7    A.  Yes.

8    Q.  And where is that information stored?

9    A.  It's stored in the system that we call TECS, T-E-C-S,

10   Treasury Enforcement Communication System.

11   Q.  Okay.  And are you familiar with the TECS system?

12   A.  Yes.

13   Q.  Can you just describe what the TECS system is.

14   A.  It's a -- it's a law enforcement system which acts as a

15   platform.  It collects data from several other systems and kind

16   of compiles it into one system that CBP -- we own and control

17   TECS.  So we are able to utilize all that information to see

18   who's coming into or possibly departing the United States.

19          We also have access to NCIC, National Crime

20   Intelligence Center.  So we can see if people have warrants for

21   their arrest, missing persons, things of that nature.

22   Q.  So you mentioned that TECS pulls information from lots of

23   different sources; is that right?

24   A.  Yes.

25   Q.  What sorts of information does the TECS system store from

LCGVMAX5                    Aznaran - direct

1   these sources?

2   A.   You have -- you have travel -- I'm sorry, international

3   travel records, you have passengers' travel documents, such as

4   passports and visas.   We are able to do queries of addresses,

5   vehicles, license plates.   NCIC, as I mentioned, already

6   warrants missing persons, stolen vehicles.

7   Q.   And does the information you just mentioned include also

8   border-crossing information?

9   A.   Yes.

10  Q.   Now, with respect to border-crossing information, what

11  kinds of information are stored in the TECS system?

12  A.   As far as border crossing?

13  Q.   Yes, specifically border crossing.

14  A.   So within the aviation and vessel or, more commonly known

15  as cruise line information, you would normally have somebody's

16  full name, their passport number that they are using to travel,

17  what location they are traveling from, what location they are

18  traveling to, if they are traveling into an airport, which

19  airport they are traveling, the site code.

20              (Continued on next page)

21

22

23

24

25

LCGCmax6                          Aznaran - direct

1   BY MR. EVERDELL:

2   Q.  And just to be clear, when I refer to border crossing, what

3   does that mean to you?

4   A.  That, it could mean either any international traveler

5   coming into the United States at any international airport,

6   seaport, or land border along the Mexican or northern border of

7   Canada.

8   Q.  And the information you just listed is stored in the TECS

9   system for those passengers that are entering through ports of

10  entry; is that right?

11  A.  Yes.

12  Q.  How far back do the border crossing records go in the TECS

13  system?

14  A.  It's hard to say.  In my experience, I have not seen any

15  border crossings any earlier than roughly the early '90s, mid

16  '90s.

17  Q.  And how does the border crossing information that is stored

18  in the TECS system get input into that database?

19  A.  So, there is another system, it's called APIS, Advanced

20  Passenger Information System, and essentially what happens is

21  international airlines or any airline that has international

22  flights coming into or departing the United States, they're

23  required to submit their manifest to us.  The manifest gets

24  loaded into APIS, which is then linked to text, and that's how

25  we're able to see that information.

LCGCmax6                        Aznaran - direct

1   Q.   What sort of information is contained in the manifest from

2   the airlines?

3   A.   Generally, the name of the passenger, their date of birth,

4   the document that they're using, whether it's a passport or a

5   green card, the flight information, the carrier code, the

6   flight number, where they're traveling from and where they're

7   traveling to.

8   Q.   Is there any information in the TECS system about a border

9   crossing that gets supplied by those immigration officials we

10  talked about at the primary immigration line as opposed to the

11  airlines?

12  A.   No.

13  Q.   So the people who check you in through the kiosks, is there

14  any information that gets input from there?

15  A.   Not by the officers themselves.  Once a passenger is

16  processed, there are certain fields that will be automatically

17  updated.

18  Q.   But those fields get updated once they go through the

19  immigration line; right?

20  A.   Yes.

21  Q.   That doesn't come from the airlines?

22  A.   No.

23  Q.   For the information that comes from the airlines, the

24  information you mentioned, how soon after the flight takes off

25  does that information get input into the TECS system?

LCGCmax6                          Aznaran - direct

1   A.   It's supposed to be what's called the securing of flight

2   doors.  So once the door to the aircraft is shut, the

3   information or the manifest is supposed to be sent to APIS.

4   Q.   So the manifest information is supposed to reflect the

5   people who are on board at the time the doors are shut at the

6   gate?

7   A.   Yes.

8   Q.   Before wheels up, I guess?

9   A.   Yes.

10  Q.   All right.  And how soon after the traveler passes through

11  the immigration line at the kiosk is that information populated

12  into the TECS system?

13  A.   I'm sorry.  Could you repeat the question.

14  Q.   You mentioned that certain information gets populated after

15  the traveler goes through the immigration line at, say, the

16  airport they're coming into; right?

17  A.   Yes.

18  Q.   How soon after the passenger travels through that

19  immigration line does that information hit the system, hit the

20  TECS system?

21  A.   It should be at that same time.

22  Q.   And is it the regular practice of customs and border

23  protection to keep this type of border crossing information in

24  its records in the TECS system?

25  A.   Yes.

1    Q.  Is the text database searchable?

2    A.  Yes.

3    Q.  And what fields can you search with?

4    A.  You could search by name, last name, first name.  You could

5    search by a combination of last name, first name, and date of

6    birth.  You could search by a passport number.  You could

7    search by a visa number.

8    Q.  And those names you mentioned, those are the names of the

9    travelers; right?

10   A.  Yes.

11   Q.  So can you search by a particular traveler?

12   A.  Yes.

13   Q.  Can you limit the search to a particular timeframe?

14   A.  Yes.

15   Q.  Now, if you search the TECS system for the border crossing

16   records for a particular traveler, what does the database

17   generate?

18   A.  It would generate basically any border crossings or

19   encounters for that particular person within that timeframe.

20   It would basically be like rows of information for each

21   encounter or border crossing.

22   Q.  And it would be for whatever time period you put in for;

23   right?

24   A.  Yes.

25   Q.  And then that report contains the information that you had

1    been discussing?

2    A.   Yes.

3    Q.   Are those reports generated in the normal course of CBP's

4    regularly conducted activity?

5    A.   Yes.

6    Q.   Mr. Aznaran, did there come a time when you were asked to

7    search the TECS system for certain border crossing records

8    related to this case?

9    A.   Yes.

10   Q.   And were you asked to search for certain travelers?

11   A.   Yes.

12   Q.   How many travelers were you asked to search for?

13   A.   Three.

14   Q.   And do you know the names of those travelers without

15   telling me the name?

16   A.   I do.

17   Q.   So I want to show you first what is admitted under seal as

18   Government Exhibit 12.

19        MR. EVERDELL:   With the Court's permission, I'll show

20   it just to the Court and the deputy and the witness.   GX12,

21   please, under seal.

22   Q.   Mr. Aznaran, do you see that on your screen, that document?

23   A.   Yes.

24   Q.   That's a document that's already in evidence under seal as

25   Government Exhibit 12.   Do you see the name on that document?

LCGCmax6                        Aznaran - direct

1    Just a yes or no.

2    A.  Yes.

3    Q.  I'm going to refer to that person as Jane and you should,

4    as well.  All right?

