LCFCmax1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     UNITED STATES OF AMERICA,
 3
               v.                        20 CR 330 (AJN)
 4
     GHISLAINE MAXWELL,
 5
               Defendant.                Jury Trial
 6   ------------------------------x
                                         New York, N.Y.
 7                                       December 17, 2021
                                         8:56 a.m.
 8
     Before:
 9                      HON. ALISON J. NATHAN,

10                                       District Judge

11                            APPEARANCES

12   DAMIAN WILLIAMS
          United States Attorney for the
13        Southern District of New York
     BY:  MAURENE COMEY
14        ALISON MOE
          LARA POMERANTZ
15        ANDREW ROHRBACH
          Assistant United States Attorneys
16
     HADDON MORGAN AND FOREMAN
17        Attorneys for Defendant
     BY:  JEFFREY S. PAGLIUCA
18        LAURA A. MENNINGER
               -and-
19   BOBBI C. STERNHEIM
               -and-
20   COHEN & GRESSER
     BY:  CHRISTIAN R. EVERDELL
21
     Also Present:  Amanda Young, FBI
22                  Paul Byrne, NYPD
                    Sunny Drescher,
23                   Paralegal, U.S. Attorney's Office
                    Ann Lundberg,
24                   Paralegal, Haddon Morgan and Foreman

25
```

LCFCmax1

1          (Jury not present)

2          THE COURT:  Matters to take up, from my perspective,

3    it's obviously a long list of prior inconsistent statements I

4    need to go through.  Before that, anything, counsel?

5          MS. MENNINGER:  Your Honor, there is one witness that

6    we have under subpoena who has not been in contact with us that

7    we very much would like to call as a witness.  I can say the

8    name out loud or we can have a sidebar, but it is one of the

9    witnesses about whom the government moved to preclude their

10   testimony and your Honor ruled last night that we would be

11   permitted to put that testimony on.  All of our attempts to

12   have communication with this witness after the service of

13   subpoena have gone unresponded to.  So I think, at this point,

14   we have no choice left except to ask to have intervention of

15   the marshals to bring that witness to court to testify.

16         THE COURT:  You'll have to file something.

17         MS. MENNINGER:  Yes.

18         THE COURT:  Ms. Comey, anything on that?

19         MS. COMEY:  Your Honor, this is the first time hearing

20   of this.  We'll have to see whatever is filed.

21         THE COURT:  Obviously, if you've got authority for how

22   to proceed, you need to put that in quickly because we're not

23   delaying trial.

24         MS. MENNINGER:  Secondly, your Honor, with respect to

25   the pleading that was filed yesterday or the day before

LCFCmax1

1   asserting a Fifth Amendment privilege, I'm not sure whether

2   that --

3           THE COURT:  I don't have a pleading, I have --

4           MS. MENNINGER:  Well, a letter from a third party.

5   That person also was under our subpoena.  I don't know if your

6   Honor views that as sufficient record on a Fifth Amendment

7   assertion.  We have not released the person from their

8   subpoena.  It wasn't styled as a motion to quash.  So I'm a

9   little bit unsure.  Otherwise, we would like that witness to

10  testify, as well.

11          So, if your Honor deems it necessary to have a further

12  record on it or a formal pleading from that witness, the

13  witness is represented by counsel, Compton counsel, a former

14  AUSA.  So I don't know what their intentions are with regard to

15  their client testifying beyond what the Court received in that

16  letter.

17          THE COURT:  As I said yesterday, I don't have an

18  application.  And I asked if you have an application.

19          MS. MENNINGER:  I don't.

20          THE COURT:  And now the application is, Judge, tell me

21  what you think we should do.

22          MS. MENNINGER:  No, it would be similar.  We have a

23  valid subpoena on the person and I would ask to enforce the

24  subpoena and have the witness come testify.  And if --

25          THE COURT:  Have you communicated with counsel as to

LCFCmax1

1    whether, in lieu of appearing and outside of the presence of
2    the jury, they invoke their Fifth, whether either a declaration
3    or a letter from counsel making a representation and the like,
4    I think the letter said you rejected that, if I remember
5    correctly.
6            MS. MENNINGER:  No, your Honor.  The lawyer requested
7    that we withdraw the subpoena and we said we're not withdrawing
8    the subpoena, we want your client to testify, and if you have
9    an issue with enforcement of the subpoena, you should address
10   it to the Court, and then the lawyer submitted that particular
11   letter to the Court.  I didn't think that an email from a
12   lawyer was sufficient to invoke.
13           THE COURT:  It didn't ask the Court to do anything.
14   The Court is not in the business of just --
15           MS. MENNINGER:  I understand.
16           THE COURT:  -- reading letters and then going out in
17   the world and doing things.  It's an adversary process.  I act
18   on applications.
19           MS. MENNINGER:  Then we'll ask for the subpoena to be
20   enforced as to that witness, too.
21           THE COURT:  Okay.  Ms. Moe.
22           MS. MOE:  Yes, your Honor.  On that score, I wanted to
23   note the government agrees with the Court, I think the ball is
24   in defense counsel's court.  If they want the witness to come
25   to court and invoke in front of the jury --

LCFCmax1

1        THE COURT:  It does not happen that anyone invokes in
2   front of the jury.  All we would be doing is, outside the
3   presence of the jury, they come, questions asked, invoke, and
4   then they go home.  We could do that if that's what the parties
5   want to do — that seems like an enormous waste of time — or
6   counsel can make an application as to how to proceed after
7   consulting with counsel for the witness.  I mean, it's your
8   witness.  If you want to send the marshals, despite -- or make
9   an application to send the marshals despite the witness's
10   counsel indicating to you that they want to invoke the Fifth,
11   then I suppose you can do that, but --
12        MS. MENNINGER:  Your Honor, I didn't ask for that with
13   respect to that witness.  I asked for it for one who refused to
14   communicate with us.  I will make a formal application.  I
15   understand, your Honor.
16        THE COURT:  Okay.
17        MS. COMEY:  Your Honor, we're happy to confer with the
18   defense on this issue to the extent the defense wants to make a
19   record that this witness would have invoked, we're happy to
20   confer to the extent it would be helpful about how to make that
21   record.
22        THE COURT:  That's precisely why I raised it last
23   night and asked if there was an application, but here we are.
24   But again, we're not delaying trial, so this all needs to
25   happen yesterday.

LCFCmax1

1          It seems to me, again, I've indicated how I think this

2     proceeds, but I need counsel to tell me what they're

3     requesting.  All I have is a letter from the lawyers saying

4     that they have a defense subpoena and their witness would

5     invoke.  If the request is that you want the witness to come

6     and invoke formally outside the presence of the jury, we can do

7     that.  If the request is some substitution for that, confer

8     with the government and make a proposal to the Court.

9          Okay.  What else?

10         MS. MENNINGER:  Your Honor, I've conferred with the

11    government a couple times on redactions.  I tried that

12    yesterday, I tried it again this morning.  I don't have an

13    answer back yet from them, but I hope we can have one soon on

14    some of the exhibits that are outstanding.  That's something

15    else that's outstanding.

16         MR. ROHRBACH:  Yes, your Honor, we've been trading

17    views on redactions.  We'll finalize them and submit them to

18    the Court shortly.

19         THE COURT:  Yes, Ms. Sternheim?

20         MS. STERNHEIM:  Judge, I wanted to inform the Court,

21    as the government is aware --

22         THE COURT:  I'm not sure your mic is on.

23         MS. STERNHEIM:  Now it is.  There were technical

24    issues with regard to providing testimony from Mr. Hamilton in

25    England, and we viewed it to be just far too complicated.

LCFCmax1

1    There was no way that documents could be shown to him without

2    turning off all the equipment and depriving the public of

3    viewing him while he looks at certain things.  So we have

4    decided to withdraw our calling him as a witness.

5             THE COURT:  Okay.

6             MS. POMERANTZ:  Your Honor, I was here in the

7    courtroom while that was happening, and while there were some

8    technical challenges, we were prepared to proceed.  After

9    consulting with the defense, they indicated that they were no

10   longer prepared to call him.  So I just wanted to be clear for

11   the record that, from our perspective, this is not an issue of

12   technological difficulties, but instead that was -- my

13   understanding was they decided to not proceed and call

14   Mr. Hamilton.

15            THE COURT:  I guess, just for record preservation

16   purposes, Ms. Sternheim, is there anything that you're

17   requesting be done technologically?  We have our tech folks

18   here, they're incredibly capable.  Is there something you're

19   requesting be done?

20            MS. STERNHEIM:  No, I worked with the tech folks and

21   there were things beyond their control or ability to do and we

22   just viewed that it would be far too complicated.

23            I would also add, as I told the government, that

24   during the process, Detective Byrne kept calling Mr. Hamilton,

25   who is not well, and it was somewhat unnerving.  So we've made

LCFCmax1

1    a decision not to call him.

2             THE COURT:  Okay.

3             MS. POMERANTZ:  Your Honor, just to clarify, I don't

4    think that's an accurate representation as to Detective Byrne.

5             And I, again, would note that the very capable tech

6    folks were here working and troubleshooting the issue.  And I

7    understand the decision not to call Mr. Hamilton was not with

8    the technological issues, but instead a decision that defense

9    counsel has made.

10            MS. STERNHEIM:  We could go on all day, Judge, but

11   suffice it to say, we're not calling Mr. Hamilton.

12            THE COURT:  You're not calling Mr. Hamilton and you

13   have no additional application regarding being able to call him

14   remotely with public access at the same time.  Your concern is

15   there would be a limitation of public access during his

16   testimony, and for that reason, you've decided -- well, that's

17   the case, and you've decided not to call him.

18            MS. STERNHEIM:  That is correct.  Thank you.

19            THE COURT:  All right.  Thank you.  Anything else?

20            MS. COMEY:  Your Honor, just in terms of timing, there

21   is one brief piece of evidence that we may seek to introduce as

22   rebuttal evidence.  I think it would take 10 minutes, at most,

23   to get in.  We just need to know whether we should have those

24   witnesses — who are basically custodians — available at the end

25   of today or if they should be available Monday.

LCFCmax1

1          THE COURT:  I think it's today.  Ms. Menninger.

2          MS. MENNINGER:  I don't think so, your Honor.  I don't

3     think we'll be able to rest until Monday morning.

4          THE COURT:  That's because there is some small issue

5     you indicated or what?

6          MS. MENNINGER:  There is, your Honor.

7          There also are a number of stipulations that are

8     outstanding between the parties.  There are some other

9     documents that we are seeking to get custodians and

10    stipulations to, and they're not ready today.  So I understand

11    your Honor wants to move this forward.  The defense has had its

12    case for a day so far.  I don't think we are delaying --

13         THE COURT:  I'm not suggesting you are.  I just

14    always -- my approach is I want to use the time that we have.

15    And needless to say, there is a pandemic.  We don't want to

16    unnecessarily delay and we want to move forward as quickly as

17    we can using the time we have allocated.  So if we have time

18    today to get everything in, then we'll do it.

19         MR. EVERDELL:  Your Honor, on the issue of timing, I

20    think we mentioned yesterday we may have one more witness who

21    can only come on Monday.  It is possible that we will call him.

22    So we will need to have him on Monday, potentially.

23         MS. COMEY:  Your Honor, we don't know who that witness

24    is.

25         THE COURT:  Who is that witness and why can't they be

LCFCmax1

1    here today?

2              MR. EVERDELL:  Because they're coming from the U.K.

3    and they can't be here until Monday.

4              THE COURT:  Who is it and how long?

5              MR. EVERDELL:  How long is the witness going to be?

6    It would be a very short witness.  And this is related to the

7    Kinnerton Street property.  I think just today we got a

8    declaration from him, which I can hand over to the government.

9    They got this signed this morning about what his testimony

10   would be.  And I could provide it to the Court, as well.

11             I would like it in front of me, but I could generally

12   summarize, don't quote me on this, but he is the owner of the

13   Nags Head Pub, which is right across the street from the

14   Kinnerton Street residence.  He owned that for the whole time

15   that's relevant here.  He knew the previous owners.  He always

16   saw them there.  And he met Ghislaine Maxwell when she took

17   ownership of the property, and he knew the prior owners to be

18   living there, and then he knew Ghislaine to be living there

19   when she bought the property.  And he goes there every day.  He

20   owned the pub, he had a flat above the pub that looked across

21   to the Kinnerton Street property, and he can verify the fact

22   that she didn't take occupancy until after she purchased the

23   apartment.

24             MS. COMEY:  Your Honor, I would just note that the

25   defense has had an extraordinary amount of time to prepare its

LCFCmax1

1   defense case.  We noted early last week that we were going to

2   rest.  We rested on Friday.  They then had five full days,

3   including three business days, to prepare.  So we would object

4   to holding the case over to Monday for a new witness.

5          MR. EVERDELL:  This is a witness that is

6   extraordinarily relevant and sometimes things develop during

7   trial and we need to get witnesses to address issues that come

8   up at trial.  We were able to find this person and he's willing

9   to come, even those he's 81, because he wants to come and

10  provide this testimony if it's required.

11          This is extraordinarily relevant, especially with the

12  issue that came up with the property records and the issue

13  raised to the Court.  He can directly speak to that issue.  His

14  testimony is relevant for a critical issue in this case, which

15  is whether or not this -- the events that Kate described could

16  have even taken place at the time they took place, which she

17  alleges they took place in, and he should be heard.

18          MS. COMEY:  Your Honor, I just note this is the

19  defense's third bite of this particular apple and it emphasizes

20  the prejudice to us of delayed disclosure.  We will have no

21  opportunity to investigate further at this point.

22          THE COURT:  I mean, what we talked about yesterday was

23  inclusion of documents that show ownership; right?

24          MR. EVERDELL:  That's correct, your Honor.

25          THE COURT:  And I think I said those could come in.

LCFCmax1

1           MR. EVERDELL:  You did.

2           THE COURT:  Along with, I presume the government would

3      seek to introduce the testimony?

4           MS. COMEY:  Yes, your Honor.

5           MR. EVERDELL:  That's right, your Honor.

6           THE COURT:  So a new witness --

7           MR. EVERDELL:  Your Honor, I did not anticipate that

8      the issue between ownership versus occupancy was going to be

9      such a relevant issue, and so given that that came up in the

10     course of discussing what the stipulation --

11          THE COURT:  Just to be clear, I considered that as to

12     whether to allow you to introduce ownership documents.  I'm

13     allowing you to introduce ownership documents.  Arguably, they

14     were not relevant or marginally relevant, but a 403 issue

15     because of the complications of ownership.  If you can put in

16     the ownership documents on stipulation as to the timing of

17     ownership, I'm allowing that.  It's not a basis -- because I

18     almost excluded it, but didn't, that's not a basis to call a

19     new witness.

20          MR. EVERDELL:  Your Honor, the stipulation would allow

21     us to put in the ownership documents and the Court itself

22     raised that there is an issue with residency or occupancy.

23          THE COURT:  I raised that in questioning whether the

24     ownership documents were relevant.  I'm allowing the ownership

25     documents in.  That's not a basis to call a new witness.

LCFCmax1

1    That's just saying, oh, Judge has a good point, maybe we could

2    strengthen this, I'm going to propose a new witness and delay

3    trial.  No.

4              MR. EVERDELL:  Your Honor, we're not delaying trial.

5    We only had one day of defense case.  We're allowed to put

6    on --

7              THE COURT:  You're announcing a new witness simply

8    because I've questioned the relevance of the ownership

9    documents by asking if they showed ownership or residency,

10   because I thought, well, if it's just ownership, maybe it's not

11   relevant, but I'm letting them in.  If I weren't letting them

12   in, I suppose you'd have a point.

13             MR. EVERDELL:  Your Honor, the way the stipulation I

14   understand is going to be worded with the government allowing

15   admitting the testimony from Ms. Maxwell's testimony, they will

16   be arguing to the jury that that shows that she didn't reside

17   there, that the ownership records don't show residency, and you

18   can infer from that that maybe she was there at the time

19   period.

20             THE COURT:  Is that deposition transcript new

21   information to you?  You weren't aware that your client --

22             MS. MENNINGER:  It was a property deposition that was

23   taken in 2019, a slip and fall, and she was deposed as a

24   third-party witness.  They didn't give it to us.  We still

25   don't have the entire deposition.  So yes, your Honor, it is

LCFCmax1

1   new to us.  And what she said in that deposition is something

2   like '92 to '93.  She didn't have documents in front of her.

3   She was being inquired in 2019 about when she lived someplace

4   in the early '90s, and she made a '92 comment, '93, according

5   to the portion that was provided to us.

6           THE COURT:  You'll provide the transcript.

7           MS. COMEY:  We already have, your Honor.  We produced

8   the entire transcript as discovery last week when we realized

9   that this might be relevant.

10          MR. EVERDELL:  Given we got there last week, we are

11  trying now to address this issue with a witness that has

12  relevant testimony to the very issue.

13          MS. COMEY:  Your Honor, I would note this is a public

14  document that is available on a New York State public website.

15          THE COURT:  I have a rule:  You have your next witness

16  or you rest.  On this issue, simply because I raised a question

17  and the government has a response, we're not delaying trial.

18  So we'll see where we are, but if otherwise the case closes

19  today, it closes today.  I'm not delaying trial on this issue

20  because I let in what you sought to have let in.

21          MR. EVERDELL:  I think, your Honor, that on the issue

22  of whether we're going to rest today, we still have the issue

23  of whether the marshal is going to be able to produce one of

24  the witnesses that we want that we put on the valid subpoena.

25  So we're going to be going over to Monday probably anyway.  If

LCFCmax1

1    we're going to do that, I think we should have the ability to

2    call this witness.

3            THE COURT:  When did you start attempting to contact

4    this witness?

5            MR. EVERDELL:  We issued a subpoena to her, and I

6    don't have the dates off the top of my head, your Honor, I can

7    find that out for you.

8            THE COURT:  Two and a half weeks ago?

9            MR. EVERDELL:  I think that's when we issued the

10   subpoena.

11           THE COURT:  And you've had no contact?

12           MR. EVERDELL:  We've been trying to contact her, but

13   no.

14           MS. MENNINGER:  We gave her a letter with all of our

15   contact information contemporaneous with our subpoena.  Every

16   witness that we have subpoenaed has been in touch with us, they

17   have called our paralegal, et cetera.

18           THE COURT:  But you haven't raised this until now.

19           MS. COMEY:  That's exactly the point, your Honor.  The

20   defense has had extensive time to raise this issue and they are

21   raising it at the 11th hour when they could have raised it long

22   in advance when all of the other witnesses they subpoenaed were

23   in touch with them and this one was not.

24           MR. EVERDELL:  Your Honor, look, if the government is

25   willing to agree to a stipulation as to this witness's

LCFCmax1

