LCKCmax1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
     UNITED STATES OF AMERICA,
3
              v.                          20 CR 330 (AJN)
4
     GHISLAINE MAXWELL,
5
                   Defendant.             Jury Trial
6    ------------------------------x
                                          New York, N.Y.
7                                         December 20, 2021
                                          8:40 a.m.
8
     Before:
9                      HON. ALISON J. NATHAN,

10                                        District Judge

11                            APPEARANCES

12   DAMIAN WILLIAMS
          United States Attorney for the
13        Southern District of New York
     BY:  MAURENE COMEY
14        ALISON MOE
          LARA POMERANTZ
15        ANDREW ROHRBACH
          Assistant United States Attorneys
16
     HADDON MORGAN AND FOREMAN
17        Attorneys for Defendant
     BY:  JEFFREY S. PAGLIUCA
18        LAURA A. MENNINGER
               -and-
19   BOBBI C. STERNHEIM
               -and-
20   COHEN & GRESSER
     BY:  CHRISTIAN R. EVERDELL
21
     Also Present:  Amanda Young, FBI
22                  Paul Byrne, NYPD
                    Sunny Drescher,
23                   Paralegal, U.S. Attorney's Office
                    Ann Lundberg,
24                   Paralegal, Haddon Morgan and Foreman

25

LCKCmax1

 1            THE COURT:  Preliminary matters to take up, counsel?

 2            MS. MOE:  Not from the government, your Honor.

 3            MS. MENNINGER:  Not from the defense, your Honor.

 4            THE COURT:  Let me just confirm that we have to be

 5     docketed or had been docketed all admitted exhibits with the

 6     tailored redactions proposed.

 7            MR. ROHRBACH:  Your Honor, the pursuant to the Court's

 8     order that they've been made public through the United States

 9     Attorney's Office's press office, so the exhibits for both

10     parties are publicly available.

11            THE COURT:  There was one that the letter indicated

12     the defense would propose a more tailored redaction that was --

13            MR. EVERDELL:  Is that AF-1, your Honor?

14            THE COURT:  AF-1.

15            MR. EVERDELL:  There is AF-1R, which is the publicly

16     available version that's going to be made public.

17            THE COURT:  Great.  And we've sorted the availability

18     for the public of the visual portion of the closing to be in

19     redacted form shortly after the completions of closing.

20            MS. MENNINGER:  Yes, your Honor.  I'm not sure whether

21     we will be able to take out the slides that have the sensitive

22     materials within two hours.  I hope to be able to just redact

23     the part that's -- but I'm not sure we'll have enough time to

24     check it.  With the Court's permission, we'll tender the one

25     that has none of the sensitive slides and then replace them

LCKCmax1

1   with redacted ones as soon as we can and confirm it with the

2   government.

3           THE COURT:  I think that caution is worth it, but

4   balanced against the need to provide public access to what will

5   occur in court with appropriate tailored redactions.

6           Anything else to take up?

7           MS. MOE:  Not from the government, your Honor.

8           MS. MENNINGER:  Your Honor, can I just confirm the

9   timing which --

10          THE COURT:  That's a great point.  I thought through

11  it a little bit more and what we've done is we've ordered an

12  early -- taking Ms. Sternheim up on her suggestion, the

13  government will go and Ms. Moe, in your absence, they committed

14  you to an hour.

15          MS. MOE:  I guess I'll have to talk even more quickly

16  than I normally do.

17          MS. STERNHEIM:  Judge, if I can share, the first trial

18  I had before Judge Motley, she did that to 17 lawyers who

19  started ripping pages out.

20          THE COURT:  Ms. Moe, does it look like two?

21          MS. MOE:  Somewhere between two and two and a half

22  hours, your Honor.

23          THE COURT:  It won't be more than two and a half.

24          MS. MOE:  Of course, your Honor.

25          THE COURT:  And Ms. Menninger.

LCKCmax1

1          MS. MENNINGER:  Yes.

2          THE COURT:  It won't be more than two and a half?

3          MS. MENNINGER:  It will what?

4          THE COURT:  Not be more than two and a half?

5          MS. MENNINGER:  Correct, your Honor.

6          THE COURT:  All right.  So here's what we're going to

7    do:  The government will go straight through, we'll then break

8    and I will have the jurors' lunch -- an early lunch at that

9    point.  It will be short, 20 to 30 minutes.  We come back, the

10   defense goes all the way through.  We take a short comfort

11   break, ten minutes, and then government rebuttal and my charge

12   and begin deliberations if we have time.

13          I had told the jury to prepare to stay until 6:00 in

14   case we needed that to get through what we need to do, that

15   remains true.  As is my practice, what I'll tell them is they

16   can let us know when they would like to leave for the evening,

17   if they're in agreement to continue their deliberations until

18   they indicate to us that they're ready to call it a night.

19          MS. MENNINGER:  And then does your Honor have the

20   practice of counsel being within a certain --

21          THE COURT:  Oh, yes.

22          MS. MENNINGER:  -- in the building or what's your

23   Honor's preference?

24          THE COURT:  Look, we need to be able to --

25          MS. MENNINGER:  Yes.

LCKCmax1

1          THE COURT:  So, Ms. Williams should be able to get you

2     back here within a few minutes.

3          MR. EVERDELL:  Your Honor, on the logistics about

4     read-backs, we provided the government with a proposed set of

5     redacted transcripts which I think they still need to review,

6     it was late last night, but we'll get that approved.  So in

7     case there are read-backs, we'll have a preset redacted

8     transcript.

9          THE COURT:  Okay.  And I know you're working with

10    Ms. Williams on finalizing the exhibit list.  There were a few

11    items missing.  She'll get you the new version with the

12    additions once we've checked them and then, presumably, at the

13    lunch break, I'll get verification from both sides that the

14    list is complete and accurate.  Okay?

15         MR. ROHRBACH:  Yes, your Honor.

16         THE COURT:  And then exhibits going back to the jury,

17    I had asked the parties to confer on how they'd like to handle

18    that.  Where are we on that?

19         MR. ROHRBACH:  Yes, your Honor, with exception of the

20    physical exhibits, the parties are going to create a flash

21    drive with exhibits from both parties and indices for those

22    exhibits, which will be available for the jury.

23         THE COURT:  So not paper, just the flash drives and

24    then physical exhibits are not going back?

25         MR. ROHRBACH:  With the exception of the physical

LCKCmax1

exhibits which can't be loaded to the flash drive, I think they

are going back to the jury.

          MS. MENNINGER:  Right.  That's right.

          THE COURT:  So it will be a flash drive and the

physical exhibits and that's it.  And you've gotten that, the

flash drive.  Everybody's looked at it so you can confirm you

know what's going back?

          MR. ROHRBACH:  The parties agreed on what should be on

the flash drive and it's been created.  I don't think the

defense has had an opportunity to look at it yet.

          THE COURT:  Who's handling this, Ms. Menninger?

          MR. EVERDELL:  I will be handling it, your Honor.

          THE COURT:  Let's be ready again at the lunch break to

just confirm on the record that that's ready to go.

          Let me check if I have anything else.  I don't think

so.  The box is turned.  Okay.  All right.  We'll wait for our

jurors and let my staff know if you need me for anything before

we get underway.

          (Recess)

          (Continued on next page)

LCKVMAX2

1            THE COURT:  All right.  We have our jury.

2            Anything to raise before we bring them in?

3            MS. MOE:  Not from the government, your Honor.

4            MS. STERNHEIM:  No, your Honor.  Thank you.

5            THE COURT:  Thank you.

6            Ms. Moe, you can take your place at the podium.

7            MS. MOE:  Thank you, your Honor.

8            THE COURT:  And bring in the jury.

9            (Jury present)

10            THE COURT:  Good morning, members of the jury.  Thank

11   you so much for your timeliness.  It's good to see everyone.

12            As I indicated, we are at the summation or closing

13   argument phase of the trial.  Here's how we'll do the schedule:

14            The government, Ms. Moe, will present the closing

15   argument for the government.  She's going to go through and

16   finish her argument.  We'll then break early for lunch.  It

17   will be a short lunch, and then we'll come back -- 20 to 30

18   minutes for the lunch break.  We'll come back.

19            Ms. Menninger will present the closing argument on

20   behalf of the defense.  We'll take a short break at that point.

21   We'll come back.  Rebuttal closings by the government, and

22   instructions from me.  So that's the schedule for the day, just

23   to give you a sense of where we are.

24            With that, I ask you to please give your full

25   attention to Ms. Moe on behalf of the government.

1          MS. MOE:  Ghislaine Maxwell was dangerous.  She was a

2     grown woman who preyed on vulnerable kids, young girls from

3     struggling families.  She targeted a girl whose father had just

4     died.  She targeted a girl whose mother was an alcoholic.  She

5     targeted a girl with a single mom who was struggling to raise

6     her daughters.  Maxwell was a sophisticated predator who knew

7     exactly what she was doing.  She ran the same playbook again

8     and again and again.  She manipulated her victims and she

9     groomed them for sexual abuse.  She caused deep and lasting

10    harm to young girls.  It is time to hold her accountable.

11         Over the last few weeks, you've seen and heard a lot

12    of evidence.  You've heard from witnesses from all walks of

13    life.  You heard powerful testimony from women who told you

14    about traumatizing events from their childhoods.  You heard

15    from people they talked to years ago about those events who

16    corroborated their testimony.  You heard from law enforcement

17    officers who searched the properties where these crimes

18    happened.  You heard from employees who worked for Maxwell and

19    Epstein.

20         In addition to those witnesses, you've seen documents,

21    phone messages, FedEx records, a household manual, and a little

22    black book with victim names.  You also saw bank records

23    showing the $30 million that Jeffrey Epstein paid to Ghislaine

24    Maxwell.

25         Ladies and gentlemen, this summation is our

1    opportunity to explain how all of that evidence fits together,

2    because the proof is in.  It's clear, it's consistent, and it

3    points to only one conclusion:  Maxwell is guilty.

4           So today, I want to talk to you about eight different

5    reasons that you know Maxwell is guilty.  After that, I'll

6    discuss the charges in this case, and then I'll address some of

7    the arguments the defense has made to you throughout this

8    trial.

9           So let's start with the eight reasons that you know

10   Maxwell is guilty.

11          The first reason that you know Maxwell knew exactly

12   what she was doing when she recruited and groomed young girls

13   for abuse is that Maxwell and Epstein were partners.  They were

14   partners in crime who sexually exploited young girls together.

15   So let's talk about the relationship between Maxwell and

16   Epstein and how it shows you that Maxwell committed these

17   crimes together with Jeffrey Epstein.

18          The evidence at this trial showed you that Maxwell was

19   Jeffrey Epstein's right hand.  For many years they were in a

20   romantic relationship; they were partners.  In 2002, Maxwell

21   wrote this essay; it's Government Exhibit 422.  Now, you know

22   that Maxwell wrote this essay because you saw the metadata that

23   showed that the author of this document was G. Max, the

24   defendant.  And the document was on a computer that was

25   registered to Maxwell.  Here's that metadata.

1          So in this essay, here's how Maxwell described her

2    relationship with Jeffrey Epstein:  Jeffrey and Ghislaine have

3    been together, a couple, for the last eleven years.  They are,

4    contrary to what many people think, rarely apart.  I almost

5    always see them together.  Jeffrey and Ghislaine complement

6    each other really well, and I cannot remember one without the

7    other.  On top of being great partners, they are also the best

8    of friends.

9          A couple for eleven years.  Great partners.  Rarely

10   apart.  Best of friends.  Does that sound like a personal

11   assistant compartmentalized from Jeffrey Epstein's life?  Of

12   course not.  What Maxwell described in this essay is the

13   relationship that you heard throughout this entire trial.

14   Close partners who operated together.  And, ladies and

15   gentlemen, when you're with someone for eleven years, you know

16   what they like.  Epstein liked underage girls.  He liked to

17   touch underage girls.  Maxwell knew it.

18         Make no mistake.  Maxwell was crucial to the whole

19   scheme.  Epstein could not have done this alone.  A single

20   middle-aged man who invites a teenage girl to visit his ranch,

21   to come to his house, to fly to New York, is creepy.  That sets

22   off alarm bells.  But when that man is accompanied by a posh,

23   smiling, respectable, age-appropriate woman, that's when

24   everything starts to seem legitimate.  And when that woman

25   encourages those girls to massage that man, when she acts like

1    it's totally normal for the man to touch those girls, it lures

2    them into a trap.  It allows the man to silence the alarm bells

3    and get away with molesting those girls.

4            Maxwell was the key to the whole operation.

5            At this trial, you saw photographs that showed how

6    close Maxwell and Epstein were over a span of many, many years.

7    And the relationship that you saw in those photos was the same

8    relationship that Maxwell described in an essay.  They were

9    close.  They were partners.  They were rarely apart.  Let's

10   take a look at some of those.

11           You saw many photos for the many years that Maxwell

12   and Epstein were partners.  And what you're looking at here is

13   a couple.  Arms around each other, doting looks on their faces.

14   Here are three more photographs.  As you look through these,

15   notice that they are getting older.  Their haircuts change;

16   time appears to be passing.  But it's the same relationship the

17   whole way through.  Cheek-to-cheek, arms wrapped around each

18   other.

19           Here are three more.  These photographs show you what

20   their relationship was really like.  They were incredibly close

21   for many years.

22           I want to show you two more photographs.  That's

23   Government Exhibit 313 and 342.  On the left, you're looking at

24   Maxwell and Epstein swimming naked together in a pool.  They

25   are not alone; someone else is taking the picture.  They're

1    laughing.  On the right, that's Maxwell massaging Epstein's

2    foot with her breasts.  She's smiling.  A third person is

3    taking the photograph.

4         What you're looking at in these two photographs are

5    two people with a sexual relationship.  They were partners.

6    And throughout this trial, you heard witnesses tell you how

7    Maxwell made this kind of sexual behavior feel normal and

8    casual.  That's exactly what you're looking at in these

9    photographs.

10        Now, being the right hand to a multimillionaire came

11   with serious benefits to Maxwell.  As his partner, she had

12   access to enormous wealth and she lived his luxury lifestyle.

13   She spent her weeks flying around on Epstein's private jet from

14   his mansion on the Upper East Side, to his ranch in New Mexico,

15   to his villa in Palm Beach, to his apartment in Paris, and to

16   his private island in the U.S. Virgin Islands.  Together, they

17   moved in a social circle of rich and famous people.

18        Now, Maxwell was not just Epstein's partner; you

19   learned that she was the lady of the house.  You heard from

20   Juan Alessi, the house manager in Palm Beach, who told you all

21   about Maxwell's place in that household from the early 1990s,

22   until Alessi left in December of 2002.  Here's Alessi's

23   testimony about that.

24        Juan Alessi told you that the day Maxwell came to the

25   house, she took over right away; and she told Alessi that she

LCKVMAX2                    Summations - Ms. Moe

1    was going to be the lady of the house.  And what Alessi told

2    you about Maxwell is backed up by the household manual, that

3    document full of rules that you saw at trial.  Those were rules

4    that Maxwell put in place.  You know she put those rules in

5    place.  Alessi testified that Maxwell gave him this manual.

6            During Juan Alessi's testimony, you saw many pages

7    from this manual, and you saw all the sections that talked

8    about Maxwell and Epstein:  What to serve them for breakfast,

9    how to arrange their desks, where to put their stationery.  I'm

10   not going to go through all of those pages with you now, but

11   here's just one example.  This section tells employees to make

12   sure to set out two different sizes of Maxwell's notepads, one

13   marked "Lady Ghislaine."

14           Now, you can read through that entire manual when you

15   deliberate, but you're just going to find two names throughout

16   that whole household manual, it's Maxwell and Epstein's guests,

17   Maxwell and Epstein's phone directories, Maxwell and Epstein's

18   breakfast preferences, Maxwell and Epstein's phone messages,

19   Maxwell and Epstein's phone lines, Maxwell and Epstein's

20   residence.  These were Maxwell and Epstein's rules.  This

21   manual was clear.  She was the lady of the house.

22           And no matter how hard the defense has tried to

23   suggest throughout this trial that Maxwell was just an

24   employee, that she didn't know what was going on, this document

25   tells you otherwise.  This manual makes crystal clear who

1   mattered in that household in Palm Beach.  It was Maxwell and

2   Epstein together.  Of course, Maxwell knew what was going on in

3   that house.  She had a firm grip on everything that was

4   happening there.  She was Epstein's partner.

5          Now, the household manual isn't the only document that

6   you saw at this trial that showed you that Maxwell had a firm

7   grip on that household and that she knew everything that was

8   going on there.  I want you to take a look at Government

9   Exhibit 420.  This document is dated in 2002.  And the metadata

10  tells you that it was written by, you guessed it, G. Max.  This

11  document shows you that Maxwell wrote out a detailed list of 13

12  different oils and lotions for massages in Palm Beach.  She was

13  intimately involved in all of the details of Epstein's

14  so-called massages.

15         In fact, even the sex toys in the massage room had to

16  be returned to a basket in Maxwell's bathroom closet.  That's

17  what Mr. Alessi had to do.  Here's his testimony about that.

18  He told you about having to wash off dildos after the massages

19  and how he would return them to a basket in Maxwell's closet,

20  because that's where they were kept.  Again and again, the

21  evidence at this trial showed you how closely Maxwell was

22  involved in Epstein's so-called massages.  She managed all of

23  the details right down to the lotions and the oils.  She was in

24  on the whole thing.

25         So we were talking about the household manual.  What

LCKVMAX2                    Summations - Ms. Moe

1   else does the household manual tell you?  You remember the

2   disturbing warning in that manual.  Here it is:  Remember that

3   you see nothing, hear nothing, say nothing, except to answer a

4   question directed at you.  Respect their privacy.

5           You learned that this powerful warning to employees

6   was effective.  Here's Mr. Alessi's testimony about that.  He

7   explained that this rule was a kind of warning that he was

8   supposed to be blind, deaf, and dumb, to say nothing of their

9   lives.

10          Ladies and gentlemen, now that you've sat through this

11   entire trial, you know exactly why Maxwell told workers in the

12   house to see nothing, hear nothing, and say nothing.  It's

13   because she was Epstein's partner in crime.  And in that house,

14   behind closed doors, Maxwell and Epstein were committing

15   horrifying crimes.

16          That brings us to the second reason.  The second

17   reason that you know that Maxwell is guilty is that she ran the

18   same playbook over and over and over again as she exploited

19   young girls.  The similarities between what happened to Jane

20   and Annie and Carolyn and Kate are incredibly powerful evidence

21   of the defendant's guilt.  So I want to talk to you about the

22   playbook that Maxwell ran again and again and again.

23          Before we talk about this, remember that you heard

24   from Dr. Rocchio, an expert psychologist who specializes in

25   treating victims of sexual abuse for the trauma they suffered

LCKVMAX2                    Summations - Ms. Moe

1    as a result of their childhood experiences.  She told you that

2    childhood sexual abuse typically occurs in an established

3    relationship by a perpetrator who's known to the victim.  Dr.

4    Rocchio explained to you that perpetrators are able to abuse

5    kids by using a series of techniques called grooming.  She

6    walked you through the stages of grooming.  Here they are:

7              Identifying and selecting the child.

8              Obtaining access and isolating the child.

9              Engaging in manipulation in order to build trust and

10   attachment.

11             Desensitizing the child to physical touch and sexual

12   content.

13             And finally, maintaining control over the child to

14   continue abuse and decrease the likelihood that the victim will

15   report.

16             So let's talk through the ways that Maxwell and

17   Epstein ran this exact playbook.

18             First, the ways that they selected these girls tells

19   you that they were targeting vulnerable kids.  It is not an

20   accident that Jane and Kate and Annie and Carolyn all came from

21   single-mother households.  It is not an accident that all of

22   their families were struggling in different ways.  What that

23   tells you is that Maxwell and Epstein selected these girls

24   carefully.

25             When Jane was 14, her father had just died and her

family was struggling financially.  She didn't have her own bed
to sleep in.  Things were really tough at home.  She had big
dreams of working in the arts one day.  She was talented.

When Annie was 16, she lived with her mother who was
supporting her daughters by herself on a limited income.  Annie
was hoping to go to a good college.

When Kate was 17, she lived with her mother who had
been sick.  Things were difficult at home and Kate was alone a
lot.  And she was dazzled by this impressive woman who made her
feel special.

When Carolyn was 14, she lived with her mom, a single
mom who was an alcoholic.  She had previously been sexually
abused by family members and she told Maxwell about that.

Make no mistake.  Selecting these girls was predatory
behavior.  Maxwell and Epstein picked vulnerable girls.  They
found kids who needed something.  They were exploiting that
need.

So what was the next stage of the playbook?  It was
isolating the girls.  Maxwell and Epstein got them alone in
Epstein's enormous houses, alone on trips to Epstein's
sprawling ranch, his mansion on the Upper East Side.  They got
them alone in massage rooms.  They were away from their
parents.

Remember how Jane told you that her mother was never
invited when she would spend time with Maxwell and Epstein?

LCKVMAX2                    Summations - Ms. Moe

1  That was by design.  It was Maxwell's design.  Maxwell was

2  hanging out with these girls alone, isolating them and

3  befriending them.

4        And remember how Annie's mom told you that Epstein

5  called her to invite Annie to New Mexico?  Remember how Annie's

6  mom explained that Epstein said about 20 to 25 girls would be

7  there and so would his wife, Ghislaine.  And remember how Annie

8  told you that when she got to New Mexico, she found herself

9  alone with Maxwell and Epstein?  They were isolating these

10  girls for a reason.

11        Then came the next step in the playbook:  Making these

12  girls feel special, giving them gifts, making friends, giving

13  them money, promising to help with their futures, promises like

14  sending Annie on a trip to Thailand or helping to pay for

15  Jane's voice lessons and tuition.  They were building a

16  relationship.  They were building trust for what was going to

17  come next.

18        Once the girls were manipulated this way, Maxwell

19  helped Epstein normalize sexual situations and sexual touching.

20  For Annie, it started with Maxwell telling her how to massage

21  Epstein's feet.  And it escalated to Maxwell touching Annie's

22  breasts in a so-called massage.  For Kate too it started with

23  Maxwell asking her to rub Epstein's feet.  For Jane it started

24  with Maxwell being topless by the pool, and then Maxwell

25  talking about boyfriends and sex with Jane.  And it escalated

LCKVMAX2                     Summations - Ms. Moe

1     to sexualized massages.  Again and again throughout this trial,

2     you heard about how these girls were asked to perform

3     sexualized massages on Jeffrey Epstein.

4              While we're talking about physical touch, let me just

5     pause here and point out that Annie, Carolyn, and Jane all

6     testified that Maxwell touched their breasts.  They all had

7     very specific memories about that.

8              Here's Carolyn's testimony about that:  You remember

9     that she told you about Maxwell coming into the massage room

10    when Carolyn was naked.  Maxwell touched Carolyn's breasts and

11    told her that she had a good body.  Jane told you about Maxwell

12    touching her breasts too during sexual encounters with Maxwell

13    and Epstein during so-called massages.

14             Maxwell did it to Annie, too.  Here's her testimony

15    about that.  Here's what she said about how that made her feel:

16             I was very uncomfortable and fearful and wanted to get

17    off the table, that massage table, and wanted it to be over

18    with.

19             Ladies and gentlemen, Maxwell touched these girls'

20    bodies.  Three different women told you about Maxwell touching

21    their breasts when they were kids in massage rooms on massage

22    tables and in the context of so-called massages.  It's not an

23    accident.  It happened again and again and again.  It is

24    powerful evidence of Maxwell's guilt.

25             And the woman they all described to you when they took

LCKVMAX2                    Summations - Ms. Moe

1    that stand, when they talked about their memories of her,

2    ladies and gentlemen, they were describing the same woman.  Not

3    just her name and her physical appearance, but what she was

4    like.  These girls knew her.  They knew Maxwell.  Charming,

5    sophisticated, engaging, impressive.  A woman who moved in a

6    social circle that was intimidating.  These witnesses were

7    describing the same woman, Ghislaine Maxwell.  They knew her.

8            The relationships that Maxwell cultivated with these

9    girls were essential to the scheme.  Those relationships helped

10   Maxwell and Epstein maintain control of these girls for years.

11   Jane didn't become Epstein's so-called goddaughter by accident.

12   Maxwell helped establish a close relationship that became a

13   cover for sexual abuse.

14           The patterns you saw throughout this trial, the

15   playbook that Maxwell ran for years, is just one of the many

16   ways that you know that Maxwell is guilty.

17           I want to talk to you now about what Maxwell and

18   Epstein did to Jane.  That's the third way that you know that

19   Maxwell is guilty.

20           This is Jane.  Jane turned 14 years old in the summer

21   of 1994, when she met Maxwell at a summer camp for kids.

22   Maxwell and Epstein told her that Epstein was a wealthy donor

23   who gave scholarships.  But you learned that meeting Maxwell

24   and Epstein at summer camp was the beginning of years of sexual

25   abuse.  What Jane told you about meeting Maxwell in summer camp

1     in 1994 is backed up by documents.  So let's talk about it.

2              Here's Jane's application to Interlochen for the

3     summer of 1994.  She weighed 90 pounds and she just finished

4     the seventh grade.  There can't be any question that Jane was

5     at Interlochen that summer.  And there also cannot be any

6     question that Maxwell was there that summer, too.

7              Let's take a look at the flight records.  They show

8     you that on August 18th, 1994, Jeffrey Epstein flew to Traverse

9     City, Michigan.  That's where Interlochen is.  And sure enough,

10    two days later, on the 20th, Maxwell was on the flight home

11    with him.  She's right there in the flight records, "GM."

12    She's listed on it as a passenger on the plane ride home.

13    These flight records prove to you that Maxwell was there that

14    summer.  That's when she met Jane.  That's how it all started.

15             You also know that Epstein and Maxwell were there in

16    August of 1994 because Epstein had donated a scholarship lodge.

17    Here's the letter you saw from Interlochen; it's dated February

18    1994.  And they are thanking Epstein for donating the money to

19    build a scholarship lodge.  Government Exhibit 745 is a

20    photograph of that lodge.

21             And most importantly, you know that Maxwell was at

22    Interlochen that summer because Maxwell got a letter from

23    Interlochen in December 1994, just months after she'd met Jane

24    at camp.  The folks at Interlochen were writing Maxwell to tell

25    her that they found an envelope while they were cleaning the

LCKVMAX2                    Summations - Ms. Moe

1   Epstein lodge and they wanted to return it to her.  So when

2   Jane told you about meeting Maxwell and Epstein at summer camp

3   in 1994, you know that's the truth.

4          What Jane didn't know that summer, but what you

5   learned at this trial, is that Maxwell and Epstein were

6   targeting her for sexual abuse.  By the time she started

7   spending time with Maxwell and Epstein in Palm Beach, she was

8   an 8th grader.  She was in middle school.  Epstein told Jane's

9   mother that he would help Jane; that he gave scholarships.

10  That was the cover.

11         But once Maxwell and Epstein started spending time

12  with Jane alone, they started grooming her for abuse right

13  away.  Jane described how Maxwell acted like she was an older

14  sister figure; how she went to the movies with Maxwell and

15  Epstein.  They took her shopping.  They bought her white

16  underwear.  Epstein gave her money.  She saw Maxwell topless by

17  the pool.  And by the way, you know that's true because now

18  you've seen Maxwell topless by the pool too.

19         Jane told you about how Maxwell would chitchat with

20  her, talking about school and then about boyfriends and sex.

21  There was a purpose for all of this.  Maxwell and Epstein were

22  setting the stage for what was going to come next.

23         Jane told you about how one day after this initial

24  grooming, Epstein walked her down to the pool house.  He pulled

25  her onto his lap and started masturbating on her.  Here's her

testimony about that:  She was frozen in fear.  She had never

seen a penis before.  It was horrifying.

What did Maxwell do next?  She started teaching Jane

how to massage Epstein.  Here's her testimony about that:

Maxwell would show her how Jeffrey likes to be massaged.  And

you know what happened next:  Fully ramping up, breaking down

barriers, making it all seem okay.  Maxwell and Epstein started

sexually abusing Jane during these so-called massages.

Maxwell played an essential role in these abusive

massages.  As Jane told you, Maxwell was the person most

frequently in the room when Epstein molested her.  Along with

Epstein, Maxwell gave Jane instructions on how to massage

Epstein.  Here's her testimony about that:  Showing you, you

know, what he likes; what -- you know, what men, what women

like, sort of touching on breasts and touching his penis.

And while all of this was happening, while Jane was

being abused, Maxwell was right there acting casually and

behaving like all of this was normal.  She was doing that

because she was trying to normalize sexual abuse.

Here's Jane's testimony about that:  It seemed very

casual, like it was -- like it was very normal, like it was not

a big deal.  She's describing how Maxwell would act during

those massages.

She said, It made me feel confused because that did

not feel normal to me.  I'd never seen anything like this or

1   felt any of this and it was very embarrassing.  You know, it's

2   all these mixed emotions.  When you're 14, you have no idea

3   what's going on.

4          Ladies and gentlemen, none of this was normal.  It was

5   not okay.  It was deeply disturbing.  They were molesting an

6   underage girl.  That's what Maxwell did.  And Jane told you

7   about all the ways in which she was sexually abused during

8   these so-called massages.  You saw in her face how hard it was

9   for her to talk to you about that.  It was hard to hear.

10          She told you about having to touch Epstein's penis,

11   how Epstein touched her vagina and used vibrators; how he put a

12   back massager on her vagina, even when she said it hurt.  She

13   told you that Maxwell touched her breasts, that there were

14   hands everywhere.  She also told you that Maxwell and Epstein

15   would sometimes involve her in horrifying group encounters with

16   other women.

17          The sexual abuse didn't just happen in Florida.  You

18   learned that Maxwell and Epstein started taking Jane on trips

19   to Epstein's house in New York.  She flew to New York on

20   commercial flights, but also in the private jet.  Ask

21   yourselves, does it seem normal to you that two adults were

22   spending their weekends on trips with a 14-year-old girl?

23   Absolutely not.  There was nothing normal about that.  And your

24   common sense tells you they weren't bringing her to New York

25   for some kind of scholarship or mentoring program.  They were

1    bringing her to New York to be molested, and that is exactly

2    what happened.

3            And by the way, you know that Maxwell and Epstein

4    weren't simply charitable, wealthy people who were just trying

5    to help young girls.  There are real ways, official ways, that

6    you can help and mentor young people, but that's not what they

7    did at all.  There wasn't some scholarship foundation, there

8    certainly weren't any scholarship boys.  There were no

9    applications or legitimate selection criteria.  To qualify, you

10   just had to be a pretty, young, vulnerable girl.  That's who

11   they were targeting.

12           Jane told you about those trips with Maxwell and

13   Epstein to New York when she was 14 and 15 and 16.  She told

14   you about the abuse that happened there.  He would use

15   vibrators on me.  He would put his fingers in my vagina.  He

16   would start to masturbate and he would ask me to straddle his

17   face.  He would ask me to, like, squeeze his nipples really

18   hard while he came.

19           Let's talk about the house in New York where that

20   happened.  Here's the massage room in New York.  As you look at

21   these photos -- we're going to look at two -- let me read to

22   you from the transcript what Jane testified about this room.

23   And you're going to see she's describing this very same massage

24   room.  Here's what she said:  It was off the master bathroom.

25   Notice the bathroom on the left.  And it looked like it was

1    maybe supposed to be like a giant walk-in closet.  And it was

2    very dark.  There was a built-in bookcase on the right-hand

3    side, and there was a stereo system and there was, like, music

4    playing.  And I don't know if it was painted dark, but -- or

5    maybe that was the lighting, but it sort of had this red mood.

6    And then there was just a giant black massage table in the

7    middle of it.

8          Ladies and gentlemen, you know that Jane has been in

9    this massage room because it looks exactly like she remembered.

10          During the years that Maxwell and Epstein abused Jane,

11   she was literally growing up in front of their eyes.  She

12   turned 15 and 16 and 17.  This went on for years.  They

13   maintained a coercive relationship with her into her early

14   twenties.

15          Now, I've already talked about some of the ways that

16   Jane's testimony was corroborated.  I want to talk to you now

17   about the many other ways that Jane's testimony is backed up by

18   all of the other evidence in this case.

19          First, you heard from Juan Alessi, who remembered

20   Jane.  Here's his testimony about that.  He remembered that she

21   looked about 14 or 15, and that she spent time with Maxwell and

22   Epstein at the house.  Here's his testimony about that:  Alessi

23   remembered the school that Jane went to because he would be

24   sent to pick her up there sometimes.  He also remembered

25   driving Jane to the airport with Maxwell and Epstein.  Here's

1    part of his testimony about that.  You know that Jane traveled

2    with Maxwell and Epstein because Jane told you that.  But you

3    also know it because Alessi told you about that.  And you know

4    it because the flight records show it too.

5         So let's take a look at Government Exhibit 662.  So in

6    the flight records, you learned that the pilots didn't always

7    see the passengers or learn their names; sometimes they just

8    wrote one female or one passenger.  Here's an example from

9    January of 1995.  And, of course, you know that Maxwell and

10   Epstein wouldn't have been eager to have a pilot log the name

11   of the kid they were bringing on trips.  They wouldn't be eager

12   to introduce her to the pilots until she got older.

13        But Jane is listed on several flights in these

14   records.  Here's the first one where her name appears.  It's

15   November 1996, when Jane was just 16 years old.  Here she is on

16   a flight from Palm Beach to Teterboro Airport.  That's the

17   airport they would use when they were flying to New York.

18        What you're looking at is cold, hard proof that Jane

19   was an underage girl being transported to New York.  And while

20   Maxwell isn't listed on the flight log for the flight there,

21   you know she was there because you look -- if you look at the

22   second entry right below that, she's on the flight log leaving

23   New York the very next flight.  That's how you know that

24   Maxwell was in New York too.  She's right there.

25        Here's the next flight where Jane's name appears.

LCKVMAX2                    Summations - Ms. Moe

1    It's May 1997.  A flight from Teterboro to New Mexico.  They

2    were traveling from New York to New Mexico.  On the day of this

3    flight, Jane was still just 16 years old.  The flight log here

4    shows just Maxwell, Epstein, and Jane.  And Jane told you about

5    going on a trip alone to New Mexico with just Maxwell and

6    Epstein.  Why on earth were Maxwell and Epstein flying alone to

7    New Mexico with a 16-year-old girl?  They were doing it for the

8    same reason they did that to Annie Farmer, ladies and

9    gentlemen.  That's the playbook.

10        Let's take a look at just one more flight.  And

11   remember, these aren't the only trips that Jane took; they are

12   just the ones that happen to be captured in the flight logs

13   when she flew on the jet.

14        So here is Jane in April 1998 flying with Maxwell and

15   Epstein from Palm Beach to Teterboro, a trip to New York when

16   Jane was 17.  And by the way, remember when defense counsel

17   showed you pictures of an older woman with Jane's first name,

18   who worked as a personal assistant, and they suggested to you

19   that maybe that's the Jane on these flight logs?  That's the

20   photo they showed you.  Ladies and gentlemen, that was

21   completely misleading.

22        The pilots told you that there were only ever two

23   passengers with that first name, and they met the second

24   person, the person in this photo, years later.  And you heard

25   testimony from someone from the DMV to show you that this adult

1   woman in that picture was 11 old when these flights took off.

2   She obviously wasn't working as a personal assistant when she

3   was 11.  It's not her.  It's Jane on those flight logs.  You

4   know the girl on those flights was Jane.

5          In addition to all of that corroboration, you've also

6   heard testimony from Matt, who dated Jane for several years in

7   the mid 2000s.  He told you that he had conversations with Jane

8   more than a decade before this case.  And what Jane told him

9   back then is consistent with what she told you at this trial.

10  She told Matt that she had a godfather named Jeffrey Epstein

11  who paid for things when she was growing up.  It started when

12  she was 14, and she had to do things she didn't want to do.

13  She told him it involved massage and that there was a woman who

14  made her feel comfortable.

15          Here are two portions of Matt's testimony:  She said

16  that it started at 14.  There was a woman in the house who made

17  her feel comfortable.  You know that woman is Maxwell, because

18  when Matt learned that Maxwell had been arrested in this case,

19  he called Jane and asked her, Is that the woman you told me

20  about all of those years ago?  And Jane told him that it was.

21  Now, Jane didn't tell Matt all of the details; she just told

22  him the money wasn't free.  And Matt told you about how when

23  Jane would talk about this, she was -- and I'm quoting from the

24  transcript -- ashamed, embarrassed, horrified.

25          Jane couldn't share all of the details with Matt; it

1   took her a long time to be able to do that.  You heard expert

2   testimony at this trial from Dr. Rocchio who told you about

3   just how common that is.  Dr. Rocchio has spent literally

4   decades treating real-world patients for trauma caused by

5   sexual abuse.  She's an expert.  And she told you that it's

6   actually uncommon for kids to disclose that they've been abused

7   when it happens.

8           Here's her testimony about that.  In fact, as Dr.

9   Rocchio told you, victims are less likely to tell, and they are

10  more likely to delay telling the closer they are to the

11  perpetrator.

12          And you heard about how Maxwell was like a big sister

13  to Jane; how Epstein was Jane's so-called godfather.  It was

14  this close relationship that made it hard for Jane to talk

15  about the abuse, especially given everything that you learned

16  about what was going on at home for Jane and what her mother

17  was like.

18          Remember how Matt told you he was there when Jane

19  confronted her mother years later?  Here's his testimony about

20  that.  Jane told her mother that she -- that the money was not

21  free, and that there was no way she couldn't have known that it

22  wasn't free.

23          At this trial, you heard expert testimony from Dr.

24  Rocchio about how it's hard for victims of childhood sexual

25  abuse to tell someone that they've been abused.  And when they

do tell, here's what Dr. Rocchio explained to you.  She said,

Disclosure is a process that unfolds over time.  So individuals

will typically begin the disclosure maybe by alluding to what's

happened in a general sense or the gist of what's happened.

Let me pause here and say that's exactly what happened

with Matt.  She's alluding to what happened, giving the gist of

it, but not all the details.  It's just too hard.

Here's the rest of her testimony.  And then it's only

over time they will begin to talk more specifically about what

has happened.  And even in therapy, oftentimes disclosure of

the most intimate or difficult details is something that's very

hard and individuals are very reluctant to do.  Dr. Rocchio has

explained to you that's what happens in these cases, and she's

an expert in the psychology of sexual trauma.

Now, the defense cross-examined Jane about why she

didn't immediately tell someone about the abuse she suffered

when she was 14 and 15 and 16, as if that would have been easy.

And, in fact, when the defense points out that Jane wasn't able

to tell people what really happened to her, they're actually

pointing to what makes this a textbook case of child sexual

abuse.

How else do you know that Jane told you the truth?

It's because her testimony is corroborated by the testimony of

Annie and Carolyn and Kate, whose experiences were strikingly

similar, as we've already discussed.  It's not a coincidence.

1   You can consider all of the witnesses' testimony as

2   corroborating testimony as you consider what happened to each

3   one of them.

