# EXHIBIT 1

M38TMAX1

1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4           v.               20 CR 330 (AJN)

5   GHISLAINE MAXWELL,

6          Defendant.

7   ------------------------------x
                             New York, N.Y.
8                             March 8, 2022
                             10:15 a.m.
9

10  Before:

11                HON. ALISON J. NATHAN,

12                       District Judge

13                  APPEARANCES

14  DAMIAN WILLIAMS
       United States Attorney for the
15       Southern District of New York
    ALISON MOE
16  MAURENE COMEY
    ANDREW ROHRBACH
17  LARA POMERANTZ
       Assistant United States Attorneys
18

19  COHEN & GRESSER
       Attorneys for Defendant
    CHRISTIAN EVERDELL
20

21  BOBBI C. STERNHEIM
       Attorney for Defendant

22  SPODEK LAW GROUP
       Attorneys for Juror 50
23  TODD A. SPODEK

24

25

M38TMAX1

```
 1              (Case called)
 2              DEPUTY CLERK:  Counsel, please state your name for the
 3     record, starting with the government.
 4              MS. MOE:  Good morning, your Honor, Alison Moe, Lara
 5     Pomerantz, Andrew Rohrbach and Maurene Comey for the
 6     government.
 7              THE COURT:  Good morning, counsel.
 8              MS. STERNHEIM:  Bobbi C. Sternheim and Christian
 9     Everdell for Ghislaine Maxwell, who is present at defense
10     table.
11              THE COURT:  Good morning.
12              And Mr. Spodek on behalf of Juror 50, please state
13     your appearance.
14              MR. SPODEK:  Good morning, your Honor, Todd Spodek on
15     behalf of Juror 50, who is present.
16              THE COURT:  Thank you.  We're here today for a hearing
17     on the defendant's motion for a new trial.  The government has
18     consented and to indeed requested this hearing as to Juror 50.
19              My opinion and order dated February 24, 2022 ordered
20     this hearing into Juror 50's responses to questions on the jury
21     selection questionnaire.  That opinion lays out the scope and
22     nature of today's hearing.
23              In addition to the motion for new trial briefing that
24     I received from of the parties, I also received proposed
25     questions from both sides which I have carefully considered in
```

M38TMAX1

1    preparing for today's hearing.  In the submitted questions, the

2    defense renewed the request that counsel be permitted to

3    conduct the questioning.  I am denying that renewed request.  I

4    will conduct this proceeding in accord with my February 24

5    opinion.

6              Following my questioning, I will hear from counsel for

7    the parties at sidebar as to any proposed follow-up questions

8    that they wish be asked and I will consider those requests.

9              In a moment, I will address counsel for Juror 50.

10             Let me ask counsel for the parties if there are any

11   preliminary matters.

12             MS. MOE:  Not from the government, your Honor, thank

13   you.

14             MS. STERNHEIM:  No, thank you.

15             THE COURT:  All right.  Juror 50 is present and

16   represented by retained counsel, Mr. Spodek.

17             Mr. Spodek, just as a preliminary matter, does your

18   client wish that he be referred to here as Juror 50 rather than

19   using his full name?

20             MR. SPODEK:  Yes, your Honor.

21             THE COURT:  And I understand, but again confirm for me

22   that in post-verdict press interviews he did not reveal his

23   last name, is that correct?

24             MR. SPODEK:  That's correct.

25             THE COURT:  I do intend to continue to refer to him as

M38TMAX1

1   Juror 50.  In post-verdict press interviews he did not reveal

2   his last name.  Consistent with that and my juror anonymity

3   order during trial, I will permit that to continue.

4           I received a letter dated March 1st, 2022 from

5   Mr. Spodek.  In that letter, Mr. Spodek, you informed me that

6   Juror 50 would invoke his Fifth Amendment privilege against

7   self-incrimination at this hearing.  As you see from my

8   February 24 opinion, Mr. Spodek, I am going to ask Juror 50

9   questions today about responses that he gave during the jury

10  selection process in the case of *United States v. Maxwell*.

11          Does it remain your client's intention to assert his

12  Fifth Amendment privilege in response to those questions?

13          MR. SPODEK:  Yes, your Honor.

14          THE COURT:  I'm going to confirm on the record with

15  your client, Mr. Spodek:

16          Juror 50, is it your intention to assert your Fifth

17  Amendment privilege in response to the questions I'm going to

18  ask you today?

19          JUROR 50:  Yes, your Honor.

20          THE COURT:  All right.  I received a written

21  application from the government last night.

22          Ms. Moe, could you confirm that the government is

23  making the application?

24          MS. MOE:  Yes, your Honor.

25          THE COURT:  In accord with the application, I have

M38TMAX1

1   signed the proposed immunity order which will be docketed with

2   Juror 50's name redacted.

3           Juror 50, in view of your assertion of the Fifth

4   Amendment privilege, I have signed an order granting you

5   immunity.  It is use immunity with respect to your testimony in

6   this proceeding.  That means that no testimony given by you or

7   any information, directly or indirectly, derived from your

8   testimony may be used against you in a federal criminal case,

9   except if you testify falsely today you could be prosecuted for

10  perjury.  In light of this immunity, you will be required to

11  answer questions today.

12          So in other words, you need to answer my questions

13  today.  You need to answer truthfully.  If you don't answer

14  truthfully, you could be prosecuted for perjury.  But you will

15  not be prosecuted in federal court based on any truthful

16  testimony that you give here today, even if that testimony

17  indicated that you committed a crime.

18          Juror 50, do you understand that?

19          JUROR 50:  Yes, your Honor.

20          THE COURT:  All right.  I am going to have Juror 50

21  come forward to the witness stand, please.

22          (Continued on next page)

23

24

25

M38TMAX1

1    ███████ ,

2         having been duly sworn, testified as follows:

3    EXAMINATION

4    BY THE COURT:

5         THE COURT:  I'm going to approach with the court

6    reporter and ask Juror 50 at the sidebar to state and spell his

7    name for the record.  His name will be redacted from the public

8    transcript.

9         (At sidebar)

10        THE COURT:  Please state your name for the record.

11        THE WITNESS:  ███████ .

12        (In open court)

13   BY THE COURT:

14   Q.  With that, Juror 50, you are under oath.

15        I will begin with some general instructions to you.

16   If at any point you don't understand something that I'm asking,

17   please ask for clarification.  Don't speculate as to the

18   meaning of my question, ask for clarification.

19        In responding to questions, I do instruct you not to

20   tell me about the jury deliberations or your thought process

21   during deliberations.  I'm not asking questions about those and

22   you should not provide that information in response to my

23   questions.  So listen to my specific questions, let me know if

24   there's something you don't understand, do not respond with

25   information about the jury's deliberations, and tell the truth.

M38TMAX1

```
 1              If there is a response that is too difficult or
 2     embarrassing for you to share in open court, you may request to
 3     speak at sidebar with me and counsel.  However, if you have
 4     already shared the information publicly, including in media
 5     interviews, then I will not allow the sidebar.
 6              There's a binder in front of you.  I have marked the
 7     document in there as Court Exhibit 1, so it's Court Exhibit 1
 8     to the record for this hearing proceeding and you may open
 9     that.
10              That is a copy of the questionnaire that you filled
11     out on November 4, 2021.  Please take a moment and look through
12     it so that you're familiar with it and can identify it.
13     A.  Yes.
14     Q.  Do you recognize that as the questionnaire that you filled
15     out on November 4, 2021, as part of the jury selection process
16     in this case?
17     A.  Yes, your Honor.
18     Q.  I will ask you to turn to page 24 and look at question 48.
19              That question reads:  Have you or a friend or family
20     member ever been the victim of sexual harassment, sexual abuse
21     or sexual assault, and then in parenthesis, this includes
22     actual or attempted assault or other unwanted sexual advance,
23     including by a stranger, acquaintance, supervisor, teacher or
24     family member.  Do you see that question 48?
25     A.  Yes, your Honor.
```

M38TMAX1

1    Q.  On your questionnaire you indicated no as your answer.  You

2    checked the box for no.  Is no an accurate answer to that

3    question?

4    A.  No, it is not.

5    Q.  What is an accurate answer to that question?

6    A.  Yes for self.

7    Q.  Okay.  If you look at question 48A, that question says:  If

8    yes, without listing names, please explain.

9           And when you filled out the questionnaire on

10   November 4, 2021, you left that blank.  What is an accurate

11   answer to question 48A?

12   A.  I would have put I was abused as a child.

13   Q.  Without listing names, what happened?

14   A.  It was a family member, who is no longer a part of the

15   family, and one of their friends when I was nine and ten years

16   old.

17   Q.  Did this happen on one occasion or multiple occasions?

18   A.  Multiple occasions.

19   Q.  And did you tell anyone?

20   A.  I did not for several years until I was in high school.

21   Q.  And when you told someone in high school, did you tell

22   authorities or adults or friends?

23           Who did you tell?

24   A.  I told my mom and she called the police station and gave a

25   report of the account and but never received any paperwork.  So

M38TMAX1

1   I don't know if anything was actually filed or anything done.

2   There were no charges brought.

3   Q.  You said a family member, no longer a family member.

4   Again, without listing names, what was the nature of the

5   familial relationship?

6   A.  A stepbrother.

7   Q.  You said stepbrother?

8   A.  Yes.

9   Q.  I'm going to ask you to look at question 48B.  Question 48B

10  reads:  If your answer to 48 was yes, do you believe this would

11  affect your ability to serve fairly and impartially as a juror

12  in this case?

13          When you filled this out on November 4, you left that

14  blank.  What is an accurate answer to 48B?

15  A.  It would have been no, because it did not affect my ability

16  to be fair and impartial at all.

17  Q.  I'm going to ask you to turn to page 13 of the

18  questionnaire.  Question 25 reads:  Have you or any of your

19  relatives or close friends ever been a victim of a crime?

20          And you checked no when you filled this out on

21  November 4.  Is no an accurate answer?

22  A.  Looking back at it now, no, it's an incorrect answer.

23  Q.  Who would have an accurate answer have been?

24  A.  It would have been yes.

25  Q.  Yes self, yes friend or family?

M38TMAX1

1   A.   Yes self.

2   Q.   And when you say "yes self," what are you referring to?

3   A.   I'm referring to the sexual abuse.

4           What I was thinking when I was completing that

5   questionnaire was like if I was robbed or mugged or some sort

6   of crime like that.  I wasn't thinking of my sexual abuse as

7   being a victim of a crime because I no longer associate being a

8   victim.  It's part of my healing process and it's how I dealt

9   with the abuse.

10  Q.   Have you ever been robbed?

11  A.   Never.

12  Q.   Ever been mugged?

13  A.   Never.

14  Q.   Family or friends ever been robbed?

15  A.   No.

16  Q.   Or mugged?

17  A.   I don't know anybody that has ever been robbed or mugged.

18  Q.   Question 25A, asked:  If yes, is there anything about the

19  experience that would prevent you from acting as a fair and

20  impartial juror in this case?

21          You left that blank when you filled it out on

22  November 4.  What is an accurate answer to 25A?

23  A.   It would have been no.  I was definitely able to set aside

24  everything and be fair and impartial.

25  Q.   Okay.  In light of the answer that you gave to 48A, I am

M38TMAX1

1      going to ask you to turn to question 49.  It's on page 25.

2                  Question 49 reads:  Have you or a friend or family

3      member ever been accused of sexual harassment, sexual abuse or

4      sexual assault, and then in parenthesis:  This includes both

5      formal accusations in a court or law or informal accusations in

6      a social or work setting of actual or attempted sexual assault

7      or other unwanted sexual advance, including by a stranger,

8      acquaintance, supervisor, teacher or family member.

9                  When you filled this out on November 4, you checked

10     no.  Is that an accurate answer?

11     A.  Yes, your Honor.

12     Q.  So the incident that you described in response to 48 in

13     which, as I understand it, you informed your mother when you

14     were in high school that when you were nine or ten a family

15     member had engaged in sexual abuse with you, is that correct?

16     A.  Yes.

17     Q.  So why is that not responsive to question 49?

18     A.  Because I don't consider them part of my family.  I never

19     considered them part of my family even when they lived with us

20     for a few years.

21     Q.  And when you filled out the questionnaire, when you got to

22     this question were you thinking about what happened to you but

23     you didn't respond yes because you didn't consider them a

24     family member, or you didn't consider it?

25     A.  I didn't even consider it at all.

M38TMAX1

1    Q.  Why is that?

2    A.  I flew through this questionnaire.  I never thought that

3    I -- I honestly never thought I would be chosen to sit on this

4    jury.  We had to be at the courthouse super early, and I got

5    here early and it took 45 minutes just to get through the

6    security line.  And we get ushered into a room --

7    Q.  I will come back and ask you some questions about the

8    process for filling it out.

9    A.  Got it.

10   Q.  Just for the moment, just with respect to this question,

11   tell me your thought process.

12   A.  At this point I was super distracted because I was sat

13   right in front of the table, literally within four feet of that

14   table where everybody was dropping off their questionnaires.

15   People were asking questions, there was papers being ripped off

16   the questionnaire packets, and there's a lot of talking going

17   on, and it's super distracting.  I'm like:  I want to finish.

18   So I just start going through and marking the questions as I'm

19   like:  Okay, okay.  I didn't spend a whole lot of time thinking

20   about it.

21   Q.  As you sit here now, what's the answer to question 49?

22   A.  It would have been -- it would have been yes, that a

23   stepbrother was accused -- a stepbrother and his friend was

24   accused of sexual abuse.

25   Q.  Okay.  So a moment ago you said the answer would have been

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M38TMAX1

1    no because you didn't consider them family.

2    A.  Family, yeah.

3    Q.  But now you say yes because it would have been a

4    stepbrother.  Explain.

5    A.  Because by law, by marriage, that person was my

6    stepbrother.  So when you read the question that way and it

7    says has a friend or family member ever been accused, then the

8    correct answer would have been yes, a friend or family member.

9    Q.  Okay.  And so the same response then for 48A is what you

10   would have given for 49B?

11   A.  Yes, your Honor.

12   Q.  And 49B, if your answer to 49 was yes, do you believe this

13   would affect your ability to serve fairly and impartially as a

14   juror in this case?

15   A.  In no case.  It would not affect me.

16   Q.  In responding a moment ago you said you never thought you

17   would be chosen as a juror in this case.  Why is that?

18   A.  Only because the sheer volume of people that were there.

19   It was insane, the amount of people.  So I just never

20   thought -- number one, I didn't know what it was when I went

21   into it, and then when they played the video of you, I just

22   thought that the likelihood of being chosen, surely they will

23   be interviewing thousands of people.  And they ultimately

24   choose twelve people to sit on a jury, and I never thought I

25   would be one of those twelve.

M38TMAX1

1    Q.   Did you hope that you would be?

2    A.   I did not hope to be on this jury.  But again, like if

3    you're going to serve jury duty, it might as well as be

4    something that's interesting, but I did not set out in order to

5    get on this jury.

6    Q.   Let me ask you to return to question 48A, page 24.  You

7    spoke to this a little bit but I want to make sure I understand

8    the answer.  You indicated that when you checked no, that was

9    an inaccurate answer.  Why did you check no?

10   A.   I didn't see the part where it says self, I just -- I

11   completely skimmed way too fast.  I was distracted by all the

12   noise going on around me.  And again, like I said, I just

13   wanted to get done with this.  It had been a long process, I

14   had been sitting for hours, there were audiovisual problems

15   getting your video to play, so we literally sat there for three

16   hours.  I didn't have a phone, I didn't have a book, I was

17   sitting there twiddling my thumbs thinking about the break up

18   that just happened a few weeks prior and sitting in my feelings

19   and not very focused.

20   Q.   So tell me what you understood the question to be asking.

21   A.   I thought it was asking about family or a friend.

22   Q.   And the box that says yes for self?

23   A.   Right, I just missed it.  Inadvertent mistake.  This was

24   one of the biggest mistakes I have ever made in my life, and if

25   I could go back and change everything and have slowed down and

M38TMAX1

1    actually taken the time to read this appropriately, I would in

2    a heartbeat.

3    Q.   There are other questions on the questionnaire that are

4    structured with similar yes self, yes friend or family, or no.

5    Do you recall seeing those questions?

6    A.   Only after I have reread this do I recall that.

7    Q.   So on none of the questions that included yes, parenthesis

8    self, yes friend or family member, or no --

9    A.   I did not pick up on that when I was filling this out.

10   Q.   Okay.  When did you first learn that an answer to the

11   questionnaire was inaccurate?

12   A.   When an article had come out about the article that I had

13   given to Lucia through The Independent.

14   Q.   So you learned of an inaccurate answer in an article about

15   an interview?

16   A.   Yes.

17   Q.   And what about during the interview?

18   A.   During the interview, no.

19   Q.   When did you first learn that the questionnaire may contain

20   a question that asked about sexual abuse history?

21   A.   That was during my Daily Mail interview with the reporter

22   Laura Collins.

23   Q.   So we're talking about your response to 48 which you have

24   indicated was inaccurate.  Did you in any way intentionally

25   provide an inaccurate answer to this question?

M38TMAX1

1    A.   Absolutely not.

2    Q.   In responding to this question, did you answer no so as to

3    make it more likely that you would be selected for the jury?

4    A.   Absolutely not, your Honor.

5    Q.   Did your history of sexual abuse motivate you in any way to

6    try to tailor your answers to make it more likely that you

7    would be selected for this jury?

8    A.   Not at all, your Honor.

9    Q.   At the time you filled out the questionnaire on November 4,

10   did it occur to you that you might personally benefit in any

11   way from being on the jury in this case?

12   A.   Not at all, your Honor.

13   Q.   I'm going to return to question 25 again, which you have

14   indicated was inaccurately responded to, and again you've

15   discussed this, but I want to just hear directly in response to

16   this question, why did you check no?

17   A.   Well, again, I wasn't thinking about abuse.  I don't really

18   think about my abuse really much anymore because it doesn't

19   define me, it doesn't make me who I am today.  It's something

20   that happened, it's an experience that I lived through, and I

21   have become the person I am today because of my goals and

22   ambitions.  And I do not feel that I am a victim of a crime,

23   even though looking back on this abuse, that does make me a

24   victim of a crime, which is why I should have marked yes for

25   self.

M38TMAX1

1    Q.   In any way did you intentionally provide an inaccurate

2    answer to this question?

3    A.   Absolutely not, your Honor.

4    Q.   In responding to the question, did you answer no so as to

5    make it more likely that you would be selected for the jury?

6    A.   No, your Honor.

7    Q.   Did your history of sexual abuse motivate you, again, to

8    try to tailor this answer to make it more likely that you would

9    be selected for the jury?

10   A.   No, your Honor, I wasn't even thinking about that.

11   Q.   I am going to return to the topic of the process for

12   filling out the questionnaire, and you have spoken to that some

13   and I will give you as much space as you want to respond.  Just

14   by background, you were summoned to appear for jury duty on the

15   morning of November 4, is that correct?

16   A.   Yes, your Honor.

17   Q.   And when did you learn you would be filling out a

18   questionnaire?

19   A.   When we got to the courtroom.

20   Q.   When did you learn the case for which you were being

21   considered as a juror?

22   A.   Three hours after sitting in that chair.

23   Q.   And how long did it take you to fill out the questionnaire?

24   A.   It's a great question.  I don't recall how long it took,

25   but I want to say we were done by around noon or a little after

M38TMAX1

1    noon.

2    Q.  Were you rushed in any way?

3    A.  I felt rushed only because of all the commotion going on in

4    front of me and everybody else just going by on both sides.

5    Q.  And how did that make you feel rushed?

6    A.  It made me -- growing up in school I never wanted to be the

7    last one finished.  You want to finish your test and go hang

8    out with your friends.  So it's kinds of that same policy, I

9    just wanted -- everyone else is finishing and I'm like:  Why am

10   I still reading this?  I'm like:  I'm never going to get

11   chosen, let's get this done with.

12   Q.  Would you say you approached the filling out of the

13   questionnaire with diligence?

14   A.  Looking back on it now, no, your Honor.

15   Q.  Were you concerned with following my instructions?

16   A.  Absolutely not.

17   Q.  You were not concerned with following my instructions?

18   A.  No, I really -- this is a terrible excuse, but I didn't

19   really think I would be chosen.

20   Q.  Some of the questions required follow up depending on

21   whether a yes or no answer was provided.  Do you recall that?

22   A.  Yes, your Honor.

23   Q.  And we'll take a quick look at two examples, question 9 on

24   page 8, question 9 and 9A and question 10 and 10A.

25            Question 9 asked whether your beliefs would make you

M38TMAX1

1   unable to render a verdict.  You checked no.  9A said:  If yes,

2   please explain.  You left that blank.  So that question, if a

3   yes response called for explanation, you didn't provide an

4   explanation because you checked no.

5          The next question 10 asked about principles of law and

6   whether you would accept them if selected to serve on the jury,

7   and you said yes.  10A said:  If no, please explain.  And you

8   followed that instruction and didn't provide an explanation

9   because you had said yes.

10         You recall there were a number of questions that

11  sometimes called for explanation and sometimes didn't?

12  A.  Yes, your Honor.

13  Q.  So how did you know whether to include follow-up answers?

14  A.  So these questions are in the beginning where I had more

15  focus than I did at the end and less distractions, so it was

16  easier to follow along, like these are the first few questions.

17  It is a pretty thick packet, there's a binder of questions, so

18  at this point I was still, I guess, in focus and in the zone

19  and knew how to respond to these questions I guess accurately

20  at this part.

21  Q.  Actually throughout the questionnaire you appeared to have

22  followed the instructions with respect to follow-up questions.

23  A.  Right.

24  Q.  I reviewed a lot of questionnaires.  Some people would

25  provide follow-up when it wasn't called for or not provide

Case 1:20-cr-00330-PAE    Document 855-2    Filed 02/25/26    Page 21 of 645
Case 1:20-cr-00330-AJN   Document 645   Filed 03/11/22   Page 20 of 50    20
M38TMAX1

```
 1    follow-up when it was called for.  Your questionnaire seems to

 2    follow the instructions throughout.  It appears generally that

 3    you read and followed the instructions within each question.

 4    So how do you reconcile that with what you just testified to

 5    that you were distracted, raced through?

 6    A.   Pretty simply, because you see your answer, you mark a no,

 7    then the next question says "if yes."  Well, I marked no, so

 8    skip, go to the next question.  So that's what I'm talking

 9    about when I flew through, I skimmed, I didn't read everything.

10    So if I had just marked no and it says "if yes," immediately

11    move on.

12    Q.   Just to return to 48 now, sorry to go back, first you told

13    me it was a good question, how long it took you to fill it out,

14    and then you said you couldn't remember.  I want to go back.  I

15    think you said you were finished by noon.  Do you remember what

16    time you started the questionnaire?

17    A.   It had to be around 11-something.  Again, I don't know,

18    I --

19    Q.   I'm not sure that clock works.

20    A.   Yeah, I don't remember seeing -- obviously that clock is in

21    the back and I was facing the front of the courtroom that we

22    were in, so I wouldn't have even seen that clock.  But I feel

23    like the room we were in was much larger than this one, and I

24    don't know what time I started.  It definitely felt like we

25    were there for hours before even seeing your video and then
```

M38TMAX1

1   given the questionnaire.

2   Q.   You say, if you had to estimate, an hour to fill out the

3   questionnaire?

4   A.   Maybe.   I think that would be accurate.

5   Q.   And to return to 48, so you just said it was pretty easy

6   to, if yes, explain, if no, explain, so you skimmed through

7   that.   Looking again at 48, which has sort of a lot of white

8   space for the answer there, do you see that?

9   A.   Yes, your Honor.

10   Q.   And again, this is how many of the questions were

11   structured:   Check box yes self, yes friend or family, or no.

12          Tell me again your thought process and how you

13   understood the yes self, and yes friend or family.

14   A.   I just read the friend or family, again, like distracted,

15   so I missed that "have you," and then "yes self" while reading

16   this question.

17   Q.   At the time you were filling this out, were you surprised

18   the questionnaire asked about friend and family but not about

19   you?

20   A.   I didn't honestly think about it.

21   Q.   At the time you filled out the questionnaire, did you think

22   that your history of sexual abuse would be something that the

23   parties and I would want to know in order to determine if you

24   could be fair and impartial?

25   A.   Looking back thinking now, yes, that's a question that

M38TMAX1

1    would have been asked, but I honestly didn't think about it.  I

2    really don't think about my sexual abuse, period.  I don't tell

3    very many people.

4    Q.  After the trial you gave interviews in which you did tell

5    people about your history of sexual abuse.

6    A.  Yes.

7    Q.  How do you reconcile what you just said with that?

8    A.  So I didn't -- this is going back to a deliberation thing,

9    so I have to think about how to say this.

10   Q.  Well, I don't want you to talk about deliberations.

11   A.  Right.

12   Q.  If you can, you just said you don't talk about it, but --

13   A.  I didn't talk about my abuse, I only said that -- I only

14   used it in order to talk to a reporter about jury

15   deliberations, I didn't use it in order to insert anything.  I

16   just gave that as to why I believe a certain way based on all

17   the evidence that was provided during the trial.

18   Q.  I suppose that the question is:  You were prepared for the

19   public and you knew the public paid a lot of attention to this

20   case, you were giving national and international media

21   interviews, you were prepared for your history of sexual abuse

22   to be widely known.

23   A.  Right, but not something -- I didn't think this would

24   happen, like I didn't lie in order to get on this jury and then

25   go to the press and tell them about my abuse.  It just -- it's

M38TMAX1

1    a little illogical thinking about it, like if I lied

2    deliberately I wouldn't have told a soul.  I certainly wouldn't

3    have put myself in a position to where I could -- this position

4    that I'm in now, potentially any sort of criminal charges, I

5    just wouldn't have done it.  It was an honest mistake and one

6    of the biggest mistakes, and again, I apologize for wasting a

7    lot of people's time and money, and this is never anything that

8    I intended or did on purpose.

9    Q.   I understand your point, I still want to just make sure I

10   understand as someone who is filling out the questionnaire and

11   sort of walking through life and doesn't think about the

12   history of sexual abuse and talk about it, at the same time you

13   were prepared for the world to know about it.  Tell me how to

14   make sense of that.

15   A.   It was only how I view things and how I can recall

16   memories, that's it.  I didn't talk about my abuse, I just said

17   I can remember things and recall things, like the color of the

18   wall or --

19   Q.   Did you think about the fact that many people would learn

20   from your interview that you had this history of sexual abuse?

21   A.   No, I did not.

22   Q.   You didn't think about that?

23   A.   No, I did not think that anybody -- certainly my family or

24   friends would find this out.

25   Q.   Friends weren't following the news of the case after you

M38TMAX1

1    indicated you had been a juror on it?

2    A.    I don't know if they were following the news of the case,

3    but I have had some conversations about it with my friends

4    afterward, but most people don't even know.    It's not like -- I

5    didn't know much about it either.    Sexual abuse isn't a topic

6    that I really want to research or learn about or watch about

7    frequently.

8    Q.    You did understand from your interviews that the fact that

9    you were abused would be a known fact in the world.

10   A.    Yes, your Honor.

11   Q.    And did you make a conscious decision that you were okay

12   with that?

13   A.    Yes, your Honor.    After sitting on this trial for several

14   weeks and seeing the victims be brave enough to give their

15   story, I felt like if they can do it, then so can I.    I didn't

16   have to divulge any of the details that happened to me, I

17   focused on the memory aspect.

18   Q.    Okay.    What I'm going to do now is I'm going to take us

19   back in time to not November 4 but November 16, 2021.    That's

20   when I questioned you individually in that process that I

21   suspect now you know is called voir dire.    You recall that

22   process?

23   A.    Yes, your Honor.

24   Q.    At that time I asked you some follow-up questions based on

25   your responses to the questionnaire and some additional

M38TMAX1

1    questions.  Do you recall that?

2    A.   Yes, your Honor.

3    Q.   So if you had filled out your questionnaire accurately as

4    to 48 and 25 and 49, I would have asked additional questions

5    that day.  So what I'm going to do is ask you those questions

6    now.

7    A.   Okay.

8    Q.   And I need you to answer honestly as to how you would have

9    answered on November 16 if you had answered the questions 25,

10   48 and 49 accurately.  Do you understand that?

11   A.   Yes, your Honor.

12   Q.   And again, I'm not asking for your thought process during

13   deliberations or anything about jury deliberations, I'm asking

14   you to go back to that time and if you had answered these

15   questions accurately, how would you have responded to my follow

16   ups.  Okay?

17          So at the time I asked you questions on November 16,

18   and if you had answered the questions accurately, did you

19   believe there was anything about your prior experience with

20   sexual abuse that would affect your ability to be a fair and

21   impartial juror?

22   A.   No, it would not affect me in any way.

23   Q.   At the time I asked you the questions, if you had answered

24   the questions accurately, did you believe there was anything

25   about your experience with sexual abuse that would have

M38TMAX1

1    affected your ability to render a verdict based solely on the

2    evidence presented at trial and my instructions as to the law?

3    A.   Yeah.   No, your Honor, I would be able to review the

4    evidence based solely on the evidence.

5    Q.   Okay.   At the time I asked you questions, and if you

6    answered accurately, did you believe there's anything about

7    your experience with prior sexual abuse that would interfere

8    with your ability to assess the credibility of witnesses

9    alleging sexual abuse?

10   A.   Absolutely in no way.

11   Q.   So at the time did you believe that you would be able to

12   conclude that a witness alleging sexual abuse was not

13   testifying truthfully if that was what the evidence suggested?

14   A.   Correct, your Honor, yes, I did.

15   Q.   At the time I asked you questions on November 16, did you

16   harbor any bias against Ms. Maxwell?

17   A.   Not at all.

18   Q.   At the time I asked you questions on November 16, were with

19   you biased in favor of the government or the prosecution?

20   A.   Not at all, your Honor.

21   Q.   Did you want to put your thumb on the scale in any

22   direction?

23   A.   No.

24   Q.   At the time I asked you questions, and in light of your

25   experience with sexual abuse, did you believe that the subject

Case 1:20-cr-00330-PAE    Document 855-2    Filed 02/25/26    Page 28 of 645
Case 1:20-cr-00330-AJN   Document 645   Filed 03/11/22   Page 27 of 50      27
M38TMAX1

1   matter of the case would upset you in such a way that would

2   distract you from your duty as a juror?

3   A.  No, your Honor.

4   Q.  Would you be thinking about your own experience in a way

5   that would prevent you from being fair or impartial?

6   A.  No, your Honor.

7   Q.  At the time I asked you questions on November 16, and in

8   light of your experience with sexual abuse, did you believe

9   that issues of reporting or not reporting sexual abuse that

10  might be discussed at trial would interfere with your ability

11  to be fair or impartial as a juror in the case?

12  A.  No, your Honor.

13  Q.  At the time I asked you questions on November 16, and if

14  you had answered accurately and based on your experience with

15  sexual abuse, did you have any doubt as to your ability to be

16  fair to both sides?

17  A.  No, your Honor, no doubt.

18          THE COURT:  All right.  I will meet with counsel at

19  sidebar.

20          (At sidebar)

21          THE COURT:  I will give you an opportunity to propose

22  follow-up questions in light of his responses to questions of

23  counsel.

24          MS. MOE:  Yes, your Honor, just one proposal.  I

25  believe the Court asked Juror 50 about the way in which he

M38TMAX1

1    approached the questionnaire process, whether he took the

2    Court's instructions seriously.  We would just propose asking

3    parallel questions about the questions he was asked in person,

4    in particular because the juror was asked during voir dire

5    similar questions about questions of bias for or against the

6    government, impartiality.  And so to clarify the record,

7    whether he took answering those questions in person seriously

8    and answered truthfully.

9               MS. STERNHEIM:  Could we have a moment?

10              THE COURT:  You may.

11              (Pause)

12              MR. EVERDELL:  Your Honor, I think there was several

13    areas of follow-up here that are warranted.

14              First, the juror made some reference to his healing

15    process.  I couldn't quite understand what he said at the time,

16    something about how he views himself as a victim or not as a

17    victim of a crime.  I think we need to understand his healing

18    process and what he has gone through, because that affects his

19    ability to be an impartial juror in a case involving sexual

20    abuse.  Is this something that he still is seeking treatment

21    for?  Is this something he is still thinking?  How he deals

22    with the healing process and how he thinks about himself as a

23    victim affects how he views the victim witnesses in this case,

24    and I think there ought to be more questions about that.

25              THE COURT:  What's the proposed question?

M38TMAX1

1          MR. EVERDELL:  What was -- we gave a number of those

2     in our submissions, but:  You talked publicly about the fact

3     that you were in therapy, what was the nature of the therapy?

4     Does it deal with your experiences as victim of sexual abuse?

5     What was the healing process that you talked about?  Describe

6     this healing process for me.  Does it involve addressing this

7     issue of prior child sexual abuse?  Were you in therapy during

8     the trial?  Is this an issue that you are still dealing with?

9          THE COURT:  I did review those questions proposed and

10     I considered them.  The defense did not propose any comparable

11     questions for jurors during the voir dire process who indicated

12     yes to this question and indicated a history of sexual abuse,

13     so those requests are denied.

14          Any other follow-up requests?

15          MR. EVERDELL:  Your Honor, I think we need to talk

16     further about the nature of abuse.  We talked about the fact

17     this was repeated, happened multiple times.  This happened with

18     more than one person, a stepbrother and a friend.  I think we

19     need to understand because -- I'm not trying to pry, your

20     Honor, I'm not trying to get into these gory details, but it is

21     relevant, the extent of the similarities of this juror's abuse

22     and whether that lines up with the testimony we heard from the

23     victims is relevant in an inquiry to bias.

24          And I think we need to understand a little more about

25     similar questions that we asked -- we proposed to the Court in

M38TMAX1

1    our follow up:  How long did this go on?  When did it stop?

2    Were you home when this happened?  What was the interaction

3    between you and the abusers and family members?  These are all

4    things that go to the similarity.

5            THE COURT:  I have the same response.  I considered

6    those questions.  We had, I think it was Juror 21 who had

7    talked about familial abuse.  The defense didn't propose any

8    comparable follow-up questions.  The questions went to the core

9    questions of impartiality and fairness.  The defense didn't

10   request those questions and they didn't move to strike for

11   cause.  Here, there's dissimilarity of age; for example,

12   younger than some of the proposed jurors, some of the

13   inquired-into jurors who indicated yes, the defense didn't

14   request follow up as to the specific similarities and the like,

15   and I don't think I would have asked them because the bottom

16   line questions are what is in issue.  So that request is

17   denied.

18           Any other proposed follow up?

19           MR. EVERDELL:  Yes, I have a few more.

20           MS. STERNHEIM:  Judge, you have asked certain things

21   about the questionnaire, but I do not believe that you asked

22   about the summary of the case which specifically says what this

23   case is about, it is about sexual abuse of a minor, and did he

24   just fly through that as well?

25           It is clear that this juror has supplemented --

Case 1:20-cr-00330-PAE     Document 855-2     Filed 02/25/26     Page 32 of 645
Case 1:20-cr-00330-AJN   Document 645   Filed 03/11/22   Page 31 of 50     31
M38TMAX1

1          THE COURT:  Make your arguments in briefing

2     afterwards, if you're doing that.  I want specific proposed

3     questions in light of responses.

4          MS. STERNHEIM:  I know your Honor did not want to get

5     into what happened in the jury room, but a couple of --

6          THE COURT:  I'm not permitted to get into that.

7          MS. STERNHEIM:  You are permitted to discuss what he

8     stated publicly, and publicly he said that he --

9          THE COURT:  You misunderstand the law, or I do, but I

10    have written an analysis of that issue in my opinion.  That he

11    revealed what happened in jury deliberations does not allow me

12    to accept, as part of this hearing, evidence of what he said in

13    jury deliberations.  You may disagree with that legal analysis.

14    I have written extensively about it in my February 24 opinion.

15    I won't relitigate that now.

16         MS. STERNHEIM:  He did not tell very many people about

17    it, then he told the world.

18         THE COURT:  Right.  I pressed repeatedly on that

19    issue.  If you have a specific follow up that you would like me

20    to ask --

21         MR. EVERDELL:  I do have some follow up.  He said he

22    didn't tell many people, but he also said he didn't think

23    people would learn about his history of sexual abuse, despite

24    the fact that he was telling reporters about that.  We need to

25    ask him, I think, about his post to Annie Farmer where he says:

Case 1:20-cr-00330-PAE    Document 855-2    Filed 02/25/26    Page 33 of 645
Case 1:20-cr-00330-AJN   Document 645   Filed 03/11/22   Page 32 of 50        32
M38TMAX1

1   Thanks for telling my story.  So if he says:  I didn't expect

2   the world to hear about my sexual abuse, yet at the same time

3   he's telling Annie Farmer, one of the victims in this case,

4   post-trial, "Thanks for telling my story," that suggests to me

5   that he wanted to be known as the victim of sexual abuse, he

6   wanted to be seen as a champion of sexual abuse, and that this

7   explanation that he is giving is simply false.

8           There's also the Facebook post that he made after the

9   fact --

10          THE COURT:  Just a moment.  I will ask him to explain,

11  to reconcile that if he can, that he said he didn't think

12  people would know about it with the fact that he went on social

13  media and thanked one of the witnesses in the case.  I will ask

14  about that.

15          MR. EVERDELL:  Your Honor, he said this is a verdict

16  for all of the victims, which I think includes himself.  How

17  does he reconcile that comment with the fact that he didn't

18  want to share with the world that he himself was a victim of

19  sexual abuse, meaning:  I'm doing this for the victims of

20  sexual abuse.  That's clear import of that comment.  I think

21  that's a conflict.

22          There's also his Facebook posts after the fact where

23  he says:  I can now tell everybody that I was a juror on the

24  Ghislaine Maxwell trial.  What an incredible, surreal

25  experience.  Again, telling the world that I'm out here.

M38TMAX1

1          THE COURT:  I will ask the question how does he

2    reconcile the statement that he didn't think anyone would know

3    with the fact that he was posting on social media.

4          MR. EVERDELL:  I think we also need some follow-up

5    questions that we proposed in our letter about his belief about

6    victim memory, because I think that goes to his ability to

7    evaluate the evidence fairly and impartially.

8          THE COURT:  I will deny that.

9          MR. EVERDELL:  I believe also he said in his answers

10   that he didn't hope to be on the jury but if he is going to be

11   on a jury, it might as well be something interesting.  I'm

12   paraphrasing, but that's the import of his comment.  I think we

13   need some follow up about what he meant by that comment.  Why

14   was it that he found this interesting?  Was it some reflection

15   of the fact that it involved victims of sexual abuse, and

16   because he was the victim of sexual abuse himself that made it

17   interesting for him?

18         THE COURT:  I will ask him what he meant.

19         MS. STERNHEIM:  Judge, I may have an issue.  I thought

20   the last question about following your instructions, I think he

21   said no.  And insofar as saying no, how did he not follow your

22   instructions after he filled out the questionnaire?

23         THE COURT:  Okay.  I will ask that question and then I

24   will ask the government's question about whether he followed my

25   instructions during voir dire.

Case 1:20-cr-00330-PAE    Document 855-2    Filed 02/25/26    Page 35 of 645
Case 1:20-cr-00330-AJN    Document 645    Filed 03/11/22    Page 34 of 50    34
M38TMAX1

1          MS. MOE:  Thank you, your Honor.

2          THE COURT:  And then I will --

3          MR. EVERDELL:  Your Honor, I believe he mentioned

4    something about his interview with the journalist Lucia, first

5    name Lucia, and I was trying to follow his response, but he

6    said something about:  I didn't understand that this was an

7    issue in the questionnaire.  But I believe the reporting is

8    that they discussed this at length, the consequences of him

9    going public and the consequences of the fact that there was a

10   jury questionnaire at issue here and there were answers to

11   those questions that he would be talking about.  I can't

12   remember exactly what it is, but there was some discussion

13   about the consequences of him going forward.  And I believe

14   what he said was:  I didn't have any discussions or any lengthy

15   discussions with the journalists about me coming forward and

16   just answered their questions.  But I believe there was a

17   discussion with Lucia about the consequences, about whether he

18   wants to do this, about -- I don't remember now --

19         THE COURT:  I don't understand what you're referring

20   to.

21         MR. EVERDELL:  I think the issue is he was saying how

22   he didn't expect to be public, he didn't expect to be known

23   worldwide as a victim of sexual abuse, he didn't expect this

24   come out, even though he's talking to journalists.  My

25   understanding is he had a discussion with Lucia, the journalist

M38TMAX1

1    from The Independent, about the consequences of him coming

2    forward, which is:  This is a momentous decision you're making.

3            So I don't see how he squares his comments about I

4    never thought by talking to the press that I would come forward

5    and be known this way, when in fact I think there was a lengthy

6    discussion he had with a journalist about this very fact.

7            THE COURT:  He said that he recognized by talking to

8    the press about it that it would be known publicly.

9            MR. EVERDELL:  I think he may have said that, but I

10   think at the same time he's saying I didn't think this would be

11   known by my parents and my friends.  I don't know how you

12   square those responses.  To me -- and I know this was the

13   subject of argument that you don't want to hear at this point,

14   but his responses are simply not credible on this point because

15   he's talking out of both sides of his mouth:  I didn't think I

16   would be known, but yet I did know I would be known.  It makes

17   no sense to me.  I'm curious to hear more about what I perceive

18   as blatant conflict in answers about a discussion with a

19   journalist about the consequences of going forward.

20           THE COURT:  You want me to ask about what he discussed

21   with which journalist?

22           MR. EVERDELL:  Lucia, who I believe is The Independent

23   journalist.  So I would -- I'm sorry it's not coming out very

24   focused, I apologize, but:  You had discussed before in

25   responses to my questions about the fact that you didn't think

1    that talking to a reporter would necessarily make you known to

2    the world about -- your sexual abuse known to the world.  If

3    that wasn't something that truly entered your head, isn't it a

4    fact that you spoke to Lucia, the reporter from The Independent

5    that you spoke to, about the consequences that you might face

6    in revealing all this stuff -- we won't get into jury

7    deliberations -- about what you said to her about your sexual

8    abuse and other things, there would be well-known consequences

9    to what you were doing.  How do you square those two thoughts

10   in your head, which you didn't think it would be public, didn't

11   think you would be known for this, and the journalist is

12   telling you that very fact?

13            MS. MOE:  Your Honor, the government has no objection

14   to limited follow-up questions about his understanding about

15   whether it would become public.  I do have concerns about the

16   proposed question because it's confusing and a little cryptic.

17   I don't know what the word "consequences" might mean in

18   response to the question or what that's in particular driving

19   at.  I think, as the Court noted, he has already sort of

20   explained his understanding about speaking publicly to a

21   reporter and whether it would be publicly known that he was the

22   victim of sexual abuse.

23            There's also, I think, some tension between the

24   Court's focused question about whether he understood it would

25   become public that he was the victim of sexual abuse and

M38TMAX1

1    further questions about his understanding about sort of the

2    magnitude of press coverage arising from the issue that gives

3    rise to this hearing, which I believe he touched on as well.

4         THE COURT:  I think what I will do is go back and ask:

5    Did you understand at the time you talked to the press in the

6    way that you did, did you understand that it would be publicly

7    known that you were a victim of sexual abuse?  We'll see what

8    he says.

9         Did you think about the consequences of talking to the

10   press about that?  Did you talk to the press, the press

11   reporter about the consequences?

12        It's difficult for me to see what it's going at, but I

13   will seek clarification on his answers, as I did multiple

14   times, on the reconciling and understanding his thinking about

15   coming out publicly as a victim of sexual abuse.  He has

16   explained some of the transformation process and the like.  You

17   can make your arguments about credibility.  But I will go back

18   and see if there's something to ask regarding talking to the

19   reporter about the consequences.  Which also there's a temporal

20   issue here, he didn't think about it until he talked to the

21   press, and in the course of that the press talked to him about

22   the consequences and that changed his understanding

23   potentially.

24        MS. MOE:  Yes, your Honor.  And I think yet a third

25   point, talking about consequences today, I think Juror 50

M38TMAX1

1    rightly understands that question to be referring to whether he

2    would understand he would be sitting in a courtroom like this.

3               THE COURT:  I will go back and try to get an

4    understanding of what he thought would happen when talking to

5    the press regarding his own sexual history regarding it being

6    publicly known that he was someone who suffered from sexual

7    abuse.

8               MS. STERNHEIM:  During the interview he mentioned

9    question 48, and he said:  I recall being asking about friend

10   and family, and she said "it also asked about you," he turned

11   beet red, and she said:  You're turning beet red.  He said:

12   The blood is rushing to my head.

13              THE COURT:  She actually said:  You're not on the

14   stand.  You misquoted it in the papers.

15              MR. EVERDELL:  Not in the sun.

16              THE COURT:  You're not in the sun, she said, you're

17   not on the stand, don't worry, but yes.

18              MS. STERNHEIM:  What was going through his mind when

19   she mentioned that the question included you?

20              THE COURT:  I will ask that.  He talked about the

21   first time he learned that the questionnaire had the question.

22              MS. STERNHEIM:  And last thing is:  What was his

23   motivation in speaking to the press and being interviewed?

24              THE COURT:  Those questions, what motivated him after

25   trial, is not relevant to what was going on during the filling

M38TMAX1

1    out of the questionnaire and responding to the voir dire.    I

2    would ask questions about that, and I have, but what motivated

3    him to talk to the press is not relevant to the inquiry.

4            All right.    Anything else?

5            MS. MOE:    Not from the government, your Honor, thank

6    you.

7            (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M38YMAX2

1                (In open court)

2                THE COURT:  All right.  I do have some additional

3       questions, Juror 50.

4       BY THE COURT:

5       Q.  I asked you whether you approached filling out the

6       questionnaire with diligence.

7                Can you recall that?

8       A.  Yes, your Honor.

9       Q.  And you indicated no and you wish you had and that sort of

10      thing.  And I asked you whether you took my instructions

11      carefully in the questionnaire.

12               Do you remember that?

13      A.  Yes, your Honor.

14      Q.  And your answer is no?  Is that accurate?

15      A.  Yes, your Honor.

16      Q.  And to make sure I understand, why is that?  Why didn't you

17      take my instructions carefully?

18      A.  It was definitely inadvertent.  Again, like I said, I began

19      to float, fly through it, in order to get done.  I was super

20      distracted, and it just -- I don't know what happened.  I just

21      wanted to get done with it.

22      Q.  When you came back on November 16 for the follow-up

23      questions, there was another instruction video.

24               Do you recall that?

25      A.  Yes, your Honor.

M38YMAX2

1    Q.   And when I asked you questions, those one-on-one questions,

2    did you pay attention to the instructions at that time?

3    A.   Yes, your Honor.

4    Q.   Did you listen carefully to my questions?

5    A.   Yes, your Honor.

6    Q.   Do you have any doubt that you answered those questions

7    accurately?

8    A.   I answered every single one of those questions accurately.

9    Q.   Might you have failed to pay attention to the specifics of

10   the questions in any way?

11   A.   Not at all, your Honor.

12   Q.   And how do you know that, given how you approached the

13   questionnaire?

14   A.   Because it was a different situation.  I wasn't distracted.

15   There weren't things going on.  I wasn't sitting there for

16   hours.  It was multiple weeks later.  So, again, I wasn't -- at

17   that point, I wasn't thinking about my ex.

18   Q.   Would you say that you're distracted easily?

19   A.   I think I can become distracted, but it had no effect me

20   serving in the jury, on the jury, and listening to all the

21   evidence given during the trial.

22   Q.   And what was your approach to my instructions at various

23   points?

24   A.   It was to follow them.

25   Q.   When you were testifying earlier -- and I asked you some

M38YMAX2

```
 1   questions about this -- you said that you didn't think that
 2   your family or friends would learn that you were a victim of
 3   sexual abuse, despite the press interviews.
 4           Do I have that right?
 5   A.  Yes, your Honor.
 6   Q.  And why didn't you think that?
 7   A.  Well, I wasn't using my full name.  I'm also not ashamed
 8   about it.  It's something that happened, and it's something
 9   that is relatively common that happened to multiple people
10   throughout the world.
11   Q.  And we talked about this, but you understood that there was
12   a high level of press and public attention to the case.
13   Correct?
14   A.  Yes, your Honor.
15   Q.  Help me reconcile that you didn't think friends and family
16   would learn about your sexual abuse with the fact that you were
17   speaking publicly about it.
18   A.  The one thing that I can point to is that when my friends
19   commented, texted me -- commented on my post, texted me about
20   it, they didn't even know that this trial was even happening.
21   So I figured a little article about a juror giving their
22   experience wouldn't be record-breaking or really in the news at
23   all.
24   Q.  So you couldn't see how they would find out about it?
25   A.  Yes, your Honor.  That wasn't something that I was
```

Case 1:20-cr-00330-PAE    Document 855-2    Filed 02/25/26    Page 44 of 645
Case 1:20-cr-00330-AJN   Document 645   Filed 03/11/22   Page 43 of 50        43
M38YMAX2

1    intentionally planning to hide; right?  So if somebody were to

2    ask me if I was abused, I would say yes.

3    Q.   And otherwise -- well, let me ask you:  You were posting on

4    social media about your role as a juror.

5    A.   After the trial, yes.

6    Q.   So wouldn't your friends and family find out in that

7    regard?

8    A.   It just -- I just said that I had served on the jury.  I

9    didn't say anything about it in it.

10   Q.   There was a communication with one of the witnesses in the

11   case, Annie Farmer, on social media?

12   A.   That's right.

13   Q.   And you thanked her for sharing your story.

14   A.   Yes.

15   Q.   What did you mean by that?

16   A.   She just shared the article, and then I commented on it;

17   that thank you for sharing my story because she said that I was

18   brave enough to come forward, and so I thanked her for sharing

19   hers as well.

20   Q.   So your friends who followed you there would see that.

21   A.   I don't have any followers.  I think I had like two

22   followers, and they were random things.  Twitter is not

23   something I normally use.  So I had just randomly seen that

24   she'd shared that.  So I felt like I wanted to comment.

25   Q.   You testified, when I asked whether you hoped you'd be on

Case 1:20-cr-00330-PAE    Document 855-2    Filed 02/25/26    Page 45 of 645
Case 1:20-cr-00330-AJN   Document 645   Filed 03/11/22  Page 44 of 50      44
M38YMAX2

1  the jury, and you had said that you didn't think you would.

2  And I asked you why, and I asked you if you hoped you would.

3          And you said, well, I thought it would be interesting.

4  If you were going to serve jury duty, this would be --

5          What did you mean you thought it would be interesting?

6  A.  So not everybody gets called for jury duty.  Some people

7  never get called in their entire lifetime.  I figured if --

8  what I mean by that is this is something interesting.  It's not

9  like -- I don't know.  Maybe a fraud case might be boring.  I

10  don't know.  I just felt like this might be something

11  interesting that keeps my attention.

12  Q.  I asked you when you first learned that the questionnaire

13  included a history-of-sexual-abuse question.

14          Do you remember that?

15  A.  Yes, your Honor.

16  Q.  And you told me during a videoed interview.

17  A.  Yes, your Honor.

18  Q.  Correct.

19          What was your reaction when you learned that the

20  questionnaire contained that question?

21  A.  Well, she asked me.  And I was, like, they don't ask about

22  your own personal abuse because it's what I believed.  It's

23  what I thought.  It's what I read.  I didn't know I had made a

24  huge mistake like that, and that's why I responded that way.

25  Q.  And how did you feel?

M38YMAX2

1    A.  Well, number one, I was, like, did I just mess something up

2    entirely?  And I was embarrassed and sort of like shocked and

3    didn't know that that was the full question.

4    Q.  I think at one point you said that you sort of didn't

5    realize the extent to which your interviewing would kind of

6    reverberate.  I don't mean this process.

7         But in terms of the public knowing that you had a

8    history of sexual abuse, with any of the reporters you spoke

9    to, did you talk through the consequences?

10   A.  No, your Honor.

11   Q.  And, again, I don't mean about this kind of process.  But I

12   just mean to speak about your history of sexual abuse.

13   A.  Correct.  No, your Honor.

14        THE COURT:  I'll briefly meet with counsel.

15        (At the sidebar)

16        THE COURT:  I want to make sure that I've accurately

17   captured the follow-up questions that were requested and give

18   you a final opportunity if you have any additional questions

19   for followup.

20        MS. POMERANTZ:  Nothing further, your Honor.  Thank

21   you.

22        MS. STERNHEIM:  Judge, I had asked before if the Court

23   could inquire about the summary of the case.  He said he paid

24   attention early on.  He specifically said that the case was

25   about sexual abuse.

M38YMAX2

1              THE COURT:  I don't understand what the question is.

2              MS. STERNHEIM:  Well, you had read that.  So you knew

3       what this case about, and that was in your mind when you were

4       answering the questionnaire.  For him to say that --

5              THE COURT:  I don't want argument.

6              What question do you want me to ask?

7              MS. STERNHEIM:  Did you read the summary of the case

8       and understand that the subject matter of this case --

9              THE COURT:  Well, I won't summarize it.  I'll read the

10      whole thing and ask:  "Did you understand that that was the

11      subject matter of the case?"

12             MS. STERNHEIM:  Yes.

13             MS. POMERANTZ:  No objection, your Honor.  Thank you.

14             (In open court)

15      BY THE COURT:

16      Q.  Returning to the questionnaire, it says, page 4.  It's

17      actually the second page of the questionnaire.  There were

18      documents that you took off when you filled it out.

19             I provided a summary of the case.

20             Do you recall that?

21      A.  Yes, your Honor.

22      Q.  The third paragraph down in that summary reads:  "The

23      charges of the indictment stem from allegations that from at

24      least 1994 through 2004, the defendant conspired with and aided

25      and abetted Jeffrey Epstein to entice minors to travel to

M38YMAX2

1    engage in criminal sexual activity, to transport minors to

2    engage in criminal sexual activity, and to engage in sex

3    trafficking of a minor."

4        And then the next paragraph lays out of the specific

5    counts.

6        Do you recall if you read that summary of the case?

7    A.  Yes, your Honor.  I did.

8    Q.  So what did you understand the case to be about?

9    A.  Just that, just what was written there.

10   Q.  And in reading that, did that cause you to think about your

11   history of sexual abuse?

12   A.  It did not.  Again, it's something that I don't think

13   about.  It happened so long ago.  Again, it's not part of who I

14   am.

15       THE COURT:  All right.  You may step down.

16       (Witness excused)

17       THE COURT:  Counsel, let me ask your proposals as to

18   some briefing, if necessary, post-trial briefing.

19       Government?

20       MS. MOE:  Your Honor, the government would

21   respectfully propose that the parties submit letter briefing

22   promptly following the hearing within the next few days.

23       If I could just have a moment to confer with my

24   colleagues about a specific date.  Our general proposal would

25   be to have a short and tight briefing schedule to resolve the

M38YMAX2

1    issues from the hearing, but if I could just have one moment

2    about a specific date.

3            THE COURT:  Okay.

4            (Government counsel confer off the record)

5            MS. MOE:  Your Honor, the government would propose

6    that we submit our letter briefing by Friday.

7            MS. STERNHEIM:  May I, Judge?

8            THE COURT:  Yes.  I think your response on the other

9    briefing is due on Friday.

10           MS. STERNHEIM:  And I am starting a trial, not that

11   that is going to necessarily prolong our request.  But I would

12   ask for two weeks for us to submit our written submission.

13           MS. MOE:  Your Honor, the government respectfully

14   submits that this issue has been prolonged in litigation.  It

15   has been briefed exhaustively.  The only remaining issues are

16   about Juror 50's testimony today and the inferences to be

17   drawn, which is a very narrow and confined issue which can be

18   resolved quickly and briefed quickly.

19           MS. STERNHEIM:  Your Honor, this is an incredibly

20   important issue.  We are not asking for --

21           THE COURT:  I know it's incredibly important,

22   Ms. Sternheim.  That doesn't alter the fact of what there is to

23   do.  But let me look at the calendar.

24           What date does your trial start, Ms. Sternheim?

25           MS. STERNHEIM:  The 16th.

M38YMAX2

 1              THE COURT:  All right.  I think simultaneous briefing

 2    is appropriate.  For one, I have responsive briefing on the

 3    legal issues, and so really what we're talking about is

 4    argument following based on today's record.

 5              One week from today, the 15th.  Simultaneous briefing,

 6    I don't care if you call it letter briefing or otherwise.  As

 7    you know, all I care is that it's double-spaced so I can read

 8    it on my iPad.  Fifteen pages max per side.

 9              Anything else from the government?

10              MS. POMERANTZ:  No, your Honor.  Thank you.

11              MS. STERNHEIM:  Your Honor, I would just request that

12    our submission of questions which was sent to chambers be made

13    a part of this record.

14              THE COURT:  Yes.  As I've said, I will docket

15    everything.  There's identifying information of Juror 50 in

16    your submitted questions.  So that needs to be redacted.

17              But other than Juror 50 identifying information, the

18    redactions for all materials, I believe, for all materials

19    based on the post-trial briefing and the submitted questions

20    can be publicly docketed.

21              Is that correct?  As well as my opinion had two lines

22    of redactions.  So I'll docket my opinion without redactions.

23    I'll ask the parties to -- actually, I think we can handle the

24    submitted questions, the redactions for identifying

25    information.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

M38YMAX2

1            The parties' briefing, I'll ask you to submit the

2      briefs with redactions only for protecting juror privacy and

3      juror identity.

4            Any reason not to do that by tomorrow?

5            MS. MOE:  Yes, your Honor.

6            THE COURT:  By tomorrow?

7            MS. STERNHEIM:  Yes.

8            THE COURT:  Thank you.

9            So that will put everything on the record.  As for

10     today's hearing, the only thing that's redacted is Juror 50's

11     name.  And that's redacted on the immunity materials, as well

12     as Mr. Spodek's letter just indicated "Juror 50."

13            Anything further, Ms. Sternheim?

14            MS. STERNHEIM:  Not at this time.

15            THE COURT:  Ms. Moe?

16            MS. MOE:  No, your Honor.  Thank you.

17            THE COURT:  All right.  We're adjourned.

18            (Adjourned)

19

20

21

22

23

24

25

# EXHIBIT 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 4/1/22

United States of America,

    –v–

Ghislaine Maxwell,

        Defendant.

20-CR-330 (AJN)

OPINION & ORDER

ALISON J. NATHAN, Circuit Judge, sitting by designation:

Central to our system of justice is a defendant's right to have guilt adjudged by a lay jury of one's peers. Citizens give their time and attention to this critical role in the administration of justice, a role which is enshrined in our Constitution. Judicial officers are charged with the implementation of this constitutional right. In all cases, whether of high profile or low, trial courts must ensure that only jurors who can fairly and impartially assess the evidence are seated on the jury. And once seated, the jury must be permitted to deliberate fully and frankly in an effort to reach a unanimous verdict. Trials entail significant investments of public and private resources. *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 555 (1984). For all of these reasons, a verdict may be set aside only in the most extraordinary of circumstances.

Before the Court is the Defendant's motion for a new trial pursuant to Federal Rule of Criminal Procedure 33 on the basis that a juror provided inaccurate information during jury selection. Maxwell contends the juror's presence on the jury violated her Sixth Amendment right to an impartial jury. Bearing these principles in mind, the Court conducted an uncommon post-trial hearing. Although uncommon, the hearing was necessary because of incontrovertible evidence that Juror 50 failed to respond accurately during the jury selection process to a question on a written questionnaire about his history of sexual abuse. At the hearing, the Court

was impossible he would be selected as a final juror. *Id.* at 11–13, 18. He testified that his personal history of sexual abuse was not something he typically thought about and that it had not crossed his mind as he filled out the questionnaire.

The Court asked follow-up questions consistent with those asked of prospective jurors during *voir dire* who responded affirmatively to Questions 25, 48, and 49 on their questionnaires, including those questions proposed by Defense counsel at that stage during trial. Further, the Court asked Juror 50 about several potential inconsistencies in his testimony. The Court did not permit questions that were inconsistent with the process as it played out in *voir dire* or otherwise irrelevant or redundant. Ultimately, Juror 50 testified that his experience would not affect his ability to be a fair and impartial juror. He affirmed that he did not harbor any bias against the Defendant nor in favor of the Government. He asserted that he would be able to assess the credibility of witnesses alleging sexual abuse. And he affirmed that the subject matter of the case would not upset him in such a way that would distract him from his duty as a juror, nor would he be thinking about his experience in a way that would prevent him from being fair or impartial.

At the conclusion of the hearing, the Court ordered the parties to submit supplemental briefing on Juror 50's testimony, which the parties simultaneously submitted on March 15, 2022. Dkt. Nos. 648, 649.[2]

## II.  LEGAL STANDARD

The Sixth Amendment guarantees criminal defendants "the right to a speedy and public trial[] by an impartial jury." U.S. Const. amend. VI. An impartial jury is one "capable and

---

[2] On April 1, 2022, the Defendant requested the Court stay its ruling pending the release of a documentary in which Juror 50 is expected to appear. Dkt. No. 651. That request is denied. The Defendant provides no basis to conclude that the interview would affect the Court's analysis or conclusion having held an evidentiary hearing.

11

### 3. The Court rejects the Defendant's additional post-hearing argument that Juror 50 was biased because he failed to follow instructions.

In her post-hearing briefing, the Defendant argues that Juror 50's testimony that he was "absolutely not" concerned with following the Court's instructions when filling out the questionnaire is an additional ground for concluding that Juror 50 was unable to serve as an unbiased juror. Maxwell Post-Hearing Br. at 11–12 (quoting Hearing Tr. at 18). The Court disagrees.

Juror 50's testimony established that his lack of diligence was limited to the questionnaire session. Juror 50 showed up for trial on time every day and appeared to the Court that he was attentive throughout trial. There is no indication that Juror 50 failed to follow this Court's instructions during *voir dire*, trial, or deliberations. Juror 50 explained that he was unconcerned with following the Court's instructions while completing the questionnaire because he was "super distracted" and believed that there was no possibility that he would be selected for the jury. Hearing Tr. at 40. *Voir dire*, he testified, was a "different situation." *Id.* at 41. When he answered the Court's questions in person at *voir dire*, he had not been "sitting there for hours . . . thinking about [his] ex." *Id.* He felt confident that be accurately answered all of the Court's questions. This included affirming that he was able to follow the Court's instructions as to the presumption of innocence and the law generally, the prohibition on consuming media on the case or any other extraneous information, and his ability to put any prior knowledge to the side and decide the case based on the evidence, or lack of evidence, presented at trial. Voir Dire Tr. at 128–31. Under oath, he testified that although he "can become distracted," that "had no effect" on him serving and "listening to all the evidence given during the trial." Hearing Tr. at 41. The Court confirmed that Juror 50 "carefully" followed the Court's instructions during *voir dire* and trial. *Id.*

38

interviews he "wasn't using [his] full name," which Juror 50 apparently understood reduced the chance that people that knew him would draw the connection. *Id.* at 42. And, further, he explained that several friends that contacted him after the trial were unaware of the trial occurring, so he assumed his post-trial media interviews would not attract substantial attention.

Second, Juror 50 simultaneously acknowledged that because of his interviews, the fact that he was abused "would be a known fact in the world." *Id.* at 24. He explained that he had made a conscious decision in favor of disclosure because, "[a]fter sitting on this trial for several weeks and seeing the victims be brave enough to give their stories, [he] felt" that he could too. *Id.*; *see also id.* at 42 ("I'm also not ashamed about it. It's something that happened, and it's something that is relatively common that happened to multiple people throughout the world.").

In short, Juror 50's willingness to disclose his sexual abuse changed to some extent between November 4, 2021, and January 2022. He made a conscious decision to share the fact of his sexual abuse with a wider circle of people than he had prior to the time that he completed the questionnaire. At the same time, he presumed—in hindsight, mistakenly—that his interviews, given without his last name and predominantly to international media outlets, would not be seen by his friends or family in his life who, he believed, had not followed the trial up to that point. That explanation of partial public disclosure is further consistent with the fact that in his interviews he related only the fact that he had been abused, not any details of what had occurred. Juror 50's wishful thinking—or as the Government suggests, naivety—with respect to his post-trial interviews does not suggest that when he completed his questionnaire, he intended to deceive. *See* Government Post-Hearing Br. at 10 n.4, Dkt. No. 648.

The Court also asked Juror 50 about his social media interaction with Annie Farmer. On Twitter, Farmer shared an article that contained an interview with Juror 50 and she said that

of these questions, Juror 50 answered "No" on the questionnaire, but testified that the correct
answer would have been "Yes (self)" for Questions 25 and 48 and "Yes (friend or family
member)" for Question 49. Hearing Tr. at 7–12. Those three inaccurate answers all stem from
Juror 50's failure to disclose that he was sexually abused as a child. Under the Defendant's
interpretation of *McDonough*, that would be sufficient to satisfy the first prong. But the
Government's interpretation requires that the Court make a further finding that the inaccurate
answers were made deliberately.

After close consideration of the record, including Juror 50's testimony under oath, the
Court concludes that Juror 50's answers to the questionnaire, while incorrect, were not
deliberately inaccurate. Rather, for the reasons that follow, the Court credits Juror 50's
explanation that he "flew through" the questionnaire, misread the relevant questions, and
provided inadvertently inaccurate responses. *Id.* at 12.

As a preliminary matter, Juror 50 testified under oath pursuant to a grant of immunity.
*Id.* at 5. He faces the possibility of perjury charges if he testified falsely at the hearing. Juror 50
therefore had a strong incentive to testify truthfully.

Moreover, the Court credits Juror 50's testimony in light of his demeanor in testifying
under oath. At the hearing, the Court was able to closely observe Juror 50 as he testified and to
assess his reaction to questions, including those he appeared not to expect, as well as to the
overall tone of his answers. Juror 50 answered the Court's questions in a calm and
straightforward manner. He was apologetic for his carelessness. His tone, demeanor, and
responsiveness gave no indication of false testimony.

Further, Juror 50's answers to the Court's questions were logical explanations and
generally internally consistent. He testified that his attention to the questionnaire was distracted

16

The parties dispute whether the first prong of *McDonough* requires "deliberate juror misconduct"—that is, whether the juror must have deliberately provided a false answer in *voir dire*. The Government, relying on Second Circuit precedent such as *United States v. Shaoul*, argues that a deliberate falsehood is required. Gov. Br. at 13 (citing *Shaoul*, 41 F.3d at 815–16). In contrast, the Defendant contends that *McDonough* does not require deliberateness and that an inadvertent false statement satisfies the first prong. Maxwell Br. at 23–28; Maxwell Reply at 9–14, Dkt. No. 644.[3] The Court does not resolve this legal dispute because, as explained in the analysis section below, regardless of which approach is the correct one, the Court finds that the false answers were not deliberate *and* that the second prong of *McDonough* is not satisfied.

Under the second prong of *McDonough*, the Court "must determine if it would have granted the hypothetical challenge" for cause if the juror had responded accurately. *United States v. Greer*, 285 F.3d 158, 171 (2d Cir. 2002); *United States v. Stewart*, 433 F.3d 273, 304 (2d Cir. 2006). "Challenges for cause are generally based on actual bias, implied bias, or inferable bias." *Greer*, 285 F.3d at 171. These categories do not always elucidate the analysis and there is overlap (and sometimes confusion) in how they are discussed in some of the cases. Nevertheless, it is important to attempt to delineate. Actual bias is "bias in fact," due either to the juror admitting partiality or a judge finding actual partiality based on the juror's *voir dire* answers. *United States v. Torres*, 128 F.3d 38, 43 (2d Cir. 1997). Implied bias is "bias presumed as a matter of law" due to a juror's relationship to the parties or connection to the actual crime itself. *Greer*, 285 F.3d at 171–72. Finally, a judge may infer bias when actual or implied bias does not apply. "Bias may be inferred when a juror discloses a fact that bespeaks a risk of partiality sufficiently significant to warrant granting the trial judge discretion to excuse

---

[3] In an amicus curiae brief, the National Association of Criminal Defense Lawyers also argues that deliberateness is not required under *McDonough*. *See* Dkt. No. 614.

sexual activity" and "sex trafficking of a minor," did not cause him to think of his own sexual abuse. Hearing Tr. at 47; Questionnaire at 4. The Court finds that explanation to be reasonable.

Last, the Court finds Juror 50's explanation that his answers were made inadvertently to be the most logical explanation of his overall behavior. Shortly after trial, Juror 50 readily disclosed the fact of his sexual abuse in several media interviews in which he used his real first name and pictures of himself. Finding that Juror 50 intentionally provided false answers on the questionnaire requires concluding that he willingly disclosed his deliberate and unlawful deception in public interviews. The more likely explanation for Juror 50's behavior is the one to which he credibly testified: Juror 50's inaccurate answers were provided inadvertently, and he was made aware of his mistake only after he completed his media interviews. That explanation is corroborated by a video recording of Juror 50's interview with the *Daily Mail*, which the Defendant entered into the record and previously cited in support of her claim for a new trial. *See* Maxwell Br. at 39–40. In that video, Juror 50 states that he was asked only about the sexual abuse history of his friends and family but not his own. When the interviewer asks Juror 50 about Question 48 in particular, he appears genuinely and completely surprised to learn that the questionnaire included this question. That moment of surprise is consistent with Juror 50's hearing testimony that this was the moment at which he realized he may have made a serious, but honest, mistake. *See* Hearing Tr. at 15 (stating that he first learned that the questionnaire may ask about his own sexual abuse history "during [his] Daily Mail interview with the reporter Laura Collins").

The Defendant raises several arguments for why the Court should instead find that Juror 50 committed perjury at the hearing and that his answers on the questionnaire were intentionally inaccurate. The Court is not persuaded. *First*, the Defendant characterizes much of Juror 50's

18

limited approach proposed by the Government. The Court also rejected many of the Defendant's proposed lines of questions. The parties were also permitted to propose follow-up questions at the hearing in light of the Court's questioning and Juror 50's responses. The Court accepted some of these proposals and rejected others.

Juror 50 testified that his answers to Questions 25, 48, and 49 were not accurate. He explained that when he was nine and ten years old, he was abused on multiple occasions by a stepbrother, who he no longer considered part of the family, and one of the stepbrother's friends. Hearing Tr. at 8. He disclosed the abuse to his mother when he was in high school. His mother called the police and gave a report, but no charges were brought. *Id.* at 8–9. Although he first testified that "no" was correct for Question 49 because he did not consider the stepbrother part of his family, upon further questioning from the Court, he acknowledged that the correct answer would have been "yes." *Id.* at 11–13. He similarly acknowledged that "yes (self)" would have been correct to Question 25; although at the time of the questionnaire, he understood the question to be asking about being "robbed or mugged or some sort of crime like that." *Id.* at 9–10.

Juror 50 testified that these incorrect answers were an inadvertent mistake and that he had not intentionally failed to disclose his personal history of sexual abuse. *Id.* at 14–16, 22–23. He explained that he was distracted as he filled out the questionnaire and "completely skimmed way too fast," leading him to misunderstand the questions. *Id.* at 14–15. It took several hours to start the questionnaire after a long security line and technical issues with the Court's instructional video. His mind was preoccupied with a recent romantic breakup and the commotion at the nearby check-out table. He saw other prospective jurors completing their questionnaires and rushed to finish. He explained that he was unconcerned with diligently completing the questionnaire; he assumed due to the sheer "volume" of prospective jurors being screened that it

10

# EXHIBIT 3

# THE LASTING HARM

## WITNESSING THE TRIAL OF GHISLAINE MAXWELL

### LUCIA OSBORNE-CROWLEY

4th ESTATE • London

penis – the only time he tried this – and she immediately said no. Jeffrey had sex with one of the other women in the room instead.

At some point during her visits to Jeffrey's house, Carolyn began suspecting that his mansion was being monitored by law enforcement. She noticed that a house across the street always had camera lenses and telescopes trained on the mansion as the young girls would come and go. She believed it was the FBI, and that they knew what he was up to with underage girls.

'Why would they keep letting me – a 14-year-old girl – go over there? Why didn't they do anything?' she says to me now via video call.

When Carolyn brought this up with federal prosecutors ahead of the Maxwell trial, however, she was instructed that she was *not allowed* to mention these observations on the witness stand.

When I ask Carolyn why she thinks they told her not to say this on the stand, her answer is immediate: 'They are trying to protect the FBI.'

Carolyn also believes that the FBI stole from her home a physical photo of her, while underage, posing with Epstein, Maxwell and Donald Trump.

The photo was in a folder that went missing after the FBI's first visit to Carolyn's house to ask her about potential victimisation by Jeffrey Epstein. When I asked Carolyn, she could not recall exactly which year this was. Carolyn's husband, who was also present for the interview, confirmed to me that he saw the photo before the FBI came and that it went missing afterwards. The photo was also on Carolyn's Myspace page, she explains – but when Trump became president, she was locked out of her Myspace account and has been ever since.

On one occasion, Carolyn was forced to have sex with an older, pudgier man that she hadn't seen before. It was at the Palm Beach mansion. There was another woman in the room when it happened. When we speak on a call in 2022, Carolyn

*The Lasting Harm*

friends a photo of me at the airport, on the way home. We all say goodbye.

It's 7am on New Year's Eve when I land back in London and take the Piccadilly Line all the way to Finsbury Park. I haven't seen my partner or my cats in almost six weeks. I missed Christmas with them, and almost New Year's Eve. I am thrilled to be home, and also can't shake the feeling that something important in my life has shifted, that I am not the same person I was when I left.

I open Instagram and someone I don't know has sent me a message. There is no text in it, just a link to a profile. I open it up. It belongs to someone called Scotty David, and as I scroll, wondering why I've been sent this profile, I see a close-up of his face. It's a juror I recognise from the top-left corner of the jury box.

I open up his larest post to read the caption and, sure enough, he has just posted that he was on the Maxwell jury. I DM him immediately and ask if he wants to talk.

Scotty looks at my profile, follows me back. Not long afterwards, he messages me in reply: he does want to talk.

Scotty David, who wishes to be identified by his first and middle name, told me that he believed all the victims. All the accusers corroborated each other and were backed up by other evidence, he said.

Scotty said he is proud to be part of holding Maxwell accountable for her crimes.

'This verdict is for all the victims,' Scotty told me. 'For those who testified, for those who came forward and for those who haven't come forward. I'm glad that Maxwell has been held accountable.

'This verdict shows that you can be found guilty no matter your status.'

Scotty told me that he found all the accusers who testified to be believable and credible, despite the defence's many attacks on their credibility and their attempts to poke holes in their memory.

*New York, 2021*

this, I can think only of his words: *I believe so strongly in the concept of innocent until proven guilty. I went into every day of that trial assuming she didn't do it.*

Everyone on my social media platforms immediately starrs demonising Scotty for lying. But we haven't yet confirmed that he has 'lied' – and weren't we now, yet again, just assuming that an abuse victim is dishonest?

I ask the court for Scotty's juror form to see his answers, but the court administrators refuse to give it to me. Soon, it transpires that there was a question about being a victim of abuse, and Scotty answered 'no'. The internet lights up again with allegations that he has misled the court. But I am the only one who has spoken to him, who heard the tone of his voice when he realised he might have mistakenly not disclosed his abuse. I know, in a way that no one else can know, that he didn't lie – he made a mistake.

The question asked of the jurors, in full, read: 'Have you or a friend or family member ever been the victim of sexual harassmenr, sexual abuse or sexual assault? (This includes acrual or attempted sexual assault or other unwanted sexual advance, including by a stranger, acquaintance, supervisor, teacher or family member.)'

Scotty ticked the box for 'no'.

There are two issues here, though, and both of them bother me. The first, of course, is the fact that Scotty answered 'no' when asked if he had been an abuse victim. That is worthy of consideration – and I'll get to that in a second. But what bothered me more was that the overwhelming sense from the public was that people genuinely believed that sexual abuse victims are not fit to sit on juries in sexual abuse trials – which just isn't true, and is not said about victims of burglary or fraud.

Everyone who wrote to me, commented, called me, seemed to think that once a person has been a victim of abuse, they can never again be fair or rational. This seems far too close, in my

Kindle

Nobody's Girl: A Memoir of Surviving Abuse...



# NOBODY'S GIRL

## A Memoir of Surviving Abuse and Fighting for Justice

# Virginia Roberts Giuffre

Cover

Location 1 of 5367 · 1%

—

EPSTEIN LIKED TO share with me what he insisted were "scientific" justifi-
cations for his yearnings for young girls. For example, he would only have
sex with girls who had started menstruating. Why? So he could assert that
—since they were biologically able to bear children—they were "of age." I
was flabbergasted when he said this stuff, but I held my tongue. No matter
how young a girl looked, or how sexually inexperienced she was, if she had
her period, he felt he could defend his abuse of her as part of the natural
order of things. I was never sure who he imagined making this argument to
—the girls themselves? his business associates? law-enforcement officers?
himself?—but it was clear that he took a certain glee in what he saw as a
loophole in society's moral code. The fact that different nations and states
define the age of consent differently (in Florida it's eighteen; in New York
it's seventeen; in England it's sixteen) only gave him ammunition. He said
these inconsistencies proved these laws were arbitrary and meaningless; no
one could convince him that sex with minors was wrong, because no one
could agree on what a minor was! Epstein also claimed that because women,
unlike men, can have multiple orgasms, that meant they were supposed to
have multiple sexual partners as well. His logic was loopy, propped up by
pseudoscience, but he presented it as reality. I never challenged him. It was
easier to pretend to believe him.

    Early on, he'd made clear that during sexual encounters, I should appear
to be enjoying what he did to me or what he made me do to him. "I want
bubbly and energetic," he said. "Nobody wants a dead horse." So when he'd
ask me questions about my body's response to him—to describe having an
orgasm, say—I would do so, even though most times, I had faked it and had
to lie. Of course, sometimes there was so much stimulation from vibrators
or sex toys, particularly during the orgies that Epstein liked to orchestrate,
that I couldn't help but climax. When that happened, it sparked confusing
feelings in me, just as it had in my childhood. Did having an orgasm mean I
was a willing participant? I suspected that it did, and that only increased my
self-loathing.

# EXHIBIT 4

HOST: Welcome to the Kicker. I'm Kyle Pope, Editor and publisher of the Columbia Journal Review. This week the coverage of the GM trial and in general the coverage of sexual abuse victims. At the end of December as everybody knows, GM was convicted of 5 sex trafficking charges after a jury in New York concluded she played a pivotal part in recruiting and grooming teenage girls to be sexually abused by Jeffrey Epstein. Maxwell was found guilty of 5 of the 6 federal counts she was charged with and faces up to 65 years in prison. The sentencing hearing has not yet been held. The trial and the way it was conducted raise all kinds of important questions for journalists, about how sexual assault victims are treated in the justice system - by lawyers, by jury, and all of this is now being discussed in light of this very high profile trial.

I am really pleased to be joined today by two journalists who have followed this closer than anybody - Julie K Brown an investigative journalist with the Miami Herald who is the reporter who first brought JE's crimes to light. Her work includes the Herald 2018 series examining how he managed to arrange a secret plea deal and escape life in prison even though he was suspected of abusing more than 100 underage girls; and Lucia Osborne Crowley is a London-based journalist, a lawyer and a reporter from Law360. She's covered the Maxwell trial for her forth-coming book and documentary, and she's the author of *My body keeps your secrets* which tells the story of a young woman's body in the age of social media. Julie and Lucia, thank you so much for being here.

02.09
JULIE: Thanks so much for having us
LUCIA: Thank you so much for having us, it's such a pleasure

02:14
HOST: It's a real honor to be here with both of you. Before we get into it to the core of this question, just give me your sense before we start, before we started recording this conversation, just about what it was like covering this trial in New York and how hard it was and how hard it was especially for journalists for doing this. Give me a sense of, of what it was like day to day.

1

https://player.fm/series/the-kicker/julie-k-brown-lucia-osborne-crowley-and-cover
age-of-the-ghislaine-maxwell-trial

02.47
JULIE: well I've covered you know I've been doing this for 30+ years and I've
covered many many trials both in state

courts and federal courts and in New York; and I have to say this is probably the
worst experience I've ever had in my career covering a trial. I just think you know
it was complicated in part by the fact we are in the throes of Covid. I think that
that aggravated the situation, but beyond that I think that there was this
unnecessary chaos. Given the fact that this trial had been planned for so long I
think that everything was very unorganized especially in the beginning. For the
first few weeks of the trial nobody knew where to go even though you know,
people running the courthouse didn't know where to tell people to go - we were
told one thing one day another thing another day. So it was as I said it was
probably my worst experience covering a case in my 30 + years of journalism

HOST TO LUCIA: Yeah, Lucia, what it what did you make of it?

3:59
LUCIA: Well I completely agree with Julie I mean I was really I was genuinely
very very shocked by this, it was a really difficult experience covering this Trial. I
feel like there was a lot of ways in which the court made it quite inhospitable for
reporters; um and I and I feel like that attitude was made quite obvious to us in a
way that I am found quite difficult to deal with. And I have nowhere near as much
experience as Julie but I cover courts in London as a reporter and you know the
difference is night and day and here you know I'm very much

welcomed into the court and they make space for me and I have my phone on
my laptop and I file stories from the court room with all the same rules applying

2

TRANSCRIPT OF podcast Lucille Osborne Crowley & Julie Brown _
The Kicker _Jan 7, 2022 IMPORTANT FOR DISCUSSION OF SCOTTY DAVID
AND LUCIA'S 'IDEAS' ON JURIES AND BIAS _WP/im

as in other courts you know I can't record anything and I can't take pictures under
the penalty of contempt of court. But I'm still trusted to have my devices in there
and I can file stories from in there and it's a kind of welcoming environment and

Case 1:20-cr-00330-PAE   Document 835-2   Filed 02/25/26   Page 71 of 645

covering this trial was nothing like that. I mean we had to wait outside in the cold, the earliest I got there one day was 2 o'clock in the morning to wait outside until 8 o'clock when they let us in the courtroom so it was you know if nothing else it was a physical test; and I have a disability and physically it was very very hard on me to do four weeks of this. And as I said I genuinely found that quite surprising. You know I think we often talk about being committed to principles of open justice and you know the fact that we value what reporters add to our system by by covering how justice is administered and while that was technically the case here, in practice it was made very hard for us and I think that's a real problem.

5:56
HOST: Who is calling the shots on those kind of details? Was it the facilities people at the courthouse, the Federal courthouse. Or was it The SDNY? do you know who was making these decisions?

06:15
JULIE : Well the problem that happened I think is that nobody took responsibility for handling this - no one entity. When we would call you know the court administrator he would say well I have nothing to do with it it's the US attorney's office then you call US attorney's office and they would say we have nothing to do with it is the court administrators office. At one point I think some people contacted the judge and the judge referred again to the administrator's office so it was being handed around and I think that was part of the problem. There was so much chaos and basically what I realized was you know if we're having such a hard time I wonder how these victims are dealing with it and that that's when it occurred to me that it was time to really take a look at how the system is really treating the victim. They showed up on the first couple of days some of them had complained about the way that they were forced to wait in line like cattle; er and going through that rigorous, I mean they had been through so much and this was their time for justice so you can imagine for them to be treated in this way was very demoralizing yeah.

07.33
HOST: Yeah, in fact, Julie you wrote the story about these victims who were basically out in the cold literally waiting to get in, and you, you tweeted I think at the time that the, the federal court system and the southern district must rethink how they treat victims. And at one point you you witnessed a court official screaming at one of them. tell us tell us about that.

3

08.05

JULIE: well and you know I had written about this Woman I had noticed her in the quart room coming in very quietly every day and I you know you're there for a long time people that are there orange I started chatting with her and here I had spoken with her on the phone before I had remembered that she had called me before to talk about her story about being a victim and she turns out she was taking a greyhound she lives in Philadelphia she was getting up at 3 o'clock in the morning taking the Greyhound bus from Quick cold freezing temperatures sleeting at times very windy bitter and she's taking a Greyhound bus from Philadelphia into New York then taking the subway to the courthouse then wait in line outside with the rest of everybody else hoping she's going to get a seat in the main room and I just found it her story very compelling You know told me her story about being abused by both Maxwell and Epstein and the fact that she felt she was in his sons being re-traumatizing and treated poorly at once again by the criminal justice system that had as much every window from the very beginning

HOST: Yeah I mean in this sort of is is a segue into it which is this whole series of ways in which these victims were either where case of it windy there was a deer was the actual read the family there was cross examination of the items by Aggressive and I'm just curious Julie like wether with this whether this is all in your experience sort of the way that things work, or whether

JULIE: Well from my experience it was a trial I think that there was really no reason that the US attorney's office in New York could've taken a handle on this and realized that there should've been some kind of accommodation for the victims. I was told basically 'you're not victims' - that doesn't make any sense and finally you know after days of questioning and I'm not really answering the questions that I was posing to them they finally said, ' Well they're not the four victims in this case so the only people that were entitled to be in the actual court room itself were these four women who were part of the case. The four women never came back to the court room to sit in the gallery you know they were you know, aggressively questioned, they were in tears when they left one of them lived in California another lives in, I think I think two of them live in California. They don't even live local they're not gonna sit there in the courtroom right behind Maxwell's family who by the way we're ushered in and allowed to take a side door, ushered into the quart room every day, allowed to move around even talk with Ghislaine and you know so there was no court room no court. The

4

administrator US attorney's office said we had these overflow court rooms and so
they were allowed to go into the, everybody was allowed to go who can't get into
the main hall room with very limited seating because of Covid distancing rules.
They were allowed to go into one of the overflow court rooms but there were no
provisions for the
victims to have maybe their own overflow court room. They're being thrown in
there with every you know member of the public - you know people who are you
don't even quite frankly crazy people sometimes coming into these trials, a little
off kilter and you know there was no provision for them to even have a place
where all of them could possibly go and support each other and so they you
know not only were they shut out of the main court room even though there are
two for the public showed up they were they were treated as if they were just
basically cattle in some ways I feel .


13:09
HOST: Lucia you have experience covering I don't know how much you paid
attention to the US what was your perception of the treatment of the victims
here?

LUCIA: Yeah it will even you know I I was very very shocked by the way the court
and the US office really because as Julie said you know this government and
different branches of this government have let these women down again and
again and again for 25 years now and this was the one time that that they were
able to bring someone forward and hold someone accountable for these crimes
and you know it is so disappointing to me that even though they finally managed
to make this happen after decades of doing nothing and they steal him managed
to undermine that experience And I think you know him I'm not might not even be
a strong enough word because you know I saw one of the "officials raise his

voice in my mind you're not a victim face while while she was in tears and you
know that is traumatizing him and you know how to treat a person in the way who
has come along way to watch this trial is really to my mind unforgivable and also
inexplicable I can't think of a single reason why this happened or to justify you
know why the victims in this way and again as Julie said it it would have been
easy for the court and the government and the administrative system to come up
with a way to ensure that these victims were placed in a court room, were safe
were together and were able to support each other. And none of that was done,
so for example you know there was one day that when a victim sitting near me in
the courtroom and there were two reporters sitting right near her and they were

5

making jokes about things that Maxwell had done with each other and you know
it's real locker room talk and it was not no I mean that in the court locker-room
talk know it I know and it was awful it was awful and you know I hated the fact
that she had to hear, that she had to hear those jokes being mean about some of
the worst things and you know it didn't have to be like that and I've spoken to
absolutely horrible experience with this trial and I you know I just think that's a
real problem and the same goes for the way they were treated by the defense
lawyers - people say that they have to do this but I don't think that's true. So
because because the tone of this was different to what I had seen before it was
more aggressive and the air quotes example is a perfect example and they were
so many of them. I was reviewing my notes yesterday and there were so many
moments where, where attacking the victims that you know they just kept I was
going through again you know I can't think of a single reason why it had to be that
way when it's taking so much to get here. Yeah I think we all have to dollars that
we would even be here if it wasn't for Julie Brown.

16:54
JULIE BROWN Exactly well that's what you know brings up another point I mean
I couldn't get credentials for this trial ends I almost didn't come to cover it
because I you know we really can't even really get the courtroom Rules in the
Southern District of New York royal herb or a key can't really say really far in this
day and age when there's so much limited resources for you know newspapers
and media outlets I think they need to rethink not only the way that they
credential people but also this idea that there's somehow you know that they
can't bring in any kind of you know not recording devices but devices like phones
or you know hear that the credentials credential reporters who are based in New
York have all their phones there in the quart room they are texting they are
looking things up on the Internet lawyers are allowed in and they're using their
phones but yet anybody who comes from anywhere else isn't permitted to do
that and Hass to go through you know security every single time turn in there
And if something happens you have to run out throw your coat on dictate
something if you're lucky you can get back in right

away if you're not you're gonna have to wait in line again I mean it was just the
way that it was done and it doesn't matter how many times you did it if you did it
six times a day you had to go through the same thing take your shoes off take
your scarf off I mean they were going through the women's purses I had a lipstick
in my purse that I had in it every single day and it had a weird top on it and I
swear to God every single time I went through that thing they had to open my

purse they had to look at it I need some of these guys were the same guys knew
what they were doing they were eight you just had to think that this was
something they were almost enjoying giving the media a hard time every single
time I know it was crazy I mean How dreadful in the here even even relative to
other trials I am aware of this from reading your work in because our producer
and then went to jail but I got to say the general tone of the coverage of this trial
did not really did you disagree with that

HOST: I did but I'm curious why you think that as well

JULIE: you know think about the way that this case has been covered from 15
years ago this has been a problem with the case from the very beginning I think it
a lot a medium miss the real story here in that Justice system and how it treats
victims how it treats really or we're not even talking about victims necessarily with
how it treats just the general public you know they work for the public and just the
way that they are lawyers are very chummy with each other the judges are very
lawyers it's like this inside club and I think that it's just to insist to us and it doesn't
recognize the fact that we need to for one thing and I think also the media
unfortunately you know when it becomes your beach on a regular basis you don't
wanna rock the boat you don't want to criticize the people that you're getting your
stories from and I think that that was part of the problem here.

21:16
JULIE CONTINUES: The administrator of the Court system was extremely
aggressive and you know it is I've never seen anything like it I mean he was
screaming and yelling at people for things that were really unnecessary all the
time and I think that a lot of the media didn't wanna rock the boat because I mean
I was afraid they were going to me out of the quart room one time because I
wanted to go up I wanted to ask him about why he wasn't letting why there wasn't
a seat in the quart room for a victim and he started screaming for security
because I had walked over to the well which where he was standing when I ask
you a question and he screaming security and I saw Roman I think I'm sure a lot
of reporters felt like they needed to stand out or that may be perhaps there would
be consequences what are you How do you think yeah well I think I am this is a
really good point is that you know the people who are in charge really let us know
that they were the ones who are in charge weather in aggressive and it times

threatening and so you know I think he is their plan was to intimidate him a lot of
reporting on it probably worked for that reason because we were treated as if you

know that we should feel lucky that we are being given access to this realm of us
we had a right to be there but that's not how I am

22:10
LUCIA: I think it's partly that I also think you know it comes down to the fact that
reporters like Julie weren't given priority to be in Cover the story from the
beginning who are the reason we are here and doing really difficult trauma
informed reporting for decades weren't given access to the quart room and then
all the reporters who do you know I just come onto the story were given priority
and and you can see from the coverage I have to agree with you a lot of the
coverage didn't reflect at all what I was seeing and hearing and feeling in that

8

room and you know I think a lot of the reporters that their priorities were to kind of
bring out the most sensational things that happened every day and really good
job of looking at looking at the words that we use in each piece things like the big
names that came out or Annie Farmer's boots - you know the amount of reporting
on Aninie Farmer's which just reflected exactly what the defense wanted to be
reflected, which is that the boots were a really big deal but had you had more
trauma-informed reporting, you wouldn't wouldn't give so much time to the way
the defense kind of aggressively questioned Annie about those boots. And I think
that's just

really a cool good example of how some of the coverage I think, missed the
important stories in an important stories where the people who are sitting in the
room with us who you know had had to fight tooth and nail to even get in there,
and then you know I see them because they couldn't get in at all and you know I
think it is reading a lot of that coverage that it it, it, it divert in diverge from from
my experience of the child.

LUCIA: an exception of course Julie he did tell the story of the victim who is out
in the cold and and she wrote about her experience but you know a lot of people
went

25:22 HOST: So finally I'm wondering, Lucia had a dream interview with a

Case 1:20-cr-00330-PAE   Document 855-2   Filed 02/25/26   Page 77 of 645

member of the Jury um who talked about why he believed the women who
testified as well as his own experience of sexual abuse, and um, a couple things
about this, one is all this stuff we've been talking about, how horribly the lawyers
treated the victims, in his mind backfired it seemed to me. ..was saying not only
did it turn me off but it so it almost like drew him closer to the victims. And I got to
think even if you just approach, forget the human part of this, like what's the most
effective way to get what you want in the courtroom, it seemed like these lawyers
are not taking the track that's working.

26:27 LUCiA: Yeah and you know I thought that so often during this trial
especially in moments when victims were being cross examined in this really
aggressive and sometimes snarky and just downright nasty manner you know. in
a way that I don't think talking to people that way in the trial is ever appropriate
and the fact that being spoken to in that nasty way, were so shocking to me as
you say Kyle on a human level but it did keep occurring to me that I wasn't, I
didn't think it was a good strategic move either.

27:06
JULIE: If I can just interrupt also remember, I'm sorry interrupt but I these
women, I don't think there was any dispute that they were abused by Jeffrey
Epstein, there was never a dispute about that, so for them to treat these victims
like this like they were horrible human beings when they were clearly victims.
You could argue that they were not victims of Maxwell but they were definitely
victims.

27:54
HOST: Yeah that's what's so shocking to me that the prosecutors didn't get the
memo on, do you know what I mean? Cos it seemed to me that it was their job to
do something else which was to tie Maxwell to this, not to re
relitigate whether these women were victimized. But

LUCIA: Absolutely.

27:48
HOST: You know one of the things , Lucia I am curious whether you anticipated
this when you did this piece about the Juror who talked about his own experience
of sexual abuse and how according to your story he shared the rest of these

9

Case 1:20-cr-00330-PAE    Document 835-2    Filed 02/25/26    Page 78 of 645

details with the rest of the Jurors to sort of help, tell them how he saw it. And he helped them understand why you know, why people may have been delayed in coming forward and all these issues. Anyway, so now, this has kicked up a debate now about whether people who have been abused themselves can be impartial jurors. I think it's a silly discussion. I mean people are talking about it being used in an appeal.. Did you anticipate that debate being picked up by his comments?


28:50 TALKING ABOUT HER INTERVIEW WITH SCOTTY -

LUCIA: Well I mean, in one way yes and in one way no. I mean he and I had a conversation about this, you know, about what the repercussions might be and er you know, there's 2 issues. One is what he put on his juror questionnaire and in my mind it's lots more complicated than it seems to be in the minds of lots of other people. So that's one thing and we talked a lot about that and his best memory is that he filled in those forms honestly. Ummmm but we still had that discussion. The second issue which seems to be kind of dominating the discussion and which I think is really important to talk about, is this idea that so many people seem to have that a sexual abuse victim would automatically be excluded from a jury in this case; and that that is right. And you know I think we really need to interrogate that that's a really problematic position to take, both legally and ethically; and the amount, the kind of wave of opinions that I've heard that you know - that people with this experience should never be allowed on these juries - is quite surprising to me. And actually, just you know, before I logged on here I got off the phone with a jury expert for my follow up story about this exact question; and the truth is that you know, there is no way that we should be excluding all sexual abuse victims from sexual abuse trials because that would completely skew a jury - so that question - so taking the Maxwell trial - that question that said 'have you ever been sexually assaulted abused or harassed?' that's a very broad question and I looked at reports of you know people who've been asked essentially that same question in studies. 81% of women answer that question yes yes and 43% of men so think about who you're left with if you take out those huge chunks of the population to answer yes to that question. And if you are saying that people who have a past experience of abuse, have an incurable bias, um, you know you are saying something really alarming about those people so I think you are saying something really really alarming because you are saying those people who have been subjected to a certain experience have to be excluded because they have this bias that they couldn't possibly set

10

Case 1:20-cr-00330-PAE    Document 835-2    Filed 02/25/26    Page 79 of 645

aside. And I think what we need to think

11

TRANSCRIPT OF podcast Lucille Osborne Crowley & Julie Brown _
The Kicker _Jan 7, 2022 IMPORTANT FOR DISCUSSION OF SCOTTY DAVID
AND LUCIA'S 'IDEAS' ON JURIES AND BIAS _WP/im

about is if we are saying that the consequence of that is a different kind of bias.
The consequence of that is only having juries made up of people who have never
been touched by this issue. And that means you are going to have juries who
look a lot more like the perpetrators of abuse than the victims of abuse. [WOW
im] and that is, that is you know biased, you know that is also a problem. So you
know, I think it's something we really need to look at. I mean I'd love to know your
thoughts Julie.

HOST: Well I want to hear Julie's too but it just seems so absurd because it
creates a special class of victim of sexual assault.

LUCIA: Yes

HOST: Because if you were in a trial and you were asked hae you ever been the
victim of a crime and you say yes, you are not excluded from the Jury.

LUCIA: Right

HOST: Even if you are a victim of a crime that is related to what's on
[unintelligible] - like people carving out a special category of victimhood.

33.24
JULIE: It also occurs to me ... concern about re-traumatising these women - -
victims tend to have, they do tend to forget details, to mix up certain things over
time...and If you have a victim that remembers everything exactly, then that's a
problematic victim. Because you don't remember things exactly. So I would
expect that having someone on a jury who understands how you are traumatized
is also important to recognize victims who are not genuine victims. They are also
capable of recognizing a victim who is not telling the truth.

34:10

11

Case 1:20-cr-00330-PAE   Document 835-2   Filed 02/25/26   Page 80 of 645

HOST: Lucia's story he goes by his first and middle name, Scotty David. He basically says, look up , "We are not here to judge these victims. We are here to judge whether we believe their stories" which is the [point Julie just made. "We

12

TRANSCRIPT OF podcast Lucille Osborne Crowley & Julie Brown _
The Kicker _Jan 7, 2022 IMPORTANT FOR DISCUSSION OF SCOTTY DAVID
AND LUCIA'S 'IDEAS' ON JURIES AND BIAS _WP/im

are not hear to judge the decisions they made". Lucia you were going to say something on this?

34:36
LUCIA : Yeah well, to Julie's point, about victims on a jury being able to recognize stories that don't gel with their experience and are perhaps more likely to not be truthful.

I just entered to Julie's point about victims on a jury being able to recognize stories that are perhaps don't gel with their own experience and then I'm more likely to not be truthful that goes to this point that I have been thinking and thinking about turning over in my head the last few days, and speaking to the experts about, which is that you know what do we mean when we think about bias and if we are saying that that knowledge, that a personal experience is the same as bias, then that really conflates two concepts that I think are very different because personal knowledge of something can actually make you more empowered to identify you know the truth from things that are less truthful truth from lies or it can help you assess evidence. And your own knowledge of how traumatic memory works can help you forensically assess you know other peoples' recollections of their traumatic memories and, and that should be something that we want on Jerry's rather than assuming that knowledge equals bias; and then if you know about something all you can do with that knowledge is immediately you know be on one side of a certain case. I think that's the problem if we assume.

36.09
HOST: That sets a very dangerous precedent because that questions of race

effects people in juries. fascinating and I look forward thank you both so much for coming on .

13

# EXHIBIT 47

09.22,.2020_ *Broken-Seeking Justice* Season 2, Episode 2. "Witness" – [WITH JUAN ALESSI]

\

Sept 22, 2020  *Broken-Seeking Justice* – Season 2, Episode 2. "Witness"  [WITH JUAN ALESSI]
https://www.sonymusic.co.uk/podcast/broken-jeffrey-epstein/

INTRO:

**0:10 [Voice of] Juan Alessi:** One time before I left, I remember I was in the kitchen and he [JE] was sitting on top of the counter, in the kitchen. Sometimes he would talk to me.

**0.22. Host** Tara Palmeri: This is Juan Alessi, Epstein's one-time house manager and driver in PB. He's talking about his former boss, who called him John, instead of Juan. ....

0:31
**Alessi:** And he complained about his back. I says, Jeffrey, take it easy, all these women that [unintelligible] I says you are gonna be in trouble, as a man, how can you perform with so many people?

Virginia Roberts Giuffre [VR]: Right

**Alessi:** Right. And I say, one of these girls, one day, is gonna get you in trouble. I swear to god, one of these girls is going to get you in trouble. He says, John they just want money. That was his answer - They only want money, John.

HOST: Juan worked for E for 10 years and was in a perfect position to witness Epstein's massive sex abuse operation. But when I knocked on his door last February, he never talked about Epstein publicly. He says Epstein fired him after that conversation about the girls.

**Alessi:** I told him, I says, one time, one of these girls, one day, is gonna get you in trouble. I swear to God.

2:27
**Host:** I'm Tara Palmeri, Host of Broken, Seeking Justice. Epstein is dead but according to dozens of his victims, many individuals helped him run his sex trafficking operation, and in some cases, took part in abusing girls. Only Ghislaine Maxwell, Epstein's right-hand woman. has been indicted. No one else has been prosecuted or gone to jail. I've spent the last 10 months with some of Epstein's survivors as they fight to hold these people accountable, in order to get justice, both on a personal and legal level they need people like Juan Alessi to come forward and speak about what they witnessed. I spent weeks with Virginia Roberts Guiffre. I traveled with her all over the country to try to get Epstein's former employees to talk to her, to come out of the shadows and help her in her pursuit of justice. And it's been hard. Virtually every door Virginia knocks on, is slammed in her face.

3:16.
VR: Ok so would you meet me for lunch? No.

1

09.22.,2020_ *Broken-Seeking Justice_ _ Season 2  Episode 2  "Witness"* – [WITH JUAN ALESSI]

Host: It's an uphill battle for Virginia to have her existence acknowledged, let alone her accounts of abuse corroborated.

V/O of Brad Edwards, Atty at Depo of Jeffrey Epstein: Let's talk about Jane Doe 102, Virginia Roberts, do you know Virginia Roberts?

JE: Say, she's, say again who?

Host: That was Jeffrey Epstein claiming he did not even know her name.

JE: Can you spell it?

ATTY: Common name, Virginia like the State.
JE: Can you spell it for me please.

HOST: What Virginia really wants is for someone who was there to say 'I remember you. What Epstein did was wrong and horrible. I'm sorry that was your childhood. She isn't looking to sue anyone else, she simply wants acknowledgement of the abuse.

VR: Jeffrey's dead, and you know we are not coming after you criminally. We are just coming after you for answers to help.

Host: So when Virginia and I showed up exhausted at Juan Alessi's house in Florida, I was not exactly optimistic about him letting us in.

[Virginia and Tara try his bell..] He told us he was buzzing us in…oh thank you so much, he's buzzing us in… we are on our way.

4:50
Host: This was the first time that he and Virginia have seen each other since their Epstein days. After a long embrace with Virginia, Jean sees my recording equipment and asks me to shut it off, so I do.

[Host then describes Juan's home, near a golf course, paintings [by him] and what he is wearing. Juan asks us to sit down on a tufted couch across from his wife, Maria who also worked for him as a housekeeper. They have 2 small dogs who bark a lot. They seemed anxious to see Virginia and nervously repeat how surprised they are to see her.

5:57
Juan says he remembers the day when he met Virginia. He was driving GM, doing something he says she often did, roaming the streets of PB looking for pretty girls who could become masseuses for Epstein. She spotted Virginia at the Country Club, Mar A Lago.  And sure enough, Ghislaine told Juan, 'stop, I have to talk to this girl'. Juan waited for a long time while Ghislaine tried to persuade Virginia to become E's masseuse. He remembers sweating, sitting in the convertible.  Juan says that Virginia was so skinny and pretty, he knew that she was just the right type.  That day, he told his wife Maria, 'just you wait, you are going to see this girl this

2

afternoon. The story about Ghislaine is exactly what Virginia has been looking for. I can see the appreciation and excitement on her face.   Here is the first person witness to her time with Maxwell and Epstein, who is willing to talk about it. After 15 minutes of conversation, I take out my recorder and ask him tentatively, would he please agree to be recorded. I am shocked when he says, OK.

7:40 I asked Juan to start from the beginning. What was it like working for JE? At first Juan says it was a regular job working for a regular guy. He started working for E in the early 90s, before E was wildly rich, before he had all the homes, the jets, an island. Epstein was just one of Juan's clients.

7.58
Alessi: I went to work for him as a maintenance.  I was doing maintenance in the house and I did repairs in maybe 30 homes in Palm Beach. Jeffrey a normal guy, er he didn't have the money. The money came like [click] that.

Host: After the money started flowing, Juan saw Epstein's life start to change. Juan was hired to work there, full time. GM came into the picture; girls started visiting in large numbers, and Juan found himself living under a regime of silence and secrecy.

8:35
Alessi:  This didn't happen in 1990.  This happens in 2002, 2003, 200 after that. Yes it was visits. it was girls. He likes massages from the day I that I met him.

VR: Did he ever say to you like, 'don't you dare ever say anything about this?

Alessi: Oh yeah, I was not supposed to talk to the guests. I was not supposed to talk to Virginia. Not talk.

Host: How did you get to know each other then?

9:05
Well you come to the house, she says, Hi, Hi John [in a whisper voice]. And that was it. I was not supposed to talk any conversations - in the pool or in the house or in the kitchen. Nothing. No talking. I was not allowed. I was not allowed to discuss anything. I was not allowed to interrupt the conversation.

Host: It took a while for Juan and Virginia to get to know each other because none of the staff was allowed to interact.  But what blossomed was a bond, kind of like the bond that forms between prisoners of war. It reminded me of what Virginia said about her relationship with Epstein's chef, Adam Perry Lang, who we talked about last episode. Viginia's friendships with E's staff were a big part of her life back then. She looks back at them fondly, almost like a silver lining if there can be one. Juan and Virginia both explain that these staff to staff friendships had to be conducted in secret out of Ghislaine's sight and like unhappy employees everywhere, they bonded over a shared dislike of the boss, Ghislaine. They speculated ad nauseam about her

09.22..2020   _Broken-Seeking Justice    Season 2, Episode 2  "Witness"_ – [WITH JUAN ALESSI]

dysfunctional relationship with Epstein, that's what bought them together. And they still can't make sense of it all.

**10:13**
**Alessi:** That er, how you call, relationship between E and her I never understood.

**VR:** Me neither. You know I asked him once, I asked Maxwell, I said, so

**Alessi:** I said, what are you doing? I told her many times, because she would come sometimes crying in the car for me to drive right?

**VR:** oh, wow

Alessi: And I says, "Ghislaine, Why are you doing this, why are you staying with this guy? [GM]: 'I hate him, I hate him. But John, I can't leave. I say, why? You have money. She had money

**VR:** Yes she had money

10:49
**Alessi:** Why you are not leaving?  That relationship [unintelligible]

10:55
HOST: It's fascinating to learn that even the people right there -  first hand witnesses found E's and Ghislaine's relationship as baffling as we all do.  Why did Ghislaine do all the things she did for Epstein? Were they in love? Was it for the money? Did she want to do it?  A few weeks after we talked with Juan, Ghislaine seemed to provide an answer to some of these questions. She sued Epstein's Estate claiming that Epstein promised in writing to always provide for her financially, that now includes paying her legal fees and personal security costs for any claims from the dozens of women who say she recruited for Epstein.  But those claims obscured some interesting information.  When Ghislaine was later arrested on Jul 2nd, a Govt filing said that they thought that she had up to  $20 m at her disposal. Despite almost all of the victims referring to Ghislaine's role in E's scheme, she has claimed that she had no knowledge of his crimes. Juan's willingness to speak to V meant a lot to her. Even more than just opening his door, he seemed to believe her and expressed seemingly heartfelt sympathy for what she went through.

I feel so sorry that this jerk was at the end abusing little girls, that's sickening, sickening. He could have had all the women it the world. He could have buy a woman a day, an adult woman. Right. No, he went and abused these girls. That's sickness.

12:25
HOST: Virginia looked downright triumphant when she heard Juan acknowledge that she and others had been sexually abused as children. This moment, this admission was what she had flown all the way from Australia to hear.  And Juan's retelling of his conversation where he warned Epstein about what was going on "one of these girls is going to get you in trouble, Jeffrey" – that story seemed to indicate that Juan knew something troubling was happening.  Yet

4

09.22,.2020_ _Broken-Seeking Justice_    Season 2, Episode 2, "Witness" – [WITH JUAN ALESSI]

despite all of this, Juan insisted to us that he had no idea about the sexual abuse happening in the house, that he really wishes he could help Virginia out, but he just didn't see anything.

Alessi: I wish I could help them more. I wish I could be more helpful these girls. But I never saw –my job was to take care of the house, to take care of the food, open the doors, make sure the guests were feeling right, and that's it.

HOST:
So Juan maintains that he kept his head down and just did his job. It was disturbing to hear and unsatisfying. If this were an ordinary house, maybe, but the thing about working for Epstein mean that doing your job involved doing some pretty out of the ordinary things. Doing your job meant driving GM around to recruit young girls to massage your boss. Doing your job meant calling these young girls to come visit Epstein.

Alessi: He would come to me and say, John, call this girl, call Alison, it was hundreds of of girls, I had a list and he said, . call this, call this, call Johann, call Judy, call Nicole, call .. so many girls, I thought they were adults and they were massage therapists.

VR: How did you know they were adults though?

Alessi: I don't know.

Host: doing your job meant walking by photos of very young naked girls.

VR:  But what about all the pictures of the girls naked everywhere.

14:22
Alessi: They were [unintelligible] and that was Ghislaine taking those photos.

Host: It's all very confusing and frankly frustrating. But Juan has always been very cautious about discussing what he saw at Epstein's. He's changed his story over the years. A lot. 15 years ago, he was a lot more open with investigators than he was with Virginia that day. In 2005 when the police first began investigating Epstein, the police called Juan.. We were able to get a recording of that call

14:51
**Alessi:**     This is something I really not like to be involved with it, if I'm not involved with it I prefer. Not to be involved with it, I've been out of a job for 3 years now….

**Det Recarey's voice:** I understand but you may hold some information that would assist me in this case.
Alessi: Ok.  I'm not going to say no. I'm not going to say no to you . because that would be dumb, but I would prefer to come to this with my attorney and see what he says.

**Det Recarey's voice:** Absolutely you have the [right]

09.22,.2020_ *Broken-Seeking Justice* – Season 2, Episode 2, "Witness" – [WITH JUAN ALESSI]

**Alessi:** I don't want to involved I don't want to get in trouble or get sued by Mr Epstein or by his company.....

15:20
**HOST:** 11 days later Juan was interviewed by that same Detective – Josephy Recarey. You'll hear more about him in our next episode – According to a Police report, Juan told Detective Recarey that towards the end of his employment, the masseuses appeared to be younger and younger. When asked how young, Juan said they appeared to be about 16 or 17. Juan told Recarey the massages took place in E's bedroom or bathroom. He knew this because he often had to set up massage tables. Juan stated that towards the end of his employment, he would have to wash off a vibrator and a long rubber penis that were left in the sink after the massage. He said that the bed would almost always have to be made after the massages suggesting that the massage was not limited to the massage table.

Juan's story has been changing ever since that first interview with Law Enforcement. Years later in 2009, Juan gave a deposition where he said he was certain that one of these girls was under the age of 18. He concluded that she was a minor because he dropped her off at High School. Then in 2016, the prominent defense lawyer, Alan Dershowitz obtained a sworn statement from Juan. He's the same Alan Dershowitz who Virginia claims sexually abused her, which Dershowitz denies saying that he has never met her. He also says that he has proof that Virginia is lying. She is included in his book, *Guilt By Accusation*. That evidence includes emails between Virginia and a reporter *[Sharon Churcher]*, a recording of a call between Virginia and one of Virginia's childhood friends, Dershowitz' own records of his whereabouts during the period of Virginia's allegations and a phone call he had with Virginia's lawyer David Boies, plus Virginia's own unpublished memoir. Connie Bruck who examined similar evidence for a story in The New Yorker, was only able to conclude that Dershowitz' often led to further disputes. Now, Virginia and Dershowitz are suing each other for defamation. Juan's 2016 statement for Dershowitz is notable in that his story has changed from what he told the police 7 years earlier. In this second statement, J said he never knew of any masseuse being under the age of 18. The masseuses were apparently mostly middle aged. Some were men, one was called Olga.

17: 34 And yet here is Juan, sitting in front of us, now saying that he knew that V was underage. Not only that, but that there was another girl who visited Epstein who was also underage. 15:48
**Alessi:** that was the only two girls that I saw that were underage, Virginia and ███ . If they were abused, I don't know.

HOST: Virginia was 16 and the other victim was 14 at the time, we agreed not to use her name.

**Alessi:** [*unintelligible word, sound v faded*] that in my statements that she was young she was er um, she was not a massage therapist, it was [conversation cuts completely off here ]

18:30
HOST: The dogs start barking like crazy and Virginia leans forward.

09.22,.2020_  *Broken-Seeking Justice    Season 2, Episode 2. "Witness"* – [WITH JUAN ALESSI]

**Alessi:** She came to the house with her **mother.** And her **mother** would leave her there. I don't know if she did anything with him, maybe you know, but er she was abused [word a bit unintelligible].

We were flabbergasted. Despite Juan's statement just minutes earlier that he was unaware there was any sexual abuse happening in the house, he was admitting that this 14year old girl that he drove to and from the house, had been abused. But how does he know this if he never saw anything?

**18:48**
**Alessi:** And She was young, probably younger than you. And she never [emphasis]

Host: Juan would drive the 14 year old to and from Epstein's house.

Alessi: Every day that she come to the house I have to drive her home.  And she never mentioned to me, never spoke a word.

HOST: It's possible that none of the victims ever told J about the abuse. And so in that sense, Juan can claim that he didn't know anything.  If that's the test for right and wrong, then Juan may have passed. But is that really our test? Do we live in a world where if a 14 year old doesn't voluntarily come forward, it's ok to look the other way, ignoring all the signs staring you in the face? Virginia tried to get Juan to admit that he did indeed see even more than he was admitting to.  At one point in the interview Virginia confronted Juan about seeing her naked and paying her money.  He said he didn't recall any of it.

19:40: I swear to God, Virginia, as is my god, I **never** [emphasis] saw you naked. I didn't even know you.  [over dog barks]. I saw other girls – adult – not you or _____ ███████

19:55
HOST:  Virginia um, she recalls in her memoir and affidavit that you often paid her

Alessi: Virginia?

VR: Yeah

Alessi: I don't remember paying you

VR:  just from the black bag

Alessi: No I never took $ from the black bag. No I had my own money I had my own [mumble] pay cash

VR:  It had like a little TV in it, behind the kitchen and then I would .. sometimes I would have to put E to bed in Palm Beach and he would go off to sleep and then I'd have to come downstairs and get the money.  It wasn't like you

7

09.22,.2020   _Broken-Seeking Justice_   Season 2, Episode 2. "Witness" – [WITH JUAN ALESSI]

20: 27.

**Alessi:** I swear. It is not incriminating. I never remember I..in a matter of fact that can be a record - they should have it in the office.  Because I used to send, when I pay somebody, they would have to sign it, sign it and I would send that to NY because they checked me up every penny that went out

VR: Of course, because Epstein was very tight on his money right

**Alessi:** Every tight I would have to send the office a statement – this girl paid here's the signature, here's the check, copies of the check. I would make copies of the check. If it was cash you would have had to sign for me.. I don't know if you did but I cannot remember paying you.

21:10

HOST: We talked to Juan in February but in May the British Tabloid The Mirror, released a story about Juan. They interviewed him about this exact thing. The payments. And his story changed. The article says Juan admitted to paying Virginia and other girls, they he didn't realize what the money was really for. " Juan is quoted as saying
"I used to go to the bank, withdrew $10k. I paid them out of petty cash and filled out a receipt. So what's going on in all this. Why is Juan changing his story so much? Why is he now denying seeing things that he has admitted to seeing before?

21:45 Voice of SPENCER KUVIN, Atty : Any good lawyer could cross examine him based upon the statements he's made.

HOST: I called Spencer Kuvin, a lawyer who has represented a number of Epstein's victims, to explain how Juan's changing story may become an issue.

**Spencer Kuvin:**  And when there's conflicting statements, it tends to lead one to believe that maybe the full story is not being told truthfully. So er, he should be concerned. But again, if he co-operates fully with authorities, then he can probably execute some kind of a deal.

HOST: Could making untruthful statements get him in legal trouble?

Spencer Kuvin: Yes, as long as those statements are made in the context of some legal proceedings like a deposition or some other sworn testimony.  If we see er, for example, Ms. Maxwell's charges, two of her charges are for perjury. And that perjury was lies that she made during a civil deposition.

Host: But making untruthful statements to the press, is that consequential at all?

Spencer Kuvin: It's not. It happens all the time in major news media outlets unfortunately and even by politicians nowadays, but those are not criminally chargeable.

Host:  What would a prosecutor need to charge him?

09.22..2020  *Broken-Seeking Justice* – Season 2, Episode 2, "Witness" – [WITH JUAN ALESSI]

He could be charged with similar counts like Ms. Maxwell was charged with such as conspiracy. Um even if he wasn't engaged in the actual acts themselves, if there was a conspiracy to cover up those acts, or to assist in those acts in any regard, then he doesn't need to be an active participant. He could be a portion of that conspiracy.

But the NPA in Fl has been upheld so far. So if he is actually a co-conspirator is he protected?

Spencer Kuvin: Um I think that's a legal question that will. Have to be fought and deal with later – there are a number of co-conspirators specifically identified in the NPA and then there's a vague general statement about any others so that will be hashed out later. But I certainly don't think that should stop the US Attorney's office form doing their job which would be prosecuting the criminals that they feel committed these heinous acts.

HOST: How valuable is he as a witness?

**Spencer Kuvin:** I think he's certainly important as a corroborating witness for many of the charges brought against other individuals like Ms. Maxwell. Frankly I think he's more important to the government as a co-operating witness if he chooses to do so.

**Host:** Do you think that Juan is changing his story because he realizes that he may be in some sort of legal jeopardy?

**Spencer Kuvin:** Without a doubt, er I think that his story probably continually changes because he's seen what has been happening around him because the people he thought were untouchable like Ms. Maxwell and Mr. Epstein are getting arrested. So, if those powerful people are getting arrested, then you know, there's no one around to protect him anymore.

**Host:** I didn't know all those things back in February. I was shocked to hear some of the things Juan was saying.

24:33
**Host:** And then something even crazier happened right in front of us. Juan got a call

**Alessi:** Shhhh I think this is the FBI

**Host:** Yeah, the FBI called, in the middle of our conversation.

**Alessi:** [Whispering] Don't say a word. Hello? Hi _____ How are you? How are you doing?

25: 39
**Host:** Virginia and I are staring at Juan, hardly able to believe that of all the times, the FBI would call, it would be at the exact moment we are talking to him. We were spooked. Were they following us? Timing was uncanny. From Juan's end of the conversation, it seems like he's surprised too. He said he had not heard from the FBI since last July. And today, of all days, they were calling.

09.22..2020   *Broken-Seeking Justice – Season 2, Episode 2, "Witness"* – [WITH JUAN ALESSI]

Alessi: How are you? I thought this was over, I thought I he was dying it was finally over and I guess it is not.

Host: We hear the agent ask Juan to do a follow up interview. And they both agree to talk next week.

Alessi: Give me a call back, any time, Ok bye _____ bye bye.

26:26
HOST: So the investigation was still moving along in some fashion. But after our conversation it made me wonder if Juan could ever be a reliable witness. Why would he admit to some things and deny others?

Beyond legal repercussions he could be protecting his reputation. This is understandable but my gut sense is there is something more at play here. IF his were a legal or reputational issue why speak at all. I think what's happening here is that Juan is revealing how people, at least some people, allowed themselves to continue to work as what as what they might have known in their guts as a massive operation to sexually abuse girls. It goes by a simple name – denial. You see each discreet fact, but you just deny the obvious conclusion. Because not denying it would mean you would have to give up a job that pays a fortune or admitting to yourself that you are standing by something very very wrong. But denial doesn't always work, because sometimes you are faced with something more compelling. Something like sitting on a sofa facing Virginia, a woman you've known since she was a girl. So he sees all these girls coming over every day, girl after girl, but he tells himself they are just massaging Epstein. Epstein really likes massages, and for some reason, likes them from teenage amateurs. Of course, it's absurd but that's the whole frigging point. The only people who are going to work in that house are those who have this mental capacity for profound denial. I can't say any of this is clearly true. I am not inside Juan's head. I've tried repeatedly to reach Juan since we went to his house but I haven't heard back. Even amidst the denials, Juan places some of Epstein's more prominent friends at the house during a period of time when there was a constant inflow of girls including very young ones.

I was interested to hear if you remember seeing Alan Dershowitz. He did.

28:28
Alessi: Alan Dershowitz was many times at the house. Many times at the house.

Host: With children or girls, young girls?

Alessi: No, no no no. I never saw children with him.

This is one point however where his story hasn't changed. Juan has consistently said he never saw Dershowitz around young girls and that Dershowitz had never been at Epstein's house at the same time as Virginia. Dershowitz acknowledges that he has been to Epstein's properties including his residences in NY and PB. He says that his time there was limited to public areas of the homes and that he never saw anything inappropriate including photos of naked girls. He's also said that he never observed Epstein with underaged girls. If he had, he told us that he would

have reported it to the authorities. Juan also remember Prince Andrew but says he never saw him with girls.

29:16

Alessi:  Prince Andrew was at the house maybe 2 or three times when I was there, he was always nice and very nice guy. He was the only guy who ever left us a tip.

V is sitting here listening to all of this. Juan's inconsistencies, the FBI calling, and it gives me a sense of her life for the past decade. She is trying to reveal the truth, she is trying to get witnesses to come forward. Yet each of those witnesses is deeply problematic, either because of their un-willingness to speak like Adam Perry Lang or because of their utter unreliability like Juan Alessi. And yet, Virginia remains positive through all of it. She's just so grateful despite Juan's contradictions and denials and in a way, her relentless optimism is inspiring. As we left Juan's house he apologized to her again.

30:11

Alessi: Virginia, I feel so bad what happened. To you but I feel so good to see you so great now. So good that you make up your life, that you have a family and try to nail that son of a bitch.

VR: Absolutely. This has been a beautiful reunion. Thanks so much. Thank you for opening up your doors and your heart to me.

Alessi:  You were the person I never imagined will be in my house. I thought you hate me because
VR: oh really I told these ladies here we have to stop off and see Juan,

Alessi -let me give you my email.

Virginia it as so worth it because I said, these are the people.

Host: Why would she hate you though?

Alessi: I thought you know she would have blamed me by not doing something. I thought these girls would go against me. Or they would say, 'Oh John, John! Knew it!  **I didn't know!**

VR: [Sounds of kissing/hugging] You were an amazing person then and an amazing person now. Thank you.

I'm so glad to see you as a full-grown woman and beautiful. Ok. .

VR:
Thank you so much for your time. Let your knee get better. Thank you guys so much. Have a beautiful night.

31:26

09.22,.2020_ *Broken-Seeking Justice*_ Season 2, Episode 2, "Witness" – [WITH JUAN ALESSI]

**Host:** When we leave Juan's house, I feel tired and frustrated as we walk out to our car. We had come so close to getting a full detailed account of life under Epstein from one of the witnesses best positioned to see everything, at least everything at E's PB house. And yet he kept denying that he knew anything substantial. Virginia though was elated. How do you feel right now?

**VR:** I felt really happy. You know I do feel like he had to protect himself in some ways, which is totally cool. I don't expect everyone to come full forward and say exactly what they saw cos that could incriminate them.

**Host:** Yeah. I mean I was a little frustrated to be honest. I tried probing him on like, how did you not see girls naked like Virginia writes in her Affidavit that she, you paid her that she was often naked round there; and he was, 'I saw nothing, I saw nothing'.

VR: The sheer fact that he puts Dershowitz there, the sheer fact that he puts Andrew there, even though he says he doesn't think Andrew does anything wrong, he's had to set up all these massage tables upstairs. What were these massage tables about? No, they weren't just about Shiatsu.

32:36
HOST: She's talking about Prince Andrew of Britain right there. He's had to step back from royal duties because of his links to Epstein. He denies having any sexual contact with Virginia.

32:45
VR: And what he means is like his heart is good. He couldn't do shit about it. He feels horrible about it but um at least he took us in and at least let us inside the condo. It wasn't all bad, so

Host: So you are just happy that he was willing to engage/

VR: Yeah, very much so and even you are willing to admit 10% of what you know there, that 10% can help so many other people.

Host: That's fair. There's a part of me that's like he was lying, like he was lying. He knew. He was out with G hunting for masseuses, I mean, it's just..

33:22

VR. I know he saw me and like he goes back to his wife and says you watch, this one is going to come back to the house. We have to go between the fine lines of um what's truth and what's not; and for him that's as much truth as he was willing to give. So even though it was only a very small % of truth we still have to be grateful. And maybe down the track as things go on, I just think he is seriously afraid of the FBI like because he did see all this stuff.

Host: She may be thrilled but Virginia still has clear painful memories of those times when she needed Juan's help and did not get it .

09.22,.2020_ *Broken-Seeking Justice*    Season 2. Episode 2. "Witness" – [WITH JUAN ALESSI]

VR:  I was crying n the car on the way home. I still remember crying silently to myself. I was scared. My eyes were tearing up. He didn't say one word to me on the trip home. Now it doesn't make him like the worst person in the world because here he is wanting to help and talk. Could he have. Helped more, could he have talked more? Yes. But it's the beginning of a dialog so I'll help that as a plus.

34:24
HOST: Right, I mean I id think to myself. I mean like I have a lot of thoughts on that and I didn't want to ruin that moment for you cos I know that it's so hard to get people to talk so just to have somebody let you into their house. I'm like, Is a big thing but for me yeah, i was just like, yeah, I don't believe that you didn't know what was happening. You admitted that you were cleaning off dildoes. Like what the heck do you think - why would, why would Ghislaine go looking for new masseuses and come home with the prettiest youngest girls she found? Girls that weren't even masseuses, girls that were underage hadn't even finished high school.

35:03
VR: Right. So there's a point where he, he had to try to stop himself from telling the truth which you could see; and then there's just no point in asking for the truth any further because he obviously wasn't going to say what he knew.  But he said what he knew to the extent that he felt comfortable with and for that I'm grateful. This is as good as it gets. And I'm ok with that, Juan I'm grateful that you invited me to your home and hugged me and treated me like a human being and wanted to help. So for that I'm grateful.

35:36
Host: But he knew how young you were.  Like that was pretty clear. That was the one thing that was pretty clear, that was the one thing I take away from all that, was like, whether he knew there was abuse or not, he knew that you were very young.

35:46
VR: Yeah he did remember that and me and ▮▮▮▮ for some reason we stick out in his mind although we all know there was lots and lots and lots of under-age girls. Ummm, that's just something he's going to have to live with until the day he dies. You know, I think it's sad, maybe as time goes on and more comes out, maybe he will feel OK to come out.

HOST: After the break, how Virginia led the charge to collect evidence against Jeffrey Epstein at a time when he still seemed invincible.

HOST: 36:40
Every now and then after having spent time with Virginia and other victims of Jeffrey Epstein, I find myself overwhelmed, emotionally exhausted. It is so much. And then I realize they have been going through this for decades. They were abused and they kept telling their story and nobody seemed to care. It's only been a year and a half since this has been a big story. They spent most of those years struggling to get anybody to listen. Which makes it even more remarkable that Virginia is still at it. I could barely stand 10 days of knocking on doors and hearing 'no' hearing the absurd denials. Virginia has been actively hearing that for 10 years.

09.22,.2020_ _Broken-Seeking Justice_ – Season 2. Episode 2 _"Witness"_ – [WITH JUAN ALESSI]

Has she ever really been able to get anyone though? I put that question to Brad Edwards, a lawyer who represents many of Jeffrey Epstein's victims:

37:27
**BRAD EWARDS:** Oh yeah.

Host: Really?

Brad Edwards -- Oh Yeah. For sure.

**HOST:** And maybe that's why she keeps going. Sometimes she wins. Virginia has been central to the many fights against Epstein both in civil and in criminal cases, not because she is involved in every case, she is not, but because she is always ready to go on the record and speak truth to power. Back when Edwards first started working on the case, he couldn't get anybody to talk – witnesses or any victims to come forward and talk publicly. That was, until he talked to Virginia.

38:04
Brad Edwards: I remember the first day she came into my office. It was like, 'let's go get everyone.' You know, a different kind of attitude. Not like other clients where 'ok, you are going to issue subpoenas, she said, 'let's just go get these people'. I said, 'what do you mean' she says, 'listen, I was part of their dysfunctional family for a two or three year period of time. Let's just go to New York and I'll just get them to come co-operate'. 'You really don't understand. I mean, these people are not going to cooperate.' She said, 'just let's get on a plane. So I thought, actually I have never had a client like this before, you know, where she's like 'I'll just take on the world, and come hang out with me and I had a very take on the world kind of attitude too, so I thought alright, she's a breath of fresh air. So we get on an airplane and come up to New York.

38:49
**Host:** They had some other meetings scheduled but Virginia knew who she wanted to track down - the long-time housekeeper of Epstein's upper east side home. She was confident that he still worked at 9 E 71 street for Epstein. She told Edwards,

**Brad Edwards:** I'll get him to come out and tell he'll just tell us everything. He knows it all, he's going to tell you all of this as if it is going to happen right in the middle of the street. And she's so brave and has so much courage and it's like 'nothing's going to stand in my way' which you know, who doesn't love that?

**HOST:** Edwards waited for Virginia across the street from Epstein's house. He actually hid behind a car. Epstein already thought of him as an enemy and Virginia was nervous about what would happen if E saw the two of them and figured out they were working together.

**Brad Edwards:** Hey these are 2 people who could destroy my life and now they've teamed up. We are going to get like killed right in the middle of the street. So she like walks up to the door and bangs on that big door.
39:46

14

09.22,.2020_  *Broken-Seeking Justice*    Season 2, Episode 2, "Witness" – [WITH JUAN ALESSI]

I'm like looking from across the road thinking, what kind of liability is this, her husband tells, hey don't let her do anything crazy. And now she's like banging on this guy's door who I know is this evil powerful person. What do I do when she just walks in the house, like now what.

**HOST:** So she bangs on the door so there's a female who comes to the door. Brad can see V talking to the woman who appears to be Epstein's staff. Virginia asks her to see the House Manager calling him an old friend.  The woman disappears into the house.

**Brad Edwards:**  And comes back out let's say 5 minutes later and says, um, he can't talk to you
.
And she says well why can't he talk to me; I'll just stay here all day, she doesn't care. And they said, he's not going to be able to come out. So she says, I'm Virginia Roberts, this happened to me, I need him to be on the good side, he's a good guy, I always thought he is a good guy, you know I always thought he was a good guy. The house slams the door in her face. The conversation is over. That's kind of the rsvp that I expected 'cos I had been litigating with him for a while. She comes over and she has that look of like she's so perplexed. I can't believe they won't let me in, you know, these are all his disciples in his house and you basically tried to infiltrate him by just by bum-rushing his house you know, just walk right in and take him out. She almost believed that she was going to accumulate all of the staff and they were going to go up and just put him in handcuffs and drag him out of the house. So then she told me why don't we just go to all the girls that he has at E 66th Street, the stash houses. But then we went there – yeah, we went there and she starts reeling off all the Apt #s that Jeffrey owned there where he kept all the girls.  And tells the bellman, 'bring this person down, bring that person down'.  And he said, I can't even tell you that they live here.  And she's like, 'I know that they live here'. She's just like this fireball that is ready to go, you know, get these people.  Which you know, you've met Virginia.  There is nobody that has no credibility than somebody who is willing to go directly to their house and call them out.

Next week, Ghislaine Maxwell. She's still in jail in New York waiting for trial, but notably not for anything to do with her time with Epstein in Florida. How Ghislaine Maxwell ended up being charged with crimes a decade earlier?  That's next week on *Broken – Seeking Justice*.

END

# EXHIBIT  5

 INDEPENDENT

JANUARY 4 2022 [at 13.45pm GMT] - or 18.45pm EST...

NewsWorldAmericas

# Ghislaine Maxwell juror breaks silence to The Independent: 'This verdict is for all the victims'

For those who testified, for those who came forward and for those who haven't come forward. I'm glad that Maxwell has been held accountable,' a juror in Maxwell's sex-trafficking trial tells **Lucia Osborne-Crowley**

A juror in the Ghislaine Maxwell sex-trafficking trial has told *The Independent* that he voted to find Maxwell guilty of the majority of the charges against her because he believed the stories told by the victims and because he believed the pattern of abuse they all described.

Scotty David, who wishes to be identified by his first and middle name, told *The Independent* in his first media interview that he believed all of the victims who testified against Ghislaine Maxwell in her sex-trafficking trial that took place in lower Manhattan over the past four weeks. All of the accusers corroborated each other and were backed up by other evidence, he said.

David said he is proud to be part of holding Maxwell accountable for her crimes.

"This verdict is for all the victims," David told *The Independent*. "For those who testified, for those who came forward and for those who haven't come forward. I'm glad that Maxwell has been held accountable.

"This verdict shows that you can be found guilty no matter your status."

David told *The Independent* that he found all of the accusers who testified to be believable and credible, despite the defence's many attacks on their credibility and their attempts to poke holes in their memory.

"They were all believable. Nothing they said felt to me like a lie," he said.

1

David knows that sometimes you can misremember small details of traumatic memories without ever doubting the core of the memory. He knows that because he is himself a survivor of sexual abuse.

"I know what happened when I was sexually abused. I remember the colour of the carpet, the walls. Some of it can be replayed like a video," he said. He explained this to the jury.

"But I can't remember all the details, there are some things that run together."

So he knew that some misremembered details doesn't mean the memory itself didn't happen.

There were also questions from the jury about why the girls didn't come forward earlier.

But David said he knows what that's like, too. "I didn't disclose my abuse until I was in high school," he said.

The jury room went dead silent when he shared his story, he told *The Independent*.

David believes this helped the jury understand that it's possible that these women were telling the truth.

You might forget some things, he said, but the core of a traumatic memory stays with you.

There were also questions about why the girls kept going back to Epstein and Maxwell, why they accepted their help.

"We are not here to judge these victims," David told *The Independent*. "We are here to judge whether we believe their stories, but we are not here to judge the decisions they made or didn't make.

"We cannot judge what they did or didn't do afterward," he said. "It doesn't change that it happened."

David felt that the defence were continually attacking the accusers on the stand, and he said these attempts did little to change his mind.

At one point, the accuser testifying under the name "Carolyn" threw her binder of evidence down beside her because she was so distressed by the questioning she was being subjected to.

"It just made me feel more compassion for her," David said.

The juror said that, ultimately, the jury found that all the victims were credible.

The defence team focused strongly on its memory expert, Professor Elizabeth Loftus. Loftus testified about experiments that had been conducted in which researchers had successfully implanted a false memory into the mind of research subjects.

In one study, the researchers were able to change a detail of a memory about witnessing a car accident. They were able to convince participants that the scene featured a stop sign rather than a yield sign.

But that didn't sway the jury either, David said.

"None of that relates to traumatic memory," he said. Loftus said herself that she had never conducted a study on whether these tactics would work with memories of sexual abuse, David recalled.

Since the trial, there has been speculation that the fact a juror had been a victim of sexual abuse could be used by Maxwell as grounds for appeal.

Speaking separately to MailOnline, David said he could not remember the details of the 50 question pre-trial questionnaire each potential juror was asked about whether they were a victim of sexual abuse or a relative or a friend of a victim, but felt he had answered all questions honestly.

David told The Independent that the accusers' testimony was corroborated by a significant amount of evidence.

He specifically mentioned Kate – an accuser who testified but was not allowed to be considered for the actual charges because she was over the age of consent in the UK when she was abused – and said her testimony powerfully corroborated the other accusers' stories.

"She was able to show us that this was a pattern," David said. "We knew we couldn't use her testimony to convict Maxwell, but she showed the pattern of how those girls were groomed.

"She showed us the pattern that happened to all of these girls.

"It was about confusing their boundaries," he said. "For Jane, it started with seeing Maxwell topless. For Annie Farmer, it started with Maxwell showing her how to give Epstein a foot massage.

"The pattern is that Ghislaine talks to you like she is also a teenager. Then it moves into massage. She tries to make you comfortable, to see what they can get away with.

"What she did was wrong."

Annie Farmer's story was backed up by her teenage diary, as well as her high school boyfriend. That was important to the jury, he said.

Carolyn's story was backed up by Shawn, her ex-boyfriend who testified that he used to drive her to Epstein's Palm Beach mansion.

Jane's story was backed up by her high school boyfriend, who remembered being told about Epstein when they were younger.

The accuser's stories were backed up by flight logs which placed Jane on at least one flight with Maxwell, David said.

Their stories were backed up by Maxwell's "little black book" – an address book found in Epstein's home that listed the names of "masseuses" including Jane and Carolyn.

David said the little black book also gave the jurors clues about how Maxwell and Epstein had evaded accountability in the past. There were names of several Palm Beach police officers listed on a first-name basis in that book, David said.

"Those girls' names and phone numbers were listed next to the words 'mom' and 'dad'," he said. "Professional masseuses do not need their parents with them."

4

Many speculated that the jury chose to acquit Maxwell on count two because that count related solely to Jane, and that Jane was less credible than other victims.

But David told *The Independent* that wasn't the case.

"We simply didn't see enough direct evidence to convict on count two," he said. "It wasn't about not believing Jane."

Count two was a substantive charge that required proof that Maxwell "enticed" Jane to travel across state lines. David said there just wasn't any direct evidence for any specific trip that Maxwell took any action to entice Jane to get on those flights.

"I personally was willing to find her guilty on count two," he said. "But we all decided in the end that there wasn't enough evidence."

David also explained that he was convinced by the closeness of Maxwell and Epstein's relationship and the key role she played in his life. "Of course she knew what was going on," he said.

The schedule for Maxwell's sentencing hearing has not yet been set.

# EXHIBIT 6

OBJECTIONS PODCAST
Lucia OC Interview Transcript with Objections - Host Adam Klasfield Jan 11, 2022

Adam Klausfield - Host

HOST- Well thank you very much....Welcome back to Objections.... 03:54 Just to get right into it, tell me how you got this scoop about the first interview with a Ghislaine Maxwell juror?

4:06

LUCIA OSBORNE-CROWLEY "LOC": So it's a funny story actually. I'd been posting online about the Maxwell trial on Twitter obviously and on Instagram. And there's a huge amount of interest in this case on Instagram in particular. And so I got a lot of messages on Instagram about it and I got a lot of messages that were just links to some documents that people wanted me to see and then one of these messages was just a link to Scotty's profile. And it was someone who knows him personally and knew that I was covering the case and thought that we should be in touch. And then he didn't say anything in the message he just sent the profile and um allowed me to kind of work out who he was. And then I messaged him and we went back and forth a lot and he had to get sign-off from his employer to speak to the media; and so he said, you know like 'look I'll be in touch once I've spoken to them'. I know he was getting messages from a lot of people, a lot of journalists um and he said, 'you know, look I've got a lot of people, a lot of journalists um and he said look I've got everyone trying to interview me, I just got to talk to my employers.' And I said, 'great, just let me know'. And then he sent me a message as soon as he got sign-off from his employer and he said, 'I'd love to speak to you, shall we Facetime?' And so we got on Facetime so that I could confirm that he was someone that I recognized from the courtroom as being on the jury. And then we did an on the record interview and he was quite pleased about me being the first person he spoke to and he said that he had a number of other people lined up that he was going to speak to afterwards.

5.00 But of course you know, I didn't know what he was going to say um when we got on Facetime. I assumed we would talk about the evidence in the trial and his own reflections on the case but I didn't know that he was going to talk to me about his own experience with sexual abuse and so, as you can imagine, well I mean, we spoke for three or four hours and a lot of our conversation was about that because you know he wanted to talk about that what that meant in the jury room. Er and so then of course, while I was in that conversation, I wrote to my editor and i said just a heads up, this was like 2am in London and 9pm in New York and I wrote to my editor and I said, 'I just want to let you know that this is what's happening in this interview and obviously this is a big deal.
And they got legal on it straight away um and so then the lawyers spent a long time with it - and then obviously we published it the next day once the lawyers signed off on it, so now, the rest is history.

HOST: So what was going through your mind when he started opening up and telling you his story and why, as he said in the headline of your story, 'this is a verdict for all of the victims'

LOC: Yeah, so, I mean, it was a really really overwhelming interview for me because there were so many things going through my head. One of them was that it's incredibly powerful that he was choosing to share this story and that he was able to open up about what his history, his past history of abuse mean in terms of being a juror on this trial but of course, I also knew, you know I'm legally trained and I knew that this could be a huge issue. Um and so I was of course immediately unsure what the right thing to do is. Um and I still am, you know. And I think i will be because the last thing I would ever want is to, you know, for us to be in a situation that there is a new trial and the victims have to go through this experience again and I feel very, very conflicted about whether that was the right thing to do. On the other hand, what I was thinking to myself then that night was, you know, the only other option is not to publish it . And to go back to him and say, 'I'm not going to publish this'; and um, I don't think that would have been the right decision either. So you know, during all this thing, I found it really really difficult and, it's just really, really tricky.

09:14
And also, you know, the Juror's best memory that night, was that he filled in that form correctly and honestly. And I asked the Court for a copy of that form so I could check but of course, it was under seal and they would not give it to me. And, and, you know we still don't know what's on that form for sure, until we have this inquiry and until we can see the form with our eyes so I don't know what he put on there but he believed that he had filled it in honestly and if that's the case then there is no problem here. But of course the next day, after a bunch of followup stories, he said that he wasn't sure, um, and I advised him to contact the court at that point, which is what he did. So to go back to your actual question which was, lots of different things, lots of conflicting things, ultimately I thought, that on balance, the right thing to do as a journalist was to publish the story, um, as I said, you know, I think I'll always be unsure about that.

10.37
HOST: It sounds like you are describing this with a strong degree of ambivalence. I mean 20/20 both directions at the same time. Did the fact that there were two other organizations that ran the story after, give you comfort that you did the right thing, that you were in fact, doing your job as a journalist to tell the story and to tell the truth?

11:04
Lucia OC: Yeah, it did give me some degree of comfort, um, knowing that he was interviewed by other reporters after me and; and this is, you know, it is really tricky because as a journalist as you said, my job is to tell the truth, and I don't think

suppressing a story like this would have been the right thing to do as a journalist. But I also have worked in law, and, obviously there was a part of me that felt really worried about the impact this would have on the courts. But then the other part of me, you know, having studied legal ethics, and, I also knew that if I was aware of this case and I came across this information, I would have a duty to report, to disclose it. But then there's another instinct as a lawyer which kind of tells the opposite thing which is that you don't want to interfere with the administration of justice. And then of course I'm also an abuse survivor that's what the books I've written are about. I grew up in a similar situation to the Maxwell Epstein story - it's why I covered this case, it's why I'm so invested in it and again, there were two parts of that, as well.

12:29
One part of that version of me, the part that is a survivor of child sexual abuse, um thought that it was imp that Scotty wanted to tell his story and I thought it was important for that to be done right and to be done sensitively. Of course, the other part of me wants, you know, is really, really afraid of the impact this might have on other survivors and on Maxwell and Epstein survivors if they have to go through another trial . And so, kind of, in each of those worlds, there was conflict.

13:14
Ultimately I spoke to editors and I spoke to a lot of mentors and ultimately, you know, I did that interview in my role as a reporter and I think; and I decided that the right thing to do as a reporter was to publish it. Um, Yeah. Ambivalence is exactly the right word.

13:34
HOST: You mentioned saying that you come at this with some personal history as well, can you tell me about your book that you published on the subject.......

17:21
And also what you quite vividly reported about Scotty David and the particular memories that manifested for him. Can you describe those moments when he is talking about his own experience at the Maxwell trial?

Yeah i mean it was really um, it was really powerful to hear him speak about that because sometimes it feels like so few sections of society really understand how traumatic memory works; and the fact that you and I heard in that courtroom from the government when they were doing their closing arguments which is that details, peripheral details in particular can become confused, can be mixed up, um, but that doesn't mean that you are any less certain that something happened. And that is how Scotty recounted his own memories of abuse. He said some things run together. Um, traumatic memories are really really hard to recover clearly. But the core of it I am so sure about.
And that felt very important to me that's how my own memories of abuse were and that's what we heard from all the victims who testified in this trial, and you know I think

3

while I really you know, I would so hate if this interview resulted in another trial, I do think it's important to think about this very strong reaction that's come out since that story was published - that it seems that so many people genuinely think that um, abuse victims shouldn't serve on juries for abuse cases. And um, I think we need to interrogate that because um, It's conflating a bunch of things, it's basically saying we think that personal knowledge of something is the same as bias; and certainly in other types of crimes we don't make that assumption. So we are putting and I spoke to a jury person about this on Friday, just the idea of putting an abuse victim in a different category, this category of incurable bias, um, I think that is difficult. And er, I think we need to look at that and I hope that Judge Nathan does. You know, I hope that she reflects on this when she, if there is an inquiry and if she does rule on this issue because you know,

Scotty David said to me so many times and I printed this in the story, that, that he genuinely believed GM was innocent when he started that trial; and he took that duty so seriously he said she was innocent until proven guilty and I was not going to convict her unless there was enough evidence, documentary evidence, enough testimony; um and so..at least in his own words, it was not the case that he had a preconception of whether she had done this or not; and he was persuaded by the evidence; and you know he did also exposed his own experience in the Jury room; um, but I don't know that that 's the same as him being a biased juror. And so I think it's important that we look at that.

21:03  And also I think you know the prosecution didn't give the Jury a memory expert, you know they don't have someone who squarely said, this is how traumatic memories are stored, this is how traumatic memories are retrieved, this is why it can be difficult for victims to place these things with certainty in time and place. And so the jurors, the now 3 jurors who said that they discussed their abuse in that jury room, were doing something that I think a prosecution expert witness should have done for the Jury, which was explain how various things work and we didn't have that. So you know, I think there are a lot of questions that are thrown up about this idea that these 3 jurors shared their experience and whether or not that helped other people on the jury understand how these memories work.

And certainly for me hearing that from him in an interview as someone who has been researching and reporting on traumatic memory for a long time, it felt very significant um, so yeah.

22:09
HOST: And as you mentioned, since the publication of your story and the publication of the other interviews with Scotty David, more jurors have come forward and said that there's been other reports that there was at least another juror who was a survivor of sexual abuse. And it's interesitng, I'v been monitoring that docket very closely and nothing has happened since those particular stories; it seems likely perhaps that other jurors disclosed their history of their sexual abuse and they were empanneled and Ghislaine Maxwell's defense had no grounds to challenge anything because that was disclosed. Can you talk about the significance of that because as you said, a lot of

4

people have taken away from this that somehow, sexual abuse survivors are not fit to serve on juries and that's the absolute wrong lesson to take away.

23:17

Lucia OC: Utterly and the way you just phrased it is exactly right.You know, now we have 3 people who have gone to the press to say that they had um, had this experience in their lives and we haven't had any information on the docket in relation to those people - so perhaps it is the case that they disclosed that on their juror questionnaires and were empanelled anyway; and if you look at the case law, that is the most likely outcome - if those people didn't say or didn't give any answers which suggested they couldn't over dome any bias tht that experience left them with. So it's certainly not the case that the defense has this right to just strike any person who has ever been abused from the jury. And I think it's likely, as you say, that in fact in this case there were 1 or maybe 2 jurors who did disclose it and who they couldn't get off the jury. And that's because it's not the courts' view that sexual abuse survivors are not fit to serve on juries for these cases. The question they ask sex abuse survivors is 'can you put that to one

5

Lucia OC Interview Transcript with Objections - Host Adam Klasfield Jan 11, 2022

side and assess the evidence?' And if the answer to that question is yes and the court believes that in voir dire, in hearing that answer , then that juror would be empanelled. So I think that's important as you say, the lesson we take away is that it's not right to think that sexual abuse survivors shouldn't be on those kinds of juries because that's not the law and also, if it were the law I think that would be a really big problem. Especially if you think about that question, um, it's incredibly broadly worded, it's very broad. It says, 'have you ever been sexually abused, assaulted or harassed? Or has a friend or family member ever beeen sexually abused, assaulted or harassed? And when you include sexual harassment in that question, based on the latest statistics that I've been abel to find, 81% of women say they've been sexually harassed. That leaves 19% of women who can say no to that question, plus then you add has a friend of family member been sexually harassed? So you know it's about 43% of men who say they've been abused or sexually harassed. Then you have a friend or family member who's been sexually abused or harassed, that's a huge chunk of the population And In fact it you know, statistically it would be surprizing if most of the jury could say no to that question.

25:54

Because it is, on its terms it is so broad. So you know I think that's an interesting thing for us to look at, is, um, how many people can really say no to that? And so it's important to understand if you say yes to that question, you are not automatically excluded from the jury. It's only if you say yes to that question, and the judge is convinced that that experience is so dominant that you would automatically convict anyone accused of sexual abuse, which certainly would not be the case for most abuse

survivors.

26:32

Um and you know, as i think it was Julie [Brown] who pointed out um that abuse survivors who have experience and who know how memory works, would arguably be better at assessing both cases...You know if they thought a witness wan't telling the truth about a traumatic memory, they would probably be very well equipped to assess that rather than this idea that they would just automatically believe any story about sexual abuse and convict any person who had been an abuser. So you know, i really think we need to be clear about what the law is here, you know if it's not the case that if someone had a past experience they should have been excluded from that jury, I think we really need to resist that narrative; and be clear about what the law is here. You know, it's not the case if someone has had a past experience, that we really need to resist that that narrative. Because the people who would be left on the jury if you were to say the law is that you can't serve on this kind of jury if you have had this experience or know anyone who has had this experience. The jury would look a lot more like Je than it would look like the victims of Jeffrey Epstein and Ghislaine Maxwell because you would only be empanelling people who had never been affected by gender based violence or harassment and that would be a problem too.

27:46

HOST: Right I think you raise a good point that beyond being a kind of problem in principle and ethics it raises a practical concern once you kind of look at the numbers once you look at the numbers and the percentages.

27:51

HOST: Continues - I think you raise a good point. In making the decision to run with the story have you experienced any public blowback?

LUCIA OC: Yes

HOST: What has that been like?

LUCIA OC: It's really hard as I said, given that I felt conflicted about it anyway. Um, of course I've internalized this public feedback because I was unsure if this was the right decision.And so I find it very difficult, especially of course, you know, being a survivor myself and having spent most of my journalistic career writing about these issues and trying to be a journalistic advocate for victims. Of course you know the feedback that centers around the fact that my actions might cause further hardship for victims, I find that very difficult because that is the last thing I want. Um and these victims deserve closure and finality and justice and I wouldn't you know I wouldn't want this interview and Scotty's story to end up hurting this process for them. So that I find very difficult.. [pause] Because i've been reporting on sexual violence for a long time, I've always had, i get a lot of hate from the internet but this is of course because a little criticism is coming from people who are advocating for victims and that is very, very difficult for me

as I never intended that outcome and I never wanted that to happen. So I still feel conflicted and I think the questions around the ethics of this are important too and that feedback is important and I take it on board.

30:14 - 37:18
[HOST AND LOC discuss the difference between Jury law in England and Australia This part has not been transcribed tonight....and discussion of accountability around the jury system...]

37:19
Like for example with these 3 jurors who've said that they had been sexually abused - if, we don't know but if it is the case that 2 or more of them didn't disclose, then maybe we need to look at that questionnaire and we need to think, is this question clear? Should we be putting that very sensitive question in amongst a lot of other questions not necessarily of that nature? Should we be asking jurors in a different context? Should we be asking that question at all Those kinds of things are important and if we didn't know what was happening in jury rooms we would not be able to review processes and procedures, I think it's important to do that...

HOST: Thank you so much for talking with us today.

# EXHIBIT 7

PARAMOUNT PLUS GHISLAINE, PARTNER IN CRIME - Ep 1 of 4 April 6, 2022

00.
DIRECTOR: Alright, good to go.

R CORI HAYE, NY GOSSIP COLUMNIST: All right I'm ready. I think Ghislaine Maxwell was always sensual and sexy and probably liked sex. When she met Jeffrey it all became more professional. She sold herself undeniably to Jeffrey so when the love started to wear thin and Jeffrey sort of rejected her in bed, then Ghislaine started recruiting girls and had sex with [emphasized] Jeffrey, the threesomes started happening when Jeffrey decided Ghislaine Maxwell wasn't enough.

OUTSIDE THE COURTHOUSE: JOURNALISTS TALKING TO WITNESSES: Did Miss Maxwell instruct you to pick up the young girls? Do you regret that you worked for Mr. Epstein, Sir?

VARIOUS NEWSCASTERS: It was the trial that exposed the secret lives of the rich, the famous and the powerful; Maxwell is accused of transporting a minor for criminal sexual activity; Prosecutors portrayed Ghislaine Maxwell as Epstein's partner in crime.

**1.05**
**SCOTTY DAVID, JUROR: I was looking at her the entire time. There was no emotion. It was like she was a stone.**

01.11
SARAH RANSOM: I was groomed into doing massages on Jeffrey, and then raped.

01.17
LISA BLOOM: Ghislaine was essentially the pimp

01.20
LADY VICTORIA HERVEY: Ghislaine was going out and essentially hunting for the girls, sort of bringing them in.

01.27
NARRATOR: But is there another Ghislaine Maxwell?

01.30
IAN MAXWELL: I just don't believe that my sister would have crossed those bars.

01.33
NARRATOR: How did a newspaper tycoon's favorite child, the youngest of nine, become ensnared in such a sordid affair?

01.43
R. CORI HAY: Ghislaine had it all.

especially to the front row where her two siblings Kevin and Isabel are sitting. It strikes me that she really is trying to present herself as, as very warm and also perhaps there is still this element of her that, that likes being a socialite and that likes being the center of attention in every room.

11.33
NARRATOR: A key witness in the case is E's pilot, LV who flew M and E to the billionaires homes all over the world, often with young women on board.

5

PARAMOUNT PLUS GHISLAINE, PARTNER IN CRIME - Ep 1 of 4 April 6, 2022

JOURNALIST: Are you ashamed of your work for Mr. Epstein?

SIOBHAN KENNEDY, CHANNEL 4 NEWS: While this is a case against, GM. it was JE who was the person who loomed large. The Jury was given a real insight into his wealth and his connections from his sprawling estate in NM to a private island in the Caribbean, through the testimony of the pilot who worked for Epstein for 30 years.

**12.13**
**LOC:** What we heard from Larry was a detailed description of all of JE's homes and all of JE's planes.

12.23
NARRATOR: The prosecution hopes Visosky's testimony will help plant the idea deep in the minds of the jurors that for a decade wherever Jeffrey went, Ghislaine was by his side.

**12.37**
**SCOTTY DAVID JUROR: What I took away from Visovsky was his experience on what he thought Ghislaine was to Epstein. She orchestrated a lot of the flights, she would reach out to him and say 'Wheels up at such and such time on such and such date and we'll have this amount of people with us'. He knew that they had a romantic relationship for a while and that she was 2nd in command. She was Number Two.**

13.15
Narrator: Her number One of course, was Jeffrey Epstein - a man of conspicuous wealth. But just how much money he had and how he acquired it, was a well-kept secret.

13.25
ANNETTE WITHERIDGE, FORMER JOURNALIST, DAILY MIRROR: Who's Jeffrey Epstein? He's a financier. But who does he work for? Nobody. And he lived in the biggest private residence in Manhattan. It looks like it should be a museum.

6

GRAPHIC DECEMBER 2021

39.08
NORA ODONNELL, CBS EVENING NEWS: Well it was an emotional day at the sex trafficking trial of British Socialite, Ghislaine Maxwell. An accuser testified that Maxwell and her boyfriend Jeffrey Epstein sexually abused her when she was just 14.

39.22
NARRATOR: The prosecution hopes that the witnesses will establish how Epstein relied on Ghislaine to help him procure underage girls for sex.
The first of 4 testifying survivors wishes to remain anonymous and be only referred to as "Jane"

**39.37**
**LOC:** She told the court that she met Maxwell and Epstein at a summer art camp the year she turned 14. It was an arts camp that was for talented kids who dream of having professions in music or theater.

**39.51**
**SCOTTY DAVID, JUROR: She told us a story where she was sitting on a bench somewhere in the park when Jeffrey and Ghislaine had approached her. They sat down with her, they spoke to her about what was going on in her life, where she lived.**

**40.06**
**LOC:** After learning that her father had just died and her family was in financial trouble, Maxwell and Epstein offered for her to come to their house for tea. She then describes going to their house for tea at which point the pair offered her financial support and offered her help with her career as a musician.

**40.26**
**SCOTTY DAVID, JUROR: Jeffrey and Ghislaine used those sorts of situations to pray on their victims. They used things to entice her like paying for her schools and moved her family from Florida to New York and paid for their housing.**

**40.41**
**LOC:** She then testified that this turned into sexual abuse at the hands of Jeffrey Epstein and she testified that during some of those incidents Ghislaine Maxwell was in the room and was participating in these sex acts.

VLADIMIR DUTHIERS ANNE MARIE GREEN CBSN: The sex trafficking trial of Ghislaine Maxwell resumes today in federal court in Manhattan. The Defense will begin to lay out its case in the hope of painting Maxwell as a scapegoat for the alleged sex crimes of Jeffrey Epstein.

41.21
RIKKI KLIEMAN, ATTORNEY, CBS LEGAL ANALYST: There is no way that the deny the amount of time that Ghislaine Maxwell originally spent with Jeffrey Epstein. 41.21 RIKKI

KLIEMAN, ATTY CBS LEGAL: There is no way that the Defense can deny the amount of time that Ghislaine Maxwell originally spent with Jeffrey Epstein - the pictures alone tell the tale. There are a great number of photographs of the two of them together and they seem intimately happy that you can't just disassociate her. So if she's with him in the beginning and it's really just the two of them and it's a romance that's just fine. But once you have any of the allegations of the alleged victims who say at what particular date they were sexually abused by Jeffrey Epstein - by that time, did she know what he was up to? We have to understand what made Ghislaine Maxwell stay with Jeffrey Epstein through thick and thin. Did she participate? Was there a reason, some psychological reason? or did she simply know nothing?

42.27
NARRATOR: The Defense will try to discredit the testimony of the witness known as "Jane" - a strategy that may backfire, but they have no choice.

**42.38**
**LUCIA OSBORNE CROWLEY:** The defensive strategy in their cross-examination of Jane was very clearly to try and convince the jury that she was unreliable and she was not a credible witness. They tried to draw out her current career as an actress in a soap opera - they suggested to her that she plays fictional roles for a living and that being in a soap opera leads her to sensationalize the facts of her life. So they were trying to suggest that as an actress she's very good at lying.

43.09
RIKKI KLIEMAN, ATTY CBS LEGAL: The Defense has to do this but they can do it more gently,

or they can do it with a desire to eviscerate. But let me say this - if you're going to try to eviscerate someone who says that they were sexually abused, you better have earned the right to do that, you really better have shown that this person is a liar - a true liar - and if you are not able to do that, going after them to destroy them, is not only appalling to a jury, but it really makes a jury not trust you.

43.52
**SCOTTY DAVID: I definitely think that she felt that her status and hiring some of the best attorneys in the nation was what was going to help get her off and that they would be able to poke holes in these victims' stories.**

44.08
**LUCIA OSBORNE CROWLEY:** They are really asking, you know trying to draw out of every single witness that it is hard to remember exact details of things that happen two or three decades ago. So they are trying to undermine those memories and trying to say that all the prosecution has is er memories from witnesses from decades ago that can't be trusted.

**GRAPHIC 1996**

GHISLAINE, PARTNER IN CRIME - EPISODE 2 of 4 - *Lady of the House*
PARAMOUNTPLUS TRANSCRIPT, Aired April 6, 2022 - -

01.43
R. CORI HAY: Ghislaine had it all!

01.46
NARRATOR: How did she hit rock bottom ?

GM: FILE INTERVIEW W DAPHNE BARAK: I'm extremely sad that my father is no longer here

01.51
TERESA HELM: Ghislaine says to me, 'make sure you give Jeffrey what he wants because Jeffrey always gets what he wants'

01.57
How did this daughter of privilege become a pedophile's accomplice?

**END OF OPENING TITLE SEQUENCE**

02.07
NARRATOR: In downtown Manhattan, wealthy socialite Ghislaine Maxwell is fighting to avoid spending the rest of her life in jail.

02.17
TERESA HELM, SURVIVOR: Ghislaine Maxwell clearly has a major disconnect with humanity, because she does not regard other human beings as equals or even as human. I don't think I really understand what motivates her. I think she must be very unhealthy in her mind. I think she must be very unhealthy in her heart.

02.46: The picture emerging in court is a ruthlessly efficient operator aiding in the abuse of young women. Only in the trial the court hears critical testimony from a key eye witness - the housekeeper and driver, Juan Alessi, who worked at Epstein's Palm Beach mansion for 12 years.
**03.19**
**LOC:** Alessi told the court about the closeness of Jeffrey Epstein and Ghislaine Maxwell's relationship. He said he believed they were a couple, that shared a bedroom and he described her several times as the lady of the house.

03.36
NARRATOR: In court Alessi talks about the atmosphere at Epstein's Palm Beach mansion with Ghislaine in charge.

03.42
EMMA MURPHY, ITV NEWS AT TEN: Juan Alessi said there were many, many hundreds of

women that he'd seen over the years but two stood out in his mind. Those two girls he thought were aged around 14 or 15 and he identified them as Virginia Roberts, the woman who went on to accuse Prince Andrew of sexually abusing her and also Jane

04.02
MOLA LENGHI, CBS NEWS: Jane is one of the four females who are testifying throughout this trial who are accusing Maxwell of being central to Jeffrey Epstein's sex trafficking operation. Jane of course is a pseudonym, it's not her real name, and Alessi was able to corroborate some of her testimony.

**04:16**
**SCOTTY DAVID, JUROR: He had a lot of information to share with us. Eh when we were discussing in the jury room about him, we had to figure out is he credible. I thought he was very credible. He acted as a chauffeur. And he picked up Jane multiple times. He remembers meeting Jane and, and thinking how young this girl is.**

04.41
NARRATOR: Alessi told the Jury drove Ghislaine Maxwell around town as she looked for new girls to bring to Epstein.

04.49
SIOBHAN KENNEDY, CHANNEL 4 NEWS: There had to be cash he said in the car, $100 bills in the car in every car. He didn't say what that money was for but we do know some of the alleged victims have claimed they were paid in cash for giving what they alleged to be those sexualized massages to Mr. Epstein.

05.09
NARRATOR: According to Alessi, Ghislaine Maxwell was the crucial link in the pipeline of girls that regularly turned up at the mansion.

05.20
RIKKI KLIEMAN, ATTORNEY. CBS LEGAL ANALYST: The prosecution's theory of the case is that Jeffrey Epstein and Ghislaine Maxwell were partners - they were equals; that without Ghislaine Maxwell as the total enabler of Jeffrey Epstein, Jeffrey Epstein could not have run this enterprise of abusing young girls. What the defense must do is be able to show if they can, that Ghislaine Maxwell is a separate individual.

05.50
R.CORI HAY: At first Ghislaine Maxwell and Jeffrey Epstein were lovers although I think he thought of her more as a friend and a lover as she was way too old really for Jeffrey Epstein's taste in girls. In the end I think that Jeffrey's sense or lack of morality and Ghislaine's mirrored each other, I think Jeffrey won her over to the darkest side.

**GHISLAINE, PARTNER IN CRIME - EPISODE 2 of 4 -** *Lady of the House*
PARAMOUNTPLUS TRANSCRIPT, Aired April 6, 2022 - -

and it was his way of bringing them to heal if it they were not towing the line for instance not working at school while he was breaking his back to give him the best education money could buy. He was very good father really loving father.

DAVID FROST: Meaning the children

BETTY MAXWELL: Yes yes, but you know David, you must realize that now you give a clip on the ear to a child, you are practically brought in front of a judge. [DAVID FROST IS NODDING YES]. 40 years ago it wasn't the way.

16.21
IAN MAXWELL: He took school reports very very seriously. I was caned for bad reports. 7

**GHISLAINE, PARTNER IN CRIME - EPISODE 2 of 4 -** *Lady of the House*
PARAMOUNTPLUS TRANSCRIPT, Aired April 6, 2022 - - WP/im

LAUGHING, you know, If you're not gonna get taught by the honey you're gonna get taught by the rocks.

16.31
EVE POLLARD: They were frightened of him as well as loving him, I mean, it was a strange complex situation as some men do have with their fathers. And Ghislaine had it with him too. He is the loving person handing out the goodies - a house, a car, some jewelry. He can take and he can give, absolute power.

**GRAPHIC 2021**

17.15
NARRATOR: in 2021 At the trial in New York one of Epstein and Maxwell's youngest victims is called to the witness stand.

17.23
EMMA MURPHY, US CORRESPONDENT: We heard today from Carolyn who was 14 when she was taken to the Epstein home that was shared with Ghislaine Maxwell by Virginia Roberts.

**17.32**
**LOC:** Carolyn came from a very very difficult upbringing. Her home life was very unstable, she told the court that Jeffrey Epstein and Ghislaine Maxwell really preyed on her vulnerabilities.

**17.44**
**SCOTTY DAVID: Carolyn's testimony was almost so tragic that it just didn't feel real. I felt the most compassion for her because she went she had, literally had one of the hardest life stories. Er she was raped multiple times that, starting at the age of four years old er dropped out of school at seventh grade and, just entered into a lifestyle of drugs and [pause] then entered into Epstein's world.**

18.26
EMMA MURPHY, ITV NEWS AT TEN: She knew that she was going to be asked to do massage for money. She said she didn't expect to have to take her clothes off, but in the hundreds of other times that she visited, she felt more comfortable and did. She said she told Miss Maxwell she was only 14 years old when she was asked whether or not she had a passport. She went on to say that on another occasion, that Ghislaine Maxwell had touched her body when she was naked in the massage room.

**18.49**
**SCOTTY DAVID: Caroline took the money and continually called Jeffrey Epstein's home in order to make more money because she was a 14-year-old who had dropped out of school and wanted money to live and to buy drugs.**

8

19.08
CLAIRE FALLON, CHANNEL 4 NEWS: The women who gave evidence as part of the prosecution, claimed Ghislaine Maxwell was crucial in a grooming process that's been likened to a pyramid scheme with claims girls recruited by Ghislaine Maxwell were then told to bring more girls who would be abused too.

**19.24**
LOC: The prosecution created a picture for the jury of how this pyramid scheme operated and they were really trying to focus on the strategic way that Jeffrey Epstein and Ghislaine Maxwell set up the situation to ensnare young girls.

19.45
FILE FILM OF NINE NETWORK AUSTRALIA WITH COURTNEY WILD: I knew that I was coming here to give a guy a massage and to make $200, I did now that. It was never told to me that I would be molested by this man or anything like that. And so we would massage him for about 30 minutes and then whenever he was ready, he rolled over and that's when the sexual abuse happened.

20:08
NARRATOR: Courtney Wild was a troubled 14 year old when she was abused by Epstein and then became a part of the pyramid scheme procuring new girls to come to the mansion.

COURTNEY WILD: After maybe the second time I when he asked me to recruit other girls. You can tell his addiction wasn't drugs or alcohol, it was definitely young girls. And if I couldn't bring him young girls and if I didn't bring him a girl and he couldn't get his obsession he would just get so mad. Just hold a lot of guilt and shame for doing those things and just to know that I have

9

any influence on that happening to somebody else, just you know, it really, it's just devastating, breaks my heart.

20.56
LISA BLOOM: The were recruited in because a young girl would come to them and say, I know this older man. You can give them a massage and you can get $300, and to some of my clients that was a huge amount of money and because it was a young girl around their age, recruiting them, they trusted her.

21.15
TERESA HELM: We don't know how many girls he's abused, we just don't know; and those are his crimes and Ghislaine Maxwell made it all happen. She made it happen. She worked right alongside.

21.32
NARRATOR: For nearly a decade Ghislaine managed Epstein's various palatial homes.

R.CORI HAY: Jeffrey did describe Ghislaine Maxwell in the late 90s as his best friend.

9

She ran the houses, she hired the cooks, she oversaw the gardeners, she'll oversaw some of the decoration, she ran his social life.
21.53
NARRATOR: Even after they stopped being romantically involved Elaine and Epstein looked every bit the power couple when appearing on the social circuit or out in public.

R.CORY HAY: She acted as the wife, but Jeffrey would never marry her.

GRAPHIC: 2005

22.15
NARRATOR: by the early 2000s, ugly rumors were circulating in Palm Beach. In 2005 police received a tip-off from an alarmed stepmother and started an investigation. On October 20 they conducted a dawn raid on Epstein's mansion. [FILE FILM OF THE 2005 POLICE RAID INCLUDING A GREEN MASSAGE TABLE].

22.46
NARRATOR CONTINUES: They found one particular item that would become a critical piece of evidence 16 years later in Ghislaine's trial. Jurors are stunned to see the massage table on which so much of the sexual abuse was alleged to have taken place

**22.50**
**SCOTTY DAVID: I was confused at first why they brought the massage table in, this big**

GHISLAINE, PARTNER IN CRIME - EPISODE 2 of 4 - *Lady of the House*
PARAMOUNTPLUS TRANSCRIPT, Aired April 6, 2022 - -

green massage table like why are you bringing this, why are you spending so much time on this. And then it, then it clicked.

23.02
LOC: When the massage table that was found in the Palm Beach mansion was brought into the courtroom and physically opened up in front of the jury, Ghislaine Maxwell appeared very uncomfortable.

[GOV EXHIBIT OF EMPLOYEE HOUSEHOLD MANUAL]

23.15
NARRATOR: The jury is shown another key piece of evidence that Juan Alessi says bore Ghislaine's imprint.

23.21
SIOBHANN KENNEDY, CHANNEL FOUR NEWS: This 56 page household manual giving staff strict instructions on everything from the distance between hangers in the wardrobe to Jeffrey Epstein's preferred brand of cough sweets, down to the precise number of seconds to warm up their breakfast coffee in the microwave.

NARRATOR: Epstein's housekeeper Juan Alessi was asked about the manual.

SIOBHANN KENNEDY, CHANNEL FOUR NEWS: Alessi made clear that Ghislaine Maxwell was in charge of every single aspect of life in Palm Beach.

23.54
SCOTTY DAVID, JUROR:: They made this instruction manual, and it just pointed to how she was actually number two - in this whole scheme; and she not only worked for Epstein, she was the lady of the house

24.10
LOC, JOURNALIST AND AUTHOR: The household manual included instructions to always smile to always be unobtrusive and most importantly for the prosecution, to hear nothing say nothing and say nothing

24.24
RIKKI KLIEMAN, ATTORNEY. CBS LEGAL ANALYST: The testimony of Juan Alessi had to be extraordinarily damaging to Ghislaine Maxwell because the detail of the list in and of itself, made Ghislaine look like she was not only the Madame of the house it made her look like she was the Madame of the scheme of sexual abuse.

MOLA LENGHI, CBS NEWS: Juan Alessi recalled that Epstein liked to receive at least three massages a day which is what Jane testified earlier this week, and of course while Alessi was not in the massage rooms with with Epstein, he did have to clean up after and he testified to

**GHISLAINE, PARTNER IN CRIME - EPISODE 2 of 4 - *Lady of the House***
PARAMOUNTPLUS TRANSCRIPT, Aired April 6, 2022 - -

finding sex toys in those massage rooms after cleaning up.

## 25.14
**SCOTTY DAVID, JUROR: Juan Alessi he said it was odd that he would have to put away sex toys that would have to go into Ghislaine's bathroom there were two bathrooms in the master bedroom one was Epstein's and the other one was Ghislaine's.**

25.28
**GRAPHIC: 2006 POLICE FOOTAGE**

**NARRATOR:** Nine months went by between the police raid and the time Epstein was finally arrested on suspicion of unlawful sex with minors. In the interim he had hired a team of private investigators and high power defense lawyers. Among them were Alan Dershowitz and Kenneth Star. They tried to discredit his alleged victims, painting them as troubled promiscuous, drug abusing teenagers. Doubting that the Palm Beach office would ultimately prosecute the case, Palm Beach's Chief of Police gave his evidence to the FBI, hoping it would lead to federal sex trafficking charges. But another year passed before federal prosecutors reached a secret sweetheart deal with Epstein.

**GRAPHIC 2008**

He would plead guilty instead to soliciting a minor for prostitution.

26.27
FILE FILM WPTV NEWS: Jeffrey Epstein went to jail just before 10am this morning. He pleaded guilty in open court. He will serve a total of 18 months in a Palm Beach Detention Facility.

26.36
R. CORI HAY: We really weren't sure what happened in Florida - oh yes we heard the word prostitution, we might've heard the word 'under age' but it was sort of not played out, it seemed far away, it didn't seem to involve it didn't involve us, New York society.

27.01
NEWSCASTER: Jeffrey Epstein served 13 months of an 18 month sentence. A few steps, a smile and a wave to the Deputy at the door, we watched Epstein walk out of jail. As exciting as this day is for the New York money manager, it isn't the first time he's walked this walk. He's actually been leaving the county detention center since last fall on work release. Epstein would work at his Palm Beach office every Friday through Wednesday.

NARRATOR: By 2010, Epstein was a free man but his victims were furious that the billionaire had gotten off so lightly. It was a story some journalists found too good to pass up.

27.39.
STEPHEN WRIGHT, INVESTIGATIONS EDITOR, DAILY MAIL: We went to um, the home of Juan Alessi. I was there about an hour with him, talking about Epstein, talking about what the Palm Beach mansion was like. Full of people who were there and the type of girls who, young

women who used to visit. Alessi told me, a very detailed description he gave me of the Palm Beach house, the naked pool parties. The pictures of scantily clad and naked girls on the wall. The massages, young girls coming in I wouldn't say they were under age but they were young women, you know. He was alluding to late teens, early 20s - that sort of age. The image that Alessi painted was of a place of, you know, almost debauchery.

**GRAPHIC: 2021**

28.53
NARRATOR: In the New York Courtroom, Flight logs are introduced to confirm the testimony of the victim known as Jane. The logs show her traveling between Epstein's homes in several states. They also show how Epstein flew important friends like Donald Trump, Bill Clinton and Kevin Spacey. One of his pilots, David Rogers, testifies Ghislainea approved everything including pilot vacations.

NORTH JERSEY RECORD, NEWSCASTER: A small New Jersey airport is now under scrutiny for become Jeffrey Epstein's travel hum for his alleged sex trafficking ring. Epstein was allegedly able to fly underage girls across the country and sometimes the world from Teterboro Airport.

29.46
EMMA MURPHY, US CORRESPONDENT: The prosecution have been really trying to build the image of Jeffrey Epstein and Ghislaine Maxwell as a couple, and also as people who work very closely together. And that's why they have released these photos, some of them giving him a foot rub, on top of the Lolit Express, nicknamed because of the number of young women that were transported on it, and some of the girls who had given evidence actually said that they were taken on board and also therefore trafficked.

30.25
NARRATOR: A key prosecution witness takes the stand. Annie Farmer. Her testimony is backed up by a journal she kept when she was 16. She met Epstein through her sister, Maria Farmer, who was working for him

**GRAPHIC: 1996 [ZORRO RANCH, NM]**

NARRATOR CONTINUES: Epstein offered to finance Annie's education and invited her to his isolated desert ranch in New Mexico. That's where she met Ghislaine.

30.58
**SCOTTI DAVID, JUROR: She was inappropriately touched by Ghislaine. There was a massage and then Ghislaine asks her to turn over. Ghislaine pulls the sheet down below revealing her chest and then doesn't massage her breast but massages her upper chest which is still in my mind extremely inappropriate. She had this weird suspicion that somebody was watching her. Annie Farmer after that experience was in bed in the room that she was sleeping in, when Jeffrey came in to cuddle with her and she felt so creeped out that she got up, said she had to use the bathroom, locked herself in the bathroom and Epstein went away. And that is the only thing that saved her from additional abuse.**

women that he'd seen over the years but two stood out in his mind. Those two girls he thought were aged around 14 or 15 and he identified them as Virginia Roberts, the woman who went on to accuse Prince Andrew of sexually abusing her and also Jane

04.02
MOLA LENGHI, CBS NEWS: Jane is one of the four females who are testifying throughout this trial who are accusing Maxwell of being central to Jeffrey Epstein's sex trafficking operation. Jane of course is a pseudonym, it's not her real name, and Alessi was able to corroborate some of her testimony.

**04:16
SCOTTY DAVID, JUROR: He had a lot of information to share with us. Eh when we were discussing in the jury room about him, we had to figure out is he credible. I thought he was very credible. He acted as a chauffeur. And he picked up Jane multiple times. He remembers meeting Jane and, and thinking how young this girl is.**

04.41
NARRATOR: Alessi told the jury drove Ghislaine Maxwell around town as she looked for new girls to bring to Epstein.

04.49
SIOBHAN KENNEDY, CHANNEL 4 NEWS: There had to be cash he said in the car, $100 bills in the car in every car. He didn't say what that money was for but we do know some of the alleged victims have claimed they were paid in cash for giving what they alleged to be those sexualized massages to Mr. Epstein.

05.09
NARRATOR: According to Alessi, Ghislaine Maxwell was the crucial link in the pipeline of girls that regularly turned up at the mansion.

05.20
RIKKI KLIEMAN, ATTORNEY. CBS LEGAL ANALYST: The prosecution's theory of the case is that Jeffrey Epstein and Ghislaine Maxwell were partners - they were equals; that without Ghislaine Maxwell as the total enabler of Jeffrey Epstein, Jeffrey Epstein could not have run this enterprise of abusing young girls. What the defense must do is be able to show if they can, that Ghislaine Maxwell is a separate individual.

05.50
R.CORI HAY: At first Ghislaine Maxwell and Jeffrey Epstein were lovers although I think he thought of her more as a friend and a lover as she was way too old really for Jeffrey Epstein's taste in girls. In the end I think that Jeffrey's sense or lack of morality and Ghislaine's mirrored each other, I think Jeffrey won her over to the darkest side.

and it was his way of bringing them to heal if it they were not towing the line for instance not working at school while he was breaking his back to give him the best education money could buy. He was very good father really loving father.

DAVID FROST: Meaning the children

BETTY MAXWELL: Yes yes, but you know David, you must realize that now you give a clip on the ear to a child, you are practically brought in front of a judge. [DAVID FROST IS NODDING YES]. 40 years ago it wasn't the way.

16.21
IAN MAXWELL: He took school reports very very seriously. I was caned for bad reports. 7


**GHISLAINE, PARTNER IN CRIME - EPISODE 2 of 4 - *Lady of the House***
PARAMOUNTPLUS TRANSCRIPT, Aired April 6, 2022 - - WP/im

LAUGHING, you know, If you're not gonna get taught by the honey you're gonna get taught by the rocks.

16.31
EVE POLLARD: They were frightened of him as well as loving him, I mean, it was a strange complex situation as some men do have with their fathers. And Ghislaine had it with him too. He is the loving person handing out the goodies - a house, a car, some jewelry. He can take and he can give, absolute power.

**GRAPHIC 2021**

17.15
NARRATOR: in 2021 At the trial in New York one of Epstein and Maxwell's youngest victims is called to the witness stand.

17.23
EMMA MURPHY, US CORRESPONDENT: We heard today from Carolyn who was 14 when she was taken to the Epstein home that was shared with Ghislaine Maxwell by Virginia Roberts.

**17.32**
**LOC:** Carolyn came from a very very difficult upbringing. Her home life was very unstable, she told the court that Jeffrey Epstein and Ghislaine Maxwell really preyed on her vulnerabilities.

**17.44**
**SCOTTY DAVID: Carolyn's testimony was almost so tragic that it just didn't feel real. I felt the most compassion for her because she went she had, literally had one of the hardest life stories. Er she was raped multiple times that, starting at the age of four years old er dropped out of school at seventh grade and, just entered into a lifestyle of drugs and [pause] then entered into Epstein's world.**

Case 1:20-cr-00330-PAE    Document 855-2    Filed 02/25/26    Page 127 of 645
GHISLAINE, PARTNER IN CRIME - EPISODE 2 of 4 - *Lady of the House*
PARAMOUNTPLUS TRANSCRIPT, Aired April 6, 2022 - -

18.26
EMMA MURPHY, ITV NEWS AT TEN: She knew that she was going to be asked to do massage for money. She said she didn't expect to have to take her clothes off, but in the hundreds of other times that she visited, she felt more comfortable and did. She said she told Miss Maxwell she was only 14 years old when she was asked whether or not she had a passport. She went on to say that on another occasion, that Ghislaine Maxwell had touched her body when she was naked in the massage room.

**18.49**
**SCOTTY DAVID: Caroline took the money and continually called Jeffrey Epstein's home in order to make more money because she was a 14-year-old who had dropped out of school and wanted money to live and to buy drugs.**

8

19.08
CLAIRE FALLON, CHANNEL 4 NEWS: The women who gave evidence as part of the prosecution, claimed Ghislaine Maxwell was crucial in a grooming process that's been likened to a pyramid scheme with claims girls recruited by Ghislaine Maxwell were then told to bring more girls who would be abused too.

**19.24**
LOC: The prosecution created a picture for the jury of how this pyramid scheme operated and they were really trying to focus on the strategic way that Jeffrey Epstein and Ghislaine Maxwell set up the situation to ensnare young girls.

19.45
FILE FILM OF NINE NETWORK AUSTRALIA WITH COURTNEY WILD: I knew that I was coming here to give a guy a massage and to make $200, I did now that. It was never told to me that I would be molested by this man or anything like that. And so we would massage him for about 30 minutes and then whenever he was ready, he rolled over and that's when the sexual abuse happened.

20:08
NARRATOR: Courtney Wild was a troubled 14 year old when she was abused by Epstein and then became a part of the pyramid scheme procuring new girls to come to the mansion.

COURTNEY WILD: After maybe the second time I when he asked me to recruit other girls. You can tell his addiction wasn't drugs or alcohol, it was definitely young girls. And if I couldn't bring him young girls and if I didn't bring him a girl and he couldn't get his obsession he would just get so mad. Just hold a lot of guilt and shame for doing those things and just to know that I have

any influence on that happening to somebody else, just you know, it really, it's just devastating, breaks my heart.

20.56
LISA BLOOM: The were recruited in because a young girl would come to them and say, I know this older man. You can give them a massage and you can get $300, and to some of my clients that was a huge amount of money and because it was a young girl around their age, recruiting them, they trusted her.

21.15
TERESA HELM: We don't know how many girls he's abused, we just don't know; and those are his crimes and Ghislaine Maxwell made it all happen. She made it happen. She worked right alongside.

21.32
NARRATOR: For nearly a decade Ghislaine managed Epstein's various palatial homes.

R.CORI HAY: Jeffrey did describe Ghislaine Maxwell in the late 90s as his best friend.

9

GHISLAINE, PARTNER IN CRIME - EPISODE 2 of 4 - *Lady of the House*
PARAMOUNTPLUS TRANSCRIPT, Aired April 6, 2022 - - WP/im

She ran the houses, she hired the cooks, she oversaw the gardeners, she'll oversaw some of the decoration, she ran his social life.
21.53
NARRATOR: Even after they stopped being romantically involved Elaine and Epstein looked every bit the power couple when appearing on the social circuit or out in public.

R.CORY HAY: She acted as the wife, but Jeffrey would never marry her.

GRAPHIC: 2005

22.15
NARRATOR: by the early 2000s, ugly rumors were circulating in Palm Beach. In 2005 police received a tip-off from an alarmed stepmother and started an investigation. On October 20 they conducted a dawn raid on Epstein's mansion. [FILE FILM OF THE 2005 POLICE RAID INCLUDING A GREEN MASSAGE TABLE].

22.46
NARRATOR CONTINUES: They found one particular item that would become a critical piece of evidence 16 years later in Ghislaine's trial. Jurors are stunned to see the massage table on which so much of the sexual abuse was alleged to have taken place

**22.50**
**SCOTTY DAVID: I was confused at first why they brought the massage table in, this big**

Case 1:20-cr-00330-PAE    Document 855-2    Filed 02/25/26    Page 129 of 645
GHISLAINE, PARTNER IN CRIME - EPISODE 2 of 4 - *Lady of the House*
PARAMOUNTPLUS TRANSCRIPT, Aired April 6, 2022 - -

**green massage table like why are you bringing this, why are you spending so much time on this. And then it, then it clicked.**

### 23.02

LOC: When the massage table that was found in the Palm Beach mansion was brought into the courtroom and physically opened up in front of the jury, Ghislaine Maxwell appeared very uncomfortable.

[GOV EXHIBIT OF EMPLOYEE HOUSEHOLD MANUAL]

23.15

NARRATOR: The jury is shown another key piece of evidence that Juan Alessi says bore Ghislaine's imprint.

23.21

SIOBHANN KENNEDY, CHANNEL FOUR NEWS: This 56 page household manual giving staff strict instructions on everything from the distance between hangers in the wardrobe to Jeffrey Epstein's preferred brand of cough sweets, down to the precise number of seconds to warm up their breakfast coffee in the microwave.

NARRATOR: Epstein's housekeeper Juan Alessi was asked about the manual.

SIOBHANN KENNEDY, CHANNEL FOUR NEWS: Alessi made clear that Ghislaine Maxwell was in charge of every single aspect of life in Palm Beach.

### 23.54

**SCOTTY DAVID, JUROR:: They made this instruction manual, and it just pointed to how she was actually number two - in this whole scheme; and she not only worked for Epstein, she was the lady of the house**

### 24.10

**LOC, JOURNALIST AND AUTHOR:** The household manual included instructions to always smile to always be unobtrusive and most importantly for the prosecution, to hear nothing say nothing and say nothing

24.24

RIKKI KLIEMAN, ATTORNEY. CBS LEGAL ANALYST: The testimony of Juan Alessi had to be extraordinarily damaging to Ghislaine Maxwell because the detail of the list in and of itself, made Ghislaine look like she was not only the Madame of the house it made her look like she was the Madame of the scheme of sexual abuse

MOLA LENGHI, CBS NEWS: Juan Alessi recalled that Epstein liked to receive at least three massages a day which is what Jane testified earlier this week, and of course while Alessi was not in the massage rooms with with Epstein, he did have to clean up after and he testified to

finding sex toys in those massage rooms after cleaning up.

**25.14**
**SCOTTY DAVID, JUROR: Juan Alessi he said it was odd that he would have to put away sex toys that would have to go into Ghislaine's bathroom there were two bathrooms in the master bedroom one was Epstein's and the other one was Ghislaine's.**

25.28
**GRAPHIC: 2006 POLICE FOOTAGE**

**NARRATOR:** Nine months went by between the police raid and the time Epstein was finally arrested on suspicion of unlawful sex with minors. In the interim he had hired a team of private investigators and high power defense lawyers. Among them were Alan Dershowitz and Kenneth Star. They tried to discredit his alleged victims, painting them as troubled promiscuous, drug abusing teenagers. Doubting that the Palm Beach office would ultimately prosecute the case, Palm Beach's Chief of Police gave his evidence to the FBI, hoping it would lead to federal sex trafficking charges. But another year passed before federal prosecutors reached a secret sweetheart deal with Epstein.

**GRAPHIC 2008**

He would plead guilty instead to soliciting a minor for prostitution.

26.27
**FILE FILM WPTV NEWS:** Jeffrey Epstein went to jail just before 10am this morning. He pleaded guilty in open court. He will serve a total of 18 months in a Palm Beach Detention Facility.

26.36
**R. CORI HAY:** We really weren't sure what happened in Florida - oh yes we heard the word prostitution, we might've heard the word 'under age' but it was sort of not played out, it seemed far away, it didn't seem to involve it didn't involve us, New York society.

27.01
**NEWSCASTER:** Jeffrey Epstein served 13 months of an 18 month sentence. A few steps, a smile and a wave to the Deputy at the door, we watched Epstein walk out of jail. As exciting as this day is for the New York money manager, it isn't the first time he's walked this walk. He's actually been leaving the county detention center since last fall on work release. Epstein would work at his Palm Beach office every Friday through Wednesday.

**NARRATOR:** By 2010, Epstein was a free man but his victims were furious that the billionaire had gotten off so lightly. It was a story some journalists found too good to pass up.

27.39.
**STEPHEN WRIGHT, INVESTIGATIONS EDITOR, DAILY MAIL:** We went to um, the home of Juan Alessi. I was there about an hour with him, talking about Epstein, talking about what the Palm Beach mansion was like. Full of people who were there and the type of girls who, young

GHISLAINE, PARTNER IN CRIME - EPISODE 2 of 4 - *Lady of the House*
PARAMOUNTPLUS TRANSCRIPT, Aired April 6, 2022 - -

women who used to visit. Alessi told me, a very detailed description he gave me of the Palm Beach house, the naked pool parties. The pictures of scantily clad and naked girls on the wall. The massages, young girls coming in I wouldn't say they were under age but they were young women, you know. He was alluding to late teens, early 20s - that sort of age. The image that Alessi painted was of a place of, you know, almost debauchery.

**GRAPHIC: 2021**

28.53
NARRATOR: In the New York Courtroom, Flight logs are introduced to confirm the testimony of the victim known as Jane. The logs show her traveling between Epstein's homes in several states. They also show how Epstein flew important friends like Donald Trump, Bill Clinton and Kevin Spacey. One of his pilots, David Rogers, testifies Ghislainea approved everything including pilot vacations.

NORTH JERSEY RECORD, NEWSCASTER: A small New Jersey airport is now under scrutiny for become Jeffrey Epstein's travel hum for his alleged sex trafficking ring. Epstein was allegedly able to fly underage girls across the country and sometimes the world from Teterboro Airport.

29.46
EMMA MURPHY, US CORRESPONDENT: The prosecution have been really trying to build the image of Jeffrey Epstein and Ghislaine Maxwell as a couple, and also as people who work very closely together. And that's why they have released these photos, some of them giving him a foot rub, on top of the Lolit Express, nicknamed because of the number of young women that were transported on it, and some of the girls who had given evidence actually said that they were taken on board and also therefore trafficked.

30.25
NARRATOR: A key prosecution witness takes the stand. Annie Farmer. Her testimony is backed up by a journal she kept when she was 16. She met Epstein through her sister, Maria Farmer, who was working for him

**GRAPHIC: 1996 [ZORRO RANCH, NM]**

NARRATOR CONTINUES: Epstein offered to finance Annie's education and invited her to his isolated desert ranch in New Mexico. That's where she met Ghislaine.

30.58
**SCOTTI DAVID, JUROR: She was inappropriately touched by Ghislaine. There was a massage and then Ghislaine asks her to turn over. Ghislaine pulls the sheet down below revealing her chest and then doesn't massage her breast but massages her upper chest which is still in my mind extremely inapropropriate. She had this weird suspicion that somebody was watching her. Annie Farmer after that experience was in bed in the room that she was sleeping in, when Jeffrey came in to cuddle with her and she felt so creeped out that she got up, said she had to use the bathroom, locked herself in the bathroom and Epstein went away. And that is the only thing that saved her from additional abuse.**

out at will.

22.03
R COURI HAY: So i wouldn't be surprised if Ghisaline Maxwell was sleeping with both Prince Andrew and Jeffrey Epstein, potentially at the same time.

NARRATOR: The two men in Ghisaline's life drew closer. A genuine friendship seemed to bloom.

22.22
RUSSELL MEYERS, ROYAL EDITOR, DAILY MAIL: He's spoken about this himself, about his involvement with Jeffrey Epstein that was of benefit to him because he saw him in a business mind - certainly they were being hosted by one another whether it was at shooting w/ends or royal palaces or estates and the fact that they are together proves that there relationship was very close at one stage. ….

**GRAPHICS - ASCOT SANDRINGHAM**

I think he just really called into question the access that Epstein and Maxwell had to Prince Andrew and into the relationship that those three people had.

23.33
NARRATOR: Back across the Atlantic in Feb, 2000 Prince Andrew was photographed with Ghislaine and Epstein at Donald Trump's Mar a Lago club, just a six minute drive from Epstein's mansion, the setting for many events that witnesses testified about at Ghislaine Maxwell's trial. In court, Jurors hear how the Palm Beach home was the center for illicit sexual activities involving under age girls.

ANNE MARIE GREEN, CBS NEWSCASTER: You heard from Juan Alessi from the early 90s. He also testified to constantly seeing many girls, many many many girls is the way that he put it. And many many women around the house and really creating an atmosphere around Jeffreys house

**24.39**
NARRATOR: A green massage table recovered by Police from the house, was set up in front of the jury.

**24.45**
**SCOTTY DAVID: The FBI Agent said look under the massage table it shows that this**


**massage table was manufactured in CA and then sold to his home in Florida. And also used in New York and wherever else they may have gone because he owned multiple properties; and that table was crucial in interstate commerce - easy to prove guilt for certain counts.**

ParamountPlus_ GM Partners in Crime_EP 3 *The Prince and the Predator*
Transcript_Apr 6, 2022

private time ... he was on his own, he was staying at the British Consul's which was only a 5 minutes walk from Jeffrey's house. ... so how could it be that he doesn't pop in to see Epstein?.

VRG FILE FILM OF HER CRYING LOOKING AT JE'S TOWNHOUSE: It should be ripped down it should be burned to the ground. Some of my worst memories are from this place.

30.33
NARRATOR: Throughout her trial, reporters observed how Ghislaine Maxwell avoids engaging with testifying survivors.

**31.42**
LOC: There are moments especially when survivor witnesses are testifying that she looks uncomfortable and she starts to look away. It seems that she is very reluctant to make eye contact with the victims or to look up while they are giving evidence or indeed to look at the jury while they are giving evidence. She always has her eyes downcast looking at her piece of paper, trying not to engage with anyone while we are hearing evidence from the victims.

NARRATOR: Ghislaine May have felt especially uncomfortable listening to the witness known as Kate who testified how the couple groomed her.

**32.25**
**SCOTTY DAVID: It would start off as innocent but really creepy to me by massaging Jeffrey Epstein's feet and showing how he likes to be massaged, it's like well she specifically told Kate, well you look like you have strong hands, why don't you try it. So she's trying it, feeling a little nervous while doing it, but you know, does it anyway. And then it escalates where they massage Epstein naked. And then that's where the sexual advances comes into play.**

33.10
NARRATOR: Kate testifies that she was flown to Epstein's private island in the Caribbean so she could continue to provide him with erotic massages. On the map, it's called Little St. James, but locals had another name for it - orgy island. A place that Virginia Giuffre says she can't forget where Epstein and Maxwell trafficked her repeatedly.

VRG: They lent me out to all sorts of different types of men. It wasn't just Jeffrey telling me ok i'm sending you to the island for the weekend to take care of so and so. It was Ghislaine organizing all of this for me too. She was the person in control. She was the mastermind.

33.58
NARRATOR: Prince Andew was supposed to spend Easter in the Caribbean with his family. He was due to go directly to the Bahamas to link up with his family, the duchess and the daughter and the official itinerary seen by the Mail shows that he changed that plan at the last minute. Prince Andrew did go to the Caribbean but not the island where his family was vacationing. At Ghislaine's trial, Epstein's Personal pilot Larry Visosky testified that Prince Andrew took several flights on the billionaire's private plane. Private logs show that he traveled with Epstein and

11

**PARAMOUNTPLUS GHISLAINE, PARTNER IN CRIME** *The Verdict. Is it Over?*
**Master Transcript Ep 4 of 4 _APR 6, 2022_WP/im**

**PARAMOUNT PLUS GHISLAINE, PARTNER IN CRIME** *The Verdict. Is it Over?* **Master Transcript Ep 4 of 4 _APR 6, 2022_WP/im**

001. VIRGINIA ROBERTS GIUFFRE ("VRG"): It's hard, it's really hard being back here [at 9 E 71St Street, New York - JE's home). There's a lot of scars hidden behind those walls. It should be ripped down. It should be burned to the ground. Some of my worst memories are from this place.

**00.13**
**SCOTTY DAVID, JUROR: The second I left the courtroom, I'm walking down the stairs of that courthouse, I lost it. I couldn't contain my tears, because this is somebody's life on the line.**

[ OPENING CREDIT SEQUENCE, SAME AS FOR EACH EPISODE]

OUTSIDE THE COURTHOUSE: JOURNALISTS TALKING TO WITNESSES: Did Miss Maxwell instruct you to pick up the young girls? Do you regret that you worked for Mr. Epstein, Sir?

VARIOUS NEWSCASTERS: It was the trial that exposed the secret lives of the rich, the famous and the powerful; Maxwell is accused of transporting a minor for criminal sexual activity; Prosecutors portrayed Ghislaine Maxwell as Epstein's partner in crime.

**00.50**
**SCOTTY DAVID: I was looking at her the entire time. There was no emotion. It was like she was a stone.**

00.55
SARAH RANSOM: I was groomed into doing massages on Jeffrey, and then raped. 01.02
LISA BLOOM: Ghislaine was essentially the pimp

01.04
LADY VICTORIA HERVEY: Ghislaine was going out and essentially hunting for the girls, sort of bringing them in.

01.11
NARRATOR: But is there another Ghislaine Maxwell?

01.14
IAN MAXWELL: I just don't believe that my sister would have crossed those bars. 1

**Master Transcript Ep 4 of 4 _APR 6, 2022_WP/im**

01.18
NARRATOR: How did a newspaper tycoon's favorite child, the youngest of nine, become ensnared in such a sordid affair?

01.28
R. CORI HAY: Ghislaine had it all!

NARRATOR: How did she hit rock bottom?

GM: FILE INTERVIEW W DAPHNE BARAK:
GM: I'm extremely sad that my father is no longer here

01.51
TERESA HELM: Ghislaine says to me, 'make sure you give Jeffrey what he wants because Jeffrey always gets what he wants'

01.57
How did this daughter of privilege become a pedophile's accomplice?
GRAPHIC VISUAL: GHISLAINE MAXWELL, PARTNER IN CRIME
END OF TITLE SEQUENCE -

NARRATOR; The eyes of the world focus on Manhattan as the Ghislaine Maxwell sex abuse trial reaches its climax.

**GRAPHIC DECEMBER 20, 2021**

02.07
NEWSCASTER: Ghislaine Maxwell 's fate could be in a jury's hands as soon as today.

02.16
NARRATOR: After 12 days of shocking evidence the jury are sent out to deliberate from testimony from 32 witnesses including 4 victims, the youngest just 14 when Maxwell's alleged crimes began.

**02.30:**
**SCOTTY DAVID, JUROR: Ouuuf we got back there and we had no clue how to really start that process so we tried a few things, we just felt like we knew deep down we want to be able to work together, to come to a conclusion.**

FILM FILM OF SIBLINGS OUTSIDE COURTHOUSE:
KM: We are not going to make any comment until the verdict comes in. Thank you.

02.52:

2

**PARAMOUNTPLUS GHISLAINE, PARTNER IN CRIME *The Verdict. Is it Over?***
**Master Transcript Ep 4 of 4 _APR 6, 2022_WP/im**

RIKKI KLIEMAN, ATTORNEY, CBS LEGAL ANALYST: If a jury thinks that she might have done it, if the jury guesses that she did it, if the jury speculates that she did it, if the jury thinks she probably did it, she is not guilty. The only way she can be found guilty is if the prosecution proves each and every element of each charge beyond a reasonable doubt.


03.20
**SCOTTY DAVID, JUROR: The prosecution painted a picture of a woman who was working hand in hand with Jeffrey Epstein; that she was there every step of the way.**

03.34
LISA BLOOM: Most young women even if you're very young and you're very naïve, you may think twice about going off with an older man who you don't know. But if it's a woman you're going to be more trusting and Ghislaine took advantage of that.

03.47
TERESA HELM, SURVIVOR: The emotional connection that Ghislaine was making with me was all by design and intention to get me to the point of being as comfortable as I was, to where I walked myself to this man's home, where I was going to be abused.

04.06
**SCOTTY DAVID, JUROR: The defense said that she was just a bystander, that she just happened to be there and had been a love interest to Epstein but that had ended and it was just a work situation; that this was all a lie because Epstein had died and they needed somebody to paint it on.**

04.34
IAN MAXWELL: She is here as a full guy for Jeffrey Epstein and all of this evidence has been gathered late in the day because 10 years ago when he went down, Ghislaine's name didn't featuring any police report, there's always no mention of Ghislaie anywhere, and then suddenly it gets_____ [unintelligible word] and Jeffrey dies and bang, it takes off.

05.06
NARRATOR: Ghislaine Maxwell might not be in court today if Epstein had been given a longer prison sentence after his arrest for sex crimes in Florida over 15 years ago.

GRAPHIC 2006
POLICE INTERVIEW RECORDING

[JOE RECAREY"S VOICE} Tell me about the part when he got down to your underwear, did he touch your vaginal area?

YOUNG WOMAN VOICE: Yeah

3

back decades. The reckoning means that we are now revisiting the stuff that happened ten, twenty years ago, and it's absolutely essential that we do that. Justice delayed is better than justice denied.

13.37 GRAPHIC: Ghislaine Maxwell Trial.
NARRATOR: It's been four years since the #MeToo movement began to change the culture and in Lower Manhattan, 12 jurors pour over the testimony from Ghislaine Maxwell's alleged victims.

RIKKI KLIEMAN, ATTORNEY, CBS LEGAL ANALYST: You had a very thoughtful jury here, they were out not only for hours, they were out for many days and they wanted transcripts of witness after witness and they reviewed virtually the entire trial a second time.

**14.06**
**SCOTTY DAVID, JUROR: We were exhausted, we were mentally exhausted, there was so much information that we, we had to sort through. What we had to deal with was peoples' memories from more than 20 years ago. and some jurors did have serious credibility issues with some of these victims.**

NARRATOR: Ghislaine's freedom depends on whether the accusers are considered reliable witnesses.

**14.41**
RIKKI KLIEMAN, ATTORNEY, CBS LEGAL ANALYST: In any case involving allegations of sexual assault or sexual abuse a defence lawyer cannot be a nice person. A defense lawyer goes into the trial and must test the victims' recollection, the victims memory and the victim's ability to fabricate .

NARRATOR: The defense team had adopted a wrecking ball strategy, attacking the credibility of the accusers, insisting that the women's stories were lies or false memories, and calling psychologist Elizabeth Loftus to support their case.

**15.20:**
**SCOTTY DAVID, JUROR: Elizabeth Loftus had testified to us that she had done research for many years on different scenarios but none of them related to sexual abuse victims.**

**15.33**
RIKKI KLIEMAN, ATTORNEY, CBS LEGAL ANALYST: If you're going to try to eviscerate someone who says that they were sexually abused, you better have earned the right to do that - meaning that you really better have shown that this person is a liar, a true liar and if you are not able to do that, going after them to destroy them is not only appalling to a jury, but it really makes a jury not trust you.

**16.08**
**SCOTTY DAVID: The defense was very brutal. I feel like an attorney should be able to still cross examine a witness but you don't have to be rude; and the way that they were speaking to them was incredibly rude. It was, it was awful. If you go through something traumatic those memories tend to stick around with you a lot longer then say, what you got for dinner last week. And while some things are fuzzy, the core memories are there**

34.49

**SCOTTY DAVID, JUROR: None of us wanted a hung jury [shaking his head] but we also knew that the prosecution did have to prove beyond a reasonable doubt that Ghislaine is guilty of these counts and had to prove that there was enough evidence.**

NARRATOR: The psychologist that testified for the prosecution, unlike the defence's, is a specialist in sexual abuse cases. A courtroom sketch of a dark-haired woman. Dr. Lisa Roccio had aimed to how Ghislaine prepared and conditioned the alleged victims for what Epstein would do to them.

35.28

**SCOTTY DAVID, JUROR: She taught us about patterns and grooming, and how children are more susceptible to abuse when they are groomed and how it makes a child more comfortable being around certain situations that can lead into sexual abuse. So her testimony was crucial in helping us figure out was there a pattern.**

TERESA HELM, SURVIVOR: Ghislaine has grooming down to like an art form. I was speaking to her about how I was close with my dad and she said to me that she had been close with her dad and we joked about the fact that our birthdays you know her birthday is on Christmas day and my birthday is the day after Christmas.

NARRATOR: When she was 22, Teresa says Maxwell recruited her to give Epstein massages. In 2020, she accepted an offer from the Epstein victims' compensation fund. Young Teresa grins in a photo.

36.32

TERESA HELM: Everything that we discussed she really made it a point to connect with me on an emotional level because those emotional connections are crucial to the grooming process, to really invoke that sense of comfortability and trust. You know, I was in the largest townhouse on Manhattan Island interviewing for a job to travel the world. She said, make sure you give Jeffrey what he wants because Jeffrey always gets what he wants. He was very polite and charismatic and charming even, and then he he grabbed me from behind um in a very inappropriate place and er, he didn't take his hands off of me.

37.25

LADY VICTORIA HERVEY: If Ghislaine had not been in the picture, like it would've been impossible for Jeffrey to have um, done what he did.

TERESA HELM: I've heard statements about Ghislaine's saying that she didn't know what was going on, that she just met me and sent me off but didn't know it was going to be abused but she knew exactly what she was doing and she did it incredibly well.

LISA BLOOM, LAWYER FOR 8 VICTIMS: While the jury was deliberating, my clients were quite anxious: and I told them to keep the faith. And the prosecution did a good job and were likely to get a conviction.

38.02

NARRATOR: One of the prosecution's most compelling exhibits was the little black book of Maxwell and Epstein's contacts. [EXHIBIT SHOWN OF ADDRESS BOOK PAGES OF MASSEUSES]

**38.09**
**SCOTTY DAVID, There were names of girls listed under the category masseuse, so like for Carolyn for example, it would say Carolyn's number and they were three of them. So it would say Carolyn's … And then mom would be notated next to it. Carolyn… Boyfriend number. Masseuses don't necessarily provide their clients with their mothers or their fathers telephone number. It's just wild to me, why would you put a minor under a masseuse category?**

NARRATOR: A photo shows Epstein sitting as a young woman gives him a shoulder massage, her face blurred.

**GRAPHIC: DECEMBER 27 2021**

Reporters wait outside the courthouse, Monday. It paused deliberations Thursday and Friday because of Christmas

LISA BLOOM: That indicated to me that perhaps there was a juror who had reasonable doubt and you have to get a unanimous verdict in order for there to be decisions.

A truck driver drives by a brick building with rows of slit windows. Maxwell spent her 60th birthday in solitary confinement, claiming she was abused by guards and given disgusting food in a cell visited by rats - a far cry from the life of luxury she had been used to.

39.34
EUAN RELLIE: Ghislaine was attractive on many many different levels and, and everyone wanted to be her friend so that makes it all the more shocking her demise. Obviously I look back now and I wonder did I miss anything, did I miss any signals.

LADY VICTORIA HERVEY: She just got in so deep that I don't know if she knew what she was doing by the end. [OVER PHOTO OF HRH AND VRG AND GM]

40.07
NARRATOR: But if anyone helped the jury reach a unanimous verdict, it was Caroline's.

RIKKI KLIEMAN, ATTORNEY, CBS LEGAL ANALYST: One thing that may have done it was Carolyn's testimony because she is the person who says that she was paid, and of course that gets us to the big count of conspiracy for sex trafficking which is the count that carries 40 years.

**40.33**
**SCOTTY DAVID, JUROR: So Carolyn is 14 at the time and dating this guy Sean, and they walk into the West Palm Beach home where Ghislaine greets them in the kitchen and sends them up, sends them both up stairs to Jeffrey's bathroom which is where the massages take place. There was $300 for her sitting on the counter. She took the money and continually called Jeffrey Epstein's home in order to make more money because she**

**dropped out of school and wanted money to live and to buy drugs. And I, I don't blame her in the slightest. The defense was not able to poke holes in her testimony. They tried by asking confusing questions but back in her original questioning, she mentioned Ghislaine during those statements, so there is proof.**

NARRATOR: Three people escort Ghislaine inside. The city glows as the sky darkens. After 40 hours of deliberation, the jury arrive at unanimous decisions on each count. .

**41.56**
**SCOTTY DAVID, JUROR: It was emotional. There were tears. Because this is somebody's life on the line, yeah.**

BREAKING NEWS, DICK BRENNAN: The jury has reached a verdict in the sex trafficking trial of GM , Jeffrey Epstein's former associate:

**42.10**
**SCOTTY DAVID, JUROR: Our verdict was on count one, we found her guilty; count three we found her guilty; count four we found her guilty; count five we found her guilty and count six we also found her guilty**

42.34
 CBSN: GM former girlfriend of convicted paedophile JE has been found guilty of aiding Epstein in his abusive of underage girls. She could face up to 65 years in prison

**42.46**
**SCOTTY DAVID: I was looking at her the entire time and there was no emotion it was just like she was a stone.**

42.52
 this is a big day for a number of women, not just the 4 that were the center of this trial but the dozens of women who who accused Jeffrey Epstein of sexual abuse and never got to see him at trial.

SARAH RANSOME: I mean it's so mind-boggling it still hasn't dawned on me that justice has finally been served.

NARRATOR: Many saw this as a watershed moment proving that there are not two laws, one for the rich and powerful and another for everybody else. That even in the end, if the sex crimes happened decades ago justice will be served and the guilty punished.

43.42
R.CORI HAY: GM sold her soul in order to keep Jeffrey Epstein as her friend and her checkbook. Back in the 90s and 2000s the rich and the powerful were above the law and Jeffrey Epstein was a perfect example. And I think she sought out men like that because she thought if I'm associated with these princes, these presidents, these billionaires, I too will be able to operate outside the law. And now that we know the sick nasty secrets of her life and what she was doing with Jeffrey Epstein, how she was procuring girls at schoolyards, that we know how, how deeply evil Ghislaine Maxwell really is.

**46.06**
**SCOTTY DAVID: It was an insane experience. Felt very surreal I still feel like it's just a dream. It's crazy to have been a part of such an historical trial.**

46.18
NARRATOR: But history was still being written.
Within a week of the verdict Scotty David revealed that some jurors doubted the credibility of some of the witnesses who couldn't recall the exact dates of their abuse. He decided to share something deeply personal:

**46.38**
**SCOTTY DAVID: I felt like it was very important that I shared my sexual abuse story, so when I shared that with them I told them I could literally playback my experience in my head like a video. Sure there are certain things that do run together in a blur, but I felt that it was important because it would show that I can still remember this, I can still I can tell you what happened. These women - I don't feel like they're lying.**

RIKKI KLIEMAN: He claimed that he had told the jury during deliberations of his abuse and that he fancied himself as the persuader of this jury.

**47.21**
**SCOTTY DAVID: I wanted people to understand from somebody else in that room that had gone through the exact same thing . After I spoke my story the room was dead silent.**

47.32
CBS LEGAL DEFENSE ANALYST: This was a huge red flag. All jurors were asked if they had any history of sexual abuse.

47.42
RIKKI KLIEMAN, CBS ANALYST: He did not in his questionnaire confess that he had been a victim of childhood sexual abuse, which would have clearly prompted questions during the jury selection process by the defense and they would've never had him as a juror. Period. End.

48.00
NARRATOR: Maxwell's Defense team seized the opportunity to ask for a new trial. Judge Allison Nathan held a hearing grilling **Juror number 50, Scotty, about why he had not checked the box about prior sexual abuse. He claimed his incorrect answer was an inadvertent mistake, saying it was "One of the biggest mistakes I have ever made in my life."**
 In the end Ghislaine Maxwell's rise and fall defies explanation. The judge ruled that Scotty David's omission was not enough to overturn the verdict. Ghislaine Maxwell is guilty of five counts, the most serious, sex trafficking a minor. The defense has the right to appeal the judge's decision. Maxwell is scheduled to be sentenced in June 2022 .

R CORI HAY: Her time in jail is here and I predict she will serve 15 to 20 years after this is

# EXHIBIT 8

# The Independent
## My part in triggering Ghislaine Maxwell's appeal that could lead to a retrial

It was **Lucia Osborne-Crowley**'s interview with Juror 50 in the Ghislaine Maxwell sex-trafficking trial that led her legal team to appeal over her conviction. Here the journalist reveals how her reporting will land her in the dock as an appeal witness – and what she really thinks about the guilt of the woman she faced every day in court for five weeks

In November and December of 2021, I spent five weeks as one of only four reporters allowed in the main courtroom for the federal sex-trafficking trial of Ghislaine Maxwell, the one-time girlfriend and later assistant to convicted sex offender Jeffrey Epstein.

That means I sat within a foot or two of her every day for five weeks. One day, she started sketching me on her legal notepad, alongside my press gallery colleague from *The Times*.

On 30 December, she was convicted on five out of six sex-trafficking charges, which resulted in her being sent to jail for 20 years.

On 12 March, Maxwell will appeal over her conviction and the high-profile case will once again hang in the balance. And one of the bases for the appeal is me.

An interview I published here in *The Independent* revealed that a juror had failed to disclose, when asked on a written questionnaire, if he had any experience of sexual abuse.

As a result of this interview, it was revealed that two other jurors also failed to disclose similar information to the court, which may, in certain circumstances, have disqualified them depending on the outcome of further questioning by the court and Maxwell's lawyers.

The question Maxwell's team wanted to know was: did they deceive the court? It's a pivotal question and it means that the trial result could be overturned. My journalism could be the trigger for that. I am of course extremely torn up over this. So let me explain how it came about that my reporting may be the evidence that contributes to a retrial for Ghislaine Maxwell.

This has been a trial that has obsessed me for years, and I will explain why.

1

This photo of Maxwell and Jeffrey Epstein was entered into evidence during her trial in December 2021 *(VIA REUTERS)*

In order to be reporting inside the courtroom, I had to queue from around 1am because only the first four in line were permitted entry. On the first day, I arrived at 3am. This was too late, and the one day of the entire trial that I was not inside.

From that day onwards, my *latest* arrival time was 2am. The earliest I arrived was 11pm the night before, deciding to spend the entire night sitting on cold cement in the depths of the New York City winter, shivering to my bones.

The reason I decided to get up in the middle of the night every night for several weeks to cover this trial is because I believed it would shed light on some of the concepts that we, as a society, still deeply struggle to understand: grooming, child sexual abuse, delayed disclosure and traumatic memory.

And I was right. In many ways, this trial -- and I hope, if I've done my job, my forthcoming book about the trial, *The Lasting Harm* -- will help contribute to a better, truer and more scientific understanding of how grooming, abuse, disclosure and memory work, and importantly, the damage done to victims of abuse -- not only the harm caused by their abusers, but also by the way they are treated by society in its aftermath.

This is true for all traumatic memories but particularly for those of us who have endured organised child abuse, the term used to describe becoming trapped in the grips of a manipulative predator who has a playbook -- "playbook" here means a carefully-devised strategy that is repeated and known to work on selected victims -- for access to children, and who enacts a repeated pattern of abuse on a number of victims.

In the interests of full disclosure about why I covered the trial, I, myself, am a victim of organised child sexual abuse in a setting that is alarmingly similar -- although certainly not involving the same degree of wealth and power -- to the trap Jeffrey Epstein and his associates developed over multiple decades. I was then violently sexually assaulted by a stranger in my later teens.

I have been accused many times of being biased because of my history of abuse. To that I say: yes, I am biased. Everybody is, whether we own it or not.

On 12 March, Maxwell will appeal against her conviction and the high-profile case will once again hang in the balance *(VIA REUTERS)*

I did not choose to be sexually abused beginning at nine years old, or raped at 15, and the only way I could approach a story with complete neutrality would be

2

by writing about subjects that don't touch on any of my life experiences. But all journalists have had a great deal of life experiences, and so this is a tall order.

The idea of bias is exactly what I want to write about today, which is why I led with my own. I firmly believe that my experience of abuse should not exclude me from reporting on it.

But this question became much more real – and much more upsetting – when I found myself not only an investigative reporter covering the Maxwell trial, but a key player in its final outcome.

This is how: A chance call. A midnight request.

A night or two after the trial, I was back in England and was sent a link on Instagram for the contact details of one of the jurors. In the US it is allowed – and encouraged – for journalists to interview jurors about their decisions because it is in the public interest for the justice system to be open and transparent.

I believe in this wholeheartedly, and so I asked this juror – Juror 50, Scotty David, who I recognised immediately from the jury box – for an interview. He agreed.

Later that night, we ended up speaking for the better part of five hours – most of the night, London time, and most of the afternoon and evening for him in New York.

I expected that we would discuss his interpretation of the evidence, which we did in great detail. But what I didn't know is that he would share with me that he, himself, is a victim of child sexual abuse, and that this lived experience helped him understand, and explain to the jury, the nature of traumatic memory.

Scotty David said he at first believed Maxwell was innocent. But after hearing the evidence, his belief, and his vote in the jury room changed *(REUTERS)*

The insinuation in the interview that his experience helped other jurors understand traumatic memory caused a question to be asked about whether there could be a question of legal bias, if he had intentionally misled the court and tried to get on the jury so he could sway their opinion.

I spoke to Juror 50 for hours. I've met him many times. He told me that he walked into that trial believing wholly in the American justice system's founding principle that everyone is innocent until proven guilty.

He told me he believed Maxwell was innocent. But after hearing the evidence, his belief, and his vote in the jury room, was that she was guilty on all but one of the

counts she was charged with. He was also adamant that there was not enough evidence to convict her on the one charge that the jury ultimately dismissed.

As is their right, when my interview was published, Maxwell's team immediately called for a retrial over the potential issues of bias. I was quickly aware that my interview had resounding consequences.

The court was immediately asked to find Juror 50's confidential court questionnaire and determine whether he had answered "yes" or "no" to the following question: "Have you or a friend or family member ever been the victim of sexual harassment, sexual abuse or sexual assault? (This includes actual or attempted sexual assault or other unwanted sexual advance, including by a stranger, acquaintance, supervisor, teacher or family member.)"

It transpired that he had ticked "no" to this question, leading to more allegations of bias. However, as someone who knew the legal precedent, I was aware that there is a very strict three-part test for bias in a situation like this.

The first is whether the person intentionally lied on the questionnaire, which, as I said, Juror 50 swore he did not. But even if a person did intentionally lie, to prove bias a judge must also find that the person did so for the main purpose of getting seated on that particular jury. The third test is whether the person was unable to put their experiences aside and impartially decide the case.

An appellate judge can order a new trial. It is not open to them to vacate the conviction altogether – that is, to set Maxwell free – but only to order that the trial start afresh with a new jury *(VIA REUTERS)*

Judge Nathan questioned Juror 50 fiercely under oath to determine these issues. She needed to find out, by questioning him, whether the lie was intentional or a mistake and whether he was in fact biased because of his personal experience.

She wrote a resounding judgment saying that she believed his testimony that it was an honest mistake and she said it was clear on the evidence that he examined the case fairly and impartially.

Judge Nathan wrote: "To imply or infer that Juror 50 was biased – simply because he was himself a victim of sexual abuse in a trial related to sexual abuse and sex trafficking, and despite his own credible testimony under the penalty of perjury, establishing that he could be an even-handed and impartial juror – would be tantamount to concluding that an individual with a history of sexual abuse can never serve as a fair and impartial juror in such a trial. That is not the law, nor should it be."

4

This is the precedent that is now being challenged on appeal by Maxwell's team. Of course, appellate judges have the right to overturn the trial judge's decision – if the three appeal judges decide that Judge Nathan misinterpreted the law on juror bias.

They can overturn her ruling and order a new trial. It is not open to them to vacate the conviction altogether – that is, to set Maxwell free – but only to order that the trial start afresh with a new jury. That's what's at stake: can Ghislaine Maxwell find a legal path to freedom?

I felt conflicted. I wanted to get to the truth. I was unprepared for the consequences of my interview. Juror 50 wanted his story of abuse to be told.

Once he disclosed it to me on the record and said he wanted his story told, it was my duty as a journalist to report the truth.

However, of course it was incredibly distressing as an abuse survivor to feel that my reporting of the truth may lead to a retrial.

On the other hand, once again, I always intend to uphold the principles of the law seen through the prism of journalism – and so if something that I report does involve the ordering of a new trial, I respect and honour that decision.

If I had spiked this story out of fear of its consequences, that would have been wrong.

As part of the appeal, I have been asked to testify to the truth of my interview with Juror 50 and its contents. Again, I am happy to do this as I know it is my solemn duty to the court.

After hearing every single day of the evidence, I believe beyond any reasonable doubt that Ghislaine Maxwell committed the sex trafficking crimes for which she has been convicted.

A prosecutor points to a photo of Jeffrey Epstein and Ghislaine Maxwell during a news conference prior to Maxwell's trial in 2021 *(AP)*

But I also believe, after my own four-year investigation, that it is unjust that she is the only person who has been punished by the law for a sex-trafficking ring that involved countless perpetrators and enablers who continue to walk free.

I accept the jury's decision that the evidence proves the crimes she herself committed, but justice has not been served if she continues to be the only person punished for a decades-long organised crime ring.

5

After poring over decades of case law on juror bias, it is my personal view that it is unlikely that any appellate judge could find an error of law in Judge Nathan's ruling.

If the decision is overturned – which the appellate judges are entitled to do – then I will have to accept that outcome with equanimity and grace – because that is the consequence and value of journalism.

You must be willing to report the truth when you cannot control the outcome, and even if one possible outcome is distressing and turns the present truth on its head.

I believe the jury reached a just verdict. I also believe firmly in every defendant's right to an appeal, and I am happy to take responsibility for the role I will play in that appeal based on the journalism I published in *The Independent*.

Justice is never an easy or straightforward path and I never expected to end up in its crosshairs. But appeals are part of how the justice system works, and so what is currently transpiring is what justice looks like.

# EXHIBIT 9

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------- x

     UNITED STATES OF AMERICA,        :

                v.               :      20 Cr. 330 (AJN)

     GHISLAINE MAXWELL,           :

          Defendant.         :

                                    :

-------------------------------------------------- x

## **GHISLAINE MAXWELL'S MOTION FOR A NEW TRIAL**

Jeffrey S. Pagliuca
Laura A. Menninger
HADDON, MORGAN & FOREMAN P.C.
150 East 10th Avenue
Denver, CO 80203
Phone: 303-831-7364

Christian R. Everdell
COHEN & GRESSER LLP
800 Third Avenue
New York, NY 10022
Phone: 212-957-7600

Bobbi C. Sternheim
Law Offices of Bobbi C. Sternheim
225 Broadway, Suite 715
New York, NY 10007
Phone: 212-243-1100


*Attorneys for Ghislaine Maxwell*

- Of the 5 jurors seated as alternates, *none* disclosed on their questionnaires that they were victims of sexual abuse, sexual assault, or sexual harassment.[4]

- Of the 12 deliberating jurors, *none* disclosed on their questionnaires that they were victims of sexual abuse, sexual assault, or sexual harassment.

As we now know, however, Juror No. 50 was not telling the truth when he denied being a victim of a crime or being a victim of sexual abuse, sexual assault, or sexual harassment. And as explained below, it appears a second deliberating juror was also untruthful when they denied being a victim of sexual abuse, sexual assault, or sexual harassment.



## II.   Juror No. 50's admissions that he wasn't truthful with the Court

---

[4] The court originally seated 6 alternates, but one alternate became a deliberating juror when an original juror was excused due to a family commitment. None of the 18 individuals selected for service as a deliberating or alternate juror answered "yes" when asked if they were a victim of sexual abuse, sexual assault, or sexual harassment.

11

# EXHIBIT 10

LC3KMAX6                          Parkinson - Direct

1    binders for this witness.

2    BY MS. COMEY:

3    Q.  Mr. Parkinson, what, if any, evidence do you remember

4    personally physically carrying during the search of 358

5    El Brillo Way on October 20, 2005?

6    A.  I carried the green massage table.

7            MS. COMEY:  Your Honor, at this time I would ask for

8    permission to bring into the courtroom for Mr. Parkinson what's

9    been marked for identification as Government Exhibit 51, which

10   is a physical exhibit.

11           MR. EVERDELL:  No objection, your Honor.

12           THE COURT:  Okay.

13           MS. COMEY:  Your Honor, I would ask for permission for

14   Detective Byrne to bring the exhibit forward.

15           THE COURT:  Okay.

16           MS. COMEY:  Thank you.

17           Ms. Drescher, we can take down Government Exhibit 284.

18   Thank you.

19           Your Honor, I would ask for permission for the witness

20   to step down from the witness box to examine the exhibit that's

21   been marked for identification as Government Exhibit 51.

22           THE COURT:  He may.

23           Mask, please, Mr. Parkinson.  Thank you.

24   BY MS. COMEY:

25   Q.  Mr. Parkinson, would you please take a look at this exhibit

# EXHIBIT 11

102

1    forgot.

2        MS. BELOHLAVEK:  In or at his home.

3    Not in sex acts though.

4        THE WITNESS:  No, not in sex acts.

5    They were conducting surveillance from the

6    outside.

7        A JUROR:  I know.  Did you do any

8    telephone research or was everything done

9    over cell phones?

10       THE WITNESS:  Everything was done

11   over cell phones.

12       MS. BELOHLAVEK:  All right.

13       Thank you very much Detective

14   Recarey.

15       (Witness excused.)

16       (WITNESS ██████ ( ████████ )

17       MS. DUGGAN:  Okay.  Would you raise

18   your right hand?

19       THE WITNESS:  Yes.

20       MS. DUGGAN:  Do you swear or affirm

21   the testimony you're about to give today

22   will be the truth, the whole truth, and

23   nothing but the truth, so help you got?

24       THE WITNESS:  Yes, I do.

25                    EXAMINATION

```
1     BY MS. BELOHLAVEK:

2         Q.  Okay.  Would you introduce yourself to the

3     grand jurors, please?

4         A.  Good morning, ladies and gentlemen.

5              My name is ████████ / ████████ .

6         Q.  How -- how long have you been employed as a

7     law enforcement officer?

8         A.  I have been in business 40 years now.  I

9     started on ████████ ██ of 1966.

10        Q.  And where were you working then?

11        A.  I worked for the West Palm Beach Police

12    Department, where I served for 34 years, until I

13    retired on ████ ██ of the year 2000.

14             I had the 4th of July off and went to work

15    the next day as an investigator for the State

16    Attorney's Office where I worked for 3 years.

17             I left on ████████ / ██ of 2003, had the

18    weekend off, and then took over a management

19    position with the Town of Palm Beach Police

20    Department, where I am still currently employed.

21        Q.  What is your position with Palm Beach

22    Police Department?

23        A.  I hold the rank of police officer, but I

24    also hold the title of civilian where I am in

25    charge of the crime scene investigation unit, the
```

NOT A CERTIFIED COPY

1    photography unit, the evidence holding unit, and

2    the fingerprint unit.

3        Q.  In your capacity as the crime scene head

4    did you take part in the search warrant executed

5    on Jeffrey Epstein's house on August --

6    October 20, 2005?

7        A.  Yes, I did.

8        Q.  Tell us how you go about executing a search

9    warrant in general.

10       A.  Once the warrant is signed and brought back

11   to headquarters, I am not aware of this at that

12   time.

13           On this morning, which was a Thursday

14   morning, when I went to the morning briefing, at

15   that time I was informed that a search warrant

16   would be executed and that it would be at a

17   residence.

18           My responsibility is to then assemble a

19   team of evidence specialists and crime scene

20   processors that will respond to this unannounced

21   scene.  We don't even know where we're going until

22   we are in a -- what looks like a funeral

23   procession or a parade; all the cars are ready to

24   go.  We follow the lead car.  And only then, when

25   we arrive, do we know the location.

NOT A CERTIFIED COPY

105

1     Q.  Why is that done?

2     A.  It's -- it's an issue of security, it's an

3  issue of privacy, and it's an issue of officer

4  safety, so that there is a guarantee that there

5  can be no leak of any information, even as simple

6  as an address, from my office.

7      And we prefer to operate in that manner.

8  So we don't know until we get there.

9      All we really need to know is what are we

10  going to be going into, so that we know the volume

11  of bags, the volume of boxes, the volume of gloves

12  or masks or processing gowns or lab coats; whether

13  we would need head cover to protect -- or to

14  prevent contamination of a scene or shoe covers,

15  which will also prevent contamination of the

16  scene.

17      We don't need to know a lot about the

18  scene, we only need to know what type of evidence

19  we're going to be looking for, and the potential

20  volume or size of the area.

21      Knowing this, we are then prepared to go to

22  the scene and do whatever's necessary to fulfill

23  the requirements of the search warrant, and that

24  is searching for specific items.

25     Q.  Mr. ███████, so that would -- in addition

106

```
1       to officer safety; so that someone's not waiting
2       there to ambush you; also, nobody at the place to
3       be searched knows you're coming so they can just
4       dispose of things?
5           A.  That is correct.
6           Q.  Okay.  On this date, October 20th, where
7       did you go?
8           A.  I went to a residence located on the island
9       of Palm Beach, Palm Beach County, Florida.  With
10      an address of 358 El Brillo.
11              The 300 block is the block just immediately
12      west of the Intracoastal Waterway.
13          Q.  East of the Intracoastal Waterway?
14          A.  It is on the east side of the Intracoastal
15      Waterway.  In fact, this particular residence is
16      on the Intracoastal Waterway.
17          Q.  Okay.  Describe to us how the house is
18      entered?
19          A.  The residence had staff or personnel
20      present at the time of our arrival.  Detective
21      ███████ went in ahead of me.
22              And understanding that once you enter the
23      property there is a heightened danger factor with
24      persons or personnel on the scene.  And the first
25      thing that must be done, for everyone's safety, is
```

1    to go in and not search for items, but clear the

2    residence of living human beings, so that there

3    can be no access to weapons or any endangerment to

4    them.   This was done.   And I took part in the

5    search of the second floor on the west end of the

6    residence.

7          All the living persons -- and there were no

8    dead persons there -- so all of the persons,

9    non-police persons, were escorted out to the south

10   side of the residence into a patio area.

11       Q.   Were they allowed to take any items out of

12   the home with them?

13       A.   No. ‖Nor did the police look, touch, or

14   move anything; other than opening doors, closets,

15   to make sure there were no other persons inside.‖

16          It was not a search in the sense of the

17   search warrant at this time.   It was a search of

18   the residence to clear it and neutralize any

19   element of danger.

20          This was done.   This was accomplished.

21          At this time officer -- Detective ███████

22   would read out loud, word for word, the search

23   warrant to those persons that were removed from

24   the house.

25          My responsibility at this time was to video

NOT A CERTIFIED COPY

1    and audio record the reading of that search

2    warrant to these persons.  That I did.  And

3    recorded it until the conclusion of the reading of

4    the search warrant.

5        Q.  Okay.  Were you requested by myself to

6    prepare a diagram of the upper floor of the home

7    searched?

8        A.  Yes, I was.

9        Q.  What rooms are on that upper floor?

10       A.  There are several rooms that are located on

11   the second floor.  It is basically an L-shaped

12   appearance where the main body of the house is

13   aligned east and west.  There is an L-shaped short

14   leg which protrudes to the north.  That actually

15   sits -- that L leg sits over a three car garage.

16           The second floor contains a -- on the west

17   end, a large master bedroom, which is aligned

18   north and south.  And then off of the south side

19   there is a large master bedroom and large closet.

20   Coming back through the bedroom to the north side

21   there is another bathroom.

22           And these are quite large bathrooms.

23   They're not like our --

24       Q.  Okay.

25       A.  -- you know, not like my house.

1    Q.  Is this the diagram you prepared?

2    A.  Yes, it is.

3    Q.  Okay.  Can I ask you to step down and --

4    A.  Yes.

5    Q.  -- indicate to the grand jurors what the

6    upstairs looks like, what rooms we're seeing here.

7    A.  To orient you -- bear in mind you're

8    looking at the second floor here, and this is a

9    spiral staircase which goes from the second floor

10   down to the first floor.

11        And this, coincidentally, is a double door

12   main entrance to the front of the house.  And once

13   inside -- oops.

14                A JUROR:  Broke the stairway.

15   A.  I did, I broke the stairway.

16        Once entering the front door and coming up

17   the stairway you entered a landing.  Once inside

18   the landing, it is basically a very long hallway.

19   This hallway has a double door set here and a

20   double door set here.  They open inward on the

21   east side; they open inward on the west side.

22        Once coming through this hallway you then

23   reach a normal size door which gives you access to

24   the master bedroom.  Which, this is the master

25   bedroom.  This is the large bathroom on the south

1    side.  And this is the large walk-in closet of

2    which there are two doors that you can enter and

3    walk in all the way through and back out to the

4    other.

5            And, again, moving back through the

6    bedroom, past the hallway you then enter another

7    large bathroom which has a sink, closets, and a

8    large bathtub.

9            And it was right in here, what looked very

10   similar to a dentist's chair, without the big

11   light.  It has all kinds of tubes and things on

12   it.  I don't know really what that thing would do.

13   Q.  And that wasn't related to the

14   investigation?

15   A.  No.  It was just part of the furniture

16   there, like a -- similar to, a bed was here and a

17   credenza over here.

18   Q.  Are there toilet facilities here or is it

19   just sinks in these bathrooms?

20   A.  I believe that there were toilets also

21   there in the hall.

22   Q.  All right.  Did you find a massage table?

23   A.  Yes.  There was massage table in this

24   clos -- bathroom.

25   Q.  Okay.  How about massage oils?  Were there

```
1      massage oils up in that bathroom?

2          A.  I believe there were.  I know that we got

3      some kind of a jar of material out of this master

4      bedroom, one of -- out of the dresser.

5          Q.  What about out of the actual room where the

6      massage table was?

7          A.  That, I'm not sure.

8              I was involved in the actual search and

9      photography of that.  Other investigators would

10     have to comment on it.

11         Q.  Okay.  Do you have the reports --

12         A.  Yes, I do.

13         Q.  -- from those investigators?

14         A.  I -- well, I have the evidence sheets --

15         Q.  Okay.

16         A.  -- of where things were found.

17         Q.  Okay.  Could you see if there were any

18     massage oils found within the same room where the

19     massage table was.

20         A.  I don't have a listing of that in the

21     packet that I have here.

22         Q.  Okay.  And items that would be taken into

23     custody by the police department would be itemized

24     on the property receipt like that?

25         A.  That's true.
```

112

```
1        Q.  Okay.  But -- and so there was a massage

2   oil found by the master bedroom, this room?

3        A.  Yes.  And I actually had that pointed out

4   to me by Detective ████████.  And it was called a

5   bottle -- or a Joy Jelly.  And it was from the

6   master bedroom on the -- in the credenza which was

7   right here.

8        Q.  Okay.  You can have a seat again.

9        A.  Thank you.

10       Q.  Thank you.

11           You've had a chance to go over those

12  receipts of all the property that was contained?

13       A.  Yes.

14       Q.  Did any of the officers find a purple

15  vibrator in the home?

16       A.  I have item 24, which -- which may be that.

17  I have not actually seen it, but it's called a

18  twin torpedo.

19       Q.  All right.  The twin torpedo was not found

20  in the master bedroom though, wasn't it found in

21  the other bedroom?

22           I think Detective ████████ testified it was

23  found in Ghislaine Max -- or ████████ bedroom?

24       A.  I don't know.  I don't have a listing right

25  here on this particular document as to where it
```

111

1    massage oils up in that bathroom?

2        A.  I believe there were.  I know that we got

3    some kind of a jar of material out of this master

4    bedroom, one of -- out of the dresser.

5        Q.  What about out of the actual room where the

6    massage table was?

7        A.  That, I'm not sure.

8        I was involved in the actual search and

9    photography of that.  Other investigators would

10   have to comment on it.

11       Q.  Okay.  Do you have the reports --

12       A.  Yes, I do.

13       Q.  -- from those investigators?

14       A.  I -- well, I have the evidence sheets --

15       Q.  Okay.

16       A.  -- of where things were found.

17       Q.  Okay.  Could you see if there were any

18   massage oils found within the same room where the

19   massage table was.

20       A.  I don't have a listing of that in the

21   packet that I have here.

22       Q.  Okay.  And items that would be taken into

23   custody by the police department would be itemized

24   on the property receipt like that?

25       A.  That's true.

NOT A CERTIFIED COPY

1   was found on the evidence sheet.  That would be

2   covered in Detective ███████'s report.

3      Q.  Nothing listed as a purple vibrator though?

4      A.  Not on the sheets that I have.

5      Q.  What about a white vibrator?

6      A.  I don't remember seeing a white vibrator.

7   That may have been something that was recovered by

8   them and photographed by CSI ███████

9      Q.  But you have the property receipts in this

10  case, and it's not listed?

11     A.  I don't see it listed here.  No.

12     Q.  Okay.

13          MS. BELOHLAVEK:  At this point I'm

14     going to see if the grand jurors have any

15     further questions for you.

16          THE WITNESS:  I'm at your service.

17     Yes, sir?

18          A JUROR:  Do you have any sexual

19     toys, other than the double-headed torpedo

20     on your list of --

21          THE WITNESS:  Not on the list that I

22     have here, sir.

23          A JUROR:  That's the only sexual toy

24     you have?

25          THE WITNESS:  Pardon?

NOT A CERTIFIED COPY

114

```
1          A JUROR:  That's the only sexual toy

2     you have that was confiscated in this --

3     search?

4          THE WITNESS:  I believe, to my

5     knowledge, it is.  I haven't seen the white

6     or purple, so I can't --

7          A JUROR:  Or any other type of sexual

8     toy, period.

9          THE WITNESS:  Right.  Personally I

10    have not seen those.

11         A JUROR:  Okay.

12         THE WITNESS:  But that is not

13    uncommon either because of the nature of

14    this investigation.

15         Detective ████ would be the one

16    that has the knowledge on all those

17    specific items.

18         Other than filming the room itself --

19    or I'm sorry -- the residence itself prior

20    to the search, recording the reading of the

21    search warrant.  And then, folks, also

22    after the search I go through and re-video

23    to show that the police did not do any

24    damage.  And then the door is finally

25    locked and secured.
```

NOT A CERTIFIED COPY

115

1          So there would be areas, while I was
2    in it I photographed it from a video
3    standpoint, I would not have direct
4    knowledge of the -- some of the items that
5    were found, but Detective ███████ would.
6          MS. BELOHLAVEK:  And you obtained
7    copies of all the evidence sheets of
8    evidence checked in; correct?
9          THE WITNESS:  As -- I think so.  Yes.
10          MS. BELOHLAVEK:  Yes.
11          THE WITNESS:  Yes.
12          MS BELOHLAVEK:  And only that twin
13    torpedo is the only sexual item listed?
14          THE WITNESS:  As best I can tell you.
15    Correct
16          MS. BELOHLAVEK:  Okay.
17          Yes, sir?
18          THE WITNESS:  Yes, sir?
19          A JUROR:  Is that report just from
20    the master bedroom or from all the bedrooms
21    on the second floor?
22          THE WITNESS:  Actually, it represents
23    the entire residence, plus the two -- the
24    servants quarters, barracks; and on the
25    southwest corner, the fitness and exercise

1       room.  I believe this encompasses --

2              A JUROR:  Can you --

3              THE WITNESS:  -- everything.

4              A JUROR:  Can you point out on that

5       what -- the room was that this woman ▆▆▆▆

6       was in?

7              MS. BELOHLAVEK:  Are you familiar

8       with which bedroom was ▆▆▆▆▆?

9              THE WITNESS:  I am not.

10             MS. BELOHLAVEK:  Detective ▆▆▆ --

11       ▆▆▆▆   we can --

12             THE WITNESS:  Right.

13             MS. BELOHLAVEK:  -- bring him back to

14       show that.  Okay.

15             THE WITNESS:  Right.

16             MS. BELOHLAVEK:  Any other questions?

17       Yes, sir.  In the back.

18             A JUROR:  Was the suspect at the

19       house at the time that you served the

20       warrant, sir?

21             THE WITNESS:  No, sir.  He was not.

22             A JUROR:  Thank you.

23             MS. BELOHLAVEK:  Yes, sir?

24             A JUROR:  Do your warrants have

25       anything listed for like computer equipment

117

```
1              or things like that or is it --
2                   THE WITNESS:  It did.
3                   A JUROR:  It did?
4                   THE WITNESS:  Yes.
5                   And we did take computer equipment.
6                   A JUROR:  And is -- can you say
7       what's on it or --
8                   THE WITNESS:  That was handled by the
9       special investigations unit.
10                  And while I saw -- actually
11      physically saw the computers, and saw them
12      disconnected and removed, I never saw
13      anything that was on those computers.
14                  A JUROR:  And did they confiscate
15      passports or anything from anyone in the
16      home or --
17                  THE WITNESS:  No, sir.  Not
18      passports.
19                  And there were weapons in the house,
20      rifles --
21                  A JUROR:  And they left them.
22                  THE WITNESS:  -- that -- yes, sir.
23                  They were left behind because that
24      was never part of what we were looking for,
25      so those were all left behind.
```

```
 1              MS. BELOHLAVEK:  Yes, sir?

 2              THE WITNESS:  Yes, sir?

 3              A JUROR:  Could you tell us, the

 4     people that -- that you found there, who

 5     they were?

 6              THE WITNESS:  Do I know who they

 7     were?

 8              A JUROR:  The people -- yeah.  Who

 9     they were.

10              THE WITNESS:  I understand one was

11     the property management -- manager.  I

12     think he was either Germanic or possibly

13     Polish, he has an Eastern European accent.

14              A JUROR:  That was the only person?

15              THE WITNESS:  No.  There were, I

16     think, three other people.

17              A JUROR:  Who were they?

18              THE WITNESS:  I don't know who they

19     were, sir.

20              MS. BELOHLAVEK:  We can ask Detective

21     ████████.

22              THE WITNESS:  Right.  Detective

23     ████████ would know who they were.

24              A JUROR:  Do you know that the

25     gentlemen that owned the house was out --
```

1                did they tell you he was out of town?

2                    THE WITNESS:  Yes.  We knew he was

3                out of town.  Yes.

4                    MS. BELOHLAVEK:  All right.  Thank

5                you.

6                    THE WITNESS:  Thank you all very

7                much.

8                    (Witness excused.)

9                    (WITNESS ██████  ██████ RECALLED)

10                    CONTINUED EXAMINATION

11      BY MS. BELOHLAVEK:

12          Q.  You're still under oath.

13              Who was in the home when the search warrant

14      was executed?

15          A.  Several designers from New York City, and

16      Janusz Banasiak, his current houseman.

17          Q.  Okay.  And where were those people located

18      in the mansion?

19          A.  In the kitchen area.  And there were some

20      that were in the main living room area.

21          Q.  Downstairs --

22          A.  Downstairs, first floor.

23          Q.  Okay.  Computers were seized?

24          A.  One computer -- two computers were seized.

25      One was the covert cameras, and the other one was

119

```
1              did they tell you he was out of town?
2                   THE WITNESS:  Yes.  We knew he was
3              out of town.  Yes.
4                   MS. BELOHLAVEK:  All right.  Thank
5              you.
6                   THE WITNESS:  Thank you all very
7              much.
8                   (Witness excused.)
9                   (WITNESS ███████ RECALLED)
10                  CONTINUED EXAMINATION
11   BY MS. BELOHLAVEK:
12        Q.  You're still under oath.
13             Who was in the home when the search warrant
14   was executed?
15        A.  Several designers from New York City, and
16   Janusz Banasiak, his current houseman.
17        Q.  Okay.  And where were those people located
18   in the mansion?
19        A.  In the kitchen area.  And there were some
20   that were in the main living room area.
21        Q.  Downstairs --
22        A.  Downstairs, first floor.
23        Q.  Okay.  Computers were seized?
24        A.  One computer -- two computers were seized.
25   One was the covert cameras, and the other one was
```

# EXHIBIT 12

UNITED STATES OF AMERICA, v.
GHISLAINE MAXWELL,

December 7, 2021

| LC7VMAX3 | Carolyn - direct | Page 1519 |
|---|---|---|

1  A. No.
2  Q. What did she tell you?
3  A. That we were going to go to her friend's house who lived on
4  Palm Beach Island, and I was going to meet one of her wealthy
5  friends.
6  Q. And do what?
7  A. Give him a massage.
8  Q. How did you respond?
9  A. Okay. I said okay.
10  Q. Why did you say okay?
11  A. Because I was going to make a lot of money.
12  Q. About how old were you the first time you went to Jeffrey
13  Epstein's house?
14  A. Fourteen.
15  Q. Do you remember about what time of year it was the year you
16  were 14?
17  A. Yes. It is around spring, like going into summer.
18  Q. How did you get to Jeffrey Epstein's house that first time?
19  A. Virginia drove me.
20  Q. When you got to Jeffrey Epstein's house -- withdrawn.
21       Where was Jeffrey Epstein's house?
22  A. On Palm Beach Island.
23  Q. What did the outside of the house look like that first day
24  you went there?
25  A. I could tell it was a mansion and it was pink.

| LC7VMAX3 | Carolyn - direct | Page 1521 |
|---|---|---|

1  Q. Why did you call her Maxwell instead of using her first
2  name?
3  A. Because I couldn't exactly pronounce her first name
4  correctly.
5  Q. When Maxwell greeted you in the kitchen, what, if anything,
6  did Virginia say to Maxwell?
7  A. That I was her friend.
8  Q. Did she say your name?
9  A. Yes.
10  Q. What did she say?
11  A. She said, This is my friend Carolyn.
12  Q. And what did Maxwell say?
13  A. You can bring her upstairs and show her what to do.
14  Q. What happened next?
15  A. We walked up the stairs that were in the kitchen, and we
16  passed a bunch of bedrooms and entered into Mr. Epstein's
17  bedroom, into his bathroom area.
18  Q. Can you describe the bathroom that you went into off of
19  Mr. Epstein's bedroom.
20  A. Yes. When you walk in, there is a sink to your right,
21  there is a dresser to the left, there is a closet area, there
22  is a toilet area, there is a steam room, and then there's a
23  shower.
24  Q. What, if any, seating do you remember?
25  A. There is an ugly polka-dotted couch.

| LC7VMAX3 | Carolyn - direct | Page 1520 |
|---|---|---|

1  Q. Did you go there multiple times after that?
2  A. Yes.
3  Q. Did the color of the house change at some point?
4  A. Yes.
5  Q. To what?
6  A. White.
7  Q. That first day when you got to Jeffrey Epstein's house, who
8  went inside?
9  A. Me and Virginia.
10  Q. What room did you walk into?
11  A. The kitchen.
12  Q. When you walked into the kitchen, what happened?
13  A. We were greeted by Ms. Maxwell.
14  Q. What did Ms. Maxwell look like?
15  A. An older lady.
16  Q. Can you describe her.
17  A. She had an accent and she had like shoulder-length black
18  hair.
19  Q. How did you learn her name?
20  A. She introduced herself.
21  Q. Did she say just her last name or both her first and her
22  last name?
23  A. Her first and her last name.
24  Q. What did you call her?
25  A. Maxwell.

| LC7VMAX3 | Carolyn - direct | Page 1522 |
|---|---|---|

1  Q. After you went into that room with Virginia, what did
2  Virginia show you?
3  A. Where the massage table was.
4  Q. Then what happened?
5  A. We walked into the little closet area and she was pulling
6  out the massage table. And I was looking at all the photos
7  that were on the wall.
8  Q. What else did Virginia show you, if anything?
9  A. Where all the massage oils and lotions were kept.
10  Q. And where was that?
11  A. In the bottom drawer of the dresser that is on your
12  left-hand side.
13  Q. After the massage table was set up, what did you and
14  Virginia do next?
15  A. Virginia had taken off her clothes and she asked me if I
16  would be comfortable taking off mine. And I told her I would
17  like to keep my bra and underwear on.
18  Q. So at that point what was Virginia wearing?
19  A. Nothing.
20  Q. And what were you wearing?
21  A. My bra and underwear.
22  Q. What happened next?
23  A. Mr. Epstein came into the room.
24  Q. Then what happened?
25  A. He brushed his teeth and then laid face down on the massage

# EXHIBIT  13

# In The Matter Of:

*UNITED STATES OF AMERICA, v.*
*GHISLAINE MAXWELL,*

---

*TRIAL*
*December 2, 2021*

---

*Southern District Court Reporters*

Original File LC2VMAXF.txt
Min-U-Script® with Word Index

| LC2VMAX6 | Alessi - Direct | Page 877 |
|---|---|---|

1     THE COURT: You may.
2     BY MS. COMEY:
3  Q. Mr. Alessi, I want to talk some more about the massages
4     that Jeffrey Epstein received at his Palm Beach house.
5  A. Okay.
6  Q. Did you see the people who came to the house to give
7     Mr. Epstein massages during your employment?
8  A. Yes.
9  Q. About what percentage of those people were female?
10 A. I would say 98 percent they were female.
11 Q. And when those females would come to Mr. Epstein's Palm
12    Beach house to give him massages, which entry would they
13    take -- would they use to get into the house?
14 A. If they were there for the first time, they will go through
15    the front entrance, front door.
16 Q. Go ahead.
17 A. And if they were repeat visits, they will come through the
18    kitchen always.
19 Q. And when a female came through the kitchen and was there to
20    massage Jeffrey Epstein, where did they go from there based on
21    your observations?
22 A. Based on my observation, they will stay in the kitchen, I
23    will let Mr. Epstein know, Ms. Maxwell, that this person is
24    here for a massage. And they will tell me, Okay. Set it up
25    upstairs in his bathroom, Mr. Epstein's bathroom, or by the

| LC2VMAX6 | Alessi - Direct | Page 878 |
|---|---|---|

1     pool, in different locations of the house.
2  Q. Where did Mr. Epstein receive the majority of his massages?
3  A. His bathroom.
4  Q. And is that the bathroom attached to the master bedroom
5     that we were talking about earlier?
6  A. Yes.
7  Q. What, if any, massage tables were in Jeffrey Epstein's Palm
8     Beach house when you worked for him?
9  A. We have a massage table in every guest room, and
10    Mr. Epstein room.
11 Q. Where in Mr. Epstein's room was the massage table?
12 A. It was on his bathroom.
13 Q. The same bathroom where you said he received the majority
14    of his massages?
15 A. Yes.
16 Q. While you worked for Mr. Epstein, when someone called
17    Mr. Epstein's Palm Beach house, how would employees keep track
18    of any messages left for Mr. Epstein?
19 A. Most of the times I will answer the phone. And I will ask
20    who the -- they want to talk to, and they will tell me, Is
21    Mr. Epstein at the house? I will say, Yes. He's busy. You
22    want to leave a message? And I will write it down in a -- in a
23    message sheet. It was this booklet. I think they have three
24    or four messages in each booklet, and they have a carbon copy.
25 Q. Let me ask you some questions about that.

| LC2VMAX6 | Alessi - Direct | Page 879 |
|---|---|---|

1     Where would you write phone messages down for
2     Mr. Epstein when you worked for him?
3  A. Usually at the kitchen desk.
4  Q. And into what type of book? You mentioned a book.
5  A. It was a book with three or four pull-out pages. And it
6     had a copy, carbon copy on each page.
7  Q. So after you wrote down a message for Mr. Epstein, what did
8     you do?
9  A. If it was a message for Mr. Epstein and if he was in the
10    house, I will leave it in the -- his desk or in the kitchen
11    table.
12 Q. And once you --
13       THE COURT: I'm sorry, can I just ask, can we collect
14    52?
15       MS. COMEY: Oh, yes, your Honor. May I approach?
16       THE COURT: You may. Thank you.
17 Q. Once you removed the message you had written for
18    Mr. Epstein, what would be left in the book?
19 A. The carbon copy of the -- of the message.
20 Q. Would it be an exact copy of the message you had written
21    down?
22 A. Yes.
23 Q. And what was the practice when you worked for Mr. Epstein
24    of how you would take messages?
25 A. I will answer the phone, I will listen who is calling. And

| LC2VMAX6 | Alessi - Direct | Page 880 |
|---|---|---|

1     if the message was for Mr. Epstein, and if he wants to take the
2     call, he usually answer his calls, he has his number. And if
3     he was there, he will answer his calls. If he was not there, I
4     will take a message. Who's calling? I will ask for the
5     telephone number, the name, and I will write it down in the --
6     in the -- in the message book.
7  Q. And when would you write it in the message book?
8  A. Soon while I was talking on the phone.
9  Q. As you're talking on the phone receiving the information,
10    you were writing down that information into the book?
11 A. Yes.
12 Q. Other than you, who else took messages in message books for
13    Mr. Epstein?
14 A. Occasionally, my wife and occasionally he will preliminary
15    injunction Taylor.
16 Q. When a message book was full, what would happen to it?
17 A. We have a closet, utility closet in my office, in my little
18    office. And it was a bunch of books, new books, and the old
19    ones were kept there.
20 Q. Were the old books kept off of the staff room that we were
21    talking about earlier?
22 A. Yes.
23       MS. COMEY: Your Honor, I'd ask permission now to
24    approach the witness with what's been marked for identification
25    as Government Exhibit 2.

UNITED STATES OF AMERICA, v.                                                                              TRIAL
GHISLAINE MAXWELL,                                                                             December 2, 2021

| LC2VMAX6 | Alessi - Direct | Page 877 |
| --- | --- | --- |

1    THE COURT: You may.
2    BY MS. COMEY:
3    Q. Mr. Alessi, I want to talk some more about the massages
4    that Jeffrey Epstein received at his Palm Beach house.
5    A. Okay.
6    Q. Did you see the people who came to the house to give
7    Mr. Epstein massages during your employment?
8    A. Yes.
9    Q. About what percentage of those people were female?
10   A. I would say 98 percent they were female.
11   Q. And when those females would come to Mr. Epstein's Palm
12   Beach house to give him massages, which entry would they
13   take -- would they use to get into the house?
14   A. If they were there for the first time, they will go through
15   the front entrance, front door.
16   Q. Go ahead.
17   A. And if they were repeat visits, they will come through the
18   kitchen always.
19   Q. And when a female came through the kitchen and was there to
20   massage Jeffrey Epstein, where did they go from there based on
21   your observations?
22   A. Based on my observation, they will stay in the kitchen, I
23   will let Mr. Epstein know, Ms. Maxwell, that this person is
24   here for a massage. And they will tell me, Okay. Set it up
25   upstairs in his bathroom, Mr. Epstein's bathroom, or by the

| LC2VMAX6 | Alessi - Direct | Page 878 |
| --- | --- | --- |

1    pool, in different locations of the house.
2    Q. Where did Mr. Epstein receive the majority of his massages?
3    A. His bathroom.
4    Q. And is that the bathroom attached to the master bedroom
5    that we were talking about earlier?
6    A. Yes.
7    Q. What, if any, massage tables were in Jeffrey Epstein's Palm
8    Beach house when you worked for him?
9    A. We have a massage table in every guest room, and
10   Mr. Epstein room.
11   Q. Where in Mr. Epstein's room was the massage table?
12   A. It was on his bathroom.
13   Q. The same bathroom where you said he received the majority
14   of his massages?
15   A. Yes.
16   Q. While you worked for Mr. Epstein, when someone called
17   Mr. Epstein's Palm Beach house, how would employees keep track
18   of any messages left for Mr. Epstein?
19   A. Most of the times I will answer the phone. And I will ask
20   who the -- they want to talk to, and they will tell me, Is
21   Mr. Epstein at the house? I will say, Yes. He's busy. You
22   want to leave a message? And I will write it down in a -- in a
23   message sheet. It was this booklet. I think they have three
24   or four messages in each booklet, and they have a carbon copy.
25   Q. Let me ask you some questions about that.

| LC2VMAX6 | Alessi - Direct | Page 879 |
| --- | --- | --- |

1    Where would you write phone messages down for
2    Mr. Epstein when you worked for him?
3    A. Usually at the kitchen desk.
4    Q. And into what type of book? You mentioned a book.
5    A. It was a book with three or four pull-out pages. And it
6    had a copy, carbon copy on each page.
7    Q. So after you wrote down a message for Mr. Epstein, what did
8    you do?
9    A. If it was a message for Mr. Epstein and if he was in the
10   house, I will leave it in the -- his desk or in the kitchen
11   table.
12   Q. And once you --
13       THE COURT: I'm sorry, can I just ask, can we collect
14   52?
15       MS. COMEY: Oh, yes, your Honor. May I approach?
16       THE COURT: You may. Thank you.
17   Q. Once you removed the message you had written for
18   Mr. Epstein, what would be left in the book?
19   A. The carbon copy of the -- of the message.
20   Q. Would it be an exact copy of the message you had written
21   down?
22   A. Yes.
23   Q. And what was the practice when you worked for Mr. Epstein
24   of how you would take messages?
25   A. I will answer the phone, I will listen who is calling. And

| LC2VMAX6 | Alessi - Direct | Page 880 |
| --- | --- | --- |

1    if the message was for Mr. Epstein, and if he wants to take the
2    call, he usually answer his calls, he has his number. And if
3    he was there, he will answer his calls. If he was not there, I
4    will take a message. Who's calling? I will ask for the
5    telephone number, the name, and I will write it down in the --
6    in the -- in the message book.
7    Q. And when would you write it in the message book?
8    A. Soon while I was talking on the phone.
9    Q. As you're talking on the phone receiving the information,
10   you were writing down that information into the book?
11   A. Yes.
12   Q. Other than you, who else took messages in message books for
13   Mr. Epstein?
14   A. Occasionally, my wife and occasionally he will preliminary
15   injunction Taylor.
16   Q. When a message book was full, what would happen to it?
17   A. We have a closet, utility closet in my office, in my little
18   office. And it was a bunch of books, new books, and the old
19   ones were kept there.
20   Q. Were the old books kept off of the staff room that we were
21   talking about earlier?
22   A. Yes.
23       MS. COMEY: Your Honor, I'd ask permission now to
24   approach the witness with what's been marked for identification
25   as Government Exhibit 2.

# EXHIBIT 14

# RELENTLESS

# PURSUIT

## MY FIGHT FOR THE VICTIMS OF
## JEFFREY EPSTEIN

# BRADLEY J. EDWARDS

### WITH BRITTANY HENDERSON

# TWENTY-TWO IT'S NEVER OVER

IN LATE 2010 OR EARLY 2011, a reporter named Sharon Churcher from the *Daily Mail* called me saying that she wanted to meet with Virginia Roberts and asked if I could find her. I had figured out that Virginia was Jane Doe 102 because her name appeared repeatedly on various pieces of evidence that I had obtained. From questions her lawyers had asked during the Jane Doe 102 lawsuit, I also knew she had been lent out for sex to others. To me, she held the key to unlocking another level of Epstein's depravity.

I needed to speak with Virginia, so if some dogged reporter was willing to take a chance traveling across the world to knock on her door, I was happy to share what I knew. I passed along the few leads that I had to Sharon, who quickly tracked Virginia down in Australia. Sharon went to see Virginia and called me after interviewing her for two days. She told me Virginia wanted to be involved in the CVRA case. Finally, someone from Epstein's inner circle wanted to talk, and wanted to help.

After her interview with Churcher, Virginia called me herself. I explained the CVRA case, which was still in the discovery phase as we attempted to uncover documentation to prove that Epstein and the government actively concealed the NPA from the victims. We discussed how the goal of the case was in line with her own—to put Epstein in jail. She'd heard Epstein had attacked me personally with a bogus lawsuit. She knew he would attack anyone, which is why she had escaped from him the first chance she got, during a trip to Thailand nine years earlier.

At Epstein's direction, Virginia had been dispatched to Thailand to pick up a young girl, interview her, and let Epstein know if she was "qualified." But after having been used as a sex slave for years, Virginia saw the trip to Thailand as a way to free herself from the invisible chains of sexual servitude.

Epstein paid for Virginia's coach ticket to Thailand and for her hotel in Chiang Mai during the trip. Rather than meet the little girl for Epstein, she recognized her chance to escape—she went into town and met a guy from Down Under who fell in love with her and promised to take care of her. She married him days later, hopped a plane with him to Australia, and never looked back. She hid in Australia for nearly ten years, during which she had three children. That she had left the United States—the only country that she had ever known—in order to escape Epstein gave further credence to her story.

Virginia explained that she had been recruited by Ghislaine Maxwell. Maxwell had escaped being held responsible for any of Epstein's transgressions in any way up until this point, but that could all change after Virginia. Virginia began traveling with Epstein and Maxwell and became part of what she called their "dysfunctional family."

If she wasn't servicing Epstein, Virginia was being made to service one of his high-powered friends, and if she wasn't servicing someone at Epstein's direction, she was working for the organization, which meant hunting down girls to bring to Epstein. Maxwell was the one who knew what Jeffrey liked, which meant she was the one who taught Virginia the skills she needed in order to keep him happy. Those skills included how to act in front of important and powerful people, how to dress, how to hold her knife and fork, and, of course, how to please him sexually.

Because of her upbringing, Virginia was a prime target. She had been

abused at an early age, was a runaway many times over by thirteen, had multiple run-ins with the law, and was a school dropout. Not to mention, she was stunningly attractive.

On Virginia's initial call, I asked her to provide proof of some of her allegations, including her dramatic escape from Epstein into a new life in Australia. She scanned and sent me the envelope with Maxwell's directions and cell phone number as well as the travel and hotel receipts from Thailand charged to Epstein's card.

Not long after, Virginia showed me a photograph of herself as a seventeen-year-old girl wedged in between Ghislaine Maxwell and Prince Andrew, a photo that she described as being taken by Jeffrey Epstein in Maxwell's apartment in London. Of all the people she claimed to have been introduced to and made to have sex with, the Duke of York sounded the most preposterous. Yet here was a picture of the two of them arm in arm, smiling like a happy pair out for the night—though he's twenty-three years her senior.

I hung up the phone and thought about all the things Virginia had told me. None of it was surprising, but all of it was confirmation of an extraordinary sex abuse enterprise that went far beyond what was uncovered in Florida. We knew Epstein was addicted to sex with children and had assistants scheduling multiple appointments per day with different girls. He traveled all the time, all over the world, with the same assistants, some of whom were named co-conspirators and who clearly knew what he was up to. The "Holy Grail" from Alfredo Rodriguez listed female names and telephone numbers from numerous locations around the world under the heading of "massage" in the exact same way that it listed the names of many underage girls under the same title for Florida. It only made sense that his sex addiction was not confined to Florida.

# EXHIBIT  15

*chapter 14*

# THE SWEETHEART DEAL

It was now almost eight months since Epstein's arrest in Palm Beach County on solicitation charges, and rumors were circulating that there was a plea bargain in the offing.

FBI records show that a tentative date of May 15, 2007, had been set for Epstein's indictment, and the agency engaged its gang and criminal enterprise team to help assist with the case, as they began to look at possible money laundering charges to bolster their case.

A subpoena was issued to two of Epstein's companies, demanding tax records and W-2s from all his employees, as well as a list of his corporate directors, board members, and shareholders.

Villafaña stood firm, saying that an indictment was drafted, and if both sides couldn't agree to a deal, she intended to file charges. But the May date came and went.

In July, Lefcourt and Dershowitz wrote another treatise on be-

If they are only telling you a portion of the story, they are only going to charge on a portion of the story," Recarey said.

On Monday, July 26, 2006, Epstein was indicted on a single charge of solicitation of prostitution, a second-degree misdemeanor, which meant that Epstein would likely serve no time in jail. There were no charges involving minors, no assault charges, and no sex charges. It was a whitewash. Epstein turned himself in and was released on bail.

By then, Recarey and Reiter already suspected that the state attorney, for whatever reason, was throwing the case and simply using the grand jury as a mechanism to legitimize their decision not to prosecute Epstein.

"I saw how enamored prosecutors were with the defense team, and that bothered me," Recarey said of his decision to go to the FBI.

The fact that evidence had disappeared—chiefly Epstein's computers—and that the state attorney's office didn't see fit to issue subpoenas for them, also rankled Recarey.

"The amount of evidence that disappeared, was destroyed or covered up in this case is mind boggling," the detective told me.

Recarey began discussing the case with Ann Marie Villafaña, an assistant prosecutor who had worked in the major crimes division of the U.S. Attorney's Office in Miami and later transferred to the district office in West Palm Beach, where she specialized in child exploitation cases. She was also coordinator for Project Safe Childhood, a federal initiative to combat child abuse and trafficking.

Recarey told Villafaña that Epstein had hired private investigators to tail him and Reiter, and in his view, how Krischer had sabotaged the criminal investigation.

IT WAS POURING A TROPICAL RAIN THE DAY IN SEPTEMBER 2006 WHEN FBI agents appeared at the Town of Palm Beach Police Department with a large truck. They produced a subpoena for all the police rec-

ords on Epstein, and Recarey turned over everything, including his own notes.

"The FBI was on board. They couldn't understand why the state would not pursue more serious charges," Recarey said.

He felt relieved that someone was finally going to help him put Epstein away.


AFTER EPSTEIN'S INDICTMENT, THE STORY BECAME NATIONAL NEWS. Epstein hired publicists in New York, Los Angeles, and Florida to help "get his side of the story out." The *New York Post* quoted one of Epstein's New York lawyers, Gerald Lefcourt, as saying Epstein was only being targeted "because of the craziness of the police chief," and Jack Goldberger, Epstein's Palm Beach attorney, told the *Palm Beach Post* that police were tarnishing the reputation of an upstanding citizen by trying to expand a run-of-the-mill prostitution offense into a salacious major crime based on the stories of girls who were liars and opportunists.

"It was just a childish performance by the Palm Beach Police Department," Goldberger told the newspaper.[1]


THE CHARACTER ASSASSINATION AGAINST REITER AND RECAREY mounted as Epstein's lawyers went beyond reasonable efforts to defend their client. They obtained Reiter's entire police personnel file, and began to track down people who knew him from childhood. Even one of his grade-school teachers called Reiter's brother to tell him that private investigators had tried to talk to her about him. Other people he knew in law enforcement also warned him that they were getting calls from Epstein's camp.

Reiter found himself not only defending his long, unblemished career but also his personal life.

*chapter 13*

# OPERATION LEAP YEAR

Ann Marie Villafaña had never heard of Jeffrey Epstein.

But after doing some homework, she knew she was up against a wealthy, politically connected man who had a history of taking a scorched-earth approach to his adversaries. Like Recarey, she suspected that Epstein and his defense team had manipulated Barry Krischer, and she knew it was possible that he would put the same pressure to bear on the U.S. Attorney's Office.

She wanted to make sure that that didn't happen. So she asked for a meeting with her top bosses: Alex Acosta, the Miami U.S. attorney, and Jeff Sloman, who was in charge of Miami's criminal division. She told them she knew that the case was going to require a lot of time and resources and that it was possible they would face political pressure as a result of the investigation. They told her they weren't concerned about the pressure; after all, they had prosecuted

high-profile, politically connected people before, such as lobbyist Jack Abramoff.

THE FBI CHRISTENED THE EPSTEIN PROBE "OPERATION LEAP YEAR" because at the time they took over the state's criminal case in 2006, there were twenty-nine victims. In October, shortly after reviewing the police and state attorney's files, the FBI began carving out federal grand jury subpoenas in New York and Florida. FBI records show that the feds were not only looking into Epstein's Palm Beach sex operation, but also investigating whether he was abusing girls in other cities where he lived. They were also poking into his finances, which had always been a mystery, and exploring the possibility of seizing some of his assets under a category they labeled in their reports as "general forfeiture matters." Agents traveled to all the places where Epstein had homes—New York; Santa Fe, New Mexico; and St. Thomas in the U.S. Virgin Islands—in order to interview possible witnesses and victims.

At the same time, Epstein was regrouping his legal team, hiring new attorneys who had experience and political connections to the White House, then occupied by George W. Bush. Epstein had already dropped Fronstin, but kept Roy Black and Gerald Lefcourt, a prominent New York criminal attorney with a reputation for taking on tough cases. He added former Miami U.S. attorney and Acosta predecessor Guy Lewis; Lilly Ann Sanchez, who had just left her federal prosecutor's post as deputy chief of the Palm Beach criminal division; and Jay Lefkowitz, an adviser to President George W. Bush and an attorney with the influential law firm of Kirkland & Ellis, where Acosta had worked early in his career. Epstein also brought on Kenneth Starr, the former Clinton-Whitewater prosecutor, who was also with Kirkland. Both Starr and Lefkowitz were members of the conservative Federalist Society, which produced six Supreme Court justices, including Acosta's mentor, Samuel Alito.

half of their client. This one was twenty-three pages long, and it was addressed to Villafaña's bosses, Sloman and Lourie.

The letter was stuffed with federal statutes and common definitions to explain the dense language of some of the statutes. They salted the letter with complicated case law and even hired a linguist to help translate state statutes. The linguist was Steven Pinker, a psychology professor at Harvard, whose expertise in language was yet another masterful touch by Epstein, who was friends with Pinker.

More notably, however, the lawyers also went to great lengths to emphasize Epstein's Horatio Alger–like success story, describing their egotistical client as a generous self-made soul who had devoted a good deal of his money and time to noble causes.

They wrote about the two-year-old son of one of Epstein's employees who was diagnosed with retinal blastoma, and how Epstein gave the employee unlimited time off and put him in contact with a noted eye researcher at Washington University. The letter said that Epstein further paid for the private schooling of the child, along with his five siblings.

Four pages of the letter were devoted to all the good deeds that Epstein had done in his fifty-plus years, sponsoring athletic wellness programs, community building projects, and peace missions; helping poor children; investing in scientific discoveries and research; even hiring masseuses for ballet dancers.

They talked about Epstein's business, professional, and personal ties, noting that one of them was Clinton. They quoted the former president from a magazine story in which he described Epstein as "a committed philanthropist," adding that Epstein had taken a monthlong trip to Africa with Clinton. Epstein, they added, was part of the original group that conceived of the Clinton Global Initiative.

They talked about all his business and financial connections to

was not privy to any confidential information about the case. But his former bosses in the U.S. Attorney's Office, in a 2013 federal court pleading, said that Reinhart "learned confidential, non-public information about the Epstein matter."

Reinhart, whose wife, Carolyn Bell, was also an assistant federal prosecutor in Palm Beach in 2007, was appointed to a federal magistrate post in May 2018. That same week, his wife was appointed by then Florida governor Rick Scott to the Palm Beach circuit court bench.

IN THE SUMMER AND FALL OF 2007, ACOSTA WAS NEGOTIATING DIRECTLY with Epstein's lawyers, emails show.

Each reiteration of the plea seemed to be more watered down than the last, records show.

"I have been spending some quality time with Title 18 [the criminal code] looking for misdemeanors," Villafaña wrote to Lefkowitz.

Drafts of the plea deal were passed back and forth, some of them sent to Villafaña's personal email. She gave Lefkowitz her personal cell phone number and invited him to call her over the weekend after giving him another offer and asking him for suggestions.

About the only interesting part of these drafts, some of which became part of the public record, was that they barely mentioned Epstein's missing computers, the ones that were removed in advance of the police search warrant.

It's not clear why the feds didn't ever get their hands on them.

One of the drafts read: "Epstein and his counsel agree that the computers that are currently under [redacted] will be safeguarded in their current condition by Epstein's counsel . . . until the terms and conditions of the agreement are fulfilled."

ON SEPTEMBER 19, 2007, A TENTATIVE ACCORD WAS REACHED. Goldberger called Barry Krischer to coordinate Epstein's arraign-

ment in state court in Palm Beach. He told the state attorney to contact Acosta directly to discuss the particulars.

"Barry, here is Acosta's phone number. Let me know what he has to say because Jay Lefkowitz has to follow up with a call to him to finalize," Goldberger wrote to Krischer.

But one day later, the deal had disintegrated—yet again.

"Our plea negotiations are not going very well, and I have given the defense a deadline of tomorrow afternoon to provide me with a signed agreement," Villafaña wrote to Krischer on September 20. "If we cannot reach such an agreement, then I will need to indict the case on Tuesday. . . . I think Mr. Epstein is having second thoughts about spending time in jail and paying damages to the girls."

The issue of paying restitution to his victims had been discussed throughout the negotiations, but there was no consensus as to how it was going to be administered through the Justice Department.

Then there was the issue of Acosta's wanting Epstein to register as a sex offender, a designation that would follow him for the rest of his life, requiring him to take certain steps each time he traveled to a new state.

Lefkowitz, in an email to Acosta, told the U.S. attorney that Krischer and Belohlavek had assured him that his client wouldn't have to register as a sex offender, writing: "Registration is a life sentence . . . a punishment harsher than what Mr. Epstein deserves."

BY SEPTEMBER 24, A NEW NON-PROSECUTION DOCUMENT WAS DRAFTED that enumerated five criminal counts Epstein violated under federal law, most of them involving underage girls whom he recruited through interstate and foreign commerce to engage in commercial sex acts.

Federal prosecutors, however, agreed to defer prosecution on those federal charges in exchange for Epstein pleading guilty to the weak charge that the state grand jury had indicted him on: one count

*chapter 15*

# DANCING WITH WOLVES

Brad Edwards was among a crop of freshly minted cogs in a 150-member legal stable at Rothstein, Rosenfeldt and Adler, one of the most prestigious law firms in South Florida.

In 2008, Edwards was representing a small group of Epstein's victims who had brought individual civil lawsuits against the multimillionaire. But Edwards, who had a solo practice in Hollywood, Florida, was outgunned by Epstein's vast legal arsenal, and had hoped that by joining Rothstein's firm, he could gain more muscle. Soon, he had seven of Epstein's victims—but, unbeknownst to him, the firm was under scrutiny by federal authorities. The following year, the firm imploded when Scott Rothstein, the flamboyant senior partner, was arrested for operating a massive Ponzi scheme. Edwards would later learn that Rothstein used him and a lot of other lawyers at the firm as unwitting pawns to sell legal settlements to unsuspecting investors for profit.

Edwards found himself back out on his own and waging a lop-sided battle against Epstein's fat war chest.

**EDWARDS WAS TALL, YOUNG, AND CONFIDENT, WITH A BROOKS BROTHERS** law firm look. A former all-star tennis player at Florida State and state prosecutor, he was outgoing and hungry to be successful. Edwards had plowed through the records that were part of the yearlong police inves-tigation. After several months of long hours reviewing interviews that the police detectives conducted in the case, he was exasperated.

There was something very wrong with the way the case had been handled.

**EDWARDS WASN'T PARTICULARLY ENCOURAGING WHEN I REACHED OUT** to him in July 2017 and explained my project. I had already tracked down about two dozen victims, but was still having difficulty getting anyone to talk. I hoped he, and a number of other victims' lawyers I had reached out to, would help connect me with them.

But Edwards had been burned by the media at least once before. In 2015, Edwards had traveled with Giuffre, whom he was represent-ing at the time, to New York for an interview with ABC News. Giuf-fre, dressed in a new white suit, was interviewed at the Ritz Carlton Hotel in New York, telling her story on camera for the first time, to reporter Amy Robach.

But the story never saw the light of day. ABC claimed that "not all of the reporting met our standards to air," and while the story was shelved at the time, it remained one they claimed they continued to probe with the intention to air. But in reality, a number of influential people, including Dershowitz and representatives of Prince Andrew, objected to the story, and ABC killed it.

I didn't really, at the time, believe that any media network would have succumbed to pressure to ignore or drop such an important story.

I just told myself that decisions are made every day about which stories to dedicate news resources to. I was, however, naïve, and wrong.

I would later learn that NBC News had discouraged journalist Ronan Farrow from reporting the Harvey Weinstein story, forcing him to take the story to *The New Yorker*, which published the piece. The story subsequently shared a Pulitzer Prize with the *New York Times* for exposing the Hollywood movie mogul's sexual abuse of women.

So I learned that there are news organizations that protect powerful people, especially when it comes to sexual harassment and abuse. The words of victims, especially those whose lives are lived on the margins, don't matter as much as the words of the man in the boardroom with major dollars at stake. Transparency and accountability, values journalists are supposed to fight for, apparently were easy to push aside. This was a bitter truth for me to accept, as I watched how men like *Today* show co-anchor Matt Lauer, *CBS This Morning* anchor Charlie Rose, Weinstein, and others accused of sexual improprieties were protected. It was horrifying that so many people, including those in my own industry, looked the other way when it came to predators, rapists, and abusers.

EDWARDS AND I MET FOR THE FIRST TIME AT HIS LAW OFFICES IN FORT Lauderdale on August 8, 2017. His building, along Andrews Avenue, was on the edge of an up-and-coming area of the city, in the midst of a transformation from its "old Florida" beginnings. Edwards's office was in a decaying warehouse district blossoming into a magnet for young urban professionals, with gleaming new high-rise condos on one side of the street and dilapidated pawnshops (soon to be trendy vegan cafés) on the other. His building embraced its modern industrial architecture, with high open ceilings and exposed pipes, ducts, and beams. The firm itself occupied a maze of very small, cubicle-like offices, with dim lighting and a craft-beer-bar vibe, even though three of its partners were old enough to have millennial-aged children.

Edwards, who was in his early forties, was among the youngest in

the firm, which was then Farmer, Jaffe, Weissing, Edwards, Fistos & Lehrman—all of the name partners Rothstein law firm alums.

I already knew that Edwards was a shrewd lawyer from reading some of the case files and depositions. I remember reviewing one particular civil case, involving eleven of Epstein's victims, all of whom had their own lawyers. The women were listed as Jane Does, and all had initially filed separate civil lawsuits that were eventually consolidated into one case.

Epstein's civil lawyers, Robert Deweese Critton Jr., Michael Tein, and James Pike, were ruthless, and the legal maneuvers had become incredibly ugly. Magistrate Judge Linnea R. Johnson presided over the case, and it astonished me how much room she gave those civil lawyers to torture Epstein's victims.

The worst was that she allowed Epstein's lawyers to depose one of the girls' parents and question them about their religious beliefs on abortion. The victim, who had undergone several abortions, had never told her devout Catholic parents about the abortions, and the depositions of her and her parents are among the most painful I've ever read.

But Edwards aggressively fought for his victims, not allowing them to be bullied by Epstein's lawyers.

One of Edwards's first smart moves among many was to ask the court to appoint a receiver to control and account for Epstein's assets. By that time, twenty-five victims had filed lawsuits against Epstein, seeking damages. Edwards claimed that Epstein was fraudulently transferring money to overseas locations in order to insulate his fortune from being captured in civil litigation.

Another brilliant gambit was to compel Epstein and his lawyers to produce all materials relating to the 2006–08 criminal case. This would include exchange of discovery in both the state case and the federal probe of Epstein's crimes. This meant all documents, evidence, and correspondence that prosecutors collected in his criminal case would become part of the civil litigation against Epstein.

Neither Epstein nor federal prosecutors wanted the victims to

chair of ChildNet, a nonprofit based in Fort Lauderdale that provides aid for abused, abandoned, and neglected children.

Boies wisely recognized that McCawley's background and her resilience as a lawyer would help them build a case against Maxwell and, by extension, Epstein.

Giuffre, now in her thirties, was suing Maxwell for defamation, after the British socialite issued a number of public statements branding Virginia a liar. Giuffre alleged, as part of the suit, that Maxwell recruited her into Epstein's sex trafficking operation and groomed her to be a sex slave for Epstein, Maxwell, and other prominent men, including Alan Dershowitz and Prince Andrew.

While the case was at its heart a defamation claim, it would require McCawley to produce evidence that Giuffre's sex abuse allegations against Epstein and Maxwell were true. To this end, McCawley deposed a number of witnesses, including several of Epstein's employees.

Every part of the case tested McCawley's mettle, as she faced criticism from both Maxwell's lawyers and others in the legal community who warned her that going up against Epstein and his powerful lawyers was going to limit her career opportunities.

"I never worked so hard or cared so much about a case," McCawley said. "The fight was so incredibly fierce."

Dershowitz was hoping that he would be able to leverage some of the testimony and evidence produced during the case to exonerate himself. Part of his strategy involved not just going after Virginia but attacking her lawyers. He would file bar complaints against both Boies and McCawley, alleging a number of ethical improprieties that were ruled to be without merit.

"The bullying got to such a level that it affected my law license," McCawley recalled. "It was beyond a low blow; it was meant to distract from the case—and it did."

During this time, McCawley filed an application for a vacancy on the federal bench, but was rejected. She was later told that Epstein's lawyers played a role in her not getting a judgeship.

But she would have the last laugh when the case was settled in Virginia's favor for about five million dollars.

"The best thing they could have done was to get rid of me," McCawley now says, looking back.

VIRGINIA HAD SPOKEN PUBLICLY IN 2011. HER INTERVIEWS WITH SHARON Churcher of London's *Daily Mail* focused primarily on her allegations that she had been ordered by Epstein and Maxwell to have sex with Prince Andrew when she was seventeen. Virginia had not been interviewed by journalists in the United States because her agreement with the British tabloid was an exclusive, which meant she was paid for the piece and agreed not to speak to other media.

I WAS SO SICK ON THE DAY IN MARCH 2018 WHEN EMILY AND I MET Virginia that I coughed my way through the entire interview. Edwards and McCawley were both there, as was a young woman named Jena-Lisa Jones who had just contacted Edwards to see if he could represent her. She had been to Epstein's mansion one time, when she was fifteen, brought by a friend of a friend. She had never spoken to anyone about the ordeal. So unlike Virginia, she was still very raw with her emotions. Though she was in her early thirties, she looked at least ten years younger. I'm sure when she met Epstein she looked like she was eleven.

I won't say that her story was like all the others, because I've come to learn that each survivor's trauma is often as fresh as it was the day it happened, and each woman's healing journey is their own. Jena-Lisa had lived a tough life, and she had never been able to forgive herself for what happened. The absolute hardest part for me about doing this project was watching how these women, so many years later, still harbored so much shame.

searched my memory to recall whether I had ever done anything that could cause me embarrassment. There were times I had a couple too many beers at Nick's, the local watering hole, and had left my shoes behind because heels don't work walking home on the beach. I knew I had more than a few parking tickets and a lot of unpaid bills. I was glad my children were away at school. My boyfriend, Mr. Big, was oblivious to the success of the story and how much it was shaking up the quiet life that I had constructed around him and my work. We were not seeing each other as often because of the time I needed to put into finishing the project. He was jealous that perhaps I was seeing someone else, which didn't make sense because our relationship was never exclusive, especially on his part. Suddenly, he seemed needy. He didn't like the attention I was getting.

Yet he knew, perhaps more than anyone else in my life, the sacrifices I had made, how hard I had worked, and the pennies I had scraped together to take care of my children. In the midst of the biggest success of my career, he couldn't even bring himself to be happy for me. For the first time during all our years together, I didn't have the time or even the yearning to cry over him.

WHAT I DIDN'T KNOW AT THE TIME WAS THAT MY SERIES HAD SET OFF a bombshell of events not only in my life but also within the U.S. Department of Justice. Almost immediately, members of the public corruption unit at the U.S. Attorney's Office in the Southern District of New York took my story to their boss, Geoffrey Berman, who had been tapped earlier that year to replace Preet Bharara, a longtime SDNY federal prosecutor who had been fired by Trump.

The Manhattan U.S. Attorney's Office is arguably the most influential, independent, and prestigious in the country. Its prosecutors usually go on to lucrative jobs at corporate law firms or are appointed to high-profile government posts.

Bharara had a reputation as a tough, independent prosecutor who

took on a long list of public corruption and Wall Street cases. While he was considered an outspoken "crusader" who successfully prosecuted insider trading and securities fraud cases, he had been criticized for an unwillingness to go after some powerful and politically connected figures.[1]

Bharara, who was now a TV commentator, had been in charge of SDNY when Virginia Giuffre went public with allegations that she was abused by Epstein, Dershowitz, Prince Andrew, and a number of other prominent men at Epstein's New York mansion. Lawyers representing Epstein's victims had met several times over the years with New York federal prosecutors in hopes of convincing them to prosecute Epstein on charges in New York.

Bharara, a former chief counsel to Democratic senator Chuck Schumer, never took up the Epstein case, even when new evidence and witnesses surfaced. He has never explained why his office didn't act. Nor has he answered any of my email or phone queries about the case.

Berman, however, wasn't going to let Epstein slide this time. He gave his team the green light to investigate.


MY SERIES ALSO DID NOT GO UNNOTICED BY EPSTEIN. TWO DAYS AFTER it ran, he wired $100,000 to one of his co-conspirators and three days later, wired $250,000 to another. One of those who received money, sources later told me, was Sarah Kellen, and the other was Lesley Groff, who was in charge of Epstein's Manhattan office. The story also alarmed Epstein's financial institution, Deutsche Bank, where some employees had already been raising flags about Epstein's accounts.

Over the years, Epstein had opened forty different accounts with the bank, and had made millions of dollars in transfers and other suspicious transactions that should have raised scrutiny with bank officials because of his criminal past.

The money he moved included payments to lawyers, victims, Russian models, and tuition payments and checks written directly

to women "with Eastern European surnames," federal authorities would later discover.

Then there were at least seventeen out-of-court settlements to Epstein's victims, totaling more than seven million dollars.

The same day that Epstein made the payments to Kellen and Groff, Nebraska senator Ben Sasse, a Republican member of the Senate Judiciary Committee, wrote a letter to the Justice Department, demanding an investigation into Acosta's handling of the Epstein case. Citing my series, he wanted a review of the entire prosecution, and by the end of the month, he was joined by a chorus of lawmakers, both Democrat and Republican.

THE PROJECT WASN'T PRAISED IN ALL QUARTERS. THOSE WHO criticized my work fell into several categories: journalists who knew about the case, had written about it years earlier, and thought my project was nothing but a redo; Epstein prosecutors who were not happy at the way they were portrayed; and Epstein's co-conspirators, enablers, and lawyers.

But it was a former writer for the *Daily Beast* who took criticism of the series to a completely different level.

At first, Conchita Sarnoff congratulated me on the project in a breezy, cheerful email. Then, as the story received more attention, she grew angrier and angrier, demanding that I call her because she said, "I broke the Epstein story in 2010."

She then reached out to one of our columnists whom she knew personally, and he forwarded her concerns to Mindy Marqués, who by then had been promoted and was now the *Herald*'s publisher.

Up until then, I had only read one story Sarnoff wrote about Epstein—and the only reason I read that one was because there was a copy of it in the FBI files. A socialite turned journalist turned human trafficking activist, Sarnoff was divorced from Daniel Sarnoff, whose grandfather, David Sarnoff, founded RCA and NBC. After reading

the story in the FBI file, I saw that she had in fact self-published a book about the Epstein case years earlier. By January 2018, however, Sarnoff was running a nonprofit organization for victims of human trafficking.

Since she was now an activist on the topic of trafficking, I thought I might interview her for my story.

I don't remember all the details of our conversation, except that I found it difficult to get a word in. It also seemed that she felt she was the only person who knew the Epstein story. I quickly realized that it would be better not to tell her I had interviewed several victims. All I remember thinking after hanging up the phone was "I am never going to read that woman's book." To this day, I never have.

After the series was published, she wrote letters to my editors, my publisher, and the Pulitzer Prize board. At first, she indicated she was upset that she didn't get credit for being the person who broke the story. We checked the clips. The problem was, she didn't "break" the story. The *Palm Beach Post* was the first paper to write about Epstein, in 2005.

Then she claimed that I had "repackaged" her work. As evidence of her "great expertise" on the story, she listed all the pertinent people whom she had interviewed over the years, including Acosta. However, we couldn't find any of those interviews in her stories. The last story I could find that she wrote about Epstein was in 2011, seven years before.

After speaking to some of the people she claimed she had "interviewed," I was told that she used her society connections to interview them at cocktail parties and charitable events. Anything they might have told her, which wasn't much, was off the record, according to several people who said she cornered them at these functions.

Mindy wrote Sarnoff a lengthy letter, addressing every allegation she had made, disputing each one of them.

Sarnoff then called former Palm Beach police chief Mike Reiter to ask him whether he had actually spoken to me. Reiter was as baffled as I was, because after all, we had him on camera.

When that approach didn't work, she moved on to accusations of plagiarism. Casey had to buy her book and read it.

# EXHIBIT  16

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------- x
                                                    :
UNITED STATES OF AMERICA,                           :
                                                    :
          v.                                        :   20 Cr. 330 (AJN)
                                                    :
GHISLAINE MAXWELL,                                  :
                                                    :
          Defendant.                                :
                                                    :
                                                    :
------------------------------------------------- x

**REPLY MEMORANDUM OF GHISLAINE MAXWELL
IN SUPPORT OF HER MOTION UNDER THE DUE PROCESS CLAUSE TO
SUPPRESS ALL EVIDENCE OBTAINED FROM THE GOVERNMENT'S SUBPOENA
TO BOIES SCHILLER AND TO DISMISS COUNTS FIVE AND SIX**

Jeffrey S. Pagliuca
Laura A. Menninger
HADDON, MORGAN & FOREMAN P.C.
150 East 10th Avenue
Denver, CO 80203
Phone: 303-831-7364

Christian R. Everdell
COHEN & GRESSER LLP
800 Third Avenue
New York, NY 10022
Phone: 212-957-7600

Bobbi C. Sternheim
Law Offices of Bobbi C. Sternheim
33 West 19th Street – 4th Floor
New York, NY 10011
Phone: 212-243-1100

*Attorneys for Ghislaine Maxwell*

From any perspective, therefore, AUSA ▮▮▮ 2021 version of events is not worthy of credence, nor is the government's Response to Maxwell's Motion, which adopts AUSA ▮▮▮ version of events (to the extent she claims to remember them) while ignoring the contemporaneous evidence of what actually happened. The record is surpassingly clear: In February 2016 and the weeks and months after, Giuffre's attorneys "pitched" a prosecution of Maxwell and Epstein.[9]

- **Defense 2: The government was not asked to consider a perjury charge against Maxwell.**

Noting that the February 29, 2016 meeting occurred before Maxwell's two depositions (April and July 2016), the government insists that Giuffre's attorneys did not ask (indeed could not have asked) the government to consider charging Maxwell with perjury. Resp. at 63. Again, the documentary evidence belies this claim.

First, AUSA ▮▮▮ contemporaneous notes say that "Giuffre wants prosecution." Ex. J, p 7. AUSA ▮▮▮ knew what Giuffre's attorneys were after, which is why she emailed the Chief of the Criminal Division just days after the meeting to discuss the "intriguing" case, Ex. M.

Second, in the 2021 interview with prosecutors, AUSA ▮▮▮ did not deny that Giuffre's attorneys asked her to consider a perjury prosecution. Ex. K, p 5. Instead, AUSA ▮▮▮ said that she "does not remember one way or the other if any of the attorneys referenced the possibility of perjury." *Id.*

---

[9] There are other indications as well that Giuffre's attorneys pressed AUSA ▮▮▮ to investigate Maxwell. For example, while AUSA ▮▮▮ notes say ▮▮▮ "is wanting to cooperate," Ex. J, p 2, they say nothing of the sort about Maxwell, instead describing her as Epstein's "head recruiter," *id. See also* Ex. O.

10

Third, in the same interview, AUSA ▮▮▮▮ *admitted* that she contemplated a perjury prosecution, and she "recalls thinking that a perjury investigation would have . . . challenges." Ex. K, p 5. Left unexplained by the government in its Response to Maxwell's Motion is why AUSA ▮▮▮▮ would have contemplated a perjury prosecution if Giuffre's attorneys had not proposed one.

There are two possible explanations. Either (1) Giuffre's attorneys knew in February 2016 that they were going to set a perjury trap for Maxwell, and they discussed that plan with AUSA ▮▮▮▮ at the time, or (2) there were additional communications between AUSA ▮▮▮▮ and Giuffre's attorneys (phone calls or even a second meeting) *after* Maxwell was deposed. Either way, the government contemplated a perjury charge against Maxwell in 2016, and the Response's insistence otherwise is not credible.

- **Defense 3: Maxwell's argument relies on nothing but the *Daily News* article.**

The government says that Maxwell's argument "is premised solely on her use of selective snippets from a lone *Daily News* Article that is premised, in meaningful part, on anonymous sources and hearsay." Resp. at 89. This claim is stunningly disingenuous, and it fails on its own terms.

When Maxwell filed her Motion, she did not have access to the government's emails and AUSA ▮▮▮▮ contemporaneous notes, despite their obvious exculpatory value. *See Brady v. Maryland*, 373 U.S. 83, 87–88 (1963). The government did not disclose these materials until Maxwell challenged the government's candor and conduct before Judge McMahon. One wonders whether the government would have provided them to Maxwell had she not filed this Motion.

The government's claim also fails on its own terms. The article is not meaningfully anonymous.[10] Among others, the article quotes David Boies, who said:

> We were saying to anyone who would listen: We've got clients who were abused. Some of them were underage. We have the evidence. There's a whole record that's been developed. We can establish beyond any reasonable doubt there was a massive sex trafficking ring going on.

The article also quotes Brad Edwards, who describes in his self-published memoir the various contacts Giuffre's attorneys had with the U.S. Attorney's Office in 2016.

Finally, as detailed above, AUSA ▇▇▇▇▇▇ contemporaneous notes confirm most of the article's substance.[11] Ex. J.

- **Defense 4: There was only one meeting.**

The government denies there was a second meeting between the U.S. Attorney's Office and Giuffre's attorneys. Resp. at 92. This denial, though, is based solely on AUSA ▇▇▇▇▇▇ foggy memory and in the absence of any credible investigation. Contrary to the government's claim, the evidence strongly suggests there *was* a second meeting or some further contact between them. At the very least, this Court should hold an evidentiary hearing to find the truth.

---

[10] Stephen Rex Brown, *Manhattan federal prosecutors declined to pursue Jeffrey Epstein and Ghislaine Maxwell case in 2016*, New York Daily News (Oct. 13, 2020), https://www.nydailynews.com/new-york/ny-jeffrey-epstein-maxwell-case-20201013-jmzhl7zdrzdgrbbs7yc6bfnszu-story.html.

To the extent the article relies on unnamed sources, there is no indication those sources are anonymous in the sense that the author is unaware of their identity. In the 2021 call, the government apparently did not ask AUSA ▇▇▇▇▇▇ whether she was one of the unnamed sources. *See* Ex. K.

[11] The government also says the article is hearsay. Resp. at 89. This is an odd claim for the government to make while asking this Court to credit double hearsay: someone's notes of statements made by AUSA ▇▇▇▇▇▇ during a phone call. The government's hearsay argument does nothing but support Maxwell's request for an evidentiary hearing.

Two of the sources in the Daily News article insisted there was a second meeting in the summer of 2016.[12]

In addition, as described above, AUSA ████ in 2021 said she recalls contemplating a perjury prosecution of Maxwell. Ex. K, p 5. But if there were only the one meeting, it makes little sense for AUSA ████ to have been thinking about a potential perjury prosecution in February of 2016, before Maxwell had even been deposed (unless the plan was to set a perjury trap for Maxwell). It is more likely that AUSA ████ contemplated a perjury prosecution after a second meeting with Giuffre's attorneys, which took place after at least one of Maxwell's depositions. As reported in the *Daily News*, "David [Boies] was particularly frustrated by the failure to pursue a perjury charge."[13] "We have her dead to rights," he said.[14]

This Court cannot accept without further inquiry the government's assertion that there wasn't a second meeting or any further contact between the U.S. Attorney's Office and Giuffre's attorneys. At a minimum, an evidentiary hearing is required.

- **Defense 5: AUSA ████ had no idea what was in Boies Schiller's files.**

The government stands by the claim that AUSA ████ had "either little or no additional information than [Judge McMahon did] in terms of what materials there are [and] who was deposed" and, for all the government knew, the deposition transcripts would show "page after page of people taking the Fifth." *See* Resp. at 70. The government's Response is not credible.

---

[12] *Supra* Note 10.

[13] *Supra* Note 10.

[14] *Supra* Note 10.

# EXHIBIT 17

| | |
|---|---|
| **From:** | Kramer, Amanda (USANYS) |
| **To:** | Diskant, Edward (USANYS); Capone, Russell (USANYS); Kurland, Abigail (USANYS) |
| **Subject:** | FW: Virginia Guiffre |
| **Date:** | Friday, November 30, 2018 4:01:53 PM |

**From:** Peter Skinner <PSkinner@BSFLLP.com>
**Sent:** Tuesday, March 8, 2016 12:28 PM
**To:** Kramer, Amanda (USANYS) <AKramer@usa.doj.gov>
**Cc:** StanPottinger@aol.com; brad@pathtojustice.com; Sigrid McCawley <Smccawley@BSFLLP.com>
**Subject:** RE: Virginia Guiffre

Amanda,

If you haven't already seen it, the Post reported today on Jeffrey Epstein's continued
relationships with young women.

http://pagesix.com/2016/03/08/jeffrey-epsteins-east-side-mansion-houses-russian-
playmates/

Best,
Pete


**From:** Peter Skinner
**Sent:** Monday, February 29, 2016 10:13 PM
**To:** Amanda Kramer
**Cc:** StanPottinger@aol.com; brad@pathtojustice.com; Sigrid McCawley
**Subject:** Re: Virginia Guiffre

Amanda,

I am adding Sigrid McCawley to this email chain as well. As we mentioned earlier today, Sigrid is one of the
lead attorneys on the case and knows both Virginia and the facts very well. Please include Sigrid in any
follow-up that you may.

Best,
Pete


**From:** Peter Skinner <pskinner@bsfllp.com>
**Date:** Monday, February 29, 2016 at 10:03 PM
**To:** Amanda Kramer <amanda.kramer@usdoj.gov>

**Cc:** "StanPottinger@aol.com" <StanPottinger@aol.com>, "brad@pathtojustice.com"
<brad@pathtojustice.com>
**Subject:** Virginia Guiffre

Amanda,

Thank you again for meeting with us today. We very much appreciate your time. I am attaching the
following documents for your review:

1. Complaint in the defamation case against Ghislaine Maxwell (just today, Judge Sweet denied Maxwell's
motion to dismiss today);
2. Declarations that Virginia filed in the CVRA case;
3. The Rule 56.1 statement recently filed in the CVRA case;
4. The redacted 302

Please let us know what other information we can provide or if you have any further questions.

Best,
Pete

The information contained in this electronic message is confidential information intended only for the use of the named recipient(s) and
may contain information that, among other protections, is the subject of attorney-client privilege, attorney work product or exempt from
disclosure under applicable law. If the reader of this electronic message is not the named recipient, or the employee or agent responsible
to deliver it to the named recipient, you are hereby notified that any dissemination, distribution, copying or other use of this
communication is strictly prohibited and no privilege is waived. If you have received this communication in error, please immediately
notify the sender by replying to this electronic message and then deleting this electronic message from your computer. [v.1]

# EXHIBIT  18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------- x

UNITED STATES OF AMERICA,                    :

            v.                               :      20 Cr. 330 (AJN)

GHISLAINE MAXWELL,                           :

            Defendant.                       :

                                             :
--------------------------------------------------- x

## REPLY MEMORANDUM OF GHISLAINE MAXWELL
## IN SUPPORT OF HER MOTION UNDER THE DUE PROCESS CLAUSE TO
## SUPPRESS ALL EVIDENCE OBTAINED FROM THE GOVERNMENT'S SUBPOENA
## TO BOIES SCHILLER AND TO DISMISS COUNTS FIVE AND SIX

Jeffrey S. Pagliuca
Laura A. Menninger
HADDON, MORGAN & FOREMAN P.C.
150 East 10th Avenue
Denver, CO 80203
Phone: 303-831-7364

Christian R. Everdell
COHEN & GRESSER LLP
800 Third Avenue
New York, NY 10022
Phone: 212-957-7600

Bobbi C. Sternheim
Law Offices of Bobbi C. Sternheim
33 West 19th Street - 4th Floor
New York, NY 10011
Phone: 212-243-1100

*Attorneys for Ghislaine Maxwell*

# Table of Contents

Table of Contents..................................................................................................... i

Table of Authorities............................................................................................... ii

Table of Exhibits .................................................................................................. iv

Introduction and Summary of the Argument........................................................ 1

I.     The Facts ...................................................................................................... 2

II.    The Government's Response to Maxwell's Motion. ................................... 6

    A.   The Government's Defenses Are Not Credible. .................................... 7

    B.   Assuming the Government's Defenses Are Worthy of Belief, the Government Still Misled the Court. ...................................................................... 17

III.   The Materiality of the Government's False Statements. ........................... 18

IV.   The Remedy for the Government's Misconduct......................................... 20

    A.   Pursuant to its Inherent Power, this Court Should Suppress the Evidence Obtained from Boies Schiller and Dismiss Counts Five and Six, which are the Fruits of that Evidence. ........................................................................................ 20

    B.   At a Minimum, this Court Should Order a Hearing at which Maxwell May Inquire into the Circumstances Surrounding the Government's Misrepresentation to Judge McMahon. ...................................................................................... 26

Conclusion ............................................................................................................ 27

Certificate of Service ........................................................................................... 29

# Table of Authorities

**Cases**

*Abdell v. City of New York*, No. 05 CIV. 8453 KMK JCF, 2006 WL 2664313
(S.D.N.Y. Sept. 14, 2006)................................................................................................. 8

*Berger v. United States*, 295 U.S. 78 (1935) ............................................................... 24

*Brady v. Maryland*, 373 U.S. 83 (1963) ....................................................................... 11

*Brown v. Maxwel*, 929 F.3d 4 (2d Cir. 2019) ........................................................ 19, 20

*Chemical Bank v. Affiliated FM Ins. Co.*, 154 F.R.D. 91 (S.D.N.Y. 1994)...................... 14, 18, 19

*Elkins v. United States*, 364 U.S. 206 (1960)................................................................ 20

*Four Star Fin. Servs., LLC v. Commonwealth Mgmt. Assocs.*, 166 F. Supp. 2d 805
(S.D.N.Y. 2001)............................................................................................................... 25

*Franks v. Delaware*, 438 U.S. 154 (1978)............................................................... 20, 22

*Giuffre v. Maxwell*, 325 F. Supp. 3d 428 (S.D.N.Y. 2018) ....................................... 8, 15

*Hampton v. United States*, 425 U.S. 484 (1976)......................................................... 20

*In re WinNet R CJSC*, 2017 WL 1373918 (S.D.N.Y. No. 16MC484(DLC), Apr. 13, 2017)....... 24

*Martindell v. Int'l Tel. & Tel. Corp.*, 594 F.2d 291 (2d Cir. 1979) ....................... 18, 21

*McNabb v. United States*, 318 U.S. 332 (1943)........................................................... 20

*Morales v. Portuondo*, 165 F. Supp. 2d 601 (S.D.N.Y. 2001) .................................... 24

*Rea v. United States*, 350 U.S. 214 (1956) .................................................................. 20

*United States v. Bout*, 731 F.3d 233 (2d Cir. 2013)..................................................... 23

*United States v. Cortina*, 630 F.2d 1207 (7th Cir. 1980)........................................ 20, 22, 25, 26

*United States v. Falso*, 544 F.3d 110 (2d Cir. 2008) .................................................. 22

*United States v. Lambus*, 897 F.3d 368 (2d Cir. 2018)........................................... 23, 25

*United States v. Ming He*, 94 F.3d 782 (2d Cir. 1996) .............................................. 20

*United States v. Paredes-Cordova*, No. S1 03 CR. 987DAB, 2009 WL 1585776
(S.D.N.Y. June 8, 2009) ................................................................................................. 25

*United States v. Payner*, 447 U.S. 727 (1980) .............................................................................. 20

*United States v. Pena*, 961 F.2d 333 (2d Cir. 1992) ...................................................................... 25

*United States v. Russell*, 411 U.S. 423 (1973) .............................................................................. 21

*United States v. Schmidt*, 105 F.3d 82 (2d Cir. 1997) .................................................................. 23

*Wang v. Reno*, 81 F.3d 808 (9th Cir. 1996) .................................................................................... 2

*Young v. United States*, 481 U.S. 787 (1987) ................................................................................ 24

**Other Authorities**

Stephen Rex Brown, *Manhattan federal prosecutors declined to pursue Jeffrey Epstein and Ghislaine Maxwell case in 2016*, New York Daily News (Oct. 13, 2020) .............................. 11

U.S. Dept. of Justice, JUSTICE MANUAL, JM § 9-11.151 ............................................................. 15

**Rules**

Fed. R. Civ. P. 5.2 .......................................................................................................................... 19

N.Y. Rules of Professional Conduct, Rule 3.3(d) ........................................................................... 24

N.Y. Rules of Professional Conduct, Rule 3.8, cmt. [6A] ............................................................. 16

**Constitutional Provisions**

U.S. CONST. amend. IV .................................................................................................................. 22

U.S. CONST. amend. V ................................................................................................................... 21

U.S. CONST. amend. VI .................................................................................................................. 26

## Table of Exhibits

EXHIBIT J: Notes of Feb. 11, 2021 Call with AUSA ▮▮▮▮ (Sealed)

EXHIBIT K: Handwritten Notes by AUSA ▮▮▮▮ of Meeting and Contacts with Peter Skinner, Stan Pottinger, and Brad Edwards

EXHIBIT L: Email String Between Peter Skinner and AUSA ▮▮▮▮, cc'ing Stan Pottinger, Brad Edwards, and Sigrid McCawley (Feb. 29, 2016–Mar. 5, 2016) (Sealed)

EXHIBIT M: Emails between AUSA ▮▮▮▮ and Chief of the Criminal Division (Mar. 3, 2016) (Sealed)

EXHIBIT N: Emails between AUSA ▮▮▮▮ and AUSA ▮▮▮▮ and other AUSAs (Nov. 30, 2018–Dec. 6, 2018) (Sealed)

EXHIBIT O: Email from Stan Pottinger to AUSA ▮▮▮▮, cc'ing Brad Edwards and Sigrid McCawley, re Daniel Siad (Mar. 3, 2016) (Sealed)

EXHIBIT P: Giuffre Supplemental Privilege Log, Apr. 4, 2016

EXHIBIT Q: Defendant's Response in Opposition to Motion to Exceed Presumptive Ten Deposition Limit, *Giuffre v. Maxwell*, No. 15-cv-07433-RWS (S.D.N.Y.) (June 16, 2016)

Ghislaine Maxwell submits this reply in support of her Motion to suppress all evidence the government obtained from a grand jury subpoena it issued to Boies Schiller Flexner LLP and to dismiss Counts Five and Six, which are the fruits of that unlawful subpoena.

## Introduction and Summary of the Argument

If the government meant to reassure this Court that nothing improper happened, its Response was anything but reassuring.

The government now confesses that it had significant and substantial contact with Virginia Giuffre's attorneys in 2016—while the Giuffre defamation suit against Maxwell was on-going—as part of an effort to instigate a criminal prosecution of Maxwell for allegedly trafficking Giuffre and others and then lying under oath. Doubling down on an increasingly farfetched story, however, the government insists that nothing improper occurred when it misrepresented these contacts to the Chief Judge of the Southern District of New York.

Contrary to the government's portrayal of events, what happened here is that a prosecutor from the *public corruption* unit of the United States Attorney's Office, in an *ex parte* proceeding, affirmatively misled Chief Judge McMahon to circumvent a Protective Order entered by one of her colleagues. The prosecutor then exploited the material he obtained to indict Maxwell.

Had the prosecutor not affirmatively misled Judge McMahon, the government would never have obtained the 90,000 pages of material it now possesses, material that is central—indeed, essential—to its case against Maxwell. It would be the height of irony, not to mention injustice, to allow the government to convict Maxwell of testifying falsely when the government could not have indicted Maxwell but for the false statements it made to a federal judge.

"In a situation like this, the judiciary . . . may exercise its supervisory power to make it clear that the misconduct was serious, that the government's unwillingness to own up to it was more serious still, and that steps must be taken to avoid a recurrence of this chain of events."

*Wang v. Reno*, 81 F.3d 808, 821 (9th Cir. 1996). For the reasons given below, the exercise of this Court's supervisory authority is called for here.

### I.  The Facts

Pressed into some minimal measure of candor, the government now admits the following facts are true:

- On February 29, 2016, AUSA ▮▮▮▮, the Human Trafficking Coordinator and Project Safe Childhood Coordinator for the U.S. Attorney's Office for the Southern District of New York, Ex. J, p 1, met with Peter Skinner of Boies Schiller, Stan Pottinger, and Brad Edwards, who represented Virginia Giuffre, Ex. K, p 1.

- The meeting concerned Giuffre's allegations of sexual abuse and trafficking by Jeffrey Epstein and Maxwell. Ex. J, pp 1–3.

- At the meeting, Giuffre's attorneys told AUSA ▮▮▮▮ the following:

  - That Maxwell was Epstein's "head recruiter" of underage victims. *Id.* at 2.

  - That Giuffre was underage when she was brought to New York "for training by Maxwell and Epstein [in] how to service men." *Id.* at 3.

  - That Giuffre had a pending civil lawsuit against Maxwell for defamation alleging that Maxwell had recruited Giuffre to be trafficked and abused by Epstein. *Id.* at 4, 7.

  - That Maxwell was asserting truth as a defense to Giuffre's defamation claim. *Id.* at 4, 7.

  - That Maxwell had photos of naked underage girls on her computer. *Id.* at 6.[1]

---

[1] No such photos were found on or produced from any computers associated with Maxwell.

- o That Maxwell and Epstein-friend ███████████ "took sexually explicit photos of [Giuffre] regularly."[2] *Id.*

- o That, as a birthday present, Maxwell gave Epstein a sexually explicit photo of Giuffre taken when Giuffre was sixteen.[3] *Id.*

- o That Epstein hung the photo on one of his walls.[4] *Id.*

- o That Giuffre has a note in Maxwell's handwriting with the name of another victim. *Id.* at 8.[5]

- o That Giuffre was "live in" sex slave from 2000-2002.[6] *Id.* at 3.

- o That there were other victims of Epstein and Maxwell, including ████████, *id.* at 7, who is apparently Accuser-1 in this case, and another woman whose description matches ████████████, *id.* at 9, who is apparently Accuser-3.

- o That Accuser-1 was "highly credible." *Id.* at 7.

- o That Epstein and Maxwell used "the same MO with" Accuser-3 that they used with Giuffre. *Id.* at 7, 9.

- o And that Giuffre "wants [a] prosecution." *Id.* at 7.

---

[2] Maxwell denies ever taking any photos of Giuffre, and we have seen no sexually explicit photo of Giuffre in any of the civil or criminal document productions.

[3] Not only did Maxwell not meet Giuffre until Giuffre was seventeen years old, Maxwell never provided any such photo to Epstein, nor, to our knowledge, has any such photo ever been produced, in the civil or criminal cases.

[4] Again, we have not seen any such photo produced in any discovery, either in the civil or criminal cases.

[5] We are aware of no note in Maxwell's handwriting being produced in the *Giuffre* action, or the criminal discovery.

[6] Giuffre was in fact living with her fiancé at the time and held multiple other jobs, as later confirmed through depositions and documents in the *Giuffre* action.

- The attorneys promised to send AUSA ▮▮▮ "affidavits and depositions" to support their request for a prosecution. *Id.* at 8.

- Calling the meeting "intriguing," AUSA ▮▮▮ emailed the Chief of the Criminal Division three days later and proposed to "talk over" the facts with him. Ex. M, pp 1–2. He agreed. *Id.* at 1.

- In the days and weeks after the February 29 meeting, there were several emails between Giuffre's attorneys and AUSA ▮▮▮. Exs. L & N.

- There was also at least one phone call. Ex. K, at 4.

- Giuffre's attorneys provided AUSA ▮▮▮ with documents as promised. *Id.* at 2; *see also* Ex. L, p 2.

Most importantly, the government now admits that AUSA ▮▮▮, the prosecutor in charge of the case who appeared before Chief Judge McMahon on April 9, 2019, *knew all of this* and still denied that Boies Schiller had any role in fomenting the investigation and claimed that there had been no contacts between Boies Schiller and his office before November 2018, when he claimed the investigation first began.

None of these statements by AUSA ▮▮▮ to Judge McMahon were true.

As described above, Giuffre's attorneys pressed the U.S. Attorney's Office for the Southern District of New York to investigate and prosecute Epstein and Maxwell. Ex. J.

Then, two months after the meeting with AUSA ▮▮▮, Giuffre's attorneys told Judge Sweet—who was presiding over Giuffre's defamation against Maxwell—that there was an

"ongoing criminal investigation" into Maxwell, and they withheld from discovery 57 separate documents, invoking the "law enforcement privilege." Ex. P.[7]

In late November 2018 and early December 2018—just two months before AUSA ███████ filed the *ex parte* request before Judge McMahon seeking modification of the civil Protective Order entered by Judge Sweet—AUSA ████ shared with AUSA ██████, as well as one other member of the trial team and the heads of the Public Corruption Unit, everything she learned from her contacts with Giuffre's attorneys. Ex. N.

AUSA ████ gave AUSA ██████ and his colleagues: (1) nine pages of detailed, hand-written notes from the February 29 meeting; (2) the emails she received from Giuffre's attorneys; and (3) all the documents provided to her by Giuffre's attorneys. *Id.* Some of what she gave AUSA ████ included material Boies Schiller attorneys designated a short time later as "confidential" under Judge Sweet's Protective Order, including flight records and Palm Beach Police Department Records.

AUSA ████ took an active role in gathering these materials from AUSA ████. Copying AUSA ██████, AUSA ████ had emailed AUSA ████ on December 5, 2018, to obtain all the records of the February 29 meeting with Giuffre's attorneys. *Id.* at 1. In that email, AUSA ████ also asked AUSA ████ whether, after February 29, she met "again with [Peter Skinner] or anyone else." *Id.*

---

[7] Two other aspects to the privilege log are notable: (a) In the *Giuffre* litigation, Boies Schiller did not produce its emails with the U.S. Attorney's Office to Maxwell, despite the fact that they were directly responsive to a Request for Production of Documents Maxwell served just a couple of weeks after those emails were sent; and (b) Peter Skinner, the Boies Schiller attorney at the AUSA ████ meeting who also sent emails to AUSA ████ after the meeting, Ex. L, is not even listed on the privilege log, though the log purports to reflect *all* email communications about the "ongoing criminal investigation" that Boies Schiller had tried to initiate just a couple of weeks earlier.

Barely twelve hours later, when AUSA ▮▮▮▮ hadn't responded, AUSA ▮▮▮▮ took it upon himself to follow up, emailing AUSA ▮▮▮▮: "Just quickly following up on this we're trying to get a complete handle on the landscape – thanks!" *Id.*

AUSA ▮▮▮▮ responded one hour later: "Just went through my files and found a folder w/ the notes I took and the documents they brought me." *Id.* She turned everything over to AUSA ▮▮▮▮ and other prosecutors in the office, including one other prosecutor on this trial team. *Id.* AUSA ▮▮▮▮ did not answer AUSA ▮▮▮▮ original question: "[D]id [she] meet again with [Peter Skinner] or anyone else" after the February 29, 2016 meeting with Giuffre's attorneys. *Id.* But AUSA ▮▮▮▮ certainly did not deny a second meeting or a subsequent phone call occurred. *Id.*

By the end of the day on December 6, 2018, AUSA ▮▮▮▮ had in his possession everything Giuffre and her attorneys provided to AUSA ▮▮▮▮ as well as AUSA ▮▮▮▮ extensive hand-written notes. He also had access to AUSA ▮▮▮▮ herself for any follow up questions. By the end of the day, AUSA ▮▮▮▮ had a "complete handle on the landscape," just as he asked for a couple hours earlier.

When AUSA ▮▮▮▮ appeared before Judge McMahon barely four months later, however, he told her none of this, unequivocally and falsely disavowing any role by Boies Schiller in fomenting the investigation and denying any contacts between Boies Schiller and his office before November 2018. Even though AUSA ▮▮▮▮ had a "complete handle on the landscape," he painted an entirely different, false picture for Judge McMahon.

## II. The Government's Response to Maxwell's Motion.

Confronted with evidence of AUSA ▮▮▮▮ misrepresentations to Judge McMahon, the government has filed a Response reluctantly admitting that the U.S. Attorney's Office had sustained contact with Boies Schiller in 2016. Even so, the government tries its best to minimize

6

the significance of those interactions and of AUSA ▮▮▮▮▮ misrepresentations to an Article III federal judge. This Court should not permit the government to whitewash its conduct.

The discovery provided to Maxwell in response to her Motion rebuts every defense the government now offers of its conduct. And if that weren't enough, the government's defense fails on its own terms, because if this Court were to assume its truth (an assumption the government has not earned), AUSA ▮▮▮▮▮ statements to Judge McMahon would still have been demonstratively and materially false.

### A. The Government's Defenses Are Not Credible.

Discovery provided to Maxwell in response to her Motion rebuts every defense the government now offers of its conduct.

- **Defense 1: The February 29, 2016 meeting was only about Epstein.**

AUSA ▮▮▮▮▮ contemporaneous hand-written notes entirely undermine the government's claim that the February 29, 2016 meeting was about Epstein only and had nothing to do with Maxwell. Resp. at 89 & n.39. *See* Ex. J. AUSA ▮▮▮▮▮ notes refer to Maxwell as Epstein's "head recruiter" of underage girls; they document allegations that Maxwell "regularly" took sexually explicit photos of Giuffre and other underage girls, which she kept on her computer; they allege that Maxwell gave one such photo to Epstein as a birthday present, which he hung on his wall; they claim that Maxwell, along with Epstein, brought Giuffre to New York to personally "train[] [her] . . [in] how to service men;" and they assert that Maxwell used the "same MO" to recruit other girls to the sex trafficking scheme. The contents of AUSA ▮▮▮▮▮ notes belie any notion that Giuffre's attorneys—who at that very moment were suing Maxwell

for defamation for *denying* she had trafficked and abused Giuffre—were focused only on Epstein and not on Maxwell.

Despite AUSA ██████ contemporaneous notes showing that the meeting very much concerned Maxwell, the government now claims that "the pitch was to investigate Epstein, not Maxwell," and that the discussion included only "passing references to Maxwell." Resp. at 89 n.39. The government bases this argument *exclusively* on a phone call prosecutors conducted with AUSA ██████ on February 11, 2021, five years *after* the February 29 meeting actually took place. Ex. K. This Court should reject the government's revisionist history.

The best evidence of what happened on February 29, 2016—at least the best evidence the government has produced so far—is AUSA ██████ contemporaneous notes.[8] Ex. J.; *Abdell v. City of New York*, No. 05 CIV. 8453 KMK JCF, 2006 WL 2664313, at *7 (S.D.N.Y. Sept. 14, 2006) (denying motion to quash third-party subpoena because "contemporaneous statements of witnesses constitute best evidence"). Although the government attached these notes to its Response, Resp. Ex. 5, the government does not rely on them as part of its argument, choosing instead to rely on AUSA ██████ 2021 recollection of what happened, Resp. at 62–66, 89 & n.39, 92 (citing Ex. 4).

_____

[8] It appears the government does not actually want to know anything beyond what AUSA ██████ remembers (or doesn't remember) of 2016. All the government did in response to Maxwell's Motion was telephone AUSA ██████ The government apparently: (1) did not search its system for any and all emails from, to, or about David Boies, Sigrid McCawley, Stan Pottinger, Brad Edwards, or Peter Skinner; and (2) did not interview anyone other than AUSA ██████, such as the other attendees of the meeting (Pottinger, Edwards, and Skinner), or any of the other AUSAs whom AUSA ██████ talked to about her contacts with Giuffre's attorneys.

Most conspicuous, of course, is the government's failure to interview AUSA ██████ or secure an affidavit from him. If this Court does not grant Maxwell's Motion on the papers, only an evidentiary hearing can address these issues.

But in her 2021 interview, AUSA ████ mostly disclaimed a memory of what happened in 2016. Ex. K. The phrases "does not recall," "does not remember," or some similar expression of lack of memory appear at least ***thirty-two*** times in the notes of the government's 2021 call with AUSA ████. *Id.*

Many of AUSA ████ disclaimers, however, are simply not credible. For example, AUSA ████ claimed not to "have an independent memory of the *Giuffre v. Maxwell* [defamation] lawsuit being mentioned" during the meeting, *id.* at 1, even though her notes are replete with references to the lawsuit, Ex. J. After reviewing her notes, AUSA ████ denied that they refreshed her memory. Ex. K, p 1.

AUSA ████ similarly denied remembering whether Giuffre's attorneys ever provided her with documents, *id.* at 6, despite the email from Peter Skinner just hours after the February 29 meeting providing AUSA ████ with numerous documents, Ex. L, p 1–2, and despite the fact that AUSA ████ in 2018 personally delivered those documents to AUSA ████ AUSA ████, and one member of the prosecution team in this case, Ex. N, p 1 (12/6/2018 Email to AUSA ████: "Just went through my files and found a folder w/ the notes I took and the documents they brought me. Want to come by?").

When AUSA ████ did claim to remember what transpired, her memory was often inconsistent with the contemporaneous evidence. Take just one example. "To [her] knowledge," AUSA ████ said, she did "not receive[] any discovery materials from any civil case." Ex. K, p 6. That is not correct. The government admits that AUSA ████ received from Giuffre's attorneys, and turned over to AUSA ████ and others in the office, including flight records and Palm Beach Police Department Records. Resp. at 66 & n.2. Both of these documents were produced in discovery in the civil case.

From any perspective, therefore, AUSA ████ 2021 version of events is not worthy of credence, nor is the government's Response to Maxwell's Motion, which adopts AUSA ████ version of events (to the extent she claims to remember them) while ignoring the contemporaneous evidence of what actually happened. The record is surpassingly clear: In February 2016 and the weeks and months after, Giuffre's attorneys "pitched" a prosecution of Maxwell and Epstein.[9]

- **Defense 2: The government was not asked to consider a perjury charge against Maxwell.**

Noting that the February 29, 2016 meeting occurred before Maxwell's two depositions (April and July 2016), the government insists that Giuffre's attorneys did not ask (indeed could not have asked) the government to consider charging Maxwell with perjury. Resp. at 63. Again, the documentary evidence belies this claim.

First, AUSA ████ contemporaneous notes say that "Giuffre wants prosecution." Ex. J, p 7. AUSA ████ knew what Giuffre's attorneys were after, which is why she emailed the Chief of the Criminal Division just days after the meeting to discuss the "intriguing" case, Ex. M.

Second, in the 2021 interview with prosecutors, AUSA ████ did not deny that Giuffre's attorneys asked her to consider a perjury prosecution. Ex. K, p 5. Instead, AUSA ████ said that she "does not remember one way or the other if any of the attorneys referenced the possibility of perjury." *Id.*

---

[9] There are other indications as well that Giuffre's attorneys pressed AUSA ████ to investigate Maxwell. For example, while AUSA ████ notes say ████ "is wanting to cooperate," Ex. J, p 2, they say nothing of the sort about Maxwell, instead describing her as Epstein's "head recruiter," *id. See also* Ex. O.

Third, in the same interview, AUSA ▮▮▮ *admitted* that she contemplated a perjury prosecution, and she "recalls thinking that a perjury investigation would have . . . challenges." Ex. K, p 5. Left unexplained by the government in its Response to Maxwell's Motion is why AUSA ▮▮▮ would have contemplated a perjury prosecution if Giuffre's attorneys had not proposed one.

There are two possible explanations. Either (1) Giuffre's attorneys knew in February 2016 that they were going to set a perjury trap for Maxwell, and they discussed that plan with AUSA ▮▮▮ at the time, or (2) there were additional communications between AUSA ▮▮▮ and Giuffre's attorneys (phone calls or even a second meeting) *after* Maxwell was deposed. Either way, the government contemplated a perjury charge against Maxwell in 2016, and the Response's insistence otherwise is not credible.

- **Defense 3: Maxwell's argument relies on nothing but the *Daily News* article.**

The government says that Maxwell's argument "is premised solely on her use of selective snippets from a lone *Daily News* Article that is premised, in meaningful part, on anonymous sources and hearsay." Resp. at 89. This claim is stunningly disingenuous, and it fails on its own terms.

When Maxwell filed her Motion, she did not have access to the government's emails and AUSA ▮▮▮ contemporaneous notes, despite their obvious exculpatory value. *See Brady v. Maryland*, 373 U.S. 83, 87–88 (1963). The government did not disclose these materials until Maxwell challenged the government's candor and conduct before Judge McMahon. One wonders whether the government would have provided them to Maxwell had she not filed this Motion.

The government's claim also fails on its own terms. The article is not meaningfully anonymous.[10] Among others, the article quotes David Boies, who said:

> We were saying to anyone who would listen: We've got clients who were abused. Some of them were underage. We have the evidence. There's a whole record that's been developed. We can establish beyond any reasonable doubt there was a massive sex trafficking ring going on.

The article also quotes Brad Edwards, who describes in his self-published memoir the various contacts Giuffre's attorneys had with the U.S. Attorney's Office in 2016.

Finally, as detailed above, AUSA ▮▮▮▮ contemporaneous notes confirm most of the article's substance.[11] Ex. J.

- **Defense 4: There was only one meeting.**

The government denies there was a second meeting between the U.S. Attorney's Office and Giuffre's attorneys. Resp. at 92. This denial, though, is based solely on AUSA ▮▮▮▮ foggy memory and in the absence of any credible investigation. Contrary to the government's claim, the evidence strongly suggests there *was* a second meeting or some further contact between them. At the very least, this Court should hold an evidentiary hearing to find the truth.

---

[10] Stephen Rex Brown, *Manhattan federal prosecutors declined to pursue Jeffrey Epstein and Ghislaine Maxwell case in 2016*, New York Daily News (Oct. 13, 2020), https://www.nydailynews.com/new-york/ny-jeffrey-epstein-maxwell-case-20201013-jmzhl7zduzdgrbbs7yc6bfnszu-story.html.

To the extent the article relies on unnamed sources, there is no indication those sources are anonymous in the sense that the author is unaware of their identity. In the 2021 call, the government apparently did not ask AUSA ▮▮▮▮ whether she was one of the unnamed sources. *See* Ex. K.

[11] The government also says the article is hearsay. Resp. at 89. This is an odd claim for the government to make while asking this Court to credit double hearsay: someone's notes of statements made by AUSA ▮▮▮▮ during a phone call. The government's hearsay argument does nothing but support Maxwell's request for an evidentiary hearing.

Two of the sources in the Daily News article insisted there was a second meeting in the summer of 2016.[12]

In addition, as described above, AUSA ▮▮▮▮ in 2021 said she recalls contemplating a perjury prosecution of Maxwell. Ex. K, p 5. But if there were only the one meeting, it makes little sense for AUSA ▮▮▮▮ to have been thinking about a potential perjury prosecution in February of 2016, before Maxwell had even been deposed (unless the plan was to set a perjury trap for Maxwell). It is more likely that AUSA ▮▮▮▮ contemplated a perjury prosecution after a second meeting with Giuffre's attorneys, which took place after at least one of Maxwell's depositions. As reported in the *Daily News*, "David [Boies] was particularly frustrated by the failure to pursue a perjury charge."[13] "We have her dead to rights," he said.[14]

This Court cannot accept without further inquiry the government's assertion that there wasn't a second meeting or any further contact between the U.S. Attorney's Office and Giuffre's attorneys. At a minimum, an evidentiary hearing is required.

- **Defense 5: AUSA ▮▮▮▮ had no idea what was in Boies Schiller's files.**

The government stands by the claim that AUSA ▮▮▮▮ had "either little or no additional information than [Judge McMahon did] in terms of what materials there are [and] who was deposed" and, for all the government knew, the deposition transcripts would show "page after page of people taking the Fifth." *See* Resp. at 70. The government's Response is not credible.

---

[12] *Supra* Note 10.

[13] *Supra* Note 10.

[14] *Supra* Note 10.

For one thing, the government admits that Giuffre's attorneys turned over several documents in 2016, which were in the government's possession when AUSA ███████ claimed to Judge McMahon that he did not know what was in Boies Schiller's file. Moreover, by the time AUSA ███████ told Judge McMahon that, for all he knew, the deposition transcripts would show "page after page of people taking the Fifth," it was already a matter of public record that Maxwell had been deposed and that she had *not* invoked the Fifth Amendment. Ex. Q, p 1.

The government's argument also defies logic. The government was asking Judge McMahon to authorize a subpoena of Boies Schiller's *entire* file. At a minimum, the government had to have asked Boies Schiller about the size of the file and issues related to privilege to determine if Boies Schiller would contest the subpoena or notify either the civil court or Maxwell when the subpoena was issued and responsive documents produced. In fact, the government issued *two* subpoenas to Boies Schiller: the first for material covered by the Protective Order, and the second for material outside the Protective Order's reach. Clearly, the government knew more about Boies Schiller's file than AUSA ███████ let on.

- **Defense 6: The "subject of your investigation" to whom Judge McMahon referred was Jeffrey Epstein.**

According to the government, when Judge McMahon asked AUSA ███████ "about contacts between the United States Attorney's Office and the Boies Schiller firm prior to the issuance of the subpoena on the subject of your investigation." Mot. Ex. E, p 2. Judge McMahon was referring only to Epstein. Resp. at 71. This is not a plausible reading of the transcript.

After his first appearance before her, Judge McMahon haled AUSA ███████ back to court for one reason. "I'll be very up-front with you," she said. Mot. Ex. E, p 2.

14

I want to make sure I'm not in a *Chemical Bank*[15] kind of situation, so I would like to know about contacts between the United States Attorney's Office and the Boies Schiller firm prior to the issuance of the subpoena on the *subject of your investigation*.

*Id.* (emphasis added).

"Tellingly,"[16] Judge McMahon did not ask AUSA ▬▬▬ about the "target" of his investigation: she asked about its "subject." The "subject of [the] investigation" is much broader than its "target."

"A 'target' is a person as to whom the prosecutor or the grand jury has substantial evidence linking him or her to the commission of a crime and who, in the judgment of the prosecutor, is a putative defendant."[17] "A 'subject' of an investigation is a person whose conduct is within the scope of the grand jury's investigation."[18] The scope of an investigation, in turn, includes not only potential defendants and potential victims, but also the conduct at issue and the locations involved.

Were there any doubt about Judge McMahon's meaning, she put that doubt to rest in her written order authorizing the subpoena. Mot. Ex. G, p 21. The "subject of the investigation," she explained, was "the matters that were the subject of the *Giuffre* [defamation] Action." *Id.* And having asked AUSA ▬▬▬ about his office's contacts with Boies Schiller about "the

---

[15] *Chemical Bank v. Affiliated FM Ins. Co.*, 154 F.R.D. 91 (S.D.N.Y. 1994).

[16] "Tellingly," claims the government in the Response, "Maxwell omits [the phrase 'subject of your investigation'] of this question from her motion." Resp. at 70 n.34. Not true. On page 13 of Maxwell's Motion, in arguing that AUSA ▬▬▬ mislead Judge McMahon, Maxwell fully and completely quotes Judge McMahon's question, just as she does above. Mot. at 13 (quoting Ex. E, p 2).

[17] United States Department of Justice, JUSTICE MANUAL, JM § 9-11.151, *Grand Jury, Advice of "Rights" of Grand Jury Witnesses* (updated Jan. 2020), available at: https://www.justice.gov/jm/jm-9-11000-grand-jury#9-11.151 (last accessed Mar. 11, 2021).

[18] *Id.*

matters that were the subject of the *Giuffre* [defamation] Action," and having been misled by

AUSA ▇▇▇▇ response, Judge McMahon erroneously (though blamelessly) concluded that

> [n]othing in this record suggests to me that Giuffre or Boies Schiller had anything
> to do with the Government's decision to convene a grand jury to look into *the
> matters that were the subject of the Giuffre Action.* . . There is no evidence of
> "collusion," to invoke a term of the moment, and it is quite clear that Boies Schiller
> did not foment the Government's investigation.

*Id.* (emphasis added).

For her part, AUSA ▇▇▇▇ shared the very concern Judge McMahon later expressed to

AUSA ▇▇▇▇: that Boies Schiller was trying to instigate an investigation of Maxwell to

leverage its position in the "*Giuffre* Action." Mot. Ex. K, p 3. In the 2021 call, AUSA ▇▇▇

recalled that the

> pending CVRA civil case and other civil litigation . . . gave [her] some pause
> because she had other occasions where civil litigants have decided to report
> something to the USAO because they think it will help them in their civil case.

AUSA ▇▇▇▇ even mentioned this concern to the Chief of the Criminal Division. *Id.* If AUSA

▇▇▇▇ and the Chief of the Criminal Division recognized what was going on, AUSA ▇▇▇▇

can hardly feign ignorance.[19]

If the government means to suggest that when Judge McMahon asked about any prior

contacts concerning "the subject of your investigation," she was somehow confining her inquiry

to the time period surrounding November 2018, *see* Resp. at 90–91, that too is an implausible

reading of the transcript. If Judge McMahon meant "subject" to be a term of art ("subject" of the

investigation as opposed to a "target" of the investigation), then the government should have

---

[19] Of course, if AUSA ▇▇▇▇ honestly did not understand Chief Judge McMahon's question, once she issued her opinion there could no longer be any doubt. And at that point, AUSA ▇▇▇▇ would have been duty-bound to correct the misimpression he had created. N.Y. Rules of Professional Conduct, Rule. 3.8. cmt. [6A] ("Like other lawyers, prosecutors are subject to Rule 3.3, which requires a lawyer to take reasonable remedial measures to correct material evidence that the lawyer has offered when the lawyer comes to know of its falsity.").

disclosed the Boies Schiller contacts for the reasons given above. And if Judge McMahon meant "subject" to have its everyday meaning, then she was asking about something even broader: Whether the U.S. Attorney's Office had contacts with Boies Schiller about the "subject"—i.e., the "conduct"—being investigated.

Nothing about the transcript supports the government's overly narrow, hindsight-based interpretation of Judge McMahon's question.

\* \* \*

For these reasons, this Court should reject the government's attempt to rewrite the history of its investigation and its affirmative misrepresentations to Judge McMahon.

### B. Assuming the Government's Defenses Are Worthy of Belief, the Government Still Misled the Court.

Even if the government's account were worthy of belief (which it is not), that doesn't get the government off the hook.

The government would like this Court to believe that: (1) the February 29 meeting concerned a prosecution of Epstein *only* and not Maxwell; and (2) when Judge McMahon asked AUSA ▮▮▮▮ about his office's prior contacts with Boies Schiller concerning "the subject of its investigation," Judge McMahon was referring to Epstein *only* and not Maxwell.

Even if those two assertions were true, however, then AUSA ▮▮▮▮ still misled Judge McMahon and misrepresented the origins of the investigation. Under the government's version of events, "the pitch was to investigate Epstein, not Maxwell." Resp. at 89 n.39. If that's true, AUSA ▮▮▮▮ unquestionably should have told Judge McMahon about the February 2016 meeting when she asked him "about contacts between the United States Attorney's Office and the Boies Schiller firm prior to the issuance of the subpoena on the *subject of your investigation*"—i.e., Epstein. AUSA ▮▮▮▮ did not tell Chief Judge McMahon about the

17

contacts with Boies Schiller on the topic of Epstein any more than he shared the contacts on the topic of Maxwell—he simply denied any contacts had occurred, something that is demonstrably false.

Whether Boies Schiller "pitched" a prosecution of Epstein only or of Epstein and Maxwell as a duo, AUSA ████████ misled Judge McMahon by denying there was any "pitch" whatsoever.

## III. The Materiality of the Government's False Statements.

The government halfheartedly suggests that "there is no reason to believe that a description of the February 2016 meeting would have been material to Chief Judge McMahon's analysis of whether she was facing a `*Chemical Bank* kind of situation.'" Resp. at 91. Hardly. In fact, there is *every reason* to believe Judge McMahon would have refused to authorize the subpoena if AUSA ████████ had not so misled her.

How do we know? Because Judge McMahon said so—at least twice.

Judge McMahon first made this clear by haling AUSA ████████ back in for one and only one reason: To ask him about the contacts between Boies Schiller and his office before November 2018. So crucial was this question to Judge McMahon's decision that the transcript of the AUSA ████████ second appearance before her is just three pages long. Mot. Ex. E.

Judge McMahon made her thinking even clearer in her written order authorizing the subpoena. Mot. Ex. G. On page 12 of her opinion, when attempting to reconcile *Chemical Bank* with *Martindell*,[20] Judge McMahon found that "nothing in the record suggests that the Government's investigation in this case was occasioned by Boies Schiller—a point to which I will return later in this opinion." Mot. Ex. G, p 12.

---

[20] *Martindell v. Int'l Tel. & Tel. Corp.*, 594 F.2d 291 (2d Cir. 1979).

18

Judge McMahon "returned" to that point when discussing whether Maxwell could have reasonably relied on the Protective Order:

> [T]he only thing on which Maxwell or anyone else might reasonably have relied is that Giuffre or her lawyers would not do what the defendant in *Chemical Bank* did—that is, forward discovery materials in their possession to prosecutors for the purpose of fomenting an investigation. But I am not faced with that situation. Nothing in this record suggests to me that Giuffre or Boies Schiller had anything to do with the Government's decision to convene a grand jury to look into the matters that were the subject of the *Giuffre* Action. On the contrary—the Government has advised the Court that it contacted Boies Schiller as part of its search for parties who might have been victims in its investigation; and that Boies Schiller told the Government that it could not consensually produce at least some documents in its files because of the existence of the Protective Order. There is no evidence of "collusion," to invoke a term of the moment, and it is quite clear that Boies Schiller did not foment the Government's investigation. Moreover, the Assistant United States Attorney has represented to this Court that he has no idea what is in Boies Schiller's files, and that for all he knows every witness who was deposed stood on his/her Fifth Amendment rights and refused to answer questions.

*Id.* at 21.

Contrary to Judge McMahon's understanding, Boies Schiller contacted the government (not the other way around); there was ample evidence of "collusion"; it was "quite clear that Boies Schiller *did* . . . foment the Government's investigation"; and AUSA ▇▇▇ knew much more about what was in Boies Schiller's files than he let on.

The *Chemical Bank* situation Judge McMahon was worried about— when civil litigant attempts to foment a criminal investigation of her opponent—is exactly what occurred.

Judge McMahon cannot be faulted for not knowing all the facts. AUSA ▇▇▇, on the other hand, had a "complete handle on the landscape," and he withheld the truth from Judge McMahon. Had AUSA ▇▇▇ not misled her, it is clear Judge McMahon would not have authorized the subpoena.[21]

---

[21] It's notable that even without the benefit of truth from AUSA ▇▇▇, Judge McMahon wrongly concluded that Maxwell could not have reasonably relied on the Protective Order. In fact, the

IV. **The Remedy for the Government's Misconduct.**

A. **Pursuant to its Inherent Power, this Court Should Suppress the Evidence Obtained from Boies Schiller and Dismiss Counts Five and Six, which are the Fruits of that Evidence.**

This Court has inherent authority to regulate the administration of criminal justice among the parties. *McNabb v. United States*, 318 U.S. 332, 340 (1943). "Judges have an obligation to exercise supervision over the administration of criminal justice in federal courts, a responsibility that 'implies the duty of establishing and maintaining civilized standards of procedure and evidence.'" *United States v. Ming He*, 94 F.3d 782, 789 (2d Cir. 1996) (quoting *McNabb*, 318 U.S. at 340). As the Supreme Court held in *United States v. Payner*, "Federal courts may use their supervisory power in some circumstances to exclude evidence taken from the defendant by 'willful disobedience of law.'" 447 U.S. 727, 735 (1980) (quoting *McNabb*, 318 U.S. at 345) (citing *Elkins v. United States*, 364 U.S. 206, 223 (1960); *Rea v. United States*, 350 U.S. 214, 216–17 (1956); *Hampton v. United States*, 425 U.S. 484, 495 (1976) (Powell, J., concurring in judgment)). A court should invoke its supervisory power of suppression when "there has been a fraud upon the court in addition to a violation of the defendant's rights." *United States v. Cortina*, 630 F.2d 1207, 1216 (7th Cir. 1980).

In *United States v. Cortina*, a magistrate issued a search warrant based upon an affidavit subscribed by FBI Agent Linda Stewart, which itself was based on the reports and investigation of FBI Agent William Brown. *Id.* at 1208. Unbeknownst to Agent Stewart, Agent Brown's

---

Second Circuit in *Brown v. Maxwell* held a few months after Judge McMahon's ruling that Maxwell had reasonably relied on the Protective Order's guarantee of confidentiality in substantial part, and it therefore redacted *sua sponte* from the summary judgment material those "deposition responses concerning intimate matters where the questions were likely only permitted—and the responses only compelled— because of a strong expectation of continued confidentiality. 929 F.3d 4, 48, n.22 (2d Cir. 2019) (citing Fed. R. Civ. P. 5.2). So, too, has Judge Preska redacted substantial material from the documents she has released on remand from the Second Circuit, again reflecting that Maxwell reasonably relied on the Protective Order.

reports were replete with misrepresentations and outright lies about the conversations he had with, and information provided by, a confidential informant. *Id.* at 1212–13. The Court of Appeals affirmed the district court's order suppressing the evidence obtained from the search conducted under the warrant. *Id.* at 1213. "This search," said the Court, "never should have taken place." *Id.*

The Court offered two bases for its decision. It first invoked the *Franks* analysis to affirm the district court's conclusion that Agent Brown intentionally or recklessly misrepresented material information in Agent Stewart's affidavit. *Id.* But the Court went further, concluding that suppression was independently required as a matter of inherent authority. *Id.* at 1214–17. Because Agent Brown lied in the affidavit (in addition to lying at the *Franks* hearing), "[t]he call for the court's supervisory power under the[] circumstances is at its strongest and most defensible." *Id.* at 1214.

The Court recognized that the inherent authority doctrine is not a free pass for courts to suppress evidence or "merely [to] disagree with the method[s] of law enforcement." *Id.* "[T]he federal supervisory power does not give 'the federal judiciary a 'chancellor's foot' veto over law enforcement practices of which it (does) not approve.'" *Id.* (quoting *United States v. Russell*, 411 U.S. 423, 435 (1973)). Even so, inherent authority is properly invoked to "prevent[] the court from condoning a fraud perpetrated upon it." *Id.* Suppression serves both to deter unlawful governmental conduct and to protect judicial integrity. *Id.* (weighing "the deterrent values of preventing the incrimination of those whose rights the police have violated . . . and the need to protect the integrity of the federal courts against the cost to society of excluding 'probative but tainted evidence'").

21

Maxwell had a due process right to notice and an opportunity to be heard on the government's request to modify the Protective Order and issue a subpoena to Boies Schiller. Mot. Ex. A, ¶ 14 (permitting modification of the Protective Order only "for good cause shown following notice to all parties and an opportunity to be heard"); Mot. Ex. H (Judge Netburn denying the government's *ex parte* request to modify the Jane Doe 43 Protective Order in part because the government was attempting to deprive Maxwell of notice and an opportunity to be heard); *Martindell*, 594 F.2d at 294; *see* U.S. CONST. amend. V. Maxwell also had a privacy interest in the materials subject to the subpoena, including most especially her deposition transcripts. Mot. Ex. A (defining "confidential" material as that which "implicates common law and statutory privacy interests of . . . Ghislaine Maxwell"); *see* U.S. CONST. amend. IV. The government violated these rights when it secured an *ex parte* modification of the Protective Order based on materially false statements to Judge McMahon. In resisting any sanction for its misconduct, and in denying that Maxwell should even be afforded a hearing, the government asks this Court to "condon[e] a fraud perpetrated upon it." *See Cortina*, 630 F.2d at 1214.

To be sure, AUSA ███████ misled Judge McMahon in answering the singular question she posed, and he did so with full knowledge of the facts. AUSA ███████ misrepresentations were material to Judge McMahon's decision, because she would not have modified the Protective Order if AUSA ███████ had been candid about Boies Schiller's role in initiating the investigation. As Judge McMahon put it, "the only thing on which Maxwell . . . might reasonably have relied is that Giuffre or her lawyers" would not approach prosecutors and "foment the Government's investigation." Mot. Ex. G, p 21. I. That is, in fact, exactly what happened. As in *Cortina*, the modification of the Protective Order "never should have taken place." *Id.* When, as here, a prosecutor—from the public corruption unit no less—misrepresents

22

material information to a federal judge in an *ex parte* proceeding, "[t]he call for the court's supervisory power . . . is at its strongest and most defensible." *Cortina*, 630 F.2d at 1214.

Maxwell need not satisfy the standard of *Franks v. Delaware*, 438 U.S. 154 (1978) in order to obtain relief. But even if *Franks* applies, Maxwell has easily met her burden. To obtain a *Franks* hearing, a defendant must make a "substantial preliminary showing," *United States v. Falso*, 544 F.3d 110, 125 (2d Cir. 2008) (quoting *Franks*, 438 U.S. at 155–56), that (i) there were "inaccuracies or omissions" in the affidavit, (ii) "the alleged falsehoods or omissions were necessary to the issuing judge's probable cause or necessity finding," and (iii) "the claimed inaccuracies or omissions [were] the result of the affiant's deliberate falsehood or reckless disregard for the truth." *United States v. Lambus*, 897 F.3d 368, 397 (2d Cir. 2018). Here, there is no dispute that (i) AUSA ▮▮▮▮▮▮ representations to Judge McMahon were false and misleading, (ii) Judge McMahon would not have modified the Protective Order to authorize the subpoena if AUSA ▮▮▮▮▮▮ had been honest with her, and (3) AUSA ▮▮▮▮▮▮ statements were deliberately false, since he had a "complete handle on the landscape" months before he appeared in front of and misled Judge McMahon.

Nor need Maxwell prove "outrageous government conduct" to obtain relief. Were that her burden, however, Maxwell would have easily satisfied it. "The concept of fairness embodied in the Fifth Amendment due process guarantee is violated by government action that is fundamentally unfair or shocking to our traditional sense of justice." *United States v. Schmidt*, 105 F.3d 82, 91 (2d Cir. 1997). To prevail on an outrageous government conduct claim, "a defendant must show that the government's conduct is 'so outrageous that common notions of fairness and decency would be offended were judicial processes invoked to obtain a

23

conviction.'" *United States v. Bout*, 731 F.3d 233, 238 (2d Cir. 2013) (quoting *United States v. Schmidt*, 105 F.3d 82, 91 (2d Cir. 1997)).

Here, it would "shock the conscience" to permit a prosecutor to make false statements to a federal judge to circumvent another judge's duly-entered order, all in violation of the defendant's due process, privacy, and Fourth and Fifth Amendment rights. The only way to prevent Maxwell from suffering unconstitutional prejudice because of the government's misconduct is to suppress the evidence the government unlawfully obtained and to dismiss Counts 5 and 6.

\* \* \*

AUSA ▬▬▬ breached two separate but equally consequential duties: The duty of a public prosecutor and the duty of candor.

"[T]he responsibility of a public prosecutor differs from that of the usual advocate: his duty is to seek justice, not merely to convict." *Young v. United States*, 481 U.S. 787, 803 (1987). Prosecutors are held to a higher standard, and for good reason. "[The prosecutor] is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer." *Berger v. United States*, 295 U.S. 78, 88 (1935).

Moreover, "[i]n light of the prosecutor's public responsibilities, broad authority and discretion, the prosecutor has a heightened duty of candor to the courts and in fulfilling other professional obligations." ABA Criminal Justice Standards, Prosecution Function, Standard 3-1.4 (4th ed. 2017). "While all lawyers owe a duty of honesty and candor to the Court, 'this obligation lies most heavily upon [public prosecutors] who are not merely partisan advocates, but public officials charged with administering justice honestly, fairly and impartially." *Morales v. Portuondo*, 165 F. Supp. 2d 601, 612 (S.D.N.Y. 2001).

24

In turn, this already high standard ratchets up even higher when a prosecutor appears before the court *ex parte*. "The duty of candor is, if anything, more critical when *ex parte* applications are made to a court." *In re WinNet R CJSC*, 2017 WL 1373918, at *9 (S.D.N.Y. No. 16MC484(DLC), Apr. 13, 2017); *see* N.Y. Rules of Professional Conduct, Rule 3.3(d) ("In an ex parte proceeding, a lawyer shall inform the tribunal of all material facts known to the lawyer that will enable the tribunal to make an informed decision, whether or not the facts are adverse."); *see also id.* cmt. [14]. And it "is not a defense to claim that, while factual statements to the Court were materially misleading, they were not literally false. Attorneys are officers of the Court, and our system of justice cannot operate efficiently if the Court cannot rely on the candor of counsel presenting an application for *ex parte* relief." *Four Star Fin. Servs., LLC v. Commonwealth Mgmt. Assocs.*, 166 F. Supp. 2d 805, 810 (S.D.N.Y. 2001).

AUSA ███████ failed to live up to these standards. In an *ex parte* proceeding, AUSA ███████ affirmatively misled Judge McMahon, with full knowledge of what issue concerned Judge McMahon and what information would be material to her decision. When, as here, "there has been a fraud upon the court," *Cortina*, 630 F.2d at 1216, "[t]he court has inherent authority to regulate the administration of criminal justice among the parties before the bar . . . . [by] exclud[ing] evidence taken from the defendant by willful disobedience of law," *id.* at 1214. *United States v. Lambus*, 897 F.3d 368, 386 (2d Cir. 2018) ("It is within the court's inherent authority to suppress evidence gathered unlawfully in order to maintain the integrity of its own proceedings. . . .").

**B. At a Minimum, this Court Should Order a Hearing at which Maxwell May Inquire into the Circumstances Surrounding the Government's Misrepresentation to Judge McMahon.**

"An evidentiary hearing is normally required to address motions to suppress where a factual issue is in dispute." *United States v. Paredes-Cordova*, No. S1 03 CR. 987DAB, 2009 WL 1585776, at *1 (S.D.N.Y. June 8, 2009); *United States v. Pena*, 961 F.2d 333, 339 (2d Cir. 1992) ("[A]n evidentiary hearing on a motion to suppress ordinarily is required if the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question." (quotation omitted))). Here, the government has confessed enough facts to demonstrate that Maxwell at least is entitled to a hearing.

There is no merit to the government's assertion that Maxwell is not entitled to a hearing because she has not submitted an affidavit in support of her Motion. An affidavit is not a prerequisite to a hearing when the government has confessed the existence of facts sufficient to entitle a defendant to an evidentiary hearing.

Nor is an affidavit required when information at issue is peculiarly within the possession of the government (*e.g.*, AUSA ▮▮▮▮ and AUSA ▮▮▮▮) or others who are adverse to Maxwell (*e.g.*, Boies, Edwards, Skinner, Pottinger). *See Cortina*, 630 F.2d at 1216 ("The violation here is particularly insidious because it is difficult to uncover misrepresentations in an [*ex parte* submission]. The information needed to prove such assertions false is peculiarly within the hands of the government."). Since Maxwell was not at the February 29 meeting or copied on any of the emails or communications that followed, the Response does not explain how Maxwell could possibly submit an affidavit attesting to the government's misrepresentations based on personal knowledge.

①

P. Skinner                    2/29/16
Brad Edwards
Stan Pottinger
A. Kramer (notes)

                             Re:
                             Virginia Roberts
BE - rep. Virginia Roberts      (who now lives in
SP - rep. Virginia          ███████████)

Long history of litigation

BE

Init. inv. into Jeffrey Epstein was done by local Palm
Beach P.D. ≈ 2005
- rounded up app. 24 girls molested by JE
- represented about 10 girls
- JE's MO - w/ adults they'd tell 13 yr. old girl *come to
rich guy's house to give paid massage. JE naked -
starts as massage & extension demand of sex acts
(if you want $, do x). After paid $200/300 +
they're offered $200-300 finders fee. Victims recruited
other victims. Mother complained + involved PD.
- PD turned case over to FBI + USAO. Most of
girls (appr. 40+) in FL. No flight logs.
Issued GJ subpoenas. Epstein + 4 named co-conspirators
Entered into a non pros w/ guilty plea to state ct. to
2001-2007      procuring minor for prost. + immunized
        from fed. pros. for sx crimes comm. in FL
        b/w 2001 + 2007
- Jerry Lefcourt, Jay Lefkowitz, Ken Starr, Roy Black, ⟩ Epstein
Martin Weinberg, Guy Lewis - never Jerry Shargel ⟩ counsel
- SDFL - at off. Palm Beach. Marie Villafagna.
     Alex Acosta US Atty.
- Limited to FL in mos.

②

- US Attorney has said cald be prosecuted elsewhere
- Agmt. under 2255 if victim elect to proceed
  under 2255 + forfeit civil remedies Epstein must
  pay stat. min. 50K or 150K  At least 12
  proceeded under that provision
- Named

[redacted]

Ghislaine Maxwell - daughter of Robert Maxwell
        head recenter

- Evidence = 2000(Virginia roberts - her case unknown
         ② time)
      - NO END?

[redacted]

③

Virginia Roberts
- victimized summer 2000 @ age 16 ( ▨ ) - about to turn 17
- taken to NY for training by Maxwell + Epstein - how to sevice men
- in civil case, got records corr. her on his plane
- she goes to private island Little St. James - USVI
  - few miles off St. Th
- Virginia said that in affidavit - same thing happening
- 2000-2002 was live in sex slave - for Epstein + others.
- Promised educ. in maar. ther

④

- @ 18 told by Epstein too old
- ② turns 19 went to Thailand to get underage girl
  + fled to ████████ where lived for a decade.
- filed curr lawsuit in 2015 - defamation suit
  against Maxwell
- she went public by atty. declaration in FL suit
- FL suit - pro bono - crime victims rights act -
  against USAO b/c they didn't interview
  girls
- Virginia Roberts moved to join those suits

- in 2011 a British reporter found her + interviewed her
  about Prince Andrew. Also said met ████████
- said was Epstein sex slave
- 2011 was first atty. of her.
- FBI went + interviewed Virginia - FL FBI -
  302 FBI FL wants to pursue inv.
  Agents Jason Richards + Nesbit Kirkendal

Virginia

████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████

⑤



- 2010 - civil depos. A Epstein former butler
Alfredo Rodriguez Bel. Epstin + Maxwell were
going to kill him. Downloaded their black book.
Bad went to FBI, made controlled calls, they
arrested him + he went to prison for obstruction.
Pled to corp. agmt + blew deaf b/c
he was selly AK-47s.
- tried to sell Book explained how it all worked
in recorded mtgs. FBI agent ___ interview
- Rodriguez died in jail.
- Agent filed affidavit in obstruction case.
- Epstein's lawyers said his property

1997 - JWS flight logs + manifests

CP - Virginia

- Have been told Epstein had photos in house in PB + NY+
USVI
CP? - One photo is a photo of Virginia w/ another girl - naked
+ in sexual pose - on his wall - "artistic" - visible
genitals

(6)

- Photos of naked girls on Maxwell's comp.

* SW executed on PB house. Collage of photos included
  nude girls incl. clients. Epstein tipped off. All computers
  were gone.
- Virginia says cameras all over NY house. She believes
  they were used for extortion or bm by Epstein. When led
  out 6 other men had to report back.
- Videos recorded in bathroom. - recording? security?
- Maxwell + ▮▮▮▮▮▮ took sexually explicit photos of her
  regularly
- Maxwell gave photo to Epstein for bday @ age 16.
- Photo hung in one of the homes
- Saved on computers.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

- Subp. issued for computers

Registered as sex offender in FL
          level 3
USMS  Registered in NY
      - Depart by private jet

- Sex acts on planes -

Manhattan



Virginia wants prosecution. [redacted] feels oblig. to do
something about it.

From 2014/2015, she believed it was summer 1999.
As it turns out, it was summer of 2000.

She has lawsuit against Maxwell for defamation. Truth
is defense.

She wants settlement/neg. into nonprofit to help girls
in same situation
   - of attorney.                          admit ????
Her father negotiated a settlement w/ Epstein + she
has a confidentiality provision limiting amount.
Epstein's attorneys reached at + neg. settlement.

Did FBI search his planes? Did they find hidden
cameras?

Concern active pedophile.

Pitch to other prosecutors? no
Book deal? not now
   - 20/20 interview last spring > ABC killed it - lawyers pulled it
[redacted]                                      but they still
                                                have it
Have portions of diary



- They will send me affidavits + deposition

- Blond, part. size + shape.
- Wanted to have baby w/ her -
- Same MO w/ one other victim - 17 yr. old - emails w/ her

- As young as 12 but younger the better.

Virginia emailed Epstein
Thailand - mm charges + handwritten note w/ name of
          girls - written by Maxwell.

**Brad Edwards**
Trial Attorney

Farmer, Jaffe, Weissing,
Edwards, Fistos & Lehrman, P.L.

Mass Torts
Class Action
Personal Injury
Wrongful Death
Whistleblower Cases

WWW.PATHTOJUSTICE.COM

STAN POTTINGER

J. STANLEY POTTINGER PLLC



# EXHIBIT 19

# Russell Adler Part 3 - "Interesting Lawyers Podcast"
## Unmasking the Enablers: Epstein's Financial Ties Exposed

435 views  May 14, 2024 .



so I was calling the prosecutors and saying I hope you get him

8:03 / 51:10

This is the final part of Russ's 3 part interview with Bradley Edwards, the relentless lawyer representing 250 victims of the Jeffrey Epstein- Ghislaine Maxwell sex trafficking scandal.

In this episode, Brad Edwards shares incredible stories about how Jeffrey Epstein blackmailed people, how he created a moat made of sea urchins to assure that nobody escaped from his private island, how Epstein's relationship with fellow pedophile Harvey Weinstein ended over a victim, and the class action lawsuits Brad filed against Epstein's banks, J.P. Morgan and Deutsche Bank, for knowingly supporting and enabling Epstein's sex trafficking empire.

[Also hear the shocking facts behind Brad's recently-filed sex trafficking case against Abercrombie and Fitch, whose CEO engaged in sex trafficking of young boys with the promise of becoming Abercrombie model. ] TRANSCRIPT ENDS WHEN THIS PART OF THE TRANSCRIPT BEGINS

0:01 RUSS ADLER (HOST) some other offshoot cases as a result of the Epstein litigation that you were involved in then you brought were a series of defamation cases against people so categorically I know you sued gain Maxwell for defamation; I know that you suit Alan Dershowitz for defamation, how many defamation cases did you guys file?

0.20 BRAD EDWARDS: I think that those are the only two related defamation cases, I had the malicious prosecution case against Jeffrey Epstein which was similar but different and with defamation case the devil's in the details but the broad strokes were

Russell Adler Part 3  - "Interesting Lawyers Podcast"
Unmasking the Enablers: Epstein's Financial Ties Exposed

435 views  May 14, 2024 .

yeah what were the theories of those cases?

BRAD EDWARDS:  so we represented one of the victims that we represented I think we started representing her 2014 or so was Virginia Roberts and Virginia Roberts was one of the minor victims under 18 victims that traveled nationally and internationally on Jeffrey Epstein's plane. There was hard evidence of him trafficking miners across state and international lines. So she was an important client of ours, became a good friend of ours and we represented her as she wanted to get into the crime victims rights act case and help us to invalidate the Jeffrey Epstein's non-prosecution agreement. So that was initial context

1.15  HOST: to invalidate the sweetheart agreement he reached before you ever got involved in his case.

1.20 BRAD EDWARDS:  Exactly. Because one of one of the defenses to the government was was lodging was the girls were all coming to Jeffrey Epstein's home locally, it wasn't nationally or across borders, yet that defense was a lie.  They knew about Virginia Roberts they knew about her travel they knew all of these things but they also knew Virginia Roberts had escaped to Australia so she likely wasn't going to surface and  throw egg on their face.

But here she was she surfaced she had become a client of ours and so we were moving her into the Crime Victims Rights Act case and one of the things she said was that I'll get the quote wrong but one of the things said was that Jeffrey Epstein and Ghislaine  Maxwell had sex trafficked her. she was a victim of sex trafficking by both of them.  Now Jeffrey Epstein was smart enough not to respond but Ghislaine Maxwell wasn't.  She responded by saying essentially 'she's a liar'. That's not true so we filed.  Now the statute of limitations had run on filing a sex trafficking or sex abuse case against Ghislaine Maxwell but a defamation case hadn't because that is from the time  that the defamation occurs. Ghislaine Maxwell calling her a liar it then pitted was Virginia Roberts telling the truth that she was a sexual abuse victim and sexual trafficking victim of Ghislaine  Maxwell and Jeffrey Epstein or was she
telling a lie and in which case there would be a defense to the defamation case.  So we sued Ghislaine  Maxwell for that and but really at the heart of it is Ghislaine  Maxwell a sex trafficker? I'll tell you during that civil litigation and only during that civil litigation we uncovered all of the people that ultimately, when I say all, every single victim that testified as a victim or a witness against Ghislaine Maxwell in her ultimate criminal trial years later in 2020 we discovered them during that defamation case that started in 2015.
But for Ghislaine  Maxwell making that statement that Virginia Roberts was a liar there's no way she would be in prison right now. zero chance.

2

Russell Adler Part 3 - "Interesting Lawyers Podcast"
Unmasking the Enablers: Epstein's Financial Ties Exposed

435 views  May 14, 2024 .

3.28 HOST: Wow
BRAD EDWARDS: Every single one of those Witnesses was us turning over every stone to
prove Virginia Roberts was telling the truth when she made the statement.

3.39 HOST: Incredible it's just funny how things turn out sometimes right>

3.42 BRAD EDWARDS: yeah

3.44 HOST: Yeah, they yeah they say that prisons are full of people who thought they could get
away with it and she's clearly one of them. My thought about her is that 20 years is very nice but
not enough for her.
    3:54
BRAD EDWARDS: I, I agree with you yeah I agree with you because I I've said said this before
too, but for her influence, Jeffrey Epstein never becomes the serial abuser that he did become he
always wanted to, but without her influence and her connections he never could have done it and
4.19 HOST: And as I said at the beginning of the show Brad, today, but for your tireless efforts
and Britney's tireless efforts but for that persistence and that grit that you demonstrated they
might still be doing it today, both of them.  Epstein and Maxwell.

4.35: BRAD EDWARDS: Without any doubt without any doubt when we were, when we
instigated the uh New York investigation that had him arrested and we worked all of us
very secretly before he was arrested that was one of the scariest times of the case I don't think
that any other lawyers would have done what we did because it was a very risky operation
that we were involved in

HOST: in what way?

BRAD EDWARDS: So it's 2000, it's the end of 2018, Jeffrey Epstein apologizes to me publicly
for, for - as part of the settlement to the malicious prosecution - and he said to me I have a
divorce from you now, like I'm done with you; and I think that most people would have let it go
but I took that as look he's not going to see me coming anymore it's time now to to not only
investigate, but unveil what he still doing, which is international sex trafficking.

5.33 HOST: he was still doing it?

5.34 BRAD EDWARDS: Oh still doing it till the till literally the trip that he was arrested on he
was still doing it to the very end

Russell Adler Part 3 - "Interesting Lawyers Podcast"
Unmasking the Enablers: Epstein's Financial Ties Exposed

435 views  May 14, 2024 .

5.39: HOST: and where was he trafficking these people to these underage

5.42 BRAD EDWARDS: So he changed a little bit once he went to to jail in 2008 he gets out in 2010 and what he decides

HOST: He gets out from spending weekends in the Palm Beach County Jail

5.33 BRAD EDWARDS: Not only spending weekends in the Palm Beach County jail but engaging in illegal sex on work while he's on work release at his office

HOST: during the week?

BRAD EDWARDS: yeah with victims when when he was released his "work" was only engaging in illegal sex with victims of his

6.06 HOST: I know they let him hang out at some oceanography office or something yeah some BS office but that's what he was doing

BRAD EDWARDS: That's what he was doing the Florida Science Foundation the Florida Science Center that was his company that he established for his work release was really just a place for him to go and make sex abuse and sex trafficking victims engage in sex with him while he's wearing his ankle monitor that's all that was happening there was no other, there was no other productive business going on but I digress.  Um when 2019 we start working with the Southern District of New York - we had great prosecutors that were really listening to - Alex Rossmeyer [spelling?] I think is one of the very best prosecutors I've ever worked with him and Alison Moe and Moreen Comey were all in on the idea that if he's still trafficking we're going to get him and so we started pulling together some of our clients that 1) we knew were were strong victims that would hold up in court, and 2) they wouldn't get frightened off and and during that period of time I was still meeting with Jeffrey Epstein like why was I still meeting with the case is over because the Crime Victim Rights Act case was still annoying Jeffrey Epstein because remember by that time the point of the Crime Victim Rights Act case was to invalidate his non-prosecution agreement which he was scared of so he would call me and meet with me at Starbucks during that six months period of time before he's arrested in 2019 and he started getting paranoid he was look over my shoulder and saying who's that guy in the parking lot as if I have people watching him which, it's just random people so I knew this is not Jeffrey Epstein the one who is always in control he's losing it, like he thinks something is about to happen and he said 'look I'm getting rumors that the FBI is looking at me again why?' and I said oh that's only because we're trying to work out a settlement with the government on the Crime Victim Rights Act Case which wasn't true but I was trying to give him a reason why cuz he had sources in the

4

Russell Adler Part 3 - "Interesting Lawyers Podcast"
Unmasking the Enablers: Epstein's Financial Ties Exposed

435 views  May 14, 2024 .

FBI why people in the FBI looking at him so I was calling the prosecutors and saying I hope you get him arrested soon because it's getting scary .

8.06 HOST: What do you mean he had sources in the FBI

8.08 BRAD EDWARDS: Oh my God he knew information every single time that I went to the FBI he would know about it before I got back to my office he would call and tell me about it there was a time we called the FBI in 2000 and _ [ISABEL does not finish saying the exact year] and we're going to bring Jean Luc Brunel who was another recruiter he used, bad guy who ultimately also got arrested for sex trafficking of Virginia Roberts. We we did an interview with him in New York and called the prosecutors and said we want to bring him in tomorrow morning to tell you about the ongoing Jeffrey Epstein sex trafficking operation. It was not five hours later that we got a call from Jeffrey Epstein's lawyer saying 'we hear that you're bringing Jean Luc into the office tomorrow tell John Luc that if that happens he will have waged war against Jeffrey and he knows what that means'. Jean Luc didn't want any piece of that and left. It was right away as soon as information went to the feds Jeffrey Epstein had it it wasn't until Alex Rossmeyer and that crew of prosecutors and the FBI agents at the very end knew that they had to really protect this investigation, that they were able to pull it off without him, without Jeffrey knowing exactly what was going on.

9.26 HOST: To complete their investigation, to iinpanel a grand jury and to get him indicted ultimately and arrested

BRAD EDWARDS:yeah

9.37 HOST: Amazing amazing story I know you had some other offshoot cases against multiple other people associated with Epstein about 25 or so you told me. friends Associates who are these people generally you don't necessarily have to put a name on it, who are they and and what sorts of things did you go after them for doing?  yeah so

9.54 BRAD EDWARDS:  Yeah, so I, I would couch it this way is that there there was always this there is always this uh talk about when is the Jeffrey Epstein list coming out and I think the public believes there's like a list of Epstein clients as if Epstein was sending girls to people to collect blackmail it's not really true in that extreme sense but I will tell you what he did do when

Jeffrey Epstein was tired of certain of the girls that he was abused abusing and by tired, I mean they had aged out,  Jeffrey Epstein likes a certain age range but

Russell Adler Part 3  - "Interesting Lawyers Podcast"
Unmasking the Enablers: Epstein's Financial Ties Exposed

435 views  May 14, 2024 .
HOST: Once they turned 18 he was not interested in them anymore?

10.30 BRAD EDWARDS: it wasn't actually 18.  So if he started abusing somebody at 16
sometimes he would abuse that person till they were 24 25 years old in in very and as they got
older the abuse would actually get worse take their passports threaten them with
immigration problems, use more force get them isolated on the island, the abuse was
nastier much more egregious as they got older because he knew he had to exert a different level
of authority to gain the same level of control - as people get older and mature they they start
using resources to get away, he would then just disarm them of all those resources so he had to
be more aggressive with them and that was just his pattern but as somebody got older and he said
you know what now this person don't more no no longer useful for me here I'm going to, I'm
going to act like I'm giving them a break and allow them freedom from what is this kind of sex
and slavery. He would send them to certain friends. Now he did have ulterior motives there
it wasn't to be kind to his friends like it was a gift it was to ultimately have this victim to bring
him information back that he could use if necessary not a whole lot of evidence that he actually
had to use it but there's all kinds of evidence that these individuals, when they found out hey this
is a really bad guy, they couldn't do anything about it they couldn't report him because now he
had some blackmail on them

12.00  HOST: he had information on them for future negotiations as we say

12.02 BRAD EDWARDS:exactly and whether he actually had to use that for future negotiations
who knows, but he got a lot of business deals done that he otherwise probably wouldn't have
received but for accumulating dirt on these various individuals.  So let's just say that over the
years there's 25 of those individuals.  Several of those people legitimately - we tried to do what
was right investigate the bad guys investigate the good guys, but if we learned that they were
good guys shaking somebody down because they happened to accidentally purely accidentally
do something with somebody who was an adult that that we thought that they that they may want
to pay their way out of that wasn't really that's not us, that's not who we are so it was try to focus
on of these 25 guys who knew at the time that Jeffrey Epstein was a bad guy who knew
that he was controlling these various women,  who knew that these women were actually his sex
slaves, or who actually believed they were in New York wanted to go out on a date
treated it like a date worked up a relationship - that's a different category of person - so it took us
a long time to investigate who was who but also our clients helped us because they would say
'look I have a relationship with this now very famous or very powerful person and it's very good
I could call them on my cell phone right now he never mistreated me he didn't know what was
going on'  so they also steered the ship.

Russell Adler Part 3  - "Interesting Lawyers Podcast"
 Unmasking the Enablers: Epstein's Financial Ties Exposed

435 views  May 14, 2024 .

I would say of those 25 10 to 15 were had bad motives and with any of them we always told each
client look we can launch a war right away uh a war meaning litigation yeah war meaning
litigation you have a lot of power on the other side but we have the facts we have the evidence
and we're ready to go but also you got to figure out what stage you're at in your life when many
of them wanted to move on they wanted it to be confidential but they wanted somebody to be
held responsible and so we worked up uh confidential settlements and I think I'm not a big fan of
certain circumstance and this was the right circumstance where many of these people had been
through real hell with Jeffrey Epstein and now it was these offshoots as you call them and they
say look this guy's a bad guy but he's not as bad of a guy it's not something that the prosecutors
are ever going to arrest the person for it's not that type of criminality but it's something that from
a civil aspect I'd like for that person to be held responsible and we did I think a very effective and
good job of making that happen and carrying out the interest of our clients there are
still people that I personally think should have been exposed

14.51 HOST:  But not at the expense of your client wishes like

14.58 BRAD EDWARDS: client comes first and then I did think there were certain that should
have been exposed and I think that that's going to be one that's going to happen in the
next month that really should be exposed and will be so it's a lingering case that's about to kick
off  [ ISABEL - MAYBE THIS IS LEON BLACK? I HAVE TO CHECK!]
15.11 HOST:  I reserve the right to bring you back on a future episode so we can talk about that
when it comes out let's talk about

15:16
BRAD EDWARDS: I can't wait

15.24 HOST: When it comes out you know you're always welcome here because Britney's
coming back anyway

BRAD EDWARDS: right

15.22 HOST: let's talk about Harvey Weinstein he knew Epstein?

15:24 BRAD EDWARDS: he did know Epstein and
HOST:  talk about that please
BRAD EDWARDS: yeah the interesting thing is the way that I found out that Harvey
Weinstein knew Epstein was from Epstein Epstein called me when Harvey when it first was
hitting the media that Harvey was this kind of predator in the movie industry and he called me
and said look see what you're doing to me Brad you're putting me in a

Russell Adler Part 3 - "Interesting Lawyers Podcast"
Unmasking the Enablers: Epstein's Financial Ties Exposed

435 views  May 14, 2024 .

category that's worse than this guy let me tell you worse than Harvey worse than Harvey
Weinstein and I've known Harvey for so long and I've known that he's a bad guy I've known that
he was a predator and I think that what you' have done then is turn the world against me to see
me in the same light as him and I said I didn't know that you knew each other and
he went on telling me various stories of Harvey Weinstein being a bad guy but basically in
generalities and then it was not that long after that I got a call from one of our clients [ISABEL. this
is ▓▓▓▓▓▓ saying hey I had an interaction with Harvey Weinstein when when I was very
young and here's how the interaction went - I was 18 years old just flown to France with Jeffrey
Epstein under under coercion and duress at all times my entire life was controlled by Jeffrey
Epstein and he said I have another I have a friend a close friend of mine in a room, go give him a
massage and I this is the girl talking, says I went in to give him a massage and he threw $20 at
me and said you're going to fill in the blank with sexual acts and she said no and ended up
running out and telling Jeffrey Epstein who went,  Jeffrey then went back in the room kicked
Harvey out of his house said get the F out of here and that was also the when I later told Jeffrey
hey I know this story about this other victim he said yeah that's one of the examples where I was
the good guy I protected her against Harvey Harvey was this pig of a person and she wasn't the
only one of Jeff enslaved girls that Harvey at least attempted to sexually assault

17.41 HOST: wow bad guys know each other I guess so Harvey Weinstein''s in prison but for
his own misdeeds not for anything directly connected to the Epstein cases

17:46 BRAD EDWARDS:  Yeah yeah in fact I think that all of his attempts I don't think that
he he accomplished any of them and that one treating one of Jeffrey Epstein's girls like too
cheap is what offended Jeffrey Epstein  and that's what ended the relationship

18:05 HOST: Wow that's pretty incredible by the way you mentioned about Epstein's house
in the Virgin Islands I always found that to be quite ironic that's the name of the place
where his island is,  you've been to that Island yeah tell tell us about that

18:23 BRAD EDWARDS: When  Britney and I flew down to uh the US Virgin Islands to attend
the probate hearing and ultimately it turned into our meeting with the attorney general we
decided we were so close that we had to go see the island so we contacted a guy who runs a he
has a boat him and his wife run this like day trip where they travel yeah Charter but they it's not
for fishing or anything it's just to travel around the islands and we said how close can we get to
Jeffrey Epstein's Island and he said you can get about 500 yards and we could let you take
pictures we didn't tell them who we were

19.00 HOST: and by this time Epstein was dead

Russell Adler Part 3 - "Interesting Lawyers Podcast"
 Unmasking the Enablers: Epstein's Financial Ties Exposed

435 views  May 14, 2024 .

BRAD EDWARDS: yeah this time he just had died so this is it could be end of 2019 or beginning of 2020

19.10 HOST:  but you were down there in connection with the probate proceedings in the Virgin Islands and,  about his over his estate

BRAD EDWARDS: yeah exactly

HOST: okay yeah

19.24 BRAD EDWARDS:so the Island's like possession of the estate at that point he's dead so we get on this Charter and it's just Britney me and this husband and wife and we're driving over to his Island and Britney goes up and hands the uh the the boat captain her phone and says hey I want you to just take pictures of us but still doesn't tell him anything and she brings to me these flippers and she says hey look we're so close don't you think that we have to go there said yeah I can't look at this and think all of these clients have told us the hell that it is on the island the isolation the I can't escape don't you think that we have to at least be there to see if we can experience what they're even talking about like what that isolationism even feels like she said no doubt I said these people are going to be so mad they might leave us like we might be stuck on this island forever.  She looked over and she says I think we can swim I think we can get back to shore like all right cool,  so we put on these flippers and the boat captain says wait what are you guys doing you can't swim here we literally just dive off of the front of the boat swimming towards the island and she and Britney yells back just take pictures so we end up getting pretty close I take off my we both take off our flippers and step and we both step on sea urchins and then I remember our client saying so that girls could not escape the island Jeffrey put sea urchins in surrounding the island it's true

HOST: wow true unbelievable

20.55 BRAD EDWARDS:I was like oh my God how are we going to get there so we end up putting our slippers back,  on stepping on sea urchins, getting on to the island and the boat captain took a picture of us sitting on a bench on the island from the boat.  He still wasn't happy but he did capture it

HOST: incredible and that really probably brought a little bit of closure

BRAD EDWARDS:it did

Russell Adler Part 3 - "Interesting Lawyers Podcast"
Unmasking the Enablers: Epstein's Financial Ties Exposed

435 views  May 14, 2024 .

HOST: to be on this island that had played a part in these horrendous things that had happened with this moat of sea urchins

21:21 BRAD EDWARDS: An eerie feeling and uh a true appreciation for the, of, of any of the victims there, there's nothing that anybody could have done to escape whatever he wanted to do to him once there.

21.16 HOST: incredible Brad let's talk about the class action cases that were brought by you and David Boies who I know you brought in as co-counsel on these cases against JP Morgan which ultimately settled for $280 million as well as another class action against Deutsche Bank which ultimately settled for $75 million.First of all talk about about those cases and what specifically was your legal Theory against those uh companies.

22.14 BRAD EDWARDS: during the Epstein victim claim program where we represented 71 or more victims in the program we learned so many more details as we were getting more information from victims and one thing that struck us was all of the minors Jeffrey Epstein is paying $300 $400 of cash every single person he's also paying he's also engaging in this illegal sex three times a day he's also paying their recruiters $300 or $400 a day

HOST: three times a day was three

BRAD EDWARDS: three times a day was his routine

HOST: that was his like his M.O. like wow.

22.46 BRAD EDWARDS: Every day abusing three different girls a day at least, at least, so if he's paying in cash the victim and the victim recruiter and there's up to six of them a day that he's paying $300 a day he has to have access to a lot of cash, at a time period where people aren't carrying that much cash. He has to have thousands of dollars going out every single day which in the aggregate means somebody is giving him a lot of cash - there has to be a follow the money here. We also started meeting a lot of Eastern European women who are being sent wire transfers. I'm going okay wait after he's a registered sex offender he gets out of jail and he's still getting access to tons of cash, he's also making wire transfers which seem to be dozens and dozens of young females - isn't the, what is the bank doing?

23.38 HOST: young females in Europe who he would ultimately traffic over to the United States and for more of the same

10

Russell Adler Part 3  - "Interesting Lawyers Podcast"
 Unmasking the Enablers: Epstein's Financial Ties Exposed

435 views  May 14, 2024 .

23.45 BRAD EDWARDS: yes exactly. So we thought the bank has to have known what Jeffrey
Epstein has been up to for a long period of time.  Why would they tolerate this,  and the answer
has to be he's bringing them a lot of money so then we start researching some of his high net
worth friends and reading about business deals with them that he's engaging in and thinking okay
wait,  I bet he's also bringing accounts to the various Banks so I had this idea that Jeffrey Epstein
could not have operated this particular type of sex trafficking operation where you need access to
a lot of cash and you're able to wire transfer either to victims who people we know are sex
trafficking victims or their schools their their ballet programs whatever it is without everyone at
the bank on the top levels knowing what he was doing he needed a financial infrastructure.  The
banks provided the financial infrastructure for a known sex trafficking operation what we also
had going for us is everybody said everybody asked the question where did Jeffrey Epson get his
money - forget that question. What did Jeffrey Epstein do for a living?  All he did was sex
trafficking,  that's all he did,  there's no legitimate business that he did.  Now we ultimately found
out that he was just a a high-level grifter con artist of of other billionaires,  but mainly on a
day-to-day basis he was only concerned with sex- sexual abuse and sex trafficking.  So the
theory was let's file the lawsuit against Deutsche Bank and JP Morgan knowing that those are his
two primary Banks he used JP Morgan from the 90s through 2013 and then he switched over to
Deutsch bank from 2013 to 2019 and file it as a class action because
what they did the bank did is the same they provided him the money he needed to operate the the
operation and what we found during the case solidified every belief that we had and then some

25.50 HOST: Quick quick question for you I know that for these ultra high net worth individuals
Banks treat them differently than they might treat me or anyone else and they assign handlers
people to watch over their money yeah to see what they're doing to make sure that the bank is not
complicit in some kind of organized crime scheme or anything else is that generally the way that
they're set up and structured?

26.12: BRAD EDWARDS: Yes,
HOST: did he have handlers many at these banks?

BRAD EDWARDS: Many at the highest levels

HOST: and so how did that turn out once you got into these cases how
much did they really know?

26.26 BRAD EDWARDS:  They knew everything they, in fact JP Morgan knew more about
what Jeffrey Epstein was doing and with whom before the Palm Beach Police investigated in
2005 than anyone else in the world because they actually opened accounts for many of Jeffrey

11

Russell Adler Part 3  - "Interesting Lawyers Podcast"
 Unmasking the Enablers: Epstein's Financial Ties Exposed

435 views  May 14, 2024 .

EP several of Jeffrey Epstein's victims they they handled not only Jeffrey Epstein's personal accounts but dozens of companies that were shell companies that were just moving money around that had no legitimate purpose and for a bank you have know your customer laws they didn't know any of their customers they they knew Jeffrey Epstein they no Bank employee none could tell us what Jeffrey Epstein did legitimately you can't have a 20-year banking relationship with somebody that's a billionaire and have no idea how he made his money or what he was doing on a daily basis but also in your banking records see that he's withdrawing tens of thousands of dollars of cash every week to the point of to the to the tune of he was withdrawing cash on an average of greater than a million dollar a year a million dollar a year in cash when I say cash,  I'm saying dollars like $20 bills why would you need that much cash on top of that remember he gets arrested in Palm Beach in 2008 and the Palm Beach police report comes out saying he's using this cash to pay victims and recruiters at that point in time JP Morgan knows what he's doing right he's still after he gets out of jail still withdrawing that type of cash

HOST: and they still kept him as a depositor

27.57 BRAD EDWARDS: Not only kept him as a depositor, they assigned their number two at the whole bank at JP Morgan Jeff Staley to be his Handler. Jeff Staley then became a friend of Jeffrey Epstein's. He came down while Jeffrey Epstein was in jail he maintained communication with Jeffrey Epstein while Jeffrey Epstein was on work release here. He went to Jeffrey Epstein's Island, he went to Jeffrey Epstein's Palm Beach house. He visited very frequently Jeffrey Epstein's place in in Manhattan, so they became even tighter friends after Jeffrey Epstein was convicted and pled guilty in Florida, and continued the operation right when Jeffrey Epstein got out of jail in Florida, hit the ground running sex trafficking all over again he couldn't have done it without JP Morgan now in 2013 JP Morgan uh realizes, hey there's no way that we as a bank are going to be able to justify the amount of cash that this guy's pulling out after we know that his sex trafficking scheme involves a lot of cash,  so they kicked him out of the bank

29.02 HOST: yeah but until before that happened for years and years 20 years they knew everything that was going on 20 years yet they kept him as a client they didn't have to but they did and I take it that the answer the obvious answer is because he had so much money on deposit with them

29.20 BRAD EDWARDS: He had so much money and he had he did have many connections he brought them a lot of business he connected them with some of the world's most most powerful and wealthiest people he really did have those connections behind the scenes seeing the the thousands and probably now hundreds of thousands of documents that we have access to - some

Russell Adler Part 3  - "Interesting Lawyers Podcast"
Unmasking the Enablers: Epstein's Financial Ties Exposed

435 views  May 14, 2024 .

of it was a facade but some of it wasn't. Jeffrey Epstein truly had more powerful connections than I think anybody else, maybe on the planet because if he was communicating with a foreign Prince or a prime minister, those individuals would be coming to Jeffrey Epstein for connections.

HOST: he would hook them up with the banks

BRAD EDWARDS: He would hook them up with the banks and he would hook them up with other individuals that also could then be hooked up with the banks so whether it was direct connection or indirect connection There Was You Know seven degrees of Kevin Bacon it was like seven degrees of Jeffrey Epstein there was some way that the bank was going to be rewarded for keeping Jeffrey Epstein on as a client. Now what I was going to tell you is when he leaves, JP Morgan fires him, Jeffrey Epstein realizes that one of his prior bankers at JP Morgan has gone to Deutsch Bank contacts that guy who then picks right back up with the exact same infrastructure needed for Jeffrey Epstein to continue running his operation and this time so that he would stay out of the limelight, he turns his focus almost exclusively to Europeans, to Russians Ukrainians girls,

HOST: you're talking girls

31.06 BRAD EDWARDS:Yeah and he deviates slightly in his operation but ultimately it's recruiting young girls from over there 18 or over but very young 18 to 20 was his range telling them that he could get them into the modeling industry bringing them over from Eastern Europe paying them through Deutsch Bank accounts and then taking their passports and essentially enslaving them they couldn't do anything he could get them kicked out of the country he would set them up with modeling gigs or not and in exchange they had to do whatever he wanted so he ultimately came more and more ruthless when he realized hey somebody separated from their parents by a lot of distance and he capitalized on that so he never changed his ways till literally the day that he was arrested.

31.52  Brad as I'm listening to you the one word that keeps going through my mind is evil, pure evil.

32.00 BRAD EDWARDS: oh yeah as evil as it gets and you'd never know it by looking at him if you didn't know who he was you look like a normal guy but that's what's so evil about him he's so charismatic he's a chameleon he becomes whatever he needs to with everybody in the room but he has no conscience whatsoever which makes it very easy for him to pretend like he cares for everybody he was really good at trying to figure out like what does this person need to survive and what does this person want then that turns into what he can promise and that's the bait and once he had them there was no Escape no way out as a result of all of this you

13

Russell Adler Part 3  - "Interesting Lawyers Podcast"
Unmasking the Enablers: Epstein's Financial Ties Exposed

435 views  May 14, 2024 .

you've truly become an expert in sex trafficking cases sexual abuse cases and

HOST: 32:42 I'm very proud of you I've always thought that the most fulfilling type of cases that I handled as a lawyer over the 27 years I practiced were the sexual abuse cases whether I got money or didn't get money I was truly helping  these survivors deal with something that in many situations is even worse than death y they end up with these horrendous psychiatric problems with post-traumatic stress disorder which is like the gift that keeps on giving not a good gift and I'm sure that you see that play out to this day in a lot of the survivors no matter how much money they get that's one of the things that money just can't fix no it can't fix and as these individuals mature they encountered new problems as a consequence of the abuse as somebody gets at at the time when I meet them they could be at a certain stage in their lives, but then when they go to get married and it causes problems with their marriage it causes intimacy problems,  it causes trust problems with other relationships things that they don't know are going to be a problem until they actually encounter it years later after a case is over whether there was a case or not . that's something that's it's a lifelong treatment plan and

33:54 HOST:  I discovered all this when I was handling my Arch Diocese  cases and I saw you know I I represented a lot of men who had been molested as alter boys and they were still being affected by this and I learned that post-traumatic stress disorder the reason I say it's the gift that keeps on giving is because anything that happens in one's life that's out of the ordinary could be good could be bad could be a birthday could be a wedding could be a death or a funeral or an illness that can set them off and set them right back into this this this.

 34.34 HOST: Six months ago you filed a sex trafficking lawsuit against Abbercrombi and Fitch the retailer I did a little research about Abbercrombi and Fitch, this company was founded in 1892 by Abbercrombi and and soon Fitch came along and invested and they became an iconic sporting goods company and I used to remember I'm old enough to I don't know if you're old enough to remember this they had these great catalogs and they had all these great sporting good thingS, but just cool things cool new gadgets and that was their whole their whole business model clearly Mr Abbercrombi and Fitch must be turning in their graves over what that company became and what happened so could you take our listeners through your involvement in the Abbercrombi and Fitch sex trafficking case.  I know it got quite a bit of publicity when it was filed 6 months ago but not a lot since then so tell us what happened tell us what they did and bring us up to date

35.29 BRAD EDWARDS: Yeah. in the 90s the owner of Abbercrombi was Les Wexner who another friend of Epstein by the way who was Epstein's Mentor so in what way the only person Jeffrey Epstein looked up to was Les Wexner and Jeffrey Epstein was Les had

Russell Adler Part 3 - "Interesting Lawyers Podcast"
Unmasking the Enablers: Epstein's Financial Ties Exposed

435 views  May 14, 2024 .

ultimate power of attorney for Les Wexner. He handled all of his businesses Jeffrey Epstein was
Les Wexner's number one right-hand man - in fact a lot lot of Jeffrey Epstein's wealth is derived
from his relationship with with Les Wexner. what we did not know and never discovered while
investigating Epstein and only happened to to to discover when we started investigating
Abbercrombi is that Les Wexner also in running Abbercrombi was the boss of Mike Jeffers. He
made Mike Jeffers the CEO of Abbercrombi and Fitch. So Mike Jeffers is at at the helm making
a lot of money and Mike Jeff is almost solely responsible for changing the image, creating the
image that you just described which I, that wasn't my thing so I wasn't, I didn't know it then but
now I've done a lot of research and I see how the advertisement marketing changed for for
Abbercrombi but Mike Jeffers was married initially and then he started uh a relationship with a
man named ma Matthew Smith and they had a place in the Hamptons and on behalf of
Abbercromhi. Mike Jeffers would have model scouts scour the internet for
young models and basically pitch them once they found a model that he liked
that you could be your possibility for the Abbercrombi catalog which at the time was the biggest
thing that a male model could ever strive for and

37.19 HOST: I know this is I have a copy of the lawsuit that you filed and the way it's described
in your lawsuit is that he over sexualize these young men he was looking for these young boys or
young men to be Abbercrombi models and and back at the time that you're talking about now it
was a very hot retail brand it was a very successful marketing campaign and it created an entire
aura

HOST: right talk about that yeah exactly that's

37.41 BRAD EDWARDS: that also provided cover for what Mike Jeff was doing behind the
scenes so Jeffers is the head he he's as high as you can get at Abercrombie, if there's anybody
that can make Abercrombie happen for a young male model it's him; and so when a
male model has their pictures on Model Mayhem or one of these sites where they're trying to be
seen and recognized and one of Jeffer's people reaches out to him and says look you can I can
get you an interview with the actual CEO at his house in Abbercrombi interview and here's the
ground rules and it's almost the it's basically the same for every single one of them. Say David
Bradberry is our named plaintiff and he chose not to go under a pseudonym so we can talk about
that he's contacted he's made to wear Abbercrombi clothes he's even made to go by an
Abbercrombi store so that he could the flagship store in New York so that he
can be dressed appropriately for his interview at Mike Jeffer's house he's then taken to um have
to this interview at Mike Jeffer's house and him similar to the rest of the class members because
we did file this as a class action is interviewed initially by Mike Jeffers and also at times by
Matthew Smith at their house in the Hampton at their house in the Hampton at the end of the

Russell Adler Part 3 - "Interesting Lawyers Podcast"
Unmasking the Enablers: Epstein's Financial Ties Exposed

435 views  May 14, 2024 .

interview Mike Jeff and Matthew Smith always turn it into turn the situation from your normal
casual interview to, we have to see you naked into coercive sex acts with other men and
there are always other men in another room that are already engaging in sex acts and now this
model finds themselves there with no way to escape believing that they're there under this very
prestigious company and what's happening is they're forced into these sex acts now Mike Jeff did
try to have as many heterosexually identified men as possible because he thought they they're
less likely to tell on him which has taken a really long time from the time period that he was
doing these things which ended when he was terminated in 2014 till now when we're finally
catching up to speed with just how bad it was some of his strategy some of his
devious strategy was successful in that it wasn't reported for a long time the BBC so British
media they initially started investigating this when they they found David Bradberry and some of
the other victims that had been forced into this coercion of sex with Mike Jeffers and they asked
me whether or not this constituted sex trafficking in a general sense and asked me to just give
them my opinion and I did. Ultimately they ran a show over there and when it came down to it
many of the victims started calling saying hey look is this sex trafficking. I said this is absolutely
a sex trafficking I know the sex trafficking statute as well as anybody I've read it a million times
there is a civil component to it, can you just uh share with our listeners and viewers uh just a
basic definition of sex trafficking and then how civil people can be held responsible for that I
know there's Federal statutes I know there's State statutes but just give us the overall

40.54 BRAD EDWARDS: Alright the devil's always in the details but we won't get too deep in
the weeds here so under 18 USC 15 91 is the sex trafficking statute um causing an individual to
engage in commercial sex in exchange for anything if they are under the age of 18 sex trafficking
if they're not under the age of 18 causing an individual to engage in commercial sex through the
use of force fraud or coercion is sex trafficking you're causing somebody who's not a minor
through Force fraud or coercion to engage in sex here we have all of them you have fraud you're
promising them essentially that they could be an an Abercrombie catalog but it's a bait and
switch you're really just getting them to your house to engage in some sex acts or Force there
was force used or coercion and coercion is the reasonable belief that if they don't engage in sex
they would be subject to harm could be Financial harm reputational harm or other harm or not
being able to leave the country because he conveniently has

41:56

her passports exactly right next to their clothing so that's generally sex trafficking no case that
I've ever looked at more squarely fits sex trafficking than this one where he's recruiting models
from all over the place. He's only able to do that through his position at Abercrombie, he's
forcing them to wear certain clothing that's all connected to Abbercrombi and then he's forcing
them into these coercive commercial sex acts tell you what happened we filed the case you're
right it got a lot of attention also got the attention of law enforcement I think when we when I
and Britney were going after Jeffrey Epstein looking back a lot of prosecutors have egg on their

16

Russell Adler Part 3 - "Interesting Lawyers Podcast"
Unmasking the Enablers: Epstein's Financial Ties Exposed

435 views  May 14, 2024 .

face a lot of FBI agents have egg on their face why didn't you do something sooner this is something that Brad's been screaming has been happening with Jeffrey Epstein since 2008 right and

that was my sentiment the first time I ever looked at the evidence when I first got involved in those cases going so now we file a case and I think most look at us and go this is a law firm that cares about representing Crime Victims and doing right and never in it for the wrong reason if they say something happened it's because they have the evidence so the FBI opened up an investigation convened a grand jury and we actually learned that they and they started investigating the case I think that's all that I can really say I was

about to to go a little bit further but I don't think I can they started investigating the case so because the FBI is investigating the case and the Eastern District of New York is investigating the case. The defendants in our civil case have asked the judge for a stay, asked the judge to stop the civil case until after the criminal case is over I don't think that should happen but but it might but it might

HOST: I know that you sued but it's not a bad thing like somebody's being prosecuted fine we'll eventually get back to our civil case whether it's now or later they can delay the inevitable but we're eventually coming after him calls to mind the old saying ask Not For Whom the belt holds for thee and I'm sure they know that but you sued Abbercrombi and

Fitch Michael Jeffers, Matthew Smith his partner and the Jeff family office LLC what's that so a lot of wealthy individuals life gets complicated when they accumulate significant wealth they have a bunch of houses each one of the homes needs employees they have to have staff at each one of them they accumulate boats and planes and cars and other things that require essentially a separate entity a company to maintain it now within that company are emails exchanged and who's going to pick up some of the victims and who's going to take them here or there what money is going to be transferred it becomes a separate entity that is committing the crimes that's assisting facilitating the commission of the crimes the other thing about this is

individuals we know have a right to remain silent right they have a Fifth Amendment right right to in to invoke their right to remain silent corporations don't abomi for instance if we took a corporate representative of Abbercrombi's deposition they would not be allowed to take the fifth same with the family office they're going to have to put up an individual who's going to have to answer questions so but it it's a defendant right at the heart of the case and your lawsuit does talk about how this CEO Jeffers, uh he had basically unfettered discretion he ran that company he did whatever he wanted he was beyond reproach I know you normally answerable

to the shareholders when you're a CEO but he had cart blanch and I think that's part of your I know that's part of your reason about why Abbercrombi as an entity he was ABI yeah but he controlled it in every way and he used that as a vehicle to attract these young models and reading from the complaint here it says that was the case from the time that he conceptualized over sexualization of young men to catapult the Ambercrombi brand into success and

17

Russell Adler Part 3  - "Interesting Lawyers Podcast"
 Unmasking the Enablers: Epstein's Financial Ties Exposed

435 views  May 14, 2024 .

it remained the case when he used his role as CEO of Ambercromby to prey upon
attractive young men who believed that Jeff was going to hire them as an Abercrombie model the
pinnacle at the time of the modeling industry for men during the relevant time period does that
sum it up?
fu
46:26 HOST:  That does sum it up perfectly and that's exactly what he did he had like you say
car launch power to do what he wanted to when he wanted to do it with very little if any
oversight you you'd also mention to me another sex trafficking case that that you're involved in
involving some orgasmic yoga company or something like that

46.50: BRAD EDWARDS: Yeah we we tell us about that we filed a sex trafficking case against
one taste and then the owner of one taste has now been indicted on the sex trafficking charges so
that case also the defendants in our case have moved to stay it because there's a parallel
criminal case I also don't think that one should get stayed either but we haven't had the
arguments on it yet but again it's um they created a platform that was intended for Spiritual and
mental health and being and the allegations to the complaint are and and the indictment or they
used it to ultimately sex traffic those who who were involved forced fraud or use Force fraud or
coercion to cause them to engage in sex so that's still pending as well still pending as well so
these cases all seem to the Common Thread seems to be they go on for a long time they're
complicated, the civil cases are complicated by the pendency of criminal cases but I know you
work closely with the Department of Justice with the federal prosecutors to make that to make
Justice happen on the criminal side

BRAD EDWARDS: I think that what I've done probably different than most civil law lawyers
in a way that's been appreciated over time by law enforcement is to come in from the very
beginning and tell them that if you're represented by me the criminal case matters more uh
than the civil case does um and for our firm we care more about we care that the criminal case
is not negatively impacted by the civil case so if we get evidence on the Civil point during the
Civil Case we're going to wrap it up in a bow and we're going to deliver it to us to you we are
never going to do anything that's going to negative impact your case so if you want to work
with us and tell us what you need and what you don't need let me know that's what we're here
to do our firm is not about trying to pursue some Avenue to get some quick payout and move
on to the next case that's not how we practice that's not how we live and I think that's gone a
long way so now our relationship with law enforcement all law enforcement that we've
worked with federal and state I think is much different than most civil lawyers I think we have
a track record for putting our money where our mouth is and doing what we can to help
prosecutors and not get in the way

# Russell Adler Part 3 - "Interesting Lawyers Podcast"
## Unmasking the Enablers: Epstein's Financial Ties Exposed

435 views  May 14, 2024 .

49.02 HOST: I'd say but and at your relatively young age you've done so well you've had so many of these great cases

49.10 BRAD EDWARDS: I love what I do like Britney andI love and our whole firm has bought into we're a family as more than a law firm that care about each other but also just care about making the world a better place staying in our lane staying focused doing what we enjoy doing and to me there's nothing more rewarding than the fact that our former clients are some of our very best friends and we were able to start this Foundation *The Survivors Foundation* which is survivors of sex abuse and trafficking helping other survivors of sex abuse and trafficking it's it's right now Britney's like pride and joy all of our efforts are going into it but being a lawyer is so much fun you have so much power to do good and to off balance the power of bad guys doing bad if not us who else and if you're not going to do something relentlessly don't do it. So if there ever comes a point in time where it doesn't feel like we have the same energy and the same zest and the same relentlessness, we will stop. That day is not even close.

50.20 HOST: You've done so much for so many and I am so proud of you and all of your accomplishments and I honestly from the heart I just I feel honored and privileged to have worked with you at all even for the short time that I did.

50.31 BRAD EDWARDS: Me, I feel the same way and

HOST: I'm glad that helped make a difference in your life and your career and keep doing what you're doing because you're really one of a kind. Brad Edwards thank you so much for coming on the show I really appreciate it you're always welcome back.
    50:37
I'll see you on the pickle ball court soon if not the pickle ball court I'll see you when Britney's back here if you choose to come with her but I'd love to have you back in the future this is a Hot Topic in the world now for the wrong reasons and I also hope that in the way that litigation makes Society better and safer there will be more accountability there will be more safeguards and more steps taken to protect the vulnerable because really that's what you're all about

51.03 BRAD EDWARDS:Thank you Russell thank you so much
51.08: HOST  and that wraps this episode of the interesting lawyers podcast thanks for joining us see you next time

19

EXHIBIT 20

OPR that "he did not recall having read the NPA at this juncture and 'had no involvement with it.'" OPR Report at 64 n. 105.[7]

Beyond this, the OPR Report and the record in the civil case note contacts with Main Justice about the NPA, but only *after* the NPA was negotiated, drafted, and signed. In the civil case, the district court detailed the history of the plea negotiations—and noted that, after the NPA was signed, Epstein's counsel appealed to officials in Washington, D.C., hoping to avoid enforcement of the NPA's requirement that Epstein plead guilty to state offenses, as the agreement required. *Doe 1 v. United States*, 359 F. Supp. 3d 1201, 1212-13 (S.D. Fla. 2019). As the district court noted, that appeal was rejected. *Id.* at 1213.

In particular, and following the execution of the NPA, the report reflects that the USAO-SDFL contacted the CEOS Chief in connection with a letter from Epstein's counsel, Kenneth Starr, protesting about complying with certain parts of the NPA. OPR Report at 95. According to the report:

> At the same time, at [USAO-SDFL supervisor] Lourie's request, Villafaña sent the NPA and its addendum to Lourie and Oosterbaan. Oosterbaan responded to Lourie that he was "not thrilled" about the NPA; described Epstein's conduct as unusually "egregious," particularly because of its serial nature; and observed that the NPA was "pretty advantageous for the defendant and not all that helpful to the victims." He opined, however, that the Assistant Attorney General would not and should not consider or address the NPA "other than to say that she agrees with it." During her OPR interview, [Assistant Attorney General] Fisher did not recall reading Starr's letter or discussing it with Oosterbaan, but believed the comment about her "agree[ing] with it" referred to a federal prosecution of Epstein, which she believed was appropriate. She told OPR, however, that she "played no role in" the NPA and did not review or approve the agreement either before or after it was signed.

---

[7] The OPR Report further reflects that, at the time, a supervisor at the USAO-SDFL noted the CEOS had "no approval authority." OPR Report at 60.

12

The protective order, among other things, restricted the parties from disclosing discovery materials marked confidential to third parties, absent express permission from the Court.

In connection with the defamation suit, Maxwell was deposed by Boies Schiller, counsel for Giuffre, on April 22, 2016 and July 22, 2016.

On or about May 24, 2017, the parties entered into a settlement agreement and voluntarily dismissed the civil action. (*See* 15 Civ. 7433 (LAP), Dkt. No. 916). Boies Schiller has continued to represent Giuffre in post-settlement litigation. *Giuffre v. Maxwell*, No. 18-2868 (2d Cir.); *Giuffre v. Maxwell*, No. 20-2413 (2d Cir.).

## 4. The USAO-SDNY Commences the Instant Investigation in 2018

On or about November 29, 2018, the USAO-SDNY initiated its investigation into Epstein and possible co-conspirators, and formally opened the investigation by completing the requisite paperwork to open an investigation on or about November 30, 2018. The investigation was prompted by a series of articles published by the *Miami Herald* earlier that same week relating to Epstein, his conduct, and the circumstances of his prior conviction. *See* Julie K. Brown, "Even from Jail, Sex Abuser Manipulated the System. His Victims Were Kept in the Dark," *Miami Herald* (Nov. 28, 2018).[31] AUSA-1 was not involved in the decision to open the investigation or in the investigation itself. (*See* Ex. 4 at 6). Indeed, AUSA-1 stopped serving as the Office's Human Trafficking and Project Safe Childhood Coordinator as of April 2017.

Shortly after initiating the investigation, the prosecutors involved in the investigation learned of the prior February 2016 meeting and requested copies of AUSA-1's notes and records

---

[31] Indeed, on July 8, 2019, at the press conference following the arrest of Epstein, Geoffrey S. Berman, then United States Attorney for the Southern District of New York, stated that while he was not "going to go into any aspects of how our investigation originated[,] I will say that we were assisted from some excellent investigative journalism."

from that meeting. On or about December 6, 2018, AUSA-1 provided the prosecutors with her notes from the February 2016 meeting (which are attached as Exhibit 5) and documents the attorneys provided.[32]

### 5. The USAO-SDNY's Subpoenas and *Ex Parte* Applications for Materials

Shortly after opening the investigation in late November 2018, the Government identified possible victims and their counsel through public filings or media reports, which included Boies Schiller. (Def. Mem. 3, Ex. E at 2-3). The USAO-SDNY first contacted Boies Schiller about its investigation on or about December 18, 2018. Shortly thereafter, in or about December or January 2018, the Government indicated to Boies Schiller that it intended to make document requests. Boies Schiller generally advised the Government that a protective order would govern some of the materials. (*Id.* at 3).

In or about February 2019, approximately two months after the USAO-SDNY opened its investigation (and almost three years after the February 29, 2016 meeting described above), the USAO-SDNY issued two criminal grand jury subpoenas to Boies Schiller. One of the subpoenas requested non-privileged documents relating to *Giuffre v. Maxwell*, 15 Civ. 7433 (RWS); the other

---

[32] The Government has reviewed the file that AUSA-1 provided to the prosecution team on or about December 6, 2018 and understands, based on a review of that file, that at the February 2016 meeting, AUSA-1 received copies of Epstein's black book, flight records, and Palm Beach Police Department reports. Although AUSA-1 does not now recall the attorneys providing her with any documents at the meeting (Ex. 4 at 2), an email she sent to the prosecution team on December 6, 2018 refers to these documents as materials that the attorneys provided at the meeting.

The Government notes that as of March 7, 2016, one week after AUSA-1's February 29, 2016 meeting with the attorneys when she received these documents, Maxwell had only produced two emails in response to Giuffre's discovery requests. (*See* 15 Civ. 7433 (LAP), Dkt. No. 43 at 1-2). None of the documents apparently provided to AUSA-1 during the February 2016 meeting was an email. Accordingly, the Government has no reason to believe that Giuffre's counsel provided AUSA-1 with any discovery materials from the *Giuffre v. Maxwell* civil case. AUSA-1 also does not believe she ever received any such discovery materials. (Ex. 4 at 6).

requested the same relating to *Jane Doe 43 v. Epstein, et al.*, 17 Civ. 0616 (JGK) (SN). Because of the ongoing and covert nature of the grand jury investigation, and consistent with its standard practice under such circumstances, the Government did not notify the defendant or her counsel that it had issued the subpoenas.

In response to receiving the subpoenas, Boies Schiller began producing materials not covered by the protective orders in the relevant civil cases. However, Boies Schiller also had advised the Government that although it would not otherwise contest compliance with the subpoenas, it believed that the protective orders precluded full compliance.[33]   (Exs. 8 & 9). Accordingly, the Government applied *ex parte* and under seal to each relevant court (Judge Sweet and Magistrate Judge Sarah Netburn, respectively) to request that each court modify the respective protective orders to permit compliance with the subpoenas. (Def. Mot. 3, Ex. C).

Following a request by Judge Sweet for briefing supporting the Government's initial application, *see* Def. Mot. 3, Ex. D at 4, 20; Ex. G at 6, the Government submitted *ex parte* and sealed letters in support of its applications to each court on or about February 28, 2019. (Exs. 8 & 9). The Government wrote, "Where, as here, a grand jury subpoena has validly issued, and the recipient of the subpoena is not contesting compliance—but rather seeking authorization to comply with the subpoena—a court should grant such permission through limited modification of an applicable protective order, absent countervailing interests not present in this case." (*Id.* at 2). The Government submitted that the court was "best guided" by *Chemical Bank v. Affiliated FM Ins. Co.*, 154 F.R.D. 91, 93 (S.D.N.Y. 1994), in which the court rejected an application for a party in civil litigation to be held in contempt for complying with a grand jury subpoena by producing

---

[33] Significantly, and as detailed herein, Boies Schiller did not produce to the Government *any* materials subject to the protective orders until, as further described below, it received an order granting it the ability to do so in one of the civil cases.

67

materials in violation of a protective order, without first obtaining authorization from the court, because the court would have granted such authorization had it been sought. (*Id.*). The court also stated that such formal judicial approval could be obtained *ex parte* if sufficient reason was provided. (*Id.*). In its letters, the Government noted that its "specific knowledge of the subject matter of discovery materials is relatively limited, due to the confidential nature" of the litigation. (*Id.* at 2 n.1). The Government also submitted that the court need not employ the *Martindell* balancing test to evaluate the Government's ability to obtain access to materials covered by a protective order because (1) the *Martindell* balancing test generally relates to "instances where the Government sought protected information *without* [ ] grand jury process" and (2) "any presumption against modification of a protective order is unreasonable where, as here, the protective order is on its face temporary or limited." (*Id.* at 3-4).

### 6. Proceedings before Chief Judge McMahon

#### a. March 26, 2019 Hearing

Judge Sweet passed away in March 2019 before ruling on the Government's application. After Judge Sweet's death, but before the civil case was reassigned to a new judge, Chief Judge McMahon took up the Government's application. Chief Judge McMahon subsequently inquired about the Government's application in two transcribed *ex parte* and sealed hearings. (Def. Mot. 3, Exs. D & E). At the first hearing, on March 26, 2019, Chief Judge McMahon inquired as to why Boies Schiller did not make an application for permission to be relieved from the protective order, to which the Government replied that it could not "speak to why Boies Schiller in particular didn't make their own application." (Def. Mot. 3, Ex. D at 3). The Government further noted that Boies Schiller "simply isn't in a position to be able to describe the investigation in the way that we have in our submission." (*Id.* at 11-12). Chief Judge McMahon noted that she believed that

68

*Martindell* was applicable. (*Id.* at 3). She stated that were the Government's application disclosed to the parties, "Maxwell would protest" and argue that the Government lacked standing as it was not a party to the protective order. (*Id.* at 8). In response to questions from Chief Judge McMahon, the Government explained that the protective order, on its face, did not implicate the types of confidential business information or trade secrets ordinarily considered by courts in conducting the *Martindell* balancing test. (*Id.* at 13).

Chief Judge McMahon stated that the protective order did not contain a provision allowing a party to the order to disclose materials requested by law enforcement without permission of the court, noting her understanding that "it may have been negotiated out." (*Id.* at 14-15). The court inquired whether the Government's position was that "reliance on the nondisclosure of confidential materials to law enforcement in connection with a grand jury subpoena that has been duly authorized would be unreasonable." (*Id.* at 14). The Government responded in the affirmative, stating that the Government believed a provision precluding compliance with a law enforcement request would be void for public policy. (*Id.* at 15). The Government further cited *Chemical Bank* in support of the proposition that it would be unreasonable to rely on a protective order provision that barred the disclosure of information to law enforcement. (*Id.* at 15-16).

In response to questions about the breadth of the subpoena, the Government explained that it was "essentially unable to significantly narrow the request for information . . . . We have either little or no additional information than the Court does in terms of what materials there are [and] who was deposed." (*Id.* at 17). In response to Chief Judge McMahon's question about the privacy interests implicated by the protective order, (*id.* at 16-17), the Government also noted that it was dissimilar to an ordinary third-party intervenor in that it would be "extremely restricted" in its use

of the materials in light of the "extraordinary protections" of Federal Rule of Criminal Procedure 6(e). (*Id.* at 17-18).

Finally, Chief Judge McMahon also inquired whether the materials sought by the Government might be used to commence criminal proceedings against either of the parties to the libel case, *i.e.,* including Maxwell. (*Id.* at 18). The Government acknowledged that possibility as a general matter. (*Id.*). Chief Judge McMahon noted that the parties to the protective order relied on that order "in order to give whatever in discovery they gave, whether it was deposition testimony they gave or – then again, I can't fathom why anybody who has any criminal exposure would not have taken the Fifth Amendment in response to questions in a civil deposition, but I don't know." (*Id.* at 18-19). The Government stated, "I do not know, but I think it is entirely possible that what we are seeking is page after page of people taking the Fifth. That is entirely possible. But to the extent that it is not or there are other materials -- and this may be bad for our argument, but in all transparency and candor, I think there may be other individuals who also relied on the protective order." (*Id.*). The Government further explained that it "want[ed] to have a formal application" for the relevant materials and took that approach to "avoid the types of problems" created by other less formal government requests in other cited cases. (*Id.* at 20).

### b. April 9, 2019 Hearing

Chief Judge McMahon held another conference on April 9, 2019. She stated that she wanted "to make sure I'm not in a *Chemical Bank* kind of situation, so I would like to know about contacts between [the USAO-SDNY and Boies Schiller] prior to the issuance of the subpoena *on the subject of your investigation.*" (Def. Mot. 3, Ex. E at 2 (emphasis added)).[34] In *Chemical*

---

[34] Tellingly, Maxwell omits the italicized portion of this question from her motion, thereby stripping important context from the nature of Chief Judge McMahon's question which, as asked, was focused on "your investigation." (*See* Def. Mot. 3 at 7).

*Bank*, of course, as noted above, the subpoena recipient *produced materials to a prosecutor in direct violation of the relevant protective order*, without seeking a modification of the protective order and without any court authorization to do so. 154 F.R.D. at 93. Moreover, in that case, the District Attorney seemingly opened its investigation and issued the subpoena in direct response to information provided by the subpoena recipient who was then a party to civil litigation. *Id.*

The Government responded to Chief Judge McMahon by explaining its contacts with Boies Schiller in connection with the instant (and only) investigation it had opened on Epstein, that is, the investigation prompted by, and opened following, public reporting on Epstein in November 2018. In particular, the Government explained that the USAO-SDNY opened an investigation first, on either November 30, 2018 or December 3, 2018, and then made contact with Boies Schiller shortly thereafter. (Def. Mot. 3, Ex. E at 2-3). In this respect, the Government further explained that the USAO-SDNY, after opening the investigation, had endeavored to identify counsel who represented victims or witnesses in public filings or media reports, which included Boies Schiller, noting that "[w]ith respect to Boies Schiller in particular, we quickly came to learn during the investigation that they had at the time either active or recently completed civil litigation" and indicated that the USAO-SDNY intended to make document requests. (*Id.*). The Government also noted that, unlike in *Chemical Bank*, here Boies Schiller had informed the Government that it would be unable to comply with the subpoena in light of the protective order. (*Id.* (noting that Boies Schiller "generally advised us that they believed there was a protective order that would govern at least some of the materials, and that is why we ultimately made the application to the Court.")).

        c.      **Chief Judge McMahon's Memorandum and Order**

On or about April 9, 2019, Chief Judge McMahon granted the Government's application and issued a memorandum and order. (Def. Mot. 3, Exs. F & G). The Court noted that while the Government's application was procedurally "[i]rregular," there was precedent for granting the Government's request and, therefore, the Court would consider the application. (Def. Mot. 3, Ex. G at 6, 8-9). The Court found that, contrary to the Government's arguments, it was appropriate for the Court to analyze the Government's application in light of the *Martindell* factors. (*Id.* at 9-12).

In so doing, Chief Judge McMahon considered, among other things, "the degree to which . . . the party who could be expected to oppose unsealing[] reasonably relied on the protective order." (*Id.* at 16). She concluded that such reliance was unreasonable. (*Id.* at 22). She evaluated the factors under Second Circuit case law that are relevant to assessing whether a party's reliance on the protective order was reasonable, namely the scope of the protective order, the language of the order itself, the court's level of inquiry before granting the order, and the nature of reliance on the order. (*Id.* at 17). She concluded that first three factors favored granting the Government's application for modification. (*Id.* at 17-20). Chief Judge McMahon noted that, as the order "plainly gives the court the power to enter an order compelling disclosure to anyone—law enforcement included—Maxwell could not reasonably have relied on the absence of automatic permission for such disclosure to shield anything she said or produced from a grand jury's scrutiny." (*Id.* at 18-19).

As to the last factor, Chief Judge McMahon found that "the nature of the parties' reliance on the order does seem to weigh against modification." (*Id.* at 20). She noted that the record indicated that "Giuffre likely could not have secured Maxwell's deposition—at least in the absence of substantial court involvement—without" the protective order. (*Id.*). "However, the only thing

72

on which Maxwell or anyone else might reasonably have relied is that Giuffre or her lawyers would not do what the defendant in *Chemical Bank* did—that is, forward discovery materials in their possession to prosecutors for the purpose of fomenting an investigation. But I am not faced with that situation." (*Id.* at 21). Chief Judge McMahon further stated, "Nothing in this record suggests to me that Giuffre or Boies Schiller had anything to do with the Government's decision to convene a grand jury to look into the matters that were the subject of the [civil lawsuit]." (*Id.*). Instead, she explained that the Government informed the Court that it had "contacted Boies Schiller as part of its search for parties who might have been victims in its investigation; and that Boies Schiller told the Government that it could not consensually produce at least some documents in its files because of the existence of the Protective Order." (*Id.*). Chief Judge McMahon concluded that it was "quite clear that Boies Schiller did not foment the Government's investigation." (*Id.*).

Among other conclusions, Chief Judge McMahon found that because Maxwell's reliance on the protective order in that case as a "shield [. . .] from the court-ordered disclosure of Confidential Materials pursuant to a grand jury subpoena was unreasonable, the Court may exercise its discretion to grant the Government's application." (*Id.* at 22). The Court further concluded that "[t]he Government has persuasively demonstrated extraordinary circumstances, which would entitle it to modification in any event." (*Id.*). She also noted that "while in other circumstances the breadth of the subpoena might be troubling, here the Government is in no position to narrow its request, because [the civil case] was litigated almost entirely under seal." (*Id.* at 25).

Chief Judge McMahon permitted that the Government share the order—and only that order, which itself prohibited further dissemination, and not including any other materials associated with the Government's application—with Boies Schiller. The relevant order was

73

# EXHIBIT 20

was a protective order that would govern at least some of the materials, and that is why we ultimately made the application to the Court.")).

While the Government appreciates, with the benefit of hindsight, that an answer that had also referenced the February 2016 meeting (and the fact that USAO-SDNY took no action as a result of that meeting) would have provided additional context—and would have further reinforced that this was not a "*Chemical Bank* situation"—as noted above, the Government's response accurately described its contacts with Boies Schiller as relevant to "your investigation" and the issuance of the subpoena at hand. Indeed, there is no reason to believe that a description of the February 2016 meeting would have been material to Chief Judge McMahon's analysis of whether she was facing a "*Chemical Bank* kind of situation." (Def. Mot. 3, Ex. E at 2).

In *Chemical Bank*, counsel for a civil party approached the Manhattan District Attorney's Office "suggesting that it had evidence of criminal violations relating to the case." 154 F.R.D. at 93. In response, a grand jury subpoena was issued and "confidential documents were produced by the defendant without complying with any of the specific procedures or exceptions provided in the [confidentiality] orders." *Id.* Here, by contrast, the Government accurately conveyed to Chief Judge McMahon the opening of its investigation in late 2018, the reason it made contact with Boies Schiller shortly thereafter and served a subpoena in February 2019, and that no documents governed by the protective order had yet been produced. Aside from rank speculation loosely premised on an anonymously sourced news report, the defendant offers nothing to support her assertion that "Boies Schiller was *instrumental* in fomenting the Maxwell prosecution" (Def. Mot. 3 at 2) (emphasis in original), or that AUSA-1's February 2016 meeting with Boies Schiller (as it actually occurred) undercut the accuracy of the Government's representations to Chief Judge McMahon, or played any role in the Government opening its investigation in November 2018.

91

*Second*, the Government did not misrepresent the extent of its knowledge of the contents of Boies Schiller's files. As the Government correctly represented to the court, the Government had "either little or no additional information than the Court does in terms of what materials there are [and] who was deposed." (Def. Mot. 3, Ex. D at 17). In support of her argument, Maxwell cites again to the *Daily News* Article, which reports that "after Maxwell's two depositions, David Boies himself apparently approached the government in the summer of 2016, asking 'if the Southern District would consider charging Maxwell with perjury'" (Def. Mot. 3 at 8). But the Government has uncovered no evidence that such a meeting ever occurred. AUSA-1 does not recall ever speaking with or meeting David Boies in her life. (Ex. 4 at 4). Moreover, AUSA-1 does not recall being asked if the USAO-SDNY would consider charging Maxwell with perjury (*id.* at 5), and while notes of the February 2016 meeting refer to the existence of depositions generally, there can be no question Chief Judge McMahon appreciated the Government's general understanding that such transcripts would be part of the civil litigation file. (Def. Mot. 3, Ex. G at 21). Simply put, there is no evidence that the Government had any significant knowledge of the contents of Boies Schiller's files, or that the Government's representations to Chief Judge McMahon were incorrect.

In sum, Maxwell has failed to put forth any evidence that the Government misled Chief Judge McMahon, and as such, the good faith exception applies. To the contrary, the record before the Court demonstrates that the Government directly responded to Chief Judge McMahon's question and accurately described the contacts between Boies Schiller and the USAO-SDNY in connection with the investigation, the Government's lack of knowledge of the contents of that file, and the fact that no protected materials had been produced in violation of the protective order. Upon receiving a court order issued by a Chief United States District Judge who had carefully

lawsuit against the defendant or took her deposition years before the Government initiated its own investigation. The defendant offers no evidence to the contrary, and there is no reason to believe, on this record, that the Government in any way controlled Boies Schiller when it litigated a civil case against the defendant. As such, the Fifth Amendment does not apply.

The defendant's claim further fails because without coercion or compulsion, there is no Fifth Amendment violation. *See Minnesota v. Murphy*, 465 U.S. 420, 431 (1984) (rejecting claim that a "failure to inform [the defendant] of the Fifth Amendment privilege barred use of his confession at trial"); *United States v. Mitchell*, 966 F.2d 92, 100 (2d Cir. 1992) ("Inculpatory statements are not involuntary when they result from a desire to cooperate, or from a defendant's ignorance of, or inattention to, his right to remain silent."); *United States v. Mast*, 735 F.2d 745, 750 (2d Cir. 1984) (same). The defendant implicitly argues that she only testified under oath in the civil matter because she thought she would not be held to that oath. In other words, had she known that she would be subject to the penalties of perjury, she would have invoked her Fifth Amendment right.    But the defendant's misguided expectation that she would face no consequences cannot be said to coerce speech. The defendant, represented by able counsel, voluntarily chose to waive her Fifth Amendment rights and testify under oath. And she chose to do so in connection with civil depositions that occurred over two years before the Government opened its investigation. The circumstances surrounding that decision come nowhere near the type of coercion that rises to the level of a Fifth Amendment violation. *See, e.g.*, *United States v. Ash*, 464 F. Supp. 3d 621, 627-30 (S.D.N.Y. 2020) (finding suppression of defendant's phone unwarranted where defendant complied with former employer's request to return the phone because defendant was not coerced into doing so, and rejecting defendant's argument that the

*Franks*, 438 U.S. at 171 ("To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine."). Instead, to warrant a *Franks* hearing:

> [t]here must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. . . . Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant.

*Id.*

The burden to even obtain a *Franks* hearing is a heavy one, and such hearings are thus exceedingly rare. *See United States v. Brown*, 744 F. Supp. 558, 567 (S.D.N.Y. 1990) ("A defendant seeking to have the Court hold a *Franks* hearing bears a substantial burden."); *United States v. Swanson*, 210 F.3d 788, 790 (7th Cir. 2000) ("These elements are hard to prove, and thus *Franks* hearings are rarely held.").

### b. Discussion

In an alternative effort to suppress the materials obtained pursuant to the subpoena, the defendant argues that an evidentiary hearing is warranted to inquire into the Government's "misrepresentations" to Chief Judge McMahon. (Def. Mot. 3 at 16). However, as discussed extensively above, Maxwell's motion is little more than speculation and innuendo, itself rooted in a lone news article that, as described above, is not fully accurate. She otherwise presents no admissible evidence, affidavits, or other materials supporting the breathless accusations contained in her motion papers. As such, because the defendant does not include "an affidavit of someone with personal knowledge of the underlying facts," *Shaw*, 260 F. Supp. 2d at 570, and because the

Government has responded with reliable information directly rebutting the defendant's allegations, there is no material issue of fact sufficient to justify an evidentiary hearing.[44]

The defendant cites *Franks*, to suggest that a hearing is somehow warranted, but her motion falls far short of the standard required to obtain a hearing. "While the *Franks* analysis discussed above is typically employed to evaluate misstatements and omissions relating to probable cause, the Second Circuit has extended the Franks analysis to other Title III requirements for obtaining a warrant." *United States v. Rajaratnam*, No. 09 Cr. 1184 (RJH), 2010 WL 4867402, at *18 (S.D.N.Y. Nov. 24, 2010). The defendant fails to identify the standard that would govern such a hearing. In light of the interests implicated by a Title III wiretap, the USAO-SDNY submits that the defendant's depositions in a civil matter, even with a protective order, are no more significant than the interests implicated by a Title III wiretap. As such, the exacting standard of *Franks* should apply. On this record, the defendant has not made a threshold showing that the Government acted with the intent to mislead or in reckless disregard for the truth. The *Franks* standard is rightly a "high one," *Rivera*, 928 F.2d at 604, and one the defendant has failed to meet here.

The defendant's bald assertions alone do not entitle her to a fishing expedition in the form of a hearing.

## V. The Jury Should Decide Whether the Defendant Committed Perjury

Counts Five and Six of the Indictment allege that, during the course of two depositions, the defendant knowingly made false material declarations, in violation of 18 U.S.C. § 1623. The defendant moves to dismiss those Counts, arguing that the Court can determine now—on a pre-

---

[44] For similar reasons, the defendant's request for discovery regarding this matter should be denied. The defendant has failed to meet her burden under Rule 16 of making "a *prima facie* showing of materiality and must offer more than the conclusory allegation that the requested evidence is material." *Urena*, 989 F. Supp. 2d at 261 (citations omitted). Because the defendant has offered nothing more than her conjecture, based on an inaccurate and hearsay-ridden article, that some unspecified evidence might exist, her request for discovery should be denied.

116

denial . . ."). A properly instructed jury could conclude after hearing all of the evidence at trial that the defendant intended the natural meaning of the words she used, not the allegedly truthful answer she suggests now, and therefore that she lied. In sum, the defendant's post-hoc efforts to inject confusion into clear questioning are unavailing and should be rejected, and the jury should decide whether the defendant's answers were false.

### 2. July 2016 Deposition

Count Six charges the defendant with perjury arising from three colloquies at the second deposition.



Following that line of questioning, the following colloquy occurred:

Government has reviewed the full report and confirmed that there is nothing exculpatory contained therein. To the contrary, the report *inculpates* the defendant. Accordingly, the defendant is not entitled to its immediate disclosure. The Government will produce an unredacted version of this document together with all other witness statements in advance of trial.[67]

*Fourth*, the defense requests production of pages from a personal diary that is in the custody of a civilian third party and is not in the custody or control of the Government. (Def. Mot. 10 at 10). Leaving aside the fact that the defense cites no authority for the proposition that the Government has an obligation to obtain the personal papers of a third party, *see United States v. Collins*, 409 F. Supp. 3d 228, 239 (S.D.N.Y. 2019) ("The Government's '*Brady* obligations extend only to materials within prosecutors' possession, custody or control or, in appropriate cases, that of the Department of Justice, perhaps another part of the Executive Branch, or a comparable state authority involved in the federal prosecution.'" (quoting *United States v. Blaszczak*, 308 F. Supp. 3d 736, 742 (S.D.N.Y. 2018))), the Government has already represented that it has asked the third party at issue about the materials the defendant purports to seek and that no such materials exist. In particular, to the extent the defense is concerned with whether there are diary entries from the spring of 1996, the Government has already indicated in response to the defendant's second bail motion that it is aware of none. (*See* Dkt. No. 100 at 11 n. 2 ("Because this victim stopped writing in her journal about a month after that first meeting with Epstein, there are no entries regarding the subsequent trip she took months later to visit Epstein, during which she met the defendant. This victim provided the Government with copies of her journal entries relating to Epstein and informed the Government that the remaining entries are personal in nature and have nothing to do with

---

[67] As is the case with the other redacted document referenced in this motion, the redacted copy defense counsel attached as Exhibit D was recovered during the execution of a search warrant for one of Epstein's devices and was produced to defense counsel in the form in which it was recovered from the device.

Epstein or the defendant.")). In other words, the defendant again seeks supposedly exculpatory evidence that does not exist. The defendant offers no basis on which to conclude that this representation is false or that any such evidence does in fact exist. As such, this motion should be denied.

*Fifth*, the defendant asks this Court, again without citing any legal authority, to order the Government to produce copies of *all* subpoenas it has issued for the defendant's records as part of its investigation in this case. (Def. Mot. 10 at 11). This incredibly broad request is nothing more than a fishing expedition inappropriately seeking the details of investigative requests made through the grand jury process. The defense has cited no legal basis for the Court to direct the Government to provide the defense with copies of the subpoenas themselves (as opposed to records or other materials received in response to such subpoenas), let alone *every subpoena* issued for the defendant's records during a multi-year and ongoing grand jury investigation. The types of requests issued by the grand jury have no conceivable bearing on the defense or on any motion the defense may seek to bring. The Government has already produced to the defense all discoverable material that it has received in response to subpoenas issued to date during this investigation. In the absence of any legal authority justifying this request, it should be denied. Additionally, for the reasons discussed above in Sections I and IV, the defendant is not entitled to discovery or a hearing relating to her motion to dismiss the Indictment based on the NPA or her motion to suppress subpoena returns.

*Sixth*, the defendant asks the Court to direct the Government to immediately disclose any *Brady* and *Giglio* material. (Def. Mot. 10 at 11-13). The motion for disclosure of *Brady* material should be denied as moot because the Government has conducted a search for any such material and has already disclosed any potentially exculpatory information in its possession of which it is

aware, consistent with the Rule 5(f) *Brady* order previously issued by the Court in this case. *See* Fed. R. Crim. P. 5(f); Dkt. No. 68. The Government recognizes its continuing obligation to disclose any *Brady* material, and to make a diligent search for any relevant material that may be in the possession of the prosecution team, including investigating agents and officers. As the Government has already emphasized in this case, the Government takes its disclosure obligations very seriously and has committed to being transparent with the Court and the defense regarding its approach to obtaining and reviewing files, including other agency files, that may be relevant to this case. (*See, e.g.*, Gov't Letter dated October 7, 2020, Dkt. No. 63). Consistent with that commitment, the Government has completed an initial review of its files for *Brady* material and Rule 16 material and has produced more than 2.7 million pages of discovery as a result of that review. These productions have included specific disclosures of certain witness statements that may arguably be exculpatory. The Government also intends to produce all statements and potential impeachment material in its possession regarding any potential witness identified during its investigation, including those individuals whom the Government does not intend to call at trial. As discussed below, the Government is in the process of reviewing all files in its possession for potential impeachment material. The Government remains cognizant of its *Brady* obligations and will promptly produce any potentially exculpatory material if any is identified during that review.

The Government is not currently aware of any undisclosed *Brady* material in its possession, but it will certainly provide timely disclosure of any additional *Brady* material if any such material comes to light. Courts in this Circuit routinely deny specific requests for *Brady* material where, as here, the Government has made a good-faith representation to the court and defense counsel that it recognizes and has complied with its disclosure obligations under *Brady*. *See, e.g.*, *Thompson*, 2013 WL 6246489 at *9 ("In light of the Government's 'good-faith representation to

# EXHIBIT 21

# EXHIBIT  22

February 11, 2021 Call with Amanda Kramer

Present on Conference Call:
- AUSAs Lara Pomerantz & Maurene Comey
- FBI Special Agent Amanda Young
- Amanda Kramer
- Covington & Burling LLP General Counsel, Steve Anthony

AK's recollections regarding February 29, 2016 Meeting:
- AK confirmed the handwritten notes sent to AK by LP were AK's own notes from the February 29, 2016 meeting.
- In advance of the meeting, AK remembers Pete Skinner reaching out to AK and asking if he could come in to present on a potential case with some other attorneys. AK doesn't recall how Skinner contacted AK. Skinner was at Boies Schiller at the time, Skinner and AK are friends and were in the SDNY USAO together. At this time, AK was the Human Trafficking Coordinator and believes she was also the Project Safe Childhood Coordinator.
- Meeting took place in a conference room at 1 St. Andrews Plaza USAO SDNY. Pete Skinner, Brad Edwards, Stan Pottinger, and AK were at the meeting.
  - AK doesn't recall what each attorney's role was, but her notes say that they represented Virginia Roberts. AK also understood that Edwards was involved in representing multiple individuals in a civil litigation involving the CVRA, but AK is not certain of that.
  - AK understood that Skinner or his colleagues at Boies were representing Virginia Roberts. AK doesn't know if Skinner was involved in representing Roberts.
  - Brad Edwards did most of the talking during the meeting.
  - AK recalls that Pete Skinner spoke a little bit, but AK doesn't recall what, if anything, he said on substance. AK doesn't remember what he said.
- AK understood the purpose of the meeting to be the attorneys presenting information that they believed or suggested should be the subject of a criminal investigation into Jeffrey Epstein.
  - AK understood that the attorneys were advocating that the Jeffrey Epstein case should be investigated by SDNY.
- LP directed AK to references to lawsuits on pages 4 and 7 of AK's notes from the meeting, and asked what AK recalls about what civil lawsuits she learned of during the meeting.
  - AK remembers there was a CVRA lawsuit that was mentioned.
  - AK remembers that there were other civil lawsuits mentioned. Aside from what is in AK's notes, AK has no memory of what those lawsuits were about or the nature of those lawsuits.
  - AK does not have an independent memory of the *Guiffre v. Maxwell* lawsuit being mentioned, and her memory is not refreshed from looking at the notes.

1

- LP directed AK to "they will send me affidavits and depositions" on page 8 of AK's notes and asked if AK recalls what that line refers to and whether the attorneys sent AK any such materials.
  - ○ AK does not recall what that line refers to.
  - ○ AK does not recall if the attorneys sent her any such materials after the meeting.
  - ○ AK does not believe the attorneys provided her any materials during the meeting.
  - ○ AK has a vague memory that the attorneys sent her something by email, but does not recall what it was.
    - One of the emails LP sent to AK was an email from Skinner to AK the evening of February 29, 2016 after the meeting sending AK documents. AK does not remember the particular documents she received. AK does not recall receiving any additional documents.
- AK remembers the mention of several people, including Ghislaine Maxwell as either in the context of who had benefited from the Florida NPA or who the people were that had worked for or helped Epstein. AK doesn't recall much specifics about Maxwell. Maxwell was not a focus of the meeting.
- AK does not recall the attorneys saying anything about what charges the office could bring. Related to that, AK recalls asking questions to understand what kind of charges they were proposing because it was not clear. The attorneys did not present particular statutes that might be pursued.
- AK recalls trying to understand what prior statements of Virginia Roberts existed in the context of assessing how much of a record there already was. AK recalls that the information about civil lawsuits came up when AK asked the attorneys what record there was of Roberts's statements about Epstein, either in the context of the Florida case or otherwise.
  - ○ AK's notes don't jog AK's memory of what she learned about Virginia Roberts's prior statements.
  - ○ AK does remember that there was some civil litigation, including CVRA litigation and some other civil case, and not just involving Virginia, but also civil litigation involving other potential witness or witnesses. AK's takeaway was that there was a large and potentially complicated record of civil litigation that would have to be at some point parsed through in assessing what any potential witness had said. It wasn't only that there was civil litigation involving Virginia, but there was also some person in Europe involved in litigation. AK felt this was a situation where there would be a lot of material to gather and read before talking to witnesses.
- AK doesn't remember being told any specific allegations victims had made against Maxwell. AK generally remembers Maxwell being mentioned as someone who had worked for Epstein.
  - ○ Notes reflect that Maxwell was "head recruiter," but AK does not recall that description being attributed to any particular witness

2

SDNY_GM_02742888

# EXHIBIT 23

EXHIBIT 22

# EXHIBIT K

February 11, 2021 Call with Amanda Kramer

Present on Conference Call:
- AUSAs Lara Pomerantz & Maurene Comey
- FBI Special Agent Amanda Young
- Amanda Kramer
- Covington & Burling LLP General Counsel, Steve Anthony

AK's recollections regarding February 29, 2016 Meeting:
- AK confirmed the handwritten notes sent to AK by LP were AK's own notes from the February 29, 2016 meeting.
- In advance of the meeting, AK remembers Pete Skinner reaching out to AK and asking if he could come in to present on a potential case with some other attorneys. AK doesn't recall how Skinner contacted AK. Skinner was at Boies Schiller at the time, Skinner and AK are friends and were in the SDNY USAO together. At this time, AK was the Human Trafficking Coordinator and believes she was also the Project Safe Childhood Coordinator.
- Meeting took place in a conference room at 1 St. Andrews Plaza USAO SDNY. Pete Skinner, Brad Edwards, Stan Pottinger, and AK were at the meeting.
  - AK doesn't recall what each attorney's role was, but her notes say that they represented Virginia Roberts. AK also understood that Edwards was involved in representing multiple individuals in a civil litigation involving the CVRA, but AK is not certain of that.
  - AK understood that Skinner or his colleagues at Boies were representing Virginia Roberts. AK doesn't know if Skinner was involved in representing Roberts.
  - Brad Edwards did most of the talking during the meeting.
  - AK recalls that Pete Skinner spoke a little bit, but AK doesn't recall what, if anything, he said on substance. AK doesn't remember what he said.
- AK understood the purpose of the meeting to be the attorneys presenting information that they believed or suggested should be the subject of a criminal investigation into Jeffrey Epstein.
  - AK understood that the attorneys were advocating that the Jeffrey Epstein case should be investigated by SDNY.
- LP directed AK to references to lawsuits on pages 4 and 7 of AK's notes from the meeting, and asked what AK recalls about what civil lawsuits she learned of during the meeting.
  - AK remembers there was a CVRA lawsuit that was mentioned.
  - AK remembers that there were other civil lawsuits mentioned. Aside from what is in AK's notes, AK has no memory of what those lawsuits were about or the nature of those lawsuits.
  - AK does not have an independent memory of the *Guiffre v. Maxwell* lawsuit being mentioned, and her memory is not refreshed from looking at the notes.

1

SDNY_GM_02742887

- LP directed AK to "they will send me affidavits and depositions" on page 8 of AK's notes and asked if AK recalls what that line refers to and whether the attorneys sent AK any such materials.
  - o AK does not recall what that line refers to.
  - o AK does not recall if the attorneys sent her any such materials after the meeting.
  - o AK does not believe the attorneys provided her any materials during the meeting.
  - o AK has a vague memory that the attorneys sent her something by email, but does not recall what it was.
    - One of the emails LP sent to AK was an email from Skinner to AK the evening of February 29, 2016 after the meeting sending AK documents. AK does not remember the particular documents she received. AK does not recall receiving any additional documents.
- AK remembers the mention of several people, including Ghislaine Maxwell as either in the context of who had benefited from the Florida NPA or who the people were that had worked for or helped Epstein. AK doesn't recall much specifics about Maxwell. Maxwell was not a focus of the meeting.
- AK does not recall the attorneys saying anything about what charges the office could bring. Related to that, AK recalls asking questions to understand what kind of charges they were proposing because it was not clear. The attorneys did not present particular statutes that might be pursued.
- AK recalls trying to understand what prior statements of Virginia Roberts existed in the context of assessing how much of a record there already was. AK recalls that the information about civil lawsuits came up when AK asked the attorneys what record there was of Roberts's statements about Epstein, either in the context of the Florida case or otherwise.
  - o AK's notes don't jog AK's memory of what she learned about Virginia Roberts's prior statements.
  - o AK does remember that there was some civil litigation, including CVRA litigation and some other civil case, and not just involving Virginia, but also civil litigation involving other potential witness or witnesses. AK's takeaway was that there was a large and potentially complicated record of civil litigation that would have to be at some point parsed through in assessing what any potential witness had said. It wasn't only that there was civil litigation involving Virginia, but there was also some person in Europe involved in litigation. AK felt this was a situation where there would be a lot of material to gather and read before talking to witnesses.
- AK doesn't remember being told any specific allegations victims had made against Maxwell. AK generally remembers Maxwell being mentioned as someone who had worked for Epstein.
  - o Notes reflect that Maxwell was "head recruiter," but AK does not recall that description being attributed to any particular witness

2

- AK's recollection is that the attorneys did not make any suggestions regarding what investigative steps SDNY should take. The attorneys did not suggest that SDNY use civil lawsuits as a means to conduct a criminal investigation.
- Discussion of Epstein's conduct expanded beyond Virginia Roberts. Attorneys described the conduct as involving many or several other girls. There was more detail provided about Virginia Roberts's experience, but there was a broader discussion about Epstein's conduct as a pattern and long-running, if not ongoing, behavior that continued after Virginia was no longer involved.
- AK's understanding was not that the attorneys were hoping SDNY would investigate or charge anyone other than Epstein. The meeting was focused on Epstein. There was mention of other people who had helped him over time, including an individual who was in Europe and potentially was a source of evidence against Epstein. The thrust of the discussion was about building a case against Epstein. The other individuals were mentioned or described as part of telling the story, or as potential sources of information.
- AK does not remember exactly what she said at the end of the meeting, but she knows her practice was that in every such meeting she has ever had, she has thanked the people for coming in and been completely non-committal and non-responsive about what the office would do about the information that was provided.
    - o AK absolutely did not tell the attorneys that an investigation would be opened.

Events after February 29, 2016 meeting:

- After the February 29, 2016 meeting, AK emailed Dan Stein (Chief of Criminal Division at the time). Had a meeting in his office. AK discussed with Stein what the lawyers had shared, AK's thoughts, and Stein's thoughts. Decided on an action plan.
    - o AK knew there was the pending CVRA civil case and other civil litigation, which gave AK some pause because she had other occasions where civil litigants have decided to report something to the USAO because they think it will help them in their civil case. AK mentioned that to Stein.
    - o Discussed the length of time that had passed; wasn't clear there was any ongoing conduct; USAO SDFL is a reputable USAO with skilled FBI agents, and AK's assumption was that however they concluded their case probably reflected something about the strength of the case or some issue that existed.
    - o One thing that leaned in favor of taking action was that one of the lawyers (Stan or Brad) said that FBI agents in Florida case were not happy with the result and how the case was resolved. That concerned AK because experienced FBI agents in this area usually, in AK's experience, make collaborative decisions with the USAO.
    - o AK & Stein decided (don't recall who came up with idea) that AK would reach out to Sean Watson (head of FBI C-20 at the time) and ask him to contact Miami FBI agents to ask if they in fact were unhappy with the outcome and felt like justice had not been served.
- After the meeting with Stein, AK called Sean Watson and relayed the summary of this and asked him to reach out to the Miami agents who were on the Epstein case. AK asked

3

Sean to call AK back and let her know if the Florida agents had concerns. Sean never called AK back. AK doesn't recall ever affirmatively following up with Sean, but she took the radio silence to mean that the FBI agents in Florida did not express dissatisfaction.

- No investigation was opened as a result of the February 29, 2016 meeting.
- No investigation into Epstein was opened while AK was the Human Trafficking Coordinator and Project Safe Childhood coordinator.
- AK never met with any other Boies Schiller attorneys. AK does not recall ever speaking with David Boies at any point.
- AK never met with the attorneys from the February 29, 2016 meeting again.
- When asked what, if any, communications AK had with the attorneys, AK noted that she sees an email from May 2016 with Stan Pottenger. AK believes it's possible Stan called AK, but she does not remember that.
- AK does not recall any further conversations re Epstein in SDNY until much later when the Miami Herald series was published.

AK confirmed she has read the Daily News Article LP sent

- AK indicated that the article did not accurately describe AK's interactions with attorneys for Virginia Roberts.
- AK's recollection is not that attorneys urged SDNY to open an investigation into "the duo." They were focused on Epstein. Maxwell was mentioned in passing, not as a target.
- AK did not participate in a second meeting with anyone. Had there been a meeting on this subject in the summer of 2016 in SDNY, AK would have known about it in her capacity as Human Trafficking Coordinator.
  - o AK had been in that role since approximately 2010, and if someone came in to meet with a unit chief about a potential human trafficking matter, AK would get contacted about the meeting. AK met with chiefs to gather information about any cases they had that touched on human trafficking so that AK could coordinate. So if a second meeting had taken place with a supervisor in the office, AK would have known about it. Dan Stein also would have brought AK in if he learned of a second meeting.
  - o AK would have made a record if there had ever been a second meeting. AK would remember if there were a second meeting. She has no record and no memory of any second meeting.
- AK does not recall ever speaking with or meeting David Boies in her life, so to her knowledge, Boies was not making any effort to persuade SDNY to investigate Epstein. AK noted it is possible Boies could have been on the phone if Stan Pottinger called AK in or around May of 2016, but AK has no recollection of such a call.
- AK does not recall the attorney presentation being framed on highlighting Maxwell's assistance with Epstein's sexual abuse. It was not presented as a "duo." AK recalls the mention of a pilot and the mention of someone having an address book, so other people were mentioned as part of telling the story of Epstein.

4

- AK did not express any concerns about anything to the attorneys. AK may have asked something like whether the attorneys are asking SDNY to re-do the Florida investigation because AK was trying to understand what the attorneys were proposing: was it looking at the same conduct that was investigated in Florida and mishandled, or was it looking at different conduct and possibly ongoing conduct? AK recalls asking questions to clarify that point.
- AK is sure one of the things she asked would have been venue oriented to understand what the attorneys were describing and what the conduct was. AK would not have responded to a question asking about why AK wouldn't just open an investigation. Purpose of the meeting was for AK to understand what the attorneys were trying to convey, not for AK to make any representation about her thoughts or what she was going to do.
- Brad Edwards's book suggesting that the AUSA seemed "confident that a case would be brought" does not seem accurate to AK. AK did not intend to give such an impression during the meeting. That decision is not one for AK to make alone, in any event.
- AK does not recall any mention that the number of victims in NY far exceeded the number in Florida.
- Brad Edwards's description of wanting a case against Epstein is consistent with AK's recollection that the focus was on Epstein.
- If anyone called AK, she does not remember that, and she would not have mentioned the comity shown to other USAOs around the country.
- AK does not recall anyone ever approaching her to ask if SDNY would consider charging Maxwell with perjury.
  - o AK has a vague memory that the attorneys called or emailed AK at some point and told her that there had been depositions, presumably by contact from one of these lawyers, but AK cannot recall the specifics. AK does not remember one way or the other if any of the attorneys referenced the possibility of perjury.
  - o AK recalls thinking that a perjury investigation would have the same challenges. AK recalls thinking in her mind that if the depositions were about the underlying conduct that had all of the issues that gave AK pause after the meeting (length of time that had passed, sense there must have been a reason SDFL resolved the case the way they did) were not alleviated by a perjury-based prosecution.
  - o AK does not recall ever knowing anything about the substance of the depositions and does not remember anyone sending her a deposition transcript.
  - o AK does not remember who had been deposed or who might have been the subject of a possible perjury investigation.
  - o No investigation into perjury was ever opened.
- AK took no further action re Epstein after calling Sean Watson.
  - o Though there may be emails or calls AK cannot remember, she knows that she took no action after the call to Sean Watson. Part of the reason AK felt horrible when reading the Miami Herald article was because AK took no action after calling Sean Watson.

5

SDNY_GM_02742691

When the Topic of Epstein Came Back up with the Miami Herald Article

- Arose when AK was in Securities. AK was no longer the Human Trafficking Coordinator or the Project Safe Childhood Coordinator.
- AK may have told someone that there had been a presentation for SDNY to prosecute Epstein. AK read the article and was very disturbed to read about how the case was resolved in SDFL, which was inconsistent with AK's assumptions when the case was presented by the attorneys in February 2016.
- AK remembers speaking with someone in Public Corruption about the February 29, 2016 meeting and shared her notes and emails with Public Corruption.
- AK remembers that someone from the original case team (thinks Alison Moe) came by her office and they chatted. AK may have also spoken with Alex Rossmiller or Ted Diskant, but is not sure.
  - When speaking with members of the Public Corruption team: AK remembers telling them that she felt terrible reading the Miami Herald series. AK remembers telling them that she had the impression that the lawyers who came in to meet with AK were disorganized, and AK's impression was that they thought it would help the CVRA case if SDNY opened a criminal case.
  - AK is sure that she gave Alison whatever she had, including the notes that LP emailed AK. AK handed to Alison whatever was in AK's folder.
  - AK does not remember having any documents or receiving any documents from the Roberts attorneys.
  - AK remembers understanding that Public Corruption had opened an investigation into Epstein.
- AK did not play any role in opening the SDNY investigation into Epstein.
- To AK's knowledge, AK has not received any discovery materials from any civil case.

6

EXHIBIT 23

| | |
|---|---|
| **From:** | Kramer, Amanda (USANYS) |
| **To:** | Diskant, Edward (USANYS); Capone, Russell (USANYS); Kurland, Abigail (USANYS) |
| **Subject:** | FW: Virginia Guiffre |
| **Date:** | Friday, November 30, 2018 4:01:53 PM |

**From:** Peter Skinner <PSkinner@BSFLLP.com>
**Sent:** Tuesday, March 8, 2016 12:28 PM
**To:** Kramer, Amanda (USANYS) <AKramer@usa.doj.gov>
**Cc:** StanPottinger@aol.com; brad@pathtojustice.com; Sigrid McCawley <Smccawley@BSFLLP.com>
**Subject:** RE: Virginia Guiffre

Amanda,

If you haven't already seen it, the Post reported today on Jeffrey Epstein's continued relationships with young women.

http://pagesix.com/2016/03/08/jeffrey-epsteins-east-side-mansion-houses-russian-playmates/

Best,
Pete

---

**From:** Peter Skinner
**Sent:** Monday, February 29, 2016 10:13 PM
**To:** Amanda Kramer
**Cc:** StanPottinger@aol.com; brad@pathtojustice.com; Sigrid McCawley
**Subject:** Re: Virginia Guiffre

Amanda,

I am adding Sigrid McCawley to this email chain as well. As we mentioned earlier today, Sigrid is one of the lead attorneys on the case and knows both Virginia and the facts very well. Please include Sigrid in any follow-up that you may.

Best,
Pete

---

**From:** Peter Skinner <pskinner@bsfllp.com>
**Date:** Monday, February 29, 2016 at 10:03 PM
**To:** Amanda Kramer <amanda.kramer@usdoj.gov>

**Cc:** "StanPottinger@aol.com" <StanPottinger@aol.com>, "brad@pathtojustice.com"
<brad@pathtojustice.com>
**Subject:** Virginia Guiffre

Amanda,

Thank you again for meeting with us today. We very much appreciate your time. I am attaching the following documents for your review:

1. Complaint in the defamation case against Ghislaine Maxwell (just today, Judge Sweet denied Maxwell's motion to dismiss today);
2. Declarations that Virginia filed in the CVRA case;
3. The Rule 56.1 statement recently filed in the CVRA case;
4. The redacted 302

Please let us know what other information we can provide or if you have any further questions.

Best,
Pete

The information contained in this electronic message is confidential information intended only for the use of the named recipient(s) and may contain information that, among other protections, is the subject of attorney-client privilege, attorney work product or exempt from disclosure under applicable law. If the reader of this electronic message is not the named recipient, or the employee or agent responsible to deliver it to the named recipient, you are hereby notified that any dissemination, distribution, copying or other use of this communication is strictly prohibited and no privilege is waived. If you have received this communication in error, please immediately notify the sender by replying to this electronic message and then deleting this electronic message from your computer. [v.1]

# EXHIBIT  24

# EXHIBIT J

①

P. Skinner                                                    2/29/16
Brad Edwards
Stan Pottinger
A. Kramer (notes)

                                                    Re:
                                                    Virginia Roberts
BE - rep. Virginia Roberts                          (who now lives in
SP - rep. Virginia                                  ████████

Long history of litigation

BE
- Int. inv. into Jeffrey Epstein was done by local Palm
  Beach PD ≈ 2005
- rounded up app. 24 girls molested by JE
- represented about 10 girls
- JE's MO - w/ adults they'd tell 13 yr. old girl + came to
  rich guy's house to give paid massage. JE naked -
  Start as massage, elaborate demand of sex acts
  (if you want $, do x). After paid 200/300 +
  their offered 200-300 finders fee. Victims recruited
  other victims. Mother complained + involved PD.
- PD turned case over to FBI + USAO. Most of
  girls (appr. 40+) in FL. No flight logs.
  Issued GJ subpoenas.  Epstein + 4 named co-conspirators
- Entered into a non pros w/ guilty plea to state ct. to
  2001-2007   procuring minor for prost. + immunity
            from fed. pros. for sex crimes comm. in FL
            b/w 2001 + 2007
- Jerry Lefcourt, Jay Lefkowitz, Ken Starr, Roy Black,  }  Epstein's
  Martin Weinberg, Guy Lewis - never Jerry shared / counsel
- SDFL - at off Palm Beach. Marie Villafagna.
        Alex Acosta US Atty.
- Limited to FL in pros.

CONFIDENTIAL                                        SDNY_GM_02742878

②

- US Attorney has said could be prosecuted elsewhere
- Agmt. under 2255 if victim elect to proceed
  under 2255 + forfeit civil remedies Epstein must
  pay stat. min. 50k or 150k.  At least 12
  proceeded under that provision
- Named

Ghislaine Maxwell – daughter of Robert Maxwell –
head recruiter

- Evidence = 2000 (Virginia Roberts – her case unknown
  @ time)
  – NO END?

CONFIDENTIAL                        SDNY_GM_02742879

③



Virginia Roberts
- victimized summer 2000 @ age 16 (███) - about
  to turn 17
- taken to NY for training by Maxwell + Epstein - how to
  service men
- in civil case, got records conn. her as his plane
- She goes to private island Little St. James - USVI
                                    - few miles off of St. Ann
- Virginia said that in affidavit - same thing happening
- 2000 - 2002 was live in sex slave - for Epstein +
  others.
- Promised educ. in mass. then

CONFIDENTIAL                          SDNY_GM_02742880

④

- ④ UE told by Epstein too old
- ① from 19 went to Thailand to get underage girl
  + fled to ████████ where lived for a decade
- filed civil lawsuit in 2015 - defamation suit
  against Maxwell
- she went public by atty. declaration in FL suit
- FL suit - pro bono - crime victims rights act —
  against USAO b/c they didn't interview
  girls.
- Virginia Roberts moved to join those suits

- in 2011 a British reporter find her + interviewed her
  about Prince Andrew. Also said met ████████
- said was Epstein sex slave
- 2011 was first atty of her.
- FBI went + interviewed Virginia - FL FBI -
  302 FBI FL want to pursue inv.
  Agents - Jason Richards + Nesbit Kirkendal

Virginia

████████████████████████████████████████████

CONFIDENTIAL    SDNY_GM_02742881

⑤



- 2010 - civil depos. of Epstein former butler
Alfredo Rodriguez. Bel. Epstein + Maxwell were
gng. to kill him. Downloaded their black book.
Brad went to FBI, made controlled calls, they
arrested him + he went to prison for obstruction.
Pled to coop. agmt + blew deal b/c
he was selling AK-47s.
- tried to sell book, explained how it all worked
in recorded mtgs. FBI agent ~~interview~~ names
- Rodriguez died in jail.
- Agent filed affidavit in obstruction case.
- Epstein's lawyers said his property

1997-2005 flight logs + manifests

<u>VP - Virginia</u>

- Have been told Epstein had photos in house in PB + NY +
USVI
CP? - One photo is a photo of Virginia w/ another girl - naked
+ in sexual pose - on his wall - artistic - visible
genitals

CONFIDENTIAL                    SDNY_GM_02742882

⑥

- Photos of naked girls on Maxwell's comp.

* SW executed on PB house. Collage of photos included
nude girls incl. clients. Epstein tipped off. All computers
were gone.
- Virginia says cameras all over NY house. She believes
they were used for extortion or bm by Epstein. When "lent
out" to other men had to report back.
- Videos recorded in bathroom. - recordly? security?
- Maxwell + ▮▮▮▮ took sexually explicit photos of her
regularly
- Maxwell gave photo to Epstein for bday @ age 16.
- Photo hung in one of the homes
- Saved on computers.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

- Subp. issued for computers

Registered as sex offender in FL
                Level 3
USMS
Registered in NY.
- Repay by private jet

( Sex acts on planes - )

Manhattan

CONFIDENTIAL                    SDNY_GM_02742883



⑦

Virginia wants prosecution ▮▮▮▮▮▮ feels oblg. to do
something about it.

From 2014/2015, she believed it was summer 1999.
As it turns out, it was summer of 2000.

She has lawsuit against Maxwell for defamation. Truth
is defense.

She wants settlement/reg. into nonprofit to help girls
in same situation                            - around 2009
                    - of attorney.
Her father negotiated a settlement w/ Epstein + she
has a confidentiality provision limiting amount.
Epstein's attorneys reached at + neg. settlement.

Did FBI search his planes? Did they find hidden
cameras?

Concern active pedophile.

Pitch to other prosecutors? no
Book deal? not now
- 20/20 interview last spring → ABC killed it - lawyers pulled it
▮▮▮▮▮▮▮▮▮▮                                    but they still
                                              have it

- Have portions of diary

**CONFIDENTIAL**

SDNY_GM_02742884

⑧

██████████████████████████████

- They will send me affidavits + depositions

- Blond, part. size + shape.
- Wanted to have baby w/ her -
- Same MO w/ one other victim - 17yr. old - emails w/her

- As young as 12 but younger the better.

Virginia emailed Epstein
Thailand - nun charges + handwritten note w/ name of
     girl # - written by Maxwell.

CONFIDENTIAL

SDNY_GM_02742885



**Brad Edwards**
Trial Attorney

Farmer, Jaffe, Weissing,
Edwards, Fistos & Lehrman, P.L.

WWW.PATHTOJUSTICE.COM

STAN POTTINGER

J. STANLEY POTTINGER PLLC

CONFIDENTIAL

SDNY_GM_02742886

# EXHIBIT 25

1

2

3

4

5    COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM,

6    U.S. HOUSE OF REPRESENTATIVES,

7    WASHINGTON, D.C.

8

9

10

11

12    DEPOSITION OF:    WILLIAM P. BARR

13

14

15

16                            Monday, August 18, 2025

17

18                            Washington, D.C.

19

20

21        The interview in the above matter was held in room 2335, Rayburn House Office Building,

22    commencing at 10:03 a.m.

23        Present:    Representatives Comer, Subramanyam, and Crockett.

1  Appearances:

2

3

4

5  For the COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM:

6

7  ████████████, DEPUTY DIRECTOR OF INFORMATION TECHNOLOGY

8  ████████████, GENERAL COUNSEL

9  ██████████, COUNSEL, OVERSIGHT

10  ████████████, SENIOR ADVISOR

11  ██████████, RESEARCH ASSISTANT

12  ████████████, DIGITAL DIRECTOR

13  ████████████, PROFESSIONAL STAFF MEMBER

14  ██████████████, MINORITY STAFF DIRECTOR

15  ██████████, MINORITY FELLOW

16  ██████████, MINORITY COUNSEL

17  ██████████, MINORITY SENIOR COUNSEL

18  ████████████, MINORITY COUNSEL

19  ████████, MINORITY FELLOW

20  ██████████, MINORITY DEPUTY CHIEF OVERSIGHT COUNSEL

21

22

23

24

25

1    For THE WITNESS:

2

3    ED O'CALLAGHAN

4    Cahill Gordon & Reindel LLC

5    900 16th Street NW #500

6    Washington, D.C. 20006

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          ███████████          We can go on the record.

2          This is a deposition of Mr. William Barr conducted by the House Committee on Oversight and

3  Government Reform under the authority granted to it pursuant to House rule X.   Accordingly,

4  House rule X grants the Committee broad jurisdiction for the Committee to conduct investigations of

5  any matter at any time.

6          On July 23, 2025, the Subcommittee on Federal Law Enforcement of the Committee on

7  Oversight and Government Reform voted by voice to approve a motion directing the Chairman to

8  authorize and issue a subpoena to Mr. Barr for deposition.

9          On August 5, 2025, Chairman Comer issued a subpoena for Mr. Barr to appear today for a

10  deposition in furtherance of the Committee's investigation into the actions and investigations of

11  Mr. Jeffrey Epstein and Ms. Ghislaine Maxwell.   I will enter the subpoena and corresponding cover

12  letter as exhibit 1.

13                              [Barr Majority Exhibit No. 1

14                              was marked for identification.]

15          ███████████  The Committee then noticed today's deposition on August 13, 2025.   I will

16  enter the notice for this deposition as exhibit 2.

17                              [Barr Majority Exhibit No. 2

18                              was marked for identification.]

19          ███████████  While exhibit 2 is being passed around, I'll note for the record that Mr. Barr

20  said that he would comply voluntarily and is here to testify today.

21          Can the witness please state his name and spell his last name for the record.

22          The Witness.   William P. Barr, B-a-r-r.

23          ███████████  Thank you.   My name is ███████████, and I am the general counsel for

24  Chairman James Comer.

25          Under the Committee on Oversight and Government Reform's rules, you are allowed to have

1    a counsel present to advise you during this deposition.    Do you have counsel representing you in a

2    personal capacity with you today?

3           The <u>Witness.</u>    Yes.

4               Will counsel please identify themselves.

5           Mr. <u>O'Callaghan.</u>    Yes.    Edward O'Callaghan, Cahill Gordon & Reindel, for Mr. William P.

6    Barr.

7           Thank you.

8           For the record, starting with the rest of the majority staff, can the additional staff members

9    please introduce themselves with their name, title, and affiliation.

10           , counsel for the majority.

11           , professional staff member for the majority.

12           , staff assistant for the majority.

13           , senior adviser for the majority.

14           , digital director for the majority.

15           , systems administrator for the majority.

16           , fellow for the minority.

17           , fellow for the minority.

18           , counsel, minority.

19           , senior counsel, minority.

20           , counsel, minority.

21           , counsel, minority.

22           , deputy staff director, minority.

23           And the Members in the room?

24    Chairman <u>Comer.</u>    James Comer, Chairman House Oversight Committee.

25    Mr. <u>Subramanyam.</u>    Suhas Subramanyam, Oversight Committee, minority.

1          ████████████      Thank you, all.

2          Mr. O'Callaghan.    Good morning.

3          ████████████      Mr. Barr, before we begin, I would like to go over the ground rules for the

4    deposition.    The questioning will proceed in rounds.    The majority will ask questions for an hour,

5    and then the minority will have an opportunity to ask questions for an hour if they choose.    To the

6    extent Members have questions for the witness, they will be propounded during their side's

7    respective rounds.

8          The clock will stop if you need to confer with counsel, your counsel is speaking, and when

9    Members or staff are speaking during the opposing side's round of questions.    We will alternate

10   back and forth until there are no more questions.    Do you understand?

11         The Witness.    Yes.

12         ████████████      There is a court reporter taking down everything I say and everything you say

13   to make a written record of the interview.    For the record to be clear, please wait until the staffer

14   questioning you finishes each question before you begin your answer, and the staffer will wait until

15   you finish your response before proceeding to the next question.    To ensure the court reporter can

16   properly record this deposition, please speak clearly, concisely, and slowly.    The court reporter

17   cannot record nonverbal answers, such as nodding or shaking your head.    So it is important that you

18   answer each question with an audible, verbal answer.    Do you understand?

19         The Witness.    Yes.

20         ████████████      Exhibits may be entered into the record.    Majority exhibits will be identified

21   numerically; minority exhibits will be identified alphabetically.    Do you understand?

22         The Witness.    Yes.

23         ████████████      We want you to answer our questions in the most complete and truthful

24   manner possible.    So we will take our time.    If you have any questions or do not fully understand

25   the question, please let us know and we will attempt to clarify, add context to, or rephrase our

1    questions.

2              If we ask about specific conversations or events in the past and you are unable to recall the

3    exact words or details, you should testify to the substance of those conversations or events to the

4    best of your recollection.    If you recall only a part of a conversation or event, you should give us

5    your best recollection of those events or parts of conversations that you do recall.    Do you

6    understand?

7              The Witness.    Yes.

8              ███████    You are required by law to answer questions from Congress truthfully.    This

9    also applies to questions posed by congressional staff in this deposition.    Do you understand?

10             The Witness.    Yes.

11             ███████    If at any time you knowingly make false statements, you could be subject to

12    criminal prosecution, including but not limited to perjury.    Do you understand?

13             The Witness.    Yes.

14             ███████    This includes both knowingly providing false testimony but also stating that

15    you do not recall or remember something when, in fact, you do.    Do you understand?

16             The Witness.    Yes.

17             ███████    Furthermore, you cannot tell half-truths or exclude information necessary to

18    make statements accurate.    You are required to provide all information that would make your

19    response truthful.    A deliberate failure to disclose information can constitute a false statement.

20    Do you understand?

21             The Witness.    Yes.

22             ███████    Is there any reason you are unable to provide truthful testimony in today's

23    deposition?

24             The Witness.    No.

25             ███████    Please note that, if you wish to assert a privilege over any statement today,

1    that assertion must comply with the rules of the Committee on Oversight and Government Reform.

2    Pursuant to that, Committee rule 16(c)(1) states, "For the chair to consider assertions of privilege

3    over testimony or statements, witnesses or entities must clearly state the specific privilege being

4    asserted and the reason for the assertion on or before the scheduled date of testimony or

5    appearance."

6            For the purposes of the deposition, objections must be stated concisely and in a

7    non-argumentive and nonsuggestive manner.    If the witness refuses to answer a question to

8    preserve a privilege, the Committee may seek a ruling from the chair.    If the chair overrules any

9    such objection, the witness shall be ordered to answer.    If the witness continues to refuse to answer

10   a question despite being ordered to do so, the witness may be subject to sanction.    Do you

11   understand?

12           The Witness.    Yes.

13           ██████████    Ordinarily, we take a 5-minute break at the end of each hour of questioning,

14   but if you need a longer break or a break before that, please let us know and we will be happy to

15   accommodate.    However, to the extent that there is a pending question, we would ask that you

16   finish answering the question before we take the break.    Do you understand?

17           The Witness.    Yes.

18           ██████████    Finally, I will note for everyone here today that the contents of what we

19   discuss in the deposition are confidential under the House deposition regulation.    Under the rules,

20   the Chairman and Ranking Minority Member shall consult before any release of testimony or

21   transcripts, including portions thereof.    This means it is a violation of House and Committee rules to

22   disclose content of the deposition prior to its official release.    For this reason, the marked exhibits

23   you that we will use today will remain with the court reporter so they can go into the official

24   transcript, and any copies of those exhibits will be kept at the table or returned to us when we wrap

25   up.

1          Can the reporter please swear in the witness.

2          The <u>Reporter.</u>    Will you raise your right hand for me.

3          Do you solemnly declare and affirm under penalty of perjury that the testimony you are about

4    to give will be the truth, the whole truth, and nothing but the truth?

5          The <u>Witness.</u>    Yes.

6          ███████████    Mr. Barr, do you have any more questions before we begin?

7          The <u>Witness.</u>    No.

8          ███████████    Thank you.    My clock says 10:10.    The majority hour will begin now.

9                                        EXAMINATION

10              BY ███████████ :

11          Q    Very, very briefly, we want to go through your background and the only two experiences

12    that I think are relevant today.    Where did you attend undergrad, and what year did you graduate?

13          A    Graduated Columbia College in 1971.    I grad -- I got a master's from Columbia in 1973.

14    I went to law school at GW here in Washington at night and graduated in 1977.

15          Q    Thank you.

16          A    During that time, I worked at CIA.

17          Q    And then President H.W. Bush appointed you to be United States Attorney General from

18    1991 to 1993.    Is that correct?

19          A    Yes.    I was in the Department at the start of his administration, and he ultimately

20    appointed me Attorney General.

21          Q    And then President Trump appointed you Attorney General February 2019

22    through -- and then you left December 2020, correct?

23          A    Right.    I was confirmed in February 2019.

24          Q    Were you acting prior to your confirmation?

25          A    No.

1    Q    Moving on to the topic at hand, just some preliminary questions, have you ever met

2  Mr. Epstein?

3    A    Have I what?

4    Q    Have you ever met Jeffrey Epstein?

5    A    Not to my knowledge.

6    Q    I'll pause for a minute.

7    Ms. Crockett, do you mind identifying yourself for the record?

8    Ms. Crockett.    Yes.    Jasmine Crockett, Texas-30.

9         BY ▊▊▊▊▊▊ :

10    Q    And, then, have you ever met Ms. Ghislaine Maxwell?

11    A    Not to my knowledge.

12    Q    In general, is the Attorney General aware of every Federal criminal investigation that's

13  happening at any given point?

14    A    No.

15    Q    What sort of cases would the Attorney General be made aware of?

16    A    Well, generally, things would percolate -- generally, people report into the Deputy

17  Attorney General.    Every morning I would have a staff meeting where the Deputy participated and

18  his principal staff and my own staff, and matters that had come -- that required my attention would

19  come up through that system.    Sometimes offices would directly communicate with me, especially

20  when there was a conflict, but matters would either come to my attention if there was a

21  disagreement within the Department or if it was a matter of national importance.

22    Q    Did you or your staff closely monitor high-profile cases within the United States?

23    A    I think my staff monitored high-profile cases and brought things to my attention that

24  they felt I should be aware of.

25    Q    And then, for the -- pretty much the remainder of the deposition, we'll focus on your

1    time as Attorney General in the first Trump administration.

2         A    Sure.

3         Q    Did you have any conversations about the Epstein case while you were Attorney

4    General?

5         A    Any conversations?

6         Q    Yeah, just broadly.

7         A    Yes.

8         Q    Do you recall when the first one was?

9         A    I became -- at some point, and this was 6 years ago, but I became aware that the

10   Southern District was conducting an investigation.    I think it was a little bit before his arrest, but I

11   can't be sure of that.    It could've been around the time of his arrest, but I was aware that they were

12   conducting an investigation.    I don't recall specific discussions surrounding that.    I could tell you

13   what my understanding of what were investigating, but I don't remember particular

14   conversations.    It's just my impression of what came up to me at that time.

15        Q    Can you describe your general understanding of what they were investigating?

16        A    So my understanding was that they were investigating whether he committed trafficking

17   offenses, particularly focusing on his exploitation of young women, and they were trying to make

18   that case against him.    And, in that context, they were also looking as to whether any individuals

19   were accomplices or complicit in that activity, either as facilitators -- as, you know, they ultimately

20   went after and convicted Ghislaine Maxwell.    And I think they were -- and I know they were also

21   looking at whether there was evidence to charge anyone with participating in trafficking by having

22   involvement with the trafficked victims.

23        Q    To the best that you can, can you describe the difference between what participating in

24   the trafficking would be and what facilitating the trafficking would be?

25        A    Having -- well, the latter -- I mean, I'm sorry, participation as a -- would be having illicit

1    sex with a minor, a trafficked minor.

2          Q    And facilitating --

3          A    Or anyone who was trafficking.

4          Q    Yeah.

5          A    But certainly what the focus was on was illicit sexual activity with a minor.

6          Q    And then what would facilitating be of, I believe, Ms. Maxwell was --

7          A    Helping -- helping conscript young girls into Epstein's network of young girls who

8    primarily were involved in giving him massages and engaged in sexual activity with him.

9          Q    And then you said you don't -- correct me if I'm wrong -- don't really recall more than

10   the general conversations at that point in time?

11         A    Right.

12         Q    Do you recall who those conversations were with in -- or kind of surrounding the arrest

13   of Epstein in 2019?

14         A    Yeah.    It was either before -- it could've been before the arrest, but certainly, by the

15   time of the arrest, I was aware of it, and it would've been -- it would've been the people who

16   normally attend my meeting.    It could've been a conversation with the U.S. attorney, but I don't

17   remember if it was.

18         Q    Do you recall who normally attended those meetings?    You might've said earlier, but --

19         A    It would've been the Deputy and the Deputy's principal associate, as well as my chief of

20   staff, and sometimes additional members of the staff.    And it would also include, from time to time,

21   you know, other people -- other members of the staff who were directly concerned with the matter.

22         Q    Do you recall any conversations with the FBI at that point in time -- still sticking to

23   surrounding his arrest?

24         A    No.

25         Q    And then, you said might've included the U.S. attorney.    Are you referring to the U.S.

1    attorney for the Southern District of New York?

2        A    Geoff Berman, yeah.

3        Q    Do you recall any conversations with anyone with the Southern District of Florida at that

4    time?

5        A    I don't recall.

6        Q    And, then, do you recall any conversations with Mr. Alex Acosta at that time?

7        A    Not about -- not about this case.

8        Q    Not about Epstein?

9        A    Not about Epstein.

10       Q    Okay.    He obviously served in the administration --

11       A    Yes.

12       Q    -- with you, so in other cases.

13       A    Yes.

14       Q    I'm going to -- similar questions, different timeframe and different subject for

15   Ms. Maxwell.    Do you recall any conversations about Ms. -- the Maxwell case while you were

16   Attorney General?

17       A    Yes.    I can't pinpoint particular discussions.    I think, once he committed suicide, you

18   know, the office -- I remember being told and agreeing that the office had to go full bore ahead on

19   finding other crimes that may have been committed, including looking for people who were

20   accomplices in some way or complicit in some way.    And her name came up in that context,

21   obviously, as the prime person they were --

22       Q    And don't recall -- just to avoid the same list of people, but don't recall specific

23   conversations with anybody regarding that case?

24       A    I may have had a conversation with Berman where he said in the wake of the suicide

25   that he -- you know, that the office was very much committed to continuing the case, getting to the

1    bottom of everything.

2         Q    Thank you.

3         I'm going to --

4         A    I would say, she went -- she disappeared, and there was this embarrassing period where

5    they couldn't locate her.    And, you know, at some point, I became aware that they were prepared

6    to indict her and that they couldn't find her.    So -- but, aside from that general information, I don't

7    recall anything specific about that.

8         Q    I believe they eventually found her in like a cabin in Vermont or something?

9         A    New Hampshire.

10        Q    New Hampshire.    Do you recall how they ended up finding her?

11        A    No, I don't.

12        Q    I'm going to shift ahead in the timeline a little bit to Mr. Epstein's death while at MCC in

13   Manhattan.    So you previously stated that you personally reviewed the security footage from MCC

14   from August 9, 2019, into the morning of August 10th.    On -- we'll pull up what the Department has

15   since released just so that you can view it, and I just want to ask you a first question.    Does this look

16   like the security footage that you would've reviewed at the time?

17        A    No, I can't remember specifically the security footage and what the composition of it

18   was.    I do recall that it showed the common area and a portion of the stairway up to Tier L.    I think

19   it's Tier L.

20        Q    Yes.    So I'll ask some more specific questions, but this is the about 11 hours that the

21   Department released this -- a month or so ago.    And it's a -- we'll look at it schematically.    It's a

22   camera pointed towards the common area of the Special Housing Unit at MCC.    The stairway on the

23   left goes to a different tier, and then you can see a very little bit of a stairway on the right that goes

24   to Tier L.

25        A    Uh-huh.

1    Q    But you do --

2    A    I really can't compare it because I can't really remember --

3    Q    Yeah.

4    A    -- exactly what I saw.    I remember -- what I remember about what I saw is that the

5    resolution was good enough that I could see what the guards were up to -- the correctional officers

6    were doing.    I mean, not crystal clear, but I could tell that they were looking at computers and

7    working on computers and so forth.    So I remember that the resolution was pretty good, and it may

8    have been -- it could've been an enhanced or an enlarged part of this.    I just don't remember.

9    Q    And, to the best of your recollection, were there any anomalies in the tape that you

10   reviewed, any missing minutes or anything like that?

11   A    Not that I'm aware of.    I was told that it covered the period from the time he was put

12   in his cell to the time he was discovered.    I wasn't told of any missing minute and didn't notice any.

13   Q    Do you recall viewing other camera angles like a camera pointed down Tier L or a

14   camera in the stairwell or anything?

15   A    I do remember other footage, looking at other footage as well, but I -- I think some may

16   have been of hallways or entrances and things like that.

17   Q    Do -- the inspector general ended up reviewing Mr. Epstein's death, investigating --

18   A    Yeah.

19   Q    -- Mr. Epstein's death.    And they found that the camera pointed directly down L block

20   was transmitting in real time but not recording to the DVR.    Does that --

21   A    Yeah.

22   Q    -- match your recollection?

23   A    That matches my recollection.    Let me just say that, you know, the video came to me

24   after, but a lot of information started coming to me immediately in the wake of his death, and I was

25   getting a lot of information sort of real time, and including from the Bureau.    And, as I found out

1    things, you know, I started reaching my conclusions.    And this sort of came later in the process.

2    Q    Okay.

3    A    It wasn't the first thing I looked at.

4    Q    Yeah.    I'll --

5    A    I think it took some time of working to get whatever they were getting to me, so --

6    Q    I'll try to cover as much as I can, but we'll start with the video.

7    ███████    I'm going to go ahead and introduce what will be exhibit 3, just because I think

8    it'll help in discussions.

9                            [Barr Majority Exhibit No. 3

10                            was marked for identification.]

11           BY ███████ :

12    Q    And it is a map of the Special Housing Unit, the top tier of the Special Housing Unit at

13    MCC --

14    A    Thank you.

15    Q    -- with the cell.    It's produced by CBS.

16    A    Yeah.

17    Q    And Mr. Epstein's cell is the one highlighted in red.    And, just while we're looking at

18    this and looking at the camera footage, the camera angle that we're looking at is that little alcove in

19    kind of the center of the map.

20    Mr. O'Callaghan.    This is -- you're representing that, ███ about -- that that's --

21    ███████    Yes, I am.

22    Mr. O'Callaghan.    Okay.

23    ███████    And I can pull the CBS article.

24    Mr. O'Callaghan.    I just want to make sure he's looking at where you're pointing.

25    ███████    So that camera is positioned right here.

Mr. O'Callaghan.   See, look at what ▇ is doing.

▇   That camera is positioned right here and pointed towards the common area.

Mr. O'Callaghan.   So, it's up here.

The Witness.   Okay.   I'm glad you -- yeah, yeah.

Mr. O'Callaghan.   And that's his cell.

The Witness.   Yeah.   Right.

Mr. O'Callaghan.   Okay.

▇   All right.   I'm going to play 30ish seconds just so we can get our bearings on what the movings of the jail look like.

[Video shown.]

BY ▇ :

Q    So, just while this is playing, you see what appear to be corrections officers kind of walking around the common area going back to the desk.

And then there's specific points I want to point out.   So that corrections officer came from what appears to be a blind spot on the camera towards the right.   And that inmate came from what appears to be a blind spot on the camera to the right.

We can pause it.

Just -- I understand we reviewed 15 seconds of footage, but based off that review, do you agree that a there is a bit of a blind spot on this camera blocked by the stair landing and that cell?

A    Yes.

▇ .   I'm going to shift ahead to the 9:20 mark.   So I will preface this with this is 7:49 p.m. on August 9, 2019.

And you can hit play.

[Video shown.]

▇   So this video shows Mr. Epstein escorted from a -- escorted by a corrections

1   officer from making a phone call back to his cell in L block.     So you can see him kind of go out of

2   frame and go up those stairs to L block.

3        Mr. O'Callaghan.     Again, ▇▇▇, you're representing that that's Epstein walking through?

4             ▇▇▇▇▇▇     Yes.     And --

5        Mr. O'Callaghan.     You can't really tell --

6             ▇▇▇▇▇▇     -- so is the DOJ, IG, and the FBI.

7        The Witness.     I'm not going to challenge it.

8             BY ▇▇▇▇▇▇:

9        Q     Okay.     And -- that was going to be my next -- is that your recollection of that scene as

10  well, that, around 7:49, Mr. Epstein went to his cell for the evening?

11       A     That's my -- I can't say actually -- that's my recollection of events that I saw on the video,

12  which is him being taken to his cell.     That was 7:49 or whatever.

13       Q     And, then, again, understanding that we watched about 10 seconds of that walk from

14  his phone call to his cell, but in addition to the blind spot of the camera kind of like off to the right,

15  it's also a bit of a blind spot on the staircase up to L block.     Would you agree?

16       A     On this video, you know, only a portion of the stairway is -- all the way up is reflected,

17  and my recollection was a portion of the stairway was reflected on the video.

18       Q     That you reviewed as well?

19       A     Yes.

20       Q     Okay.     Do you recall reviewing any video that showed that staircase in its entirety?

21       A     No.

22       Q     Do you recall reviewing any video that showed L block in its entirety?

23       A     No.

24       Q     So, going back to the diagram and understanding kind of, again, we reviewed all of

25  30 seconds of this footage, but I am representing that it's the 30 seconds that surround his

1  death -- or surround him going back to his cell, the blind spot also includes this door on the kind of

2  center of this schematic, which is an entrance into the Special Housing Unit.

3           And just asking, based off your experience and everything that you reviewed, looking at this,

4  looking at the video, this -- the only video that is publicly available, is it possible for someone to get

5  up to Mr. Epstein's cell while evading that camera?

6       A    I don't believe so.

7       Q    You don't believe so?

8       A    No.

9       Q    Even though part of the staircase is blocked and that entire doorway would be blocked?

10      A    Yes.    I do not think it was physically possible for someone else to go up that stairway.

11      Q    And then --

12      A    You --

13      Q    At the time, you said that you believe no one entered L block between the time --

14      A    Not just because of the camera though.

15      Q    Uh-huh.

16      A    Yeah.

17      Q    So what other evidence did you have to support the statement that no one entered L

18  block between 7:50ish and --

19      A    Okay.    Well, I know we're starting with the video, but, for me, the video was the icing

20  on the cake, okay.

21      Q    Okay.

22      A    So there was a lot of evidence about, you know, his state of mind and other physical

23  evidence pointing to suicide and also testimonial and records pointing to this.    But, in a nut -- but

24  one aspect of this is that the SHU is itself physically isolated from the rest of the facility and that it

25  only has two entranceways.    The primary entranceway has to be opened remotely by central

1      control.   So no one would have the key for it.   And it was my understanding that that would leave

2      a record of it being opened.   So there was no way to come in that door except going through central

3      control -- having it remotely opened.

4              And then, second, the second door --

5          Q     I'm sorry, just the primary door is the door in the center of the schematic that appears

6      open in the picture.   Is that the primary one?

7              Mr. O'Callaghan.   He's saying this one.

8              The Witness.   In the -- the one up here?

9              ███████████     Yes.

10             Mr. O'Callaghan.   Are you pointing to the black rectangular section?

11             ███████████     Yes.

12             Mr. O'Callaghan.   He's saying it's that.

13                 BY ███████████ :

14         Q     Which one is the primary entrance into the SHU?

15         A     Well, I don't recognize the schematic, but from my recollection is the primary -- the

16     primary exit is over on the right-hand side --

17         Q     Okay.

18         A     -- here.   And, if it's over here, then I would have to see a schematic.   But my

19     recollection is that you have to come up an elevator, and then you get into a room where you have to

20     get through the control door that can only be opened centrally.   And, then, if you -- once you get

21     through that, you come through the door that immediately enters onto the SHU, and that requires a

22     key.   And my understanding was that the key to that was held by the officers inside the SHU, and

23     they would have to come and let that person in.   That's my understand -- that was my

24     understanding.

25             So I think it was not physically possible in the first instance -- well, in my opinion -- for

1    someone to come through there.    But, otherwise, it was also my judgment that the video

2    corroborated that because, number one, it showed the two officers who were in the SHU.    The only

3    ones in the SHU at the time did not leave their desk.    So they didn't go to let anyone in.

4        Q    Uh-huh.

5        A    And, second, it was my judgment, from what I saw on the camera and what I looked at, I

6    didn't think it was possible for someone to get up to the tier and open the door without being picked

7    up in the camera, so --

8        Q    Opening the door would also potentially make noise?

9        A    Oh, clearly.    It's a big, heavy, steel door.

10       Q    Yeah.

11       A    Yeah.

12       Q    Thank you.

13            And, then, did -- you said that the Central Command had to open one of the doors, and then a

14   key --

15       A    Yes.

16       Q    -- located at the guard desk had to open a second --

17       A    Right.

18       Q    -- set of doors?

19       A    Right.

20       Q    Did you --

21       A    And it was also that arrangement for the secondary entrance as well.

22       Q    Did you review the command logs --

23       A    -- no, I didn't.

24       Q    Nobody entered?

25       A    I didn't review them, no.

1    Q    Oh, you didn't review the command logs.

2         Are you aware of the --

3    A    I didn't personally review them.    I was aware that they had judged that it was not

4    possible for someone to come in.

5    Q    Are you aware if anyone reviewed whether or not an entrance or exit was logged?

6    A    I believe the Bureau was looking at that intensively, the whole issue of whether this

7    could've been anything other than a suicide.

8    Q    The -- are you referring to the Bureau of Prisons or the FBI?

9    A    I'm sorry; the FBI.

10   Q    Thank you.

11   A    And the IG.

12   Q    And they did an almost 4-year investigation into this, I think?

13   A    The IG did.

14   Q    Yeah.

15   A    The Bureau was much quicker.

16   Q    Now we're going to go back -- back in time based off the evidence that you reviewed.

17   Around 6:30 a.m., on August 10th, the -- one of the -- I'm not sure their title, but the individual

18   delivering breakfast to the inmates attempted to deliver breakfast to Mr. Epstein.    He did not

19   answer the door.    He called the guards, and they found his body and began providing medical care.

20   Does that sound correct to you, to the best of your recollection?

21   A    Yes.

22   Q    And then, about an hour later, he was pronounced dead at a hospital at New York

23   Presbyterian, I believe, in New York.

24   A    I know he was pronounced dead at the hospital, yeah.

25   Q    When were you first informed of Mr. Epstein's death?

1    A    It was Sunday morning.    I was in my study at home, and I got a call from my chief of

2    staff saying that -- that Epstein died from an apparent suicide.

3    Q    Do you recall about how close in time it was to the pronouncement of death?

4    A    I -- I don't recall.    It was in the morning, I believe.

5    Q    And it's still your opinion today that Mr. Epstein died by suicide?

6    A    Absolutely.

7    Q    Before getting into kind of what the investigation looked like after that, what

8    information was flowing to you, do you know, to the best of your knowledge, what are the policies

9    and procedures in place to -- that were in place to ensure that Mr. Epstein didn't commit suicide?

10    A    Well, there had been an -- as you know, there had been an attempted suicide in July.

11    And, based on that, they put him under suicide watch, which is the most intensive form of

12    monitoring.    And then he was taken off suicide watch, based on the psychologists at the MCC

13    making the determination that he could be taken off that kind of intensive watch.

14         I found out afterward that, you know, his lawyers had been pressing hard for him to be let out

15    of suicide watch.    And, in any event, he was put on the next level down, which was -- I forgot exactly

16    the term used for it, but it required that he have a cell mate and he be checked every 30 minutes.

17    Those were the -- in addition to, you know, the other general security systems in place, those were

18    the two that applied directly to him that were supposed to prevent this.

19    Q    And on -- understanding suicide watch is very intensive, requires a lot of staff power,

20    and on suicide watch, are they provided with clothes that don't tear and sheets that don't tear?

21    A    I believe that's the case.

22    Q    And then, as --

23    A    I don't know.    I can't -- I believe that they -- they're careful about the utensils, but I

24    think eyeballs are on them 24/7.    That's my understanding of it.

25    Q    And, then, when were you first provided with a more formal briefing regarding

1   Mr. Epstein's death?

2       A       I think it came virtually every day I found out more information.    You know, I was

3   obviously covering it very quickly and wanted to rule out anything other than suicide, and so

4   pertinent information was flowing to me pretty consistently.

5       Q       And it was -- and --

6       A       The FBI was conducting an investigation, and the Southern District was involved in that.

7   And I -- the -- within an hour or minutes of finding out about it, I directed the IG to have people in

8   New York go to the scene and conduct an investigation -- start an investigation.

9       Q       And you've already said that, you know, you reviewed security camera footage.

10  Obviously, there was a previous suicide attempt that probably had psychologist notes and things that

11  were available to the FBI and BOP to review and the IG to review.    Were there any other things that

12  you reviewed specifically?

13      A       I've -- from time to time, I would -- I would review photographs when people were

14  discussing things that were pertinent.    I may have seen -- I think I may have been shown logs that

15  were apparently, you know, erroneously filled out by the corrections officers, things like that.    The

16  systems were explained to me from time to time.    The BOP was also conducting their own

17  investigation.    So there was sort of three investigations going on at once.

18      Q       And it was kind of the culmination of all the information that was provided to you that

19  led to the judgment that it was a suicide?

20      A       Yes.    Well, over time, it became clearer and clearer to me that it was undoubtedly

21  suicide.    And.    As I say, the video was probably the last thing that I looked at -- or, you know, in

22  reaching that conclusion.

23      Q       Do you recall viewing any specific documents during that time period, like the coroner's

24  report or --

25      A       I did review the coroner's report.

1    Q    Did you -- I asked this, but did you review like entry and exit logs for the SHU?

2    A    I may have.    I saw some records.    I can't remember what they were.

3    Q    Okay.    The chief medical examiner at the time stated after examination that Epstein

4    died by, I believe it was described as kneeling hanging, so not jumping off the top bunk but using

5    leverage to kind of lean forward.    Does that fit your recollection?

6    A    I remember discussion of a kneeling hanging, but I -- I can't remember what posture he

7    was in at the end.

8    Q    And --

9    A    They found him with his buttocks facing the --

10    Q    The ground.

11    A    -- the ground.    So I'm not sure he was on his knees at that point.

12    Q    But you hadn't -- do you recall seeing any evidence that he jumped off the bunk or

13    otherwise like fell --

14    A    I think --

15    Q    -- versus just kind of --

16    A    No.    I think the evidence was that he hung himself.    And it was essentially close to the

17    modus operandi that he had used before being put on watch, you know, the same nooses and

18    coming off the top and landing.    In that case, he landed on his knees apparently.    It didn't work.

19    Q    Were you being kept apprised of the autopsy and its results in sort of real time?

20    A    No.

21    Q    Do you recall when --

22    A    That's -- that was conducted by New York.

23    Q    Do you recall when you --

24    A    Or the city, I think, maybe, but --

25    Q    Do you recall when you first got briefed on the autopsy?

1        A      Well, I heard about it pretty soon after it came out.

2        Q      And, at that point, it kind of confirmed to you that the medical examiner ruled it a

3    suicide?

4        A      Yes.    And the fact that there were -- I mean, I think, not only that ruling but the fact

5    that there was no sign of any struggle.    I mean, he was a fairly large guy, and the idea that people

6    would go in there and hang him in that way with numerous nooses being tied and so forth without

7    any sign of a scuffle was not plausible.

8        Q      Yeah.    I think I remember -- I don't remember which investigation it was in, but I

9    remember reading like no, you know, skin or fibers under his fingernails.

10       A      There was none.

11       Q      No, like, scratch marks, anything --

12       A      No contusions.

13       Q      -- any kind of like defensive marks.

14       A      None.

15       Q      Is that similar to your --

16       A      Yes.

17       Q      -- recollection?

18       A      Yes.

19       Q      The -- I believe Mr. Epstein's brother hired an expert medical witness to rereview the

20    autopsy and --

21       A      Right.

22       Q      -- the examiner's report, named Dr. Michael Baden.    Are you --

23       A      Yes.    I'd see him occasionally on TV.    I've seen him.    He frequently comes into these

24    kinds of situations.

25       Q      I believe he was described as an expert medical witness in high-profile cases, so --

1    A    Uh-huh.

2    Q    -- take with that what you will.

3    A    Yes.

4    Q    But do you recall Dr. Baden being involved at the time?

5    A    I remember just reading news coverage -- well, he came in after, I believe, after the

6    autopsy, reached his conclusions, and he offered another view of it.    And I remember press reports

7    to that effect.

8    Q    He -- his view, which is contrary to the medical examiner's, and, again, I will say that he

9    is an expert medical witness not a medical examiner, but that Epstein had fractures to his larynx, and

10    I believe it was three fractures -- three different fractures to his hyoid bone in his neck, and that was

11    described as extremely unusual in suicidal hangs and more consistent with homicidal strangulation.

12    Do you recall any conversations about Mr. Baden's report within the Department or with the FBI?

13    A    I remember conversations about it, commenting on it.

14    Q    Did anyone agree with Mr. -- Dr. Baden's finding?

15    A    No.    I mean, no one expressed agreement during any of my conversations.

16    Q    No one expressed disagreement to you.

17    Did -- understanding evidence was -- and information was flowing really quickly, did you ever

18    see any evidence that suggested Mr. Epstein's death was a homicide?

19    A    No.    On the contrary, I think, when you look at the cumulation of all the evidence,

20    including the testimony of individuals, his state of mind, you know, the whole thing, the processes,

21    you know, one of the things that impressed me was that it would have required -- it would have

22    required people -- it wasn't known until 8 o'clock that morning, I believe, that his cellmate was gone,

23    and it wasn't even clear during the day whether he'd get a replacement.

24    So there wasn't much time for people to understand that he was going to be by himself, very,

25    very little time.    And this would've required coordination from probably two dozen people maybe

1    within the prison.    And all these people were in different groups -- you know, the people who were

2    repairing the cameras, the people who, you know, were responsible for opening and closing the

3    door, the people who were responsible for putting in a new cellmate, things like that.    For all that to

4    be coordinated, it would've required, I think, as I say, maybe two dozen people.

5         Q    Uh-huh.    So kind of -- and I'm not -- I don't mean to be testifying, but, like, in summary,

6    kind of between his state of mind, previous suicide attempt, and the processes in place, in addition to

7    the coordination it would take to override those processes all pointed towards a suicide?

8         A    Absolutely.    Even before you got to the physical possibility of getting into the SHU and

9    getting up into his cell.

10        Q    All right.

11        A    And the fact that there are eyewitnesses on that very tier, other prisoners, including two

12    right across the way who saw no one go in that night.

13        Q    And said they never heard the door open --

14        A    Right.

15        Q    -- and things like that.

16             To your knowledge, did the FBI ever investigate Epstein's death as a homicide?

17        A    To my knowledge, no.

18        Q    Do you know if anyone investigated --

19        A    I think they investigated to determine whether it was a homicide, but I don't think they

20    ever, you know, got to the point of feeling that this was a homicide.

21        Q    They never -- the evidence --

22        A    I mean, it was -- a homicide -- or, I mean, suicide.

23        Q    Yeah.

24        A    Yeah.

25        Q    The -- kind of that -- the evidence never swung to more probable --

1    A    No.

2    Q    -- that it was a homicide?

3    Do you recall --

4    A    No, not that I was aware of.

5    Q    Do you recall anyone investigating it as a homicide that you were aware of?

6    A    No.    I don't think anyone got to the point of feeling that it was murder.

7    Q    Going back to Dr. Baden just very briefly, I know that you said that you

8    recalled -- generally, you recalled conversations regarding his contrary findings.    Do you recall

9    having any conversations about Mr. Epstein's broken larynx and hyoid bones outside of Dr. Baden's

10    findings?

11    A    I think -- I heard it discussed within the Department.

12    Q    And, to the best of your recollection, the discussions were that it was still consistent

13    with a suicidal hanging?

14    A    Right, that they still believed the medical examiner was correct.

15    Q    And, then, you already said this, but I want to ask it explicitly:    You instructed the IG to

16    open the investigation into --

17    A    Yes.

18    Q    -- Epstein's death?

19    A    On the -- as soon as I got off the phone with my chief of staff, I believe he contacted -- I

20    asked him to contact the IG immediately.    I know that they're very familiar with Bureau of Prisons

21    and its processes, and I was told that he had people up in New York who could get to the prison right

22    away.

23    Q    And, then, we've talked about Mr. Epstein's state of mind an awful lot, and you said that

24    you or someone reviewed kind of the psychologist notes from the previous suicide attempt, the

25    reports that are associated with taking an individual off suicide watch.    Do you recall any other

1    evidence regarding -- that you reviewed regarding his state of mind, Mr. Epstein's state of mind?

2    A    Well, you know, I was aware that, you know, he had tried suicide, which I viewed as an

3    attempted suicide.    The -- he had done his last will and testament right before.

4    Q    When did you become aware of that one?

5    A    Sometime during this period where I was absorbing information.    I can't pinpoint it.

6    But there was a period of time where things were being learned, and I was finding out about them, if

7    they were pertinent.    And he -- his efforts to get bail had failed.    So he was looking at a period of

8    time of incarceration in that place, which I think for him was very difficult.

9         And I do remember the buzz that was caused that Friday, I believe, by the release of

10   documents by the court that had a lot of salacious material in there about prominent individuals and

11   so forth, and that that caused quite a stir.    And so I think that my judgment was this will sort of set

12   the stage for -- and was -- and he made a call to his girlfriend apparently.    I found out early that

13   he -- that procedures were not followed, and he was allowed to make an unmonitored call to a

14   woman, who I believe was in Byelorussia and who was his -- I understood to be or believed to be his

15   girlfriend at the time.    And he made a call to her at that point.    So it seemed important for him to

16   make a call that evening to her.

17        And so, putting all these together, I think it was consistent with suicide.

18   Q    And then during --

19   A    Just as to -- just as to his state of mind.

20   Q    Uh-huh.    During a speech shortly thereafter at the Fraternal Order of Police conference

21   on August 12th, you said that you learned of serious irregularities that were deeply concerning at

22   MCC.

23   A    Uh-huh.

24   Q    Do you recall what the irregularities were?

25   A    Well, one, you know, I was wondering who the person was who made the decision to

1   take him off suicide watch.    He had already attempted suicide.    And, for all the reasons I just

2   stated, it was someone that had to be watched, and he was high -- very high profile, and he would be

3   under pressure to identify coconspirators.    So I think that was one.

4          The fact that the checks, the 30-minute checks were not performed.    And I would say that

5   there was nothing apparently unusual about that.    This wasn't like people getting together and

6   saying, "Okay, tonight we're not going to perform the watches."    Apparently, it was pretty

7   consistent that they failed to perform the checks.

8          And, thirdly, that they didn't place -- and very importantly, that they didn't place another

9   prisoner in his cell.    So I was referring to those and, you know, all these -- and the camera not being

10  on.    That -- you know, that's obviously not necessarily directly relevant to it, but -- you know, the

11  same way the others are, but it's still all these screwups happening at the same time.

12         Q    And that was going to be my next question.    You also described it as a perfect storm of

13  screwups, is --

14         A    Uh-huh.

15         Q    -- I think, the exact quote, that you're referencing the same things, the checks not being

16  done, the guards allegedly falsified the records regarding --

17         A    Uh-huh.

18         Q    -- the checks, the cameras not working.    Also, the corrections officers also didn't

19  perform the institutional counts that night.

20         A    Right.

21         Q    Those kinds of things, the perfect storms of screwups.    Is that what you were referring

22  to?

23         A    Right.    And that became clearer and clearer as things went by.    But I started off with a

24  state of mind on this thing like, you know, this is going to take some explaining, you know, and I can

25  see why people would be suspicious, more than suspicious.

1      Q    Were the -- the IG report came out after your time as Attorney General in June of 2023?

2      A    Yes.

3      Q    The -- were you getting updates from the IG or just the FBI?

4      A    I think, my best recollection is that initially I did get some updates, you know, sort of

5  orienting me to some of the big facts and factors.    But, as -- but, you know, that -- that sort of

6  dribbled away, and certainly, after I left the Department, I wasn't getting anything.    But I don't -- I

7  can't -- initially I got some information, and that gradually ended.

8      Q    So the kind of steady stream, as much as it can be described that way, was more

9  from -- internal to the Department, FBI, BOP investigations that you were getting information from?

10     A    Yeah, through, staff, sometimes through BOP people, through my own staff who they

11  would talk to, sometimes directly.    David Bowdich, who was the Deputy FBI Director, and I had a

12  good relationship, and we talked frequently.    And, even as time went by, during the rest of my

13  tenure, when something -- some, you know, click-bait-type article appeared about something in the

14  Epstein case, I would sometimes call him and say, "Did you guys look at that," and, you know, so I

15  was continuing to pick up information.

16     Q    You just mentioned David Bowdich, Deputy Director of the FBI at the time.    It was

17  reported that you instructed him to keep the Deputy AG Mr. Rosen informed every 3 hours.    Does

18  that sound accurate?

19     A    Maybe on the first day or second day --

20     Q    Yeah.    It definitely --

21     A    -- I mean, initially.    Did I say every 3 hours?

22     Q    That's what was reported, but, you know, it's what was reported.

23     A    But it wasn't in my book?

24     Q    No.

25     A    Okay.    I told him to keep the Deputy's Office advised, you know, I think, probably every

1    day.    I doubt I said every 3 hours.    But, if I did say it, that may have been just on the first few days,

2    like we need to know in real time because all these allegations and the internet was going crazy.

3         Q     Yeah.    We just discussed some of the -- I'll describe them as kind of security failures at

4    that time, more -- maybe caused by low staffing, low budget, whatever the cause was.    There were

5    a number of failures that occurred between August 9th and August 10th.    We've discussed

6    the -- Mr. Epstein's attempted suicide on July 23, 2019, and you said you were -- you -- did you

7    become aware of that after his death, or was it prior?

8         A     Become aware of what?

9         Q     His attempted suicide in July.

10        A     That's a good question.    I -- you know, at some point, I obviously became aware of it.

11    My -- it's possible it happened before his suicide.    That he was taken off, you're saying?

12        Q     Or that he --

13        A     No.    No.    I heard about his suicide.

14        Q     No, no, that in July --

15        A     I mean suicide attempt.

16        Q     You heard about the suicide attempt --

17        A     Yes.

18        Q     -- prior to his eventual death?

19        A     Yes.    Yes.    I -- yes.    And I knew he was put on -- I knew he was put on suicide watch.

20        Q     And was that -- I mean, I --

21        A     But I don't remember being told that he was off the watch.    I could've been told before

22    his suicide.    My best recollection is that, after his suicide, I was certainly told about their kerfuffle

23    over whether or not he should be taken off watch.

24        Q     And that kind of information flowing up to the Attorney General's Office, was it primarily

25    because Mr. Epstein was a -- it was a very high-profile inmate?

1      A      That he had attempted suicide?

2      Q      Uh-huh.

3      A      Yes.

4      Q      Did --

5      A      Well, yes.

6      Q      The Attorney General wouldn't be notified every time an inmate in BOP custody

7      attempts suicide?

8      A      Not for an attempt.

9      Q      We discussed him being put on suicide watch and kind of what that entailed, and you

10     just mentioned where I was going next, that he was removed from watch after 24 hours, which I

11     believe is the minimum amount of time that you're allowed to be on suicide watch?

12     A      I don't -- I can't remember exactly how long he was on watch.      I was on the impression

13     it was multiple days, but I don't know.

14     Q      He was on -- I'll represent this, and I can bring it into the record, but he was on official

15     suicide watch for 24 hours and then stayed in that cell for about a week but was no longer on

16     constant monitoring, and then was moved back to the SHU.

17     A      I just can't remember those details.

18     Q      Okay.

19     A      I know he was on suicide watch, and then he was released from suicide watch.

20     Q      And you mentioned, and I'll just get your thought, a kind of kerfuffle around --

21     A      Yeah.

22     Q      -- whether or not to be removed from suicide watch.      Can you go into more detail

23     about that?

24     A      Well, that happened, and people were filling me in on this because it did not cast either

25     BOP or the Department in a good light that he was -- that someone like this would attempt suicide

1    and then be not put on suicide watch.    So I was regaled about that, you know, the arguments and

2    the process.

3        Q    Okay.    And you recall -- do you recall people advocating for a longer suicide watch for

4    him or --

5        A    I don't recall the details, no.

6        Q    Okay.    And then --

7        A    I -- you know, I mean, Main Justice would not have been involved in that, because, you

8    know, this was a pretrial -- MCC is pretrial.    And, you know, generally, the way a pretrial suspect is

9    handled is monitored by the U.S. Attorney's Office because they're the ones that have to report to

10    the judge when the judge is asking questions about, you know.    And so I normally wouldn't have

11    been brought into that.    Something of this profile, I wish I had been.

12        Q    And then the IG kind of went into detail about going on and taken off suicide watch.

13    Do you remember any internal investigations after his death, whether -- about the decision to take

14    him off suicide watch?

15        A    Just the IG's.    And -- yeah, just the IG's.    I don't know about the Bureau.    I can't

16    remember.

17        Q    And FBI is the Bureau in that case?

18        A    Yes.

19        Q    Okay.    I'm sorry.    There's lots of bureaus.

20        A    They're the only bureau.

21        Q    After -- and, again, all of this is to the best of your recollection.    So, if you don't recall

22    the specifics, that's totally okay.    After he was put back in the Special Housing Unit, according to his

23    roommate, who was interviewed by the IG, he was provided with extra bedding and sheets, a perk

24    that not very many inmates got.    Do you recall any conversations about that?

25        A    I don't remember that.

1    Q    Okay.    Shifting to the security cameras, which we talked about a little bit, but I want to

2    talk about the circumstances surrounding the cameras a little bit more, that there were 11 or so in or

3    around the SHU entrance and exits, hallways.    And we already discussed the one pointing straight

4    down L block, and then we watched the footage from the one pointing into the common area.

5    There was a DVR failure that resulted in these cameras working in real time but not recording.    Does

6    that -- do you recall that?

7    A    It was my understanding that a number of the cameras were not recording, although

8    they were still streaming live.

9    Q    And the DVR failure was -- for a while, had been going on for a while but was discovered

10    on August 8th.    Does that sound --

11    A    I didn't know that at the time but subsequently found that out.

12    Q    And then kind of the process of getting it back on --

13    A    Getting it fixed.

14    Q    -- getting it fixed took longer than expected, I think --

15    A    Yes.

16    Q    -- is correct?    Is that right?

17    A    Yes.    I was not aware of this as it was going on.    I was aware shortly after the suicide

18    that the cameras had apparently failed, and there was an effort that went on for, I would say, more

19    than 1 day, you know, of the Bureau going in to -- with technical experts to try to still capture

20    something and go over the disk and stuff like that.

21    Q    Do you recall the explanation given for the failure of the cameras?

22    A    No.    I can't remember the details of it, but I did monitor the technical people were

23    working hard on trying to get it, and then, you know, I saw whatever that was what they had.

24    Q    Do you recall seeing any evidence of tampering with the DVR system?

25    A    The Bureau, I don't think, believed it was tampered.    They felt it was -- there was a

1    nonmalicious explanation for it.

2        Q    And, kind of generally, in your discussions with the FBI and others investigating this, did

3    the lack of camera recordings have any negative impact on the investigation?

4        A    You know, I mean, it made the investigation harder, obviously, yeah.

5        Q    I mean, if the camera down L block had been working, it would've been an easier

6    investigation?

7        A    Yeah.    Now, it was working, and that's --

8        Q    Yes.    If it had been recording.

9        A    It wasn't in -- I'm not sure, but in -- my belief is that it was not general knowledge that

10    they were not recording, and people would've thought they were working.

11        Mr. O'Callaghan.    So, when you spoke about camera failures in answering ▆▆▆ questions,

12    the failures were the recording.

13        The Witness.    That's --

14            BY ▆▆▆▆▆▆▆:

15        Q    Yes.    And, I apologize, I'm trying to be very specific in that it was not recording to the

16    DVR.    They were projecting on the security monitors in real time, just not saving to the DVR.

17        You talk about another one of the series of mistakes is the lack of roommate, that, after

18    suicide watch, the psych department had said that he needed to have a roommate at all times.    Do

19    you recall conversations in the aftermath about why there wasn't a roommate assigned to his cell?

20        A    Yes.

21        Q    What were those conversations?

22        A    I can't remember the details, but I actually spent a lot of time on this issue and had

23    people walk me through, you know, why was he being released, what was the process, why did he

24    have to be released then, who was in charge of that, why did he get released, and I went through all

25    that stuff, and I went through it in detail.

1      Q    And didn't find -- to your knowledge, didn't find anything malicious in the timing of his

2  release?

3      A    No.

4      Q    And didn't find anything malicious in that the -- that MCC had not assigned Epstein a

5  new roommate?

6      A    I think that was the judgment of the FBI after a period of time, and then that ultimately

7  was the judgment of the IG as well.    That's my recollection.

8      Q    What -- do you recall kind of what the indications were brought to you that it was just a

9  mistake to not assign him a roommate?

10     A    I can't remember the details of it, the who struck John, but there were a lot of people

11  involved who, you know, "I told him this," "No, he didn't tell me this," you know, whether this watch

12  officer knew something or whether they didn't know something, and it was sort of -- it was intricate.

13  That's all I can remember.

14     Q    Yeah.

15     A    But, at the end of the day, it appeared to be screwups.

16     Q    And I think that's -- as you said, that was the IG's conclusion, too, that it was a lot of

17  word of mouth of this guy is getting transferred and confusion regarding if it was just going to trial or

18  a permanent transfer --

19     A    Right.

20     Q    -- that kind of stuff.

21     A    There were things like that.    And then there's, you know, different correctional officers'

22  shifts and things, and whether things that are important are communicated, and all that kind of

23  thing.

24     Q    It was -- in the course of the investigation, did you ever go to MCC?

25     A    No.

1    Q    Did you ever speak to the -- any of the inmates that were around Mr. Epstein at the

2    time?

3    A    No.

4    Q    Did you ever speak to any of his roommates?

5    A    No.    But I believe they were interviewed and was told the results.

1    [11:02 a.m.]

2                    BY [REDACTED]:

3        Q    I have nine minutes left, so I'm going to do the unmonitored phone call, and then we'll

4    go off the record for this round.

5            You had mentioned earlier and said that the IG, in its review, that Mr. Epstein made an

6    unmonitored phone call the evening prior to being brought back to his cell before he was -- before

7    his death on the 10th.

8            Do you recall being made aware of that after the fact?

9        A    After his suicide?

10       Q    Uh-huh.

11       A    Yes.

12       Q    And were you briefed regarding what happened with the call?

13       A    Along the way, I -- my recollection is the Bureau spent time trying to figure out who was

14   the recipient and trying to track that person down.

15       Q    And is it --

16       A    And, you know, eventually I -- the only thing I really remember, it was someone in

17   Byelorussia, I think.    That's my best recollection.

18       Q    But with a New York City area code?

19       A    I don't remember the details.

20       Q    Okay.

21           What are the -- to the best of your knowledge, what are the policies for inmates making

22   phone calls to non-attorneys?

23       A    You know, I did ask the FBI what was the call about, what did people -- what did she say,

24   and all that kind of thing.

25           So my understanding was that calls like that had to be monitored, and you couldn't make an

1    unmonitored call unless there was a reason, like, "My lawyer is going to" -- "I'm talking to my

2    lawyer."

3         Q     And in addition to being monitored by a corrections officer, these calls are usually

4    recorded?

5         A     Yes.

6         Q     Is that correct?

7         A     Yes.

8         Q     Was this call recorded?

9         A     I don't -- no, not that I'm aware of.

10        Q     The IG did a review, and I believe the Southern District of New York eventually did as

11   well, where individual one, the recipient of the call, or her attorney, gave a proffer to the Southern

12   District of New York.   Are you aware of that?

13        A     I can't remember.   I remember asking, I think it was Bowdich, what we had discovered

14   about that call.

15        Q     In the -- the proffer described the call of Mr. Epstein saying, like, "There's going to be

16   tough times, I love you, I'm sorry," that kind of -- those kinds of language.

17              Do you recall hearing that kind of readout of the call?

18        A     I don't recall the specifics, but I thought the call was consistent with saying goodbye to

19   someone, but not telling them you're about to commit suicide.

20        Q     Did they ever discover the identity of the recipient?

21        A     I'm not sure -- and I couldn't say, by the way, at that point he had already made up his

22   mind as to exactly when he was going to do it.   But it -- it was -- to me, it was consistent with -- with

23   it.

24              I'm sorry.   What was your other question?

25        Q     Did they ever discover the identity of the recipient of the phone call?

1      A      I believe they did.    That's my best recollection.

2      Q      Do you recall who it was?

3      A      No.

4      Q      I'll just ask about one person.

5             Do you recall if it was Ghislaine Maxwell?

6      A      It was not.    It was not her.

7      Q      It was not her?

8      A      No.

9      ▓▓▓▓▓▓▓      That's a good spot.    We can go off the record.

10     [Recess.]

11     Mr. O'Callaghan.    We're on the record?

12     ▓▓▓▓▓▓▓      We're on the record.

13     Mr. O'Callaghan.    So just before we start with your questions, Attorney General Barr just

14     wanted to clarify two points from the prior testimony.    It makes sense to do it now and, obviously,

15     won't count against your time, if that's okay.

16     ▓▓▓▓▓▓▓      Yeah, absolutely.

17     Mr. O'Callaghan.    Okay.

18     The Witness.    So despite your best efforts to orient me to this floor plan --

19     Mr. O'Callaghan.    He's referring to the schematic, exhibit 3.

20     The Witness.    -- I was completely turned around on it, and for some reason was discussing it

21     as if the camera was to the lower left instead of where it was, which was to the upper right.

22            And, as I said, the main entrance would be to the lower right of the camera scene.    And so

23     that door that counsel showed me at the far end of this -- of the common area -- is the principal

24     entrance, the primary entrance to the SHU.

25     Mr. O'Callaghan.    So just -- the witness is indicating the black rectangular box next to the red

1    portion of Mr. Epstein's cell on the schematic.

2         The <u>Witness.</u>    The other thing is that I don't have a specific recollection of the exact time I

3    found out about being taken off suicide watch, but my best recollection was it was after his suicide.

4         Mr. <u>O'Callaghan.</u>    Those are the two points.

5         ▇▇▇▇▇▇▇    Thank you.

6                              EXAMINATION

7              BY ▇▇▇▇▇▇ :

8    Q     Mr. Barr, good morning.

9         I am going to proceed chronologically, and in doing so, I'm going to cover some of the topics

10   that my majority colleagues did in a previous round, not to make you repeat yourself, but just to

11   follow up on some issues and ensure that we have a clear record.

12        And I'll start with the Florida investigation; that is, the investigation into Mr. Epstein by the

13   U.S. Attorney's Office for the Southern District of Florida.

14        When did you become aware of that investigation?

15   A     With everyone else, according to the papers, while it was going on.

16   Q     At the time it was --

17   A     When there was the -- when there was the big outburst about a special deal and all that

18   kind of stuff.

19   Q     So roughly in the 2007 time frame?

20   A     Whenever it became public there was a plea agreement.

21   Q     And do you recall how you became aware of it?

22   A     The newspapers.

23   Q     Newspapers.

24        Just a question about the resolution of that investigation.

25        As I'm sure you're aware, Mr. Epstein entered into a nonprosecution agreement with the U.S.

1   Attorney's Office in September -- September 2007.    Among other things, that agreement bound the

2   United States not to, quote, "institute any criminal charges against any potential coconspirators of

3   Epstein," unquote.

4           Are you familiar with that agreement?

5           Mr. O'Callaghan.    So, hold on.    Excuse me.    Attorney General Barr was under subpoena,

6   and the scope of the cover letter was about the investigation by the Department of Justice into

7   Epstein and Maxwell while he was Attorney General.

8           You're asking about information that he was not Attorney General, and so I think it's beyond

9   the scope of what the subpoena called for.

10          █████████       I don't think I would agree with that scope, and I think the proceedings here

11  today are focused on the DOJ's investigation concerning Mr. Epstein generally.

12          And the question I'm asking now goes to Mr. Barr's perspective based on his experience as

13  Attorney General.

14          Mr. O'Callaghan.    Which time?

15          █████████       Which time?    Well, experience as Attorney General both times.

16              BY █████████:

17  Q       Just based on your professional perspective, sir.

18          Have you seen a provision in a plea agreement that bound the United States not to pursue

19  coconspirators that were unknown at the time the agreement was entered into?

20  A       I don't recall having any inside information or information that wasn't publicly available

21  about those events about the investigation in Florida and its ultimate -- and the ultimate plea

22  agreement.    To the best of my recollection, I knew what I saw in the papers.

23          I remember at the time having a reaction -- looking at -- because there was a hubbub about it.

24  I remember looking at -- or thinking about and delving a little bit into it and -- but that happened

25  before I was Attorney General the second time.

1       Q       The second time.

2               During either of your tenures as Attorney General, have you ever seen a comparable provision

3       that had the same effect, again --

4       A       During the time I was Attorney General, I don't recall seeing a comparable provision.     I

5       think the thing that I didn't like about it was that it took away from the victims their allocution rights,

6       and I thought that that was pretty aggressive, and I thought it was vulnerable.

7               So that's just my own thinking when I saw it.

8       Q       I appreciate that.     Just to ask you --

9       Ms. Crockett.     Can I jump in really quickly?

10      ███████     Yeah.

11      Ms. Crockett.     I'm sorry.     Just to go back to what was just brought up about -- during your

12      tenure during either times you were Attorney General, do you recall there ever being a scenario that

13      you authorized that was similar that disallowed the prosecution of coconspirators in this type of plea

14      deal?

15      The Witness.     You know, I can't specifically remember things that were -- that I approved.

16      But I'm not sure that provision sticks out at me as odd.

17      Ms. Crockett.     Okay.     But you can't recall ever approving anything like that before, right?

18      The Witness.     Right.

19      Ms. Crockett.     Thank you.

20              BY ███████ :

21      Q       There was discussion during the previous round of the chain of communication within

22      DOJ and between Main Justice and the U.S. Attorney's Office.     I'd like to ask you about

23      communication between DOJ and the White House.     And, again, this is focused on both of your

24      tenures as Attorney General.

25              How common was it, generally speaking, for you to communicate directly with the President

1    about investigations that DOJ was handling?

2         A    Well, it depends what the investigation was about.    On Epstein, I only remember two

3    conversations I had with the President.

4         Q    So could you tell us about those two conversations?

5         A    One was when I heard about the suicide, I called him up and said, "You better brace for

6    this," and I told him words to that effect, and I told him about it and told him we were going to be

7    investigating it very vigorously.

8         And the second one, I can't say for sure whether it happened before his suicide,

9    during -- meaning around the time of his arrest or whether it happened after his suicide during the

10   continued developments there.

11        But the topic of Epstein came up in the conversation.    Multiple people were there.    And,

12   sort of, the news of -- it was commented on being the news of the day.

13        And the President said something to the effect that he had broken off with Epstein long ago

14   and that he had actually pushed him out of Mar-a-Lago.

15        Q    Okay.    And just to clarify, those were both conversations with President Trump?

16        A    Both involved with President Trump, yeah.    Those are the only two conversations I can

17   remember where Epstein came up with the President.

18        Q    And when you say that you told President Trump who the news of the suicide would

19   affect, what did you mean by that?

20        A    Who it would affect?    Did I say that?

21        Q    I'm sorry.    Unless I'm misunderstanding your characterization.

22        A    I didn't mean to say that.

23        Q    Okay.

24        A    I said that I told him that he committed suicide and that he suspected it was apparently

25   suicide.    And he had the same reaction I did, which was, "How the hell did that happen, he's in

1    Federal custody?"   And the last everyone knew, he was being carefully watched precisely for that

2    reason.

3           And I think I conveyed to him that it was appalling and that we were going to investigate it

4    vigorously and I -- and he had the same reaction I did, which is this is going to certainly generate a lot

5    of conspiracy theories.

6           These are not his exact words, but that's what I remember about the conversation being

7    effectively -- maybe words to the effect, yeah.

8           Q     Did President Trump say anything else in that conversation?

9           A     That's all I can recall.

10          Q     So just to tie all this together, would I be correct in understanding that prior to

11   Mr. Epstein's suicide, you did not communicate directly with the President in connection with the

12   Epstein investigation?

13          A     I said that the one conversation I recall could have happened before his suicide, around

14   the time of his arrest, but my best recollection is it happened later.    But those are the only two

15   conversations I can remember having with the President directly about Epstein.

16          Mr. O'Callaghan.    About Epstein generally, not the Epstein investigation?

17          The Witness.   Right.   Yeah.

18          BY ▌▌▌▌▌▌▌:

19          Q     Shifting back to the Florida investigation, it's my understanding that you recused

20   yourself during your second tenure as Attorney General from DOJ's review of that prosecution and

21   the plea agreement.    Is that correct?

22          A     No, I didn't recuse myself.    I think in my confirmation hearing I put that -- I didn't want

23   to cross that bridge because I needed to consult people about the issue, and I wasn't sure of the

24   timing of things.    And so -- you know, when things occurred and so forth.

25          So later on, when it became an issue, I had it reviewed and got the advice of the Ethics people

1    in the DOJ, and I did not recuse myself.

2         Q    Did not recuse yourself?

3         A    Yes.

4         Q    And this is the Florida investigation?

5         A    No.    It was the --

6         Q    The Southern District of New York investigation?

7         A    That's the only thing that I was aware of going on when I was there.

8         Q    Okay.    So to clarify, did you have any involvement at all in DOJ's review of the Florida

9    investigation that took place during your second tenure?

10        A    I don't recall playing a role in the review of that.    In terms of whether it was a proper?

11   I didn't play a role in that review.

12        I think there was discussions when New York was moving forward with the prosecution.

13   People wanted to be careful that it didn't run afoul of any of the provisions in that agreement.

14        Q    And I can be more specific.

15        So it's my understanding that the DOJ's Office of Professional Responsibility undertook an

16   investigation in 2019 --

17        A    Right.

18        Q    -- into the circumstances surrounding the Florida plea deal.

19        A    Right.    I didn't -- I wasn't hovering over that or involved in that.    I learned about their

20   conclusions, you know, from when they concluded, when they reached them.

21        Q    After they issued the report?

22        A    I can't remember exactly when.    At some point I learned that OPR was saying that it

23   was improper.

24        Q    Have you ever discussed the Epstein investigation generally with Mr. Acosta?

25        A    I don't recall discussion of the investigation.    I may have around that -- there was a lot

1    of publicity around the fact that he might be pushed out of the administration.

2        I may have expressed commiseration with him that he was facing that kind of public

3    challenge, but I didn't discuss the investigation.

4        Q    What was your understanding of the reason that he was pushed out of the

5    administration?

6        A    I don't know.    I don't -- I think he -- I think he resigned.    I think he resigned, so

7    he -- my understanding was he resigned so he didn't -- so this didn't continue -- this issue didn't

8    continue to hound the administration.    That was my recollection of what happened.

9        Q    And to your understanding, did he resign on his own initiative, or was it under pressure

10   from the White House?

11       A    I don't know.    I think it was explained as him stepping down to avoid the continued

12   problem, but I don't know what happened behind the scenes.

13       Q    With respect to the report that OPR issued, you mentioned that you took issue with, as I

14   understood it, Mr. Acosta's failure to involve the victims in the process.

15       A    Well, my recollection -- and I haven't looked at this -- but my recollection is that part of

16   it ended up not allowing the victims to have their say, which is under Federal statute they have the

17   right to do.    That's my recollection of the issue.

18       And so I thought that -- I think it's wrong not to let the victims have their say.    And here I

19   also thought it was a legal vulnerability.    But that was just me as a private citizen saying, "Well, gee,

20   wow."

21       Q    I'll represent to you the report also concluded that Mr. Acosta's decision to resolve the

22   Federal investigation through the MPA constituted poor judgment, in OPR's words, among other

23   things, by resolving the Federal investigation before significant investigative steps were completed.

24       Is that consistent with your understanding?

25       A    Right now, I don't have a recollection of that.

1    Q    Mr. Acosta reportedly has stated that he was told that Jeffrey Epstein, quote, "belongs

2    to intelligence and to leave it alone," unquote.

3         Are you aware of Mr. Acosta saying that?

4    A    No.    Other than what's ever been reported in articles over the years.

5    Q    Do you have any knowledge of Mr. Epstein having any ties to any intelligence agency?

6    A    No.

7    Q    Or of Mr. Acosta being told --

8    A    I don't know about any ties.

9         I have no reason to believe he was working for the CIA or any intelligence agency, and I'm

10   dubious about claims like that.

11        Now, many American businessmen who have foreign contacts sometimes will talk to

12   intelligence agencies and provide information to them.    And the CIA has a unit that goes around and

13   talks to people who are well-connected and asks them questions.

14        So my supposition, when I saw things about him being connected to U.S. intelligence, maybe,

15   like many other businessmen, he talks to them, but this is not, in my opinion, based on what I saw, I

16   didn't think it was an intelligence operation, and I never received any information that led me to

17   believe that.

18   Q    Do you have any idea why Mr. Acosta would suggest that it was?

19   A    I don't know he did -- whether he did.    Wasn't that someone attributing something to

20   him?

21   Q    That's his reported statement.

22   A    Okay.

23   Q    I'll shift gears now and move on to the Southern District of New York investigation.

24   And for the sake of brevity, if it's okay with you, I'll refer to Southern District of New York as SDNY.

25   A    Sure.    That's how I would refer to it.

1       Q     I understand -- you mentioned earlier that you -- a determination was made that you

2  would not recuse yourself from the SDNY investigation.

3            And just to make sure my understanding is clear, was that based on input from the Ethics

4  Office at DOJ?

5       A     That's my recollection, yeah.

6       Q     Okay.   And do you recall the rationale for concluding that your continued involvement

7  was consistent with the ethics regs?

8       A     Because I really didn't have a connection.   I wasn't involved in the first investigation.

9       Q     There has been mention in the press about your father's role as the headmaster of the

10  Dalton School in New York.   Was that a consideration in the Ethics Office analysis?

11      A     Actually, I don't even think -- I don't know whether I was aware of that at that time.

12  Obviously not.   It's not pertinent at all.

13      Q     You spoke generally during the previous round about the nature and extent of your

14  involvement in the SDNY investigation.   I'd like to just delve into that in a bit more detail, if I could.

15            To begin with, could you describe the allocation of responsibility between yourself and U.S.

16  Attorney Berman?

17      A     Well, the U.S. Attorney -- all U.S. Attorneys are responsible for pursuing investigations

18  and making prosecutorial judgments.

19      Q     Yeah.   Just to clarify, I don't mean generally operationally within DOJ.   I'm speaking

20  specifically with respect to the Epstein investigation.

21      A     Well, this was a case that was within his purview.   He had, obviously, approved or was

22  involved in either its launching or continued under him, and so he was responsible for conducting the

23  investigation and making the initial prosecutorial judgments.

24            Also, under the Department rules, that if he believes there's a basis for investigating someone

25  who is a prominent person or a senior political official or whatever, he is supposed to send an urgent

1    report to my attention.

2        Q    What was the extent during the SDNY investigation of your interaction with FBI agents?

3        A    During the investigation of it?

4        Q    Yes.    The Epstein investigation.

5        A    I would say the agents up in New York, but people at headquarters, after the suicide, I

6    told the headquarters to make sure that they flooded the zone.    That is, that they provided the

7    investigative office, which was the New York FBI office, all the resources necessary and made sure

8    that a Federal investigation was being done.    And Bowdich oversaw.    He's the deputy in

9    Washington.

10        The actual investigation was carried out by the New York agents -- most of it, I think, by New

11    York agents.    I didn't have contact with people up in New York, the agents up in New York.

12        Q    And apart --

13        A    It is possible that when I was being briefed at some points they would put someone like

14    that on the line to explain something to me, but I didn't seek out contacts with people and the

15    people the FBI made available to me.

16        Q    Within FBI Headquarters, apart from Mr. Bowdich, was there anyone else you

17    communicated with directly about the investigation?

18        A    FBI?

19        Q    Yes.

20        A    I'm trying to remember who was the head of the Criminal Division.    I don't recall

21    anyone other than Bowdich.    I think I may have had conversations with Chris Wray about it, sort of

22    what a mess the thing was.

23        Q    And within SDNY, did you ever communicate directly with any of the line prosecutors?

24        A    No, not that I recall.

25        Q    And you spoke in the previous round, as I understood, about being briefed by the DAG

1    at the regular meetings that were held at Main Justice.

2           Were you briefed by U.S. Attorney Berman as well?

3           A      You know, I think I probably had a conversation with Berman, a general conversation.

4    But I think, to the extent he communicated or his people communicated, it would have been more to

5    the deputy's office, and then I would have been told about it.

6           Q      When did your conversation with Mr. Berman take place?

7           A      You know, I can't say for sure there was.    I think -- all I know is that I became aware of

8    the investigation.    I became aware that there was people looking at the issue of whether or not it

9    would be permitted under the -- to what extent there are limitations imposed by the Florida plea

10   agreement, things like that.

11          And I remember -- my best recollection is I had a conversation with him after the suicide

12   where he strongly assured me and made it clear that this was a priority of the office and that they

13   would continue pushing ahead.

14          Q      Did you ever discuss with Mr. Berman any of the conversations you had with President

15   Trump?

16          A      No.    Not that I can recall.

17          Q      And, again, in terms of the investigative process, were you involved at all in the decision

18   surrounding what charges to bring before the grand jury against Mr. Epstein?

19          A      No.

20          Q      Did you review the indictment?

21          A      I can't recall reviewing the indictment.    I may have been -- I may have or been shown

22   it --

23          Q      And were you --

24          A      -- but I don't recall it.

25          Q      Were you briefed regarding the specific charges that SDNY intended to bring?

A I think I was told what they were. I don't recall how deep the conversation was.

Q Was there ever any disagreement between you and SDNY over who to charge or what charges to bring?

A I don't remember one.

Q Any --

A You mean the first time around?

Q The --

A The initial indictment against Epstein in July?

Mr. <u>O'Callaghan.</u> Maybe a time frame would help.

The <u>Witness.</u> July.

Mr. <u>O'Callaghan.</u> 2019? Are we talking 2019?

[redacted] Yes, yes.

The <u>Witness.</u> Okay.

[redacted] Thanks.

BY [redacted]:

Q To your knowledge, did anyone else at Main Justice disagree with the charges that SDNY intended to bring?

A I don't recall any disagreement.

Q In the two conversations you had with President Trump, did the President express any views on the investigation?

A Not that I can recall, no.

Q Did he ever give you any instructions with respect to it --

A No.

Q -- or express any preferences --

A No.

1 Q -- with respect to the investigation?

2 A No.

3 Q To your knowledge, did anyone else at DOJ discuss the SDNY investigation with anyone

4 in the White House?

5 A Not to my knowledge.

6 Q The FBI's investigation, did that continue post-indictment?

7 A The FBI's investigation of the suicide?

8 Q The FBI's investigation into Mr. Epstein's crimes.

9 A My understanding is that the investigation was going forward because they were at that

10 stage looking for people who were complicit in the trafficking, either by facilitating it or by essentially

11 exploiting the victims.

12 Q And do you know how long the FBI's investigation continued?

13 A I think it continued throughout my tenure.

14 Q I'd like to shift and focus on the evidence that the FBI obtained during the course of the

15 investigation, and I'm going --

16 A I think this was an investigation directed by the Southern District, so it involved their

17 prosecutorial team. It wasn't the FBI in the initial stages of the investigation, but they were

18 essentially --

19 Q Yes.

20 A -- working with the prosecutors.

21 Q Understood.

22 A Yes.

23 Q I'm going to ask the court reporter to mark as exhibit A an ABC News article titled "What

24 the government evidence list tells us about the unreleased Epstein files," dated July 17th, 2025, and

25 as exhibit B a three-page catalog of evidence that was reportedly prepared by the FBI.

1          [Barr Minority Exhibits A and B

2          were marked for identification.]

3     The <u>Witness.</u>    Should I read the whole thing or --

4     ██████████    No, I can point you to -- you're certainly welcome to.    I can also point you to

5     the portions that I plan to ask you about.

6     The <u>Witness.</u>    Well, why don't we try that --

7     ██████████    Sure.

8     The <u>Witness.</u>    -- and let's save time.

9          BY ██████████:

10    Q    So the article describes Attorney General Bondi making available, quote-unquote, "the

11    first phase of the declassified Epstein files."

12    Mr. Barr, were you previously aware of Ms. Bondi making these materials public?

13    A    Just what I read in the press.

14    Q    Do you have an understanding as to why Attorney General Bondi did so?

15    A    I've never discussed the matter with her.    I don't know.

16    Q    And do you have an understanding of what the Epstein files contained, as the phrase is

17    used in this piece?

18    Mr. <u>O'Callaghan.</u>    As -- you mean in the ABC piece?

19    The <u>Witness.</u>    Where is that used?

1          BY ▓▓▓▓▓▓▓ :

2      Q     I'm looking at the first sentence of the article, that refers to Attorney General Bondi

3   releasing the first phase of the declassified Epstein files.    It's the very first sentence of the article.

4      A     Yeah, I see that.    Yeah.

5      Q     Do you have an understanding as to what those files are comprised of?

6      A     No.

7      Q     And then exhibit B is a catalog which, according to the ABC piece, is the only document

8   in the first phase of the declassified files that hadn't previously been made public.

9      A     This is what was given to what?

10     Q     So it's what the ABC piece describes as the only documents in the first phase of the

11  declassified materials that Attorney General Bondi released that have not previously been made

12  public.

13     A     Okay.

14     Q     And my question is, have you seen this catalog before?

15     A     I don't recall seeing it before.

16     Q     Are you familiar with any of the items that it describes?

17     A     You want me to go through each item?    I'm not generally -- I'll just say this.

18  I'm not generally familiar -- or even specifically familiar -- with the evidence amassed by the

19  Southern District to prosecute either Epstein before he committed suicide, obviously, and then what

20  they may have collected that affected other potential defendants.

21  In other words, I wasn't monitoring the case that closely to know what the evidence was.

22     Q     You mentioned that --

23     A     I think while I was there, they reached the conclusion that they had a case against

24  Ghislaine Maxwell.    And I don't have specific recollections of it, but I'm sure I was briefed on what

25  the charges were and what evidence supported it.

1       Q    Okay.

2       A    But I have no way of linking any -- this is gibberish to me because I have no way of

3  linking the content to the case.

4       Q    Okay.

5       Mr. O'Callaghan.   █████, are you sure exhibit B is what the article refers to?   Because the

6  article refers to a three-page index, and this is much longer than three pages.

7       █████████    Yep.   So, Ed, that is an enhanced version of the catalog, which if you print it

8  out from a publicly available source contains typeface that is far smaller, so we blew it up so that

9  your client would be able to read it at the witness table.

10      Mr. O'Callaghan.   Okay.

11      The Witness.   Thank you.

12      Mr. O'Callaghan.   Me, too.

13      The Witness.   I wouldn't know what this stuff is.   I mean, I may have been aware of some of

14  it, but it has to be better identified for me, you know.

15      But as I say, generally speaking, the way I understood what was going on in the Southern

16  District, other than looking at the issue of the suicide, which I carefully monitored, was doing what a

17  U.S. Attorney Office normally does.

18      And my understanding is that at that point after the suicide, they were looking to make -- to

19  see if there was evidence to charge someone for participating in the trafficking.   And I didn't

20  monitor their investigation, as I wouldn't generally monitor an investigation unless there was a

21  particular reason to do it.

22      BY █████████:

23       Q    You mentioned earlier, as I understood, that to your knowledge, the FBI's investigation

24  continued throughout your tenure as Attorney General.

25       A    Yes.

1      Q    To your understanding, did it continue after you left DOJ?

2      A    I don't recall.   I think -- I don't -- I don't recall.

3      But my impression is that this was a very motivated group of prosecutors, and this was a high

4 priority for the office and for the Department, and they were moving forward.

5      My belief and understanding was that if they came across evidence that would establish

6 either that someone helped in recruiting these young girls or was involved in sexual activity with

7 them that they would have proceeded on that case.   That was my view.

8      And I didn't think this group of prosecutors would stop until they were satisfied that they had

9 gone through the evidence.

10      So from my standpoint, both for reasons of Justice Department protocol, which required

11 them to alert me if they actually started going down that trail as to any prominent person, and also

12 just from the practicality that I think that kind of information, if someone is trying to sit on it, would

13 have bled out eventually, I was not aware of what evidence they had that would do that, I was never

14 given reason to believe that they had evidence to make a case.

15      Ms. Crockett.   Can I jump in really quickly on this point just to follow up?

16      It's been widely reported that the President was informed by the current Attorney General,

17 Pam Bondi, that he appears in the Department of Justice's files on Jeffrey Epstein.

18      I'm curious to know, in those conversations that you do recall with the President, do you

19 recall ever informing him that he was in the Epstein files at all, number one?   I'll ask that so I don't

20 have a compound question.

21      The Witness.   Yeah.   Well, I'm not sure what "Epstein files" refer to these days.   But, no, I

22 didn't -- I didn't have that kind of conversation with him.

23      I think at some point logs were made public that he was on Epstein's plane making commutes

24 from -- or flying between Miami and New York or Miami and New Jersey or stuff like that, and I think

25 that that got out publicly.   I don't recall discussing that with him.

1    Ms. Crockett.    Okay.

2    The Witness.    And I can't even remember when it came out.

3    Ms. Crockett.    Okay.    So to be clear, you had no direct knowledge of the President himself

4    being named in the Epstein investigation is what you're telling us?

5    The Witness.    No.    I'm saying that in the year -- many years up to the case -- there had been

6    news coverage reporting on, essentially, two kinds of people, people who were in his either business

7    or social network and had connections with him -- which to me doesn't mean that that is a crime, and

8    there are many names thrown around like that -- and then there were names where there was

9    specific credible evidence or specific serious evidence by, for example, a victim, a specific victim, that

10    they were exploited by a particular person.

11        So there were those sort of people.    And my understanding was that the New York office

12    was trying to see if there was, in fact, any evidence to support that any of these people actually

13    violated the law.

14    Ms. Crockett.    And you have no direct knowledge of any of the now young women or

15    women that claimed that they had encounters with the President through Epstein, correct?

16    The Witness.    I never was told by the Southern District that they had evidence to support

17    any claim like that.

18    Ms. Crockett.    Thank you.

19    The Witness.    As to who?    As to Trump?

20    Ms. Crockett.    Yes.

21    The Witness.    Yeah.

22    Ms. Crockett.    Sorry.    President Trump.

23    The Witness.    I was never told that there was evidence to support that claim.

24    Ms. Crockett.    I'm done.    Sorry.

25        BY ▮▮▮▮▮▮▮:

1      Q    Just shifting back to the evidence that the FBI gathered.    There have been reports of

2    hidden cameras and a recording system at Jeffrey Epstein's New York City residence.

3             Are you aware of the existence of any such cameras and a recording system?

4      A    I think when the search -- I was aware -- I can't even remember if it was after I left or

5    while I was there -- but I remember that there were cameras uncovered during the searches that

6    were made of the Manhattan building, and I think also the island, maybe even -- wasn't there a place

7    in New Mexico as well?    I heard that there were things being uncovered like that.

8      Q    Did you ever see the footage --

9      A    No.

10      Q    -- from those systems?

11      A    No.

12      Q    And is that footage, to your knowledge, still within the possession of DOJ?

13      A    To my -- whatever information was collected, I have no reason to think it's not in their

14    possession.    I never went and looked at the evidence they were collecting.

15      Q    Do you have an understanding as to why that material hasn't been publicly released?

16      A    I have no knowledge as to why, but I think I understand the potential reasons for it.

17      Q    Which, in your view, are what?

18      A    Well, I mean, in terms of conducting an investigation, you would have some stuff that's

19    grand jury material that was collected pursuant to grand jury process and through the grand jury

20    process, and that would normally not be made public.    And I think there are strong reasons for not

21    making grand jury public, including requiring the approval of a court's approval.

22             As to other evidence, I think there's strong policy reasons not to make available, which an

23    Attorney General at the time has to make judgments as to what are the reasons to make it public and

24    what are the reasons against making it public.

25             And among the reasons for not making it public generally, just here it all is, is because there

1    are frequently -- there's frequently tidbits of evidence that can be cast publicly as incriminating

2    when, in fact, against all of the evidence it isn't, and the judgments about credibility that are made.

3         I think we've all seen examples where 302s don't necessarily -- could be wrong on something

4    they say.   A witness could later say, "I didn't say that," and so forth.   So you have to be careful

5    about what you say about people.

6         And so the general principle is, if you have enough evidence to charge someone, you put that

7    evidence out through the process, but you don't just open your files.

8         So I can understand why there is reluctance to do it.   And as I say, an Attorney General has

9    to make a balance.

10        Q    As we saw a few minutes ago when we looked at the ABC article, exhibit A, Attorney

11   General Bondi did release a significant volume of material earlier this year.

12        Do you disagree with her decision to do that?

13        A    No, I don't -- I don't agree or disagree.   I don't know -- I haven't kept up with what's in

14   there.   And as I say, it's sort of an individual judgment based on a balancing, and I don't have

15   transparency into all the factors that are at play there.

16        Q    Sorry.   I didn't want to interrupt you.

17        A    I mean, a lot of the information is out there because of civil cases.   You know, that's

18   another important part of the context here.   A lot -- to the extent there are victims, I mean -- which,

19   obviously, there are victims -- but a lot of those victims have either been encouraged to bring civil

20   suits or have brought civil suits.   And in that context, a lot of the evidence has been released

21   through those cases.

22        Q    And just so we're clear on the parameters, am I correct that it is within the Attorney

23   General's authority to release materials like this at his or her discretion?

24        A    There's no law against it other than -- I guess the way I look at it, there's no law against

25   it except for the grand jury secrecy.   That's my understanding of the situation.

1       Q       Okay.

2       A       But there are consequences for releasing everything out there because that will make it

3    harder to conduct investigations in the future on anything if people say -- whatever they say is going

4    to be out in the public even though it is not evidence of a crime.

5       Q       Are there, in your view, certain categories of cases that rise to a level of public interest

6    such that the release of this kind of information is appropriate despite the considerations that you

7    just articulated?

8       A       Well, part of my own direct experience was, obviously, the Mueller report.     Now, it's

9    not exactly the same kind of situation, but there I did agree to put out the reports even though it

10    canvassed a lot of the evidence.

11             But we sanitized it for grand jury material and for classified material and also material that

12    was unfair to third parties who we were not charging, if we weren't charging someone with a crime

13    or accusing someone of committing a crime.     That was one of the other considerations that we

14    used.

15             But we did -- at the end of the day, I felt the public interest demanded putting out what we

16    put out.

17       Q       Do you think that a case for public release in the instance of the Mueller report was

18    stronger or weaker than the case with respect to the Epstein materials?

19       A       You know, it had to do with a head of state and whether he was a Russian spy.     I don't

20    think you can get more important than that.

21       Q       Shifting back to the evidence.     As you're probably aware, there's been a significant

22    focus on the possible existence of what's been described as an Epstein client list.

23             Is that a term that you've heard before?

24       A       I've heard the term, but I've always been confused as to what it actually referred to.     I

25    think it needs to be clarified.

1    Q    Do you have an understanding as to what the term refers to?

2    A    Well, so I guess my view is Epstein sort of had three lives.

3         He was a socialite and had a lot of social activity that was legal, and he was meeting

4    prominent people all over the place socially.

5         Second, he was a business guy and had business relationships all over the place.

6         And third, he had a perverted practice of recruiting young girls for his own satisfaction, and

7    there were some allegations that he made those girls available to contacts of his.

8         And when so I hear "client list," are we talking about his financial clients?    I doubt it.    Are

9    we talking about his social phone book?    I doubt it.    Are we talking -- are we sort of equating this

10   to acting like a madam at a bordello and that he sort of has a list of the clients that use the bordello?

11   That's what I think people are referring to.

12   Q    So --

13   A    So that's how I take the term.

14   Q    So with that understanding, are you aware of a list that fits the category that you just

15   described?

16   A    Like a bordello madam?

17   Q    Yes.

18   A    No.    I was never told there was such a list.    I never -- I don't have a reason to think

19   that there is such a list.

20        But by that, we're talking about a list that's put together by him, okay?    He's compiled

21   something.    That's not to say that by going through the evidence -- interviews, the statements of

22   the victims, and so forth -- you couldn't figure out who some of those people were.

23   Q    But, again, just tying all this together, to your understanding, does there exist a single

24   document that contains the names of individuals who had participated in or were complicit in the

25   crimes that Jeffrey Epstein was charged with?

1     A    I have no reason to -- I was never told that that was the case by the SDNY --

2     Q    In --

3     A    -- or by the FBI.

4     Q    In public statements, Attorney General Bondi had initially seemed to acknowledge that

5    such a document existed and was asked specifically about a, quote-unquote, "client list," but then

6    backtracked, as reflected in the July 2025 memorandum from the FBI that explicitly disclaims the

7    existence of any such list.

8          Do you have an understanding as to why Attorney General Bondi initially made that

9    representation?

10    A    No.   I have no knowledge.   I could see that her explanation -- I heard her explanation

11   of it, and I think it's potentially a good explanation.   I don't discount it.

12    Q    Did it strike you as unusual that she changed her position publicly?

13    A    Well, I don't know if she changed her position.   My understanding is that -- and I did

14   watch the interview that she -- you know, she started answering -- she was basically geared up to

15   answer the question about how she was going to get the material out.   And the questioner at the

16   end put in the phrase "client list," and she blew through that and just gave the answer she was going

17   to give, like, "It's on my desk."   And her explanation, I think, is that she was referring to the file that

18   she intended to put out.   I don't discount that, but I have no knowledge.

19    Q    Okay.   Are you aware of a document that Jeffrey Epstein kept that's been referred to in

20   the press as a, quote-unquote, "black book"?

21    A    Do I have knowledge of what?

22    Q    A document that the press has described as maintained by Mr. Epstein and referred to

23   as a "black book"?

24    A    I think I've heard -- I've seen that expression in the media.   But as I say, no one has

25   ever -- and I sort of took that as the client list sense versus as a phone book with his -- everybody in it

1    that he socializes or does business with.

2           And as I said, no one has ever indicated to me that there is something, one place that

3    compiles the people that he essentially exploited these girls by providing them to these individuals.

4      Q    So you haven't seen a phone directory that Mr. Epstein compiled?

5      A    Not that I can recall.   You mean a phone directory of what?

6      Q    Containing names of people that were associated with Mr. Epstein.

7      A    Just generally associated?   I don't recall that, but it wouldn't surprise me, and I

8    wouldn't think that by itself it had evidentiary value other than that he knew a person.

9      Q    You mentioned earlier that the FBI continued to investigate the existence of possible

10   coconspirators of Mr. Epstein.

11          Could you just generally walk us through the investigative steps that DOJ took to pursue those

12   coconspirators?

13     A    I mean, that was done by the Southern District.   I mean, the person in charge of the

14   investigation was U.S. Attorney Geoff Berman, and he had an experienced team, and they would

15   have -- he would have, to the extent there was any direction or judgments being made that required

16   supervision, he would have made them, not me.

17     Q    Did you have any visibility into subpoenas that SDNY issued?

18     A    Visibility in the sense of approving them ahead of time?   I don't recall approving

19   subpoenas in that case.   I don't recall issues coming up to me.   It's possible.   I mean, a lot was

20   coming in.

21     Q    And what about knowing after the fact that they had been issued?

22     A    Well, I think, to the extent I read things that may have involved like that, I assume they

23   got search warrants to collect stuff from the house and things like that.

24     Q    But you didn't get any direct information from SDNY regarding the issuance of

25   subpoenas?

1    A    Not that I can recall.

2    Q    And what about witness interviews?

3    A    I think there was a dispute over Prince Andrew.

4    Q    Okay.    And how did you --

5    A    Not between me and the office, but between Prince Andrew and the Southern District.

6    And I was aware of that dispute because it -- I forgot how I became aware, whether it was public or

7    what.

8    Q    And what do you recall about that dispute?

9    A    I think they wanted to talk to him, and he wouldn't really submit to an interview.

10   That's my recollection of what the dispute was over.

11   Q    And did you discuss that with SDNY?

12   A    No.    I think after the fact -- I think Berman went out and gave a pretty strong

13   statement.    I think he may have been standing in front of the house, as I recall, something to that

14   effect.

15   And it was about Andrew not -- basically trying to say publicly that he was cooperating and in

16   real fact he was not cooperating.    And I think I talked to him about that.

17   Q    Talked to?

18   A    After -- I think it was after his --

19   Q    Mr. Berman?

20   A    Yeah.

21   Q    A number of prominent individuals have been alleged to be connected to Mr. Epstein as

22   his clients or otherwise as associates.

23   What I'd like to do is to read you a list of names, and for each I ask you to state whether, to

24   your knowledge, that individual was within the scope of DOJ's investigation and what, if anything,

25   DOJ determined with respect to that individual.    Does that make sense?

1    A    Yeah.    But, I mean, I would not -- I don't know what "within the scope of the

2    investigation" means.    Whether they were subjects or targets?

3    Q    How about witness, subject, or target?

4    Mr. O'Callaghan.    In an Epstein investigation that's lasted for multiple decades, you're going

5    to ask him if any of these individuals were ever somehow a part of that investigation?

6    ▬▬▬▬    Yeah.

7    Mr. O'Callaghan.    It's too broad.    I don't think it actually comports with what the stated

8    scope of this is.

9    ▬▬▬▬    Okay.    I can come at it a different way.

10   I'll just -- I'll read the first name.

11   Alan Dershowitz.    Did Mr. Dershowitz, to your knowledge, ever become relevant to the

12   Epstein investigation in any respect?

13   The Witness.    I don't know.

14   Mr. O'Callaghan.    And this is all --

15   The Witness.    I assumed -- I did not go and ask them, "Who are you looking at?"

16   Now, that, in itself, sort of suggests they're targeting someone or even thinks someone is a

17   subject versus a witness and so forth.

18   But I didn't get into that.    I did not go up and say, "Gee, are you looking at Dershowitz?    Are

19   you looking at Governor Richardson?    Are you looking at George Mitchell?    Are you looking at

20   Donald Trump?    Are you looking at Branson or whatever."    I didn't do that.

21   I saw names appearing and the media hyping all these so-called connections.    I did not ask

22   them whether -- but I assumed that some of these people were examined.

23   ▬▬▬▬    So you didn't discuss Alan Dershowitz with anyone else within DOJ?

24   The Witness.    No.    I, obviously, may have mentioned -- may have discussed Dershowitz

25   sitting around my office saying, "Wow."

1    Mr. O'Callaghan.    That's part of the problem, is that there's so much media reporting --

2    The Witness.    Right.

3    Mr. O'Callaghan.    -- media reporting on individuals that in common workplace conversation

4    stuff like that happens.    He just happens to be the Attorney General of the United States.

5    The Witness.    I did not delve into the investigation of Epstein.

6    ██████████    So --

7    The Witness.    I let the investigators -- let the chips fall where they may.

8    ██████████    Understood.    So, again, just for the sake of clarity, apart from information

9    that came to you through the media, what was publicly reported, was, to your knowledge, Alan

10   Dershowitz relevant to the investigation in any way?

11   The Witness.    I don't know.    I mean, these questions are a little bit too broad for my taste.

12   Mr. O'Callaghan.    It's a very difficult thing you're asking him to do.

13   The Witness.    Of course he's relevant to the investigation, you would think.

14   ██████████    Were there discussions within DOJ about Alan Dershowitz, to your

15   recollection?

16   The Witness.    As I say, sitting around my office, people could say, "Gee, Professor

17   Dershowitz is in hot water."

18   But I did not -- I was not in communication with the Southern District about the handling of

19   this investigation.

20   Mr. O'Callaghan.    I mean, that might be an approach, if Southern District ever briefed him,

21   you know, these people as being targets of their investigation.    Because SDNY, as he's testified to

22   over and over again, was in charge of the investigation.    So if they were going to report, they would

23   have reported an urgent matter to him.

24   The Witness.    I don't recall any discussion with the Southern District where we discussed the

25   nature and weight of evidence they had against the individuals that, in my mind, had been identified

1     publicly as people who could have been involved in improper activities.    I didn't --

1    [12:16 p.m.]

2                    BY ███████████ :

3        Q    Okay.

4        A    I didn't -- I did not -- I was not told that the office had evidence in its possession that

5    established that somebody was involved in those activities.    I don't remember sitting down

6    discussing, you know, gee, here's the weight of the evidence or here's something that gives us a lead

7    we can pursue.    I wasn't focused on, you know, myself, looking at and hovering over the handling of

8    that case.

9        Q    Okay.    So, for the rest of the names, I will couch the question as follows:    Did you ever

10    become aware of each of these individuals either being a witness, a subject, or a target in the SDNY

11    investigation?

12        And so the next --

13        A    "Become aware of" -- you had things being published all the time --

14        Q    Right.

15        A    -- in the press.

16        Q    About their formal status in the DOJ's investigation?    I don't think that would be

17    publicly reported.

18        A    Okay.    Okay.    The formal status that was provided me by the Southern District.

19        Q    Yep.    That's all I'm asking.

20        A    Okay.

21        Q    So the next name is David Copperfield.

22        A    I don't recall that being so.

23        Q    Michael Jackson?

24        A    I don't recall being so.

25        Q    Prince Andrew?

1    A    And when I say "don't recall," I mean, my best recollection is I did not get that

2    information.

3    Q    Okay.

4    A    Go ahead.    I mean, just read down the list.

5    Mr. O'Callaghan.    I think the question about Prince Andrew is pending.

6    The Witness.    That's right.

7    I was aware of the Prince Andrew issue.

8    You know, go through the list.    I'll tell you --

9    Mr. O'Callaghan.    So, just to clarify, you're aware of Prince Andrew being sought as a witness

10    by the Southern --

11    The Witness.    Yes.

12    Mr. O'Callaghan.    -- District of New York?

13    The Witness.    And a dispute over him cooperating.    I was aware of that.

14                    BY ▮▮▮▮▮▮▮▮▮▮ :

15    Q    Bill Clinton?

16    A    Same answer.

17    Q    Bill Richardson?

18    A    Same answer.

19    Q    George Mitchell?

20    A    Same answer.

21    Q    Glenn Dubin?

22    A    Same answer.

23    Q    Bill Gates?

24    A    Same answer.

25    Q    And Leon Black?

1      A    Same answer.

2      Q    Okay.

3      Ms. Crockett.   Just to clarify, when you're saying "same answer," is that the same answer as

4    Prince Andrew or is that the same answer as the prior -- because --

5      The Witness.   The ones other than --

6      Ms. Crockett.   -- they were different.

7      The Witness.   -- other than Prince Andrew.

8      Ms. Crockett.   Okay.   Just to be clear for the record.

9      And, really quickly, I'm going to jump in just before we have to wrap.

10     Because we are talking about the investigations, Maxwell was investigated during your

11   tenure, not necessarily taken to trial, while you were still at the DOJ.   She is someone that was

12   involved in this SDNY situation.

13     You are aware that Maxwell was not born in this country, correct?

14     The Witness.   Yes.

15     Ms. Crockett.   Okay.

16     You are also aware that a jury of her peers found her guilty of five out of six counts that were

17   brought against her by SDNY, including child sex trafficking and conspiracy, correct?

18     The Witness.   Yes.

19     Ms. Crockett.   In addition to that, have you been made aware through public reports -- well,

20   let me clarify this.   Child sex trafficking is not considered to be a low-level offense in the Federal

21   Government, correct?

22     The Witness.   I'm not sure what "low-level" means, but it's a serious offense.

23     Ms. Crockett.   It's definitely a felony, correct?

24     The Witness.   Oh, yes.

25     Ms. Crockett.   And a person can face up to life imprisonment for it, correct?

1          The Witness.    I haven't looked at the statute, but it wouldn't surprise me.

2          Ms. Crockett.    Okay.

3          And typically when someone is classified by the time that they enter into the Bureau of

4    Prisons, their classification is usually based upon a multitude of things, one of them being how

5    serious of an offense a person has been found guilty of, correct?

6          The Witness.    That's one of the factors.

7          Ms. Crockett.    Okay.    In addition to their criminal history and other things.    But, long story

8    short, they are looking at whether or not a person is potentially a danger to the community, correct?

9          The Witness.    That's another factor.

10          Ms. Crockett.    When you are reading your public things, I'm assuming you've heard that

11    there has been a transfer approved for Ms. Maxwell to a minimum-security prison camp.    Are you

12    aware of that?

13          Mr. O'Callaghan.    You're referring to press reports, Congresswoman?

14          Ms. Crockett.    Yes, because that --

15          The Witness.    I've seen --

16          Ms. Crockett.    -- that would be the only way that --

17          The Witness.    I've seen those press reports.

18          Ms. Crockett.    During your tenure as Attorney General, during either time, I'm curious to

19    know, are you ever -- is it ever within your recollection that there was someone who had been

20    convicted, finally convicted -- well, I guess it's not final; she's still on appeal -- convicted of five counts

21    of child sexual trafficking and they somehow ended up transferred to a minimum-security prison

22    camp?

23          The Witness.    I mean, off the top of my head, I can't remember a situation like that.

24          Ms. Crockett.    In fact, you'd agree with me that, in order for someone to be transferred

25    under those type of circumstances, it would actually take a higher level of approval.    That is not

1  something that just any old low-level BOP person would be able to do, correct?

2          The Witness.   I wish that were correct.   You never know.

3          Ms. Crockett.   Because mistakes happen.

4          The Witness.   Yeah.   Sometimes you wake up and you find that something's happened, like

5  taking someone off suicide watch.

6          Ms. Crockett.   But you'd would agree with me that the policy in general is not to put

7  someone who's been convicted of those types of crimes into a minimum-security camp?

8          The Witness.   I think -- actually, I think the way the system works is, the political level usually

9  allows the Bureau of Prisons broad leeway in determining how people are handled under their

10  structure and using their criteria, and if they disagree, they might intervene.

11          Ms. Crockett.   Understood.

12          The Witness.   That's how I think the system generally operates.

13          Ms. Crockett.   Understood.

14          To the best of your knowledge, whether it's during your tenure or during reports, she's never

15  been in that type of facility in the last 4 years of her incarceration until now, correct?

16          The Witness.   I gather that's the case.

17          Ms. Crockett.   Okay.   Thanks.

18          ▋▋▋▋▋   Off the record.

19          [Recess.]

20          ▋▋▋▋▋   On the record.

21          Chairman Comer.   General Barr, I may jump in for a couple of questions.

22          Were you aware of the involvement of Hillary Clinton and the Clinton campaign in the Russia

23  collusion investigation involving President Trump?

24          The Witness.   To the extent it was determined by Durham, yes.   Durham was looking into

25  that.

1          Chairman <u>Comer.</u>    Did you review documents that indicated the involvement of former

2    Secretary Clinton in the Russia collusion investigation involving President Trump?

3          The <u>Witness.</u>    Did I look at documents?

4          Chairman <u>Comer.</u>    Yes.

5          The <u>Witness.</u>    Yes.

6          Chairman <u>Comer.</u>    To the best of your recollection, did you at any point attempt to declassify

7    items in the Russia collusion investigation?

8          The <u>Witness.</u>    Some items declassified, and some I opposed declassifying.

9          Chairman <u>Comer.</u>    Okay.

10         Were you aware of the involvement of President Obama or his officials in the Russia collusion

11    investigation involving President Trump?

12         The <u>Witness.</u>    I was aware of meetings held at the end of the Obama administration.    They

13    were described.

14         Chairman <u>Comer.</u>    And did you review any documents?

15         The <u>Witness.</u>    I think I saw a set of notes taken by an intelligence official perhaps.

16         Chairman <u>Comer.</u>    Okay.

17         All right.

18         ▯▯▯▯▯▯▯▯    Thank you, sir.

19              BY▯▯▯▯▯▯▯▯:

20         Q    And much like the disclaimer at the beginning of the minority hour, I might ask some

21    similar questions this hour.    But we're going to start back with Mr. Epstein's death and some of the

22    irregularities within the jail.

23         We talked about the missed institutional counts and observations.    And the two guards, two

24    corrections officers, Tova Noel and Michael Thomas, were eventually indicted for falsifying those

25    records.

1      Were you involved at all in that indictment?

2      A     I was -- it was -- I think it was passed by me.    I think I was informed as to what they

3   were going to do.

4      Q     I think they eventually entered a plea agreement or --

5      A     Yes.

6      Q     -- the case was otherwise dropped.    Were you involved at all in that?

7      A     I think people described it to me, I think, before it happened.    Yeah.

8      Q     But much like some of the Epstein investigation, you're not involved in the prosecutorial

9   decisions on whether or not --

10      A     Right.

11      Q     -- to take the case?

12      On the institutional counts, my understanding of these is that, at set intervals, corrections

13   officers need to go through their area of responsibility and just do a count of the inmates to make

14   sure that everyone is accounted for.

15      Is that a fair summary of that?

16      A     The count process, yes.

17      Q     And --

18      A     And they report the counts, I think it's -- is it -- I forgot how frequently they report the

19   counts, but they call in the counts.

20      Q     My -- from the indictment, at least, they were responsible for counts at 4:00 p.m., 10:00

21   p.m., 12:00 a.m., 3:00 a.m., and 5:00 a.m.    Does that sound right?

22      A     Sounds right.

23      Q     And then, to the best of your recollection, were these institutional counts done by those

24   officers?

25      A     I can't remember if one of them was done, but they generally were not done.

1     Q     And then you testified earlier, but the officers falsified the records.    Is that correct?

2     A     Yes.

3     Q     Moving to the 30-minute rounds, again, my understanding of the rounds were that they

4  were directed by the psych department, the medical department, because Mr. Epstein was coming

5  off suicide watch and coming off, kind of, the more enhanced observation.    Is that correct?

6     A     Yes.

7     Q     And --

8     A     I'm not sure if it was -- I think that's part and parcel of this level of scrutiny.

9     Q     Like, the step-down from --

10    A     Yes.

11    Q     -- suicide watch?

12    A     Yes.

13    Q     And my understanding, again, is that they would be conducted twice an hour, once the

14  first 30 minutes, once in the second, at irregular intervals and at least 40 minutes apart.    Does that

15  sound right?

16    A     Yes.

17    Q     To your recollection --

18    A     To my knowledge, yes.

19    Q     To the best of your recollection, were these 30-minute rounds done?

20    A     I believe that's what they were prosecuted for, not doing them and lying about it.

21    Q     And then, to your recall, the officers falsified the records?

22    A     Yes.

23    Q     I believe you said it, and I know I have, but I want to ask directly:    Were those

24  30-minute rounds specific to Mr. Epstein?

25    A     I believe they were specific to anyone who warrants that kind of level of a watch.    I

1    don't know who else did in that SHU.

2        Q    So that was my next question.    Do you recall if anyone else on L Block required

3    30-minute observation?

4        A    Or even in 9 South.    I don't know.

5        Q    There was -- I can introduce it if you need me to, but there was a sign on the SHU

6    officer's desk that read, "Mandatory rounds must be conducted every 30 minutes on Epstein, as per

7    God."    The "as per God," I'm assuming, is a joke for the warden or something.

8        A    Right.

9        Q    Do you recall hearing about that sign?

10       A    After the fact.

11       Q    Prior to your departure as Attorney General?

12       A    I can't remember.

13       Q    And what -- do you recall any discussions regarding that sign?

14       A    It may have been part of the case.    In other words, that it was clear to them that it was

15   a priority to conduct those rounds as to Epstein.

16       Q    Part of the case against Noel and Thomas?

17       A    Yes.

18       Q    We've gone through all of the, kind of, major irregularities.    After you learned of these,

19   did you take any disciplinary action against anyone involved?

20       A    It could be referred to as "disciplinary."    I think on the very day I was informed of his

21   death, I started reaching out to find the old management of BOP that I was familiar with and had

22   always considered to be, you know, fantastic managers of BOP.    So I started lining them up because

23   I intended to see if I could bring them in.

24            And then within days I -- I think maybe very quickly I reassigned the warden.    And I replaced,

25   I think the following -- I had the people come in to interview within a few days with the job, and then

1    I think within a week I moved out the head of BOP and I put in the new people.

2         Q    And appointed a new Deputy BOP Director?

3         A    Yes, both the top and the deputy, and that was all done within a week.    And I left the

4    other discipline up to them to mete out.

5         Q    They would be the ones that placed the two guards on leave and --

6         A    I don't know when they were -- I think they were probably put on leave right away, I

7    think --

8         Q    Okay.

9         A    -- but further discipline and figuring out, you know, who was responsible for what

10   oversight.

11        But I think there was no question -- they admitted right up front that they had --

12        Q    They were --

13        A    -- screwed up, as they said.

14        Q    -- asleep at the desk?

15        A    Yeah.

16        Q    Was there -- to your knowledge, was there a larger investigation into whether or not

17   these issues were systemic at MCC or if they were isolated to Epstein?

18        A    I don't -- I actually can't answer that authoritatively.    I think BOP does a lot of

19   investigations of the BOP, and I think maybe their report on this incident says this is not new news; I

20   mean, this is a problem.

21        Q    Uh-huh.

22        A    I think BOP, you know, has gone downhill in terms of its professional- -- you know, its

23   management structure and professionalism.    Part of that is the nature of the job and, especially in

24   big cities, the pay rates and so forth.    It's very hard to get good people.

25        Q    MCC, I believe, is now closed?

1    A    I think it was closed on the -- after I left.    Yeah.

2    Q    It was after you left?

3    A    Yeah.    Well, I stopped new prisoners from going in; I believe that's what I did.    And I

4    think I redirected them to Brooklyn MDC.

5    Q    Thank you.

6    I'm going to ask a few questions about the individual cases, similar to what my colleagues

7    asked, and might have a few followups based off their questions.

8    You testified a little bit about, you know -- I want to quote it as best as possible -- that you

9    wanted to let the investigators let the chips fall where they may -- in other words, not involve

10    yourself too heavily in the Epstein -- the 2019 Epstein prosecution and --

11    A    Investigation.

12    Q    -- investigation in general.

13    And then you said that -- I want to get it right -- that it's DOJ policy to bring to the Attorney

14    General's attention if a prominent person was going to be the subject of an investigation.

15    Is that a fair summary of what the policy is?

16    A    Yes.    It's called "urgent reports."    I think they have to file an urgent report.

17    Q    Did the Southern District of New York ever file an urgent report regarding the Epstein

18    case?

19    A    I can't remember -- I don't remember that they did, but -- you know, I certainly was

20    never informed by them that they were focused -- you know, that they believed that they had

21    predicate to actually investigate the individual, individual people --

22    Q    And, pardon me, I don't know the --

23    A    -- other than Maxwell and Epstein.

24    Q    And I don't know the actual, like, formal designations, but the -- they wouldn't have

25    to -- would they have to issue a formal report if they wanted to interview someone as a witness that

1      was a prominent individual, or just if that prominent individual was going to become a suspect or a

2      target of the investigation?

3           A      I think -- I don't think it was that refined.    I think they had to use their rule of common

4      sense as to what would the national leadership of the Department want to know about.

5           Q      Uh-huh.

6           A      And, you know, I think, if they decided they were -- you know, had some predicate to

7      actually pursue an individual, you know, moving into the potential area of a target, they would have

8      to do an urgent report.    Yeah.

9           Q      And to the best of your -- like, out of the list that the minority read to you, the one that

10     you recalled elevating to witness, suspect, or a target was Prince Andrew.    Do you recall --

11          A      I don't know if he was a target, and I actually -- you know, I guess, to my knowledge, he

12     was at least a witness --

13          Q      Uh-huh.

14          A      -- but I don't know if he went beyond that.    But, you know, that's somebody who in

15     real-time I understood they were trying to get in the door to question.

16          Q      Would -- understanding, again, that you said you don't recall specific urgent reports

17     being filed with you, would that have been someone that met the criteria of prominent person?

18          A      In my mind.

19          Q      And I'll ask it specifically to him.    Do you recall whether or not you got an urgent

20     report --

21          A      And it could affect foreign relations and so forth.    It's a sensible rule.

22               Now, is it always followed by U.S. attorneys?    No.    There are many sit- -- not many, but

23     there's sometimes a case where you don't get a report for something that should have been.    And

24     the SDNY is relatively well-known for playing its cards very close to the vest.

25          Q      And, again, to the best of your recollection, you never got an urgent report regarding

1    Prince Andrew?

2         A    I don't recall.    Quite possibly.    But I don't recall that.

3         Q    When -- do you recall when a more --

4         A    You know, an urgent report could also be done -- I mean, it's a judgment call.    A U.S.

5    attorney can want to question somebody as sensitive as a member of the royal family, you know, our

6    closest ally, and they might file an urgent report saying, I want you to know that we're going to be

7    pursuing this guy as a witness and it's going to make the papers.

8         Q    So that's definitely someone that there should have been an urgent report filed?

9         A    Yeah.

10        Q    Now, whether it made it to your --

11        A    Well, no.    I mean, they can say he's just a witness.

12             But the fact -- I think one of the reasons -- when you go and you hold a press conference and

13   you attack him in front of the mansion and so forth, that is actually something that the U.S. attorney

14   should've run by me.    Not that I would've opposed it, but I would like to know about it.

15        Q    Uh-huh.    So --

16        A    I don't think he told me.    But I wasn't mad at him for the substance.

17        Q    This is potentially a poorly worded question, but -- so, based off that, your recollection,

18   is it possible that they just didn't inform you that there were other prominent people under

19   investigation or as witnesses?

20        A    I think it is possible that the SDNY did not inform me, you know, how deep they were in

21   the investigation of particular individuals.    That would not surprise me.

22             By the same token, I feel that my view of that office and the people involved would be that, if

23   they had evidence establishing a crime, they would pursue it as such.

24             And I also feel -- you know, I'm -- it's sort of amazing, after all these years, you know, going

25   back to the '90s when you had people reporting and the victims and a lot of speculation and people

1  finding connections, I still have not heard any -- no evidence has come out that would establish

2  criminality for most of the individuals --

3      Q    Uh-huh.

4      A    -- that have been named.    And I think it would come out if there was any feeling that,

5  within the government, on either side, that someone was covering up.    I think it would get out.    I

6  mean, SDNY is also -- and New York -- is also well-known as being the home of many, many a leak on

7  investigations, so --

8      Q    So, in your experience, you have no doubt, if SDNY prosecutors saw evidence of a crime,

9  they would've followed that evidence, and if it led to an indictment, they would've indicted, and if it

10  led to a conviction, they would've followed the facts where they led.    Is that fair?

11      A    Yes, for that group.    I also feel, you know, that, you know, they would've done the

12  same for Clinton, I believe.

13      I think -- you know, remember, this stuff also went on under President Biden's administration,

14  and they were looking for something to bring against President Trump, and this was -- if they had

15  evidence, this would've been low-hanging fruit.    I just don't -- I was never informed of the evidence,

16  and I'm skeptical there is any.

17      Q    Do you recall when a more -- the SDNY's more formal investigation into Epstein began?

18      A    No.    I mean, I may have at the time.    I just don't remember.

19      Q    Likely prior to you becoming Attorney General?

20      A    Not necessarily, but quite possibly.

21      Q    Okay.    Do you recall generally when you became aware of the ongoing investigation?

22      A    No, I don't.    I obviously became aware of it around the time of his arrest.    It could've

23  been shortly before his arrest.    I mean, usually we would be told of an arrest like that going down in

24  Teterboro.

25      Q    A more high-profile arrest the moment someone lands in an airport?

1  A    Yeah.

2  Q    In cases like this one -- we'll stick with the high-profile cases -- do any of the, kind of,

3  investigatory decisions rise to the Attorney General's Office, whether or not to issue a search warrant

4  or apply for a search warrant or apply for a subpoena?    Would any of that have risen to your office?

5  A    I wouldn't say -- it would be very unusual for it, but there could be unusual

6  circumstances, like if you're going to search a very sensitive area, you know, that's going to cause all

7  kinds of hubbub.

8  Q    I believe it was a Member of Congress a couple years ago suggested that you personally

9  approved the search warrant for Epstein's house in New York, his townhouse in New York.    Do you

10  recall --

11  A    Did someone say that?

12  Q    I believe so.    I don't --

13  A    I don't recall that.

14  Q    But that --

15  A    That's not the kind of thing I would've thought was particularly needed -- you know, you

16  needed my approval for.

17  Q    Kind of just the run-of-the-mill search warrant of a --

18  A    Of somebody who's already been arrested.

19  Q    Yeah.

20  Mr. O'Callaghan.    "Run-of-the-mill" is your term?

21  ████████  Yes.    Like, not outside the ordinary practice of an investigation, I believe

22  would be --

23  The Witness.    I would've considered that normal.

24  BY ████████ :

25  Q    Okay.

1        During the course of the investigation, did you receive any regular briefings from the FBI or

2  the SDNY?

3      A    During what?

4      Q    During the course of their investigation.

5      A    Into?

6      Q    Mr. Epstein.

7      A    Death?   Or --

8      Q    No --

9      A    Oh, you're talking about before he committed suicide?

10     Q    Yes, sir.

11     A    I don't recall any.

12     Q    Would there be -- would that normally, those kinds of briefings or updates, fall to the

13  head of the Criminal Division, or would it be even lower than that?

14     A    The investigation itself, I think -- I'm not even sure it would get to Main Justice, other

15  than alerting us maybe that the investigation was going on, but particular actions wouldn't be

16  regularly reported.

17     Q    And then -- I don't want to get it wrong, but I believe you said that there were -- in

18  regards to the non-prosecution agreement out of the Southern District of Florida, there were

19  conversations about being careful that the 2019 investigation did not run afoul of that.   Did I

20  summarize that correctly?

21     A    I vaguely recall some discussion -- I don't know exactly when it occurred -- about, you

22  know, to what extent can charges be brought that don't run afoul of that plea agreement.  I

23  remember some discussions.

24     Q    Do you recall any more of the content of those discussions?  Any --

25     A    No.

1      Q    -- concerns that the plea agreement restricted the Southern District of New York?

2      A    No.   I just think it was a question of everyone agreeing on that we had a good legal

3  argument.

4      Q    And then --

5      A    "We" being the whole Department of Justice.

6      Q    And then you were asked about the -- kind of specific on the seizure list that the DOJ

7  released earlier this year from the FBI that had, like, picked up a laptop but didn't say what was on

8  the laptop.

9      Do you recall ever reviewing any of the FBI's evidence in the Epstein criminal investigation?

10     A    Before his suicide?

11     Q    Yes, sir.

12     A    No.

13     Q    Do you recall reviewing any of the evidence after his suicide?

14     A    Just evidence relating to his -- you know, relating to his suicide.   I don't recall reviewing

15  evidence relating to charging Maxwell or anybody else.

16     Q    So no --

17     A    I mean, I was told in Maxwell's case, when they got to the point that they were ready to

18  indict, I was -- I believe I was told the substance.   But I didn't review the evidence myself.

19     Q    Applying to both Mr. Epstein and Ms. Maxwell, you reviewed -- I'll -- for Mr. Epstein, you

20  reviewing evidence surrounding his death --

21     A    Uh-huh.

22     Q    -- but not the substantive criminal evidence regarding his investigation and prosecution.

23  Is that correct?

24     A    Right.

25     Q    And then with Ms. Maxwell, you didn't review the underlying criminal evidence.   You

1    just got notified about a pending indictment.

2         A    Right.

3         Q    Okay.

4         A    That's my best recollection.

5         Q    I just wanted to make sure it was all in line there.    We've been back and forth a little

6    bit.

7         And, on that note, I want to shift to the non-prosecution agreement a little bit as in relation to

8    both, kind of, like the minority said, your experience generally with non-prosecution agreements but

9    then a few questions about whether or not that had any impact during your second tenure as

10   Attorney General.

11        You were asked if you were aware of it at the time.    I believe you said you were not aware of

12   it in 2007.

13        A    I became aware of it when it was public -- you know, in public coverage of the matter.

14        Q    Uh-huh.    Did you ever review the agreement as Attorney General in those discussions

15   about its potential impacts?

16        A    I don't recall going back and looking at it myself.    I think other people were doing that.

17        I mean, everyone, I think, understood that there would be litigation over whether or not the

18   indictment could stand and whether it was preempted by that settlement.    Everyone understood

19   that, and I think they were -- everyone was satisfying themselves that we were in a strong legal

20   position.

21        Q    Of course, Mr. Epstein never got the chance to appeal -- never got convicted and never

22   got the chance to appeal the conviction, but Ms. Maxwell is appealing based on the non-prosecution

23   agreement.

24        Is that your understanding?

25        A    That's my understanding.

1      Q     You were asked a little bit about this, specifically the "co-conspirator" language in that

2  agreement.    You said something along the lines of the United States not prosecuting any and all

3  co-conspirators, including but not limited to -- and then listed four people affiliated with Epstein.

4            And I want to ask you again:    Had you seen, in your experience, that breadth of language in

5  these kinds of agreements before?

6      A     You know, I can't -- I don't recall seeing that.

7            You know, I think, as a general matter, in a, you know, unspectacular case, I think it may not

8  be inappropriate to, when you are trying to get a deal done with the primary suspect, to agree that

9  you wouldn't go after peripheral people as a way of continuing the case.    Like, "I'm going to also go

10 after your" -- "I won't go after your wife for, you know, her role in this" --

11     Q     Uh-huh.

12     A     -- or "I won't go after your children for their role in this" and so forth.    That kind of

13 stuff is done, okay?

14           But this case is different because of the nature of the crime and because of the span of the

15 victims.

16     Q     And, kind of, the breadth of what those potential co-conspirators could be.

17     A     Yes.

18     Q     Do -- in general, and then I'll ask about high-profile --

19     A     And, you know, arguably, not enough was known to make that kind of broad

20 agreement.

21     Q     In general, do non-prosecution agreements need to be approved by someone in Justice

22 headquarters?

23     A     Actually, off the top of my head, I don't know.

24     Q     What about in --

25     A     I think there are certain kinds of cases, definitely, but I'm not sure about this.

1    Q    And would it be more likely in higher-profile cases?

2    A    No.    I mean, certain kinds of cases where the substantive law is in play and the

3    money-laundering section may have to sign off on some things or the fraud section may have to sign

4    off on some things.

5    Q    So it's, to the best of your recollection, more akin to what the alleged crime is versus the

6    profile of the person being charged?

7    A    Right.

8    Q    Okay.

9        Since it's been in the news, in your experience, are non-prosecution agreements binding

10   within all districts in the United States?

11       You said you felt like you had a good legal standing to bring the 2019 case against Epstein and

12   then the 2020 case against Maxwell.    But the current argument is that the Southern District of

13   Florida can bind the Southern District of New York.

14       Is there any Department of Justice manual that talks about that?

15   A    I don't -- not that I'm aware of.    I can't recall that -- how that issue is handled.

16   Q    On this specific agreement between the Southern District of Florida and Mr. Epstein, I

17   believe it was sealed as part of the case.    Is that common?

18   A    I know it happens.

19   Q    And you had said before that one of your problems with the -- one of the issues, to you,

20   with this particular agreement was that it restricted the ability for victims to speak about the case or

21   speak about the agreement.    I believe the CVRA requires victims be able to speak about --

22   A    Yes.

23   Q    -- potential plea agreements?    Is that the case?

24   A    I believe so.    I think it's a statutory requirement.

25   Q    Did you come to that view after reviewing it in -- after reviewing the agreement in 2019

1    or just based off news coverage?

2         A    Just based off news coverage.

3         Q    Again, this is kind of just using it as an example of what's common.   He agreed to plead

4    guilty to a couple charges and eventually served 13 months in Palm Beach County jail and left for

5    16 hours a day to go work.

6         Is that common in those kinds of agreements, the broad work release?

7         Mr. O'Callaghan.   You're asking about -- that's the State execution of the plea agreement in

8    the State, right?

9         ████████████   Yes.   It was still signed off on by the --

10       Mr. O'Callaghan.   And he's never -- he's never been -- the non-prosecution agreement is

11   with the subject of Florida U.S. Attorney's Office.   The way that the State sentence is executed,

12   that's a local Florida, Palm Beach matter.   And I don't think Mr. Barr has any -- you know, any

13   information about that.

14        ████████████   All right.

15      The Witness.   That's true.

16         BY ████████ :

17        Q    So the post-sentencing, how an inmate is -- work release for an inmate is done by the

18   local folks?   The U.S. Attorney's Office wouldn't be involved?

19        A    Not usually, I would suspect.   But I don't know.

20        Q    Okay.

21        The -- and, again, I want to get it right, so I'm not -- you said that, in your personal view, you

22   thought it was wrong to not let victims have a say and also that there was a legal vulnerability.

23   Again, the vulnerability is the potential -- is that potential impact on future cases.   Is that fair?

24        A    The reason you let them have their say?

25        Q    No, no, no.   You said that you had two, kind of, personal concerns with the

1    non-prosecution agreement for Mr. Epstein:    that it was wrong to not let victims have their say,

2    both, I imagine, personally and under the CVRA, but also that it had a legal vulnerability.    And I'm

3    just wondering if --

4        A    Well, no, it's the same thing.

5        Q    The same -- the CVRA?

6        A    I thought, at the time, that made it legally vulnerable.

7        Q    All right.    It wasn't that --

8        A    These were -- you know, I was not an advocate -- you know, here, I generally am

9    concerned about victims' rights.    I looked at this.    I didn't like that aspect of it, and I thought it was

10    a legal vulnerability.    But I wasn't sitting in judgment of the decision.    I didn't know all the facts.

11        Q    No, no.    And I'm not asking for judgment of the overall decision.    Just if, like, on your

12    first-blush read of this it had multiple --

13        A    That's what I was concerned about --

14        Q    All right.

15        A    -- or, you know, felt I wouldn't have done.

16        Q    I think it was -- I think it got a little jumbled in the last hour, of possible recusals.    You

17    did not recuse from the SDNY investigation.    Is that correct?

18        A    I did not recuse from the SD- -- I think I was -- considered whether I should.    There was

19    a question asked me during my confirmation.    I'm not sure what that was relating to, but something

20    about Epstein.

21        Q    I thought it was relating to if you would investigate the non-prosecution agreement.

22        A    Ah.

23        Q    And I believe there were issues with Kirkland & Ellis representing Mr. Epstein in that

24    case, your former employment, and --

25        A    Yeah.    So I wasn't sure about the timing of things and whether it implicated the time

1    that I was there or, you know, anything like that.    And I don't think it did.    I actually don't think I

2    would've had to recuse myself from that.    But I just was never involved in that.

3            I mean, the thing that happened under my tenure relating to Epstein was the investigation of

4    Epstein in the Southern District.    And I did not recuse myself from that.

5         Q    Courtney Wild, one of the Epstein victims, said that she sent a letter to you during your

6    tenure as Attorney General.    Do you recall receiving that letter?

7         A    No.

8         Q    And then I believe you said that you were made aware of the OPR investigation into Mr.

9    Costa while he was U.S. Attorney for the Southern District of Florida kind of, like, at the end of the

10   OPR investigation?    That you were aware of their findings but not the investigation itself?

11        A    No, no.    I may have been aware that they were investigating.    I just was not aware of

12   where they stood.    I didn't monitor the investigation.

13        Q    Okay.

14        A    They finish when they finish, and I found out what they were thinking.

15        Q    Okay.    No, that's helpful.    I wanted to clarify that.

16           Do you know, just to the best of your knowledge, how does -- can the Attorney General direct

17   OPR to conduct investigations, or do they do it?

18        A    No, the AG can direct them.    That's how they were originally established.

19        Q    Did you direct OPR to investigate the non-prosecution agreement?

20        A    No.

21        Q    Do you know who did?

22        A    No.

23           But they don't have to be directed.    They can also initiate their own.

24        Q    Uh-huh.

25        A    So no one had to direct it.    If they saw it in the newspapers and, you know, were

1    concerned about it, they can initiate it.    It doesn't require being directed.    I'm just saying the AG

2    can direct it.

3         Q     Again, this is more just a your-experience-type question.    The agreement was signed in

4    late 2007 and then executed in 2008, and then the OPR investigation came out in 2020.    Is it

5    common for, kind of, an internal review of U.S. attorneys to happen so far after the fact of the

6    alleged --

7         A     By OPR standards, that's speedy.

8         Q     Okay.    And it could be --

9         A     In those days.

10        Q     In those days.    It could -- could it have been a result of the agreement being sealed and

11   then press reports --

12        A     Could've been.

13        Q     -- coming out later?

14        A     Could've been.    The answer is that these things -- investigations by OPR as OIG take a

15   long time.

16        Q     All right.

17              In addition to being informed of the outcomes of the OPR investigation, did you review any of

18   the underlying materials?

19        A     Concerning what?

20        Q     The OPR investigation into the non-prosecution agreement of Mr. Epstein.

21        A     I don't recall looking at it.    I may have seen a summary of their reasoning or something

22   like that, but I just don't recall --

23        Q     Do you --

24        A     -- delving into it.    He was no longer there.

25        Q     The OPR said that they conducted a number of witness interviews during their

1    investigation.    To your knowledge, does OPR keep records of witness interviews?    Would they

2    have been transcribed?

3         A    I don't know.

4         Q    Shifting to Ms. Maxwell, she was arrested during your tenure but, as it was pointed out,

5    did not go to trial until after you had left the Department.    And you've talked about being made

6    aware of her pending indictment.    Was that when you were first made aware of a potential

7    investigation into Ms. Maxwell?

8         A    No.    I mean -- well, I would say that I assumed that they were looking -- I don't know if I

9    was told, but I think anyone would've assumed that they were looking at Maxwell as a facilitator and

10   a co-conspirator.    So I assumed that.

11        Q    Do you know if their more formal investigation into her occurred after Mr. Epstein's

12   death, or was it running concurrently with the Epstein case?

13        A    I don't know exactly how they were staging things, but my assumption was that they

14   were focusing on building their case against Epstein and also trying to develop evidence that would

15   support a charge against her.    And I think they were probably doing them in tandem, but, you know,

16   how much they were pushing one over the other, I don't know.

17        Q    And then we talked about the urgent requests of high-value co-conspirators.    Were

18   you aware of any other potential co-conspirators in the Epstein or Maxwell case that have not been

19   prosecuted?

20        A    That have not been prosecuted?    I mean, now we're switching to the term

21   "co-conspirator."    I think I laid out that I have -- I was not aware that SDNY had concluded that -- or

22   had established that any of the names that have been bandied about were, in fact, engaged in illegal

23   activity that they could charge.

24        Q    Okay.    That's helpful.

25        A    When I say "bandied about," I'm talking about, you know, the names that have come up

1      here, like Dershowitz and Branson and Richardson and people like that.

2           Q      The names on the flight logs and --

3           A      Well, being on a flight log is not even -- I mean, it's not even prima facie evidence of

4      wrongdoing; it's just that you know the person.

5           Q      But you don't recall ever being told that those names that were being -- that were on

6      flight logs or fluttered about in the press ever rose to "this is someone that we could potentially

7      indict"?

8           A      That's right.

9           Q      Were you kept up to date on the Maxwell investigation, or -- I don't need to reread the

10     quote, but -- were you taking a similar posture of let the investigators run the course of the

11     investigation?

12          A      To which investigation?

13          Q      Ms. Maxwell.

14          A      Same course.

15          Q      Do you recall any conversations regarding the non-prosecution agreement impacting

16     the potential of a charge for Ms. Maxwell?

17          A      I remember a discussion about it impacting the work of the SDNY, but I can't pin down,

18     you know, how much it related to Epstein versus Maxwell.

19          Q      And then a few blanket questions before some more general investigative-type

20     questions.

21                 Did anyone ever instruct you to not investigate or not prosecute Jeffrey Epstein?

22          A      No.

23          Q      Did anyone instruct you to not investigate or not prosecute Ms. Maxwell?

24          A      No.

25          Q      Did anyone ever instruct you to not investigate or not prosecute any other potential

1    co-conspirator?

2          A     No.

3          Q     And I believe you said this earlier, but you're confident that if the Southern District of

4    New York identified a co-conspirator that they believed they could convict, they would have brought

5    the case?

6          A     I believe so.

7          Q     We've talked, as you had mentioned the kind of broad nature of whatever the Epstein --

8          A     And also, just as a practical matter, you know, I was aware of a lot of leaks out of the

9    Southern District of New York, not just the U.S. Attorney's Office but also the FBI office there.    And it

10   was my view -- and this, I think, would be on both sides of the issue -- if they felt that there was a

11   political effort to block what they felt was a righteous case, it would leak out.    There's no doubt in

12   my mind it would leak out and we would've heard about it long ago.

13         Q     I appreciate that.

14               I want to talk about, again, the colloquial Epstein files and what that means.    Obviously, it's

15   kind of taken on a life of its own, of what that could possibly mean, along with the client list.    I think

16   your description of the client list is how I will -- if I say "client list," is how I will use "client list,"

17   whether or not there is a list of people that Jeffrey Epstein facilitated prostitution or underage

18   prostitution to individuals.

19               As an overarching general question, what kind of documents make up a criminal investigative

20   file?

21         A     Whatever documents are potential evidence in the case.

22         Q     So witness interviews?

23         A     Yes.

24         Q     Evidence gathered during a search warrant?

25         A     Records of activities, whether it be comings and goings on planes or whether someone

1    was in the same place, as an allegation.

2         So, for example, on, you know, Prince Andrew, they spent at least -- I think I've seen reports

3    that say -- this was not reported to me by the Southern District -- that Virginia Giuffre's allegations of,

4    you know, "something happened in London," "something happened here" corresponded to where

5    people were.

6         So those are the kinds of things, those kinds of records, hotel records, things like that, and

7    witness interviews and things like that.

8         Q    And you mentioned a little bit earlier about protecting grand jury secrecy and Federal

9    Rule 6(e).   Would everything that's in a case file be presented to a grand jury?

10        A    No.

11        Q    And then would it be common -- and I think this is what has come out of the

12   Department's efforts to unseal some grand jury transcripts in this case -- that the, kind of, underlying

13   investigative interview, you know, between the FBI agent and the witness, for purposes of the grand

14   jury, the FBI agent would testify as to what the witness said?    Is that common?

15        A    Yes.

16        Q    Would the -- in your experience, would the underlying interview transcript be prevented

17   from disclosure, or just what was presented to the grand jury?

18        A    The transcript of the testimony would be protected.

19        Q    The underlying testimony?

20        A    What do you mean, "underlying testimony"?

21        Q    So the FBI agent interviews a witness; the FBI agent then testifies to the grand jury --

22        A    The material presented to the grand jury would be protected.

23        Q    But not necessarily --

24        A    It's not the -- it's not the medium that -- it's not limited to medium.    It's --

25        Q    Okay.

1      A      -- the substance.     That's my understanding.

2      Q      Do you know if those underlying interviews are recorded or just transcribed?

3      A      I don't know.

4      Q      Could a case file also include FBI 302s?

5      A      Yes.

6      Q      And 1023s?

7      A      Any document that reflects evidence that is potentially relevant could be in the case file.

8   So the word "case file" is a little ambiguous.

9      Q      Yes.     As is "Epstein files" as a whole.

10     A      Right.

11     Q      The -- and we've talked a lot, and you saw it -- the list of what the FBI seized in this case.

12   Is seized evidence kept after a case concludes?     So Mr. Epstein died; his case concluded.     Would

13   seized evidence still exist?

14     A      I think -- I'm not sure of the answer to that.     I think people who claim to have an

15   interest in the property have to sort of seek it back, and the government has to make its case as to

16   why it has to be kept.     That's my understanding of the process, but I'm not sure.

17     Q      An ongoing -- a separate ongoing criminal case would possibly be good reason to keep

18   the evidence?     Is that --

19     A      Yeah, including whether there are appeals pending.

20     Q      Yeah.     And, obviously, some of the real property, at least, has gone -- like, I think the

21   island was purchased by someone else.

22     A      I don't know.

23     Q      The subpoena process for the U.S. attorneys -- and this is my own lack of knowledge, so

24   excuse me.     But does the U.S. attorney issue the subpoena, or does the grand jury issue the

25   subpoena?

1        A     Well, the grand jury subpoenas.     But, in practice, the prosecutor determines -- you

2   know, basically determines what is going to be produced on behalf of the grand jury.

3        Q     And then -- so the grand jury would say -- would recommend a subpoena for testimony

4   to X, and then the U.S. attorney would draft and --

5        A     No.     I think the U.S. attorney would say, "We're going to interview this person" --

6        Q     All right.

7        A     -- and bring that person before the grand jury.

8        Q     And those subpoenas can be for documents and testimony?

9        A     Yes.

10       Q     Why issue a document subpoena versus execute a search warrant?

11       A     Because, you know, many subpoenas are third-party subpoenas, like for bank records

12   and so forth.     You don't go into a bank and search them.     You impose the obligation on the bank to

13   produce them, and they will.

14       Q     And those can be --

15       A     And even for a subject, you know, you would still frequently give that person the chance

16   to comply.     You don't go searching unless there's some reason you're concerned about the

17   destruction of evidence.

18       Q     And those can be executed against more than just the subject of the investigation,

19   right?     You just --

20       A     Anybody.

21       Q     -- mentioned banks and --

22       A     Anybody that, you know, you believe could have relevant evidence.

23       Q     So other witnesses or companies, businesses, telecom providers?     All --

24       A     Sure.

25       Q     All yes?

1      A      All yes.

2      Q      What about company data repositories -- Google, Microsoft?

3      A      Yes.

4      Q      You mentioned banks and financial institutions.    What about for State governments,

5   like camera footage off of the State courthouse or anything like that?    Could they do that as well?

6      A      Government stuff?

7      Q      Yeah.

8      A      Yes.

9      Q      So, in the Epstein case, and without -- I think you said that you didn't review the,

10   quote/unquote, "Epstein files" in their fulsomeness, but it would be likely that that case would

11   include information like I just laid out -- 302s, 1023s, returns from subpoenas, returns from search

12   warrants, other witness interviews?    All of that would be included, potentially, in a case file.    Is

13   that fair?

14      A      Potentially, yes.

15      Q      And this could potentially include information that for whatever reason should not be

16   released, victims' personal identity and child sexual abuse material being two prominent examples in

17   this one?

18      A      Those are examples, but there are multiple reasons why you wouldn't want to release

19   the raw files.

20      Q      What are some others?

21      A      Because it's sometimes unfair to the individual who the government does not -- has not

22   concluded based on the evidence that they've done anything wrong.

23      Q      So, like, a hypothetical would be:    FBI conducts a witness interview, produces a 302.

24   The interview names four people.    After further investigation, it's determined that those four

25   people -- that that interview is not credible and those four people likely didn't commit any crimes.

1    Is that fair?    Something that would --

2         A    So, I mean, you could take examples from this case.    You know, some of the victims

3    made public allegations, anyway, that were fabrications.

4         Q    Uh-huh.

5         A    I'm not saying this is true of all the victims, but there are some that then withdrew.

6         So it's possible that there's material in there that the government has come to the conclusion

7    is not credible or is, you know, conclusively refuted by other evidence.

8         Q    Uh-huh.

9         A    You know, in the case of Bill Clinton, as far as I was aware, there was no evidence that

10    he visited the island.    You know, the government did not obtain any such evidence.

11         Q    Uh-huh.

12         A    And he denied it.    But there is somebody who asserts he did.    I'm just using that as an

13    example.

14         Q    Uh-huh.

15         A    Is it fair to put that -- if the government has come to the conclusion that he didn't visit

16    the island and the police has evidence to show that, why would you put all the raw stuff out there to

17    permit all the -- you know, the internet to get heated up about this and assault the person for what

18    you know is not accurate?

19         Q    And then you said earlier, and I want to ask again using the language, the descriptor of a

20    "client list" that we all kind of agreed on, you never saw a document or anything resembling a client

21    list?

22         A    I've never seen a document resembling a client list.

23         Q    What about any evidence or anything suggesting Mr. Epstein was bribing individuals

24    with salacious material?

25         A    You mean "bribing" them, giving them something?

1      Q    Extorting them.

2      A    No, I don't recall ever seeing such evidence.    And it seems highly improbable to me

3  that you would extort somebody by engaging in an act yourself that's a crime.    You don't get much

4  leverage if you go to jail too.

5      Q    Yeah.

6           Same kind of -- same question with the Maxwell case.    All of the potential evidence and

7  documents that we just discussed about potentially being in a case file, it's possible all that exists for

8  Ms. Maxwell as well?

9      A    The same kind of stuff?

10     Q    Uh-huh.

11     A    Possibly.

12     Q    Did you ever review any of the substantive evidence in her case?

13     A    I think I said no.

14     Q    Okay.

15          And then you discussed it a little bit in relation to communications between DOJ and the

16  White House regarding cases, that it would be rare, but you had two conversations with President

17  Trump regarding the Epstein case?

18     A    I recall two conversations with Trump relating to the Epstein case.

19     Q    Is it common to have communications regarding cases within the Department of

20  Justice?

21     A    Within the Department?

22     Q    Uh-huh.

23     A    For who to have to talk to whom?

24     Q    Well, I mean, for SDNY to notify you, would they pick up the phone, or was it an email,

25  or was it a memo?    How would that -- if SDNY needed to get in contact with you, how would they

1    do it?

2          A      Well, it is rare for SDNY to want to get in contact with Main Justice.    But if they wanted

3    to, it could be anything from a communication to a division, to the deputy's office, or to the AG,

4    which was -- is pretty rare.

5          Q      Okay.

6                 And then I'm going to phrase these two --

7          A      But, you know, look, every case is different.    So, for example, on the Maduro

8    indictments, I was very involved in those because we were trying to coordinate an indictment -- I

9    mean, a case in Florida, a case in the Southern District, and national security interests and so forth.

10         Q      Uh-huh.

11         A      Something like that, you would have more interaction with the office.    But on

12   something like this, you wouldn't generally have that much interaction.

13         Q      All right.

14                And then maybe the last three questions, which were already similar questions --

15         A      Okay.

16         Q      -- that were asked before, but I'm going to rephrase them a little bit.

17                You were asked these a little bit earlier, but are you aware of any information or evidence

18   that suggests Jeffrey Epstein was an employee of any foreign intelligence service?

19         A      No.

20         Q      What about Mr. Epstein being an asset or an informant for any foreign intelligence

21   service?

22         A      As opposed to an employee?

23         Q      Uh-huh.

24         A      And the question is, did I see any such evidence?

25         Q      Are you aware of any evidence of that?

1    A    No.

2    Q    Similar questions for the U.S.   And I believe you answered them.   Aware of any

3    information or evidence --

4    A    Oh, "evidence," meaning stuff that the Southern District has and says, this is evidence of

5    that?   As opposed to speculation or --

6    Q    Yes.

7    A    -- allegations that you see floating around the press?

8    Q    Yes.

9    A    Yeah.   No, I've never seen SDNY evidence.   No.

10   Q    And I'm going to be obnoxious and ask it:   Any other official-channel evidence that

11   suggests that he was a foreign intelligence --

12   A    No.

13   Q    -- asset?

14   A    No.

15   Q    And then you said earlier, and I'll summarize it, and you can please correct me if it's an

16   improper summary --

17   A    I believe that, if he was an American asset, as opposed to some businessman who

18   shares stuff with the government, I would've heard about it from the intelligence agency.

19   Q    That was going to be my short summary here.   You testified earlier, not aware of any

20   evidence of Mr. Epstein being employed by U.S. intelligence services.   And then your assumption is

21   that, much like other people with large foreign ties, it would be not uncommon for him to have

22   discussions with the intelligence community --

23   A    Yeah, to share some information.   I mean, it's not uncommon at all for businessmen

24   who are being investigated to tell the prosecutors, "Gee, you know, I work all the time with U.S.

25   intelligence."   That's not at all unusual.   And the answer to that is, okay, a lot of people do, but,

1    you know, you're still capable of going to jail for committing a crime.

2            Q    Yes.

3            And you just touched on this, but were you ever informed by the National Security Division of

4    any potential impact to intelligence-gathering or national security regarding the Maxwell or Epstein

5    prosecutions?

6            A    No, especially not related to Epstein, you know, being prosecuted, or Maxwell.

7            Q    Okay.

8            We can go off the record.    Thank you.

9            [Recess.]

1    [1:38 p.m.]

2            ▮▮▮▮▮▮▮▮    On the record.

3            BY ▮▮▮▮▮▮ :

4        Q    Mr. Barr, I'd like to return to the topic of Jeffrey Epstein's prison death.

5            You mentioned at the outset this morning, if I understood correctly, that you were informed

6    by your chief of staff that Mr. Epstein was dead.    Is that correct?

7        A    Yes.

8        Q    And that the chief of staff told you, in his words, that it was an apparent suicide.    Is

9    that right?

10       A    I think so.

11       Q    Okay.

12       A    "Apparently," words to that effect.

13       Q    Did you have an understanding as to how your chief came to that conclusion on the

14   morning of his death?

15       A    No.    This was a somewhat on-the-fly call to alert me to this.    And also, it was clear

16   that the circumstance was such that it called for an investigation.    And I think, as the term may have

17   been used, it was a "shit show," and they would have to be looked at, but it was an apparent suicide.

18       Q    And so what, to your understanding --

19       A    Or presented itself as a suicide that way.

20       Q    To your understanding, what led him to that conclusion?

21       A    Common sense.

22       Q    Could you elaborate?

23       A    Well, you know, I think at first blush, while a lot went wrong, he was found by himself in

24   a cell apparently hanging himself and using the same modus operandi he did in his previous attempt.

25       Q    With respect to OIG's investigation, do you recall the names of the personnel in the

1   OIG's office who were involved?

2       A   In what?

3       Q   In the OIG investigation.

4       A   No.   I called -- Horowitz was called directly.

5       Q   Do you know the names of any of the other staff who were involved --

6       A   No.

7       Q   -- and working on it?

8       A   Like, not off the top of my head.   And I don't actually -- I don't think I knew.   Maybe I

9   knew at the time, but I certainly don't know now.

10          There was somebody I think up in New York that was close at hand whose name was used.

11  So at the time they had -- he did identify some people who would be involved, but I don't know

12  them.

13      Q   You were asked earlier about the FBI investigation in connection with the death.   And

14  just to make sure that we're all on the same page as to the scope of that investigation, it's my

15  understanding that a principal focus for the FBI was whether Mr. Epstein's death was caused by

16  homicide.   Is that fair?

17      A   I think to figure out was this a real suicide or was, you know, some kind of -- was this a

18  murder, basically.

19      Q   You were asked earlier whether you had spoken with any inmates at MCC, and you said

20  you hadn't.

21          Just revisiting this, because there was some public reporting or suggestion that you spoke

22  with an Efrain "Stone" Reyes following Mr. Epstein's death.   Is that name familiar to you?

23      A   No.

24      Q   Okay.

25      A   I mean, I -- who did he say he was, and what did I talk to him about?

1    Q    As I understand --

2    A    I mean, this stuff happened 6 years ago, and it's conceivable, but I don't recall talking to

3    an inmate.   It was a former inmate or an inmate?

4    Q    As I understand, an inmate of SHU contemporaneously with Mr. Epstein.

5    A    No.   I didn't go up there to the SHU.

6    Q    This is my understanding from the public reporting, at the time -- this is

7    August 2019 -- you pointed to some delays in the investigation because certain witnesses were not

8    cooperative.   Do you recall?

9    A    When?

10    Q    Do you recall that?   This is August of 2019.

11    A    Yeah.

12    Q    And specifically a number of them, as you described, required having union

13    representatives and lawyers before you were able to schedule interviews.

14    A    Before the Southern District was able to schedule interviews.

15    Q    You recall that?

16    A    Yes.

17    Q    Okay.   Was the lack of cooperation that you encountered solely the insistence on

18    union representation, or were there other factors?

19    A    There may have been other factors.   I don't know.

20        My recollection is that the Southern District was explaining to me what was taking time.   It

21    was important to get the facts out as quickly as we could, given all the conspiracy theories.

22    Q    According to the IG report, Mr. Epstein was taken by ambulance from MCC to New York

23    Presbyterian Lower Manhattan Hospital.

24        To your knowledge, were EMT and medical personnel questioned?

25    A    I don't know.   I mean, I don't know now.   I may have known at the time.

1    Q    To your knowledge, were DNA tests conducted on the bedsheets in Mr. Epstein's cell?

2    A    I couldn't tell you.

3    Q    We spoke earlier about the video footage in SHU.

4    A    By the way, I would just say that, again, this is 6 years later, I'm not saying I never knew

5    whether DNA was run.    Just sitting here, I can't remember whether that was an aspect that I knew

6    about.

7         I did know or was told that very good FBI agents were on this and were doing a very thorough

8    job.

9    Q    Turning back to the video footage, I just want to make sure that we're all on the same

10   page as to what you looked at.

11        There is the footage that the FBI made publicly available in July of this year.    Is that the same

12   footage that you personally reviewed?

13   A    I said that I cannot say whether it was the same because I don't have what I viewed.

14   But what I viewed showed the common area.

15   Q    Are you aware of there being more than one version of that footage?

16   A    Of that footage?

17   Q    Yes.

18   A    From the same camera?

19   Q    Yes.

20   A    I don't know.    I think at some point I was told that they were working on enhancing it.

21   Q    Enhancing the same version?

22   A    I don't -- they were -- I was interested in seeing the video, and they were working on

23   enhancing the video.    And the primary video I viewed was one showing the common area and the

24   guards and a portion of the stairway.

25   Q    Did you have any understanding as to what that enhancement involved exactly?

1      A    No.    And I don't even know whether it was enhanced.    I'm just saying that I was told

2    they were working on enhancing it.

3                              [Barr Minority Exhibit C

4                              was marked for identification.]

5             BY ▮▮▮▮▮▮▮▮▮ :

6      Q    I'd like to mark as exhibit C a CBS article.    It is entitled "CBS News investigation of

7    Jeffrey Epstein jail video reveals new discrepancies."    It is dated July 29th, 2025.

8             Mr. Barr, I'm going to ask you a couple of aspects of this article, but please take all the time

9    you need to review it.

10      A    Well, just tell me what the aspects are.

11      Q    Sure.    So I'm looking seven pages in, and I apologize, this document is not paginated.

12    There is a subheading that reads, "Experts question investigators' interpretation of orange shape

13    moving up the stairs."

14      A    Uh-huh.

15      Q    Do you see that?

16      A    Yeah.

17      Q    And then the paragraph below it reads, "Just before 10:40 p.m., an orange shape is seen

18    moving up the stairs leading to Epstein's tier."

19             Do you recall there being an orange shape in the video along the lines of that description?

20      A    I don't recall focusing on an orange shape going up.    Well, wait.    I'd have to see the

21    clip --

22      Q    Okay.

23      A    -- to see what that refers to.

24      Q    According to this piece -- and, again, I'll read it into the record -- the report says,

25    "Through review and analysis of the SHU video footage, witness statements, and BOP records, the

1    OIG determined that at approximately 10:40 p.m. a CO [corrections officer], believed to be Noel,

2    carried linen or inmate clothing up to the L Tier, which was the last time any CO approached the only

3    entrance to the SHU tier in which Epstein was housed."

4        Are you familiar with that determination by OIG?

5        A    I recall when I watched the video that I watched that I believed a CO went up the stairs

6    but did not go into the tier.

7        Q    CBS, based on its analysis, and, again, I'll read from the next paragraph here, "Video

8    forensic experts who reviewed that footage at the request of CBS News were skeptical about that

9    interpretation and suggested that the shape could be a person dressed in an orange prison jumpsuit

10   climbing the stairs.    Conor McCourt, a retired NYPD sergeant and forensic video expert, told CBS

11   News, 'Based on the limited video, it's more likely it's a person in an [orange] uniform.'"

12       Would you agree with that observation?

13       A    No.

14       Q    And why not?

15       A    Because when I watched it, I concluded it was -- that a CO went up around that time and

16   didn't go in.

17       Q    And then, skip ahead one, two --

18       A    That was not only my interpretation; it was the OIG's interpretation and the Southern

19   District and the FBI's interpretation of whatever they watched.

20       Q    I'm skipping four pages ahead in the same article --

21       A    Uh-huh.

22       Q    -- to the subheading that reads, "At 12:05:48 a.m., an unidentified individual passes

23   through the SHU."

24       Mr. O'Callaghan.    Over here.    Here.

25       The Witness.    Yeah, I see it.

1          BY █████████ :

2     Q     So just for the record, I'll read the paragraph.

3          "The inspector general's report says only two staff members entered the unit after midnight:

4     one is a corrections officer, identified only as 'CO3,' the other is described as the Morning Watch

5     Operations Lieutenant.    The presence of a third unidentified individual seen on the video is not

6     addressed by the inspector general's report."

7          Were you aware of there being a third unidentified individual in the footage?

8     A     All I can say is that when I watched it and the movements were explained it correlated

9     to other evidence, that I saw nothing of some strange, unidentified person lingering around.    If

10    there was such a person, there was an explanation for it.

11    Q     And would --

12    A     I haven't -- I'd have to see what the inspector general also says, but there was nothing

13    that raised that question for me.

14    Q     And just one last question on this article, and I'm skipping ahead a couple of

15    pages -- one page, I'm sorry -- to the bottom of the following page under the subheading, "Were

16    there other cameras recording?"

17    A     Yeah.

18    Q     And, again, I'll just read the first two paragraphs into the record.

19         "In addition to the cameras that failed to record other angles of the SHU common area, the

20    inspector general's report states there were two additional cameras recording events in the vicinity

21    of the Epstein unit -- one covering an elevator bank used to transport inmates and another focused

22    on a nearby guard desk.    Neither of those videos has been released, but a screen grab from one was

23    included in the report."

24         So were you aware of those recordings?

25    A     I was aware there were other cameras that were recording in the vicinity, and I believe

1    that when I reviewed video I saw excerpts from other videos.

2         Q    CBS goes on to conclude --

3         A    That's my best recollection.    I'd have to see the screen grab, also.    I don't know.

4         Q    CBS goes on to conclude, "While Federal officials have dismissed those recordings as

5    unhelpful in documenting what occurred that night, experts told CBS News that those videos could

6    add value to the analysis.    They could, for instance, help determine whether the DVR system did in

7    fact reset nightly and consistently lose one minute, as Attorney General Pam Bondi said -- or provide

8    evidence to contradict her claim."

9         Do you have a view on that conclusion?

10        A    No.

11        Q    In light of CBS's observation, do you think that those additional --

12        A    I mean, we had a number of experts, you know, different sets of experts go over this

13   and look at all the evidence together and correlate it.    This is all very interesting, but to me it

14   doesn't carry weight.

15        Q    In light of CBS's conclusion, do you think that those additional recordings should be

16   publicly released?

17        A    I think that's a call for the AG.    I think if they conclude it adds value, I'd like to see them

18   all released.

19        Q    Nothing further on this exhibit.

20        A    Okay.

21        Q    Mr. Barr, I apologize for not asking this earlier.    What was the name of your chief of

22   staff?

23        A    Brian Rabbitt.

24        Q    Thank you.

25        A    At that time.

1      Q    We spoke earlier about the autopsy performed by the Office of the Chief Medical

2    Examiner for the City of New York.

3         Do you recall any of the specific staff at the Medical Examiner's Office who were involved?

4      A    No.   It's the city's.   I think it belongs to the city.

5      Q    Okay.

6      A    At the time I knew the name of the medical examiner, but I couldn't recall that now.

7      Q    Did you ever see the autopsy report before it was released?

8      A    No.

9      Q    Or, I'm sorry, before it was completed, rather.

10     A    No.

11     Q    Do you have an understanding as to why it hasn't been publicly released?

12     A    No.   I don't know what their practice is.

13     Q    So the medical examiner determined that the death was a suicide.   To your knowledge,

14   did the FBI continue to investigate the circumstances surrounding Mr. Epstein's death after that

15   point?

16     A    Yes.

17     Q    And did it continue to investigate it as a possible homicide?

18     A    I think they were carrying out the investigation that was initiated as to determine why

19   this Federal prisoner wound up dead in his cell.

20     Q    So to ask it a different way, did the FBI accept the medical examiner's conclusion?

21     A    It was the medical examiner's evidence; strong evidence, obviously.

22     Q    And so did the FBI rule out the possibility of homicide at that point?

23     A    No.   The FBI, I think -- my understanding is the FBI continued to rely on its own

24   evidence and conclusions and determinations.   It didn't stop just because the medical examiner

25   made that ruling.   And that would be true, I think, almost in any case.

1          If the FBI is told to go in and conduct an investigation, Federal investigation for the

2   Department of Justice on something, it'll do it.    The fact that a State official makes that ruling won't

3   stop them.

4          Q    Okay.    I understand that you directed certain changes at BOP following Mr. Epstein's

5   death --

6          A    Uh-huh.

7          Q    -- including replacing BOP leadership.

8          A    Uh-huh.

9          Q    And that included Kathy Hawk Sawyer?

10         A    I brought her in.

11         Q    And Tom Kane?

12         A    Yes.

13         Q    And is the name Timothy Shea familiar to you?

14         A    Yes.

15         Q    And who is Mr. Shea?

16         A    Shea was on my staff at the time.

17         Q    Okay.    And what was his role?

18         A    Among -- on his portfolio were BOP matters.

19         Q    To your knowledge, did Mr. Shea have any communication with the Medical Examiner's

20   Office?

21         A    Not to my knowledge.    I don't recall that.

22         Q    Is there anyone else at BOP who worked on addressing the operational issues that

23   surrounded Mr. Epstein's death?

24         A    I'm sure there were.

25         Q    Any names that you can recall?

1       A     Not that I can recall.

2             You mean, remedying the problems that were found?    Is that what you're talking about?

3       Addressing?

4       Q     Well, generally, yeah, the circumstances surrounding his death and the remedial

5       measures that were undertaken afterwards.

6       A     Those are two different -- those are two different things.

7       Q     Yes, so globally.

8       A     I couldn't -- I don't remember the people involved in those efforts.

9       Q     Okay.    There was discussion earlier regarding Jeffrey Epstein's relationship with Donald

10      Trump.    Mr. Trump has stated that he and Epstein fell out in the early 2000s.

11            Did you ever have an understanding as to the cause of their falling out?

12      A     I mean, just what has been speculated about in the press.    All I can recall Trump saying

13      to me is that he had a falling out and pushed him out of or somehow got him out of Mar-a-Largo.

14      That's what I remember.

15      Q     And this came up earlier.    It was reported that Attorney General Bondi advised the

16      White House in May of this year that President Trump's name appears in the Epstein files.

17            Do you have an understanding as to why Attorney General Bondi flagged that for the

18      White House?

19      A     I think that would normally be what the Attorney General would do, you know, is to give

20      the President a heads-up if something is going to happen like that, the release of documents that

21      have his name in it and that will be, you know, a lot -- there would be a lot of speculation about it.

22      Q     Why is that?

23      A     It's normal to -- I mean, it's completely normal to tell the Chief Executive that his name

24      is about to be released.    There's nothing inherently wrong with that.

25      Q     A few questions for you, Mr. Barr, concerning Ghislaine Maxwell.

1      Understanding that you were no longer at DOJ when charges were brought against

2  Ms. Maxwell --

3      A      No, I was at DOJ when the charges --

4      Q      You were at DOJ, I'm sorry.    Right.    You were still at the Department.

5          Were the charges that were brought against her supported by the evidence in your view?

6      A      I was assured they -- I mean, I think I was made aware of what the evidence -- what they

7  intended to prove and that it would support the charge.    So at the time I felt that they were.    I

8  don't have a different view today.

9      Q      And as we spoke about earlier, Ms. Maxwell's conviction made her a sex offender for

10  purposes of Federal law, correct?

11      A      Uh-huh.

12      Q      She was sentenced following trial to 240 months imprisonment to be followed by

13  5 years of supervised release.    The court imposed a $750,000 fine.

14          Do you view that as an appropriate sentence?

15      A      Yes.

16      Q      Do you believe Ms. Maxwell to be a credible witness?

17      A      Depends what she was testifying about [inaudible] and what she --

18          The Reporter.    Can you repeat that?

19      A      It would depend what she was testifying about.

20      Q      And would the fact that she was charged with two counts of perjury influence your

21  answer at all?

22      A      Of course.

23      Q      You're aware that in July of this year Ms. Maxwell was interviewed by Deputy Attorney

24  General Todd Blanche?

25      A      Yes.

1    Q    Okay.

2    A    From public reports.

3    Q    It's my understanding that at no point during DOJ's investigation or during her

4    prosecution did Ms. Maxwell meet with the government to offer information relevant to the Epstein

5    investigation.    Is that an accurate understanding?

6    A    I'd have to go back and see.    Nothing springs to mind of her having done that.

7    Q    Do you have an understanding as to why the Deputy Attorney General met with

8    Ms. Maxwell?

9    A    No.

10    Q    Is it unusual, in your view, for the second-highest law enforcement official at DOJ to

11    interview a potential cooperating witness?

12    A    It doesn't happen every day.

13    Q    Can I take that as a yes?

14    A    It's -- yeah, of course, it's unusual.

15    Q    And would you agree with me that typically the line prosecutors handling the case do

16    interviews with potential cooperators?

17    A    Typically.    That's in a normal case.    This case has features that most cases don't have.

18    Q    Even in an abnormal case, would it be your expectation that in an interview like this the

19    Deputy Attorney General would be accompanied by line prosecutors who handled the case?

20    A    As I say, I'm not -- it's hard to say there's a particular practice there since this doesn't

21    normally happen.

22    Q    DOJ has -- sorry.    Back up for a second.

23    It is also my understanding that in a typical case it's customary for an FBI agent to be present

24    for these interviews as well for the purpose of note taking.    Is that consistent with your

25    understanding?

1       A       Usually in the investigation of a case, yes.   I'm not sure what stage this was in and what

2   it related to.

3       Q       DOJ to date has not shared details of who from DOJ was present in the room, if anyone,

4   with Mr. Blanche and Ms. Maxwell.   Is that unusual in your view?

5       A       No, because usually the Justice Department does not share information like that.

6       Q       Even in a case like this one that's pretty closely in the public eye?

7       A       Well, this is -- well, as I say, this -- that's why this is an unusual case.   So to say, does

8   this usually happen?   Does this usually happen?   The answer usually is, no.

9       Q       Until recently, Ms. Maxwell had been serving her sentence at a Federal prison facility in

10  Tallahassee, Florida.   Following her interview with Mr. Blanche, she was transferred to a Federal

11  prison camp in Bryan, Texas.

12          Are you familiar with that Federal prison camp?

13      A       No.

14      Q       Do you have an understanding as to why BOP moved Ms. Maxwell to a Federal prison

15  camp?

16      A       No.

17      Q       Do you have a view as to whether that decision was appropriate?

18      A       No, because I think the initial regime that's used when someone is sent to a corrections

19  facility does not necessarily dictate the way they're going to be treated all the way through.

20          And it is not uncommon for there to be lesser and lesser security involved once the BOP has

21  experience with people as a prisoner and see that they don't pose a threat and, you know, they're,

22  you know -- I forgot what the word is used -- but they -- they're not disruptive prisoners or anything

23  like that, they're relatively easy to manage.

24          There is a process whereby they go to less and less secure facilities.   So, you know, it doesn't

25  strike me as odd that she was put in that facility.   You also have to remember, her initial

1    confinement was quite severe because she was watched 24/7.

2                              [Barr Minority Exhibit No. D

3                              was marked for identification.]

4              BY ███████ :

5         Q      I'd like to ask the court reporter to mark as exhibit D a Washington Post article.    It is

6    titled, "Ghislaine Maxwell's move to 'country club' prison smacks of special treatment, experts say."

7              And I'm focusing on the fifth paragraph down at the bottom of the first page.    It refers to,

8    "Long-standing policy from the Federal Bureau of Prisons," which according to the article, "restricts

9    inmates with certain elevated security classifications, known as 'public safety factors,' from serving in

10   federal prison camps.    Sex offenses are among the most severe," unquote.

11             Is that consistent with your understanding?

12        A      Obviously, one of the public safety factors is the severity of the crime.    You also look at

13   someone's role and whether they constitute -- the extent to which they constitute an ongoing threat

14   to the public.

15             Frequently, you know, it may be that the fact it's a sex offense reflects a perversion, a

16   compulsion, and so forth, will frequently be determinative of that, but not in all cases.

17        Q      The article goes on to note in the next sentence, and this is the top of the second page,

18   quote, "Inmates serving sentences of 10 years or more generally aren't eligible for transfer to

19   minimum-security facilities.    This, too, would have applied to Maxwell, who is not due for release

20   until 2037," unquote.

21             Is that consistent with your understanding?

22        A      That is -- what?

23        Q      That inmates serving sentences of 10 years or more generally aren't eligible for transfer

24   to Federal prison camps.

25        A      Again, "general," you know, to me doesn't -- you know, I do think that the

1    only -- frequently the only way you can get a prisoner in a facility for a long period of time to

2    cooperate is to offer something that you can deliver.

3           And I don't think it's unusual to put someone in a less severe condition of confinement in

4    return for cooperation.    Usually that's the only way you can get someone who's in for a long term to

5    cooperate.

6           Q    Just one more statement in this article I'd like to direct your attention to, if I could, and

7    it's in the following paragraph.    The sentence reads, "While it's not uncommon for prison officials to

8    allow inmates who cooperate with investigations to move to lower-security facilities, it's rare for sex

9    offenders to receive such benefits, and they almost never get moved into prison camps like Bryan,

10   experts said," unquote.

11          Do you agree with that statement?

12          A    I'd have to see what the situation is.    You know, it may be that sex offenders rarely

13   cooperate, and frequently the whole picture of the person reflects an ongoing threat to the public.

14   And I don't know what the analysis was here by Bureau of Prisons.

15          Q    Ms. Maxwell's current attorney has stated publicly that he hopes his client receives

16   clemency from President Trump.

17          In your view, do circumstances exist that would justify a pardon or any other form of

18   clemency for Ms. Maxwell?

19          A    That's an issue for the President to address.

20          Q    Chairman Comer stated -- I'm sorry.    Ms. Maxwell's attorney stated in a July 29th,

21   2025, letter to Chairman Comer that his client, quote, "did not receive a fair trial," unquote.

22          Do you agree with that assertion?

23          A    I haven't seen his basis for saying that, so I can't agree with it.

24          Q    In the same letter, her attorney also describes Ms. Maxwell as, quote, "a convenient

25   scapegoat," unquote, following Mr. Epstein's death.

1          Do you agree with that characterization?

2          A      Not to the extent that it just dismisses the idea that she was herself guilty of a serious

3   crime.    You know, I mean, it may be that a lot of public outrage at the events then became solely

4   focused on her, but that doesn't excuse or make her less responsible for that conduct.

5          Q      I'm getting close to the end.    Just a few more questions.    And my next questions

6   pertain to an investigation that this Committee undertook in 2019 in connection with the Florida plea

7   deal, and that was during your tenure.

8          Do you recall that investigation?

9          A      I'm sorry, I thought you were talking about the Florida plea deal back in the early 2000s?

10         Q      Yes.    So this Committee, the Oversight Committee, in 2019 undertook an investigation

11  into the circumstances surrounding the 2007 plea deal in Florida.

12         Do you recall that investigation?

13         A      I actually don't recall that.

14         Q      Okay.

15         A      I'm sure it happened, but I don't recall it.

16                          [Barr Minority Exhibits Nos. E and F

17                          were marked for identification.]

18              BY ▮▮▮▮▮▮▮:

19         Q      I'm just going to mark as exhibits, I think we're up to E, and so this will be E and F?    Yes.

20  These are two letters from 2019 from the Committee in connection with this investigation.

21         [Pause.]

22         A      Okay.

23         Q      So I'll turn to exhibit E first.    That's the July letter to Corey Amundson of OPR.

24         Have you ever seen this letter before?

25         A      It's possible I have.    I frequently am briefed -- I was frequently briefed by the

1    Legislative Affairs person as to any developments on the Hill.    I don't remember it though.

2          Q       So the letter requested a briefing from OPR on issues relating to the 2007 plea deal.    I

3    can represent to you that OPR sent the Committee a response confirming that it was conducting an

4    investigation, but it declined to provide the requested briefing.

5          Do you have an understanding as to why it declined?

6          A       I don't recall.    As I say, I may very well have been briefed on this letter, because I

7    regularly was briefed on developments, including letters like this that were going to be rejected, you

8    know, declined.

9          So I can't specifically say that it was explained -- I can remember the explanation, but it

10   doesn't surprise me they would decline it.    I think that would be normal.

11         Q       And why is that?

12         A       Because it was an ongoing investigation.    Department isn't going to put that stuff out.

13         Q       And then I'll turn to exhibit F, which is the --

14         A       And generally, that stuff around the plea agreement wouldn't be normally put out.    So

15   it doesn't surprise me that they rejected it.

16         Mr. O'Callaghan.    Do you have a copy of the Department's response to the July 10th letter?

17   It's referenced in the December 20th letter.    It's an August 5th, 2019, letter from Assistant Attorney

18   General Stephen Boyd in response to Chairman Cummings' letter.

19         ███████████       Yeah.    I wasn't planning to introduce it.

20         Mr. O'Callaghan.    It would just be -- if you're showing the Attorney -- the former Attorney

21   General a sequence of letters that --

22         The Witness.    Also, I mean, you asked me why it was declined.

23         Mr. O'Callaghan.    Yeah.

24         The Witness.    It would've been good to see the letter, but that's okay.    Let's --

25         Mr. O'Callaghan.    Okay.    I don't want to hold things up.

1          BY ▮▮▮▮▮▮▮▮ :

2          Q    Turning to the December 20th letter, which is exhibit F, do you recall receiving that

3    letter?

4          A    No.

5          Q    Okay.

6          A    But for the same thing, I mean, letters are coming -- during the Trump administration --

7          Q    Sure.

8          A    -- we got a lot of letters coming in like this.

9          Q    Understood.

10         To your knowledge, did DOJ ever provide the documents that the Committee requested in

11   this letter?

12         A    I don't know.    Is it the same documents?

13         Mr. O'Callaghan.    This document request is --

14         The Witness.    Yeah.    This would normally be -- I mean, I think any Department of Justice

15   would at least initially really decline.

16         BY ▮▮▮▮▮▮▮▮ :

17         Q    And why is that?

18         A    The reasons I stated.

19         Q    And I'll represent that DOJ did not, in fact, provide documents pursuant to this letter.

20         Just a few more questions and then I'm done.

21         Mr. Barr, we've talked about a lot of names throughout the course of today.    Is there anyone

22   else, in your opinion, who may have firsthand knowledge relating to the Epstein investigation or the

23   Maxwell investigation that this Committee should speak with?

24         A    Well, I mean, I think the people conducting the investigation.    I mean, Main Justice did

25   not conduct the investigation.    And as I said, the information was limited, partly because that would

1    be appropriate and partly because it all depended on what the Southern District wished to share.

2          So I was -- you know, if you're interested in finding out whether the investigation ever

3    developed information that would establish misconduct by someone other than the two who were

4    charged, I think the starting point would be the people who were involved in or supervised the

5    investigation and the people who conducted it.

6          Q    So specifically the line attorneys in SDNY and the FBI agents --

7          A    Well, I mean, the U.S. Attorney, Geoff Berman.

8          Q    Yes.

9          A    He supervised the investigation.

10         Q    Anyone else?

11         A    Well, I mean, usually the Department doesn't like line attorneys hauled up before

12   Congress.   On the other hand, some of them have appeared to leave.

13         Q    I asked you earlier about any communications you had during your tenure in the first

14   Trump administration with the White House.    Just to complete the picture, have you discussed the

15   Epstein investigation with anyone in the current Trump administration?

16         A    No.

17         Q    Do you --

18         A    Not that I can recall.   I may have expressed surprise that the thing had taken on the

19   character that it has.

20         Q    And who would you have expressed that to?

21         A    I don't know, some friend.

22         Q    And have you --

23         A    No one in the Department of Justice that I can think of.

24         Q    And then, last question:   So I would put this in the category of conspiracy theory, but

25   there has been a theory to the effect that Democratic politicians, including President Obama,

1    President Biden, Hillary Clinton, so forth, have tried to -- or have planted President Trump's name in

2    the Epstein files or otherwise tried to connect him to the Epstein investigation.

3            Do you have any knowledge to support that theory?

4       A    I don't know the extent to which his name appears.    I mean, I know it's been on flight

5    records.    That's been public.    But I personally have no knowledge of, you know, any false

6    information being fabricated on him or anyone else.

7       Q    Okay.

8       A    Well, except for witnesses that have fabricated stories.

9       Q    Apart from the individuals who I just named.    The individuals you're referring to are

10   not the individuals that I just named in my question, the Democratic politicians who I just named.

11      A    Right.    Okay.

12       No further questions.    Thank you very much.

13             Off the record.

14          [Whereupon, at 2:21 p.m., the deposition was concluded.]

1          Certificate of Deponent/Interviewee

2

3

4      I have read the foregoing _____ pages, which contain the correct transcript of the answers made

5   by me to the questions therein recorded.

6

7

8

9                    ————————————————————

10                         Witness Name

11

12

13                   ————————————————————

14                           Date

15

ERRATA SHEET

INSTRUCTIONS: After reading the transcript of testimony, please note any change, addition, or deletion on this sheet. DO NOT make any marks or notations on the actual transcript. Use additional paper if needed and attach to this sheet.

Please sign and date this errata sheet and return it to the Majority staff of the Committee on Oversight and Government Reform.

| Deposition/Interview of: | William P. Barr |
| Date Taken: | August 18, 2025 |

| PAGE | LINE | CORRECTION |
|------|------|------------|
| 13 | 18 | should read "full bore ahead" |
| 15 | 5 | Should read "up to" |
| 25 | 2 | "?" should be "." |
| 26 | 12 | should read "no contusions" |
| 27 | 5 | should read "coverage" |
| 27 | 15 | "disagreement" should read "agreement" |
| 81 | 4 | should read "Brooklyn MDC" |
| 97 | 9 | "Attorney General" should read "US Attorney" |
| | | |
| | | |

DATE: 8/27/25

NAME/OFFICE: Edward C. O'Callaghan / Cahill Gordon Rendel

SIGNATURE: Edward C. O'Callay

# EXHIBIT 26

Relentless Pursuit: My Fight for the Victims of Jeffrey Epstein

**Top Shelf Podcast** - HOST: John Uustal , Jan 26, 2022 Transcript WP/im

## Relentless Pursuit: My Fight for the Victims of Jeffrey Epstein



In this session, **John Uustal** discusses relevant book relevant to current events: Relentless Pursuit: My Fight for the Victims of Jeffrey ...

YouTube · John Uustal · Jan 26, 2022

Relentless Pursuit: My Fight for the Victims of Jeffrey Epstein

**Top Shelf Podcast** - HOST: John Uustal

599 subscribers 425 views, Jan 26, 2022

In this session, John Uustal discusses relevant book relevant to current events: *Relentless Pursuit: My Fight for the Victims of Jeffrey Epstein*, by Bradley Edwards with Brittany Henderson. "This is the definitive story of the case against Jeffrey Epstein and the corrupt system that supported him and Ghislaine Maxwell, told in thrilling detail by the lawyer who has represented Epstein's victims for more than a decade." - Simon & Schuster

11.20 mins [starts at 11.20 mins in, first 11 mins are commercials]

**Host, John Uustal, (JOHN):** Alright guys, welcome, we always start with a little video, funny video, I hadn't seen that one yet, it was, I thought, funny. So,we have an exciting event tonight, there'll be a link in the chat to the recipe, it's called the Poets' Martini and we'll take a very short break around 6.45 for the
drink lesson which we always do for those of you who are new tonight. But I want to jump right into it. We've got Brad Edwards, Brittany Henderson and their partner, Stan Pottinger. I'm going to start with Brad and Brittany who wrote this book that we've all read, Roland, let's bring them on while I introduce them.

12.09
Brad is a founding partner of Edwards Pottinger. He speeializes in representing children and survivors of sexual abuse and victims of violent crime. He and Brittany won the largest jury verdict that I know of in the United States on behalf of a single sexual abuse survivor. I should say, right at the start Brad was in New York today with, you know the

Relentless Pursuit: My Fight for the Victims of Jeffrey Epstein

Top Shelf Podcast - HOST: John Uustal , Jan 26, 2022 Transcript WP/im

Maxwell trial was going on.[1] He was with some of the Epstein victims and um, he's under a strict order from the Judge in the trial to ensure that the defendants get a fair trial, so I just want to mention two things we're going to be very careful about that, first of all; and secondly I want to remind everyone that everything on this trial forum is confidential.

We also have Brittany Henderson, who is also a partner at Edwards, Pottinger and she represents crime victims and spouses of sexual abuse. She has over 100 million $ in jury verdicts and settlements. She co-founded two charities for sexual abuse survivors and together they have done some amazing lawyering in the Epstein cases, and they have written a really fascinating book. So welcome guys.

13.26
Brad Edwards (BE) and Brittany Henderson (BRITTANY) [together]: Thank you , thank you for having us.
JOHN: Yeah, I know you have so much going on right now. In some ways it's a great time for us but I know it's a hard time for you guys so thank you for being here.

13.35
BRAD: No problem, it's great and I thought that video at the start was pretty funny too.

JOHN: Yeah, yeah, sometimes Roland picks the video and sometimes I get nervous about what's going to come on, but that one I think we were ok with [smiling].Look, we have some other panelists, we've got Stan who we'll bring on soon, but I'll wait to bring them on to introduce them so we don't start with too many introductions. Look there is so much about the case and people have emailed me or called me, they've got questions for you, er, there's really been a lot of interest in it, and there is so much about the case I want to talk about. Brad, I've known you but I didn't really know who you were until I bought the book. There were so many moments in that book where you  made decisions that I thought, 'wow' , I mean that truly from my heart. I mean I think for all three of you guys, you did heroic lawyering and it's inspiring. But before we get into that, let's talk about writing the book because in my opinion it's hard for lawyers to write good books, something about law school, there's something..I don't know what it is but there's a lot of

---

[1] This actual conversation took place sometime during the Maxwell trial between Nov 29-Dec 29th, 2021, but was not released until January 26th, 2022...

Relentless Pursuit: My Fight for the Victims of Jeffrey Epstein

Top Shelf Podcast - HOST: John Uustal , Jan 26, 2022 Transcript WP/im

books written by lawyers that not as fascinating and compelling as yours, so let me start with that and all my questions are for both of you and we from al the other panelists, but from both of you how did you guys do it? How did you guys write such a great book?

15.03

BRAD: So I have my version and I assume that Britany will correct me. But you know, it really came about because every time we would get close to trying a case, somehow the case would settle, and I would say, I can't believe we don't get to do a closing argument in this case. I mean I've been preparing a closing for 10 years and I don't get to give it. And then we just started hearing rumors that all these people were going to write an Epstein book and these people don't know anything about this, so now I'm just complaining to Brittany.  And so she says well why don't you write it. I've heard enough of you just talking about it, let's just write the book. I said we don't really have time to write the book and she said, 'sure, all you like to do is walk around and talk, so after that I promise you that 6 o'clock happens, instead of you walking around the office telling stories, why don't you start at the beginning and just tell them to me, and then we'll start just putting it together .  So I'll tell you the first couple of nights was literally six at night till 4 in the morning for almost a month straight. Almost every day from 6 o'clock till 4 in the morning we wrote. And really the process was me more like stream of consciousness ranting in terms of how I remembered the story, and then after I was done talking for 8 hours, Brittany would then edit all night so that she would actually take my memory and make it factual she would come back the next day and say, 'yeah, you thought said this in this deposition but it didn't really go down like that', and I would argue with her, she'd have the book, the transcript, and uh, you know, I can tell you that for instance, as good friends as we are, there were times during that writing process where I thought that we would never talk to each other again. [smiles from Host and Brittany]. It's 3 in the morning and we are screaming at each other at the top of our lungs about what should go in this hook, what shouldn't go in this book.  But I'm really proud of it. I think that we really captured, kind of the ebb and flow of the case pretty well.

17.09

BRITTANY: I think if you asked Brad he would think that he just talked and a book appeared but it took a lot for us to take what we started with 1200 pages of written material that you have read. I think a lot of the fighting came from that. Brad would read the transcripts and see that he was wrong and still say, 'no, no, it didn't happen that way, I remember it differently. It has to go in the book how I remember it.' Okay [saying ok to

3

Relentless Pursuit: My Fight for the Victims of Jeffrey Epstein

Top Shelf Podcast - HOST: John Uustal , Jan 26, 2022 Transcript WP/im

Brad]. So we did have a lot of fun. But it was a lot more difficult a process than I think he remembers.

17.38

JOHN, HOST: He wrote in the acknowledgments that, uh, and assume the acknowledgements were written totally by Brad, but he wrote that you, Brittany, edited, rearranged and generally wrote the book, which you know, Oh Man [LIGHTS IN THE HOST'S ROOM CUT OUT, IT'S A HOTEL ROOM IN CHICAGO, HOST APOLOGIZES AND SWITCHES ROOM LIGHTS BACK ON]. I guess my question, I'm going to ask Brad because he does not realize how lucky he was to be working with you and how hard that process was. But first just let me ask, just in terms of what goes first, the way you started the book, instead of having it at the end, having that at the beginning, the pacing, how much time you put in each chapter.. I mean it's really wonderful so congratulations, Brad. I mean, how did you know how to do that?

18.44

BRITTANY: Honestly, everything we do in our office from Brad's perspective, is in chronological order, so if you are working on a case, you are working on a book, you are working on a conversation with your kids, you start at the beginning and you go to the end. It made the process very easy for us because he literally just started telling the story from the very first time, he ever heard Jeffrey Epstein's name. And we went through the whole thing and I think there were a lot of personal things that were going on and different facts and it was really difficult for him to cut out because it was his life. Whereas having me there doing it with him made it a lot easier to get to a final product. Because I would say, like, you know, 'is it really that important that you went to this restaurant and had dinner on July 7th of 2009? He's like, 'yeah, that's where everything was happening on my end and I decided what was going on'. 'But can't we just tell what happened without explaining to them you had chicken for dinner?' So I think having someone who wasn't as intimately involved in the story, especially at the beginning, made it a lot easier to get to the end.

19.38

BRAD: But we did make a decision at the end to take, to start the book where we had just finished, you know basically with him being arrested and when we learned of his being arrested and everything else - because we thought it made most sense for people who were just now catching up to the story because he had just died. The hearing had just

Relentless Pursuit: My Fight for the Victims of Jeffrey Epstein

Top Shelf Podcast - HOST: John Uustal , Jan 26, 2022 Transcript WP/im

been held where all these victims testified, and then we went back to how the book was originally written and it was totally chronological. And actually, after one month we had 1200 pages. And the next six months was reducing it to something that someone would actually read.

20.16
BRITTANY; Well, and Stan Pottinger is on and you are going to bring him on a bit later but he's our law partner and he's also an author of a number of books, so we ran a lot of this by Stan; and so we had a boring story from start to finish, and Stan's like, 'that is guys, you are not authors, you are lawyers, you've got to start with something dramatic, theatrical like in the courtroom'. So Brad was like [pumping her fist] yes, I've got this. We are going to start with thunder and lightning and all these things going on [laughing]. So, I'm trying to transition to authors from trial lawyers to make it a little more exciting too.

20.43
JOHN: It was almost like lightning in a bottle to have the two of you and then to have Stan, so as I've been preparing for this, I saw he wrote 4 books, I haven't read them yet but I will, and I'll report back to everybody on them. I can't yet say that they are good but just based on his advice that he gave you on this, I expect they are. So that was lucky that you had him too, we'll have him on in just a minute but before we start bringing more people on, this is a reflection of your lawyering and your writing but you did an amazing job describing the disorientation of the victims, the grooming, the things that might seem strange to jurors initially or people who don't understand this kind of situation like, that they took money, going back again. Um, so my question is first of all as a lawyer, what did you do to understand your client so well so that one day you could try the case or in this situation, write about it?

21.50
BRAD; Spend a lot of time with them. We got to know so many of them so well, I mean, I would say that, you know, Courtney Wild is one of my best friends in the world now and that's a pretty rare thing for any lawyer to say about a client and that's how close we became over 13 years, and so you get to know them and I think one of the first things that we wanted to do, that I wanted to do when I got the case, was reframe the way that the victims were being treated. As you may recall they were all being kind of labeled as prostitutes. And so, that was very important, that to, 1) understand that the public will

5

<u>Relentless Pursuit: My Fight for the Victims of Jeffrey Epstein</u>

**Top Shelf Podcast** - HOST: <u>John Uustal</u> . Jan 26, 2022 Transcript WP/im

latch onto that and repeat that mantra that they were just prostitutes. I mean we even had, as you saw, some judges who were very respected who thought, these aren't normal high school girls and they don't deserve this level of protection. So I thought one of the main things we wanted to do with the case from the very beginning, was describe them as the children that they were who came from the backgrounds that they did, and these were very clearly not prostitutes and it would be wrong to cast them as that.   And so I think we took how we litigated the case and how we relabeled them during the case, as "children" and took away that false label of being a prostitute, or any of these other derogatory terms, drug addicts, and things like that. Because a lot of other terms like 'drug addicted' 'homelessness' was a consequence of the abuse they suffered. That's something we've known from other cases, and seen it in other cases, so at this point, it's easier for us, but I thought what we wanted to do was convey it in terms that people could read and understand it, it wasn't just legalese or lawyer-expert type talk.

23.38
BRITTANY: and with respect to the book, it was really important to us that we had captured everyone's perspectives accurately and it wasn't just ours. So each character, each woman that you see in the book, we talked to before the book was published, while we were writing- gave them a chance to make sure their voice was adequately covered by what we wrote too. So that was, one thing that I think held Brad back from wanting to write the book was like, 'I can't do this and not do justice for our clients, you know, what if they don't like it, what if they don't like what we write? So I think our main focus was making sure we had a final product that really captured how they felt.

24.08
JOHN: Well you did a remarkable job of it and I think it's a real value in the book not just a small group of people in a courtroom round the jury, but to bring it to a much larger audience to understand the situation that those girls were in.  I actually want to follow up on what the judge said, Brad, I think you just brought up. Let me bring on Stan [Pottinger] and I'll also bring on Rich Newsome now.  So, Roland, if you could bring them on, Stan is also a founding partner at Edwards Pottinger. He's the former director at the office of Civil Rights. He was instrumental in the passage of Title 9 and he was in charge of school desegregation and affirmative action in the employment of women and minorities by colleges, universities and hospitals; and as Brittany just brought up, he's written 4 novels. I won't promise to read all 4 of them but within the next month or two

Relentless Pursuit: My Fight for the Victims of Jeffrey Epstein

Top Shelf Podcast - HOST: John Uustal , Jan 26, 2022 Transcript WP/im

I'll read at least one and I'll let you guys know about them. And then we've got Rich.. and Stan, you are on video so I hope you are not doing something that you don't want us to see but when you are ready, turn the video on. Hey Stan.

STAN POTTINGER (POTTINGER): Can you hear me ok?

JOHN: Yeah, yeah, we can hear you and see you now. Thank you for being here.

POTTINGER: Happy to be here, this is fun.

25.33
JOHN: And then we've got Rich Newsome, everyone in trial school knows Rich, um ,just to keep this short, National Law Journal, recognize him as having won two of the nation's largest verdicts in a single year. He's an amazing trial lawyer, amazing, amazing human being. He's in Chicago with me right now in the same hotel, so hopefully if the lights go out, they go out for him too and it's not just somebody who's mad at me. So, for all you guys, Stan, Rich, feel free to jump in and ask questions of Brad and Brittany, or Rich and Stan at any time and especially if you disagree, don't keep it to yourself. Bring it up, I'd love to get differences of opinion.

26.19
JOHN[continues]But let me follow up now with something that Brad said, he was talking about the judge on the motion for punitive damages where he had to get authority to amend the judicial complaint, you had to get judicial permission before you can amend the complaint before you can get a complaint to get punitive damages; and I'll say in general I've really felt inspired by you three and the lawyering, but I also felt bad after reading this book and part of it is what the victims went through that you did such a good job, but it's more than that. If you look at that moment when the judge was commenting on the record, 'so look, you're moving to amend a complaint to add punitive damages for an intentional tort, child molestation, sexual assault, obviously there is no doubt that is punitive damages, there is no doubt about it. All you have to do is prove it was committed, judge said, and I'll quote him on this,

30.39
STAN POTTINGER:
I'd like to second one thing that Brad is saying and I know Brittany feels the same, and

7

Relentless Pursuit: My Fight for the Victims of Jeffrey Epstein

**Top Shelf Podcast** - HOST: John Uustal . Jan 26, 2022 Transcript WP/im

that is this sea change, this big shift occurred in our culture. You know if laws are a reflection ultimately over a period of time of cultural values and political values, then what Brad has just described about what the judge was doing and how to label people. I think those days are, are behind us at least, I hope so.

31.03
BRITTANY: Well I think it's one thing to look at this from all of our perspectives, but it's a different thing be Courtney Wild or be one of the victims who was either in the courtroom or had to be reported back to by Brad and the other lawyers and say this is what happened and this is what the judge said and this is what the judge labeled you. So I think hearing the defense and the bad guys label you as a prostitute, or label you in a certain way is one thing, but hearing a court refer to you in that same way, you can imagine the kind of impact that had to have on these women.

31.30
RICH NEWSOME: Hey John can I ask a huge question, I know that you and I talked about that I would love to get the inside scoop on, do you mind if I ,

JOHN: SURE.

31.43
RICH NEWSOME: So one of the things Brittany and Brad didn't talk about a lot was, how in the heck the US Attorney's office, how in the heck the US Attorney agreed to that plea hargain? I mean, it stinks of corruption. So I was hoping you guys obviously played that beautifully, delicately in the book but I was hoping maybe you could share for those of us who would love to hear the theory on what the heck happened?

32.16
BRAD: Yeah. It took a long time for us to really understand what it happened, as you read in the book, it took us years just to get the correspondence between the government and Epstein, appealing it to the 11th Circuit and getting a ruling and then still getting back dribs and drabs of discovery until we could finally pull all of the thousands of documents that were exchanged between the government and Epstein's team. And the picture that looks pretty clear is that from the very beginning, it's not only a really reputable defense team, that covers its political bases, both locally, nationally, all of that, but they are also in their letters hinting towards Epstein's importance in the world and his

8

Relentless Pursuit: My Fight for the Victims of Jeffrey Epstein

**Top Shelf Podcast - HOST:** John Uustal , Jan 26, 2022 Transcript WP/im

philanthropy, and that he helps children in schools and other places, and that he's best
friends with Clinton and helped found the Clinton Global Initiative, and all this other
stuff. We always believed, well not always. We believed for many years that this was
somebody high up in DoJ that cut the deal for him because nothing else made sense. And
especially it doesn't make any sense in juxtaposition with the fact that the victims are
totally kept in the dark, not only kept in the dark, they are telling the victims, be patient,
hang out here there is going to be this massive federal investigation. Meanwhile they are
like working out a plea deal behind the scenes. It doesn't make sense. So, you know, I
don't think after the 400-page OPR report that I'm revealing too much. But it was a more
localized decision than most people think. It had to do with relationships, specifically
relationships between prosecutors and members, or a member of Jeffrey Epstein's team.
It's not one of the main names who is thrown around a lot but it was a personal
relationships between a very high up supervisor who was actually making calls on the
case, and one of Epstein's attorneys; and you know, for years we never even understood
why he hired this attorney because she doesn't fall in, good attorney, but doesn't fall in
the category of the caliber of attorney that he had otherwise - until we later learned about
this relationship and it seems like they kind of worked on a water-side chat, of, er, 'do
me a favor here'. And the girls aren't really going to know about it and the girls don't
really have a voice and they don't really have parents who care and it's all going to go
away so, you know,  let's be friends.  That's kind of how it went down.

34.59 [BRAD CONTINUES]
Alex Acosta, really didn't pay any, I think he didn't care one way or the other. I think he
was really influenced by Jay Lefkowitz as his former law partner. I do think it smells
really bad that Alex would meet with, during the middle of these negotiations, he would
go meet at hotel rooms with Jay Lefkowitz to talk about the case. It's totally improper.
And you're going into these hotel room meetings where they're talking about potentially
charging him with a 53-page indictment and coming out of it with 'what do you think
about a non-prosecution agreement? So, the whole thing just smelled and what I don't
think we put in the book was how many times we tried to get Alex to talk with us, even
informally, and he refused. So I tried to get him to sit for a deposition and he refused. He
would never even meet with us and now his explanations are pretty weak.

35.57
JOHN: Well, I think you are right that if you really think about it, the chance that this
corrupt scheme was going to be exposed, was very low, and somehow you guys made it

Relentless Pursuit: My Fight for the Victims of Jeffrey Epstein

Top Shelf Podcast - HOST: John Uustal . Jan 26, 2022 Transcript WP/im

happen. But that's going to be in the mind of prosecutors in the future in similar situations and it's going to have a really great effect in other situations. I hope you guys are right, you know, you 've got Brittany who's a lot younger than me and you 've got Stan, no offense but I think he's a lot older than me, I hope he is after all he's accomplished in his life because I haven't come close to that, er, I hope you are right but I don't think so. I think that that attitude is still there. Epstein's someone famous, he must be someone great - he must be a valuable human being and these poor kids are not valuable. I think that you know I don't want to be too critical because I know some of those people, I think they're good people but I just think that's what they were thinking and I don't, I'm not so sure that has changed so much in the past few years.

37.07

BRAD: The only way I can really compare it though is to say, it's basically the same case that was prosecuted back in 2007, or non-prosecuted and the case where we ultimately, you know, worked with the Southern District of New York, got him arrested. We've been dealing with the prosecutors in New York both on Epstein's case and now Maxwell, and it's very, very different treatment, and I think that's why we started the book with the Hearing where essentially the judge in that case is citing to our case, I was wait i have to speak at this hearing even if it's dismissal here. Um and so the treatment is much different. Now, is the treatment much different because they don't want to screw the same case up twice, maybe, there's a little bit of that. But they do bend over backwards for us with the travel, keeping us informed, any conferral. There is still proseeutorial discretion, nobody is trying to override that, but
the level of meaningful conference that we are getting with the prosecutors is extraordinary whereas before it was literally just lying to the victims and then doing whatever they wanted so,
You know, versus the past, there's been no eomparison.

38.25

JOHN: Yeah it was against all odds you guys accomplished that and I really do congratulate you because I think you've made a big effect on other cases. Let me bring on one more panelist. Julie King is not going to be with us, her flight was delayed, she was coming to Chicago too but we have one more panelist which is Peter Spillis if you could bring him up, and he's one of my partners. I asked him to read the book after I finished it, which was well before we were going to do a book club on this. He also

Relentless Pursuit: My Fight for the Victims of Jeffrey Epstein

**Top Shelf Podcast** - HOST: John Uustal , Jan 26, 2022 Transcript WP/im

thinks it's a phenomenal book, so I wanted to bring him on. He heads up our medical malpractice team and I won't say any more about my own partner but he is great.

39.13
BRAD: I should be in Chicago, what am I missing?

39.17
JOHN: Yeah they, there are big things going on here but not, apparently, consistent lighting. Alright so let me go back in, I know we've got Peter here, and again, all the panelists join in whenever you and Brad, and by the way later I'm going to be asking, know a lot of you guys have emailed me questions which you want which I've got, but we'll be asking a few additional questions for Brittany and Stan and Brad. Let me follow up with something that Brad was talking about which is the initial petition for the enforcement of the Crime Victims Rights Act.
39.57
You know, one thing that may not be clear from the book, is how brilliant that was, right? and how unprecedented that was. So, I mean, how did you come up with that idea?

40.13
BRAD: Er honestly it was, It was er, working as a sole practitioner and at that time, knowing that I had to do something. It was just such an unusual situation. I really thought this was going to be a 2-minute telephone call to Marie Villefana and she was going to say, Yeah, 'tell Courtney to hang tight everything's gonna be alright,' and then that just wasn't the answer I got, and then when I was getting the answers, I could tell she wanted to tell me so much more than she was telling me. It was such a cagey interaction, but I said I have to do something so what is the mechanism here? So I go and read the Crime Victim Rights Act which I had never read before - and I was only really familiar with the state system and, like, our enforcement components there, so I read through it and it says you can file an action in the district court. I thought Ok, but what's the action? [laughs], I need to know what action this is. So I just made up the title and I think i tried to lay it out pretty good in the book just how it was a little bit of being naïve, a little bit of being stupid, a little, you know, just I have to do something, i have to do something right now. But even as a, at that time, I think a five years lawyer, it was pretty ignorant of me to think that I was gonna go to the courthouse and literally get a hearing that second, but that is how important that I knew this was, right. I knew something is happening that is really bad on some monumental scale and we as lawyers have to figure out some way to

Relentless Pursuit: My Fight for the Victims of Jeffrey Epstein

**Top Shelf Podcast** - HOST: John Uustal , Jan 26, 2022 Transcript WP/im

fix it. So my fix was like, create this pleading and go to the courthouse and tell them I want a hearing. So I will never forget how that went down and er you know

42.03

BRITTANY: And he's repeated that 100 times since. And if something is wrong and needs to be corrected, Brad will correct it in the most unconventional way even when there is a conventional way to correct it, which I think is why we are sitting here today. It's why Jeffrey Epstein was arrested, you know, It's why Ghislaine Maxwell is on trial. It's pretty awesome.

42.19

RICH: Yeah I absolutely agree with that. I, it's really remarkable how all this was exposed. It makes me wonder how much other bad things are going on at Kirkland and Ellis with prosecutors or in other firms too. We just never find out about it. So look, I tried to get a state attorney as well as some assistant state attorneys and federal prosecutors but no one wanted to be a panelist on this one. So everyone on here has prosecuted civil cases. So this question, I'd really like to get all of your thoughts on this, each one of you -

I read Julie Brown's book on Epstein too and it was after reading both of the books I realized something and the first thing I'm going to ask is, do you agree? With what I think is true my realization and then secondly, is there anything we can do about it. She goes into a little more detail on some areas, but it just hit me that the prosecutors or at least some of them, thought of you and by extension, civil plaintiff lawyers in general, as worse than Epstein, right? They were trying to protect him from the really bad guys and they felt it was appropriate to do that. And you know, if you look at some of the emails Julie Brown has, they really have a negative view of civil plaintiff lawyers. So, I mean at first I was like, Holy Shit, they think we are worse than Epstein. So my first question is, do you think I'm getting it wrong, I don't know if you read Julie's book. I don't know if you saw the emails when they were negotiating with them, but you probably saw them before they were in Julie's book. And then, secondly, I mean, is there anything we can do about that? Are we at fault for how they look at us?

<u>Relentless Pursuit: My Fight for the Victims of Jeffrey Epstein</u>

Top Shelf Podcast - HOST: <u>John Uustal</u>, Jan 26, 2022 Transcript WP/im

44.17
BRAD: Well first, Julie got those emails from me.

JOHN: OK.

44.21
BRAD: So we got it from after fighting the 11th Circuit, er, but, um [long pause] um so in the beginning, I know what you are talking about, there is a series [of emails] where they are trying to choose who the er, who is going to be the representative for all of the victims. The idea that they are going to get shuttled to this one lawyer who ends up being Bob Josephsberg. But they're going to get shuttled to one lawyer and all the cases are going to resolve for $50,000-that's how it was supposed to work out. And there was some discussion about other lawyers that might be in the mix. Chris Searcy was one that was named. And I think that the prosecutor, I don't remember if it was Andy or Marie but she says, or he says, 'look, I've heard some bad things about these plaintiff lawyers-that they are basically not going to play ball and just settle these cases. And she says it as a bad thing, as opposed to 'it's a good thing'. I mean these cases shouldn't have been settled for $50,000, that's ridiculous. It's almost like we are cast as the bad guys for not agreeing to railroad these girls even more. It's totally absurd. But um and I don't know that that's really changed. Brittany and I did a couple of talks, uh, in the last let's call it, 3 or 4 years, to different state attorneys' offices. Not many in Florida although we were able to do one in Broward State Attorney's Office. And since then, with that office and some of the others that we talked to, Colorado, we have a good working relationship now and they respect the fact that we can help them, and they can help us.

45.59
I would say that the prosecutors in New York, I mean a lot of this was because they had to rely on us a lot at least initially because we're sitting over here with 75 bankers' boxes of material and they have nothing. So uh, but we developed a really good working relationship with them. And I think they realized that there's some benefit to this symbiotic relationship, that we can share information, they can share information, we can work together as a team. However, I think that generally, if you ask almost any prosecutor in their heart of hearts, 99% of plaintiff lawyers are only going to foul up their case, don't understand the criminal system and are going to put the civil case in front of the criminal case, and out of an abundance of caution, don't talk to them at all. Unfortunately, there are some lawyers who can fit that description, and that makes it hard

Relentless Pursuit: My Fight for the Victims of Jeffrey Epstein

Top Shelf Podcast - HOST: John Uustal , Jan 26, 2022 Transcript WP/im

for us, but it's not the vast majority like the prosecutors think and I think it's a hard mindset to change.

47.04

BRITTANY: And I think with respect to that particular subset of emails, it was, I was a baby lawyer when Brad and I were reading through them and it was particularly concerning to me because it seemed like they were looking at the civil lawyers as more of a checks and balances system - if you are not doing something wrong as a prosecutor, why are you so concerned with people like Brad you know, overseeing it and getting involved and uncovering what they were doing which was wrong. And so I think that having that extra layer of people who represent the victim themselves. You know the state does not represent the victim, they represent the state or the fed government - is represented by the AUSAs and the victims having their lawyers to have a voice for them I think, for our clients at least, has been particularly important.

47.49

RICH NEWSOME: Yeah, I was just going to chime in as having been with DOJ through the US Attorney's office in two different district offices, the northern district of Florida and the _ district of Florida. There is a culture, a prosecution culture that I think from a couple different perspectives causes that kind of animosity it's just baked into the office - one of which is that they also you got to remember, they also defend the government. Their whole civil office is defending cases against firms like ours, so just right off the bat they are by nature a defense firm and so we are kind of the bad guy to begin with. You know they are all government lawyers, they are all on a modest salary. And then, you know, when you look at the Chris Searcys of the world, there's another chink in the armor. There's a little of that, you know, so when you start out with the defense mindset, you start out with the typical government lawyer, not to disparage them.

Um, And then the third thing is, and I don't know if this has changed, I don't think it has, but
back in the day the one of the big driving factors for so many of these cases, was Press, and reputation and statistics. They are driven by those things and so , you 've got a deal, you want your statistics, you don't want any bad press-those are the worst possible things, you want good press- to see your name in the paper is the greatest thing in the world as a federal prosecutor, especially as the US Attorney - this is a political guy - and so the fact that now this plaintiff lawyer who is a money-grubber is coming in, is going to

Relentless Pursuit: My Fight for the Victims of Jeffrey Epstein

Top Shelf Podcast - HOST: John Uustal . Jan 26, 2022 Transcript WP/im

disrupt this plea, make more work for us and maybe get us, god forbid, bad press, that's an anathema. And so I think for all those reasons, it's cultural, and it's baked in and that's what we're going against, we are seeing this in the other case, you know, you would think, 'of course they're going to cooperate with us and work with us. We represent the victims. Nope, it's cultural. That's my personal take, I could be wrong, but unfortunately..

49.53
JOHN: Let me ask Stan and Peter your thoughts also maybe 'cos Brad and Brittany and Richard and Rich, I don't know why I said Richard, I guess  because that's what it says under his name [laughing]  we are talking about the prosecutors but I also want to talk about us  - if there's anything that we can contribute to that viewpoint , anything you want to add, Stan or Peter?

50.15
POTTINGER: Yeah, I have I have a reaction to what Rich said and what you said earlier which is, er, I agree with it. I was at the department of justice also for a number of years, I did prosecute some criminal cases, the Kent State case probably the most notorious of the bunch,  but the civil rights, you are absolutely right Rich, I discovered when we would have those meetings,  you know, with all the 94 US attorneys once a year, that there was usually some sort of concern about 'what's the civil rights division doing? why can't you share things more with us ?' So we did, we said 'fantastic go for it', nothing would be better than to have 94 offices engaged in civil rights enforcement.  And then all at once, it was exactly what you said, it was like 'wait a minute, not so fast there, Schwartz, wait, wait, wait, wait, this is just a pain, this is ugly stuff, why don't you guys handle this in main justice? So, you are absolutely right, that was my experience, I was a little surprised by it but I think it is baked into the system.

The other thing I just mentioned to all of the people who are participating in this seminar is that nobody, nobody gets to the bottom of justice like lawyers do, nobody, even the press and by the way, the press has been a major source of information for us in the government when I was in the government. It's also a major source of information now. So I've nothing but respect for good investigative journalism but nobody can dig and get to the bottom of what is harming the people that John started out by talking about - those are people who even today after #MeToo, are, are still powerless.  And, and I think there's nothing more dramatic than the powerlessness of girls and women who are assaulted. But it goes across the board - Indian Americans are powerless and invisible; the mentally

Relentless Pursuit: My Fight for the Victims of Jeffrey Epstein

**Top Shelf Podcast** - HOST: John Uustal , Jan 26, 2022 Transcript WP/im

retarded in Willowbrook, totally invisible; Hispanic kids who are put in the back of the room to cut and paste instead of learning, are powerless; black kids all over the place for a whole variety of reasons we all know about, powerless. So I think that only the people who are on this is phone call or this zoom call, are the people who make the difference.

52.35

PETER SPILLIS [Partner of John, Host]: Stan, I love hearing that because what I've been thinking this whole time I was reading Brad and Brittany's book, is, it's just downright inspirational. You know, we do these things in trial school to learn and also to be inspired and just you know, putting into their world and watching how many points along the way, it would have been so easy to just pack up your bags and go. Just dozens of points along the way, you know. And the courage to walk away from big er settlements, right? The courage to, you know when you lost the summary judgment on the malicious prosecution, and you are facing millions of dollars you know, in fees and a judgment against you, it would have been awful easy and I think a lot of people would have said, 'you know what, you've got to live to fight another day and let's move on'. And seeing you not do that was really inspirational for all of us, the people who do this you know, every day.

53.39

JOHN: Rich and I were just saying today when I saw him earlier that we think we would have folded at that point, You know, I'm you know I've assumed this is a closed group, right, trial school and no one on here is going to tell the defense attorneys that I said that [group laughter]. Sorry Rich, I added you too. No, but seriously, I mean, you know, that was a heroic moment, Brad, I don't know if people tell you that as much as they should because, I don't know if it's just you don't care about money [Brad is smiling broadly listening]; I think a lot of great plaintiff lawyers um, or you had greater faith in the court system maybe than the court system justified [laughing] . You know, maybe you're somewhat naive about the chances, the political pull of the people you were against. I don't know. But whatever it was, that was really a heroic moment.

54.32
POTTINGER: Agreed

<u>Relentless Pursuit: My Fight for the Victims of Jeffrey Epstein</u>

**Top Shelf Podcast** - HOST: <u>John Uustal</u>. Jan 26, 2022 Transcript WP/im

54.33

RICH NEWSOME: Yeah, I told John the same thing. I would have punted. Man, when I read that, I was just like, this guy, man, really, next level, bravo.

54.54

PETER SPILLIS: Can I ask something, I don't know if you will tell us or not, but er, along the same vein, he kept hitting you with proposals for settlement that sounds like they were getting bigger and bigger. Are you able to tell us how big they got [laughing]?

54.56

BRAD: I don't remember but into the millions though, into the millions. Because he knew that I was turning it down and I don't know that we were able you know, once, once Jack Scarola and I got to really know one another, 1, I realized I had the right lawyer because he can be super aggressive; and er he really was, he was just. His whole attitude from the beginning was, 'I do not want you to get distracted from representing these girls, and representing this case against the government, it's too important. Um, I'll try to deal with the fact that Epstein is attacking you on the side'. And I said 'I'm not settling the case'. I would say the first two proposals Jack and I had long discussions about the pros and cons and the risks, and um, that 'it would probably be a good idea for you, Brad, to consider it because his legal fees are going to be astronomical and he wants nothing more than to hold something over your head'. And I told him, no absolutely not, I'm not settling this. At first, I think he thought that I was kidding, but like I said, after Jack and I got to know one another uh, he would literally call me and say, 'hey, you set a new record today'. I'd say, 'what?' He said, 'we got a proposal for settlement'. I sent an email back 3 seconds later saying 'reject it'. [Laughing]. Yup, you understand me now.

56.19

BRAD [CONTINUES]: So, one of the things I couldn't put in the book just so you know, is just how crazy some of the things Epstein would do were, he sent a lawyer to me to meet me at a restaurant, called me and said, we have to meet right now. I was represented by Jack. This lawyer contacted me under false pretense, acting as if he wanted to meet me on a different case. I showed up and he said um, he talked about the other case for three seconds and then he said, 'I just wanted to tell you I talked to Mr. Epstein today and he realized is, that you had a house that went into foreclosure because it had a flood and that nobody these days in 2009 is foreclosing on such a situation. But Mr. Epstein is

Relentless Pursuit: My Fight for the Victims of Jeffrey Epstein

**Top Shelf Podcast** - HOST: John Uustal , Jan 26, 2022 Transcript WP/im

going to call um, the bank tomorrow and buy that loan and unless you want him crawling up your ass, then I think you need to start seeing things his way.

57.27
PETER SPILLIS: That's unbelievable

57.29
BRAD: Yes, so he was really pulling uh, you know, a lot of, a lot of different maneuvers that

57.34
RICH NEWSOME: Hey, Brad, can you tell the name of that lawyer? I mean that's not confidential, is it? [laughter]

57.38
BRAD: I mean, I don't know. I'll tell you, I'll tell you offline, I don't know.

57.44
BRITTANY: Yeah.

57.46
RICH NEWSOME: That's unbelievable, unbelievable.

57.50
JOHN: Let me guys, we're going to take a 4-minute break, it literally is only 4 minutes, um to make a drink. We really want this to be a chat, a chat among friends so everyone who is prepared to make a drink, the panelists, hopefully you have your drink kits.... So don't go anywhere......
COMMERCIAL BREAK

1.06.15
JOHN: Alright, so I've got a bunch of questions from participants and I'm sure we'll be getting some more as we go. I guess, let me start for Stan and Brad and Brittany, all of you, we've got somebody who's done a lot of uh, similar work um, and er, faced the reality in some of his cases against er churches I think er with modest recoveries. And just the reality that sometimes the recoveries weren't as high as um, we all think they

Relentless Pursuit: My Fight for the Victims of Jeffrey Epstein

**Top Shelf Podcast** - HOST: John Uustal . Jan 26, 2022 Transcript WP/im

should be in situations like that. What are your thoughts on that and how to handle that how to talk to clients about the situations like that?

1.07.08
BRAD: So, are we just talking about the fact that a lot of these intentional torts, they are either isn't um, let's call it deep pockets or somebody who's able to pay - not every single person who commits these types of acts is a Jeffrey Epstein or Bill Cosby or Harvey Weinstein or whatever. Um, I think that you know like, I always like to say first meeting with clients is from me, Brittany could finish my sentence. You are going to get the good, the bad, and the ugly, and it's not always going to be what you want to hear. It's going to be just the flat dead honest truth; and let's talk about you know, the fifth element to any tort which is, 'where's the money coming from?' You know, is there any insurance, is there anybody who is going to be able to pay because we have to set reasonable expectations up front, um and I think that's a big part of it because if you don't do that and you don't have that discussion, you're only going to have a very upset client along the way. So you know, to me it's one of those things where you have to tell them going in and I think it's more important at least from my standpoint, for me to know what their expectations are so that I make sure that even if we hit a home run, that we are going to be able to meet their expectations and that they are reasonable. Because, I love what we do, but we are not magicians, I mean, we are lawyers who hopefully are going to do a really good job and get justice, but it's not always going to be you know, $10 million dollars because er, because either the circumstances don't justify it or, you are not draining blood from a rock. So I really think that upfront we handle those conversations and then we still run into issues with certain clients along the way. But I do find, in this niche of representing crime victims, that we have people who recognize that we are not just lawyers, where we become somehow their therapists, their trusted friends, the person they call about everything, and that we have a good enough relationship that um, and in line of communication that we don't really run into too many issues like that, and if we do they're going to know about it the second we know about it. I just think its communication.

1.09.25
JOHN: Brittany, you want to add to that?

1.09.27
BRITTANY: Yeah. Something interesting that we've experienced specifically with

Relentless Pursuit: My Fight for the Victims of Jeffrey Epstein

**Top Shelf Podcast** - HOST: John Uustal , Jan 26, 2022 Transcript WP/im

Epstein, or some of these wealthier defendants too, is the way that the press influences our clients' expectations. You know, you have the Epstein Estate when he died that has $600 million dollars in it so you have each individual client thinking this guy has $600 million dollars and all of his victims should get all of that money and nothing should be left over because he was a bad guy. So tempering expectations with media reports and how much money exists I think, has been particularly difficult for us because it's hard to explain why this person who did these horrible things, why all of his money shouldn't just go to all of his victims and not to any of the beneficiaries so, you know, we do we feel like we've done a great job for someone when they call and they say OK but now there's $559 million dollars left, where's that going? So I think the media has an influence on this topic for us too.

1.10.15
RICH NEWSOME:  Hey Brittany, do you mind just again because I know others have those questions, what's the status of the Estate and the Island, I mean, what's the rest of the story, I mean it's, I'd love to hear kind of, what happened to all of that stuff and how much the victims did get?

1.10.30
BRITTANY: Brad you can answer, I know this is one of your favorites.

1.10.32
BRAD: I knew you were going to kick it over to me.
BRITTANY: Yeah.
BRAD: So I think there is a pretty good basis for believing that there is a lot of money outside of jurisdictions, likely in Saudi Arabia, type area, that nobody is going to get, and that's just kinda the way it is. But $669 million dollars was what the Estate was originally estimated as in um, in the Virgin Islands.  They had not paid taxes, so $200 million dollars came right off the top, so we were down to $450 [million]. They then er, paid $171 million dollars in back taxes, so we almost lost $400 million right away, we were down to about $300 million because some of the assets ended up being worth more than they were originally estimated so it started balancing a little bit but were down to about $300 million. And I don't think, you know, we wrote the book before the claim program got set up, but I thought that was pretty interesting because when Jeffrey Epstein died, we filed the first claim against the Estate and I called the Estate lawyers and said, we need to try set up a program otherwise um, we are, you are going to end up in litigation and the

Relentless Pursuit: My Fight for the Victims of Jeffrey Epstein

**Top Shelf Podcast** - HOST: John Uustal , Jan 26, 2022 Transcript WP/im

money's going to get eaten up and a lot of victims aren't gonna get anything and you're gonna be wasting the estate. And so , we started working with the estate lawyers. Actually, Brittany and I and the estate lawyers writing up what the protocol would be for this uh, for the crime victim I mean, for the, for the Epstein victim program. And the estate wanted to do it their way with their people under their rules and we essentially had the Attorney General for the USVI, we provide them information; they filed a civil SICO case which is basically their version of RICO, against the estate which froze the island, and it froze the entire estate. So then we go to this hearing in the USVI and the courtroom has no air conditioning or anything and the judge is super overwhelmed, I mean there was lawyers flying in from the United States and it's kind of chaotic.

1.13.01

BRAD [CONTINUES]: But afterward, everybody is fighting in the hallway trying to get on camera and Brittany and I basically snuek out the backdoor, went down the street, this is true, we went down the street, went to the Attorney General's office, knocked on her door and asked, hey, can we have a meeting with you? And she thought like we are crazy, but we go in and have a meeting. I know that the substance of all the meetings that transpired after that is probably very heavily confidential, but um, but we developed a really close relationship and we ultimately said, um, we can use you to help us make the best program that can exist. First of all, we are going to assign as one of the panelists, that's going to be in charge of this program, somebody that's victim-friendly, not chosen by the estate, and we want Marcie Hamilton. Marcie Hamilton's like the most well-known victim advocate that there is in the country. We said, put her on the panel. Once she's on the panel, now we know it's going to operate fairly. The system is going to operate fairly, the system is going to operate fairly. She [the AG] says okay will they go along with it? I said they have to go along with it, the estate has to go along with it because you are basically holding the entire estate hostage. And then when we get, we will try these mini trials and whatever the award is, you then agree only to release that amount. Let's say there's a two-million-dollar reward, we will then call you, Attorney General, you can release two million dollars to be paid right to the victim and you can still keep the estate fully um, under wraps like they can't get to anything and that's still the case today. Now obviously there has to be something in it for the USVI so what currently has happened is the two islands down there look like they are going to be forfeited to the USVI under their RICO laws, um because they were used for the commission of sex trafficking. So it's worked out good for the Attorney General, it did

Relentless Pursuit: My Fight for the Victims of Jeffrey Epstein

**Top Shelf Podcast - HOST:** John Uustal , Jan 26, 2022 Transcript WP/im

work out I think, really well, of all of those types of programs, I don't think any program has even come close to the one that we put together for the Epstein victims.

1.15.19
BRAD [CONTINUES]: We tried 68, tell me if my numbers are wrong Brittany, but we had 68 Epstein clients, we tried 68 of those trials by zoom in 13 months. So we were in trial constantly on these cases and of the 68, I think we got verdicts in 60 of them, maybe 58 of them and now we are still litigating the other 10 um, but overall I thought that it was really successful but I think that the er, the estate is probably down to, take the islands away because they are going to be the USVI, it's probably down to $100 million dollars.

1.15.50
BRITTANY: And statistically speaking there were 100 claims that were accepted as eligible by the program and they paid out $121million dollars. But that's how to get from the number we had before down to the 50 or so.

1.16.03
RICH NEWSOME: That's what we were asking, Brittany

1.16.07
BRITTANY: I got you

1.16.08
RICH NEWSOME: That was, that was a great story, thank you for that, I was really curious.

1.16.13
BRAD: I was answering the next question

1.16.16
JOHN: No no, I didn't mean to say we didn't want to hear what you said, Brad, that was all interesting but you left out the part that Brittany

1.16.20
BRITTANY: We work together like together we're one lawyer so

# EXHIBIT 27

NETFLIX - GHISLAINE MAXWELL: FILTHY RICH  AIRED 25 NOV 2022
TRANSCRIPT W/P im


NETFLIX GHISLAINE MAXWELL: FILTHY RICH - TRANSCRIPTION - WP/im
*"You are watching Ghislaine Maxwell: Filthy Rich 2022. TV-MA 1 h 41 m*
*Stories from survivors frame this documentary detailing the sex-trafficking trial of Ghislaine*
*Maxwell, a socialite and accomplice of Jeffrey Epstein."*

0.15
V/O JEFFREY EPSTEIN ON PHONE, 2009 INTERVIEW WITH NY DAILY NEWS [GEORGE
RUSH?]: Look if there's something we can do to minimize Ghislaine's involvement I'd appreciate
it because there's nothing... it's, it's just unfair because she really plays no role and Ghislaine
was never.. never ever a part of any of this stuff. It turned out not to be you know, truthful that
she was involved in procuring women. The whole thing's ridiculous. I am willing to take the heat
for you know, the situation I've been involved in. She's really fragile. You know to bring innocent
people in simply because she's well known, I just think it's unfair and I'm telling you it's
defamatory. and it's bullshit.

GRAPHICS: AUGUST 16, 2019
NEWS ANCHOR: Speculation has abounded for several days as to the whereabouts of
Ghislaine Maxwell

01.17
CHIRSTOPHER MASON:  After Jeffrey Epstein's death, the inevitable question was, when is
Ghislaine going to be arrested?

GRAPHIC:  A NETFLIX DOCUMENTARY.

EMILY COMPAGNO, ATTORNEY FILE VIDEO, HANNITY SPECIAL: Maxwell has been
accused of recruiting underage girls to act as sex slaves for Epstein and other men. She's
accused of being not only a co-conspirator but also an abuser herself.

GRAPHIC: A RADICAL MEDIA PRODUCTION IN ASSOCIATION WITH THIRD EYE MOTION
PICTURE COMPANY.

01.12
EUAN RELLIE, BANKER, FORMER FRIEND OF GHISLAINE MAXWELL: All her friends who'd
known her at the time were like, where the hell is Ghislaine

01.33
NEWSCASTER: Maxwell who is now allegedly under a new FBI investigation, is in hiding.

GRAPHIC: EXECUTIVE PRODUCER, JOE BERLINGER.

NETFLIX - GHISLAINE MAXWELL: FILTHY RICH  AIRED 25 NOV 2022
TRANSCRIPT W/P im

01.39
SIGRID MCCAWLEY: Ghislaine Maxwell has multiple citizenships. She could flee to a country
where we could no longer prosecute her.
GRAPHIC: EXECUTIVE PRODUCERS, LISA BRIANT, MAIKEN BAIRD

NEWSCASTER: It's been nearly half a year since Epstein's death and Ghislaine Maxwell is still
nowhere to be found.

01.54
LADY VICTORIA HERVEY: I was thinking in my head well she better stay hidden because they
are going to destroy her.

EXECUTIVE PRODUCERS: JON KAMEN, JON DORAN

2.01
BRAD EDWARDS V/O: Ghislaine Maxwell was hiding from the public. She was hiding from the
press. She was hiding from authorities. She was hoping that everybody would forget about it.
Clearly they weren't.

GRAPHIC: EXECUTIVE PRODUCERS  JEN ISAACSON, LEOPOLDO GOUT

GRAPHIC ELEVEN MONTHS AFTER EPSTEIN'S SUICIDE, JULY 2, 2020

FEMALE V/O: Authorities have been searching for Ghislaine Maxwell.
GRAPHIC  PRODUCED BY LORI GORDON-LOGAN
At 8.30 this morning, They found her here in New Hampshâire.

02.29
TARA PALMERI: HOST PODCAST POWER THE MAXWELLS: It was an aggressive raid and
she ran to the other room. They found that she was trying to hide her location by putting tinfoil
on her cell phone. She clearly did not want to be found.
GRAPHIC: EDITED BY CY CHRISTIANSEN

02.40
FILM FILM SDNY PRESS CONFERENCE - AUDREY STRAUSS: Today we announce charges
against Ghislaine Maxwell for helping Jeffrey Epstein sexually exploit and abuse multiple  minor
girls.

02.51
PETRONELLA WYATT, JOURNALIST AND MAXWELL FAMILY FRIEND: I firmly believe that
she didn't think she was doing anything wrong , 'cos at that point she could have gone down a
different road.

GRAPHIC: DIRECTED BY LISA BRYANT , MAIKEN BIRD

NETFLIX  - GHISLAINE MAXWELL: FILTHY RICH  AIRED 25 NOV 2022
TRANSCRIPT W/P im


FEMALE V/O: If convicted on all counts, the 58 year old Maxwell could face up to 35 years in prison.

V/O: And now that Ghislaine has been arrested, Another client has been arrested the more important question is, will power and money stand in the way of justice once again, the way it has so many times before in this twisted story.

GRAPHIC: GHISLAINE MAXWELL: FILTHY RICH

03.41  GRAPHIC, AUSTIN TEXAS - OVER FILM OF ANNIE FARMER WALKING HER DOGS, THEN TALKING TO CAMERA.

ANNIE FARMER, SURVIVOR  - v/o WHILE WALKING DOGS::  I'm a survivor of the abuse of Maxwell and Epstein and I'm going to be . . I met Maxwell and Epstein testifying at her upcoming trial.

ANNIE FARMER CONTINUES NOW TO CAMERA: I met Maxwell and Epstein when I was just 16 years old through my sister, Maria Farmer. We were both abused by Maxwell and Epstein in separate instances in the 90s. We reported it to the authorities and nothing was done. My sister went to the FBI in 1996 and told them. We both talked to reporters in 2002, then we talked to the FBI in 2006 but still nothing was done; and then in 2019 I was so hopeful that we would finally get accountability.

NEWSCASTER AISHAH HASNIE, FOX NEWS FILE ALERT:  Fox news has learned that billionaire Jeffrey Epstein has been charged by prosecutors with sex trafficking.

GEOFFREY BERMAN FMR US ATTORNEY, SDYN:  Epstein is charged with a 2 count indictment m first conspiracy to commit sex trafficking and second, the substantive crime of sex trafficking of under-age girls.

04.42
ANNIE FARMER:  We were finally hoping to get justice.  But then my husband woke me up early in the morning with the news of what happened and I felt sick to my stomach

 FILE HEADLINES, DEATH BY SUICIDE, WORLD NEWS TONIGHT
05.04
We do want to start here with breaking news right now, sources telling ABC News that accused sex trafficker, Jeffrey Epstein, has died by suicide. Epstein's accusers are furious tonight saying he won't have to face justice while they have to live with their scars for the rest of their lives. [FILM FILM OF VRG, SIGRID, SARAH RANSOM AND Chauntai Davies leaning on Brad Edward's shoulder].

05.16
ANNIE FARMER:  It was, It was the summer of 2020 and it had been sometime since Epstein

NETFLIX - GHISLAINE MAXWELL: FILTHY RICH  AIRED 25 NOV 2022
TRANSCRIPT W/P im

had died. It was the morning of my birthday I woke up very early to a phone call that I was not expecting and I saw that it was Sigrid calling me.  Sigrid McCawley and David Boies are my attorneys, and I've worked with them for several years to pursue justice against Epstein and Maxwell. When I answered the phone Sigrid told me that Maxwell had just been arrested and that I was one of the women that had been included in the charges against her.

06.00
SIGRID MCCAWLEY, ANNIE FARMER'S ATTORNEY:  I've been working with victims of Jeffrey Epstein and Ghislaine Maxwell for about seven years now.  What's so incredible about Annie's story is that she started telling it decades ago and finally now Ghislaine Maxwell is being tried for those crimes.

06.18 DAVID BOIES, ANNIE FARMER'S ATTORNEY: The Maxwell and Epstein sex trafficking enterprise is a good illustration of how slow society moves and how slow the justice system moves. This is finally an opportunity for vindication for the survivors. The current criminal case against Ghislaine [OVER PRESS FILE OF JULY 14, 2020 - GHISLAINE  MAXWELL PLEADS NOT GUILTY TO SEX TRAFFICKING, ABUSE CHARGES, has  three victims, all underage victims,

SIGRID MCCAWLEY: Two of whom are not public and one of them is Annie Farmer.

06.44
ANNIE FARMER: I chose to use my name at the trial because I had been working already to bring attention to what had happened in this case.  David and Sigrid are helping me to know what's coming in to help me think about how to clearly present my story.

07.10
SIGRID MCCAWLEY [re-enactment]  I think we see in the indictment there's a lot in here that's really critical to her story. I think what I was taken by was the focus on grooming. The grooming was such a big piece of what she went through and how they lured her into this. [DAVID BOIE'S HAND HOLDING PHOTO OF ANNIE FARMER IN PROM DRESS] Annie presents incredibly well, she has a degree in psychology, a doctorate, and frankly the consistency of her story over many many years.  At the trial I expect that they're going to get into the details of what happened to her. I think they're going to pick it apart quite a bit and I think being put on the stand and being cross examined by these really ferocious lawyers is going to be hard -

DAVID BOIES: She's a  wonderfully strong, articulate young woman but she's not an experienced witness we're gonna have to be sure that she knows the kinds of questions that Maxwell's attorneys are going to ask her on cross examination..

07.56
ANNIE FARMER: This process of waiting to get to trial is hard because on the one hand I'm dreading testifying and on the other hand I'm really ready to close this chapter of my life and move on to other things.

NETFLIX - GHISLAINE MAXWELL: FILTHY RICH  AIRED 25 NOV 2022
TRANSCRIPT W/P im

GRAPHIC, FORT LAUDERDALE:
08.20
BRAD EDWARDS:  I've been fighting for justice on behalf of now, more than 65 of Ghislaine
Maxwell and Jeffrey Epstein's victims over 13 years. I represent one of  three victims that is
going to be called to testify in the Maxwell trial. My client is going to proceed under the
pseudonym *Kate*, as this case has international attention, and she has a young daughter, she
wants to be protective of her, she wants to be protective of her own privacy and she feels that
it's very important to bring Ghislaine Maxwell to justice as do I. [OVER FILE BOXES USA V
MAXWELL]



After accumulating 100 Bankers' Boxes of material - this is just a small fraction of the
information that we compiled regarding the whereabouts of at certain times - photographs,
witness statements, police reports, timelines, spiderwebs of victims, all of the evidence that
showed direct interaction between the victims and Ghislaine Maxwell.  The identical evidence
that the prosecutors are going to show the jury in the upcoming trial against Ghislaine Maxwell.

My best guesstimate just based on everything that I know is that Jeffrey Epstein accumulated
more than 500 victims.  At this point I think Jeffrey Epstein is the undisputed most prolific sexual
predator of all time but without Ghislaine's help he could never have pulled off such an elaborate
scheme and abused so many. She fed a monster, you had to kinda be a monster to do it.

Jeffrey Epstein is molesting hundreds and hundreds of girls from the time that Ghislaine meets
him, until he's arrested [POINTING TO PHOTO OF JE IN 2019]

and yet the only trial that's going to happen related to the sex trafficking is against Ghislaine.

5

NETFLIX  - GHISLAINE MAXWELL: FILTHY RICH  AIRED 25 NOV 2022
TRANSCRIPT W/P im



10.20
BRAD EDWARDS: My law partner, Brittany Henderson, David Boies, Sigrid Macauley and I
have worked for years to put this puzzle together. Even though we represent different clients, we
have a united front and are now helping the prosecutors to make sure they put the strongest
case forward. Four sex trafficking charges and now there's a lot of work to be done. The victims
and witnesses are going to be ready.

BRITTANY HENDERSON: They've always been ready.

11.05
SIGRID MCCAWLEY: I think the strongest arguments for the prosecution are really the voices of
of these young women. I think the biggest challenge is that Ghislaine Maxwell is very effective at
presenting herself incredibly well; she is well educated, she comes across as a very
sophisticated woman which gives people comfort because they assume that somebody of that
stature is of course not going to be somebody that they would envision as being an abuser.

GRAPHIC, 2021 SPINNING BACK TO 1989

12.00
CHRISTOPHER MASON:  I met Ghislaine in November 1989.  At the time, she was visiting
from London. I was going to a nightclub and having dinner with some friends who had been at
Oxford with Ghislaine.  She was the life of every party, knew absolutely everyone, extremely
popular, vivacious personality. I remember Ghislaine told a lot of very funny dirty jokes. That
night I went home and wrote in my diary, Met Ghislaine Maxwell, hilarious sense of humor,
incredibly good fun, and she's just a really live wire, and I hope I get to see her again.

NETFLIX  - GHISLAINE MAXWELL: FILTHY RICH  AIRED 25 NOV 2022
TRANSCRIPT W/P im

12.50

EUAN RELLIE, INVESTMENT BANKER, FORMER FRIEND OF GHISLAINE MAXWELL: I met Ghislaine in New York and we had a fair number of friends in common.  A couple of people I knew had dated her.  She was a connector, she was gregarious and quite glamorous and a bit raunchy and quite wild. And made more interesting by the fact that her father was this rather notorious business figure, Robert Maxwell.

13.01

CHRISTOPHER MASON: Robert Maxwell was this larger than life character, notorious press baron, a wheeler dealer and just a monstrous ego, a kind of successful scoundrel.

EUAN RELLIE: Her father had set her up, in this life which allowed her to be at the fulcrum of New York society. She was you know, like the sparkling debutante or something.

13.35

LADY VICTORIA HERVEY, FORMER MODEL, GHISLAINE MAXWELL'S FORMER FRIEND:: So the bottom picture we are at an event in Los Angeles and, I'm in like my early 20s. We were having like a lot of fun back then. Yeah she was definitely like a kind of flirtatious character for sure. She exuded this mysterious air about her. Like you never knew, like, which tropical location she just jetted in from. She was like a Bond character. She never stayed in one place very long. She didn't really even need to be a social climber, because she already was at the top because of her father. She knew everyone and these people were, like, running countries, or were like, famous musicians, or you know, she.. . knew, like, the very top percentage of the people that basically rule the world. Could she read a room? yeah for sure,  definitely. She knew exactly, like if  was going to an event,  who was going to be there and she would've scoped it out and she would know all about them and  who she's going to spend time on. On the scale of shark, she'd probably be a great white shark.

14.48

PETRONELLA WYATT, JOURNALIST, MAXWELL FAMILY ACQUAINTANCE: She's never been really sensitive to the feelings of others. She had no boundaries. She was overtly sexual but more as an arranger and a teacher. And I remember one party, Ghislaine who I hadn't seen for a while, sort of appears from nowhere,  grabs my hand and suddenly suggests that she gives me a lesson in the art of performing oral sex. I was absolutely flabbergasted. She would encourage girls at parties to flirt with the men there. And do even more than flirt. I mean, literally to go to bed with them.

15.48

NICOLA GLUCKSBERG, GHISLAINE MAXWELL ACQUAINTANCE: I remember meeting Ghislaine for the first time at Headington Hill Hall, the family home of the Maxwells, and being very struck by how beautiful she was. She was just delightful. I was there for a dinner party and I don't remember anybody else in the family being there. Ghislaine was 29 at the time and most of the people there  seemed to be around that age or slightly older in their mid thirties. We had a very nice meal, there was a lot of laughter. Then Ghislaine stood up and disappeared. She

NETFLIX - GHISLAINE MAXWELL: FILTHY RICH  AIRED 25 NOV 2022
TRANSCRIPT W/P im

came back with a handful of scarves and then sort of you know, demanded everybody's attention and then described the game.  And the game involved blindfolding the men with these scarves and then she explained the women would take off their tops and bras off and would parade before the men, and the men would then be able to fondle the breasts and the men would feel them and attempt to identify to whom the breasts belonged relative to the other women in the room.  This was my idea of the ultimate nightmare. I just remember feeling incredibly shocked and immediately started working on my escape plan. But it's haunted me ever since. The women had no power and the men were being invited by a woman to be assaulted.

17.27
PETRONELLA WYATT:  Ghislaine Maxwell grew up with sexism for men's. pleasure and convenience.  He really did view women as objects.  I met Robert Maxwell for the first time at my father's house and I remember noticing that his wife Betty was like a sort of poor dormouse. She hardly said a word. Maxwell immediately started to flirt with my mother and then flirt with me which is something he did a lot. He treated his wife badly. He was unfaithful to his wife.

18.06
LADY VICTORIA HERVEY: I think that the fact that her mother stayed with her father even though he had like, multiple affairs. I think that did probably have an affect on her. She probably like, in her head, thought that that was normal.

18.18
EUAN RELLIE: But still, she was desperately, desperately fond of her dad. Ghislaine doted on her father and vice versa

18.34 PETRONELLA WYATT: Robert Maxwell used to go round with Ghislaine as a kind of mascot. It was an odd relationship because it was more like a kind of man-and-his-lover relationship.  I don't mean in a physical sense but he was very proud of her figure and the fact that she was attractive and glamorous and he liked having her on his arm. In a rather unhealthy way he was her anchor and her ballast.

19.13
GRAPHIC NOVEMBER 5, 1991
[BOARD MEMBER] The Board of Mirror Group Newspapers announces with deep regret that Robert Maxwell,  Chairman of Mirror Group Newspapers, PLC and Maxwell Communication Corporation is missing at sea.   Maxwell was last seen before dawn off the Canary Islands in the Atlantic. Hours later searchers found his body.

CHRISTOPHER MASON: His death was big news. And it was this big mystery. Had he been murdered? Had he just fallen off his yacht? Ghislaine seemed utterly devastated by her father's death.

NETFLIX - GHISLAINE MAXWELL: FILTHY RICH  AIRED 25 NOV 2022
TRANSCRIPT W/P im

FILE FOOTAGE OF GHISLAINE THANKING PRESS FROM THE DECK OF THE LADY
GHISLAINE - I want to take this opportunity thank all the many hundreds of people who have
sent messages of support to us at this very very sad time....

20.25
PETRONELLA WYATT: I think without him she was like somebody who'd been chucked into the
sea without a life belt.

CHRISTOPHER MASON: The news of his death was followed very shortly thereafter by these
revelations that he had plundered the pension plans of his workers.'''

ROBERT COUTURIER, INTERIOR DECORATOR, GHISLAINE MAXWELL'S FORMER
FRIEND: It would have been very difficult for her to continue existing in London, and I think that
she really had to move away..

20.53
CHRISTOPHER MASON: I remember visiting her in her apartment on the Upper East side, and
she was suddenly out of money. Robert Maxwell has left his family in the lurch.  It was as if she
was sort of bravely weathering this challenge, of you know, the mysterious death of her beloved
father.

FILE FILM OF GHISLAINE TALKING TO DAPHNA BARAK IN CENTRAL PARK IN NEW YORK
IN 1992.

GHISLAINE MAXWELL: I am extremely sad that my father is not here.. I don't feel in any way
smaller or lesser than what I was. You just have to get on and the future is the future, you do
whatever you can do. if I have a wish for myself it's to do something positive with my life.

21.52
PETRONELLA WYATT: And she veered towards a replacement Robert Maxwell,  a bombastic
man who was also very, very rich and who has many of the traits of her father, and he was .
called Jeffrey Epstein.

GRAPHIC, 1991 SPINS FORWARD TO 2021
22.34
REPORTER 1: Ghislaine Maxwell is facing new federal charges of child sex trafficking.
GRAPHIC: NEW YORK FEDERAL COURTHOUSE, APRIL 23, 2021.
The new indictment adds a fourth alleged victim.  Prosecutors accusing her of trafficking a
14-year-old girl in the early 2000s.

[Reporter 2] : This is on top of six charges Maxwell was already facing tied to Epstein's alleged
sex trafficking network.

NETFLIX - GHISLAINE MAXWELL: FILTHY RICH  AIRED 25 NOV 2022
TRANSCRIPT W/P im

22.29
REPORTER #3: It could be effectively a life sentence for her if she's convicted and given the maximum here..

22.29 [OVER FILM OF DAVID BOIES AND SIGRID MCCAWLEY WALKING OUTSIDE THE COURTHOUSE.]

DAVID BOIES: The newest victim that's been added to the criminal indictment lays out how Maxwell got her to try to solicit other people to join the sex trafficking er, enterprise. So this takes the indictment to another level.

22.41
SIGRID MCCAWLEY:  I would say in this case truth is stranger than fiction so I think it's really hard for people to understand the vast depth of the trafficking that occurred and that's so unnatural to so many people. So I think people are fascinated with it for those reasons.

23.18
KATE BRIQUELET, SENIOR REPORTER, THE DAILY BEAST:  After the hearing was over, Ghislaine stood up. She stood around her attorneys, and I saw her look over to her sister who was waiting in the Gallery and um, she tapped her eye and she also waved at her, and that was the first time we've seen one of Ghislaine's relatives appear before the court in support of her.

23.30
FILE FILM OF ATTY, DAVID MARCUS: Ghislaine is in very, very, very difficult conditions - conditions none of us would wish on our worst enemies. I've never seen anything like it, how she's being treated.  It's the Epstein effect .

GRAPHIC, 2021 SPINS BACK TO 1991

24.00
CHRISTOPHER MASON, WRITER, GHISLAINE MAXWELL FORMER FRIEND: The first time I remember hearing about Jeffrey Epstein was, Ghislaine invited me to a party she was giving for her mother, in New York, and she explained that it was at the house of this guy she was dating, Jeffrey Epstein.

24. 30
EUAN RELLIE, INVESTMENT BANKER, FORMER FRIEND OF GHISLAINE MAXWELL: When I first met Jeffrey Epstein,  I thought he was a wildly successful investment banker, turned money manager for whom everything in the world, you know, had fallen into his lap.

24.48
CHRISTOPHER MASON, WRITER, GHISLAINE MAXWELL FORMER FRIEND: The story Ghislaine told over and over again was that you didn't have a chance of Jeffrey taking you on as

10

NETFLIX  - GHISLAINE MAXWELL: FILTHY RICH  AIRED 25 NOV 2022
TRANSCRIPT W/P im

a client if you had less than $1 billion to invest.  That was part of the mystique of the man that Ghislaine was dating.

24. 55
EUAN RELLIE, INVESTMENT BANKER, FORMER FRIEND OF GHISLAINE MAXWELL:So I remember thinking he's clearly talented, successful, well dressed, handsome, but he made extraordinarily little effort really, frankly, as a host. It was an odd dichotomy between the two of them, with Ghislaine flitting around making everybody comfortable, getting drinks, champagne, whatever you wanted. Ghislaine was kind of orchestrating the waiters, bringing people snacks and so on.

PETRONELLA WYATT: She knew how to be a hostess in the grand old-fashioned way, And I think somebody like Epstein, um who was very much new money, was attracted to this because he probably saw her as upper-class English accent, been to Oxford, you know, wears designer clothes, has lots of well-known friends. And suddenly they were seen together at all these smart parties all these expensive parties, seemingly as a couple.

25.42
CHRISTOPHER MASON, WRITER, FORMER FRIEND OF GHISLAINE MAXWELL: She seemed genuinely deeply in love with him.

EUAN RELLIE, INVESTMENT BANKER, FORMER FRIEND OF GHISLAINE MAXWELL: She would be quite touchy-feely with him. She's touch his elbow, she'd touch his shoulder. And they seemed intimate.

LADY VICTORIA HERVEY: Whenever you talk a Lannister That spoke about with him and got this feeling that she was just like so loyal to him That spoke about with him and got this feeling that she was just like so loyal to him

25.38
.....CHRISTOPHER MASON CONTINUES: small parties all the small parties seemingly as a couple She seemed genuinely deeply in love with him. She would be quite touchy-feely with him. They seemed intimate.

26.00
LADY VICTORIA HERVEY:  Whenever you saw Ghislaine, it was, "Jeffrey this and Jeffrey that", and all she spoke about was him.  You got this feeling that she was just like, so loyal to him.

26.15
ELIZABETH STEIN, SURVIVOR: I met Ghislaine Maxwell in the fall of 1994 while I was a senior at the Fashion Institute of Technology. At the time, I was 21. I worked at Henri Bendel. One day while I was working Ghislaine came in to the store. When she told me her name I remember thinking she I couldn't figure out how to spell her name, I couldn't figure out how you would spell that. And I said "That sounds like a French spelling of gasoline", and she laughed at me and she

NETFLIX  - GHISLAINE MAXWELL: FILTHY RICH  AIRED 25 NOV 2022
TRANSCRIPT W/P im

said,  'my boyfriend thinks I'm a lot like gasoline he's a match, and I'm gasoline", and we
laughed over that and I helped her shop.  And she picked out things and we continued the
conversation. It was easy to talk to her. I felt like I had met a friend in Ghislaine that I could trust.
I felt safe. So when we wrapped up the transaction, she let me know that she wanted me to
deliver her packages that evening at a hotel that was close by. When I arrived the concierge
escorted me into the bar, where I met G and ultimately JE. If I thought Ghislaine was
electrifying, Jeffrey was... on fire. They explained to me that the residence was undergoing
renovations at that time, and they asked me if I would come up to their room to deliver the
packages. .

 We went up to the room and we were just having normal conversation.

At one point, Jeffrey got up and went into the bathroom and Ghislaine followed him. Jeffrey and
Ghislaine both came out in bathrobes. For the most part it was pretty lighthearted until it wasn't.
The tone of everything changed in a moment. They started talking about relationships between
men and women, and they started to kiss each other in front of me. As Ghislaine and Jeffrey
started to become increasingly intimate, I was sitting across from them watching and I was in
shock. I was completely taken aback. I thought I was there in a professional capacity and I really
didn't know how to react. Ghislaine encouraged me to join, and Ghislaine started to instruct me,
kind of as a big sister, about what he liked and how she pleased him, and the alarm bells in me
were going off. Ghislaine was insistent that I participate, and I was scared that this was going to
potentially turn into an assault. And it did turn into an assault.  I was visibly freaked out and not
wanting to participate.  And as soon as I could, I backed away. I reminded Ghislaine that my
boyfriend was coming in for the weekend, and that's how I got out of the hotel room that
evening.  [Grim music playing - [footsteps receding rapidly]


30.05
EUAN RELLIE, INVESTMENT BANKER, FORMER FRIEND OF GHISLAINE MAXWELL: We
used to gossip about Jeffrey and Ghislaine to try and make sense of this slightly odd
relationship. It was a rather strange mixture of facets.

30.14
PETRONELLA WYATT: I mean, it wasn't a normal relationship, but it was a kind of relationship
she obviously needed. She couldn't feel secure without money. And he was a good catch for her
financially. They became totally dependent on each other in a weird way.


30.59
ROBERT COUTURIER, INTERIOR DECORATOR, GHISLAINE MAXWELL'S FORMER
FRIEND: As far as Jeffrey Epstein was concerned, there was something that... that sort of
reeked of vice. I mean, its not that we were all saints. You know, we all did things that we
shouldn't have done. But there was something that was... charged in negativity in him, which
few people that I met had.

NETFLIX - GHISLAINE MAXWELL: FILTHY RICH  AIRED 25 NOV 2022
TRANSCRIPT W/P im

31.06
EUAN RELLIE: He could be quite dismissive towards Ghislaine. There was a darkness about
the whole thing.

ROBERT COUTURIER, INTERIOR DECORATOR, GHISLAINE MAXWELL'S FORMER
FRIEND: And actually the funny thing is, is that he owed her all these entries into society that he
might not have had otherwise. You know, like royalty.

31.42
TARA PALMIERI, PODCAST HOST, POWER: THE MAXWELLS: Ghislaine's connection to the
royal family really dates back to her father Robert Maxwell who knew the Queen of England.
Ghislaine Maxwell met Prince Andrew while she was studying at Oxford. And because of her
father's business ties, she was already running around in circles with Royals.

EUAN RELLIE: Some time in the late 90s, Ghislaine said, "My old friend Andrew's in town, will
you come for dinner?". I said 'of course, love to, thank you." And I remember Prince Andrew
being distinctly bored by the whole thing. And it was almost sort of competitive between uh,
Epstein and Prince Andrew as to who could seem more haughty and bored and...and disdainful
of the whole event. I remember Andrew cheering up a tiny bit when there was a younger
female sitting and talking to him. And otherwise having practically no interest in anything else or
anyone else. It was a sort of unhealthy scene. [grim music playing]

32.41
CHRISTOPHER MASON: The story I started hearing was that apparently.. Jeffrey Epstein kind
of likes younger women and that he·kind of likes um… school girls, and that Ghislaine
introduces him to girls because that's his thing. [Somber music playing]. And people were
speculating that Ghislaine was hanging out with seniors at a very fancy private girl's school on
the Upper East Side and that she was introducing these girls to Jeffrey. Just seemed deeply
weird. Why would she be dating a guy who liked younger women?

32.20
EUAN RELLIE: Girls I knew had talked about being invited for tea and they didn't always want to
talk more than that. So I got the sense, at the time that there was something.a bit strange.

33.50
CHRISTOPHER MASON: In retrospect, it seems so horrific to think that we were hearing about
this, and we weren't outraged. But honestly, it just seemed like…flirtation. But what the hell was
I thinking? What were we all thinking?

[NY - CARS HONKING]
34.17
CHRISTINA OXENBERG, WRITER, GHISLAINE MAXWELL ACQUAINTANCE: In 1997,
Ghislaine had contacted me and asked me to meet her at her apartment. [GRIM MUSIC

NETFLIX  - GHISLAINE MAXWELL: FILTHY RICH  AIRED 25 NOV 2022
TRANSCRIPT W/P im

PLAYING [ELEVATOR DINGS]. She started off very confident, saying, "I'm going to change your life. I'm gonna give you a lot of money, and you're going to meet everyone" And then she asked me to help her write her book. She says,'I want you to live with me for a full year so you can learn everything about me." She's staring out the window somewhat dramatically. She says, 'you have to write this book for me,' she says, 'because I want Jeffrey to marry me." And she says  'I need for Jeffrey to see me in a more elevated light, and I believe that with this book that will be achieved. And then she starts to tell me that Jeffrey has been medically diagnosed by the best doctors in the world,  and he needs three orgasms a day. At this point I realize [chuckling], Am I on drugs? Is she on drugs? What is going on? I'm also thinking to myself, which chapter does she want me to put that in? I mean, is this for real? Then she says she picks up three girls a day for Jeffrey. And the phrase she used, which she thought explained it all was, I cannot keep up with his needs. I drive around. I search for a girl that looks like Jeffrey's type. And then I go and make a deal and ask them if they'd like to give him a massage for a couple of hundred bucks." And I say, 'Who are these girls? Who are you talking about?" And she says, and this is such a reveal. She says, 'They are nothing. They are trash." And it tells you everything. It tells you everything about how she compartmentalized people. I mean, she's not even acknowledging them as human beings. And of course I didn't know we were talking about children. Had I, I would have called the police then.

36.50
ROBERT COUTURIER: I think that society people are quite protective of their own. You know, if somebody you know has secrets that - - Secrets ought not to be talked about. People would tend to be silent.

37.10
GRAPHIC - 1997 SPINS FORWARD TO 2021 [FOREBODING MUSIC PLAYING]
GR[APHIC: METROPOLITAN DETENTION CENTER, BROOKLYN, NY

[REPORTER 1]: Ghislaine Maxwell has been in the Brooklyn jail cell since her arrest in July of last year.
[REPORTER 2]: And as the world awaits her fate, we're all wondering will this formally missing puzzle piece sing like a bird or suffer in silence.

REPORTER QUESTIONING DAVID BOIES: There are those who say she might have "other dirt" on other powerful men. Thoughts on that?

37.55
DAVID BOIES, CHMN BOIES SCHILLER & FLEXNER: No question about it. Maxwell knows where a lot of bodies are buried. If I was somebody who had participated in their sex trafficking, um I would not be sleeping easily tonight. Now she's at the top of the pyramid and if she doesn't do a plea deal, she is facing maybe the rest of her life in jail. Unattractive though it may be, at some point you have to face reality.

14

NETFLIX  - GHISLAINE MAXWELL: FILTHY RICH  AIRED 25 NOV 2022
TRANSCRIPT W/P im

38.21
BRAD EDWARDS, SURVIVORS ATTORNEY: There is going to come a point in time, if it has
happened already, and I'd be shocked if it hasn't', when the prosecutors are going to offer her
some plea deal.  I don't know what Ghislaine Maxwell's pain threshold is, if she's gonna roll the
dice and go to trial. But if it seems like something that's tolerable to her and less than what she
would likely get if she goes to trial and loses, I'd imagine that Ghislaine Maxwell is going to
consider taking it because the credibility of the victims testifying against her is very high.

GRAPHIC 2021 SPINNING BACK TO 1996

39.13
ANNIE FARMER, SURVIVOR: I knew of Epstein and Maxwell before I met them, because my
sister, Maria was working for Epstein, and she had described him as a very generous patron of
the arts and someone who was interested in supporting people who were pursuing higher
education.  One of the things Epstein brought up was that it might be beneficial for me to do
something to make my college application stand out. And so he talked about taking a trip
abroad. He said he would financially help me with a trip like that, and I was really excited about
that possibility.

GRAPHIC: STANLEY NEW MEXICO, ZORRO RANCH:

ANNIE FARMER CONTINUES: And so arrangements were made for me to fly to New Mexico to
meet with Epstein and Maxwell on Epstein's ranch. They were both really warm and excited for
me to be there and immediately started giving me a tour of the property. It was very impressed
and right away I felt swept into this world of theirs but I soon realized that I was the only other
person staying at the ranch with them and tried to just, you know, convince yourself that this
was normal, and this would still be a good experience.  They took me into town to a western
store where they had me pick out some cowboy boots. So they really made a lot of effort to
make me feel special.  But once we returned from shopping there were moments when things
were very uncomfortable. One was when Maxwell said that it was important that I learn how to
rub Jeffrey's feet. So she took one foot and showed me how to massage them and I uh, you
know, was not... was not wanting to do this,  but it seemed like this was just expected. Maxwell
talked quite a bit about massage generally and she said that she would be happy to give me a
massage. Eventually I said OK and so she got out her massage table and set it up in my
bedroom and asked me to undress and lay on the table. Once I was on my back and she had
pulled the sheet down, she touched my breasts. And I felt very uncomfortable you know and
was, you know, just thinking about wanting to get off of that massage table and have this be
done.

41.47 ANNIE CONTINUES:
The next morning Jeffrey came into my bedroom and uh, said that he wanted to cuddle with me.
And so he, you know,  got into bed with me and held me from behind. This was now a situation
that I knew in the pit of my stomach was  not right. That was very scary, because I realized that I
was very isolated. I didn't know what else might happen next. I just wanted to try to get away as

NETFLIX - GHISLAINE MAXWELL: FILTHY RICH  AIRED 25 NOV 2022
TRANSCRIPT W/P im

soon as possible. This incident of course did affect me.  It was over 25 years ago, and it's
heartbreaking how different if someone had listened when my sister reported Epstein and
Maxwell.

GRAPHIC 1996  SPINNING FORWARD TO 2021  [foreboding music, wind gusting]

PALM BEACH, FLORIDA

42.36
[WOMAN] This is the victim file. I wanna
RANDEE KOGAN, PSYCHOTHERAPIST: I began working with survivors of Jeffrey Epetin in
2007. I had two survivors referred to me by the FBI. And then I had the opportunity of getting to
know some of the attorneys in the area who were working with victims, who referred more
victims to me. I have treated survivors who have been manipulated by Ghislaine.With the
upcoming trial being only months away, I'm really concerned about how significant the triggers
are going to be for the survivors. When Jeffrey Epstein was arrested again in 2019, a number of
the survivors returned to therapy, because many of their memories were triggered. Many were
experiencing a number of trauma reactions and flashbacks, and it brought them back to the
abuse that they endured by Jeffrey and Ghislaine. Hearing Ghislaine Maxwell's name on the
news can produce memories. These triggers can have all of these symptoms to resurface.
When somebody has been sexually abused, it doesn't matter if it was 20 years ago or 50 years
ago. This is something that will never be forgotten.

GRAPHIC 2021 SPINNING BACK TO 1994

44.17
ELIZABETH STEIN: After the assault in that hotel room, I wanted to completely forget Ghislaine
Maxwell and Jeffrey Epstein. So, I went to another high-end retailer in Manhattan. And I wasn't
there for very long when Ghislaine Maxwell came into the store one day. And I asked her, 'how
did you find me here?' And she said that some of the people that I worked with had told her that
I had moved on. She again encouraged the friendship. Uh, we started talking again. And she
began to invite me out socially. And I tried to stave off her advances. I tried to make excuses for
why I couldn't do things. But she knew everyone in fashion, and I understood how important it
was for my future to not upset them. One minute I was Ghislaine's best friend and the next
minute, I was her worst enemy. She was making me question myself so that she and Jeffrey
could use me for their purposes. But I knew what was happening between us was not right.
Every time I tried to get away from them, they found me. I would change phone numbers,
locations. There was nothing I could do to get away from them. So there was a lot of fear, and
they were connected to some of the most powerful people in the world. I knew that if I told
anyone, my life was in danger. I think the pursuit of me was definitely a game to Ghislaine and
Jeffry. And finally after three years of harassment, Ghislaine and Jeffrey stopped pursuing me.

NETFLIX - GHISLAINE MAXWELL: FILTHY RICH  AIRED 25 NOV 2022
TRANSCRIPT W/P im

46.16
EUAN RELLIE: Ghislaine was in love with Jeffrey. She was so spellbound by him. And my impression was Ghslaine would have done anything for... for Jeffrey.

46.23
LADY VICTORIA HERVEY: I always, like, thought it was really weird that they never ended up, you know, getting married. I did think it was strange, like, you know, what is going on in this relationship?

46.31
EUAN RELLIE: But Ghislaine also played this kind of hybrid role as social fixer, social secretary and the notion was that they had dated, but some time in the late 90s they stopped, but now they were best friends. The way that it felt that she was doing the job of a wife

46.55
ROBERT COUTURIER: The way that you know she was doing the job of a wife without, you know, having an intimate relationship with him any more.

PETRONELLA WYATT: I think she was too old. Jeffrey Epstein.  He really liked younger women. But there was this bond between them, and she needed money. She couldn't feel secure without Epstein's money.

ROBERT COUTURIER: It felt that she was entrapped in that whole thing. It was the price that she had to pay. She basically played a role of a madame.

[SOMBER MUSIC PLAYING]  ][WIND GUSTING]
GRAPHIC: PALM BEACH, FLORIDA

47.43
RANDEE KOGAN: Ghislaine didn't only groom underaged girls. Many, many victims were just barely the age of consent. Yet considered adults legally, so they can't testify in Ghislaine's upcoming trial. A victim who is over the age of 21, they feel it is their responsibility, and they made the decision. They blame themselves. And these women often have a harder time coming forward to get help, or talk about what happened.

[WOMAN] : It is the first time I am speaking out.

48.00
"MARY", SURVIVOR , VOICE ALTERED TO PROTECT IDENTITY [ISABEL_ALLEGED VICTIM NOT READY TO GO PUBLIC, SHOWN ONLY IN SILHOUETTE]: I want to tell my story but I'm just not ready to completely expose myself.  I have gone through therapy and I wanted people to know that it's OK to talk about it. [OVER FILE FILM OF EPSTEIN'S PALM BEACH HOME] In

NETFLIX - GHISLAINE MAXWELL: FILTHY RICH  AIRED 25 NOV 2022
TRANSCRIPT W/P im

my twenties, I was a licensed massage therapist, and that's when I first met Jeffrey and Ghislaine. Ghislaine asked me to do things while I was massaging Jeffrey. And I said I didn't feel comfortable, and she's like, 'Well why wouldn't you? This is what a man needs in order to have a complete massage." And I just felt as though I couldn't say no because I was abused when I was younger. So when the abuse started, I did exactly what I did when I was a little girl. I just detached and i just did it. When you've been abused younger, you don't have the ability to just say "No". There were times when I was exposed to someone other than Jeffrey. Some were CEOs and founders of large, well-known brand companies. Some were politicians. And the expectations were, do what you do for Jeffrey. Ghislaine got off on this. She empowered herself with that, that she was also going to make these high-powered men happy. She was being validated. Felt as though Ghislaine was worse than Jeffrey.

One time I was finished giving Jeffrey a massage and Ghislaine came in and I was not expecting her. She handed me the $200 and then she started taking off my clothes. Then she proceeded to start things... I didn't want to happen. And...I was just numb. I didn't have any words. [voice breaks].  That's why, when all of this came out, I remember it's not so much Jeffrey as it was Ghislaine because she was just the one that was guiding it all, and leading it all. And I just kept talking to myself through this and holding back the tears. The whole thing just sucks. [sobs, sniffles] [somber music playing]

51.17 RANDEE KOGAN
 Female abusers comprise about 5% of the sexual crimes that are reported. Um, so it's a low number.  Ghislaine Maxwell doesn't necessarily fit the mold of a female abuser. You know, class can cloud reality.  So somebody who looks like Ghislaine, well-dressed, beautifully put-together, it will give more victims the opportunity to relax and let their guard down. This one is good. That's ready [handing assistant files]. So it was very easy for Ghislaine, because of how she presents herself, to take advantage of these victims and groom them so successfully. Based on the survivors that I treat and with everything that I have read about Ghislaine, Ghislaine exhibits characteristics of that of a psychopath. Characteristics like inability to maintain healthy relationships, uh, manipulation, deception, bullying. She also exhibits signs of a narcissist. That sense of entitlement, the sense of, "I want power and control at any cost".

GRAPHIC: EIGHT MONTHS BEFORE TRIAL, MARCH 2021
[reporter] : A Judge has denied bail for Ghislaine Maxwell with the concern that she is a flight risk. The judge in the case determined that Maxwell still has international connections, funding, and experience evading detection.


52.50:
SIGRID MCCAWLEY, ANNIE FARMER'S ATTORNEY: Six times thus far, bail has been denied in Ghislaine Maxwell's case. And the basis for that is a number of things. She is charged with crimes against minors and that does have a much higher standard with respect to getting bail.

NETFLIX - GHISLAINE MAXWELL: FILTHY RICH  AIRED 25 NOV 2022
TRANSCRIPT W/P im

53.03
KATE BRIQUELET, SENIOR REPORTER THE DAILY BEAST: In the eyes of the public
Ghislaine is a monster. And so Ghislaine's family needed a way to counteract this narrative. And
they built a website called realghislaine.com
FILE FILM VIDEO OF IAN MAXWELL SPEAKING TO CAMERA ON THE WEBSITE: "Imagine
yourself arrested and imprisoned in solitary confinement, deprived of bail for nine months.
Whatever your feelings about the allegations, she's entitled to a fair trial, to due process and the
presumption of innocence. My brothers and sisters and I will never stop fighting for Ghislaine.

53.37 [ISABEL - VOICES OF DAVID BOIES & SIGRID MCCAWLEY OVER FILM OF THE
BOIES SCHILLER OFFICES]:

DAVID BOIES: We've got what looks like a new development.  Uh you may have missed seeing
this already asking. Maxwell's lawyers are asking for all of our files.  A lot of discovery that they
are not ever entitled to get.

SIGRID MCCAWLEY: It looks incredibly broad, I mean they're seeking all of our files for all of
the victims that we have ever represented.  That would be you know, giving over records of
individuals who weren't even ever public.

DAVID BOIES: They don't have a right to pour through our files and just see what they can find
to embarrass some of our clients. It's a fishing expedition. They don't know if there's anything
there. They just figure the more stuff they get, maybe they'll find something they can use. And I
..And I...And I think to some extent it shows the Court how desperate they are.

54.24
GRAPHIC, AUSTIN TEXAS [pensive music playing]

ANNIE FARMER: I hope Maxwell is held accountable and that she sees jail time for what she's
done.  But we know that she has a history of evading uh... evading justice.

54.42
JOHN GRUBER, HUSBAND OF ANNIE FARMER: Annie first told me about Epstein and
Maxwell in 2004. So, I've seen Maxwell I have been a big part of our lives for years.  I've been
married to Annie for 14 years and we met 18 years ago in Bethel, Alaska where she was a
children' advocate. And it took me kind of years to get to a point where I kind of understand how
best to support Annie.

55.11
ANNIE FARMER: I'm definitely nervous, as it gets closer, I'm a little more nervous. I did talk to
Sigrid and I think we're gonna have a conversation with the government attorney sometime
soon. It's hard not to feel some pressure just 'cause I know so many people er want to see
justice.

NETFLIX - GHISLAINE MAXWELL: FILTHY RICH  AIRED 25 NOV 2022
TRANSCRIPT W/P im

55.36.JOHN GRUBER: Is there any, like  feedback they've given you, like advice in terms of being on the stand?

ANNIE FARMER: Well I think mostly to slow down.

JOHN GRUBER: Yeah, that makes sense.

ANNIE FARMER: And just to really listen to the questions because, especially during cross examination, right. They try and confuse you, ask you things that, um, might throw you off. I want to do as good a job as I can in telling my story clearly so that the jury understands this predatory behavior and that she's held accountable.

JOHN GRUBER: I think you'll do great.

GRAPHIC, 2021 SPINS BACK TO 2000, [Foreboding music playing] PALM BEACH, FLORIDA

56.20
BRAD EDWARDS, SURVIVORS ATTORNEY: Jeffrey Epstein had a very precise system for grooming and abusing young girls and that was a system that was established through Ghislaine Maxwell and for a time period in Florida, Ghislaine was able to introduce Jeffrey Epstein to young females and these people start being abused by Jeffrey Epstein and the pyramid begins. Those females were instructed to go get other females and it began growing into this sex trafficking operation.

56.40  GRAPHIC, PALM BEACH
TARA PALMERI, HOST PODCAST, POWER: THE MAXWELLS: Starting in the early 2000s, the local police in Palm Beach became aware of Jeffrey Epstein. There was suspicious activity. There were young girls in taxis crossing the bridge from West Palm Beach to the very wealthy Palm Beach.  He had actually created a sex trafficking scheme in a local high school and it was starting to get out.

REPORTER 1: [OVER PRESS HEADLINES ["Eptein was indicted last week"]: A New York billionaire with a home in Palm Beach is at the center of a scandal. He is charged with soliciting a prostitute.

REPORTER 2: A 22 page probable cause details in graphic language, alleged sexual encounters between billionaire Jeffrey Epstein and several under 18  girls at  his  $7 million dollar home at 358 El Brillo Way home in Palm Beach.

57.34
DAVID BOIES: When Epstein was first arrested it is hard to know why Maxwell was not arrested at the same time.

57.54.

NETFLIX - GHISLAINE MAXWELL: FILTHY RICH  AIRED 25 NOV 2022
TRANSCRIPT W/P im

BRAD EDWARDS: One of the detectives that I deposed testified that he attempted to contact and interview Ghislaine Maxwell and got no cooperation.

58.00
SIGRID MCCAWLEY: But her name is listed in the police materials. She's on bank accounts with that house in Florida.  She's in message pads going back-and-forth showing that she's at the location even though she says she wasn't. And that's why investigators were interested in trying to talk to her.  How she evaded it is another story.

58.27
DAVID BOIES: Epstein himself got essentially a slap on the wrist. He spent just over a year in jail. This was one of the worst miscarriages of justice that I've seen.

REPORTER # 3: A secret Non Prosecution Agreement kept Epstein and his co-conspirators from being charged with federal sex crimes in the Southern District of Florida

58.53
SIGRID MCCAWLEY: And that's the story hear that we've seen gone for so long of power and privilege  - that the powerful and the privileged were able to avoid being held accountable in this circumstance.

59.00
BRAD EDWARDS:  The person Jeffrey Epstein wanted to protect the most was Ghislaine Maxwell. He had to know that if Ghislaine Maxwell ever flipped on him, then he was cooked. She essentially stopped coming to Florida and began to create significant buffers between her and Epstein. But we know that there was still a relationship between Ghislaine and Jeffrey because we have pictures of them in 2006 and 2007.

59.23
SARAH RANSOME:  I was 22 years old when I first met Ghislaine in 2006. These are the photos that were taken during the time that Ghislaine had said that she was slowly phasing out of Jeffrey's life and my photos clearly indicate that that was not the case. Ghislaine was very much a part of Jeffrey's life.  Ghislaine was always on her phone, always organizing. At this stage, Ghislaine didn't need to go on the prowl for new victims for Jeffrey because Ghislaine effectively started training and recruiting other girls, and then they would train and recruit other girls. I was in a nightclub when I was targeted and befriended by a girl my age. A couple days later, my new friend invited me to join her and another group of girls to go to the Virgin Islands. And the island was owned by Jeffrey Epstein. I remember Ghislaine getting off the helicopter and I said to her, 'Hi, I'm Sarah.' and she looked me up and down as if I was invisible, as if I didn't even exist. I'd been on the island for a few days. I was sitting on the patio and Ghislaine marched over and grabbed my arm and forced me into Jeffrey's room where I was raped. She knew exactly what was going to happen to me. She is as guilty as Jeffrey if not more.

NETFLIX - GHISLAINE MAXWELL: FILTHY RICH  AIRED 25 NOV 2022
TRANSCRIPT W/P im

1.01.18
DAVID BOIES:  So many young girls were abused during that period of time. There was an
arrogance there. They just thought they were above the law. They'd gotten away with it so long,
for years and years, hiding in plain sight the sex trafficking that was going on.

1.01.43
TARA PALMERI: But life changes dramatically for Ghislaine when in 2011, when an underaged
victim named Virginia Roberts decides to come out publicly and  name Ghislaine Maxwell as
Epstein's partner in crime. [tense music playing]

1.01.48
SIGRID MCCAWLEY: In 2000, my client, Virginia Giuffre, was recruited by Ghislaine Maxwell at
Trump's Mar-a-Lago and brought to Jeffrey Epstein for purposes of sexual abuse. And in 2001,
Ghislaine Maxwell and Jeffrey Epstein flew Virginia over to London, and they introduced her to
Ghislaine Maxwell's good friend, Prince Andrew.

REPORTER 1: I want to begin with the scandal that has the Royal Family in an uproar  -
allegations that Prince Andrew had sex with an underage girl.

1.02.24
SIGRID MCCAWLEY: There is a photograph that has been widely circulated, that was taken of
her and Prince Andrew and you can see her standing with Prince Andrew and then Ghislaine
Maxwell in the background. And that's when the focus also shifted to  Ghislaine Maxwell .

FILE FILM OF J OURNALISTS FOLLOWING GHISLAINE MAXWELL IN NEW YORK AND
ASKING QUESTIONS: Can I ask you about all the allegations that have come out, Ghislaine?
GHISLAINE MAXWELL:  Happy New Year

REPORTER 2: Can…Obviously they are very damning, involving British royalty. Have you got
no comment at all?

GHISLAINE MAXWELL:  I've made a statement, thank you.

Reporter #2: Do you know Virginia?  Can you at least say if she's been in your house?

1.02.40
EUAN RELLIE; Ghislaine's reputation was in tatters.  She was a broken woman, and she
seemed to be desperately trying to repair her reputation.

1.03.14
CHRISTOPHER MASON: She invited me over to her townhouse on the Upper East Side and
she was talking in this very fevered passionate way about saving the world's oceans.
FILE FILME OF GHISLAINE MAXWELL SPEAKING AT TED

NETFLIX - GHISLAINE MAXWELL: FILTHY RICH  AIRED 25 NOV 2022
TRANSCRIPT W/P im

GHISLAINE MAXWELL: I'm passionate about the ocean, the deep sea and the wild animals that live there. The ocean is essential to life on earth, yet despite the ocean's importance to us, we know so little about it. In 2012 I founded the TerraMar Project

1.03.32
CHRISTOPHER MASON: So this was a new topic for Ghislaine. The TerraMar Project was her great cause.  This was something she was doing for the planet for humanity.

TARA PALMERI: So while Ghislaine was still welcome in high Society and she had her charities and she's speaking on these panels about saving the ocean, she appears to be repairing her image.

GRAPHIC UNITED NATIONS FEBRUARY 4, 2014:
FILE FILM OF GHISLAINE MAXWELL: Your Excellencies, presidents, lords, ladies and gentlemen, um I just would like to thank you so much. It's such an honor to be here.

CHRISTOPHER MASON: TerraMar was linking herself to a cause that was much greater than herself. It seemed a whole lot more respectable than being the former girlfriend of Jeffrey Epstein .

GRAPHIC: KIAWAH ISLAND, SOUTH CAROLINA

1.04.33
COLE HONS, MEDIA PRODUCER: I met Ghislaine Maxwell at a conference. Uh, it was at Kiawah Island, outside Charleston, South Carolina, in February, 2014.  She was very elegant , very put together. She's very confident. She just told me all about TerraMar and everything she said to me was completely convincing.  I'm a media producer and a marketing professional and Ghislaine floated this idea like we really need like a one-minute promo, you know, to get people to sign this pledge to save the ocean. I was like, just shoot something, like, while I'm here." So after we had come up with the idea for her one-minute promo, we're like, great, let's go have a drink. Now we are at the hotel bar. That's when things got a little weird. I think I said, youknow, "What are you wearing tomorrow when we shoot you down by the beach for this promo?" And she said, "Well, I've got my TerraMar T-shirt that I'm presenting in. You know, like 'I heart the ocean." I was like, "That's perfect." And then she goes, "You know, you should see me in my full-length leather outfit, you know, with my weapons." And I just kind of dumbly stared at her, like, "What is she talking about?" She had an incredibly electric sexual energy about her.  She turned to me and she said, uh "You know Laura Croft from Tomb Raider?" She's like, "Well, I'm the real-life version." And then she gave me this look, right? I was really taken aback.  There was something just a little creepy, something just a little off.

So we met in the lobby the next morning. She's wearing stiletto heels.  And I don't know what she thought about us shooting down on a beach or what it was going to be, but she ended up like, walking down to the ocean and back in these stiletto heels. I was trying to have a vision of, like, "Show me your love of the ocean"

23

NETFLIX  - GHISLAINE MAXWELL: FILTHY RICH  AIRED 25 NOV 2022
TRANSCRIPT W/P im

GHISLAINE MAXWELL FILM TO CAMERA: Show your love of the ocean. Sign the pledge.
Thank you.  Again? [asking the producer]
[REPEATS]

COLE HONS, MEDIA PRODUCER: But it ended up kind of absurd. It was almost like a glamor
shoot. The irony of her trying to reinvent herself with the ocean and then just being the
same…the same person. You know, none of us can run away from ourselves you know? None
of us can run away from our past , none of us can run away from our actions.

1:07.35
GRAPHIC: 2014 SPINS FORWARD TO 2021 [foreboding music playing]
TRIAL DAY 1, NOVEMBER 29, 2021

[REPORTER 1]: Victims of sex trafficker Jeffrey Epstein are finally getting their day in court.
Opening statements in a trial that is expected to last six weeks, begins today.

[REPORTER 2]: And it is one of the most eagerly anticipated criminal trials in years.

FILE FILM BOBBI STERNHEIM WALKING TO COURT: Good Morning everybody. It's going to
be a great day.

MALE PROTESTOR;  We, the people, deserve to know. We deserve honest and fair and ample
coverage of the trial of the century.

[WOMAN REPORTING IN ITALIAN]:

[WOMAN REPORTER]: This is a case that has international attention.

[REPORTER IN FRENCH]

[REPORTER IN DANISH]

KATE BRIQUELET, SENIOR REPORTER, THE DAILY BEAST: People all over the world are
going to be watching.

1.08.40
SARAH RANSOME [getting into car to go to the trial] I hardly slept a wink last night. I was up
every hour. It was important for me to be here to show solidarity to the survivors that are
testifying. They are so brave and courageous, and they're standing in their truth and they are
not backing down.

[Reporter 2]: If she's convicted of all six charges leveled against her, she'll likely die in an
American prison, so it's an incredibly high-stakes trial clearly for Ghislaine Maxwell.

24

NETFLIX - GHISLAINE MAXWELL: FILTHY RICH  AIRED 25 NOV 2022
TRANSCRIPT W/P im

1.09.03
CHRISTOPHER MASON: This has been one hell of a saga, leading up to this moment. The
charges seem so utterly devastating.
1.09.19
VOICE ACTOR FOR LAURA POMERANZ, PROSECUTOR: Ladies and gentlemen, members
of the jury, during the course of the trial, you will learn that the defendant and Epstein lured their
victims with the promise of a brighter future, only to sexually exploit them and forever change
their lives. She knew exactly what she was doing.  She was dangerous. She was setting young
girls up to be molested by a predator.

1.09.45
VOICE ACTOR FOR BOBBI STERNHEIM, DEFENSE ATTORNEY: Ever since eve was
tempting Adam with the Apple, women have been blamed for the bad behavior of men. The
charges against Ghislaine Maxwell are for things that Jeffrey Epstein did.  But she is not Jeffrey
Epstein. She's not like Jeffrey Epstein.

1.10.11
SIGRID MCCAWLEY: In opening statements, the defense lawyers used biblical references
talking about Adam and Eve and trying to paint Ghislaine Maxwell as a scapegoat because she
is a woman. That was really offensive to hear, trying to allow Ghislaline Maxwell a pass because
she's a woman, was really something below the belt.

[REPORTER 1]: An accuser of Ghislaine Maxwell, a woman known as "Jane", began testifying
today.

1.10.40
BRAD EDWARDS, VICTIMS ATTORNEY:  Jane was chosen as one of the testifying victims for
many reasons. She was extraordinarily young when she was recruited by Ghislaine Maxwell.
There was direct abuse, not just grooming, but direct abuse by Ghislaine Maxwell.

1.11.00
[REPORTER 2]: Jane claiming her first sexual contact with Epstein was at his palm beach
house in 1994 when she was just 14.

1.10.54
SIGRID MCCAWLEY: Her story was really hard to hear cause it included multiple offenses over
many years, with not only Ghislaine Maxwell but with others. [unsettling music playing]
And then the Defence was relentless and their attack of her, because her background is that
she is an actress and so they tried to use that against her.

ACTOR'S VOICE OF LAURA MENNINGER, DEFENSE ATTORNEY·  Jane, you're able to cry
on command ?
[voice actor for "JANE": No, not always, it's not really how it works.
[voice actor for] LAURA MENNINGER:  Are you acting here today?

NETFLIX - GHISLAINE MAXWELL: FILTHY RICH  AIRED 25 NOV 2022
TRANSCRIPT W/P im

[voice actor for "JANE": No.

1.11.46
SIGRID MCCAWLEY: The defensive strategy is memory manipulation and money.  [GRAPHIC OF : MEMORY
        MANIPULATION
        MONEY
They're trying to say that these witnesses are only trying to manipulate people and are after money and they really pressed some of the details.

1.12.05
BRAD EDWARDS: When Jeffrey Epstein died there was a victim compensation program set up. During the testimony it was revealed for the first time publicly that some of the determination through the program were in the millions of dollars for victims.

[voice actor for] LAURA MENNINGER: How much money does the fund award you?

[voice actor for "JANE":  $5 million.

1.12.28
SARAH RANSOME: The defense made me really angry. I found the defense, uh, incredibly victim-shaming, and I think we're in the era where victim-shaming and victim-blaming really news to stop.

1.12.52
CHRISTOPHER MASON: It's kind of a night and day,  or in this case "day and night" difference, I wanted this case day and night difference because in the morning, I've, I entered the courtroom pretty convinced that she was going away for a long, long time. But when  the defense began, I have to say I was astonished. Trying to imagine how the jury was reacting to hearing these…huge amounts of money. It has to be feeling like sunshine for Ghislaine Maxwell at this point.

[man] Hey, guys, Move out of his way, please


1.13.51
[FILE FILM OF KEVIN MAXWELL SPEAKING WITH ISABEL OUTSIDE THE COURT AFTER DAY 1:] I am very pleased to have attended uh, today in court, in person, together with Isabel, and in support of our sister Ghislaine. On a personal note, it was a tremendous… gave me a tremendous sense of relief, to be close to her. Uh, to actually see her in the flesh, uh even to be able to speak to her. And that's the first time that I've spoken to her personally in over 500 days, uh, since her pre-trial detention started.

REPORTER 1: How is Ghislaine holding up, Kevin?

NETFLIX  - GHISLAINE MAXWELL: FILTHY RICH  AIRED 25 NOV 2022
TRANSCRIPT W/P im

REPORTER 2: What did she say to you?


1.14.01
ROBERT COUTURIER, INTERIOR DESIGNER, GHISLAINE MAXWELL'S FORMER FRIEND: I
understand why her brothers can't recognize that  something evil ever happened. How could
you recognize something like that? And I think you have to protect your own, especially your
own family.  It's not that you want to find excuses for the evil that people have done, but you try
to understand where they come from.

GRAPHIC: 2021 SPINS BACK TO 1966 -
1966 CHRISTMAS SPECIAL

1.14.48
OVER FILE BLACK AND WHITE OLD DOCUMENTARY OF MAXWELL FAMILY AT
HEADINGTON HILL HALL,  XMAS TIME - NARRATOR: Once upon a Christmastime, in a big
house on a hill, there lived a man and his wife and their eight children.
[GHISLAINE AGED 5 SPEAKING] When Father Christmas came last year, I was fast asleep
and he put-- I took my daddy's stocking away from his bedroom, then I hung it up on my bed,
then Father Christmas put some toys in my daddy's …in my daddy's stocking.


1.15.00
TARA PALMERI, PODCAST HOST POWER: THE MAXWELLS: A really big part of the image of
Robert Maxwell was that he had a perfect family.  No one really knew that behind closed doors it
was actually very dysfunctional.


1.15.15
MICHAEL MALONE:  Betty told me that the children had to stand up at the dinner table and tell
their father what they had done during the course of that year, and what they were hoping to
achieve. And then, if he didn't like what somebody had said, he's whip them with a belt, they
had to write a letter to their father of apology.


1.15.44
MIKE TULLY, SPECIAL ASSISTANT TO ROBERT MAXWELL:  I remember well… I met
Ghislaine for the first time in September 1984. She was about 22 at the time. It was at a regular
Sunday lunch at Headington Hill Hall with business executives that Robert invited and Maxwell
was presiding that rather as.. As a  Roman Emperor or Henry VIII, this sort of large figure.  But
kneeling at his knee was Ghislaine.  And she was sobbing, um, very, very profusely and
dramatically.  There was snot. I mean this girl was crying her eyes out, trying to persuade her
father to agree to something. And he was ignoring this. And this went on to the embarrassment
of everyone else who was there, but everyone was just completely ignoring this bizarre sight.
I think with Ghislaine that her affection for her father was unconditional and that the urge to
please him was probably a huge driving force. And you know, perhaps she devoted the same
sort of acclaim that she had to her father, to Epstein instead.

NETFLIX - GHISLAINE MAXWELL: FILTHY RICH  AIRED 25 NOV 2022
TRANSCRIPT W/P im

GRAPHIC: 1983 SPINS FORWARD TO 2021 [foreboding music playing]
GRAPHIC: TRIAL DAY 6, december 6, 2021
[reporter] And now, to week two of Ghislaine Maxwell trial, here in Manhattan. Today, another woman is going to testify about her decades long interactions with Maxwell and the late Jeffrey Epstein.

1.17.10
BRAD EDWARDS: My client Kate is protected and she's able to proceed under a pseudonym. And Kate was first abused by Jeffrey Epstein when she was 17.  And she was abused for many, many, many years. Kate was a teenager, an aspiring British model, a talented musician, just a brilliant person.  In fact, she was accepted to Oxford.  Ghislaine had gone to Oxford so Ghislaine in a lot of ways, was everything Kate wanted to be.  And one of the first things that Ghislaine told her was that she had this very powerful boyfriend who was a philanthropist, who could assist Kate in getting her foot in the door in basically any industry you wanted.  What was originally an innocuous introduction to Jeffrey Epstein had her in the devil's den being abused in no time, and then with literally no realistic way out.

1.18.31
VOICE ACTOR FOR  LAURA POMERANZ, PROSECUTOR: Did Epstein engage in a sex act with you during the massage?

1.18.16
VOICE ACTOR FOR "KATE": Yes

LAURA POMERANZ: After it ended, where did you go?

VOICE ACTOR FOR "KATE":  I left the room and started walking down the stairs

VOICE ACTOR FOR LAURA POMERANZ: And who if anyone did you see?

VOICE ACTOR FOR "KATE": I saw Ghislaine.

VOICE ACTOR FOR LAURA POMERANZ: What, if anything, did Maxwell say?

VOICE ACTOR FOR "KATE": She said, 'How did it go?' Did you have fun? Was it good? She seemed very excited and happy. She thanked me again.

1.18.52
BRAD EDWARDS: ; My strategy for preparing Kate for the trial was pretty simple - just tell the truth and don't worry about all of the other nonsense that Ghislaine Maxwell is going to throw your way to try to discredit you. It's not gonna work.

VOICE ACTOR FOR BOBBI STERNHEIM: Now you've testified there was a period time,  I think upwards of ten years that you used drugs, correct ?

28

NETFLIX - GHISLAINE MAXWELL: FILTHY RICH AIRED 25 NOV 2022
TRANSCRIPT W/P im

VOICE ACTOR FOR "KATE": Yes.

VOICE ACTOR FOR BOBBI STERNHEIM: Fair to say that using and abusing those substances over a ten-year period has had an impact on memory correct?

VOICE ACTOR FOR "KATE": It has not had an impact on the memories that I have always had.

1.19.31
BRAD EDWARDS: I'm very proud of Kate and many of the other, uh, clients and victims and survivors that were willing to come forward and many who did, so...She, she... she was what she always is, just a completely honest person. I think that the most significant contribution that Kate made to the trial was explaining how Ghislaine Maxwell specifically invoked the grooming process in a way that facilitated Jeffrey Epstein that particular perpetrators ability to abuse little girls. I would believe the jury had a lightbulb go off and appreciate, 'Oh wait. Now I understand how this happened.

1.20.10
ELIZABETH STEIN SURVIVOR: They finally caught up with Ghislaine and that is something I never thought I'd live to see happen. And so I wake up at 4 AM every morning to be at the trial. I take the two hour journey from Philadelphia to New York. And every day I wear a pair of Gucci loafers that were given to me by Jeffrey and Ghislaine. And I think that it's important symbolically that I'm taking my journey every day walking in these shoes. [somber music playing]. [OVER FILM OF MULTIPLE SILK SCARVES AND GIFTS AND DRESSES]: These are gifts that Ghislaine and Jeffrey gave me. Over the three years that I was involved with them. This is a gown that I wore to a New Year's Eve party with them. Ghislaine picked it out for me. I realize that some people might not understand why I held onto all of these things for so many years, but it's validating my experience. Having those items really helped me to understand what happened to me and were an integral part of my healing. It's, it's grueling physically traveling for hours to the trial but there is nothing in the world that can stop me from going there every day.

GRAPHIC: TRIAL DAY 7, DECEMBER 7, 2021
[reporter] It is a new day of testimony in the sex trafficking trial of Ghislaine Maxwell, and a third accuser, who's going by the name "Carolyn" taking stand. Carolyn was 14 when Maxwell allegedly set her up for Epstein's abuse that went on for years.

1.22.01
ACTOR VOICE FOR MAUREEN COMEY, PROSECUTOR: What is the last grade you attended before dropping out in Middle School?

ACTOR VOICE FOR "CAROLYN": Seventh

ACTOR VOICE FOR MAUREEN COMEY, PROSECUTOR: Why is that?

NETFLIX - GHISLAINE MAXWELL: FILTHY RICH  AIRED 25 NOV 2022
TRANSCRIPT W/P im

ACTOR VOICE FOR "CAROLYN": Because my mom was an alcoholic and a drug addict.
ACTOR VOICE FOR MAUREEN COMEY, PROSECUTOR: When you were between the ages of 14 and 16, how did you make money?

ACTOR VOICE FOR "CAROLYN": I went to Mr. Epstein's house and got money that way.

1.22.21
BRAD EDWARDS: Whether it was an apartment, or a car, or a phone, they will dangle that carrot in front of them in order to string them along and make them succumb to sexual abuse.

ACTOR VOICE FOR MAUREEN COMEY, PROSECUTOR: What, if any, conversations do you remember having with Maxwell about your bra and hip size?

1.22.50
ACTOR VOICE FOR "CAROLYN": I was upstairs setting up the massage table. And she came in and felt my boobs and my hips and my buttocks and said that I had a great body for Mr. Epstein and his friends.

1.23.09
[reporter] Carolyn becoming emotional several times over the course of her testimony as she detailed the abuse, saying she ultimately went to Epstein's Palm Beach mansion over 100 times. The experience, Carolyn said, contributed to mental health issues and addiction issues that continue to today.

1.23.16
SIGRID MCCAWLEY: Carolyn's story was particularly hard to hear but I think the jury connected with her. She was powerful on the stand. She didn't back down even when challenged by the defense. The defense's strategy has been to really try to attack the victims' credibility, but I think that was going to backfire for them.

GRAPHIC: TRIAL DAY 10
DECEMBER 10, 2021

[reporter 2]: This morning, we're expecting to hear from perhaps the most powerful and compelling witness of all. She's an American woman named Annie Farmer who claims she was sexually abused by Jeffrey Epstein and Ghislaine Maxwell at Epstein's um ranch in New Mexico.

1.24.00
ANNIE FARMER, SURVIVOR: I was outside the courtroom with my husband and my attorney Sigrid and my heart was pounding.  Once the door opened, one of the FBI agents led the way, and I walked into the courtroom. I wanted to make eye contact with Maxwell to communicate that I'm not afraid and that I'm here for a purpose. So I start to walk past the table where she is

NETFLIX - GHISLAINE MAXWELL: FILTHY RICH  AIRED 25 NOV 2022
TRANSCRIPT W/P im

sitting. I did make a point  to look in her direction. And I think that she looked like she was trying
to kind of busy herself by looking down and looking at notes, and she didn't want to make eye
contact.  Sitting up there on the witness stand, I feel very nervous. Physiologically, very nervous.
My feet are sweating profusely, my hands were shaking. I made eye contact with Sigrid and, you
know, she gestured, putting her hand on her heart, um, and I knew, you know, that she
was...she was there with me.

1.25.04
SIGRID MCCAWLEY: Annie kept a journal [ISABEL - DEFENDANT'S EXHIBIT AF-1-R] at the
time that she was abused by Ghislaine  Maxwell and Jeffrey Epstein, and as part of the case
that became evidence at the trial.

1.25.17
ANNIE FARMER:  Maxwell's defense attorneys had me read a portion of my journal in the court
room,  in particular where I was going back-and-forth about how to interpret behavior.  "One
night we went to the movies with Jeffrey Epstein. It was a little weird, one of those things that is
hard to explain...we were sitting next to each other and he put out his hand for me to hold.
Then he kind of caressed, rubbed my arm and shoe/foot . Overall I decided it was no big deal, it
just made me mad because he's being so amazing, paying for a summer program for me,
helping me with college. As a 16-year-old, I was trying to make excuses because in my mind it
didn't fit that he was being so generous and nice and then doing these things to make me so
uncomfortable and violate my boundaries.

1.26.05
SIGRID MCCAWLEY:  The defensive strategy is to use the nuance that when she was trying to
explain to herself in the journal, and say that it wasn't that bad, the defense tried to use that and
say, "Well, it wasn't that bad".

1.26.52
ANNIE FARMER:  Then, as a part of the cross examination, they bring up a brown paper bag
with these cowboy boots in them, the boots that Maxwell and Epstein had purchased for me in
New Mexico back in 1996 and asked me to .... To show them. And I started to realize that what
they were insinuating here is that because they were well-worn, it hadn't in fact, been such a
bothersome memory to me. I actually had worn the boots in order to, you know, to reclaim this
part of my history and not just avoid it or feel stressed when I saw these in the back of my
closet. I think what was most really disgusting to me, was the way that her defense attorneys
tried to minimize and downplay what my experience was.
[OVER GRAPHIC :Q. I want to talk about the full body massage that you described  Her
defense attorneys asked me about this incident. When Maxwell gave me this massage, and she
had touched my breasts, they tried to challenge the language that I used.
GRAPHIC OF TRIAL TRANSCRIPT: Q. In the area of your pectoral muscles; correct?

1.27.26
SIGRID MCCAWLEY: They tried to get her to admit it wasn't the nipples. It was really sort of,

NETFLIX - GHISLAINE MAXWELL: FILTHY RICH  AIRED 25 NOV 2022
TRANSCRIPT W/P im

the outside portions of the breast. But what we are talking about here is a 16 year-old child being rubbed by an adult woman on her breasts, regardless of which part of the breast it is.

1.27.39
It just infuriates me to see someone equating those two and trying to confuse the public about what sexual abuse is.
[somber music playing]

1.27.46
SIGFRID MCCAWLEY: And I think that was just a really powerful moment, to see her on the stand, saying that and speaking her truth.

1.27.57
ANNIE FARMER:  I was just barely making it out of the courtroom before I burst into tears. It took a little while to get composure. My husband came, telling me I'd done a good job and that it was over. And that was really…[sighs] it was really such a huge relief.

[somber music playing]
GRAPHIC: DELIBERATIONS BEGIN, DECEMBER 20, 2021

1.28.39
BRAD EDWARDS [WALKING WITH BRITTANY HENDERSON TOWARDS THE COURT]: You can't ever project what a jury's going to do, but you know they have all of the evidence now so, hopefully, they do the right thing.

BRITTANY HENDERSON: No matter what happens I don't think there's anything more that any of our clients or any of the women could've done, and we're really, really, really proud of them.

BRAD EDWARDS: I agree with that.

1.28.40
[reporter 1]: The case is now in the hands of the jury, and a verdict is possible before Christmas Day, which will be Ghislaine Maxwell's 60th birthday.

[reporter 2]: Just before 10.30 this morning, the jury asked for office supplies including posted, a whiteboard and also asked for the definition of the word "enticement".

KATE BRIQUELET: I know a lot of people are impatient there hasn't been a verdict, they're really putting thought into this and consideration, and I think, if you were Ghislaine Maxwell, you would be happy about that.

1.28.50

NETFLIX - GHISLAINE MAXWELL: FILTHY RICH  AIRED 25 NOV 2022
TRANSCRIPT W/P im

SIGFRID MCCAWLEY:  We were hoping of course that there would be a very quick verdict, but as the days go on, certainly it becomes concerning that there could be a hung jury.

GRAPHIC: DLIBERATIONS DAY 5

[reporter 3] We're standing by, and we may have a verdict any moment or not today, who knows? [tense music playing]

GRAPHIC: AUSTIN, TX.
DECEMBER 29, 2021 - 4.50PM

1.29.34
ANNIE FARMER: I was at home, and I had been trying to distract myself. And so my mom and I decided that we would go thrift shopping. And I didn't realize my ringer was off, and so I looked at my phone, and I had a missed call from my husband, and I had a text message from another Epstein survivor. [TEXT: I heard a verdict has been reached?

REPORTER: I've just rushed out of the courtroom now. To give you a sense of the picture inside that courtroom. Ghislaine Maxwell is sat behind the defense table, as she has been throughout this trial. She's wearing a maroon turtleneck jumper. Judge Alison Nathan took her seat in the courtroom and said, "I have a verdict".

1.30.28
ANNIE FARMER: So I ran into the parking lot and called my husband and he was on the computer and read to me as the verdict  came out.

[reporter 3]: Ghislaine Maxwell has been found guilty of five of the six charges including that most serious sex trafficking charge.  She faces for that charge alone a maximum of 40 years in prison.

1.30.37
ANNIE FARMER: I started crying in the parking lot and jumping up and down, and Sigrid called on the other line.

1.30.43
SIGRID MCCAWLEY: Of course the very first thing I called Annie and we just had an incredible moment.

ANNIE FARMER: I think we both cried together, It was, it was very emotional.

OVER FILE FILM OF KEVIN AND CHRISTINE AND ISABEL COMING OUT OF THE COURTHOUSE
[Woman] Kevin, will you be speaking?

NETFLIX - GHISLAINE MAXWELL: FILTHY RICH  AIRED 25 NOV 2022
TRANSCRIPT W/P im

[man1] Mr. Maxwell?

[man 2] What's your reaction?

[Reporter 1]: Tonight marks the final fall from grace for Ghislaine Maxwell. A jury has decided that she wasn't just a bystander to the sexual offenses by Jeffrey Epstein. They decided that she was, herself, a predator.

[reporter 2] What was her… What was her reaction backstage? Was it emotional?

 1.31.46 KATE BRIQUELET: Ghislaine's reaction to the guilty verdict was a little bit surprising. She didn't break down, she didn't cry or say anything. It just seemed like she took a sip of water and sat down and that was it. Ghislaine is going to go down in history as one of those rare female predators and that's highly unusual.  What is her legacy now?  It's one of disgrace.

GRAPHIC: GHISLAINE MAXWELL VERDICT - GUILTY
SEX TRAFFICKING OF A MINOR
TRANSPORTING A MINOR TO ENGAGE IN CRIMINAL SEXUAL ACTIVITY
3 CONSPIRACY CHARGES RELATED TO SEX TRAFFICKING.

[Reporter 3] The charges that Maxwell has been convicted of include sex trafficking of a minor, transporting a a minor to engage in criminal sexual activity, and three conspiracy charges related to sex trafficking.

[reporters]: Miss Menninger! Miss Meninger!  Will there be an appeals process? Do you intend to appeal this verdict?

1.32.10
FILE FILM OF BOBBI STERNHEIM SPEAKING TO THE PRESS:  We firmly believe in Ghislaine's innocence.  Obviously we are very disappointed with the verdict , we have already started working on the appeal and we are confident that she will be vindicated.  Everyone, be healthy, have a happy New Year.

[reporter 4] How is Ghislaine doing?

1.32.37
SIGRID MCCAWLEY: With counts that Ghislaine Maxwell has been convicted on she could be in prison for up to 65 years so this is really a tremendous verdict for the survivors. It really shows that the jury heard them, believed them and did the right thing by convicting Ghislaine Maxwell.

1.32.55
ELIZABETH STEIN:  For a few minutes I cried uncontrollably. I never thought I'd ever see the day… where she was convicted.

NETFLIX - GHISLAINE MAXWELL: FILTHY RICH  AIRED 25 NOV 2022
TRANSCRIPT W/P im

1.33.05
SARAH RANSOME:  It's very much been a group effort to bring her down. And it's taken many, many years to finally get justice. It's one of the happiest days of my life.
1.33.19
BRAD EDWARDS:  I think I've spoken to over 50 of my clients about this verdict. And one of them put it, I thought, best. She said, "I feel like we've finally been heard."

1.33.31
[reporter 1]: Breaking news out of Buckingham Palace, just weeks after the Ghislaine Maxwell verdict, the fallout continues for a man associated with Maxwell and Jeffrey Epstein.

NEWSCASTER; Britain's Prince Andrew has reached a settlement with his accuser in a sexual assault lawsuit. [anchor] Miss Giuffre had, of course, been suing the Duke of York, claiming that he sexually assaulted her on three occasions when she was 17. The figure that's been touted widely this morning in all the newspapers and outlets is about
£12 million.

1.34.04
TARA PALMERI, PODCAST HOST, POWER: THE MAXWELLS: Prince Andrew settled with Virginia Roberts Giuffre,  and the queen stripped him of his royal title.

[reporter 2]: An unprecedented situation, this, for the Royal Family.

1.34.20
DAVID BOIES: This is the Queen's favorite son. That has been his persona for his entire life. He has been His Royal Highness, Prince of England, and Virginia's lawsuit is important because of that.

1.34.39
ANNIE FARMER: I was so proud of Virginia for fighting to have Prince Andrew held accountable. I could not have imagined that she would, you know,  be able to accomplish this. [somber music playing].
I think it is really important to me to make a statement about how I've  stood up for myself and for other women and girls.  Thank you so much for meeting me here. [at a boot store in austin tx]
JESSIE TEMPLE, ANNIE'S FRIEND:  Of course.

And not being afraid any longer of Maxwell or Epstein and their powerful friends.

ANNIE FARMER TO JESSIE TEMPLE:  I think I told you, they kept my boots, uh, after the trial. And I don't know if I'm getting them back, so I would like to buy a pair of nice boots for myself.  I think that this experience has made me more aware of how it's not uncommon that people who are predators have come to occupy positions with a lot of prestige or power. in some way I didn't recognize this as the system issue that it was..

NETFLIX - GHISLAINE MAXWELL: FILTHY RICH  AIRED 25 NOV 2022
TRANSCRIPT W/P im


ANNIE CONTINUES [inside boot store]. I actually was looking on your website and saw you had a boot called "The Annie".

SHOP ASSISTANT: We do

ANNIE FARMER: Ooh, Could I try some on?

SHOP ASSISTANT: Yeah, sure.

1.35.53
SIGRID MCCAWLEY?: This whole story has been about how money and power overcome justice and what we're seeing now is something vastly different. And I think that shows you, regardless of stature you will be held accountable.

1.36.10
BRAD EDWARDS: All the time and energy and effort and sleepless nights and fighting was worth it. The system worked.

ANNIE FARMER: These are good boots.

TEMPLE: They should rename them "The Annie Farmer Boots."

1.36.20
DAVID BOIES: It's a real lesson to people about the need to pay attention to what's going on, and the need to protect the vulnerable people in our society.

ANNIE FARMER: I got 'em. Are you ready?
TEMPLE: You got 'em. Yeah. You? Good night. See you. Bye.

ANNIE FARMER; Good night. I'll see you. Bye.  My new boots mean to me stepping into a new phase of my life. There was a lot of darkness around what happened with Epstein and Maxwell and I'm leaving that behind. And I'm hoping to be able to do more to share what I've learned and to connect with other people and I think that in a way these boots just feel like a powerful symbol of me stepping into that new future.

GRAPHIC: GHISLAINE MAXWELL AND HER FAMILY DECLINED TO PARTICIPATE IN THIS DOCUMENTARY.

HER ATTORNEYS HAVE FILED AN APPEAL OF THE VERDICT.
[somber music continues]
END TITLES
                    END OF TRANSCRIPTION.

# EXHIBIT 28

**AMERICAN ARBITRATION ASSOCIATION**
**Fort Lauderdale, Florida**
**Case No. _____**

MICHAEL FISTEN,

      Complainant,

v.

JULIE K. BROWN,

      Respondent.

_____/

## STATEMENT OF CLAIM

Claimant, MICHAEL FISTEN (hereinafter "FISTEN"), by and through undersigned counsel, sues Respondent, JULIE K. BROWN (hereinafter "BROWN"), and alleges the following:

### I.    INTRODUCTION

FISTEN, as co-author of a book about the crimes and prosecution of Jeffrey Epstein together with BROWN (hereinafter called the "Work"), brings this action against BROWN for declaratory relief, accounting for ████ of all proceeds generated from the Work, breach of fiduciary duty, and injunctive relief, and as grounds therefore, alleges as follows:

### II.    PARTIES, JURISDICTION AND VENUE

1.    FISTEN is a resident of Broward County, Florida, who is over the age of 18 and otherwise *sui juris*.

2.    BROWN is a resident of Broward County, Florida, is over the age of 18 and otherwise *sui juris*.

3.    This is an action for damages in excess of $575,000.00, exclusive of interest, costs and attorneys' fees.

4.    Venue is proper in this tribunal pursuant to the contract attached hereto.

### III.    GENERAL ALLEGATIONS

5.    FISTEN was a long time law enforcement officer and decorated detective and over the past 10 years was a licensed private investigator working in relevant times for lawyer, Brad Edwards, investigating alleged crimes and civil actions on behalf of victims of Jeffrey Epstein.

6.    BROWN was at all times relevant a writer for the Miami Herald, who in 2018 was writing articles about Jeffrey Epstein (Epstein).

7.    In early February, 2019, Brown requested to have lunch with FISTEN to discuss his investigation of Epstein. At this point, FISTEN had spent 10 years investigating Epstein and his collaborators, interviewing and locating many victims and others. She inquired if FISTEN was interested in writing a book about Epstein. FISTEN said he was, had written portions of the book and had shopped the book to publishing companies through his literary agent in New York. BROWN replied that, like FISTEN, she was shopping a book based upon her newspaper stories. She indicated that she had never written a book, could not do it without help and needed the results of FISTEN's investigation to complete her book.

8.    FISTEN, BROWN and their respective literary agents believed they were better off to work together, rather than have competitive books about the same subject matter.

9.    In February/March of 2019, BROWN's agent at ICM presented an offer from Penguin Books with an advance of $420,000. BROWN and FISTEN agreed to proceed with that offer. However, shortly thereafter, Epstein was arrested and the "Epstein story" garnered great

national, if not international publicity.

10.    BROWN then backed out of the deal with Penguin and as a result, her agent fired her. BROWN then hired Laurie Liss of Sterling Lord Literistics and they began to draft a collaboration agreement between FISTEN and BROWN.

11.    BROWN and FISTEN then executed a collaboration agreement, dated May 17, 2019, which is attached hereto as **Exhibit A** and hereinafter called the "Contract."

12.    Shortly thereafter, BROWN and FISTEN received an offer from publishing giant, Harper Collins, for an advance of $1,000,000. FISTEN and BROWN agreed to split the $1,000,000. Harper Collins paid the first tranche of the advance of $300,000, which was split between BROWN and FISTEN. The next payment of $300,000, was to be paid upon acceptance of the manuscript by the Publisher, which we have reason to believe has already occurred in August of 2020 adhering to her September 1st deadline by the publisher.

13.    Brown then negotiated to sell rights to the jointly created work to HBO. Initially, , she lied to FISTEN claiming all of this money would be paid to her employer, The Miami Herald.

14.    BROWN then admitted that she was licensing the rights to HBO for a filmed project based upon FISTEN's and BROWN's book to be directed by Adam Mckay. Brown had advised Fisten that she also wanted him to benefit from the HBO project, but later lied to him claiming that her employer The Miami Herald sold the rights of the story to HBO and that she too was cut out of that deal. Later through sources we had learned that the HBO film is based on the book and that Julie received approximately $450,000, in advance.

**Brown and Fisten's Collaborations**

15.    Based upon FISTEN's 10 years of investigations, working with attorney Brad

Edwards, he assembled a great deal of information about Epstein, his collaborations, his victims and his prosecution. Working together with BROWN to create the Work, he exchanged with her 183 phone calls from June 2019, totaling more than 27 hours.

16.     Between 2019-2020, BROWN and FISTEN exchanged information set forth in more than 800 text messages, 110 emails containing more than 50 documents (assembled, written, compiled by FISTEN) which is directly used in the Book. FISTEN provided to BROWN 372 exhibits, 300 photographs (taken by FISTEN), 162 pages of FISTEN's notes, a 26 page book proposal, and 41 pages of FISTEN's personal notes, including FISTEN's proprietary information about sex slave, Virginia Roberts, details about how Epstein was able to lure his victims, information about Brad Edwards, the lawyer who represented many of the victims, information about Epstein's violation of the terms of this probation, information about people such as Bill Clinton, Alan Dershowitz and Prince Andrew, information about ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ Rosalie and Michael Friedman, Richard Fandrew, Ghislaine Maxwell, ▮▮▮▮▮▮▮▮ 80 associates of Epstein, 19 employees of Epstein, 5 pilots who worked for Epstein, the 14 law enforcement officers and agents who worked on the Epstein case, 54 other victims and dozens of Epstein's childhood friends, background information about Brad Edwards, as well as other information about Alex Acosta's prosecution of and ultimate plead agreement with Epstein all of which Brown incorporated into her newspaper articles and into the Book.

17.     BROWN then asked FISTEN to obtain more background information for their Book, asking him to complete tasks, that she knew would not be possible, such as asking him to interview federal jail guards who were guarding Epstein when he committed suicide, guards that were under federal indictment, she asked him to interview FBI agents involved in the Epstein

investigation that she herself tried to interview and knew because of there official position would not be able to speak of the case.

18.     All of the foregoing information is proprietary to FISTEN, given to BROWN as part of the Collaboration Agreement, and an integral part of the Work and other projects that follow based upon the Work. FISTEN gave BROWN all information that he compiled about Epstein, holding nothing back.

19.     Upon information and belief, Brown completed a licensing agreement with HBO and received $450,000 which she did not share with FISTEN, nor has she shared the halance of advance payment that she received from Harper Collins.

### The Collaboration Agreement

20.     Pursuant to the Contract, FISTEN agreed to provide his proprietary work and information to BROWN, so they could work together to "complete a manuscript for the Work" to be delivered to ICM for submission to potential publishers.

21.     Pursuant to paragraph 4a of the Contract, Brown agreed to pay FISTEN ██ % of the net proceeds (as defined) of all advances, sums arising from royalty and licensing income.

    "All such sums shall be paid to FISTEN promptly following Brown's receipt."

Pursuant to paragraph 4b:

        "Brown agrees to pay FISTEN ██ of the net proceeds of all advances, royalties
        and licensing income through the exploitation of any other publication rights in
        the Work throughout the world"

Pursuant to paragraph 7, FISTEN is to get credit for his contributions to the Work.

### Brown Attempts to Cut Out Fisten Out of the Money He Is Entitled To

22.     On October 16, 2020, FISTEN received a letter from BROWN's lawyer, (falsely) claiming that FISTEN had breached the terms of the Contract by withholding certain information

that he assembled. This is not true. This letter was sent solely so that BROWN could make a claim to keep 100% of the money paid by HBO and Harper Collins for herself.

### Brown Holds Herself Out to the Public as the Person Who Investigated and Uncovered Epstein and his Crimes, Falsely taking Public Credit for Fisten's 10 Years of Work

23.    BROWN has held herself to the public as the person (not FISTEN) who investigated and uncovered Epstein's crimes. She has received numerous awards, which she would not have received, but for the contributions of FISTEN as detailed. BROWN actually proclaims herself as the person who "brought down Jeffrey Epstein," which if called upon will be highly disputed by attorneys, investigators and prosecutors who have and still are working this Epstein case.

### COUNT I – DECLARATORY RELIEF

24.    Plaintiff re-alleges and re-avers the allegations of paragraphs 1 through 23 above as if set forth herein.

25.    There is a bona fide, actual, present, and practical need for a declaration that the FISTEN, as the co-author of the Work, is entitled to receive ███% of the proceeds derived from the exploitation of the Work.

26.    FISTEN performed investigation services and he authored many passages in, and the Work is based predominantly upon his proprietary information and work product. As such, under the terms of the Contract, he is entitled to ███% of the proceeds derived from the exploitation of the Work.

WHEREFORE for the reasons set forth herein, FISTEN respectfully requests this Tribunal to enter a judgment declaring that he is entitled to ███% of the proceeds derived from the exploitation of the Work and for any such other relief this Tribunal deems just and appropriate.

## COUNT II – ACCOUNTING FOR 50% OF ALL PROCEEDS FROM THE WORK

27.    FISTEN re-alleges and re-avers the allegations of paragraphs 1 through 23 above as if set forth herein.

WHEREFORE for the reasons set forth herein, FISTEN respectfully requests this Tribunal to enter a judgment granting him ⬤% of all proceeds generated from the exploitation of the Work; and for any such other relief this Tribunal deems just and appropriate, including interest, cost of this arbitration and attorney's fees.

## COUNT III – BREACH OF FIDUCIARY DUTY

28.    FISTEN re-alleges and re-avers the allegations of paragraphs 1 through 23 above as if set forth herein.

29.    As Co-Authors and collaborators and as partners in the proceeds of the Work, Brown owed a fiduciary duty to FISTEN.

30.    Based upon the relationship of the parties, FISTEN relied upon BROWN to act in his best interests.

31.    BROWN breached her fiduciary duty that she owed to FISTEN by failing to account and pay monies due to FISTEN from the exploitation of the Work and by acting intentionally and punitively to cut him out of the benefits of his work.

32.    As a direct and proximate result of BROWN's breach of the fiduciary duty that she owed to FISTEN, he has been damaged.

WHEREFORE for the reasons set forth herein, FISTEN respectfully requests this Tribunal  to enter a judgment of breach of fiduciary duty on BROWN's behalf; and for any such other relief this Tribunal deems just and appropriate, including an award of punitive or exemplary damages.

## COUNT IV BREACH OF CONTRACT

33.     FISTEN  re-alleges and re-avers the allegations of paragraphs 1 through 23 above as if set forth herein.

34.     This is a count for breach of the Contract.

35.     At all time and in all respects Fisten complied with his obligations under the terms of the Contract.

36.     All conditions precedent under the Contract have occurred or have been waived.

37.     Brown breached her obligations under the terms of the Contract by failing and refusing to pay to Fisten   % from all monies paid by Harper Collins, HBO and possibly others as clearly mandated under the  terms of the Contract.

38.     As a direct and proximate result of Browns breaches of the Contract, Fisten has been damaged.

Wherefore  for  the  reasons  set  forth  herein,  Fisten  asks  this  tribunal  to  award  him damages, interest and attorneys fees and this tribunal deems appropriate.

## COUNT V RECISSION AND INJUNCTION

39.     FISTEN  re-alleges and re-avers the allegations of paragraphs 1 through 23 above as if set forth herein.

40.     This count is pled in the alternative to the claims for legal relief.

41.     To the extent that BROWN has materially breached all of her obligations under the terms of the Contract, FISTEN is entitled to rescind the Contract.

42.     Based upon the recission of the Contract, FISTEN, as joint author of the Work, and as co-owner of the copyright in the Work, his rights have been infringed by BROWN and

her licensees. As such, there is a substantial likelihood that FISTEN will prevail on the merits of his claims.

43.    BROWN has caused and continues to cause irreparable injury to FISTEN as a result of her  and her licensees' copyright infringement upon his creations, by not properly crediting him for his contributions as co-author of the Work. Such harm cannot be fully remedied by money damages alone. Based on BROWN's purposeful infringement, FISTEN has suffered irreparable injury.

44.    The risk of lost reputation and goodwill on FISTEN's behalf, should BROWN and her licensees' infringing activities continue, far outweighs any hardship to BROWN caused by enjoining those activities. BROWN will not be harmed by accurately acknowledging Plaintiff as co-author of the Work. Thus, an immediate injunction should be issued because there is minimal harm to BROWN but the harm to FISTEN is irreparable.

45.    FISTEN has demonstrated that BROWN and her licensees' infringement has stripped him of any recognition or accreditation for his hard work, proprietary information property and overall contributions to the Work.

WHEREFORE for the reasons set forth herein, FISTEN respectfully requests that this Tribunal to grant injunctive relief in his favor to restrain and prevent any further infringement of FISTEN's property.

Respectfully submitted,

**WOLFE LAW MIAMI, P.A.**
*Counsel for Claimant Michael Fisten*
Latitude One Building
175 SW 7th Street, Suite 2410
Miami, Florida 33131
Telephone: 305-384-7370
Facsimile: 305-384-7371

By:  /s/Richard C. Wolfe
RICHARD C. WOLFE
Florida Bar No. 355607

# COLLABORATION AGREEMENT

between

**JULIE K. BROWN**
(hereinafter "Brown")

and

**MICHAEL FISTEN**
(hereinafter "Fisten")

*para 2.*
*para 5.*

**WHEREAS**, Brown desires to enter into a Publishing Agreement (the "Publishing Agreement") with a publisher (the "Publisher") for the publication of a currently-untitled book-length non-fiction work about the crimes and prosecution of Jeffrey Epstein (the "Work", which term shall be deemed to include the proposal specified herein);

**WHEREAS**, Brown desires to engage Fisten to provide materials and research services for the development of a book proposal and manuscript for the Work, upon the terms set forth herein;

**NOW, THEREFORE**, in consideration of the mutual covenants and conditions stated herein and other good and valuable consideration, the receipt of which is hereby acknowledged, Brown and Fisten hereby agree as follows:

1. **ENGAGEMENT.** Fisten shall cooperate with Brown to produce a proposal and, after a Publishing Agreement is secured, a manuscript for the Work pursuant to the terms of this Agreement and pursuant to the terms of the Publishing Agreement.

2. **DUTIES.** (a) Fisten agrees to give his story, personal interviews and other information and materials obtained by Fisten relating to the subject-matter of the Work exclusively to Brown for possible inclusion in the proposal and/or Work. Fisten shall make himself reasonably available in a timely manner by submitting to interviews with Brown at mutually agreeable times and places, shall provide Brown with relevant ideas, documents, information, anecdotes, photographs and other materials related to the subject matter of the Work, and shall diligently complete any research reasonably necessary to complete the manuscript for the Work. Brown will first prepare a proposal in cooperation with Fisten to be delivered to ICM Partners for submission to potential publishers. After the Publishing Agreement is secured, Brown will undertake the writing necessary to complete the manuscript for the Work. Brown shall have sole editorial control over the proposal and Work and shall be responsible for the scope, concept, style, organization and language therein. Brown may provide Fisten with drafts of the work in progress and Fisten agrees to promptly review any such drafts for accuracy. Each party shall dedicate an amount of their time sufficient to complete each of the party's respective duties.

1

GX "A'

(b) The cost for all necessary releases and permissions for materials included in the Work shall be shared equally by Brown and Fisten. Fisten agrees to promptly advise Brown with regard to any material contributed by Fisten that is included in the proposal or the Work that may require releases or permissions from third parties. With respect to any materials controlled by Fisten included in the Work, Fisten hereby grants to Brown an exclusive, royalty-free license to Brown for Brown and her licensees to exploit all rights in the Work and derivatives thereof worldwide in perpetuity.

(c) Fisten agrees that under no circumstances will Fisten have any right to prevent or compel publication of the Work by Brown or Publisher, its licensees or assigns, or to exercise any rights in the Work, or to any compensation other than specifically provided herein, including, but not limited to, compensation for loss of opportunity.

3. **THE PUBLISHING AGREEMENT.** As between Brown and Fisten, any and all contracts for the sale, lease, license or other disposition of any of the rights in or related to the Work, including but not limited to the Publishing Agreement, shall require the approval and signature of Brown alone in her sole discretion, and Fisten shall have no authority to contract on behalf of Brown or otherwise enter into any agreements with respect to the Work. Brown will consult with Fisten with regard to the financial terms as proposed in the Publishing Agreement prior to execution thereof.

4. **FINANCIAL PARTICIPATION**  In consideration for all services Fisten is to render hereunder, and upon the condition that he complies with his material obligations, Brown shall pay Fisten as follows:

(a)     Brown agrees to pay Fisten ▓▓▓▓▓▓▓▓▓) of the Net Proceeds (as defined below) of all advances (including any bonus advances) paid by the Publisher to Brown pursuant to the terms of the Publishing Agreement, and ▓▓▓▓▓▓▓▓▓ of the Net Proceeds of all sums arising from royalty and licensing income generated under the Publishing Agreement that is received from the Publisher after Publisher recoups all of its advances (including any bonus advances) pursuant to the terms of the Publishing Agreement. All such sums shall be paid to Fisten promptly following Brown's receipt of such sums from the Publisher pursuant to the terms of the Publishing Agreement.

(b)     Brown agrees to pay Fisten ▓▓▓▓▓▓▓▓) of the Net Proceeds of all advances, royalties, and licensing income received through the exploitation of any other publication rights (including non-dramatic audio and electronic book) in the Work in any and all languages throughout the world pursuant to the terms of such other publishing rights agreements as may be entered into by Brown with respect to the Work. All such sums shall be paid to Fisten promptly following Brown's receipt of such sums from the respective licensee pursuant to the terms of the respective license.

(c) Net Proceeds shall be defined as all amounts received by Brown from third parties from the disposition of publication rights in the Work net only of: (i) the combined commission payable

2

pursuant to Paragraph 5(c) below); and (ii) if deemed necessary by Brown and/or Publisher, the actual, reasonable costs associated with the engagement by Brown of a third-party writer to provide editorial services for the manuscript of the Work.

(d)  Brown will provide Fisten with copies of the relevant parts of any written agreements in Brown's possession for the Work in which Fisten is a financial participant pursuant to this Agreement.

(e)  For avoidance of doubt, nothing contained in this Agreement shall be deemed to entitle Fisten to participate, financially or otherwise, in the exploitation of Brown's life rights or any other non-publication rights, including but not limited to motion picture or television rights based on the Work. Nothing contained in this Agreement shall be deemed to grant to Brown control of Fisten's life rights or any financial participation therein.

      5.  REPRESENTATIVES. (a) Brown hereby irrevocably appoints ICM Partners ("ICM"), 65 East 55th Street, New York, NY 10022 (Attn: Sloan Harris and Kristine Dahl) as her exclusive agent with respect to the Work, such appointment being coupled with an interest and irrevocable, and Brown shall irrevocably authorize the Publisher and any other third party to pay all monies due or to become due to Brown in connection with the Work to and in the name of said agent. Receipt by said agent shall be deemed receipt by Brown. In return for services rendered and to be rendered by the agent in connection with the Work, Brown hereby irrevocably agrees to pay and authorizes said agent to receive and retain as its commission the compensation described in Paragraph 5(c) below.

      (b)  For a term equal to the full term of copyright for and in the Work, Fisten irrevocably appoints 3 Arts Film and Television, LLC ("3Arts") as Fisten's sole and exclusive representative with respect to the Work, and 3Arts is hereby irrevocably authorized and empowered by Fisten to receive in 3Arts' name all proceeds due or to become due to Fisten hereunder, and Brown agrees to remit all such proceeds to 3Arts. In consideration of services rendered and/or to be rendered in connection with the Work, 3Arts is irrevocably entitled to receive and retain as its commission the compensation described in Paragraph 5(c) below. 3Arts' right to commissions cannot be terminated without the written consent of 3Arts. This paragraph will survive the termination of this agreement.

      (c)  Anything herein to the contrary notwithstanding, it is understood and agreed that ICM shall be the exclusive representative of the Work for the purpose of soliciting offers in connection with the sale, license or other disposition of the Work and any and all rights therein in any and all media now or hereafter known in all countries throughout the world. ICM will use commercially reasonable efforts to meaningfully consult with 3Arts in connection with securing the Publishing Agreement. It is expressly agreed that: (i) ICM will be entitled to a commission equal to 10% of all gross monies paid by any third parties in respect of dispositions by Brown of any publication rights in the Work, and 15% of all gross monies paid by any third parties in respect of dispositions by Brown of any rights in the Work other than publication rights, and (ii) 3Arts will be entitled to a commission equal to 5% of all gross monies paid by any third parties in respect of dispositions by Brown of any publication rights in the Work. Amounts paid to Fisten by Brown shall be inclusive of 3Arts' commission.

3

6.  **EXPENSES.**  Unless otherwise mutually agreed, Brown and Fisten shall each be responsible for the expenses they incur in connection with the preparation and publication of the Work.  The preceding notwithstanding, the parties agree to share equally in the costs associated with any releases and permissions required with regard to third-party material that is included in the Work.  Such expenses shall be agreed upon by the parties in advance, and shall be settled between the parties from time to time upon presentation of such itemized and documented expenses for such third-party material.  Furthermore, the parties agree and acknowledge that in the event Brown and/or Publisher deem it necessary for a third-party writer to be engaged by Brown to provide editorial services for the manuscript for the Work, such costs shall be shared equally and deducted from gross proceeds pursuant to Paragraph 4(c).

7.  **CREDIT.**  The parties agree and acknowledge that the sole authorship credit for the Work shall be in the name of Julie K. Brown.  Provided this Agreement is not terminated, Brown shall provide an acknowledgement for Fisten in the acknowledgements section of the Work. Fisten grants to Brown the irrevocable right (but not the obligation) to use Fisten's name and approved likeness in the Work.

8.  **WARRANTIES AND REPRESENTATIONS.** (a) Fisten hereby represents, warrants and agrees that (i) Fisten has a bona fide intention to cooperate with Brown in the preparation of the manuscript of the Work, (ii) Fisten has no other contractual commitments of any kind which will or might materially conflict or interfere with the performance of Fisten's obligations hereunder, and (iii) any portion of the manuscript for the Work deriving from information and/or materials provided by Fisten will not contain any matter which is libelous or, to the best of Fisten's knowledge, obscene, (iv) the publication or sale of any portion of the manuscript for the Work deriving from information and/or materials provided by Fisten will not violate any federal or state statute or regulation or be in any manner unlawful, (v) any portion of the manuscript for the Work deriving from information and/or materials provided by Fisten will not violate the right of privacy or other right of any person or party or infringe any common law or statutory copyright, (vi) all information and/or materials provided by Fisten will be original with Fisten, have not been previously published (except as identified to Brown), are not in the public domain (except as identified to Brown), and are not copied in whole or in part from any work unless otherwise indicated (vii) all facts stated as true in any portion of the manuscript for the Work deriving from information and/or materials provided by Fisten are true or based upon reasonable research for accuracy, (viii) any recipe, formula, procedure or instruction contained in any portion of the manuscript for the Work deriving from information provided by Fisten is not injurious to the user, (ix) Fisten has full power and authority to enter into this Agreement.

(a) Brown hereby represents, warrants and agrees that (i) Brown is a professional writer, knowledgeable in the art of writing books and other journalistic works, familiar with the English language and its usage, syntax, and grammar, (ii) Brown has no other contractual commitments of any kind which will or might materially conflict or interfere with the performance of Brown's obligations hereunder, (iii) any portion of the manuscript for the Work deriving from information provided by Brown will not contain any matter which is libelous or, to the best of Brown's

4

knowledge, obscene, (iv) the publication or sale of any portion of the manuscript for the Work deriving from information provided by Brown will not violate any federal or state statute or regulation or be in any manner unlawful, (v) any portion of the manuscript for the Work deriving from information provided by Brown will not violate the right of privacy or other right of any person or party or infringe any common law or statutory copyright, (vi) all facts stated as true in any portion of the manuscript for the Work deriving from information provided by Brown are true or based upon reasonable research for accuracy, (vii) any recipe, formula, procedure or instruction contained in any portion of the manuscript for the Work deriving from information provided by Brown is not injurious to the user, (viii)  Brown has full power and authority to enter into this Agreement.

(c)  The provisions of this paragraph 8 shall survive the termination of this Agreement for any reason.

9.  **INDEMNIFICATION.**  (a)  Brown will indemnify and hold harmless Fisten, and/or his heirs, executors, administrators, legal representatives, and assigns, from any and all claims, demands, suits, losses, costs, expenses (including, without limitation, reasonable attorneys' fees, legal costs and any amount paid by Fisten or such other in settlement of such claims, demands and/or suits, provided such settlement is approved by Brown, such approval not to be unreasonably withheld) which may be obtained against, imposed upon or suffered by Fisten, and/or his heirs, executors, administrators, legal representatives, and assigns, by reason of any breach by Brown of this Agreement or Brown's representations and warranties contained herein.

(b) Fisten will indemnify and hold harmless Brown, and/or her heirs, executors, administrators, legal representatives, and assigns, from any and all claims, demands, suits, losses, costs, expenses (including, without limitation, reasonable attorneys' fees, legal costs and any amount paid by Brown or such other in settlement of such claims, demands and/or suits, provided such settlement is approved by Fisten, such approval not to be unreasonably withheld) which may be obtained against, imposed upon or suffered by Brown, and/or her heirs, executors, administrators, legal representatives, and assigns, by reason of any breach by Fisten of this Agreement or Fisten's representations and warranties contained herein.

(c)  The provisions of this paragraph 9 shall survive the termination of this Agreement for any reason.

10. **OWNERSHIP OF COPYRIGHT.**  Brown owns and will own copyright and all other rights in the Work (including, without limitation, the proposal for the Work, all drafts, notes, tape recordings, research and other preparatory materials) throughout the world in perpetuity.  The Work and the results and proceeds of Fisten's services hereunder, from inception of its creation to its completion will be entirely the property of the Brown, in perpetuity, throughout the universe, under copyright and otherwise, free of any claim whatsoever, financial or otherwise, by Fisten. Fisten will have no right or power to apply for copyrights in his name, in Brown's name, or in the name of the Publisher, or in the names of any of their heirs, legal representatives, successors, or assigns, and Fisten acknowledges that Brown will be entitled to register for copyright in the

5

Brown's and/or her designee's sole name(s). Brown will have the right to use or not use any of the Work and/or to modify or otherwise alter the Work as Brown deems appropriate. Fisten hereby waives the benefit of any provision of any law known as the "moral rights" of authors or any law similar or analogous thereto. Brown will have the perpetual right to utilize and exploit the Work in any manner or media anywhere in the world and may authorize and license others to do so as Brown determines. Fisten hereby assigns to Brown all of Fisten's right, title and interest in the copyright and all other rights in and to the Work, in perpetuity, throughout the universe, and any and all renewals, revivals and extensions of such copyright. Fisten agrees to execute such other instruments as Brown may from time to time reasonably deem necessary to evidence, establish, maintain and protect the aforementioned right, title and interest in the copyright and all other rights in and to the Work. If Fisten fails to do so within ten (10) business days of Brown's request therefore, Fisten hereby appoints Brown as Fisten's attorney-in-fact solely for such purposes (it being acknowledged that such appointment is irrevocable and coupled with an interest) with full power of substitution and delegation.

11. **TERMINATION.** (a) In the event there is a Publisher for the Work and the Publisher terminates the Publishing Agreement relating to the Work, Brown shall promptly notify Fisten in writing of such termination and Brown and Fisten will each be responsible for repayment to the Publisher of their respective share of any advance(s) paid with respect to the Work. In addition, either party may terminate this Agreement if the other party materially breaches any of the terms or conditions of this Agreement and such material breach is not cured within thirty (30) days after receipt of written notice.

(b) Anything to the contrary contained herein notwithstanding, in the event of termination of this Agreement for any reason, Fisten acknowledges that Brown will own all rights, including copyright in the results and proceeds of Fisten's services and is free to use Fisten's materials in the Work and Brown may contract for publication of same, it being understood that, if Brown contracts for publication of the Work incorporating Fisten's materials, Fisten will nevertheless be entitled to receive the payments set forth in Paragraph 4 (a) and (b) above unless Brown determines that the aforesaid compensation to Fisten should be reduced in light of the nature of Fisten's contribution to the final manuscript of the Work. In such event, Brown will so notify Fisten in writing and the parties will thereupon negotiate such reduction in good faith for a period of not less than five (5) business days. If the parties are unable to reach an agreement with respect to the foregoing sentence by the expiration of such five (5) business day period, then such dispute will be settled by arbitration in at a mutually agreeable location in Florida in accordance with the following provisions:

(i)     All notices and process in connection with such arbitration will be served in accordance with the provisions in Paragraph 18 below;

(ii)     Brown and Fisten will jointly appoint a single arbitrator with at least ten (10) years experience in the book publishing industry or, if Brown and Fisten cannot agree upon a single arbitrator within fifteen (15) days after service of notice of intention to arbitrate, then the American Arbitration Association will appoint a single arbitrator with at least ten (10) years experience in the book publishing industry promptly after the end of such fifteen (15) day period;

6

(iii)    The arbitrator will render his decision as soon as possible after Brown and Fisten have both finished presenting evidence and submitting briefs to the arbitrator;

(iv)    The decision of the arbitrator will be final, and will not be appealable to any other body except as otherwise provided by law.  The arbitrator's decision may be entered in any court having competent jurisdiction.

For the avoidance of any doubt, in the event of termination of this Agreement for any reason, Brown shall be free to engage a different consultant or consultants to complete the Work in her sole discretion.

12.  **CONFIDENTIALITY/NON-COMPETITION.**  (a)  Brown and Fisten agree that the financial terms of this Agreement are confidential and will not be disclosed to any third party except to their respective agents, accountants or counsel or as required by law.  The provisions of this Paragraph 12 will survive the termination of this Agreement for any reason.

(b)  Prior to the initial publication of the Work or the earlier termination of this agreement in the event a Publishing Agreement is not secured, Fisten agrees not to participate in any interviews or podcasts, or write any articles, books, web postings, or take any other action (other than actions related to Fisten's occupation in civil and criminal investigations) which would result in disclosure of any kind or nature whatsoever of any of the information and materials furnished to Brown in connection with this Agreement and the Work, or of any meetings, discussions or interviews between Brown and Fisten or others involved in the development and/or publication of the Work.

13.  **SEVERABILITY.**  If any of the provisions of this Agreement shall contravene, or be invalid under the laws of the particular jurisdiction, such contravention or invalidity shall not invalidate the whole Agreement, but this Agreement shall be construed as if not containing the particular provision or provisions held invalid, and the rights and obligations of the parties shall be construed and enforced accordingly.

14.  **GOVERNING LAW.**  This Agreement shall be governed and interpreted in accordance with the laws of the State of New York.

15.  **ENTIRE AGREEMENT.**  This Agreement contains the sole and only agreement of the parties relating to their relationship with respect to the Work and correctly sets forth the rights, duties and obligations of each to the other in connection therewith as of this date.  Any prior agreements, promises, negotiations, or representations not expressly set forth in this Agreement are of no force or effect.  The headings used in this Agreement are intended for reference only and shall not be deemed part of this Agreement.

16.  **ASSIGNMENT.**  Neither party shall assign nor otherwise transfer this Agreement in whole or in part (voluntarily or by operation of law) without the prior written consent of the other. The rights and obligations of the parties under this Agreement shall inure to the benefit of and

7

shall be binding upon their respective heirs, executors, administrators, legal representatives, and assigns.

17. **WAIVER OF BREACH.** The waiver by Brown or Fisten of a breach or any provision of this Agreement by the other party shall not operate or be construed as a waiver of any subsequent breach. No waiver, modification or alteration shall be valid unless in writing and signed by the party from whom such waiver, modification or alteration is sought.

18. **NOTICES.** Any notice or request required or desired to be given under this Agreement will be deemed to have been validly given when personally delivered or when sent by facsimile or certified or registered mail, postage pre-paid, return receipt requested at the addresses provided above or to such other address as either party shall designate in writing to the other party from time to time.

IN WITNESS WHEREOF, the parties have executed this Agreement on the ⟋ ⟍ day of May 2019.

_____
Julie K. Brown

_____
Michael Fisten

8

# Third District Court of Appeal

### State of Florida

Opinion filed February 21, 2024.
Not final until disposition of timely filed motion for rehearing.

---

No. 3D22-2028
Lower Tribunal No. 22-5931

---

**Michael Fisten,**
Appellant,

vs.

**Julie Brown,**
Appellee.

An Appeal from the Circuit Court for Miami-Dade County, Mark Blumstein, Judge.

Andrew M. Kassier, P.A., and Andrew M. Kassier, for appellant.

Peretz, Chesal & Herrmann, PL and Steven I. Peretz and Albert A. Alvarez, for appellee.

Before SCALES, LINDSEY, and MILLER, JJ.

SCALES, J.

In this proceeding brought under Florida's Revised Arbitration Code, appellant Michael Fisten, the petitioner below, appeals a November 4, 2022 final judgment in favor of the respondent below, appellee Julie Brown. The challenged final judgment incorporates the trial court's October 28, 2022 order ("Confirmation Order") that (i) denied, as legally insufficient, Fisten's March 30, 2022 motion to vacate a March 18, 2022 arbitration award ("Vacatur Motion"), and (ii) granted Brown's motion to confirm the arbitration award. We affirm.[1]

The circuit court has the exclusive jurisdiction to enter judgment on an arbitration award. See § 682.181, Fla. Stat. (2022). Where a party to an arbitration award moves to confirm an arbitration award, "the court shall issue a confirming order unless the award is modified or corrected pursuant to s. 682.10 or s. 682.14 or is vacated pursuant to s. 682.13." § 682.12, Fla. Stat. (2022). Barring allegations that an arbitration award was procured through corruption, fraud or other undue means, a motion to vacate an arbitration award "must be filed within 90 days after the movant receives notice of the award[.]" § 682.13(2), Fla. Stat. (2022). If a party moves to vacate an

---

[1] "This Court reviews orders on a petition to vacate an arbitration award under a mixed standard: facts are reviewed for competent and substantial evidence and legal questions are reviewed de novo." Israel v. Costanzo, 216 So. 3d 644, 646 (Fla. 4th DCA 2017).

arbitration award and the trial court denies the motion, and no "motion to modify or correct the award is pending, *the court shall confirm the award.*" § 682.13(4), Fla. Stat. (2022) (emphasis added).

In this appeal, as below, Fisten concedes that his Vacatur Motion, although timely filed, was legally insufficient because the motion's allegations were in conclusory form without supporting facts demonstrating the applicability of any of section 682.13(1)'s enumerated grounds for vacating the arbitration award. See Schnurmacher Holding, Inc. v. Noriega, 542 So. 2d 1327, 1328 (Fla. 1989) ("Section 682.13(1) sets forth the only grounds upon which an award of an arbitrator in a statutory arbitration proceeding may be vacated[.] . . . Thus, in the absence of one of the . . . factors set forth in the statute, neither a trial court nor a district court of appeal has the authority to overturn the award."); § 682.015(1), Fla. Stat. (2022) (providing that "a petition for judicial relief under this chapter must be made to the court and heard in the manner provided by law or rule of court for making and hearing motions"); Fla. R. Civ. P. 1.100(b) (providing that an application to the court for an order made by written motion "must state with particularity the grounds for it"); accord Washington Mut. Bank, F.A. v. Am. Fin. Network, 414 F. Supp. 2d 1155, 1157 (S.D. Fla. 2006) ("In the instant case, American Financial Network's four-paragraph Motion to Vacate only

contains vague and conclusory allegations. These are not supported by any specific factual allegations or citation or reference to the record by which the Court could determine that the Arbitrator is guilty of misconduct, particularly in light of the great deference federal courts extend to arbitrators' procedural decisions."). Indeed, the Vacatur Motion merely cited the provisions of section 682.13(1) and alleged that "[a]t the appropriate time, FISTEN will file and serve an Amended Petition/Motion to Vacate Arbitration Award, in which he will fully present all of his grounds to vacate that award, with appropriate citations to the record." The Vacatur Motion's allegations were plainly insufficient.

Although Fisten concedes that the trial court properly denied his Vacatur Motion as legally insufficient, Fisten argues that the court should have permitted him to file an amended motion[2] rather than confirming the arbitration award. We disagree. Once the trial court denied the Vacatur Motion, and there being no pending motion to vacate, modify or correct the

_____

[2] Citing to federal case law applying Federal Rule of Civil Procedure 15(a) – the federal counterpart to Florida Rule of Civil Procedure 1.190(a) governing the amendment of pleadings – Fisten argues that an amended motion to vacate would "relate back" to the date of his Vacatur Motion, and itself be a timely motion. See Bonar v. Dean Witter Reynolds, Inc., 835 F. 2d 1378, 1382 (11th Cir. 1988). Because, though, Fisten never sought to amend the Vacatur Motion at any point below prior to the lower court's denial of Fisten's legally insufficient motion, we need not, and therefore do not, reach this question.

arbitration award before it, "the trial court had no discretion but to confirm the award as rendered." Broward Cnty. v. Paraprof'l Ass'n v. Sch. Bd. of Broward Cnty., 406 So. 2d 1252, 1253 (Fla. 4th DCA 1981); see § 682.13(4), Fla. Stat. (2022); Moya v. Bd. Of Regents, State Univ. Sys. of Fla., 629 So. 2d 282, 284 (Fla. 5th DCA 1993) ("[T]he trial court does not have any discretion and must confirm the award unless one of the parties seeks to vacate, modify or correct the award within 90 days of delivery of the arbitrator's award, or unless there is an issue presented to the trial court in the motion to confirm which was not submitted to the arbitrator.").

Accordingly, we affirm the challenged judgment.

Affirmed.

No. 3D22-2028
Florida Court of Appeals, Third District

# Fisten v. Brown

Decided Feb 21, 2024

3D22-2028

02-21-2024

Michael Fisten, Appellant, v. Julie Brown, Appellee.

Andrew M. Kassier, P.A., and Andrew M. Kassier, for appellant. Peretz, Chesal &Herrmann, PL and Steven I. Peretz and Albert A. Alvarez, for appellee.

SCALES, J.

Not final until disposition of timely filed motion for rehearing.

An Appeal from the Circuit Court for Miami-Dade County, Mark Blumstein, Judge. Lower Tribunal No. 22-5931

Andrew M. Kassier, P.A., and Andrew M. Kassier, for appellant.

Peretz, Chesal &Herrmann, PL and Steven I. Peretz and Albert A. Alvarez, for appellee.

Before SCALES, LINDSEY, and MILLER, JJ.

2    SCALES, J. *2

In this proceeding brought under Florida's Revised Arbitration Code, appellant Michael Fisten, the petitioner below, appeals a November 4, 2022 final judgment in favor of the respondent below, appellee Julie Brown. The challenged final judgment incorporates the trial court's October 28, 2022 order ("Confirmation Order") that (i) denied, as legally insufficient, Fisten's March 30, 2022 motion to vacate a March 18, 2022 arbitration award ("Vacatur Motion"), and (ii) granted Brown's motion to confirm the arbitration award. We affirm.[1]

> [1] "This Court reviews orders on a petition to vacate an arbitration award under a mixed standard: facts are reviewed for competent and substantial evidence and legal questions are reviewed de novo." *Israel v. Costanzo*, 216 So.3d 644, 646 (Fla. 4th DCA 2017).

The circuit court has the exclusive jurisdiction to enter judgment on an arbitration award. *See* § 682.181, Fla. Stat. (2022). Where a party to an arbitration award moves to confirm an arbitration award, "the court shall issue a confirming order unless the award is modified or corrected pursuant to s. 682.10 or s. 682.14 or is vacated pursuant to s. 682.13." § 682.12, Fla. Stat. (2022). Barring allegations that an arbitration award was procured through corruption, fraud or other undue means, a motion to vacate an arbitration award "must be filed within 90 days after the movant receives notice of the award[.]" § 682.13(2), Fla. Stat.
3    (2022). If a party moves to vacate an *3 arbitration award and the trial court denies the motion, and no "motion to modify or correct the award is pending, *the court shall confirm the award.*" § 682.13(4), Fla. Stat. (2022) (emphasis added).

In this appeal, as below, Fisten concedes that his Vacatur Motion, although timely filed, was legally insufficient because the motion's allegations were in conclusory form without supporting facts demonstrating the applicability of any of section 682.13(1)'s enumerated grounds for vacating the arbitration award. *See Schnurmacher Holding, Inc.*



*v. Noriega*, 542 So.2d 1327, 1328 (Fla. 1989) ("Section 682.13(1) sets forth the only grounds upon which an award of an arbitrator in a statutory arbitration proceeding may be vacated[.] . . . Thus, in the absence of one of the . . . factors set forth in the statute, neither a trial court nor a district court of appeal has the authority to overturn the award."); § 682.015(1). Fla. Stat. (2022) (providing that "a petition for judicial relief under this chapter must be made to the court and heard in the manner provided by law or rule of court for making and hearing motions"); Fla. R. Civ. P. 1.100(b) (providing that an application to the court for an order made by written motion "must state with particularity the grounds for it"); *accord Washington Mut. Bank, F.A. v. Am. Fin. Network*, 414 F.Supp.2d 1155, 1157 (S.D. Fla. 2006) ("In the instant case, American Financial Network's four-paragraph Motion to Vacate only 'd contains vague and conclusory allegations. These are not supported by any specific factual allegations or citation or reference to the record by which the Court could determine that the Arbitrator is guilty of misconduct, particularly in light of the great deference federal courts extend to arbitrators' procedural decisions."). Indeed, the Vacatur Motion merely cited the provisions of section 682.13(1) and alleged that "[a]t the appropriate time, FISTEN will file and serve an Amended Petition/Motion to Vacate Arbitration Award, in which he will fully present all of his grounds to vacate that award, with appropriate citations to the record." The Vacatur Motion's allegations were plainly insufficient.

Although Fisten concedes that the trial court properly denied his Vacatur Motion as legally insufficient, Fisten argues that the court should have permitted him to file an amended motion[2] rather than confirming the arbitration award. We

disagree. Once the trial court denied the Vacatur Motion, and there being no pending motion to vacate, modify or correct the 's arbitration award before it, "the trial court had no discretion but to confirm the award as rendered." *Broward Cnty. v. Paraprof'l Ass'n v. Sch. Bd. of Broward Cnty.*, 406 So.2d 1252, 1253 (Fla. 4th DCA 1981); see § 682.13(4). Fla. Stat. (2022); *Moya v. Bd. Of Regents, State Univ. Sys. of Fla.*, 629 So.2d 282, 284 (Fla. 5th DCA 1993) ("[T]he trial court does not have any discretion and must confirm the award unless one of the parties seeks to vacate, modify or correct the award within 90 days of delivery of the arbitrator's award, or unless there is an issue presented to the trial court in the motion to confirm which was not submitted to the arbitrator.").

> [2] Citing to federal case law applying Federal Rule of Civil Procedure 15(a) -the federal counterpart to Florida Rule of Civil Procedure 1.190(a) governing the amendment of pleadings - Fisten argues that an amended motion to vacate would "relate back" to the date of his Vacatur Motion, and itself be a timely motion. *See Bonar v. Dean Witter Reynolds, Inc.*, 835 F.2d 1378, 1382 (11th Cir. 1988). Because, though, Fisten never sought to amend the Vacatur Motion at any point below prior to the lower court's denial of Fisten's legally insufficient motion, we need not, and therefore do not, reach this question

Accordingly, we affirm the challenged judgment.

Affirmed.

casetext
Part of Thomson Reuters

# EXHIBIT  29



April 6, 2022

# Private eye slams ruling worth over $350K to Miami author Julie K. Brown who wrote book about Jeffrey Epstein drama



**By Noreen Marcus, FloridaBulldog.org**

A case about who did what to produce a sensational book rehashing the story of sex offender Jeffrey Epstein entered a new phase in a new forum, Miami-Dade Circuit Court.

An arbitrator rejected private detective Mike Fisten's $350,000 claim for his work on "Perversion of Justice: The Jeffrey Epstein Story," *Miami Herald* reporter Julie K. Brown's book about the rich serial pedophile.

Jailed in New York for sex trafficking, Epstein apparently committed suicide by hanging himself in August 2019.

Brown and Fisten, a former Miami-Dade County police detective, contracted to split a $1 million publisher's advance 50-50. Instead, she gave him $150,000 and kept $850,000.


Mike Fisten

Arbitrator David Lichter agreed with Brown that Fisten breached their contract by failing to perform investigative tasks that were supposed to generate material for the book. Published last year, it expands upon and updates Brown's award-winning 2018 newspaper series, also called "Perversion of Justice."

## ARBITER: BROWN MORE CREDIBLE

Lichter wrote in his Dec. 30 ruling that Fisten contributed no more than a "negligible" 4.3 per cent of the book's contents. He criticized as "improper messaging" Fisten's list of completed tasks and disputed many of them.

1

After a hearing, Lichter found Brown more credible, though "some of her actions were less than laudatory." He didn't elaborate, but he referenced the confidential testimony of lawyer Bradley Edwards, who represents many Epstein victims and was a source for Brown.

Still, Fisten's "credibility was damaged far more substantially [than Brown's] and in far more significant ways," Lichter concluded in his 34-page ruling.

Later he ordered Fisten to pay $58,570 in attorney fees as punishment for discovery violations and for breaching a confidentiality clause by speaking out publicly about the case.

Brown's lawyer, Steven Peretz, sent *Florida Bulldog* a statement that says the arbitration award "represents a complete vindication for Ms. Brown." He noted that Lichter "also awarded substantial attorney fees to Ms. Brown as a sanction against Mr. Fisten for his conduct during the case."

"We will be moving forward to have the award confirmed in court and we expect the court will readily do so given the arbitrator's comprehensive and detailed ruling," Peretz wrote.

## COURT FILING REVEALS ARBITRATION AWARD

Fisten called the ruling "biased and negligent." He wrote in an email that Brown "made numerous misstatements" in her testimony. "It is for these and many other reasons that we feel we will prevail in our appeal."

Peretz, when asked about Lichter's assertion that some of his client's actions were "less than laudatory," wrote this: "The arbitrator was unclear about what actions he was referring to … so I cannot comment on that point."

Bradley Edwards

*Florida Bulldog* asked Edwards to share his testimony about Brown, the testimony Lichter cited in his ruling.

"Other than being called as a witness and asked questions by both parties, I don't know enough about the dispute to comment," he wrote. Edwards said he hasn't read the arbitration ruling and hasn't worked with Fisten, once his valued lead investigator, for a decade.

On March 31 Fisten filed a motion in Miami-Dade Circuit Court to vacate the Dec. 30 arbitration award, which both parties had treated as confidential. Lichter's ruling is an exhibit attached to the motion, making it a public record.

## WHO FOUND EPSTEIN'S VICTIMS?

In the motion, Fisten's lawyer, Andrew Kassier, previews his upcoming appeal. It will be based on Lichter's "evident partiality" toward Brown and his "misconduct" directed at Fisten. Also, Lichter "refused to hear evidence material to the controversy." Kassier provides no details.

Fisten has tried to focus public attention on Brown.

Chiefly, she takes credit for single-handedly identifying more than 60 Epstein victims and persuading four of them to do on-camera interviews for the *Miami Herald* series. But Fisten insists he tracked down almost all the victims, who later became plaintiffs and witnesses, while working as Edwards's investigator.

In Edwards's own book, "Relentless Pursuit/My Fight for the Victims of Jeffrey Epstein," published in 2020, he writes about meeting Brown in 2017 after she approached him asking for help. At that point he'd already spoken to more than 50 victims, he wrote.

"I had accumulated all of the evidence in these cases and done all of the work," Edwards wrote. "Unable to imagine the scope of that decade-long task or how voluminous the materials were and how complicated piecing it together was, Julie, like other reporters, wanted to start with my just spoon-feeding her everything and making it simple."

## EDWARDS' BOOK LAUDS BROWN AND FISTEN

He wouldn't do that because he wanted her to appreciate the complexities, Edwards wrote. Instead, he made a list of documents for her to review — and she persevered. "She followed the road map and stayed on course."

Edwards praises Brown in his acknowledgements: "Thank you for having the courage to finally publish what other major publications would not. You made the public listen when all other journalists were scared."

But he's more fulsome in his praise of Fisten: "No good investigation can be done alone. While I had numerous investigators along the way, you were in the trenches with me during crucial times.

"In addition to game-planning with me, tracking down witnesses, and coordinating surveillance on Epstein, you also guarded my house and my family when things got hairy, for which I am forever grateful," Edwards wrote.

Fisten isn't the only one to raise questions and concerns about how Brown pursued and told the Epstein story.

## VICTIMS SUE BROWN, CLAIMING LIBEL

3

Two victims are suing her for defamation in Miami-Dade Circuit Court. Haley Robson alleges that Brown threatened her when she declined to be interviewed for the Epstein book, then made good on the threat by falsely portraying her as a member of Epstein's inner circle.



Haley Robson, left, and Courtney Wild

The other plaintiff, Courtney Wild, claims Brown falsely stated in her book that after Epstein raped Wild when she was underage, she had sex with him.

Wild's lawyer, Jeffrey Gutchess, wrote that she suffered abuse by Epstein but never had sex with him. The lawsuit seeks significant money damages and a public apology from Brown.

Wild has been a leader among the Epstein victims, battling for years to undo his shady 2008 plea deal and make him answer to sex-trafficking charges. Wild also pushed for a victims' compensation fund.

"Brown has sought to take credit away from the victims," her lawsuit states. "Knowing Ms. Wild had spearheaded each of these major achievements, and not Ms. Brown as she claimed in her book, Ms. Brown sought to debase and defame Ms. Wild," Gutchess wrote.

Asked for her response to the libel suit, Brown referred *Florida Bulldog* to her lawyer, Carol LoCicero, who declined to comment.

 Related posts:

1. **Two victims of sexual predator Jeffrey Epstein sue reporter and author Julie K. Brown for defamation thru false statements, alleged threat**
2. **Judge's dissent revives mystery of Jeffrey Epstein's sex ring**
3. **Jeffrey Epstein's cushy federal deal was the only one of its kind in South Florida for at least three decades**
4. **Who were pedophile Epstein and prosecutor Acosta protecting with 'bizarre' deal?**
5. **DOJ report that cleared Epstein's Miami prosecutors called 'total whitewash'**

# EXHIBIT 30

1          First, in 1999, Epstein sent Maxwell $18.3 million.

2     $18.3 million — here's the transaction.  And then, in 2002,

3     Epstein paid Maxwell $5 million — here's the transaction.  And

4     last but not least, in 2007, Epstein paid Maxwell $7.4 million.

5     $18.3 million, $5 million, $7.4 million.  It's a total of

6     $30.7 million.

7          At this point, you got to ask yourselves, what was

8     Maxwell doing for Epstein that was worth more than $30 million?

9     Your common sense tells you that you don't give someone

10    $30 million unless they're giving you exactly what you want,

11    and what Epstein wanted was to touch underage girls.  When

12    Maxwell took that money, she knew what it was for and now you

13    do, too.  It was payment for committing terrible crimes with

14    Jeffrey Epstein.

15         That brings us to reason number 8 that you know that

16    Maxwell is guilty.  When you zoom out and look at the big

17    picture, the timeline over the years, it's obvious that Maxwell

18    spent a decade aiding and abetting Jeffrey Epstein's crimes,

19    that they were coconspirators, partners crime.

20         Let's talk about the timeline the big picture.

21         In 1994, Maxwell met Jane.  In that same year, Maxwell

22    and Epstein started sexually abusing Jane, and that often

23    happened in the context of massages.  That same year, in 1994,

24    Maxwell met Kate, too, and Epstein initiated sexual contact

25    with Kate also in the context of massages, massages in which

# EXHIBIT  31

RUSS ADLER WITH BRAD EDWARDS, PART 2 OF 3_WINDING ROAD FOR EPSTEIN & MAXWELL VICTIMS

TRANSCRIPT_ MAY 7, 2024

## The Winding Road To Justice For Epstein And Maxwell Victims PART 2/3

Russell Adler
5.44K subscribers

977 views May 7, 2024 Interesting Lawyers Podcast
Join Russ in Part 2 of his gripping conversation with Bradley Edwards, the relentless lawyer representing 250 victims of the Jeffrey Epstein- Ghislaine Maxwell sex trafficking scandal. In this episode, Brad shares his thrilling journey towards justice spanning over a decade. Learn about his successful legal battle to overturn Epstein's infamous "Sweetheart Deal" with the Government, through the Crime Victims Rights Act (CVRA), a crucial victory preceding Epstein's prison demise. Discover the shocking extortion plot by Epstein's butler, Alfredo Rodriguez, demanding $50,000 for access to Epstein and Maxwell's influential Rolodex dubbed the "Holy Grail." Dive into the FBI sting operation, to recover this critical evidence and Rodriguez's criminal prosecution- shedding light on the threats faced by Brad Edwards and his team. Amidst these challenges, witness Brad Edwards' and partner Brittany Henderson's brilliant effort to persuade the Virgin Islands government to give Epstein's assets to their charity supporting the victims—a testament to their unwavering pursuit of justice. To be notified when part 3 of the Brad Edwards Interview is released, please follow and subscribe to The Interesting

0.03
**Host, Russell (Russ) Adler:** Brad let me uh pivot back to the Jeffrey Epstein cases and share with our listeners and viewers on YouTube a little bit of our personal history and how we became involved in this case together uh here's my memory um I worked out at the gym across the street from the courthouse you were at the gym I knew you were a young defense attorney doing Insurance defense at the time and you knew that I was in the process of handling sexual abuse cases against the Arch Dieces mostly Arch Dieses in Miami.

And I remember we used to talk about it and chat about it and all of that and um in about 2008, I recovered a 27 million dollar verdict up in Palm Beach County against a man who had fondled uh a little girl who was the daughter of a close family friend who he was watching and that was a jury verdict now um I never ended up collecting anything on that but it did get a lot of publicity. I know it was in the New York Times and I believe that's where you sought and called me and told me what?

0:34 BRAD EDWARDS: What I remember telling you was that Jeffrey Epstein had hired this cadre of lawyers, and it was just me—I was a solo practitioner. You had this obvious knowledge

of trying a similar type of case through trial. Could I pick your brain? Was there a way we could work together at some point in time?

1

RUSS ADLER WITH BRAD EDWARDS, PART 2 OF 3_WINDING ROAD FOR EPSTEIN & MAXWELL VICTIMS

TRANSCRIPT_ MAY 7, 2024

1:39
HOST: I remember saying, "Who's Jeffrey Epstein?" No one knew who he was at the time; he was pretty low-key. You explained to me that he's this billionaire from New York. I found it intriguing. I know we had lunch and ended up working together—at least at the inception. Those are things that I will never forget, especially since you've been good enough to memorialize them in your book. Yeah, and I know I've told you this before, but I'll tell you again: I really appreciate the way you wrote about me in the book. I thought it was really accurate and thoughtful. So thank you for that. And I think it's the only book I've really been mentioned in to date—hopefully not the last!

2:19  BRAD EDWARDS: We really tried so hard to just get it right.

2:21
Host, Russell Adler: No, you definitely did. And I will never forget those times working together. I remember going to a couple of attempted depositions of Epstein where he completely refused to testify—took the Fifth—and, uh, he was just a creepy guy.

2:35
Brad Edwards: You know, I remember I took his deposition for about three hours one morning. We broke for lunch, and you were at the Palm Beach courthouse. You stopped by the deposition on your way back. We talked in the lunchroom, and I think you went back up to the deposition room with me for the second half.

2:49
Host: Right.

2:50
Brad Edwards: And I asked about five questions that he thought were so offensive that he got up and walked out. Weren't you in the room?

2:56
Host: Now, he did—when he wasn't invoking the Fifth Amendment in response to your questions—he was getting upset and walking out. I just know that the whole thing turned into a big nothing burger because that's the way it got handled. But obviously, he got his just desserts. But Brad I remember reviewing the evidence that you had—looking through flight logs, looking through all the evidence you had—and reading about this sweetheart deal that you mentioned earlier. My feelings were, "Why isn't this guy serving a life sentence in prison for trafficking and molesting young girls?" It's—I know it's a capital felony in Florida. I know that recently, a statute was even passed that provides for the death penalty in cases of that nature. So, I'm thinking, "Why isn't he doing life in prison?" Why instead did he take a plea to soliciting a prostitute and end up doing weekends in the Palm Beach County Jail? I mean, what a total

bullshit deal, bs plea and it really, really bothered me, and I know it bothered you because we talked about it.  I also knew that this wasn't over. I was especially upset with someone I had

2

RUSS ADLER WITH BRAD EDWARDS, PART 2 OF 3_WINDING ROAD FOR EPSTEIN & MAXWELL VICTIMS

TRANSCRIPT_ MAY 7, 2024

never met and didn't know—the state attorney for Palm Beach County.  I felt that he completely sold out. Look, I knew that Epstein had this all-star team of lawyers—everyone from Alan Dershowitz to Ken Starr, to a bunch of all these other dignitaries—as you would expect a billionaire to do. And man, what a sweetheart deal they got him. But of course, as it worked out, that was not the end of the story by any stretch.

4:41
Brad Edwards: So in 2008, I was not as jaded as I am now. You know, I believed that the justice system always worked—or at least it always did if you had good lawyers on both sides—and that nobody was above the law. This was kind of my entrée into realizing things aren't always that way.

But when I got into this case, it was really because Courtney Wild asked me to help her out in the criminal case. She was cooperating with the federal government, she thought there was this long investigation going on. She was getting letters from the government saying, "Be patient; there's a federal investigation." Basically, "Don't bother us; we're investigating this and we are going to do something about it."

5:26
Russell Adler: Right.

5:27
Brad Edwards: She came to me saying they weren't talking to her. I said, "Well, I'm a former prosecutor; this is going to be easy. I'll call them, and they'll tell me there's a federal investigation and that Epstein's going to prison for life." Just like you said—as a prosecutor, that's just what should have happened based on the evidence, not just the allegations.

5:45
Russell Adler: Right.

5:46
Brad Edwards: So when I called the U.S. Attorney's Office, I was instead getting kind of a cagey runaround. They weren't telling me what was going on—not timing, not substance. I thought, "Okay, what can I do about this?" So I started reading up on federal acts that provide crime victims' rights. There's the Crime Victims' Rights Act, which provides basic rights—like the right to meaningfully confer with a prosecutor and to be treated with fairness—things that Courtney clearly wasn't getting.

6:15
Russell Adler: Right.

6:16

3

RUSS ADLER WITH BRAD EDWARDS, PART 2 OF 3_WINDING ROAD FOR EPSTEIN & MAXWELL VICTIMS

TRANSCRIPT_ MAY 7, 2024
Brad Edwards: So I filed an emergency pleading to enforce the Crime Victims' Rights Act. I filed it as Jane Doe versus United States of America and went and filed it in federal court. That's what stirred everything up because it wasn't a civil lawsuit asking for money; it also wasn't a criminal lawsuit. It was basically just saying, "Something wrong is happening here, and we need to fix it."

6:36
Russell Adler: Right. And you were trying to set aside the sweetheart deal that was made? To vacate the NPA they had arrived at.

6:40
Brad Edwards: Exactly. At the time, I didn't even know there was a sweetheart deal. At the time, they just weren't talking to Courtney. So I filed this case and said, "Hey look, something illegal is going on behind the scenes." They were working out something with Epstein. I learned later that week, through this very quick pleading process, I learned that there had already been a deal worked out behind their backs—which really was wrong.

7:01
Russell Adler: Wow.

7:02
Brad Edwards: So that was kind of the beginning of our fight under the Crime Victims' Rights Act. Ultimately, the goal was to invalidate the deal because it was an illegal deal.

7:02
Russell Adler: And I know ultimately you won that case.

7:05
Brad Edwards: Yes, although it was bittersweet because then he died.

7:09
Russell Adler: Right.

7:10
Brad Edwards: So we won that case—there was a determination that we were right, that the government violated the Crime Victims' Rights Act. The question then became, "What's the remedy?" We were at the remedy phase, arguing that the deal should be invalidated because it was illegal.

7:26
Russell Adler: Right.

7:27

4

RUSS ADLER WITH BRAD EDWARDS, PART 2 OF 3_WINDING ROAD FOR EPSTEIN & MAXWELL VICTIMS

TRANSCRIPT_ MAY 7, 2024

Brad Edwards: But then Epstein was arrested in 2019, and shortly after that, he committed suicide. So, after 11 years of litigation, we finally got a ruling, but by then, the remedy was deemed moot because he was dead.

7:41
Russell Adler: That must have been frustrating.
7:43
Brad Edwards: It was incredibly frustrating. We appealed to the Eleventh Circuit, but with Epstein gone, there wasn't much left to enforce against anyone. The case essentially ended there.

8:01
Russell Adler: I keep thinking about the word "relentless" when I hear this story. You truly epitomize what it means to be relentless as a litigator.

8:10
Brad Edwards: Thank you. You have to be relentless in cases like these because there are so many obstacles—legal and otherwise—that you have to overcome to get justice for

8:21
Russell Adler: And you've done that time and time again, not just in this case but in so many others.

8:21
Russell Adler: And you've done that time and time again, not just in this case but in so many others.

8:30
Brad Edwards: Thank you. You know, it's always about the survivors for me. Every case is different, but the mission is always the same—getting justice for those who have been wronged and ensuring their voices are heard.

8:42
Russell Adler: Speaking of survivors, let's talk about some of the offshoot cases that came out of your work on Epstein. You've mentioned before that there were numerous cases that stemmed from your involvement.

8:53
Brad Edwards: That's right. While the Epstein case was the centerpiece, there were many related cases involving other individuals and entities that enabled his crimes. For example, we pursued legal actions against financial institutions that facilitated Epstein's operations. That led to significant settlements with JP Morgan Chase and Deutsche Bank in 2023.

9:14

5

RUSS ADLER WITH BRAD EDWARDS, PART 2 OF 3_WINDING ROAD FOR EPSTEIN & MAXWELL VICTIMS

TRANSCRIPT_ MAY 7, 2024

Russell Adler: Those were groundbreaking cases. Can you elaborate on how those came about?

9:18

Brad Edwards: Sure. It became clear during our investigations that Epstein couldn't have operated on such a large scale without assistance from major financial institutions. These banks turned a blind eye to suspicious transactions and red flags because they prioritized profits over ethics. By holding them accountable, we sent a strong message that no one is above the law—not even billion-dollar corporations.

9:18

Russell Adler: That must have been incredibly satisfying to see those institutions held accountable.

9:23

Brad Edwards: It was, but more importantly, it provided another avenue for survivors to receive compensation. The Epstein Victims' Compensation Fund was already a huge success, distributing over $120 million to more than 130 survivors. These settlements added another layer of accountability and restitution.

9:40

Russell Adler: Let's shift gears a bit. You've talked about your partnership with Brittany Henderson before. Can you share more about her role in these cases?

9:50

Brad Edwards: Brittany has been instrumental in every aspect of these cases. She's not just my partner in law; she's my partner in justice. From day one, she brought an unmatched level of dedication and empathy to our work with survivors. In fact, she played a critical role in establishing the Epstein Victims' Compensation Fund and ensuring it ran smoothly.

10:12

Russell Adler: That's incredible. What would you say makes her so effective?

10:15

Brad Edwards: Brittany has this unique ability to connect with survivors on a deeply personal level while also being an exceptional litigator. We call her "the victim whisperer" because she has this innate talent for making survivors feel heard and supported. She's also one of the smartest lawyers I know—her attention to detail and strategic thinking are second to none.

10:35  Russell Adler: That's incredible. It sounds like she was instrumental in the Epstein Victims' Compensation Fund as well.

RUSS ADLER WITH BRAD EDWARDS, PART 2 OF 3_WINDING ROAD FOR EPSTEIN & MAXWELL VICTIMS

TRANSCRIPT_ MAY 7, 2024

10:42  Brad Edwards: Absolutely. When Epstein died, all his money went into his estate in the U.S. Virgin Islands, and the Attorney General there claimed it all through a forfeiture proceeding. Brittany and I felt that wasn't fair—the money should go to the victims. So we flew down, met with the Attorney General, and proposed setting up a compensation fund to ensure survivors wouldn't be revictimized during this process.

11:08  Russell Adler: That's amazing. How did you convince them?

11:11  Brad Edwards: Brittany had a brilliant idea—she suggested we bring three survivors down to speak directly with the Attorney General about why it was so important to release the frozen assets for the victims. It was a powerful moment, and it worked. That's how the Epstein Victims' Compensation Fund got off the ground.

11:30  Russell Adler: It's clear Brittany played a huge role in all of this.

11:33  Brad Edwards: She did. Without her, I don't think we would've been able to navigate the complexities of that legal process in the Virgin Islands or get the fund established as quickly as we did.

11:33  Russell Adler: Let's shift gears for a moment. You've mentioned before that there were other cases that spun off from your work on Epstein. Can you talk about some of those?

11:42  Brad Edwards: Sure. While Epstein's case was central, there were many related cases involving people and institutions that enabled his crimes. For example, we pursued legal actions against financial institutions like JP Morgan Chase and Deutsche Bank, which facilitated Epstein's operations by ignoring red flags in his transactions.

12:05  Russell Adler: Those settlements were historic, weren't they?

12:08  Brad Edwards: Yes, they were groundbreaking. In 2023, JP Morgan settled for $290 million, and Deutsche Bank settled for $75 million. These cases not only held these institutions accountable but also provided additional compensation for survivors.

12:25  Russell Adler: It must've been satisfying to see justice served on such a large scale.

12:29  Brad Edwards: It was, but more importantly, it sent a strong message that no one—not even billion-dollar corporations—is above the law when it comes to enabling crimes like these.

13:00
Russell Adler: So when Epstein died, all his money went into his estate in the U.S. Virgin Islands. And the Attorney General there claimed it all through a forfeiture proceeding.

556 of 645

RUSS ADLER WITH BRAD EDWARDS, PART 2 OF 3_WINDING ROAD FOR EPSTEIN & MAXWELL VICTIMS

TRANSCRIPT_ MAY 7, 2024

13:10
Brad Edwards: That's right. Brittany and I felt that wasn't fair—the money should go to the victims. So we flew down, met with the Attorney General, and proposed setting up a compensation fund to ensure survivors wouldn't be revictimized during this process.

13:25
Russell Adler: That's incredible. How did you manage to get them on board?

13:28
Brad Edwards: Brittany had this brilliant idea—she suggested we bring three survivors down to speak directly with the Attorney General about why it was so important to release the frozen assets for the victims. It was a powerful moment, and it worked. That's how the Epstein Victims' Compensation Fund got off the ground.

13:47
Russell Adler: It's clear Brittany played a huge role in all of this.

13:50
Brad Edwards: She did. Without her, I don't think we would've been able to navigate the complexities of that legal process in the Virgin Islands or get the fund established as quickly as we did.

13:50  Brad Edwards: She did. Without her, I don't think we would've been able to navigate the complexities of that legal process in the Virgin Islands or get the fund established as quickly as we did.
Russell Adler: Let's talk about some of the offshoot cases that came out of your work on Epstein. You've mentioned before that there were numerous cases that stemmed from your involvement.

15:12  Brad Edwards: That's right. While Epstein's case was central, there were many related cases involving people and institutions that enabled his crimes. For example, we pursued legal actions against financial institutions like JP Morgan Chase and Deutsche Bank, which facilitated Epstein's operations by ignoring red flags in his transactions.

15:30  Russell Adler: Those settlements were historic, weren't they?

15:33  Brad Edwards: Yes, they were groundbreaking. In 2023, JP Morgan settled for $290 million, and Deutsche Bank settled for $75 million. These cases not only held these institutions accountable but also provided additional compensation for survivors.

15:50  Russell Adler: It must've been satisfying to see justice served on such a large scale.

15:54  Brad Edwards: It was, but more importantly, it sent a strong message that no one—not even billion-dollar corporations- is above the law when it comes to enabling crimes like these.

RUSS ADLER WITH BRAD EDWARDS, PART 2 OF 3_WINDING ROAD FOR EPSTEIN & MAXWELL VICTIMS

TRANSCRIPT_ MAY 7, 2024

15:54  Brad Edwards: It was, but more importantly, it sent a strong message that no one—  not even billion-dollar corporations—is above the law when it comes to enabling crimes like these.

16:05  Russell Adler: Let's talk about that little black book of Epstein's.
What turned out to be in it?

16:10  Brad Edwards: The little black book was essentially Epstein and Maxwell's Rolodex. It included contacts for trafficking victims, other abusers who were their associates, and a variety of people from around the world—most of whom were not involved in any illegal activity. It was a mix of the good, the bad, and everything in between.

16:30  Russell Adler: It sounds like an incredible piece of evidence.

16:33  Brad Edwards: It was. I first learned about it while deposing Epstein's butler, Alfredo Rodriguez. During the deposition, I asked him if there was any kind of Rolodex or list of contacts, and he denied it. But I could tell he was holding something back.

16:47  Russell Adler: And what happened next?

16:49  Brad Edwards: After the deposition, Rodriguez called me and said he had what he called "the Holy Grail." He described it as a list of trafficking victims, other abusers, and detailed records of payments made to girls. He wanted $50,000 in cash for it.

17:05  Russell Adler: That must have been shocking.

17:07  Brad Edwards: It was. I told him that's not how it works—I had already subpoenaed him for any such evidence. But he refused to hand it over unless I paid him. Ultimately, I reported him to the FBI, and they set up a sting operation to recover the black book.

17:54  Russell Adler: So how did the FBI operation play out?

17:57  Brad Edwards: The FBI asked me to wear a wire and help set up a meeting with Rodriguez. He agreed to exchange the black book for cash at a motel. During our final call, I tried one last time to convince him to hand it over voluntarily, but he insisted on going through with his plan.

18:15  Russell Adler: And what happened at the motel?

18:17  Brad Edwards: Rodriguez showed up with the black book, and an undercover FBI agent posing as my "fixer" handed him the cash. As soon as the exchange was made, they arrested him on charges of obstruction of justice.

18:30  Russell Adler: What became of Rodriguez after that?

RUSS ADLER WITH BRAD EDWARDS, PART 2 OF 3_WINDING ROAD FOR EPSTEIN & MAXWELL VICTIMS

TRANSCRIPT_ MAY 7, 2024

18:33  Brad Edwards: He pled guilty and received a deferred sentence with probation. But shortly after his release from court, he was caught purchasing illegal firearms—automatic weapons—and was arrested again. He eventually served time in prison and tragically died there from mesothelioma.

20:42  Russell Adler: So Alfredo Rodriguez ultimately died in prison. That's such a wild story, Brad. But let's pivot back to the broader implications of the case. You mentioned earlier about holding institutions accountable—what do you think was the most significant outcome of those efforts?

20:56  Brad Edwards: The most significant outcome, without a doubt, was the message it sent. By holding financial institutions like JP Morgan Chase and Deutsche Bank accountable, we showed that no one is above the law—not billionaires, not corporations. These settlements, totaling hundreds of millions of dollars, provided much-needed compensation to survivors and set a precedent for future cases.

21:15  Russell Adler: And those settlements were historic—$290 million from JP Morgan and $75 million from Deutsche Bank in 2023. How did those cases come about?

21:25  Brad Edwards: It became clear during our investigations that these banks had turned a blind eye to Epstein's activities. They ignored red flags and suspicious transactions because they prioritized profits over ethics. We argued that their negligence facilitated Epstein's crimes, and ultimately, they were forced to take responsibility.

21:43  Russell Adler: That's incredible work. And what about the Epstein Victims' Compensation Fund? How did that come together?

21:50  Brad Edwards: That was another collaborative effort. After Epstein died, all his money went into his estate in the U.S. Virgin Islands. Brittany Henderson and I worked tirelessly to ensure those funds were directed to survivors instead of being tied up in legal battles or forfeited entirely to the government. We proposed a compensation fund that would allow survivors to come forward without fear of being revictimized.

22:13  Russell Adler: And it worked out beautifully—over $120 million distributed to more than 130 survivors.

22:19  Brad Edwards: Exactly. It was one of the most rewarding outcomes of this entire process.
22:19  Russell Adler: Let's talk about Ghislaine Maxwell for a moment. What role do you think she played in all of this?

22:25  Brad Edwards: Maxwell was absolutely central to Epstein's operation. She wasn't just an enabler; she was an active participant in recruiting and grooming young girls for abuse. Without her, I don't think Epstein could have operated on such a large scale for so long.

RUSS ADLER WITH BRAD EDWARDS, PART 2 OF 3_WINDING ROAD FOR EPSTEIN & MAXWELL VICTIMS

TRANSCRIPT_ MAY 7, 2024

22:40 Russell Adler: And her conviction—do you feel justice was served?

22:44 Brad Edwards: It was a step in the right direction, but it's only part of the story. Maxwell's conviction brought some closure for survivors, but there are still many unanswered questions about others who were involved or complicit in Epstein's crimes.

23:00 Russell Adler: Do you think there will ever be full accountability for everyone involved?

23:04 Brad Edwards: I hope so, but it's going to take continued pressure and relentless pursuit by attorneys, journalists, and investigators. The fight isn't over—it never really is in cases like these.

23:18 Russell Adler: That's why your work is so important, Brad. You've set an incredible example for other lawyers.

23:24 Brad Edwards: Thank you, Russ. For me, it's always been about the survivors—giving them a voice and fighting for justice on their behalf.

21:40 Russell Adler: Wow, that's an unbelievable story. Alfredo Rodriguez really played a strange role in all of this. But let's pivot back to the broader picture. What do you think is the lasting impact of your work on the Epstein and Maxwell cases?

21:55
Brad Edwards: I think the biggest legacy is the empowerment of survivors. These cases showed that even against powerful individuals and institutions, justice can prevail if you're relentless. Survivors who were silenced for years were finally able to speak out, and their voices were heard in courtrooms and beyond.

22:15 Russell Adler: And what about the systemic changes? Do you think these cases have led to any meaningful reforms?

22:20 Brad Edwards: Absolutely. One of the most significant outcomes was the increased awareness of how systems—whether they're legal, financial, or social—can fail victims. We've seen changes in how prosecutors handle victim rights, more scrutiny on financial institutions, and a broader conversation about accountability for enablers.

22:40 Russell Adler: That's so important. And speaking of accountability, do you think there are still people out there who were involved in Epstein's network but haven't been held accountable yet?

22:50 Brad Edwards: Without question. Maxwell's conviction was a step in the right direction, but there are many unanswered questions about others who were complicit. The fight for full accountability isn't over—it's ongoing.

23:05 Russell Adler: It seems like you're not done yet.

11

RUSS ADLER WITH BRAD EDWARDS, PART 2 OF 3_WINDING ROAD FOR EPSTEIN & MAXWELL VICTIMS

TRANSCRIPT_ MAY 7, 2024

23:08  Brad Edwards: Not by a long shot. There are still survivors who need justice, and there are still systems that need to be reformed. This work doesn't have an endpoint— it's a continuous effort.


END

RUSS ADLER WITH BRAD EDWARDS, PART 2 OF 3_WINDING ROAD FOR EPSTEIN & MAXWELL VICTIMS

TRANSCRIPT_ MAY 7, 2024

## The Winding Road To Justice For Epstein And Maxwell Victims PART 2/3

Russell Adler
5.44K subscribers

977 views May 7, 2024 Interesting Lawyers Podcast
Join Russ in Part 2 of his gripping conversation with Bradley Edwards, the relentless lawyer representing 250 victims of the Jeffrey Epstein- Ghislaine Maxwell sex trafficking scandal. In this episode, Brad shares his thrilling journey towards justice spanning over a decade. Learn about his successful legal battle to overturn Epstein's infamous "Sweetheart Deal" with the Government, through the Crime Victims Rights Act (CVRA), a crucial victory preceding Epstein's prison demise. Discover the shocking extortion plot by Epstein's butler, Alfredo Rodriguez, demanding $50,000 for access to Epstein and Maxwell's influential Rolodex dubbed the "Holy Grail." Dive into the FBI sting operation, to recover this critical evidence and Rodriguez's criminal prosecution- shedding light on the threats faced by Brad Edwards and his team. Amidst these challenges, witness Brad Edwards' and partner Brittany Henderson's brilliant effort to persuade the Virgin Islands government to give Epstein's assets to their charity supporting the victims---a testament to their unwavering pursuit of justice. To be notified when part 3 of the Brad Edwards Interview is released, please follow and subscribe to The Interesting

0.03
**Host, Russell (Russ) Adler:** Brad let me uh pivot back to the Jeffrey Epstein cases and share with our listeners and viewers on YouTube a little bit of our personal history and how we became involved in this case together uh here's my memory um I worked out at the gym across the street from the courthouse you were at the gym I knew you were a young defense attorney doing Insurance defense at the time and you knew that I was in the process of handling sexual abuse cases against the Arch Dieses mostly Arch Dieses in Miami.

And I remember we used to talk about it and chat about it and all of that and um in about 2008, I recovered a 27 million dollar verdict up in Palm Beach County against a man who had fondled uh a little girl who was the daughter of a close family friend who he was watching and that was a jury verdict now um I never ended up collecting anything on that but it did get a lot of publicity. I know it was in the New York Times and I believe that's where you sought and called me and told me what?

0:34  BRAD EDWARDS: What I remember telling you was that Jeffrey Epstein had hired this cadre of lawyers, and it was just me—I was a solo practitioner. You had this obvious knowledge

of trying a similar type of case through trial. Could I pick your brain? Was there a way we could work together at some point in time?

1

RUSS ADLER WITH BRAD EDWARDS, PART 2 OF 3_WINDING ROAD FOR EPSTEIN & MAXWELL VICTIMS

TRANSCRIPT_ MAY 7, 2024

1:39
HOST: I remember saying, "Who's Jeffrey Epstein?" No one knew who he was at the time; he was pretty low-key. You explained to me that he's this billionaire from New York. I found it intriguing. I know we had lunch and ended up working together—at least at the inception. Those are things that I will never forget, especially since you've been good enough to memorialize them in your book. Yeah, and I know I've told you this before, but I'll tell you again: I really appreciate the way you wrote about me in the book. I thought it was really accurate and thoughtful. So thank you for that. And I think it's the only book I've really been mentioned in to date—hopefully not the last!

2:19 BRAD EDWARDS: We really tried so hard to just get it right.

2:21
Host, Russell Adler: No, you definitely did. And I will never forget those times working together. I remember going to a couple of attempted depositions of Epstein where he completely refused to testify—took the Fifth—and, uh, he was just a creepy guy.

2:35
Brad Edwards: You know, I remember I took his deposition for about three hours one morning. We broke for lunch, and you were at the Palm Beach courthouse. You stopped by the deposition on your way back. We talked in the lunchroom, and I think you went back up to the deposition room with me for the second half.

2:49
Host: Right.

2:50
Brad Edwards: And I asked about five questions that he thought were so offensive that he got up and walked out. Weren't you in the room?

2:56
Host: Now, he did—when he wasn't invoking the Fifth Amendment in response to your questions—he was getting upset and walking out. I just know that the whole thing turned into a big nothing burger because that's the way it got handled. But obviously, he got his just desserts. But Brad I remember reviewing the evidence that you had—looking through flight logs, looking through all the evidence you had—and reading about this sweetheart deal that you mentioned earlier. My feelings were, "Why isn't this guy serving a life sentence in prison for trafficking and molesting young girls?" It's—I know it's a capital felony in Florida. I know that recently, a statute was even passed that provides for the death penalty in cases of that nature. So, I'm thinking, "Why isn't he doing life in prison?" Why instead did he take a plea to soliciting a prostitute and end up doing weekends in the Palm Beach County Jail? I mean, what a total

bullshit deal, bs plea and it really, really bothered me, and I know it bothered you because we talked about it.   I also knew that this wasn't over. I was especially upset with someone I had

2

RUSS ADLER WITH BRAD EDWARDS, PART 2 OF 3_WINDING ROAD FOR EPSTEIN & MAXWELL VICTIMS

TRANSCRIPT_ MAY 7, 2024

never met and didn't know—the state attorney for Palm Beach County. I felt that he completely sold out. Look, I knew that Epstein had this all-star team of lawyers—everyone from Alan Dershowitz to Ken Starr, to a bunch of all these other dignitaries—as you would expect a billionaire to do. And man, what a sweetheart deal they got him. But of course, as it worked out, that was not the end of the story by any stretch.

4:41
Brad Edwards: So in 2008, I was not as jaded as I am now. You know, I believed that the justice system always worked—or at least it always did if you had good lawyers on both sides—and that nobody was above the law. This was kind of my entrée into realizing things aren't always that way.

But when I got into this case, it was really because Courtney Wild asked me to help her out in the criminal case. She was cooperating with the federal government, she thought there was this long investigation going on. She was getting letters from the government saying, "Be patient; there's a federal investigation." Basically, "Don't bother us; we're investigating this and we are going to do something about it."

5:26
Russell Adler: Right.

5:27
Brad Edwards: She came to me saying they weren't talking to her. I said, "Well, I'm a former prosecutor; this is going to be easy. I'll call them, and they'll tell me there's a federal investigation and that Epstein's going to prison for life." Just like you said—as a prosecutor, that's just what should have happened based on the evidence, not just the allegations.

5:45
Russell Adler: Right.

5:46
Brad Edwards: So when I called the U.S. Attorney's Office, I was instead getting kind of a cagey runaround. They weren't telling me what was going on—not timing, not substance. I thought, "Okay, what can I do about this?" So I started reading up on federal acts that provide crime victims' rights. There's the Crime Victims' Rights Act, which provides basic rights—like the right to meaningfully confer with a prosecutor and to be treated with fairness—things that Courtney clearly wasn't getting.

6:15
Russell Adler: Right.

6:16

RUSS ADLER WITH BRAD EDWARDS, PART 2 OF 3_WINDING ROAD FOR EPSTEIN & MAXWELL VICTIMS

TRANSCRIPT_ MAY 7, 2024

Brad Edwards: So I filed an emergency pleading to enforce the Crime Victims' Rights Act. I filed it as Jane Doe versus United States of America and went and filed it in federal court. That's what stirred everything up because it wasn't a civil lawsuit asking for money; it also wasn't a criminal lawsuit. It was basically just saying, "Something wrong is happening here, and we need to fix it."

6:36
Russell Adler: Right. And you were trying to set aside the sweetheart deal that was made? To vacate the NPA they had arrived at.

6:40
Brad Edwards: Exactly. At the time, I didn't even know there was a sweetheart deal. At the time, they just weren't talking to Courtney. So I filed this case and said, "Hey look, something illegal is going on behind the scenes." They were working out something with Epstein. I learned later that week, through this very quick pleading process, I learned that there had already been a deal worked out behind their backs—which really was wrong.

7:01
Russell Adler: Wow.

7:02
Brad Edwards: So that was kind of the beginning of our fight under the Crime Victims' Rights Act. Ultimately, the goal was to invalidate the deal because it was an illegal deal.

7:02
Russell Adler: And I know ultimately you won that case.

7:05
Brad Edwards: Yes, although it was bittersweet because then he died.

7:09
Russell Adler: Right.

7:10
Brad Edwards: So we won that case—there was a determination that we were right, that the government violated the Crime Victims' Rights Act. The question then became, "What's the remedy?" We were at the remedy phase, arguing that the deal should be invalidated because it was illegal.

7:26
Russell Adler: Right.

7:27

4

RUSS ADLER WITH BRAD EDWARDS, PART 2 OF 3_WINDING ROAD FOR EPSTEIN & MAXWELL VICTIMS

TRANSCRIPT_ MAY 7, 2024

Brad Edwards: But then Epstein was arrested in 2019, and shortly after that, he committed suicide. So, after 11 years of litigation, we finally got a ruling, but by then, the remedy was deemed moot because he was dead.

7:41

Russell Adler: That must have been frustrating.

7:43

Brad Edwards: It was incredibly frustrating. We appealed to the Eleventh Circuit, but with Epstein gone, there wasn't much left to enforce against anyone. The case essentially ended there.

8:01

Russell Adler: I keep thinking about the word "relentless" when I hear this story. You truly epitomize what it means to be relentless as a litigator.

8:10

Brad Edwards: Thank you. You have to be relentless in cases like these because there are so many obstacles—legal and otherwise—that you have to overcome to get justice for

8:21

Russell Adler: And you've done that time and time again, not just in this case but in so many others.

8:21

Russell Adler: And you've done that time and time again, not just in this case but in so many others.

8:30

Brad Edwards: Thank you. You know, it's always about the survivors for me. Every case is different, but the mission is always the same—getting justice for those who have been wronged and ensuring their voices are heard.

8:42

Russell Adler: Speaking of survivors, let's talk about some of the offshoot cases that came out of your work on Epstein. You've mentioned before that there were numerous cases that stemmed from your involvement.

8:53

Brad Edwards: That's right. While the Epstein case was the centerpiece, there were many related cases involving other individuals and entities that enabled his crimes. For example, we pursued legal actions against financial institutions that facilitated Epstein's operations. That led to significant settlements with JP Morgan Chase and Deutsche Bank in 2023.

9:14

RUSS ADLER WITH BRAD EDWARDS, PART 2 OF 3_WINDING ROAD FOR EPSTEIN & MAXWELL VICTIMS

TRANSCRIPT_ MAY 7, 2024

Russell Adler: Those were groundbreaking cases. Can you elaborate on how those came about?

9;18

Brad Edwards: Sure. It became clear during our investigations that Epstein couldn't have operated on such a large scale without assistance from major financial institutions. These banks turned a blind eye to suspicious transactions and red flags because they prioritized profits over ethics. By holding them accountable, we sent a strong message that no one is above the law—not even billion-dollar corporations.

9:18

Russell Adler: That must have been incredibly satisfying to see those institutions held accountable.

9:23

Brad Edwards: It was, but more importantly, it provided another avenue for survivors to receive compensation. The Epstein Victims' Compensation Fund was already a huge success, distributing over $120 million to more than 130 survivors. These settlements added another layer of accountability and restitution.

9:40

Russell Adler: Let's shift gears a bit. You've talked about your partnership with Brittany Henderson before. Can you share more about her role in these cases?

9:50

Brad Edwards: Brittany has been instrumental in every aspect of these cases. She's not just my partner in law; she's my partner in justice. From day one, she brought an unmatched level of dedication and empathy to our work with survivors. In fact, she played a critical role in establishing the Epstein Victims' Compensation Fund and ensuring it ran smoothly.

10:12

Russell Adler: That's incredible. What would you say makes her so effective?

10:15

Brad Edwards: Brittany has this unique ability to connect with survivors on a deeply personal level while also being an exceptional litigator. We call her "the victim whisperer" because she has this innate talent for making survivors feel heard and supported. She's also one of the smartest lawyers I know—her attention to detail and strategic thinking are second to none.

10:35  Russell Adler: That's incredible. It sounds like she was instrumental in the Epstein Victims' Compensation Fund as well.

RUSS ADLER WITH BRAD EDWARDS, PART 2 OF 3_WINDING ROAD FOR EPSTEIN & MAXWELL VICTIMS

TRANSCRIPT_ MAY 7, 2024

10:42  Brad Edwards: Absolutely. When Epstein died, all his money went into his estate in the U.S. Virgin Islands, and the Attorney General there claimed it all through a forfeiture proceeding. Brittany and I felt that wasn't fair – the money should go to the victims. So we flew down, met with the Attorney General, and proposed setting up a compensation fund to ensure survivors wouldn't be revictimized during this process.

11:08  Russell Adler: That's amazing. How did you convince them?

11:11  Brad Edwards: Brittany had a brilliant idea—she suggested we bring three survivors down to speak directly with the Attorney General about why it was so important to release the frozen assets for the victims. It was a powerful moment, and it worked. That's how the Epstein Victims' Compensation Fund got off the ground.

11:30  Russell Adler: It's clear Brittany played a huge role in all of this.

11:33  Brad Edwards: She did. Without her, I don't think we would've been able to navigate the complexities of that legal process in the Virgin Islands or get the fund established as quickly as we did.

11:33  Russell Adler: Let's shift gears for a moment. You've mentioned before that there were other cases that spun off from your work on Epstein. Can you talk about some of those?

11:42  Brad Edwards: Sure. While Epstein's case was central, there were many related cases involving people and institutions that enabled his crimes. For example, we pursued legal actions against financial institutions like JP Morgan Chase and Deutsche Bank, which facilitated Epstein's operations by ignoring red flags in his transactions.

12:05  Russell Adler: Those settlements were historic, weren't they?

12:08  Brad Edwards: Yes, they were groundbreaking. In 2023, JP Morgan settled for $290 million, and Deutsche Bank settled for $75 million. These cases not only held these institutions accountable but also provided additional compensation for survivors.

12:25  Russell Adler: It must've been satisfying to see justice served on such a large scale.

12:29  Brad Edwards: It was, but more importantly, it sent a strong message that no one—not even billion-dollar corporations—is above the law when it comes to enabling crimes like these.

13:00
Russell Adler: So when Epstein died, all his money went into his estate in the U.S. Virgin Islands. And the Attorney General there claimed it all through a forfeiture proceeding.

RUSS ADLER WITH BRAD EDWARDS, PART 2 OF 3_WINDING ROAD FOR EPSTEIN & MAXWELL VICTIMS

TRANSCRIPT_ MAY 7, 2024
13:10
Brad Edwards: That's right. Brittany and I felt that wasn't fair—the money should go to the victims. So we flew down, met with the Attorney General, and proposed setting up a compensation fund to ensure survivors wouldn't be revictimized during this process.

13:25
Russell Adler: That's incredible. How did you manage to get them on board?

13:28
Brad Edwards: Brittany had this brilliant idea—she suggested we bring three survivors down to speak directly with the Attorney General about why it was so important to release the frozen assets for the victims. It was a powerful moment, and it worked. That's how the Epstein Victims' Compensation Fund got off the ground.

13:47
Russell Adler: It's clear Brittany played a huge role in all of this.

13:50
Brad Edwards: She did. Without her, I don't think we would've been able to navigate the complexities of that legal process in the Virgin Islands or get the fund established as quickly as we did.

13:50  Brad Edwards: She did. Without her, I don't think we would've been able to navigate the complexities of that legal process in the Virgin Islands or get the fund established as quickly as we did.
Russell Adler: Let's talk about some of the offshoot cases that came out of your work on Epstein. You've mentioned before that there were numerous cases that stemmed from your involvement.

15:12  Brad Edwards: That's right. While Epstein's case was central, there were many related cases involving people and institutions that enabled his crimes. For example, we pursued legal actions against financial institutions like JP Morgan Chase and Deutsche Bank, which facilitated Epstein's operations by ignoring red flags in his transactions.

15:30  Russell Adler: Those settlements were historic, weren't they?

15:33  Brad Edwards: Yes, they were groundbreaking. In 2023, JP Morgan settled for $290 million, and Deutsche Bank settled for $75 million. These cases not only held these institutions accountable but also provided additional compensation for survivors.

15:50  Russell Adler: It must've been satisfying to see justice served on such a large scale.

15:54  Brad Edwards: It was, but more importantly, it sent a strong message that no one—not even billion-dollar corporations—is above the law when it comes to enabling crimes like these.

RUSS ADLER WITH BRAD EDWARDS, PART 2 OF 3_WINDING ROAD FOR EPSTEIN & MAXWELL VICTIMS

TRANSCRIPT_ MAY 7, 2024

15:54 Brad Edwards: It was, but more importantly, it sent a strong message that no one —not even billion-dollar corporations—is above the law when it comes to enabling crimes like these.

16:05 Russell Adler: Let's talk about that little black book of Epstein's. What turned out to be in it?

16:10 Brad Edwards: The little black book was essentially Epstein and Maxwell's Rolodex. It included contacts for trafficking victims, other abusers who were their associates, and a variety of people from around the world—most of whom were not involved in any illegal activity. It was a mix of the good, the bad, and everything in between.

16:30 Russell Adler: It sounds like an incredible piece of evidence.

16:33 Brad Edwards: It was. I first learned about it while deposing Epstein's butler, Alfredo Rodriguez. During the deposition, I asked him if there was any kind of Rolodex or list of contacts, and he denied it. But I could tell he was holding something back.

16:47 Russell Adler: And what happened next?

16:49 Brad Edwards: After the deposition, Rodriguez called me and said he had what he called "the Holy Grail." He described it as a list of trafficking victims, other abusers, and detailed records of payments made to girls. He wanted $50,000 in cash for it.

17:05 Russell Adler: That must have been shocking.

17:07 Brad Edwards: It was. I told him that's not how it works—I had already subpoenaed him for any such evidence. But he refused to hand it over unless I paid him. Ultimately, I reported him to the FBI, and they set up a sting operation to recover the black book.

17:54 Russell Adler: So how did the FBI operation play out?

17:57 Brad Edwards: The FBI asked me to wear a wire and help set up a meeting with Rodriguez. He agreed to exchange the black book for cash at a motel. During our final call, I tried one last time to convince him to hand it over voluntarily, but he insisted on going through with his plan.

18:15 Russell Adler: And what happened at the motel?

18:17 Brad Edwards: Rodriguez showed up with the black book, and an undercover FBI agent posing as my "fixer" handed him the cash. As soon as the exchange was made, they arrested him on charges of obstruction of justice.

18:30 Russell Adler: What became of Rodriguez after that?

RUSS ADLER WITH BRAD EDWARDS, PART 2 OF 3_WINDING ROAD FOR EPSTEIN & MAXWELL VICTIMS

TRANSCRIPT_ MAY 7, 2024

18:33  Brad Edwards: He pled guilty and received a deferred sentence with probation. But shortly after his release from court, he was caught purchasing illegal firearms —automatic weapons—and was arrested again. He eventually served time in prison and tragically died there from mesothelioma.

20:42  Russell Adler: So Alfredo Rodriguez ultimately died in prison. That's such a wild story, Brad. But let's pivot back to the broader implications of the case. You mentioned earlier about holding institutions accountable—what do you think was the most significant outcome of those efforts?

20:56  Brad Edwards: The most significant outcome, without a doubt, was the message it sent. By holding financial institutions like JP Morgan Chase and Deutsche Bank accountable, we showed that no one is above the law —not billionaires, not corporations. These settlements, totaling hundreds of millions of dollars, provided much-needed compensation to survivors and set a precedent for future cases.

21:15  Russell Adler: And those settlements were historic —$290 million from JP Morgan and $75 million from Deutsche Bank in 2023. How did those cases come about?

21:25  Brad Edwards: It became clear during our investigations that these banks had turned a blind eye to Epstein's activities. They ignored red flags and suspicious transactions because they prioritized profits over ethics. We argued that their negligence facilitated Epstein's crimes, and ultimately, they were forced to take responsibility.

21:43  Russell Adler: That's incredible work. And what about the Epstein Victims' Compensation Fund? How did that come together?

21:50  Brad Edwards: That was another collaborative effort. After Epstein died, all his money went into his estate in the U.S. Virgin Islands. Brittany Henderson and I worked tirelessly to ensure those funds were directed to survivors instead of being tied up in legal battles or forfeited entirely to the government. We proposed a compensation fund that would allow survivors to come forward without fear of being revictimized.

22:13  Russell Adler: And it worked out beautifully —over $120 million distributed to more than 130 survivors.

22:19  Brad Edwards: Exactly. It was one of the most rewarding outcomes of this entire process.
22:19  Russell Adler: Let's talk about Ghislaine Maxwell for a moment. What role do you think she played in all of this?

22:25  Brad Edwards: Maxwell was absolutely central to Epstein's operation. She wasn't just an enabler; she was an active participant in recruiting and grooming young girls for abuse. Without her, I don't think Epstein could have operated on such a large scale for so long.

RUSS ADLER WITH BRAD EDWARDS, PART 2 OF 3_WINDING ROAD FOR EPSTEIN & MAXWELL VICTIMS

TRANSCRIPT_ MAY 7, 2024

22:40 Russell Adler: And her conviction—do you feel justice was served?

22:44 Brad Edwards: It was a step in the right direction, but it's only part of the story. Maxwell's conviction brought some closure for survivors, but there are still many unanswered questions about others who were involved or complicit in Epstein's crimes.

23:00 Russell Adler: Do you think there will ever be full accountability for everyone involved?

23:04 Brad Edwards: I hope so, but it's going to take continued pressure and relentless pursuit by attorneys, journalists, and investigators. The fight isn't over—it never really is in cases like these.

23:18 Russell Adler: That's why your work is so important, Brad. You've set an incredible example for other lawyers.

23:24 Brad Edwards: Thank you, Russ. For me, it's always been about the survivors — giving them a voice and fighting for justice on their behalf.

21:40 Russell Adler: Wow, that's an unbelievable story. Alfredo Rodriguez really played a strange role in all of this. But let's pivot back to the broader picture. What do you think is the lasting impact of your work on the Epstein and Maxwell cases?

21:55
Brad Edwards: I think the biggest legacy is the empowerment of survivors. These cases showed that even against powerful individuals and institutions, justice can prevail if you're relentless. Survivors who were silenced for years were finally able to speak out, and their voices were heard in courtrooms and beyond.

22:15 Russell Adler: And what about the systemic changes? Do you think these cases have led to any meaningful reforms?

22:20 Brad Edwards: Absolutely. One of the most significant outcomes was the increased awareness of how systems — whether they're legal, financial, or social —can fail victims. We've seen changes in how prosecutors handle victim rights, more scrutiny on financial institutions, and a broader conversation about accountability for enablers.

22:40 Russell Adler: That's so important. And speaking of accountability, do you think there are still people out there who were involved in Epstein's network but haven't been held accountable yet?

22:50 Brad Edwards: Without question. Maxwell's conviction was a step in the right direction, but there are many unanswered questions about others who were complicit. The fight for full accountability isn't over—it's ongoing.

23:05 Russell Adler: It seems like you're not done yet.

11

RUSS ADLER WITH BRAD EDWARDS, PART 2 OF 3_WINDING ROAD FOR EPSTEIN & MAXWELL VICTIMS

TRANSCRIPT_ MAY 7, 2024

23:08  Brad Edwards: Not by a long shot. There are still survivors who need justice, and there are still systems that need to be reformed. This work doesn't have an endpoint – it's a continuous effort.

END

# EXHIBIT  32

 **Reuters**

# Jeffrey Epstein victims sue FBI, allege coverup

By Jonathan Stempel

February 14, 2024 11:00 AM PST Updated February 14, 2024

NEW YORK, Feb 14 (Reuters) - A dozen victims of Jeffrey Epstein filed a lawsuit on Wednesday accusing the FBI of covering up its failure to investigate the late financier, enabling his sex trafficking to continue for more than 20 years.

The victims, using Jane Doe pseudonyms, said the FBI received credible tips as early as 1996 that Epstein trafficked young women and girls, yet failed to interview victims or share what it knew with federal and local law enforcement.

Victims said the FBI finally began a probe in 2006, but ended it two years later after Epstein pleaded guilty to a Florida prostitution charge, and kept ignoring tips until his July 2019 arrest. Epstein committed suicide a month later.
"As a direct and proximate cause of the FBI's negligence, plaintiffs would not have been continued to be sex trafficked, abused, raped, tortured and threatened," the complaint said.

"Jane Does 1-12 bring this lawsuit to get to the bottom -- once and for all -- of the FBI's role in Epstein's criminal sex trafficking ring," it added.

The U.S. Department of Justice did not immediately respond to a request for comment.

Wednesday's complaint filed in federal court in Manhattan seeks damages from the U.S. government, the only defendant.

It cited a Dec. 5, 2023, Senate Judiciary Committee hearing where FBI Director Christopher Wray was asked why the FBI didn't do more. He promised to "get with my team and figure out if there is more information we can provide."

The number of Epstein's victims is believed to be well over 100.

Victims previously reached approximately $500 million of settlements, before deducting legal fees and costs, with a program funded by Epstein's estate and with two of Epstein's banks, JPMorgan Chase (JPM.N) and Deutsche Bank (DBKGn.DE)

It is unclear whether the 12 plaintiffs received compensation from those settlements. Their lawyers did not immediately respond to requests for comment.

The case is Doe 1 et al v United States, U.S. District Court, Southern District of New York, No. 24-01071.

EXHIBIT 34

LCI1MAX1

1          THE COURT:  And again, noting that that's why I gave

2     the limiting instruction for Annie's testimony, that's why the

3     limiting instruction did differ from the limiting instruction

4     for Kate, because that is the Court's legal conclusion.

5          MR. EVERDELL:  Understood, your Honor.

6          THE COURT:  So let me just make sure my clerks --

7     yeah.  Right.  My clerk has adopted the change on line 16,

8     cutting the comma, "when Annie was under the age of 18," comma.

9          Next.

10          MR. EVERDELL:  Your Honor, just to confirm, we are

11     also eliminating, with the government's consent, No. 4, which

12     refers to Kate, the overt act referring to Kate.

13          THE COURT:  Yes.  So eliminating entirely the overt

14     act on line 18 through 20.  And then we'll have to change the

15     fifth one to 4 --

16          MR. EVERDELL:  Correct, your Honor.

17          THE COURT:  -- on line 20.  And that one looks like it

18     can stay as is with the age.

19          MR. EVERDELL:  Yes, your Honor.

20          THE COURT:  Okay.

21          MR. ROHRBACH:  Your Honor, I think that that should

22     be -- on line 21, it should still be changed to 17, even

23     though --

24          THE COURT:  Because of the --

25          MR. ROHRBACH:  Because of the legal count.  It's the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

LCI1MAX1

1    conspiracy to violate the offense with the age of consent of
2    17, even though elsewhere Carolyn is charged with an age of
3    consent of 18.
4            THE COURT:  I presume you have no objection?
5            MR. EVERDELL:  No objection, your Honor.
6            THE COURT:  Yes.  Let me just think about that.
7            I see.  Okay.  All right.  So Instruction 36, line 21,
8    changing "Carolyn was under the age of 18" to "the age of 17."
9    Yeah, that's right.
10           Okay.  Next.
11           MR. EVERDELL:  Next one, lines, on that page, 23 to
12   24, and on the following page, lines 1 through 10, it tracks
13   the same changes for the transportation charge.
14           MR. ROHRBACH:  That makes sense, I think, your Honor.
15           THE COURT:  Okay.  Let me see if I can do these.
16   Line 24, changing "age of 18" to "age of 17," and then line 2,
17   changing "age of 18" to 17.  Line 4, cutting the clause "when
18   Annie was under the age of 18," and then cutting overt act
19   regarding Kate at No. 4.  So that's lines 6 through 8.  And
20   then line 19, changing 18 to 17.
21           MR. EVERDELL:  Correct, your Honor.
22           MS. STERNHEIM:  Judge, you would also want to change
23   the bracketed No. 5 to No. 4.
24           THE COURT:  Thank you, Ms. Sternheim.  Changing the
25   fifth listed overt act to the fourth listed overt act.  Just

LCI1MAX1

1       one moment.

2               Oh, and we'll again change, on line 23, page 49, the

3       word "reads" to "alleges."

4               MR. EVERDELL:  Yes, your Honor.

5               THE COURT:  Okay.  Next.

6               MR. EVERDELL:  Same page, page 50, your Honor,

7       line 18, just going back, these are overt acts with respect to

8       Count Five.

9               THE COURT:  Mm-hmm.

10              MR. EVERDELL:  The third one, which begins on line 17,

11      between -- oh, yes.  "Between in or about 2001 and in or about

12      2004, Epstein's employees, including at times Maxwell, sent

13      Carolyn gifts, including lingerie, etc."  I don't think there's

14      any evidence in the record that Maxwell sent any gifts.  In

15      fact, I think the FedEx records show that it wasn't Maxwell

16      sending anything.  I don't think there's any testimony in the

17      record that Maxwell was sending the gifts, so I think that

18      should be excluded.

19              MR. ROHRBACH:  That's fine, your Honor.  This is what

20      the grand jury charged, but that is fine, given the state of

21      the record.

22              THE COURT:  Okay.

23              MR. ROHRBACH:  But to be clear, the government is fine

24      with including the clause -- cutting the clause "including at

25      times Maxwell."

LCI1MAX1

1          THE COURT:  So I think that's the request.  So line 18

2  on my page 50, which is the second page of Instruction No. 36,

3  we will cut comma, "including at times Maxwell," comma.

4          MR. ROHRBACH:  And in light of that change, your

5  Honor, on line 11 of that page, it should say, "The indictment

6  alleges as follows."

7          THE COURT:  Right.  On line 11, changing "reads" to

8  "alleges."

9          What's next, Mr. Everdell?

10         MR. EVERDELL:  Yes, your Honor.  It's on page 51,

11  line 15.  I think we've been using "Ms. Maxwell" in this

12  charge, so we'll change on line 15 "the defendant" to

13  "Ms. Maxwell."

14         MR. ROHRBACH:  That's fine, your Honor.

15         THE COURT:  Okay.  So we're on Instruction No. 36.

16  Close to the end of that, the second to last paragraph of that

17  instruction, line 15, changing "the defendant" to

18  "Ms. Maxwell."

19         So one question.  We've taken Kate out of the overt

20  acts.  Page 51, lines 13 through 16 are no longer seem to make

21  sense.

22         MR. EVERDELL:  51, your Honor?

23         THE COURT:  Yeah.  Right?

24         MR. EVERDELL:  Well, I understand what you're saying

25  with respect to reference to overt acts because she's not in

LCI1MAX1

1    the overt acts, but I do think it's important to instruct the

2    jury here that they can't convict solely on the basis of Kate's

3    testimony.  That I think is --

4              THE COURT:  Right, because it's not just about what's

5    in the indictment.

6              MR. EVERDELL:  Right.

7              MR. ROHRBACH:  That's right, your Honor.

8              THE COURT:  Okay.

9              MS. STERNHEIM:  Judge, may I just have one moment with

10   Mr. Everdell?

11             THE COURT:  Yes, please.  Actually, why don't we take

12   a 10-minute break.

13             MR. EVERDELL:  Thank you, your Honor.

14             MR. ROHRBACH:  Thank you, your Honor.

15             THE LAW CLERK:  All rise.

16             (Recess)

17             (Continued on next page)

18

19

20

21

22

23

24

25

LCIAMAX2ps

```
 1              (Jury not present)
 2              THE COURT:  All right.  Mr. Everdell.
 3              MR. EVERDELL:  Thank you, your Honor.  The next page
 4      we have is page 54, instruction 39, the conscious avoidance
 5      instruction.  Your Honor, on that, the defense objects to this
 6      being included, this instruction being included in the charge.
 7              I think, as the Court is aware, to include an
 8      instruction on conscious avoidance, you have to establish two
 9      prongs.  First is that the defendant has to assert some lack of
10      specific aspect of knowledge required for conviction.  I don't
11      think we're disputing that.  But the second prong is that there
12      must be an appropriate factual predicate for the charge.  And
13      here, your Honor, the government's theory of the case and the
14      proof that's been elicited through the testimony is that she
15      was an active participant in all aspects of the charges.  There
16      has been testimony by all of the witnesses that she was not
17      only participating and facilitating the sexual encounters but
18      that she participated.  So we have testimony from Jane that she
19      was involved, that Ms. Maxwell was involved in the group
20      sexualized massages.  We had testimony from Annie that the
21      topless massage was done by Ms. Maxwell; she rubbed the top
22      part of her chest during the topless massage.  We had testimony
23      from Carolyn that Ms. Maxwell groped her breasts and commented
24      upon her hips.  These are all active-participant measures.
25      This is someone that's not consciously avoiding.
```

LCIAMAX2ps

1          The theory they are proceeding on is that she is an

2     active participant.  They can't have it both ways.  The proof

3     at trial that they have elicited is that she was actively

4     involved.  This seems to be here as some sort of backup option.

5     And that's not permissible, your Honor.

6          And I would add that, in a case like this in

7     particular, there is a real concern that the jurors are going

8     to look at this evidence and, given the subject matter of the

9     case, they're going to think, well, she must have known and

10    that's enough for me because this is conduct that really I

11    can't countenance because it involves children.  And then the

12    conscious avoidance instruction will give them license to

13    convict the defendant on an improper basis simply because of

14    the nature of the subject matter.

15         So that's an overlay, your Honor.  But at the basis,

16    it's that the proof and the theory of the charging in this case

17    and the proof that's gone with it is that she's an active

18    participant o, so we do not think that there is an appropriate

19    factual predicate for this charge.

20         MR. ROHRBACH:  A few responses to that, your Honor.

21    First of all, the witnesses testified that she was an active

22    participant.  The jury may reject their testimony that she

23    actively participated and can still convict based on her

24    facilitation of the various offenses, including through a

25    conscious avoidance theory.

LCIAMAX2ps

```
 1              Second of all, there are particular factual knowledge
 2      elements that the defense is contesting.  One is her knowledge
 3      of the age of the victim.  Another is her mens rea with regard
 4      to the purposes of travel.  And so for those things the jury
 5      could reasonably conclude that she had sufficient -- that she
 6      was engaging in conscious avoidance as to those particular
 7      facts.
 8              So, for example, to take the knowledge of age issue,
 9      the defense has elicited testimony from several witnesses that
10      the defendant could not, was not aware that the various victims
11      were minors.  The jury could conclude that she in fact did have
12      that knowledge.  The jury could also conclude that she
13      consciously avoided having that knowledge.  Those are both
14      reasonable theories available for the jury for which there is
15      an adequate factual predicate in the record, your Honor.
16              MR. EVERDELL:  Your Honor, I think this is inviting
17      the jury, by considering the conscious avoidance charge, to
18      convict on an improper basis that she must have known.
19              THE COURT:  Could you just respond to the specific
20      argument, because I think you started by saying there's been no
21      contention as to a lack of knowledge with respect to any aspect
22      of the crimes charged.  So the specific contention and the
23      reason I had in my head to include it rather than not include
24      it -- which, for reasons you've indicated, is a case-by-case
25      analysis depending on what factual issues are in play.  But on
```

LCIAMAX2ps

1   the question of knowledge as to age, what's your response?  Why

2   isn't it applicable with respect to what the defense has put in

3   issue with regard to that?

4           MR. EVERDELL:  Yes, your Honor.  The witnesses

5   themselves -- sorry, your Honor.  One moment.

6           THE COURT:  Yes.

7           MR. PAGLIUCA:  If you don't mind, your Honor, it's

8   easier for me --

9           THE COURT:  Since it's Saturday, I will break my

10  one-lawyer-per-issue rule.

11          MR. PAGLIUCA:  I appreciate it.  My recollection is

12  the testimony from each of the four witnesses, I will call

13  them, is that they said that they told Ms. Maxwell their age.

14  Carolyn said that she told Ms. Maxwell her age.  Jane said she

15  told Ms. Maxwell her age.  Similarly, Kate said she told

16  Ms. Maxwell her age.

17          So there is no "I'm not trying to find out what her

18  age is" evidence in this case.  The evidence that was

19  elicited -- I think this is, you know, largely through

20  Mr. Alessi.  Mr. Alessi said that he only saw two people at the

21  house that he thought were under the age of 18, and that was

22  Ms. Roberts and Jane.  I'm trying to remember everybody's

23  names.

24          So that's that testimony.

25          I don't think there's any other testimony in the

```
 1    record that relates to that topic.  So I think that --
 2            THE COURT:  So the defense has questioned multiple
 3    witnesses on their perceptions of individual ages, of relevant
 4    individuals' ages, so that puts into question the knowledge
 5    element with respect to ages, and it's true there's testimony
 6    from each of the alleged victims as to what they told
 7    Ms. Maxwell, but of course I don't know whether the jury will
 8    accept that testimony or not, or any of those individual pieces
 9    of testimony.  So it seems like having -- the question here is
10    whether there are specific elements, knowledge elements that
11    are in issue, either because it's what some of the evidence
12    goes to or because the defense has made cross-points or will
13    make arguments regarding that.  I mean, I don't suppose it's
14    the case that the defense won't -- will it not argue during
15    closing anything with respect to whether Ms. Maxwell knew of
16    the relevant ages?
17            MS. STERNHEIM:  May we have a moment, Judge?
18            THE COURT:  Sure.
19            MR. PAGLIUCA:  Here's the -- I'm going to try to
20    address -- there's a larger concern.  I need to break this into
21    two pieces.
22            THE COURT:  OK.
23            MR. PAGLIUCA:  One that I view as an evidentiary issue
24    with the indictment and the evidence in the case is that there
25    was testimony about multiple females being at the Palm Beach
```

LCIAMAX2ps

```
 1    residence.  And I think the testimony that was elicited by the

 2    defense went to what the ages of these multiple females looked

 3    like, because the inference is that there are, you know,

 4    literally hundreds of under-age women at Epstein's house.

 5          And so the testimony from Mr. Alessi was, he only saw

 6    two people that he thought looked under age, as opposed to the

 7    rest of these people.

 8          There was no testimony elicited that, you know,

 9    Ms. Maxwell did or didn't know what -- I mean, the contention

10    is that these folks were older.  Kate, for example, the

11    contention is she wasn't under age.

12          THE COURT:  Yesterday, I think Ms. Dubin was asked how

13    Jane appeared to her.

14          MR. PAGLIUCA:  Correct, at the office.  But I also

15    think that that's a tension here, is that Jane was older than

16    she is saying.  You know, the actual factual dispute is, Jane

17    says she was 14, 15.  We disagree.  We believe it's later in

18    time.

19          So this is not an avoidance issue.  This is a factual

20    dispute as to how old these people actually were.  With the

21    exception of Carolyn, who says, you know, I was this age, and

22    we say, we never, you know, had anything to do with Carolyn.

23    That's the factual dispute.

24          And so I think there is a legitimate argument that

25    doesn't relate to conscious avoidance, which is, simply, there
```

# EXHIBIT  35

# DEPARTMENT OF JUSTICE



## OFFICE OF
## PROFESSIONAL RESPONSIBILITY

## REPORT

Investigation into the
U.S. Attorney's Office for the Southern District of Florida's
Resolution of Its 2006–2008 Federal Criminal Investigation of
Jeffrey Epstein and Its Interactions with Victims during the Investigation

November 2020

NOTE: THIS REPORT CONTAINS SENSITIVE, PRIVILEGED, AND PRIVACY ACT PROTECTED INFORMATION. DO NOT DISTRIBUTE THE REPORT OR ITS CONTENTS WITHOUT THE PRIOR APPROVAL OF THE OFFICE OF PROFESSIONAL RESPONSIBILITY.

of immunity, or (6) the deportation of criminal aliens. The potentially applicable standards that OPR considered as to each of these issues are identified and discussed later in this Report. OPR also examined whether the evidence establishes that any of the subjects were influenced to enter into the NPA, or to include in the NPA terms favorable to Epstein, because of an improper motive, such as a bribe, political consideration, personal interest, or favoritism. OPR also examined and discusses in this Report significant events that occurred after the NPA was negotiated and signed that shed additional light on the USAO's handling of the Epstein investigation.

### B.    The District Court's Conclusion That the USAO Violated the CVRA

To address the district court's adverse judicial findings, OPR assessed the manner, content, and timing of the government's interactions with victims both before and after the NPA was signed, including victim notification letters issued by the USAO and the FBI and interviews conducted by the USAO. OPR considered whether any of the subject attorneys violated any clear and unambiguous standard governing victim consultation or notification. OPR examined the government's lack of consultation with the victims before the NPA was signed, as well as the circumstances relating to the district court's finding that the USAO affirmatively misled Epstein's victims about the status of the federal investigation after the NPA was signed.

## V.    OPR'S FINDINGS AND CONCLUSIONS

OPR evaluated the conduct of each subject and considered his or her individual role in various decisions and events. Acosta, however, made the pivotal decision to resolve the federal investigation of Epstein through a state-based plea and either developed or approved the terms of the initial offer to the defense that set the beginning point for the subsequent negotiations that led to the NPA. Although Acosta did not sign the NPA, he participated in its drafting and approved it, with knowledge of its terms. During his OPR interview, Acosta acknowledged that he approved the NPA and accepted responsibility for it. Therefore, OPR considers Acosta to be responsible for the NPA and for the actions of the other subjects who implemented his decisions. Acosta's overall responsibility for the government's interactions or lack of communication with the victims is less clear, but Acosta affirmatively made certain decisions regarding victim notification, and OPR evaluates his conduct with respect to those decisions.

### A.    Findings and Conclusions Relating to the NPA

With respect to all five subjects of OPR's investigation, OPR concludes that the subjects did not commit professional misconduct with respect to the development, negotiation, and approval of the NPA. Under OPR's framework, professional misconduct requires a finding that a subject attorney intentionally or recklessly violated a clear and unambiguous standard governing the conduct at issue. OPR found no clear and unambiguous standard that required Acosta to indict Epstein on federal charges or that prohibited his decision to defer prosecution to the state. Furthermore, none of the individual terms of the NPA violated Department or other applicable standards.

As the U.S. Attorney, Acosta had the "plenary authority" under established federal law and Department policy to resolve the case as he deemed necessary and appropriate, as long as his decision was not motivated or influenced by improper factors. Acosta's decision to decline to

to the assault charge" and suggesting a different factual scenario to support a federal charge.[112] At this point, Sloman left on vacation, and he informed Acosta and Villafaña that in his absence Lourie had agreed "to help finalize this." Lourie spent the following work week at his new post at the Department in Washington, D.C., but communicated with his USAO colleagues by phone and email.

In a Sunday, September 16, 2007 email, Villafaña informed Lefkowitz that she had drafted a factual proffer to accompany a revised "hybrid" federal plea proposal. In that email, Villafaña also noted that she was considering filing charges in the federal district court in Miami, "which will hopefully cut the press coverage significantly." This email received considerable attention 12 years later when it was made public during the CVRA litigation and was viewed as evidence of the USAO's efforts to conceal the NPA from the victims. Villafaña, however, explained to OPR that she was concerned that news media coverage would violate the victims' privacy. She told OPR, "[I]f [the victims] wanted to attend [the plea hearing], I wanted them to be able to go into the courthouse without their faces being splashed all over the newspaper," and that such publicity was less likely to happen in Miami, where the press "in general does not care about what happens in Palm Beach."

Lefkowitz responded to Villafaña with a revised version of her latest proposed "hybrid" plea agreement, in a document entitled "Agreement." Significantly, this defense proposal introduced two new provisions. The first related to four female assistants who had allegedly facilitated Epstein in his criminal scheme. The defense sought a government promise not to prosecute them, as well as certain other unnamed Epstein employees, and a promise to forego immigration proceedings against two of the female assistants:

> Epstein's fulfilling the terms and conditions of the Agreement also precludes the initiation of any and all criminal charges which might otherwise in the future be brought against [four named female assistants] or any employee of [a specific Epstein-owned corporate entity] for any criminal charge that arises out of the ongoing federal investigation . . . . Further, no immigration proceeding will be instituted against [two named female assistants] as a result of the ongoing investigation.

The second new provision related to the USAO's efforts to obtain Epstein's computers:

> Epstein's fulfilling the terms and conditions of the Agreement resolves any and all outstanding [legal process] that have requested witness testimony and/or the production of documents and/or computers in relation to the investigation that is the subject of the Agreement. Each [legal process] will be withdrawn upon the execution of the Agreement and will not be re-issued absent reliable

---

[112] Villafaña told OPR that she sometimes used her home email account because "[n]egotiations were occurring at nights, on weekend[s], and while I was [away] from the office for personal reasons], . . . and this occurred during a time when out of office access to email was very limited." Records show her supervisors were aware that at times she used her personal email account in communicating with defense counsel in this case.

message, "That is fine. [The West Palm Beach manager] and I will nail everything down, we just want to get a final blessing."

Negotiations continued throughout the day on Wednesday, September 19, 2007, with Villafaña and Lefkowitz exchanging emails regarding the factual proffer for a plea and the scheduling of a meeting to finalize the plea agreement's terms. During that exchange, Villafaña made clear to Lefkowitz that the time for negotiating was reaching an end:

> I hate to have to be firm about this, but we need to wrap this up by Monday. I will not miss my [September 25 charging] date when this has dragged on for several weeks already and then, if things fall apart, be left in a less advantageous position than before the negotiations. I have had an 82-page pros memo and 53-page indictment sitting on the shelf since May to engage in these negotiations. There has to be an ending date, and that date is Monday.

Early that afternoon, Lourie—who was participating in the week's negotiations from his new post at the Department in Washington, D.C.—asked Villafaña to furnish him with the last draft of the plea agreement she had sent to defense counsel, and she provided him with the "18/12 split" draft she had sent to Lefkowitz the prior afternoon. After reviewing that draft, Lourie told Villafaña it was a "[g]ood job" but he questioned certain provisions, including whether the USAO's agreement to suspend the investigation and hold all legal process in abeyance should be in the plea agreement. Villafaña told Lourie that she had added that paragraph at the "insistence" of the defense, and opined, "I don't think it hurts us." Villafaña explained to OPR that she held this view because "Alex and people above me had already made the decision that if the case was resolved we weren't going to get the computer equipment."

At 3:44 p.m. that afternoon, Lefkowitz emailed a "redline" version of the federal plea agreement showing his new revisions, and noted that he was "also working on a deferred [sic] prosecution agreement because it may well be that we cannot reach agreement here." The defense redline version required Epstein to plead guilty to a federal information charging two misdemeanor counts of attempt to intentionally harass a person to prevent testimony, the pending state indictment charging solicitation of prostitution, and a state information charging one count of coercing a person to become a prostitute, in violation of Florida Statute § 796.04 (without regard to age). Neither of the proposed state offenses required sexual offender registration. Epstein would serve an 18-month sentence and a concurrent 60 months on probation on the state charges. The redline version again deleted the provisions relating to damages under 18 U.S.C. § 2255 and replaced it with the provision requiring creation of a trust administered by the state court. It retained language proposed by Villafaña, providing that the plea agreement "resolves the federal criminal liability of the defendant and any co-conspirators in the Southern District of Florida growing out of any criminal conduct by those persons known to the [USAO] as of the date of this plea agreement," but also re-inserted the provision promising not to prosecute Epstein's assistants and the statement prohibiting the USAO from requesting, initiating, or encouraging immigration proceedings. It also included a provision stating the government's agreement to forgo a presentence investigation and a promise by the government to suspend the investigation and withdraw all pending legal process.

The parties anticipate that this agreement will not be made part of any public record. If the United States receives a Freedom of Information Act request or any compulsory process commanding the disclosure of the agreement, it will provide notice to Epstein before making that disclosure.[128]

## VII.    SEPTEMBER 24, 2007:   ACOSTA MAKES FINAL EDITS, AND THE NPA IS SIGNED

The contemporaneous emails show that Villafaña continued to update Acosta as the parties negotiated the final language and that Acosta reviewed and edited the NPA. Shortly after midnight on Monday, September 24, 2007, Acosta sent Villafaña "[s]mall edits" to the "final" NPA she had sent to him. Among his changes was language modifying provisions that appeared to require the State Attorney's Office or the state court to take specific actions, such as requiring that Epstein enter his guilty plea by a certain date. Acosta explained in his email, "I'm not comfortable with requiring the State Attorney to enter into a [joint sentencing] recommendation" or "requiring a State court to stick with our timeline" for entry of the guilty plea and sentencing. Accordingly, Acosta substituted language that required Epstein alone to make a binding sentencing recommendation to the state court, and required Epstein to use his "best efforts" to enter his guilty plea and be sentenced by the specified dates. Acosta also instructed Villafaña to restore a reference to Epstein's wish "to reach a global resolution of his state and federal criminal liabilities." Lourie, who had returned to the Department in Washington, D.C., had a phone conversation with Lefkowitz and sent additional comments on the final draft to Acosta and Villafaña. Villafaña sent a new revision, incorporating edits from Acosta and Lourie, to Lefkowitz later that morning.

On the afternoon of September 24, 2007, Villafaña circulated the new "final" version of the NPA to Acosta, Sloman, Lourie, and other supervisors, and asked Lefkowitz to send her the signed agreement. After Lefkowitz electronically transmitted to Villafaña a copy of the NPA signed by Epstein, she emailed her immediate supervisor and her co-counsel: "They have scanned and emailed the signed agreement. It is done."

In his transmittal email, Lefkowitz asked Villafaña to "[p]lease do whatever you can to keep this from becoming public." Villafaña responded:

> I have forwarded your message only to Alex, Andy, and [the West Palm Beach manager]. I don't anticipate it going any further than that. When I receive the originals, I will sign and return one copy to you. The other will be placed in the case file, which will be kept confidential since it also contains identifying information about the girls.
>
> When we reach an agreement about the attorney representative for the girls, we can discuss what I can tell him and the girls about the

---

[128]    In commenting on OPR's draft report, Lourie observed that because the NPA contained names of uncharged co-conspirators and other protected information, the USAO would have a duty to redact the information before disclosing the NPA.

On October 22, 2007, Sloman responded to the issues Lefkowitz had raised, rejecting some defense proposals but agreeing to modify certain language in the proposed addendum to "satisfy your concern."[146]  Noting that the addendum and a revised letter to the special master were attached. Sloman ended by stating, "[T]his needs to be concluded.  Alex and I believe that this is as far as we can go.  Therefore, please advise me whether we have a deal no later than COB tomorrow . . . ."

Nonetheless, the next day, Lefkowitz sent Acosta a three-page letter reiterating the Epstein team's disagreements with the USAO's interpretation of the NPA. Lefkowitz noted, however, that Epstein had "every intention of honoring the terms of [the NPA] in good faith," and that the defense letter was not intended to be "a rescission or withdrawal from the terms of the [NPA]." Lefkowitz added:

> I also want to thank you for the commitment you made to me during our October 12 meeting in which you promised genuine finality with regard to this matter, and assured me that your Office would not intervene with the State Attorney's Office regarding this matter; or contact any of the identified individuals, potential witnesses, or potential civil claimants and their respective counsel in this matter; and that neither your Office nor the [FBI] would intervene regarding the sentence Mr. Epstein receives pursuant to a plea with the State, so long as that sentence does not violate state law.  Indeed, so long as Mr. Epstein's sentence does not explicitly violate the terms of the Agreement, he is entitled to any type of sentence available to him, including but not limited to gain time and work release.

Sloman forwarded the letter to Villafaña, commenting, "Wait [until] you see this one." Villafaña replied:

> Welcome to my world.  I love the way that they want to interpret this agreement.
>
> . . . .
>
> It also looks like they are planning to ask for and receive a sentence far lower than the one we agreed to.  Has anyone talked to Barry [Krischer] about this?  Maybe this is the real reason for the delay in entering the guilty plea?  We also have to contact the victims to tell [them] about the outcome of the case and to advise them than an attorney will be contacting them regarding possible claims against Mr. Epstein.  If we don't do that, it may be a violation of the Florida Bar Rules for the selected attorney to "cold call" the girls.

---

[146]     The defense raised issues concerning the attorney representative, the statutory limit on damages, and inclusion of certain victims.

Longstanding Department policy directs prosecutors to require the defendant to plead to the most serious readily provable charge consistent with the nature and extent of the defendant's criminal conduct, that has an adequate factual basis, is likely to result in a sustainable conviction, makes likely the imposition of an appropriate sentence and restitution order, and does not adversely affect the investigation or prosecution of others. *See* USAM §§ 9-27.430, 9-27-300, 9-27.400 (comment). The genesis of this policy, the Ashcroft Memo, specifically requires federal prosecutors to charge and pursue all readily provable charges that would yield the most substantial sentence under the Sentencing Guidelines. However, the Ashcroft Memo articulates an important exception: a U.S. Attorney or a "designated supervisory attorney" may authorize a plea that does not comport with this policy.[207] Moreover, the Ashcroft Memo explains that a charge is not "readily provable" if the prosecutor harbors "a good faith doubt," based on either the law or the evidence, as to the government's ability to prove the charge at trial.

By its plain terms, the NPA arguably does not appear to satisfy the "most serious readily provable charge" requirement. The draft indictment prepared by Villafaña proposed charging Epstein with a variety of federal crimes relating to sexual conduct with and trafficking of minors, and Epstein's sentencing exposure under the federal guidelines was in the range of 168 to 210 months' imprisonment. The original "term sheet" presented to the defense proposed a "non-negotiable" requirement that Epstein plead guilty to three state offenses, in addition to the original state indictment, with a joint, binding recommendation for a two-year term of incarceration. Instead, Epstein was permitted to resolve his federal criminal exposure with a plea to the state indictment and only one additional state offense, and an 18-month sentence.

As discussed more fully later in this Report, Acosta, Sloman, Menchel, and Lourie perceived risks to going forward to trial on the federal charges Villafaña outlined in the prosecution memorandum and identified for OPR concerns with both the evidence and legal theories on which a federal prosecution would be premised. On the other hand, Villafaña felt strongly that federal charges should be brought, and the CEOS Chief reviewed the prosecution memorandum and twice opined that the charges were appropriate. OPR found it unnecessary to resolve the question whether federal charges against Epstein were readily provable, however, because Acosta had

---

[207]    In addition to specified "Limited Exceptions," this authorization is available in "Other Exceptional Circumstances," as follows:

> Prosecutors may decline to pursue or may dismiss readily provable charges in other exceptional circumstances with the written or otherwise documented approval of an Assistant Attorney General, United States Attorney, or designated supervisory attorney. This exception recognizes that the aims of the Sentencing Reform Act must be sought without ignoring the practical limitations of the federal criminal justice system. For example, a case-specific approval to dismiss charges in a particular case might be given because the United States Attorney's Office is particularly over-burdened, the duration of the trial would be exceptionally long, and proceeding to trial would significantly reduce the total number of cases disposed of by the office. However, such case-by-case exceptions should be rare; otherwise the goals of fairness and equity will be jeopardized.

Ashcroft Memo at § I.B.6. *See also* USAM §§ 9-2.001 and 27.140 (U.S. Attorneys' authority to depart from the USAM).

d[id]n't want to have to relive what happened to them."[217] The co-case agent told OPR that one of the "strategies" for dealing with the victims' fear was "to keep them off the stand," and he generally remembered discussions about resolving the Epstein case in a way that protected the victims' identities. In addition, the CEOS Trial Attorney who briefly worked with Villafaña on the case after the NPA was signed told OPR that in her meetings with some of the victims, she formed the impression that they were not interested in the prosecution going forward. The CEOS Trial Attorney told OPR that "[the victims] would have testified," but would have required an extensive amount of "victim management" because they were "deeply embarrassed" about potentially being labeled as prostitutes. The CEOS Trial Attorney also told OPR that "there were obvious weaknesses in the case," from an evidentiary perspective.[218]

The contemporaneous records also reflect discussions of, or references to, various legal and factual issues or other concerns about the case. For example, in an early email to Menchel, Lourie noted that two key issues raised by Villafaña's proposed charges were whether the USAO could prove that Epstein traveled for the purpose of engaging in sex acts, and the fact that some minor victims had told Epstein they were 18. He later opined to Acosta and Menchel that "there is some risk on some of the statutes [proposed in Villafaña's prosecution memorandum] as this is uncharted territory to some degree." In his July 5, 2007 email to Villafaña, Menchel cited Acosta's and Sloman's "concerns about taking this case because of [the P]etit policy and a number of legal issues" and Acosta's concerns about "hurting Project Safe Childhood." Defense counsel raised myriad legal and factual challenges in their voluminous letters to the USAO. Defense submissions attacked the legal theories for a federal prosecution and detailed factors that could have undermined victims' credibility, including victim statements favorable to Epstein and evidence of victim drug and alcohol use, as well as the fact that some victims recruited other victims and purportedly lied to Epstein about their ages.

Acosta also recalled that although his "team" had expressed concern about the "trial issues," his own focus had been on "the legal side of things." Notably, during his prior tenure as the Assistant Attorney General in charge of the Department's Civil Rights Division, Acosta had been involved in efforts to address sex trafficking. He told OPR that one of the "background issues" that the Civil Rights Division addressed under his leadership, and which influenced his view of the Epstein case, was the distinction between sex trafficking and solicitation of prostitution. Specifically, he was concerned about avoiding the creation of potentially unfavorable federal precedent on the point of delineation between prostitution, which was traditionally a matter of state concern, and sex trafficking, which remained a developing area of federal interest in 2007.[219]

---

[217]    In an affidavit filed in the CVRA litigation, the co-case agent noted that in early 2007, when she located a victim living outside of the United States, she claimed only to "know Jeffrey Epstein," and stated that she "moved away to distance herself from this situation," and "asked that [the agent] not bother her with this again."

[218]    In April 2007, a victim who was represented by an attorney paid by Epstein participated in a video-recorded interview with the FBI, with her attorney and his investigator present. This victim denied being involved in, or being a victim of, criminal activity. Later, the victim obtained new counsel and joined the CVRA litigation as "Jane Doe #2."

[219]    In his March 20, 2011 letter, addressed "To whom it may concern," and published online in *The Daily Beast*, Acosta described "a year-long assault on the prosecution and the prosecutors" by "an army of legal superstars." Most of the allegations made against the prosecutors occurred after the NPA was signed and certainly after Acosta approved

parties.[258]   The rush to reach a resolution should not have led the USAO to agree to such a significant provision without a full consideration of the potential consequences and justification for the provision.  It is highly doubtful that the USAO's refusal to agree to that term would have itself caused the negotiations to fail; the USAO's rejection of the defense proposal concerning immigration consequences did not affect Epstein's willingness to sign the agreement.  The possibility that individuals other than Epstein's four female assistants could have criminal culpability for their involvement in his scheme could have been anticipated and should have caused more careful consideration of the provision.

Similarly, the confidentiality provision was also accepted with little apparent consideration of the implications of the provision for the victims, and it eventually became clear that the defense interpreted the provision as precluding the USAO from informing the victims about the status of the investigation.  Agreeing to a provision that restricted the USAO's ability to disclose or release information as it deemed appropriate mired the USAO in disputes about whether it was or would be violating the terms of the NPA by disclosing information to victims or the special master.  Decisions about disclosure of information should have remained within the authority and province of the USAO to decide as it saw fit.

There is nothing improper about a U.S. Attorney not having a meeting with the line AUSA or other involved members of the prosecution team before he or she makes a decision in a given case; indeed, U.S. Attorneys often make decisions without having direct input from line AUSAs.  And Acosta did have discussions with Menchel, and possibly Sloman, before making the critical decision to resolve the matter through a state plea, although the specifics of those discussions could not be recalled by the participants due to the passage of time.  This case, however, was different from the norm, and Acosta was considering a resolution that was significantly different from the usual plea agreement.  Contemporaneous records show that Acosta believed the case should be handled like any other, but Acosta's decision to fashion an unorthodox resolution made the case unlike any other, and it therefore required appropriate and commensurate oversight.  Acosta may well have decided to proceed in the same fashion even if he had sought and received a full briefing

---

[258]     CEOS Chief Oosterbaan told OPR this provision was "very unusual."  Principal Associate Deputy Attorney General John Roth commented, "I don't know how it is that you give immunity to somebody who's not identified.  I just don't know how that works."  Villafaña's co-counsel told OPR:

> [I]t's effectively transactional immunity which I didn't think we were supposed to do at the Department of Justice. . . .  I've never heard of anything of the sort. . . . [W]e go to great lengths in most plea agreements to go and not give immunity for example, for crimes of violence. . . . for anything beyond the specific offense which was being investigated during the specific time periods and for you and nobody else.  I mean on rare occasion I've seen cases where say someone was dealing drugs and their wife was involved. . . . And they've got kids. . . . [and] it's understood that the wife probably could be prosecuted and sent to jail too, but you know the husband's willing to go and take the weight . . . .  This is not one of those.

Deputy Attorney General Filip called the provision "pretty weird."   Menchel's successor as Criminal Chief told OPR that he had never heard of such a thing in his 33 years of experience as a prosecutor.  A senior AUSA with substantial experience prosecuting sex crimes against children commented that it was "horrendous" to provide immunity for participants in such conduct.

[A]s Chief of the Criminal Division of the USAO, I did not consider it to be within my purview to ensure that appropriate victim notifications occurred in every matter investigated or brought by the Office. I also recall that the USAO employed one or more victim-witness coordinators to work with line prosecutors to ensure that appropriate victim notifications occurred in every matter investigated or brought by the Office.

### C.    USAO and FBI Letters Are Hand Delivered

The FBI case agent told OPR that the FBI made its notifications "at the time that we met [with] the girls." The case agent recalled that she hand delivered the USAO letters and FBI letters to some victims following in-person interviews, and in the instances when she did not provide a victim with a letter, she provided an FBI pamphlet containing CVRA rights information similar to that set forth in the FBI letters.[280] The co-case agent also recalled that he may have delivered "a few" letters to victims. The FBI Victim Specialist told OPR that she mailed some FBI letters to victims and she provided some FBI letters to the case agent for hand delivery.

Nevertheless, the case agent told OPR that she "did not sit there and go through every right" with the victims. She stated, however, "[I]n the beginning whether it was through [the FBI Victim Specialist] giving the letter, me giving a letter, the pamphlet, I believed that the girls knew that they were victims and had rights, and they had a resource, [the FBI Victim Specialist], that they could call for that." The FBI case agent further explained that once the case agents connected the FBI Victim Specialist with each victim, the Victim Specialist handled the victims' "rights and resources."

## VI.    AUGUST 2006 – SEPTEMBER 2007:  FBI AND USAO CONTACTS WITH VICTIMS BEFORE THE NPA IS SIGNED

Early in the investigation, Villafaña informed her supervisors that, up to that point, "everyone whom the agents have spoken with so far has been willing to tell her story. Getting them to tell their stories in front of a jury at trial may be much harder." Between August 2006 and September 24, 2007, when the NPA was signed, the FBI case agents interviewed 22 victims. On a few occasions, Villafaña met with victims together with the FBI. Villafaña's May 1, 2007 draft indictment included substantive crimes against multiple victims, and Villafaña described the circumstances of each of their encounters with Epstein in her prosecution memorandum.

There is some evidence indicating that during interviews, some of the victims expressed to the FBI case agents and Villafaña concerns about participating in a federal trial of Epstein, and those discussions touched upon, in broad terms, the victims' views regarding the desired outcome of the investigation. Before the USAO entered into the NPA, however, no one from the

---

[280]    The case agent told OPR, "I remember giving letters to the girls when we would talk to them at . . . the conclusion, or . . . if I didn't have the file on me[,] I had pamphlets in my car, or I made sure [the victims had contact information for the FBI's Victim Specialist]."

for some victims, learning of the Epstein investigation and possible exposure of their identities caused them emotional distress. Overall, many of the victims were troubled about the existence of the investigation. They displayed feelings of embarrassment and humiliation and were reluctant to talk to investigators. Some victims who were identified through the investigation refused even to speak to us. Our concerns about the victims' well-being and getting to the truth were always at the forefront of our handling of the investigation.

The case agent told OPR that although she encountered victims who were "strong" and "believable," she did not encounter any who vigorously advocated for the prosecution of Epstein. Rather, "they were embarrassed," "didn't want their parents to know," and "wanted to forget."[283]

As of September 24, 2007, the date the NPA was signed, Villafaña informed Epstein attorney Lefkowitz that she had compiled a preliminary list of victims including "34 confirmed minors" and 6 other potential minor victims who had not yet been interviewed by the FBI.[284] Although the government had contacted many victims before the NPA was signed, Villafaña acknowledged during the CVRA litigation that "individual victims were not consulted regarding the agreement."

### B.    Before the NPA Is Signed, Villafaña Expresses Concern That Victims Have Not Been Consulted

Before the NPA was signed, Villafaña articulated to her supervisors concerns about the government's failure to consult with victims.

#### 1.    July 2007: Villafaña's Email Exchanges with Menchel

In July 2007, Villafaña learned that Menchel had discussed with defense counsel Sanchez a possible state resolution to the federal investigation of Epstein. Villafaña was upset by this information, and sent a strongly worded email to Menchel voicing her concerns. (A full account of their email exchange is set forth at Chapter Two, Part One, Section IV.A.2.) In that email, she told him that it was "inappropriate [for you] to make a plea offer that you know is completely unacceptable to the FBI, ICE, the victims, and me. These plea negotiations violate . . . all of the

---

[283] The case agent also noted that the victim who became CVRA petitioner Jane Doe #2 had expressed in her April 2007 video-recorded FBI interview her opinion that "nothing should happen to Epstein."

[284] The "victims' list" for purposes of the NPA was intended to include the names of all individuals whom the government was prepared to name in a charging document "as victims of an offense enumerated in 18 U.S.C. § 2255." Although the charges Villafaña proposed on May 1, 2007, were based on crimes against 13 victims, thereafter, as explained in Chapter Two of this Report, she continued to revise the proposed charges, adding and removing victims as the federal investigation developed further evidence. At the time the NPA was signed, the proposed charges were based on crimes against 19 victims, but others had been identified for potential inclusion.

202

> We will make our best efforts to ensure you are accorded the rights
> described. Most of these rights pertain to events occurring after the
> arrest or indictment of an individual for the crime, and it will become
> the responsibility of the prosecuting United States Attorney's Office
> to ensure you are accorded those rights. You may also seek the
> advice of a private attorney with respect to these rights.

The FBI case agent informed Villafaña that the Victim Specialist sent the letters and would follow up with a phone call "to offer assistance and ensure that [the victims] have received their letter." A sample letter is shown on the following pages.

Villafaña told OPR that she did not recall discussing the content of the letters at the time they were sent to the victims, or reviewing the letters until they were collected for the CVRA litigation, sometime after July 2008. Rather, according to Villafaña, "The decision to issue the letter and the wording of those letters were exclusively FBI decisions." Nevertheless, Villafaña asserted to OPR that from her perspective, the language regarding the ongoing investigation "was absolutely true and, despite being fully advised of our ongoing investigative activities, no one in my supervisory chain ever told me that the case was not under investigation." Villafaña identified various investigative activities in which she engaged from "September 2007 until the end of June 2008," such as collecting and reviewing evidence; interviewing new victims; re-interviewing victims; identifying new charges; developing new charging strategies; drafting supplemental prosecution memoranda; revising the charging package; and preparing to file charges. Similarly, the FBI case agent told OPR that at the time the letters were sent the "case was never closed and the investigation was continuing." The co-case agent stated that the "the case was open . . . it's never been shut down."

Victim Courtney Wild received one of the January 10, 2008 FBI letters; much later, in the course of the CVRA litigation, she stated that her "understanding of this letter was that [her] case was still being investigated and the FBI and prosecutors were moving forward on the Federal prosecution of Epstein for his crimes against [her]."[329]

---

[329]    CVRA petitioner Jane Doe #2 also received a January 10, 2008 FBI letter that was sent to her counsel.

in FBI interviews of Wild and other victims, Villafaña informed CEOS Chief Oosterbaan that she anticipated the victims "would be concerned about the status of the case."

On January 31, 2008, Villafaña, the CEOS Trial Attorney, and the FBI interviewed three victims, including Wild. Prior to the interview, Wild had received the FBI's January 10, 2008 letter stating that the case was under investigation; however, according to the case agent, Wild and two other victims had also been told by the FBI, in October 2007, that the case had been resolved. In her 2015 CVRA-case declaration, Wild stated that after receiving the FBI letter, she believed that the FBI was investigating the case, and she was not told "about any [NPA] or any potential resolution of the federal criminal investigation I was cooperating in. If I had been told of a[n NPA], I would have objected." In Villafaña's 2017 declaration in the CVRA litigation, Villafaña recalled interviewing Wild on January 31, 2008, along with FBI agents, and Villafaña told OPR she "asked [Wild] whether she would be willing to testify if there were a trial." Villafaña recalled Wild responding that she "hoped Epstein would be prosecuted and that she was willing to testify."[335]

After the first three victim interviews on January 31, 2008, Villafaña described for Acosta and Sloman the toll that the case had taken on two of the victims:

> One girl broke down sobbing so that we had to stop the interview twice . . . she said she was having nightmares about Epstein coming after her and she started to break down again so we stopped the interview.

> The second girl . . . was very upset about the 18 month deal she had read about in the paper.[336] She said that 18 months was nothing and that she had heard that the girls could get restitution, but she would rather not get any money and have Epstein spend a significant time in jail.[337]

Villafaña closed the email by requesting that Acosta and Sloman attend the interviews with victims scheduled for the following day, but neither did so.[338] Acosta told OPR that it "wasn't typical"

---

[335]    The FBI report of the interview did not reflect a discussion of Wild's intentions.

[336]    See Dareh Gregorian, "Tycoon Perved Me at 14 - $50M Suit Hits NY Creep Over Mansion Massage," New York Post, Jan. 25, 2008. As early as October 2007, the New York Post reported the 18-month sentence and that "[t]he feds have agreed to drop their probe into possible federal criminal violations in exchange for the guilty plea to the new state charge." Dan Mangan, "'Unhappy Ending' Plea Deal - Moneyman to Get Jail For Teen Sex Massages," New York Post, Oct. 1, 2007

[337]    Acosta told OPR, "The United States can't unwind an agreement just because . . . some victim indicates that they don't like it." The CEOS Trial Attorney recalled that she did not "think that any one of these girls was interested in this prosecution going forward." Furthermore, as previously noted, the CEOS Trial Attorney also opined that "[the victims] would have testified for us," but the case would have required an extensive amount of "victim management," as the girls were "deeply embarrassed" that they "were going to be called prostitutes."

[338]    OPR located FBI interview reports relating to only one February 1, 2008 victim interview. Although Villafaña's emails indicated that two additional victims were scheduled to be interviewed on February 1, 2008, OPR located no corresponding reports for those victim interviews. OPR located undated handwritten notes Villafaña

Villafaña told OPR that before the state plea hearing, she sent Reiter a list of the victims, including their telephone numbers, to notify and asked him to destroy the list. Villafaña recalled that Reiter told her that he would "try to contact as many as he could" and that he would destroy the list afterwards. Villafaña did not recall being "asked [to] provide a list of all our victims to the State Attorney's Office."

In his 2009 deposition, Reiter stated that Villafaña sent him a letter "around the time of sentencing," listing the victims in the federal investigation, and that she asked him to destroy the letter after he reviewed it. Reiter recalled that he requested the list because he was aware that the state grand jury's indictment of Epstein did not include all of the victims that the PBPD had identified and he "wanted to make sure that some prosecution body had considered all of our victims."[353]

In her 2017 declaration in the CVRA litigation, Villafaña stated that she and the PBPD "attempted to notify the victims about [the June 30] hearing in the short time available to us."[354] In her 2008 declaration, however, Villafaña conceded that "all known victims were not notified."

Villafaña told OPR that Edwards was the only victim attorney she was authorized to contact—she thought probably by Sloman—about the June 30, 2008 plea hearing because Edwards "had expressed a specific interest in the outcome." Villafaña recalled, "I was told that I could inform [Edwards] of [the plea date], but I still couldn't inform him of the NPA."[355] In her 2008 declaration in the CVRA litigation, Villafaña stated that she called Edwards and informed him of the plea hearing scheduled for Monday; Villafaña stated that Edwards told her that he could not attend the hearing but "someone" would be present. In a later filing in the CVRA litigation, however, Edwards asserted that Villafaña told him only that "Epstein was pleading guilty to state solicitation of prostitution charges involving other victims—not Mr. Edwards' clients nor any of the federally-identified victims."[356] Edwards further claimed that because Villafaña failed to inform him that the "guilty pleas in state court would bring an end to the possibility of federal prosecution pursuant to the plea agreement," his clients did not attend the hearing. Villafaña told OPR that her expectation was that the state plea proceeding would allow Edwards and his clients the ability to comment on the resolution:

[353] Reiter showed the letter to the lead Detective so he could "confirm that all of the victims that we had for the state case were included on that." The Detective "looked at it and he said they're all there and then [Reiter] destroyed it." The Detective recalled viewing the list in Reiter's office, but he could not recall when Reiter showed it to him.

[354] The FBI co-case agent told OPR that "I don't think the [FBI] reached out to anyone."

[355] Villafaña told OPR that she thought that it was Sloman who gave her the instructions, but she could not "remember the specifics of the conversation."

[356] Villafaña stated that she "never told Attorney Edwards that the state charges involved 'other victims,' and neither the state court charging instrument nor the factual proffer limited the procurement of prostitution charge to a specific victim." Although Edwards criticized Villafaña's conduct in his CVRA filings, in his recently published book, Edwards described Villafaña as a "kindhearted prosecutor who tried to do right," noting that she "believ[ed] in the victims and tr[ied] . . . to bring down Jeffrey Epstein." Bradley J. Edwards with Brittany Henderson, *Relentless Pursuit* at 380 (Gallery Books 2020).

> [M]y expectation of what was going [to] happen at the plea was that
> it would be like a federal plea where there would be a factual proffer
> that was read, and where the judge would ask if there were any
> victims present who wanted to be heard, and that at that point if Brad
> Edwards wanted to address the court or if his clients wanted to
> address the court, they would be given the opportunity to do so.[357]

Sloman told OPR that he did not recall directing Villafaña to contact anyone about the plea hearing or directing her specifically not to contact anyone about it. Acosta told OPR that he believed the state would notify the victims of the "all-encompassing plea" resolving the federal case "and [the victims would] have an opportunity to speak up at the state court hearing." Nevertheless, Acosta did not know whether the state victims overlapped with the federal victims or whether the USAO "shared that list with them." Villafaña told OPR that she and Acosta "understood that the state would notify the state victims" but that neither of them were aware "that the state only believed they had one victim."[358] Villafaña told OPR that there was "very little" communication between the USAO and the State Attorney's Office, and although she discussed a factual proffer with the State Attorney's Office and "the fact that . . . the federal investigation had identified additional victims," she did not recall discussing "who the specific people were that they considered victims in the state case."[359]

Sloman told OPR that the "public perception . . . that we tried to hide the fact of the results of this resolution from the victims" was incorrect. He explained:

> [E]ven though we didn't have a legal obligation, I felt that the
> victims were going to be notified and the state was going . . . to
> fulfill that obligation, and even as another failsafe, [the victims]
> would be notified of . . . the restitution mechanism that we had set
> up on their behalf.

Sloman acknowledged that although neither the NPA terms nor the CVRA prevented the USAO from exercising its discretion to notify the victims,

> it was [of] concern that this was going to break down and . . . result
> in us prosecuting Epstein and that the victims were going to be
> witnesses and if we provided a victim notification indicating, hey,
> you're going to get $150,000, that's . . . going to be instant
> impeachment for the defense.

---

[357] Assistant State Attorney Belohlavek told OPR that federal victims who were not a party to the state case would not have been able to simply appear at the state plea hearing and participate in the proceedings. Rather, such a presentation would have required coordination between the USAO and the State Attorney's Office and additional investigation of the victims' allegations and proposed statements by the State Attorney's Office.

[358] In an email a few months earlier, Villafaña noted, "The state indictment [for solicitation of adult prostitution] is related to two girls. One of those girls is included in the federal [charging document], the other is not."

[359] As noted in Chapter Two, Villafaña had stopped communicating with the State Attorney's Office regarding the state case following Epstein's defense team's objections to those communications.

strongly objected to the government's plan to notify victims of the state proceedings, which he described as "highly inappropriate" and an "intrusion into state affairs, when the identified individuals are not even victims of the crime for which Mr. Epstein is being sentenced."

Thereafter—at a time when the USAO believed Epstein's plea to be imminent—Villafaña drafted, and Sloman signed, the December 6, 2007 letter to Lefkowitz rejecting the defense arguments regarding notification and reiterating the USAO's position that the victims identified in the federal investigation be invited to appear at the state plea hearing. The letter took an expansive view of the applicable statutes by contending that both the CVRA and the VRRA required the USAO to notify the victims of the state proceedings:

> [T]hese sections are not limited to proceedings in a *federal* district court. Our Non-Prosecution Agreement resolves the federal investigation by allowing Mr. Epstein to plead to a state offense. The victims identified through the federal investigation should be appropriately informed, and our Non-Prosecution Agreement does not require the U.S. Attorney's Office to forego [*sic*] its legal obligations.[416]

The letter also asserted that the VRRA obligated the USAO to provide the victims with information concerning restitution to which they may be entitled and "the *earliest possible*" notice of the status of the investigation, the filing of charges, and the acceptance of a plea. Along with the letter, Sloman forwarded a revised draft victim notification letter to Lefkowitz for his comments. This draft victim notification letter stated that the federal investigation had been completed, Epstein would plead guilty in state court, the parties would recommend 18 months of imprisonment at sentencing, and Epstein would compensate victims for monetary damages claims brought under 18 U.S.C. § 2255. The draft victim notification letter provided specific information concerning the upcoming change of plea hearing and invited the victims to attend or provide a written statement to the State Attorney's Office. When Lefkowitz asked Sloman to delay sending victim notifications until after a discussion of their contents, Sloman instructed Villafaña, who was preparing letters for transmittal to 30 victims, to "Hold the letter." During his OPR interview, Sloman recalled that he had "wanted to push the letter out," but he "must have had a conversation with somebody" about whether the CVRA applied, and based on that conversation he directed Villafaña to hold the letter.

In his response letter to Acosta, Lefkowitz contended that the government had misinterpreted both the CVRA and VRRA because neither applied to the "public proceeding in this matter [which] will be in state court for the purpose of the entry of a plea on state charges."

---

[416] Sloman told Lefkowitz the USAO did not seek to "federalize" a state plea, but "is simply informing the victims of their rights." Sloman also addressed the defense attorneys' objection to advising the victims that they could contact Villafaña or the FBI case agent with questions or concerns by referencing the CVRA, noting, "Again, federal law requires that victims have the 'reasonable right to confer with the attorney for the Government in this case.'"

266

### 6.    U.S. Attorney's Office for the Middle District of Florida Records

The U.S. Attorney's Office for the Middle District of Florida provided OPR with records related to its review of evidence against Epstein, after he concluded his Florida state sentence, when the Department recused the USAO in August 2011 from "all matters, to include the investigation and potential prosecution, relating to Jeffrey Epstein's alleged sexual activities with minor females," and assigned the matter to the Middle District of Florida U.S. Attorney's Office for further consideration. The records included a declination of the matter due to the NPA.

### 7.    U.S. Attorney's Office for the Northern District of Georgia Records

The U.S. Attorney's Office for the Northern District of Georgia provided OPR with records related to its work on the CVRA litigation after the recusal of the USAO.

### 8.    Public Records

OPR obtained and reviewed a variety of public records, including publicly released records of the Palm Beach Police Department, the State Attorney's Office for the 15th Judicial Circuit, and the Palm Beach Sheriff's Office; documents pertaining to the CVRA litigation and other court proceedings involving Epstein and related individuals; and books and media reports.

### B.    Information from Subjects, Witnesses, and Victims

### 1.    Subjects

OPR requested that all five subjects provide written responses detailing their involvement in the federal investigation of Epstein, the drafting and execution of the NPA, and decisions relating to victim notification and consultation. In addition, OPR conducted extensive interviews of each subject under oath and before a court reporter. Each subject was represented by counsel and had access to relevant contemporaneous documents before the subject's OPR interview. The subjects reviewed and provided comments on their interview transcripts and on OPR's draft report.

### 2.    Witnesses

OPR conducted more than 60 interviews of witnesses, including the FBI case agents, their supervisors, and FBI administrative personnel. OPR interviewed current and former USAO staff and attorneys and current and former Department attorneys and senior managers, including former Deputy Attorney General Mark Filip and former Assistant Attorney General for the Criminal Division Alice Fisher. OPR also interviewed former State Attorney Barry Krischer and former Assistant State Attorney Lanna Behlolovick.

### 3.    Communications with Victims and Victims' Attorneys

OPR contacted attorneys known to represent 26 victims among the 30 surviving individuals who were identified in the USAO's July 2008 listing of 32 victims the USAO was prepared to include in federal charges against Epstein and who accordingly were entitled to the benefits of the 18 U.S.C. § 2255 monetary damages provision of the NPA. OPR contacted the attorneys to invite

# EXHIBIT 39

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x

UNITED STATES OF AMERICA,

              v.

GHISLAINE MAXWELL,

       Defendant.

        20 Cr. 330 (AJN)

------------------------------------------------------- x

## MEMORANDUM OF GHISLAINE MAXWELL
### IN SUPPORT OF HER MOTION UNDER THE FOURTH AMENDMENT,
### *MARTINDELL*, AND THE FIFTH AMENDMENT TO SUPPRESS ALL EVIDENCE
### OBTAINED FROM THE GOVERNMENT'S SUBPOENA TO ████████████ AND
### TO DISMISS COUNTS FIVE AND SIX

Jeffrey S. Pagliuca
Laura A. Menninger
HADDON, MORGAN & FOREMAN P.C.
150 East 10th Avenue
Denver, CO 80203
Phone: 303-831-7364

Mark S. Cohen
Christian R. Everdell
COHEN & GRESSER LLP
800 Third Avenue New
York, NY 10022
Phone: 212-957-7600

Bobbi C. Sternheim
Law Offices of Bobbi C. Sternheim
33 West 19th Street - 4th Floor
New York, NY 10011
Phone: 212-243-1100
Phone: 212-243-1100

*Attorneys for Ghislaine Maxwell*

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................. i

TABLE OF AUTHORITIES ...................................................................................... ii

FACTUAL BACKGROUND ..................................................................................... 1

ARGUMENT ............................................................................................................. 2

I.     The government's violation of the Fourth Amendment requires suppression. ..................... 2

    A.   The subpoena violated the Fourth Amendment because it was unconstitutionally overbroad. .................................................................................................. 4

    B.   The government's subpoena to ▬▬▬▬▬ was an unconstitutional warrantless Fourth Amendment search........................................................................................... 6

        1.   The third-party doctrine does not compel a different result. ........................................ 8

    C.   The government's subpoena to ▬▬▬▬▬ was an unconstitutional Fourth Amendment seizure. ............................................................................... 11

II.    The government's violation of *Martindell* requires suppression....................................... 11

III.   The government's violation of the Fifth Amendment requires suppression..................... 15

Conclusion ............................................................................................................ 17

Certificate of Service............................................................................................. 18

# TABLE OF AUTHORITIES

**Cases**

*Boyd v United States*, 116 U.S. 616 (1886) ........................................................................... 3, 6, 15

*Carpenter v. United States*, 138 S. Ct. 2206 (2018) ........................................................... 3, 5, 6, 9

*Colorado v. Bannister*, 449 U.S. 1 (1980) ..................................................................................... 3

*DeMassa v. Nunez*, 770 F.2d 1505 (9th Cir. 1985)...................................................................... 10

*Doe v. Broderick*, 225 F.3d 440 (4th Cir. 2000) ................................................................... 10, 13

*Fisher v. United States*, 425 U.S. 391 (1976)......................................................................... 3, 15

*Hale v. Henkel*, 201 U.S. 43 (1906)........................................................................................... 2, 4

*In re Grand Jury Subpoena Duces Tecum*, 945 F.2d 1221 (2d Cir. 1991).................................. 14

*In re Grand Jury Subpoena, JK-15-029*, 828 F.3d 1083 (9th Cir. 2016) ............................ 4, 5, 11

*Katz v. United States*, 389 U.S. 347 (1967) ............................................................................... 2, 6

*Murphy v. Waterfront Comm'n of New York Harbor*, 378 U.S. 52 (1964) .................................... 2

*Palmieri v. State of New York*, 779 F.2d 861 (2d Cir. 1985)....................................................... 14

*People v. Gutierrez*, 222 P.3d 925 (Colo. 2009)......................................................................... 10

*People v. Mason*, 989 P.2d 757 (Colo. 1999) ............................................................................... 8

*Smith v. Maryland*, 442 U.S. 735, 740 (1979) ..................................................................... passim

*United States v. Calandra*, 414 U.S. 338 (1974) .......................................................................... 6

*United States v. Di Re*, 332 U.S. 581 (1948) ................................................................................ 6

*United States v. Dionisio*, 410 U.S. 1 (1973)........................................................................... 2, 15

*United States v. Miller*, 425 U.S. 435 (1976).......................................................................... 9, 10

*United States v. Oshatz*, 700 F. Supp. 696 (S.D.N.Y. 1988) ....................................................... 16

*United States v. Place*, 462 U.S. 696 (1983) ................................................................................ 3

*United States v. Thomas*, 736 F.3d 54 (1st Cir. 2013) ................................................................... 6

**Constitutional Provisions**

U.S. CONST. amend. IV ........................................................................................................... passim

U.S. CONST. amend. V ............................................................................................................ passim

Ghislaine Maxwell moves under the Fourth Amendment, *Martindell v. Int'l Tel. & Tel. Corp.*, 594 F.2d 291 (2d Cir. 1979), and the Fifth Amendment, to suppress all evidence the government obtained from a grand jury subpoena it issued to ███████████ and to dismiss Counts Five and Six, which are the fruits of that unlawful subpoena.

## FACTUAL BACKGROUND

Ms. Maxwell's Motion under the Due Process Clause to Suppress and Dismiss Counts 5 and 6 sets forth the facts relevant to this motion. Ms. Maxwell incorporates those facts by reference here.



In summary, the government obtained ███████████ file, including the ███████████ ███████████, by way of a grand jury subpoena enforced through an *ex parte* proceeding before ███████████████████████████ ███████████████. Although the government claimed not to know what was in ███████████ file and that ███████████ had no role in instigating the investigation of Maxwell, both of these representations to ███████████ were false.

In turn, the government issued a ███████████████ in the ███████ ███████████. *See* Motion under the Due Process Clause to Suppress and Dismiss Counts 5 and 6, Ex. C, at 3. The government could have been, but was not, more targeted in its approach. The government has not provided Maxwell with a copy of the subpoena, but the record shows that the subpoena was incredibly broad and, as explained below, ultimately unlawful.

The subpoena violated the Fourth Amendment because it was overbroad and because it effected a warrantless search and seizure of material in which Maxwell had a reasonable expectation of privacy. Moreover, by securing a modification of the Protective Order through a secret, *ex parte* proceeding, the government violated *Martindell v. Int'l Tel. & Tel. Corp.*, 594

1

F.2d 291 (2d Cir. 1979), which required the government to give Maxwell notice and an opportunity to be heard on its request. And in bypassing *Martindell* and eviscerating the guarantee of confidentiality provided by the Protective Order, the government trampled on Maxwell's Fifth Amendment privilege against self-incrimination, which she declined to invoke in reliance on the protections afforded her by *Martindell* and the Protective Order.

This Court should (1) suppress all evidence the government obtained from ███████████ and any other evidence derived therefrom; or (2) suppress the April and July 2016 depositions and all evidence derived therefrom; and (3) dismiss Counts Five and Six.

## ARGUMENT

### I. The government's violation of the Fourth Amendment requires suppression.

The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV. The "Fourth Amendment provides protection against a grand jury subpoena duces tecum too sweeping in its terms 'to be regarded as reasonable.'" *United States v. Dionisio*, 410 U.S. 1, 11–12 (1973) (quoting *Hale v. Henkel*, 201 U.S. 43, 76 (1906), *abrogated in part on other grounds by Murphy v. Waterfront Comm'n of New York Harbor*, 378 U.S. 52, 68 (1964)).

The government engages in a "search" for Fourth Amendment purposes when its conduct encroaches on an individual's legitimate expectation of privacy. *See Katz v. United States*, 389 U.S. 347, 351 (1967) ("[T]he Fourth Amendment protects people, not places."). Absent an exception to the warrant requirement, a governmental search is unconstitutional unless the government conducts it under a warrant issued based on probable cause to believe a crime has been committed and that evidence of the crime is likely to be found in the place searched.

2

*Carpenter v. United States*, 138 S. Ct. 2206, 2213 (2018) (holding that an "official intrusion into [the] private sphere generally qualifies as a search and requires a warrant supported by probable cause"). "[A] compulsory production of . . . private books and papers . . . is the equivalent of a search and seizure—and an unreasonable search and seizure—within the meaning of the fourth amendment." *Boyd v United States*, 116 U.S. 616, 634–35 (1886), *overruling in part on other grounds as recognized in Fisher v. United States*, 425 U.S. 391, 407–08 (1976).

Finally, "The Fourth Amendment protects 'effects' as well as people from unreasonable searches and seizures." *United States v. Place*, 462 U.S. 696, 716 (1983) (Brennan, J. concurring). It thus "protects two different interests of the citizen—the interest in retaining possession of property and the interest in maintaining personal privacy." *Id.* (cleaned up). "A seizure threatens the former, a search the latter." *Id.* Like a search, a seizure is "per se unreasonable within the meaning of the Fourth Amendment unless it is accomplished pursuant to a judicial warrant issued upon probable cause and particularly describing the items to be seized." *Id.* at 701; *see Colorado v. Bannister*, 449 U.S. 1, 3 (1980).

Here, the grand jury subpoena was unconstitutionally overbroad because it sought production of ▮▮▮▮▮▮ entire file and was therefore akin to a general warrant. Moreover, there is no dispute the government did not establish probable cause to believe that ▮▮▮▮ ▮▮▮▮▮ file contained evidence of a crime. (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ ) Nor is there a dispute that the government lacked a warrant. (▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ) Since the government had neither probable cause nor a warrant, the ▮▮▮▮▮▮ must be suppressed because the subpoena to ▮▮▮▮

3

████ was in fact a Fourth Amendment search. And even if the government's conduct did not

amount to a search, it constituted a seizure, which likewise should have been supported by

probable cause and warrant.

## A. The subpoena violated the Fourth Amendment because it was unconstitutionally overbroad.

The subpoena to ████████ was unconstitutionally overbroad, and this Court should

suppress all evidence produced in response.

"[A]n order for the production of books and papers may constitute an unreasonable

search and seizure within the 4th Amendment." *Hale*, 201 U.S. at 76. Because the Fourth

Amendment was drafted with a particular eye to the abuse of general warrants, *id.* at 71, a

subpoena that is "unreasonably overbroad" effects an unreasonable search under the Fourth

Amendment, *In re Grand Jury Subpoena, JK-15-029*, 828 F.3d 1083, 1088 (9th Cir. 2016). An

overbroad subpoena is "equally indefensible as a search warrant would be if couched in similar

terms." *Id.* (quoting *Hale*, 201 U.S. at 77). A subpoena is overbroad when the government fails

to make a "reasonable effort to request only those documents that are relevant and non-

privileged, consistent with the extent of its knowledge about the matter under investigation." *Id.*

Here, the government by its own admission made *no effort*—must less a reasonable

effort—to tailor and target the subpoena to ████████. As the prosecutor said to ████

████:

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

*See* Motion under the Due Process Clause to Suppress and Dismiss Counts 5 and 6, Ex. D, at 17

(emphasis added). The government's representations to █████████ were, of course, false.

The government met with █████████ before it issued the subpoena, it knew what was in

█████████ file and who was █████████████████████████████, and it

nevertheless disclaimed any ability to narrowly tailor any subpoena. Given "its knowledge about

the matter under investigation," the government's failure to make any effort, much less a

"reasonable effort," to request "only those documents that are relevant and non-privileged,"

renders the subpoena overbroad and unconstitutional. *See In re Grand Jury Subpoena, JK-15-*

*029*, 828 F.3d at 1088.

So overbroad was the subpoena that █████████ actually produced to the government

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████

It is obvious why the Fourth Amendment requires suppression *Id.* at 1089. This type of

overbroad subpoena is exactly what the Fourth Amendment is designed to prohibit: searches that

invade "the privacies of life" from "arbitrary" power and "police surveillance" that is "too

permeating." *See Carpenter*, 138 S. Ct. at 2213 (quoting *Smith v. Maryland*, 442 U.S. 735, 740

(1979)). Otherwise, "when the government seeks all material of a broad generic type that a party

possesses—every piece of paper in a corporation's files, for example, or, as in this case," every

piece of paper in a █████████ file, "a reasonable possibility that some of that material would be

relevant would suffice to validate the subpoena, no matter how vast its sweep, and no matter the

degree to which the subpoena would reach private material of no pertinence to the grand jury's inquiry." *See In re Grand Jury Subpoena, JK-15-029*, 828 F.3d at 1089. The Fourth Amendment does not allow such a sweeping search, which would be nothing but a modern-day general warrant. *Id.* at 1088.[1] This Court should suppress all evidence the government obtained from the subpoena to █████████

## B. The government's subpoena to █████████ was an unconstitutional warrantless Fourth Amendment search.

Apart from its overbreadth, the subpoena violated the Fourth Amendment because it amounted to a warrantless search without probable cause.

The Fourth Amendment protects people, not places. *Katz*, 389 U.S. at 351. Thus, "when an individual 'seeks to preserve something as private,' and [her] expectation of privacy is 'one that society is prepared to recognize as reasonable,' . . . that official intrusion into that private sphere generally qualifies as a search and requires a warrant supported by probable cause." *Carpenter*, 138 S. Ct. at 2213 (quoting *Smith*, 442 U.S. at 740). This definition of a what constitutes a "search" "seeks to secure 'the privacies of life' against 'arbitrary power'" and "to place obstacles in the way of a too permeating police surveillance." *Id.* at 2214 (quoting *Boyd*, 116 U.S. at 630; *United States v. Di Re*, 332 U.S. 581, 595 (1948)). A "grand jury is . . . 'without power to invade a legitimate privacy interest protected by the Fourth Amendment.'" *United States v. Thomas*, 736 F.3d 54, 61 (1st Cir. 2013) (quoting *United States v. Calandra*, 414 U.S. 338, 346 (1974)).

---

[1] It is for this reason that this Court should grant Maxwell's Motion for Discovery of every grand jury subpoena. Without being able to examine the grand jury subpoenas, Maxwell cannot evaluate whether other subpoenas issued by the grand jury in connection with this case are unconstitutionally overbroad, as the subpoena to █████████ is.

6

Maxwell had a legitimate expectation of privacy in her ▮▮▮▮▮▮▮▮[2] because she reasonably sought to preserve them as private. Both of her ▮▮▮▮▮▮▮ were confidential under the Protective Order, which prohibited ▮▮▮▮▮▮▮ from sharing them with third parties, including law enforcement. The Protective Order deliberately *excluded* a law enforcement exception. While the Protective Order did not apply to evidence produced at trial, the parties settled the defamation action before trial, conclusively establishing the privacy of Maxwell's deposition testimony. Indeed, under the plain terms of the Protective Order, ▮▮▮▮▮▮▮▮ were required to return or destroy all confidential information at the conclusion of the case, including Maxwell's deposition transcripts. ▮▮▮▮▮ refused to do so although ordered to do so by Judge Sweet.[3]

In its application to ▮▮▮▮▮▮, the government ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮. Not only did the government misunderstand how the Protective Order worked, but its argument also supports rather than undermines Maxwell's legitimate expectation of privacy in her deposition transcripts.

To be sure, the Protective Order did not apply to evidence produced at trial. That is entirely unremarkable, however, because trials are open to the public and the press. What matters is that the civil case *did not go* to trial; it settled *before* trial, and under the Protective Order's terms, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

---

[2] Not to mention all the other material she designated as "Confidential" under the Protective Order.

[3] Ascribing a legitimate expectation of privacy to Maxwell's ▮▮▮▮▮▮ also fits *Martindell*'s admonition that the government may not "insinuate itself into a private civil lawsuit between others." 594 F.2d at 294.

7

including Maxwell's ████████████, and not to share Confidential information with law

enforcement. ████████████████:

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████

Motion under the Due Process Clause to Suppress and Dismiss Counts 5 and 6, Ex. F, at 11

(emphases in original).

Maxwell thus had a reasonable expectation of privacy in her ████████████ and

everything else she designated as "Confidential" under the Protective Order.[4] Obtaining that

confidential material by subpoena therefore amounted to a search under the Fourth Amendment.

Because the government had neither probable cause nor a warrant, this Court should suppress the

████████████ and all material Maxwell designated as Confidential.

### 1. The third-party doctrine does not compel a different result.

It is irrelevant that Maxwell's ████████████ were in the possession of ████

████ and not her own attorneys. The third-party doctrine does not apply here because

---

[4] This argument adheres to *Martindell*'s holding that the government there should have either moved to intervene or issued a subpoena to obtain the ████████████. For one thing, the Fourth Amendment was not at issue in *Martindell*, so the Court had no occasion to decide whether a warrant might have been required. For another, *Martindell* does not speak to what showing would have been required for the issuance of a subpoena, probable cause or something less. Even if a warrant weren't required here, a showing of probable cause was. *See People v. Mason*, 989 P.2d 757, 760 (Colo. 1999) (noting jurisdictions that recognize an expectation of privacy in subpoenaed materials and that require a subpoena *duces tecum* of such records to be supported by probable cause). Finally, of course, the government didn't comply with *Martindell* because it never gave Maxwell notice and an opportunity to quash the subpoena and to challenge the government's misrepresentations through the adversary process.

Maxwell did not voluntarily share anything with ████ and because every other circumstance supported Maxwell's expectation that her ████████████ would be private.

The Supreme Court has held that "a person has no legitimate expectation of privacy in information [she] voluntarily turns over to third parties." *Smith*, 442 U.S. at 743–44. "That remains true 'even if the information is revealed on the assumption that it will be used only for a limited purpose.'" *Carpenter*, 138 S. Ct. at 2216 (quoting *United States v. Miller*, 425 U.S. 435, 443 (1976)).

In *Smith v. Maryland*, the Court ruled that the government's use of a pen register—a device used by telephone companies to record the outgoing phone numbers dialed on a landline telephone—was not a search. By placing calls from his landline, the Court reasoned, Smith "voluntarily conveyed" the dialed numbers to the telephone company by "expos[ing] that information to its equipment in the ordinary course of business." 442 U.S. at 744. The Court held that Smith has "assumed the risk" that the telephone company's records "would be divulged to police." *Id.* at 745.

Similarly, in *United States v. Miller*, the Court ruled that the government could subpoena an individual's bank records, including several months of canceled checks, deposit slips, and monthly statements. The Court explained that because the checks were "not confidential communications but negotiable instruments to be used in commercial transactions," and because the bank statements contained information "exposed to [bank] employees in the ordinary course of business," Miller had only a limited expectation of privacy. 425 U.S. at 442. The Court determined that Miller had "take[n] the risk, in revealing his affairs to another, that the information [would] be conveyed by that person to the Government." *Id.* at 443.

Neither *Miller* nor *Smith* supports a conclusion that Maxwell had anything but a legitimate and reasonable expectation of privacy in her ████████████. First, Maxwell did not "voluntarily convey" ████████████████ sued her, not the other way around. Moreover, Maxwell declined to answer ██████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████. None of this was voluntary.

Second, Maxwell's expectation of privacy in her ████████████ is not limited in the way Miller's expectation of privacy was limited in his bank records. To the contrary, both Maxwell's ████████ were confidential under the Protective Order. And while the Protective Order did not apply to evidence produced at trial, the case settled before trial, thereby confirming Maxwell's legitimate expectation that the ████████████ would not be shared outside the attorneys working in the case and, if necessary, the district court.

Third, Maxwell reasonably understood that the ████████████████ would not be shared with the government. Giuffre proposed a law enforcement exception to the Protective Order's confidentiality requirement, but Maxwell rejected the exception and the district court never adopted it. Unlike in *Smith* and *Miller*, Maxwell did not "assume the risk" that her ████████████ would be divulged to the government.

Had the government obtained the ████████████ from Maxwell's attorneys, there would be no question that the government's conduct would constitute a Fourth Amendment search. "[C]lients of an attorney maintain a legitimate expectation of privacy in their client files." *DeMassa v. Nunez*, 770 F.2d 1505, 1506 (9th Cir. 1985); *see Doe v. Broderick*, 225 F.3d 440, 450–52 (4th Cir. 2000) (holding that detective's examination of a patient file held by a methadone clinic was a search and, without probable cause, violated the patient's Fourth

Amendment rights); *see also People v. Gutierrez*, 222 P.3d 925, 936 (Colo. 2009) (concluding that a taxpayer has a reasonable expectation of privacy in information conveyed to his tax preparer because "state and federal laws . . . shield a taxpayer's return from unfettered access by government officials"). Because she did not voluntarily offer her ███████████, and because she reasonably believed ██████ was and would remain private under the Protective Order, Maxwell had a legitimate and reasonable expectation of privacy in her ████████████ even though the government obtained them from a third party other than her attorneys. *See In re Grand Jury Subpoena, JK-15-029*, 828 F.3d at 1090 ("DAS's current possession of [Kitzhaber's] emails does not vitiate that claim. The Fourth Amendment protects people, not places. Kitzhaber's interests therefore attach to the things seized, not merely to the place where they are located." (cleaned up)).

### C. The government's subpoena to ██████████ was an unconstitutional Fourth Amendment seizure.

Although Fourth Amendment challenges typically involve "the subsequent search of the container rather than to its initial seizure by the authorities, . . . a seizure of personal property is per se unreasonable" under the "Fourth Amendment unless it is accomplished pursuant to a judicial warrant issued upon probable cause and particularly describing the items to be seized." *Smith*, 462 U.S. at 701–02. Here, the government ██████████████████ ████████████████. The government did not obtain a warrant, nor did it establish probable cause for the seizure. For this additional reason, this Court should suppress the ████████████ and all material Maxwell designated as confidential.

## II. The government's violation of *Martindell* requires suppression.

By issuing a ████████████████████████████ ██████████████, the government circumvented the Second Circuit's

decision in *Martindell v. International Telephone & Telegraph Corp.* and violated Maxwell's rights.

In *Martindell*, the government tried to obtain deposition transcripts of twelve individuals deposed in a private shareholders' derivative lawsuit. 594 F.2d at 292–93. All twelve depositions were taken "pursuant to a court-approved stipulation to the effect that the depositions should be treated as confidential and used solely by the parties for prosecution or defense of the action." *Id.* at 292. Without seeking to intervene, and without serving a subpoena or warrant, the government called and then wrote to the district court to request access to the deposition transcripts. *Id.* at 293. The government claimed that the deposition transcripts were relevant to its investigation of perjury, subordination of perjury, and conspiracy related to the 1970 presidential election in Chile. *Id.* The government, "moreover, feared that unless it could obtain the deposition transcripts, it would be unable to secure statements from the witnesses because they would claim their Fifth Amendment rights in any investigative interviews." *Id.* The district court denied the government's request, "holding that the deposition testimony had been given in reliance upon the protective order, thus rendering unnecessary invocation by the witnesses of their Fifth Amendment rights, that the requested turnover would raise constitutional issues, and that principles of fairness mandated enforcement of the protective order." *Id.* The government appealed, and the Second Circuit affirmed.

The Second Circuit was blunt in explaining the government's missteps:

The government may not . . . simply by picking up the telephone or writing a letter to the court (as was the case here), insinuate itself into a private civil lawsuit between others. The proper procedure, as the government should know, was either to subpoena the deposition transcripts for use in a pending proceeding such as a grand jury investigation or trial, in which the issue could be raised by motion to quash or modify the subpoena, see Rule 17(c), or to seek permissive intervention in the private action pursuant to Rule 24(b), for the purpose of obtaining vacation or modification of the protective order.

*Id.* at 294. Either avenue, explained the Court, would provide the real party in interest notice of

the government's request and an opportunity to be heard, either by moving to quash the

subpoena or opposing intervention and modification of the protective order. *Id.*

The Court also rejected the government's argument that the district court was too

solicitous of the witnesses' Fifth Amendment rights. *Id.* at 295. According to the Government,

the witnesses were under no compulsion to testify, and having given testimony, they voluntarily

waived any Fifth Amendment right they may have had. *Id.* But as the Second Circuit explained,

the government's argument ignored the reality of civil litigation:

> Unless a valid Rule 26(c) protective order is to be fully and fairly enforceable,
> witnesses relying upon such orders will be inhibited from giving essential
> testimony in civil litigation, thus undermining a procedural system that has been
> successfully developed over the years for disposition of civil differences. In short,
> witnesses might be expected frequently to refuse to testify pursuant to protective
> orders if their testimony were to be made available to the government for criminal
> investigatory purposes in disregard of those orders.

*Id.* at 295–96. The Court thus held:

> [A]bsent a showing of improvidence in the grant of a Rule 26(c) protective order
> or some extraordinary circumstance or compelling need, none of which appear here,
> a witness should be entitled to rely upon the enforceability of a protective order
> against any third parties, including the Government, and that such an order should
> not be vacated or modified merely to accommodate the government's desire to
> inspect protected testimony for possible use in a criminal investigation, either as
> evidence or as the subject of a possible perjury charge.

*Id.* at 296.

Maxwell did not even know the government had her &#9608;&#9608;&#9608;&#9608; until after she was

indicted, and she didn't know for a month more just ████████████████████████████████

████████

    *Martindell* has been binding Second Circuit law for more than forty years, and the government's violation of its holding is no trivial matter. ████████████████████████

██████████████████████████████████████████████████████

████████████████

██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████

████████████████████████

    In *Palmieri v. State of New York*, the federal magistrate issued two sealing orders protecting the confidentiality of settlement discussions of a private antitrust case. 779 F.2d 861, 863–64 (2d Cir. 1985). Because the subject matter of the antitrust case overlapped with an ongoing state criminal antitrust case, the state Attorney General moved to intervene in the private antitrust case, to modify the seal orders, to access the settlement material, and to present the material and testimony to a state grand jury. *Id.* at 862. The district court granted the Attorney General's request, but the Second Circuit, applying *Martindell*, reversed. *Id.* The Second Circuit recognized that the state Attorney General, like the federal government, "enjoys a similarly privileged position with respect to its investigatory powers." *Id.* at 866. Those powers, in turn, "raise[d] a rebuttable presumption against modification of the orders." *Id.* Indeed, given the parties' reliance on the sealing orders, the Attorney General's "burden [was] heavier than it might otherwise be." *Id.* at 865.

Here, the government did not even attempt the *Martindell* process the Attorney General attempted in *Palmieri*. ██████████████████████████████████████████████

██████████████████████████████████████████████████

### III. The government's violation of the Fifth Amendment requires suppression.

The Fifth Amendment provides: "No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. For three separate reasons █

████████████████████████████████████████ violates the Fifth Amendment.

First, the Fifth Amendment "proscribe[s] the compelled production of . . . a Testimonial Communication that is incriminating." *Fisher*, 425 U.S. at 408; *see Dionisio*, 410 U.S. at 11 ("The grand jury cannot require a witness to testify against himself."). The subpoena to ███

███████ contravenes this proscription because it literally "compels production" of Maxwell's incriminating testimony (██████████████████).

Second, "a compulsory production of the private books and papers . . . [also] is compelling . . . him to be a witness against himself, within the meaning of the fifth amendment." *Boyd*, 116 U.S. at 634–35. Even if the subpoena does not literally require Maxwell to "testify against herself," *Dionisio*, 410 U.S. at 11, Maxwell's ████████████████ were private and confidential under the Protective Order. *Supra* Part I.B. Compelling production of these ██████████████████ is itself a Fifth Amendment violation.

Third, the government's circumvention of *Martindell* unconstitutionally burdens Maxwell's Fifth Amendment rights. ██████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████. But *Martindell* protects Maxwell from the government's conduct, and it authorized her to give ████████████ under the shield of the Protective Order without worrying whether the government could "insinuate itself" into the

15

case and use her own words against her. 594 F.2d at 294. The Fifth Amendment would mean nothing if an individual were told by a district court that she need not invoke its protections because the government could not use her testimony against her—or at least could not do so without notice and an opportunity to be heard—only to find out that the testimony she offered with the district court's blessing was the primary evidence against her in a criminal case and the basis of perjury charges.

That is the lesson of *United States v. Oshatz*, in which this Court quashed a government subpoena issued to a court reporter for a transcript of a deposition offered by the defendant in a civil proceeding. 700 F. Supp. 696, 697 (S.D.N.Y. 1988). Oshatz (who had been indicted at the time of his deposition) was deposed and did not invoke his Fifth Amendment privilege against self-incrimination on "the understanding that a protective order would preserve his Fifth Amendment rights." *Id.* at 699. Applying *Martindell*, this Court quashed the government's subpoena and refused to release the deposition transcript because the "government [had] not argued that the protective order was improvidently granted or that there [were] some extraordinary circumstances or compelling need." *Id.* at 701.

Here, as in *Oshatz*, Maxwell was deposed on "the understanding that a protective order would preserve" the confidentiality of her testimony. And even though Maxwell had not been indicted at the time of her depositions, the threat of an investigation was obvious, and that threat was the very reason the Protective Order deliberately *excluded* a law-enforcement exception. (Moreover, Maxwell moved the court to require Giuffre to disclose any law enforcement investigation of which she was aware.) As in *Oshatz*, the Protective Order was designed to preserve Maxwell's Fifth Amendment rights. Where this Court in *Oshatz* granted a motion to quash, here it should grant a motion to suppress.

For these reasons, this Court should suppress the ███████████ under the Fifth Amendment.

## Conclusion

For these reasons, this Court should: (1) suppress all evidence the government obtained from ███████ and any other evidence derived therefrom; or (2) suppress the April and July 2016 depositions and all evidence derived therefrom; and (3) dismiss Counts Five and Six. Maxwell requests an evidentiary hearing on this Motion.

Dated: January 25, 2021

Respectfully submitted,

*s/ Jeffrey S. Pagliuca*
Jeffrey S. Pagliuca
Laura A. Menninger
HADDON, MORGAN & FOREMAN P.C.
150 East 10th Avenue
Denver, CO 80203
Phone: 303-831-7364

Mark S. Cohen
Christian R. Everdell
COHEN & GRESSER LLP
800 Third Avenue New York, NY 10022 Phone:
212-957-7600

Bobbi C. Sternheim
Law Offices of Bobbi C. Sternheim
33 West 19th Street - 4th Floor
New York, NY 10011
Phone: 212-243-1100

*Attorneys for Ghislaine Maxwell*

## Certificate of Service

I hereby certify that on January 25, 2021, I served by email, pursuant Rule 2(B) of the Court's individual practices in criminal cases, the *Memorandum of Ghislaine Maxwell in Support of Her Motion Under the Fourth Amendment, Martindell, and the Fifth Amendment to Suppress All Evidence Obtained from the government's Subpoena to* ███████████ *and to Dismiss Counts Five and Six* upon the following:

Alison Moe
Maurene Comey
Andrew Rohrbach
Lara Pomerantz
U.S. Attorney's Office, SDNY
One Saint Andrew's Plaza
New York, NY 10007
Alison.moe@usdoj.gov
Maurene.comey@usdoj.gov
Andrew.Rohrbach@usdoj.gov
Lara.Pomerantz@usdoj.gov

                                        *s/ Christian R. Everdell*

| From: | Kramer, Amanda (USANYS) |
|---|---|
| To: | Diskant, Edward (USANYS); Capone, Russell (USANYS); Kurland, Abigail (USANYS) |
| Subject: | FW: Virginia Guiffre |
| Date: | Friday, November 30, 2018 4:01:53 PM |

**From:** Peter Skinner <PSkinner@BSFLLP.com>
**Sent:** Tuesday, March 8, 2016 12:28 PM
**To:** Kramer, Amanda (USANYS) <AKramer@usa.doj.gov>
**Cc:** StanPottinger@aol.com; brad@pathtojustice.com; Sigrid McCawley <Smccawley@BSFLLP.com>
**Subject:** RE: Virginia Guiffre

Amanda,

If you haven't already seen it, the Post reported today on Jeffrey Epstein's continued relationships with young women.

http://pagesix.com/2016/03/08/jeffrey-epsteins-east-side-mansion-houses-russian-playmates/

Best,
Pete

**From:** Peter Skinner
**Sent:** Monday, February 29, 2016 10:13 PM
**To:** Amanda Kramer
**Cc:** StanPottinger@aol.com; brad@pathtojustice.com; Sigrid McCawley
**Subject:** Re: Virginia Guiffre

Amanda,

I am adding Sigrid McCawley to this email chain as well. As we mentioned earlier today, Sigrid is one of the lead attorneys on the case and knows both Virginia and the facts very well. Please include Sigrid in any follow-up that you may.

Best,
Pete

**From:** Peter Skinner <pskinner@bsfllp.com>
**Date:** Monday, February 29, 2016 at 10:03 PM
**To:** Amanda Kramer <amanda.kramer@usdoj.gov>

**Cc:** "StanPottinger@aol.com" <StanPottinger@aol.com>, "brad@pathtojustice.com"
<brad@pathtojustice.com>
**Subject:** Virginia Guiffre

Amanda,

Thank you again for meeting with us today. We very much appreciate your time. I am attaching the following documents for your review:

1. Complaint in the defamation case against Ghislaine Maxwell (just today, Judge Sweet denied Maxwell's motion to dismiss today);
2. Declarations that Virginia filed in the CVRA case;
3. The Rule 56.1 statement recently filed in the CVRA case;
4. The redacted 302

Please let us know what other information we can provide or if you have any further questions.

Best,
Pete

The information contained in this electronic message is confidential information intended only for the use of the named recipient(s) and may contain information that, among other protections, is the subject of attorney-client privilege, attorney work product or exempt from disclosure under applicable law. If the reader of this electronic message is not the named recipient, or the employee or agent responsible to deliver it to the named recipient, you are hereby notified that any dissemination, distribution, copying or other use of this communication is strictly prohibited and no privilege is waived. If you have received this communication in error, please immediately notify the sender by replying to this electronic message and then deleting this electronic message from your computer. [v.1]

denial . . ."). A properly instructed jury could conclude after hearing all of the evidence at trial that the defendant intended the natural meaning of the words she used, not the allegedly truthful answer she suggests now, and therefore that she lied. In sum, the defendant's post-hoc efforts to inject confusion into clear questioning are unavailing and should be rejected, and the jury should decide whether the defendant's answers were false.

        **2.**     **July 2016 Deposition**

Count Six charges the defendant with perjury arising from three colloquies at the second deposition.



Following that line of questioning, the following colloquy occurred:

Government has responded with reliable information directly rebutting the defendant's allegations, there is no material issue of fact sufficient to justify an evidentiary hearing.[44]

The defendant cites *Franks*, to suggest that a hearing is somehow warranted, but her motion falls far short of the standard required to obtain a hearing. "While the *Franks* analysis discussed above is typically employed to evaluate misstatements and omissions relating to probable cause, the Second Circuit has extended the Franks analysis to other Title III requirements for obtaining a warrant." *United States v. Rajaratnam*, No. 09 Cr. 1184 (RJH), 2010 WL 4867402, at *18 (S.D.N.Y. Nov. 24, 2010). The defendant fails to identify the standard that would govern such a hearing. In light of the interests implicated by a Title III wiretap, the USAO-SDNY submits that the defendant's depositions in a civil matter, even with a protective order, are no more significant than the interests implicated by a Title III wiretap. As such, the exacting standard of *Franks* should apply. On this record, the defendant has not made a threshold showing that the Government acted with the intent to mislead or in reckless disregard for the truth. The *Franks* standard is rightly a "high one," *Rivera*, 928 F.2d at 604, and one the defendant has failed to meet here.

The defendant's bald assertions alone do not entitle her to a fishing expedition in the form of a hearing.

## V. The Jury Should Decide Whether the Defendant Committed Perjury

Counts Five and Six of the Indictment allege that, during the course of two depositions, the defendant knowingly made false material declarations, in violation of 18 U.S.C. § 1623. The defendant moves to dismiss those Counts, arguing that the Court can determine now—on a pre-

---

[44] For similar reasons, the defendant's request for discovery regarding this matter should be denied. The defendant has failed to meet her burden under Rule 16 of making "a *prima facie* showing of materiality and must offer more than the conclusory allegation that the requested evidence is material." *Urena*, 989 F. Supp. 2d at 261 (citations omitted). Because the defendant has offered nothing more than her conjecture, based on an inaccurate and hearsay-ridden article, that some unspecified evidence might exist, her request for discovery should be denied.

*Franks*, 438 U.S. at 171 ("To mandate an evidentiary hearing, the challenger's attack must be more

than conclusory and must be supported by more than a mere desire to cross-examine."). Instead,

to warrant a *Franks* hearing:

> [t]here must be allegations of deliberate falsehood or of reckless
> disregard for the truth, and those allegations must be accompanied
> by an offer of proof. . . . Affidavits or sworn or otherwise reliable
> statements of witnesses should be furnished, or their absence
> satisfactorily explained. Allegations of negligence or innocent
> mistake are insufficient. The deliberate falsity or reckless disregard
> whose impeachment is permitted today is only that of the affiant,
> not of any nongovernmental informant.

*Id.*

The burden to even obtain a *Franks* hearing is a heavy one, and such hearings are thus

exceedingly rare. *See United States v. Brown*, 744 F. Supp. 558, 567 (S.D.N.Y. 1990) ("A

defendant seeking to have the Court hold a *Franks* hearing bears a substantial burden."); *United

States v. Swanson*, 210 F.3d 788, 790 (7th Cir. 2000) ("These elements are hard to prove, and thus

*Franks* hearings are rarely held.").

### b.    Discussion

In an alternative effort to suppress the materials obtained pursuant to the subpoena, the

defendant argues that an evidentiary hearing is warranted to inquire into the Government's

"misrepresentations" to Chief Judge McMahon. (Def. Mot. 3 at 16). However, as discussed

extensively above, Maxwell's motion is little more than speculation and innuendo, itself rooted in

a lone news article that, as described above, is not fully accurate. She otherwise presents no

admissible evidence, affidavits, or other materials supporting the breathless accusations contained

in her motion papers. As such, because the defendant does not include "an affidavit of someone

with personal knowledge of the underlying facts," *Shaw*, 260 F. Supp. 2d at 570, and because the

from that meeting. On or about December 6, 2018, AUSA-1 provided the prosecutors with her notes from the February 2016 meeting (which are attached as Exhibit 5) and documents the attorneys provided.[32]

### 5. The USAO-SDNY's Subpoenas and *Ex Parte* Applications for Materials

Shortly after opening the investigation in late November 2018, the Government identified possible victims and their counsel through public filings or media reports, which included Boies Schiller. (Def. Mem. 3, Ex. E at 2-3). The USAO-SDNY first contacted Boies Schiller about its investigation on or about December 18, 2018. Shortly thereafter, in or about December or January 2018, the Government indicated to Boies Schiller that it intended to make document requests. Boies Schiller generally advised the Government that a protective order would govern some of the materials. (*Id.* at 3).

In or about February 2019, approximately two months after the USAO-SDNY opened its investigation (and almost three years after the February 29, 2016 meeting described above), the USAO-SDNY issued two criminal grand jury subpoenas to Boies Schiller. One of the subpoenas requested non-privileged documents relating to *Giuffre v. Maxwell*, 15 Civ. 7433 (RWS); the other

---

[32] The Government has reviewed the file that AUSA-1 provided to the prosecution team on or about December 6, 2018 and understands, based on a review of that file, that at the February 2016 meeting, AUSA-1 received copies of Epstein's black book, flight records, and Palm Beach Police Department reports. Although AUSA-1 does not now recall the attorneys providing her with any documents at the meeting (Ex. 4 at 2), an email she sent to the prosecution team on December 6, 2018 refers to these documents as materials that the attorneys provided at the meeting.

The Government notes that as of March 7, 2016, one week after AUSA-1's February 29, 2016 meeting with the attorneys when she received these documents, Maxwell had only produced two emails in response to Giuffre's discovery requests. (*See* 15 Civ. 7433 (LAP), Dkt. No. 43 at 1-2). None of the documents apparently provided to AUSA-1 during the February 2016 meeting was an email. Accordingly, the Government has no reason to believe that Giuffre's counsel provided AUSA-1 with any discovery materials from the *Giuffre v. Maxwell* civil case. AUSA-1 also does not believe she ever received any such discovery materials. (Ex. 4 at 6).

The protective order, among other things, restricted the parties from disclosing discovery materials marked confidential to third parties, absent express permission from the Court.

In connection with the defamation suit, Maxwell was deposed by Boies Schiller, counsel for Giuffre, on April 22, 2016 and July 22, 2016.

On or about May 24, 2017, the parties entered into a settlement agreement and voluntarily dismissed the civil action. (*See* 15 Civ. 7433 (LAP), Dkt. No. 916). Boies Schiller has continued to represent Giuffre in post-settlement litigation. *Giuffre v. Maxwell*, No. 18-2868 (2d Cir.); *Giuffre v. Maxwell*, No. 20-2413 (2d Cir.).

### 4. The USAO-SDNY Commences the Instant Investigation in 2018

On or about November 29, 2018, the USAO-SDNY initiated its investigation into Epstein and possible co-conspirators, and formally opened the investigation by completing the requisite paperwork to open an investigation on or about November 30, 2018. The investigation was prompted by a series of articles published by the *Miami Herald* earlier that same week relating to Epstein, his conduct, and the circumstances of his prior conviction. *See* Julie K. Brown, "Even from Jail, Sex Abuser Manipulated the System. His Victims Were Kept in the Dark," *Miami Herald* (Nov. 28, 2018).[31] AUSA-1 was not involved in the decision to open the investigation or in the investigation itself. (*See* Ex. 4 at 6). Indeed, AUSA-1 stopped serving as the Office's Human Trafficking and Project Safe Childhood Coordinator as of April 2017.

Shortly after initiating the investigation, the prosecutors involved in the investigation learned of the prior February 2016 meeting and requested copies of AUSA-1's notes and records

---

[31] Indeed, on July 8, 2019, at the press conference following the arrest of Epstein, Geoffrey S. Berman, then United States Attorney for the Southern District of New York, stated that while he was not "going to go into any aspects of how our investigation originated[,] I will say that we were assisted from some excellent investigative journalism."

OPR that "he did not recall having read the NPA at this juncture and 'had no involvement with it.' OPR Report at 64 n. 105.[7]

Beyond this, the OPR Report and the record in the civil case note contacts with Main Justice about the NPA, but only *after* the NPA was negotiated, drafted, and signed. In the civil case, the district court detailed the history of the plea negotiations—and noted that, after the NPA was signed, Epstein's counsel appealed to officials in Washington, D.C., hoping to avoid enforcement of the NPA's requirement that Epstein plead guilty to state offenses, as the agreement required. *Doe 1 v. United States*, 359 F. Supp. 3d 1201, 1212-13 (S.D. Fla. 2019). As the district court noted, that appeal was rejected. *Id.* at 1213.

In particular, and following the execution of the NPA, the report reflects that the USAO-SDFL contacted the CEOS Chief in connection with a letter from Epstein's counsel, Kenneth Starr, protesting about complying with certain parts of the NPA. OPR Report at 95. According to the report:

> At the same time, at [USAO-SDFL supervisor] Lourie's request, Villafaña sent the NPA and its addendum to Lourie and Oosterbaan. Oosterbaan responded to Lourie that he was "not thrilled" about the NPA; described Epstein's conduct as unusually "egregious," particularly because of its serial nature; and observed that the NPA was "pretty advantageous for the defendant and not all that helpful to the victims." He opined, however, that the Assistant Attorney General would not and should not consider or address the NPA "other than to say that she agrees with it." During her OPR interview, [Assistant Attorney General] Fisher did not recall reading Starr's letter or discussing it with Oosterbaan, but believed the comment about her "agree[ing] with it" referred to a federal prosecution of Epstein, which she believed was appropriate. She told OPR, however, that she "played no role in" the NPA and did not review or approve the agreement either before or after it was signed.

---

[7] The OPR Report further reflects that, at the time, a supervisor at the USAO-SDFL noted the CEOS had "no approval authority." OPR Report at 60.

12

district in which the dismissed charges are initially brought. However, the law has evolved to the contrary. A plea agreement binds only the office of the United States Attorney for the district in which the plea is entered unless it affirmatively appears that the agreement contemplates a broader restriction.

*Annabi*, 771 F.2d at 672 (citations omitted). Thus, under *Annabi* and its progeny, a plea agreement only binds the U.S. Attorney's Office that executes the agreement, even if, as here, the agreement references "the Government" or "the United States" and even if the agreement lacks a provision that "expressly limits the scope of the agreement to the district" in which the agreement was entered.[2]

Confronted with this clear and controlling authority, the defendant's motion attempts to limit the rule of *Annabi* by noting that some decisions applying *Annabi* concerned plea agreements that also included express provisions limiting the enforceability of the agreements to the districts in which they were entered. (Def. Mot. 1 at 22). Essentially, the defendant argues that without an express provision limiting the scope of the agreement, every plea agreement should be interpreted to bind the entire federal government. But the law in this Circuit holds the opposite: the presumption is that a plea agreement in one district does not bind another, absent an affirmative appearance that the agreement extends more broadly. *See Laskow*, 688 F. Supp. at 854 ("Defendant's argument, in effect, is that unless there is an explicit statement to the contrary, it is presumed that a non-prosecution agreement binds offices of the United States Attorney that are

---

[2] The defendant's motion emphasizes that the Second Circuit has held, as a general matter, that plea agreements are construed against the Government. (Def. Mot. 1. at 13). That does not carry the day here, as *Annabi* provides a specific mode of analysis for determining whether a plea agreement applies to other districts, and the defendant's motion fails under *Annabi*. More broadly, the authorities the defendant cites for this general principle arise from circumstances in which a defendant has sought to enforce his *own* a plea agreement against the Government. (*See, e.g.*, Def. Mot. 1 at 13 citing *United States v. Feldman*, 939 F.3d 182, 189 (2d Cir. 2019) (analyzing claim by defendant seeking to enforce promises he claimed prosecutors had made to him)). Notably, the defendant has cited no authority for the proposition that plea agreements are to be construed in favor of a third party who was not involved in plea negotiations.

6

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

UNITED STATES OF AMERICA     :

    -v.-     :     S1 20 Cr. 330 (AJN)

GHISLAINE MAXWELL,     :

        Defendant.     :

-------------------------------------------------------------x

## THE GOVERNMENT'S OMNIBUS MEMORANDUM IN OPPOSITION TO THE DEFENDANT'S PRE-TRIAL MOTIONS

AUDREY STRAUSS
United States Attorney
Southern District of New York
Attorney for the United States of America

Alison Moe
Maurene Comey
Lara Pomerantz
Andrew Rohrbach
Assistant United States Attorneys
- Of Counsel -

1

(2)

Virginia wants prosecution. ▮▮▮▮▮ feels oblig. to do
something about it.

From 2014/2015, she believed it was summer 1999.
As it turns out, it was summer of 2000.

She has lawsuit against Maxwell for defamation. Truth
is defense.

She wants settlement/neg. into nonprofit to help girls
in same situation            - amt of $ ...
          - of attorney
Her father negotiated a settlement w/ Epstein + she
has a confidentiality provision limiting amount
Epstein's attorneys reached at + neg. settlement.

Did FBI search his planes? Did they find hidden
cameras?

Concern active pedophile.

Pitch to other prosecutors? no
Book deal? not now
- 20/20 interview last spring > ABC killed it - lawyers pulled it
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮                              but they still
                                            have it

Have portions of diary.

CONFIDENTIAL            SDNY_GM_02742884

Third, in the same interview, AUSA ▮▮▮ *admitted* that she contemplated a perjury prosecution, and she "recalls thinking that a perjury investigation would have . . . challenges." Ex. K, p 5. Left unexplained by the government in its Response to Maxwell's Motion is why AUSA ▮▮▮ would have contemplated a perjury prosecution if Giuffre's attorneys had not proposed one.

There are two possible explanations. Either (1) Giuffre's attorneys knew in February 2016 that they were going to set a perjury trap for Maxwell, and they discussed that plan with AUSA ▮▮▮ at the time, or (2) there were additional communications between AUSA ▮▮▮ and Giuffre's attorneys (phone calls or even a second meeting) *after* Maxwell was deposed. Either way, the government contemplated a perjury charge against Maxwell in 2016, and the Response's insistence otherwise is not credible.

- **Defense 3: Maxwell's argument relies on nothing but the *Daily News* article.**

The government says that Maxwell's argument "is premised solely on her use of selective snippets from a lone *Daily News* Article that is premised, in meaningful part, on anonymous sources and hearsay." Resp. at 89. This claim is stunningly disingenuous, and it fails on its own terms.

When Maxwell filed her Motion, she did not have access to the government's emails and AUSA ▮▮▮ contemporaneous notes, despite their obvious exculpatory value. *See Brady v. Maryland*, 373 U.S. 83, 87–88 (1963). The government did not disclose these materials until Maxwell challenged the government's candor and conduct before Judge McMahon. One wonders whether the government would have provided them to Maxwell had she not filed this Motion.

11

# EXHIBIT  40

The New York Times

# *Leon Black Agreed to Pay $62.5 Million to Settle Epstein-Related Claims*

The private equity mogul struck a deal with the U.S. Virgin Islands to avoid a potential lawsuit over his ties to Jeffrey Epstein.

Leon Black's dealings with Jeffrey Epstein had become a source of personal embarrassment for him in the years after Mr. Epstein's death.

Credit...
Lucy Nicholson/Reuters
By **Matthew Goldstein**__July 21, 2023

The billionaire investor Leon Black agreed to pay $62.5 million to the U.S. Virgin Islands in January to be released from any potential claims arising out of the territory's three-year investigation into the sex trafficking operation of the disgraced financier Jeffrey Epstein, according to a copy of the settlement agreement.

The previously undisclosed settlement came after the Virgin Islands reached a $105 million deal in November with Mr. Epstein's estate. The next month, the territory sued JPMorgan Chase in federal court over the bank's 15-year relationship with Mr. Epstein, a registered sex offender who killed himself in a Manhattan jail cell in 2019.

The Virgin Islands government produced its settlement agreement with Mr. Black in response to a public records request by The New York Times. In January, representatives of the two parties held a private mediation session to settle claims, according to another document reviewed by The Times. The $62.5 million settlement followed that session. Mr. Black agreed to pay in cash, according the settlement document.

The settlement shows the extent to which Mr. Black, once a titan of the private equity industry, has gone to limit scrutiny of his decades-long social and business ties to Mr. Epstein. Those dealings, including the revelation that he paid $158 million to Mr. Epstein for tax and estate planning services, had become a source of embarrassment for Mr. Black in the years after Mr. Epstein's death.

Mr. Black, 71, was forced to step down in early 2021 as chairman and chief executive of Apollo Global Management, the giant private equity firm he co-founded in 1990. A major art collector who made news for his $120 million purchase of a version of Edvard Munch's "The Scream," Mr. Black also stepped down as chairman of the Museum of Modern Art in New York.

The four-page settlement said nothing in it should be construed as an "admission of liability" by Mr. Black.

Venetia H. Velazquez, a lawyer with the Virgin Islands attorney general's office, which negotiated the settlement, said, "For the past several years, the Virgin Islands Department of Justice has made it a priority to support human trafficking victims and to enforce the law to prevent and deter human trafficking."

Whit Clay, a spokesman for Mr. Black, said: "Mr. Black engaged and made payments to Jeffrey Epstein for legitimate financial advisory services, which, based on everything now known, he very much regrets. Consistent with settlements of other major U.S. banks, Mr. Black resolved the U.S.V.I.'s potential claims arising out of the unintended consequences of those payments. There is no suggestion in the U.S.V.I. settlement that Mr. Black was aware of or participated in any misconduct."

The settlement occurred after a scheduled two-day mediation attended by lawyers for Mr. Black and the Virgin Islands, as well as a plaintiffs' lawyer who had represented many of Mr. Epstein's victims, according to the document reviewed by The Times.

Brad Edwards, the plaintiffs' lawyer, said he was "not at liberty to discuss the topic."

Mr. Epstein killed himself in August 2019 while being held in federal custody in Manhattan on sex trafficking charges. Lawyers for Mr. Epstein's victims have said at least 200 women — many of them teenagers at the time — were sexually abused by Mr. Epstein at his private island residence in the Virgin Islands, as well as his homes in Manhattan, Florida and elsewhere.

Some victims of Mr. Epstein who had received settlements directly from his estate were granted permission by the estate's executors to pursue claims against a handful of men who had socialized with Mr. Epstein, according to a person with knowledge of the matter. Mr. Black was one of those men, the person said.

The settlement with the Virgin Islands did not cover claims anyone else might have against Mr. Black. But the settlement itself could not be used as "evidence of wrongdoing by Black," the document said.

The Virgin Islands' investigation of Mr. Black arose from an inquiry that led to the $105 million settlement with Mr. Epstein's estate and the territory's pending lawsuit against JPMorgan Chase. The territory had been weighing a suit that would have accused Mr. Black of facilitating Mr. Epstein's sex trafficking operation by paying large sums of money to Southern Trust, which was one of Mr. Epstein's main companies in the Virgin Islands, said two people briefed on the matter.

Mr. Black's decision to step down at Apollo followed an article in The Times that reported his ties to Mr. Epstein were more extensive than previously known. Apollo subsequently hired the law firm Dechert to investigate Mr. Black's relationship with Mr. Epstein. Dechert cleared Mr. Black of any wrongdoing. But the law firm found Mr. Black had paid $158 million to Southern Trust and also provided the business with a $30 million loan.

In its report, Dechert noted that the compensation paid by Mr. Black to Mr. Epstein, a college dropout, "far exceeded any amounts" paid to his other professional advisers.

Planning for the mediation session with Mr. Black began in December while Denise N. George was still attorney general of the Virgin Islands. But she was fired on New Year's Eve by the governor of the U.S. territory — Albert Bryan Jr. — just days after her office sued JPMorgan.

In its lawsuit against JPMorgan, the Virgin Islands claims that the nation's largest bank turned a blind eye to Mr. Epstein's trafficking of teenage girls and young women for sex. It is seeking $190 million in penalties.

JPMorgan, which recently reached a $290 million settlement with Mr. Epstein's victims on similar grounds, is opposing the lawsuit filed by the Virgin Islands. The bank claims the territory should not be entitled to any money from it because government officials did little to deter Mr. Epstein's activities.

In 2013, JPMorgan dropped Mr. Epstein as a customer, after years of red flags raised by bank compliance employees about it doing business with a registered sex offender, according to court filings in the lawsuit.

But other documents reviewed by The Times show that several bank employees continued to talk to Mr. Epstein after 2013 because of his role as a tax adviser to Mr. Black, who had also been a customer of JPMorgan's private bank. These documents also show that the decision to continue to work with Mr. Epstein because he was Mr. Black's adviser was approved by top executives at the bank.

Ms. Velazquez said in her statement, "Unlike any single individual, JPMorgan had detailed and comprehensive financial data on Epstein's activities and a legal obligation to share that information with law enforcement."

A JPMorgan spokeswoman said any meeting that bank employees had with Mr. Epstein after 2013 would have been in service of his clients.

Some of the settlement money will go toward mental health programs and to combat sex trafficking on the Virgin Islands, the territory's attorney general's office said.

Jessica Silver-Greenberg and Maureen Farrell contributed to this report.
**Matthew Goldstein** covers Wall Street and white-collar crime and housing issues.

# EXHIBIT 41

LCKCmax7                          Rebuttal - Ms. Comey

1   Kate and Carolyn and Annie.  The defense seems to suggest that

2   this implantation happened from the media, greedy civil

3   lawyers, and the FBI.  None of those actually make sense and

4   not one has support in this record.

5          Starting with the media, you heard absolutely nothing

6   at this trial about any of these witnesses consuming media in

7   this case.  You heard that Jane and Annie gave some interviews

8   themselves, you heard that Kate also gave an interview, but

9   there is no evidence that any of these different witnesses saw

10  each other's interviews, they weren't asked about it, they

11  didn't say they did.  There is no evidence that any witness saw

12  each other's media or anything else about this case in the

13  news.  This is a distraction.

14         Turning to the lawyers.  There is not a shred of

15  evidence that a group of lawyers got together, made up a story

16  about Maxwell, and then implanted it into these witnesses'

17  minds.  Remember, each witness had a different lawyer.  So for

18  this theory to work, four different attorneys had to come up

19  with this story and they separately manipulate their clients

20  into perjuring themselves at a federal trial all so they could

21  get a cut of the Epstein Victim Compensation Fund.  That makes

22  no sense for a bunch of different reasons.

23         For one thing, Annie told you that her lawyer is pro

24  bono, working for free.  She doesn't get a cut of whatever

25  Annie gets from the fund, so why would she need to make up a