UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-80736-CIV-MARRA

JANE DOE 1 AND JANE DOE 2,

Petitioners,

vs.

UNITED STATES,

Respondent.

_____/

## OPINION AND ORDER

This cause is before the Court upon Jane Doe 1 and Jane Doe 2's Motion for Partial

Summary Judgment (DE 361); the United States's Cross-Motion for Summary Judgment (DE

408); Jane Doe 1 and Jane Doe 2's Motion to Compel Answers (DE 348) and Jane Doe 1 and

Jane Doe 2's Motion for Finding Waiver of Work Product and Similar Protections by

Government and for Production of Documents (DE 414).  The Motions are fully briefed and ripe

for review.  The Court has carefully considered the Motions and is otherwise fully advised in the

premises.

### I. Background

The facts, as culled from affidavits, exhibits, depositions, answers to interrogatories and

reasonably inferred, for the purpose of these motions, are as follows:

From between about 1999 and 2007, Jeffrey Epstein sexually abused more than 30 minor

girls, including Petitioners Jane Doe 1 and Jane Doe 2 (hereinafter, "Petitioners"), at his mansion

in Palm Beach, Florida, and elsewhere in the United States and overseas. (Government Resp. to

Petitioner's Statement of Undisputed Material Facts (hereinafter, "DE 407" at ¶ 1.) Because

Epstein and his co-conspirators knowingly traveled in interstate and international commerce to sexually abuse Jane Doe 1, Jane Doe 2 and others, they committed violations of not only Florida law, but also federal law. (DE 407 at ¶ 2.) In addition to his own sexual abuse of the victims, Epstein directed other persons to abuse the girls sexually. (DE 407 at ¶ 3.) Epstein used paid employees to find and bring minor girls to him. Epstein worked in concert with others to obtain minors not only for his own sexual gratification, but also for the sexual gratification of others. (DE 407 at ¶ 8.)

In 2005, the Town of Palm Beach Police Department ("PBPD") received a complaint from the parents of a 14 year old girl about her sexual abuse by Jeffery Epstein. The PBPD ultimately identified approximately 20 girls between the ages of 14 and 17 who were sexually abused by Epstein. (DE 407 at ¶ 4.) In 2006, at the request of the PBPD, the Federal Bureau of Investigation ("FBI") opened an investigation into allegations that Epstein and his personal assistants used the facilities of interstate commerce to induce girls between the ages of 14 and 17 to engage in illegal sexual activities. (DE 407 at ¶ 5.) The FBI ultimately determined that both Jane Doe 1 and Jane Doe 2 were victims of sexual abuse by Epstein while they were minors. Jane Doe 1 provided information about her abuse and Jane Doe 2's abuse to the FBI on August 7, 2007. (DE 407 at ¶ 6.)

From January of 2007 through September of 2007, discussions took place between the U.S. Attorney's Office for the Southern District of Florida ("the Office") and Jeffrey Epstein's attorneys. (DE 407 at ¶ 9.) On February 1, 2007, Epstein's defense team sent a 24-page letter to the Office going over what they intended to present during a meeting at the Office the same day. (DE 407 at ¶ 10.)

By March 15, 2007, the Office was sending letters to victims informing them of their rights pursuant to the Crime Victims' Rights Act ("CVRA"). (DE 407 at ¶ 11.) By May of 2007, the Office had drafted an 82-page prosecution memorandum and a 53-page indictment outlining numerous federal sexual offenses committed by Epstein. (DE 407 at ¶ 12.) On or about June 7, 2007, FBI agents had delivered to Jane Doe 1 a standard CVRA victim notification letter.[1] The notification letter promised that the Justice Department would make its "best efforts" to protect Jane Doe 1's rights, including "the reasonable right to confer with the attorney for the United States in the case" and " to be reasonably heard at any public proceeding in the district court involving [a] . . . plea." The notification further stated that, "[a]t this time, your case is under investigation." (DE 407 at ¶ 13.) Jane Doe 1 relied on those representations and believed that the Government would protect those rights and keep her informed about the progress of her case. (DE 407 at ¶ 14.)

On July 6, 2007, Epstein's lawyers sent a 23-page letter lodging numerous arguments to persuade the Office that no federal crimes had been committed by him. (DE 407 at ¶ 15.) By August 3, 2007, the Government had rejected Epstein's various arguments against federal

---

[1] On or about August 11, 2006, Jane Doe 2 received the same CVRA letter. (DE 407 at ¶ 7.)

Initially, Jane Doe 2 was unwilling to provide any information to the FBI or the Office unless she was assured her statements would not be used against her. She also described Epstein as "an awesome man" and stated that she hoped "nothing happens to" him. (DE 415 at ¶¶ 14-15.) This was during the time period where Jane Doe 2 had obtained counsel paid for by Epstein. (Jane Doe 2 Decl. ¶¶ 5-7.)

Assistant United States Attorney ("AUSA") A. Marie Villafaña ("line prosecutor" "Villafaña") testified that both Jane Doe 1 and Jane Doe 2 received letters describing their rights under the CVRA. Although Jane Doe 1 and 2 were given Ms. Villafaña's and the FBI agent's name and phone number, neither contacted either of them. (Villafaña Decl. ¶ 5, DE 403-19.)

charges and sent a letter to Epstein's counsel stating, "[w]e would reiterate that the agreement to Section 2255 [a civil restitution provision] liability applies to all of the minor girls identified during the federal investigation, not just the 12 that form the basis of an initial planned charging instrument." (DE 407 at ¶ 17.) On September 10, 2007, multiple drafts of a non-prosecution agreement ("NPA") had been exchanged between Epstein's counsel and the Office. (DE 407 at ¶ 18.)

On September 12, 2007, while attempting to create alternative charges against Epstein, the Office expressed concern about "the effect of taking the position that Mr. Epstein's house is in the special maritime and territorial jurisdiction of the United States" because the Government had "no evidence of any assaults occurring either on Mr. Epstein's plane or offshore from his residence." (DE 407 at ¶ 19.) On September 13, 2007, the line prosecutor emailed Epstein's counsel indicating an effort to come up with a solution to the aforementioned concern and she stated that she had been "spending some quality time with Title 18 looking for misdemeanors." The line prosecutor further indicated, "I know that someone mentioned there being activity on an airplane. I just want to make sure that there is a factual basis for the plea that the agents can confirm." Epstein's counsel responded, "[a]lready thinking about the same statutes." (DE 407 at ¶ 20.)

On September 14, 2007, after having spoken on the telephone about the subject matter of the September 13 emails, Epstein's counsel and the line prosecutor exchanged emails including a proposed plea agreement for Epstein to plead guilty to assaulting one of his coconspirators. (DE 407 at ¶ 21.) On September 15, 2007, the line prosecutor sent an email to the Epstein defense team raising concerns about a resolution that would not involve one of

4

# EXHIBIT  42

Epstein's minor victims and stating:

> I have gotten some negative reaction to the assault charge with [a
> co-conspirator] as the victim, since she is considered one of the main
> perpetrators of the offenses that we planned to charge in the
> indictment. Can you talk to Mr. Epstein about a young woman named
> [Jane Doe]? We have hearsay evidence that she traveled on Mr.
> Epstein's airplane when she was under 18, in around the 2000 or
> 2001 time frame.

(DE 407 at ¶ 22.)

On September 16, 2007, the line prosecutor corresponded with Epstein's counsel

about having Epstein plead guilty to obstruction of justice for pressuring one of his co-conspirators

not to turn over evidence or complying with a previously-served grand jury subpoena. (DE 407 at

¶ 23.) The Office also stated, "On an 'avoid the press' note, I believe that Mr. Epstein's airplane was

in Miami on the day of the [co-conspirator] telephone call. If he was in Miami-Dade County at the

time, then I can file the charge in the District Court in Miami, which will hopefully cut the press

coverage significantly." They also discussed having Epstein plead guilty to a second charge of

assaulting a different co-conspirator. (DE 407 at ¶ 24.)

On September 16, 2007, the line prosecutor wrote to Epstein's counsel indicating that

the Office did not like the factual basis for the proposed charges as the Office was "not

investigating Mr. Epstein [for] abusing his girlfriend." (DE 407 at ¶ 25.) The correspondence

further stated:

> Andy [i.e., AUSA Andrew Laurie] recommended that some of the timing issues be
> addressed only in the state agreement, so that it isn't obvious to the judge that we are
> trying to create federal jurisdiction for prison purposes.
>
> I will include our standard language regarding resolving all criminal liability and I
> will mention 'co-conspirators,' but I would prefer not to highlight for the judge all
> of the other crimes and all of the other persons that we could charge. Also, we do not

5

have the power to bind Immigration . . . there is no plan to try to proceed on any immigration charges against either Ms. [co-conspirator] or Ms. [co-conspirator]

(Ex. 7, DE 361-7.)

In the same email, the line prosecutor wrote to defense counsel about a meeting outside the U.S. Attorney's Office: "Maybe we can set a time to meet. If you want to meet 'off campus' somewhere, that is fine." (DE 407 at ¶ 27.) On about September 16, 2007, Epstein's counsel provided a proposed NPA to the Government that extended immunity from federal prosecution not only to Epstein, but also to certain co-conspirators. (DE 407 at ¶ 28.)

On September 17, 2007, the line prosecutor wrote to defense counsel Jay Lefkowitz: "Please send [a document] to my home e-mail address – [redacted] and give me a call on my cell [redacted] so I can be ready for some discussions tomorrow." (DE 407 at ¶ 29.) On September 17, 2007, Lefkowitz responded: "[D]o you have another obstruction proffer I can review that you have drafted? Also, if we go that route, would you intend to make the deferred prosecution agreement public?" (DE 407 at ¶ 30.)

On September 18, 2007, the Office responded: "A non-prosecution agreement would not be made public or filed with the Court, but it would remain part of our case file. It probably would be subject to a FOIA request, but it is not something that we would distribute without compulsory process." (DE 407 at ¶ 31.) On September 20, 2007, the U.S. Attorney's Office wrote: "On the issue about 18 USC 2255, we seem to be miles apart. Your most recent version not only had me binding the girls to a trust fund administered by the state court, but also promising that they will give up their 2255 rights.... In the context of a non-prosecution agreement, the office may be more willing to be specific about not pursuing charges against others." (DE 407 at ¶ 32.)

6

On September 21, 2007, Palm Beach County State Attorney Barry Krischer wrote the line prosecutor about the proposed agreement and added: "Glad we could get this worked out for reasons I won't put in writing. After this is resolved I would love to buy you a cup at Starbucks and have a conversation." (DE 407 at ¶ 33.) On September 21, 2007, the line prosecutor emailed Epstein's counsel stating, "I think that the attached addresses the concerns about having an unlimited number of claimed victims, without me trying to *bind* girls whom I do not represent." (DE 407 at ¶ 34.) On September 23, 2007, the U.S. Attorney's Office sent an email to Lefkowitz stating: "It is factually accurate that the list we are going to give you are persons we have identified as victims. If we did not think they were victims, they would have no right to bring suit." (DE 407 at ¶ 35.)