5    A.  Yes.

6    Q.  Was Jane one of the people whose border crossing records

7    you were asked to search for?

8    A.  Yes.

9            MR. EVERDELL:  We can remove that.

10           Now I want to bring up what's also in evidence already

11   under seal as Defendant's Exhibit LV4.  With the Court's

12   permission, just show it to the Court, the deputy, and the

13   witness.

14           THE COURT:  Okay.

15   Q.  Mr. Aznaran, do you see that document?

16   A.  Yes.

17   Q.  You're looking at a document already in evidence under seal

18   as LV4.  Do you see the name on that document?  Yes or no.

19   A.  Yes.

20   Q.  I'm going to refer to that person as Kate, and you should,

21   as well.  All right?

22   A.  Yes.

23   Q.  Was Kate one of the people whose border crossing records

24   you were asked to search for?

25   A.  Yes.

LCGCmax6                        Aznaran - direct

1              MR. EVERDELL:  All right.  We can bring that down.

2    Q.  Are you also familiar with the name, Annie Farmer?

3    A.  Yes.

4    Q.  Was Annie Farmer one of the people whose border crossing

5    records you were asked to search for?

6    A.  Yes.

7    Q.  So were Jane, Kate, and Annie Farmer the records you were

8    asked to search for in the TECS system?

9    A.  Yes.

10   Q.  Were you asked to search for the records in a particular

11   date range?

12   A.  Yes.

13   Q.  What was that date range?

14   A.  It was from January 1st, 1994, to December 31st, 2010.

15   Q.  Did you perform those searches?

16   A.  Yes.

17   Q.  And when did you conduct that search?

18   A.  A few days ago.

19   Q.  Did the TECS system generate the three reports from those

20   searches?

21   A.  Yes.

22              MR. EVERDELL:  Your Honor, at this time, I think we

23   may need to have our sidebar.

24              THE COURT:  I'll give the jurors their mid afternoon

25   break.  We'll resume in about 15 minutes.  Thank you.

LCGCmax6                              Aznaran - direct

1              (Jury not present)

2              THE COURT:  Okay.  Mr. Everdell.

3              MR. EVERDELL:  Your Honor, the exhibit is marked for

4     identification as MA1, and I'll hand up a paper copy to the

5     Court, and I believe the government has a copy, but I have

6     another one for them, as well.

7              THE COURT:  Okay.  I'll hear the objection.

8              MS. POMERANTZ:  Thank you, your Honor.  Just briefly,

9     the question posed to the defense is what is the relevance of

10    these records, and in particular, we're talking about victim

11    travel records that go over 15 years of victim travel records

12    that extend well beyond the period charged in the indictment.

13    And so, we would ask for a proffer of relevance for the

14    admissibility of such extensive travel information, private

15    information of the victims.

16             THE COURT:  So no objection within the charged

17    timeframe?

18             MS. POMERANTZ:  No objection.

19             MR. EVERDELL:  Your Honor, for example, these records

20    go up to 2010, which was the cutoff point for the request when

21    we issued the subpoena, we, in fact, negotiated with the

22    government over how broad the subpoena would be and we agreed

23    that it would go to 2010.

24             Now, as to the relevance -- and that's why the records

25    go that far.

1          As to the relevance, I mean, for example, we see

2     Jane's travel records going all the way up to 2010.  Jane

3     testified in this case already that she continued to travel

4     after she had left New York and continued to travel, and I

5     think this is, if it's already in the record, that she

6     continued to travel.  I don't think this is in any way

7     prejudicial --

8          THE COURT:  I just would like to know what the

9     relevance is.

10          MR. EVERDELL:  Your Honor, she also testified — Jane,

11     I'm referring to — that she came from a family that did not

12     have much means when she first -- when she was younger.  She

13     testified extensively about the fact that she didn't have much

14     money, and these records show extensive foreign travel, going

15     on well into the 2010s.  So it tends to counter that.

16          Same thing with Annie Farmer.  She said she came from

17     a family with a single mother, didn't have much money, and

18     these travel records show travel to Mexico and places like

19     that.

20          For Kate, there was a discussion about she traveled

21     after the incidents that she talked about in the United Kingdom

22     and she was open-ended about how often she traveled and how

23     long she traveled.  And there was also testimony that she was

24     still in contact with Jeffrey Epstein well into the 2000s.  I

25     think some of the emails are in the 2010s, 2015.  So these

LCGCmax6                          Aznaran - direct

1   travel records show her whereabouts and show her traveling

2   around the same time when she's still in contact with Jeffrey

3   Epstein.

4           THE COURT:  What's the relevance of that?

5           MR. EVERDELL:  Your Honor, I don't plan to make much

6   of an argument about those records that are happening after the

7   charged time period --

8           THE COURT:  You haven't asserted any relevance with

9   respect to after the -- where is the government with respect to

10  the time cutoff request?

11          MS. POMERANTZ:  Your Honor, our proposal would be that

12  it would be redacting anything that postdates the charged

13  conspiracy.

14          MR. EVERDELL:  Your Honor, there is probably a

15  practical solution that we could come to with this, because I

16  don't think that we -- you want to give me a moment, your

17  Honor.  I'll just confer with my colleagues.

18          THE COURT:  Okay.

19          MR. EVERDELL:  Your Honor, one other point about Kate

20  in particular, I believe her testimony was that she was on

21  public assistance at some point in her life that correspond to

22  when she's flying all over the world.  So I think that those

23  records --

24          THE COURT:  Is that during the time of the charged

25  conspiracy?

LCGCmax6                          Aznaran - direct

1           MR. EVERDELL:  I don't know if she put a timeframe on

2     exactly when that was.  I'm told it was not -- she testified it

3     was not during the period of the charged conspiracy when she

4     was on public assistance, but she did testify to it and that's

5     now on the record, and if these records tend to counter that

6     point, that she had made that point to the jury, I think we

7     could use these records to show that.

8           With the other travelers, your Honor, I think we can

9     come to a practical solution.

10          THE COURT:  See if you can come to a solution and you

11    can tell me where we are.  We'll break for 10 minutes.

12          (Recess)

13          THE COURT:  All right.  Where are we?

14          MR. EVERDELL:  Your Honor, we conferred with the

15    government.  We reached agreement as to redactions and other

16    omissions from this exhibit and we're just now printing new

17    copies of the revised exhibit.  We have about half of those

18    copies.  It's coming up right now and we'll have the other half

19    shortly in just a couple minutes.

20          THE COURT:  Okay.

21          MR. EVERDELL:  Your Honor, I have your copy I'll hand

22    up, and one to the government, and we'll put one, with the

23    Court's permission, facedown in the witness box.

24          THE COURT:  Okay.  Ms. Pomerantz, acceptable?

25          MS. POMERANTZ:  Yes, your Honor.

LCGCmax6                         Aznaran - direct

1              THE COURT:  Okay.  We can bring in the witness.

2              MS. MENNINGER:  Your Honor, may I raise one issue?

3    Your Honor gave us a 5 o'clock extension of filing of a brief

4    today.  Can I ask for one hour so that we could -- until 6:00

5    p.m. for that filing so we can confer with our office?