```
1    testimony, we can consider that.  We don't have to delay trial.
2    But I think this witness has relevant testimony.
3                THE COURT:  Which witness is it?
4                MR. EVERDELL:  The one who can only come from the U.K.
5    on Monday.  I'm not talking about the marshals issue, I'm
6    talking about the witness from the Nags Head Pub.  If they're
7    willing to agree to a stipulation, we could probably do it that
8    way, that wouldn't delay anything, but I think this is relevant
9    information.
10               MS. COMEY:  Your Honor, I was talking about the
11   marshal issue.
12               MR. EVERDELL:  I'm sorry.
13               MS. COMEY:  With respect to the marshal issue, we
14   received absolutely no materials from the defense about
15   statements that this witness has made, we have no idea what
16   this witness would say on the stand, so we would not be able to
17   stipulate to anything.
18               THE COURT:  Which witness have you subpoenaed but
19   heard nothing from for weeks that I'm hearing about for the
20   first time?
21               MS. MENNINGER:  Her name is Kelly.
22               THE COURT:  Why am I hearing about it for the first
23   time now?
24               MS. MENNINGER:  Your Honor, there has been a lot going
25   on.  I understand that your Honor runs a tight ship.  I think
```

LCFCmax1

1    that we've all been working very diligently to present a

2    defense in this case.  We have honored deadlines that are

3    issued with very short notice, we have conferred repeatedly, we

4    are trying to work out stipulations for a number of witnesses.

5    I understand trying to run the trial quickly and efficiently,

6    but to be honest, your Honor, it is a lot of work.

7              THE COURT:  I am aware of that, Ms. Menninger.  My

8    point is a nonresponsive witness is not a little thing.

9              MS. MENNINGER:  There have been -- I mean, I don't

10   know the number, but 40 witnesses, your Honor.  We are

11   working -- we've been flying people across the country, across

12   the pond.  Our client's life is on the line and we're being

13   given one day it to put on a defense, one and a half days, and

14   there is one witness that we're having problems with.  We're

15   not asking for some weeks' long delay.

16             THE COURT:  So far, I have nothing.

17             MS. MENNINGER:  I have made an oral application, your

18   Honor.  I understand we will get someone working on a written

19   one right away.

20             THE COURT:  Give me a written application, give me a

21   proposed order within a half an hour.

22             MS. COMEY:  Your Honor, I need to resist the

23   characterization that the defendant has just made.  The defense

24   has had an extraordinary amount of time between the resting of

25   the government's case and putting on their case.  They have had

LCFCmax1

1    five full days, including three business days.  They had extra

2    days' notice that we were going to rest on Friday of last week,

3    and they had plenty of time in advance of trial to plan for

4    this.  So we strongly disagree with the suggestion that defense

5    counsel has been unduly rushed here.

6              MS. MENNINGER:  I can go back and forth on this, as

7    well, your Honor.

8              THE COURT:  We're not going to go back and forth.  The

9    record is what it is.  There was a five-day, three-business-day

10   break between the close of the government's case.  The record

11   will reflect when you learned when the government will likely

12   rest, the record will reflect what you said regarding when you

13   learned of a nonresponsive witness, and the record will reflect

14   that I will take an application within a half an hour with an

15   opportunity for the government to respond all in the interest

16   of conforming to my standard practice, which is everybody has

17   their next witness or be prepared to rest or bring in a

18   different witness.

19             Now, we'll take it as it comes.  What I'm learning,

20   what is new information to me today, which is different than

21   yesterday, when we knew when I was informed that the defense

22   would rest today with the exception of some small issue or

23   document that Ms. Menninger put aside.  There is no argument

24   about a subpoenaed witness who is nonresponsive.  There was no

25   suggestion of a need for a witness to fly in from England.  So

LCFCmax1

1   I'm learning that today.  We've lost the time that we might

2   have had, had it been raised sooner.  I'll still accept the

3   application, but do I have a standard practice, which is you

4   have your witnesses or you rest.

5        I have about 40 prior inconsistent statements to rule

6   on.  Anything else before we take that up?

7        MS. COMEY:  No, your Honor.

8        THE COURT:  Anything else to take up before?

9        MS. MENNINGER:  I'm trying to get in touch with

10  someone from the office, your Honor.

11       THE COURT:  Defense seeks to admit extrinsic evidence

12  of a prior inconsistent statement under 613(b), which requires

13  that, quote, the witness is given an opportunity to explain or

14  deny the statement and an adverse party is given an opportunity

15  to examine the witness about it.

16       My colleague, Judge Kaplan, in the Gulani (ph.) case,

17  hopefully laid out the proper steps of the analysis.

18       First, the Court must determine whether the proffered

19  statement, in fact, is inconsistent with the testimony sought

20  to be impeached.  The test is whether there is any variance

21  between the statement and the testimony that has a reasonable

22  bearing on credibility.

23       Actually, I just thought of something, a question,

24  Ms. Menninger.  The witness you haven't been in touch with, is

25  that one of the witnesses for whom you sought to testify under

LCFCmax1

1  a pseudonym?

2          MS. MENNINGER:  No, it was not, your Honor.

3          THE COURT:  Okay.  Just wanted to ask that.

4          Second, the parties seeking to offer extrinsic

5  evidence of a prior inconsistent statement must have laid a

6  proper foundation for doing so by affording, A, the witness an

7  opportunity to explain or deny the prior inconsistent

8  statement; and B, the opposite party an opportunity to question

9  the witness about it.

10         Third, the extrinsic evidence of the prior

11 inconsistent statement must be competent and otherwise

12 admissible.

13         Fourth, the impeachment by prior inconsistent

14 statement must relate to material rather than a collateral

15 matter.

16         Finally, even if all these requirements have been

17 satisfied, the trial court nevertheless may exclude the

18 extrinsic evidence under Rule 403 on an appropriate finding.

19 That's United States v. Gulani, 761 F. Supp. 2d 114.  (S.D.N.Y.

20 2011).

21         At issue first is step 2, whether the witness being

22 impeached had an opportunity to explain or deny the statement.

23 Parties have diametrically opposed interpretations of this

24 requirement, but in support of its position that the witness

25 need not be shown the prior statement.  The defense has

LCFCmax1

repeatedly relied on rule 613(a), which uses different language

and is about impeachment by prior inconsistent statement on

cross examination, not introduction of a prior statement as

extrinsic evidence as it seeks to do here.

So the opportunity to explain the statement should

consist of something more than just the opportunity to admit or

deny making the statement.  That's right in Miller, 28 Federal

Practice and Procedure Evidence, Section 6205, Note 1, Second

Edition 2021.  Citing a Seventh Circuit case and an Eleventh

Circuit case.

Now I'm going to quote from Gulani again.  A trial

court has discretion to require satisfaction of the latter

requirement before the extrinsic evidence is offered or

alternatively to permit it to be satisfied by recalling the

witness after the extrinsic evidence is received.

In a case called Surdow, S-u-r-d-o-w, the Second

Circuit stated that the district court has broad discretion to

exclude extrinsic impeachment evidence that was not revealed

while the witness was on the stand or at least before the

witness was permitted to leave the court.  That's United States

v. Surdow, 121 F.Appx. 898 (2d Cir. 2005), collecting

authorities.

Therefore, the Court will sustain the government's

objection as to all proposed prior inconsistent statements to

which the witness was not presented with the statement to

LCFCmax1

1    explain or deny it.

2            Next at issue is the first step of whether the

3    witness's testimony and the prior statement are inconsistent.

4    I provide the following guidance before we turn to the

5    specifics.

6            First, if the statement was presented to the witness

7    and the witness admitted to making the statement, then

8    extrinsic evidence is inappropriate, and the parties apparently

9    agree on this point in their last two letters as do circuit

10   courts who have decided the issue.  That's true for the Fifth

11   Circuit, Sixth Circuit, and Tenth Circuit.

12           Second, the prior inconsistent statement must actually

13   be the witness's statement to show an inconsistency.  United

14   States v. Almonte, 956 F.2d 27, (2d Cir. 1992).

15           Where the defense relies on a third party's

16   characterization of the witness's words rather than a verbatim

17   transcript, then the witness must have subscribed to that

18   characterization.  On that basis, notes taken in law

19   enforcement interviews will generally not prove an

20   inconsistency for purposes of rule 613(b).  See, for example,

21   United States v. Leonardi, 623 F.2d 746, the Gulani case and

22   others.

23           Of course, that infirmity is solved by calling the

24   interviewing officer as a witness or to avoid calling another

25   witness, the government stipulates to the accuracy of the

LCFCmax1

1    notes.

2           Third, as I previously explained, testimony that a

3    witness does not recall making a statement may be but is not

4    necessarily a basis for inconsistency.

5           Finally, I'll apply 403, consistent with my prior

6    rulings of prior inconsistent statement has already been read

7    in full into the record.  I'll sustain the government's

8    objection to admitting the statement as extrinsic evidence.

9    See, for example, United States v. King, 560 F.2d 122

10   (2d Cir. 1977).  Stating where evidence is admissible under

11   613, it could be excluded under 403.

12          With that, we can turn to the list of the prior

13   statements and I'll do my best to apply that guidance I've just

14   given in light of the arguments raised by the parties and my

15   review of the transcript.

16          So beginning with Jane, transcript at 447, I will

17   overrule.  Jane denied the statement in the handwritten notes,

18   which is an inconsistency, even if the later 302 corroborates

19   Jane's testimony.  I will overrule that government objection.

20          Transcript at 455, I'll sustain the government's

21   objection for two reasons.  The full statement was read into

22   the record and Jane responded it was, quote, correct, I guess,

23   admitting the statement.

24          Transcript at 470 to 71, overruled.  Here the defense

25   has adequately identified the statement at issue.

LCFCmax1

Transcript at 471, sustained.  As I said at the time, the timeframe of that question was too unclear to create an inconsistency and no statement was presented to Jane to explain or deny it.

Transcript at 473 to 74, overruled.  That's provided admissible evidence either via stipulation or a witness is used to prove the notes.

Transcript at 475, sustained.  Jane's prior statement was that she was not sure where the incident happened, so there is no inconsistency.  She also answered "I don't recall" to each question, so there is no inconsistency.

Transcript 475 to 76, I'll sustain.  The defense's questions did not track the 302 report, does not refer to whether the defendant touched Jane or not.  The defense referred Jane to the December 2019 interview document, but then asked questions about the February 2020 interview.  So there is an inadequate basis for inconsistency.

Transcript at 476, lines 2 through 4, sustained.  Again, the defense referred Jane to the incorrect interview and for the statement it now seeks to admit in Jane's statement that she doesn't recall, she said she was not sure is not an inconsistency.

Transcript at 476, lines 8 through 10, sustained.  The question follows the above entry and again fails to properly orient Jane, and Jane said "I don't recall," which is not

LCFCmax1

1    inconsistent.

2            Transcript at 476, lines 14 through 16, sustained for

3    the same reasons as the last two.

4            Transcript at 476, line 17 through 19, sustained for

5    the same reasons.

6            Transcript at 477, sustained for the same reasons.

7            Transcript at 478, overruled.

8            Transcript at 479 to 80, overruled.

9            Transcript at 480, sustained.  There is no

10   inconsistency, because Jane's answer that she doesn't remember

11   and her prior statement that she did not know whether

12   Ms. Maxwell was present, there is no inconsistency.

13           Transcript at 499, 507 to 508, I will overrule.

14           Transcript at 506 to 7, sustained.  Jane admitted to

15   making the prior statement.

16           Transcript at 512 to 13, sustained.  Jane's prior

17   statement that they hiked is not inconsistent with her

18   testimony.  Also not material.

19           Transcript at 513, overruled.

20           Transcript at 514, overruled.

21           Transcript at 514 to 15, sustained.  Jane's prior

22   statement about abuse in New York not being, quote, a group

23   thing, is not inconsistent with her testimony.

24           Transcript at 521 to 22, sustained.  Jane agreed with

25   virtually all of the details of this event, except for the

LCFCmax1

1    timeline, which she said she does not remember and is not a

2    basis for inconsistency and it goes to a collateral matter.

3              532, sustained.  Statement was read aloud.

4              596, sustained, the statement was read aloud.

5              That's, I believe, all of the Jane statements; is that

6    correct?

7              MS. COMEY:  Yes, your Honor.

8              MS. MENNINGER:  Yes, your Honor.  The parties had

9    agreed to a few either being in or out before we submitted

10   this, so those are part of the record your Honor just gave, but

11   the parties know what they are.

12             MS. COMEY:  Yes, your Honor.

13             THE COURT:  Thank you, Ms. Menninger, for that

14   clarification.

15             Next, Annie.

16             Transcript at 2151, sustained.  She acknowledged the

17   statement but said she didn't recall making it.  So there is no

18   inference of inconsistency.

19             Transcript at 2160 to 61, sustained.  Annie said --

20   there is not an inconsistency.  Annie said she didn't recall a

21   chef, but, quote, that makes sense to me that there was a chef

22   there, quote.  It also goes only to a collateral issue.

23             Transcript at 2165 to 66, sustained.  Statement was

24   already read out loud, testimony is not inconsistent, and the

25   amount of horseback riding is collateral.

LCFCmax1

1          Transcript at 2174 to 76 and 2194 to 95, I'll sustain.

2     I sustained two objections to continuing question on this

3     issue.  Statement was read aloud and the defense made and can

4     make its impeachment argument.

5          2182 to 83, sustained.  The statement was read aloud.

6          2185 to 86, sustained.  The statement was read aloud

7     and there is no inconsistency as I previously ruled at 2186.

8          2195, sustained for the same reasons I just indicated.

9          2197 and 98, sustained.  Annie did not earlier

10    characterize Ms. Maxwell as, quote, disinterested, but that's

11    not an inconsistency.  Further, Annie had no opportunity to

12    explain or deny the statement or lack thereof.

13         2209 to 13, sustained.  There isn't an inconsistency

14    and Annie answered, "I don't recall."

15         2224, sustained.

16         I think that's it.  And just on that last one, it was

17    read aloud and I don't see an inference of inconsistency.

18         Anything else on that?

19         MS. COMEY:  No, your Honor.

20         THE COURT:  Ms. Menninger?

21         MS. MENNINGER:  No, your Honor.

22         THE COURT:  Again, recognizing that the parties had

23    agreed on others.

24         MS. MENNINGER:  Yes, your Honor.  Just with respect to

25    one thing your Honor just said, because the statement was read

LCFCmax1

1    aloud, I believe the phrase you just used was the defense can

2    make the impeachment argument.  Because the quote was read

3    aloud, even if the witness doesn't recall making the statement

4    does not prohibit us from making an argument to the jury that

5    the statement was, in fact, made to law enforcement and

6    impeaches the witness's testimony; correct?

7              THE COURT:  If it's in the record, that inference is

8    available to argue.  Any disagreement?

9              MS. COMEY:  No objection, your Honor.

10             MS. MENNINGER:  I just want to make sure in closing

11   arguments --

12             THE COURT:  I totally appreciate that.  And anything

13   to avoid objections during closing argument.

14             MS. COMEY:  Obviously it's not for the truth, it's for

15   impeachment, but no objection to that argument.

16             MS. MENNINGER:  I think impeachment is for the truth,

17   your Honor.

18             THE COURT:  That is way more metaphysical than I can

19   handle at this moment.

20             MS. MENNINGER:  Thank you.

21             THE COURT:  Thank you.

22             MS. COMEY:  Your Honor, I would note that in light of

23   the rulings on the Annie Farmer statements, it appears that

24   there is no longer any relevance for calling AUSA Rossmiller as

25   a witness, and I just want to confirm that he is released from

LCFCmax1

1          potentially having to testify.

2                  THE COURT:  I think that's a conferral question.  I

3          don't have a basis to know.

4                  MS. COMEY:  Yes, your Honor.  I'm asking so that there

5          is a clear record.

6                  THE COURT:  Okay.  Ms. Menninger, you can think about

7          it.

8                  MS. MENNINGER:  I'm not sure what the status is of

9          this email with Mr. Glassman about The Lion King, if that was a

10         stipulation --

11                 MS. COMEY:  Your Honor, I believe that was precluded.

12         Your Honor's ruling about testimony from attorneys was that the

13         only permissible testimony would have been the email from --

14         the statement by Mr. Glassman about whether testifying would

15         help her case and that all other testimony about attorneys

16         would be precluded.

17                 THE COURT:  If this is implicated in the motion

18         related to calling the three attorneys, then that was my ruling

19         with respect to that.

20                 MS. MENNINGER:  I'll have to look back at that, your

21         Honor.  That's the only other thing that's coming to mind with

22         respect to Mr. Rossmiller's potential --

23                 THE COURT:  That series was questioned during the

24         testimony, which may have been my basis.

25                 MS. MENNINGER:  It may be, your Honor.  I just don't

LCFCmax1

1    remember if the witness --

2              THE COURT:  It's fine.

3              MS. MENNINGER:  Said she didn't know about it because

4    it was her lawyer who had had the communication.

5              MS. COMEY:  My recollection, your Honor, is that we

6    had this discussion on the record and that Jane testified that

7    she was told at some point about The Lion King coming out in

8    1997, and I think defense counsel elicited from her that that

9    was -- that it was after that, that she had a different memory

10   about her travel to New York.  So I think the record is

11   available for defense to make the argument it wants to make.

12             MS. MENNINGER:  I think, as your Honor heard from

13   Dr. Loftus yesterday, the fact that someone suggests an answer

14   and that may be the part that wasn't clear from Jane's

15   testimony, because it came through her attorney,

16   Mr. Rossmiller, but I'll go back and take a look at your

17   Honor's ruling and raise any issues with the government in

18   conferral.

19             THE COURT:  Okay.  I will cross whatever bridge you

20   put in front of me.  I'm looking at my ruling on the three

21   attorneys, which kept out that testimony.

22             What else?  We do have all our jurors.

23             MR. EVERDELL:  Your Honor, I anticipate that one of

24   the witnesses this morning, the defense will call Special Agent

25   Amanda Young, who is one of the case agents on the

LCFCmax1

1    investigation.  I just want to make clear that she be called as

2    a witness who's associated with an adverse party.  So I intend

3    to use leading questions under rule 611(c).

4              THE COURT:  I always encourage you to try -- you begin

5    with direct and if she becomes adversarial, truth comes out in

6    direct questions, but if you're not getting response to the

7    answers or you're getting somewhat responsive answers but it's

8    delaying, I'll take the application.

9              Ms. Comey, did you have something?

10             MS. COMEY:  I just wanted to note, your Honor, that my

11   understanding of Agent Young's testimony is that it's going to

12   be about the prior inconsistent statements of Jane that your

13   Honor has ruled are admissible.  I don't imagine that much

14   leading will be necessary for that.

15             MR. EVERDELL:  Your Honor, I intend to go into other

16   aspects with Special Agent Young.

17             THE COURT:  Like what?

18             MR. EVERDELL:  Well, I believe, under your Honor's

19   ruling, I'm allowed to inquire about the absence of evidence,

20   and there is an absence of evidence in this case.

21             THE COURT:  Give me an example question.

22             MR. EVERDELL:  Well, there is no emails from the

23   1990s, there is no geo location.  I want to make that clear for

24   the jury, these are all things that I think jurors in the

25   modern era would expect, and there is none here, given the age

LCFCmax1

1    of the case.  There is no phone records.  There is no -- there

2    is lots of things that you might expect to be part of the case

3    that are not here.  The main reason for that is that the age of

4    the case, especially the allegations in the 1990s are quite old

5    and these records don't exist anymore.  So I think it's fair to

6    raise to the agent the absence of evidence, that evidence

7    through the agent.  That's one topic.

8         THE COURT:  So, for example, give me your example

9    question on emails.

10        MR. EVERDELL:  It's in here somewhere, your Honor.  As

11   part of your investigating the case, you tried to gather as

12   much documentary evidence as you can to corroborate what the

13   witnesses are telling you, isn't that right.  I imagine the

14   answer is going to be yes to that.  And given the age of the

15   case, there were no emails from the 1990s, there are

16   allegations in this case from the 1990s, correct, yeah.  There

17   are no emails that you have for any of the accusing witnesses

18   who testified against Ms. Maxwell from the 1990s, is that

19   right, yes.  Because, in fact, in the 1990s, nobody used email,

20   it wasn't very popular, it was just starting, yes.  So because

21   the allegations are over 25 years old, there are no emails in

22   this case from that period, isn't that right, yes, there is no

23   emails.  Same thing about phone --

24        THE COURT:  I'm sorry.  I cut you off, Mr. Everdell.

25   Same thing about phone records?

LCFCmax1

1          MR. EVERDELL:  Phone records, geo location

2     information, things like that.

3          MR. ROHRBACH:  This implicates at least two of the

4     Court's rulings on the subject.  One is that the defense can't

5     elicit direct testimony about investigative steps that the

6     government did or did not take.  And the other is defense can't

7     elicit direct testimony about the thoroughness of the

8     government's investigation.  As your Honor ruled, they can say

9     in their closing there is no email evidence before you that

10    goes to defendant's guilt or innocence, but they can't elicit

11    testimony from the special agent, the government's case agent

12    about the steps the government did or did not take or why the

13    government did or did not take them and what that says about

14    the thoroughness of the government's investigation.

15         MR. EVERDELL:  Your Honor, I believe I am allowed to

16    comment on the absence of evidence.  I'm allowed to put that in

17    through a witness if I choose and this is the witness to do it.

18         THE COURT:  Not inconsistent with my ruling.

19         MR. EVERDELL:  I understand that, your Honor.

20         THE COURT:  I'll pull it up and look again, but with

21    respect to the ability to cross examine witnesses put on to

22    show the thoroughness of the investigation, you can cross on

23    the failure to do that.  The absence of evidence is arguments

24    that you can make comments on, of course, and seek the jury to

25    conclude from it what it likes in the course of its

LCFCmax1

1    investigation, but I specifically precluded direct evidence of

2    failure of investigative techniques.

3         MR. EVERDELL:  I'm not saying an investigative

4    technique per se, your Honor.  I'm simply pointing out that

5    evidence that a jury might expect to see, given we are in the

6    modern era, is not present in front of them because of the age

7    of the allegations.  So I think this point through the agent

8    clarifies the fact that these records don't exist anymore, they

9    tried to get them, I think, and they didn't exist.  It's not a

10   particular technique, it's just highlighting the fact that, in

11   a case of this age, there are records that have disappeared,

12   phone records get deleted after a while, there is no such thing

13   as geo location information, there weren't cellphones that had

14   these things.

15        So pointing it out to the agent is simply pointing out

16   the absence of evidence because there wouldn't be anything in

17   the record to argue that to the jury if I'm not allowed to put

18   that in front of -- through this agent.  I mean, there needs to

19   be some explanation of the fact that I think this agent could

20   provide that these people didn't have cellphones to their

21   knowledge, so they wouldn't have had geo location information

22   and that's why we don't have it in this case.

23        MR. ROHRBACH:  I'm a little confused why the defense

24   wants to put this in, your Honor.  We've had testimony in this

25   case from a custodian and others about what recordkeeping

LCFCmax1

1    practices are like.  It's not clear to me that Special Agent

2    Young will have knowledge about the use of cellphones and

3    availability of geo location data, personal knowledge from that

4    era, unless the question is, did you take an investigative step

5    to hire that data and did it exist or not exist, and that is

6    precisely the kind of question that is improper.

7            Your Honor, the government did not open this door on

8    its direct case, so there is no room for the defense to start

9    eliciting direct testimony on this point.  The absence of geo

10   location information is clear in the record from the absence of

11   geo location information in the record.

12           THE COURT:  That's right.  It sounds like what you're

13   trying to do is have the inference of steps not taken in order

14   to emphasize, argumentatively, the absence of evidence, which

15   you can make those arguments in summation.

16           MR. EVERDELL:  I'll be honest with the Court, I truly

17   don't understand the distinction between investigative steps

18   versus absence of evidence, because they are inextricably

19   linked in my mind.  I'm trying to walk the line because I do

20   understand the Court's ruling, but if I'm allowed to get into

21   absence of evidence and argue that to the jury, I have to be

22   able to point out in the direct case what they're not seeing,

23   what absence of evidence there is.

24           THE COURT:  Why can't you do that?

25           MR. EVERDELL:  What I'm trying to do is do it through

LCFCmax1

1    the agent and just elicit from the agent that there were no

2    phone records because phone records get deleted after a certain

3    amount of time, but I believe they tried to get phone records,

4    but none existed because of the age of the allegations.  I

5    mean, geo location, I think anybody who could testify to the

6    fact that there aren't geo location -- the information,

7    especially an FBI agent because cellphones didn't exist back

8    then, there weren't records available back then.  And emails,

9    too, that there were no emails to get because of the age of the

10   case.  That's all I'm trying to do with that point, your Honor,

11   is elicit the absence of evidence so that we can then argue it

12   in front of the jury.

13          MR. ROHRBACH:  Your Honor, they don't have to elicit

14   the absence of evidence in order to argue to the jury that the

15   evidence is absent.  So to the extent they are trying to elicit

16   the absence of evidence through Special Agent Young is just the

17   argument they want to make in closing made through leading

18   questions on direct examination of a federal law enforcement

19   agent.

20          THE COURT:  I'm just going to reread the relevant

21   portion of the transcript.  I will take them as they come, but

22   my instinct is the government is correct, you're either

23   violating my rule or you're being argumentative in a way that

24   you can argue from an absence in closing.

25          MR. EVERDELL:  Your Honor --

LCFCmax1

1          THE COURT:  Or there would be foundation issues,

2    which, if probed into, essentially would be violative of my

3    order to the extent that you're making arguments -- to the

4    extent that foundational inferences are essentially asking the

5    agent what she did or didn't do, which is precisely a violation

6    of my order.

7          And the whole point of the -- I mean, the whole point

8    of not allowing the defense to put on a case about what the

9    government did or didn't do and the motivations and the like is

10   because that's the question for the jury.  The question for the

11   jury is, does the evidence that the government put on, that

12   they deemed credible, prove beyond a reasonable doubt or not

13   the charges.  That is the core basis of my in limine holding.

14         MR. EVERDELL:  I'm not trying to violate this, which

15   is why we're discussing this, your Honor.  I just thought there

16   was some room to be able to elicit evidence about the absence

17   of evidence rather than just argument to the jury, and that's

18   what I was intending to do with this witness.  If the Court

19   thinks what I've just proposed, that's generally the tenor of

20   the questions on that point are, violative of the order, I

21   might have to think it out and not be able to go into it

22   because of what you're saying, but I hear what you're saying.

23         THE COURT:  Yeah, I mean, take it -- imagine it's a

24   modern case, right, and you ask why didn't you get geo location

25   evidence, it's asking what the government did or didn't do.

LCFCmax1

1    You essentially want the -- I'm a little with Mr. Rohrbach.

2    I'm not sure why you want the government or if this is a spin

3    to make -- to try to hide what the question is doing, but you

4    want the government to testify, well, we didn't get geo

5    location information because it didn't exist.

6            MR. EVERDELL:  Your Honor, I'll be very transparent.

7    I think the point is highlighting the age of the allegations,

8    which I think is a fair point to make to the jury.  These are

9    allegations that are 25 years old, and when you make a case on

10   allegations that are more than 25 years old, you're not going

11   to have the same type of corroboration available to you because

12   records get destroyed in that amount of time.  The records

13   aren't available that long ago that are available today that

14   you might otherwise expect to to see in a case like this.

15           But the bigger point is just the age of the

16   allegations.  So the absence of evidence goes to the fact that

17   these are 25-year-old allegations.

18           (Continued on next page)

19

20

21

22

23

24

25

LCHVMAX2

1          THE COURT:  How about this:  I'll let you ask the

2     agent -- I suppose I'll hear from the government.

3          What is the time period of the allegations that she

4     investigated?

5          MS. COMEY:  Your Honor, I think that the investigation

6     that this agent was the case agent for was much broader than

7     the charges here.  And so it could lead to avenues that are not

8     appropriate for this trial and that are irrelevant to this

9     trial.  And I think that your Honor's pretrial ruling was

10    crystal clear here that this is not appropriate direct

11    testimony by the defense.

12         Defense counsel, in almost every trial, stands up in

13    front of a jury and says, You didn't see this kind of evidence,

14    you didn't see DNA, you didn't see phone records.  And they

15    don't need to put an agent on the stand to prove that negative.

16    They are able to make that argument without having to put on

17    that case through affirmative agent testimony, and the same is

18    true here.

19         THE COURT:  You can certainly argue to the jury from

20    the indictment and what they are being instructed to determine

21    what the age of the allegations are.

22         MR. EVERDELL:  Okay.  I understand, your Honor.

23         As we're doing this, I think maybe we should raise a

24    few other points, since I don't want to violate the judge's

25    ruling.

LCHVMAX2

1        I do intend to go through with this witness whether

2   they followed up on certain things that they heard in the

3   interviews, like, for example -- I'll give an example.

4        We heard from Jane testimony -- she confirmed on the

5   stand that she told the government that she was involved in

6   sexualized massages with multiple people, and she named the

7   first names of several of those people.  I believe we know from

8   what she was saying to the government who those people are,

9   it's the subject of some of these submissions we made to the

10  Court about other witnesses that we want to call.

11       My understanding is from looking at the records that

12  were provided to us, they didn't follow up and talk to some of

13  these witnesses, right.  So, for example, one of the names

14  mentioned was Michelle.  We think we know who that Michelle is.

15  That Michelle was evident to the government because there was a

16  Michelle -- at least one Michelle.  One Michelle was

17  communicated to the government by another witness that worked

18  in the office.  They never spoke to that Michelle.  Same thing

19  with some of the other people that were mentioned; never spoke

20  to them.

21       And I think that under your Honor's ruling, even

22  though that, I guess, is an investigative step, and I'm looking

23  at your Honor's ruling now, you were talking about the *Watson*

24  case, and you said that some arguments about the thoroughness

25  of the investigation are probative of guilt in some

LCHVMAX2

circumstances.

In that case, law enforcement had received a tip that the defendant was innocent because another individual shot the victim.  The Second Circuit stated that cross-examination of the lead investigating officer on that tip was probative because the jury could conclude that law enforcement had prematurely concluded the defendant was the shooter and it failed to investigate diligently the possibility that it was the other individual.  That was the *Watson* case.

I think we want to make these points, your Honor, because I think the point to the jury is the government credited the witnesses, the accusers in this case, without following up on the information that they provided to see if it was wrong.  Not following up on that information is probative of the defendant's guilt or innocence in this case; because had they followed up, we believe they would have heard that that was not true from these witnesses.  And so that goes to the guilt or innocence of this defendant.

I do intend to get into that on the stand and talk to them about, You spoke to Jane on X date.  And on that date she told you about group sexualized massages involving this person and that person; isn't that right?  Yes.  Spoke to her on another date; she mentioned a few other names.  Spoke to her on a third date; she mentioned names again, and she gave physical descriptions of these people.  She said certain details about

LCHVMAX2

1    these people which I will elicit.

2              You were aware of someone named Michelle in this case.

3    You were aware, for example, of this Michelle -- and I'm going

4    to have to use her full name, because we lost the anonymity

5    issue, but you're aware that there was a Michelle Healy who

6    worked in the office.  You never spoke to Michelle Healy, did

7    you?  So I would like to be able to do that.  Under your

8    Honor's ruling, I believe, that's appropriate under the *Watson*

9    case.

10             THE COURT:  Mr. Rohrbach.

11             MR. ROHRBACH:  Your Honor, I disagree with almost

12   every premise of what Mr. Everdell just said.  But the core

13   legal issue is one the Court has already analyzed which is the

14   *Watson* case is a *Brady* case.  It doesn't stand for anything, as

15   the Second Circuit has held, about exactly what sorts of

16   evidence can and can't come in.  The Court has explained that

17   the challenges of the thoroughness of the investigation can

18   come in in lots of ways, including cross-examination.  The

19   defense counsel could and did ask Jane when she testified who

20   was in the room during the massages.  They can put on evidence

21   of witnesses who they believe are the other people in the room.

22   But what they can't do is in their direct case, call a case

23   agent and say, You didn't take this investigative step; you

24   didn't take that investigative step.  That is precisely the

25   challenge to the thoroughness of the investigation that's

LCHVMAX2

1    precluded.

2            THE COURT:  I've relitigated so many issues in this

3    case, so I suppose this is just going out with the same

4    pattern.  But I said in my ruling, in its brief, the defense

5    seeks to affirmatively -- and I'll quote from the brief --

6    "call FBI case agents as witnesses" to ask who they talked to,

7    what documents they subpoenaed, and when.

8            But as the Second Circuit explained in *Saldarriaga*,

9    the government's use or nonuse of certain investigative

10   techniques does not tend to show the defendant's innocence of

11   the charges.  That's transcript at page 20.  And I also said I

12   would permit the defense to cross-examine law enforcement

13   officers about the investigative steps that were taken if the

14   government puts the thoroughness of the investigation into

15   issue, as this too would be permissible impeachment on cross,

16   and they did not.

17           I suppose words have meaning in the eyes of the

18   beholder, but what you're suggesting is directly contrary to my

19   ruling.

20           MR. EVERDELL:  Your Honor, I did see that.  I'm not

21   trying to be contrary.  I just went back to the premise of your

22   ruling when I was looking at the transcript cites and the cases

23   that you cited as premise for your ruling.  And because this

24   issue became a live issue when we had Jane's testimony, I

25   thought it appropriate to see if we could revisit this to see

LCHVMAX2

1     if this was now appropriate line of cross.

2              THE COURT:  No.

3              MR. EVERDELL:  Understood, your Honor.  Okay.

4              Then there are two other issues then.  I did want to

5     get into this with this witness, that the investigation of the

6     allegations against Ms. Maxwell started with the first three of

7     the accusers, and that time period was focused, so that's Jane,

8     Annie Farmer, and Kate.  And that time period was focused on

9     '94 to '97.  And then they got an indictment based on those

10    charges.  And then later, they talked to Carolyn and they

11    amended the indictment, and those allegations relate to a later

12    time period, 2001 to 2004, and that those are the subject of

13    the last two counts in the indictment, Counts Five and Six.

14             The purpose of this, your Honor, is just to be able to

15    show the jury that there are -- there's a difference between

16    those counts and who the witnesses are, information whose

17    evidence is related to those counts.  And I think that's

18    relevant to be able to explain that to the jury without

19    getting -- it doesn't really talk about investigative steps;

20    it's just simply saying, You talked to Carolyn after you spoke

21    to these three first.  These are the three who you originally

22    had evidence from against Ms. Maxwell.  Carolyn came to you

23    later.  You spoke to her first in 2019; she wanted to talk to

24    you with a lawyer.  You didn't speak to her again until a year

25    later.  At that point you did meet with her.  You took her

LCHVMAX2

information, you got her account, and then you amended the

indictment and added her allegations at that point.  And those

refer to the last two counts in the indictment.

MR. ROHRBACH:  Your Honor, this is another issue the

Court has already ruled on.  This is evidence and testimony

about the path of the investigation, the government's charging

decisions along the way.

THE COURT:  Could you pull up the mic.

MR. ROHRBACH:  This is proposed testimony about the

government's charging decisions and the path of the

investigation along the way, including when the defendant was a

target for certain pieces of the investigation and certain

counts of the indictment.

I think the Court relied on *Saldarriaga* again and the

*Duncan* opinion when it, in its pretrial rulings, excluded these

lines of testimony.  And in any event, I understand that

Mr. Everdell wants to make this argument to the jury.  This is

an argument they can make in closing to the jury; but it's not

something that they can elicit as evidence from the

government's case agent.

MR. EVERDELL:  Your Honor, I don't know how I can make

that argument to the jury when there are no facts about when

they spoke to these witnesses.

THE COURT:  To what investigative steps they took.

MR. EVERDELL:  When they spoke to the witnesses, if

LCHVMAX2

1   you're going to call that, broadly speaking, an investigative

2   step --

3           THE COURT:  Again, just reading from my ruling, it was

4   pretrial.  So, as I said, if you think things changed on the

5   ground, you can reargue.  I'm not aware of anything changing on

6   the ground here.  But I said specifically, Call FBI agents as

7   witnesses to ask who they talked to, what documents they

8   subpoenaed, and when.

9           But as the Second Circuit explained in *Saldarriaga*,

10  the government's use or nonuse of certain investigative

11  techniques does not tend to show defendant's innocence of the

12  charges.

13          What I hear you asking now, again, is either precluded

14  by that ruling or to the extent it's slightly different, it's

15  unclear to me what the relevance is and would likely bleed over

16  into what I've prohibited.

17          MR. EVERDELL:  All right, your Honor.

18          Well, I think my cross just got a lot shorter.

19          THE COURT:  Maybe now you can stipulate to this

20  agent's testimony, since this was why you wouldn't.

21          MS. COMEY:  Your Honor, I will reiterate our

22  willingness to stipulate to this agent's testimony on prior

23  inconsistent statements.

24          MR. EVERDELL:  The one other point --

25          THE COURT:  Mr. Pagliuca told me yesterday the reason

LCHVMAX2

1    to do it with the agent was efficiency, which I would say he

2    said it with a straight face, but I can't tell with the mask

3    on.

4              MR. EVERDELL:  Your Honor, I would just raise one last

5    point, since we're going through all this.  I also would like

6    to go through with Agent Young the fact of the search that

7    occurred in Mr. Epstein's residence in 2019.  The number of

8    devices that were taken, the fact that she, I believe, reviewed

9    virtually everything that was on those devices personally --

10   maybe not all of it, but the vast majority of it.  There were

11   millions of pages, millions of files in those documents.  And

12   we have only -- the government has only presented a certain

13   number of those for the jury.  But I think I need to be able to

14   get out the fact that there were millions and millions of

15   pages --

16             THE COURT:  That's in evidence, is it not?

17             MR. EVERDELL:  I don't know the number of files that

18   were extracted from the devices is in evidence.  I believe she

19   would know at least anecdotally, because I think she reviewed

20   all of this.

21             THE COURT:  Do you have the witness who extracted?

22   Didn't we have the person?

23             MR. EVERDELL:  We had Mr. Flatley.

24             MS. COMEY:  That was Kimberly Meder, your Honor.  And

25   Ms. Menninger on cross-examination of Ms. Meder did elicit that

LCHVMAX2

1    there were thousands of photographs seized, and that there was

2    only obviously a subset that was presented to the jury.

3            MS. MENNINGER:  Right.  Ms. Meder only was speaking to

4    photographs, your Honor, not to the number of devices.

5            MS. COMEY:  Your Honor, I would note that that was a

6    situation where we called a witness affirmatively in our case

7    to talk about photographic evidence that was seized; and then

8    the defense properly cross-examined that witness about that

9    evidence.

10           What the defense is now suggesting they should be able

11   to do is bring in a whole host of other investigative steps.

12   There was Mr. Flatley, who testified about extraction from a

13   single hard drive.  I believe what Mr. Everdell is talking

14   about is all of the other devices that were seized throughout

15   the course of this investigation.  And I think that that would

16   be in violation of the Court's order.  It would also be

17   extremely confusing, because when we're talking about this

18   investigation, it's a little ambiguous what we're talking

19   about, as we alluded to earlier.  This investigation was

20   broader than just what resulted in these charges.

21           MS. MENNINGER:  Well, your Honor, there was a search

22   that the government elicited information about that occurred in

23   2019 of our alleged co-conspirator's home.  The question can be

24   phrased because they --

25           THE COURT:  Which witness was that?

LCHVMAX2

          MS. MENNINGER:  Ms.  -- which witness what?

          THE COURT:  I thought you just said the government put

on evidence of the search.

          MS. MENNINGER:  I think it was not Ms. Meder --

Maguire, Kelly Maguire.

          MR. EVERDELL:  She was the agent who did the search.

          THE COURT:  Did you cross on devices found?

          MR. EVERDELL:  I don't believe I did, your Honor.

          THE COURT:  Why not?  I mean, I'm not trying to probe

strategy but, like, isn't that precisely --

          MS. MENNINGER:  I think Maguire only did certain parts

of the search, in the same way that the Palm Beach -- there

were only agents that did certain parts of the search.  Agent

Young was in charge of the search more broadly.

          MS. COMEY:  Your Honor, that's not accurate.

          Special Agent Maguire testified that she was the

search team leader who oversaw the entire search of that New

York residence.  And this was absolutely an avenue of cross

that defense could have taken.  We may have objected, depending

on how it was phrased, but we put on the search team leader

from that search.

          MR. EVERDELL:  But, your Honor, I don't think Agent

Maguire extracted the files from the devices.

          THE COURT:  Did Agent Young extract the files from the

devices?

LCHVMAX2

1          MR. EVERDELL:  She didn't.  But she reviewed, I

2    believe, every file that was extracted from the devices; so she

3    knows generally how many there were and what types there were.

4          MS. COMEY:  Your Honor, we put on the witness who

5    extracted all of the files from all of these devices.  That's

6    Stephen Flatley.  He was on the stand.  And we put on a witness

7    who reviewed all the photographs.  That was Kimberly Meder.

8    She was on the stand.

9          What the defense wants to do now is impeach the

10   investigation, that is what this is about.

11         THE COURT:  Okay.

12         You had the opportunity to ask witnesses put on by the

13   government.  Consistent with my ruling, to the extent they put

14   the thoroughness of the investigation -- I wouldn't say it was

15   thoroughness, but they put the relevant agent who you could

16   have crossed on this on the stand.  And maybe there would have

17   been an objection, to the extent you were calling into question

18   the thoroughness of the investigation without it being raised.

19   I might not have permitted it there, but I certainly won't

20   permit it further removed as direct evidence of the

21   thoroughness of the government's investigation and

22   investigative steps, which is precluded by my November 1st

23   ruling.

24         MR. EVERDELL:  Understood, your Honor.

25         THE COURT:  Thank you.

LCHVMAX2