4          Let me just say one last thing about Jane.  Defense

5   counsel asked Jane in cross-examination whether she remembered

6   some of the first names of people who were present for group

7   sexualized encounters.  She remembered five names:  Emmy,

8   Kelly, Sophie, Eva, and Michelle.  And keep in mind, she was a

9   kid, right; it's not like she's taking people's IDs in the room

10  when she's being sexually assaulted, but that's what she can

11  remember.

12         The defense seized on two of those names, Eva and

13  Michelle.  Here's the transcript where they asked about this on

14  cross.

15         (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1          MS. MOE:  So in the defense case, they happened to

2     find two people with the first names, Michelle and Ava, and

3     they brought them down to court to try to discredit Jane.  But

4     here's the thing, Jane never testified that Michelle Healey and

5     Eva Dubin were in the room when she was abused.  She did not

6     say that.

7          Defense counsel asked her about a Michelle and an Eva.

8     They expressly did not ask Jane if she knew those people's last

9     names.  They didn't show Jane pictures of Eva Dubin or Michelle

10    Healey to see if those were the people she was referencing.

11    They left it really vague on purpose.  But trying to discredit

12    Jane this way makes no sense.  Your common sense tells you that

13    those aren't the only Michelles and Evas in the whole wide

14    world.

15          And you can take a look at excerpts from Government

16    Exhibit 52.  That's the black contact book.  Remember, there

17    were pages from Epstein and Maxwell's contact book, and we're

18    going to talk more about this book later.  But you're going to

19    see this book had another Eva in it and three Michelles.  Of

20    course there were other Michelles and Evas out there and other

21    people with those names in Epstein's life.  Calling these women

22    to testify was completely meaningless and it was a total

23    sideshow.  Don't be distracted by that.  It was meaningless.

24          Ladies and gentlemen, the evidence tells you that Jane

25    told you the truth at this trial because you could see and hear

1   her yourself.  You met Jane.  It was powerful testimony and it

2   was difficult to hear, but you know from your direct

3   observations that she was telling you the truth.

4        You also know it was true because her testimony was

5   extensively corroborated by Alessi, by Matt, and by documents

6   like the flight records, school records, and camp records.  And

7   you know it because you recognize the same playbook they ran

8   with Jane when you compare it with what Epstein and Maxwell did

9   with the other witnesses at this trial, and the lengths the

10  defense went to, to try to discredit Jane, just tells you how

11  devastating her testimony was.  It proves Maxwell is guilty.

12       Jane was a kid in middle school.  She was sexually

13  exploited by Ghislaine Maxwell and Jeffrey Epstein.  If you

14  believe Jane's testimony, the defendant is guilty on counts One

15  through Four of the indictment.

16       I want to talk to you now about Annie.

17       The fourth reason that you know that Maxwell is guilty

18  is Annie Farmer.  Here's Annie.  Annie told you about meeting

19  Jeffrey Epstein in New York in December 1995.  She was 16 years

20  old.  Epstein said that he was taking an interest in her as a

21  student and he talked to Annie about college.  Then Epstein

22  took her to the movies with her sister, Maria.  During that

23  movie, he held Annie's hand and rubbed her arm.  He hid it from

24  Maria, but he was rubbing Annie's arm during the movie.  He was

25  trying to desensitize Annie to his touch.

LCKCmax3                    Summation - Ms. Moe

1           Here's part of Annie's teenage diary entry about the
2  trip to the movies.  It tells you a few things.  First, this
3  diary tells you that this isn't a new story.  It's right there
4  in her teenage diary, her high school diary from 1986.  And
5  what you saw in Annie's diary was just how confusing this
6  experience was for a teenage girl.  This diary entry was a
7  perfect illustration about how kids being groomed for sexual
8  abuse wrestled with understanding that confusing experience.
9  Annie wrote about how she went back and forth about how this
10  was weird, and you can see her in her diary struggling to
11  rationalize what is obviously inappropriate behavior, because
12  this adult was being nice to her, he had made promises, he was
13  important to her sister's career, and he held a position of
14  trust.  That's exactly how grooming works.
15           I want you to notice one thing more about this diary.
16  You'll notice towards the bottom that Annie wrote down, the one
17  thing that kind of weirded me out about it was that he let go
18  of my hand when he was talking to Maria.  Annie told you about
19  how in the movie theater when Epstein was touching her, he had
20  to hide it from Maria.  I want you to remember that, because
21  we're going to talk about it in a few minutes.
22           Now, Maxwell wasn't there for the trip to New York,
23  but you know that she was absolutely there for what happened
24  next, as she and Epstein tried to escalate things with Annie.
25           In the spring of 1996 when Annie was 16, she flew all

by herself to New Mexico to stay with Maxwell and Epstein.  She

thought it had to do with a potential scholarship, and so did

her mother, who took the witness stand and told you that she

remembered Annie going on this trip with Maxwell and Epstein,

and that she thought it was a trip for multiple scholarship

students who would be chaperoned by Ghislaine Maxwell.  But

when Annie got to New Mexico, she was alone.  She was alone

with Epstein and Maxwell.  She was alone with them, with no

chaperone, no other students.  She was alone with two sexual

predators.

        Over the course of the weekend, Maxwell engaged in

textbook grooming behavior with Annie.  First, Maxwell starting

chatting her up, asking her about her life.  She was charming

her.  Then Maxwell took Annie on a shopping trip.  They bought

her boots and Maxwell picked out a hair product for Annie.

        What came next?  Maxwell and Epstein took Annie to a

movie theater where Epstein began holding Annie's hand and

rubbing her foot and her arm.  He was doing the same thing he

had done in New York, but now he was doing it openly.  He was

doing it openly because this time he was doing it with Maxwell,

and he didn't have to hide it from Maxwell because she was in

on the whole thing.

        So what did Annie tell you about next?  Well, Maxwell

started rationing things up to the next level.  Here's her

testimony about that.

1        It was decided that I would learn how to give Epstein

2   a foot massage.  Maxwell wanted to show me how to rub his feet,

3   and so that was something I should learn how to do.  And so she

4   sat and held one of his feet and instructed me to hold his

5   other foot and showed me how to rub it.  Maxwell started to

6   teach Annie how to give Epstein a foot massage.

7        Now, did Maxwell know that Epstein liked foot

8   massages?  Of course she did.  You saw that photo of Maxwell

9   massaging Epstein's feet with her breasts.

10       Ladies and gentlemen, your common sense tells you, it

11  is not normal for an adult woman to teach a 16-year-old girl to

12  rub a middle-aged man's feet.  That is not part of some

13  mentoring program, it's not part of a scholarship entry

14  program.  You know exactly what that was about, and when

15  Maxwell did it, she knew exactly what she was doing, she was

16  trying to get Annie to touch Epstein.  They were confusing her

17  boundaries.  They were moving the line slowly and gradually for

18  what would come next.

19       This was classic grooming behavior.  It's what Maxwell

20  did to Jane and it's also, by the way, what Maxwell did to

21  Kate.  So let's take a moment to look at Kate's testimony about

22  that.

23       Kate told you that when Maxwell introduced her to

24  Epstein, she said, why don't you give his feet a little squeeze

25  to show him how strong you are.  Why was Maxwell asking these

1  teenage girls to touch Epstein's feet?  It's obvious.  She was

2  trying to get these girls to touch Jeffrey Epstein.  She was

3  trying to normalize touch.  She was doing it because she was a

4  predator.

5       For Annie, things didn't stop with foot massages.

6  Maxwell pushed things further.  Annie told you about how

7  Maxwell insisted on giving Annie a massage, and during that

8  massage, Maxwell folded down the sheet, exposing Annie's

9  breasts, and began touching her breasts.

10      Ladies and gentlemen, there are a lot of things you

11  can say about a woman in her 30s groping the breasts of a

12  16-year-old girl, but a therapeutic massage is not one of them.

13  That's not on a list of spa treatments anywhere.  What Maxwell

14  was doing was the same thing that she did to other girls — she

15  was introducing touch, she was normalizing sexualized massages,

16  she was breaking down barriers, she was moving the line

17  forward, slowly, but surely.

18      And what happened next is exactly what Maxwell was

19  trying to set up.  Towards the end of the trip, Epstein came

20  into Annie's room and got into her bed saying that he wanted to

21  cuddle.  A man in his 40s was in her bed.  He wrapped his arms

22  around her and pressed his body against her.  Just imagine how

23  terrifying that would be for a 16-year-old girl.  She's alone

24  on a ranch in the middle of nowhere, and the adults in charge

25  are the woman who groped her breasts and the man who's now in

LCKCmax3                    Summation - Ms. Moe

her bed trying to cuddle her.

        You learned that Annie got away.  She got out of bed
and she hid in her bathroom.  What Maxwell and Epstein were
trying to do, what they successfully did with other girls, it
didn't work on Annie.  And Annie told you that, after that, on
the last day, Maxwell suddenly seemed very disinterested in
her.  Ladies and gentlemen, Maxwell lost interest in Annie
because her scheme didn't work.  When Annie wouldn't cuddle
with Epstein, when they couldn't take things further, Maxwell
dropped the act.  She didn't have to pretend to be charming
anymore because she didn't have any use for Annie anymore, and
that was the end of the trip.  After that, Annie never spoke to
Maxwell or Epstein again.  She went to her junior prom and then
she spent the summer in Thailand on a trip that Epstein had
paid for.

        And by the way, Annie and her high school boyfriend,
David Mulligan, and Annie's mom all remember that Annie went to
Thailand that summer.

        During the defense case, the defense called someone to
testify about border patrol records, but don't let any spotty
border records from the 1990s distract you for a minute.  She
obviously went to Thailand that summer.  We're looking at a
photograph of it right here.

        When Annie got home from Thailand, her mother had
asked her what had happened in New Mexico, she wanted to know

what had happened on that trip.

Here's Janice Swain's testimony about that.  She told you that Annie said, I don't want to talk about it, I'm just not going to let it ruin my life.

But not long after this happened, Annie told her high school boyfriend what Maxwell and Epstein had done.  She told him about meeting Maxwell on the trip to New Mexico.

You heard from David Mulligan at this trial.  Here's his testimony about what Annie told him.  She said that Maxwell was very charming, very pretty, she greeted her when she arrived, and I remember that they had a day around town where Maxwell took her shopping.  He even remembered that Annie said that Maxwell had bought her cowboy boots.  But most importantly, Annie told him that Maxwell had given her a massage and touched her breasts.

Here's his testimony about that.  He remembered what Annie told him, that Maxwell had touched her, that she had touched her breasts during the massage, and in 2006, Annie told the FBI the same thing.

Here's her testimony about that.  She told them about Maxwell in 2006 — 15 years ago.  That's one of the many ways that you know that Annie is telling the truth.  She has been consistently describing since the 1990s what Maxwell did to her, and what Maxwell did to Annie is powerful evidence of her guilt.

LCKCmax3                    Summation - Ms. Moe

1          I want to talk to you now about what Maxwell and

2     Epstein did to Carolyn.  That's the fifth way that you know

3     Maxwell is guilty.

4          This is Carolyn when she was a teenage girl.  Carolyn

5     met Maxwell through a girl she knew named Virginia Roberts.  So

6     I'm going to start by talking to about Virginia Roberts.

7          This is Government Exhibit 113 and 114.  That's

8     Virginia.  This is the same girl that Juan Alessi remembered.

9     He told you about how he was driving to Mar-a-Lago one day.  He

10    was driving Maxwell one day by Mar-a-Lago, and Maxwell saw this

11    girl and told him to pull over.  Maxwell got out of the car and

12    went to go talk to that girl.

13         Here's his testimony.  She told me to stop — John,

14    stop — and I stopped the car and she opened the door and she

15    went towards this girl as she was coming down the ramp.  She

16    went to go talk to this girl.  And sure enough, he saw Virginia

17    at the house later that day.  When she arrived, Alessi brought

18    her to see Maxwell.  After that, he remembered that Virginia

19    started coming to the house and spending time with Maxwell and

20    Epstein.  He told you about that.

21         We'll talk more in a moment about Virginia, but I want

22    to be very clear that the Virginia Roberts that Carolyn told

23    you about is the very same Virginia Roberts that Juan Alessi

24    told you about.  It's the same girl that Maxwell pulled over to

25    talk to.

LCKCmax3                    Summation - Ms. Moe

1          Now Carolyn testified that when she was about 14,

2    Virginia told her about a way to make money giving a massage to

3    a wealthy man.  They went over to that man's house in Palm

4    Beach and met Maxwell there.

5          Here's her testimony about that.  Virginia said this

6    was her friend, Carolyn, and Maxwell responded, you can bring

7    her upstairs and show her what to do.  You know exactly what

8    Maxwell meant, sexual contact was about to happen in the

9    massage room, and that's exactly what happened next.

10          Virginia and Carolyn got undressed and started

11    massaging Epstein in the massage room, and then Virginia and

12    Epstein started having sex in front of Carolyn in the massage

13    room.  Carolyn sat on the couch in the massage room while it

14    happened.

15          This is the massage room.  That's the couch on the

16    left.  On the walls on the left, there were nude drawings.

17    Ladies and gentlemen, this was not a place for a therapeutic

18    massages, it is a place where Maxwell and Epstein's victims

19    were sexually abused.

20          You take a look at the drawings on the left, here is a

21    zoom-in from the search video, there are the drawings.  And

22    while we're talking about this space where things happened, I

23    want to pause here and show you the entrance to the master

24    bedroom in the Palm Beach house close by the massage room.

25    You're going to notice a large photo of a young girl pulling

1    her underwear down, and when you see that, you'll understand

2    what Maxwell understood, that Maxwell understood what was

3    happening in that house.

4         The first visit for Carolyn to this house was the

5    beginning of years of sexual abuse.  Carolyn told you about how

6    Maxwell would call her to set up appointment times for these

7    so-called massages, and sometimes Sarah Kellen would call, too.

8         Here's her testimony about that.  She told you that

9    Maxwell would call and set up appointment times.  She said for

10   the first year or two, Maxwell would call, and then Sarah would

11   call after that point.  And you know that's true because

12   Carolyn said that twice when she gave deposition testimony

13   under oath in 2009.

14        Here's the first one.

15        This is Carolyn's deposition testimony from 2009.

16   "Q.  In fact, Mr. Epstein himself did not contact you on each

17   occasion and request you to come, did he?

18   "A.  No.  He would have Sarah or Maxwell call me."

19        Here's the second one.

20   "Q.  And on these occasions that you called to see if you could

21   go over there and give him a massage, did you talk to him or

22   did you talk to others at his house?

23   "A.  I talked to Sarah or Maxwell.  I've also talked to -- I

24   don't know if it's a cook or someone else that was there that

25   took phone messages."

1           She said it twice.

2           In 2009, Carolyn testified under oath that Maxwell

3   called her to schedule sexualized massages.  And you know all

4   of this is true because you have heard testimony from Sean,

5   Carolyn's boyfriend at the time, who told you that Carolyn

6   started making money by going over to Jeffrey Epstein's house.

7   He remembered that happening a couple weeks after he met

8   Virginia Roberts in 2001 when Carolyn was just 14 years old.

9           He also remembered that Carolyn told him that she

10  interacted with Maxwell inside of Epstein's house.  Here's his

11  testimony about that.  Sean even remembered how Carolyn

12  couldn't pronounce Maxwell's first name.

13          When Carolyn went to that house, she had conversations

14  with Maxwell.  Maxwell asked her if she'd ever used sex toys,

15  and she said no.  Maxwell asked her about her plans for the

16  future.  They talked about personal things in Carolyn's life.

17  Carolyn told Maxwell about her upbringing and her home life,

18  that her mother was an alcoholic and that Karen had been

19  molested by her grandfather when she was younger.

20          Maxwell also talked to Carolyn about travel.  Maxwell

21  invited her to travel with them, and Carolyn told her that she

22  couldn't, that she was too young, she didn't have a passport,

23  and her mother wouldn't let her go.  It should come as no

24  surprise to you, ladies and gentlemen, that Maxwell asked this

25  young girl to travel with them, because that's what Maxwell and

LCKCmax3                       Summation - Ms. Moe

Epstein had been doing for years at this point — trips with

Jane when she was 14, 15, 16; spending a weekend in New Mexico

with Annie when she was 16.

        And we're about to talk in a few minutes about just

how many flight records there are that show that Virginia

Roberts flew with Maxwell and Epstein when she was 17 years

old.  This was Maxwell's playbook for years, and she tried to

get Carolyn to travel, too.

        What happened to Carolyn in the years that she was

abused in that house in Palm Beach is hard to talk about.  You

remember her testimony.  She told you about being paid to give

sexualized massages to Epstein, how he touched her breasts, put

a vibrator on her vagina, and how every massage ended with

Epstein ejaculating.  Ladies and gentlemen, that's what

happened to Jane, too.  It's one of the many ways that you know

that Carolyn is telling the truth.

        Now, remember when Carolyn told you that Epstein sent

her packages, that he sent her lingerie?  You know that's true

because you saw FedEx records that proved that Epstein sent her

packages.

        This is Government Exhibit 803.  It's a record of a

package sent to Carolyn in October of 2002, when she was 15.

It's a package from New York from Epstein's office, and it

wasn't the only package.  Here's another, Government Exhibit

801.  Again, Carolyn was 15.  And here's another, Government

1    Exhibit 802.  Again, Carolyn was 15.  Carolyn told you that she

2    got packages from Epstein from New York, and she did.  You can

3    see that here in black and white.  That's Government Exhibits

4    801, 802, and 803.

5           Who else was sending packages from Epstein's office

6    from this very same time period?  Maxwell.  She used the same

7    account to send packages.  You see Maxwell's name on each of

8    these FedEx account invoices.  Maxwell was a part of the

9    operation just like Carolyn told you.

10          You also learned about phone messages that Carolyn

11   left in the Palm Beach house on those message pads.  Those

12   phone messages corroborate Carolyn's testimony.  They prove to

13   you that she was there.

14          So let's talk about two of them.

15          First, this is Government Exhibit 608.  Carolyn

16   testified that this was her mother's phone number.  She wrote

17   it down so she wouldn't have to say it out loud at trial, and

18   we marked it as an exhibit.  That same phone number is all over

19   the message pads from the Palm Beach house, phone message after

20   message.

21          This is Government Exhibit 1-B.  It's the same phone

22   number, and that's Carolyn's full name, first and last.  It's

23   from 2004.  And remember, we were just looking at FedEx records

24   from 2002.  What's the message here?  That she wants to work

25   for Epstein today.  What you were looking at is a phone message

LCKCmax3                    Summation - Ms. Moe

1    from an underage girl who needs money and is being exploited.

2             This is Government Exhibit 3-E.  It's the same phone

3    number and that's Carolyn's full name.  What's the message?

4    It's that Kim wants to work.  Just like Carolyn told you, she

5    brought other friends to the house to give massages.

6             Ladies and gentlemen, Carolyn's testimony was

7    extensively corroborated in this case.  Her name is on FedEx

8    records and phone messages.  She has been on the record since

9    2009 about Maxwell calling her for appointments.  And her

10   exboyfriend, Sean, confirmed that Carolyn went to that house to

11   make money for years and that she interacted with Maxwell at

12   that house.

13            You know that Carolyn told you the truth.  That's what

14   the evidence tells you.  Her testimony was backed up by the

15   other evidence in this case and it was corroborated by what

16   Annie and Kate and Jane told you about Maxwell and how she

17   operated for years.  What Carolyn told you is powerful evidence

18   that Maxwell was conspiring with Epstein to abuse underage

19   girls.  Maxwell sent a teenage girl into a massage room with an

20   adult man.  She knew exactly what she was doing.  If you

21   believe Carolyn's testimony, the defendant is guilty on counts

22   One, Three, Five, and Six.  And I'll talk about those counts

23   later on.

24            That brings us to reason six.  The sixth way that you

25   know Maxwell is guilty is because Maxwell and Epstein kept a

LCKCmax3                    Summation - Ms. Moe

1    little black book with their victims' names in it.  It is a

2    powerfully incriminating document.

3          So I want to start by going back to the household

4    manual.  And what the manual shows you is that Maxwell and

5    Epstein had a phone directory, and they kept several copies of

6    it in the house.  There was a copy in the pool area, there was

7    a copy in their cars, there was a copy of it in the master

8    bedroom, and most importantly, there was a copy right on

9    Maxwell's desk.

10          Here's the part of the manual that tells you that.

11   There was a copy on her desk.  And they're not just any

12   directories.  In the manual, they're the JE and GM telephone

13   directories.  Jeffrey Epstein and Ghislaine Maxwell.  When Juan

14   Alessi testified, he was asked about a little black book and he

15   testified that he recognized it as one of those books.

16          So let's take a look at Government Exhibit 52-G, which

17   is a page from that book.  Here it is.  So the section on this

18   page is titled "Massage Florida."  I'm going to highlight a few

19   specific entries in a moment, but first let's just start with

20   the basics.  You'll notice just how many names there are.  Who

21   needs that many masseuses?  That's the first sign that

22   something is off here.  And a second thing that you're going to

23   notice is that all of the names here are female.

24          The third thing that you're going to notice is that

25   there are notes next to some of the names, things like mom,

LCKCmax3                    Summation - Ms. Moe

1    dad, or parents.  Use your common sense, ladies and gentlemen.

2    When you contact a professional masseuse, you don't need to

3    call her mom or dad.  Just looking at this page tells you that

4    none of this was legitimate.  These were millionaires who could

5    hire the top massage therapists in the whole world, but Maxwell

6    had a book with dozens of entries in a massage section that

7    makes absolutely clear that these were not real massages by

8    professional masseuses.  In fact, this book makes clear that

9    some of the entries were for kids.

10           So let's talk about one of those entries.  The entry

11   here on the left is Virginia, parents.  I want you to take a

12   look at the phone number, ladies and gentlemen.  You've seen it

13   somewhere else at this trial, and here it is.  This is

14   Government Exhibit 823.  It's the employment record for Sky

15   Roberts.  You saw Virginia Roberts' birth certificate, so you

16   know that Sky Roberts is Virginia's dad.  He was an employee at

17   Mar-a-Lago, which, as Juan Alessi testified, is the place where

18   Maxwell met Virginia Roberts.  Take a look at the phone number

19   listed for Sky Roberts on this document.  It's the same number

20   on Government Exhibit 52-G, the contact book.

21           And Virginia is also, by the way, on flight records

22   with Maxwell when she was 17 years old.  Let's take a look, and

23   as we do, you're going to see the initials "G.M." for Ghislaine

24   Maxwell on every single one.

25           Here's the first one.  Two flights, JE, GM, ET,

1    Virginia.  JE, GM, AT, Virginia.  It's from 2000.  She was 17

2    years old.  Here's another page.  JE, GM, ET, Virginia Roberts.

3    Here's another, JE, GM, ET, Virginia Roberts.  There is another

4    one, JE, GM, ET, Virginia Roberts.  This is 2001 when Virginia

5    Roberts was 17.  They were flying around with a 17-year-old

6    girl.

7              But back to the black book, there is more to talk

8    about.  Remember Sean, Carolyn's boyfriend?  There is an entry

9    for him, too, under an entry for Carolyn, Carolyn's boyfriend's

10   house.  That entry has Carolyn's first and last name.  That

11   same phone number that you're looking at here is on three

12   messages from the message pads, and here they are.  It's

13   Government Exhibits 2-U, 2-P, and 2-O.  And if you take a look

14   at the date on the two messages on the left, they're from 2003

15   when Carolyn was 16.  There's the phone number.  It's the same.

16   In fact, the message in the middle is from just a month past

17   Carolyn's 16th birthday.  There is more.  There is an entry in

18   here for Carolyn with her full name.  That number is on phone

19   messages from 2003, too.  Here they are.  One says Carolyn, two

20   say Caroline, but you know it's the same person, you know it's

21   Carolyn because the phone number is the same.

22             Who else is in this book?  Remember how Sean told you

23   that he would bring a 16-year-old girl named Melissa to the

24   house with Carolyn?  It's this girl in the photograph with

25   Carolyn.  She's the one right next to Carolyn.  That's

LCKCmax3                       Summation - Ms. Moe

 1    Melissa's birth certificate.  Sean told you this is the girl.

 2    And sure enough, there are two entries under massage for

 3    Melissa, Carolyn's friend.  Here they are.

 4              Again, remember how you learned that, by this point,

 5    things operated like a pyramid scheme.  Virginia brought

 6    Carolyn, Carolyn brought Melissa and other girls.  One girl

 7    would bring another, who would bring another.

 8              Ladies and gentlemen, this book, Maxwell's book, it

 9    proves to you that Maxwell is guilty.  What you'll see in this

10    book corroborates the witnesses who testified at this trial.

11    She had victim names written in a little black book.  This

12    document is powerful evidence of the defendant's knowledge and

13    intent.  These were not real massages.  What was happening was

14    sexual abuse with underage girls.  Maxwell knew it, she was

15    part of it, she was responsible for it, and the fact that she

16    had a little black book with her victims' names in it proves to

17    you that she is guilty.

18              That brings us to the seventh reason that you know

19    Maxwell is guilty.  It's the money.  Now, we've already talked

20    about Epstein's luxurious lifestyle and all of the perks that

21    Maxwell got from being his partner in crime, but it wasn't just

22    getting to live in the mansions and flying on the private jets,

23    maxwell got millions of dollars from Epstein.  You learned that

24    between 1999 and 2007, Jeffrey Epstein gave Maxwell about $30

25    million, and you know exactly what that money was for.

1           First, in 1999, Epstein sent Maxwell $18.3 million.

2    $18.3 million — here's the transaction.  And then, in 2002,

3    Epstein paid Maxwell $5 million — here's the transaction.  And

4    last but not least, in 2007, Epstein paid Maxwell $7.4 million.

5    $18.3 million, $5 million, $7.4 million.  It's a total of

6    $30.7 million.

7           At this point, you got to ask yourselves, what was

8    Maxwell doing for Epstein that was worth more than $30 million?

9    Your common sense tells you that you don't give someone

10   $30 million unless they're giving you exactly what you want,

11   and what Epstein wanted was to touch underage girls.  When

12   Maxwell took that money, she knew what it was for and now you

13   do, too.  It was payment for committing terrible crimes with

14   Jeffrey Epstein.

15          That brings us to reason number 8 that you know that

16   Maxwell is guilty.  When you zoom out and look at the big

17   picture, the timeline over the years, it's obvious that Maxwell

18   spent a decade aiding and abetting Jeffrey Epstein's crimes,

19   that they were coconspirators, partners crime.

20          Let's talk about the timeline the big picture.

21          In 1994, Maxwell met Jane.  In that same year, Maxwell

22   and Epstein started sexually abusing Jane, and that often

23   happened in the context of massages.  That same year, in 1994,

24   Maxwell met Kate, too, and Epstein initiated sexual contact

25   with Kate also in the context of massages, massages in which

1    Maxwell delivered Kate to Epstein.

2            In 1995 and 1996, Maxwell was still in contact with

3    Kate, encouraging Kate to travel to see her and Epstein, and in

4    that same period, Maxwell was traveling with Jane, still

5    exploiting Jane, in Palm Beach, in New York, and in New Mexico.

6            And in the spring of 1996, Annie Farmer went to New

7    Mexico where Maxwell groomed her for sexual abuse, where

8    Maxwell massaged Annie's breasts.

9            In 1999, Epstein sent Maxwell $18.3 million, and the

10   abuse continued.

11           Maxwell recruited Virginia Roberts at Mar-a-Lago.  In

12   2000, Virginia Roberts was 17 years old and flying with Maxwell

13   and Epstein on Epstein's private jet.  And in 2001, Virginia

14   Roberts was still 17 and still flying on the jet with Maxwell

15   and Epstein.  They were flying around with a teenage girl.

16           In 2001, Virginia brought Carolyn to the Palm Beach

17   house.  Carolyn was 14 years old.  That's when Carolyn met

18   Maxwell and Epstein, and that was the beginning of the pyramid

19   scheme of abuse, the scheme that no longer required Maxwell to

20   personally find young girls for Epstein, girls like Carolyn

21   incentivized by extra cash were now bringing their friends,

22   girls who needed money.

23           And one year later in 2002, Epstein paid Maxwell

24   $5 million.

25           In 2002, 2003, and 2004, Carolyn was sexually abused

1    in Epstein's Palm Beach massage room.  Maxwell called to

2    schedule some of the appointments.  Carolyn was 15, 16, and 17

3    years old.

4           Remember how the defense tried to suggest to you that

5    because Maxwell had started dating some other guy named Ted

6    Waitt around 2004, she was no longer around Epstein.  You know

7    that's not true and here's why.  You saw that household manual,

8    Government Exhibit 606, that was dated in February of 2005, the

9    manual that outlined what Epstein and Maxwell demanded in the

10   Palm Beach house.  She was still the lady of the house.  And in

11   2005, the Palm Beach Police Department searched Epstein's

12   house.  And what did the police notice during their search?

13   They found a desk with Ghislaine Maxwell's stationery on top.

14          And in 2007, two years later, Epstein paid Maxwell

15   $7.4 million.

16          When you take a step back and you look at this

17   timeline and think about the big picture, it is crystal clear

18   that Maxwell knew about and was deeply involved in Epstein's

19   sexual abuse of children.

20          Take a moment and just reflect on how deeply strange

21   this whole situation was.  For years, Maxwell took trips on

22   Epstein's private planes with Epstein and teenage girls.  For

23   years, Maxwell was right by Epstein's side as numerous teenage

24   girls came to visit him inside his homes.  There were teenage

25   boys, by the way.  For years, Maxwell watched a parade of these

girls come to massage him.  For years, she kept a list in her

little black book with dozens of female names, definitely no

boys.  For years, Maxwell lived in houses with Epstein that

were decorated with nude females, including sexualized pictures

of girls.  For years, Maxwell slept in a bedroom in Palm Beach

that had two bathrooms attached to it, one filled with nude

drawings and stocked with a massage table and all the different

types of massage oils and lotions that Epstein liked, and the

other, Maxwell's bathroom where the dildo was stored.  And over

those years, Epstein paid Maxwell millions and millions of

dollars.  Ladies and gentlemen, look at the big picture and use

your common sense.  She knew, she was complicit, she is guilty.

Ladies and gentlemen, that's eight reasons why you

know the defendant is guilty.  Let's turn and talk about the

charges against the defendant.

Here are the six counts.  I'm going to talk through

them briefly, but I want you to keep in mind that Judge Nathan

will give you detailed instructions about the law, and you

should listen closely when she does.  What Judge Nathan says

about the law controls here.

First, I want to talk to you about something called

aiding and abetting.  For counts Two, Four, and Six, which

we're going to discuss in just a moment, Maxwell is guilty if

she committed those crimes herself, but you can also find her

guilty under an aiding and abetting theory.  In other words, if

LCKCmax3                    Summation - Ms. Moe

1   you find that Epstein committed these crimes and that Maxwell

2   assisted him, she is just as guilty as if she had committed

3   those acts herself.  And we talked about the overwhelming

4   evidence that Maxwell aided and abetted these crimes.  She was

5   an essential accomplice, complicit in an extensive scheme to

6   abuse young girls.

7        So let's talk first about Count Two, which is

8   enticement to engage in an illegal sexual activity.  This count

9   is about Jane and how Maxwell and Epstein enticed her to travel

10  in interstate commerce, in other words, to go across state

11  lines to New York to be abused.

12       The first element of that crime is that the defendant

13  knowingly persuaded, or induced, or enticed, or coerced Jane to

14  travel in interstate commerce.  In other words, did the

15  defendant in some way cause Jane to travel across state lines.

16       You know that Maxwell induced Jane to travel because

17  Jane told you about traveling with Maxwell to New York.  Jane

18  flew on commercial flights and also on the private jets.  She

19  told you about how Maxwell assisted with her travel

20  arrangements, and Juan Alessi confirmed this, because he

21  remembered driving Jane with Maxwell, Epstein, and Jane right

22  up to the plane.  He watched them board together.

23       Ladies and gentlemen, Jane didn't end up in New York

24  by accident, it was a direct result of Maxwell's actions,

25  aiding and abetting Epstein as part of an ongoing pattern of

LCKCmax3                    Summation - Ms. Moe

1    abuse.

2            You also know that Maxwell enticed Jane to New York

3    because Jane told you about the pattern of her relationship

4    with Maxwell and Epstein.  She told you that Epstein gave her

5    money and gifts and paid for school.  That money wasn't free,

6    and part of the cause was getting Jane on the plane with them

7    to go to New York where she was sexually abused.  That is

8    inducement, that is enticement, that is coercion.

9            The second element is that Jane traveled in interstate

10   commerce.  We've already discussed how you know that Jane

11   traveled from New York from out of state.  You know that from

12   Jane's testimony, from Juan Alessi's testimony, and from the

13   flight records.

14           The third element is that the defendant intended that

15   Jane would engage in sexual activity for which any person can

16   be charged with a criminal offense under New York law, and

17   you're going to learn that it's a crime to engage in sexual

18   contact with a kid under 17 who is too young to consent.  And

19   the evidence shows you that Maxwell absolutely intended that

20   Jane would be abused in New York.  That was the whole point of

21   bringing her there, so that Epstein could have access to Jane.

22   They weren't traveling for mentorship or scholarships, they

23   weren't traveling with an underage girl because they were

24   friends, they were getting her to travel so that she could be

25   molested and that's exactly what happened.  The evidence shows

LCKCmax3                        Summation - Ms. Moe

you that the defendant is guilty on Count Two.

Now let's talk about Count Four, it's transportation
of an individual under age 17 to engage in illegal sexual
activity.  And again, this count is about Jane.

The first element is that the defendant knowingly
transported Jane in interstate commerce.  Here we're talking
about the travel itself.  The last count we looked at was about
enticement to travel, this one is about the travel itself.
We've already talked about how Jane was transported to New
York, and for this count, all that's required is that the
defendant was actively engaged, either personally or through an
agent, in making travel arrangements, or that she aided and
abetted Epstein.

THE COURT:  Ms. Moe, closer to the mic, please.

MS. MOE:  Thank you, your Honor.

Maxwell did not need to physically transport Jane
herself or even be present for transportation, but again, Jane
told you that Maxwell helped with her travel arrangements and
that Maxwell was on flights with Jane.  Juan Alessi confirmed
that.  The flight records confirm that.

The second element here is that the defendant
transported Jane with the intent that Jane would engage in
sexual activity for which any person can be charged with a
criminal offense under New York law.  We've already talked
about this one and how the evidence conclusively proves that

1   Maxwell intended for Jane to be sexually abused on these trips.

2          I want to emphasize here that there is no requirement

3   that abuse in New York actually happened or that the defendant

4   was the one who committed the abuse.  The crime is transporting

5   Jane with the intent that she will be abused.

6          Ladies and gentlemen, when Maxwell was helping arrange

7   travel for Jane, when she got on that plane with Jane, Maxwell

8   knew exactly what she was doing, and she knew exactly what

9   Epstein was going to do to Jane.  The crime happened the moment

10  they crossed state lines.  And to be very clear, when Epstein

11  flew Jane to New York and Maxwell aided and abetted him, that's

12  enough, too.

13         The last element is that the defendant knew Jane was

14  less than 17 years old.  And you know that the defendant knew

15  that Jane was under 17, ladies and gentlemen, she met her at a

16  summer camp for kids.  She was too young to drive.  Maxwell

17  knew this girl for years, when she was 14 and 15 and 16.  She

18  would talk to Jane where they would spend time together.

19  Maxwell absolutely knew that she was under 17.

20         And through all these elements, when we're talking

21  about the defendant's knowledge and intent, I want you to think

22  about Kate.  She told you about how the defendant asked her to

23  deliver tea to Epstein wearing a schoolgirl outfit.  That is

24  striking evidence that Maxwell knew Jeffrey Epstein had a

25  sexual preference for schoolgirls.  And after Kate delivered

1    tea in that schoolgirl outfit and Epstein initiated sexual

2    contact with Kate, later that day, Maxwell asked Kate if she

3    had fun.  Maxwell told Kate that she was a good girl.

4            Kate also told you about how Maxwell complained about

5    Epstein's need to have sex three times a day, how Maxwell was

6    constantly looking for someone to give him blowjobs.  That

7    makes it crystal clear exactly what Maxwell intended when she

8    was taking Jane on these trips.  Jane was there to satisfy

9    Epstein's constant need for sexual gratification.  The evidence

10   proves to you that Maxwell is guilty on Count Four.

11           Now let's talk about Count Six, it's sex trafficking

12   an individual under age 18.  This count is about Carolyn.

13           The first element is that the defendant knowingly

14   recruited, enticed, harbored, transported, provided, or

15   obtained Carolyn.  You heard about how the defendant called

16   Carolyn for massage appointments with Epstein.  She was

17   recruiting, enticing, providing, and obtaining Carolyn every

18   single time she did that.

19           The second element is that the defendant knew that

20   Carolyn was under age 18.  Ladies and gentlemen, Carolyn was a

21   14-year-old girl.  She came to the house over and over again

22   and interacted with Maxwell.  She talked about her home life,

23   she told Maxwell she was too young to travel, that her mother

24   wouldn't let her go on trips.  She was a girl who had just

25   dropped out of middle school.  There just can't be any question

LCKCmax3                    Summation - Ms. Moe

1    that Maxwell knew Carolyn was underage.

2              And we're talking about the counts one by one, but I

3    want to step back and ask you to keep in mind, you don't have

4    to set aside all of the evidence you heard in this case when

5    you examine each count, it's the opposite.  The pattern

6    throughout the case tells you that the defendant knew these

7    girls were under age and she knew that they were going to be

8    molested.  You should consider all of that evidence as you

9    examine each count.

10             The third element of Count Six is that the defendant

11   knew Carolyn would be caused to engage in a commercial sex act.

12   And here, a commercial sex act just means a sex act in exchange

13   for money.  That's what happened to Carolyn.  She was paid

14   hundreds of dollars every time that she was abused.  Sometimes

15   Maxwell handed over the cash herself.

16             And we've been talking all morning about the

17   overwhelming evidence that Maxwell knew these girls would be

18   sexually abused in those so-called massages.  She absolutely

19   knew.

20             Finally, there is a fourth element here.  In

21   interstate commerce here means something a little different

22   than the first two counts we talked about.  We're not talking

23   about travel across state lines.  Instead, we're talking about

24   an effect on interstate commerce.

25             So when Carolyn got packages from New York, when she

LCKCmax3                    Summation - Ms. Moe

1    was abused on a massage table that was manufactured in

2    California, that proves that there was at least a minimal

3    effect on interstate commerce, which is all that's required for

4    this count.

5            Finally, there are three conspiracy counts that charge

6    Maxwell with conspiring with Epstein to commit the three crimes

7    that we just talked about.  I expect Judge Nathan will instruct

8    you that a conspiracy just means an agreement to break the law.

9    The crime is the agreement and taking some step to carry it

10   out.  So the question for you here is, did Maxwell agree with

11   Epstein to commit these crimes.  The conspiracy counts are

12   counts One, Three, and Five.