On September 24, 2007, the line prosecutor sent an e-mail to a prospective representative for the Epstein victims, entitled "Conflict Check." The email confirmed the girls' status as victims, stating: "Please keep this confidential because these are minor victims. This is a preliminary list." Later on September 24, 2007, the line prosecutor sent an email to Lefkowitz stating: "I have compiled a list of 34 confirmed minors." (DE 407 at ¶ 36.) As correspondence continued on September 24, 2007, and the NPA was being executed, Lefkowitz sent an email to the line prosecutor stating: "Marie – Please do whatever you can to keep this [i.e., the NPA] from becoming public." (DE 407 at ¶ 37.)

On September 24, 2007, Epstein and the Office formally reached an agreement whereby the United States would defer federal prosecution in favor of prosecution by the State of Florida. Epstein and the Office accordingly entered into a NPA reflecting such an agreement. (DE 407 at ¶ 38.) The NPA provided that "the United States, in consultation with and subject to the good faith approval of Epstein's counsel, shall select an attorney representative for [the victims], who shall be

7

paid for by Epstein." The NPA also provided that if any of the victims elected to bring suit under

18 U.S.C. § 2255, they must agree to waive any other claim for damages. As part of the NPA,

Epstein would not contest the jurisdiction of the United States District Court and waived his right

to contest liability and damages. (NPA, DE 361-62.)

     Among other provisions, the NPA expanded immunity to any "potential coconspirator"

of Epstein's: "In consideration of Epstein's agreement to plead guilty and to provide compensation

in the manner described above, if Epstein successfully fulfills all of the terms and conditions of this

agreement, the United States also agrees that it will not institute any criminal charges against any

potential co-conspirators of Epstein, including but not limited to Sarah Kellen, Adriana Ross, Lesley

Groff, or Nadia Marcinkova." (DE 407 at ¶ 40.) The NPA also provided that: "The parties

anticipate that this agreement will not be made part of any public record. If the United States receives

a Freedom of Information Act request or any compulsory process commanding the disclosure of the

agreement, it will provide notice to Epstein before making that disclosure." (DE 407 at ¶ 41.)

     From the time the FBI began investigating Epstein until September 24, 2007—when

the NPA was concluded—the Office never conferred with the victims about a NPA or told the

victims that such an agreement was under consideration. (Marie Villafaña Decl. ¶ 7, DE 361-64; DE

407 at ¶ 43.) Many, if not all, other similarly-situated victims received standard CVRA victim

notification letters substantively identical to those sent to Jane Doe 1 and Jane Doe 2. (DE 407 at

¶ 44.) The Office did not consult or confer with any of the victims about the NPA before it was

signed. (DE 407 at ¶¶ 45-46.)

     Epstein's counsel was aware that the Office was deliberately keeping the NPA secret from

the victims and, indeed, had sought assurances to that effect. (DE 407 at ¶ 48.) After the NPA was

8

signed, Epstein's counsel and the Office began negotiations about whether the victims would be told

about the NPA. (DE 407 at ¶ 49.) It was a deviation from the Government's standard practice to

negotiate with defense counsel about the extent of crime victim notifications. (DE 407 at ¶ 50.)

On September 24, 2007, the Office sent an email to Lefkowitz:

Thank you, Jay. I have forwarded your message only to [United States Attorney]
Alex [Acosta], Andy, and Roland. I don't anticipate it going any further than that.
When I receive the originals, I will sign and return one copy to you. The other will
be placed in the case file, which will be kept confidential since it also contains
identifying information about the girls.

When we reach an agreement about the attorney representative for the girls, we can
discuss what I can tell him and the girls about the agreement. I know that Andy
promised Chief Reiter an update when a resolution was achieved.... Rolando is
calling, but Rolando knows not to tell Chief Reiter about the money issue, just about
what crimes Mr. Epstein is pleading guilty to and the amount of time that has been
agreed to. Rolando also is telling Chief Reiter not to disclose the outcome to anyone.

(DE 407 at ¶ 52.)

On September 25, 2007, the line prosecutor sent an e-mail to Lefkowitz stating: "And

can we have a conference call to discuss what I may disclose to . . . the girls regarding the

agreement." (DE 407 at ¶ 53.) Also on September 25, 2007, the line prosecutor sent an email to

Lefkowitz which stated in part: "They [Ted Babbitt, Stuart Grossman, Chris Searcy, [L]ake

Lytal] are all very good personal injury lawyers, but I have concerns about whether there would

be an inherent tension because they may feel that THEY might make more money (and get a lot

more press coverage) if they proceed outside the Terms of the plea agreement. (Sorry – I just

have a bias against plaintiffs' attorneys.) One nice thing about Bert is that he is in Miami where

there has been almost no coverage of this case." (DE 407 at ¶ 54.)

On September 26, 2007, the line prosecutor sent an e-mail to Lefkowitz in which she

stated: "Hi Jay – Can you give me a call at 561-[xxx-xxxx] this morning? I am meeting with the

agents and want to give them their marching orders regarding what they can tell the girls." (DE

407 at ¶ 55.) On September 27, 2007, the attorney representative for the victims emailed the

Office and asked whether he could get a copy of the indictment or plea agreement to find out

"exactly what Epstein concedes to in the civil case." (Sept. 27, 2007 email, DE 362-2.) Upon

inquiry from the Office, Lefkowitz responded by stating that the attorney representative

"certainly [] should not get a copy of any indictment." (DE 407 at ¶ 57.) That same day, the line

prosecutor informed Epstein's counsel of concerns raised by the attorney representative for the

girls. Specifically, "[t]he concern is, if all 40 girls decide they want to sue, they don't want to be

in a situation where Mr. Epstein says this is getting too expensive, we won't pay anymore

attorneys' fees." (DE 407 at ¶ 58.)

Also on that same day, the line prosecutor sent an email to state prosecutors Lanna

Belohlavek and Barry Krischer: "Can you let me know when Mr. Epstein is going to enter his

guilty plea and what judge that will be in front of? I know the agents and I would really like to

be there, 'incognito.'" (DE 407 at ¶ 59.)

On October 3, 2007, the Office sent a proposed letter that would have gone to a special

master for selecting an attorney representative for the victims under the NPA's compensation

procedure. The letter described the facts of the Epstein case as follows: "Mr. Epstein, through his

assistants, would recruit underage females to travel to his home in Palm Beach to engage in lewd

conduct in exchange for money. Based upon the investigation, the United States has identified 40

young women who can be characterized as victims pursuant to 18 U.S.C. § 2255. Some of those

women went to Mr. Epstein's home only once, some went there as many as 100 times or more. Some

of the women's conduct was limited to performing a topless or nude massage while Mr. Epstein masturbated himself. For other women, the conduct escalated to full sexual intercourse." (DE 407 at ¶ 60.)

On October 10, 2007, Lefkowitz sent a letter to U.S. Attorney Alex Acosta stating, in pertinent part: "Neither federal agents nor anyone from your Office should contact the identified individuals to inform them of the resolution of the case, including appointment of the attorney representative and the settlement process. Not only would that violate the confidentiality of the agreement, but Mr. Epstein also will have no control over what is communicated to the identified individuals at this most critical stage. We believe it is essential that we participate in crafting mutually acceptable communication to the identified individuals." The letter further proposed that the attorney representative for the victims be instructed that "[t]he details regarding the United States's investigation of this matter and its resolution with Mr. Epstein is confidential. You may not make public statements regarding this matter." (DE 407 at ¶ 61.)

U.S. Attorney Acosta then met with Lefkowitz for breakfast and Lefkowitz followed up with a letter stating, "I also want to thank you for the commitment you made to me during our October 12 meeting in which you . . . assured me that your Office would not . . . contact any of the identified individuals, potential witnesses, or potential civil claimants and their respective counsel in this matter." (DE 407 at ¶ 63.)

On October 24, 2007, AUSA Jeff Sloman sent a letter to Jay Lefkowitz, proposing an addendum to the NPA clarifying the procedures for the third-party representative for the victims under the NPA's compensation provisions. (DE 407 at ¶ 64.) On October 25, 2007, AUSA Sloman sent a letter to Retired Judge Davis about selecting an attorney to represent the victims under the

NPA's compensation procedure. (DE 407 at ¶ 65.)

On about October 26 or 27, 2007, Special Agents E. Nesbitt Kuyrkendall and Jason Richards met in person with Jane Doe 1. They explained that Epstein would plead guilty to state charges, he would be required to register as a sex offender for life, and he had made certain concessions related to the payment of damages. (DE 407 at ¶ 70.) According to Jane Doe 1, the Agents did not explain that the NPA had already been signed. (Jane Doe 1 Decl. ¶ 5, DE 361-26.) Jane Doe 1's understanding was that the federal investigation would continue. (Jane Doe 1 Decl. ¶ 6.) In contrast, Special Agent Kuyrkendall stated that the meeting with Jane Doe 1 was to advise her of the main terms of the NPA.[2] (Kuykendall Decl. ¶ 8, DE 403-18.) After the meeting, Special Agent Kuyrkendall became concerned about what would happen if Epstein breached the NPA, and thought that if the victims were aware of the NPA, the provision about monetary damages could be grounds for impeachment of the victims and herself. (Kuykendall Decl. ¶ 9.) According to Special Agent Kuyrkendall, the investigation of Epstein continued through 2008. (Kuykendall Decl. ¶ 11.)

In addition to Jane Doe 1, FBI agents only talked to two other victims out of the 34 identified victims about the "general terms" of the NPA, including the provision providing a federal civil remedy to the victims. (DE 407 at ¶ 76.) After these meetings with three victims, Epstein's defense team complained. (DE 407 at ¶ 77.)

On about November 27, 2007, AUSA Sloman sent an e-mail to Lefkowitz, (with a copy to U.S. Attorney Acosta) stating that the Office had a statutory obligation to notify the victims about Epstein's plea to state charges that was part of the NPA:

---

[2] Special Agent Kuyrkendal also stated that on August 7, 2007, Jane Doe 1 never asked to confer with anyone from the government about charging decisions or any resolution of the matter. (Kuykendall Decl. ¶ 7.)

> The United States has a statutory obligation (Justice for All Act of 2004) to notify the victims of the anticipated upcoming events and their rights associated with the agreement entered into by the United States and Mr. Epstein in a timely fashion. Tomorrow will make one full week since you were formally notified of the selection. I must insist that the vetting process come to an end. Therefore, unless you provide me with a good faith objection to Judge Davis's selection [as special master for selecting legal counsel for victims pursuing claims against Epstein] by COB tomorrow, November 28, 2007, I will authorize the notification of the victims. Should you give me the go-head on [victim representative] . . . selection by COB tomorrow, I will simultaneously send you a draft of the letter. I intend to notify the victims by letter after COB Thursday, November 29th.