6              THE COURT:  Okay.

7              MS. MENNINGER:  Thank you.

8              THE COURT:  I don't even know what it is.  I'll still

9    be here at 6:00.  That will be fine.

10             MS. COMEY:  Your Honor, just one thing to alert the

11   Court.  I believe the parties have reached, in principle,

12   agreement on a stipulation regarding Mr. Glassman.  So that

13   will obviate the need to deal with the service issue for his

14   live testimony.

15             THE COURT:  Sounds like a good idea.

16             MR. PAGLIUCA:  It could have been fun, your Honor.

17             THE COURT:  If only someone had thought of that

18   sooner.

19             The witness is coming back and we can bring in the

20   jury.  Thank you for working out agreement on the timeframe

21   issue.

22             MR. EVERDELL:  Yes, your Honor.

23             (Witness present)

24             THE COURT:  You may take a seat and you can remove

25   your mask.  Just waiting for the jury.

LCGCmax6                        Aznaran - direct

1              (Jury present)

2              THE COURT:  Thank you for your patience, members of

3      the jury.  We will continue with the direct examination of

4      Mr. Aznaran.

5              Mr. Aznaran, I remind you are you under oath.

6              Mr. Everdell you may inquire.

7              MR. EVERDELL:  Thank you, your Honor.

8      BY MR. EVERDELL:

9      Q.  Welcome back, Mr. Aznaran.

10     A.  Thank you.

11     Q.  If you recall when we left off, I was asking you about some

12     reports that you ran in the TECS system; is that right?

13     A.  Yes.

14     Q.  Can you remind us how many different travelers' reports did

15     you run in the TECS system?

16     A.  Three.

17     Q.  I believe you said those were for Jane, Kate, and Annie

18     Farmer; is that right?

19     A.  Yes.

20             MR. EVERDELL:  With the Court's permission I want to

21     show him what's been marked for identification as MA1.

22     Q.  Mr. Aznaran, there is a document on the floor next to you,

23     you can pick that up, and a copy has been provided to the

24     government and the Court.  Can you look at that document marked

25     as MA1 for identification.

LCGCmax6                      Aznaran - direct

1    A.   Okay.  Yes.

2    Q.   Do you recognize what MA1 is?

3    A.   Yes.

4    Q.   What is MA1?

5         THE COURT:  Just without saying any of the names.

6    Q.   Without saying the names of the travelers, please.

7    A.   It is a person encounter list from TECS.

8    Q.   Are these the person encounter list from the three

9    travelers you were asked to look at?

10   A.   Yes.

11   Q.   And how do you recognize them?

12   A.   I ran them on December 14th of 2021.

13   Q.   And are they fair and accurate copies of the three TECS

14   reports that you searched for and pulled off the system for the

15   border crossing records of Jane, Kate, and Annie Farmer?

16   A.   Yes.

17        MR. EVERDELL:  Your Honor, defense offers MA1 under

18   temporary seal to allow for redactions to protect privacy of

19   witnesses in this case.

20        MS. POMERANTZ:  No objection.

21        THE COURT:  All right.  MA1 is admitted under seal to

22   redact the identifying information of witnesses who I have

23   allowed to testify under pseudonyms.  Thank you.

24        (Defendant's Exhibits MA1 received in evidence)

25        MR. EVERDELL:  With the Court's permission, I'll hand

LCGCmax6                         Aznaran - direct

1    out copies to the jury.

2              THE COURT:  Okay.

3    Q.  Mr. Aznaran, do you have the document in front of you?

4    A.  Yes.

5    Q.  First I'd like you to walk us through the various columns

6    that are in this report.

7              But just for clarity sake, do domestic flights appear

8    on these reports or just international flights?

9    A.  Just international.

10   Q.  And if you could explain please then the different columns

11   as you read across the first page, what those mean.

12   A.  The first column is last name, last name of the passenger.

13   Q.  Again, please don't read the name.

14   A.  Last name of the passenger or the person that's been

15   queried.  The next column is the first name, which is the first

16   name of the person.  DOB is for date of birth.  DOC type is the

17   document type that's on record, such as, in this case, the

18   first page, the letter P is for passport.  Document number is

19   the number of the documents, on this case, the passport number.

20   Date and time, eastern.  So the date is the date of the border

21   crossing.  The time is the time that they were processed when

22   they came through port of entry.  Carrier code is two letters,

23   that's the airline code.  So towards the bottom of the first

24   page, AA is American Airlines, for an example.  Carrier number

25   is the number of the flight.  I/O is indicating whether that

1    particular record was for an inbound or an outbound travel.

2    Site is the particular federal inspection site that the person

3    was encountered at.

4    Q.  Could you explain that a little more.  What do you mean by

5    the federal inspection site?

6    A.  So on this first page, you have the very first site at the

7    top is Alpha 271.  That is the specific terminal at whatever

8    airport that that traveler was encountered.  So if I flip to --

9    it's been redacted, but -- for example, JFK airport has five

10   international terminals.  Terminal 4 is Alpha 471.  Delta used

11   to be Alpha 473.

12   Q.  When we're referring to the sites, are those the sites

13   where the booths or the kiosks are where the immigration

14   officials stamp your passports?

15   A.  Yes.

16   Q.  Going to the right, what else do you see on these columns?

17   A.  Then you have type.  So that is the type of or more like

18   the way that this information was obtained for each border

19   crossing.

20   Q.  And on that, if you look at the first entry --

21           THE COURT:  Can't quite hear you there, Mr. Everdell.

22           MR. EVERDELL:  Sorry.

23   Q.  On the column marked type, you see the first entry on the

24   top, it says airline, not API?

25   A.  Right.

1    Q.  And the one below that says APIS?

2    A.  Yes.

3    Q.  Can you explain the difference between the two.

4    A.  So the first one, airline, not API.  An airline employee at

5    some point manually entered that person's information into

6    their manifest system as opposed to APIS, which is Advanced

7    Passenger Information System.  That means that that airline

8    submitted their manifest electronically to the APIS system and

9    it was electronically and automatically uploaded into TECS.

10   Q.  Okay.  And what's next?

11   A.  The next column is status.

12   Q.  What does that indicate.  Actually, if I can have you look

13   maybe at page 3 of the document, and you look at top of the

14   page, the third entry down in the column status, it says the

15   word passenger; is that right?

16   A.  Yes.

17   Q.  So what does that indicate?

18   A.  That indicates that that person was, at one point or

19   another, added to that manifest of that airline for that

20   particular flight.

21   Q.  Going to the next column, updated status.

22   A.  Updated status, I have, in all of my experience querying

23   travel records, I have never seen anything in that column, and

24   I honestly don't know what it means or what it's supposed to.

25   Q.  Understood.  What about the columns to the right of that?

LCGCmax6                          Aznaran - direct

1   A.  So ARRLOC, arrival location.  That is the location, on the

2   first page anyway, all the airports that the flight is going to

3   be arriving or landing at.  And to the right of that, DEPLOC is

4   departure location.  That is the airport where the flight is

5   departing from.