```
 1            MS. COMEY:  So then to be clear, your Honor, is it the
 2     case that Agent Young is only being called for prior
 3     inconsistent statements?
 4            MR. EVERDELL:  Maybe we need to confer a little bit
 5     before this.
 6            THE COURT:  Okay.  Who's the first witness?
 7            MR. PAGLIUCA:  Jason Richards, your Honor, Special
 8     Agent Richards, which is a short witness.
 9            MS. COMEY:  That's another witness we offered to
10     stipulate to, your Honor.  Prior inconsistent statements, I
11     think there are two that he's going to be called to testify --
12            THE COURT:  That he's just doing those, Mr. Pagliuca,
13     or anything else?
14            MR. PAGLIUCA:  Excuse me, your Honor?
15            THE COURT:  I'm sorry.
16            Is he just doing those two --
17            MR. PAGLIUCA:  Yes, that's it.
18            THE COURT:  Okay.  And then who's after that?
19            MR. EVERDELL:  Well, it would have been Young, Agent
20     Young.
21            THE COURT:  Okay.
22            MR. EVERDELL:  And then it's -- we have Eva Dubin.
23            THE COURT:  Okay.
24            Why don't we do Richards and then Dubin, and see if
25     you can stipulate on Young.  Does that make sense?
```

LCHVMAX2

1          MR. PAGLIUCA:  I don't believe Ms. Dubin is here yet,

2     your Honor.  I had her scheduled for 11 o'clock this morning --

3          THE COURT:  Okay.

4          MR. PAGLIUCA:  -- in anticipation of some other

5     testimony.  I can reach out to her lawyer and see if she can be

6     here earlier.

7          MS. COMEY:  Your Honor, if the defense doesn't have a

8     witness and would like to put on Agent Young, we can go ahead

9     and put on Agent Young.  Again, we offered to stipulate.

10          THE COURT:  Well, here we are.

11          We don't have another witness at the moment?

12          MR. EVERDELL:  We have -- one moment, your Honor.

13          (Counsel conferred)

14          MS. MENNINGER:  We haven't spoken to the people out in

15     the hall who have the witnesses.  So if we can have a minute to

16     figure this out.

17          THE COURT:  Okay.  Why don't I give you a couple

18     minutes.  We'll let the jury know we'll start in about 15

19     minutes, so they know we haven't forgotten about them.  See

20     what you want to do, and then we'll come back and get started

21     where we can.

22          Do I have a filing yet, Ms. Menninger?

23          MS. MENNINGER:  No, your Honor.  I wasn't able to

24     reach people in Colorado.  They weren't at the office yet.

25          THE COURT:  I'm sorry?

LCHVMAX2

1            MS. MENNINGER:  They were not at the office yet in

2       Colorado when I reached out to the office.

3            THE COURT:  Okay.  I'll step down.

4            (Recess)

5            THE COURT:  Where are we?

6            MS. COMEY:  Your Honor, I believe the defense is not

7       going to stipulate, but I'll let them speak for themselves.

8            MS. MENNINGER:  That's right.

9            THE COURT:  Okay.  Then we should definitely get

10      going.

11           MR. PAGLIUCA:  I'll get the next witness, if that's

12      all right.

13           THE COURT:  We'll bring in the jury and then get the

14      witness ready to come in.

15           Ms. Menninger, the Rule 17 subpoena return date when

16      for the witness who isn't here?

17           MS. MENNINGER:  The subpoena return date was for the

18      first day of trial.  And for each one of them we communicated

19      to place them on call because we didn't know when we would need

20      them, and we didn't want them to have to wait here, so --

21           THE COURT:  Okay.  First day of trial.

22           MS. MENNINGER:  Yes, your Honor.

23           THE COURT:  Okay.

24           So the witness should just wait to be called.

25           MS. MENNINGER:  Your Honor, if I may complete that

LCHVMAX2                    Richards - direct

1    record.  She was served on December 1st.  So she was served

2    after the start of the trial.

3            THE COURT:  Do I have an application yet,

4    Ms. Menninger?

5            MS. MENNINGER:  No, your Honor.

6            THE COURT:  Okay.  Bring in the jury.

7            (Jury present)

8            THE COURT:  Good morning, members of the jury.  I

9    apologize for the delay.  We were working through issues that I

10   think will make fewer sidebars, so thank you for your patience.

11           Mr. Pagliuca, you may call your next witness.

12           MR. PAGLIUCA:  Thank you, your Honor.

13           Our next witness is Special Agent Jason Richards.

14           THE COURT:  Okay.  Jason Richards may come forward.

15    JASON RICHARDS

16        called as a witness by the Defendant,

17        having been duly sworn, testified as follows:

18           THE COURT:  You may inquire, Mr. Pagliuca.

19           MR. PAGLIUCA:  Thank you, your Honor.

20   DIRECT EXAMINATION

21   BY MR. PAGLIUCA:

22   Q.  Special Agent Richards, what do you do?

23   A.  I'm an FBI agent.  I investigate violations of laws of the

24   United States.

25   Q.  And how long have you been an agent with the FBI?

LCHVMAX2                          Richards - direct

1   A.   Eighteen years.

2   Q.   So that would take us back to 2003, is that correct, when

3   you started?

4   A.   Yes.

5   Q.   Can you tell us a little bit about your training to become

6   an FBI agent.

7   A.   Attended the FBI academy for basic new agents training.

8   And then there's obviously ongoing training as your career

9   develops.

10  Q.   And would that be in 2003 that you went -- is that in

11  Quantico, Virginia?

12  A.   Yes.

13          THE COURT:  Could you pull the mic up a little bit?

14          Perfect.  Thank you.

15          THE WITNESS:  You're welcome.

16  Q.   As part of your basic training, do you learn how to do

17  investigations in terms of talking to witnesses and recording

18  information from those witnesses?

19  A.   Yes.

20  Q.   Were you first -- well, where are you stationed currently

21  with the FBI?

22  A.   I'm currently with the Miami division at the Fort Pierce

23  resident agency.

24  Q.   And how long have you been there?

25  A.   Since 2014.

LCHVMAX2                        Richards - direct

1    Q.  And where were you before 2014?

2    A.  Prior to that I was at the Miami division's Palm Beach

3    resident agency.  I was there in 2006 to 2014.

4    Q.  Okay.  And prior to 2006, where were you stationed?

5    A.  I was stationed at the Covington resident agency at the

6    Louisville division in Kentucky.

7    Q.  I want to direct your attention to 2006, when you were in

8    the Palm Beach area.  Okay?

9    A.  Okay.

10   Q.  Were you assigned to a particular unit in 2006?

11   A.  Yes.  At that time I was assigned to squad PB2.

12   Q.  And what is squad PV2?

13   A.  It's PB2.

14   Q.  PB2.

15   A.  Yes.  It's the violent crimes squad and safe streets task

16   force.

17   Q.  And were you involved at that point in an investigation

18   regarding Jeffrey Epstein?

19   A.  Yes.

20   Q.  And did part of your job during that investigation involve

21   talking to witnesses in that case?

22   A.  Yes.

23   Q.  You indicated that as part of your training as an FBI

24   agent, you are trained to do interview techniques with

25   witnesses, right?

LCHVMAX2                      Richards - direct

1    A.   Yes.

2    Q.   Does that training and experience involve how to listen to

3    people talk?

4    A.   What we try to do is listen to get the details as accurate

5    as possible.

6    Q.   Okay.  And when you're listening and trying to get the

7    details as accurate as possible, are you trying to gather

8    information via open-ended questions to elicit responses from

9    witnesses?

10   A.   Yes.

11   Q.   As part of your training and experience, do you try to

12   limit anybody from telling you anything?

13   A.   No.

14   Q.   And as part of your investigation and training, are you

15   looking to get as much relevant information as possible from

16   anyone you're interviewing about a particular topic or subject?

17   A.   Yes.

18   Q.   Now, I want to direct your attention to 2007, which would

19   be about a year after you began working in Palm Beach; correct?

20   A.   Correct.

21   Q.   You were working with an agent Nesbitt Kuyrkendall.  Do you

22   recall Agent Kuyrkendall?

23   A.   Yes.

24   Q.   And you and Agent Nesbitt Kuyrkendall were interviewing

25   witnesses together in tandem; is that right?

LCHVMAX2                          Richards - direct

1    A.   Yes.

2    Q.   And is that part of standard practice for the FBI in

3    interviewing witnesses?

4    A.   Yes.

5    Q.   And is that so you have a witness to the witness interview?

6    A.   Yes.

7    Q.   Was part of your practice and procedure in interviewing

8    witnesses in 2007 based on your training with the FBI to take

9    notes during witness interviews?

10   A.   Yes.

11   Q.   And then would you and Special Agent Kuyrkendall review

12   those notes and turn them into what's referred to often as a

13   302?

14   A.   Yes.

15   Q.   And explain to the jury what a 302 is.

16   A.   302, that's FD-302.  That's the standard FBI investigative

17   report form.

18   Q.   And is part of the training and practice of the FBI to

19   review the 302 for accuracy prior to it being finalized?

20   A.   Yes.

21   Q.   And do you and Special Agent Kuyrkendall in this case

22   initial the 302 to show that you've reviewed it and that it's

23   accurate?

24   A.   Yes.

25            MR. PAGLIUCA:  I'd like to display for the witness

LCHVMAX2                    Richards - direct

```
 1   what's been marked as JR-1, which is 3505-005 in the 3500
 2   material.
 3              THE COURT:  Okay.
 4              MR. PAGLIUCA:  Thank you, your Honor.
 5              MS. COMEY:  No objection, your Honor.
 6              THE COURT:  Thank you.
 7              MR. PAGLIUCA:  So that should be for the witness, the
 8   Court, and the courtroom deputy only please.
 9   Q.  Do you have that on your screen yet?
10   A.  I see it, yes.
11   Q.  If we look at the lower left corner of this, do you see
12   your name, Special Agent Kuyrkendall's name, and the initials?
13   A.  Yes.
14   Q.  And those are your initials?
15   A.  Yes.
16   Q.  And that means that you at the time reviewed this and
17   determined that it was accurate at the time; is that right?
18   A.  Yes.
19   Q.  Have you had a chance to review this before your testimony
20   here today?
21   A.  Yes.
22   Q.  I understand that this was a long time ago.  And I'm
23   assuming, but you tell me if I'm incorrect, that you don't have
24   any current memory of doing this interview?
25   A.  It was 14 years ago.
```

1    Q.  Right.  And you've done a lot of interviews between 14

2    years ago and now, I assume?

3    A.  Probably thousands.

4    Q.  Now, is part of the reason why you are trained to take

5    notes and to record events accurately, so that months or years

6    later you will have a document such as this that you can

7    testify from and be confident that what you put in the document

8    is accurate?

9    A.  That's for reference, yes.

10   Q.  Okay.  What I'd like to do is direct you to some specific

11   statements in this JR-1 that we've marked for identification

12   purposes.

13          First of all, do you recall that on August 7th, 2007,

14   you spoke with Carolyn?  And we're identifying this person only

15   by the name of "Carolyn."

16   A.  Yes.

17   Q.  And again, when you spoke with Carolyn, you were gathering

18   information relative to your investigation at that time;

19   correct?

20   A.  That's correct.

21   Q.  When you spoke with Carolyn, consistent with your training

22   and experience, you were attempting to get as much information

23   as possible; is that correct?

24   A.  Yes.

25   Q.  And you were not limiting any of the responses given to you

LCHVMAX2                         Richards - direct

1   by Carolyn during that interview; correct?

2   A.   Correct.

3   Q.   In particular, I would like you to look at page 2,

4   paragraph -- full paragraph 3 of Exhibit JR-1.

5             MS. COMEY:   May I have a moment to confer, your Honor?

6             THE COURT:   Okay.

7             (Counsel conferred)

8             MS. COMEY:   Thank you, your Honor.

9             THE COURT:   Thank you.

10  Q.   Middle of the page that begins with "Carolyn."  Are you

11  there?

12  A.   I have something pulled up here.  I don't know if that's

13  the right paragraph that's pulled up or not.

14  Q.   Okay.

15            MR. PAGLIUCA:   Let me just confer, your Honor, to make

16  sure.

17            THE COURT:   Sure.

18            (Counsel conferred)

19            THE COURT:   And again, I just caution you not to use

20  the last name.

21  BY MR. PAGLIUCA:

22  Q.   Do you recall at that time Carolyn told you that Carolyn

23  obtained Epstein's phone number from a telephone book?

24  A.   That's what's in the 302, yes.

25  Q.   Okay.  And do you recall at that time also that Carolyn

LCHVMAX2                        Richards - cross

1   told you that Epstein returned Carolyn's call?

2   A.   That's what's here in the report.

3            MR. PAGLIUCA:  I have no other questions, your Honor.

4            THE COURT:  Okay.

5            MS. COMEY:  Briefly, your Honor.

6            THE COURT:  Yes.

7            MS. COMEY:  May I inquire?

8            THE COURT:  You may.

9   CROSS-EXAMINATION

10  BY MS. COMEY:

11  Q.   Good morning, Special Agent Richards.

12  A.   Good morning.

13  Q.   Is a 302 report of an interview a verbatim report of a

14  witness's statement?

15  A.   No.

16  Q.   Is it a transcript of a witness's statement?

17  A.   No, it isn't.

18  Q.   What is it?

19  A.   It's a summary of the results of our interview.

20  Q.   Do you ever show witnesses your 302 reports and ask them to

21  confirm that they are accurate?

22  A.   No.

23  Q.   Did you show Carolyn this 302 report and ask her to confirm

24  it was accurate?

25  A.   No.

LCHVMAX2                         Richards - redirect

1           MS. COMEY:  No further questions.

2           THE COURT:  Mr. Pagliuca?

3           MR. PAGLIUCA:  Thank you, your Honor.

4    REDIRECT EXAMINATION

5    BY MR. PAGLIUCA:

6    Q.  Special Agent Richards, you're writing down accurately

7    what's being told to you during these interviews; correct?

8    A.  As best as I can.

9    Q.  And you're writing it down accurately because you may be

10   called to a witness stand to testify under oath about what

11   people told you; correct?

12   A.  Correct.

13   Q.  Thank you.

14          MR. PAGLIUCA:  No further questions, your Honor.

15          THE COURT:  Okay.  Thank you, Special Agent Richards.

16          You may step down.  You are excused.

17          THE WITNESS:  Thank you, Judge.

18          (Witness excused)

19          THE COURT:  And the defense may call its next witness.

20          MS. COMEY:  May we confer briefly, your Honor?

21          THE COURT:  You may.

22          (Counsel conferred)

23          MS. MENNINGER:  Your Honor, at this time we would call

24   Agent Amanda Young.

25          THE COURT:  Amanda Young may come forward.

LCHVMAX2                          Young - direct

1    AMANDA YOUNG,

2         called as a witness by the Defendant,

3         having been duly sworn, testified as follows:

4              THE COURT:  All right.  Thank you.

5              Ms. Menninger, when you're ready, you may inquire.

6              MS. MENNINGER:  Thank you, your Honor.

7    DIRECT EXAMINATION

8    BY MS. MENNINGER:

9    Q.  Good morning, Ms. Young.

10   A.  Good morning.

11   Q.  You are the case agent assigned to this criminal case;

12   correct?

13   A.  Yes, I'm one of the case agents.

14   Q.  One of the case agents.  And when were you assigned to this

15   case?

16   A.  At the end of 2018.

17   Q.  And you have been present here in the courtroom for the

18   majority of the trial testimony, right?

19   A.  Yes, I have.

20   Q.  You just heard the testimony of Special Agent Richards;

21   correct?

22   A.  Yes.

23   Q.  And would you agree with the testimony that he gave in

24   regards to the methods of training for taking notes in

25   preparing FBI 302s?

LCHVMAX2                        Young - direct

```
 1   A.  Yes.

 2   Q.  Anything about what he said that you disagree with?

 3   A.  No.  We try to take notes as accurately as possible and

 4   then put them into a 302 document.

 5   Q.  Okay.  And that's what you did in connection with this case

 6   as well, correct?

 7   A.  Yes.

 8   Q.  So in some cases, at least as I understand it, you

 9   physically took the notes and then typed up the 302 later; is

10   that right?

11   A.  Yes.  Sometimes I took the notes, sometimes my partner took

12   the notes.

13   Q.  And your partner is Detective Byrnes?

14   A.  Yes.

15   Q.  And when one or the other of you takes the notes, do you

16   check the other's work?

17   A.  We will both review the 302 before it's finalized and sign

18   off on it.

19   Q.  And so in this case, I think you just heard Ms. Comey's

20   question to Special Agent Young, these are not meant to be

21   transcripts of the interviews, right?

22   A.  No, they are not.

23   Q.  It's a summary of what the witness said?

24   A.  Yes.

25   Q.  An accurate summary of what the witness said?
```

LCHVMAX2                        Young - direct

1    A.  As accurate as possible, yes.

2    Q.  And you don't write down the questions that were asked,

3    right?

4    A.  No.

5    Q.  You don't have something that looks like a transcript?

6    A.  Correct.

7    Q.  We don't have the words that were used and the questions

8    that gave rise to the answers that are summarized in the 302,

9    right?

10   A.  Correct.

11   Q.  And these were not audio recorded?

12   A.  No, they were not.

13   Q.  Or video recorded?

14   A.  No, they were not.

15   Q.  With respect to -- if I could just ask quickly, first about

16   witness Annie Farmer, you know who she is, right?

17   A.  Yes.

18   Q.  And you interviewed her on a number of occasions over the

19   last couple of years, right?

20   A.  Yes.

21   Q.  One issue that came up with respect to Ms. Farmer's

22   testimony had to do with the boots.  Do you remember the boots?

23   A.  Yes.

24   Q.  Just to be clear, the defense issued a subpoena for those

25   boots sometime earlier this year, right?

LCHVMAX2                          Young – direct

1          MS. COMEY:  Objection to foundation.

2          May I confer, your Honor?

3          THE COURT:  Yes.

4          (Counsel conferred)

5          MS. COMEY:  Objection withdrawn.

6          We've conferred, your Honor.

7          THE COURT:  Okay.

8          MS. MENNINGER:  Yes.  Let me rephrase that.

9   BY MS. MENNINGER:

10  Q.  Are you aware of the time when the boots were obtained from

11  Ms. Farmer?

12  A.  I don't recall the specific date, but I know that it was

13  sometime this year.

14  Q.  In June of this year, does that make --

15  A.  I don't -- I don't remember the exact month.

16  Q.  Okay.  It was earlier than this fall, is that fair?

17  A.  That's fair.

18  Q.  So it wasn't in the midst of trial preparation, I guess is

19  the point that I need to make.

20  A.  I don't -- I don't remember the exact time frame.

21  Q.  Okay.  I can pull up the report, I think.

22          Give me one second.

23  A.  Okay.

24  Q.  We'll pull that up in just a minute and come back to it.

25  Thank you though.

LCHVMAX2                        Young - direct

 1              I just wanted to clarify one thing.  Ms. Farmer said
 2      that she had reclaimed the boots by wearing them after some
 3      time in the mid 2006 period, right?  Do you remember that
 4      testimony?
 5      A.  The testimony she gave in this courtroom?
 6      Q.  Yes.
 7      A.  I don't -- I don't remember the exact words she used, but I
 8      know she talked about kind of taking back the boots.
 9      Q.  And she used the word "reclaim"?
10      A.  I don't -- I don't remember what word she used.
11      Q.  When you were interviewing her, when was the first time
12      that she mentioned to you anything about reclaiming the boots
13      or wearing the boots?
14      A.  I think it was in more recent --
15      Q.  In the trial prep time period?
16      A.  I don't recall specifically, but I think it was in the more
17      recent interview so far.
18      Q.  Okay.  And you didn't write a report about that statement;
19      correct?
20      A.  I don't recall.
21      Q.  We may need to talk about that.
22              So with respect to interviews of Jane, you had done a
23      number of interviews with the prosecutors and your partner,
24      Detective Byrnes, about -- with Jane; correct?
25      A.  Yes.

LCHVMAX2                          Young - direct

1   Q.  And those interviews began in September of 2019 and lasted

2   up until days before trial; correct?

3   A.  That sounds about right.

4   Q.  And you were there and a number of different U.S. Attorneys

5   were present, and Detective Byrnes was there on various

6   occasions, right?

7   A.  On various occasions.  It was different groups, yes.

8   Q.  Okay.  And you prepared handwritten notes of those

9   interviews and then did typewritten notes as well, correct?

10  A.  Either I did or my partner did.

11  Q.  And then if he did it, you checked his work; correct?

12  A.  Yes.

13  Q.  Okay.  Next to you is a set of the 3500 materials, the

14  reports that relate to Jane.  Can I ask you to take a look at

15  that folder.  And I'm going to direct your attention to certain

16  ones, okay?

17          If I could have you look behind tab 2.  And do you

18  recognize those?

19  A.  Yes.

20  Q.  Is that your handwriting?

21  A.  It is.

22  Q.  What was the date of this note that you took?

23  A.  September 19th, 2019.

24  Q.  Does that mean the day that you actually wrote it down?

25  A.  Yes.

LCHVMAX2                    Young - direct

1    Q.   If I could direct your attention -- this was an interview

2    with Jane that you attended, right?

3    A.   Yes.

4    Q.   And her two attorneys attended as well, correct?

5    A.   Yes.

6    Q.   And if I could direct your attention to a line nine lines

7    down with a dash that begins "GM."

8    A.   Okay.

9    Q.   Can I have you read that line and the next line into the

10   record.

11   A.   "GM walked by with dog.  JE came up to meet her."

12   Q.   Thank you.

13          And then now if I could direct your attention to the

14   tab behind the document behind tab 1.

15          Do you recognize this document?

16   A.   Yes.

17   Q.   And this is the FBI typewritten 302; correct?

18   A.   Yes, that's correct.

19   Q.   And you're the one that typed this up, right?

20   A.   Yes.

21   Q.   And this is the typewritten report from the handwritten

22   notes on September 19th; correct?

23   A.   Yes, that's correct.

24   Q.   But the typewritten report was prepared in December of

25   2019?

LCHVMAX2                         Young - direct

1    A.  No, it was actually drafted in October of 2019.  The date

2    you're referring to is the date that it was serialized to the

3    case file.

4    Q.  Okay.  So it was drafted -- it was typed up on October 3rd,

5    a couple weeks after the interview?

6    A.  Yes.

7    Q.  And then it was entered into the system in December?

8    A.  Correct.

9    Q.  And we don't have a notice of when anyone reviewed it for

10   accuracy on the document, right?

11   A.  No, the date of entry is when our supervisor signs off on

12   the reports.

13   Q.  Okay.  So if I could have you turn on this document to page

14   2, and direct your attention to the fourth full paragraph.  In

15   the middle of that paragraph is a sentence that begins with the

16   word "in."  If I could have you read that sentence.

17            THE COURT:  I caution you not to use the last name.

18            MS. MENNINGER:  Yes, your Honor.  I apologize.  Not to

19   use the witness's last name, but to substitute "Jane" for her

20   name.

21            MS. COMEY:  Sorry, your Honor.  I don't see where

22   we're being referred to.

23            MS. MENNINGER:  On page 2 of 001 in the fourth full

24   paragraph, in the middle of the paragraph.

25            MS. COMEY:  Got it.  Thank you.

LCHVMAX2                         Young - direct

1   A.   I just want to make sure I'm in the right spot.

2           Are you referring to "In the beginning"?

3   Q.   That's correct.  Just that sentence.

4   A.   Okay.  "In the beginning, Kate would be with her mother and

5   brothers at Epstein's house."

6           (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LCHCmax3                        Young - direct