13           The first two conspiracy counts are from 1994 to 2004.

14   Those counts are about Jane, Carolyn, and Annie.  Those counts

15   charge a conspiracy related to enticement and travel, as we've

16   just discussed.  We've already talked about how Maxwell and

17   Epstein completed these crimes as to Jane.  For the conspiracy

18   charges, even though Carolyn and Annie were not sexually abused

19   in New York, everything about the defendant's and Epstein's

20   interactions with those girls makes it clear that that is what

21   they both intended.  Maxwell groomed both Annie and Carolyn as

22   part of a broader agreement with Epstein to provide him with

23   underage girls for abuse.  You heard about all of the steps the

24   defendant took in those years in furtherance of that

25   conspiracy, how Maxwell traveled with Jane and groomed Annie

1    for abuse after she had already visited Epstein in New York,

2    how the defendant asked Carolyn to travel, too.  This went on

3    for years.

4            Count Five is the sex trafficking conspiracy count

5    which spans from 2000 to 2004, and this count relates to

6    Carolyn and Virginia.  You heard about the steps the defendant

7    took in those years with Carolyn and Virginia.  She was taking

8    steps to traffic girls for sex, recruiting Virginia Roberts at

9    Mar-a-Lago, transporting Virginia to other states with Epstein,

10   sending Carolyn up to the Palm Beach massage room on her first

11   visit, calling Carolyn for massage appointments in Florida so

12   that she could engage in commercial sex acts.  The defendant

13   took so many steps in furtherance of the conspiracies charged

14   in the indictment, the evidence about that was overwhelming, it

15   went on for years.

16           But let me say this, because it's very important.  For

17   each of the conspiracy counts, to find the defendant guilty,

18   you only have to find that she did it once, that there existed

19   one moment in time in all of those years where she agreed to do

20   this, and that Maxwell or Epstein took some step to carry out

21   the agreement.  That's it.  If you find that one moment

22   happened, the defendant is guilty.

23           Let me say one last thing about the law.  For each of

24   the counts, I expect Judge Nathan will instruct you about

25   something called venue.  We're required to prove that it's more

LCKCmax3                         Summation – Ms. Moe

1  likely than not that just one act in furtherance of the crimes

2  took place here in the Southern District of New York.  There

3  just cannot be any question about that.

4           For the first four counts, you heard about Jane's

5  trips to Manhattan, which is in the Southern District of New

6  York.  For counts One and Three, you also heard about Annie's

7  trip to Manhattan.  And for counts Five and Six, you saw the

8  packages sent from Manhattan, you heard about Maxwell calling

9  Carolyn to schedule sexualized massages when Maxwell was in New

10 York.

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MS. MOE:  That's more than enough for venue on each

2     count.

3          So that's all that I'm going to say about the law.

4     We've proved to you that the defendant has committed all six

5     crimes charged in the indictment.

6          I want to switch gears and talk to you about one last

7     topic.  I want to talk to you about the arguments the defense

8     has made to you at this trial.  Now, before I get into this,

9     let me be clear that Maxwell has no burden to put on a defense

10    or to put on any witnesses or evidence on her behalf.  The

11    government has the burden of proof beyond a reasonable doubt.

12    We embrace that burden and we've carried it.  But in this case,

13    Maxwell chose to cross-examine witnesses, to make arguments,

14    and to call witnesses.  You can -- and should -- scrutinize

15    that carefully.

16         In her opening statement, defense counsel said

17    something to you about Maxwell being blamed for something a man

18    did.  Let me be very clear.  The evidence at this trial showed

19    you that Ghislaine Maxwell made her own choices.  She committed

20    crimes hand-in-hand with Jeffrey Epstein.  She was a grown

21    woman who knew exactly what she was doing.  And now she's

22    sitting here in this courtroom being held accountable for

23    breaking the law.  That's what this trial is about.  That's

24    what the evidence tells you.

25         And at the beginning of this trial, defense counsel

1    said to you that this case was about manipulation, money, and

2    memory.  And you know what?  Defense counsel was exactly right,

3    but not in the way she meant.  Not at all.

4         This case was absolutely about manipulation.  You

5    learned about how Maxwell manipulated young girls, making them

6    believe that she was their friend, making them feel special,

7    all so they could be molested by a middle-aged man.  And you

8    heard from Dr. Rocchio, an expert psychologist, and you learned

9    about how perpetrators manipulate their victims in a process

10   called grooming.  The evidence in this case overwhelmingly

11   shows you that that's exactly what Maxwell did to these girls.

12        And make no mistake, this trial was absolutely about

13   money.  The evidence showed you that Maxwell and Epstein were a

14   wealthy couple who used their privilege to prey on kids from

15   struggling families.

16        Let me stop and say this:  I want you to think about

17   the few $100 that Carolyn got every time that she was sexually

18   abused.  And I want you to think about the $30 million that

19   Ghislaine Maxwell got from Jeffrey Epstein.  This case is about

20   the way that Ghislaine Maxwell and Jeffrey Epstein exploited

21   kids from struggling families.  So when defense counsel talks

22   to you about money, just think about that.

23        This trial was also about memory.  When the witnesses

24   took that witness stand, they told you about searing memories

25   of childhood sexual abuse, traumatic memories that they've

1    carried with them for years.  That is what the evidence at this

2    trial showed you.

3         Next, the defense has tried to argue to you that

4    Maxwell, that maybe she was just too busy to commit these

5    crimes.  So let's talk about that.

6         The employees you heard from at this trial told you

7    that Maxwell had all kinds of people who worked for her.  She

8    had personal assistants who she interviewed in the back of a

9    limo, a woman to walk her dog.  But despite all of this, the

10   defense tried to argue that maybe Maxwell was so busy managing

11   all of the details of Epstein's life, that maybe she wasn't

12   involved in these crimes; that maybe she was so busy ordering

13   sand to be delivered to Epstein's private island, that she just

14   didn't know what was going on right in front of her.  That's

15   the argument.

16        The argument that Maxwell did not know what was going

17   on is flatly contradicted by the evidence in this case.

18   Maxwell participated in the abuse; of course she knew what was

19   happening.  And in the moments where she wasn't in the room,

20   she absolutely knew what was going on.  The argument that

21   Maxwell didn't know what was happening in the houses that she

22   managed and lived in with the man she was sleeping with, what

23   was going on with young girls she met in person and interacted

24   with frequently, that argument is absolutely absurd and you

25   should reject it completely.

1      So next, the defense has repeatedly attacked Jane,

2   Annie, Carolyn, and Kate, claiming that they are liars or that

3   their memories are faulty or maybe it's both.  They argued both

4   to you during this trial.  They are doing that because the

5   testimony of the witnesses in this case is devastating evidence

6   of Maxwell's guilt; because if you believe them, Maxwell is

7   guilty.

8      You are the finders of the fact.  You're the judges of

9   the truth.  And your common sense tells you that only one of

10  three things can be true about Kate, Jane, Annie, and Carolyn:

11  Either they are all misremembering the same thing, or they're

12  outright lying, or they're telling the truth.

13      So I want to talk through those one-by-one.

14      First, the defense has suggested to you that perhaps

15  Jane and Kate and Annie and Carolyn are all talking about fake

16  memories.  But that's what they testified about, that they are

17  getting it wrong; that their memories are faulty.  Four women

18  have testified at this trial about Maxwell.  They all describe

19  the same woman, the same playbook.  They didn't imagine what

20  happened to them.  Your common sense tells you that just cannot

21  be true.  They are not all somehow suffering from the same mass

22  delusion.

23      And while time has passed, they told you very clearly

24  that they remember being exploited by Maxwell and Epstein.

25  Your common sense tells you that being molested is not

1    something that you forget ever.  You remember an adult woman

2    groping your breasts.  You remember a middle-aged man touching

3    your vagina.  You remember feeling scared and frozen and

4    trapped and confused.  Your common sense tells you these women

5    know what happened to them in their own lives.  They know it.

6    These are powerful memories of trauma, and they've carried

7    these haunting memories with them for years.

8            But when the defense talks about memory, they want to

9    talk about experiments, experiments that Professor Loftus

10   performed in a lab, experiments like the one where she tried to

11   convince people that they saw Bugs Bunny at Disneyland;

12   experiments where she told people that a stop sign was a yield

13   sign.  Don't be distracted by that.

14           Loftus has made a career of being a witness for the

15   defense.  And she said in her book by that name, she doesn't

16   even pretend to be an impartial expert.  She admits she is an

17   advocate for the defense.  And over the years, as she has

18   admitted, she has been paid by criminal defendants to testify

19   on their behalf.  She's made a name for herself as a witness

20   for the defense in high-profile trials.  And most importantly,

21   this case isn't about Bugs Bunny, it isn't about stop signs;

22   it's about sexual abuse, repeated sexual abuse of teenage

23   girls.  Loftus told you, never done a study about that.

24           So all of that testimony she gave about implanted

25   memories or corrupted memories, it was totally irrelevant to

LCKVMAX4                    Summation - Ms. Moe

the facts of this case.  And that's because those experiments
are nothing like what happened here.  And Loftus was basically
forced to admit that on cross-examination.

Remember that study she described about telling people
that they were lost in a mall?  Remember that she only was able
to trick 25 percent of the participants about that?

But, more importantly, another researcher then did a
follow-up study, and that researcher tried to implant two false
memories.  She tried to implant the lost-in-the-mall story, and
also a story about an unpleasant bodily intrusion, a rectal
enema.  Now, some people were tricked about getting lost in the
mall, but no one had a false memory about getting a rectal
enema.  Why is that?  Your common sense tells you that kind of
experience is the sort of thing you can't trick someone into
believing.  You cannot suggest that.  You can't make it up.  A
rectal enema is the kind of thing you'd only remember if it
really happened, kind of like sexual abuse.

And again, Loftus basically had to admit this on
cross-examination.  She said the core memory of trauma is
stronger than other types of memory.  She admitted that.
People might forget some of the peripheral details, but the
core of the traumatic event, those memories are much stronger.
You don't need a paid expert to tell you that, ladies and
gentlemen.  It's just common sense.  You remember something
like this.

LCKVMAX4                    Summation - Ms. Moe

1          Her testimony was a total distraction.  You saw the

2     witnesses yourself.  They were not talking about one time that

3     they saw a fake car crash.  They were telling you about how

4     they were sexually abused again and again and again.  You heard

5     them tell you about their worst memories, and that's why this

6     is a case about memory.

7          As jurors, you understand how memory works from your

8     own lives, and that's how you know it just doesn't make any

9     sense to say that Jane and Annie and Carolyn and Kate all

10    imagined this, or that they're experiencing some kind of false

11    memory of something that never happened.  Again and again at

12    this trial you saw the lengths the defense went to in order to

13    try to discredit the witnesses, because their testimony was

14    devastating evidence of Maxwell's guilt.

15         I want to talk about that for just a moment.  Let's

16    talk about just two examples.

17         Remember that in a cross-examination of Jane, when the

18    defense repeatedly tried to suggest that Jane had said on her

19    application to Interlochen that nothing was difficult for her?

20    This is Defense Exhibit J-3.  This went on for question after

21    question, as the defense tried to suggest that Jane was lying

22    about her difficult home life.  Here it is.  The defense

23    pointed her to the Interlochen application twice to suggest

24    this.  Here's part of the transcript where that happened.

25         You wrote that.  When asked about something difficult,

1   nothing has been difficult for me; correct?

2           I guess I did.

3           But then you saw the actual application, the whole

4   thing.

5           What was that question really about?  List two

6   difficult works performed in orchestra, band, or an ensemble

7   within the past year.  And Jane answered:  Nothing has been

8   difficult for me.

9           So what does that mean?  The defense spent a long time

10  trying to discredit Jane with a line that was really about

11  orchestra music.  Even Jane didn't realize she was being misled

12  this way until she was shown the question itself on redirect.

13          Here's another example:  Remember how Jane was asked

14  about a legal document called an interrogatory?  She told you

15  that she'd never seen this document before and she had no idea

16  what it was.  And the defense suggested to you that this legal

17  document means that Jane said nobody else besides Epstein had

18  been involved in her abuse.  There's this long question here.

19          But guess what:  Here's the portion that the defendant

20  didn't show you and didn't read to you.  It says, Maxwell

21  facilitated the sexual abuse of Jane and was frequently present

22  when the sexual abuse of Jane occurred.  It's right there in

23  that same document.  They didn't read that part to you;

24  instead, they plucked parts out of context to create a

25  misimpression.

LCKVMAX4                  Summation - Ms. Moe

1          Finally, I also expect the defense will make arguments
2     to you about property records in London.  Those all came in by
3     stipulation on Friday.  They'll say that Maxwell didn't live at
4     44 Kinnerton Street in 1994, when Kate met her; and that she
5     lived -- that Maxwell lived in another house nearby in London.
6     But that's just another distraction and here's why:
7          Maxwell herself testified under oath in a 2019
8     deposition, here it is, that she had lived at 44 Kinnerton
9     Street since 1992 or 1993.  So either the defendant lived there
10    the whole time or she mixed up her two London houses and Kate
11    did too.  Either way, it just doesn't matter.
12          So next, the defense has argued to you that Jane and
13    Kate and Carolyn and Annie are all lying.  The defense has
14    asked you to believe that Jane and Kate and Annie and Carolyn,
15    that they are all lying for money.  But none of that makes any
16    sense when you look at it closely.  It doesn't make any sense
17    when you look at the evidence.
18          Now, all four women have testified that they submitted
19    claims to the Jeffrey Epstein Victim Compensation Program.
20    They were awarded millions of dollars.  And that happened well
21    before this trial.  Their civil lawsuits are over.  Those cases
22    are done and the witnesses don't get anything out of testifying
23    at this trial.  They were clear in their testimony.  They have
24    no financial stake in the outcome of this trial.  None.
25          And one of the other ways you know the witnesses

LCKVMAX4

1    aren't making this up is that multiple other witnesses backed

2    up what they told you.  Think about all of the other witnesses

3    in this case.  Juan Alessi, David Mulligan, Janice Swain, and

4    the witnesses called Matt and Shawn.  Think about all the ways

5    their testimony was backed up by documents, all of the other

6    evidence in the case.

7        Your common sense tells you the witnesses are not

8    lying and they just cannot be all misremembering the same

9    thing.  That just leaves one conclusion:  That Maxwell is

10    guilty and you should convict her.

11        Let me take a step back and say this:  Ladies and

12    gentlemen, look at the evidence together, all of the evidence,

13    and use your common sense.  The evidence points to only one

14    conclusion:  That Ghislaine Maxwell sexually exploited young

15    girls.  She trafficked underage girls for sex.  When you

16    consider all of the evidence and use your common sense, you

17    will reach the only verdict consistent with the evidence:

18    Maxwell is guilty.

19        THE COURT:  All right.  Thank you, Ms. Moe.

20        Members of the jury, we are going to take that break

21    for lunch.  It will be a short break, 20 to 30 minutes.

22    Ms. Williams is having it set up now.  My law clerks are going

23    to assist you getting back.

24        I just want to pause one moment.  I repeat this, even

25    though we're at the later stages of the case.  No discussions

LCKVMAX4

1    with each other or anyone else about the case.  Wait until you

2    hear the remainder of the arguments to come, my instructions,

3    and you begin your deliberations.  And continue to keep an open

4    mind until we get through all of the stages of the case.

5           Enjoy your brief lunch.  We'll see you in 20 to 30

6    minutes.  Thank you.

7           (Jury not present)

8           THE COURT:  Any matters to take up?

9           MS. COMEY:  No, your Honor.

10          MS. STERNHEIM:  One brief matter, Judge.

11          THE COURT:  Okay.

12          MS. STERNHEIM:  And I preface this by saying that I

13    haven't had an opportunity to research it, but during the

14    closing argument, Ms. Moe indicated that because a massage

15    table came from California, that affects interstate commerce.

16    It is not my understanding that that is accurate.  If that were

17    the case, then any dwelling that contained any property that

18    had come out of state would have affected interstate commerce.

19    There is no evidence that the table was purchased, when it was

20    purchased, and whether it was purchased in connection with the

21    offenses charged.  It is unlike the cases where property is

22    stolen, and that property is for resale and affects interstate

23    commerce.  This is not that situation, and I think that the

24    statement is incorrect.

25          THE COURT:  Application?

LCKVMAX4

1          MS. STERNHEIM:  One moment, please.

2          (Counsel conferred)

3          MS. STERNHEIM:  Judge, if I may just from here, I

4     think our application would be a limiting instruction

5     correcting the misstatement.

6          THE COURT:  Specifically?

7          MS. STERNHEIM:  That the statement that the massage

8     table having been manufactured or sent from California is a

9     sufficient element to satisfy the interstate commerce clause of

10    Counts Five and Six.

11         MR. ROHRBACH:  Your Honor, just reading from the

12    Court's charge, it affects interstate commerce to use products

13    that traveled in interstate commerce, that's exactly the

14    situation here.

15         THE COURT:  You pulled away from the microphone.

16         MR. ROHRBACH:  Just reading from the Court's charge,

17    it affects interstate commerce to use products that traveled in

18    interstate commerce, that is exactly what Ms. Moe said here.

19    And, of course, the massage table was used in the course of the

20    crime here.

21         MS. STERNHEIM:  I'd also add that there was no

22    identification of that specific massage table as the one that

23    was used in connection with these offenses.

24         MR. ROHRBACH:  At a minimum, your Honor, this is the

25    massage table seized in 2005.  The jury can infer it was used

LCKVMAX4

1     in 2004 during the sex trafficking conspiracy.

2                 THE COURT:  All right.  Overruled.

3                 Anything else?

4                 MR. PAGLIUCA:  Yes, your Honor.

5                 This relates to Exhibit 52, which are the pages from

6     the book that were admitted.  The Court admitted those over our

7     hearsay objection with the limiting instruction.  And the

8     government assured the Court, when the Court was making this

9     decision, that they weren't going to argue the truth of the

10    matter contained in any of the books.

11                And what we heard in closing argument was exactly

12    that, that there are names in the books.  And you can then

13    infer from those names that those might be the people that were

14    being discussed by Jane as having the sexualized massages; that

15    they were reading the words mom, dad, phone numbers, and

16    suggesting that that's how Ms. Maxwell had to have known that

17    these individuals were minors.  Again, that's the truth of the

18    matter asserted; it's not for the limited purpose that the

19    Court instructed the jury.

20                My request, your Honor, my application, first, is that

21    the Court declare a mistrial based on the misuse of that

22    evidence.  If the Court is not inclined to do that, I believe

23    the Court should reinstruct the jurors about the limited

24    purpose, instruct the jurors that they can't infer what the

25    government was suggesting they could infer from that argument.

LCKVMAX4

1    And then we go from there.

2            I also object to the use of what I thought the Court

3    prohibited, which was the grooming-by-proxy argument, which was

4    re-raised in closing argument, suggesting that somehow Ms.

5    Maxwell was grooming these women for Mr. Epstein, which I

6    thought had been precluded.

7            THE COURT:  That's easy to overrule.

8            My precise conclusion was the expert couldn't testify

9    to it in part because -- well, not in part.  The expert

10   couldn't testify to it; but, of course, counsel could make

11   arguments along that regard from the facts in the evidence.

12           MR. PAGLIUCA:  Understood, your Honor.

13           Those are my remarks and requests about the closing.

14           THE COURT:  Exhibit 52.

15           MS. MOE:  Yes, your Honor.

16           The government's arguments with respect to Government

17   Exhibit 52 were entirely consistent with the Court's ruling.

18   In particular, the arguments were about knowledge and intent,

19   how it would be obvious, looking at a document, that none of

20   this was legitimate, that they weren't real masseuses, things

21   like mom and dad, we have that effect.  And when a document is

22   offered not for its truth, that is certainly a proper

23   inference.

24           When we compare the numbers in Government Exhibit 52

25   against the message pads, the language was the number here is

LCKVMAX4

1      the same number on this document.  That's certainly permissible

2      and a matter of common sense.  We just showed two documents and

3      showed they were the same phone numbers.

4            What I didn't say is, This is Carolyn's phone number,

5      you know, it's the real phone number.  It was a common sense

6      inference between two phone numbers that were the same.

7            THE COURT:  I deny the request for mistrial.  I

8      overrule the objection.  It is consistent with my -- both my

9      conclusion in allowing it with respect to the limited purpose

10     for which the document was entered as indicated in my limiting

11     instruction at the time.  And for those reasons, the motion

12     is -- the application is denied.

13            Anything else?

14            MS. STERNHEIM:  No, thank you.

15            MS. MOE:  Not from the government, your Honor.

16            THE COURT:  All right.  See you in about 15 -- I want

17     to make sure everybody has enough time for a quick lunch, but

18     my plan is to resume in 20 minutes.  Thank you.

19            (Luncheon recess)

20            MS. MENNINGER:  We have technical difficulty, your

21     Honor.  The screen is not working.

22            However, we're working on it.

23            THE COURT:  Be seated please.

24            How about a laptop?

25            (Pause)

LCKVMAX4

1           THE COURT:  Let the record reflect my suggestion was

2     paper.

3           (Pause)

4           THE COURT:  I'll ask Ms. Williams to line up the jury.

5           Ms. Menninger, are you ready now?

6           MS. MENNINGER:  Yes.  We are now.

7           Thank you, your Honor.

8           THE COURT:  Okay.  Bring in the jury.

9           Ms. Menninger, please do stay close to the mic

10    throughout, if you can.  I know sometimes it starts that way

11    and then you back up.  One backs up.

12          MS. MENNINGER:  One does.

13          THE COURT:  One does.  Thank you.

14          MS. MENNINGER:  One will try not to.

15          THE COURT:  Thank you.  Bring in the jury.

16          (Jury present)

17          THE COURT:  Everyone may be seated.

18          All right.  Thank you, members of the jury.  I hope it

19    was a good -- even if speedy -- lunch.

20          I'll ask you to now please give your full attention to

21    Ms. Menninger, who will deliver the closing argument on behalf

22    of Ms. Maxwell.

23          Go ahead, Ms. Menninger.

24          (Continued on next page)

25

1          MS. MENNINGER:  Good afternoon.  Ghislaine Maxwell is

2     an innocent woman wrongfully accused of crimes she did not

3     commit.  The government has failed to prove any charges beyond

4     a reasonable doubt, and the just and only correct verdict in

5     this case is not guilty on each and every count.

6          The evidence presented at trial has established

7     exactly what we told you it would during openings, that the

8     stories relied on by the government are the product of

9     erroneous memories, manipulation, and money.  But, in this

10    case, the order is reversed.  The money brought the accusers to

11    the FBI with their personal injury lawyers sitting right there

12    next to them.  The lawyers manipulated their stories and the

13    government accepted those stories at face value without ever

14    testing them or corroborating them or checking with other

15    witnesses to see if they were accurate.  And suddenly, the

16    women recovered memories years later, they recovered memories

17    that Ghislaine was involved, that Ghislaine was there, that

18    Ghislaine is the culprit.

19         Just as we predicted in our opening statement, the

20    government spent a lot of time focusing you on Epstein, on his

21    character, on his lifestyle, on his flaws, and they certainly

22    proved to you that Epstein had abused his money and his power.

23    They proved to you that he was a master manipulator.  That has

24    nothing to do with Ghislaine and everything to do with Jeffrey

25    Epstein.

LCKCmax5                    Summation - Ms. Menninger

1           We are not here to defend Jeffrey Epstein, he is not
2    my client.  The government played you a montage of Epstein's
3    houses, his bank accounts, his artwork, his cars, his planes,
4    his helicopters, his bank accounts, his message pads, just like
5    a sensationalist tabloid would.  His private island, his
6    photos, and those, ladies and gentlemen, are for things that
7    Epstein did, things that Epstein had, and perhaps Epstein's
8    crimes, but as we told you in our opening, Ghislaine is not
9    Jeffrey Epstein.

10          The government in this case has now pivoted because
11   Epstein is not here and they said:  Her, too; her, too.
12   Ghislaine was there, she must have known.  They said, let me
13   show you a bunch of photos of them together, undated photos
14   from unknown times with unknown hairstyles.  You've seen them
15   together.  She must have known.  Ladies and gentlemen of the
16   jury, you heard that the government seized somewhere near
17   38,000 photographs, and they brought you a handful of Jeffrey
18   Epstein and Ghislaine Maxwell together.  Where are the other
19   37,960 photographs?  Who were in those photographs?  Was it
20   other girlfriends?  Was it other women?  Who was it?  You don't
21   know.  They didn't bring you those photos.

22          You saw in the drawers, where these photos were kept,
23   the binders.  You saw the discs where they were kept.  And they
24   brought you the most innocuous photos of a couple that once was
25   together, and they didn't even tell you when.  This is proof of

LCKCmax5                    Summation - Ms. Menninger

1   nothing.  Do your former boyfriends or girlfriends still have

2   some photos of you somewhere in their drawer?  Does that make

3   you a sex offender if they are?  This is straight up

4   sensationalism, your Honor and ladies and gentlemen of the

5   jury.

6           Judge Nathan will instruct you at the end of this case

7   that you are to consider the evidence and you are also to

8   consider the lack of evidence presented to you by the

9   government to meet the highest standard of proof we have in our

10  system, proof beyond a reasonable doubt.  Those two concepts

11  are equally important, the evidence and the lack of evidence.

12  What you heard, and more importantly, what you did not hear

13  over the last three weeks is going to convince you that the

14  only correct verdict is not guilty.

15          These accusers in this case had stories to tell about

16  Jeffrey Epstein and, decades later, they inserted Ghislaine

17  Maxwell into their narrative.  There were FBI interviews, civil

18  complaints, depositions, interrogatories, settlements, all came

19  and went over those decades.  Jeffrey Epstein died and then

20  everyone lawyered up.  Every one of the accusers got themselves

21  a lawyer before they first walked in, in September of 2019 in

22  connection with this case, to talk to the FBI.  You don't need

23  a lawyer to go talk to the FBI unless you want to get money.

24  Those lawyers sat down with their clients, they met with them,

25  it's all shielded by privilege what they talked about, but we

LCKCmax5                    Summation - Ms. Menninger

1    know that the clients talked to each other.  You heard that

2    from the witnesses.  You know they emailed each other, you know

3    they met up after court appearances with Jeffrey Epstein, and

4    you heard, for example, about Jane's lawyer, Robert Glassman.

5    He told her, before this case was ever charged, that Glassman

6    stated before the government charged the case, Jane had

7    discussed whether to cooperate -- and reminding you, she didn't

8    want to cooperate before Epstein died, but he advised her that,

9    to cooperate, would quote, help her case, meaning her civil

10   case.  She hired Robert Glassman two weeks before she first

11   talked to the FBI in September of 2019.

12          So these women, with their lawyers, walked into the

13   U.S. Attorney's Office, they filed their civil lawsuits at the

14   same time, and the lawyers, like Boies Schiller, helped set up

15   the Epstein Victims Compensation Fund.  Annie told you that.

16   On that fund application, it asked you, are you cooperating

17   with a criminal investigation, have you filed a civil suit,

18   because if you are, we'll just assume you're a real victim,

19   even though we, the fund, aren't going to ask you any questions

20   or put your story to the test.  And all of these ladies had

21   lawyers, went to the FBI, and filed a civil suit and filed a

22   civil claim with the fund and they each took home millions, and

23   now they are stuck with the stories that they told.

24          That's the money piece.  Now for the manipulation, a

25   manipulation of the truth and the evidence.

LCKCmax5                    Summation - Ms. Menninger

1          As we go through the stories of each of these accusers
2     and each of the witnesses, you need to keep your eye on the
3     thing that the government hasn't, how these stories have
4     changed dramatically over time.
5          Carolyn, you heard, had a lawyer back in 2008, and she
6     started out giving a very clearcut story about Jeffrey Epstein
7     and also about a woman named Sarah Kellen, who she also sued.
8     She had no trouble articulating her claims.  She had a lawyer,
9     she filed a lawsuit, a lawsuit that didn't mention, in 290
10    paragraphs, Ghislaine Maxwell one time.
11         The same is true with Jane.  She told stories about
12    Epstein.  Initially, she said she wasn't sure that Maxwell was
13    ever in the room.  And don't be fooled about this difficulty in
14    disclosing the details of it.  She had two male lawyers.  She
15    had no difficulty disclosing it to them before she ever met
16    with the government.  And when she walked in to talk to the
17    government, she told them she wasn't sure if Maxwell was ever
18    in the room.  But her lawyer told her it would help her with
19    her case if she cooperated with this prosecution, and so she
20    did, and the lawyers kept asking, the FBI kept asking, are you
21    sure that maybe the person who had a foreign accent was perhaps
22    Ghislaine Maxwell?  Are you sure maybe he groped your breasts
23    instead of massaging your upper chest?  Are you sure there
24    wasn't sexual abuse in New Mexico?  Perhaps you met him when
25    you were only 14?  Perhaps you didn't just meet Epstein then,

LCKCmax5                      Summation - Ms. Menninger

1    maybe you met Ghislaine Maxwell there, too?

2          Every last one of the government's interviews with

3    these accusers — and there were dozens you heard — was not

4    recorded.  There is no transcript.  There is no record of the

5    exact questions that were asked or who asked what questions or

6    whether the lawyers suggested maybe their clients had something

7    more to add or another person to add, and that was by design so

8    none of us have a transcript of what actually took place in

9    these interviews with the FBI.

10         So it was left to us, the defense, to ask the hard

11   questions of these witnesses when they took the stand.  And

12   it's not easy to ask someone, well, that's not exactly what you

13   said before, is it, when you told your story the first time,

14   you didn't mention Ghislaine, and you only added that later.

15   Why would you go decades without mentioning Ghislaine Maxwell

16   and suddenly when you have your personal injury lawyer, you add

17   her to the mix.  The government never asked them, wait a

18   second, you said you were traveling with Epstein and Maxwell

19   when you were 14 and 15 years old.  We have these flight logs,

20   there's not a single record of you traveling with them when you

21   were 14 or 15 years old.  How could that be?  Where did you

22   live when this was going on?  There is two different addresses

23   and maybe we, the FBI, should go check out the house you were

24   living in.  You said you were poor, is that true?  Or, where

25   are your boots that you said they bought you?  The tough

LCKCmax5                    Summation - Ms. Menninger

1      questions weren't asked by the government, so they had to be

2      asked by us, and what you learn is that the truth was

3      manipulated and changed over time.

4              You also heard the manipulation of other storylines,

5      and I'll go through them, that Ghislaine is at the center of

6      all this, she's the right-hand woman, she's Cruella Devil and

7      the lady wears Prada all wrapped into one.  This is a

8      manipulation of the truth as old as Hollywood, your Honor, and

9      ladies and gentlemen, and don't be fooled by it.

10             With the money on the line, the accusers' goal of

11     holding someone accountable for Jeffrey Epstein, who was dead

12     at the forefront, and the tape recorders turned off, the

13     accusers' memories started to shift.

14             Earlier, Carolyn said it was Sarah Kellen, now she's

15     says it was Ghislaine Maxwell.  Before Jane said she met only

16     Epstein on a park bench at Interlochen, now she saw Ghislaine

17     walk by and then, oh, by the time she got to trial, it was

18     Ghislaine who stopped and talked to her.  Before it was, I have

19     no specific recollection of Ghislaine being in the room when it

20     happened.  That became, I remember it being once or twice or

21     all the time.  Before it was, I can't remember anything about a

22     sexualized foot massage.  Now Annie hears Jeffrey moaning with

23     pleasure.

24             Professor Loftus explained to you that's not how

25     memory works.  You don't acquire a memory, retain it, retrieve

1   it with a few details, and then decades later, acquire new

2   details, acquire new people who were there.  That's called

3   post-event suggestion, and that's what happened in this case.

4   Each of these women had talked to numerous individuals, had

5   watched media, shared their stories, talked to their lawyers,

6   and we're talking about events that supposedly happened 25

7   years ago.  In Jane's own words, she said memory is not linear,

8   or how would I know, I was only 15.

9        Memories have been manipulated in aid of the money.

10       The government made a lot of promises to you on

11   opening, promises that they broke.  The story of Jane didn't

12   pan out the way they opened.  They told you she started

13   spending time alone with Epstein at his house as a 14-year-old,

14   but it turned out she told them years ago that when she first

15   started going, she went with her mother or her mother and her

16   brothers, exactly as Juan Alessi told you.  And as Juan Alessi

17   and Larry Visoski told you, she wasn't 14 or 15 when she

18   started coming, she was older, a fully grown mature young

19   woman.

20       Ghislaine didn't target Jane as a predator, as the

21   government promised you.  Jane's original story in 2015 to the

22   press is that she was sitting on a park bench when Jeffrey

23   Epstein came up and talked to her.  Ghislaine didn't invite

24   Jane over for tea, she wasn't even there when she and her

25   mother went.  Ghislaine didn't arrange for Jane to come to

LCKCmax5                    Summation - Ms. Menninger

1    Epstein's house.  She told you it was other people in Epstein's

2    office.  And Ghislaine didn't encourage Jane to travel with

3    Epstein.  You heard not one single word out of Jane's mouth

4    that Ghislaine encouraged or enticed her to travel anywhere.

5            The government's biggest promise that they repeated to

6    you over and over again with respect to Jane is that she was,

7    quote, sometimes in the room when it happened.  But when Jane

8    got on the stand, she admitted, finally, that what she told the

9    government several times is she wasn't sure and had no

10   recollection that Ghislaine was ever in the room when Epstein

11   abused her.  She said it in February 2020, and what she said on

12   the stand in front of you is, as you sit here today, you're not

13   sure whether you were ever in the room alone with Ghislaine and

14   Epstein, correct, and she said, no.

15           The government also promised you an array of

16   witnesses, another promise they broke.  They said these

17   witnesses would back up the accusers' claims.  They told you,

18   for example, that there were relatives from the victims that

19   you would hear from, and that those relatives would tell you

20   about the victims spending time with the defendant and Epstein

21   and traveling with them and receiving phone calls from them all

22   when they were between the ages of 14 and 17.

23           Let's break that down.

24           What relatives came to tell you about Jane spending

25   time with the defendant and Epstein?  What relative was that?

LCKCmax5                    Summation - Ms. Menninger

1    You didn't hear from one.  Jane said she went to Epstein's

2    house hundreds of times, once every week or two, for three

3    years.  She lived with a mother and two brothers, and no one,

4    not one relative came and got on that stand and told you that

5    she spent time with Ghislaine and Epstein from the ages of 14

6    to 17.  No relative of Kate's came to tell you that.  No

7    relative of Carolyn's came to tell you that.  Who are these

8    relatives that are going to come and tell you about the victims

9    spending time with the defendant and Epstein?  Annie's mom

10   came.  Annie's mom came and told you she only spoke to Epstein.

11   She never met or talked to Ghislaine Maxwell.  She has no idea.

12            The government also said that these relatives would

13   come tell you about all the phone calls these females got.  Did

14   you see those phone calls?  Did you hear from those relatives?

15   Did you see a phone record?  I didn't.  These are broken

16   promises from the government in their opening.  Lack of

17   evidence.

18            The government also told you that they were going to

19   tell you, you are going to hear from a bevy of employees who

20   would back up the accusers' stories, and again, the government

21   failed to deliver the goods.  Instead, what you did you get?

22   You got some pilots.  They told you the pilots would tell you

23   about flying some of the victims.

24            We did hear from pilots.  We heard from Larry Visoski,

25   who said he never saw a woman on a plane who looked under 20

LCKCmax5                    Summation - Ms. Menninger

1    unless she was there with her parents.  He met Jane once.  He

2    remembered her striking eyes.  He said she was fully mature

3    when he met her.

4           And by the way, does it make any sense to you that if

5    Epstein is showing off Jane, he keeps her undercover when she's

6    14 and 15 to put her on a flight log as a female and all of a

7    sudden, when she's 16, takes her up to introduce her to the

8    pilot?  Does that make any sense based on the evidence that you

9    heard?  No.  No pilot came and told you they saw Carolyn on a

10   plane or Kate or Annie.  And no flight logs show any of those

11   three women either.

12          What about the multiple promised Palm Beach employees

13   who would tell you about this culture of silence?  They bombed

14   on this promise, too.  There was no culture of silence.  You

15   just got the sound of silence, ladies and gentlemen.  You heard

16   from one employee from the Palm Beach house.  You know there

17   were many, there were chefs, there were landscapers, there were

18   gardeners, there were assistants, assistants to assistants, and

19   you got a two-time burglar, obviously with an ax to grind

20   because you know he wasn't getting along with the boss.  He had

21   a deeply flawed memory, Juan Alessi did.  He couldn't remember

22   whether dates happened in '94 or 2000.  He couldn't remember

23   the number of times he robbed a house.  He couldn't remember

24   the ages of girls, whether they were 20 or 14.  Where are all

25   these Palm Beach employees who are going to tell you about a

LCKCmax5                    Summation - Ms. Menninger

1    culture of silence?  I didn't see them.

2            They told you you'd hear from law enforcement

3    witnesses and they promised photographs of the search of the

4    Palm Beach house, and that search in 2019 of the New York

5    mansion that would show that Epstein lived in mansions filled

6    with photographs of naked women with a massage room in each one

7    of those houses.  You didn't see a single massage room with

8    naked women in it.  I didn't.  You saw a closet with photos of

9    friends and family in Palm Beach where the massage table was

10   stored, but there were no nude photos in the New York

11   residence, there were no massage rooms in New Mexico.  Kate

12   said she saw a massage room in Ghislaine Maxwell's house in

13   London, but Cim Espinosa said she was there and there was no

14   massage room there.  So law enforcement witnesses failed to

15   deliver on that promise.  And you might have also noticed the

16   government didn't even call to the stand the two case agents in

17   charge of this investigation.  Why would that be?

18           The government promised you evidence from these

19   searches, a massage table, a schoolgirl outfit, and nude

20   photographs.  You saw the 20-year-old massage table sitting up

21   here in the courtroom.  What did that tell you?  You didn't see

22   a schoolgirl outfit, you didn't see all these nude photographs.

23   You saw some artistic drawings around a rich man's house.

24           You saw FedEx records that showed Ghislaine Maxwell

25   didn't send any underage girl anything.  The same FedEx records

1    that had packages going to Carolyn from others showed Ghislaine

2    sending things to her family.  That proves no involvement of

3    Ghislaine Maxwell in this enterprise.

4           And you saw no phone records.  The government promised

5    you a playbook.  It's an old gimmick.  You get an expert on the

6    stand to tell you the stages of grooming and then you try to

7    build your evidence around what they said.  But here, again,

8    the evidence didn't back up the government's promise.  Their

9    headline read, Ghislaine targets daughters of single struggling

10   moms.  What did you get instead?  Maria Farmer introduced her

11   sister to Jeffrey Epstein and told her that he might help pay

12   for her college.  Where was Ghislaine targeting Annie Farmer in

13   that storyline?

14          Epstein met Jane alone at Interlochen camp.  At least

15   that's the way she told it for years.  Where is Ghislaine

16   targeting her?  Carolyn was introduced to Epstein by Virginia

17   Roberts, not Ghislaine Maxwell.  And Kate was dating Ghislaine

18   Maxwell's classmate from Oxford, that's who introduced her to

19   him.

20          They promised you that these girls would tell you

21   about all of these discussions of sexual topics that normalized

22   the behavior.  What did you get instead?  Carolyn talked to

23   Virginia about making money going over to massage an older man.

24   Ghislaine wasn't even there.

25          Jane recalls one joke about grandfathering in old

LCKCmax5                    Summation - Ms. Menninger

1    boyfriends, and Annie didn't say any sexual topics were

2    involved?  Where's the normalizing going on there?  And by the

3    way, this story about normalizing and making it seem casual,

4    Jane told you when she was first abused she was taken alone

5    into a pool room -- pool house where Epstein masturbated on

6    her.  Ghislaine wasn't even there and she's trying to make it

7    seem like she thought that was normal because she got one joke

8    about boyfriends?  Use your common sense.