(DE 407 at ¶ 79.)

On November 28, 2007, the Government sent an email to Lefkowitz attaching a letter dated November 29, 2007 (the apparent date upon which it was intended to be mailed) and explained that "I am writing to inform you that the federal investigation of Jeffrey Epstein has been completed, and Mr. Epstein and the U.S. Attorney's Office have reached an agreement containing the following terms." The proposed letter then spelled out a number of the provisions in the NPA, including that because Epstein's plea of guilty to state charges was "part of the resolution of the federal investigation," the victims were "entitled to be present and to make a statement under oath at the state sentencing." (DE 407 at ¶ 80.)

On November 29, 2007, Lefkowitz sent a letter to U.S. Attorney Acosta objecting to the proposed victim notification letter, stating that it is inappropriate for any letter to be sent to the victims before Epstein entered his plea or had been sentenced. Lefkowitz also told the Government that the victims should not be invited to the state sentencing, that they should not be encouraged to contact law enforcement officials, and that encouraging the attorney representative to do anything other than get paid by Epstein to settle the cases was to encourage an ethical conflict. (DE 407 at ¶

13

82.)

On about November 30, 2007, U.S. Attorney Acosta sent a letter to one of Epstein's defense attorneys, Kenneth Starr, stating: "I am directing our prosecutors not to issue victim notification letters until this Friday at 5 p.m., to provide you with time to review these options with your client." The letter also explained that the line prosecutor had informed U.S. Attorney Acosta "that the victims were not told of the availability of Section 2255 relief during the investigation phase of this matter" despite the fact that the "[r]ule of law . . . now requires this District to consider the victims' rights under this statute in negotiating this Agreement." (DE 407 at ¶ 83.) On December 5, 2007, Starr sent a letter to U.S. Attorney Acosta (with copy to AUSA Sloman) asking about issuance of victim notification letters and stating: "While we believe that it is wholly inappropriate for your Office to send this letter under any circumstances, it is certainly inappropriate to issue this letter without affording us the right to review it." (DE 407 at ¶ 85.)

On about December 6, 2007, AUSA Sloman sent a letter to Lefkowitz stating in part:

[E]ach of the listed individuals are persons whom the Office identified as victims. [T]he Office is prepared to indict Mr. Epstein based upon Mr. Epstein's 'interactions' with these individuals. This conclusion is based upon a thorough and proper investigation - one in which none of the victims was informed of any right to receive damages of any amount prior to the investigation of her claim.

[T]he Office can say, without hesitation, that the evidence demonstrates that each person on the list was a victim of Mr. Epstein's criminal behavior.

Finally, let me address your objections to the draft Victim Notification Letter. You write that you don't understand the basis for the Office's belief that it is appropriate to notify the victims. Pursuant to the 'Justice for All Act of 2004,' crime victims are entitled to: 'The right to reasonable, accurate, and timely notice of any public court proceeding ... involving the crime' and the 'right not to be excluded from any such public court proceeding....' 18 U.S.C. § 3771(a)(2) & (3). Section 3771 also commands that 'employees of the Department of Justice ... engaged in the detection, investigation, or prosecution of crime shall make their best efforts to see that crime

14

victims are notified of, and accorded, the rights described in subsection (a).' 18
U.S.C. § 3771(c)(1)....

With respect to notification of the other information that we propose to disclose, the
statute requires that we provide a victim with the earliest possible notice of: the status
of the investigation, the filing of charges against a suspected offender, and the
acceptance of a plea. 42 U.S.C. 10607(c)(3). Just as in 18 U.S.C. 3771, these sections
are not limited to proceedings in a federal district court. Our Non-Prosecution
Agreement resolves the federal investigation by allowing Mr. Epstein to plead to a
state offense. The victims identified through the federal investigation should be
appropriately informed, and our Non-Prosecution Agreement does not require the
U.S. Attorney's Office to forego its legal obligations. [T]he Office believes that it has
proof beyond a reasonable doubt that each listed individual was a victim of Mr.
Epstein's criminal conduct while the victim was a minor. The law requires us to treat
all victims "with fairness and with respect for the victim's dignity and privacy." 18
U.S.C. 3771(a)(8).

The letter included a footnote stating: "Unlike the State's investigation, the federal investigation

shows criminal conduct by Mr. Epstein at least as early as 2001, so all of the victims were

minors at the time of the offense." (DE 407 at ¶ 83.)

On December 7, 2007, defense attorney Lilly Ann Sanchez sent a letter to AUSA

Sloman, requesting "that the Office hold off on sending any victim notification letters." No letters

were sent in December of 2007. (DE 407 at ¶ 88.) On December 13, 2007, the line prosecutor sent

a letter to Lefkowitz stating that "You raised objections to any victim notification, and no

further notifications were done." (DE 407 at ¶ 89.) On December 19, 2007, U.S. Attorney Acosta

sent a letter to Lilly Ann Sanchez stating, "I understand that the defense objects to the victims being

given notice of time and place of Mr. Epstein's state court sentencing hearing. We intend to provide

victims with notice of the federal resolution, as required by law. We will defer to the discretion of

the State Attorney regarding whether he wishes to provide victims with notices of the state

proceedings. (DE 407 at ¶ 90.)

In January of 2008, any requirement that Epstein carry out his obligations under the NPA was delayed while he sought higher level review within the Justice Department. (DE 407 at ¶ 92.) On January 10, 2008, Jane Doe 1 and Jane Doe 2 were sent victim notification letters from the FBI advising them that "[t]his case is currently under investigation. This can be a lengthy process and we request your continued patience while we conduct a thorough investigation." (DE 407 at ¶ 93.) The January 10, 2008 notification letters did not disclose that the Jane Doe 1 and Jane Doe 2 case in the Southern District of Florida was the subject of the NPA entered into by Epstein and the Office, or that there had been any potentially binding resolution. (DE 407 at ¶ 94.) Other victims received the same letters as sent to Jane Doe 1 and Jane Doe 2. (DE 407 at ¶ 95.)

According to the declaration of Jane Doe 1, she believed that criminal prosecution of Epstein was important and she wanted to be consulted by prosecutors before any resolution. Based on the letters received, she believed the Government would contact her before reaching any final resolution. (Jane Doe 1 Decl. ¶ 9.) On January 31, 2008, Jane Doe 1 met with FBI Agents and an AUSA from the U.S. Attorney's Office. She provided additional details of Epstein's sexual abuse of her. The AUSA did not disclose to Jane Doe 1 at this meeting that they had already negotiated a NPA with Epstein. (DE 407 at ¶ 97.) According to the declaration of Jane Doe 2, while she recognizes she did not initially help the investigation, she later tried to cooperate with the investigation but was never given an opportunity to cooperate with the investigation.[3] (Jane Doe 2

---

[3] The Government believed that a negotiated resolution was in the best interest of the Office and the victims as a whole based on information obtained from the victims and the agents assigned to the case. (Villafaña Decl. ¶ 19.) The Government also believed that Epstein was trying to set aside the NPA and therefore the Government needed to be prepared for a prosecution. (Villafaña Decl. ¶ 34.) Petitioners object to this evidence, claiming the Government previously claimed work product and similar protections over internal materials. Given that the Court is ruling in favor of Petitioners on the present motions, the Court need not address this

Decl. ¶¶ 13-14, DE 361-27.)

On March 19, 2008, the line prosecutor sent a lengthy email to a prospective pro bono attorney for one of Epstein's victims who had been subpoenaed to appear at a deposition. The email listed the attorneys representing Epstein, the targets of the investigation, and recounted in detail the investigation that had been conducted to that point. The email did not reveal the fact that Epstein had signed the NPA in September 2007. (DE 407 at ¶ 98.)

On May 30, 2008, Jane Doe 5, who was recognized as an Epstein victim by the Office, received a letter from the FBI advising her that "[t]his case is currently under investigation. This can be a lengthy process and we request your continued patience while we conduct a thorough investigation." (DE 407 at ¶ 99.) The May 30, 2008 victim letter to Jane Doe 5 also acknowledged the victims' rights under the CVRA . (DE 407 at ¶ 100.)

In mid-June of 2008, Mr. Bradley Edwards, the attorney for Petitioners, contacted the line prosecutor to inform her that he represented Jane Doe 1 and, later, Jane Doe 2. Edwards asked to meet to provide information about the federal crimes committed by Epstein against these victims. The line prosecutor and Edwards discussed the possibility of federal charges being filed in the future. Edwards was led to believe federal charges could still be filed, with no mention whatsoever of the existence of the NPA or any other possible resolution to the case. (DE 407 at ¶ 101.)

At the end of the call, the line prosecutor asked Edwards to send any information that he wanted considered by the Office in determining whether to file federal charges. The line prosecutor did not inform Edwards about the NPA. (DE 407 at ¶ 102.) On June 19, 2008, Edwards

---

issue. To the extent it might have an impact on future rulings, Petitioners may reassert this argument if and when appropriate.

sent an email to the line prosecutor requesting to meet and discuss plans. (DE 407 at ¶ 103.)

On June 23, 2008, the line prosecutor sent an email to Lefkowitz stating that the Deputy Attorney General had completed his review of the Epstein matter and "determined that federal prosecution of Mr. Epstein's case [wa]s appropriate. Accordingly, Mr. Epstein ha[d] until the close of business on Monday, June 30, 2008, to comply with the terms and conditions of the agreement between the United States and Mr. Epstein." (DE 407 at ¶ 105.)

On or about June 27, 2008, the Office called Edwards to provide notice to his clients regarding the entry of Epstein's guilty plea in state court. (DE 407 at ¶ 107.) According to Edwards, the line prosecutor only told him that Epstein was pleading guilty to state solicitation of prosecution. He was not told that the state plea was related to the federal investigation or that the state plea would resolve the federal crimes. Edwards claims he was not told his clients could address the state court. (Edwards Decl. ¶¶ 17-18, DE 416-1.) In contrast, the line prosecutor claims she told Edwards that his clients could address the state court. (Villafaña Decl. ¶ 38, DE 403-19.)

On or before June 30, 2008, the Office prepared a draft victim notification to be sent to the victims. The notification was designed to inform the victims of the provisions of the deferral of federal prosecution in favor of state charges. The notification letter began by describing Epstein's guilty plea in the past tense: "On June 30, 2008, Jeffrey Epstein … entered a plea of guilty to violations of Florida statutes forbidding the solicitation of minors to engage in prostitution and felony solicitation of prostitution." Later, a substantively identical letter was prepared for Epstein's and his counsel's review. (DE 407 at ¶ 110.)