6   Q.  So let's just take one example, the first example on

7   page 1.  That reflects a flight that Jane took from CDG to LAX;

8   right?

9   A.  Yes.

10  Q.  Do you know what CDG is?

11  A.  Is Paris, Charles de Gaulle.

12  Q.  And LAX is what?

13  A.  Los Angeles International.

14  Q.  And was that an incoming or outgoing flight?

15  A.  That would be incoming.  It departed from Paris and it

16  landed at LAX, or Los Angeles.

17  Q.  And you know the incoming from the I in the I/O category?

18  A.  Yes, also Paris to Los Angeles.  So that would be an

19  incoming.

20  Q.  And the date and time reflected there is 7/25/2004; right?

21  A.  Yes.

22  Q.  So what does that date reflect?

23  A.  That is the date that that passenger arrived into the

24  United States and was processed.

25  Q.  And the time?

1    A.   The time is the updated time that the passenger was

2    actually processed by a CBP officer in the passenger operations

3    environment.

4    Q.   All right.  So looking at the information in this chart,

5    what of this information comes from the airlines and what of

6    this information comes from the kiosks when they're stamped

7    into the country?

8    A.   So the airline manifest is going to provide the last name,

9    first name, the date of birth, document type, document number,

10   the carrier code, the carrier number, inbound or outbound, the

11   type, the arrival location, and the departure location.

12   Q.   That all comes from the airline?

13   A.   Yes.

14   Q.   And the rest of the information that's not that is, I

15   think, the date and time and the site; is that right?

16   A.   The date and the time is when the manifest is first loaded.

17   The date and the time will reflect the date of the flight and

18   it will reflect the time of the flight, the time of arrival.

19   Once the passenger is processed and that information is

20   captured by their border crossing into TECS, that time is

21   supposed to be updated to the time when they were processed.

22   Q.   Processed at the immigration kiosk?

23   A.   At the kiosk, correct.

24   Q.   At the site location listed there?

25   A.   Yes.

1    Q.   Okay.  It looks like outbound flights, O's in that column

2    don't have any site information typically.  Why is that?

3    A.   Because CBP, we don't have a 100 percent outbound mandate,

4    if you will.

5    Q.   So you need to track incoming flights, people coming into

6    the United States, but not necessarily people leaving the

7    United States?

8    A.   I wouldn't say track.  I would say when you come into the

9    United States, you are required to be processed or admitted

10   into the country.  When you depart the country, there is no --

11   for example, at JFK, there is no FIS, or federal inspection

12   site with actual CBP officers that are processing you when you

13   go to get on board your outbound flight.

14   Q.   Understood.  So I just want to take a look at the years

15   that's reflected in this report.  If you look at the first

16   page, which are the records of Jane's travel; right?

17   A.   Yes.

18   Q.   You see the earliest one there is January 6th, 1996; right?

19   A.   Yes.

20   Q.   And the latest one there is July 25th, 2004; right?

21   A.   Correct.  Yes.

22   Q.   Now, when you originally did this search, I think you said

23   you searched all the way up to 2010; correct?

24   A.   Yes.

25   Q.   And were there records going that late, do you recall?

LCGCmax6                       Aznaran - direct

1   A.  I believe so, yes.

2   Q.  So we're just looking at a subset; right?

3   A.  Yes.

4   Q.  And same thing with Kate's records.  If you go to page 3 of

5   that exhibit, you see on that page, there is some records of

6   transits, earliest one there is February 29th of 2004; is that

7   right?

8   A.  My pages are --

9   Q.  I think you have to count manually, one, two, three, third

10  page?

11          THE COURT:  The page number is at the bottom right.

12          MR. EVERDELL:  We can try that.

13  Q.  That page is 5.  Do you see that?

14  A.  5.

15  Q.  For Kate, the earliest one on that page is February 29th,

16  2004?

17  A.  Yes.

18  Q.  And the latest one is April 3rd of 2006; right?

19  A.  Yes.

20  Q.  Going to what's page 7, there is some redacted entries, but

21  those are also Kate records; is that right?

22  A.  I'm sorry?

23  Q.  Those are also Kate records on page 7?

24  A.  Yes.

25  Q.  And the earliest one there is November 1st, 1997; correct?

LCGCmax6                          Aznaran - direct

1    A.   Correct.

2    Q.   And that one is October 14th, 2006?

3    A.   Yes.

4    Q.   And then finally, looking at Annie Farmer on page 9,

5    earliest record there is July 20th, 1997?

6    A.   Yes.

7    Q.   And the latest one there is April 11th, 2006; right?

8    A.   Yes.

9    Q.   Now, just to be clear, we talked about how late you

10   searched, 2010, but how early did you search the records?

11   A.   1994.  January 1st, 1994.

12   Q.   And these are the first records that come up in that

13   system, going back to '94?

14   A.   Yes.

15   Q.   Let's actually flip back to page 1, or I guess it's page 2

16   of the exhibit, even though it's the first page, you'll see

17   that's a record for Jane.  If you look down at the last one on

18   the page, the flight on January 6th, 1996 -- do you see that?

19   A.   Yes.

20   Q.   That is the earliest border entry in the TECS system for

21   Jane; correct?

22   A.   Yes.

23   Q.   And you see the date of birth for Jane there.  I don't want

24   you to say what it is, but do you see it?

25   A.   Yes.

LCGCmax6                              Aznaran - direct

```
 1    Q.  And if you can do the math, based on her date of birth, how

 2    old was she when this flight -- when she made this border

 3    crossing back in the United States?

 4    A.  16.

 5    Q.  Actually.  You want to do the math again?  It's date of

 6    birth --

 7              MR. EVERDELL:  I can say the year, can I not?

 8    Q.  Is it accurate to say that she would have been 15 when that

 9    flight took place?

10    A.  Yes.

11    Q.  Then you look at the entry above that, that's the flight on

12    April 15th of 1996; right?

13    A.  Yes.

14    Q.  And where did that flight arrive into?

15    A.  Arrived into JFK.

16    Q.  Where did it depart from?

17    A.  MXP, which is Milan, Italy.

18    Q.  Based on the date of birth, fair to say that Jane would

19    have been 15 when that flight took place?

20    A.  Yes.

21    Q.  And if you look at the flight above that, that's the flight

22    on June 21st, 1997; right?

23    A.  Yes.

24    Q.  And, again, based on the date of birth for Jane, she would

25    have been 16 when that flight took place; right?
```

1    A.   Yes.

2    Q.   Let's take a look at a few of Kate's entries.  So flip to

3    page 7 of what's marked on the bottom right as page 7.

4    A.   Yes.

5    Q.   You see the entry there is November 1st of 1997; is that

6    right?

7    A.   Yes.

8    Q.   Is that the earliest border entry in the TECS system for

9    Kate?

10   A.   Yes.

11   Q.   And you see her date of birth over to the left?

12   A.   Yes.

13   Q.   Based on her date of birth, she would have been 20 years

14   old when that flight took place; is that right?

15   A.   Yes.

16   Q.   So does this report reflect that Kate had any border

17   crossings in 1994?