```
 1   BY MS. MENNINGER:
 2   Q.  And I think it's Jane, not Kate?
 3   A.  I'm sorry.  I'm sorry.
 4   Q.  That's fine.  If you don't mind reading it again with Jane.
 5   A.  In the beginning, Jane would be with her mother and
 6   brothers at Epstein's house.
 7   Q.  Now, if I could have you take a look at the tab 3.  Do you
 8   recognize this report?
 9   A.  Yes.
10   Q.  This one actually was authored by your partner, Mr. Byrne
11   or Detective Byrne; right?
12   A.  Yes.
13   Q.  But you checked his work?
14   A.  Yes, I signed off on it.
15   Q.  And this one relates to an interview that took place in
16   November of 2019; right?
17   A.  Yes, that's correct.
18   Q.  And if I could direct your attention on this interview with
19   Jane to the fourth full paragraph, the third line, begins Jane,
20   Jane was not.  If you could read that sentence with Jane.
21   A.  Jane was not sure if Maxwell ever called her to make
22   appointments.
23   Q.  Thank you.  And now if I could have you turn to tab 5.  Are
24   you there?
25   A.  Yes.
```

LCHCmax3                         Young - direct

1    Q.   Thank you.  And this one is an interview that took place in

2    December of 2019; correct?

3    A.   Yes, that's correct.

4    Q.   And again, this one was written by Detective Byrne, but you

5    signed off on it; is that accurate?

6    A.   Yes.

7    Q.   If I could have you turn to page 3 of that report.  If I

8    could ask you in the very first paragraph, substituting Jane's

9    name, to read the first three sentences of that paragraph that

10   begins with fairly, and just be cautious to use the name Jane.

11   A.   Fairly early on, Maxwell joined in and started taking her

12   clothes off.  This is about six months into being with them.

13   Kate --

14   Q.   I'm sorry.

15   A.   I'm sorry.  Jane was still 14 at this time.

16   Q.   And one more sentence.

17   A.   Jane does not have a specific memory of the first time.

18   Q.   Thank you.  And now if I could have you turn to document

19   behind tab 8.  Are you there?

20   A.   Yes.

21   Q.   This is from an interview that took place in February of

22   2020; correct?

23   A.   Yes, that's correct.

24   Q.   And you authored this typewritten report; correct?

25   A.   Yes.

LCHCmax3                         Young - direct

1   Q.  If I could have you turn to page 5, and the last full
2   paragraph on that page, I'm going to read this, the first
3   couple sentences here and just let me know if I read anything
4   wrong.  I'll substitute the name Jane again.  Okay?
5   A.  Okay.
6   Q.  When Jane was asked if there were times where it was only
7   Epstein, Maxwell, and her in the room, Jane was not sure.  As
8   Epstein progressed incidents sexually with Jane, it would go
9   back and forth between just being solely with Jane and going
10  back to the group setting.
11              Did I read that right?
12  A.  Yes.
13  Q.  And now I want to turn to page 7 of that same document.
14  Are you there?
15  A.  Yes.
16  Q.  And the last full paragraph, I'm going to just read one
17  sentence that begins on the fourth line of that paragraph.
18  This relates to the New Mexico trip.  She, Jane, did not recall
19  specific abuse that may have occurred.
20              Do you see that?
21  A.  Yes.
22  Q.  And then just a few lines later, there is a separate
23  notation and it carries onto the next page.  I'm going to read
24  that.  Jane was asked if she recalled any specific abuse that
25  occurred in New Mexico and she stated that she was not sure.

LCHCmax3                          Young – direct

1              Did I read that accurately?

2    A.  Yes.

3    Q.  And then on that same page, 8, in the fourth full

4    paragraph, the second sentence reads:  Her first trip to New

5    York was to just go and have fun.

6              Did I read that correctly?

7    A.  Yes.

8    Q.  And I think there is one more on page 12 of this document.

9    If I could direct your attention to the fourth full paragraph,

10   the last three sentences of that paragraph.  Are you there?

11   A.  I'm not sure which paragraph.

12   Q.  The fourth full paragraph.  So it's the second from the

13   bottom.

14   A.  Thank you.

15   Q.  And then the last three lines of that paragraph.  From when

16   Jane met Epstein to when she moved to New York, she lived in

17   the same house in Florida.  This house was in a gated community

18   called Bear Lakes.  It was a three-bedroom house.

19             Did I read that correctly?

20   A.  Yes.

21             MS. MENNINGER:  And if I could just briefly go back to

22   the Annie Farmer issue.  If I could pull up on the screen for

23   the witness and the Court 3514-26.

24   Q.  Do you have that in front of you?

25   A.  I do.

LCHCmax3                          Young - direct

1    Q.  Does that refresh your recollection about the date that the

2    boots were seized?

3    A.  This is a 302 of an interview with Annie.

4            MS. MENNINGER:  Your Honor, we're going to stipulate

5    to the date of the seizure because I think that makes the most

6    efficient sense for use of the witness's time.  I can read it

7    into the record later.

8            THE COURT:  Ms. Comey.

9            MS. COMEY:  So stipulated, your Honor.  We'll check

10   the date, confirm the date of seizure, and then stipulate to

11   that date orally.

12           MS. MENNINGER:  One more question for the witness,

13   though.

14   BY MS. MENNINGER:

15   Q.  The discussion about Ms. Farmer wearing the boots happened

16   during a recent trial prep session; correct?

17   A.  I believe so.

18   Q.  And it was after the boots were seized; correct?

19   A.  I believe so.

20           MS. MENNINGER:  Thank you, your Honor.  No further

21   questions.

22           THE COURT:  Thank you.  Ms. Comey.

23           MS. COMEY:  Thank you, your Honor.

24           May I inquire?

25           THE COURT:  You may.

LCHCmax3                          Young – cross

1    CROSS-EXAMINATION

2    BY MS. COMEY:

3    Q.  Good morning, Agent Young.

4    A.  Good morning.

5    Q.  Will you please tell the jury what you did before becoming

6    an FBI agent?

7    A.  I was a child adolescent forensic interviewer.

8    Q.  What is a child adolescent forensic interviewer?

9    A.  I was trained in a research-based protocol to conduct

10   interviews of children to gather information when there are

11   allegations of child abuse.

12              MS. MENNINGER:  Objection, your Honor.  702.

13              MS. COMEY:  I have no intention of eliciting --

14              MS. MENNINGER:  -- and no disclosure and --

15              THE COURT:  I understand, Ms. Menninger.  Let me hear

16   from you at the side, please.

17              (Continued on next page)

18

19

20

21

22

23

24

25

LCHCmax3                    Young - cross

1              (At the sidebar)

2              THE COURT:  Where is this going?

3              MS. COMEY:  Your Honor, I believe Agent Young will

4      testify about her experience conducting interviews and her

5      experience and training both before being at the FBI and as an

6      FBI agent in practices of conducting non-suggestive interviews.

7      This is relevant both because the defense asked a number of

8      questions about how they conduct interviews, so it's within the

9      scope of the direct.  And also, the defense elicited expert

10     testimony from Dr. Loftus about how suggestive questioning and

11     leading questioning can lead to implanted memories.  And the

12     premise, the basis for admitting that opinion in a letter that

13     was submitted to your Honor just this week was that there was

14     going to be a suggestion by the defense that the agents who

15     conducted interviews here conducted them in a leading fashion.

16     So this is responsive directly to the premise of that expert

17     testimony.

18             MS. MENNINGER:  We were just precluded from asking any

19     questions about investigative techniques.

20             THE COURT:  I mean, you want to open the door on how

21     interviews were conducted of these witnesses, that opens the

22     door.  I think it's beyond the scope.

23             MS. MENNINGER:  It is beyond the scope, your Honor.

24             MS. COMEY:  I apologize, your Honor.  I don't

25     understand what your Honor means by open the door.

LCHCmax3                    Young - cross

 1          THE COURT:  If you want to go into the thoroughness
 2   and carefulness and non-suggestiveness with which this witness
 3   interviewed the alleged victims, your ballgame, but I actually
 4   will sustain the beyond-the-scope objection.
 5          (Continued on next page)
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

LCHCmax3                          Young - cross

1              (In open court)

2              MS. MENNINGER:  Your Honor, can we strike the answer?

3              THE COURT:  Jury will disregard the answer regarding

4     the agent's training in conducting interviews with children to

5     gather information.

6              MS. COMEY:  I'll move on, your Honor.

7              THE COURT:  Thank you.

8     BY MS. COMEY:

9     Q.  Agent Young, did you participate in all of Jane's

10    interviews with law enforcement?

11    A.  Yes, I did.

12    Q.  During those interviews, was Jane able to talk about

13    everything that happened with Maxwell and Epstein in a single

14    meeting or did she disclose more over time?

15    A.  No, she wasn't able to talk about everything in one

16    meeting.  It was a process and she disclosed at different

17    points.

18    Q.  Did you ever have to stop interviews with Jane when

19    discussing abuse involving Epstein and Maxwell?

20             MS. MENNINGER:  Objection, your Honor.  Beyond the

21    scope.

22             THE COURT:  Sustained.

23    Q.  Were you able to cover everything that Jane remembered

24    about Jeffrey Epstein and Ghislaine Maxwell in a single

25    interview?

1              MS. MENNINGER:  Objection.  Beyond the scope, your

2     Honor.

3              THE COURT:  Sustained.

4     Q.  Who was present in the room for interviews with Jane?

5     A.  Her attorneys and Assistant United States Attorneys,

6     myself, my partner.  In the initial interviews, it was a larger

7     group.  Later, in later interviews, we condensed it down to

8     myself and another AUSA.

9     Q.  And in your more recent interviews with Jane, who was in

10    the room?

11             MS. MENNINGER:  Objection, your Honor.  Beyond the

12    scope.  I didn't ask about recent ones.

13             THE COURT:  Sustained.

14    Q.  I think you already addressed this a little bit on direct,

15    but just to be clear, are the reports that were read into the

16    record just now verbatim?

17    A.  No.

18    Q.  Are they transcripts?

19    A.  No.

20    Q.  What are they?

21    A.  They're a summary of the interview with Jane.

22    Q.  Did you ever ask Jane to review your reports to confirm

23    they were accurate?

24    A.  No.

25    Q.  To your knowledge, was Jane ever shown those reports before

LCHCmax3                        Young – cross

1    she testified in court during this trial?

2    A.   No, she was not.

3             MS. COMEY:   Your Honor, may I have a moment?

4             THE COURT:   You may.

5             MS. COMEY:   Your Honor, may I confer with defense

6    counsel?

7             THE COURT:   You may.

8             MS. COMEY:   Your Honor, I think we need to approach.

9             THE COURT:   Okay.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LCHCmax3                          Young - cross

1            (At the sidebar)

2            MS. COMEY:  Your Honor, I'm transitioning entirely

3    away from where we were at the prior sidebar.  I was about to

4    switch to eliciting some prior consistent statements of Jane's.

5    I do believe the door has been opened for that, but I

6    understand defense counsel would object as beyond the scope.

7    But for efficiency purposes, I was going to ask her now while

8    she's on the stand about these prior consistent statements.

9            MS. MENNINGER:  I mean, your Honor, opening the door

10   to prior consistent statements in this manner will then, on

11   recross, I think open the door to any number of other prior

12   inconsistent statements that your Honor just ruled out, and we

13   had to go through an entire process to get in the very few

14   prior inconsistent statements we did.  The government hasn't

15   even told us now which prior consistent statement that they're

16   offering.

17           THE COURT:  Rebuttal if it's beyond the scope.  So

18   sustained with the opportunity to confer if they want to recall

19   the witness for rebuttal.

20           (Continued on next page)

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

LCHCmax3                        Young - redirect

1              (In open court)

2              MS. COMEY:  No further questions, your Honor.

3              MS. MENNINGER:  Briefly, your Honor.

4              THE COURT:  Thank you.

5    REDIRECT EXAMINATION

6    BY MS. MENNINGER:

7    Q.  You used these interviews of Jane in the grand jury;

8    correct?

9    A.  Not all of them.  The interviews prior to the grand jury.

10   Q.  Selective ones; right?

11   A.  I'm not sure what you're --

12   Q.  You chose which of these statements of Jane to present to

13   the grand jury; correct?

14             MS. COMEY:  Objection, your Honor.

15             THE COURT:  Sustained.

16   Q.  You were just asked on cross examination whether Jane had

17   an opportunity to review these notes before she testified;

18   correct?

19   A.  Yes.

20   Q.  You could have shown her the notes before she testified;

21   right?

22   A.  That's not our practice.  We don't -- we don't show

23   witnesses notes taken by law enforcement.

24   Q.  You couldn't have done it?

25   A.  It's not ethical.

LCHCmax3                    Young - redirect

1    Q.  You chose not to review her prior reports with her;

2    correct?

3    A.  Again, we don't -- we don't do that.  Her memory is her

4    memory and we take the best notes we can, but we don't compare

5    our notes with her.  That's not appropriate.

6    Q.  You chose not to record the interviews?

7    A.  No, we don't record.

8    Q.  The FBI protocol provides for you to record interviews;

9    correct?

10   A.  No, it doesn't.

11   Q.  The FBI protocol provides for custodial situations to be

12   recorded; correct?

13   A.  Yes, that's correct.

14   Q.  And makes it optional for other situations; correct?

15   A.  We don't -- we don't record witness interviews.

16   Q.  I'm asking you about FBI protocol.

17   A.  Yes, we record individuals who are in custody, but we don't

18   record victim witness interviews unless they're a minor.

19   Q.  It's not an option?

20   A.  It's not something we do.  It's not our practice.

21   Q.  Is it an option under the FBI protocols or not?

22            MS. COMEY:  Objection, your Honor.

23            THE COURT:  Sustained.

24   Q.  Are you familiar with the Department of Justice obtaining

25   evidence protocols?

LCHCmax3                         Young - redirect

 1              MS. COMEY:  Your Honor, I'm going to object.  It's

 2     beyond the scope.

 3              THE COURT:  Overruled.  I just want you to use words

 4     to be specific about what you're referring to.

 5              MS. MENNINGER:  I have a document that we have marked

 6     for identification as AY-1.  I can show it to the government.

 7              THE COURT:  Please.

 8     Q.  Are you familiar with the Department of Justice protocols

 9     on electronic recording of statements?

10              MS. COMEY:  Your Honor, I'm going to object.  Beyond

11     the scope.  And I'd want to be heard if there is going to be

12     further questions.

13              (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

LCHCmax3                          Young - redirect

1              (At the sidebar)

2              MS. COMEY:  Your Honor, this is not an FBI protocol.

3      I think all of the predicate questions leading up to this

4      document was about FBI protocols.  This is a Department of

5      Justice protocol that references the United States Marshal

6      Service.  So I would object to further questioning or reading

7      from this.

8              MS. MENNINGER:  It talks about the policy applicable

9      to FBI agents in the very first sentence.

10             MR. EVERDELL:  Your Honor, this is from the Justice --

11             THE COURT:  Just a second.

12             MR. EVERDELL:  I'm sorry, your Honor.

13             MS. COMEY:  Your Honor, I would also note that I

14     believe I have walked away from opening the door on

15     interrogating the methods used to conduct --

16             THE COURT:  You asked if it was recorded.  I mean --

17             MS. COMEY:  That is true, your Honor.

18             THE COURT:  I think it's the only reason it is within

19     the scope.

20             MS. COMEY:  Your Honor, I did not ask if it was

21     recorded.  I believe Ms. Menninger asked if it was.  I asked if

22     it was a transcript.

23             THE COURT:  Let me check.  The question on cross was,

24     are they transcripts, are they verbatim.  Not about recording.

25             MS. MENNINGER:  Right.  But the recording would give

LCHCmax3                        Young - redirect

1    us a transcript.

2              MS. COMEY:  Not necessarily, your Honor.  We're not

3    being recorded right now and we're getting a transcript.

4              THE COURT:  I'm going to sustain.  Beyond the scope.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LCHCmax3                    Young - redirect

1              (In open court)
2       Q.  Are you aware of any witnesses in this case who were
3       recorded during their interviews?
4              MS. COMEY:  Objection, your Honor.
5              THE COURT:  Sustained.
6              MS. MENNINGER:  No further questions, thank you.
7              MS. COMEY:  Nothing, your Honor.
8              THE COURT:  Agent Young, you may step down.  You are
9       excused.  Thank you.
10              (Witness excused)
11              Mr. Pagliuca, defense may call its next witness.
12              MR. PAGLIUCA:  Thank you, your Honor.  Our next
13       witness is Dr. Eva Dubin.
14              THE COURT:  Eva Dubin may come forward.
15       EVA ADNERSSON DUBIN,
16          called as a witness by the Defendant,
17          having been duly sworn, testified as follows:
18              Please be seated.  Once you're seated, please remove
19       your mask.  And if you could speak directly into the microphone
20       and state and spell your name for the record, please.
21              THE WITNESS:  My name is Eva Andersson.  I also go by
22       Eva Andersson Dubin.
23              THE COURT:  Could you spell your name, please.
24              THE WITNESS:  E-v-a  A-n-d-e-r-s-s-o-n.
25              THE COURT:  And Dubin is spelled D-u-b-i-n?

1           THE WITNESS:  Right.

2           THE COURT:  You may inquire, Mr. Pagliuca.

3           MR. PAGLIUCA:  Thank you, your Honor.

4    DIRECT EXAMINATION

5    BY MR. PAGLIUCA:

6    Q.  Good morning.  Is it Dr. Dubin?

7    A.  Yes.

8    Q.  Dr. Dubin, where do you live, not the address, but just

9    generally.

10   A.  I live in New York City.

11   Q.  Thank you.  And how old are you, Dr. Dubin?

12   A.  I'm 60.

13   Q.  And I take it you are married by your description of your

14   last name?

15   A.  Yes.

16   Q.  And what is your husband's name?

17   A.  Glenn Dubin.

18   Q.  How long have you been married to Glenn Dubin?

19   A.  28 years.

20   Q.  And do you and Mr. Dubin have any children?

21   A.  Yes, we do.

22   Q.  How many children do you have?

23   A.  We have three children.

24   Q.  What are the ages of your children, starting with the

25   oldest?

LCHCmax3                    Dubin - direct

1    A.  27, 25, and 20.  They are all about to be 21, 26, and 28.

2    Q.  I see.  They're about to have their next birthdays?

3    A.  Correct.

4    Q.  It took a second to process that.  I'm not going to ask you

5    their names, but what are their genders, starting with the 25,

6    almost going to be 28?

7    A.  Female.

8    Q.  I'm sorry.  27, almost going to be 28.  Female.  25, almost

9    going to be 26?

10   A.  Male.

11   Q.  And 20, almost going to be 21?

12   A.  Female.

13   Q.  So two girls and a boy?

14   A.  Right.

15   Q.  What does Mr. Dubin do for employment?

16   A.  He is selfemployed.

17   Q.  And is he in the financial industry?

18   A.  Correct.

19   Q.  And are you employed as a medical doctor?

20   A.  I am not.

21   Q.  Were you employed as a medical doctor?

22   A.  I was.

23   Q.  And when you were employed as a medical doctor, what,

24   generally, did you do?

25   A.  I was an internist.

LCHCmax3                         Dubin - direct

1    Q.  And were you or are you licensed to practice medicine in

2    the State of New York?

3    A.  I am.

4    Q.  Just briefly, where did you attend medical school?

5    A.  I attended medical school at the Karolinska Institute in

6    Stockholm for three and a half years, and then UCLA medical

7    school.

8    Q.  And did you graduate from UCLA medical school?

9    A.  Yes, I did.

10   Q.  Did you complete a residency for internal medicine?

11   A.  Yes, I did.

12   Q.  And where did you complete your residency for internal

13   medicine?

14   A.  In Lennox Hill Hospital.

15   Q.  Here in New York?

16   A.  Yes.

17   Q.  I want to ask you some questions about a man named Jeffrey

18   Epstein.  Did you know Mr. Epstein?

19   A.  Yes, I did.

20   Q.  And how did you know Mr. Epstein?

21   A.  We dated off and on from the start of 1983.

22   Q.  So 1983 until approximately when did you date Mr. Epstein

23   off and on?

24   A.  Approximately 1990, 1991.

25   Q.  Okay.  And after you stopped dating Mr. Epstein in

LCHCmax3                     Dubin - direct

1    approximately 1990 or 1991, did you and Mr. Epstein remain

2    friends?

3    A.  Yes, we did.

4    Q.  And after you stopped dating Mr. Epstein, did you have

5    regular contact with Mr. Epstein on a friend basis?

6    A.  Yes, we did.

7    Q.  Both when you were dating Mr. Epstein and after you were

8    dating Mr. Epstein, did you travel on airplanes, either owned

9    or controlled by Mr. Epstein?

10   A.  Yes, I did.

11   Q.  Did you sometimes travel with Mr. Epstein himself?

12   A.  Yes, and my family.

13   Q.  And did you sometimes travel without Mr. Epstein on the

14   plane, but with other people?

15   A.  I cannot recall if I traveled without Mr. Epstein on the

16   flight.

17   Q.  When you traveled with Mr. Epstein, do you recall traveling

18   with other adults, as well?

19   A.  There were other adults, as well.  I don't recall --

20   Q.  Sure.  And I'm not asking for names.  I'm just asking

21   generally, do you recall traveling with Mr. Epstein on his

22   planes with other adults?

23   A.  Yes, I did.

24   Q.  And I think you said that sometimes you and your family

25   would travel with Mr. Epstein on Mr. Epstein's planes; is that

LCHCmax3                         Dubin - direct

1   right?

2   A.  That's correct.

3   Q.  I take it traveling and being around Mr. Epstein after you

4   stopped dating him -- let me back up.

5            When did you and Mr. Dubin get married?

6   A.  We got married at 1994 on my birthday.

7   Q.  And after 1994, did you and Mr. Dubin continue to be

8   friendly with Mr. Epstein and travel with Mr. Epstein?

9   A.  Yes.

10  Q.  After you had children with Mr. Dubin, did Mr. Epstein get

11  to know your children?

12  A.  Yes, he did.

13  Q.  And were you and Mr. Dubin comfortable with the

14  relationship between Mr. Epstein and your children?

15  A.  Yes, we were.

16  Q.  Did it appear to you that Mr. Epstein was fond of your

17  children?

18  A.  Yes, he was.

19  Q.  And did it appear to you that your children were fond of

20  Mr. Epstein?

21  A.  Yes, they were.

22  Q.  Would you describe the relationship between your children

23  and Mr. Epstein as an uncle-like relationship?

24  A.  I would.

25  Q.  Did they have a nickname for Mr. Epstein?

LCHCmax3                         Dubin – direct

1   A.   Yes.   They called him Uncle F.

2   Q.   Uncle F, as in Frank, but short for Jeff; is that correct?

3   A.   Yes.

4   Q.   During the time that you dated Mr. Epstein, so '83 through

5   '91 I think roughly is what you said, did you observe any

6   inappropriate conduct between Mr. Epstein and any teenage

7   females?

8                MS. MOE:   Objection.

9                MR. PAGLIUCA:   What's the basis for the objection,

10  your Honor?

11               THE COURT:   Just a minute.   Grounds.

12               MS. MOE:   Your Honor, may we approach?

13               THE COURT:   You may.

14               (Continued on next page)

LCHCmax3                          Dubin - direct

1           (At the sidebar)

2           MS. MOE:  Thank you.  Your Honor, this is an issue I

3    believe we raised in advance of trial about the relevance of

4    asking witnesses about uncharged conduct and whether the

5    defendant or Epstein committed crimes in other instances that

6    are not charged.  I think the foundation here is about the

7    entirety of a very broad relationship between, I think, the

8    1980s and the present, and the question is whether, over

9    several decades, she was aware of any kind of inappropriate

10   conduct with other people.  It's extraordinarily broad.  And as

11   we briefed in advance of trial, there is no relevance, it's

12   inappropriate to suggest that there are uncharged conduct on

13   other occasions is probative of what happened with the

14   particular individuals at issue in this case.  So we think this

15   line of questioning is inappropriate.

16           I would also note, your Honor, as we briefed in

17   advance of this witness's testimony, we don't believe there is

18   a foundation to suggest that this person was in the room with

19   Jane.  We think our notes on this are clear, that Jane has

20   expressly said that this person was not involved in sexualized

21   massages.  So we think that questions that are designed to

22   impeach and the misimpression that defense counsel has created

23   are inappropriate.

24           And for those reasons, we would object.

25           THE COURT:  So the specific objection is to other than

LCHCmax3                        Dubin - direct

1     what I allowed in overruling your motion to preclude is

2     timeframed.  So you want the timeframe narrowed to the window

3     in which the witness testified that there was sexualized

4     massages with --

5              MS. MOE:  Yes, your Honor, and limited to particular

6     individuals who are at issue in this case.  It's not before the

7     jury whether Maxwell and Epstein committed misconduct with

8     other people, the question is whether she has relevant

9     knowledge about misconduct with the people who are at issue in

10    this case.  The absence of misconduct with other people who are

11    not at issue in this case is not relevant.

12             THE COURT:  I think you should narrow the timeframe in

13    which the witness testifies.

14             MR. PAGLIUCA:  I can do that, your Honor.

15             Just so the record is clear, I don't believe this was

16    litigated at all pretrial.  This witness was not questioned

17    about Ms. Maxwell or not being there, which were litigated

18    pretrial.  This really is foundational to the next question,

19    which is going to be after she stopped dating him, which is

20    then into the relevant timeframe, did she see any of this

21    activity, any of which she considered to be inappropriate

22    activity.  So that's actually the next question.  So I'm moving

23    out of this into that.  But it seems to me to be logically

24    relevant, your Honor, frankly because if she had seen any of

25    that activity, I doubt she would have been dating him or would

LCHCmax3                          Dubin – direct

1    be on his planes, et cetera.  So it is foundational for her

2    knowledge about Mr. Epstein, about why she was with Mr. Epstein

3    during the relevant timeframe, why her children are with

4    Mr. Epstein during the relevant timeframe.

5             THE COURT:  You've already established she was

6    comfortable with the children.  So I think you have -- you'll

7    move on.

8             MR. PAGLIUCA:  Yes, I am.

9             THE COURT:  I'll sustain on the current question and

10   then move on.

11            (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2              THE COURT:  Go ahead, Mr. Pagliuca.

3              MR. PAGLIUCA:  Thank you, your Honor.

4    BY MR. PAGLIUCA:

5    Q.  Dr. Dubin, so after you stopped dating Mr. Epstein, and

6    let's focus on roughly 1994 through, let's say, 2004, did you

7    observe any inappropriate conduct between Mr. Epstein and any

8    teenage females?

9    A.  I did not.

10             MR. PAGLIUCA:  I'd like to show you some pictures that

11   have been admitted under seal.  So we just need to show those

12   to the witness, the Court, and I will tell the government which

13   exhibits those are.  I'm happy to show them to the government.

14             MS. MOE:  Thank you, your Honor.  I have those.

15             THE COURT:  Can you give the trial mark and yes, for

16   the Court and the witness.

17             MR. PAGLIUCA:  Yes, your Honor.  So the first exhibit

18   is Government Exhibit 241, which I believe has been admitted

19   under seal previously.

20             MS. MOE:  That's correct, your Honor.

21             THE COURT:  Okay.  Thank you.

22             MR. PAGLIUCA:  So this will be for the Court and the

23   witness.  And do we have that up, your Honor?

24             THE COURT:  We do.

25             MR. PAGLIUCA:  If I could ask Ms. Lundberg to expand

1    Government Exhibit 241, the photograph that is closest to the

2    foreground in the picture.

3    BY MR. PAGLIUCA:

4    Q.  Do you see that, Dr. Dubin?

5    A.  I do.

6    Q.  Do you recognize anyone in that expanded part of exhibit

7    241?

8            MS. MOE:   I'm sorry, your Honor, the question is

9    without saying that person's name.  I just wanted to make sure

10   that was clear.

11   Q.  The question was very simple.  Do you recognize anyone?

12   A.  I do.

13   Q.  Okay.  Do you recognize one or two people in that

14   photograph?

15   A.  Two people.

16   Q.  And without saying -- well, is one of the people

17   Mr. Epstein?

18   A.  That's correct.

19   Q.  And without saying the name of the other person, is the

20   other person one of your children?

21   A.  Yes.

22   Q.  Okay.  And in terms of the age range, do you recall whether

23   this is your now 27, 25, or 20?

24   A.  The 20.

25   Q.  I'm assuming you were aware that Mr. Epstein had this

LCHCmax3                    Dubin - direct

1    picture?

2    A.  I have never seen this picture before.

3           MR. PAGLIUCA:  If we could now show the witness

4    Government Exhibit 248, please.  This is just for the witness

5    and the Court.  If we could expand the photograph that's in the

6    center of that bookcase.

7    Q.  Again, Dr. Dubin, do you recognize two people in that

8    photograph?

9    A.  I do.

10   Q.  And is one of those people Mr. Epstein?

11   A.  Correct.

12   Q.  And is one of those people one of your children?

13   A.  Correct.

14   Q.  And is that the same child or a different child that we saw

15   in the other photograph?

16   A.  Different child.

17   Q.  And order age, which child is this?

18   A.  27.

19   Q.  So this is your oldest child in this photograph; is that

20   right?

21   A.  Correct.

22   Q.  And do you have any sense of when this photograph might

23   have been taken?

24   A.  I have never seen this photo before.

25           MR. PAGLIUCA:  Then if we can look at Government

LCHCmax3                          Dubin - direct

1    Exhibit 249, please.  Again, this is under seal and just for

2    the witness.

3    Q.  I don't know if you need that expanded or not, Dr. Dubin,

4    but we can if you need it expanded.

5           THE COURT:  If they can make it a little larger.

6           MR. PAGLIUCA:  Certainly, your Honor.

7    Q.  Do you recognize that person, without saying the name,

8    Dr. Dubin?

9    A.  I do not.

10          MR. PAGLIUCA:  Thank you.  We can take that down.

11          THE WITNESS:  Possible to have some water?

12          THE COURT:  Yes.  I'm sorry.

13          MR. PAGLIUCA:  May I approach, your Honor?

14          MS. MOE:  I can do it.

15          THE COURT:  Thank you.

16          THE WITNESS:  Thank you.

17          MR. PAGLIUCA:  Let me know when you're ready,

18   Dr. Dubin.

19          THE WITNESS:  I'm ready.

20          MR. PAGLIUCA:  Thank you.

21   BY MR. PAGLIUCA:

22   Q.  Dr. Dubin, earlier we discussed traveling on Mr. Epstein's

23   airplanes.  I want to talk about some, what have been admitted

24   as flight records with you.

25          First of all, prior to coming to court today, have you

LCHCmax3                    Dubin - direct

1    ever seen any documents that are supposed to be flight records

2    of Mr. Epstein's plane flights?

3    A.  I have, yes.

4    Q.  And do you recall seeing those records in media

5    publications?

6    A.  Yes.

7    Q.  And when you saw those records in the media publications,

8    did you believe whatever you saw in the media to be accurate or

9    inaccurate?

10             MS. MOE:  Objection, your Honor.  Can we be more

11   specific?

12             THE COURT:  Please.

13   Q.  Did you read whatever you saw in the media that purported

14   to be the flight records?

15             MS. MOE:  Same objection, your Honor.

16             MR. PAGLIUCA:  I'm not sure what the objection is,

17   your Honor.

18             THE COURT:  The flight records you're referring to,

19   what exactly, timeframe, quantity?

20             MR. PAGLIUCA:  I think it's --

21             THE COURT:  If you could add specificity, then we'll

22   see from there.

23   BY MR. PAGLIUCA:

24   Q.  Do you recall what you saw in the media when you looked at

25   what looked like flight records in the media?

LCHCmax3                        Dubin - direct