9          Then again, there's that promise that you would learn

10   that sometimes Ghislaine was in the room when it happened,

11   except Jane can't actually remember any one of those times or

12   what happened during those times.

13         Finally, the government promised you a motive, and the

14   motive that they came up with was that Ghislaine, a happy,

15   educated, beautiful woman in her 30s would just start and end

16   her career as a facilitator of sexual abuse for one man,

17   Jeffrey Epstein, because they said he was a means to support

18   her lifestyle and she needed to stay in a lifestyle to which

19   she had become accustomed.  That's why they claim she became a

20   facilitator of sexual abuse, and where was the evidence they

21   delivered to you about that?

22         First, it was clear Epstein was a manipulator of

23   everyone around him.  He's having Juan Alessi take down photos

24   of Ghislaine when he brings other women to the house.  He's

25   dating women behind her back.

1           But in terms of Ghislaine Maxwell's lifestyle, do you

2   know what it was before she met Jeffrey Epstein?  No, because

3   the government didn't tell you about that.  Do you know what it

4   was after she left Jeffrey Epstein?  No, because the government

5   didn't tell you about that.  Do you know her financial

6   situation?  Do you know whether she had luxury in her life?

7   You saw photos of her that they showed you wearing tartan or

8   hunting with dogs in the U.K., it looks from the pictures.  So

9   maybe it was Jeffrey that needed Ghislaine and her connections

10  and not the other way around.

11          And does that motive even make sense for a woman in

12  her 30s, that she needs this lifestyle, so she's just willing

13  to drag 14-year-olds in for sexual abuse?  Use your common

14  sense.

15          And if that's the case, your Honor and ladies and

16  gentlemen of the jury, then why wouldn't Eva Dubin be telling

17  you the same thing?  She dated Jeffrey Epstein for a decade.

18  She saw nothing abnormal.  She let her kids hang around with

19  Jeffrey Epstein.  She went on to marry a billionaire.

20          Not one witness came in to tell you that Ghislaine

21  Maxwell needed Jeffrey Epstein's lifestyle so bad she was

22  willing to perpetrate on young females.

23          I'm going to take some time now, after talking about

24  the promises the government did not keep to you in their

25  opening, and go through each one of these women's stories and

LCKCmax5                    Summation - Ms. Menninger

1      then I want to talk about the lack of evidence that

2      corroborated each one of their stories.

3             Let's start with Jane.

4             The government started their opening with, this is the

5      story of Jane, and it was just that, quite a story, like an

6      actress who forgot her lines.  She was supposed to place

7      Ghislaine Maxwell in the middle of Epstein's sexual abuse ring,

8      but she doesn't actually have a clear recollection of anything

9      that Ghislaine did.  Time and time again, she couldn't remember

10     whether Maxwell ever touched her, kissed her, or even was in

11     the room when Epstein was supposedly abusing her.

12            When actually asked on the stand to retrieve memories

13     of whether Ghislaine Maxwell was in the room, they had to ask

14     her that specific question, were there times when Ghislaine was

15     in the room when it happened.  She said yes to the government's

16     questions, but her body language said hesitation, I don't

17     remember it, I can't remember the details.  Indeed, when I

18     asked her on the stand, as you sit here today, isn't it true

19     that you don't remember being alone in the room with Epstein

20     and Ghislaine, and she said, no.

21            In February 2020, they asked her if there were times

22     it was just her, Epstein, and Ghislaine in the room, and she

23     said she was not sure, she doesn't recall that now.  I asked

24     her when she was talking to the government whether she ever

25     told them that she, Ghislaine, and Jeffrey were alone in the

1    room together, she was not sure that ever happened and she

2    doesn't recall that now, no.  But now, as she sits on the

3    stand, she can't recall whether she was ever alone in the room.

4            And as we talked about in her interrogatory response,

5    she was asked in 2020 to identify all other persons, other than

6    Epstein, who had ever committed or attempted to commit sexual

7    misconduct.  This is notable not only because she doesn't

8    identify Ghislaine, but she also doesn't identify all these

9    other women who were supposedly in these orgies with her when

10   she was 14 over a three-year period.  She'd given names to the

11   government, like Eva and Michelle and Sophie, but she doesn't

12   tell them here in her sworn pleading.

13           You've seen this before, but I just want to bring up

14   Jane's actual birthdate as we talk through some of the timeline

15   so you can remember when she was 14, 15, or 16, and I want to

16   talk about the story of Jane, the one that's actually backed by

17   documents and facts.

18           It is true that her father died when she was 13, which

19   is a tragedy and is sad.  She went on to tell you, though, that

20   she was so stricken by poverty that she had no lunch money at

21   times, and she was homeless.  That's not the way it looked to

22   the outside world.  She's applying to go to an arts camp with

23   her two brothers every summer for three years.  That arts camp

24   costs $4,000 per person, per summer, so $12,000 per year, all

25   three of them go all three years.  They don't even apply for

LCKCmax5                    Summation - Ms. Menninger

1   financial aid.

2           She went to public school.  She was obviously talented

3   and performing well, and that sentiment was echoed in the

4   supporting materials to her applications, which you will have

5   with you in the deliberation room.  That guidance counselor,

6   you know, the one that she supposedly had confided in the year

7   earlier, the one that she said she told about how she was

8   struggling with talking to her mom, that's the guidance

9   counselor that wrote her a letter of recommendation saying she

10  came from a loving and supportive family.

11          She received glowing reviews from people who were well

12  positioned in the community, a board member from the Palm Beach

13  school system who was formerly on the board of the professional

14  children's school where she ultimately went.

15          You see from her applications that she had two

16  different addresses, one that she lived in a house from '94 to

17  '95, and a third one in her application from 1996 when she was

18  16.  She told you she lived in a two-bedroom house and she

19  moved into a three-bedroom house, and the three-bedroom house

20  was in a gated community in Bear Lake Estates.  That's someone

21  who just described for you that she was destitute and homeless.

22  She recognized the street she lived on, but not the house with

23  her house number.

24          In 1995, she filled out the application again.  And by

25  the way, this is in October of '94, she filled out the

1    application for the summer of '95.  Again, she doesn't mention

2    that Epstein is providing her any support or paying for her to

3    go.  By this point, in her budding career, she has been in

4    commercials, she has been in a Broadway production of Joseph

5    and the Technicolor Dreamcoat on the touring group that came to

6    Palm Beach.  She's got more prestigious letters of

7    recommendation, still no application for financial aid, still

8    no mention of Epstein.

9         And after her second year at Interlochen, we see her

10   customs and border protection records which show how many times

11   when she was a teen that she was traveling internationally.

12   This person who said she didn't have lunch money, she's going

13   to Italy for an international trip she told you about, a vocal

14   competition with her school.  And she's going on an

15   international trip to Europe with her family to see other

16   family back there.

17        And in 1996, she applies for Interlochen again.  And

18   on that one, they actually go so far as to ask her, in this

19   yellow highlighted area, not only are you applying for

20   financial aid, which she says no, but does the student expect

21   to be the recipient of any funds from any individual

22   specifically for attendance at Interlochen Arts Camp, and she

23   says no, while she came in here and told you that Epstein was

24   paying for her.

25        The government touted, touted the trips in August to

1    Interlochen on the flight logs.  And you should take a look at

2    those, because Epstein went every year, pretty much, including

3    with Itzhak Perlman, a famous musician himself.  And not only

4    did Epstein and Maxwell go to Interlochen in '94, they also

5    went in '96.  And actually, they both went in 1996.  And so,

6    while they claim the flight log from '94 establishes that Jane

7    met Epstein and Maxwell in '94, in fact, it's just as possible

8    that she met them in '96.  And if she met them in '96, it

9    certainly makes a lot more sense given the rest of the

10   evidence, which we'll talk about now.

11           Because the next thing that happened is there is a

12   flight in November of 1996 which the government showed you, and

13   I'll show you again in a minute, that has Jane going on a

14   flight from Palm Beach, when she's 16, to New York.  That's the

15   very first time someone with Jane's first name flies on a

16   flight, when she's 16, while she came and told you all that she

17   was flying repeatedly when she was 14 and 15, but there is no

18   records, miraculously, of those flights.

19           In March of 1997, Jane and her mother, when she's 16,

20   file a lawsuit against her voice teacher, her principal, and

21   her guidance counselor.  That lawsuit went on for two years.

22   Jane said she remembered her teacher pulling her hair one time,

23   but she had no idea that her mother and she had sued her own

24   principal, guidance counselor, and voice teacher.  Is that

25   credible, that a 16-year-old doesn't know she's in litigation

1    with the three most important people to her at her school?  Is

2    that credible?  It is not credible, I submit to you.

3         And if Jane is unable to tell her mother about sexual

4    abuse, but she's able to tell her mother that she got her hair

5    pulled one time and she gets a lawsuit out of it, what makes

6    her think her mother is not going to get her back.  This sounds

7    like a whole lot of hindsight changing the stories around.

8         And where is her mother?  Why didn't her mother come

9    to testify about this?  Oh, I kept that lawsuit from Jane, I

10   didn't want her to know we were in a lawsuit for two years.

11        And by the way, if you're getting wads of cash from

12   Jeffrey Epstein every time you go over there, why do you need

13   to file a lawsuit?

14        There's a flight log entry with Jane's first name in

15   May of '97 that goes from New Jersey to New Mexico.  She's

16   almost 17 at that point.  And then in August of '97, she turns

17   17.  Before that, though, while she's still 16, she takes

18   another international trip.  She doesn't remember that trip

19   either when I asked her.  She turns 17 in the fall of '97, The

20   Lion King is released.  She told you originally her first trip

21   to New York was when The Lion King was released.  It turns out

22   she was 17 when that happened.  She got her dates wrong in a

23   case that's about dates and about travel.  She got her dates

24   wrong by three years.  And then in January of '98, she goes to

25   Europe again with her family.  You can see the cities that she

1    goes to when you look at these flight logs because they're on

2    there.  This destitute, homeless, penniless Jane.

3          In May of '98, she says she's singing to Mike Wallace

4    for his birthday, his 80th birthday, and she estimated she was

5    15 or 16 years old, but it turns out he turned 80 when she was

6    17, almost 18 years old.  So she got that date wrong by a few

7    years, as well.

8          Upon graduation, she left for LA, but before that, she

9    went to high school, and this is the only document from 1998

10   when she's 18 that shows Mr. Epstein paying for anything for

11   her.  High school, not Interlochen.  She attends the

12   professional school and when she goes off to LA, she writes

13   back to Epstein, as you see on these photos, Jeffrey, thanks

14   for rocking my world, you're the best, love, Jane.  She said

15   her mom made her send that photo, but again, you didn't hear

16   from her mom.

17         She continues to fly on Epstein's planes when she's 19

18   and 20 and 21.  I asked her about those flights that were paid

19   for by the Shoppers Travel witness you saw, and she didn't

20   remember that she kept taking flights on his dime when she was

21   20 and 21.

22         And then you will see and hear from on the flight

23   logs, in a moment, that she said she was on numerous flights

24   with famous people.  You may recall she said she flew with

25   Prince Andrew, for example, and Mark Epstein, and Epstein's

LCKCmax5                    Summation - Ms. Menninger

mom, that there is not a single flight log entry with her

flying with those famous people.  And we'll get back to her

memory being tainted by those flight logs in a second.

Let's talk about her memory.  She demonstrated a very

poor and inconsistent memory about things that if were true,

she would have remembered.  Her memory is the underpinning of

this entire case, because the government has to prove to you

beyond a reasonable doubt that she was traveling, enticed to

travel, encouraged to travel, transported while she was under

the age of 17 in order to find Ghislaine Maxwell guilty of

counts One through Four.

And the government overlooks each one of these

significant memory gaps.  They try to tell you, and I expect on

rebuttal Ms. Comey will tell you, she was too scared to

disclose the facts about what happened to her.  Or, you know,

we overlooked that she's telling her male lawyers all these

facts for purposes of her civil suit.  They brought up they had

to reduce the number of people in the room so she would feel

comfortable enough talking to them about it.  You could judge

for yourself, her lack of discomfort and talking about it on

the stand.

But what she said in December of 2019 and in February

of 2020 was, I don't feel comfortable talking about this right

now.  She said, I have no specific recollection of that or I

don't remember.  If she doesn't remember something, the

LCKCmax5                    Summation - Ms. Menninger

1    government didn't confront her about it.  The one time they

2    did, they brought up the lack of memory about The Lion King

3    date, and that certainly backfired.  And so what they did was

4    say, okay, we'll just assume that wasn't your first trip to New

5    York, because your dates don't match, and then they stop

6    looking for other evidence that would corroborate her claims,

7    like, where are you on these flight logs.

8         Her lapses of memory pervade this case, and as

9    Dr. Loftus told you, very traumatic things one is unlikely to

10   forget, the where it happened, the who was there, the when it

11   happened, the how it happened, those would be core parts of her

12   story.

13        So, for example, a core part of her story would be

14   when and where was the first time you were sexually abused.

15   That's not something you forget.  She told you that it was when

16   she was in a pool house in Florida, and she told you about

17   that.  But remarkably, back in December of 2019, that's not

18   what she told the government.  She said the first time she

19   experienced abuse was when she was about 14 years old in New

20   York.  She met Epstein to take headshots and that is when he

21   masturbated.  Those are two totally different stories, in a

22   pool house in Florida or in New York when you go to get your

23   photos taken.  When I asked her about it, she said the FBI got

24   it wrong, I didn't write any of this, I've never read this

25   document before.  What is beyond dispute, because the FBI agent

LCKCmax5                    Summation - Ms. Menninger

1    came in and told you that that is what she told them back in

2    2019, and that's a core detail you're not likely to forget if

3    it's true.

4           Let's take another example, whether there was ever

5    abuse in New Mexico.  Jane told you, told the government

6    repeatedly, she had no specific recollection of abuse in New

7    Mexico.  So what did the government do?  They kept asking her

8    over and over again — remember, they're trying to prosecute a

9    case about transportation and enticement to cross state lines —

10   are you sure there was no evidence?  There was no abuse in New

11   Mexico?  I have no memory of abuse in New Mexico.  Are you

12   sure?  Maybe there was some abuse in New Mexico?  And finally,

13   after they asked her four times, she suddenly got back a memory

14   of abuse in New Mexico that she testified to here on the stand,

15   that she said someone came to get her, she doesn't know who,

16   and that her heart sank when she was taken to Epstein's room

17   for the abuse.  That's not how memory works.  That's

18   suggestion.

19          And clearly, for purposes of this case, the most

20   important thing is what did Ghislaine know about what was going

21   on, if anything, between Jane and Jeffrey Epstein.  Was she

22   ever in the room as the government told you over and over?  And

23   when I asked her, she does not recall if she was ever alone in

24   the room with Ghislaine and Jeffrey for any of the abuse.

25          And not only does she not remember being in the room

LCKCmax5                    Summation - Ms. Menninger

1   specifically, she's not sure -- you heard the government say

2   their stories were all remarkably similar because they each had

3   their breasts touched.  In the trial testimony, she told you

4   she was not sure that Maxwell ever touched her during these

5   encounters.  She does not have a recollection, she said in

6   December of 2019, if Ghislaine touched her during these

7   encounters.  At trial, she said she doesn't remember that, but

8   it's written here and the government notes, she's not sure

9   Maxwell ever kissed her.

10          She also, the government told you in their closing,

11  that Ghislaine was giving her directions about how to massage

12  Jeffrey Epstein, but that's not what she said on the stand.

13  She said she doesn't recall Ghislaine ever giving her a talk

14  about how to massage Jeffrey.

15          And what other things does she say she doesn't know

16  that Ghislaine ever saw?  Never saw this oral sex she said she

17  had to perform in the orgy, she said she never saw hand jobs,

18  she said he never used sex toys on her, she said Ghislaine

19  never saw her have intercourse, and, in fact, she has no memory

20  of Ghislaine being present when Epstein engaged in sexual

21  contact with her.  She told me, I don't remember.

22          If she doesn't remember ever being alone in the room

23  with him, then she also doesn't remember the story that she

24  told you on direct about the first time with Ghislaine.  And

25  that's also what she confirmed to me on the stand, she had no

1    specific memory of the first time with Ghislaine until she got

2    up on the stand and told you one.

3          So the government kept asking her, was Ghislaine ever

4    in the room when it happened.  I asked her, how many times, and

5    she said I don't know -- I'm sorry.  The government asked her

6    how many times, and she said I don't know.  Was it once, no.

7    Was it twice, no.  How many times, I don't know, but more than

8    twice.  That's the evidence they want you to convict Ghislaine

9    Maxwell on?  I don't know?  I don't remember?

10         She also told you the thing that happened more

11   frequently was being in these group sexualized massages, and

12   because that involves other witnesses, you have a right to

13   evidence about this.  She said that this group sex massages —

14   she called them orgies — happened frequently, and that Epstein

15   would just summon people up to a room and they would all follow

16   him up there.  And she said she was a 14-year-old girl when

17   these orgies were going on in his house, and she wasn't sure

18   how often Ghislaine was ever present for these orgies, but she

19   gave other names.

20         Apparently none of these other women thought it was

21   unusual that a 14-year-old was in an orgy with them and they

22   didn't call the police or report it, but naturally, being the

23   FBI when they got names of these other women, they ran right

24   out to try to corroborate those stories and be like, hey,

25   sounds like maybe you were in a group orgy with a 14-year-old

1    back in the '90s, can we talk about that.  No.  No, they didn't

2    do that.

3           Jane told about a woman named Sophie.  She gave a

4    description.  She was blond and pretty.  She said Sophie

5    married a racecar driver and Sophie joined in these sexual

6    massages.

7           And then she told the government about a woman named

8    Eva, correct, she did not use a last name, but Eva.  And this

9    wasn't just some disconnected Eva that showed up in an address

10   book from some unknown time in the future, jane said that Eva

11   joined in with Sophie.  She joined in with Sophie.  Those were

12   your words, yes, Eva joined in with Sophie.

13          So where would Jane have gotten these names, Sophie

14   and Eva, if the massage didn't really happen and she was trying

15   to come up with some names?  Well, let's look.  Sure enough, on

16   her very first flight log entry that has her name on it from

17   November of 1996, she's on a flight with Sophie and Eva.  What

18   are the odds that the very first flight she takes is with two

19   women who she claims are on a group sexualized massage?

20          Let's look at Eva.  Eva is flying with her child and

21   her nanny.  She told you on the stand that she just had a baby.

22   Do you think that Dr. Eva Dubin that you just saw on the stand

23   with a child and a nanny who's on a flight with Sophie, she

24   joined in with Sophie was in a group sexualized massage.  Eva

25   told you she knows Sophie.  Sophie was a professional masseuse.

1   They know each other.  This isn't some Eva that the

2   government's now gone back and scrambled and found a name in an

3   address book.

4           The next group of people she talks about is Emmy.  She

5   remembers Emmy was British and she was in the group sexualized

6   massages, and there was a woman named Michelle.  And now the

7   government wants to suggest that Michelle is some random

8   Michelle and we don't know who Michelle is, and Michelle could

9   be any old Michelle, and look at this address book with

10  Michelle's name.  There is Michelles everywhere.

11          But Jane told you from the stand it wasn't just any

12  old Michelle, it's the Michelle that she hung out with her and

13  Emmy.  So it's Emmy's friend, Michelle, and she said it was

14  Emmy's friend, Michelle, that she hung out with.  And you heard

15  Michelle on the stand say that's the Michelle, I'm the Michelle

16  that hung out with Emmy.  I don't know any other Michelles that

17  Emmy hung out with.  And no, we weren't involved in any group

18  sexualized massages.  I'm a housewife.

19          What you see here is a pattern, you see a pattern of

20  Jane picking names out of people she knew she met in Epstein's

21  world at some point in time.  The receptionist, the first

22  person you see when you come into his office, and she came in

23  there with her mom.  That's the one now she remembers she was

24  in a group sexualized massage with or a person she saw in the

25  flight log with another person in a flight log.

1          Did the government show Jane photos of any of these

2    women that they got in their address book now and say, hey, is

3    this the one you were in a group sexualized massage with, they

4    haven't done it, they haven't done it since they got those

5    names two years ago.

6          And just because I point out a few big problems with

7    the big parts of the story, don't be confused, Jane's story is

8    wrong, wrong, wrong on many, many points.  She gave you a

9    description of the Palm Beach house.  She said this massage

10   room that she went to hundreds of times, hundreds of times was

11   in the massage room that was off the master bathroom, and that

12   the house itself had creepy looking animals.  We all sat

13   through the floor plan discussion that went on and on, and you

14   know what, there's not a massage room off the master bathroom.

15   The master bathroom was the massage room.  So if she had been

16   there hundreds of times, do you think she would have gotten

17   that wrong?

18         She said it had a light beachy feel.  It was light

19   because it was off the master bathroom and it had like a beachy

20   feel.  What was in the room, I don't think I saw anything past

21   the massage table.  You recall a massage room that was attached

22   to the bathroom, correct, that's my memory, yes.  We saw the

23   room attached to the bathroom, it's a closet.  We saw the floor

24   plan.  There is no massage room off the master bathroom.  And

25   we saw the bathroom, which is hardly a light beachy feel with

1    its white marble.

2           She was asked about the New York house.

3           Now, by the way, on the floor plans, as Juan Alessi

4    told you — and you'll have these exhibits back with you in the

5    deliberation room — this whole entire room has floor plans that

6    were major reconstruction being planned in 1994 with walls

7    being torn down.  She never told you about any reconstruction

8    or being there during reconstruction or Epstein moving out, as

9    Larry Visoski told you he moved out for six to eight months for

10   the renovation, she didn't remember any of that.

11          What about the New York house?  She did talk about the

12   room being dark, an old building and lots of stones, but she

13   also told you artwork, paintings of orgies, creepy animal head

14   things.  And you know the government didn't show her any

15   photographs to try to match up her memory with any of those

16   photos.

17          And the government staff members from the New York

18   house to come in and say, yeah, that was a little weird when a

19   14-year-old was staying here alone at our house.  Not one.  All

20   this staff that you know is there, their chef, the doorman, the

21   assistants to assistants.

22          You did hear, however, from Cim Espinosa, who worked

23   in Epstein's office and she kept the calendar for the

24   apartments that Epstein had and he lent out to guests.  And Cim

25   Espinosa told you she specifically booked Jane and her mother

and her brothers to stay in those apartments.  Nothing about

Jane staying in Epstein's house.

          And the same is true with the Santa Fe property.  She

told you she stayed in this big grand house, a big, big

structure, big house.  Annie told you she was there at roughly

the same time and there was no big ranch.  It was a small

residence.  Larry Visoski told you that big ranch wasn't built

until the late '90s, and guess what, there is a flight log

entry showing that Jane went there when she was 21 when the big

house was there.  That's when Jane went to Santa Fe.  She

didn't remember her other trips, her trips abroad.

          We know her memory was contaminated post-event because

she was talking to her family members, her exboyfriend, Matt.

She was reading the news, she hired a lawyer to cancel all the

news about her, not to report this claim.  She was reading the

news and now she's incorporating all of those facts into her

head and trying to make some kind of sense out of it.

          She has deliberately, however, attempted to move the

timeline back to make herself younger when she was with

Epstein.

          She did that, first, by telling the government that

she was in the same house for three years when she met Epstein

until the time she moved to New York.  She was in the same

house.  She lived in the same house.  It was in a gated

community in Bear Lake Estates, the same house, a three-bedroom

LCKCmax5                    Summation - Ms. Menninger

1    house, but that house doesn't show that she was homeless, so

2    now she doesn't remember saying that, what she said to the FBI.

3    She said it might be a typo.  Does that sound like something

4    the FBI can write a typo about, I lived in the same house in

5    Bear Lake Estates in a gated community?  That's a really big

6    typo.  And the Interlochen records show she didn't move there

7    until she was 16, and the flight records show that she could

8    have met Epstein in 1996.

9              She got the date wrong for Mike Wallace's birthday.

10             She told you she met Donald Trump when she was driven

11   there in a green car by Jeffrey Epstein before any of the abuse

12   happened, and you heard from Larry Visoski that Mr. Epstein

13   didn't get that car until the later '90s.

14             She's tried to explain why her mom's not here

15   essentially by telling you her mom was mean and oppressive, but

16   that doesn't square with what happened with her lawsuit and the

17   glowing recommendation of her guidance counselor who talked

18   about how great her family was and loving and supportive.  And

19   you'll look at her grades.  Her grades stayed the same all the

20   way through before she met Epstein until after she met Epstein.

21   She didn't miss a beat when she says all this is going on.

22             But most importantly, she's trying to insert Ghislaine

23   into this story well after the fact, and she's doing that

24   because she got this personal injury lawyer, Mr. Glassman, and

25   she promised -- he promised her that it would help her case if

1    she participated with the government, so she did and she got

2    $5 million.

3          No one corroborates her story.  There were people

4    everywhere — brothers, mother, friends from high school.  And

5    she's just secretly flying all over the country, no one knows,

6    no one remembers her going to a commercial airport, there is no

7    record of her going on any commercial flights.  That's just a

8    coverup for the fact that she's not on flight records until

9    she's older.  None of her flight memories check out.  The

10   people she said she flew with were not on those planes.

11         Let's turn to Annie Farmer now.

12         Annie Farmer is a psychologist who primarily works as

13   a therapist.  Before Annie testified, the Court gave you this

14   instruction, I instruct you that the alleged physical contact

15   Annie says occurred with Mr. Epstein and Ms. Maxwell in New

16   Mexico was not, quote, illegal sexual activity, end quote, as

17   the government has charged in the indictment.  So what she told

18   you is not illegal conduct as charged in the indictment,

19   despite the fact that the government wants you to think that

20   this shows a pattern of targeting of young women.

21         What you heard is that Annie's sister, Maria, is the

22   one that introduced her to Epstein, that Epstein purchased a

23   ticket for Annie to come to New York as a gift to her sister

24   who was working with Epstein, and while she was in New York,

25   she spent 99 percent of her time with her sister doing

LCKCmax5                    Summation - Ms. Menninger

sisterly-type things.  They went to see a play, they went to the Blue Man Group, they went to the Met, they went to a New Year's party, they went to thrift stores, and she got a dress.

There were two instances she met Epstein while she was in New York, and during those events, she and her sister sat had in his office across a desk and discussed her college applications.  She told you she thought Epstein's home was under renovation at the time, and she told you that there was no sexual activity that occurred whatsoever in that home.  She told you Ghislaine Maxwell was not in the home, never came to the home, no physical contact happened in the home, she wasn't present, she wasn't there, and she didn't see anything that had to do with Ghislaine Maxwell while she was in New York.  So how did Ghislaine target her somehow to come into New York to see her sister?  Where is Ghislaine Maxwell's role in any of that?

The second contact she had was in the movie theater when they went to see a movie, she said she remembers was called Five Monkeys.  There isn't a movie called Five Monkeys, there is a movie called 12 Monkeys, but that's what she remembers.  And while she was in Five Monkeys, Epstein caressed her hand and held her hand, and as creepy as this is, what she told the Victims Compensation Fund was that him holding her hand was sexual abuse.

(Continued on next page)

1           MS. MENNINGER:  She was awarded one and a half million

2      dollars for that.

3           But there's no dispute Ghislaine Maxwell had nothing

4      to do with getting her to New York, and nothing to do with

5      touching her in a movie theater.  And there's no dispute that

6      the reason she went to New York was to see her sister.  So the

7      purpose of her trip was to see her sister.

8           Ghislaine wasn't at the movies.  She didn't meet

9      Ghislaine during the trip.  She didn't fly her to the trip, she

10     didn't arrange for the travel, she didn't call her mother

11     before she traveled, she didn't encourage her to travel to New

12     York.  She never even, as you know and I know, heard of

13     Ghislaine Maxwell when she went on that trip to New York.

14     Ghislaine was simply nowhere around.

15          And so Ghislaine couldn't have been making her feel

16     more comfortable or normalizing sexual talk.  She wasn't even

17     there, as Annie's diaries confirm.  Ghislaine is never

18     mentioned in those diaries.  Even though we don't have all of

19     the diaries, she's clear that there is no mention in any entry

20     of any journal about Ghislaine Maxwell.  And that's true from

21     the journal you saw some photos of, and that's true for the

22     ones she didn't show you.

23          She admitted that reviewing those journals helps her

24     remember things that happened in hindsight.  She said her

25     memories are colored by hindsight, and that what happened to

LCKVMAX6                    Summation - Ms. Menninger

1   her later affects how she perceives what happened to her in New

2   York, like the sexualized hand-holding.

3          She doesn't know how the trip to New Mexico was

4   planned, but she's clear that Ghislaine is not the one who

5   called her.  And her mother is clear that Ghislaine never

6   called her.  So what Epstein did, Epstein, who's hiding things

7   from women around him, including Ghislaine, is the one that

8   called Annie's mom.

9          You know that Ghislaine had no role in any of her

10  travel because she told you that.  And she also told you her

11  original purpose or the original thought behind this trip to

12  New Mexico was that her sister was going to be there.  That's

13  what she told the government in 2006.  She's conveniently

14  forgotten that in the last 15 years.  But what she told them in

15  2006 is her sister was supposed to accompany her on that trip.

16         She said she doesn't know whether Ghislaine saw

17  Epstein trying to hold her hand in the movie theater; she just

18  thought it was more blatant.  She talked about the foot

19  massages.  But she told the government in May of 2020, she

20  didn't remember those foot massages being sexualized.

21         She testified that Ghislaine gave her a massage; she

22  wasn't sure if she was topless or had her underwear on, excuse

23  me.  But what she told you from the stand is that Ghislaine

24  massaged her chest and upper breast; and she confirmed for you

25  that that is where your pectoral muscles are.  That's where she

1    got the massage.  But then she turned around a month later and

2    told the victims' compensation fund that that was groping her

3    breast.  Ghislaine never touched her nipples or never touched

4    around her nipple area.  But on her victims' compensation fund,

5    she told them that was groping her breast, and that's exactly

6    the language that Ms. Moe adopted here today.

7          You heard about an incident where she says that

8    Epstein entered her room and Ghislaine was not in that room

9    when it happened.  Epstein was not in the room when she got the

10   massage.  And she told the compensation fund that she was

11   sexually abused in the movie theater.  She told them her

12   breasts were groped.  She told them that she had Mr. Epstein's

13   genitals pressed against her; and she, for that story, got one

14   and a half million dollars.

15         But what is the evidence about what Ghislaine Maxwell

16   knew about this trip?  Originally, Maria was supposed to go on

17   the trip.  And so Ghislaine had no role in planning the trip,

18   aiding, abetting the trip, conspiring to make the trip happen.

19   We only know that Epstein called Annie's mom and talked to her

20   about Ghislaine being there.

21         Imagine for a minute that you're Ghislaine Maxwell,

22   and you fly out to Santa Fe because you're going to meet with

23   some architects and plan the building of a new house.  And all

24   of a sudden, some high school student shows up, was supposed to

25   come with her sister for some kind of trip, and then the sister

1    is not there, and you have no idea what's going on.  Imagine

2    that.  What are you going to do?  Are you going to take them on

3    a tour of the ranch, spend a significant amount of time taking

4    them horseback riding, helping her get cowboy boots so she can

5    go horseback riding, talk to her about school?  This isn't

6    Ghislaine Maxwell targeting someone.  This is Annie showing up

7    at the ranch without Ghislaine's knowledge.

8            Annie told you about reconstructing her memory of when

9    this trip occurred.  She said it was in April of '96, and she

10   said she thinks that because she thinks she saw *Primal Fear*,

11   which came out in 1996.  She researched that on the internet.

12   And then she talked to her friends about how prom was later

13   that year.  And it happened before she went to prom, so she's

14   pretty sure it happened in April of '96.  I mean, she's a

15   doctor.  She knows how to go back and research things and put

16   it together.  And she reconstructed that memory.

17           But when you look at the flight logs, she told you

18   also it was a weekend trip, mind you, and her mother confirmed

19   it was a weekend trip.  But when you look in April of 1996,

20   there is no weekend in April of 1996 that Ghislaine Maxwell and

21   Jeffrey Epstein are in New Mexico.  It doesn't fit.  There is a

22   March trip where just Jeffrey is in -- goes to Santa Fe for

23   like a day, and then there's a trip in the middle of May where

24   they both go to Santa Fe, but that's in the middle of the week.

25   There's no weekend trips in April or May of 1996.  Okay.  So it

LCKVMAX6                    Summation - Ms. Menninger

doesn't work.  She tried her best to reconstruct the time.
She's wrong.  That's just the way it is.  So if we had her
journals, we might know, but we don't.

So then if you look a year later, in April of 1997,
there is a trip where Jeffrey and Ghislaine go about that time
of year together to New Mexico in March or April of 1997.
Annie Farmer is 17, almost 18 years old.  And there is a flight
log that shows them going at that time.  So maybe she just got
it wrong by a year, meaning she's 17 when she went there.

She also says that trip to New Mexico happened right
before she went to Thailand.  So naturally, one would look at
her border patrol records and figure out when did she go to
Thailand, because that would help us figure out when she
actually went.  So when you look at those records, it shows her
very first trip out of the country and coming back into the
country was in July of '97, not in '96, when she was 18.

And you see she's coming back through a city called
Düsseldorf in Germany, which is not Thailand, I understand
that.  But then you remember I asked her mom, Weren't you in
Germany when she was in Thailand?  And she said, Yes, I was.
So Annie flies back from Thailand to Germany, where her mother
is, and then they fly back together when she's a senior, not a
junior, in 1997, and not 1996.  That's what the documents show.

And don't let the government tell you these records --
I mean, the government is going to tell you that their own

1   Customs and Border Patrol records are not accurate.

2              Okay.  Well, that's kind of silly.

3              But if you look at Jane's records that come in the

4   same exhibit number, you'll see that they go back to January of

5   '96.  So the records go back that far.  There just isn't a

6   record of Annie going to Thailand in 1996.  And so the

7   government didn't bring you the Customs and Border Patrol

8   records.

9              And finally, I want to consider one other piece about

10  Annie's story.  She's saying that she wore -- she was bought

11  these boots by the people who sexually abused her; Epstein

12  bought her these boots.  And she said that she kept them in the

13  closet, and then the government didn't ask for them in 2006,

14  excuse me.  And you'll have the boots with you back in the jury

15  room, and you can see for yourselves how worn those boots are.

16             And so when the government finally got those boots in

17  June of 2021, even though they'd met with her repeatedly, and

18  she never told them anything about wearing these boots, she

19  just said they bought her these boots, and then when they

20  finally got them and looked at them and saw that she's been

21  wearing boots from the people that she says sexually abused

22  her, she came up with a new story, and that story was that she

23  resided to reclaim the boots.  And that's the story she told

24  for the first time right before trial and what she told you on

25  the stand.

1    Again, the government promised you relatives who were

2    going to come corroborate these stories.  Where was Annie

3    Farmer's sister?  Where were the people at the ranch?  Where

4    was the chef?  Where's the rest of her diaries?

5    What you got was a photograph of the front and back of

6    a diary, and you got photographs of several of the pages from

7    the diary.  What you didn't get was the rest of the diary.  You

8    don't even get to take the diary back into the room with you.

9    And she told you that she had diaries from Thailand.  Why

10   didn't she share those diaries?  Why didn't she give this diary

11   to the government?

12   Also, Ms. Farmer is the one who explained a lot of the

13   intersection of these lawyers and the witnesses.  She told you

14   she first met with the Boies Schiller firm when they were

15   representing Virginia Roberts, and she was going to be a

16   witness.  And then she hired them.  And she told you that Jane,

17   who told you she had talked to Kate's lawyers, Brad Edwards --

18   and Brad Edwards was here in the courtroom when Kate was

19   testifying, Jane talked to him as well.  And then Jack Scarola,

20   who represents Carolyn, and brought her to the government, he

21   also talked to the same other witnesses, and they all talked to

22   their family members and saw the media.  That's the

23   contamination of memory that we were talking about.

24   Finally, with respect to Annie's story and the money

25   piece, she told the FBI that all of this was not sexualized

LCKVMAX6                    Summation - Ms. Menninger

1   when she talked to them in May of 2006, and then again in May

2   of 2020.  But then the Epstein Victims' Compensation Fund

3   opened, her lawyers had helped set it up on June 25th of 2020,

4   and the very next day she was first in line with her

5   application to get the money in saying that it all was

6   sexualized.

7         Let's talk about Kate.

8         I'm not really sure why Kate testified here because,

9   once again, the judge instructed you that any sexual conduct

10  she says occurred was not illegal activity.  And you may not

11  convict Ms. Maxwell on the basis of Kate's testimony regarding

12  any sexual contact that she says she had with Mr. Epstein.

13        Again, the government told you that Ghislaine Maxwell

14  targeted a woman who had a single parent, and her mother was

15  sick, I think they said.  That's not what she told you.  She

16  told you she had a wealthy stepfather who lived -- had his own

17  plane.  She lived in the South of France before moving to

18  Ghislaine's -- close to Ghislaine's home in the Tony section of

19  London known as Belgravia.  She admitted to being fiercely

20  ambitious, spending 90 percent of her time thinking about her

21  next move.  And when she was 17 and in Paris, she met

22  Ghislaine, who was with an Oxford classmate of hers, of

23  Ghislaine's.  She was dating him.  So she was dating a man that

24  was Ghislaine's age at the time that Ghislaine met her.

25        And then she said, basically, she wanted to be

1    Ghislaine.  Kate told you, I was quite excited to be friends

2    with her.  And she was friends with a man I was dating.  And

3    she seemed very exciting; and she seemed everything that I

4    wanted to be.

5         So Kate traded up from the one prominent gentleman to

6    the next, Jeffrey Epstein.  Kate told you about her life in

7    this time period where she was abusing cocaine and sleeping

8    pills and alcohol for more than ten years.  She was an

9    international model, she was in a movie with a prominent

10   English actor.  She had a relationship with Epstein that

11   spanned decades.  She was a billboard model, a lingerie model,

12   she was in tabloid magazines.  She helped set up a man in a

13   tabloid magazine for asking him to get drugs in a conversation

14   that was recorded.  That's the kind of information that Kate

15   shared with you about her life.

16        And whatever she did Epstein was above the age of

17   consent.  She maintained contact with Epstein into her

18   thirties.  He was in prison, and she was writing and sending

19   him emails offering to send him pictures while he was in

20   prison, while she was in her thirties.  Use your common sense.

21   Is that someone who was abused by Epstein?

22        She signed those emails, and these are Exhibits K-8

23   and K-10.  Best love always, Kate.

24        When confronted with a 2011 email she sent to Epstein

25   asking if she could stay at his place, she told you that she

1    felt compelled to contact him.  She emailed Epstein for

2    decades, and there's not one single proof of her ever

3    contacting or being in touch with Ghislaine.