On June 30, 2008, the Office sent an e-mail to Epstein's counsel: "The FBI has received several calls regarding the Non-Prosecution Agreement. I do not know whether the title of the

18

document was disclosed when the Agreement was filed under seal, but the FBI and our office are declining comment if asked." (DE 407 at ¶ 111.) That same day, Epstein pled guilty to state law solicitation of prostitution charges. (DE 407 at ¶ 112.) Immediately following the June 30, 2008 hearing, the line prosecutor told one of the victims' attorneys that Epstein had "pled guilty today in state court." (DE 407 at ¶ 113.) Also after the plea, the line prosecutor emailed the assistant state attorney a copy of the NPA to be filed under seal. (July 1, 2008 email, DE 362-38.)

On June 30, 2008, based on what she had been told by the Government, Jane Doe 1 thought that the Office was still investigating and pursuing her case. She did not receive notice that Epstein's state guilty plea affected her rights in any way. If she had been told that the state plea had some connection to blocking the prosecution of her case, she would have attended and tried to object to the judge to prevent that plea from going forward. (Jane Doe 1 Decl. ¶ 13.) According to the line prosecutor, Edwards did not tell her that Jane Doe 1 wanted to meet with her before a resolution was reached. (Villafaña Decl. ¶ 37, DE 403-19.)

On July 3, 2008, as specifically directed by the Office, Edwards sent a letter to the Office communicating the wishes of Jane Doe 1, Jane Doe 2, and Jane Doe 5 that federal charges be filed against Epstein: "We urge the Attorney General and our United States Attorney to consider the fundamental import of the vigorous enforcement of our Federal laws. We urge you to move forward with the traditional indictments and criminal prosecution commensurate with the crimes Mr. Epstein has committed, and we further urge you to take the steps necessary to protect our children from this very dangerous sexual predator." (DE 407 at ¶ 118.)

On July 7, 2008, the line prosecutor corresponded with Epstein's counsel seeking his signed agreement concerning a notification letter to the victims before beginning the distribution of that

19

letter. (DE 407 at ¶ 120.) That same day, Jane Doe 1 filed an emergency petition for enforcement

of her rights under the CVRA. (DE 407 at ¶ 126.) On July 9, 2008, Edwards saw the first reference

to the NPA when the Government filed its responsive pleading to Jane Doe's emergency petition.

(Edwards Decl. ¶ 21.)

On July 8, 2008, the line prosecutor sent a letter to Epstein's counsel stating that

victims would be informed about the civil compensation provision of the NPA the next day:

> In accordance with the terms of the Non-Prosecution Agreement, on June 30,
> 2008, the United States Attorney's Office provided you with a list of thirty-one
> individuals "whom it was prepared to name in an Indictment as victims of an
> enumerated offense by Mr. Epstein." . . . In deference to your vacation, we
> allowed you a week to provide us with any objections or requested modifications
> of the list and/or the Notification language. Yesterday, I contacted you via
> telephone and e-mail, but received no response. Accordingly, the United States
> hereby notifies you that it will distribute the victim notifications tomorrow, July 9,
> 2008, to each of the thirty-two identified victims, either directly or via their
> counsel.

(DE 407 at ¶ 127.)

On July 9, 2008, Epstein's counsel sent a letter to the line prosecutor raising concerns

about the notifications, and suggesting modifications to the notification letter. Epstein's counsel

also objected to the victim notification letters containing certain information about the NPA. (DE

407 at ¶ 128.) The line prosecutor responded: "Without such an express Acknowledgment by

Mr. Epstein that the notice contains the substance of that Agreement, I believe that the victims

will have justification to petition for the entire agreement, which is contrary to the confidentiality

clause that the parties have signed." (DE 407 at ¶ 129.) That same day, the U.S. Attorney's

Office sent victim notification letters to Jane Doe 1 and Jane Doe 5, via their attorney, Edwards,

and to other identified victims of Epstein. That notification contained a written explanation of

20

some of the civil compensation provisions of the NPA. The notification did not provide the full terms of the NPA.

On July 10, 2008, Epstein's counsel continued to protest victim notification as evidenced by an email to the line prosecutor stating, "we respectfully request a reasonable opportunity to review and comment on a draft of the modified notification letter you intend to mail before you send it." (DE 407 at ¶ 131.)

On August 10, 2008, Jane Doe 1 and Jane Doe 2 filed a motion seeking release of the NPA. (DE 407 at ¶ 136.) On August 14, 2008, the line prosecutor emailed Epstein's counsel stating that the court has "ordered us to make the Agreement available to the plaintiffs." (DE 407 at ¶ 141.)

On August 18, 2008, Lefkowitz wrote the line prosecutor that Epstein objected to disclosure of the terms of the NPA, but that Epstein would "cooperate with the government to reach an agreement as to substance of the notification to be sent to the government's list of individuals. Based on the Agreement, the information contained in the notification should be limited to (1) the language provided in the Agreement dealing with civil restitution (paragraphs 7-10) and (2) the contact information of the selected attorney representative. We object to the inclusion of additional information about the investigation of Mr. Epstein, the terms of the Agreement other than paragraphs 7-10 and the identity of other identified individuals." (DE 407 at ¶ 143.) On August 21, 2008, the Government sent a letter to Epstein's counsel stating that, "[c]opies of the victim notifications will continue to be provided to counsel for Mr. Epstein."

Jane Doe 2 was not informed of the contents of the NPA until August 28, 2008, when the line prosecutor provided a copy to Edwards. (DE 407 at ¶ 146.) On September 2, 2008, the line

21

prosecutor sent an email to Epstein's counsel stating, "I will start sending out the victim notifications today. In accordance with your request, I have changed the language regarding the victims' right to receive a copy of the Agreement." (DE 407 at ¶ 147.) On September 2 and 3, 2008, the Office sent to Jane Doe 1 and other identified victims amended notification letters, stating "the United States has agreed to defer federal prosecution in favor of this state plea and sentence." (Sept. 3, 2008 letter, DE 363-66; (DE 407 at ¶ 148.)

On September 16, 2008, attorney Jeffrey Herman, who represented several Epstein victims, wrote to the line prosecutor to object to the restitution procedures established in the NPA after learning that another attorney, established through the NPA, would be making unsolicited contacts to the victims. Mr. Herman explained that the notification letters were "misleading" because they referred generally to a waiver of "any other claim for damages," without informing them that this waiver might include a valuable punitive damages claim against an alleged billionaire. (DE 407 at ¶ 152.) On September 17, 2008, the line prosecutor sent an email to State Attorney Barry Krischer, explaining that the NPA "contain[ed] a confidentiality provision that require[ed] us to inform Mr. Epstein's counsel before making any disclosure." (DE 407 at ¶ 153.)

Around this same time period, Jane Doe 1 and Jane Doe 2 filed actions in Palm Beach County, seeking money damages from Epstein from sexually abusing them. (Petitioners' Resp. to Gov't's Statement of Undisputed Material Facts (hereinafter "DE 415") at ¶¶ 8-9.) Eventually, they received monetary settlements of their lawsuits. (DE 415 at ¶ 12.)

In moving for summary judgment, the Petitioners make the following arguments in support of their contention that the Government violated their CVRA rights. The Government

22

violated Petitioners' right to confer under the CVRA: (1) when the Government was negotiating and signing the NPA; (2) when the Government sent letters telling Petitioners to be patient while the Government completed its investigation and (3) when the Government did not tell the victims that the state plea would extinguish the federal case. Petitioners also claim the Government violated their right to be treated with fairness under the CVRA by concealing the negotiations of the NPA. Additionally, Petitioners contend the Government violated their rights to reasonable and accurate notice when it concealed that the NPA and the federal investigation were implicated in the state court proceeding.

In moving for and responding to summary judgment, the Government contends that there is no right to notice or conferral about a NPA; it was reasonable for the Government to send letters to victims while continuing to investigate the case because the Government could not assume that Epstein would plead guilty; and the line prosecutor contacted Petitioners' attorneys about the state court plea hearing. The Government also claims it did not violate the right to reasonable, accurate and timely notice because the CVRA does not create any right to notice of state court proceedings and, in any event, the Government gave notice. The Government asserts it did not treat the victims unfairly and used its best efforts to comply with the CVRA, including complying with the Attorney General's guidelines for victim assistance. Furthermore, the Government argues that Petitioners are equitably estopped from challenging the NPA because they relied upon the NPA in their state court civil actions against Epstein. Lastly, the Government contends that Petitioners are judicially estopped from challenging the validity of the NPA because they have asserted mutually inconsistent positions; namely, that the NPA is invalid in federal court but was binding on Epstein in state court.

23

## II. Summary Judgment Standard

The Court may grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The stringent burden of establishing the absence of a genuine issue of material fact lies with the moving party. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The Court should not grant summary judgment unless it is clear that a trial is unnecessary, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986), and any doubts in this regard should be resolved against the moving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).

The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp., 477 U.S. at 323. To discharge this burden, the movant must point out to the Court that there is an absence of evidence to support the nonmoving party's case. Id. at 325.

After the movant has met its burden under Rule 56(a), the burden of production shifts and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electronic Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) and (B).

Essentially, so long as the non-moving party has had an ample opportunity to conduct discovery, it must come forward with affirmative evidence to support its claim. Anderson, 477

24

U.S. at 257. "A mere 'scintilla' of evidence supporting the opposing party's position will not

suffice; there must be enough of a showing that the jury could reasonably find for that party."

Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990). If the evidence advanced by the non-

moving party "is merely colorable, or is not significantly probative, then summary judgment may

be granted." Anderson, 477 U.S. 242, 249-50.

III. Discussion

The CVRA was designed to protect victims' rights and ensure their involvement in the

criminal justice process. United States v. Moussaoui, 483 F.3d 220, 234 (4th Cir. 2007); Kenna

v. U.S. Dist. Court, 435 F.3d 1011, 1016 (9th Cir. 2006) ("The [CVRA] was enacted to make

crime victims full participants in the criminal justice system."). The statute enumerates the

following ten rights:

(1) The right to be reasonably protected from the accused.

(2) The right to reasonable, accurate, and timely notice of any public court
proceeding, or any parole proceeding, involving the crime or of any release or escape
of the accused.

(3) The right not to be excluded from any such public court proceeding, unless the
court, after receiving clear and convincing evidence, determines that testimony by the
victim would be materially altered if the victim heard other testimony at that
proceeding.

(4) The right to be reasonably heard at any public proceeding in the district court
involving release, plea, sentencing, or any parole proceeding.

(5) The reasonable right to confer with the attorney for the Government in the case.

(6) The right to full and timely restitution as provided in law.

(7) The right to proceedings free from unreasonable delay.

(8) The right to be treated with fairness and with respect for the victim's dignity and

25

privacy.

(9) The right to be informed in a timely manner of any plea bargain or deferred prosecution agreement.

(10) The right to be informed of the rights under this section and the services described in section 503(c) of the Victims' Rights and Restitution Act of 1990 (42 U.S.C. 10607(c)) and provided contact information for the Office of the Victims' Rights Ombudsman of the Department of Justice.