18   A.   No.

19   Q.   Does it reflect any border crossings for Kate in 1995?

20   A.   No.

21   Q.   Does it reflect any border crossing records for Kate in

22   1996?

23   A.   No.

24   Q.   First one was that one in November 1st, 1997, when she's

25   20?

LCGCmax6                          Aznaran – cross

1    A.  Yes.

2    Q.  Now I want you to flip to the last page.  Those are the

3    records for Annie Farmer?

4    A.  Yes.

5    Q.  Why don't you look at that last entry.  That's a flight on

6    July 20th, 1997; correct?

7    A.  Yes.

8    Q.  What city did this flight depart from?

9    A.  DUS, which is Düsseldorf, Germany.

10   Q.  Where did it arrive?

11   A.  EWR, which is Newark Airport, New Jersey.

12   Q.  Is this the earliest border entry in the TECS system for

13   Annie Farmer?

14   A.  Yes.

15   Q.  Does this report show any border crossings for Annie Farmer

16   in 1996?

17   A.  No.

18           MR. EVERDELL:  One moment, your Honor.

19           THE COURT:  Okay.

20           MR. EVERDELL:  No further questions, your Honor.

21           THE COURT:  Ms. Pomerantz.

22           MS. POMERANTZ:  Thank you, your Honor.

23   CROSS-EXAMINATION

24   BY MS. POMERANTZ:

25   Q.  Good afternoon.

LCGCmax6                          Aznaran - cross

1   A.  Good afternoon.

2   Q.  You've been testifying about CBP records of international

3   flights from the 1990s and 2000s; right?

4   A.  Yes.

5   Q.  In your work as a CBP officer, do you have experience

6   reviewing flight records from before September 11th, 2001?

7   A.  Yes.

8   Q.  In your work as a CBP officer, do you have experience

9   reviewing flight records from after 9/11?

10  A.  Yes.

11  Q.  Based on your review of CBP records in your experience as a

12  CBP officer, have you noticed a difference between CBP records

13  from before 9/11 and after 9/11?

14  A.  Yes.

15  Q.  What difference have you noticed?

16  A.  Well, so if you -- if you look at the records, not

17  necessarily these, but just in general, from my experience,

18  what I have noticed is the farther back you go from the present

19  time, the more likelihood that you are not going to get an

20  on-board or not-on-board status for those records.

21          (Continued on next page)

22

23

24

25

LCGVMAX7                    Aznaran - cross

BY MS. POMERANTZ:

Q.  As a CBP officer, is it important to your job to understand
whether the CBP records you are reviewing are thorough and
accurate?

A.  Yes.

Q.  And in your day-to-day work as a CBP officer, do you rely
on CBP records from before 9/11 to be complete?

A.  We'd like to rely on or hope that the records are complete,
but not necessarily all the time, no.

Q.  And why is that the case that records before 9/11 are not
necessarily complete?

A.  Prior to 9/11, there was a little bit of a difference
between how the records were submitted to CBP systems and the
reliability of the airlines was not as good as it is now or
after 9/11.

Q.  And when did that start to change in terms of when did the
records start to be more complete and thorough?

A.  After 9/11, there were several acts put into place by the
U.S. Government.  The Department of Homeland Security was
created.  And basically, the airline industry was at one point
mandated now to submit more complete records to CBP.  I feel
comfortable saying -- as far as the status indicators, I feel
comfortable saying roughly 2009, 2010, based on the records
that I have ran in my experience, you would see more onboard or
not onboard status.

LCGVMAX7                    Aznaran - cross

1   Q.  I want to talk about people traveling into the United

2   States.  In your work you refer to that as inbound travel,

3   right?

4   A.  Yes.

5   Q.  Based on your review of CBP records and your experience as

6   a CBP officer, if someone was traveling into the United States

7   before September 11th, 2001, would CBP records necessarily

8   reflect that person's travel into the United States?

9   A.  Not necessarily.

10  Q.  Can you explain why?

11  A.  Once again, the recordkeeping and the way that the airlines

12  used to basically operate, I'll go back to APIS, Advance

13  Passenger Information System.  Prior to 9/11, it was voluntary

14  for airlines to submit their manifests to APIS.  After 9/11

15  and, more specifically, the most recent update that I'm aware

16  of in, I believe it's 2005, mandated airlines to submit full

17  and complete manifests to CBP using the APIS system.

18  Q.  I want to talk about when someone leaves the United States

19  and travels internationally.  In your work, you refer to that

20  as outbound travel, right?

21  A.  Yes.

22  Q.  Based on your review of CBP records and your experience as

23  a CBP officer, if someone was traveling out of the United

24  States before September 11th, would CBP records necessarily

25  reflect that person's travel out of the United States?

1    A.  Not necessarily, no.

2    Q.  And can you briefly explain why?

3    A.  Once again, the airlines, it was a little bit of a

4    different -- different world before 9/11 happened.

5    Q.  I want to turn to the records that defense counsel asked

6    you about during direct examination.

7             Can you be certain that all outbound travel before

8    9/11 for the listed individuals is reflected in those records?

9    A.  No.

10   Q.  And again, briefly, why not?

11   A.  I can't really say whether these records truly reflect

12   exactly any passenger's complete travel history.

13   Q.  Can you be certain that all inbound travel before 9/11 for

14   those individuals is reflected in these records?

15   A.  No.

16   Q.  So it is possible that the people named in these records,

17   in fact, took international trips in the 1990s that are not

18   reflected in these records, right?

19   A.  Possible.

20   Q.  I think defense counsel had pointed you to -- if we could

21   turn to page 9.  We're in Defendant's Exhibit MA-1.

22            THE COURT:  I can't quite hear you, Ms. Pomerantz.

23            MS. POMERANTZ:  I'm sorry.  Defense Exhibit MA-1.

24   Q.  We're on page 9.  And on the last line there is a flight on

25   July 20th, 1997.  Do you see that?

1    A.  Yes.

2    Q.  And I believe that you testified that that was a flight

3    from Düsseldorf to Newark; is that right?

4    A.  Yes.

5    Q.  But there is no flight reflected here of Annie's trip to

6    Düsseldorf, right?

7    A.  No.

8    Q.  So to be clear, these records are not necessarily an

9    exhaustive list of every time Jane, Kate, and Annie traveled

10   internationally before September 11th, 2001, are they?

11   A.  Not necessarily, no.

12           MS. POMERANTZ:  No further questions.

13           THE COURT:  Mr. Everdell.

14           MR. EVERDELL:  Redirect.

15           THE COURT:  Okay.

16   REDIRECT EXAMINATION

17   BY MR. EVERDELL:

18   Q.  Mr. Aznaran, you were asked some questions on

19   cross-examination about the completeness of the records, right?

20   A.  Yes.

21   Q.  And I think you mentioned that before 9/11, the airlines

22   weren't always as complete with providing manifests as they

23   were after 9/11; is that right?

24   A.  Yes.

25   Q.  But as we discussed, not all the information on this TECS

1    report comes from the airlines, isn't that right?