```
1    A.  I don't really recall exactly what I saw.  I saw my name
2    and flights.
3    Q.  Do you recall when you saw these in the media?
4    A.  I can't recall.
5    Q.  When you read what you believed to be flight records in the
6    media, did anything strike you as being inaccurate in what was
7    being published from your memory?
8             MS. MOE:  Same objection, your Honor.
9             THE COURT:  I'll permit response to this question.  So
10   when you read what you believed to be flight records in the
11   media, did anything strike you as being inaccurate?
12   A.  I saw that the media had copied the flight book
13   incorrectly.
14   Q.  Okay.  What did you believe was incorrect in what the media
15   had copied incorrectly?
16            MS. MOE:  Your Honor, we'd object.  There is evidence
17   in the record that he can ask the witness about.  I'm not sure
18   what we're talking about even at this point.
19            MR. PAGLIUCA:  I can discuss this at sidebar if you
20   want, your Honor.  I think it's relevant.
21            THE COURT:  We'll give the jury their morning break
22   and we'll discuss it.
23            Members of the jury, we'll take a 15-minute break.
24            (Continued on next page)
25
```

LCHCmax3                          Dubin - direct

1           (Jury not present)

2           THE COURT:  You may step down, Dr. Dubin.

3           (Witness excused)

4           Go ahead, Ms. Moe.

5           MS. MOE:  Yes, your Honor.  Thank you.  So as the

6    Court is aware, there are flight records in evidence.  We would

7    certainly have no objection to Mr. Pagliuca asking this witness

8    whether she recognizes them, whether they're accurate, the

9    like, that is entirely appropriate, but I think it's very

10   confusing to ask about what her memory is of what she saw in

11   the media and whether that's accurate.  I think there is no way

12   for the jury to tell what witness we're talking about, whether

13   it's the items in evidence -- I think the proper way to do this

14   is to show the witness the flight records and ask whether

15   they're accurate or not.  If we're talking about things that

16   are not in evidence and whether things that are not in evidence

17   are accurate, I don't see the relevance of it, and that, of

18   course, wouldn't be appropriate.

19           THE COURT:  What is the relevance, Mr. Pagliuca?

20           MR. PAGLIUCA:  I think the relevance is patent, your

21   Honor.

22           THE COURT:  Perhaps, but not to me.

23           MR. PAGLIUCA:  Here's why.  These flight records were,

24   in some fashion, leaked to the media.

25           THE COURT:  When you say these flight records, you

LCHCmax3                        Dubin - direct

1    mean the flight records that are in evidence?

2            MS. MOE:  That's not correct, your Honor.  The

3    entirety of the flight records in evidence are not public.

4    That's the exact reason why portions of them are under seal and

5    redacted.  So we're not talking about the same flight records.

6            MR. PAGLIUCA:  Well, I disagree, but the point is, we

7    had a live witness who reviewed what purported to be in the

8    media her travel with Mr. Epstein.  That media exposure has

9    influenced other people and I believe, frankly, influenced

10   other people, relative to my client, putting my client on

11   flights saying my client did things.  It is the exposure to

12   this information.  This witness, I believe, will testify, and

13   has so indicated to the government, that what she viewed was

14   inaccurate information.  That's the import of it.

15           THE COURT:  So the theory is media defined broadly,

16   could be a blog, a tweet, contains any inaccurate information,

17   it is relevant to ask this witness as to the accuracy of that?

18           MR. PAGLIUCA:  It is inaccurate as to her personally.

19           THE COURT:  I understand.  But let's say you pull from

20   some blog post, something perhaps inaccurate; relevant to ask

21   this witness?

22           MR. PAGLIUCA:  About her and flight records.

23           THE COURT:  Whatever it is from whatever source, there

24   is flight records that show she went to the moon, you should

25   ask her about it?

1           MR. PAGLIUCA:  No, I'm not asking her about flight

2    records going to the moon.

3           THE COURT:  So it does matter what you're asking her

4    about.

5           MR. PAGLIUCA:  Of course.

6           THE COURT:  So I'll sustain at least on that ground,

7    401, 403.

8           MR. PAGLIUCA:  Okay.  I understand.

9           THE COURT:  We can take our break.

10          (Recess)

11          THE COURT:  So I note, I did, at 11:54, Ms. Menninger,

12   receive an application.  I think one of the things I asked for

13   was a proposed order, which I don't see.

14          When would the government like to respond?

15          MS. COMEY:  Your Honor, Mr. Rohrbach is currently

16   writing our response.  I suspect we can get it to your Honor by

17   the beginning of the lunch break.

18          THE COURT:  Thank you.  And Mr. Pagliuca, I just want

19   to make sure, we're moving on from the media?

20          MR. PAGLIUCA:  Yes.

21          THE COURT:  All right.

22          MS. MOE:  Very briefly, your Honor, to flag some

23   logistics that Mr. Pagliuca and I worked out.  My understanding

24   is that he intends to publish a redacted version flight

25   records --

LCHCmax3                    Dubin - direct

1           THE COURT:  Can we have the witness wait outside for a

2     moment.  I apologize.  Thank you.  Go ahead.

3           MS. MOE:  To flag in advance, I think Mr. Pagliuca

4     intends to offer a redacted version of a government exhibit

5     that we've agreed upon but is not yet in evidence, and so I

6     anticipate that he'll offer a redacted version of the

7     government exhibit, which we prepared and we won't object.  And

8     that will be the exhibit that is published.

9           (Continued on next page)

1            THE COURT:  Okay.

2            MR. PAGLIUCA:  So the Court knows, Exhibit 662 is the

3    flight logs.  We're going to offer 662-R.  I will be -- I would

4    be publishing 662-R to everyone when I refer to 662-R.  There

5    are two instances where I will need to refer to 662, and I will

6    only display those to the witness and the Court.

7            MS. COMEY:  And just to clarify, your Honor, when

8    Mr. Rodgers testified, we offered a version of 662-R that had

9    many more redactions.  And after conferral with the defense,

10   this new 662-R is a much more narrowly tailored redacted

11   version; so it will replace the 662-R that was previously

12   offered.

13           THE COURT:  Okay.

14           Perhaps a different mark for clarity.

15           MR. PAGLIUCA:  I'm happy to call it and we can remark

16   it 662-RR.

17           MS. COMEY:  That's fine, your Honor.

18           THE COURT:  Great.  Thank you.

19           Okay.  And just to be clear, Mr. Pagliuca, when those

20   records are introduced, I'm just trying to avoid the sidebars,

21   is it then going to be about any comparison with what she saw

22   in the media?

23           MR. PAGLIUCA:  No.

24           THE COURT:  Okay.

25           MR. PAGLIUCA:  I didn't think you would let me do

 1    that, so --

 2              THE COURT:  That doesn't always stop you.  I wanted to

 3    make sure we were on the same page.

 4              MR. PAGLIUCA:  Like any good lawyer, your Honor --

 5              THE COURT:  There's no doubt about the zealousness of

 6    anyone in this room.

 7              Are we ready?

 8              MR. PAGLIUCA:  I am ready to resume.

 9              MS. MOE:  Yes, your Honor.  Thank you.

10              THE COURT:  Now we can get the witness and bring in

11    the jury.  Thank you, Ms. Williams.

12              (Jury present)

13              THE COURT:  All right.  Mr. Pagliuca, you may continue

14    with your direct examination of Dr. Dubin.

15              Dr. Dubin, I remind you, you are under oath.

16              You may inquire.

17              MR. PAGLIUCA:  Thank you, your Honor.

18              At this point, based on the discussion with the

19    government, I would offer Government Exhibit 662-RR at this

20    point, your Honor.

21              MS. MOE:  No objection.

22              THE COURT:  Thank you.  662-RR is admitted.

23              (Defendant's Exhibit 662-RR received in evidence)

24              MR. PAGLIUCA:  And for the record, your Honor, as we

25    discussed, 662-RR is the redacted version of 662, which are the

LCHVMAX4                    Dubin - direct

1    Dave Rodgers flight records.

2                THE COURT:  Thank you.

3                MR. PAGLIUCA:  Thank you, your Honor.

4    BY MR. PAGLIUCA:

5    Q.  Dr. Dubin, I'd like to just go through a few examples of

6    flight records.  And I understand these are not your records,

7    but they've been admitted in evidence.  I want to ask you some

8    questions.  I'm not going to go through all of the entries,

9    just a few examples, okay?

10                MR. PAGLIUCA:  If we can show Dr. Dubin, please,

11   GX-662, now marked RR, at page 30, please.

12   Q.  Do you have that on your screen, Dr. Dubin?

13                THE COURT:  It's up and you'll need to enlarge.

14                MR. PAGLIUCA:  I will, your Honor.

15                If we can blow up the entry with the 26 on the side.

16   It's going to be flight number 587, which is in the middle of

17   the page.

18                Has that been expanded, your Honor?

19                THE COURT:  It has.

20                MR. PAGLIUCA:  And this can be displayed for everyone.

21                THE COURT:  Oh, yes, yes.  Right.

22                MR. PAGLIUCA:  This is RR.

23                THE COURT:  I don't see a mark on it, but can we just

24   get a confirmation that it's RR?

25                MR. PAGLIUCA:  We have the first page that we can

1    display for you, your Honor.  And I've shown this to the

2    government.

3             THE COURT:  It says R, but --

4             MR. PAGLIUCA:  We added an R during the break.

5             THE COURT:  Okay.  All right.  Yes.

6             MR. PAGLIUCA:  Might I inquire, your Honor?

7             THE COURT:  You may.  And yes, this may be published.

8             MR. PAGLIUCA:  Thank you, your Honor.

9             And now if we can blow up -- this is RR.  We need to

10   go to page 30, please.  And the 26 in the middle, those two.

11   BY MR. PAGLIUCA:

12   Q.  Do you see those entries, Dr. Dubin?

13   A.  Yes, I do.

14   Q.  Now, this is a long time ago, and I expect that you don't

15   remember this flight; is that correct?

16   A.  What year is this flight?

17   Q.  1994.

18   A.  I do not remember the flight, no.

19   Q.  Okay, then that's fine.

20            I just wanted to ask you some questions about some of

21   the names that are listed, and this is the remarks section.

22            When we're looking to the right, there is JE.  Do you

23   know who that refers to?

24   A.  I assume it's Jeffrey Epstein.

25   Q.  Okay.  And then there is Eva Andersson, A-N-D-E-R-S-S-O-N.

LCHVMAX4                        Dubin - direct

1    That would be you?

2    A.  Correct.

3    Q.  And then someone named Frances Jardine.

4           Do you recall Frances Jardine?

5    A.  I recall Frances.  I did not know that her last name was

6    Jardine.

7    Q.  Do you recall that that was someone that Mr. Epstein was

8    dating in 1994?

9    A.  Yes.

10   Q.  Okay.  It appears from this flight record that you and

11   Mr. Epstein and Frances Jardine went to DCA -- which I will

12   represent to you is Washington, D.C. airport -- and then

13   returned the same day.  And I guess the question is do you

14   recall making that trip?

15           MS. MOE:  Your Honor, I'd object to counsel

16   testifying.

17           MR. PAGLIUCA:  I'm just orienting the witness, your

18   Honor.

19           THE COURT:  All right.  I'll allow it, but then let's

20   get to direct questions.

21           MR. PAGLIUCA:  Yes, your Honor.

22   Q.  Do you recall making this trip?

23   A.  I do not.

24   Q.  Okay.

25           MR. PAGLIUCA:  If we can go down to the second to the

LCHVMAX4                        Dubin - direct

1   last entry.

2   Q.  And again, I'm directing your attention to the people

3   there.  Do you recognize this as yourself, Mr. Epstein, and

4   again, Frances Jardine?

5   A.  I do.

6   Q.  Okay.  And I'm assuming, again -- and this is in 1994 --

7   that you don't have a specific memory of this flight; is that

8   right?

9   A.  I do not remember this flight.

10  Q.  Okay.

11          MR. PAGLIUCA:  If we can now turn to page 39 of

12  662-RR.  The entry -- fourth and fifth entries from the top.

13  This would be November '95, November 21st, November 26th.

14  Q.  Can you see that, Dr. Dubin?

15  A.  Yes, I can.

16  Q.  Okay.  In the remarks column, the exhibit reflects JE, AS.

17          Do you know who "AS" might have been?

18          MS. MOE:  Objection.

19  A.  I don't.

20          THE COURT:  Overruled.  Overruled.

21          You may answer.  Do you know?

22          THE WITNESS:  I don't know who "AS" is.

23  Q.  Okay.  Then there is Eva.  That would be you; is that

24  correct?

25  A.  That's correct.

LCHVMAX4                       Dubin - direct

1    Q.  Glen, that would be Glen Dubin?

2    A.  Yes.

3    Q.  And then baby.  Did you have a child at that point in time?

4    A.  What date is this?

5    Q.  This is November 21st, 1995.

6    A.  Yes, I did.

7    Q.  Okay.  And then there is an entry, one female.  Did you

8    bring a nanny with you after you had a child on the plane?

9    A.  Most likely, yes.

10   Q.  Okay.  And this record reflects a flight from Teterboro,

11   which is in New Jersey, to Palm Beach Island.

12            MS. MOE:  Same objection, your Honor.

13            THE COURT:  I'll sustain now.  Move on.

14            MR. PAGLIUCA:  Understood, your Honor.

15   Q.  Do you recall taking this trip over Thanksgiving with your

16   husband and child to Palm Beach?

17   A.  I don't recall.

18            MS. MOE:  Objection.

19            THE COURT:  I'm sorry.

20            MS. MOE:  Objection to leading.

21            MR. PAGLIUCA:  "Recall" is not leading.

22            THE COURT:  I'll allow it.

23            MR. PAGLIUCA:  Thank you.

24   A.  I don't recall this specific trip, no.

25   Q.  Okay.  Now I'd like to turn to GX-12, which is under seal

LCHVMAX4                      Dubin - direct

1    and should only be shown to the witness and the Court.

2              THE COURT:  Okay.

3    Q.  Dr. Dubin, do you have GX-12 in front of you?

4              THE COURT:  Just to caution the witness not to read

5    the name on the document; not to say out loud the name on the

6    document.

7    A.  I have the document, yes.

8    Q.  Okay.  And could you just read it to yourself, please, and

9    not read it out loud.

10   A.  Okay.

11   Q.  The exhibit GX-12 has the name of a person.  And again,

12   we're not using the name of the person.  But I want to see if

13   you see the name of the person on GX-12, without saying it?

14   A.  Yes, I do.

15   Q.  Okay.  We are referring to that person as Jane, okay?

16   A.  Okay.

17   Q.  And without saying her name, do you recall meeting the

18   person identified in GX-12 at any point in time?

19   A.  I don't recall ever meeting this person.

20   Q.  Okay.

21             MR. PAGLIUCA:  We can take that down.

22             I'd like to show the witness GX-662, page 44, which is

23   unredacted, so just to the witness and the Court please.

24             THE COURT:  Okay.  Ms. Moe?

25             MS. MOE:  Yes, your Honor.

1          THE COURT:  Thank you.

2     Q.  Do you have that in front of you?

3     A.  I do.

4          MR. PAGLIUCA:  And I'd like to focus on the second and

5     third lines up from the bottom, page 44.  And if you could blow

6     up just for the Court and the witness the second and third

7     lines from the bottom, please.  That starts with seven and an

8     11.

9     Q.  Have you been able to read that, Dr. Dubin?

10    A.  I can't read everything, but I can read some of it.

11    Q.  Okay.  The person that we're referring to as Jane, do you

12    see Jane's name next to the flight entry 916, without saying

13    her name?

14    A.  Yes.

15    Q.  Okay.  And again, you do not -- I'm assuming you do not

16    recall meeting anyone named Jane on this flight; is that

17    correct?

18         MS. MOE:  Objection.  Leading.

19         THE COURT:  Sustained.

20    Q.  Do you recall meeting anyone named Jane on this flight?

21    A.  I don't remember this flight.

22    Q.  Okay.

23    A.  Or anyone on this flight.

24    Q.  Okay.  That's fine.

25         MR. PAGLIUCA:  We can take that down.  And can we put

LCHVMAX4                        Dubin - direct

1   up 662, page 44-R, the same entries, and display those to the

2   jury please, your Honor.

3               THE COURT:  Ms. Moe?

4               MS. MOE:  No objection, your Honor.

5               THE COURT:  All right.  Go ahead.

6               MR. PAGLIUCA:  We need to make sure this is the RR,

7   redacted version, page 44.  And it is.

8   Q.  This is the same document that you were just shown just

9   with a blackout spot there.  Do you see that, Dr. Dubin?

10  A.  Yes.

11  Q.  Okay.  And the flight entry has "Eva" in it?

12  A.  Correct.

13  Q.  Do you recognize any of the other individuals listed in the

14  remarks section?

15  A.  The first one or the second one?

16  Q.  Let's start with the first one and then move on to the

17  second one.

18  A.  Do I recognize their names?

19  Q.  Yes.

20  A.  I recognize Sophie.

21  Q.  Who do you recognize Sophie as being?

22  A.  Sophie Biddle was someone that worked for Jeffrey.

23  Q.  Okay.  Do you know what she did?

24  A.  I believe she was a massage therapist.

25  Q.  Okay.  And do you recognize any other names on those

LCHVMAX4                    Dubin - direct

1   entries?

2   A.  I've heard the name Jeff Schantz, but I can't remember who

3   he is.

4   Q.  Okay.  Anyone else in that entry, which is 915?

5   A.  I can't read the name after Jeff Schantz.

6   Q.  Neither can I.

7           And then below that, do you see any names that you

8   recognize?

9   A.  I see my husband's name, yes.

10  Q.  Okay.  And then the next entry, flight 916, do you see any

11  names that you recognize in that entry?

12  A.  I see my name, I see JE, I see Sophie.  I can't read what

13  comes after Sophie.

14  Q.  That's fine.

15          MR. PAGLIUCA:  We can take that down now.

16          I'd like to next show the witness 662-RR, page 49.

17          THE COURT:  And if it's 662-RR, it may be published.

18          MR. PAGLIUCA:  Thank you, your Honor.

19          And if we can go to the entries that are the fifth and

20  fourth entries from the bottom.

21  Q.  I want to focus on someone named -- well, do you recognize

22  the name Celina Midelfart?

23  A.  I do.

24  Q.  Do you recognize that as someone that was dating

25  Mr. Epstein in the '97 time frame?

1          MS. MOE:  Objection.  Leading.

2          THE COURT:  Sustained.

3   Q.  Do you know Celina Midelfart?

4   A.  I know who she is, yes.

5   Q.  How do you know who she is?

6   A.  She was a girlfriend of Jeffrey Epstein's.

7   Q.  Okay.  This flight appears to be on August 20th and 23rd,

8   1997.  Do you have any memory of being on this flight?

9   A.  I don't remember this flight at all.

10  Q.  Okay.

11         MR. PAGLIUCA:  Next I'd like to turn to 662

12  unredacted.  So this should be just for the witness and the

13  Court, please.  Page 55, third line up from the bottom.  If we

14  can expand that, please.

15  Q.  Do you have that in front of you, Dr. Dubin?

16  A.  It's only one entry, right?

17  Q.  Yes, just one entry.  Thank you.

18  A.  Yes.

19  Q.  Okay.  And again, I want to focus on the names in that

20  entry, which is from 1998.  And it looks like it's May 3rd,

21  1998.  And without saying the name that we're not saying, do

22  you see that name in that entry?

23  A.  Yes, I do.

24  Q.  Okay.  And are there other names in that entry that you

25  recognize, without saying who they are at this point?

LCHVMAX4                        Dubin - direct

1   A.  Yes.

2   Q.  Okay.  Is one of your children's names on this flight list?

3   A.  Yes.

4   Q.  And that's fine.

5       And then do you see that you and your husband are on

6   this flight as well?

7   A.  Correct.

8   Q.  And then the last entry that I would like to look at, and

9   we can use the redacted version for this, so this will be

10  662-RR, page 114.

11      MR. PAGLIUCA:  And may we publish this, your Honor?

12      THE COURT:  Yes.

13      MR. PAGLIUCA:  I'd like to look at the entry eight

14  lines up from the bottom which begins with a 19.  And expand

15  that, please.

16  Q.  Do you see that entry, Dr. Dubin?

17  A.  I do.

18  Q.  And again, focusing on the remarks section, do you

19  recognize names there?

20  A.  I do.

21  Q.  And are some of your children on that flight, without

22  identifying them by name?

23  A.  Yes, misspelled name.

24  Q.  Sure.  Okay.  This is from TIST to PBI; is that right?

25  A.  I don't know what TIST is.

LCHVMAX4                          Dubin - direct

1    Q.  That was going to be my next question.

2                THE COURT:  Just to make sure I'm right, this is RR;

3    correct?

4                MR. PAGLIUCA:  It is RR, your Honor.

5                THE COURT:  Okay.

6                MR. PAGLIUCA:  We can take that down.

7    Q.  That's all I'm doing with the flight records.  I just have

8    a few more questions, Dr. Dubin.

9                THE COURT:  Go ahead.

10   Q.  Dr. Dubin, during the 1994 to 2004 time frame, were you

11   ever introduced to any other person named Eva who was dating

12   Mr. Epstein?

13   A.  Not that I can recall.

14   Q.  Were you ever introduced to anyone else named Eva who had a

15   close relationship, to your knowledge, with Mr. Epstein?

16   A.  Not that I can recall.

17   Q.  Okay.  And I need to ask a couple of final questions about

18   the person that we identified in Exhibit 12, the person that

19   we're calling Jane.  And I apologize for asking these

20   questions, okay?

21               Have you ever been in a group sexual encounter with

22   the person we are calling Jane?

23   A.  Absolutely not.

24   Q.  Okay.  Have you ever been in a group sexualized massage

25   with Jane?

LCHVMAX4                        Dubin - cross

1    A.  I have not.

2    Q.  Thank you.

3            MR. PAGLIUCA:  That's all I have, your Honor.

4            Thank you.

5            THE COURT:  Okay.  Ms. Moe.

6            MS. MOE:  Thank you, your Honor.

7    CROSS-EXAMINATION

8    BY MS. MOE:

9    Q.  Good afternoon, Dr. Dubin.

10   A.  Good afternoon.

11   Q.  To be clear, your first name is Eva; is that correct?

12   A.  That's correct.

13   Q.  Are you the only person named Eva in the whole wide world?

14   A.  It's a very, very common name in the Scandinavia, northern

15   Europe, and here.

16   Q.  In the course of your life, have you met many, many people

17   named Eva?

18   A.  Many --

19           MR. PAGLIUCA:  Your Honor, I object to the relevance

20   of these questions.

21           THE COURT:  Overruled.

22   A.  Many, many, many.

23   Q.  Do you know the first name of every person Jeffrey Epstein

24   ever met?

25   A.  Absolutely not.

LCHVMAX4                    Dubin - cross

1    Q.  You were asked some questions on direct about your contacts

2    with Jeffrey Epstein, so I want to ask you about some time

3    periods in particular.

4           Focusing on the time frame from 1994 to 2004, how

5    often did you spend time in Jeffrey Epstein's house in Palm

6    Beach?

7    A.  Not that often.  We live in New York City and we would only

8    go to Palm Beach on vacations and occasionally long weekends.

9    Q.  And when you say "not that often," can you explain for the

10   jury what kind of frequency we're talking about?

11   A.  Very hard to say because there's so many years.  But in

12   Palm Beach specifically?

13   Q.  Yes, just focusing on Palm Beach from 1994 to 2004, how

14   often were you in that house in Palm Beach?

15   A.  Maybe four times per year.  It's hard -- I really can't

16   remember.

17   Q.  Did you know what was going on in that house on a

18   day-to-day basis?

19   A.  Absolutely not.

20   Q.  I'm going to ask you just a few questions about what was

21   going on in your life during those years, focusing on the 1990s

22   and, in particular, between 1994 and 2000.

23          In 1994, were you living in Paris?

24   A.  Yes, we were.

25   Q.  And in 1995, your first child was born; is that right?

LCHVMAX4                          Dubin - cross

1    A.   That's correct.

2    Q.   And then your second child was born later in the 1990s?

3    A.   1997.

4    Q.   And so you had a lot going on in the 1990s; is that right?

5    A.   That's correct.

6    Q.   I want to ask you now about your relationship with Jeffrey

7    Epstein and Ghislaine Maxwell.  And in particular, I want to

8    ask you about your observations of the relationship between

9    Ghislaine Maxwell and Jeffrey Epstein.

10           Did you ever have any conversations with Jeffrey

11   Epstein about the nature of his relationship with Ghislaine

12   Maxwell?

13           MR. PAGLIUCA:  Your Honor, I'm going to object to this

14   as being hearsay, calling for a hearsay response.

15           THE COURT:  Just a moment.

16           Sustained.

17   Q.   Dr. Dubin, based on your conversations -- well, I'll

18   withdraw that and rephrase.

19           Did you have occasions in the 1990s to observe the

20   interactions between Ghislaine Maxwell and Jeffrey Epstein?

21           MR. PAGLIUCA:  I'm going to object to this as being

22   vague, time frame, and lacking in foundation.

23           THE COURT:  Foundation, overruled.

24           Time frame, sustained.

25   Q.   Dr. Dubin, focusing on the time frame from 1994 to 2000,

LCHVMAX4                    Dubin - cross

1   during those years, did you have occasion to observe the

2   interactions between Ghislaine Maxwell and Jeffrey Epstein?

3   A.  Yes.  I can't remember specific things, but yes.

4   Q.  In general, based on your observations of their

5   interactions, at the time, was it your understanding that they

6   were in a relationship?

7             MR. PAGLIUCA:  Your Honor, objection.

8             Lack of foundation.

9             THE COURT:  Overruled.  You may answer.

10  A.  It's hard to define, I think, "relationship."  But they

11  were living in the same house.

12  Q.  And did you have an understanding at the time that they had

13  an open relationship?

14            MR. PAGLIUCA:  Objection.  Lack of foundation.

15            THE COURT:  Sustained.

16  Q.  Based on your observations and interactions with Maxwell

17  and Epstein, did you have an understanding during the years

18  we've been talking about that they had an open relationship?

19            MR. PAGLIUCA:  Objection.  Lack of foundation.

20            THE COURT:  I'll take an answer to the question.

21            Do you need to hear it again?

22            THE WITNESS:  Yes, please.

23            THE COURT:  Based on your observations and

24  interactions with Ms. Maxwell and Mr. Epstein, did you have an

25  understanding during the years we've been talking about that

LCHVMAX4                          Dubin - cross

1    they had an open relationship?

2           THE WITNESS:  I can't really say that I knew whether

3    they did or did not.

4    BY MS. MOE:

5    Q.  Based on your interactions with them in the 1990s, it was

6    your understanding at the time that Maxwell was responsible for

7    navigating all of the details of Mr. Epstein's personal life;

8    is that correct?

9           MR. PAGLIUCA:  Object to the lack of foundation, your

10   Honor.  And it's also a compound question.

11          THE COURT:  Sustained.

12   Q.  In the 1990s, what was your understanding of what Maxwell's

13   role was in Epstein's life?

14          MR. PAGLIUCA:  Again, I object to the lack of

15   foundation and the time frame, your Honor.

16          THE COURT:  Sustained.

17   Q.  Focusing on the time period from 1994 and 2000, did you

18   have an understanding of what Maxwell's role was in Epstein's

19   life?

20   A.  I think I do.

21   Q.  What kinds of things did you see Maxwell doing for Jeffrey

22   Epstein between 1994 and 2000?

23   A.  I can't say that I saw what she did, but my understanding

24   was that --

25          MR. PAGLIUCA:  I'm going to object to the rest of

LCHVMAX4                        Dubin - cross

1    this, your Honor, as being lacking in foundation and hearsay.

2                THE COURT:  Sustained.

3    Q.  From your conversations with Ghislaine Maxwell between 1994

4    and 2000, what kinds of things would she tell you about that

5    she did for Jeffrey Epstein?

6                MR. PAGLIUCA:  Your Honor, this is beyond the scope of

7    my direct examination, so I object to this as well.

8                THE COURT:  Sustained.

9    Q.  On direct examination, you were asked some questions about

10   your memories of meeting people.  Do you remember being asked

11   those questions?

12   A.  When were the questions?

13   Q.  My question is do you remember Mr. Pagliuca asking you some

14   questions about whether you remembered meeting certain people?

15   A.  On the flights?

16   Q.  Yes.

17   A.  Yes, I do.

18   Q.  So I want to ask you a few questions about your memory.

19                Dr. Dubin, without getting into any personal medical

20   details, are you having some issues with your memory?

21   A.  Yes, I do.

22   Q.  Again, without getting into details because I don't want to

23   invade your privacy, can you just explain for the jury what you

24   mean by that?

25   A.  It's very hard for me to remember anything far back.  And

LCHVMAX4                      Dubin - cross

1    sometimes I can't even remember things from last month.  And my

2    family notices it and I notice it and it's been an issue.

3    Q.  And is that because you've been treated for particular

4    medical conditions?

5            MR. PAGLIUCA:  Your Honor, I think this is beyond the

6    scope of what needs to be discussed at this point.

7            THE COURT:  Is this the last question?

8            MS. MOE:  Yes, your Honor.

9            THE COURT:  Nothing -- just the question is, is it

10   related to medical issues?

11           MS. MOE:  Yes, your Honor.

12           THE COURT:  I'll allow it.

13   A.  I believe it is.

14           MS. MOE:  Just one moment, your Honor.

15           THE COURT:  Okay.

16           (Counsel conferred)

17           MS. MOE:  Nothing further, your Honor.

18           Thank you.  Thank you, Dr. Dubin.

19           THE COURT:  Mr. Pagliuca.

20           MR. PAGLIUCA:  I have no redirect, your Honor.

21           THE COURT:  Thank you.

22           Dr. Dubin, you may step down.

23           You are excused.  Thank you.

24           THE WITNESS:  Thank you so much.

25           (Witness excused)

LCHVMAX4                          Healy - direct

1          THE COURT:  All right.  Defense may call -- we have

2    about ten minutes before the lunch break.  Defense may call its

3    next witness.

4          MS. MENNINGER:  At this time we call Michelle Healy.

5          THE COURT:  Michelle Healy may come forward.

6     MICHELLE HEALY

7          called as a witness by the Defendant,

8          having been duly sworn, testified as follows:

9          THE COURT:  You may inquire.

10         MS. MENNINGER:  Thank you, your Honor.

11   DIRECT EXAMINATION

12   BY MS. MENNINGER:

13   Q.  Good afternoon, Ms. Healy.

14   A.  Good afternoon.

15   Q.  How old are you?

16   A.  I'm 47.

17   Q.  And where do you live?

18   A.  I live in Dallas, Texas.

19   Q.  Are you married?

20   A.  I am.

21   Q.  And what do you do for a living?

22   A.  I'm a housewife.

23   Q.  What does your husband do?

24   A.  He's an architect.

25   Q.  There in Texas?

LCHVMAX4                          Healy - direct

1    A.  No, in Albuquerque, New Mexico.

2    Q.  And do you have any siblings?

3    A.  I have a sister.

4    Q.  What's her name?

5    A.  Shannon.

6    Q.  And where does she live?