4          At the time she met with the government, her lawyer

5    provided a U visa form and asked if they could help with it.  A

6    U visa is for people who are exceptional.  And she said that

7    she is exceptional.  She's a music therapist.  And she was

8    starting a foundation, which opened right before Epstein

9    died -- after Epstein died, excuse me, and closed right after

10   she got her $3.25 million from the fund.

11         She claims she was using a fake name during this trial

12   because of her child.  But she had used her real name in

13   repeated media appearances and publicly in court about Epstein

14   after her -- after his death.

15         What Professor Loftus tells us about post-event

16   information and suggestiveness would suggest that Kate made her

17   own choices to engage with Epstein when she was over the age of

18   consent.  And she made her own choice to blame Ghislaine.  And

19   her memory is affected by a decade or more of substance abuse.

20         What I really want to emphasize about Kate though is

21   that she told you she met Ghislaine Maxwell at Ghislaine

22   Maxwell's home in London, and the address is 44 Kinnerton

23   Street.  And she said that she met her in 1994.  In order to be

24   awarded money from the victims' comp fund, you had to be 17 or

25   younger.  So it was important to her story that she say that

1    she met Ghislaine in 1994, when she was younger than 17.  And

2    so Kate was firm that that's the address she went to, the house

3    with the red door.  It's actually Government Exhibit 702.  So

4    when you see that house, you'll know that's the one that Kate

5    was talking about.  It's across from something called The Nags

6    Head Pub.

7            But the problem is Ghislaine Maxwell didn't own that

8    home until 1997, not 1994.  She owned that home when Kate was

9    20 years old, not 16 years old, not 17 years old.  You will see

10   those exhibits, A-5 -- and A-5 refers you to MG-12 and MG-1.

11   And what these show is that Ghislaine Maxwell owned a home,

12   another home, at 69 Stanhope Mews; and that she sold that home,

13   and then she bought the next home at 44 Kinnerton Street.  And

14   the purchase of that home, purchased from another family,

15   occurred in March of 1997, when Kate was 20 years old.  So the

16   entire story about going to that home and there being a massage

17   room in that roam at Kinnerton Street is just wrong.  If it

18   happened at all, it happened three years after Kate said it

19   happened.

20           Now, the government showed you an offhand remark made

21   in another property dispute from 2019 that Ghislaine Maxwell

22   gave under oath when it was talking about a totally different

23   property.  And they asked her in 2019, When did you start

24   living at Kinnerton Street?  And she said, 92, '93.  She didn't

25   have any documents in front of her.  And she's talking about a

LCKVMAX6                    Summation - Ms. Menninger

1    totally different property.  The property records show when she

2    owned the home, and they showed that Kate's story is wrong,

3    something the government didn't want you to see.  I still don't

4    know what Kate's story brings to this prosecution.

5            Carolyn.  Let's talk about Carolyn.

6            Carolyn talked to two FBI agents in 2007, Agents

7    Kuyrkendall and Richards.  And you saw Special Agent Richards,

8    he testified here last week.  And he told you that he's trained

9    at Quantico on how to interview people; and when he talks to

10   people, he's taking down notes carefully; and he's writing down

11   what they say; and he's not limiting them in what they can talk

12   about; and that all these agents review their notes for

13   accuracy, and they check their other agents' notes, and they

14   are all making sure that what they are writing down is accurate

15   because, who knows, 14 years later, you might have to get on a

16   witness stand and talk about what someone told you in an

17   interview, right.  So you've got to be pretty careful when you

18   work for the FBI and you're taking notes.

19           So he said he met with Carolyn and asked her what

20   happened.  And Carolyn told him a whole long list of things

21   that happened.

22           And she told Special Agent Richards that she was

23   recruited by Virginia Roberts.  Virginia Roberts told her how

24   much money she would make.  Virginia Roberts brought her

25   inside.  She saw a lady inside who had an unknown accent.  She

1    told you that she knows what a British accent was.  And she

2    didn't identify this person as Ghislaine back in 2007.  And it

3    was Roberts who instructed her how to massage Epstein.  And

4    Roberts and Epstein had sex while Carolyn watched.  And Epstein

5    paid Carolyn.  And Carolyn and Roberts left.  And Carolyn

6    looked up Epstein's number in a phone book.  And she called

7    Epstein.  And either Epstein or Kellen would call her, she

8    said.

9         And on the second visit, the chef asked her if she was

10   hungry.  And she was greeted by someone named Sarah.  And Sarah

11   is the one that placed towels on the massage table.  And Sarah

12   called to tell her about concert tickets.  And Epstein sent her

13   gifts.  And Kellen took pictures of her.

14        That's her story from 2007.  Not one mention of

15   Ghislaine or Maxwell or Maxwell calling her or Maxwell trying

16   to touch her breasts.  I mean, that would be something you

17   would tell the FBI who was there investigating you --

18   investigating a sex assault inquiry, right?  She didn't mention

19   anything about Maxwell or Maxwell touching her breast.

20        And one year later, she files not one, but two civil

21   lawsuits.  And exactly like her statement to Mr. -- Special

22   Agent Richards, she has lawyers, they draft up these long

23   lawsuits.  And not one thing in those civil lawsuits, that go

24   on for 70 pages and 209 paragraphs, is there one mention of

25   Maxwell or Ghislaine.

1          Twelve years ago she was asked under oath to answer

2     questions about who was involved in the trafficking of her or

3     the sexual abuse of her.  And she had lawyers who helped her

4     answer those questions.  And again, she didn't say anything

5     about Ghislaine Maxwell.  And then she even updated her answers

6     again.  So she's looking at her answers to make sure that they

7     are accurate.  And once again, she does not mention anything

8     about Maxwell.

9          She had a third opportunity to talk about who was

10    involved in this operation at the Epstein home.  She gave a

11    deposition.  And the deposition went on for hours.  And she was

12    asked in that deposition, Are all of the things in your civil

13    complaint accurate?  Do they include everything?  Are they

14    complete?  Are they true?

15          And she said, Yes, they are.

16          Not one mention of Ghislaine Maxwell in hours of

17    deposition testimony back in 2009.  She may have mentioned that

18    Maxwell answered the phone once.  But guess what?  The

19    government grabbed all of those message pads which they talked

20    to you about, and there are message pads and there are message

21    pads, and you will get all these message pads back in the jury

22    deliberation room.  And you will see there's not one single

23    message for Ghislaine Maxwell having to do with Carolyn.  She's

24    calling for Epstein.

25          And look at the name on GX-2T in the upper right-hand

LCKVMAX6                    Summation - Ms. Menninger

1     corner.  It's a French woman taking a message for Mr. Epstein

2     about Carolyn, a French woman with an accent.  We're talking

3     about the 2000s now.  So one might imagine that there are phone

4     records.  There might be phone records about all of these phone

5     calls, right?  But there's not.  There's not a single phone

6     record showing any calls from Ghislaine Maxwell's cell phone to

7     Carolyn or from Carolyn to Ghislaine Maxwell.

8              And then Carolyn doesn't talk to anyone between -- in

9     the government between 2007 and 2020, okay.  She gets a

10    settlement with Epstein, several hundred thousand dollars, that

11    money gets used up, and then she doesn't talk to anyone about

12    Maxwell.

13             And so then in 2019, her lawyer, civil lawyer, Jack

14    Scarola, calls up the government and says, Hey, let me put you

15    in touch with my client, because he's no dummy.  And he knows

16    Epstein is dead; and he knows Epstein left behind a pile of

17    cash.

18             So she responds through her lawyer in July 2020, right

19    after the victims' compensation fund was opened.  And that's

20    when her lawyer puts her in touch with the government, because

21    again, it helps you with your claim if you're cooperating in a

22    prosecution.

23             And in those 12 years when she wasn't saying anything

24    before about Ghislaine Maxwell, all through 2007, eight, and

25    nine, she didn't say anything about Ghislaine being there,

1   introducing her, taking her upstairs, anything like that.  She

2   gave extensive testimony about it.  And it happened shortly in

3   time after the events.  She didn't say anything about Ghislaine

4   Maxwell.  She had a therapist, Susan Pope, she met with for

5   years.  She didn't tell her therapist about Ghislaine Maxwell.

6   She didn't tell the other doctor that she met with.

7           And soon after she files these lawsuits, she starts

8   mentioning Ghislaine.  And that's the story that you heard from

9   the stand.  For the first time in 17 years, all of a sudden,

10  her too; Ghislaine Maxwell's involved too.  And she gets

11  several million dollars.

12          Is that the kind of evidence you would rely on in a

13  matter of importance to yourself?

14          She told you that she saw a photograph of Ghislaine

15  pregnant.  There's no evidence that Ghislaine was ever

16  pregnant.  No one so Ghislaine Maxwell pregnant, and there's no

17  photograph of Ghislaine Maxwell being pregnant.  But that's

18  what Carolyn told you, that she saw a photograph of her

19  pregnant.

20          Money.  The first time that Maxwell is accused of

21  anything by Carolyn is during this victims' compensation fund,

22  where she ultimately got $2.8 million.  The government argues

23  that Carolyn has no financial incentive to stick with her story

24  here, but that's not supported by the facts.  The new story is

25  the one she told the fund.  And the fund tells you, if you

1    don't tell the truth, they can prosecute you.  So it's much

2    easier to just stick with her story here to keep the cash she's

3    already gotten.

4           Carolyn, 17 years later, now claims that Ghislaine

5    Maxwell called her.  There's not one phone record showing you

6    that.  She claims that Ghislaine sent her things.  There's not

7    one FedEx record telling you that.  The message pads don't show

8    any contact between Ghislaine and Epstein.  She wasn't taking

9    messages for Carolyn, Evelyn was.  And they show that Carolyn

10   was calling and her calls were not being returned.  There would

11   be evidence if her story were true.

12          Let's talk about Shawn, her boyfriend, with his felony

13   convictions.  He says that their visits happened in 2002 and

14   2003, not 2001 or 2004.  He testified in response to questions

15   by the government that Carolyn never talked about Ghislaine.

16   They never talked about Maxwell.

17          Carolyn tried to minimize her drug abuse.  But Shawn

18   told you that they were abusing -- let me find it, sorry --

19   were abusing marijuana, cocaine, ecstasy and other pills during

20   that time period.  According to Shawn, he and Carolyn shared a

21   phone, and he identified three callers.

22          It would either be Epstein or Sarah Kellen calling;

23   correct?

24          Correct.  Yes.

25          He knew it was Sarah, because Sarah told him she was

1    calling on behalf of Epstein, right?  And he claimed to

2    remember some of what he thought was a French accent.

3           And in that meeting, he identified Sarah and then

4    another European with an accent that wasn't British that you

5    couldn't identify; correct?

6           Correct.

7           He met with the government five times.  And in a fifth

8    meeting, he said he couldn't identify the accent.  The truth of

9    the matter is Shawn never talked to Ghislaine Maxwell and never

10   heard her voice.

11          I want to turn to the other witnesses that came and

12   testified here.

13          The government talked to you about Dr. Rocchio, the

14   ultimate victim apologist who tried to explain away why these

15   accusers continued to have contact, including traveling with

16   Epstein or offering to send photos to him in jail 30 years

17   later.  And to Dr. Rocchio, that's just proof that they are

18   victims.  She's not trained as a treating therapist to question

19   accusers' accounts.  She's not a lawyer or a judge or a juror.

20   She's a treating therapist.

21          The government has spent a lot of time and money on

22   Dr. Rocchio talking to you about grooming.  There was no

23   evidence that Ghislaine Maxwell groomed anyone.  Carolyn was

24   recruited by someone else.  Annie met Ghislaine Maxwell one

25   time in her life.  Kate was a sophisticated adult above the age

LCKVMAX6                    Summation - Ms. Menninger

1   of consent who was dating a man Ghislaine Maxwell's age.  And

2   Jane came from a prominent musical family with supportive

3   brothers and sisters and a mom and two older siblings as well.

4   She had a singing and acting career, and there's no evidence

5   whatsoever that Ghislaine Maxwell's chitchat with her, as she

6   called it, was grooming.

7        The government brought you these pilots.  But the

8   pilots said they didn't see anyone underage.  And nothing ever

9   once hinted to them that there was sexual activity going on

10  with underage girls.  You heard Larry Visoski talk about how he

11  left his daughters -- he was happy to have his daughters go

12  horseback riding with Ghislaine Maxwell all the time.  You

13  heard from the FedEx records custodian, Tracy Chapell was her

14  name.  And again, she told you that there were no packages from

15  Ghislaine Maxwell to Carolyn or any other underage girls.

16       The government only showed you a few that went to

17  Carolyn, but she had gathered hundreds, and we provided with

18  you the rest of those, which just show that Ghislaine Maxwell

19  sent FedExes to her family.  Not one of the accusers got a

20  package from Ghislaine Maxwell.

21       The government brought you some law enforcement

22  specialists.  Kelly Maguire said she searched the 71st Street

23  residence and located hundreds of hard drives and tons of

24  photographs.  Kimberly Meder said she scoured those 40,000

25  photos, and all they came up with were some old

1    girlfriend/boyfriend looking photos of Ghislaine and Jeffrey.

2            Stephen Flatley.  Let's take a minute on Stephen

3    Flatley.  He's the computer forensic guy.  And he's the one

4    that pulled the metadata that the government just showed you on

5    their closing.  And they are trying to argue that these

6    documents, because they came from a computer that was loaded up

7    originally by Ghislaine Maxwell, that she wrote every document

8    on that computer.  You know what's easy as can be, doesn't take

9    the FBI to do it?  You just pull up the dates of that metadata

10   when those documents were created, and you look and see from

11   the flight logs where Ghislaine Maxwell was when those

12   documents were created.  And she's in about four or five

13   different places.  So whoever had that desktop computer Stephen

14   Flatley told you about wasn't carrying it with them on

15   airplanes.

16           And if other people could use that Ghislaine Maxwell

17   computer, what on earth makes the government think that

18   Ghislaine Maxwell was writing an essay about herself in the

19   third person with Jeffrey Epstein?  You don't know about that

20   document.  Not one single person told you what that document

21   is, where it came from.  You got some metadata from a computer

22   that's clearly being used by a number of different people,

23   because Ghislaine Maxwell is not in the house when documents

24   are being created.  But the FBI didn't put that together for

25   you.  They want to just say, This is Ghislaine Maxwell's

document because it's got her name in the metadata.  Please.

They've got a list of massage oils.  Ghislaine Maxwell wasn't in town when that list of massage oils was created.  They've got a household manual that wasn't on Ghislaine Maxwell's computer, by the way.  No one's explained where that thing came from, but it's dated in 2005.  There's an email between Ghislaine Maxwell and another woman talking about the household manual and also about what a terrible job Juan Alessi was doing.  That's the one email off of those hundreds of hard drives you saw and the pictures, one email the government brought you for a ten-year conspiracy, complaining about Juan Alessi's job performance.  What a smoking gun.

The Palm Beach detectives came and they told you about their walk-through at the Palm Beach house, the one that showed the massage room, which was really the master bedroom -- bathroom, excuse me.  There is no creepy animals that she talked about or orgy paintings on the wall.  They brought you the massage table which proved nothing to you.

They showed you that photo up close of the girl with her pants being pulled down that was on the wall.  Go back and compare that with the other photos.  That's the same girl that Eva Dubin identified as her daughter in the other photos in the house, okay.  This isn't child pornography.  This is a photo that was given to Jeffrey Epstein by Eva Dubin of his goddaughter.  Photo doesn't prove anything.

1          They talked to you about sex toys that were found on a

2     shelf in a guest room closet.  What does that prove to you?

3          Then there's Virginia Roberts.  The government wants

4     to try to claim that Virginia Roberts was also a victim.

5          Where is Virginia Roberts?  Why didn't Virginia

6     Roberts come and get on the stand and tell you that she was a

7     victim?  Use your common sense.  If she could corroborate

8     Carolyn, you think they might have had her come in and do that?

9          What the government just told you is that Ghislaine

10    Maxwell basically picked her up off the side of the road.

11    That's not what you heard.  Juan Alessi told you he --

12    Ghislaine Maxwell went to get a treatment at the spa at

13    Mar-a-Lago, and Virginia Roberts came out wearing a white

14    uniform, as though she worked there.  And Juan Alessi also told

15    you and said in a deposition in 2009, she was a masseuse.  He

16    understood her to be a masseuse.  This isn't picking up a girl

17    off the side of the road.

18         And look at the records, okay.  We put in Virginia

19    Roberts' school records.  She was going to Survivor Charter

20    School from 2001 to 2002.  She was 18 years old.  That's where

21    Shawn says he met her.  And in 2002 is when Virginia introduced

22    Carolyn to Epstein, when she was 18 years old.  So Virginia is

23    the one who's taking underage girls to meet Epstein, not

24    Ghislaine Maxwell.

25         Virginia's presence on a flight log when she was 17,

1  rather than 18, tells you nothing about what she did or didn't

2  do.  And if the government had proof to back up Virginia's

3  claims, they could have brought it to you and put her on the

4  stand.

5          As I said at the beginning, the government has really

6  struggled to explain why an Oxford-educated, proper English

7  woman would suddenly agree to facilitate sex abuse of minors.

8  And they told you it was to maintain her jet-setter lifestyle.

9  They've also suggested at least three other reasons.

10         One is this culture of silence theory, which is

11 dependent entirely on Juan Alessi and the mysterious household

12 manual.  Now, Juan Alessi told you he threw that manual away

13 and never used it, so we don't actually have a single employee

14 who came and testified that they used this household manual.

15 The pilots didn't use it.  The office people told you they were

16 never given directions like that and didn't know about it.  No

17 one was told not to look anybody in the eye.

18         Larry Visoski did tell you he signed a nondisclosure

19 agreement.  He told you that was common for people of wealth;

20 that he had signed it for other people of wealth because they

21 don't want them -- their pilots writing about the famous people

22 who are flying on their planes, like Bill Clinton or Donald

23 Trump or Senator John Glenn or any of the other famous people

24 who you will see on the flight logs.  Nondisclosures aren't to

25 hide illicit sexual activity; and not one witness told you that

LCKVMAX6                    Summation - Ms. Menninger

1    it was.

2              Secondly, the government makes a big show of these big

3    dollar transfers.  And they claim it's the finances; that

4    Ghislaine Maxwell was basically being purchased to facilitate

5    sexual abuse because she got big dollar transfers of money that

6    you can see from bank statements.

7              That is some thin testimony.

8              What they are asking you to do is to speculate.  And

9    speculation is not evidence.  Putting up a bank statement that

10   shows transfers tells you nothing about what was going on and,

11   in fact, it's not even clear that Ghislaine Maxwell knew that

12   these transfers were being made in her name.

13             You saw evidence that Epstein bought a helicopter, and

14   he owned it through a company called Air Ghislaine.  Dave

15   Rodgers told you that's totally common for wealthy people to

16   own their private planes through companies, because it limits

17   their liability.  And that's exactly what the $7.4 million

18   would have corresponded with, because the bank records show it

19   was Air Ghislaine.  It's not like Epstein put all his assets in

20   Ghislaine's name.  Larry Visoski told you that he put

21   several -- that Epstein put several of the cars in Palm Beach

22   under Larry Visoski's name.

23             You also heard that Epstein was generous with a number

24   of people.  He donated to numerous charities.  He was a sponsor

25   of the arts and individual artists.  He gave money to build a

lodge at Interlochen.  He paid for his employees' kids to go to
college.  He gave Larry Visoski 40 acres of land on a ranch
free of charge so he could build a house there.  He didn't ask
anything in return for this generosity.  Education was
important to him, and he did it for a number of employees.

Everyone knew that Epstein was doing this.  The
employees knew about the tuition payments.  Everyone knew he
was building a lodge at Interlochen that was handicap
accessible.  So to everyone, including Ghislaine, it looked
like Epstein wanted to use his money to further the ambitions
and education of those around him.

As far as these bank records, where they showed you
these big numbers, and Ms. Moe just argued that's essentially
buying off a sex abuse case, you saw that for all those
records, the person who signed for the accounts was Harry
Beller, who Cim Espinosa told you was Epstein's accountant.  He
was signing all the checks.  Beller had control over the
account, and he's the one signing for the accounts.

Who knows what that money was for.  Did anyone from
the bank tell you what that money was for?  Certainly no one
from JPMorgan did.  What about all these other people around
Epstein who made the wire transfers or paid for it?  Did they
come and testify?

The government wants you to speculate over and over,
and they want to put up big dollar signs and make you believe

LCKVMAX6                    Summation - Ms. Menninger

1    that that turns someone into a sex abuser.

2              THE COURT:  Ms. Menninger, we're just going to take a

3    real quick stretch break.

4              MS. MENNINGER:  Sure.

5              THE COURT:  Anyone who wants to stretch may do so.

6              MS. MENNINGER:  You heard from the government that

7    Ghislaine was Epstein's right-hand woman; that she controlled

8    everything in his life; she knew everything, she saw

9    everything, she did everything, she's to blame for his sins.

10             That's not what the evidence showed you at all.

11             Everyone knew that Jeffrey was keeping secrets from

12   Ghislaine, except Ghislaine.  The pilots knew it when they were

13   flying Epstein with other women.  Her own assistant, Cim, was

14   sending flowers to other women for Mr. Epstein.  Mr. Alessi

15   told you that when Epstein was coming with other women, he was

16   ordered to take the photos down off the walls of Ghislaine.

17             We can see the flight logs -- you'll see the flight

18   logs and the testimony of other witnesses like Dr. Dubin,

19   Nicole Hesse, Larry Visoski, that Mr. Epstein had many other

20   women in his life:  Frances Jardine, Celina Midelfart, Sherry

21   Lewis, and who knows how many more.  There are trips over and

22   over on those flight logs with these women and without

23   Ghislaine going to Palm Beach.

24             Check out the flight logs for yourself.

25             Someone like Jeffrey Epstein is always trying to

LCKVMAX6                    Summation - Ms. Menninger

1    control the people around them.  He used his position to

2    manipulate people and play them off against one another.

3          Juan Alessi told you -- despite their one quote the

4    government showed you about Ghislaine being the lady of the

5    house when she first started, that, in 2016, Mr. Alessi

6    testified it was Epstein who was his direct supervisor.  And if

7    Epstein was in the house, he would never go to Ghislaine, he

8    would go directly to Epstein.

9          And let's talk a little bit about Mr. Alessi.

10          Mr. Alessi worked for Epstein for many years.  But you

11    can tell from the one email exchange, Government Exhibit 424,

12    between Ghislaine and Sally Markham that Mr. Alessi was not

13    doing a very good job.  In fact, I think she called it a truly

14    awful job.  So we know the two of them weren't getting along.

15          But does being a tough boss make you an enforcer of a

16    code of silence?  Mr. Alessi is simply not credible.  He said

17    he didn't follow the household manual, which is dated years

18    later.  He threw it away.  Not one employee told you they

19    followed this household manual.

20          He's also the one that the government tried to get in

21    this little black address book from, right?  He's the one.  He

22    said he recognized it; it looked like the one he had seen.  He

23    has no idea what year it's from.  He doesn't know how accurate

24    it is; that people get added every year and taken away every

25    year.  So somehow in 2021, a black address book shows up on the

LCKVMAX6                    Summation - Ms. Menninger

1    stand with some names in it, and not one single person says

2    that that black address book is from the time we're talking

3    about and not Epstein's own address book from years later after

4    Ghislaine had nothing to do with it.  Not one.  If all these

5    employees are around the house all the time seeing these

6    address books laying everywhere, where are those employees and

7    where are all those address books?  So Juan Alessi is the sole

8    guardian who can tell you about this black address book from

9    which the government wants to build their case.

10           What do we know about Mr. Alessi?

11           During his direct examination, the government asked

12   him about his burglary of Jeffrey Epstein's home.  And he

13   turned on the stand and he looked at you in the eye and he

14   said, I will tell the truth.  And then he proceeded to not tell

15   you the truth.  He told you a story that he concocted to make

16   himself look better.  He told you that he broke into Epstein's

17   home one time to try to help someone because he was out of

18   money.  But he told the police back in 2003 that he broke in to

19   steal a gun.

20           He told you he stole the money because he needed it,

21   but then he told you he owned multiple rental properties.  He

22   told you he broke in once.  But the truth was, as he told the

23   police in 2003, he broke in twice.  He went in, stole some

24   money, and then he came back a few weeks later and stole some

25   more money.  So the man who turned and looked you in the eye

LCKVMAX6                    Summation - Ms. Menninger

1    and said, I will tell you the truth, turned and didn't tell the

2    truth.  You cannot trust this man's word, certainly not as

3    proof beyond a reasonable doubt, of anything.

4           And on top of that, his memory is all over the place.

5    He told different stories at different times.  He couldn't

6    remember if he met someone in '94 or '99.  He has no business

7    being the one corroborating witness for Jane.  But even there,

8    he testified that he met her later in '98 or '99, when she

9    would have been 18 or 19.

10          He told you that he picked her up a few times, not the

11   hundreds of times she claims.  He thinks he drove her to the

12   airport once, not the dozens of times she claims.  And who

13   drove her to the commercial airport or back?  Was that her mom

14   we didn't hear from?  He did tell you he'd worked in

15   construction, and that the plans that he was shown demonstrated

16   that there was renovation that was about to start taking place

17   in the summer of '94.

18          Mr. Alessi does not have credible or complete or

19   accurate information.  You should not rely on him in reaching a

20   verdict.

21          I want to talk a little bit about the defense case.

22          As you know, we called Dr. Loftus to the stand.  She's

23   a prominent memory scientist.  And she gave us a user-friendly

24   master class on how the brain works and how human memory works.

25   And I understand the government wants to minimize her

LCKVMAX6                   Summation – Ms. Menninger

1    significant body of research and work because she wrote one

2    book called *Witness for the Defense*.  But you will have her CV

3    and you can look at her eminent qualifications and all of her

4    research on how people can develop memories of things that

5    didn't happen or remember things differently from the way they

6    actually were and how people can develop false memories.

7              And what she told you is that memory is malleable.

8    Memory weakens over time.  And memory can be impacted and

9    corrupted by post-event contamination.  She talked about times

10   when false memories can be planted in a person's mind, and that

11   the person could then become just as emotional about these

12   created memories as other individuals who truly had the

13   experiences.  And contrary to what most people think, memory

14   doesn't work like a recording device; you can't just push play

15   and it all comes back later.

16             Memories can be impacted by post-event information

17   that comes from all different sources.  Interviews that use

18   words that are suggestive.  You'll recall that she talked about

19   the study where they used the word "smashed."  How fast was the

20   car going when it smashed into the other car; and that people

21   gave much higher rates of speed when they heard that word,

22   because it was suggested to them that it was fast.

23             And then think back about how none of the interviews

24   of these accusers were recorded and we don't have transcripts

25   and we don't know the words that were used in those interviews.

LCKVMAX6                    Summation - Ms. Menninger

1         We know that the accusers talked to their lawyers; we

2    know that many talked to the media; we know that they saw the

3    media; we know that they talked to other accusers; we know that

4    they all had at least a plan of recovering money through their

5    lawsuits and the victims' compensation fund, and that works on

6    your memories.

7         She told you about the three different stages of

8    memories, and that one thing that can happen is what's called

9    autosuggestion.  Basically, when people suggest things to

10   themselves, and then they start to remember things and they

11   start to draw inferences, and then they start to feel as if

12   those things are actual memories.  But memories come from the

13   acquisition of the event, the retention of the information, and

14   the retrieval.  And post-event information can impact a memory

15   at any one of those stages.

16        If you're under the influence of drugs or alcohol at

17   the time you acquire the memory, that affects the quality of

18   the formation of the memory in the first place.  The older a

19   memory gets, the more susceptible it is to post-event

20   information.  A little bit can come in, the older the memory

21   is, and it can cause a contamination or a distortion or a

22   supplementation.  And news media in whatever form can include

23   re-dramatization.

24        Sometimes there's pressure to provide more and more

25   details about some particular subject.  I don't know.  Like the

1   government asking you four times, Are you sure there was no

2   sexual abuse in New Mexico?  Could that possibly be pressure to

3   give more information that sometimes leads to corrupt memories?

4          And she explained to you that memory is a constructive

5   process; that we often takes bits and pieces of experiences and

6   try to put them together to make sense, which is exactly what

7   Annie Farmer told you she did when she figured out the April

8   1996 date and she happened to be wrong.

9          How vivid a memory seems does not make it more

10  accurate.  She talked about false memories being planted in

11  people's minds.  You remember things like being attacked by a

12  vicious animal or nearly drowning; and that people can have

13  rich false memories that have been planted in their minds.  She

14  also talked about confidence malleability; that the more

15  confident a person gets if they receive confirming information

16  like from their lawyer or another accuser, then they go up in

17  their confidence.

18         Dr. Loftus has consulted with the Department of

19  Justice, the bosses of these prosecutors; the FBI, the people

20  who interviewed in this case; and the Secret Service.  So to be

21  telling you that she's only a defense witness is simply not

22  true.  And if the government had called her, she would have

23  told them the same information, it's just information they

24  didn't want to hear.

25         You remember the government asking questions of Dr.

1   Dubin to try to suggest that maybe her memory wasn't so good

2   because of a medical condition.  But she was quite firm in the

3   one thing, she absolutely did not take part in sexual abuse

4   with Jane.

5          Science is science.  And Dr. Loftus, Professor Loftus,

6   would say the same thing, no matter who called her to the

7   stand.  You can look at her CV.  You can't compare it to Dr.

8   Rocchio's, because Dr. Rocchio's is not in evidence.  But Dr.

9   Rocchio told you she hasn't done any research.  And you don't

10  even need an expert to tell you some basic facts.  Memory fades

11  over time, manipulation can alter memories, and money is a

12  powerful manipulator.

13         Any claim to truth must be accompanied by the proof.

14  And here, these women are claiming to be telling you true

15  stories and true memories; but in many cases, if not most, they

16  are contradicted by the actual documents we have from the time

17  period.

18         I'm going to talk to you a little bit about the law,

19  as the government did.

20         As you heard, Ghislaine Maxwell is charged with six

21  counts, and you're going to have the opportunity to acquit her

22  of all of those.  I'm going to walk you through this.

23         Counts One, Three, and Five are the ones that accuse

24  her of participating in a conspiracy.  A conspiracy is an

25  agreement between two or more people to violate the law.  It's

LCKVMAX6                    Summation - Ms. Menninger

1    not mere presence around someone else who is violating the law;

2    it's an agreement to help that person.  It's different from an

3    actual violation yourself of the law.  And Counts Two, Four,

4    and Six are the ones that charge her with actually being the

5    one to violate the law.  So it's a little confusing, but these

6    come in pairs, as you see from the color coding.

7              One and Two are the conspiracy and the substantive

8    count for enticement or persuading someone under the age of 17

9    to travel to engage in a legal sexual activity.  Count One is

10   the conspiracy, Count Two is the substantive count.

11             The same is true for Counts Three and Four; they are

12   the substantive and the conspiracy counts for transportation.

13             And Five and Six are the same for sex trafficking.

14             It's very important that you understand that certain

15   counts relate to certain accusers.  So, for example, Counts Two

16   and Four are entirely based on Jane.  If you don't believe

17   Jane, you just acquit Ms. Maxwell right away of Counts Two and

18   Four.

19             (Continued on next page)

20

21

22

23

24

25

LCKCmax7                    Summation - Ms. Menninger

1

2          MS. MENNINGER:  And Count Six only relates to Carolyn.

3   So if you don't believe Carolyn or if you have a reasonable

4   doubt about Carolyn adding Ghislaine to the story, you just

5   acquit her on that charge, as well.

6          And there are numerous reasons why you should have

7   substantial reasonable doubt in this case.

8          But before I get to that, let's talk about conspiracy.

9          Judge Nathan will explain to you that conspiracy is an

10  agreement to accomplish something unlawful, and the

11  government's theory is that Epstein and Maxwell agreed that

12  they would encourage or arrange for females under the age of 17

13  to travel to New York to engage in sex acts with Epstein, and

14  New York law provides that an adult of someone under 17 cannot

15  legally consent to have sexual contact.

16          So, what did Annie Farmer and Kate and Carolyn have to

17  do with that violation of New York law?  Nothing.  Carolyn

18  never went to New York.  She never traveled anywhere.  Any

19  suggestion that she was asked to travel was something she added

20  in the last year after her first lawsuits were over and her

21  money was gone and she was adding Ghislaine Maxwell to the

22  case.

23          Annie came to New York through no involvement of

24  Ghislaine Maxwell.  As she told you, quite clearly on the stand

25  and after she went to New Mexico, nobody asked her to travel

LCKCmax7                    Summation - Ms. Menninger

1    anywhere.  While she went to New York the one time before New

2    Mexico, Ghislaine Maxwell wasn't there, had nothing to do with

3    it.  And Kate, as we've already told you, nothing illegal

4    happened with Kate.

5         Counts Five and Six, the sex trafficking counts, these

6    are the counts that relate to Carolyn.

7         Now, the government wants you to believe that because

8    Ghislaine Maxwell traveled to Palm Beach at some points in that

9    period and helped to manage Epstein's properties, she was the

10   one orchestrating massages, despite the fact that you've seen

11   no proof of that, no message pads, no phone records, nothing.

12   You've seen Sarah Kellen was there.

13        The Judge is also going to explain to you that mere

14   presence is not enough -- mere presence at the scene of the

15   alleged crime does not, by itself, does not make someone a

16   member of the conspiracy.  And she will also, I expect,

17   instruct you that knowledge without participation in the

18   unlawful plan is also not sufficient to convict.  In other

19   words, you cannot conclude Ghislaine was a member of the

20   conspiracy simply because she visited Palm Beach in the 2000s,

21   nor can you convict her because you have some nagging sense

22   that she must have known.  She must have known is not proof

23   beyond a reasonable doubt.

24        The law presumes, as you sit here today, as I stand

25   here today, that Ghislaine Maxwell is innocent of all the

1   charges against her.  And Ms. Maxwell does not have to prove

2   her innocence to you.  You already know it to be true as you

3   sit there.  It is the government's burden to prove each element

4   of each of these crimes beyond a reasonable doubt.  Those of

5   you that have worked in regulatory jobs or banking or finance

6   will be familiar with regulations and how there are knit-picky

7   rules.  The Judge is going to give you the law.  That's the law

8   that you'll follow.  You'll get those instructions and you need

9   to follow those rules, each one of them, very carefully,

10  because if the government has failed to prove any element of

11  any count beyond a reasonable doubt, no matter how silly or

12  small it might seem to you, the Judge will instruct you, you

13  have to acquit.  You only convict if you find the burden of

14  proof has been met as to each element of each count.

15          Reasonable doubt is something I've talked a little bit

16  about and the Judge, I expect, will give you the instruction

17  that you see here.  So I'm just trying to point out a couple of

18  pieces of it, but obviously you'll need to read the entire

19  instruction and listen to all of the Judge's instructions

20  because they're all important.  But when you're weighing the

21  credibility of the witnesses that you've heard from and you're

22  evaluating whether the government has met its burden of proof

23  as to each element of each count, you are to weigh whether or

24  not the government has satisfied their proof beyond a

25  reasonable doubt.

1          And what does reasonable doubt mean?  I expect the

2    Judge will instruct you reasonable doubt is a doubt based in

3    reason in arising out of the evidence in the case or the lack

4    of evidence.  It is a doubt that a reasonable person has after

5    carefully weighing all of the evidence in the case or the lack

6    of evidence.  So every witness you didn't hear from, every

7    piece of document that you didn't see, every piece of evidence

8    that you didn't see, you can take that into account and decide

9    whether the government has met their awesome burden.  In other

10   words, if you have such a doubt as would reasonably cause a

11   prudent person to hesitate to act in matters of importance in

12   his or her own affairs, then you have a reasonable doubt, and

13   in that circumstance, it is your duty to acquit Ms. Maxwell of

14   that charge.

15         What does that mean?  It means something different to

16   every person.  But what is a matter of importance in your own

17   affairs or someone else's own affairs?  Is it whether to get

18   heart surgery?  Is it whether to buy a house?  What major

19   events in your own affairs do you need highly trustworthy

20   information to make a decision about?

21         And then ask whether the quality of the evidence, the

22   lack of the evidence, the evidence that you did get, the

23   evidence that you didn't get was of such a standard that you

24   would not hesitate to act in a matter of importance to

25   yourself.  Would you hesitate to act in a matter of importance

LCKCmax7                    Summation - Ms. Menninger

to yourself based on the word of Carolyn?  Would you hesitate
to act in a matter of importance to yourself based on the word
of Jane?  Did they demonstrate to you that their stories were
credible?  I submit to you that they did not.

          All of these witnesses have changed their stories many
times.  Why?  Was it a lack of memory?  Was it a motivation to
change their story?  And each change of story should cause you
to hesitate to act, and should evidence, the lack of proof
beyond a reasonable doubt.

          There are many reasons to hesitate and many reasons to
doubt.  You have to use your common sense.  Money is a powerful
motivating factor.  The time that has elapsed has made it very
difficult for people to go back and reconstruct their memories,
and their memories are highly flawed.  How easy is it for
someone to get on the stand and say, okay, well, I know I told
you many times that I don't remember her being in the room, but
now I do.  It's pretty easy because no one is here to confront
her.  Epstein is dead.  No one can say that they're lying
except asking them questions and pointing out that their
stories are not accurate.

          But Eva and Michelle came in and they told you they
absolutely did not participate in sexual orgies that Jane said
they did.  That should make you hesitate about all of Jane's
story.

          Carolyn swore many times to tell the truth, and all of

LCKCmax7                    Summation - Ms. Menninger

1   her depositions and in her civil complaints and then she added

2   someone else decades later.  That should make you hesitate.

3          They all changed their stories when the Epstein

4   Victims Compensation Fund was opened up.  That should make you

5   hesitate.

6          Mr. Alessi turning and looking at you and saying he's

7   going to tell the truth and not telling the truth, that should

8   make you hesitate.

9          The lack of evidence should make you hesitate.  Where

10  is one photograph of Ghislaine with any one of these accusers

11  or any underage girl?  That should make you hesitate.

12         What are all the rest of those photographs show?  That

13  should make you hesitate.

14         The absence of one other employee to come in here

15  should make you hesitate.

16         The absence of relatives who were living in the house,

17  mother and brothers who supposedly saw their sister go over to

18  a middle-aged man's house hundreds of times at the ages of 14,

19  15, and 16, they didn't come here, and that should make you

20  hesitate.

21         No phone records, no thank you notes, no proof that

22  Epstein gave money to Interlochen for Jane, that should make

23  you hesitate.

24         Certainly, if it was a matter of importance to

25  yourself, because I assure you this a matter of great

1    importance to my client, Ghislaine Maxwell, that hesitation is

2    reasonable doubt.

3            As we have said from the beginning, Ghislaine Maxwell

4    is not Jeffrey Epstein.  She's being tried here for being with

5    Jeffrey Epstein.  Maybe that was the biggest mistake of her

6    life, but it was not a crime.

7            Please only consider the evidence against her, don't

8    be fooled by the government's smoke in mirrors and big fancy

9    houses and bank accounts.  What was the evidence that pertains

10    to her?  The evidence on the law, the burden of proof, justice,

11    demand that you acquit Ghislaine Maxwell of every single count

12    with which she is charged.