18 U.S.C. § 3771(a).

This Court previously held the following with respect to the CVRA: First, the rights under the CVRA attach before the Government brings formal charges against a defendant. Does v. United States, 817 F. Supp. 2d 1337, 1341 (S.D. Fla. 2011). Second, the CVRA authorizes the rescission or "reopening" of a prosecutorial agreement, including a non-prosecution agreement, reached in violation of a prosecutor's conferral obligations under the statute. Doe v. United States, 950 F. Supp. 2d 1262, 1267 (S.D. Fla. 2013). Third, section 3771(d)(5) of the CVRA authorizes the setting aside of pre-charge prosecutorial agreements, despite the fact that the particular statutory enforcement provision expressly refers to the reopening of a plea or sentence. Id. at 1267. Fourth, the "reasonable right to confer . . . in the case" extends to the pre-charge state of criminal investigations and proceedings. Id. Fifth, the federal sex offense crimes involving minors allegedly committed by Epstein renders these Petitioners crime victims under the CVRA. Id. at 1269. Sixth, "questions pertaining to [the] equitable defense[s] are properly left for resolution after development of a full evidentiary record." Id. at 1269 n. 6.

Here, it is undisputed that the Government entered into a NPA with Epstein without conferring with Petitioners during its negotiation and signing. Instead, the Government sent letters to the victims requesting their "patience" with the investigation even after the Government

26

entered into the NPA. At a bare minimum, the CVRA required the Government to inform

Petitioners that it intended to enter into an agreement not to prosecute Epstein. Although the

binding effect of the NPA was contingent upon Epstein pleading guilty to the state charges, that

contingency was out of the control of the Government. The Government's hands were

permanently tied if Epstein fulfilled his obligations under the NPA. Thus, Petitioners and the

other victims should have been notified of the Government's intention to take that course of

action before it bound itself under the NPA. Had the Petitioners been informed about the

Government's intention to forego federal prosecution of Epstein in deference to him pleading

guilty to state charges, Petitioners could have conferred with the attorney for the Government and

provided input. In re Dean, 527 F.3d 391, 394 (5th Cir. 2008) (there are rights under the CVRA

including the "reasonable right to confer with the attorney for the Government"). Hence, the

Government would have been able to "ascertain the victims' views on the possible details of the

[non-prosecution agreement]." Id. Indeed, it is this type of communication between prosecutors

and victims that was intended by the passage of the CVRA. See United States v. Heaton, 458 F.

Supp. 2d 1271 (D. Utah 2006)(government motion to dismiss charge of using facility of

interstate commerce to entice minors to engage in unlawful sexual activity would not be granted

until government consulted with victim); United States v. Ingrassia, No. CR-04-0455ADSJO,

2005 WL 2875220, at *17 n. 11 (E.D.N.Y. Sept. 7, 2005) (Senate debate supports the view that

the contemplated mechanism for victims to obtain information on which to base their input was

conferral with the prosecutor concerning any critical stage or disposition of the case).

   Particularly problematic was the Government's decision to conceal the existence of the

NPA and mislead the victims to believe that federal prosecution was still a possibility.[4]  When
the Government gives information to victims, it cannot be misleading. While the Government
spent untold hours negotiating the terms and implications of the NPA with Epstein's attorneys,
scant information was shared with victims. Instead, the victims were told to be "patient" while
the investigation proceeded.

The Government, however, interprets the CVRA as only obligating the prosecutor to
answer inquiries by a crime victim and does not impose a duty on the prosecutor to give notice
about case developments, other than what is required in section 3771(a)(2).  Such an
interpretation is in direct contravention of the intent of the CVRA. See Ingrassia, 2005 WL
2875220, at *17 n.11 (Senate debate explaining the right to confer is "intended to be expansive"
including the right of victim to confer "concerning any critical state of disposition of the case").
In any event, no meaningful conferral could take place as long as the Government chose to
conceal the existence of the NPA from the victims.[5]

Nor does the Court agree with the Government that the 2015 amendment to the CVRA,
section 3771(a)(9), which gave victims the "right to be informed in a timely manner of any plea

---

[4] Even if the Court accepted the Government's version of the facts relative to the Agent
having told Jane Doe 1 the "main terms" of the NPA (which is left undefined), the victims were
not told about it until *after* it was signed and the Government was bound.  This precluded the
Government from obtaining any input from the victims.

[5] The Government devotes time to distinguishing between the words "confer" and
"notice" and suggesting that "confer" is more limited in scope than "notice."  Nothing about the
definition of confer, however, suggests it is limited to one party bearing the burden of
communication. See Merriam-Webster Online Dictionary, https://www.merriam-webster.com/
dictionary (last visited January 7, 2019) ("to compare views or take counsel"); Blacks Law
Dictionary (10th ed. 2014) ("to hold a conference, to consult with one another").

28

bargain or deferred prosecution agreement" specifically excluded the right of victims to be informed of a non-prosecution agreement. Prior to this amendment, this Court held that the right to confer extended to the pre-charge state of criminal investigations and proceedings. Doe, 950 F. Supp. 2d at 1267; see also 157 Cong. Rec. S7060-01, 157 Cong. Rec. S7060-01, S7060 (CVRA co-sponsor Senator Jon Kyl's 2011 letter to the Attorney General, explaining that "Congress intended the CVRA to broadly protect crime victims throughout the criminal justice process-from the investigative phases to the final conclusion of a case.")

The 2015 amendment did not serve to repeal or restrict the obligations of the Government to confer with victims in the early stages of a case. Instead, the 2015 amendment clarified that certain events, such as plea agreements or deferred prosecution agreements, must be conveyed to the crime victim. Put another way, the 2015 amendment codified what the courts had been interpreting the CVRA to require, such as entitlement to notice of a plea bargain. See In re Dean, 527 F.3d at 394 ("the government should have fashioned a reasonable way to inform the victims of the likelihood of criminal charges and to ascertain the victims' views on the possible details of a plea bargain"); United States v. Okun, No. CRIM. 3:08CR132, 2009 WL 790042, at *2 (E.D. Va. Mar. 24, 2009) (the statutory language of the CVRA gives the victims' rights before the accepting of plea agreements).

To the extent the Government relies upon the "interpretive canon, *expressio unius est exclusio alterius*, 'expressing one item of [an] associated group or series excludes another left unmentioned'" the Court is not persuaded. Chevron U.S.A. Inc. v. Echazabal, 536 U.S. 73, 80 (2002) (quoting United States v. Vonn, 535 U.S. 55, 65 (2002)). "The force of any negative implication . . . depends on context." Marx v. General Revenue Corp., 568 U.S. 371, 381 (2013).

29

"[T]he *expressio unius* canon does not apply unless it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it, and that the canon can be overcome by contrary indications that adopting a particular rule or statute was probably not meant to signal any exclusion." Id. (internal citations and quotation marks omitted).

The expansive context of the CVRA lends itself to only one interpretation; namely, that victims should be notified of significant events resulting in resolution of their case without a trial. See Kenna v. U.S. Dist. Court for C.D.Cal., 435 F.3d 1011, 1016 (9th Cir. 2006) ("[t]he statute was enacted to make crime victims full participants in the criminal justice system"); Heaton, 458 F. Supp. 2d at 1273 (the right to confer is "not limited to particular proceedings" but is "expansive" and applies broadly to "any critical stage or disposition of the case"). Reading into the statute a negative implication that victims need not be informed of non-prosecution agreements, and only informed of the more common events of plea bargains or deferred prosecution agreements, would be inconsistent with the goal of the CVRA.[6] In the context of plea agreements, the CVRA provides victims with rights prior to the acceptance of plea agreements. See In re Dean, 527 F.3d at 394; United States v. Okun, No. CRIM. 3:08CR132, 2009 WL 790042, at *2 (E.D. Va. Mar. 24, 2009). Furthermore, victims obtain rights under the CVRA even before prosecution. Okum, 2009 WL 790042, at *2 (citing In re Dean, 527 F.3d at 394). Based on this authority, the Court concludes that the CVRA must extend to conferral about non-prosecution agreements.

---

[6] A NPA entered into without notice has a more damaging impact on the victims than a plea agreement entered into without notice. When a plea agreement is entered into without notice, the victims will at least have an opportunity to provide input to a judge at sentencing. Once a NPA is entered into without notice, the matter is closed and the victims have no opportunity to be heard regarding any aspect of the case.

Next, the Government claims it did not violate the right to confer when, in January of 2008, it sent letters to the victims counseling patience because, at that time, Epstein's attorneys were seeking review of the NPA at higher levels within the Department of Justice. As indicated previously, however, at this point, the Government had bound itself to the terms of the NPA unless Epstein failed to comply with its terms. It was a material omission for the Government to suggest to the victims that they have patience relative to an investigation about which it had already bound itself not to prosecute. While Epstein was within his rights to attempt to persuade higher authorities within the Department of Justice to overrule the prosecutorial decisions of the U. S. Attorney's Office in the Southern District of Florida, the CVRA was designed to give the victims the same opportunity to attempt to affect prosecutorial decisions before they became final. Instead, the Office engaged in lengthy negotiations with Epstein that included repeated assurances that the NPA would not be "made public or filed with the Court." (DE 407 at ¶ 31.)

Nor did the Justice Department guidelines create an exemption from the CRVA's statutory requirements. Although the Government points to guidelines that conflicted with the requirements of the CVRA (by restricting CVRA rights until after a formal indictment), the Court is not persuaded that the guidelines were the basis for the Government's decision to withhold information about the NPA from the victims. If that had been the case, the Government would not have sent the victim letters telling them that they had rights protected under the CVRA. Nor would they have told Epstein's attorneys that it had obligations to notify the victims. In any event, an agency's own "'interpretation' of a statute cannot supersede the language chosen by Congress." Mohasco Corp. v. Silver, 447 U.S. 807, 825 (1980).

Next, the Court rejects the Government's contention that Jane Doe 2 is not protected by

31

the CVRA because she made statements favorable to Epstein early in the investigation.[7] There is
no dispute that Epstein sexually abused Jane Doe 2 while she was a minor. Therefore, regardless
of her comments to the prosecutor, she was a victim. See 18 U.S.C. § 3771(e) (the CVRA
defines a victim as "a person directly and proximately harmed as a result of the commission of a
Federal offense"); In re Stewart, 552 F.3d 1285, 1288 (11th Cir. 2008) ("to determine a crime
victim, then, first, we identify the behavior constituting 'commission of a Federal offense.'
Second, we identify the direct and proximate effects of that behavior on parties other than the
United States. If the criminal behavior causes a party direct and proximate harmful effects, the
party is a victim under the CVRA.").

The Court need not resolve the factual questions surrounding what and when the victims
were told about the state court proceeding and whether a state court proceeding is covered by the
CVRA. Under the facts of this case, once the Government failed to advise the victims about its
intention to enter into the NPA, a violation of the CVRA occurred.