2    A.  Correct.

3    Q.  You mentioned certain columns that came from the kiosks and

4    the people who actually swiped the passports in at the

5    immigration sites; is that right?

6    A.  Yes.

7    Q.  And so, in fact, the site that you discussed was the site

8    where people passed through?

9    A.  Yes.

10   Q.  And that would get populated when that traveler went

11   through that site, right?

12   A.  Yes.

13   Q.  And the date and time you said should get updated with that

14   information of when that passenger goes through the site in the

15   TECS report if they go through that immigration site, right?

16           MS. POMERANTZ:  Objection, your Honor.

17           If we can just place this in time.

18   Q.  I'm talking about prior to 9/11.

19   A.  I'm sorry, say the question again.

20   Q.  We're talking about records prior to 9/11.  You said that

21   for any of these records, before 9/11 or not, the date and time

22   reflects the date and time -- first it reflects the date and

23   time of the flight.  But if the person goes through an

24   immigration site, it then gets updated to reflect the time that

25   they went through the kiosk and got their passport stamped;

LCGVMAX7                      Aznaran - redirect

1   correct?

2   A.  Correct.  Yes.

3   Q.  And that is information that comes from the people on the

4   ground at the immigration sites, not from the airlines, right?

5   A.  Not from the people, but from the actual kiosk, yeah, or

6   the -- the booth.

7   Q.  From the computer systems that they are working on, right?

8   A.  Correct.

9   Q.  Okay.  And so that's not dependent on whether the airlines

10  has given their manifests or not, right?

11  A.  Correct.

12  Q.  Okay.  So if we look at that last page again of the

13  exhibit, MA-1, and let's just take an example.  You see the

14  second entry from the bottom, that's a flight on May 27th,

15  2000, for Annie Farmer?

16  A.  Correct.

17  Q.  And you see that there is a site listed there, right?

18  A.  Yes.

19  Q.  That's Alpha 263, right?

20  A.  Yes.

21  Q.  And there is a date and time listed for that -- for that

22  border crossing, right?

23  A.  Yes.

24  Q.  Okay.  And it's that site and that date and time would

25  reflect when they actually passed through immigration, right?

LCGVMAX7                          Aznaran - recross

1    A.   Yes.

2    Q.   That is not dependent on the airline information; correct?

3    A.   Correct.

4    Q.   All right.  And if we look just down below at the entry for

5    the Düsseldorf flight that you were just asked about, right?

6    A.   Yes.

7    Q.   That also reflects a site, does it not?

8    A.   Yes.

9    Q.   And it reflects a date at least of that entry, right?

10   A.   Yes.

11   Q.   So that record reflects an actual border crossing at a site

12   in an immigration line at an airport for Annie Farmer, doesn't

13   it?

14   A.   Yes.

15   Q.   Okay.  And that is not dependent on the airlines, right?

16   A.   No.  Correct.

17   Q.   Okay.  One moment, please.

18               THE COURT:  Okay.

19               MR. EVERDELL:  No further questions, your Honor.

20               THE COURT:  Okay.

21   RECROSS EXAMINATION

22   BY MS. POMERANTZ:

23   Q.   In the 1990s, there were no digital kiosk stands, right?

24   A.   There were no digital kiosk stamps?

25   Q.   Stands.

1    A.  Oh, stands?  I -- I don't know.

2    Q.  Well, it was paper records; correct?

3            MR. EVERDELL:  Objection.  Foundation.

4            THE COURT:  Sustained.

5    Q.  Officer Aznaran, based on your experience as a CBP officer

6    and your review of CBP records, the CBP records from the 1990s

7    were paper records; correct?

8            MR. EVERDELL:  Objection.  Foundation.

9            THE COURT:  Sustained.

10           MS. POMERANTZ:  Your Honor, may I have just one moment

11   please?

12           THE COURT:  Okay.

13           (Counsel conferred)

14   Q.  Officer Aznaran, do you know whether they were paper

15   records in the 1990s?

16           MR. EVERDELL:  Objection.

17           Asked and answered.

18           THE COURT:  Overruled.

19   A.  I'm sorry, say the question again.

20   Q.  Do you know whether they were paper records in the 1990s?

21   A.  Yes.

22   Q.  And were they paper records?

23   A.  Yes.

24   Q.  And before 9/11, were paper records always logged in the

25   system?

LCGVMAX7                            Aznaran – recross

1              MR. EVERDELL:  Objection.  Foundation.

2              THE COURT:  Sustained.

3              (Counsel conferred)

4    Q.  Do you know if in the 1990s, before 9/11, if paper records

5    were logged into CBP's system?

6    A.  I would think that they were, but I'm not sure.

7              MR. EVERDELL:  Objection.  He's speculating.

8              THE COURT:  Well, the answer is "I'm not sure," so --

9              MS. POMERANTZ:  Your Honor, may I have just one

10   moment?

11             THE COURT:  Okay.

12             (Counsel conferred)

13             MS. POMERANTZ:  Nothing further, your Honor.

14             THE COURT:  Okay.

15             MR. EVERDELL:  Nothing further, your Honor.

16             THE COURT:  All right.  Thank you, Mr. Aznaran.

17             You may step down.  You are excused.

18             (Witness excused)

19             THE COURT:  Defense may call its next witness.

20             MS. MENNINGER:  Your Honor, at this time we call

21   Dominique Hyppolite.

22    DOMINIQUE HYPPOLITE,

23        called as a witness by the Defendant,

24        having been duly sworn, testified as follows:

25             THE COURT:  Thank you.  You may inquire,

LCGVMAX7                        Hyppolite – direct

1    Ms. Menninger.

2              MS. MENNINGER:   Thank you, your Honor.

3    DIRECT EXAMINATION

4    BY MS. MENNINGER:

5    Q.   Good afternoon, Mr. Hyppolite.

6    A.   Good afternoon.

7    Q.   Where do you live?

8    A.   In West Palm Beach, Florida.

9    Q.   In Florida?

10   A.   Yes, ma'am.

11   Q.   And how long have you lived there?

12   A.   Thirty-five years.

13   Q.   Where do you work?

14   A.   With Palm Beach School District.

15   Q.   And where is the Palm Beach School District located?

16   A.   In Florida, 3300 Forest Hill Boulevard, West Palm Beach,

17   Florida, 33406.

18   Q.   Thank you.

19              And what is your title at the Palm Beach School

20   District?

21   A.   As a specialist.

22   Q.   What are your job responsibilities?

23   A.   I coordinate the processing of subpoenas and represent the

24   district as a record custodian for trial and depositions.

25   Q.   So you do subpoena responses for trials and depositions of

LCGVMAX7                    Hyppolite - direct

1   records from the Palm Beach County School District?

2   A.  Students records.

3   Q.  Student records?

4   A.  Yes.

5   Q.  Okay.  Are you familiar with the way that school records

6   are kept for the Palm Beach County School District?

7   A.  Yes, ma'am.

8   Q.  And can you describe for the jury a little bit about how

9   student records are kept.

10  A.  Each school has a data processor and record custodian

11  depend on the level.  Elementary, they have data processor.