7    A.  She lives in Albuquerque.

8    Q.  Was there a point in time in which you lived in New York?

9    A.  Yes.

10   Q.  When was that?

11   A.  I'm born and raised in New York.  I grew up on Long Island.

12   So 1974 to about 1999.

13   Q.  And I want to direct your attention to years around the mid

14   '90s, to '96 or so.

15   A.  Okay.

16   Q.  Where were you working in around 1996?

17   A.  J. Epstein and Company.

18   Q.  And how did it come to pass that you were working at J.

19   Epstein and Company?

20   A.  How did I receive the job?

21   Q.  Yes.

22   A.  Needed somebody to fill in.  My sister was working there,

23   so I just filled in.  I had a previous job that I was working

24   at, so I was just there to fill in.

25   Q.  Great.  So what was your previous job?

1    A.  I was working at Pete's Tavern.

2    Q.  And I think you said your sister was working at J. Epstein;

3    is that right?

4    A.  Yes, she was a receptionist.

5    Q.  And at some point did someone ask you to come fill in?  Do

6    you know who that was?

7    A.  I can't recall that.

8    Q.  Okay.  But your sister was working there before you?

9    A.  Yes.

10   Q.  And when you came to fill in, what job did you do when you

11   came to fill in at J. Epstein and Company?

12   A.  Just errands.

13   Q.  And where was J. Epstein and Company?

14   A.  457 Madison Avenue.

15   Q.  How long did you end up working at J. Epstein and Company?

16   A.  I think I was there from 1996 until about 1999.

17   Q.  And where did you go in 1999?

18   A.  I went to New Mexico.

19   Q.  So just focusing on that period of time, 1996 to 1999,

20   while you were working at J. Epstein and Company, did you meet

21   Jeffrey Epstein?

22   A.  Yes.

23   Q.  How did you meet him?

24   A.  He was my boss.

25   Q.  And what were your roles and responsibilities during that

1  entire three-year period?

2  A.  I was receptionist for a good part of the time.  So I did

3  errands, answered phones, and then I was his assistant for a

4  bit.  So really running around New York City working for my

5  bosses.

6  Q.  Okay.  And when you were working as a receptionist, where

7  were you situated within the office?

8  A.  So if you walk into the office, you come out of the

9  elevator, I'm the first desk.  I'm the first person that you

10 would have seen.

11 Q.  Okay.  So if people came to visit the office in that time

12 period, you were the first person that they would see?

13 A.  Yes.

14 Q.  And when you were working as Mr. Epstein's assistant, were

15 you in a -- sitting in a different place in the office?

16 A.  I was just in the front of the office.

17 Q.  Okay.

18 A.  So --

19 Q.  And also when you're sitting in the front of the office,

20 could visitors see you when they came to visit?

21 A.  Yes.

22 Q.  Can you remember the names of some of your coworkers when

23 you worked in the office between '96 and '99?

24 A.  Yes.  There was Kimberly, there was Lauren, there was Eric,

25 there was Darren, there was Jeff, and that's about all I can

LCHVMAX4                          Healy – direct

1    remember.

2    Q.   Did you ever meet Ghislaine Maxwell?

3    A.   I did.

4    Q.   And who was she?

5    A.   She was my boss as well.

6    Q.   Do you see her in the courtroom?

7    A.   I do.

8    Q.   And where is she and what is she wearing?

9    A.   She is right there, and she's wearing a black mask.

10            MS. MENNINGER:  If the record could reflect

11   identification of Ghislaine Maxwell.

12            THE COURT:  It may so reflect.

13            MS. MENNINGER:  Thank you.

14   Q.   What kinds of things did you see Ghislaine doing in the

15   office?

16   A.   She oversaw properties and decorating and, you know, that

17   kind of stuff.

18   Q.   Were you reporting directly to her?

19   A.   I reported to her and I reported to Jeffrey as well.

20   Q.   And when you talked about running all over New York, what

21   kinds of things were you doing in your roles running around New

22   York?

23   A.   To be quite honest, it's a long time ago.  If documents

24   needed to be dropped off or picked up or just really -- I

25   really can't answer it because it's so long ago, to be quite

LCHVMAX4                         Healy - direct

1    honest.

2    Q.   And how old were you in '96?

3    A.   I was born in 1974, so in my twenties.

4    Q.   What were your impressions of Ghislaine Maxwell as a boss?

5    A.   She's fantastic.

6    Q.   Why do you say that?

7    A.   She taught me a lot.  I respected her.  She was tough.  But

8    she was great.

9    Q.   Did she ever tell you not to look people in the eye when

10   you were talking to them?

11   A.   No.

12   Q.   Did she ever give you directions about how you should speak

13   to other people?

14   A.   No.

15   Q.   In your capacity of running around, did you ever work out

16   of any other location besides 457 Madison?

17   A.   No.

18   Q.   Did you ever go to any of Mr. Epstein's properties?

19   A.   The only time I went, I went to Zorro Ranch.  My sister got

20   into a very bad car accident and broke her jaw.  And Ghislaine

21   was kind enough to take me there.  I was working, but at least

22   to set eyes on my sister because she was so hurt.

23   Q.   And where was your sister working at that time?

24   A.   She was on the ranch.

25   Q.   And do you know how long she worked on the ranch?

LCHVMAX4                          Healy - direct

1    A.  I don't.

2    Q.  Was it a short period of time or multiple years?

3    A.  It was multiple years.

4    Q.  And this accident that you described her being injured,

5    that happened while she was working at Zorro Ranch?

6    A.  Yes.

7    Q.  And is that the time that you went to visit her?

8    A.  Yes.  And that's the only time that I went anywhere.

9    Q.  I want to ask you a little bit about some of the other

10   people.  Did you come to know a woman named Emmy Tayler?

11   A.  I did.

12   Q.  And do you know where Emmy Tayler was from?

13   A.  I think London.

14   Q.  Did she have an accent?

15   A.  Yes.

16   Q.  Did you socialize with Ms. Tayler?

17   A.  I did.

18   Q.  And can you just kind of describe what types of things you

19   and Ms. Tayler would do together?

20   A.  We were friends.  You know, we would go out.  You know,

21   again, it's so long ago.

22   Q.  Was she about your age?

23   A.  I think so.

24   Q.  And you guys hung out together just in the city --

25   A.  Yeah.  Not on a regular basis, but did I socialize with her

1   on occasion?  Yes.

2   Q.  Okay.

3        MS. MENNINGER:  I want to show the witness and the

4   Court only an exhibit that's been previously entered under

5   seal, Government Exhibit 12.

6        THE COURT:  Okay.  Just the witness and the Court.

7        MS. MENNINGER:  Yes.

8   Q.  And Michelle, I'm going to ask you to take a look at this

9   document, not read anything out loud, but just take a look at

10  it and see if you see a name listed there.

11  A.  I do.

12  Q.  Okay.  And without saying the name, I want to direct you

13  that we're going to refer to that person as Jane, okay?

14  A.  Okay.

15  Q.  And so I'll refer to her as Jane, and you should only refer

16  to her as Jane.

17  A.  Okay.

18  Q.  Do you recognize Jane's real name?

19  A.  Yes.

20  Q.  Is that someone that you met?

21  A.  I did meet her.

22  Q.  Where do you recall meeting Jane?

23  A.  In the office.  I was told that it was Jeffrey's

24  goddaughter.

25  Q.  And you were in the office and she was in the office?

LCHVMAX4                         Healy - direct

1    A.  Yes.

2    Q.  Do you remember her being with anyone else when she came to

3    the office?

4    A.  I know her mom --

5    Q.  And don't say her mom's name.

6    A.  No.  I know her mom.  Her mom would come in quite

7    frequently, if I remember correctly.  But I didn't see much of

8    Jane.

9    Q.  And do you remember getting phone calls from either Jane or

10   her mother that you answered?

11   A.  The mother would call to speak to Jeffrey; but Jane, no.

12   Q.  How old did Jane appear to you when you saw her in the

13   office?

14   A.  I never even thought about it.  She looked like a grown-up

15   to me.

16   Q.  Was she wearing makeup and --

17   A.  She had a lot of makeup on.

18   Q.  Did you ever socialize with Jane?

19   A.  When I was out with Emmy.  Emmy was closer to her, like

20   I -- I didn't socialize with Jane.  But on occasion, maybe

21   twice, she would have been there.  But, again, it wasn't on

22   like a -- I didn't even have her phone number, let's just put

23   it that way.

24   Q.  At the time you were working at J. Epstein and Company and

25   hanging out with Emmy in the late '90s in New York, was there

LCHVMAX4                        Healy - direct

1    any other Michelle that you saw in the office, for example?

2    A.  No.

3    Q.  Was there any other Michelle that hung out with Emmy that

4    you are aware of?

5    A.  Not that I'm aware of.  But she had a lot of friends, so

6    I -- I can't speak for her.

7    Q.  Was there any other Michelle that you saw when you saw Emmy

8    with Jane?

9    A.  Not that I can recall.

10   Q.  I'm sorry to ask you this, but were you ever involved in

11   any group sexualized massages with Jane?

12   A.  Absolutely not.

13   Q.  Were you ever involved in any group sexualized massages

14   with Jeffrey Epstein?

15   A.  Absolutely not.

16   Q.  Did you have anything to do with massages in your job with

17   Jeffrey Epstein or anyone around the office that you met

18   through Jeffrey Epstein?

19   A.  Absolutely not.

20   Q.  Have you been contacted by the FBI to speak to them in

21   connection with this case?

22   A.  Yes.

23   Q.  When was the first time they contacted you?

24   A.  I can't give you the exact date.

25   Q.  Was it within the last week?

LCHVMAX4                         Healy - cross

1    A.  Yes.

2              MS. MENNINGER:  If I could have one moment, your

3    Honor.

4              THE COURT:  You may.

5              (Counsel conferred)

6              MS. MENNINGER:  No further questions, your Honor.

7              Thank you.

8              THE COURT:  Ms. Comey?

9              MS. COMEY:  Thank you, your Honor.

10   CROSS-EXAMINATION

11   BY MS. COMEY:

12   Q.  Good afternoon.

13   A.  Good afternoon.

14   Q.  Are you the only Michelle in the world?

15   A.  I hope not.

16   Q.  Have you met other people named Michelle?

17   A.  I sure have.

18   Q.  Okay.  Do you know the first name of every person that

19   Jeffrey Epstein interacted with in the late '90s?

20   A.  No.

21   Q.  Do you know whether he had masseuses named Michelle?

22   A.  No.

23   Q.  You worked in Jeffrey Epstein's office; correct?

24   A.  Yes.

25   Q.  You did not work in any of his homes; is that right?

1    A.  No.

2    Q.  You've never visited his Palm Beach house, have you?

3    A.  Nope.

4    Q.  Just got to finish the question so the court reporter can

5    get it all down.  So just let me finish, okay?

6            You've never been to the Palm Beach house; is that

7    right?

8    A.  Correct.

9    Q.  Okay.  Have you ever been to his New York residence?

10   A.  Just to drop off documents, but never spent any time there.

11   It was just you delivered something.

12   Q.  So you were never a guest at that home?

13   A.  No.

14   Q.  Never stayed over at that home?

15   A.  No.

16   Q.  Never went beyond the front entrance of that home?

17   A.  No.

18   Q.  Okay.

19           And the only home you've ever been inside of was on

20   Zorro Ranch one time?

21   A.  Yes.

22   Q.  You never flew on any of Jeffrey Epstein's private planes,

23   did you?

24   A.  No.

25   Q.  You never traveled with Jeffrey Epstein, did you?

LCHVMAX4

1  A.  No.

2              MS. COMEY:  May I have a moment, your Honor?

3              THE COURT:  You may.

4              (Counsel conferred)

5              MS. COMEY:  Nothing further.

6              THE COURT:  Okay.

7              MS. MENNINGER:  No redirect.  Thank you, your Honor.

8              THE COURT:  Okay.  Thank you, Ms. Healy.

9              You may step down.  You are excused.  Thank you.

10             (Witness excused)

11             THE COURT:  And we'll break for lunch, members of the

12  jury.

13             Ms. Healy, if you could just step this way.

14             Thank you.

15             And then, members of the jury, enjoy your lunch.

16             We'll see you in about an hour.  Thank you.

17             (Jury not present)

18             THE COURT:  All right.  Let's see.

19             Matters to take up.

20             MS. MOE:  Yes, your Honor.

21             We just wanted to follow up on an issue we'd raised

22  this morning about confirming that AUSA Alex Rossmiller has

23  been released from defense subpoena.

24             THE COURT:  Ms. Menninger.

25             MR. PAGLIUCA:  Given the Court's rulings, your Honor,

LCHVMAX4

1  I don't really think there would be any need to have them under

2  subpoena.  So, yes, the answer is yes.

3          THE COURT:  Yes.  Okay.

4          MS. MOE:  Thank you, your Honor.  We'll let him know.

5          THE COURT:  Okay.  Other matters?

6          MS. MOE:  Not from the government, your Honor.

7          MR. EVERDELL:  Your Honor, I think just over the lunch

8  break the parties are going to confer over some stipulations.

9  And we should hopefully have things hammered out on those when

10 we return.  But we'll use the lunch break to do that.  We may

11 ask for a little bit more time just to get everything written

12 down and marked properly, but that's the next task.

13         THE COURT:  Okay.

14         I think this is yours, Ms. Menninger.  So I will look

15 at during lunch break the application that came in a little

16 before noon for assistance of the marshals to enforce the trial

17 subpoena.  And I think we just got the letter from the

18 government.

19         Just quickly, Ms. Menninger, I think your -- I just

20 looked very briefly at your declaration, and it indicated that

21 you've made efforts to contact this witness, but there's no

22 details.  Do you know if the witness is represented?

23         MS. MENNINGER:  I do not.

24         THE COURT:  Could you pull up the mic.  Thank you.

25         MS. MENNINGER:  Your Honor, I don't believe the

LCHVMAX4

1    witness is represented in connection with this case.

2              THE COURT:  Okay.

3              MS. MENNINGER:  There was no counsel appointed for

4    this witness as there were with other witnesses.

5              THE COURT:  And so the efforts made to contact the

6    witness consisted of what?

7              MS. MENNINGER:  Your Honor, I was not the one doing it

8    myself.  I can get the detail from my assistants who were

9    making the calls, and also our investigator that was making the

10   calls.  I can get the dates and times of the calls.  I don't

11   have that on me at the moment.

12             THE COURT:  Okay.  I think I need to understand, since

13   I'm -- given where we are and what I'm -- in the trial, and I

14   see that the subpoena -- so the subpoena was -- the return date

15   was for the first day of trial.

16             So I would like details as to what efforts were made

17   to contact the witness.  I guess the other question is the

18   testimony that you're seeking from this witness is the same

19   essentially as the last two witnesses?

20             MS. MENNINGER:  It's very similar, your Honor.

21   There's only one distinction with this one.  On this one, Jane

22   told the government early on that Kelly could confirm her story

23   about what was going on.  That's in the 3500.  I can pull up

24   the exact verbiage.  And she also gave the woman's last name.

25   So it was highly specific reference that this -- she also said

LCHVMAX4

1    that this person was involved in the massages in a way that the

2    last two witnesses were claimed to have been.

3            THE COURT:  When did you receive that 3500 material?

4            MS. MENNINGER:  That would probably have been on

5    October 11th, your Honor.

6            THE COURT:  Okay.  And Ms. Moe, did you have

7    something?

8            MS. MOE:  Your Honor, I was just going to clarify.

9        I think Ms. Menninger is referring to the 3500

10   materials.  With respect to the matters that are before the

11   jury, the testimony was about a Kelly.  So in that respect, the

12   testimony would have to mirror the past two witnesses about are

13   you a person named Kelly.

14       But I recognize the Court's question was about 3500

15   material.  And when the defense was on notice of this issue, I

16   just want to clarify in terms of the anticipated scope of the

17   testimony.  I can't imagine, given that record and

18   cross-examination of Jane and the Court's other rulings about

19   investigative steps, that there would be anything other than

20   what we've just seen now twice.

21           MS. MENNINGER:  Actually, I asked one other question

22   of Jane, which was, Do you recall her last name?  Because I had

23   it --

24           THE COURT:  And she said yes, if I remember, and then

25   you didn't ask --

LCHVMAX4

1          MS. MENNINGER:  Well, at the time, because I was not

2     in touch with that witness, I didn't know if we were going to

3     move to have her testify under her first name, given --

4          THE COURT:  And did you so move?

5          MS. MENNINGER:  I did not with respect to this witness

6     because I hadn't spoken to her.  The witnesses that we've

7     moved --

8          THE COURT:  Right.  But so you've never sought

9     anonymity with respect to this witness.

10          MS. MENNINGER:  That's correct.

11          MS. MOE:  I also add, your Honor, that when defense

12     counsel wanted to put in the record the first and last names of

13     folks when there were sensitivities, they wrote them down on a

14     piece of paper.  There were a million different ways to get

15     that before the jury, and they chose not to.

16          MS. MENNINGER:  I understand that the cross -- or the

17     direct would be based on what the questions were of Jane.  I'm

18     not here to dispute that.  I'm just telling the Court in terms

19     of who it is.  She told the government the last name and what

20     she told the government.

21          THE COURT:  I understand.  Which just indicates that

22     the defense has been on notice of this person, which I presume

23     is what -- since October, as someone who Jane indicated was

24     involved in the sexualized massages.  I presume that's why you

25     noticed this person Kelly as a defense witness and issued a

LCHVMAX4

1    trial subpoena weeks ago.

2              MS. MENNINGER:  Yes, your Honor.

3              I can make a representation about the number of names

4    that were mentioned in the volumes of 3500 material.  I know

5    your Honor has received the testifying Witness 1, but I can

6    tell your Honor there was approximately 500 nontestifying

7    witnesses with similar volumes of interviews with those

8    individuals.  So the fact that we received it on October 11th

9    doesn't mean that's the day we saw this.

10             THE COURT:  Of course.  Fair enough.

11             I'm just trying to understand why I got an application

12   at 11:54, it was almost -- 11:54, seeking enforcement of a

13   trial subpoena regarding a witness who's been disclosed, a

14   potential defense witness who's been disclosed for months, who

15   the defense noticed and attempted to serve a subpoena on, who,

16   unlike the other witnesses the defense attempted to serve a

17   subpoena on, you received no contact.

18             I know you're busy.  I get that.  You have a

19   million -- and I mean that genuinely, obviously.  I know this

20   team -- both teams are working extremely hard.  This one is

21   just a little hard to understand, unless maybe you thought I

22   would exclude the witness.

23             (Continued on next page)

24

25

LCHCmax5

1              MS. MENNINGER:  That was an application, your Honor.

2              THE COURT:  It was an application.  It was an

3       application that you asked to respond to at -- I think it was

4       6 o'clock last night.  So I didn't get your response on that

5       until 6 o'clock last night.  I ruled as fast as I could, which

6       meant last night, I think it was probably after 11:00 p.m. or

7       close to midnight, but thought it was important to give that

8       resolution as soon as I could once the issue was raised and I

9       had full briefing.

10             Even if there hadn't been an application to preclude

11      that witness, you hadn't taken steps to enforce the subpoena

12      until 11:55 a.m. today.  I'm going to look at the materials,

13      but I just want to have the factual record that I need to make

14      a determination.

15             MS. MENNINGER:  I can email chambers as soon as I

16      gather the dates and times of the communication efforts.  I can

17      put that in a writing, this way your Honor has a factual record

18      on it.

19             MS. MOE:  Just with respect to developing a record on

20      this issue, I just want to make sure it's clear that when we

21      produced 3500 materials, we designated them for testifying

22      witnesses, which was a much narrower scope.  Accompanied with

23      that, I think, earlier than October, was a letter identifying

24      the particular victims in this case.  The materials with

25      respect to Jane talked about the very, very limited number of

LCHCmax5

1    people who Jane recalled in particular being present for these

2    group sessions.  I don't know the exact number off the top of

3    my head, but I think it is just the people who Ms. Menninger

4    asked about on cross examination and those particular first

5    names.  So I want to make sure the record is clear, that it's

6    not the case that the 3500 materials had hundreds of names of

7    people --

8              THE COURT:  Can you just give me one second.  Sorry.

9    Go ahead.

10             MS. MOE:  I just want to make sure the record was

11   clear that in the materials relating to Jane that we produced

12   in October, it's not the case that those materials contain

13   hundreds of names of people.  In fact, it was, I want to say,

14   five or fewer.  But Ms. Menninger has those materials and it's

15   a very narrative scope.  So I just want to make sure the record

16   is clear on that in terms of when the relevance of that would

17   have become apparent and how specific it was.

18             THE COURT:  And the address or contact information

19   that you used to try to contact this witness, do you have any

20   basis -- what is the basis to the current contact information?

21             MS. MENNINGER:  She was served personally by a process

22   server, and with that handover, I believe she was handed the

23   contact information to get in touch with us to be placed on

24   call.  We had a standard letter that we gave to all of the

25   witnesses we've placed on call.

LCHCmax5

1          THE COURT:  Okay.  I will look at it and see what the

2    request is.

3          The issue that you noted last night, Ms. Menninger,

4    that you said needed to be done on Monday, what is that?  There

5    was something last night when we talked about the defense would

6    likely finish today, you caveated that there was one small

7    short matter that would be done on Monday, and I don't think I

8    know what that is.

9          MS. MENNINGER:  I think it's the witness from London,

10   your Honor, that you discussed with Mr. Everdell earlier.

11         MR. EVERDELL:  I believe that's what we were referring

12   to.

13         THE COURT:  I didn't realize that.

14         MR. EVERDELL:  I thought I actually said, your Honor,

15   another witness, a short witness that we might need to put on

16   on Monday.

17         THE COURT:  That's the same as what you caveated?

18         MS. MENNINGER:  Yes.

19         MS. STERNHEIM:  Yes, Judge.  That's when I said that

20   we would make sure that we were finished so that we could go

21   right into the closings.

22         MS. MOE:  Your Honor, on that score, I did not realize

23   that that was the same witness we were talking about this

24   morning.  If they were aware of this witness yesterday, that

25   name was not on the witness list provided to the government,

LCHCmax5

1    there weren't any 26.2 materials disclosed.

2            So I think, from that record, they're aware of who

3    this person was, they were planning on calling them on Monday,

4    and had still not disclosed to the government they were

5    planning to call this person or who they were.

6            Just to echo our concern from this morning about why

7    we're hearing about this so late and why the case would be held

8    over for a late disclosed witness --

9            THE COURT:  What was the government's understanding of

10   what they were referring to for Monday?

11           MS. MOE:  We didn't know.  And we were confused about

12   the issue related to the person who had asked for anonymity who

13   was a plainclothes police officer in the United Kingdom.  So

14   when defense referred to a witness potentially from the United

15   Kingdom, that's what we thought that was referring to.  We did

16   not realize that was a reference to someone who had not been

17   disclosed to the government.

18           MR. EVERDELL:  Your Honor, I believe the way the

19   sequence worked, there was a different witness from the U.K.

20   that, days ago, we said we might need to call, and anticipated

21   Monday because of the number of witnesses we thought we were

22   going to call.  That is somebody different.

23           Then, as we were talking about it, I believe the other

24   day, I said there may be another short witness on Monday.  I

25   was referring to the same witness.  We hadn't given the name of

LCHCmax5

1    that person because, at that point, we were still trying to

2    gather the information to see if he could be a witness.  I

3    didn't -- there was nothing to disclose at that point because

4    we were still working this out to make sure we had this person

5    lined up and they would be a witness with relevant admissible

6    information.

7              His 26.2 material would be a one-page or maybe a

8    two-page declaration, which could be reviewed in 10 minutes, so

9    I don't think that's an issue.  The name of the person is sort

10   of irrelevant.  We said it was going to be a witness -- sorry,

11   your Honor.  And I believe the Court did say, I'm looking at

12   the transcript on page 25 --

13             THE COURT:  This is from yesterday?

14             MR. EVERDELL:  Yes, it's from December 16th, so that

15   is yesterday, at page 2534, I had said, I think if we went over

16   in the morning, even if we had this one witness, it would be

17   very brief, so we could have almost a full day on Monday.  The

18   Court responds okay.  So finishing tomorrow or a very short

19   witness on Monday means closings on Monday and then a charge to

20   the jury.  Okay, I'll permit that, so long as it does not

21   interfere with that schedule.

22             So we were on the assumption that we could get this --

23             THE COURT:  I didn't know until now that that --

24   something in the course of the conversation, my memory of it is

25   that it was Ms. Menninger who noted that there was one small

LCHCmax5

1    thing that needed to be do on Monday.  I didn't understand

2    until this moment that that was the same person who you've

3    raised this morning as a witness regarding Ms. Maxwell -- the

4    timing of Ms. Maxwell's residence at the Kinnerton address.

5              MR. EVERDELL:  Yes.  And I'm sorry I wasn't clear

6    about that, your Honor.  I think there has been a lot going on,

7    but I apologize about that.  That was who I was referring to

8    there because the other person who we had put the name on the

9    witness list who is from the U.K., we had decided not to call

10   that person before yesterday.  It was this one that I was

11   referring to.  And I can even give the name now so we're not

12   talking about an anonymous person.

13             MS. MOE:  Yes, your Honor.  As I stand here, I still

14   don't know who this person's name was and it hasn't been

15   produced and the defense is out of witnesses.  I think this is

16   the definition of a delayed disclosure.  We're at the

17   conclusion of the defense's case and I'm learning for the first

18   time the name of this witness.  I still haven't received their

19   26.2 material.  And it's clear the defense has been on notice

20   of --

21             MR. EVERDELL:  It's not true at all.  We did not know

22   about this witness until yesterday.  His name is Kevin Moran,

23   and he is the owner of the Nags Head Pub across the street from

24   44 Kinnerton Street.  We did not know about him until very,

25   very recently.  I'll have to get the exact time.  It was within

LCHCmax5

1    the last day or two that we knew this about this person.  And

2    we actually had to confirm that he had relevant information

3    before I proffered him as a witness in this case.  And now

4    we've been able to do that and that's the one when, yesterday,

5    at the end of the day, I told the Court that we may have one

6    additional witness, that's who I was referring to.

7            Your Honor, actually, I'm sorry.  It was yesterday

8    because this issue came up after the property issue was

9    discussed earlier in the day, and we felt like we had to find

10   somebody who could establish her residency at 44 Kinnerton

11   instead of not just her ownership.  We were able to find

12   Mr. Moran.

13           THE COURT:  I mean, again, I find it amusing, somehow.

14   The government moved to preclude the ownership documents on

15   Kinnerton.

16           MR. EVERDELL:  I understand the Court's ruling and if

17   that's the basis --

18           THE COURT:  I'm letting it in.  I'm letting it.  I

19   queried the relevance of it because it was ownership, not

20   residence, but I'm letting it in because I think you persuaded

21   me that you can argue the inference of residence from

22   ownership.

23           MR. EVERDELL:  And, your Honor -- I'm sorry.

24           THE COURT:  Just -- all along, I gather that was what

25   the defense intended to do, to establish timing of residence;

LCHCmax5

1    correct?

2              MR. EVERDELL:  That's right, your Honor.

3              THE COURT:  You didn't see a need to find other

4    witnesses regarding --

5              MR. EVERDELL:  And the reason why we had to is because

6    that is what we were planning to do all along, to show when she

7    was at that place.

8              However, when we litigated this issue and discussed it

9    yesterday, the Court -- the government raised the deposition

10   transcript from the defendant who said, in sort of an offhand

11   way, if you read the transcript, '92, '93 was when I was there.

12   Then it became an issue of when she was actually residing there

13   as opposed to when she owned it.  We thought if the stipulation

14   was going to have to involve that testimony, as well, we then

15   now needed a witness, because the facts we believe to be true

16   was that she was not only -- did not own it until then, she was

17   not there, she did not reside there, she wasn't renting it.

18   There was another couple that was in that house living there

19   until she owned it, purchased it, and then owned it, and then

20   moved in.

21             THE COURT:  So really, this is a new -- let me see if

22   I get this right.

23             MR. EVERDELL:  Your Honor, if I can add one more

24   thing.  She had another residence in London prior to the

25   Kinnerton Street residence.

LCHCmax5

1          THE COURT:  And that's in the record; right?

2          MR. EVERDELL:  We're going to have to add that as part

3     of the stipulation.  We have the land registry records for that

4     residence now, as well, showing her ownership of that

5     residence, but we still want to be able to counter what I think

6     is an incorrect inference to the jury that she wasn't there.

7     Yes, I understand there is a deposition where she made an