13            Thank you for your time.

14            THE COURT:  Thank you, Ms. Menninger.

15            Members of the jury, we'll take our short break now,

16    and bearing in mind all my instructions, which continue to

17    apply.  When we return, we'll have rebuttal by the government

18    and then I'll give you my charge.  Enjoy your break.

19            (Continued on next page)

20

21

22

23

24

25

LCKCmax7

1          (Jury not present)

2          THE COURT:  Matters to take up?

3          MR. PAGLIUCA:  No, your Honor.

4          THE COURT:  Ms. Moe?

5          MS. MOE:  Yes, your Honor.  We would like to make an

6    application, if possible, could we do so when we return from

7    the break?  I just want to confer with my colleagues on the

8    particulars of our application with respect to the defense

9    summation.  We wanted to look at the transcript in particular.

10         THE COURT:  Well, why don't you raise it and then

11   we'll take a short break?

12         MS. MOE:  Yes, your Honor.  There were a number of

13   points during defense counsel's summations where they referred

14   to facts which are not in evidence and testified to things

15   which are not in evidence.  And for that reason, we would

16   respectfully request that the Court give a curative

17   instruction, essentially in reminding the jurors that it's

18   their recollection of the evidence that controls and not what

19   the lawyers say.

20         I think, in particular, there is one example, I

21   believe Ms. Menninger read into the record an email from Kate

22   which the Court expressly precluded and which is not in

23   evidence.

24         THE COURT:  What exhibit?

25         MS. MOE:  I don't have the number in front of me, but

LCKCmax7

1    they were the emails that Ms. Menninger referenced between Kate

2    and Epstein.

3              THE COURT:  Those came in redacted?

4              MS. MOE:  Yes, completely redacted without any

5    content.

6              MS. MENNINGER:  Judge, it came in the testimony.  The

7    emails themselves were redacted.  The content was part of the

8    testimony.

9              THE COURT:  I think that's right.

10             MS. MOE:  I don't believe the emails -- were offered,

11   were offered for the truth.  That's one of the reasons we

12   wanted to check the transcript.

13             THE COURT:  The curative instruction that you're

14   asking for is in the charge, precisely the words that you just

15   indicated, that it's, what's in evidence and not counsel's

16   arguments.  The jury is going to get that.  It's in the charge.

17             MS. MOE:  Yes, your Honor.  Our concern was that there

18   were a number of items throughout the closing that were

19   mischaracterizations of testimony or inaccurate or references

20   to items that were not in evidence.  That's why we're

21   requesting it now, although I understand the Court's point that

22   the jury will be charged this afternoon and that language is in

23   the charge.

24             The second issue that we wanted to raise is, as the

25   Court will recall from pretrial litigation, we moved to

LCKCmax7

1    preclude any arguments to the jury that the defendant was a

2    substitute for Jeffrey Epstein.  That's the exact argument that

3    Ms. Menninger advanced to the jury in closing, which the Court

4    precluded.

5         THE COURT:  Not with respect to motivation for the

6    witness's testimony.  There is a reason I gave -- for both

7    sides, you've both now done this, which is basically to reargue

8    sort of precisely the line that I crafted and ruled on in my

9    pretrial rulings.  I have maintained those lines throughout

10   trial with a couple of exceptions where there was a little bit

11   of door opening and the like, but I don't have in mind, yes,

12   they made the argument that Epstein's death is a factor in the

13   motivation for the changing the stories, which is what I said

14   was -- to the extent that arguments go to the credibility of

15   witnesses, that's where I drew the line.

16        MS. MOE:  Yes, your Honor.  I was referring to the

17   argument early in Ms. Menninger's summation about I took to

18   mean an argument that the government was substituting

19   Ms. Maxwell for Mr. Epstein.  Again, we want to review the

20   transcript, but that's how we heard it.

21        There were also arguments throughout summation about

22   the victims doing that, which I understand the Court has ruled

23   on that there is a difference between those two, but we think

24   where that crosses the line is an argument where the government

25   is doing that.

LCKCmax7

1           THE COURT:  I don't recall hearing a crossing of the

2      line, but I'll step down and you can point me to language and,

3      again, they're about to get the instruction, so I'm not going

4      to give an instruction that's a repetition about what I'm about

5      to instruct them.  We'll break for five.

6           (Recess)

7           THE COURT:  Yes.

8           MR. ROHRBACH:  Your Honor, with the benefit of the

9      break, the government has honed its request and basis for it.

10     So, as Ms. Moe said, we think there was several assertions

11     which were not in the record, but the clearest one perhaps is

12     Ms. Menninger's arguments about the way interviews were

13     conducted in this case.

14          The Court will recall we had extended discussion about

15     that when Special Agent Young was on the stand on Friday,

16     Ms. Comey asked a question and the Court said that if

17     Ms. Comey, in fact, asked the question and got the answer, it

18     opened the door to evidence about how the interviews were

19     conducted.

20          THE COURT:  It was referencing the cross examination

21     of the witnesses themselves regarding how they were questioned

22     in the interviews and the prior interviews.  That was the

23     evidentiary basis for those comments.  Overruled.

24          Anything else?

25          MR. ROHRBACH:  Nothing else from the government, your

LCKCmax7

1    Honor.

2             THE COURT:  Anything from the defense?

3             MS. STERNHEIM:  No.  Thank you.

4             THE COURT:  You can set up and we'll bring in the

5    jury.

6             MS. COMEY:  Thank you, your Honor.

7             THE COURT:  Counsel, you have ready the exhibits to go

8    back to the jury?

9             MR. ROHRBACH:  Yes, your Honor.  They've now been

10   reviewed by both sides, I assume, Mr. Everdell?

11            MR. EVERDELL:  I just turned them over to the

12   government, so we've got everything ready.

13            THE COURT:  I think you're still finalizing the

14   exhibit list, that's fine, because I want it to go being I'll

15   mark it as a Court Exhibit once you've finalized it.

16            MR. EVERDELL:  Yes, your Honor.

17            MR. ROHRBACH:  Yes, your Honor.

18            THE COURT:  35, correct, Ms. Comey?

19            MS. COMEY:  Yes, your Honor.

20            (Continued on next page)

21

22

23

24

25

1              (Jury present)

2              THE COURT:  Everyone may be seated.  Thank you,

3     members of the jury.  We'll now hear a short rebuttal argument

4     by the government.

5              Ms. Comey, you may proceed.

6              MS. COMEY:  Thank you, your Honor.

7              I want to start off by making one thing very clear,

8     this case is about that woman, it's about the children that she

9     targeted, the steps that she took to serve those children up to

10    be abused.  It's about her own participation in that abuse when

11    she touched Jane's breasts and Carolyn's breasts and Annie's

12    breasts.  This case is about Ghislaine Maxwell, the crimes she

13    committed.

14             The defense just spent a whole lot of energy trying to

15    get you to think about anyone other than the defendant, trying

16    to get you to look away from the massive amount of evidence

17    that Ms. Moe walked you through this morning.

18             Now, to be clear, the defense doesn't have to do

19    anything at all at this trial.  As Judge Nathan has instructed

20    you, the government bears the burden of proof and we embrace

21    that burden, but when the defense makes arguments like they

22    just did, it is perfectly appropriate for you to think about

23    whether those arguments make any sense at all and it is

24    perfectly appropriate for the government to respond to those

25    arguments.  Here, the defense's theories just do not hold up.

1    I'm not going to address all the stuff you just heard, I'm

2    going to focus primarily on the core of the defense's arguments

3    here, that you can't believe the four women you heard from,

4    Jane, Kate, Carolyn, and Annie.  Never mind that they

5    corroborate each other, never mind the mountain of evidence

6    that backs those four up, the defense is desperate for you not

7    to believe these women, so they're throwing up anything they

8    can think of at the wall to see if anything will stick, but if

9    you think about those arguments for just a little bit, you'll

10   see they don't hold any water.

11         Let's walk through them.

12         The defense tried to suggest that even if Jeffrey

13   Epstein did engage in sexual contact with Jane, Kate, Carolyn,

14   and Annie, Maxwell didn't know about it.  She just had no idea

15   that her boyfriend and best friend for more than a decade had a

16   thing for teenage girls.  Ladies and gentlemen, that suggestion

17   is borderline laughable.  Of course she knew.  The defendant

18   ran every aspect of Jeffrey Epstein's life for the better part

19   of a decade.  She traveled with him constantly.  She shared a

20   bed with him, inside a bedroom they can't get to without

21   walking past a photo of a young girl pulling down her

22   underwear.  She had a bathroom off of that master bedroom.  She

23   referred to her homes as his home.  She was the lady of the

24   house.  So of course she knew what was going on.  Of course she

25   knew that her boyfriend, when he was spending time with teenage

1    girls like Jane, like Carolyn, like Annie, like Virginia

2    Roberts, she knew that he was doing it because he was attracted

3    to them, because he wanted to have sex with them.  The

4    suggestion that she didn't know borders on the absurd.

5           Think about that Palm Beach house filled with

6    sexualized photos of girls around his desk, in the bedroom, in

7    the closet where the massage table was kept, and think about

8    that list of masseuses.  Who needs that many masseuses?  You

9    saw that list from Government Exhibit 52-G.  And who needs that

10   many massages?  Those were so obviously a ruse for sex.  The

11   defendant clearly knew what was going on, and she was

12   complicit.  She was in the room.  So of course she knew.  That

13   $30 million is not just house-manager, hold-my-money-for-me

14   money, it is, we-molested-kids-together money.  The defendant

15   was a crucial part of this scheme.

16          Now the defense talked a lot about what you don't have

17   here, what's not in evidence in this case.  See that for what

18   it is, a distraction.  It's a desperate attempt to get you to

19   think about anything other than the powerful testimony you

20   heard during this trial from Jane, Kate, Carolyn, and Annie.

21          Just a few points on this particular argument.

22          First, Ms. Menninger talked a lot about where are the

23   photographs or where are the hard drives.  I expect that Judge

24   Nathan is going to instruct you that the government is not

25   required to use any particular investigative techniques.  What

LCKCmax7                      Rebuttal - Ms. Comey

1   is before you is whether the evidence that you heard in this

2   courtroom proves the defendant's guilt beyond a reasonable

3   doubt, and it absolutely does.

4            Second, I expect that Judge Nathan will instruct you

5   that any witnesses who did not testify here were equally

6   available or equally unavailable to both sides, the government

7   and the defense.  So when Ms. Menninger stands up here and says

8   where is Virginia Roberts, where is Jane's mom, where are the

9   employees, keep that in mind, it's just a distraction.

10           Third, your common sense tells you that the sexual

11  abuse of children is not the kind of crime that leaves paper

12  evidence.  The victims are the evidence.  Their testimony,

13  their consistent accounts of Maxwell and Epstein and how they

14  operated, that's how you know they were in those massage rooms.

15  People who prey on children do not leave behind documents

16  admitting to what they did.  The defendant was not walking out

17  of those massage rooms writing a memo to herself saying, today

18  I touched Jane's breasts.  But you do have powerful

19  corroboration from three different victims who each told you

20  compellingly similar accounts of their experiences, three

21  different victims who remember the defendant touching their

22  breasts, three different victims describing how the defendant

23  used massage as a technique to move into sexual abuse.

24           And by the way, you do have documents to back up their

25  testimony.  Ms. Moe walked you through them.  You've got the

1    contact book, the message pads, the FedEx records, you have

2    evidence on top of the witnesses.

3          The defense spent most of their time attacking Jane,

4    Kate, Carolyn, and Annie, and now it's obvious why they did

5    that.  Those four witnesses gave you the most damning testimony

6    in this trial.  If you believe those women, then that's it, the

7    defendant is guilty.  So of course the defendant is spewing out

8    anything they can think of to attack these women.

9          I'm not going to respond to every single sideshow that

10   Ms. Menninger tried to lead you down about each of these women,

11   but let me just address a few of the most obviously false ones.

12         First, there is literally no evidence in this record

13   of an age limit at the Epstein Victim Compensation Fund.

14   That's something Ms. Menninger just made up.  There is nothing

15   in the record to say you have to be a particular age to put in

16   a claim to that fund.

17         Second, the suggestion that Annie was 17, not 16 when

18   she went to Santa Fe.  Three different witnesses, Annie, her

19   mother, and her high school boyfriend all remember that Annie

20   took that Thailand trip the summer between her junior and her

21   senior year.  David Mulligan remembered she had just gotten

22   back when they started dating and that she went after they met

23   at junior prom.  They didn't just make that up.

24         And remember, this trip to Santa Fe with Annie took

25   place close in time to the trip around Christmas time to New

York.  Epstein wanted to get her back in his clutches as
quickly as he could, and he wanted his right-hand woman there
to help groom her.  That's how you know it happened in '96.

And this thing about flight records, also a
distraction.  If you want to take a look for yourself, go to
Government Exhibit 662 at page 40, look at the flight on March
29th, 1996.  You'll see Jeffrey Epstein flying to Santa Fe, New
Mexico.  The next flight is more than a week later, April 8th,
1996.  Maxwell is on that next flight with Epstein.  That span
of time of more than a week covers a weekend.  Take a look at
that, ladies and gentlemen.

And third, Ms. Menninger talked a lot about Jane's
testimony on cross examination.  And to give you an example of
some supposedly "aha" moment, she showed you a question that
she asked Jane that was written like a riddle.  Remember that
question, it was, you don't recall Maxwell and Epstein being in
the room, correct, and Jane answered no.  What that means is,
no, that's not correct.  Ms. Menninger was trying to mislead
you about what the answer to that riddle-like question meant
just like she was trying to mislead you about what nothing has
ever been difficult for me meant on that Interlochen
application.  Don't be distracted by that nonsense.

I want to walk through the main arguments at the core
of what the defense has said to you today about these
witnesses.

1            First, the defense tries to argue that Jane, Kate,

2     Carolyn, and Annie are all misremembering what happened to

3     them.  They concede that the sexual contact happened with

4     Epstein, but the theory is, Maxwell just had no part in it,

5     wasn't involved.  So the theory is that all four of these women

6     had a massive false memory event that just happen to include

7     details of the defendant grooming them in the same way using

8     the same playbook.  Your common sense tells you that didn't

9     happen.  The defense's own expert, Professor Loftus, confirmed

10    that the core memories of trauma are solid.  Peripheral details

11    make it a little fuzzy, but those main memories, those events

12    that are at the center are implanted.  Some things you never

13    forget because they're seared into your brain forever.

14            You remember keen moments, moments that change your

15    life, like Jane remembering the defendant touching her breasts,

16    Carolyn remembering the defendant touching her breasts, Annie

17    remembering the defendant touching her breasts, Kate

18    remembering the defendant standing right next to her in the

19    doorway the first time she sees Jeffrey Epstein naked, frozen

20    with fear.

21            There was nothing peripheral about the defendant.  She

22    was the core memory, she was essential to this scheme.  And to

23    distract you from the remarkable clarity with which these women

24    remember those core details, the defense primarily points to

25    how Jane and Carolyn have described aspects of their

1    experiences differently over time.  They mixed up details,

2    couldn't remember exactly when certain things took place.  But

3    if you think about your own lives and your own memories, you

4    will see that difficulty remembering certain things doesn't

5    mean that they didn't happen, doesn't mean that you don't

6    remember the core.  Jane and Carolyn were both abused many,

7    many times over a period of years.  The abuse became routine,

8    the same sickening process each time, these were recurring

9    events.

10           Now imagine you were asked to recall a recurring event

11    from years ago in your own lives.  Say something like a

12    holiday, like Thanksgiving.  There is a routine you follow each

13    year, the same food, the same people attend.  That event stands

14    out in your mind because it's significant, it's a holiday, but

15    you won't necessarily remember the specific dinner conversation

16    you had each year.  You're sure you had turkey because that

17    happened every time, but some details are just not going to

18    stand out to you because essentially the same thing happens

19    every year.

20           Now what might stand out is when a routine gets

21    broken.  Say one year a neighbor came over to join who was

22    unexpected or you switched up salt and sugar and a pie got

23    totally ruined.  You'll remember that different thing, but you

24    might not be able to remember which Thanksgiving that thing

25    happened.  Did the neighbor come when I was 14, or 15, or 16?

1   What year was it that I ruined that pie and it was salty?  Just

2   because you can't remember exactly how old you were, which

3   Thanksgiving it was, does that mean it didn't happen?  Of

4   course not.

5          The same is true of Jane and Carolyn.  The abuse

6   stands out in their mind because it was formative, but it

7   happened so often that the details run together.  They remember

8   certain things like when someone else was in the room or going

9   to get to see The Lion King during one of the trips, but those

10  can be hard to place in time because of how frequent and

11  similar their experiences were.

12         Now, by contrast, Annie had a much smaller window of

13  interactions with Maxwell and Epstein.  So for her, many more

14  details stand out very vividly.  It's less like Thanksgiving

15  for her and more like a sweet 16 party, something unique that

16  only happens once, so it stands out much more clearly in every

17  detail.

18         For Jane and Carolyn, even though some of those

19  peripheral details got jumbled, they have solid memories of the

20  core events.  And you know from the defense's own expert that

21  when an event you're remembering is traumatic, not just some

22  holiday, the memory is going to be even stronger.

23         Like Jane, she remembers Maxwell being in the room.

24  The presence of a woman that she had looked up to like an older

25  sister during this horrifying sexual abuse is a traumatic core

1    event.  And you know Jane was 14 when she met Maxwell and

2    Epstein.  She vividly remembers being 14 years old when that

3    abuse began.  It was within a year of her father dying.  That's

4    an anchoring way for her to hold onto that memory and know she

5    was 14.  It's also what she told Matt a decade ago long before

6    this trial.  And there are documents to confirm she's right.

7    You saw the Interlochen records putting her and the defendant

8    and Epstein all at Interlochen the same summer of 1994.  You

9    saw the flight records putting Maxwell and Epstein there that

10   summer.  It is so clear that Jane was 14 when she met these

11   predators.

12        Now the defense tries to wiggle out of that by

13   suggesting that Jane's estimation that she was approximately 15

14   on Mike Wallace's birthday somehow means that she got that date

15   wrong.  Ladies and gentlemen, which would stand out more in

16   your mind, how old you were on Mike Wallace's birthday or how

17   old you were the first time a middle-aged man molested you?  It

18   is obvious that Jane remembers these core events clearly, and

19   that is what matters.

20        And hypothetically, let's just say the defense was

21   right.  Let's just say that she got the timing of her first

22   meeting wrong, that it was actually that last summer when she

23   turned 16 in 1996, and you know that she knew them by the time

24   she was 16 because you saw the flight records putting her on

25   those planes with defendant and Epstein going to New York when

LCKCmax7                        Rebuttal - Ms. Comey

she was 16.  So the best argument the defense has is she was

16, not 14, when the abuse happened.  That is not a defense.

It is still illegal.  It is not a defense to say, oh, no, no,

no, she was 16, not 14, when I touched her breasts.  It's still

a crime.

        Now Carolyn.  Carolyn vividly remembers the first time

she met the defendant.  You saw her correct defense counsel on

cross examination.  Remember, he tried to skip over the part of

meeting her and she said no, no, you forgot about when I met

Maxwell.  That first day was a scarring memory for Carolyn, and

she remembers Maxwell as a fixture in her experiences at the

Palm Beach house, like the stuffing at Thanksgiving, there

every time.

        The defense is very focused on the peripheral details

that got mixed up for Carolyn between her earlier statements

and her trial testimony more than a decade later.  And they

harped a lot on her memory of seeing a photo of Maxwell

pregnant in the massage room.

        Ladies and gentlemen, I'd encourage you to take a look

at Government Exhibits 286 and 287.  Those show pictures that

were on the wall in the closet where the massage table was kept

in the Palm Beach master bathroom.  You look at those and

you'll see that there appear to be three different pictures

that appear to show a pregnant woman in a two-piece swimsuit.

So what if Carolyn mistakenly thought that one of those showed

LCKCmax7                    Rebuttal - Ms. Comey

1   Maxwell?  What do you think stands out in her memory more, who

2   the pregnant person in that picture was or the middle-aged man

3   who was masturbating and touching her breasts inside that room?

4   That is the definition of a peripheral detail.

5          And why is the defense focusing so much on these

6   peripheral details?  Because they desperately want you to

7   ignore the fact that Carolyn has consistently remembered

8   Maxwell as one of the people involved in her experiences at

9   that house.  They want you to forget that she mentioned Maxwell

10  not once, but twice in her 2009 deposition.  Without prompting,

11  Carolyn named Maxwell as one of the two people who would call

12  her to schedule these massages with Jeffrey Epstein.  She named

13  her as one of the two people she would talk to when she called

14  herself begging to come over because she needed the money.  And

15  Carolyn told Sean that she met a woman named Maxwell, whose

16  first name she couldn't pronounce.

17         Now, back then there was no reason for Carolyn to go

18  into more detail about what was happening with Maxwell,

19  especially not in a lawsuit that was about Sarah and Epstein.

20  But when she was asked more detailed questions, she remembered

21  the core events, and she'd already mentioned Maxwell, without

22  prompting, long before there could be anything to contaminate

23  her memory.

24         Next, the defense suggests that somehow these clear

25  memories of Maxwell got implanted into the brains of Jane and

1   Kate and Carolyn and Annie.  The defense seems to suggest that

2   this implantation happened from the media, greedy civil

3   lawyers, and the FBI.  None of those actually make sense and

4   not one has support in this record.

5            Starting with the media, you heard absolutely nothing

6   at this trial about any of these witnesses consuming media in

7   this case.  You heard that Jane and Annie gave some interviews

8   themselves, you heard that Kate also gave an interview, but

9   there is no evidence that any of these different witnesses saw

10  each other's interviews, they weren't asked about it, they

11  didn't say they did.  There is no evidence that any witness saw

12  each other's media or anything else about this case in the

13  news.  This is a distraction.

14           Turning to the lawyers.  There is not a shred of

15  evidence that a group of lawyers got together, made up a story

16  about Maxwell, and then implanted it into these witnesses'

17  minds.  Remember, each witness had a different lawyer.  So for

18  this theory to work, four different attorneys had to come up

19  with this story and they separately manipulate their clients

20  into perjuring themselves at a federal trial all so they could

21  get a cut of the Epstein Victim Compensation Fund.  That makes

22  no sense for a bunch of different reasons.

23           For one thing, Annie told you that her lawyer is pro

24  bono, working for free.  She doesn't get a cut of whatever

25  Annie gets from the fund, so why would she need to make up a

LCKCmax7                        Rebuttal - Ms. Comey

story about the defendant?  And it makes no sense for the other

lawyers to push this supposedly made up story about the

defendant when they've already gotten paid.  Remember, the

payments have all been made, the lawyers got their money long

before this trial started.

        And you know these lawyers didn't just implant the

defendant into these victims' minds.  Jane, Carolyn, and Annie

all talked about Maxwell, remembered her as part of their

experiences a long, long time ago.  They all included her in

their accounts before there was some supposed incentive for a

payday.  Annie mentioned it to Dave Mulligan, her high school

boyfriend, and the FBI in 2006.  She told both of them how

Maxwell touched her breasts during a massage.  Jane told Matt,

her boyfriend from a decade ago, about the woman who would make

her feel comfortable in the room.  Carolyn mentioned meeting

the woman with short black hair and an accent to the FBI in

2007.  She mentioned Maxwell twice in her deposition, and she

told Sean that she saw Maxwell at the house at that time, way

before there was a compensation fund or any incentive to add in

Maxwell if it wasn't true.

        And that timing is crucial here because it completely

guts the whole defense theory.  The defense suggests that some

lawyers made everything up about Maxwell to get money, but even

if adding Maxwell in to get money could get you money, which is

not true, there is no universe in which that was the case when

LCKCmax7                        Rebuttal - Ms. Comey

1    Epstein was alive.  Before he died in 2019, Epstein was the big
2    fish, he's who you go after if you're going to make up a story.
3    So all of the things that these witnesses said about Maxwell
4    before 2019 were not part of some frame-job for the defendant.
5    Even under the defense theory there was zero reason to make up
6    her involvement when these disclosed years ago.
7                   (Continued on next page)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1              MS. COMEY:  Finally, there is this, frankly, desperate

2      suggestion that the FBI manipulated these witnesses; asked

3      leading questions to fit a narrative.

4              Let me be very clear here.  There is not one shred of

5      evidence to support that in this case.  Ms. Menninger seemed to

6      improvise, ad-libbed, made up, some theoretical questions that

7      she'd like to think that the FBI asked some of these witnesses

8      in their meetings with the government.  But you didn't hear

9      anything about that on the witness stand or the exhibits in

10     this case.  What you did hear was Special Agent Young.  She

11     told you how she values being ethical.  She told you it matters

12     to her that a victim's memory is her memory.

13             Not a single witness at this trial suggested for even

14     a moment that the FBI told them what to say.  Remember, every

15     single witness who was asked told you flat out, the only thing

16     the governed asked of them was to tell the truth.  And you know

17     that's what they did here.

18             Really the whole memory thing makes no sense at all.

19     There is no way that Jane, Kate, Carolyn, and Annie just

20     misremembered the defendant's core role in abusing them.  So

21     what does that leave the defense with?  They are all liars.  In

22     order for the defense to be right, for the defendant not to

23     have known about the abuse, for the defendant not to have

24     participated in it, witness after witness after witness must

25     have lied to you.  Jane and Kate and Carolyn and Annie must

LCKVMAX8                    Rebuttal - Ms. Comey

1   have just stacked lie on top of lie on top of lie.  That

2   doesn't make any sense for a whole host of reasons.

3        First, if these women are lying, then that means all

4   of the witnesses who backed them up are lying too.  The

5   ex-boyfriends, Matt, Dave, Shawn, they must be lying.  Juan

6   Alessi must be lying.  That's simply nonsensical for the

7   ex-boyfriends.  Matt, Dave, and Shawn have nothing to gain from

8   testifying here.  They have no reason whatsoever to lie.  No

9   motive.  Why would they come here and lie to you?

10        The same goes for Juan Alessi.  The defense spent a

11   lot of time trying to dirty Alessi up.  You know why they did

12   that?  It's because his testimony is incredibly powerful

13   evidence that backs up so much of what these other witnesses

14   say.  But their arguments about him are really just silly.

15   They spent time talking about the money and the gun.

16        Remember, Mr. Alessi told you himself he stole money

17   from Jeffrey Epstein and he paid it back.  Some police report

18   says that he was also looking for a gun.  So what?  Does that

19   mean that he would make up an entire story about the defendant?

20   No.  And you know he told you the truth because he was

21   corroborated by other evidence.  Flight records confirmed that

22   Jane and Virginia flew on Epstein's planes when they were

23   minors, just like he told you.  The pilots confirmed that Juan

24   Alessi drove passengers up to the tarmac, just like he told

25   you.  The household manual showed you in black and white that

LCKVMAX8                    Rebuttal - Ms. Comey

Maxwell was exactly who Alessi said she was.  And just like the
ex-boyfriends, Alessi has no reason to lie to you.

Second.  Jane, Kate, Carolyn, and Annie have no motive
to lie at this trial.  The defense's only explanation for why
they would perjure themselves on that stand is money.  But the
facts just do not support that.  Remember, the victim
compensation fund is finished; the civil cases are done.
There's nothing pending.  These women have already received
millions of dollars.  They are not getting a penny more.

Now, the defense tried to point you to this
stipulation about Jane's lawyer.  I'd encourage you to take a
look at it.  Look at the whole stipulation.  You'll see it
doesn't change anything I've said.  Jane's lawyer told the
prosecutor that he remembered telling Jane that testifying
would be the morally right thing to do and that it could help
her case.  But to be clear, that conversation with that
prosecutor occurred in 2021, long after Jane's civil case was
settled, long after she already received her award from the
fund.  So there was no case to help.  Whatever the lawyer meant
by that, there is absolutely no evidence that Jane had any
financial incentive to testify at this trial.  There's no money
to be had.  You heard Jane, Kate, Carolyn, and Annie each tell
you unequivocally they have no financial stake in the outcome
of this trial.  This verdict will have zero impact on the money
they received.

LCKVMAX8                          Rebuttal - Ms. Comey

1            Third.  If Jane, Kate, Carolyn, and Annie really

2    believed that making up a story about Maxwell would somehow

3    benefit them, you better believe they would have told much

4    better lies.  If they wanted to frame Maxwell, if they thought

5    doing so would somehow benefit her, they would put Maxwell in

6    way deeper.  They would have said that Maxwell was in the room

7    every single time Jeffrey Epstein initiated sexual contact.

8    Jane, Carolyn, and Annie would have said that Maxwell

9    participated in all kinds of sex acts:  Intercourse, oral sex,

10   you name it.  That's not what they did.

11           Remember, Annie was so careful to make clear that the

12   defendant touched the tops of her breasts, but not her nipples.

13   Jane was careful to explain that Maxwell wasn't always in the

14   room, and that the only physical contact she remembers is the

15   defendant touching her breasts.

16           Carolyn described oral sex and intercourse involving

17   two other women, but with Maxwell it was just one time touching

18   her breasts.  Her memory is that Maxwell mostly talked with

19   her, called to schedule appointments, invited her to travel.

20           And how about Kate?  She never put Maxwell in the room

21   for a single sex act.  She just remembered Maxwell walking her

22   to the door and leading her into that sexualized massage.  And

23   remember, she said she was 17 when this happened.  If she was

24   going to lie about her age, why wouldn't she make herself

25   younger?  16, 15, 14.

LCKVMAX8                          Rebuttal - Ms. Comey

1          If these four witnesses wanted to dirty Maxwell up for

2     a huge payday, they would have told way better lies.

3          But, you know, let's just say the defense is right.

4     Let's say these women are lying.  Given how consistent their

5     accounts are with each other and with the other witnesses in

6     this case, that would mean that at least eight people -- Jane,

7     Kate, Carolyn, Annie, Dave, Shawn, Matt, and Juan Alessi -- all

8     are part of a massive conspiracy to frame the defendant.  And

9     then they just happened to be lucky enough that the FBI had

10    documents to back up what they said:  Flight records, FedEx

11    records, message pads, contact book, household manual to back

12    up their lies.

13         Beyond how implausible such a massive conspiracy of

14    eight people to lie in a federal court is, the timing here

15    makes it impossible.  Remember, the defense's theory is that

16    the incentive to frame Maxwell arose after Epstein died in

17    2019.  So this supposed frame job was hatched in 2019, meaning

18    Carolyn had to get in a time machine, go back to 2009 and

19    sprinkle in a couple references to Maxwell in her deposition.

20    And then Annie had to borrow that time machine, go back to

21    2006, and tell the FBI about how Maxwell touched her breast

22    during a massage.

23         Ladies and gentlemen, that's fiction.  You know that

24    did not happen.  Annie told the FBI about Maxwell because it

25    was the truth.  Carolyn described Maxwell in her deposition

LCKVMAX8                       Rebuttal - Ms. Comey

1   because it was the truth.  There is no massive conspiracy here

2   to frame Ghislaine Maxwell.

3          Finally, if these four witnesses really believed that

4   lying and framing Maxwell would get them more money with the

5   compensation, there is no way they would have testified at this

6   trial.  No way.  They got million-dollar payouts already.  The

7   plan worked.  They got the money.  Why on earth would they then

8   take the huge risk of perjuring themselves in a federal trial?

9   If all of this was just lies, made up to get money, why would

10  they push their luck after they already reached their goal?  If

11  money is all they wanted, they would have walked away as soon

12  as the check cleared.

13         That's not what happened.  These women put themselves

14  through the hell of testifying at this trial, even though they

15  have nothing to financially gain.  They exposed the darkest,

16  most traumatizing events of their lives to the world at this

17  trial.  They sat on that stand and went through excruciating

18  and humiliating cross-examination.  Did that look fun?  Why

19  would they put themselves through that when they already got

20  millions of dollars?  Why would they let themselves be attacked

21  like that?  You know why.  They told you themselves and you

22  could see it on their faces.  They did it for justice, for the

23  hope that the defendant would be held accountable for her role

24  in shattering their lives.

25         The defendant never thought that those teenage girls

would have the strength to report what happened to them.  In

her eyes, they were just trash, beneath her.  Those girls would

never stand up to a power couple like Jeffrey Epstein and

Ghislaine Maxwell.  And if they ever did, who would believe

them?  Who would believe Jane or Kate or Carolyn or Annie over

Ghislaine Maxwell and Jeffrey Epstein, who rubbed shoulders

with presidents and celebrities and business leaders?

         But the defendant didn't count on those teenage girls

growing up into the women who testified at this trial; women

who would be willing to take that stand and tell the truth

about what happened.  The defendant didn't count on all four of

them coming forward in an avalanche of evidence.  And the

defendant did not count on the witnesses -- Shawn, Matt, Dave

Alessi -- who would come forward and back those women up.  And

she didn't count on you.  She didn't count on a jury who would

see past the nonsense that she tried to throw up, who would

look at the evidence clear-eyed and see her for the predator

that she is.

         Ladies and gentlemen, you know what happened here.

Four incredibly brave women came forward and told you what

happened to them.  They opened themselves up and shared their

horrifying experiences.  Jane, Kate, Carolyn, Annie, they each

told you how the defendant played a pivotal role in the worst

events of their lives.  They corroborated each other and were

further corroborated by the evidence in this case.  There is no

 1   reasonable doubt that the defendant participated in the sexual

 2   abuse of underage girls.

 3          Now it is time to hold her accountable.  If you use

 4   your common sense, stay focused on the evidence, and follow

 5   Judge Nathan's instructions on the law, then you will reach the

 6   only verdict that is consistent with the evidence, the verdict

 7   that justice demands:  The defendant is guilty.

 8          THE COURT:  All right.  Thank you, Ms. Comey.

 9          We will hand out the jury instructions to members of

10   the jury who may read along while I read it to you.

11          Please wait till I direct you.

12          All right.  Counsel, are you ready for me to read the

13   charge?

14          MR. ROHRBACH:  Yes, your Honor.

15          MS. STERNHEIM:  Yes.

16          THE COURT:  Okay.  Members of the jury, you may read

17   along or not, as you like.  I'm going to read you the jury

18   instructions.  Instructions begin on page 5, which is after the

19   table of contents.

20          Instruction No. 1.  Role of the Court.

21          You've now heard all of the evidence in the case, as

22   well as the final arguments of the lawyers for the parties.  My

23   duty at this point is to instruct you as to the law.  And it's

24   your duty to accept these instructions of law and apply them to

25   the facts as you determine them.

1          On these legal matters, you must take the law as I

2     give it to you.  Regardless of any opinion that you may have as

3     to what the law may be or ought to be, it would violate your

4     sworn duty to base a verdict upon any view of the law than that

5     which I give you.  If an attorney or anyone else at trial has

6     stated a legal principle different from any that I state to you

7     my instructions, it's my instructions that you must follow.

8          You should not single out any instruction alone

9     stating the law, but you should consider my instructions as a

10     whole when you retire to deliberate in the jury room.  You may

11     take a copy of these instructions with you into the jury room.

12          Instruction No. 2.  Role of the jury.

13          Your role is to pass upon and decide the fact issues

14     that are in the case.  You, the members of the jury, are the

15     sole and exclusive judges of the facts.  You pass upon the

16     weight of the evidence or lack of evidence, you determine the

17     credibility of the witnesses, you resolve such conflicts as

18     there may be in the testimony, and you draw whatever reasonable

19     inferences you decide to draw solely based on the evidence and

20     from the facts as you've determined them.  You must determine

21     the facts based solely on the evidence received in this trial.

22          In determining the facts, you must rely upon your own

23     recollections of the evidence.  What the lawyers have said, for

24     instance, in opening statements, in closing arguments, in

25     objections, or in questions is not evidence.  You should bear

LCKVMAX8                    Charge

in mind particularly that questions put to witnesses --
although they can provide the context -- the questions are not
themselves evidence.  It's only the answers that are evidence.

        I remind you also that nothing I have said during the
trial or will say during these instructions is evidence.
Similarly, the rulings I've made during the trial are not any
indication of my views of what your decision should be.

        The evidence before you consists of the answers given
by the witnesses, and the exhibits and stipulations that were
received into evidence.  If I have sustained an objection to a
question or told you to disregard testimony, the answers given
by a witness are no longer part of the evidence and may not be
considered by you.  I'll instruct you at the end of these
charges about your ability to request to have testimony read
back and your access to other evidence admitted during the
trial.

        Instruction No. 3.  Contact with others, social media.

        During your deliberations, you must not communicate
with or provide any information to anyone by any means about
this case.  You may not use any electronic devices or media
such as a telephone, cell phone, smartphone, iPhone,
BlackBerry, or computer, the internet or any internet service
or any text or instant messaging service or any internet chat
room, blog, or website such as Facebook, Instagram, LinkedIn,
YouTube, Twitter, or Snapchat to communicate to anyone any

LCKVMAX8                    Charge

information about this case or to conduct any research about

this case until I accept your verdict.  In other words, you

cannot talk to anyone on the phone or in person, correspond

with anyone or electronically communicate with anyone about

this case.  You can only discuss the case in the jury room with

your fellow jurors during deliberations.

Along the same lines, you may not try to access any

information about the case or do research on any issue that

arose during the trial from any outside source, including

dictionaries, reference books, or anything on the internet.  In

our judicial system, it is important that you are not

influenced by anything or anyone outside of this courtroom.

Your sworn duty is to decide the case solely and wholly on the

evidence that was presented to you in the courtroom.

Instruction No. 4.  Statements of counsel and Court

not evidence; jury's recollection controls.

You must determine the facts by relying upon your own

recollection of the evidence.  The case is not to be decided on

the rhetoric of either the attorneys for the government or the

attorneys for the defendant.  The lawyers' arguments are

intended to convince you to draw certain conclusions from the

evidence or lack of evidence, and those arguments are

important.  You should weigh and evaluate them carefully; but

you must not confuse them with the evidence.  If your

recollection of the evidence differs from the statements of the

1    lawyers, follow your recollection.

2              You should draw no inference or conclusion for or

3    against any party by reason of lawyers making objections or my

4    rulings on such objections.  Counsel have not only the right,

5    but the duty to make legal objections that they think are

6    appropriate.  You should not be swayed against the government

7    or the defendant simply because counsel for either side has

8    chosen to make an objection.  Similarly, statements made by

9    counsel when arguing the admissibility of evidence are not to

10   be considered as evidence.

11             If I comment on the evidence during my instructions,

12   do not accept my statements in place of your recollection.

13   Again, it is your recollection that governs.  Do not concern

14   yourself with what was said at sidebar conferences or during my

15   discussions with counsel.  Those discussions related to rulings

16   of law, which are my duty, and not to matters of fact, which

17   are your duty to determine.

18             At times I may have admonished a witness or directed a

19   witness to be responsive to questions or to keep his or her

20   voice up or to repeat an answer.  My instructions were intended

21   only to clarify the presentation of evidence.  You should draw

22   no inference or conclusion of any kind, favorable or

23   unfavorable, with respect to any witness or party in the case

24   by reason of any comment, question, or instruction of mine.

25   Nor should you infer that I have any views as to the

LCKVMAX8                    Charge

credibility of any witness, as to the weight of the evidence,

or as to how you should decide any issue that is before you.

That is entirely your role.

       Instruction No. 5.  Improper considerations.