Nor does the Court need to consider the Government's estoppel arguments at this time.
These arguments relate only to the remedy, and not the determination of whether there was a
CVRA violation. Therefore, the Court will address this issue at the appropriate juncture.

Lastly, the Court will address the Government's argument that its prosecutorial discretion
permitted it to enter into the NPA. The Government correctly notes that the CVRA provides that
"[n]othing in this chapter shall be construed to impair the prosecutorial discretion of the Attorney
General or any officer under his direction." 18 U.S.C.A. § 3771(d)(6). The Court is not ruling

---

[7] In fact, the Office considered Jane Doe 2 a victim as early as August of 2006 when it
sent her a CVRA letter.

that the decision not to prosecute was improper. The Court is simply ruling that, under the facts of this case, there was a violation of the victims rights under the CVRA.

IV. Conclusion

Accordingly, it is hereby **ORDERED AND ADJUDGED** as follows:

1) Jane Doe 1 and Jane Doe 2's Motion for Partial Summary Judgment (DE 361) is **GRANTED** to the extent that Petitioners' right to conferral under the CVRA was violated.

2) The United States's Cross-Motion for Summary Judgment (DE 408) is **DENIED.**

3) Jane Doe 1 and Jane Doe 2's Motion to Compel Answers (DE 348) is **DENIED WITHOUT PREJUDICE.**

4) Jane Doe 1 and Jane Doe 2's Motion for Finding Waiver of Work Product and Similar Protections by Government and for Production of Documents (DE 414) is **DENIED WITHOUT PREJUDICE.**

5) The parties should confer and inform the Court **within 15 days of the date of entry of this Order** how they wish to proceed on determining the issue of what remedy, if any, should be applied in view of the violation.

**DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 21st day of February, 2019.

KENNETH A. MARRA
United States District Judge

33

# EXHIBIT  43

    **COHEN & GRESSER LLP**

800 Third Avenue
New York, NY 10022
+1 212 957 7600 phone
www.cohengresser.com

Christian R. Everdell
+1 (212) 957-7600
ceverdell@cohengresser.com

July 2, 2021

**BY ECF**

The Honorable Alison J. Nathan
United States District Court
Southern District of New York
United States Courthouse
40 Foley Square
New York, NY 10007

Re: *United States v. Ghislaine Maxwell*, **S2 20 Cr. 330 (AJN)**

Dear Judge Nathan:

Pursuant to the Court's order dated July 1, 2021 (Dkt. 308), we have attached to this letter the unsealed copies of Exhibits D, E, F, and G of Ms. Maxwell's memorandum of law in support of her first motion to suppress (Dkt. 134) to be filed on the public docket.

Respectfully submitted,

___/s/ Christian Everdell___
Christian R. Everdell
**COHEN & GRESSER LLP**
800 Third Avenue, 21st Floor
New York, New York 10022
(212) 957-7600

cc:    All Counsel of Record (By ECF)

To Be Filed Under Seal

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
———————————————————————x

IN RE GRAND JURY SUBPOENA

19 Misc. 149 (CM)

———————————————————————x

**SEALED MEMORANDUM DECISION AND ORDER GRANTING
THE GOVERNMENT'S APPLICATION TO MODIFY THE PROTECTIVE ORDER**

McMahon, C.J.:

The Government has filed an application for modification of a March 18, 2016 pretrial

protective order, entered by the late Hon. Robert W. Sweet in a civil defamation action, *Giuffre*

*v. Maxwell*, No. 15-cv-7433 (S.D.N.Y.) ("the *Giuffre* Action"), in order to permit the law firm of

Boies Schiller Flexner LLP ("Boies Schiller") to comply with a grand jury subpoena.

The application is granted.

I.    **Background**

A.    **The Protective Order**

In September 2015, Virginia L. Giuffre commenced a civil suit against Ghislaine

Maxwell, alleging that Maxwell had defamed Giuffre by stating that Giuffre was not the victim

of sex crimes perpetrated by, among others, Maxwell and Jeffrey Epstein ("Epstein"). (15-cv-

7433, Dkt. No. 1.) Boies Schiller represented the plaintiff in the litigation, and continues to

represent her on a pending post-settlement appeal, which is described below.

On March 3, 2016, Maxwell moved before the assigned judge, the Hon. Robert W.

Sweet, for entry of a protective order for materials produced in discovery. Maxwell cited

1

SDNY_GM_00000875

To Be Filed Under Seal

of turning over their discovery to the government in order to coerce a settlement"). The parties also settled just a short time before trial; such a settlement could have been occasioned, at least in part, to avoid the public disclosure of any confidential materials.

However, the only thing on which Maxwell or anyone else might reasonably have relied is that Giuffre or her lawyers would not do what the defendant in *Chemical Bank* did — that is, forward discovery materials in their possession to prosecutors for the purpose of fomenting an investigation. But I am not faced with that situation. Nothing in this record suggests to me that Giuffre or Boies Schiller had anything to do with the Government's decision to convene a grand jury to look into the matters that were the subject of the *Giuffre* Action. On the contrary — the Government has advised the Court that it contacted Boies Schiller as part of its search for parties who might have been victims in its investigation; and that Boies Schiller told the Government that it could not consensually produce at least some documents in its files because of the existence of the Protective Order. There is no evidence of "collusion," to invoke a term of the moment, and it is quite clear that Boies Schiller did not foment the Government's investigation. Moreover, the Assistant United States Attorney has represented to this Court that he has no idea what is in Boies Schiller's files, and that for all he knows every witness who was deposed stood on his/her Fifth Amendment rights and refused to answer questions.

The literal terms of the Protective Order permit the court to authorize the release of Confidential Materials by parties to the Order "for good cause shown." (Protective Order, ¶ 14.) Any party who read the order had to be aware that it contained no promise that Confidential Materials would forever be withheld from a prosecuting agency — especially where, as here, a duly empowered grand jury seeks their production.