12  And middle school, they have -- each grade has a -- someone

13  that takes care of records.  And high school, they have record

14  custodian.

15  Q.  And are the student's records entered into the system at

16  the time the student is there at the school?

17  A.  Yes, ma'am.  And the records follow the student.  If the

18  student -- when the student is in elementary school.  And once

19  they pull more to middle, and then everything follow the

20  student.  And there is no information on the student in the

21  elementary school.  Middle, and then it's transferred to high

22  school.  And then after three years, then the student leave the

23  school system, and then the records and -- are -- they send the

24  records to the district to be purged and kept at the district

25  level.

1   Q.  Does the Palm Beach County School District keep some

2   electronic records of all students that have gone to school in

3   the district?

4   A.  Yes.  After three years, when the student withdraw from

5   Palm Beach -- from the schools, and then if the student is --

6   exceptional student education, the schools keeps the record for

7   five years.  If the student is a regular student, after three

8   years the records are purged and processed and kept at the

9   district.

10  Q.  And are they kept electronically?

11  A.  Yes, ma'am.

12  Q.  Are you able to go and search for a particular student's

13  name in the system?

14  A.  Definitely, yes.  I have access to that.

15  Q.  And when you enter a student's name in the system, are you

16  able to pull up certain of their education records?

17  A.  Yes.

18  Q.  Is that true even if the student went to school in the '90s

19  or the early 2000s?

20  A.  Yes, ma'am.

21  Q.  So does the Palm Beach County School keep records for

22  decades, for example, on students?

23  A.  Yes.

24  Q.  Are there certain records that they get rid of?  I think

25  you said some were purged.

1    A.  Yes, they keep the most significant information on the

2    student, and then they do that according to the procedures of

3    the school board of Palm Beach County.

4    Q.  Great.  And were you asked to search for certain student

5    files related to our case here?

6    A.  Yes, ma'am.

7    Q.  Did you put those students' name into the system and pull

8    up the records that the district still keeps for those

9    students?

10   A.  Yes, ma'am.

11             MS. MENNINGER:  Your Honor, may I approach with some

12   records?

13             THE COURT:  Yes.  Although it's 4:59, so are we

14   wrapping up?

15             MS. MENNINGER:  I probably have 10 to 15 more minutes,

16   your Honor.

17             THE COURT:  We'll have to break.

18             MS. MENNINGER:  All right.

19             THE COURT:  We'll break here, members of the jury, for

20   the evening.  Same schedule for tomorrow.  Thank you so much.

21             See you then.

22             (Jury not present)

23             THE COURT:  Mr. Hyppolite, the witness may step down

24   and out for the evening.  Thank you.

25             (Witness not present)

1              THE COURT:  Everyone may be seated.

2              All right.  Matters to take up.

3              MS. COMEY:  Your Honor, I would just note that we

4      previously offered to stipulate to this witness's testimony.

5      We're happy to stipulate to the remainder of it if he can be

6      released.  I don't know whether the defense would like that.

7      They did us that courtesy with another witness from Florida who

8      had to stay overnight, so I wanted to offer it.

9              THE COURT:  Thank you.

10             MS. MENNINGER:  Thank you, your Honor.

11             I'll speak with the government afterwards about a

12     potential stipulation.

13             THE COURT:  Okay.  Thank you.

14             Other matters?

15             MS. COMEY:  Nothing from the government, your Honor.

16             MS. MENNINGER:  No, your Honor.  Just that we have

17     conferrals on the inconsistent statements we are planning to do

18     after we finish.

19             THE COURT:  What I'd like is for you to identify what

20     remains in dispute.  What time can I hear from you on that?

21             MS. MENNINGER:  7:30?

22             MS. COMEY:  That sounds reasonable to us, your Honor.

23             THE COURT:  Okay.  If there are issues that remain in

24     dispute, I guess I could ask for anything, just like a joint

25     chart that --

1           MS. MENNINGER:  Yes, your Honor.  I think we can take

2      the same chart we have both been working off of and just

3      eliminate the ones that are no longer -- or somehow with color

4      indicate the ones that are still in dispute.

5           THE COURT:  Yes.  Or give me a new chart with the ones

6      that are in dispute and each just very briefly state each

7      side's position.

8           MS. MENNINGER:  Yes, your Honor.

9           MS. COMEY:  Yes, your Honor.

10          THE COURT:  Okay.  The only other thing -- oh, right.

11     So I gave you till 6 o'clock on what I didn't recall

12     at the time.  It was your response on the remaining witness.  I

13     sort of staggered the response time on the motion to preclude

14     based on when we thought we would have witnesses.

15          So who remains in dispute who will be called tomorrow?

16          MS. MENNINGER:  I think there were Eva, Michelle, and

17     Kelly.  I think Mr. Lopez, I believe, we're not calling.

18          MR. EVERDELL:  That's right, your Honor.

19          MS. MENNINGER:  So that one is no longer in dispute.

20          THE COURT:  Okay.  So you said Eva, Michelle, and

21     Kelly.

22          MS. MENNINGER:  Yes, your Honor.

23          THE COURT:  So they will be called tomorrow if they

24     are not precluded.

25          MS. MENNINGER:  Yes, your Honor.  I believe so.

1              THE COURT:  All right.

2              So I'll get the defense's response to the motion to

3     preclude on that this evening.

4              And so what is tomorrow looking like?

5              MS. MENNINGER:  I think we will be done, your Honor.

6     I am looking at my co-counsel.  We've had to -- we have to make

7     a couple of inquiries because your Honor ruled this morning on

8     anonymity, and there may be some other issues that we have to

9     figure out whether that will carry forward to Monday or not.

10             MR. EVERDELL:  Your Honor, sorry to interrupt.

11             There may be one witness that does carry over to

12    Monday.  We have to figure that out.  But our goal, I think, is

13    to try to wrap up, with the exception of this one potential

14    witness, by tomorrow.

15             MS. STERNHEIM:  Judge, may I have a moment?

16             THE COURT:  Yes.

17             (Counsel conferred)

18             MR. EVERDELL:  I think if we went over in the morning,

19    even if we had this one witness, it would be very brief, so we

20    could have almost a full day on Monday.

21             THE COURT:  Okay.

22             So finishing tomorrow or a very short witness on

23    Monday means closings on Monday and then charge and to the

24    jury.  Okay.  I'll permit that so long as it does not interfere

25    with that schedule.

1          MS. STERNHEIM:  It will not interfere, Judge.

2          THE COURT:  Okay.

3          MR. PAGLIUCA:  Your Honor, just --

4          THE COURT:  It's like I'm getting triple-teamed here.

5     I can barely keep up.

6          MR. PAGLIUCA:  Sometimes five heads, six heads may be

7     better than one, sometimes maybe not.

8          But there is an issue about a government rebuttal

9     witness that I don't know if that's been resolved yet.  And I

10    just wanted to lay that out there for the Court.

11         MS. COMEY:  Yes, your Honor.  We are leaning against

12    calling that witness.  We need to circle up as a team and we'll

13    have a final decision tomorrow morning for your Honor.  I doubt

14    we will be calling any rebuttal witnesses.