8     offhand reference and got the years wrong, but we now have a

9     witness who can actually say what we believe to be true, which

10    is that she wasn't living there either until she owned it.

11         THE COURT:  And sometimes details are off.

12         MR. EVERDELL:  And she may have in that deposition

13    gotten the place wrong because she had the prior place in

14    London, and Stanhope Mews was the name of the street.  At that

15    time in '92, '93, she owned that place.  So she may have gotten

16    the place wrong in the deposition.

17         So what I think it sets up is a misleading --

18    factually misleading impression for the jury based on an

19    offhand deposition transcript quote, one line from a 2019

20    deposition where it's not exactly clear which residence she may

21    be referring to in the first place.

22         And this is an important point for the defense, your

23    Honor.  We feel like --

24         THE COURT:  Let me just make sure, because all of

25    this, all of this is impeachment of a witness who says that

LCHCmax5

1    Ms. Maxwell lived at the Kinnerton residence at a particular

2    time.

3              MR. EVERDELL:  That's right.  She testified that the

4    events that she testified to in the U.K., the events of sexual

5    conduct -- contact with Jeffrey Epstein took place in the

6    Kinnerton Street address.  She even identified the photo of the

7    house with the red door across from the Nags Head Pub, which is

8    the 44 Kinnerton Street --

9              THE COURT:  It was an interesting moment during the

10   cross that focused on the pub across the street.  I remember

11   thinking, huh, I wonder if they have a witness from the pub

12   across the street.  I actually did.  You know what, you were

13   thinking the same thing, too.

14             MR. EVERDELL:  Well, no, your Honor.  What we were

15   thinking is we wanted to make sure, because that witness had

16   said on different occasions to the government that the events

17   took place in the apartment across from the Nags Head Pub, that

18   was one time, but she also said it happened at a Kensington

19   address, which, by the way, is not Belgravia, it's somewhere

20   else in London.  It's nearby, but it's next door, it's several

21   subway tube stops away.  So we weren't sure she was going to

22   say it was the Kensington address or it was the Belgravia

23   address at Kinnerton Street.  She committed to the Belgravia.

24             THE COURT:  What date was that?

25             MR. EVERDELL:  What date was what?

LCHCmax5

1        THE COURT:  That testimony that she committed to the

2   Kinnerton.

3        MR. EVERDELL:  She had said two different things in

4   the 302s to the government.

5        THE COURT:  I'm talking about at trial.

6        MR. EVERDELL:  What day was in the trial transcript?

7        THE COURT:  Yes.

8        MR. EVERDELL:  I think Kate testified on 12/6, your

9   Honor.

10       MS. MOE:  It was Monday of last week, your Honor.

11       MR. EVERDELL:  Yes.  And in order to counter that, we

12   thought we were just going to use the property records.

13       THE COURT:  Right.

14       MR. EVERDELL:  But because then the government raised

15   the issue of the deposition testimony, which we weren't

16   anticipating, which we think is misleading, because we think

17   that is factually inaccurate, we thought, well, okay, now we

18   better get somebody who can testify about her actual residency

19   there.  That's why we scrambled to find Mr. Moran, who we now

20   have.

21       THE COURT:  From the pub across the street?

22       MR. EVERDELL:  Yes.

23       THE COURT:  Isn't that funny.

24       MS. MOE:  Your Honor, just a few things in response.

25       The first is the defense now has property records for

LCHCmax5

1    the second address, it had not been disclosed to the

2    government.  So we're now having a Friday afternoon, at the

3    conclusion of the defense case, mini trial about properties in

4    London, when all of this could have been anticipated long ago.

5            I think what defense counsel has said about mixing up

6    addresses is, it's very telling because, it appears to be that

7    their explanation for Ms. Maxwell's deposition testimony is

8    that she mixed up two properties, and that shows that extremely

9    marginal relevance, if any, of impeachment value for Kate's

10   testimony because there doesn't appear to be any dispute that

11   Ms. Maxwell was living in that area of London during the

12   relevant time and defense counsel can't have it both ways.

13   They can't say Ms. Maxwell easily confused two properties.

14           THE COURT:  Sure they can.  Everybody does that.

15           MS. MOE:  My point, your Honor, is the relevance.  If

16   the view is it's easy to mix up two houses, what's the

17   relevance of going down this rabbit hole of two different

18   properties in London and records at this late stage, especially

19   given the late disclosure to the government and our inability

20   to look into this or respond to it.  It's such a sideshow at

21   such a late hour.  This could have been teed up much earlier.

22           MR. EVERDELL:  I don't know how this could have been

23   considered a sideshow.  This shows that what the witness

24   testified to was a factual impossibility.

25           THE COURT:  Just like Ms. Maxwell's testimony that she

LCHCmax5

1    lived there from '92 to '93; right?  In fact, your argument is

2    it's a factual impossibility that she lived there in '92, '93?

3                 MR. EVERDELL:  I'm saying the witness is mistaken

4    based on the property records, yes, your Honor.

5                 MS. MOE:  Just like Ms. Maxwell, your Honor.  That's

6    why this is such a sideshow.

7                 THE COURT:  Look, I always say, I have so many bridges

8    to across, I cross the bridge that's in front of me.  So what

9    is the question?

10                MR. EVERDELL:  Well, so, there are, I think, a few

11   questions.  We still have to confer on the stipulation to the

12   Kinnerton Street records.  We are going to propose being able

13   to admit the land registry records showing the transfer of

14   title of both the Kinnerton Street residence and the Stanhope

15   Mews residence.  Those are both land registry documents.  And

16   by the way, your Honor, those are selfauthenticating because

17   they came from the land registry and they are

18   selfauthenticating foreign public documents.  Those can be

19   admitted just by themselves, but we want a stipulation to the

20   fact that they reflect certain information.  And I think what

21   the Court said is if we're going to be permitted to admit

22   those, the defense should be able to permit -- sorry.  The

23   prosecution should be able to admit that deposition testimony

24   from when Ms. Maxwell said '92, '93.

25                So we have to --

LCHCmax5

1          THE COURT:  Look, is there a basis for the government

2     not to admit the testimony?

3          MR. EVERDELL:  Well, I think, your Honor, it's -- one

4     moment, your Honor.

5          Your Honor, the government, as we discussed, provided

6     that last week to us.  So it's new information for us that we

7     had to respond to.  She was never shown these documents.  And

8     it was during the deposition.  I mean, she was never shown the

9     registry records of the property records.  If you own houses

10    and there is already evidence --

11         THE COURT:  I don't know.

12         MR. EVERDELL:  I don't know either, your Honor, but I

13    imagine if you own several places over the years, as

14    Ms. Maxwell has, there is evidence in the record that she was

15    living in different places over different years, many different

16    places.  You might not recall right off the top of your head

17    the exact years that you lived at some address unless you can

18    refresh your recollection.  And it's also possible that if

19    you're being asked a vague question in a deposition and you had

20    two different addresses in London, you may assume they're

21    talking about one and not the other, and you may answer the

22    years you lived in the other address instead of the one we're

23    actually talking about today.

24         THE COURT:  If we get a stip on the two addresses, the

25    two property records coming in and the depo coming in, then I

LCHCmax5

1    think both sides argue what they want from it; right?

2             MR. EVERDELL:  I think that's right.  All I heard was

3    from the government is that they're now going to object to the

4    other property records, the Stanhope Mews property records,

5    which we were just getting today because we're trying to deal

6    with this issue that came up.  We got them from the land

7    registry.  I'm happy to show them to the government.

8             THE COURT:  You say they came up.  The whole point of

9    this is you want to impeach the witness's testimony as to which

10   residence it was; right?  That's the whole point of this?

11            MR. EVERDELL:  That's correct.

12            THE COURT:  So let me just ask, if there is a stip as

13   to the two different property ownership records and the depo

14   testimony coming in, is there a need for an additional witness?

15   Is the defense still seeking an additional witness on Monday

16   that delays trial?

17            MR. EVERDELL:  Your Honor, I think we need to just

18   confer on that one moment.

19            THE COURT:  Sure.

20            MR. EVERDELL:  Your Honor, yes, because at that point,

21   even though the sides could argue both sides, we feel like we

22   need additional factual development to be able to counter the

23   government's argument that she didn't reside there based on the

24   deposition testimony.

25            THE COURT:  And when did you get the depo?

LCHCmax5

1          MR. EVERDELL:  I can't remember when the government

2     produced the depo to us.

3          MS. MOE:  Your Honor, on Friday evening, the defense

4     produced the Kinnerton Street records to the government.  The

5     next day, we produced the deposition in which Ms. Maxwell made

6     that statement.  Of course, it's Ms. Maxwell's own deposition

7     and it's also a public record.

8          THE COURT:  Right.  I mean, it comes in.  I don't see

9     any basis it doesn't come in.  The question is --

10         MS. MOE:  Your Honor, with respect to the deposition,

11    just so the record is clear, it's only being offered to rebut

12    this last minute registry issue.  There is no -- to the extent

13    defense counsel is arguing they need to call this witness to

14    rebut an inference from the government, I want to be clear it's

15    only because the defense is putting this at issue.  We would be

16    happy to just rest here and not make this an issue at all.  The

17    reason that there is a purported need for this is, again,

18    because the defense is inviting this issue at this late hour.

19         MR. EVERDELL:  Your Honor, if the government is

20    willing to stip to just putting in the property records showing

21    the title ownership without the deposition transcript, we're

22    willing to do that, we won't need the extra witness.  If

23    they're going to put in the deposition transcript and make that

24    an issue, we feel like we need the other witness to be able to

25    counter that.

LCHCmax5

1          THE COURT:  Well, you'll discuss it and when I come

2    back, you'll tell me, both sides, what the application is.

3          What do we have after lunch?

4          MR. EVERDELL:  Your Honor, I think we would like to

5    use the lunch break to hammer out the final stipulations.  If

6    we can have extra time to get that done, I think that's going

7    to be it, is the reading of the stipulations.  There are some

8    documents, but these are things we have to go through over the

9    break.

10         THE COURT:  So basically no other defense witnesses

11   are available today following stips.  And then the open

12   question, is the defense seeking to have potentially this

13   rebuttal, rebuttal, rebuttal on points, the witness regarding

14   timing of residence on Monday.  I don't know when even if the

15   defense's application -- I did ask for a proposed order because

16   I don't --

17         MS. MENNINGER:  It was sent, your Honor.

18         THE COURT:  I mean, the question is, to what end.

19         MR. EVERDELL:  Yes.  Why don't we see about the

20   conferral, we'll see how that process goes and maybe it won't

21   be an issue, your Honor.

22         THE COURT:  You'll confer on that.  I don't know if

23   there is a conferral to be had on the Kelly issue, because I'm

24   going to spend my remaining lunch hour looking at this

25   material.  Seems to me, best case scenario is if I agree with

LCHCmax5

1   the order, it goes to the marshals and then what?  She's not

2   produced today, she's not produced Monday, then what?

3          MS. MENNINGER:  I think, your Honor, our intent would

4   be if she's not produced by Monday morning, then, you know, we

5   don't have time.  But given that it's 1:30 and there is a lunch

6   break, so that's 2:30, it's two and a half hours with a break

7   in there of continuance for purposes of trying to get the

8   witness's appearance.

9          THE COURT:  I'll look at the materials.

10          Anything else?

11          MS. MOE:  Not from the government, your Honor.  Thank

12   you.

13          THE COURT:  Anything else?

14          MR. EVERDELL:  No, your Honor.  Thank you.

15          THE COURT:  It will be a long break for the jury, but

16   we'll resume in 45.  Okay?

17          MS. MOE:  Yes, your Honor.

18          MS. MENNINGER:  Your Honor, if we had time to work on

19   these stipulations, an hour might make sense, but only if the

20   government's available to meet.

21          THE COURT:  I'll give you an hour.  It just means the

22   jury is sitting there for an hour and a half at this point.

23          All right.  I'll meet with you in an hour, 2:30.

24          I'm sorry.  One more thing.  Ms. Sternheim, when we

25   return from lunch, I would intend to allocute Ms. Maxwell on

LCHCmax5

1    her right to testify or not testify.

2              MS. STERNHEIM:   Yes.   Thank you.

3              (Recess)

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LCHVMAX6

          A F T E R N O O N   S E S S I O N

                     3:15 P.M.

          THE COURT:  Okay.  We have a few things to take up.

          Ms. Comey.

          MS. COMEY:  Yes, your Honor.  We appreciate the
Court's indulgence.  We've reached a number of stipulations,
and I believe we'll be able to finish the case this afternoon
as a result.  So we very much appreciate the Court's patience
with the parties.

          There is one issue that I believe the defense still
wanted to raise that we were not able to reach agreement on.  I
would propose that we have that argument now and then,
depending on the result of that, I think we can proceed to wrap
the case up.

          THE COURT:  Okay.  All right.

          How long will the reading of stips take?

          MS. COMEY:  Ten to 15 minutes, your Honor.

          THE COURT:  Oh, okay.  So I didn't know if we were
talking an hour, in which case my suggestion was going to be
let's do that and then give the jury a break and then finish,
but okay.  I'll hear the issue.

          Ms. Menninger.

          MS. MENNINGER:  Thank you, your Honor.

          As your Honor is aware from prior proceedings in this
trial, one of the facts about which there is dispute involves

LCHVMAX6

the date on which Jeffrey Epstein began living at 9 East 71st

Street.  Jane contended that she went to only one home over the

years, she was 14, 15, and 16.  Those are the years 1994

through 1996.

We ask the Court to take judicial notice of several

documents under Federal Rule of Evidence 201.  These relate to

a case in this district, in this courthouse, United States

District Court for the Southern District of New York.  The case

number is 96 CV 8307, Denny Chin was the presiding judge, now

Second Circuit justice.  It was United States of America --

THE COURT:  Just a judge.  Second Circuit judge.

You've given him an early promotion.

MS. MENNINGER:  If you could let him know.

*United States of America v. Jeffrey Epstein and Ivan*

*Fisher.*  It was an action brought by the U.S. Attorney's Office

for the Southern District of New York.  They were the party in

interest -- they were the lawyers representing the United

States of America in that proceeding, so the same Southern

District of New York office.

In that proceeding, the questions -- Mr. Epstein's

prior residence at East 69th Street was leased from the U.S.

Government, who had taken possession of it after -- from the

government of Iran.  And he began a lease in that residence in

1992.

The contention in the litigation was that he had

LCHVMAX6

abandoned living in East 69th in or about January of 1996.
Then he leased it to Mr. Fisher, who was a codefendant in the
case.  And then the U.S. Government sought to evict Mr. Fisher.
So both Mr. Epstein and Mr. Fisher were the defendants in the
action.

There were, on behalf of Mr. Epstein, two answers
filed in the case, answer to cross-claims.  These are docket
entry numbers 15 and 45 from that action.  In the first
paragraph of those two answers, Mr. Epstein admitted that in or
about January 1996, he vacated the premises, the premises being
East 69th Street.  And then subsequent to that, other events
happened.

In an opinion in docket entry 46, Judge Chin issued an
opinion, and he made a finding of fact that Epstein and his
family continued to reside at the premises, East 69th, until
January of 1996, at which time Epstein abandoned.  So that is
an opinion and two answers that we seek to admit under Federal
Rule of Evidence 201, judicial notice.

Under the terms of that, your Honor, it is, I believe,
a fact that can be judicially noticed.  201(f) describes what
instructions are given to the jury in the event that it is
criminally noticed; and in a criminal case, the jury is to be
instructed that it may or may not accept the noticed fact as
conclusive.  I'm not intending or offering the full documents
that I just cited to your Honor, but the fact of Mr. Epstein's

LCHVMAX6

1    admission that he vacated East 69th in or about January '96,

2    and then Judge Chin's decision making that finding of fact.

3              There is one other document from that docket that we

4    seek to admit, but under a separate rule of evidence,

5    804(b)(1).  There was actually a deposition transcript from

6    Mr. Epstein in which he is asked -- and it was taken by the

7    U.S. Attorney's Office for the Southern District of New York.

8    And he was asked in that deposition, Is it correct that you

9    moved from the premises -- meaning East 69th -- to 9 East 71st

10   Street in or around the beginning of '96?

11             And Mr. Epstein responded, You asked me that question

12   three times.  I believe it is around then, but I don't know

13   exactly when.

14             This deposition excerpt was appended to a pleading

15   that was submitted by the U.S. Attorney's Office in support of

16   their case at docket number 52.  So I believe that one is

17   admissible under 804(b)(1), the deposition transcript.

18             THE COURT:  Okay.  One at a time, Mr. Rohrbach.

19             MR. ROHRBACH:  Yes, your Honor.

20             I will go through each of the documents, but just as a

21   substantive point, this is very much like the 44 Kinnerton

22   Street issues we've been talking about.

23             And substantively --

24             THE COURT:  Microphone.

25             MR. ROHRBACH:  This is very much like the 44 Kinnerton

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

LCHVMAX6

Street documents we've been talking about, in that the legal

documents describing when Mr. Epstein abandoned this property

does not reflect where Mr. Epstein was living.  As the defense

knows, one of the defense witnesses, who they ultimately

decided not to call, would have testified that Epstein was

living on East 71st Street prior to 1996.

And so if the Court admits this -- this is the reason

this has to go first in the remaining issues.  If the Court

admits this, the government would put on rebuttal evidence

showing that, in fact, Mr. Epstein lived on 71st Street before

he says he abandoned the property in 1996.

So that's sort of a substantive background point.

Moving through the documents, your Honor, Judge Chin's

opinion is a summary judgment opinion.  So I think it's quite

clear actually that the facts can reasonably be disputed.  The

summary judgment standard, as the Court well knows, is that the

Court -- is that Judge Chin had to take all facts in the light

most favorable to the nonmoving party, which in this case was

not the United States.  So I think it very much can be

controverted that the fact in -- the statement in the

background section of Judge Chin's opinion is not a factual

finding about when Mr. Epstein abandoned --

THE COURT:  Can I see it?

MS. MENNINGER:  What's that, your Honor?

THE COURT:  Can I see the document?

LCHVMAX6

1          MS. MENNINGER:  Oh, yes, your Honor.  I apologize.  I

2     have copies for the Court, and I gave a copy to the government.

3          THE COURT:  Okay.

4          MR. ROHRBACH:  Judge Chin sets out the summary

5     judgment standard on page 12.

6          THE COURT:  Yes.

7          Do you want to respond to the summary judgment point?

8          So 201(b), the Court may judicially notice a fact that

9     is not subject to reasonable dispute.

10          MS. MENNINGER:  This was the government's motion for

11     summary judgment; and it was Mr. Epstein's admission that

12     that's when he vacated the premises.  So I don't think that --

13     in terms of that's why I think that you need to take both the

14     answers and the summary judgment together, rather than trying

15     to introduce one or the other.  It was the government's

16     position that he abandoned in January of '96, and he admitted

17     that.

18          MR. ROHRBACH:  The defense is not offering any of

19     these documents which contain the government's position, your

20     Honor.

21          MS. MENNINGER:  That's not true.

22          Docket entry 52 is a submission by the government.

23          MR. ROHRBACH:  I apologize.  I'm talking about the

24     summary judgment opinion and the answers, but not the

25     government's claims, which is not a document -- I'll speak --

LCHVMAX6

1   the letter, I think, is a sort of separate matter than the

2   summary judgment opinion and the answers.  Those are ones where

3   all we have is a summary judgment opinion.  We don't know what

4   the basis was for it.  And we have some answers to cross-claims

5   in which Mr. Epstein asserts some facts to which we don't know

6   what the question was.

7        And I suppose this brings me to the broader point

8   which applies to the letter and Epstein deposition as well,

9   which is that this was not a material fact in that litigation;

10  and so there was no reason for the government to litigate when

11  Mr. Epstein, in fact, lived in and was occupying the particular

12  residences.

13       What mattered in that litigation is that at some point

14  in early 1996, Mr. Epstein made an attempt to do an illegal

15  sublet of the property; and so the government was suing for

16  ejectment and back rent from Mr. Epstein.  But it did not

17  matter to the government whether Mr. Epstein abandoned the

18  property in January 1996, December 1995, November 1995.  There

19  was no reason for that to be litigated in the course of that

20  litigation.  It just mattered that he abandoned the property

21  before he tried to do the illegal sublet.  That's why it's in

22  the background section of Judge Chin's opinion; that's why it's

23  not a significant portion of any of the other documents.  There

24  is absolutely no reason to take judicial notice of it.  And

25  actually for the same reason, it's not subject to the 804

LCHVMAX6

1      hearsay exception.

2                    MS. MENNINGER:  That's not true, your Honor.

3                    In this litigation, one of the central issues that the

4      government -- this same office -- put forth is that

5      Mr. Epstein's abandoning that property was in violation of the

6      lease, which kept him -- which he needed to reside in the

7      residence under the terms of the lease.  So it was a central

8      fact.  It was admitted by Mr. Epstein.  It was put forth in

9      their claims against him, and that is all covered in the

10     summary judgment motion.  It was admitted on an answer.  It was

11     the only admission on that point.  And then it was testified to

12     in a deposition.  So I don't think that saying it was not an

13     issue in the case can possibly withstand scrutiny when you look

14     at all of these.

15                    Also, the factual background about the witness that

16     they said that they would call to dispute this, we've

17     interviewed this witness, and his testimony is not at all in

18     contradiction to this.  He was hired in December of '95.  He

19     said Mr. Epstein wasn't living there for the first three weeks

20     that he was hired in December of '95, and took possession in

21     early '96.  So I don't think there is a basis to call a

22     rebuttal witness to dispute these documents, all of which are

23     covered both by 201, as well as 804(b)(1).

24                    MR. ROHRBACH:  That's not accurate about this witness.

25                    But as a general point, there's no question that if

LCHVMAX6

1    they offered evidence like this, the government can and will

2    call rebuttal witnesses to testify about occupancy.

3            As to the point about whether this is a material fact,

4    it was material that Mr. Epstein stopped living at some point

5    in the 69th Street home.  It was not material the precise date

6    on which he stopped living there, much less whether he had

7    started spending his nights living on 71st Street at some point

8    prior to that.

9            THE COURT:  All right.

10           Do you want to indicate which documents by mark you're

11   seeking admission?

12           MS. MENNINGER:  Yes, your Honor.

13           THE COURT:  Forgive me if you said them before, I'm

14   not sure.

15           MS. MENNINGER:  That's okay.

16           Z-9 is the first answer.  That was docket entry number

17   15.

18           THE COURT:  Okay.

19           MS. MENNINGER:  And it would be the first paragraph.

20           The same is true of Z-10, first paragraph.

21           With respect to Z-7, that's the opinion.  The fact is

22   contained on page 4 in the first full paragraph, first

23   sentence.

24           And then with respect to Z-8, your Honor, it's towards

25   the back of the document.  It's paginated page 45 of 53, that's

LCHVMAX6

1    where the deposition excerpt was contained.

2             THE COURT:  Okay.

3             MS. MENNINGER:  And it's on that page 45.  It's the

4    first question on that page.

5             THE COURT:  All right.

6             I'm sustaining the objection.  201(a) has not been

7    sufficiently established, in light of the posture of the

8    litigation and what was materially in dispute.

9             What's next?

10            MS. MENNINGER:  With respect to 804(b)(1), your Honor,

11   for the deposition excerpt for Mr. Epstein.

12            THE COURT:  Okay.  Okay.  Mr. Rohrbach.

13            MR. ROHRBACH:  It is the same objection here, your

14   Honor.  Since this is a question about a fact that was the

15   precise -- sorry, let me --

16            THE COURT:  It's not the same.

17            MR. ROHRBACH:  It's not exactly the same.  But let's

18   look at the language of 804, which is, in order for it to be

19   offered against a party, the party has to have had an

20   opportunity and similar motive to develop it.

21            The government's motive in developing this fact is

22   completely different than it was in the civil litigation.  The

23   government's motive here is to determine where Mr. Epstein

24   personally lived.  The government's motive in this deposition

25   was to determine whether he had moved -- whatever that means --

LCHVMAX6

1    from one residence to another one by a certain date in order to

2    advance their claims about ejectment and back rent.

3           MS. MENNINGER:  In the answer itself, Mr. Epstein

4    says, You asked me that question three times.  And the question

5    was, Is it correct that you moved from the premises to 9 East

6    71st in or around the beginning of 1996?

7           That's the exact question --

8           THE COURT:  What was the response?

9           MS. MENNINGER:  You asked me that question three

10   times.  I believe it is around then, but I don't know exactly

11   when.

12          And the position of Jane was that he was living there

13   in 1994.  So I think under 401, it is a question of whether

14   that's relevant.  It is certainly different than the

15   testimony --

16          THE COURT:  The fact that it was asked three times is

17   the argument that it -- contrary to my immediately prior

18   ruling, that there was a motive to develop it?

19          MS. MENNINGER:  There was motive to develop it, your

20   Honor.  That was the whole point of this litigation.  I mean, I

21   can offer the complaint as well, but it's in the summary

22   judgment ruling.

23          THE COURT:  Okay.

24          For the same reason, it's sustained.

25          What else?

LCHVMAX6

1        MR. ROHRBACH:  Nothing else on this from the

2   government, your Honor.

3        MS. COMEY:  In that case, your Honor, I think that we

4   have a number of stipulations to finalize, and then I think we

5   will be ready to bring the jury back out, and it should take

6   about 10 or 15 minutes, at which point I think the presentation

7   of evidence will be complete.

8        THE COURT:  Okay.  So I got the note, just for the

9   record, the withdrawal of the request to issue an arrest

10   warrant for the witness Kelly, who hasn't responded to the

11   subpoena.

12        MS. MENNINGER:  Yes, your Honor.  Part of the

13   discussions are that we would wrap up today.

14        THE COURT:  I know.  But you sent my chambers an

15   email.  Is that application withdrawn?

16        MS. MENNINGER:  Yes, your Honor.

17        THE COURT:  To be clear, which application is that?

18        MS. MENNINGER:  The application to have the marshals

19   arrest Kelly Bovino for nonappearance on her subpoena.

20        THE COURT:  Okay.  We are working out a resolution of

21   issues that would also not necessitate the witness from London

22   on Monday?

23        MS. COMEY:  That's exactly right, your Honor.

24        THE COURT:  Okay.

25        MS. COMEY:  And it would mean that there would be no

LCHVMAX6

1    government rebuttal case as well.

2                THE COURT:  And no government rebuttal.

3                MS. COMEY:  No government rebuttal case.

4                THE COURT:  Okay.

5                MS. COMEY:  The parties have reached consensus to end

6    the case.

7                THE COURT:  Okay.  All right.

8                While you're working, Ms. Sternheim, are you ready for

9    the allocution?

10               MS. STERNHEIM:  I am.

11               THE COURT:  Okay.

12               I'll ask Ms. Maxwell and Ms. Sternheim to stand.

13               Ms. Maxwell, I want to make sure you understand that

14   you have the right to testify in your own defense.  You also

15   have the right not to testify.

16               If you decide not to testify, I will instruct the jury

17   that they may not draw any inference against you based on that

18   decision, and that fact may not enter into their deliberations.

19               I want to make sure that you know that the decision

20   whether to testify or not is your decision.  You are entitled

21   to the best advice of your attorneys in making this decision,

22   but the decision is yours.

23               Ms. Maxwell, do you understand that?

24               THE DEFENDANT:  Your Honor, the government has not

25   proven its case beyond a reasonable doubt; and so there is no

LCHVMAX6