       Your verdict must be based solely upon the evidence or

the lack of evidence; and it is important that you discharge

your duties without discrimination.  Thus, it would be improper

for you to consider any personal feelings you may have about

Ms. Maxwell's race, color, religious beliefs, national

ancestry, sexual orientation, gender identity, gender, economic

circumstances, or any other such factor.  Similarly, it would

be improper for you to consider any personal feelings you may

have about the race, color religious beliefs, national

ancestry, sexual orientation, gender identity, gender, economic

circumstances, or any other similar factor of any other

witnesses or anyone else involved in this case.

       Do not allow yourself to be influenced by personal

likes or dislikes, sympathy, prejudice, fear, public opinion,

or biases, including unconscious biases.  Unconscious biases

are stereotypes, attitudes, or preferences that people may

consciously reject, but may be expressed without conscious

awareness, control, or intention.  Like conscious bias,

unconscious bias can affect how we evaluate information and

make decisions.

       Finally, it also would be improper for you to allow

LCKVMAX8                    Charge

any feelings you might have about the nature of the crimes

charged to interfere with your decision-making process.  Ms.

Maxwell is entitled to a trial free from prejudice; and our

judicial system cannot work unless you reach your verdict

through a fair and impartial consideration of the evidence.

Instruction No. 6.  All parties are equal before the

law.

You are to perform the duty of finding the facts

without bias or prejudice as to any party.  You are to perform

your final duty in an attitude of complete fairness and

impartiality.  The fact that the prosecution is brought in the

name of the United States of America entitles the government to

no greater consideration than that given to any other party to

this litigation.  By the same token, the government is entitled

to no less consideration.  All parties stand as equals at the

bar of justice.

Instruction No. 7.  Presumption of innocence and

burden of proof.

The law presumes the defendant to be innocent of all

charges against her.  Ms. Maxwell has pleaded not guilty to the

charges in the indictment.  As a result, the burden is on the

government to prove Ms. Maxwell's guilt beyond a reasonable

doubt as to each charge.  This burden never shifts to the

defendant for the simple reason that the law never imposes upon

a defendant in a criminal case the burden or duty of

testifying, of calling any witness, or locating or producing

any evidence.  In other words, Ms. Maxwell does not have to

prove her innocence.  The presumption of innocence was with Ms.

Maxwell when the trial began, and remains with Ms. Maxwell

unless and until you're convinced that the government has

proven her guilt beyond a reasonable doubt as to each charge.

Even though Ms. Maxwell has presented evidence in her

defense, the presumption of innocence remains with her, and it

is not her burden to prove that she is innocent.  It's always

the government's burden to prove each of the elements of the

crimes charged beyond a reasonable doubt.

Instruction No. 8.  Reasonable doubt.

The question that naturally arises is what is a

reasonable doubt?  What does that phrase mean?  The words

almost define themselves.

A reasonable doubt is a doubt based in reason and

arising out of the evidence in the case or the lack of

evidence.  It is a doubt that a reasonable person has after

carefully weighing all of the evidence in the case.  Reasonable

doubt is a doubt that appeals to your reason, your judgment,

your experience, and your common sense.  Reasonable doubt is

not whim or speculation; it's not an excuse to avoid an

unpleasant duty, nor is it sympathy for the defendant.

The law in a criminal case is that it is sufficient if

the guilt of the defendant is established beyond a reasonable

LCKVMAX8                    Charge

1    doubt, not beyond all possible doubt.  Therefore, if, after a

2    fair and impartial consideration of all of the evidence, you

3    can candidly and honestly say that you do have an abiding

4    belief of Ms. Maxwell's guilt as to any crime charged in this

5    case, such a belief as a prudent person would be willing to act

6    upon in important matters in the personal affairs of his or her

7    own life, then you have no reasonable doubt and, under such

8    circumstances, it is your duty to convict Ms. Maxwell of the

9    particular crime in question.

10        On the other hand, if, after a fair and impartial

11   consideration of all of the evidence, you can candidly and

12   honestly say that you are not satisfied with Ms. Maxwell's

13   guilt as to any charge, that you do not have an abiding belief

14   of her guilt as to that charge, in other words, if you have

15   such doubt as would reasonably cause a prudent person to

16   hesitate in acting in matters of importance in his or her own

17   affairs, then you have a reasonable doubt and, in that

18   circumstance, it is your duty to acquit Ms. Maxwell of that

19   charge.

20        Instruction No. 9.  The indictment.

21        The defendant, Ghislaine Maxwell, has been formally

22   charged in what is called an indictment.  As I instructed you

23   at the outset of the trial, the indictment is simply a charge

24   or accusation.  It's not evidence; it's not proof of Ms.

25   Maxwell's guilt.  It creates no presumption and it permits no

LCKVMAX8                    Charge

1   inference that Ms. Maxwell is guilty.  Ms. Maxwell begins trial

2   with an absolutely clean slate and without any evidence against

3   her.  You must give no weight to the fact that an indictment

4   has been returned against Ms. Maxwell.

5           I will not read the entire indictment to you at this

6   time; rather, I will first summarize the offenses charged in

7   the indictment, and then explain in detail the elements of each

8   of the offenses.

9           Instruction No. 10.  Summary of indictment.

10           The indictment contains six counts or charges against

11   the defendant.  Each count constitutes a separate offense or

12   crime.  You must consider each count of the indictment

13   separately and you must return a separate verdict on each

14   count.  I am briefly going to summarize each count and then

15   I'll give you the law in greater detail.

16           Count One of the indictment charges Ghislaine Maxwell,

17   the defendant, with conspiring -- that is, agreeing, with

18   others -- to entice an individual to travel in interstate

19   commerce to engage in sexual activity for which a person can be

20   charged with a criminal offense.  Count One relates to multiple

21   alleged victims and the time period 1994 to 2004.

22           Count Two of the indictment charges the defendant with

23   enticing an individual to travel in interstate commerce to

24   engage in sexual activity for which a person can be charged

25   with a criminal offense.  Count Two relates solely to Jane and

the time period 1994 to 1997.

Count Three of the indictment charges the defendant with conspiring with others to transport an individual under the age of 17 in interstate commerce with intent that the individual engaged in sexual activity for which a person can be charged with a criminal offense.  Count Three relates to multiple alleged victims and the time period 1994 to 2004.

Count Four of the indictment charges the defendant with transporting an individual under the age of 17 in interstate commerce, with the intent that the individual engage in sexual activity for which a person could be charged with a criminal offense.  Count Four relates solely to Jane and the time period 1994 to 1997.

Count Five of the indictment charges the defendant with conspiring to engage in sex trafficking of individuals under the age of 18.  Count Five relates to multiple alleged victims in the time period 2001 to 2004.

Count Six of the indictment charges the defendant with sex trafficking of an individual under the age of 18.  Count Six relates solely to Carolyn and the time period 2001 to 2004.

Instruction No. 11.  Multiple counts.

As I just explained, the indictment contains six counts.  Each count charges Ms. Maxwell with a different crime. You must consider each count separately and return a separate verdict of guilty or not guilty for each.  Whether you find Ms.

LCKVMAX8                         Charge

Maxwell guilty or not guilty as to one offense should not
affect your verdict as to any other offense charged unless you
are instructed otherwise.

You may only find Ms. Maxwell guilty of a particular
count if the government has proven each element of the offense
charged with respect to that count beyond a reasonable doubt.

Instruction No. 12.  Conspiracy and substantive
counts.

As I've just described, there are certain counts in
the indictment that are conspiracy counts, while others are
what are referred to as substantive counts.  Unlike the
conspiracy charges which allege agreements to commit certain
offenses, the substantive counts are based on the actual
commission of offenses or aiding others to actually commit
offenses.

A conspiracy to commit a crime is an entirely separate
and different offense from the substantive crime which may be
the object of the conspiracy.  Congress has deemed it
appropriate to make conspiracy standing alone a separate crime,
even if the object of the conspiracy is not achieved.  The
essence of the crime of conspiracy is an agreement or
understanding to violate other laws.  Thus, if a conspiracy
exists, even if it fails, it's still punishable as a crime.
Consequently, in a conspiracy charge, there's no need to prove
that the crime that was the objective of the conspiracy was

LCKVMAX8                       Charge

actually committed.

By contrast, the substantive counts require proof that the crime charge was actually committed, but do not require proof of an agreement.  Of course, if a defendant both participates in a conspiracy to commit a crime and then actually commits that crime, that defendant may be guilty of both the conspiracy and the substantive crime, as I'll instruct you shortly.

We will turn first to the substantive charges in the indictment, which are more convenient to consider before the conspiracy charges.  Therefore, I'll instruct you first on Counts Two, Four, and Six, and then I'll instruct you on Counts One, Three, and Five.

Instruction No. 13.  Count Two, enticement to engage in an illegal sexual activity, the statute.

The relevant statute for Count Two is Title 18, United States Code, Section 2422, which provides that:  "Whoever knowingly persuades, induces, entices, or coerces any individual to travel in interstate commerce or in any territory or possession of the United States to engage in any sexual activity for which any person can be charged with a criminal offense" is guilty of a federal crime.

Instruction No. 14.  Count Two, enticement to engage in illegal sexual activity, the elements.

To prove the defendant guilty of Count Two, the

LCKVMAX8                        Charge

government must prove each of the following three elements

beyond a reasonable doubt:

First, that the defendant knowingly persuaded or

induced or enticed or coerced an individual to travel in

interstate commerce as alleged in the indictment.

Second, that the individual traveled in interstate

commerce.

And third, that the defendant acted with the intent

that the individual would engage in sexual activity for which

any person could be charged with a criminal offense under New

York law as alleged in the indictment.

Count Two relates solely to Jane during the time

period 1994 to 1997.

Instruction No. 15.  Count Two, enticement to engage

in illegal sexual activity.  First element.

The first element of Count Two which the government

must prove beyond a reasonable doubt is that Ms. Maxwell

knowingly persuaded or induced or enticed or coerced an

individual to travel in interstate commerce as alleged in the

indictment.  The terms "persuaded, induced, enticed, and

coerced" have their ordinary everyday meanings.  The term

"interstate commerce" simply means movement from one state to

another.  The term "state" includes a state of the United

States and the District of Columbia.

"Knowingly" defined.

1     Ms. Maxwell must have acted knowingly.  An act is done

2     knowingly when it's done voluntarily and intentionally and not

3     because of accident, mistake, or some other innocent reason.

4     Now, knowledge is a matter of inference from the proven facts.

5     Science has not yet devised a manner of looking into a person's

6     mind and knowing what that person is thinking.  Whether Ms.

7     Maxwell acted knowingly may be proven by Ms. Maxwell's conduct

8     and by all of the facts and circumstances surrounding the case.

9           Instruction No. 16.  Count Two.  Enticement to engage

10    in illegal sexual activity.  Second element.

11          The second element of Count Two which the government

12    must prove beyond a reasonable doubt is that the individual

13    traveled in interstate commerce as alleged in the indictment.

14    As I just stated, "interstate commerce" simply means movement

15    between one state and another.

16          Instruction No. 17.  Count Two.  Enticement to engage

17    in illegal sexual activity.  Third element.

18          The third element of Count Two which the government

19    must prove beyond a reasonable doubt is that Ms. Maxwell acted

20    with the intent that the individual would engage in sexual

21    activity for which any person can be charged with a criminal

22    offense under New York law.

23          "Intentionally" defined.

24          A person acts intentionally when the act is the

25    product of her conscious objective; that is, when she acts

LCKVMAX8                    Charge

deliberately and purposely and not because of mistake or

accident.  Direct proof of a person's intent is almost never

available; it would be a rare case where it could be shown that

a person wrote or stated that as of a given time, she committed

an act with a particular intent.  Such direct proof is not

required.  The ultimate fact of intent, though subjective, may

be established by circumstantial evidence based upon the

defendant's outward manifestations, her words, her conduct, her

acts, and all the surrounding circumstances disclosed by the

evidence and the rational or logical inferences that may be

drawn from them.

                Significant or motivating purpose.

                In order to establish this element, it's not necessary

for the government to prove that the illegal sexual activity

was Ms. Maxwell's sole purpose for encouraging Jane to travel

across state lines.  A person may have several different

purposes or motives for such conduct, and each may prompt in

varying degree the person's actions.  The government must prove

beyond a reasonable doubt, however, that a significant or

motivating purpose of encouraging Jane to travel across state

lines was that she would engage in illegal sexual activity.  In

other words, the illegal sexual activity must not have been

merely incidental to the trip.

                Violation of New York criminal law.

                Count Two alleges that Ms. Maxwell enticed Jane to

1   travel across state lines with the intent that she would engage

2   in sexual activity for which a person could be charged with a

3   crime under the penal law of New York State, namely, New York

4   Penal Law Section 130.55.  I instruct you as a matter of law

5   that sexual abuse in the third degree -- the offense set forth

6   in Count Two of the indictment -- was a violation of New York

7   State Penal Law from in or about 1994, up to and including in

8   or about 1997, at the time the acts are alleged to have been

9   committed.

10          A person violates New York State Penal Law Section

11   130.55, sexual abuse in the third degree, when he or she

12   subjects another person to sexual contact without the latter's

13   consent.  Under New York law, "sexual contact" means any

14   touching of the sexual or other intimate parts of a person for

15   the purpose of gratifying the sexual desire of either party.

16   It includes the touching of the victim by the actor, whether

17   directly or through clothing; as well as the emission of

18   ejaculate by the actor upon any part of the victim, clothed or

19   unclothed.

20          Also under New York law, lack of consent can result

21   from incapacity to consent.  A person less than 17 years old is

22   deemed incapable of consenting to sexual contact under New York

23   law.  Thus, the law deems sexual contact with a person less

24   than 17 years old to be without that person's consent even if,

25   in fact, that person did consent.  However, in order to find

LCKVMAX8                       Charge

that the intended acts were nonconsensual solely because of the victim's age, you must find that Ms. Maxwell knew that Jane was less than 17 years old.

Instruction No. 18.  Count Four.  Transportation of an individual under the age of 17 to engage in illegal sexual activity.  The statute.

The relevant statute for Count Four is Title 18, United States Code, Section 2423(a), which provides that a person who "knowingly transports any individual under the age of 17 years in interstate commerce, with the intent that such individual engage in any sexual activity for which any person can be charged with a criminal offense" is guilty of a federal crime.

Instruction No. 19.  Count Four.  Transportation of an individual under the age of 17 to engage in illegal sexual activity.  The elements.

In order to prove the defendant guilty of Count Four, the government must establish each of the following three elements of the crime beyond a reasonable doubt:

First, that the defendant knowingly transported an individual in interstate commerce as alleged in the indictment.

Second, that the defendant transported the individual with the intent that the individual would engage in sexual activity for which any person can be charged with a criminal offense under New York law as alleged in the indictment.

LCKVMAX8                         Charge

1          And third, that the defendant knew that the individual

2     was less than 17 years old at the time of the acts alleged in

3     Count Four of the indictment.  Count Four also relates solely

4     to Jane during the time period 1994 to 1997.

5          Instruction No. 20.  Count Four.  Transportation of an

6     individual under the age of 17 to engage in illegal sexual

7     activity.  First element.

8          The first element of Count Four which the government

9     must prove beyond a reasonable doubt is that Ms. Maxwell

10    knowingly transported Jane in interstate commerce as alleged in

11    the indictment.  The phrase "to transport an individual in

12    interstate commerce" means to move or carry or cause someone to

13    be moved or carried from one state to another.

14         The government does not have to prove that Ms. Maxwell

15    personally transported Jane across a state line; it is

16    sufficient to satisfy the element that Ms. Maxwell was actively

17    engaged, either personally or through an agent, in the making

18    of the travel arrangements such as by purchasing tickets

19    necessary for Jane to travel as planned.  Ms. Maxwell must have

20    knowingly transported or caused the transportation of Jane in

21    interstate commerce.  That means that the government must prove

22    that Ms. Maxwell knew both that she was causing Jane to be

23    transported and that Jane was being transported in interstate

24    commerce.  As I've explained, an act is done knowingly when

25    it's done voluntarily and intentionally and not because of

LCKVMAX8                    Charge

1  accident, mistake, or some innocent reason.

2          It is the defendant's intent that matters here.  If

3  the government establishes each of the elements of the crime

4  beyond a reasonable doubt, then the defendant is guilty of this

5  charge whether or not the individual agreed or consented to

6  cross state lines.

7          Instruction No. 21.  Count Four.  Transportation of an

8  individual under the age of 17 to engage in illegal sexual

9  activity.  Second element.

10         The second element of Count Four which the government

11  must prove beyond a reasonable doubt is that Ms. Maxwell

12  knowingly transported Jane in interstate commerce with the

13  intent that Jane engage in sexual activity for which any person

14  can be charged with a criminal offense in violation of New York

15  law.

16         Like Count Two, Count Four alleges sexual activity for

17  which an individual could be charged with a violation of New

18  York Penal Law, Section 130.55, sexual abuse in the third

19  degree.  I've already instructed you regarding that crime, and

20  those instructions apply equally here.

21         In order to establish this element, it's not necessary

22  for the government to prove that the illegal sexual activity

23  was Ms. Maxwell's sole purpose for transporting Jane across

24  state lines.  A person may have several different purposes or

25  motives for such conduct, and each may prompt in varying degree

LCKVMAX8                         Charge

the person's actions.

The government must prove beyond a reasonable doubt, however, that a significant or motivating purpose of Jane's travel across state lines was that she would engage in illegal sexual activity; in other words, the illegal sexual activity must not have been merely incidental to the trip.

Instruction No. 22.  Count Four.  Transportation of an individual under the age of 17 to engage in illegal sexual activity.  Third element.

The third element of Count Four which the government must prove beyond a reasonable doubt is that Ms. Maxwell knew that Jane was less than 17 years old at the time of the acts alleged in Count Four of the indictment.

Instruction No. 23.  Counts Two and Four.  Failure to accomplish intended activity is immaterial.

Now, with respect to Counts Two and Four, it is not a defense that the sexual activity which may have been intended by the defendant was not accomplished.  In other words, it's not necessary for the government to prove that anyone, in fact, engaged in any sexual activity for which any person can be charged with a criminal offense with the individual after she was enticed for Count Two or transported for Count Four across state lines.  It is enough if the defendant has the requisite intent at the time of the enticement or transportation.

Instruction No. 24.  Count Six.  Sex trafficking of an

LCKVMAX8                          Charge

1    individual under the age of 18.  Statute.

2              The relevant statute for Count Six is Title 18, United

3    States Code, Section 1591, which provides, in pertinent part,

4    that:  "Whoever knowingly, in or affecting interstate commerce,

5    recruits, entices, harbors, transports, provides, or obtains by

6    any means a person, knowing that the person has not attained

7    the age of 18 years and will be caused to engage in a

8    commercial sex act" is guilty of a crime.

9              Instruction No. 25.  Count Six.  Sex trafficking of an

10   individual under the age of 18.  The elements.

11             To find the defendant guilty of Count Six, the

12   government must prove each of the following four elements

13   beyond a reasonable doubt:

14             First, the defendant knowingly recruited, enticed,

15   harbored, transported, provided, or obtained a person.

16             Second, the defendant knew that the person was under

17   the age of 18 years.

18             Third, the defendant knew that the person would be

19   caused to engage in a commercial sex act.

20             And fourth, the defendant's acts were in or affecting

21   interstate commerce.

22             The count relates solely to Carolyn during the time

23   period 2001 to 2004.

24             Instruction No. 26.  Count Six.  Sex trafficking of an

25   individual under the age of 18.  First element.

LCKVMAX8                    Charge

1            The first element of Count Six which the government

2      must prove beyond a reasonable doubt is that Ms. Maxwell

3      knowingly recruited, enticed, harbored, transported, provided,

4      or obtained a person, Carolyn.  The terms "recruited, enticed,

5      harbored, transported, provided, and obtained" have their

6      ordinary everyday meanings.  And considering whether Ms.

7      Maxwell has acted knowingly, please apply the definition of

8      "knowingly" previously provided to you.

9            Instruction No. 27.  Count Six.  Sex trafficking of an

10     individual under the age of 18.  Second element.

11           The second element of Count Six which the government

12     must prove beyond a reasonable doubt is that Ms. Maxwell knew

13     that Carolyn was under the age of 18.  In considering whether

14     Ms. Maxwell knew that Carolyn had not attained the age of 18,

15     please apply the definition of "knowingly" previously provided

16     to you.

17           Instruction No. 28.  Count Six.  Sex trafficking of an

18     individual under the age of 18.  Third element.

19           The third element of Count Six which the government

20     must prove beyond a reasonable doubt is that Ms. Maxwell knew

21     that the person Carolyn would be caused to engage in a

22     commercial sex act.  The term "commercial sex act" means any

23     sex act on account of which anything of value is given to or

24     received by any person.  The thing of value may be money or any

25     other tangible or intangible thing of value that may be given

LCKVMAX8                    Charge

1  to or received by any person, regardless of whether the person

2  who receives it is the person performing the commercial sex

3  act.  It's not relevant whether or not Carolyn was a willing

4  participant in performing commercial sex acts when she was

5  under the age of 18 years old.

6          Consent by the person is not a defense to the charge

7  in Count Six of the indictment if Carolyn was under the age of

8  18 at the time the commercial sex acts took place.  It's also

9  not required that the person actually performed a commercial

10 sex act, so long as the government has proved that Ms. Maxwell

11 recruited, enticed, harbored, transported, provided, or

12 obtained the person for the purpose of engaging in commercial

13 sex acts.

14         Instruction No. 29.  Count Six.  Sex trafficking of an

15 individual under the age of 18.  Fourth element.

16         The fourth and final element of Count Six which the

17 government must prove beyond a reasonable doubt is that Ms.

18 Maxwell's conduct was in interstate commerce or affected

19 interstate commerce.  "Interstate commerce" simply means the

20 movement of goods, services, money, and individuals between any

21 two or more states.

22         I instruct you that acts and transactions that cross

23 state lines or which affect the flow of money in the stream of

24 commerce to any degree, however minimal, are acts and

25 transactions affecting interstate commerce.  For instance, it

LCKVMAX8                    Charge

affects interstate commerce to use products that traveled in interstate commerce.  It's not necessary for the government to prove that Ms. Maxwell specifically knew or intended that her conduct would affect interstate commerce; it's only necessary that the natural consequences of such conduct would affect interstate commerce in some way, even if minor.

If you find beyond a reasonable doubt that the recruitment, enticement, harboring, transportation, providing, or obtaining of a person for the purpose of engaging in commercial sex acts was economic in nature and involved the crossing of state lines or was economic in nature and otherwise affected the flow of money to any degree, however minimal, you may find that the interstate commerce requirement of the offense of sex trafficking of an individual under the age of 18 has been satisfied.

I further instruct you that to find this element has been proven beyond a reasonable doubt, it's not necessary for you to find that any interstate travel occurred.  Proof of actual travel is not required.

Instruction No. 30.  Counts Two, Four, and Six. Aiding and abetting.

In connection with the crimes charged in Counts Two, Four, and Six, the defendant is also charged with aiding and abetting the commission of those crimes.  Aiding and abetting liability is its own theory of criminal liability.  In effect,

1    it's a theory of liability that permits a defendant to be

2    convicted of a specified crime if the defendant, while not

3    herself committing the crime, assisted another person or

4    persons in committing the crime.  As to Counts Two, Four, and

5    Six, therefore, the defendant can be convicted either if she

6    committed the crime herself or if another person committed the

7    crime and the defendant aided and abetted that person to commit

8    that crime.

9              Under the federal aiding and abetting statute, whoever

10   "aids, abets, counsels, commands, induces, or procures" the

11   commission of an offense is punishable as a principle.  You

12   should give those words their ordinary meaning.  A person aids

13   or abets a crime if she knowingly does some act for the purpose

14   of aiding or encouraging the commission of that crime with the

15   intention of causing the crime charged to be committed.

16             "To counsel" means to give advice or recommend.  "To

17   induce" means to lead or move by persuasion or influence as to

18   some action or state of mind.  "To procure" means to bring

19   about by unscrupulous or indirect means.  "To cause" means to

20   bring something about to effect something.  In other words,

21   it's not necessary for the government to show that Ms. Maxwell

22   herself physically committed the crime charged in order for you

23   to find her guilty.  This is because a person who aids, abets,

24   counsels, commands, induces, or procures the commission of a

25   crime is just as guilty of that offense as if she committed it

LCKVMAX8                    Charge

1    herself.  Accordingly, you may find Ms. Maxwell guilty of the

2    offenses charged in Counts Two, Four, and Six if you find

3    beyond a reasonable doubt that the government has proven that

4    another person actually committed the offense with which Ms.

5    Maxwell is charged, and that Ms. Maxwell aided, abetted,

6    counseled, commanded, induced, or procured that person to

7    commit the crime.

8         As you can see, the first requirement is that another

9    person has committed the crime charged.  Obviously, no one can

10   be convicted of aided and abetting the criminal acts of another

11   if no crime was committed by the other person.  But if you find

12   that a crime was committed, then you must consider whether Ms.

13   Maxwell aided or abetted the commission of the crime.

14        To aid or abet another to commit a crime, it is

15   necessary that the government prove that the defendant

16   willfully and knowingly associated herself in some way with the

17   crime committed by the other person, and willfully and

18   knowingly sought by some act to help commit the crime succeed.

19        However, let me caution you that the mere presence of

20   the defendant where a crime is being committed, even coupled

21   with knowledge by the defendant that a crime is being

22   committed, or the mere acquiescence by a defendant in the

23   criminal conduct of others, even with guilty knowledge, is not

24   sufficient to make the defendant guilty under this approach of

25   aiding and abetting.  Such a defendant would be guilty under

LCKVMAX8                        Charge

this approach of aiding and abetting only if, in addition to
knowing of the criminal activity, she actually took actions
intended to help it succeed.  An aider and abettor must know
that the crime is being committed and act in a way that is
intended to bring about the success of a criminal venture.

To determine whether Ms. Maxwell aided or abetted the
commission of the crime with which she is charged, ask yourself
these questions:

One.  Did the defendant participate in the crime
charged as something she wished to bring about?

Two.  Did the defendant knowingly and willfully
associate herself with the criminal venture?

Three.  Did the defendant seek by her actions to make
the criminal venture succeed?

If she did, then Ms. Maxwell is an aider and abettor
and, therefore, guilty of the offense.  If, on the other hand,
your answer to any of these questions is no, then Ms. Maxwell
is not an aider and abettor, and you must find her not guilty
under that theory.

Instruction No. 31.  Counts One, Three, and Five.
Conspiracy to violate federal laws.  Conspiracy and substantive
counts.

Counts One, Three, and Five of the indictment each
charge Ms. Maxwell with participating in a "conspiracy."  The
statute for Counts One, Three, and Five is Title 18, United

LCKVMAX8                    Charge

States Code, Section 371, which provides that:  "If two or more

people conspire to commit any offense against the United

States, and one or more of such persons do any act to effect

the object of the conspiracy, each person is guilty of a

federal crime."

          As I'll explain, a conspiracy is a kind of criminal

partnership, an agreement of two or more people, to join

together to accomplish some unlawful purpose.  The crime of

conspiracy to violate federal laws is an independent offense;

it is separate and distinct from the actual violation of any

specific federal laws which the law refers to as "substantive

crimes."

          Indeed, you may find Ms. Maxwell guilty of conspiring

to violate federal laws, even if you find that the crime which

was the object of the conspiracy was never actually committed.

As I'll explain, the three different conspiracy counts are

separate offenses, and each conspiracy alleges a different

purpose, which I'll describe to you shortly.

          Instruction No. 32.  Counts One, Three, and Five.

Conspiracy to violate federal law.  The elements.

          To prove the defendant guilty of the crime of

conspiracy, the government must prove each of the following

four elements beyond a reasonable doubt:

          First, that two or more persons entered the unlawful

agreement charged in the particular count of the indictment.

LCKVMAX8                    Charge

1          Second, that the defendant knowingly and willfully

2     became a member of that conspiracy.

3          Third, that one of the members of the conspiracy

4     knowingly committed at least one overt act.

5          And fourth, that the overt act which you find to have

6     been committed was committed to further some objective of that

7     conspiracy.

8          Each of these elements must be satisfied beyond a

9     reasonable doubt.

10          Now, let us separately consider each of these

11     elements.

12          Instruction No. 33.  Counts One, Three, and Five.

13     Conspiracy to violate federal law.  First element.

14          Starting with the first element, what is a conspiracy?

15          A conspiracy is an agreement or an understanding

16     between two or more persons to accomplish by joint action a

17     criminal or unlawful purpose.  The essence of the crime of

18     conspiracy is the unlawful agreement between two or more people

19     to violate the law.

20          As I mentioned earlier, the ultimate success of the

21     conspiracy, meaning the actual commission of the crime that is

22     the object of the conspiracy, is not an element of the crime of

23     conspiracy.  In order to show that a conspiracy existed, the

24     evidence must show that two or more people in some way or

25     manner, through any contrivance, explicitly or implicitly --

LCKVMAX8                    Charge

that is, spoken or unspoken -- came to a mutual understanding
to violate the law and to accomplish an unlawful plan.

          Express language or specific words are not required to
indicate assent or attachment to a conspiracy.  If you find
beyond a reasonable doubt that two or more persons came to an
understanding, express or implied, to violate the law and to
accomplish an unlawful plan, then the government will have
sustained its burden of proof as to this element.

          To show that a conspiracy existed, the government is
not required to show that two or more people sat around a table
and entered into a solemn pact orally or in writing stating
that they had formed a conspiracy to violate the law, spelling
out all of the details.  Common sense tells you that when
people, in fact, agree to enter into a criminal conspiracy,
much is left to the unexpressed understanding.  It is rare that
a conspiracy can be proven by direct evidence of an explicit
agreement.  Conspirators do not usually reduce their agreements
to writing or acknowledge them before a notary public, nor do
they publicly broadcast their plans.

          In determining whether an agreement existed, you may
consider direct as well as circumstantial evidence.  The old
adage "actions speak louder than words" applies here.  Often
the only evidence that is available with respect to the
existence of a conspiracy is that of disconnected acts and
conduct on the part of the alleged individual co-conspirators.

LCKVMAX8                        Charge

1    When taken all together and considered as whole, however, these

2    acts and conduct may warrant the inference that a conspiracy

3    existed as conclusively as would direct proof, such as evidence

4    of an express agreement.

5          In short, as far as the first element of the

6    conspiracy is concerned, the government must prove beyond a

7    reasonable doubt that at least two alleged conspirators came to

8    a mutual understanding, either spoken or unspoken, to violate

9    the law in the manner charged in Counts One, Three, and Five of

10   the indictment.

11         Instruction No. 34.  Counts One, Three, and Five.

12   Conspiracy to violate federal law.  First element.  Object of

13   the conspiracy.

14         Count One charges Ms. Maxwell with participating in a

15   conspiracy from at least in or about 1994, up to and including

16   in or about 2004, to entice individuals under the age of 17 to

17   travel to engage in sexual activity for which any person can be

18   charged with a criminal offense.  The object of the conspiracy

19   charged in Count One of the indictment is to entice individuals

20   under the age of 17 to travel to engage in sexual activity for

21   which any person could be charged with a criminal offense.

22         I have already reviewed the elements of that offense

23   in connection with Count Two.  If you find beyond a reasonable

24   doubt that the defendant agreed with at least one other person

25   that those elements be done, then the enticement of individuals

LCKVMAX8                    Charge

under the age of 17 to travel to engage in sexual activity for which any person could be charged with a criminal offense objective would be proved.

Count Three charges the defendant with participating in a conspiracy from at least in or about 1994, up to and including in or about 2004, to transport individuals under the age of 17 with the intent to engage in sexual activity for which any person can be charged with a criminal offense.

The object of the conspiracy charged in Count Three of the indictment is to transport individuals under the age of 17 with the intent to engage in sexual activity for which any person can be charged with a criminal offense. I've already reviewed the elements of that offense in connection with Count Four. If you find beyond a reasonable doubt that the defendant agreed with at least one other person that those elements be done, then the transportation of individuals under the age of 17 with the intent to engage in sexual activity for which any person can be charged with a criminal offense objective would be proved.

(Continued on next page)

LCKCmax9                          Charge

1          THE COURT:  Finally, Count Five charges Ms. Maxwell

2     with participating in a conspiracy from at least in or about

3     2001 up to and including in or about 2004 to commit sex

4     trafficking of individuals under the age of 18.

5          The object of the conspiracy charged in Count Five of

6     the indictment is to commit sex trafficking of individuals

7     under the age of 18.  I've already reviewed the elements of

8     that offense in connection with Count Six.

9          If you find beyond a reasonable doubt that Ms. Maxwell

10     agreed with at least one other person that those elements be

11     done, then the sex trafficking of individuals under the age of

12     18 objective would be proved.

13          Instruction No. 35, Counts One, Three, and Five:

14     Conspiracy to Violate Federal Law — Second Element:  Membership

15     in the Conspiracy.

16          With respect to each of Counts One, Three, and Five,

17     if you conclude that the government has proven beyond a

18     reasonable doubt that the relevant conspiracy existed and that

19     the conspiracy had the object I just mentioned, then you

20     must -- you must next consider the second element, namely,

21     whether Ms. Maxwell knowingly and willfully participated in the

22     conspiracy knowing its unlawful purpose and intending to

23     further its unlawful objectives.

24          In order to satisfy the second elements of Counts One,

25     Three, or Five, the government must prove beyond a reasonable

LCKCmax9                    Charge

1    doubt that Ms. Maxwell knowingly and willfully entered into the

2    conspiracy charged in the particular count with a criminal

3    intent, that is with a purpose to violate the law, and that she

4    agreed to take part in the conspiracy to further promote and

5    cooperate in its unlawful objective.

6           Willfully and Knowingly.

7           An act it is done knowingly and willfully if it's done

8    deliberately and purposefully.  That is, Ms. Maxwell's actions

9    must have been her conscious objective rather than a product of

10   a mistake or accident, mere negligence or some other innocent

11   reason.

12          To satisfy its burden of proof that Ms. Maxwell

13   willfully and knowingly became a member of a conspiracy to

14   accomplish an unlawful purpose, the government must prove

15   beyond a reasonable doubt Ms. Maxwell knew that she was a

16   member of an operation or conspiracy to accomplish that

17   unlawful purpose and that her action of joining such an

18   operation or conspiracy was not due to carelessness,

19   negligence, or mistake.

20          Now, as I've said, knowledge is a matter of inference

21   from the proven facts.  Science has not yet devised a manner of

22   looking into a person's mind and knowing what that person is

23   thinking.  However, you do have before you the evidence of

24   certain acts of conversations alleged to have taken place

25   involving Ms. Maxwell or in her presence.  You may consider

LCKCmax9                          Charge

1   this evidence in determining whether the government has proven

2   beyond a reasonable doubt Ms. Maxwell's knowledge of the

3   unlawful purposes of the conspiracy.

4          It is for you to determine whether the government has

5   established beyond a reasonable doubt that such knowledge and

6   intent on the part of Ms. Maxwell existed.  It is important for

7   you to know that Ms. Maxwell's participation in the conspiracy

8   must be established by independent evidence of her own acts or

9   statements, as well as those of the alleged coconspirators and

10  the reasonable inferences that may be drawn from that evidence.

11         It's not necessary for government to show that

12  Ms. Maxwell was fully informed of all the details of the

13  conspiracy in order for you to infer knowledge on her part.  To

14  have guilty knowledge, Ms. Maxwell need not have known the full

15  extent of the conspiracy or all of the activities of all of its

16  participants.  It's not even necessary for a defendant to know

17  every other member of the conspiracy.

18         In addition, the duration and extent of Ms. Maxwell's

19  participation has no bearing on the issue of her guilt.  She

20  need not have joined the conspiracy at the outset.  Ms. Maxwell

21  may have joined it for any purpose at any time in its progress

22  and she will be held responsible for all that was done before

23  she joined and all that was done during the conspiracy's

24  existence while she was a member.  Each member of a conspiracy

25  may perform separate and distinct acts and may perform them at

LCKCmax9                          Charge

```
 1   different times.  Indeed, a single act may be enough to bring
 2   one within the membership of the conspiracy, provided that
 3   Ms. Maxwell was aware of the conspiracy, and knowingly
 4   associated herself with its criminal aims.  It does not matter
 5   whether Ms. Maxwell's role in the conspiracy may have been more
 6   limited than or different in nature or the length of time from
 7   the roles of her coconspirators, provided she was, herself, a
 8   participant.
 9           I want to caution you, however, that Ms. Maxwell's
10   mere presence at the scene of the alleged crime does not by
11   itself make her a member of the conspiracy.  Similarly, a
12   person may know, assemble with, or be friendly with one or more
13   members of a conspiracy without being a conspirator herself.  I
14   want to caution you that mere knowledge or acquiescence,
15   without participation in the unlawful plan, is not sufficient.
16   In other words, knowledge without agreement and participation
17   is not sufficient.  What is necessary is that Ms. Maxwell -- is
18   that Ms. Maxwell participate in the conspiracy with knowledge
19   of its unlawful purposes and with an intent to aid in the
20   accomplishment of its unlawful objectives.
21           It's also not necessary that Ms. Maxwell receive or
22   even anticipate any financial benefit from participating in the
23   conspiracy as long as she participated in it in the way I've
24   explained.  That said, while proof of a financial interest in
25   the outcome of a scheme is not essential, if you find that
```

1    Ms. Maxwell had such an interest, that is a factor which you

2    may properly consider in determining whether or not she was a

3    member of the conspiracy charged in the indictment.

4           Once a conspiracy is formed, it is presumed to

5    continue until either its objective is accomplished or there is

6    some affirmative act of termination by the members.  So too,

7    once a person is found to be a member of a conspiracy, she is

8    presumed to continue as a member in that conspiracy until the

9    conspiracy is terminated unless it's shown by some affirmative

10   proof that the person withdrew and disassociated herself

11   prosecute it.

12          In sum, the defendant, with an understanding of the

13   unlawful nature of the conspiracy, may have intentionally

14   engaged, advised, or assisted in the conspiracy for the purpose

15   of furthering an illegal undertaking.  The defendant thereby

16   becomes a knowing and willful participant in the unlawful

17   agreement, that is to say, she becomes a conspirator.

18          Instruction No. 36:  Counts One, Three, and Five:

19   Conspiracy to Violate Federal Law — Third Element.

20          The third element that the government must prove

21   beyond a reasonable doubt to establish the offense of

22   conspiracy is that at least one overt act was knowingly

23   committed by at least one of the conspirators.  The overt act

24   element requires the government to show something more than

25   mere agreement.  Some overt step or action must have been taken

LCKCmax9                     Charge

1    by at least one of the conspirators in furtherance of that

2    conspiracy.  In other words, the government must show that the

3    agreement went beyond the mere talking stage.  It must show

4    that at least one the conspirators in furtherance of the

5    conspiracy.

6         With respect to the overt acts for Count One, the

7    indictment alleges as follows:

8         One, between in or about 1994 and in or about 1997,

9    when Jane was under the age of 17, Maxwell participated in

10   multiple group sexual encounters with Epstein and Jane in New

11   York and Florida.

12        Two, in or about 1996, when Jane was under the age of

13   17, Jane was enticed to travel from Florida to New York for

14   purposes of sexually abusing her at the New York residence in

15   violation of New York Penal Law, Section 130.55.