21

# EXHIBIT  44

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────┐
│ USDC SDNY                   │
│ DOCUMENT                    │
│ ELECTRONICALLY FILED        │
│ DOC #:                      │
│ DATE FILED: 4/27/21         │
└─────────────────────────────┘
```

---

United States of America,

     –v–

Ghislaine Maxwell,

          Defendant.

20-CR-330 (AJN)

ORDER

---

ALISON J. NATHAN, District Judge:

Defendant Ghislaine Maxwell seeks an order authorizing a subpoena pursuant to Rule 17(c)(3) of the Federal Rules of Criminal Procedure. As detailed in the subpoena and Maxwell's moving papers, she seeks authorization to serve a subpoena to the law firm of Boies, Schiller and Flexner LLP. BSF has filed a letter in opposition to the subpoena request. Additionally, the Government submitted a letter requesting that it be given notice of all pending and future subpoenas applications, an opportunity to challenge them, and copies of any documents produced. For the reasons that follow, the Court denies Maxwell's motion as to Requests 1 through 8 and Request 12 and reserves judgment on Requests 9 through 11. The Court also denies the Government's requests, though it will direct the Government to notify the Court of its views as to Requests 9 through 11.

## I.    Legal Standard

Rule 17(c) permits subpoenas ordering the production of "books, papers, documents, data, or other objects." Fed. R. Crim. P. 17(c)(1). When the subpoena seeks the production of personal or confidential information about a victim, it may be served on a third party only by court order. Fed. R. Crim. P. 17(c)(3).

The purpose of Rule 17(c) is to facilitate the trial by designating a time and place prior to trial to obtain and inspect evidentiary material. *See United States v. Nixon*, 418 U.S. 683, 698–99 (1974) (citing *Bowman Dairy Co. v. United States*, 341 U.S. 214, 220 (1951)). It is not intended to provide an additional means of discovery or to serve as a general "fishing expedition." *Id.* at 698-700. As a result, courts must be mindful not to allow the Rule 17(c) process to become a "broad discovery device" that would undermine the discovery procedures set forth in Rule 16. *United States v. Cherry*, 876 F. Supp. 547, 552 (S.D.N.Y. 1995). Thus, if an item is not discoverable under Rule 16, a party cannot make it discoverable simply by subpoenaing it under Rule 17. *United States v. Barnes*, No. S9 04-CR-186 (SCR), 2008 WL 9359654, at *2 (S.D.N.Y. Apr. 2, 2008).

To determine whether issuance of the subpoena is appropriate, the Court considers the factors articulated in *United States v. Nixon*, 418 U.S. at 699–700. In *Nixon*, the Supreme Court explained that in order to require production prior to trial, the moving party must show: (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general 'fishing expedition.'" *Id.* at 698–700. To clear that hurdle, the Court considers (1) relevancy, (2) admissibility, and (3) specificity. *Id.* at 700.

## II. Discussion

### A. The BSF Subpoena

The proposed subpoena makes twelve requests. Some of the requests relate to documents that Maxwell believes will be relevant at trial. For others, the proffered relevance relates to

2

Maxwell's pending motions to suppress evidence. While ordinarily Rule 17(c) is "trial-focused" and "may be used only to obtain materials admissible as evidence at trial," at least some courts have held that Rule 17(c) can be used to compel the production of documents in connection with a suppression hearing. *United States v. Louis*, No. 04-CR-203 (LTS), 2005 WL 180885, at *3 (S.D.N.Y. Jan. 27, 2005). Even then, the requests fail for the reasons stated below.

Requests 1 through 5 all fail on the basis that they do not comply with *Nixon*'s specificity requirement. Requests 1 through 5 all target communications between "any" owner, shareholder, partner or employee of BSF and government officials or co-counsel in civil litigation, from 2015 to the date of the subpoena. While the requests focus on a certain subject, the requests are so overbroad that issuance of the Rule 17(c) subpoena would be improper. As set forth in the subpoena, the term "communications" encompasses "all forms of correspondence, including regular mail, email, text message, memorandum, or other written communication of information of any kind." The use of the terms "all" and "any" "do not evince specificity." *United States v. Tagliaferro*, No. 19-CR-472 (PAC), 2021 WL 980004, at *3 (S.D.N.Y. Mar. 16, 2021). Here, the requests do not identify specific lawyers or employees of BSF whose communications are relevant. *See United States v. Wey*, 252 F. Supp. 3d 237, 243 (S.D.N.Y. 2017) (discussing that while an originally requested subpoena was insufficiently specific, a new requested subpoena satisfied the specificity requirement because it identified a specified set of individuals whose records were sought). The requests also encompass "all" forms of correspondence without limitation. And while the requested subpoenas are limited to the period between 2015 and 2021, the timeframe is still overly broad. These requests are precisely the kind of "fishing expedition" that the specificity requirement is designed to prevent. *See Bowman Dairy Co.*, 341 U.S. at 221. Indeed, the requests are akin to discovery requests in civil litigation.

3

*See United States v. Avenatti*, No. (S1) 19-CR-373 (PGG), 2020 WL 86768, at *6 (S.D.N.Y. Jan. 6, 2020). But Rule 17(c) subpoenas are not tools of discovery. *Nixon*, 418 U.S. at 698; Wey, 252 F. Supp. 3d at 253. On the specificity prong alone, Requests 1 through 5 fail to satisfy the *Nixon* standard.

Requests 1 and 2 fail for the separate reason that, if Maxwell is entitled to the materials sought at all, they should come from the Government. Requests 1, 2, and 8 all seek documents that are procurable from the Government. As noted above, Requests 1 and 2 seek communications between BSF and government officials regarding a certain subject, from 2015 to the date of the subpoena. Request 8, meanwhile, refers to a specific grand jury subpoena that the Government issued to BSF. As to all of these requests, Maxwell asserts that the Rule 17(c) subpoena is necessary to fix what she deems to be the Government's failure to comply with its discovery obligations. Among the principles set forth in *Nixon* is that the materials must not be otherwise procurable reasonably in advance of trial by exercise of due diligence. *Nixon*, 418 U.S. at 699. These three requests target information that reasonably can be expected to be in the hands of the Government. To the extent that Maxwell has a basis to argue that the Government has not met its discovery obligations, the Rule 17(c) subpoena process is not the proper mechanism for pursuing that. Rather, with notice to the Government so that the issue is properly joined, Maxwell must make some showing of that failure and seek specific and appropriate relief from this Court.

Requests 6 and 7 seek contingency fee agreements or engagement letters between BSF and two of its clients who are alleged victims. Maxwell has failed to make the required showing under *Nixon* that these records would be relevant or admissible for purposes of her Rule 17(c) application. The only plausible theory of relevance set forth in Maxwell's papers is that these

documents are necessary for purposes of impeachment. But as a general matter, the need to impeach witnesses generally "is insufficient to require [materials'] production in advance of trial." *Nixon,* 418 U.S. at 701. Many courts have held that impeachment material does not become relevant until after the witness testifies. *United States v. Skelos,* No. 15-CR-317 (KMW), 2018 WL 2254538, at *2 (S.D.N.Y. May 17, 2018), ), *aff'd,* 988 F.3d 645 (2d Cir. 2021) (collecting cases); *United States v. Scaduto,* No. 94-CR-311 (WK), 1995 WL 130511, at *1 (S.D.N.Y. Mar. 27, 1995) ("Potentially impeaching statements 'ripen into evidentiary material . . . only if and when the witness testifies at trial . . . ." (citation omitted)). *See also Avenatti,* 2020 WL 86768, at *6 (rejecting the argument that the defendant needed the recordings in question prior to trial in order "to demonstrate witnesses' bias or self-interest."). The arguments as to relevance are otherwise specious, and the Court cannot discern what relevance the materials responsive to Requests 6 and 7 may have. In any event, there is little risk that review of these materials, if they become relevant and admissible, will lead to a delay at trial, given their limited volume. *United States v. Seabrook,* No. 16-CR-467, 2017 WL 4838311, at *2 (S.D.N.Y. Oct. 23, 2017). For documents that may ripen into relevance if and when the BSF clients testify, Maxwell presumably could request that the Court issue a subpoena to require production of the engagement letters to the Court so that the information can be made available to Maxwell, if appropriate, at the conclusion of each witness's direct testimony. *See United States v. Giampa,* No. S 92-CR-437 (PKL), 1992 WL 296440, at *3-*4 (S.D.N.Y. Oct. 7, 1992); *United States v. Ferguson,* No. 3:06-CR-137 (CFD), 2007 WL 4577303, at *3 (D. Conn. Dec. 26, 2007).

Maxwell also argues that compulsion of the materials' production under Rule 17(c) is justified because the materials appear not to have been produced by BSF in response to the grand

5

jury subpoena at issue in Request 8; she thus contends that the absence of the documents in that production suggests coordination between the Government and BSF. Other than through conclusory speculation, she fails to explain how the contents of those letters may be relevant to her theory of preexisting coordination between the Government and BSF. Furthermore, to the extent Maxwell argues that the Government may have the documents and has refused to produce them in contravention of *Brady* or *Giglio*, the argument is little more than an attempt to circumvent the discovery processes that are in place. The production of *Giglio* material has not yet happened, and so any claim that the Government has failed to produce these documents consistent with its *Giglio* obligations is premature. Furthermore, as set forth in the Opinion & Order resolving some of Maxwell's pre-trial motions, the Government has represented in good faith that it is cognizant of its *Brady* obligations and that it has complied and will continue to comply with them. This Court knows well that the Government has not always lived up to those obligations in every case. But nothing has transpired that provides any reason to doubt the good faith representations that have been made to the Court by the AUSAs appearing here. In sum, none of Maxwell's theories justify production of these documents under the Rule 17(c) process.

Request 12, which seeks "any" submission to the Epstein Victims' Compensation Program made by BSF, fails under the relevance prong of the *Nixon* standard. The request seeks "any" submission made by BSF to the EVCP. In its reply brief, BSF represents that Maxwell offered to narrow this request to just those materials submitted on behalf of victims who ultimately testify in this action.

The request's failure to satisfy the *Nixon* standard is in part due to its relative lack of specificity, for even if Maxwell had established the relevance of *some* evidence captured by this request, she plainly has not demonstrated the relevance of all materials submitted to the EVCP.

*See United States v. Aguilar*, No. CR 07-00030 (SBA), 2008 WL 3182029, at \*6 (N.D. Cal. Aug. 4, 2008). Maxwell argues that the materials are relevant because they may reveal monetary incentives to testify in a particular way. That argument demonstrates that the documents are being sought for impeachment. As stated above, the mere fact that certain documents might be impeachment evidence does not render them "relevant" for purposes of Rule 17(c); if at all, those documents would become relevant only after a witness testifies. *See Skelos*, 2018 WL 2254538, at \*2. Maxwell's argument that the documents are relevant because their impeachment value is exculpatory does not get around this general bar. These materials only become relevant if or when those witnesses testify. She presents no other nonconclusory basis as to why they are exculpatory. Indeed, Maxwell concedes that the primary purpose of these documents will be for purposes of cross-examination, leaving little doubt as to the purported claim of relevance. And to the extent Maxwell posits that statements made as part of the EVCP process may be exculpatory in themselves, the argument is speculative because she provides no basis for why that expectation might be reasonable. The "mere hope" that the documents may contain some exculpatory evidence is insufficient to justify enforcement of a Rule 17(c) subpoena (or, as here, issuance of such a subpoena in the face of objections). *See United States v. Rich*, No. S 83-CR-579 (SWK), 1984 WL 845, at \*3 (S.D.N.Y. Sept. 7, 1984). Maxwell's reliance on cases involving the Government's obligations under *Brady* and *Giglio* to produce impeachment evidence prior to trial are thus inapposite to the current context. *Pena*, 2016 WL 8735699, at \*2-3. Maxwell thus fails to establish Request 12's compliance with the *Nixon* standards. Maxwell may renew her request for these documents once she identifies specific individuals whose submissions she seeks and spells out with specificity the relevance of all requested materials. At that time, the Court will determine whether it is proper to require production of these materials to

the Court so that the information may be made available to Maxwell, if appropriate, at the conclusion of each witness's direct testimony. *See Giampa*, 1992 WL 296440, at *3; *Ferguson*, 2007 WL 4577303, at *3.

The Court will reserve on Requests 9 through 11 in order to allow the Government to weigh in on the propriety of the requests. The Court assumes that the Government has enough information, based on the public filings, to provide its views. If the Government seeks the specific subpoena requests, it shall confer with defense counsel and raise any dispute with the Court. The Government shall file its response within one week of this Order.

In sum, for Request 1 through 8 and 12, the Court will not authorize service of the proposed subpoena on the basis that Maxwell has failed to establish that the requests are sufficiently specific and that the materials sought are relevant or admissible. Maxwell may renew more tailored requests in compliance with this Order. The Court sees no basis for doing so on an *ex parte* basis. For Requests 9 through 11, the Court will reserve its decision until it hears from the Government.

### B. The Government's Subpoena-Related Request

The Government seeks a preemptive, blanket ruling that it be entitled notice of all future subpoenas, an opportunity to challenge them, and production of any information obtained therefrom. This request is denied. Assuming Maxwell seeks the issuance of a future subpoena for which there is no basis to proceed *ex parte*, the Government will be provided notice and the Court would likely consider the Government's briefing regardless of standing as part of its duty to ensure that the subpoena meets the requirements of *Nixon*. *See United States v. Bergstein*, No. 16-CR-746 (PKC), 2017 WL 6887596, at *3 (S.D.N.Y. Dec. 28, 2017). But *ex parte* Rule 17(c) subpoenas are possible in some circumstances if justified. *See Skelos*, 2018 WL 2254538, at *8

8

(collecting cases). As a result, the blanket ruling sought by the Government is improper and denied.