15         THE COURT:  Okay.  I guess the only thing I would ask

16    you to consider is if we have time left over tomorrow, if there

17    is a very short witness on Monday, if perhaps the government

18    does intend to call a rebuttal, if you would consider using the

19    time tomorrow for the rebuttal, if that's acceptable to the

20    defense.

21         MR. PAGLIUCA:  If there is going to be a rebuttal

22    witness, your Honor, there's going to be briefing on it

23    tonight.

24         THE COURT:  I'm here all day.

25         When will you come to a decision?

1          MS. COMEY:  Your Honor, I think we can come to a

2     decision tonight by 8 o'clock.  I'll be with Ms. Menninger

3     until 7:30.  At 8 o'clock.

4          THE COURT:  All right.  So by 8 o'clock.  So if there

5     is, and that requires briefing, when will I get your brief,

6     Mr. Pagliuca?

7          MR. PAGLIUCA:  8:05, your Honor.

8          THE COURT:  It's in the can.  Glad to hear it.

9          I don't know if you are joking, actually.

10          MR. PAGLIUCA:  No, I'm not joking, your Honor.  8:05

11     is when you will get it.

12          THE COURT:  Good deal.  I like it.

13          Okay.  A couple other odds and ends.

14          I got a letter yesterday from counsel for a potential

15     defense witness.  As far as I could tell, there was no

16     application in the letter.  I don't know if anyone has an

17     application.

18          MS. COMEY:  I don't believe there's any application

19     from that witness or from the government with respect to that

20     witness, your Honor.

21          MS. MENNINGER:  We don't have it, your Honor.  I don't

22     know what you're talking about.

23          THE COURT:  One of you was cc'd on it.

24          MS. COMEY:  I believe Ms. Menninger was cc'd on it.

25          May I confer?

1          THE COURT:  You may.

2          (Counsel conferred)

3          MS. MENNINGER:  Your Honor, if we could consider

4    whether what we need to do as far as docketing that or making a

5    record about it, we could do it tomorrow morning at the 8:45

6    mark.  It may be important for a foundational -- an exhibit

7    that may be predicated on an unavailable witness, and that's

8    the only reason I am considering whether anything else needs to

9    happen.

10          THE COURT:  Okay.  You'll confer.

11          MS. MENNINGER:  Yes.

12          MS. COMEY:  Yes, your Honor.

13          THE COURT:  Okay.  But, as I said, I didn't understand

14    an application in that letter, so I'm not doing anything with

15    it.

16          MS. MENNINGER:  Your Honor, we just needed a record of

17    that officially in case we needed it for a foundational

18    purpose, and so that was the reason that I had said if --

19          THE COURT:  Okay.  If that becomes a judicial

20    document, if I use it in some way, it will be docketed.

21          MS. MENNINGER:  Right.  I understand.

22          MS. COMEY:  Yes, your Honor.

23          THE COURT:  Okay.  And then the only other thing I

24    want to ask about is defense counsel as to timing.  It's

25    usually around here where I allocute the defendant as to their

1    rights.

2              MS. STERNHEIM:  Judge, I would ask that we wait until

3    tomorrow please.

4              THE COURT:  Okay.

5              MS. STERNHEIM:  Thank you.

6              THE COURT:  We will do that.

7              MS. COMEY:  Just one quick question, your Honor.

8              THE COURT:  Yes.

9              MS. COMEY:  Is there any sense of when we might expect

10   a draft of the jury charge?

11             THE COURT:  It will be tomorrow.

12             MS. COMEY:  Thank you, your Honor.

13             THE COURT:  That's tonight's project for the 9 a.m.

14   conference.

15             I don't suppose anyone has a time estimate of

16   closings?

17             MS. STERNHEIM:  What's a closing, Judge?

18             I don't think we have an idea yet.  As soon as we

19   do --

20             THE COURT:  Do you prefer "summations"?

21             MS. STERNHEIM:  I prefer that, too.  I prefer actually

22   getting two cracks at it, like the government, but we'll be

23   sparse.  I don't think we're in a position to inform the Court

24   yet.

25             THE COURT:  Okay.  But presumably we're looking at

1    completing closings and the charge on Monday.

2              MS. STERNHEIM:  Yes.

3              THE COURT:  Okay.

4              MS. MENNINGER:  May I inquire, your Honor?  In some

5    courtrooms I've been in there is a rule, perhaps not strongly

6    enforced, but strongly suggested, that the government only

7    reserve a certain portion of their summation for the rebuttal

8    piece because otherwise it ends up being a bit of a more in

9    rebuttal than in the actual substance.  I don't know if your

10   Honor has that practice, but I would request that some

11   reasonable percentage be allocated to the first versus the

12   rebuttal portion.

13             MS. COMEY:  Your Honor, I expect the rebuttal will be

14   significantly shorter than the closing.  I don't think that's

15   going to be an issue.

16             THE COURT:  Well, it certainly should be.  It should

17   be rebuttal and not --

18             MS. COMEY:  That's exactly right, your Honor.  And

19   I'll be doing the rebuttal.  I fully intend it to be much

20   shorter than the closing and to the point, as is consistent

21   with our office practice before your Honor and in this

22   district.

23             THE COURT:  Okay.  Anything else on that?

24             Let me just check my various inputs to see if I'm

25   missing -- check with my law clerk.

LCGVMAX7                         Hyppolite - direct

1              All right.  I don't have anything else.

2              So I will hear from you this evening.  You'll get the

3    charge tomorrow.  And I'll see you at 8:45.  Thank you.

4              (Adjourned to December 17, 2021 at 8:45 a.m.)

```
 1                        INDEX OF EXAMINATION

 2   Examination of:                              Page

 3    CIMBERLY ESPINOSA

 4   Direct By Mr. Everdell . . . . . . . . . . .2327

 5   Cross By Ms. Pomerantz . . . . . . . . . . .2386

 6    RAGHU SUD

 7   Direct By Mr. Everdell . . . . . . . . . . .2388

 8   Cross By Ms. Moe . . . . . . . . . . . . . .2397

 9    ELIZABETH LOFTUS

10   Direct By Ms. Sternheim . . . . . . . . . .2398

11   Cross By Ms. Pomerantz . . . . . . . . . . .2454

12   Redirect By Ms. Sternheim  . . . . . . . . .2482

13    MICHAEL WILLIAM AZNARAN

14   Direct By Mr. Everdell . . . . . . . . . . .2486

15   Cross By Ms. Pomerantz . . . . . . . . . . .2517

16   Redirect By Mr. Everdell . . . . . . . . . .2522

17   Recross By Ms. Pomerantz . . . . . . . . . .2525

18    DOMINIQUE HYPPOLITE

19   Direct By Ms. Menninger  . . . . . . . . . .2528

20                       DEFENDANT EXHIBITS

21   Exhibit No.                              Received

22    CE3 through CE8  . . . . . . . . . . . . .2363

23    RS-1  . . . . . . . . . . . . . . . . . .2394

24    EF-1  . . . . . . . . . . . . . . . . . .2450

25    MA1  . . . . . . . . . . . . . . . . . . .2506
```