```
1    need for me to testify.

2              THE COURT:  All right.

3              Ms. Sternheim, have you discussed the issue with your

4    client?

5              MS. STERNHEIM:  Yes, we have.

6              THE COURT:  And you've advised her that it is her

7    decision?

8              MS. STERNHEIM:  Yes, we have.

9              THE COURT:  She's just indicated that her decision is

10   not to testify; is that correct?

11             MS. STERNHEIM:  That is correct.

12             THE COURT:  Ms. Maxwell, that is correct?

13             THE DEFENDANT:  Your Honor, that is correct.

14             THE COURT:  Thank you.

15             You may be seated.

16             MS. STERNHEIM:  Thank you.

17             THE COURT:  All right.  Five minutes?

18             MS. COMEY:  Yes, please, your Honor.

19             THE COURT:  Okay.

20             (Recess)

21             THE COURT:  Counsel, are you ready?

22             MS. COMEY:  Yes, your Honor.

23             THE COURT:  On the defense?

24             MR. EVERDELL:  Yes, your Honor.

25             THE COURT:  Okay.  One thought for Monday.  I'm going
```

LCHVMAX6

1    to tell the jury to be here at 9, rather than 9:30.  We'll take

2    as much advantage of the day as we can.

3         MS. STERNHEIM:  Your Honor, the government and I had

4    spoken about this.  And if it's amenable to the Court -- they

5    haven't spoken yet, but we can talk about this after.

6         THE COURT:  Okay.  Fair enough.  Thank you.

7         All right.  We'll bring in the jury.

8         MS. COMEY:  Yes.  Thank you, your Honor.

9         MS. STERNHEIM:  We were going to suggest also

10   beginning at 9.  And whether the Court would inquire of the

11   jury if they would be willing to stay a little later so that we

12   can complete everything on Monday.

13        THE COURT:  Okay.  You don't mean extended time for

14   deliberations, you mean the closings.

15        MS. STERNHEIM:  No, I mean to do the closing

16   arguments.

17        THE COURT:  You pushed it off.  Yes.

18        MS. STERNHEIM:  Closing arguments, rebuttal, charge.

19        THE COURT:  And what's your best estimate?

20        We'll do a shortened lunch too, because we presumably

21   won't have issues to work through.

22        MS. COMEY:  Your Honor, we estimate that the summation

23   argument for Ms. Moe will be between two and three hours.  My

24   rebuttal, it's hard to estimate.  I doubt it would be more than

25   45 minutes at most.

LCHVMAX6

1              THE COURT:  And the defense.

2              MS. STERNHEIM:  It would not exceed the government's

3    main closing argument, and hopefully would be shorter.

4              THE COURT:  Okay.  It will be tight.

5              So I'll tell them that we'll start at 9, and that they

6    should prepare for the possibility of being kept until 5:30?

7              MS. STERNHEIM:  We had proposed 6 o'clock.

8              THE COURT:  Okay.

9              MS. COMEY:  Obviously, your Honor, we will strive for

10   efficiency in our arguments.

11             THE COURT:  Yes.  Okay.

12             I will say that.  I need to give them an opportunity

13   to let Ms. Williams know if that's not possible.  I don't know

14   if somebody has childcare responsibilities or the like.

15             MS. STERNHEIM:  Understood.

16             That's why we wanted to raise it with you now.

17             MS. COMEY:  Yes, your Honor.

18             THE COURT:  All right.  Thank you.

19             Bring in the jury.

20             (Jury present)

21             THE COURT:  Members of the jury, thank you so much for

22   your patience.  I greatly appreciate it.

23             Mr. Everdell, you may proceed.

24             MR. EVERDELL:  Thank you, your Honor.

25             Your Honor, at this time the parties have a number of

LCHVMAX6

1      stipulations that we would like to read for the jury.

2                   THE COURT:  Go ahead.

3                   MR. EVERDELL:  The first is an oral stipulation

4      between the parties, and I would like to have Ms. Comey read

5      that one out to the jury.

6                   THE COURT:  Okay.

7                   MS. COMEY:  Thank you, your Honor.

8                   The parties have hereby stipulated and agreed that

9      Government Exhibits 52-K, 52-J, and 52-L are redacted excerpts

10     of what has been marked for identification as Government

11     Exhibit 52.  And the government would offer those three

12     exhibits, 52-K, J, and L under seal to protect the privacy of

13     third parties.

14                  MR. EVERDELL:  And without waiving our prior

15     objections, no objection, your Honor.

16                  THE COURT:  All right.  52-K, 52-J, and 52-L are

17     admitted under temporary seal for me to consider limited

18     redactions.

19                  MS. COMEY:  Yes, your Honor.  Thank you.

20                  (Government's Exhibits 52-J, 52-K, 52-L received in

21     evidence)

22                  MR. EVERDELL:  Your Honor, we have another oral

23     stipulation agreed to by the parties.

24                  The parties hereby stipulate and agree that Annie

25     Farmer's boots were seized by the FBI on June 29th, 2021.

LCHVMAX6

1           THE COURT:  Okay.  Thank you.

2           MR. EVERDELL:  We have another oral stipulation.

3           The parties hereby stipulate and agree that Mike

4    Wallace's date of birth is May 9th, 1918.

5           THE COURT:  Thank you.

6           MR. EVERDELL:  We have one more oral stipulation.

7           The parties hereby stipulate and agree that *The Lion

8    King*, the Broadway musical, opened in previews at the New

9    Amsterdam Theater in New York City on October 15th, 1997, with

10   the official opening on November 13th, 1997.

11          THE COURT:  Okay.

12          MR. EVERDELL:  And your Honor, we have some written

13   stipulations now, which I would like to read to the jury.

14          THE COURT:  Okay.

15          MR. EVERDELL:  First, it is hereby stipulated and

16   agreed by and among the United States of America, by Damian

17   Williams, United States Attorney for the Southern District of

18   New York, and Maurene Comey, Alison Moe, Laura Pomerantz, and

19   Andrew Rohrbach, Assistant United States Attorneys, of counsel,

20   and defendant Ghislaine Maxwell, by and with the consent of her

21   attorneys, Christian Everdell, Esquire, Laura Menninger,

22   Esquire, Jeffrey Pagliuca, Esquire, and Bobbi Sternheim,

23   Esquire, that:

24          The witness referred to as Kate and her counsel

25   attended a meeting with the government prosecutors on September

LCHVMAX6

1    3rd, 2021.  At that meeting, Kate's counsel provided the

2    government prosecutors with a partially completed visa

3    application for a U visa, and asked to discuss Kate's visa

4    status.

5          It is further stipulated and agreed that this

6    stipulation marked as Defense Exhibit A-1 may be received in

7    evidence at trial.  It's dated today's date, signed by the

8    parties.

9          (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LCHCmax7

```
 1              MS. COMEY:  No objection, your Honor.

 2              THE COURT:  A-1 is admitted.

 3              (Defendant's Exhibit A-1 received in evidence)

 4              MR. EVERDELL:  Your Honor, I now have A2.

 5              THE COURT:  And you could you skip the preface and

 6    say, between the parties.

 7              MR. EVERDELL:  Sure, your Honor.

 8              THE COURT:  Thank you.

 9              MR. EVERDELL:  It is hereby stipulated and agreed by

10    and among the parties that, if recalled as a witness, Dominique

11    Hyppolite would testify as follows:  The Palm Beach County

12    school maintains school records in the ordinary course of

13    business.

14              The document marked Defense Exhibits DH1, DH2, and DH3

15    are each a true and accurate copy of Palm Beach County school

16    records for Virginia Robertson.

17              The document marked Defendant's Exhibit J2 is a true

18    and accurate copy of Palm Beach County school records for the

19    witness identified as Jane.

20              It is further stipulated and agreed that Defense

21    Exhibits DH1, DH2, DH3, and J2, and this stipulation marked as

22    Defense Exhibit DH4, may be received in evidence at trial.

23              And it's dated today's date, signed by the parties.

24              MS. COMEY:  No objection.  The government would

25    request that Exhibit J2 be accepted under seal consistent with
```

LCHCmax7

1    the Court's prior order.

2            THE COURT:  DH1, DH2, DH3, and DH4 are admitted.  J2

3    is admitted under seal with the opportunity to propose a narrow

4    redaction.

5            (Defendant's Exhibits DH1, DH2, DH3, DH4, J2 received

6    in evidence)

7            MR. EVERDELL:  That's correct, your Honor.  And I have

8    copies for the Court if you want me to hand those up now.

9            THE COURT:  It's okay.  I'll take them after.

10           MR. EVERDELL:  Yes, your Honor.

11           We have A5 now, your Honor.

12           THE COURT:  Okay.

13           MR. EVERDELL:  It is hereby stipulated and agreed by

14   and among the parties that the HM Land Registry is the

15   governmental authority in the United Kingdom that maintains

16   official public records relating to the ownership of land and

17   property located in the United Kingdom.

18           Defense Exhibit MG12 are documents relating to the

19   property located at 69 Stanhope Mews East, London SQ75QT,

20   United Kingdom, that were retrieved from the HM Land Registry

21   on March 26th, 2021.

22           Defense Exhibit MG1 are documents related to the

23   property located at 44 Kinnerton Street, London, SW1XHES,

24   United Kingdom, that were retrieved from the HM Land Registry

25   on December 13th, 2021.

LCHCmax7

1          Pages 1 to 3 of defense Exhibit MG12 is a true and

2    accurate copy of the HM Land Registry official public record

3    dated January 21st, 1994, confirming the registered ownership

4    of Ghislaine Noelle Marion Maxwell as of November 11th, 1988 of

5    the property located at 69 Stanhope Mews East, London, SQ75QT,

6    United Kingdom.

7          Pages 4 to 6 of Defense Exhibit MG12 is a true and

8    accurate copy of the HM Land Registry official public record,

9    dated April 24th, 1995, confirming the registered ownership of

10   Anthony John Jets as of April 4th, 1995, of the property

11   located at 69 Stanhope Mews East, London, SQ75QT, United

12   Kingdom, after ownership of said property by Ghislaine Noelle

13   Marion Maxwell.

14         Pages 1 to 2 of Defense Exhibit MG1 is a true and

15   accurate copy of the HM Land Registry official public record,

16   dated March 20th, 1997, confirming the registered ownership of

17   Ghislaine Noelle Marion Maxwell as of March 20th, 1997, of the

18   property located at 44 Kinnerton Street, London, Southwest

19   1XATS, United Kingdom.

20         Pages 3 to 4 of Defense Exhibit MG1 is a true and

21   accurate copy of the HM Land Registry official public record

22   dated December 15th, 1992, confirming the registered ownership

23   of John Gerard O'Neal and Nessa O'Neal, as of June 30th, 1986,

24   of the property located at 44 Kinnerton Street, London

25   SW1XEHES, United Kingdom, before ownership of said property by

LCHCmax7

1   Ghislaine Noelle Marion Maxwell.

2            It is further stipulated and agreed that Government

3   Exhibit 610A is a fair and accurate copy of selected pages from

4   a transcript of a deposition of Ghislaine Maxwell on April 9th,

5   2019.

6            It is further stipulated and agreed that Defense

7   Exhibit MG12, Defense Exhibit MG1, Government Exhibit 610A, and

8   this stipulation marked as Defense Exhibit A5 may be received

9   in evidence at trial.  It's dated with today's date and signed

10  by the parties.

11           MS. COMEY:  No objection, your Honor.

12           THE COURT:  Great.  Defense MG12, MG1, and A5 are

13  admitted, and GX610A is admitted.

14           (Defendant's Exhibits MG12, MG1, A5 received in

15  evidence)

16           (Government's Exhibit 610A received in evidence)

17           MR. EVERDELL:  Correct, your Honor.

18           I believe this is the final stipulation, A6, your

19  Honor.

20           THE COURT:  Go ahead.  Thank you, Mr. Everdell.

21           MR. EVERDELL:  It is hereby stipulated and agreed by

22  and among the parties that on August 17th, 2021, Robert

23  Glassman, counsel for the witness testifying using the

24  pseudonym Jane, spoke by phone with a prosecutor in this case.

25  The notes of the call reflect that Glassman stated that before

LCHCmax7

 1   the government charged the case, Jane had discussed with

 2   Glassman whether to cooperate with the case, and during those

 3   conversations, Glassman had advised Jane to cooperate, and

 4   discussed with Jane that cooperating with the case was the

 5   morally right thing to do, and they had discussed how

 6   testifying at trial was the right thing to do.  Glassman also

 7   mentioned that Glassman had told Jane it would, quote, help her

 8   case, unquote.

 9          It is further stipulated and agreed that this

10   stipulation, marked as Defense Exhibit A6, may be received in

11   evidence at trial.  And it's dated with today's date, signed by

12   the parties.

13          MS. COMEY:  No objection.

14          THE COURT:  A6 is admitted.

15          (Defendant's Exhibit A6 received in evidence)

16          MR. EVERDELL:  May I have a moment, your Honor?

17          THE COURT:  You may.

18          MR. EVERDELL:  Your Honor, those are all the

19   stipulations.

20          THE COURT:  Go ahead, Ms. Sternheim.

21          MS. STERNHEIM:  Thank you, Judge.  At this time, the

22   defense rests.

23          THE COURT:  Ms. Comey.

24          MS. COMEY:  The government has no further case, your

25   Honor.

LCHCmax7

1          THE COURT:  All right.  Thank you.

2          Members of the jury, that closes the evidence portion

3     of the trial.

4          Let me tell you what comes next.

5          Closing arguments are summation by the parties.  Both

6     sides will have an opportunity to summarize for you their view

7     of the evidence in the case and the arguments they wish you to

8     consider.  Following that, I'll instruct you as to the law that

9     you'll follow during your deliberations and then you'll begin

10    your deliberations.

11         Monday, I'm going to ask that we start at 9:00 a.m.

12    instead of 9:30.  And I want you -- I believe we'll finish at

13    our normal time, but there is a possibility that, just to get

14    through what we need to do on Monday, we may go a little bit

15    later.  So I'm going to ask you to arrange to be here as late

16    as 6:00 p.m.  If that is a problem, on your way out tonight,

17    let Ms. Williams know, and we won't do that.  I want to stick

18    to my promise to the schedule, but if everybody is able to stay

19    as late as 6:00 on Monday, that might help us ensure that we

20    can get done what we want to do in one day.

21         So again, Monday, 9:00 a.m., the parties will do their

22    closing arguments, their summations, then I'll instruct you as

23    to the law, and then the deliberations will begin.

24         So 9:00 a.m. on Monday.  If staying until 6:00 on

25    Monday is a hardship, please let Ms. Williams know on your way

LCHCmax7

1   out and we'll end at our normal time.

2              I'm going to let you go for the weekend and the day

3   given where we are in the trial.

4              I want to just take a couple moments to really

5   emphasize how important it is, of course, that you continue to

6   follow all of my instructions.  Even though we're at this

7   different phase of the case, no communications with each other

8   or anyone else through any means about the case.  No consuming

9   any information about the case through any means.  Continue to

10  keep an open mind until you hear the summation -- the closing

11  arguments of the parties, my instructions as to the law, and

12  you begin your deliberations as a jury.  It's vitally important

13  that those rules continue to be followed all the way through.

14             I'm very grateful for your patience today and

15  throughout.  I wish you a very good and safe weekend.  Please

16  be cautious out there.  I want to see everybody back here

17  Monday at 9:00.  And I hope you have a wonderful weekend.

18  Thank you.

19             (Continued on next page)

20

21

22

23

24

25

LCHCmax7

1           (Jury not present)

2           THE COURT:  Matters to take up.  Oh, the charge, I bet

3    you're curious.  I want to give it just one more read.  I

4    haven't had time to do that today given the issues that

5    occupied the lunch break.  I would say by 6:00 p.m., you'll

6    have a copy of my draft charge and the draft verdict sheet and

7    we'll meet at 9:00 a.m. here for the charging conference

8    tomorrow.

9           MS. MOE:  Thank you, your Honor.

10           Just on a separate housekeeping matter, your Honor, I

11    just wanted to flag, given the number of issues we're trying to

12    streamline and resolve today and yesterday, we haven't had a

13    chance yet to discuss logistics for closing, but we want to

14    make sure we iron that out so we make sure we're ready to go on

15    Monday morning.  I wanted to flag that we'll confer this

16    evening to make sure we're on the same page on logistics and

17    screens and the like.

18           Would the Court prefer that we reach out about a

19    proposal about how that should be arranged?  I want to make

20    sure we're not causing any delay on Monday morning.

21           THE COURT:  I mean, I think confer with the court

22    staff to make sure you have what you need.  Only if there is a

23    dispute do you need to raise it with me.

24           MS. MOE:  Is there anyone in particular within the

25    courthouse staff we should reach out to about logistics?

LCHCmax7

1        THE COURT:  Start with Ms. Williams.  I guess it

2    depends what it is.  We'll have some staff here tomorrow for

3    the charging conference, but Ms. Williams will be reachable no

4    matter what over the weekend and she can direct traffic.

5        MS. MOE:  Thank you very much, your Honor.  Just

6    wanted to work that out in advance.

7        THE COURT:  Thank you.

8        MS. STERNHEIM:  Judge, at this time, we would

9    reiterate and renew our motion pursuant to Rule 29.

10        THE COURT:  With that reservation, we can proceed to

11    the charging conference.

12        Anything else to take up?

13        MS. MOE:  Not from the government, your Honor.  Thank

14    you.

15        MR. EVERDELL:  Not from the defense, your Honor.

16        THE COURT:  I thank everyone.  I'll see everyone at

17    9:00.  You'll get the charge as soon as I can, but by 6:00.

18        (Adjourned to December 18, 2021 at 9:00 a.m.)

19                              * * *

20

21

22

23

24

25

1                         INDEX OF EXAMINATION

2    Examination of:                              Page

3     JASON RICHARDS

4    Direct By Mr. Pagliuca . . . . . . . . . . . .2595

5    Cross By Ms. Comey . . . . . . . . . . . . . .2603

6    Redirect By Mr. Pagliuca . . . . . . . . . . .2604

7     AMANDA YOUNG

8    Direct By Ms. Menninger  . . . . . . . . . . .2605

9    Cross By Ms. Comey . . . . . . . . . . . . . .2619

10   Redirect By Ms. Menninger  . . . . . . . . . .2626

11    EVA ADNERSSON DUBIN

12   Direct By Mr. Pagliuca . . . . . . . . . . . .2632

13   Cross By Ms. Moe . . . . . . . . . . . . . . .2665

14    MICHELLE HEALY

15   Direct By Ms. Menninger  . . . . . . . . . . .2672

16   Cross By Ms. Comey . . . . . . . . . . . . . .2682

17

18

19

20

21

22

23

24

25

```
1                        DEFENDANT EXHIBITS

2     Exhibit No.                              Received

3      662-RR   . . . . . . . . . . . . . . . . .2652

4      A-1   . . . . . . . . . . . . . . . . . .2728

5      DH1, DH2, DH3, DH4, J2  . . . . . . . . . .2729

6      MG12, MG1, A5   . . . . . . . . . . . . .2731

7      A6   . . . . . . . . . . . . . . . . . . .2732

8

9

10                      GOVERNMENT EXHIBITS

11    Exhibit No.                              Received

12     52-J, 52-K, 52-L  . . . . . . . . . . . .2725

13     610A    . . . . . . . . . . . . . . . . .2731

14

15

16

17

18

19

20

21

22

23

24

25
```