16        Three, in or about 1996, Maxwell provided Annie with

17   an unsolicited massage in New Mexico during which Annie was

18   topless.

19        Four, between in or about 2001 and in or about 2002,

20   when Carolyn was under the age of 17, Maxwell and Epstein

21   invited Carolyn to travel from Florida to a place outside of

22   Florida with Epstein.

23        With respect to the overt acts to Count Three, the

24   indictment alleges as follows:

25        Between in or about 1994 and in or about 1997 when

LCKCmax9                         Charge

Jane was under the age of 17, Maxwell participated in multiple group sexual encounters with Epstein and Jane in New York and Florida.

Two, in or about 1996 when Jane was under the age of 17, Jane was enticed to travel from Florida to New York for purposes of sexually abusing her at the New York residence in violation of New York Penal Law, Section 130.55.

Three, in or about 1996, Maxwell provided Annie with an unsolicited massage in New Mexico during which Annie was topless.

Four, between in or about 2001 and in or about 2002 when Carolyn was under the age of 17, Maxwell and Epstein invited Carolyn to travel from Florida to a place outside of Florida with Epstein.

With respect to the overt acts for Count Five, the indictment alleges as follows:

One, between in or about 2001 and in or about 2004, Epstein and Maxwell recruited Carolyn to engage in sex acts with Epstein at the Palm Beach residence after which Epstein and, at times, Maxwell provided Carolyn with hundreds of dollars in cash for each encounter.  Carolyn truthfully told both Epstein and Maxwell her age.

Two, between in or about 2001 and in or about 2004, Epstein and Maxwell both encouraged and enticed Carolyn to recruit other girls to engage in paid sex acts with Epstein,

LCKCmax9                           Charge

1    which she did.

2              Three, between in or about 2001 and in or about 2004,

3    Epstein's employees sent Carolyn gifts, including lingerie from

4    an address in the Southern District of New York to Carolyn's

5    residence in Florida.  For example, on one occasion, in or

6    about October of 2002, Epstein caused a package to be sent by

7    Federal Express from an address in Manhattan to Carolyn in

8    Florida.

9              Four, on multiple occasions between in or about 2001

10   and in or about 2004, Epstein, Maxwell, or one of Epstein's

11   other employees called Carolyn to schedule an appointment for

12   Carolyn to massage Epstein.  For example, in or about April of

13   2004 or May of 2004, another employee of Epstein's called

14   Carolyn to schedule such appointments.

15             In order for government to satisfy this element, it's

16   not necessary for the government to prove that Ms. Maxwell

17   committed the overt act.  It is sufficient for the government

18   to show that any of the members of the conspiracy knowingly

19   committed some overt act in furtherance of the conspiracy.

20             Further, the overt act need not be one that is alleged

21   in the indictment.  Rather, it can be any overt act that is

22   substantially similar to those acts alleged in the indictment,

23   if you are convinced that the act occurred while the conspiracy

24   was still in existence and that it was done in furtherance of

25   the conspiracy as described in the indictment.

LCKCmax9                          Charge

1        In addition, you need not be unanimous as to which

2   overt act you find to have been committed.  It is sufficient as

3   long as all of you find that at least one overt act was

4   committed by one of the conspirators.

5        As to Counts One and Three, the government has to

6   prove that at least one of the overt acts in furtherance of

7   that conspiracy involved a witness other than Kate.  Put

8   simply, you may not convict Ms. Maxwell on Counts One or Three

9   solely on the basis of Kate's testimony or an overt act

10  involving Kate.

11       You are further instructed that the overt act need not

12  have been committed at precisely at the time alleged in the

13  indictment.  It is sufficient if you are convinced beyond a

14  reasonable doubt that it occurred at or about the time and

15  place stated.

16       Instruction No. 37:  Counts One, Three, and Five:

17  Conspiracy to Violate Federal Law — Fourth Element.

18       The fourth and final element which the government must

19  prove beyond a reasonable doubt is that the overt act was

20  committed for the purpose of carrying out the unlawful

21  agreement.

22       In order for the government to satisfy this element,

23  it must prove beyond a reasonable doubt that at least one overt

24  act was knowingly and willfully done by at least one

25  coconspirator in furtherance of some object or purpose of the

LCKCmax9                         Charge

conspiracy as charged in the indictment.

In this regard, you should bear in mind that the overt act, standing alone, may be an innocent, lawful act. Frequently, however, an apparently innocent act sheds its harmless character if it is a step in carrying out, promoting, aiding, or assisting the conspiratorial scheme.  You are therefore instructed that the overt act does not have to be an act which, in and of itself, is criminal or constitutes an objective of the conspiracy.

Instruction No. 38:  Counts One, Three, and Five: Liability for Acts and Declarations of Coconspirators.

When people enter into a conspiracy to accomplish an unlawful end, they become agents or partners of one another in carrying out the conspiracy.  Accordingly, the reasonably foreseeable acts, declarations, statements, and omissions of any member of the conspiracy and in furtherance of the common purse purpose of the conspiracy are deemed under the law to be acts of all of the members.  All of the members are responsible for such acts, declarations, and statements, and omissions.

If you find beyond a reasonable doubt that the defendant knowingly and willfully participated in the conspiracy charged in the indictment, then any acts done or statements made in furtherance of the conspiracy by persons also found by you to have been members of that conspiracy may be considered against the defendant.  That is so even if such

LCKCmax9                        Charge

 1    acts were done and statements were made in the defendant's

 2    absence and without her knowledge.  However, before you may

 3    consider the statements or act of a coconspirator in deciding

 4    the issue of the defendant's guilt, you must first determine

 5    that the acts and statements were made during the existence and

 6    if in furtherance of the unlawful scheme.  If the acts were

 7    done or the statements made by someone whom you do not find to

 8    have been a member of the conspiracy at the time of the acts or

 9    statements or if they were not done or said in furtherance of

10    the conspiracy, they may not be considered by you as evidence

11    against the defendant.

12              Instruction No. 39:  Conscious Avoidance.

13              This includes my instruction on the crimes charged in

14    the indictment, but before I move on to my remaining

15    instructions, I want to instruct you on the instruction of

16    conscious avoidance.

17              Each of the counts charged in the indictment requires

18    the government to prove the defendant acted knowingly.  As I've

19    already defined that term, if a person is actually aware of a

20    fact, then she knows that fact, but in determining whether the

21    defendant acted knowingly, you may also consider whether the

22    defendant deliberately closed her eyes to what otherwise would

23    have been obvious.

24              To be clear, the necessary knowledge on the part of

25    the defendant with respect to any particular charge cannot be

established by a showing that the defendant was careless,

negligent, or foolish.  However, one may not willfully and

intentionally remain ignorant of a material fact and important

to her conduct in order to escape the consequences of criminal

law.  The law calls this conscious avoidance or willful

blindness.

An argument by the government of conscious avoidance

is not a substitute for proof, it is simply another factor that

you, the jury, may consider in deciding what the defendant

knew.  Thus, if you find beyond a reasonable doubt that the

defendant was aware that there was a high probability a crime

was being committed but that the defendant deliberately and

consciously avoided confirming this fact such as by

purposefully closing her eyes to it or intentionally failing to

investigate it, then you may treat this deliberate avoidance of

positive knowledge as the equivalent of knowledge, unless you

find that defendant actually believed that she was not engaged

in such unlawful behavior.  In other words, a defendant cannot

avoid criminal responsibility for her own conduct by

deliberately closing her eyes or remaining purposefully

ignorant of facts which would confirm to her that she was

engaged in unlawful conduct.

With respect to the conspiracy counts, you must also

keep in mind that there is an important difference between

knowingly and intentionally participating in a conspiracy, on

LCKCmax9                          Charge

1    the one hand — and which I just explained to you — and knowing

2    the specific objective of the conspiracy on the other.  You may

3    consider conscious avoidance in deciding whether the defendant

4    knew the objective of a conspiracy, that is whether she

5    reasonably believed that there was a high probability that a

6    goal of the conspiracy was to commit the crime charged as

7    objects of the conspiracy and took deliberate and conscious

8    action to avoid confirming that fact, but participated in the

9    conspiracy anyway.  But conscious avoidance cannot be used as a

10   substitute for finding that the defendant knowingly and

11   intentionally joined the conspiracy in the first place.  It is

12   logically impossible for a defendant to intend to agree to join

13   a conspiracy if she does not actually know it exists.

14          In sum, if you find the defendant believed there was a

15   high probability that a fact was so and that the defendant took

16   deliberate and conscious action to avoid learning the truth of

17   the fact, you may find that the defendant acted knowingly with

18   respect to that fact.  However, if you find that the defendant

19   actually believed the fact was not so, then you may not find

20   that she has acted knowingly with respect to that fact.

21          Instruction No. 40:  Venue.

22          With respect to each of the counts of the indictment,

23   you must also consider the issue of venue, namely whether any

24   act in furtherance of the unlawful activity charged in that

25   count occurred within the Southern District of New York.  The

LCKCmax9                          Charge

1    Southern District of New York encompasses the following

2    counties New York County, i.e., Manhattan, Bronx, Westchester,

3    Rockland, Putnam, Dutchess, Orange, and Sullivan Counties.

4    Anything that occurs in any of those places occurs in the

5    Southern District of New York.

6              Venue must be examined separately for each count in

7    the indictment.  Venue on one count does not establish venue on

8    another.  If applicable, you may rely on the same evidence to

9    establish evidence on multiple counts.

10             The government need not prove venue beyond a

11   reasonable doubt, but only by a mere preponderance of the

12   evidence.  A preponderance of the evidence means more likely

13   than not.  Thus, the government, which does bear the burden of

14   proving venue, has satisfied that if you conclude that it is

15   more likely than not that some furtherance of each charged

16   offense occurred in the Southern District of New York.  If, on

17   the other hand, you find that the government has failed to

18   prove the venue requirement as to a particular offense, then

19   you must acquit Ms. Maxwell of that offense even if all the

20   other elements of the offense are proven.

21             Instruction No. 41:  Time of Offense.

22             The indictment alleges that certain conduct occurred

23   on or about various dates or during various time periods.  It's

24   not necessary, however, for the government to prove that any

25   conduct alleged occurred exactly on such dates or throughout

LCKCmax9                          Charge

any such time periods.  As long as the conduct occurred around

any dates or within any time periods the indictment alleges it

occurred, that is sufficient.

           Instruction No. 42:  Direct and Circumstantial

Evidence.

           I turn now to some general instructions.

           There are two types of evidence that you may use in

reaching your verdict.  One type of evidence is direct

evidence.  One kind of direct evidence is a witness's testimony

about something that the witness knows by virtue of his or her

own senses, something that the witness has seen, smelled,

touched, or heard.  Direct evidence may also be in the form of

an exhibit.

           The other type of evidence is circumstantial evidence.

Circumstantial evidence is evidence that tends to prove one

fact by proof of other facts.

           There a simple example of circumstantial evidence,

it's often used in the courthouse.  Assume that when you came

into the courthouse this morning, the sun was shining and it

was a nice day.  Assume that there are blinds on the courtroom

windows that are drawn and you can't look outside.  As you're

sitting here, someone walks in with an umbrella that's dripping

wet.  Someone else then walks in with a raincoat that's also

dripping wet.  Now you can't look outside to courtroom and you

can't see whether or not it's raining, so you have no direct

LCKCmax9                    Charge

evidence of that fact, but on the combination of the facts that
I've asked you to assume, it would be reasonable and logical
for you to conclude that between the time you arrived at the
courthouse and the time these people walked in it had started
to rain.

That's all there is to circumstantial evidence.  You
infer based on reason, experience, and common sense from an
established fact the existence or the nonexistence of some
other fact.  Many facts, such as a person's state of mind, can
only rarely be proved by direct evidence.

Circumstantial evidence is of no less value than of
direct evidence.  It is a general rule that the law makes no
distinction between direct and circumstantial evidence, but
simply requires that, before convicting Ms. Maxwell, you, the
jury, must be satisfied of her guilt beyond a reasonable doubt
from all of the evidence in the case.

Instruction No. 43:  Inferences.

During the trial, and as I give you these
instructions, you've heard and will hear the term inference.
For instance, if, in their closing arguments, attorneys have
asked you to infer based on your reason, experience, and common
sense from one or more established facts the existence of some
other fact.  I've instructed you on circumstantial evidence in
that it involves inferring a fact based on other facts, your
reason, and common sense.

LCKCmax9                        Charge

1          What is an inference?  What does it mean to infer

2     something?  An inference is not a suspicion or a guess.  It is

3     a reasoned, logical decision to conclude that a disputed fact

4     exists based on another fact that you are satisfied exists.

5          There are times when different inferences may be drawn

6     from different facts, whether proved by direct or

7     circumstantial evidence.  The government asks you to draw one

8     set of inferences while the defense asks you to draw another.

9     It is for you and you alone to decide what inferences you will

10    draw.  The process of drawing inferences from facts in evidence

11    is not a matter of guesswork or speculation.  An inference is a

12    deduction or a conclusion that you, the jury, are permitted but

13    not required to draw from the facts that have been established

14    by either direct or circumstantial evidence.

15          In drawing inferences, you should exercise your common

16    sense.  Therefore, while you're considering the evidence

17    presented to you, you may draw from the facts that you find to

18    be proven such reasonable inferences as would be justified in

19    light of your experience.  Some inferences, however, are

20    impermissible.  You may not infer that Ms. Maxwell is guilty of

21    participating in criminal conduct if you find merely that she

22    was present at the time the crime was being committed and had

23    knowledge that it was being committed.  Nor may you use

24    evidence that I instructed you was admitted for a limited

25    purpose for any inference beyond that limited purpose.

LCKCmax9                          Charge

1          In addition, you may not infer that Ms. Maxwell is

2     guilty of participating in criminal conduct merely from the

3     fact that she associated with other people who were guilty of

4     wrongdoing or merely because she had has or had knowledge of

5     the wrongdoing of others.

6          Here again, let me remind you that, whether based upon

7     direct or circumstantial evidence or upon logical reasonable

8     inferences drawn from such evidence, you must be satisfied of

9     the guilt of Ms. Maxwell as to each count charged before you

10    may convict her as to that count.

11          Instruction No. 44:  Credibility of Witnesses.

12          You've had the opportunity to observe the witnesses.

13    It is your job to decide how believable each witness was in his

14    or her testimony.  You are the sole judges of the credibility

15    of the witnesses.

16          How do you evaluate the credibility or believability

17    of the witness?  The answer is that you use your common sense,

18    judgment, and experience.  Common sense is your greatest asset

19    as a juror.  You should ask yourself, did the witness impress

20    to you as honest, open, and candid?  Or did the witness appear

21    evasive as though the witness was trying to hide something?

22    How responsive was the witness to the questions asked on direct

23    examination and on cross examination?  Consider the witness's

24    demeanor, manner of testifying, and accuracy of the witness's

25    recollection.  In addition, consider how well the witness

1    recounted what was heard or observed as the witness may be

2    honest but mistaken.

3           If you find that a witness is intentionally telling a

4    falsehood, that is always a matter of importance that you

5    should weigh carefully.  If you find that any witness has lied

6    under oath at this trial, you should view the testimony of such

7    a witness cautiously and weigh it with great care.  You may

8    reject the entirety of the witness's testimony, part of it, or

9    none of it.  It's for you to decide how much of any witness's

10   testimony, if any, you wish to credit.  A witness may be

11   inaccurate, contradictory, or even untruthful in some respects,

12   and yet entirely believable and truthful in other respects.

13   It's for you to determine whether such untruths or

14   inconsistencies are significant or inconsequential and whether

15   to accept or reject all or to accept some and reject the

16   balance of the testimony of any witness.

17          In evaluating the credibility of the witnesses, you

18   should take into account any evidence that the witness who

19   testified may benefit in some way from the outcome of this

20   case.  If you find that any witness whose testimony you're

21   considering may have an interest in the outcome of the trial,

22   then you should bear that factor in mind when evaluating the

23   credibility of his or her testimony and accept it with great

24   care.  This is not to suggest that any witness who has an

25   interest in the outcome of the case would testify falsely.  It

is for you to decide to what extent, if at all, the witness's

interest has affected or colored his or her testimony.

You have heard the testimony of a witness who was

previously convicted of a crime punishable by more than one

year in jail.  This prior conviction was put into evidence for

you to consider in evaluating the witness's credibility.  You

may consider the fact that the witness who testified is a

convicted felon in deciding how much of his or her testimony to

accept and what weight, if any, it should be given.  You're not

required to accept testimony even though the testimony is not

contradicted and the witness's testimony is not challenged.

You may decide because of the witness's bearing or demeanor or

because of the inherent improbability of the testimony or for

other reasons sufficient to yourselves that the testimony is

not worthy of belief.  On the other hand, you may find because

of a witness's bearing and demeanor and based upon your

consideration of all of the other evidence in the case that the

witness is truthful.

Thus, there is no magic formula by which you can

evaluate testimony.  You bring to this courtroom all your

experience and common sense.  You determine for yourselves in

many circumstances the reliability of statements that are made

by others to you and upon which you are asked to rely and act.

You may use the same tests here that you use in your everyday

lives.  You may consider the interest of any witness in the

LCKCmax9                    Charge

outcome of this case and any bias or prejudice of any such witness, and this is true regardless of who called or questioned the witness.

Finally, as you know, I have permitted certain witnesses to be referred to in open court either by their first name or a pseudonym.  As I explained to you in my preliminary instructions before opening statements, this process is to protect the privacy of witnesses as this case has received significant attention in the media.  I instruct you again that this process should not bear in any way on your evaluation of the evidence or credibility of any witness in this case.

Instruction No. 45:  Credibility of Witnesses — Impeachment by Prior Inconsistent Statement.

You have heard evidence that a witness made a statement on an earlier occasion which counsel argues is inconsistent with the witness's trial testimony.  Evidence of a prior inconsistent statement is not to be considered by you as affirmative evidence bearing on Ms. Maxwell's guilt.  Evidence of the prior inconsistent statement was placed before you for the more limited purpose of helping you decide whether to believe the trial testimony of the witness who contradicted him or herself.  If you find that the witness made an earlier statement that conflicts with his or her trial testimony, you may consider that fact in deciding how much of the trial testimony, if any, to believe.

LCKCmax9                        Charge

          In making this determination, you may consider whether

the witness purposefully made a false statement or whether it

was an innocent mistake, whether the inconsistency concerns an

important fact or whether it had to do with a small detail,

whether the witness had an explanation for the inconsistency

and whether the explanation appealed to your common sense.

          It is exclusively your duty based on all the evidence

and your own good judgment to determine whether the prior

statement was inconsistent and, if so, how much, if any, weight

to be given to the inconsistent statement in determining

whether to believe all or part of the witness's testimony.

          Instruction No. 46:  Law Enforcement and Government

Employee Witnesses.

          You have heard testimony from law enforcement

officials and employees of the government.  The fact that a

witness may be employed by the federal government as a law

enforcement official or employee does not mean that his or her

testimony is necessarily deserving of more or less

consideration or greater or less weight than that of an

ordinary witness.  In this context, defense counsel is allowed

to try to attack the credibility of such a witness on the

ground that his or her testimony may be colored by a personal

or professional interest in the outcome of the case.  It is

your decision after reviewing all the evidence whether to

accept the testimony of the law enforcement or government

1    employee witness and to give to that testimony the weight you

2    find it deserves.

3              Instruction No. 47:  Expert Testimony.

4              You have heard what is called expert testimony.  An

5    expert is allowed to express his or her opinion -- his or her

6    opinion on those matters about which he or she has special

7    knowledge and training.  Expert testimony is presented to you

8    on the theory that someone who is experienced in the field can

9    assist you in understanding the evidence or in reaching an

10   independent decision on the facts.

11             In weighing an expert's testimony, you may consider

12   the expert's qualifications, opinions, reasons for testifying,

13   as well as all of the other considerations that ordinarily

14   apply when you are deciding whether or not to believe a

15   witness's testimony.  You may give the expert testimony

16   whatever weight, if any, you find it deserves in light of all

17   of the evidence in this case.

18             You should not, however, accept a witness's testimony

19   merely because he or she is an expert.  Nor should you

20   substitute it for your own reason, judgment, and common sense.

21   The determination of the facts in this case rests solely with

22   you.

23             Instruction No. 48:  Limiting Instructions — Similar

24   Act Evidence.

25             The government has offered evidence which it argues

shows on different occasions Ms. Maxwell engaged in conduct

similar to the charges in the indictment.  It is for you to

decide whether Ms. Maxwell engaged in the other conduct.

Let me remind you that Ms. Maxwell is on trial only

for committing acts alleged in the indictment.  Accordingly,

you may consider this evidence of similar acts as a

substitute -- you may not consider this evidence -- let me

start that sentence again.  Accordingly, you may not consider

this evidence of similar acts as a substitute for proof that

Ms. Maxwell committed the crimes charged nor may you consider

this evidence as proof that Ms. Maxwell has a criminal

personality or bad character.  The evidence of the other

similar acts was admitted for a much more limited purpose and

you may consider it only for that limited purpose.

If you determine that Ms. Maxwell committed the acts

charged in the indictment and the similar acts, as well, then

you may, but you need not draw an inference that in doing the

acts charged in the indictment, that Ms. Maxwell acted

knowingly and intentionally and not because of some mistake,

accident, or other innocent reasons.  You may also consider

this evidence in determining whether Ms. Maxwell utilized a

scheme or common plan in committing both the crimes charged in

the indictment and the similar acts introduced by the

government.

Evidence of similar acts may not be considered by you

LCKCmax9                        Charge

1   for any other purpose.  Specifically, you may not consider it

2   as evidence that Ms. Maxwell is of bad character or has the

3   propensity to commit crimes.

4            Instruction No. 49:  Defendant's Right Not to Testify.

5            The defendant did not testify in this case.  Under our

6   constitution, a defendant has no obligation to testify or to

7   present any evidence, because it is the government's burden to

8   prove a defendant guilty beyond a reasonable doubt.  That

9   burden remains with the government throughout the entire trial,

10  never shifts to a defendant.  A defendant is never required to

11  prove that she is innocent.

12           You may not attach any significance to the fact that

13  Ms. Maxwell did not testify.

14           No adverse inference against Ms. Maxwell may be drawn

15  by you because she did not take the witness stand.  You may not

16  consider this against Ms. Maxwell in any way in your

17  deliberations in the jury room.

18           Instruction No. 50:  Uncalled Witnesses — Equally

19  Available to Both Sides.

20           There are people whose names you heard during the

21  course of the trial that did not appear to testify.  One or

22  more of the attorneys has referred to their absence from the

23  trial.  I instruct you that each party had an equal opportunity

24  or lack of opportunity to call any of these witnesses.

25  Therefore, you should not draw any inference or reach any

LCKCmax9                    Charge

conclusion as to what they would have testified to had they

been called.  Their absence should not affect your judgment in

any way.

　　　　You should remember my instruction, however, that the

law does not impose on the defendant in a criminal case the

burden or duty of calling any witness or producing any

evidence.

　　　　Instruction No. 51:  Particular Investigative

Techniques Not Required.

　　　　You have heard reference, in the arguments of defense

counsel in this case, to the fact that certain investigative

techniques were used or not used by the government.  There is

no legal requirement, however, that the government prove its

case through any particular means.  Your concern is to

determine whether or not on the evidence or lack of evidence

the defendant's guilt has been proved beyond a reasonable

doubt.

　　　　Instruction No. 52:  Use of Evidence From Searches.

　　　　You have heard testimony about evidence seized in

connection with certain searches conducted by law enforcement

officers.  Evidence obtained from these searches was properly

admitted in this case and may be properly considered by you.

Such searches were appropriate law enforcement actions.

Whether you approve or disapprove of how the evidence was

obtained should not enter into your deliberations because I

instruct you that the government's use of the evidence is

entirely lawful.  You must therefore, regardless of your

personal opinions, give this evidence full consideration along

with all the other evidence in the case in determining whether

the government has proven the defendant's guilt beyond a

reasonable doubt.  As with all evidence, it's for you to

determine that -- to determine what weight, if any, to give

such evidence.

                    Instruction No. 53:  Use of Electronic Communications.

                    Some of the evidence in this case has consisted of

electronic communications seized from computers or electronic

accounts.  There is nothing illegal about the government's use

in such electronic communications in this case and you may

consider them along with all the other evidence in the case.

Whether you approve or disapprove of the seizure of these

communications may not enter your deliberations.

                    You may, therefore, regardless of any personal

opinions, consider this evidence along with all the other

evidence in the case in determining whether the government has

proven the defendant's guilt beyond a reasonable doubt.

However, as with the other evidence, it is for you to determine

what weight, if any, to give such evidence.

                    Instruction No. 54:  Persons Not on Trial.

                    You may not draw any inference, favorable or

unfavorable, towards the government or the defendant on trial

LCKCmax9                         Charge

from the fact that any person, in addition to the defendant, is

not on trial here.  You also may not speculate as to the

reasons why other persons are not on trial.  Those matters are

wholly outside your concern and have no bearing on your

function as jurors in deciding the case before you.

          Instruction No. 55:  Preparation of Witnesses.

          You've heard evidence during the trial that witnesses

have discussed the facts of the case and the testimony with the

government lawyers, the defense lawyers, their own lawyers

before the witnesses appeared in court.  Although you may

consider that fact while you're evaluating witness's

credibility, I should tell you there is nothing either unusual

or improper about a witness meeting with lawyers before

testifying so that the witness can be aware of the subjects he

or she will be questioned about, focus on those subjects, and

have the opportunity to review relevant exhibits before being

questioned about them.  Such consultation helps conserve your

time and the Court's time.  It would be unusual for a lawyer to

call a witness without such consultation.  The weight you give

to the witness's preparation for his or her testimony and what

inferences you draw from such preparation are matters

completely within your discretion.

          Instruction No. 56:  Redaction of Evidentiary Items.

          We have, among the exhibits received in evidence, some

documents that are redacted.  Redacted means that part of a

LCKCmax9                      Charge

document has been taken out.  Material may be redacted for any

number of reasons, including that it's not relevant to the

issues you must decide in this case among other reasons.  You

are to concern yourself only with a part of the item that's

been admitted into evidence and you should not consider any

possible reason for the redactions.

Instruction No. 57:  Stipulations.

In this case, you've heard evidence in the form of

stipulations.  A stipulation of testimony is an agreement among

the parties that, if called, a witness would have given certain

testimony.  You must accept as true the fact that the witness

would have given the testimony.  However, it is for you to

determine the effect or weight to be given -- to give to that

testimony.

You've also heard evidence in the form of stipulations

that contain facts that were agreed to be true.  In such cases,

you must accept those facts as true.

Instruction No. 58:  Punishment Not to be Considered

by the Jury.

Under your oath as jurors, you cannot allow a

consideration of possible punishment that may be imposed upon a

defendant if convicted to influence you in any way or in any

sense to enter into your deliberations.  The duty of imposing

sentence is mine and mine alone.

Your function is to weigh the evidence in the case and

LCKCmax9                        Charge

1    to determine whether or not the government has proved that

2    Ms. Maxwell is guilty beyond a reasonable doubt, solely upon

3    the basis of such evidence.

4           Therefore, I instruct you not to consider punishment

5    or possible punishment in any way in your deliberations in this

6    case.

7           Instruction No. 59:  Right to Hear Testimony; Election

8    of Foreperson; Communications with the Court; Juror

9    Note-Taking.

10          You're about to go into the jury room and begin your

11   deliberations.  The documentary evidence will be sent back with

12   you.  If you want any of the testimony read to you, that can be

13   arranged, but please remember that it's not always easy to

14   locate or you might want to be as specific as you possibly can

15   in requesting portions of the testimony that you might want.

16          Your first task as a jury will be to choose your

17   foreperson.  The foreperson has no greater voice or authority

18   than any other juror, but is the person who will communicate

19   with the Court through written note when questions arise and to

20   indicate when you've reached your verdict.

21          Your request for testimony — in fact, any

22   communications with the Court — should be made to me in

23   writing, signed by your foreperson, by number, and given to one

24   of the marshals outside the jury room.  I'll respond to any

25   questions or requests you have as promptly as possible, either

LCKCmax9                         Charge

1    in writing or by having you return to the courtroom so I can

2    speak with you in person.  In any communication, please do not

3    tell me or anyone else how the jury stands on the issue of the

4    jury's verdict until after a unanimous verdict is reached.

5         For those of you who took notes during the course of

6    the trial, you should not show your notes to or discuss your

7    notes with any other juror during your deliberations.  Any

8    notes you have taken are to assist you and you alone.  The fact

9    that a particular juror has taken notes entitles that juror's

10   views to no greater weight than those of any other juror.

11        Finally, your notes are not to substitute for your

12   recollection of the evidence in this case.  If you have any

13   doubt as to any testimony, you may request that the official

14   transcript that has been made of these proceedings be read or

15   otherwise provided to you.

16        Concluding Remarks.

17        Members of the jury, that about concludes my

18   instructions to you.  The most important part of this case,

19   members of the jury, is the part that you, as jurors, are now

20   about to play as you deliberate on the issues of fact.  It's

21   for you and you alone to weigh the evidence in this case and

22   determine whether the government has proved beyond a reasonable

23   doubt each of the essential elements of the crime with which

24   Ms. Maxwell is charged.  If the government has succeeded, your

25   verdict should be guilty as to that charge.  If it has failed,

LCKCmax9                        Charge

 1   your verdict should be not guilty as to that charge.

 2          You must base your verdict solely on the evidence or

 3   lack of evidence and these instructions as to the law, and

 4   you're obliged under your oath as jurors to follow the law as

 5   I've instructed you, whether you agree or disagree with the

 6   particular law in question.

 7          Under your oath as jurors, you're not to be swayed by

 8   sympathy.  You should be guided solely by the evidence

 9   presented during the trial and the law as I gave it to you

10   without regard to the consequences of your decision.  You have

11   been chosen to try the issues of fact and reach a verdict on

12   the basis of the evidence or lack of evidence.  If you let

13   sympathy interfere with your clear thinking, there is a risk

14   that you'll not arrive at a just verdict.

15          As you deliberate, please listen to the opinions of

16   your fellow jurors and ask for an opportunity to express your

17   own views.  Every juror should be heard, no one juror should

18   hold center stage in the jury room, and no one juror should

19   control or monopolize the deliberations.  If, after listening

20   to your fellow jurors, and if, after stating your own view, you

21   become convinced that your view is wrong, do not hesitate

22   because of stubbornness or pride to change your view.  On the

23   other hand, do not surrender your honest convictions and

24   beliefs solely because of the opinions of your fellow jurors or

25   because you are outnumbered.  Your final vote must reflect your

LCKCmax9                        Charge

conscientious belief as to how the issues should be decided.

        Thus, the verdict must represent the considered judgment of each juror.  In order to return a verdict, it is necessary that each juror agree to it.  Your verdict must be unanimous.

        If at any time you are divided, do not report how the vote stands, and if you have reached a verdict, do not report what it is until you are asked in open court.

        A verdict form has been prepared for your convenience. After you've reached your decision, your foreperson will fill in the form.  At that point, the foreperson should advise the marshal outside your door that you are ready to return to the courtroom.

        Finally, I say this not because I think it necessary, but because it is the custom in this courthouse to say this: You should treat each other with courtesy and respect during your deliberations.

        In conclusion, ladies and gentlemen, I am sure that if you listen to the views of your fellow jurors and if you apply your own common sense, you will deliberate fairly.

        Members of the jury, I ask your patience for a few minutes longer.  It's necessary for me to spend a few moments with counsel and the reporter at sidebar.  I'll ask you to remain patiently in the jury box without speaking to each other and we will return in just a moment to submit the case to you.

LCKCmax9                         Charge

1    Thank you.  And I ask all members -- all people in the

2    courtroom to make -- remain quiet while we have this final

3    sidebar thank you.

4                (Continued on next page)

1          (At the sidebar)

2          THE COURT:  Counsel, anything to raise in my reading

3     of the charge?

4          MS. MOE:  No, your Honor.

5          MS. MENNINGER:  No, your Honor.

6          THE COURT:  Two things.  One, I will indicate the

7     alternate jurors, I will tell them they will not take part in

8     the deliberations, but they are not excused and they are under

9     my rules until they hear from Ms. Williams.  I'm going to put

10    extra emphasis on that because we're in a pandemic and we might

11    need a juror to return.  I'll could say what I normally say,

12    but just say this could happen.

13         MS. STERNHEIM:  Judge, are you requiring that they be

14    here or just on call?

15         THE COURT:  I mean, I've always just done on call, but

16    I'm happy to take a suggestion otherwise.

17         MR. PAGLIUCA:  There is no need for them to stay here.

18         MS. STERNHEIM:  That's fine.

19         THE COURT:  We'll bring them in if we need to.

20         Just so everybody agrees, the alternates are 125, 149,

21    151, 152, and 170.

22         MS. STERNHEIM:  We're all too tired.  That's right.

23         THE COURT:  I'm going to tell the jurors, I just want

24    to make sure everybody agrees with the wording, you may

25    deliberate as long this evening as you all agree to.  Just let

1    me know by a note when you wish to be -- when you wish to break

2    for the evening.  I'll bring you into the courtroom for

3    directions.

4              MS. STERNHEIM:  Are you allowing them to set the start

5    time or is the Court --

6              THE COURT:  I will set it.  So, assuming we don't get

7    a verdict tonight, when they say they're ready to break, I'll

8    bring them in and I'll direct them to resume deliberations at

9    9:00 a.m., that they should go straight to the jury room and

10   begin deliberations once all 12 of them are there.

11             Anything else?

12             MR. PAGLIUCA:  During the morning when they get here,

13   we will be here in the courthouse, but we're not in the

14   courtroom necessarily, and then when they break in the evening,

15   you just let them go and we're not in the courtroom?

16             THE COURT:  Right.  And to be clear, they can take the

17   instructions back with them and then my deputy will hand one

18   copy of the verdict form to someone as they're going in.

19             MR. EVERDELL:  Do they need to request the exhibits or

20   does that go back automatically?

21             THE COURT:  That's automatic.  So you give back to

22   Ms. Williams to send back what you need and hopefully we've got

23   the person -- she can show them how to technologically use it.

24             Last point is, we'll have the marshal come forward to

25   be sworn before they go back.

LCKCmax9

1     (In open court)

2     THE COURT:  Thank you so much for your patience,

3 members of the jury.  I am going to send you back in a moment

4 to begin your deliberations.

5     There are five of you who are alternate jurors, and

6 I'm going to tell you, you're the higher number five.  They are

7 juror number 125, juror number 149, 151, 152, and 170.

8     The alternate jurors were not to participate in the

9 deliberations, however, it is possible, and it does happen,

10 that we need to bring an alternate juror back in order to

11 participate in the deliberations.  So, I am going to release

12 the alternate jurors.

13     You can't participate in the deliberations unless and

14 until you hear from Ms. Williams that you're being brought back

15 into the deliberations.  However, because you could be brought

16 back into the deliberations, and because it does happen, all of

17 my rules continue to apply.

18     So, for my alternate jurors, no communications with

19 anyone through any means about the case, no discussions, no

20 consuming of any information through any means about the case

21 until you hear from Ms. Williams either asking you to come back

22 because we need you for the deliberations or telling you that

23 the process is over, and that is very important.

24     So, again, the alternates are 125, 149, 151, 152, and

25 170.

LCKCmax9

1          So when I send you back in a moment, the alternates

2     will gather their belongings, no communications with each other

3     about the case, gather their belongings, quick wave goodbye and

4     then you may head home until you hear from Ms. Williams about

5     next steps.

6          With respect to the 12 jurors who will be

7     deliberating, it's 4:48.  You may deliberate as long as this

8     evening as you all agree to.  So just let me know by a note

9     when you wish to break for the evening.  At that point, I'll

10     bring you into the courtroom for instructions.

11          I'll ask the U.S. Marshal, the court security officer,

12     who will safeguard the jury's deliberations, to please come

13     forward and be sworn by Ms. Williams.

14          (Marshal sworn)

15          With that, you'll take your instructions back to the

16     jury room with you.

17          For the alternates, Ms. Williams will collect the

18     instructions from you.

19          We will send you back with a copy of the verdict form,

20     and Ms. Williams will show you how to access the admitted

21     exhibits should you wish to access them.

22          Members of the jury, you may begin your deliberations.

23          (At 4:49 p.m., the jury retired to deliberate)

24          (Continued on next page)

25

LCKCmax9

```
 1              (Jury not present)

 2              THE COURT:  Matters to take up?

 3              MS. MOE:  Not from the government, your Honor.  Thank

 4     you.

 5              MS. MENNINGER:  Your Honor, I believe at the outset

 6     you said you would provide counsel a copy of a juror seating

 7     chart.  I don't think we ever got one, but is it possible to

 8     get one to refresh our recollection?

 9              THE COURT:  Yes.  We have that prepared.  I had

10     thought you gotten it, but we will get you each a copy.

11              MS. MENNINGER:  Thank you, your Honor.

12              THE COURT:  Anything else?

13              MS. MOE:  No, your Honor.  Thank you.

14              THE COURT:  All right.  With that, we will wait until

15     we hear from the jury.

16              Let me just thank counsel for your zealous advocacy.

17     The eight of you performed your duties with professionalism and

18     excellence and I learned a lot from watching the eight of you.

19     Thank you.

20              (Recess)

21              THE COURT:  We received a note that says.  "We're

22     leaving at 5:30.  Thanks."  Which we'll mark as a court

23     exhibit.  We'll bring in the jury, I'll give them instructions

24     for resuming deliberations in the morning.

25              (Continued on next page)
```

LCKCmax9

1          (Jury present)

2          THE COURT:  I did get your note saying you're ready to

3     leave at 5:30.  Sorry you're a little delayed getting you out

4     of here, I know it's a long day.  Thank you for your diligence

5     and your attention.

6          I want to of course remind you, bear all of my

7     instructions in mind, even though we're at the deliberations,

8     especially because and in addition we're at the deliberation

9     stage of the case.

10          So just to reiterate, no communications with each

11     other or -- no communications outside of the jury room with

12     each other or anyone else regarding the case, no consuming any

13     information regarding the case in any way.

14          I'm going to ask that you resume your deliberations

15     tomorrow morning at 9:00 a.m.  You come straight into the jury

16     room.  Once all 12 of you are there, you begin your

17     deliberations, not before, but once all 12 of you are there.

18     Just start right away again with your deliberations, you don't

19     have to wait for further instruction for me.  If you have

20     questions, you put them in a note and I'll get you a response.

21     Ms. Williams will get your lunch order.  Even though we're at

22     this phase in the case, please continue to keep an open mind

23     until you're together deliberating in the jury room.

24          Have a goodnight.  Thank you.

25          (Continued on next page)

LCKCmax9

1                    (Jury not present)

2                    THE COURT:  Any matters to take up, counsel?

3                    MS. MOE:  Not from the government, your Honor.  Thank

4    you.

5                    MS. STERNHEIM:  No.  Thank you.

6                    THE COURT:  Please be ready to pick up any notes

7    beginning at 9:00.  Have a goodnight, everyone.

8                    (Adjourned to December 21, 2021 at 9:00 a.m.)

9                                        * * *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25