## III.  Conclusion

The Defendant's motion for an order authorizing the subpoena pursuant to Rule 17(c)(3) is DENIED.  The Government is ORDERED to respond to Requests 9 through 11 of the proposed subpoena within one week of this Order.

SO ORDERED.

Dated: April 27, 2021
      New York, New York

ALISON J. NATHAN
United States District Judge

9

# EXHIBIT  45



# NOBODY'S GIRL

## A Memoir of Surviving Abuse and Fighting for Justice

### Virginia Roberts Giuffre

Cover

Location 1 of 5367 · 1%

I felt I had to. Our livelihoods depended on it, for one thing, but I also truly believed there was no way for me to free myself from Epstein and Maxwell's grip. While traveling, Maxwell had made me hand over my passport. That night Tony's voice sounded worried. He was scared that I was alone in a foreign country with people so powerful; he said he understood why I felt powerless. Less than four years earlier, Lady Diana had died in a car accident, prompting some conjecture (never proven) that the royal family had somehow been involved. Tony and I had no way of knowing if this was true, but we were sure that I was surrounded by people who wielded vastly more clout than I ever would. After a few more minutes of trying to soothe each other's paranoia, we said goodnight—but not before Tony and I agreed that, especially while I was abroad, I needed to keep Epstein and Maxwell happy.

After we returned to Florida, I took my FunSaver cameras to a one-hour photo developer near my house in West Palm Beach. Thanks to the store's system of marking the back of each print, I can tell you exactly the date I first held the image of me, Prince Andrew, and Maxwell in my hands: March 13, 2001. I showed the four-by-six-inch photo to Tony. At the time, we were both just glad I'd made it home in one piece; we had no idea what a commotion this photo would later cause.

---

SKIP NOTES

* Thanks to flight logs that have been made public in various court proceedings, we know the exact date of the flight that Matt Groening was on: February 23, 2001.

and somehow, while running around after our five-year-old, our four-year-old, and our one-year-old, I managed to start writing a draft. Eventually, I completed a 139-page typewritten manuscript I titled "The Billionaire's Playboy Club," in which I told some but not all of my story. I didn't reveal that my father had abused me, for example. And I fictionalized parts of the narrative because Churcher told me if I did so, I couldn't be sued. That was entirely false, I now know, but this accounts for why some details in the manuscript—which was never published but which later became part of the public court file—do not align with what actually happened. (I wrote that my third encounter with Prince Andrew, for example, occurred at Zorro Ranch, not where it actually occurred: the Caribbean.) I changed those details on purpose, thinking (wrongly) that I was protecting myself.

Some critics have used my 2011 manuscript—just as they used the fact that I accepted payment from the *Mail*—to imply that I was telling my story (or exaggerating and making things up) to profit from my misery. Instead, my goal was and has always been to try to free myself of some of the memories that haunted me, while also focusing attention on the wrongdoing of my abusers. Just as the teenage me had when I was journaling at Growing Together, the adult me felt better when I grabbed hold of the memories that ricocheted inside my head and got them down on paper.

—

BACK IN 2007, Palm Beach police chief Michael Reiter had taken his department's findings about Epstein to the FBI. As I've said, I soon heard from someone I thought might be posing as an agent, but I heard nothing more after I hung up on him. Now, four years later, the *Daily Mail's* stories about me led the Bureau straight to my door. On March 17, 2011, the FBI interviewed me for the first time about Epstein at the US consulate in Sydney. The meeting lasted several hours; I wanted to help the investigators, but it was a stressful experience. It was difficult for me to talk about all that I'd experienced in one sitting; I got through it, though sometimes tearfully. Like Churcher, the FBI agents showed me photographs of men's faces and asked me if I recognized any of them or had been trafficked to any of them. Again,

I identified several men who had abused me. Robbie insisted on being by my side during the interview, which was both a plus and a minus. As always, he made me feel safe, but when I described being passed around from man to man to man, my husband got almost as upset as I was. At one point, as the line of questioning got more and more detailed, Robbie completely lost it, lashing out at the federal agents. "You sick perverts," he yelled. "Do you *really* need to know every fucking thing that happened in each and every room?!"

I tried to calm him down. "Robbie, they have to ask all their questions," I said. But when I mentioned even tiny details Robbie hadn't yet heard, he was gutted. You may wonder why I'd kept things from him. But the truth was that at a certain point in our marriage, he'd said he didn't want to hear more about my time with Epstein. Now, though, he felt blindsided. "Why didn't you tell me those things before?" he asked when we got home from the consulate. "Because I don't want you to know every awful fact," I told him, stroking his head. "When you close your eyes and go to sleep or when you look at me across the kitchen table or when we are making love, I don't want you to see some of the things I see." Robbie was fuming. "I don't need you to protect me," he said. "I need you to be straight with me." But I was adamant. "Robbie, at the end of the day, I'm your wife. And I'd like to remain your wife." By which I meant: if you let me leave out some things, we will both be happier.

The day after the interview, two FBI agents came to our house, where I handed over twenty photographs taken during my time with Epstein and Maxwell. The photo with Prince Andrew was among them. I also gave them the massage certificates I'd received in Thailand from ITM. The FBI would later send me a compact disc with digital copies of all these items, but I would never get any of the originals back.

---

SKIP NOTES

˚ Only later would it become clear that Epstein had been shunned by at least one powerful person he'd previously wooed: Donald Trump. In their 2020 book called *The Grifters' Club: Trump, Mar-a-Lago, and the Selling of the Presidency*, journalists

TWENTY-FIVE

## Back in the Sunshine State

On our eleventh wedding anniversary, in October 2013, Robbie and I moved our three kids and two dogs—Champ and Bear, a hundred-pound Alaskan malamute we'd gotten just after Ellie's birth—from Australia to Titusville, a city of about forty thousand people in east-central Florida. Titusville is probably best known for its proximity to the Kennedy Space Center, and it's less than an hour from Orlando. At first we stayed with my brother Danny, his wife, Lanette, and their daughter, Sara. Then we bought our own house on half an acre nearby.

Our new house had two stories, with a screened-in porch and a two-car garage. But my favorite part was the backyard; dominated by a gargantuan oak tree, draped in Spanish moss, it backed up to a canal. Every day, I'd take the kids down to watch the turtles and feed the ducks. Robbie and I made friends with our neighbors, a retired minister and her husband. And our location was ideal: I was a three-hour drive from Brad Edwards's Fort Lauderdale office and just ten minutes from Danny. Soon my little brother, Skydy, and his girlfriend moved in with us for a while, which I was thrilled about. It was amazing how quickly we fell back into our old teasing routines (I'd call him Stupid Head, he'd call me Sissie). It felt good to have my family around me again.

We enrolled the kids in school, and for a moment, it seemed they couldn't have been happier. I began looking for work as a bartender and briefly took a job at a closed-down restaurant that someone was trying to reopen. That's about the time we discovered that the local schools were terribly overcrowded. Our kids kept coming home and talking about how they weren't allowed to ask questions in class; the teachers were struggling just to maintain control. I took a leap of faith: we'd try homeschooling. I threw myself into keeping the kids engaged. We'd go to the beach or explore the

local tidal pools. We were regulars at the nearby Manatee Observation Deck, where we watched those huge mammals eat seagrass. Some days I'd play classical music in the kitchen until the kids finished their lessons. Other days would be all Eminem, all the time. Alex in particular loved Eminem. Even at seven years old, he'd run around the living room rapping. "I'm not afraid," he'd squeal, and I'd echo him, just as in the song. "To take a stand," he'd call out, and I'd repeat it.

Moving back to the Sunshine State also put me nearer to my dad, who had come back to Florida from California. He now lived in a triple-wide mobile home in Summerfield, about a hundred miles to the east. I tried to see this as an opportunity: for all Dad's faults, I wanted my kids to know their grandpa. Robbie was down on the idea, but I promised him I could manage my father. "He has good qualities," I said. My husband was skeptical, but he went along with my plan at first. For a while, I thought I was making it work—taking the kids to visit Dad and letting them see the playful, fun side of him. Alex loved being a passenger when my dad fired up his riding lawnmower and took it for a spin around his yard. Tyler was transfixed by Dad's PeeWee 500 minimotorcycle. When we bought Ellie her first horse—a cantankerous animal we called Angel, although she was anything but—we kept her in Dad's barn. I was flooded with memories of how Dad and I had bonded over horses, and I wanted Ellie to love horses too. When we got a second horse, Copper, he also stayed at Dad's.

At this point, I asked Brad Edwards to be my lawyer, and as I got to know him, I began to feel as if he were my third brother. Brad had been locking horns with Epstein for years, and man, did he have stories to tell. Once in a court-ordered mediation session, Epstein had tried to be buddy-buddy with him, suggesting conspiratorially: "We should just start breaking the shit out of all these glasses"—he waved at several drinking glasses laid out on a table—"and make everyone think we're killing each other." Brad believed there was a part of Epstein that enjoyed the cat-and-mouse game of being investigated; he wanted the world to know what he'd done (but only if he still got away with it). Whenever anyone zeroed in on his culpability, however, Epstein would turn snide. Brad told me that when he'd deposed Epstein in 2010, he'd specifically asked him if he knew a woman named Virginia

Chauntae Davies, who'd been recruited to be a masseuse for Epstein, recalled how at first she'd tried to reject his sexual advances, but that seemed to excite him. He ended up abusing her for years, she said. "We have all suffered, and he is still winning in death," she said.

Jennifer Araoz said that she was first abused by Epstein when she was fourteen and that he forcibly raped her at fifteen. "He stole my chance at really feeling love because I was so scared to trust anyone for so many years," she said, speaking through tears.

Annie Farmer, Anouska De Georgiou, Teala Davies, Teresa Helm, Sarah Ransome, and Marijke Chartouni—these might be names you've heard, as all of them have been quoted in media accounts speaking out about what they'd been through. But they are only a few of my Survivor Sisters (as we'd soon come to call ourselves) who spoke that day. We all shared the belief that by raising our voices, we might comfort and inspire others who weren't yet ready to reveal their own suffering. Several of us thanked the prosecutors who were there for finally assembling a case against Epstein, but I was not the only one to remind them that there were others walking free who should still be held to account. "The reckoning must not end," I told the court in my remarks. "It must continue. He did not act alone, and we, the victims, know that. We trust the government is listening and that the others will be brought to justice."

After the public hearing ended, the prosecutors invited all Epstein's victims to meet with them in a private room. It was an emotional session. Geoffrey Berman, the US attorney, had tears in his eyes as he told us how sorry he was for all we had endured. William Sweeney, the head of the FBI's New York office, thanked us for our presence. And both pleaded with us to help them in their ongoing investigations into Epstein's coconspirators. Siggy and I would soon meet with them, as I know many Survivor Sisters did.

In addition to whatever leads we provided the prosecutors, the hearing and its aftermath resulted in something else that I'd never known to hope for. Being with all those resilient women in one place gave me back a piece of myself that had gone missing. When David Boies and Siggy offered to take several Survivor Sisters to the US Open, Farmer, Helm, Ransome, Char-

touni, and I were among those who gathered in Queens to watch a match. As we had dinner together later and drank champagne, I felt as if, despite our differences, I could tell these women anything. There was a palpable feeling that each of us understood and supported the others. And it was more than symbolic. Some of us were still looking for answers.

For example, Marijke Chartouni told me she thought she'd been abused by Epstein around the same time I was. She was trying to identify the woman who'd recruited her, and when she described what the woman looked like, I recognized her instantly as a woman I'd known who was in Epstein's circle for a time. I remembered her first name but not her last. Marijke is like a detective—she would soon use pattern matching and public records to find what she thought must be the woman's last name, and quickly after that she found the woman's website and social-media accounts. When we looked at the photographs the woman had posted of herself, there was no denying it was her. Because this woman witnessed Marijke's assault and participated in it, Marijke felt that finding her again—seeing that she still existed—helped defang a trauma that had gnawed at her for years.

For weeks after that hearing, I mostly felt jubilant. The way all these strangers had come together, like pieces of a huge jigsaw puzzle, to comfort one another and help fill in each other's gaps was electrifying. When united —we formed a WhatsApp group chat to keep in touch—we felt as if we had power. "Now I know I'm on the right road," I said to Robbie, "because look what is happening!"

In addition to this new form of kinship, the Survivor Sisters were dealing with a full-on media frenzy. All the women who'd spoken in the courtroom in August were being asked by various news outlets to tell their stories. For me it started right after Judge Berman's hearing, when I stood in front of the courthouse with a dozen microphones in my face and tried to keep people focused on the wrongs that still needed to be righted. "It's not how Jeffrey died, but it's how he lived," I said. "And we need to get to the bottom of everybody who was involved with that, starting with Ghislaine Maxwell...I will never be silenced until these people are brought to justice." Before I stepped away from the mic, a reporter asked me whether that included Prince An-